# EXHIBIT D

**CERTIFIED COPY**

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

---

*LARSON, LAURA SIEGEL - Vol. 1*

*July 22, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | |
| PACIFIC PICTURES CORPORATION, ) | CV-10-3633 ODW (RZx) |
| IP WORLDWIDE, LLC, IPW, LLC, ) | |
| MARC TOBEROFF, an individual, ) | |
| MARK WARREN PEARY, as ) | |
| personal representative of ) | |
| the ESTATE OF JOSEPH SHUSTER, ) | |
| JEAN ADELE PEAVY, an ) | |
| individual, JOANNE SIEGEL, ) | |
| an individual, LAURA SIEGEL ) | |
| LARSON, an individual, and ) | |
| DOES 1-10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| ———————————————————— ) | |

DEPOSITION OF:

      LAURA SIEGEL LARSON

      FRIDAY, JULY 22, 2011

      9:45 A.M.

Reported by:

      Kathleen E. McCarthy

      CSR No. 4483

```
 1           Deposition of LAURA SIEGEL LARSON, the witness,

 2    taken on behalf of the Plaintiff, on Friday, July 22,

 3    2011, 9:45 a.m., at 1999 Avenue of the Stars,

 4    Sixteenth Floor, Los Angeles, California, before

 5    Kathleen E. McCarthy, CSR No. 4483.

 6

 7    APPEARANCES OF COUNSEL:

 8         FOR PLAINTIFF:

 9              O'MELVENY & MYERS LLP

10              BY:  DANIEL M. PETROCELLI, ESQ.

11                   MATTHEW T. KLINE, ESQ.

12                   JASON TOKORO, ESQ.

13                   CASSANDRA L. SETO, ATTORNEY AT LAW

14              1999 Avenue of the Stars

15              Seventh Floor

16              Los Angeles, California  90067-6035

17              (310) 553-6700

18

19         FOR DEFENDANTS:

20              TOBEROFF & ASSOCIATES

21              BY:  MARC TOBEROFF, ESQ.

22              2049 Century Park East

23              Suite 3630

24              Los Angeles, California  90067

25              (310) 246-3333
```

EXHIBIT D
18

LAURA SIEGEL LARSON - 7/22/2011

```
 1      APPEARANCES (Continued):

 2        ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT D
19

```
 1                        INDEX

 2   WITNESS              EXAMINATION       PAGE

 3   LAURA SIEGEL LARSON

 4                        Mr. Petrocelli      10

 5

 6                        EXHIBITS

 7   NO.        PAGE          DESCRIPTION

 8   Exhibit 55    13    Last Will of Joanne Siegel;

 9                        Durable Power of Attorney for

10                        Management of Property and

11                        Personal Affairs (LSL 00414 -

12                        00428 and LSL 00430 - 00450)

13   Exhibit 56   110    Letter to Paul Levitz from Joanne

14                        Siegel and Laura Siegel Larson

15                        dated September 21, 2002

16                        (WB006022)

17   Exhibit 57   177    Siegel Privilege Log

18   Exhibit 58   196    Superman -- Marc Toberoff Timeline

19                        (Q 0001 - Q 0007)

20   Exhibit 59   211    First Amended Complaint dated

21                        September 3, 2010

22   Exhibit 60   234    Facsimile Cover Page to Ariel Z.

23                        Emanuel from Marc Toberoff dated

24                        6-3-02; Memorandum of Agreement

25                        (EN00001 - 00007)
```

1                    INDEX (Continued)

2                      EXHIBITS

3    NO.      PAGE          DESCRIPTION

4    Exhibit 61   236   Letter to Richard D. Parsons from

5                       Joanne Siegel dated May 9, 2002

6                       (000000676 - 000000678)

7    Exhibit 62   253   Letter to Lillian J. Laserson from

8                       Joanne Siegel and Laura Siegel

9                       Larson dated October 28, 2002

10                      (000001299 - 000001300)

11   Exhibit 63   260   Letter to Don W. Bulson from

12                      Joanne Siegel and Laura Siegel

13                      Larson dated November 1, 2002 (LSL

14                      00451)

15   Exhibit 64   285   Letter to Joanne Siegel and Laura

16                      Siegel Larson from Marc Toberoff

17                      dated November 26, 2002

18                      (000001894)

19   Exhibit 65   289   Letter to Joanne Siegel, Laura

20                      Siegel Larson, and Ariel Emanuel

21                      from Marc Toberoff dated December

22                      16, 2002 (000001883 - 000001884)

23

24

25

```
 1                    INDEX (Continued)

 2               PREVIOUSLY MARKED EXHIBITS

 3      NO.       PAGE           DESCRIPTION

 4    Exhibit 45   60    Letter to Joanne Siegel and Laura

 5                        Siegel Larson from Marc Toberoff

 6                        and Ariel Emanuel dated as of

 7                        October 3, 2022 (000001878 -

 8                        000001881)

 9    Exhibit 48  108    Letter to John A. Schulman from

10                        Kevin S. Marks dated October 19,

11                        2001; Transmission Report (GTRB

12                        0302 - 0308)

13    Exhibit 10  212    Joint Venture Agreement made as of

14                        November 23, 2001 (134 - 137)

15    Exhibit 17  220    Renewal Registrations

16    Exhibit 18  220    U.S. Copyright Office certificate;

17                        Application for Registration of a

18                        Claim to Renewal Copyright

19    Exhibit 19  221    List of books

20    Exhibit 13  226    Letter to Mark Warren Peary from

21                        Marc Toberoff dated October 27,

22                        2003 (125 - 128)

23

24

25
```

LAURA SIEGEL LARSON - 7/22/2011

Page 7

```
 1                    INDEX (Continued)

 2              PREVIOUSLY MARKED EXHIBITS

 3   NO.        PAGE         DESCRIPTION

 4   Exhibit 54   243   Letter to Kevin S. Marks and Bruce

 5                      M. Ramer from Joanne Siegel and

 6                      Laura Siegel Larson dated

 7                      September 21, 2002; Transmission

 8                      Report (GTRB 0321 - 0322)

 9   Exhibit 46   293   Letter to Joanne Siegel and Laura

10                      Siegel Larson from Marc Toberoff

11                      dated January 21, 2002 (000001888

12                      - 000001890)

13   Exhibit 30   298   Letter to Laura from Michael

14                      Siegel dated May 13, 2003 (LSL

15                      00211 - 00212)

16

17

18

19

20

21

22

23

24

25
```

LAURA SIEGEL LARSON 7/22/2011

1                    INDEX (Continued)

2            INSTRUCTIONS NOT TO ANSWER

3    PAGE    LINE        PAGE    LINE        PAGE    LINE

| | PAGE | LINE | PAGE | LINE | PAGE | LINE |
|---|---|---|---|---|---|---|
| 4 | 27 | 4 | 106 | 1 | 323 | 3 |
| 5 | 27 | 12 | 106 | 9 | 324 | 12 |
| 6 | 28 | 3 | 147 | 8 | 325 | 13 |
| 7 | 28 | 11 | 147 | 17 | 326 | 10 |
| 8 | 33 | 13 | 147 | 22 | 326 | 13 |
| 9 | 34 | 11 | 148 | 4 | 327 | 15 |
| 10 | 41 | 13 | 148 | 10 | 327 | 24 |
| 11 | 41 | 19 | 148 | 15 | 328 | 7 |
| 12 | 42 | 1 | 156 | 16 | 328 | 17 |
| 13 | 42 | 23 | 156 | 23 | 328 | 22 |
| 14 | 44 | 13 | 186 | 1 | 329 | 1 |
| 15 | 45 | 1 | 219 | 24 | 329 | 23 |
| 16 | 46 | 1 | 258 | 4 | 330 | 7 |
| 17 | 46 | 9 | 260 | 4 | 330 | 17 |
| 18 | 48 | 7 | 266 | 9 | 332 | 10 |
| 19 | 50 | 17 | 266 | 19 | 333 | 1 |
| 20 | 101 | 5 | 268 | 6 | | |
| 21 | 103 | 25 | 268 | 15 | | |
| 22 | 105 | 21 | 322 | 14 | | |

23

24

25

EXHIBIT D
24

Page 9

```
 1            LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011
 2                         9:45 A.M.
 3                                                          08:45:40
 4            THE VIDEOGRAPHER:  Good morning.  This marks  09:45:27
 5    the beginning of Volume 1, videotape number one, in  09:45:29
 6    the deposition of Laura Siegel in the matter entitled 09:45:32
 7    DC Comics versus Pacific Pictures Corporation, et al.,09:45:36
 8    filed in the United States District Court for the     09:45:40
 9    Central District of California.  This is Case No.     09:45:42
10    CV-10-3633 ODW (RZx)                                  09:45:45
11            Today's date is July 22, 2011, and the time   09:45:51
12    on the video monitor is 9:45 a.m.                     09:45:53
13            The video operator today is Fritz Sperberg, a 09:45:57
14    notary public contracted by Merrill Legal Solutions at 09:46:01
15    20750 Ventura Boulevard, Woodland Hills, California.  09:46:03
16            This video deposition is taking place at 1999 09:46:08
17    Avenue of the Stars in Los Angeles and was noticed by 09:46:12
18    Daniel Petrocelli of O'Melveny & Myers.              09:46:15
19            Counsel, please identify yourselves and state 09:46:17
20    whom you represent.                                   09:46:18
21            MR. PETROCELLI:  Dan Petrocelli for DC        09:46:20
22    Comics.                                               09:46:24
23            MR. TOBEROFF:  Mark Toberoff for Laura Siegel  09:46:25
24    Larson and Warren Peavy -- Peary and Jean Peavy.     09:46:28
25            MR. PETROCELLI:  We also have Jason Tokoro     09:46:35
```

EXHIBIT D
25

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | and Matt Kline of O'Melveny here as well. | 09:46:36 |
| 2 | THE WITNESS:  Excuse me.  Which is Matt and | 09:46:41 |
| 3 | which is -- | 09:46:42 |
| 4 | MR. PETROCELLI:  Jason -- | 09:46:43 |
| 5 | THE WITNESS:  Jason, and Matt -- | 09:46:44 |
| 6 | MR. PETROCELLI:  -- is to my right -- | 09:46:45 |
| 7 | THE WITNESS:  Okay. | 09:46:45 |
| 8 | MR. PETROCELLI:  -- and then Matt is down at | 09:46:45 |
| 9 | the end there. | 09:46:48 |
| 10 | THE WITNESS:  All right.  Thank you. | 09:46:48 |
| 11 | THE VIDEOGRAPHER:  The court reporter today | 09:46:48 |
| 12 | is Kathy McCarthy of Merrill. | 09:46:50 |
| 13 | Would the reporter please swear in the | 09:46:50 |
| 14 | witness. | 09:46:52 |
| 15 | | 09:46:52 |
| 16 | LAURA SIEGEL LARSON, | |
| 17 | having been first duly sworn, was | |
| 18 | examined and testified as follows: | |
| 19 | | 09:47:02 |
| 20 | THE VIDEOGRAPHER:  You may begin. | 09:47:02 |
| 21 | | |
| 22 | EXAMINATION | 09:47:03 |
| 23 | BY MR. PETROCELLI: | |
| 24 | Q.  Could you please state your full name. | 09:47:04 |
| 25 | A.  Laura Siegel Larson. | 09:47:07 |

| | | |
|---|---|---|
| 1 | Q.    And shall I call you Ms. Larson? | 09:47:08 |
| 2 | A.    That's fine. | 09:47:10 |
| 3 | Q.    Thank you. | 09:47:11 |
| 4 | Ms. Larson, first of all, let me express our | 09:47:13 |
| 5 | condolences of the passing of your mother earlier this | 09:47:17 |
| 6 | year, and we're sorry about that.  And I understand | 09:47:21 |
| 7 | also that you may have some need for a rest or breaks | 09:47:29 |
| 8 | during the course of the day. | 09:47:34 |
| 9 | A.    Yes. | 09:47:35 |
| 10 | Q.    And please let us know whenever you need to | 09:47:36 |
| 11 | take a break because you're not feeling well or you're | 09:47:43 |
| 12 | tired.  Just say so and we'll stop.  Okay? | 09:47:45 |
| 13 | A.    All right. | 09:47:48 |
| 14 | Q.    Okay.  Let me just begin by saying you | 09:47:51 |
| 15 | understand that we're taking this deposition in a case | 09:47:55 |
| 16 | filed by DC Comics? | 09:47:58 |
| 17 | A.    Yes. | 09:47:59 |
| 18 | Q.    Okay.  And you have previously been deposed | 09:47:59 |
| 19 | in the lawsuit that you filed a few years back.  You | 09:48:05 |
| 20 | recall that? | 09:48:10 |
| 21 | A.    Yes. | 09:48:10 |
| 22 | Q.    I want you to know that I have reviewed your | 09:48:12 |
| 23 | testimony in your deposition, and I will endeavor not | 09:48:16 |
| 24 | to go over or repeat things you have already said.  To | 09:48:21 |
| 25 | be sure, though, there will be overlap, and I will be | 09:48:24 |

LAURA SIEGEL LARSON 7/22/2011

Page 12

| | | |
|---|---|---|
| 1 | mindful, though, of not wasting your time or my time | 09:48:28 |
| 2 | by asking you things we already know. | 09:48:32 |
| 3 | A.   Good. | 09:48:33 |
| 4 | Q.   You are the executrix of your mother's | 09:48:37 |
| 5 | estate? | 09:48:42 |
| 6 | A.   That's correct. | 09:48:42 |
| 7 | MR. PETROCELLI:  Okay.  Let me show you as | 09:48:43 |
| 8 | the first deposition exhibit -- | 09:48:47 |
| 9 | And forgive me.  What is the convention that | 09:48:50 |
| 10 | we're using here? | 09:48:51 |
| 11 | MR. TOKORO:  We're continuing the exhibit | 09:48:55 |
| 12 | numbers from the last time. | 09:48:57 |
| 13 | MR. PETROCELLI:  Okay.  I'm told we're | 09:48:58 |
| 14 | continuing exhibit numbers from when we last left off. | 09:48:59 |
| 15 | So what is the next in order? | 09:49:02 |
| 16 | MR. TOKORO:  This is going to be number 53. | 09:49:04 |
| 17 | MR. PETROCELLI:  So we're going to mark as -- | 09:49:07 |
| 18 | MR. TOKORO: 55.  I'm sorry.  55. | 09:49:10 |
| 19 | MR. PETROCELLI:  -- 55 your mother's Last | 09:49:12 |
| 20 | Will and a Durable Power of Attorney as one document. | 09:49:16 |
| 21 | I just have a couple questions about them. | 09:49:19 |
| 22 | THE WITNESS:  Thank you.  Let me just ask, | 09:49:31 |
| 23 | could you speak up just a little bit more because I | 09:49:32 |
| 24 | also have a hearing impairment, so it would help. | 09:49:35 |
| 25 | MR. PETROCELLI:  Sure.  It's important that | 09:49:38 |

EXHIBIT D
28

| 1 | you hear me. | 09:49:39 |
|---|---|---|
| 2 | THE WITNESS:  Yes. | 09:49:41 |
| 3 | MR. PETROCELLI:  So I'm glad you pointed that | 09:49:41 |
| 4 | out. | 09:49:43 |
| 5 | (Whereupon, Plaintiff's Exhibit 55 | |
| 6 | was marked for identification.) | 09:49:49 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q.   These two documents, your mother's Last Will | 09:49:49 |
| 9 | and the Durable Power of Attorney, were executed in | 09:49:52 |
| 10 | November of 2000, according to the documents, November | 09:49:58 |
| 11 | 14, 2000.  To your knowledge, these are the last time | 09:50:01 |
| 12 | your mother executed a Will and Power of Attorney? | 09:50:06 |
| 13 | A.   Yes, that's correct. | 09:50:09 |
| 14 | Q.   And you were appointed as the person who | 09:50:11 |
| 15 | would have power of attorney over her affairs -- | 09:50:16 |
| 16 | A.   Yes. | 09:50:21 |
| 17 | Q.   -- in the year 2000? | 09:50:22 |
| 18 | A.   I think there were some limitations to that, | 09:50:23 |
| 19 | though. | 09:50:25 |
| 20 | Q.   Based on what the document says? | 09:50:26 |
| 21 | A.   Yes. | 09:50:27 |
| 22 | Q.   And in the year 2000 was your mother of sound | 09:50:28 |
| 23 | mind and health? | 09:50:32 |
| 24 | A.   Oh, yes, of course. | 09:50:33 |
| 25 | Q.   Did there come a time since 2000 to the | 09:50:50 |

| | | | |
|---|---|---|---|
| 1 | | present when she exhibited symptoms of dementia? | 09:50:54 |
| 2 | A. | No. | 09:51:02 |
| 3 | Q. | So until she passed away, she was of sound | 09:51:02 |
| 4 | mind? | | 09:51:05 |
| 5 | A. | Oh, absolutely. | 09:51:05 |
| 6 | Q. | On page 2 of the will, there are different | 09:51:08 |
| 7 | beneficiaries named.  Michael Larson and James Larson | | 09:51:16 |
| 8 | are your two children? | | 09:51:19 |
| 9 | A. | That's correct. | 09:51:20 |
| 10 | Q. | And those are the only grandchildren of your | 09:51:20 |
| 11 | mother? | | 09:51:23 |
| 12 | A. | Yes. | 09:51:23 |
| 13 | Q. | And Sophie Halko, H-a-l-k-o, that's your | 09:51:25 |
| 14 | mom's sister, your aunt? | | 09:51:29 |
| 15 | A. | It's her only surviving sister, yes. | 09:51:30 |
| 16 | Q. | Only surviving sibling? | 09:51:33 |
| 17 | A. | Yes. | 09:51:36 |
| 18 | Q. | Where does she live? | 09:51:37 |
| 19 | A. | In Ohio, Cleveland, Ohio. | 09:51:37 |
| 20 | Q. | Has lived there her whole life? | 09:51:41 |
| 21 | A. | Yes. | 09:51:43 |
| 22 | Q. | Okay.  And how old is she? | 09:51:43 |
| 23 | A. | She's in her eighties. | 09:51:46 |
| 24 | Q. | And does she live alone, or is she married? | 09:51:48 |
| 25 | A. | No.  She's living with her son. | 09:51:51 |

LAURA SIEGEL 7/22/2011

Page 15

| | | |
|---|---|---|
| 1 | Q.   Son.  Okay.  What's his name? | 09:51:53 |
| 2 | A.   Gregory -- well, she has more than one son, | 09:51:55 |
| 3 | but Gregory is living with her now. | 09:51:58 |
| 4 | Q.   Gregory Halko? | 09:52:00 |
| 5 | A.   Yes. | 09:52:01 |
| 6 | Q.   And who is, finally, George Zadrozny, Esq. | 09:52:02 |
| 7 | of -- | 09:52:08 |
| 8 | A.   Yes.  He's -- | 09:52:08 |
| 9 | Q.   -- Timber Bay Circle, Oldsman, Florida? | 09:52:09 |
| 10 | A.   He's a long-time friend and also served as an | 09:52:13 |
| 11 | attorney for us in the early days of the terminations. | 09:52:17 |
| 12 | Q.   What do you consider the early days of the | 09:52:23 |
| 13 | termination? | 09:52:26 |
| 14 | A.   Well, it was prior to my father's death.  So | 09:52:26 |
| 15 | he was a -- he was a consultant helping, you know, my | 09:52:30 |
| 16 | mother and father learn about the -- about the | 09:52:35 |
| 17 | copyright law. | 09:52:38 |
| 18 | Q.   Your father passed in 1996? | 09:52:40 |
| 19 | A.   Correct. | 09:52:42 |
| 20 | Q.   Okay.  Did there come a time when | 09:52:43 |
| 21 | Mr. Zadrozny stopped rendering services as a lawyer to | 09:52:49 |
| 22 | any member of your family? | 09:52:52 |
| 23 | A.   No.  I mean he's -- you know, he's on an | 09:52:54 |
| 24 | as-needed basis. | 09:53:00 |
| 25 | Q.   Has he continued to render services to this | 09:53:00 |

| | | |
|---|---|---|
| 1 | day? | 09:53:03 |
| 2 | A.    When needed. | 09:53:05 |
| 3 | Q.    When is the last time he has been called upon | 09:53:06 |
| 4 | to give any advice? | 09:53:10 |
| 5 | A.    I really don't remember, but, you know, it | 09:53:16 |
| 6 | was fairly recently. | 09:53:21 |
| 7 | Q.    In connection with Superman? | 09:53:24 |
| 8 | A.    I -- I don't remember if the last time that I | 09:53:27 |
| 9 | spoke to him was about Superman or whether it had to | 09:53:31 |
| 10 | do with my mother's estate. | 09:53:34 |
| 11 | Q.    Has he provided advice regarding Superman | 09:53:41 |
| 12 | since the time that you retained Mr. Toberoff? | 09:53:52 |
| 13 | A.    Regarding -- could you clarify your question? | 09:53:58 |
| 14 | Q.    Yeah.  I'm trying to deliberately be very | 09:54:00 |
| 15 | vague -- not vague, but broad -- | 09:54:03 |
| 16 | A.    It is broad. | 09:54:06 |
| 17 | Q.    -- because I want to stay away from privilege | 09:54:07 |
| 18 | issues, so I'm not asking you, at least right now, | 09:54:09 |
| 19 | about any specific subject matter.  I'm just trying to | 09:54:12 |
| 20 | generally understand if this person is a relevant | 09:54:16 |
| 21 | witness to anything.  And so the question I'm putting | 09:54:19 |
| 22 | to you is whether since the time that you first | 09:54:22 |
| 23 | entered into a relationship with Mr. Toberoff back in | 09:54:27 |
| 24 | 2002, since that time to the present, has Mr. Zadrozny | 09:54:33 |
| 25 | rendered any legal advice regarding Superman? | 09:54:40 |

| 1 | A. | Yes. | 09:54:42 |
| 2 | Q. | And when is the last time that he has done | 09:54:43 |
| 3 | so? | | 09:54:47 |
| 4 | A. | As I said, I can't recall, but I would be | 09:54:47 |
| 5 | guessing. | | 09:54:52 |
| 6 | Q. | Has he done so since your mother passed away? | 09:54:52 |
| 7 | A. | Not regarding Superman. | 09:54:55 |
| 8 | Q. | Not regarding.  And prior to your mom's | 09:54:57 |
| 9 | passing, you don't remember the last time? | | 09:55:00 |
| 10 | A. | No. | 09:55:03 |
| 11 | Q. | Did you send him a copy of the lawsuit in | 09:55:03 |
| 12 | this case? | | 09:55:07 |
| 13 | A. | Yes. | 09:55:08 |
| 14 | Q. | Okay.  And without getting into the details, | 09:55:10 |
| 15 | have you had discussions -- | | 09:55:15 |
| 16 | A. | Oh, I'm sorry.  When you say in this case, | 09:55:16 |
| 17 | you're talking about the current -- the current one | | 09:55:19 |
| 18 | that we're discussing. | | 09:55:21 |
| 19 | Q. | The DC Comics case, correct. | 09:55:22 |
| 20 | A. | That I don't recall. | 09:55:23 |
| 21 | Q. | But the other case you did. | 09:55:24 |
| 22 | A. | Yes. | 09:55:25 |
| 23 | Q. | The one you filed. | 09:55:25 |
| 24 | A. | Yes. | 09:55:26 |
| 25 | Q. | Okay.  Is he -- how old is Mr. Zadrozny?  Do | 09:55:30 |

```
 1    you know?                                                    09:55:36

 2         A.   I would say he's probably somewhere between       09:55:39

 3    58 and 62.                                                   09:55:43

 4         Q.   And he's still an active member of the bar?       09:55:44

 5         A.   Yes.                                               09:55:46

 6         Q.   Does he work with a firm?                         09:55:49

 7         A.   No.  He works independently.                      09:55:51

 8         Q.   If you go to page 15 of the will, there are       09:56:03

 9    two witnesses who attested to the will.  I just want        09:56:08

10    to make sure we know who they are.  The first one           09:56:14

11    looks like to be the signature of the lawyer who            09:56:17

12    prepared the document, Gary Ruttenberg; is that             09:56:20

13    correct?                                                     

14         A.   Yes.                                               09:56:24

15         Q.   And the second person is his legal assistant,     09:56:24

16    Mary Carrier?                                                09:56:27

17         A.   That's true.                                       09:56:27

18         Q.   And how long have Mr. Ruttenberg -- how long      09:56:29

19    has Mr. Ruttenberg been a lawyer for your family?           09:56:31

20         A.   Probably -- well, the only -- only thing that     09:56:38

21    he ever dealt with was, you know, wills.  You know, I       09:56:43

22    mean he had nothing to do with any other legal              09:56:46

23    matters.  So if we needed something having to do with       09:56:49

24    a will, I believe that -- that that would be 19 --          09:56:52

25    about 1995.                                                  09:57:06
```

LAURA SIEGEL LARSON 7/22/2011

Page 19

| | | |
|---|---|---|
| 1 | Q.   That had to do with a prior will? | 09:57:11 |
| 2 | A.   No, had to do with my father's will. | 09:57:14 |
| 3 | Q.   Your father's will.  Okay.  And since 2000 | 09:57:16 |
| 4 | when he prepared your mother's will until your mom | 09:57:21 |
| 5 | passed earlier this year, did you have any interaction | 09:57:25 |
| 6 | with him at all regarding Superman? | 09:57:29 |
| 7 | A.   No. | 09:57:31 |
| 8 | Q.   Or did your mother, to your knowledge? | 09:57:31 |
| 9 | A.   No. | 09:57:33 |
| 10 | Q.   Has Mr. Zadrozny, to your knowledge, reviewed | 09:57:34 |
| 11 | any of the -- any agreements relating in any way to | 09:57:39 |
| 12 | Superman? | 09:57:47 |
| 13 | A.   Could you be more specific? | 09:57:48 |
| 14 | Q.   H'm.  The notice of termination that you | 09:57:51 |
| 15 | served in 1997, did he have anything to do with its | 09:57:56 |
| 16 | preparation? | 09:58:01 |
| 17 | A.   He was a consultant for us at that time. | 09:58:01 |
| 18 | Q.   Was he at all involved in any way regarding | 09:58:05 |
| 19 | your negotiations and discussions with Warner Bros. or | 09:58:13 |
| 20 | DC Comics prior to your relationship with | 09:58:16 |
| 21 | Mr. Toberoff? | 09:58:19 |
| 22 | A.   You know, he was not a negotiator. | 09:58:19 |
| 23 | Q.   Was he consulted from time to time in regard | 09:58:21 |
| 24 | to those matters? | 09:58:23 |
| 25 | A.   As a friend, perhaps. | 09:58:26 |

LAURA SIEGEL JOHNSON 7/22/2011

Page 20

| | | |
|---|---|---|
| 1 | Q.   Okay. | 09:58:29 |
| 2 | A.   I don't -- I don't really -- | 09:58:30 |
| 3 | Q.   So, for example -- | 09:58:32 |
| 4 | A.   May I just clarify? | 09:58:33 |
| 5 | Q.   Sure. | 09:58:34 |
| 6 | A.   My mother really communicated with him far | 09:58:35 |
| 7 | more than I did, so I really couldn't be exactly sure | 09:58:40 |
| 8 | of the answer to that. | 09:58:42 |
| 9 | Q.   Okay.  Did you ever communicate with him | 09:58:50 |
| 10 | during the time when there were discussions with | 09:58:53 |
| 11 | Warner Bros. let's say from 1997 until the time that | 09:58:57 |
| 12 | you started your relationship with Mr. Toberoff, let's | 09:58:59 |
| 13 | say during that five-, six-year period of time?  You | 09:59:02 |
| 14 | recall there were lots of discussions and negotiations | 09:59:06 |
| 15 | with DC Comics and Warner Bros.? | 09:59:09 |
| 16 | A.   Um-hum.  Yes. | 09:59:10 |
| 17 | Q.   You have to answer audibly. | 09:59:12 |
| 18 | A.   Yes. | 09:59:13 |
| 19 | Q.   At some point in time you were represented, | 09:59:16 |
| 20 | your family was, by -- is it George Levine?  Arthur | 09:59:18 |
| 21 | Levine.  Excuse me. | |
| 22 | A.   Arthur Levine. | |
| 23 | Q.   And then Kevin Marks and Bruce Ramer of the | 09:59:22 |
| 24 | Gang Tyre firm. | 09:59:27 |
| 25 | A.   Yes. | 09:59:27 |

EXHIBIT D
36

```
 1                MR. TOBEROFF:  Wait until he finishes the        09:59:27
 2     question.                                                   09:59:30
 3                THE WITNESS:  I'm sorry.                          09:59:30
 4                MR. TOBEROFF:  And you need to give me time       09:59:31
 5     in case I want to object.                                   09:59:33
 6     BY MR. PETROCELLI:
 7         Q.   And prior to Mr. Toberoff, were you                 09:59:34
 8     represented by any other lawyer, you or any member of       09:59:39
 9     your family, regarding Superman besides Arthur Levine       09:59:40
10     and besides the Gang Tyre law firm?                         09:59:47
11         A.   No.                                                10:00:02
12         Q.   Okay.                                              10:00:11
13              Did Mr. -- to your knowledge, did                  10:00:12
14     Mr. Zadrozny review any agreements that you or members     10:00:16
15     of your family entered into with Mr. Toberoff?             10:00:21
16         A.   Yes.                                               10:00:24
17         Q.   Which agreements?                                  10:00:26
18         A.   The original documents when we were retaining      10:00:28
19     his legal services in 2002 and also when we entered        10:00:35
20     into a litigation agreement with him in -- I believe       10:00:43
21     that was 2004.                                              10:00:48
22         Q.   And "with him," you meant with Mr. Toberoff.       10:00:50
23         A.   Correct.                                           10:00:53
24         Q.   Do you know whether Mr. Zadrozny charged your      10:00:55
25     family for any legal fees for reviewing those              10:01:00
```

| | | | |
|---|---|---|---|
| 1 | documents? | | 10:01:04 |
| 2 | A. | Yes. | 10:01:05 |
| 3 | Q. | How do you know that? | 10:01:05 |
| 4 | A. | My mother told me. | 10:01:07 |
| 5 | Q. | Do you know how much he charged? | 10:01:10 |
| 6 | A. | It was a very low hourly rate. | 10:01:12 |
| 7 | Q. | After this litigation document in 2004 that | 10:01:17 |
| 8 | | you entered into -- when I say "you," you know I'm | 10:01:22 |
| 9 | | talking about really you and your mother. | 10:01:24 |
| 10 | A. | Correct. | 10:01:28 |
| 11 | Q. | Joanne Siegel. | 10:01:29 |
| 12 | A. | Us as the Siegels. | 10:01:30 |
| 13 | Q. | But I'm not talking about Michael Siegel. | 10:01:31 |
| 14 | A. | No, no.  He wasn't -- he had nothing to do | 10:01:33 |
| 15 | | with that. | 10:01:36 |
| 16 | Q. | We'll deal with him separately. | 10:01:37 |
| 17 | | MR. TOBEROFF:  I just want to for clarity, | 10:01:39 |
| 18 | | when "you" does not refer to her and her mother and | 10:01:41 |
| 19 | | refers just to her, you need to tell her. | 10:01:45 |
| 20 | | MR. PETROCELLI:  Fair enough.  Fair enough. | 10:01:47 |
| 21 | | I will try to be clear. | 10:01:50 |
| 22 | | I forgot what I was asking.  So it was a | 10:01:55 |
| 23 | | clever device by good lawyers to get you off track. | 10:01:59 |
| 24 | | What was I asking?  Senior moment here. | 10:02:06 |
| 25 | | (The record was read.) | 10:02:22 |

EXHIBIT D
38

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  Okay.  There you go. | 10:02:22 |
| 2 | THE WITNESS:  Okay. | 10:02:24 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.   So after the litigation document that you and | 10:02:25 |
| 5 | your family entered into with Mr. Toberoff in 2004, | 10:02:27 |
| 6 | were there any other documents, to your knowledge, | 10:02:31 |
| 7 | that were sent to Mr. Zadrozny for his review related | 10:02:34 |
| 8 | to Superman? | 10:02:40 |
| 9 | A.   I don't recall. | 10:02:41 |
| 10 | Q.   You signed a document sometime in or about | 10:02:44 |
| 11 | 2008 that the Shusters also signed, some agreement; | 10:02:49 |
| 12 | correct? | 10:02:52 |
| 13 | A.   Yes. | 10:02:53 |
| 14 | Q.   And Mr. Toberoff also signed that; correct? | 10:02:54 |
| 15 | A.   Yes. | 10:02:57 |
| 16 | Q.   Did Mr. Zadrozny, to your knowledge, review | 10:02:59 |
| 17 | that document? | 10:03:05 |
| 18 | A.   Yes. | 10:03:05 |
| 19 | Q.   Did he review that document prior to the time | 10:03:07 |
| 20 | you signed it? | 10:03:10 |
| 21 | A.   Yes. | 10:03:11 |
| 22 | Q.   How do you know he reviewed it? | 10:03:14 |
| 23 | A.   Because he and I spoke about it. | 10:03:20 |
| 24 | Q.   How long before you signed it -- withdrawn. | 10:03:27 |
| 25 | Did you send him a copy of it before signing | 10:03:33 |

LAURA SIEGEL LARSON 7/22/2011

Page 24

| | | |
|---|---|---|
| 1 | it? | 10:03:35 |
| 2 | A.    Yes. | 10:03:36 |
| 3 | Q.    Was he here in town with you or -- | 10:03:37 |
| 4 | A.    No. | 10:03:40 |
| 5 | Q.    He was living in Florida? | 10:03:40 |
| 6 | A.    Yes. | 10:03:42 |
| 7 | Q.    Has he lived in Florida the whole time you've | 10:03:42 |
| 8 | been dealing with him? | 10:03:45 |
| 9 | A.    Yes. | 10:03:45 |
| 10 | Q.    Okay.  Did any other attorney besides | 10:03:51 |
| 11 | Mr. Zadrozny review that document, to your knowledge, | 10:03:53 |
| 12 | before you or your mother signed it? | 10:03:57 |
| 13 | A.    Which document are you speaking of? | 10:03:58 |
| 14 | Q.    This 2008 -- we've been calling it a consent | 10:04:00 |
| 15 | agreement. | 10:04:04 |
| 16 | A.    Oh.  The -- no. | 10:04:05 |
| 17 | Q.    How many documents have you or your mother | 10:04:11 |
| 18 | signed that the Shusters also signed, one or more | 10:04:15 |
| 19 | Shuster people? | 10:04:19 |
| 20 | A.    Only one. | 10:04:20 |
| 21 | Q.    Was the 2008 consent agreement the last | 10:04:32 |
| 22 | document you asked or your mother asked, to your | 10:04:41 |
| 23 | knowledge, Mr. Zadrozny to review related to Superman? | 10:04:44 |
| 24 | A.    I believe so. | 10:04:49 |
| 25 | Q.    Have you signed any other documents related | 10:04:52 |

Merrill   Corporation   -   Los Angeles
800-826-0277                              www.merillcorp.com/law

EXHIBIT D
40

| | | |
|---|---|---|
| 1 | to Superman after the 2008 consent agreement that you | 10:04:56 |
| 2 | signed together with the Shusters and Mr. Toberoff and | 10:05:02 |
| 3 | your mother? | 10:05:05 |
| 4 | A.   I don't remember any other document. | 10:05:07 |
| 5 | Q.   How did you obtain a copy -- withdrawn. | 10:05:22 |
| 6 | Did you or your mother send the draft of the | 10:05:26 |
| 7 | 2008 consent agreement to Mr. Zadrozny, or did someone | 10:05:29 |
| 8 | else send it on your behalf? | 10:05:33 |
| 9 | A.   I believe my mother sent it. | 10:05:36 |
| 10 | Q.   And do you know how long before your signing | 10:05:40 |
| 11 | it your mother sent it to him? | 10:05:48 |
| 12 | A.   I don't know.  I would be guessing, but, you | 10:05:52 |
| 13 | know -- | 10:05:54 |
| 14 | MR. TOBEROFF:  Don't guess. | 10:05:55 |
| 15 | THE WITNESS:  You know. | 10:05:56 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.   On the subject of guessing, your lawyer said | 10:05:57 |
| 18 | don't guess, and I concur with that except that you | 10:06:00 |
| 19 | need to understand that there's a wild guess, which we | 10:06:02 |
| 20 | don't want to know about.  Wild speculation we don't | 10:06:06 |
| 21 | want to know about.  But if you have some basis to | 10:06:08 |
| 22 | estimate something or approximate something based on | 10:06:12 |
| 23 | your overall knowledge, we are entitled to that, just | 10:06:14 |
| 24 | so you keep that in mind.  Okay? | 10:06:19 |
| 25 | A.   Um-hum.  Yes.  You pointed -- | 10:06:22 |

LAURA SIEGEL LARSON 7/22/2011

| | | | |
|---|---|---|---|
| 1 | Q. | Yeah. | 10:06:24 |
| 2 | A. | Pointing reminder. | 10:06:26 |
| 3 | Q. | The pointing is not to be rude at all.  It's | 10:06:27 |
| 4 | just that -- | | 10:06:30 |
| 5 | A. | I understand. | 10:06:31 |
| 6 | Q. | -- to make sure that you answer audibly. | 10:06:31 |
| 7 | | MR. TOBEROFF:  Give me time to object. | 10:06:33 |
| 8 | | MR. PETROCELLI:  Mr. Toberoff does like to | 10:06:38 |
| 9 | object, so we don't want -- we don't want to take away | | 10:06:39 |
| 10 | that pleasure. | | 10:06:44 |
| 11 | | MR. TOBEROFF:  I like to have something to do | 10:06:45 |
| 12 | at deposition. | | 10:06:47 |
| 13 | | MR. PETROCELLI:  You don't need to be here, | 10:06:47 |
| 14 | you know. | | 10:06:49 |
| 15 | | THE WITNESS:  Yes, he does.  I would miss him | 10:06:50 |
| 16 | if he wasn't here. | | 10:06:52 |
| 17 | BY MR. PETROCELLI: | | |
| 18 | Q. | Did -- do you remember if there were any | 10:06:55 |
| 19 | changes made to the consent agreement after | | 10:07:00 |
| 20 | Mr. Zadrozny reviewed it? | | 10:07:04 |
| 21 | A. | I don't remember. | 10:07:08 |
| 22 | Q. | Did you discuss it with him? | 10:07:13 |
| 23 | A. | Yes. | 10:07:15 |
| 24 | Q. | What did you and he discuss about it? | 10:07:17 |
| 25 | | MR. TOBEROFF:  Actually, you can't disclose | 10:07:22 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | that. | 10:07:24 |
| 2 | THE WITNESS:  I didn't think I could. | 10:07:24 |
| 3 | MR. TOBEROFF:  Attorney-client privilege, and | 10:07:26 |
| 4 | I instruct you not to answer. | 10:07:27 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q.   Did you discuss with your mother what you and | 10:07:29 |
| 7 | Mr. Zadrozny talked about? | 10:07:35 |
| 8 | A.   Probably. | 10:07:42 |
| 9 | Q.   As best as you can remember, what did you and | 10:07:45 |
| 10 | your mom say to each other in that regard? | 10:07:48 |
| 11 | MR. TOBEROFF:  Joint client privilege. | 10:07:53 |
| 12 | Instruct you not to answer. | 10:07:54 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   I'm referring to discussions that the two of | 10:07:55 |
| 15 | you had privately, not with Mr. Zadrozny in the room | 10:07:57 |
| 16 | or on the phone.  You understand that? | 10:08:01 |
| 17 | A.   I hear what you're saying. | 10:08:04 |
| 18 | Q.   Okay.  And I'm asking you to tell me what you | 10:08:06 |
| 19 | discussed with your mother regarding what Mr. Zadrozny | 10:08:08 |
| 20 | did or said. | 10:08:13 |
| 21 | MR. TOBEROFF:  You can answer so long as your | 10:08:15 |
| 22 | answer doesn't disclose the substance of conversations | 10:08:17 |
| 23 | that you had with Mr. Zadrozny. | 10:08:21 |
| 24 | THE WITNESS:  Um-hum. | 10:08:23 |
| 25 | That we were grateful for his input. | 10:08:26 |

LAURA SIEGEL LARSON 7/22/2011

| | |
|---|---|
| 1    BY MR. PETROCELLI: | 10:08:29 |
| 2        Q.    What was his input? | 10:08:29 |
| 3            MR. TOBEROFF:   I instruct you not to answer. | 10:08:32 |
| 4    Attorney-client privilege. | 10:08:35 |
| 5    BY MR. PETROCELLI: | |
| 6        Q.    You and your mother discussed his input? | 10:08:37 |
| 7        A.    Yes. | 10:08:40 |
| 8        Q.    What did the two of you discuss about his | 10:08:41 |
| 9    input? | 10:08:44 |
| 10            MR. TOBEROFF:   Attorney-client privilege. | 10:08:44 |
| 11    Joint client privilege.  I instruct you not to answer. | 10:08:46 |
| 12    BY MR. PETROCELLI: | |
| 13        Q.    Did he provide any input to you or your | 10:08:48 |
| 14    mother in writing? | 10:08:53 |
| 15        A.    I don't believe so. | 10:08:56 |
| 16        Q.    Did he mark up a document and send you some | 10:08:57 |
| 17    revisions or tell you -- send you some revisions in | 10:09:01 |
| 18    writing? | 10:09:05 |
| 19        A.    I don't recall that. | 10:09:06 |
| 20        Q.    Were there any -- did you e-mail him at all? | 10:09:06 |
| 21        A.    Well, on other occasions, but, you know, not | 10:09:10 |
| 22    regarding this. | 10:09:13 |
| 23        Q.    Did you meet with him in person regarding the | 10:09:16 |
| 24    2008 consent agreement? | 10:09:19 |
| 25        A.    No. | 10:09:20 |

| | | |
|---|---|---|
| 1 | Q.   Did you meet with him in person regarding the | 10:09:20 |
| 2 | 2004 litigation agreement with Mr. Toberoff? | 10:09:24 |
| 3 | A.   No. | 10:09:28 |
| 4 | Q.   And did you meet with him in person regarding | 10:09:28 |
| 5 | the 2002 agreement with Mr. Toberoff? | 10:09:31 |
| 6 | A.   No. | 10:09:41 |
| 7 | Q.   And to be clear, Mr. Zadrozny is the only | 10:09:41 |
| 8 | lawyer to review your agreements with Mr. Toberoff? | 10:09:48 |
| 9 | A.   No, that's not correct. | 10:09:52 |
| 10 | Q.   Okay.  Is he the only lawyer to review the | 10:09:54 |
| 11 | 2008 consent agreement? | 10:09:57 |
| 12 | A.   I believe so. | 10:10:02 |
| 13 | Q.   Okay.  And with respect to the 2002 | 10:10:06 |
| 14 | agreement, the first agreement with Mr. Toberoff, who | 10:10:12 |
| 15 | reviewed that agreement, if anyone, other than | 10:10:12 |
| 16 | Mr. Zadrozny? | 10:10:15 |
| 17 | A.   I believe Arthur Levine looked at it, if I'm | 10:10:16 |
| 18 | recalling correctly. | 10:10:20 |
| 19 | Q.   During the time that you were working with | 10:10:23 |
| 20 | Gang Tyre, Bruce Ramer and Kevin Marks of Gang Tyre, | 10:10:26 |
| 21 | you were still calling on Mr. Levine from time to | 10:10:29 |
| 22 | time -- | 10:10:31 |
| 23 | A.   Yes. | 10:10:32 |
| 24 | Q.   -- with regard to Superman? | 10:10:32 |
| 25 | A.   Yes. | 10:10:34 |

| | | |
|---|---|---|
| 1 | Q.   And have you continued to do so even after | 10:10:34 |
| 2 | your relationship with Mr. Toberoff began? | 10:10:37 |
| 3 | A.   Yes. | 10:10:42 |
| 4 | Q.   And to the present? | 10:10:43 |
| 5 | A.   Well, I haven't talked to Arthur in a really | 10:10:47 |
| 6 | long time. | 10:10:50 |
| 7 | Q.   When is the last time that you or your mother | 10:10:50 |
| 8 | consulted with Mr. Levine regarding Superman? | 10:10:54 |
| 9 | A.   I don't remember.  I couldn't give you a | 10:11:04 |
| 10 | date. | 10:11:07 |
| 11 | Q.   Would it be within the last five years? | 10:11:07 |
| 12 | A.   Possibly. | 10:11:14 |
| 13 | Q.   Did Mr. Levine review the 2004 litigation | 10:11:16 |
| 14 | agreement with Mr. Toberoff? | 10:11:22 |
| 15 | A.   Yes, he did. | 10:11:23 |
| 16 | Q.   Did any other lawyer besides Mr. Levine and | 10:11:25 |
| 17 | Mr. Zadrozny review the 2002 agreement with | 10:11:29 |
| 18 | Mr. Toberoff, to your knowledge? | 10:11:31 |
| 19 | A.   Are you saying, you know, on my behalf? | 10:11:36 |
| 20 | Q.   Or your mother's behalf, yes. | 10:11:39 |
| 21 | A.   No. | 10:11:42 |
| 22 | Q.   The same question for the 2004 litigation | 10:11:43 |
| 23 | agreement. | 10:11:46 |
| 24 | A.   No other lawyer besides Arthur and George. | 10:11:47 |
| 25 | Q.   Okay.  Arthur Levine and George Zadrozny. | 10:11:50 |

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | A.    Correct. | 10:11:55 |
| 2 | Q.    And the 2008 consent agreement was just | 10:11:56 |
| 3 | George, not Arthur. | 10:11:59 |
| 4 | A.    I believe so.  I -- I don't remember talking | 10:12:00 |
| 5 | to Arthur about it, but I might have, but I really | 10:12:05 |
| 6 | think it was just George. | 10:12:09 |
| 7 | Q.    Do you know whether the Shusters had any | 10:12:12 |
| 8 | lawyer review the 2008 consent agreement? | 10:12:18 |
| 9 | A.    I have no idea. | 10:12:22 |
| 10 | Q.    Do you recall that Mr. Toberoff sent you some | 10:12:31 |
| 11 | letters regarding a potential conflict of interest | 10:12:41 |
| 12 | with respect to acquiring Michael Siegel's termination | 10:12:46 |
| 13 | interest? | 10:12:53 |
| 14 | A.    I believe he did, yes. | 10:12:54 |
| 15 | Q.    And I'll show them to you as we get into it. | 10:12:56 |
| 16 |       Do you know whether any lawyer for you or | 10:12:59 |
| 17 | your mother reviewed those documents? | 10:13:02 |
| 18 | A.    I'm -- probably -- I'm guessing, but I | 10:13:06 |
| 19 | probably would have had George look at that also. | 10:13:11 |
| 20 | Q.    You're not -- | 10:13:18 |
| 21 | A.    Zadrozny. | |
| 22 | Q.    -- sure, is it fair to say? | 10:13:18 |
| 23 | A.    I'm not sure, but I -- I would say probably. | 10:13:20 |
| 24 | Q.    The record will show that those consent -- | 10:13:31 |
| 25 | excuse me -- those disclosure -- withdrawn. | 10:13:35 |

EXHIBIT D
47

LAURA SIEGEL 7/22/2011

| | | |
|---|---|---|
| 1 | The record will show that those conflict of | 10:13:38 |
| 2 | interest letters were sent to you -- | 10:13:40 |
| 3 | What year was that? | 10:13:44 |
| 4 | MR. TOKORO:  2002, 2003. | 10:13:48 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q.    -- 2002, 2003, that general time frame.  And | 10:13:49 |
| 7 | I'll show them to you when we get to them, but for | 10:13:52 |
| 8 | now -- and again, I'm trying to get a broad picture of | 10:13:55 |
| 9 | who is involved in all this. | 10:13:58 |
| 10 | Have you received any conflict of interest | 10:14:04 |
| 11 | letters from Mr. Toberoff since those ones in 2002 and | 10:14:10 |
| 12 | 2003 related to Michael Siegel? | 10:14:15 |
| 13 | MR. TOBEROFF:  Vague and -- are you asking | 10:14:21 |
| 14 | whether any other conflict of interest letters, | 10:14:23 |
| 15 | period, or any other conflict of interest letters | 10:14:27 |
| 16 | relating to Michael Siegel? | 10:14:30 |
| 17 | MR. PETROCELLI:  Let me clarify. | 10:14:33 |
| 18 | Q.    Other than conflict of interest letters | 10:14:37 |
| 19 | related to Michael Siegel -- | 10:14:40 |
| 20 | A.    Yes. | 10:14:42 |
| 21 | Q.    -- have you received any conflict of interest | 10:14:43 |
| 22 | letters from Mr. Toberoff in the course of your | 10:14:46 |
| 23 | relationship with him? | 10:14:49 |
| 24 | A.    Well, every time there was any sort of | 10:14:51 |
| 25 | agreement that we were entering into with | 10:14:56 |

LAURA SIEGEL LARSON   7/22/2011

Page 33

| | | |
|---|---|---|
| 1 | Mr. Toberoff, he would disclose to us any conflicts of | 10:14:58 |
| 2 | interest that he had in writing. | 10:15:02 |
| 3 | Q.    Which -- can you give -- can you be more | 10:15:06 |
| 4 | specific? | 10:15:11 |
| 5 | A.    For the 2002 agreement. | 10:15:12 |
| 6 | Q.    There's a letter he sent to you disclosing | 10:15:16 |
| 7 | conflicts of interest? | 10:15:19 |
| 8 | A.    I believe so. | 10:15:20 |
| 9 | Q.    And what do you -- what do you understand the | 10:15:22 |
| 10 | potential conflict of interest to have been that he | 10:15:25 |
| 11 | was disclosing to you? | 10:15:27 |
| 12 | MR. TOBEROFF:  Attorney-client privilege.  I | 10:15:29 |
| 13 | instruct you not to answer. | 10:15:30 |
| 14 | BY MR. PETROCELLI: | |
| 15 | Q.    Was that conflict of interest -- do you know | 10:15:39 |
| 16 | who it is? | 10:15:42 |
| 17 | A.    Do I know who what is? | 10:15:44 |
| 18 | Q.    Bad question. | 10:15:45 |
| 19 | As you sit here now, do you remember the | 10:15:46 |
| 20 | subject matter of the conflict of interest letter that | 10:15:49 |
| 21 | you received from Mr. Toberoff at the time that you | 10:15:52 |
| 22 | entered into the first agreement with him in 2002? | 10:15:55 |
| 23 | A.    I don't -- | 10:15:59 |
| 24 | MR. TOBEROFF:  You can answer. | 10:16:00 |
| 25 | THE WITNESS:  I don't remember details. | 10:16:01 |

Merrill   Corporation   -   Los Angeles

EXHIBIT D
49

LAURA SIEGEL LARSON   7/22/2011

Page 34

```
 1   BY MR. PETROCELLI:                                    10:16:04

 2       Q.   Are you certain that you received in writing  10:16:04

 3   a conflict of interest letter when you entered into    10:16:11

 4   the written agreement with Mr. Toberoff in 2002?       10:16:17

 5           MR. TOBEROFF:  Asked and answered.             10:16:21

 6           THE WITNESS:  Yes.                             10:16:24

 7   BY MR. PETROCELLI:

 8       Q.   Did that conflict of interest letter pertain  10:16:29

 9   in any way to Mr. Toberoff's relationship with the     10:16:32

10   Shusters?                                              10:16:38

11           MR. TOBEROFF:  I instruct you not to answer    10:16:39

12   as to the contents of any conflict of interest waivers 10:16:41

13   based on the attorney-client privilege, attorney work  10:16:48

14   product.                                               10:16:51

15   BY MR. PETROCELLI:

16       Q.   Did you sign any document relating to a       10:16:52

17   conflict of interest that you received from            10:16:59

18   Mr. Toberoff at the time you signed your first         10:17:03

19   agreement with him in 2002?                            10:17:07

20       A.   Yes.                                          10:17:10

21       Q.   And who else, to your knowledge, signed such  10:17:12

22   a document?                                            10:17:15

23       A.   My mother.                                    10:17:19

24       Q.   Were there any other signatories to such a    10:17:19

25   document?                                              10:17:22
```

EXHIBIT D
50

LAURA SIEGEL LARSON 7/22/2011

Page 35

| | | | |
|---|---|---|---|
| 1 | A. | Mr. Toberoff. | 10:17:22 |
| 2 | Q. | Were there any other signatories? | 10:17:23 |
| 3 | A. | I don't believe so. | 10:17:25 |
| 4 | Q. | This is in 2002 now. | 10:17:25 |
| 5 | A. | Yeah. | 10:17:27 |
| 6 | Q. | Okay. | 10:17:29 |
| 7 | A. | I'm trying to follow that.  Yes.  No other -- | 10:17:29 |
| 8 | Q. | Like did the Shusters sign the document? | 10:17:33 |
| 9 | A. | No. | 10:17:35 |
| 10 | Q. | Okay. | 10:17:36 |

11          Is the next conflict of interest document        10:17:42

12     that you recall receiving from Mr. Shuster -- from      10:17:45

13     Mr. Toberoff, again, unrelated to Michael Siegel, in    10:17:49

14     2004 when you signed the litigation agreement with      10:17:54

15     him?                                                    10:17:57

16          A.    Yes.                                         10:17:57

17          Q.    Okay.  And you are certain that you received 10:17:58

18     and signed such a document?                             10:18:02

19          A.    Yes.                                         10:18:04

20          Q.    Have you reviewed either the 2002 conflict   10:18:08

21     document that you signed or the 2004 conflict document  10:18:13

22     that you signed recently?                               10:18:16

23          A.    No, not for a long time.                     10:18:19

24          Q.    Do you remember who the signatories are to   10:18:23

25     the 2004 conflict document that you signed?            10:18:26

| | | |
|---|---|---|
| 1 | A. It would have been my mother and me and | 10:18:31 |
| 2 | Mr. Toberoff. | 10:18:33 |
| 3 | Q. Do you know if that document was reviewed by | 10:18:38 |
| 4 | Mr. Zadrozny? | 10:18:42 |
| 5 | A. I believe it was. | 10:18:42 |
| 6 | Q. Was it reviewed by anyone else? | 10:18:45 |
| 7 | A. I believe it was reviewed by Arthur Levine. | 10:18:48 |
| 8 | Q. Is 2004 the last time that you received a | 10:18:53 |
| 9 | conflict of interest document from Mr. Toberoff? | 10:18:59 |
| 10 | A. No. | 10:19:02 |
| 11 | Q. When is the last time -- let me ask it this | 10:19:03 |
| 12 | way. When is the next time after the 2004 litigation | 10:19:05 |
| 13 | agreement? | 10:19:12 |
| 14 | A. Well, I know we received one in 2008. | 10:19:12 |
| 15 | Q. Is the conflict of interest document that you | 10:19:18 |
| 16 | received in 2008 one that you also signed? | 10:19:20 |
| 17 | A. Yes. | 10:19:26 |
| 18 | Q. Your mother signed it? | 10:19:28 |
| 19 | A. Yes. | 10:19:30 |
| 20 | Q. And who else signed it? | 10:19:30 |
| 21 | A. Mr. Toberoff, Warren Peary, and Jean Shuster | 10:19:35 |
| 22 | Peavy. | 10:19:44 |
| 23 | MR. PETROCELLI: Peary is P-a-e-r-y. | 10:19:44 |
| 24 | THE WITNESS: Yes. | 10:19:47 |
| 25 | BY MR. PETROCELLI: | |

| | |
|---|---|
| 1 | Q.   Okay.  Did you have someone review that 2008 | 10:19:49 |
| 2 | conflict document that you received from Mr. Toberoff? | 10:19:54 |
| 3 | A.   Yes. | 10:19:56 |
| 4 | Q.   And who reviewed it? | 10:19:57 |
| 5 | A.   George Zadrozny and -- yes, I believe it was | 10:19:59 |
| 6 | just George.  As I said, I don't remember whether or | 10:20:02 |
| 7 | not Arthur was involved with that. | 10:20:06 |
| 8 | Q.   Okay.  Do you know whether any lawyer | 10:20:11 |
| 9 | reviewed it on behalf of the Shuster family? | 10:20:14 |
| 10 | A.   I have no idea. | 10:20:16 |
| 11 | Q.   Is the 2008 conflict document that you | 10:20:18 |
| 12 | reviewed and signed a separate document from the 2008 | 10:20:23 |
| 13 | consent agreement that you signed? | 10:20:29 |
| 14 | A.   Yes.  I believe they were two separate | 10:20:32 |
| 15 | documents. | 10:20:34 |
| 16 | Q.   So there are actually two documents, then, | 10:20:34 |
| 17 | that bear your signature and a signature of a member | 10:20:37 |
| 18 | of the Shuster family related to Superman. | 10:20:42 |
| 19 | A.   Well, they were in essence all the, you know, | 10:20:45 |
| 20 | the same issue.  It was all, you know, all at one | 10:20:49 |
| 21 | time. | 10:20:53 |
| 22 | Q.   I understand that. | 10:20:53 |
| 23 | A.   They were given to us. | 10:20:55 |
| 24 | Q.   Two separate documents, though. | 10:20:56 |
| 25 | A.   Two separate documents, I believe. | 10:20:57 |

LAURA SIEGEL LARSON 7/22/2011

Page 38

| | | |
|---|---|---|
| 1 | Q.   Okay.  And is that the last time in 2008 that | 10:20:58 |
| 2 | you signed a conflict of interest document received | 10:21:05 |
| 3 | from Mr. Toberoff? | 10:21:08 |
| 4 | A.   I believe so. | 10:21:09 |
| 5 | Q.   Is that the last time in 2008 that you | 10:21:11 |
| 6 | received a conflict of interest document from | 10:21:14 |
| 7 | Mr. Toberoff? | 10:21:15 |
| 8 | A.   Yes. | 10:21:17 |
| 9 | Q.   And are you certain that you have signed no | 10:21:19 |
| 10 | other conflict of interest documents or any other | 10:21:26 |
| 11 | documents with the Shuster family other than the 2008 | 10:21:30 |
| 12 | consent agreement and the related conflict document? | 10:21:34 |
| 13 | A.   Those were the only occasions on which we | 10:21:40 |
| 14 | signed a document that the Shusters also signed. | 10:21:44 |
| 15 | Q.   And even with respect to that issue in 2008, | 10:21:49 |
| 16 | were there any other documents that you recall having | 10:21:51 |
| 17 | signed together with the Shusters? | 10:21:54 |
| 18 | A.   I'm sorry.  Could you repeat that? | 10:21:56 |
| 19 | Q.   Were there any other documents that you | 10:21:58 |
| 20 | recall having signed with the Shusters other than | 10:21:59 |
| 21 | those two documents, the 2008 consent agreement and | 10:22:02 |
| 22 | the related conflict document? | 10:22:06 |
| 23 | A.   No. | 10:22:08 |
| 24 | Q.   Okay. | 10:22:15 |
| 25 | Did you have any discussions with either Jean | 10:22:16 |

LAURA SIEGEL LARSON 7/22/2011

Page 39

| | | |
|---|---|---|
| 1 | Peavy or Warren Peary about the 2008 consent | 10:22:22 |
| 2 | agreement? | 10:22:31 |
| 3 | A.   No, we did not. | 10:22:32 |
| 4 | Q.   To your knowledge, did your mother? | 10:22:34 |
| 5 | A.   I don't believe so. | 10:22:36 |
| 6 | Q.   Have you ever had any discussion with any | 10:22:48 |
| 7 | member of the Shuster family regarding the 2008 | 10:22:52 |
| 8 | consent agreement? | 10:22:58 |
| 9 | A:   I can't recall any discussion that we had. | 10:23:02 |
| 10 | Q.   Have you ever -- you understand that in this | 10:23:08 |
| 11 | lawsuit DC is alleging certain issues with respect to | 10:23:14 |
| 12 | that document? | 10:23:18 |
| 13 | A.   I think, you know, that's one of several | 10:23:21 |
| 14 | things in that lawsuit. | 10:23:24 |
| 15 | Q.   Have you read the lawsuit? | 10:23:25 |
| 16 | A.   Yes.   Not recently, but I've read it. | 10:23:26 |
| 17 | Q.   After this lawsuit was filed, which you | 10:23:32 |
| 18 | believe was on or about May 14 of 2010, did you have | 10:23:34 |
| 19 | any discussion with either Jean Peavy or Warren Peary | 10:23:38 |
| 20 | about the lawsuit? | 10:23:43 |
| 21 | A.   No. | 10:23:50 |
| 22 | Q.   Did you talk to your mother about the | 10:23:50 |
| 23 | lawsuit? | 10:23:54 |
| 24 | A.   Yes. | 10:23:54 |
| 25 | Q.   Did you talk to your mother about the consent | 10:23:58 |

EXHIBIT D
55

```
 1    agreement after the filing of the lawsuit?         10:24:01

 2       A.    The consent -- the consent agreement from  10:24:10

 3    2008 after the lawsuit was filed in 2010?           10:24:13

 4       Q.    Exactly.  You're very good.                10:24:16

 5       A.    Have to try and follow this.               10:24:22

 6       Q.    You're following it perfectly.             10:24:22

 7       A.    You're throwing a lot of dates at me here. 10:24:23

 8             I don't remember any particular conversation 10:24:28

 9    that we had.                                        10:24:31

10       Q.    Okay.                                       10:24:32

11             Have you signed any conflict document since 10:24:38

12    the filing of this lawsuit in May, 2010?            10:24:45

13       A.    I don't believe so.                        10:24:51

14       Q.    And have you signed any agreements at all  10:24:55

15    with Mr. Toberoff since the filing of this lawsuit in 10:25:00

16    May, 2010?                                          10:25:06

17       A.    No.                                         10:25:09

18       Q.    And to your knowledge, your mother didn't  10:25:09

19    either; correct?                                    10:25:12

20       A.    No.                                         10:25:12

21       Q.    Is that correct?                            10:25:13

22       A.    Correct.  She did not.                     10:25:13

23       Q.    Okay.  Do you have any agreements with any 10:25:15

24    member of the Shuster family regarding Superman other 10:25:43

25    than the 2008 consent agreement or the conflict     10:25:53
```

| | | |
|---|---|---|
| 1 | document related to it? | 10:25:58 |
| 2 | A. No. | 10:26:06 |
| 3 | Q. Do you have any arrangements with the Shuster | 10:26:06 |
| 4 | family to share in any monies that either the Shusters | 10:26:13 |
| 5 | or the Siegels receive for the sale of their Superman | 10:26:17 |
| 6 | rights, including in settlement of litigation? | 10:26:24 |
| 7 | MR. TOBEROFF: Excuse me. Could you read | 10:26:28 |
| 8 | back that question for me? | 10:26:30 |
| 9 | (The record was read.) | 10:26:51 |
| 10 | MR. TOBEROFF: To the extent any part of that | 10:26:51 |
| 11 | question reveals the substance of -- any part of it | 10:26:56 |
| 12 | reveals the substance of the consent agreement, which | 10:27:00 |
| 13 | was held to be privileged twice, I would instruct you | 10:27:02 |
| 14 | not to answer. | 10:27:05 |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q. Do you have any arrangement to share with the | 10:27:15 |
| 17 | Shusters any monies that the Siegel family might | 10:27:25 |
| 18 | receive with respect to their accounting on Superman? | 10:27:33 |
| 19 | MR. TOBEROFF: Same instruction. Same basis. | 10:27:40 |
| 20 | BY MR. PETROCELLI: | |
| 21 | Q. Do you have any arrangements with the | 10:27:43 |
| 22 | Shusters to share in any money that the Siegel family | 10:27:46 |
| 23 | might receive with respect to the disposition of | 10:27:51 |
| 24 | Superboy rights or settlement of litigation regarding | 10:27:58 |
| 25 | Superboy? | 10:28:02 |

LAURA SIEGEL LARSON 7/22/2011

Page 42

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Same instruction.  We made an | 10:28:02 |
| 2 | exception with respect to Warren Peary based on an | 10:28:07 |
| 3 | agreement that that exception would not constitute a | 10:28:12 |
| 4 | waiver of privilege.  If we had the same agreement | 10:28:14 |
| 5 | with respect to Laura Siegel, I will let her answer | 10:28:16 |
| 6 | that question.  Otherwise I have to instruct her not | 10:28:19 |
| 7 | to answer. | 10:28:21 |
| 8 | MR. PETROCELLI:  Well, you know, it's a bit | 10:28:24 |
| 9 | unprincipled to be selectively waiving, but for the | 10:28:29 |
| 10 | purpose of this question, I'll make that agreement. | 10:28:35 |
| 11 | MR. TOBEROFF:  You can answer. | 10:28:43 |
| 12 | THE WITNESS:  Could you -- | 10:28:45 |
| 13 | MR. TOBEROFF:  Read back the question? | 10:28:46 |
| 14 | THE WITNESS:  Yeah.  Would you ask the | 10:28:48 |
| 15 | question again, please? | 10:28:49 |
| 16 | MR. PETROCELLI:  Please repeat it. | 10:28:50 |
| 17 | (The record was read.) | 10:29:08 |
| 18 | THE WITNESS:  No. | 10:29:09 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q.   Does the consent agreement that you signed | 10:29:11 |
| 21 | with the Shusters make any reference at all to | 10:29:16 |
| 22 | Superboy? | 10:29:22 |
| 23 | MR. TOBEROFF:  I instruct you not to answer | 10:29:24 |
| 24 | based on the consent agreement being held to be | 10:29:27 |
| 25 | privileged, not disclose the substance. | 10:29:31 |

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | MR. PETROCELLI:  And to be clear, with | 10:29:38 |
| 2 | respect to the last several questions on which you | 10:29:40 |
| 3 | have instructed, you decline to allow the witness to | 10:29:45 |
| 4 | answer even were I to agree that it would not | 10:29:52 |
| 5 | constitute a waiver of any privilege? | 10:29:55 |
| 6 | MR. TOBEROFF:  If you would agree -- in some | 10:29:59 |
| 7 | instances if you agree that it doesn't constitute a | 10:30:02 |
| 8 | waiver of privilege, I could allow her to answer | 10:30:04 |
| 9 | certain questions. | 10:30:10 |
| 10 | MR. PETROCELLI:  Okay. | 10:30:11 |
| 11 | MR. TOBEROFF:  But -- | 10:30:12 |
| 12 | MR. PETROCELLI:  I notice you didn't extend | 10:30:12 |
| 13 | the offer with respect to some of those questions, but | 10:30:14 |
| 14 | you did on the Superboy, so -- | 10:30:16 |
| 15 | MR. TOBEROFF:  You know, there are a number | 10:30:18 |
| 16 | of issues here surrounding, you know -- also, you | 10:30:20 |
| 17 | know, when the answer to something is no, you're not | 10:30:25 |
| 18 | revealing the content, so it wouldn't actually be | 10:30:27 |
| 19 | privileged, but I don't necessarily know how the | 10:30:30 |
| 20 | witnesses is going to answer. | 10:30:34 |
| 21 | MR. PETROCELLI:  Okay.  Well, with respect | 10:30:35 |
| 22 | to -- with respect to my question, then, about | 10:30:38 |
| 23 | arrangements that you have with the Shusters regarding | 10:30:40 |
| 24 | the sharing in any Superman recoveries or proceeds, I | 10:30:43 |
| 25 | would like the witness to answer, and I will agree | 10:30:49 |

| | | |
|---|---|---|
| 1 | that her answer is not a waiver of any privilege. | 10:30:52 |
| 2 | MR. TOBEROFF:  She already answered that | 10:30:54 |
| 3 | question.  She said no. | 10:30:55 |
| 4 | MR. PETROCELLI:  Not with respect to | 10:30:57 |
| 5 | Superman.  She did with respect to Superboy. | 10:30:58 |
| 6 | MR. TOBEROFF:  I thought you said -- | 10:31:01 |
| 7 | MR. PETROCELLI:  Did I misspeak? | 10:31:02 |
| 8 | THE WITNESS:  I kind of lost track for a | 10:31:03 |
| 9 | minute. | 10:31:06 |
| 10 | MR. PETROCELLI:  Let me put it again for the | 10:31:06 |
| 11 | record, then. | 10:31:08 |
| 12 | MR. TOBEROFF:  As to that question, we are | 10:31:08 |
| 13 | asserting privilege, and I'm instructing her not to | 10:31:11 |
| 14 | answer. | 10:31:13 |
| 15 | MR. PETROCELLI:  Okay.  So even though I | 10:31:13 |
| 16 | would agree that the answer would not affect the | 10:31:15 |
| 17 | waiver. | 10:31:17 |
| 18 | MR. TOBEROFF:  Yes. | 10:31:18 |
| 19 | MR. PETROCELLI:  Okay. | 10:31:19 |
| 20 | Q.   And does the -- did you discuss with your | 10:31:51 |
| 21 | mother at any time whether or not to enter into an | 10:31:55 |
| 22 | agreement with the Shusters regarding the sharing of | 10:32:04 |
| 23 | recoveries or proceeds from Superman? | 10:32:09 |
| 24 | A.   I believe we talked about it. | 10:32:18 |
| 25 | Q.   Can you relate that discussion to me? | 10:32:21 |

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  I instruct you not to answer | 10:32:23 |
| 2 | based on the attorney-client privilege, joint client | 10:32:25 |
| 3 | privilege. | 10:32:28 |
| 4 | BY MR. PETROCELLI: | |
| 5 | Q.   And these were conversations just between | 10:32:30 |
| 6 | your mother and you; is that correct? | 10:32:32 |
| 7 | A.   Yes. | 10:32:33 |
| 8 | Excuse me.  May I take a bathroom break for a | 10:32:41 |
| 9 | moment? | 10:32:43 |
| 10 | MR. PETROCELLI:  Sure.  Let's stop right now. | 10:32:44 |
| 11 | THE VIDEOGRAPHER:  Off the record.  The time | 10:32:48 |
| 12 | is 10:32. | 10:32:48 |
| 13 | (A recess was taken.) | 10:33:54 |
| 14 | THE VIDEOGRAPHER:  We're back on the record | 10:46:52 |
| 15 | at 10:46. | 10:46:54 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.   I just want to follow up a bit on that last | 10:46:57 |
| 18 | area that we covered about the consent agreements and | 10:47:01 |
| 19 | the arrangements with the Shusters.  Does -- do the | 10:47:04 |
| 20 | consent agreements -- I may have asked you this | 10:47:10 |
| 21 | already, but let me ask you again.  Do the consent | 10:47:17 |
| 22 | agreement documents -- does the consent agreement | 10:47:22 |
| 23 | document make any reference at all to Superboy? | 10:47:25 |
| 24 | A.   You did ask me that. | 10:47:31 |
| 25 | MR. TOBEROFF:  Asked and answered.  And I | 10:47:32 |

```
 1    instruct you not to answer.                          10:47:34

 2              MR. PETROCELLI:  If I agree that it's not a  10:47:37

 3    waiver, do you continue to instruct on that?         10:47:39

 4              MR. TOBEROFF:  Yes.                          10:47:41

 5              MR. PETROCELLI:  Okay.                       10:47:42

 6         Q.   Are you currently able to enter into an     10:47:59

 7    agreement with DC Comics without the consent of the   10:48:04

 8    Shuster side, the Shuster family?                     10:48:15

 9              MR. TOBEROFF:  I instruct you not to answer  10:48:22

10    that.                                                 10:48:25

11              MR. PETROCELLI:  Same objection?  Privilege? 10:48:25

12              MR. TOBEROFF:  Same objection.  Privilege.  10:48:30

13    BY MR. PETROCELLI:                                    

14         Q.   Have you had any discussions with any member 10:48:35

15    of the Shuster family since 2008 when the both of you  10:48:38

16    signed the consent agreement about the marketing of   10:48:45

17    the Superman rights?                                  10:48:50

18         A.   I can't recall any discussion.             10:48:54

19         Q.   Are -- have any efforts been made on your   10:49:02

20    behalf or your family's behalf to market the Superman 10:49:05

21    rights since 2008?                                    10:49:10

22              MR. TOBEROFF:  You can -- you could answer  10:49:15

23    that yes or no, a yes or no question, and you can also 10:49:23

24    answer it to the extent your knowledge does not reveal 10:49:28

25    the substance of your communications with counsel.    10:49:31
```

EXHIBIT D
62

| | | |
|---|---|---|
| 1 | THE WITNESS: Okay. | 10:49:35 |
| 2 | MR. TOBEROFF: So -- | 10:49:37 |
| 3 | MR. PETROCELLI: To be clear, Marc, and we're | 10:49:39 |
| 4 | not going to settle this on the record, but I do want | 10:49:41 |
| 5 | to make clear that I disagree that all conversations | 10:49:43 |
| 6 | with you are privileged. They have to involve the | 10:49:46 |
| 7 | rendition of legal advice at the very minimum. | 10:49:48 |
| 8 | MR. TOBEROFF: Well, the marketing of her -- | 10:49:51 |
| 9 | the subject of a litigation for the past six now going | 10:49:55 |
| 10 | to the seventh year of rights wouldn't necessarily | 10:49:58 |
| 11 | entail legal advice. | 10:50:01 |
| 12 | MR. PETROCELLI: If you meet with Paramount | 10:50:03 |
| 13 | Pictures about the sale of Superman or you go to Fox | 10:50:05 |
| 14 | and you then report on the meeting, that's hardly the | 10:50:08 |
| 15 | rendition of legal advice. | 10:50:11 |
| 16 | MR. TOBEROFF: It's totally intertwined with | 10:50:12 |
| 17 | legal advice. Any studio would want to know the state | 10:50:15 |
| 18 | of the litigation, the odds of the litigation, the | 10:50:18 |
| 19 | odds on appeal. There's so much going on in this case | 10:50:21 |
| 20 | that would be relevant to the status of those rights | 10:50:25 |
| 21 | and which would -- it's just very closely intertwined. | 10:50:28 |
| 22 | If she has knowledge of that independent of her | 10:50:34 |
| 23 | discussions with me, I will allow her to answer. | 10:50:37 |
| 24 | Otherwise I would instruct you not to answer. | 10:50:38 |
| 25 | MR. PETROCELLI: It seems like it's | 10:50:40 |

LAURA SIEGEL LARSON 7/22/2011

Page 48

| | | |
|---|---|---|
| 1 | impossible for her to have any knowledge independent | 10:50:41 |
| 2 | of you. | 10:50:44 |
| 3 | MR. TOBEROFF:  Certainly when it regards | 10:50:45 |
| 4 | legal matters, that would be the case. | 10:50:48 |
| 5 | MR. PETROCELLI:  This is a business question | 10:50:50 |
| 6 | about selling the rights. | 10:50:51 |
| 7 | MR. TOBEROFF:  Same instruction. | 10:50:55 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.   Have you -- let me ask the question so we | 10:50:56 |
| 10 | have a record here. | 10:51:00 |
| 11 | Do you -- are you aware of any efforts made | 10:51:02 |
| 12 | on your behalf to market your Superman rights since | 10:51:04 |
| 13 | 2008? | 10:51:10 |
| 14 | MR. TOBEROFF:  You could just answer that yes | 10:51:10 |
| 15 | or no. | 10:51:12 |
| 16 | Laura? | 10:51:16 |
| 17 | THE WITNESS:  I'm thinking. | 10:51:17 |
| 18 | MR. TOBEROFF:  Okay. | 10:51:18 |
| 19 | THE WITNESS:  There's -- there's so much to | 10:51:21 |
| 20 | remember in this -- | 10:51:22 |
| 21 | MR. PETROCELLI:  That's like -- | 10:51:23 |
| 22 | THE WITNESS:  -- situation. | |
| 23 | MR. PETROCELLI:  -- the old Jack Benny joke. | 10:51:24 |
| 24 | "Your money or your life," and he goes "I'm thinking! | 10:51:26 |
| 25 | I'm thinking!" | 10:51:30 |

EXHIBIT D
64

```
 1              THE WITNESS:  I know the joke.            10:51:30

 2              MR. PETROCELLI:  Marc, you're still smiling.  10:51:37

 3    You appreciate that, I know.                       10:51:39

 4              THE WITNESS:  That's a good joke.  That's a  10:51:41

 5    good joke.                                         10:51:43

 6              MR. PETROCELLI:  I used to love Jack Benny.  10:51:44

 7              THE WITNESS:  I know.  I did too.        10:51:46

 8              MR. PETROCELLI:  We're telling our age.  10:51:50

 9              THE WITNESS:  I don't believe so.        10:51:51

10              MR. TOBEROFF:  As to showing your age or the  10:51:52

11    question?                                          10:51:54

12              MR. PETROCELLI:  We will get back on track  10:51:54

13    here.  It's really my fault.                       10:51:56

14        Q.   You're not aware of any efforts to market the  10:51:58

15    Superman rights since 2008; is that correct?       10:52:03

16        A.   I don't recall any.                       10:52:05

17        Q.   Are you aware of any discussions that were  10:52:06

18    had on your behalf with representatives of Paramount  10:52:11

19    Pictures or the Paramount Studio?                  10:52:17

20        A.   I don't remember a time frame.  I believe  10:52:21

21    that may have occurred, but --                     10:52:24

22        Q.   Why do you believe it may have occurred?   10:52:27

23        A.   I'm just trying to draw on my memory here.  10:52:29

24    Was it Paramount?  Yeah.  I guess it was Paramount.  10:52:37

25        Q.   And are you aware of any efforts to market  10:52:41
```

LAURA SIEGEL LARSON - 7/22/2011

| | |
|---|---|
| 1    the property to anyone other than Paramount? | 10:52:43 |
| 2        A.    I can't recall any right now. | 10:52:49 |
| 3        Q.    What came of the Paramount marketing effort? | 10:52:52 |
| 4        A.    I don't believe -- | 10:52:58 |
| 5            MR. TOBEROFF:  I instruct you not to -- you | 10:52:59 |
| 6    know, again, we have to be careful here because | 10:53:00 |
| 7    when -- you object to my instruction based on | 10:53:04 |
| 8    privilege, and then when I let her answer, you claim a | 10:53:06 |
| 9    broad waiver of privilege.  So it's almost a | 10:53:08 |
| 10   self-fulfilling prophecy to a certain extent. | 10:53:14 |
| 11           MR. PETROCELLI:  You act as though I'm taking | 10:53:16 |
| 12   some kind of inappropriate position, Marc.  I have to | 10:53:19 |
| 13   follow the rules and we have to abide by the | 10:53:22 |
| 14   consequences. | 10:53:24 |
| 15           MR. TOBEROFF:  We have different views | 10:53:26 |
| 16   clearly as to what's appropriate. | 10:53:27 |
| 17           So I'm instructing you not to answer as to | 10:53:30 |
| 18   the marketing of or whatever his question regarding | 10:53:35 |
| 19   the marketing of your rights to the extent your | 10:53:40 |
| 20   knowledge of the details come only through me.  If you | 10:53:45 |
| 21   have independent knowledge of that, then you can | 10:53:48 |
| 22   discuss that. | 10:53:52 |
| 23           THE WITNESS:  Okay. | 10:53:53 |
| 24   BY MR. PETROCELLI: | |
| 25       Q.    Is everything you know about the marketing of | 10:53:56 |

| | | |
|---|---|---|
| 1 | the Superman rights information you learned from Marc | 10:53:58 |
| 2 | Toberoff? | 10:54:05 |
| 3 | A.    Yes. | 10:54:05 |
| 4 | Q.    In every single discussion you had with Marc | 10:54:06 |
| 5 | Toberoff, you are receiving legal advice? | 10:54:10 |
| 6 | A.    Yes. | 10:54:13 |
| 7 | Q.    And you believe that when he's reporting on a | 10:54:14 |
| 8 | meeting that he had with third parties, that's legal | 10:54:17 |
| 9 | advice? | 10:54:21 |
| 10 | A.    Yes. | 10:54:21 |
| 11 | Q.    Why? | 10:54:23 |
| 12 | A.    He's my lawyer. | 10:54:24 |
| 13 | Q.    You also know that he's an entrepreneur in | 10:54:26 |
| 14 | the motion picture industry; correct? | 10:54:30 |
| 15 | A.    It has nothing to do with me. | 10:54:33 |
| 16 | MR. TOBEROFF:  Vague and ambiguous. | 10:54:35 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.    I didn't ask you that question; right?  I | 10:54:35 |
| 19 | simply asked you whether you were aware of that. | 10:54:37 |
| 20 | MR. TOBEROFF:  Just focus on his question. | 10:54:40 |
| 21 | THE WITNESS:  I am not aware of him having | 10:54:45 |
| 22 | any current activities. | 10:54:47 |
| 23 | BY MR. PETROCELLI: | |
| 24 | Q.    I didn't ask that question either.  You are | 10:54:48 |
| 25 | aware -- | 10:54:53 |

LAURA SIEGEL LARSON 7/22/2011

Page 52

| | | |
|---|---|---|
| 1 | MR. TOBEROFF: Just wait. Wait. Wait. I | 10:54:53 |
| 2 | just want to instruct -- | 10:54:55 |
| 3 | THE WITNESS: Okay. Okay. I'm reading too | 10:54:57 |
| 4 | much into what you're saying. | 10:54:59 |
| 5 | MR. PETROCELLI: I think you are. I think | 10:55:00 |
| 6 | you are, because you're -- | 10:55:01 |
| 7 | MR. TOBEROFF: Wait. Wait. I'd just like to | 10:55:03 |
| 8 | talk to my client. | 10:55:04 |
| 9 | Just try and -- first of all, I want to slow | 10:55:06 |
| 10 | it down so I have time to object. Just try and focus | 10:55:09 |
| 11 | on his question. Don't try and think of where he's | 10:55:11 |
| 12 | going with the question. Just focus on the question | 10:55:14 |
| 13 | and answer the question. | 10:55:16 |
| 14 | THE WITNESS: Um-hum. Okay. | 10:55:17 |
| 15 | MR. PETROCELLI: I concur. | 10:55:18 |
| 16 | Q. You are aware based on your knowledge of | 10:55:24 |
| 17 | Mr. Toberoff from the first time you ever heard his | 10:55:29 |
| 18 | name until today that he has been involved in various | 10:55:32 |
| 19 | business activities in the entertainment industry; | 10:55:39 |
| 20 | correct? | 10:55:42 |
| 21 | A. Yes. | 10:55:42 |
| 22 | Q. And that he has been involved in the | 10:55:43 |
| 23 | acquisition of various literary properties; correct? | 10:55:47 |
| 24 | A. Acquisition? | 10:55:54 |
| 25 | Q. Yes. | 10:55:55 |

LAURA SIEGEL LARSON 7/22/2011

Page 53

| | | |
|---|---|---|
| 1 | A.    Do you want to define "acquisition" for me? | 10:55:56 |
| 2 | Q.    To acquire rights to sell or produce various | 10:55:58 |
| 3 | properties in the entertainment business. | 10:56:02 |
| 4 | A.    Yes. | 10:56:04 |
| 5 | Q.    And you are aware that he had a business | 10:56:09 |
| 6 | collaboration with Ari Emanuel in connection with the | 10:56:21 |
| 7 | acquisition of various entertainment properties; | 10:56:27 |
| 8 | correct? | 10:56:31 |
| 9 | A.    Yes. | 10:56:31 |
| 10 | Q.    And you were aware that he had that | 10:56:32 |
| 11 | collaboration when you first became acquainted with | 10:56:35 |
| 12 | Mr. Toberoff; correct? | 10:56:39 |
| 13 | A.    Yes. | 10:56:40 |
| 14 | Q.    And when you entered into your first | 10:56:42 |
| 15 | agreement with Mr. Toberoff, part of that agreement | 10:56:46 |
| 16 | involved services to be rendered by Mr. Toberoff and | 10:56:49 |
| 17 | Mr. Emanuel for a 10 percent representation fee; | 10:56:55 |
| 18 | correct? | 10:57:03 |
| 19 | A.    Yes. | 10:57:04 |
| 20 | Q.    That would be like an agent's fee; correct? | 10:57:04 |
| 21 | A.    Yes. | 10:57:07 |
| 22 | Q.    And you understood that Mr. Toberoff would | 10:57:07 |
| 23 | share in that agent's fee of 10 percent; correct? | 10:57:10 |
| 24 | MR. TOBEROFF:  I object.  Objection.  Vague | 10:57:13 |
| 25 | and ambiguous. | 10:57:20 |

LAURA SIEGEL LARSON 7/22/2011

Page 54

```
 1    BY MR. PETROCELLI:                              10:57:20

 2        Q.   You may answer.                        10:57:20

 3        A.   Well, the -- the -- could you reask the   10:57:24

 4    question so I'm sure that I'm answering it correctly,  10:57:35

 5    you know?  I do not want to read into what you're   10:57:38

 6    saying.                                         10:57:42

 7        Q.   With respect to the 10 percent representation  10:57:42

 8    or agent's fee that you agreed to pay in connection   10:57:45

 9    with the efforts of Mr. Emanuel and Mr. Toberoff, you  10:57:52

10    understood that Mr. Toberoff would share in part of   10:58:00

11    that 10 percent fee; correct?                    10:58:04

12            MR. TOBEROFF:  Vague and ambiguous.      10:58:06

13    BY MR. PETROCELLI:                              10:58:07

14        Q.   Yes or no?                              10:58:07

15        A.   I would like to go back and say that when you  10:58:09

16    refer to it as an agent's fee, I didn't -- I didn't   10:58:12

17    understand, you know, exactly what you were referring  10:58:17

18    to.  Mr. Toberoff did not act as an agent.       10:58:20

19        Q.   Well, when you signed an agreement in 2002 --  10:58:24

20        A.   Yes.                                    10:58:28

21        Q.   -- you didn't sign it personally with   10:58:28

22    Mr. Toberoff.  You signed it with an entity called IP  10:58:30

23    Worldwide; is that correct?                      10:58:36

24        A.   That's correct.                         10:58:37

25        Q.   And that was a company, to your knowledge, at  10:58:39
```

LAURA SIEGEL LARSON  7/22/2011

Page 55

| | | |
|---|---|---|
| 1 | the time that consisted of Mr. Toberoff and | 10:58:43 |
| 2 | Mr. Emanuel; correct? | 10:58:48 |
| 3 | A.    Yes. | 10:58:50 |
| 4 | Q.    And the fee that you agreed to pay to employ | 10:58:52 |
| 5 | Mr. Toberoff and Mr. Emanuel was 10 percent of the | 10:58:59 |
| 6 | proceeds that they would generate with respect to the | 10:59:06 |
| 7 | sale of your Superman rights; correct? | 10:59:09 |
| 8 | A.    I don't believe "sale" is the correct word to | 10:59:15 |
| 9 | use. | 10:59:18 |
| 10 | Q.    What is the correct word? | 10:59:18 |
| 11 | A.    Negotiations on representation. | 10:59:21 |
| 12 | Q.    Okay. | 10:59:26 |
| 13 | A.    Exploring, you know, different avenues of, | 10:59:26 |
| 14 | you know, how, you know, our rights could be marketed. | 10:59:30 |
| 15 | Q.    But the 10 percent fee would not be payable | 10:59:34 |
| 16 | until and unless their efforts to exploit and | 10:59:37 |
| 17 | negotiate and market resulted in a transaction that | 10:59:42 |
| 18 | generated proceeds; correct? | 10:59:45 |
| 19 | A.    Correct. | 10:59:46 |
| 20 | Q.    Okay.  And with respect to that 10 percent | 10:59:47 |
| 21 | that you agreed to pay if the transaction was | 10:59:52 |
| 22 | consummated that generated proceeds, did you have any | 10:59:56 |
| 23 | understanding as to how that money would be split up | 11:00:00 |
| 24 | as between Mr. Toberoff and Mr. Emanuel? | 11:00:03 |
| 25 | A.    No. | 11:00:10 |

Page 56

| | | |
|---|---|---|
| 1 | Q.    Were you made aware of the joint venture | 11:00:10 |
| 2 | agreement between the two of them that created IP | 11:00:17 |
| 3 | Worldwide? | 11:00:23 |
| 4 | A.    Could you define "made aware"? | 11:00:23 |
| 5 | Q.    Did you ever see it? | 11:00:25 |
| 6 | A.    No. | 11:00:27 |
| 7 | Q.    Have you ever seen it? | 11:00:30 |
| 8 | A.    No. | 11:00:33 |
| 9 | Q.    Did they describe it to you? | 11:00:33 |
| 10 | A.    Well, Mr. Toberoff was acting as my attorney, | 11:00:38 |
| 11 | so I'm not sure whether -- | 11:00:42 |
| 12 | Q.    Okay.  Well, you're not responding to my | 11:00:44 |
| 13 | question -- | 11:00:46 |
| 14 | A.    No. | 11:00:47 |
| 15 | Q.    -- but I don't want to interrupt you, so | 11:00:47 |
| 16 | complete the answer.  Normally when a witness doesn't | 11:00:49 |
| 17 | respond to a lawyer, at least a good lawyer moves to | 11:00:51 |
| 18 | strike as nonresponsive.  I'm trying not to do that -- | 11:00:53 |
| 19 | A.    Um-hum. | 11:00:56 |
| 20 | Q.    -- because I want to accommodate you, but it | 11:00:57 |
| 21 | would be helpful if you tried to just respond to my | 11:00:59 |
| 22 | question. | 11:01:03 |
| 23 | A.    Okay.  So could you -- could I have the | 11:01:04 |
| 24 | question again, please? | 11:01:07 |
| 25 | MR. TOBEROFF:  Who's here to hear your motion | |

|    |                                                                 |          |
|----|-----------------------------------------------------------------|----------|
| 1  | to strike as nonresponsive?                                     | 11:01:11 |
| 2  | MR. PETROCELLI:  It's only for the purpose of                   | 11:01:12 |
| 3  | preserving it for the record so when we're in trial, I          | 11:01:14 |
| 4  | can seek to have that excluded from the record.                 | 11:01:16 |
| 5  | Q.    Did Mr. Emanuel or Mr. Toberoff describe to               | 11:01:30 |
| 6  | you the terms of their arrangement prior to the time            | 11:01:33 |
| 7  | you retained them in 2002?                                       | 11:01:37 |
| 8  | A.    Yes.                                                       | 11:01:39 |
| 9  | Q.    What did they say to you?                                 | 11:01:41 |
| 10 | A.    That they had a company together.                         | 11:01:43 |
| 11 | Q.    Okay.  And did they tell you about their                 | 11:01:46 |
| 12 | track record as a company together?                             | 11:01:51 |
| 13 | A.    Yes.                                                       | 11:01:55 |
| 14 | Q.    And did they tell you about prior successes             | 11:01:56 |
| 15 | that they had achieved together?                                | 11:02:02 |
| 16 | A.    I remember Mr. Toberoff's achievements.                  | 11:02:05 |
| 17 | Q.    Did they tell you about prior transactions              | 11:02:10 |
| 18 | that they, "they" being Mr. Emanuel and Mr. Toberoff            | 11:02:16 |
| 19 | through their company, had accomplished prior to your           | 11:02:20 |
| 20 | retaining them?  Did they say, for example, "We did a         | 11:02:26 |
| 21 | similar transaction for" this person or that person.            | 11:02:30 |
| 22 | "We can do the same for you"?                                   | 11:02:34 |
| 23 | A.    As a company, no.                                          | 11:02:36 |
| 24 | Q.    Okay.  Was it your understanding that the               | 11:02:40 |
| 25 | arrangement with you that IP Worldwide made was the             | 11:02:46 |

LAURA SIEGEL LARSON 7/22/2011

Page 58

| | | |
|---|---|---|
| 1 | first business dealing of this new company, of this | 11:02:49 |
| 2 | company, IP Worldwide? | 11:02:55 |
| 3 | A.    I had no knowledge of that. | 11:02:57 |
| 4 | Q.    Did you have any knowledge how old the | 11:02:59 |
| 5 | company was? | 11:03:01 |
| 6 | A.    I believe it was -- it was a fairly new | 11:03:03 |
| 7 | company. | 11:03:06 |
| 8 | Q.    And again, did you believe that yours was the | 11:03:07 |
| 9 | first transaction the company entered into? | 11:03:10 |
| 10 | A.    I don't have any recollection of it being a | 11:03:14 |
| 11 | first. | 11:03:17 |
| 12 | Q.    Did you do any research on the company? | 11:03:18 |
| 13 | A.    I did research on Mr. Toberoff and on | 11:03:21 |
| 14 | Mr. Emanuel. | 11:03:25 |
| 15 | Q.    And did you do any research on IP Worldwide? | 11:03:25 |
| 16 | A.    I don't recall anything specific. | 11:03:32 |
| 17 | Q.    Now, at the time you knew that Mr. Toberoff | 11:03:33 |
| 18 | also was a lawyer; right? | 11:03:37 |
| 19 | A.    Yes. | 11:03:39 |
| 20 | Q.    Okay.  And you knew that Mr. Emanuel was a | 11:03:40 |
| 21 | talent agent; correct? | 11:03:44 |
| 22 | A.    Correct. | 11:03:45 |
| 23 | Q.    And you knew that Mr. Emanuel was a partner | 11:03:45 |
| 24 | at an agency called Endeavor; correct? | 11:03:49 |
| 25 | A.    Correct. | 11:03:52 |

LAURA SIEGEL LARSON 7/22/2011

Page 59

| | | |
|---|---|---|
| 1 | Q. We're now talking 2002; right? | 11:03:52 |
| 2 | A. Yes. | 11:03:54 |
| 3 | Q. And you knew Mr. Toberoff had a law firm; | 11:03:55 |
| 4 | correct? | 11:03:59 |
| 5 | A. Correct. | 11:04:00 |
| 6 | Q. Did you know the name of his law firm? | 11:04:00 |
| 7 | A. Law Offices of Marc Toberoff. | 11:04:04 |
| 8 | Q. Okay. You did not enter into an agreement | 11:04:07 |
| 9 | with The Law Offices of Marc Toberoff in 2002; is that | 11:04:09 |
| 10 | correct? | 11:04:15 |
| 11 | A. Not that name, no. | 11:04:15 |
| 12 | Q. There is no agreement between any member of | 11:04:18 |
| 13 | the Siegel family and The Law Offices of Marc Toberoff | 11:04:22 |
| 14 | in 2002; correct? | 11:04:27 |
| 15 | A. Correct. | 11:04:28 |
| 16 | Q. And there is no agreement between any member | 11:04:29 |
| 17 | of the Siegel family and the Endeavor talent agency in | 11:04:33 |
| 18 | 2002; correct? | 11:04:37 |
| 19 | A. Correct. | 11:04:37 |
| 20 | Q. The only agreement that you entered into for | 11:04:38 |
| 21 | the services of Mr. Emanuel and Mr. Toberoff was the | 11:04:41 |
| 22 | IP Worldwide agreement; is that right? | 11:04:45 |
| 23 | A. Correct. | 11:04:46 |
| 24 | Q. The 10 percent -- let me ask you this | 11:04:58 |
| 25 | question. The record will reflect that that agreement | 11:05:01 |

LAURA SIEGEL LARSON 7/22/2011

Page 60

| | | |
|---|---|---|
| 1 | is dated as of October 3, 2002.  In fact, let me just | 11:05:04 |
| 2 | show you a copy of it. | 11:05:12 |
| 3 |     A.    Okay. | 11:05:14 |
| 4 |     Q.    It's been previously marked as Plaintiff's | 11:05:14 |
| 5 | Exhibit 45. | 11:05:17 |
| 6 |     A.    Thank you. | 11:05:18 |
| 7 |         (Whereupon, Plaintiff's Exhibit 45 | |
| 8 |         was placed before the witness.) | 11:05:29 |
| 9 | BY MR. PETROCELLI: | 11:05:31 |
| 10 |     Q.    And you'll see at the last page it bears | 11:05:31 |
| 11 | your -- | 11:05:32 |
| 12 |     A.    It's a bad copy. | 11:05:33 |
| 13 |     Q.    It's the best copy we have. | 11:05:34 |
| 14 |     A.    Okay. | 11:05:36 |
| 15 |     Q.    You'll see on the last page it bears your | 11:05:36 |
| 16 | signature? | 11:05:41 |
| 17 |     A.    Yes. | 11:05:41 |
| 18 |     Q.    And the signature of your mother, Joanne | 11:05:41 |
| 19 | Siegel? | 11:05:45 |
| 20 |     A.    Yes. | 11:05:45 |
| 21 |     Q.    And Mr. Toberoff? | 11:05:46 |
| 22 |     A.    Yes. | 11:05:47 |
| 23 |     Q.    And Mr. Emanuel. | 11:05:48 |
| 24 |     A.    Yes. | 11:05:52 |
| 25 |     Q.    You'll see that in paragraph 6 there's a | 11:06:01 |

EXHIBIT D
76

LAURA SIEGEL LARSON 7/22/2011

Page 61

| | | |
|---|---|---|
| 1 | provision for a 10 percent payment to IP Worldwide, | 11:06:06 |
| 2 | based on any gross proceeds that they generate.  And | 11:06:13 |
| 3 | I'm simplifying it.  I don't want to read that whole | 11:06:18 |
| 4 | paragraph.  Do you see that? | 11:06:22 |
| 5 | A.    I'm reading it. | 11:06:24 |
| 6 | Okay.  I'm sorry.  Your question? | 11:06:54 |
| 7 | Q.    You see that paragraph 6 provides for the | 11:06:57 |
| 8 | compensation of 10 percent to IP Worldwide for the | 11:07:00 |
| 9 | rendition of their services? | 11:07:03 |
| 10 | A.    Yes. | 11:07:04 |
| 11 | Q.    Do you know if this agreement still exists? | 11:07:29 |
| 12 | A.    It does not. | 11:07:35 |
| 13 | Q.    When did it end? | 11:07:39 |
| 14 | A.    It expired, I believe, early 2005.  I believe | 11:07:42 |
| 15 | it was 2005. | 11:07:52 |
| 16 | Q.    And what about 2005 causes you to believe | 11:07:54 |
| 17 | that it expired? | 11:07:57 |
| 18 | A.    Well, because we had an end date for it. | 11:07:58 |
| 19 | Q.    Where is the end date indicated? | 11:08:02 |
| 20 | A.    It's not in this document. | 11:08:04 |
| 21 | Q.    Is it in another document? | 11:08:06 |
| 22 | A.    Yes, it is. | 11:08:07 |
| 23 | Q.    What's the other document? | 11:08:09 |
| 24 | A.    There was a -- we extended this for a limited | 11:08:10 |
| 25 | period of time, and there was an end date stated in | 11:08:17 |

LAURA SIEGEL LARSON 7/22/2011

Page 62

```
 1    that document.                                      11:08:21

 2              MR. PETROCELLI:  Bear with me.            11:08:25

 3              This is a better copy.                    11:08:33

 4    Q.   Can you take a look at paragraph 10 of         11:08:43

 5    Exhibit 45?                                         11:08:50

 6    A.   Yes.                                           11:08:50

 7    Q.   It states:                                     11:08:51

 8              "The parties understand and               11:08:52

 9         acknowledge that the scope of this             11:08:56

10         Agreement does not include legal               11:08:57

11         services and/or expenses in                    11:09:00

12         connection with litigation or formal           11:09:04

13         legal arbitration, if any.  The                11:09:06

14         provision of such services and                 11:09:09

15         advancing of such expenses, is                 11:09:13

16         requested and desired by Owner" --            11:09:15

17         excuse me -- "if requested and                 11:09:18

18         desired by Owner, will be rendered             11:09:20

19         and provided by Marc Toberoff, Esq.,           11:09:22

20         subject to good faith negotiation of           11:09:27

21         mutually acceptable" -- "of a                   11:09:30

22         mutually acceptable agreement                   11:09:32

23         executed by Mr. Toberoff and Owner,"           11:09:33

24         end of quotes.                                  11:09:36

25         And you agreed to that provision when you      11:09:38
```

EXHIBIT D

78

LAURA SIEGEL LARSON 7/22/2011

Page 63

| | | |
|---|---|---|
| 1 | signed Exhibit 45; correct? | 11:09:40 |
| 2 | A.    Yes, regarding litigation. | 11:09:42 |
| 3 | Q.    Right.  And it wasn't until I believe you | 11:09:44 |
| 4 | said 2004 that you entered into the litigation | 11:09:51 |
| 5 | agreement -- entered into a litigation agreement with | 11:09:56 |
| 6 | Mr. Toberoff; is that correct? | 11:09:59 |
| 7 | A.    Correct. | 11:10:00 |
| 8 | Q.    And between the signing of Exhibit 45 as of | 11:10:07 |
| 9 | October 3, 2002, and the signing of the litigation | 11:10:13 |
| 10 | agreement in 2004, you signed no agreements with | 11:10:18 |
| 11 | Mr. Toberoff for the rendition of litigation services; | 11:10:22 |
| 12 | correct? | 11:10:29 |
| 13 | A.    Not for litigation, correct.  I don't know if | 11:10:30 |
| 14 | I answered yes or no to that the way it's phrased. | 11:10:35 |
| 15 | That's why I'm trying to clarify. | 11:10:39 |
| 16 | Q.    Let me repeat it -- | 11:10:40 |
| 17 | A.    Okay. | 11:10:42 |
| 18 | Q.    -- because I think if you had said yes, we | 11:10:42 |
| 19 | would be in agreement with each other. | 11:10:44 |
| 20 | A.    Oh. | 11:10:47 |
| 21 | Q.    From the time that you signed Exhibit 45 as | 11:10:48 |
| 22 | of October 3, 2002, until the time that you signed the | 11:10:50 |
| 23 | litigation agreement with Mr. Toberoff in 2004, | 11:10:56 |
| 24 | neither you nor your mom signed an agreement with | 11:11:02 |
| 25 | Mr. Toberoff calling for him to render litigation | 11:11:05 |

EXHIBIT D
79

```
 1     services; correct?                              11:11:08

 2        A.    Correct.                               11:11:09

 3        Q.    Do you recall having signed an amendment to    11:11:24

 4     this Exhibit 45 extending the term till, I think you    11:11:29

 5     said, 2005?                                     11:11:34

 6        A.    Yes.                                    11:11:35

 7        Q.    What can you tell me about that document?  I   11:11:38

 8     don't believe we have it.                       11:11:40

 9        A.    It was very short, and I believe it just    11:11:43

10     referenced this document, and the only thing that was    11:11:50

11     different about it was it said that we were extending    11:11:54

12     the terms of this contract through a particular date.    11:11:58

13           MR. PETROCELLI:  Marc, have you produced    11:12:03

14     that?  I mean we may have overlooked it.        11:12:04

15           MR. TOBEROFF:  I can't say off the top of my    11:12:09

16     head.  We can --                               11:12:10

17           MR. PETROCELLI:  Can you please check?    11:12:11

18           MR. TOBEROFF: -- see if we have it.  We will    11:12:13

19     look for it and produce it.                    11:12:16

20           MR. PETROCELLI:  Thank you.              11:12:18

21        Q.    Is it -- in two thousand --            11:12:21

22           MR. TOBEROFF:  I should say if it exists and    11:12:27

23     we have it, we will produce it.                11:12:29

24     BY MR. PETROCELLI:

25        Q.    Do you have a copy?                    11:12:32
```

LAURA SIEGEL LARSON   7/22/2011

| | | |
|---|---|---|
| 1 | A.   I -- I don't know what I -- what I have. | 11:12:34 |
| 2 | Q.   Where do you -- where do you have your | 11:12:38 |
| 3 | documents related to this whole Superman saga? | 11:12:41 |
| 4 | A.   All over the place.  I'm not very organized. | 11:12:46 |
| 5 | Q.   There's a black cabinet that contained a lot | 11:12:54 |
| 6 | of these documents; right? | 11:12:56 |
| 7 | A.   No.  There was a black cabinet that my | 11:13:00 |
| 8 | ex-husband had that contained some of his things. | 11:13:02 |
| 9 | Q.   Was that a black cabinet that was in the home | 11:13:06 |
| 10 | that you shared with your husband before the two of | 11:13:10 |
| 11 | you separated? | 11:13:12 |
| 12 | A.   Yes, yes. | 11:13:13 |
| 13 | Q.   Okay.  And was that the same cabinet that you | 11:13:13 |
| 14 | shared your materials while you were married with | 11:13:18 |
| 15 | him related to this case? | 11:13:21 |
| 16 | A.   No.  That was strictly his. | 11:13:22 |
| 17 | Q.   What color was your cabinet? | 11:13:24 |
| 18 | A.   I don't have a cabinet.  No, it's -- you | 11:13:27 |
| 19 | know, I mean I have boxes. | 11:13:31 |
| 20 | Q.   What was the address where you lived with | 11:13:34 |
| 21 | your husband before your separation in 2000? | 11:13:37 |
| 22 | A.   The same address I have now. | 11:13:41 |
| 23 | Q.   Which is what? | 11:13:43 |
| 24 | A.   6400 Pacific Avenue, Playa del Rey, | 11:13:44 |
| 25 | California. | 11:13:48 |

LAURA SIEGEL LARSON 7/22/2011

Page 66

| | | |
|---|---|---|
| 1 | Q.    And is there a space in your home where you | 11:13:48 |
| 2 | keep your papers related to this matter, "this matter" | 11:13:54 |
| 3 | being going back to the serving of the termination | 11:13:56 |
| 4 | notices to the present? | 11:13:59 |
| 5 | A.    Well, I have -- I have them throughout the | 11:14:00 |
| 6 | place.   There isn't one place.   Throughout my | 11:14:05 |
| 7 | condominium. | 11:14:10 |
| 8 | Q.    Is there a room where you have most of the | 11:14:10 |
| 9 | papers? | 11:14:14 |
| 10 | A.    I wish I could say yes.   The answer is no. | 11:14:15 |
| 11 | Q.    Do you have filing cabinets where you keep | 11:14:17 |
| 12 | them? | 11:14:21 |
| 13 | A.    No. | 11:14:22 |
| 14 | Q.    Do you just put them on the floor in boxes? | 11:14:22 |
| 15 | A.    They are in boxes. | 11:14:25 |
| 16 | Q.    Okay.   About how many boxes do you have? | 11:14:26 |
| 17 | A.    Well, some are in boxes and some are in | 11:14:32 |
| 18 | furniture where I had to put them because I can't live | 11:14:36 |
| 19 | with that many boxes. | 11:14:38 |
| 20 | Q.    What kind of furniture? | 11:14:39 |
| 21 | A.    It's just a large -- I used to have records | 11:14:40 |
| 22 | in there, but now I have no space for the records | 11:14:44 |
| 23 | because I put papers in there. | 11:14:47 |
| 24 | Q.    And -- | 11:14:50 |
| 25 | A.    It's just a couple of shelves. | 11:14:51 |

| | | |
|---|---|---|
| 1 | Q.   When your husband left the home, he took his | 11:14:52 |
| 2 | black cabinet with him? | 11:14:55 |
| 3 | A.   No, he did not. | 11:14:56 |
| 4 | Q.   He left it there, but he took the papers out | 11:14:58 |
| 5 | of it? | 11:15:00 |
| 6 | A.   Yes. | 11:15:00 |
| 7 | Q.   When Michael Siegel -- he's your stepbrother. | 11:15:04 |
| 8 | He was your stepbrother? | 11:15:07 |
| 9 | A.   Half brother. | 11:15:09 |
| 10 | Q.   Half brother.  Excuse me.  He died in what | 11:15:10 |
| 11 | year?  2006? | 11:15:14 |
| 12 | A.   Yes. | 11:15:16 |
| 13 | Q.   After his death, did you receive any papers | 11:15:17 |
| 14 | from him or his estate or related to Superman in any | 11:15:23 |
| 15 | way, any correspondence, any letters, anything like | 11:15:28 |
| 16 | that? | 11:15:33 |
| 17 | A.   I can't recall any after his death, no. | 11:15:33 |
| 18 | Q.   Who took possession of his papers, if you | 11:15:37 |
| 19 | know? | 11:15:41 |
| 20 | A.   Well, I hired somebody to go in and to help | 11:15:42 |
| 21 | me clear out the place. | 11:15:47 |
| 22 | Q.   Who was that? | 11:15:48 |
| 23 | A.   My cousin. | 11:15:50 |
| 24 | Q.   Who is your cousin? | 11:15:51 |
| 25 | A.   Michele Innenberg. | 11:15:52 |

LAURA SIEGEL LARSON  7/22/2011

Page 68

| | | | |
|---|---|---|---|
| 1 | Q. | Where does Michele live? | 11:15:54 |
| 2 | A. | In Cleveland. | 11:15:56 |
| 3 | Q. | How is she your cousin?  Through what | 11:15:57 |
| 4 | | relationship? | 11:15:59 |
| 5 | A. | She -- like a second cousin.  She's the | 11:15:59 |
| 6 | | daughter of one of my cousins. | 11:16:03 |
| 7 | Q. | What town does she live in? | 11:16:07 |
| 8 | A. | Cleveland. | 11:16:09 |
| 9 | Q. | Cleveland? | 11:16:10 |
| 10 | A. | Um-hum. | 11:16:11 |
| 11 | Q. | And was -- now, is she related to Michael? | 11:16:11 |
| 12 | A. | No.  She's related to me through my father's | 11:16:15 |
| 13 | | side of the family. | 11:16:19 |
| 14 | Q. | Okay.  Did Michael -- well, that's the same | 11:16:20 |
| 15 | | side that -- | 11:16:24 |
| 16 | A. | It has nothing -- it wasn't -- | 11:16:24 |
| 17 | Q. | Okay.  Michael's father was Jerome Siegel, | 11:16:27 |
| 18 | | your father; right? | 11:16:34 |
| 19 | A. | Yes. | 11:16:35 |
| 20 | Q. | Okay.  Who was Michael's mother? | 11:16:35 |
| 21 | A. | Bella Siegel. | 11:16:39 |
| 22 | Q. | When did she -- is she alive? | 11:16:40 |
| 23 | A. | No. | 11:16:41 |
| 24 | Q. | When did she pass? | 11:16:41 |
| 25 | A. | Maybe about a year before Michael. | 11:16:47 |

EXHIBIT D
84

LAURA SIEGEL LARSON   7/22/2011

Page 69

| | | |
|---|---|---|
| 1 | Q. Okay. And did Michael have any other -- so | 11:16:50 |
| 2 | your dad was married to Bella before your dad married | 11:16:57 |
| 3 | Joanne? | 11:17:00 |
| 4 | A. Correct. | 11:17:01 |
| 5 | Q. Did they have any children other than | 11:17:01 |
| 6 | Michael? | 11:17:06 |
| 7 | A. There -- there was a child that died at | 11:17:07 |
| 8 | birth. | 11:17:10 |
| 9 | Q. Okay. And was Michael ever married? | 11:17:10 |
| 10 | A. No. He lived with his mother his whole life. | 11:17:13 |
| 11 | Q. How old was Michael when he died? | 11:17:19 |
| 12 | A. In his sixties. | 11:17:21 |
| 13 | Q. And he had had heart problems? | 11:17:25 |
| 14 | A. He had a lot of health problems. | 11:17:27 |
| 15 | Q. Did Michele know Michael? | 11:17:31 |
| 16 | A. No. I should actually clarify. Michele's | 11:17:33 |
| 17 | role was to help with furniture and to help clear out, | 11:17:45 |
| 18 | you know, certain -- certain things that I wanted. So | 11:17:52 |
| 19 | she boxed them up. | 11:17:58 |
| 20 | Q. Did -- what did you want? | 11:18:01 |
| 21 | A. Oh, there was a saxophone. There were | 11:18:04 |
| 22 | pictures of Michael as a kid, things like that. | 11:18:08 |
| 23 | Q. Did you receive from Michael after his death | 11:18:13 |
| 24 | through Michele or through anyone else any materials | 11:18:17 |
| 25 | of any kind related to Superman? | 11:18:20 |

EXHIBIT D
85

| | | |
|---|---|---|
| 1 | A.   He had some Superman books and pins and | 11:18:23 |
| 2 | things like that. | 11:18:29 |
| 3 | Q.   What about any papers, letters, things like | 11:18:30 |
| 4 | that? | 11:18:35 |
| 5 | A.   No, I don't recall any. | 11:18:35 |
| 6 | Q.   Letters to you, for example? | 11:18:37 |
| 7 | A.   I don't recall any. | 11:18:39 |
| 8 | Q.   Okay.  You and he corresponded from time to | 11:18:41 |
| 9 | time in writing about Superman; correct? | 11:18:47 |
| 10 | A.   Every so often. | 11:18:49 |
| 11 | Q.   And there were some letters, in fact, about | 11:18:50 |
| 12 | Mr. Toberoff; correct? | 11:18:53 |
| 13 | A.   He mentioned him.  It wasn't, you know, all | 11:18:56 |
| 14 | he would talk about. | 11:18:59 |
| 15 | Q.   No, I'm not saying that's all he would talk | 11:19:00 |
| 16 | about, but there was correspondence that you and he | 11:19:04 |
| 17 | exchanged, prior to his death, of course, about | 11:19:06 |
| 18 | Mr. Toberoff; correct? | 11:19:09 |
| 19 | A.   Yes. | 11:19:10 |
| 20 | Q.   Including his expressing his concern to you | 11:19:10 |
| 21 | about Mr. Toberoff; correct? | 11:19:14 |
| 22 | A.   Yes. | 11:19:16 |
| 23 | Q.   Have you reviewed any of that correspondence | 11:19:17 |
| 24 | recently? | 11:19:20 |
| 25 | A.   Not recently. | 11:19:21 |

EXHIBIT D
86

LAURA SIEGEL LARSON 7/22/2011

| | | | |
|---|---|---|---|
| 1 | Q. | You met with Mr. Toberoff yesterday? | 11:19:22 |
| 2 | A. | Yes. | 11:19:25 |
| 3 | Q. | Who else was present? | 11:19:26 |
| 4 | A. | Just Mr. Toberoff. | 11:19:28 |
| 5 | Q. | At his office? | 11:19:30 |
| 6 | A. | Yes. | 11:19:30 |
| 7 | Q. | How long did you meet? | 11:19:31 |
| 8 | A. | A couple of hours, maybe two and a half. | 11:19:33 |
| 9 | Q. | Prior to yesterday did you have any | 11:19:35 |
| 10 | | discussions with him about the deposition other than | 11:19:38 |
| 11 | | scheduling it? | 11:19:43 |
| 12 | A. | Just scheduling. | 11:19:43 |
| 13 | Q. | Did you review any documents, see any | 11:19:45 |
| 14 | | documents, look at any documents yesterday? | 11:19:48 |
| 15 | A. | I looked at my former depositions. | 11:19:52 |
| 16 | | (Whereupon, Ms. Seto entered the room.) | 11:19:55 |
| 17 | | BY MR. PETROCELLI: | 11:19:58 |
| 18 | Q. | Besides your former depositions? | 11:19:58 |
| 19 | A. | No. | 11:20:01 |
| 20 | Q. | Okay.  Were you shown any letters, any | 11:20:01 |
| 21 | | agreements, anything at all in your meeting yesterday? | 11:20:03 |
| 22 | A. | No. | 11:20:10 |
| 23 | Q. | Have you looked at any materials in the last | 11:20:13 |
| 24 | | couple of weeks, except your deposition, related to | 11:20:13 |
| 25 | | this case? | 11:20:19 |

LAURA SIEGEL LARSON 7/22/2011

Page 72

| | | |
|---|---|---|
| 1 | A.   I don't think so. | 11:20:23 |
| 2 | Q.   What happened to Michael's correspondence, to | 11:20:31 |
| 3 | your knowledge, after his death? | 11:20:35 |
| 4 | MR. TOBEROFF:  Vague and ambiguous. | 11:20:38 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q.   About Superman. | 11:20:39 |
| 7 | A.   Well -- | 11:20:42 |
| 8 | MR. TOBEROFF:  Still vague and ambiguous. | 11:20:44 |
| 9 | Lacks foundation. | 11:20:45 |
| 10 | THE WITNESS:  Some -- somewhere I have the | 11:20:48 |
| 11 | copies of the things that he sent to me. | 11:20:50 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   And that's somewhere in your home? | 11:20:54 |
| 14 | A.   I would -- yes. | 11:20:57 |
| 15 | Q.   Okay.  Where did your mom live before she | 11:20:59 |
| 16 | died? | 11:21:10 |
| 17 | A.   In Marina del Rey. | 11:21:10 |
| 18 | Q.   In a different place than you? | 11:21:11 |
| 19 | A.   Yes. | 11:21:13 |
| 20 | Q.   Did she live alone? | 11:21:14 |
| 21 | A.   Yes. | 11:21:15 |
| 22 | Q.   All the way into the very end? | 11:21:16 |
| 23 | A.   Yes. | 11:21:17 |
| 24 | Q.   What was the address, if you remember? | 11:21:20 |
| 25 | A.   13929 Marquesas Way in Marina Del Rey. | 11:21:24 |

| | | |
|---|---|---|
| 1 | Q.   Was she renting? | 11:21:30 |
| 2 | A.   Yes. | 11:21:31 |
| 3 | Q.   And so now someone else has that place? | 11:21:32 |
| 4 | A.   Yes. | 11:21:35 |
| 5 | Q.   Okay.  And did you help clean it out after | 11:21:35 |
| 6 | she passed? | 11:21:39 |
| 7 | A.   Yes. | 11:21:40 |
| 8 | MR. PETROCELLI:  I was told I'm a little bit | 11:21:46 |
| 9 | too close to the camera, so it was picking up my hand. | 11:21:49 |
| 10 | I have now moved away.  Thank you for letting me know. | 11:21:52 |
| 11 | Q.   Your mother kept papers in her home related | 11:21:58 |
| 12 | to Superman? | 11:22:02 |
| 13 | A.   Yes. | 11:22:03 |
| 14 | Q.   Including letters and agreements and | 11:22:05 |
| 15 | memorabilia, all sorts of things? | 11:22:10 |
| 16 | A.   That's right. | 11:22:11 |
| 17 | Q.   And did she also have them all over the | 11:22:12 |
| 18 | place, to use your expression? | 11:22:16 |
| 19 | A.   Yes. | 11:22:18 |
| 20 | Q.   She did not have like an office or a filing | 11:22:18 |
| 21 | cabinet where she kept the materials? | 11:22:22 |
| 22 | A.   She didn't keep an office. | 11:22:24 |
| 23 | Q.   Okay.  Now, did your mother have a typewriter | 11:22:28 |
| 24 | or computer in her home? | 11:22:32 |
| 25 | A.   She didn't -- no.  She had a computer, but | 11:22:34 |

LAURA SIEGEL LARSON 7/22/2011

Page 74

| | | | |
|---|---|---|---|
| 1 | | she never figured out how to use it. | 11:22:36 |
| 2 | Q. | And she didn't have a typewriter; right? | 11:22:39 |
| 3 | A. | She gave up using that years ago. | 11:22:42 |
| 4 | Q. | Now, you have a computer in your home? | 11:22:45 |
| 5 | A. | Yes. | 11:22:48 |
| 6 | Q. | And what kind of computer do you have? | 11:22:49 |
| 7 | A. | I have a laptop. | 11:22:51 |
| 8 | Q. | What -- how long have you had it? | 11:22:57 |
| 9 | A. | I think two years. | 11:23:04 |
| 10 | Q. | And before the laptop, what did you have? | 11:23:05 |
| 11 | A. | I had a PC that died. | 11:23:09 |
| 12 | Q. | How long did you have the PC? | 11:23:12 |
| 13 | A. | Several years. | 11:23:15 |
| 14 | Q. | Would -- let's say starting in 2000 -- 2000, | 11:23:18 |
| 15 | | what equipment did you have in your home that you | 11:23:26 |
| 16 | | would use to type or create letters or other | 11:23:30 |
| 17 | | documents? | 11:23:36 |
| 18 | A. | A computer. | 11:23:36 |
| 19 | Q. | Okay.  You're a former journalist; right? | 11:23:37 |
| 20 | A. | Yes. | 11:23:40 |
| 21 | Q. | You retired in the mid eighties? | 11:23:40 |
| 22 | A. | No, 1994. | 11:23:43 |
| 23 | Q. | 1994.  And you were a broadcast journalist? | 11:23:44 |
| 24 | A. | Yes. | 11:23:48 |
| 25 | Q. | For CNN and some other organizations? | 11:23:49 |

LAURA SIEGEL LARSON   7/22/2011

Page 75

| | | |
|---|---|---|
| 1 | A.    CNN, CBS, KCAL. | 11:23:51 |
| 2 | Q.    On camera? | 11:23:55 |
| 3 | A.    On camera and also as an executive producer | 11:23:56 |
| 4 | and producer and writer. | 11:24:00 |
| 5 | Q.    Was it a network program, or was it a local | 11:24:02 |
| 6 | program? | 11:24:05 |
| 7 | A.    Some of my things were carried on the | 11:24:05 |
| 8 | network.  Of course on CNN it was carried on the | 11:24:08 |
| 9 | network. | 11:24:11 |
| 10 | Q.    Right. | 11:24:11 |
| 11 | A.    And some of my CBS programming was carried on | 11:24:13 |
| 12 | ESPN, and also they would pick up things sometimes on | 11:24:19 |
| 13 | the CBS network. | 11:24:22 |
| 14 | Q.    And you wrote a lot of your own scripts and | 11:24:24 |
| 15 | stories? | 11:24:27 |
| 16 | A.    Oh, yes. | 11:24:27 |
| 17 | Q.    So let's go back to the equipment in your | 11:24:36 |
| 18 | place. | 11:24:42 |
| 19 | First of all, you have had no office outside | 11:24:42 |
| 20 | of your home since the year 2000 to the present? | 11:24:44 |
| 21 | A.    No. | 11:24:47 |
| 22 | Q.    So the only place that you would create | 11:24:48 |
| 23 | documents like letters would be in your house? | 11:24:52 |
| 24 | A.    Correct. | 11:24:55 |
| 25 | Q.    Did you ever create any documents or letters | 11:24:56 |

EXHIBIT D
91

LAURA SIEGEL LARSON 7/22/2011

Page 76

```
 1    related to Superman in your mother's home?        11:24:59

 2        A.    No.                                      11:25:05

 3        Q.    Okay.  And to your knowledge, your mother 11:25:05

 4    never typed out or caused to be printed on a computer 11:25:11

 5    a letter or a document related to Superman; correct?  11:25:16

 6        A.    Well, she wrote tons of things longhand, and 11:25:20

 7    there were times when she would type a few things up  11:25:26

 8    on her old typewriter until that, you know, wasn't    11:25:31

 9    working any longer.                                   11:25:35

10        Q.    That would be before year 2000; right?      11:25:35

11        A.    You know, I don't know whether it was before 11:25:38

12    or after 2000.                                         11:25:40

13        Q.    That she would work on a typewriter?         11:25:42

14        A.    Yes.  I don't know for sure.                 11:25:44

15        Q.    Did you retrieve the typewriter when she     11:25:48

16    passed away?                                           11:25:50

17        A.    Yes.                                         11:25:51

18        Q.    You still have it?                           11:25:51

19        A.    Yes.                                         11:25:52

20        Q.    Where is it?                                 11:25:52

21        A.    I put it with her other furniture that I     11:25:54

22    currently have just put in storage until I figure out 11:25:58

23    what to do with it.                                    11:26:02

24        Q.    What's the storage facility?                 11:26:03

25        A.    It's called Public Storage.                  11:26:05
```

| | | |
|---|---|---|
| 1 | Q.   The one -- is there one in Marina nearby? | 11:26:07 |
| 2 | A.   Yes. | 11:26:11 |
| 3 | Q.   The Superman papers and materials that you | 11:26:12 |
| 4 | collected from your mother's home -- | 11:26:15 |
| 5 | A.   Um-hum. | 11:26:17 |
| 6 | Q.   -- did you put those in Public Storage? | 11:26:18 |
| 7 | A.   Well, I brought a lot of them home.  I'm | 11:26:21 |
| 8 | currently trying to go through things.  So at the | 11:26:26 |
| 9 | moment my place is almost unlivable because I have, | 11:26:30 |
| 10 | you know, my stuff and her stuff, and, you know, it's | 11:26:33 |
| 11 | unbelievable. | 11:26:40 |
| 12 | Q.   And again, I'm only focused on Superman | 11:26:40 |
| 13 | materials.  But between your Superman papers, files, | 11:26:46 |
| 14 | and materials and your mother's -- | 11:26:50 |
| 15 | A.   Yes. | 11:26:52 |
| 16 | Q.   -- can you somehow in your own way | 11:26:52 |
| 17 | approximate the volume?  Let's say boxes.  If you put | 11:26:55 |
| 18 | it all in the bankers boxes, how many boxes would | 11:27:00 |
| 19 | there be?  Ten boxes? | 11:27:02 |
| 20 | A.   I couldn't guess at that because there were a | 11:27:06 |
| 21 | lot of things that -- there are many different things | 11:27:08 |
| 22 | in any one given box, these things that I haven't gone | 11:27:12 |
| 23 | through yet.  So there could be a box that has one | 11:27:16 |
| 24 | paper relating to Superman or there could be many | 11:27:19 |
| 25 | papers. | 11:27:28 |

EXHIBIT D
93

LAURA SIEGEL LARSON 7/22/2011

Page 78

| | |
|---|---|
| 1 | Q. Like, for example, the letters that you | 11:27:28 |
| 2 | exchanged with Michael Siegel that you said are in | 11:27:31 |
| 3 | your home, where in your home are those letters? | 11:27:34 |
| 4 | MR. TOBEROFF: Lacks foundation. | 11:27:37 |
| 5 | THE WITNESS: Well, anything that I had, you | 11:27:40 |
| 6 | know, is also mixed in with papers. I mean I have -- | 11:27:44 |
| 7 | I have various boxes that relate to the case. I have | 11:27:51 |
| 8 | other boxes that relate to my divorce. I've got a lot | 11:27:56 |
| 9 | of different things. | 11:28:01 |
| 10 | BY MR. PETROCELLI: | |
| 11 | Q. Have you -- since this lawsuit was filed in | 11:28:02 |
| 12 | May, 2010, have you gone and searched for and given to | 11:28:05 |
| 13 | someone else your Michael Siegel correspondence? | 11:28:13 |
| 14 | A. Well, whenever I find anything that I think | 11:28:20 |
| 15 | relates to the case, I turn it over to Mr. Toberoff. | 11:28:24 |
| 16 | Q. Since May, 2010, have you turned over to | 11:28:28 |
| 17 | Mr. Toberoff any of your correspondence with Michael | 11:28:31 |
| 18 | Siegel that was in your home? | 11:28:36 |
| 19 | A. Probably. | 11:28:39 |
| 20 | Q. Okay. | 11:28:40 |
| 21 | A. Oh, excuse me. May I say something about | 11:28:42 |
| 22 | 2010? | 11:28:46 |
| 23 | Q. You may. | 11:28:47 |
| 24 | A. I believe that you -- I believe that you | 11:28:49 |
| 25 | asked me earlier about documents from 2010, around | 11:28:52 |

EXHIBIT D
94

LAURA SIEGEL LARSON 7/22/2011

Page 79

| | | |
|---|---|---|
| 1 | that time.  We were talking about different agreements | 11:29:00 |
| 2 | and we were talking about in connection with when this | 11:29:03 |
| 3 | lawsuit had been filed. | 11:29:08 |
| 4 | Q.    Proceed. | 11:29:09 |
| 5 | A.    Okay.  I believe that I misstated something. | 11:29:10 |
| 6 | I -- after this lawsuit was filed, Mr. Toberoff did | 11:29:16 |
| 7 | send me another -- what was it called? -- conflict, | 11:29:20 |
| 8 | another, you know, delineating, you know, potential | 11:29:29 |
| 9 | conflicts, a document regarding conflicts, and I | 11:29:33 |
| 10 | don't -- I don't believe I mentioned that earlier. | 11:29:36 |
| 11 | You were asking me different ones for different dates. | 11:29:38 |
| 12 | Q.    And your recollection about that was prompted | 11:29:41 |
| 13 | as a result of Mr. Toberoff mentioning it to you | 11:29:43 |
| 14 | during a break? | 11:29:45 |
| 15 | A.    Well, I went to the bathroom.  It was cooler. | 11:29:46 |
| 16 | I was -- | 11:29:49 |
| 17 | MR. TOBEROFF:  You can -- you can -- you | 11:29:50 |
| 18 | can -- you can answer that you recalled that during | 11:29:55 |
| 19 | the break. | 11:29:58 |
| 20 | THE WITNESS:  Yeah, I recalled it during the | 11:30:00 |
| 21 | break. | 11:30:03 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.    And as a result of talking to Mr. Toberoff? | 11:30:04 |
| 24 | MR. TOBEROFF:  Well, you can't -- you can't | 11:30:06 |
| 25 | talk about your conversations with me. | 11:30:09 |

Page 80

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 11:30:10 |
| 2 | Q. Did you talk to Mr. Toberoff about anything | 11:30:10 |
| 3 | during the break? | 11:30:12 |
| 4 | MR. TOBEROFF: You can answer that. | 11:30:14 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q. Yes or no? | 11:30:15 |
| 7 | A. Yes. | 11:30:16 |
| 8 | Q. Okay. And you remembered this new document | 11:30:19 |
| 9 | that I will now ask you about after talking to | 11:30:25 |
| 10 | Mr. Toberoff during the break. | 11:30:28 |
| 11 | A. Yes. | 11:30:33 |
| 12 | Q. Okay. | 11:30:34 |
| 13 | A. While I was in the restroom. | 11:30:34 |
| 14 | Q. Well, so tell me more about this document. | 11:30:38 |
| 15 | What is it and -- | 11:30:42 |
| 16 | A. No, I just remember that -- that he wanted to | 11:30:45 |
| 17 | make sure that -- | 11:30:51 |
| 18 | MR. TOBEROFF: Don't -- don't talk about the | 11:30:53 |
| 19 | contents of the document. You can talk about whether | 11:30:55 |
| 20 | or not you signed it. | 11:30:57 |
| 21 | THE WITNESS: Right. | 11:30:59 |
| 22 | MR. TOBEROFF: Another conflict waiver. | 11:31:00 |
| 23 | THE WITNESS: Right. He wanted to make sure | 11:31:01 |
| 24 | that I signed, you know, this document that he felt | 11:31:03 |
| 25 | was warranted. | 11:31:08 |

LAURA SIEGEL LARSON 7/22/2011

```
 1    BY MR. PETROCELLI:                                        11:31:10

 2        Q.   What was the subject matter of the document?    11:31:10

 3        A.   As I said, it was a conflict disclosure.        11:31:15

 4        Q.   Did it relate to this new case that DC filed?   11:31:18

 5        A.   It was as a result of this case.                11:31:22

 6        Q.   Did anybody else sign it besides you and -- I   11:31:25

 7    presume Mr. Toberoff signed it?                          11:31:30

 8        A.   I believe my mother signed it.                  11:31:31

 9        Q.   Anyone else?                                    11:31:33

10        A.   I don't think so.                               11:31:34

11        Q.   Did anybody review it on your behalf?           11:31:35

12        A.   I'm sure George did, George Zadrozny.           11:31:40

13        Q.   You remember that he did?                       11:31:48

14        A.   I believe that he did.                          11:31:49

15        Q.   Did you send it to him before signing it?       11:31:51

16        A.   I believe so.                                   11:31:55

17        Q.   How do you send things to George?               11:31:56

18        A.   Well, sometimes by mail.                        11:32:00

19        Q.   In 2010 how did you send this document to       11:32:03

20    George?                                                  11:32:07

21        A.   If it was sent to me in electronic form,        11:32:07

22    then --                                                  11:32:12

23        Q.   E-mailed?                                       11:32:13

24        A.   -- then I could e-mail him.  I don't recall     11:32:14

25    whether this one was sent to me or, you know --          11:32:16
```

EXHIBIT D

97

LAURA SIEGEL LARSON 7/22/2011

Page 82

| | | |
|---|---|---|
| 1 | Q.    You would forward the e-mail. | 11:32:19 |
| 2 | A.    A copy, right.  If I get something that's | 11:32:21 |
| 3 | papers, then I can fax it, but, you know -- | 11:32:25 |
| 4 | Q.    What is your e-mail address? | 11:32:27 |
| 5 | A.    Mistylight3@cs.com. | 11:32:29 |
| 6 | Q.    What is George's e-mail address? | 11:32:33 |
| 7 | MR. TOBEROFF:  I would just like to say in | 11:32:35 |
| 8 | terms of her home address and her e-mail address, I | 11:32:36 |
| 9 | want to keep that private on the record -- | 11:32:39 |
| 10 | MR. PETROCELLI:  That's fine. | 11:32:42 |
| 11 | MR. TOBEROFF:  -- to disclose documents, | 11:32:43 |
| 12 | because there's so many -- so much commentary and fans | 11:32:44 |
| 13 | that are interested in this Superman case. | 11:32:48 |
| 14 | MR. PETROCELLI:  We have no interest at all | 11:32:50 |
| 15 | in publicizing it.  We may use it for purposes of the | 11:32:53 |
| 16 | lawsuit, but -- | 11:32:58 |
| 17 | MR. TOBEROFF:  But when it's used for | 11:32:58 |
| 18 | purposes of the lawsuit, I don't want her address and | 11:32:58 |
| 19 | her personal e-mail to be disclosed.  I want it to | 11:33:00 |
| 20 | be -- | 11:33:05 |
| 21 | MR. PETROCELLI:  Well, I want to work with | 11:33:05 |
| 22 | you on that because we have no interest in causing any | 11:33:06 |
| 23 | unwarranted invasion of her privacy, but the details | 11:33:10 |
| 24 | of that we will have to work out.  Okay?  Because I | 11:33:13 |
| 25 | don't know exactly what that means.  We're not going. | 11:33:15 |

| | | |
|---|---|---|
| 1 | to negotiation a protective order right now on the | 11:33:17 |
| 2 | record. | 11:33:20 |
| 3 | MR. TOBEROFF:  No.  What I'm saying is we've | 11:33:20 |
| 4 | talked at times about having a protective order in | 11:33:21 |
| 5 | this case. | 11:33:23 |
| 6 | MR. PETROCELLI:  Okay. | 11:33:23 |
| 7 | MR. TOBEROFF:  And I'm sure your client is | 11:33:24 |
| 8 | going to want a protective order when it comes to | 11:33:25 |
| 9 | discovery of its materials, and that day is coming, | 11:33:30 |
| 10 | that we -- this information should be subject to that | 11:33:32 |
| 11 | protective order. | 11:33:37 |
| 12 | MR. PETROCELLI:  I understand you would like | 11:33:38 |
| 13 | to designate this as confidential.  Okay. | 11:33:39 |
| 14 | Q.    What is George's e-mail address? | 11:33:42 |
| 15 | A.    I don't have it off the top of my head. | 11:33:44 |
| 16 | Q.    Did your mother have an e-mail address? | 11:33:47 |
| 17 | A.    No. | 11:33:57 |
| 18 | Q.    So before you remembered this document, we | 11:33:57 |
| 19 | were talking about documents in general, and I want to | 11:34:00 |
| 20 | go back to that.  Okay? | 11:34:04 |
| 21 | A.    Okay. | 11:34:05 |
| 22 | Q.    You said you -- when you gave Mr. Toberoff | 11:34:08 |
| 23 | documents related to this case -- | 11:34:18 |
| 24 | A.    Yes. | 11:34:19 |
| 25 | Q.    -- did you keep copies for yourself? | 11:34:22 |

EXHIBIT D
99

```
 1        A.    No.   When I gave them to him, I gave them to      11:34:29
 2   him.                                                          11:34:32
 3        Q.    When your mom passed and you took some -- you      11:34:33
 4   took all of her files and papers, did you turn any of        11:34:35
 5   that material over to Mr. Toberoff?                           11:34:38
 6        A.    Yes.   I found something that I --                 11:34:42
 7        Q.    What did you find?                                 11:34:45
 8        A.    I found a file that she had about a lawyer         11:34:46
 9   that we had been talking about potentially hiring.           11:34:50
10        Q.    Is that Gerry Spence?                              11:34:53
11        A.    Gerry Spence, yes.                                 11:34:55
12        Q.    And you just turned that over to him when?        11:34:58
13        A.    Just a couple of days ago.                         11:35:01
14        Q.    Okay.  So what caused you a couple of days        11:35:03
15   ago to come across that file?  Were you looking for          11:35:06
16   materials related to this case?                              11:35:09
17        A.    No.   I was going -- going through a box of        11:35:11
18   her papers, and it happened to be in there.                  11:35:14
19        Q.    Has anyone other than you -- since the filing     11:35:17
20   of this lawsuit in May, 2010, has anyone other than          11:35:22
21   you searched the papers in your home related to this         11:35:26
22   case?                                                        11:35:32
23            MR. TOBEROFF:  At her home?                          11:35:32
24            MR. PETROCELLI:  Yes.                                11:35:33
25            THE WITNESS:  No.                                    11:35:36
```

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 11:35:36 |
| 2 | Q.   For example, did Mr. Toberoff come to your | 11:35:37 |
| 3 | house and search through your files or a member of his | 11:35:40 |
| 4 | law firm? | 11:35:43 |
| 5 | A.   No. | 11:35:44 |
| 6 | Q.   Okay.  Since the filing of this case, have | 11:35:47 |
| 7 | you provided Mr. Toberoff with any materials other | 11:35:57 |
| 8 | than that Gerry Spence file you just found? | 11:36:02 |
| 9 | A.   Yes. | 11:36:08 |
| 10 | Q.   What did you give? | 11:36:08 |
| 11 | A.   Papers relating to my divorce. | 11:36:13 |
| 12 | Q.   When was that? | 11:36:18 |
| 13 | A.   There was a document request from, I believe, | 11:36:21 |
| 14 | your office, and in response to that, I produce those. | 11:36:25 |
| 15 | Q.   Anything other than the divorce file -- | 11:36:30 |
| 16 | that's from your former husband, Dennis Larson; | 11:36:34 |
| 17 | correct? | 11:36:37 |
| 18 | A.   Yes. | 11:36:38 |
| 19 | Q.   And the Gerry Spence file.  Anything else | 11:36:38 |
| 20 | since the filing of this lawsuit that you gave to | 11:36:43 |
| 21 | Mr. Toberoff from your home? | 11:36:43 |
| 22 | A.   Since the filing of this lawsuit.  I don't | 11:36:43 |
| 23 | recall anything specific. | 11:36:47 |
| 24 | Q.   Okay.  Now, why -- how was it that you came | 11:36:52 |
| 25 | across the Gerry Spence file a couple of days ago? | 11:36:59 |

LAURA SIEGEL LARSON 7/22/2011

Page 86

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Asked and answered. | 11:37:01 |
| 2 | You can answer. | 11:37:02 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.   You were looking -- | 11:37:03 |
| 5 | A.   I was -- I wasn't looking for it, but I was | 11:37:04 |
| 6 | going through, you know, one of the boxes of my mom's | 11:37:06 |
| 7 | papers, and it was in there. | 11:37:10 |
| 8 | Q.   Okay.  Have you provided any papers in your | 11:37:11 |
| 9 | home since the filing of this lawsuit to anyone other | 11:37:17 |
| 10 | than Mr. Toberoff? | 11:37:21 |
| 11 | A.   No. | 11:37:24 |
| 12 | Q.   Has any other lawyer seen any materials in | 11:37:24 |
| 13 | your home or have you given them any materials? | 11:37:28 |
| 14 | A.   No. | 11:37:38 |
| 15 | Q.   When you collected the papers from your | 11:37:38 |
| 16 | mother's place, how did you collect them?  You just | 11:37:42 |
| 17 | put them in a box or a couple of boxes? | 11:37:44 |
| 18 | A.   Well, she had a lot of boxes already, and she | 11:37:46 |
| 19 | had -- you know, there were bags.  There were boxes. | 11:37:51 |
| 20 | There were a lot of -- a lot of different things that | 11:37:54 |
| 21 | were already, you know -- what can I call them?  They | 11:37:58 |
| 22 | were in containers of one sort or another. | 11:38:04 |
| 23 | Q.   Paper containers? | 11:38:06 |
| 24 | A.   Well, when I say container -- | 11:38:08 |
| 25 | Q.   What kind of -- cardboard containers? | 11:38:10 |

Merrill  Corporation  -  Los Angeles
800-826-0277                              www.merrillcorp.com/law

EXHIBIT D
102

| | | |
|---|---|---|
| 1 | A.    No, no.   I'm using the term generically for | 11:38:11 |
| 2 | both bags and boxes. | 11:38:14 |
| 3 | Q.    I see.   Like those big trash bags? | 11:38:15 |
| 4 | A.    No.   Oftentimes they were like Ralphs bags. | 11:38:18 |
| 5 | Q.    Okay. | 11:38:23 |
| 6 | A.    Things like that, you know, so I -- you know, | 11:38:24 |
| 7 | in the interest of time I couldn't go through | 11:38:27 |
| 8 | everything.   So, you know, I packed those things, you | 11:38:31 |
| 9 | know, into my car, took them to the place where I | 11:38:34 |
| 10 | live, and then there were other things that I had a | 11:38:39 |
| 11 | professional mover when he moved the furniture also | 11:38:43 |
| 12 | moved some additional boxes for me because it was just | 11:38:46 |
| 13 | too much stuff for me to transport. | 11:38:49 |
| 14 | Q.    I was going to ask you that.   Who helped you | 11:38:51 |
| 15 | move these containers of papers and Superman-related | 11:38:53 |
| 16 | materials from your mother's home to your home? | 11:38:57 |
| 17 | A.    Well, my sons helped me, and it was just my | 11:39:03 |
| 18 | sons and me and then professional movers. | 11:39:04 |
| 19 | Q.    What was the moving company you used? | 11:39:08 |
| 20 | A.    Starving Students. | 11:39:12 |
| 21 | Q.    How old are your children? | 11:39:15 |
| 22 | A.    20 and 23 years old. | 11:39:18 |
| 23 | Q.    The 20-year-old is whom? | 11:39:21 |
| 24 | A.    Michael -- no, no.   James.   James is 20. | 11:39:22 |
| 25 | Q.    And Michael is how old? | 11:39:25 |

LAURA SIEGEL LARSON 7/22/2011

Page 88

```
 1        A.    23.                                              11:39:27

 2        Q.    Do they live with you?                           11:39:28

 3        A.    Some of the time, not really anymore.            11:39:30

 4        Q.    Okay.  Now, with respect to the typing or        11:39:36

 5    computer equipment in your home since 2000, and you       11:39:41

 6    said you did take possession of your mother's             11:39:45

 7    typewriter, and remind me.  Did she or did she not        11:39:48

 8    have an old computer there as well?                       11:39:52

 9        A.    She had a laptop that my sons tried to teach     11:39:53

10    her how to use, but it was unused.                        11:39:57

11        Q.    Where is that laptop now?                        11:40:00

12        A.    I have it.                                       11:40:01

13        Q.    In your home?                                    11:40:03

14        A.    Yes.                                             11:40:04

15        Q.    Okay.  And with respect to the computer          11:40:05

16    equipment going back to 2000 that you used --            11:40:08

17        A.    Um-hum.                                          11:40:11

18        Q.    -- why don't you just bring me up to date on    11:40:12

19    that.  What did you use going back to 2000 to today?     11:40:16

20        A.    Well, I had -- you know, I had a PC, as I       11:40:19

21    explained before.                                        11:40:23

22        Q.    What kind of PC?  Do you remember?              11:40:24

23        A.    It was a Hewlett Packard or something.          11:40:28

24        Q.    Do you have a printer in your home?             11:40:30

25        A.    Yes.  I've had -- you know, they die, you       11:40:32
```

| | | |
|---|---|---|
| 1 | know, periodically, you know, so I had printers that I | 11:40:36 |
| 2 | had to throw away and replace, and I currently have an | 11:40:42 |
| 3 | all in one.  It's an all in one.  You know, it's both | 11:40:46 |
| 4 | a fax machine and a -- | 11:40:49 |
| 5 | Q.    Right. | 11:40:50 |
| 6 | A.    -- printer. | 11:40:51 |
| 7 | Q.    What's the name of the laptop that you now | 11:40:51 |
| 8 | use?  What's the model? | 11:40:54 |
| 9 | A.    Toshiba. | 11:40:55 |
| 10 | Q.    Are you a pretty good typist? | 11:40:57 |
| 11 | A.    I'm okay. | 11:41:00 |
| 12 | Q.    And you typed letters for your mother related | 11:41:02 |
| 13 | to this case? | 11:41:06 |
| 14 | A.    Yes. | 11:41:07 |
| 15 | Q.    Okay. | 11:41:17 |
| 16 | What were the reasons why you decided not to | 11:41:31 |
| 17 | extend your business arrangement with IP Worldwide | 11:41:38 |
| 18 | calling for the payment of a 10 percent commission? | 11:41:42 |
| 19 | A.    It became unnecessary because we were | 11:41:46 |
| 20 | entering into litigation. | 11:41:48 |
| 21 | Q.    And that was about the late 2004 and early | 11:41:52 |
| 22 | 2005 time period? | 11:41:55 |
| 23 | A.    Yes. | 11:41:57 |
| 24 | Q.    Any -- is it your understanding, then, | 11:42:04 |
| 25 | that -- well, before I go there, prior to the time | 11:42:06 |

LAURA SIEGEL LARSON 7/22/2011

Page 90

| | |
|---|---|
| 1 | that you decided not to extend the IP Worldwide | 11:42:11 |
| 2 | business arrangement, was the commission still 10 | 11:42:16 |
| 3 | percent, or had that number been modified in some way? | 11:42:23 |
| 4 | A.    You mean just this document itself, or are | 11:42:28 |
| 5 | you talking about services?   I -- | 11:42:33 |
| 6 | Q.    I'm not sure why you're asking me those | 11:42:35 |
| 7 | questions, so -- | 11:42:38 |
| 8 | A.    I'm not understanding your question. | 11:42:40 |
| 9 | Q.    Well, in paragraph 6 of this agreement -- | 11:42:41 |
| 10 | A.    Yes. | 11:42:43 |
| 11 | Q.    -- Exhibit 45, there's a 10 percent | 11:42:44 |
| 12 | commission. | 11:42:45 |
| 13 | A.    Yes. | 11:42:46 |
| 14 | Q.    When this agreement was no longer in effect | 11:42:47 |
| 15 | sometime in early 2005, as you said -- | 11:42:52 |
| 16 | A.    Yes. | 11:42:55 |
| 17 | Q.    -- was the commission still 10 percent at | 11:42:56 |
| 18 | that moment in time? | 11:42:59 |
| 19 | A.    No. | 11:43:02 |
| 20 | Q.    What was it? | 11:43:02 |
| 21 | A.    It -- once the -- once the litigation | 11:43:05 |
| 22 | agreement went into effect, it was reduced because | 11:43:08 |
| 23 | Mr. Toberoff was not going to receive any -- any | 11:43:12 |
| 24 | percentage under the IP Worldwide. | 11:43:19 |
| 25 | Q.    And it was reduced -- | 11:43:22 |

| | | |
|---|---|---|
| 1 | A. So it was reduced to 5 percent for | 11:43:24 |
| 2 | Mr. Emanuel only. | 11:43:29 |
| 3 | Q. I see. So that any money that Mr. Toberoff | 11:43:29 |
| 4 | would get he would get pursuant to the litigation | 11:43:32 |
| 5 | agreement which had shortly before been executed. | 11:43:34 |
| 6 | A. Correct. | 11:43:38 |
| 7 | Q. Okay. And so for a period of time, then, you | 11:43:39 |
| 8 | had in effect a litigation agreement with Mr. Toberoff | 11:43:45 |
| 9 | calling for a particular percentage, and then you had | 11:43:50 |
| 10 | an IP Worldwide agreement that the commission of which | 11:43:54 |
| 11 | in paragraph 6 was reduced from 6 -- from 10 to 5 | 11:43:58 |
| 12 | percent; correct? | 11:44:02 |
| 13 | A. Correct. | 11:44:03 |
| 14 | Q. Okay. Now, was there a document that | 11:44:03 |
| 15 | reflected the reduction of the commission from 10 | 11:44:06 |
| 16 | percent to 5 percent for IP Worldwide? | 11:44:10 |
| 17 | A. It was -- it was reflected in the litigation | 11:44:15 |
| 18 | agreement. | 11:44:22 |
| 19 | Q. So the litigation agreement contains a | 11:44:23 |
| 20 | reference that the IP Worldwide commission is dropping | 11:44:26 |
| 21 | from 10 to 5. | 11:44:29 |
| 22 | A. I can't remember the exact details. | 11:44:32 |
| 23 | Q. Okay. You indicated that there was a | 11:44:36 |
| 24 | document that you recall having signed that extended | 11:44:38 |
| 25 | the IP Worldwide agreement. Do you remember that | 11:44:41 |

1    testimony?                                              11:44:44

2         A.    Yes.                                         11:44:44

3         Q.    Was there one extension that you signed or   11:44:45

4    more than one?                                          11:44:48

5         A.    There may have been more than one.           11:44:53

6         Q.    And did any of those extensions that you     11:44:55

7    signed also address the reduction of the commission     11:44:58

8    from 10 to 5?                                           11:45:00

9         A.    No.                                          11:45:07

10        Q.    Now, when -- given that you had for at least  11:45:07

11   a period of time two agreements in effect, one for the  11:45:15

12   litigation with Mr. Toberoff and then the IP Worldwide  11:45:19

13   agreement at 5 percent, why did you then decide to      11:45:22

14   stop the 5 percent agreement?                           11:45:27

15        A.    Well, Mr. Emanuel's services were not needed. 11:45:31

16        Q.    Well, why were Mr. Emanuel's services needed  11:45:36

17   the moment you signed the litigation agreement with      11:45:39

18   Mr. Toberoff?                                            11:45:43

19             MR. TOBEROFF:  You mean not needed?  You said  11:45:44

20   "needed."                                               11:45:46

21             MR. PETROCELLI:  No.  I meant "needed."        11:45:47

22             MR. TOBEROFF:  Oh.                             11:45:50

23             MR. PETROCELLI:  Let me go back.               11:45:50

24             THE WITNESS:  Okay.                            11:45:51

25   BY MR. PETROCELLI:

| 1 | Q. First of all, the percentage in the | 11:45:52 |
| 2 | litigation agreement with Mr. Toberoff ranged from 33 | 11:45:55 |
| 3 | percent to 40 percent; correct? | 11:45:59 |
| 4 | A. Yes. | 11:46:01 |
| 5 | Q. Okay. Is that still the current arrangement? | 11:46:02 |
| 6 | A. Yes. | 11:46:05 |
| 7 | MR. TOBEROFF: Okay. I just want to -- | 11:46:06 |
| 8 | before we ask more questions regarding the retainer | 11:46:08 |
| 9 | agreement, I just want you to be aware that certain | 11:46:10 |
| 10 | portions of the retainer agreement have been redacted | 11:46:13 |
| 11 | as privileged. | 11:46:16 |
| 12 | THE WITNESS: Okay. | 11:46:17 |
| 13 | MR. TOBEROFF: They made a motion to compel, | 11:46:18 |
| 14 | and a redaction was upheld by the court. So I need | 11:46:19 |
| 15 | you to pause and particularly when they start asking | 11:46:22 |
| 16 | you questions about what's in the retainer agreement | 11:46:25 |
| 17 | so I can instruct you -- | 11:46:27 |
| 18 | THE WITNESS: All right. | 11:46:29 |
| 19 | MR. TOBEROFF: -- accordingly. | 11:46:30 |
| 20 | BY MR. PETROCELLI: | |
| 21 | Q. After the -- you signed the 33 to 40 percent | 11:46:32 |
| 22 | litigation agreement with Mr. Toberoff, you determined | 11:46:37 |
| 23 | you would still have an arrangement with IP Worldwide | 11:46:41 |
| 24 | for Mr. Emanuel's services, but that was reduced to 5 | 11:46:46 |
| 25 | percent; correct? | 11:46:50 |

```
 1            MR. TOBEROFF:  Misstates her testimony.          11:46:51

 2            MR. PETROCELLI:  I didn't misstate anything.     11:46:54

 3    It's not even a proper objection.                        11:46:56

 4            But go ahead.                                     11:46:58

 5            MR. TOBEROFF:  Misstates the record.             11:46:59

 6            MR. PETROCELLI:  Nor is that.                    11:47:01

 7            THE WITNESS:  I'm lost.                          11:47:04

 8            MR. TOBEROFF:  Misstates the --                  11:47:05

 9    BY MR. PETROCELLI:

10        Q.   When you -- you indicated that there was --    11:47:09

11    at the time of the litigation agreement with            11:47:12

12    Mr. Toberoff which called for a percentage to           11:47:15

13    Mr. Toberoff of 33 to 40 percent, that there was a      11:47:19

14    simultaneous reduction of the IPW commission, IP        11:47:23

15    Worldwide commission, from 10 percent to 5 percent.     11:47:28

16    Do you recall that?                                     11:47:31

17        A.   Yes.                                           11:47:31

18        Q.   In fact, you said it was in the same document  11:47:32

19    that that occurred, the litigation document; right?     11:47:34

20        A.   Yes.                                           11:47:37

21        Q.   Okay.  Why did you retain Mr. Emanuel once     11:47:37

22    you had signed the litigation agreement with            11:47:42

23    Mr. Toberoff?                                            11:47:46

24            MR. TOBEROFF:  Assumes facts.  Lacks            11:47:46

25    foundation.                                             11:47:48
```

EXHIBIT D
110

LAURA SIEGEL LARSON 7/22/2011

Page 95

| | | |
|---|---|---|
| 1 | THE WITNESS:  There was a -- | 11:47:49 |
| 2 | BY MR. PETROCELLI: | |
| 3 | Q.   Why did you continue the services of | 11:47:51 |
| 4 | Mr. Emanuel at 5 percent after having entered into the | 11:47:53 |
| 5 | litigation agreement with Mr. Toberoff? | 11:47:57 |
| 6 | MR. TOBEROFF:  Objection.  Assumes facts. | 11:47:59 |
| 7 | Lacks foundation. | 11:48:01 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.   You may answer. | 11:48:01 |
| 10 | A.   There was a very short period of time.  The | 11:48:03 |
| 11 | litigation had not actually begun yet.  There was a | 11:48:08 |
| 12 | possibility that Mr. Emanuel's services prior to the | 11:48:13 |
| 13 | initiation of the actual litigation might be needed. | 11:48:17 |
| 14 | MR. PETROCELLI:  Okay.  We have to stop now | 11:48:21 |
| 15 | because he needs to change the tape. | 11:48:23 |
| 16 | THE WITNESS:  Okay. | 11:48:24 |
| 17 | MR. PETROCELLI:  So we'll take a short break. | 11:48:25 |
| 18 | THE WITNESS:  Okay.  Good. | 11:48:28 |
| 19 | THE VIDEOGRAPHER:  This will mark the end of | 11:48:29 |
| 20 | Volume 1, tape number one, in the deposition of Laura | |
| 21 | Siegel.  Going off the record.  The time is 11:48. | 11:48:30 |
| 22 | (A recess was taken.) | 11:59:45 |
| 23 | THE VIDEOGRAPHER:  We're back on the record, | 11:59:48 |
| 24 | and this marks the beginning of Volume 1, tape number | 11:59:51 |
| 25 | two, in the deposition of Laura Siegel.  The time is | 11:59:53 |

EXHIBIT D
111

| | | |
|---|---|---|
| 1 | 11:59.  Go ahead. | 11:59:56 |
| 2 | BY MR. PETROCELLI: | |
| 3 | Q.    When is the last -- after the end of the | 12:00:03 |
| 4 | IPW -- IP Worldwide agreement in early 2005, as you | 12:00:10 |
| 5 | said, when litigation began, you said it became | 12:00:15 |
| 6 | unnecessary; right? | 12:00:18 |
| 7 | A.    Correct. | 12:00:19 |
| 8 | Q.    Okay.  From that point on until today, have | 12:00:21 |
| 9 | you had any contact at all with Ari Emanuel? | 12:00:25 |
| 10 | A.    No. | 12:00:30 |
| 11 | Q.    Has your mother?  Did your mother, to your | 12:00:30 |
| 12 | knowledge, prior to her death? | 12:00:34 |
| 13 | A.    I don't believe so. | 12:00:36 |
| 14 | Q.    Are you aware of any ongoing role that Ari | 12:00:37 |
| 15 | Emanuel plays -- | 12:00:44 |
| 16 | A.    I'm not -- | 12:00:46 |
| 17 | Q.    -- with respect to your Superman rights? | 12:00:47 |
| 18 | A.    I'm not aware of that. | 12:00:50 |
| 19 | Q.    Are you aware of any financial arrangement | 12:00:52 |
| 20 | that may exist with respect to the services of Ari | 12:00:57 |
| 21 | Emanuel regarding any transaction for your Superman | 12:01:03 |
| 22 | rights? | 12:01:07 |
| 23 | A.    I'm not aware of anything like that. | 12:01:08 |
| 24 | Q.    So for example, if your Superman rights were | 12:01:10 |
| 25 | sold in a transaction to Paramount Pictures, to your | 12:01:15 |

LAURA SIEGEL LARSON 7/22/2011

```
 1    knowledge, would Ari Emanuel receive a fee of any       12:01:21
 2    kind?                                                   12:01:25
 3         A.   I don't believe so.                           12:01:25
 4         Q.   It's your view that you have no current       12:01:28
 5    agreements with him at all; is that right?              12:01:30
 6         A.   I believe so, yes.                            12:01:33
 7         Q.   Based on the totality of your financial       12:01:35
 8    arrangements, if you entered into a transaction to      12:01:41
 9    sell your Superman rights today, what would be the      12:01:46
10    percentage of the gross proceeds that you would be     12:01:55
11    obligated to pay?                                       12:01:58
12         MR. TOBEROFF:  Wait.  If you can answer that       12:01:59
13    without revealing the contents of the consent           12:02:07
14    agreement, I would allow you to answer that question    12:02:11
15    if you know the answer.  Otherwise I instruct you not   12:02:14
16    to answer.                                              12:02:16
17         THE WITNESS:  You know, I really don't know        12:02:21
18    exactly what it is.                                     12:02:24
19    BY MR. PETROCELLI:                                      
20         Q.   Well, you do know; right?  I mean you do know 12:02:29
21    the terms that you have with Mr. Toberoff; correct?     12:02:32
22         A.   Not separately from the instruction that I    12:02:37
23    received.                                               12:02:41
24         Q.   Well, the instruction had to do with the      12:02:41
25    consent agreement.  The financial terms, at least some  12:02:43
```

LAURA SIEGEL LARSON 4/22/2011

```
1    of them, have already been disclosed to us with        12:02:48

2    respect to the litigation retainer agreement.          12:02:51

3         A.   Oh, okay.  Sometimes it gets confusing        12:02:53

4    because we're talking about so many agreements, you     12:02:55

5    know.                                                   12:02:57

6         Q.   Okay.  So let me see if I can break it down   12:02:58

7    for you.                                                12:03:00

8         A.   All right.                                    12:03:00

9         Q.   If there were a transaction today for the    12:03:01

10   sale of your Superman rights, you would have to pay     12:03:03

11   Mr. Toberoff 33 to 40 percent based on your agreement;  12:03:10

12   is that correct?                                        12:03:14

13        A.   I believe so.                                 12:03:14

14        Q.   And would that be 33 or 40 percent?  Do you   12:03:15

15   know?  What range applies as of today?                 12:03:21

16        A.   I believe because we had an initial trial     12:03:36

17   before -- was that considered a trial with Judge        12:03:45

18   Larson?                                                 12:03:50

19        Q.   Well, Mr. Toberoff has -- would certainly     12:03:51

20   suggest that it was.                                    12:03:55

21        A.   I mean, you know, what's the definition of a  12:03:57

22   trial, yes.  Okay.                                      12:04:00

23        Q.   So an argument could be made that the current 12:04:02

24   percentage of 40 percent is owed; correct?  If that     12:04:05

25   were a trial?                                           12:04:10
```

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | A.    If it were a trial, yes. | 12:04:10 |
| 2 | Q.    Okay.  So besides that 40 percent to | 12:04:12 |
| 3 | Mr. Toberoff, is there any other percent that would | 12:04:22 |
| 4 | have to be paid to Mr. Toberoff? | 12:04:26 |
| 5 | A.    No. | 12:04:31 |
| 6 | Q.    Is there any other fee that would have to be | 12:04:32 |
| 7 | paid to Mr. Toberoff? | 12:04:35 |
| 8 | A.    No.  I can't think of any. | 12:04:38 |
| 9 | Q.    Any other type of remuneration of any kind | 12:04:39 |
| 10 | that would be paid to Mr. Toberoff? | 12:04:42 |
| 11 | A.    You know, I think that there were some -- | 12:04:44 |
| 12 | some costs that were advanced. | 12:04:47 |
| 13 | Q.    Besides that. | 12:04:49 |
| 14 | A.    Other than costs, no. | 12:04:50 |
| 15 | Q.    Okay.  Is there anything in the 2008 consent | 12:04:51 |
| 16 | agreement that would trigger additional remuneration | 12:04:56 |
| 17 | to Mr. Toberoff based on a transaction of the Siegel | 12:05:01 |
| 18 | rights? | 12:05:05 |
| 19 | MR. TOBEROFF:  I -- I will allow you to | 12:05:06 |
| 20 | answer as to -- because what is not in the agreement | 12:05:09 |
| 21 | would not be privileged.  Did I say that right? | 12:05:13 |
| 22 | MR. PETROCELLI:  You did. | 12:05:18 |
| 23 | MR. TOBEROFF:  Some things not in the | 12:05:18 |
| 24 | agreement we are not asserting privilege.  We are | 12:05:20 |
| 25 | asserting privilege to what is in the agreement.  So | 12:05:24 |

```
 1    to that extent, you can answer the question.          12:05:25
 2             THE WITNESS:  Well, there's no -- I can never  12:05:27
 3    say the word.  What is it?  Remuneration?  There's     12:05:28
 4    no -- you know what I'm talking about.  There's no     12:05:33
 5    additional percentage.                                 12:05:35
 6    BY MR. PETROCELLI:
 7       Q.   To Mr. Toberoff.                               12:05:38
 8       A.   To Mr. Toberoff.                               12:05:39
 9       Q.   As a result of anything in the consent         12:05:40
10    agreement.                                             12:05:42
11       A.   Correct.                                       12:05:43
12       Q.   Correct?                                       12:05:43
13       A.   Correct.                                       12:05:45
14       Q.   Okay.  And to your knowledge, would there be   12:05:46
15    any percentage -- in addition to the 40 to             12:05:50
16    Mr. Toberoff, would there be any percentage or any fee 12:05:56
17    payable to Ari Emanuel or any of his companies?        12:05:59
18       A.   No.                                            12:06:05
19       Q.   So to your knowledge, he would not             12:06:06
20    participate at all in any current transaction.         12:06:08
21             MR. TOBEROFF:  Asked and answered.            12:06:12
22    BY MR. PETROCELLI:
23       Q.   Is that correct?                               12:06:13
24       A.   Correct.                                       12:06:13
25       Q.   Out of the 60 percent or other proceeds that  12:06:18
```

| | | |
|---|---|---|
| 1 | you would receive, putting aside Mr. Toberoff's 40 | 12:06:22 |
| 2 | percent, would you have to share any of those proceeds | 12:06:27 |
| 3 | with anyone else as a result of any contractual | 12:06:31 |
| 4 | arrangements that you currently have? | 12:06:34 |
| 5 | MR. TOBEROFF: I instruct you not to answer | 12:06:36 |
| 6 | to the extent your answer would necessarily reveal the | 12:06:38 |
| 7 | substance of the consent agreement held to be | 12:06:45 |
| 8 | privileged. | 12:06:48 |
| 9 | MR. PETROCELLI: May I just take one shot at | 12:06:50 |
| 10 | you on this, Marc, because what the court held was | 12:06:51 |
| 11 | that a particular document, at least on that record, | 12:06:56 |
| 12 | was not discoverable at this time. But the court did | 12:07:03 |
| 13 | not hold that any and all financial arrangements or | 12:07:07 |
| 14 | contractual arrangements between the parties or | 12:07:11 |
| 15 | between witnesses, and these parties are also | 12:07:18 |
| 16 | witnesses, are barred from discovery. It goes | 12:07:22 |
| 17 | directly, among other things, to motive and -- | 12:07:26 |
| 18 | MR. TOBEROFF: I think -- | 12:07:31 |
| 19 | MR. PETROCELLI: -- a host of other | 12:07:32 |
| 20 | credibility issues. | 12:07:33 |
| 21 | MR. TOBEROFF: I think I stated my | 12:07:34 |
| 22 | instruction, and if I wasn't clear -- I thought it was | 12:07:36 |
| 23 | clear. | 12:07:38 |
| 24 | MR. PETROCELLI: The existence of those | 12:07:39 |
| 25 | arrangements are relevant and would be discoverable in | 12:07:41 |

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | any case. | 12:07:45 |
| 2 | MR. TOBEROFF:  I said she can't disclose to | 12:07:47 |
| 3 | the extent there is another agreement out there in | 12:07:49 |
| 4 | which she's sharing her proceeds.  Other than anything | 12:07:54 |
| 5 | that speaks to that in the consent agreement she can | 12:07:59 |
| 6 | testify. | 12:08:02 |
| 7 | MR. PETROCELLI:  I'm suggesting to you that | 12:08:02 |
| 8 | the court did not issue an order categorically ruling | 12:08:03 |
| 9 | that we are unable to discover financial or | 12:08:15 |
| 10 | contractual arrangements between the parties even if | 12:08:19 |
| 11 | reflected in the consent agreement. | 12:08:25 |
| 12 | MR. TOBEROFF:  I -- the court doesn't have to | 12:08:28 |
| 13 | use those exact words. | 12:08:29 |
| 14 | MR. PETROCELLI:  I didn't say it had to use | 12:08:31 |
| 15 | those exact words, but that's the essence of your | 12:08:32 |
| 16 | position. | 12:08:34 |
| 17 | MR. TOBEROFF:  I disagree.  There are | 12:08:35 |
| 18 | certain -- the court held that the contents of that | 12:08:37 |
| 19 | document are privileged, and that therefore, if your | 12:08:40 |
| 20 | question by necessity requires her to divulge -- or it | 12:08:44 |
| 21 | may or may not, but to the extent it requires her to | 12:08:48 |
| 22 | divulge contents of the consent agreement, I'm | 12:08:52 |
| 23 | instructing her not to answer. | 12:08:55 |
| 24 | MR. PETROCELLI:  Okay.  Well, to the | 12:09:04 |
| 25 | extent -- | 12:09:04 |

LAURA SIEGEL LARSON - 6/22/2011

Page 103

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Well, if she answers in the | 12:09:04 |
| 2 | negative where she's not implicating any of the | 12:09:06 |
| 3 | contents of the consent agreement, I'm -- there's no | 12:09:10 |
| 4 | intention, to the extent I let her answer questions, | 12:09:13 |
| 5 | to waive the privilege as to the consent agreement. | 12:09:15 |
| 6 | MR. PETROCELLI:  I understand that's your | 12:09:17 |
| 7 | position, but, you know, we will obviously have to | 12:09:19 |
| 8 | litigate this issue before the court. | 12:09:23 |
| 9 | MR. TOBEROFF:  In other words, I don't | 12:09:30 |
| 10 | believe that you can, if there's a ruling that the | 12:09:31 |
| 11 | document is privileged, you can get around the ruling | 12:09:33 |
| 12 | by asking questions that unearth the contents of the | 12:09:36 |
| 13 | privileged documents. | 12:09:40 |
| 14 | MR. PETROCELLI:  I think you've | 12:09:41 |
| 15 | misapprehended the court's ruling, and the record now | 12:09:43 |
| 16 | is different in any event.  But I think we've | 12:09:46 |
| 17 | discussed it sufficient to persuade me you're not | 12:09:50 |
| 18 | going to change your mind at this deposition.  So we | 12:09:54 |
| 19 | will just proceed. | 12:09:56 |
| 20 | Q.   Are you aware of any other piece of paper of | 12:10:02 |
| 21 | any kind other than the consent agreement document | 12:10:10 |
| 22 | that expresses or reflects any arrangement between the | 12:10:18 |
| 23 | Siegels and the Shusters regarding the sharing of | 12:10:25 |
| 24 | proceeds? | 12:10:29 |
| 25 | MR. TOBEROFF:  I instruct you not to answer | 12:10:30 |

| | | |
|---|---|---|
| 1 | to the extent that question implies the contents of | 12:10:33 |
| 2 | the consent agreement, but you can -- you can answer | 12:10:36 |
| 3 | whether there's any other document other than -- | 12:10:39 |
| 4 | there's a document -- excluding the consent agreement, | 12:10:42 |
| 5 | is there another document that provides for you to | 12:10:45 |
| 6 | share proceeds, you can answer that question. | 12:10:48 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q.   Or that just discusses it or references or | 12:10:50 |
| 9 | mentions.  It's not that it has to be a contract in | 12:10:53 |
| 10 | and of itself.  Any piece of paper. | 12:10:55 |
| 11 | A.   I can't think of any. | 12:10:59 |
| 12 | Q.   Did you -- did you engage in any negotiations | 12:11:01 |
| 13 | with anyone regarding the terms of the consent | 12:11:09 |
| 14 | agreement? | 12:11:16 |
| 15 | A.   Could you -- could you explain that a little | 12:11:16 |
| 16 | bit better?  I don't quite understand what you mean. | 12:11:20 |
| 17 | Q.   Yeah. | 12:11:23 |
| 18 | Who created the terms in the consent | 12:11:23 |
| 19 | document? | 12:11:28 |
| 20 | MR. TOBEROFF:  Vague and ambiguous as to | 12:11:29 |
| 21 | "created." | 12:11:31 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.   Who came up with them? | 12:11:32 |
| 24 | A.   You mean who -- who wrote the document? | 12:11:35 |
| 25 | Q.   Not who was the scrivener who put the words | 12:11:39 |

LAURA SIEGEL LARSON - 6/22/2011

| | | |
|---|---|---|
| 1 | on the paper, but who conceived and who came up with | 12:11:42 |
| 2 | the terms that are subsequently put down in the paper? | 12:11:47 |
| 3 | A.   I think it evolved out of conversations that | 12:11:53 |
| 4 | my mother and I had with Mr. Toberoff and perhaps | 12:11:58 |
| 5 | conversations that the Shusters had with Mr. Toberoff. | 12:12:04 |
| 6 | Q.   Okay.  And do you recall that you wanted to | 12:12:11 |
| 7 | have particular provisions as part of the arrangement | 12:12:18 |
| 8 | that the Shusters had a different view about and that | 12:12:23 |
| 9 | there was kind of a back-and-forth exchange? | 12:12:28 |
| 10 | A.   I -- the way I recall it, there was -- | 12:12:32 |
| 11 | MR. TOBEROFF:  Wait.  Wait.  Wait.  Wait. | 12:12:34 |
| 12 | I'm not going to allow questions as to -- the consent | 12:12:35 |
| 13 | agreement is held to be privileged.  There's a joint | 12:12:40 |
| 14 | interest privilege between my representation of the | 12:12:42 |
| 15 | Siegels and my representation of the Shusters, the | 12:12:45 |
| 16 | Shusters we'll call them, and I'm not going to allow | 12:12:50 |
| 17 | questions as to characterizing conversations that are | 12:12:53 |
| 18 | privileged. | 12:13:03 |
| 19 | MR. PETROCELLI:  Are you instructing not to | 12:13:03 |
| 20 | answer on that question? | 12:13:05 |
| 21 | MR. TOBEROFF:  Yes. | 12:13:06 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.   Did you agree to share in any of your | 12:13:15 |
| 24 | proceeds for this -- the disposition or sale or | 12:13:21 |
| 25 | settlement of the Siegel rights with the Shusters? | 12:13:24 |

LAURA SIEGEL LARSON - 5/22/2011

Page 106

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  I instruct you not to answer | 12:13:31 |
| 2 | that question to the extent that the question | 12:13:32 |
| 3 | implicates the contents of the consent agreement. | 12:13:35 |
| 4 | BY MR. PETROCELLI: | |
| 5 | Q.   Right now do you have an agreement in place | 12:13:38 |
| 6 | to share with the Shusters with respect to any sale or | 12:13:41 |
| 7 | disposition or settlement regarding the Siegel rights? | 12:13:45 |
| 8 | MR. TOBEROFF:  Same -- asked and answered. | 12:13:50 |
| 9 | Same instruction based on attorney-client privilege, | 12:13:51 |
| 10 | joint interest. | 12:13:55 |
| 11 | MR. PETROCELLI:  You know what?  This is | 12:14:07 |
| 12 | probably a good time to break. | 12:14:09 |
| 13 | THE WITNESS:  Okay. | 12:14:10 |
| 14 | MR. PETROCELLI:  We'll make it like 30 | 12:14:11 |
| 15 | minutes or 45 minutes. | 12:14:13 |
| 16 | MR. TOBEROFF:  Same objection.  Same | 12:14:15 |
| 17 | instruction.  Just kidding. | 12:14:17 |
| 18 | MR. PETROCELLI:  You're on a roll, Marc.  By | 12:14:18 |
| 19 | the way, that's not much different than your other | 12:14:21 |
| 20 | instructions. | 12:14:23 |
| 21 | THE VIDEOGRAPHER:  Off the record.  The time | 12:14:24 |
| 22 | is 12:14. | 12:14:25 |
| 23 | (Lunch recess taken at 12:14 p.m.) | 12:14:27 |
| 24 | | |
| 25 | | |

LAURA SIEGEL LARSON 7/22/2011

Page 107

| | | |
|---|---|---|
| 1 | LOS ANGELES, CALIFORNIA; FRIDAY, JULY 22, 2011 | |
| 2 | 1:29 P.M. | |
| 3 | | |
| 4 | (Whereupon, Ms. Seto was not present.) | 12:15:00 |
| 5 | THE VIDEOGRAPHER:  We are back on the record | 13:29:24 |
| 6 | at 1:29. | 13:29:26 |
| 7 | EXAMINATION (Resumed) | 13:29:27 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.   Ms. Siegel, we took a longer break than I had | 13:29:27 |
| 10 | expected only because I understand and was told that | 13:29:32 |
| 11 | you needed to rest, and again, that's fine, and if you | 13:29:34 |
| 12 | continue to need to rest, just let us know.  All | 13:29:39 |
| 13 | right? | 13:29:41 |
| 14 | A.   Thank you. | 13:29:42 |
| 15 | Q.   And we did find an office here for you that | 13:29:43 |
| 16 | had a couch to accommodate you. | 13:29:48 |
| 17 | A.   Good. | 13:29:50 |
| 18 | Q.   Okay.  Sorry we didn't have room service, but | 13:29:51 |
| 19 | maybe -- maybe next time. | 13:29:55 |
| 20 | A.   Not necessary. | 13:29:56 |
| 21 | Q.   Okay.  So what I would like to do is I want | 13:29:58 |
| 22 | to go back to a point in time when for point of | 13:30:06 |
| 23 | reference you had been working with the lawyers at | 13:30:14 |
| 24 | Gang Tyre in conducting negotiations with Warner Bros. | 13:30:23 |
| 25 | and DC Comics, and for point of reference, let me show | 13:30:26 |

| | | |
|---|---|---|
| 1 | you Exhibit 48, which is a letter dated October 19, | 13:30:32 |
| 2 | 2001, from Kevin Marks to John Schulman. | 13:30:40 |
| 3 | (Whereupon, Plaintiff's Exhibit 48 | |
| 4 | was placed before the witness.) | 13:30:47 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q.   And you have already testified about this | 13:30:48 |
| 7 | letter, I believe, and I'm not going to go into it, | 13:30:50 |
| 8 | but I just want to orient you regarding the time | 13:30:54 |
| 9 | period. | 13:30:59 |
| 10 | A.   Okay. | 13:31:00 |
| 11 | Q.   So you recall that in or about October of | 13:31:00 |
| 12 | 2001 this correspondence occurred regarding your | 13:31:07 |
| 13 | negotiations with Superman -- with Warner Bros. | 13:31:16 |
| 14 | regarding Superman and receiving a copy of your | 13:31:20 |
| 15 | lawyer's letter to Mr. Schulman that's been marked as | 13:31:24 |
| 16 | Exhibit 48; right? | 13:31:27 |
| 17 | A.   Yes. | 13:31:28 |
| 18 | Q.   Indicating that your family had accepted DC | 13:31:30 |
| 19 | Comics' offer based on the terms set forth in the | 13:31:35 |
| 20 | document; correct? | 13:31:37 |
| 21 | A.   Yeah, it was a provisional acceptance. | 13:31:39 |
| 22 | Q.   Okay.  And I don't want to go through that. | 13:31:42 |
| 23 | The word "provisional" isn't in there, but you | 13:31:45 |
| 24 | testified to that in your previous deposition. | 13:31:49 |
| 25 | Now, as of this point in time, October 19, | 13:31:51 |

LAURA SIEGEL LARSON - 7/22/2011

Page 109

| | | |
|---|---|---|
| 1 | 2001, is it fair to say that through different lawyers | 13:31:55 |
| 2 | you had been in discussions and negotiations with | 13:32:00 |
| 3 | Warner Bros. and DC Comics for a number of years? | 13:32:04 |
| 4 | Correct? | 13:32:08 |
| 5 | A.    A long time. | 13:32:08 |
| 6 | Q.    Going back to when -- even before the notices | 13:32:11 |
| 7 | of termination were served in 1997; right? | 13:32:14 |
| 8 | A.    No.    There were no negotiations before 1997. | 13:32:18 |
| 9 | Q.    But shortly -- but upon issuance of the | 13:32:21 |
| 10 | notice of termination, is that when the negotiations | 13:32:24 |
| 11 | began initially with Arthur Levine?    Correct? | 13:32:27 |
| 12 | A.    Yes, sometime during 1997. | 13:32:30 |
| 13 | Q.    Okay.    And they had been going on all the way | 13:32:33 |
| 14 | through October 19, 2001; correct? | 13:32:36 |
| 15 | A.    Yes. | 13:32:39 |
| 16 | Q.    Okay.    And they actually continued after | 13:32:40 |
| 17 | October 19, 2001.    This is not the last document in | 13:32:44 |
| 18 | the exchange; correct? | 13:32:47 |
| 19 | A.    Correct. | 13:32:49 |
| 20 | Q.    And you formally -- withdrawn. | 13:32:51 |
| 21 | You notified DC Comics at some point in time | 13:32:55 |
| 22 | that you were cutting off any further negotiations; | 13:32:59 |
| 23 | correct? | 13:33:03 |
| 24 | A.    Correct. | 13:33:03 |
| 25 | Q.    And you did so in writing; correct? | 13:33:04 |

```
 1        A.    Correct.                                       13:33:05

 2        Q.    And you notified DC Comics for the first time  13:33:07

 3   that you were cutting off negotiations in a document      13:33:10

 4   sent to them in October, 2001; is that correct?           13:33:13

 5        A.    No.                                            13:33:30

 6        Q.    Excuse me.  Let me withdraw the question.      13:33:30

 7              First of all, let me find the document so I'm  13:33:33

 8   not guessing on the dates.  I'm a year off.               13:33:35

 9              The first time that you notified DC Comics or  13:33:54

10   Warner Bros. that you were cutting off negotiations       13:34:00

11   towards an agreement with him to sell your Superman       13:34:04

12   rights was when you sent your letter dated September      13:34:07

13   21, 2002, that you signed together with your mother;      13:34:11

14   correct?                                                  13:34:15

15        A.    Yes, that's correct.                           13:34:16

16        Q.    Let me show you a copy of that letter.  That   13:34:17

17   is Exhibit 56.                                            13:34:21

18              (Whereupon, Plaintiff's Exhibit 56

19              was marked for identification.)                13:34:45

20              MR. TOBEROFF:  Did you say -- did you date     13:34:46

21   this letter in the last question?                         13:34:47

22              MR. PETROCELLI:  Yes, I'll follow up on it.    13:34:50

23   The date was in the question, but it's also in the        13:34:52

24   exhibit number.  We have an exhibit number.  We have a    13:34:56

25   specific document, and the document is dated September    13:35:02
```

| | | |
|---|---|---|
| 1 | 21, 2002.  So let me just -- | 13:35:04 |
| 2 | MR. TOBEROFF:  I thought you had said 2001. | 13:35:07 |
| 3 | Maybe I heard it wrong. | 13:35:10 |
| 4 | MR. PETROCELLI:  Okay.  Let's start all over | 13:35:13 |
| 5 | again. | |
| 6 | What's the exhibit number? | 13:35:13 |
| 7 | MR. TOKORO:  56. | 13:35:15 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.   You have Exhibit 56 in front of you, which is | 13:35:15 |
| 10 | the letter that you and your mother sent to DC Comics | 13:35:17 |
| 11 | dated September 21, 2002, when you for the first time | 13:35:21 |
| 12 | cut off negotiations with them; correct? | 13:35:25 |
| 13 | A.   Yes. | 13:35:27 |
| 14 | Q.   Now, when -- did you write this letter | 13:35:28 |
| 15 | yourself? | 13:35:33 |
| 16 | A.   No. | 13:35:34 |
| 17 | Q.   Who wrote it? | 13:35:35 |
| 18 | A.   My mother with some input from me. | 13:35:36 |
| 19 | Q.   Well, your mother didn't type. | 13:35:40 |
| 20 | A.   Well, she wrote it.  She wrote it out in | 13:35:42 |
| 21 | longhand. | 13:35:46 |
| 22 | Q.   How do you know? | 13:35:46 |
| 23 | A.   How do I know? | 13:35:47 |
| 24 | Q.   Yeah. | 13:35:48 |
| 25 | A.   She gave it to me. | 13:35:50 |

EXHIBIT D
127

| | | |
|---|---|---|
| 1 | Q.    Where is the -- you have the paper that she | 13:35:50 |
| 2 | gave you? | 13:35:55 |
| 3 | A.    I don't know. | 13:35:56 |
| 4 | Q.    What did she write it on? | 13:35:57 |
| 5 | A.    A piece of paper this big.  Sometimes she | 13:36:04 |
| 6 | would write -- I don't remember this specific one. | 13:36:07 |
| 7 | Sometimes she would write on a yellow pad.  Sometimes | 13:36:10 |
| 8 | she would write on a white pad. | 13:36:13 |
| 9 | Q.    Did you type it? | 13:36:15 |
| 10 | A.    Yes. | 13:36:17 |
| 11 | Q.    Where did you type it? | 13:36:17 |
| 12 | A.    I typed it on my computer. | 13:36:19 |
| 13 | Q.    Your computer at your home? | 13:36:21 |
| 14 | A.    Yes. | 13:36:23 |
| 15 | Q.    That was which computer?  The PC that you | 13:36:24 |
| 16 | said you had? | 13:36:30 |
| 17 | A.    Yes. | 13:36:30 |
| 18 | Q.    Did you show this letter to anybody after | 13:36:34 |
| 19 | typing it before it went out? | 13:36:38 |
| 20 | A.    No.  Just my mother and I saw it. | 13:36:40 |
| 21 | Q.    Well, I'm curious about that.  You had | 13:36:42 |
| 22 | Mr. Levine.  You had Mr. -- what's George's last name? | 13:36:46 |
| 23 | A.    Zadrozny. | 13:36:52 |
| 24 | Q.    Zadrozny. | 13:36:53 |
| 25 | A.    You pronounced it correctly. | 13:36:54 |

LAURA SIEGEL LARSON 5/22/2011

Page 113

| | |
|---|---|
| 1 | Q.   You had Mr. Zadrozny.  You didn't have him | 13:36:56 |
| 2 | take a look at this before it went out? | 13:36:59 |
| 3 | A.   I don't recall us having them look at it. | 13:37:01 |
| 4 | Q.   And you had certainly been in touch with | 13:37:04 |
| 5 | Mr. Toberoff by this time, September 21, 2002. | 13:37:06 |
| 6 | A.   We had only learned of his existence at a | 13:37:14 |
| 7 | point shortly before this, but he -- you know, he | 13:37:23 |
| 8 | didn't see this, if that's what you're asking me. | 13:37:29 |
| 9 | Q.   How do you know he didn't see it?  You didn't | 13:37:33 |
| 10 | show it to him.  Is that what you're saying? | 13:37:35 |
| 11 | A.   Correct. | 13:37:37 |
| 12 | Q.   You said it was shortly before this letter, | 13:37:44 |
| 13 | Exhibit 56, which is dated September 21, 2002, that | 13:37:48 |
| 14 | you first interacted with Mr. Toberoff? | 13:37:52 |
| 15 | MR. TOBEROFF:  Misstates her testimony. | 13:37:57 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.   That you first interacted with Mr. Toberoff? | 13:37:59 |
| 18 | MR. TOBEROFF:  Misstates the testimony. | 13:38:02 |
| 19 | THE WITNESS:  No, that we were first informed | 13:38:03 |
| 20 | of him. | 13:38:06 |
| 21 | BY MR. PETROCELLI: | |
| 22 | Q.   Is it your testimony that you never spoke to | 13:38:08 |
| 23 | Mr. Toberoff prior to September 21, 2002? | 13:38:13 |
| 24 | A.   I don't recall speaking with him before then. | 13:38:17 |
| 25 | Q.   Can you say so with certainty? | 13:38:19 |

EXHIBIT D
129

```
 1         A.    I can't say so with absolute certainty.        13:38:23

 2         Q.    Okay.  And do you have any way of refreshing    13:38:27

 3    your recollection as to the exact date that you first     13:38:33

 4    spoke to Mr. Toberoff?                                     13:38:36

 5         A.    Well, my mother first spoke to Mr. Toberoff,    13:38:41

 6    so --                                                      13:38:46

 7         Q.    Before you did?                                 13:38:46

 8         A.    Yes.                                            13:38:47

 9         Q.    Do you know with certainty the date your       13:38:50

10    mother first spoke to Mr. Toberoff?                        13:38:53

11         A.    No, I don't.                                    13:38:54

12         Q.    Do you know whether it was -- well, it was      13:38:56

13    certainly before September 21, 2002; correct?             13:39:02

14         A.    No.  I said I don't know when it was.           13:39:05

15         Q.    Nor do you know when your mother first spoke    13:39:08

16    with Mr. Toberoff; is that correct?                        13:39:12

17         A.    Yes.  I don't know when she spoke to him.       13:39:13

18         Q.    Okay.  And you have no way of dating when       13:39:16

19    your mother first spoke with Mr. Toberoff just like       13:39:19

20    you don't have any way of dating when you did;            13:39:21

21    correct?                                                   13:39:23

22         A.    Yes.                                            13:39:23

23         Q.    Okay.  Did you keep a calendar of              13:39:24

24    appointments, you know, like a daily reminder book or     13:39:29

25    anything else in which you made appointments?             13:39:32
```

LAURA SIEGEL LARSON 21071/22/2011

Page 115

| | | | |
|---|---|---|---|
| 1 | A. | No, not really. | 13:39:34 |
| 2 | Q. | Or did you do so on your computer? | 13:39:35 |
| 3 | A. | No. | 13:39:39 |
| 4 | Q. | Did your mother? | 13:39:39 |
| 5 | A. | No. | 13:39:40 |
| 6 | Q. | Not on the computer, but let's say some kind | 13:39:41 |

6    Q.    Not on the computer, but let's say some kind

7   of appointment book?  Did she keep anything like that?

8        A.    Not that I'm aware of.

9        Q.    You had -- by the way, when your -- how did

10   you find out about your mother's first contact with

11   Mr. Toberoff?

12        A.    Well, she told me.

13        Q.    Did she tell you before she spoke with him or

14   after she spoke with him?

15        A.    No.  She was -- she -- we had been looking

16   for attorneys, and we had been talking to, you know,

17   different people.  I had been doing research to try

18   and -- you know, like the Gerry Spence research that I

19   was doing.  We were -- but it wasn't an easy process

20   trying to find, you know, an attorney that would be

21   willing to on a contingency fee -- excuse me -- on a

22   contingency fee that did not have a conflict with

23   Warner Bros. to, you know, to find additional

24   representation.

25        Q.    Did you talk to Gerry Spence or your mother

13:39:44
13:39:46
13:39:59
13:40:05
13:40:11
13:40:11
13:40:13
13:40:16
13:40:18
13:40:23
13:40:27
13:40:29
13:40:33
13:40:36
13:40:40
13:40:46
13:40:52
13:40:57
13:40:58

| | | |
|---|---|---|
| 1 | talk to Gerry Spence or communicate with Gerry Spence | 13:41:01 |
| 2 | in some way in 2002? | 13:41:03 |
| 3 | A.   Yes. | 13:41:08 |
| 4 | Q.   Is that the only time you communicated with | 13:41:08 |
| 5 | him? | 13:41:10 |
| 6 | A.   Yes, because he appeared to have a conflict | 13:41:10 |
| 7 | of interest. | 13:41:12 |
| 8 | Q.   And that was the end of it? | 13:41:13 |
| 9 | A.   Yes. | 13:41:15 |
| 10 | Q.   Okay.  The -- did you -- your mother found | 13:41:16 |
| 11 | out about Mr. Toberoff from whom? | 13:41:35 |
| 12 | A.   From Jean Peavy. | 13:41:36 |
| 13 | Q.   And then she informed you, your mother did. | 13:41:38 |
| 14 | A.   Yes. | 13:41:44 |
| 15 | Q.   You were not on the call with -- | 13:41:44 |
| 16 | A.   No. | 13:41:46 |
| 17 | Q.   Okay.  And do you know from the time she told | 13:41:46 |
| 18 | you about Mr. Toberoff how long it was thereafter that | 13:41:51 |
| 19 | she met with Mr. Toberoff or spoke with him, "she" | 13:41:59 |
| 20 | being your mother? | 13:42:02 |
| 21 | A.   I don't really know. | 13:42:03 |
| 22 | Q.   In other words, did your mother come to you | 13:42:04 |
| 23 | and say, "Hey, there's some person named Marc Toberoff | 13:42:07 |
| 24 | that Jean Peavy told me about.  I would like you to do | 13:42:10 |
| 25 | some research into him or check into him"?  Did she | 13:42:12 |

| 1 | have that kind of conversation with you? | 13:42:16 |
| 2 | A. She said, "It sounds interesting. You know, | 13:42:18 |
| 3 | we should probably look into this some more." | 13:42:21 |
| 4 | Q. And what did you do to look into it? | 13:42:24 |
| 5 | A. I'm trying to remember. I think -- I think I | 13:42:32 |
| 6 | searched his name on the Internet, you know, to see if | 13:42:37 |
| 7 | there was any information on him. | 13:42:41 |
| 8 | Q. What did you find out from the Internet | 13:42:43 |
| 9 | search? | 13:42:47 |
| 10 | A. I -- it's hard to remember. It's a long time | 13:42:47 |
| 11 | ago, but I think that there was like a press article | 13:42:50 |
| 12 | or something about his involvement in some | 13:42:55 |
| 13 | intellectual property rights cases in which he was | 13:42:59 |
| 14 | protecting the interests of authors and creators. | 13:43:02 |
| 15 | Q. Did you print that material? | 13:43:06 |
| 16 | A. I did at the time, yeah. | 13:43:08 |
| 17 | Q. And did you keep a copy of it? | 13:43:09 |
| 18 | A. I did at that time, yeah, and I shared it | 13:43:12 |
| 19 | with my mother. | 13:43:16 |
| 20 | Q. Do you still have it in your papers at home? | 13:43:18 |
| 21 | A. I doubt it -- | 13:43:20 |
| 22 | Q. You kept -- | 13:43:22 |
| 23 | A. -- because I've been -- | 13:43:23 |
| 24 | Q. -- the Gerry Spence material, but you didn't | 13:43:24 |
| 25 | keep the Marc Toberoff material? | 13:43:27 |

Case 2:10-cv-03633-ODW-RZ    Document 316-5    Filed 09/02/11    Page 120 of 344
LAURA SIEGEL PERSON 2107 4/22/2011
Page ID #:2107

Page 118

| | | |
|---|---|---|
| 1 | A.    I didn't keep the Gerry Spence material.  My | 13:43:27 |
| 2 | mom did.  It was among her things. | 13:43:31 |
| 3 | Q.    But you gave it to her because you downloaded | 13:43:35 |
| 4 | it from the computer; right? | 13:43:35 |
| 5 | A.    Yes, yes. | 13:43:37 |
| 6 | Q.    And did you find the materials that you | 13:43:37 |
| 7 | downloaded about Mr. Toberoff when you went through | 13:43:38 |
| 8 | your mom's files? | 13:43:42 |
| 9 | A.    I have not found it. | 13:43:44 |
| 10 | Q.    Have you gone through everything yet? | 13:43:46 |
| 11 | A.    No. | 13:43:49 |
| 12 | Q.    Okay.  You're still working through it? | 13:43:49 |
| 13 | A.    Yes. | 13:43:50 |
| 14 | Q.    Other than the Internet search, did you do | 13:43:54 |
| 15 | anything else to research Mr. Toberoff? | 13:43:57 |
| 16 | A.    Well, my mother did. | 13:44:00 |
| 17 | Q.    How do you know that? | 13:44:02 |
| 18 | A.    She told me. | 13:44:03 |
| 19 | Q.    And what did she tell you? | 13:44:05 |
| 20 | A.    She told me that she -- and this was at the | 13:44:06 |
| 21 | point when she called Mr. Toberoff and said that she | 13:44:11 |
| 22 | had gotten his name from Jean Peavy and she was | 13:44:15 |
| 23 | interested in knowing, you know, who he had | 13:44:19 |
| 24 | represented and, you know, what his attitude was | 13:44:22 |
| 25 | towards -- towards intellectual property.  So they had | 13:44:26 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | a conversation. | 13:44:30 |
| 2 | Q.    You're now reporting what your mother told | 13:44:30 |
| 3 | you about her first conversation with Mr. Toberoff; | 13:44:33 |
| 4 | right? | 13:44:35 |
| 5 | A.    Yes. | 13:44:35 |
| 6 | Q.    But before that first conversation, before | 13:44:36 |
| 7 | Mr. Toberoff -- before she called Mr. Toberoff -- | 13:44:39 |
| 8 | well, let me ask you that question.  We lawyers | 13:44:44 |
| 9 | shouldn't assume anything, so forgive me for having to | 13:44:48 |
| 10 | ask so many questions. | 13:44:51 |
| 11 | Did she call Mr. Toberoff first, or did he | 13:44:53 |
| 12 | call her based on, you know, some reference that he | 13:44:57 |
| 13 | had been given? | 13:45:01 |
| 14 | A.    No.  Jean Peavy gave his phone number to my | 13:45:02 |
| 15 | mom, and my mom called him. | 13:45:04 |
| 16 | Q.    Okay.  And before your mom called | 13:45:07 |
| 17 | Mr. Toberoff, you had already given your mom the | 13:45:10 |
| 18 | downloaded commuter material about him? | 13:45:14 |
| 19 | A.    No.  No. | 13:45:16 |
| 20 | Q.    No.  So the sequence of events was Jean Peavy | 13:45:17 |
| 21 | told your mother about Mr. Toberoff, and without | 13:45:21 |
| 22 | consulting you, your mother then called Mr. Toberoff | 13:45:23 |
| 23 | and then reported the conversation to you? | 13:45:27 |
| 24 | A.    No.  I think -- well, you know, I'm trying to | 13:45:29 |
| 25 | remember it.  I think -- I think she had the | 13:45:32 |

EXHIBIT D
135

| | | |
|---|---|---|
| 1 | conversation with Jean.  She told me about it, and | 13:45:36 |
| 2 | then she said, you know, "We should be looking" -- "We | 13:45:40 |
| 3 | should look into this," and probably around that time | 13:45:44 |
| 4 | I started looking up things on the Internet, and she | 13:45:48 |
| 5 | placed a call to him because she had gotten his phone | 13:45:51 |
| 6 | number from Jean. | 13:45:54 |
| 7 | Q.   And you don't know whether you had given her | 13:45:56 |
| 8 | the Internet materials before or after her phone call | 13:45:59 |
| 9 | with Mr. Toberoff? | 13:46:03 |
| 10 | A.   No, I don't remember. | 13:46:05 |
| 11 | Q.   Okay.  And so after the first phone call that | 13:46:06 |
| 12 | she reported to you -- | 13:46:10 |
| 13 | A.   Um-hum. | 13:46:10 |
| 14 | Q.   -- what was the next thing that happened? | 13:46:11 |
| 15 | A.   Well, she had asked for him to -- | 13:46:13 |
| 16 | MR. TOBEROFF:  Okay.  I just want to say | 13:46:15 |
| 17 | that -- | 13:46:17 |
| 18 | THE WITNESS:  Yeah. | 13:46:17 |
| 19 | MR. TOBEROFF:  -- when it comes to general | 13:46:18 |
| 20 | subject matter of a conversation in these | 13:46:22 |
| 21 | conversations, you can disclose it, but I don't want | 13:46:25 |
| 22 | you to disclose what your mother said I said to her or | 13:46:28 |
| 23 | she said to me -- | 13:46:31 |
| 24 | THE WITNESS:  Okay. | 13:46:33 |
| 25 | MR. TOBEROFF:  -- because that would be | 13:46:34 |

| | | |
|---|---|---|
| 1 | privileged. | 13:46:35 |
| 2 | MR. PETROCELLI:  Well, I disagree. | 13:46:36 |
| 3 | MR. TOBEROFF:  Even if she had not yet | 13:46:38 |
| 4 | retained me. | 13:46:38 |
| 5 | MR. PETROCELLI:  But we're going to have to | 13:46:39 |
| 6 | make a record here.  So if your lawyer instructs you | 13:46:40 |
| 7 | not to answer, that's one thing, but I don't want you | 13:46:45 |
| 8 | to answer my questions in a misleading way.  So I'll | 13:46:47 |
| 9 | just ask the questions, and either you'll answer or he | 13:46:50 |
| 10 | will instruct you not to answer. | 13:46:53 |
| 11 | THE WITNESS:  Um-hum.  Um-hum. | 13:46:54 |
| 12 | MR. PETROCELLI:  Okay. | 13:46:56 |
| 13 | Q.   So I think my question was after this initial | 13:46:56 |
| 14 | phone call and you downloaded the material on | 13:46:59 |
| 15 | Mr. Toberoff, what was the next step in terms of any | 13:47:08 |
| 16 | further contacts with Mr. Toberoff? | 13:47:11 |
| 17 | A.   Well, my mother wanted references, you know, | 13:47:13 |
| 18 | of other people that he had represented so that she | 13:47:17 |
| 19 | could, you know, interview them and get a feel for | 13:47:21 |
| 20 | what they thought of him and his work. | 13:47:25 |
| 21 | Q.   Your mother wanted references? | 13:47:30 |
| 22 | A.   Yes. | 13:47:31 |
| 23 | Q.   And then she asked you to go and get them? | 13:47:32 |
| 24 | A.   No.  She obtained them. | 13:47:36 |
| 25 | Q.   How do you know that? | 13:47:38 |

Page 122

| | | |
|---|---|---|
| 1 | By the way, I have to keep asking you that | 13:47:41 |
| 2 | because your mom is not here to testify. | 13:47:43 |
| 3 | A.    I understand. | 13:47:45 |
| 4 | Q.    Okay. | 13:47:46 |
| 5 | A.    No.  She gave me a copy of the printout of | 13:47:47 |
| 6 | the names and phone numbers of the people. | 13:47:50 |
| 7 | Q.    Do you still have a copy of the printout? | 13:47:53 |
| 8 | A.    I don't know. | 13:47:55 |
| 9 | Q.    Okay.  When you say a printout, what do you | 13:47:57 |
| 10 | mean by that? | 13:48:02 |
| 11 | A.    Well, I remember it was typed, but, you know, | 13:48:03 |
| 12 | I don't -- I don't know whether it came by -- by | 13:48:07 |
| 13 | e-mail or whether it was mailed to her.  That part I | 13:48:11 |
| 14 | don't remember. | 13:48:14 |
| 15 | Q.    How would it have come -- it wouldn't have | 13:48:14 |
| 16 | come from your mother to you by e-mail; right? | 13:48:17 |
| 17 | A.    No, that's true.  That's true, because she | 13:48:20 |
| 18 | didn't get it by e-mail.  So she must have -- it could | 13:48:22 |
| 19 | have been faxed to her because she had a fax machine, | 13:48:26 |
| 20 | so it was either faxed to her or it was mailed to her. | 13:48:29 |
| 21 | Q.    And do you know who gave it to her, this | 13:48:32 |
| 22 | list? | 13:48:35 |
| 23 | A.    Mr. Toberoff. | 13:48:35 |
| 24 | Q.    I see.  Do you know any of the names on the | 13:48:37 |
| 25 | list? | 13:48:44 |

```
 1      A.    Oh, I can't remember exactly.              13:48:44

 2      Q.    Did you contact any of the people?         13:48:49

 3      A.    My mother did.  My mother -- I was very     13:48:51

 4  involved in something at that time, so --            13:48:55

 5      Q.    That was your divorce?                      13:48:57

 6      A.    It -- yeah.                                 13:49:00

 7      Q.    Your divorce was around 2000; right?        13:49:00

 8      A.    No.  We separated in 2000, and I was heavily  13:49:03

 9  involved in divorce matters until -- it was either --  13:49:05

10  I think it was 2005 when things finally wrapped up.   13:49:08

11      Q.    When you said you were involved with        13:49:13

12  something in 2002 around this time period --          13:49:16

13      A.    Um-hum                                      13:49:19

14      Q.    -- that we're discussing, what were you      13:49:19

15  involved in?                                          13:49:22

16      A.    It could very well have been my divorce, or  13:49:22

17  it could have been illness on my part because my       13:49:25

18  multiple sclerosis and other illnesses that I have.    13:49:29

19      Q.    When --                                     13:49:32

20      A.    But she took the initiative to make the phone  13:49:32

21  calls, and this is what I'm saying.                    13:49:35

22      Q.    Okay.  And she contacted the references?  You  13:49:37

23  didn't contact any of them; is that right?             13:49:40

24      A.    I think I did contact one of them.           13:49:44

25      Q.    Who did you contact?                         13:49:46
```

LAURA SIEGEL LARSON - 7/22/2011

Page 124

| | | |
|---|---|---|
| 1 | A.    I don't know.  Maybe if I have some more time | 13:49:54 |
| 2 | to think about it, maybe it will come back to me. | 13:49:56 |
| 3 | Q.    You'll -- | 13:49:58 |
| 4 | A.    I'll think about it. | 13:49:59 |
| 5 | Q.    You'll let me know.  Okay? | 13:50:01 |
| 6 | A.    Yeah.  Yeah.  I mean I'll try and remember. | 13:50:02 |
| 7 | Q.    Do you remember any of the names your mom | 13:50:12 |
| 8 | contacted? | 13:50:19 |
| 9 | A.    Right here today at this minute, no.  I have | 13:50:21 |
| 10 | a mental picture of the page and with things typed on | 13:50:28 |
| 11 | it, but it's not clear enough for me to focus on, you | 13:50:32 |
| 12 | know, the names that were on it. | 13:50:35 |
| 13 | Q.    And you think it was a page that came from | 13:50:37 |
| 14 | Mr. Toberoff's office? | 13:50:40 |
| 15 | A.    Yes. | 13:50:40 |
| 16 | Q.    And it had several names on it? | 13:50:42 |
| 17 | A.    I -- I think it had at least three.  There | 13:50:45 |
| 18 | may have been more. | 13:50:48 |
| 19 | Q.    When is the last time you saw that piece of | 13:51:00 |
| 20 | paper? | 13:51:03 |
| 21 | A.    It's been a number of years. | 13:51:03 |
| 22 | Q.    After you and/or your mom made the phone | 13:51:10 |
| 23 | calls, did you and she discuss what you had learned? | 13:51:16 |
| 24 | A.    Yes. | 13:51:19 |
| 25 | Q.    Okay.  And you received, I assume, favorable | 13:51:20 |

| | | |
|---|---|---|
| 1 | reports? | 13:51:25 |
| 2 | A.   Yes.   She -- very favorable. | 13:51:25 |
| 3 | Q.   What was the next thing that then happened in | 13:51:29 |
| 4 | terms of contacting Mr. Toberoff? | 13:51:32 |
| 5 | A.   I think -- I think my mother said, you know, | 13:51:39 |
| 6 | "Maybe we should -- we should talk to him in person | 13:51:46 |
| 7 | and, you know, see if we like him." | 13:51:49 |
| 8 | Q.   And did that happen? | 13:51:54 |
| 9 | A.   Yes. | 13:51:55 |
| 10 | Q.   Who met with him? | 13:51:56 |
| 11 | A.   My mother and I. | 13:51:58 |
| 12 | Q.   And anyone else present? | 13:52:02 |
| 13 | A.   No. | 13:52:04 |
| 14 | Q.   Just you, your mother, and Mr. Toberoff? | 13:52:04 |
| 15 | A.   That's right. | 13:52:07 |
| 16 | Q.   And where was that meeting? | 13:52:07 |
| 17 | A.   It was in Beverly Hills. | 13:52:09 |
| 18 | Q.   At his -- | 13:52:12 |
| 19 | A.   An office in Beverly Hills. | 13:52:12 |
| 20 | Q.   His office? | 13:52:14 |
| 21 | A.   That first meeting I think we went to a | 13:52:17 |
| 22 | restaurant.   But -- no, no, no.   I think we met at the | 13:52:20 |
| 23 | Endeavor offices in a conference room. | 13:52:24 |
| 24 | Q.   Was Mr. Emanuel present at all? | 13:52:28 |
| 25 | A.   No, he was not. | 13:52:31 |

LAURA SIEGEL LARSON - 4/22/2011

```
 1       Q.   Did you -- when you were at the offices of      13:52:31
 2   Endeavor meeting Mr. Toberoff, that was your first        13:52:37
 3   time meeting with him; right?                             13:52:39
 4       A.   That's right.                                    13:52:40
 5       Q.   And you had heard of Mr. Emanuel by then;        13:52:41
 6   correct?                                                  13:52:55
 7       A.   No, we had not.                                  13:52:55
 8       Q.   Did you ask why --                               13:52:57
 9       A.   Oh, wait, wait, wait.  I'm sorry.  Yes, we       13:52:58
10   did.                                                      13:53:00
11       Q.   Yeah, you were meeting in his firm; right?       13:53:00
12       A.   Yeah, but it wasn't -- he wasn't a part of       13:53:02
13   the discussion.                                           13:53:05
14       Q.   Did you ask why you were meeting in his          13:53:08
15   office?                                                   13:53:11
16       A.   I think --                                       13:53:11
17            MR. TOBEROFF:  Vague and ambiguous.              13:53:14
18            THE WITNESS:  We weren't meeting in his          13:53:16
19   office.  We were meeting in a conference room, and,       13:53:18
20   you know, there was no meeting with Mr. Emanuel.          13:53:22
21   BY MR. PETROCELLI:                                        
22       Q.   You said you had heard of him by then.           13:53:28
23       A.   I'm sorry.  Had heard of Mr. --                  13:53:31
24       Q.   Thank you.  You said you had heard of            13:53:32
25   Mr. Emanuel --                                            13:53:35
```

LAURA SIEGEL LARSON 7/22/2011

```
 1      A.    Okay.                                          13:53:35

 2      Q.    -- as of the date that you were meeting with   13:53:35

 3   Mr. Toberoff and your mother in the conference room at  13:53:38

 4   Endeavor.                                               13:53:41

 5      A.    Yes.                                           13:53:41

 6      Q.    Okay.  That was on -- Endeavor's offices are   13:53:42

 7   in Beverly Hills I think on Camden; is that correct?    13:53:47

 8      A.    Probably.                                      13:53:51

 9      Q.    Okay.  And how had you heard of Mr. Emanuel?   13:53:51

10      A.    Well, he was in Variety and in The Hollywood   13:53:57

11   Reporter, and, you know, he had a, you know, a high     13:54:01

12   profile as, you know, as an agent.                      13:54:06

13      Q.    But you had also heard of him in connection    13:54:09

14   with Mr. Toberoff; correct?  By the time you were       13:54:13

15   meeting with Mr. Toberoff in the Endeavor office?       13:54:15

16      A.    Yes.                                           13:54:18

17      Q.    Okay.  And is that something your mother       13:54:19

18   learned in her conversations with Mr. Toberoff that     13:54:22

19   she reported to you?                                    13:54:27

20      A.    She may have mentioned that.                   13:54:30

21      Q.    Did you uncover any of that in your research   13:54:31

22   at all?                                                 13:54:34

23      A.    I -- I think there may have been one -- one    13:54:36

24   article.  I mean there were certainly, you know,        13:54:40

25   things on the Internet about Emanuel that I read at     13:54:43
```

LAURA SIEGEL LARSON 7/22/2011

Page 128

| | | |
|---|---|---|
| 1 | one point or another, but what the sequence was in | 13:54:47 |
| 2 | time, I can't recall. | 13:54:50 |
| 3 | Q.   After that -- were there any documents | 13:54:52 |
| 4 | displayed or used or exchanged at that first meeting | 13:55:01 |
| 5 | with Mr. Toberoff? | 13:55:06 |
| 6 | A.   No.  It was really a -- pretty much a casual | 13:55:08 |
| 7 | meet and greet kind of thing, just "Hi," you know. | 13:55:13 |
| 8 | Q.   Before entering into the first agreement with | 13:55:19 |
| 9 | Mr. Toberoff and Mr. Emanuel in October of 2002, the | 13:55:22 |
| 10 | one that we just saw -- | 13:55:25 |
| 11 | A.   Um-hum. | 13:55:27 |
| 12 | Q.   Actually, it says "as of October, 2002," had | 13:55:28 |
| 13 | you interviewed any other people to assist in | 13:55:33 |
| 14 | connection with your Superman issues? | 13:55:39 |
| 15 | A.   I -- | 13:55:43 |
| 16 | MR. TOBEROFF:  Vague. | 13:55:45 |
| 17 | THE WITNESS:  In what time frame are you | 13:55:47 |
| 18 | talking about? | 13:55:49 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q.   Oh, in 2002. | 13:55:51 |
| 21 | A.   2002, I believe I spoke to some people on the | 13:55:55 |
| 22 | phone, you know, following things that I found on the | 13:56:00 |
| 23 | Internet to try and see whether, you know, whether the | 13:56:03 |
| 24 | firm was taking on new clients or something like that. | 13:56:06 |
| 25 | Q.   Who did you speak to? | 13:56:08 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | A.   You know, I would have to see whether I can | 13:56:10 |
| 2 | remember that.  You know, this period of time is not | 13:56:16 |
| 3 | all that easy for me to recall. | 13:56:18 |
| 4 | Q.   You did speak to some lawyers? | 13:56:20 |
| 5 | A.   I don't know whether I spoke directly to like | 13:56:23 |
| 6 | the lawyer or whether I was speaking to an associate. | 13:56:26 |
| 7 | I really don't remember. | 13:56:30 |
| 8 | Q.   Did you speak to any -- | 13:56:32 |
| 9 | A.   But I wasn't particularly interested in them, | 13:56:33 |
| 10 | so it didn't kind of lodge itself in my memory. | 13:56:35 |
| 11 | Q.   Why did you call them if you weren't | 13:56:38 |
| 12 | interested in them? | 13:56:40 |
| 13 | A.   No.  I mean after talking and, you know, just | 13:56:41 |
| 14 | getting a feel for, you know, it was a company that | 13:56:44 |
| 15 | did have a conflict of interest or they were closely | 13:56:47 |
| 16 | aligned with a lot of studios, and it just didn't seem | 13:56:50 |
| 17 | to feel like a good fit for us. | 13:56:54 |
| 18 | Q.   Is it fair to say that you contacted | 13:56:56 |
| 19 | entertainment lawyers in town? | 13:57:00 |
| 20 | A.   Yes. | 13:57:02 |
| 21 | Q.   Okay.  And you obtained their names from | 13:57:02 |
| 22 | Internet work that you did? | 13:57:08 |
| 23 | A.   Well, you know, I had interviewed a lot of | 13:57:09 |
| 24 | entertainment attorneys prior to retaining Gang Tyre, | 13:57:15 |
| 25 | so I had already talked to and eliminated a number of | 13:57:21 |

EXHIBIT D
145

| | | |
|---|---|---|
| 1 | people a couple of years before this.  So, you know, | 13:57:25 |
| 2 | during -- from that search I already had knowledge of | 13:57:30 |
| 3 | people not to bother to contact this time. | 13:57:34 |
| 4 | Q.    You didn't go back to the people you had | 13:57:36 |
| 5 | eliminated; right? | 13:57:38 |
| 6 | A.    No, no, because at that time we interviewed a | 13:57:40 |
| 7 | lot of people. | 13:57:43 |
| 8 | Q.    Can you remember the names of any of the | 13:57:44 |
| 9 | firms that you contacted? | 13:57:47 |
| 10 | A.    Yeah.  There was somebody at William Morris. | 13:57:48 |
| 11 | There were some -- God, what was the -- I remember the | 13:57:52 |
| 12 | office.  There was an office on Olympic where there | 13:57:57 |
| 13 | was a fairly large firm. | 13:58:00 |
| 14 | Q.    Is that Mitchell, Silberberg & Knupp? | 13:58:02 |
| 15 | A.    It could have been.  It could have been.  I | 13:58:05 |
| 16 | think there was somebody in that office.  My | 13:58:07 |
| 17 | ex-husband had been asking around.  He's an attorney, | 13:58:10 |
| 18 | so he asked some people for referrals. | 13:58:13 |
| 19 | Q.    We're now talking about 2002. | 13:58:16 |
| 20 | A.    No.  I'm talking about prior to retaining | 13:58:18 |
| 21 | Gang Tyre in 1999. | 13:58:22 |
| 22 | Q.    Those are the folks that you contacted and | 13:58:24 |
| 23 | eliminated. | 13:58:28 |
| 24 | A.    Correct. | 13:58:28 |
| 25 | Q.    Someone at William Morris and someone -- | 13:58:29 |

EXHIBIT D
146

| | | |
|---|---|---|
| 1 | A.   There were probably at least five to seven. | 13:58:32 |
| 2 | Oh, what was the name of that guy?  We talked to Joel | 13:58:37 |
| 3 | Gotler. | 13:58:43 |
| 4 | Q.   Again, in '97? | 13:58:43 |
| 5 | A.   No.  '99. | 13:58:45 |
| 6 | Q.   '99.  Excuse me.  Right. | 13:58:46 |
| 7 | A.   Yeah.  I know we talked -- we met quite a bit | 13:58:48 |
| 8 | with Joel Gotler several times but ultimately decided | 13:58:52 |
| 9 | not to hire him and went with Gang Tyre. | 13:58:55 |
| 10 | Q.   Now going to 2002, other than Mr. Toberoff, | 13:58:58 |
| 11 | can you search your memory and tell me the names of | 13:59:04 |
| 12 | any firm or person that you contacted? | 13:59:08 |
| 13 | A.   I can think about it, but right now I can't | 13:59:10 |
| 14 | remember specifically. | 13:59:13 |
| 15 | Q.   Do you have some notes at home about this? | 13:59:16 |
| 16 | A.   Possibly. | 13:59:21 |
| 17 | Q.   Do you remember whether you actually met | 13:59:22 |
| 18 | anyone in person other than Mr. Toberoff? | 13:59:25 |
| 19 | A.   I don't think so. | 13:59:28 |
| 20 | Q.   Do you know whether your mother spoke to | 13:59:30 |
| 21 | other people other than Mr. Toberoff in 2002? | 13:59:33 |
| 22 | A.   I don't remember her mentioning anyone | 13:59:40 |
| 23 | specific. | 13:59:48 |
| 24 | Q.   What happened after the discussion with | 13:59:49 |
| 25 | Mr. Toberoff at the offices of Endeavor?  What was the | 13:59:55 |

```
 1    next thing that happened regarding your entering into      13:59:58
 2    an agreement with Mr. Toberoff and Mr. Emanuel?            14:00:00
 3         A.    Well, we were -- we were very impressed with    14:00:05
 4    Mr. Toberoff's history of commitment to helping            14:00:11
 5    authors and his, you know, knowledge of intellectual       14:00:20
 6    property issues, and we found a rapport with him that      14:00:24
 7    we hadn't found with people that we had historically       14:00:30
 8    spoken to, whether it was in 1999 or whenever, you         14:00:33
 9    know.  So it felt -- it felt comfortable.                  14:00:36
10         Q.    So what was the next step then after the        14:00:41
11    discussion at Endeavor?                                    14:00:46
12         A.    Well, it was a discussion with my mom about,    14:00:47
13    you know, what was our comfort level.                      14:00:50
14         Q.    I see.                                          14:00:52
15         A.    And so after that, I think we got back to him   14:00:53
16    and we asked to -- oh, yeah.  This is when we asked to     14:00:59
17    see copies of briefs, things that he had done for          14:01:03
18    other clients, because we wanted to get a feel for the     14:01:08
19    quality of his work, his legal work.                       14:01:13
20         Q.    Did you get them?                               14:01:16
21         A.    Yes.                                            14:01:16
22         Q.    What were they?  Do you remember?               14:01:16
23         A.    Well, they were specific to cases that he had   14:01:18
24    handled, and we liked them.                                14:01:25
25         Q.    How did you request them?                       14:01:27
```

| | | | |
|---|---|---|---|
| 1 | A. | A verbal request. | 14:01:31 |
| 2 | Q. | Over the telephone? | 14:01:33 |
| 3 | A. | I think we asked him in that -- in that | 14:01:34 |
| 4 | | meeting, either in that meeting or over the telephone. | 14:01:37 |
| 5 | Q. | How long thereafter did you receive these | 14:01:40 |
| 6 | | materials? | 14:01:43 |
| 7 | A. | Very quickly. | 14:01:43 |
| 8 | Q. | How did you receive them? | 14:01:45 |
| 9 | A. | Well, there was a big stack of them, so I | 14:01:48 |
| 10 | | think they came in the mail. | 14:01:51 |
| 11 | Q. | And did you read them? | 14:01:55 |
| 12 | A. | Yes. | 14:01:57 |
| 13 | Q. | Did you have anyone else take a look at them? | 14:02:00 |
| 14 | A. | My mother looked at them. | 14:02:02 |
| 15 | Q. | Did you have anyone else like Mr. Levine or | 14:02:05 |
| 16 | | Mr. -- | 14:02:09 |
| 17 | A. | George might have looked at them. | 14:02:09 |
| 18 | Q. | George. | 14:02:11 |
| 19 | A. | George might have looked at them. | 14:02:12 |
| 20 | Q. | You would have e-mailed them to him? | 14:02:14 |
| 21 | A. | No, because they didn't have it in electronic | 14:02:17 |
| 22 | | form.  You know, if there -- if there was something | 14:02:19 |
| 23 | | that I had a question about, I may have faxed, you | 14:02:22 |
| 24 | | know, one of the briefs to him or something. | 14:02:26 |
| 25 | Q. | Do you remember what the specific documents | 14:02:31 |

Case 2:10-cv-03633-ODW-RZ    Document 316-5    Filed 09/02/11    Page 136 of 344
LAURA SIEGEL LARSON 210/022/2011
Page ID #:21030

Page 134

```
 1    were that you received and reviewed?                14:02:33

 2         A.    Are you asking me what the cases were?   14:02:38

 3         Q.    Or anything you can recall about them.   14:02:40

 4         A.    I -- I believe that one of them was -- maybe  14:02:42

 5    it was a motion for summary judgment, and there    14:02:46

 6    were -- there were -- you know, there were various  14:02:50

 7    briefs.  They weren't all the same type of brief,  14:02:53

 8    which was kind of, you know, reassuring because I   14:02:55

 9    think my mom and I both wanted to get an idea for how  14:02:58

10    his -- how his mind worked, and so this told us, you  14:03:03

11    know, his approach and how he argues things having to  14:03:07

12    do with intellectual property.                      14:03:11

13         Q.    Did you -- were they copyright termination  14:03:13

14    cases on behalf of similarly situated authors or    14:03:17

15    heirs?                                              14:03:22

16         A.    I don't think they were copyright        14:03:22

17    termination.                                        14:03:26

18         Q.    You still have those papers at your home?  14:03:27

19         A.    Could be.                                14:03:29

20         Q.    Okay.  What was the next thing that happened  14:03:32

21    after you reviewed those materials that he sent you?  14:03:34

22         A.    We called him back and --               14:03:38

23         Q.    A telephone call?                        14:03:42

24         A.    Meaning my mother and I, yes.  I don't know  14:03:43

25    whether we were both on the phone or what, but, you  14:03:47
```

| | | |
|---|---|---|
| 1 | know, either one or both of us said that we were, you | 14:03:50 |
| 2 | know, interested in him representing us. | 14:03:55 |
| 3 | Q.    What happened next? | 14:03:59 |
| 4 | A.    I think, you know, he said he was delighted, | 14:04:02 |
| 5 | and, you know, beyond that, I think we got into | 14:04:07 |
| 6 | discussing matters relating to our case. | 14:04:10 |
| 7 | Q.    What happened next? | 14:04:14 |
| 8 | A.    We formalized our arrangement. | 14:04:18 |
| 9 | Q.    And then you signed what we previously saw as | 14:04:21 |
| 10 | Exhibit 45? | |
| 11 | A.    Was that the -- | 14:04:28 |
| 12 | Q.    Is that 46?  What's the exhibit number? | 14:04:29 |
| 13 | A.    This one? | 14:04:31 |
| 14 | Q.    Let me see. | 14:04:32 |
| 15 | A.    45. | 14:04:33 |
| 16 | Q.    45.  Okay. | 14:04:34 |
| 17 | A.    Yes. | 14:04:37 |
| 18 | Q.    Which is the document that's dated as of | 14:04:39 |
| 19 | October 3, 2002; correct? | 14:04:43 |
| 20 | A.    Correct. | 14:04:47 |
| 21 | Q.    Now -- | 14:04:50 |
| 22 | A.    But the -- you know -- well -- | 14:04:50 |
| 23 | MR. TOBEROFF:  Wait for the question. | 14:04:53 |
| 24 | THE WITNESS:  I was just going to say -- | 14:04:55 |
| 25 | MR. TOBEROFF:  Wait. | 14:04:56 |

Page 136

```
 1   BY MR. PETROCELLI:                                    14:04:57
 2       Q.   Now, prior to your getting this document, you 14:04:58
 3   had to have some discussion about the role of Ari     14:05:04
 4   Emanuel.                                              14:05:08
 5       A.   Yes.                                         14:05:09
 6       Q.   Given that you're not -- you were not given a 14:05:09
 7   litigation retainer agreement of the sort that you    14:05:13
 8   filed in 2004, but you're given a --                  14:05:15
 9            MR. TOBEROFF:  Signed.                        14:05:19
10   BY MR. PETROCELLI:
11       Q.   -- representation --                          14:05:20
12            Excuse me?                                    14:05:21
13            MR. TOBEROFF:  You said "filed" in --         14:05:22
14            MR. PETROCELLI:  Thank you.                   14:05:24
15       Q.   Given that you did not receive and then sign  14:05:25
16   a litigation agreement in 2002, but instead received  14:05:28
17   and ended up signing this particular agreement,       14:05:33
18   Exhibit 45 --                                         14:05:37
19       A.   Yes.                                         14:05:37
20       Q.   -- with a company called IP Worldwide signed  14:05:38
21   by Mr. Emanuel and Mr. Toberoff, at some point in your 14:05:42
22   chronology --                                         14:05:50
23       A.   Um-hum.                                      14:05:50
24       Q.   -- there had to have been some discussion     14:05:51
25   about Mr. Emanuel; is that right?                      14:05:54
```

| | | |
|---|---|---|
| 1 | A.    Yes. | 14:05:56 |
| 2 | Q.    Okay.  And prior to signing this document, | 14:05:57 |
| 3 | Exhibit 45, did you meet Mr. Emanuel? | 14:06:02 |
| 4 | A.    I believe we did. | 14:06:04 |
| 5 | Q.    Okay.  And did your mother meet him? | 14:06:06 |
| 6 | A.    Yes. | 14:06:08 |
| 7 | Q.    Where did you meet him? | 14:06:09 |
| 8 | A.    At Endeavor. | 14:06:10 |
| 9 | Q.    Again, before signing Exhibit 45; right? | 14:06:12 |
| 10 | A.    I believe so. | 14:06:15 |
| 11 | Q.    Okay.  And who else was present at that | 14:06:16 |
| 12 | meeting? | 14:06:18 |
| 13 | A.    My mother, I was there, Mr. Emanuel, and | 14:06:20 |
| 14 | Mr. Toberoff. | 14:06:25 |
| 15 | Q.    Okay.  And this is the first time you met | 14:06:25 |
| 16 | Mr. Emanuel? | 14:06:29 |
| 17 | A.    Yes. | 14:06:30 |
| 18 | Q.    And did you have a draft of this agreement, | 14:06:31 |
| 19 | Exhibit 45, as of the date of your meeting with | 14:06:38 |
| 20 | Mr. Emanuel? | 14:06:41 |
| 21 | A.    I don't believe so. | 14:06:42 |
| 22 | Q.    And what was discussed at that meeting? | 14:06:44 |
| 23 | A.    Well, since that was the first time we were | 14:06:53 |
| 24 | meeting Mr. Emanuel, we wanted to know what his vision | 14:06:57 |
| 25 | was of the character and what he thought he might, you | 14:07:01 |

LAURA SIEGEL LARSON 10/22/2011

Page 138

| | | |
|---|---|---|
| 1 | know, bring to us as a representative. | 14:07:06 |
| 2 | Q.   Did you ask Mr. Emanuel about the nature of | 14:07:10 |
| 3 | his relationship with Mr. Toberoff and their business, | 14:07:16 |
| 4 | IPW, and what work they had done together or whether | 14:07:19 |
| 5 | this was their maiden voyage and, you know, things | 14:07:22 |
| 6 | like that? | 14:07:25 |
| 7 | A.   No, because we knew that Ari's reputation was | 14:07:26 |
| 8 | huge.  He had, you know, a long -- a long-term, you | 14:07:33 |
| 9 | know -- what am I trying to say?  He had a long-term | 14:07:38 |
| 10 | high profile in the entertainment industry, and, you | 14:07:42 |
| 11 | know, that was -- those were his credentials.  We had | 14:07:46 |
| 12 | researched Mr. Toberoff's credentials.  We were | 14:07:52 |
| 13 | looking at them as two individuals who would be | 14:07:55 |
| 14 | serving different functions for us, but they were | 14:07:59 |
| 15 | united, so we were kind of getting a two for one in | 14:08:02 |
| 16 | the deal in a sense. | 14:08:05 |
| 17 | Q.   A dynamic duo. | 14:08:06 |
| 18 | A.   Yes. | 14:08:08 |
| 19 | Q.   Okay. | 14:08:10 |
| 20 | A.   You could say that. | 14:08:10 |
| 21 | Q.   Now, as of the time -- | 14:08:13 |
| 22 | MR. TOBEROFF:  That's a competing property. | 14:08:17 |
| 23 | MR. PETROCELLI:  I understand. | 14:08:20 |
| 24 | THE WITNESS:  I know.  You know, dynamic duo. | 14:08:21 |
| 25 | I hear that. | 14:08:22 |

|    |                                                            |          |
|----|------------------------------------------------------------|----------|
| 1  | MR. PETROCELLI:  Or we could go Clark Kent,                | 14:08:25 |
| 2  | Superman, you know, either way.                            | 14:08:26 |
| 3  | Q.   From the time that you first met Mr. Toberoff         | 14:08:28 |
| 4  | until the meeting with Mr. Toberoff and Mr. Emanuel --     | 14:08:32 |
| 5  | A.   Um-hum.                                               | 14:08:35 |
| 6  | Q.   -- what's a -- how long did that take in             | 14:08:36 |
| 7  | between?                                                    | 14:08:40 |
| 8  | A.   Not very long.                                        | 14:08:40 |
| 9  | Q.   A week?                                               | 14:08:41 |
| 10 | A.   Possibly.                                             | 14:08:43 |
| 11 | Q.   Okay.  And again, that was also at the               | 14:08:44 |
| 12 | offices of Endeavor?                                        | 14:08:48 |
| 13 | A.   Correct.                                              | 14:08:49 |
| 14 | Q.   And no one else was there except the four of         | 14:08:49 |
| 15 | you; right?                                                | 14:08:53 |
| 16 | A.   No, because we went in at this -- for that           | 14:08:53 |
| 17 | meeting we went into Mr. Emanuel's office.  It wasn't      | 14:08:56 |
| 18 | in a conference room.  It was in Mr. Emanuel's office.     | 14:09:01 |
| 19 | Q.   But did anybody else participate at all in           | 14:09:04 |
| 20 | any part of the meeting?                                    | 14:09:06 |
| 21 | A.   No.                                                   | 14:09:08 |
| 22 | Q.   Like anybody else from his agency come in?           | 14:09:08 |
| 23 | A.   No.                                                   | 14:09:11 |
| 24 | Q.   Okay.  Now, did you understand that you were         | 14:09:11 |
| 25 | doing this deal with Mr. Emanuel as part of IP            | 14:09:17 |

EXHIBIT D
155

LAURA SIEGEL LARSON - 6/22/2011

```
 1    Worldwide or Mr. Emanuel as part of Endeavor or both?        14:09:23

 2        A.    No.   By that time, you know, we understood        14:09:27

 3    that, you know, that the intellectual property aspects       14:09:31

 4    that we were interested in, you know, was under this         14:09:36

 5    heading of IP Worldwide.                                     14:09:40

 6        Q.    Okay.   Did you understand that Endeavor, the      14:09:44

 7    talent agency, was somehow involved in your agreement        14:09:47

 8    with IP Worldwide, or was it just Ari Emanuel and            14:09:52

 9    Mr. Toberoff?                                                14:09:58

10        A.    I believe that Endeavor was going to supply        14:09:59

11    some support services, but, you know, it was Ari             14:10:01

12    Emanuel that we were interested in.   We weren't             14:10:09

13    interested in Endeavor.                                      14:10:11

14        Q.    Okay.                                              14:10:16

15              Now, by the time of this meeting, and indeed       14:10:17

16    by the time of your first meeting with Mr. Toberoff --       14:10:20

17        A.    Um-hum.                                            14:10:24

18        Q.    -- you had already heard that Mr. Toberoff         14:10:26

19    and Mr. Emanuel had presented an offer to your prior         14:10:29

20    counsel, Mr. Marks; right?                                   14:10:38

21        A.    Yes.                                               14:10:40

22        Q.    Okay.   And an offer to acquire the property;      14:10:43

23    correct?                                                     14:10:45

24        A.    It was an offer to -- I believe to market the      14:10:48

25    property.                                                    14:11:01
```

LAURA SIEGEL LARSON - 3/22/2011

Page 141

1    Q.    An offer to market the property to whom?                    14:11:01

2    A.    You know, I mean I don't have, you know,                    14:11:06

3    anything in front of me right now.  I'm trying to                14:11:09

4    recall the exact terminology, but to represent -- to            14:11:12

5    represent us concerning our rights.                             14:11:18

6    Q.    Now, when you heard that Ari Emanuel and Marc             14:11:21

7    Toberoff had approached Kevin Marks, it was --                   14:11:26

8    correct?                                                         14:11:31

9    A.    Yes.                                                       14:11:31

10   Q.    When you learned that Ari Emanuel and Marc                14:11:32

11   Toberoff had approached Kevin Marks about, as you just          14:11:37

12   put it, representing the property for purposes of               14:11:40

13   marketing it, was that before or after Jean Peavy gave          14:11:46

14   your mother the name of Marc Toberoff?                          14:11:55

15   A.    I don't recall exactly, but it must have been            14:12:03

16   kind of like all around the same time.                          14:12:08

17   Q.    Well, if Jean Peavy is giving the name of                14:12:11

18   Marc --                                                         14:12:14

19   A.    No, no, no.  It had to be after.                         14:12:15

20   Q.    So Jean Peavy -- just to get the sequence                14:12:17

21   straight, Jean Peavy gives the name of Marc Toberoff            14:12:21

22   to your mother.  You and your mother then do some due          14:12:23

23   diligence on Marc Toberoff.                                     14:12:29

24   A.    Right.                                                    14:12:30

25   Q.    And right around that same period of time               14:12:30

```
1    when you're doing this due diligence about Marc      14:12:33
2    Toberoff, you suddenly hear that Marc Toberoff and Ari 14:12:39
3    Emanuel have contacted Kevin Marks?                   14:12:44
4         A.   No, no.  That's why I said, after you said 14:12:46
5    that, that it had to have -- we -- we did not know of 14:12:48
6    Marc Toberoff, to my recollection, of Marc Toberoff or 14:12:54
7    Ari Emanuel independently of the information that we  14:12:59
8    were given by Kevin Marks.  We were in the process of 14:13:01
9    looking for other attorneys during that period of    14:13:06
10   time.                                                 14:13:10
11        Q.   So --                                       14:13:10
12        A.   So we had already -- you know, in March we 14:13:11
13   had contacted Gerry Spence.  We were looking at       14:13:13
14   various people.                                       14:13:16
15        Q.   And you said March because you saw the file 14:13:16
16   recently.                                             14:13:19
17        A.   A couple of days ago.                       14:13:20
18        Q.   That had the date on it.  You would never  14:13:21
19   have remembered that; correct?                        14:13:25
20        A.   No, I would not have remembered it.         14:13:27
21        Q.   So in March you contacted Gerry Spence.  He 14:13:29
22   had a conflict.  So continue.                         14:13:33
23        A.   Yeah.  So we were thinking about other      14:13:33
24   attorneys.  At what point my mom revealed to Jean that 14:13:37
25   we were looking for other attorneys and she mentioned 14:13:39
```

```
 1    his name, I'm not sure.  However, logic tells me that    14:13:43
 2    it must have been after it was -- it was already         14:13:52
 3    mentioned to us, you know, that Kevin Marks had           14:13:57
 4    received contact from them because the name didn't        14:14:00
 5    ring a bell.  You know, it just --                        14:14:03
 6         Q.    I'm getting confused about the sequence, and  14:14:07
 7    I want to be clear about this.                            14:14:09
 8         A.    Well, I'm confused about the sequence too.    14:14:10
 9         Q.    Okay.  Well, maybe we can see if we can do    14:14:13
10    the best we can to get the best recollection you have    14:14:15
11    on this.                                                  14:14:18
12         A.    Um-hum.                                        14:14:18
13         Q.    What happened first is the question --        14:14:21
14    okay? -- your learning about Marc Toberoff from your     14:14:23
15    mother and your mother calling him up and you're         14:14:31
16    checking him out on the Internet or your learning        14:14:35
17    about Marc Toberoff and Ari Emanuel from Kevin Marks?    14:14:40
18         A.    I would be guessing.  I can't -- I can't 100  14:14:48
19    percent say.  But --                                     14:14:57
20         Q.    Well, when you had -- if Jean Peavy had told  14:15:00
21    your mother about a guy named Marc Toberoff --           14:15:11
22         A.    Well, she said "I've got a lawyer."           14:15:15
23         Q.    -- you would have said, "Oh, that's the same  14:15:17
24    guy that Mark -- Kevin Marks just told us about, and     14:15:19
25    he's with Ari Emanuel," and you would have made that     14:15:24
```

Page 144

```
 1    connection; correct?                          14:15:28

 2        A.   It sounds that way.  I don't remember it that   14:15:28

 3    way, but as I said, logic sort of says that that would  14:15:31

 4    probably be the case.                          14:15:33

 5        Q.   So then did you ask yourself why is a guy   14:15:34

 6    that we're thinking about hiring as a lawyer calling   14:15:37

 7    Kevin Marks and presenting himself as a person who   14:15:42

 8    will market a property?                        14:15:45

 9        A.   You know, what Kevin Marks told us was that   14:15:48

10    Marc Toberoff was a lawyer, you know, who was   14:15:53

11    partnered with a Hollywood agent.  You know, it didn't   14:15:57

12    seem to us that he was recommending him as anything.   14:16:00

13    He wasn't recommending him at all.  You know, he was   14:16:06

14    simply relaying to us that there was an intellectual   14:16:09

15    property lawyer named Marc Toberoff who was partnered   14:16:14

16    with a Hollywood agent, you know, named Ari Emanuel.   14:16:16

17        Q.   And that they had called him to --   14:16:21

18        A.   They had called him to see what the status   14:16:23

19    was of the Superman.                           14:16:25

20        Q.   Well, let's be clear.  Mr. Marks -- Mr. Marks   14:16:28

21    didn't tell you that Marc Toberoff called him and   14:16:32

22    said, "Hey, Mr. Marks, I'm a lawyer, and I want to   14:16:35

23    take your client away from you."               14:16:38

24        A.   He didn't --                         14:16:40

25             MR. TOBEROFF:  Wait a second.          14:16:41
```

EXHIBIT D
160

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 14:16:41 |
| 2 | Q. He didn't say that to you; right? | 14:16:42 |
| 3 | A. Yes, that's right. | 14:16:43 |
| 4 | MR. TOBEROFF: I don't want you getting | |
| 5 | into -- | |
| 6 | THE WITNESS: I shouldn't be talking about -- | 14:16:44 |
| 7 | MR. TOBEROFF: -- the disclosure about what | 14:16:45 |
| 8 | Mr. Marks said to you or didn't say other than broad | 14:16:47 |
| 9 | subjects. | 14:16:51 |
| 10 | THE WITNESS: Okay. | 14:16:52 |
| 11 | BY MR. PETROCELLI: | |
| 12 | Q. But you have already testified that what | 14:16:52 |
| 13 | Mr. Marks told you is that these were two people who | 14:16:56 |
| 14 | were calling about marketing the property; correct? | 14:16:58 |
| 15 | A. He didn't tell us anything. He wrote | 14:17:02 |
| 16 | something to us in the mail. | 14:17:06 |
| 17 | Q. Okay. You received that by way of a written | 14:17:08 |
| 18 | communication. | 14:17:10 |
| 19 | A. Correct. | 14:17:10 |
| 20 | Q. A letter? | 14:17:11 |
| 21 | A. Yes. | 14:17:12 |
| 22 | Q. Okay. Do you have a copy of it? | 14:17:14 |
| 23 | A. I believe so. | 14:17:18 |
| 24 | Q. When is the last time you saw it? | 14:17:19 |
| 25 | A. It's been quite a while. | 14:17:21 |

LAURA SIEGEL LARSON - 6/22/2011

| | | |
|---|---|---|
| 1 | Q.   And did Mr. Marks convey to you -- by the | 14:17:23 |
| 2 | way, to whom was the letter addressed? | 14:17:33 |
| 3 | A.   To my mother and to me. | 14:17:35 |
| 4 | Q.   And so he would have mailed -- he mailed two | 14:17:37 |
| 5 | copies, one to you and one to your mother at the | 14:17:41 |
| 6 | separate addresses? | 14:17:44 |
| 7 | A.   Yeah, I would think so. | 14:17:45 |
| 8 | Q.   Okay. | 14:18:03 |
| 9 | Hold on one second. | 14:18:04 |
| 10 | (Pause in proceedings.) | 14:18:23 |
| 11 | BY MR. PETROCELLI: | |
| 12 | Q.   Did -- | 14:18:25 |
| 13 | So I'm sorry.  I'm trying to get some | 14:18:26 |
| 14 | information from my colleagues so I can frame my next | 14:18:29 |
| 15 | question. | 14:18:33 |
| 16 | Did -- I apologize for asking you again, but | 14:18:36 |
| 17 | did you say you received a copy at your home and your | 14:18:38 |
| 18 | mother also received a copy? | 14:18:42 |
| 19 | A.   Yes. | 14:18:43 |
| 20 | Q.   Okay. | 14:18:44 |
| 21 | A.   However, my mother -- | 14:18:52 |
| 22 | MR. TOBEROFF:  Hey, there's no question | 14:18:53 |
| 23 | pending. | 14:18:54 |
| 24 | THE WITNESS:  Okay. | 14:18:55 |
| 25 | BY MR. PETROCELLI: | |

EXHIBIT D
162

|    |    |    |
|----|----|----|
| 1  | Q.    Did you -- have you seen that letter in the | 14:18:57 |
| 2  | last week? | 14:18:59 |
| 3  | A.    No. | 14:18:59 |
| 4  | MR. TOBEROFF:  Asked and answered. | 14:19:00 |
| 5  | BY MR. PETROCELLI: | |
| 6  | Q.    Now, the letter said that an offer had been | 14:19:01 |
| 7  | made? | 14:19:11 |
| 8  | MR. TOBEROFF:  I instruct you not to answer | 14:19:11 |
| 9  | as to the contents of the attorney-client | 14:19:13 |
| 10 | communication.  I allowed you to broadly speak about | 14:19:17 |
| 11 | the subject matter. | 14:19:20 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.    Did the letter state that Mr. Toberoff and | 14:19:21 |
| 14 | Mr. Emanuel were themselves seeking to acquire the | 14:19:28 |
| 15 | interest in your Superman rights? | 14:19:36 |
| 16 | MR. TOBEROFF:  Attorney-client privilege. | 14:19:38 |
| 17 | Instruct you not to answer. | 14:19:39 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.    Did the letter say that Mr. Toberoff and | 14:19:41 |
| 20 | Mr. Emanuel had a wealthy investor who might be | 14:19:49 |
| 21 | interested in acquiring your rights? | 14:19:56 |
| 22 | MR. TOBEROFF:  Same instruction and | 14:19:58 |
| 23 | objection. | 14:20:00 |
| 24 | BY MR. PETROCELLI: | |
| 25 | Q.    Did the letter indicate that such an investor | 14:20:01 |

Page 148

```
 1    was willing to pay much more money than the last offer      14:20:04

 2    Warner Bros. and DC Comics had made to you?                  14:20:11

 3         MR. TOBEROFF:  Same objection.  Same                    14:20:16

 4    instruction.                                                 14:20:16

 5    BY MR. PETROCELLI:

 6    Q.   Did the letter indicate that such an investor           14:20:16

 7    or party was interested in paying as much as                 14:20:22

 8    $15 million --                                               14:20:27

 9         MR. TOBEROFF:  Same objection.  Same                    14:20:27

10    instruction.                                                 14:20:29

11    BY MR. PETROCELLI:

12    Q.   -- plus additional terms including a back end           14:20:29

13    if a movie was made?                                         14:20:31

14         MR. TOBEROFF:  Same objection.  Same                    14:20:33

15    instruction.                                                 14:20:39

16    BY MR. PETROCELLI:

17    Q.   What did you do after you got the letter?               14:20:39

18         MR. TOBEROFF:  Vague as to -- calls for a               14:20:45

19    narrative.                                                   14:20:48

20    BY MR. PETROCELLI:                                           14:20:50

21    Q.   You understand what I'm asking you; right?             14:20:50

22    It's not like did you go get a cup of coffee.  What          14:20:52

23    did you do in reference to the letter?                       14:20:55

24    A.   My mother got it several days before I did              14:20:57

25    because I was out of town.                                   14:20:59
```

Merrill  Corporation  -  Los Angeles

800-826-0277.                      www.merillcorp.com/law

EXHIBIT D
164

| | | |
|---|---|---|
| 1 | Q.    Okay.  Did she discuss it with you? | 14:21:00 |
| 2 | A.    When I was back, yes. | 14:21:03 |
| 3 | Q.    What did she say to you? | 14:21:04 |
| 4 | MR. TOBEROFF:  You can only talk about that | 14:21:07 |
| 5 | discussion to the extent you're not revealing the | 14:21:09 |
| 6 | contents of Mr. Marks' communication considering you | 14:21:12 |
| 7 | were both represented by the same attorney. | 14:21:18 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.    What did she say to you? | 14:21:19 |
| 10 | A.    She was surprised. | 14:21:21 |
| 11 | MR. TOBEROFF:  Object -- oh, you're answering | 14:21:23 |
| 12 | subject to my instruction; correct? | 14:21:24 |
| 13 | THE WITNESS:  Yes. | 14:21:26 |
| 14 | MR. TOBEROFF:  Okay.  Go ahead. | 14:21:27 |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q.    And did -- what was she surprised about? | 14:21:29 |
| 17 | A.    She was surprised to receive this | 14:21:38 |
| 18 | information. | 14:21:42 |
| 19 | Q.    What about the information surprised her? | 14:21:43 |
| 20 | MR. TOBEROFF:  You can answer so long as | 14:21:49 |
| 21 | you're not divulging the contents of the | 14:21:51 |
| 22 | attorney-client communication. | 14:21:55 |
| 23 | THE WITNESS:  I know.  Well, I'm thinking | 14:21:56 |
| 24 | about it. | 14:21:57 |
| 25 | I don't think there's anything that I could | 14:22:03 |

```
 1    say that would not divulge attorney-client privilege.        14:22:05

 2    BY MR. PETROCELLI:

 3        Q.   There was no attorney present during that           14:22:09

 4    conversation with your mother.                               14:22:11

 5        A.   No, but -- okay.  Maybe I'm --                       14:22:13

 6             MR. TOBEROFF:  She's following my                    14:22:15

 7    instruction.                                                 14:22:16

 8             MR. PETROCELLI:  Okay.  I just want the              14:22:16

 9    record to be clear that --                                   14:22:19

10             THE WITNESS:  I don't want to -- I maybe used        14:22:21

11    the wrong term.                                              14:22:23

12    BY MR. PETROCELLI:

13        Q.   This is just you and your mom talking; right?       14:22:24

14        A.   Yes.                                                14:22:26

15        Q.   When you got the letter, had you already by         14:22:38

16    that time heard of Mr. Toberoff?                             14:22:44

17             MR. TOBEROFF:  Asked and answered.                   14:22:46

18             MR. PETROCELLI:  It was not asked and                14:22:49

19    answered.  It doesn't matter.                                14:22:50

20             THE WITNESS:  I don't believe so.  But as I          14:22:53

21    said, that particular time for me, you know, what the        14:22:56

22    sequence of events was, I don't recall exactly.             14:23:00

23    BY MR. PETROCELLI:                                           14:23:05

24        Q.   So in your view, was it a complete                  14:23:05

25    coincidence that you got a letter about a man named          14:23:10
```

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | Toberoff who was interested in marketing the property | 14:23:14 |
| 2 | and then around the same time your mother gets a call | 14:23:19 |
| 3 | from Jean Peavy about a man named Toberoff? | 14:23:23 |
| 4 | MR. TOBEROFF:  Misstates the record and lacks | 14:23:26 |
| 5 | foundation. | 14:23:29 |
| 6 | THE WITNESS:  If I had heard of Toberoff | 14:23:31 |
| 7 | previous -- you know, prior to any communication, it | 14:23:34 |
| 8 | was only when I was doing kind of generic research of | 14:23:38 |
| 9 | who were lawyers who specialized in intellectual | 14:23:42 |
| 10 | property.  So it wasn't -- it wasn't as if I was, you | 14:23:46 |
| 11 | know, I was looking for research on Marc Toberoff at | 14:23:49 |
| 12 | that point.  If you go to Martindale Hubbell or | 14:23:56 |
| 13 | something and you type in a specialty and you look to | 14:23:59 |
| 14 | see what lawyers are available, that's the kind of | 14:24:01 |
| 15 | research that I was initially doing. | 14:24:06 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.   So you would have done that research, then, | 14:24:09 |
| 18 | prior to having received this letter mentioning the | 14:24:12 |
| 19 | name Marc Toberoff. | 14:24:15 |
| 20 | A.   Generic research I would have done prior to. | 14:24:16 |
| 21 | Q.   Which meant that your mother would have | 14:24:19 |
| 22 | received the call about Toberoff, again, prior to your | 14:24:21 |
| 23 | having gotten this letter. | 14:24:25 |
| 24 | A.   No, not necessarily.  What I was saying is | 14:24:26 |
| 25 | that as far back as when I was contacting Gerry | 14:24:30 |

| | | |
|---|---|---|
| 1 | Spence, I was researching to see what types of lawyers | 14:24:33 |
| 2 | who, you know, might be able to help us existed | 14:24:37 |
| 3 | generically.  You know, I wasn't looking up | 14:24:43 |
| 4 | Mr. Toberoff.  And so I think your question was asking | 14:24:46 |
| 5 | me was I looking for Mr. Toberoff because Jean Peavy | 14:24:50 |
| 6 | had mentioned his name. | 14:24:53 |
| 7 |     Q.   No.  I think you misunderstood my question. | 14:24:54 |
| 8 |     A.   Okay. | 14:24:56 |
| 9 |     Q.   And/or I miscommunicated it, so I apologize. | 14:24:57 |
| 10 |     When you did your Internet search on | 14:24:59 |
| 11 | Mr. Toberoff, that wasn't because you were searching | 14:25:02 |
| 12 | entertainment lawyers and his named popped up.  That | 14:25:06 |
| 13 | was because your mother had mentioned that Jean had | 14:25:08 |
| 14 | given her that name and you were specifically looking | 14:25:11 |
| 15 | into that person; correct? | 14:25:14 |
| 16 |     A.   When I looked specifically for him. | 14:25:15 |
| 17 |     Q.   Okay.  And when you had done your generic | 14:25:18 |
| 18 | search that yielded the name Gerry Spence, for | 14:25:22 |
| 19 | example -- | 14:25:25 |
| 20 |     A.   Um-hum. | 14:25:25 |
| 21 |     Q.   -- you hadn't come across Mr. Toberoff's name | 14:25:26 |
| 22 | at that point in time; correct? | 14:25:29 |
| 23 |     A.   I may have in terms of lawyers in the | 14:25:30 |
| 24 | Los Angeles area that handled intellectual property. | 14:25:34 |
| 25 |     Q.   But you don't specifically recall having done | 14:25:36 |

EXHIBIT D

168

| | | |
|---|---|---|
| 1 | so, and if you did, you didn't follow up on it; | 14:25:38 |
| 2 | correct? | 14:25:41 |
| 3 | A.    Yeah.   I didn't put a gold star next to his | 14:25:42 |
| 4 | name and immediately do something, you know. | 14:25:44 |
| 5 | Q.    But you did put a gold star next to Gerry | 14:25:46 |
| 6 | Spence's name. | 14:25:51 |
| 7 | A.    Yes, but my mom put a gold star next to Gerry | 14:25:51 |
| 8 | Spence's name. | 14:25:53 |
| 9 | MR. TOBEROFF:  They liked the jacket. | 14:25:53 |
| 10 | THE WITNESS:  Yep.  Well, my mom had seen him | 14:25:55 |
| 11 | like on CNN or something, and, you know -- | 14:25:57 |
| 12 | MR. TOBEROFF:  He's got the gift. | 14:26:02 |
| 13 | MR. PETROCELLI:  I won't comment. | 14:26:05 |
| 14 | THE WITNESS:  I can read into that. | 14:26:08 |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q.    Now, when you did your search, by the way, | 14:26:15 |
| 17 | back in '99 and interviewed all those lawyers, Marc | 14:26:20 |
| 18 | Toberoff wasn't one of them; correct? | 14:26:24 |
| 19 | A.    No. | 14:26:25 |
| 20 | Q.    In fact, his name didn't even come up; right? | 14:26:25 |
| 21 | A.    No. | 14:26:28 |
| 22 | Q.    Is that correct? | 14:26:28 |
| 23 | A.    That's correct. | 14:26:28 |
| 24 | Q.    Okay.  So getting back to the sequence here, | 14:26:37 |
| 25 | you -- by the time you had first spoken to your | 14:26:47 |

EXHIBIT D
169

| | |
|---|---|
| 1 | mother -- excuse me.  You received this letter from | 14:26:51 |
| 2 | Kevin Marks mentioning Marc Toberoff and Ari Emanuel | 14:26:56 |
| 3 | after your mother had told you the name Marc Toberoff | 14:27:01 |
| 4 | that she had received from Jean Peavy; correct? | 14:27:05 |
| 5 | A.   As I said, I can't testify for sure. | 14:27:07 |
| 6 | Q.   Do you know the date of the letter that you | 14:27:27 |
| 7 | received from Mr. Marks that mentioned Mr. Toberoff? | 14:27:31 |
| 8 | A.   I haven't seen it in a long time. | 14:27:34 |
| 9 | Q.   Now, again -- | 14:27:36 |
| 10 | A.   No.  The answer is no. | 14:27:40 |
| 11 | Q.   -- I'm trying to press your recollection on | 14:27:41 |
| 12 | this.  But when you first saw the letter or heard | 14:27:44 |
| 13 | about it from your mother that mentioned Mr. Toberoff | 14:27:49 |
| 14 | and Mr. Emanuel, do you have a state of mind or did | 14:27:51 |
| 15 | you have a state of mind at the time that this is the | 14:27:55 |
| 16 | same person that you had already looked into and | 14:27:59 |
| 17 | indeed had already contacted? | 14:28:02 |
| 18 | A.   No.  As I said, there may have been some | 14:28:04 |
| 19 | generic information. | 14:28:11 |
| 20 | Q.   So by the time that Jean Peavy gave your | 14:28:12 |
| 21 | mother the name of Marc Toberoff, you would have | 14:28:16 |
| 22 | associated it with the same name you had seen in | 14:28:22 |
| 23 | Mr. Marks' letter; right? | 14:28:27 |
| 24 | A.   I really don't recall. | 14:28:28 |
| 25 | Q.   Did you -- you said your mother was surprised | 14:28:48 |

| | | |
|---|---|---|
| 1 | when she got the letter. | 14:28:59 |
| 2 | A. Um-hum. | 14:29:01 |
| 3 | Q. What -- what did you do next with respect to | 14:29:02 |
| 4 | the letter? So, for example, did you contact | 14:29:07 |
| 5 | Mr. Marks? | 14:29:16 |
| 6 | A. Possibly. | 14:29:16 |
| 7 | Q. Were you interested in pursuing the | 14:29:21 |
| 8 | Toberoff/Emanuel proposal or introduction that was set | 14:29:33 |
| 9 | forth in the letter? | 14:29:36 |
| 10 | MR. TOBEROFF: When they first -- | 14:29:39 |
| 11 | BY MR. PETROCELLI: | |
| 12 | Q. Yeah. You saw the letter. The letter says, | 14:29:41 |
| 13 | you know, "These people called me and they're | 14:29:44 |
| 14 | interested in" whatever it is they said, and were you | 14:29:45 |
| 15 | and your mom interested in pursuing it? | 14:29:50 |
| 16 | A. We wanted to know what it was all about. | 14:29:53 |
| 17 | Q. Okay. And did you find out what it was all | 14:29:57 |
| 18 | about? | 14:30:00 |
| 19 | A. Eventually. | 14:30:00 |
| 20 | Q. How did you find out? | 14:30:01 |
| 21 | A. Through the contact that we had with Mr. -- | 14:30:04 |
| 22 | Mr. Toberoff and then Mr. Emanuel when my mother | 14:30:11 |
| 23 | placed a call to him and began to ask him some | 14:30:16 |
| 24 | questions. | 14:30:18 |
| 25 | Q. So by the time that your mother placed that | 14:30:18 |

LAURA SIEGEL LARSON 6/22/2011

Page 156

| | | |
|---|---|---|
| 1 | call, you had already had the letter from Mr. Marks | 14:30:21 |
| 2 | and were able to follow up on it? | 14:30:24 |
| 3 | A.    I don't know whether it was following up on | 14:30:26 |
| 4 | that.  I'm just -- you asked me how I got information | 14:30:28 |
| 5 | about them, and I'm just talking in general terms. | 14:30:32 |
| 6 | Q.    Did you get any information from Mr. Marks | 14:30:34 |
| 7 | beyond that letter? | 14:30:39 |
| 8 | A.    I can't recall any. | 14:30:43 |
| 9 | Q.    Did you have -- did you give Mr. Marks any | 14:30:48 |
| 10 | directions or instructions with respect to that | 14:30:55 |
| 11 | letter? | 14:31:01 |
| 12 | A.    No. | 14:31:03 |
| 13 | Q.    Did you -- did Mr. Marks tell you that if you | 14:31:04 |
| 14 | pursued any arrangement with Mr. Toberoff or | 14:31:26 |
| 15 | Mr. Emanuel, that it posed any legal risk to you? | 14:31:30 |
| 16 | MR. TOBEROFF:  Excuse me.  I instruct you not | 14:31:34 |
| 17 | to answer.  Attorney-client privilege. | 14:31:36 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.    Did he tell you that he might be called upon | 14:31:38 |
| 20 | to testify and might have to testify in a way that was | 14:31:41 |
| 21 | not helpful to you? | 14:31:45 |
| 22 | MR. TOBEROFF:  Same objection.  Same | 14:31:46 |
| 23 | instruction. | 14:31:49 |
| 24 | BY MR. PETROCELLI: | |
| 25 | Q.    After receiving that letter did you | 14:31:49 |

Merrill   Corporation   -   Los Angeles

| | | |
|---|---|---|
| 1 | immediately fire Mr. Marks? | 14:31:52 |
| 2 | MR. TOBEROFF:  Which letter? | 14:31:54 |
| 3 | MR. PETROCELLI:  The letter that she | 14:31:55 |
| 4 | received, that your mother received, talking about | 14:31:57 |
| 5 | Mr. Toberoff and Mr. Emanuel. | 14:31:59 |
| 6 | THE WITNESS:  Not immediately. | 14:32:01 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q.   Did you receive any other letters from | 14:32:03 |
| 9 | Mr. Marks regarding Mr. Toberoff and Mr. Emanuel | 14:32:09 |
| 10 | except that one that you have already described? | 14:32:12 |
| 11 | A.   I don't believe so. | 14:32:14 |
| 12 | Q.   Did you have any meetings with Mr. Marks | 14:32:17 |
| 13 | following your receipt of that letter, a copy of which | 14:32:22 |
| 14 | your mother also received? | 14:32:26 |
| 15 | A.   I'm trying to reconstruct the time frame. | 14:32:30 |
| 16 | I don't remember whether we had a meeting | 14:32:46 |
| 17 | with him. | 14:32:48 |
| 18 | Q.   Or with Mr. Ramer?  Do you remember that? | 14:32:50 |
| 19 | A.   We almost never saw Mr. Ramer, so I know it | 14:32:53 |
| 20 | wouldn't have been with Mr. Ramer. | 14:32:57 |
| 21 | Q.   Mr. Marks by then was your lead lawyer? | 14:32:58 |
| 22 | A.   Yes. | 14:33:01 |
| 23 | Q.   Okay.  Did you discuss the letter with | 14:33:06 |
| 24 | anyone -- with anyone after you received it other than | 14:33:12 |
| 25 | your mother? | 14:33:14 |

LAURA SIEGEL LARSON 11/22/2011

Page 158

| | | |
|---|---|---|
| 1 | A. We may have discussed it with George. | 14:33:23 |
| 2 | Q. Did you send George a copy of the letter? | 14:33:27 |
| 3 | A. I don't recall. | 14:33:29 |
| 4 | Q. Did you discuss it with Jean Peavy? | 14:33:36 |
| 5 | A. No. | 14:33:43 |
| 6 | Q. You had learned at some point that Jean Peavy | 14:33:43 |
| 7 | had retained Mr. Toberoff at an earlier point in time; | 14:33:46 |
| 8 | correct? | 14:33:50 |
| 9 | A. Yes. When my mom had the conversation with | 14:33:51 |
| 10 | Jean, Mr. Toberoff was already her attorney. | 14:33:54 |
| 11 | Q. Did Mr. -- did Ms. Peavy tell you that she | 14:33:58 |
| 12 | had entered into a joint venture agreement with | 14:34:03 |
| 13 | Mr. Toberoff's company, Pacific Pictures Corporation? | 14:34:06 |
| 14 | A. No. | 14:34:12 |
| 15 | Q. Did she share any of her agreements with you | 14:34:12 |
| 16 | or your mother? | 14:34:16 |
| 17 | A. No. | 14:34:17 |
| 18 | Q. Her agreements with Mr. Toberoff's company? | 14:34:18 |
| 19 | A. No. | 14:34:28 |
| 20 | Q. When did you first -- so when you first | 14:34:28 |
| 21 | contacted Mr. Toberoff, it was your belief that he was | 14:34:36 |
| 22 | already a lawyer working with the Shusters? | 14:34:42 |
| 23 | A. Yes. I -- you know, if that's the correct | 14:34:45 |
| 24 | sequence. I'm trying to remember. | 14:34:52 |
| 25 | Q. You're not sure of the exact sequence. | 14:34:54 |

LAURA SIEGEL LARSON 7/22/2011

Page 159

| | | |
|---|---|---|
| 1 | A.    I'm not sure, no. | 14:34:57 |
| 2 | Q.    Okay.  I appreciate that. | 14:34:57 |
| 3 | A.    In general, you know. | 14:34:59 |
| 4 | Q.    Did you sign any conflict documents in 2002 | 14:35:05 |
| 5 | having to do with Mr. Toberoff's relationship with the | 14:35:08 |
| 6 | Shusters? | 14:35:18 |
| 7 | MR. TOBEROFF:  Don't discuss the contents of | 14:35:18 |
| 8 | the conflict waivers. | 14:35:20 |
| 9 | BY MR. PETROCELLI: | |
| 10 | Q.    You can answer that question. | 14:35:25 |
| 11 | A.    Well, no, I'm trying to remember.  There -- | 14:35:26 |
| 12 | you know, since this was 2002 and there was a conflict | 14:35:30 |
| 13 | waiver that accompanied this, so yes, we did sign a | 14:35:35 |
| 14 | conflict waiver in 2002. | 14:35:39 |
| 15 | Q.    And did that conflict waiver that you signed | 14:35:41 |
| 16 | in 2002, was that a conflict waiver with IP Worldwide | 14:35:43 |
| 17 | or with The Law Offices of Marc Toberoff, or do you | 14:35:48 |
| 18 | not remember? | 14:35:51 |
| 19 | A.    I don't remember. | 14:35:52 |
| 20 | Q.    Okay.  And did it have anything to do with | 14:35:56 |
| 21 | the Shusters? | 14:36:01 |
| 22 | A.    I -- well, I don't remember. | 14:36:01 |
| 23 | MR. TOBEROFF:  Don't discuss what the | 14:36:03 |
| 24 | conflict waiver -- excuse me.  Don't discuss the | 14:36:06 |
| 25 | substance of the conflict waiver.  It's privileged. | 14:36:08 |

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law

EXHIBIT D
175

LAURA SIEGEL LARSON 7/22/2011

Page 160

```
 1              THE WITNESS:  Besides, I don't remember.          14:36:10

 2              MR. TOBEROFF:  It's moot.                         14:36:16

 3   BY MR. PETROCELLI:

 4        Q.    Were you ever shown a copy of Mr. Toberoff's     14:36:27

 5   agreements with the Shuster family?                         14:36:33

 6        A.    No.                                              14:36:38

 7        Q.    Was your mother?                                 14:36:38

 8        A.    No.                                              14:36:41

 9        Q.    Do you know whether you requested that such      14:36:41

10   agreements be made available to any other counsel on        14:36:44

11   your behalf, like Arthur Levine or George?                  14:36:48

12        A.    No.                                              14:36:57

13        Q.    Were you -- did you ever become aware that        14:36:58

14   Mr. Toberoff owned a company called Pacific Pictures?        14:37:05

15        A.    Not until your lawsuit.                          14:37:09

16        Q.    Prior to my lawsuit did you become aware that     14:37:13

17   Mr. Toberoff through a company by whatever name             14:37:20

18   entered into a joint venture where his company             14:37:23

19   acquired 50 percent of the Shusters' termination           14:37:26

20   interests?                                                  14:37:29

21        A.    No.                                              14:37:37

22        Q.    Prior to reading our lawsuit did you ever         14:37:38

23   become aware that the agreement Mr. Toberoff entered        14:37:45

24   into with the Shuster family was void under the            14:37:53

25   copyright statute?                                          14:37:59
```

EXHIBIT D
176

```
 1        A.    I don't understand the question.           14:38:01

 2        Q.    That he had entered into an agreement with  14:38:05

 3   the Shuster family that violated a copyright statute?  14:38:07

 4        A.    I have no knowledge of anything like that.  14:38:13

 5        Q.    Are you aware that Mr. Toberoff has conceded 14:38:20

 6   in this case that his Pacific Pictures agreement with  14:38:24

 7   the Shuster family did not comply with the copyright   14:38:30

 8   statute?                                               14:38:36

 9        A.    No, I'm not aware of that.                  14:38:36

10        Q.    Did anything about -- were you aware prior to 14:38:53

11   the filing of our lawsuit that Mr. Toberoff's Pacific  14:39:04

12   Pictures agreement with the Shusters concerned         14:39:12

13   Superboy as well as Superman?                          14:39:21

14        A.    I wasn't --                                 14:39:22

15        MR. TOBEROFF:   Wait.   Lacks foundation.         14:39:24

16   Assumes facts.                                         14:39:26

17        THE WITNESS:   I wasn't conscious of any          14:39:27

18   agreement.                                             14:39:31

19   BY MR. PETROCELLI:                                     14:39:31

20        Q.    Since this lawsuit have you seen the written 14:39:31

21   agreement that Mr. Toberoff's Pacific Pictures company 14:39:38

22   entered into with the Shusters in 2001 relating to     14:39:43

23   both Superman and Superboy?                            14:39:47

24        A.    I don't remember exactly what exhibits were 14:39:51

25   shown to me in my previous depositions.   So, you know, 14:39:54
```

```
 1    I remember that there was some document that was shown    14:40:00

 2    to me, but exactly what it was, I really don't recall,    14:40:05

 3    but I -- you know, so I can't really answer your          14:40:10

 4    question.                                                 14:40:14

 5        Q.    Okay.  Was there anything about Mr. Marks'      14:40:17

 6    letter to you that discussed Mr. Toberoff and            14:40:21

 7    Mr. Emanuel that angered you or your mother?             14:40:26

 8            MR. TOBEROFF:  You can answer whether the        14:40:32

 9    letter angered you or your mother.                       14:40:34

10    BY MR. PETROCELLI:                                        

11        Q.    Or upset you in some way.                      14:40:36

12            MR. TOBEROFF:  You can answer that.              14:40:38

13            THE WITNESS:  We were kind of upset.             14:40:42

14    BY MR. PETROCELLI:                                        

15        Q.    Okay.  How long after you received the letter 14:40:53

16    that kind of upset you did you terminate Mr. Marks?      14:40:59

17        A.    Well, I don't recall the date of his letter,  14:41:07

18    so I can't really answer that.                           14:41:10

19        Q.    I appreciate you don't know the dates, but in 14:41:12

20    terms of the passage of time, was it a day?  Was it     14:41:15

21    two days?  Was it two months?  Can you estimate for     14:41:18

22    me?                                                      14:41:22

23        A.    I would say weeks, but I don't know how many  14:41:23

24    weeks.                                                   14:41:39

25        Q.    Given that Mr. Marks' letter informed you     14:41:40
```

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | that Mr. Emanuel and Mr. Toberoff had an interest in | 14:41:45 |
| 2 | marketing the property, I assume you discussed with | 14:41:50 |
| 3 | both of Mr. Emanuel and Mr. Toberoff when you met with | 14:41:57 |
| 4 | them both what that interest was? | 14:42:01 |
| 5 | A.   Yes. | 14:42:04 |
| 6 | Q.   Okay.  And in that discussion did you inquire | 14:42:04 |
| 7 | whether they had an investor who was interested in | 14:42:09 |
| 8 | acquiring the property? | 14:42:15 |
| 9 | MR. TOBEROFF:  You can answer as to your | 14:42:16 |
| 10 | discussions with Mr. Emanuel. | 14:42:18 |
| 11 | THE WITNESS:  Um-hum. | 14:42:20 |
| 12 | Ari gave us information, you know, relating | 14:42:26 |
| 13 | to his offer, and, you know, I mean he, you know, he's | 14:42:34 |
| 14 | a rich guy.  He's got rich friends and you know, so | 14:42:41 |
| 15 | he, you know, had -- had good connections, and it was | 14:42:46 |
| 16 | interesting, but, you know -- | 14:42:53 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.   Well, what did he say about his offer?  What | 14:42:57 |
| 19 | did you mean by "his offer"? | 14:43:03 |
| 20 | A.   Well, he -- he offered to put a substantial | 14:43:04 |
| 21 | amount of money up front and, you know, if he was able | 14:43:09 |
| 22 | to negotiate, you know, a good deal for us, that we | 14:43:15 |
| 23 | would have meaningful participation, and it sounded | 14:43:23 |
| 24 | interesting. | 14:43:32 |
| 25 | Q.   Let's be clear.  This would be a deal whereby | 14:43:32 |

```
 1    you and your mom would sell your interest to        14:43:32
 2    Mr. Emanuel.                                        14:43:36
 3         A.    I don't believe we were selling our interest  14:43:37
 4    to him.                                             14:43:39
 5         Q.    What were you doing, then?  Partnering with  14:43:40
 6    him?                                                14:43:45
 7         A.    That's more the feel that I got from it.  14:43:45
 8         Q.    Okay.  So it wasn't like you were going to  14:43:48
 9    give up all your Superman interests and he would now  14:43:50
10    own them.  It was that there would be some business  14:43:53
11    arrangement between the two of you where you would  14:43:56
12    mutually exploit the property; correct?             14:43:59
13         A.    Mutually benefit from it, I believe was the  14:44:00
14    gist of it.                                         14:44:03
15         Q.    And how much did Mr. Emanuel say that he  14:44:06
16    would be willing to invest?                         14:44:09
17         A.    Well, I think it was in the range of      14:44:14
18    15 million.                                         14:44:17
19         Q.    Okay.  And did he identify anyone else who  14:44:18
20    might co-invest with him?  You said he had a lot of  14:44:24
21    rich friends.                                       14:44:27
22         A.    Um-hum.  Well, he didn't give us specific  14:44:28
23    names.                                              14:44:34
24         Q.    Did he identify any other -- did he say  14:44:34
25    anything about a Superman movie to you?             14:44:39
```

| | | |
|---|---|---|
| 1 | A.   No, there was no mention of a movie. | 14:44:41 |
| 2 | Q.   But if there were a movie that could be | 14:44:43 |
| 3 | produced, then you might share in the exploitation of | 14:44:46 |
| 4 | it? | 14:44:49 |
| 5 | A.   On down the line if there was a movie. | 14:44:50 |
| 6 | Q.   Okay. | 14:44:52 |
| 7 | MR. TOBEROFF:  Are you referring to her | 14:44:53 |
| 8 | understanding of what a deal would be with Mr. Emanuel | 14:45:01 |
| 9 | or as to a conversation? | 14:45:04 |
| 10 | MR. PETROCELLI:  I'm talking about the | 14:45:07 |
| 11 | information she got from Mr. Emanuel at this meeting, | 14:45:08 |
| 12 | her conversation. | 14:45:12 |
| 13 | Q.   What happened -- | 14:45:19 |
| 14 | MR. TOBEROFF:  Well, then vague as to that. | 14:45:20 |
| 15 | BY MR. PETROCELLI: | 14:45:22 |
| 16 | Q.   What happened -- did you pursue with | 14:45:22 |
| 17 | Mr. Emanuel this interest that he expressed? | 14:45:35 |
| 18 | A.   My mother and I discussed it, and our feeling | 14:45:38 |
| 19 | was that if he was willing to come up with 15 -- he or | 14:45:43 |
| 20 | a group of people were willing to come up with | 14:45:49 |
| 21 | $15 million, that that told us that the property was | 14:45:52 |
| 22 | worth a lot more than that because why would he be | 14:45:57 |
| 23 | willing to pay full value for it?  And so in thinking | 14:46:01 |
| 24 | about how we wanted to proceed, we thought that it | 14:46:06 |
| 25 | would be better for us to simply have an arrangement | 14:46:10 |

| | | |
|---|---|---|
| 1 | with him in which he would for a 10 percent or an | 14:46:14 |
| 2 | agent's fee negotiate these things for us, you know, | 14:46:20 |
| 3 | because his 10 percent of a much larger figure would | 14:46:23 |
| 4 | be better for us in the long run financially. | 14:46:28 |
| 5 | Q.    Did you then tell him at some point that you | 14:46:31 |
| 6 | were not interested in doing an arrangement with him | 14:46:34 |
| 7 | for the 15 million where he was a direct participant? | 14:46:40 |
| 8 | A.    Yes. | 14:46:44 |
| 9 | Q.    Was it at that meeting, or was it at a | 14:46:44 |
| 10 | subsequent meeting? | 14:46:48 |
| 11 | A.    I believe it was at a subsequent meeting. | 14:46:48 |
| 12 | Q.    And did you inform him of your decision and | 14:46:50 |
| 13 | your mother's decision not to do a deal with him where | 14:46:55 |
| 14 | he was a principal as opposed to an agent prior to | 14:46:58 |
| 15 | signing Exhibit 45, the IPW -- IP Worldwide agreement? | 14:47:02 |
| 16 | A.    Yes. | 14:47:08 |
| 17 | Q.    When you had this discussion with Mr. Emanuel | 14:47:13 |
| 18 | in his office at Endeavor together with your mother -- | 14:47:17 |
| 19 | I think you said Mr. Toberoff also was there? | 14:47:21 |
| 20 | A.    Um-hum. | 14:47:23 |
| 21 | Q.    -- did he confirm to you that he had | 14:47:27 |
| 22 | presented this same proposal to Mr. Marks sometime | 14:47:33 |
| 23 | before? | 14:47:38 |
| 24 | A.    I believe he did. | 14:47:38 |
| 25 | Q.    Okay.  And did he tell you whether or not he | 14:47:40 |

| | | |
|---|---|---|
| 1 | had ever heard back from Mr. Marks? | 14:47:43 |
| 2 | A.   I don't recall him talking about it. | 14:47:48 |
| 3 | Q.   Did you tell him that you had instructed | 14:47:49 |
| 4 | Mr. Marks not to get back to him? | 14:47:54 |
| 5 | A.   No. | 14:48:02 |
| 6 | Q.   By the time of this meeting with Mr. Emanuel | 14:48:03 |
| 7 | in his office talking about this arrangement, had you | 14:48:09 |
| 8 | already terminated Mr. Marks? | 14:48:12 |
| 9 | A.   Yes. | 14:48:16 |
| 10 | Q.   Are you certain? | 14:48:17 |
| 11 | A.   I believe so.  It was -- it was right around | 14:48:19 |
| 12 | the same time, because we're talking about September, | 14:48:22 |
| 13 | you know, so sometime in September. | 14:48:26 |
| 14 | Q.   Was $15 million the number that Mr. Emanuel | 14:48:32 |
| 15 | mentioned to you more than any offer that DC Comics or | 14:48:37 |
| 16 | Warner Bros. had previously presented to you? | 14:48:44 |
| 17 | A.   Yes, I believe it was. | 14:48:47 |
| 18 | Q.   Did Mr. Emanuel identify any other investors | 14:48:56 |
| 19 | besides himself? | 14:49:05 |
| 20 | MR. TOBEROFF:  Asked and answered. | 14:49:06 |
| 21 | You can answer. | 14:49:08 |
| 22 | THE WITNESS:  No. | 14:49:15 |
| 23 | BY MR. PETROCELLI: | |
| 24 | Q.   Did you have an understanding that | 14:49:16 |
| 25 | Mr. Emanuel -- from Mr. Emanuel's proposal about | 14:49:21 |

EXHIBIT D
183

LAURA SIEGEL LARSON 7/22/2011

Page 168

| | | |
|---|---|---|
| 1 | $15 million and whatever other terms there were | 14:49:24 |
| 2 | whether that would include some participation by | 14:49:32 |
| 3 | Mr. Toberoff? | 14:49:37 |
| 4 | MR. TOBEROFF: Vague and ambiguous as to -- | 14:49:38 |
| 5 | THE WITNESS: I -- I don't recall any mention | 14:49:40 |
| 6 | of that. | 14:49:42 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q. Okay. Was there any discussion at this | 14:49:46 |
| 9 | meeting about Michael Siegel's 25 percent ownership of | 14:49:49 |
| 10 | the Siegel termination interests? | 14:49:57 |
| 11 | A. I don't -- I don't believe that it was | 14:50:01 |
| 12 | discussed except to the extent of making him realize | 14:50:05 |
| 13 | that there was a Michael Siegel and that there was a | 14:50:09 |
| 14 | passive interest involved. | 14:50:14 |
| 15 | Q. Was there any discussion that the $15 million | 14:50:18 |
| 16 | would also involve the exploitation of Superboy | 14:50:23 |
| 17 | rights? | 14:50:29 |
| 18 | A. I think only Superman was mentioned. | 14:50:29 |
| 19 | Q. Did -- was there any discussion at this | 14:50:34 |
| 20 | meeting with Mr. Emanuel about the fact that DC Comics | 14:50:38 |
| 21 | would hold the remaining 50 percent of the copyright | 14:50:48 |
| 22 | interest for an extended period of time? | 14:50:55 |
| 23 | A. He was aware of that. | 14:50:58 |
| 24 | THE REPORTER: Was that "50"? | |
| 25 | MR. PETROCELLI: Fifty, yes. | 14:51:02 |

EXHIBIT D
184

Page 169

| | | |
|---|---|---|
| 1 | Q.    At least until 2013; right? | 14:51:02 |
| 2 | A.    He was aware of that. | 14:51:05 |
| 3 | Q.    And did he indicate whether that would | 14:51:06 |
| 4 | necessitate trying to reengage with DC comics or | 14:51:14 |
| 5 | Warner Bros. to do a deal? | 14:51:19 |
| 6 | A.    Well, he felt that they were the likely | 14:51:21 |
| 7 | purchaser if there was going to be a purchaser or, you | 14:51:26 |
| 8 | know, that a license agreement, you know, could be | 14:51:29 |
| 9 | entered into with them. | 14:51:33 |
| 10 | Q.    Did you -- when you got back to him and told | 14:51:37 |
| 11 | him that you preferred to work with him as an agent, | 14:51:41 |
| 12 | not as a business partner -- | 14:51:44 |
| 13 | A.    Um-hum. | 14:51:46 |
| 14 | Q.    -- did you and he have discussion then about | 14:51:47 |
| 15 | reengaging with Warner Bros. and DC Comics along the | 14:51:51 |
| 16 | lines that you had previously discussed? | 14:51:54 |
| 17 | A.    Yes. | 14:51:56 |
| 18 | Q.    And did he still agree that that was a | 14:51:57 |
| 19 | logical thing to do? | 14:52:01 |
| 20 | A.    Yes. | 14:52:02 |
| 21 | Q.    Okay.  Then he underwent -- undertook to do | 14:52:03 |
| 22 | that? | 14:52:07 |
| 23 | A.    At some point, yes. | 14:52:08 |
| 24 | MR. PETROCELLI:  Okay.  And why don't we stop | 14:52:10 |
| 25 | right now and take a short break.  We've been going | 14:52:15 |

Merrill  Corporation  -  Los Angeles

800-826-0277                              www.merillcorp.com/law

| | | |
|---|---|---|
| 1 | for a bit. | 14:52:17 |
| 2 | THE VIDEOGRAPHER:  This will mark the end of | 14:52:19 |
| 3 | Volume 1, tape number two, in the deposition of Laura | 14:52:20 |
| 4 | Siegel.  Going off the record.  The time is 2:52. | 14:52:23 |
| 5 | (A recess was taken.) | 14:52:44 |
| 6 | THE VIDEOGRAPHER:  We are back on the record, | 15:22:09 |
| 7 | and this marks the beginning of Volume 1, tape number | 15:22:11 |
| 8 | three, of the deposition of Laura Siegel.  The time is | 15:22:13 |
| 9 | 3:22. | 15:22:17 |
| 10 | BY MR. PETROCELLI: | |
| 11 | Q.    Was -- going back to your discussion with | 15:22:35 |
| 12 | Mr. Emanuel -- this was in his office -- Mr. Toberoff, | 15:22:40 |
| 13 | you, and your mother and Mr. Emanuel -- | 15:22:49 |
| 14 | A.    Um-hum. | 15:22:52 |
| 15 | Q.    Remember we were talking about that before | 15:22:54 |
| 16 | the break? | 15:22:56 |
| 17 | A.    Yes. | 15:22:57 |
| 18 | Q.    Did -- I think you said you were not sure | 15:22:58 |
| 19 | whether you had already terminated the services of | 15:23:02 |
| 20 | Mr. Marks as of the time of this discussion; correct? | 15:23:06 |
| 21 | A.    You know, the time frame is difficult to | 15:23:12 |
| 22 | remember, but -- no, no, no, no.  Wait.  What am I | 15:23:15 |
| 23 | saying?  No.  We had -- we definitely had.  I mean | 15:23:20 |
| 24 | back as far as May, you know, we were like 95 percent | 15:23:24 |
| 25 | there.  We were, you know, going to cut off | 15:23:28 |

LAURA SIEGEL LARSON - 7/22/2011

Page 171

| | | |
|---|---|---|
| 1 | negotiations and everything, you know, so we were | 15:23:30 |
| 2 | really, really close to doing it early on. | 15:23:35 |
| 3 | Q.   Now, this idea about cutting off negotiations | 15:23:38 |
| 4 | in May, is that something that you and Mr. Toberoff | 15:23:41 |
| 5 | discussed during the break? | 15:23:45 |
| 6 | A.   No. | 15:23:47 |
| 7 | Q.   Is it something that you have had some -- | 15:23:47 |
| 8 | A.   It was that I didn't -- | 15:23:50 |
| 9 | Q.   -- some recollection about or something? | 15:23:51 |
| 10 | A.   Well, like, you know, I didn't have an | 15:23:53 |
| 11 | opportunity really to clarify it before. | 15:23:56 |
| 12 | Q.   The truth of the matter is you did not cut | 15:23:57 |
| 13 | off negotiations with Warner Bros. until the date you | 15:24:00 |
| 14 | sent your letter; correct? | 15:24:04 |
| 15 | A.   Correct. | 15:24:05 |
| 16 | Q.   Okay. | 15:24:06 |
| 17 | A.   Yeah.  But we were contemplating it, was all | 15:24:07 |
| 18 | I was saying. | 15:24:10 |
| 19 | Q.   I didn't ask you about cutting off | 15:24:10 |
| 20 | negotiations, and I noticed that you injected that | 15:24:13 |
| 21 | into your testimony, and I would appreciate it if you | 15:24:16 |
| 22 | could just try to answer my questions. | 15:24:18 |
| 23 | A.   What was your question? | 15:24:20 |
| 24 | Q.   My question was about the discharge of | 15:24:21 |
| 25 | Mr. Marks. | 15:24:28 |

Page 172

```
 1        A.    Yes.                                          15:24:28

 2        Q.    You had not discharged Mr. Marks as of the    15:24:37

 3   time of that meeting with Mr. Emanuel; correct?         15:24:39

 4        A.    No, that's not correct.                       15:24:43

 5        Q.    Had you written Mr. Marks the letter          15:24:44

 6   terminating him?                                         15:24:48

 7        A.    Yes.                                          15:24:48

 8        Q.    Prior to the meeting?                         15:24:48

 9        A.    Yes.                                          15:24:50

10        Q.    Okay.  And why is it that you, given your     15:24:50

11   inability to recall with precision any of these other   15:24:54

12   dates, you remember that clearly or definitely, as you  15:24:57

13   said?                                                    15:25:01

14        A.    Well, because you're pressing me on it now.   15:25:01

15        Q.    I've been pressing you on the sequence of     15:25:04

16   events throughout the day.                               15:25:07

17        A.    Yeah.                                         15:25:08

18        Q.    But that one you know for sure.               15:25:08

19        A.    I just had a break and I had some water, and  15:25:10

20   I feel a little bit better.                              15:25:12

21        Q.    So what is the date, then, of your meeting    15:25:15

22   with Mr. Emanuel?                                        15:25:17

23        A.    The date I couldn't tell you for sure, but,   15:25:21

24   you know, I knew that we felt that we were, you know,    15:25:24

25   completely free and clear of the Gang, you know, Tyre    15:25:28
```

EXHIBIT D

| | | |
|---|---|---|
| 1 | group before we had a meeting. | 15:25:32 |
| 2 | Q.   I didn't ask if you felt you were free and | 15:25:34 |
| 3 | clear.   I've asked whether you were a hundred -- I'll | 15:25:37 |
| 4 | ask it to you this way.   Are you 100 percent certain | 15:25:40 |
| 5 | that the date you met with Mr. Emanuel that you've | 15:25:46 |
| 6 | been testifying about with Mr. Toberoff and your | 15:25:48 |
| 7 | mother, by that date you had already sent your letter | 15:25:54 |
| 8 | terminating Mr. Marks? | 15:25:58 |
| 9 |    MR. TOBEROFF:   Asked and answered. | 15:26:00 |
| 10 |    THE WITNESS:   To the best of my recollection, | 15:26:00 |
| 11 | yes. | 15:26:01 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   Okay.   So you're not a hundred percent | 15:26:03 |
| 14 | certain; correct? | 15:26:05 |
| 15 | A.   Correct. | 15:26:05 |
| 16 | Q.   Okay.   Now, do you have any way of | 15:26:08 |
| 17 | establishing the date of your meeting with | 15:26:13 |
| 18 | Mr. Emanuel? | 15:26:15 |
| 19 | A.   With Mr. -- | 15:26:19 |
| 20 | Q.   Emanuel. | 15:26:20 |
| 21 | A.   The exact date? | 15:26:22 |
| 22 | Q.   Yes. | 15:26:24 |
| 23 | A.   No. | 15:26:24 |
| 24 | Q.   Do you have any way of refreshing your | 15:26:25 |
| 25 | recollection about the date? | 15:26:27 |

```
 1        A.   I can keep trying to remember.  I can keep        15:26:28

 2   trying to think about it.                                   15:26:31

 3        Q.   Is there any document or anything that would      15:26:32

 4   refresh your memory that you're aware of?                   15:26:35

 5        A.   No, there are no documents.                       15:26:43

 6        Q.   Is there any document or anything that would      15:26:45

 7   refresh your memory about the first time you met            15:26:47

 8   Mr. Toberoff before the Mr. Emanuel meeting?               15:26:52

 9        A.   No, there are no documents.                       15:26:55

10        Q.   Is there anything else that would refresh        15:26:56

11   your recollection as to the date of that meeting?           15:26:58

12        A.   No, I don't think so.                             15:27:00

13        Q.   When you met with Mr. Emanuel, did you and --    15:27:04

14   was there any discussion in that meeting about the         15:27:09

15   fact that Kevin Marks might have to testify in a way        15:27:12

16   that was not helpful to you?                               15:27:18

17        A.   In which meeting?                                 15:27:20

18        Q.   The meeting with Mr. Emanuel.                     15:27:22

19             MR. TOBEROFF:  Excuse me.  Lacks foundation.     15:27:23

20   Assumes facts.                                              15:27:25

21             THE WITNESS:  I -- I don't recall any            15:27:28

22   discussion of that.                                         15:27:30

23   BY MR. PETROCELLI:                                          15:27:31

24        Q.   Was there any discussion that if -- that         15:27:31

25   Warner Bros. or DC Comics may sue for interference?         15:27:43
```

LAURA SIEGEL LARSON - 3/22/2011

Page 175

| | | |
|---|---|---|
| 1 | A.    With -- have a discussion with whom? | 15:27:47 |
| 2 | Q.    With Mr. Emanuel. | 15:27:51 |
| 3 | A.    No. | 15:28:03 |
| 4 | Q.    You understand that Warner Bros. in this case | 15:28:03 |
| 5 | is suing Mr. -- excuse me -- DC Comics in this case is | 15:28:11 |
| 6 | suing Mr. Toberoff and certain of his entities for | 15:28:15 |
| 7 | interfering with rights stemming from the negotiations | 15:28:22 |
| 8 | and discussions with you and your mother to acquire | 15:28:30 |
| 9 | the Siegel interest; correct? | 15:28:35 |
| 10 | A.    Yes. | 15:28:37 |
| 11 | MR. TOBEROFF:  Misstates your own Complaint, | 15:28:38 |
| 12 | but that's okay. | 15:28:40 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.    And you understand that we contend that | 15:28:41 |
| 15 | Mr. Toberoff's and Mr. Emanuel's proposal to Mr. Marks | 15:28:55 |
| 16 | and then to you about a $15 million investment was | 15:29:03 |
| 17 | designed to break off your dealings with DC Comics and | 15:29:12 |
| 18 | Warner Bros.  You understand that's our contention; | 15:29:18 |
| 19 | correct? | 15:29:21 |
| 20 | A.    That's your contention. | 15:29:22 |
| 21 | Q.    How do you know that's our contention? | 15:29:23 |
| 22 | A.    From -- from the Complaint in this action. | 15:29:26 |
| 23 | Q.    Okay.  And when you just gave your answer a | 15:29:29 |
| 24 | few minutes ago after the break -- by the way, you | 15:29:35 |
| 25 | spoke to Mr. Toberoff during break; correct? | 15:29:39 |

LAURA SIEGEL LARSON - 7/22/2011

Page 176

| | | |
|---|---|---|
| 1 | A.    Yes.  He accompanied me to the restroom. | 15:29:40 |
| 2 | Q.    After the break -- after coming back from the | 15:29:46 |
| 3 | break and after speaking to Mr. Toberoff, you gave an | 15:29:51 |
| 4 | answer that was not responsive to my question about | 15:29:57 |
| 5 | being 95 percent sure that you were going to break off | 15:30:01 |
| 6 | dealings with DC as early as May.  Do you recall that? | 15:30:06 |
| 7 | A.    Yes, I do. | 15:30:09 |
| 8 | Q.    And you understood in giving that answer that | 15:30:10 |
| 9 | that would be helpful to Mr. Toberoff because it would | 15:30:12 |
| 10 | help establish that Mr. Toberoff did not interfere | 15:30:20 |
| 11 | with DC Comics' rights; correct? | 15:30:25 |
| 12 | A.    I was simply telling the truth. | 15:30:28 |
| 13 | Q.    I didn't ask you that question.  But you | 15:30:30 |
| 14 | understood that that answer was helpful to | 15:30:32 |
| 15 | Mr. Toberoff; correct? | 15:30:35 |
| 16 | A.    I wasn't thinking about that. | 15:30:36 |
| 17 | Q.    You have -- you understood that we were | 15:30:38 |
| 18 | making the interference claim; correct?  You said you | 15:30:44 |
| 19 | read the lawsuit; right? | 15:30:48 |
| 20 | A.    I did read the lawsuit. | 15:30:50 |
| 21 | Q.    And you were trying to help Mr. Toberoff | 15:30:52 |
| 22 | because he told you to give that answer and to work | 15:30:57 |
| 23 | that into one of your answers when you came back after | 15:31:00 |
| 24 | a break; correct? | 15:31:03 |
| 25 | A.    No.  No, that's not correct. | 15:31:04 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | Q.   Fortunately we have documents. | 15:31:08 |
| 2 | Speaking of which -- | 15:31:15 |
| 3 | MR. TOBEROFF:  Is that a question? | 15:31:17 |
| 4 | MR. PETROCELLI:  It is.  It is a prelude to a | 15:31:19 |
| 5 | question. | 15:31:21 |
| 6 | Q.   Mr. Marks sent you this document that you've | 15:31:25 |
| 7 | described in which Mr. Toberoff appeared on the scene | 15:31:30 |
| 8 | with Mr. Emanuel talking about a $15 million | 15:31:36 |
| 9 | investment, much greater than any offer Warner Bros. | 15:31:41 |
| 10 | or DC had ever made in mid August, 2002; correct? | 15:31:43 |
| 11 | A.   Well, as I said, I don't recall the date. | 15:31:49 |
| 12 | Q.   Okay.  Well, take a look at this privilege | 15:31:51 |
| 13 | log which we will mark as Exhibit 57. | 15:31:55 |
| 14 | (Whereupon, Plaintiff's Exhibit 57 | |
| 15 | was marked for identification.) | 15:32:16 |
| 16 | THE WITNESS:  Is there a page you want me to | 15:32:17 |
| 17 | look at? | 15:32:18 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.   Yes.  Take a look at item number -- take a | 15:32:21 |
| 20 | look at the page that starts with or that ends with | 15:32:29 |
| 21 | item 628. | 15:32:34 |
| 22 | A.   Okay. | 15:32:39 |
| 23 | MR. TOBEROFF:  You got there pretty quickly. | 15:32:44 |
| 24 | THE WITNESS:  I got lucky. | 15:32:46 |
| 25 | MR. TOBEROFF:  Wait a second.  I need to turn | 15:32:47 |

|   |   |   |
|---|---|---|
| 1 | to this. | 15:32:48 |
| 2 | Okay. | 15:32:51 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.   Now, you see the entry for 623? | 15:33:01 |
| 5 | A.   Yes. | 15:33:06 |
| 6 | Q.   Does Attorney Kevin Marks' letter to Joanne, | 15:33:07 |
| 7 | Laura Siegel -- Joanne is your mother; right? | 15:33:11 |
| 8 | A.   Correct. | 15:33:14 |
| 9 | Q.   -- Attorney Don Bulson and Attorney Bruce | 15:33:15 |
| 10 | Ramer.  Do you see that? | 15:33:20 |
| 11 | A.   Yes. | 15:33:22 |
| 12 | Q.   Do you remember whether the letter you | 15:33:23 |
| 13 | received and that your mother received in which | 15:33:24 |
| 14 | Mr. Marks discussed the Toberoff/Emanuel proposal | 15:33:27 |
| 15 | was -- also included Mr. Bulson on it? | 15:33:31 |
| 16 | A.   I don't remember. | 15:33:35 |
| 17 | Q.   Okay.  Did you discuss the letter with | 15:33:36 |
| 18 | Michael Siegel or Mr. Bulson? | 15:33:39 |
| 19 | A.   I don't remember doing that. | 15:33:43 |
| 20 | Q.   Mr. Bulson you understood to be Mr. Michael | 15:33:43 |
| 21 | Siegel's lawyer? | 15:33:49 |
| 22 | A.   Correct. | 15:33:49 |
| 23 | Q.   And you will see that was item number 623 on | 15:33:49 |
| 24 | this privilege log which has been marked as Exhibit -- | 15:33:52 |
| 25 | What? | 15:33:54 |

```
 1              MR. TOKORO:   57.                         15:33:55

 2              MR. PETROCELLI:   57.                     15:33:56

 3       Q.   And now we go to item 624, and that's a    15:34:02

 4  document dated August 12, 2002, which is a letter to  15:34:06

 5  you and your mother.  Do you see that?                15:34:11

 6       A.   Yes.                                        15:34:12

 7       Q.   And then if you skip down, there's a document 15:34:14

 8  dated August 20, 2002, a letter to you, your mother,  15:34:17

 9  with a copy to Bruce Ramer.  That's Mr. Marks'        15:34:21

10  partner; right?                                       15:34:27

11       A.   Yes.                                        15:34:28

12       Q.   Is it your recollection that the letter you 15:34:51

13  received occurred in or about August, 2002?  Does that 15:34:55

14  sound right timewise?                                 15:35:00

15       A.   I have no way of knowing whether it was back 15:35:01

16  here in July or if it was in August.                  15:35:04

17       Q.   Okay.                                       15:35:07

18              You did not notify DC that you were cutting 15:35:22

19  off negotiations until after you heard about the      15:35:29

20  Toberoff/Emanuel offer from Kevin Marks; correct?     15:35:37

21       A.   Could have been.                            15:35:45

22       Q.   Well, we saw that you cut off the --        15:35:46

23       A.   In September.                               15:35:49

24       Q.   Correct.  And that was after you had already 15:35:51

25  heard about the Toberoff/Emanuel proposal from        15:35:53
```

| | |
|---|---|
| 1 | Mr. Marks; correct? | 15:35:58 |
| 2 | A.    It seems that way. | 15:36:00 |
| 3 | Q.    Okay. | 15:36:22 |
| 4 | Did you discuss with Mr. Emanuel in the | 15:36:22 |
| 5 | meeting that we've been talking about, the date of | 15:36:26 |
| 6 | which you can't give us -- | 15:36:30 |
| 7 | A.    Um-hum. | 15:36:31 |
| 8 | Q.    -- that Mr. Marks might take the position | 15:36:32 |
| 9 | that you already had reached an agreement with | 15:36:46 |
| 10 | Time-Warner and DC Comics? | 15:36:49 |
| 11 | MR. TOBEROFF:  Asked and answered. | 15:36:51 |
| 12 | THE WITNESS:  No.  I think you asked me.  I | 15:36:52 |
| 13 | said no. | 15:36:55 |
| 14 | BY MR. PETROCELLI: | |
| 15 | Q.    I didn't ask you that.  I asked you about | 15:36:55 |
| 16 | whether he would testify adversely to you.  This is a | 15:36:58 |
| 17 | different question. | 15:37:02 |
| 18 | A.    The answer is still no. | 15:37:03 |
| 19 | Q.    Okay.  You don't recall, or it's definitively | 15:37:04 |
| 20 | no? | 15:37:07 |
| 21 | A.    Well, I don't remember talking to Mr. Emanuel | 15:37:08 |
| 22 | about that subject. | 15:37:10 |
| 23 | Q.    This is in the group meeting now we're | 15:37:11 |
| 24 | talking about. | 15:37:13 |
| 25 | A.    Yeah, you're talking about with Mr. Emanuel | 15:37:18 |

EXHIBIT D
196

| | | |
|---|---|---|
| 1 | and my mother. | 15:37:21 |
| 2 | Q. Right. Did you have any discussion in that | 15:37:22 |
| 3 | meeting that Warner Bros. or DC Comics might take that | 15:37:24 |
| 4 | position, that there was already an agreement reached | 15:37:28 |
| 5 | and you're not going to be able to get out of it? | 15:37:30 |
| 6 | A. I don't believe so. I think we were looking | 15:37:34 |
| 7 | forward, not backward. | 15:37:36 |
| 8 | Q. But you had to appreciate that DC Comics and | 15:37:37 |
| 9 | Warner Bros. might have a different view than you; | 15:37:41 |
| 10 | right? That they might say you had no right to just | 15:37:44 |
| 11 | terminate a deal? | 15:37:48 |
| 12 | A. Everybody -- they could take that position if | 15:37:49 |
| 13 | they chose to. | 15:37:52 |
| 14 | Q. Correct, and what I'm asking you is whether | 15:37:53 |
| 15 | you discussed that with the folks at this meeting. | 15:37:55 |
| 16 | A. I don't remember discussing that. | 15:38:00 |
| 17 | Q. Okay. And you said you were looking forward, | 15:38:02 |
| 18 | meaning your focus was looking forward in making a new | 15:38:07 |
| 19 | deal. | 15:38:11 |
| 20 | A. Yes. | 15:38:11 |
| 21 | Q. Does the name David Michaels mean anything to | 15:38:26 |
| 22 | you? | 15:38:28 |
| 23 | A. Yes. | 15:38:28 |
| 24 | Q. Who is he, or how do you know him? | 15:38:31 |
| 25 | A. He was a guy who worked for a short amount of | 15:38:34 |

LAURA SIEGEL LARSON - 7/22/2011

Page 182

| | |
|---|---|
| 1    time in Mr. Toberoff's office. | 15:38:37 |
| 2         Q.    And how do you know that? | 15:38:40 |
| 3         A.    Because when my mother and I went for, you | 15:38:42 |
| 4    know, a meeting or two with Mr. Toberoff, he was | 15:38:45 |
| 5    there, and I was introduced to him. | 15:38:49 |
| 6         Q.    Do you know what year it was? | 15:38:55 |
| 7         A.    What year was that?  I don't know.  Maybe | 15:39:02 |
| 8    around 2004, 2005, in there somewhere. | 15:39:08 |
| 9         Q.    Did you interact with him at all? | 15:39:13 |
| 10         A.    You know, "Hello.  How are you."  You know, | 15:39:16 |
| 11    he said, you know, he was excited to be working on | 15:39:21 |
| 12    Superman. | 15:39:30 |
| 13         Q.    When is the last time you had any interaction | 15:39:30 |
| 14    with him of any kind or the last time your mother did, | 15:39:34 |
| 15    to your knowledge? | 15:39:38 |
| 16         A.    Yeah, it was -- it was late in -- I think it | 15:39:39 |
| 17    was 2005.  Yeah, I think it was late in 2005. | 15:39:46 |
| 18         Q.    What was the nature of that interaction? | 15:39:53 |
| 19         A.    He contacted me and said he had some | 15:39:56 |
| 20    information for my mother and me about our case. | 15:40:00 |
| 21         Q.    Was he still working for Mr. Toberoff at that | 15:40:04 |
| 22    time? | 15:40:07 |
| 23         A.    It wasn't really clear to me. | 15:40:08 |
| 24         Q.    What else was discussed? | 15:40:14 |
| 25         A.    Other than -- are you talking about when he | 15:40:19 |

EXHIBIT D
198

```
 1    first contacted me?                                    15:40:21

 2       Q.   I thought I asked you when you and he last     15:40:22

 3    interacted.                                            15:40:27

 4       A.   Yes.                                           15:40:28

 5       Q.   Was that the occasion?                         15:40:28

 6            MR. TOBEROFF:  She was -- I think she -- at     15:40:29

 7    least I thought and she thought you were asking about  15:40:32

 8    when he first contacted her.                           15:40:34

 9            MR. PETROCELLI:  Okay.  Let me rewind this a    15:40:38

10    bit.                                                   15:40:41

11            THE WITNESS:  Okay.                            15:40:41

12    BY MR. PETROCELLI:

13       Q.   Is the last time -- when is the last time you  15:40:42

14    had any communication with David Michaels?             15:40:45

15       A.   Late in -- as I said, I believe it was 2005.   15:40:49

16       Q.   And that is because you received a telephone   15:40:52

17    call from him?                                         15:40:54

18       A.   A telephone call, and then he followed --      15:40:55

19    followed that up with a meeting with my mom and me.    15:40:58

20       Q.   Okay.  And where did the meeting take place?   15:41:02

21       A.   At my condominium.                             15:41:07

22       Q.   Did you tell Mr. Toberoff about this meeting?  15:41:11

23       A.   Later.                                         15:41:13

24       Q.   Not at the time.                               15:41:15

25       A.   Not at the time.                               15:41:18
```

| | | |
|---|---|---|
| 1 | Q.    And that was a deliberate choice on your part | 15:41:18 |
| 2 | not to mention to Mr. Toberoff that you were having a | 15:41:27 |
| 3 | meeting with someone who used to work for him; | 15:41:27 |
| 4 | correct? | 15:41:27 |
| 5 | A.    Well, yeah, it was kind of an embarrassing | 15:41:27 |
| 6 | situation, but, you know, we were curious.  We wanted | 15:41:30 |
| 7 | to know what this guy had to say. | 15:41:34 |
| 8 | Q.    Okay.  And how long -- what -- how long was | 15:41:40 |
| 9 | it between the time he called you and the time that | 15:41:44 |
| 10 | you folks met at your home?  What was the -- a day?  A | 15:41:46 |
| 11 | couple of days? | 15:41:52 |
| 12 | A.    A few days. | 15:41:54 |
| 13 | Q.    Prior to the time that he called you, you | 15:42:00 |
| 14 | said you think it was maybe late '05? | 15:42:04 |
| 15 | A.    I think so. | 15:42:07 |
| 16 | Q.    What was the last time before then that you | 15:42:08 |
| 17 | had any kind of communication with him? | 15:42:11 |
| 18 | A.    It was, I guess, a couple of months before | 15:42:14 |
| 19 | that when I had seen him at Mr. Toberoff's office. | 15:42:18 |
| 20 | Q.    Okay.  And when he spoke to you on the phone | 15:42:24 |
| 21 | and said he had information for you, did he say he | 15:42:28 |
| 22 | wanted to meet you? | 15:42:31 |
| 23 | A.    Yes. | 15:42:32 |
| 24 | Q.    Okay.  And you agreed? | 15:42:32 |
| 25 | A.    Well, I said, "What is this about," you know, | 15:42:36 |

LAURA SIEGEL HANSON, 7/22/2011

```
 1    and he said, "I really don't want to talk about it on      15:42:38

 2    the phone.  You know, is it okay if I come by?"            15:42:42

 3         Q.    Okay.  Did he tell you what the nature of the    15:42:45

 4    information was?                                            15:42:48

 5         A.    No, he did not, not on the phone.               15:42:48

 6         Q.    So when you met with him, what did he tell       15:42:50

 7    you?                                                        15:42:52

 8             MR. TOBEROFF:  Okay.  We have asserted             15:42:52

 9    privilege between your conversation with David             15:42:55

10    Michaels other than pleasantries or saying "I want to      15:42:57

11    speak to you."  As to your actual conversation, those     15:43:00

12    are privileged.                                            15:43:04

13    BY MR. PETROCELLI:                                         

14         Q.    Did -- did he give you legal advice at this     15:43:07

15    meeting --                                                 15:43:14

16             MR. TOBEROFF:  Don't -- don't --                  15:43:14

17    BY MR. PETROCELLI:                                         

18         Q.    -- at a meeting that you secreted from your     15:43:15

19    lawyer?                                                     15:43:18

20             MR. TOBEROFF:  Don't --                           15:43:19

21             THE WITNESS:  No, he was a lawyer.                15:43:19

22             MR. TOBEROFF:  Wait.  Wait.  Wait.  Don't --      15:43:21

23    BY MR. PETROCELLI:                                         

24         Q.    I know Mr. Michaels is a lawyer, but he did     15:43:22

25    not give you legal advice at this meeting; correct?       15:43:29
```

| | | |
|---|---|---|
| 1 |     MR. TOBEROFF:  Okay.  I instruct you not to | 15:43:32 |
| 2 | answer as to the legal conclusion as to whether it's | 15:43:34 |
| 3 | legal advice, not legal advice.  We have already | 15:43:39 |
| 4 | litigated this, and those communications were upheld | 15:43:42 |
| 5 | as privileged. | 15:43:45 |
| 6 |     THE WITNESS:  Okay. | 15:43:46 |
| 7 |     MR. TOBEROFF:  So we're going to follow the | 15:43:46 |
| 8 | court's ruling. | 15:43:48 |
| 9 |     MR. PETROCELLI:  You know, Marc, you have a | 15:43:49 |
| 10 | way of misstating the record.  What the court ruled on | 15:43:52 |
| 11 | were certain written communications.  As you know, | 15:43:56 |
| 12 | there has been no record put in front of the judge | 15:44:00 |
| 13 | about these conversations.  So you can take the | 15:44:03 |
| 14 | position that the same reasoning and ruling would | 15:44:06 |
| 15 | apply, but I do object to your overstating the record. | 15:44:09 |
| 16 |     MR. TOBEROFF:  And I object to you accusing | 15:44:12 |
| 17 | me of misstating the record when I'm not. | 15:44:14 |
| 18 |     MR. PETROCELLI:  Okay, but you are misstating | 15:44:17 |
| 19 | it. | 15:44:19 |
| 20 |     MR. TOBEROFF:  No, I'm not.  The whole | 15:44:19 |
| 21 | lawsuit that you designed and filed is designed to | 15:44:22 |
| 22 | improperly interfere with the attorney-client | 15:44:24 |
| 23 | relationship.  So I have no doubt that you will | 15:44:26 |
| 24 | continue that attempt at interference at every chance | 15:44:28 |
| 25 | you get, try and learn every single privileged | 15:44:32 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | communication you can possibly learn, and I object to | 15:44:34 |
| 2 | that.  And the process, we have a lengthy list of | 15:44:37 |
| 3 | written communications from you and your cohorts at | 15:44:40 |
| 4 | your firm almost pathologically misstating the record. | 15:44:44 |
| 5 | MR. PETROCELLI:  And -- | 15:44:49 |
| 6 | MR. TOBEROFF:  So we can cross swords on -- | 15:44:49 |
| 7 | MR. PETROCELLI:  Just -- | 15:44:51 |
| 8 | MR. TOBEROFF:  If we had a score board as to | 15:44:52 |
| 9 | characterizing the record -- mischaracterizing the | 15:44:54 |
| 10 | record, I think you're way ahead of me. | 15:44:59 |
| 11 | MR. PETROCELLI:  I doubt it.  And I think you | 15:45:00 |
| 12 | are the lawyer who identified as privileged 15 | 15:45:02 |
| 13 | communications that a judge found to be bogus 15 out | 15:45:06 |
| 14 | of 15 times. | 15:45:10 |
| 15 | MR. TOBEROFF:  He didn't find them bogus, but | 15:45:11 |
| 16 | you also challenged all the communications.  So it was | 15:45:13 |
| 17 | something like 15 out of 150 that were found to be | 15:45:16 |
| 18 | privileged -- | 15:45:21 |
| 19 | MR. PETROCELLI:  Irrelevant, because they did | 15:45:21 |
| 20 | not relate to the accounting issues. | 15:45:22 |
| 21 | MR. TOBEROFF:  And you said none of them were | 15:45:23 |
| 22 | privileged. | 15:45:25 |
| 23 | MR. PETROCELLI:  So let's get back on track | 15:45:26 |
| 24 | here.  You -- | 15:45:28 |
| 25 | MR. TOBEROFF:  And in fact, you're seeking -- | 15:45:29 |

| | |
|---|---|
| 1 | your whole lawsuit is based on privileged documents | 15:45:30 |
| 2 | stolen from my law firm that your client held onto for | 15:45:34 |
| 3 | about five months, illegally stolen property without | 15:45:39 |
| 4 | even letting us know. | 15:45:42 |
| 5 | MR. PETROCELLI:  As far as I'm concerned, | 15:45:43 |
| 6 | there's zero evidence -- | 15:45:44 |
| 7 | MR. TOBEROFF:  There's zero evidence? | 15:45:45 |
| 8 | Consider this an early holiday gift and an enclosing | 15:45:45 |
| 9 | document and your client said they got it in June or | 15:45:48 |
| 10 | July? | 15:45:51 |
| 11 | MR. PETROCELLI:  Well, if you were right -- | 15:45:52 |
| 12 | MR. TOBEROFF:  What holiday are you taking | 15:45:53 |
| 13 | about?  July 4th? | 15:45:55 |
| 14 | MR. PETROCELLI:  If you were right, then such | 15:45:56 |
| 15 | a person would be behind bars, would have been | 15:45:57 |
| 16 | criminally convicted, and no judge would have ever | 15:46:00 |
| 17 | ordered the production of those documents. | 15:46:02 |
| 18 | MR. TOBEROFF:  Not necessarily, as we'll see. | 15:46:05 |
| 19 | MR. PETROCELLI:  So I guess it's not as clear | 15:46:06 |
| 20 | cut as you're suggesting. | 15:46:08 |
| 21 | MR. TOBEROFF:  We asked your client for -- | 15:46:10 |
| 22 | it's a studio that keeps track of everything going in | 15:46:12 |
| 23 | and out of that studio 18 different ways from Sunday, | 15:46:15 |
| 24 | and they didn't have a single record of three packages | 15:46:18 |
| 25 | of documents in the middle of a litigation that the | 15:46:22 |

Page 189

| | | |
|---|---|---|
| 1 | general counsel to Alan Horn, the president or CEO -- | 15:46:24 |
| 2 | I forget which -- and the head of production, they | 15:46:29 |
| 3 | didn't have a single corroborating piece of evidence | 15:46:34 |
| 4 | as to when these three huge packages of documents | 15:46:34 |
| 5 | arrived at their firm, arrived at their studio. | 15:46:40 |
| 6 | MR. PETROCELLI:  Just like you mysteriously | 15:46:40 |
| 7 | don't have any evidence to date the contacts that you | 15:46:41 |
| 8 | made when you interfered with my client's rights? | 15:46:43 |
| 9 | MR. TOBEROFF:  I interfered with your | 15:46:46 |
| 10 | client's rights? | 15:46:48 |
| 11 | MR. PETROCELLI:  We'll get there. | 15:46:48 |
| 12 | MR. TOBEROFF:  This is something spun out of | 15:46:50 |
| 13 | whole cloth in order to try and leverage a settlement, | 15:46:52 |
| 14 | and we all know it. | 15:46:55 |
| 15 | MR. PETROCELLI:  We'll get there. | 15:46:55 |
| 16 | MR. TOBEROFF:  You will not get there. | 15:46:56 |
| 17 | MR. PETROCELLI:  It may take time, but | 15:46:58 |
| 18 | there's no quickness. | 15:47:00 |
| 19 | MR. TOBEROFF:  You don't have a prayer, and | 15:47:01 |
| 20 | you know it. | 15:47:02 |
| 21 | MR. PETROCELLI:  I don't need prayers. | 15:47:04 |
| 22 | MR. TOBEROFF:  You don't have a -- as -- | 15:47:06 |
| 23 | if -- I could use an expression from my father, but I | 15:47:11 |
| 24 | probably shouldn't. | 15:47:15 |
| 25 | MR. PETROCELLI:  No, you shouldn't.  You | 15:47:16 |

EXHIBIT D
205

| | | |
|---|---|---|
| 1 | shouldn't invoke your dad.  Okay? | 15:47:17 |
| 2 | Q.   Ms. Siegel, when you met with Mr. Michaels -- | 15:47:20 |
| 3 | first of all, did you take any notes? | 15:47:30 |
| 4 | A.   No, I don't believe so. | 15:47:32 |
| 5 | Q.   Did your mother? | 15:47:33 |
| 6 | A.   No. | 15:47:35 |
| 7 | Q.   What happened with respect to your | 15:47:39 |
| 8 | interaction with Mr. Michaels after he left? | 15:47:42 |
| 9 | Anything? | 15:47:46 |
| 10 | A.   After he left? | 15:47:47 |
| 11 | Q.   Yes, after the meeting was over. | 15:47:47 |
| 12 | A.   He sent -- he sent me a follow-up e-mail. | 15:47:50 |
| 13 | Q.   So you got just one e-mail from him? | 15:47:57 |
| 14 | A.   I'm remembering one in particular right now. | 15:48:02 |
| 15 | May have received more than one. | 15:48:06 |
| 16 | Q.   And did you respond to the e-mails? | 15:48:07 |
| 17 | A.   Yes, I did. | 15:48:10 |
| 18 | Q.   Did you basically tell him not to contact you | 15:48:16 |
| 19 | again? | 15:48:19 |
| 20 | A.   You bet. | 15:48:19 |
| 21 | Q.   Okay.  So after you responded to his e-mail, | 15:48:20 |
| 22 | did he respond to you again or communicate in any way | 15:48:27 |
| 23 | with you again, or your mother, for that matter? | 15:48:32 |
| 24 | A.   Yeah, I think he sent an e-mail apologizing | 15:48:34 |
| 25 | for trying to -- | 15:48:38 |

EXHIBIT D
206

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Don't -- don't discuss the | 15:48:39 |
| 2 | substance. | |
| 3 | THE WITNESS:  Okay. | 15:48:41 |
| 4 | BY MR. PETROCELLI: | |
| 5 | Q.    Apologizing? | 15:48:42 |
| 6 | A.    Apologizing to my mom and me. | 15:48:43 |
| 7 | Q.    Okay.  And when is the last time you saw | 15:48:48 |
| 8 | those e-mails? | 15:48:50 |
| 9 | A.    It's been a long time.  I don't know. | 15:48:52 |
| 10 | Q.    What was he apologizing for? | 15:48:54 |
| 11 | A.    For something that was discussed that it | 15:48:57 |
| 12 | seems to me that I cannot reveal. | 15:49:02 |
| 13 | Q.    Do you remember what you and he discussed? | 15:49:06 |
| 14 | A.    Yes. | 15:49:09 |
| 15 | Q.    Okay.  And I think I've asked you this, and I | 15:49:10 |
| 16 | think you have instructed.  But did he give you legal | 15:49:17 |
| 17 | advice in that meeting? | 15:49:19 |
| 18 | MR. TOBEROFF:  Calls for a legal conclusion. | 15:49:23 |
| 19 | THE WITNESS:  May I answer that question? | 15:49:27 |
| 20 | MR. TOBEROFF:  No, I don't think you can | 15:49:33 |
| 21 | answer that question, characterizing his | 15:49:35 |
| 22 | communications.  There's been certain limited | 15:49:39 |
| 23 | disclosure as to David Michaels which was held not to | 15:49:42 |
| 24 | be a waiver of the privilege, and I don't want you to | 15:49:46 |
| 25 | go beyond that. | 15:49:53 |

| | |
|---|---|
| 1 | THE WITNESS:  Okay. | 15:49:54 |
| 2 | BY MR. PETROCELLI: | |
| 3 | Q.   Did -- well, certainly when Mr. Michaels | 15:49:59 |
| 4 | apologized to you, he wasn't giving you legal advice, | 15:50:06 |
| 5 | was he? | 15:50:10 |
| 6 | A.   No.  It was at -- the apology was based on | 15:50:12 |
| 7 | something that had previously occurred. | 15:50:16 |
| 8 | Q.   And did -- do you know -- did Mr. -- to your | 15:50:20 |
| 9 | knowledge, did Mr. Michaels learn anything at the | 15:50:24 |
| 10 | meeting that caused him later to apologize? | 15:50:29 |
| 11 | A.   No.  It's not something that he learned. | 15:50:34 |
| 12 | It's -- he was apologizing for something that he did. | 15:50:36 |
| 13 | Q.   To you and your mother? | 15:50:40 |
| 14 | MR. TOBEROFF:  I will allow you to testify as | 15:50:43 |
| 15 | to what he apologized -- you know, I think we're -- | 15:50:45 |
| 16 | you characterize as an apology broadly because I | 15:50:51 |
| 17 | believe it was disclosed previously and held not to be | 15:50:57 |
| 18 | a waiver of the privilege.  So you can testify | 15:51:00 |
| 19 | generally as to what he was apologizing for. | 15:51:03 |
| 20 | THE WITNESS:  It became very clear when he | 15:51:07 |
| 21 | was -- when he was at the meeting and then in this | 15:51:10 |
| 22 | follow-up e-mail that he sent to us that it was a bold | 15:51:13 |
| 23 | attempt on his part to steal my mom and I away from | 15:51:17 |
| 24 | Mr. Toberoff as clients, and he wanted us to sign with | 15:51:22 |
| 25 | him for him to be our attorney. | 15:51:26 |

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 15:51:29 |
| 2 | Q.   And why would he apologize for that, to your | 15:51:29 |
| 3 | knowledge? | 15:51:33 |
| 4 | A.   Because we let him know that we were | 15:51:34 |
| 5 | outraged -- | 15:51:39 |
| 6 | Q.   Okay. | 15:51:39 |
| 7 | A.   -- that he would do that. | 15:51:40 |
| 8 | Q.   When did you let him know that? | 15:51:41 |
| 9 | A.   By e-mail. | 15:51:43 |
| 10 | Q.   You didn't tell him at the meeting? | 15:51:44 |
| 11 | A.   We told him that -- you know, we didn't -- | 15:51:48 |
| 12 | MR. TOBEROFF:  Wait. | 15:51:52 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   Did you kick him out of your house and say | 15:51:52 |
| 15 | "What are you doing here?" | 15:51:56 |
| 16 | A.   Let me put it this way.  All of his motives | 15:51:58 |
| 17 | were not revealed in our meeting.  It became much -- | 15:52:03 |
| 18 | it became clearer, you know, after the meeting when he | 15:52:08 |
| 19 | sent follow-up e-mails what his actual intention was. | 15:52:13 |
| 20 | Q.   After the meeting and before you received the | 15:52:21 |
| 21 | e-mails -- well, after he left the meeting with you, | 15:52:27 |
| 22 | did you have a belief that he was interested in having | 15:52:30 |
| 23 | you sign with him? | 15:52:35 |
| 24 | A.   On his way out the door he turned and said, | 15:52:37 |
| 25 | "I've got an idea.  You know, why don't you guys just, | 15:52:41 |

| | |
|---|---|
| 1    you know, come with me and I'll introduce you to | 15:52:44 |
| 2    another firm." | 15:52:47 |
| 3         Q.    Did he identify the firm? | 15:52:49 |
| 4         A.    No.  I think he was looking for a job at the | 15:52:52 |
| 5    time. | 15:52:56 |
| 6         Q.    Okay.  Had he been fired? | 15:52:58 |
| 7         A.    I don't -- I don't know. | 15:53:02 |
| 8         Q.    Did he tell you what his employment status | 15:53:02 |
| 9    was? | 15:53:05 |
| 10        A.    I think he said he was looking for a job. | 15:53:05 |
| 11        Q.    And then when he said that to you as he was | 15:53:12 |
| 12   going out the door, what did you or your mother say to | 15:53:15 |
| 13   him?  "Don't waste your time" or you're not | 15:53:19 |
| 14   interested, or what do you recall saying? | 15:53:22 |
| 15        A.    It was -- it was like -- first of all, we | 15:53:24 |
| 16   were shocked because we thought it was pretty | 15:53:28 |
| 17   outrageous, and, you know, we felt that he had, you | 15:53:32 |
| 18   know, come -- come in to talk to us under false | 15:53:35 |
| 19   pretenses.  But he was -- he was on the way out the | 15:53:42 |
| 20   door, and my mom and I, you know, didn't have to kick | 15:53:45 |
| 21   him out because he was already leaving, but, you know, | 15:53:47 |
| 22   we wanted to talk about it afterwards and figure out | 15:53:51 |
| 23   what had just happened. | 15:53:54 |
| 24        Q.    So after he left, what did you and your | 15:53:58 |
| 25   mother discuss that you would do with this encounter | 15:54:01 |

| | | |
|---|---|---|
| 1 | that you just had? | 15:54:03 |
| 2 | A.    My mom and I said we didn't have a good | 15:54:06 |
| 3 | feeling about it, you know, but we just -- we wanted | 15:54:08 |
| 4 | to, you know, to kind of think, just as we do about | 15:54:12 |
| 5 | everything, think about things, talk about things, and | 15:54:15 |
| 6 | what could this guy's motivations possibly be. | 15:54:18 |
| 7 | Q.    Did he provide you any documents? | 15:54:22 |
| 8 | A.    He had documents with him, but he didn't | 15:54:25 |
| 9 | really provide them to me. | 15:54:27 |
| 10 | Q.    Did he show them to you? | 15:54:29 |
| 11 | A.    He was waving stuff around. | 15:54:30 |
| 12 | Q.    What was he waving?  Can you tell me the best | 15:54:32 |
| 13 | as you can recall any of the documents that he was | 15:54:35 |
| 14 | waving around? | 15:54:37 |
| 15 | A.    I did not see them enough to be able to read | 15:54:39 |
| 16 | them, so I couldn't identify them. | 15:54:44 |
| 17 | Q.    Well, when he was waving them around, he was | 15:54:47 |
| 18 | identifying them; right? | 15:54:51 |
| 19 | A.    He said, "I've got some stuff here and" -- | 15:54:52 |
| 20 | Q.    Did it relate to your case? | 15:54:55 |
| 21 | A.    He said -- he said it did. | 15:54:57 |
| 22 | Q.    Had he written this -- do you think he's the | 15:55:01 |
| 23 | author of this timeline document?  Are you familiar | 15:55:03 |
| 24 | with the timeline document? | 15:55:06 |
| 25 | A.    I saw it in your Complaint. | 15:55:08 |

LAURA SIEGEL LARSON - 7/22/2011

Page 196

| | | |
|---|---|---|
| 1 | Q.   Okay.  And you had not seen it prior to | 15:55:09 |
| 2 | seeing it in our Complaint? | 15:55:19 |
| 3 | A.   No.  I don't recall ever seeing it before | 15:55:21 |
| 4 | your Complaint. | 15:55:23 |
| 5 | Q.   You had not -- you had not heard about the | 15:55:24 |
| 6 | litigation regarding it in your case back in 2006, '7, | 15:55:32 |
| 7 | and '8? | 15:55:37 |
| 8 | A.   Oh, well, I'm sorry.  I'm sorry.  I guess | 15:55:38 |
| 9 | you're right.  I guess it was before then. | 15:55:41 |
| 10 | Q.   Was this encounter with Mr. Michaels before | 15:55:44 |
| 11 | or after he sent -- withdrawn. | 15:55:47 |
| 12 | Do you believe he's the person who wrote this | 15:55:51 |
| 13 | timeline document? | 15:55:54 |
| 14 | A.   Yes, I do. | 15:55:54 |
| 15 | Q.   How do you know he wrote it? | 15:55:55 |
| 16 | A.   It sounds like him. | 15:55:58 |
| 17 | Q.   Let me make sure I put the document in front | 15:56:01 |
| 18 | of you just so we have a record. | 15:56:04 |
| 19 | A.   Okay. | 15:56:05 |
| 20 | MR. PETROCELLI:  This is Exhibit 58. | 15:56:09 |
| 21 | THE WITNESS:  Thank you. | 15:56:10 |
| 22 | (Whereupon, Plaintiff's Exhibit 58 | |
| 23 | was marked for identification.) | 15:56:16 |
| 24 | BY MR. PETROCELLI: | |
| 25 | Q.   Did you first learn of Exhibit 58, what we've | 15:56:17 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | been calling the Toberoff timeline, before or after | 15:56:20 |
| 2 | your encounter with Mr. Michaels at your home? | 15:56:23 |
| 3 | A.    After. | 15:56:25 |
| 4 | Q.    Okay.  Was it shortly after or long after? | 15:56:26 |
| 5 | Can you estimate the time interval? | 15:56:31 |
| 6 | A.    I -- I think it was long after, but it | 15:56:36 |
| 7 | depends what you mean by long. | 15:56:39 |
| 8 | Q.    Months?  Years? | 15:56:41 |
| 9 | A.    It wasn't years. | 15:56:42 |
| 10 | Q.    Was -- so it's now your recollection that you | 15:56:47 |
| 11 | first saw this timeline document when the issues | 15:56:53 |
| 12 | surfaced in the case you brought? | 15:56:57 |
| 13 | A.    Well, whenever it was first produced for | 15:57:01 |
| 14 | whatever case that was, that was when I saw it. | 15:57:06 |
| 15 | What -- which case it was, there's so many different | 15:57:11 |
| 16 | cases and motions and things like that, I mean I | 15:57:14 |
| 17 | can't -- I can't remember exactly which one, but | 15:57:16 |
| 18 | whenever it was first presented, that -- in a legal | 15:57:19 |
| 19 | forum, that was the first time I saw it. | 15:57:23 |
| 20 | Q.    At some point in time you learned that Warner | 15:57:26 |
| 21 | Bros. had received and notified Mr. Toberoff that it | 15:57:30 |
| 22 | had received an anonymous submission regarding your | 15:57:34 |
| 23 | case; correct? | 15:57:40 |
| 24 | A.    Yes. | 15:57:41 |
| 25 | MR. TOBEROFF:  Anonymous submission.  I like | 15:57:43 |

```
 1    that.                                                      15:57:47

 2    BY MR. PETROCELLI:

 3        Q.   And at that time did you have an occasion to      15:57:48

 4    see the document or the documents that Warner Bros.        15:58:00

 5    had received?  Were they shown to you by Mr. Toberoff      15:58:05

 6    or anyone else?                                            15:58:09

 7        A.   I -- I don't remember when it was that I          15:58:12

 8    first saw it.                                              15:58:14

 9        Q.   When you saw the document for the first time,     15:58:15

10    that is, Exhibit 56 --                                     15:58:17

11             Jason?                                            15:58:21

12             THE WITNESS:  58.                                 15:58:23

13             MR. TOKORO:  58.                                  15:58:24

14             MR. PETROCELLI:  58?  Okay.                       15:58:24

15        Q.   When you saw Exhibit 58, did it discuss           15:58:25

16    matters similar to what had been discussed in the         15:58:30

17    meeting that Mr. Michaels had with you?                    15:58:35

18        A.   Yes.                                              15:58:37

19        Q.   Okay.                                             15:58:39

20        A.   Because he was talking about unconscionable      15:58:39

21    fees, unconscionable fees.                                 15:58:42

22        Q.   And did you -- after the meeting that you had     15:58:50

23    with Mr. Michaels, did you relate the contents of the     15:58:53

24    meeting to Mr. Toberoff?                                   15:58:59

25        A.   Yes, at a certain point I did, yes.               15:59:03
```

| | | |
|---|---|---|
| 1 | Q.   Did you do that before the e-mail exchange or | 15:59:08 |
| 2 | right after Mr. Michaels left your home? | 15:59:12 |
| 3 | A.   No.   It was after the e-mail exchange. | 15:59:15 |
| 4 | Q.   So even though I think you said you were | 15:59:17 |
| 5 | outraged by his suggestion as he left the door, it | 15:59:21 |
| 6 | wasn't until after this e-mail exchange that you first | 15:59:25 |
| 7 | mentioned it to Mr. -- Mr. Toberoff; right? | 15:59:28 |
| 8 | A.   Right. | 15:59:31 |
| 9 | Q.   Did you relate that discussion that you had | 15:59:35 |
| 10 | with Mr. Michaels to anybody else in order to see if | 15:59:38 |
| 11 | there was any, you know, anything to it? | 15:59:43 |
| 12 | A.   No. | 15:59:46 |
| 13 | Q.   Like, for example, George? | 15:59:46 |
| 14 | A.   No. | 15:59:48 |
| 15 | Q.   Or Arthur? | 15:59:48 |
| 16 | A.   No. | 15:59:50 |
| 17 | Q.   Arthur Levine I'm talking about. | 15:59:51 |
| 18 | A.   Correct. | 15:59:53 |
| 19 | Q.   The unconscionable fee, is that -- what was | 16:00:03 |
| 20 | the unconscionable fee?  The 40 percent fee? | 16:00:06 |
| 21 | A.   Yeah. | 16:00:10 |
| 22 | Q.   The document that you received and the e-mail | 16:00:20 |
| 23 | from Mr. Michaels following your meeting with him was | 16:00:24 |
| 24 | what?  A proposed engagement agreement? | 16:00:28 |
| 25 | MR. TOBEROFF:  You can answer that. | 16:00:31 |

LAURA SIEGEL LARSON 5/22/2011
Page ID #:21156

Page 200

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 16:00:32 |
| 2 | BY MR. PETROCELLI: | |
| 3 | Q.   And on the stationery of or letterhead of | 16:00:34 |
| 4 | what firm? | 16:00:37 |
| 5 | A.   His -- his own, his home address. | 16:00:38 |
| 6 | Q.   Okay.  And did you ask for it? | 16:00:41 |
| 7 | A.   Absolutely not. | 16:00:46 |
| 8 | Q.   So it was unsolicited? | 16:00:47 |
| 9 | A.   Unsolicited. | 16:00:49 |
| 10 | Q.   What did you do with it? | 16:00:51 |
| 11 | A.   Well, I discussed it with my mother, and we | 16:00:53 |
| 12 | wrote a response telling him, you know, that we had | 16:00:58 |
| 13 | absolutely no interest in that or in discussing | 16:01:02 |
| 14 | anything with him further. | 16:01:06 |
| 15 | Q.   And then he wrote back saying "I'm sorry"? | 16:01:08 |
| 16 | A.   Yeah, "Didn't want to offend you." | 16:01:11 |
| 17 | Q.   And that's where it was left, with his | 16:01:15 |
| 18 | apology? | 16:01:18 |
| 19 | A.   Yes. | 16:01:18 |
| 20 | Q.   Okay.  And what did his document provide? | 16:01:21 |
| 21 | A.   What do you mean? | 16:01:24 |
| 22 | Q.   What did it say, his unsolicited agreement or | 16:01:26 |
| 23 | proposed agreement? | 16:01:31 |
| 24 | A.   Well, he actually sent two documents. | 16:01:31 |
| 25 | Q.   What were the two documents? | 16:01:34 |

|   |   |   |
|---|---|---|
| 1 | A.    One was his draft of an unsolicited, you | 16:01:36 |
| 2 | know, agreement retaining him as our attorney at a -- | 16:01:43 |
| 3 | at a lower percentage than the one that Mr. Toberoff | 16:01:48 |
| 4 | had in our litigation agreement with him. | 16:01:55 |
| 5 | Q.    What was the percentage? | 16:01:57 |
| 6 | A.    I really don't -- I don't remember right now. | 16:01:58 |
| 7 | Q.    But you do remember it was lower. | 16:02:00 |
| 8 | A.    Yes.  Yes. | 16:02:02 |
| 9 | Q.    What was the other document? | 16:02:04 |
| 10 | A.    The other document was an unsolicited draft | 16:02:05 |
| 11 | that he had put together that he wanted us to sign | 16:02:09 |
| 12 | terminating -- | 16:02:15 |
| 13 | Q.    Mr. Toberoff? | 16:02:15 |
| 14 | A.    -- Mr. Toberoff. | 16:02:17 |
| 15 | Q.    Okay.  And you didn't ask for any of those | 16:02:17 |
| 16 | documents; right? | 16:02:19 |
| 17 | A.    No. | 16:02:20 |
| 18 | Q.    And there was no discussion at the meeting | 16:02:20 |
| 19 | that he was going to send you those documents? | 16:02:22 |
| 20 | A.    No. | 16:02:24 |
| 21 | Q.    That was a complete surprise to you; right? | 16:02:24 |
| 22 | A.    Yes.  It really pissed us off. | 16:02:26 |
| 23 | Q.    Okay.  And you -- what did the -- did the | 16:02:30 |
| 24 | letter terminating Mr. Toberoff -- Mr. Toberoff give a | 16:02:36 |
| 25 | reason for his termination? | 16:02:39 |

LAURA SIEGEL LARSON   7/22/2011

Page 202

| | | |
|---|---|---|
| 1 | A.    No, I don't think so.  I think it was just, | 16:02:41 |
| 2 | you know, "We no longer want your services" or | 16:02:45 |
| 3 | something like that, and we had never said anything | 16:02:48 |
| 4 | like that to him.  In fact, we were very happy with | 16:02:52 |
| 5 | Mr. Toberoff. | 16:02:56 |
| 6 | Q.    Did Mr. Michaels explain to you why he | 16:02:57 |
| 7 | thought you should fire Mr. Toberoff? | 16:03:02 |
| 8 | A.    Because he said that he was charging us | 16:03:05 |
| 9 | unconscionable fees. | 16:03:08 |
| 10 | Q.    Did you do any diligence or checking into the | 16:03:10 |
| 11 | reasonableness of the fee after that discussion? | 16:03:17 |
| 12 | A.    No. | 16:03:24 |
| 13 | Q.    Did he explain to you why he thought it was | 16:03:25 |
| 14 | unconscionable? | 16:03:29 |
| 15 | A.    His discussion was -- it seemed to be coming | 16:03:30 |
| 16 | from a very confused person.  He was talking all over | 16:03:35 |
| 17 | the place and not very clear about what he was trying | 16:03:38 |
| 18 | to express, so it was very hard to follow what he was | 16:03:41 |
| 19 | saying. | 16:03:46 |
| 20 | Q.    Did he seem to you like he was not of sound | 16:03:46 |
| 21 | mind? | 16:03:52 |
| 22 | A.    He seemed extremely nervous and very, very | 16:03:52 |
| 23 | skittish about everything. | 16:03:58 |
| 24 | Q.    Did you think he was ill? | 16:04:01 |
| 25 | A.    He didn't look like he was ill.  It just | 16:04:04 |

Merrill   Corporation   -   Los Angeles

800-826-0277                                    www.merillcorp.com/law

| | | |
|---|---|---|
| 1 | looked like he was -- | 16:04:07 |
| 2 | Q.   Mentally imbalanced? | 16:04:08 |
| 3 | A.   I don't know whether it was -- it's like he | 16:04:10 |
| 4 | knew he was doing something wrong and that -- that he | 16:04:14 |
| 5 | felt guilty about it and he was trying to kind of | 16:04:17 |
| 6 | cover his tracks or something. | 16:04:21 |
| 7 | Q.   Did he explain to you why he would care if | 16:04:23 |
| 8 | Mr. Toberoff was charging you an unconscionable fee? | 16:04:30 |
| 9 | A.   That's what didn't make sense to us at all. | 16:04:34 |
| 10 | You know, that's -- you know, it was like, you know, | 16:04:37 |
| 11 | "It hurts me to see this happening to you," you know. | 16:04:41 |
| 12 | So when the pitch came at the end for "Hey, I can do | 16:04:45 |
| 13 | this for you for less," it started, you know -- | 16:04:48 |
| 14 | Q.   Well, you said before that it was kind of a | 16:04:52 |
| 15 | passing comment as he walked out the door.  "Hey, I've | 16:04:57 |
| 16 | got an idea.  You can hire me."  Do you recall that? | 16:04:59 |
| 17 | A.   Yes. | 16:05:02 |
| 18 | Q.   When he said that, did you tell him "I have | 16:05:05 |
| 19 | no interest in hiring you," or I think you said you | 16:05:09 |
| 20 | didn't and that's why he followed up with those | 16:05:12 |
| 21 | e-mails; right? | 16:05:14 |
| 22 | A.   Yeah.  We just -- you know, it's like "Bye." | 16:05:15 |
| 23 | Q.   Well, when he was explaining this story to | 16:05:20 |
| 24 | you about unconscionable fees and all, did you ask | 16:05:28 |
| 25 | him, "Why are you telling us this?  What's your | 16:05:28 |

EXHIBIT D
219

| | | |
|---|---|---|
| 1 | purpose?  Why are you here?  What is the reason why | 16:05:31 |
| 2 | you're sharing this with us?" | 16:05:34 |
| 3 | A.    Because he -- | 16:05:36 |
| 4 | Q.    Did you ask him those questions? | 16:05:38 |
| 5 | A.    Well, as I said before, you know, he was | 16:05:39 |
| 6 | volunteering that out of the goodness of his heart. | 16:05:42 |
| 7 | You know, he felt that, you know, he as an attorney | 16:05:44 |
| 8 | had a -- what was it?  He had the responsibility to | 16:05:49 |
| 9 | talk to us about this. | 16:05:55 |
| 10 | Q.    Did he tell you that he had had some kind of | 16:05:59 |
| 11 | dispute or disagreement with Mr. Toberoff? | 16:06:03 |
| 12 | A.    No.  I don't recall him saying anything like | 16:06:06 |
| 13 | that. | 16:06:07 |
| 14 | Q.    Did he tell you that he had been fired? | 16:06:08 |
| 15 | A.    I think he just -- you know, I don't -- I | 16:06:14 |
| 16 | don't remember how he explained it.  I think he just | 16:06:21 |
| 17 | said, you know, "I'm no longer with the firm."  I | 16:06:25 |
| 18 | think that was it. | 16:06:28 |
| 19 | Q.    Okay.  And now, given this bizarre discussion | 16:06:29 |
| 20 | about a person who seemed skittish to you, talking | 16:06:36 |
| 21 | about unconscionable fees, kind of not making sense, | 16:06:41 |
| 22 | going outside, you know, and as he leaves he said | 16:06:45 |
| 23 | "Hey, I'll represent you," why didn't you immediately | 16:06:48 |
| 24 | call up Mr. Toberoff and say, "What's the story with | 16:06:52 |
| 25 | this guy?" | 16:06:55 |

| | | |
|---|---|---|
| 1 | A.   I don't know.  You know, it just -- we | 16:06:57 |
| 2 | felt -- we felt uncomfortable about the whole thing, | 16:07:01 |
| 3 | and in a way we kind of felt sorry for the guy, you | 16:07:03 |
| 4 | know, because I mean here's this young guy.  You know, | 16:07:06 |
| 5 | he's out of work.  He said he was trying to do | 16:07:11 |
| 6 | something to help us.  It turned out that he wasn't, | 16:07:14 |
| 7 | but, you know, we thought, you know, he'll just go | 16:07:19 |
| 8 | away. | 16:07:23 |
| 9 | Q.   Why do you say it turned out that he wasn't? | 16:07:23 |
| 10 | A.   No, I don't know why I said that.  No, I just | 16:07:29 |
| 11 | mean that at that moment he didn't appear threatening | 16:07:31 |
| 12 | to us.  You know, when we were right there, it wasn't | 16:07:34 |
| 13 | as if we felt we were physically in danger or | 16:07:39 |
| 14 | anything, but we became more concerned, you know, when | 16:07:43 |
| 15 | we started getting these e-mails, and fortunately, you | 16:07:45 |
| 16 | know, he wasn't in our presence, but, you know, I | 16:07:49 |
| 17 | started really getting concerned at that point about, | 16:07:53 |
| 18 | you know, what's going on with this guy? | 16:07:55 |
| 19 | Q.   Did you forward the e-mails to Mr. Toberoff? | 16:07:58 |
| 20 | A.   I did eventually, yes. | 16:08:03 |
| 21 | Q.   Have you forwarded them to anyone else? | 16:08:07 |
| 22 | A.   I don't believe so. | 16:08:09 |
| 23 | Q.   Did he discuss with you other -- besides the | 16:08:19 |
| 24 | unconscionable fees, did he discuss with you other | 16:08:23 |
| 25 | matters of the sort set forth in Exhibit 58, the | 16:08:28 |

| | | |
|---|---|---|
| 1 | Superman Marc Toberoff timeline? | 16:08:32 |
| 2 | A.    Well, you know, I know he said something to | 16:08:36 |
| 3 | us to the effect of "Did you know that Marc represents | 16:08:38 |
| 4 | the Shusters?"  Of course we knew that.  You know, I | 16:08:42 |
| 5 | mean he acted like that was, you know, a big | 16:08:44 |
| 6 | disclosure, that it was something that we didn't know | 16:08:47 |
| 7 | and that it was something -- that there was something | 16:08:50 |
| 8 | wrong with that.  And of course, you know, we knew | 16:08:53 |
| 9 | that because Jean Peavy had recommended Marc Toberoff. | 16:08:56 |
| 10 | So he kept, you know, trying to, you know, stir the | 16:09:03 |
| 11 | pot. | 16:09:08 |
| 12 | Q.    Did he discuss with you the idea that Marc | 16:09:09 |
| 13 | Toberoff together with Ari Emanuel claimed to have had | 16:09:21 |
| 14 | a billionaire, a mysterious billionaire investor as a | 16:09:27 |
| 15 | way of getting in the door with you? | 16:09:34 |
| 16 | A.    Yeah, well, he said a lot of things that we | 16:09:35 |
| 17 | thought was a lot of crap. | 16:09:38 |
| 18 | Q.    Was that one of them? | 16:09:40 |
| 19 | A.    That was one of them. | 16:09:41 |
| 20 | Q.    He said that at the meeting, or are you just | 16:09:42 |
| 21 | remembering what you think he wrote in the document? | 16:09:47 |
| 22 | A.    I don't know.  It could be that the document | 16:09:49 |
| 23 | is influencing me.  But I know that he, you know, he | 16:09:52 |
| 24 | was just constantly saying -- saying things that in | 16:09:59 |
| 25 | his mind he thought would shock us. | 16:10:04 |

```
 1        Q.   Did -- when he discussed -- when he discussed    16:10:07

 2   the issue of the Shusters with you, did he talk about      16:10:13

 3   issues related to Superboy?                                 16:10:21

 4        A.   I don't recall that coming up.                    16:10:25

 5        Q.   Did he discuss with you that when                16:10:27

 6   Mr. Toberoff first began to work with the Shusters,         16:10:35

 7   that the Shusters claimed that Joe Shuster had been a       16:10:40

 8   co-creator of Superboy and they were seeking rights to      16:10:48

 9   Superboy?                                                   16:10:51

10             MR. TOBEROFF:  Misstates the record and the      16:10:52

11   evidence.                                                   16:10:55

12             MR. PETROCELLI:  I'm not purporting to state      16:10:55

13   anything.                                                   16:10:58

14             MR. TOBEROFF:  The way you're phrasing it.        16:10:58

15             MR. PETROCELLI:  I'm asking a question.           16:10:59

16             MR. TOBEROFF:  The way -- you had said            16:11:00

17   "discussed his claim that."  You stated it as a fact        16:11:02

18   almost.                                                     16:11:08

19             MR. PETROCELLI:  It's called coaching the        16:11:08

20   witness.                                                    16:11:10

21        Q.   Can you answer that question?                     16:11:11

22        A.   Well, I believe you're asking me whether he      16:11:13

23   discussed Superboy with us?                                 16:11:16

24        Q.   Generally, but I was asking for specifically     16:11:18

25   whether he discussed the idea that the Shuster family      16:11:20
```

Page 208

```
 1    asserted that Joe Shuster was a co-creator of Superboy    16:11:25

 2    and on that basis the Shusters were claiming copyright    16:11:32

 3    termination interests.                                    16:11:37

 4        A.   I --                                             16:11:37

 5            MR. TOBEROFF:  Wait.  Same objection.  Lacks      16:11:39

 6    foundation.  Assumes facts.                               16:11:40

 7            THE WITNESS:  No, I don't recall that being       16:11:41

 8    discussed.                                                16:11:45

 9    BY MR. PETROCELLI:

10        Q.   Did he discuss with you that after or as part    16:11:46

11    of working with the Siegel family, Mr. Toberoff caused    16:11:54

12    the Shusters to disavow any interest in Superboy?         16:12:01

13        A.   No, he did not discuss that with us.            16:12:04

14        Q.   You're aware that the Shusters when they         16:12:13

15    initially began working with Mr. Toberoff asserted an    16:12:21

16    interest in Superboy.                                    16:12:25

17        A.   Well, I really don't know much about the        16:12:27

18    Shuster case because that's their business.              16:12:29

19        Q.   Well, you were aware from reading our           16:12:32

20    lawsuit; right?                                          16:12:35

21        A.   From reading your lawsuit.                      16:12:35

22        Q.   Right.  And you're aware from reading our       16:12:37

23    lawsuit that when Mr. Toberoff started working with      16:12:41

24    you and your mom, he then entered into a new             16:12:46

25    arrangement with the Shusters whereby they disavowed     16:12:51
```

| | | |
|---|---|---|
| 1 | any interest in Superboy. | 16:12:55 |
| 2 | A.  I don't know anything about his arrangements | 16:12:57 |
| 3 | with the Shusters. | 16:12:58 |
| 4 | Q.  Have you ever inquired of anybody why the | 16:13:00 |
| 5 | Shusters would give up their entire interest in | 16:13:04 |
| 6 | Superboy that they were asserting at one point in | 16:13:07 |
| 7 | time? | 16:13:10 |
| 8 | MR. TOBEROFF:  Assumes facts.  Lacks | 16:13:10 |
| 9 | foundation. | 16:13:12 |
| 10 | THE WITNESS:  I think they -- they found out | 16:13:12 |
| 11 | by reading more carefully the 1947 ruling. | 16:13:16 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.  Well, that's an interesting point.  It's not | 16:13:21 |
| 14 | what I asked you.  That's your speculation; right? | 16:13:23 |
| 15 | A.  That's my speculation. | 16:13:28 |
| 16 | Q.  And you know there's a lot of documents after | 16:13:30 |
| 17 | 1947 that they could have read that would have | 16:13:32 |
| 18 | informed them that Joe Shuster was a co-creator of | 16:13:36 |
| 19 | Superboy; correct? | 16:13:41 |
| 20 | A.  I don't know that. | 16:13:41 |
| 21 | Q.  I know that you picked the 1947 ruling | 16:13:42 |
| 22 | because that's the one Mr. Toberoff likes to talk | 16:13:44 |
| 23 | about; right? | 16:13:46 |
| 24 | A.  No.  That's the one that my father told me | 16:13:48 |
| 25 | about my entire life. | 16:13:51 |

LAURA SIEGEL LARSON 6/22/2011

| | | |
|---|---|---|
| 1 | Q.   But that's not the last word on the subject; | 16:13:52 |
| 2 | right? | 16:13:54 |
| 3 | A.   I don't know that that's the last word on the | 16:13:54 |
| 4 | subject. | 16:13:56 |
| 5 | Q.   And you're aware that there are documents | 16:13:57 |
| 6 | that both Joe Shuster and your dad caused to be filed | 16:13:58 |
| 7 | in which they claimed co-credit for Superboy; correct? | 16:14:03 |
| 8 | A.   I do not know that. | 16:14:06 |
| 9 | Q.   And you have seen those copyright | 16:14:07 |
| 10 | certifications. | 16:14:10 |
| 11 | A.   I don't recall anything like that. | 16:14:10 |
| 12 | Q.   Copyright registration documents; correct? | 16:14:11 |
| 13 | MR. TOBEROFF:  Just slow it down.  Let him | 16:14:15 |
| 14 | finish the question.  What's your answer? | 16:14:18 |
| 15 | THE WITNESS:  My answer is I have not seen | 16:14:20 |
| 16 | those.  I have not seen what you're referring to. | 16:14:21 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.   But I had asked you not to surmise that the | 16:14:24 |
| 19 | Shusters must have read some opinion back in 1947.  I | 16:14:29 |
| 20 | had asked you if you had ever discussed with anyone | 16:14:32 |
| 21 | why they would disavow on the interest in Superboy | 16:14:36 |
| 22 | that they previously had -- | 16:14:42 |
| 23 | A.   Okay. | 16:14:43 |
| 24 | Q.   -- claimed. | 16:14:44 |
| 25 | A.   I didn't understand that that was your | 16:14:45 |

| | |
|---|---|
| 1 | question.  The answer to that is no. | 16:14:46 |
| 2 | Q.   Okay.  Do you have a copy of our Complaint | 16:15:06 |
| 3 | there just while we're on this subject? | 16:15:14 |
| 4 | A.   No, I don't. | 16:15:18 |
| 5 | Q.   You are aware that in Action Comics No. 1, | 16:15:34 |
| 6 | Mr. Shuster did the illustrations or worked on the | 16:15:39 |
| 7 | illustrations; correct? | 16:15:43 |
| 8 | A.   Yes. | 16:15:44 |
| 9 | Q.   And there's some depiction of Superman as a | 16:15:44 |
| 10 | youth with super powers; correct -- not in Action | 16:15:51 |
| 11 | Comics No. 1.  Excuse me.  In Superman No. 1. | 16:15:54 |
| 12 | A.   I haven't seen it for a long time. | 16:15:58 |
| 13 | Q.   Okay.  Well, rather than put you through a | 16:16:01 |
| 14 | memory test, can you take a look at our Complaint | 16:16:03 |
| 15 | which has been marked as Exhibit 59.  Turn to page 29, | 16:16:07 |
| 16 | paragraph 88. | 16:16:12 |
| 17 | (Whereupon, Plaintiff's Exhibit 59 | |
| 18 | was marked for identification.) | 16:16:16 |
| 19 | THE WITNESS:  29, paragraph 88, yes. | 16:16:17 |
| 20 | MR. PETROCELLI:  Yes. | 16:16:18 |
| 21 | Q.   When you read paragraph 88 and you saw the | 16:16:21 |
| 22 | first bullet under paragraph 88 which states that, in | 16:16:26 |
| 23 | part, "Toberoff had entered into the 2001 | 16:16:33 |
| 24 | joint-venture agreement with the Shuster Heirs, | 16:16:37 |
| 25 | specifying that the Shuster Heirs owned an interest in | 16:16:40 |

EXHIBIT D
227

| | | |
|---|---|---|
| 1 | 'Superboy,'" do you see that? | 16:16:42 |
| 2 | A.    I see that. | 16:16:43 |
| 3 | Q.    Was that the first time you had learned that? | 16:16:44 |
| 4 | A.    Yes, I believe so.  I don't recall, you know, | 16:16:46 |
| 5 | any -- any previous discussion. | 16:16:52 |
| 6 | Q.    Okay. | 16:16:54 |
| 7 | MR. TOBEROFF:  I object to the question to | 16:16:55 |
| 8 | the extent that you're characterizing allegations as | 16:16:58 |
| 9 | fact. | 16:17:11 |
| 10 | MR. PETROCELLI:  Can you get me the 2001. | 16:17:11 |
| 11 | Q.    Take a look at Exhibit 10, please. | 16:17:20 |
| 12 | (Whereupon, Plaintiff's Exhibit 10 | |
| 13 | was placed before the witness.) | 16:17:23 |
| 14 | THE WITNESS:  Thank you. | 16:17:23 |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q.    This is an agreement by Pacific Pictures | 16:17:31 |
| 17 | Corporation through its president, Marc Toberoff, and | 16:17:37 |
| 18 | Jean Peavy and Warren Peary dated as of November 23, | 16:17:42 |
| 19 | 2001.  This has previously been marked as Exhibit 10. | 16:17:48 |
| 20 | Do you see that? | 16:17:50 |
| 21 | A.    Yes, I do. | 16:17:51 |
| 22 | Q.    Okay.  And you will see that in the first | 16:17:53 |
| 23 | paragraph it's discussing formation of a joint venture | 16:18:00 |
| 24 | with respect to Mr. Shuster's claimed copyright | 16:18:04 |
| 25 | interest.  Do you see that? | 16:18:07 |

EXHIBIT D
228

Page 213

| | | |
|---|---|---|
| 1 | A.   Well, I see it, but I'm not fully reading it. | 16:18:08 |
| 2 | Do you want me to spend the time to read it? | 16:18:11 |
| 3 | Q.   Not really just because I don't want to pass | 16:18:16 |
| 4 | the time. | 16:18:18 |
| 5 | Take paragraph 1, and you might read | 16:18:18 |
| 6 | paragraph 1 to yourself. | 16:18:22 |
| 7 | MR. TOBEROFF:  Before answering any questions | 16:18:25 |
| 8 | regarding this agreement, if there is a question as | 16:18:26 |
| 9 | opposed to a rhetorical statement, then I would like | 16:18:29 |
| 10 | you to please read whatever he's asking you very | 16:18:32 |
| 11 | carefully. | 16:19:05 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   You do see the reference there that the | 16:19:06 |
| 14 | rights that are the subject of this agreement include | 16:19:11 |
| 15 | Superboy and Smallville; correct? | 16:19:21 |
| 16 | A.   I see that it's written there. | 16:19:22 |
| 17 | Q.   Okay.  Was this shown to you at the time that | 16:19:28 |
| 18 | you entered into your first agreement with | 16:19:31 |
| 19 | Mr. Toberoff? | 16:19:36 |
| 20 | A.   No, it was not. | 16:19:36 |
| 21 | Q.   When you signed your agreement with | 16:19:40 |
| 22 | Mr. Toberoff in August, 2002 -- excuse me -- in | 16:19:43 |
| 23 | October, 2002, the one with IP Worldwide -- | 16:19:46 |
| 24 | A.   Yeah, the end of October. | 16:19:49 |
| 25 | Q.   The end -- whenever it was -- | 16:19:51 |

EXHIBIT D
229

Case 2:10-cv-03633-ODW-RZ    Document 316-5    Filed 09/02/11    Page 216 of 344
LAURA SIEGEL LARSON 21170 /22/2011
Page ID #:21170

Page 214

|   |   |   |
|---|---|---|
| 1 | A.    Yeah. | 16:19:53 |
| 2 | Q.    -- were you aware that as of that point in | 16:19:53 |
| 3 | time that Mr. Toberoff had entered into a joint | 16:19:58 |
| 4 | venture through his company, Pacific Pictures, with | 16:20:02 |
| 5 | the Shusters regarding Superman rights that included, | 16:20:06 |
| 6 | without limitation, Superboy? | 16:20:09 |
| 7 | MR. TOBEROFF:  Misstates the paragraph 1. | 16:20:11 |
| 8 | BY MR. PETROCELLI: |  |
| 9 | Q.    You can answer. | 16:20:15 |
| 10 | A.    The information that we had from Jean Peavy | 16:20:17 |
| 11 | was that Mr. Toberoff was her attorney, and she didn't | 16:20:20 |
| 12 | supply us with any agreements or any more details than | 16:20:25 |
| 13 | that. | 16:20:29 |
| 14 | Q.    You didn't even know that Mr. Toberoff had | 16:20:29 |
| 15 | entered into a joint venture through his company, | 16:20:32 |
| 16 | Pacific Pictures? | 16:20:36 |
| 17 | A.    We knew that he was their attorney. | 16:20:37 |
| 18 | Q.    No, you're not answering my question. | 16:20:39 |
| 19 | A.    No, I'm trying to.  I'm sorry. | 16:20:41 |
| 20 | Q.    No.  What you're doing is you're continuing | 16:20:43 |
| 21 | to assert that Mr. Toberoff's your attorney because | 16:20:45 |
| 22 | you believe that it is important to his case and your | 16:20:49 |
| 23 | case to say that. | 16:20:53 |
| 24 | MR. TOBEROFF:  Please don't argue with the | 16:20:54 |
| 25 | witness. | 16:20:55 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  No, I'm not. | 16:20:55 |
| 2 | MR. TOBEROFF:  Wait a second.  Ask your | 16:20:57 |
| 3 | question.  Don't argue with her. | 16:20:59 |
| 4 | BY MR. PETROCELLI: | |
| 5 | Q.  I'm capable of asking a question that will | 16:20:59 |
| 6 | elicit that answer, but frankly, you know, we have | 16:21:02 |
| 7 | somewhat limited time.  I'm not asking that question, | 16:21:05 |
| 8 | so please bear with me. | 16:21:08 |
| 9 | Can you read my question back?  I move to | 16:21:10 |
| 10 | strike that answer as nonresponsive. | 16:21:12 |
| 11 | THE WITNESS:  Okay.  I just wanted to say I'm | 16:21:14 |
| 12 | sorry.  That's just the way I express myself | 16:21:16 |
| 13 | sometimes.  I'll try and listen more closely to your | 16:21:19 |
| 14 | question. | 16:21:21 |
| 15 | MR. TOBEROFF:  And I would advise you don't | 16:21:22 |
| 16 | let Mr. Petrocelli browbeat you with his argumentative | 16:21:25 |
| 17 | statements.  You answer the questions as you see fit. | 16:21:29 |
| 18 | THE WITNESS:  Um-hum. | 16:21:32 |
| 19 | (The record was read.) | 16:21:51 |
| 20 | THE WITNESS:  The answer is no. | 16:21:51 |
| 21 | MR. PETROCELLI:  Let me sharpen my question a | 16:21:54 |
| 22 | bit. | 16:21:56 |
| 23 | Q.  As of the time you had entered into the first | 16:21:56 |
| 24 | agreement with Mr. Toberoff, the IP Worldwide | 16:21:59 |
| 25 | agreement in October of 2002 or as of October, 2002, | 16:22:02 |

| | | |
|---|---|---|
| 1 | were you aware that he, through Pacific Pictures or | 16:22:07 |
| 2 | any other entity, had entered into a joint venture | 16:22:10 |
| 3 | agreement with the Shusters regarding Superboy or | 16:22:16 |
| 4 | Superman? | 16:22:19 |
| 5 | A.   Would you speak up just a little bit?  I | 16:22:19 |
| 6 | think I got what you said, but I'd appreciate it if | 16:22:22 |
| 7 | maybe she could read it back. | 16:22:24 |
| 8 | MR. PETROCELLI:  Definitely I will try to | 16:22:27 |
| 9 | speak up. | 16:22:28 |
| 10 | THE WITNESS:  Thank you. | 16:22:29 |
| 11 | (The record was read.) | |
| 12 | THE WITNESS:  No, I was not aware of that. | 16:22:52 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   Were you aware of that as of the time that | 16:22:54 |
| 15 | you entered into what you call the litigation | 16:22:57 |
| 16 | agreement with Mr. Toberoff sometime in 2004? | 16:22:59 |
| 17 | A.   You're asking the same question about if I | 16:23:05 |
| 18 | knew about this? | 16:23:07 |
| 19 | Q.   Yes. | 16:23:08 |
| 20 | A.   No, I don't believe so. | 16:23:09 |
| 21 | Q.   And to your knowledge, your mother was not | 16:23:15 |
| 22 | aware of it either; correct? | 16:23:16 |
| 23 | A.   Except it's possible, because I have not read | 16:23:19 |
| 24 | it in a really long time, but it's possible that it | 16:23:24 |
| 25 | was disclosed in one of the -- one of the -- what was | 16:23:26 |

| | | |
|---|---|---|
| 1 | it called?  The conflict.  It might have been | 16:23:31 |
| 2 | disclosed in the conflict document. | 16:23:38 |
| 3 | Q.   Are you saying that it was? | 16:23:39 |
| 4 | A.   I'm saying -- | 16:23:40 |
| 5 | MR. TOBEROFF:  Don't discuss the content of | 16:23:41 |
| 6 | conflict letter. | 16:23:45 |
| 7 | THE WITNESS:  Okay.  I'm saying I don't know. | 16:23:45 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.   Okay.  So let's go back to paragraph 88 of | 16:23:54 |
| 10 | the Complaint, which is paragraph 59.  The second | 16:23:58 |
| 11 | bullet states "The original Superboy 'script' on which | 16:24:01 |
| 12 | the Siegel Heirs' ownership claims rely openly | 16:24:04 |
| 13 | contains the byline:  By Jerry Siegel and Joe | 16:24:07 |
| 14 | Shuster."  Do you see that? | 16:24:10 |
| 15 | A.   I do see that. | 16:24:12 |
| 16 | Q.   Were you aware of Superboy scripts -- prior | 16:24:13 |
| 17 | to reading this Complaint, were you aware that there | 16:24:17 |
| 18 | were Superboy scripts that contained a byline that | 16:24:19 |
| 19 | included Joe Shuster as well as Jerry Siegel? | 16:24:23 |
| 20 | A.   I -- I saw a script that had that written, | 16:24:26 |
| 21 | typed on it. | 16:24:31 |
| 22 | Q.   Just one. | 16:24:31 |
| 23 | A.   Well, I only believe there was one.  I can't | 16:24:33 |
| 24 | remember more than one. | 16:24:35 |
| 25 | Q.   Okay.  And you had seen that prior to reading | 16:24:36 |

Page 218

| | |
|---|---|
| 1 | this lawsuit; is that right? | 16:24:42 |
| 2 |     A.   I saw that a long time ago. | 16:24:43 |
| 3 |     Q.   A long time ago.  And the next bullet talks | 16:24:45 |
| 4 | about "In 1948, a Court in Westchester, New York found | 16:24:49 |
| 5 | that Joe Shuster provided the artwork for the Superboy | 16:24:55 |
| 6 | story and More Fun Comics No. 101."  Were you aware of | 16:24:58 |
| 7 | that? | 16:25:04 |
| 8 |     A.   Yes. | 16:25:04 |
| 9 |     Q.   Okay.  And the next bullet says "In 1972 and | 16:25:04 |
| 10 | 1973, Siegel and Shuster together filed their own | 16:25:06 |
| 11 | copyright renewal notices with the copyright office | 16:25:10 |
| 12 | for Superboy, in which they identified Superboy as a | 16:25:12 |
| 13 | work that they had jointly created."  Were you aware | 16:25:15 |
| 14 | of that? | 16:25:17 |
| 15 |     A.   I'm not aware of that. | 16:25:18 |
| 16 |     Q.   When you read this, did you inquire of anyone | 16:25:19 |
| 17 | whether that was true or not? | 16:25:25 |
| 18 |     A.   Well, I was surprised by it, and no, I didn't | 16:25:27 |
| 19 | inquire about it. | 16:25:33 |
| 20 |     Q.   Well, given you were surprised by it, do you | 16:25:34 |
| 21 | mean it was not consistent with what you believed to | 16:25:36 |
| 22 | be true? | 16:25:39 |
| 23 |     A.   Was this consistent? | 16:25:39 |
| 24 |     Q.   This was inconsistent with what you believed | 16:25:40 |
| 25 | to be true; correct? | 16:25:43 |

EXHIBIT D
234

| | | |
|---|---|---|
| 1 | A.   Could you ask that in another way?  I'm not | 16:25:44 |
| 2 | following you. | |
| 3 | Q.   You said you were surprised by it.  Why were | 16:25:47 |
| 4 | you surprised by it? | 16:25:49 |
| 5 | A.   I was surprised that this, what you're saying | 16:25:50 |
| 6 | here, occurred in 1972 and 1973. | 16:25:56 |
| 7 | Q.   Why were you surprised? | 16:25:58 |
| 8 | A.   Because I was not aware of it. | 16:26:00 |
| 9 | Q.   Okay.  And did you disbelieve it when you | 16:26:03 |
| 10 | read it? | 16:26:05 |
| 11 | A.   I questioned whether it was true or not. | 16:26:10 |
| 12 | Q.   And have you since found out whether or not | 16:26:13 |
| 13 | it's true? | 16:26:16 |
| 14 | A.   I believe that it falls under a discussion | 16:26:18 |
| 15 | that I had with Mr. Toberoff. | 16:26:24 |
| 16 | Q.   Okay.  Did you have that discussion after | 16:26:28 |
| 17 | reading it in the lawsuit that we filed in May, 2010, | 16:26:31 |
| 18 | the one that you just described? | 16:26:35 |
| 19 | A.   I believe so. | 16:26:37 |
| 20 | Q.   Okay.  Did Mr. Toberoff show you the | 16:26:38 |
| 21 | copyright renewal forms or the copyright registration | 16:26:47 |
| 22 | forms? | 16:26:50 |
| 23 | MR. TOBEROFF:  Attorney-client privilege. | 16:26:50 |
| 24 | Instruct you not to answer. | 16:26:51 |
| 25 | BY MR. PETROCELLI: | |

```
 1      Q.   Have you ever seen those forms, the ones        16:26:52

 2   referenced in paragraph 88 of our lawsuit?             16:26:56

 3      A.   I don't remember ever seeing them.             16:26:58

 4      Q.   Take a look at Exhibit 17.                     16:27:01

 5           (Whereupon, Plaintiff's Exhibit 17

 6           was placed before the witness.)               16:27:09

 7           THE WITNESS:  Thank you.                       16:27:10

 8   BY MR. PETROCELLI:

 9      Q.   This is for the year 1972 listing of renewal   16:27:16

10   registrations from the copyright office.  The year     16:27:20

11   "1972" is in the top-left corner.  And -- well, first  16:27:23

12   of all, have you ever seen this document before?       16:27:28

13      A.   I've seen similar documents.  I can't tell     16:27:32

14   you whether I saw this page or not.                    16:27:36

15      Q.   Well, have you ever seen a document which      16:27:38

16   identified the name Joe Shuster and Superboy?          16:27:40

17      A.   I don't recall that, no.                       16:27:44

18      Q.   I'll show you one more for 1973.  Okay.  I'll  16:27:51

19   show you another one I forgot to include.  This is     16:27:56

20   Exhibit 18.                                            16:28:00

21           (Whereupon, Plaintiff's Exhibit 18

22           was placed before the witness.)               16:28:02

23           THE WITNESS:  Excuse me.  May I just have a    16:28:02

24   minute because I'm having trouble with this small      16:28:04

25   print.                                                 16:28:07
```

```
 1    BY MR. PETROCELLI:                                    16:28:24

 2        Q.   Take a look at Exhibit 18, which is a        16:28:25

 3    November 15, 1972, certification of a copyright       16:28:29

 4    registration for Superboy.                            16:28:36

 5        A.   Okay.                                        16:28:40

 6        Q.   And you will see on the second page that the 16:28:41

 7    two claimants are Jerome Siegel -- that's your        16:28:47

 8    father -- as an author and Joe Shuster as an author   16:28:51

 9    for the title "Superboy."  Do you see that?           16:28:56

10        A.   Yes.                                         16:29:01

11        Q.   And is this the first time you've seen this  16:29:02

12    document?                                             16:29:04

13        A.   Yes.                                         16:29:04

14        Q.   And finally, take a look at Exhibit 19, which 16:29:08

15    is a listing of registrations for the year 1973.

16            (Whereupon, Plaintiff's Exhibit 19

17            was placed before the witness.)              16:29:25

18    BY MR. PETROCELLI:

19        Q.   And you'll see a reference to "Superboy."    16:29:26

20        A.   I see "Superman."                            16:29:38

21        Q.   You see under the name "Jerome Siegel" it    16:29:48

22    says "Superboy.  By Jerome Siegel"?                   16:29:52

23        A.   This one entry, yeah.  All of these others   16:29:54

24    are Superman.  I see.                                 16:29:56

25        Q.   Do you see the one for Superboy where it says 16:29:57
```

|    |    |    |
|----|----|----|
| 1  | "By Jerome Siegel & Joe Shuster"? | 16:30:00 |
| 2  | A.    In More Fun Comics? | 16:30:02 |
| 3  | Q.    Yes.  Is that the first time you've seen this | 16:30:04 |
| 4  | document? | 16:30:11 |
| 5  | A.    Yeah, I believe so. | 16:30:11 |
| 6  | Q.    Okay.  Are you aware, going down to the next | 16:30:21 |
| 7  | bullet of paragraph 88, that in Action Comics No. 1, | 16:30:25 |
| 8  | Joe Shuster drew Superman as a very young boy | 16:30:29 |
| 9  | displaying a chair being held over his head? | 16:30:34 |
| 10 | A.    Yes.  You mean that one -- that one -- if I'm | 16:30:40 |
| 11 | recalling correctly, there's one panel. | 16:30:43 |
| 12 | Q.    If you turn the page -- | 16:30:46 |
| 13 | A.    That's the panel. | 16:30:49 |
| 14 | Q.    -- that's the panel that you're referring to? | 16:30:51 |
| 15 | MR. TOBEROFF:  Superbaby. | 16:30:53 |
| 16 | THE WITNESS:  As a baby, right. | 16:30:54 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.    "Action Comics No. 1 (1930)."  Do you see that? | 16:30:55 |
| 19 | A.    Yes. | 16:30:58 |
| 20 | Q.    And you understood that Joe Shuster had | 16:30:58 |
| 21 | illustrated that; correct? | 16:31:01 |
| 22 | A.    Yes, he did. | 16:31:02 |
| 23 | Q.    And in the next panel on page 30 of the | 16:31:06 |
| 24 | Complaint, which is part of paragraph 88, were you | 16:31:10 |
| 25 | aware that Mr. Shuster had illustrated a -- Superman | 16:31:17 |

|    |                                                                        |          |
|----|------------------------------------------------------------------------|----------|
| 1  | as a youth in Superman No. 1 in May of 1939?                            | 16:31:24 |
| 2  | A.   Well, this says it's from Superman No. 1,                          | 16:31:30 |
| 3  | and, you know, I don't recall it being, but I                          | 16:31:34 |
| 4  | recognize this panel.  So yes, this one panel I do                     | 16:31:38 |
| 5  | recognize.                                                              | 16:31:42 |
| 6  | Q.   Okay.  And then also comic strips in 1942                         | 16:31:43 |
| 7  | depicting Superman as a youth as shown in the Superman                 | 16:31:53 |
| 8  | Sunday Strip, May 31, 1942, depicted on page 31 of our                 | 16:32:01 |
| 9  | Complaint, have you seen that panel before?                            | 16:32:01 |
| 10 | A.   No, I haven't seen that one before.  I don't                      | 16:32:02 |
| 11 | recall that one.                                                       | 16:32:04 |
| 12 | Q.   Now, given that Joe -- given this body of                        | 16:32:05 |
| 13 | evidence that Joe Shuster was a co-creator of                          | 16:32:15 |
| 14 | Superboy, are you aware of any reason why --                           | 16:32:24 |
| 15 | withdrawn.                                                              | 16:32:30 |
| 16 | Given this body of evidence regarding Joe                              | 16:32:30 |
| 17 | Shuster's role in the creation of Superboy, including                  | 16:32:39 |
| 18 | illustrating Superboy and filing the copyright                         | 16:32:44 |
| 19 | registrations in his name and so forth --                              | 16:32:48 |
| 20 | MR. TOBEROFF:  Assumes facts.  Lacks                                   | 16:32:50 |
| 21 | foundation.                                                             | 16:32:52 |
| 22 | BY MR. PETROCELLI:                                                      |          |
| 23 | Q.   -- are you -- did you ever have any                              | 16:32:53 |
| 24 | discussion with anyone about why the Shusters two                      | 16:32:57 |
| 25 | years after entering into that agreement with                          | 16:33:05 |

Page 224

|     |                                                                  |          |
|-----|------------------------------------------------------------------|----------|
| 1   | Mr. Toberoff's company in which they included as one             | 16:33:07 |
| 2   | of the claimed rights -- rights to Superboy would then          | 16:33:11 |
| 3   | disavow such rights?                                             | 16:33:15 |
| 4   | MR. TOBEROFF:  Assumes facts.  Lacks                            | 16:33:17 |
| 5   | foundation.  Misstates the record.                              | 16:33:19 |
| 6   | And you could answer excluding your                             | 16:33:24 |
| 7   | conversations with your attorneys.                              | 16:33:29 |
| 8   | THE WITNESS:  And the question was did I                        | 16:33:31 |
| 9   | discuss this with anyone?                                       | 16:33:33 |
| 10  | MR. PETROCELLI:  Yes.                                           | 16:33:34 |
| 11  | THE WITNESS:  No one other than my attorney.                   | 16:33:39 |
| 12  | BY MR. PETROCELLI:                                              |          |
| 13  | Q.   And who is your attorney?                                 | 16:33:41 |
| 14  | A.   Marc Toberoff.                                            | 16:33:43 |
| 15  | Q.   And you discussed with your attorney --                  | 16:33:45 |
| 16  | MR. TOBEROFF:  Excuse me.  Excuse me.  I want                  | 16:33:48 |
| 17  | to make sure when you're answering these privileged           | 16:33:51 |
| 18  | questions not to answer the question -- the questions         | 16:33:54 |
| 19  | that invade the privilege, when I say to you you can          | 16:33:58 |
| 20  | only answer to the extent of conversations excluding          | 16:34:02 |
| 21  | your conversations with me, that means if you have a          | 16:34:05 |
| 22  | conversation with somebody outside of your                     | 16:34:08 |
| 23  | conversations with me and they're not an attorney, you        | 16:34:10 |
| 24  | can answer the question.  Otherwise, you don't answer          | 16:34:12 |
| 25  | the question.                                                   | 16:34:14 |

EXHIBIT D
240

| | | |
|---|---|---|
| 1 | THE WITNESS:  Oh, oh.  Okay.  I'm sorry.  I | 16:34:15 |
| 2 | didn't -- | 16:34:17 |
| 3 | MR. TOBEROFF:  Don't answer the question in | 16:34:18 |
| 4 | such a way that by inference you're disclosing the | 16:34:19 |
| 5 | substance of your conversations with me. | 16:34:22 |
| 6 | THE WITNESS:  Okay.  I was confused. | 16:34:24 |
| 7 | MR. TOBEROFF:  It's tricky.  It can be | 16:34:26 |
| 8 | tricky. | 16:34:27 |
| 9 | THE WITNESS:  Yeah. | 16:34:28 |
| 10 | BY MR. PETROCELLI: | |
| 11 | Q.   Did you ever discuss this with your mother? | 16:34:29 |
| 12 | MR. TOBEROFF:  Discuss what? | 16:34:34 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   The issue that I've been talking about, | 16:34:35 |
| 15 | why -- why on the one hand the Shusters would claim an | 16:34:39 |
| 16 | interest in Superboy, particularly given some of the | 16:34:43 |
| 17 | evidence that I have discussed with you, and then on | 16:34:49 |
| 18 | the other hand relinquish any interest in Superboy two | 16:34:52 |
| 19 | years later. | 16:34:55 |
| 20 | MR. TOBEROFF:  Mis- -- lacks foundation. | 16:34:57 |
| 21 | Assumes facts.  Misstates the record. | 16:34:59 |
| 22 | You can answer. | 16:35:01 |
| 23 | THE WITNESS:  I don't -- I don't believe that | 16:35:03 |
| 24 | I -- that I discussed the way you asked the question. | 16:35:04 |
| 25 | BY MR. PETROCELLI: | |

LAURA SIEGEL LARSON 7/22/2011

Page 226

```
 1       Q.    Well, did you discuss with your mother --        16:35:10
 2             MR. TOBEROFF:  You can say no.  Don't --          16:35:16
 3  BY MR. PETROCELLI:                                           16:35:17
 4       Q.    -- any issue relating to the relinquishment      16:35:17
 5  of the Superboy interest or any claim to a Superboy         16:35:23
 6  interest by the Shuster family?                             16:35:27
 7       A.    No.                                              16:35:31
 8             MR. TOBEROFF:  Same -- you answered for me       16:35:31
 9  too quickly for me to object.                               16:35:34
10  BY MR. PETROCELLI:
11       Q.    Were --
12             MR. TOBEROFF:  Excuse me.  Same objection.       16:35:35
13  BY MR. PETROCELLI:
14       Q.    Were you aware prior to reading our lawsuit      16:35:43
15  that after Mr. Toberoff's agreement with you in             16:35:55
16  October, 2002, he entered into a new agreement with         16:36:01
17  the Shusters which deleted Superboy from the                16:36:10
18  definition of rights in their joint venture?                16:36:14
19       A.    No.                                              16:36:18
20       Q.    Take a look at Exhibit 13.                       16:36:18
21             (Whereupon, Plaintiff's Exhibit 13
22             was placed before the witness.)                  16:36:28
23  BY MR. PETROCELLI:
24       Q.    Now, what's the other one?  Exhibit -- I want    16:36:29
25  you to put Exhibit 10 and Exhibit 13 next to each           16:36:38
```

EXHIBIT D
242

```
 1    other.                                              16:36:41

 2         A.    What is 10?  What am I looking for?      16:36:43

 3         Q.    I'll straighten this all out for you once you  16:36:46

 4    get 10.                                             16:36:49

 5         A.    Oh, I didn't get it yet.  That's why.    16:36:50

 6    There's a copy here?                                16:36:54

 7         Q.    Yes.                                      16:36:55

 8         A.    Do you want this back?  Do you need it, Marc?  16:37:01

 9         MR. TOBEROFF:  I already have it.               16:37:05

10         THE WITNESS:  Okay.                             16:37:07

11    BY MR. PETROCELLI:                                   16:37:07

12         Q.    So just to make sure that we're oriented  16:37:07

13    correctly, Exhibit 10 is the first Joint Venture    16:37:10

14    Agreement between Mr. Toberoff's company and the    16:37:14

15    Shusters dated as of November 23, 2001, and Exhibit 13  16:37:17

16    is the change or supplement to that joint venture   16:37:30

17    dated as of -- dated as of October 27, 2003, some two  16:37:36

18    years later.  Okay?                                 16:37:42

19         A.    Uh-huh.                                   16:37:43

20         Q.    And you will see in paragraph 1 of Exhibit 10  16:37:44

21    where it discusses the rights, it references the    16:37:49

22    Superboy and Smallville.  I've already showed that to  16:37:52

23    you; right?  In Exhibit 10?                          16:37:55

24         A.    Yes, I saw Exhibit 10.                    16:37:57

25         Q.    And now if you go to Exhibit 13 where there's  16:37:59
```

EXHIBIT D
243

| | | |
|---|---|---|
| 1 | a discussion of Superman in paragraph 1, you'll see | 16:38:03 |
| 2 | the word "Rights" in capital letter "R" is defined in | 16:38:13 |
| 3 | the first sentence of paragraph 1.  Do you see that? | 16:38:16 |
| 4 | A.    Yes, I see it. | 16:38:19 |
| 5 | Q.    And then if you read the rest of that | 16:38:20 |
| 6 | paragraph you'll see a reference to "all rights to | 16:38:23 |
| 7 | proceeds from 'SUPERMAN,' or the 'SUPERMAN' stories in | 16:38:26 |
| 8 | comic books, including, without limitation, Client's | 16:38:32 |
| 9 | copyright termination interest in 'SUPERMAN.'"  Do you | 16:38:36 |
| 10 | see that? | 16:38:40 |
| 11 | A.    Yes, I do. | 16:38:40 |
| 12 | Q.    And you do not see any reference in paragraph | 16:38:43 |
| 13 | 1 to Superboy or Smallville; is that correct? | 16:38:46 |
| 14 | MR. TOBEROFF:  Before you answer the | 16:38:47 |
| 15 | question, since he's asking you to compare these | 16:38:48 |
| 16 | paragraphs, I would like you to read the sentences | 16:38:50 |
| 17 | he's referring to carefully before you answer any | 16:38:52 |
| 18 | questions about it. | 16:38:54 |
| 19 | THE WITNESS:  Um-hum. | 16:38:56 |
| 20 | And your question was? | 16:39:12 |
| 21 | MR. TOBEROFF:  And read the other one he's | 16:39:14 |
| 22 | asking you to compare it to as well. | 16:39:15 |
| 23 | THE WITNESS:  Yeah, I did just read that. | 16:39:17 |
| 24 | Thank you. | 16:39:19 |
| 25 | BY MR. PETROCELLI: | |

Page 229

| | |
|---|---|
| 1      Q.    And you would agree with me you see no | 16:39:19 |
| 2    reference to Superboy or Smallville in the discussion | 16:39:22 |
| 3    of the rights in paragraph 1 of Exhibit 13, the 2003 | 16:39:24 |
| 4    agreement; correct? | 16:39:29 |
| 5      A.    Yes. | 16:39:29 |
| 6      Q.    And in between these two joint venture | 16:39:30 |
| 7    agreements, 2001 and 2003, that Mr. Toberoff entered | 16:39:34 |
| 8    into with the Shusters is when he and you joined up | 16:39:38 |
| 9    and signed your agreement in October of 2002; correct? | 16:39:45 |
| 10      A.    Yes. | 16:39:50 |
| 11      Q.    And when you signed this agreement with | 16:39:52 |
| 12    Mr. Toberoff and Mr. Emanuel in October of 2002, you | 16:39:58 |
| 13    were asserting a 100 percent interest to Superboy on | 16:40:03 |
| 14    the ground that your father, Jerome Siegel, was the | 16:40:07 |
| 15    sole creator of Superboy; correct? | 16:40:12 |
| 16        MR. TOBEROFF:  Vague and ambiguous.  Where in | 16:40:15 |
| 17    the agreement?  Just in general? | 16:40:18 |
| 18        MR. PETROCELLI:  Just in general. | 16:40:20 |
| 19        THE WITNESS:  In general that our -- | 16:40:21 |
| 20    BY MR. PETROCELLI: | |
| 21      Q.    That was your point of view. | |
| 22      A.    You said that our belief, our point of view | 16:40:24 |
| 23    was that -- yes. | 16:40:27 |
| 24      Q.    And you expressed that point of view to | 16:40:28 |
| 25    Mr. Emanuel and Mr. Toberoff, that your father was the | 16:40:31 |

| | | |
|---|---|---|
| 1 | sole creator of Superboy and you were claiming a | 16:40:34 |
| 2 | hundred percent termination interest to Superboy; | 16:40:37 |
| 3 | correct? | 16:40:41 |
| 4 | MR. TOBEROFF:  Vague as to time. | 16:40:41 |
| 5 | BY MR. PETROCELLI: | |
| 6 | Q.    Correct? | 16:40:44 |
| 7 | A.    Are you saying at the time in 2002? | 16:40:44 |
| 8 | Q.    Yes. | 16:40:47 |
| 9 | A.    Yes. | 16:40:48 |
| 10 | Q.    And it was shortly -- a very short time after | 16:40:48 |
| 11 | you signed the agreement with Mr. Emanuel and | 16:40:52 |
| 12 | Mr. Toberoff in October, 2002, that your family issued | 16:40:57 |
| 13 | a notice of termination with respect to Superboy; | 16:41:03 |
| 14 | correct? | 16:41:05 |
| 15 | A.    Yes. | 16:41:06 |
| 16 | Q.    That was, in fact, the next month, in | 16:41:06 |
| 17 | November; correct? | 16:41:09 |
| 18 | A.    It could have been November. | 16:41:11 |
| 19 | Q.    And that notice of termination for Superboy | 16:41:12 |
| 20 | that your family filed or that was filed on behalf of | 16:41:15 |
| 21 | your family asserted that your father, Mr. Siegel, was | 16:41:18 |
| 22 | the sole creator of Superboy and you were claiming a | 16:41:22 |
| 23 | hundred percent termination interest, not 50 percent; | 16:41:25 |
| 24 | correct? | 16:41:28 |
| 25 | MR. TOBEROFF:  Okay.  Wait.  I would like to | 16:41:28 |

| | | |
|---|---|---|
| 1 | slow this down.  I need time to object.  Okay?  So | 16:41:30 |
| 2 | after he asks the question, count to 5 or 10 so I have | 16:41:34 |
| 3 | time to object even if I don't object.  Okay? | 16:41:37 |
| 4 | MR. PETROCELLI:  I don't think it's | 16:41:40 |
| 5 | reasonable to count to 5 to 10. | 16:41:41 |
| 6 | MR. TOBEROFF:  Count to 5. | 16:41:44 |
| 7 | MR. PETROCELLI:  You just need to pause. | 16:41:45 |
| 8 | MR. TOBEROFF:  I'm happy with 5. | 16:41:47 |
| 9 | MR. PETROCELLI:  Just be reasonable. | |
| 10 | Can we repeat the question, please? | 16:41:49 |
| 11 | MR. TOBEROFF:  It's a common instruction. | 16:41:51 |
| 12 | You say count to 10 knowing no one is going to count | 16:41:52 |
| 13 | to 10 and you end up with 2. | 16:41:56 |
| 14 | (The record was read.) | 16:42:23 |
| 15 | THE WITNESS:  Yes. | 16:42:24 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.   And at the time that you authorized the | 16:42:25 |
| 18 | filing of that hundred percent Superboy termination | 16:42:26 |
| 19 | notice in November of 2002, were you aware that | 16:42:29 |
| 20 | Mr. Toberoff through his company, Pacific Pictures, | 16:42:38 |
| 21 | had entered into a joint venture agreement with the | 16:42:41 |
| 22 | Shusters in which they included among the rights of | 16:42:46 |
| 23 | the joint venture references to Superboy? | 16:42:50 |
| 24 | A.   No, we were not aware of that. | 16:43:00 |
| 25 | MR. PETROCELLI:  Okay.  We'll take your break | 16:43:02 |

| | | |
|---|---|---|
| 1 | now. | 16:43:04 |
| 2 | THE WITNESS:  Thank you. | 16:43:04 |
| 3 | THE VIDEOGRAPHER:  Off the record.  The time | 16:43:05 |
| 4 | is 4:43. | 16:43:08 |
| 5 | (A recess was taken.) | 17:00:12 |
| 6 | THE VIDEOGRAPHER:  We're back on the record, | 17:00:20 |
| 7 | and this marks the beginning of tape number four in | 17:00:22 |
| 8 | the deposition of Laura Siegel.  The time is 5 | 17:00:26 |
| 9 | o'clock. | 17:00:28 |
| 10 | BY MR. PETROCELLI: | |
| 11 | Q.   Ms. Siegel, were you aware that in -- that | 17:00:28 |
| 12 | after Mr. Toberoff entered into his first agreement | 17:00:34 |
| 13 | with the Shusters in November, 2001, that around that | 17:00:37 |
| 14 | same period of time, I should say, that he contacted | 17:00:43 |
| 15 | Kevin Marks or left a voicemail for Kevin Marks -- | 17:00:48 |
| 16 | A.   I -- no. | 17:00:54 |
| 17 | Q.   -- on November 29, 2001? | 17:00:54 |
| 18 | A.   2001, no. | 17:00:57 |
| 19 | Q.   Did you learn about that contact from | 17:00:58 |
| 20 | Mr. Marks at that time? | 17:01:02 |
| 21 | A.   No. | 17:01:07 |
| 22 | Q.   And are you aware that in February, 2002, | 17:01:08 |
| 23 | February 6, to be exact, that Mr. Toberoff contacted | 17:01:14 |
| 24 | Kevin Marks again? | 17:01:19 |
| 25 | A.   No. | 17:01:23 |

EXHIBIT D
248

LAURA SIEGEL LARSON 3/22/2011

Page 233

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  What date? | 17:01:23 |
| 2 | MR. PETROCELLI:  February 6, 2002. | 17:01:25 |
| 3 | Q.   And are you aware -- and I'm basing these | 17:01:27 |
| 4 | questions off of, I'll tell you, the testimony of | 17:01:32 |
| 5 | Kevin Marks -- | 17:01:35 |
| 6 | A.   Okay. | 17:01:35 |
| 7 | Q.   -- in the case that you filed. | 17:01:35 |
| 8 | A.   Um-hum. | 17:01:37 |
| 9 | Q.   Are you aware -- | 17:01:39 |
| 10 | MR. TOBEROFF:  Allegedly. | 17:01:40 |
| 11 | BY MR. PETROCELLI: | |
| 12 | Q.   -- that Mr. Marks said or -- are you aware | 17:01:41 |
| 13 | that Mr. Toberoff told Mr. Marks that he was | 17:01:45 |
| 14 | interested in the Superman property and the Superboy | 17:01:47 |
| 15 | property when he called him and spoke to him for the | 17:01:51 |
| 16 | first time in February of 2002? | 17:01:53 |
| 17 | A.   2000 -- I can't hear you. | 17:01:56 |
| 18 | Q.   February, 2002.  Were you aware that | 17:02:01 |
| 19 | Mr. Toberoff told Mr. Marks that he was interested in | 17:02:01 |
| 20 | the Superman property and the Superboy property? | 17:02:03 |
| 21 | A.   No, I was not. | 17:02:06 |
| 22 | Q.   Mr. Marks did not convey that to you? | 17:02:07 |
| 23 | A.   No, he did not. | 17:02:09 |
| 24 | Q.   And are you aware that Mr. Marks told | 17:02:13 |
| 25 | Mr. Toberoff on that occasion that the Siegels were | 17:02:18 |

EXHIBIT D
249

| | |
|---|---|
| 1 | very far along with DC Comics and at a documentation | 17:02:22 |
| 2 | phase? | 17:02:26 |
| 3 | A.    Well, I don't know that he had the | 17:02:27 |
| 4 | conversation. | 17:02:28 |
| 5 | Q.    Okay.  Were you aware that three days later | 17:02:30 |
| 6 | on February 9, 2002, Mr. Toberoff approached Steve | 17:02:33 |
| 7 | Spira, an executive at Warner Bros., at an event and | 17:02:38 |
| 8 | said that Warner Bros. had a Superman rights problem? | 17:02:42 |
| 9 | A.    No, I did not know that. | 17:02:46 |
| 10 | Q.    Take a look at the next exhibit in order, | 17:02:48 |
| 11 | which is Exhibit 60.  And this is an agreement -- | 17:02:50 |
| 12 | excuse me.  This is a document between Mr. Emanuel and | 17:03:08 |
| 13 | Mr. Toberoff dated June 3. | 17:03:11 |
| 14 | A.    Thank you. | 17:03:15 |
| 15 | (Whereupon, Plaintiff's Exhibit 60 | |
| 16 | was marked for identification.) | 17:03:24 |
| 17 | THE WITNESS:   June 3. | 17:03:24 |
| 18 | MR. PETROCELLI:  Excuse me.  Exhibit 60 is a | 17:03:42 |
| 19 | redacted agreement, redacted meaning that we don't | 17:03:45 |
| 20 | have the whole agreement, just parts of it, signed | 17:03:48 |
| 21 | between Mr. Emanuel and Mr. Toberoff on or about | 17:03:52 |
| 22 | February 12, 2002. | 17:03:57 |
| 23 | Q.    Have you ever seen this document before -- or | 17:03:59 |
| 24 | have you ever seen the agreement in its entirety? | 17:04:04 |
| 25 | A.    No. | 17:04:11 |

| | | |
|---|---|---|
| 1 | Q.   And were you aware that IP Worldwide was | 17:04:11 |
| 2 | created as a combination between Mr. Emanuel and | 17:04:20 |
| 3 | Mr. Toberoff's company, Pacific Pictures Corporation? | 17:04:24 |
| 4 | A.   No. | 17:04:40 |
| 5 | MR. TOBEROFF:  I just want to object.  This | 17:04:41 |
| 6 | document is stamped "Confidential," and I believe it | 17:04:44 |
| 7 | was stamped -- I believe by the Bates number this is a | 17:04:47 |
| 8 | document produced by Endeavor. | 17:04:53 |
| 9 | MR. PETROCELLI:  In the Siegel case. | 17:05:00 |
| 10 | MR. TOBEROFF:  In the Siegel case, and I | 17:05:01 |
| 11 | believe it was stamped "Confidential" pursuant to and | 17:05:02 |
| 12 | under a protective order in that case, and I'm just | 17:05:06 |
| 13 | objecting on that basis and not waiving any objections | 17:05:09 |
| 14 | to the use of this document in this deposition, and at | 17:05:17 |
| 15 | a minimum it should be subject to that protective | 17:05:22 |
| 16 | order because I believe the protective order extends | 17:05:29 |
| 17 | beyond the Siegel case. | 17:05:32 |
| 18 | MR. PETROCELLI:  Okay.  Well, we're willing | 17:05:32 |
| 19 | to treat it as such until we work this out. | 17:05:37 |
| 20 | Okay.  I'm told that it was reproduced in | 17:05:43 |
| 21 | this case in the absence of any protective order.  But | 17:05:46 |
| 22 | look, I'm not going to argue about that, so we'll | 17:05:50 |
| 23 | figure it out. | 17:05:52 |
| 24 | Next is a document dated May 9, 2002 -- | 17:05:55 |
| 25 | MR. TOKORO:  Exhibit 61. | 17:06:06 |

Case 2:10-cv-03633-ODW-RZ    Document 316-5    Filed 09/02/11    Page 238 of 344
LAURA SIEGEL LARSON - 11/22/2011
Page ID #:21922

Page 236

```
 1                MR. PETROCELLI:  -- which will be Exhibit 61.    17:06:07
 2    It's a letter from -- from Joanne Siegel to Richard         17:06:08
 3    Parsons.                                                    17:06:19
 4                (Whereupon, Plaintiff's Exhibit 61
 5                was marked for identification.)                 17:06:19
 6    BY MR. PETROCELLI:
 7        Q.    You testified about this letter in your prior     17:06:23
 8    deposition in the Siegel case.  A couple of follow-up       17:06:26
 9    questions.                                                  17:06:32
10                Did you type this letter?                       17:06:32
11        A.    Yes, I typed it.                                  17:06:34
12        Q.    And you typed it at your home?                    17:06:36
13        A.    Yes.                                              17:06:37
14        Q.    Did you assist in drafting it?                    17:06:38
15        A.    If I'm recalling correctly, my mom said          17:06:42
16    "Don't change one word."  She was pretty insistent, so     17:06:46
17    no, I did not make changes to it.                          17:06:50
18        Q.    Did you show it to anybody before it went        17:06:52
19    out?                                                        17:06:54
20        A.    No.                                               17:06:54
21        Q.    Did you discuss -- do you know if your           17:06:54
22    attorneys knew it had gone out, Mr. Marks?                 17:07:02
23        A.    No.                                               17:07:06
24        Q.    They did not know?                               17:07:06
25        A.    They did not know.                               17:07:07
```

```
 1        Q.    Now, in this letter you say -- it states at       17:07:24
 2   the very end --                                              17:07:40
 3        A.    You mean she says?                                17:07:43
 4        Q.    She says, correct -- that -- part of the last     17:07:44
 5   paragraph "Have you been aware that your                     17:07:50
 6   representatives have gone too far?  If not, you do           17:07:52
 7   now."  Were you -- was your mother concerned as far as      17:07:57
 8   you knew that the lawyers were taking positions that        17:08:02
 9   the company wasn't aware?                                    17:08:06
10        A.    Yes.  I believe that's what she was              17:08:09
11   expressing here.                                             17:08:11
12        Q.    Was there a response received to this letter?    17:08:12
13        A.    Oh.  Perhaps, but I don't know for sure.         17:08:16
14        Q.    Okay.                                            17:08:27
15              MR. TOBEROFF:  A response from Dick Parsons?     17:08:28
16              THE WITNESS:  That's what I assumed you          17:08:30
17   meant.                                                       17:08:32
18              MR. PETROCELLI:  I did mean that, right.         17:08:32
19              THE WITNESS:  Dick Parsons' response.           17:08:34
20   BY MR. PETROCELLI:                                          
21        Q.    And the answer is you don't know.                17:08:35
22        A.    I don't know.                                    17:08:37
23        Q.    And do you know whether anyone else responded    17:08:37
24   to this letter?                                              17:08:40
25        A.    I don't -- I don't recall.                       17:08:40
```

| | | |
|---|---|---|
| 1 | Q. Okay. | 17:08:42 |
| 2 | Now, did at some point you make your lawyers | 17:09:04 |
| 3 | aware that your mother had sent this letter? | 17:09:08 |
| 4 | A. Actually, they found out, and then my mother | 17:09:11 |
| 5 | and I discussed it with them. | 17:09:15 |
| 6 | Q. How did they find out? From Warner Bros.? | 17:09:16 |
| 7 | A. Yes. | 17:09:19 |
| 8 | Q. And you wrote this letter on May 9, 2002. | 17:09:23 |
| 9 | A. No, I didn't write it. My mother did. | 17:09:27 |
| 10 | Q. Excuse me. You typed it for your mother? | 17:09:29 |
| 11 | A. Yes. | 17:09:31 |
| 12 | Q. And is it your testimony that every single | 17:09:31 |
| 13 | word was drafted by your mother and no one else? | 17:09:33 |
| 14 | A. That's correct. | 17:09:36 |
| 15 | Q. Including some of the legal-sounding | 17:09:40 |
| 16 | sentences? | 17:09:46 |
| 17 | A. That's right. She -- she was a hell of a | 17:09:47 |
| 18 | writer. | 17:09:54 |
| 19 | Q. Did she have a writing background? | 17:09:54 |
| 20 | A. She had written, yes. | 17:09:57 |
| 21 | Q. What had she written? | 17:10:01 |
| 22 | A. Well, she didn't -- she didn't get to sell | 17:10:01 |
| 23 | them, but she had written several books, and, you | 17:10:04 |
| 24 | know, she was constantly writing and drafting things | 17:10:08 |
| 25 | for my father through the years. | 17:10:11 |

LAURA SIEGEL LARSON 7/22/2011

Page 239

| | | |
|---|---|---|
| 1 | Q. What kind of books had she written? | 17:10:13 |
| 2 | A. Well, she wrote a children's book. She | 17:10:16 |
| 3 | wrote, you know, just things that moved her, memories | 17:10:18 |
| 4 | that she had from her youth. | 17:10:24 |
| 5 | Q. Did she ever write anything regarding | 17:10:25 |
| 6 | Superman or her husband's role in Superman? | 17:10:28 |
| 7 | A. No. | 17:10:41 |
| 8 | Q. And again, you sent this -- this letter was | 17:10:41 |
| 9 | sent by your mother on May 9, 2002, but it was not | 17:10:46 |
| 10 | until September 21, 2002, that DC was informed that | 17:10:50 |
| 11 | negotiations were being stopped; correct? | 17:10:55 |
| 12 | A. Yes. I mean we -- you know, by that time we | 17:10:58 |
| 13 | reached our decision, and that was it. | 17:11:01 |
| 14 | Q. By that time, meaning September 21, 2002? | 17:11:05 |
| 15 | A. By September 21, right. | 17:11:08 |
| 16 | Q. 2002. | 17:11:10 |
| 17 | A. 2002. | 17:11:11 |
| 18 | Q. Okay. Thank you. | 17:11:12 |
| 19 | At some point -- the reaction expressed in | 17:11:28 |
| 20 | this letter was to the -- a proposed agreement that | 17:11:33 |
| 21 | was sent to your lawyer by the folks at Warner Bros. | 17:11:43 |
| 22 | and DC Comics; is that correct? | 17:11:46 |
| 23 | A. You're talking about the February -- | 17:11:48 |
| 24 | Q. Yes. | 17:11:50 |
| 25 | A. -- 2002 one? Yes. | 17:11:50 |

| | | |
|---|---|---|
| 1 | Q.   And after that, your lawyer, Mr. Marks, | 17:11:53 |
| 2 | undertook to prepare a redraft of that document; | 17:11:56 |
| 3 | correct? | 17:11:59 |
| 4 | A.   After a long period of time he suggested that | 17:11:59 |
| 5 | he might do that. | 17:12:03 |
| 6 | Q.   Okay.  And you saw that redraft; right? | 17:12:04 |
| 7 | A.   Yes, I did. | 17:12:08 |
| 8 | MR. TOBEROFF:  Okay.  Try and stay away | 17:12:09 |
| 9 | from -- give ballpark things, but try and stay away | 17:12:14 |
| 10 | from the substance of your conversations with your | 17:12:16 |
| 11 | attorney, what he said, what you said. | 17:12:18 |
| 12 | THE WITNESS:  Right. | 17:12:21 |
| 13 | MR. TOBEROFF:  Don't try and stay away from | 17:12:22 |
| 14 | it.  Stay away from it. | 17:12:25 |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q.   And did you ever have an occasion to see the | 17:12:32 |
| 17 | redraft that he prepared? | 17:12:35 |
| 18 | A.   That Kevin Marks prepared? | 17:12:37 |
| 19 | Q.   Yes. | 17:12:39 |
| 20 | A.   Yes. | 17:12:40 |
| 21 | MR. TOBEROFF:  I just want to tell you | 17:12:40 |
| 22 | because I don't want to read your work product, but on | 17:12:41 |
| 23 | the back of that thing you're holding up there's | 17:12:43 |
| 24 | language.  There's writing. | 17:12:47 |
| 25 | MR. PETROCELLI:  It's about Woody Harrelson | 17:12:52 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | being a big Oscar nominee. | 17:12:54 |
| 2 | THE WITNESS: How did it get in my file? | 17:12:58 |
| 3 | Tell Woody I said hi. | 17:13:01 |
| 4 | BY MR. PETROCELLI: | 17:13:03 |
| 5 | Q.    And you're aware that the date of that | 17:13:04 |
| 6 | redrafted long-form agreement was July 15, 2002? | 17:13:08 |
| 7 | A.    Sounds about right. | 17:13:12 |
| 8 | Q.    Shortly after the redraft was created, are | 17:13:50 |
| 9 | you aware that Mr. Toberoff called Mr. Marks to try to | 17:13:55 |
| 10 | set up a meeting with Mr. Toberoff and Mr. Emanuel? | 17:14:03 |
| 11 | A.    Set up a meeting with whom? | 17:14:09 |
| 12 | Q.    With Mr. Toberoff and Mr. Emanuel. | 17:14:12 |
| 13 | A.    No, no, no.  You're saying he called and | 17:14:14 |
| 14 | wanted to set up a meeting with Kevin Marks? | 17:14:16 |
| 15 | Q.    Or another -- Mr. Toberoff calls Mr. Marks to | 17:14:19 |
| 16 | try to arrange a meeting or a conference call with | 17:14:21 |
| 17 | Toberoff, Marks, and Emanuel. | 17:14:26 |
| 18 | A.    No, I was not aware of that. | 17:14:29 |
| 19 | Q.    Okay.  Then that -- according to Mr. Marks' | 17:14:31 |
| 20 | call logs, Mr. Toberoff made that contact on July 24, | 17:14:35 |
| 21 | 2002.  Do you have any recollection of Mr. Marks | 17:14:41 |
| 22 | having conveyed that to you? | 17:14:43 |
| 23 | A.    Mr. Marks did not. | 17:14:44 |
| 24 | Q.    Why are you -- are you certain he didn't? | 17:14:52 |
| 25 | A.    I'm very certain that he didn't. | 17:14:54 |

| | | |
|---|---|---|
| 1 | Q.    Why is that? | 17:14:55 |
| 2 | A.    Because when we -- we finally received | 17:14:57 |
| 3 | communication from Mr. Marks that he had been | 17:15:01 |
| 4 | contacted by -- by Mr. Toberoff, it was later than | 17:15:05 |
| 5 | that.  So, you know, he didn't specify the date on | 17:15:11 |
| 6 | which -- on which he contacted him, but when did you | 17:15:16 |
| 7 | say that was?  July what? | 17:15:19 |
| 8 | Q.    24th. | 17:15:21 |
| 9 | A.    Yeah, I think it was shortly thereafter that | 17:15:21 |
| 10 | we found out about it, but he never referenced any | 17:15:24 |
| 11 | phone call in July, is what I'm trying to -- | 17:15:28 |
| 12 | Q.    I see. | 17:15:30 |
| 13 | A.    He didn't convey it to us. | 17:15:31 |
| 14 | Q.    When you say you shortly found out about it, | 17:15:32 |
| 15 | meaning you shortly found out about the | 17:15:35 |
| 16 | Toberoff/Emanuel contact when you received the letter | 17:15:42 |
| 17 | from Mr. Marks. | 17:15:43 |
| 18 | A.    I believe so, yes. | 17:15:46 |
| 19 | Q.    That's the first time you found out from | 17:15:48 |
| 20 | Mr. Marks that Mr. Toberoff had contacted him; is that | 17:15:52 |
| 21 | right? | 17:15:55 |
| 22 | A.    That's correct. | 17:15:55 |
| 23 | Q.    And Mr. Marks had not told you about the | 17:15:58 |
| 24 | February contact. | 17:16:01 |
| 25 | A.    No. | 17:16:02 |

Merrill  Corporation  -  Los Angeles
800-826-0277                              www.merillcorp.com/law

EXHIBIT D
258

```
 1        Q.    Or that Mr. Toberoff had called him in      17:16:02

 2    November of '01.                                        17:16:04

 3        A.    No.                                           17:16:25

 4        Q.    Now, when Mr. -- according to Mr. Marks'     17:16:25

 5    testimony, on August 8, 2002, there was a conference   17:16:31

 6    call with Mr. Emanuel and Mr. Marks and Mr. Toberoff   17:16:36

 7    in which Mr. Emanuel and Mr. Toberoff expressed their  17:16:41

 8    interest in pursuing the property.  Did Mr. Marks      17:16:45

 9    convey to you what had transpired in that call prior   17:16:51

10    to your receiving the letter from him about it?        17:16:56

11        A.    No, he did not.                              17:16:59

12        Q.    Okay.  Take a look at Exhibit 54.            17:17:14

13            MR. TOBEROFF:  What was the number of the      17:17:25

14    Parsons letter?                                         17:17:26

15            THE WITNESS:  That's 61.                        17:17:28

16            MR. TOKORO:  61.                                17:17:29

17            MR. TOBEROFF:  Thank you.                       17:17:30

18            (Whereupon, Plaintiff's Exhibit 54

19            was placed before the witness.)                 17:17:32

20    BY MR. PETROCELLI:

21        Q.    Exhibit -- excuse me.  Exhibit 54 is a letter 17:17:33

22    from your mother and you to Mr. Marks and Mr. Ramer of  17:17:38

23    Gang Tyre dated September 21, 2002 --                   17:17:47

24        A.    Um-hum.                                       17:17:47

25        Q.    -- stating that you had rejected the DC       17:17:51
```

```
 1    Comics offer sent to you on February 4, 2002, as well        17:17:55
 2    as Mr. Marks' redraft which was sent to you on July          17:18:01
 3    15, 2002.  Do you see that?                                  17:18:07
 4        A.    Yes, I do.                                         17:18:08
 5        Q.    And then you say due to irreconcilable             17:18:10
 6    differences and so forth, that you're terminating           17:18:13
 7    Mr. Marks' firm's services effective, I guess -- well,       17:18:18
 8    immediately; right?                                          17:18:25
 9        A.    That's right.                                      17:18:26
10        Q.    As of September 21, 2002; correct?                 17:18:28
11        A.    Yes.                                               17:18:32
12        Q.    Now, you copied Michael Siegel on this as          17:18:32
13    well as his lawyer, Don Bulson.  As of this point in         17:18:34
14    time, September 21, 2002, you had heard about the            17:18:42
15    Toberoff/Emanuel discussion with Mr. Marks through his       17:18:51
16    letter to you.  You had now terminated Mr. Marks.           17:18:56
17        A.    Um-hum.                                            17:19:04
18        Q.    On the same date, September 21, 2002, you          17:19:06
19    advised DC that you were terminating negotiations with       17:19:10
20    them as well as with Warner Bros.; correct?                  17:19:14
21        A.    Correct.                                           17:19:16
22        Q.    You copied Michael Siegel and Mr. Bulson on        17:19:18
23    these various letters.  Had you had conversations with       17:19:21
24    Michael as of this point in time about what you were         17:19:26
25    doing?                                                       17:19:30
```

LAURA SIEGEL LARSON - 7/22/2011

Page 245

| | | |
|---|---|---|
| 1 | A.    We were -- we were frustrated because we felt | 17:19:30 |
| 2 | that the Ramer firm had really done as much as they | 17:19:42 |
| 3 | could do, and from -- okay.  I won't say what. | 17:19:46 |
| 4 | MR. TOBEROFF:  I want you to focus on his | 17:19:50 |
| 5 | question. | 17:19:52 |
| 6 | THE WITNESS:  Okay.  I'm sorry.  What was | 17:19:52 |
| 7 | your question? | 17:19:54 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.    My question was given that you had copied | 17:19:55 |
| 10 | Mr. Siegel and his lawyer, Don Bulson, in these | 17:19:59 |
| 11 | important notifications that you sent out on September | 17:20:06 |
| 12 | 21, 2002, whether and to what extent you had | 17:20:09 |
| 13 | communicated with Mr. Siegel about these plans and | 17:20:14 |
| 14 | these activities. | 17:20:17 |
| 15 | A.    Oh.  No.  We didn't talk about them | 17:20:18 |
| 16 | beforehand.  We were -- | 17:20:22 |
| 17 | Q.    Just out of the clear blue you sent him a | 17:20:23 |
| 18 | copy of your letters? | 17:20:26 |
| 19 | A.    Yes.  That's the way I remember it. | 17:20:27 |
| 20 | Q.    Do you recall any discussion with him or his | 17:20:31 |
| 21 | lawyer, Mr. Bulson? | 17:20:35 |
| 22 | A.    You know, we didn't really communicate very | 17:20:38 |
| 23 | much. | 17:20:41 |
| 24 | Q.    Okay.  Why did you copy him? | 17:20:41 |
| 25 | A.    Because his attorney would on occasion | 17:20:48 |

Merrill  Corporation  -  Los Angeles

800-826-0277                              www.merrillcorp.com/law

| | | |
|---|---|---|
| 1 | communicate with Kevin Marks, and we wanted to let | 17:20:54 |
| 2 | them know that that was no longer appropriate, that | 17:20:57 |
| 3 | they were no longer representing us. | 17:20:59 |
| 4 | Q.   When you were -- you hadn't paid Kevin Marks | 17:21:03 |
| 5 | any fee because their firm was charging 5 percent of | 17:21:08 |
| 6 | whatever settlement might occur; right? | 17:21:11 |
| 7 | A.   We made regular payments on costs. | 17:21:14 |
| 8 | Q.   Costs. | 17:21:16 |
| 9 | A.   Only. | 17:21:16 |
| 10 | Q.   Was Mr. Siegel, Michael Siegel, sharing in | 17:21:17 |
| 11 | those costs? | 17:21:20 |
| 12 | A.   We asked him to, and there was an ongoing | 17:21:21 |
| 13 | dispute over that. | 17:21:26 |
| 14 | Q.   And had you asked him to share in those costs | 17:21:27 |
| 15 | all the way back to the beginning, starting with the | 17:21:29 |
| 16 | termination notice with Mr. Levine and then going | 17:21:33 |
| 17 | forward through the Marks firm? | 17:21:35 |
| 18 | A.   We requested that. | 17:21:37 |
| 19 | Q.   And did you bill him for it? | 17:21:40 |
| 20 | A.   Yes, we billed him for it. | 17:21:42 |
| 21 | Q.   Who prepared the bills? | 17:21:44 |
| 22 | A.   My mother and I did. | 17:21:45 |
| 23 | Q.   Who would you send the bills to? | 17:21:47 |
| 24 | A.   We sent -- we sent -- well, when you say | 17:21:49 |
| 25 | bills -- | 17:21:51 |

```
 1        Q.   Or statements or requests for his share of    17:21:51
 2   the costs.                                               17:21:55
 3        A.   I believe we gave that to Kevin Marks, and     17:21:56
 4   Kevin Marks submitted it on our behalf.                  17:22:01
 5        Q.   What did you charge him?  25 percent of the    17:22:02
 6   total costs?                                             17:22:06
 7        A.   That -- that was what we asked for.            17:22:07
 8        Q.   Or actually was it more than that?  Was it a   17:22:09
 9   third?  How did you do the math?                         17:22:12
10        A.   No, it was 25 percent.  I mean under           17:22:14
11   copyright law it was 50 percent for my mother, 25        17:22:17
12   percent for me, 25 percent for Michael.  And so, you     17:22:20
13   know, we felt it was appropriate for him to have a       17:22:23
14   corresponding responsibility for costs.                 17:22:27
15        Q.   When Mr. Ramer was doing the negotiations --   17:22:29
16   Mr. Marks or Mr. Ramer, the Gang Tyre firm, with         17:22:34
17   Warner Bros. and DC Comics, was that on behalf of the    17:22:39
18   entire hundred percent Siegel interest, including        17:22:42
19   Michael's 25 percent?                                    17:22:45
20        A.   Yes, it was.                                   17:22:46
21        Q.   Had Michael entered into an engagement letter  17:22:48
22   with the Gang Tyre firm, to your knowledge?              17:22:51
23        A.   I don't believe he did.                        17:22:55
24        Q.   Did Bulson and -- did Kevin Marks ever meet    17:23:06
25   Michael Siegel, to your knowledge?                       17:23:14
```

| | | |
|---|---|---|
| 1 | A.    I -- not to my knowledge. | 17:23:15 |
| 2 | Q.    Were there ever any joint meetings with all | 17:23:17 |
| 3 | of you together and Kevin Marks or Bruce Ramer? | 17:23:20 |
| 4 | A.    Not -- not all of us together, but I know | 17:23:23 |
| 5 | that Don Bulson, you know, did meet up with Kevin | 17:23:27 |
| 6 | Marks at one point. | 17:23:31 |
| 7 | Q.    When you sent out the -- excuse me.  When | 17:23:32 |
| 8 | your mother wrote out and you typed out and you sent | 17:23:35 |
| 9 | to Warner Bros. and DC Comics the letter in May | 17:23:39 |
| 10 | expressing your upset about the February -- | 17:23:44 |
| 11 | A.    This one?  Yeah. | 17:23:44 |
| 12 | Q.    -- long form agreement -- | 17:23:47 |
| 13 | A.    Um-hum. | 17:23:50 |
| 14 | Q.    -- did you first clear that with Michael | 17:23:50 |
| 15 | Siegel or Don Bulson? | 17:23:50 |
| 16 | A.    No. | 17:23:53 |
| 17 | Q.    Did you send them a copy of it? | 17:23:53 |
| 18 | A.    That I don't remember. | 17:23:57 |
| 19 | Q.    Oh.  Why was there a dispute between you and | 17:24:08 |
| 20 | your mother on the one hand and Michael Siegel on the | 17:24:13 |
| 21 | other hand regarding this issue prior -- yes, as of | 17:24:16 |
| 22 | September 21, 2002? | 17:24:22 |
| 23 | A.    You're talking about costs. | 17:24:23 |
| 24 | Q.    Was that the subject of the dispute, the | 17:24:24 |
| 25 | costs? | 17:24:26 |

LAURA SIEGEL LARSON 5/22/2011

Page 249

| | | |
|---|---|---|
| 1 | A.    Yes. | 17:24:26 |
| 2 | Q.    And why was there a dispute about the costs? | 17:24:27 |
| 3 | A.    Michael was the child of a very upsetting | 17:24:33 |
| 4 | divorce, and he -- you know, it hurts me to have to | 17:24:39 |
| 5 | say this, but, you know, he was a very kind of | 17:24:44 |
| 6 | confused guy and he really kind of couldn't keep | 17:24:48 |
| 7 | things straight.  It was very difficult to communicate | 17:24:50 |
| 8 | with him, and it was very upsetting to receive | 17:24:54 |
| 9 | communications from him that were kind of all over the | 17:25:04 |
| 10 | place, things that didn't really make any sense, and | 17:25:08 |
| 11 | he was very secretive, and he just couldn't really | 17:25:14 |
| 12 | grasp legal principles.  So discussions with -- | 17:25:20 |
| 13 | directly with him really didn't work.  It really | 17:25:24 |
| 14 | required attorneys to explain things to him, and | 17:25:32 |
| 15 | that's why he had his own attorney, who was, of | 17:25:34 |
| 16 | course, interpreting things, you know, for Michael and | 17:25:38 |
| 17 | explaining things to him.  But he didn't -- he didn't | 17:25:42 |
| 18 | have any -- any background in understanding the | 17:25:46 |
| 19 | history of, you know, the Superman litigations or -- | 17:25:50 |
| 20 | you know. | 17:25:54 |
| 21 | Q.    What did he do for a living? | 17:25:54 |
| 22 | A.    He was a plumber. | 17:25:55 |
| 23 | Q.    And so you didn't grow up close at all. | 17:26:00 |
| 24 | A.    I never met him. | 17:26:06 |
| 25 | Q.    Ever? | 17:26:07 |

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | A.   Ever.   And he wouldn't send me any | 17:26:07 |
| 2 | photographs of himself. | 17:26:12 |
| 3 | Q.   He did or did not? | 17:26:13 |
| 4 | A.   Did not.   I sent him photographs of myself | 17:26:14 |
| 5 | and my children and asked him to reciprocate, and he | 17:26:17 |
| 6 | refused to do that.   So the first time I ever saw what | 17:26:23 |
| 7 | my brother looked like was after he died and I went to | 17:26:27 |
| 8 | the home that he had shared with his mother, and, you | 17:26:31 |
| 9 | know, found things like a dog dish, you know, in the | 17:26:35 |
| 10 | kitchen, and I said, "Where's the dog?"  And they | 17:26:38 |
| 11 | said, you know, the dog -- when I say "they," a friend | 17:26:41 |
| 12 | told me that the dog had died years before and -- you | 17:26:45 |
| 13 | know, but I found photographs of him in his home. | 17:26:48 |
| 14 | Q.   Your children never met with him either? | 17:26:52 |
| 15 | A.   No. | 17:26:54 |
| 16 | Q.   Did your mom ever meet him? | 17:26:54 |
| 17 | A.   No, I don't believe so.  He was -- he was | 17:26:56 |
| 18 | very young when the divorce occurred. | 17:27:01 |
| 19 | Q.   How old was he? | 17:27:04 |
| 20 | A.   5 or 6, I think. | 17:27:06 |
| 21 | Q.   What year was it that your dad divorced his | 17:27:08 |
| 22 | mom? | 17:27:11 |
| 23 | A.   It was in the 1940s. | 17:27:11 |
| 24 | Q.   And when did your mother and your father | 17:27:13 |
| 25 | marry? | 17:27:16 |

| | | |
|---|---|---|
| 1 | A.    In 1948. | 17:27:16 |
| 2 | Q.    How did you first get in touch with Michael | 17:27:27 |
| 3 | Siegel about this termination issue going back to | 17:27:31 |
| 4 | 1997? | 17:27:37 |
| 5 | A.    Well, my husband, who was an attorney -- | 17:27:37 |
| 6 | excuse me -- and also, you know, kind of helped us | 17:27:41 |
| 7 | with things, phoned -- phoned Michael and informed him | 17:27:44 |
| 8 | that, you know, he had a passive interest and, you | 17:27:50 |
| 9 | know, that he wanted to let him know about that, and, | 17:27:54 |
| 10 | you know, after -- after that, Michael retained an | 17:28:00 |
| 11 | attorney in Cleveland. | 17:28:04 |
| 12 | Q.    Did you ever meet Mr. Bulson? | 17:28:06 |
| 13 | A.    I did after Michael died. | 17:28:08 |
| 14 | Q.    Are you aware that Michael wanted to have a | 17:28:17 |
| 15 | will made out but never got -- | 17:28:21 |
| 16 | A.    He never did it. | 17:28:25 |
| 17 | Q.    Did you ever see what his wishes were? | 17:28:27 |
| 18 | A.    He had some kind of rambling communications | 17:28:31 |
| 19 | with his attorney. | 17:28:33 |
| 20 | Q.    To the effect that he did not want either you | 17:28:35 |
| 21 | or your mother to share in anything? | 17:28:38 |
| 22 | A.    He stated that in an e-mail, but the court | 17:28:40 |
| 23 | ruled otherwise.  Not for my mother, but for me. | 17:28:44 |
| 24 | Q.    The next exhibit is -- | 17:29:00 |
| 25 | Make sure we did. | 17:29:06 |

Page 252

| | | |
|---|---|---|
| 1 | MR. TOKORO:  It's 56. | 17:29:15 |
| 2 | MR. PETROCELLI:  Are you sure? | 17:29:17 |
| 3 | MR. TOKORO:  Yes. | 17:29:18 |
| 4 | MR. PETROCELLI:  I thought he did multiple. | 17:29:22 |
| 5 | Q.  Going back to Exhibit 56 for a second, which | 17:29:32 |
| 6 | is your notification to DC Comics that you were | 17:29:35 |
| 7 | terminating negotiations dated September 21, 2002 -- | 17:29:39 |
| 8 | A.  Is it 54?  I have 54. | 17:29:43 |
| 9 | Q.  Can I see that? | 17:29:46 |
| 10 | A.  Yes.  I think that's only the Ramer and Marks | 17:29:47 |
| 11 | one. | 17:29:51 |
| 12 | Q.  Yes, this is the termination of the Gang Tyre | 17:29:52 |
| 13 | firm. | 17:29:55 |
| 14 | A.  I don't have that yet unless it's stapled to | 17:29:55 |
| 15 | this. | 17:30:01 |
| 16 | MR. TOKORO:  It was one of the early ones. | 17:30:01 |
| 17 | MR. PETROCELLI:  I showed it to you earlier | 17:30:03 |
| 18 | on, all the way on the bottom.  He'll fish it out for | 17:30:05 |
| 19 | you. | 17:30:08 |
| 20 | THE WITNESS:  Okay. | 17:30:09 |
| 21 | Oh, thank you. | 17:30:12 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.  So you have in front of you now Exhibit 56? | 17:30:13 |
| 24 | A.  Um-hum. | 17:30:16 |
| 25 | Q.  And you will see that you're advising DC | 17:30:17 |

LAURA SIEGEL LARSON 5/22/2011

Page 253

| | |
|---|---|
| 1  about the termination of the Gang Tyre firm and that | 17:30:22 |
| 2  you have instructed the Gang Tyre firm to take no | 17:30:25 |
| 3  further actions on your behalf.  Do you see that? | 17:30:28 |
| 4      A.    Yes, I do. | 17:30:32 |
| 5      Q.    And September 21, 2002, is the first time | 17:30:32 |
| 6  that you so advised DC Comics that you were | 17:30:38 |
| 7  terminating the Gang Tyre firm and that they were to | 17:30:39 |
| 8  take no further actions on your behalf; correct? | 17:30:42 |
| 9      A.    Yes. | 17:30:45 |
| 10     Q.    And that's the first time that you also | 17:30:45 |
| 11 advised the Gang Tyre firm that they were to take no | 17:30:47 |
| 12 further actions on your behalf; correct? | 17:30:50 |
| 13     A.    Yes, that's correct. | 17:30:52 |
| 14     Q.    Okay. | 17:31:36 |
| 15         Okay.   Let me mark as the -- | 17:31:36 |
| 16     MR. TOKORO:  62. | 17:31:39 |
| 17     MR. PETROCELLI:  -- next exhibit in order, | 17:31:40 |
| 18 Exhibit 62, a letter to DC Comics by your mother and | 17:31:46 |
| 19 you dated October 28, 2002 -- | 17:31:51 |
| 20     (Whereupon, Plaintiff's Exhibit 62 | |
| 21     was marked for identification.) | 17:32:00 |
| 22     MR. PETROCELLI:  -- giving notice of the | 17:32:00 |
| 23 cancellation of a tolling period under a tolling | 17:32:05 |
| 24 agreement. | 17:32:08 |
| 25     Q.    Do you see that? | 17:32:09 |

LAURA SIEGEL LARSON - 7/22/2011

Page 254

| | | | |
|---|---|---|---|
| 1 | A. | Yes, I do. | 17:32:09 |
| 2 | Q. | Now, did you type this document? | 17:32:11 |
| 3 | A. | Yes, I did. | 17:32:13 |
| 4 | Q. | Who drafted this document? | 17:32:17 |
| 5 | A. | My mother and I did. | 17:32:19 |
| 6 | Q. | Did you have the assistance of a lawyer? | 17:32:22 |
| 7 | A. | No. | 17:32:25 |
| 8 | Q. | Are you sure? | 17:32:25 |
| 9 | A. | I'm pretty sure.  I don't recall. | 17:32:27 |
| 10 | Q. | Even though you had already retained | 17:32:29 |
| 11 | | Mr. Emanuel and Mr. Toberoff? | 17:32:33 |
| 12 | A. | Without revealing the communication between | 17:32:39 |
| 13 | | my former attorney and me, I will say that we were | 17:32:44 |
| 14 | | informed by the Gang Tyre firm that we needed to pay | 17:32:50 |
| 15 | | attention to the wording in the tolling agreement. | 17:32:56 |
| 16 | Q. | Why -- | 17:33:01 |
| 17 | A. | So as a result of reading the tolling | 17:33:02 |
| 18 | | agreement and seeing that notification was necessary | 17:33:04 |
| 19 | | to certain people under the tolling agreement, we went | 17:33:07 |
| 20 | | ahead, my mother and I, and drafted this. | 17:33:11 |
| 21 | Q. | Did you run it by a lawyer first? | 17:33:14 |
| 22 | A. | I -- I don't remember. | 17:33:17 |
| 23 | Q. | Even though you were now working with | 17:33:20 |
| 24 | | Mr. Toberoff, you didn't -- | 17:33:22 |
| 25 | A. | Oh -- | 17:33:24 |

LAURA SIEGEL LARSON - 7/22/2011

Page 255

| | | |
|---|---|---|
| 1 | Q.    -- show it to him? | 17:33:25 |
| 2 | A.    Well, actually -- | 17:33:27 |
| 3 | Q.    And it's in a totally different type face -- | 17:33:29 |
| 4 | A.    Possibly -- | 17:33:31 |
| 5 | Q.    -- than the prior document. | 17:33:32 |
| 6 | A.    That doesn't mean anything.  That's because, | 17:33:33 |
| 7 | you know, my computers were always on the fritz. | 17:33:36 |
| 8 | Q.    It's kind of -- | 17:33:43 |
| 9 | A.    No.  It's -- well, we had been talking to | 17:33:44 |
| 10 | Mr. Toberoff since the beginning of October about | 17:33:48 |
| 11 | retaining him.  We did not actually sign with him | 17:33:51 |
| 12 | until the end of October.  So we had not signed and | 17:33:54 |
| 13 | fully retained him at the time when my mother and I | 17:33:58 |
| 14 | were drafting this, because when you showed me -- you | 17:34:02 |
| 15 | showed me the -- our agreement earlier, I looked at | 17:34:08 |
| 16 | the back and the signature page said October 28. | 17:34:11 |
| 17 | Q.    No.  I think -- take a look at it again, | 17:34:15 |
| 18 | Exhibit 45. | 17:34:28 |
| 19 | A.    These are all mixed up. | 17:34:28 |
| 20 | Oh, 23.  I'm sorry.  I'm sorry.  The "3" | 17:34:43 |
| 21 | looked like an "8" to me when I looked at the Xerox | 17:34:46 |
| 22 | because it's not a great Xerox. | 17:34:49 |
| 23 | Q.    So now you're seeing more clearly that it was | 17:34:52 |
| 24 | as of October 23, 2002, that you had signed the IP | 17:34:57 |
| 25 | Worldwide agreement with Mr. Emanuel and Mr. Toberoff. | 17:35:01 |

LAURA SIEGEL LARSON 7/22/2011

Page 256

| | | |
|---|---|---|
| 1 | A.    Yes. | 17:35:03 |
| 2 | MR. TOBEROFF:  Objection to "as of." | 17:35:04 |
| 3 | Otherwise -- | 17:35:06 |
| 4 | THE WITNESS:  We had just finalized our | 17:35:07 |
| 5 | agreement. | 17:35:11 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.    And now does that cause you to believe that | 17:35:12 |
| 8 | you had some assistance in the preparation of the | 17:35:13 |
| 9 | tolling agreement? | 17:35:16 |
| 10 | A.    Well, we weren't advised to do it by | 17:35:19 |
| 11 | Mr. Toberoff.  He may have looked at the draft just to | 17:35:22 |
| 12 | make sure that the language was correct. | 17:35:25 |
| 13 | Q.    Well, why wouldn't you have him do it?  Why | 17:35:28 |
| 14 | are you -- | 17:35:31 |
| 15 | A.    You asked me if I remembered it. | 17:35:31 |
| 16 | Q.    You don't remember. | 17:35:33 |
| 17 | A.    Okay.  I'm trying to answer your question. | 17:35:35 |
| 18 | Q.    Before you answered with some degree of | 17:35:37 |
| 19 | certainty that you and your mother wrote this | 17:35:39 |
| 20 | document, which I must say seems implausible to me. | 17:35:41 |
| 21 | It's a -- it's a technical legal document that your | 17:35:44 |
| 22 | prior counsel had advised you was important for you to | 17:35:49 |
| 23 | pay attention to. | 17:35:52 |
| 24 | A.    Uh-huh. | 17:35:53 |
| 25 | Q.    And I'm just pressing you now on whether you | 17:35:53 |

LAURA SIEGEL LARSON - 7/22/2011

| | |
|---|---|
| 1   actually remember or you're just trying to surmise | 17:35:56 |
| 2   that you prepared this document. | 17:36:00 |
| 3       A.   I'm trying to surmise. | 17:36:03 |
| 4       Q.   Okay.  Is it fair to say -- | 17:36:08 |
| 5       A.   No, no.  Excuse me.  I don't think I really | 17:36:09 |
| 6   answered -- you're saying do I think I prepared it? | 17:36:13 |
| 7       Q.   Do you -- | 17:36:19 |
| 8       A.   Or do I think somebody else prepared it? | 17:36:20 |
| 9       Q.   Do you know whether, even though it went out | 17:36:22 |
| 10  on your letterhead -- | 17:36:25 |
| 11      A.   Yes. | 17:36:25 |
| 12      Q.   -- do you know whether this was prepared by a | 17:36:26 |
| 13  lawyer for you to send out? | 17:36:29 |
| 14      A.   Oh.  It -- we did a draft -- my mother and I | 17:36:31 |
| 15  did a draft, and to the best of my recollection, we | 17:36:34 |
| 16  probably ran it by Mr. Toberoff. | 17:36:39 |
| 17      Q.   Did you run it by Arthur or George, the other | 17:36:44 |
| 18  lawyers? | 17:36:48 |
| 19      A.   We might have. | 17:36:48 |
| 20      Q.   When you were told by Gang Tyre to pay | 17:36:55 |
| 21  attention to this, some concern was expressed to you | 17:36:58 |
| 22  that deadlines might run? | 17:37:02 |
| 23          MR. TOBEROFF:  Don't talk any more of | 17:37:05 |
| 24  substance than he advised you to draw your attention | 17:37:07 |
| 25  to the tolling agreement. | 17:37:10 |

```
 1              THE WITNESS:  Yeah.  I mean that's really --      17:37:11
 2    BY MR. PETROCELLI:                                          
 3         Q.   Why did you send this out to DC Comics?           17:37:14
 4              MR. TOBEROFF:  Privileged.  I instruct you        17:37:16
 5    not to answer.                                              17:37:19
 6    BY MR. PETROCELLI:                                          
 7         Q.   Privilege with whom?  Who is the lawyer that      17:37:19
 8    you're asserting your privilege with?                       17:37:22
 9              MR. TOBEROFF:  I'm going to --                     17:37:22
10              MR. PETROCELLI:  I'm asking her, not you.         17:37:23
11              MR. TOBEROFF:  I'm asserting it on her            17:37:25
12    behalf.                                                     17:37:27
13              MR. PETROCELLI:  I know, but I'm asking her.      17:37:28
14         Q.   With whom did you have an attorney-client --      17:37:28
15    who were the attorneys with whom you received legal         17:37:31
16    advice, if any, about the -- about this tolling             17:37:34
17    agreement, Exhibit 62?                                      17:37:38
18         A.   Well, as I testified before, I don't remember    17:37:40
19    exactly which attorneys we shared this with, but any       17:37:43
20    attorney that is in our employ I have an                    17:37:49
21    attorney-client privilege with.  So --                      17:37:52
22              MR. TOBEROFF:  And --                             17:37:54
23              MR. PETROCELLI:  I know, but I'm asking you.      17:37:54
24              MR. TOBEROFF:  I'm asserting the                  17:37:56
25    attorney-client privilege on your behalf with respect      17:37:57
```

EXHIBIT D
274

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | to Kevin Marks even though he has been terminated | 17:37:58 |
| 2 | since the subject of the communication is a tolling | 17:38:01 |
| 3 | agreement that was entered into that he negotiated and | 17:38:04 |
| 4 | entered into as part of his legal representation of | 17:38:08 |
| 5 | you. | 17:38:10 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.   Did -- | 17:38:12 |
| 8 | MR. TOBEROFF:  Clearly privileged. | 17:38:14 |
| 9 | BY MR. PETROCELLI: | |
| 10 | Q.   With what lawyers specifically do you | 17:38:15 |
| 11 | remember discussing this tolling agreement with | 17:38:17 |
| 12 | prior -- this tolling notice, Exhibit 62, prior to | 17:38:20 |
| 13 | your sending it out? | 17:38:24 |
| 14 | A.   As I testified before, I don't recall. | 17:38:24 |
| 15 | Q.   And do you recall discussing it with any | 17:38:30 |
| 16 | lawyer? | 17:38:33 |
| 17 | A.   With my mother. | 17:38:33 |
| 18 | Q.   Any lawyer I said. | 17:38:35 |
| 19 | A.   I don't recall. | 17:38:37 |
| 20 | Q.   Okay.  Why did you send it out? | 17:38:40 |
| 21 | A.   Because in reading the tolling -- | 17:38:44 |
| 22 | MR. TOBEROFF:  Wait, wait, wait.  You've | 17:38:46 |
| 23 | testified that you received advice -- | 17:38:52 |
| 24 | MR. PETROCELLI:  Marc -- | 17:38:55 |
| 25 | MR. TOBEROFF:  Excuse me. | 17:38:55 |

```
 1                MR. PETROCELLI:  -- you're just coaching the    17:38:56
 2    witness.                                                    17:38:58
 3                MR. TOBEROFF:  I'm not coaching the witness.    17:38:58
 4    Attorney-client privilege.  Instruct you not to            17:39:00
 5    answer.  I'm not going to explain it.                      17:39:01
 6                THE WITNESS:  Okay.                             17:39:04
 7                MR. TOBEROFF:  Is that better?                  17:39:05
 8                MR. PETROCELLI:  I can't control what you do.   17:39:08
 9    I'm not here to critique you.                              17:39:11
10                MR. TOBEROFF:  What exhibit number is this     17:39:14
11    one?                                                       17:39:16
12                THE WITNESS:  That was 62.  This one you       17:39:16
13    mean; right?                                               17:39:19
14                MR. TOBEROFF:  Right.                          17:39:21
15                THE WITNESS:  Yeah.                            17:39:21
16                MR. PETROCELLI:  Let's look at the next        17:39:53
17    document, which is what?                                   17:39:54
18                MR. TOKORO:  63.                               17:39:56
19                MR. PETROCELLI:  Exhibit 63?                   17:39:57
20                MR. TOKORO:  63.                               17:39:59
21                (Whereupon, Plaintiff's Exhibit 63
22                was marked for identification.)                17:40:10
23                THE WITNESS:  Thank you.                       17:40:11
24    BY MR. PETROCELLI:
25        Q.   This is a letter to Mr. Bulson with a copy to     17:40:14
```

LAURA SIEGEL LARSON 7/22/2011

Page 261

| | | |
|---|---|---|
| 1 | Michael Siegel by you and your mother.  Do you see | 17:40:17 |
| 2 | that? | 17:40:22 |
| 3 | A.    Yes. | 17:40:22 |
| 4 | Q.    Enclosing your letter? | 17:40:23 |
| 5 | A.    Excuse me.   This? | 17:40:30 |
| 6 | Q.    Which was the prior exhibit, apparently; | 17:40:31 |
| 7 | right? | 17:40:34 |
| 8 | A.    Yes, it looks that way. | 17:40:34 |
| 9 | Q.    About the tolling agreement; correct? | 17:40:37 |
| 10 | A.    It looks that way. | 17:40:38 |
| 11 | Q.    It states notifying DC "that under the terms | 17:40:40 |
| 12 | of the April 6, 2000 Tolling Agreement, and due to our | 17:40:42 |
| 13 | written notification to DC Comics on September 21, | 17:40:46 |
| 14 | 2002 which totally stopped and ended negotiations with | 17:40:51 |
| 15 | that company, its parent company and all its | 17:40:54 |
| 16 | representatives, the Tolling Period has been | 17:40:58 |
| 17 | canceled."  Why did you send this to Michael Siegel's | 17:41:02 |
| 18 | lawyer? | 17:41:05 |
| 19 | A.    To keep him informed. | 17:41:05 |
| 20 | Q.    Did you get a response from Michael Siegel or | 17:41:13 |
| 21 | his lawyer to your letter in September when you sent | 17:41:16 |
| 22 | him copies of the September 21 letters?  Did you hear | 17:41:20 |
| 23 | from him at that time as to what's going on? | 17:41:24 |
| 24 | A.    I could have. | 17:41:26 |
| 25 | Q.    Do you remember? | 17:41:27 |

LAURA SIEGEL LARSON - 7/22/2011

Page 262

| | | |
|---|---|---|
| 1 | A.    I don't remember specifically. | 17:41:28 |
| 2 | Q.    Do you remember any communication with him | 17:41:30 |
| 3 | about why you're changing representatives? | 17:41:33 |
| 4 | A.    There probably -- there probably was, but I | 17:41:39 |
| 5 | can't remember specifically when it was. | 17:41:43 |
| 6 | Q.    Given your testimony that you never met him, | 17:41:47 |
| 7 | did you ever speak to him? | 17:41:52 |
| 8 | A.    No. | 17:41:57 |
| 9 | Q.    And to your knowledge, did your mother ever | 17:41:58 |
| 10 | speak to him? | 17:42:00 |
| 11 | A.    I think -- no, I don't think she even spoke | 17:42:01 |
| 12 | to him when he was a child. | 17:42:06 |
| 13 | Q.    So the only type of communication that you | 17:42:08 |
| 14 | actually had with Michael Siegel was in writing | 17:42:11 |
| 15 | directly to him or to Mr. Bulson; correct? | 17:42:18 |
| 16 | A.    It -- it was more often through his attorney. | 17:42:21 |
| 17 | It was occasionally directly with Michael.  But he was | 17:42:26 |
| 18 | sick for like long periods of time, so, you know, long | 17:42:31 |
| 19 | periods would go by and I wouldn't hear from him, and | 17:42:37 |
| 20 | then all of a sudden a letter would pop up. | 17:42:40 |
| 21 | Q.    And the only way that you would hear from him | 17:42:42 |
| 22 | was through a letter; right? | 17:42:47 |
| 23 | A.    Yes. | 17:42:48 |
| 24 | Q.    Did you have his phone number? | 17:42:48 |
| 25 | A.    I did not have his phone number. | 17:42:49 |

Merrill  Corporation  -  Los Angeles

800-826-0277                                    www.merillcorp.com/law

Page 263

| | | |
|---|---|---|
| 1 | Q. Did you give him your phone number? | 17:42:51 |
| 2 | A. I don't remember whether I did or not. | 17:42:55 |
| 3 | Q. Did you give him your e-mail address? | 17:42:57 |
| 4 | A. We never communicated by e-mail, so I | 17:43:03 |
| 5 | probably did not. | 17:43:05 |
| 6 | Q. Can you go to the next exhibit, which is the | 17:43:17 |
| 7 | Superboy termination notice that was sent out on your | 17:43:19 |
| 8 | behalf on November 8, 2002. | 17:43:26 |
| 9 | A. Thank you. | 17:43:31 |
| 10 | Q. Why didn't you send this out sooner? | 17:43:39 |
| 11 | MR. TOBEROFF: You can answer except I | 17:43:53 |
| 12 | wouldn't go into anything that implicates | 17:43:56 |
| 13 | communication with an attorney. | 17:43:59 |
| 14 | THE WITNESS: We had our hands full. We had | 17:44:02 |
| 15 | a lot of -- a lot of things that were going on in the | 17:44:04 |
| 16 | case and trying to find a new attorney after we were | 17:44:08 |
| 17 | dissatisfied with the February offer from DC. We | 17:44:15 |
| 18 | spent a long period of time just trying to decide what | 17:44:20 |
| 19 | to do with what was already before us, and once we | 17:44:23 |
| 20 | figured that out, then we turned our attention to | 17:44:29 |
| 21 | Superboy. | 17:44:35 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q. Do you know when the earliest time was when | 17:44:35 |
| 24 | you could have sent out a notice of termination for | 17:44:37 |
| 25 | Superboy? | 17:44:39 |

EXHIBIT D
279

Page 264

```
 1        A.    No, I really don't.                      17:44:39
 2        Q.    Do you know whether you were bumping up   17:44:42
 3   against a deadline to send out the Superboy notice?  17:44:44
 4        A.    I think we were getting close to a deadline, 17:44:48
 5   I think more in terms of end date than beginning date. 17:44:50
 6        Q.    Did you have any discussions with any member 17:44:55
 7   of the Shuster family that you were going to be      17:45:03
 8   sending out the Superboy notice --                   17:45:06
 9        A.    No.                                       17:45:09
10        Q.    -- claiming a hundred percent termination 17:45:10
11   interest?                                            17:45:12
12        A.    No, we did not.                           17:45:12
13        Q.    Did you and your mother discuss whether you 17:45:14
14   should do so beforehand?                             17:45:16
15        A.    Whether we should what?                   17:45:18
16        Q.    Contact them beforehand and let them know. 17:45:19
17        A.    No.                                       17:45:26
18        Q.    Did you have any idea what their view was  17:45:27
19   about Mr. Shuster's termination interest with respect 17:45:33
20   to Superboy?                                         17:45:37
21        A.    We didn't talk to them about Superboy.    17:45:39
22        Q.    Well, were you not concerned that they might 17:45:43
23   protest or contest the assertion by the Siegel family 17:45:48
24   that Jerome Siegel was the sole creator and the sole 17:45:53
25   person entitled to claim a termination interest?     17:45:57
```

EXHIBIT D
280

| | | | |
|---|---|---|---|
| 1 | A. | No. | 17:45:59 |
| 2 | Q. | Why not? | 17:46:02 |
| 3 | A. | Because we were, you know, relying on the | 17:46:05 |
| 4 | | Westchester decision. | 17:46:08 |
| 5 | Q. | In 1947? | 17:46:10 |
| 6 | A. | Yes, correct. | 17:46:11 |
| 7 | Q. | But -- | 17:46:12 |
| 8 | A. | '47, '48, whenever it was. | 17:46:13 |
| 9 | Q. | How did you know they were aware of it? | 17:46:15 |
| 10 | A. | We weren't trying to get inside their minds. | 17:46:17 |
| 11 | | We were doing what we thought, you know, we had rights | 17:46:20 |
| 12 | | to. | 17:46:25 |
| 13 | Q. | But what if -- but did you discuss with your | 17:46:26 |
| 14 | | mother the possibility that you may now be entering | 17:46:30 |
| 15 | | into an area in which they might contest your | 17:46:33 |
| 16 | | position? Did that thought ever occur to you? | 17:46:43 |
| 17 | A. | We felt perfectly confident that we were | 17:46:45 |
| 18 | | within our rights. | 17:46:47 |
| 19 | Q. | I understand that you made a judgment that | 17:46:48 |
| 20 | | you were within your rights, but did you give some | 17:46:49 |
| 21 | | consideration to the idea that the family of Joe | 17:46:52 |
| 22 | | Shuster might have a different view and might dispute | 17:46:58 |
| 23 | | this in some way? | 17:47:01 |
| 24 | A. | I don't recall that being a concern. | 17:47:05 |
| 25 | Q. | Never even occurred to you? | 17:47:07 |

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | A.   I don't think so. | 17:47:08 |
| 2 | Q.   And you knew that their lawyer was your | 17:47:13 |
| 3 | lawyer; right? | 17:47:17 |
| 4 | A.   Correct. | 17:47:17 |
| 5 | Q.   Did you ask your lawyer? | 17:47:17 |
| 6 | A.   Do we -- | 17:47:20 |
| 7 | MR. TOBEROFF:  Don't disclose -- | 17:47:21 |
| 8 | MR. PETROCELLI:  Yes. | 17:47:23 |
| 9 | MR. TOBEROFF:  Don't disclose -- I instruct | 17:47:24 |
| 10 | you not to answer. | 17:47:26 |
| 11 | THE WITNESS:  Okay. | 17:47:27 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   Did you ask Mr. Toberoff in his -- | 17:47:28 |
| 14 | MR. TOBEROFF:  Privilege.  Excuse me. | |
| 15 | BY MR. PETROCELLI: | |
| 16 | Q.   Did you ask Mr. Toberoff in his capacity as a | 17:47:31 |
| 17 | lawyer for the Shusters what their view of the | 17:47:35 |
| 18 | Superboy issue was? | 17:47:39 |
| 19 | MR. TOBEROFF:  Privileged.  Instruct you not | 17:47:41 |
| 20 | to answer. | 17:47:42 |
| 21 | BY MR. PETROCELLI: | |
| 22 | Q.   I'm not asking about any conversations with | 17:47:42 |
| 23 | you as their lawyer, but with you as the Shuster | 17:47:46 |
| 24 | lawyer. | 17:47:50 |
| 25 | MR. TOBEROFF:  You know -- | 17:47:51 |

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 17:47:52 |
| 2 | Q.   Did you understand my question? | 17:47:52 |
| 3 | MR. TOBEROFF:  Dan, you can't have it both | 17:47:54 |
| 4 | ways.  You can't ask me to keep my objections short | 17:47:56 |
| 5 | and accuse me of coaching and then when I keep it | 17:47:58 |
| 6 | short you engage me in conversations which makes me | 17:48:00 |
| 7 | defensive the next time I object so I explain my | 17:48:03 |
| 8 | objections. | 17:48:05 |
| 9 | MR. PETROCELLI:  Okay.  I just want to make | 17:48:05 |
| 10 | sure, though, based on your objections that you | 17:48:06 |
| 11 | understood and more importantly that the witness | 17:48:08 |
| 12 | understood.  So let me -- because I don't want to | 17:48:10 |
| 13 | argue with you, and I regret the few instances in | 17:48:13 |
| 14 | which we have and apologize if I said anything in | 17:48:18 |
| 15 | temper. | 17:48:25 |
| 16 | MR. TOBEROFF:  I accept your apology in this | 17:48:25 |
| 17 | limited instance. | 17:48:27 |
| 18 | MR. PETROCELLI:  And I accept yours. | 17:48:30 |
| 19 | MR. TOBEROFF:  I didn't apologize. | 17:48:32 |
| 20 | MR. PETROCELLI:  Noted. | 17:48:34 |
| 21 | THE WITNESS:  You guys. | 17:48:36 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.   Did -- did you, knowing that a lawyer with | 17:48:40 |
| 24 | whom you were dealing, Marc Toberoff, was also a | 17:48:44 |
| 25 | person who represented the Shusters -- | 17:48:50 |

| | | |
|---|---|---|
| 1 | A.    Um-hum. | 17:48:53 |
| 2 | Q.    -- did you ask Mr. Toberoff with his Shuster | 17:48:54 |
| 3 | lawyer hat on, not the Siegel lawyer hat on, to | 17:48:59 |
| 4 | discuss with you what the Shuster position was on | 17:49:03 |
| 5 | Superboy? | 17:49:10 |
| 6 |     MR. TOBEROFF:  Instruct you not to answer. | 17:49:10 |
| 7 | Privilege. | 17:49:14 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.    Did you have any discussions with | 17:49:17 |
| 10 | Mr. Toberoff in his capacity as a lawyer for the | 17:49:23 |
| 11 | Shusters -- | 17:49:29 |
| 12 |     MR. TOBEROFF:  Same. | 17:49:30 |
| 13 |     THE WITNESS:  You can't separate them out, | 17:49:30 |
| 14 | though. | 17:49:33 |
| 15 |     MR. TOBEROFF:  Same instruction. | 17:49:33 |
| 16 |     THE WITNESS:  I couldn't separate them out. | 17:49:34 |
| 17 |     MR. TOBEROFF:  Same instruction. | 17:49:36 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.    Can you answer that question for me? | 17:49:41 |
| 20 | A.    I think I've been instructed not to. | 17:49:43 |
| 21 | Q.    Okay.  And did you have any conversations | 17:49:49 |
| 22 | with your mother about what the Shuster position is or | 17:49:51 |
| 23 | might be regarding your issuance of a notice of | 17:49:59 |
| 24 | termination claiming a hundred percent of the | 17:50:03 |
| 25 | termination interest to Superboy? | 17:50:06 |

LAURA SIEGEL LARSON - 12/22/2011

Page 269

| | | |
|---|---|---|
| 1 | A.   I don't believe we did. | 17:50:07 |
| 2 | Q.   And even though Ms. Peary had been kind | 17:50:11 |
| 3 | enough to refer Mr. Toberoff to your family -- | 17:50:20 |
| 4 | A.   Um-hum. | 17:50:23 |
| 5 | Q.   -- it didn't occur to you that you might want | 17:50:24 |
| 6 | to check with the Peary family or the Peavy family on | 17:50:27 |
| 7 | what their view is on Superboy before you filed a | 17:50:32 |
| 8 | notice claiming a hundred percent of the termination | 17:50:36 |
| 9 | interest? | 17:50:39 |
| 10 | A.   I can't -- I can't testify as to what my | 17:50:40 |
| 11 | mother may or may not have done. | 17:50:44 |
| 12 | Q.   Well, what about you? | 17:50:44 |
| 13 | A.   I did not. | 17:50:53 |
| 14 | Q.   Okay.  Did you tell your mother it might be a | 17:50:53 |
| 15 | good thing as a courtesy to let Ms. Peavy know? | 17:50:53 |
| 16 | A.   I don't recall. | 17:50:57 |
| 17 | Q.   You didn't give your mother that advice? | 17:50:57 |
| 18 | A.   I don't remember giving her advice. | 17:51:00 |
| 19 | Q.   Did your mother -- you certainly understood | 17:51:02 |
| 20 | how proud Jean Peavy was of her husband's | 17:51:07 |
| 21 | contributions -- | 17:51:13 |
| 22 | A.   Her brother. | 17:51:13 |
| 23 | Q.   -- her brother's contributions to Superman? | 17:51:14 |
| 24 | A.   Of course. | 17:51:17 |
| 25 | Q.   And the whole Superman history; correct? | 17:51:18 |

Merrill  Corporation  -  Los Angeles

800-826-0277                                      www.merillcorp.com/law

EXHIBIT D
285

LAURA SIEGEL LARSON - 7/22/2011

Page 270

| | | |
|---|---|---|
| 1 | A.   Of course. | 17:51:23 |
| 2 | Q.   And you knew your father felt that way also; | 17:51:25 |
| 3 | right? | 17:51:28 |
| 4 | A.   Yes. | 17:51:28 |
| 5 | Q.   And your mother felt that way; correct? | 17:51:29 |
| 6 | A.   We all did. | 17:51:31 |
| 7 | Q.   And do you think that -- did it occur to you | 17:51:32 |
| 8 | that Jean Peavy might have some feelings about her | 17:51:35 |
| 9 | brother's getting credit for Superboy when you now | 17:51:40 |
| 10 | were claiming sole credit? | 17:51:45 |
| 11 | A.   To the best of my recollection, it wasn't -- | 17:51:46 |
| 12 | it wasn't anything that we were concerned about or | 17:51:51 |
| 13 | worried about.  We thought that they shared the same | 17:51:54 |
| 14 | view that we had. | 17:51:58 |
| 15 | Q.   You had no basis to think that.  What was | 17:51:59 |
| 16 | your basis? | 17:52:02 |
| 17 | A.   I'm -- | 17:52:03 |
| 18 | Q.   Some opinion in 1947 that you don't even know | 17:52:04 |
| 19 | that they were aware of? | 17:52:07 |
| 20 | A.   Just discussions that I had had with my | 17:52:08 |
| 21 | father during his lifetime. | 17:52:10 |
| 22 | Q.   Did you ever at any time have a discussion | 17:52:14 |
| 23 | with someone in the Shuster family about whether they | 17:52:17 |
| 24 | agreed with that position? | 17:52:21 |
| 25 | A.   I did not. | 17:52:22 |

EXHIBIT D
286

Page 271

1      Q.   Do you know if your mother did?                17:52:22

2      A.   She may have.                                  17:52:25

3      Q.   Do you know if she did?                        17:52:25

4      A.   I do not know whether she did.                 17:52:27

5      Q.   Did you inform the Peary or Peavy family       17:52:42

6   after you served the notice of termination claiming a  17:52:52

7   hundred percent termination interest for Superboy that 17:52:56

8   you had done so?                                       17:52:58

9      A.   Yes, I believe we did.                         17:52:59

10      Q.   Who did so?                                    17:53:01

11      A.   I think my mother did.                         17:53:03

12      Q.   How do you know she did?                       17:53:06

13      A.   Well, just every so often she would talk to    17:53:08

14   Jean on the phone.  I mean they had a very friendly    17:53:11

15   relationship, and I think she brought it up.           17:53:14

16      Q.   She said, "Hey, Jean, just want you to know    17:53:16

17   we filed a notice of termination claiming a hundred    17:53:19

18   percent on Superboy"?                                  17:53:21

19      A.   Possibly.  I wasn't on the phone.              17:53:24

20      Q.   Are you speculating or do you know for a fact  17:53:25

21   that she told that to Ms. Peavy?                       17:53:27

22      A.   I'm speculating what she said.                 17:53:30

23      Q.   Okay.  Well, that's -- that's of no help to    17:53:32

24   us.                                                    17:53:35

25           Okay.  Let's take a look at the next exhibit.  17:53:49

LAURA SIEGEL LARSON - 7/22/2011

Page 272

| | | |
|---|---|---|
| 1 | At some point in time did Mr. Emanuel and | 17:53:55 |
| 2 | Mr. Toberoff approach you about their wanting to | 17:54:00 |
| 3 | pursue Michael Siegel's termination interest? | 17:54:07 |
| 4 | A.    Yes. | 17:54:11 |
| 5 | Q.    And that they were going to purchase it | 17:54:12 |
| 6 | themselves? | 17:54:16 |
| 7 | A.    That -- they -- it was Ari who was going to | 17:54:17 |
| 8 | purchase it. | 17:54:21 |
| 9 | Q.    Did Ari ask your permission? | 17:54:27 |
| 10 | A.    Yes, he did. | 17:54:29 |
| 11 | Q.    Okay.  Did you give it to him? | 17:54:31 |
| 12 | A.    Yes, we did. | 17:54:33 |
| 13 | Q.    Did you discuss the price that he would pay? | 17:54:35 |
| 14 | A.    No. | 17:54:44 |
| 15 | Q.    He said to you, "I want to buy Michael | 17:54:44 |
| 16 | Siegel's termination interest," and you said, "Fine"? | 17:54:47 |
| 17 | A.    Well, it wasn't only the word "fine."  We | 17:54:53 |
| 18 | talked about it a little bit more than that, but -- | 17:54:56 |
| 19 | Q.    Tell me what you said, and what did you guys | 17:54:58 |
| 20 | talk about in that regard? | 17:55:01 |
| 21 | A.    It was just that, you know, Michael was kind | 17:55:03 |
| 22 | of a loose cannon.  He was, you know -- he was | 17:55:07 |
| 23 | difficult to deal with.  At times he perfectly | 17:55:11 |
| 24 | understood that, you know, we should have a united | 17:55:17 |
| 25 | family front, and at other times he was, you know, | 17:55:20 |

LAURA SIEGEL LARSON - 2/22/2011

Page 273

```
 1     kind of off the beam, and so it became increasingly        17:55:27
 2     difficult to deal with him.  So it seemed that it          17:55:34
 3     might be a good idea to have somebody who was friendly     17:55:39
 4     to us acquire his rights.                                  17:55:44
 5          Q.   Did you tell Michael that you were involved      17:55:49
 6     in Ari, in the decision to have Ari Emanuel acquire        17:55:58
 7     his termination interests?                                 17:56:03
 8          A.   I don't believe we discussed it.                 17:56:05
 9          Q.   Well, you never had a conversation with him.     17:56:06
10          A.   No.                                              17:56:09
11          Q.   Okay.  And did you write him a letter saying,    17:56:12
12     "Michael, I want you to understand that I'm having Ari     17:56:14
13     Emanuel approach you to buy your interest because          17:56:17
14     you're out of control and this will be in my best         17:56:20
15     interest if I have this happen"?  Did you write that      17:56:23
16     kind of a letter to him?                                   17:56:26
17          A.   I did not write it in the words that you         17:56:27
18     used.                                                      17:56:28
19          Q.   Did you write any letter to him advising him     17:56:29
20     that Michael -- that you were giving -- you had           17:56:32
21     approved Ari Emanuel purchasing his termination            17:56:38
22     interest?                                                  17:56:41
23          A.   I believe that he wrote to me and had            17:56:41
24     mentioned it to me, and I responded and said if he        17:56:47
25     wanted to do it, I would not stand in his way.            17:56:50
```

LAURA SIEGEL LARSON - 7/22/2011

Page 274

| | | |
|---|---|---|
| 1 | Q.   Did he write to you saying what? | 17:56:53 |
| 2 | A.   He said he was in need of immediate cash. | 17:56:55 |
| 3 | Q.   He happened to write to you just at the same | 17:57:00 |
| 4 | time that -- withdrawn. | 17:57:04 |
| 5 | When did he write this letter to you? | 17:57:06 |
| 6 | A.   It had to have been after an offer was made | 17:57:09 |
| 7 | to him because he was telling me about an offer. | 17:57:14 |
| 8 | Q.   Okay.  But when you -- you initially spoke | 17:57:17 |
| 9 | with Mr. Emanuel about his purchasing the interest | 17:57:21 |
| 10 | because you thought that would be beneficial to you | 17:57:27 |
| 11 | and your mother's interest; correct? | 17:57:30 |
| 12 | A.   And to Michael because he was looking for | 17:57:33 |
| 13 | money. | 17:57:35 |
| 14 | Q.   Well, I didn't ask you about that -- | 17:57:36 |
| 15 | A.   Sorry. | 17:57:38 |
| 16 | Q.   -- because you didn't know that Michael was | 17:57:38 |
| 17 | looking for money at the time.  He told you | 17:57:40 |
| 18 | afterwards. | 17:57:42 |
| 19 | A.   No.  I'm sorry.  He was always saying that he | 17:57:43 |
| 20 | needed money. | 17:57:45 |
| 21 | Q.   But he didn't call you up and say, "Look, I'm | 17:57:46 |
| 22 | looking for money," and it was for that reason that | 17:57:48 |
| 23 | you and Ari first had your discussion about his | 17:57:51 |
| 24 | buying the Super- -- about his buying Michael's | 17:57:55 |
| 25 | interest. | 17:57:56 |

Merrill  Corporation  -  Los Angeles

LAURA SIEGEL LARSON - 7/22/2011

Page 275

| | | |
|---|---|---|
| 1 | A.    No, he never called me. | 17:57:56 |
| 2 | Q.    Okay.  So you had no communication with | 17:57:58 |
| 3 | Michael that he wanted to sell his Superman interest | 17:57:59 |
| 4 | which led you to then authorize Ari to go ahead and do | 17:58:03 |
| 5 | it.  That's not what happened; correct? | 17:58:06 |
| 6 | A.    Could you ask it again?  I'm a little | 17:58:08 |
| 7 | confused. | 17:58:13 |
| 8 | Q.    You did not receive the communication from | 17:58:13 |
| 9 | Michael Siegel saying he needed money, he wanted to | 17:58:15 |
| 10 | sell his Superman interest, and for that reason you | 17:58:17 |
| 11 | then went to Ari and said, "Here, go buy it.  My | 17:58:19 |
| 12 | brother needs money."  There's no such document; | 17:58:23 |
| 13 | correct? | 17:58:26 |
| 14 | A.    It was -- is there a document.  I haven't | 17:58:26 |
| 15 | seen those documents in a really long time.  I can't | 17:58:29 |
| 16 | really answer your question. | 17:58:32 |
| 17 | Q.    Where are those documents? | 17:58:33 |
| 18 | A.    Whatever documents that -- | 17:58:35 |
| 19 |     MR. TOBEROFF:  What documents are you | 17:58:36 |
| 20 | referring to? | 17:58:37 |
| 21 | BY MR. PETROCELLI: | |
| 22 | Q.    You said "I haven't seen those documents in a | 17:58:38 |
| 23 | long time."  Where are those documents? | 17:58:41 |
| 24 | A.    Any letters between myself and Michael. | 17:58:42 |
| 25 | Q.    Where are they? | 17:58:45 |

EXHIBIT D
291

| | | |
|---|---|---|
| 1 | A.   I turned them over to my attorney. | 17:58:45 |
| 2 | Q.   You said you had letters in your apartment, | 17:58:47 |
| 3 | in your condominium. | 17:58:50 |
| 4 | A.   Well, anything that I found I turned over to | 17:58:52 |
| 5 | my attorney.  I said that if there's anything else, it | 17:58:55 |
| 6 | would be in my apartment. | 17:58:58 |
| 7 | Q.   When you turned those letters over to your | 17:58:59 |
| 8 | attorney, do you mean Marc Toberoff? | 17:59:02 |
| 9 | A.   Yes. | 17:59:03 |
| 10 | Q.   How did you turn your letters with Michael | 17:59:03 |
| 11 | Siegel over to Marc Toberoff? | 17:59:05 |
| 12 | A.   Well, in a general request for production of | 17:59:07 |
| 13 | documents. | 17:59:11 |
| 14 | Q.   How did you give them to Mr. Toberoff? | 17:59:12 |
| 15 | MR. TOBEROFF:  He's talking about -- | 17:59:15 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.   How did you transmit them to Mr. Toberoff? | 17:59:16 |
| 18 | MR. TOBEROFF:  Mail it? | 17:59:18 |
| 19 | THE WITNESS:  In a box. | 17:59:20 |
| 20 | BY MR. PETROCELLI: | |
| 21 | Q.   Did you ever fax any to Mr. Toberoff? | 17:59:20 |
| 22 | A.   I don't recall any faxes. | 17:59:23 |
| 23 | Q.   You have a fax machine; right? | 17:59:25 |
| 24 | A.   Yes, I do. | 17:59:27 |
| 25 | Q.   Okay.  Is it fair to say that Mr. Toberoff | 17:59:31 |

EXHIBIT D
292

| | | |
|---|---|---|
| 1 | has a copy of every single letter that you exchanged | 17:59:34 |
| 2 | with Michael Siegel -- | 17:59:40 |
| 3 | A.    What I -- | 17:59:44 |
| 4 | Q.    -- regarding Superman? | 17:59:45 |
| 5 | A.    Whatever I have found that pertains to the | 17:59:47 |
| 6 | case I have turned over to him. | 17:59:50 |
| 7 | Q.    Okay.  And when is the last time that you | 17:59:54 |
| 8 | gave Mr. Toberoff or any member of his firm a -- any | 17:59:59 |
| 9 | correspondence with Michael Siegel? | 18:00:05 |
| 10 | A.    Oh. | 18:00:07 |
| 11 | Q.    When is the last time that you located such a | 18:00:08 |
| 12 | document and gave it to him? | 18:00:10 |
| 13 | A.    Well, that's hard to answer because, you | 18:00:14 |
| 14 | know, I -- I don't necessarily just find something of | 18:00:17 |
| 15 | Michael's separately from finding other things. | 18:00:21 |
| 16 | Q.    So I didn't mean to suggest -- | 18:00:24 |
| 17 | A.    No, I'm just trying -- I know I'm not | 18:00:26 |
| 18 | answering your question.  I'm trying to reconstruct in | 18:00:27 |
| 19 | my mind. | 18:00:30 |
| 20 | Q.    Okay.  I'm just saying when is the last time | 18:00:31 |
| 21 | you recall coming across a Michael Siegel letter and | 18:00:32 |
| 22 | giving it to Mr. Toberoff? | 18:00:36 |
| 23 | A.    I don't know.  It could have been a few | 18:00:39 |
| 24 | months ago. | 18:00:41 |
| 25 | Q.    What was the letter that you found? | 18:00:41 |

LAURA SIEGEL LARSON - 3/22/2011

| | | |
|---|---|---|
| 1 | MR. TOBEROFF: Misstates. Okay. | 18:00:43 |
| 2 | BY MR. PETROCELLI: | |
| 3 | Q. What was the letter that you came across a | 18:00:46 |
| 4 | few months ago and gave to Mr. Toberoff? | 18:00:50 |
| 5 | MR. TOBEROFF: Misstates her testimony. | 18:00:52 |
| 6 | I just want to instruct you when he's asking | 18:00:53 |
| 7 | you these questions, just focus on the question, and | 18:00:55 |
| 8 | this isn't a memory test. If you know the answer, let | 18:00:59 |
| 9 | him know. If you can recall, recall. But you don't | 18:01:01 |
| 10 | have to feel constrained to put something together if | 18:01:05 |
| 11 | you don't remember. Just let him know what you | 18:01:09 |
| 12 | remember. | 18:01:12 |
| 13 | MR. PETROCELLI: You know, to the extent your | 18:01:12 |
| 14 | lawyer is telling you to say you don't recall, it's | 18:01:14 |
| 15 | really not appropriate. | 18:01:17 |
| 16 | MR. TOBEROFF: I'm not -- I'm not saying | 18:01:18 |
| 17 | that. | 18:01:18 |
| 18 | THE WITNESS: No, I don't -- | 18:01:19 |
| 19 | MR. PETROCELLI: We've gone over this, and | 18:01:21 |
| 20 | it's really late in the day to be talking about this | 18:01:21 |
| 21 | now. You just have to give me your very, very best | 18:01:21 |
| 22 | recollection even if it's a faint recollection. I | 18:01:25 |
| 23 | don't want you speculating wildly. | 18:01:26 |
| 24 | MR. TOBEROFF: Excuse me. I object to the | 18:01:27 |
| 25 | implication I'm telling her not to recall. She | 18:01:29 |

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | started saying things that were unresponsive, and then | 18:01:30 |
| 2 | she said she's just trying to put it together and by | 18:01:34 |
| 3 | vocalizing various things, and I said look, it's not a | 18:01:38 |
| 4 | memory test.  Try and remember.  If you can remember, | 18:01:40 |
| 5 | give it to him.  If you don't, don't.  That's not | 18:01:42 |
| 6 | coaching her not to recall, and I take object -- you | 18:01:45 |
| 7 | know, that's a snotty comment, and I object to it. | 18:01:47 |
| 8 | MR. PETROCELLI:  We better change the tape. | 18:01:52 |
| 9 | THE VIDEOGRAPHER:  Okay.  This will mark the | 18:01:54 |
| 10 | end of Volume -- sorry -- Volume 1, tape number four, | 18:01:55 |
| 11 | in the deposition of Laura Siegel.  Going off the | 18:01:58 |
| 12 | record.  The time is 6:02. | 18:02:04 |
| 13 | (A recess was taken.) | 18:08:07 |
| 14 | THE VIDEOGRAPHER:  We are back on the record. | 18:08:15 |
| 15 | This marks the beginning of Volume 1, tape number | 18:08:17 |
| 16 | five, in the deposition of Laura Siegel.  The time is | 18:08:19 |
| 17 | 6:08. | 18:08:23 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.   I want to get back to these questions about | 18:08:24 |
| 20 | Mr. Emanuel purchasing the interest of Mr. Siegel. | 18:08:32 |
| 21 | Now, first of all, were you aware that | 18:08:37 |
| 22 | Mr. Toberoff would be assisting Mr. Emanuel in | 18:08:40 |
| 23 | acquiring Mr. Michael Siegel's termination interest? | 18:08:45 |
| 24 | A.   What do you mean by assisting? | 18:08:49 |
| 25 | Q.   Working with him in some way. | 18:08:52 |

LAURA SIEGEL LARSON - 6/22/2011

Page 280

| | | |
|---|---|---|
| 1 | A.    I believe that he was communicating with | 18:08:56 |
| 2 | Michael Siegel or with Don Bulson. | 18:09:00 |
| 3 | Q.    Mr. Toberoff was? | 18:09:03 |
| 4 | A.    Mr. Toberoff. | 18:09:04 |
| 5 | Q.    On behalf of whom? | 18:09:05 |
| 6 | A.    On behalf of Mr. Emanuel. | 18:09:07 |
| 7 | Q.    Okay.  And how do you know that? | 18:09:08 |
| 8 | A.    It was a discussion. | 18:09:13 |
| 9 | Q.    Mr. Emanuel told you that, that he would be | 18:09:16 |
| 10 | working with Mr. Toberoff in connection with his | 18:09:18 |
| 11 | activities with Mr. Siegel and Mr. Bulson? | 18:09:21 |
| 12 | A.    Yes. | 18:09:24 |
| 13 | Q.    Okay.  Did you and Mr. Emanuel discuss price? | 18:09:24 |
| 14 | A.    No, we did not. | 18:09:40 |
| 15 | MR. TOBEROFF:  Asked and answered. | 18:09:41 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q.    Were you made aware at any time of any of the | 18:09:41 |
| 18 | offers going back and forth? | 18:09:45 |
| 19 | A.    No. | 18:09:49 |
| 20 | Q.    Are you certain? | 18:09:50 |
| 21 | A.    Not the amount of the offers.  I was aware | 18:09:50 |
| 22 | that offers were going back and forth. | 18:09:53 |
| 23 | Q.    Were you aware generally of the nature of the | 18:09:55 |
| 24 | offers that were going back and forth? | 18:09:59 |
| 25 | MR. TOBEROFF:  Vague and ambiguous. | 18:10:01 |

EXHIBIT D
296

| | | |
|---|---|---|
| 1 | THE WITNESS:  I don't believe that there was | 18:10:03 |
| 2 | a number ever mentioned. | 18:10:05 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.    But you were being kept apprised of what was | 18:10:07 |
| 5 | happening on a general basis; is that right? | 18:10:11 |
| 6 | A.    Yes, correct. | 18:10:13 |
| 7 | Q.    Was it your view that it would be | 18:10:19 |
| 8 | advantageous to have the Michael Siegel interest | 18:10:25 |
| 9 | purchased and getting a maximum price for your | 18:10:34 |
| 10 | interest and your mother's interest in your dealings | 18:10:36 |
| 11 | with Warner Bros. or DC? | 18:10:38 |
| 12 | A.    I'm not sure I understand the question. | 18:10:41 |
| 13 | Q.    Did you believe that if Mr. Emanuel purchased | 18:10:44 |
| 14 | the Michael Siegel interest, that would facilitate | 18:10:49 |
| 15 | discussions that you and your mother would have to | 18:10:53 |
| 16 | transact your interest? | 18:10:56 |
| 17 | A.    Yes. | 18:10:58 |
| 18 | Q.    Did you think it was important for Michael | 18:11:02 |
| 19 | Siegel, your stepbrother, to know that it was Ari | 18:11:05 |
| 20 | Emanuel, a person with whom you were doing business, | 18:11:11 |
| 21 | who was seeking to purchase his interest? | 18:11:14 |
| 22 | A.    First of all, he was my half brother, but -- | 18:11:18 |
| 23 | Q.    Half brother.  Forgive me. | 18:11:21 |
| 24 | Did you think it was important for your half | 18:11:25 |
| 25 | brother, Michael Siegel, to know that the person who | 18:11:27 |

Page 282

| | |
|---|---|
| 1   was seeking to acquire his termination interest was | 18:11:31 |
| 2   Ari Emanuel, the same person with whom you were doing | 18:11:37 |
| 3   business? | 18:11:40 |
| 4       A.   No, I didn't think that was important. | 18:11:41 |
| 5       Q.   And you did not ever communicate to your | 18:11:44 |
| 6   brother that it was Ari Emanuel who was this investor; | 18:11:47 |
| 7   correct? | 18:11:53 |
| 8       A.   I don't recall doing that. | 18:11:54 |
| 9       Q.   And you know that your brother -- excuse me. | 18:11:56 |
| 10  You know that Michael Siegel was never told that Ari | 18:12:00 |
| 11  Emanuel was the person who was interested in | 18:12:03 |
| 12  purchasing his termination interest; correct? | 18:12:09 |
| 13          MR. TOBEROFF:  Vague as to time. | 18:12:11 |
| 14          THE WITNESS:  Well, I do not know that. | 18:12:12 |
| 15  BY MR. PETROCELLI: | 18:12:14 |
| 16      Q.   You know that in the correspondence and the | 18:12:16 |
| 17  communications with Michael Siegel and his lawyer, Don | 18:12:18 |
| 18  Bulson, the purchaser was never named; correct? | 18:12:21 |
| 19      A.   I -- I think -- I think that I heard that. | 18:12:26 |
| 20      Q.   What was the strategy behind not telling | 18:12:31 |
| 21  Michael Siegel that it was Ari Emanuel? | 18:12:35 |
| 22      A.   I don't know that there was a strategy. | 18:12:41 |
| 23      Q.   You didn't want Mr. Siegel to know that it | 18:12:43 |
| 24  was Ari Emanuel; correct? | 18:12:46 |
| 25      A.   I didn't have any feelings about it one way | 18:12:47 |

EXHIBIT D
298

LAURA SIEGEL LARSON - 7/22/2011

Page 283

| | | |
|---|---|---|
| 1 | or another. | 18:12:49 |
| 2 | Q.   But you never felt that you should tell him; | 18:12:50 |
| 3 | right? | 18:12:54 |
| 4 | A.   No. | 18:13:00 |
| 5 | Q.   And you had rejected selling your interest to | 18:13:00 |
| 6 | Ari Emanuel because you thought that he wasn't | 18:13:04 |
| 7 | offering enough money; right? | 18:13:09 |
| 8 | A.   No. | 18:13:13 |
| 9 | Q.   You said that he offered you 15 million and | 18:13:14 |
| 10 | that why would he ever pay full value, so it must be | 18:13:18 |
| 11 | worth a lot more than that.  Do you recall that? | 18:13:21 |
| 12 | A.   We preferred to have him negotiate for us | 18:13:23 |
| 13 | than make a purchase. | 18:13:26 |
| 14 | Q.   Did you make a counteroffer to him and say, | 18:13:26 |
| 15 | "You know, Ari, a guy like you would never offer 15 if | 18:13:29 |
| 16 | it's worth 15, so it must be worth 30 or 40 or 50 or a | 18:13:34 |
| 17 | hundred, so I'm going to counter at a much higher | 18:13:38 |
| 18 | number"?  Did you ever have that kind of discussion | 18:13:40 |
| 19 | with Mr. Emanuel? | 18:13:42 |
| 20 | A.   No. | 18:13:43 |
| 21 | Q.   Did you ever make any counterproposal to his | 18:13:43 |
| 22 | $15 million proposal? | 18:13:46 |
| 23 | A.   Yeah.  The counter was "Why don't you | 18:13:47 |
| 24 | represent us." | 18:13:50 |
| 25 | Q.   A counter to do a deal with him, I meant, | 18:13:50 |

EXHIBIT D
299

LAURA SIEGEL LARSON 7/22/2011

Page 284

| | | |
|---|---|---|
| 1 | other than an agency deal. | 18:13:53 |
| 2 | A.   No. | 18:14:01 |
| 3 | Q.   Why didn't you suggest to Mr. Emanuel that he | 18:14:01 |
| 4 | represent Michael Siegel just like he was representing | 18:14:05 |
| 5 | you to try to sell Michael Siegel's interest as an | 18:14:09 |
| 6 | agent rather than as a principal? | 18:14:12 |
| 7 | A.   He didn't express any interest in doing that. | 18:14:14 |
| 8 | Q.   Did you try to persuade him to doing so, into | 18:14:16 |
| 9 | doing that? | 18:14:23 |
| 10 | A.   We may have discussed it, but he didn't ever | 18:14:23 |
| 11 | show any interest in doing that. | 18:14:25 |
| 12 | Q.   Did you have a point of view about that?  Did | 18:14:25 |
| 13 | you have a preference? | 18:14:30 |
| 14 | A.   Not really. | 18:14:31 |
| 15 | Q.   Did you have any issue with the fact that the | 18:14:46 |
| 16 | person that you thought was your lawyer was now acting | 18:14:51 |
| 17 | in an adverse capacity to your stepbrother? | 18:14:54 |
| 18 | A.   I don't think we considered it an adverse | 18:15:00 |
| 19 | capacity. | 18:15:03 |
| 20 | Q.   You don't believe that Mr. Toberoff | 18:15:03 |
| 21 | representing Ari Emanuel in trying to provide the | 18:15:06 |
| 22 | lowest price to Michael Siegel to acquire his interest | 18:15:14 |
| 23 | was adverse to Michael Siegel? | 18:15:19 |
| 24 | A.   We had knowledge of the fact that Michael | 18:15:23 |
| 25 | wanted to speed up the process.  He really didn't want | 18:15:25 |

| | | |
|---|---|---|
| 1 | to wait things out.  He wasn't interested in | 18:15:27 |
| 2 | prolonging anything and wanted some money.  So it | 18:15:33 |
| 3 | seemed as if it was going to be to his advantage. | 18:15:37 |
| 4 | Q.    Why didn't you buy it? | 18:15:40 |
| 5 | A.    Didn't have the money. | 18:15:41 |
| 6 | Q.    Why didn't you try to borrow the money? | 18:15:42 |
| 7 | A.    Hey, I'm disabled.  I live on a disability | 18:15:47 |
| 8 | income.  There's no way that I could borrow any kind | 18:15:51 |
| 9 | of money for that. | 18:15:53 |
| 10 | Q.    Why didn't you ask Ari Emanuel to put up the | 18:15:54 |
| 11 | funds on your behalf? | 18:15:58 |
| 12 | A.    I just didn't think of it. | 18:15:59 |
| 13 | Q.    Nobody suggested that to you? | 18:16:00 |
| 14 | A.    No. | 18:16:07 |
| 15 | Q.    Did you tell -- since you never spoke to | 18:16:07 |
| 16 | Michael Siegel, did you communicate with Michael | 18:16:12 |
| 17 | Siegel that -- did you ask Michael Siegel in writing | 18:16:16 |
| 18 | whether he had any issue with your lawyer, Marc | 18:16:29 |
| 19 | Toberoff, representing this purchaser of his interest? | 18:16:34 |
| 20 | A.    I never asked him that. | 18:16:40 |
| 21 | Q.    Take a look at the next exhibit. | 18:16:54 |
| 22 | MR. TOKORO:  64. | 18:16:59 |
| 23 | (Whereupon, Plaintiff's Exhibit 64 | |
| 24 | was marked for identification.) | |
| 25 | THE WITNESS:  Thank you. | 18:17:08 |

LAURA SIEGEL LARSON 12/22/2011

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 18:17:08 |
| 2 | Q.  This is a document sent to you and your | 18:17:08 |
| 3 | mother on the letterhead of IP Worldwide dated | 18:17:10 |
| 4 | November 26, 2002, with respect to the purchase of | 18:17:15 |
| 5 | Michael Siegel's termination interest by Ari Emanuel. | 18:17:27 |
| 6 | A.  I'm reading it, so I'm sorry.  If you could | 18:17:33 |
| 7 | give me a few minutes. | 18:17:37 |
| 8 | Q.  Tell me when you're ready. | 18:17:56 |
| 9 | A.  Okay.  I've read it. | 18:18:19 |
| 10 | Q.  What were the potential conflicts of interest | 18:18:21 |
| 11 | that you understood related to this document? | 18:18:27 |
| 12 | A.  I don't recall because it's not in this | 18:18:35 |
| 13 | document. | 18:18:38 |
| 14 | Q.  What's not in this document? | 18:18:38 |
| 15 | A.  Potential conflicts of interest.  It's not -- | 18:18:40 |
| 16 | it's not explained in the document, so I don't recall | 18:18:44 |
| 17 | something that was discussed in 2002 that's not in | 18:18:49 |
| 18 | front of me. | 18:18:52 |
| 19 | Q.  Right now as you sit here, you have no idea | 18:18:53 |
| 20 | what the potential conflicts of interest were? | 18:18:56 |
| 21 | A.  May I read that paragraph again? | 18:18:58 |
| 22 | Q.  Please. | 18:19:00 |
| 23 | A.  It doesn't refresh my memory by reading it. | 18:19:32 |
| 24 | Q.  Now, you see it's on the stationery or | 18:19:35 |
| 25 | letterhead of IP Worldwide.  Do you see that? | 18:19:41 |

EXHIBIT D
302

| | | |
|---|---|---|
| 1 | A.   Yes. | 18:19:43 |
| 2 | Q.   Go to the beginning of the second paragraph. | 18:19:43 |
| 3 | It says "IPW will enter into negotiations."  Do you | 18:19:46 |
| 4 | see that? | 18:19:52 |
| 5 | A.   Yes, I do. | 18:19:52 |
| 6 | Q.   What did you understand IPW to be? | 18:19:53 |
| 7 | A.   IP Worldwide. | 18:19:55 |
| 8 | Q.   Tell me -- so then it was IP Worldwide that | 18:19:58 |
| 9 | was going to acquire the Michael Siegel interests; | 18:20:00 |
| 10 | correct? | 18:20:04 |
| 11 | A.   No.  It says it will be directly financed by | 18:20:06 |
| 12 | Ari Emanuel. | 18:20:08 |
| 13 | Q.   Financed by, but the acquisition is to occur | 18:20:09 |
| 14 | by IPW; correct? | 18:20:13 |
| 15 | A.   My understanding of that was that IP | 18:20:15 |
| 16 | Worldwide, meaning as a lawyer, Mr. Toberoff was going | 18:20:20 |
| 17 | to conduct the negotiations. | 18:20:24 |
| 18 | Q.   If IPW acquired the termination interest of | 18:20:28 |
| 19 | Michael Siegel, a company in which Mr. Toberoff had an | 18:20:33 |
| 20 | ownership interest, you would have had no objection to | 18:20:36 |
| 21 | that; correct? | 18:20:38 |
| 22 | MR. TOBEROFF:  I just want to make -- when | 18:20:39 |
| 23 | we're speaking -- you're saying I, because there is a | 18:20:40 |
| 24 | company called IPW. | |
| 25 | MR. PETROCELLI:  I know, but not at this | |

| | | |
|---|---|---|
| 1 | point in time. | |
| 2 | MR. TOBEROFF: You're talking about IP | 18:20:44 |
| 3 | Worldwide; correct? | 18:20:45 |
| 4 | MR. PETROCELLI: Yes. I'm using "IPW" | 18:20:46 |
| 5 | because as the witness said, she understood it to mean | 18:20:48 |
| 6 | IP Worldwide as used in this letter. | 18:20:52 |
| 7 | MR. TOBEROFF: Okay. | 18:20:53 |
| 8 | THE WITNESS: And the question? | 18:20:54 |
| 9 | BY MR. PETROCELLI: | |
| 10 | Q. You would have had no objection to Michael | 18:20:55 |
| 11 | Siegel's interests being purchased in the name of IP | 18:20:58 |
| 12 | Worldwide, a company in which Mr. Toberoff had an | 18:21:01 |
| 13 | ownership interest; correct? | 18:21:04 |
| 14 | A. Correct. | 18:21:05 |
| 15 | Q. And again, you can't recall any of the | 18:21:13 |
| 16 | conflicts over the subject of this document. | 18:21:16 |
| 17 | A. No. Sorry. I can't. | 18:21:18 |
| 18 | MR. PETROCELLI: What exhibit number is this? | 18:21:21 |
| 19 | MR. TOKORO: 64. | 18:21:23 |
| 20 | MR. PETROCELLI: Go to the next one. | 18:21:29 |
| 21 | MR. TOBEROFF: I would like you to read me -- | 18:21:30 |
| 22 | she asked a question, and you said "correct," and you | 18:21:32 |
| 23 | said "correct." Can you read me that question, | 18:21:34 |
| 24 | please? | 18:21:37 |
| 25 | (The record was read.) | 18:21:51 |

EXHIBIT D
304

LAURA SIEGEL LARSON - 6/22/2011

Page 289

```
 1              MR. TOBEROFF:  Okay.  Thank you.        18:21:51
 2              MR. PETROCELLI:  Next is Exhibit 65, which is  18:21:55
 3    another draft of this document dated December 16,  18:21:58
 4    2002, which contains more terms.                  18:22:02
 5              (Whereupon, Plaintiff's Exhibit 65
 6              was marked for identification.)          18:22:11
 7    BY MR. PETROCELLI:
 8        Q.    Were you negotiating this document with  18:22:12
 9    Mr. Emanuel?                                       18:22:17
10        A.    May I read it first?                     18:22:18
11        Q.    Sure.                                    18:22:20
12        A.    Thank you.                               18:22:21
13              MR. TOBEROFF:  Do you have a signed -- you're  18:22:45
14    showing her documents that are unsigned.  Do you have  18:22:47
15    a signed document?                                18:22:50
16              MR. PETROCELLI:  No.  You didn't produce it.  18:22:58
17        Q.    You do recall signing a version of this  18:23:19
18    document; is that right?                          18:23:19
19        A.    A version.  I can't say this was the final.  18:23:19
20              MR. TOBEROFF:  I think there was a signed  18:23:20
21    document that was produced.                       18:23:22
22              MR. PETROCELLI:  Well, I don't have it here,  18:23:24
23    and it's certainly possible.                      18:23:28
24              THE WITNESS:  Okay.  I'm ready for your  18:23:55
25    question.                                         18:23:58
```

EXHIBIT D
305

|   |   |   |
|---|---|---|
| 1 | MR. PETROCELLI:  Oh.  So you did find one. | 18:23:58 |
| 2 | Let me see it. | 18:24:03 |
| 3 | We're going to get to a signed version. | 18:24:17 |
| 4 | THE WITNESS:  Okay. | 18:24:19 |
| 5 | MR. PETROCELLI:  But it's not -- we're going | 18:24:20 |
| 6 | to stay with this document first. | 18:24:22 |
| 7 | THE WITNESS:  All right. | 18:24:24 |
| 8 | BY MR. PETROCELLI: | 18:24:32 |
| 9 | Q.  This is Exhibit 65.  Who was negotiating the | 18:24:32 |
| 10 | terms of this document? | 18:24:37 |
| 11 | A.  My mother and I. | 18:24:39 |
| 12 | Q.  And who were you negotiating with? | 18:24:42 |
| 13 | A.  Ari. | 18:24:47 |
| 14 | Q.  How?  Over the phone?  In person?  Through | 18:24:49 |
| 15 | Mr. Toberoff?  All the above? | 18:24:52 |
| 16 | A.  All the above. | 18:24:53 |
| 17 | Q.  Was anybody other than Mr. Toberoff working | 18:24:58 |
| 18 | with you on the negotiations? | 18:25:02 |
| 19 | A.  No. | 18:25:10 |
| 20 | Q.  You -- you were the one insisting that if | 18:25:11 |
| 21 | Michael Siegel sold this interest to IPW and/or Ari | 18:25:19 |
| 22 | Emanuel, that they in turn, that is, IPW and/or Ari | 18:25:26 |
| 23 | Emanuel, would only sell the Michael Siegel interest | 18:25:35 |
| 24 | to a third party in connection with the sale of your | 18:25:39 |
| 25 | interest; correct? | 18:25:43 |

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | A.   Can you show me where in the document it says | 18:25:45 |
| 2 | that? | 18:25:47 |
| 3 | Q.   3(a). | 18:25:48 |
| 4 | A.   If this was the final version, then that's | 18:25:58 |
| 5 | what we agreed to. | 18:26:01 |
| 6 | Q.   But that's -- I'm not asking right now | 18:26:02 |
| 7 | whether you agreed to it, but that's something you | 18:26:05 |
| 8 | wanted; right? | 18:26:07 |
| 9 | A.   Yes. | 18:26:07 |
| 10 | Q.   And you wanted the complete decision making | 18:26:08 |
| 11 | authority with respect to the disposition of not only | 18:26:12 |
| 12 | your interest, but the Michael Siegel interest; | 18:26:15 |
| 13 | correct? | 18:26:17 |
| 14 | A.   That's correct. | 18:26:17 |
| 15 | Q.   So you were basically using Ari Emanuel and | 18:26:18 |
| 16 | IPW as a front to acquire this interest that you would | 18:26:22 |
| 17 | ultimately control without telling your stepbrother; | 18:26:27 |
| 18 | correct? | 18:26:29 |
| 19 | A.   No. | 18:26:30 |
| 20 | Q.   And you did not tell your stepbrother that it | 18:26:30 |
| 21 | was you who was going to have complete control over | 18:26:32 |
| 22 | his interest; correct? | 18:26:35 |
| 23 | A.   I didn't discuss the details with him. | 18:26:36 |
| 24 | Q.   Well, you didn't tell him anything, did you? | 18:26:39 |
| 25 | A.   I don't recall. | 18:26:41 |

| | | |
|---|---|---|
| 1 | Q.   You never spoke to him, you said. | 18:26:41 |
| 2 | A.   No, I didn't. | 18:26:44 |
| 3 | Q.   You never wrote to him about any of this; | 18:26:45 |
| 4 | right? | 18:26:47 |
| 5 | A.   I said I didn't remember whether I wrote to | 18:26:48 |
| 6 | him about this. | 18:26:50 |
| 7 | Q.   You remember, and you did not advise Michael | 18:26:53 |
| 8 | Siegel that you were negotiating against him through | 18:26:57 |
| 9 | Ari Emanuel; correct? | 18:27:00 |
| 10 | MR. TOBEROFF:  Argumentative. | 18:27:02 |
| 11 | THE WITNESS:  I don't think you can read my | 18:27:03 |
| 12 | mind, with all due respect. | 18:27:05 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   Well, are you saying you did make this full | 18:27:07 |
| 15 | disclosure to him about what your demands were of | 18:27:09 |
| 16 | Mr. Ari Emanuel, that you wanted to control the | 18:27:14 |
| 17 | disposition of the Michael Siegel interests, that it | 18:27:17 |
| 18 | could only be sold in connection with your interest? | 18:27:19 |
| 19 | Are you telling me that you told that to your half | 18:27:22 |
| 20 | brother in writing? | 18:27:25 |
| 21 | A.   I don't -- I don't remember what we discussed | 18:27:28 |
| 22 | in writing. | 18:27:31 |
| 23 | Q.   Did you have a single communication with him | 18:27:32 |
| 24 | in writing on this subject? | 18:27:34 |
| 25 | A.   I do not recall. | 18:27:36 |

Page 293

| | | |
|---|---|---|
| 1 | Q. In paragraph (c) here of this draft it says | 18:27:43 |
| 2 | that Mr. Emanuel is going to indemnify you in case | 18:27:47 |
| 3 | there is any litigation arising out of your -- arising | 18:27:51 |
| 4 | out of the purchase of the Michael Siegel interests. | 18:27:54 |
| 5 | Why do you want an indemnification from Mr. Emanuel? | 18:27:56 |
| 6 | What kind of litigation were you concerned about? | 18:28:00 |
| 7 | A. We had no idea what might occur in the | 18:28:02 |
| 8 | future. | 18:28:16 |
| 9 | Q. How were you communicating your demands and | 18:28:16 |
| 10 | your positions such that they were being embodied in | 18:28:20 |
| 11 | these drafts? Were you doing it orally, or were you | 18:28:25 |
| 12 | like typing things out and sending it to Mr. Toberoff | 18:28:29 |
| 13 | or Mr. Emanuel? | 18:28:33 |
| 14 | A. Oh, you're saying the negotiation over -- | 18:28:34 |
| 15 | Q. Yes. | 18:28:36 |
| 16 | A. -- over this document? | 18:28:37 |
| 17 | Q. Yes. | 18:28:38 |
| 18 | A. I think we did it in conversation. | 18:28:41 |
| 19 | Q. Okay. Take a look at the next document. | 18:28:47 |
| 20 | This is Exhibit 46. | 18:28:51 |
| 21 | (Whereupon, Plaintiff's Exhibit 46 | |
| 22 | was placed before the witness.) | 18:28:59 |
| 23 | BY MR. PETROCELLI: | |
| 24 | Q. Now, it says that it's dated January 21, | 18:28:59 |
| 25 | 2002. I'm assuming that's a typo. That must be 2003. | 18:29:03 |

| | | |
|---|---|---|
| 1 | A.    Yeah, because it's -- | 18:29:07 |
| 2 | Q.    The sequence of time here.  Does that make | 18:29:09 |
| 3 | sense to you? | 18:29:11 |
| 4 | A.    It's signed on 2003. | 18:29:11 |
| 5 | Q.    Well, Exhibit 46 is not signed.  You're | 18:29:13 |
| 6 | looking at the wrong exhibit. | 18:29:15 |
| 7 | A.    46. | 18:29:18 |
| 8 | MR. TOBEROFF:  Signed. | 18:29:20 |
| 9 | THE WITNESS:  Is signed. | 18:29:20 |
| 10 | MR. PETROCELLI:  Time out.  Time out.  Time | 18:29:23 |
| 11 | out.  Time out. | 18:29:25 |
| 12 | Q.    You have Exhibit 46 in front of you? | 18:29:55 |
| 13 | A.    Yes, I do. | 18:29:57 |
| 14 | Q.    And that is a signed version? | 18:29:57 |
| 15 | A.    Yes. | 18:29:59 |
| 16 | Q.    Okay.  And you will see in paragraph 2 -- in | 18:30:08 |
| 17 | paragraph 1 we're dealing with Mr. Siegel's interests, | 18:30:21 |
| 18 | Michael Siegel's interest in Superman, Superboy, and | 18:30:26 |
| 19 | The Spectre.  Do you see that? | 18:30:29 |
| 20 | A.    Yes, I do. | 18:30:30 |
| 21 | Q.    What's The Spectre? | 18:30:31 |
| 22 | A.    That's another character that my father | 18:30:32 |
| 23 | co-created. | 18:30:39 |
| 24 | Q.    And you wanted to have Mr. Emanuel acquire | 18:30:39 |
| 25 | Michael Siegel's interest in that character as well? | 18:30:42 |

LAURA SIEGEL LARSON - 2/22/2011

```
 1      A.   Yes.                                          18:30:45

 2      Q.   So at the end of the day, you wanted to       18:30:45

 3  obtain everything Michael Siegel might own with        18:30:50

 4  respect to your father's creations; correct?          18:30:53

 5           MR. TOBEROFF:  Misstates the document and the 18:30:56

 6  record.  Assumes facts.  Lacks foundation.            18:30:58

 7           MR. PETROCELLI:  Repeat the question because  18:31:02

 8  I made a mistake in it.                                18:31:04

 9      Q.   You wanted Mr. Emanuel and negotiated and     18:31:05

10  contracted with Mr. Emanuel that he would acquire all  18:31:09

11  copyright termination interests that Michael Siegel    18:31:15

12  might hold with respect to your father's creations;    18:31:17

13  correct?                                               18:31:20

14      A.   These Superman, Superboy, and The Spectre     18:31:22

15  were the only properties that had at this point been   18:31:25

16  terminated.  There is always the possibility that      18:31:30

17  there are additional characters created by my father   18:31:32

18  that would be terminated in the future.                18:31:36

19      Q.   Were you --                                   18:31:39

20      A.   This agreement didn't apply to anything       18:31:40

21  except for the specific characters.                    18:31:43

22      Q.   What were the other characters that you were  18:31:43

23  leaving available for Michael Siegel to exercise       18:31:46

24  copyright termination interests over?                  18:31:48

25      A.   Anything that came -- because of the calendar 18:31:50
```

LAURA SIEGEL LARSON - 7/22/2011

| | | |
|---|---|---|
| 1 | of the way copyright terminations go, there are -- you | 18:31:53 |
| 2 | know, there are different dates of publication, and, | 18:31:57 |
| 3 | you know, the window for termination for each | 18:32:01 |
| 4 | character is different. | 18:32:04 |
| 5 | Q.   Well, were you aware of any other windows of | 18:32:05 |
| 6 | termination for any other characters that were coming | 18:32:08 |
| 7 | up? | 18:32:11 |
| 8 | A.   There were some, but they were way down the | 18:32:11 |
| 9 | road. | 18:32:14 |
| 10 | Q.   What were they? | 18:32:14 |
| 11 | A.   Oh, you would ask me that.  At this moment I | 18:32:15 |
| 12 | can't recall. | 18:32:30 |
| 13 | Q.   Well, as of January 21, 2003, you were | 18:32:30 |
| 14 | authorizing Ari Emanuel to purchase all existing | 18:32:37 |
| 15 | termination interests of Michael Siegel in your | 18:32:42 |
| 16 | father's creations; is that correct? | 18:32:46 |
| 17 | A.   That were -- that were in effect or had been | 18:32:48 |
| 18 | terminated at that point. | 18:32:51 |
| 19 | Q.   And this is the document you did sign; right? | 18:32:56 |
| 20 | A.   Yes. | 18:33:02 |
| 21 | Q.   Which sets forth the condition that the | 18:33:03 |
| 22 | Michael Siegel interests so acquired by Mr. Emanuel | 18:33:10 |
| 23 | could only be sold to a third party in conjunction | 18:33:12 |
| 24 | with the sale of the Siegel interests, your interests; | 18:33:17 |
| 25 | correct? | 18:33:20 |

| | | |
|---|---|---|
| 1 | A.    Correct. | 18:33:20 |
| 2 | Q.    And that you and your mother would retain | 18:33:21 |
| 3 | full and complete decision making authority with | 18:33:24 |
| 4 | respect to such a disposition; correct? | 18:33:26 |
| 5 | A.    Where is that, please?  I didn't have a | 18:33:29 |
| 6 | chance to read the entire document. | 18:33:31 |
| 7 | Q.    3(b). | 18:33:33 |
| 8 | A.    Correct. | 18:33:39 |
| 9 | Q.    3(c) is the indemnity that you're getting | 18:33:40 |
| 10 | from Mr. Emanuel in case there's any litigation | 18:33:43 |
| 11 | arising out of the purchase of the Michael Siegel | 18:33:46 |
| 12 | interest; correct? | 18:33:49 |
| 13 | A.    Correct. | 18:33:49 |
| 14 | Q.    And you understood that might apply if | 18:33:49 |
| 15 | Michael Siegel himself filed suit against you; | 18:33:52 |
| 16 | correct? | 18:33:54 |
| 17 | A.    I believe so. | 18:33:54 |
| 18 | Q.    In paragraph 3(d) you ask Mr. Emanuel to | 18:34:03 |
| 19 | reimburse you for the Michael Siegel 25 percent share | 18:34:08 |
| 20 | of the expenses that you had been advancing; correct? | 18:34:13 |
| 21 | A.    That we advanced on behalf of the entire | 18:34:19 |
| 22 | interest. | 18:34:37 |
| 23 | Q.    In the first paragraph of this document, | 18:34:37 |
| 24 | Exhibit 46, again it makes reference to various risks | 18:34:42 |
| 25 | and potential problems regarding Michael Siegel and | 18:34:48 |

LAURA SIEGEL LARSON 5/22/2011

```
 1    the mitigation of possible conflicts of interest with        18:34:52
 2    respect to the following proposed remedial actions.          18:34:56
 3    What were the risks, the potential problems, and the         18:35:00
 4    possible conflicts?                                          18:35:05
 5        A.   I really don't recall.                              18:35:07
 6        Q.   You can't remember a single thing about that?       18:35:08
 7        A.   Not today.                                          18:35:11
 8        Q.   Take a look at the next document in order,          18:35:56
 9    Exhibit 30.                                                  18:36:03
10             (Whereupon, Plaintiff's Exhibit 30
11              was placed before the witness.)
12    BY MR. PETROCELLI:
13        Q.   This is a letter from Michael Siegel to you         18:36:12
14    dated May 13; is that correct?                               18:36:15
15        A.   Yes.                                                18:36:19
16        Q.   When is the last time you saw this document?        18:36:22
17        A.   It's been quite a while.                            18:36:25
18        Q.   When you received documents -- well,                18:36:34
19    withdrawn.                                                   18:36:37
20        A.   I'm sorry.  What was --                             18:36:38
21        Q.   Withdrawn.  Let me start all over again.            18:36:40
22             When did you first give a copy of this              18:36:42
23    document to Mr. Toberoff?                                    18:36:45
24        A.   Whenever there was a request for the                18:36:50
25    production of documents, whenever that was.                  18:36:53
```

LAURA SIEGEL LARSON - 3/22/2011

| | | |
|---|---|---|
| 1 | Q. In what case? | 18:36:56 |
| 2 | A. Good question. There's just so many cases. | 18:36:59 |
| 3 | You know, they're all kind of running together for me, | 18:37:04 |
| 4 | so I don't remember. | 18:37:06 |
| 5 | Q. When you provided documents from time to time | 18:37:12 |
| 6 | to Mr. Toberoff, did you maintain copies for yourself? | 18:37:15 |
| 7 | A. No. | 18:37:20 |
| 8 | Q. Never? | 18:37:21 |
| 9 | A. I don't -- I don't believe so. | 18:37:21 |
| 10 | Q. Even letters with your stepbrother? | 18:37:23 |
| 11 | A. Well, I knew that he had them, and if I | 18:37:26 |
| 12 | needed them, I could always get a copy from him. | 18:37:28 |
| 13 | Q. This letter starts out "Thank you for your | 18:37:42 |
| 14 | letter of November 2 of last year." What letter was | 18:37:44 |
| 15 | that? | 18:37:49 |
| 16 | A. A letter I sent him on November 2. | 18:37:49 |
| 17 | Q. Do you have any idea what you wrote in that | 18:37:51 |
| 18 | letter? | 18:37:53 |
| 19 | A. No, I don't. | 18:37:54 |
| 20 | Q. Now, you see -- you recall receiving this | 18:38:01 |
| 21 | letter? | 18:38:05 |
| 22 | A. Well, the part that I remember is when he | 18:38:05 |
| 23 | told me that his mother passed away. | 18:38:07 |
| 24 | Q. That's in the second sentence. | 18:38:11 |
| 25 | A. That's right. | 18:38:13 |

EXHIBIT D
315

| | | |
|---|---|---|
| 1 | Q.   And then the rest of this letter goes on to | 18:38:13 |
| 2 | discuss his concerns about Mr. Toberoff, and are you | 18:38:17 |
| 3 | suggesting that none of that was important to you? | 18:38:21 |
| 4 | A.   I didn't say it wasn't important to me.  I | 18:38:27 |
| 5 | just said that the thing that made me remember this | 18:38:31 |
| 6 | letter was the fact that he said that his mother | 18:38:34 |
| 7 | passed away. | 18:38:34 |
| 8 | Q.   Do you know what prompted his sending this | 18:38:50 |
| 9 | letter to you? | 18:38:52 |
| 10 | A.   I don't know. | 18:38:54 |
| 11 | Q.   Did you respond to it? | 18:38:59 |
| 12 | A.   I'm sure I did. | 18:39:02 |
| 13 | Q.   What did you say? | 18:39:05 |
| 14 | A.   I'm sorry, but I don't recall. | 18:39:08 |
| 15 | Q.   He said here in the -- directing your | 18:39:14 |
| 16 | attention to the second paragraph, okay -- | 18:39:18 |
| 17 | A.   Um-hum. | 18:39:21 |
| 18 | Q.   -- it starts out "I really wish to discuss | 18:39:22 |
| 19 | Marc Toberoff."  And it says in the third sentence: | 18:39:26 |
| 20 | "I told you when he first contacted | 18:39:37 |
| 21 | me, he wanted to buy my share of the | 18:39:41 |
| 22 | copyright.  Marc had a mysterious | 18:39:47 |
| 23 | billionaire who wanted to invest in | 18:39:51 |
| 24 | the Superman copyright, put | 18:39:52 |
| 25 | 15 million dollars up front plus | 18:39:54 |

Merrill  Corporation  -  Los Angeles

800-826-0277                                    www.merillcorp.com/law

| | | |
|---|---|---|
| 1 | participation.  When you signed with | 18:39:57 |
| 2 | Marc the billionaire invested | 18:40:01 |
| 3 | elsewhere." | 18:40:04 |
| 4 | Do you know where he got that information? | 18:40:08 |
| 5 | A.    I have no idea. | 18:40:10 |
| 6 | Q.    You don't think he made it up, do you? | 18:40:11 |
| 7 | A.    You know, Michael was a very confused guy, on | 18:40:14 |
| 8 | a lot of medication, and when he would write things to | 18:40:21 |
| 9 | me, such as asking me did I know that Marc was the | 18:40:25 |
| 10 | attorney for the Shusters, well, of course I did, and, | 18:40:29 |
| 11 | you know -- | 18:40:33 |
| 12 | Q.    He's telling you that Marc Toberoff contacted | 18:40:35 |
| 13 | him and said he had a mysterious billionaire. | 18:40:38 |
| 14 | A.    Yeah.  Well, I don't know where that came | 18:40:43 |
| 15 | from. | 18:40:45 |
| 16 | Q.    Did you think your brother -- your | 18:40:46 |
| 17 | stepbrother was lying? | 18:40:48 |
| 18 | A.    I don't -- I don't know that he came up with | 18:40:49 |
| 19 | the wording himself.  You know, I mean it -- I had | 18:40:57 |
| 20 | never heard this referred to in any way other than in | 18:41:01 |
| 21 | this letter, "mysterious billionaire."  I don't know | 18:41:04 |
| 22 | what that means. | 18:41:08 |
| 23 | Q.    Put $15 million up front, plus participation, | 18:41:12 |
| 24 | that happened to be exactly the same number that | 18:41:15 |
| 25 | Mr. Emanuel had offered you; correct? | 18:41:19 |

| | | |
|---|---|---|
| 1 | A.   That was interesting, and that caught my eye. | 18:41:21 |
| 2 | Q.   Mr. Toberoff had told you that he knew | 18:41:27 |
| 3 | billionaire investors; correct? | 18:41:32 |
| 4 | A.   No, he never used that term. | 18:41:33 |
| 5 | Q.   Well, he used terms similar, like he knew | 18:41:34 |
| 6 | very wealthy investors and people in the entertainment | 18:41:39 |
| 7 | industry who had money and would buy properties; | 18:41:41 |
| 8 | correct? | 18:41:43 |
| 9 | A.   No.   The offer came from -- directly from Ari | 18:41:44 |
| 10 | Emanuel. | 18:41:46 |
| 11 | Q.   What offer? | 18:41:47 |
| 12 | A.   Well, Ari Emanuel was involved in that | 18:41:49 |
| 13 | proposal of the $15 million. | 18:41:53 |
| 14 | Q.   Was involved with Mr. Toberoff. | 18:41:56 |
| 15 | A.   No, was -- it was going to be Ari Emanuel | 18:41:58 |
| 16 | putting up the $15 million in that discussion, the | 18:42:02 |
| 17 | initial discussion that apparently happened with Kevin | 18:42:07 |
| 18 | Marks. | 18:42:11 |
| 19 | Q.   How do you know that it was so specific that | 18:42:11 |
| 20 | it was only going to be Ari Emanuel acquiring the | 18:42:13 |
| 21 | interest and not IPW or an entity with which | 18:42:17 |
| 22 | Mr. Toberoff had an interest? | 18:42:23 |
| 23 | A.   It wasn't mentioned to me. | 18:42:24 |
| 24 | Q.   It was not. | 18:42:25 |
| 25 | A.   No. | 18:42:26 |

| | | |
|---|---|---|
| 1 | Q.    Okay. | 18:42:26 |
| 2 | A.    Not that I recall. | 18:42:31 |
| 3 | Q.    Then you're basing that off of your | 18:42:33 |
| 4 | recollection of the letter, what you just told me? | 18:42:35 |
| 5 | MR. TOBEROFF:  What letter?  What letter? | 18:42:38 |
| 6 | THE WITNESS:  Yeah. | 18:42:40 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q.    The letter you got from Mr. Marks that | 18:42:40 |
| 9 | advised you about the approach by Mr. Emanuel and -- | 18:42:43 |
| 10 | A.    I believe that -- | 18:42:46 |
| 11 | MR. TOBEROFF:  Wait a second.  You can | 18:42:47 |
| 12 | answer -- let me slow this down for a second. | 18:42:49 |
| 13 | THE WITNESS:  Of course. | 18:42:52 |
| 14 | MR. TOBEROFF:  You can answer not in such a | 18:42:53 |
| 15 | way that discloses the substance of the letter from | 18:42:55 |
| 16 | Kevin Marks advising you that there had been a | 18:42:58 |
| 17 | $15 million offer. | 18:43:02 |
| 18 | THE WITNESS:  Um-hum. | 18:43:03 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q.    You just gave some testimony -- | 18:43:04 |
| 21 | MR. TOBEROFF:  And make sure when you're | 18:43:05 |
| 22 | answering, you keep your parties straight. | 18:43:06 |
| 23 | THE WITNESS:  Yes. | 18:43:09 |
| 24 | BY MR. PETROCELLI: | |
| 25 | Q.    You just gave some testimony about the | 18:43:09 |

Page 304

| | | |
|---|---|---|
| 1 | $15 million was to be from Ari Emanuel, and then I | 18:43:11 |
| 2 | pressed you about, well, maybe Mr. Toberoff would have | 18:43:15 |
| 3 | had a piece of it through IPW, and you said, well, | 18:43:18 |
| 4 | you're not sure, okay, words to that effect.  When you | 18:43:22 |
| 5 | gave that answer about the $15 million coming from | 18:43:25 |
| 6 | Ari, was that based on your recollection of the letter | 18:43:28 |
| 7 | from Kevin Marks? | 18:43:31 |
| 8 | A.   It -- I believe it was based not only on the | 18:43:34 |
| 9 | letter, but on a subsequent conversation with Kevin | 18:43:36 |
| 10 | Marks and also with Ari Emanuel. | 18:43:41 |
| 11 | Q.   Where they said that Mr. Emanuel was going to | 18:43:44 |
| 12 | fund the $15 million? | 18:43:47 |
| 13 | MR. TOBEROFF:  You can answer only with | 18:43:48 |
| 14 | respect to the conversation with Ari Emanuel. | 18:43:50 |
| 15 | THE WITNESS:  Yeah.  Well, you know, it may | 18:43:52 |
| 16 | not have solely been Ari, but, you know, he was | 18:43:55 |
| 17 | obviously the driving force in it. | 18:43:59 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.   Yes, and again, you had no issue whatsoever | 18:44:02 |
| 20 | if Ari was funding an investment through IPW in which | 18:44:06 |
| 21 | Mr. Toberoff -- IP Worldwide in which Mr. Toberoff had | 18:44:15 |
| 22 | an interest; correct? | 18:44:18 |
| 23 | A.   At that point I wasn't aware of IP Worldwide, | 18:44:19 |
| 24 | if you're talking -- if you're talking about when | 18:44:24 |
| 25 | Kevin Marks first mentioned it. | 18:44:27 |

```
 1        Q.    Later on when you had your meeting with        18:44:28

 2   Mr. Emanuel and again he discussed the $15 million        18:44:31

 3   offer and you said ultimately "No, I want you to be an     18:44:35

 4   agent, not a business partner" --                          18:44:38

 5        A.    Um-hum.                                          18:44:41

 6        Q.    -- had you done a deal for $15 million or       18:44:41

 7   whatever with Mr. Emanuel, you would have had no           18:44:52

 8   objection to doing it with IP Worldwide and                18:44:52

 9   Mr. Toberoff participating; correct?                       18:44:52

10             MR. TOBEROFF:  Incomplete hypothetical.          18:44:54

11             THE WITNESS:  Well, we didn't proceed with       18:44:55

12   it, so we weren't -- you know, it wasn't that we were      18:44:57

13   in favor of it.  We were not in favor of it because we     18:45:00

14   didn't do it.                                              18:45:03

15   BY MR. PETROCELLI:

16        Q.    I understand, but you didn't have some hard     18:45:03

17   and fast rule that in no circumstance could Marc           18:45:06

18   Toberoff participate in the acquisition of any             18:45:10

19   interest that you would sell.                              18:45:12

20             MR. TOBEROFF:  Same objection.                   18:45:13

21   BY MR. PETROCELLI:

22        Q.    Correct?                                        18:45:14

23             THE WITNESS:  What was the objection?            18:45:15

24             MR. TOBEROFF:  It's okay.                        18:45:17

25             MR. PETROCELLI:  He doesn't even remember.       18:45:18
```

LAURA SIEGEL LARSON 7/22/2011

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  I remember.  Incomplete | 18:45:20 |
| 2 | hypothetical. | 18:45:23 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q.  In other words, you understand my question. | 18:45:24 |
| 5 | You had no hard and fast rule that if you were going | 18:45:27 |
| 6 | to sell your interest to IP Worldwide or Mr. Emanuel, | 18:45:29 |
| 7 | that Mr. Toberoff was not to participate economically; | 18:45:33 |
| 8 | correct? | 18:45:36 |
| 9 | A.  It was never discussed. | 18:45:37 |
| 10 | MR. TOBEROFF:  Same objection. | 18:45:39 |
| 11 | BY MR. PETROCELLI: | |
| 12 | Q.  I understand it wasn't discussed, but you | 18:45:40 |
| 13 | didn't have the state of mind that you were going to | 18:45:42 |
| 14 | be adamantly opposed to it; correct? | 18:45:43 |
| 15 | MR. TOBEROFF:  Incomplete hypothetical. | 18:45:46 |
| 16 | THE WITNESS:  I didn't form an opinion. | 18:45:47 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.  Never; right?  One way or the other; correct? | 18:45:49 |
| 19 | A.  Not that I can recall. | 18:45:51 |
| 20 | Q.  One way or the other; correct? | 18:45:52 |
| 21 | A.  Correct. | 18:45:54 |
| 22 | Q.  Okay. | 18:45:55 |
| 23 | A.  I think, if I'm following that. | 18:45:55 |
| 24 | Q.  By the way, when you wrote your stepbrother | 18:46:18 |
| 25 | back, did you straighten him out on things that you | 18:46:21 |

| | |
|---|---|
| 1 | think he had wrong in his letter to you of May 13? | 18:46:24 |
| 2 | A.   I did my best to. | 18:46:27 |
| 3 | Q.   Can you explain to me as best as you can, for | 18:46:29 |
| 4 | example, what you said about the billionaire, the | 18:46:32 |
| 5 | mysterious billionaire? | 18:46:36 |
| 6 | A.   You know, I don't remember how I put it to | 18:46:37 |
| 7 | him, but I, you know, I tried to in as simple a manner | 18:46:39 |
| 8 | as possible explain what he had wrong in this letter. | 18:46:46 |
| 9 | Regarding specifically the billionaire, I really don't | 18:46:51 |
| 10 | recall what I said. | 18:46:54 |
| 11 | Q.   Did you type the letter yourself? | 18:46:55 |
| 12 | A.   Yes, I did. | |
| 13 | Q.   Did your mother help you prepare it? | 18:46:59 |
| 14 | A.   I think she had input. | 18:47:01 |
| 15 | Q.   Now, did you explain to him the situation | 18:47:02 |
| 16 | with the Shusters? | 18:47:05 |
| 17 | A.   Well, I cleared up some of his misconceptions | 18:47:09 |
| 18 | about the Shusters. | 18:47:13 |
| 19 | Q.   How did you clear them up?  In other words, | 18:47:14 |
| 20 | just generally what did you say? | 18:47:16 |
| 21 | A.   Once again, you're asking me to answer | 18:47:19 |
| 22 | something that I really can't recall.  I'm sorry. | 18:47:22 |
| 23 | Q.   When you said you cleared up the Shuster | 18:47:25 |
| 24 | issue for him, did you explain to him that you were | 18:47:27 |
| 25 | aware that Mr. Toberoff was working with the Shusters? | 18:47:29 |

| | | |
|---|---|---|
| 1 | A.    I'm sure I did. | 18:47:33 |
| 2 | Q.    Do you know when you wrote your responsive | 18:47:36 |
| 3 | letter back to this May 13 letter? | 18:47:39 |
| 4 | A.    I don't know exactly. | 18:47:41 |
| 5 | Q.    Did you have Mr. Toberoff assist in any way | 18:47:43 |
| 6 | in the response that you prepared? | 18:47:48 |
| 7 | A.    I believe I had him look at it. | 18:47:51 |
| 8 | Q.    And before you sent it to Mr. -- | 18:47:53 |
| 9 | A.    Yes. | 18:47:55 |
| 10 | Q.    And why did you have him look at it? | 18:47:56 |
| 11 | A.    Well, you know, it was dealing with issues | 18:47:58 |
| 12 | that had to do with legal matters, and I didn't want | 18:48:04 |
| 13 | to misstate something that basically would, you know, | 18:48:07 |
| 14 | come back and bite me in the butt later.  So I just | 18:48:11 |
| 15 | wanted -- wanted to make sure that I was as a civilian | 18:48:15 |
| 16 | expressing myself properly. | 18:48:19 |
| 17 | Q.    And in order for Mr. Toberoff to assist or | 18:48:21 |
| 18 | review the letter that you drafted, you would have | 18:48:27 |
| 19 | sent him Mr. Michael Siegel's May 13 letter so he | 18:48:30 |
| 20 | could have both letters. | 18:48:35 |
| 21 | A.    This letter? | 18:48:36 |
| 22 | Q.    Correct. | 18:48:37 |
| 23 | A.    Probably. | 18:48:37 |
| 24 | Q.    Okay.  And take a look at the Toberoff | 18:48:39 |
| 25 | timeline for a second, please, which is Exhibit 58. | 18:48:42 |

Page 309

| | | |
|---|---|---|
| 1 | A.   I already have that, don't I? | 18:48:45 |
| 2 | Q.   Yes. | 18:48:49 |
| 3 |      MR. PETROCELLI:  Can you fish that out for | 18:48:49 |
| 4 | her, Jason?  Thank you. | 18:48:51 |
| 5 |      THE WITNESS:  Thank you. | 18:48:53 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.   I'd like to direct your attention -- | |
| 8 |      THE WITNESS:  Do I still need this one? | 18:48:54 |
| 9 |      MR. PETROCELLI:  Yeah, leave it there. | 18:48:56 |
| 10 |      THE WITNESS:  Okay.  Thank you. | 18:49:10 |
| 11 |      MR. TOBEROFF:  I can help explain it. | |
| 12 |      MR. KLINE:  Are you reading our notes, Marc? | |
| 13 |      THE WITNESS:  Thank you. | |
| 14 |      MR. TOBEROFF:  No, because I haven't gotten a | 18:49:17 |
| 15 | package -- duplicate packages with your notes. | 18:49:17 |
| 16 |      MR. KLINE:  Oh, no.  Did you read this note? | 18:49:22 |
| 17 |      MR. PETROCELLI:  Okay.  So you have them. | |
| 18 |      MR. KLINE:  Please don't -- | 18:49:24 |
| 19 |      MR. TOBEROFF:  Of course not.  I'm making a | 18:49:25 |
| 20 | joke.  Lighten up. | 18:49:28 |
| 21 | BY MR. PETROCELLI: | |
| 22 | Q.   So you have the Superman -- you have the Marc | 18:49:29 |
| 23 | Toberoff timeline, Exhibit 58, in front of you? | 18:49:32 |
| 24 | A.   Yes. | 18:49:33 |
| 25 | Q.   And you also have Exhibit 30, the Michael | 18:49:33 |

EXHIBIT D
325

LAURA SIEGEL LARSON - 6/22/2011

| | | |
|---|---|---|
| 1 | Siegel letter to you dated May 13, 2003? | 18:49:37 |
| 2 | A.   Yes, I do. | 18:49:39 |
| 3 | Q.   Now, go to the end of the fourth page as | 18:49:40 |
| 4 | Q 0004 and you'll see a reference to a July 5, 2003 -- | 18:49:46 |
| 5 | first of all, go to the prior page of this Exhibit 58. | 18:50:02 |
| 6 | A.   Okay. | 18:50:06 |
| 7 | Q.   And you'll see that the author of this | 18:50:06 |
| 8 | document is identifying Michael Siegel's May 13, 2003, | 18:50:09 |
| 9 | letter, the one that you have in front of you as | 18:50:15 |
| 10 | Exhibit 30.  Do you see that? | 18:50:18 |
| 11 | A.   I do. | 18:50:19 |
| 12 | Q.   And then he is -- he or she is purporting to | 18:50:19 |
| 13 | state some of the contents of that letter.  Do you see | 18:50:23 |
| 14 | that? | 18:50:26 |
| 15 | A.   I see a paragraph about it. | 18:50:26 |
| 16 | Q.   Okay.  And now dropping down to the end of | 18:50:29 |
| 17 | the next page with the Bates label Q 0004, the | 18:50:32 |
| 18 | reference to the July 5, 2003, date, do you see that? | 18:50:43 |
| 19 | A.   Yes, I do. | 18:50:43 |
| 20 | Q.   It says "Laura Siegel reveals her ignorance | 18:50:43 |
| 21 | of Toberoff's dubious actions in her return letter | 18:50:52 |
| 22 | back to Michael."  Putting aside the characterization | 18:50:52 |
| 23 | of your ignorance, does July 5, 2003, sound right to | 18:50:54 |
| 24 | you as around the time that you responded to the May | 18:50:58 |
| 25 | 13, 2003, letter? | 18:51:01 |

| | | |
|---|---|---|
| 1 | A.    It could have been. | 18:51:04 |
| 2 | Q.    Okay.  Is it fair to say that your letter | 18:51:11 |
| 3 | back to Mr. Michael Siegel did not agree with any of | 18:51:16 |
| 4 | his criticisms of Mr. Toberoff's actions and | 18:51:24 |
| 5 | Mr. Toberoff generally? | 18:51:29 |
| 6 | A.    Well, whoever stole this document, you know, | 18:51:32 |
| 7 | is doing his version of what he's reading into | 18:51:36 |
| 8 | whatever the letter said. | 18:51:40 |
| 9 | Q.    You're not following my question. | 18:51:42 |
| 10 | A.    Well, I haven't read the letter in a long | 18:51:44 |
| 11 | time. | 18:51:51 |
| 12 | Q.    My question to you is when you wrote back to | 18:51:51 |
| 13 | Michael -- | 18:51:54 |
| 14 | A.    Yes. | 18:51:54 |
| 15 | Q.    -- in response to his May 13, 2003, letter, | 18:51:56 |
| 16 | is it fair to say that you expressed no agreement with | 18:51:59 |
| 17 | any of his criticisms of Mr. Toberoff? | 18:52:04 |
| 18 | A.    I would say that's probably safe to say. | 18:52:08 |
| 19 | Q.    Did you tell Michael Siegel in your response | 18:52:19 |
| 20 | letter back that Mr. Toberoff does not have a | 18:52:26 |
| 21 | production company? | 18:52:31 |
| 22 | A.    Yes, I believe I did. | 18:52:32 |
| 23 | Q.    And you will see on the next page of this | 18:52:35 |
| 24 | document, Exhibit 58, in the description of the entry | 18:52:39 |
| 25 | July 5, 2003 -- | 18:52:45 |

EXHIBIT D
327

| | | |
|---|---|---|
| 1 | A.   I'm sorry.  You're saying continuation on the | 18:52:47 |
| 2 | top of the page? | 18:52:50 |
| 3 | Q.   Yes.  It says "Also, in the letter back to | 18:52:51 |
| 4 | Michael Siegel, that MT helped Laura Siegel draft -- | 18:52:53 |
| 5 | in response to Michael's accusations of Toberoff, | 18:52:57 |
| 6 | Laura clearly states that MT does not have a | 18:53:00 |
| 7 | production company."  And that was your belief at the | 18:53:06 |
| 8 | time; correct? | 18:53:08 |
| 9 | A.   Correct. | 18:53:10 |
| 10 | Q.   And it goes on to say that, in parentheses: | 18:53:11 |
| 11 | "(This is false -- Marc Toberoff's | 18:53:17 |
| 12 | IPW has been in existence, partly | 18:53:19 |
| 13 | funded by Ari Emanuel, since at | 18:53:21 |
| 14 | least 2002).  In the draft of the | 18:53:21 |
| 15 | letter, MT crossed out the statement | 18:53:26 |
| 16 | that he does not have a production | 18:53:27 |
| 17 | company, and writes," quote, "'MT | 18:53:29 |
| 18 | has not plans to produce a SUPERMAN | 18:53:33 |
| 19 | movie, nor is this feasible given | 18:53:36 |
| 20 | the division of ownership of the | 18:53:38 |
| 21 | rights,'" end of quotes. | 18:53:41 |
| 22 | Now, does that -- is that consistent with | 18:53:43 |
| 23 | your recollection that your statement that | 18:53:47 |
| 24 | Mr. Toberoff did not have a production company was | 18:53:51 |
| 25 | crossed out by Mr. Toberoff in the final draft and | 18:53:54 |

| | | |
|---|---|---|
| 1 | replaced with the quoted language that I just read? | 18:53:57 |
| 2 | A.    It could have been. | 18:53:59 |
| 3 | Q.    And when Mr. Toberoff made his changes to the | 18:54:03 |
| 4 | letter and returned it to you, did you review it and | 18:54:07 |
| 5 | sign it before you sent it out as your response letter | 18:54:11 |
| 6 | back to Michael? | 18:54:15 |
| 7 | A.    Well, he made suggestions of changes in the | 18:54:16 |
| 8 | wording of certain areas, and, you know, I retyped the | 18:54:22 |
| 9 | letter, accepted some of the things that he said and | 18:54:28 |
| 10 | didn't use some other suggestions that he made. | 18:54:30 |
| 11 | Q.    How did he convey his suggestions to you? | 18:54:33 |
| 12 | A.    He wrote it on -- he wrote it on this | 18:54:36 |
| 13 | letter -- no, not this letter.  He wrote it on that | 18:54:39 |
| 14 | letter that's being discussed here and faxed it back | 18:54:43 |
| 15 | to me. | 18:54:46 |
| 16 | Q.    Okay.  So you did engage in faxed | 18:54:47 |
| 17 | communication with Mr. Toberoff from time to time. | 18:54:50 |
| 18 | A.    Yes. | 18:54:51 |
| 19 | Q.    Okay.  Including with respect to this very | 18:54:53 |
| 20 | correspondence that we're discussing. | 18:54:55 |
| 21 | A.    I believe so. | 18:54:56 |
| 22 | Q.    Okay. | 18:54:58 |
| 23 | Now, did you show him the final draft before | 18:54:59 |
| 24 | you sent it out? | 18:55:03 |
| 25 | A.    I believe I did. | 18:55:05 |

| | | |
|---|---|---|
| 1 | Q.   And which of the changes did you reject? | 18:55:07 |
| 2 | A.   I don't remember.  I just remember the | 18:55:16 |
| 3 | process, but I don't remember the contents. | 18:55:18 |
| 4 | Q.   Now, by the time you received this letter, | 18:55:37 |
| 5 | Mr. Emanuel was -- | 18:55:43 |
| 6 | A.   I'm sorry.  You're talking about the May 13 | 18:55:44 |
| 7 | letter? | 18:55:47 |
| 8 | Q.   Thank you. | 18:55:47 |
| 9 | By the time you received the May 13, 2003, | 18:55:48 |
| 10 | letter, Exhibit 30, and then responded with your | 18:55:50 |
| 11 | letter that you've been describing, during that period | 18:55:53 |
| 12 | of time, that's when you knew that Mr. Emanuel was | 18:55:58 |
| 13 | secretly attempting to purchase Michael Siegel's | 18:56:07 |
| 14 | interest; correct? | 18:56:09 |
| 15 | MR. TOBEROFF:  Misstates the record. | 18:56:11 |
| 16 | THE WITNESS:  I -- you know, I wouldn't use | 18:56:13 |
| 17 | the word "secretly," but I believe an offer -- an | 18:56:16 |
| 18 | offer may have been made during that period. | 18:56:20 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q.   You said you wouldn't use the word | 18:56:21 |
| 21 | "secretly," but you knew that Mr. Michael Siegel did | 18:56:24 |
| 22 | not know that it was Mr. Emanuel who was the | 18:56:26 |
| 23 | prospective purchaser.  We've discussed that already; | 18:56:29 |
| 24 | correct? | 18:56:31 |
| 25 | A.   Yes, we did. | 18:56:31 |

| | | |
|---|---|---|
| 1 | Q.   And you did not tell Michael Siegel in your | 18:56:32 |
| 2 | response letter back that Mr. Emanuel was indeed the | 18:56:39 |
| 3 | very person with your full knowledge and blessing who | 18:56:46 |
| 4 | was attempting to acquire his interest. | 18:56:48 |
| 5 | MR. TOBEROFF:  Asked and answered. | 18:56:51 |
| 6 | THE WITNESS:  No, I did not mention that. | 18:56:52 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q.   And your letter back to Mr. Michael Siegel | 18:56:56 |
| 9 | does in fact mention Mr. Emanuel; correct? | 18:56:59 |
| 10 | A.   I'm sorry.  Does or does not? | 18:57:01 |
| 11 | Q.   Does. | 18:57:03 |
| 12 | A.   Does mention Mr. Emanuel? | 18:57:05 |
| 13 | Q.   Yes. | 18:57:07 |
| 14 | A.   I don't -- I don't recall. | 18:57:07 |
| 15 | Q.   Have you given any consideration to the idea | 18:57:16 |
| 16 | that is being stated in these documents that | 18:57:27 |
| 17 | Mr. Toberoff is going to end up with the lion's share | 18:57:30 |
| 18 | of the money with respect to any disposition of the | 18:57:32 |
| 19 | termination interests of the -- stemming from Superman | 18:57:39 |
| 20 | both from the Siegel side and the Shuster side? | 18:57:42 |
| 21 | A.   Well, I disagree with your characterization | 18:57:44 |
| 22 | of lion's share. | 18:57:49 |
| 23 | Q.   Well, let's -- | 18:57:52 |
| 24 | A.   I mean he has a contingency agreement with me | 18:57:52 |
| 25 | and with my mom, and he had a contingency agreement | 18:57:56 |

| | | |
|---|---|---|
| 1 | with the Shusters. | 18:57:59 |
| 2 | Q.   So when you do the math, though, as was | 18:58:00 |
| 3 | pointed out in some of these documents, he ends up | 18:58:03 |
| 4 | with the biggest percentage, bigger than what you | 18:58:05 |
| 5 | would receive and bigger than what the Shuster side | 18:58:09 |
| 6 | would receive; right? | 18:58:13 |
| 7 | A.   He was being compensated for at this point | 18:58:14 |
| 8 | nearly ten years of work. | 18:58:16 |
| 9 | Q.   But when you made these deals, there wasn't | 18:58:18 |
| 10 | ten years of work; correct? | 18:58:20 |
| 11 | A.   No, but we had no idea how long or how much | 18:58:22 |
| 12 | or how expensive it was all going to be. | 18:58:24 |
| 13 | Q.   So you understood that at the end of the day | 18:58:26 |
| 14 | Mr. Toberoff might end up with 45 percent or so of the | 18:58:30 |
| 15 | total proceeds with you and your mother's side, | 18:58:36 |
| 16 | Michael Siegel's side 27 and a half percent and the | 18:58:42 |
| 17 | Shuster side 25 percent; correct? | 18:58:46 |
| 18 | A.   You know, I'm sorry, but you're throwing | 18:58:48 |
| 19 | around percentages, and that's not correct. | 18:58:51 |
| 20 | Q.   But you have fully appreciated that at the | 18:58:52 |
| 21 | end of the day Mr. Toberoff would have the biggest | 18:58:55 |
| 22 | stake in the proceeds. | 18:59:01 |
| 23 | A.   My only concerns -- excuse me.  Were you | 18:59:03 |
| 24 | finished?  I didn't want to interrupt you. | 18:59:06 |
| 25 | Q.   I want to make sure you understand what I'm | 18:59:07 |

| | | |
|---|---|---|
| 1 | asking you, that you have understood and understand to | 18:59:10 |
| 2 | this day that given his agreements with the Shuster | 18:59:15 |
| 3 | family, given his agreements with you and your mother, | 18:59:19 |
| 4 | given the fact that you succeeded to your half | 18:59:23 |
| 5 | brother's rights, that Mr. Toberoff's aggregate share | 18:59:28 |
| 6 | in any proceeds from the disposition of all these | 18:59:37 |
| 7 | Shuster and Siegel interests is greater than your | 18:59:40 |
| 8 | interest and greater than the Shuster interest; | 18:59:44 |
| 9 | correct? | 18:59:46 |
| 10 | A.   I was only concerned with my interest.  I did | 18:59:46 |
| 11 | not even know what his percentage was with the | 18:59:50 |
| 12 | Shusters. | 18:59:53 |
| 13 | Q.   But you certainly became aware of it when you | 18:59:53 |
| 14 | read it in the timeline document; correct? | 18:59:56 |
| 15 | A.   Well, I didn't get this timeline until | 18:59:59 |
| 16 | much -- a long time afterward, and, you know -- | 19:00:03 |
| 17 | Q.   Well, when you saw -- take a look at the | 19:00:06 |
| 18 | timeline.  That's Exhibit 58 -- bear with me.  I'm | 19:00:09 |
| 19 | looking for -- | 19:00:37 |
| 20 | Here it is. | 19:00:52 |
| 21 | When you were meeting with David Michaels, by | 19:01:02 |
| 22 | the way, did he run through these different numbers in | 19:01:04 |
| 23 | the way that I just did in describing to you that | 19:01:08 |
| 24 | Mr. Toberoff would end up with the biggest share? | 19:01:10 |
| 25 | A.   He ran some numbers by us, but, you know, he | 19:01:14 |

| | | |
|---|---|---|
| 1 | offered no proof. | 19:01:17 |
| 2 | Q.   Well, you knew what your agreements were, and | 19:01:20 |
| 3 | he was aware of them as well. | 19:01:22 |
| 4 | A.   He was actually mischaracterizing to us what | 19:01:24 |
| 5 | our agreement was. | 19:01:26 |
| 6 | Q.   You mean the percentages? | 19:01:27 |
| 7 | A.   Correct. | 19:01:28 |
| 8 | Q.   In what way did he mischaracterize it? | 19:01:29 |
| 9 | A.   He was inflating it. | 19:01:32 |
| 10 | Q.   It was 40 percent; right? | 19:01:33 |
| 11 | A.   It was 40 percent, but he was claiming | 19:01:35 |
| 12 | something much larger than that. | 19:01:37 |
| 13 | Q.   He was claiming an additional 5 or 10 percent | 19:01:39 |
| 14 | that you thought no longer applied? | 19:01:42 |
| 15 | A.   Well, that I knew no longer applied. | 19:01:44 |
| 16 | Q.   Okay. | 19:01:55 |
| 17 | Can you turn to page 6 of Exhibit 58. | 19:02:00 |
| 18 | A.   Yeah. | 19:02:15 |
| 19 | Q.   First of all, on page 1 it states: | 19:02:21 |
| 20 | "As it stands right now, the | 19:02:25 |
| 21 | single person who would stand to | 19:02:27 |
| 22 | gain the MOST in a settlement with | 19:02:28 |
| 23 | Time Warner regarding the ongoing | 19:02:30 |
| 24 | SUPERMAN legal dispute would not be | 19:02:33 |
| 25 | the heirs themselves, but Marc | 19:02:34 |

EXHIBIT D
334

| | | |
|---|---|---|
| 1 | Toberoff." | 19:02:36 |
| 2 | Now, when you read that, did you agree with | 19:02:37 |
| 3 | that statement? | 19:02:39 |
| 4 | A. No. | 19:02:40 |
| 5 | Q. But it is factually true that in terms of the | 19:02:41 |
| 6 | division of the proceeds, he would receive the largest | 19:02:43 |
| 7 | share; correct? | 19:02:47 |
| 8 | A. What I objected to was the -- was the way | 19:02:48 |
| 9 | this was -- the way that this was presented. | 19:02:51 |
| 10 | Q. Putting this aside, though, in terms of the | 19:02:54 |
| 11 | mathematical division of the shares, the Toberoff | 19:02:56 |
| 12 | share is the biggest share. It's 45 or 40 -- in | 19:03:01 |
| 13 | excess of 45 percent; correct? | 19:03:05 |
| 14 | A. Well, it's not bigger than my share now. | 19:03:08 |
| 15 | Q. Why is that? | 19:03:10 |
| 16 | A. Well, I inherited my mother's, I inherited | 19:03:12 |
| 17 | Michael's, and I have my own. | 19:03:16 |
| 18 | Q. But if you take all of that, Mr. Toberoff | 19:03:17 |
| 19 | gets 40 percent of that; right? | 19:03:21 |
| 20 | A. He gets 40 percent. I get 60 percent. | 19:03:22 |
| 21 | Q. And then he gets 40 percent of your piece, | 19:03:25 |
| 22 | which is half, with the Shusters owning the other | 19:03:29 |
| 23 | half; correct? | 19:03:33 |
| 24 | A. You're not saying that he gets half of mine. | 19:03:33 |
| 25 | You're saying that my share of the overall Superman | 19:03:36 |

LAURA SIEGEL LARSON 6/22/2011

Page 320

| | | |
|---|---|---|
| 1 | copyright is 50 percent? | 19:03:39 |
| 2 | Q.   Correct.  And he gets 40 percent of your 50 | 19:03:41 |
| 3 | percent; correct? | 19:03:47 |
| 4 | A.   Correct. | 19:03:47 |
| 5 | Q.   And he gets 50 percent of the Shuster 50 | 19:03:47 |
| 6 | percent; right? | 19:03:49 |
| 7 | A.   If he does. | 19:03:49 |
| 8 | Q.   Well, you saw that referenced in the timeline | 19:03:53 |
| 9 | document; right? | 19:03:54 |
| 10 | A.   Yeah, but there are errors in this timeline, | 19:03:55 |
| 11 | so I don't know if that's correct. | 19:03:58 |
| 12 | Q.   You don't know that it's incorrect, do you? | 19:03:59 |
| 13 | A.   No. | 19:04:01 |
| 14 | Q.   The bottom line is you are aware that there's | 19:04:01 |
| 15 | a possibility that he could end up as the biggest | 19:04:04 |
| 16 | financial recipient of proceeds among you and the | 19:04:07 |
| 17 | Shuster family and him; correct? | 19:04:11 |
| 18 | A.   Look -- | 19:04:13 |
| 19 | Q.   Are you aware of that? | 19:04:14 |
| 20 | A.   It may be possible.  I'm not doing the math | 19:04:16 |
| 21 | today. | 19:04:28 |
| 22 | Q.   Have you ever calculated how much you would | 19:04:29 |
| 23 | have received today had you accepted the proposal that | 19:04:33 |
| 24 | DC had made back in 2001, 2002? | 19:04:45 |
| 25 | A.   At the time it was offered -- | 19:04:49 |

EXHIBIT D
336

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Again, objection.  Compound. | 19:04:50 |
| 2 | Which are you referring to, the February, 2002, draft | 19:04:53 |
| 3 | or the Kevin Marks letter in October of 2001? | 19:04:56 |
| 4 | MR. PETROCELLI:  Either one. | 19:05:04 |
| 5 | Q.  Have you ever done the -- | 19:05:05 |
| 6 | MR. TOBEROFF:  Compound. | 19:05:06 |
| 7 | BY MR. PETROCELLI: | |
| 8 | Q.  Have you ever done the calculation of what | 19:05:07 |
| 9 | dollars would have been received by you and your | 19:05:10 |
| 10 | mother? | 19:05:13 |
| 11 | A.  Well, you're talking about two different | 19:05:14 |
| 12 | calculations. | 19:05:17 |
| 13 | Q.  Have you done the calculations for both of | 19:05:17 |
| 14 | them? | 19:05:19 |
| 15 | A.  You say ever.  At one time when it was | 19:05:19 |
| 16 | initially offered, you know, we did a projection on | 19:05:22 |
| 17 | it.  I haven't done it recently. | 19:05:27 |
| 18 | Q.  Do you have any -- | 19:05:31 |
| 19 | A.  We just knew a lot of money had already been | 19:05:32 |
| 20 | owed to us, which was the basis of the accounting | 19:05:35 |
| 21 | claim. | 19:05:41 |
| 22 | Q.  How is it -- | 19:05:41 |
| 23 | A.  That lawsuit. | 19:05:41 |
| 24 | Q.  How is it that you think that you can | 19:05:42 |
| 25 | financially benefit from now having, like you said, a | 19:05:45 |

EXHIBIT D
337

| | | |
|---|---|---|
| 1 | hundred percent of 50 percent of the copyright subject | 19:05:50 |
| 2 | to Mr. Toberoff's share?  How is it that you can | 19:05:55 |
| 3 | financially benefit from the termination interests | 19:05:58 |
| 4 | that you believe you have recaptured and that you -- | 19:06:00 |
| 5 | that you believe you have recaptured? | 19:06:04 |
| 6 |      MR. TOBEROFF:  Objection.  Vague and | 19:06:06 |
| 7 | ambiguous. | 19:06:08 |
| 8 | BY MR. PETROCELLI: | |
| 9 |      Q.    You can answer. | 19:06:09 |
| 10 |      A.    It's so broad, I don't understand. | 19:06:10 |
| 11 |      Q.    Well, what are the ways in which you believe | 19:06:12 |
| 12 | that you can turn your termination interest into | 19:06:13 |
| 13 | money? | 19:06:16 |
| 14 |      MR. TOBEROFF:  I instruct you not to answer | 19:06:16 |
| 15 | to the extent your answer reveals communications with | 19:06:18 |
| 16 | your attorney, either with me or with your former | 19:06:27 |
| 17 | attorney, Kevin Marks. | 19:06:30 |
| 18 | BY MR. PETROCELLI: | |
| 19 |      Q.    I don't believe you need to rely on | 19:06:32 |
| 20 | attorney-client discussions to answer this question. | 19:06:36 |
| 21 | I'm asking you, an extremely intelligent person who | 19:06:38 |
| 22 | has been involved with this for many years. | 19:06:41 |
| 23 |      MR. TOBEROFF:  Excuse me. | 19:06:44 |
| 24 | BY MR. PETROCELLI: | |
| 25 |      Q.    In what ways have you considered that you | 19:06:45 |

EXHIBIT D
338

| | | |
|---|---|---|
| 1 | might be able to turn your termination interest, | 19:06:47 |
| 2 | whatever it is and whenever it's final, into money? | 19:06:51 |
| 3 | MR. TOBEROFF:  I instruct you not to answer | 19:06:56 |
| 4 | to the extent your answer reveals the contents of | 19:06:59 |
| 5 | attorney-client communications.  If you can answer | 19:07:08 |
| 6 | without divulging the substance of attorney-client | 19:07:14 |
| 7 | communications, then you can only answer to that | 19:07:18 |
| 8 | extent. | 19:07:20 |
| 9 | THE WITNESS:  Yeah. | 19:07:21 |
| 10 | My answer is that's the subject of | 19:07:21 |
| 11 | litigation. | 19:07:25 |
| 12 | BY MR. PETROCELLI: | |
| 13 | Q.   What's the subject of litigation? | 19:07:26 |
| 14 | A.   You know, what -- what my rights were and | 19:07:28 |
| 15 | potentially what the value of the rights are. | 19:07:32 |
| 16 | Q.   But you understand that -- you're talking | 19:07:33 |
| 17 | about the lawsuit that you filed on your termination | 19:07:35 |
| 18 | interest? | 19:07:37 |
| 19 | A.   Yes. | 19:07:38 |
| 20 | Q.   Okay.  Now, you understand, though, that as a | 19:07:38 |
| 21 | result of that lawsuit, and let's say you're | 19:07:41 |
| 22 | completely successful in every respect after all | 19:07:45 |
| 23 | appeals and so forth, the only compensation you would | 19:07:48 |
| 24 | receive as a result of the lawsuit is an accounting | 19:07:51 |
| 25 | from 1999 to 2013; correct? | 19:07:55 |

LAURA SIEGEL LARSON - 12/22/2011

Page 324

| | | |
|---|---|---|
| 1 | A.    Not necessarily. | 19:07:58 |
| 2 | Q.    What other compensation do you believe in | 19:07:59 |
| 3 | terms of money that would -- can be awarded to you by | 19:08:02 |
| 4 | way of a lawsuit? | 19:08:07 |
| 5 | A.    I believe it depends on the court ruling. | 19:08:08 |
| 6 | Q.    How so? | 19:08:10 |
| 7 | MR. TOBEROFF:  I again -- | 19:08:12 |
| 8 | BY MR. PETROCELLI: | |
| 9 | Q.    How so do you -- | 19:08:14 |
| 10 | MR. TOBEROFF:  If you have any understanding | 19:08:15 |
| 11 | of those things that are independent of the advice of | 19:08:16 |
| 12 | counsel, you can answer.  If you don't, I instruct you | 19:08:19 |
| 13 | not to answer. | 19:08:21 |
| 14 | BY MR. PETROCELLI: | |
| 15 | Q.    I'm not asking about your legal advice.  I'm | 19:08:22 |
| 16 | asking about you as a plaintiff in that -- | 19:08:24 |
| 17 | MR. TOBEROFF:  That's not the instruction. | 19:08:25 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.    -- in that, and you can disregard whatever | 19:08:26 |
| 20 | Mr. Toberoff and you have discussed.  But do you have | 19:08:28 |
| 21 | an understanding that you have a claim for money in | 19:08:31 |
| 22 | that case other than the accounting claim? | 19:08:36 |
| 23 | A.    Well, I believe that there are numerous | 19:08:42 |
| 24 | appeals.  There are numerous issues that are still | 19:08:46 |
| 25 | going to be examined in a court of law that could | 19:08:48 |

EXHIBIT D
340

| | | |
|---|---|---|
| 1 | directly affect, you know, my income going forward. | 19:08:52 |
| 2 | Q.   Well, is it your -- but isn't your | 19:08:58 |
| 3 | understanding that the only way -- the only possible | 19:09:02 |
| 4 | money that you can recover from your lawsuit is | 19:09:08 |
| 5 | whatever the court finally determines is the amount | 19:09:13 |
| 6 | that DC was required to account and pay to you for the | 19:09:17 |
| 7 | years 1999 through 2013 for the works in which the | 19:09:22 |
| 8 | court finds you had an interest? | 19:09:28 |
| 9 | MR. TOBEROFF:  Again, my instruction is if | 19:09:30 |
| 10 | you can answer that question on your own and not based | 19:09:32 |
| 11 | on any advice or discussions with counsel, you can | 19:09:35 |
| 12 | answer the question.  If your answer is based on your | 19:09:38 |
| 13 | discussions with counsel, then I instruct you not to | 19:09:41 |
| 14 | answer. | 19:09:46 |
| 15 | THE WITNESS:  Going beyond the lawsuit, there | 19:09:48 |
| 16 | are always possibilities. | 19:09:52 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.   I was just focused on the lawsuit, that the | 19:09:52 |
| 19 | only -- that you have an understanding that the only | 19:09:54 |
| 20 | money that you can recover from your lawsuit is the | 19:09:56 |
| 21 | accounting money for the period 1999 to 2013.  Are you | 19:10:00 |
| 22 | aware of that? | 19:10:05 |
| 23 | A.   Yes. | 19:10:06 |
| 24 | Q.   Okay.  And in terms of getting any other | 19:10:07 |
| 25 | money in respect of your termination interest, you | 19:10:13 |

LAURA SIEGEL LARSON 3/22/2011

| | | |
|---|---|---|
| 1 | understand that that would require some kind of | 19:10:16 |
| 2 | business transaction? | 19:10:17 |
| 3 | A.    Yes, that's correct. | 19:10:18 |
| 4 | Q.    Okay.  A business transaction in which you | 19:10:19 |
| 5 | would partner up with someone or license someone or | 19:10:22 |
| 6 | sell your interest; correct? | 19:10:26 |
| 7 | A.    Correct. | 19:10:27 |
| 8 | Q.    When do you believe that you will be able to | 19:10:33 |
| 9 | do so? | 19:10:35 |
| 10 | MR. TOBEROFF:  I'm instructing you not to | 19:10:37 |
| 11 | answer unless you can answer independent of any advice | 19:10:39 |
| 12 | of counsel, if you can answer.  If your answer | 19:10:43 |
| 13 | implicates advice of counsel, I instruct you not to | 19:10:48 |
| 14 | answer the question. | 19:10:50 |
| 15 | THE WITNESS:  Yeah, I mean -- | 19:10:51 |
| 16 | MR. TOBEROFF:  You don't -- do you understand | 19:10:53 |
| 17 | the instruction? | 19:10:55 |
| 18 | THE WITNESS:  I do. | 19:10:55 |
| 19 | MR. TOBEROFF:  Okay. | 19:10:56 |
| 20 | THE WITNESS:  I do. | 19:10:57 |
| 21 | I'm not able to say anything, you know, | 19:10:57 |
| 22 | specific because it all involves discussions with my | 19:11:01 |
| 23 | attorney regarding legal matters. | 19:11:06 |
| 24 | MR. PETROCELLI:  Well, that doesn't necess- | 19:11:08 |
| 25 | arily mean you can't answer the question.  Let me -- | 19:11:09 |

LAURA SIEGEL LARSON 3/22/2011

| | | |
|---|---|---|
| 1 | THE WITNESS:  In my mind it does. | 19:11:12 |
| 2 | MR. PETROCELLI:  Let me try again. | 19:11:13 |
| 3 | Q.  Do you have an understanding -- | 19:11:15 |
| 4 | MR. TOBEROFF:  It does pursuant to my | 19:11:17 |
| 5 | instruction. | 19:11:21 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.  Do you have an understanding that -- | 19:11:21 |
| 8 | withdrawn. | 19:11:31 |
| 9 | Do you have a plan or intent to enter into a | 19:11:31 |
| 10 | business transaction regarding your Superman rights? | 19:11:36 |
| 11 | A.  I believe I have very valuable rights and | 19:11:39 |
| 12 | that at some point I will be able to profit from them. | 19:11:43 |
| 13 | Q.  Do -- what are the ways in which you believe | 19:11:48 |
| 14 | you can profit from them? | 19:11:50 |
| 15 | MR. TOBEROFF:  Same instruction. | 19:11:52 |
| 16 | THE WITNESS:  That's something that I really | 19:11:55 |
| 17 | can't respond to. | 19:11:56 |
| 18 | BY MR. PETROCELLI: | |
| 19 | Q.  Well, you just said "I believe they're | 19:11:58 |
| 20 | valuable."  Why do you believe they're valuable? | 19:12:00 |
| 21 | A.  Because it's Superman. | 19:12:02 |
| 22 | Q.  Do you believe that you'll have the ability | 19:12:04 |
| 23 | to sell them? | 19:12:06 |
| 24 | MR. TOBEROFF:  Same instruction.  Same | 19:12:08 |
| 25 | instruction. | 19:12:11 |

| | | |
|---|---|---|
| 1 | THE WITNESS: I can't respond to that. | 19:12:11 |
| 2 | BY MR. PETROCELLI: | |
| 3 | Q. Have you ever attempted to find out, other | 19:12:15 |
| 4 | than through talking to Marc Toberoff, what kind of | 19:12:19 |
| 5 | value there is in these Superman rights for which you | 19:12:23 |
| 6 | have been involved for 15 years or so? | 19:12:26 |
| 7 | MR. TOBEROFF: Same instruction, and that | 19:12:29 |
| 8 | instruction doesn't just implicate talking to Marc | 19:12:31 |
| 9 | Toberoff. It implicates things that Marc Toberoff has | 19:12:34 |
| 10 | done on your behalf and my work product. | 19:12:37 |
| 11 | THE WITNESS: It's all intertwined with | 19:12:40 |
| 12 | matters that are of a legal nature, so I can't answer | 19:12:44 |
| 13 | that question. | 19:12:47 |
| 14 | BY MR. PETROCELLI: | |
| 15 | Q. Have you identified in your own mind or | 19:12:49 |
| 16 | thinking any prospective purchasers of your rights? | 19:12:51 |
| 17 | MR. TOBEROFF: Same instruction. | 19:12:56 |
| 18 | THE WITNESS: No one specific. | 19:12:58 |
| 19 | BY MR. PETROCELLI: | |
| 20 | Q. Have you given some thought to how much you | 19:13:00 |
| 21 | would sell your rights for? | 19:13:06 |
| 22 | MR. TOBEROFF: Same instruction. | 19:13:09 |
| 23 | THE WITNESS: I don't have a clear number. | 19:13:11 |
| 24 | BY MR. PETROCELLI: | |
| 25 | Q. A range. | 19:13:14 |

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Same instruction. | 19:13:17 |
| 2 | THE WITNESS:  Sitting here today, no. | 19:13:18 |
| 3 | MR. TOBEROFF:  Not -- and if you did, you | 19:13:21 |
| 4 | could only disclose that to the extent that it's not | 19:13:24 |
| 5 | the product of your conversations with your attorney | 19:13:26 |
| 6 | or the analysis done by your attorneys on your behalf. | 19:13:29 |
| 7 | You understand that?  You understand that? | 19:13:32 |
| 8 | THE WITNESS:  Yes, I do.  That goes without | 19:13:33 |
| 9 | saying. | 19:13:35 |
| 10 | BY MR. PETROCELLI: | |
| 11 | Q.   Do you have a belief that DC Comics or Warner | 19:13:35 |
| 12 | Bros. is a potential purchaser of your rights? | 19:13:43 |
| 13 | A.   Of course. | 19:13:48 |
| 14 | Q.   Why do you believe that? | 19:13:49 |
| 15 | A.   Well, they're one of many studios, and I | 19:13:51 |
| 16 | believe that they would have -- it would be in their | 19:13:55 |
| 17 | best interest to try to, you know, make a reasonable | 19:13:58 |
| 18 | deal with me.  When I say reasonable, I mean, you | 19:14:02 |
| 19 | know, something that would be completely acceptable to | 19:14:06 |
| 20 | me. | 19:14:09 |
| 21 | Q.   Do you know what that is? | 19:14:10 |
| 22 | A.   Sitting here -- | 19:14:12 |
| 23 | MR. TOBEROFF:  Same instruction. | 19:14:13 |
| 24 | THE WITNESS:  Sitting here today, I cannot | 19:14:14 |
| 25 | give you an answer to that. | 19:14:15 |

|    |                                                            |          |
|----|------------------------------------------------------------|----------|
| 1  | BY MR. PETROCELLI:                                          | 19:14:19 |
| 2  | Q.    Do you believe that because the Shusters have         | 19:14:20 |
| 3  | asserted that their termination interest becomes            | 19:14:26 |
| 4  | effective in 2013, that that will somehow enhance the       | 19:14:30 |
| 5  | value of your Superman rights?                              | 19:14:36 |
| 6  | A.    Yes.                                                  | 19:14:39 |
| 7  | MR. TOBEROFF:  Same instruction.  You can                   | 19:14:40 |
| 8  | only answer that if you formed a belief as to that          | 19:14:41 |
| 9  | independent of your advice of counsel.                      | 19:14:44 |
| 10 | THE WITNESS:  Yes, I do.                                    | 19:14:46 |
| 11 | BY MR. PETROCELLI:                                          |          |
| 12 | Q.    Why do you believe that?                              | 19:14:49 |
| 13 | A.    Well --                                               | 19:14:50 |
| 14 | MR. TOBEROFF:  I -- if you want -- don't                    | 19:14:53 |
| 15 | venture into this territory unless your answer to his       | 19:14:56 |
| 16 | question is independent of any advice of counsel, and       | 19:14:59 |
| 17 | if you can't separate the two, then I instruct you not      | 19:15:02 |
| 18 | to answer.                                                  | 19:15:04 |
| 19 | THE WITNESS:  Just very simply, I think that                | 19:15:06 |
| 20 | a whole is always more valuable than part, than a           | 19:15:11 |
| 21 | part.                                                       | 19:15:14 |
| 22 | BY MR. PETROCELLI:                                          |          |
| 23 | Q.    Do you believe that between the Shuster               | 19:15:15 |
| 24 | interest if and when it were to become effective and        | 19:15:19 |
| 25 | the interests that you own, that that is the entirety       | 19:15:22 |

| | | |
|---|---|---|
| 1 | of the Superman interest? | 19:15:26 |
| 2 | A.    I'm sorry? | 19:15:28 |
| 3 | Q.    Do you believe that the Shuster interest and | 19:15:29 |
| 4 | the Siegel interest -- you said a whole is better than | 19:15:31 |
| 5 | a part or words to that effect.   Do you believe that | 19:15:34 |
| 6 | the Siegel termination interest and the Shuster | 19:15:37 |
| 7 | termination interest constitute 100 percent of the | 19:15:41 |
| 8 | interest in Superman? | 19:15:43 |
| 9 | MR. TOBEROFF:   Vague and ambiguous as to -- | 19:15:46 |
| 10 | vague and ambiguous. | 19:15:50 |
| 11 | THE WITNESS:   It depends on the time frame | 19:15:50 |
| 12 | that you're talking about. | 19:15:59 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.    Well, do you understand that DC Comics owns | 19:15:59 |
| 15 | Superman rights that you don't have the ability to | 19:16:00 |
| 16 | recapture? | 19:16:03 |
| 17 | A.    As of today.   That may change. | 19:16:04 |
| 18 | Q.    As of any day. | 19:16:07 |
| 19 | A.    That may change. | 19:16:08 |
| 20 | Q.    How? | 19:16:09 |
| 21 | A.    There are court decisions that are yet to | 19:16:10 |
| 22 | come. | 19:16:12 |
| 23 | Q.    Assuming you win every single court decision | 19:16:12 |
| 24 | and assuming the Shusters win every single court | 19:16:15 |
| 25 | decision, is it your belief that the Shusters and the | 19:16:18 |

Page 332

| | | |
|---|---|---|
| 1 | Siegels collectively could end up with every single | 19:16:21 |
| 2 | right associated with Superman? | 19:16:25 |
| 3 | MR. TOBEROFF:  Vague and ambiguous.  Again, | 19:16:28 |
| 4 | you're getting into legal territory here. | 19:16:29 |
| 5 | He's asking you for legal conclusions, and if | 19:16:32 |
| 6 | you can form an opinion independent of your advice of | 19:16:35 |
| 7 | counsel, you can only answer to that limited extent. | 19:16:38 |
| 8 | But if you can't or your opinions are so intertwined | 19:16:40 |
| 9 | with the advice of counsel that you can't, then I'm | 19:16:44 |
| 10 | instructing you not to answer. | 19:16:47 |
| 11 | MR. PETROCELLI:  Do you want to hear the | 19:16:49 |
| 12 | question back? | 19:16:50 |
| 13 | THE WITNESS:  No, I don't need to hear the | 19:16:51 |
| 14 | question. | 19:16:52 |
| 15 | You know, I really don't think that it's | 19:16:53 |
| 16 | appropriate for me to answer that. | 19:16:55 |
| 17 | BY MR. PETROCELLI: | |
| 18 | Q.   Why is that? | 19:16:56 |
| 19 | A.   Because it's too enmeshed in years of | 19:16:57 |
| 20 | discussions with legal counsel. | 19:17:02 |
| 21 | Q.   Are you aware that there are rights that DC | 19:17:04 |
| 22 | Comics and or Warner Bros. has that are not subject to | 19:17:11 |
| 23 | termination or recapture at all?  Is it your belief | 19:17:15 |
| 24 | that there are such Superman rights or Superboy | 19:17:20 |
| 25 | rights? | 19:17:23 |

| | | |
|---|---|---|
| 1 | MR. TOBEROFF:  Same -- same instruction.  I'm | 19:17:23 |
| 2 | instructing you not to answer that question because it | 19:17:25 |
| 3 | calls for a legal conclusion.  So I don't have to ask | 19:17:27 |
| 4 | you whether it's unrelated to advise of counsel | 19:17:30 |
| 5 | MR. PETROCELLI:  I didn't ask you for a legal | 19:17:34 |
| 6 | conclusion.  I asked for your belief and understanding | 19:17:34 |
| 7 | in that regard. | 19:17:36 |
| 8 | MR. TOBEROFF:  I'm instructing you not to | 19:17:37 |
| 9 | answer.  It divulges attorney-client communications. | 19:17:39 |
| 10 | MR. PETROCELLI:  You know, we're going to | 19:17:42 |
| 11 | stop right now.  I have a ton more of documents, as | 19:17:43 |
| 12 | you can see, in front of you. | 19:17:45 |
| 13 | THE WITNESS:  I'm begging you not to stop. | 19:17:47 |
| 14 | MR. PETROCELLI:  I understand, but we can't | 19:17:49 |
| 15 | go any further.  It's past quarter after 7:00, and I | 19:17:51 |
| 16 | have accommodated your schedule and your situation, | 19:17:53 |
| 17 | and I'm not being disrespectful, but there's no way | 19:17:58 |
| 18 | we're going to finish, and so we'll just have to fight | 19:18:02 |
| 19 | about it another day. | 19:18:05 |
| 20 | MR. TOBEROFF:  I would like to know -- wait a | 19:18:06 |
| 21 | second.  I would like to know how much time we have | 19:18:07 |
| 22 | been on the record. | 19:18:09 |
| 23 | THE VIDEOGRAPHER:  At this point you're a | 19:18:11 |
| 24 | minute or two shy of seven hours. | 19:18:15 |
| 25 | MR. PETROCELLI:  There you go. | 19:18:17 |

LAURA SIEGEL LARSON 6/22/2011

|   |   |   |
|---|---|---|
| 1 | MR. TOBEROFF:  So you're stopping a minute or | 19:18:18 |
| 2 | two shy of seven hours and you're not finishing the | 19:18:20 |
| 3 | deposition when you -- | 19:18:22 |
| 4 | MR. PETROCELLI:  As you know, I made my | 19:18:24 |
| 5 | statement without having any knowledge of the time. | 19:18:26 |
| 6 | MR. TOBEROFF:  Okay.  Well, now you have -- | 19:18:28 |
| 7 | MR. PETROCELLI:  I don't have an internal | |
| 8 | clock. | |
| 9 | MR. TOBEROFF:  Now you have the knowledge of | 19:18:29 |
| 10 | the time, so -- and please let me finish.  I didn't | 19:18:30 |
| 11 | interrupt you when you were speaking. | 19:18:33 |
| 12 | MR. PETROCELLI:  Sure.  You can finish. | |
| 13 | MR. TOBEROFF:  You're not stopping as a | 19:18:35 |
| 14 | strategic effort a minute or two before seven hours to | 19:18:38 |
| 15 | continue the deposition.  And you're smiling.  It's | 19:18:41 |
| 16 | clear that that's what you're doing.  So -- | 19:18:43 |
| 17 | MR. PETROCELLI:  You are joking; right? | 19:18:46 |
| 18 | MR. TOBEROFF:  Am I joking?  It's obvious -- | 19:18:47 |
| 19 | excuse me.  I'm allowed to speak.  I'm not joking. | 19:18:49 |
| 20 | MR. PETROCELLI:  You're going to embarrass | 19:18:52 |
| 21 | yourself. | 19:18:54 |
| 22 | THE WITNESS:  You have one day of seven hours | 19:18:54 |
| 23 | of Ms. Siegel.  She wants to continue to complete her | 19:18:56 |
| 24 | deposition.  You refuse to do that even though she's | 19:19:00 |
| 25 | the one with M.S. and you're perfectly happy -- | 19:19:02 |

EXHIBIT D
350

```
 1    perfectly capable of finishing the deposition, but      19:19:06

 2    you're choosing not to and choosing not to close the    19:19:09

 3    deposition.  This deposition is going to close after    19:19:13

 4    today, and we will vigorously oppose you dragging her    19:19:15

 5    back in here for more time because you have two         19:19:19

 6    minutes left on your seven hours.                       19:19:22

 7             MR. PETROCELLI:  You know, I will respond.     19:19:25

 8    Okay?                                                   19:19:26

 9             I think your comments are disgraceful          19:19:28

10    especially in reference to the witness' condition       19:19:31

11    because I have done everything, frankly, beyond the     19:19:34

12    call of duty, to accommodate her, her illness, her      19:19:39

13    schedule, finding an office with a sofa so she can lie  19:19:43

14    down, in every --                                       19:19:47

15             MR. TOBEROFF:  No one -- no one --             19:19:47

16             MR. PETROCELLI:  Excuse me.  I'm not           19:19:47

17    finished.                                               19:19:48

18             MR. TOBEROFF:  I wasn't referring to that.     19:19:49

19             MR. PETROCELLI:  Excuse me -- in every one of  19:19:51

20    the requests, and I have made it perfectly clear on     19:19:51

21    the record throughout that she is entitled to take as   19:19:52

22    many and as lengthy breaks as she wants knowing that    19:19:57

23    it was going to require us to work far, far later than  19:20:00

24    a normal schedule would.  So I really find that         19:20:05

25    distasteful.
```

| | | |
|---|---|---|
| 1 | Secondly -- | 19:20:11 |
| 2 | MR. TOBEROFF: I'm referring to the couple | 19:20:11 |
| 3 | minutes short of the seven hours, not to be | 19:20:12 |
| 4 | providing -- | |
| 5 | MR. PETROCELLI: Time out. Don't -- | |
| 6 | MR. TOBEROFF: -- for a room to lie down, | 19:20:13 |
| 7 | and -- | |
| 8 | MR. PETROCELLI: I'm not finished. | |
| 9 | MR. TOBEROFF: -- I thanked you for that. | 19:20:14 |
| 10 | MR. PETROCELLI: I'm not finished with my | 19:20:16 |
| 11 | statement. | 19:20:19 |
| 12 | Secondly, as you well know, I indicated that | 19:20:19 |
| 13 | we were stopping because the court reporter told me we | 19:20:22 |
| 14 | had three minutes and two minutes on the tape, and I | 19:20:28 |
| 15 | knew I wasn't going to possibly finish the deposition. | 19:20:33 |
| 16 | I had no idea whatsoever, of course, and you know I | 19:20:36 |
| 17 | didn't, that there was two minutes left to go to | 19:20:39 |
| 18 | complete seven hours. And for you to accuse me of | 19:20:42 |
| 19 | trying to make some kind of tactic about that, I want | 19:20:46 |
| 20 | to be real clear about that. I will cede the two | 19:20:51 |
| 21 | minutes to you. | 19:20:54 |
| 22 | MR. TOBEROFF: Okay. If you're ceding the | 19:20:54 |
| 23 | two minutes to me, then the deposition is over. | 19:20:58 |
| 24 | MR. PETROCELLI: No, it is not. | 19:20:58 |
| 25 | MR. TOBEROFF: Because you have seven hours | 19:20:58 |

```
 1    of deposition.                                      19:20:59

 2            MR. PETROCELLI:  I understand your position, 19:20:59

 3    but, Marc, that's really quite sophomoric of you.  You  19:21:01

 4    don't decide when depositions are over.  Courts decide  19:21:05

 5    that.  So I understand your position that you want to   19:21:09

 6    resist this deposition from being continued to a later 19:21:15

 7    date, but that's what I'm doing.                        19:21:21

 8            MR. TOBEROFF:  Okay.                            19:21:23

 9            MR. PETROCELLI:  And you obviously will        19:21:23

10    disagree about it, and we'll go to court about it.  I  19:21:26

11    just want to be clear that I'm not going to make an    19:21:28

12    argument that I'm entitled to more time because        19:21:31

13    apparently there were one or two minutes left before   19:21:34

14    the seven hours.  It's because I have not had enough   19:21:37

15    within seven hours to complete the examination given   19:21:41

16    the importance of this witness --                      19:21:44

17            MR. TOBEROFF:  Just so --                      19:21:46

18            MR. PETROCELLI:  -- and we will argue about    19:21:47

19    it another day.                                        19:21:48

20            MR. TOBEROFF:  Just to be clear, my reference  19:21:49

21    to tactics doesn't refer to the two minutes left on    19:21:52

22    the seven hours.  It refers -- because I said the same 19:21:56

23    exact thing to you when you told me you were going to  19:21:59

24    stop at 6:00.  I objected at that point.  And this     19:22:02

25    isn't state court, and I think you're confusing the    19:22:06
```

EXHIBIT D
353

| | | |
|---|---|---|
| 1 | two.  This is federal court.  In federal court you | 19:22:08 |
| 2 | have one day of seven hours.  You don't continue from | 19:22:11 |
| 3 | day to day until you're finished. | 19:22:14 |
| 4 | MR. PETROCELLI:  Marc, you -- | 19:22:15 |
| 5 | MR. TOBEROFF:  So we will vigorously | 19:22:17 |
| 6 | oppose -- oppose, and Laura stated on the record that | 19:22:19 |
| 7 | she would like you to continue rather than have to | 19:22:22 |
| 8 | come back for yet another deposition.  This is now her | 19:22:26 |
| 9 | third deposition. | 19:22:29 |
| 10 | MR. PETROCELLI:  Wait a second.  There's | 19:22:30 |
| 11 | nothing to continue.  Are you telling me that you're | 19:22:31 |
| 12 | going to make her available tonight beyond seven | 19:22:33 |
| 13 | hours? | 19:22:36 |
| 14 | MR. TOBEROFF:  No.  I'm telling you -- | 19:22:36 |
| 15 | MR. PETROCELLI:  Okay. | 19:22:37 |
| 16 | MR. TOBEROFF:  -- you can finish her | 19:22:38 |
| 17 | seven-hour deposition. | 19:22:40 |
| 18 | MR. PETROCELLI:  It's done.  I told you I'm | 19:22:41 |
| 19 | giving up the last one or two minutes just to make the | 19:22:43 |
| 20 | point to you.  But to be clear, you're not willing | 19:22:46 |
| 21 | tonight to have the witness stay beyond seven hours of | 19:22:48 |
| 22 | testimony. | 19:22:51 |
| 23 | MR. TOBEROFF:  I don't think you're entitled | 19:22:51 |
| 24 | to more than one day of seven hours. | 19:22:52 |
| 25 | MR. PETROCELLI:  That's my point.  Because I | 19:22:54 |

| | | |
|---|---|---|
| 1 | believe that I am entitled to more than seven hours, I | 19:22:55 |
| 2 | will have to go to court and seek the court's | 19:22:58 |
| 3 | intervention. | 19:23:01 |
| 4 | MR. TOBEROFF:  That's your -- you can do -- | 19:23:01 |
| 5 | you can always make a motion to the court. | 19:23:02 |
| 6 | MR. PETROCELLI:  Let's have a stipulation on | 19:23:04 |
| 7 | the record as we had before that the witness will have | 19:23:06 |
| 8 | within 30 days of your receipt to advise us of any | 19:23:10 |
| 9 | corrections to the deposition transcript, but bearing | 19:23:15 |
| 10 | in mind, Ms. Siegel -- Ms. Larson, of course, that if | 19:23:19 |
| 11 | you do make any changes of substance, it can be | 19:23:23 |
| 12 | commented upon as affecting your credibility.  The | 19:23:26 |
| 13 | court reporter's transcript can be signed under | 19:23:31 |
| 14 | penalty of perjury, and the court reporter is | 19:23:34 |
| 15 | otherwise relieved of her duties under the Code.  So | 19:23:36 |
| 16 | stipulated? | 19:23:38 |
| 17 | MR. TOBEROFF:  So stipulated. | 19:23:38 |
| 18 | THE REPORTER:  Where is the original to go, | 19:23:41 |
| 19 | please? | 19:23:42 |
| 20 | MR. PETROCELLI:  The original should go to, I | 19:23:43 |
| 21 | guess -- | 19:23:46 |
| 22 | What did we do last time? | 19:23:46 |
| 23 | MR. TOKORO:  The original to them and a copy | 19:23:49 |
| 24 | to us. | 19:23:51 |
| 25 | THE VIDEOGRAPHER:  That will then mark the | 19:23:51 |

```
 1    end of Volume 1, tape number five, in the deposition      19:23:53

 2    of Laura Siegel.  Going off the record.  The time is      19:23:55

 3    7:24.

 4              (The deposition was concluded at 7:24 p.m.)      19:24:01

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Merrill   Corporation   -   Los Angeles

800-826-0277                                www.merillcorp.com/law

Page 341

```
 1    STATE OF CALIFORNIA        )

 2                               ) ss.

 3    COUNTY OF LOS ANGELES      )

 4

 5

 6         I, LAURA SIEGEL LARSON, declare under the

 7    penalties of perjury under the laws of the United

 8    States that the foregoing is true and correct.

 9         Executed this     day of                  ,

10    2011, at                        , California.

11

12

13

14

15                              LAURA SIEGEL LARSON

16

17

18

19

20

21

22

23

24

25
```

1    STATE OF CALIFORNIA        )

2                               )    ss.

3    COUNTY OF LOS ANGELES    )

4        I, Kathleen E. McCarthy, Certified Shorthand Reporter

5    No. 4483 for the State of California, do hereby certify:

6        That prior to being examined, the witness named in the

7    foregoing deposition was duly sworn to testify the truth,

8    the whole truth, and nothing but the truth;

9        That said deposition was taken down by me in shorthand

10    at the time and place therein named and thereafter reduced

11    by me to typewritten form and that the same is a true,

12    correct, and complete transcript of said proceedings.

13        Before completion of the deposition, review of

14    the transcript [ ] was [ ] was not requested.  If

15    requested, any changes made by the deponent (and provided

16    to the reporter) during the period allowed are appended

17    hereto.

18        I further certify that I am not interested in the

19    outcome of the action.

20    Witness my hand this 3rd day of August ,2011 .

21

22

23        Kathleen E. McCarthy, CSR No. 4483

24

25

EXHIBIT D
358