# EXHIBIT J

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1999 Avenue of the Stars, 7th Floor | SAN FRANCISCO |
| BRUSSELS | Los Angeles, California 90067-6035 | SHANGHAI |
| HONG KONG | | SILICON VALLEY |
| LONDON | TELEPHONE (310) 553-6700 | SINGAPORE |
| LOS ANGELES | FACSIMILE (310) 246-6779 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |
| NEW YORK | | |

August 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Keith Adams
Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re: *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Keith:

In response to your letter of yesterday sent at 9:31 a.m., let's plan to talk Friday morning concerning dates for Mr. Toberoff's and Mr. Marks' depositions in late September or early October. We spoke to Susan Allison today about the latter.

1. We disagree that Mr. Toberoff and his companies should not and cannot be deposed separately and reserve all rights to take separate depositions of his three companies. DC alleges that each company engaged in separate and distinct acts of misconduct. *See* FAC ¶¶ 165-89. We intend separately to question each company about its individual acts of misconduct under Rule 30(b)(6). The depositions of Pacific Pictures and IP Worldwide will take the longest—though each may be shorter than a day—as these companies entered into many of the offending agreements with the Shuster and Siegel heirs. Any follow-up deposition of IPW will be shorter and cover separate ground, and the deposition of Mr. Toberoff under Rule 30(a)(1) will cover only additional conduct he engaged in as an individual, and will not re-plough the same ground covered in the companies' Rule 30(b)(6) depositions. Defendants have not conceded that the three companies are alter egos or agents of Mr. Toberoff or one another, and, thus, we need to examine these companies as well on inter-corporate liability issues, which takes time and is distinct as to each company. *E.g.*, *Sonora Diamond Corp. v. Super. Ct.*, 83 Cal. App. 4th 523, 538-39 (2000); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837-38 (1962). Your Rule 12 and SLAPP motions notably do not contest these alter-ego and agency allegations and, thus, there can be no question that they are ripe for discovery.

You have cited three cases in support of your argument that DC is not entitled to separately depose the Toberoff defendants, all of which are inapposite:

O'MELVENY & MYERS LLP
August 11, 2011 - Page 2

    a. In *Novartis Pharmaceuticals Corp. v. Abbott Labs.*, 203 F.R.D. 159, 162-63 (D. Del. 2001), the court found that, "[o]n the record presented," a Rule 30(b)(6) deposition of a witness who had already testified about the same topic in his individual capacity was not warranted because (1) the defendant offered to be bound by the witness's testimony, (2) the witness was the person most knowledgeable on the topic, and (3) another deposition would be "duplicative" and "cumulative to the testimony already procured." You may concede that Mr. Toberoff's companies are bound by his individual testimony and assert that he is the person most knowledgeable at each company. But unlike in *Novartis*, we are not attempting to depose Mr. Toberoff as both an individual and a corporate designee on the same, limited topic (*i.e.*, the companies' conduct), and so the testimony we obtain from Mr. Toberoff in his individual capacity will not be "duplicative" or "cumulative." As for the time it will take to conduct these four depositions, the Rules presumptively entitle us to four days—one each with each defendant. As we have noted, however, we would try to complete all four examinations in one long day, or over two days. You have declined those middle-ground offers.

    b. In *A.I.A. Holdings v. Lehman Bros., Inc.*, 2002 U.S. Dist. LEXIS 9218, at *13 (S.D.N.Y. 2002), the plaintiff sought a protective order to limit its Rule 30(b)(6) deposition because three of its principals had been deposed in their individual capacities on the majority of topics in the Rule 30(b)(6) deposition notice. The court rightly observed that "the mere fact that the principal of a corporation has been deposed is not an automatic substitute for a 30(b)(6) deposition," although it noted that a Rule 30(b)(6) deposition may not be warranted where the testimony "would be identical to his testimony as an individual and the 30(b)(6) is limited, or substantially limited, to topics covered in the deposition taken in the witness's individual capacity." *Id.* at *17-18. In this case, no one has been deposed yet on behalf of any of the Toberoff defendants on any topic. Our deposition of Mr. Toberoff will not concern the acts of his companies; the company depositions will cover separate and distinct topics. All of the depositions are proper, and no showing has been made that they would be cumulative.

    c. Your third case—*Sabre v. First Dominion Capital, L.L.C.*, 2001 U.S. Dist. LEXIS 20637, at *1 (S.D.N.Y. 2001)—confirms that "the depositions of an individual who is noticed as an individual witness pursuant to Fed. R. Civ. P. 30(b)(1) and who is also produced as a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) *are presumptively subject to independent seven-hour time limits*." (Emphasis added.) In dicta, *Sabre* noted that separate depositions of a closely-held corporation and its principal may be unnecessary where the corporation adopts the principal's statements; in such a case, "if the questioning … becomes repetitive or is otherwise being conducted in an oppressive manner, the aggrieved party can always make application for a protective order." *Id.* at *2. In this case, there is no need for a protective order because DC does not seek to cover the same ground in its four depositions—and in any event, a protective order motion is not yet ripe because DC has not yet taken *any* deposition of the Toberoff defendants, much less a "repetitive" second deposition.

    We have tried to be accommodating and propose alternatives that would allow the four depositions to be completed in one or two days, but you have declined to accept those offers. In

O'MELVENY & MYERS LLP
August 11, 2011 - Page 3

a final effort to avoid motion practice, we reiterate our offer to have a consolidated deposition of the Toberoff defendants over one long day or two days, whatever is needed, in late September.

2. On the Laura Siegel Larson documents, we will move to compel production of Ms. Larson's letter to her half-brother (and the drafts of it) that she described at length at her deposition:

> Q. This is a letter from Michael Siegel to you dated May 13; is that correct?
> A. Yes.
> …
> Q. Did you respond to it?
> A. I'm sure I did.
> …
> Q. [The Toberoff Timeline] says "Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael." Putting aside the characterization of your ignorance, does July 5, 2003, sound right to you as around the time that you responded to the May 13, 2003, letter?
> A. It could have been.
> Q. Okay. Is it fair to say that your letter back to Mr. Michael Siegel did not agree with any of his criticisms of Mr. Toberoff's actions and Mr. Toberoff generally?
> A. Well, whoever stole this document, you know, is doing his version of what he's reading into whatever the letter said.
> Q. You're not following my question.
> A. Well, I haven't read the letter in a long time.
> Q. My question to you is when you wrote back to Michael --
> A. Yes.
> Q. -- in response to his May 13, 2003, letter, is it fair to say that you expressed no agreement with any of his criticisms of Mr. Toberoff?
> A. I would say that's probably safe to say.
> Q. Did you tell Michael Siegel in your response letter back that Mr. Toberoff does not have a production company?
> A. Yes, I believe I did.
> …
> Q. Yes. It says "Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft -- in response to Michael's accusations of Toberoff, Laura clearly states that MT does not have a production company." And that was your belief at the time; correct?
> A. Correct.
> Q. And it goes on to say that, in parentheses: "(This is false -- Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes, quote, "MT has not plans to produce

O'MELVENY & MYERS LLP
August 11, 2011 - Page 4

> a SUPERMAN movie, nor is this feasible given the division of ownership of the rights," end of quotes. Now, does that -- is that consistent with your recollection that your statement that Mr. Toberoff did not have a production company was crossed out by Mr. Toberoff in the final draft and replaced with the quoted language that I just read?"
> A. It could have been.
> Q. And when Mr. Toberoff made his changes to the letter and returned it to you, did you review it and sign it before you sent it out as your response letter back to Michael?
> A. Well, he made suggestions of changes in the wording of certain areas, and, you know, I retyped the letter, accepted some of the things that he said and didn't use some other suggestions that he made.
> Q. How did he convey his suggestions to you?
> A. He wrote it on -- he wrote it on this letter -- no, not this letter. He wrote it on that letter that's being discussed here and faxed it back to me.
> Q. Okay. So you did engage in faxed communication with Mr. Toberoff from time to time.
> A. Yes.
> Q. Okay. Including with respect to this very correspondence that we're discussing.
> A. I believe so.
> Q. Okay. Now, did you show him the final draft before you sent it out?
> A. I believe I did.
> Q. And which of the changes did you reject?
> A. I don't remember. I just remember the process, but I don't remember the contents.

July 22, 2011, Larson Dep. Tr. at 298:12-15, 300:11-12, 310:20-311:22, 312:3-314:3.

Ms. Larson's description of her response letter to Michael's May 13, 2003, letter confirms the Toberoff Timeline's claim that Ms. Larson wrote a responsive letter and that Mr. Toberoff edited it:

> July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this*. The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitmize his claims. *(please see enclosed letter)*

O'MELVENY & MYERS LLP
August 11, 2011 - Page 5

> Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

FAC Ex. A at 65-66. The Toberoff Timeline notes that it enclosed a copy of Ms. Larson's responsive letter to her brother, yet defendants have never produced that document.

Defendants notably do not deny—either in your two recent letters on the subject, or during ou meet-and-confer with Mr. Toberoff in New Mexico—that the non-privileged letter that Ms. Larson wrote to her half-brother and the accompanying drafts of it about which she testified exist in your and/or her files. Nor do you disclose whether the letter and drafts of it are among the documents listed on your privilege logs or at what entries—*i.e.*, entries on which DC moved to compel production or not.

Because of this ambiguity, which you decline to help clarify, we will need to file the motion for these documents as one to compel and/or, in the alternative, as one for reconsideration. Even if it is the latter, we have studied the Magistrate's stated reasons for declining to compel the production of this document:

> The Court feels, however, that reconsideration is not appropriate as to the July 11th letter. Knowing the specific language of the May 13 letter does not tell much about the July 11th letter. There's nothing to demonstrate that the prior orders long ago upheld on the grounds that DC Comics did not seek review of this Court's earlier ruling were materially wrong.
>
> Even more so, the May 13th letter does not justify a different ruling on the July 5th letter. As the Court previously stated, the defendants clearly stated that such a letter did not exist. Plaintiff asserts that maybe it exists in a different form or with a different date, but the Court declines to order defendants to undertake a vague or amorphous further search.

June 20, 2011, Hr'g Tr. at 19. Ms. Larson's recent deposition testimony makes clear that defendants need not engage in a "vague or amorphous further search" to see if her letter and the drafts of it described in her deposition and in the Timeline exist. *Id.* Moreover, Magistrate Zarefsky's June 20 ruling was focused on the May 13 letter; he did not have Ms. Larson's testimony before him, which she gave almost a month later, on July 22, 2011.

O'MELVENY & MYERS LLP
August 11, 2011 - Page 6

    3. As for the Toberoff defendants' document production, we believe we have fully met and conferred on these issues, but so there is no argument to the contrary, attached is a proposed order specifying exactly what documents we intend to move on. We have limited those issues to the following 12 categories. We raised each in our June 1 and July 7 correspondence, but we can discuss those issues on a Rule 37 call, within the next 10 days, as needed:

    a. <u>Drafts of agreements.</u> As we pointed out and excerpted on page 26 of our July 7 letter, Mr. Peary testified at his deposition that "[t]here were drafts" of the 2001 Pacific Pictures agreement that "went back and forth," but no such drafts have been produced. Toberoff Request No. 12 seeks "All DOCUMENTS created during or since 1997 RELATING to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY," and our July 7 letter specifically mentioned drafts of the Pacific Pictures agreements as within the category of documents sought by that request. July 7 Letter at 5. Drafts of any other agreements between defendants likewise fall within this category. Will you be producing such drafts, or is it your position that no such drafts exist?

    b. <u>Toberoff's ownership interest.</u> The 2001 and 2003 Pacific Pictures agreements provide for the transfer of 50% of the Shusters' purported rights to the joint venture if the venture were "terminated for any reason." DC's proposed order seeks any document transferring, assigning, or disclaiming such rights by Mr. Toberoff's companies, as Pacific Pictures contributed its "current IP business" to IP Worldwide in February 2002, EN 00001-7, and IP Worldwide later transferred its rights to IPW, Nov. 17, 2006 Toberoff Dep. Tr. at 45:6-15. At deposition, Mr. Peary asserted that Paragraph 9 of the Shusters' retainer agreement "supersedes all prior and contemporaneous understandings" between Mr. Toberoff and the Shusters, but could identify no document by which Pacific Pictures itself disclaimed any such interest. June 29, 2011, Peary Dep. Tr. 335:16-340:2; *see also* July 7 Letter at 27. If it is your position that no such documents exist—and defendants intend to produce no further documents in response to Toberoff Request Nos. 12-15, 29, 40, 41; Pacific Pictures Request Nos. 24-25, 27-28; IP Worldwide Request No. 24, 25, 27—please let us know. The "if any" language in your responses is not conclusive on this point. Have you made your full production and do no such documents exist, or will you be producing more?

    As noted in the proposed order, DC also seeks unredacted copies of all documents showing what interest, if any, Ari Emanuel holds in those rights. We understand you refuse to produce such unredacted copies. Is it your position that no part of the Ari Emanuel documents that you redacted, EN 00001-142, relates to Superman, the Shusters, or the Siegels? A review of what Endeavor produced suggests that might not be the case. *Cf.* EN 00142 (redacted page with words "Toberoff" and "Superman - may find problem now, but doesn't surface until after the term."). We need your clear position on this and want to discuss the redactions on our call.

    c. <u>Meetings with the Siegels or Shusters in 2001 and 2002.</u> Toberoff Request Nos. 27 and 28, Pacific Pictures Request No. 19, and IP Worldwide Request No. 18 seek documents related to the introduction of those defendants to the Siegels and Shusters. Our July 7 letter made clear for each of these requests that DC seeks "phone records, calendar logs, [or]

O'MELVENY & MYERS LLP
August 11, 2011 - Page 7

correspondence setting up meetings." July 7 Letter at 6-7, 16, 20. Defendants responded that they would produce all "non-privileged documents, if any," responsive to these requests, but produced no such documents. We find it difficult to believe that no phone or calendar records—physical or electronic—or correspondence exist setting up, confirming, or reflecting the dates on which these initial meetings between defendants occurred. *Cf.* July 22, 2011, Larson Dep. Tr. at 125-28, 131-39; June 29, 2011, Peary Dep. Tr. at 101-07. Is it defendants' position that no such documents exist? If it is, please let us know so clearly.

      d. <u>Toberoff's marketing efforts.</u> Toberoff Request No. 15 seeks "All DOCUMENTS created during or since 1997 RELATING to the potential sale, assignment, license, or other disposition of any rights RELATING to SUPERMAN and/or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement." As noted in our August 3 letter, while the August 1 interrogatory responses of Mr. Toberoff's business entities make clear that they engaged in no efforts to market the purported rights of the Siegels or Shusters to third-party investors, it is unclear the extent to which Mr. Toberoff has otherwise engaged in such efforts. Your August 10 letter does not clarify whether Mr. Toberoff will respond to the DC's proposed interrogatories on this subject, which we enclosed with our August 3 letter. On July 15, Mr. Toberoff agreed to produce any responsive, non-privileged documents, but his July 18 production of one page included no new documents on this topic. If it is your contention that no such documents exist, please let us know so definitively.

      e. <u>Corporate documents.</u> As our July 7 letter made clear, Toberoff Request Nos. 56(a)-(d), 57(a)-(d), and 58(a)-(d); Pacific Pictures Request Nos. 31 and 33; IP Worldwide Request Nos. 32, 33, and 34; and IPW Request Nos. 27 and 29 removed the "RELATING" language that defendants originally objected to as overbroad, replaced it with narrowed requests for documents "identifying" or "evidencing" relevant aspects of Mr. Toberoff's business entities, and clarified that DC does not seek "every transaction in which [defendants] ever engaged." *E.g.*, July 7 Letter at 13. Despite the clarification, defendants simply reiterated that Magistrate Zarefsky originally denied DC's motion as to these requests as "calling for everything there is about companies with which Mr. Toberoff has been associated." This response fails to engage on the current issues, as detailed by DC's exhaustive July 7 letter. If you are willing to stipulate that Mr. Toberoff is bound to his companies' actions as its alter-ego and agent, we can forego or limit these requests. Otherwise, DC is entitled to discovery related to veil-piercing factors such as commingling of funds and assets, adequate capitalization, disregard of corporate formalities, etc. *See Sonora Diamond.*, 83 Cal. App. 4th at 538-39. Do you refuse to produce such documents?

      f. <u>Ari Emanuel documents.</u> Despite Mr. Toberoff's "long-standing relationship with Mr. Emanuel" referred to by Ms. Brill's February 2011 correspondence, defendants have not listed a single communication with Mr. Emanuel on their privilege logs on this case. As noted on page 28 of our July 7 letter, defendants have produced in this matter only *seven pages* of non-substantive e-mails between Mr. Toberoff and Mr. Emanuel, including *zero* from Mr. Emanuel himself. Is it really defendants' position that they possess, control, or have custody of *no* communications from Mr. Emanuel relating to Superman, Superboy, or the Siegel or Shuster heirs? If so, please let us know that is the case clearly.

O'MELVENY & MYERS LLP
August 11, 2011 - Page 8

    g. <u>Conflict disclosures and waivers.</u> Toberoff Request No. 30 seeks "All COMMUNICATIONS RELATING to any disclosure of a potential or actual conflict of interest by or to YOU, the SIEGEL HEIRS, or SHUSTER HEIRS," and Request No. 31 seeks any "waiver or acknowledgement" of the same. Mr. Toberoff stated he would produce "responsive, non-privileged documents, if any" pertaining to that request, but has produced no such documents, despite both Mr. Peary and Ms. Larson admitting to having signed such conflict waivers. June 29, 2011, Peary Dep. Tr. at 93:24-95:12; July 22, 2011, Larson Dep. Tr. at 31:10-36:22.

    During our meet and confer on July 20, we asked that you identify the privilege log entries that correspond to the conflict waiver that Mr. Peary signed in 2010, but you refused. At present, we have no way of knowing whether that document—or any of the conflict-related correspondence identified by Ms. Larson—is identified on defendants' privilege logs; there are well over 500 entries on Mr. Toberoff's log from 2010 alone, all identified simply as "E-mail," "Letter," or "Facsimile." Moreover, you have provided no case law or authority underlying your assertion that such a communication constitutes the provision of legal advice. Nor have you provided any response to DC's case law on this point. *E.g.*, *Maine Baptist Church v. Regions Bank*, 207 WL 1445257, at *2-3 (E.D. Mo. May 10, 2007) ("The production of conflict memoranda, new matter forms, and correspondence regarding conflicts is not protected by the attorney-client privilege or work product doctrine."). What is your position on these issues?

    h. <u>Documents obtained before meeting heirs.</u> Mr. Toberoff stated he would produce documents relating to the Siegels or Shusters obtained prior to his initial contact with them, but has produced none. *See* Toberoff Request Nos. 9(a-b). At his deposition he testified to reading "the Siegels' termination notice or a copy of one of their termination notices on the internet" and that news of their termination efforts "was all over the internet." Nov. 17, 2007 Toberoff Dep. Tr. at 85:16-86:12, 140:7-24. Such documents should be produced. If it is defendants' position that no such documents exist, please so advise us.

    i. <u>Valuations.</u> Defendants' July 15 responses agreed to produce "All DOCUMENTS created during or since 1995 RELATING to the valuation of any past, current, or potential ownership interest in SUPERMAN and/or SUPERBOY," "if any." Toberoff Request No. 18; Pacific Pictures Request No. 15; IP Worldwide Request No. 15. If no such documents exist or you are claiming privilege over any such documents, please state so clearly.

    j. <u>Communications with Kevin Marks.</u> Toberoff Request Nos. 42(a-b) and 44 seek documents relating to communications with Kevin Marks, and while Mr. Toberoff agreed to produce documents as to all three requests, no new documents were produced. July 15, 2011, Toberoff Responses at 19-21 ("Toberoff will produce the responsive, non-privileged documents, if any"). If none exist, please let us know.

    k. <u>Communications with Michael Siegel.</u> Toberoff Request Nos. 46 and 48 seek documents relating to communications with Michael Siegel and, again, Mr. Toberoff agreed to produce any such documents, but produced none. July 15, 2011, Toberoff Responses at 21-23

O'MELVENY & MYERS LLP
August 11, 2011 - Page 9

("Toberoff will produce the responsive, non-privileged documents, if any"). If none exist, please let us know. If no such documents exist, please state so.

l. <u>Communications with David Michaels.</u> On April 4, DC moved to compel the production of defendants' communications with David Michaels. Docket No. 205 at 13-16. In opposing that motion, defendants argued:

> Michaels communicated with the Siegels in connection with his potential representation of them, and discussed their case, based on privileged and confidential information he obtained while working for Toberoff & Associates as their attorney. It is well-established that "consulting" an attorney as to retention, if any, is considered to entail the provision of "legal advice" and is protected by the attorney-client privilege. *See Barton v. United States Dist. Court*, 410 F.3d 1104, 1108 (9th Cir. 2005) ("privilege applied to pre-employment communications with an attorney by a prospective client"). Thus, there is no basis to assert that Michaels' communications with the Siegels are not privileged, regardless of whether he was attempting to "steal" a client from Toberoff & Associates.

Docket No. 210 at 11-12. While Magistrate Zarefsky denied that motion, Docket No. 262 at 4, on July 21, Ms. Larson produced documents related to her communications with Gerry Spence, another attorney she "consult[ed] … as to retention." LSL 00452-481. Defendants may not produce documents as to one potential new attorney while withholding documents as to another. A privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). Please confirm whether you will now produce the David Michaels letters.

If you decline to produce the documents discussed in paragraphs 3.a-l above, please let us know when we can meet and confer within the next 10 days regarding our motion to compel their production. We also need to know in the next 10 days what you mean by the following statement for the following document responses: defendants agree to produce "responsive, non-privileged documents, if any."[1] As to each of the document requests listed above and in the margin below, it appears you produced no responsive documents to these requests. Is your production fully complete as to these listed requests, or do documents exist that you have yet to produce? We need clarity on this.

4. We take it from your letter that you decline to produce copies of Ms. Peavy's will and the Superman script based on the prior discovery that DC served. Is that your position? If so, we need to include this issue in our Rule 37 discussion.

---

[1] Toberoff Request Nos. 9(a-b), 12-15, 18, 27-32, 40-41, 42(a-b), 44, 46, 48; Pacific Pictures Request Nos. 15, 19, 24, 27-28; IP Worldwide Request Nos. 15, 18, 24, 27.

O'MELVENY & MYERS LLP
August 11, 2011 - Page 10

   5. Finally, as we asked Mr. Toberoff when we met in New Mexico, please let us know if you can commit to a date certain in September—*i.e.*, no later than September 9—to complete your review of Ms. Larson's files and to update her privilege logs. This date gives defendants more than a month to do this work. Despite your claims to the contrary, important new documents were revealed at her deposition that heretofore had never been produced. This includes the extension of the IP Worldwide agreement that defendants never before produced, July 22, 2011, Larson Dep. Tr. at 60:4-62:1, 64:3-23; IPWW 00006-7, and Ms. Larson's testimony about her correspondence with her brother, *e.g.*, July 22, 2011, Larson Dep. Tr. at 246-47, 299, 310-14, which you continue to refuse to produce or discuss with us.

   All of DC's rights are reserved.

              Very truly yours,

              /s/ Matthew T. Kline

              Matthew T. Kline
              of O'Melveny & Myers LLP

cc:  Daniel M. Petrocelli, Esq.
   Laura Brill, Esq.

```
 1  DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
 2  MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
 3  CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
 4  O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
 5  Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
 6  Facsimile:   (310) 246-6779

 7  PATRICK T. PERKINS (admitted pro hac vice)
       pperkins@ptplaw.com
 8  PERKINS LAW OFFICE, P.C.
    1711 Route 9D
 9  Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11  Attorneys for Plaintiff DC Comics
```

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>                Plaintiff,<br><br>        v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>                Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DISCOVERY MATTER**<br><br>**[PROPOSED] ORDER GRANTING DC COMICS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**<br><br>**Judge**:         Hon. Otis D. Wright II<br>**Magistrate**: Hon. Ralph Zarefsky<br><br>**Hearing Date**:         Sept. 19, 2011<br>**Hearing Time**:         10:00 a.m.<br>**Courtroom**:              540<br>**Discovery Cutoff**:    None Set<br>**Pretrial Conference**: None Set<br>**Trial**:                         None Set |

[PROPOSED] ORDER GRANTING
DC'S MOT. TO COMPEL

For the reasons set forth in DC Comics' Motion To Compel The Production Of Documents, and for good cause shown:

IT IS HEREBY ORDERED that defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC, (the "Toberoff Defendants") shall produce, by September 26, 2011:

(1) All drafts and/or correspondence related to negotiations of agreements entered into by any of the Toberoff Defendants related to Superman and/or Superboy, including those drafts described by Mark Warren Peary at deposition:

> Q. The [Pacific Pictures] agreement that you did sign which I'll show you in a bit, were there drafts of that that went back and forth or -- as you recall or did you get a document, sign it and return it?
> A. There were drafts.  June 29, 2011 Peary Dep. 107:7-11.

(2)(a) All "documents" (as that term is defined in DC's requests for production) in which Pacific Pictures Corporation purports to transfer, assign, or disclaim any rights related to Superman and/or Superboy, including as described in the November 23, 2001, agreement between Pacific Pictures Corporation, Jean Peavy, and Mark Warren Peary;

(b) All "documents" (as that term is defined in DC's requests for production) in which IP Worldwide, LLC purports to transfer, assign, or disclaim any rights related to Superman and/or Superboy;

(c) All "documents" (as that term is defined in DC's requests for production) in which IPW, LLC purports to transfer, assign, or disclaim any rights related to Superman and/or Superboy;

(d) Unredacted copies of the agreements produced by the Endeavor talent agency as EN 00001-7 and EN 00008-19;

(3) All "documents" (as that term is defined in DC's requests for production) evidencing or showing on what dates in 2001 to 2002 any of Toberoff Defendants or Ari Emanuel, on one hand, and Joanne Siegel, Laura Siegel Larson, Michael Siegel, Jean Peavy, and/or Mark Warren Peary or their representatives, on the other

1 hand, had any meetings or discussions, whether in-person, telephonic, via written communication or otherwise.  Such meetings include those described in Laura Larson Siegel's July 22, 2011, deposition at pages 125-28, 131-39, and Mark Warren Peary in his June 29, 2011, deposition at pages 101-07.  Such "documents" would include physical or electronic calendar entries, call logs, billing records, e-mails confirming meetings, and/or other such documents establishing when the defendants met and spoke;

(4)  All "documents" (as that term is defined in DC's requests for production) related to efforts by Marc Toberoff to market the purported rights of Joanne Siegel, Laura Siegel Larson, Michael Siegel, Jean Peavy, and/or Mark Warren Peary;

(5)  All "documents" (as that term is defined in DC's requests for production) identifying the past and present corporate structure and management of Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC, including articles of incorporation/organization, operating agreements, minutes, capital tables, filings, business plans, as well as documents identifying Marc Toberoff's role and ownership interest in those companies.  Such documents are relevant to DC's alter-ego and agency claims, which defendants, dispute. *See, e.g.*, *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-40 (1962);

(6)  All "documents" (as that term is defined in DC's requests for production) relating to communications between any of the defendants and Ariel Emanuel that pertain in any way to Superman, Superboy, Joanne Siegel, Laura Siegel Larson, Mark Warren Peary, and/or Jean Peavy;

(7)  All "communications" (as that term is defined in DC's requests for production) among any of the defendants relating to the disclosure of any potential or actual conflict of interest, or waiver or acknowledgement of the same, including those referred to by Mr. Peary at pages 93:24-95:12 of his June 29 deposition, and by Ms. Larson at her July 22 deposition, at pages 31:10-36:22;

    (8) All "documents" (as that term is defined in DC's requests for production) related to Mark Warren Peary and/or Jean Peavy obtained by the Toberoff Defendants prior to November 23, 2001;

    (9) All "documents" (as that term is defined in DC's requests for production) related to Joanne Siegel and/or Laura Siegel Larson obtained by the Toberoff Defendants prior to October 3, 2002;

    (10) All "documents" (as that term is defined in DC's requests for production) created between 2000 and the present relating to the valuation of any past, current, or potential ownership interest in Superman and/or Superboy;

    (11) All "documents" (as that term is defined in DC's requests for production) relating to communications with Kevin Marks relating to Joanne Siegel, Laura Siegel Larson, Mark Warren Peary, and/or Jean Peavy, including documents related to the letter from Mr. Marks to Ms. Siegel and/or Ms. Larson described at Docket No. 49, Ex. A at 63, and identified by Ms. Larson at her deposition, Transcript 144:6-146:7;

    (12) All "documents" (as that term is defined in DC's requests for production) relating to communications between David Michaels and any of the defendants, including but not limited to those listed at entries 1063-72, 3476-77 of the Toberoff privilege log.

    IT IS SO ORDERED.

Dated: _____
                                Honorable Ralph Zarefsky
                         Magistrate Judge, United States District Court