# EXHIBIT A

1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:   (845) 265-2819

11 Attorneys for Plaintiff DC Comics

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14 DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

15              Plaintiff,             **DISCOVERY MATTER**

16        v.                          **JOINT STIPULATION
                                       REGARDING DC COMICS'**
17 PACIFIC PICTURES                   **MOTION TO COMPEL THE**
   CORPORATION, IP WORLDWIDE,         **PRODUCTION OF DOCUMENTS**
18 LLC, IPW, LLC, MARC TOBEROFF,      **OR, IN THE ALTERNATIVE, FOR**
   an individual, MARK WARREN         **RECONSIDERATION OF THE**
19 PEARY, as personal representative of **COURT'S JUNE 20 AND**
   the ESTATE OF JOSEPH SHUSTER,      **APRIL 11, 2011, ORDERS**
20 JEAN ADELE PEAVY, an individual,
   LAURA SIEGEL LARSON, an            NOTICE OF MOTION,
21 individual and as personal         DECLARATIONS OF MATTHEW T.
   representative of the ESTATE OF     KLINE AND CASSANDRA SETO,
22 JOANNE SIEGEL, and DOES 1-10,      AND [PROPOSED] ORDER FILED
   inclusive,                         CONCURRENTLY HEREWITH
23
              Defendants.
24
                                      **Judge**:        Hon. Otis D. Wright II
25                                     **Magistrate**:   Hon. Ralph Zarefsky
26
                                      **Hearing Date**:   Sept. 26, 2011
27                                     **Hearing Time**:   10:00 a.m.
                                      **Courtroom**:      540
28

                                      JOINT STIP. RE: DC'S MTC PROD. OF
                                      DOCS OR MOT. FOR RECON.

                        **EXHIBIT A**
                             **2**

1    (continued from previous page)

2

3    MARC TOBEROFF (S.B. #188547)
       mtoberoff@ipwla.com
4    NICHOLAS C. WILLIAMSON (S.B. #231124)
       nwilliamson@ipwla.com
5    KEITH G. ADAMS (S.B. #240497)
       kgadams@ipwla.com
6    TOBEROFF & ASSOCIATES, P.C.
7    2049 Century Park East, Suite 3630
     Los Angeles, California 90067
8    Telephone:  (310) 246-3333
     Facsimile:   (310) 246-3101
9

10   Attorneys for Defendants Mark Warren
     Peary, Jean Peavy, and Laura Siegel Larson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**
**3**

1      Pursuant to Federal Rules of Civil Procedure 7, 26, 34, and 37 and Central

2   District Local Rules 7-18 and 37-2, the parties respectfully submit the following

3   Joint Stipulation Regarding DC Comics' Motion To Compel The Production Of

4   Documents Or, In The Alternative, For Reconsideration Of The Court's June 20

5   and April 11, 2011, Orders.  Pursuant to Central District Local Rules 7-3 and 37-1,

6   the parties have attempted unsuccessfully to resolve their disputes and therefore

7   respectfully seek the assistance of the Court.

8   Dated:      September 2, 2011         Respectfully Submitted,

9                                        O'MELVENY & MYERS LLP

10

11                                       By: /s/ Daniel M. Petrocelli

12                                          Daniel M. Petrocelli
                                            Attorneys for Plaintiff DC Comics

13  Dated:      September 2, 2011         Respectfully Submitted,

14                                       TOBEROFF & ASSOCIATES, P.C.

15

16                                       By:  /s/ Marc Toberoff

17                                          Marc Toberoff
                                            Attorneys for Defendants Laura
18                                          Siegel Larson, Mark Warren Peary,
                                            and Jean Adele Peavy
19

20

21

22

23

24

25

26

27

28

JOINT STIP. RE: DC'S MTC PROD. OF
                                         DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**4**

# TABLE OF CONTENTS

**Page**

I.      DC'S INTRODUCTION ................................................................................ 1

II.     DEFENDANTS' INTRODUCTORY STATEMENT ..................................... 4

III.    DC'S STATEMENT OF ISSUES IN DISPUTE ........................................... 6

        A.    Relevant Factual Background ............................................................ 6

        B.    Defendants Should Be Ordered to Produce Larson's Response
              Letter And All Related Drafts ......................................................... 14

        C.    Conclusion ........................................................................................ 20

IV.     DEFENDANTS' POSITION ...................................................................... 21

        A.    There is No Basis to Reconsider This Court, Judge Larson's and
              Judge Wright's Decisions ................................................................ 21

        B.    Communications Between Ms. Larson and Mr. Siegel Are
              Privileged ......................................................................................... 24

        C.    The "Toberoff Timeline" Does Not Create a Waiver of Privilege ..... 26

        D.    DC Is Not Entitled to Privileged Drafts ........................................... 28

        E.    DC Repeated Motions Seeks Material of Minimal Relevance to
              Support Baseless Claims ................................................................... 29

        F.    Conclusion ........................................................................................ 31

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**5**

## I.     DC'S INTRODUCTION

DC recently deposed defendant Laura Siegel Larson, and she confirmed that she wrote a letter to her half-brother Michael Siegel responding to his letter of May 13, 2003.  In April 2011, the Court ordered defendants to produce Michael's May 13 letter, but in that same ruling and one subsequent, Docket No. 209 at 11-12; 288 at 19-20, denied DC's motions to obtain a copy of "Larson's Response Letter"— about which she has now testified and she *confirms she indeed wrote and sent*.

At her deposition, which post-dated the Court's two rulings, Larson said she typed her response letter to Michael; her mother likely gave input; she shared drafts with Marc Toberoff; Mr. Toberoff made suggested edits by fax (some of which she took); and she gave Mr. Toberoff a final copy of the letter she sent Michael.  Kline Decl. Ex. D at 314:12-330:3.  Both the existence of "Larson's Response Letter" and its drafting history are disclosed in the Toberoff Timeline.  Docket No. 49 FAC Ex. A at 65-66.  When we examined Larson concerning the Timeline's description of her letter and its drafting, she did not dispute the Timeline accurately depicted when she sent her letter or that Mr. Toberoff edited it.  *Id*. Ex. D at 325:22-330:3.

Despite Larson's testimony confirming the existence of her response letter to Michael, the relevance of her letter to DC's claims, and the clearly non-privileged nature of Larson's communication with her half-brother, defendants refuse to:

- produce a copy of Larson's Response Letter and/or drafts of it to DC;
- confirm whether they possess Larson's Response Letter and/or the drafts;
- address whether it is defendants' position that Larson's Response Letter and/or drafts of it are privileged and, if so, why;
- confirm whether Larson's Response Letter and/or drafts of it appear on defendants' privilege logs and, if so, at what entry numbers; or
- confirm whether Larson's Response Letter and/or drafts of it are listed at privilege log entry numbers 712-716, which were the subject of DC's prior motions, Docket Nos. 160, 253, 274.

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**6**

1    As the Court stated in its April 2011 ruling ordering the production of the

2    May 13 letter, defendants' position as to whether Larson's Response Letter exists

3    has been "cryptic."  Docket No. 209 at 11.  Larson's sworn deposition testimony

4    eliminates any such ambiguity and proves such a letter exists and Larson gave Mr.

5    Toberoff a copy of it.  Kline Decl. Ex. D at 314:12-330:3.  Defendants also likely

6    posses Michael Siegel's copy of Larson's Response Letter; after Michael died, Mr.

7    Toberoff, on behalf of Larson, took custody of Michael's files and those of his

8    lawyer, Don Bulson.  *Id.* Exs. B, C; *see, e.g.,* Docket No. 207-9 at 233-35 (Entries

9    145-84).  Defendants do not deny Larson's Response Letter exists in their files, and

10   when we sought to ask Don Bulson if the letter was in his files, defendants

11   instructed him not to answer.  Docket No. 305-52 at 1802:1-1803:23.

12   Defendants should be ordered to produce Larson's Response Letter to DC, as

13   well as drafts of the letter that exist.  Such documents are clearly responsive to

14   DC's document requests (*e.g.*, Docket No. 161-15 at 163-65, Request Nos. 8, 11,

15   23) and highly relevant to DC's claims.  Larson's Response Letter is not

16   privileged—it is a letter between brother and sister (both non-lawyers)—and any

17   claims of privilege in the drafts cannot be sustained, as the Timeline discloses

18   certain contents of the drafts and edits, Docket No. 49, FAC Ex. A at 65-66, and

19   Larson testified about them without *any* objections being made, Kline Decl. Ex. D

20   at 329:3-330:3.

21   Neither this Court's nor Judge Larson's rulings bar this motion.  And even if

22   a motion for reconsideration was technically required, Larson's new testimony

23   would provide ample grounds for reconsideration of the Courts' prior rulings.

24   However, it is not clear that reconsideration is applicable since defendants refuse to

25   confirm whether Larson's Response Letter or its drafts are among the same

26   documents on which DC previously moved—*i.e.*, the "July 5" letter, the "July 11"

27   letter, or privilege log entries 712-716.  *See id.* Ex. E; Docket Nos. 160 at 2, 30-33,

28   37-38; 253 at 6-9; 274 at 7-8; 209 at 11-12; 288 at 8:14-18, 19:1-20:4.  But even if

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**7**

1    they were the same documents, in denying DC's motions, the Court reasoned (a)

2    defendants "clearly stated" the "July 5th" letter did not exist; (b) the May 13 letter

3    did not "tell much about the July 11th letter"; and (c) the Court was not inclined to

4    compel defendants to "undertake a vague or amorphous search" for a similar letter

5    that may "exist[] in a different form or with a different date."  Docket No. 288 at

6    19:17-23.  None of these reasons remains, and Larson's Response Letter and the

7    drafts of it should be produced.  Larson admits she wrote the letter; she described

8    some (but not all) of its contents; she testified she gave a copy of the letter to Mr.

9    Toberoff; and either she or Mr. Toberoff should be able to find the letter and drafts

10   among their files.  If defendants could not locate the letter, they were obligated to

11   tell DC so during the parties' extensive Rule 37 discussions on these issues.

12   Tellingly, they did not deny possessing these documents.

13       In sum, there is no principled basis for defendants' refusal to produce or even

14   identify the documents requested herein.  DC is being deprived of important

15   evidence and its right to a fair process and trial.  We respectfully submit this motion

16   should be granted.

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**8**

## II.    DEFENDANTS' INTRODUCTORY STATEMENT

DC raises in its motion, for the ***ninth*** time, a July 2003 letter from Laura Siegel Larson to Michael Siegel (the "July 2003 letter"). DC's repeated motions to compel this logged document have been *denied* three times in this case alone. DC moved for both reconsideration and review, and there is no basis for DC's repeat motion for reconsideration of this Court's and Judge Wright's orders. DC trumpets as a revelation Ms. Larson's simple deposition testimony that she wrote a letter in response to Michael Siegel's May 13, 2003 letter (the "May 13 letter"), while ignoring that DC repeatedly moved to compel the July 2003 letter before and presented testimony to that effect. DC's motion for reconsideration does no more than "restate[] the arguments and allegations made in support of [the] original motion," and should be denied on that ground alone. *McCoy v. Roe*, 234 Fed. Appx. 559, 560 (9th Cir. 2007).

DC is not entitled to either the July 2003 letter or drafts thereof sent to Mr. Toberoff for review and comment, as such are protected, were duly listed on privilege logs, and such have been consistently upheld by this Court, Judge Larson and Judge Wright. DC's argument that privilege was waived through involuntary disclosure in the Timeline is frivolous; unauthorized disclosure of stolen privileged documents does not constitute a waiver. *See, e.g., Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y. 1997). DC's argument that Ms. Larson waived privilege by answering basic deposition questions as to the general subject of the July 2003 letter is also incorrect.

DC's assertions as to the "important" nature of the July 2003 letter do not add up. The July 2003 letter was a response to a May 11, 2003 letter from Michael Siegel that concerned an offer to purchase Mr. Siegel's limited Superman interest. DC's complaint makes no mention of such an offer or Mr. Siegel, and such do not form the basis of any of DC's claims for relief. *See* Docket No. 49 ("FAC"). DC's Fifth Claim is for interference with a non-existent settlement agreement between

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**9**

1   DC and the Siegels that allegedly occurred in August 2002, after the Siegels had

2   "clearly and unequivocally" rejected DC's proposals in May 2002.  *Siegel v.*

3   *Warner Bros. Entertainment, Inc.,* 542 F. Supp. 2d 1098, 1139 (C.D. Cal. 2008).

4   DC's Fifth Claim does not make sense and, in any event, is barred by both the

5   statute of limitations and litigation privilege.  *See* Docket Nos. 145-146.

6       DC's clear objective in bringing such frivolous retaliatory claims is to obtain

7   economic leverage over defendants by driving up their litigation costs.  DC's

8   unbridled discovery on unwinnable claims is not a means to an end, but an end in

9   itself.  In this case alone, DC has brought overzealous discovery motions covering

10  *twenty-nine* issues, and has lost as to *twenty-three* of such issues.  *See* Docket No.

11  313, ¶ 9.  DC's abusive discovery practices impose an unwarranted burden on the

12  Court and defendants.  DC's motion should be denied and it should not be

13  permitted to bring such repetitive motions for reconsideration.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**10**

III.   **DC'S STATEMENT OF ISSUES IN DIPSUTE**

A.   **Relevant Factual Background**

1.  In their responses to DC's document requests, none of the defendants produced or specifically logged the May 2003 or July 2003 correspondence between Michael Siegel and Laura Siegel Larson that is disclosed in the Toberoff Timeline.  Docket No. 49 FAC Ex. A at 64-66.  DC moved to compel the production of these documents, and the Court ruled on April 11, 2011:

> <u>Michael Siegel Documents</u>
> July 11, 2003 letter.  Although Defendants are somewhat cryptic about this letter, nevertheless the record establishes that they asserted privilege as to the letter during the prior litigation, a designation that was upheld by this Court.  Plaintiff points to nothing to demonstrate that the prior ruling was incorrect; Plaintiff simply wants to see the document still.  The Court sees no basis for re-visiting the prior decision. …
> <u>Documents Referred to in the so-called Toberoff Timeline.</u>
> Plaintiff refers to two documents that were identified in the so-called Toberoff Timeline, and that have not been produced or logged, a May 13, 2003 letter from Michael Siegel to Ms. Larson, and a July 5, 2003 letter from Ms. Larson to Michael Siegel. Joint Stipulation at 37. As to the latter, Defendants respond that the document does not exist. Joint Stipulation at 71 n.26.  The Court finds no response as to the May 13, 2003 letter.  Accordingly, as to this letter, within seven days Defendants shall either (a) produce it to Plaintiff; or (b) submit a verified further response to Plaintiff indicating that it does not exist or, if it already has been produced, identifying it by Bates number or other identifying mark. …  Docket No. 209 at 11-12.

On April 18, defendants produced to DC Michael Siegel's May 13, 2003, letter to Laura Siegel Larson.  Michael's May 13 letter states:

> I really wish to discuss Marc Toberoff.  I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this?  Now that you have signed with him, he is in control of the whole Superman copyright.  I told you when he first contacted me, he wanted to buy my share of the copyright.  Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation.  When you signed with Marc the billionaire invested elsewhere.  Marc has his own production company, he was going to team with Emmanuel and make a movie.  This has not happened. You mentioned Marc had a number of innovative, proactive ideas that

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**11**

1
2
3
could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us.  Marc has chosen not to open any dialog with Time Warner or anyone else.  How can he negotiate a contact if he is not talking to anyone?

4
5
6
7
8
9
10
11
12
13
14
Marc is now the attorney for the entire Superman copyright.  In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner.  Has he told you this?  Do you know who owns the Shuster interest in the Superman copyright?  Has Marc bought the Shuster interest himself?  For a long time now, Marks and Rammer said there should be a united Siegel front.  Marc is not negotiating with anyone, but he has found someone willing to buy me out.  How can he find someone to buy me out and not negotiate for the entire Siegel interest?  Has Marc offered to find someone to buy your interest?  If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright.  This would weaken your position?  The amount Marc's investor is offering is less than half of what DC showed as my share.  There is a very real possibility I will contact Time Warner and see if they will buy me out.  Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get.  Marc is really pressing for an answer to the offer his investor made…. Docket No. 225-4.

15
16
The Timeline discloses that Larson wrote a response letter to Michael and discloses how Mr. Toberoff made key factual changes to the body of her letter:

17
18
19
20
21
22
23
24
25
July 5, 2003.  Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Shuster interest in Superman.  He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this*. The Schusters - through the Pacific Pictures Corp agreement - gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners - it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

26
27
28
Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft -- in response to Michael's accusations of Toberoff.  Laura clearly states that MT does *not* have a production company. (This is false - Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002).  In the draft of the letter, MT crossed

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

**EXHIBIT A**

**12**

out the statement that he does not have a production company, and writes "MT has no[] plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff' never had the intention of making a movie, and approached the Siegels and Schusters  separately - not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.  Kline Ex. A at 6-7.

When DC obtained a copy of Michael's May 13 letter, it moved this Court to reconsider its April 11 ruling.  DC requested that defendants be ordered to:

> [a] conduct a diligent review of all files in their possession, custody, or control (including any files obtained Michael Siegel and/or Don Bulson) for any unproduced documents from June or July 2003 involving Michael Siegel, Don Bulson, Laura Siegel Larson, or Joanne Siegel, and either submit a sworn verification that no such documents exist, or if such documents exist, to produce them to DC; and
> [b] produce the July 11, 2003, correspondence from Laura Siegel Larson to Michael Siegel, as well as to submit privilege log entries 715 and 716 to the Court for *in camera* review (and production to DC, in all or in part, if they are not privileged).  Docket No. 253-17.

*See also* Docket No. 288 at 8:14-18 ("An alternative way of getting at that issue, your Honor, is for you to order the *in camera* inspection of those five privilege log entries from Ms. Larson to Mr. Toberoff during that relevant time period.  And, again, those privilege log entries are 7[12] through 7[16].").

On June 20, 2011, the Court denied DC's motion, reasoning:

> The Court feels … that reconsideration is not appropriate as to the July 11th letter.  Knowing the specific language of the May 13 letter does not tell much about the July 11th letter.  There's nothing to demonstrate that the prior orders long ago upheld on the grounds that DC Comics did not seek review of this Court's earlier ruling were materially wrong.
> Even more so, the May 13th letter does not justify a different ruling on the July 5th letter.  As the Court previously stated, the defendants clearly stated that such a letter did not exist.
> Plaintiff asserts that maybe it exists in a different form or with a different date, but the Court declines to order defendants to undertake a vague or amorphous further search. …  Docket No. 288 at 19:10-23.

2.  DC deposed Larson on July 22—some four weeks after the Court issued its June 20 ruling.  Kline Dec. Ex. D.  During her deposition, Larson confirmed that

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

**EXHIBIT A**

**13**

1    she responded to Michael's May 13 letter, that Mr. Toberoff made factual edits to

2    the letter (via faxes to her), and that she gave Mr. Toberoff a copy of the final letter:

3        Q. This is a letter from Michael Siegel to you dated May 13; is that
4        correct?
         A. Yes.
5        …
         *Q. Did you respond to it?*
6        *A. I'm sure I did.*
7        …
         *Q. Did you type the letter yourself?*
8        *A. Yes, I did.*
         Q. Did your mother help you prepare it?
9        A. I think she had input.
10       …
         Q.   So you have the Superman -- you have the Marc Toberoff
11       timeline, Exhibit 58, in front of you?
         A.   Yes.
12       Q.   And you also have Exhibit 30, the Michael Siegel letter to you
         dated May 13, 2003?
13       A.   Yes, I do.
         Q.   Now, go to the end of the fourth page as Q 0004 and you'll see a
14       reference to a July 5, 2003 -- first of all, go to the prior page of this
         Exhibit 58.
15       A.   Okay.
         Q.   And you'll see that the author of this document is identifying
16       Michael Siegel's May 13, 2003, letter, the one that you have in front of
         you as Exhibit 30.  Do you see that?
17       A.   I do.
         Q.   And then he is -- he or she is purporting to state some of the
18       contents of that letter.  Do you see that?
19       A.   I see a paragraph about it.
         Q.   [N]ow dropping down to the end of the next page with the Bates
20       label Q 0004, the reference to the July 5, 2003, date, do you see that?
21       A.   Yes, I do.
         Q.   It says "Laura Siegel reveals her ignorance of Toberoff's
22       dubious actions in her return letter back to Michael."  Putting aside the
         characterization of your ignorance, *does July 5, 2003, sound right to you*
23       *as around the time that you responded to the May 13, 2003, letter?*
24       *A. It could have been.*
         Q. Okay. Is it fair to say that your letter back to Mr. Michael Siegel
25       did not agree with any of his criticisms of Mr. Toberoff's actions and
         Mr. Toberoff generally?
26       A.  Well, whoever stole this document, you know, is doing his
27       version of what he's reading into whatever the letter said.
         Q. You're not following my question.
28       A. Well, I haven't read the letter in a long time.

- 9 -

*Q. My question to you is when you wrote back to Michael --*
*A. Yes.*
*Q. -- in response to his May 13, 2003, letter, is it fair to say that you expressed no agreement with any of his criticisms of Mr. Toberoff?*
*A. I would say that's probably safe to say.*
*Q. Did you tell Michael Siegel in your response letter back that Mr. Toberoff does not have a production company?*
*A. Yes, I believe I did.*
…
Q. Yes.  It says "Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft -- in response to Michael's accusations of Toberoff, Laura clearly states that MT does not have a production company." And that was your belief at the time; correct?
A.  Correct.
Q.  And it goes on to say that, in parentheses: "(This is false -- Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002).  In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes, quote, "MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights," end of quotes. Now, does that -- *is that consistent with your recollection that your statement that Mr. Toberoff did not have a production company was crossed out by Mr. Toberoff in the final draft and replaced with the quoted language that I just read?"*
*A. It could have been.*
*Q. And when Mr. Toberoff made his changes to the letter and returned it to you, did you review it and sign it before you sent it out as your response letter back to Michael?*
*A. Well, he made suggestions of changes in the wording of certain areas, and, you know, I retyped the letter, accepted some of the things that he said and didn't use some other suggestions that he made.*
*Q. How did he convey his suggestions to you?*
*A. He wrote it on -- he wrote it on this letter -- no, not this letter.  He wrote it on that letter that's being discussed here and faxed it back to me.*
Q. Okay. So you did engage in faxed communication with Mr. Toberoff from time to time.
A. Yes.
Q. Okay. Including with respect to this very correspondence that we're discussing.
A. I believe so.
*Q. Okay.  Now, did you show him the final draft before you sent it out?*
*A. I believe I did.*
Q. And which of the changes did you reject?
A. I don't remember.  I just remember the process, but I don't remember the contents.  *Id.* at 314:12-15, 316:11-12, 323:11-14, 325:22-327:22, 328:3-330:3 (emphasis added).

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**15**

1   During her deposition, Larson admitted that Mr. Toberoff had not told her
2   about the contracts that his production company, Pacific Pictures, had signed with
3   the Shuster heirs.  *Id.* at 158:11-19, 176:13-178:4, 228:16-233:7, 247:17-24.  In
4   these contracts, the Shusters assigned 50% of their putative copyright interests to a
5   new joint venture, in which Pacific Pictures was a 50% owner.  Docket No. 307 at
6   6-9, 13-15.  These Pacific Pictures contracts, defendants' admissions that they were
7   "unlawful," and the proof that the contracts continue to interfere with DC's rights to
8   this day are all addressed in DC's recent SLAPP opposition brief.  *Id.*

9   Larson also admitted that she possesses "various boxes that relate to the
10  case" that neither she nor Mr. Toberoff has ever reviewed.  This includes boxes she
11  obtained from her late mother (and former co-defendant) Joanne Siegel:

12      Q.  And again, I'm only focused on Superman materials.  But
13  between your Superman papers, files, and materials and your mother's--
        A.  Yes.
14      Q.  -- can you somehow in your own way approximate the
    volume?  Let's say boxes.  If you put it all in the bankers boxes, how
15  many boxes would there be?  Ten boxes?
16      A.  I couldn't guess at that because *there were a lot of things
    that -- there are many different things in any one given box, these
17  things that I haven't gone through yet.  So there could be a box that
    has one paper relating to Superman or there could be many papers.*
18      Q.  Like, for example, the letters that you exchanged with
    Michael Siegel that you said are in your home, where in your home are
19  those letters?
        MR. TOBEROFF:  Lacks foundation.
20      THE WITNESS:  Well, anything that I had, you know, is also
    mixed in with papers.  I mean I have -- I have various boxes that relate
21  to the case.  I have other boxes that relate to my divorce.  I've got a lot
22  of different things.
        …
23      Q.  When your mom passed and you took some -- you took all
    of her files and papers, did you turn any of that material over to Mr.
24  Toberoff?
25      A.  Yes.  I found something that I --
        Q.  What did you find?
26      A.  I found a file that she had about a lawyer that we had been
    talking about potentially hiring.
27      Q.  Is that Gerry Spence?
        A.  Gerry Spence, yes.
28

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**16**

1
2
3
4
5
6
7
8
9

Q.   And you just turned that over to him when?
A.   Just a couple of days ago.
Q.   Okay.  So what caused you a couple of days ago to come across that file?  Were you looking for materials related to this case?
A.   No.  I was going -- going through a box of her papers, and it happened to be in there.
*Q.   Has anyone other than you -- since the filing of this lawsuit in May, 2010, has anyone other than you searched the papers in your home related to this case?*
*MR. TOBEROFF:  At her home?*
*MR. PETROCELLI:  Yes.*
*THE WITNESS:  No.*
*Q.   For example, did Mr. Toberoff come to your house and search through your files or a member of his law firm?*
*A.   No.  Id.* at 93:12-94:9, 100:3-101:5 (emphasis added).

10
11
12
13
14
15

Defendants have yet to review these un-searched boxes or commit to a date certain to do so.  Kline Decl. Exs. E-J.  This is despite their representations to the Court, at the June 20 hearing, that they "perform[ed] a diligent search of our records, all of our records," and "we also, of course, asked our client [Larson] whether she had a copy [of the November 2002 and July 2003 correspondence] and to research her records" as well.  Docket No. 288 at 38:23-39:1, 39:8-10.

16
17
18
19
20

3.  In light of Larson's July 22 testimony, DC asked defendants to produce copies of Larson's Response Letter and all related drafts.  Kline Decl. Ex. E at 362.  DC's letter making this request quoted Larson's testimony at length.  Defendants responded on August 1, saying only:  "July 2003 Letter:  DC has made numerous motions to compel on this subject which have been **denied**."  *Id.* Ex. G at 365.

21
22

On August 3, the parties met and conferred, in person, to discuss, *inter alia*, Larson's Response Letter and related drafts.  In the meeting, defendants would not:

23
24
25
26
27
28

- agree to produce a copy of Larson's Response Letter and/or drafts of it;
- confirm whether they possess Larson's Response Letter and/or the drafts;
- address whether it was defendants' position that Larson's Response Letter and/or drafts of it are privileged, and, if so, why;
- confirm whether Larson's Response Letter and/or drafts of it appear on defendants' privilege logs, and, if so, at what entry numbers; or

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

1      • confirm whether Larson's Response Letter and/or drafts of it were the

2         subject of DC's prior motions.

3    *Id.* ¶ 9; Decl. of Cassandra Seto ¶¶ 3-4. As DC documented in an August 4 letter:

4         Mr. Toberoff … refused to confirm the existence of Mr. Larson's
      response to Michael Siegel's May 13, 2003 letter—even though she
5      testified that she was "sure" she responded to the May 13 letter, *id.* at
      267, Mr. Toberoff "made suggestions of changes in the wording" of her
6      response, *id.* at 279, and that the response may well have been sent on
      July 5, 2003, as recounted in the Toberoff Timeline, *id.* at 277.
7      Mr. Toberoff refused to address whether such a letter or drafts of it
      existed in his files, whether Ms. Larson possessed a copy of it, or
8      whether this document was among those defendants have listed on their
      privilege logs. When we said her recent testimony clearly confirmed
9      the existence of such a responsive letter, as raised in our previous
      motions, Mr. Toberoff suggested that Ms. Larson might have been
10     referring to another letter of another date. When we asked him when
      the letter she testified about was sent, if not in July, he refused to
11     address the issue. When we pointed out that his refusal to provide these
      details made it impossible to determine whether to file our motion as
12     one to compel or one for reconsideration, he acknowledged this
      problem, but still refused to provide the necessary detail…. *Id.* Ex. H at
13     368-369.

14
15         On August 10, defendants responded. Notably, they did *not* deny Larson's
16
17   Response Letter and drafts of it exist or that they possess these documents:

18         DC has already made two motions to compel the production of
      Ms. Larson's correspondence with David Michaels, including the "July
19     2003" letter and the "November 2002" letter, both of which were
      denied, and we see no grounds for further discussion of the subject on
20     the thin pretext of Ms. Larson's production of her brief, non-substantive
      communications with Gary Spence….
21         You make various other mischaracterizations of the parties' meet
22     and confer that do not merit a point by point discussion as this time.
23         In light of Magistrate Zarefsky's comments at yesterday's hearing,
      DC should not bring yet another frivolous motion for reconsideration of
24     these already-decided issues. *Id.* Ex. I at 429-30.

25   On August 11, DC confirmed it would have to file this motion:

26         On the Laura Siegel Larson documents, we will move to compel
      production of Ms. Larson's letter to her half-brother (and the drafts of
27     it) that she described at length at her deposition. … Tr. at 298:12-15,
      300:11-12, 310:20-311:22, 312:3-314:3.
28

- 13 -

1
2
3
4

Ms. Larson's description of her response letter to Michael's May 13, 2003, letter confirms the Toberoff Timeline's claim that Ms. Larson wrote a responsive letter and that Mr. Toberoff edited it … FAC Ex. A at 65-66.  The Toberoff Timeline notes that it enclosed a copy of Ms. Larson's responsive letter to her brother, yet defendants have never produced that document.

5
6
7
8

Defendants notably do not deny—either in your two recent letters on the subject, nor did Mr. Toberoff during our meet-and-confer in New Mexico—that the non-privileged letter that Ms. Larson wrote to her half-brother and the accompanying drafts of it about which she testified exist in your and/or her files.  Nor do you disclose whether the letter and drafts of it are among the documents listed on your privilege logs or at what entries—*i.e.*, entries on which DC moved to compel….

9
10

Because of this ambiguity, which you decline to help clarify, we will need to file the motion for these documents as one to compel and/or, in the alternative, as one for reconsideration….   *Id*. Ex. J.

11
12

**B.    Defendants Should Be Ordered to Produce Larson's Response Letter And All Related Drafts.**

13
14
15

Defendants should be ordered to produce to DC Larson's Response Letter (as she described the document at her deposition (*id*. Ex. D at 316:11-12, 324:22-329:2), as well as drafts of the letter that exist (*id*. at 329:3-330:3).

16
17
18
19
20
21
22

1. The Documents DC Seeks Are Relevant And Responsive.  DC's complaint challenges the Toberoff defendants' tortious business acts, including his and his companies' efforts to obtain and exclusively market the Siegels' putative Superman rights—all of which interfered with DC's business relationship with the Siegels.  Docket No. 49, FAC ¶¶ 1-12, 51-91.  DC's document requests to each defendant seek copies of communications among the Siegel heirs, including Michael Siegel, concerning Mr. Toberoff's solicitations.[1]  Defendants do not

23
24
25
26
27
28

---

[1] *E.g.,* Docket No. 161-15 at 163-65 (requesting "All DOCUMENTS relating to":  "the disposition, division, or ownership of any rights in SUPERMAN," (Larson No. 8); "the potential sale, assignment, license, or other disposition of any rights relating to SUPERMAN …, including but not limited to any solicitation, offer…." (Larson No. 11); and 'any solicitation, offer, or option from any DEFENDANT regarding the purported rights of YOU or the SIEGEL HEIRS in SUPERMAN," (Larson No. 23)).  The definition of "SIEGEL HEIRS" included "Michael Siegel." *Id.* at 160 ¶ 7. *See also* Docket Nos. 161-14 at 153-55 (J. Siegel Nos. 8, 11, 23); 207-5 at 17-18 (Toberoff Nos. 12, 15), 28-29 (IPW, LLC Nos. 12,

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

1    dispute that Larson's Response Letter, and the drafts of the letter Larson exchanged

2    with Mr. Toberoff, are responsive to DC's document requests or are relevant to

3    DC's claims.

4           DC's complaint alleges that Mr. Toberoff used misrepresentations regarding

5    a wealthy investor and a movie production deal to induce the Siegels to sever their

6    relationship with DC and give Mr. Toberoff and his companies a controlling

7    interest in the Siegels' putative rights.  Docket No. 49 FAC ¶¶ 7-8, 66-85.  Michael

8    Siegel's May 13 letter—which defendants *never* logged as privileged, *never*

9    produced to DC, and *never* disclosed as a part of the parties' meet-and-confer

10    efforts, Docket No. 160 at 37-38—corroborates these allegations.  For example, it

11    states:

12        •   "I told you when [Toberoff] first contacted me, he wanted to buy my
13            share of the copyright.  Marc had a mysterious billionaire who wanted to
        invest in the Superman copyright, put 15 million dollars up front plus
14            participation.  When you signed with Marc the billionaire invested
        elsewhere.  Marc has his own production company, he was going to team
15            with Emmanuel and make a movie.  This has not happened."

16        •   "You mentioned Marc had a number of innovative, proactive ideas that
17            could bring all members of the Siegel interest both justice and many times
        more than the amount DC's representatives wanted to throw our way to
18            get rid of us.  Marc has chosen not to open any dialog with Time Warner
        or anyone else."

19        •   "Do you know who owns the Shuster interest in the Superman copyright?
20            Has Marc bought the Shuster interest himself?"  Docket No. 225-4 at 3.

21    Larson's Response Letter addresses these assertions, and drafts of the letter, as well

22    as Mr. Toberoff's factual revisions to it, bear on DC's allegations about what Mr.

23    Toberoff and his companies did and did not disclose to the Siegel heirs.  *Supra* at

24    12-14.

25           2.  Larson's Response Letter and Drafts of It Exist in Defendants' Files.

26    Larson testified that she was "sure" she responded to Michael's May 13 letter, Mr.

27    Toberoff "made suggestions of changes in the wording," she may have well sent the

28    15), 36-37 (IP Worldwide, LLC Nos. 12, 15), 45-46 (Pacific Pictures Nos. 12, 15).

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

1    response in July 2003 (as recounted in the Timeline), and she gave Mr. Toberoff a

2    final copy of the letter she sent her brother.  Kline Decl. Ex. D at 314:12-15,

3    316:11-12, 324:22-330:3.  DC gave defendants every chance—in three letters and a

4    face-to-face meet-and-confer—to deny that the Larson Response Letter and drafts

5    of it exist in defendants' files.  *Id.* Exs. E-J; *id.* ¶ 9; *supra* at 12-14.  Not once did

6    defendants do so.  *See id.*

7          3.  Larson's Response Letter and Drafts of It Are Not Privileged.  Defendants

8    refuse to engage with DC on whether they claim that Larson's Response Letter and

9    drafts of it are privileged.  *Supra* at 12-14.  Neither Michael Siegel's May 13 letter

10   nor Larson's Response Letter is privileged, as both communications are between

11   two non-lawyers and concerning claims regarding Mr. Toberoff's

12   misrepresentations as a businessman.  Such non-privileged discussions between

13   half-brother and -sister do not become privileged because Larson sent a copy of

14   them to Mr. Toberoff—a business partner/lawyer.  *See Suezaki v. Super. Ct.*, 58

15   Cal. 2d 166, 176 (1962) (transmission to counsel of non-privileged communication

16   "cannot create the privilege").[2]

17          Similarly, the drafts of Larson's Response Letter (including the marked-up

18   copies) should not be blanketed by privilege in their entirety or at all.  The Toberoff

19   Timeline—which Judge Larson ordered defendants to produce, Case No. CV-04-

20   8400, Docket No. 374, and which the parties jointly and openly filed in the *Siegel*

21

22          [2] *Accord U.S. v. Ruehle*, 583 F.3d 600, 608-09 (9th Cir. 2009) (district court's
     presumption of privilege over all communications during attorney-client
23   relationship was error); *U.S. v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir.), *cert.
     denied*, 377 U.S. 976 (1964) (attorney-client relationship does not create an
24   automatic "cloak of protection … draped around all occurrences and conversations
     which have any bearing, direct or indirect, upon the relationship of the attorney
25   with his client"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127
     (N.D. Cal. 2003) (statements made in meeting not necessarily privileged simply
26   because legal counsel present); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4
     (N.D. Ill. 1980) ("Attachments which do not, by their content, fall within the realm
27   of the privilege cannot become privileged by merely attaching them to a
     communication with the attorney.").
28

- 16 -

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**21**

1   case for all the world to see in 2009, *id.* Docket No. 476-4 at 5-11—discloses

2   certain contents of the drafts and Mr. Toberoff's proposed factual edits.  For

3   example, the Timeline states:  "In the draft of [Larson's Response] letter, MT

4   crossed out the statement that he does not have a production company, and writes

5   'MT has no[] plans to produce a SUPERMAN movie, nor is this feasible given the

6   division of ownership of the rights.'"  Docket No. 49 FAC Ex. A at 66.  Such

7   disclosures vitiate any claim of privilege, *e.g.*, *U.S. v. Nobles*, 422 U.S. 225, 239

8   (1975); *Weil v. Inv./Indicators, Research & Mgmt, Inc.*, 647 F.2d 18, 24 (9th Cir.

9   1981), and Mr. Toberoff's factual corrections about whether he—the

10  businessman—owned production companies are not privileged.  *Supra* n.2 (cases).

11       Indeed, Larson testified openly at her deposition about the drafts, Mr.

12  Toberoff's proposed revisions, and her response to them—all without any privilege

13  objection being interposed.  Kline Decl. Ex. D at 329:3-330:3; *supra* at 9-10

14  (collecting this testimony).  During the remainder of Larson's deposition, counsel

15  interposed no fewer than 45 "privilege" objections and instructed her not to answer

16  45 questions.  Seto Decl. ¶ 2.  Yet not once did counsel make such an objection or

17  give such an instruction during this line of inquiry about the edits and drafts of the

18  letter:

19           Q. My question to you is when you wrote back to Michael --
             A. Yes.
20           Q. -- in response to his May 13, 2003, letter, is it fair to say that you
         expressed no agreement with any of his criticisms of Mr. Toberoff?
21           A. I would say that's probably safe to say.
             *Q. Did you tell Michael Siegel in your response letter back that*
22       *Mr. Toberoff does not have a production company?*
             *A. Yes, I believe I did.*
23           ...
24           Q.  It says "Also, in the letter back to Michael Siegel, that MT
         helped Laura Siegel draft -- in response to Michael's accusations of
25       Toberoff, Laura clearly states that MT does not have a production
         company." And that was your belief at the time; correct?
26           A.  Correct.
             Q.  And it goes on to say that, in parentheses: "(This is false -- Marc
27       Toberoff's IPW has been in existence, partly funded by Ari Emanuel,
28

- 17 -

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**22**

since at least 2002).  In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes, quote, "MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights," end of quotes. *Now, does that -- is that consistent with your recollection that your statement that Mr. Toberoff did not have a production company was crossed out by Mr. Toberoff in the final draft and replaced with the quoted language that I just read?"*

A. It could have been.

Q. And when Mr. Toberoff made his changes to the letter and returned it to you, did you review it and sign it before you sent it out as your response letter back to Michael?

A. Well, he made suggestions of changes in the wording of certain areas, and, you know, I retyped the letter, accepted some of the things that he said and didn't use some other suggestions that he made.  Kline Decl. Ex. D at 327:12-22, 328:3-329:10 (emphasis added).

"[O]bjections on ground of privilege or work product … are *waived* unless a *specific* objection to disclosure is *timely made* during the deposition."  SCHWARZER ET AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:1553 (Rutter 2011); *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999) (same); *In re Qwest Comms. Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) ("Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege.").

4.  The Courts' Prior Orders Do Not Bar This Motion.  DC could not know whether to style this motion as one for reconsideration because defendants refuse to disclose whether Larson's Response Letter and the drafts are among the documents DC sought in its prior motions—*i.e.*, the "July 5" letter, the "July 11" letter, or privilege log entries 712-716.  *Compare* Kline Decl. Exs. E-J (DC's meet-and-confer efforts on this topic), *with* Docket Nos. 160 at 2, 30-33, 37-38; 253 at 6-9; 274 at 7-8; 209 at 11-12; 288 at 8:14-18, 19:1-20:4 (DC's prior motions).  Defendants assert that "DC has made numerous motions to compel on this subject which have been **denied**," Kline Decl. Ex. G at 365, but will not confirm whether the response letter that Larson testified about is listed among log entries 712 to 716 or is dated July 5, 11, or some other date appurtenant thereto, *supra* at 12-14.

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**23**

1      Even if Larson's Response Letter or its drafts are among these documents

2  DC sought to compel production of unsuccessfully, Larson's testimony, which was

3  not available when the courts made their rulings, is newly discovered evidence that

4  constitutes good cause for reconsideration.  *See* C.D. L.R. 7-18; *Intamin, Ltd. v.*

5  *Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1068 (C.D. Cal. 2009); *Milton H.*

6  *Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152, 1162-63

7  (C.D. Cal. 2008); *Kennedy v. Lubar*, 273 F.3d 1293, 1299 & n.6 (10th Cir. 2001).

8      In denying DC's motions, the Court reasoned (a) defendants "clearly stated"

9  the "July 5th" letter did not exist; (b) the May 13 letter did not "tell much about the

10  July 11th letter"; and (c) it was disinclined to compel defendants to "undertake a

11  vague or amorphous search" for a similar letter that may "exist[] in a different form

12  or with a different date."  Docket No. 288 at 19:11-23; *see also* Docket No. 209 at

13  11-12.  None of these reasons remains, given Larson's recent sworn testimony.

14      • Larson admits she wrote and sent a letter to Michael in response to his

15          May 13 letter.  Kline Decl. Ex. D at 314:12-15, 316:11-12, 323:11-14,

16          326:20-327:1.  That letter has never been produced, and defendants do not

17          deny it exists.

18      • There is no basis to conclude the letter is privileged.  Defendants have

19          asserted no such claim, and Larson's limited testimony about the

20          document reveals it addresses her response to "criticisms of

21          Mr. Toberoff's actions" and facts like whether he owned a production

22          company.  *Id.* at 325:22-327:22.  Such discussions—especially between

23          non-lawyer, half-siblings—are not privileged.

24      • Larson testified she sent Mr. Toberoff a copy of the Response Letter (both

25          draft and final forms) and that he faxed her edits as well.  *Id.* at. 328:3-

26          330:3.  Larson confirmed, moreover, that she gave Mr. Toberoff, as a

27          general matter, correspondence concerning Superman.  *Id.* at 291:22-

28          294:18.

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**

1   Neither Judge Larson nor this Court had before it such testimony that Larson wrote

2   such a letter to Michael.  DC did not have Larson's admissions about the letter's

3   contents to challenge any asserted privilege claims.  Nor did DC have her sworn

4   testimony, which shows that defendants need not engage in a "vague" search to find

5   the Response Letter or its drafts.  Such documents should exist in Mr. Toberoff's

6   files and/or Larson's files, and defendants tellingly have not disputed this.

7        **C.    Conclusion**

8        DC's motion should be granted.

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**

**25**

## IV.    DEFENDANTS' POSITION

### A.    There is No Basis to Reconsider This Court, Judge Larson's and Judge Wright's Decisions

Motions for reconsideration "are disfavored and are rarely granted." *Trust Corp. v. Aetna Casualty and Surety Co.*, 873 F. Supp. 1386, 1393 (D. Ariz. 1994). *See 389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) ("[A] motion for reconsideration should not be granted, absent highly unusual circumstances..."). "To succeed, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1132 (E.D. Cal. 2010). DC has completely failed to justify its motion for reconsideration under Local Rule 7-18.

The July 2003 letter is privileged, has been claimed and upheld as privileged, and there is no basis to reconsider such decisions. As this Court held in its April 11, 2011 order that rejected DC's prior attempt to compel the July 2003 letter, "the record establishes that [defendants] asserted privilege as to the [July 2003] letter during the prior litigation, a designation that was upheld by the Court." Docket No. 209 at 11. In total, DC ***unsuccessfully*** challenged Defendants' privilege assertion as to the July 2003 letter in the *Siegel* action on no fewer than ***five*** separate occasions (*see* Docket No. 160 at 66:10-68:14; *see also* Docket No. 163, Ex. TT, ¶ 9; Docket No. 164, Ex. B, ¶ 3; Docket No. 163, Ex. UU; Docket No. 164, Ex. C at 20:15-22:26; Docket No. 164, Ex. D, ¶¶ 48-51; Docket No. 164, Ex. G at 5; Docket No. 163, Ex. VV, ¶¶ 6-7; Docket No. 164, Ex. I at 1, 4) and on ***three*** separate occasions in this litigation. *See* Docket Nos. 160, 225, 253. DC claims that its motion is based on "new" testimony from Ms. Larson, but this is just a pretext, as DC advanced its exact same argument as to the existence of the July 2003 letter in its prior unsuccessful motions to compel:

- In support of DC's first motion to compel the production of the stolen documents in *Siegel*, Warner's in-house counsel Wayne Smith specifically

JOINT STIP. RE: DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

1    testified that the stolen documents included un-produced correspondence

2    between Laura Siegel and her "estranged step-brother, Michael Siegel" that

3    had not been produced.  Docket No. 163, Ex. TT, ¶ 9; No. 164, Ex. B, ¶ 3.

4  •  In response to this Court's April 30, 2007 order (Docket No. 163, Ex. UU),

5    the July 2003 letter was matched up to the Siegels' "supplemental privilege

6    log # 82."  Docket No. 163, Ex. VV, ¶¶ 6-7.  Judge Larson upheld privilege

7    as to all documents matched up to privilege log entries, including the July

8    2003 letter. Docket No. 164, Ex. I at 4.

9  •  On September 17, 2007, DC filed a further motion to compel in *Siegel*

10   regarding the stolen documents, and specifically contended that "[a]mong the

11   'non-privileged' Escrow Documents was correspondence [the July 2003

12   letter] concerning … Michael Siegel.  That correspondence has never been

13   produced…."  *See* Docket No. 164, Ex. C at 20:15-22:26.

14  •  DC thereafter filed a declaration claiming that the Siegels' privilege logs

15   were inaccurate, based, among other things, on the July 2003 letter.  Docket

16   No. 164, Ex. D, ¶¶ 48-51.

17  •  Later, DC again argued that "[o]ne of the Escrow Documents that has not

18   been produced is believed to be a communication [the July 2003 letter] from

19   plaintiff Laura Siegel Larson to Michael Siegel."  Docket No. 164, Ex. G at

20   5.

21  •  On September 26, 2008, Judge Larson *rejected* DC's repeated challenge to

22   the Siegels' privilege logs, including its attempt to compel the July 2003

23   letter.  Docket No. 164, Ex. H at 5.  That order specifically upheld the

24   "privilege log entries … in Mr. Toberoff's May 21, 2007 declaration," made

25   pursuant to this Court's April 30, 2007 order.  *Id.*, Ex. H at 5.

26  •  DC's supposedly "neutral escrow" attorney wrote to the Court *ex parte* on

27   October 16, 2008 advocating that he be permitted to peek beneath the logs by

28   "matching up" privileged escrow documents, citing DC's challenges to the

- 22 -

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**27**

1    Siegels' logs. Docket No. 164, Ex. I at 1. The *Siegel* Court *denied* that **fifth**

2    attempt to challenge the privilege logs, and ended the matter on December 4,

3    2008, by ordering the escrow holder to finally disburse the stolen documents.

4    Docket No. 164, Ex. I at 4.

5  •  Then, in **this** litigation, DC again argued that "[o]n July 11, 2003, Laura

6    Siegel Larson sent a letter or email to her half-brother, Michael Siegel," and

7    that "Defendants claim privilege over this letter and have included it on their

8    privilege log," but that the letter should be produced. Docket No. 160 at 30-

9    33. On April 11, 2011, this Court denied DC's motion, holding that

10   defendants "asserted privilege as to the letter during the prior litigation; a

11   designation that was upheld." Docket No. 209 at 11.

12 •  On April 25, 2011, in a motion for review of this Court's April 11, 2011

13   order, DC argued to Judge Wright that the July 2003 letter existed, was in

14   response to the May 13 letter, was not privileged, and must be produced. *See*

15   Docket No. 225 at 15-17 ("the Toberoff Timeline describes a July 2003 letter

16   from Laura Siegel Larson to Michael Siegel"; Defendants do "not deny there

17   was correspondence between Ms. Larson … and Mr. Siegel during this

18   general time period"; and "[n]or is there any other reason to allow

19   defendants to shield this clearly non-privileged communication from

20   disclosure"); No. 243 at 10 ("Ms. Larson wrote a reply in July 2003"; "By all

21   accounts, the 'July 11, 2003,' letter exists and is a non-privileged

22   communication"). On May 11, 2011, Judge Wright rejected DC's motion.

23   Docket Nos. 248, 252.

24 •  On May 23, 2011, in a motion for reconsideration to this Court, DC again

25   argued that the July 2003 letter was a response to the May 13 letter, was in

26   defendants' possession, was not privileged and should be produced. Docket

27   No. 253 at 6-9 ("the May 13 letter is new proof that the July 11 letter exists";

28   "It appears that the July 11 letter … contains Ms. Larson's response"). On

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**28**

1    June 20, 2011, this Court rejected DC's motion in its entirety.  Docket No.

2    285.

3         DC thus repeatedly made the same argument that it makes now to the *Siegel*

4    Court, to this Court, and to Judge Wright, and such arguments were consistently

5    rejected.  DC has no new argument to justify reconsideration.  Rather, DC merely

6    points to the testimony of Ms. Larson that she wrote such a letter.  Such testimony

7    does nothing to distinguish this motion from DC's denied motions where it offered

8    similar testimony as to the letter's existence.  *See* Docket No. 163, Ex. TT, ¶ 9;

9    Docket No. 164, Ex. B, ¶ 3, Ex. D, ¶¶ 48-51.  As with DC's prior motions on this

10   subject, DC "points to nothing to demonstrate that the prior ruling was incorrect;

11   [DC] simply wants to see the document still."  Docket No. 209 at 11.  DC's motion

12   does no more than recycle its prior arguments, and it should be denied on that

13   ground alone.  *See McCoy v. Roe*, 234 Fed. Appx. 559, 560 (9th Cir. 2007)

14   (approving denial of motion for reconsideration that "restated the arguments and

15   allegations made in support of [the] original motion"); *Aventis Pharms. SA v.*

16   *Amphastar Pharm., Inc.*, 2005 WL 5957795, at *2 (C.D. Cal. Mar. 25, 2005)

17   (motion to reconsider failed because it was "repeating an argument"); *Hepler v.*

18   *Wash. Mut. Bank, F.A.*, 2008 WL 4866285, at *1 (C.D. Cal. Oct. 28, 2008) (same).[3]

19        **B.    Communications Between Ms. Larson and Mr. Siegel Are**

20               **Privileged**

21        DC erroneously argues that communications between Michael Siegel and

22   Laura Siegel cannot be privileged.  *Supra* at 16-18.  Mr. Siegel and Ms. Larson had

23   an obvious common interest in the Siegel terminations, as Mr. Siegel had a

24   statutory interest in the terminations as a matter of law.  17 U.S.C. § 304(c)(2).

25        Communications between clients, where such clients have a common legal

26        [3] DC's repeated complaint that the May 13 letter was not logged or previously
27   produced (*supra* at 15, citing Docket No. 160 at 37-38) is a *non sequitur*.  As the
     Court noted in its April 11 Order (Docket No. 209 at 12), Defendants never claimed
28   that the May 13 Letter had been logged or produced, unlike the July 2003 letter.

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

1    interest, are privileged.  *See* 6-26 Moore's Federal Practice § 26.49[5][b] ("The

2    common interest doctrine, which is an exception to the general rule that the

3    attorney-client privilege is waived on disclosure of privileged information with a

4    third party, provides that parties with a shared interest in actual or potential

5    litigation against a common adversary may share privileged information without

6    waiving the privilege."); *U.S. v. Under Seal*, 902 F.2d 244, 249 (4th Cir. 1990)

7    (collecting cases) ("[T]he rationale for the joint defense rule remains unchanged:

8    persons who share a common interest in litigation should be able to communicate

9    with their respective attorneys ***and with each other***…") (emphasis added).  Such a

10   common interest can exist even if the interests of the clients are at odds in certain

11   respects.  *See Hunydee v. U.S.*, 355 F.2d 183, 185 (9th Cir. 1965) (applying

12   common interest doctrine to statements concerning a matter of common concern,

13   even though co-defendants generally had a conflict of interest); *Griffith v. Davis*,

14   161 F.R.D. 687, 692 n.6 (C.D. Cal. 1995) (holding the interest applies even if the

15   parties "may even be adverse in some respects"); *Eisenberg v. Gagnon*, 766 F.2d

16   770, 787-788 (3d Cir. 1985) (same).

17        The courts have also emphasized that direct communications between

18   jointly-interested clients are privileged where both parties have an interest in

19   potential litigation, even where such communications are not sent through an

20   attorney.  *See Britesmile, Inc. v. Discus Dental, Inc.*, 2004 U.S. Dist. LEXIS 20023

21   (N.D. Cal. Aug. 10, 2004) (common interest privilege applied where seller sent

22   privileged material directly to potential buyer); *Hewlett-Packard Co. v. Bausch &*

23   *Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987) (same); *Official Committee of*

24   *Administrative Claimants v. Bricker*, 2011 U.S. Dist. LEXIS 49504, at *10–11

25   (N.D. Ohio May 9, 2011) (communications between "'individual [committee]

26   members and professionals'" protected by common-interest privilege, even though

27   not sent to an attorney).

28

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**30**

1    This Court has expressly upheld the joint-interest privilege for "interests that

2    Mr. Siegel and Ms. Larson held in common" (Docket No. 239 at 1) – *i.e.,* the

3    "Michael Siegel" interest that is the subject of the May 13 letter, and any response

4    by Ms. Larson to the May 13 letter.  Even if the July 2003 letter is as described by

5    DC, Ms. Larson duly logged this document and her logs have been repeatedly

6    upheld.

7    **C.    The "Toberoff Timeline" Does Not Create a Waiver of Privilege**

8    DC half-heartedly argues that the disclosure of the "Toberoff Timeline," and

9    Ms. Larson's answers to deposition questions derived from the Timeline, somehow

10    waived privilege.  *Supra* at 16-18.  It does not.  This Court held that DC could

11    question witnesses on the Timeline (Docket No. 74) and defendants preserved their

12    rights on this issue under Local Rule 72.  Docket No. 101.  DC's waiver argument

13    creates an intolerable "Catch-22" of the sort this Court has rejected:  either Ms.

14    Larson would refuse to answer questions and be in violation of a court order; or she

15    answers questions and waives privilege.  *See* Docket No. 209 at 13.

16    Moreover, Ms. Larson's generic testimony as to the July 2003 letter does not

17    waive privilege.  As this Court has held, the disclosure that documents or

18    communications exist or their basic subject matter does not waive privilege. *See,*

19    *e.g.,* Docket No. 262 at 4 ("[T]he descriptions provided by Mr. Toberoff are not

20    sufficiently revealing to constitute a waiver.").  Only the disclosure of the specific

21    *contents* of the communications, which did not occur here, would waive privilege.

22    *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (noting

23    waiver extends "only [] to communications … actually disclosed").  The disclosure

24    of the basic subject matter of the communications hardly waives privilege as to the

25    actual substance of the underlying communications.  *See Home Indem. Co. v. Lane*

26    *Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995) (holding that a waiver

27    occurs only when "through [an] affirmative act [such as filing a complaint], ***the***

28    ***asserting party puts the privileged information at issue***….").  Nowhere in the

- 26 -

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**31**

1  extensive testimony quoted in DC's motion does it cite a single instance where Ms.

2  Larson disclosed the specific contents of the communication or place them at issue.

3       Egregiously, DC also argues that the compelled disclosure of the Timeline in

4  the *Siegel* litigation "vitiate[s] any claim of privilege." *Supra* at 17.  DC argues that

5  the Timeline acts as a subject-matter waiver, even though privilege was expressly

6  upheld as to the documents referenced without permission in the Timeline. *See*

7  *Docket No. 164, Ex. I at 4*; No. 209 at 11.[4]  DC cites no authority for this radical

8  assertion, and the relevant cases clearly hold that the unauthorized disclosure of

9  stolen privileged information does *not* waive the attorney-client privilege. *See*

10  *Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y. 1997) ("The

11  assertion of privilege . . . is not waived through public disclosure of a stolen

12  privileged document"); *In re Grand Jury Proceedings Involving Berkley & Co.,*

13  *Inc.*, 466 F. Supp. 863, 869 (D. Minn. 1979) (disclosure to opposing party of stolen

14  documents does not waive privilege); *Mayman v. Martin Marietta Corp.*, 886 F.

15  Supp. 1243, 1245-47, 1252 n.15 (D. Md. 1995)(same); *Resolution Trust Corp. v.*

16  *Dean*, 813 F. Supp. 1426, 1427-1430 (D. Ariz. 1993)(same).

17       A district court addressed this precise issue in *Smith v. Armour*

18  *Pharmaceutical Co.*, 838 F. Supp. 1573, 1575-77 (S.D. Fla. 1993), stating "what if

19  a confidential memorandum is stolen from an attorney's office and subsequently

20  published in newspapers across the country? Clearly, the client should not be held

21  to have waived the attorney-client privilege." *See also Resolution Trust*, 813 F.

22  Supp. at 1427, 1430 (unauthorized leak published in *Washington Post* does not

23  vitiate the attorney-client privilege in litigation); *In re Dayco Corp. Derivative Sec.*

24  *Litig.*, 102 F.R.D. 468, 470 (S.D. Ohio 1984) (publication in *Dayton Daily News* of

25       [4] DC misleadingly claims "the parties jointly and openly" filed the Timeline in

26  the *Siegel* litigation (*supra* at 16).  In reality, DC attached the Timeline to a motion

27  to compel, and the Siegels argued in response that the Timeline was privileged, that
   it should not have been ordered produced, and that its use should be precluded.
   *Siegel*, Docket No. 476 at 55-66.

28

JOINT STIP. RE: DC'S MTC PROD. OF
                                                                      DOCS OR MOT. FOR RECON.

**EXHIBIT A
32**

1    excerpt of diary written by defendant's employee does not waive privilege).  There

2    is no basis for the Timeline to operate as a subject-matter waiver as to the stolen

3    documents it purports to discuss without authorization from the Siegels or the

4    Shusters.

5    **D.    DC Is Not Entitled to Privileged Drafts**

6        DC erroneously assumes that it is entitled to drafts of the July 2003 letter.

7    However, draft communications shared with an attorney for review and comment

8    are privileged.  *See In re Grand Jury Subpoenas Dated Dec. 18, 1981*, 561 F. Supp.

9    1247, 1258-59 (E.D.N.Y. 1982) (applying attorney-client privilege to draft letters);

10    *Rainey v. Plainfield Cmty. Consol. Sch. Dist. No. 202*, 2009 U.S. Dist. LEXIS

11    33206, at *8 (N.D. Ill. Apr. 16, 2009) ("[W]hen a draft communication is sent for

12    an attorney's advice before being finalized, the draft itself is a privileged document

13    even if the final version is not."); *In re Yasmin & Yaz Mktg., Sales Practices &*

14    *Prods. Liab. Litig.*, 2011 U.S. Dist. LEXIS 64736, *8-9, at *11 (S.D. Ill. June 17,

15    2011) (noting that "even after public disclosure of a final version of a document, its

16    prior drafts are privileged if they reveal confidential communications between the

17    attorney and client for the purpose of obtaining legal advice"); *Macario v. Pratt &*

18    *Whitney*, 1990 U.S. Dist. LEXIS 18075 (E.D. Pa. Jan. 16, 1991) (holding that a

19    "draft of a letter" sent to counsel is privileged); *Richmond v. Coastal Bend College*

20    *Dist.*, 2009 U.S. Dist. LEXIS 56255 (S.D. Tex. July 2, 2009) (stating that privilege

21    would be upheld where a "draft was submitted to counsel for comment and

22    approval"); *U.S. Postal Service v. Phelps Dodge Refining Co.*, 852 F. Supp. 156,

23    163 (E.D.N.Y. 1994) (holding that drafts sent to counsel "may be considered

24    privileged if they were prepared for the purpose of obtaining legal advice.").

25        Furthermore, "[a]ttorney notations regarding legal questions render the

26    draft[s] privileged and they should not be produced."  *In re Adobe Systems, Inc.*

27    *Sec. Litigation*, 1991 U.S. Dist. LEXIS 15929, *11-12 (N.D. Cal. Oct. 23, 1991).

28    Ms Larson duly logged such drafts as DC effectively admits (*supra* at 1), and her

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

1   privilege logs have been consistently upheld.  *See* Docket No. 164, Ex. I at 4; No.

2   209 at 11, 13-14; No. 248; No. 252; No. 285.

3       **E.    DC Repeated Motions Seeks Material of Minimal Relevance to**

4           **Support Baseless Claims**

5       Not only does DC move to compel the same document for the ninth time, the

6   document, by DC's own pleadings, has minimal relevance to its claims.  DC argues

7   that, in August 2002, "Mr. Toberoff used misrepresentations regarding a wealthy

8   investor and a movie production deal to induce [Laura and Joanne] Siegel[] to sever

9   their relationship with DC" (*supra* at 15), the purported basis for DC's Fifth Claim,

10  and that the July 2003 letter, which responded to Michael Siegel's May 13 letter, is

11  purportedly relevant to this.

12      DC's motion thus misrepresents the May 13 letter as "corroborating" (*supra*

13  at 15) its Fifth Claim.  However, the May 13 letter does not refer to any statements

14  by Mr. Toberoff to Joanne and Laura Siegel, in August 2002 or otherwise.  This

15  letter concerns an offer on behalf of an investor, Ari Emanuel (now head of the

16  William Morris Endeavor Agency)[5] to buy **Michael Siegel's** limited Superman

17  interest, as DC long ago acknowledged.  *See* Docket No. 160 at 70-71; No. 164,

18  Ex. A at 7.  The offer was the subject of extensive discovery in *Siegel*.  *See* Docket

19  No. 160 at 35-36.  Although DC had numerous documents concerning this Michael

20  Siegel offer when it filed its complaint, Michael Siegel is never mentioned in DC's

21  complaint.  Docket No. 49 ("FAC"), ¶¶ 1-198.   The May 13, 2003 letter was

22  written nine months after the August 2002 events in question, by an individual who

23  did not witness or address them, and it does *nothing* to "corroborate" DC's

24  frivolous allegations.[6]

25      _____

        [5] DC has long been aware that Mr. Emanuel was the investor.  *See, e.g.,* Docket
26  No. 196-2, Ex. H at 166:6-170:24 (Kevin Marks testimony), Ex. E at 98:25-104:14
    (Marc Toberoff testimony).  Yet, in over a year of discovery DC has not even
27  bothered to notice Mr. Emanuel's deposition.

        [6] Nor can DC point to commonalities between the Timeline and the May 13
28  letter as independent support for its allegations.  The Timeline's author, who stole

                                        JOINT STIP. RE: DC'S MTC PROD. OF
                                        DOCS OR MOT. FOR RECON.

**EXHIBIT A**

**34**

1    DC's actual Fifth Claim (FAC, ¶¶ 77-80, 180-186) boils down to a bald

2    accusation that Mr. Emanuel's August 2002 offer to buy the interest of *Joanne and*

3    *Laura Siegel* was purportedly fake and caused the Siegels to cut off negotiations

4    with DC.  After significant discovery in *Siegel* and this case, DC has no evidence to

5    support this.  DC cannot show that the highly successful Mr. Emanuel was not

6    sincere in offering to buy the Siegels' valuable Superman copyrights.  Nor can DC

7    show that the Siegels relied on this offer or that it caused them to end their already

8    moribund negotiations with DC.  Notably, DC has no explanation for why the

9    Siegels freely chose Mr. Toberoff as their counsel and have remained with him for

10   nine years, if he had sponsored the supposed misrepresentions alleged by DC.[7]

11   Moreover, as set forth in Defendants' Anti-SLAPP motion (Docket No. 145-

12   1 at 7:1-9:20, 22:4-24:2), DC's Fifth Claim contradicts the discovery in *Siegel* and

13   here regarding Mr. Emanuel's legitimate offer. As the Siegels' former counsel, Mr.

14   Kevin Marks, clearly testified, there was no mention of a "billionaire investor" or

15   producing a Superman movie in his August 2002 conversations with Mssrs.

16   Emanuel and Toberoff.  *See, e.g.,* Docket No. 312-2, ¶¶ 2-5.

17   DC's claim also makes no sense as a matter of timing / causation.  Judge

18   Larson held, based on DC's **October 26, 2001** and **February 2002** settlement

19   counteroffers, that *no settlement* was reached after four years of negotiation.

20   *Siegel,* 542 F. Supp. 2d at 1139; Docket No. 669.  Dissatisfied with the

21   negotiations, the Siegels looked for litigation counsel as early as **March 2002**, well

22   before any contact with Mr. Toberoff.  *See, e.g.,* Docket No. 314, Ex. B; Docket

23

24   the May 13 Letter from Mr. Toberoff's legal files, mimicked and freely adapted the
     letter to contrive the Timeline, an anonymous, inadmissible "hit piece" designed to
25   smear Mr. Toberoff.

26   [7] DC misleadingly argues that Ms. Larson "admitted that Mr. Toberoff had not
     told her about the contracts … with the Shuster heirs" (*supra* at 11); however, it is
27   well established that the Siegels first contacted Mr. Toberoff for legal
     representation based on the Shusters' recommendation and were fully aware that he
28   was the Shusters' attorney.  Docket No. 145-2, Ex. B at 107:8-24.

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

1   No. 206, Ex. 24 at 142:4-17.  As Judge Larson also held, Joanne Siegel's **May 9,**

2   **2002** letter to Time Warner "clearly and unequivocally" rejected DC's proposals,

3   and made clear that the negotiations were moribund.  *Siegel,* 542 F. Supp. 2d at

4   1139; Docket No. 145-5, Ex. O ("After four years we have no deal and this contract

5   makes an agreement impossible.").  DC's alleged "reasonable probability of future

6   economic benefit" (FAC ¶ 183) (an essential element of its claim for tortious

7   interference with prospective economic advantage) was at an end long before Mr.

8   Toberoff had any substantive communication with Mr. Marks, the Siegels'

9   attorney, in **August 2002**.

10          DC's claim is also squarely barred by both the statute of limitations (as DC

11   had the alleged information in 2006) and by the litigation privilege.  *See* Docket

12   No. 145-1 at 7-9, 22-24.  From every possible angle, DC's Fifth Claim is meritless.

13          **F.    Conclusion**

14          DC's motion should be denied, and the Court should order DC to file no

15   further motions for reconsideration.

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIP. RE: DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**36**

1

2      Dated:         September 2, 2011          Respectfully Submitted,

3                                               O'MELVENY & MYERS LLP

4
                                                By:  /s/ Daniel M. Petrocelli
5                                                    Daniel M. Petrocelli
                                                     Attorneys for Plaintiff DC Comics
6

7      Dated:         September 2, 2011          Respectfully Submitted,

8                                               TOBEROFF & ASSOCIATES, P.C.

9
                                                By:  /s/ Marc Toberoff
10                                                   Marc Toberoff
                                                     Attorneys for Defendants Laura
11                                                   Siegel Larson, Mark Warren Peary,
                                                     and Jean Adele Peavy
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                JOINT STIP. RE: DC'S MTC PROD. OF
                                                DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**37**

1  DANIEL M. PETROCELLI (S.B. # 097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. # 211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. # 246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:   (310) 553-6700
6  Facsimile:    (310) 246-6779

7  PATRICK T. PERKINS (admitted pro hac vice)
     pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:   (845) 265-2820
10 Facsimile:    (845) 265-2819

11 Attorneys for Plaintiff DC Comics

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14 DC COMICS,                          Case No.  CV 10-3633 ODW (RZx)

15                    Plaintiff,        **DISCOVERY MATTER**

16         v.                           **DC COMICS' SUPPLEMENTAL
                                        MEMORANDUM IN SUPPORT OF
17 PACIFIC PICTURES                     MOTION TO COMPEL THE
   CORPORATION, IP                      PRODUCTION OF DOCUMENTS
18 WORLDWIDE, LLC, IPW, LLC,            OR, IN THE ALTERNATIVE, FOR
   MARC TOBEROFF, an individual,        RECONSIDERATION OF THE
19 MARK WARREN PEARY, as                COURT'S JUNE 20 AND APRIL 11,
   personal representative of the       2011 ORDERS**
20 ESTATE OF JOSEPH SHUSTER,
   JEAN ADELE PEAVY, an                 SUPPLEMENTAL DECLARATION OF
21 individual, LAURA SIEGEL             MATTHEW T. KLINE FILED
   LARSON, an individual and as         CONCURRENTLY HEREWITH
22 personal representative of the
   ESTATE OF JOANNE SIEGEL, and         **Judge**:        Hon. Otis D. Wright II
23 DOES 1-10, inclusive,                **Magistrate**:   Hon. Ralph Zarefsky

24                    Defendant.        **Hearing Date**:       Sept. 26, 2011
25                                      **Hearing Time**:       10:00 a.m.
                                        **Courtroom**:          540
26                                      **Discovery Cutoff**:   None Set
27                                      **Pretrial Conference**: None Set
                                        **Trial**:              None Set
28
                                        SUPPL. MEMO ISO DC'S MTC PROD. OF
                                        DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**38**

1     No court—not this Court, not Judge Wright, not Judge Larson in *Siegel*—has

2     ever had the opportunity to answer the following question:  Whether a July 2003

3     letter from Laura Siegel to her brother Michael concerning the sale of the Siegels'

4     purported Superman rights to an unnamed "billionaire investor" is shielded by the

5     common-interest privilege.  Defendants assert this issue was resolved in their favor

6     eight times.  That is untrue.  While there are five court rulings relating to this issue,

7     *none* addressed—or much less answered—this question.  There is a very simple

8     reason why this is so:  Before filing their current opposition, defendants *never*

9     confirmed the existence of the July 2003 letter, *never* listed it among their 7,565

10     privilege-log entries, and *never* asserted a "common interest" privilege over it.

11     Appendix A to this brief contains all Siegel privilege log entries for July

12     2003.  No letter from Laura to Michael is listed.  Nor is any common-interest claim

13     made, other than for a July 21, 2003, note by Don Bulson, and for a fax (Entry 325)

14     Toberoff sent to Bulson on July 16, 2003.  An Ohio district court ordered the July

15     16 fax be produced because the common-interest privilege asserted was without

16     basis.  The July 16 fax, like other communications improperly withheld, was not

17     privileged because it "relate[d] to the offers [made by] … Toberoff, on behalf of an

18     investor who wishes to purchase Michael Siegel's interest…."  Docket No. 161-5 at

19     31.  As defendants admit, Laura's July 2003 letter concerns the same subject:  "The

20     July 2003 letter was a response to a May 11, 2003 letter from Michael Siegel *that*

21     *concerned an offer to purchase Mr. Siegel's limited Superman interest*."  Opp. at

22     4:24-25.  Laura's response letter is equally not privileged and must be produced.

23     **I.    No Court Has Ever Ruled That Larson's July 2003 Letter Is Privileged.**

24     Defendants assert the July 2003 Letter is a "logged document" that has been

25     held to be privileged, Opp. at 4:4, but they refused to disclose during our Rule 37

26     conferences where among the privilege logs the letter appeared.  It was only in their

27     opposition to this motion that they finally conceded that the letter can be found at

28     Entry 82 of Laura Siegel's privilege log in *Siegel*.  *Id.* at 22:6.  However, Entry 82

SUPPL. MEMO ISO DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**39**

1   is listed as a facsimile from Laura to Marc Toberoff, *see* Appendix A at 2—it says
2   nothing about a letter from Laura to Michael.  This is definitive proof of what DC
3   has urged all along:  Defendants' privilege logs have deliberately misidentified
4   documents in an effort to shield them from disclosure.

5       Because defendants, until now, have succeeded in withholding the existence
6   and identification of Laura's letter to Michael, DC has never been able to address
7   defendants' assertion that the letter is shielded by the common-interest privilege.
8   As shown below, no court ruling decided this claim, and the claim is unfounded.

9       Ruling No. 1.  In March 2007, DC moved in the *Siegel* case to compel the
10  production of all non-privileged enclosures to the Toberoff Timeline, including
11  "correspondence concerning the interest in Superman that might be owned by …
12  Michael Siegel."  Docket Nos. 163-12, Ex. TT ¶ 9; 164-1, Ex. B ¶ 3.  In response,
13  defendants did not disclose Laura's July 2003 letter, did not list it on a log, and did
14  not say it was subject to a common-interest privilege.  Defendants, instead, argued
15  they had "produced non-privileged responsive documents in their possession and
16  listed the privileged documents in a privilege log."  Docket No. 42-13 at 129-32.

17      On April 30, the Court ordered Toberoff to submit a declaration identifying
18  the Bates-stamp or log-entry number for each Timeline enclosure.  Kline Decl. Ex.
19  3.  Defendants now assert, for the first time, that "the July 2003 letter was matched
20  up to the Siegels' 'supplemental privilege log #82,'" Opp. at 22:5-6, even though
21  Entry 82 makes *no* mention of a July 2003 letter from Laura to Michael or common
22  interest privilege.  Far from it, Entry 82 lists a July 11, 2003, "Facsimile" from
23  Laura to Toberoff allegedly covered by "Atty/Client" privilege.  Appendix A at 2.

24      Ruling No. 2.  In September 2007, DC challenged Toberoff's reading of the
25  Court's April 30 order as justification for withholding numerous documents.
26  Docket No. 164-1, Ex. C.  DC pointed to missing correspondence between Laura
27  and Michael as examples of documents yet to be produced.  *Id.* at 49; Docket No.
28  164-2 at 92-93.  In their opposition, defendants did not disclose that Laura's July

SUPPL. MEMO ISO DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**40**

1    2003 letter existed or claim any privilege over it; rather, they argued the Court had

2    "approved the format of [their] logs."  Docket No. 164-1, Ex. C at 70.

3         Before Judge Larson addressed DC's motion, an Ohio court ordered Toberoff

4    to produce 15 communications between Toberoff and Bulson post-dating January

5    2003 regarding efforts by the "investor" to buy Michael's rights.  The ruling did not

6    address Laura's July 2003 letter—that document was not disclosed on any log—but

7    did reject Toberoff's claim that such communications about Michael's rights were

8    subject to a common-interest privilege.  Docket No. 161-5 at 30-31.  DC informed

9    Judge Larson of this ruling and noted that "a letter dated on or about July 11, 2003"

10   from Laura to Michael likely also existed.  Docket No. 164-2 at 108-09.  Judge

11   Larson did not "*reject*[] DC's repeated challenge to the Siegels' privilege logs," as

12   defendants wrongly assert.  Opp. at 22.  To the contrary, in late 2008, he ordered

13   the escrow holder to "produce to [DC] any escrow document not previously listed

14   in a privilege log" or not previously produced.  Docket No. 164-2 Ex. H at 116.

15        Ruling No. 3.  The escrow holder sought clarification of the order, and DC

16   urged the Court to allow him to compare the Timeline documents with Toberoff's

17   declaration to ensure all non-privileged documents were produced.  Docket No.

18   164-2 at 118.  Judge Larson declined to permit the escrow holder to assess

19   Toberoff's privilege claims.  *Id.* at 121.  Judge Larson made no ruling regarding

20   Laura's July 2003 letter.  Nor could he have.  The July letter is mentioned *nowhere*

21   in Toberoff's declaration, and *no* claim of common-interest privilege was asserted

22   over the letter or ever litigated.  We only now have confirmed—as of two weeks

23   ago—that the letter was buried without identification under privilege log Entry 82.

24        Ruling No. 4.  DC finally obtained a copy of the Timeline and moved earlier

25   this year to obtain correspondence between Laura and Michael from May and July

26   2003 that the Timeline describes.  Docket No. 160 at 30-38.  Defendants refused to

27   confirm whether the May and July correspondence existed—except to deny that a

28   "July 5 letter" existed.  Docket No. 160 at 71-72n.26.  Defendants *never asserted*

- 3 -

1   the May or July 2003 correspondence between brother and sister was covered by a

2   common-interest privilege.  Instead, they argued the Court rejected challenges to

3   "the Siegels' privilege logs" and there was no basis to revisit those rulings.  *Id.* at

4   67.  They also argued the Timeline was "a grossly inaccurate hit piece," referred "to

5   numerous documents that do not exist," and to "the extent that relevant documents

6   exist, they have either been produced or designated as privileged."  *Id.* at 71.

7       On April 11, the Court ordered defendants to produce the May 2003 letter

8   from Michael to Laura, but declined to order the production of Laura's July 2003

9   response, reasoning "[a]lthough defendants are somewhat cryptic about [the July

10  11, 2003] letter, … they asserted privilege as to the letter during the prior litigation,

11  a designation that was upheld by this Court. …"  Docket No. 209 at 11.  But

12  defendants have now conceded the truth:  The letter to which "they asserted

13  privilege" is at Entry 82, and is a facsimile from Laura to Toberoff—*not* the July

14  2003 letter from Laura to Michael.  *Compare* Opp. at 22:6, *with* Appendix A at 2.

15      Ruling No. 5.  Citing the May 13 letter, DC moved to compel Laura's likely

16  July 2003 response to it.  Docket No. 253.  Defendants again did not admit such a

17  letter existed or claim it was covered by a common-interest privilege.  They

18  contended the Court's rulings barred DC's motion.  Docket No. 269 at 12.  The

19  Court denied DC's motion, saying it did not want to compel defendants to conduct

20  a "vague" search for a document that might not exist.  Docket No. 288 at 19:11-23.

21      Laura's deposition and defendants' opposition now change this.  Both prove

22  the July letter exists, and defendants *know exactly where it is*:  It is hidden behind

23  log entry 82.  No court has ever addressed whether Laura's letter to her brother is

24  privileged, and defendants cannot rely on any ruling concerning Entry 82, given

25  that it blatantly misdescribes the document over which privilege is now claimed.

26  **II.    The July 2003 Letter Is Not Shielded By A Common-Interest Privilege.**

27      Having never done so before, defendants now assert Laura's July 2003 letter

28  is privileged because she shared a "common interest in the Siegel terminations"

SUPPL. MEMO ISO DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**42**

1  with Michael.  Opp. at 24.  The Ohio court rejected this very argument.  Analyzing

2  15 communications from the same time period (post-January 2003) concerning the

3  same subject matter (efforts by Toberoff's "investor" to purchase Michael's rights):

> [T]he court f[ound] that the interest of Michael Siegel … is separate
> and apart from those of Joanne and Laura Siegel.  These documents
> relate to offers back and forth between [Marc] Toberoff, on behalf of
> an investor who wishes to purchase Michael Siegel's interest and
> Bulson on behalf of Michael Siegel.  Docket No. 161-5 at 30-31.

7  If anyone is seeking reconsideration of past rulings, it is defendants in asserting a

8  common-interest claim over the July 2003 letter.  The privilege claim also makes

9  no sense.  Defendants produced Michael's May letter and never asserted privilege.

10  Laura's response is equally non-privileged.  As her deposition shows, her letter

11  concerns "criticisms of Mr. Toberoff," Docket No. 316-5 at 325-27, and false

12  promises he made to the Siegels about "investors," which are central to DC's case.

### III.    Drafts Of The July 2003 Letter Should Also Be Produced.

14       Defendants attack a straw man in arguing that a purported theft at Toberoff's

15  offices does not trigger waiver of privilege over drafts of the July 2003 letter.  Opp.

16  at 26-28.  But DC never relied on the delivery of the Timeline to Warner Bros. as

17  the act of waiver.  The waiver was defendants' decision not to list the Timeline on

18  any privilege log or in Toberoff's 2007 court-ordered declaration.  Judge Larson

19  held these were the acts of waiver (not any alleged theft) that entitled DC to the

20  Timeline.  Docket No. 42-14 at 213-17.  The Timeline, in turn, openly discloses

21  how Toberoff and Laura edited the July 2003 letter, and when Laura was deposed

22  about these drafts and changes to the letter, *no privilege objections were made*.

23  Mot. at 9-10.  These were further acts of waiver, if any privilege still obtained.

### IV.    Conclusion

25       DC's motion should be granted and only reconfirms the prejudice caused by

26  defendants' privilege logs.  DC does not have the space to respond to defendants'

27  other arguments, but defendants' concessions that their business arrangements were

28  "unlawful," Docket No. 307 at 8-9, confirms that DC's claims here are well-taken.

SUPPL. MEMO ISO DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**43**

1

2

Dated:        September 12, 2011                Respectfully Submitted,
                                                                O'MELVENY & MYERS LLP

3

4

                                                        By:  /s/ Daniel M. Petrocelli
                                                                Daniel M. Petrocelli
                                                                Attorneys for Plaintiff DC Comics

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPL. MEMO ISO DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**44**

1

## APPENDIX A—July 2003 Log Entries From:

2

**A. Laura Siegel Larson Privilege Log in this Case** (Docket No. 162-6 at 427):[1]

3

4

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|-------|------------------|-----------------------|--------------------------|---------------|-----------------|------------------|
| 712 | 7/5/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 713 | 7/8/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 714 | 7/8/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 715 | 7/11/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 716 | 7/11/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 717 | 7/14/2003 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 718 | 7/14/2003 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 719 | 7/14/2003 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 720 | 7/21/2003 | Atty Don Bulson | | Notes | Atty/Client-Joint Interest | Defendants' Counsel |

10

11

**B. Michael Siegel Privilege Log in the *Siegel* Case** (Kline Dec. Ex. 2 at 46):

12

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|-------|------------------|--------------------------|-----------------------|----------------------|-----------------|------------------|
| 322 | 7/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 323 | 7/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 324 | 7/14/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 325 | 7/16/2003 | Atty Don Bulson | Atty Marc Toberoff | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 326 | 7/21/2003 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |

18

19

20

21

22

23

24

---

25

[1] The Siegels' privilege log produced in this *Pacific Pictures* case includes all of the log entries from the *Siegel* case plus additional entries not previously identified by in the *Siegel* case. As a result, the logs do not track one another one-for-one. For example, log-entry numbers 82 and 83 in the *Siegel* case are now entry numbers 715 and 716 in this case, as confirmed by defendants. *See* Docket No. 162-9 at 576.

28

- 1 -

SUPPL. MEMO ISO DC'S MTC PROD. OF
DOCS OR MOT. FOR RECON.

**EXHIBIT A**

**C.  Marc Toberoff Privilege Log in this Case** (Docket No. 207-9 at 264):

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 715 | 7/5/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 716 | 7/8/2003 | Atty John Pettker | Atty Marc Toberoff | Letter | Atty/Client | Defendants' Counsel |
| 717 | 7/8/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 718 | 7/8/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 719 | 7/10/2003 | Atty Marc Toberoff | Jean Peavy, Mark Warren Peary | Letter | Atty/Client | Defendants' Counsel |
| 720 | 7/11/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 721 | 7/11/2003 | Laura Siegel | Atty Marc Toberoff | Facsimile | Atty/Client | Defendants' Counsel |
| 722 | 7/14/2003 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 723 | 7/14/2003 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 724 | 7/14/2003 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 725 | 7/15/2003 | Atty Marc Toberoff | Atty John Pettker | Letter | Atty/Client | Defendants' Counsel |
| 726 | 7/15/2003 | Atty Marc Toberoff | Mark Warren Peary | Letter | Atty/Client | Defendants' Counsel |
| 727 | 7/21/2003 | Atty Marc Toberoff | Atty John Pettker | Letter | Atty/Client | Defendants' Counsel |
| 728 | 7/21/2003 | Atty Don Bulson | | Notes | Atty/Client-Joint Interest | Defendants' Counsel |

**D.  The Siegel's Original Privilege Log in the *Siegel* Case—Entries 82 and 83** (Kline Decl. Ex. 1 at 8; *see also* Docket No. 163, Ex. VV ¶ 6):

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s)r | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |
| 83 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

SUPPL. MEMO ISO DC'S MTC PROD. OF DOCS OR MOT. FOR RECON.

**EXHIBIT A**
**46**