# EXHIBIT A

# In The Matter Of:

*DC COMICS*
*v.*
*PACIFIC PICTURES CORPORATION*

_____

## *PEAVY, DAWN - Vol. 1*

### *August 3, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT A**
4

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,

            Plaintiffs,

     vs.          NO:  CV-10-3633 ODW (RZx)

PACIFIC PICTURES CORPORATION, et al.,

            Defendants.


        VIDEOTAPED DEPOSITION OF DAWN PEAVY
               August 3, 2011
               9:09 a.m. MST
            Santa Fe Hilton Hotel
            100 Sandoval Street
            Santa Fe, New Mexico


         PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  MR. MATTHEW T. KLINE
          Attorney for Plaintiff

REPORTED BY: Mary Abernathy Seal, RDR, CRR, NM CCR 69
          Bean & Associates, Inc.
          Professional Court Reporting Service
          201 Third Street, Northwest, Suite 1630
          Albuquerque, New Mexico 87102


(1729K) MAS

**EXHIBIT A**

**5**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 2

1           A P P E A R A N C E S
2    For the Plaintiff:
3           MR. MATTHEW T. KLINE
            MS. CASSANDRA L. SETO
4           O'MELVENY & MYERS, LLP
            1999 Avenue of the Stars, Suite 700
5           Los Angeles, California 90067-6033
            (310) 553-6700
6           mkline@omm.com
7    For the Defendants Toberoff, Peary, Larson, Peavy,
     and the witness:
8
            MR. MARC TOBEROFF
9           TOBEROFF & ASSOCIATES
            2049 Century Park East, Suite 3630
10          Los Angeles, California 90067
            (310) 246-3333
11
     Also Present:  Mr. Dale Alverson, videographer
12                  Ms. Ellen Heckl, Bean & Associates
                        Court Reporters
13
14                  I N D E X
15   EXAMINATION OF DAWN PEAVY

16   By Mr. Kline                                      4
17   REPORTER'S CERTIFICATE                          112
18   WITNESS SIGNATURE/CORRECTION PAGE               114
19          EXHIBITS MARKED OR IDENTIFIED
20   Ex 5    August 1, 1992, letter                   79
21   Ex 7    April 27, 1995, letter                   73
22   Ex 8    September 7, 1999, letter                73
23   Ex 12   Qualifying bond and accompanying documents, 51
             last will and testament of Joseph Shuster;
24           order admitting will to probate, appointing
             executor and authorizing independent
25           administration of estate with limited
             authority, with accompanying documents

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 3

1

Ex 24  Dave Sim's blogandmail #161, Feb. 19, 2007  18
2

Ex 47  April 28, 2005, letter                      65
3

Ex 59  First amended complaint                     80
4

Ex 66  February 9, 2008, letter                    20
5

Ex 67  February 23, 2006, e-mail                   26
6

Ex 68  Defendants Mark Warren Peary, as personal   43
7         representative of the Estate of Joseph
          Shuster, and Jean Adele Peavy's reply in
8         support of renewed motion to dismiss and/or
          stay plaintiff's first amended complaint
9         pursuant to Fed. R. Civ. P. 12(b)(6)
10 Ex 70  Duties and liabilities of personal         55
          representative
11

Ex 71  Deposition of Mark Warren Peary, November   58
12        11, 2006
13 Ex 72  Memorandum opinion and order granting      82
          plaintiffs' motion for summary judgment and
14        denying defendants' cross motion for
          summary judgment
15

Ex 73  Excerpts of legal rulings                   91
16

Ex 74  Plaintiff DC Comics' notice of deposition   97
17        of Dawn Peavy and request for production of
          documents
18
19
20
21
22
23
24
25

**EXHIBIT A**
7

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 4

1          MR. KLINE:  Can I just clarify one thing?

2    We did give notice to the other defense counsel and

3    I assume they chose not to attend today.

4          MR. TOBEROFF:  Yes.  And I'm also here

5    representing Dawn Peavy for purposes of her

6    deposition.

7                    DAWN PEAVY,

8       after having been first duly sworn under oath,

9       was questioned, and testified as follows:

10                    EXAMINATION

11   BY MR. KLINE:

12       Q.   Good morning, Ms. Peavy.  Thank you for

13   meeting with us here today.  Have you ever been

14   deposed before?

15       A.   No.

16       Q.   This is kind of a formal proceeding, so I

17   want to go over a few of the ground rules with you,

18   if that's okay.  We can take breaks throughout the

19   day if you're tired, obviously have to go to the

20   restroom, feeling hungry, want to address something

21   like a hang nail.  If for any reason you want to

22   take a break, you can take a break.  I would just

23   ask not to do it in a middle of a line of questions

24   or in the middle of a question.  If you don't

25   understand any of my questions, I would like you to

DAWN PEAVY - 8/3/2011

Page 5

1    say, "I don't understand your question, can you

2    please re-ask that."  Can you do that?

3         A.    (Witness nods.)

4         Q.    And one of the ground rules here today is,

5    I need you to say "yes" or "no" in response to

6    questions, because our fine court reporter here is

7    taking down your responses, and if you nod or shake

8    your head or say "uh-huh" or "huh-uh," there could

9    be a dispute later on about what you meant.  So do

10   you mind giving me answers "yes" or "no," if you

11   could?

12        A.    I will.

13        MR. TOBEROFF:  That assumes the question

14   can be answered yes or no.

15        MR. KLINE:  Of course.

16        Q.    (By Mr. Kline) And you understand that

17   you're testifying under oath today under the penalty

18   of perjury?

19        A.    Yes.

20        Q.    Okay.  Are there any medications you're on

21   today that would impact your ability to give

22   truthful and complete and honest testimony?

23        A.    No.

24        Q.    Any medical issues that you have that

25   would interfere with your ability to give complete

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 6

1    and honest testimony?

2         A.    No.

3         Q.    I don't want you to give any speculative

4    answers today, or wild guesses, but if I do ask you

5    for a question for your best estimate, I'm entitled

6    to that.  So I don't want you to speculate as to

7    answers, but if you can estimate or give a best

8    estimate, I will ask you to do that today.  Okay?

9         A.    Yes.

10            MR. TOBEROFF:  That's so long as you have

11   a basis for making an estimation.

12        Q.    I'm not certain how long we'll go today,

13   but obviously, if we come to the lunch hour, we'll

14   probably take a short lunch break and then resume

15   afterwards.

16            I just want to talk a little bit about any

17   preparation you did in advance of your deposition

18   today.  Did you talk to anybody about coming here

19   for your deposition?

20        A.    No.

21        Q.    You didn't talk to your brother at all

22   about today's deposition?

23        A.    Well, yes.  My brother.  I spoke to him.

24        Q.    And what did you talk about with Mark

25   about the deposition today?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 7

1        A.    Just that I was coming to the deposition.

2        Q.    Did he give you any advice on the

3    deposition?

4        A.    No.

5              THE REPORTER:    I'm sorry?

6        A.    Not really.    No.

7        Q.    Did he talk to you about the lawyers

8    involved in the case?

9        A.    No.

10       Q.    Did he talk to you about the claims

11   involved in the case?

12       A.    No.

13       Q.    Did you talk to your mother about coming

14   here for today's deposition?

15       A.    I told her that I was coming, but she --

16   she doesn't speak real well.    I mean, you can't...

17       Q.    And I know this is a hard subject to talk

18   about.    Your mother's health is not good right now;

19   correct?

20       A.    No.

21       Q.    She's 90 years old?

22       A.    (Witness nods.)

23       Q.    Okay.    And again, if there's something

24   that is a bothersome area of testimony and you want

25   to take a break and not talk about it, you know, for

**EXHIBIT A**
**11**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 8

1    a while, I'm happy to do that.  I know your mother

2    had a stroke a couple of years ago and has been

3    pretty sick.

4         A.    (Witness nods.)

5         Q.    So just let me know if you want to take a

6    break to do that.  Okay?

7         A.    Okay.

8         Q.    Did you meet with Mr. Toberoff at all

9    about today's deposition?

10        A.    Yes.

11        Q.    When was that?

12        A.    Last night.

13        Q.    Where did you meet?

14        A.    Hotel Santa Fe.

15        Q.    Okay.  How long did you meet with him?

16        A.    About an hour.

17        Q.    Did you review any documents with him?

18        A.    Other than the deposition papers, nothing.

19        Q.    That was it?

20        A.    The one that --

21              THE REPORTER:  I'm sorry, the one --

22        A.    The deposition papers, right?  Oh, I guess

23    the paper that --

24        Q.    Was it a document --

25        A.    Not only --

**EXHIBIT A**
**12**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 9

1      Q.    -- saying you need to come appear for this
2   deposition?
3      A.    Yes, the same one that -- yes.
4      Q.    Did you review a list of requests that you
5   produce documents to DC in this case?
6      A.    Yes.
7      Q.    And you went through each one of those
8   requests?
9      A.    Yes.
10     Q.    Did you search your home and personal
11  files for those -- for documents responsive to those
12  requests?
13     A.    I don't have any personal documents.
14     Q.    What do you mean by that answer?
15     A.    I don't have any documents that would be
16  of use.
17     Q.    Okay.  But you do keep personal documents
18  at home?
19     A.    My insurance, yes.
20     Q.    Do you have an e-mail account?
21     A.    Yes.
22     Q.    And do you save e-mails that you send and
23  receive?
24     A.    No, not really.
25     Q.    What is your e-mail address?

EXHIBIT A
13

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 10

1        A.    DawnPeavy@gmail.com.

2        Q.    No dot between Dawn Peavy?

3        A.    (Witness shakes head.)

4        Q.    And do you have a Facebook account, a

5    Twitter account, anything like that?

6        A.    Facebook.

7        Q.    Okay.  Was yesterday at the Hotel Santa Fe

8    the first time you spoke to Mr. Toberoff about this

9    deposition?

10        A.    I'm sorry?

11        Q.    You met with Mr. Toberoff yesterday, you

12    said, at his hotel, I believe; is that correct?

13        A.    Correct.

14        Q.    Was that the first time you spoke to him

15    about this deposition?

16        A.    Yes.

17        Q.    You didn't speak to him by phone at all?

18        A.    Yes, I did talk to him by phone, to tell

19    me when it was.

20        Q.    But you didn't in any way prepare for the

21    deposition during those conversations?

22        A.    No.

23        Q.    Did you talk to Keith Adams in his office

24    at all about this deposition?

25        A.    I don't know who Keith Adams is.

**EXHIBIT A**

**14**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 11

1      Q.   Did you talk to any other lawyers that
2  you're aware of about this deposition?
3      A.   No.
4      Q.   You obviously told your employer that
5  you'd be here today; correct?
6      A.   Uh-huh.
7      Q.   So that's another person you told about
8  the deposition?
9      A.   No, I didn't tell him.  Sick day.  I can't
10  take -- I wouldn't -- I'd have to take a vacation
11  day.
12      Q.   And I apologize we had to do that.  We
13  tried to get this done on a Sunday, but we couldn't
14  agree on a date.  So I apologize you had to take a
15  sick day today.
16           Did you review any documents on your own
17  in preparing for today's deposition?
18      A.   No.
19      Q.   You didn't review the complaint in this
20  case that DC Comics has filed?
21      A.   No.
22      Q.   Have you ever seen the complaint in this
23  case --
24      A.   No.
25      Q.   -- that DC Comics has filed?  Now,

**EXHIBIT A**

**15**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 12

1    Mr. Toberoff said at the start of the deposition
2    that he represents you for purposes of today's
3    deposition; is that correct?
4         A.    Yes.
5         Q.    Are you paying him to do that?
6               MR. TOBEROFF:  You can answer the
7    question.
8         A.    I don't think so.  I don't know.  I don't
9    know.  I don't know.
10        Q.    So you don't --
11        A.    We haven't discussed that.
12        Q.    Okay.  You don't have any formal written
13   agreement with him about his provision of services
14   to you today?
15        A.    No.
16        Q.    And the issue of fees that he would charge
17   you for his representation today never came up?
18        A.    No.
19        Q.    Did he disclose to you any potential
20   conflicts of interest that he may have --
21        A.    No.
22        Q.    -- in representing you?
23        A.    (Witness shakes head.)
24        Q.    Do you understand he also represents the
25   Siegel heirs --

EXHIBIT A
16

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 13

1        A.    Yes.

2        Q.    -- against DC?  And you understand that he

3    represents your brother and mother?

4        A.    Yes.

5        Q.    Okay.  I want to talk a little bit about

6    your background just briefly.  Where were you born?

7        A.    Sacramento, California.

8        Q.    Okay.  And is that where you grew up and

9    went to high school?

10       A.    No.

11       Q.    Where did you grow up and go to high

12   school?

13       A.    El Paso, Texas.

14       Q.    Okay.  Did you graduate from high school?

15       A.    Yes.

16       Q.    Did you attend any college?

17       A.    No.  Well, community college.

18       Q.    Where did you -- what was the name of your

19   high school, by the way?

20       A.    Andress.

21       Q.    How do you spell that?

22       A.    A-N-D-R-E-S-S.

23       Q.    Okay.  And the community college that you

24   attended -- you didn't get your AA degree there;

25   correct?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 14

1        A.    I only went one semester.

2        Q.    Which community college --

3        A.    TVI, in Albuquerque.

4        Q.    I'm sorry?

5        A.    In Albuquerque.

6        Q.    Okay.  And after your time at community

7    college, can you just walk me through your

8    employment history, different jobs you have held

9    over the years, and the names of the different

10   companies you have worked for, or individuals?

11       A.    I worked for Wal-Mart and then I worked

12   for El Paso -- well, no, Vista Hills Country Club,

13   in El Paso.

14            THE REPORTER:  I'm sorry --

15       A.    Vista Hills Country Club in El Paso.

16       Q.    Was the Wal-Mart in El Paso or

17   Albuquerque?

18       A.    El Paso and Albuquerque.

19       Q.    Okay.

20       A.    And Bennigan's Restaurant.  Quinco Sales,

21   Sysco Foods, and now I work for Zanios Labatt Foods.

22       Q.    What do you do in your current job?

23       A.    Sales representative.

24       Q.    Do you travel around the country

25   selling --

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 15

1        A.    No.

2        Q.    What's your geography that you focus on?

3        A.    Santa Fe and a little north.

4        Q.    And what type of food products do you

5    sell?

6        A.    Full-line distributor.

7        Q.    Okay.  To hotels and restaurants?

8        A.    Yes.

9        Q.    Do you sell up in Taos, as well?

10        A.    No.

11        Q.    Okay.  And how long have you worked there

12    for?

13        A.    Seven years.

14        Q.    In that job role, do you work with

15    lawyers?

16        A.    No.

17        Q.    How do you communicate with your

18    customers?  On the phone?

19        A.    In person, on phone.

20        Q.    E-mails?

21        A.    Maybe a few.  I mean, I guess at some

22    point, yes.

23        Q.    But mainly on the phone or in person?

24        A.    Yes.  In person, mainly.

25        Q.    And where do you live right now?

**EXHIBIT A**
**19**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 16

1        A.    51 Camino Cabo.

2        Q.    And that's where your brother and mother

3    reside, as well?

4        A.    Yes.

5        Q.    Okay.  And I attended his deposition, and

6    he says that your youngest child, I believe,

7    occasionally stays with you there, as well?

8        A.    Yes.

9        Q.    Okay.  And your other children live in

10   Denver and El Paso?

11       A.    Yes.

12       Q.    Okay.  How big is your family home that

13   you live in now?

14       A.    I don't know.

15       Q.    Is it -- how many bedrooms?

16       A.    Four.

17       Q.    Okay.  And do you spend a lot of time

18   interacting with your mother and brother at home?

19       A.    Yes.

20       Q.    Good close relationships with them?

21       A.    Yes.

22       Q.    Is Mark your older brother or --

23       A.    Yes.

24       Q.    -- your younger brother?

25       A.    Yes.

EXHIBIT A
20

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 17

1           (A discussion was held off the record.)
2      Q.   And what do you understand Mark does to
3   make a living right now?
4      A.   A writer and an investor.
5      Q.   What does he write?
6      A.   Books.
7      Q.   He writes scripts, as well; correct?
8      A.   Yes.
9      Q.   Have you read his two scripts about Joseph
10  Shuster --
11     A.   No.
12     Q.   -- and his life?  You're aware that he
13  wrote two scripts, though, about his life --
14     A.   Yes.
15     Q.   -- correct?
16          MR. TOBEROFF:  Assumes facts.  Assumes
17  facts.
18          Give me a second to object when we start
19  getting into more substantive questions.
20     Q.   You wrote a letter to a blogger named
21  Mr. Sim, correct, and talked about the fact that
22  Mark had written a screenplay, and it had been
23  optioned by Ilya Salkind; correct?
24     A.   No, not that I know of.
25     Q.   Okay.

EXHIBIT A
21

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 18

1            MR. TOBEROFF:  Counsel, can we have that

2       as an exhibit, please?

3            MS. SETO:  24.

4            (Exhibit 24, previously marked.)

5       Q.    (By Mr. Kline)  This is Exhibit 24.  We

6   showed it to your brother at his recent deposition,

7   if you could take a look at it.  And I'll ask you to

8   look at the second and third pages.  One more page,

9   please.  I'm sorry.  The picture gets cut off.

10           And I'm going to show you and

11  Mr. Toberoff, just from here, my copy that's in

12  color.  These are pictures of you, your brother, and

13  your mother at the "Superman Returns" premiere;

14  correct?

15      A.    Correct.

16      Q.    And going back to the second page of this

17  blog, do you know who Dave Sim is, at all?

18      A.    Yes, I met him once.

19      Q.    Okay.  Do you see here, about three or

20  four paragraphs down, it says, "Oh, here's a great

21  one, a letter from Jean and Dawn and Warren Shuster

22  Peavy/Peary"?

23           MR. TOBEROFF:  What page are you on?

24      A.    That's my mom.

25           MR. KLINE:  The second page.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 19

1      Q.   (By Mr. Kline)  Oh, so your mom wrote this
2    letter?

3      A.   Yeah.

4           MR. TOBEROFF:  Do you know, one way or
5    another?

6           THE WITNESS:  I think.  I believe.

7           MR. TOBEROFF:  Don't -- if you know,
8    testify.  Do you know one way or another what
9    they're talking about?

10          THE WITNESS:  I didn't write the letter.

11     Q.   (By Mr. Kline)  Did you know that your
12   mom -- or somebody had sent a letter purporting to
13   be from you, your mother, and your brother, to
14   Mr. Sim, including these copies of pictures?

15     A.   I don't know who wrote the letter.

16     Q.   But do you know that someone wrote a
17   letter to him purporting to come from you, your
18   mother --

19     A.   Well, just from reading this, I would
20   assume it was my mom, nutritional consultant--

21          MR. TOBEROFF:  Don't make assumptions.
22   You're not here to make assumptions.  You're here to
23   testify as to what you know or don't know.

24     A.   Okay.  I don't.  I don't know.  I did not
25   see a letter, so...

**EXHIBIT A**

**23**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 20

1        Q.    I'm going to give you another letter.  I'm

2     going to mark it as Exhibit 66.

3              (Exhibit 66 marked.)

4        Q.    Ms. Peavy, it's actually marked a new

5     exhibit there, marked as Exhibit 66.

6              MR. TOBEROFF:  I want to instruct my

7     client for a second.  Before you -- when you answer

8     questions, you're here to testify as to what you

9     know.

10             THE WITNESS:  Know.

11             MR. TOBEROFF:  The facts.  Not to

12    speculate, not to guess, and not to make any

13    assumptions.  That's all I want you to testify.

14       Q.    (By Mr. Kline)  I'm showing you another

15    letter that we have marked as Exhibit 66.  It's

16    dated February 9, 2008.  Do you see that at the top

17    there?

18       A.    The date?

19       Q.    Yes.

20       A.    Yes.

21       Q.    And do you see at the end of the second

22    page it says, "Love from the Joe Shuster family,

23    Jean, Dawn, and Warren"?

24       A.    Yes.

25       Q.    Have you seen this letter before?

**EXHIBIT A**
**24**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 21

1       A.    No.

2       Q.    I know your mom had a stroke in -- I think

3   it was 2008; correct?

4       A.    Correct.

5       Q.    Was it later than February 9, 2008?

6       A.    Yes.

7       Q.    Before then, did she have a computer that

8   she typed letters on?

9       A.    No.

10      Q.    Did she have a typewriter that she typed

11  letters on?

12      A.    Yes.

13      Q.    Would you or your brother help her type

14  those letters?

15      A.    No.

16      Q.    She did it on her own?

17      A.    Yes.

18      Q.    Do you know if she kept copies of the

19  letters that she wrote?

20      A.    No.

21      Q.    Did she ever talk to you about letters

22  that she was sending to Dave Sim?

23      A.    No.

24      Q.    When did you meet Dave Sim?

25      A.    I don't recall.

**EXHIBIT A**
**25**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 22

1        Q.    You said you did meet him, though;
2    correct?
3        A.    Yes.
4        Q.    Was it at the "Superman" premiere?
5        A.    No.
6        Q.    Was it at the Toronto Comic Con?
7        A.    Yes.
8        Q.    Does that sound familiar?  So you have
9    attended "Superman" related events with your mother
10   in recent years; correct?
11       A.    One.
12       Q.    Well --
13       A.    Or two.
14       Q.    You went to the premiere in Los Angeles;
15   correct?
16       A.    (Witness nods.)
17       Q.    Yes?
18       A.    Yes.
19       Q.    And you went to the Toronto Comic Con --
20       A.    Yes.
21       Q.    -- correct?  Did you also go to Cleveland
22   at any point in time --
23       A.    Yes.
24       Q.    -- for a celebration of Joe Schuster's
25   life?  So that's three; correct?

**EXHIBIT A**
**26**
b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 23

1      A.   Yes.

2      Q.   Do you also ever speak with -- do you know

3   who Mike Catron is, C-A-T-R-O-N?

4      A.   I met him once.

5      Q.   And who is he?

6      A.   A friend of my mother's.

7      Q.   Where did you meet him?

8      A.   I don't remember.

9      Q.   Are you aware that he helped your family

10   go to the "Superman Returns" premiere?

11      A.   No.

12           MR. TOBEROFF:  Vague.

13      Q.   Do you know if -- does your mother have an

14   e-mail account, by the way?

15      A.   No.

16      Q.   Has she ever, to your knowledge?

17      A.   No.

18      Q.   If she wants to find something on the

19   Internet, would she ask you or your brother for help

20   doing that?

21      A.   No.

22      Q.   Has she ever asked you for help --

23      A.   No.

24      Q.   -- finding something on the Internet?

25      A.   She's not on the computer, doesn't...

EXHIBIT A

27

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 24

1    Q.    Have you ever heard her ask your brother
2    for help using the Internet or finding something on
3    the Internet?
4    A.    No.
5    Q.    Are you aware that she's written letters
6    to Paul Levitz at DC Comics saying she found
7    something on the Internet or heard about something
8    on the Internet?
9    A.    No.
10    Q.    Would that surprise you, that she would
11    say she had heard about it that way?
12    A.    Yeah.  Well, no, because she might hear it
13    from a friend or somebody else, you know.  So I
14    can't say -- I mean, she's heard of the Internet.
15    It's not like she's oblivious to it.
16    Q.    But you have never seen her use the
17    Internet on her own?
18    A.    On her own, no.
19    Q.    Have you ever seen her sit down with Mark
20    and --
21    A.    No.
22    Q.    -- look for things on the Internet with
23    him?
24    A.    No.
25    Q.    Does Mark -- do you have a computer in the

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 25

1    family home?

2         A.    No.

3         Q.    Does your brother, Mark?

4         A.    Yes.

5         Q.    What type of computer does he have?  Is it

6    a desktop or a laptop?

7         A.    Desktop.

8         Q.    Okay.  Do you know if it's an IBM type

9    computer, or a Macintosh type computer?  Apple?  You

10    don't know?

11         A.    Old.

12         Q.    It's old?

13         A.    (Witness nods.)

14         Q.    But he does have Internet access; correct?

15         A.    Yes.

16         Q.    Do you use his computer to monitor your

17    Facebook account?

18         A.    No.

19         Q.    Where do you do that?

20         A.    Usually my work laptop, if I do get on it,

21    or I'll use someone else's.

22         Q.    Are you able to bring your work laptop

23    home?

24         A.    Yes.

25         Q.    Okay.  And that's where you also use your

**EXHIBIT A**
**29**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY – 8/3/2011

Page 26

1    Gmail account?

2         A.    No.   My BlackBerry.

3         Q.    You have a BlackBerry, as well?   And do

4    you send and receive text messages on your

5    BlackBerry?

6         A.    Yes.

7         Q.    Okay.   Have you ever corresponded with

8    Dave Sim via e-mail?

9         A.    Not that I recall.

10        Q.    How about Mike Catron?

11        A.    No, not that I recall.

12        Q.    Have you spoken to either of them on the

13   phone?

14        A.    No.   I don't think so.

15        Q.    I'm going to mark a new exhibit, Exhibit

16   67.

17             (Exhibit 67 marked.)

18        A.    Other than maybe when we went to Canada, I

19   talked to him, I mean, to pick us up or something.

20        Q.    Okay.

21        A.    To Dave Sim, the first time I met him.

22        Q.    You met him up in Canada?

23        A.    Right.

24        Q.    But you can't remember where you met Mike

25   Catron?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 27

1      A.    No.

2      Q.    You know, did you ever go to -- can you

3   take a look at Exhibit 24 again, at the Dave Sim --

4   I wanted to have you look at the pages.  It's

5   numbered 5 of 7 in the bottom left-hand corner.  The

6   first full paragraph there, it says, "When I did an

7   interview with Tina for CBC" -- and then there's a

8   bracket there, presumably for Mr. Sim saying "this

9   would be Jean asking" -- "do you know if that

10  program was ever on any TV schedule?  It would be

11  fun for me to have a copy if it was ever shown."

12          Do you see that paragraph there?

13     A.    No.  Where is it?  Very bottom?  Oh, okay.

14     Q.    Have you seen videotapes in your home or

15  video recordings in your home of your mother giving

16  TV interviews about Joe Shuster?

17     A.    No.

18     Q.    Have you seen a videotape recording of her

19  speaking on a panel at Comic Con in San Diego?

20     A.    No.

21     Q.    She's never showed you those videos?

22     A.    No.

23          MR. TOBEROFF:  Assumes facts.

24     Q.    And you're not aware that she has any such

25  videos?

**EXHIBIT A**
**31**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 28

1        A.    No.

2        Q.    In your family home, does your mother

3    have, you know, VHS tapes?

4        A.    Yes.

5        Q.    Does she have DVDs?

6        A.    Yes.

7        Q.    And have you gone through those

8    collections, ever?

9        A.    No.

10        Q.    Has your brother or your mother ever

11    spoken to you about tape-recordings of interviews of

12    your mother regarding Joe Shuster or "Superman"?

13        A.    I'm sorry, say that again?

14        Q.    Has your mother ever spoken to you about

15    tape-recorded interviews that she gave?

16        A.    She might have mentioned it.

17        Q.    I mean, you were on this Canada trip;

18    correct?

19        A.    Correct.

20        Q.    And were you aware that she gave an

21    interview to a woman named Tina from the Canadian

22    Broadcasting Company while she was on that trip?

23        A.    Yes.

24        MR. TOBEROFF:  Assumes facts.

25        Q.    You're aware that happened; correct?

**EXHIBIT A**
**32**

DAWN PEAVY - 8/3/2011

Page 29

1        A.    Yes.

2        Q.    Were you in the room when the interview

3    occurred?

4        A.    Not in the exact room, no.

5        Q.    Where were you physically situated when

6    that interview occurred?

7        A.    At the Comic Con.

8        Q.    Okay.  And your mom went off on her own to

9    give the interview?

10       A.    Uh-huh.  I don't recall.  I don't

11   remember.  That was years.  It's been, you know --

12       Q.    But you do remember she gave an interview

13   to Canadian television; correct?

14       A.    (Witness nods.)  Yes.

15       Q.    When you accompanied her to the "Superman

16   Returns" premiere in Los Angeles, you and your

17   brother, you remember that; correct?

18       A.    Uh-huh, yes.

19       Q.    And that was a fun and proud time for the

20   family, I assume?

21       A.    Yes.

22       Q.    Did any of you give press interviews?

23       A.    I don't recall.

24       Q.    You don't recall your mother giving a

25   press interview?

**EXHIBIT A**
**33**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 30

1          THE REPORTER:  Is that a no?

2     A.    No.

3     Q.    I'm going to give you Exhibit 67.

4          (A discussion was held off the record.)

5     Q.    This is a February 23, 2006, e-mail from

6     Michael Catron to Paul Levitz.  Do you know who Paul

7     Levitz is, Ms. Peavy?

8     A.    Something to do with DC.

9     Q.    And the subject is Jean Shuster Peavy and

10    "Superman Returns."  "Dear Paul, how are you?  I am

11    writing to you as the representative of Jean Shuster

12    Peavy.  As you may recall, Jean and Joe attended the

13    world premiere of 'Superman the Movie' at the

14    Kennedy Center in Washington, D.C., in 1978.  (I was

15    there, too.  It was a benefit for the Special

16    Olympics.)  Jean is now interested in also attending

17    the world premiere of 'Superman Returns' or perhaps

18    the Los Angeles premiere.  She would be pleased if

19    DC or Warner would arrange for her and her immediate

20    family, son, daughter, and two grandchildren's

21    expenses and would be willing, if asked, to do an

22    interview or two with the press.  Seems likely at

23    this point that I will be escorting her, so perhaps

24    my expenses could be included as well."

25          Did you ever see this e-mail before?

**EXHIBIT A**
**34**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 31

1       A.    No.

2       Q.    Did your children attend the premiere with

3    you?

4       A.    No.

5       Q.    Did Michael Catron attend the premiere

6    with you and escort your mother?

7       A.    No, not that I recall.

8       Q.    Does this refresh your recollection at all

9    whether your mother gave press interviews at the

10   premiere?

11      A.    I don't remember.

12      Q.    Did you know that Michael Catron was

13   holding himself out as the representative for Jean

14   Shuster Peavy in 2006?

15      A.    No.

16      Q.    Did your mother tell you that Michael

17   Catron was arranging for your family to attend the

18   premiere in 2006?

19      A.    No.

20      Q.    How did you come to learn that you were

21   going to go attend the premiere?  Did your mother

22   tell you?

23      A.    Yes.

24      Q.    And what did she say?

25      A.    I don't recall word for word.  I mean,

**EXHIBIT A**
**35**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 32

1    that we were -- you know, that we were invited to go

2    to the premiere.

3         Q.   Were you excited about that?

4         A.   Yes, very much so.

5         Q.   And why is that?

6         A.   Because it's a creation of my uncle.

7         Q.   Any other reasons?

8         A.   No.  It's in honor of him.

9         Q.   It was a fun event?

10        A.   Uh-huh, yes.

11        Q.   Are you interested in his creation?  I

12   mean, are you a "Superman" fan?

13        A.   Yes.

14        Q.   And do you follow the progression of the

15   character, and do you read the comic books, ever?

16        A.   No.

17        Q.   Do you read stories about new movies that

18   might be made about it?

19        A.   No.

20        Q.   Do you ever talk to your brother or mother

21   about those things?

22        A.   No.

23        Q.   Are you aware that Warner Brothers is

24   thinking about making a new "Superman" movie?

25        A.   Yes.

EXHIBIT A
36

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 33

1        Q.   Are you aware that Christopher Nolan, who

2    was involved with "Batman" and "Inception" is

3    involved with that project?

4        A.   No.

5        Q.   How did you come to learn that Warner

6    Brothers is making a new "Superman" movie?

7        A.   A friend told me.

8        Q.   Have you ever discussed that with your

9    brother?

10       A.   No.

11       Q.   Do you ever talk to your brother about

12   Superman-related issues?

13       A.   Not really.

14       Q.   Why is that?

15       A.   I'm very busy.  I don't -- that's his -- I

16   mean, that's -- I don't know.

17       Q.   Do you eat dinner together at night?

18       A.   Nope.

19       Q.   Breakfast in the morning?

20       A.   No.

21       Q.   Do you see him when you're at home?

22       A.   Yes.

23       Q.   Do you speak to him when you're at home?

24       A.   Yes.

25       Q.   And the subject of "Superman" just never

EXHIBIT A
37

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 34

1    comes up?

2         A.   I mean, no.  We talk about -- I don't

3    understand the question.  I mean, we talk just like

4    brother and sister, but we don't talk in depth

5    about -- I'm very busy.  I work a lot.  So I mean,

6    when I get home, it's mainly focused on my mom.

7         Q.   Taking care of her; right?

8         A.   Yes.  It's her time.

9         Q.   You understand, though, that your

10   brother -- you understand that your lawyer here

11   today, Mr. Toberoff, and your brother are seeking to

12   get millions of dollars for your family based on the

13   alleged "Superman" rights that your family holds;

14   correct?

15        A.   Yes.

16             MR. TOBEROFF:  Assumes facts.

17        Q.   You understand that; correct?

18        A.   Yes.

19        Q.   And you also understand that you and your

20   brother split the proceeds of your mother's estate

21   50/50 in her will; correct?

22        A.   Yes.

23        Q.   And it would be a significant change in

24   your life, would it not, if their efforts were

25   successful and millions of dollars were obtained for

DAWN PEAVY - 8/3/2011

Page 35

1    your family; correct?

2         A.   I don't understand "change," what you mean

3    by...

4         Q.   What don't you understand about that?

5         MR. TOBEROFF:   What's the question?

6         Q.   What don't you understand about -- is it

7    the word "change" that you don't understand?

8         A.   Yes.

9         Q.   How do you define that word?

10        A.   I don't know.  Depends on who's asking it,

11   what, I mean...

12        Q.   I assume your mother has significant

13   medical bills?

14        A.   I don't know.

15        Q.   Who handles those --

16        A.   My brother.

17        Q.   If your mother or your family recovered

18   the millions of dollars they're claiming an

19   entitlement to --

20        MR. TOBEROFF:   Assumes facts, misstates

21   the record.

22        MR. KLINE:   You need to let me finish my

23   questions, Marc.

24        MR. TOBEROFF:   I thought you were

25   finished.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 36

1    Q.   (By Mr. Kline)  If your family recovered
2  the millions of dollars they say they're entitled
3  to, do you think it would have an impact on your
4  life?
5           MR. TOBEROFF:  Assumes facts.  Misstates
6  the record.  There has been no claim by the Shuster
7  family to millions of dollars.
8           You can answer the question.
9           Vague and ambiguous.
10    A.   Okay, repeat the question.
11    Q.   If your family recovered the millions of
12  dollars they say they're entitled to, do you think
13  it would have an impact on your life?
14           MR. TOBEROFF:  Same objections.
15           You can answer.
16    A.   Yes.
17    Q.   And what would that impact be?
18    A.   I don't know how to answer that question.
19    Q.   Would you have to work less hard,
20  potentially?
21    A.   No, I'd probably still work just as hard.
22    Q.   Could you provide more for your children?
23           MR. TOBEROFF:  Matt, these questions are
24  ridiculous.
25           THE WITNESS:  Yeah.

**EXHIBIT A**
**40**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 37

1           MR. TOBEROFF:  She's here to testify as to
2     what she knows or doesn't know, not these rhetorical
3     questions about whether millions of dollars could
4     benefit her and how.  This is ridiculous.
5           MR. KLINE:  Marc, the speaking objection
6     is inappropriate.  I'm trying to figure out --
7           MR. TOBEROFF:  These questions are
8     inappropriate and ridiculous.  Ask her factual
9     questions.
10          MR. KLINE:  Stop your speeches.
11     Q.   (By Mr. Kline)  I'm trying to figure out
12     why is it you say you never speak to your brother
13     about "Superman," when your family is claiming that
14     it's entitled to a lot of money from Warner
15     Brothers, and I find it hard to believe that --
16     A.   Well, I don't speak --
17     Q.   -- you never talked to him about it.
18          MR. TOBEROFF:  Wait.
19     Q.   So that's what I'm pursuing.  I'm trying
20     to find out why it is you would never talk to your
21     brother about this if this could have a dramatic
22     impact on your family, the rights that you're
23     claiming that -- the rights that your brother is
24     claiming that your family has, why you would never
25     talk about that.  Why is that?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 38

1          MR. TOBEROFF:  Objection, misstates the
2     record.  There has been no claim from the Shuster
3     family to millions of dollars.  They have exercised
4     their termination rights under the Copyright Act.
5               (A discussion was held off the record.)
6          Q.   Why is it you never speak to your brother
7     about "Superman"?
8          A.   I don't speak to him about anything of the
9     legal fight, other than -- I mean, I talk to him
10    about "Superman," or -- but I don't ask what's going
11    on, or -- I don't -- I mean, that's -- he's doing it
12    for the -- he's doing it for our -- for the estate
13    and for our family.  I mean, I trust whatever he's
14    doing, you know.  I don't know.
15         Q.   Okay.  Now, when you do talk about
16    "Superman," what do you talk about, if you don't
17    talk about the legal stuff?
18         A.   Just mention to him, did he know that
19    there was another "Superman" movie coming out.
20         Q.   And what did he say?
21         A.   He said yeah, he knew about it.
22         Q.   Do you know that your brother, on behalf
23    of your family, through your attorney, has made
24    specific settlement demands on my client for money,
25    millions of dollars?

Merrill  Corporation  -  Los Angeles
800-826-0277                    www.merrillcorp.com/law

**EXHIBIT A**
**42**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 39

1          MR. TOBEROFF:  You're not free to discuss
2     settlement demands in a deposition that are
3     confidential.  You're bound by a confidentiality
4     agreement.
5          Q.   Are you aware that your family and your
6     brother have made settlement demands on my client to
7     settle their claims?
8          A.   I don't understand the question.
9     "Settlement."  I don't --
10         Q.   Do you know that your brother traveled to
11    Los Angeles about a year and a half ago to go to a
12    settlement mediation in this case?
13         A.   I didn't know what the term was of it.  I
14    just know he went to California for something to do
15    with "Superman."
16         Q.   Okay.  And are you aware that DC Comics
17    has made settlement offers to your family over the
18    years?
19         A.   No.
20         Q.   He's never disclosed that to you?
21         A.   (Witness shakes head.)  I'm sure he's
22    doing the right thing.
23         Q.   Has he ever discussed it in front of your
24    mother -- with your mother in front of you?
25         A.   No.

**EXHIBIT A**
**43**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 40

1    Q.   Have you ever been with him when he

2    discusses this case with your mother?

3    A.   No.

4    Q.   Have you ever heard your mother ask

5    questions about this case?

6    A.   No.  Their time is during the day, so I

7    mean...

8    Q.   That's when she's doing --

9    A.   Yeah, when I come home, it's me and my

10   mom.  I mean, we don't sit around and -- we make

11   dinner, you know...

12   Q.   So other than the one conversation where

13   you talked about the new "Superman Returns" movie,

14   do you have any recollection of conversations with

15   your brother about "Superman" in the last, say,

16   year?

17   A.   No.

18   Q.   Are you saying that such conversations

19   didn't take place, or that you can't recall?

20   A.   I can't recall.  I'm sure we talked, but

21   just -- I don't -- I don't really understand why I'm

22   here.  I don't have any -- you know, this is my

23   brother's -- I'm very busy.  I have my work I got to

24   focus on, and I don't -- I mean, it's in good hands.

25   I trust my brother.  I love my brother.  I love my

**EXHIBIT A**

**44**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 41

1    family.  I trust Marc.  I don't understand why I'm

2    here.

3        Q.    When did you first meet Marc?

4        A.    The "Superman" premiere.

5        Q.    That was in what year?

6        A.    I don't remember.

7              THE WITNESS:  2006, was it?

8        Q.    Do you ever speak with him on the phone?

9        A.    No.

10        Q.    Do you ever e-mail with him?

11        A.    No.

12        Q.    So other than meeting him at the

13    "Superman" premiere and meeting with him last night,

14    have you ever met with him other than that?

15        A.    I talked to him on the phone once, I mean,

16    to set this up, or maybe twice.  I think it was

17    twice.

18        Q.    So other than those three times, have you

19    ever talked to him?

20        A.    Not that I recall.  I told you, that's my

21    brother.  That's my brother's business, he needs --

22    I got too much going on in my business.

23        Q.    So you trust Mr. Toberoff based on --

24        A.    Yes.

25        Q.    -- what your brother has told you about

**EXHIBIT A**

**45**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 42

1    him?

2         A.   Yes.  Well, yes.

3         Q.   And what has your brother told you about

4    Mr. Toberoff?

5         A.   That he's representing us.

6         Q.   And that he's trustworthy?

7         A.   Yes.

8         Q.   Has your brother told you that on behalf

9    of the family, he entered into business transactions

10   with one of Mr. Toberoff's entertainment companies,

11   Pacific Pictures Corporation?

12        A.   No.

13        Q.   Has he told you that Mr. Toberoff has

14   admitted in this lawsuit that that agreement was

15   void under the Copyright Act?

16        MR. TOBEROFF:  Totally misstates the

17   record.

18        Q.   Has he told you that?

19        A.   No.

20        MR. TOBEROFF:  Matt, I just want to tell

21   you that you're here to ask her -- and don't

22   interrupt me, please.  You're here to ask her

23   questions as a percipient witness, what she knows,

24   what she doesn't know.  You're not here to make your

25   case and to tarnish me.  So if that becomes what

**EXHIBIT A**

**46**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 43

1    this deposition is about, I'm going to shut it down.

2    You're on notice.  That's it.

3          MR. KLINE:  Okay, that's an improper

4    objection and an improper speaking objection.

5          MR. TOBEROFF:  We'll see.

6      Q.    (By Mr. Kline) I'd like you to look at

7    Exhibit 68, which is a brief filed on behalf of

8    defendants Warren -- Mark Warren Peary, as personal

9    representative of the Estate of Joseph Shuster, and

10   Jean Adele Peavy's reply in support of renewed

11   motion to dismiss and/or stay plaintiff's first

12   amended complaint pursuant to Federal Rule of Civil

13   Procedure 12(B)(6).

14          And I'd like you to read this paragraph

15   right here, paragraph 8, please, on page 8, please.

16          (Exhibit 68 marked.)

17          MR. TOBEROFF:  May I have a copy to show

18   the witness?

19          MR. KLINE:  Of course.

20      A.    This first part?

21      Q.    (By Mr. Kline)  Letter C, paragraph C,

22   starts about line...

23          Are you done reading the paragraph?

24      A.    Yes.

25      Q.    Does Mr. -- has your brother shared any

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 44

1    legal briefs with you that are --

2        A.    No.

3        Q.    -- filed in the case?  And he hasn't told

4    you that Mr. Toberoff has admitted in the case that

5    the business arrangements that Mr. Toberoff set up

6    between his company, Pacific Pictures, and your

7    family were void under the Copyright Act?

8        A.    No.

9            MR. TOBEROFF:  Misstates the brief,

10   misstates the record.

11       Q.    I'm going to give you a copy of your

12   brother's deposition.  Have you read that

13   deposition?

14       A.    No.

15       Q.    Did he talk to you about the deposition

16   that he gave?

17       A.    No.

18       Q.    Nothing about it?

19       A.    (Witness shakes head.)  Other than I asked

20   him if it went well.

21       Q.    What did he say?

22       A.    "Okay."  I mean, I really don't...

23       Q.    Anything else?

24       A.    Huh-uh.

25       Q.    I know he had a hard time catching his

**EXHIBIT A**
**48**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 45

1    flight.  He didn't talk about that?

2        A.    Yeah, but what does that have to do with

3    it?

4        Q.    Well, see, what I'm entitled here today is

5    just a full and complete answer of what you talked

6    about, and I want to get through the day.  I know

7    you're a very busy person, and so I'm going to try

8    to ask the questions.  If you can just give me a

9    full and complete answer, we'll move on a lot --

10            MR. TOBEROFF:  She has been.  Why are you

11   asking her whether her brother asked her whether she

12   had trouble catching his flight?  It's totally

13   irrelevant to this case.  You're just billing your

14   client and you're wasting our time.

15            MR. KLINE:  Marc, under the federal rules

16   you're not entitled to make these speeches.

17            MR. TOBEROFF:  You're not entitled to ask

18   questions like that.

19            MR. KLINE:  You can make objections.

20            MR. TOBEROFF:  It's abusive.

21            THE REPORTER:  I'm sorry, gentlemen.  One

22   at a time, please.

23        Q.    (By Mr. Kline)  What else did you and your

24   brother talk about, about the deposition?

25        A.    Nothing.

**EXHIBIT A**
**49**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 46

1      Q.   So he talked about he thought it went

2   well?

3      A.   I don't know about well.  He just said it

4   was okay.  You know...

5      Q.   And he talked about some flight logistics,

6   but that's it?

7      A.   Not flight.  Just told me he had to rush

8   to get to the airport, I think.

9      Q.   And you don't remember anything else?

10     A.   (Witness shakes head.)

11     Q.   But you do know that he gave a deposition

12  in this case pretty recently; correct?

13     A.   Yes.

14     Q.   Okay.  I'm going to give you and

15  Mr. Toberoff a copy of his deposition.  We'll mark

16  your copy.  What are we up to?  We'll give

17  Mr. Toberoff a copy also.  And I apologize, to save

18  some trees, we've printed it out four to a page.  If

19  you have any trouble reading it, let me know.  And I

20  want you to read page 233 right here, if you could.

21          MR. TOBEROFF:  What page are you on?

22          MS. SETO:  Page 233.

23     Q.   (By Mr. Kline)  Just 233, that bottom

24  right-hand page.

25          Are you done with that page?  Can you just

EXHIBIT A
50

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 47

1    read a little bit of page 234, through line 4?

2    Actually, through line 11, please.

3         A.    All the way to line what?

4         Q.    Eleven, please.

5         A.    Oh, okay.

6         Q.    Now, I just want to confirm.  Your

7    brother's never told you that Mr. Toberoff admitted

8    that these original agreements he secured would

9    work; correct?

10              MR. TOBEROFF:  Asked and answered.

11   Misstates the record.

12        Q.    Correct?

13              MR. TOBEROFF:  You can answer.  You asked

14   that question three times.

15        A.    I have never talked about any of this.  I

16   don't even understand this part.

17        Q.    You understand that your brother has

18   testified in this case that he is your fiduciary, he

19   has fiduciary duties in his role as the executor of

20   your mother's estate; correct?

21              MR. TOBEROFF:  Assumes facts.

22              Only answer --

23        A.    What's "fiduciary"?  I don't even know

24   what that is.  What's "fiduciary"?

25        Q.    It means that he owes you legal duties, as

Merrill  Corporation  -  Los Angeles

800-826-0277                    www.merrillcorp.com/law

EXHIBIT A
51

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 48

1    somebody looking out for your interest.  You say you

2    trust him; correct?

3         A.   Yes.

4         Q.   And he owes you legal duties to protect

5    your mother's interests and your interests as the

6    beneficiary of her will; correct?

7         A.   Yes.

8         Q.   And have you discussed that with him, that

9    he owes you --

10        A.   You're talking about my brother; correct?

11        Q.   Yes, your brother, Mark Peary.

12        A.   Yes.

13             MR. TOBEROFF:  He's asking you whether you

14    ever discussed with --

15             MR. KLINE:  Marc, that's completely

16    inappropriate --

17             MR. TOBEROFF:  Don't interrupt me when

18    I'm --

19             THE REPORTER:  Gentlemen, please.  One at

20    a time.

21             MR. TOBEROFF:  The court reporter can't

22    take it down when you're talking over me.  You have

23    to stop doing that.  Now, please --

24             THE WITNESS:  Okay, can you repeat the

25    question?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 49

1          MR. TOBEROFF:  Wait, wait.  Please don't.

2   I would like you just to testify as to what you

3   know, what you don't know, what you perceived, what

4   you saw, what you smelled, what you heard.  But

5   other than that, don't assume something if you don't

6   know it.  That's all I'm asking.  You're here to

7   testify as to what you know.

8          MR. KLINE:  Okay.  That's another

9   inappropriate objection, and I'm going to ask you to

10  stop spending the time on the record making

11  speeches.

12         MR. TOBEROFF:  I want to make sure you

13  have testimony as to what she knows.

14     Q.   (By Mr. Kline) Have you seen a copy of

15  your mother's will?

16     A.   No.

17     Q.   Do you know that it names you as a

18  beneficiary?

19     A.   Yes.

20     Q.   How do you know that?

21     A.   They told me.

22     Q.   Who is "they"?

23     A.   My brother and her.

24     Q.   Did they keep a copy of it in the house;

25  do you know?

Merrill  Corporation  -  Los Angeles

800-826-0277                    www.merrillcorp.com/law

EXHIBIT A
53

DAWN PEAVY - 8/3/2011

Page 50

1        A.    I don't know.

2        Q.    Do you know if that will names any of your

3    children as beneficiaries?

4        A.    No.

5        Q.    You don't know, one way or the other,

6    or --

7        A.    No.

8        Q.    Okay.  Do you think that it does, or you

9    just don't know at all?

10       A.    Don't know.

11       Q.    Have you discussed with your brother and

12   your mother setting up a trust that would receive

13   the benefits of your mother's estate, and that trust

14   would pay out monies to you and your brother?

15       A.    Yes.

16       Q.    Can you describe those discussions,

17   please?

18       A.    I asked my brother -- or he told me, I

19   guess, I didn't ask him -- that the estate is set

20   up, and that there will be a trust in both of our

21   names.  That's about it.  And I did ask.

22       Q.    And you say this is a conversation you

23   think he prompted?

24       A.    No, maybe I asked what was -- how it was

25   going to work out.

Merrill  Corporation  -  Los Angeles

800-826-0277                    www.merrillcorp.com/law

**EXHIBIT A**

**54**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 51

1       Q.    Do you know if those trusts, formal
2   documents, have been set up and signed?
3       A.    No.
4       Q.    Do you know if your mother -- I mean, is
5   your mother in a state right now where she could be
6   signing legal documents like that?
7       A.    She can sign her name.
8       Q.    But she has a hard time communicating with
9   you verbally?
10      A.    Yes.
11      Q.    Does she have a hard time understanding
12  things?
13      A.    (Witness nods.)
14      Q.    Again I'm sorry, I know this is a --
15      A.    I don't want to talk about my mom.
16      Q.    I know.  And I want to make this as brief
17  as possible, and I think you nodded yes.  You want
18  to take a break?
19      A.    (Witness nods.)
20            (Recess from 10:02 a.m. to 10:11 a.m.)
21            (Exhibit 12, previously marked.)
22      Q.    Ms. Peavy, I'm going to switch topics for
23  a moment, because talking about your mom is tough.
24  What I have put in front of you is Exhibit 12, which
25  was used at your brother's deposition.  And

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 52

1   unfortunately, this is not a consecutively paginated

2   document, but if you look about, I don't know, 15

3   pages in, there's a document that you signed called

4   "Waiver of notice and consent, petition for probate

5   of (lost) will."  I think if you turn to the page

6   with your signature on it --

7           MR. TOBEROFF:  Assumes facts.

8       Q.    -- is that your signature, Ms. Peavy?

9       A.    Yes.

10      Q.    And do you remember in 2003 signing this

11  document?

12          THE VIDEOGRAPHER:  Pardon me,

13  Mr. Toberoff.  Your microphone is currently off.

14      A.    I guess I don't remember when, but I guess

15  I signed it.  It's my signature.

16      Q.    Do you have any recollection -- it says,

17  "Signed, executed this 20th day of August, 2003, in

18  Santa Fe, New Mexico."  Were you living in Santa Fe

19  at the time?

20      A.    In August?  No.

21      Q.    You were not?

22      A.    No, I don't think I was living here.

23      Q.    Do you remember receiving and signing this

24  document?

25      A.    I don't remember.  I don't remember.

**EXHIBIT A**
**56**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 53

1      Q.   Do you remember being presented documents

2    to sign in connection with the probate of Joseph

3    Shuster's estate?

4      A.   I don't remember.  I mean, it's been eight

5    years.  I guess I'm...

6      Q.   But you have no recollection, as you sit

7    here today, eight years after August 21, 2003, of

8    signing this document; is that correct?

9      A.   No.

10      Q.   Do you remember signing a separate

11    document that would entitle your brother to act as

12    the administrator of the Joseph Shuster estate?

13      A.   No.

14      Q.   And I think I was imprecise in my

15    language.  Do you remember signing a separate

16    document that would entitle him to act as personal

17    representative of the estate of Joseph Shuster?

18      A.   No.

19      Q.   Do you remember signing a document saying

20    that he could act as the executor of the estate of

21    Joseph Shuster?  Is the answer no?

22      A.   No.

23      Q.   Do you know that Joseph Shuster's will, or

24    at least the copy that we've been given, says that

25    your mother would act as the executor of the estate?

**EXHIBIT A**
**57**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 54

1    Were you aware of that?

2         A.    No.

3         Q.    Are you aware that your brother was

4    substituted in as the executor instead of her?

5         A.    I know he's the executor of the estate.

6         Q.    Okay.  And you don't remember signing

7    documents waiving any right for you, yourself, to

8    serve as the executor?

9         A.    No.

10        Q.    Have you done anything to track your

11   brother's work as executor of Joseph Shuster's

12   estate?

13        A.    No.

14        Q.    And this is because you trust him to

15   represent your mother and your interests?

16        A.    Yes.

17        Q.    And he's told you he would do that?

18        A.    Yes.

19        Q.    Do you understand that he has certain

20   duties and liabilities as the executor of her

21   estate?

22        A.    I don't understand the question.

23        Q.    Well, I'm going to show you a document

24   that was filed in Los Angeles superior court in

25   October of 2003.

EXHIBIT A
58

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 55

1           (Exhibit 70 marked.)

2      Q.   I'm going to mark it as Exhibit 70.  I'll

3  give Mr. Toberoff a copy, also.

4           Do you see -- can you turn to the second

5  page, please, of this document?  See where it says

6  September 30, 2003, at the bottom there?  And the

7  name Mark Warren Peary is typed, and there's a

8  signature to the right of it?

9      A.   Yes.

10     Q.   Do you recognize that to be your brother's

11  signature?

12     A.   Yes.

13     Q.   I want to turn your attention to page 2 --

14  I'm sorry, to page 1.  And at the bottom there it

15  says, "Number 2," and this is in all caps,

16  "Inventory of estate property."  Do you see that,

17  this part?

18     A.   Oh, yeah.

19     Q.   And do you see letter C below there?

20     A.   Yes.

21     Q.   "File and inventory appraisal"?  Can you

22  just read into the record what it says there?

23     A.   "Within four months after letters are

24  first issued to you as personal representatives, you

25  must file with the Court an inventory and appraisal

Merrill  Corporation  -  Los Angeles

800-826-0277              www.merrillcorp.com/law

**EXHIBIT A**
**59**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 56

1    of all the assets in the estate."

2        Q.   Do you know if your brother has ever filed

3    such an inventory?

4        A.   I don't even understand what that means.

5    I don't understand legal.

6        Q.   Has he ever told you -- and I'm not asking

7    you to understand legal.  Has he ever told you that

8    he has never filed such an inventory, though?

9        A.   I don't know what inventory -- I don't

10   understand the question.

11       Q.   So I want to be as clear as I possibly

12   can.  Has Mark ever said to you, "Dawn" -- and I'm

13   just going to use your first name for this

14   example -- in words or effect, "Dawn, I have chosen

15   not to file an inventory in the probate action in

16   California"?

17       A.   No.  I don't -- we don't talk about that.

18       Q.   So you don't know, one way or another,

19   whether such an inventory has been filed?

20       A.   I don't even know what you mean by

21   "inventory."  I don't understand the question.  I

22   don't -- he's never talked to me about that.

23       Q.   Okay.  And just because you're saying you

24   don't understand the question, I'm sorry if I'm

25   being imprecise, but I just want to understand this.

DAWN PEAVY - 8/3/2011

Page 57

1    He's never discussed the issue of filings he has

2    made or has not made in the probate action with you?

3         A.    No.

4         Q.    Okay.  So I'm trying to kind of figure out

5    a way to kind of know what he has told you and not

6    told you.  It's your testimony he's never told you

7    about anything he's doing in the probate action?

8         A.    No.

9         Q.    Okay.  Can you turn to page 2?

10        A.    Am I supposed to be reading this?

11        Q.    No, you're just waiting for a lawyer who's

12   looking to formulate a question, and I apologize for

13   that.

14               On number 3, and I think your previous

15   answer answers this, but do you see notice to

16   creditors at the top there?

17        A.    Yes.

18        Q.    Has he ever discussed with you whether

19   he's served such notices or not?

20        A.    No.

21        Q.    On number 5, the record-keeping, do you

22   see that word, those two words, "record-keeping"

23   there?

24        A.    Yes.

25        Q.    Has he ever discussed with you what

EXHIBIT A
61

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 58

1    record-keeping he's done?

2        A.    No.

3        Q.    Number 6.  Can you read that, what it says

4    below, "Consulting an attorney"?

5        A.    "If you have an attorney, you should

6    cooperate with the attorney at all times.  You and

7    your attorney are responsible for completing the

8    estate administration as promptly as possible.  When

9    in doubt, contact your attorney."

10        Q.    Did your brother tell you that as of this

11    2006 deposition, he had never spoken directly to his

12    probate attorney about these proceedings?

13        A.    No.  No.

14            MR. KLINE:  Can we get a copy of

15    Mr. Peary's first deposition, please?

16            I'm going to mark this as Exhibit 71.

17            (Exhibit 71 marked.)

18        Q.    If you could just read page 38, please.

19            Are you all done?

20        A.    Uh-huh.

21        Q.    Do you know who John Pettker is?

22        A.    No.

23        Q.    Has your brother Mark ever talked to you

24    about his probate attorney in Los Angeles?

25        A.    No.

EXHIBIT A
62

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 59

1      Q.   He's never discussed any of his

2  interactions with him with you?

3      A.   No.

4      Q.   Can you take a look at the last exhibit I

5  gave you, which is 70?  And I want to focus your

6  attention on the part of paragraph 6 that you read,

7  "You and your attorney are responsible for

8  completing the estate administration as promptly as

9  possible."

10     A.   Are you reading that?

11     Q.   Under "Consulting an attorney."

12     A.   On the second page?

13     Q.   Yes, on the second page.  I'm sorry.

14  Under number 6.

15     A.   Okay, say -- repeat that.

16     Q.   The second sentence, "You and your

17  attorney are responsible for completing the estate

18  administration as promptly as possible.  When in

19  doubt, contact your attorney."

20          Do you see that?

21     A.   Yes.

22     Q.   Do you -- has Mark, your brother, Mark,

23  and I'm only using this for shorthand, and I'll use

24  "Mr. Peary" if you'd like me to -- has your brother

25  told you that that probate case remains open?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 60

1      A.    No.

2      Q.    Has he told you that the assets of the

3  estate have not been distributed to your mother yet?

4      A.    No.

5      Q.    Can you look down here on -- there's a box

6  and it says "Notice."  Can you read number 2 for me,

7  please?

8      A.    "If you fail to perform your duties or to

9  meet the deadlines, the Court may reduce your

10  compensation, remove you from office, and impose

11  other sanctions."

12      Q.    Has Mark, your brother, Mr. Peary,

13  discussed with you that there's a requirement under

14  California law that he close the estate and

15  distribute the assets to your mother in a timely

16  manner?

17      A.    No.

18      Q.    And do you know that the estate has

19  remained open for several years and not been closed?

20      A.    No.

21      Q.    He hasn't discussed that with you at all?

22      A.    No.

23      MR. TOBEROFF:  May I make --

24      Q.    Have you heard him discuss this with your

25  mother?

EXHIBIT A
64

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 61

1        A.    No.

2        Q.    Have you heard him talk to your mother

3   about John Pettker?

4        A.    No.

5        Q.    Have you heard him talk to your mother

6   about a separate probate lawyer in California who's

7   going to help the family out?

8        A.    No.

9        Q.    Have you heard him talk to your mother

10   about inventory of estate property?

11        A.    No.

12        Q.    Have you heard him talk to your mother

13   about the need within four months after letters are

14   first issued to you as personal representative, you

15   must file with the Court an inventory and appraisal

16   of all the assets in the estate?

17        A.    No.  We don't talk about this.  I already

18   told you.  I don't understand.  I mean, I trust him.

19   He's doing what's right for the family, and

20   that's -- I mean, that's basically what I know.  I

21   mean, I love my brother and I trust him.

22        Q.    But he's making all the decisions without

23   consultation with you.

24        A.    Right.

25             MR. TOBEROFF:  May I make a suggestion?

DAWN PEAVY - 8/3/2011

Page 62

1    When you refer to her brother, to avoid confusion,

2    since my name is also Marc, I would say "Warren,"

3    because he goes -- is Mark Warren Peary, and he

4    actually goes by the name Warren.

5            MR. KLINE:  I'm happy to do that.  I just

6    didn't want to be disrespectful.  I'll actually call

7    him Mr. Peary.  I'm just trying to --

8            MR. TOBEROFF:  I think Warren is good.

9        A.    You can call him Warren.

10           MR. TOBEROFF:  Good shorthand.

11           MR. KLINE:  Okay.

12       Q.    (By Mr. Kline)  Did your brother tell you

13   that he and your mother had been sued in this

14   lawsuit?

15       A.    No.

16       Q.    You understand that a complaint has been

17   filed against him and your mother; correct?

18       A.    No.

19       Q.    You have never seen the complaint in this

20   case?

21       A.    No.

22       Q.    Okay.  And he's not told you that DC

23   Comics has filed a lawsuit challenging whether your

24   family has any rights to terminate copyright

25   interests?

EXHIBIT A
66

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 63

1      A.   No.

2      Q.   Did he tell you that as early as 2005, if

3  not well before, DC Comics was challenging your

4  family's claim to copyright termination interests?

5      A.   No.

6      Q.   Did he tell you that despite DC

7  challenging that -- the copyright termination

8  interests, he never filed any lawsuit seeking to

9  protect your family's rights?

10     A.   No.

11     Q.   Did you ever hear him discuss any of these

12  issues with your mother?

13     A.   Not that I paid attention, no.  I don't

14  know.  No.

15     Q.   Did he ever talk to you about how the

16  statute of limitations might run on any claims your

17  family might have?

18     A.   No.  I already told you, we don't talk

19  about this.

20     Q.   I know.  I know.  And I'm just trying to

21  kind of get a complete record here.

22     A.   Okay.

23     Q.   Did you ever hear him talk to your mother

24  about a statute of limitations running --

25     A.   No.

EXHIBIT A
67

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 64

1        Q.   -- on any claims your family might have?

2   Are you aware that your mother and her brother --

3   you know your Uncle Frank -- you remember him?

4        A.   Yes.

5        Q.   Are you aware that your mother and your

6   Uncle Frank signed a contract with DC in 1992?

7        A.   No.

8        Q.   Are you aware that your mother has sent

9   letters to DC Comics over the years?

10       A.   No.

11       Q.   Are you aware that she receives a pension

12  payment --

13       A.   Yes.

14       Q.   -- from DC Comics?  How are you aware of

15  that?

16       A.   Because of source of income.  We need to

17  know a source of income for her.

18       Q.   So has she ever told you why she gets that

19  payment?

20       A.   No.  Not really, no.  Has to do with my

21  uncle.

22       Q.   Has your brother told you -- strike that.

23            Are you aware that on occasion, she has

24  asked for and received special bonuses or special

25  payments from DC Comics over the years?

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 65

1        A.    No.

2        Q.    Who helps your mother handle her financial

3    issues?  I think you said it was your brother,

4    Warren?

5        A.    My brother.

6        Q.    And so you have no involvement in that?

7        A.    No.  His side.

8              (Exhibit 47, previously marked.)

9        Q.    Okay.  I'm going to show you an exhibit

10    marked as Plaintiff's Exhibit 47 in your brother's

11    deposition.  I'd ask you to take the time to read

12    the letter, please.

13        A.    You want me to read the whole thing?

14        Q.    Sure.  Take your time.

15              MR. TOBEROFF:  Objection.  This is a

16    seven-page single-spaced letter.  She's not going to

17    sit here and read this entire letter.  For what

18    purpose?  Why are you asking her to read a

19    seven-page single-spaced letter in the middle of the

20    deposition?

21        Q.    Please read the letter.

22              MR. TOBEROFF:  Why are you asking her to

23    read a single-spaced --

24              MR. KLINE:  I'm not going to engage you,

25    Marc.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 66

1        MR. TOBEROFF:  I object to having her have
2   to read this letter.
3        MR. KLINE:  Okay.
4        MR. TOBEROFF:  You better have substantive
5   questions around the substance of this letter, after
6   making her read the entire letter.
7        A.    I'm a slow reader.
8        Q.    (By Mr. Kline)  That's fine.  Take your
9   time.
10       When you get to page 4, if you don't mind,
11  just let me know.
12       A.    Okay.  Three, you said?
13       Q.    Yes, just through the first paragraph of
14  page 4.
15       A.    Okay.
16       Q.    Were you living with your mother and
17  brother in April of 2005?
18       A.    Yes.
19       Q.    Did you see a copy of this letter?
20       A.    No.
21       Q.    Were you part of any discussions regarding
22  this letter?
23       A.    No.
24       Q.    Do you remember overhearing your brother
25  and mother discussing DC's offer to settle its

**EXHIBIT A**
**70**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 67

1    claims with your family?

2        A.    No.

3        Q.    Did your brother tell you that DC offered

4    your family a settlement in which there would be a

5    certain upfront cash component and then these

6    royalties on future "Superman" products?

7        A.    No.

8        Q.    Did he tell you that the upfront cash

9    component would be paid right away, and not in 2013,

10    when the purported termination takes effect?

11            MR. TOBEROFF:  Asked and answered.  She

12    just said she had no discussions about the document.

13    Why are you asking her separate little questions?

14    She already said she had no --

15            MR. KLINE:  Marc, your objections are

16    improper.  You can't make speeches.

17        A.    No.

18        Q.    (By Mr. Kline)  That didn't come up?

19        A.    No.

20        Q.    Do you know that this offer was rejected

21    by your brother?

22        A.    No.

23        Q.    Have you had any discussions with your

24    brother about the Kirby lawsuit that's pending in

25    New York by the Kirby heirs?

**EXHIBIT A**
**71**

DAWN PEAVY - 8/3/2011

Page 68

1      A.    No.

2      Q.    Do you know who Jack Kirby is, the comic

3   book author?

4      A.    No.

5      MR. TOBEROFF:  Objection, I want to object

6   to having you having wasted our time having her read

7   a single-spaced seven-page letter where you could

8   have first asked her whether she has any knowledge

9   of this letter.

10      The purpose of this deposition is not to

11   impart information to Dawn Peavy.  The purpose of

12   the deposition is to get information that she knows

13   to her -- that she's aware of.  If you improperly

14   use this deposition, continue to do so, like you

15   have done at other depositions, I will shut it down.

16   You're not entitled to use depositions to impart

17   information to people.  Ask her questions as a

18   percipient witness.  That's it.

19      MR. KLINE:  Marc, your objections are

20   completely inappropriate.  They violate the federal

21   rules, and I am entitled to show her a document --

22      MR. TOBEROFF:  You're violating the

23   federal rules.

24      THE REPORTER:  I'm sorry, gentlemen, one

25   at a time, please.

**EXHIBIT A**
**72**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 69

1          MR. KLINE:  -- refresh her recollection

2    and ask her if certain facts are conveyed to her.

3          MR. TOBEROFF:  We both know you're not

4    doing that.

5          MR. KLINE:  You need to stop making

6    speaking objections.

7          MR. TOBEROFF:  We both know you're --

8          MR. KLINE:  You're violating the federal

9    rules in doing do.

10         MR. TOBEROFF:  And I believe you're being

11   disingenuous.

12     Q.   (By Mr. Kline)  Putting this 2005 episode

13   aside, have you had any other discussions with your

14   mother or brother concerning a settlement with DC?

15     A.   No.

16     Q.   You have never discussed the issue with

17   either of them?

18     A.   This issue, no.

19     Q.   And by "this issue," I want to be clear.

20   I'm not just talking about this 2005 letter.  I'm

21   talking about, in general, any settlement of the

22   claims your family is asserting, their a copyright

23   interest in "Superman."  You have never had any

24   discussions with your mother or brother about that?

25     A.   All I know is, they're working on it.  My

DAWN PEAVY - 8/3/2011

Page 70

1   brother is working on it.

2        Q.   How do you know that?

3        A.   Because it's not done yet.

4        Q.   Now, do you know -- I just want to parse

5   that a little bit.  You understand that your brother

6   filed a copyright termination notice that's supposed

7   to take effect in 2013?

8        A.   No.

9        Q.   When you say your brother is working on

10  it, what do you mean by that?

11       A.   Whatever is going on with this case.

12       Q.   And what case do you think there is?

13       A.   The case of the estate against DC Comics.

14       Q.   Okay.  And you think that your family

15  initiated that lawsuit, or that DC initiated the

16  lawsuit, or do you know, one way or the other?

17       A.   I don't know.  I never asked.

18       Q.   When your brother has said he's working on

19  it, what does he say that he's working on?

20       A.   He doesn't say he's working on it.  I know

21  he's working on it.

22       Q.   How do you know that?

23       A.   Well, let's see.  He went to the

24  deposition last month for it.  And now I'm coming.

25       Q.   Did your mom ever discuss with you her

**EXHIBIT A**
**74**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 71

1    relationship with DC Comics?

2         A.    No.

3         Q.    You're aware, though, that your mom

4    started receiving a pension payment from DC Comics

5    in the 1990s; correct?

6         A.    Yes.  Didn't know when.

7         Q.    Okay.  And she never said anything to you

8    about how she felt about DC or people there?

9         A.    No.

10        Q.    She never mentioned anybody like Paul

11   Levitz?

12        A.    No.

13        Q.    Did you meet anybody either at the Toronto

14   Comic Con or at the 2006 film premiere or when you

15   went to Cleveland for the "Superman" celebration --

16   did you meet anybody from DC Comics?

17        A.    No.

18        Q.    Do you remember your mom meeting with

19   anybody from DC Comics?

20        A.    Not that I recall.

21        Q.    Do you remember your mother traveling to

22   New York in 1994 to meet with DC Comics along with

23   her brother Frank?

24        A.    No.

25        Q.    Do you recall her doing the same in 1992?

**EXHIBIT A**
**75**

DAWN PEAVY - 8/3/2011

Page 72

1      A.    No.

2      Q.    Does your mom -- in the last few years,

3  does she talk about her brother Joe and his

4  contributions to "Superman"?

5      A.    Repeat the question?

6      Q.    In the years that you have been living

7  with your mother, is her brother Joe and his

8  contributions to "Superman" -- is that a topic of

9  discussion in the house?

10     A.    Well, we're very proud of it, if that's

11  what you're asking.

12     Q.    During those discussions, has Mark -- I'm

13  sorry, Warren, your brother -- ever commented on DC

14  Comics?

15     A.    No.

16     Q.    Or Warner Brothers?

17     A.    No.

18     Q.    Do you know that in the scripts that he

19  wrote, the final act, as it were, of the scripts is

20  that your Uncle Joe and Jerry Siegel enter into

21  pension agreements with Warner Brothers that take

22  care of them and their families?  Are you aware of

23  that?

24          MR. TOBEROFF:  Assumes facts not in

25  evidence.  Lacks foundation.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 73

1       A.   Ask the question again.

2       Q.   Do you know that in the final act or the

3   final part of these movie scripts your brother has

4   written, that your -- it recounts your Uncle Joe and

5   Jerry Siegel entering into pension agreements with

6   Warner Brothers that provide money and health care

7   benefits to them and their families?

8           MR. TOBEROFF:   Same objections.

9       A.   No.

10      Q.   Do you know if your brother keeps copies

11  of those scripts?

12      A.   I don't know.  I have never seen them, so

13  I don't know.

14      Q.   Have you ever, to your knowledge,

15  received -- you or your family ever received any

16  money from Marc Toberoff or one of his film

17  production companies?

18      A.   No.

19          MR. TOBEROFF:   Lacks foundation.

20      Q.   I'm going to show you two letters that

21  were used as exhibits at your brother's deposition,

22  previously marked as Exhibit 7 and 8 in this case,

23  and ask you to read them, please.  That's 7 and 8,

24  I'll give Mr. Toberoff his copies.

25          (Exhibits 7 and 8, previously marked.)

DAWN PEAVY - 8/3/2011

Page 74

1      A.    What do you want me to do?  Just read
2  this?
3      Q.    Yes, read those two letters, please.
4      A.    Okay.
5      Q.    Have you had a chance to read these,
6  Ms. Peavy?
7      A.    Yes.
8      Q.    Have you seen these before?
9      A.    No.
10      Q.    Does reading -- can you turn to Exhibit 8
11  for a second?  It's the longer letter of the two.
12  Does reading the first paragraph there refresh your
13  recollection at all about Mike Catron sending your
14  mother a video he made of a panel on which she
15  participated?
16      A.    No.
17      Q.    You have never seen her watching such a
18  video?
19      A.    No.
20      Q.    Turning to the second paragraph there, the
21  last sentence, the last two sentences, "I think back
22  of the 30 years in which they," I think she means
23  Joe Shuster and Jerry Siegel, "suffered in poverty
24  and my brother Frank and I supporting Joe.  We're
25  all glad that a new generation of true comic book

**EXHIBIT A**
**78**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 75

1    enthusiasts took over DC Comics."

2            Did you ever have any discussions with

3    your mother about those types of sentiments?

4        A.    Where are you reading that?

5        Q.    End of the second paragraph in Exhibit 8.

6        A.    Oh, okay.  Now, what was the question

7    again?

8        Q.    Your mom says here, "I think back of the

9    30 years in which they," meaning Joe and Jerry,

10   "suffered in poverty, and my brother Frank and I

11   supported Joe.  We're all glad that a new generation

12   of true comic book enthusiasts took over DC Comics."

13           Do you recall your mother discussing those

14   types of sentiments with you?

15       A.    No.

16       Q.    This is the reason I asked the Internet

17   question at the start of the day.  In the last

18   paragraph, do you see her, "I have learned from the

19   Internet that Joanne Siegel has filed a copyright

20   claim for 'Superman.'"

21           Do you see that?

22       A.    Uh-huh.

23       Q.    And then your mother says, "I want you to

24   know that I intend to continue to honor our pension

25   agreement.  I would, however, appreciate a generous

**EXHIBIT A**
**79**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 76

1  bonus for this year, as you have done many times in

2  the past."

3           Does this refresh your recollection at all

4  about your mother receiving bonuses from DC?

5       A.    No.

6       Q.    Did she ever talk to you about the

7  generous bonuses she received from DC?

8       A.    No.

9       Q.    Did she ever talk to you about the Siegel

10  family filing a copyright claim, copyright

11  termination claim?

12      A.    No.

13      Q.    Have you and your brother ever talked

14  about the Siegel family filing a copyright

15  termination claim?

16      A.    No.

17      Q.    I thought you said earlier that you

18  understood that Mr. Toberoff also represents the

19  Siegels in their case against DC.

20      A.    Yes.

21      Q.    How did you come to learn that?

22      A.    That he's representing both of us.

23      Q.    Who told you that?

24      A.    Probably my brother.  I don't recall who.

25  I'm sure it was my brother.  My mom.  I don't...

DAWN PEAVY - 8/3/2011

Page 77

1    Q.   But isn't it part -- I mean, wouldn't you

2    have also had to discuss with them the Siegels, were

3    filing their own copyright termination claim, as

4    well?

5    A.   I don't understand all the legal.  I just

6    know that he represents both the families.

7    Q.   Do you remember when you learned that?

8    A.   No.

9    Q.   Were you living with your brother and

10   mother at the time?

11   A.   Probably not.  I don't -- I'm sure it

12   was -- I don't remember when it was, whether it was

13   early 2000s, or -- I don't know.  Then no.  I didn't

14   start living with her until 2004.

15   Q.   Can you walk me through the chronology --

16   and I don't need to know addresses or anything like

17   that -- just the different cities you were living

18   in, let's say, from the early 1990s up to the

19   present.

20   A.   In El Paso, and then Santa Fe.

21   Q.   And you were in El Paso from about when to

22   when?

23   A.   I guess 1990 or 1991 until 2003.

24   Q.   Okay.

25   A.   Or the beginning of...

EXHIBIT A
81

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 78

1    Q.   And did you ever live in Albuquerque, or
2    always just El Paso and --
3    A.   Yes.
4    Q.   Okay.  When was that?  Was that before?
5    A.   That was in 1988.
6    Q.   Okay.  Great.  Can you look at Exhibit 7?
7    It's the shorter letter of the two.  Have you seen
8    "The Adventures of Superman" book in your home by
9    this gentleman Lowther?
10   A.   It's probably on my mom's "Superman"
11   bookcase.  I don't know.  I don't know about that
12   title.  She has her books on a bookcase.
13   Q.   She has a special bookcase devoted to
14   "Superman" stuff?
15   A.   Yes.
16   Q.   Does your brother have a similar bookcase,
17   or --
18   A.   Well, I guess it's both of theirs.  It's
19   everybody's.  It's the family's.
20   Q.   Do you remember receiving or them
21   receiving gifts over the years from DC Comics of
22   books or --
23   A.   I didn't know they were from DC.  I mean,
24   I see books that come in that are given to my
25   mother.  I don't know who they came from.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 79

1      Q.   Did she tell you -- do you remember
2   discussing with her in the '90s that DC was
3   thoughtful and was sending these types of materials?
4      A.   No.  I was very busy.  I had a career and
5   young children.
6      Q.   But she conversely never said to you,
7   "Gosh, I hate those guys at DC Comics"?
8      A.   Not that -- no.  I didn't really -- we
9   didn't talk about DC Comics.  I mean...
10      Q.   Same for Warner Brothers?
11      A.   Yeah, we talked about personal things, you
12   know.
13           MR. KLINE:  Okay.  I'm going to take a
14   quick break now, if you don't mind, and try to
15   figure out how I can sharpen this up the best I can
16   and finish as early as we can today.  So maybe take
17   about a ten-minute break, if that's okay.
18           MR. TOBEROFF:  Sure.
19           (Recess from 10:58 a.m. to 11:33 a.m.)
20      Q.   (By Mr. Kline)  Are you okay to continue,
21   Ms. Peavy?
22      A.   Yes.
23           (Exhibit 5, previously marked.)
24      Q.   Great.  Thank you.  I'm going to put in
25   front of you what was marked as Exhibit 5 at your

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 80

1   brother's deposition.  It's a 1992 agreement between

2   your Uncle Frank, your mother, and DC Comics.  Just

3   take a minute to take a look at it, please.

4           Have you had a chance to read the

5   document?

6       A.   Yes.

7       Q.   Have you seen this document before?

8       A.   No.

9       Q.   Have you ever discussed this 1992

10  agreement with your brother, Warren?

11      A.   No.

12      Q.   With your mother, Jean?

13      A.   No.

14      Q.   By the way, in any of our breaks, have you

15  called your brother to talk to him about the

16  deposition?

17      A.   No.

18           (Exhibit 59, previously marked.)

19      Q.   The next exhibit was marked as Exhibit 59

20  at your brother's deposition, I believe.

21           MR. KLINE:  Is that correct?

22           MS. SETO:  Yes.

23      Q.   (By Mr. Kline)  It's marked as Exhibit 59

24  at some deposition.  It's marked as Exhibit 59 here.

25  And I will not ask you to read this whole document.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 81

1    This is the complaint that DC Comics filed.  It's

2    actually the first amended complaint.  The first

3    complaint was filed in May of 2010, and then an

4    amended complaint was filed in September of 2010.

5          And I just want to confirm your testimony

6    from earlier.  You were not aware that DC Comics

7    filed a lawsuit in Los Angeles against your brother

8    and mother?

9          A.    No.

10         Q.    And have you ever seen this document lying

11   around your house?

12         A.    No.

13         Q.    If you turn to the back of this document,

14   it's a document starting Exhibit A, and it's

15   probably a few pages before where you are.  It's

16   titled "Superman, Marc Toberoff timeline."  Do you

17   ever remember seeing this document?

18         A.    No.

19         Q.    Do you remember discussing it with your

20   brother?

21         A.    No.

22         Q.    Do you remember discussing with your

23   brother that an anonymous individual made certain

24   allegations against Mr. Toberoff?

25         A.    No.

**EXHIBIT A**
**85**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 82

1        Q.    Do you remember discussing that with your
2    mother?
3        A.    No.
4        Q.    Do you remember discussing that with
5    anybody?
6        A.    No.
7        Q.    Are you aware -- that's it for that.  This
8    is going to be new Exhibit 72.
9            (Exhibit 72 marked.)
10        Q.    And a bit earlier, I referred to a Kirby
11    lawsuit and asked you if you and your brother had
12    had any discussions about that.  Do you remember
13    those questions?
14        A.    Yes.
15        Q.    And your answer was you don't remember any
16    discussions.
17        A.    I don't know who Kirby is.
18        Q.    Okay.  And so your brother has not
19    discussed the fact that the Kirbys filed a lawsuit
20    and lost that lawsuit recently?
21        A.    Nope.
22        Q.    And you have not discussed with him that
23    they turned down a settlement offer before
24    litigation commenced?
25        A.    No.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 83

1          MR. TOBEROFF:  Misstates the facts,
2     assumes facts not in evidence, and lacks foundation.
3          Q.   And so you have never reviewed this legal
4     opinion concerning the Kirbys' rights?
5          A.   No.
6          Q.   And you don't remember your brother
7     discussing that with your mother?
8          A.   No.
9          Q.   Or with anybody else?
10         A.   No.
11         Q.   I want to talk a little bit about your
12     relationship with your Uncle Joe, or Joseph.  What
13     did you call him?
14         A.   Uncle Joe.
15         Q.   Can you describe your interactions with
16     him?
17         A.   He was my uncle.  I mean --
18         Q.   You lived in different cities; right?
19         A.   Yeah.
20         Q.   Would he come to visit you and --
21         A.   We'd go see him.
22         Q.   Where would you go see him?
23         A.   In -- well, the last time I saw him, I
24     guess he was in San Diego or Brentwood or...
25         Q.   Out in California?

EXHIBIT A
87

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 84

1        A.    Yeah, in California.

2        Q.    And was he living with anybody?

3        A.    No, not that I know of.

4        Q.    Your brother testified that he had a lady

5   friend and -- who had a son who was a psychologist.

6   Do you remember meeting them?

7        A.    No.

8        Q.    When you saw your uncle, would you talk

9   about "Superman"?

10       A.    I don't remember.  It's been many years.

11  I don't recall.  I mean, probably not.  I mean, he

12  was my uncle.

13       Q.    Do you remember him having a lot of

14  "Superman" memorabilia in his apartment?

15       A.    Not really.  A few things.

16       Q.    Your mother has said that his apartment

17  was filled with a lot of stereo equipment.  Do you

18  remember that?

19       A.    Uh-huh.

20       Q.    He was a kind of audiophile, I guess?

21       A.    I just remember drawing tables and stereo

22  equipment.  I don't remember.

23       Q.    But you don't remember any specific

24  discussions about "Superman"?

25       A.    No.

DAWN PEAVY - 8/3/2011

Page 85

1      Q.   Did he talk to you at all, to your

2    recollection, about his relationship with Warner

3    Brothers or DC Comics?

4      A.   No.

5      Q.   Ever talk to you about copyright issues?

6      A.   No.

7      Q.   Ever talk to you about contract issues?

8      A.   No.

9      Q.   Do you remember how old you were when

10   you -- the last time you saw him?

11     A.   Early 30s, maybe?  I don't know exact.

12     Q.   Would you ever talk to him on the phone?

13     A.   Maybe when I was younger, yeah.  When I

14   would call him to tell him we were going to go visit

15   him or something.

16     Q.   But you didn't have a relationship where

17   you and he would kind of have separate conversations

18   from your mom?

19     A.   No.

20     Q.   Did he ever say to you anything about,

21   "Hey, you know, I feel aggrieved by DC Comics or

22   Warner Brothers"?

23     A.   No.

24     Q.   What about your Uncle Frank?  Can you

25   describe your relationship with him?  Was it any

**EXHIBIT A**
**89**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 86

1    closer?  Did you see him more frequently?

2         A.   No, because he lived in New York.  Less.

3    I didn't see him as much as Joe.

4         Q.   Do you remember the last time seeing your

5    Uncle Frank?

6         A.   No.

7         Q.   What decade, even?

8         A.   Huh-uh.  I was young.

9         Q.   Like under 18?

10        A.   I don't recall.

11        Q.   You do know your mom traveled to New York

12   a couple of times in the 1990s to visit with him and

13   with DC Comics.  We talked about that; right?

14        A.   I don't think about DC Comics.  I know she

15   went to visit my uncle.

16        Q.   Okay.  And you didn't accompany her on

17   those trips?

18        A.   No.

19        Q.   Did your brother, Warren, to your

20   knowledge?

21        A.   I don't know.

22        Q.   Did your dad; do you know?

23        A.   I don't know.

24        Q.   Have you ever spoken to Jerry Siegel?

25        A.   No, not that -- I mean -- no.  Maybe when

**EXHIBIT A**
**90**

DAWN PEAVY - 8/3/2011

Page 87

1    I was a kid.  I don't really recall.  I mean --

2         Q.    Okay.  What about his wife for many years,

3    Joanne Siegel?

4         A.    Yes.

5         Q.    Can you describe those communications?

6         A.    Well, I would see her at the events.

7         Q.    What type of events?

8         A.    The last one was the Cleveland one.

9         Q.    And what would you talk about at those

10   events?

11        A.    How my mom is basically doing, I guess,

12   the last time I saw Joanne.

13        Q.    Did the legal issues, as you call them,

14   ever come up in those conversations?

15        A.    No.

16        Q.    Did you ever discuss Mr. Toberoff's

17   representation --

18        A.    No.

19        Q.    -- of your family and them?  Would you

20   ever speak to Joanne Siegel on the phone?

21        A.    Other than to answer the phone when she

22   was calling to talk to my mom or something, no.

23        Q.    Did she call your mom frequently?

24        A.    They'd talk.

25        Q.    How often?

**EXHIBIT A**
**91**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 88

1      A.   Oh, I don't know, because I'm not there
2   all the time.  I'm at work.
3      Q.   Did you get a sense, from when you were
4   there, that they talked once a month, every couple
5   of weeks?
6      A.   I can't answer that question.
7      Q.   You just don't know?
8      A.   I know they'd talk.
9      Q.   How about her daughter, Laura Siegel
10  Larson?  Do you talk to her at all?
11     A.   Not since she called to say her mother
12  passed.
13     Q.   Had you -- but you talked to her before
14  then?
15     A.   Other than answering the phone and she's
16  calling to talk to my mom.  Basically it.  And then
17  at the event.
18     Q.   So the two of you have no personal
19  friendship?
20     A.   Well, we're friends.  I don't know what --
21     Q.   But you don't talk on the phone
22  regularly --
23     A.   No.
24     Q.   -- or e-mail?
25     A.   No.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 89

1    Q.   Do you know if she and your brother talk
2  on the phone?
3    A.   No.
4    Q.   You just don't know, one way or the other?
5    A.   Huh-uh, I don't know, either way.  I never
6  asked that question, so I don't know the answer.
7    Q.   And he's never described his relationship
8  with them to you?
9    A.   We're all friends.  I mean, we've known
10  each other all our lives, or all my life.
11    Q.   Would you go on vacations together --
12    A.   No.
13    Q.   -- or hang out together?  You just would
14  see each other at kind of Superman-related events?
15    A.   Uh-huh.
16    Q.   And is this going back before these recent
17  celebrations, like into the '70s and '80s?  Or has
18  it been more of a -- these events have happened more
19  recently?  I'm just trying to figure that out.
20    A.   No, I think we've always been -- I can
21  probably remember when we go to California, go visit
22  them...
23    Q.   So when you'd go see your uncle, you'd try
24  to stop by and see the Siegels also?
25    A.   Uh-huh.

EXHIBIT A
93

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 90

1        Q.    Do you remember talking with any of your
2    family members about the "Superboy" character?
3        A.    No.
4        Q.    Do you know who "Superboy" is?
5        A.    Other than what I just read in here, no.
6    I mean -- well, I know who he is, from TV.
7        Q.    What did you read in there about
8    "Superboy"?
9        A.    He had that -- whatever you made me read
10   about that "Superboy" -- the Siegel thing, one of
11   those papers.
12       Q.    Okay.  So you don't know him as an
13   independent character?
14       A.    Besides TV.  I mean, I know there was
15   "Superboy" on the TV.
16       Q.    Okay.  Are you talking about "Smallville,"
17   or --
18       A.    No, wasn't there -- like when he was
19   younger, when they -- probably a video or something.
20   I don't know.  In "Smallville," I mean to me, that's
21   "Superman," but...
22       Q.    Okay.  Have you ever talked to the Siegels
23   about "Superboy"?
24       A.    No.
25       Q.    Has your brother disclosed to you -- and

**EXHIBIT A**
**94**

DAWN PEAVY - 8/3/2011

Page 91

1    I'll do you first and then your mother in your
2    presence -- has your brother disclosed to you that
3    as part of this copyright termination notice he
4    filed, he gave up any claims to "Superboy" in favor
5    of the Siegels?
6          A.    No.
7          Q.    Have you heard him talk about that with
8    your brother?
9          A.    Who?
10          Q.    I'm sorry.  I apologize.  Have you heard
11    your brother talk about that issue with your mother?
12          A.    Oh, no.
13          Q.    I'd like you to take a look at this new
14    exhibit.
15          (Exhibit 73 marked.)
16          Q.    And I'll represent to you that these are
17    excerpts of legal rulings.
18          A.    What's an excerpt or whatever?
19          Q.    It's like a quote from -- it's not the
20    whole legal ruling.  It's just a part of legal
21    rulings in the Siegel case.
22          A.    Okay.
23          Q.    And I just want you to take a look at
24    these, and I'm going to ask you some questions about
25    them after you read them, please.

DAWN PEAVY - 8/3/2011

Page 92

1    MR. TOBEROFF:  I object to this exhibit,
2  taking statements out of context.  You can present
3  the document itself.

4    A.    Okay.

5    Q.    Have you ever discussed the proceedings in
6  the Siegel case with your brother?

7    A.    No.

8    Q.    Do you know if your brother follows those
9  proceedings?

10    A.    No.

11    Q.    Has he ever told you about these rulings
12  by Judge Larson in the Siegel case concerning your
13  uncle's contributions to the "Superboy" character?

14    A.    No.

15    Q.    Has he told you that in his -- the
16  original contract he signed on behalf of your family
17  with Mr. Toberoff's film production company, that
18  "Superboy" was listed as one of the rights or
19  interests your family possessed?

20    MR. TOBEROFF:  Misstates the record as to
21  the nature of Pacific Pictures Corporation.

22    Q.    Has he told you that in the 2001 agreement
23  with Pacific Pictures Corporation that "Superboy"
24  was listed as part of your family's rights?

25    A.    No.

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 93

1      Q.    Has he told you that in a subsequent

2   amendment, they eliminated any reference to

3   "Superboy"?

4      A.    No.

5      Q.    Has he told you that the Siegels had filed

6   a lawsuit concerning "Superboy" specifically?

7      A.    No.

8      Q.    Or that they're seeking millions of

9   dollars in that case based on the "Superboy" rights?

10     A.    No.

11           MR. TOBEROFF:  Misstates the record.

12     Q.    Has he told you that the sole and only

13  basis -- and this is what he testified to -- for

14  giving up the "Superboy" rights was conversations

15  with Mr. Toberoff?

16     A.    I don't know.  I don't know anything about

17  "Superboy."

18     Q.    He didn't disclose that to you, though?

19     A.    Disclose what?  Anything about "Superboy"?

20  No.

21     Q.    Did he disclose to you that he never

22  sought a second opinion from another attorney as to

23  whether your family had rights in "Superboy"?

24           MR. TOBEROFF:  Okay, objection, again.

25  You're using improperly -- my objection is as

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 94

1  follows.  You're improperly using the deposition as

2  an excuse to try and impart information to Ms. Peavy

3  as opposed to discovering information from him

4  (sic).  She said she had no conversations with her

5  brother regarding "Superboy."  From that, you break

6  down and start -- you're telling her things, you're

7  not asking her questions.  Under the guise of asking

8  whether her brother told you, you're trying to

9  impart information, which is improper use of a

10  deposition process.  If she says that she's had no

11  discussions with her brother about any "Superboy,"

12  then she couldn't possibly have had a detailed

13  discussion regarding some aspect of "Superboy."

14      Q.    (By Mr. Kline) Ms. Peavy, did he disclose

15  to you that he never sought a second opinion from

16  another attorney as to whether your family had a

17  right in "Superboy"?

18      MR. TOBEROFF:  Objection, misuse of the

19  discovery process.

20      Q.   Did he disclose that to you?

21      A.   No.

22      Q.   As I understand it, your brother's doing

23  all the work on these legal issues on behalf of your

24  family; correct?

25      A.   My brother and Marc -- I mean, and

Merrill   Corporation   -   Los Angeles

**EXHIBIT A**
**98**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 95

1  Toberoff are the ones working on it.

2      Q.   And you have also testified that you and

3  your brother, Warren, share 50/50 under your

4  mother's will; correct?

5      A.   Yes.

6      Q.   Do you and your brother, Warren, have any

7  agreement by which he would be compensated for the

8  work that your brother, Warren, is doing on these

9  legal matters?

10     A.   No.  The agreement is, it's an estate

11  that's set up for both of us to share.

12     Q.   And so you don't have some agreement that,

13  "Hey, I'm going to record the time that I spend on

14  this matter and I'll charge some hourly rate to the

15  estate"?

16     A.   No.  We're family.  We do everything

17  together.

18     Q.   Okay.  Just wanted to confirm that.  And

19  it's never been discussed?

20     A.   No.

21     Q.   Okay.  Has he disclosed to you that

22  Mr. Toberoff's contingency fee for his work on

23  behalf of your family is 50 percent of any recovery

24  you obtain?

25     A.   I know that.

**EXHIBIT A**
**99**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 96

1      Q.    How do you know that?

2      A.    I think my mom told me that.

3      Q.    When did your mom tell you that?

4      A.    Yesterday, when I asked.

5      Q.    Okay.  So you did talk to her a little bit

6   about the lawsuit yesterday?

7      A.    I don't know about the lawsuit.  I just

8   told her, you know -- I told her I visited with

9   Marc.  My mom showed up for a little while to say

10  hello and give him a hug.  I mean, we were all...

11     Q.    Were there any other questions you asked

12  your mom about Mr. Toberoff?

13     A.    No.

14     Q.    Any other discussions with her about this

15  case?

16     A.    No.

17     Q.    Have you discussed with your mom or your

18  brother the fact that your family can't reach an

19  agreement with Warner Brothers to settle their

20  claims, or DC Comics to settle their claims, without

21  the consent of the Siegel family?

22     A.    No.

23     Q.    Have you discussed with your brother or

24  mother any agreements that your family has entered

25  into with the Siegel family?

**EXHIBIT A**

**100**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 97

1       A.    No.

2             THE VIDEOGRAPHER:  Mr. Kline, I'll need to

3       change the DVD in a minute.

4             MR. KLINE:  Okay.  Why don't we do it now?

5             (Recess from 11:57 a.m. to 12:00 p.m.)

6             MR. KLINE:  The next exhibit?

7             (Exhibit 74 marked.)

8       Q.    (By Mr. Kline)  Handing you Exhibit 74,

9       which was Plaintiff DC Comics' notice of deposition

10      on Dawn Peavy and request for production of

11      documents, is this -- if you could just look through

12      this quickly, or take as much time as you like, is

13      this the document request that you reviewed with

14      Mr. Toberoff yesterday?

15      A.    Yes.

16      Q.    And focusing your attention on pages 5 to

17      6, titled document -- starting at the line 14

18      document requests, do you see that there?

19      A.    Which one?  Five?

20      Q.    Page 5, line 14.

21      A.    Oh.  Yes.

22      Q.    What is the first time you saw this

23      document?  Was it yesterday?

24      A.    No.  They e-mailed it before that.

25      Q.    And did you go through each one of these

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 98

1    numbered requests and look for documents --

2        A.    I don't have any documents.

3        Q.    -- responsive to that?

4        MR. TOBEROFF:  Asked and answered.

5        Q.    Well, take a look at number 4.  "All

6    documents relating to the disposition, division, or

7    ownership of any rights in 'Superman' and/or

8    'Superboy.'"  Do you see that one?

9        A.    Uh-huh.  Yes.

10       Q.    You're aware that there's a will, correct,

11   that provides that you get 50 percent of your

12   mother's estate --

13       A.    Yes.

14       Q.    -- on her passing?  And you understand

15   that the most significant asset in that estate will

16   probably be whatever purported "Superman" copyright

17   interests she has?

18       MR. TOBEROFF:  Misstates the record.  The

19   mom doesn't have "Superman" copyright interest.

20       A.    I don't understand that question.

21       Q.    Well, you understand that there is -- what

22   do you understand -- you understand that your family

23   has claimed an interest in certain "Superman"

24   copyrights; correct?

25       MR. TOBEROFF:  Misstates the record.

EXHIBIT A
102

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 99

1      A.   I don't -- I don't -- I mean -- what was

2   the question again?

3      Q.   I'm just -- I'm trying to get at something

4   pretty simple.  As I understand it, you and your

5   brother are going to receive 50/50 of the proceeds

6   under your mother's will; correct?

7      A.   Correct.

8      Q.   And that may happen through a trust; it

9   may not.  That hasn't been documented yet; correct?

10     A.   You mean written down?  It's an estate

11  that's set up, it's going to be a trust for me and

12  my brother.

13     Q.   And your understanding is that the trust

14  part of it has not been documented yet; correct?

15     A.   I don't know what you mean by

16  "documented."

17     Q.   Reduced to a written agreement or writing.

18     A.   Oh, anything between my brother and I?

19  No.  I don't have -- is that what you're asking?

20     Q.   Not that.  Has any official trust -- has

21  your brother worked -- has your mother worked with a

22  lawyer to set up trust documents?

23     A.   No.

24     Q.   I don't want to get into your mother's

25  other assets.  I mean, I know you have a home and

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 100

1    probably other bank accounts and things like that.

2    Do you understand that if and when she passes away,

3    one of the assets you and your brother might be

4    entitled to are these "Superman" copyright

5    interests?

6        A.   I understand that for the whole family.  I

7    don't understand -- I mean, you said it's a simple

8    question, but I still don't understand the question.

9        Q.   For the whole family -- it's you and your

10   brother.

11       A.   Correct.

12       Q.   Do you understand that one of the assets

13   that you would be sharing in 50/50 under your

14   mother's will would be "Superman" copyright

15   interests?

16       A.   I don't understand.

17       Q.   Help me ask a better question.  Is there

18   particular word you don't understand, a

19   particular --

20       A.   Yeah, "copyright."  I don't understand.  I

21   don't -- I mean, I don't know much, so I don't

22   know -- I don't understand what you mean by

23   "copyright" and I don't want to say anything wrong

24   because I don't understand it.

25       Q.   Understood.  You understand that your

EXHIBIT A
104

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 101

1    family is claiming an interest in certain rights --

2         A.   Correct.  I understand that.

3         Q.   -- related to "Superman."  You understand

4    that; correct?

5         A.   Yes.

6         Q.   And those rights come from the fact that

7    your Uncle Joe Shuster was the original illustrator;

8    correct?

9         A.   Correct.

10        Q.   And when your brother shares 50/50 under

11   your mother's will, is it your expectation that

12   whatever those rights are -- and I know they're a

13   legal definition -- that's one of the assets?

14        A.   That we'll split 50/50, yes.

15        Q.   Okay.

16        A.   Is that the question you're trying to --

17        Q.   It is.

18        A.   -- get at?

19        Q.   It is.  And obviously, you hadn't thought

20   this -- or at least on my level -- all the way

21   through when you're looking at number 4.  But there

22   is a written will that your family possesses for

23   your mother; correct?

24        A.   I was told there's a will.  And I'm on it.

25        Q.   And it's a written document, as far as you

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 102

1   understand?

2       A.   I would assume that's what a will is, yes.

3   I have never seen it.

4       Q.   You have never seen it?

5       A.   No.

6       Q.   And your brother -- neither your brother

7   nor your mother has told you where it is?

8       A.   No.  It's probably in the safety-deposit

9   box, I'm sure.  I don't know.

10      Q.   Okay.

11      A.   My mom might have mentioned -- this was --

12  you know, this has been years back when she told --

13  she told me that.

14      Q.   Okay.  But more recently, you and your

15  brother have discussed this trust concept?

16      A.   Yes.

17      Q.   And in those discussions, has he ever made

18  reference of a written will?

19      A.   No.

20      Q.   Do you know if he's seen the written will?

21      A.   I'm sure.  He's the one that holds all the

22  documents and stuff.  That's his deal.

23      Q.   Okay.  Now, I wanted to ask you a

24  question.  On the first page of this document -- can

25  you go back to the first page?  Do you see that

EXHIBIT A
106

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 103

1    caption at the bottom left there, DC Comics,

2    plaintiff, v. Pacific Pictures Corporation, IP

3    Worldwide, LLC, IPW, LLC, Marc Toberoff, an

4    individual, Mark Warren Peary, as personal

5    representative of the estate of Joseph Shuster, and

6    some other names following along after that?  Do you

7    see that part of that first page?

8         A.    My mother's name?  I don't see my mother's

9    name.

10        Q.    This is an old caption, apparently.  If

11   you could look back at the amended complaint that I

12   showed you a couple of documents ago.

13        A.    Oh.

14        Q.    Do you see her name there?

15        A.    Yeah.

16        Q.    Did you have any occasion when you

17   received this document or discussed it with

18   Mr. Toberoff to take a look at the first page here?

19        A.    I looked at it when it was given to me.

20        Q.    You testified earlier that you weren't

21   aware that DC Comics had filed a lawsuit against

22   your family.  I'm just wondering if that didn't

23   occur to you when you saw this document saying that

24   DC Comics is a plaintiff.

25        A.    No.  I don't -- I don't understand legal

EXHIBIT A
107

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 104

1    stuff.  That's my brother's part.  That's why I'm

2    probably not involved at all.

3         MR. KLINE:  Well, why don't we take

4    another quick break, and we'll either go to lunch --

5    so let's just take two, three minutes.  We'll either

6    go to lunch or we might even end things.  So I'll

7    just kind of review my notes, and we may be done

8    soon.

9         THE WITNESS:  Okay.

10        MR. TOBEROFF:  Okay.

11        (Recess from 12:09 p.m. to 12:18 p.m.)

12    Q.   (By Mr. Kline)  Are you ready to proceed?

13    A.   Yes.

14    Q.   I think we'll just be a few minutes and be

15    all done.

16        Have you ever had any conversations with

17    an attorney or any of your friends other than Marc

18    Toberoff, other than your brother, other than your

19    mother, have you ever had any conversations with --

20    let's start with another attorney concerning your

21    family's "Superman" rights?

22    A.   Another attorney, no.  Not that...

23    Q.   Anybody at work?

24    A.   Okay, what question are you asking, again?

25    Q.   Have you ever had a conversation with

**EXHIBIT A**
**108**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 105

1    anybody at work concerning your family's "Superman"
2    rights?
3         A.   I mean, they know I'm tied in with
4    "Superman," I mean, so yeah, I guess the answer
5    would be yes.
6         Q.   Anything about your claimed rights that,
7    you know, starting in 2013 you'll recapture certain
8    copyrights?
9         A.   Probably.  Yes.  I mean...
10        Q.   So have you talked a little bit about the
11   legal proceedings with some friends at work?
12        A.   I don't know if it's legal proceedings.
13   They know more than me, mostly, from reading off the
14   Internet, I guess, asking me questions.
15        Q.   Any friends beyond work that you have
16   talked with this about?
17        A.   Beyond work?  I don't recall.
18        Q.   Who are the friends at work that you
19   talked about it with?  Do you remember?
20        A.   Probably Chas, close colleague.
21        Q.   Who is Chas?
22        A.   My close colleague.
23        Q.   What's his full name, please?
24        A.   DeMott.
25        Q.   Can you spell that for the court reporter?

EXHIBIT A
109

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 106

1        A.    D-E-M-O-T-T.

2        Q.    You have been a little bit involved in

3    New Mexico politics; is that correct?

4        A.    Correct.

5        Q.    Have you discussed the same "Superman"

6    rights issues with any of the people in that world?

7    Representative Lujan?  Anybody else?

8        A.    Yes.

9        Q.    With Representative Lujan?

10       A.    Yes.

11       Q.    Have you ever sought independent advice

12   and counsel from him about the legal case?

13       A.    No.

14       Q.    Have you ever encouraged your brother to

15   do so?

16       A.    No.  What do you mean by "independent"?

17       Q.    I mean, you understand that your family is

18   working with Mr. Toberoff; correct?

19       A.    Correct.

20       Q.    And you understand -- or maybe you don't

21   understand -- that Mr. Toberoff at times has

22   encouraged your brother to seek independent legal

23   counsel.  Do you have any knowledge of that?

24       A.    I remember we talked about it before.

25       Q.    You and your brother?

Merrill  Corporation  -  Los Angeles

800-826-0277                    www.merrillcorp.com/law

**EXHIBIT A**
**110**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 107

1      A.   Yes.

2      Q.   And what did he say?

3      A.   Just asking -- he just asked me if I knew

4  any attorneys, basically.

5      Q.   When was this?

6      A.   I don't recall.

7      Q.   In the last --

8      A.   A few months back, maybe.  A year ago,

9  maybe.  Maybe a year.

10      Q.   Okay.  Did you give him any names?

11      A.   No.

12      Q.   And you didn't refer him to your colleague

13  Chas or --

14      A.   No.

15      Q.   -- the congressman?

16      A.   Why would I -- no.

17      Q.   When your brother asked for this advice or

18  asked this question -- I don't want to characterize

19  it.  Let me ask this question.  Did he tell you that

20  Mr. Toberoff was asking him to sign a conflict

21  waiver?

22      A.   I don't know.  I don't know the answer to

23  that.

24      Q.   You just don't remember, one way or the

25  other?

**EXHIBIT A**
**111**

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 108

1      A.   I don't -- no, no.  I guess the answer
2  would be no.
3      Q.   He didn't talk about it --
4      A.   Mention it.
5      Q.   Okay.  Did he give you any reason why he
6  was asking that question?
7      A.   No.
8      Q.   Was he there yesterday when you prepared
9  with Mr. Toberoff?
10     A.   He came for a little bit with my mom.
11     Q.   Did he give you any advice on how to --
12     A.   No.
13     Q.   -- do this deposition today?
14     A.   Be strong.
15     Q.   Anything else?
16     A.   (Witness shakes head.)
17     Q.   Does your family, to your knowledge, have
18  any affiliation with a group called Aquarian
19  Perspectives Inter-Planetary Mission?
20     A.   I don't know.  Never heard of it.
21     Q.   Are you aware that your mother is a
22  reverend?
23     A.   Used to be.
24     Q.   With that group, or you just don't know,
25  one way or another?

EXHIBIT A
112

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 109

1      A.    I don't know the group.

2      Q.    Okay.  Or a website called Stardoves?

3      A.    Never heard of it.

4      MR. KLINE:  Well, here's what I'd like to

5  do.  A couple of things.  We'll end the deposition

6  now.  Mr. Toberoff and I will no doubt disagree on

7  this.  If we discover new documents, if new

8  testimony comes out, if for any other reason we

9  think we need to take your deposition again, we are

10  reserving our right to do so.

11      And Mr. Toberoff, I'm assuming you

12  disagree, or --

13      MR. TOBEROFF:  We disagree.  You have one

14  day of seven hours.  Today is your day.  Ask her

15  everything you need to ask her.  You should have

16  completed whatever discovery you thought was

17  necessary prior to her deposition.  You have had

18  over a year to do so.  So you can say anything you

19  want, but we will vigorously oppose you taking

20  Ms. Peavy's deposition again.

21      MR. KLINE:  So safe to say, you're aware

22  that the parties disagree about that.

23      You do have one duty that you do have to

24  comply with.  The court reporter's going to send you

25  a copy of the transcript of this deposition and the

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 110

1    exhibits, and it's your duty within the next 30 days

2    to review that transcript and make any corrections.

3    And I'll advise you that if you make any corrections

4    of substance to the deposition, we have a right to

5    impeach your credibility based on those corrections,

6    and even potentially ask you further questions about

7    it.  And we can either send you the deposition

8    transcript and exhibits through Mr. Toberoff, or

9    directly to you.  Do you have a preference?

10              THE WITNESS:  Through him.

11              MR. TOBEROFF:  Send it to me, and I'll

12   send it.

13              MR. KLINE:  We'll send it on.

14              THE WITNESS:  I don't understand why we

15   can't finish everything today.  It's hard for me to

16   take off work.  I mean, I had to arrange -- plus,

17   you know, manipulate --

18              MR. TOBEROFF:  We have finished it today.

19   They're not going to be able to take your deposition

20   twice.

21              MR. KLINE:  I'll just explain it to you.

22   There's a lot of documents we want to get our hands

23   on, including a big discovery ruling that we won

24   that Mr. Toberoff's appealing.  And if we win that

25   discovery ruling and documents come out that mention

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 111

1   or discuss you or raise issues related to your

2   testimony, we may or may not pursue your testimony

3   again.

4           And it sounds like, no matter what, he'll

5   disagree with that.  But I don't think -- it's not

6   right before us right now.  Right now we're going to

7   end the deposition for today, and I thank you for

8   your time.

9           Marc, you want to use the normal

10  stipulation we've been using?

11          MR. TOBEROFF:  Yes.

12          MR. KLINE:  Okay.  And we'll supply that

13  to the court reporter and the videographer.  And

14  thank you very much for your time today.

15          (A discussion was held off the record.)

16          (Off the videotaped record, the following

17  stipulations were entered into by counsel.  The

18  witness will have 30 days to review the transcript

19  and advise of any corrections.  It shall be signed

20  under penalty of perjury, and if not signed, it may

21  be used as though signed.  The court reporter is

22  relieved of her duties.  A signature copy will be

23  sent directly to the witness via Federal Express.)

24          (The deposition concluded at 12:26 p.m.)

25

EXHIBIT A
115

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 112

1              IN THE UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
3    DC COMICS,
4                     Plaintiffs,
5        vs.              NO:  CV-10-3633 ODW (RZx)
6    PACIFIC PICTURES CORPORATION, et al.,
7                     Defendants.
8                REPORTER'S CERTIFICATE
9            I, MARY ABERNATHY SEAL, New Mexico CCR
     #69, DO HEREBY CERTIFY that on August 3, 2011, the
10   deposition of DAWN PEAVY was taken before me at the
     request of, and sealed original thereof retained by:
11

                Attorney for the Plaintiff
12              Mr. Matthew T. Kline
                O'MELVENY & MYERS, LLP
13              1999 Avenue of the Stars, Suite 700
                Los Angeles, California 90067-6033
14              (310) 553-6700
15           I FURTHER CERTIFY that copies of this
     Certificate have been mailed or delivered to all
16   Counsel, and parties to the proceedings not
     represented by counsel, appearing at the taking of
17   the Deposition.
18           I FURTHER CERTIFY that examination of this
     transcript and signature of the witness were
19   required by the witness and all parties present.  On
     _____, a letter was mailed or
20   delivered to Ms. Dawn Peavy regarding obtaining
     signature of the witness, and corrections, if any,
21   were appended to the original and each copy of the
     Deposition.
22
             I FURTHER CERTIFY that the recoverable
23   cost of the original and one copy of the Deposition,
     including exhibits, to Mr. Matthew T. Kline is
24   $_____.
25

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 113

1            I FURTHER CERTIFY that I did administer
   the oath to the witness herein prior to the taking
2  of this Deposition; that I did thereafter report in
   stenographic shorthand the questions and answers set
3  forth herein, and the foregoing is a true and
   correct transcript of the proceeding had upon the
4  taking of this Deposition to the best of my ability.
5            I FURTHER CERTIFY that I am neither
   employed by nor related to nor contracted with
6  (unless excepted by the rules) any of the parties or
   attorneys in this case, and that I have no interest
7  whatsoever in the final disposition of this case in
   any court.
8
9

                    _____
10                   Mary Abernathy Seal
                     BEAN & ASSOCIATES, INC.
11                   NM Certified Court Reporter #69
                     License Expires: 12/31/11
12
   (1729K) MAS
13 Date taken:  August 3, 2011
   Proofread by:  KW
14
15
16
17
18
19
20
21
22
23
24
25

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

DAWN PEAVY - 8/3/2011

Page 114

1    DC COMICS v. PACIFIC PICTURES CORP., et al.

2            WITNESS SIGNATURE/CORRECTION PAGE

3            If there are any typographical errors to
             your deposition, indicate them below:

4

5    PAGE  LINE

6    _____ Change to _____

7    _____ Change to _____

8    _____ Change to _____

9    _____ Change to _____

10           Any other changes to your deposition are
             to be listed below with a statement as to

11           the reason for such change.

12   PAGE  LINE  CORRECTION              REASON FOR CHANGE

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19           I, DAWN PEAVY, do hereby certify that I
     have read the foregoing pages of my testimony as

20   transcribed and that the same is a true and correct
     transcript of the testimony given by me in this

21   deposition on August 3, 2011, except for the changes
     made.

22

23           _____

             DAWN PEAVY

24

     (1729K) MAS Proofread by:  KW

25

b2c0c5d3-e6d1-4ac7-bbed-6f9ac1620250

# EXHIBIT B

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 4, 2011

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

**VIA MESSENGER & E-MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Laura Brill
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write to confirm our efforts to meet and confer with Marc Toberoff on open discovery issues following Dawn Peavy's deposition yesterday.

First, we discussed defendants' request to consolidate the Rule 30(a)(1) deposition of defendant Marc Toberoff and the Rule 30(b)(6) depositions of the corporate designees of defendants Pacific Pictures Corporation; IP Worldwide, LLC; and IPW, LLC.  Mr. Toberoff confirmed his intention to appear as the Rule 30(b)(6) designee of all three corporate defendants. DC clearly is entitled to separately depose Mr. Toberoff in his individual capacity and his Rule 30(b)(6) capacity as a representative for each company.  *See* FED. R. CIV. P. 30(b)(6) ("This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules."). Defendants notably had no response to the plain language of Rule 30(b)(6) in their August 1, 2011, letter—or to the fact that the very case they rely on, *Sabre v. First Dominion Capital, LLC*, 2001 WL 1590544, *2 (S.D.N.Y. Dec. 12, 2001), confirms that "the 30(b)(6) deposition of an witness is a separate deposition from the deposition of that same person as an individual witness and is presumptively subject to a *separate, independent seven-hour time limit*."  (Emphasis added.)

In an effort to avoid unnecessary motion practice, we offered to consolidate the Toberoff defendants' depositions to two, seven-hour days.  Mr. Toberoff refused, asserting that he will only appear for one, seven-hour day of deposition on behalf of all four defendants, because he

**EXHIBIT B**
**119**

O'MELVENY & MYERS LLP
August 4, 2011 - Page 2

claims that Pacific Pictures, IP Worldwide, and IPW are "closely-held corporations" that are largely inactive—despite the fact that DC's complaint alleges that each of these defendants engaged in separate and distinct acts of misconduct.  Docket No. 49 ¶¶ 165-89.  Mr. Toberoff stated he has been deposed before, he knows all the questions we are going to ask, and that his counsel at the deposition (Mr. Kendall) will object less frequently than Mr. Toberoff has done in this case, and thus the seven hours would be adequate for all four defendants.

We asked Mr. Toberoff if defendants were willing to concede that all three companies are his alter egos and act as his agent.  He said defendants do not concede this.  We asked about other potential 30(b)(6) designees—*e.g.*, J. Todd Harris—but Mr. Toberoff refused to discuss the details of who the companies' employees, investors, and officers were, saying we would have to ask such questions at his deposition.

In a final effort toward compromise, we are willing to discuss scheduling one, extended day of deposition during which we will endeavor to complete our questioning of the four Toberoff defendants, with the understanding that if we are unable to do so, we will continue to a second day.  Let us know if you will agree to this compromise so we can discuss scheduling the deposition.

<u>Second</u>, we discussed defendants' failure to review for responsive documents the "various boxes" related to this case that Laura Siegel Larson testified she has in her possession, *e.g.*, July 22, 2011, Larson Tr. at 64, 70, 245, 267, 275, 277—which include documents that defendants previously represented were non-existent to the Court and DC.  Mr. Toberoff confirmed that Ms. Larson has documents that have never been reviewed, including documents formerly belonging to her mother, Joanne Siegel, but that have been in Mr. Larson's possession for months, and were in her possession when DC's recent discovery motions were litigated.  We asked Mr. Toberoff to commit to a date certain by which he would review Ms. Larson's files and produce or log any responsive documents, but he declined to do so, saying only that he would speak to Ms. Larson when she returns from vacation in two weeks.

When we pressed for further document productions or privilege logs concerning the other attorneys with whom the Siegels have admittedly communicated in recent years, you again declined to provide any date certain by which you would make this production.  Moreover, we note a disturbing pattern in defendants' production of communications with attorneys—while Ms. Larson produced her written communications with Gerry Spence (a lawyer whom defendants say her mother considered hiring), defendants refuse to produce the Siegels' communications with David Michaels.  Docket No. 210 at 11-12.  This is yet another selective waiver, and further grounds to compel the production of the Michaels letters.

Mr. Toberoff also refused to confirm the existence of Mr. Larson's response to Michael Siegel's May 13, 2003 letter—even though she testified that she was "sure" she responded to the May 13 letter, *id.* at 267, Mr. Toberoff "made suggestions of changes in the wording" of her response, *id.* at 279, and that the response may well have been sent on July 5, 2003, as recounted in the Toberoff Timeline, *id.* at 277.  Mr. Toberoff refused to address whether such a letter or

**EXHIBIT B**

O'MELVENY & MYERS LLP
August 4, 2011 - Page 3

drafts of it existed in his files, whether Ms. Larson possessed a copy of it, or whether this document was among those defendants have listed on their privilege logs. When we said her recent testimony clearly confirmed the existence of such a responsive letter, as raised in our previous motions, Mr. Toberoff suggested that Ms. Larson might have been referring to another letter of another date. When we asked him when the letter she testified about was sent, if not in July, he refused to address the issue. When we pointed out that his refusal to provide these details made it impossible to determine whether to file our motion as one to compel or one for reconsideration, he acknowledged this problem, but still refused to provide the necessary detail.

Nor would Mr. Toberoff confirm or deny the existence of the letter that Ms. Larson testified she "sent [Michael Siegel] on November 2", 2002, Tr. at 267, saying only that he reviewed "our files" and was "unable to find" such a letter.

Mr. Toberoff asserted that DC's motions seeking production of the July 5 and November 2 letters were denied—but failed to explain his representations in opposition to those motions that, for example,

- he "did perform a diligent search of our records, *all of our records*," for responsive documents, June 20, 2011 Hr'g Tr. at 38:23-39:1 (emphasis added);

- he "asked [Ms. Larson] whether she had a copy and to *research her records*," *id.* at 39:8-10 (emphasis added);

- "To the extent that relevant documents exist, they have either been produced or designated as privileged," Jan. 8, 2011 Letter from M. Toberoff to M. Kline at 3.

- he conducted "a diligent search" but could not locate "a supposed November 2, 2002 letter," Docket No. 267-1 at 4; and

- he "caused [his] office to re-check our relevant case files" for responsive documents, Docket No. 267-16 ¶ 4.

Finally, Mr. Toberoff argued generally that we had taken Ms. Larson's testimony out of context, but would not explain how or point to any testimony suggesting that DC had misread Ms. Larson's sworn statements.

We have reached an impasse on the production of Ms. Larson's letter responding to her brother's May 13, 2003 letter and related drafts, and will serve a motion on the subject shortly, unless you produce those documents this week. Moreover, unless defendants commit to a date certain for producing and/or logging all responsive documents in Ms. Larson's possession, custody, and control—including her letters to Michael Siegel dated on or around July 5, 2003, and November 2, 2002—DC will move to compel on this issue, as well as the issue of the Siegels' correspondence with counsel.

**EXHIBIT B**
**121**

O'MELVENY & MYERS LLP
August 4, 2011 - Page 4

Third, we attempted to meet and confer on the deficiencies in defendants' responses to DC's revised requests for production. We clearly identified those deficiencies in our 30-page letter sent on July 7, 2011, requested a meet and confer on these issues in our July 19 letter, and reiterated that request in our July 29 letter—all of which are attached. Mr. Toberoff, however, refused to meet and confer, asserting—incorrectly—that DC had failed to timely request a meet and confer pursuant to Local Rule 37. DC will therefore proceed with its motion to compel, unless you agree to meet and confer on these issues sometime tomorrow.

Finally, we asked Mr. Toberoff why defendants had failed to produce several documents discussed during the depositions of Mr. Peary and Ms. Peavy, including unredacted versions of defendants' agreements with Ari Emanuel, Jean Peavy's will, and the two scripts concerning Joseph Shuster's life written by Mr. Peary. After discussing these documents at some length and why they should or should not be produced, Mr. Toberoff claimed that we had not met and conferred on the need to produce them, pursuant to Rule 37. Demand is hereby made to have such conference. Also, although we think DC's current document requests call for Ms. Peavy's will and Mr. Peary's scripts, please find enclosed additional requests for production seeking them specifically.

We reserve all rights.

Very truly yours,

Matthew T. Kline

cc:    Daniel M. Petrocelli, Esq.

Enclosures

**EXHIBIT B**
**122**

# EXHIBIT C

1   DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11  Attorneys for Plaintiff DC Comics

12                  **UNITED STATES DISTRICT COURT**

13                 **CENTRAL DISTRICT OF CALIFORNIA**

14
    DC COMICS,                          Case No. CV-10-3633 ODW (RZx)
15
                      Plaintiff,        **DISCOVERY MATTER**
16
           v.                           **PLAINTIFF DC COMICS'**
17                                      **SECOND SET OF REQUESTS**
    PACIFIC PICTURES                    **FOR PRODUCTION TO**
18  CORPORATION, IP WORLDWIDE,          **DEFENDANT JEAN PEAVY**
    LLC, IPW, LLC, MARC TOBEROFF,
19  an individual, MARK WARREN          **Judge**:  Hon. Otis D. Wright II
    PEARY, as personal representative of **Magistrate**:  Hon. Ralph Zarefsky
20  the ESTATE OF JOSEPH SHUSTER,
    JEAN ADELE PEAVY, an individual,
21  LAURA SIEGEL LARSON, as
    personal representative of the ESTATE
22  OF JOANNE SIEGEL and an
    individual, and DOES 1-10, inclusive,
23
                      Defendants.
24

25  **PROPOUNDING PARTY**:    Plaintiff DC Comics

26  **RESPONDING PARTY**:     Defendant Jean Peavy

27  **SET NUMBER**:           Two (Request Nos. 23-38)

28
                                        REQS. FOR PRODUC. OF DOCS.
                                        TO DEF. JEAN PEAVY

                          **EXHIBIT C**

1    Pursuant to Federal Rule of Civil Procedure 34, plaintiff DC Comics hereby

2   requests that defendant Jean Peavy produce for inspection and copying all

3   documents described in the following Requests for Production, in accordance with

4   the definitions and instructions contained therein, by no later than September 6,

5   2011.

## DEFINITIONS AND INSTRUCTIONS

6        1.    "DOCUMENT" shall be interpreted in its broadest sense to include

7   any and all "documents" and "other tangible things" as those terms are

8   understood in Federal Rule of Civil Procedure 34, including, without limitation,

9   any "writing," "recording," or "photograph" as those terms are defined in Federal

10  Rule of Evidence 1001.  This shall include, but is not limited to:  e-mail, audio or

11  video recordings, correspondence, letters, phone messages, notes, memoranda,

12  facsimiles, publications, contracts, agreements, calendars, drafts of proposed

13  contracts or agreements, papers, and photographs.

14       2.    "VIDEO FOOTAGE" means any recording of visual images and/or

15  sound, including without limitation any recording stored in videotape, DVD, or

16  digital format.

17       3.    "COMMUNICATION" means any written, electronic, oral,

18  telephonic, gesture, or other transmission or exchange of information, including

19  without limitation any inquiry, request, dialogue, discussion, conversation,

20  interview, correspondence, letter, note, consultation, negotiation, agreement,

21  understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or

22  nonverbal interaction between any individuals or entities.

23       4.    "RELATE" means, without limitation, to refer to or bear upon.

24       5.    "PERSON" means any natural person, firm, association, corporation,

25  partnership, or other legal entity or organization separately identifiable, and any

26  department(s) or division(s) therein.

27

28

- 1 -

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

**EXHIBIT C**
**124**

1   6. "YOU" or "YOUR" means Jean Peavy and, as applicable, any

2 PERSON that is acting on her behalf, including but not limited to her agents,

3 employees, attorneys, representatives, and caretakers.

4   7. "SHUSTER HEIRS" means, collectively and severally, YOU, the

5 Estate of Joseph Shuster, Mark Warren Peary, Dawn Peavy, Joseph Barry, Nicole

6 Peavy, Jacob Anderson, or any other executor, administrator, heir, relative, or

7 representative of Joseph Shuster and, as applicable, any PERSON acting on their

8 behalf, including but not limited to their agents, employees, attorneys, and

9 representatives.

10   8. "SIEGEL HEIRS" means, collectively and severally, Joanne Siegel,

11 Laura Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,

12 administrator, heir, relative, or representative of Jerome Siegel and, as applicable,

13 any PERSON acting on their behalf, including but not limited to their agents,

14 employees, attorneys, and representatives.

15   9. "DC COMICS" means plaintiff DC Comics and any of its affiliates

16 or predecessors, including but not limited to National Allied Publications,

17 Detective Comics, National Comics, and National Periodical Publications.

18   10. "WARNER" means Time Warner Inc. and any of its subsidiaries,

19 affiliates, or predecessors, including but not limited to Warner Bros.

20 Entertainment Inc., Warner Communications Inc., and Warner Bros. Television

21 Production Inc.

22   11. "PEAVY WILL" means any written instrument relating to the

23 disposition or division of any actual or prospective right, interest, or property

24 YOU hold that is intended to take effect after YOUR death.

25   12. "PEAVY TRUST" means any *inter vivos*, testamentary, or other

26 trust created to dispose of or divide any actual or prospective right, interest, or

27 property YOU hold.

28

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

**EXHIBIT C**

1    13.    "1997 PEARY SCREENPLAY" means the screenplay titled

2  "Dreamers" submitted by Mark Warren Peary and/or Rick Palacioz to WARNER

3  and/or DC COMICS on or around January 21, 1997.

4    14.    "2006 PEARY SCREENPLAY" means the screenplay titled "Ilya

5  Salkind's Siegel & Shuster" submitted by Mark Warren Peary, Rick Palacioz,

6  and/or Ilya Salkind to WARNER and/or DC COMICS on or around September 6,

7  2006.

8    15.    "WORKING SCREENPLAY DRAFT" means the screenplay

9  identified by Mark Warren Peary during his June 29, 2011, deposition in the

10  above-entitled action:

```
0018
23     Q.  Have you been on any -- have you
24  participated in any presentations or pitches to
25  third parties about acquiring options for any work
0019
 1  that you've done?
 2     A.  At one time --
 3        MR. TOBEROFF:  Meaning -- meaning --
 4        THE WITNESS:  On a screenplay?
 5        MR. TOBEROFF:  -- authored work?
 6        MR. PETROCELLI:  Yeah.
 7     Q.  Any work that you've authored or -- yeah.
 8  Any work that you authored?
 9     A.  On any screenplay or -- I have other
10  screenplays I've also worked on, so --
11        MR. TOBEROFF:  He's just talking about any
12  literary work.
13        THE WITNESS:  I've been offered options on
14  other screenplays, yes.
15  BY MR. PETROCELLI:
16     Q.  Have any of them been developed?
17     A.  No.
18     Q.  Have any of the screenplays concerned at
19  all the life of Joe Shuster, the one that was an
20  option?
21     A.  There was one that was.
22     Q.  Was optioned?
23     A.  It has expired, so it's no -- it's not
24  active.
25     Q.  Now, was that -- what was the underlying
0020
 1  work that was optioned?
 2     A.  Screenplay.
 3     Q.  Was that the screenplay to which you
 4  adverted in your deposition in 2006?
```

- 3 -

5      A.  Yes, yes.
6      Q.  And it was after your deposition that you
7  optioned it?
8      A.  I'm not -- I'm not sure of the exact date.
9  I don't -- I really don't recall the exact date on
10   that.
11     Q.  Did you option it to Ilya Salkind?
12     A.  Yes.
13     Q.  Okay.  And the option was renewed?
14     A.  No.
15     Q.  How much did you receive for the option?
16     A.  We weren't paid anything up front.
17     Q.  Okay.  Did the -- how long was the option?
18     A.  I believe it was a year.
19     Q.  Did it expire?
20     A.  Yes, it did.
21     Q.  And has anything happened to that
22  screenplay since the expiration of the option to
23  Mr. Salkind?
24     A.  No.  We have no sales or options.
25     Q.  Have you attempted to present or pitch the
0021
1  screenplay to anyone else?
2      A.  No, I have not.
3      Q.  How many pages is that screenplay?
4      A.  130.
5      Q.  And have you done any further work on it
6  since the time you optioned it?
7      A.  Nothing substantial.
8      Q.  And is the screenplay about the life of Joe
9  Shuster?
10     A.  Yes.

16.    "JOSEPH SHUSTER FILE" means any and all articles,

correspondence, notes, outlines, artwork, comic books, and other documents

concerning Joseph Shuster, including the file Mark Warren Peary identified

during his June 29, 2011, deposition in the above-entitled action:

11     Q.  When you wrote the screenplay, did you
12  collect a -- a file on Joe Shuster from which you
13  put together your screenplay?
14     A.  I did historical background research.
15     Q.  What were the years when you wrote the
16  screenplay?
17     A.  1996 I started, up until the early 2000s.
18     Q.  When your uncle died, he died in July of
19  1992.
20      Is that right?
21     A.  Yes.
22     Q.  And after he passed, you were involved in
23  collecting his belongings?
24     A.  Yes.

- 4 -

25    Q.  You went out to his apartment in
0022
1  Los Angeles with your mom?
2    A.  Yes.
3    Q.  And did you then take possession of some of
4  his papers and library of comic book materials,
5  whatever he had, drawings, things like that?
6    A.  There were -- there were very limited
7  papers and we didn't find any vintage comics,
8  unfortunately, which would have been worth a lot.
9  He didn't have any.  There were some limited papers,
10  but nothing -- nothing significant.  Mostly personal
11  items.
12    Q.  Where did you get the materials that you
13  used for your book?
14    A.  The book?
15    Q.  Excuse me, the screenplay.
16    A.  The materials, it came from historical
17  research.
18    Q.  About Joe?
19    A.  Yes.  I had a lot of -- a lot of vintage
20  articles that came from the -- the era, which is
21  probably unusual to have a lot of material.  That's
22  where most of it came from.
23    Q.  You collected this on your own?
24    A.  Yes.
25    Q.  By doing public record searches?
0023
1    A.  Yes.  And family files.
2    Q.  Who -- who had possession of the family
3  files?
4    A.  My mother had collected articles throughout
5  the years.
6    Q.  And those articles are in your home where
7  you and your mother now live, right?
8    A.  Oh, I -- I guess so.  It's just old
9  magazine articles.

17.    "PEARY RECORDS" means any and all documents, agreements,

correspondence, e-mails, notes, and other records in YOUR residence, including

without limitation the lock box, filing cabinet, and e-mail account identified by

Mark Warren Peary during his June 29, 2011, deposition in the above-entitled

action:

0050
24  BY MR. PETROCELLI:
25    Q.  From whom -- where in your home are the --
0051
1  are the papers related to this case or any legal
2  matter having to do with Joe Shuster?
3    A.  I have a filing cabinet.

- 5 -

1

        4    Q.  How many drawers?
        5    A.  Three.
2       6    Q.  When did you start to collect that material
        7  that is contained in these drawers of this filing
3       8  cabinet?
        9    A.  It would have been with the original legal
4      10  agreement.
       11    Q.  Back in 2001?
5      12    A.  Yes.
       13    Q.  Where is the cabinet located?
6      14    A.  In a study.
       15    Q.  In your home?
7      16    A.  Yes.
       17    Q.  And that has all the physical copies of
8      18  documents?
       19    A.  Yes.
9      20    Q.  And besides -- it fills up three drawers?
       21    A.  No.  It shares it with a host of other
10     22  papers.
       23    Q.  Okay.  And besides that filing cabinet,
11     24  where else, if any place, do you keep any copies of
       25  documents relating to this -- this matter?
12     0052
        1    A.  Perhaps a lock box.
13      2    Q.  What's --
        3    A.  A lock box.
14      4    Q.  What do you mean by "a lock box"?
        5    A.  Just a fireproof lock box.
15      6    Q.  In your house?
        7    A.  Yes.
16     …

17     0040
        9    Q.  Do you have an e-mail address?
18     10    A.  Yes.
       11    Q.  What is it?
19     12    A.  WPeary@comcast.net.
       13    Q.  Is that P-e-a-r-y?
20
       18.    14    A.  Yes.
21
       19.    "SUPERMAN" means the Superman character as delineated in
22
literary works such as comic books, newspapers, novels, radio programs,
23
television programs, and motion pictures, and any of the works in which he
24
appears, including but not limited to *Action Comics. No. 1.*
25
       20.    "SUPERBOY" means the Superboy character as delineated in
26
literary works such as comic books, newspapers, novels, radio programs,
27

28

- 6 -
**EXHIBIT C**
**129**

1 television programs, and motion pictures, and any of the works in which he

2 appears, including but not limited to *More Fun Comics No. 101*.

3      21. "INCLUDING" means "including, but not limited to."

4      22. "Any" and "All" are interchangeable.

5      23. The singular form includes the plural form, and vice versa.

6      24. YOU are instructed to produce all DOCUMENTS that are responsive

7 to these Requests and that are in YOUR possession, custody, or control. A

8 DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR

9 physical possession, located in your place of residence, or if, as a practical matter,

10 YOU have the ability, upon request, to OBTAIN possession of the DOCUMENT

11 or a copy thereof from another person or entity that has physical possession of the

12 DOCUMENT.

13      25. If any DOCUMENT or category of DOCUMENTS is not produced

14 in full, please state with particularity the reason or reasons it is not being

15 produced in full, and describe, to the best of YOUR knowledge, information and

16 belief, and with as much particularity as possible, the DOCUMENT or portions of

17 the DOCUMENT that are not being produced.

18      26. Each DOCUMENT is to be produced as it is kept in the usual course

19 of business, including all file folders, binders, notebooks, and other devices by

20 which such DOCUMENTS may be organized or separated.

21      27. If YOU withhold any DOCUMENT, or portion of a DOCUMENT,

22 on grounds that it is protected from discovery by the attorney-client privilege,

23 work-product doctrine, or other privilege or immunity from discovery, please set

24 forth, for each DOCUMENT or portion of a DOCUMENT withheld:

25           (a) The place, approximate date, and manner of recording, creating

26                 or otherwise preparing the DOCUMENT;

27           (b) The names and organization position, if any, of each author,

28                 sender, and recipient of the DOCUMENT;

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

**EXHIBIT C**

**130**

1          (c)    A general description of the subject matter of the DOCUMENT;

2          (d)    The basis of any claim of privilege; and

3          (e)    If work-product is asserted, the proceeding for which the

4                 DOCUMENT was created.

5      28.    For any DOCUMENT or category of DOCUMENTS that was, but

6  no longer is, in YOUR possession, custody or control, please describe each such

7  DOCUMENT as completely as possible and provide the following information:

8          (a)    The reason the DOCUMENT is no longer in YOUR possession,

9                 custody or control;

10         (b)    The person or entity, if any, who has possession, custody or

11                control or, if unknown, so state; and

12         (c)    If the DOCUMENT was destroyed or otherwise disposed of,

13                state (i) the manner of disposal (*i.e.*, destruction, loss, discarding

14                or other means of disposal); (ii) the date of disposal; (iii) the

15                reason for disposal; (iv) the person authorizing disposal; (v) the

16                person disposing of the DOCUMENT; and (vi) the name and

17                address of the most recent custodian of the DOCUMENT.

18     29.    Each Request shall be construed independently and no Request shall

19  be viewed as limiting the scope of any other Request.

20     30.    All responsive DOCUMENTS maintained or stored in electronic

21  format shall be produced in native file format with all associated metadata

22  preserved.  All responsive DOCUMENTS maintained in hard copy shall be

23  produced in TIFF.

24     31.    The collection and production of DOCUMENTS shall be performed

25  in a manner that ensures that the source of each DOCUMENT may be

26  determined, if necessary.

27     32.    DOCUMENTS attached to each other shall not be separated.

28  These Requests impose a continuing obligation subsequent to YOUR initial

- 8 -

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

**EXHIBIT C**

**131**

1  production within thirty days of the service date of these Requests, or other date

2  mutually agreed upon by the parties, to timely supplement YOUR response or

3  production if YOU determine that YOUR response or production is incomplete or

4  incorrect.

5  **DOCUMENTS REQUESTED**

6  **Request No. 23**

7       The PEAVY WILL, including any and all drafts and prior versions of the

8  PEAVY WILL.

9  **Request No. 24**

10      All DOCUMENTS RELATING to the PEAVY WILL.

11  **Request No. 25**

12      All DOCUMENTS RELATING to the PEAVY TRUST.

13  **Request No. 26**

14      All COMMUNICATIONS with Michael Catron.

15  **Request No. 27**

16      All COMMUNICATIONS with David Sims.

17  **Request No. 28**

18      All COMMUNICATIONS with Ilya Salkind.

19  **Request No. 29**

20      The 1997 PEARY SCREENPLAY, including any and all drafts and prior

21  versions of the 1997 PEARY SCREENPLAY.

22  **Request No. 30**

23      All DOCUMENTS RELATING to the 1997 PEARY SCREENPLAY.

24  **Request No. 31**

25      The 2006 PEARY SCREENPLAY, including any and all drafts and prior

26  versions of the 2006 PEARY SCREENPLAY.

27  **Request No. 32**

28      All DOCUMENTS RELATING to the 2006 PEARY SCREENPLAY.

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

**EXHIBIT C**

**132**

**Request No. 33**

The WORKING SCREENPLAY DRAFT, including any and all drafts and prior versions of the WORKING SCREENPLAY DRAFT.

**Request No. 34**

Any and all drafts, outlines, or notes RELATING to any script, screenplay, or story regarding SUPERMAN, SUPERBOY, the SHUSTER HEIRS, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

**Request No. 35**

The JOSEPH SHUSTER FILE.

**Request No. 36**

All VIDEO FOOTAGE depicting YOU or any other SHUSTER HEIR RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC, including without limitation all VIDEO FOOTAGE of YOUR interview on the Canadian Broadcasting Corporation on or around April 30, 2005, and all VIDEO FOOTAGE of a panel discussion YOU participated in at a Comic-Con event in or around 1998.

**Request No. 37**

All DOCUMENTS received from Dawn Peavy, including without limitation any e-mails sent from the e-mail account dawnpeavy@gmail.com, RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

**Request No. 38**

All DOCUMENTS in the PEARY RECORDS RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

1

2
Dated:  August 4, 2011                    Respectfully submitted,

3
By:  /s/ Daniel M. Petrocelli

4
Daniel M. Petrocelli

5
Attorneys for Plaintiff DC Comics

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQS. FOR PRODUC. OF DOCS.
TO DEF. JEAN PEAVY

**EXHIBIT C**

**134**

# EXHIBIT D

DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
   cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
   pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS, | Case No. CV-10-3633 ODW (RZx) |
| Plaintiff, | **DISCOVERY MATTER** |
| v. | **PLAINTIFF DC COMICS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT MARK WARREN PEARY** |
| PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, as personal representative of the ESTATE OF JOANNE SIEGEL and an individual, and DOES 1-10, inclusive, | **Judge**:  Hon. Otis D. Wright II<br>**Magistrate**:  Hon. Ralph Zarefsky |
| Defendants. | |

**PROPOUNDING PARTY**:    Plaintiff DC Comics

**RESPONDING PARTY**:    Defendant Mark Warren Peary

**SET NUMBER**:    Two (Request Nos. 23-38)

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

Pursuant to Federal Rule of Civil Procedure 34, plaintiff DC Comics hereby requests that defendant Mark Warren Peary produce for inspection and copying all documents described in the following Requests for Production, in accordance with the definitions and instructions contained therein, by no later than September 6, 2011.

## DEFINITIONS AND INSTRUCTIONS

1.      "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001.  This shall include, but is not limited to:  e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2.      "VIDEO FOOTAGE" means any recording of visual images and/or sound, including without limitation any recording stored in videotape, DVD, or digital format.

3.      "COMMUNICATION" means any written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

4.      "RELATE" means, without limitation, to refer to or bear upon.

5.      "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

- 1 -

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**
**136**

1   6.     "YOU" or "YOUR" means Mark Warren Peary and, as applicable,

2   any PERSON that is acting on his behalf, including but not limited to his agents,

3   employees, attorneys, and representatives.

4   7.     "SHUSTER HEIRS" means, collectively and severally, YOU, the

5   Estate of Joseph Shuster, Jean Peavy, Dawn Peavy, Joseph Barry, Nicole Peavy,

6   Jacob Anderson, or any other executor, administrator, heir, relative, or

7   representative of Joseph Shuster and, as applicable, any PERSON acting on their

8   behalf, including but not limited to their agents, employees, attorneys, and

9   representatives.

10   8.     "SIEGEL HEIRS" means, collectively and severally, Joanne Siegel,

11   Laura Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,

12   administrator, heir, relative, or representative of Jerome Siegel and, as applicable,

13   any PERSON acting on their behalf, including but not limited to their agents,

14   employees, attorneys, and representatives.

15   9.     "DC COMICS" means plaintiff DC Comics and any of its affiliates

16   or predecessors, including but not limited to National Allied Publications,

17   Detective Comics, National Comics, and National Periodical Publications.

18   10.    "WARNER" means Time Warner Inc. and any of its subsidiaries,

19   affiliates, or predecessors, including but not limited to Warner Bros.

20   Entertainment Inc., Warner Communications Inc., and Warner Bros. Television

21   Production Inc.

22   11.    "PEAVY WILL" means any written instrument relating to the

23   disposition or division of any actual or prospective right, interest, or property held

24   by Jean Peavy that is intended to take effect after her death.

25   12.    "PEAVY TRUST" means any *inter vivos*, testamentary, or other

26   trust created to dispose of or divide any actual or prospective right, interest, or

27   property held by Jean Peavy.

28

- 2 -

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**

**137**

1    13.    "1997 PEARY SCREENPLAY" means the screenplay titled

2  "Dreamers" submitted by YOU and/or Rick Palacioz to WARNER and/or DC

3  COMICS on or around January 21, 1997.

4    14.    "2006 PEARY SCREENPLAY" means the screenplay titled "Ilya

5  Salkind's Siegel & Shuster" submitted by YOU, Rick Palacioz, and/or Ilya

6  Salkind to WARNER and/or DC COMICS on or around September 6, 2006.

7    15.    "WORKING SCREENPLAY DRAFT" means the screenplay YOU

8  identified during your June 29, 2011, deposition in the above-entitled action:

```
0018
23     Q.  Have you been on any -- have you
24   participated in any presentations or pitches to
25   third parties about acquiring options for any work
0019
 1   that you've done?
 2       A.  At one time --
 3         MR. TOBEROFF:  Meaning -- meaning --
 4         THE WITNESS:  On a screenplay?
 5         MR. TOBEROFF:  -- authored work?
 6         MR. PETROCELLI:  Yeah.
 7       Q.  Any work that you've authored or -- yeah.
 8   Any work that you authored?
 9       A.  On any screenplay or -- I have other
10   screenplays I've also worked on, so --
11         MR. TOBEROFF:  He's just talking about any
12   literary work.
13         THE WITNESS:  I've been offered options on
14   other screenplays, yes.
15   BY MR. PETROCELLI:
16       Q.  Have any of them been developed?
17       A.  No.
18       Q.  Have any of the screenplays concerned at
19   all the life of Joe Shuster, the one that was an
20   option?
21       A.  There was one that was.
22       Q.  Was optioned?
23       A.  It has expired, so it's no -- it's not
24   active.
25       Q.  Now, was that -- what was the underlying
0020
 1   work that was optioned?
 2       A.  Screenplay.
 3       Q.  Was that the screenplay to which you
 4   adverted in your deposition in 2006?
 5       A.  Yes, yes.
 6       Q.  And it was after your deposition that you
 7   optioned it?
 8       A.  I'm not -- I'm not sure of the exact date.
```

- 3 -

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

9  I don't -- I really don't recall the exact date on
10  that.
11      Q. Did you option it to Ilya Salkind?
12      A. Yes.
13      Q. Okay. And the option was renewed?
14      A. No.
15      Q. How much did you receive for the option?
16      A. We weren't paid anything up front.
17      Q. Okay. Did the -- how long was the option?
18      A. I believe it was a year.
19      Q. Did it expire?
20      A. Yes, it did.
21      Q. And has anything happened to that
22  screenplay since the expiration of the option to
23  Mr. Salkind?
24      A. No. We have no sales or options.
25      Q. Have you attempted to present or pitch the
0021
1  screenplay to anyone else?
2      A. No, I have not.
3      Q. How many pages is that screenplay?
4      A. 130.
5      Q. And have you done any further work on it
6  since the time you optioned it?
7      A. Nothing substantial.
8      Q. And is the screenplay about the life of Joe
9  Shuster?
10      A. Yes.

16.     "JOSEPH SHUSTER FILE" means any and all articles,

correspondence, notes, outlines, artwork, comic books, and other documents

concerning Joseph Shuster, including the file YOU identified during your June

29, 2011, deposition in the above-entitled action:

11      Q. When you wrote the screenplay, did you
12  collect a -- a file on Joe Shuster from which you
13  put together your screenplay?
14      A. I did historical background research.
15      Q. What were the years when you wrote the
16  screenplay?
17      A. 1996 I started, up until the early 2000s.
18      Q. When your uncle died, he died in July of
19  1992.
20        Is that right?
21      A. Yes.
22      Q. And after he passed, you were involved in
23  collecting his belongings?
24      A. Yes.
25      Q. You went out to his apartment in
0022
1  Los Angeles with your mom?
2      A. Yes.

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3     Q.  And did you then take possession of some of
4  his papers and library of comic book materials,
5  whatever he had, drawings, things like that?
6     A.  There were -- there were very limited
7  papers and we didn't find any vintage comics,
8  unfortunately, which would have been worth a lot.
9  He didn't have any.  There were some limited papers,
10  but nothing -- nothing significant.  Mostly personal
11  items.
12     Q.  Where did you get the materials that you
13  used for your book?
14     A.  The book?
15     Q.  Excuse me, the screenplay.
16     A.  The materials, it came from historical
17  research.
18     Q.  About Joe?
19     A.  Yes.  I had a lot of -- a lot of vintage
20  articles that came from the -- the era, which is
21  probably unusual to have a lot of material.  That's
22  where most of it came from.
23     Q.  You collected this on your own?
24     A.  Yes.
25     Q.  By doing public record searches?
0023
1     A.  Yes.  And family files.
2     Q.  Who -- who had possession of the family
3  files?
4     A.  My mother had collected articles throughout
5  the years.
6     Q.  And those articles are in your home where
7  you and your mother now live, right?
8     A.  Oh, I -- I guess so.  It's just old
9  magazine articles.

17.    "PEARY RECORDS" means any and all documents, agreements,

correspondence, e-mails, notes, and other records in YOUR possession, custody,

and control, including without limitation the lock box, file cabinet, and e-mail

account YOU identified during YOUR June 29, 2011, deposition in the above-

entitled action:

0050
24  BY MR. PETROCELLI:
25     Q.  From whom -- where in your home are the --
0051
1  are the papers related to this case or any legal
2  matter having to do with Joe Shuster?
3     A.  I have a filing cabinet.
4     Q.  How many drawers?
5     A.  Three.
6     Q.  When did you start to collect that material
7  that is contained in these drawers of this filing

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**

**140**

8   cabinet?
9       A.  It would have been with the original legal
10  agreement.
11      Q.  Back in 2001?
12      A.  Yes.
13      Q.  Where is the cabinet located?
14      A.  In a study.
15      Q.  In your home?
16      A.  Yes.
17      Q.  And that has all the physical copies of
18  documents?
19      A.  Yes.
20      Q.  And besides -- it fills up three drawers?
21      A.  No.  It shares it with a host of other
22  papers.
23      Q.  Okay.  And besides that filing cabinet,
24  where else, if any place, do you keep any copies of
25  documents relating to this -- this matter?
0052
1       A.  Perhaps a lock box.
2       Q.  What's --
3       A.  A lock box.
4       Q.  What do you mean by "a lock box"?
5       A.  Just a fireproof lock box.
6       Q.  In your house?
7       A.  Yes.
…

0040
9       Q.  Do you have an e-mail address?
10      A.  Yes.
11      Q.  What is it?
12      A.  WPeary@comcast.net.
13      Q.  Is that P-e-a-r-y?
14      A.  Yes.

18.    "SUPERMAN" means the Superman character as delineated in

literary works such as comic books, newspapers, novels, radio programs,

television programs, and motion pictures, and any of the works in which he

appears, including but not limited to *Action Comics. No. 1*.

19.    "SUPERBOY" means the Superboy character as delineated in

literary works such as comic books, newspapers, novels, radio programs,

television programs, and motion pictures, and any of the works in which he

appears, including but not limited to *More Fun Comics No. 101*.

20.    "INCLUDING" means "including, but not limited to."

21.    "Any" and "All" are interchangeable.

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

1    22.    The singular form includes the plural form, and vice versa.

2    23.    YOU are instructed to produce all DOCUMENTS that are responsive

3    to these Requests and that are in YOUR possession, custody, or control.  A

4    DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR

5    physical possession, located in your place of residence, or if, as a practical matter,

6    YOU have the ability, upon request, to OBTAIN possession of the DOCUMENT

7    or a copy thereof from another person or entity that has physical possession of the

8    DOCUMENT.

9    24.    If any DOCUMENT or category of DOCUMENTS is not produced

10    in full, please state with particularity the reason or reasons it is not being

11    produced in full, and describe, to the best of YOUR knowledge, information and

12    belief, and with as much particularity as possible, the DOCUMENT or portions of

13    the DOCUMENT that are not being produced.

14    25.    Each DOCUMENT is to be produced as it is kept in the usual course

15    of business, including all file folders, binders, notebooks, and other devices by

16    which such DOCUMENTS may be organized or separated.

17    26.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT,

18    on grounds that it is protected from discovery by the attorney-client privilege,

19    work-product doctrine, or other privilege or immunity from discovery, please set

20    forth, for each DOCUMENT or portion of a DOCUMENT withheld:

21        (a)    The place, approximate date, and manner of recording, creating

22            or otherwise preparing the DOCUMENT;

23        (b)    The names and organization position, if any, of each author,

24            sender, and recipient of the DOCUMENT;

25        (c)    A general description of the subject matter of the DOCUMENT;

26        (d)    The basis of any claim of privilege; and

27        (e)    If work-product is asserted, the proceeding for which the

28            DOCUMENT was created.

- 7 -

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

1    27.    For any DOCUMENT or category of DOCUMENTS that was, but

2    no longer is, in YOUR possession, custody or control, please describe each such

3    DOCUMENT as completely as possible and provide the following information:

4              (a)    The reason the DOCUMENT is no longer in YOUR possession,

5                      custody or control;

6              (b)    The person or entity, if any, who has possession, custody or

7                      control or, if unknown, so state; and

8              (c)    If the DOCUMENT was destroyed or otherwise disposed of,

9                      state (i) the manner of disposal (*i.e.*, destruction, loss, discarding

10                     or other means of disposal); (ii) the date of disposal; (iii) the

11                     reason for disposal; (iv) the person authorizing disposal; (v) the

12                     person disposing of the DOCUMENT; and (vi) the name and

13                     address of the most recent custodian of the DOCUMENT.

14   28.    Each Request shall be construed independently and no Request shall

15   be viewed as limiting the scope of any other Request.

16   29.    All responsive DOCUMENTS maintained or stored in electronic

17   format shall be produced in native file format with all associated metadata

18   preserved.  All responsive DOCUMENTS maintained in hard copy shall be

19   produced in TIFF.

20   30.    The collection and production of DOCUMENTS shall be performed

21   in a manner that ensures that the source of each DOCUMENT may be

22   determined, if necessary.

23   31.    DOCUMENTS attached to each other shall not be separated.

24   These Requests impose a continuing obligation subsequent to YOUR initial

25   production within thirty days of the service date of these Requests, or other date

26   mutually agreed upon by the parties, to timely supplement YOUR response or

27   production if YOU determine that YOUR response or production is incomplete or

28   incorrect.

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**

**143**

1

## DOCUMENTS REQUESTED

2 **Request No. 23**

3   The PEAVY WILL, including any and all drafts and prior versions of the

4 PEAVY WILL.

5 **Request No. 24**

6   All DOCUMENTS RELATING to the PEAVY WILL.

7 **Request No. 25**

8   All DOCUMENTS RELATING to the PEAVY TRUST.

9 **Request No. 26**

10   All COMMUNICATIONS with Michael Catron.

11 **Request No. 27**

12   All COMMUNICATIONS with David Sims.

13 **Request No. 28**

14   All COMMUNICATIONS with Ilya Salkind.

15 **Request No. 29**

16   The 1997 PEARY SCREENPLAY, including any and all drafts and prior

17 versions of the 1997 PEARY SCREENPLAY.

18 **Request No. 30**

19   All DOCUMENTS RELATING to the 1997 PEARY SCREENPLAY.

20 **Request No. 31**

21   The 2006 PEARY SCREENPLAY, including any and all drafts and prior

22 versions of the 2006 PEARY SCREENPLAY.

23 **Request No. 32**

24   All DOCUMENTS RELATING to the 2006 PEARY SCREENPLAY.

25 **Request No. 33**

26   The WORKING SCREENPLAY DRAFT, including any and all drafts and

27 prior versions of the WORKING SCREENPLAY DRAFT.

28

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**

**144**

**Request No. 34**

Any and all drafts, outlines, or notes RELATING to any script, screenplay, or story regarding SUPERMAN, SUPERBOY, the SHUSTER HEIRS, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

**Request No. 35**

The JOSEPH SHUSTER FILE.

**Request No. 36**

All VIDEO FOOTAGE depicting YOU or any other SHUSTER HEIR RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC, including without limitation all VIDEO FOOTAGE of an interview with Jean Peavy on the Canadian Broadcasting Corporation on or around April 30, 2005, and all VIDEO FOOTAGE of a panel discussion featuring Jean Peavy at a Comic-Con event in or around 1998.

**Request No. 37**

All DOCUMENTS received from Dawn Peavy, including without limitation any e-mails sent from the e-mail account dawnpeavy@gmail.com, RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

**Request No. 38**

All DOCUMENTS in the PEARY RECORDS RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

Dated:  August 4, 2011                    Respectfully submitted,

By:  /s/ Daniel M. Petrocelli

Daniel M. Petrocelli

Attorneys for Plaintiff DC Comics

REQS. FOR PRODUC. OF DOCS.
TO DEF. MARK WARREN PEARY

**EXHIBIT D**

**145**

# EXHIBIT E

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 10, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Matt:

The factual and legal assertions in your August 4 letter are disputed, and your letter significantly mischaracterizes your meet-and-confer discussions with Mr. Toberoff on August 3, 2011.

<u>Deposition of Marc Toberoff:</u>  As to the multiple depositions sought by DC, my letters of July 25 and August 1, 2011 make it clear that Pacific Pictures Corporation (dissolved), IP Worldwide, LLC (inactive), and IPW, LLC (irrelevant) will designate Mr. Toberoff as their F.R.C.P. 30(b)(6) witness, and will adopt his testimony.  Where "the knowledge of an individual concerning a particular subject also constitutes the total knowledge of the entity …. the witness could simply adopt the testimony he or she provided in a former capacity, thereby obviating the need for a second deposition," the exact procedure defendants have adopted.  *Sabre v. First Dominion Capital, LLC,* 2001 U.S. Dist. LEXIS 20637, at *3-*4 (S.D.N.Y. Dec. 10, 2001)**.**  We informed DC of this in advance so that it could properly plan its deposition.

Your purported compromise offer to "discuss" the possibility of "one extended day of deposition during which we will endeavor to complete our questioning … with the understanding that if we are unable to do so, we will continue to a second day" is illusory.  This gives DC the ability to extend the deposition at its sole discretion for fourteen hours or more given your reference to the first day as an "extended day."  This is uncalled for and unnecessarily burdensome.

Your statement that when "asked about other potential 30(b)(6) designees – *e.g.,* J. Todd Harris – [] Mr. Toberoff refused to discuss the details" mischaracterizes your meet and confer with Mr. Toberoff, who clearly stated that Mr. Harris was/is not an employee.  Mr. Harris would also not be a proper Rule 30(b)(6) witness on any of the topics in DC's deposition notices.  Mr. Toberoff is the only knowledgeable Rule 30(b)(6) witness for any of the entities.

**EXHIBIT E**
**146**

**TOBEROFF & ASSOCIATES, P.C.**

August 10, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 3

You make various other misstatements and self-serving exaggerations as to the meet and confer regarding the Toberoff defendants that are not well taken, but do not merit discussion as this juncture.

<u>Scheduling of Mr. Toberoff's Deposition:</u>  DC failed to respond to my August 1 letter regarding whether Mr. Toberoff's deposition would go forward on August 10.  When I again asked in an August 3 e-mail whether DC intended to proceed with Mr. Toberoff's deposition on the noticed dates, DC again dodged the question and merely referred to its August 3, 2011 letter.  DC's response in its August 3 letter is that the parties should "discuss scheduling the deposition."

Despite DC's studied ambiguity on this subject, in a telephone conversation between Mr. Toberoff and Mr. Petrocelli on August 5, 2011, Mr. Petrocelli confirmed that DC did not intend to depose Mr. Toberoff on August 10, 2011 due to a potential scheduling conflict with another case, and that the parties should reschedule the deposition for sometime in September, 2011.  We should confer on possible September dates for Mr. Toberoff's deposition before he leaves for his rescheduled vacation from August 22-September 6, 2011.

<u>DC's Motions for Reconsideration re: Laura Siegel Larson Documents:</u>  DC's assumption that Ms. Larson's boxes of documents "include documents that defendants previously represented were non-existent" is completely unfounded.  Contrary to your claims and as Mr. Toberoff specifically stated in your meet and confer, Ms. Larson long ago conducted a diligent search and produced the responsive documents in her possession or control, and there is no grounds for further motion practice by DC on this subject.  Mr. Toberoff also clearly informed you that Ms. Larson obtained some materials when she recently cleaned out her late mother, Joanne Siegel's apartment; that Ms. Larson has searched most of these materials for any responsive documents, and will complete this search upon return from her summer vacation.  So far nothing new was located, except for the non-substantive Gary Spence materials that were produced. Upon Ms. Larson's return, we will provide DC with dates by which Ms. Larson will finish her review of her mother's materials.  However, DC should not have unrealistic expectations regarding the remainder of Ms. Larson's review, as Joanne Siegel herself, while she was alive, conducted a diligent search and produced all non-privileged documents in her possession or control responsive to DC's requests in both the closely related *Siegel* litigations and in this case.

DC has already made two motions to compel the production of Ms. Larson's correspondence with David Michaels, including the "July 2003" letter and the "November 2002" letter, both of which were *denied*, and we see no grounds for further discussion of the subject on the thin pretext of Ms. Larson's production of her brief, non-substantive communications with Gary Spence.

DC's complaint that defendants "would not explain" how DC misinterpreted and misconstrued Ms. Larson's testimony is hollow.  As explained in Mr. Toberoff's August 1, 2011 letter, DC takes snippets of Ms. Larson's deposition testimony out of context.  It is obvious from DC's selective quotations and the truth that DC is willfully misinterpreting Ms. Larson's testimony.

**EXHIBIT E**
**147**

**TOBEROFF & ASSOCIATES, P.C.**

August 10, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  3 of 3

You make various other mischaracterizations of the parties' meet and confer that do not merit a point by point discussion as this time.

In light of Magistrate Zarefsky's comments at yesterday's hearing, DC should not bring yet another frivolous motion for reconsideration of these already-decided issues.

Toberoff Document Production:  DC has had the Toberoff defendants' written responses to DC's amended discovery requests since July 15, 2011, and their document production since July 27, 2011.  All of DC's supposed requests to "meet-and-confer" simply refer to DC's old July 7, 2011 letter, which obviously did not address defendants' subsequent responses and document production.  DC has not even attempted to properly meet-and-confer on the subject of defendants' actual responses and production.  Defendants again caution DC that its assumption that there are numerous responsive documents that have not been produced is erroneous.

Your letter also seeks "unredacted versions of defendants' agreements with Ari Emanuel."  As Magistrate Zarefsky stated in his May 25, 2011 order, DC is not entitled to "everything" about the businesses of the various defendants in the case, and the redacted portions of that agreement are not relevant to this litigation.  DC received redacted copies of such agreements years ago in the *Siegel* litigation based on similar requests as in this case, and in all this time, including over a year in this action, has failed to voice any objection to the redaction.

Peary/Peavy Document Requests:  DC demands a meet-and-confer on various documents – notably, scripts by Warren Peary and Jean Peavy's will – that it vaguely claims are responsive to DC's prior discovery requests, while serving new requests for production of such scripts and will.   DC was well-aware that the scripts existed from Mr. Peary's prior deposition in 2006, that Ms. Peavy could have a will, and that such documents were not part of the Shusters' production in December 2010.  If these documents were actually responsive to DC's prior discovery requests, it undoubtedly would have brought them up in connection with its prior motions to compel, and not waited for over eight months to even address the issue.

Your August 4 letter does not even remotely comply with L.R. 37-1 as to DC's prior requests, and it is outside the rules and makes no sense to meet-and-confer on pending discovery requests, especially when defendants' responses are due before any motion to compel on the subject could be heard.  Defendants will respond to DC's new discovery in due course pursuant to the Federal Rules of Civil Procedure.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

**EXHIBIT E**
**148**

# EXHIBIT F

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Keith Adams
Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Keith:

In response to your letter of yesterday sent at 9:31 a.m., let's plan to talk Friday morning concerning dates for Mr. Toberoff's and Mr. Marks' depositions in late September or early October. We spoke to Susan Allison today about the latter.

1. We disagree that Mr. Toberoff and his companies should not and cannot be deposed separately and reserve all rights to take separate depositions of his three companies. DC alleges that each company engaged in separate and distinct acts of misconduct. *See* FAC ¶¶ 165-89. We intend separately to question each company about its individual acts of misconduct under Rule 30(b)(6). The depositions of Pacific Pictures and IP Worldwide will take the longest—though each may be shorter than a day—as these companies entered into many of the offending agreements with the Shuster and Siegel heirs. Any follow-up deposition of IPW will be shorter and cover separate ground, and the deposition of Mr. Toberoff under Rule 30(a)(1) will cover only additional conduct he engaged in as an individual, and will not re-plough the same ground covered in the companies' Rule 30(b)(6) depositions. Defendants have not conceded that the three companies are alter egos or agents of Mr. Toberoff or one another, and, thus, we need to examine these companies as well on inter-corporate liability issues, which takes time and is distinct as to each company. *E.g.*, *Sonora Diamond Corp. v. Super. Ct.*, 83 Cal. App. 4th 523, 538-39 (2000); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837-38 (1962). Your Rule 12 and SLAPP motions notably do not contest these alter-ego and agency allegations and, thus, there can be no question that they are ripe for discovery.

You have cited three cases in support of your argument that DC is not entitled to separately depose the Toberoff defendants, all of which are inapposite:

O'MELVENY & MYERS LLP
August 11, 2011 - Page 2

a. In *Novartis Pharmaceuticals Corp. v. Abbott Labs.*, 203 F.R.D. 159, 162-63 (D. Del. 2001), the court found that, "[o]n the record presented," a Rule 30(b)(6) deposition of a witness who had already testified about the same topic in his individual capacity was not warranted because (1) the defendant offered to be bound by the witness's testimony, (2) the witness was the person most knowledgeable on the topic, and (3) another deposition would be "duplicative" and "cumulative to the testimony already procured." You may concede that Mr. Toberoff's companies are bound by his individual testimony and assert that he is the person most knowledgeable at each company. But unlike in *Novartis*, we are not attempting to depose Mr. Toberoff as both an individual and a corporate designee on the same, limited topic (*i.e.*, the companies' conduct), and so the testimony we obtain from Mr. Toberoff in his individual capacity will not be "duplicative" or "cumulative." As for the time it will take to conduct these four depositions, the Rules presumptively entitle us to four days—one each with each defendant. As we have noted, however, we would try to complete all four examinations in one long day, or over two days. You have declined those middle-ground offers.

b. In *A.I.A. Holdings v. Lehman Bros., Inc.*, 2002 U.S. Dist. LEXIS 9218, at *13 (S.D.N.Y. 2002), the plaintiff sought a protective order to limit its Rule 30(b)(6) deposition because three of its principals had been deposed in their individual capacities on the majority of topics in the Rule 30(b)(6) deposition notice. The court rightly observed that "the mere fact that the principal of a corporation has been deposed is not an automatic substitute for a 30(b)(6) deposition," although it noted that a Rule 30(b)(6) deposition may not be warranted where the testimony "would be identical to his testimony as an individual and the 30(b)(6) is limited, or substantially limited, to topics covered in the deposition taken in the witness's individual capacity." *Id.* at *17-18. In this case, no one has been deposed yet on behalf of any of the Toberoff defendants on any topic. Our deposition of Mr. Toberoff will not concern the acts of his companies; the company depositions will cover separate and distinct topics. All of the depositions are proper, and no showing has been made that they would be cumulative.

c. Your third case—*Sabre v. First Dominion Capital, L.L.C.*, 2001 U.S. Dist. LEXIS 20637, at *1 (S.D.N.Y. 2001)—confirms that "the depositions of an individual who is noticed as an individual witness pursuant to Fed. R. Civ. P. 30(b)(1) and who is also produced as a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) *are presumptively subject to independent seven-hour time limits*." (Emphasis added.) In dicta, *Sabre* noted that separate depositions of a closely-held corporation and its principal may be unnecessary where the corporation adopts the principal's statements; in such a case, "if the questioning … becomes repetitive or is otherwise being conducted in an oppressive manner, the aggrieved party can always make application for a protective order." *Id.* at *2. In this case, there is no need for a protective order because DC does not seek to cover the same ground in its four depositions—and in any event, a protective order motion is not yet ripe because DC has not yet taken *any* deposition of the Toberoff defendants, much less a "repetitive" second deposition.

We have tried to be accommodating and propose alternatives that would allow the four depositions to be completed in one or two days, but you have declined to accept those offers. In

**EXHIBIT F**
**150**

O'MELVENY & MYERS LLP
August 11, 2011 - Page 3

a final effort to avoid motion practice, we reiterate our offer to have a consolidated deposition of the Toberoff defendants over one long day or two days, whatever is needed, in late September.

    2.  On the Laura Siegel Larson documents, we will move to compel production of Ms. Larson's letter to her half-brother (and the drafts of it) that she described at length at her deposition:

        Q. This is a letter from Michael Siegel to you dated May 13; is that correct?
        A. Yes.
        …
        Q. Did you respond to it?
        A. I'm sure I did.
        …
        Q. [The Toberoff Timeline] says "Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael."  Putting aside the characterization of your ignorance, does July 5, 2003, sound right to you as around the time that you responded to the May 13, 2003, letter?
        A. It could have been.
        Q. Okay. Is it fair to say that your letter back to Mr. Michael Siegel did not agree with any of his criticisms of Mr. Toberoff's actions and Mr. Toberoff generally?
        A.  Well, whoever stole this document, you know, is doing his version of what he's reading into whatever the letter said.
        Q. You're not following my question.
        A. Well, I haven't read the letter in a long time.
        Q. My question to you is when you wrote back to Michael --
        A. Yes.
        Q. -- in response to his May 13, 2003, letter, is it fair to say that you expressed no agreement with any of his criticisms of Mr. Toberoff?
        A. I would say that's probably safe to say.
        Q. Did you tell Michael Siegel in your response letter back that Mr. Toberoff does not have a production company?
        A. Yes, I believe I did.
        …
        Q. Yes. It says "Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft -- in response to Michael's accusations of Toberoff, Laura clearly states that MT does not have a production company." And that was your belief at the time; correct?
        A. Correct.
        Q. And it goes on to say that, in parentheses: "(This is false -- Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes, quote, "MT  has not plans to produce

O'MELVENY & MYERS LLP
August 11, 2011 - Page 4

a SUPERMAN movie, nor is this feasible given the division of ownership of the rights," end of quotes. Now, does that -- is that consistent with your recollection that your statement that Mr. Toberoff did not have a production company was crossed out by Mr. Toberoff in the final draft and replaced with the quoted language that I just read?"

A. It could have been.

Q. And when Mr. Toberoff made his changes to the letter and returned it to you, did you review it and sign it before you sent it out as your response letter back to Michael?

A. Well, he made suggestions of changes in the wording of certain areas, and, you know, I retyped the letter, accepted some of the things that he said and didn't use some other suggestions that he made.

Q. How did he convey his suggestions to you?

A. He wrote it on -- he wrote it on this letter -- no, not this letter. He wrote it on that letter that's being discussed here and faxed it back to me.

Q. Okay. So you did engage in faxed communication with Mr. Toberoff from time to time.

A. Yes.

Q. Okay. Including with respect to this very correspondence that we're discussing.

A. I believe so.

Q. Okay.  Now, did you show him the final draft before you sent it out?

A. I believe I did.

Q. And which of the changes did you reject?

A. I don't remember. I just remember the process, but I don't remember the contents.

July 22, 2011, Larson Dep. Tr. at 298:12-15, 300:11-12, 310:20-311:22, 312:3-314:3.

Ms. Larson's description of her response letter to Michael's May 13, 2003, letter confirms the Toberoff Timeline's claim that Ms. Larson wrote a responsive letter and that Mr. Toberoff edited it:

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitmize his claims. *(please see enclosed letter)*

**EXHIBIT F**
**152**

O'MELVENY & MYERS LLP

August 11, 2011 - Page 5

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted, but to gain an unconscionable fee from a very large possible settlement with Time Warner.**

FAC Ex. A at 65-66.  The Toberoff Timeline notes that it enclosed a copy of Ms. Larson's responsive letter to her brother, yet defendants have never produced that document.

Defendants notably do not deny—either in your two recent letters on the subject, or during ou meet-and-confer with Mr. Toberoff in New Mexico—that the non-privileged letter that Ms. Larson wrote to her half-brother and the accompanying drafts of it about which she testified exist in your and/or her files.  Nor do you disclose whether the letter and drafts of it are among the documents listed on your privilege logs or at what entries—*i.e.*, entries on which DC moved to compel production or not.

Because of this ambiguity, which you decline to help clarify, we will need to file the motion for these documents as one to compel and/or, in the alternative, as one for reconsideration.  Even if it is the latter, we have studied the Magistrate's stated reasons for declining to compel the production of this document:

The Court feels, however, that reconsideration is not appropriate as to the July 11th letter.  Knowing the specific language of the May 13 letter does not tell much about the July 11th letter.  There's nothing to demonstrate that the prior orders long ago upheld on the grounds that DC Comics did not seek review of this Court's earlier ruling were materially wrong.

Even more so, the May 13th letter does not justify a different ruling on the July 5th letter.  As the Court previously stated, the defendants clearly stated that such a letter did not exist.  Plaintiff asserts that maybe it exists in a different form or with a different date, but the Court declines to order defendants to undertake a vague or amorphous further search.

June 20, 2011, Hr'g Tr. at 19.  Ms. Larson's recent deposition testimony makes clear that defendants need not engage in a "vague or amorphous further search" to see if her letter and the drafts of it described in her deposition and in the Timeline exist.  *Id.*  Moreover, Magistrate Zarefsky's June 20 ruling was focused on the May 13 letter; he did not have Ms. Larson's testimony before him, which she gave almost a month later, on July 22, 2011.

O'MELVENY & MYERS LLP

August 11, 2011 - Page 6

3.  As for the Toberoff defendants' document production, we believe we have fully met and conferred on these issues, but so there is no argument to the contrary, attached is a proposed order specifying exactly what documents we intend to move on.  We have limited those issues to the following 12 categories.  We raised each in our June 1 and July 7 correspondence, but we can discuss those issues on a Rule 37 call, within the next 10 days, as needed:

a.  Drafts of agreements.  As we pointed out and excerpted on page 26 of our July 7 letter, Mr. Peary testified at his deposition that "[t]here were drafts" of the 2001 Pacific Pictures agreement that "went back and forth," but no such drafts have been produced.  Toberoff Request No. 12 seeks "All DOCUMENTS created during or since 1997 RELATING to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY," and our July 7 letter specifically mentioned drafts of the Pacific Pictures agreements as within the category of documents sought by that request.  July 7 Letter at 5.  Drafts of any other agreements between defendants likewise fall within this category.  Will you be producing such drafts, or is it your position that no such drafts exist?

b.  Toberoff's ownership interest.  The 2001 and 2003 Pacific Pictures agreements provide for the transfer of 50% of the Shusters' purported rights to the joint venture if the venture were "terminated for any reason."  DC's proposed order seeks any document transferring, assigning, or disclaiming such rights by Mr. Toberoff's companies, as Pacific Pictures contributed its "current IP business" to IP Worldwide in February 2002, EN 00001-7, and IP Worldwide later transferred its rights to IPW, Nov. 17, 2006 Toberoff Dep. Tr. at 45:6-15.  At deposition, Mr. Peary asserted that Paragraph 9 of the Shusters' retainer agreement "supersedes all prior and contemporaneous understandings" between Mr. Toberoff and the Shusters, but could identify no document by which Pacific Pictures itself disclaimed any such interest.  June 29, 2011, Peary Dep. Tr. 335:16-340:2; *see also* July 7 Letter at 27.  If it is your position that no such documents exist—and defendants intend to produce no further documents in response to Toberoff Request Nos. 12-15, 29, 40, 41; Pacific Pictures Request Nos. 24-25, 27-28; IP Worldwide Request No. 24, 25, 27—please let us know.  The "if any" language in your responses is not conclusive on this point.  Have you made your full production and do no such documents exist, or will you be producing more?

As noted in the proposed order, DC also seeks unredacted copies of all documents showing what interest, if any, Ari Emanuel holds in those rights.  We understand you refuse to produce such unredacted copies.  Is it your position that no part of the Ari Emanuel documents that you redacted, EN 00001-142, relates to Superman, the Shusters, or the Siegels?  A review of what Endeavor produced suggests that might not be the case.  *Cf.* EN 00142 (redacted page with words "Toberoff" and "Superman - may find problem now, but doesn't surface until after the term.").  We need your clear position on this and want to discuss the redactions on our call.

c.  Meetings with the Siegels or Shusters in 2001 and 2002.  Toberoff Request Nos. 27 and 28, Pacific Pictures Request No. 19, and IP Worldwide Request No. 18 seek documents related to the introduction of those defendants to the Siegels and Shusters.  Our July 7 letter made clear for each of these requests that DC seeks "phone records, calendar logs, [or]

**EXHIBIT F**
**154**

O'MELVENY & MYERS LLP
August 11, 2011 - Page 7

correspondence setting up meetings." July 7 Letter at 6-7, 16, 20. Defendants responded that they would produce all "non-privileged documents, if any," responsive to these requests, but produced no such documents. We find it difficult to believe that no phone or calendar records— physical or electronic—or correspondence exist setting up, confirming, or reflecting the dates on which these initial meetings between defendants occurred. *Cf.* July 22, 2011, Larson Dep. Tr. at 125-28, 131-39; June 29, 2011, Peary Dep. Tr. at 101-07. Is it defendants' position that no such documents exist? If it is, please let us know so clearly.

d. <u>Toberoff's marketing efforts.</u> Toberoff Request No. 15 seeks "All DOCUMENTS created during or since 1997 RELATING to the potential sale, assignment, license, or other disposition of any rights RELATING to SUPERMAN and/or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement." As noted in our August 3 letter, while the August 1 interrogatory responses of Mr. Toberoff's business entities make clear that they engaged in no efforts to market the purported rights of the Siegels or Shusters to third-party investors, it is unclear the extent to which Mr. Toberoff has otherwise engaged in such efforts. Your August 10 letter does not clarify whether Mr. Toberoff will respond to the DC's proposed interrogatories on this subject, which we enclosed with our August 3 letter. On July 15, Mr. Toberoff agreed to produce any responsive, non-privileged documents, but his July 18 production of one page included no new documents on this topic. If it is your contention that no such documents exist, please let us know so definitively.

e. <u>Corporate documents.</u> As our July 7 letter made clear, Toberoff Request Nos. 56(a)-(d), 57(a)-(d), and 58(a)-(d); Pacific Pictures Request Nos. 31 and 33; IP Worldwide Request Nos. 32, 33, and 34; and IPW Request Nos. 27 and 29 removed the "RELATING" language that defendants originally objected to as overbroad, replaced it with narrowed requests for documents "identifying" or "evidencing" relevant aspects of Mr. Toberoff's business entities, and clarified that DC does not seek "every transaction in which [defendants] ever engaged." *E.g.*, July 7 Letter at 13. Despite the clarification, defendants simply reiterated that Magistrate Zarefsky originally denied DC's motion as to these requests as "calling for everything there is about companies with which Mr. Toberoff has been associated." This response fails to engage on the current issues, as detailed by DC's exhaustive July 7 letter. If you are willing to stipulate that Mr. Toberoff is bound to his companies' actions as its alter-ego and agent, we can forego or limit these requests. Otherwise, DC is entitled to discovery related to veil-piercing factors such as commingling of funds and assets, adequate capitalization, disregard of corporate formalities, etc. *See Sonora Diamond.*, 83 Cal. App. 4th at 538-39. Do you refuse to produce such documents?

f. <u>Ari Emanuel documents.</u> Despite Mr. Toberoff's "long-standing relationship with Mr. Emanuel" referred to by Ms. Brill's February 2011 correspondence, defendants have not listed a single communication with Mr. Emanuel on their privilege logs on this case. As noted on page 28 of our July 7 letter, defendants have produced in this matter only *seven pages* of non-substantive e-mails between Mr. Toberoff and Mr. Emanuel, including *zero* from Mr. Emanuel himself. Is it really defendants' position that they possess, control, or have custody of *no* communications from Mr. Emanuel relating to Superman, Superboy, or the Siegel or Shuster heirs? If so, please let us know that is the case clearly.

O'MELVENY & MYERS LLP
August 11, 2011 - Page 8

  g. <u>Conflict disclosures and waivers.</u> Toberoff Request No. 30 seeks "All COMMUNICATIONS RELATING to any disclosure of a potential or actual conflict of interest by or to YOU, the SIEGEL HEIRS, or SHUSTER HEIRS," and Request No. 31 seeks any "waiver or acknowledgement" of the same. Mr. Toberoff stated he would produce "responsive, non-privileged documents, if any" pertaining to that request, but has produced no such documents, despite both Mr. Peary and Ms. Larson admitting to having signed such conflict waivers. June 29, 2011, Peary Dep. Tr. at 93:24-95:12; July 22, 2011, Larson Dep. Tr. at 31:10-36:22.

  During our meet and confer on July 20, we asked that you identify the privilege log entries that correspond to the conflict waiver that Mr. Peary signed in 2010, but you refused. At present, we have no way of knowing whether that document—or any of the conflict-related correspondence identified by Ms. Larson—is identified on defendants' privilege logs; there are well over 500 entries on Mr. Toberoff's log from 2010 alone, all identified simply as "E-mail," "Letter," or "Facsimile." Moreover, you have provided no case law or authority underlying your assertion that such a communication constitutes the provision of legal advice. Nor have you provided any response to DC's case law on this point. *E.g.*, *Maine Baptist Church v. Regions Bank*, 207 WL 1445257, at *2-3 (E.D. Mo. May 10, 2007) ("The production of conflict memoranda, new matter forms, and correspondence regarding conflicts is not protected by the attorney-client privilege or work product doctrine."). What is your position on these issues?

  h. <u>Documents obtained before meeting heirs.</u> Mr. Toberoff stated he would produce documents relating to the Siegels or Shusters obtained prior to his initial contact with them, but has produced none. *See* Toberoff Request Nos. 9(a-b). At his deposition he testified to reading "the Siegels' termination notice or a copy of one of their termination notices on the internet" and that news of their termination efforts "was all over the internet." Nov. 17, 2007 Toberoff Dep. Tr. at 85:16-86:12, 140:7-24. Such documents should be produced. If it is defendants' position that no such documents exist, please so advise us.

  i. <u>Valuations.</u> Defendants' July 15 responses agreed to produce "All DOCUMENTS created during or since 1995 RELATING to the valuation of any past, current, or potential ownership interest in SUPERMAN and/or SUPERBOY," "if any." Toberoff Request No. 18; Pacific Pictures Request No. 15; IP Worldwide Request No. 15. If no such documents exist or you are claiming privilege over any such documents, please state so clearly.

  j. <u>Communications with Kevin Marks.</u> Toberoff Request Nos. 42(a-b) and 44 seek documents relating to communications with Kevin Marks, and while Mr. Toberoff agreed to produce documents as to all three requests, no new documents were produced. July 15, 2011, Toberoff Responses at 19-21 ("Toberoff will produce the responsive, non-privileged documents, if any"). If none exist, please let us know.

  k. <u>Communications with Michael Siegel.</u> Toberoff Request Nos. 46 and 48 seek documents relating to communications with Michael Siegel and, again, Mr. Toberoff agreed to produce any such documents, but produced none. July 15, 2011, Toberoff Responses at 21-23

O'MELVENY & MYERS LLP

August 11, 2011 - Page 9

("Toberoff will produce the responsive, non-privileged documents, if any").  If none exist, please let us know.  If no such documents exist, please state so.

l.  <u>Communications with David Michaels.</u>  On April 4, DC moved to compel the production of defendants' communications with David Michaels.  Docket No. 205 at 13-16.  In opposing that motion, defendants argued:

> Michaels communicated with the Siegels in connection with his potential representation of them, and discussed their case, based on privileged and confidential information he obtained while working for Toberoff & Associates as their attorney.  It is well-established that "consulting" an attorney as to retention, if any, is considered to entail the provision of "legal advice" and is protected by the attorney-client privilege. *See Barton v. United States Dist. Court*, 410 F.3d 1104, 1108 (9th Cir. 2005) ("privilege applied to pre-employment communications with an attorney by a prospective client").  Thus, there is no basis to assert that Michaels' communications with the Siegels are not privileged, regardless of whether he was attempting to "steal" a client from Toberoff & Associates.

Docket No. 210 at 11-12.  While Magistrate Zarefsky denied that motion, Docket No. 262 at 4, on July 21, Ms. Larson produced documents related to her communications with Gerry Spence, another attorney she "consult[ed] … as to retention."  LSL 00452-481.  Defendants may not produce documents as to one potential new attorney while withholding documents as to another.  A privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.  He may elect to withhold or disclose, but after a certain point his election must remain final." *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).  Please confirm whether you will now produce the David Michaels letters.

If you decline to produce the documents discussed in paragraphs 3.a-l above, please let us know when we can meet and confer within the next 10 days regarding our motion to compel their production.  We also need to know in the next 10 days what you mean by the following statement for the following document responses:  defendants agree to produce "responsive, non-privileged documents, if any."[1]  As to each of the document requests listed above and in the margin below, it appears you produced no responsive documents to these requests.  Is your production fully complete as to these listed requests, or do documents exist that you have yet to produce?  We need clarity on this.

4.  We take it from your letter that you decline to produce copies of Ms. Peavy's will and the Superman script based on the prior discovery that DC served.  Is that your position?  If so, we need to include this issue in our Rule 37 discussion.

---

[1] Toberoff Request Nos. 9(a-b), 12-15, 18, 27-32, 40-41, 42(a-b), 44, 46, 48; Pacific Pictures Request Nos. 15, 19, 24, 27-28; IP Worldwide Request Nos. 15, 18, 24, 27.

O'Melveny & Myers llp
August 11, 2011 - Page 10

     5.  Finally, as we asked Mr. Toberoff when we met in New Mexico, please let us know if you can commit to a date certain in September—*i.e.*, no later than September 9—to complete your review of Ms. Larson's files and to update her privilege logs.  This date gives defendants more than a month to do this work.  Despite your claims to the contrary, important new documents were revealed at her deposition that heretofore had never been produced.  This includes the extension of the IP Worldwide agreement that defendants never before produced, July 22, 2011, Larson Dep. Tr. at 60:4-62:1, 64:3-23; IPWW 00006-7, and Ms. Larson's testimony about her correspondence with her brother, *e.g.*, July 22, 2011, Larson Dep. Tr. at 246-47, 299, 310-14, which you continue to refuse to produce or discuss with us.

     All of DC's rights are reserved.

                      Very truly yours,

                      /s/ Matthew T. Kline

                      Matthew T. Kline
                      of O'Melveny & Myers LLP

cc:    Daniel M. Petrocelli, Esq.
        Laura Brill, Esq.

**EXHIBIT F**
**158**

1  DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone: (845) 265-2820
10 Facsimile: (845) 265-2819

11 Attorneys for Plaintiff DC Comics

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14 DC COMICS,                          | Case No. CV 10-3633 ODW (RZx)

15              Plaintiff,              | **DISCOVERY MATTER**

16       v.                            | **[PROPOSED] ORDER GRANTING
                                          DC COMICS' MOTION TO
17 PACIFIC PICTURES                      COMPEL THE PRODUCTION OF
   CORPORATION, IP WORLDWIDE,            DOCUMENTS**
18 LLC, IPW, LLC, MARC TOBEROFF,
   an individual, MARK WARREN
19 PEARY, as personal representative of  | **Judge**:      Hon. Otis D. Wright II
   the ESTATE OF JOSEPH SHUSTER,         | **Magistrate**: Hon. Ralph Zarefsky
20 JEAN ADELE PEAVY, an individual,
   LAURA SIEGEL LARSON, an
21 individual and as personal            | **Hearing Date**:      Sept. 19, 2011
   representative of the ESTATE OF       | **Hearing Time**:      10:00 a.m.
22 JOANNE SIEGEL, and DOES 1-10,         | **Courtroom**:         540
   inclusive,                           | **Discovery Cutoff**:  None Set
23                                       | **Pretrial Conference**: None Set
              Defendants.               | **Trial**:             None Set
24

25

26

27

28

                                        [PROPOSED] ORDER GRANTING
                                        DC'S MOT. TO COMPEL

                    **EXHIBIT F**
                        **159**

1    For the reasons set forth in DC Comics' Motion To Compel The Production

2    Of Documents, and for good cause shown:

3    IT IS HEREBY ORDERED that defendants Marc Toberoff, Pacific Pictures

4    Corporation, IP Worldwide, LLC, and IPW, LLC, (the "Toberoff Defendants")

5    shall produce, by September 26, 2011:

6    (1) All drafts and/or correspondence related to negotiations of agreements

7    entered into by any of the Toberoff Defendants related to Superman and/or

8    Superboy, including those drafts described by Mark Warren Peary at deposition:

9    Q.  The [Pacific Pictures] agreement that you did sign
     which I'll show you in a bit, were there drafts of
10   that that went back and forth or -- as you recall or
     did you get a document, sign it and return it?
11   A.  There were drafts.  June 29, 2011 Peary Dep. 107:7-11.

12   (2)(a)  All "documents" (as that term is defined in DC's requests for

13   production) in which Pacific Pictures Corporation purports to transfer, assign, or

14   disclaim any rights related to Superman and/or Superboy, including as described in

15   the November 23, 2001, agreement between Pacific Pictures Corporation, Jean

16   Peavy, and Mark Warren Peary;

17   (b)  All "documents" (as that term is defined in DC's requests for production)

18   in which IP Worldwide, LLC purports to transfer, assign, or disclaim any rights

19   related to Superman and/or Superboy;

20   (c)  All "documents" (as that term is defined in DC's requests for production)

21   in which IPW, LLC purports to transfer, assign, or disclaim any rights related to

22   Superman and/or Superboy;

23   (d)  Unredacted copies of the agreements produced by the Endeavor talent

24   agency as EN 00001-7 and EN 00008-19;

25   (3)  All "documents" (as that term is defined in DC's requests for production

26   evidencing or showing on what dates in 2001 to 2002 any of Toberoff Defendants

27   or Ari Emanuel, on one hand, and Joanne Siegel, Laura Siegel Larson, Michael

28   Siegel, Jean Peavy, and/or Mark Warren Peary or their representatives, on the other

- 1 -

[PROPOSED] ORDER GRANTING
DC'S MOT. TO COMPEL

1   hand, had any meetings or discussions, whether in-person, telephonic, via written

2   communication or otherwise.  Such meetings include those described in Laura

3   Larson Siegel's July 22, 2011, deposition at pages 125-28, 131-39, and Mark

4   Warren Peary in his June 29, 2011, deposition at pages 101-07.  Such "documents"

5   would include physical or electronic calendar entries, call logs, billing records, e-

6   mails confirming meetings, and/or other such documents establishing when the

7   defendants met and spoke;

8       (4)  All "documents" (as that term is defined in DC's requests for production)

9   related to efforts by Marc Toberoff to market the purported rights of Joanne Siegel,

10  Laura Siegel Larson, Michael Siegel, Jean Peavy, and/or Mark Warren Peary;

11      (5)  All "documents" (as that term is defined in DC's requests for production)

12  identifying the past and present corporate structure and management of Pacific

13  Pictures Corporation, IP Worldwide, LLC, and IPW, LLC, including articles of

14  incorporation/organization, operating agreements, minutes, capital tables, filings,

15  business plans, as well as documents identifying Marc Toberoff's role and

16  ownership interest in those companies.  Such documents are relevant to DC's alter-

17  ego and agency claims, which defendants, dispute.  *See, e.g.*, *Associated Vendors,*

18  *Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838-40 (1962);

19      (6)  All "documents" (as that term is defined in DC's requests for production)

20  relating to communications between any of the defendants and Ariel Emanuel that

21  pertain in any way to Superman, Superboy, Joanne Siegel, Laura Siegel Larson,

22  Mark Warren Peary, and/or Jean Peavy;

23      (7)  All "communications" (as that term is defined in DC's requests for

24  production) among any of the defendants relating to the disclosure of any potential

25  or actual conflict of interest, or waiver or acknowledgement of the same, including

26  those referred to by Mr. Peary at pages 93:24-95:12 of his June 29 deposition, and

27  by Ms. Larson at her July 22 deposition, at pages 31:10-36:22;

28

- 2 -

[PROPOSED] ORDER GRANTING
DC'S MOT. TO COMPEL

1      (8)  All "documents" (as that term is defined in DC's requests for production)

2  related to Mark Warren Peary and/or Jean Peavy obtained by the Toberoff

3  Defendants prior to November 23, 2001;

4      (9)  All "documents" (as that term is defined in DC's requests for production)

5  related to Joanne Siegel and/or Laura Siegel Larson obtained by the Toberoff

6  Defendants prior to October 3, 2002;

7      (10)  All "documents" (as that term is defined in DC's requests for

8  production) created between 2000 and the present relating to the valuation of any

9  past, current, or potential ownership interest in Superman and/or Superboy;

10      (11)  All "documents" (as that term is defined in DC's requests for

11  production) relating to communications with Kevin Marks relating to Joanne

12  Siegel, Laura Siegel Larson, Mark Warren Peary, and/or Jean Peavy, including

13  documents related to the letter from Mr. Marks to Ms. Siegel and/or Ms. Larson

14  described at Docket No. 49, Ex. A at 63, and identified by Ms. Larson at her

15  deposition, Transcript 144:6-146:7;

16      (12)  All "documents" (as that term is defined in DC's requests for

17  production) relating to communications between David Michaels and any of the

18  defendants, including but not limited to those listed at entries 1063-72, 3476-77 of

19  the Toberoff privilege log.

20      IT IS SO ORDERED.

21

22  Dated:                              _____

23                                      Honorable Ralph Zarefsky
                                        Magistrate Judge, United States District Court

24

25

26

27

28

- 3 -

[PROPOSED] ORDER GRANTING
DC'S MOT. TO COMPEL

**EXHIBIT F**

**162**

# EXHIBIT G

**Attachments:**          8.11.11 Letter.pdf

---

**From:** Hayden, Aaron
**Sent:** Thursday, August 25, 2011 6:02 PM
**To:** 'mtoberoff@ipwla.com'; 'Keith Adams'; 'nwilliamson@ipwla.com'; 'rkendall@kbkfirm.com'; 'lbrill@kbkfirm.com'; 'ndaum@kbkfirm.com'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra
**Subject:** DC v. Pacific Pictures

Counsel, please see the email below sent on behalf of Matt Kline.

*          *          *

Counsel:

On August 11, we sent the attached letter requesting, *inter alia*, a Rule 37 conference on DC's requests for production directed to the Toberoff defendants.  On page 6, we noted that each issue had been previously raised "in our June 1 and July 7 correspondence, but we can discuss those issues on a Rule 37 call, within the next 10 days" and reiterated, on page 9, our request to "meet and confer within the next 10 days regarding our motion to compel."  In the fourteen days since we requested a meeting, you have neither responded in writing or agreed to a date or time to meet, as required by Local Rule 37-1.

We are willing to attempt one final time to confer on these issues.  Please let us know a time tomorrow or Monday when you are available.  DC reserves all rights.

Very truly yours,

Matt Kline

**EXHIBIT G**
**163**

# EXHIBIT H

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 30, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

       Re:   *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

       We write in response to last night's filing of the Toberoff Defendants' Reply
Memorandum In Support Of Motion To Strike Plaintiff's State Law Causes Of Action Pursuant
To California's Anti-SLAPP Law. Attached as Exhibit D to Mr. Toberoff's declaration in
support of defendants' reply is a letter agreement between defendants Mark Warren Peary, Jean
Adele Peavy, and Mr. Toberoff dated August 2, 2011. Docket No. 314-2 at 118-19. Prior to
yesterday, defendants had neither produced nor logged the August 2 letter, despite it being
clearly responsive to DC Comics' document requests.[1] Defendants' withholding of the August 2
letter—and any other similar documents that may exist—is totally improper and violates
defendants' discovery obligations. Defendants are not allowed to selectively disclose documents
and waive privileges when they believe it is to their benefit.

---

       [1] *E.g.*, Peary Request No. 1 ("All agreements between or among YOU and any DEFENDANTS regarding the
SHUSTER HEIRS' purported rights in Superman and/or SUPERBOY."); Peary Request No. 6 ("All DOCUMENTS
relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY.");
Toberoff Request No. 2 ("All agreements between or among YOU and any DEFENDANT RELATING to the
SHUSTER HEIRS' purported rights in SUPERMAN and/or SUPERBOY."); Toberoff Request No. 3 ("All
agreements between or among YOU and any DEFENDANT."); Toberoff Request No. 10 ("All DOCUMENTS
RELATING to your past, current, or potential ownership interest in any rights in SUPERMAN and/or
SUPERBOY."); Toberoff Request No. 13 ("All DOCUMENTS RELATING to or affecting the disposition,
division, or ownership of any rights in SUPERMAN and/or SUPERBOY.").

O'MELVENY & MYERS LLP
August 30, 2011 - Page 2

First, the August 2 letter indicates that it was delivered to Mr. Peary and Ms. Peavy "Via E-Mail." Defendants have never produced or logged the cover email attaching the document. DC requests that defendants produce or log the cover email by no later than Friday, September 2, 2011. If defendants refuse to do so, we request a conference to discuss this issue pursuant to Local Rule 37. Please provide us with a date this week when you are available to meet and confer.

Second, there is absolutely no basis for defendants' secretion of this document. Defendants do not claim the document is privileged or dispute that it is responsive to DC's document requests. On December 7, 2010, the Court entered a stipulated order compelling defendants to produce or list on a privilege log all responsive documents. Docket No. 133 at 1. Defendants are obligated to supplement their prior discovery responses on an ongoing basis where documents come into their possession after an earlier response. *See* FED. R. CIV. P. 26(e)(1); *U.S. v. Boyce*, 148 F. Supp. 1069, 1088 (S.D. Cal. 2001); WILLIAM W. SCHWARZER ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL §§ 11:1241-11:1262 (2011). DC requests that defendants supplement their document production or confirm that all responsive documents have been produced or logged.

Very truly yours,

Jason H. Tokoro
for O'MELVENY & MYERS LLP

cc:     Daniel M. Petrocelli, Esq.
        Matthew T. Kline, Esq.

**EXHIBIT H**
**165**

# EXHIBIT I



## O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1999 Avenue of the Stars, 7th Floor | SAN FRANCISCO |
| BRUSSELS | Los Angeles, California 90067-6035 | SHANGHAI |
| HONG KONG | | SILICON VALLEY |
| LONDON | TELEPHONE (310) 553-6700 | SINGAPORE |
| LOS ANGELES | FACSIMILE (310) 246-6779 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |
| NEW YORK | | |

September 2, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

> Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write in response to your September 1, 2011, letter addressing the deficiencies in defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC's discovery responses and document production.

First, we believe your positions on the completeness of defendants' document production are untenable and reserve all rights to move to compel further production. We have fully completed our Rule 37 discussions on these issues and in, fact, you declined our several invitations to speak on these issues. Your letter does notably fail to close the loop on one issue: the corporate documents of defendants Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC addressed in Toberoff Request Nos. 56-58; PPC Requests 29-31, 33; IP Worldwide Request Nos. 29-30, 32-34; and IPW Request Nos. 24-27, 29 which were discussed in our letters of June 1, 2011, at pages 6-7, 9-10, and 11-12, and of July 7, 2011, at pages 13-14, 18-19, 22-24, and 24-26. Please provide us with times next week on September 6, 7, 8, or 9, when you can to discuss this issue. You have ignored our previous invitations of August 11 and August 25 to discuss these issues before.

Second, you state that you are "currently reviewing the Renner Otto electronic archive," which you claim was "only recently" received. You did not provide us a date certain when you will complete your review and produce or log the documents contained therein. Nor have you provide us with a date certain when you will complete your review and produce or log Renner Otto's expert report and its calendar and billing entries regarding Michael Siegel's representation. It has been 45 days since DC requested those records during Mr. Bulson's July 19 deposition.

**EXHIBIT I**
**166**

O'MELVENY & MYERS LLP
September 2, 2011 - Page 2

    Third, you still have not provided us a date certain when defendant Laura Siegel Larson will complete her review of the "boxes" of documents in her possession that have never been reviewed, and produce or log responsive documents.  Ms. Larson described these "boxes" of documents during her July 22 deposition—over 40 days ago—yet defendants continue to avoid addressing this failure to meet their discovery obligations.  Please confirm that Ms. Larson will complete her review no later than Friday, September 9.

    Fourth, you have not responded to my letter of August 30 addressing the letter agreement between defendants Mark Warren Peary, Jean Adele Peavy, and Mr. Toberoff dated August 2, 2011.  You produced the August 2 letter—Bates stamped MWP 00058-59—but did produce or log the cover email to Mr. Peary and Ms. Peavy.  Nor did you address the issue of defendants' supplementing their document production or confirming that all responsive documents have been logged or produced.  We will address these issues during the requested meet-and-confer discussed above.

    DC Comics reserves all rights.

Very truly yours,

Jason H. Tokoro
for O'MELVENY & MYERS LLP

cc:   Daniel M. Petrocelli, Esq.
      Richard Kendall, Esq.
      Gerald Berk, Esq.
      Josh Ryland, Esq.

EXHIBIT I
167

# EXHIBIT J

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 6, 2011

<u>Via E-Mail</u>

Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Jason:

I write in response to your August 30, 2011 letter, regarding the August 2, 2011 letter between Pacific Pictures Corporation, Mark Warren Peary and Jean Adele Peavy.  DC's hyperbole on this issue – that defendants have "withheld" or "secreted" the August 2 letter – is absurd.  DC received the letter on August 29, 2011, three weeks after it was executed, and it was formally produced to DC on September 1, 2011.  F.R.C.P. 26(e)(1) requires that parties supplement their production "in a timely manner" – not the instant a document is created.  DC's demand that documents be produced immediately is especially absurd in light of DC's own practices in *Siegel*, where DC only supplemented documents on a delayed, drawn out schedule.

DC's further exaggerated comment that "Defendants are not allowed to selectively disclose documents and waive privileges" is a *non sequitur*.  As DC acknowledges, Defendants do not claim privilege as to the August 2, 2011 letter.

As to DC's objection that defendants have not produced or logged the cover e-mail to Mr. Peary attaching the August 2 letter, defendants anticipate that they will update their privilege logs this month and will log the "cover" e-mail at that time, rather than on a piecemeal basis as DC suggests.

Very truly yours,

Keith Adams

# EXHIBIT K

1  Marc Toberoff (CA State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Keith G. Adams (CA State Bar No. 240497)
     *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
4  Los Angeles, CA 90067
   Telephone: (310) 246-3333
5  Facsimile: (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy
   and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
   Joanne Siegel

9

10                   **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12  DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

13              Plaintiff,              Hon. Otis D. Wright II, U.S.D.J.
         vs.
14                                      **DEFENDANT JEAN ADELE
                                        PEAVY'S RESPONSE AND
15  PACIFIC PICTURES CORPORATION;       OBJECTIONS TO PLAINTIFF
    IP WORLDWIDE, LLC; IPW, LLC;        DC COMICS' SECOND SET OF
16  MARC TOBEROFF, an individual;       REQUESTS FOR PRODUCTION
                                        OF DOCUMENTS**
    MARK WARREN PEARY, as personal
17  representative of the ESTATE OF     Complaint Filed: May 14, 2010
                                        Trial Date: None Set
18  JOSEPH SHUSTER; JEAN ADELE
    PEAVY, an individual; LAURA
19  SIEGEL LARSON, individually and as
20  personal representative of the ESTATE
    OF JOANNE SIEGEL, and DOES 1-10,
21  inclusive,

22              Defendants.
23

24

25

26

27

28

                DEFENDANT JEAN ADELE PEAVY'S RESPONSE AND OBJECTIONS
                TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

                              **EXHIBIT K**
                                **169**

1  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2      Defendant Jean Adele Peavy ("Peavy"), pursuant to the provisions of Rule

3  34(b)(2) of the Federal Rules of Civil Procedure, makes the following objections to

4  Plaintiff DC Comics' Second Set of Requests for Production ("Request") that was

5  served on August 4, 2011 by plaintiff DC Comics ("Plaintiff" or "DC"):

6                                    I.

7              **OBJECTIONS TO THE ENTIRE REQUEST**

8      Peavy objects to the entire Request on each of the following grounds and

9  incorporates by reference each of the following objections into her response to each

10  individual request for documents within it:

11      1.    Peavy objects to each individual request within the Request to the extent

12  it is relevant only to the Fourth through Sixth state law claims for relief in DC's First

13  Amended Complaint ("FAC").  Defendants contend that their pending anti-SLAPP

14  motion stays discovery regarding these state law claims, as well as the related Third

15  Claim for Relief.  *See* Cal. Code Civ. Proc. § 425.16(g); *Shady Grove Orthopedic*

16  *Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1452 (2010) (Stevens, J.,

17  concurring); *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003); *Godin v. Schencks*,

18  2010 U.S. App. LEXIS 25980 (1st Cir. Dec. 22, 2010).

19      2.    To the extent the Request and each document request therein seeks

20  documents concerning an agreement between the Shusters and Siegels to act

21  collectively in negotiations with DC regarding the settlement of their termination

22  claims ("Collective Bargaining"), Peavy objects on the following grounds:  the

23  privilege on such agreement was upheld by the Court's April 11, 2011 order.

24  Furthermore, any documents that exist relating to Collective Bargaining contain and

25  memorialize attorney-client privileged communications and attorney work product

26  and reveal sensitive settlement strategy that would give DC an unfair advantage.

27  Moreover, any Collective Bargaining documents were prepared in connection with

28  settlement mediation in the closely related cases *Joanne Siegel, et al. v. Warner Bros.*

**EXHIBIT K**
**170**

1  *Entertainment Inc., et al.*, Case No. 04-CV-8400 ODW (RZx) and *Joanne Siegel, et*
2  *al. v. Time Warner Inc., et al.,* Case No. 04-CV-8766 ODW (RZx) (collectively
3  "*Siegel* Litigation") and the use of such information plainly violates the parties' May
4  1, 2008 JAMS Confidentiality Agreement.

5       3.     Peavy objects to the Request and each document request therein to the
6  extent that it seeks the production of any item, or portion thereof, that has already
7  been the subject of motion practice in this case or the *Siegel* Litigation, and
8  specifically to the extent that the Request seeks discovery barred by the Court's April
9  11, 2011, May 25, 2011 and/or June 20, 2011 orders.

10       4.     Peavy objects to the Request and each document request therein to the
11  extent that it seeks the production of any item, or portion thereof, comprising or
12  reflecting information transmitted and maintained in confidence between Peavy or
13  any person or entity acting on her behalf and her counsel for the purpose of obtaining
14  legal advice or representation, on the grounds that such information is protected from
15  disclosure by the attorney-client privilege and the joint-interest privilege. Such
16  documents will not be produced in response to the request, and any inadvertent
17  production thereof shall not be deemed a waiver of any privilege or doctrine with
18  respect to such documents. With respect to such documents, Peavy hereby
19  incorporates by reference the privilege logs served by the Defendants in this action
20  on December 15, 2010, and any logs served by Defendants thereafter.

21       5.     Peavy objects to the Request and each document request therein to the
22  extent that it seeks the production of any item, or portion thereof, comprising or
23  reflecting information with any confidential impression, conclusion, opinion, legal
24  research, or legal theory of counsel for Peavy or any other person or entity, on the
25  grounds that such information is protected from disclosure by the attorney work
26  product doctrine. Such documents will not be produced in response to the request,
27  and any inadvertent production thereof shall not be deemed a waiver of any privilege
28  or doctrine with respect to such documents. With respect to such documents, Peavy

hereby incorporates by reference the privilege logs served by the Defendants in this action on December 15, 2010.

6.    Peavy objects to the Request and each document request therein to the extent that it seeks the production of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, on the grounds that it exceeds the permissible scope of discovery delimited by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

7.    Peavy objects to the Request and each document request therein to the extent that it seeks the production of any item, or portion thereof, comprising or reflecting any trade secret or other confidential or proprietary information of Peavy or any other entity or person.

8.    Peavy objects to the Request and each document request therein to the extent that it seeks the production of any item, or portion thereof, which is protected from disclosure by court order, or any privacy or similar rights of any person or entity.

9.    Peavy objects to the Request and each document request therein to the extent that it is unduly burdensome, overly broad, imposes extreme hardship, is oppressive and harassing, or would result in the expenditure of unnecessary time and resources.

10.    Peavy objects to the Request and each document request therein to the extent that the expense of producing documents outweighs the likely benefit of discovery provided to Plaintiff.

11.    Peavy objects to the Request and each document request therein to the extent that it seeks the production of duplicative identical items, or documents or information already in Plaintiff's possession, or by reason of public filing, publication or otherwise are readily accessible to Plaintiff through other means.

12.    Peavy objects to the Request and each document request therein to the extent that it seeks the production of any item which has been served, filed, or

**EXHIBIT K**
**172**

1    transmitted in the course of this action, on the grounds that such production would be

2    burdensome, oppressive, and unnecessary.

3        13.    Peavy objects to the Request and each document request therein to the

4    extent that it seeks the production of any item which has already been produced,

5    served, or filed in the course of the related actions *Joanne Siegel, et al. v. Warner*

6    *Bros. Entertainment Inc., et al.*, Case No. 04-CV-8400 ODW (RZx) and *Joanne*

7    *Siegel, et al. v. Time Warner Inc., et al.,* Case No. 04-CV-8766 ODW (RZx)

8    (collectively "*Siegel* Litigation"), on the grounds that such production would be

9    duplicative, burdensome, oppressive, and unnecessary.

10       14.    In making any document production, Peavy will reference by their Bates

11   numbers documents already produced to DC in the *Siegel* Litigation, rather than re-

12   copy and reproduce such documents. Peavy will not produce or designate by Bates

13   numbers documents Peavy obtained solely as a result of a document production by

14   the other side in the *Siegel* Litigation.

15       15.    Consistent with the agreement governing privilege logs negotiated by

16   the parties concerning Plaintiff and other defendants, Peavy will not log privileged

17   communications or attorney work-product documents in either this case or the *Siegel*

18   Litigations, that (a) are internal communications by defendants' counsel at the law

19   firms of Toberoff & Associates, P.C. and Kendall Brill & Klieger, L.L.P., or (b)

20   between  Toberoff & Associates P.C and defendants' counsel at the law firm of

21   Kendall, Brill & Klieger LLP.   Logging such documents would constitute an

22   extraordinary interference by DC in the affairs of its opposing counsel in both this

23   action and the ongoing *Siegel* litigation.

24       16.    Peavy objects to the Request and each document request therein to the

25   extent that it seeks the production of any item or document that is not the property of

26   Peavy.  Peavy will not produce any items or documents that are the property of any

27   other person or entity.

28       17.    Peavy objects to the Request and each document request therein and to

4
DEFENDANT JEAN ADELE PEAVY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT K**
**173**

1  the definitions and instructions therein to the extent that they purport to alter or

2  extend Peavy's obligations beyond those established by the Federal Rules of Civil

3  Procedure, the Local Rules of the United States District Court for the Central District

4  of California, or any order or ruling by the Court in this action.

5       18.    Peavy objects generally to the definitions of the terms "YOU" and

6  "YOUR" as vague and ambiguous, overbroad and unduly burdensome, especially

7  with respect to the definition's reference to "attorneys". Peavy will construe these

8  terms to refer to Peavy.

9       19.    Peavy objects generally to the definitions of the terms "DEFENDANT"

10 and "DEFENDANTS" as vague and ambiguous, overbroad and unduly burdensome,

11 especially with respect to the definition's reference to "attorneys". Peavy will

12 construe these terms to refer only to the specific defendants in this action.

13      20.    Peavy objects generally to the definition of the term "SHUSTER

14 HEIRS" as vague and ambiguous, overbroad and unduly burdensome, especially with

15 respect to the definition's reference to "attorneys". Solely for the purposes of these

16 responses, and for no other purpose, Peavy will construe this term to refer only to the

17 Estate of Joseph Shuster, Jean Peavy, Mark Peary, Dawn Peavy and Frank Shuster.

18      21.    Peavy objects generally to the definition of the term "SIEGEL HEIRS"

19 as vague and ambiguous, overbroad and unduly burdensome, especially with respect

20 to the definition's reference to "attorneys". Solely for the purposes of these

21 responses, and for no other purpose, Peavy will construe this term to refer only to

22 Joanne Siegel and Laura Siegel Larson.

23      22.    Peavy reserves the right to revise, amend, supplement or clarify any of

24 the objections set forth herein.

25

26

27

28

**EXHIBIT K**
**174**

## II.

## DOCUMENTS TO BE PRODUCED

## SPECIFIC RESPONSES TO INDIVIDUAL REQUESTS

**Document Request No. 23**

The PEAVY WILL, including any and all drafts and prior versions of the PEAVY WILL.

**Response to Document Request No. 23**

Peavy objects to this request on the grounds that it is compound, overbroad, burdensome and oppressive.  Peavy further objects to this request on the grounds that it is vague and ambiguous, and lacks sufficient precision to allow her to formulate an appropriate response.  Peavy additionally objects to this request on the grounds that it is indefinite as to time, not reasonably limited in scope, and to the extent that it seeks the production of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Peavy also objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the joint-interest privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Peavy will produce the responsive, non-privileged documents, if any, consistent with her understanding of this request.

**Document Request No. 24**

All DOCUMENTS RELATING to the PEAVY WILL.

**Response to Document Request No. 24**

Peavy objects to this request to the extent it seeks any privileged documents concerning any collective bargaining of any settlement by the Shusters and Siegels and because Plaintiff's use of such information violates the parties' May 1, 2008 JAMS Confidentiality Agreement, and because the Court's April 11, 2011 order upheld that collective bargaining agreement as privileged.  Peavy also objects to this

DEFENDANT JEAN ADELE PEAVY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT K**
**175**

1  request on the grounds that it is compound, overbroad, burdensome and oppressive,

2  as it could be reasonably construed to request all documents related to this litigation,

3  the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.* litigations,

4  documents created and/or produced by Plaintiff and all documents relating to the

5  exploitation of Superman and/or Superboy over the past 80 years.  Peavy further

6  objects to this request on the grounds that it is vague and ambiguous, and lacks

7  sufficient precision to allow her to formulate an appropriate response.  Peavy

8  additionally objects to this request on the grounds that it is indefinite as to time, not

9  reasonably limited in scope, and to the extent that it seeks the production of any item,

10  or portion thereof, which is not reasonably calculated to lead to the discovery of

11  relevant and admissible evidence.  Peavy also objects to this request to the extent that

12  it seeks communications or items protected by the attorney-client privilege, the joint-

13  interest privilege, the attorney work product doctrine and any other privilege or

14  immunity available under law or arising from contractual obligation.  Subject to and

15  without waiving the foregoing general and specific objections, Peavy will produce

16  the responsive, non-privileged documents, if any, consistent with her understanding

17  of this request.

18  **Document Request No. 25**

19      All DOCUMENTS RELATING to the PEAVY TRUST.

20  **Response to Document Request No. 25**

21      Peavy objects to this request to the extent it seeks any privileged documents

22  concerning any collective bargaining of any settlement by the Shusters and Siegels

23  and because Plaintiff's use of such information violates the parties' May 1, 2008

24  JAMS Confidentiality Agreement, and because the Court's April 11, 2011 order

25  upheld that collective bargaining agreement as privileged.  Peavy also objects to this

26  request on the grounds that it is vague and ambiguous, and lacks sufficient precision

27  to allow her to formulate an appropriate response.  Peavy further objects to this

28  request on the grounds that it is compound, overbroad, burdensome and oppressive,

**EXHIBIT K**
**176**

1  as it could be reasonably construed to request all documents related to this litigation,

2  the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.* litigations,

3  documents created and/or produced by Plaintiff and all documents relating to the

4  exploitation of Superman and/or Superboy over the past 80 years.  Peavy additionally

5  objects to this request on the grounds that it is indefinite as to time, not reasonably

6  limited in scope, and to the extent that it seeks the production of any item, or portion

7  thereof, which is not reasonably calculated to lead to the discovery of relevant and

8  admissible evidence.  Peavy further objects to this request to the extent that it seeks

9  communications or items protected by the attorney-client privilege, the joint-interest

10  privilege, the attorney work product doctrine and any other privilege or immunity

11  available under law or arising from contractual obligation.  Subject to and without

12  waiving the foregoing general and specific objections, Peavy will produce the

13  responsive, non-privileged documents, if any, consistent with her understanding of

14  this request.

15  **Document Request No. 26**

16       All COMMUNICATIONS with Michael Catron.

17  **Response to Document Request No. 26**

18       Peavy objects to this request on the grounds that it is vague and ambiguous,

19  and lacks sufficient precision to allow her to formulate an appropriate response.

20  Peavy also objects to this request on the grounds that it is compound, overbroad,

21  burdensome and oppressive, as it seeks all communications with Michael Catron

22  regardless whether the communications are related to the litigation at issue or are

23  likely to lead to the discovery of admissible evidence.  Peavy further objects to this

24  request on the grounds that it is indefinite as to time, not reasonably limited in scope,

25  and to the extent that it seeks the production of any item, or portion thereof, which is

26  not reasonably calculated to lead to the discovery of relevant and admissible

27  evidence.  Peavy additionally objects to this request to the extent that it seeks

28  communications or items protected by the attorney-client privilege, the joint-interest

1 privilege, the attorney work product doctrine and any other privilege or immunity

2 available under law or arising from contractual obligation.  Subject to and without

3 waiving the foregoing general and specific objections, Defendants will meet-and-

4 confer with Plaintiff regarding narrowing the scope of this request.

5 **Document Request No. 27**

6      All COMMUNICATIONS with David Sims.

7 **Response to Document Request No. 27**

8      Peavy objects to this request on the grounds that it is vague and ambiguous,

9 and lacks sufficient precision to allow her to formulate an appropriate response.

10 Peavy further objects to this request on the grounds that it is compound, overbroad,

11 burdensome and oppressive, as it seeks all communications with David Sims

12 regardless whether the communications are related to the litigation at issue or are

13 likely to lead to the discovery of admissible evidence.  Peavy further objects to this

14 request on the grounds that it is indefinite as to time, not reasonably limited in scope,

15 and to the extent that it seeks the production of any item, or portion thereof, which is

16 not reasonably calculated to lead to the discovery of relevant and admissible

17 evidence.  Peavy further objects to this request to the extent that it seeks

18 communications or items protected by the attorney-client privilege, the joint-interest

19 privilege, the attorney work product doctrine and any other privilege or immunity

20 available under law or arising from contractual obligation.  Subject to and without

21 waiving the foregoing general and specific objections, Defendants will meet-and-

22 confer with Plaintiff regarding narrowing the scope of this request.

23 **Document Request No. 28**

24      All COMMUNICATIONS with Ilya Salkind.

25 **Response to Document Request No. 28**

26      Peavy objects to this request on the grounds that it is vague and ambiguous,

27 and lacks sufficient precision to allow her to formulate an appropriate response.

28 Peavy further objects to this request on the grounds that it is compound, overbroad,

1  burdensome and oppressive as it seeks all communications with Ilya Salkind

2  regardless whether the communications are related to the litigation at issue or are

3  likely to lead to the discovery of admissible evidence. Peavy further objects to this

4  request on the grounds that it is indefinite as to time, not reasonably limited in scope,

5  and to the extent that it seeks the production of any item, or portion thereof, which is

6  not reasonably calculated to lead to the discovery of relevant and admissible

7  evidence. Peavy further objects to this request to the extent that it seeks

8  communications or items protected by the attorney-client privilege, the joint-interest

9  privilege, the attorney work product doctrine and any other privilege or immunity

10  available under law or arising from contractual obligation. Subject to and without

11  waiving the foregoing general and specific objections, Defendants will meet-and-

12  confer with Plaintiff regarding narrowing the scope of this request.

13  **Document Request No. 29**

14      The 1997 PEARY SCREENPLAY, including any and all drafts and prior

15  versions of the 1997 PEARY SCREENPLAY.

16  **Response to Document Request No. 29**

17      Peavy objects to this request on the grounds that it is vague and ambiguous,

18  and lacks sufficient precision to allow her to formulate an appropriate response.

19  Peavy also objects to this request on the grounds that it is compound, overbroad,

20  burdensome and oppressive. Peavy further objects to this request on the grounds that

21  it is indefinite as to time, not reasonably limited in scope, and to the extent that it

22  seeks the production of any item, or portion thereof, which is not reasonably

23  calculated to lead to the discovery of relevant and admissible evidence. Peavy

24  additionally objects on the grounds that it seeks the production of documents that are

25  not in her possession, custody or control. Peavy further objects to this request to the

26  extent that it seeks communications or items protected by the attorney-client

27  privilege, the joint-interest privilege, the attorney work product doctrine and any

28  other privilege or immunity available under law or arising from contractual

**EXHIBIT K**
**179**

1   obligation.

2   **Document Request No. 30**

3       All DOCUMENTS RELATING to the 1997 PEARY SCREENPLAY.

4   **Response to Document Request No. 30**

5       Peavy objects to this request on the grounds that it is vague and ambiguous,

6   and lacks sufficient precision to allow her to formulate an appropriate response.

7   Peavy also objects to this request on the grounds that it is compound, overbroad,

8   burdensome and oppressive.  Peavy further objects to this request on the grounds that

9   it is indefinite as to time, not reasonably limited in scope, and to the extent that it

10  seeks the production of any item, or portion thereof, which is not reasonably

11  calculated to lead to the discovery of relevant and admissible evidence.  Peavy

12  additionally objects on the grounds that it seeks the production of documents that are

13  not in her possession, custody or control.  Peavy further objects to this request to the

14  extent that it seeks communications or items protected by the attorney-client

15  privilege, the joint-interest privilege, the attorney work product doctrine and any

16  other privilege or immunity available under law or arising from contractual

17  obligation.

18  **Document Request No. 31**

19      The 2006 PEARY SCREENPLAY, including any and all drafts and prior

20  versions of the 2006 PEARY SCREENPLAY.

21  **Response to Document Request No. 31**

22      Peavy objects to this request on the grounds that it is vague and ambiguous,

23  and lacks sufficient precision to allow her to formulate an appropriate response.

24  Peavy also objects to this request on the grounds that it is compound, overbroad,

25  burdensome and oppressive.  Peavy further objects to this request on the grounds that

26  it is indefinite as to time, not reasonably limited in scope, and to the extent that it

27  seeks the production of any item, or portion thereof, which is not reasonably

28  calculated to lead to the discovery of relevant and admissible evidence.  Peavy

**EXHIBIT K**
**180**

1  additionally objects on the grounds that it seeks the production of documents that are

2  not in her possession, custody or control.  Peavy further objects to this request to the

3  extent that it seeks communications or items protected by the attorney-client

4  privilege, the joint-interest privilege, the attorney work product doctrine and any

5  other privilege or immunity available under law or arising from contractual

6  obligation.

7  **Document Request No. 32**

8      All DOCUMENTS RELATING to the 2006 PEARY SCREENPLAY.

9  **Response to Document Request No. 32**

10     Peavy objects to this request on the grounds that it is vague and ambiguous,

11  and lacks sufficient precision to allow her to formulate an appropriate response.

12  Peavy also objects to this request on the grounds that it is compound, overbroad,

13  burdensome and oppressive.  Peavy further objects to this request on the grounds that

14  it is indefinite as to time, not reasonably limited in scope, and to the extent that it

15  seeks the production of any item, or portion thereof, which is not reasonably

16  calculated to lead to the discovery of relevant and admissible evidence.  Peavy

17  additionally objects on the grounds that it seeks the production of documents that are

18  not in her possession, custody or control.  Peavy further objects to this request to the

19  extent that it seeks communications or items protected by the attorney-client

20  privilege, the joint-interest privilege, the attorney work product doctrine and any

21  other privilege or immunity available under law or arising from contractual

22  obligation.

23  **Document Request No. 33**

24     The WORKING SCREENPLAY DRAFT, including any and all drafts and

25  prior versions of the WORKING SCREENPLAY DRAFT.

26  **Response to Document Request No. 33**

27     Peavy objects to this request on the grounds that it is vague and ambiguous,

28  and lacks sufficient precision to allow her to formulate an appropriate response.

1   Peavy also objects to this request on the grounds that it is compound, overbroad,

2   burdensome and oppressive.  Peavy further objects to this request on the grounds that

3   it is indefinite as to time, not reasonably limited in scope, and to the extent that it

4   seeks the production of any item, or portion thereof, which is not reasonably

5   calculated to lead to the discovery of relevant and admissible evidence.  Peavy

6   additionally objects on the grounds that it seeks the production of documents that are

7   not in her possession, custody or control.  Peavy further objects to this request to the

8   extent that it seeks communications or items protected by the attorney-client

9   privilege, the joint-interest privilege, the attorney work product doctrine and any

10  other privilege or immunity available under law or arising from contractual

11  obligation.

12  **Document Request No. 34**

13          Any and all drafts, outlines, or notes RELATING to any script, screenplay, or

14  story regarding SUPERMAN, SUPERBOY, the SHUSTER HEIRS, the SIEGEL

15  HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

16  **Response to Document Request No. 34**

17          Peavy objects to this request on the grounds that it is vague and ambiguous,

18  and lacks sufficient precision to allow her to formulate an appropriate response.

19  Peavy also objects to this request on the grounds that it is compound, duplicative,

20  overbroad, burdensome and oppressive.  Peavy further objects to this request on the

21  grounds that it is indefinite as to time and not reasonably limited in scope.  Peavy

22  additionally objects on the grounds that it seeks the production of documents that are

23  not in her possession, custody or control.  Peavy further objects to this request to the

24  extent that it seeks communications or items protected by the attorney-client

25  privilege, the joint-interest privilege, the attorney work product doctrine and any

26  other privilege or immunity available under law or arising from contractual

27  obligation.

28  **Document Request No. 35**

13
DEFENDANT JEAN ADELE PEAVY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

1    The JOSEPH SHUSTER FILE.

2    **Response to Document Request No. 35**

3    Peavy objects to this request on the grounds that "JOSEPH SHUSTER FILE"

4    as defined by Plaintiff is vague and ambiguous, and lacks sufficient precision to

5    allow her to formulate an appropriate response.  Peavy also objects to this request on

6    the grounds that it is compound, duplicative, overbroad, burdensome and oppressive,

7    as it could reasonably be construed to request all documents related to this litigation,

8    the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.* litigations,

9    documents created by Plaintiff, and all documents relating to the exploitation of

10   Superman and/or Superboy over the past 80 years.  Peavy further objects to this

11   request on the grounds that it is indefinite as to time and not reasonably limited in

12   scope.  Peavy additionally objects on the grounds that it seeks the production of

13   documents that are not in her possession, custody or control.  Peavy further objects to

14   this request to the extent that it seeks communications or items protected by the

15   attorney-client privilege, the joint-interest privilege, the attorney work product

16   doctrine and any other privilege or immunity available under law or arising from

17   contractual obligation.  Subject to and without waiving the foregoing general and

18   specific objections, Peavy will produce the responsive, non-privileged documents, if

19   any, consistent with her understanding of this request.

20   **Document Request No. 36**

21   All VIDEO FOOTAGE depicting YOU or any other SHUSTER HEIR

22   RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster,

23   Jerome Siegel, WARNER, or DC, including without limitation all VIDEO

24   FOOTAGE of YOUR interview on the Canadian Broadcasting Corporation on or

25   around April 30, 2005, and all VIDEO FOOTAGE of a panel discussion YOU

26   participated in at a Comic-Con event in or around 1998.

27   **Response to Document Request No. 36**

28   Peavy objects to this request on the grounds that it is vague and ambiguous,

14
DEFENDANT JEAN ADELE PEAVY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

1  and lacks sufficient precision to allow her to formulate an appropriate response.

2  Peavy also objects to this request on the grounds that it is compound, duplicative,

3  overbroad, burdensome and oppressive.  Peavy further objects to this request on the

4  grounds that it is indefinite as to time and not reasonably limited in scope.  Peavy

5  additionally objects on the grounds that it seeks the production of documents that are

6  not in her possession, custody or control.  Peavy further objects to this request to the

7  extent that it seeks communications or items protected by the attorney-client

8  privilege, the joint-interest privilege, the attorney work product doctrine and any

9  other privilege or immunity available under law or arising from contractual

10  obligation.  Subject to and without waiving the foregoing general and specific

11  objections, Peavy has no documents responsive to this request.

12  **Document Request No. 37**

13       All DOCUMENTS received from Dawn Peavy, including without limitation

14  any e-mails sent from the e-mail account dawnpeavy@gmail.com, RELATING to

15  SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel,

16  WARNER, or DC.

17  **Response to Document Request No. 37**

18       Peavy objects to this request on the grounds that it is compound, overbroad,

19  burdensome and oppressive.  Peavy also objects to this request on the grounds that it

20  is vague and ambiguous, and lacks sufficient precision to allow her to formulate an

21  appropriate response.  Peavy further objects to this request on the grounds that it is

22  indefinite as to time and not reasonably limited in scope.  Peavy additionally objects

23  to this request to the extent that it seeks communications or items protected by the

24  attorney-client privilege, the joint-interest privilege, the attorney work product

25  doctrine and any other privilege or immunity available under law or arising from

26  contractual obligation.

27

28  **Document Request No. 38**

15
DEFENDANT JEAN ADELE PEAVY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT K**
**184**

1       All DOCUMENTS in the PEARY RECORDS RELATING to SUPERMAN,

2   SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or

3   DC.

4   **Response to Document Request No. 38**

5       Peavy objects to this request to the extent it seeks any privileged documents

6   concerning any collective bargaining of any settlement by the Shusters and Siegels

7   and because Plaintiff's use of such information violates the parties' May 1, 2008

8   JAMS Confidentiality Agreement, and because the Court's April 11, 2011 order

9   upheld that collective bargaining agreement as privileged.  Peavy also objects to this

10  request on the grounds that it is compound, duplicative, overbroad, burdensome and

11  oppressive, as it could reasonably be construed to request all documents related to

12  this litigation, the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.*

13  litigations, documents created by Plaintiff, and all documents relating to the

14  exploitation of Superman and/or Superboy over the past 80 years.  Peavy further

15  objects to this request on the grounds that it is indefinite as to time and not

16  reasonably limited in scope.  Peavy additionally objects on the grounds that it seeks

17  the production of documents that are not in her possession, custody or control.  Peavy

18  further objects to this request to the extent that it seeks communications or items

19  protected by the attorney-client privilege, the joint interest privilege, the attorney

20  work product doctrine and any other privilege or immunity available under law or

21  arising from contractual obligation.

22  DATED: September 6, 2011        TOBEROFF & ASSOCIATES, P.C.
23

24
                                   By   /s/ Marc Toberoff
25                                         Marc Toberoff

26                                 Attorneys for Defendants Mark Warren
                                   Peary, as personal representative of the Estate
27                                 of Joseph Shuster, Jean Adele Peavy and
                                   Laura Siegel Larson, individually and as
28                                 personal representative of the Estate of

Joanne Siegel

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT L

1  Marc Toberoff (CA State Bar No. 188547)
    *mtoberoff@ipwla.com*
2  Keith G. Adams (CA State Bar No. 240497)
    *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
4  Los Angeles, CA 90067
   Telephone: (310) 246-3333
5  Facsimile: (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy
   and Laura Siegel Larson, individually and
8  as personal representative of the Estate of
   Joanne Siegel
9

10              **UNITED STATES DISTRICT COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

12  DC COMICS,                          Case No: CV 10-03633 ODW (RZx)

13              Plaintiff,              Hon. Otis D. Wright II, U.S.D.J.

14      vs.                            **DEFENDANT MARK WARREN
                                        PEARY'S RESPONSE AND
15  PACIFIC PICTURES CORPORATION;       OBJECTIONS TO PLAINTIFF
    IP WORLDWIDE, LLC; IPW, LLC;        DC COMICS' SECOND SET OF
16  MARC TOBEROFF, an individual;       REQUESTS FOR PRODUCTION
                                        OF DOCUMENTS**
    MARK WARREN PEARY, as personal
17  representative of the ESTATE OF     Complaint Filed: May 14, 2010
    JOSEPH SHUSTER; JEAN ADELE         Trial Date: None Set
18  PEAVY, an individual; LAURA
19  SIEGEL LARSON, individually and as
    personal representative of the ESTATE
20  OF JOANNE SIEGEL, and DOES 1-10,
21  inclusive,
22
                Defendants.
23

24

25

26

27

28

           DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
           TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

                            **EXHIBIT L**
                               **187**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Defendant Mark Warren Peary ("Peary"), pursuant to the provisions of Rule 34(b)(2) of the Federal Rules of Civil Procedure, makes the following objections to Plaintiff DC Comics' Second Set of Requests for Production ("Request") that was served on August 4, 2011 by plaintiff DC Comics ("Plaintiff" or "DC"):

## I.

## OBJECTIONS TO THE ENTIRE REQUEST

Peary objects to the entire Request on each of the following grounds and incorporates by reference each of the following objections into his response to each individual request for documents within it:

1.    Peary objects to each individual request within the Request to the extent it is relevant only to the Fourth through Sixth state law claims for relief in DC's First Amended Complaint ("FAC").  Defendants contend that their pending anti-SLAPP motion stays discovery regarding these state law claims, as well as the related Third Claim for Relief.  *See* Cal. Code Civ. Proc. § 425.16(g); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1452 (2010) (Stevens, J., concurring); *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003); *Godin v. Schencks*, 2010 U.S. App. LEXIS 25980 (1st Cir. Dec. 22, 2010).

2.    To the extent the Request and each document request therein seeks documents concerning an agreement between the Shusters and Siegels to act collectively in negotiations with DC regarding the settlement of their termination claims ("Collective Bargaining"), Peary objects on the following grounds:  the privilege on such agreement was upheld by the Court's April 11, 2011 order. Furthermore, any documents that exist relating to Collective Bargaining contain and memorialize attorney-client privileged communications and attorney work product and reveal sensitive settlement strategy that would give DC an unfair advantage. Moreover, any Collective Bargaining documents were prepared in connection with settlement mediation in the closely related cases *Joanne Siegel, et al. v. Warner Bros.*

1    *Entertainment Inc., et al.*, Case No. 04-CV-8400 ODW (RZx) and *Joanne Siegel, et*

2    *al. v. Time Warner Inc., et al.,* Case No. 04-CV-8766 ODW (RZx) (collectively

3    "*Siegel* Litigation") and the use of such information plainly violates the parties' May

4    1, 2008 JAMS Confidentiality Agreement.

5         3.     Peary objects to the Request and each document request therein to the

6    extent that it seeks the production of any item, or portion thereof, that has already

7    been the subject of motion practice in this case or the *Siegel* Litigation, and

8    specifically to the extent that the Request seeks discovery barred by the Court's April

9    11, 2011, May 25, 2011 and/or June 20, 2011 orders.

10         4.     Peary objects to the Request and each document request therein to the

11    extent that it seeks the production of any item, or portion thereof, comprising or

12    reflecting information transmitted and maintained in confidence between Peary or

13    any person or entity acting on his behalf and his counsel for the purpose of obtaining

14    legal advice or representation, on the grounds that such information is protected from

15    disclosure by the attorney-client privilege and the joint-interest privilege.  Such

16    documents will not be produced in response to the request, and any inadvertent

17    production thereof shall not be deemed a waiver of any privilege or doctrine with

18    respect to such documents.  With respect to such documents, Peary hereby

19    incorporates by reference the privilege logs served by the Defendants in this action

20    on December 15, 2010, and any logs served by Defendants thereafter.

21         5.     Peary objects to the Request and each document request therein to the

22    extent that it seeks the production of any item, or portion thereof, comprising or

23    reflecting information with any confidential impression, conclusion, opinion, legal

24    research, or legal theory of counsel for Peary or any other person or entity, on the

25    grounds that such information is protected from disclosure by the attorney work

26    product doctrine.  Such documents will not be produced in response to the request,

27    and any inadvertent production thereof shall not be deemed a waiver of any privilege

28    or doctrine with respect to such documents.  With respect to such documents, Peary

1  hereby incorporates by reference the privilege logs served by the Defendants in this

2  action on December 15, 2010.

3      6.     Peary objects to the Request and each document request therein to the

4  extent that it seeks the production of any item, or portion thereof, which is not

5  reasonably calculated to lead to the discovery of relevant and admissible evidence, on

6  the grounds that it exceeds the permissible scope of discovery delimited by Rule

7  26(b)(1) of the Federal Rules of Civil Procedure.

8      7.     Peary objects to the Request and each document request therein to the

9  extent that it seeks the production of any item, or portion thereof, comprising or

10  reflecting any trade secret or other confidential or proprietary information of Peary or

11  any other entity or person.

12     8.     Peary objects to the Request and each document request therein to the

13  extent that it seeks the production of any item, or portion thereof, which is protected

14  from disclosure by court order, or any privacy or similar rights of any person or

15  entity.

16     9.     Peary objects to the Request and each document request therein to the

17  extent that it is unduly burdensome, overly broad, imposes extreme hardship, is

18  oppressive and harassing, or would result in the expenditure of unnecessary time and

19  resources.

20     10.    Peary objects to the Request and each document request therein to the

21  extent that the expense of producing documents outweighs the likely benefit of

22  discovery provided to Plaintiff.

23     11.    Peary objects to the Request and each document request therein to the

24  extent that it seeks the production of duplicative identical items, or documents or

25  information already in Plaintiff's possession, or by reason of public filing,

26  publication or otherwise are readily accessible to Plaintiff through other means.

27     12.    Peary objects to the Request and each document request therein to the

28  extent that it seeks the production of any item which has been served, filed, or

3
DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT L**
**190**

1    transmitted in the course of this action, on the grounds that such production would be

2    burdensome, oppressive, and unnecessary.

3        13.    Peary objects to the Request and each document request therein to the

4    extent that it seeks the production of any item which has already been produced,

5    served, or filed in the course of the related actions *Joanne Siegel, et al. v. Warner*

6    *Bros. Entertainment Inc., et al.*, Case No. 04-CV-8400 ODW (RZx) and *Joanne*

7    *Siegel, et al. v. Time Warner Inc., et al.*, Case No. 04-CV-8766 ODW (RZx)

8    (collectively "*Siegel* Litigation"), on the grounds that such production would be

9    duplicative, burdensome, oppressive, and unnecessary.

10       14.    In making any document production, Peary will reference by their Bates

11   numbers documents already produced to DC in the *Siegel* Litigation, rather than re-

12   copy and reproduce such documents. Peary will not produce or designate by Bates

13   numbers documents Peary obtained solely as a result of a document production by

14   the other side in the *Siegel* Litigation.

15       15.    Consistent with the agreement governing privilege logs negotiated by

16   the parties concerning Plaintiff and other defendants, Peary will not log privileged

17   communications or attorney work-product documents in either this case or the *Siegel*

18   Litigations, that (a) are internal communications by defendants' counsel at the law

19   firms of Toberoff & Associates, P.C. and Kendall Brill & Klieger, L.L.P., or (b)

20   between  Toberoff & Associates P.C and defendants' counsel at the law firm of

21   Kendall, Brill & Klieger LLP.   Logging such documents would constitute an

22   extraordinary interference by DC in the affairs of its opposing counsel in both this

23   action and the ongoing *Siegel* litigation.

24       16.    Peary objects to the Request and each document request therein to the

25   extent that it seeks the production of any item or document that is not the property of

26   Peary.  Peary will not produce any items or documents that are the property of any

27   other person or entity.

28       17.    Peary objects to the Request and each document request therein and to

4
DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT L**
**191**

the definitions and instructions therein to the extent that they purport to alter or extend Peary's obligations beyond those established by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Central District of California, or any order or ruling by the Court in this action.

18.     Peary objects generally to the definitions of the terms "YOU" and "YOUR" as vague and ambiguous, overbroad and unduly burdensome, especially with respect to the definition's reference to "attorneys". Peary will construe these terms to refer to Peary.

19.     Peary objects generally to the definitions of the terms "DEFENDANT" and "DEFENDANTS" as vague and ambiguous, overbroad and unduly burdensome, especially with respect to the definition's reference to "attorneys". Peary will construe these terms to refer only to the specific defendants in this action.

20.     Peary objects generally to the definition of the term "SHUSTER HEIRS" as vague and ambiguous, overbroad and unduly burdensome, especially with respect to the definition's reference to "attorneys". Solely for the purposes of these responses, and for no other purpose, Peary will construe this term to refer only to the Estate of Joseph Shuster, Jean Peavy, Mark Peary, Dawn Peavy and Frank Shuster.

21.     Peary objects generally to the definition of the term "SIEGEL HEIRS" as vague and ambiguous, overbroad and unduly burdensome, especially with respect to the definition's reference to "attorneys". Solely for the purposes of these responses, and for no other purpose, Peary will construe this term to refer only to Joanne Siegel and Laura Siegel Larson.

22.     Peary reserves the right to revise, amend, supplement or clarify any of the objections set forth herein.

**EXHIBIT L**
**192**

## II.

## DOCUMENTS TO BE PRODUCED

## SPECIFIC RESPONSES TO INDIVIDUAL REQUESTS

**Document Request No. 23**

The PEAVY WILL, including any and all drafts and prior versions of the PEAVY WILL.

**Response to Document Request No. 23**

Peary objects to this request on the grounds that it is compound, overbroad, burdensome and oppressive.  Peary further objects to this request on the grounds that it is vague and ambiguous, and lacks sufficient precision to allow him to formulate an appropriate response.  Peary additionally objects to this request on the grounds that it is indefinite as to time, not reasonably limited in scope, and to the extent that it seeks the production of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Peary further objects on the grounds that it seeks the production of documents that are not in his possession, custody or control.  Peary also objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the joint-interest privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.  Subject to and without waiving the foregoing general and specific objections, Peary will produce the responsive, non-privileged documents, if any, consistent with his understanding of this request.

**Document Request No. 24**

All DOCUMENTS RELATING to the PEAVY WILL.

**Response to Document Request No. 24**

Peary objects to this request to the extent it seeks any privileged documents concerning any collective bargaining of any settlement by the Shusters and Siegels and because Plaintiff's use of such information violates the parties' May 1, 2008

DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT L**
**193**

1   JAMS Confidentiality Agreement, and because the Court's April 11, 2011 order
2   upheld that collective bargaining agreement as privileged.  Peary also objects to this
3   request on the grounds that it is compound, overbroad, burdensome and oppressive,
4   as it could be reasonably construed to request all documents related to this litigation,
5   the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.* litigations,
6   documents created and/or produced by Plaintiff and all documents relating to the
7   exploitation of Superman and/or Superboy over the past 80 years.  Peary further
8   objects to this request on the grounds that it is vague and ambiguous, and lacks
9   sufficient precision to allow him to formulate an appropriate response.  Peary
10  additionally objects to this request on the grounds that it is indefinite as to time, not
11  reasonably limited in scope, and to the extent that it seeks the production of any item,
12  or portion thereof, which is not reasonably calculated to lead to the discovery of
13  relevant and admissible evidence.  Peary further objects on the grounds that it seeks
14  the production of documents that are not in his possession, custody or control.  Peary
15  also objects to this request to the extent that it seeks communications or items
16  protected by the attorney-client privilege, the joint-interest privilege, the attorney
17  work product doctrine and any other privilege or immunity available under law or
18  arising from contractual obligation.  Subject to and without waiving the foregoing
19  general and specific objections, Peary will produce the responsive, non-privileged
20  documents, if any, consistent with his understanding of this request.

21  **Document Request No. 25**

22      All DOCUMENTS RELATING to the PEAVY TRUST.

23  **Response to Document Request No. 25**

24      Peary objects to this request to the extent it seeks any privileged documents
25  concerning any collective bargaining of any settlement by the Shusters and Siegels
26  and because Plaintiff's use of such information violates the parties' May 1, 2008
27  JAMS Confidentiality Agreement, and because the Court's April 11, 2011 order
28  upheld that collective bargaining agreement as privileged.  Peary also objects to this

1  request on the grounds that it is vague and ambiguous, and lacks sufficient precision

2  to allow him to formulate an appropriate response.  Peary further objects to this

3  request on the grounds that it is compound, overbroad, burdensome and oppressive,

4  as it could be reasonably construed to request all documents related to this litigation,

5  the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.* litigations,

6  documents created and/or produced by Plaintiff and all documents relating to the

7  exploitation of Superman and/or Superboy over the past 80 years.  Peary additionally

8  objects to this request on the grounds that it is indefinite as to time, not reasonably

9  limited in scope, and to the extent that it seeks the production of any item, or portion

10 thereof, which is not reasonably calculated to lead to the discovery of relevant and

11 admissible evidence.  Peary also objects on the grounds that it seeks the production of

12 documents that are not in his possession, custody or control.  Peary further objects to

13 this request to the extent that it seeks communications or items protected by the

14 attorney-client privilege, the joint-interest privilege, the attorney work product

15 doctrine and any other privilege or immunity available under law or arising from

16 contractual obligation.  Subject to and without waiving the foregoing general and

17 specific objections, Peary will produce the responsive, non-privileged documents, if

18 any, consistent with his understanding of this request.

19 **Document Request No. 26**

20    All COMMUNICATIONS with Michael Catron.

21 **Response to Document Request No. 26**

22    Peary objects to this request on the grounds that it is vague and ambiguous, and

23 lacks sufficient precision to allow him to formulate an appropriate response.  Peary

24 also objects to this request on the grounds that it is compound, overbroad,

25 burdensome and oppressive, as it seeks all communications with Michael Catron

26 regardless whether the communications are related to the litigation at issue or are

27 likely to lead to the discovery of admissible evidence.  Peary further objects to this

28 request on the grounds that it is indefinite as to time, not reasonably limited in scope,

1  and to the extent that it seeks the production of any item, or portion thereof, which is

2  not reasonably calculated to lead to the discovery of relevant and admissible

3  evidence.  Peary additionally objects to this request to the extent that it seeks

4  communications or items protected by the attorney-client privilege, the joint-interest

5  privilege, the attorney work product doctrine and any other privilege or immunity

6  available under law or arising from contractual obligation.  Subject to and without

7  waiving the foregoing general and specific objections, Defendants will meet-and-

8  confer with Plaintiff regarding narrowing the scope of this request.

9  **Document Request No. 27**

10     All COMMUNICATIONS with David Sims.

11  **Response to Document Request No. 27**

12     Peary objects to this request on the grounds that it is vague and ambiguous, and

13  lacks sufficient precision to allow him to formulate an appropriate response.  Peary

14  further objects to this request on the grounds that it is compound, overbroad,

15  burdensome and oppressive, as it seeks all communications with David Sims

16  regardless whether the communications are related to the litigation at issue or are

17  likely to lead to the discovery of admissible evidence.  Peary further objects to this

18  request on the grounds that it is indefinite as to time, not reasonably limited in scope,

19  and to the extent that it seeks the production of any item, or portion thereof, which is

20  not reasonably calculated to lead to the discovery of relevant and admissible

21  evidence.  Peary further objects to this request to the extent that it seeks

22  communications or items protected by the attorney-client privilege, the joint-interest

23  privilege, the attorney work product doctrine and any other privilege or immunity

24  available under law or arising from contractual obligation.  Subject to and without

25  waiving the foregoing general and specific objections, Defendants will meet-and-

26  confer with Plaintiff regarding narrowing the scope of this request.

27  **Document Request No. 28**

28     All COMMUNICATIONS with Ilya Salkind.

DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT L**
**196**

**Response to Document Request No. 28**

Peary objects to this request on the grounds that it is vague and ambiguous, and lacks sufficient precision to allow him to formulate an appropriate response. Peary further objects to this request on the grounds that it is compound, overbroad, burdensome and oppressive as it seeks all communications with Ilya Salkind regardless whether the communications are related to the litigation at issue or are likely to lead to the discovery of admissible evidence. Peary further objects to this request on the grounds that it is indefinite as to time, not reasonably limited in scope, and to the extent that it seeks the production of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence. Peary further objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the joint-interest privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Defendants will meet-and-confer with Plaintiff regarding narrowing the scope of this request.

**Document Request No. 29**

The 1997 PEARY SCREENPLAY, including any and all drafts and prior versions of the 1997 PEARY SCREENPLAY.

**Response to Document Request No. 29**

Peary objects to this request on the grounds that it is vague and ambiguous, and lacks sufficient precision to allow him to formulate an appropriate response. Peary also objects to this request on the grounds that it is compound, overbroad, burdensome and oppressive. Peary further objects to this request on the grounds that it is indefinite as to time, not reasonably limited in scope, and to the extent that it seeks the production of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence. Peary also objects to this request to the extent that it seeks communications or items protected

1  by the attorney-client privilege, the joint-interest privilege, the attorney work product

2  doctrine and any other privilege or immunity available under law or arising from

3  contractual obligation.

4  **Document Request No. 30**

5      All DOCUMENTS RELATING to the 1997 PEARY SCREENPLAY.

6  **Response to Document Request No. 30**

7      Peary objects to this request on the grounds that it is vague and ambiguous, and

8  lacks sufficient precision to allow him to formulate an appropriate response.  Peary

9  also objects to this request on the grounds that it is compound, overbroad,

10  burdensome and oppressive.  Peary further objects to this request on the grounds that

11  it is indefinite as to time, not reasonably limited in scope, and to the extent that it

12  seeks the production of any item, or portion thereof, which is not reasonably

13  calculated to lead to the discovery of relevant and admissible evidence.  Peary also

14  objects to this request to the extent that it seeks communications or items protected

15  by the attorney-client privilege, the joint-interest privilege, the attorney work product

16  doctrine and any other privilege or immunity available under law or arising from

17  contractual obligation.

18  **Document Request No. 31**

19      The 2006 PEARY SCREENPLAY, including any and all drafts and prior

20  versions of the 2006 PEARY SCREENPLAY.

21  **Response to Document Request No. 31**

22      Peary objects to this request on the grounds that it is vague and ambiguous, and

23  lacks sufficient precision to allow him to formulate an appropriate response.  Peary

24  also objects to this request on the grounds that it is compound, overbroad,

25  burdensome and oppressive.  Peary further objects to this request on the grounds that

26  it is indefinite as to time, not reasonably limited in scope, and to the extent that it

27  seeks the production of any item, or portion thereof, which is not reasonably

28  calculated to lead to the discovery of relevant and admissible evidence.  Peary also

1    objects to this request to the extent that it seeks communications or items protected

2    by the attorney-client privilege, the joint-interest privilege, the attorney work product

3    doctrine and any other privilege or immunity available under law or arising from

4    contractual obligation.

5    **Document Request No. 32**

6        All DOCUMENTS RELATING to the 2006 PEARY SCREENPLAY.

7    **Response to Document Request No. 32**

8        Peary objects to this request on the grounds that it is vague and ambiguous, and

9    lacks sufficient precision to allow him to formulate an appropriate response.  Peary

10   also objects to this request on the grounds that it is compound, overbroad,

11   burdensome and oppressive.  Peary further objects to this request on the grounds that

12   it is indefinite as to time, not reasonably limited in scope, and to the extent that it

13   seeks the production of any item, or portion thereof, which is not reasonably

14   calculated to lead to the discovery of relevant and admissible evidence.  Peary also

15   objects to this request to the extent that it seeks communications or items protected

16   by the attorney-client privilege, the joint-interest privilege, the attorney work product

17   doctrine and any other privilege or immunity available under law or arising from

18   contractual obligation.

19   **Document Request No. 33**

20       The WORKING SCREENPLAY DRAFT, including any and all drafts and

21   prior versions of the WORKING SCREENPLAY DRAFT.

22   **Response to Document Request No. 33**

23       Peary objects to this request on the grounds that it is vague and ambiguous, and

24   lacks sufficient precision to allow him to formulate an appropriate response.  Peary

25   also objects to this request on the grounds that it is compound, overbroad,

26   burdensome and oppressive.  Peary further objects to this request on the grounds that

27   it is indefinite as to time, not reasonably limited in scope, and to the extent that it

28   seeks the production of any item, or portion thereof, which is not reasonably

DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT L**
**199**

calculated to lead to the discovery of relevant and admissible evidence.  Peary also objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the joint-interest privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.

**Document Request No. 34**

Any and all drafts, outlines, or notes RELATING to any script, screenplay, or story regarding SUPERMAN, SUPERBOY, the SHUSTER HEIRS, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or DC.

**Response to Document Request No. 34**

Peary objects to this request on the grounds that it is vague and ambiguous, and lacks sufficient precision to allow him to formulate an appropriate response.  Peary also objects to this request on the grounds that it is compound, duplicative, overbroad, burdensome and oppressive.  Peary further objects to this request on the grounds that it is indefinite as to time and not reasonably limited in scope.  Peary also objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the joint-interest privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation.

**Document Request No. 35**

The JOSEPH SHUSTER FILE.

**Response to Document Request No. 35**

Peary objects to this request on the grounds that "JOSEPH SHUSTER FILE" as defined by Plaintiff is vague and ambiguous, and lacks sufficient precision to allow him to formulate an appropriate response.  Peary also objects to this request on the grounds that it is compound, duplicative, overbroad, burdensome and oppressive, as it could reasonably be construed to request all documents related to this litigation, the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.* litigations,

13
DEFENDANT MARK WARREN PEARY'S RESPONSE AND OBJECTIONS
TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION

**EXHIBIT L**
**200**

1   documents created by Plaintiff, and all documents relating to the exploitation of

2   Superman and/or Superboy over the past 80 years.  Peary further objects to this

3   request on the grounds that it is indefinite as to time and not reasonably limited in

4   scope.  Peary also objects to this request to the extent that it seeks communications or

5   items protected by the attorney-client privilege, the joint-interest privilege, the

6   attorney work product doctrine and any other privilege or immunity available under

7   law or arising from contractual obligation.  Subject to and without waiving the

8   foregoing general and specific objections, Peary will produce the responsive, non-

9   privileged documents, if any, consistent with his understanding of this request.

10  **Document Request No. 36**

11      All VIDEO FOOTAGE depicting YOU or any other SHUSTER HEIR

12  RELATING to SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster,

13  Jerome Siegel, WARNER, or DC, including without limitation all VIDEO

14  FOOTAGE of an interview with Jean Peavy on the Canadian Broadcasting

15  Corporation on or around April 30, 2005, and all VIDEO FOOTAGE of a panel

16  discussion featuring Jean Peavy at a Comic-Con event in or around 1998.

17  **Response to Document Request No. 36**

18      Peary objects to this request on the grounds that it is vague and ambiguous, and

19  lacks sufficient precision to allow him to formulate an appropriate response.  Peary

20  also objects to this request on the grounds that it is compound, duplicative,

21  overbroad, burdensome and oppressive.  Peary further objects to this request on the

22  grounds that it is indefinite as to time and not reasonably limited in scope.  Peary

23  additionally objects on the grounds that it seeks the production of documents that are

24  not in his possession, custody or control.  Peary further objects to this request to the

25  extent that it seeks communications or items protected by the attorney-client

26  privilege, the joint-interest privilege, the attorney work product doctrine and any

27  other privilege or immunity available under law or arising from contractual

28  obligation.  Subject to and without waiving the foregoing general and specific

1  objections, Peary has no documents responsive to this request.

2  **Document Request No. 37**

3      All DOCUMENTS received from Dawn Peavy, including without limitation

4  any e-mails sent from the e-mail account dawnpeavy@gmail.com, RELATING to

5  SUPERMAN, SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel,

6  WARNER, or DC.

7  **Response to Document Request No. 37**

8      Peary objects to this request on the grounds that it is compound, overbroad,

9  burdensome and oppressive.  Peary also objects to this request on the grounds that it

10  is vague and ambiguous, and lacks sufficient precision to allow him to formulate an

11  appropriate response.  Peary further objects to this request on the grounds that it is

12  indefinite as to time and not reasonably limited in scope.  Peary additionally objects

13  to this request to the extent that it seeks communications or items protected by the

14  attorney-client privilege, the joint-interest privilege, the attorney work product

15  doctrine and any other privilege or immunity available under law or arising from

16  contractual obligation.

17  **Document Request No. 38**

18      All DOCUMENTS in the PEARY RECORDS RELATING to SUPERMAN,

19  SUPERBOY, the SIEGEL HEIRS, Joseph Shuster, Jerome Siegel, WARNER, or

20  DC.

21  **Response to Document Request No. 38**

22      Peary objects to this request to the extent it seeks any privileged documents

23  concerning any collective bargaining of any settlement by the Shusters and Siegels

24  and because Plaintiff's use of such information violates the parties' May 1, 2008

25  JAMS Confidentiality Agreement, and because the Court's April 11, 2011 order

26  upheld that collective bargaining agreement as privileged.  Peary also objects to this

27  request on the grounds that it is compound, duplicative, overbroad, burdensome and

28  oppressive, as it could reasonably be construed to request all documents related to

**EXHIBIT L**
**202**

1  this litigation, the *Siegel v. Warner Bros. Ent. Inc.* and *Siegel v. Time Warner Inc.*

2  litigations, documents created by Plaintiff, and all documents relating to the

3  exploitation of Superman and/or Superboy over the past 80 years.  Peary further

4  objects to this request on the grounds that it is indefinite as to time and not

5  reasonably limited in scope.  Peary further objects to this request to the extent that it

6  seeks communications or items protected by the attorney-client privilege, the joint

7  interest privilege, the attorney work product doctrine and any other privilege or

8  immunity available under law or arising from contractual obligation.

9

   DATED: September 6, 2011        TOBEROFF & ASSOCIATES, P.C.

10

11

                                   By    /s/ Marc Toberoff
12                                 _____
                                        Marc Toberoff
13
                                   Attorneys for Defendants Mark Warren
14                                 Peary, as personal representative of the Estate
                                   of Joseph Shuster, Jean Adele Peavy and
15                                 Laura Siegel Larson, individually and as
                                   personal representative of the Estate of
16                                 Joanne Siegel

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT L**
**203**

# EXHIBIT M

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 8, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Matt:

This letter is to follow-up on defendants Mark Warren Peary and Jean Adele Peavy's September 6, 2011 discovery responses.

DC has requested Ms. Peavy's will and other confidential documents.  In light of DC's untenable position that confidentiality designations pursuant to the protective order in *Siegel* have been effectively nullified, and DC's repeated assertions that no protective order applies in this case, Ms. Peavy shall produce the will as set forth in her discovery responses once the parties agree on a mutually acceptable protective order.

A proposed protective order like the one executed by the parties in *Siegel* is attached.  This proposal is without prejudice to our assertion that documents falling under the protective order in *Siegel* remain protected in this litigation.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

Enclosure

**EXHIBIT M**
**204**

1   Marc Toberoff (S.B. #188547)
      *mtoberoff@ipwla.com*
2   Keith G. Adams (S.B. #240497)
      *kgadams@ipwla.com*
3   TOBEROFF & ASSOCIATES, P.C.
    2049 Century Park East, Suite 2720
4   Los Angeles, California 90067
    Telephone:  (310) 246-3333
5   Facsimile:   (310) 246-3101

6   Attorneys for Defendants Mark Warren
    Peary, Jean Peavy, and Laura Siegel Larson
7
    (continued on next page)
8
                    **UNITED STATES DISTRICT COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
11  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

12              Plaintiff,              **DISCOVERY MATTER**

13       v.                            **[PROPOSED] STIPULATION RE:**
                                       **PROTECTIVE ORDER**
14  PACIFIC PICTURES
    CORPORATION, IP WORLDWIDE,
15  LLC, IPW, LLC, MARC TOBEROFF,      **Judge**:        Hon. Otis D. Wright II
    an individual, MARK WARREN         **Magistrate**:   Hon. Ralph Zarefsky
16  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
17  JEAN ADELE PEAVY, an individual,   **Complaint Filed**: May 14, 2010
    LAURA SIEGEL LARSON, an            **Trial Date**:      None Set
18  individual, and DOES 1-10, inclusive,
19              Defendants.
20
21
22
23
24
25
26
27
28
                            **EXHIBIT M**
                                **205**

1 | (continued from previous page)

2 | Richard B. Kendall (S.B. # 90072)
    *rkendall@kbkfirm.com*
3 | Laura W. Brill (S.B. #195889)
    *lbrill@kbkfirm.com*
4 | Nicholas F Daum (S.B. #236155)
    *ndaum@kbkfirm.com*
5 | KENDALL BRILL & KLIEGER LLP
    10100 Santa Monica Blvd., Suite 1725
6 | Los Angeles, California, 90067
    Telephone:   310.556.2700
7 | Facsimile:    310.556.2705

8 | Attorneys for Defendants Marc Toberoff,
    Pacific Pictures Corporation, IP Worldwide,
9 | LLC, and IPW, LLC

10 | Daniel M. Petrocelli (S.B. #097802)
     *dpetrocelli@omm.com*
11 | Matthew T. Kline (S.B. #211640)
     *mkline@omm.com*
12 | Cassandra L. Seto (S.B. #246608)
     *cseto@omm.com*
13 | O'MELVENY & MYERS LLP
     1999 Avenue of the Stars, 7th Floor
14 | Los Angeles, CA  90067-6035
     Telephone:   (310) 553-6700
15 | Facsimile:    (310) 246-6779

16 | PATRICK T. PERKINS (admitted *pro hac vice*)
     *pperkins@ptplaw.com*
17 | PERKINS LAW OFFICE, P.C.
     1711 Route 9D
18 | Cold Spring, NY 10516
     Telephone:  (845) 265-2820
19 | Facsimile:    (845) 265-2819

20 | Attorneys for Plaintiff DC Comics

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

[PROPOSED] STIPULATED PROTECTIVE
ORDER

**EXHIBIT M**
**206**

Plaintiff DC Comics ("Plaintiff"), and defendants Mark Warren Peary, Jean Peavy, and Laura Siegel Larson, Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC, by and through their respective counsel of record, hereby stipulate to and jointly request that the Court enter this Protective Order governing this action as follows:

1.    For purposes of this Order, a "Writing" means any tangible expression or communication – however created, recorded, embodied, maintained, filed, or stored in any medium, mode, form, or technology – including, without limitation, as defined by Rule 1001 of the Federal Rules of Evidence.

2.    For purposes of this Order, a "Document Production" means the production of any Writing by any party or non-party witness pursuant to any procedure set forth in the Federal Rules of Civil Procedure, including, without limitation, any initial disclosure pursuant to Rule 26(a)(1), any deposition notice pursuant to Rule 30, any request for production of documents pursuant to Rule 34, and any subpoena pursuant to Rule 45.

3.    Except as provided in Paragraph 13 below, each Writing produced by any party or non-party witness in any Document Production – whether or not designated "CONFIDENTIAL" pursuant to Paragraph 4 below – shall be used solely for purposes of this action.

4.    Except as provided in Paragraph 13 below, the additional provisions of this Order shall apply to:  (1) any Writing produced in any Document Production by any party or non-party witness marked as "CONFIDENTIAL," (2) any previously produced Writing  marked as "CONFIDENTIAL," and produced herein by designation of its Bates number in any Document Production by any party or non-party witness, and (3) any Writing produced in any Document Production by any party or non-party witness which any other party requests be marked as "CONFIDENTIAL" and so notifies all other parties within twenty-one days (21) days of its production, or the entry of this order, whichever comes later,

- 1 -

JOINT STIPULATION RE:
DENNIS LARSON DOCUMENTS

**EXHIBIT M**

**207**

1  in which case the original and all copies of the Writing shall be promptly marked

2  "CONFIDENTIAL."  The following categories of documents may be marked as

3  "CONFIDENTIAL": (i) documents containing non-public commercially sensitive,

4  confidential financial information, including reports, records and projections; (ii)

5  documents including financial and developmental information that would assist a

6  competitor; (iii)  unpublished creative materials, such as scripts, artwork and the

7  like; (iv) non-public, private agreements, Writings disclosing the terms of such

8  agreements and documentation relating to the negotiation thereof; and (v)

9  information which the party is contractually or otherwise by law required to

10  maintain as confidential (*e.g.*, due to a non-disclosure agreement).  Such

11  documents may be marked "CONFIDENTIAL" if the marking or requesting party

12  reasonably believes:

13        (a)    the Writing contains confidential proprietary information; <u>or</u>

14        (b)    disclosure of such commercially sensitive Writing could

15             reasonably harm competitive advantage, or foster a

16             competitive disadvantage; <u>or</u>

17        (c)    the disclosure of such confidential Writing could impair or

18             disrupt future or current business relationships.

19  Any such Writing, and every copy thereof, is referred to herein as a "Protected

20  Writing."

21      5.    The following persons are collectively referred to herein as "Covered

22  Recipients":

23        a.    A party to this action, and each of her or its agents and

24  employees;

25        b.    Counsel for a party to this action and such counsel's support

26  employees;

27        c.    A deposition or trial witness who testifies in this action, or any

28  other person reasonably believed by counsel for any party to this action to have

JOINT STIPULATION RE:
DENNIS LARSON DOCUMENTS

**EXHIBIT M**

**208**

1  relevant knowledge or information, that person's counsel, and such counsel's

2  support employees;

3            d.     An expert witness, consultant, or investigator engaged by a

4  party to this action and that person's support employees;

5            e.     The Court and its support employees;

6            f.     A mediator, arbitrator, or other settlement officer who renders

7  service in this action, and that person's support employees;

8            g.     A court reporter transcribing any proceeding in this action and

9  that person's support employees; and

10            h.     Any other person as to whom all parties agree in writing.

11       6.     Except as expressly permitted by this Order, neither a Protected

12  Writing nor any of its contents shall ever be viewed by or disclosed to, directly or

13  indirectly, any person who is not a Covered Recipient.  Except as required by law

14  or pursuant to subpoena, no Covered Recipient shall ever disclose to any person

15  who is not a Covered Recipient, directly or indirectly, the existence or contents of

16  any Protected Writing.  A Protected Writing may be viewed by or disclosed to a

17  Covered Recipient solely for purposes of and as is necessary for these related

18  actions.

19       7.     Notwithstanding any other provision herein, a Protected Writing may

20  be filed or lodged with the Court or offered as evidence at trial in this action

21  without placing the Protected Writing under seal, unless the Court grants an order

22  permitting the Protected Writing to be filed under seal pursuant to Local Rule 79-

23  5.  Counsel for any party that intends to file or lodge with the Court any Protected

24  Writing, or to offer any Protected Writing as evidence at trial, shall, prior to such

25  use, endeavor in good faith to notify counsel for all other parties and (as

26  applicable) any non-party witness that produced the Protected Writing of such

27  intended use sufficiently early to permit any party to file and obtain a ruling on a

28  motion for a sealing order pursuant to Local Rule 79-5.

JOINT STIPULATION RE:
DENNIS LARSON DOCUMENTS

8.    Except solely for a Covered Recipient who is (1) a party to this action, her or its counsel, or such counsel's support employee, (2) a witness during deposition or at trial, (3) a court reporter transcribing any proceeding in this action or that person's support employee, or (4) the Court or its support employee, prior to the disclosure of any Protected Writing or any of its contents to a Covered Recipient, that Covered Recipient shall be given a copy of this Order and shall execute a Certificate of Compliance in the form of Exhibit A hereto.

9.    If a Protected Writing is marked and attached as an exhibit to a deposition transcript, then that portion of the transcript discussing or disclosing information contained in the Protected Writing shall be designated as "Confidential" pursuant to the terms of this Order.

10.    Except as provided in Paragraph 13 below, no copy shall be made of any Protected Writing except for use in and as is necessary for this action. Promptly following the conclusion of this action, the original and all copies of each Protected Writing shall be destroyed or returned to counsel for the party or non-party witness that produced it, provided, however, that counsel for any party to this action may permanently retain one copy of each Protected Writing, and the original and one copy of each pleading, brief, deposition transcript, and exhibit which attaches or includes any Protected Writing, for insurance, tax, risk management, or archival purposes.

11.    If any party to this action believes that any Writing designated by another party (the "Designating Party") hereunder as CONFIDENTIAL does not reasonably merit such designation (the "Objecting Party") it may inform the Designating Party of such by written notice stating with particularity for each challenged Writing the grounds why such designation is improper hereunder.  The parties will promptly confer pursuant to Local Rule 37-1 regarding such notice in a good faith effort to resolve the matter.  However, if an agreement is not reached within seven (7) days from the Designating Party's receipt of such notice, the

- 4 -

1    Designating Party may within twenty-one (21) days from its receipt of the notice

2    serve on the Objecting Party its portion of a Local Rule 37-1 joint stipulation on a

3    motion for a protective order regarding the designation(s) in question.  The

4    challenged CONFIDENTIAL designation(s) will be deemed to be removed from

5    the information and/or document(s) in question only if: (a) the Designating Party

6    fails within such time period to serve its portion of a joint stipulation on a motion

7    for a protective order pursuant to Local Rule 37-1 or (b) if upon such motion the

8    challenged designation(s) is/are not upheld by the Court.

9        12.    The Court will retain jurisdiction over all persons necessary to

10   enforce this Order, and to modify this Order upon the application and

11   demonstration of good cause by any person, even after the termination of these

12   related actions.  The Court may impose a monetary sanction against any person

13   who willfully violates this Order in an amount which the Court deems appropriate.

14   Additionally, if any person threatens to violate any provision of this Order, then

15   any potentially aggrieved person may apply to the Court for injunctive relief and

16   the respondent shall not assert as a defense that the potentially aggrieved person

17   has an adequate remedy at law.

18       13.    Notwithstanding any other provision herein, and without prejudice to

19   the right of any person to seek any additional protective order, this Order is not

20   intended to be and shall not be construed as (1) a ruling on the admissibility of any

21   Writing, (2) a waiver of any objection to the production or use of any Writing on

22   grounds of confidentiality or otherwise, (3) a ruling requiring the production of

23   any Writing, (4) a limitation on the right of any party to disclose a Protected

24   Writing to any person who authored that Writing, or (5) a limitation on the right of

25   any party or non-party witness to use in this action or otherwise any Writing that

26   she or it authored or obtained in any manner other than through a Document ///

27   Production, even if an original or duplicate of that Writing is produced in a

28   Document Production.

- 5 -

JOINT STIPULATION RE:
DENNIS LARSON DOCUMENTS

**EXHIBIT M**

**211**

1    IT IS SO STIPULATED.

2

3    Dated:  September __, 2011        RESPECTFULLY SUBMITTED,
                                       /s/ Marc Toberoff

4                                      Marc Toberoff
                                       TOBEROFF & ASSOCIATES, P.C.
5

6                                      Attorneys for Defendants, Mark Warren Peary, as
                                       personal representative of the Estate of Joseph
7                                      Shuster, Jean Adele Peavy, and Laura Siegel
                                       Larson, individually and as personal
8                                      representative of the Estate of Joanne Siegel

9

10                                     /s/ Daniel Petrocelli

11                                     Daniel M. Petrocelli
                                       O'MELVENY & MYERS LLP
12

13                                     Attorneys for Plaintiff DC Comics

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

# EXHIBIT N

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6707

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

September 15, 2011

**VIA E-MAIL**

Marc Toberoff
Keith Adams
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re: *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

I write in response to your letters of September 6 and 8, 2011, addressing discovery issues raised in our September 2 letter.

Corporate Documents. You have declined to engage us on our requests for the corporate documents of defendants Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC. Nor have you proposed any way to narrow the requests. DC broke up and narrowed its requests over two months ago, and despite your objections and statements that the requests should be narrowed further, you ignored our invitations of August 11, August 25, and September 2 to meet-and-confer on these issues. Though we believe our requests are fully appropriate, we have further narrowed our requests as set forth in Appendix A attached hereto. DC has now twice sought to narrow its requests while defendants have yet to make a single proposal. DC is prepared to move to compel responses to its requests unless defendants respond to them or propose any way to narrow them by Tuesday, September 20. The impending depositions of Mr. Toberoff, Pacific Pictures, IP Worldwide, and IPW, are scheduled to commence less than two weeks from now. In refusing to produce documents plainly relevant to these depositions, defendants are only causing delay and the need for multiple depositions. Your refusal to meet-and-confer on these issues also belies your assurance to the Court that defendants are willing to meet and confer with DC to tailor its requests to be not objectionable. Docket 210 at 21-23.

**EXHIBIT N**
**213**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 2

Renner Otto Production.  DC's position concerning defendants' review of the Renner Otto expert report and calendar/billing entries is set forth in Matt Kline's forthcoming letter.  DC does not understand defendants' position regarding the log being prepared of Renner Otto's electronic archive of Mr. Siegel's files.  In one sentence the Estate requests that the outstanding discovery disputes regarding the log "be resolved before it incurs the time and expense of having lengthy privilege logs drafted relating to the Renner Otto archive."  In the next sentence, you represent that "such privilege logs will be furnished within a reasonable time."  Please clarify defendants' position and provide DC with a date certain when defendants will complete their review and produce or log all of the Renner Otto documents.  We need to assess whether we need to move to compel on this issue.

Laura Siegel Larson Review.  We regret what happened to Ms. Larson's son and wish him a speedy recovery.  However, it has been more than 50 days since Ms. Larson's July 22 deposition, yet defendants still have not provided us a date certain when she will complete her review of the "boxes" of documents in her possession that have never been reviewed.  Your speculation that Ms. Larson's review will not uncover anything of relevance does not meet defendants' discovery obligations under the Federal Rules.  Indeed, if the "boxes" contain the types of documents you claim they do—"the materials consist, for the most part, of random personal documents (*e.g.,* bills, etc.)"—Ms. Larson's review should not be time-consuming.  Please confirm Ms. Larson will complete her review no later than next Friday, September 23.

August 2, 2011, Letter Agreement.  We disagree with your contention that defendants supplemented their production "in a timely manner" consistent with FED. R. CIV. P. 26(e)(1) by producing the August 2, 2011, letter agreement between defendants Pacific Pictures, Mr. Peary, and Ms. Peavy, on August 29—almost four weeks after it was purportedly executed—as an exhibit in support of defendants' SLAPP reply.  If you believed such a document was relevant to your SLAPP motion, it should have been produced before DC's opposition papers were due.  We are moving to strike this manufactured evidence.

You state that defendants "anticipate" updating their privilege logs "this month" to include the cover e-mail to Mr. Peary attaching the August 2 letter, among other things.  When this month?  And what other materials are being logged?

Dawn Peavy's Will and Other "Confidential" Materials.  In Matt Kline's September 12 e-mail to you, he wrote:

I write in response to your September 8, 2011, letter below concerning a protective order in this case.  We will review your draft and provide any comments this week[, which we have now done].

To expedite the production of documents, DC agrees that Ms. Peavy's will, which you identified in your letter as confidential, can be treated as "CONFIDENTIAL" pursuant to the protective order in the *Siegel* case.  Please stamp it as such and produce it tomorrow.  Also, what "other confidential documents" are defendants withholding?  We can probably reach a quick interim agreement on those documents as well.

**EXHIBIT N**
**214**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 3

We have received no response to this e-mail.  Why have you not produced Ms. Peavy's will—
your confidentiality concerns have been addressed?  And what are the "other confidential
documents" you are withholding?

Very truly yours,

Jason N. Tokoro
for O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.
       Matthew T. Kline, Esq.

OMM_US:70001940

**EXHIBIT N**
**215**

# **Appendix A**

**EXHIBIT N**
**216**

## **Requests for Production to Defendant Marc Toberoff**

<u>Request No. 56</u>

- Original:  All DOCUMENTS RELATING to your role and ownership interest in Pacific Pictures Corporation, including, articles of organization, operating agreements, minutes, capital tables or other DOCUMENTS evidencing capital accounts or capital structure, filings, income statements, business plans, etc.

<u>July 7, 2011</u>

- Proposed 56(a):  All DOCUMENTS identifying your past, present, and/or future role or position in Pacific Pictures Corporation.

- Proposed 56(b):  All DOCUMENTS identifying your past and/or present ownership interest in Pacific Pictures Corporation.

- Proposed 56(c):  All DOCUMENTS involved in the formation of Pacific Pictures Corporation, including articles of organization, operating agreements, minutes, filings, business plans.

- Proposed 56(d):  All DOCUMENTS evidencing Pacific Pictures Corporation's past and/or present capital structure, including capital tables or other DOCUMENTS evidencing capital accounts or capital structure.

<u>September 14, 2011</u>

- Proposed 56(a):  All DOCUMENTS reflecting YOUR initial role or position in Pacific Pictures Corporation.

- Proposed 56(b):  All DOCUMENTS reflecting any change in YOUR role or position in Pacific Pictures Corporation.

- Proposed 56(c):  All DOCUMENTS reflecting YOUR initial ownership interest in Pacific Pictures Corporation.

- Proposed 56(d):  All DOCUMENTS reflecting any change in YOUR ownership interest in Pacific Pictures Corporation.

- Proposed 56(e):  All DOCUMENTS filed with any government agency concerning the formation of Pacific Pictures Corporation, including articles of organization, operating agreements, minutes, filings, business plans.

- Proposed 56(f):  All DOCUMENTS reflecting Pacific Pictures Corporation's initial capital structure, including capital tables or other DOCUMENTS reflecting capital accounts or capital structure.

**EXHIBIT N**

**217**

- Proposed 56(g):  All DOCUMENTS reflecting any change in Pacific Pictures Corporation's capital structure, including capital tables or other DOCUMENTS reflecting capital accounts or capital structure.

These requests remove the "RELATING" language characterized by defendants as overbroad and substitute "reflecting."  Through these requests, DC seeks documents identifying the ownership, management and capital structures, and formation documents of Pacific Pictures, not every transaction in which it ever engaged.  Such documents are clearly relevant to DC's Third, Fourth, and Sixth claims, all of which relate to, *inter alia*, efforts by Mr. Toberoff and Pacific Pictures to market the Shuster heirs' purported Superman rights and agreements entered into for that purpose.  Defendants have also asserted that Mr. Toberoff acted as the Shuster heirs' lawyer from the outset of their relationship, while the only agreement under which they operated at that time was through Pacific Pictures, which is not a law firm.  The nature of this relationship is a factual issue that must be explored through discovery before defendants' Rule 12 and SLAPP motions can be adjudicated.

<u>Request No. 57</u>

- Original:  All DOCUMENTS RELATING to your role and ownership interest in IP Worldwide LLC, including, articles of organization, operating agreements, minutes, capital tables or other DOCUMENTS evidencing capital accounts or capital structure, filings, income statements, business plans, etc.

<u>July 7, 2011</u>

- Proposed 57(a):  All DOCUMENTS identifying your past, present, and/or future role or position in IP Worldwide, LLC.

- Proposed 57(b):  All DOCUMENTS identifying your past and/or present ownership interest in IP Worldwide, LLC.

- Proposed 57(c):  All DOCUMENTS involved in the formation of IP Worldwide, LLC, including, articles of organization, operating agreements, minutes, filings, business plans.

- Proposed 57(d):  All DOCUMENTS evidencing IP Worldwide, LLC's past and/or present capital structure, including capital tables or other DOCUMENTS evidencing capital accounts or capital structure.

<u>September 14, 2011</u>

- Proposed 57(a):  All DOCUMENTS reflecting YOUR initial role or position in IP Worldwide, LLC.

- Proposed 57(b):  All DOCUMENTS reflecting any change in YOUR role or position in IP Worldwide, LLC.

- Proposed 57(c):  All DOCUMENTS reflecting YOUR initial ownership interest in IP Worldwide, LLC.

- Proposed 57(d):  All DOCUMENTS reflecting any change in YOUR ownership interest in IP Worldwide, LLC.

- Proposed 57(e):  All DOCUMENTS filed with any government agency concerning the formation of IP Worldwide, LLC, including, articles of organization, operating agreements, minutes, filings, business plans.

- Proposed 57(f):  All DOCUMENTS reflecting IP Worldwide, LLC's initial capital structure, including capital tables or other DOCUMENTS reflecting capital accounts or capital structure.

- Proposed 57(g):  All DOCUMENTS reflecting any change in IP Worldwide, LLC's capital structure, including capital tables or other DOCUMENTS reflecting capital accounts or capital structure.

These requests remove the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through these requests, DC seeks documents identifying the ownership, management and capital structures, and formation documents of IP Worldwide. Such documents are clearly relevant to DC's First claim, which, *inter alia*, seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures.  Documents previously produced show that Pacific Pictures contributed its "current IP business" at the formation of IP Worldwide, presumably including the Shuster heirs' purported Superman interest.  Regardless of defendants' current position on this issue, DC seeks any documents relating to it.  DC is entitled to test defendants' representation through the discovery process.  They are also relevant to DC's Fifth claim, which, *inter alia*, relates to Mr. Toberoff's and his companies' interference with DC's rights with relation to the Siegel heirs.  Defendants have asserted that Mr. Toberoff acted as the Siegel heirs' lawyer from the outset of their relationship, while the only agreement under which they operated at that time was through IP Worldwide, which is not a law firm.  The nature of this relationship is a factual issue that must be explored through discovery before defendants' Rule 12 and SLAPP motions can be adjudicated.

Request No. 58

- Original:  All DOCUMENTS RELATING to your role and ownership interest in IPW, LLC, including, articles of organization, operating agreements, minutes, capital tables or other DOCUMENTS evidencing capital accounts or capital structure, filings, income statements, business plans, etc.

July 7, 2011

- Proposed 58(a):  All DOCUMENTS identifying your past, present, and/or future role or position in IPW, LLC.

- Proposed 58(b):  All DOCUMENTS identifying your past and/or present ownership interest in IPW, LLC.

- Proposed 58(c):  All DOCUMENTS involved in the formation of IPW, LLC, including, articles of organization, operating agreements, minutes, filings, business plans.

- Proposed 58(d):  All DOCUMENTS evidencing IPW, LLC's past and/or present capital structure, including capital tables or other DOCUMENTS evidencing capital accounts or capital structure.

September 14, 2011

- Proposed 58(a):  All DOCUMENTS reflecting YOUR initial role or position in IPW, LLC.

- Proposed 58(b):  All DOCUMENTS reflecting any change in YOUR role or position in IPW, LLC.

- Proposed 58(c):  All DOCUMENTS reflecting YOUR initial ownership interest in IPW, LLC.

- Proposed 58(d):  All DOCUMENTS reflecting any changes in YOUR ownership interest in IPW, LLC.

- Proposed 58(e):  All DOCUMENTS filed with any government agency concerning the formation of IPW, LLC, including, articles of organization, operating agreements, minutes, filings, business plans.

- Proposed 58(f):  All DOCUMENTS reflecting IPW, LLC's initial capital structure, including capital tables or other DOCUMENTS reflecting capital accounts or capital structure.

- Proposed 58(g):  All DOCUMENTS reflecting any changes in IPW, LLC's capital structure, including capital tables or other DOCUMENTS reflecting capital accounts or capital structure.

These requests remove the "RELATING" language characterized by defendants as overbroad and substitute "reflecting."  Through these requests, DC seeks documents identifying the ownership, management and capital structures, and formation documents of IPW, not every transaction in which it ever engaged.  Such documents are clearly relevant to DC's First claim, which, *inter alia*, seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures.  Documents previously produced show that Pacific Pictures contributed its "current IP business" at the formation of IP Worldwide, presumably including the Shuster heirs' purported Superman interest.  Mr. Toberoff has stated at deposition that interests in rights held by IP Worldwide were assigned to IPW.  We are entitled to see all documents effectuating and related

**EXHIBIT N
220**

to that transfer.  Regardless of defendants' current position on this issue, DC seeks any documents relating to it.  DC is entitled to test defendants' representation through the discovery process.

## Requests for Production to Defendant Pacific Pictures Corporation

Request No. 29

- Original:  All DOCUMENTS RELATING to the formation of PACIFIC PICTURES.

July 7, 2011

- Proposed:  All DOCUMENTS involved in the formation of PACIFIC PICTURES, including, articles of organization, operating agreements, minutes, filings, business plans.

September 14, 2011

- Proposed:  All DOCUMENTS filed with any government agency concerning the formation of PACIFIC PICTURES, including, articles of organization, operating agreements, minutes, filings, business plans.

This request removes the "RELATING" language characterized by defendants as overbroad.  Through this request, DC seeks all of Pacific Pictures' formation documents.  Such documents are clearly relevant to DC's Third and Sixth claims, which, *inter alia*, relate to efforts by Mr. Toberoff and Pacific Pictures to market the Shuster heirs' purported Superman rights and agreements entered into for that purpose.  Defendants have also asserted that Mr. Toberoff acted as the Shuster heirs' lawyer from the outset of their relationship, while the only agreement under which they operated at that time was through Pacific Pictures, which is not a law firm.  DC is entitled to test defendants' representation through the discovery process.

Request No. 30

- Original:  All DOCUMENTS RELATING to the current corporate status of PACIFIC PICTURES.

July 7, 2011

- Proposed:  All DOCUMENTS identifying the current corporate status of PACIFIC PICTURES.

September 14, 2011

- Proposed:  All DOCUMENTS filed with or received from any government agency reflecting the current corporate status of PACIFIC PICTURES.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying the current status of Pacific Pictures.  Such documents are clearly relevant to DC's Third, Fourth,

and Sixth claims, all of which relate to, *inter alia*, efforts by Mr. Toberoff and Pacific Pictures to market the Shuster heirs' purported Superman rights and agreements entered into for that purpose. They are also relevant to DC's First claim, which, *inter alia*, seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures. Regardless of defendants' current position on this issue, DC seeks any documents relating to it. Moreover, the extent to which Mr. Toberoff and/or his companies have an interest in the heirs' rights is a factual issue that must be resolved before defendants' Rule 12 and SLAPP motions can be adjudicated.

Request No. 31

- Original: All DOCUMENTS RELATING to any past, current, or planned business activity of PACIFIC PICTURES.

July 7, 2011

- Proposed: All DOCUMENTS identifying any business plans of PACIFIC PICTURES, including but not limited to marketing of rights held, solicitation of new business, or plans to sell, lease, license, or otherwise transfer rights.

September 14, 2011

- Proposed: All DOCUMENTS reflecting any business plans of PACIFIC PICTURES concerning SUPERMAN, SUPERBOY, and/or The Spectre, including but not limited to marketing of rights held, solicitation of new business, or plans to sell, lease, license, or otherwise transfer rights.

DC offers this narrowed request, which removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting." Through this request, DC seeks documents identifying business plans relating to rights held by Pacific Pictures (including any efforts to promote, arrange, or negotiate the sale, assignment, lease, license, or any other disposition or exploitation of rights or property) concerning Superman, Superboy, and/or The Spectre, not all unrelated business activities. Such documents are relevant to same claims and for the reasons stated in PPC Request No. 30.

Request No. 33

- Original: All DOCUMENTS RELATING to any individual or entity that currently holds property or interests formerly held by PACIFIC PICTURES.

July 7, 2011

- Proposed: All DOCUMENTS identifying any individual or entity that currently holds property or interests formerly held by PACIFIC PICTURES.

**EXHIBIT N**

**222**

September 14, 2011

- Proposed 33(a):  All DOCUMENTS reflecting any transfers by PACIFIC PICTURES of interests RELATING to SUPERMAN, SUPERBOY, and/or The Spectre, including but not limited to any sale, assignment, license, lease, or conveyance.

- Proposed 33(b):  All DOCUMENTS reflecting the ownership interest of any individual or entity in interests RELATING to SUPERMAN, SUPERBOY, and/or The Spectre formerly held by PACIFIC PICTURES.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying any transfers by Pacific Pictures of interests related to Superman, Superboy, and/or The Spectre, including agreements, drafts of agreements, correspondence evidencing negotiations, or numerous other documents.  Such documents are relevant to same claims and for the reasons stated in PPC Request No. 30.

## Requests for Production to Defendant IP Worldwide, LLC

Request No. 29

- Original:  All DOCUMENTS RELATING to the formation of IP WORLDWIDE.

July 7, 2011

- Proposed:  All DOCUMENTS involved in the formation of IP WORLDWIDE, including, articles of organization, operating agreements, minutes, filings, business plans.

September 14, 2011

- Proposed:  All DOCUMENTS filed with any government agency concerning the formation of IP WORLDWIDE, including, articles of organization, operating agreements, minutes, filings, business plans.

This request removes the "RELATING" language characterized by defendants as overbroad.  Through this request, DC seeks all of IP Worldwide's formation documents.  Such documents are clearly relevant to DC's Fifth claim, which, *inter alia*, relates to interference by Mr. Toberoff (the businessman) and his companies with DC's rights with relation to the Siegel heirs.  Defendants have also asserted that Mr. Toberoff acted as the Siegel heirs' lawyer from the outset of their relationship, while the only agreement under which they operated at that time was through IP Worldwide, which is not a law firm.  Moreover, these documents relate to DC's First claim, which seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures.  Documents previously produced show that Pacific Pictures contributed its "current IP business" at the formation of IP Worldwide, presumably including the Shuster heirs' purported Superman interest.  Regardless of defendants' current position on this issue, DC seeks any

documents relating to it.  DC is entitled to test defendants' representations through the discovery process.

Request No. 30

- Original:  All DOCUMENTS RELATING to the current corporate status of IP WORLDWIDE.

July 7, 2011

- Proposed:  All DOCUMENTS identifying the current corporate status of IP WORLDWIDE.

September 14, 2011

- Proposed:  All DOCUMENTS filed with or received from any government agency reflecting the current corporate status of IP WORLDWIDE.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying the current status of IP Worldwide.  Such documents are clearly relevant to DC's First claim, which, *inter alia*, seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures.  Documents previously produced show that Pacific Pictures contributed its "current IP business" at the formation of IP Worldwide, presumably including the Shuster heirs' purported Superman interest.  Regardless of defendants' current position on this issue, DC seeks any documents relating to it.  DC is entitled to test defendants' representation through the discovery process.

Request No. 32

- Original:  All DOCUMENTS RELATING to any past, current, or planned business activity of IP WORLDWIDE.

July 7, 2011

- Proposed:  All DOCUMENTS identifying any business plans of IP WORLDWIDE, including but not limited to marketing of rights held, solicitation of new business, or plans to sell, lease, license, or otherwise transfer rights.

September 14, 2011

- Proposed:  All DOCUMENTS reflecting any business plans of IP WORLDWIDE concerning SUPERMAN, SUPERBOY, and/or The Spectre, including but not limited to marketing of rights held, solicitation of new business, or plans to sell, lease, license, or otherwise transfer rights.

DC offers this narrowed request, which removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying business plans relating to rights held by IP Worldwide (including any efforts to promote, arrange, or negotiate the sale, assignment, lease, license, or any other disposition or exploitation of rights or property) concerning Superman, Superboy, and/or The Spectre, not all unrelated business activities.  Such documents are clearly relevant to DC's First claim, which, *inter alia*, seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures.  Documents previously produced show that Pacific Pictures contributed its "current IP business" at the formation of IP Worldwide, presumably including the Shuster heirs' purported Superman interest.  Mr. Toberoff has stated at deposition that interests in rights held by IP Worldwide were assigned to IPW.  Regardless of defendants' current position on this issue, DC seeks any documents relating to it.  DC is entitled to test defendants' representation through the discovery process.  These documents are also relevant to statements by Mr. Toberoff regarding efforts by his companies and him to market the Siegel heirs' and Shuster heirs' purported Superman rights and to claims in the May 13, 2003, letter from Michael Siegel alleging that Mr. Toberoff was making no efforts to market the Siegel heirs' rights, all of which DC is entitled to investigate.

Request No. 33

- Original:  All DOCUMENTS RELATING to any past, current, or planned property in which IP WORLDWIDE held, holds, or will hold an interest.

July 7, 2011

- Proposed:  All DOCUMENTS identifying any past, current, or planned property in which IP WORLDWIDE held, holds, or will hold an interest.

September 14, 2011

- Proposed:  All DOCUMENTS reflecting any rights or interests IP Worldwide ever held in SUPERMAN, SUPERBOY, and/or The Spectre including but not limited to any copyright interest, trademark interest, right to market, right to lease, right to license, or right to exploit.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Such documents are relevant to same claims and for the reasons stated in IP Worldwide Request No. 32.

Request No. 34

- Original:  All DOCUMENTS RELATING to any individual or entity that currently holds property or interests formerly held by IP WORLDWIDE.

July 7, 2011

- Proposed:  All DOCUMENTS identifying any individual or entity that currently holds property or interests formerly held by IP WORLDWIDE.

September 14, 2011

- Proposed 34(a):  All DOCUMENTS reflecting any transfer by IP WORLDWIDE of interests RELATING to SUPERMAN, SUPERBOY, and/or The Spectre, including but not limited to any sale, assignment, license, lease, or conveyance.

- Proposed 34(b):  All DOCUMENTS reflecting the ownership interest of any individual or entity in interest RELATING to SUPERMAN, SUPERBOY, and/or The Spectre formerly held by IP WORLDWIDE.

DC offers this narrowed request, which removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting." Through this request, DC seeks documents identifying any transfers by IP Worldwide of interests related to Superman, Superboy and/or The Spectre.  Such documents are relevant to same claims and for the reasons stated in IP Worldwide Request No. 32.

**Requests for Production to Defendant IPW, LLC**

Request No. 24

- Original:  All DOCUMENTS RELATING to the formation of IPW.

July 7, 2011

- Proposed:  All DOCUMENTS involved in the formation of IPW, including, articles of organization, operating agreements, minutes, filings, business plans.

September 14, 2011

- Proposed:  All DOCUMENTS filed with any government agency concerning the formation of IPW, including, articles of organization, operating agreements, minutes, filings, business plans.

This request removes the "RELATING" language characterized by defendants as overbroad.  Through this request, DC seeks all of IPW's formation documents.  Such documents are clearly relevant to DC's First claim, which, *inter alia*, seeks to determine the validity of the Shuster heirs' termination effort and alleges, in part, that their termination fails because they lacked the necessary majority interest to terminate due to the Shuster heirs' transfer of 50% of their purported Superman rights to Pacific Pictures.  Documents previously produced show that Pacific Pictures contributed its "current IP business" at the formation of IP Worldwide, presumably including the Shuster heirs' purported Superman interest.  Mr. Toberoff has stated at deposition that interests in rights held by IP Worldwide were assigned to IPW.  Regardless of

defendants' current position on this issue, DC seeks any documents relating to it.  DC is entitled to test defendants' representations through the discovery process.

Request No. 25

- Original:  All DOCUMENTS RELATING to the current corporate status of IPW.

July 7, 2011

- Proposed:  All DOCUMENTS identifying the current corporate status of IPW.

September 14, 2011

- Proposed:  All DOCUMENTS filed with or received from any government agency reflecting the current corporate status of IPW.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying the current status of IPW.  Such documents are relevant to the same claims and for the reasons stated in IPW Request No. 24.

Request No. 26

- Original:  All DOCUMENTS RELATING to the past and current ownership and management structure of IPW, including operating agreements, capitalization schedules, capital accounts, filings, and other financial forms.

July 7, 2011

- Proposed:  All DOCUMENTS identifying the past and current ownership and management structure of IPW, including operating agreements, capitalization schedules, capital accounts, filings, and other financial forms.

September 14, 2011

- Proposed 26(a):  All DOCUMENTS reflecting the initial ownership structure of IPW.

- Proposed 26(b):  All DOCUMENTS reflecting any changes in the ownership structure of IPW.

- Proposed 26(c):  All DOCUMENTS reflecting the initial management structure of IPW.

- Proposed 26(d):  All DOCUMENTS reflecting any change in the management structure of IPW.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying the ownership and management structure of IPW, not every transaction in which it ever engaged.

Such documents are relevant to the same claims and for the reasons stated in IPW Request No. 24.

Request No. 27

- Original:  All DOCUMENTS RELATING to any past, current, or planned business activity of IPW.

July 7, 2011

- Proposed:  All DOCUMENTS identifying any business plans of IPW, including but not limited to marketing of rights held, solicitation of new business, or plans to sell, lease, license, or otherwise transfer rights.

September 14, 2011

- Proposed:  All DOCUMENTS reflecting any business plans of IPW, concerning SUPERMAN, SUPERBOY, and/or The Spectre including but not limited to marketing of rights held, solicitation of new business, or plans to sell, lease, license, or otherwise transfer rights.

    DC offers this narrowed request, which removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying business plans relating to rights held by IPW (including any efforts to promote, arrange, or negotiate the sale, assignment, lease, license, or any other disposition or exploitation of rights or property) concerning Superman, Superboy, and/or The Spectre, not all unrelated business activities.  Such documents are relevant to the same claims and for the reasons stated in IPW Request No. 24.  These documents are also relevant to statements by Mr. Toberoff regarding efforts by his companies and him to market the Siegel heirs' and Shuster heirs' purported Superman rights and to claims in the May 13, 2003, letter from Michael Siegel alleging that Mr. Toberoff was making no efforts to market the Siegel heirs' rights, all of which DC is entitled to investigate.

Request No. 29

- Original:  All DOCUMENTS RELATING to any individual or entity that currently holds property or interests formerly held by IPW.

July 7, 2011

- Proposed:  All DOCUMENTS identifying any individual or entity that currently holds property or interests formerly held by IPW.

September 14, 2011

- Proposed 29(a):  All DOCUMENTS reflecting any transfer by IPW of interests RELATING to SUPERMAN, SUPERBOY, and/or The Spectre, including but not limited to any sale, assignment, license, lease, or conveyance.

- Proposed 29(b):  All DOCUMENTS reflecting the ownership interest of any individual or entity in interests RELATING to SUPERMAN, SUPERBOY, and/or The Spectre formerly held by IPW.

This request removes the "RELATING" language characterized by defendants as overbroad and substitutes "reflecting."  Through this request, DC seeks documents identifying any transfers by IPW of interests related to Superman, Superboy, and/or The Spectre, including agreements, drafts of agreements, correspondence evidencing negotiations, or numerous other documents.  Such documents are relevant to the same claims and for the reasons stated in IPW Request No. 24.

# EXHIBIT O

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 16, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    _DC Comics v. Pacific Pictures Corp. et al._, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write to address the September 6, 2011, interrogatory responses by defendant Marc Toberoff, and defendants Mark Warren Peary and Jean Adele Peavy's responses to DC's document requests.

**Defendant Toberoff's Interrogatory Responses**

We are troubled by your tactical decision to wait 30 days to respond to DC's interrogatories only to state that defendants will not provide any substantive answer because DC's requests "exceed[] the limit of 25 total interrogatories under Federal Rule 33(a)(1)." Defendants' choice was clearly intended only to cause delay.

Having refused to answer our questions about his communications with actual or potential investors during our June 13 meet-and-confer, Mr. Toberoff advised DC to serve interrogatories on the subject. We served the requested interrogatories on August 3 and asked you to "confirm immediately that you will respond to these simple interrogatories by the date listed." Mr. Toberoff's associate, Keith Adams, sent a response letter on August 10 and wrote that Mr. Toberoff "will respond/object to the interrogatories pursuant to and consistent with the federal rules." Mr. Adams did not say that Mr. Toberoff would not substantively respond to the interrogatories, or that defendants would refuse to answer on grounds that the interrogatories exceeded the number allowed by the Federal Rules.

**EXHIBIT O**
**230**

O'MELVENY & MYERS LLP
September 16, 2011 - Page 2

We sought to clarify Mr. Adams' statement and sent an email the same day asking whether Mr. Toberoff would "respond to [the interrogatories] in substance, or do we need to seek leave to ask these additional interrogatories?" We stated that "[i]f it's the latter, we request a Rule 37 conference." Mr. Adams responded by writing, "Mr. Toberoff will respond/object to DC's interrogatories within the time period provided by the Rules." He did not say that DC needed to seek leave to ask these additional interrogatories, nor did he respond to our request for a Rule 37 conference by providing us with times when he was available to meet. To be certain of defendants' position, we wrote back to Mr. Adams and asked him to answer two simple questions: "[(1)] Are you accepting service of the interrogatories? [(2)] Will Mr. Toberoff respond to them in substance or object on numerosity grounds?" We stated that "[i]f [Mr. Toberoff] objects on numerosity grounds, we will seek leave to ask these additional interrogatories, and request a Rule 37 conference to do so." Defendants never responded and instead waited until September 6 to object to DC's interrogatories on numerosity grounds.

Defendants' refusal to substantively respond to DC's interrogatories is even more disconcerting given their position that the depositions of Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC, are limited to examination of Mr. Toberoff for one day of seven hours. DC had hoped to streamline parts of the examination by receiving answers to its interrogatories, but will now be forced to go through these topics with Mr. Toberoff in full and, of course, spend other days and hours examining the companies on their activities.

Please let us know if you are willing to withdraw your objections and substantively respond to DC's interrogatories by Wednesday, September 21. If not, please let us know when you are available next week to meet and confer to discuss these issues.

**Defendants Peary and Peavy's Document Production Responses and Objections**

Not a single document was produced to DC by Peary or Peavy with their September 6, 2011, responses to DC's second set of requests for production of documents. Nor did either defendant provide DC with an updated privilege log identifying withheld documents. Defendants continue to ignore their discovery obligations causing unnecessary delay and requiring DC on multiple occasions to seek the Court's assistance. They do so, even though key depositions are scheduled for the coming weeks.

1. <u>Privilege Logs</u>. You stated in recent correspondence that defendants "anticipate" updating their privilege logs "this month," but have not provided a date certain when DC will receive the updated logs, what materials are being logged, or whether we will have these logs in advance of September 27, when depositions again begin. Please confirm whether documents withheld by Peary and Peavy in response to DC's document requests will be included in the updated logs.

2. <u>Boilerplate Objections</u>. Peary and Peavy assert many of the same boilerplate objections they chose not to defend in entering into the parties' December 7, 2010, stipulated order. Docket No. 133. DC has shown that these non-specific objections are "inadequate and

**EXHIBIT O**
**231**

O'MELVENY & MYERS LLP
September 16, 2011 - Page 3

tantamount to not making any objection at all." *E.g., Walker v. Lakewood Condo. Owners Ass'n.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999); *see* Docket No. 205 at 25-29. None of these objections has merit; all are asserted to obstruct and delay. Please confirm that defendants will withdraw these objections.

2. Peavy Will and Trust (Request Nos. 23-25). Defendants respond to each of these requests that they "will produce the responsive, non-privileged documents, if any, consistent with [their] understanding of th[e] request." No documents were produced with defendants' September 6 responses, and even now, 10 days later, DC has not received a single responsive document. Nor have defendants provided a date certain when they will produce these documents. There is no basis for defendants not to have produced these documents with their responses.

We have addressed your confidentiality concerns and offered to treat the Peavy will/trust and all related documents produced for the first time in this case as "CONFIDENTIAL" pursuant to the protective order in the *Siegel* case. Please confirm that defendants will produce all responsive documents by no later than Friday, September 23.

3. Communications with Catron, Sim, and Salkind (Request Nos. 26-28). Defendants state they "will meet-and-confer with [DC] regarding narrowing the scope of [these] request[s]," but do not propose any ways to narrow them. It is defendants' obligation to identify specifically what they believe is objectionable about each request so that DC can meaningfully respond during the parties' meet-and-confer efforts, and defendants failed to meet that obligation.

Defendants' stated objections, moreover, are without merit. There is no indication that the communications sought by DC are numerous or that defendants are not readily in possession of the documents. There is no basis to assert privilege over communications with these non-lawyer, third parties. And the relevance of the communications is apparent:

- Catron: Catron was originally identified as the administrator of the Estate of Joseph Shuster, but was replaced by Peary when the estate was probated in 2003. Peary Tr. at 214:16-216:4. DC is entitled to discover why Catron was removed, including why he was selected as administrator of the estate, whose idea it was to remove him, and whether and how he was notified. Catron also communicated with DC as the "representative of Jean Shuster Peavy." Ex. 67 (Feb. 23, 2006 Catron Email to Levitz). DC is permitted to discover the extent of the relationship between Catron and the Shusters.

- Sim: Peary and Dawn Peavy testified that they are familiar with Sim and have met him on at least one occasion. Peary Tr. at 27:4-30:15; D. Peavy Tr. at 17:20-23:1. And DC is aware of at least two letters from the Shusters to Sim. *See* Exs. 24, 66. The letters discuss the Shusters' treatment by DC, including their attendance at the premiere of "Superman Returns," and the screenplay written by Peary about the lives of Joseph Shuster and Jerry Siegel. DC is entitled to discover the complete correspondence.

O'MELVENY & MYERS LLP
September 16, 2011 - Page 4

- Salkind:  Peary confirmed that he optioned to Illya Salkind his screenplay about the lives of Joseph Shuster and Jerry Siegel.  Peary Tr. at 20:11-24.  The relevance of these screenplays is discussed below, and the relevance of Peary seeking to market Superman-related rights is obvious.  DC is entitled to discover the correspondence between Salkind and the Shusters concerning Peary's screenplay, including Salkind's efforts to license, market, or otherwise exploit the screenplay.

4. <u>Screenplays / Joseph Shuster File (Request Nos. 29-35)</u>.  DC urges defendants to produce the requested screenplays and related documents as there is no basis for these documents to be withheld.  There can be no dispute that these documents are relevant to DC's claims in this case and defendants' defenses.  The screenplays, as described by Peary, revolve around the lives of Joseph Shuster and Jerry Siegel, including the creation and development of Superman.  *E.g.,* Peary Tr. 18:23-21:10.  We understand that, in these screenplays, DC and Warner Bros. are depicted as laudable good companies that came to the aid of Shuster and Siegel in the later years of their lives.  This depiction, which Peary authored, directly contradicts your arguments in briefing in this case, as well as Peary's testimony, that Mr. Shuster or his family still felt aggrieved by DC or Warner Bros. in the later years of Mr. Shuster's life.  DC is entitled to discover the screenplays and the related documents on which Mr. Peary based them.

5. <u>Dawn Peavy Documents (Request No. 37)</u>.  To our knowledge, defendants have never produced a single document or communication from Dawn Peavy; not in this case and not in the *Siegel* cases.  Nor have any communications involving Dawn been logged.  Is it defendants' position that no responsive documents involving Dawn exist?  She mentioned at her deposition having discussions about Superman with at least one co-worker.

6. <u>Peary Records (Request No. 38)</u>.  It cannot be disputed that DC is entitled to discover all documents in the Shusters' possession, custody, or control relating to Superman, Superboy, the Siegels, Joseph Shuster, Jerome Siegel, Warner Bros., and DC.  DC's requests seek the production of just those types of documents, limited to the files maintained by Peary as he described them at his deposition.  Peary Tr. 40:9-14, 50:24-52:7.  Peary knows exactly where these documents are located and there is no indication that non-responsive documents are kept in the same location.  These documents need to be produced.

Please confirm that defendants will withdraw all objections and produce (redacted if need be) or log all responsive documents by Friday, September 23.  If not, please let us know when you are available next week to meet and confer, pursuant to Rule 37, to address these issues.

All of DC's rights are reserved.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline, Esq.

**EXHIBIT O**
**233**

# EXHIBIT P

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 21, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

    We have not received responses to any of the attached correspondence sent last week between September 14 and September 16.  You are not complying with your obligations timely to meet and confer or to produce documents and privilege logs in a timely manner.  You are leaving us no choice but to move on these issues.

    All of DC's rights are reserved.

                    Very truly yours,

                    Matthew T. Kline
                    of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.

**EXHIBIT P
234**

# EXHIBIT Q

A235-10
R235-04

# LAST WILL AND TESTAMENT

BE IT KNOWN that I,    Jean Adele Peavy                    , a resident of
Santa Fe                      , County of   Santa Fe            , in the State of
New Mexico              , being of sound mind, do make and declare this to be my Last Will and
Testament expressly revoking all my prior Wills and Codicils at any time made

I.        **PERSONAL REPRESENTATIVE:**

I appoint   Mark Warren Peary                    of Santa Fe
                        , as Personal Representative of this my Last Will and Testament and pro-
vide if this Personal Representative is unable or unwilling to serve then I appoint
                                                    of
            , as alternate Personal Representative. My Personal Representative shall be authorized to carry out all pro-
visions of this Will and pay my just debts, obligations and funeral expenses. I further provide my Personal
Representative shall not be required to post surety bond in this or any other jurisdiction, and direct that no expert
appraisal be made of my estate unless required by law

II.        **GUARDIAN:**        N/A

In the event I shall die as the sole parent of minor children, then I appoint
                                        is Guardian of said minor children. If this named Guardian is
unable or unwilling to serve, then I appoint
as alternate Guardian.

III.        **BEQUESTS:**

I direct that after payment of all my just debts, my property be bequeathed in the manner following

Upon my death or upon being declared legally missing for one month
Mark Warren Peary of 51 Camino Cabo, Santa Fe, NM  87508 shall be
sole beneficiary of my estate.

If he does not survive me or is declared legally missing for at
least one month, Dawn Laura Peavy of 11405 Lake Nemi, El Paso, TX
79936 shall be the sole beneficiary of my estate.

If she does not survive me or is declared legally missing for at
least one month, my estate shall be split among the following
charities and persons:

A.Santa Fe Habitat for Humanity, 621 Old Santa Fe Trail, PO Box 2844,
Santa Fe, NM  87504 shall receive the property at 51 Camino Cabo,
Belicia Estates, Santa Fe, NM  87508 held through PEAVY TRUST
NO. WSP-1 as Trustee plus all furniture, fixtures and personal
property unless specifically given elsewhere to sell, auction or
use to further the cause of affordable housing.

B.My remaining interests in various financial accounts through
PEAVY-PEARY PARTNERS L.P. or jointly with my son Mark Warren Peary
shall be split as follows:

_____
Testator's Initials

Page ____ of ____



Execute and attest before a notary.  Caution: Louisiana residents should
consult an attorney before preparing a will.

**CONFIDENTIAL**                                                    **MWP 00060**

**EXHIBIT Q**
**235**

1. $2,500 shall go to David L. Cooke, PO Box 32261, Santa Fe NM 87594 to build free energy devices for the benefit of humanity.

2. $5,000 shall go to the National Arbor Day Foundation, 100 Arbor Ave., Nebraska City, NE 68410 to promote tree planting and forestry.

3. The remaining financial assets shall be split with 45% going to the American Institute for Cancer Research, 1759 R Street, NW Washington, DC 20009 to promote research and education on disease prevention through healthy plant-based diets and 55% going to the Physicians Committee for Responsible Medicine, 5100 Wisconsin Ave., Suite 404, Washington, DC 20016 to promote education and lobbying efforts for healthy, plant-based diets and humanitarianism.

C. My 7⅛% interest in the screenplay 'DREAMERS' shall go to Rick Palacioz of 2908 Espanola, Albuquerque, NM 87110.


IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of August, 2001 (year), to this my Last Will and Testament.

_Jean Adele Peavy_
Testator Signature

IV    WITNESSED:

The testator has signed this will at the end and on each other separate page, and has declared or signified in our presence that it is his/her last will and testament, and in the presence of the testator and each other we have hereunto subscribed our names this 24th day of August, 25__ (year).

_____    873 Matta Dr. Albuqrque-02
Witness Signature             Address

_Megan Bland_               411 Sandstone Es Rancho Santa 87124
Witness Signature             Address

_____    _____
Witness Signature             Address


                    ACKNOWLEDGMENT

State of N. Mex.
County of SANTA FE }

We, Mark Warren Peavy, Susan Vornock, Megan Bland _____ and _____ the testator and the witnesses, respectively, whose names are signed to the attached and foregoing instrument, were sworn and declared to the undersigned that the testator signed the instrument as his/her Last Will and that each of the witnesses, in the presence of the testator and each other, signed the will as a witness

Testator _Jean Adele Peavy_      Witness _____
                                 Witness _Megan Bland_
                                 Witness _____

On Aug 24-01 before me, ~~Mark~~ Jean Adele Peavy appeared personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Emily W. Suazo_
                 Signature of Notary

OFFICIAL SEAL
Emily Suazo
NOTARY PUBLIC
STATE OF NEW MEXICO
My commission expires 1-7-03

Affiant ___ Known ___ Produced ID
Type of ID _____
                         (Seal)

Page ___ of ___

EXHIBIT Q
236

# EXHIBIT R

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

October 7, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:   *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Marc:

We write to address issues raised by defendants' September 30, 2011, production of the Last Will and Testament of Jean Adele Peavy (MWP 00060-61) ("Peavy Will"). At his June 29 deposition, defendant Mark Warren Peary testified that he believed that Dawn Peavy would share with him under the Peavy Will. M. Peary Tr. at 76:14-80:4. At Dawn Peavy's August 3 deposition she also testified that it was her understanding that she would benefit under the will. D. Peavy Tr. 49:14-51:3. Defendants refused to produce the Peavy Will to DC—even though it was clearly responsive to DC's document requests served in August 2010,[1] and even though defendants waived all objections to these requests, save for privilege, Docket No. 133 at 1— until *after* Mr. Peary's and Dawn Peavy's deposition, and *after* forcing DC to serve a second set of document requests on the Shuster heirs in August 2011 additionally asking for this document. The Peavy Will discloses that Mr. Peary is the sole beneficiary of the estate, and that Dawn Peavy only benefits in the extremely unlikely event that Mr. Peary predeceases his mother. We need to examine Dawn Peavy and Mr. Peary regarding this revelation as well as the recent agreement between Mr. Peary and Pacific Pictures that you produced last month, among other issues.

We are also deeply concerned about another issue. You purported to represent Dawn Peavy for purposes of her deposition, D. Peavy Tr. at 4:4-6; and you heard her testimony that she understood that she would inherit under Ms. Peavy's will; you also represent Mr. Peary; and you

---

[1] *E.g.,* Peary Requests No. 6 ("All DOCUMENTS relating to or affecting the disposition, division, or ownership of any rights in SUPERMAN and/or SUPERBOY."); No. 7 ("All DOCUMENTS relating to or affecting the division of revenue, proceeds, or other profits regarding SUPERMAN and/or SUPERBOY."); No. 8 ("ALL DOCUMENTS relating to or affecting the division of any settlement proceeds regarding SUPERMAN and/or SUPERBOY.").

**EXHIBIT R**
**237**

O'MELVENY & MYERS LLP
October 7, 2011 - Page 2

heard his testimony that Dawn would share the estate with him.  No corrections were made on this point to either witnesses' testimony.  These circumstances raise serious questions regarding not only the conduct and credibility of your clients, but also conflicts of interest on your part, especially since you also represent Ms. Peavy.  We need to address these issues promptly.

All of DC's rights are reserved.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline, Esq.
       Richard Kendall, Esq.

**EXHIBIT R**
**238**

# EXHIBIT S

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

October 14, 2011

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Dan:

I write in response to your October 7, 2011 letter regarding DC's desire to re-depose Dawn Peavy and Mark Warren Peary based on the production of Jean Adele Peavy's will, dated August 24, 2001.

DC's arguments that the will, which does not refer to termination rights or Joseph Shuster's copyrights and pre-dates the November 23, 2001 Pacific Pictures Agreement at the center of DC's allegations, was responsive to DC's first set of production requests are not well-taken. As Mr. Adams stated in his August 10 letter, DC was well aware that Jean Peavy could have a will, and that the will was not part of the Shusters' production in December 2010. If the will was responsive to DC's prior discovery requests, DC undoubtedly would have brought up the issue in the motion to compel it brought as to those requests, but did not.

DC's complaint that it did not receive the will until after Mr. Peary and Dawn Peavy's depositions is also off-point. DC controlled the timing of the depositions, controlled the timing of its discovery requests, knew that it did not have Jean Peavy's will, and knew that there were numerous, significant discovery issues outstanding (*e.g.,* the "stolen documents"), but DC nonetheless proceeded with the depositions of both Mr. Peary and Dawn Peavy. There is no reasonable basis for DC to take their depositions again.

DC's vague allusions as to potential "conflicts" between Dawn Peavy and Mr. Peary, or inaccuracies in their deposition testimony, also do not go anywhere. While DC claims "Dawn Peavy only benefits [from the will] in the extremely unlikely event that Mr. Peary predeceases his mother," Mr. Peary clearly testified to his and his mother's intent to set up a trust to benefit Dawn, and that such a trust did not yet exist. *See* Peary Trans. at 75:22-23 ("We plan on any proceeds would go into a trust."), 76:12-13 ("Q: Does such a trust exist? A: Not yet.").

## EXHIBIT S
## 239

**TOBEROFF & ASSOCIATES, P.C.**

October 14, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 2

It appears from these vague, invasive comments that DC simply seeks to re-depose Mr. Peary and Dawn Peavy in the hope of driving some sort of wedge between them.  In the same divisive vein DC baselessly alludes to potential conflicts between me and Mr. Peary and/or Dawn Peavy, which DC has no standing to assert.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

# EXHIBIT T

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

October 19, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Marc:

We write in response to your October 14, 2011, letter addressing defendants' production of Jean Peavy's will.

Defendants do not dispute that Ms. Peavy's will is relevant to DC's claims or that defendants waived all objections to DC's initial document requests, save for privilege. Docket No. 133 at 1. Defendants instead assert the will is somehow not responsive to DC's initial set of document requests, but do not and cannot explain why. This position is without basis. To take one example, Peavy's will plainly relates to "ownership of any rights in SUPERMAN," Peary Request No. 6, and Peavy was adjudged to be the sole heir to Joe Shuster, and defendants claim the primary asset of his estate is Superman-related copyrights. Nonetheless, defendants failed to produce or log the Peavy will in December 2010, when their discovery responses were due.

There is no basis for Mr. Adams' charge that "DC was well aware Jean Peavy could have a will, and that the will was not part of the Shusters' production in December 2010." The first time DC was advised Ms. Peavy had a will was during defendant Mark Peary's June 29, 2011, deposition. M. Peary Tr. at 76:14-15. DC cannot be faulted for its decision to proceed with Mr. Peary's deposition when it did when defendants represented to DC and the Court that it had produced or logged all responsive, non-privileged documents, Docket Nos. 133; 160 at 64-74; 162-12, but, in fact, had held back Ms. Peavy's will. Indeed, it is defendants who are responsible for DC's need to further examine Mr. Peary and Dawn Peavy regarding both the Peavy will, as well as the erroneous testimony from Mr. Peary and Ms. Peavy that the will exposes. Defendants tactically chose not to produce the will until after these depositions were taken. DC also reserved its right, at both Mr. Peary's and Dawn Peavy's depositions, to seek further testimony from both witnesses to address this type of gamesmanship. M. Peary Tr. at 359:15-360:5; D. Peavy Tr. at 109:4-111:8.

**EXHIBIT T**
**241**

O'MELVENY & MYERS LLP
October 19, 2011 - Page 2

Defendants' discussion of Mr. Peary's testimony concerning his mother's purported intent to establish a trust to benefit Dawn Peavy does not address the issue raised in our October 7 letter:  That Mr. Peary's and Dawn Peavy's testimony that Dawn would share 50/50 under the Peavy will is contradicted by the express terms of the will, which discloses that Mr. Peary is the sole beneficiary of the estate unless he predeceases his mother.  M. Peary Tr. at 76:20-22 ("Q: Does [the Peavy will] distribute the estates equally between you and your sister Dawn?  A: I believe."); D. Peavy Tr. at 49:17-23 ("Q:  Do you know that [the Peavy will] names you as a beneficiary?  A:  Yes.  Q:  How do you know that?  A:  They told me.  Q:  Who is 'they'?  A: My bother and [mother].").  Neither Mr. Peary nor Dawn Peavy qualified their testimony by saying that Dawn would share in her mother's estate's assets only if her mother first set up a trust, otherwise amended her will, or Mr. Peary pre-deceased his mother.  Moreover, establishing such a trust now appears impossible, given Mr. Peary and Dawn Peavy's testimony about Jean Peavy's infirm mental and physical condition.  *E.g.,* M. Peary Tr. at 36:18-21; D. Peavy Tr. at 7:13-22, 51:4-13.

Your accusations regarding why DC seeks to re-depose Mr. Peary and Dawn Peavy are unfounded.  Your conflicts in representing Ms. Peavy and Ms. Peary, as well as other parties in this case, remain a serious issue and one that the District Court has the full right to remedy.  *See Abbott v. Kidder Peabody & Co.*, 42 F. Supp. 2d 1046, 1050-51 (D. Col. 1999); *Moreno v. Autozone, Inc.*, 2007 WL 4287517, at *3, *17 (N.D. Cal. Dec. 6, 2007).

All of DC's rights are reserved.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:     Matthew T. Kline, Esq.
Richard Kendall, Esq.

**EXHIBIT T**
**242**

# EXHIBIT U

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

November 4, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Marc:

We write to follow up on our October 19, 2011, letter to you addressing issues raised by defendants' production of Jean Peavy's will, including DC's right to take further depositions of defendant Mark Warren Peary and his sister Dawn Peavy.  We have received no response from you.  Please advise us of your position forthwith.

All of DC's rights are reserved.

Very truly yours,

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline, Esq.
Richard Kendall, Esq.

**EXHIBIT U**
**243**

# EXHIBIT V

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

November 9, 2011

<u>Via E-Mail</u>

Dan Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dan:

I write to follow up on certain outstanding discovery issues.

As to your October 19 and November 4, 2011 letters, those letters simply re-stated the erroneous factual contentions originally set forth in your October 7, 2011 letter, which were addressed in my October 14, 2011 letter.  In fact, while your October 7, October 19 and November 4, 2011 letters vaguely allude to "issues" and DC's desire to re-depose Dawn Peavy and Mark Warren Peary, there does not appear to be any concrete dispute for the parties to address.

In response to the inquiry in Mr. Tokoro's November 4, 2011 letter, Ms. Larson will complete her review of her mother's documents, and any relevant, responsive documents will be produced to DC by no later than November 25, 2011.  Ms. Larson was in the process of completing her review when her building's mangers announced that they will be fumigating the entire premises, which will require her to pack her belongings, etc., and will delay her by a couple of weeks.

Lastly, please be advised that, in addition to the log already produced by Renner Otto and incorporated in defendants' privilege logs, defendants anticipate that they will produce a log of the "Bulson" electronic archive at the same time that Ms. Larson produces any remaining "Joanne Siegel" documents.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT V**
**244**

# EXHIBIT W

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

November 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    ___DC Comics v. Pacific Pictures Corp. et al.__, CV-10-3633 (ODW) (RZx)

Dear Marc:

We write in response to your letter of yesterday addressing various outstanding discovery issues.

1. <u>Jean Peavy Will</u>.  You have not responded to the issues we raised in our October 7, October 19, and November 4 letters.  Your assertion that "there does not appear to be any concrete dispute for the parties to address" is contradicted by the record.

First, you do not address the fact that at his June 29 deposition, defendant Mark Warren Peary testified that he believed Dawn Peavy would share with him under the Peavy Will.  M. Peary Tr. at 76:14-80:4.  At Dawn Peavy's August 3 deposition, she also testified that it was her understanding that she would benefit under the will, as discussed with Mr. Peary.  D. Peavy Tr. at 49:14-51:3.  The Peavy Will contradicts these assertions and discloses that Mr. Peary is the sole beneficiary of the estate.  Neither Mr. Peary nor Dawn Peavy testified that Dawn would share in her mother's estate's assets only if her mother first set up a trust, otherwise amended her will, or Mr. Peary pre-deceased his mother.  We are entitled to examine Dawn Peavy and Mr. Peary regarding this inconsistency.  In addition, you have nowhere addressed DC's right to depose both Dawn Peavy and Mr. Peary concerning the recent agreement between Mr. Peary and Pacific Pictures that you produced in September.

Second, we remain concerned about the conduct and credibility of your client, and the conflicts of interest on your part, especially since you represent also Ms. Peavy.  This concern is highlighted by Ms. Peavy and Mr. Peary's inconsistent testimony about the distribution of the estate and ensuing failure to correct their testimony.  We need to address these issues promptly.

**EXHIBIT W**
**245**

O'MELVENY & MYERS LLP
November 11, 2011 - Page 2

    2.  <u>Laura Siegel Larson Review</u>.  We requested that defendant Laura Siegel Larson review her mother's files and produce or log responsive documents at her July 22, 2011, deposition, almost four months ago.  We cannot wait any longer.

    3.  <u>Bulson Log</u>.  It is unclear what you mean in saying that "defendants anticipate that they will produce a log of the 'Bulson' electronic archive."  Please confirm that defendants will be providing DC with a log of Renner Otto's entire digital copy of Mr. Siegel's files identifying who authored the document, to whom it was sent (if anyone), the date of the document, when it was received by Renner Otto (if that date is known), and the total number of pages for each individual document.  Also, please confirm that attachments and enclosures will be listed separately, as would each part of an email chain.

    4.  <u>Bulson Document Production</u>.  You letter once again does not provide a date certain when you will complete your review and produce or log Renner Otto's expert report and its calendar and billing entries.  It has been four months since we made our request at Mr. Bulson's July 19, 2011, deposition, and there is no justification for defendants' delay.  Please confirm that you will complete your review no later than next Friday, November 18.

                  Very truly yours,

                  /s/ Daniel M. Petrocelli

                  Daniel M. Petrocelli
                  of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline, Esq.
       Richard Kendall, Esq.

**EXHIBIT W**
**246**