1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11  Attorneys for Plaintiff DC Comics

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  DC COMICS, | Case No. CV 10-3633 ODW (RZx) |
| 15            Plaintiff, | **DISCOVERY MATTER** |
| 16         v. | **DC COMICS' NOTICE OF MOTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |
| 17  PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | DECLARATIONS OF MATTHEW T. KLINE AND CASSANDRA SETO, AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | **Judge**:         Hon. Otis D. Wright II |
| 23 | **Magistrate**:   Hon. Ralph Zarefsky |
|            Defendants. | |
| 24 | **Hearing Date**:      Feb. 13, 2012 |
| 25 | **Hearing Time**:      10:00 a.m. |
|  | **Courtroom**:          540 |
| 26 | **Discovery Cutoff**:   None Set |
| 27 | **Pretrial Conference**: None Set |
|  | **Trial**:                   None Set |
| 28 | |

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2        PLEASE TAKE NOTICE that on February 13, 2012, at 10:00 a.m., or as

3 soon thereafter as the matter may be heard by the above-entitled court, located at

4 255 East Temple Street, Los Angeles, California in Courtroom 540, plaintiff DC

5 Comics will and hereby does move the Court for an order compelling defendants

6 (1) to produce to DC an unredacted copy of the communication from Kevin Marks

7 (the "Marks Communication) identified in defendant Laura Siegel Larson's July 11,

8 2003, letter to her half brother Michael, Seto Decl. Ex. C at 287, and the Toberoff

9 Timeline document, Docket No. 49, FAC Ex. A at 63; or (2) to provide the Court,

10 for its *in camera* review, the Marks Communication.

11        This motion is made pursuant to Rules 26, 34, and 37 of the Federal Rules of

12 Civil Procedure and Rule 37-2 of the Local Rules of this Court on the grounds that

13 defendants have no proper grounds to resist producing the Marks Communication.

14 Any asserted privilege in the document was waived when defendants disclosed its

15 contents in, *inter alia*, Larson's July 2003 letter. Significant portions of the Marks

16 Communication, moreover, are not privileged, but rather merely recount and

17 convey business communications. The Marks Communication is directly relevant

18 to DC's federal and state-law claims in this case and significantly undermines the

19 credibility of at least three key witnesses: Marks, Larson, and Marc Toberoff.

20        Pursuant to Local Rule 37-1, the parties have attempted unsuccessfully to

21 resolve their disputes and therefore respectfully seek the assistance of the Court.

22 Pursuant to Central District Local Rule 37-2.4, and as explained the Declaration of

23 Matthew T. Kline filed concurrently herewith, DC is forced to submit this as a

24 motion rather than a joint stipulation because defendants have improperly refused to

25 provide their opposition in s timeline manner in accordance with Local Rule 37-2.2.

26        This motion is based on this Notice of Motion and Motion; the

27 accompanying Memorandum of Points and Authorities; the concurrently-filed

28 Declarations of Matthew T. Kline and Cassandra Seto and exhibits in support

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

thereof; any additional briefing that may be filed; all exhibits, files, and records on file in this action; matters of which judicial notice may be taken; and such additional submissions and argument as may be presented at or before the hearing on this motion.

Dated:        January 23, 2012                    Respectfully Submitted,
                                                  O'MELVENY & MYERS LLP


                                                  By: /s/ Daniel M. Petrocelli
                                                      Daniel M. Petrocelli
                                                      Attorneys for Plaintiff DC Comics

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .............................................................................. 1

II.   RELEVANT FACTUAL BACKGROUND ...................................................... 3

    1.  The Marks Communication At Issue And Its Relevance.......................... 3

    2.  Larson's July 2003 Letter And Its Revelations Concerning Marks........... 4

III.  DEFENDANTS SHOULD BE COMPELLED TO PRODUCE

      MARKS COMMUNICATION IDENTIFIED IN LARSON'S JULY

      2003 LETTER .............................................................................. 8

IV.   CONCLUSION .............................................................................. 14

1

# TABLE OF AUTHORITIES

2

**Page**

3    CASES

4
*Applied Med. Res. Corp. v. Ethicon, Inc.*,
5       2005 U.S. Dist. LEXIS 41199 (C.D. Cal. May 23, 2005)................................ 14

6    *Burden-Meeks v. Welch*,
7       319 F.3d 897 (7th Cir. 2003) ................................................................ 10

8    *Dellwood Farms, Inc. v. Cargill, Inc.*,
9       128 F.3d 1122 (7th Cir. 1997) .............................................................. 10

10   *Electro Scientific Indus., Inc. v. Gen. Scanning, Inc.*,
11      175 F.R.D. 539 (N.D. Cal. 1997) ............................................................. 9

12   *In re Fischel*,
        557 F.2d 209 (9th Cir. 1977) ................................................................ 13
13
     *In re Grand Jury Investigation*,
14      974 F.2d 1068 (9th Cir. 1992) .............................................................. 14

15   *In re Qwest Commc'ns Int'l Inc.*,
16      450 F.3d 1179 (10th Cir. 2006) .............................................................. 9

17   *In re Teleglobe Commc'ns Corp.*,
18      493 F.3d 345 (3d Cir. 2007) ................................................................ 11

19   *Mckay v. Comm'r*,
20      886 F.2d 1237 (9th Cir. 1989) .............................................................. 13

21   *Permian v. U.S.*,
        665 F.2d 1214 (D.C. Cir. 1981) ............................................................ 10
22
     *Tennenbaum v. Deloitte & Touche*,
23      77 F.3d 337 (9th Cir. 1996) ................................................................. 8

24
     *U.S. v. Freeman*,
25      519 F.2d 67 (9th Cir. 1975) ................................................................ 13

26   *U.S. v. Hall*,
27      346 F.2d 875 (2d Cir. 1965) ................................................................ 13

28

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3
4

*U.S. v. Jacobs,*
    117 F.3d 82 (2d Cir. 1991) ............................................................................ 8, 12

5
6

*U.S. v. Martin,*
    278 F.3d 988 (9th Cir. 2002) ............................................................................. 10

7
8

*U.S. v. Mendelsohn,*
    896 F.2d 1183 (9th Cir. 1990) ............................................................................. 9

9
10

*U.S. v. Reyes,*
    239 F.R.D. 591 (N.D. Cal. 2006) ........................................................................ 9

11

*U.S. v. Ruehle,*
    583 F.3d 600 (9th Cir.2009) ............................................................................... 10

12
13

*Upjohn Co. v. U.S.,*
    449 U.S. 383 (1981) ..................................................................................... 12, 13

14
15

*Weil v. Inv./Indicators, Research & Mgmt., Inc.,*
    647 F.2d 18 (9th Cir. 1981) ....................................................................... passim

16
17

*Westinghouse Elec. Corp. v. Republic of the Philippines,*
    951 F.2d 1414 (3d Cir. 1991) ............................................................................. 10

18

**OTHER AUTHORITIES**

19

FED R. CIV. P. 34(b)(2)(C) ........................................................................... 14

20

6-26 MOORE'S FEDERAL PRACTICE - CIVIL § 26.49 (2011) .................................... 13

21

MOORE'S FEDERAL DISCOVERY PRACTICE § 3.17 (2011) ........................................ 14

22
23
24
25
26
27
28

# I.    INTRODUCTION

DC brings this motion to obtain a single communication from Kevin Marks to the Siegel heirs—a communication whose existence and substance is openly disclosed in both defendant Laura Siegel Larson's July 11, 2003, non-privileged letter to her half-brother Michael, as well as the non-privileged Toberoff Timeline. DC's complaint alleges that in October 2001, DC reached an agreement with the Siegels finally settling the Siegels' copyright claims.  Marks negotiated the contract on behalf of the Siegels, and he told DC in October 2001 the Siegels "accepted" DC's then-pending offer.  Toberoff, who was well aware of this agreement from conversations with Marks, falsely represented to the Siegels, through Marks, that a wealthy investor was prepared immediately to pay the Siegels $15 million for their putative Superman rights, plus other consideration.  Based on Toberoff's false promises, the Siegels in 2002 repudiated their 2001 agreement with DC and entered into a series of agreements with Toberoff and defendant IP Worldwide, LLC, which gave Toberoff and his company a 45% interest in the Siegels' putative rights.

Larson's July 2003 letter, which Judge Wright recently ordered defendants to produce, confirms that Marks communicated Toberoff's offer to the Siegels, and that when he did so, he told them they could not accept it because they "had a deal with Time Warner/DC."  Marks said further that, if the Siegels repudiated their deal with DC to accept Toberoff's offer, Marks "would testify against [the Siegels] in court."  Larson's July 2003 letter openly admits Marks said this, and Larson's admission—*which defendants fought for years to keep hidden from DC*—validates DC's claims in this case, impeaches key testimony from Larson, Marks, and Toberoff, and contradicts defendants' contention in this case and *Siegel* that the Siegels and DC did not reach a binding settlement in October 2001.

DC was entitled to Larson's July 2003 letter to her brother, and is now entitled to the underlying Marks communication that both the July 2003 letter and the Toberoff Timeline openly disclose.  Larson's disclosure of Marks' message in

1  her non-privileged July 2003 letter waived any claim of privilege defendants could

2  assert in Marks' communication.  Judge Wright ordered defendants to produce the

3  July 2003 letter over defendants' specious objections that the July 2003 letter was

4  privileged, and over defendants' claims that prior rulings in this case and *Siegel*

5  barred DC from discovering the document.

6      The Toberoff Timeline—which Judge Larson ordered defendants to produce,

7  and defendants jointly and publicly filed in *Siegel* in March 2009, Docket No. 42 at

8  40-54—similarly discusses Toberoff approaching Marks to acquire the Siegels'

9  interests; Marks' conveying Toberoff's offer to the Siegels; and Marks "tell[ing] the

10  Siegels that he would testify in court against the Siegels if they accepted this

11  offer…."  This disclosure of Marks' communications—which defendants

12  previously asserted the Toberoff Timeline invented and did not exist—also vitiated

13  any claims of privilege in the Marks' communication.

14      In any event, it is clear that at least significant parts of the Marks

15  communication were not privileged, because the document merely conveyed

16  Toberoff's offer to the Siegels, Marks' responsive comments to Toberoff, and his

17  affirmation that DC and the Siegels had reached an agreement in 2001.  As courts

18  in this circuit and elsewhere have held, attorney-client privilege does not extend to

19  the transmission of such business proposals from one party to another, or to a

20  recitation of such underlying, operative facts.

21      Parts of the Marks communication not disclosed in the July 2003 letter or the

22  Toberoff Timeline might be privileged, but defendants have neither explained nor

23  showed why that is the case, or redacted the document to eliminate subject matters

24  other than those disclosed in the July 2003 letter and the Timeline.  Indeed, DC

25  does not know whether the Marks communication is lengthy or brief, or whether

26  there is a basis to redact any of its contents.  What DC *does* know is that the

27  communication contains Marks' message conveying Toberoff's offer to the Siegels

28  and his objections to it.  DC is entitled to discover Marks' communication on these

1    subjects in his own words—both as proof of its claims and to impeach his,

2    Larson's, and Toberoff's contrary testimony.  In short, defendants should be

3    ordered to produce the Marks communication without delay.  Alternatively, the

4    Court should order defendants to provide the document for *in camera* review, to

5    produce the document to DC, with redactions if necessary.

6    **II.    RELEVANT FACTUAL BACKGROUND**

7         *1.  The Marks Communication At Issue And Its Relevance*

8         Defendant Laura Siegel Larson sent her half-brother Michael Siegel a letter

9    dated July 11, 2003, in which she openly disclosed the existence and substance of a

10   communication she received from Kevin Marks—the Siegels' prior lawyer who

11   negotiated with DC a settlement of the heirs' putative Superman claims in October

12   2001.  Cassandra Seto Decl. ("Seto Decl.") Ex. C at 287.  According to Larson,

13   Marks communicated to the Siegels in 2002:  an offer made by defendant Marc

14   Toberoff on behalf of an unnamed "investor" to acquire the Siegels' putative

15   Superman rights; that the heirs could not accept the offer because they "had a deal

16   with Time Warner/DC" providing that DC would retain all rights to Superman; and

17   that Marks "would testify against [the Siegels] in court" if they repudiated the

18   October 2001 agreement with DC to accept Toberoff's offer.  *Id.*

19         The Marks Communication validates DC's federal and state-law claims here.

20   As alleged in DC's complaint, DC and the Siegels engaged in negotiations for four

21   years after the Siegels served their Superman termination notice in 1997, resulting

22   in an agreement in October 2001 finally settling the Siegels putative claims.

23   Docket No. 49, First Amended Complaint ("FAC") ¶¶ 66-69.  Indeed, Marks sent

24   John Schulman, general counsel for Warner Bros., a letter on October 19, 2011,

25   confirming the parties' agreement:  "The Siegel Family (through Joanne Siegel and

26   Laura Siegel Larson, the majority owners of the terminated copyright interests) has

27   accepted D.C. Comics' offer of October 16, 2011 in respect of the 'Superman' and

28   'Spectre' properties."  Docket No. 305-15 at 414.

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

1       After securing half of the Shuster heirs' putative Superman copyright

2   interests for himself, Toberoff reached out to Marks in late 2001, early 2002, and

3   again in the summer of 2002.  Docket No. 49, FAC ¶¶ 66-79.  As Marks has

4   testified, he told Toberoff of the existence of the 2001 agreement between the

5   Siegels and DC, refused to discuss its specifics, but Toberoff pressed for details

6   concerning the agreement and asked Marks to communicate to the Siegels an offer

7   to buy out their rights.  Docket Nos. 49, FAC ¶ 77; 307 at 9-13; 308 ¶¶ 16-31.

8       Toberoff falsely represented to the Siegels (through Marks) that if they

9   repudiated their agreement with DC and entered into an agreement with him

10  instead, a wealthy "investor" was prepared immediately to pay them $15 million for

11  their Superman rights, plus generous back-end profit participations and other

12  consideration.  Toberoff also falsely represented that he and his business partner

13  would help the Siegels produce their own Superman movie.  Docket Nos. 49, FAC

14  ¶¶ 71-78 & Ex. A at 63; 225-4 at 3; 305-14 at 375:20-376:5; 308 ¶¶ 29-31.  Based

15  on Toberoff's false inducements, the Siegels repudiated their 2001 agreement with

16  DC and entered into agreements with Toberoff and defendant IP Worldwide, LLC,

17  which provided Toberoff and his company a 45% interest in any recovery by the

18  Siegels.  Docket Nos. 49, FAC ¶¶ 79-85, 180-86; 305-26; 305-56 308 ¶¶ 32-41.

19      *2. Larson's July 2003 Letter And Its Revelations Concerning Marks*

20      From the outset of discovery in this case, DC pressed defendants to produce

21  correspondence between Larson and her brother Michael identified in the Toberoff

22  Timeline—*none* of which had been provided to DC in the *Siegel* case or appeared

23  on defendants' numerous privilege logs.  *E.g.*, Docket No. 160 at 30-38.  This

24  includes a May 2003 letter from Michael to Larson and Larson's July response.

25  Docket Nos. 49, FAC Ex. A at 64-66; 160 at 37-38.  Defendants refused to produce

26  these non-privileged communications between brother and sister, forcing DC to file

27  motion after motion seeking these unaccounted for Larson-Michael Siegel

28  correspondence.  *E.g.,* Docket Nos. 160 at 30-38; 225 at 13-17; 316 at 6-20.

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

1    This Court ordered defendants to produce to DC a May 13, 2003, letter from
2    Michael to Larson.  Docket No. 209 at 12.  The May 13 letter directly refutes
3    factual contentions in SLAPP briefing, corroborates DC's claims in the case, and
4    confirms the veracity of parts of the Toberoff Timeline document.  *See* Docket No.
5    225 at 13-14.[1]  DC examined Larson about Michael's May 13 letter during her
6    deposition.  She confirmed that she responded to his May 13 letter; that she
7    believed her response was sent in July 2003; and that she gave Toberoff a copy of
8    the final letter.  Docket No. 316-5 at 314:12-15, 316:11-12, 323:11-14, 325:22-
9    327:22, 328:3-330:3.  Toberoff refused to produce the letter or confirm it existed
10   for months—then he finally disclosed its existence on defendants' privilege logs
11   (where it was hidden behind other entries) and claimed it was subject to a common-
12   interest privilege.  Docket Nos. 329, 331, 332.

13   Judge Wright ultimately ordered defendants to produce the July 2003 letter to
14   DC, rejecting as clearly erroneous defendants' arguments that, *inter alia*, the July
15   2003 letter was protected by a common-interest privilege, or that prior discovery
16   rulings in this case or *Siegel* barred DC from seeking it.  Docket No. 336.

17   Like the May 2003 letter, the July 2003 letter contains especially important
18   revelations—both because of the facts it recounts, and because it underpins many of
19   DC's key allegations in this case.  *Compare* Seto Decl. Ex. C at 287-90, *with*
20   Docket No. 49, FAC ¶¶ 7-8, 66-85, 180-86.  Significantly, Larson openly discloses
21   receiving a communication from Marks in which he conveyed Toberoff's offer to
22   Siegels, while at the same time stating that he would testify against the heirs if they
23

---

[1] The opening line of the May 13 letter also disclosed yet another Larson-Michael correspondence defendants never logged, produced, or disclosed—a November 2, 2002, letter from Larson to Michael.  Docket No. 225-4 at 3.  Defendants represented to this Court that they were not in possession of the November 2 letter,  Docket Nos. 267-1 at 25-26; 288 at 38:22-39:13, and based on that representation, the Court denied DC's motion to compel its production, Docket No. 288 at 43:23-44:2.  Defendants now *admit* the November 2 letter is in their possession, yet they still refuse to produce it.  Seto Decl. Ex. F at 311 (Entry No. 399).  DC will be moving separately to compel its production.

DC'S NOTICE OF MOT. & MOT. TO COMPEL PROD. OF DOCS

accepted his offer.  Larson wrote to her brother (in a letter she admits Toberoff

reviewed, edited, and approved):

> We fired Kevin Marks and Bruce Ramer because they were insisting
> we take a bad TW/DC deal.  You'll remember that you, Don Bulson
> and we were shocked when *Kevin Marks said that if asked to, he
> would testify against us in court*. …
>
> *Kevin Marks had turned Marc away saying we had a deal with DC*
> when we did not. …
>
> *Kevin Marks told Marc we had a deal with Time Warner/DC*.

Seto Decl. Ex. C at 287 (emphasis added).

The Marks Communication not only directly supports DC's claims in this

case, it bears importantly on Larson's, Marks', and Toberoff's credibility as

witnesses.  For example—before DC obtained the Timeline document or any of the

evidence above—Marks equivocated in the *Siegel* case:

> Q. Did you as of February 6, '02 believe that you had closed a deal
> with DC for the Superman interest?
>
> A. Well, if the question is did I think at this point there was a final,
> binding, enforceable agreement, the answer would be no, but I did
> believe that we had come to an agreement back on October 19th, 2001,
> that was reflected exactly in the terms that I set out.  At the end of that
> letter I wrote to John in substance and effect, "John, if I've gotten
> anything wrong, if I've misstated any of these terms, please let me
> know."  When John writes back on October 26, which I see later, in
> effect his letter is, "Yeah, you've got terms wrong.  My outline of the
> deal terms is different than your outline of the deal terms."  So while I
> thought we had an agreement on these terms, John evidently didn't,
> and where you don't have a meeting of the minds, you don't have an
> agreement.

Docket No. 305-14 at 360:21-362:2.

Larson made similar claims, *see* Seto Decl. Ex. B at 130-155:24; 224:21-

225:5; 266:10-270:3 ("We never reached a final agreement."), and Toberoff

testified that Marks did *not* tell Toberoff the Siegels already had a deal with DC.

*Compare*, *e.g.,* Docket Nos. 305-17 at 517:13-532:20 (Toberoff: "[Marks']

indicated that the *Siegel rights were available*, and if there was an interest in those

rights, you can make an offer, but he can't discuss anything with me.") (emphasis

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

added), *with* Seto Decl. Ex. C at 287 (Larson, in 2003 Letter edited and approved by Toberoff: "Kevin Marks told Marc we had a deal with Time Warner/DC.").[2]

Larson's July 2003 letter also confirms, once again, the accuracy of the Toberoff Timeline. Defendants have claimed the Timeline is an "untrustworthy," "ranting" "hitpiece" and chastised DC and its counsel for relying on it. *E.g.*, Docket Nos. 160 at 5, 71-73; 162-10 at 581-82 ¶ 10; 196 at 2, 10; 230 at 9-10. Yet, discovery revelation after discovery revelation—all made under force of court order—has verified the Timeline is in fact a truthful recitation of defendants' admissions and conduct, and that it identifies documents defendants improperly buried and withheld. *E.g.,* Docket Nos. 209 at 12; 230 at 9-10; 336. The Timeline, like the July 2003 letter, discloses the Marks communication and recounts:

> MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer [sic], Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer,* stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

> On August 8, 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, 'Don't do it." …

> *In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.*

> *Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached [with DC].*

> The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer [sic]. They fire Gang, Tyrer.

---

[2] The Court in *Siegel*, which did not have the benefit of this new evidence, denied DC's settlement defense based, *inter alia*, on Marks', Larson's, and Toberoff's deposition testimony. Case No. CV-04-8400, Docket No. 293 at 57-62. DC will be presenting this new evidence in *Siegel*, as one of many grounds to overturn Judge Larson's ruling.

DC'S NOTICE OF MOT. & MOT. TO COMPEL PROD. OF DOCS

1  Docket No. 49, FAC Ex. A at 63 (emphasis added).

2      Hoping to avoid motion practice, DC asked defendants to produce the Marks

3  communication identified in the July 2003 letter and Timeline.  Defendants refused.

4  Seto Decl. Exs. D, E.[3]  They also refuse to describe the communication beyond

5  what is disclosed in the July 2003 letter and Timeline, nor will they confirm where

6  it is listed on their various privilege logs.  DC believes, but cannot know for certain,

7  that it is at Entry No. 623 of the Siegel Privilege Log—an August 9, 2002, "Letter"

8  from "Kevin Marks" to "Joanne, Laura Siegel, Atty Don Bulson, Atty Bruce

9  Ramer," which was withheld on "Atty/Client" grounds, Docket No. 162-6 at 422.

10  **III.   DEFENDANTS SHOULD BE COMPELLED TO PRODUCE MARKS**

11         **COMMUNICATION IDENTIFIED IN LARSON'S JULY 2003**

12         **LETTER**

13      1.  Larson's July 2003 Letter Waived Privilege in the Marks Communication.

14  Larson's disclosure of the substance of the Marks communication in her July 2003

15  letter waived whatever privilege might otherwise have existed in the document.  *See*

16  *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996) ("disclosure of

17  privileged communications to someone outside the attorney-client relationship"

18  waives privilege); *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25

19  (9th Cir. 1981) (waiver applies to all "communications about the matter actually

20  disclosed"); *U.S. v. Jacobs*, 117 F.3d 82, 91 (2d Cir. 1991) ("[d]isclosure of the

21

22      [3] Defendants do not dispute that the Marks communication is responsive to DC's requests for production served in *Siegel* and this case or relevant.  *E.g.,* Docket Nos. 161-
23  14 at 154-55 (Larson Request No. 15 ("All DOCUMENTS relating to the October 19, 200[1] letter from Kevin Marks to John Schulman confirming that the SIEGEL HEIRS
24  'accepted D.C. Comics' offer of October 16, 2001."); *Id.* No. 23 ("All DOCUMENTS relating to any solicitation, offer, or option from any DEFENDANT regarding the
25  purported rights YOU or the SIEGEL HEIRS [have] in SUPERMAN and/or
26  SUPERBOY.")); 296-3 at 17 (Siegel Heirs Request No. 52 in *Siegel* ("All Writings concerning the settlement discussions between Plaintiffs and Defendants that took place
27  from approximately April 17, 1997 through September 30, 2002."); *Id.* No. 59 ("All Writings concerning any disposition of any rights relating to Superman, including but not
28  limited to any solicitation, offer, option, agreement or license.")).

DC'S NOTICE OF MOT. & MOT. TO COMPEL PROD. OF DOCS

1    substance of a privileged communication" effects waiver); *In re Qwest Commc'ns*

2    *Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) ("voluntary disclosure by the client

3    is inconsistent with the attorney-client relationship and waives the privilege").

4        The law in this circuit is well-established that voluntary disclosure of the

5    substance of a claimed attorney-client communication waives privilege as to that

6    communication.  For example, in *Electro Scientific Indus., Inc. v. Gen. Scanning,*

7    *Inc.*, 175 F.R.D. 539, 543 (N.D. Cal. 1997), the court found that a news release

8    stating that counsel advised that the subject patents were invalid waived privilege as

9    to underlying legal opinions.  The court reasoned that the news release "voluntarily

10    disclosed an important, substantive component of a *communication* from counsel";

11    indeed, the news release disclosed "the most important part of it:  the bottom line of

12    the lawyer's opinion, his conclusion, the ultimate outcome of his legal reasoning,"

13    *Id.* (emphasis in original).  Larson similarly discloses in her July 2003 letter the

14    "most important parts" of Marks' communication:  that Marks believed the Siegels

15    "had a deal with Time Warner/DC" finally settling their putative Superman claims

16    in October 2001; that Marks "turned Marc [Toberoff] away saying [the Siegels] had

17    a deal with DC"; and that Marks made clear to the Siegels he "would testify against

18    them in court" if they repudiated the October 2001 agreement to accept Toberoff's

19    offer on behalf of the unnamed "investor."  Seto Decl. Ex. C at 287.[4]

20        Defendants cannot avoid this waiver by having improperly withheld the July

21    2003 letter from DC for over six years based on specious common-interest privilege

22    claims now rejected by Judge Wright.  The July 2003 letter was written by Larson

23    in response to Michael's May 13 letter concerning Toberoff's misconduct—and his

24    illicit efforts to secure Michael's rights.  Docket No. 225-4; 316-5 at 314:12-15,

25    _____

26        [4] *Accord Weil,* 647 F.2d at 25 (disclosure to opposing counsel of content of privileged
    communication waived privilege) *U.S. v. Mendelsohn*, 896 F.2d 1183, 1189 (9th Cir.

27    1990) (waiver found where statements concerning advice of counsel made to third party);
    *U.S. v. Reyes*, 239 F.R.D. 591, 602-603 (N.D. Cal. 2006) (disclosure of substance of legal

28    investigative reports to government waived privilege as to underlying documents).

1   316:11-12, 323:11-14, 325:22-327:22, 328:3-330:3.  Larson drafted and sent her

2   July 2003 letter to address these accusations of misconduct, Docket Nos. 329 at 3;

3   332 at 7—and she did so *after* September 2002, and at a time when the Ohio district

4   court held (and Judge Wright confirmed) Michael's and Larson's interests were *not*

5   in common, but were "separate and apart."  Docket Nos. 161-5 at 31; 336.  When

6   Michael received the July 2003 letter—which contains *no* privilege or

7   confidentiality markings—he had no duty to keep the July 2003 letter or its

8   discussions of the Marks' communication private, meaning the July 2003 letter

9   "surrenders the privilege with respect to the world at large; selective disclosure is

10  not an option."  *Burden-Meeks v. Welch*, 319 F.3d 897, 898 (7th Cir. 2003); *accord*

11  *supra* n.4 & accompanying text; *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d

12  1122, 1126-27 (7th Cir. 1997); *Permian v. U.S.*, 665 F.2d 1214, 1219-22 (D.C. Cir.

13  1981); *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414,

14  1423-27 (3d Cir. 1991).

15        Defendants assert that no waiver occurred because in 2001 and part of 2002

16  Michael and Larson shared a common-interest, and all Larson was doing in her

17  2003 letter was discussing a 2002 communication—Marks' message—that once

18  was confidential.  Seto Decl. Ex. E at 293.  Whether Michael previously shared a

19  common interest with Larson makes no difference.  In July 2003, Michael stood in

20  the same shoes as any other third-party recipient of Larson's letter.  He was not

21  within the umbrella of any privilege and could disclose its contents to anyone.

22  Larson could have no expectation (reasonable or otherwise) of confidentiality in her

23  letter or its contents, *see U.S. v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002), and

24  she thereby waived any privilege in the contents of the letter, including her detailed

25  description of the Marks communication and the underlying Marks document that

26  communicated it, *U.S. v. Ruehle*, 583 F.3d 600, 612 (9th Cir.2009) ("*any* voluntary

27  disclosure of information to a third party waives the attorney-client privilege");

28  *Weil*, 647 F.2d at 24.  Parties who share the common-interest privilege expressly

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

1    agree not to disclose such communications, *e.g., In re Teleglobe Commc'ns Corp.*,

2    493 F.3d 345, 364-65 (3d Cir. 2007), but as the Ohio court and Judge Wright both

3    confirmed, Michael was under no such duty in July 2003.

4          Indeed, at the time Larson sent her July 2003 letter, her and Michael's

5    interests were palpably at odds.  Larson agreed Toberoff should try to buy, in

6    partnership with Ari Emanuel, her sick brother Michael's putative interests in

7    Superman.  Seto Decl. Ex. A at 3-5.  Larson, by her own admission, worked with

8    Toberoff to convince Michael to accept Toberoff's offer on behalf on his "unnamed

9    investor," *id.* Ex. C at 288-90, even though the terms Toberoff was offering

10   Michael were worse than he and Larson were themselves demanding from DC, *see*

11   Docket No. 183-4 at 47.  Toberoff also withheld key information from Michael and

12   his lawyer, Don Bulson.  Bulson recently confirmed that in negotiating with

13   Toberoff he asked for transparency, *e.g.,* Docket No. 305-52 at 1877:21-1878:3,

14   and despite repeated requests that Toberoff identify the unnamed "investor" on

15   whose behalf he was purportedly acting, Toberoff refused to tell him it was

16   Emanuel.  *E.g., id.* at 1863:5-11.  Toberoff likewise refused to disclose his own

17   *personal business interests* in the transaction, including that Emanuel was his

18   business partner.  *E.g., id.* at 1863:18-1867:2.

19         Defendants suggest DC is precluded from discovering the Marks document

20   based on rulings by the Ohio court in the *Siegel* case, Seto Decl. Ex. E at 293, but

21   *no court*—not this Court, not the Court in *Siegel*, and not the Ohio court—has ever

22   adjudicated whether Larson's disclosure in her July 2003 letter waived privilege in

23   the Marks communication.  No court could have so ruled since defendants first

24   produced the July 2003 letter in *October 2011*, pursuant to Judge Wright's order,

25   and after having obscured it for years behind a false privilege log entry listing a

26   "Facsimile" from "Laura Siegel" to "Marc Toberoff."  Docket No. 329 at 1.

27         2. <u>Defendants' Disclosure of the Toberoff Timeline Also Waived Privilege in</u>

28   <u>the Marks Communication</u>.  The Timeline, like Larson's July 2003 letter, openly

                                    - 11 -

1    discloses Marks' communications with the Siegels' concerning Toberoff's illicit

2    offer. *See supra* at 7-8. Such disclosures vitiate any claims of privilege in the

3    document. *E.g., Weil*, 647 F.2d at 24 (waiver applies to all "communications about

4    the matter actually disclosed"); *Jacobs*, 117 F.3d at 91 ("[d]isclosure of the

5    substance of a privileged communication" effects waiver).

6        Defendants repeatedly waived all privilege claims over the Timeline, as

7    Judge Larson squarely held. *E.g.*, Docket No. 42 at 45-47. And when DC finally

8    obtained the document in December 2008, defendants took no steps to maintain its

9    confidentiality. Just the opposite: *defendants* chose openly and publicly to file the

10   Timeline on March 2, 2009, as part of a discovery joint stipulation in the *Siegel*

11   case. *See* Docket No. 42 at 43-44. As quoted and shown above, the Timeline

12   contains lengthy descriptions of the Marks communication, and defendants never

13   sought to redact those descriptions or quotations—rather, instead, they called them

14   a delusional and false rant. *E.g.,* Docket Nos. 160 at 5, 71-73; 162-10 at 581-82

15   ¶ 10; 196 at 2, 10; 230 at 9-10. But Larson's very own July 2003 letter (which

16   Toberoff scripted) shows that the Timeline's disclosures were not a wild rant, and

17   confirm that Marks, in fact, told Toberoff and the Siegels exactly what the Timeline

18   author reported. By failing to assert privilege over the Timeline in 2007 or 2008,

19   and by failing to protect or redact its contents from full public review in 2009,

20   defendants waived any privilege claim over the Marks communication.

21        3. In Any Event, The Marks Communication Is Not Privileged (And Least

22   Not In Its Entirety). Larson's July 2003 letter and the Timeline both describe the

23   Marks communication as (a) Marks' republishing Toberoff's offer to acquire the

24   Siegels' purported Superman rights; (b) Marks' republishing his disclosure to

25   Toberoff that the Siegels reached agreement with DC; and (c) Marks' recounting

26   the fact the Siegels reached a settlement agreement with DC in 2001. It is well-

27   established that the attorney-client privilege does not extend to the transmission of

28   facts such as this, as opposed to the conveyance of legal advice. *E.g., Upjohn Co.*

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

1    *v. U.S.*, 449 U.S. 383, 395-396 (1981) (protection of attorney-client privilege does

2    not extend to "facts").  Facts do not become privileged simply because they are

3    incorporated into a communication from counsel.  *Id.* at 396; *see* 6-26 MOORE'S

4    FEDERAL PRACTICE - CIVIL § 26.49 (2011) ("The underlying facts of an action are

5    not protected by the attorney-client privilege.").

6         In *Mckay v. Comm'r*, 886 F.2d 1237, 1238 (9th Cir. 1989), the Ninth Circuit

7    permitted an attorney to testify, over an attorney-client privilege objection, that he

8    conveyed a notice of deficiencies from the IRS to his client.  The "relaying of this

9    message is not in the nature of a confidential communication." *Id.*  The privilege

10   does not extend to the Marks communication for the same reason:  Marks was

11   merely conveying the terms of Toberoff's offer to the Siegels, his response, and the

12   fact of their October 2001 agreement with DC.  Marks "served merely as a conduit

13   for transmission of a message," *U.S. v. Freeman,* 519 F.2d 67, 68 (9th Cir. 1975)

14   (quoting *U.S. v. Hall*, 346 F.2d 875, 882 (2d Cir. 1965)).

15        Likewise, in *In re Fischel*, 557 F.2d 209, 212 (9th Cir. 1977), the Ninth

16   Circuit ordered an attorney to produce lawyer-created documents that summarized

17   business transactions with third parties.  The facts incorporated into the summary

18   documents did not become privileged because an attorney gathered them.  The

19   "purpose of the [attorney-client] privilege," the court held, "is not to permit an

20   attorney to conduct his client's business affairs in secret," and that an "attorney's

21   involvement in, or recommendation of, a transaction does not place a cloak of

22   secrecy around all incidents of the transaction." *Id.* at 211-12.  Marks' words and

23   actions as "attorney-messenger" similarly do not cloak the facts conveyed.

24        4. <u>The Order DC Seeks.</u>  Defendants should be ordered to produce the Marks

25   communication to DC without redaction.  Defendants refuse to describe the

26   document beyond what is disclosed in Larson's July 2003 letter and the Timeline,

27   so DC has no way of determining whether it includes any privileged material

28   beyond the non-privileged contents discussed above.  DC believes the Marks

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS

1   communication is identified as Entry No. 623 of the Siegel Privilege Log in this

2   case, Docket No. 162-6 at 422, but as noted above, defendants refuse to confirm

3   that.  To the extent the document incorporates legal advice, defendants had a duty

4   to produce a redacted copy of the document, excluding any claimed privileged

5   material.  *See* FED R. CIV. P. 34(b)(2)(C).  Defendants did not and therefore waived

6   any privilege claims.  *See Weil*, 647 F.2d at 24 (voluntary disclosure of claimed

7   privileged material to a third party constitutes waiver); MOORE'S FEDERAL

8   DISCOVERY PRACTICE § 3.17 (2011) (produced documents to be redacted to

9   preserve privilege claims).

10          In the alternative to ordering the document produced outright, the Court

11   could order defendants to submit it for *in camera* review, to determine whether any

12   additional contents in the document other than those described above exist and

13   should be redacted.  *See In re Grand Jury Investigation*, 974 F.2d 1068, 1074 (9th

14   Cir. 1992); *Applied Med. Res. Corp. v. Ethicon, Inc.*, 2005 U.S. Dist. LEXIS 41199,

15   at *4 (C.D. Cal. May 23, 2005).  At all events, DC should be provided without

16   delay the portions of the Marks memo disclosed in the July 2003 letter and

17   Timeline.

18   **IV.    CONCLUSION**

19          For the foregoing reasons, DC's motion should be granted.

20   Dated:          January 23, 2012                    Respectfully Submitted,
21                                                       O'MELVENY & MYERS LLP

22                                                       By:  /s/ Daniel M. Petrocelli
23                                                           Daniel M. Petrocelli
24                                                           Attorneys for Plaintiff DC Comics

25

26

27

28

DC'S NOTICE OF MOT. & MOT. TO
COMPEL PROD. OF DOCS