# EXHIBIT A

# Ip worldwide

January 21, 2003

_Privileged & Confidential_

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Dear Joanne and Laura:

This is to confirm the agreement and understanding in connection with our recent discussion and disclosure to you of various risks and potential problems regarding Michael Siegel, and the mitigation of possible conflicts of interest with respect to the following proposed remedial actions:

1.      Ariel Emanuel ("AE") will attempt to purchase all of Michael Siegel's rights, title and interest in _Superman_, _Superboy_ and _The Spectre_ ("MS Interests") to be financed by AE.

2.      The proposed purchase will be subject to Michael Siegel entering into a formal written settlement agreement, settling and releasing each of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding _Superman, Superboy and The Spectre_. The settlement agreement will specifically disclose the separate _Superboy_ termination, recently served and filed.

3.      In the event Michael Siegel agrees to the above purchase and settlement, the following conditions will apply to and bind AE, any designee entity owned or controlled by him and his heirs, successors or assigns with respect to the MS Interests:

        (a)      The MS Interests will only be sold or assigned to a separate third party (i.e., not owned or controlled by AE) in conjunction with the sale or assignment of your interests in _Superman, Superboy_ and/or _The Spectre_, respectively, to said third party and not independently of your interests.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

IPWW 00003

EXHIBIT A

3

# Ip worldwide

Page 2
Joanne Siegel and Laura Siegel Larson
January 21, 2003

    (b)    You retain full and complete decision making authority with respect to the disposition of the copyright termination interests in *Superman*, *Superboy* and *The Spectre* arising from Jerome Siegel's copyright interest therein.

    (c)    AE will fully indemnify you and hold you completely harmless against any and all claims, causes of action, damages, costs or loss (including attorney's fees), if any, arising out of the purchase of the MS Interests and the settlement agreement.

    (d)    AE will reimburse you for twenty-five percent (25%) of any expenses paid by you after October 17, 2000 in connection with the Jerome Siegel copyright termination interests in *Superman*, *Superboy or The Spectre* , including without limitation, the filing cost of the Superboy Copyright Termination, upon and subject to your providing him with an itemized list of such expenses.

    (e)    AE will also pay twenty-five percent (25%) of the following sums: (i) fees, commission or settlement amounts, if any, to the law firm of Gang, Tyre, Ramer & Brown and/or its attorneys regarding their alleged services in connection with Jerome Siegel's copyright termination interests; (ii) fees, costs or expenses of any audit, if any, of revenues or profits derived from *Superman*, *Superboy or The Spectre* and (iii) fees, costs or expenses of any other actions to protect, enforce or enhance Jerome Siegel's copyright termination interests in *Superman*, *Superboy or The Spectre.*

    (f)    If , after the sale or assignment of the *Superman/Superboy/The Spectre* rights is made and royalties are being paid to the Siegel interest, AE chooses to offer his royalty interest for sale, you, or in the event of your death, your heirs, will have the right of first refusal to purchase said royalty interest.

4.    This letter contains the full and complete understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by each party. This letter shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this letter shall be valid

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**IPWW 00004**

**EXHIBIT A**

**4**

# Ip worldwide

Page 3
Joanne Siegel and Laura Siegel Larson
January 21, 2003

acceptable substitutes for executed originals.

If the above comports with your understanding please indicate this by your signatures below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Agreed, Understood and Accepted:

_____        Date: 1/23/03
Ariel Z. Emanuel

_____        Date: 1/22/03
Joanne Siegel

_____        Date: 1/22/03
Laura Siegel Larson

IPWW 00005

**EXHIBIT A**

5

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

       Plaintiffs,

    vs.                 No. 04-8400 (RSWL)(RZx)

                        -and-

WARNER BROS. ENTERTAINMENT   No. 04-8776 (RSWL)(RZx)
INC., et al.,

       Defendants.

AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

**SARNOFF**
*Court Reporters and*
*Legal Technologies*

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JOANNE SIEGEL and LAURA
      SIEGEL LARSON,
 5
              Plaintiffs,
 6
          vs.                        No. 04-8400 (RSWL) (RZx)
 7
      WARNER BROS. ENTERTAINMENT
 8    INC., et al.,

 9            Defendants.
      _____              -and-
10    JOANNE SIEGEL and LAURA
      SIEGEL LARSON,
11
              Plaintiffs,
12                                   No. 04-8776 (RSWL)(RZx)
          vs.
13
      TIME WARNER INC., WARNER
14    COMMUNICATIONS INC., WARNER
      BROS. ENTERTAINMENT INC., WARNER
15    BROS. TELEVISION PRODUCTION INC.,
      DC COMICS, and DOES 1-10,
16
              Defendants.
17    _____
      AND RELATED COUNTERCLAIMS.
18

19    _____

20            Deposition of LAURA SIEGEL LARSON, taken on

21    behalf of Defendants and Counterclaimants, at 9665

22    Wilshire Boulevard, 9th Floor, Beverly Hills, California,

23    beginning at 10:05 AM and ending at 8:50 PM on Tuesday,

24    August 1, 2006, before DAVID S. COLEMAN, Certified

25    Shorthand Reporter No. 4613.
```

                                                                2

**EXHIBIT B**

7

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4         LAW OFFICES OF MARC TOBEROFF
           BY:  MARC TOBEROFF
 5         Attorney at Law
           2049 Century Park East, Suite 2720
 6         Los Angeles, California 90067
           310-246-3333
 7

 8

 9    For Defendants and Counterclaimant:

           WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
10         BY:  MICHAEL BERGMAN
           Attorney at Law
11         9665 Wilshire Boulevard, 9th Floor
           Beverly Hills, California 90212
12         310-858-7888
           mbergman@wwllp.com
13
                -and-
14
           FROSS ZELNICK LEHRMAN & ZISSU
15         BY:  ROGER L. ZISSU
           Attorney at Law
16         866 United Nations Plaza
           New York, New York 10017
17         212-813-5900
           rzissu@frosszelnick.com
18

19

20    Also Present:

           LILLIAN LASERSON
21

22

23

24

25
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**8**

```
1                          INDEX

2   WITNESS                           EXAMINATION

3   LAURA SIEGEL LARSON

4

5        BY MR. ZISSU                      9

6

7                     EXHIBITS

8

    DEFENDANT                            PAGE
9

    1     Complaint in USDC 04-8400 (RSWL)    10
10        (RZx)

11  2     Complaint in USDC 04-08776 (RSWL)   11
          (RZx)
12

    3     Defendants'/Counterclaimant's First  17
13        Set of Requests for the Production
          of Documents and Things
14

    4     E-mail from Mark Toberoff to James   24
15        Weinberger dated June 19, 2006

16  5     Web page for Intellectual Properties  26
          Worldwide, LLC
17

    6     Letter from Ariel Emanuel to Bruce    58
18        Rosenblum

19  7     Letter from Paul Levitz to Jean       62
          Adele Peavy dated April 28, 2005
20

    8     Letter from Joanne Siegel to John     64
21        Schulman dated April 9, 1997

22  9     Findings and Order After Hearing      68
          in LASC Case No. BD321289
23

24  10    Income and Expense Declaration in     71
          LASC Case No. BD321289

25
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
9

INDEX (Continued):

EXHIBITS (Continued)

| DEFENDANT | | PAGE |
|---|---|---|
| 11 | Complaint for Declaratory Judgment; Demand for Trial by Jury in Probate Court, Case No. 2006 ADV 0112506 | 73 |
| 12 | Letter from Michael Bergman to Magistrate Judge Ralph Zarefsky dated July 6, 2006 | 74 |
| 13 | Letter from Jay Emmett to Jerome Siegel and Joseph Shuster dated December 23, 1975 | 76 |
| 14 | Letter from Joanne Siegel to Gerald Levin dated April 9, 1997 | 83 |
| 15 | Letter from Paul Levitz to Joanne Siegel dated April 15, 1999 | 85 |
| 16 | Notice of Termination of Transfer Covering Extended Renewal Term | 88 |
| 17 | Notice of Termination of Transfer Covering Extended Renewal Term Superboy | 105 |
| 18 | Notice of Termination of Transfer Covering Extended Renewal Term | 107 |
| 19 | Cover and one page from Issue No. 51 of More Fun Comics dated January, 1940 | 108 |
| 20 | *Cover and one page from* Issue No. 31 of More Fun Comics dated May, 1938, *Cover and one page from Issue No. 26 of Adventure Comics dated May, 1938, and cover and one page from Issue No. 15 of Detective Comics* | 110 |
| 21 | Issue No. 1 of Action Comics dated June, 1938 | 114 |
| 22 | Letter from Kevin Marks to John Schulman dated October 19, 2001 | 131 |
| 23 | Letter from Joanne Siegel to Richard Parsons dated May 9, 2002 | 134 |

5

**EXHIBIT B**
**10**

INDEX (Continued):

### EXHIBITS (Continued)

DEFENDANT                                                              PAGE

24   Letter from John Schulman to Kevin        139
     Marks dated October 26, 2001

25   Letter from Patrick Perkins to Kevin      151
     Marks dated February 1, 2002

26   Letter from Carol Simkin to Arthur        221
     Levine dated April 17, 1997

27   Letter from Arthur Levine to Carol        223
     Simkin dated April 22, 1997

28   Letter from Arthur Levine to Carol        223
     Simkin dated May 15, 1997

29   Letter from Arthur Levine to Carol        224
     Simkin dated June 19, 1997

30   Letter from Arthur Levine to Carol        225
     Simkin dated October 3, 1997

31   Letter from Arthur Levine to Carol        226
     Simkin dated December 17, 1997

32   Letter from Paul Levitz to Joanne         227
     Siegel and Laura Siegel Larson
     dated October 10, 1997

33   Letter from Carol Simkin to Arthur        234
     Levine dated December 18, 1997

34   Letter from Arthur Levine to              244
     Register of Copyrights, Library of
     Congress, dated February 2, 1998

35   Letter from Carol Simkin to Arthur        245
     Levine dated May 29, 1998

36   Letter from Arthur Levine to Carol        247
     Simkin dated June 19, 1998

37   Letter from Carol Simkin to Arthur        248
     Levine dated July 23, 1998

6

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**EXHIBIT B**

**11**

```
 1   INDEX (Continued):
 2                   EXHIBITS (Continued)
 3   DEFENDANT                                   PAGE
 4   38   Letter from Carol Simkin to Arthur    249
          Levine dated March 3, 1999
 5
 6   39   Letter from Bruce Ramer to John       252
          Schulman dated September 28, 1999
 7   40   Letter from Kevin Marks to Carol      259
          Simkin dated March 7, 2000
 8
 9   41   Letter from Joanne Siegel and Laura   261
          Siegel Larson to Kevin Marks and
          Bruce Ramer dated September 21, 2002
10
11   42   1 page of handwritten notes, Bates    273
          stamped WB005972
12
13
                 INSTRUCTION NOT TO ANSWER
14
                     Page   Line
15
                       50     19
16                     50     25
                       51     23
17                     54      7
                       55     11
18                     56      6
                       56     15
19                     66     12
                       76     14
20                    123      3
                      129     22
21                    195      8
                      203     13
22                    203     21
                      209     16
23                    228     17
                      251      3
24                    269      7
                      271     21
25                    272     22
```

                                                          7

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
                    877.955.3855


EXHIBIT B
12

1    (Continued):

2            INSTRUCTION NOT TO ANSWER (Continued)

3                        Page   Line

4                        273    10
                         275    21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

**EXHIBIT B**
**13**

```
 1           Beverly Hills, California, Tuesday, August 1, 2006
 2                    10:05 AM - 8:50 PM
 3
 4                    LAURA SIEGEL LARSON,
 5     having been administered an oath, was examined and
 6     testified as follows:
 7
 8                         EXAMINATION
 9     BY MR. ZISSU:
10          Q    Could you tell us your name?
11          A    Laura Siegel Larson.
12          Q    And where do you live?
13          A    6400 Pacific Avenue, No. 106, in Playa Del Rey,
14     California 90293.
15               MR. ZISSU:  Now, we will have certain
16     stipulations, which I think are normal.  Objections
17     except as to form are reserved.
18               Okay?
19               MR. TOBEROFF:  That's fine.
20     BY MR. ZISSU:
21          Q    Should I call you Miss Larson or Miss Siegel
22     or...
23          A    Miss Siegel.
24          Q    What do you prefer?
25          A    Miss Siegel would be fine, thank you.
```

9

1       Q   Miss Siegel, are you taking any medicines that

2  would impair your ability to understand questions and

3  respond?

4       A   No.

5       Q   Is there any reason why your ability to testify

6  will be impaired?

7       A   Well, I have multiple sclerosis, and the way

8  that affects me is I can get very exhausted.  When that

9  happens, it kind of comes on me slowly, and then it

10 affects my concentration, my ability to focus.  Visually

11 I have disturbances, and sometimes it affects my hearing

12 as well.

13      Q   Please let us know if that's a problem.

14      A   I'll try.

15      Q   All right.

16          I'd like to first mark as I guess Defendants'

17 Exhibit 1 to the examination a document entitled

18 "Complaint."  It's one of the complaints in the actions.

19          I am handing -- the procedure is I will hand you

20 a copy in each case, and I will hand one to the reporter

21 to mark for the witness.

22          (Defendants' Exhibit 1 marked.)

23          MR. ZISSU:  And then let's mark a second

24 complaint, which is the other action in the case -- we

25 will do it the same way -- as Defendants' Exhibit 2.

10

**EXHIBIT B**

**15**

1              (Defendants' Exhibit 2 marked.)

2              MR. TOBEROFF:  I just want to point out for the

3    record that both Exhibit 1 and Exhibit 2 have been

4    amended.  I just want to make sure that this is not the

5    current complaint.

6              MR. ZISSU:  It's what they say they are.  I am

7    going to ask the witness to identify them.

8         Q    Now, Miss Siegel, are you familiar with those

9    documents, Defendants' Exhibit 1 and 2?

10             Have --

11        A    Yes.

12        Q    -- you seen them before?

13             And what are they?

14        A    They're the complaints in the two current cases.

15        Q    And are you a plaintiff in both of these

16    actions?

17        A    Yes, I am.

18        Q    And what do you understand the nature of the

19    actions to be?

20             MR. TOBEROFF:  Objection.  Calls for a legal

21    conclusion.

22             You can answer.

23             MR. ZISSU:  Please do not reveal -- if you have

24    a form objection, just say "form objection."  I don't

25    want any suggestions.

11

**EXHIBIT B**

**16**

```
 1              MR. TOBEROFF:  It's not a suggestion.  It's a
 2    perfectly legitimate objection.
 3              MR. ZISSU:  It's not necessary to talk about
 4    whether it's a legal conclusion or anything else, so I
 5    ask you to refrain from that.  Just note your objection.
 6              MR. TOBEROFF:  I will, which is what I did.
 7              THE WITNESS:  Could you ask me the question
 8    again, please?
 9    BY MR. ZISSU:
10       Q    Yeah.  What's the nature -- let's take
11    Defendants' Exhibit 1.  What's the nature of that action
12    as you understand it?
13              MR. TOBEROFF:  Same objection.
14              MR. ZISSU:  You want to stipulate, so that we
15    don't have these objections, you can reserve your form
16    objections?
17              MR. TOBEROFF:  No, I do not.  I do not.
18              MR. ZISSU:  Well, I'm going to ask you to do
19    that.
20              MR. TOBEROFF:  It's a perfectly legitimate
21    objection.
22              MR. ZISSU:  If you are going to object to every
23    question as we go through the course of the day to
24    preserve your right to object, what we are going to have
25    is the deposition is going to be twice as long.  I am
```

12

1  trying to accommodate your witness, your time and mine,

2  by not doing that.

3          MR. TOBEROFF:  It's a well-known and perfectly

4  legitimate objection, and I am going to make the

5  objections as I see fit.  I agree that we should try not

6  to engage in colloquy regarding the merits of objections,

7  but I am entitled to make my objections, and I am going

8  to do so, and I will try and do so succinctly.

9          MR. ZISSU:  You need not go into the particular

10  reason for the objection on the record.

11          MR. TOBEROFF:  I said calls for a legal

12  conclusion.  It's a perfectly legitimate objection.

13          MR. ZISSU:  I think it may be a signal to the

14  witness.  I ask you to refrain from doing that.  It's

15  unnecessary.

16          MR. TOBEROFF:  I disagree with you.  You're

17  showing her a legal document obviously prepared by

18  attorneys and asking her questions about it.

19          MR. ZISSU:  Please don't testify as to who

20  prepared it in front of the witness and whether it was by

21  an attorney or anybody else.  That's exactly the kind of

22  thing I want you to refrain from doing in this

23  examination.

24          Do you understand that?

25          MR. TOBEROFF:  I am responding to your colloquy

13

1    regarding the objection.

2            MR. ZISSU:  All right.

3            You want to repeat the question?

4            (Record read as follows:

5                "Q   Yeah.  What's the nature --

6            let's take Defendants' Exhibit 1.

7            What's the nature of that action as

8            you understand it?")

9            THE WITNESS:  I believe this is the -- this is

10   the action regarding the Superman terminations.

11   BY MR. ZISSU:

12       Q   But what's your understanding of its goal?

13            MR. TOBEROFF:  Same objection.

14            THE WITNESS:  It relates to our termination that

15   became effective on April 16, 1999, and the fact that we

16   have not been -- no accounting of profits has been paid

17   to us.

18   BY MR. ZISSU:

19       Q   And, now, what's your understanding of the

20   nature of the Defendants' Exhibit 2?

21       A   Exhibit 2 relates to Superboy and the

22   termination that has been filed regarding Superboy.

23       Q   Did you see both of these complaints before they

24   were filed?

25       A   Yes.

14

```
 1        Q    You read them personally?

 2        A    Yes.

 3        Q    What have been your addresses since 1997 --

 4   since January 1, 1997?

 5        A    The same as they are now.

 6        Q    And could you receive faxes at that address, at

 7   your home?

 8        A    Yes.

 9        Q    And what's your fax number?

10        A    Area code 310-827-7227.

11        Q    And that's been the same throughout the

12   period --

13        A    Yes.

14        Q    -- from --

15        A    Yes.

16        Q    -- January 1, '97 to date?

17        A    Yes.

18        Q    And what did you do to prepare for this

19   examination?

20        A    I looked over these complaints and just thought

21   about it.

22        Q    Did you look over any other documents besides

23   the pleadings in the case?

24        A    No, not really.

25        Q    Are you married?
```

15

```
 1        A    I'm divorced.

 2        Q    And when were you divorced?

 3        A    I was divorced in 2001.

 4        Q    Have you attended college?

 5        A    Yes.

 6        Q    Where?

 7        A    UCLA.

 8        Q    From what years to what years?

 9        A    1969 to 1972.1973

10        Q    Do you have a degree?

11        A    Yes.

12        Q    What degree?

13        A    B.A.

14        Q    Have you attended graduate school?

15        A    No.

16        Q    Any other post-college education?

17        A    On-the-job training.

18        Q    And what's your employment history after

19   college?

20        A    I was a broadcast journalist for a number of

21   years, and I became disabled in 1994.

22        Q    And where were you employed as a broadcast

23   journalist?

24        A    I worked for CNN, for the ABC station in Palm

25   Springs.  I worked for the CBS station in Los Angeles and
```

16

```
1    KCAL in Los Angeles, which was owned by the Disney

2    company at that time.

3         Q    And since you have been disabled, you have not

4    been employed?

5         A    Correct.

6         Q    When was the first time you had any

7    communication with Marc Toberoff?

8         A    I believe it was in late 2002.

9         Q    Okay.  And do you remember the occasion of

10   meeting him?

11        A    My mother had spoken to him on the phone.  She

12   had had a conversation with Jean Peavy, and Jean Peavy

13   recommended him, and subsequent to that we met.

14        Q    And who is Jean Peavy?

15        A    Jean Peavy is an old family friend, and she is

16   the sister of Joe Shuster.

17        Q    Do you know whether that telephone conversation

18   was initiated by Ms. Peavy or by your mother?

19        A    I don't know.

20             MR. ZISSU:  Let's mark as Defendants' Exhibit 3

21   a document entitled "Defendants'/Counterclaimant's First

22   Set of Requests for the Production of Documents and

23   Things."

24             (Defendants' Exhibit 3 marked.)

25   BY MR. ZISSU:
```

17

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**

1      Q    And my first question is have you ever seen that

2   before?

3      A    Yes.

4      Q    And when did you see that?

5      A    Whenever my lawyer sent it to me.

6      Q    Do you understand that it was on or shortly

7   after the point at which he received it?

8      A    I'm sure it was.

9      Q    What did you do in looking for documents?

10      A    I asked my mother to find what she had, and she,

11   you know, put them together, you know, threw them in a

12   box and stuff and turned them over to me, and then I

13   looked for what I had, and some of them were in bags and

14   some were in boxes, and I delivered them to my attorney.

15      Q    Did you both have documents, or did you have

16   separate documents?  How did that work?

17      A    Well, my mom has some things that I don't have,

18   and I had some things that she didn't have.

19      Q    Is there any rationale to why she would have

20   things that you would not have and vice versa?

21      A    Well, she had some things that my father gave

22   her that he didn't give to me.

23      Q    And you keep these -- the documents that you

24   looked at that you have, you keep them at home?

25      A    Yes.

18

1      Q    And do you have files for them or, as you said,

2   bags?

3      A    Not really.  They're kind of disorganized, I'm

4   afraid to say.

5      Q    All right.  Let me direct your attention to the

6   requests number 2 and 3 in Defendants' Exhibit 3 on page

7   4.  Number 2 is, "All Writings concerning any

8   communication or agreements among or between Siegel and

9   Shuster," and number 3 is, "All Writings concerning any

10  communication or agreement between Siegel and/or Shuster,

11  on the one hand, and Defendants, on the other hand."

12          Did you find any agreements relating to -- did

13  you find any agreements between yourselves or Jerome

14  Siegel on the one hand and any representative of the

15  Shusters on the other hand?

16     A    Are you asking -- could you rephrase that?

17     Q    Well, in looking for these documents requested

18  in numbers 2 and 3, did you find any documents between

19  the Siegels on the one hand, Jerome Siegel and any

20  successor, such as yourselves, and the Shusters on the

21  other hand?

22          MR. TOBEROFF:  Objection.  Compound.

23  BY MR. ZISSU:

24     Q    Can you answer the question?

25          MR. TOBEROFF:  You can answer.

19

```
 1              THE WITNESS:  Well, okay.  I don't remember
                                    anything
 2    anything specific.  I don't remember like that.  It could

 3    have been in the box, but if it is, my attorney has it.

 4    BY MR. ZISSU:

 5         Q    Is there any agreement you're aware of between

 6    your mother and yourself on the one hand and any

 7    representative or heir of Joseph Shuster on the other

 8    hand?

 9         A    No.

10         Q    Do you know who Jean Adele Peavy and Mark Warren

11    Peavy are?

12         A    Yes.

13         Q    I think you've identified Jean as a sister?

14         A    She was Joe Shuster's sister.

15         Q    And who is Mark Warren Peavy?

16         A    That's her son.

17         Q    Have you or your mother ever sold or given away

18    any interest in your rights that are being asserted in

19    these cases?

20         A    No.

21         Q    Have you ever sold any interest in those rights?

22         A    No.

23         Q    Let me direct your attention to requests 59, 63

24    and 64.  You should read them first.

25         A    You are going to ask me about these one at a
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**25**

1    time.

2         Right?

3    Q    Yeah, that's easier.  Let's do 59 first.

4    Simplify this.  Just let me know when you're ready.

5    A    Okay, I'm ready.

6    Q    In 59 are you aware of -- the question is are

7    you aware of any writings concerning any disposition of

8    any rights relating to Superman, as asked there?

9    A    In what time frame?

10   Q    First let me exclude from that question the

11   documents relating to potential deals with the

12   defendants, with DC Comics or any Warner entities, and

13   the time frame would be since 1995.

14   A    Oh.

15        MR. TOBEROFF:  Objection.  Ambiguous.

16        THE WITNESS:  Could you explain it a little bit

17   more?

18   BY MR. ZISSU:

19   Q    Yeah.  It says, "All Writings concerning any

20   disposition of any rights relating to Superman, including

21   but not limited to any solicitation, offer, option,

22   agreement or license," and putting aside documents

23   between the Siegels and any of the defendants, are you

24   aware of any such documents?

25   A    By "disposition," do you mean sale?

21

1        Q    It could mean sale or gift or transfer.

2        A    No sale, no gift, no transfer.

3        Q    I'm asking are you aware of any documents

4    concerning that?  The answer is no?

5        A    No.

6        Q    Okay.  Now, 63, "All Writings concerning the

7    Shuster Representatives," is 63, "including but not

8    limited to any communication or agreements between

9    Plaintiffs and any of the Shuster Representatives."

10       A    No.

11       Q    There are no such documents of which you're

12   aware?

13       A    No.

14       Q    And you understand representatives could include

15   any kind of agent or your lawyer.

16            Do you understand that?

17       A    You're saying between the Shuster

18   Representatives and --

19       Q    And --

20       A    -- and the Siegel interests?

21       Q    Yeah.

22       A    The answer is no.

23       Q    And number 64, "All Writings concerning Marc

24   Toberoff or his law firm which were created and which

25   refer to the period beginning prior to his being retained

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**27**

1    as counsel for Plaintiffs in these related actions."

2            MR. TOBEROFF:  What's the question?

3    BY MR. ZISSU:

4        Q    The question is, are you aware of any such

5    documents?

6        A    I think the question is confusing.  Could you

7    try and rephrase it for me?

8        Q    Well, I'll break it up into two parts.

9            Did you in your document search find any such

10   writings concerning Marc Toberoff or his law firm which

11   were created or which refer to the period prior to his

12   being retained as counsel for Plaintiffs in these related

13   actions, and the "actions" refers to these two actions

14   you've described?

15           MR. TOBEROFF:  Objection.  Calls for attorney-

16   client privileged information.

17           You can answer, though.

18           THE WITNESS:  I think there was an article about

19   other cases that he had worked on.

20   BY MR. ZISSU:

21       Q    You mean a press article?

22       A    I think so.

23       Q    Anything else?

24       A    Not that I can remember.

25       Q    The question is anything else that you found in

23

```
 1    your possession.  No.

 2            Correct?

 3        A   I don't recall.  I believe the answer is no.

 4        Q   And anything else you're aware of, you said

 5    maybe a press article?

 6        A   Yes.

 7        Q   Do you know whether your mother has copies of

 8    any such documents?

 9        A   I wouldn't know.

10        Q   When did Mr. Toberoff become your lawyer?

11        A   In late 2002.

12        Q   Did you ever speak with him about anything else

13    before he became your lawyer?

14        A   No.

15        Q   Do you know who the lawyer is representing the

16    estate of Joseph Shuster?

17        A   I believe it's Mr. Toberoff.

18            MR. ZISSU:  Let's mark as Defendants' 4 an

19    e-mail dated June 19, 2006 from Marc Toberoff.

20            (Defendants' Exhibit 4 marked.)

21    BY MR. ZISSU:

22        Q   First, have you ever seen this before or a copy

23    of it?

24        A   I don't remember it, no.

25        Q   Directing your attention to the e-mail address
```

24

1    of Mr. Toberoff, do you know this website?

2          A    Well, it's an e-mail address.  I don't believe

3    it's a website.

4          Q    Yes.  Do you know what will happen if you click

5    on it and you go to that address, if you're surfing?

6                MR. TOBEROFF:  Ambiguous.

7                THE WITNESS:  I don't surf for any e-mail

8    address.

9    BY MR. ZISSU:

10         Q    Do you know whether Mr. Toberoff has a website?

11         A    No, I don't know if he has a website.

12         Q    Do you know anything about his business other

13   than his practice of law?

14         A    He's my attorney.  That's the way I function

15   with him.

16         Q    You don't know any other businesses that he's

17   in?

18         A    I believe he has produced films.

19         Q    Did he ever discuss with you acquiring rights

20   from the Siegels?

21         A    Could you explain that?

22         Q    Did Mr. Toberoff ever have a discussion with you

23   about acquiring any interest in the Superman rights from

24   you or your mother?

25         A    No.

                                                          25

```
 1          Q    Do you know whether he had any such discussion
 2    with Kevin Marks or Bruce Ramer?
 3          A    I don't know.
 4          Q    Or anyone else at the Gang Tyre law firm?
 5          A    I don't know.
 6               MR. ZISSU:  Let's mark as Defendants' 5 a
 7    document that says "Home," and it has a heading
 8    "Intellectual Properties Worldwide, LLC."
 9               (Defendants' Exhibit 5 marked.)
10    BY MR. ZISSU:
11          Q    I think I can represent to you on the basis
12    of -- if you look down in the lower left-hand corner, you
13    will see the e-mail address, which I believe is the same
14    as that on Defendants' Exhibit 4, for Marc Toberoff.
15               Have you ever seen this before?
16               MR. TOBEROFF:  Objection.  That's incorrect.
17               You can answer.
18               THE WITNESS:  I haven't seen this website.  I'm
19    aware of Mr. Toberoff's e-mail address.
20    BY MR. ZISSU:
21          Q    Are you aware of a company called Intellectual
22    Properties Worldwide, LLC?
23          A    Yes.
24          Q    And what's your understanding of who that
25    company is?
```

26

```
 1            MR. TOBEROFF:  Objection.  Ambiguous.  Calls for
 2    a narrative.
 3            THE WITNESS:  My understanding is that at one
 4    time Ari Emanuel, who is a well-known Hollywood agent,
 5    was a part of this company with Mr. Toberoff,
 6    Mr. Toberoff providing legal services.
 7    BY MR. ZISSU:
 8        Q   Do you know -- who is Mr. Ari Emanuel?
 9        A   He is an agent, a Hollywood agent.
10        Q   And you said "at one time."  Do you know when
11    that ended, if it ended?
12        A   I don't know.
13        Q   At what time did you become aware of it?
14        A   In late 2002.
15        Q   Did you have any discussions with Ari Emanuel?
16        A   Yes.
17        Q   And what was the subject of those discussions?
18        A   He was interested in representing the Siegel
19    rights in negotiations.
20        Q   And did you speak with him?
21        A   Yes.
22        Q   Did he call you, or did you call him?
23        A   I believe Mr. Toberoff set up the meeting.
24        Q   And where did the meeting take place?
25        A   At Mr. Emanuel's office.
```

27

**EXHIBIT B**
**32**

```
 1          Q    And where is that?

 2          A    In Beverly Hills.

 3          Q    And when was that?

 4          A    I believe the meeting was actually -- I don't

 5     recall whether it was late 2002 or if it was early 2003,

 6     because of the holidays.

 7          Q    And was your mother there?

 8          A    Yes.

 9          Q    Was Mr. Toberoff there?

10          A    Yes.

11          Q    Anybody else there besides Mr. Emanuel?

12          A    No.

13          Q    And how long did it last?

14          A    Less than an hour.

15          Q    And what was the subject of the meeting?

16          A    Mr. Emanuel believed that we had very valuable

17     rights and that any offer that had previously been made

18     to us was ridiculously low.

19          Q    And did he say how he knew what offer had been

20     made to you?

21          A    I believe Mr. Toberoff discussed it with him.

22     We had given him permission to discuss it.

23          Q    And was Mr. Toberoff your lawyer at this time?

24          A    Yes.

25          Q    Okay.  And when you say offer that had been made
```

28

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**33**

```
 1     to you, are you referring to the amounts that had been

 2     the subject of communications between the Siegels through

 3     the Gang Tyre law firm and DC Comics and the Warner

 4     entities?

 5         A   Yes.

 6             MR. TOBEROFF:  Objection -- you have to give me

 7     time to object.  Objection.  Compound.  Vague and

 8     ambiguous.

 9             You can answer.

10     BY MR. ZISSU:

11         Q   You answered "yes"?

12         A   Yes.

13         Q   And did -- other than -- did Mr. -- are you

14     saying that Mr. Toberoff had a prior conversation with

15     Ari Emanuel before the meeting --

16             MR. TOBEROFF:  Objection --

17     BY MR. ZISSU:

18         Q   -- in your understanding?

19             MR. TOBEROFF:  Objection.  Misstates her

20     testimony.

21             THE WITNESS:  Could you rephrase that?

22     BY MR. ZISSU:

23         Q   Yeah.

24             I think you testified -- correct me if I'm

25     wrong -- that Mr. Emanuel had said something to the
```

29

1    effect that the amounts you had been previously offered

2    were not sufficient or were not fair, and I think --

3    well, let me go back a little.

4             Had you previously, before the meeting, told

5    Mr. Emanuel what you had been offered by the defendants?

6             MR. TOBEROFF:  Objection.  Vague and ambiguous.

7             You can answer.

8             THE WITNESS:  I don't believe that I actually

9    spoke to Mr. Emanuel until our face-to-face meeting.

10   BY MR. ZISSU:

11       Q    And do you think your mother spoke to him before

12   the face-to-face meeting?

13       A    I don't think so.

14       Q    So in your understanding, how did he know what

15   you had been previously offered by the defendants?

16       A    I believe Mr. Toberoff discussed it with him.

17       Q    And had you authorized Mr. Toberoff to discuss

18   that with him?

19       A    Yes.

20       Q    And as best you can tell me today, tell me what

21   was said at that meeting.

22       A    The meeting with Mr. Emanuel?

23       Q    Yes, with Mr. Emanuel.

24       A    He was very happy to meet us.  He was very

25   energetic and passionate about the Siegel and — the

30

EXHIBIT B
35

1  Siegels, my father's history and our rights and the value

2  of our rights.

3       Q    Just to make this clear, were there any other

4  offers made to the Siegels to which Mr. Emanuel was

5  referring beyond the offers made by defendants?

6            MR. TOBEROFF:  Objection.  Vague and ambiguous.

7            THE WITNESS:  Could you be a little more

8  specific for me?

9  BY MR. ZISSU:

10      Q    Yeah.

11           You discussed that Mr. Emanuel referred to what

12  you were previously offered, and I think you've

13  identified that as an offer from the defendants.

14           Were there any other offers from any other

15  people that Mr. Emanuel was referring to?

16      A    No.

17      Q    And did he tell you that he had done any

18  assessment of the valuation of that offer from the

19  defendants?

20      A    Mr. Emanuel has a great deal of experience in

21  the entertainment industry, and based on his general

22  knowledge he had an assessment.

23      Q    Did he show you any piece of paper or document

24  with a summary or reference to such assessment?

25      A    I don't believe so.

31

1      Q   It was oral?

2      A   Yes.

3      Q   And did he tell you what the value of the rights

4    were?

5      A   He didn't have a dollar figure, but he had a

6    general figure of what things go for in the entertainment

7    industry.

8      Q   And what did he tell you your rights would go

9    for in the entertainment industry?

10     A   He said he would need to do more research.

11     Q   But he didn't give you any specifics as to the

12   percentage by which the defendants' offer was too low or

13   anything else?

14     A   I don't believe so.

15     Q   And was anything agreed to at that meeting with

16   Mr. Emanuel?

17     A   Not at that meeting.

18     Q   Was there a subsequent communication --

19     A   Yes.

20     Q   -- with Mr. Emanuel?

21         And when did that take place?

22     A   I don't remember the exact date, but we did have

23   subsequent meetings and communications with him.

24     Q   Why don't you tell me the best you can, just

25   outline each of those communications.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**EXHIBIT B**

1          MR. TOBEROFF:  Calls for a narrative.

2          You can answer.

3          THE WITNESS:  We decided to enter into an

4   agreement with IP Worldwide for Mr. Emanuel to represent

5   us in negotiations for our rights.

6   BY MR. ZISSU:

7      Q   And was that agreed to in a telephone

8   conversation or another face-to-face meeting?

9      A   We discussed it, and it was probably both in a

10  face-to-face meeting and by telephone, but I don't really

11  recall.

12     Q   Did you go to his office, Mr. Emanuel's

13  office --

14     A   Yes.

15     Q   -- again?

16     A   Yes.

17     Q   And how many -- in terms of time frame, how much

18  after the first meeting did that take place?

19          MR. TOBEROFF:  Ambiguous.

20          THE WITNESS:  I believe the next meeting lasted

21  about 45 minutes.

22  BY MR. ZISSU:

23     Q   And how -- and it was -- you're not sure --

24     A   Not sure.

25     Q   -- whether it was two weeks later or a week

33

EXHIBIT B
38

```
 1    later?

 2         A    No.

 3         Q    Was it after the holidays or before?

 4         A    I believe so.

 5         Q    And who was at that meeting?

 6         A    My mother, myself, Mr. Toberoff and Mr. Emanuel.

 7         Q    And you came to some kind of an agreement?

 8         A    Yes.

 9         Q    And what was that agreement?

10         A    We decided that Mr. Emanuel would be a

11    negotiator for us, and Mr. Toberoff would serve as our

12    attorney.

13         Q    And when you say you decided that Mr. Emanuel

14    would serve you, did you agree that Intellectual

15    Properties Worldwide, LLC would be the entity through

16    which you would work?

17         A    Yes.

18         Q    And do you know who owns Intellectual Properties

19    Worldwide, LLC?  Today do you know?

20         A    Today I don't know.

21         Q    Did you know at the time in early 2003 or late

22    2002?

23         A    My understanding was that it was a partnership

24    between Mr. Emanuel and Mr. Toberoff.

25         Q    And do you know who J. Todd Harris is?
```

34

1   A No.

2   Q If you look at Defendants' Exhibit 5, you will

3 see reference to him in the second paragraph.  It states,

4 "Marc Toberoff IPW's, Chairman & CEO, is an experienced

5 entertainment attorney and producer with expertise in

6 identifying and obtaining intellectual property.  J. Todd

7 Harris, the head of production [sic] -- of the production

8 division, is a seasoned Hollywood producer with over

9 twenty three...films to his credit."

10    But you didn't hear his name at the time, did

11 you?

12   A No.

13   Q And do you know whether Mr. Toberoff was the

14 chairman and CEO of Intellectual Properties Worldwide,

15 LLC at the time of your meeting?

16   A He could have been.  I don't know what his title

17 was.

18   Q And was the agreement you reached with

19 Mr. Emanuel and/or Intellectual Properties Worldwide,

20 LLC, was that ever written up in a piece of paper?

21   A Yes.

22   Q And have you produced that in this case?

23   A I'm not sure.

24   Q Do you have a copy of it?

25   A Yes, I have a copy of it.

35

1         Q    At home, or where do you keep it?

2         A    It would be at home.

3         Q    Well, we would -- if it hasn't been produced, we

4    are going to ask you -- we call for the production of it.

5              How lengthy --

6              MR. TOBEROFF:  Excuse me.  I can simplify this

7    for you --

8              MR. ZISSU:  Yeah.

9              MR. TOBEROFF:  -- and represent to you that the

10   company that Siegel is talking about is not Intellectual

11   Properties Worldwide, LLC.

12             MR. ZISSU:  If you want to fill out some more

13   blanks --

14             MR. TOBEROFF:  Yes.

15             MR. ZISSU:  -- and tell us what the name of it

16   is --

17             MR. TOBEROFF:  It's IP Worldwide, which is not

18   the same company even though they have similar names.  So

19   I'm telling you that for your benefit.

20             MR. ZISSU:  Right.  Well, I don't want to make

21   this an examination of counsel, so we can talk about that

22   separately.

23             MR. TOBEROFF:  I understand.  Just to make it

24   easier, your questioning that a fact, and I can

25   understand how...

36

BY MR. ZISSU:

Q   Okay.  Without regard to that, you understood that there was a company or entity of some kind in which Mr. Toberoff was a partner with Mr. Emanuel, and you agreed with them in the manner you've described to proceed.

Correct?

MR. TOBEROFF:  Objection.  Misstates her testimony.

BY MR. ZISSU:

Q   Is that correct?

A   Could you rephrase that?

Q   You had a meeting, and you agreed that there was a company that Mr. Emanuel was involved with and of which you understood Mr. Toberoff was a partner that would proceed to represent you in connection with dealing with your rights at that point?

MR. TOBEROFF:  Objection.  Misstates her testimony.

You can answer.

THE WITNESS:  Mr. Emanuel was a negotiator, and Mr. Toberoff was our attorney, and that's the way we understood the situation.

BY MR. ZISSU:

Q   And you understood that they were partners

37

```
 1    together --
 2            MR. TOBEROFF:  Misstates the testimony.
 3    BY MR. ZISSU:
 4        Q    -- in some kind of company that you have
 5    described.
 6            Correct?
 7        A    That didn't enter into our relationship with
 8    them.
 9        Q    I didn't ask you whether it entered into your
10    relationship.
11            Have you testified today that you understood
12    that there was some company, the name of which you may
13    have gotten correctly or incorrectly, and Mr. Toberoff
14    was involved as a partner with Mr. Emanuel?
15            Did you so testify?
16        A    I believe they had a company.
17            MR. ZISSU:  Let's mark as Defendants' Exhibit
18    6 -- no.
19        Q    Before we go to that, and what happened after
20    this agreement was entered into with Mr. Emanuel or
21    Mr. Toberoff or both of them, whatever, what happened
22    after that meeting --
23            MR. TOBEROFF:  Objection.  Calls --
24    BY MR. ZISSU:
25        Q    -- and the agreement?
```

38

1            MR. TOBEROFF:   Objection.   Calls for a

2      narrative.

3            You can answer.

4            THE WITNESS:   Mr. Emanuel met with John Schulman

5      of Warner Bros.

6      BY MR. ZISSU:

7       Q   Were you there?

8       A   No.

9       Q   Did you have further conversations with

10     Mr. Emanuel or Mr. Toberoff with respect to this

11     representation?

12      A   Yes.

13           MR. TOBEROFF:   Objection.   Don't testify as to

14     your conversations with me --

15           MR. ZISSU:   She can --

16           MR. TOBEROFF:   -- it's attorney-client

17     privileged.

18           MR. ZISSU:   She can testify as to the -- whether

19     there was a conversation, but you should avoid telling me

20     the contents --

21           THE WITNESS:   Right.

22           MR. ZISSU:   -- of any discussions with counsel.

23           MR. TOBEROFF:   Correct.

24           MR. ZISSU:   So if you want to go back to the

25     last question.

                                                        39

```
 1            (Record read as follows:

 2              "Q   Did you have further

 3            conversations with Mr. Emanuel or

 4            Mr. Toberoff with respect to this

 5            representation?

 6              "A   Yes.")

 7  BY MR. ZISSU:

 8       Q   All right.  With whom did you have conversations

 9  and when?

10       A   Mr. Emanuel and Mr. Toberoff.

11       Q   In another meeting or by telephone?

12       A   Another meeting.

13       Q   And where was that and when?

14       A   Mr. Emanuel's office, but I don't recall when.

15       Q   And were there -- and thereafter were there any

16  further meetings?

17           MR. TOBEROFF:  Vague and ambiguous.

18           THE WITNESS:  We had many conversations with

19  Mr. Toberoff but not as many conversations with

20  Mr. Emanuel.

21  BY MR. ZISSU:

22       Q   And how long -- did there come a time when that

23  relationship ended with Mr. Emanuel?

24           MR. TOBEROFF:  Vague and ambiguous.

25           THE WITNESS:  Well, there came a time when we
```

40

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    had to enter into litigation.  At that point

2    Mr. Emanuel's services were no longer needed.

3    BY MR. ZISSU:

4        Q    So Mr. Emanuel's efforts and services in your

5    behalf continued until the litigation began?

6        A    Yes.

7        Q    And what were the terms of your agreement with

8    Mr. Emanuel, if you can summarize them?

9        A    I haven't read that agreement for a long time.

10   I really don't recall.

11       Q    Was he to get a percentage of any compensation

12   that you would derive from marketing or selling or

13   licensing your rights?

14       A    I believe so.

15       Q    Do you remember what that percentage was?

16       A    No, I don't.

17       Q    Do you know whether he had -- Mr. Emanuel had

18   any conversations with Gang Tyre about the deal you made

19   with Mr. Emanuel?

20       A    Could you speak up a little, please?  I'm having

21   trouble hearing you.

22       Q    I'm sorry.

23            Do you know whether Mr. Emanuel had any

24   conversations with the Gang Tyre law firm about the deal

25   he made, he, Mr. Emanuel, made with you?

41

```
 1        A    No.
 2        Q    And in this time period that Mr. Emanuel
 3   provided services, what did he do for you?
 4        A    He researched the property.  He, as I said, met
 5   with John Schulman.
 6        Q    Did he ever provide any report or memorandum or
 7   writing concerning his research?
 8        A    No.
 9        Q    Did he ever provide any written communications
10   concerning his discussions with John Schulman or anyone
11   else?
12        A    I don't recall.
13        Q    In working with your mother in relation to the
14   rights in the Superman and Superboy properties, how do
15   you work together?
16             MR. TOBEROFF:  Objection.  Vague and ambiguous.
17   BY MR. ZISSU:
18        Q    In general, how do you work together?
19             MR. TOBEROFF:  Objection.  Vague, ambiguous.
20   Calls for a narrative.
21             THE WITNESS:  Could you ask me like in a
22   specific situation?
23   BY MR. ZISSU:
24        Q    Yes.
25             Well, if there is a decision to be made, such as
```

42

1    whether to engage Mr. Emanuel, do you meet with each

2    other?  Do you speak with each other on the phone?  Do

3    you have counsel involved?  How does it work?

4            MR. TOBEROFF:  Objection.  Compound.

5            THE WITNESS:  We talk.  We talk a lot about any

6    decision that we reach.

7    BY MR. ZISSU:

8        Q    And is there one of you that predominates or

9    makes the decisions, or are these jointly made?

10           MR. TOBEROFF:  Objection.  Compound.  Vague and

11   ambiguous.

12           THE WITNESS:  It's always a joint decision, but

13   when it comes to the actual work of a lot of phone calls,

14   things of that sort, oftentimes I will do more of that.

15   BY MR. ZISSU:

16       Q    And will you do more of that when it relates to

17   reading through communications you receive pertaining to

18   your efforts?

19       A    Yes.  My mother, you know, is very interested in

20   everything that goes on.

21       Q    But she relies on you to do some of the more

22   labor-intensive aspects of things?

23       A    Yes.

24       Q    With respect to the meeting with John Schulman,

25   what is your remembrance or recollection of what happened

43

```
 1   at that meeting?
 2              MR. TOBEROFF:  Objection.  Vague and ambiguous.
 3              THE WITNESS:  I wasn't there.
 4   BY MR. ZISSU:
 5        Q   Did you learn what transpired at that meeting?
 6        A   Yes.
 7        Q   And, first of all, when did that meeting occur?
 8              MR. TOBEROFF:  Same objection.
 9              THE WITNESS:  I don't recall.
10   BY MR. ZISSU:
11        Q   Was it a long time into 2003, or was it in early
12   2003?
13        A   It was sometime in 2003.
14        Q   Could have been any time in the course of the
15   whole year, as best you can recall?
16        A   It could have been any time.
17        Q   And it was only Mr. Emanuel who met with
18   Mr. Schulman as far as you recall?
19        A   No.  Mr. Toberoff was there also.
20        Q   And did Mr. Emanuel ever tell you what happened
21   at the meeting?
22        A   Yes.
23        Q   And what did he say happened?
24        A   He said that he believed that the Siegel rights
25   were extremely valuable and that it was a whole new ball
```

44

1    game and that he was going to aggressively pursue the

2    true value of our rights.

3         Q    Is it fair to say that the problem with the --

4    what you've called the offer from the defendants was

5    insufficient in terms of its valuation?

6              MR. TOBEROFF:  Objection.  Vague and ambiguous.

7              You can answer.

8              THE WITNESS:  There were different stages of

9    what you refer to as "the offer," so if you could be more

10   specific, I could answer you better.

11   BY MR. ZISSU:

12        Q    Well, I believe, subject to your agreeing with

13   me, that in October of 2001 there was a letter from Kevin

14   Marks, which listed a summary of terms and conditions,

15   and it had a financial component.

16             And so my question is -- that's the offer to

17   which I was referring.

18             Is that what the problem was, that you

19   eventually concluded that that amount or the amounts

20   being offered were not enough?

21             MR. TOBEROFF:  Objection.  Vague and ambiguous.

22   Assumes facts not in evidence.  Lacks foundation.

23             THE WITNESS:  I can't make the connection that

24   you're asking about.  What I can say is that --

25             MR. TOBEROFF:  Answer his question.

45

1          THE WITNESS:  Okay.  Then could you restate the

2   question?

3   BY MR. ZISSU:

4       Q   Well, you were about to answer.  You -- Mr. -- I

5   think you've described Mr. Emanuel as saying that he was

6   going to pursue getting the maximum value, and I'm asking

7   you whether the problem with the offer to which you

8   referred was that it didn't pay you enough?

9          MR. TOBEROFF:  Assumes facts not in evidence --

10  BY MR. ZISSU:

11      Q   It's that simple.

12         MR. TOBEROFF:  Objection.  Assumes facts not in

13  evidence.  Lacks foundation.  Vague and ambiguous.

14  BY MR. ZISSU:

15      Q   Will you answer the question?

16      A   No.  The problem with -- we had agreed to the

17  terms that were represented in the October 19 letter from

18  Kevin Marks.  Subsequently, those are not the terms that

19  ended up being presented to us later.

20      Q   So my question is, was it the financial aspect

21  of those terms or some other aspect that was the problem?

22      A   There were many things.

23         MR. TOBEROFF:  Objection.  You're getting into

24  an area here where the answer divulges attorney work

25  product and attorney-client privileged communications

46

EXHIBIT B
51

1   because you're dealing with -- please let me finish --

2   you are dealing with a negotiation of an agreement.  That

3   agreement is being negotiated by attorneys.

4          Any conclusions or mental impressions drawn by

5   Miss Siegel in that negotiation obviously are those

6   received upon the advice of counsel, and you're

7   essentially asking for those conclusions, which by nature

8   divulges attorney-client privileged communications.

9          MR. ZISSU:  I --

10          MR. TOBEROFF:  So she can answer certain

11   questions, but she can't answer others.

12          MR. ZISSU:  Read the last question back, and

13   please answer it.

14          MR. TOBEROFF:  Well, no.  You --

15          MR. ZISSU:  Would you read the question back,

16   please?

17          Don't interrupt my request of the reporter.

18          MR. TOBEROFF:  I thought you were done.

19          MR. ZISSU:  Please read the question back.

20          (Record read as follows:

21             "Q   So my question is, was it the

22             financial aspect of those terms or

23             some other aspect that was the

24             problem?")

25          THE WITNESS:  At what point?

47

1    BY MR. ZISSU:

2        Q    At the point where you decided to engage

3    Mr. Emanuel.

4            MR. TOBEROFF:  Vague and ambiguous.

5            THE WITNESS:  I don't know how to answer that

6    question because so much had happened.

7    BY MR. ZISSU:

8        Q    Well, we're going to go through a stack of

9    documents of so much that happened.  To the extent I can

10   shortcut that, I would like to.

11           I am trying to find out -- and there was an

12   offer that you have referred to.  That offer was --

13   according to your position in the case, was not accepted.

14   At a later point, you've testified you got advice that

15   that offer was insufficient, and I am asking you to

16   characterize your own understanding of the respect in

17   which it was insufficient.  Was it the financial?  Was it

18   the financial plus something?  Was it something else and

19   not financial?  I am just asking you to characterize what

20   the problem was when you decided to not go forward with

21   the offer and then when you engaged Mr. Emanuel.

22       A    Okay.  Well, those are two different times, and

23   it's two different questions.

24       Q    Okay.  First, when you engaged Mr. Emanuel.

25           MR. TOBEROFF:  What is the question?

48

EXHIBIT B
53

```
 1   BY MR. ZISSU:

 2       Q    What was the problem?  Was it financial or

 3   something else when you decided to engage Mr. Emanuel?

 4       A    Something else.

 5       Q    All right.  What was the something else?

 6       A    It's hard to answer that question without

 7   answering the other half of your compound question.

 8       Q    Take a stab at it and do the best you can in

 9   your own words.  You made decisions.  I am asking you why

10   you made them, and I am asking you in these questions to

11   sum them up a little bit, and we will get to the

12   particulars in the rest of the examination.

13            MR. TOBEROFF:  Objection.  The question is vague

14   and ambiguous.  What is the question you're asking her?

15            If you understand the question he is asking you,

16   you can answer.

17            THE WITNESS:  No, I'm still confused.

18   BY MR. ZISSU:

19       Q    You testified that it was something other.  You

20   just testified to that.

21            Correct?

22       A    Yes.

23       Q    And I am asking you, what was the other?

24       A    We wanted to be represented by someone that we

25   felt we could trust, and we wanted to deal with people
```

49

EXHIBIT B
54

1    that we could trust.

2        Q    So is it fair to say that you didn't trust the

3    Gang Tyre representatives?

4            MR. TOBEROFF:  Objection.  That's attorney-

5    client privileged information.  You're asking her

6    questions about her relationship with her attorneys.  I

7    think that's objectionable.

8            MR. ZISSU:  Look, if you have a direction on

9    attorney-client privilege, you direct her not to answer.

10   I didn't ask her anything about any conversation with

11   you.  I asked her about the operation of her own state of

12   mind, and I am asking you who were the representatives

13   that you didn't trust and why.  That's something that's

14   in your mind, and it has nothing to do with attorney-

15   client communications, so --

16           MR. TOBEROFF:  I am instructing you not to

17   answer questions regarding your relationship with Gang

18   Tyre.

19           (Instruction not to answer.)

20   BY MR. ZISSU:

21       Q    I am asking you to tell me who you didn't trust

22   that you were referring to.  First of all, who?

23           MR. TOBEROFF:  Same instruction.  Don't answer

24   that.

25           (Instruction not to answer.)

50

1            MR. ZISSU:  You're instructing her not to answer

2    that?

3            MR. TOBEROFF:  Yes, I am.

4    BY MR. ZISSU:

5        Q    And why?

6        A    Why?  You have to ask him why if he just

7    objected to it.

8        Q    No.  You said you didn't trust somebody.  I am

9    asking you who it is that you didn't trust.  It has

10   nothing to do with an attorney-client communication

11   despite the speeches of counsel who has testified

12   repeatedly and improperly on the record to seek to have

13   you not answer the questions even when they are not

14   privileged.

15           So my question is -- don't go into privileged

16   areas -- who is it that you didn't trust?

17           MR. TOBEROFF:  Objection.  The question calls

18   for her to reveal attorney-client privileged information

19   as to the reasons why she terminated Gang Tyre.

20           MR. ZISSU:  All right.

21       Q    Now please answer the question.

22           MR. TOBEROFF:  I'll instruct you not to answer.

23           (Instruction not to answer.)

24   BY MR. ZISSU:

25       Q    And is there somebody you did trust?

51

1          A    My mother.

2          Q    Okay.  Is there somebody other than your mother

3     that you trusted to represent you?

4          A    Once we got to know Mr. Toberoff and

5     Mr. Emanuel, we trusted them.

6          Q    And I am asking you, why didn't you trust your

7     prior representatives?

8               MR. TOBEROFF:  Same objection.  Asked and

9     answered.  Instruct you not to answer.  Please stop

10    asking the same question.  We are going to waste time.  I

11    will instruct her the same way.

12              (Instruction not to answer.)

13              MR. ZISSU:  We will obviously reserve our rights

14    to pursue this.

15              Let's move to Defendants' -- strike that.

16         Q    Were there any other documents besides this

17    agreement relating to the representation of you and your

18    mother and your interests by Ari Emanuel?

19              MR. TOBEROFF:  Vague and ambiguous.

20              You can answer.

21              THE WITNESS:  I can't recall any.

22    BY MR. ZISSU:

23         Q    So your best recollection is there was one piece

24    of paper which was an agreement, and there was nothing

25    else in writing.

                                                              52

1            Correct?

2        A    I believe so.

3        Q    And do you know whether there were any documents

4    between Mr. Toberoff and Mr. Emanuel that related to the

5    same representation?

6        A    I have no idea.

7        Q    In looking for documents in response to the

8    document request, did you ask Mr. Toberoff to look in his

9    files to find documents for you?

10            MR. TOBEROFF:  Objection.  Attorney-client

11   privilege.  A communication of what you asked me is

12   privileged.  I instruct her not to answer.

13            (Instruction not to answer.)

14            MR. ZISSU:  You are instructing her not to

15   answer whether she asked her counsel to look in his files

16   for documents?

17            MR. TOBEROFF:  It's an attorney-client

18   communication.

19            MR. ZISSU:  It's not.  It's compliance with a

20   discovery request, and you must get documents within your

21   possession and control.

22            MR. TOBEROFF:  The way you asked the question is

23   privileged.

24   BY MR. ZISSU:

25        Q    Did you ask Gang Tyre to help look for documents

EXHIBIT B
58

1    in response to the discovery requests in this case?

2        A    I --

3            MR. TOBEROFF:    Privileged.    Please wait for me

4    to object before you answer.    That's also an attorney-

5    client privileged communication, and she will not answer

6    with respect to what you asked or did not ask Gang Tyre.

7            (Instruction not to answer.)

8    BY MR. ZISSU:

9        Q    Did you request any lawyers who represented you

10    at any time, in connection with complying with the

11    discovery requests in this case, to look through their

12    files and provide documents to you?

13            MR. TOBEROFF:    Vague and ambiguous.

14            THE WITNESS:    That's up to the lawyers to do.

15    BY MR. ZISSU:

16        Q    Did you request anybody?    It's not up to a

17    lawyer.    Did you use your mouth or your hand in a letter

18    and request that they provide you with documents to

19    comply with your discovery responses in this case --

20            MR. TOBEROFF:    Objection --

21    BY MR. ZISSU:

22        Q    -- yes or no?

23            MR. TOBEROFF:    Objection.    Counsel is raising

24    his voice and being argumentative and harassing the

25    witness.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**EXHIBIT B**

```
 1              Don't testify as to any communications with
 2    attorneys.
 3    BY MR. ZISSU:
 4        Q    Yes or no?
 5              Are you directing her not to answer?
 6              MR. TOBEROFF:  Yes, I am, as to communications
 7    with attorneys.  You can ask her whether she made a
 8    diligent search, you can ask her all those questions, but
 9    the way you are asking the question is highly
10    objectionable.
11              (Instruction not to answer.)
12    BY MR. ZISSU:
13        Q    You made a diligent search in your own home and
14    through your mother.
15              Correct?
16        A    Yes.
17        Q    And did you ask any representatives who had
18    dealt with you over the years to also look for documents?
19              MR. TOBEROFF:  Objection to the extent you are
20    talking about attorneys.
21              You can answer with non-attorneys, such as
22    Mr. Emanuel.
23    BY MR. ZISSU:
24        Q    Did you ask Mr. Emanuel?
25        A    No.
```

55

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1          Q    Did you ask any attorneys?

2               MR. TOBEROFF:  Objection.  Same objection.

3               MR. ZISSU:  Are you directing her not to answer?

4               MR. TOBEROFF:  Yes, I am, as to what she asked

5     attorneys.

6               (Instruction not to answer.)

7     BY MR. ZISSU:

8          Q    Not asked.  Requested.  Directed.

9               Did you direct them to provide you with

10    documents, the attorneys?

11              MR. TOBEROFF:  Same objection.  Asked and

12    answered.

13              Please don't answer questions about your

14    communications with attorneys.

15              (Instruction not to answer.)

16    BY MR. ZISSU:

17         Q    When you -- did you ever -- after you -- there

18    came a time when you told Gang Tyre that they would no

19    longer represent you.

20              Correct?

21         A    Correct.

22         Q    Did you obtain back your documents from your

23    attorneys, from Gang Tyre, your files?

24         A    They went to my new attorney.

25         Q    Who is Mr. Toberoff?

56

```
 1        A    Correct.

 2        Q    And did the documents with Arthur Levine's firm

 3   go to Mr. Toberoff as well?

 4        A    I don't know.

 5        Q    Did there come a time when you terminated your

 6   relationship with Arthur Levine's firm?

 7        A    No.

 8        Q    Let's look at Defendants' 5 -- I am sorry --

 9   Defendants '6.

10            MR. TOBEROFF:  Is this -- you are not in the

11   middle of a line of questioning.  Can we take a short

12   break?

13            MR. ZISSU:  No.  I am in the middle of a line of

14   questioning, so in a second.  Okay?  Just one more.

15            MR. TOBEROFF:  What time is it?

16            MR. ZISSU:  It's a letter from Mr. Emanuel.

17   You'll see.  It's a letter from Mr. Emanuel --

18            THE WITNESS:  When you can, though, I've been

19   drinking a lot of water; I would like a bathroom break

20   when --

21            MR. ZISSU:  No.  You want to go to the bathroom

22   now?  He said if it wasn't in the middle of a line.  It

23   is --

24            THE WITNESS:  I said when you're finished with

25   that.
```

57

```
 1            MR. TOBEROFF:  I thought you were going on to --
 2   even though it's connected to a new subject, we have been
 3   over an hour.  I thought it was a good time to take a
 4   short break.
 5            MR. ZISSU:  You will see.
 6            MR. TOBEROFF:  That's fine.
 7            MR. ZISSU:  It's just this one.  It's
 8   Defendants' Exhibit 6.  It's a letter from Ari Emanuel to
 9   Mr. Bruce Rosenblum at Warner Bros.  It does not appear
10   to have a date.
11            (Defendants' Exhibit 6 marked.)
12   BY MR. ZISSU:
13       Q   So with respect to Defendants' 6, have you ever
14   seen that or a copy of it before?
15       A   I don't recall this document.  I might have seen
16   it.
17            MR. TOBEROFF:  Don't speculate.
18   BY MR. ZISSU:
19       Q   Do you know when it might have been written
20   from --
21       A   No.
22       Q   -- reading its contents?
23       A   No.
24            MR. TOBEROFF:  I just want to note for the
25   record that this document may or may not have been
```

58

**EXHIBIT B**
**63**

1    redacted.  It has a -- the reason I'm saying that is at

2    the bottom in the right-hand corner it says "Total" --

3            MR. ZISSU:  You --

4            MR. TOBEROFF:  Excuse me.  I'm not commenting on

5    the substance of the document.  It says, "Total page

6    [sic] 02," which looks like it was stamped by the

7    receiving fax machine, where a cover page would be page

8    1.  So I think the exhibit is incomplete.

9            In addition to that, normally fax machines when

10   they stamp documents this way contain the date and time

11   of receipt, and that's missing here.  And also I see just

12   above that where it says "Agency" and address, that's cut

13   off as well.  So this may or may not have been redacted

14   either intentionally or unintentionally.

15   BY MR. ZISSU:

16       Q    This doesn't stimulate any recollection one way

17   or another about when --

18       A    No.

19       Q    -- it might have been sent?

20            And you don't know anything about it.

21            Correct?

22       A    No.

23            MR. ZISSU:  Okay.  Take a break.

24            (Recess.)

25   BY MR. ZISSU:

59

1         Q    Just to follow up, your relationship with

2    Mr. Emanuel is no longer in effect?

3              MR. TOBEROFF:  Vague and ambiguous.

4              THE WITNESS:  It's no longer needed.

5    BY MR. ZISSU:

6         Q    But you still have an arrangement with him or

7    not?

8         A    It expired.

9         Q    Going back to that first meeting with him, you

10   thought, I think you testified, it was before the

11   holidays?

12        A    I don't believe I said that.  I said I didn't --

13   I wasn't sure when it was.

14        Q    You weren't sure.  You thought it might be

15   before the holidays because you --

16        A    I don't recall.

17        Q    You don't recall.

18             I think you testified that Mr. Emanuel told you

19   the offer you'd received was ridiculously low?  Do you

20   recall that?

21        A    He thought that our rights were worth more.

22        Q    Did he ever -- what -- to your best

23   recollection, what did he actually say at the time, if we

24   can focus on that?

25        A    Well, he's a big Hollywood agent, and we

60

1    believed that he would be a good person to represent our

2    rights.

3         Q    What did he say about the value that you'd been

4    offered?

5         A    That it was very, very low.

6         Q    Did he say anything about what he thought it

7    should be or what range it should be in, the offer?

8              MR. TOBEROFF:  Objection.  Asked and answered.

9              You can answer it.

10             THE WITNESS:  He didn't have anything specific.

11   BY MR. ZISSU:

12        Q    And was it at that meeting that you made the

13   arrangement to have Mr. Toberoff represent you?

14        A    Mr. Toberoff was already representing us before

15   that.

16        Q    When did he first begin to represent you?

17             MR. TOBEROFF:  Objection.  Asked and answered.

18             THE WITNESS:  In late 2002.

19   BY MR. ZISSU:

20        Q    Sometime before the meeting, though?

21        A    Yes.

22             MR. ZISSU:  Let's mark as 7, I guess,

23   Defendants' 7, a letter dated April 28, 2005 from DC

24   Comics.  I think it's from Mr. Levitz to Jean Adele Peavy

25   and Mark Warren Peavy [sic].

                                                              61

```
 1              (Defendants' Exhibit 7 marked.)
 2   BY MR. ZISSU:
 3        Q    My first question is have you seen a copy of
 4   that letter before?
 5        A    No.
 6        Q    Have you seen it, ever?
 7        A    No.
 8        Q    Did you ever hear from either of the Peavys that
 9   they received an offer --
10        A    No.
11        Q    -- from DC Comics?
12        A    No.
13             MR. TOBEROFF:  While the next question is
14   pending, before you answer, please give me time.  Count
15   to 5.
16   BY MR. ZISSU:
17        Q    When did your own involvement with the copyright
18   termination rights pertaining to your father's works
19   begin?
20             MR. TOBEROFF:  Objection.  Vague and ambiguous.
21   Lacks foundation.  Calls for a narrative.
22             THE WITNESS:  When my father died.
23   BY MR. ZISSU:
24        Q    Had you any involvement with these kinds of
25   rights before he died?
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
67

1        A    He talked to me about what he was doing.

2        Q    And what's your recollection of what he told

3    you?

4        A    He was going to pursue his termination rights

5    that were given to him under the copyright law.

6        Q    Did he ever say why he had not already pursued

7    them?

8        A    No.

9        Q    Did you ever discuss with him why he didn't

10   serve a termination notice while he was alive?

11       A    No.

12       Q    Do you know whether your mother discussed that

13   with him?

14       A    I don't know.

15       Q    Did he ever discuss with you what he thought his

16   termination rights were worth?

17       A    No.

18       Q    Did you ever hear that he had ever done any

19   evaluation or assessment of the value of those rights?

20       A    No.

21       Q    To your knowledge is there any evaluation that

22   was done for him of those rights?

23       A    No.

24       Q    Have you ever had a deposition taken of you

25   before?

63

1        A    Yes.

2        Q    And in what cases?

3        A    My divorce.

4        Q    And did that happen on more than one on occasion

5    in your divorce?

6        A    No.

7        Q    What was it, a one-day or half-a-day thing, or

8    what was it?

9        A    A few hours.

10       Q    Did you testify at any hearings in the divorce

11   in court or before a court officer?

12       A    Yes.

13       Q    And how long were you on the stand for those

14   examinations?

15       A    Maybe 10 or 15 minutes.

16            MR. ZISSU:  Let's mark as Defendants' 8 a letter

17   dated April 9, 1997 to John Schulman from Joanne Siegel.

18            (Defendants' Exhibit 8 marked.)

19   BY MR. ZISSU:

20       Q    You've seen that letter before?

21       A    Why isn't it signed?

22       Q    This -- there is a reason.  This comes from your

23   document production, so the recipient may have a signed

24   copy, but your own may have been just a file copy.

25       A    Okay.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B

1        Q    If you look down at the bottom of these

2    documents, when it just has a number with no, I guess,

3    "DC" or "WB," it means it came from your files.

4        A    Okay.

5        Q    But you've seen this letter before?

6        A    Yes.

7        Q    And between the time that your father died and

8    the sending of this letter, did you and your mother ever

9    have any evaluation or assessment of value done of the --

10    what the termination rights were worth?

11        A    No.

12        Q    Did you consult anybody on that subject other

13    than lawyers?

14        A    No.

15        Q    Is there a reason you waited a couple of years

16    before serving the termination notices?

17            MR. TOBEROFF:  Objection.  Attorney work

18    product.

19    BY MR. ZISSU:

20        Q    I am asking you why you waited between the time

21    your father died and the time you served him.  It has

22    nothing to do with a communication from you to an

23    attorney.

24            MR. TOBEROFF:  You --

25            MR. ZISSU:  Let me finish the question.

65

EXHIBIT B
70

1          MR. TOBEROFF:   Okay.

2    BY MR. ZISSU:

3        Q   Why did you wait this long?

4          MR. TOBEROFF:   Objection.   The termination

5    notice is a legal document obviously prepared by Arthur

6    Levine.   Asking here these questions reveals by its

7    nature legal strategies between her and her counsel,

8    which is privileged.

9          I instruct you not to answer.

10         Don't ask the question over and over, because I

11   am going to make the same objection.

12         (Instruction not to answer.)

13         MR. ZISSU:   I will make a record of each and

14   every time you without justification interfere with the

15   examination and instruct the witness not to testify as to

16   her own -- the operation of her own mind and her own

17   understanding --

18         MR. TOBEROFF:   I assume that.

19         MR. ZISSU:   -- so you are going to have to sit

20   through it, because we are not going to do this without a

21   record.

22         MR. TOBEROFF:   I assume that.

23   BY MR. ZISSU:

24       Q   Is there some reason your mother signed this

25   letter and not you?

66

1          A    It was her letter.

2          Q    Well, did she ask you to sign on it?

3          A    No.

4          Q    And did you discuss it with her before she sent

5    it?

6          A    She told me she was going to send the letter.

7          Q    Did you discuss with your mother over the years

8    why between 1995 or the end of '95 -- or when your father

9    died and this date why the letter hadn't -- strike that.

10         Did you discuss with your mother why you did not

11   serve the termination notices earlier, yes or no?

12         MR. TOBEROFF:   You can answer whether you

13   discussed that with her.

14         THE WITNESS:   I'd like to clarify.   My father

15   died in 1996.

16   BY MR. ZISSU:

17         Q    Okay.   That's why I changed the question.

18         A    Yeah.

19         Q    Okay.   Did you discuss why you waited with your

20   mother?

21         MR. TOBEROFF:   Objection.   Assumes facts not in

22   evidence --

23   BY MR. ZISSU:

24         Q    Yes or no --

25         MR. TOBEROFF:   Excuse me.   I'm in the middle of

67

1   an objection.  Objection.  Assumes facts not in evidence.

2   Lacks foundation.

3          THE WITNESS:  It took time to prepare things.

4   BY MR. ZISSU:

5      Q   But I asked you did you discuss this with your

6   mother.

7          MR. TOBEROFF:  Please focus on his question.

8   Just answer his question.

9          THE WITNESS:  Yes.

10  BY MR. ZISSU:

11     Q   And what did you say to --

12     A   Excuse me.

13     Q   Yes.

14     A   Did I discuss what with my mother?

15     Q   Why you waited from the time your father died

16  until April of 1997 to serve the termination notices.

17     A   No.

18     Q   You did not discuss it?

19     A   No.

20         MR. ZISSU:  I am going to mark as Defendants' 9

21  some kind of a copy of -- it has a caption that relates

22  to your divorce case, I believe, and I am going to ask

23  you a question about it.  I will have it marked as 9,

24  Defendants' 9.

25         (Defendants' Exhibit 9 marked.)

68

EXHIBIT B
73

BY MR. ZISSU:

    Q   Have you seen that before is the first question?

    A   Yes.

    Q   Now, with respect to -- if you go to the second page of the exhibit, under the heading "Bifurcation of the Copyright Termination Rights Issue," the question is -- this states, "The Court finds that all interest in the copyrights and/or termination rights held by Petitioner are Petitioner's sole and separate property, acquired for [sic] inheritance and under federal copyright law. The Court further finds that no authority will support Respondent or the community having acquired an interest in that property. The Court also finds that Petitioner has not transmuted her interest at any time," close quote.

    My question is, did the final result of the divorce come out that your former husband owns no right in the termination interests?

    MR. TOBEROFF:  Objection.  I just want to state for the record that -- it's minor, but he said "acquired for inheritance," and it says "acquired by inheritance."

    MR. ZISSU:  Yes.  Sorry.

    THE WITNESS:  And your question?

BY MR. ZISSU:

    Q   Yeah.  Did it come out as a result of the

69

1    divorce that your former husband does not own any part of

2    your termination interests?

3        A    Yes, that was this judge's ruling.

4        Q    Yeah.  And this became final?

5        A    This became final, yes.

6        Q    And in the first paragraph there is some

7    reference to "domestic violence."  My question is, was

8    evidence of domestic violence offered with respect to any

9    copyright ownership issue in the case?

10            MR. TOBEROFF:  Objection.  Vague and ambiguous.

11   BY MR. ZISSU:

12       Q    Well, if you go to the lines 6 through 11,

13   starting with the sentence in the middle of line 6, it

14   says, "Respondent is entitled to introduce evidence of

15   domestic violence at the time of the trial in the context

16   of credibility issues, only, and only to the extent it is

17   relevant to the custody issues, if any."

18            And so my question is, had your former husband

19   attempted to offer that evidence in relation to who would

20   own an interest in the copyright terminations?

21            MR. TOBEROFF:  Objection.  Vague and ambiguous.

22   Calls for a legal conclusion.

23            You can answer.

24            THE WITNESS:  No.

25   BY MR. ZISSU:

70

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1      Q    What was the nature of this evidence, domestic

2   violence?  What was that all about?

3      A    I --

4           MR. TOBEROFF:  Do we really need to go into

5   this?

6           MR. ZISSU:  I am asking the question.

7           THE WITNESS:  It has nothing to do with the

8   copyright issue.

9   BY MR. ZISSU:

10     Q    I don't ask you to go into it, but what was the

11  nature of it, though?

12     A    The final settlement of the divorce would

13  prevent me from answering that question.

14     Q    It's secured -- sealed or confidential.

15          Is that it?

16     A    That's correct.

17          MR. ZISSU:  Next is Defendants' 10, which is

18  another document from the divorce proceedings.  It has an

19  original filed stamp of December 14, 2005 on the front

20  page.

21          (Defendants' Exhibit 10 marked.)

22  BY MR. ZISSU:

23     Q    And I just ask -- I am seeking authentication.

24  Is this a copy of the Income and Expense Declaration, as

25  best you can tell, filed on your behalf?

71

1        A    Yes.

2        Q    Are there any agreements you made to share any

3   of the proceeds of the termination rights case with

4   anyone else, such as accountants or lawyers?

5              MR. TOBEROFF:  Objection.  Vague and ambiguous.

6              THE WITNESS:  I don't understand the question.

7   BY MR. ZISSU:

8        Q    In the cases we're here for, the termination

9   cases, you're seeking an accounting.  My question is, are

10  you going to share whatever you obtain under the

11  accounting, the current cases, with any lawyers from the

12  divorce case or any other lawyers?

13       A    Not from the divorce case.

14       Q    With Mr. Toberoff?

15             MR. TOBEROFF:  You can answer whether or not we

16  have a contingency arrangement.

17             THE WITNESS:  We have a contingency agreement.

18  BY MR. ZISSU:

19       Q    Is it a lengthy document?

20       A    Could you speak up?

21       Q    Is it a lengthy document?

22       A    The --

23       Q    Contingency fee agreement.

24       A    The fee agreement?

25       Q    Yes.

72

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

```
1          A    I don't know what you would consider lengthy.

2          Q    Well, is it more than 10 pages?

3          A    I don't believe so.

4          Q    Were you represented by a lawyer other than

5     Mr. Toberoff when you signed it?

6          A    Yes.

7          Q    And who was that lawyer?

8          A    Mr. Levine.

9               MR. ZISSU:  Defendants' 11 is a complaint in the

10    probate court of Cuyahoga County, Ohio -- a copy of a

11    complaint.

12              (Defendants' Exhibit 11 marked.)

13    BY MR. ZISSU:

14         Q    Have you seen a copy of this document before?

15         A    Yes.

16         Q    And do you have knowledge of this proceeding in

17    Ohio?

18         A    Yes.

19         Q    And what do you know about it?

20              MR. TOBEROFF:  Objection.  Calls for a

21    narrative.

22              THE WITNESS:  My half-brother Michael's cousins

23    are trying to get themselves declared his heir.

24              My half-brother Michael's --

25              MR. ZISSU:  Declared --
```

73

```
 1              THE WITNESS:  -- cousins declared his heir.
 2    BY MR. ZISSU:
 3         Q    And do you know what the status is, as best you
 4    understand it, currently?
 5         A    An attorney representing Mr. Banchek has filed a
 6    motion to dismiss.
 7         Q    And has that been granted, or is it pending?
 8         A    It's pending.
 9         Q    Are you a party to that case?
10         A    No.
11         Q    Have you submitted any papers --
12         A    No.
13         Q    -- to the case?
14              Nothing you signed has been submitted in that
15    case?
16         A    Not to my knowledge.
17              MR. ZISSU:  Defendants' Exhibit 12 is a copy of
18    a letter from Michael Bergman in this case to the United
19    States Magistrate in the case dated July 6, 2006.
20              (Defendants' Exhibit 12 marked.)
21    BY MR. ZISSU:
22         Q    My first question will be have you seen this
23    before?
24         A    There are two documents here.
25         Q    Two?  Let me see.  Oh, you mean two in the
```

74

1    exhibit.  Yeah.  The second document, which is part of

2    the exhibit, is a July 5, 2006 letter from a lawyer named

3    John J. Quinn at Arnold & Porter to the defendants'

4    counsel in the termination cases.

5         A    Okay.  And your question was?

6         Q    My question is have you seen a copy of this

7    letter before?

8         A    Yes.

9         Q    And do you know anything about the subject of

10    the documents referred to in this letter?

11         And for the record, just let me read into the

12    record before you answer.  I am quoting from the second

13    paragraph:  Quote, "As Mr. Quinn's letter indicates,

14    defendant Warner Bros. has received certain unsolicited

15    documents from an unidentified source; it appears that

16    some or all of these documents may relate in some way to

17    the above actions and that some of the documents may be

18    protected by a privilege held by Plaintiffs or their

19    counsel.  Neither I" -- that's Mr. Bergman -- "nor my

20    co-counsel have seen these documents or discussed their

21    contents with Mr. Quinn or any of the defendants.

22    However, I believe that the procedure suggested by

23    Mr. Quinn is both reasonable and consistent with

24    standards of professional responsibility," close quote.

25         So my question is, do you know anything about

75

1    the subject of these documents?

2         MR. TOBEROFF:  Objection.  Instruct you not to

3    divulge the substance of any communications from me

4    regarding this letter or regarding this subject.  If you

5    independently know something, you can testify to it.

6         THE WITNESS:  I don't know anything other than

7    communications I've had with my attorney.

8    BY MR. ZISSU:

9         Q    Now I will ask you, and what do you know from

10   your attorney?

11        MR. TOBEROFF:  Objection.  Attorney-client

12   privilege.  Instruct you not to answer the substance of

13   your communications with your attorney.

14        (Instruction not to answer.)

15        MR. ZISSU:  I am going to mark as Defendants' 13

16   a letter dated December 23, 1975 to Mr. Jerome Siegel and

17   Mr. Joseph Shuster on the letterhead of Warner

18   Communications.

19        (Defendants' Exhibit 13 marked.)

20   BY MR. ZISSU:

21        Q    And my question is first, have you seen a copy

22   of that letter before?

23        A    Yes.

24        Q    And have you yourself had any involvement before

25   your father died in the rights and obligations of the

76

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**81**

1    parties to that letter over the years?

2           MR. TOBEROFF:  Objection.  Vague and ambiguous.

3           THE WITNESS:  I don't really understand your

4    question.

5    BY MR. ZISSU:

6       Q    Do you understand what this letter is about?

7       A    Yes.

8       Q    Okay.  And it has to do, among other things,

9    with annual payments --

10      A    Yes.

11      Q    -- that were made to your mother, among other

12   people?

13      A    No.

14      Q    Or to your father and then to your mother?

15          MR. TOBEROFF:  Just one second.  Because the

16   court reporter can't take people talking together --

17          MR. ZISSU:  Yes.

18          MR. TOBEROFF:  -- let him finish his question

19   before responding, and please give me the opportunity to

20   object without answering right away.

21          THE WITNESS:  Okay.

22   BY MR. ZISSU:

23      Q    Okay.  Do you understand it had to do with

24   annual payments that were made to your father and then

25   your mother by Warner Communications?

77

EXHIBIT B
82

1          MR. TOBEROFF:  Objection.  Lacks foundation.

2    Assumes facts not in evidence.

3    BY MR. ZISSU:

4       Q   Do you understand the nature of the letter and

5    the subject of the letter in that respect?

6          MR. TOBEROFF:  Same objection.

7    BY MR. ZISSU:

8       Q   You can answer.

9       A   I disagree with the compound that you put into

10   that question.

11      Q   Well, tell me what you understand about the

12   letter.

13      A   It has to do with payments to my father.

14      Q   Okay.  And were you involved in any of the

15   discussions or negotiations relating to the payments that

16   were made, before your father died, under this letter?

17      A   No.

18      Q   And have you been involved since your father

19   died with respect to any payments made under this letter?

20         MR. TOBEROFF:  Objection.  Vague and ambiguous.

21         THE WITNESS:  Since my father died --

22   BY MR. ZISSU:

23      Q   Since your father died, yeah.

24      A   This related to payments to him during his

25   lifetime.

1    Q    Right.

2    A    So there -- the answer is no.

3    Q    And have there been payments to your knowledge

4    made since his death, under this letter, to your mother?

5    A    No.  This letter has nothing to do with my

6    mother.

7    Q    It has nothing to do with your mother.

8    Have there ever -- to your knowledge have any

9    payments ever been made relating to this letter to your

10   mother since your father died?

11   A    My mother is not a party to this document.

12   Q    I know that, but what do you know about this

13   document in relation to your mother?

14   MR. TOBEROFF:  I object to that question.  Also

15   vague and ambiguous.

16   And, Laura, if I can ask you to just focus on

17   the specific question and answer the specific question if

18   you understand it.

19   THE WITNESS:  Could you repeat it?

20   BY MR. ZISSU:

21   Q    What knowledge do you have as to payments made

22   to your mother -- forget the document -- since your

23   father died on an annual basis from Warner Communications

24   or DC Comics or any of the defendants?

25   MR. TOBEROFF:  Objection.  Calls for a

79

**EXHIBIT B**
**84**

```
 1    narrative.

 2              You can answer.

 3              THE WITNESS:  My mother needed money, and she

 4    asked for money after my father died.

 5    BY MR. ZISSU:

 6         Q    And was she paid money after your father died by

 7    one or more of the defendants?

 8         A    Yes.

 9         Q    And how much to your knowledge was she paid

10    since 1996?

11         A    I don't know.

12         Q    Were you involved in any of the discussions

13    relating to what your mother was paid?

14         A    No.

15         Q    Were you ever involved in any discussions about

16    how this letter might apply to your mother between --

17    with any representative of the defendants?

18              Were you involved is the question?

19         A    No.

20         Q    Who would have been involved, if you know?

21         A    Who would have been involved in --

22         Q    Involved in any discussions relating to these

23    payments or requests for payment by your mother.  Who

24    would have been involved in those discussions?

25         A    My mother.
```

80

```
 1              MR. TOBEROFF:  Objection -- excuse me.

 2              THE WITNESS:  Sorry.

 3              MR. TOBEROFF:  Objection.  Calls for

 4    speculation.

 5    BY MR. ZISSU:

 6         Q    And your answer is your mother?

 7         A    I -- yes.

 8         Q    Would you have discussed with your mother these

 9    payments made or requested after your father died?

10              MR. TOBEROFF:  Objection.  Vague and ambiguous.

11              THE WITNESS:  Could you ask a more specific

12    question?

13    BY MR. ZISSU:

14         Q    Did you ever discuss with your mother her

15    requests to any of the defendants for payments after she

16    died?  After she died?

17         Q    I am sorry.  After your father died.

18         A    Yes.

19         Q    And what was the substance of those discussions?

20         A    She was concerned about her ability to survive

21    without any kind of annual income.

22         Q    And what's your best understanding of what

23    happened to her requests?

24         A    She made an appeal and was granted an annual

25    income.
```

81

```
 1        Q    And has that continued to date?

 2        A    Yes.

 3        Q    Do you know what time of the year it's paid?

 4        A    I believe she gets biweekly checks.

 5        Q    And has she also requested money for medical

 6   expenses?

 7             MR. TOBEROFF:  Objection.  Are you asking her

 8   what --

 9   BY MR. ZISSU:

10        Q    Since your father died.

11             MR. TOBEROFF:  Objection.  Are you asking her

12   what her mother told her?

13             MR. ZISSU:  Yes.  It's based on -- unless she

14   was involved in them, yes.

15             MR. TOBEROFF:  Okay.

16             THE WITNESS:  Yes, my mother told me that she

17   was receiving medical benefits.

18   BY MR. ZISSU:

19        Q    And is that done on a biweekly -- or what --

20   strike that.

21             On what basis is that done so far as you

22   understand?

23             MR. TOBEROFF:  Objection.  Vague and ambiguous.

24             THE WITNESS:  She has medical coverage.

25   BY MR. ZISSU:
```

82

```
1        Q    It's in the form of insurance coverage?

2        A    Correct.

3        Q    Which is paid for by one of the defendants?

4        A    Yes.

5             MR. ZISSU:  Now, I have a series of letters.  We

6   will make it into one exhibit.  There are five letters.

7   They are -- the first is to Gerald M. Levin; the second

8   is to Jenette, J E N E T T E, Kahn, K A H N; the third is

9   to Robert Daly, D A L Y; the fourth is to Terry,

10  T E R R Y, Semel, S E M E L.  It's only four letters.

11  I'd like to make it five letters.  And the fifth one is

12  to Paul Levitz.  They're the same date.

13            MR. TOBEROFF:  Do you have a paper clip or

14  something?

15            MR. BERGMAN:  I'll get some.

16            MR. TOBEROFF:  We are off the record?

17            MR. ZISSU:  Yeah.

18            (Recess.)

19            MR. ZISSU:  So this series of letters are

20  Defendants' 14.  There are five of them.

21            (Defendants' Exhibit 14 marked.)

22            MR. TOBEROFF:  Are these in the order that are

23  going to be --

24            MR. ZISSU:  Yes.

25            MR. TOBEROFF:  What's the first one, 1069?
```

83

**EXHIBIT B**
**88**

```
 1          MR. ZISSU:  Yes.  The numbers are not
 2  sequential, but they are in the order in which I put it
 3  together.  There is no magic to it.
 4      Q   If you will look through these letters, and my
 5  question would be whether you have seen these letters
 6  previously.
 7      A   Okay.  And your question was?
 8      Q   Have you seen these letters before?
 9      A   Yes.
10      Q   Did you participate in writing them?
11      A   No.
12      Q   Did you see them before they were sent or after
13  they were sent?
14      A   Before.
15      Q   And did you discuss them with your mother, the
16  content, before she sent them?
17      A   She said she was going to send them.
18      Q   Did you make suggestions about the wording of
19  them to her?
20      A   I don't believe so.
21      Q   Did you approve them?
22          MR. TOBEROFF:  I am going to make an objection
23  as to the whole line of questioning.  Because there are
24  five letters in Exhibit 14, that I believe by definition
25  they're objectionable as compound.
```

84

**EXHIBIT B**
**89**

1            You can answer.

2            THE WITNESS:  I don't approve what my mother

3    does.  That's not my role.

4    BY MR. ZISSU:

5        Q   Did you consent to them?  Since they are, I

6    think, in part written with regard to actions taken by

7    you and your mother.

8        A   She didn't ask for my consent.

9        Q   But did you consent to them or approve them

10   afterwards?

11           MR. TOBEROFF:  Vague and ambiguous.

12   BY MR. ZISSU:

13       Q   Did you ever tell your mother that you objected

14   to any of the content of these letters after she sent

15   them?

16       A   No.

17           MR. ZISSU:  Let's mark as I think it's 15 two

18   letters, the top one of which is from Paul Levitz to

19   Joanne Siegel, and the second of which is from Joanne

20   Siegel to Paul Levitz.

21           (Defendants' Exhibit 15 marked.)

22   BY MR. ZISSU:

23       Q   I will give you a chance to read them both.  I

24   am going to ask you if you've seen them both before.

25       A   Okay.  And your question is?

85

1      Q    Yeah.  Let's look at the first letter, which is

2  the second in the exhibit.  It's dated April -- I'm

3  sorry.

4           Look at the top one, April 15, 1999.  Have you

5  seen that letter before?

6      A    Yes.

7      Q    And did you see it on or about that time, April

8  15, 1999?

9      A    I saw it shortly after my mother received it.

10     Q    And did your mother discuss that with you?

11     A    Yes.

12     Q    And what did she say?

13     A    She told me she got a letter from Paul.

14     Q    Did she say that she was going to respond to it?

15     A    Yes.

16     Q    And did you discuss the response with her?

17     A    I believe so.

18     Q    Which is the second letter, April 19, 1999?

19     A    Uh-huh.

20          THE REPORTER:  That's "yes"?

21          THE WITNESS:  Yes.  Sorry.

22          MR. TOBEROFF:  He can't take down "uh-huh."

23          THE WITNESS:  I know, I know.  I'm getting

24  tired.

25  BY MR. ZISSU:

86

EXHIBIT B
91

1        Q    There is a handwritten word that looks like the

2   word "negotiators" that is crossed out in the sentence

3   that reads, "Please know that Laura and I have been

4   assured and we believe that our" -- the typed text says

5   "negotiators will indeed contact you shortly," and it

6   looks like that was crossed out, and there is a word

7   written below which I think says "representatives."

8        Is that --

9        A    Uh-huh, looks like that.

10       Q    Is that your handwriting?

11       A    It's a bad xerox.  It could be.

12       Q    And do you recall making that change in this

13   text?

14       A    Probably.

15       Q    And why was it changed?

16       A    I don't know.  Just sounded better.

17       Q    Was it your mother's practice to show you her

18   drafts of letters, and then you would review them and

19   edit them?

20       A    Sometimes.

21       Q    And did you help write this letter, which is

22   April 19, 1999?

23       A    I believe she wrote it, and, you know, I may

24   have made that, you know, suggestion.

25       Q    You didn't make any other suggestions to change?

87

1         A    I don't recall any.

2              MR. ZISSU:  The next exhibit, Defendants' 16, is

3    a thick document.  It says, "Notice of Termination of

4    Transfer Covering Extended Renewal Term."  It's Bates

5    numbers 848 through 910.

6              (Defendants' Exhibit 16 marked.)

7    BY MR. ZISSU:

8         Q    And have you seen that document before, or a

9    copy of it?

10        A    This is a collection of several documents.

11        Q    Yes.  These are the -- I think they're the

12   termination notices that were served in the Superman case

13   or are the basis for the Superman case and --

14             MR. TOBEROFF:  Just to clarify the record --

15             MR. ZISSU:  Yeah.

16             MR. TOBEROFF:  -- there were several termination

17   notices that were sent, but each of them had a --

18             MR. ZISSU:  A list.

19             MR. TOBEROFF:  -- a very lengthy list, and for

20   both parties' convenience what was produced was the list,

21   but then each of the other notices included everything

22   but the list, so we wouldn't have to keep --

23             MR. ZISSU:  Right.  And I am doing likewise.

24   This is just the notices without the list.

25             MR. TOBEROFF:  Well, it's the notices excluding

                                                              88

1    the list which goes in the center of each notice.

2            MR. ZISSU:  Yes, correct.  But this is

3    reproduced in the way it was from the notices as you

4    produced them, following your Bates numbers, and --

5            MR. TOBEROFF:  But I believe we clarified in

6    making the production --

7            MR. ZISSU:  Yeah.

8            MR. TOBEROFF:  -- why we didn't produce the list

9    over and over again.

10            MR. ZISSU:  And I think there are seven notices

11    of termination, if I'm correct.

12            MR. TOBEROFF:  I believe that's correct.

13            MR. ZISSU:  And each of them is signed -- by way

14    of example, if you look on page 907, they're signed by

15    Joanne Siegel and Laura Siegel Larson.

16        Q    The question is do you recognize these notices

17    of termination without the list?

18        A    Yes.

19        Q    And you signed them in each case with your

20    mother?

21        A    Yes.

22        Q    And did you read through them and review them

23    before you signed them?

24        A    Yes.

25        Q    And I think in each one -- let's take the first

89

EXHIBIT B
94

1    one, and go to page 3 of it.  There is a footnote number

2    1, which I think is repeated in each of the notices, and

3    this footnote refers to the list that was -- the full

4    list that was attached to each of the notices.

5           Do you see that?

6       A   Yes.

7       Q   Okay.  And each of the footnotes refers to --

8    well, I will read this footnote on page -- it's on 850 of

9    the Bates numbers.  It's page 3 of the first notice.

10          Quote, "This Notice of Termination applies to

11   each and every work (in any medium whatsoever, whenever

12   created) that includes or embodies any character, story

13   element, or indicia reasonably associated with SUPERMAN

14   or the SUPERMAN stories, such as, without limitation,

15   Superman, Clark Kent, Lois Lane, Perry White, Jimmy

16   Olsen, Superboy, Supergirl, Lana Lang, Lex Luthor,

17   Mr." -- and this is in all caps -- MXYZTPLK (also known

18   as Mr. MXYZTPLK) -- in caps again -- "Ma and Pa Kent,

19   Steel," S T E E L, "the planet Krypton," K R Y P T O N,

20   "Kryptonite, Metropolis" -- these are initial cap --

21   "Smallville or the Daily Planet.  Every reasonable effort

22   has been made to find and list herein each such SUPERMAN-

23   related work ever created.  Nevertheless, if any such

24   work has been omitted, such omission is unintentional and

25   involuntary, and this Notice," with a capital N, "also

90

1    applies to each and every such omitted work."

2        Did you understand that in signing this notice,

3    that Superboy is a related work to Superman?

4        MR. TOBEROFF:  Objection.  Calls for a legal

5    conclusion.

6        If you can answer the question without revealing

7    information obtained from your attorney, you can answer,

8    but only to that extent.

9        THE WITNESS:  That was left to the attorneys.

10   BY MR. ZISSU:

11      Q   But do you -- you signed this, and you filed

12   this in the copyright office.

13       Correct?

14      A   Uh-huh.

15      Q   Do you understand that Superboy is related to

16   Superman?

17       MR. TOBEROFF:  Objection.  Calls for a legal

18   conclusion.

19       Only answer to the extent you are not revealing

20   any attorney-client communications or attorney work

21   product.

22       MR. ZISSU:  Did you instruct her not to answer?

23       MR. TOBEROFF:  She can answer but only to the

24   extent the answer does not reveal communications between

25   her attorneys or legal strategies communicated between

91

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    her and her attorneys.

2    BY MR. ZISSU:

3        Q    Are you familiar with your father's Superman

4    works?

5        A    Yes --

6        Q    You've seen --

7        A    -- to a certain extent.  I'm not a comic book

8    historian.

9        Q    But you've read or seen works?

10        A    Some of them.

11        Q    Some of them.

12             You've seen Action Comics No. 1?

13        A    Yes.

14        Q    You've read it?

15        A    Yes.

16        Q    Have you read your father's -- in 1938 he wrote

17    a letter to Detective Comics proposing a Superboy comic

18    book.  You've read that letter.

19             Correct?

20             MR. TOBEROFF:  Objection.  Lacks foundation.

21    Assumes facts not in evidence.

22    BY MR. ZISSU:

23        Q    Did you read that letter?

24        A    A long time ago.

25        Q    And did you ever read a script or continuation

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    from 1940 which proposed a form of Superboy comic book?

2              MR. TOBEROFF:  Same objection.

3              THE WITNESS:  I read that some time ago as well.

4    BY MR. ZISSU:

5        Q   And have you ever read More Fun Comics -- any of

6    the More Fun Comics which featured Superboy?

7        A   A long time ago.

8        Q   How long --

9              MR. TOBEROFF:  Just a second.  Assumes facts not

10   in evidence.

11   BY MR. ZISSU:

12       Q   How long ago?

13       A   I don't recall.

14       Q   Did you read them in connection with any aspect

15   of these cases in which you're a plaintiff?

16             MR. TOBEROFF:  Vague and ambiguous.

17             THE WITNESS:  I probably read it a couple of

18   years ago.

19   BY MR. ZISSU:

20       Q   Do you understand that there is any relationship

21   between the Superman character and Superboy?

22       A   That's --

23             MR. TOBEROFF:  Vague and ambiguous.

24             THE WITNESS:  Could you be more specific,

25   because that's such a broad question?

93

1    BY MR. ZISSU:

2        Q    Well, I'm asking you if you understand there is

3    any relationship between the character Superman and the

4    character Superboy?

5              MR. TOBEROFF:  Objection.  Vague and ambiguous.

6              THE WITNESS:  They were both created by my

7    father.

8    BY MR. ZISSU:

9        Q    And are the characters as created related in any

10   way?

11             MR. TOBEROFF:  Objection.  Vague and ambiguous.

12   Calls for a legal conclusion.

13   BY MR. ZISSU:

14       Q    In your understanding as a reader.

15       A    They have completely different story lines.

16       Q    Isn't it a fact that Superboy is portrayed as

17   Superman as a youth?

18             MR. TOBEROFF:  Objection.  Assumes facts not in

19   evidence.  Lacks foundation.

20             THE WITNESS:  Could you ask the question again,

21   please?

22   BY MR. ZISSU:

23       Q    Isn't it a fact that as portrayed in the comic

24   books, Superboy is Superman as a youth?

25             MR. TOBEROFF:  You can answer.

                                                            94

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**

1          THE WITNESS:  Yes.

2    BY MR. ZISSU:

3       Q   And isn't that a relationship between the two

4    characters, as portrayed?

5          MR. TOBEROFF:  Vague and ambiguous.

6          THE WITNESS:  It's -- there are a lot of legal

7    aspects to this that I'm not qualified to answer.

8    BY MR. ZISSU:

9       Q   I am not asking you anything legal.  You look at

10   the two.  One is a version of the other as a youth;

11   you've just admitted that, and I asked you if that makes

12   them related, and you say you can't answer.

13         MR. TOBEROFF:  Object --

14   BY MR. ZISSU:

15      Q   Correct?  That's your answer?

16         MR. TOBEROFF:  Excuse me.  Let me object.

17   Objection.  Misstates her prior testimony.  That was not

18   her answer.

19         Do you know what the pending question is?

20         THE WITNESS:  I did not say that he was a

21   version of him.

22   BY MR. ZISSU:

23      Q   What aspects of the character Superman can be

24   found in the character Superboy?

25         MR. TOBEROFF:  Objection.  Calls for a legal

95

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    conclusion.

2    BY MR. ZISSU:

3        Q    You understand you are the plaintiff in this

4    action?

5        A    Yes.

6        Q    And you understand you're making claims,

7    apparently, that Superboy is not related to Superman as

8    the characters have been portrayed in publications?  Do

9    you understand that that's what you're saying?

10           MR. TOBEROFF:  Objection.  Lacks foundation.

11    Misstates the evidence.

12           THE WITNESS:  That's not what the case says.

13    BY MR. ZISSU:

14        Q    I didn't -- there are aspects of the case in

15    which -- including your deposition today in which you're

16    unwilling to concede that Superboy is related to

17    Superman.

18           Do you understand that?

19           MR. TOBEROFF:  Objection.  Vague and ambiguous.

20    Misstates her testimony.

21    BY MR. ZISSU:

22        Q    Do you understand that?

23        A    I don't know how to answer your question.

24           MR. TOBEROFF:  What is the pending question?

25    BY MR. ZISSU:

96

EXHIBIT B
101

1       Q    The question now is -- we will go on to another

2   question -- is it your testimony that the character

3   Superboy as he's appeared in publications is not related

4   to the character Superman as Superman has been portrayed

5   in publications?

6            MR. TOBEROFF:  Objection.  Vague and

7   ambiguous --

8   BY MR. ZISSU:

9       Q    Is that --

10           MR. TOBEROFF:  -- but you can answer.

11  BY MR. ZISSU:

12      Q    -- your testimony?

13      A    No, that's not my testimony.

14      Q    Well, what, if any, relationship do those two

15  characters have?

16           MR. TOBEROFF:  Asked and answered.

17           You can answer again.

18           THE WITNESS:  As I said before, they -- you

19  know, they're -- they were both created by my father, but

20  they're separately created characters.

21  BY MR. ZISSU:

22      Q    I didn't ask you whether they were separately

23  created.

24           As you see them on a page when you read them, is

25  it your testimony that they are not related?

97

1          MR. TOBEROFF:  Objection --

2    BY MR. ZISSU:

3        Q    Yes or no?

4          MR. TOBEROFF:  Objection.  Asked and answered.

5          You can answer, Laura.

6          MR. ZISSU:  You've obstructed the examination --

7          MR. TOBEROFF:  No, I haven't.  I'm telling

8    her --

9          MR. ZISSU:  -- by suggesting repeatedly that she

10   not answer the question, and then you have the nerve to

11   say "asked and answered."  I just want an answer to the

12   question.

13         MR. TOBEROFF:  Okay.  I have to address you

14   since you've addressed me now with colloquy.  I try to

15   keep it simple and just voice my objections.  That's not

16   the nature of the objections.  Most of the questions,

17   I've said "You can answer" after stating my objection,

18   but certain questions, because it's phrased in the

19   context of this lawsuit, ask for a legal conclusion.  You

20   know it, I know it, that's why you're asking, and because

21   of that they're unfair.

22         MR. ZISSU:  Let me just --

23         MR. TOBEROFF:  The last question that's pending,

24   about whether or not they're related, you can answer

25   that, Laura.  I don't think it's a trick question.  You

                                                          98

1    can answer that simple question.  He is just asking you

2    whether or not they are.

3            THE WITNESS:  I understand.  It's the word

4    "related" that I have a little difficulty with.

5    BY MR. ZISSU:

6        Q    Let me just say something to you, and I will say

7    it to your counsel.  I'm asking you facts in terms of

8    what you see and what you perceive.  They do definitely

9    have legal consequences in the case, but that does not

10   enable you to avoid discussing the facts.

11           The consequences can be argued about later by

12   lawyers, but if this character was based in part upon

13   Superman, and then -- even if separately created but

14   based in part on Superman, and that is apparent by

15   viewing them, that's what I'm asking about.

16           Does it have a legal consequence?  It might, but

17   that's not what -- you're not a lawyer, and I am not

18   asking you for a legal consequence, but I am entitled to

19   ask you a fact, from which I will argue legal

20   consequences, and your counsel will argue the other way.

21           And I am asking you, if you read the stories,

22   you read your father's submissions to Detective Comics,

23   which you acknowledged reading, is Superboy based in part

24   on Superman?  That's the question.  How do you see it?

25       A    Yes.

99

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**104**

1      Q   Now, you don't deny that these notices, all

2  seven of them, repeat throughout in the footnote 1 to

3  each notice the statements that Superboy and a bunch of

4  other characters listed here are, quote, a "SUPERMAN-

5  related work"?

6      A   Yes, that's what it says.

7      Q   Okay.  And each of them say this.

8          Correct?

9      A   Yes.

10     Q   Now, if you go to page 897 in this Exhibit 16,

11 on that page -- and I will let you read it, but there is

12 a description of various documents, among others, related

13 to a 1947 or 1948 case that I can represent took place in

14 the State of New York, and in the third and fourth lines

15 there is -- among the documents referenced there is,

16 quote, ":  A stipulation executed on or about May 19,

17 1948, providing in part that by virtue of a March 1, 1930

18 [sic] agreement, the co-authors" --

19          MR. TOBEROFF:  1938.

20          MR. ZISSU:  Sorry.

21     Q   -- "1938 agreement, the co-authors transferred

22 to Detective Comics...," et cetera, and do you see that?

23     A   Yes, I do.

24     Q   Okay.  Now, the question I am asking you is

25 not -- again, I am not asking you for a legal conclusion.

100

1    I'm asking you -- the question is, there was also -- and

2    I will represent to you, and I think your counsel will

3    agree, that there was another document in that case

4    called -- that was a consent judgment that was from 1948

5    as well, and this consent judgment is not mentioned in

6    any of these notices of termination, and my question to

7    you is, do you know anything about why, either yes or no?

8    I am not asking you for what your counsel told you.  I am

9    only asking you if you have knowledge on the subject.

10          MR. TOBEROFF:  Objection.  Compound.  Vague and

11   ambiguous.

12          And you can only answer to the extent your

13   answer does not entail any -- the substance of any

14   attorney-client communications.

15          THE WITNESS:  And the question again is?

16   BY MR. ZISSU:

17       Q   The question is --

18          MR. TOBEROFF:  Does she know why?

19          MR. ZISSU:  Right.

20       Q   In these notices, the consent judgment from that

21   case is not listed as among the documents -- among the

22   transfers or grants being terminated.

23          My question is, do you know why it was omitted?

24       A   Yes.

25       Q   And why was it omitted?

101

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1            MR. TOBEROFF:  Objection --

 2            THE WITNESS:  That --

 3            MR. TOBEROFF:  Objection.  You can't -- the only

 4   way she knows why -- put it another way:  You can only

 5   testify as to why if you know that independently of an

 6   attorney-client communication.  If you know that through

 7   an attorney-client communication, you are divulging the

 8   substance by nature of the question, and I will stand by

 9   that.  So you can only testify what you know that's not

10   through the result of an attorney-client communication.

11            MR. ZISSU:  You are not supposed to tell her

12   what she knows and on what basis she knows --

13            MR. TOBEROFF:  I am not doing that.

14            MR. ZISSU:  Well, you just did that.

15            MR. TOBEROFF:  The record speaks for itself.

16            MR. ZISSU:  It will.

17       Q   My question is, do you know anything about it,

18   yes or no?

19            MR. TOBEROFF:  She already answered that.  Asked

20   and answered.

21            THE WITNESS:  I said yes.

22   BY MR. ZISSU:

23       Q   I am going to ask you now, what do you know

24   about it?

25            MR. TOBEROFF:  Same objection.  You can only
```

                                                          102

```
 1    testify what you know --
 2           MR. ZISSU:  I know the objection.  Are you
 3    directing her not to answer?
 4           MR. TOBEROFF:  My objection and direction
 5    stands.
 6           MR. ZISSU:  You didn't make the direction, so I
 7    am asking you if you are making the direction.  If you
 8    are going to make it, make it.
 9           MR. TOBEROFF:  I did make the direction.  I'm
10    trying not to repeat.  Shall I repeat it?
11           MR. ZISSU:  Yes.
12           MR. TOBEROFF:  Okay.  The objection is --
13           MR. ZISSU:  No, no.  I'm sorry.  Let me --
14           MR. TOBEROFF:  The instruction is I am
15    instructing you not to answer to the extent your
16    knowledge entails the substance of an attorney-client
17    communication.  To the extent you have knowledge as to
18    why independent of attorney-client communications, you
19    can answer.  That's the instruction.
20    BY MR. ZISSU:
21       Q   All right.  Do you have any knowledge why?
22       A   I only know what my lawyer told me.
23       Q   Do you know -- this is a different question.
24    Did you ever give your lawyer a copy of the consent
25    judgment from 1948?
```

                                                            103

```
 1        A    I don't recall.

 2        Q    You don't.  Okay.

 3             MR. TOBEROFF:  I didn't have time to voice an

 4    objection.  I believe that's also objectionable.

 5             MR. ZISSU:  Your objections to form have to take

 6    place before, not after the question.  That's the way it

 7    works, Marc.

 8             MR. TOBEROFF:  I understand that.

 9             MR. ZISSU:  Occasionally if you have a problem,

10    and it went too quickly and you want to make it

11    afterwards, I'll allow it, okay.  I am not afraid, as you

12    apparently are afraid, of every question, so you have to

13    make a speech about it.

14             MR. TOBEROFF:  I object to your

15    characterization.

16             MR. ZISSU:  It's called litigation by fear.

17             MR. TOBEROFF:  No, it's not.  The questions are

18    objectionable.  That's my job.  I'm objecting on the

19    record.  We have nothing to be fearful of, on the

20    contrary.

21             MR. ZISSU:  I didn't say we.  I said you.

22             MR. TOBEROFF:  I have nothing to be fearful of,

23    on the contrary.

24             MR. ZISSU:  We are almost ready for a breaking

25    point, so maybe we can get through these next two
```

104

1   documents.

2           MR. TOBEROFF:  Give me five seconds to object

3   before your answer.  Okay, Laura?

4           THE WITNESS:  I'm very tired.

5           MR. ZISSU:  We are going to break soon, so...

6   Sorry for that.

7           Okay.  Defendants' 17, which is a Notice of

8   Termination of Transfer Covering Extended Renewal Term

9   Superboy.  And I think this is the whole one, if I'm not

10  wrong.  We were able to put the whole thing together.

11          (Defendants' Exhibit 17 marked.)

12  BY MR. ZISSU:

13      Q   My questions are pretty focused.

14          If you go to page 616, and there is a paragraph

15  2, and there is a reference in the fourth line to "More

16  Fun Comics, No. 101," and my question is, do you think

17  you may have looked at More Fun Comics on or shortly --

18  on or about or shortly before this termination notice was

19  signed by you?

20      A   I believe so.

21      Q   And your signature appears on page 669, just for

22  your own information.

23          And then on the next page there is -- there are

24  references to -- in small Roman numbers -- they follow

25  small Roman numbers.  (I) is a synopsis of a 1938 letter,

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    and then after little Roman (ii) there is a reference to

2    a 13-page script, and my question is, did you shortly

3    before signing this document review or look through those

4    two documents, namely, the summary or synopsis and the

5    13-page script?

6              MR. TOBEROFF:  Objection.  Misstates what this

7    exhibit says and misstates the evidence and lacks

8    foundation.

9              You can answer.

10             THE WITNESS:  Yeah, I'm trying to read it.  My

11   vision is not so good at this moment, so I'm sorry it's

12   taking so long.

13   BY MR. ZISSU:

14        Q    Well, let me read it into the record.  After the

15   little (i) it says, "a three-page summary or synopsis of

16   the concept and plan for a new comic strip to be known as

17   SUPERBOY solely originated, created, conceived and

18   written by Jerome Siegel (c. 1938) and submitted by

19   Jerome Siegel to Detective Comics, Inc. on or about

20   November 30, 1938; and (ii) a complete thirteen page

21   script containing the continuity, plan and dialogue for

22   the first 'release' or 'releases' of the proposed new

23   comic strip, SUPERBOY, the concept and character of

24   SUPERBOY and the entire plan for the future publication

25   of SUPERBOY...," et cetera.

106

1           So my question is, did you read those two

2    referenced documents shortly before or in connection with

3    signing this document?

4       A    Yes.

5           MR. ZISSU:  And then this is the last one before

6    lunch, if I can find it.  This is a Notice of Termination

7    of Transfer Covering Extended Renewal Term.  Let me find

8    it.

9           (Defendants' Exhibit 18 marked.)

10   BY MR. ZISSU:

11      Q    It doesn't have all the pages.  It has pages 1,

12   2, 3, 24, 25 and 26 of the document.  On page 25 it has

13   the signatures of Joanne Siegel and Laura Siegel Larson,

14   and it has to do, I think, with a character called

15   Spectre or The Spectre, spelled T H E S P E C T R E.

16          And do you recognize this?

17      A    Yes.

18      Q    And if you go to page 2 in paragraph 2 following

19   the Arabic number (1) in parentheses, there is reference

20   to the "Spectre character appearing in costume in an ad

21   in issue No. 51 of More Fun Comics, copyrighted November

22   28, 1939...," and then it goes on, and my question is, do

23   you remember reviewing or seeing a copy of the ad that's

24   referenced?

25      A    No.

107

```
 1        Q    Have you ever seen it?

 2        A    No.

 3             MR. ZISSU:  Okay.  We can break.

 4             (Lunch recess from 1:02 PM to 3:25 PM.)

 5             MR. ZISSU:  We will mark as Defendants' Exhibit

 6   19 photocopies of excerpts from the January 1940 More Fun

 7   Comics.

 8             (Defendants' Exhibit 19 marked.)

 9             MR. TOBEROFF:  Before we start, I would just

10   like to note for the record that this copy is extremely

11   dark.

12             MR. ZISSU:  Yeah.

13             MR. TOBEROFF:  They were xeroxing a comic, so

14   it's very hard to make a lot out.

15             MR. ZISSU:  Yeah.  Let's go off the record for a

16   second.

17             (Discussion held off the record.)

18             MR. ZISSU:  All right.  Back on.

19

20                      EXAMINATION  (Resumed)

21   BY MR. ZISSU:

22        Q    I think, if you turn to the second page of

23   Defendants' 19, in the lower right corner there is a box

24   that reads as follows:  "SPECTRE!  Who is he.  What is

25   he," and there is some kind of artwork, and underneath
```

108

1    that it says, "Read this brand-new feature in the next

2    issue of More Fun Comics."  I think that's what it says.

3              My question is -- I believe this is some kind of

4    ad for Spectre.  Do you have any familiarity with this,

5    or have you ever seen it before?

6         A    I've never seen it before.

7              MR. TOBEROFF:  I didn't have time to object, but

8    I'd like to object that while it may say what you're

9    saying, I could not follow it even as you were reading it

10   from this copy, so it may or may not say what you just

11   said, but --

12             THE WITNESS:  Yeah, and I was just going to say

13   I couldn't read it.  I was just listening to what you had

14   to say.

15   BY MR. ZISSU:

16        Q    Putting aside whether you could read it, are you

17   familiar with any ads for Spectre before the first

18   publication of The Spectre comic book?

19        A    I have not seen it.

20        Q    Such an ad?

21        A    I have not seen any ads.

22        Q    Are you -- ever?  You've never seen any ads for

23   The Spectre comic book --

24        A    No.

25        Q    -- before it came out?

                                                              109

**EXHIBIT B**
**114**

1      A    No.

2           MR. ZISSU:  20 is a series of excerpts, which

3      are more legible, from various comic books starting with

4      More Fun Comics, New Adventure Comics, Detective Comics.

5           (Defendants' Exhibit 20 marked.)

6      BY MR. ZISSU:

7      Q    Do you recognize these as something you've seen

8      before?  I think each one of these three comic books

9      mentioned contain an ad which is pictured in these -- in

10     this Exhibit 20.

11          For example, if you look at the second page of

12     the exhibit, you'll see an ad for Action Comics dated

13     June 1938 in this issue of More Fun Comics, which is

14     dated May 1938.  Have you ever seen that ad before?

15          MR. TOBEROFF:  Objection.  I'm objecting to the

16     exhibit in that it's just not clear what one is really

17     looking at -- if I could just finish my objection --

18          MR. ZISSU:  I am not introducing anything into

19     evidence.  You don't have to comment on the exhibit.  I'm

20     showing her a piece of paper.  I'm asking if she's

21     familiar with it.

22          MR. TOBEROFF:  Yes, but you're presenting an

23     exhibit, and the question combined with the exhibit may

24     be misleading, and my objection is that we don't know and

25     have no idea whether this ad that's in back of what

110

1    says --

2            MR. ZISSU:  We know -- it's not -- I am not

3    asking her to establish it, and I am not saying we know

4    it.  I am asking her if she's ever seen this piece of

5    paper before or a copy of it, period.

6            MR. TOBEROFF:  And my question to you is -- this

7    is a legitimate question -- normally when you present a

8    document, you present the full document.  Are you

9    representing that this second page --

10           MR. ZISSU:  Yes.

11           MR. TOBEROFF:  -- is part --

12           MR. ZISSU:  Yes.

13           MR. TOBEROFF:  I haven't finished my question.

14           MR. ZISSU:  Okay.

15           MR. TOBEROFF:  In other words, my problem with

16   this exhibit you're asking her to comment on is that you

17   have a first page dated May 1938.  Then you have another

18   page.  We have no idea whether that goes with the first

19   page.  Then you have --

20           MR. ZISSU:  Let me provide a narration so that

21   you don't have to ask all these questions, and then if

22   you have questions, you can ask me, because I don't want

23   to waste time.

24           MR. TOBEROFF:  I want to finish my objection

25   regarding the exhibit.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1           MR. ZISSU:  It's not an objection.  It's a

2   speech.

3           MR. TOBEROFF:  No, it's not.  I am just trying

4   to focus on the evidence.  It's very straightforward.

5   Please stop interrupting me when I object.  I don't

6   interrupt you.

7           The second page of Exhibit 20 -- the third page

8   of Exhibit 20 has a new cover of a new comic, and the

9   fourth page has another ad, which we don't know where

10  that comes from, and then the fifth page has another page

11  from a comic with a different date, and then the last

12  page has another ad, and we don't know whether this goes

13  with this, whether it's part of the same document or

14  whether you're taking this and making three xeroxes of it

15  and attaching it to different cover pages.

16          MR. ZISSU:  Let me explain.  This exhibit

17  consists of the following, and I represent this to be

18  true:  The first two pages come from the May 1938

19  Adventure Comics, issue No. 26.  The second page that

20  follows that --

21          MR. TOBEROFF:  It says "No. 31," by the way.

22          MR. ZISSU:  You're looking at the wrong exhibit.

23          THE WITNESS:  Well, this one is 20 that you just

24  gave us.

25          MR. ZISSU:  I'm sorry.  Okay.  Start again.

1           This is Defendants' 20.  The first page says,

2    "No. 31 More Fun Comics May 1938."  The page following

3    that I represent is an excerpt from that issue of More

4    Fun Comics, which is a page containing an advertisement.

5    Next is May 1938 Adventure Comics No. 26, and the page

6    following that page, which is the fourth page of this

7    exhibit, is an ad that I represent as coming from

8    Adventure Comics May 1938.  Next is a cover of Detective

9    Comics, May 1938, No. 15, and following that, which is

10   the sixth page of the exhibit, is an advertisement which

11   I represent came from Detective Comics May 1938.

12           Is that followable now?  Okay?  Okay, you follow

13   that?

14           MR. TOBEROFF:  Yes.

15   BY MR. ZISSU:

16      Q    My question is, have you seen these ads before

17   in these publications?

18      A    No.

19      Q    Do you know -- did you know that they occurred?

20      A    No.

21      Q    In signing and having served the notices of

22   termination relating to Superman, did you know anything

23   about the appearance of these ads?

24      A    No.

25      Q    All right.  Thanks.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1          Defendants' 21 are excerpts from Action Comics

2    No. 1, June 1938.  Actually, the exhibit I think includes

3    the whole text of the content of Action No. 1 relating to

4    Superman in color.

5          (Defendants' Exhibit 21 marked.)

6          MR. TOBEROFF:  Just to be clear, you're saying

7    these aren't excerpts; it's the complete Action Comics

8    No. 1?

9          MR. ZISSU:  Of the portions relating to

10   Superman.  I don't know if there is something beyond

11   Superman in Action No. 1, but these are the Superman

12   portions.

13         MR. TOBEROFF:  I just want to point out on page

14   1 of Exhibit 21, it says "DC Comics Millennium Editions,"

15   so I believe this is not from that Action Comics No. 1

16   but some --

17         MR. ZISSU:  Copy of it.

18         MR. TOBEROFF:  I don't know.  A reprint, copy --

19         MR. ZISSU:  Correct.

20         MR. TOBEROFF:  -- I don't know if it's that, and

21   I don't know how accurate that preprinted copy is.

22         MR. ZISSU:  That's correct, but we represent

23   that it's accurate.  For the purposes of the examination,

24   I represent that it's accurate, and I want to ask some

25   questions about it.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
119

1  Q Now, you have seen Action Comics No. 1 before.

2   Correct?

3  A Yes.

4  Q And I am going to come back to that.  I first

5 have some other questions.

6   MR. TOBEROFF:  Give me time if I want to

7 interpose an objection.

8 BY MR. ZISSU:

9  Q When did you first have any communications with

10 Arthur Levine?

11  A During the summer of 1996.

12  Q Ninety?

13  A '96.

14  Q And did you ever meet him in person?

15  A Yes.

16  Q And where was that?

17  A In his office in Washington.

18  Q And was your mother there as well?

19  A Yes.

20  Q And in working with him, was it your practice --

21 or his practice to send you copies of written

22 communications to the representatives of DC Comics on a

23 consistent basis?

24  A Yes.

25  Q And how soon -- how did he send you copies of

115

1  those communications?

2       A    Sometimes they were by mail.  Sometimes they

3  were by fax.

4       Q    And with regard to his letters, did you see the

5  letters that he was sending before he would send them

6  out?

7       A    I believe so.  I can't say whether I saw all of

8  them, but I believe so.

9       Q    And the ones that you would not have seen

10  beforehand, would you have seen them soon thereafter?

11       A    I don't remember.

12       Q    How frequently did you speak with Mr. Levine

13  after you engaged him as your lawyer?

14       A    It varied.  Sometimes quite frequently.

15  Sometimes there would be periods of time when there was

16  nothing to talk about.

17       Q    And when you spoke with him, was your mother on

18  the call as well as yourself?

19       A    Not always.

20       Q    And were you the primary person that dealt with

21  Mr. Levine?

22       A    I'd say, you know, different people would do it

23  at different times.

24       Q    Would you say you did -- you had more of the

25  contact with him directly than your mother?

116

1        A    No.  I'd say it was about equal.  And there were

2   times when we were both on the phone at the same time,

3   but that wasn't always the case.

4        Q    Would you say it was more frequently that you

5   were both on the phone than one of you was on the phone?

6        A    More frequently only one of us would be on the

7   phone.

8        Q    Did you review each of the letters that he sent

9   out to DC Comics' representatives and the letters that

10   came back from DC Comics' lawyers?

11            MR. TOBEROFF:  Objection.  Vague and ambiguous.

12            THE WITNESS:  Could you -- it seems like there

13   are two questions.  Could you please ask me one at a

14   time?

15   BY MR. ZISSU:

16        Q    Well, did you review each of his letters to --

17   that was sent to a representative of DC Comics?

18            MR. TOBEROFF:  Asked and answered.

19            THE WITNESS:  I believe so.

20   BY MR. ZISSU:

21        Q    And did you also review each of the responses

22   that would come from the lawyers for DC Comics?

23        A    I believe so.

24        Q    You seem hesitant.

25        A    Well, I can't say for sure if there was

117

1    something that I might have missed.

2        Q    But it was your practice --

3        A    Yes.

4        Q    -- to see them?

5        A    Yes.

6        Q    In the discussions and communications that took

7    place between Mr. Levine and the lawyers for DC Comics

8    and the Gang Tyre firm and the lawyers for DC Comics, how

9    did you -- how were you able to evaluate whether the

10    prices being paid or offered were sufficient?

11        MR. TOBEROFF:  Vague and ambiguous and...

12    BY MR. ZISSU:

13        Q    You want to answer it, please?

14        MR. TOBEROFF:  Don't reveal communications with

15    your attorneys, but other than that you can answer.

16        THE WITNESS:  And actually I couldn't quite hear

17    the question.

18    BY MR. ZISSU:

19        Q    How could you evaluate the fairness of the

20    offers being made to you in financial terms?

21        MR. TOBEROFF:  Same objection.

22        THE WITNESS:  I would listen to my attorneys.

23    BY MR. ZISSU:

24        Q    Anything else that you brought to that analysis,

25    such as your own sense of what the rights were worth or

118

1    what anybody else told you besides lawyers?

2         A    I think it was just a sense of what seemed to be

3    fair.

4         Q    Did you ever -- what did you use as your

5    guidepost to fairness aside from what your lawyer told

6    you?

7         A    That's a lot of years now.  A lot of gut

8    feelings.

9         Q    Did you ever try to make an analysis yourself of

10   what your income stream would be from the amounts that

11   would be paid by DC Comics?

12            MR. TOBEROFF:  Are you talking now solely about

13   Arthur -- when she had Arthur Levine?

14            MR. ZISSU:  No.

15        Q    I'm talking about Arthur Levine and Gang Tyre,

16   but really the consistent part is there are offers being

17   made to you by DC Comics.

18        A    Yes.

19        Q    Did you ever try to make an analysis of what

20   your income stream would be from any offers that might

21   have been accepted or considered?

22            MR. TOBEROFF:  Objection.  Vague and ambiguous.

23   Indefinite as to time and place.

24   BY MR. ZISSU:

25        Q    Between 1996 when you hired Mr. Levine and May

                                                          119

1    of 2002, did you ever attempt to evaluate what your

2    annual income would be from the offers that were being

3    made by Warner or by DC Comics and the Warner entities?

4              MR. TOBEROFF:  Objection.  Calls for --

5    BY MR. ZISSU:

6         Q    Yes or no.

7              MR. TOBEROFF:  Can I finish my objection?

8    Objection.  Attorney work product and attorney-client

9    privilege as to a negotiation handled by lawyers, and it

10   reveals the strategies and evaluation of offers being

11   made to her attorneys.

12             MR. ZISSU:  Marc, I'm really --

13             MR. TOBEROFF:  That's work product.

14             MR. ZISSU:  -- I'm warning you now that you're

15   interfering with the examination.  The question had

16   nothing to do with attorneys.  I asked -- I questioned

17   her for a yes or no answer.  I asked her whether she ever

18   made an assessment herself of what income she would

19   receive from these offers.  It has nothing to do with

20   lawyers.  I asked her whether she had done that herself.

21             MR. TOBEROFF:  And --

22             MR. ZISSU:  And you keep making speeches and

23   talking about the privilege.  They're totally unfounded,

24   and they're delaying the examination, and they're

25   cumulative.  There is no reason for any of this.  Speak

120

1    to your client before the examination.  You're coaching

2    her as to what to answer, and you're encouraging her not

3    to answer our questions.

4            MR. TOBEROFF:  I disagree with you

5    wholeheartedly.  Please don't patronize me.  You're

6    asking questions about a negotiation that took place

7    where the Siegels were represented by attorneys, and in

8    that process obviously evaluations are being made, advice

9    is being given by attorneys, and you're asking her how

10   did she make that evaluation.  The only question you're

11   allowed to ask her is did you make an evaluation on your

12   own excluding any evaluations made by your attorneys.

13   It's an unfair question.  You're asking for attorney work

14   product --

15           MR. ZISSU:  Read the question back.

16           MR. TOBEROFF:  -- in anticipation of litigation,

17   and I am going to stand by my objection.

18           MR. ZISSU:  Let's read back the original

19   question.

20           MR. TOBEROFF:  You can warn me as much as you

21   want.

22           MR. ZISSU:  The original question was exactly

23   what you told me I could ask, now that' you've explained.

24           (Record read as follows:

25               "Q    Between 1996 when you hired

121

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
126

```
 1              Mr. Levine and May of 2002, did you

 2              ever attempt to evaluate what your

 3              annual income would be from the offers

 4              that were being made by Warner or by

 5              DC Comics and the Warner entities?")

 6              MR. ZISSU:  And I said calls for a yes or no

 7    answer.

 8              MR. TOBEROFF:  And does that exclude --

 9    include --

10              MR. ZISSU:  The question is stated.  I didn't

11    ask her how.  You've gone through this whole thing, and

12    you keep doing it.

13    Q    I ask you, yes or no, did you ever make such an

14    attempt yourself?

15    A    If you're asking me if I did it myself, no, I

16    did not do it myself.

17    Q    Did you have an accountant attempt to do that

18    for you?

19    A    No, not an accountant.

20    Q    Did your mother attempt to do that herself?

21    A    No.

22    Q    Did you ever in any way, with advice of somebody

23    else, including a lawyer, make such an attempt, yes or

24    no?

25              MR. TOBEROFF:  Objection.  That contained
```

122

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    attorney-client privileged information, attorney work

2    product.  Don't answer that question.

3              (Instruction not to answer.)

4    BY MR. ZISSU:

5         Q   Are you going to answer it or not?

6         A   I have to --

7              MR. TOBEROFF:  I am instructing you not to

8    answer the question.

9              THE WITNESS:  -- listen to what my attorney

10   says.

11   BY MR. ZISSU:

12        Q   So you are refusing to answer?

13             MR. TOBEROFF:  That's correct.

14   BY MR. ZISSU:

15        Q   Now, when did you first engage anyone at the

16   Gang Tyre law firm to represent you?

17        A   I believe it was sometime in 1999, but it could

18   have -- yeah, it had to be 1999.

19        Q   And when was -- when did you have your first

20   communication with any lawyer at the Gang Tyre law firm?

21        A   Sometime during that year.

22        Q   And who were the lawyers that you communicated

23   with?

24        A   Bruce Ramer and Kevin Marks.

25        Q   And was your first communication by telephone or

123

1    meeting?

2        A    There was a meeting.

3        Q    And where did you meet?

4        A    At their offices.

5        Q    And did you see beforehand the various letters

6    that were written on your behalf by the Gang Tyre law

7    firm to representatives of DC Comics?

8            MR. TOBEROFF:  Vague and ambiguous.  Indefinite

9    as to time and place.

10   BY MR. ZISSU:

11       Q    You want to answer it, please?

12       A    Could you be specific about what time frame

13   you're talking about?

14       Q    Well, the time frame would be from the time they

15   started representing you in 1999 until -- through

16   September of I think it was 2002.

17       A    Okay.  And the question was?

18       Q    The question is, did you see the letters that

19   were written in your behalf before they were sent to

20   representatives of DC Comics?

21       A    Not always.

22       Q    Did you most of the time?

23       A    I would say probably, but I don't know.  You'd

24   have to ask me about specific letters.

25       Q    I will.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**EXHIBIT B**

1          What about the October 19, 2001 letter from

2    Kevin Marks to John Schulman?

3          A    I did not see that letter before he sent it to

4    John Schulman, but he sent it to us immediately after

5    having sent it to John Schulman.

6          Q    How did he send it to you?

7          A    By fax.

8          Q    And did you know that the contents of that

9    letter would be before it was sent even though you didn't

10   see the actual letter beforehand?

11         A    My mom and I had conditionally --

12              MR. TOBEROFF:  Don't talk about communications

13   with Kevin Marks.

14   BY MR. ZISSU:

15         Q    I am just asking you if you knew -- the question

16   is first if you knew.

17         A    If I knew the contents?

18         Q    Yes.  Before the letter was sent out.

19         A    I knew deal points.  I did not know wording.

20         Q    And did you approve those deal points before

21   this letter was sent out?

22         A    We conditionally approved deal points on the --

23   provided that they would not be changed in any way, that

24   no new material would be added, that there would be no

25   changes that we objected to, and that they were written

125

1    up in a manner that we could be comfortable with and that

2    we felt was consistent with our understanding of what had

3    been discussed.

4        Q    And you discussed each of those deal points with

5    your lawyer beforehand.

6            True?

7            MR. TOBEROFF:    Objection.  You're asking her --

8    you should phrase it a different way.  And you already

9    phrased it as asked and answered.  Don't ask her what she

10   discussed with her attorneys.

11           MR. ZISSU:  I will ask her, because you have

12   waived the privilege.

13           MR. TOBEROFF:  Now you're claiming we've waived

14   the privilege?

15           MR. ZISSU:  Well, we are claiming you waived the

16   privilege, so I am going to make you, you know,

17   distinguish between what's waived and not.  Your

18   responses to interrogatories as supplemented have still

19   put into question the authority of Kevin Marks to have

20   written that letter as he wrote it.

21           MR. TOBEROFF:  And we have disagreed with your

22   contention.  There is a motion pending on it, and that

23   motion has yet to be decided.

24   BY MR. ZISSU:

25       Q    So did you -- let me strike that.

126

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**131**

1           You saw the letter immediately afterwards.

2           True?

3           MR. TOBEROFF:  Misstates her testimony.

4    BY MR. ZISSU:

5       Q   Did you?

6       A   I saw the letter after it had been sent to John

7    Schulman.

8       Q   And you received it by fax?

9       A   Correct.

10      Q   And you received it that day?

11      A   I believe so.

12      Q   And you approved of its contents when you saw

13   it.

14          True?

15      A   Not necessarily the wording, but the deal

16   points.

17      Q   Even after you saw the wording, you didn't

18   approve of the way it was worded?

19      A   I would --

20          MR. TOBEROFF:  Excuse me.  Objection.  Vague and

21   ambiguous.

22          THE WITNESS:  I would have worded some of it

23   differently.

24   BY MR. ZISSU:

25      Q   But you saw it as written.

127

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**132**

1          Correct?

2     A    Yes.

3     Q    Did you ever object to the -- to Kevin Marks or

4    tell DC Comics that you didn't approve the language in

5    the letter?

6     A    I -- that actually --

7          MR. TOBEROFF:  You can't say whether you

8    objected to Kevin Marks or not.

9          THE WITNESS:  No.  I was just going to say

10    that's calling for me to discuss a private conversation

11    that I had with my attorney.

12    BY MR. ZISSU:

13    Q    You saw the letter and the way it was written.

14    Did you find a problem with the language in the way it

15    was phrased?

16         I am not asking you about talking to Kevin

17    Marks.  You saw it.  Did you have that reaction?  That's

18    what I'm asking.

19    A    Well, if you're asking me the first part of your

20    question, did I see it and did I object to some of the

21    wording, the answer is yes.

22    Q    To whom?

23         MR. TOBEROFF:  That's --

24    BY MR. ZISSU:

25    Q    Did you ever object to DC Comics?  Did you ever

128

**EXHIBIT B**
**133**

1    tell DC Comics or their lawyers that you objected to the

2    language in the letter?

3        A    I wasn't communicating with DC Comics.  That was

4    my lawyer's job.

5        Q    I just asked you whether you communicated with

6    DC.  The answer is no.

7            Is that correct?  You didn't tell DC Comics?

8        A    The answer is no.

9        Q    Do you know whether Kevin Marks ever told DC

10   Comics that any of the phrasing in the letter was not

11   authorized or agreed to by you?

12       A    I don't know.

13           MR. TOBEROFF:  Misstates her testimony.

14           Give me time to object, please.  You have to

15   give me time to object.

16   BY MR. ZISSU:

17       Q    Did you ever instruct Mr. Marks to communicate

18   to the lawyers for DC Comics that there should be a

19   correction made in his letter?

20           MR. TOBEROFF:  Objection.  Attorney-client

21   privilege.  Instruct you not to answer.

22           (Instruction not to answer.)

23   BY MR. ZISSU:

24       Q    Are you going to answer it?

25           MR. TOBEROFF:  She is going to follow my

129

```
 1    instruction.  Please don't --

 2              MR. ZISSU:  No, she'll --

 3              MR. TOBEROFF:  Excuse me.  I am not finished.

 4    Don't ask her whether she is going to answer a question

 5    after she's been instructed by me not to answer.  That's

 6    totally inappropriate.

 7              MR. ZISSU:  It's not appropriate to point your

 8    finger at me that way, Marc.  Get control of yourself.

 9              I will assume that she will follow your

10    instructions, and I want the record to be clear that the

11    matter has been exhausted once you give the instruction.

12              Okay?

13              MR. TOBEROFF:  I don't know what that means.

14    You can say anything you want on the record.

15              MR. ZISSU:  If there is any uncertainty as to

16    whether she is following your instructions, I am going to

17    ask her.  Otherwise, I want the fact that you give an

18    instruction to be deemed to mean that she would follow

19    it.  Now, if you are not willing to agree to that --

20              MR. TOBEROFF:  I am willing to agree to that --

21              MR. ZISSU:  Thank you.

22              MR. TOBEROFF:  -- but you added a lot of unclear

23    verbiage to it.

24              MR. ZISSU:  You're just always afraid of things,

25    so you can't get a straight answer out of you.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1           Let's mark as Defendants' Exhibit 22 a letter

 2    dated October 19, 2001, which we have been referring to,

 3    from Kevin Marks to John Schulman.

 4           (Defendants' Exhibit 22 marked.)

 5    BY MR. ZISSU:

 6      Q    Can you go look at this letter and go through it

 7    and tell me which language you didn't agree to?

 8           MR. TOBEROFF:  Misstates her testimony.

 9           THE WITNESS:  The first paragraph.

10    BY MR. ZISSU:

11      Q    The first paragraph reads, "This is to confirm

12    our telephone conversation of October 19, 2001.  The

13    Siegel family (through Joanne Siegel and Laura Siegel

14    Larson, the majority owners of the terminated copyright

15    interests) has accepted DC Comics' offer of October 16,

16    2001 in respect of the 'Superman' and 'Spectre'

17    properties.  The terms are as follows:"

18           What -- is there some portion of that paragraph

19    that you found -- use your own terms -- either not

20    approved or not acceptable or objectionable?

21           MR. TOBEROFF:  What she said was, since she

22    didn't necessarily approve all the wording of the

23    letter --

24           MR. ZISSU:  Right.

25           MR. TOBEROFF:  -- but she approved the deal
```

131

```
 1    points.
 2              MR. ZISSU:  I heard that.
 3        Q    What --
 4              MR. TOBEROFF:  That's all she said.
 5    BY MR. ZISSU:
 6        Q    What language in that paragraph, what wording,
 7    did you not agree with?
 8        A    "The Siegel family (through Joanne Siegel and
 9    Laura Siegel Larson, the majority owners of the
10    terminated copyright interests) has accepted DC Comics'
11    offer..."
12        Q    And what was your point on that?
13        A    We conditionally accepted the offer provided
14    that there were no changes to it, there were no additions
15    to it, and that it was written up in a manner that was
16    going to be acceptable to us and true to our
17    understanding.
18        Q    You don't disagree that Joanne Siegel and Laura
19    Siegel Larson -- that's yourself -- were the majority
20    owners of the terminated copyright interests, do you?
21        A    I don't disagree with that.
22        Q    And you don't disagree that the deal points had
23    been accepted.
24              Correct?
25        A    They were conditionally accepted.
```

132

1      Q   And he should have told DC Comics, according to

2   what you're testifying, that these deal points were

3   accepted on the conditions you've just testified to?

4      A   Yes.

5      Q   And did -- and was that information ever

6   conveyed either by you or by Mr. Marks to DC Comics, the

7   conditions you've just mentioned?

8      A   I don't recall.

9      Q   To this day has that ever been explained or

10  communicated to DC Comics?

11     A   I believe it was.

12     Q   When?

13     A   I believe that my mother made it perfectly

14  clear.

15     Q   To whom?

16     A   In a letter that she wrote.

17     Q   To?  To whom?

18     A   To Dick Parsons.

19     Q   These conditions were mentioned in a letter that

20  your mother wrote in May of the next year -- is that what

21  you're referring to? -- to Dick -- to Mr. Parsons?

22     A   Yes, I believe that was the letter.

23         MR. ZISSU:  Let's mark as Defendants' Exhibit 23

24  a letter dated May 9, 2002 from Joanne Siegel to Richard

25  D. Parsons.

133

```
 1              (Defendants' Exhibit 23 marked.)
 2    BY MR. ZISSU:
 3         Q   Do you want to look through that for a second,
 4    please?
 5              Have you finished?
 6         A   Yes.
 7         Q   Where are those conditions mentioned in this
 8    letter, which is Defendants' Exhibit 23?
 9         A   In the first line of the fourth paragraph on
10    page 1 is one place.
11         Q   And you want to read that?
12         A   "Your company's unconscionable contract dated
13    February 4, 2002 contained new, outrageous demands that
14    were not in the proposal."
15         Q   Maybe I'm missing something.  I don't see that
16    that sentence refers to the conditions you mentioned, and
17    I don't think it says that the October 19, 2001 letter
18    included -- was to have included such conditions.
19              Could you explain that to me?
20              MR. TOBEROFF:  Objection.  Argumentative.
21    BY MR. ZISSU:
22         Q   Well, I'm asking you, how does this sentence
23    include a statement to Mr. Parsons that the October 19,
24    2001 letter was conditional?
25         A   Because our conditions were that no new demands
```

134

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    would appear in a proposal -- I mean that ^no conditions that were not in the
2    ^original proposal would appear in a final write-up.

3        Q    I think you gave me an explanation of what the

4    conditions were in your prior testimony, and I don't

5    think you mentioned in those conditions that there

6    wouldn't be new demands made.

7        A    I believe I did say that.

8        Q    You did?

9             Could we find that portion of the testimony?

10            THE WITNESS:   If I didn't, I certainly would say

11    that right now.

12            MR. ZISSU:   Can we find the -- that question and

13    answer where the conditions were outlined?

14            (Record read as follows:

15            "A    We conditionally accepted the

16            offer provided that there were no

17            changes to it, there were no additions

18            to it, and that it was written up in a

19            manner that was going to be acceptable

20            to us and true to our understanding.")

21    BY MR. ZISSU:

22        Q    My question is, did you tell -- in Defendants'

23    Exhibit 23 did you tell Mr. Parsons that the acceptance

24    of the October 19, 2001 letter was conditioned on there

25    being no new demands made?  Did you tell him that was a

135

1    condition of the October 19, 2001 letter?

2            MR. TOBEROFF:  Objection.  This is a letter from

3    Joanne Siegel.  You mean through her mom?

4    BY MR. ZISSU:

5        Q   Yes, through your mom, your mother, this letter.

6        A   I don't believe that the October 19th letter is

7    specifically referenced in this letter.  Nevertheless,

8    our condition was no changes, no new demands.

9        Q   My point is directed, did you ever tell anyone

10   at DC Comics before today that that was a condition of

11   your acceptance of the deal points in the October 19,

12   2001 letter?

13       A   I personally have never spoken to anyone at DC

14   Comics about it.

15       Q   And your mother's letter doesn't say that

16   either.

17           Correct?

18           MR. TOBEROFF:  Objection --

19   BY MR. ZISSU:

20       Q   It says --

21           MR. TOBEROFF:  Strike that.

22   BY MR. ZISSU:

23       Q   It says you objected to the demands, but it

24   didn't say the making of new demands was a condition of

25   acceptance of the October 19, 2001 letter.

136

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1       A    I would need more time to read this entire

2   letter very carefully.

3       Q    Well, I will let you take some time to read it.

4       A    I'm sorry.  What -- now would you like to phrase

5   your question?

6       Q    Yeah.

7            Did you find any other portion of this letter

8   which refers to the acceptance of the deal points in the

9   October 19, 2001 letter as being conditional?

10      A    I would actually like to say it was more we

11  approved the deal points.  We did not accept the deal

12  points.

13      Q    Approved being a condition.

14      A    Well, my mother does say here, "For your

15  representatives to condition our receiving financial

16  compensation for our rights on demands which were not in

17  the proposal we accepted, is deceitful."

18      Q    Where --

19      A    That's in paragraph 3, page 2.

20      Q    But that doesn't say that this was a condition

21  communicated -- strike that.

22           I don't read this -- and I am asking you whether

23  you agree with me or not the way you do read this.  I

24  don't see this as saying to Mr. Parsons when we accepted

25  or approved, whatever the word you want to use, on

137

EXHIBIT B
142

1    October 19, 2001, it was conditional.

2         MR. TOBEROFF:  Objection.  That's not a

3    question.  It's a comment on the evidence.

4         MR. ZISSU:  I'm not finished with the question.

5    Q    Do you agree with me?

6    A    You'd have to say it again.

7    Q    Do you agree with me that this language you have

8    cited on page 2 does not inform Mr. Parsons that the

9    approval on October 19, 2001 was conditional?

10   A    No, I disagree with your statement.

11   Q    You disagree.  You think that this makes it

12   clear that whatever happened on October 19, 2001 from

13   your part was conditional?

14   A    Yes.

15   Q    Let me direct your attention on the prior page

16   of Defendants' Exhibit 23 to the following paragraph:

17        "Every step" -- third paragraph.  "Every step in

18   the termination process, the filing, the timing, were

19   carefully researched, checked and rechecked with

20   knowledgeable attorneys on both coasts before going

21   ahead.  We then hired two additional Beverly Hills

22   entertainment attorneys as our negotiators.  Negotiations

23   dragged on for four difficult years.  We made painful

24   concessions assured if we did we would arrive at an

25   agreement.  When we made those difficult concessions and

138

1    reluctantly accepted John Schulman's last proposal six

2    months ago, we were stabbed in the back with a shotgun

3    contract," close quote.

4            Now, first, it's true that your mother uses the

5    word "accepted" here, not "approved," which you say you

6    prefer.

7            Isn't that true?

8        A    I prefer the word "approved."

9        Q    But she said "accepted."

10        A    She said that in this letter.

11        Q    Right.

12            And, by the way, what was John Schulman's last

13    proposal six months ago?

14        A    It was the -- our understanding of the

15    discussion that he had had with Kevin Marks --

16        Q    What was --

17        A    -- on October 16th.

18        Q    Was -- okay.  Is that a reference to a letter

19    that Mr. Schulman wrote?

20        A    No, there was no letter.  It was a verbal

21    discussion.

22            MR. ZISSU:  Let's have marked as Defendants'

23    Exhibit 24 a letter dated October 26 from John Schulman

24    to Kevin Marks.

25            (Defendants' Exhibit 24 marked.)

139

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

```
 1   BY MR. ZISSU:
 2        Q    Have you seen that before?
 3        A    The first time I saw this was when Warner Bros.
 4   produced this during this litigation.
 5        Q    You never saw that before?
 6        A    No.
 7        Q    Did your mother see it before?
 8        A    No.
 9        Q    So her -- your mother's reference wasn't to that
10   letter --
11        A    No.
12        Q    -- in the --
13        A    She never saw --
14        Q    In this Defendants' Exhibit 23, your mother was
15   not referring to Defendants' Exhibit 24.
16             Correct?
17        A    Correct.
18        Q    Now going back to Defendants' Exhibit 23, and I
19   will read again the last sentence of the portion I read
20   before:  "When we made those difficult concessions and
21   reluctantly accepted John Schulman's last proposal six
22   months ago, we were stabbed in the back with a shocking
23   contract."
24             Now, your mother didn't say that the acceptance
25   was conditional, did she, in this letter?
```

140

1      A   She didn't --

2          MR. TOBEROFF:  Excuse me.  Asked and answered.

3   BY MR. ZISSU:

4      Q   Will you answer it again?

5      A   She did not use those words, but it was a

6   condition all the same.

7      Q   It was a condition, but it's not a condition

8   that your lawyer ever mentioned to DC Comics' lawyers or

9   that you or your mother ever mentioned to DC Comics'

10  lawyers between October 19, 2001 and today.

11          Isn't that correct?

12     A   I can't --

13          MR. TOBEROFF:  Objection.  Are you representing

14  to her what her lawyers told DC or Warner Bros.?

15          MR. ZISSU:  I am.

16          MR. TOBEROFF:  Because she doesn't know what her

17  lawyer actually --

18  BY MR. ZISSU:

19     Q   I am asking so far as you know.

20     A   I can't testify as to anything other than what I

21  said or what my knowledge is.

22     Q   And so you don't know that that condition -- the

23  acceptance -- the fact that it was conditional was ever

24  communicated to anybody at DC Comics or to any DC Comics

25  representative.

141

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1              Correct?

2              MR. TOBEROFF:  Misstates her testimony.

3              MR. ZISSU:  I am asking her, and I am leading

4    her so that she can disagree with it.  So you don't have

5    to coach her about what it misstates.  She can disagree

6    if she disagrees.

7              So let's have the question back.

8              MR. TOBEROFF:  Don't accuse me of coaching.  If

9    you read the record, you'll see criticism coming from --

10   do I criticize the way you're asking your questions?  Do

11   I belittle you the way you're asking your questions?  The

12   truth is if you ask better questions, you'll get less

13   objections, there will be less problems, but I've

14   refrained from criticizing that, so please stop --

15             MR. ZISSU:  That wasn't a criticism, was it?

16             MR. TOBEROFF:  -- please stop accusing -- yes.

17   Your questions are overly vague, they're overbroad,

18   they're nonspecific, and very often they call for the

19   disclosure of privileged attorney work product and

20   attorney-client privileged communication, and when they

21   don't do that, I don't object.

22             MR. ZISSU:  Can we have the question read back,

23   please?

24             (Record read as follows:

25             "Q   And so you don't know that

142

1          that condition -- the acceptance --

2          the fact that it was conditional was

3          ever communicated to anybody at DC

4          Comics or to any DC Comics

5          representative.

6               Correct?")

7     MR. TOBEROFF:  Object --

8     THE WITNESS:  Could you rephrase that?  That's

9  too confusing to me.

10    MR. TOBEROFF:  Compound.

11  BY MR. ZISSU:

12    Q    You are not able to say that the fact that the

13  October 19, 2001 acceptance or approval was conditional

14  was ever communicated to any representative of DC Comics.

15          Correct, question mark?

16    MR. TOBEROFF:  Objection.  Vague and ambiguous.

17  Compound.  Indefinite as to time and place.

18    THE WITNESS:  I'm still kind of confused by your

19  wording, but I think I know what you're getting at, but

20  could you just say it one more time, please?

21    MR. ZISSU:  Well, I'll have him read the

22  question back.

23    THE WITNESS:  Well, maybe you could rephrase it.

24  Maybe that that would help.

25  BY MR. ZISSU:

                                                        143

1      Q    I don't have to rephrase it, okay.  You have to

2   answer it, and do the best you can.

3      A    I'm trying.

4           MR. TOBEROFF:  If you don't understand the

5   question, you don't have to answer it.

6           MR. ZISSU:  I'll try it again.

7      Q    You've testified that the approval or acceptance

8   of the deal points in the October 19, 2001 letter from

9   your lawyer was conditional, and you've also testified

10  that you didn't tell or communicate to any representative

11  of DC Comics that it was conditional, and you, I think,

12  would agree that your mother did not tell any

13  representative of DC Comics that this approval or

14  acceptance was conditional.

15          So my question is, is it correct to say that

16  you're not able to say that the fact that the approval

17  was conditional was ever communicated to anybody

18  representing DC Comics?

19          MR. TOBEROFF:  Objection.  Vague and ambiguous.

20  Compound.  Indefinite as to time and place.

21          THE WITNESS:  Well, I disagree with the

22  statement that you said that my mother did not

23  communicate it because I believe that my mother did

24  communicate it.  Aside from that, if you're asking if

25  anyone -- do I have knowledge of whether anyone else

144

EXHIBIT B
149

1    communicated it --

2    BY MR. ZISSU:

3        Q   Yes, I am asking you that.

4        A   -- I have no knowledge as to whether anyone else

5    did.

6        Q   And therefore you cannot say as we sit here

7    today that it was communicated.

8            Correct?

9        A   I do not know.

10           MR. TOBEROFF:   Objection.   Misstates prior

11   testimony.

12           MR. ZISSU:   I am not trying to state her

13   testimony.   I am asking whether she can cite me any

14   example or tell me that it was communicated, and your

15   answer is you can't --

16           MR. TOBEROFF:   Objection --

17           MR. ZISSU:   -- other than your mentioning the

18   May 9, 2002 letter.

19           THE WITNESS:   At this point -- at this point I

20   can't.

21   BY MR. ZISSU:

22       Q   Thank you.

23           Now going back to Defendants' Exhibit 22, is

24   there any other text or wording in this letter that you

25   disapproved of?

145

1       A    No.

2       Q    And going back to Defendants' Exhibit 23, in the

3  last sentence of the third paragraph it reads, "When we

4  made those difficult concessions and reluctantly accepted

5  John Schulman's last proposal six months ago...," et

6  cetera, am I correct that you understand that the sense

7  of that is to read as follows:  When we made those

8  difficult concessions and reluctantly agreed --

9  accepted -- I'm sorry -- accepted conditionally John

10  Schulman's last proposal six months ago?

11          Is that the way you read that language?

12      A    I would say conditionally accepted John

13  Schulman's proposal, and I would clarify as discussed on

14  October 16th.

15      Q    That's how you -- that's your sense of it --

16      A    Yes.

17      Q    -- as you read it today?

18      A    Yes.

19      Q    But it doesn't say "conditionally," does it?

20      A    I believe that that's what it conveys.

21      Q    But does it say "conditionally"?

22          MR. TOBEROFF:  The document speaks for itself.

23  BY MR. ZISSU:

24      Q    Will you concede that it doesn't use the word

25  "conditionally"?

1        A    I do not see the word "conditional" here.

2        Q    Thank you.

3        A    I know what the situation was.

4        Q    Now going back to Defendants' Exhibit 22, which

5   is the October 19, 2001 letter, except for the language

6   you described which you would have wanted in the first

7   paragraph about a conditional acceptance, did you

8   otherwise agree to me -- I'm sorry.  Strike that -- did

9   you otherwise intend to be bound by these financial and

10  deal points?

11          MR. TOBEROFF:  Objection.  Vague and ambiguous.

12          THE WITNESS:  I don't know what you mean by the

13  word "bound."

14  BY MR. ZISSU:

15       Q    Well, you have a whole letter that you said you

16  wouldn't have worded any differently, and you have the

17  first paragraph that you said you didn't approve of the

18  way it was worded.  I'm talking about the rest of the

19  points.

20          Except for that qualification, did you intend to

21  agree to and accept and be bound by the rest of these

22  terms, subject to your -- what you've testified to about

23  the first paragraph?

24          MR. TOBEROFF:  Objection.  Misleading.  Vague

25  and ambiguous.

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**152**

1          THE WITNESS:  We approved these deal points

2    provided that there were no changes to them, so I can't

3    say that we were saying that we were bound to these.

4    BY MR. ZISSU:

5          Q    If there had never been any changes in these

6    deal points, would you have accepted them and proceeded

7    with the agreement?

8          A    At that time.

9          Q    And what about a month later?  You wouldn't

10   have?  You mean only that day you would have?

11          I'm not sure I understand your answer.  What do

12   you mean --

13         A    At the time this letter was written, there was

14   one offer.  Later on something -- another document came

15   in that was completely different, very aggressively in

16   Warner Bros.', Time Warner's and DC Comics' favor and to

17   our detriment in a number of areas.

18         Q    What was to your detriment?

19         A    Well, it would take a lawyer to go through and

20   compare the documents, but I will say --

21         Q    Yes.

22         A    -- there are three points that jump out at me in

23   my memory.  One of them was that the original -- our

24   original understanding was that the rights being

25   discussed only had to do with Superman, Superboy and The

                                                              148

1    Spectre.  When the written-up version arrived in February

2    of 2002, all of a sudden DC Comics, Warner Bros. and Time

3    Warner wanted rights to everything that my father had

4    ever written in his entire career, things that had

5    absolutely nothing to do with these properties.  That was

6    completely objectionable to us.  That was one point.

7            Another point had to do with warranties and

8    liabilities.  The proposal that had been made to us was

9    very simple, and it afforded us some protection in the

10   area of warranty and liability.  Suddenly, when the

11   February 2002 document showed up, there were all kinds of

12   new provisions and things that had been inserted in there

13   that would have exposed us to millions of dollars in

14   liability -- in potential liability, and they were all in

15   Warner Bros.' favor.  That was completely out of line.

16   We couldn't do that.

17       Q   What was the third?

18       A   And the third point was we had, as reflected in

19   here, talked about a royalty of 6 percent.  When the

20   document showed up, that 6 percent was eroded in a number

21   of ways.  There were all kinds of new conditions that

22   were inserted that would reduce the overall financial --

23   what's the word I'm searching for --

24       Q   Do you remember --

25       A   -- that would reduce the money that we would

149

1  get.

2      Q   Do you remember what you were -- what the

3  liabilities were?  What kinds of liabilities are you

4  talking about, as best you can recall?

5      A   It was very simple.  It was -- all we had to do

6  was warrant that we had not sold any of our termination

7  rights to anyone else.

8          MR. TOBEROFF:  I think he's asking --

9          MR. ZISSU:  Yeah.

10     Q   And what was added?  In what respect was that

11  enlarged?

12         MR. TOBEROFF:  I am not objecting, but just to

13  make this record clear --

14         MR. ZISSU:  Yeah.

15         MR. TOBEROFF:  -- are you asking about the

16  original proposal in October, or are you asking about the

17  February 2002 --

18         MR. ZISSU:  I am asking about the February 2002

19  proposal.

20     Q   In what way were your liabilities enlarged, so

21  far as you understand it?

22     A   There was a whole list of different things, and

23  all of them exposed my mom and me and my half-brother

24  Michael to a dangerous situation.

25         MR. ZISSU:  We will mark the February 1, 2002

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
155

1    draft as Defendants' Exhibit 25.

2              (Defendants' Exhibit 25 marked.)

3    BY MR. ZISSU:

4        Q    Are you able to point me in the direction of the

5    -- for example, the last point you mentioned about the

6    liabilities, representations and warranties increasing?

7        A    Warranties and indemnification, but this is a

8    huge document.  I don't know where it is.

9        Q    Well, maybe I could help you with that, so...

10             MR. TOBEROFF:  I see page 41 says

11   "Representations And Warranties..."

12             MR. ZISSU:  Yeah, okay.

13       Q    If you read -- why don't you read 41 and onto

14   42.

15       A    I believe it goes beyond that, doesn't it?

16             MR. TOBEROFF:  41 --

17             THE WITNESS:  Doesn't it go to 46?

18             MR. TOBEROFF:  41, 42, and then it picks up on

19   45 to 46.  Essentially paragraph 12.

20             Right?

21             MR. ZISSU:  I think 12 first.

22       Q    Can you tell me what in paragraph 12 presented

23   the problem you described?

24             MR. TOBEROFF:  Okay.  Objection.  Calls for a

25   legal conclusion, and you're asking my client to review a

                                                           151

```
1    document -- a complex -- parts -- select parts of a 54-

2    page complex agreement drafted by lawyers, and you're

3    asking her to make conclusions, give you her opinions

4    about it without the benefit of counsel.  It's

5    objectionable.

6         MR. ZISSU:  Well, she's testified already about

7    it, and I am asking her what is it in the document, which

8    she is familiar with and was familiar with at the time,

9    she considers to have increased her liabilities.

10        MR. TOBEROFF:  And she --

11        MR. ZISSU:  This is a contract --

12        MR. TOBEROFF:  And she --

13        MR. ZISSU:  -- proposed contract.

14        MR. TOBEROFF:  -- can tell you that, as she

15   already has, but when you ask her to start pointing to

16   what provisions in a 54-page legal document reflect her

17   impressions as to what was objectionable, that's a job

18   for a lawyer.

19        MR. ZISSU:  Actually, it's a job for a

20   contracting party to say why they didn't want to sign an

21   agreement, and I'm asking why.  I will go through these

22   specifically.

23        MR. TOBEROFF:  And she told you.

24        MR. ZISSU:  I will go through these

25   specifically.
```

152

EXHIBIT B
157

```
1              MR. TOBEROFF:  Please don't ask her to interpret
2    this agreement.
3              MR. ZISSU:  I am not asking her to interpret it.
4    I am asking for her reaction as to why she didn't find it
5    acceptable, which she's basically testified to, but I
6    want to probe her on that, and I have a right to.
7        Q    Let's look at representation (i):  "They have
8    the right and power to enter into this Agreement and to
9    grant all rights which are granted by them herein and
10   covered by this Agreement."
11             Did that representation present a problem for
12   you?
13       A    No.
14       Q    And (ii):  That "neither they nor Jerome Siegel
15   have granted any right, license, or permission, or
16   entered into any transaction or agreement in relation to
17   or with respect to, the subject matter hereof, to any
18   other party or encumbered any of The SIEGELS' (or Jerome
19   Siegel's) rights or interests in The WORKS or the MARKS
20   in any way."
21             Did that present a problem to you?
22       A    We're beginning to get into language that I'm
23   not qualified to really comment on.
24       Q    Is it that you don't --
25       A    It's getting more complex.
```

153

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**158**

1        Q    I am asking you if you can -- do you understand
2    this language or not?
3        A    Not at this moment.
4        Q    Don't you -- do you -- don't you understand that
5    to mean that it's a representation that as grantors in
6    this agreement, you haven't already transferred away the
7    rights that you would be granting?
8        A    I don't know.  It could read something else to a
9    lawyer.
10       Q    What about as you understand it in English?
11            MR. TOBEROFF:  She just answered the question.
12   BY MR. ZISSU:
13       Q    So your testimony is you can't understand this
14   language.
15            Correct?
16       A    Not at this moment.
17       Q    And, (iii):  That "they," meaning you, "know of
18   no other party with any rights of any kind to or that
19   claim to have any rights of any kind to The WORKS or The
20   MARKS."
21            Do you understand that?
22       A    May I --
23       Q    Yes.
24       A    -- make a comment here?
25       Q    Sure.

154

1       A   My eyes are jumping around right now --

2       Q   Okay.

3       A   -- so it's difficult for me to read this, and I

4   am trying --

5       Q   Okay.

6       A   -- to listen to you --

7       Q   Right.

8       A   -- but that's why I'm saying not at this time.

9   I just can't --

10      Q   Oh, I see.  I thought you meant -- okay.

11          MR. TOBEROFF:  I just want --

12          MR. ZISSU:  I thought you meant at the time this

13  was proposed.  Sorry.

14          MR. TOBEROFF:  My client said very clearly

15  although she understands the English language and reads,

16  subject to she has some eyesight problems --

17          MR. ZISSU:  Right.  Sorry.

18          MR. TOBEROFF:  -- She doesn't feel qualified,

19  and rightly so, to comment on whether something is

20  acceptable or objectionable without the advice of

21  counsel.  This is obvious.  You know it.  It's an unfair

22  question --

23          MR. ZISSU:  No.

24          MR. TOBEROFF:  -- and you can ask certain

25  questions within limits, but if you go beyond those

155

```
 1    limits, I am going to instruct her not to answer.
 2            MR. ZISSU:  You don't have a right to instruct
 3    her not to answer.  It's not privileged, and it's not
 4    harassment.  I am asking her about her understanding of
 5    an agreement that she was going to have to sign --
 6    understand to sign an agreement.  She's already testified
 7    that she understood that these terms changed something
 8    from October 19, 2001, and I have a right to ask her
 9    about in what respect she understands there to have been
10    changes.
11            MR. TOBEROFF:  And --
12            MR. ZISSU:  That's not -- that's a traditional
13    way in which questions like this -- you separate stating
14    legal conclusions from the witness' understanding, right
15    or wrong.
16            MR. TOBEROFF:  And she --
17            MR. ZISSU:  That's separate from her health.  I
18    understand that.
19            MR. TOBEROFF:  And she was very articulate, well
20    beyond most civilians, in articulating in general those
21    areas that she recalls, going back to 2002, that were
22    objectionable, but that's a far cry from going through
23    the legalese of five pages where paragraphs are all
24    interrelated and you reading her a paragraph out of
25    context and saying, "Do you understand it?"
```

156

1          What about it don't you understand when she

2   tells you that at some point her understanding is getting

3   hazy without a lawyer telling her what this means, and

4   you are trying to pin her down, and that's unfair.

5          MR. ZISSU:  The plaintiffs in this case are

6   going to have to explain and get on the stand and testify

7   to a jury as to what it is in this draft, for example,

8   that supports what you described as her great recall.

9   Her recall and her statement may not comport with what's

10  actually in the agreement, and if that's true, I am

11  entitled to probe it, and I am doing so.

12          I want to, for example, show that what she

13  stated was in this agreement is not what's in this

14  agreement, and I am entitled to inquire into that, and

15  you basically have been blocking it, so --

16          MR. TOBEROFF:  I haven't.

17          MR. ZISSU:  Well, all right --

18          MR. TOBEROFF:  She's been giving you answers --

19          MR. ZISSU:  Her health is a different question

20  and --

21          MR. TOBEROFF:  There is a happy medium.  You

22  will agree there is a line, and I am willing to work with

23  you within that line, but there is a point where it

24  becomes ridiculous and unfair.

25          MR. ZISSU:  I haven't gotten into it at all, and

157

1    you're already talking about what's ridiculous.  There

2    really is no line between asking a party to a contract

3    what their understanding of the agreement is.  There is

4    no line.  They can testify, and if language in the

5    agreement is inconsistent with their understanding, I can

6    ask her about that.  So it's just not right.

7            MR. TOBEROFF:  If she tells you that she doesn't

8    quite understand it without a lawyer telling her what all

9    these words mean, you can't keep asking the same

10   question.

11           MR. ZISSU:  I didn't hear any statement by her

12   that she couldn't understand -- aside from her eyesight,

13   understanding what these contractual terms meant and

14   that --

15           MR. TOBEROFF:  It's on the record.

16           MR. ZISSU:  Well, no.  It's on the record from

17   you.

18           MR. TOBEROFF:  No.  It's on the record from

19   him -- from her.

20           MR. ZISSU:  No, it isn't, actually.

21           MR. TOBEROFF:  Can we go back there?

22           MR. ZISSU:  Is it --

23       Q   I'll ask you.  Is it your testimony, apart from

24   your eyesight, that you just can't understand any of

25   these legal terms that I'm going to ask you about in the

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**163**

1   agreement?

2       A    I can't say that there wouldn't be something

3   that I would understand, but I think that after that

4   first statement that you asked me, it's too complex

5   legally for me to be able to give you an answer without

6   input from an attorney.

7       Q    Well, what if I -- I will ask you by surmising

8   and translating it, and if you can't understand it,

9   you'll tell me you can't, and if you can't understand it

10  without an attorney.

11          And so with respect to subdivision (ii) here, if

12  DC asks you to represent that you hadn't already sold the

13  rights that you were granting to them to a third person,

14  would that be something that you found as adding new

15  conditions or going beyond what you had agreed -- had

16  accepted or approved in October of 2001?

17      A    Well, I can't be sure that that's what this

18  says, but if that's your question, I would suppose that I

19  wouldn't object to that.

20      Q    All right.  And what if -- and with regard to

21  number (iii), if they asked you to represent that you

22  didn't know of any other party who was claiming to own

23  the same rights that you were selling to DC Comics, would

24  that be a problem?  And if I'm misstating by the

25  question, you can note that, but if that's what's being

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    asked, is that a problem?

2         MR. TOBEROFF:  I just want to note one basic

3    thing, and it's not --

4         MR. ZISSU:  Yeah.

5         MR. TOBEROFF:  -- that 12. a) doesn't stand

6    alone.  It's a warranty connected to page 45 where you

7    indemnify for those things.  So simply stating you don't

8    know of anybody, which seems fair enough, can come

9    obviously as a liability if somebody comes out of the

10   woodwork and makes a claim, and this is why a lawyer --

11        MR. ZISSU:  You are not supposed to be --

12        MR. TOBEROFF:  And you are not supposed to be

13   asking questions like this, and you know it.  It's an

14   unfair trick question.

15        MR. ZISSU:  I can't ask every --

16        MR. TOBEROFF:  Come on.

17        MR. ZISSU:  Listen, I can't ask every question

18   about all provisions at once.  I have to go through them

19   one by one.  We will get to the indemnification, and you

20   on cross-examination can bring out that, but you're not

21   supposed to do what you're doing.  You've completely

22   disrupted the examination and interfered with it.

23        MR. TOBEROFF:  If you are going to purport to

24   tell her what this means --

25        MR. ZISSU:  You are making arguments, and I want

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**165**

1   to ask questions.

2          MR. TOBEROFF:  Let me just say this and try to

3   work this out with you.  If you are going to purport to

4   say what this means, you have to give the full

5   implication of the paragraph.  Otherwise it's a trick

6   question, and it's misleading.

7          Is that fair to say?

8          MR. ZISSU:  No, it is not fair to say.  I didn't

9   say anything about whether it would trigger an indemnity

10  or not.  We will get to that.

11     Q   I am asking -- these are the representations.

12  It's in a separate paragraph because it's not mixed in

13  the same paragraph with the indemnification.

14         So I am asking you if it was unfair to ask or

15  beyond what you thought you had agreed to to ask for this

16  kind of a representation, and basically so far you've

17  testified no, but then your lawyer jumped in and said,

18  well, it would trigger an indemnity somewhere else.

19         MR. TOBEROFF:  Misstates her testimony.

20         MR. ZISSU:  That's what cross-examination is

21  for, that's how you're supposed to do it, and what you've

22  done is you've made more -- you've talked more on this

23  record than I have.

24     Q   And I am now going to ask you about number

25  (iv) --

```
 1        A   I don't think I answered number (iii).
 2            MR. TOBEROFF:  She didn't answer number (iii).
 3   BY MR. ZISSU:
 4        Q   Okay, number (iii), I would like an answer to
 5   it.
 6            MR. TOBEROFF:  What's the question?
 7   BY MR. ZISSU:
 8        Q   The question is basically, was this request,
 9   which I read as saying that you would represent that you
10   didn't know of any other party claiming to own the same
11   rights that you would be selling, if that presented a
12   problem for you?
13        A   I didn't read this separately from what it could
14   mean to us.  You know, I mean --
15        Q   Well --
16        A   -- are you asking did I know of any other party
17   with any rights?  I didn't know of any party with any
18   rights --
19        Q   Right.
20        A   -- but I was concerned that if some bizarre
21   claim would come up, what that could mean.  So I wasn't
22   entirely comfortable with that being in there.
23        Q   We will talk about the consequences and why that
24   may -- but I'm asking you, does the fact that you would
25   represent it alone, would that have made you
```

162

1    uncomfortable and present a problem, and I think you've

2    testified no, but it might have had consequences

3    somewhere else in the agreement that you want -- I'll ask

4    you about that, but I can't do it all at once.  I've got

5    to go one by one, and then we will get to what else

6    might -- I am going to ask you what made you

7    uncomfortable, and you can tell the whole story.

8            If I leave it out, that's what cross-

9    examination -- counsel is supposed to then fill in if

10   I've done something that's incomplete.  He is not

11   supposed to sit in the middle of my examination, which he

12   has done all day, and interrupt it and prevent it from

13   taking place.  And we have a limited amount of time with

14   you.  I don't want to spend any more time than we have

15   to, but I have to get through these questions.

16           Your position is there were deal points you

17   accepted, but they changed in a way that were very

18   detrimental, is what you said, and I'm trying to ask you

19   in what respect detrimental, and I will demonstrate to

20   you, we will in this case, that they weren't detrimental.

21   And I don't fully understand your reasons.  Maybe it's a

22   misunderstanding, but I've got to look into that, so

23   that's what we have to do.

24           So in number (iv) --

25       A    Number (iii), I'm really not comfortable with.

163

1    Q    So in other words, you were not comfortable

2    making a representation that nobody else owned the rights

3    that you would be selling to DC Comics.

4    A    No, I'm not comfortable with that.

5    Q    Okay.  That's all you have to say.

6         (iv) --

7    A    Now I understand the question.

8    Q    Okay.  I'm trying to make you understand the

9    questions, because I want to get through this.

10        And (iv), it says, "they," meaning you, "shall

11   not" at any other time sell the rights again to anybody

12   else or interfere with them by --

13   A    Who is "they"?

14   Q    "They" is you and your mother will not, after

15   entering into this agreement, try to enter into other

16   deals to sell the same rights or to encumber them.  That

17   means to tie them up or burden them.

18        Is that something that made you uncomfortable or

19   would make you uncomfortable?

20        MR. TOBEROFF:  Objection.  Calls for a legal

21   conclusion.

22   BY MR. ZISSU:

23   Q    Whether it made you uncomfortable is not a legal

24   conclusion.  You could be irrationally uncomfortable

25   without regard to any legal conclusions or because you're

164

1    not feeling well today or at the time.

2         I am asking you, is that something that would

3    have been something that was a problem?

4         MR. TOBEROFF:  Objection.  Calls for a legal

5    conclusion.  Calls for speculation.

6    BY MR. ZISSU:

7         Q   So can you try to answer it, please?

8         MR. TOBEROFF:  Vague and ambiguous.

9         THE WITNESS:  I'm having trouble with the last

10   part of that.  I'm having trouble with the words, "any

11   copyright termination interest or any Reversionary Rights

12   in any rights related to The WORKS."

13   BY MR. ZISSU:

14        Q   Yeah.  That's saying the kind of thing you might

15   try to offer and sell to somebody else whatever your

16   rights that were to be recaptured.

17        A   I guess what I'm saying is I'm confused by this

18   section.

19        Q   You had legal counsel, though, at the time.

20        Correct?

21        A   Yes.

22        Q   So you could have -- if you had some confusion,

23   they could have explained it to you, either in a

24   satisfactory manner or otherwise.

25        Correct?

165

```
 1        A    Yes.

 2        Q    Let's go to number (v) --

 3             MR. TOBEROFF:  Also --

 4             THE WITNESS:  I don't know that we did -- wait a

 5    minute.

 6             MR. TOBEROFF:  Also, don't accept his statement

 7    of what this says for what it says, because he is not

 8    your lawyer.

 9             MR. ZISSU:  I'll accept that she doesn't accept

10    it.  I want to ask the questions and get her answers.  If

11    you want to argue about it later, that's fine.

12             THE WITNESS:  I see two different (iv)s here.

13    There are two different (iv)s on page 41.

14             MR. TOBEROFF:  That's true.  There are.

15             MS. LASERSON:  There are.

16             MR. ZISSU:  Two different (iv)s?

17             Which is the good (iv)?

18        Q    Okay.  The second (iv) --

19             MR. TOBEROFF:  Did you object to that?

20    BY MR. ZISSU:

21        Q    If the rights fall into the public domain, in

22    other words, at the time the copyright rights expire,

23    this asks you to agree that you are not going to go use

24    your father's works, that you would agree to that.  You

25    would in effect get out of the business of owning and
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**

1    dealing in his rights.

2            Is that a problem for you?

3            MR. TOBEROFF:  Excuse me.  Are you asking what's

4    a problem for her now as she sits here today or what's a

5    problem when this was rejected?  What are you asking?

6            MR. ZISSU:  Well, I think they coincide, but she

7    said that this draft included warranties that created

8    liabilities that she was not willing to risk, and so I am

9    asking really when she decided that this draft was a stab

10   in the back and didn't comply with the conditions that

11   she would have wanted.  I am asking her to go through

12   that at that time.  That's the time frame.

13       Q   So at the time that you considered that DC

14   Comics had gone beyond the conditions that you wanted

15   Mr. Marks to have included, my question is, would this

16   representation that you wouldn't in the future, when The

17   WORKS went into the public domain, use them or exploit

18   them, was that a problem?

19       A   As heartbreaking as that aspect of this

20   negotiation was to us, we had conditionally approved that

21   being a part of this, provided there weren't any other

22   changes.  That was a very difficult one for us.

23       Q   Why was that difficult?

24       A   Because it's my family's legacy, and everyone in

25   the world would be able to do something with my father's

167

EXHIBIT B
172

1    creation except for me and my children.

2         Q   Okay.  (v) is...  (v) I think provides in

3    effect -- you need a moment?

4         A   Yes, I do.

5         Q   You want to take a short break?

6              MR. TOBEROFF:  Yeah, let's take a short break.

7              (Recess.)

8    BY MR. ZISSU:

9         Q   I am now directing your attention again to

10   Defendants' Exhibit 25, to little Roman (v) at the bottom

11   of page 41 in Defendants' Exhibit 25.

12             Would the representation that you would not

13   exploit The WORKS or The MARKS that were being sold or

14   license others to do so after you signed the agreement be

15   a problem?

16             MR. TOBEROFF:  Objection.  Ambiguous.  Calls for

17   speculation, the way you phrased it.

18             THE WITNESS:  And I don't know whether it is.

19   BY MR. ZISSU:

20        Q   Well, if you read number (v) at the bottom of

21   page 41 going over to the top of page 42, you're

22   representing and warranting there, quote, "any and all

23   rights that they own, owned, claim or claimed in The

24   WORKS or The MARKS, including but not limited to all

25   trademark rights (if any) and copyright rights, and all

168

1   termination rights arising under the U.S. Copyright Act

2   and Reversionary Rights, if any, derive and flow directly

3   and only from Jerome Siegel."

4          So I had -- I misstated that previously because

5   of the mistake in the document which had two Roman (iv)s,

6   so I should have said that that (v) provides in effect as

7   follows:  That any rights that you owned flowed only from

8   Jerry Siegel.

9          Is that a problem, making that kind of a

10  representation?

11         MR. TOBEROFF:  Objection.  Calls for a legal

12  conclusion.  Vague and ambiguous.  Compound.

13         THE WITNESS:  You know, I'm -- I'm uncomfortable

14  with having to go through point by point, and, you know,

15  you're asking me specifics here when this was something

16  that was discussed as a whole with my attorney.

17  BY MR. ZISSU:

18      Q   I am not asking you about any discussions with

19  your attorney.

20      A   I understand that, but I think you are asking me

21  for an opinion based on something -- you're asking me to

22  consider things differently now.

23      Q   No, I am not asking you to consider anything

24  differently, and I am not asking you for an opinion.

25         I am asking you at the time you had a reaction,

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**174**

1    and your reaction was that the representations being

2    asked of you in this draft went beyond what you had

3    expected and were detrimental and would expose you to

4    liability, so I am asking you about the representations,

5    each one of them.  We can't just talk about them as a

6    ball of wax.  We have to say, well, what is it in here

7    that was a problem?  What do you think is going to create

8    liability that was detrimental to you?

9            And I am asking you with regard to this one

10   whether a representation that any and all other rights

11   that you were going to be selling stemmed and flowed only

12   from your father, and I am asking you what was the

13   problem with that?

14           MR. TOBEROFF:  Objection.  Calls for a legal

15   conclusion as to, "what was the problem with that?"

16           MR. ZISSU:  Why don't we say you have a

17   continuing objection as you have formulated several times

18   so that we can just go with the question.

19           MR. TOBEROFF:  I want to --

20           MR. ZISSU:  You want to remind her each time,

21   don't you.

22           MR. TOBEROFF:  No.  I want to just state my

23   objection.

24           MR. ZISSU:  Well, it's clear on the record if I

25   say you have a continuing objection.

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**175**

1          MR. TOBEROFF:  I'd rather just state my

2     objections.

3          MR. ZISSU:  Why is that?  Is that because the

4     examiner takes more time, and then you can repeat it to

5     the witness?

6          MR. TOBEROFF:  I don't think I need to justify

7     that.

8          MR. ZISSU:  I think you do, because the rule

9     states that you're not supposed to make long and lengthy

10    objections, and you are not supposed to make them

11    suggestive.  They are to be concise.  And when I tell you

12    the objection is preserved and you have it and it's not

13    waived, you don't have to repeat it.

14          The purpose of an objection is not to inform the

15    witness.  It's to preserve your right to object to the

16    introduction of the evidence at trial, and I will

17    stipulate with you to that effect.

18          MR. TOBEROFF:  That that's the purpose of the

19    objection?

20          MR. ZISSU:  That's the purpose of objections --

21          MR. TOBEROFF:  I agree with you.

22          MR. ZISSU:  -- other than to direct the witness

23    not to answer for --

24          MR. TOBEROFF:  And that's my purpose in making

25    the objection, despite the nasty way in which you're

EXHIBIT B

1    trying to color it.

2         MR. ZISSU:  I am trying to agree with you that

3    that objection can be preserved, and I will stipulate to

4    you to that effect so you don't have to keep repeating it

5    and interrupting the flow of the questions and

6    lengthening the deposition.

7         MR. TOBEROFF:  So we can agree that your

8    questions asking her to read specific paragraphs of this

9    agreement are objectionable --

10        MR. ZISSU:  No, not that they're objectionable.

11   That your right to object is preserved.

12        MR. TOBEROFF:  Excuse me.  That I have a

13   standing objection --

14        MR. ZISSU:  Yes.

15        MR. TOBEROFF:  -- for all of those, that they

16   ask for a legal conclusion and that they --

17        MR. ZISSU:  Whatever you stated, you have a

18   standing objection --

19        MR. TOBEROFF:  I am talking, and you are talking

20   over me.

21        That they -- stipulate a standing objection that

22   these questions ask for a legal conclusion --

23        MR. ZISSU:  No.

24        MR. TOBEROFF:  This is why I just want to make

25   my objection quickly, if I can.

172

1            MR. ZISSU:  Well, state it, and then we will try

2    to give you a continuing objection.

3            MR. TOBEROFF:  We are going to argue over what

4    the stipulation is.

5            MR. ZISSU:  I won't.  Just state what the

6    objection is.

7            MR. TOBEROFF:  The standing objection is your

8    questions ask for a legal conclusion, and they are

9    confusing and misleading to the extent you are taking

10   complex 54-page legal document, taking select paragraphs

11   out of context.  Many of these paragraphs are tied to one

12   another, and it's not apparent even that they're tied

13   till you get to the end of the paragraph or if you're a

14   lawyer, and with all the difficulties of understanding a

15   document, even lawyers come to disagreements as to the

16   meaning of complex contracts like this.

17           You're asking a civilian to read something, tell

18   you whether she objects to it or not, and whether or not

19   she objects to it is based on whether or not she

20   understands it, and she keeps telling you, "I don't

21   understand it without the advice of legal counsel."  You

22   keep asking the same questions.

23           That's my objection.  That's my objection.

24   Calls for a legal conclusion.  I haven't instructed her,

25   however, but that's my standing objection.

173

1          MR. ZISSU:  That standing objection is

2    preserved.  I agree it's preserved so that you don't have

3    to repeat it each time.  We each have different views as

4    to whether the objection is valid, but it will be deemed

5    to be a standing objection to this line of questioning.

6          MR. TOBEROFF:  Fine.  I may have other

7    objections in addition to that, but I will not repeat

8    that one.

9          MR. ZISSU:  Fine.

10   Q    So now go back to the representation number --

11   which is listed here as number (v).  Was the

12   representation that any rights that you would be selling

13   and claim to own flowed only from Jerry Siegel, was that

14   a representation that you considered would be detrimental

15   and inconsistent with the deal points in the October 19,

16   2001 letter?

17         MR. TOBEROFF:  Ambiguous.  Indefinite as to

18   time.

19         MR. ZISSU:  I'll stipulate that that's a

20   continuing objection as well that you can preserve.

21         MR. TOBEROFF:  That doesn't apply to all your --

22   hopefully to all your questions.

23         THE WITNESS:  But I'm confused by your question.

24   Are you asking me at the time that I read it then?  Are

25   you asking me how I feel about it now?

174

EXHIBIT B
179

```
 1   BY MR. ZISSU:

 2       Q    I am not asking you how do you feel about it

 3   now.   In terms of your feelings and what governed your

 4   actions in not accepting the February 1, 2002 draft or

 5   making any counterproposal, was this a representation

 6   that presented the kind of problem you previously

 7   described as creating, potentially, liabilities that were

 8   unacceptable?

 9       A    So you're asking me to recall --

10       Q    Yes.

11       A    -- my impression --

12       Q    Yes.

13       A    -- two and a half years ago?

14       Q    Just the way you recalled your impression, as

15   you testified, that the warranties and liabilities that

16   could be created by these warranties were something you

17   couldn't accept.   So I am going through each of them and

18   saying, well, is this one a problem or is that one a

19   problem, at the time.

20       A    I'll do my best to remember.

21       Q    Okay.

22            So was it a problem for you to represent that

23   all the rights that were involved that you'd be selling

24   flowed only from Jerry Siegel?

25       A    I don't believe there was a problem.
```

175

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1      Q    And the next one is under Roman (vi) here,

2    little (vi) here, in effect that no one other than DC

3    Comics or the Siegels owned any of the rights in the

4    Works created by Jerome Siegel.

5           Is that a problem?  The rights that were being

6    sold.

7      A    I'm not comfortable with that statement, so if

8    you're asking me is that a problem, yes, that's a

9    problem.

10     Q    In this little Roman (vi), for you to make a

11   statement nobody else beyond the Siegels and DC Comics

12   owned any of these rights, that was a problem?

13     A    Yes.

14     Q    Now, as you sit here today, do you know of

15   anybody else who may have owned the rights that were

16   involved in this proposed transaction?

17     A    I have no way of knowing what sort of

18   arrangements DC Comics has entered into.

19     Q    It says other than somebody through DC.

20          Other than DC or anybody they have licensed, do

21   you know anybody else claiming that they owned these

22   rights?

23     A    It doesn't say who they licensed.

24     Q    I'm sorry.  "No person or entity other than The

25   SIEGELS and/or DC COMICS own any rights or could possibly

176

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
181

1    claim any rights of any nature in, or arising out of, any

2    of The works -- [sic] any Works created by Jerome

3    Siegel."

4              Today do you know anybody else who could own or

5    claim rights in these Works?

6        A    It's something that I don't have enough

7    information to form an opinion on.

8        Q    Is that a representation -- was it -- I'm asking

9    you today is that a representation, if you were selling

10   the rights, that you thought was a stab in the back or

11   unreasonable for somebody buying the rights to make?

12             MR. TOBEROFF:  Vague and ambiguous.  Confusing

13   and indefinite as to time and place.

14             THE WITNESS:  I believe you were asking me if it

15   was something I objected to.

16   BY MR. ZISSU:

17       Q    At the time.

18       A    Yes.

19       Q    Right.

20             And the answer is yes?

21       A    The answer is yes.

22       Q    And my question is why, that representation?

23       A    As I said, I have no knowledge of whether there

24   could be someone else who would assert that they owned

25   the rights.

                                                          177

1        Q    Have you ever heard of anybody else other than

2    DC Comics or the Siegels claiming they owned these

3    rights?

4        A    What I've heard and what could end up happening

5    are two different things.

6        Q    No, but I'm asking you about what you'd ever

7    heard.

8        A    I know they license things all the time.  I have

9    no idea whether there's ownership involved.

10        Q    That would be somebody claiming through DC

11    Comics.  But other than the Siegels or DC Comics or DC

12    Comics licensees, have you ever heard about a third

13    person coming along, not licensed by DC Comics and not

14    licensed by the Siegels, claiming they own any of the

15    rights involved in the Superman or Superboy properties?

16        A    That's why I would need an expert to advise me

17    on that.

18        Q    I asked you what you heard with your ears.  Have

19    you ever heard that from anywhere?  Have you ever heard

20    it?  Did anybody ever tell you that there's a third

21    person out there claiming to own some part of Superman?

22    Have you ever heard that?

23        A    I have not heard that.

24        Q    Thank you.

25             The next one is (vii).  That representation says

                                                              178

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    you didn't know of any Works other than the Superman and

2    The Spectre Works created by Jerome Siegel in which you

3    claimed rights.

4        A    I don't understand the way this is written, and

5    I don't understand your explanation of it.

6        Q    So this one, you couldn't understand?

7        A    I don't understand it, because it's relating to

8    other Siegel Works, et cetera.  It relates to a

9    completely different portion of this document.

10       Q    Were there ever any efforts to seek

11   clarification as to what it meant by your lawyer?

12       A    My lawyer and my mother and I discussed things.

13            MR. TOBEROFF:  Don't say anything that reveals

14   the substance of your conversations with your lawyer.

15            THE WITNESS:  I'm not planning to.

16   BY MR. ZISSU:

17       Q    But apart from any discussions, did you take any

18   action, like trying to clarify or change that, so far as

19   you know, this provision?

20       A    What do you mean by "action"?

21       Q    Did your lawyer to your knowledge ever go back

22   to DC Comics' lawyer and say, "What is this?  It's not

23   understandable.  What do you mean by it?"

24            Did anybody seek clarification on your behalf?

25       A    I don't know.

179

1      Q   Now, the next one is (viii).  It says you would

2  represent that you know of no Works included among the

3  Superman Works that were not listed in the Superman

4  notices of termination.

5          Was that kind of a representation one that would

6  be -- would have been a problem?

7      A   Well, I believe there's several ways of

8  interpreting that.

9      Q   Well --

10     A   When you say, "no Works included among the

11  Superman Works," are you referring -- is this ~~contract~~

12  referring to the list of Works that was part of the

13  notices of termination?

14     Q   Right.  No.  It's referring to the notices of

15  termination and -- so it's incorporating by reference

16  whatever you have listed on that big -- I think this

17  representation means -- I wanted to know to the best of

18  your knowledge was this a complete list of the Superman

19  Works?

20         MR. TOBEROFF:  Misstates the documents.

21         THE WITNESS:  Yeah, this document really doesn't

22  say that, and also it says no Works included were not

23  listed.  You know, by its very nature, if something was

24  included, how could it not be listed?  I think it's --

25  BY MR. ZISSU:

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
185

1        Q    It sounds to me like you had a grammatical

2    problem, but I -- the way I read this thing is DC Comics

3    wanted to be assured that among the Works they were

4    purchasing were all the Superman Works and that there

5    were no Works -- Superman Works out there except the ones

6    that you have listed, so that that's what the transaction

7    was about.

8              MR. TOBEROFF:  Objection --

9    BY MR. ZISSU:

10       Q    Can you read it that way?  If I explain that,

11    can you understand that?

12       A    But I think your explanation is different from

13    the document that I was considering at the time.

14       Q    So just so I understand it, how did you read

15    this provision at the time?  What was your understanding?

16             MR. TOBEROFF:  Don't -- when he says how did you

17    read it, if your understanding in reading it is only

18    through the advice of counsel, don't disclose that.  If

19    you made an independent assessment not with advice of

20    counsel, you can disclose it.

21             THE WITNESS:  It was unclear and contradictory,

22    so I couldn't form an opinion on it.

23    BY MR. ZISSU:

24       Q    But even though you couldn't form an opinion,

25    you decided it was detrimental and would expose you to

181

EXHIBIT B
186

1    liabilities.

2            Correct?

3        A    I didn't make an opinion on that particular

4    provision of many provisions that are in here.

5        Q    Well, this was one of them.

6        A    It was one of them, but I didn't --

7        Q    Maybe this was not one of them.  Was it one of

8    them or not?

9        A    This particular one was not one I formed an

10   opinion on because -- outside of consultation with my

11   attorney.

12       Q    And, finally, the last one, and I think it's

13   (x), it is a representation that "Joanne [sic] Siegel is

14   the sole executor, trustee, administrator and personal

15   representative of Mr. Siegel and his estate."

16            That was not a problem?

17       A    No, that's not a problem.

18       Q    Now, you have also -- I think you mentioned that

19   the Defendants' Exhibit 25 involved --

20       A    Excuse me.

21       Q    Yes.

22       A    Excuse me.  I do have a problem with the words,

23   "personal representative of Mr. Siegel and his estate."

24       Q    What was the problem?

25       A    She was the sole executor, trustee and

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
187

1    administrator of his estate, but she was not the only

2    representative of Mr. Siegel and his estate.

3        Q    And who was the -- who were the other

4    representatives, if any?

5        A    Legal counsel.

6        Q    Okay.  Other than that?

7        A    At that time, legal counsel.

8        Q    Was legal counsel named in the will of your

9    father as an executor?

10        A    No.  But executor is a separate question here.

11        Q    Was legal counsel named as a personal

12    representative or other kind of agent in the will of your

13    father?

14        A    Well, this doesn't read to me as if it's only

15    asking about his will.

16        Q    But I'm asking you.

17        A    No.

18        Q    And was legal counsel ever appointed under any

19    court order or --

20        A    Ever -- what was the word?

21        Q    Appointed by any court --

22        A    No.

23        Q    -- as -- let me finish the question.

24        A    Sorry.

25        Q    -- as legal representative, and the answer is

183

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**188**

```
 1    no.  All right.
 2            Now, I think you also said earlier that the
 3    Defendants' Exhibit 25 would require you to sell and
 4    transfer to DC Comics all rights in any Works that your
 5    father ever created.
 6            Do I have that right?
 7       A   Excuse me for just a moment.
 8       Q   Yes.
 9       A   May I consult with my attorney for a question?
10       Q   Sure.
11            MR. TOBEROFF:  We can go outside.
12            THE WITNESS:  Okay.
13            (Recess.)
14            (Record read as follows:
15                "Now, I think you also said
16             earlier that the Defendants' Exhibit
17             25 would require you to sell and
18             transfer to DC Comics all rights in
19             any Works that your father ever
20             created.
21                "Do I have that right?")
22            THE WITNESS:  Yes.
23    BY MR. ZISSU:
24       Q   Okay.  And do you have -- are you able to recall
25    now any specific language of the draft that was that
```

184

EXHIBIT B
189

1    broad?

2        A    I can't remember.

3        Q    Would it refresh your recollection if I directed

4    you to page 20 of Defendants' Exhibit 25 where there is a

5    subparagraph small g)', and the caption or the heading of

6    that subparagraph reads, "grant Of All Rights In the

7    OTHER SIEGEL Works" -- does that stir your recollection

8    as to the basis for your feeling that you were being

9    asked to grant rights in all Siegel Works?

10       A    I don't recall this particular paragraph.   I

11   haven't read this document in a really long time.

12       Q    I will represent to you that when I read -- have

13   read this agreement, I see that there are grants of

14   rights in SUPERMAN Works, which is a defined term, and

15   then there are grants of rights in SPECTRE Works, and

16   there is a grant of rights in OTHER SIEGEL Works, but

17   that's also a defined term, and I read a limitation in

18   the definition of OTHER SIEGEL Works so that it would

19   only include works that were -- for which Jerome Siegel

20   was paid and compensated by DC Comics or its predecessor,

21   Detective.

22          Does that make any sense to you, or is that

23   something you disagree with?

24          MR. TOBEROFF:   Objection.   Compounding

25   confusing, vague and ambiguous.

185

1    BY MR. ZISSU:

2        Q    Can you answer it as best you can?

3        A    I -- could you just read it back to me, please?

4        Q    The way I read the grant provision, there are

5    grants of rights in SUPERMAN Works and SPECTRE Works and

6    other works, but other works is defined to only include

7    works that Jerome Siegel did for DC Comics or its

8    predecessor, and I am asking you if you understood that.

9            MR. TOBEROFF:  Objection.  Most of that question

10   is not a question.  He's commenting on the evidence.  And

11   also you're asking her to interpret this contract to see

12   if your legal definition of what that says is correct?

13           MR. ZISSU:  Yes.  I'm asking whether she agrees

14   with the way I read the contract and the way DC Comics

15   reads the contract.

16   BY MR. ZISSU:

17       Q    Where can you -- strike that.

18           On what basis can you say that it required the

19   transfer of all rights to any works ever created by

20   Jerome Siegel that were not published or submitted to DC

21   Comics?

22       A    To --

23           MR. TOBEROFF:  If you are not sure, don't

24   answer.  Only if you know the answer, answer it.

25           THE WITNESS:  I was going to say to answer that

186

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    question, I -- you know, I feel completely unqualified.

2    This is a matter that I had to -- excuse me.  This is a

3    matter that I had to fully discuss with my attorney, and

4    I can't -- it's not a simple yes or no answer.

5    BY MR. ZISSU:

6        Q    When you read the agreement -- you did read it

7    at some point, this draft --

8        A    Yes.

9        Q    -- Defendants' Exhibit 25?

10        Apart from any discussions with your attorney,

11    did you read it and say to yourself or -- did you read it

12    and understand that it was a grant as broad as you have

13    indicated?

14        A    Yes.

15        Q    That's the way you read it?

16        A    Correct.

17        Q    Is there any way you can -- if I take you

18    through the grant provisions, you could explain to me how

19    you read it that way?

20        A    No.

21        Q    Well, let me direct your attention to some of

22    these provisions, and if you turn to page 13, you will

23    see a paragraph 1, "GRANT OF RIGHTS."  I am going to ask

24    you about page 13, the grant of rights in paragraph 1 of

25    Defendants' Exhibit 25.

187

1              You see 1 a), it says, "Grant Of All Rights In

2    The SUPERMAN Works."

3              Correct?

4         A    I see that it says that.

5         Q    All right.  And then if you turn to the next

6    page, on page 14 -- no.  If you continue and go to

7    subdivision b) -- that's 1 a).  If you go to 1 b) there

8    is reference to a grant on the second page, 15 --

9         A    Yeah.

10        Q    -- of all rights in the SUPERMAN Derivative

11   Works.

12        A    I see it says that.

13        Q    Do you recall whether that was a problem?

14        A    I don't recall.

15        Q    But this was a very important point to you, was

16   it not?

17        A    Well --

18             MR. TOBEROFF:  Vague and ambiguous.

19             THE WITNESS:  Everything's important to me.

20   BY MR. ZISSU:

21        Q    Well, you identified three points as being the

22   key or the crucial points.

23             MR. TOBEROFF:  Misstates her testimony

24   completely.

25   BY MR. ZISSU:

                                                          188

1          Q    In effect I've gotten it right.

2               What was the term you used in describing these

3     three areas?

4          A    I said to the best of my recollection, there

5     were three areas that really jumped out at me.

6          Q    Okay, the three areas that jumped out at you.

7               And is it fair to say that these struck you as

8     very important at the time?

9          A    The issues?

10         Q    Yes, the three that jumped out at you.

11         A    Sure.

12         Q    They were crucial to you.

13              Correct?

14         A    Yes.

15         Q    So do you consider that I have misstated your

16    testimony in saying that they were key for you?

17         A    I --

18              MR. TOBEROFF:  She didn't say they were key.

19              THE WITNESS:  I don't remember what the context

20    was that you asked me.

21    BY MR. ZISSU:

22         Q    You said they jumped out to you and were

23    important, and I referred to them as key or crucial to

24    you.  Do you think that was unfair?

25         A    No.  They were important to me.

                                                          189

1    Q    They -- do you recall --

2    A    That's not to say that there weren't other

3    things that were important too.

4    Q    I know.  This is your characterization, and I am

5    asking you -- I am following that up.  I can't follow up

6    the ones you didn't tell me about.  Not yet.

7         So you can't recall that the grant of rights in

8    the SUPERMAN Derivative Works was among those you were --

9    that jumped out to you as a problem.

10   A    I can't recall.

11   Q    If you turn to the next page, paragraph

12   subdivision c), 1 c), that there is a grant of all rights

13   in the SUPERMAN Marks.  Is that one of the ones that

14   jumped out to you as going too broadly?

15   A    It may have been.  I don't remember.

16   Q    But you don't have any recollection of it today?

17   A    No.

18   Q    And in the next paragraph, paragraph d), there

19   is a grant of -- reference to a "Grant Of All Rights In

20   The SPECTRE WORKS."  Do you recall that granting rights

21   in The SPECTRE Works was something that went too broadly

22   in relation to the deal points?

23   A    I don't remember whether the way it's written up

24   here was what our understanding of it was going to be.

25   Q    But apart from the definition, the idea that The

190

EXHIBIT B
195

1    SPECTRE Works were going to be the subject of the grant,

2    that wasn't among the ones that you considered as being

3    too broad, was it?

4        A    No.

5        Q    And going to page 19, subdivision e), there is

6    reference to a "...Grant Of All Rights In The SPECTRE

7    Derivative Works."  Do you have any recollection that

8    that grant provision was among the ones that jumped out

9    to you as being too broad?

10       A    I don't remember.

11       Q    And in subdivision 1 f) on the same page, do you

12   have any recollection that the grant of all rights in The

13   SPECTRE Marks was going beyond what the deal points

14   called for?

15       A    I don't remember.

16       Q    And in g) on the next page, 20, I've asked you

17   about the grant of all rights in The OTHER SIEGEL Works.

18   Do you recall that that was -- had gone too broadly in

19   relation to what the deal points called for?

20       A    I don't remember the specifics of this

21   paragraph.

22       Q    But it doesn't strike you today as being --

23   having been a problem at the time?

24       A    It may have been a problem at the time.  I don't

25   remember.

191

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1      Q    I am not able to stimulate your recollection so

2    that you can remember.

3           Correct?

4      A    Correct.

5      Q    And in h), "Acknowledgment/Grant Of All Rights

6    In the OTHER Marks," was -- is that something that jumps

7    out at you today as having been a problem in having gone

8    too broadly?

9      A    I can't remember.

10     Q    Now, you also mentioned the royalty of 6

11   percent --

12     A    Excuse me.

13     Q    I'm sorry?

14     A    You know, it occurs to me that when we were

15   talking about the warranties before --

16     Q    Yes.

17     A    -- you said that you were going to discuss the

18   indemnification aspects of this, and since those were

19   completely a part of my impression, I feel it's important

20   to point out we have to discuss that.

21     Q    You don't mind if I don't ask you all the

22   questions at once, do you?

23     A    No.  I just --

24     Q    So I ask one question, and then I get to

25   another, and that's okay with you.  You understand that's

192

EXHIBIT B
197

1   part of the process?  Otherwise, your lawyer would say

2   it's a compound question.

3          Correct?

4      A   No, I can't speak for him.

5          MR. TOBEROFF:  Objection.  Argumentative.

6   BY MR. ZISSU:

7      Q   But you can't answer more than one question at a

8   time.

9          Isn't that correct?

10         MR. TOBEROFF:  Objection.  Argumentative.

11         THE WITNESS:  My understanding was that you were

12  going to follow questions of warranties with questions

13  about indemnification --

14  BY MR. ZISSU:

15     Q   I am.

16     A   -- because --

17     Q   I am about to turn to that --

18         MR. TOBEROFF:  Let her finish.  Please don't

19  interrupt the witness when she's speaking.

20         MR. ZISSU:  Well, it's not an answer to a

21  question, so I will interrupt her.  Just tell her to

22  answer the questions asked, and then if you have a

23  problem with the question, you can tell me about it,

24  instead of telling me what questions to ask and when.

25         Okay?

193

```
 1            MR. TOBEROFF:  Laura, finish what you were
 2    saying.
 3            THE WITNESS:  I was saying that it was my
 4    impression we were going to get to this.  I'm glad we're
 5    going to get to it.
 6    BY MR. ZISSU:
 7        Q   Well, fine.
 8            Do you have anything else you have the
 9    impression I'm going to get to?
10        A   You haven't stated anything else.
11        Q   You know, let me know if you do.
12            MR. TOBEROFF:  Objection.  Harassing the
13    witness.  Argumentative.
14    BY MR. ZISSU:
15        Q   Do you have anything you want to tell me about
16    the indemnification provisions?
17        A   You had questions for me about the others --
18        Q   I will.
19        A   -- do you have questions about these?
20        Q   You seemed to have something to say about it.
21    If you do, say it.  Otherwise, we can proceed to my
22    questions.
23        A   No.
24        Q   Okay.  In 12 -- I think it's in paragraph 12 b),
25    did you have a discussion with your counsel when you went
```

194

1    out of the room about the indemnification issue?

2            MR. TOBEROFF:  Objection.

3            MR. ZISSU:  I have a right to ask about that.

4            MR. TOBEROFF:  No, you can't --

5            MR. ZISSU:  I am asking her yes or no.

6            MR. TOBEROFF:  Objection.  Don't answer that

7    question.  I instruct you not to answer.

8            (Instruction not to answer.)

9            THE WITNESS:  Okay.

10            MR. ZISSU:  I will ask you.  Did you?  You're

11   not supposed to do that in the course of an examination.

12            MR. TOBEROFF:  I am not going to -- first of

13   all, I'm not the witness here, and I certainly wouldn't

14   discuss what I discussed with my client.

15            MR. ZISSU:  I've got to find it before I can ask

16   you about it.

17      Q    All right.  It's on page 45, and there is an

18   indemnification provision and a release.  This runs from

19   page 45 into page 46.  Can you just please look at it,

20   and I will ask you some questions?

21            Do you -- have you read it?

22      A    Yes.

23      Q    Are you able to tell me what at the time was a

24   problem in this indemnification?

25      A    The whole thing.

```
 1        Q   Did you understand that you would have to --
 2   strike that.
 3            Did you understand from the deal points that you
 4   would have to indemnify DC Comics with respect to
 5   breaches of your representations and warranties?
 6            MR. TOBEROFF:  Objection.  Vague and ambiguous.
 7   Do you mean the October 19 letter?
 8            MR. ZISSU:  Yes.
 9            THE WITNESS:  The October 19th letter did not
10   contain this and --
11   BY MR. ZISSU:
12        Q   It didn't contain -- I'm sorry?
13        A   Did not contain all of these conditions and
14   specifications.  It was never our understanding that all
15   of these would be required of us.
16        Q   So let me direct your attention to Defendants'
17   Exhibit 22, which is the October 19, 2001 letter.  On
18   page 5 there is paragraph 13.  Paragraph 13 reads,
19   "Siegel Family would not make any warranties as to the
20   nature of rights but would represent that they have not
21   transferred the rights to any party.  The Siegel Family
22   would agree that there will be no interference with the
23   Superman rights, or disparagement of D.C. Comics.  D.C.
24   Comics and Time Warner agree not to disparage the Siegel
25   Family," close quote.
```

196

**EXHIBIT B**
**201**

1           Do I understand your testimony correctly that to

2    have provided an indemnification for DC Comics for breach

3    of the representation and warranties is something you

4    felt was added and not called for by the deal points in

5    this letter?

6           MR. TOBEROFF:  Objection.  Misstates her

7    testimony and --

8           MR. ZISSU:  It's a question.

9           MR. TOBEROFF:  And, Laura --

10          You misstated her testimony within the question.

11          And, Laura, I really don't want you to answer --

12   you are instructed not to answer questions if you don't

13   precisely know what he's talking about or any -- he's

14   talking about your understanding at the time for

15   rejecting something, and if your understanding at the

16   time for rejecting something is based on conversations

17   with your attorney and you're seeking legal advice, you

18   cannot testify to it.  And don't try and connect the dots

19   if you don't understand it, and you would need the advice

20   of counsel to understand it.

21          And I am going to put -- I am going to stop --

22   and you can bring this up in as many motions as you want.

23   I am going to stop this line of questioning if you

24   continue to ask her to do so because --

25          MR. ZISSU:  Well, I am going to put on the

                                                          197

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1    record what my questions are because --

2             MR. TOBEROFF:  You can put them on the record,

3    but --

4             MR. ZISSU:  You are getting out of control.

5             MR. TOBEROFF:  No.  I think you've been out of

6    control most of this whole time.  This line of

7    questioning -- this was an agreement negotiated by

8    counsel.  Obviously, any understanding she received was

9    through her attorneys, and now you are asking her to go

10   back and both --

11            MR. ZISSU:  No.

12            MR. TOBEROFF:  What are you asking her to do, to

13   interpret the legal agreements?

14            MR. ZISSU:  No.

15            MR. TOBEROFF:  What are you asking her?  What

16   her understanding was then --

17            MR. ZISSU:  I'll answer your question --

18            MR. TOBEROFF:  -- after speaking to her

19   attorneys?

20            MR. ZISSU:  I'm asking her -- she read this at

21   the time, the same day --

22            MR. TOBEROFF:  Yes.

23            MR. ZISSU:  -- and she found that when a

24   provision was made with respect to it later in long-form

25   agreement, it was inconsistent with the provisions in

                                                          198

1    this Defendants' Exhibit 22 --

2            MR. TOBEROFF:  And she found that independently

3    or upon the advice of counsel?  Obviously, she conferred

4    with her counsel on that matter.

5            MR. ZISSU:  You can't, as a lawyer -- as a party

6    seeking to pursue a claim when there is a defense that

7    there has been a settlement contract, avoid questions as

8    to what the meanings of the agreements are and what you

9    understood the agreements to mean on the grounds that

10   your mental impressions were solely created by speaking

11   to a lawyer.  You stated --

12           MR. TOBEROFF:  That --

13           MR. ZISSU:  You stated that her sole knowledge

14   of this was through a lawyer, and it's not true.  She

15   testified she read this agreement, and her mother wrote a

16   letter about it which she saw and knows fully, and I am

17   asking her what was it in this Defendants' Exhibit 22

18   that was changed or added to, as she has testified, in a

19   later draft, the February 1, 2002 draft, to her

20   understanding.  It doesn't matter where her understanding

21   [sic].  If she had the mental impressions, she had an

22   understanding, she has to tell us what her understanding

23   is --

24           MR. TOBEROFF:  Even though --

25           MR. ZISSU:  -- or she is not going to be able to

199

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**204**

1    tell the court at trial.

2          MR. TOBEROFF:  Even though if that understanding

3    comes from a communication and advice from her counsel?

4          MR. ZISSU:  That's correct.

5          MR. TOBEROFF:  That's incorrect.  That's

6    absolutely incorrect.

7          MR. ZISSU:  And it doesn't come from counsel.

8          MR. TOBEROFF:  It doesn't?

9          MR. ZISSU:  She's already --

10          MR. TOBEROFF:  Where do you think it comes from?

11          MR. ZISSU:  Well, she read the document.  She

12    read it and --

13          MR. TOBEROFF:  She read the document and

14    obviously discussed it with her counsel.

15          MR. ZISSU:  No, no, no.  She read it.  Were you

16    there when she read it?

17          MR. TOBEROFF:  No, I was not there.

18          MR. ZISSU:  She read it, and she had an --

19      Q   Did you have an understanding of it when you

20    read it?

21      A   No.

22      Q   You had no understanding of it?

23          In other words -- let's go to the first

24    paragraph.  You read this first paragraph.

25          Correct?  You testified --

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1        A    Which document are you talking about?

2        Q    Defendants' Exhibit 22.  This is the first

3    paragraph, written by Kevin Marks.

4            MR. TOBEROFF:  Hold on a second.

5    BY MR. ZISSU:

6        Q    Did you --

7            MR. TOBEROFF:  You spoke without me interrupting

8    you, and now I am going to speak.

9            MR. ZISSU:  Well, no.  I'm going to ask her a

10    question.

11            MR. TOBEROFF:  You spoke without me

12    interrupting.  I didn't interrupt you, and now I'm going

13    speak --

14            MR. ZISSU:  You're interrupting --

15            THE REPORTER:  Counsel, hold on.  I can't get

16    both of you at one time.

17            MR. TOBEROFF:  You're absolutely right.

18            MR. ZISSU:  Go ahead, you make your statement.

19            MR. TOBEROFF:  I'd ask when I speak that you

20    please not interrupt me.  I give you that courtesy.

21            You're asking her what her opinions or

22    objections were at a time in the middle of a negotiation

23    when she was represented by counsel where it's a given

24    that any opinions she formed at the time were formed

25    after discussions with her counsel as to what the

201

1    meanings of provisions are.

2            You are now asking her to go back from 2006,

3    more than four years ago, and, while looking at the

4    document today, testifying as to what her understanding

5    or objections are to a document, an understanding that

6    was formed through the advice of counsel.  That

7    reveals -- that's attorney-client privileged information.

8    That's attorney work product information.  It's

9    privileged.  I've let this go to a certain extent.  I am

10   going to put an end to it and instruct her not to answer

11   if you continue to do it in this fashion.

12           MR. ZISSU:  I am going to ask her the

13   questions --

14           MR. TOBEROFF:  And you know very well she

15   doesn't understand what she's reading, and you're taking

16   advantage of that point.

17   BY MR. ZISSU:

18       Q   Miss Siegel, you testified that on October 19th,

19   2001, that you had read Defendants' Exhibit 22, a copy of

20   it.

21           Correct?

22       A   I don't know whether I read it on the 19th.

23       Q   Well, you read it the next day.  You read it in

24   or about that time.

25           Correct?

202

```
 1        A    Yes.

 2        Q    And when you saw it, you decided that the first

 3   paragraph was something that you did not approve of.

 4             MR. TOBEROFF:   Asked and answered.

 5   BY MR. ZISSU:

 6        Q    Now, you didn't make that -- you didn't have

 7   that reaction on the basis solely of a discussion with

 8   your counsel.

 9             Correct?

10             MR. TOBEROFF:   Don't answer that question

11   because it reveals whether or not you discussed it with

12   your counsel.

13             (Instruction not to answer.)

14   BY MR. ZISSU:

15        Q    You had that impression -- reaction based on

16   your reading of it, and you decided that this was

17   something you didn't approve of and found inappropriate.

18             Correct?

19             MR. TOBEROFF:   Instruct you not to answer.   It's

20   been asked and answered.

21             (Instruction not to answer.)

22   BY MR. ZISSU:

23        Q    And that reaction, as you've testified today,

24   was not formed by discussion with counsel; it was formed

25   by your own reaction, that you saw something that you
```

                                                            203

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
208

1   didn't like.

2           Correct?

3           MR. TOBEROFF:  Objection.  Misstates her

4   testimony.  Are you testifying?

5           MR. ZISSU:  I am asking her the answer to that

6   question.

7           THE WITNESS:  I don't know anymore what your

8   question is.

9   BY MR. ZISSU:

10     Q   Is it your testimony that everything you know

11  about Defendants' Exhibit 22 and the contents thereof

12  including the deal points came solely through

13  communications from your lawyer?

14     A   It came --

15          MR. TOBEROFF:  You can answer that question.

16          THE WITNESS:  It came mostly from my discussions

17  with my lawyer.

18  BY MR. ZISSU:

19     Q   When you first read it, had you spoken with your

20  lawyer?

21          MR. TOBEROFF:  Vague and ambiguous as to time

22  and place.

23          THE WITNESS:  Yeah, I don't understand what you

24  mean.

25  BY MR. ZISSU:

204

```
 1        Q    You got a copy of it.

 2             Right?

 3        A    Yes.

 4        Q    Did you read it?

 5        A    Yes.

 6        Q    Did you call your lawyer before you read it?

 7        A    I couldn't call him before I read it.  I didn't

 8   know it was coming.

 9        Q    Okay.  And when you read it, you had certain

10   reactions and understanding from reading it.

11             Correct?

12        A    Yes.

13        Q    And that was before you spoke with your lawyer.

14        A    I had questions for him about it.

15        Q    Based on your understanding of what you were

16   reading.

17             Correct?

18             MR. TOBEROFF:  Or lack of understanding.

19   BY MR. ZISSU:

20        Q    Or lack of understanding.

21        A    Right.

22        Q    And I am asking you about your understanding.  I

23   am not asking you about what any lawyer told you.

24             MR. TOBEROFF:  Objection.  It's impossible for

25   her to be --
```

205

```
1   BY MR. ZISSU:

2       Q   Correct?

3       A   I --

4           MR. TOBEROFF:  Excuse me.  Don't -- I'm

5   objecting.

6           Objection.  It's impossible for her to

7   differentiate between that understanding she

8   instantaneously had and that understanding she had after

9   talking to her lawyer, going back four years, and you

10  know it.

11          MR. ZISSU:  No.  You're testifying about what

12  she could and could not understand --

13          MR. TOBEROFF:  No, I am not testifying.

14          MR. ZISSU:  -- I am asking the witness to

15  testify to that, not you.

16          MR. TOBEROFF:  I am highlighting why that

17  question is improper and objectionable and why it calls

18  for the disclosure of an attorney-client communication

19  and attorney work product.

20          MR. ZISSU:  You are really signaling to the

21  witness how she --

22          MR. TOBEROFF:  Nobody's signaling.

23          MR. ZISSU:  Let me talk.

24          MR. TOBEROFF:  Let's go --

25          MR. ZISSU:  You're signaling -- can I talk now?
```

206

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**211**

1          MR. TOBEROFF:  Yes, certainly.

2          MR. ZISSU:  You are signaling to the witness

3    what she recalls and doesn't recall, and it's the witness

4    who decides what she can and cannot recall.  She's

5    already testified to what she recalled on the day about

6    certain aspects of this document, and she's also

7    testified that an indemnification provision in the

8    Defendants' Exhibit 25 was inconsistent and added

9    something to the points that were acceptable or approved

10   in the October 19, 2001 Defendants' Exhibit 22, and I am

11   asking her about what it was that she found had been

12   added.  And if she has no knowledge of what has been

13   added except what her attorney told her, that's one

14   thing, but if she had some understanding, mental

15   understanding of it, I'm entitled to ask about it, and

16   you're really doing wrong here to interfere with that, so

17   I ask you to stop it so that we can go on and finish

18   this.

19      Q   So I'll go back to my question.  If you turn to

20   paragraph -- point 13 of Defendants' Exhibit 22, there is

21   a reference to the Siegel family giving some

22   representations and warranties.  This provision does not

23   refer to any indemnification provision from you, and I am

24   asking you whether the adding of an indemnification

25   provision with respect to these representations and

207

EXHIBIT B
212

1    warranties in the February 1, 2002 draft is what you

2    meant by something that had been added in the

3    indemnification provision.  That's all I'm asking you.

4             MR. TOBEROFF:  Objection.  Compound.  Indefinite

5    as to time and space.  Objection on the basis of

6    attorney-client privilege, and instruct you not to answer

7    except to the limited extent that you formed an opinion

8    and you know the opinion you formed without depending on

9    the advice of counsel or interpreting these provisions

10   through speaking with your attorney.

11            THE WITNESS:  When I read this October 19th

12   document, I did not understand the portions about

13   warranties or the portions about indemnities without

14   speaking to my attorney.  I did not understand what that

15   meant.  He had to explain it to me.

16   BY MR. ZISSU:

17      Q   So when you testified previously about the

18   addition -- about the points that jumped out to you, you

19   were not testifying on the basis of your personal

20   knowledge except as you have learned what you stated from

21   your attorney.

22            Correct?

23      A   Correct.

24      Q   So you have no independent knowledge of those

25   three points that you testified jumped out at you.

208

```
 1          Correct?

 2      A   Correct.

 3          MR. ZISSU:  Let's go off the record.

 4          (Discussion held off the record.)

 5          (Recess.)

 6  BY MR. ZISSU:

 7      Q   Miss Siegel, are you willing to answer questions

 8  about your understanding of the February 1, 2002 draft

 9  even though these reactions and understandings are

10  affected all or in part by communications between you and

11  your lawyer?

12      A   Well --

13      Q   I am just asking whether you're willing to.

14          MR. TOBEROFF:  I am instructing her she cannot

15  to the extent that they are.

16          (Instruction not to answer.)

17          THE WITNESS:  So my answer is no.

18  BY MR. ZISSU:

19      Q   So the answer is no because of the instruction

20  on your lawyer?

21      A   Yes.

22      Q   Between October 21, 2001 when the Kevin Marks

23  letter was sent and May 9, 2002 when your mother wrote to

24  Richard Parsons, did you have communications with any

25  third party other than lawyers about the subject of your
```

209

EXHIBIT B
214

```
 1   deal --

 2              MR. TOBEROFF:  I am sorry --

 3   BY MR. ZISSU:

 4        Q    -- with DC Comics?

 5              MR. TOBEROFF:  I am sorry.  Could I just ask you

 6   to repeat that?  I apologize.

 7              MR. ZISSU:  If you got it, you can read it back.

 8              (Question read.)

 9              THE WITNESS:  No.

10   BY MR. ZISSU:

11        Q    With respect to Defendants' Exhibit 22, which is

12   the October 19, 2001 letter, did you ever see any prior

13   drafts of this letter before it was sent?

14        A    No.

15        Q    Did you make any notes about this when you read

16   a copy?

17        A    I don't believe so.

18        Q    Turning to the Defendants' Exhibit 23, the

19   letter from your mother to Mr. Parsons, and with respect

20   to the third paragraph, there is reference to hiring --

21   or to having various lawyers at various points.  You say

22   you checked and rechecked with knowledgeable attorneys.

23              Were the knowledgeable attorneys you checked

24   with -- please just tell me who -- the identification of

25   the lawyers was.
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**215**

```
1       A    Arthur J. Levine, George Zadorozny --

2       Q    George?

3       A    Zadorozny.

4       Q    Spell it.

5       A    Z A D O R O Z N Y.

6       Q    Where does he practice?

7       A    In Florida.

8            And Dennis Larson.

9       Q    And Dennis Larson is also your husband?

10      A    Is my ex-husband.

11      Q    Okay.  Is he still a lawyer for you?

12      A    No.

13      Q    Is Mr. Zadorozny still a lawyer for you?

14      A    He's on a consulting basis.

15      Q    And then it says you hired two additional

16   attorneys, and does that mean Kevin Marks and Bruce

17   Ramer?

18      A    Yes.

19      Q    Other than in the ways you've been -- strike

20   that.

21           Your counsel has given you an instruction not to

22   answer certain questions.  Is there any way for you to

23   tell me anything further about what the new, outrageous

24   demands were that were not in the October 1 -- actually,

25   I'm sorry, October 19, 2001 proposal?
```

211

EXHIBIT B
216

```
 1              MR. TOBEROFF:  That was asked and answered.

 2              THE WITNESS:  Well --

 3              MR. TOBEROFF:  You can tell him you told him

 4     before.

 5              THE WITNESS:  I was gonna say that, you know,

 6     everything was really discussed with the attorneys.

 7     BY MR. ZISSU:

 8         Q   So you can't answer anything on that subject?

 9         A   No.

10         Q   Your mother also states in the fourth paragraph

11     with regard to the February -- I think it's the February

12     1, 2002 draft, quote, "The document is a heartless

13     attempt to rewrite the history of the Superman [sic]

14     creation..."

15              Can you tell me what you understood her to mean

16     by rewriting the history?  Your mother refers to

17     rewriting the history of the Superman creation.  Do you

18     know what she meant by that?

19         A   I don't recall what she was referring to.

20         Q   Did you help write this letter?

21         A   Not really.  She wrote a draft, and, you know,

22     she sent it.  I think I looked at it.  I might have made

23     a suggestion, you know, for a word or two here or there,

24     but she pretty much just did it herself.

25         Q   But you saw a draft beforehand?
```

212

```
 1        A    You know, I don't remember, actually.  I don't

 2   know if I saw this one or not.  I don't remember whether

 3   I saw this one or not.

 4        Q    Did you or your mother consult with a lawyer

 5   about the content of this letter?

 6        A    No.

 7        Q    Your mother also states that this attempts to,

 8   quote, "discredit my late husband, Jerry Siegel," close

 9   quote.

10             Do you know what she meant by discredit him?

11        A    I don't remember what she was referring to.

12        Q    On the next page it says, "This contract" -- at

13   the top -- "was sent to us three months ago."

14             Do you know why it took three months or whatever

15   the time was to write this letter to Mr. Parsons?

16        A    Well, it was an agonizing time trying to figure

17   out what to do.

18        Q    And I guess my question is why didn't you write

19   this letter right away?

20        A    We were agonizing over the situation.  It was

21   very painful.

22        Q    In the entire period from October 19, 2001 to

23   May 9, 2002?

24        A    No.  She -- my understanding is that you are

25   asking about the period between February and May.
```

213

**EXHIBIT B**
**218**

```
 1        Q   Oh, I'm sorry.  You're right.
 2            Yes, in that period, the entire time you were
 3    agonizing.
 4            Correct?
 5        A   Yes.
 6        Q   In the next paragraph it says in the last
 7    sentence, "In addition, my disabled daughter" --
 8        A   I'm sorry.  Where is this?
 9        Q   In the next page --
10        A   Page 2?
11        Q   -- second paragraph on that page?
12            MR. TOBEROFF:  Page 2?
13            MR. ZISSU:  Page 2.
14        Q   "In addition, my disabled daughter still has not
15    received the medical coverage she and her children were
16    promised several years ago."
17            Is that true?
18        A   Yes.
19        Q   Wasn't there some problem with getting you
20    coverage under the company insurance policy?
21        A   That wasn't at this point, from my
22    understanding.
23        Q   There is a reference to DC's lawyers having --
24    representatives having asked you to do unethical things.
25            Do you know what she meant by "the unethical
```

214

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**219**

1    things demanded"?

2        A    I don't recall.

3        Q    In the next paragraph there is a statement,

4    quote, "Just like the Gestapo, your company wants to

5    strip us naked of our legal rights."

6             Do you know what your mother meant by the term

7    "Gestapo"?

8        A    She was angry.

9        Q    But was she referring to the Nazi police?

10       A    Yes.

11       Q    And do you agree that considering a proposal --

12   strike that.

13            Do you agree that requesting you to consider the

14   proposal made on February 1, 2002 to your lawyers is the

15   equivalent of stripping you naked of your legal rights

16   the way the Gestapo did in Germany?

17       A    I can't speak for my mother, but your question

18   is what is my opinion?

19       Q    Yeah.  Did you have that reaction?

20            MR. TOBEROFF:  He is asking about the Gestapo.

21            THE WITNESS:  I think that it is -- how can I

22   put this --

23   BY MR. ZISSU:

24       Q    Hyperbole?

25       A    Yeah, I think she was making a comparison to

215

1    make a point.  I don't think she meant it literally.  In

2    fact, I can tell you for a fact she didn't mean it

3    literally.

4        Q    Did you and your mother ever consider counter-

5    proposing with regard to the February 1, 2002 draft?

6        A    That was up to our lawyers.

7        Q    Did you ever think about it?

8        A    Yes, we thought about it.

9        Q    And you decided not to?

10        A    I can't answer that.

11            MR. TOBEROFF:  Objection.  You're getting into

12    the --

13            MR. ZISSU:  Well, you made a --

14        Q    Was there any counterproposal made to your

15    knowledge?

16        A    I believe that in the talks with Ari Emanuel,

17    John Schulman asked for Ari to make a proposal.

18        Q    And what happened?

19        A    I believe that he did.

20        Q    Ari made a proposal?

21        A    I believe so.

22        Q    Did he write it up, or was this just orally?

23        A    I don't know.

24        Q    Did you ever see a copy of --

25        A    I don't remember.

216

1       Q    -- a proposal?

2            Who was at that meeting with John Schulman?  It

3   was Ari Emanuel, John Schulman?

4       A    Ari Emanuel, John Schulman and Marc Toberoff.

5       Q    Was Paul Levitz there?

6       A    I don't know.

7       Q    Do you know anything else about what was said at

8   that meeting?

9       A    I was told that Mr. Schulman was very negative

10  about what Mr. Emanuel was proposing.

11      Q    Do you recall hearing how the meeting ended?

12      A    It ended with Schulman saying, "Make a

13  proposal."

14      Q    And to your knowledge there never was such a

15  proposal?

16      A    No, I believe -- I don't know what it was, but I

17  believe that there was a proposal, and I believe that it

18  was rejected.

19      Q    A proposal at the meeting or subsequently?

20      A    No.  Subsequently.

21      Q    Oh, subsequently.

22           Do you know how it was made, whether by phone or

23  by meeting or --

24      A    I don't know.

25      Q    In the next paragraph, I think the fifth

217

1    paragraph, your mother refers to "suffering."

2        Do you understand that she suffered as a result

3    of this proposal?

4        A    Yes.

5        Q    And --

6        MR. TOBEROFF:  That's the fifth paragraph on

7    page 2?

8        MR. ZISSU:  Page 2.

9        Q    Is the suffering you refer to her being upset

10   about it or something beyond that?

11       A    Extremely upset.

12       Q    Anything beyond that?

13       A    No.  Well, let me -- I mean, she was upset with

14   the document, but I think she was also talking about

15   long-term -- the long-term effect that such a document

16   would have on her and on me.

17       Q    Meaning what?

18       A    Meaning that it would not bring us what we had

19   hoped for and what we expected.

20       Q    Meaning financially?

21       A    Meaning in every way.

22       Q    In what ways beyond financial?

23       A    Well, we felt that we had been betrayed.  We

24   made every effort, every good-faith effort over a long

25   period of time to reach an agreement.  We wanted an

218

1    agreement, and then when we were presented with what

2    ended up being apparently the other side's understanding

3    or the changes that they wanted to put into the

4    agreement, it was not something that we could go forward

5    with, and we lost all trust in the company.  They...

6        Q    Did the proposal that all of your ownership

7    rights would end up with DC Comics -- was that something

8    that was upsetting?

9            MR. TOBEROFF:  Asked and answered.

10           You can answer again.

11           THE WITNESS:  Well, yes, it was upsetting.

12   BY MR. ZISSU:

13       Q    Had you wanted to retain certain ownership

14   rights notwithstanding the -- whatever would be paid to

15   you to acquire them?

16       A    That was the subject of long-term negotiations.

17       Q    And that's one of the concessions that you made,

18   isn't it?

19       A    That was a concession that we made conditioned

20   on other things not being changed.

21       Q    Turning your attention to the last paragraph of

22   that page, there is a reference to -- it says, quote, "I

23   had hoped that Laura and my good relationships with Jerry

24   Levin and D C Comics would continue after we reached...

25   agreement," close quote.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1              The "after we reached...agreement," is that

 2     referring to the period following Kevin Marks' October

 3     19, 2001 letter?

 4         A   No.  She was talking about if we reached a final

 5     agreement.  We never reached a final agreement.

 6              MR. TOBEROFF:  I guess I can't say it.  I think

 7     I know what it means, but I'm not going to say it.

 8     BY MR. ZISSU:

 9         Q   At the top of the next page it says, "But this

10     contract seeks to discredit Jerry...and to undermine our

11     rights, a direct contradiction to what was said."

12              Did you consider this contract to be a

13     contradiction because all of the rights would end up with

14     DC?

15         A   No.  I think she's talking about a contradiction

16     to the -- to terms that we had approved.  She's not

17     talking about anything that we --

18         Q   And what --

19         A   -- didn't approve.

20              THE REPORTER:  "Didn't approve"?  Is that what

21     you said?

22              THE WITNESS:  I don't know what I said.

23              (Answer read.)

24              THE WITNESS:  I guess I said "didn't approve."

25     BY MR. ZISSU:
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**225**

1      Q   The sentence also says it was "a direct

2  contradiction to what was said," and to what are you

3  referring when you say "what was said"?

4      A   I didn't say.

5      Q   Are you and your mother referring.

6      A   I'm not sure.  You'd have to find out from her.

7      Q   And I think I've asked you earlier about what

8  your mother meant by discrediting Jerry Siegel, but what

9  would discrediting Jerry Siegel have to do with the basic

10 deal points?

11     A   I think it's something that wasn't in the deal

12 points.  It obviously was something that we did not

13 approve.

14     Q   And is it correct that the same text was sent to

15 Mr. Case at AOL Time Warner?  Is that your recollection?

16     A   I don't remember, and there is no cc on the

17 letter, so I don't know.

18     Q   Do you know whether your mother wrote to

19 Mr. Case at this time?

20     A   I don't know.

21         MR. ZISSU:  Let's mark as Defendants' Exhibit 26

22 a letter dated April 17, 1997 to Arthur Levine from Carol

23 Simkin.

24         (Defendants' Exhibit 26 marked.)

25 BY MR. ZISSU:

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**226**

1      Q   The question is, do you recall seeing this

2   letter at about the time it was dated -- it's dated?

3      A   I -- as of today, I don't remember exactly, but

4   I believe I did.

5      Q   And do you recall what authority you gave to

6   Mr. Levine in relation to dealing -- strike that.

7          Let me direct your attention to the third

8   paragraph, the language which reads, quote, "Our client

9   would like very much to engage in a dialogue with your

10   clients in order to find a mutually agreeable resolution

11   of this matter," close quote.

12          Do you -- did you give Mr. Levine authority to

13   enter into such a dialogue?

14      A   He had many discussions with --

15          MR. TOBEROFF:  Answer the question.

16          THE WITNESS:  Yes.

17   BY MR. ZISSU:

18      Q   And what authority did you give him in that

19   regard?

20      A   To conduct dialogues.

21      Q   To negotiate?

22      A   I don't know if I'd use the word "negotiate."

23      Q   What would you use?

24      A   To talk to --

25      Q   About a deal or settlement?

222

**EXHIBIT B**

1          A    -- the other side, to see what the other side

2      had in mind when they said "to engage in a dialogue."

3               MR. ZISSU:  Let's mark as Defendants' Exhibit 27

4      a letter dated April 22, 1997 from Arthur Levine to Carol

5      Simkin.

6               (Defendants' Exhibit 27 marked.)

7               MR. TOBEROFF:  I'm sorry.  I just want to get

8      these --

9               MR. ZISSU:  27 is the April 22 --

10              MR. TOBEROFF:  April 17 is 26?

11              MR. ZISSU:  26.

12              MR. TOBEROFF:  I am missing --

13              THE WITNESS:  This was 25.

14              MR. ZISSU:  25 was the February --

15              MR. TOBEROFF:  Excuse me.  They're sitting here.

16     BY MR. ZISSU:

17          Q    Did you see Defendants' Exhibit 27 at or about

18     the time it was sent?

19          A    Yes.

20              MR. ZISSU:  Defendants' Exhibit 27 is a letter

21     from Arthur Levine to Carol Simkin dated May 15, 1997.

22     This is 27.  This is 28.

23              (Defendants' Exhibit 28 marked.)

24     BY MR. ZISSU:

25          Q    Did you see this letter at or about the time it

223

1   was sent?

2       A    Yes.

3       Q    And is it fair to say that Mr. Levine was

4   authorized to invite a proposal, as he states in this

5   letter?

6       A    Yes.

7           MR. ZISSU:  Defendants' Exhibit 29 is a letter

8   from Mr. Levine to Carol Simkin dated June 19, 1997.

9           (Defendants' Exhibit 29 marked.)

10  BY MR. ZISSU:

11      Q    Did you see this Defendants' Exhibit 29 at or

12  about the time it was sent?

13      A    Yes.

14      Q    Did you -- is there anything in this letter that

15  you disapprove of?

16          MR. TOBEROFF:  Sitting here today?

17  BY MR. ZISSU:

18      Q    That you disapproved of at the time you saw it.

19      A    I don't remember any disapproval.

20      Q    Is it fair to say that -- as Mr. Levine does,

21  that the primary and most significant consideration to

22  the Siegels -- strike that.

23          Is it fair to say, as Mr. Levine says, that the

24  primary and most significant matter is the consideration

25  to the Siegels representing the future value of the

224

1    Superman characters?

2        A    I don't know.

3        Q    I'm sorry.  I didn't hear you.

4        A    I don't know.

5        Q    At the time was the primary and most significant

6    of the matters to be discussed between the counsel for

7    both sides the consideration that you would receive for

8    the future value of the Superman characters?

9        A    I don't recall.

10        Q    Would you say that this is incorrect?

11        A    But I don't remember, so I can't really tell

12    you.

13        Q    Did you ever tell Mr. Levine that you disagreed

14    with him about that?

15        A    I don't remember a conversation like that.

16            MR. ZISSU:  Defendants' Exhibit 30 is an October

17    3, 1997 letter from Arthur Levine to Carol Simkin.

18            (Defendants' Exhibit 30 marked.)

19    BY MR. ZISSU:

20        Q    Did you see that letter at or about the time it

21    was sent?

22        A    Yes.

23        Q    And do you recall your mother's apartment

24    building undergoing renovations?

25        A    Yes.

225

1        Q    Is this reflective of the way you worked with

2    your mother; namely, that both of you had to be involved

3    and available to consider the matters being discussed

4    between Mr. Levine and Miss Simkin?

5        A    Yes.

6            MR. ZISSU:   Defendants' Exhibit 31 is a letter

7    from Mr. Levine dated December 17th, 1997 to Carol

8    Simkin.

9            (Defendants' Exhibit 31 marked.)

10   BY MR. ZISSU:

11       Q    Did you receive that letter -- I'm sorry.

12           Did you see that letter at or about the time it

13   was sent?

14       A    I remember this issue, but I don't remember, you

15   know, whether this is the only letter that may have

16   discussed it, but I'm sure I saw it.

17       Q    And I think Mr. Levine refers to the discussions

18   between him and Miss Simkin as "our clients'

19   negotiations."  Do you see that in the first paragraph?

20       A    No.   Where is that?

21           Oh, I see.

22       Q    Is it fair to characterize the discussions that

23   were going on as negotiations on each side through their

24   counsel?

25       A    I guess, if that's what he called it.

226

**EXHIBIT B**
**231**

1          Q    I mean, do you disagree with that?

2          A    No.  I don't know.

3               MR. ZISSU:  Exhibit 32 is a letter from Paul

4     Levitz to Joanne Siegel dated October 10, 1997.

5               (Defendants' Exhibit 32 marked.)

6     BY MR. ZISSU:

7          Q    It's also to yourself, Laura Siegel Larson.

8          A    Yes.

9          Q    Did you receive that letter on or shortly after

10    it was sent?

11         A    Yes.

12         Q    And --

13              MR. TOBEROFF:  Wait.  It's a six-page letter,

14    so, Laura, I would like you to read it over before you

15    answer questions.

16    BY MR. ZISSU:

17         Q    Directing your attention to the second page,

18    there is an indented text from Mr. Levitz in which he

19    tries to state various things about a proposal that DC

20    Comics was making.  In particular, I'm directing your

21    attention to the text that reads, quote, "The Siegel

22    interest is a set of rights which gives Jerry's heirs the

23    ability to benefit from the copyrights in the early

24    Superman stories that were not created as 'works for

25    hire' in copyright terms," and then at the beginning of

227

1    the next paragraph, he says, "The Siegel interest does

2    not include any right to use the almost 60 years of

3    stories, artwork, characters, and other elements created

4    after the relatively small (but obviously vital) original

5    copyrights."

6            Did you consider Mr. Levitz's reference to what

7    the Siegel interest did not include as a -- as

8    discrediting Jerome Siegel?

9        A    No.

10       Q    Did you consider this an insult?

11       A    No.

12       Q    Did you agree with his statement?

13           MR. TOBEROFF:  Objection.  I don't believe she

14   can answer that without divulging both attorney work

15   product and attorney-client communications, and to that

16   extent I instruct you not to answer.

17           (Instruction not to answer.)

18   BY MR. ZISSU:

19       Q    When you read it, did you -- when you first read

20   it, did you have a reaction as to whether Mr. Levitz was

21   correct in making the statement that "The Siegel interest

22   does not include any right to use the almost 60 years of

23   stories...and other elements created after the relatively

24   small (but obviously vital) original copyrights"?

25       A    I didn't --

                                                            228

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
233

1          MR. TOBEROFF:  Objection.  Objection.  You've

2    got to give me time to object, particularly when we get

3    into these legal matters.

4          The objection is that as a layman, she can't

5    possibly form an opinion as to work for hire without

6    counsel because it's a legal concept with different

7    definitions under different copyright acts, and there is

8    no way she can answer that without divulging attorney-

9    client communications.

10   BY MR. ZISSU:

11        Q    When you read it, did you have a reaction to

12   this statement I've just quoted?

13        A    No.  I had to discuss it with my attorney.

14        Q    I didn't ask you about whether you had to

15   discuss it.

16          You read it.  Did you sit down and say, "What

17   the hell is this" or "This is wonderful"?  Did you have a

18   reaction --

19          MR. TOBEROFF:  She --

20   BY MR. ZISSU:

21        Q    -- and the answer is you had no reaction?

22        A    No.

23        Q    You just read it with no reaction.

24          Correct?

25        A    Yes.

229

1          Q    And you decided to do what after you read this?

2    To consult a lawyer about it.

3               Correct?

4          A    Discuss it with my attorney.

5          Q    But you knew that this was DC Comics' view.

6               Correct?

7          A    Well, it was written by --

8          Q    Paul Levitz.

9          A    -- Paul Levitz.

10         Q    Now, on the next page the beginning of the

11   second paragraph states, quote, "In return, then, for a

12   re-grant of the Siegel interest in the Superman rights,

13   we propose...," and he goes on to make a proposal.

14              You understood from that that DC Comics was

15   going to seek a re-grant of the Siegel interest in all

16   the Superman rights.

17              Correct?

18         A    That's --

19              MR. TOBEROFF:  Wait a minute.  Where are we

20   here?

21              MR. ZISSU:  I am asking her on page 3, the

22   beginning of the second paragraph, I quoted her a

23   statement made by Paul Levitz.  It says, "In return,

24   then, for a re-grant of the Siegel interest in all the

25   Superman rights," we make such-and-such proposal.

                                                          230

1    Q    And my question is, you understood that DC

2    Comics was seeking a re-grant of the Siegel interest in

3    all the Superman copyrights.

4         Correct?

5         MR. TOBEROFF:  You can answer that narrowly.

6         MR. ZISSU:  That's not appropriate, for you to

7    give instructions like that.

8    Q    Answer the question.

9         MR. TOBEROFF:  Excuse me.  When I say

10   "narrowly," I mean without -- it was implied that I meant

11   without disclosing attorney-client communications.

12        MR. ZISSU:  I didn't ask her anything about an

13   attorney.  I asked her whether she understood what the DC

14   Comics was seeking from the letter.

15        MR. TOBEROFF:  And I said she could answer that,

16   and by "narrowly" I meant without disclosing attorney-

17   client privileged communications.

18        THE WITNESS:  I understood that's what Paul

19   Levitz was asking for.

20   BY MR. ZISSU:

21   Q    On the next page, which is 4, in the second two

22   paragraphs there is reference to percentages, percentage

23   payments, and in the first paragraph there is a reference

24   to paying the Siegels "5% of DC's income from such

25   licenses."

231

```
 1              Did you understand that that meant that you
 2    would be paid on gross revenues?
 3         A    No.
 4         Q    What did you understand?
 5         A    I didn't understand it.
 6         Q    You didn't understand it.
 7         A    No.
 8         Q    You didn't understand it at all?
 9         A    Not on my own.
10         Q    Going towards the bottom of the page,
11    "Insurance," it says in the first bullet point at the
12    bottom of the page, "DC will extend medical insurance in
13    substantially the same comprehensive form that now covers
14    Joanne to both Joanne and Laura for their respective
15    lifetimes."
16              Did -- was DC extending medical insurance to
17    Joanne for her lifetime?
18         A    Yes.
19         Q    And that was under this 1975 agreement?
20         A    No.
21         Q    It was a gift?
22         A    Yes.
23         Q    On the next page in the first paragraph, the
24    third sentence, quote, "As you know, without a re-grant
25    to DC, you would find yourselves possessed of a narrow
```

232

1     set of rights."

2              My question is, did you have any understanding

3     at this time of what rights you would possess if there

4     were no re-grant to DC of the terminated rights?  The

5     question is whether, yes or no, you had any

6     understanding.

7              MR. TOBEROFF:  Including an understanding from

8     her attorneys?

9              MR. ZISSU:  Including any understanding.

10             MR. TOBEROFF:  You can answer yes or no, but you

11    can't disclose or -- that part of your understanding

12    which came through speaking with your counsel.

13             THE WITNESS:  I had no independent understanding

14    of it.

15    BY MR. ZISSU:

16       Q    And did you have any understanding -- I am not

17    asking you what the understanding was -- based on advice

18    of counsel?

19       A    Uh-huh.

20       Q    Yes?

21       A    No.  I understand what you're saying, but what

22    are you asking me?

23       Q    Did you have an understanding based on advice

24    from counsel, yes or no?

25       A    Yes.

233

```
 1        Q    In the bottom paragraph...

 2             Defendants' Exhibit 33 is a letter from Carol

 3   Simkin, I believe, to Arthur Levine dated December 18,

 4   1977 -- 97.

 5             (Defendants' Exhibit 33 marked.)

 6   BY MR. ZISSU:

 7        Q    Do you recall seeing this at or shortly after

 8   the time it was received by Mr. Levine's office?

 9        A    Yes.

10        Q    Directing your attention to the first page, the

11   bottom paragraph, quote, "In other words, the intention

12   of our offer is for DC to receive, in exchange, for [sic]

13   the perpetual enjoyment of all rights relating to work

14   created by or contributed to by Mr. Siegel which was done

15   for or furnished to DC Comics."

16             MR. TOBEROFF:  Minor point.  You inserted a

17   "for" before "DC."

18             MR. ZISSU:  Yeah, I'll read it again.

19        Q    "In other words, the intention of our offer is

20   for DC to receive, in exchange, the perpetual enjoyment

21   of all rights relating to the [sic] work created by or

22   contributed to by Mr. Siegel which was done for or

23   furnished to DC Comics."

24             Did you understand that to be DC's goal in the

25   transaction or the proposed transaction?
```

234

EXHIBIT B
239

```
 1        A    At what time?

 2        Q    At this time.

 3        A    Are you saying without benefit of counsel's

 4   input?

 5        Q    Yeah.  When you read it, did you understand that

 6   that's what they were asking for?

 7        A    I had to discuss it with my attorney first.

 8        Q    So when you read it, you didn't know what DC

 9   Comics was asking for?

10             When you read it, you did not know what they

11   were asking for?

12        A    I did not form an independent opinion.

13        Q    You read it, and you didn't understand what it

14   said.

15             Correct?

16        A    Correct.

17        Q    On the next page under the heading "DC's Proven

18   Excellence," there is a sentence in there that says, and

19   I will read it to you, "DC has done a superb job with

20   Superman."

21             Did you agree with that?

22        A    I don't see it.

23        Q    In that paragraph seven lines down.  You see,

24   "DC has done a superb job with Superman"?

25        A    I see it.
```

235

1      Q    Did you agree with that statement?

2      A    No.

3      Q    Why not?

4      A    I think that they did a good job with some

5   aspects of the character and missed the boat with other

6   aspects.

7      Q    What aspects did they miss the boat on?

8      A    They didn't market it sufficiently during

9   certain periods of time.  They let the character sort of

10  dwindle while other minor characters were being licensed

11  and marketed and sold to movies, and there was very

12  little activity during certain periods of time with the

13  character.

14     Q    Did you -- do you have any -- do you recall any

15  of the minor characters you had in mind?

16     A    Well, I'm talking about things like Spiderman,

17  made into movies and things of that sort.

18     Q    When Superman was not made into a movie?

19     A    Yes.

20     Q    On the next page at the bottom of the page,

21  about seven lines up from the bottom there is a sentence

22  which begins -- it's the last two sentences in the

23  paragraph -- quote, "In addition, the appearance of the

24  Superman character has evolved" --

25     A    I am sorry.  I don't see it.  Seven lines up

236

```
 1   from the bottom?

 2        Q   This is on page 3, starting in --

 3        A   Oh, I'm sorry.  I was on page 2.

 4        Q   "In addition, the appearance of the Superman

 5   character has evolved significantly since 1938, and new

 6   characters and story elements have been created during

 7   the grant period."

 8            Did you understand that to be the case?

 9        A   I had to consult with my attorney to figure out

10   what they were really saying here.

11        Q   Well, did you at the time understand that there

12   were new story elements added to the Superman exploits

13   after Action Comics No. 1?

14        A   I suppose.

15        Q   Were you familiar with any of them over the

16   years?

17        A   I couldn't tell you what they are.  I'm not a

18   comics historian.

19        Q   Did you feel you needed to ask your attorney if

20   that was a fact?

21        A   I asked him for his opinion.

22        Q   What?

23        A   I asked him for his opinion.

24        Q   Who -- was Mr. -- your attorney was Mr. Levine.

25   Was he an expert on the comic book history of Superman?
```

237

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

1          MR. TOBEROFF:  I think you're crossing wires in

2     terms of what you're asking and what she's answering.

3     What are you asking?

4          MR. ZISSU:  I am asking was she aware that the

5     Superman character had evolved significantly since 1938.

6          MR. TOBEROFF:  And she's answering that she

7     couldn't form an opinion on that --

8          MR. ZISSU:  Without speaking to her attorney.

9          MR. TOBEROFF:  Right.  Exactly.

10    BY MR. ZISSU:

11         Q    And I am asking, was your attorney knowledgeable

12    with respect to the evolution of the Superman character

13    from 1938?

14         A    He was able to do research.

15         Q    And had you not seen examples of your father's

16    creations in these comic books over the years?

17         A    I've seen some.

18         Q    And did you know that there were new characters

19    added after Action Comics No. 1?

20         A    Well, Superman is Superman.

21         Q    No.  There are -- comics books have stories in

22    them.

23         A    Are you talking about minor characters?

24         Q    No.  New characters in the plot, in the

25    exploits.  Like Lex Luthor.  He wasn't in Action Comics

238

```
 1   No. 1.
 2        A    Oh, yes.
 3        Q    Characters like that.
 4        A    Yes.
 5        Q    So there were.
 6             And there were new plot lines added over the
 7   years.
 8        A    Yes.
 9        Q    In the next sentence it says, "DC will continue
10   to own these, and the Siegels' termination gives them no
11   rights to use or license these, or to participate in the
12   income that flows from these uses, whenever received."
13             My question is, is that something you could not
14   understand without consulting your lawyer?
15        A    I could not understand it without consulting my
16   lawyer.
17        Q    Were you insulted when you read it?
18        A    No.  I wanted to know what it meant.
19        Q    On the next page there is a statement under the
20   heading little Roman (iv).  It says, "DC's Proposal" --
21   there is a heading, and it says, "DC's Proposal Provides
22   For Sharing In Revenues From Worldwide Use," and the next
23   sentence reads, "Your clients' termination of the grant
24   in the Superman Comic has no effect on DC's rights
25   outside of the United States," and when you read that,
```

239

1    did you have any understanding of it?

2          A    No.

3          Q    Apart from whether this is correct or not, are

4    you saying you couldn't understand the meaning of the

5    sentence, or you couldn't understand whether it was

6    correct?

7          A    I couldn't understand if it was correct.

8          Q    But you did understand what it said?

9          A    I knew what the words meant.

10         Q    Yes.

11         A    I didn't, you know, form an opinion.

12         Q    And then at the bottom of the page there are

13   some statements about trademarks, and it says in the last

14   sentence, "They," meaning the Siegels, "would not be

15   entitled to income attributable to other factors,

16   including the Superman trademark, and the associated

17   goodwill built up by DC over the years," close quote.

18              Is that another statement that you understood

19   what was being said, but you didn't understand whether it

20   was correct?

21              MR. TOBEROFF:  I am sorry.  Before you answer

22   that, could you just point out which -- I lost you.

23              MR. ZISSU:  The last sentence on the page.

24   "They" --

25              THE WITNESS:  I think you're on the wrong page.

240

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

```
 1              MR. ZISSU:  Page 4.

 2              THE WITNESS:  Could you ask the question again,

 3    please?

 4    BY MR. ZISSU:

 5        Q    The question is whether you understood what was

 6    being said but didn't understand whether it was correct

 7    without speaking to your lawyer.

 8        A    I had to speak to my attorney about it.  The

 9    whole wording of this was confusing.

10        Q    Did you ever gain any familiarity with the

11    decision of the federal court in the case your father

12    brought against I think it was National Periodical

13    Publications about ownership of the Superman character?

14        A    What do you mean by "familiarity"?

15        Q    Did you ever read the decision?

16        A    Yes.

17        Q    And did you understand that the court said that

18    Action Comics No. 1 was not a work made for hire, that

19    that's what the court said in the opinion?

20              MR. TOBEROFF:  Which opinion again are you

21    talking about?

22              MR. ZISSU:  This is in the Second Circuit

23    opinion.

24              MR. TOBEROFF:  Lower court?

25              MR. ZISSU:  Second Circuit Court of Appeals.
```

241

1    The Second Circuit Court of Appeals is an appellate

2    court.

3              THE WITNESS:  Yes.  In which year?

4    BY MR. ZISSU:

5         Q    In the mid '70s.

6              MR. TOBEROFF:  And you are asking whether she

7    understood that the Second Circuit said it was not work

8    for hire?

9              MR. ZISSU:  She said she read it, and I am

10   asking her whether she understood or recalls that the

11   Second Circuit ruled that the work Action Comics No. 1

12   was not a work made for hire.

13        Q    I am asking you that.

14             MR. TOBEROFF:  Objection.  Lacks foundation, and

15   misstates the case.

16   BY MR. ZISSU:

17        Q    Can you answer the question?

18        A    I'm confused by the question.  Could you re- --

19   say it maybe another way?

20        Q    Well, you read an opinion --

21        A    Yes.

22        Q    -- and it ruled that your father's creation,

23   Action Comics No. 1, had not been and was not a work made

24   for hire, owned on that basis by Detective Comics.

25             MR. TOBEROFF:  Objection --

242

```
1   BY MR. ZISSU:

2       Q   Do you remember that?  Do you recall reading

3   that or not?

4           MR. TOBEROFF:  Let me make my objection.

5           MR. ZISSU:  Yeah.

6           MR. TOBEROFF:  She already said she recalls --

7   she already said she read the decision.

8           If you formed an opinion by talking about that

9   decision with counsel, you can't testify as to your

10  understanding of that case.

11          MR. ZISSU:  You keep introducing to my questions

12  statements about what she might have learned from

13  counsel, and I didn't ask her that.  She read the opinion

14  herself.

15      Q   You read it yourself, didn't you?

16          MR. TOBEROFF:  You are asking a layman about the

17  impact of a legal decision.  It's a joke, and it's never

18  going to stand up, and I challenge you to -- I challenge

19  you to support these questions.  They are never going to

20  stand up.  They wouldn't stand up in court, and they

21  don't stand up in a deposition.

22          MR. ZISSU:  This is a deposition, and I'm asking

23  her -- she said she read something, and I am asking her

24  what she understood when she read it.

25          MR. TOBEROFF:  I am instructing you that if your
```

243

1    understanding is based on advice from counsel, you cannot

2    discuss it.

3    BY MR. ZISSU:

4        Q    Go ahead.  You wanted to say something?

5        A    I read the document, but I don't remember what

6    you're discussing.

7        Q    When did you read it?

8        A    Many years ago.

9        Q    10 years ago or more recently?

10       A    At least 10 years ago.

11            MR. ZISSU:  Defendants' Exhibit 34 is a letter

12   from Mr. Levine to the copyright office, the Register of

13   Copyrights.

14            (Defendants' Exhibit 34 marked.)

15   BY MR. ZISSU:

16       Q    So you don't have to read the whole thing, it

17   refers to a check having been paid in the amount of

18   $20,000 to pay for the registration of the notices of

19   termination, although there was a question Mr. Levine

20   asked about whether the payment was too high.

21            My question is only this:  Did the $20,000 get

22   paid to the copyright office, or did they refund part of

23   it?

24       A    I think there was an adjustment made.

25       Q    Do you recall how much you spent, roughly?

244

1      A    You'd have to ask my mother.  She wrote the

2  check.

3      Q    Okay.

4           Defendants' Exhibit 35.

5           (Defendants' Exhibit 35 marked.)

6  BY MR. ZISSU:

7      Q    Did you see this letter at or shortly after it

8  was sent to Mr. Levine?  It's from Carol Simkin to Arthur

9  Levine dated May 29, 1998.

10     A    This is a bad xerox.  It's hard for me to read

11  it.

12     Q    Well --

13     A    I'm trying.

14     Q    Yeah.  Let me try to save some time, subject to

15  your counsel's comment.

16          The letter is basically saying on May 29, 1998,

17  that in a year and a half the Siegels, you and your

18  mother, had not responded to the proposal of DC Comics

19  made in earlier letters, and so my question is --

20     A    Could you tell me where it says that?

21     Q    Yeah.  It's in the beginning of the second

22  paragraph.

23     A    My --

24     Q    I don't have a question.

25          My question is, is there a reason it took

245

1    time -- this amount of time to respond to the proposal?

2              MR. TOBEROFF:  I just want to -- are you

3    referring to this letter?  Because it's a little bit hard

4    to read, so I want to make sure my client is able to read

5    it.  I think I can --

6              MR. ZISSU:  That's my only question.

7              MR. TOBEROFF:  Right, but are you referring to

8    this letter when you ask the question?

9              MR. ZISSU:  I am referring to the statement --

10             MR. TOBEROFF:  Why don't we just read that

11   statement.

12             MR. ZISSU:  "Art, as you know, it took nearly

13   half a year and the exchange of considerable

14   correspondence for our clients to finally agree" -- wait

15   a minute.  Yeah, okay.  I know...

16        Q    This is to -- okay.  Let me read it again.

17   "Art, as you know, it took nearly a half a year and the

18   exchange of considerable correspondence for our clients

19   to finally agree on the terms of the December 17, 1997

20   Agreement," and that agreement, I think I can represent

21   to you, had to do with the confidentiality of

22   negotiations.

23             So my first question is, is there a reason that

24   you recall that it took so long to respond?

25        A    I don't remember.

246

```
 1        Q   And then it continues on in that paragraph to
 2   read, "On the basis of that agreement, our client
 3   delivered to you an extensive proposal, for your clients'
 4   consideration.  The proposal was prepared after a great
 5   deal of work, at your clients' specific request.  You
 6   have now had [sic] it almost" --
 7             MR. TOBEROFF:  It says, "you have had it now."
 8             MR. ZISSU:  "You have had it now" --
 9             MR. TOBEROFF:  "For almost" --
10             MR. ZISSU:  -- "for almost 6 months."
11             MR. TOBEROFF:  I can't read that as "6."  I
12   don't know what it is.  Could be "8" --
13             MR. ZISSU:  It's "almost 6 months" because it
14   was made in December of the prior year.
15        Q   My question is, do you recall why it took the
16   length of time it did to respond to that proposal?
17        A   No.
18             MR. ZISSU:  This is Defendants' Exhibit 36, a
19   letter from Arthur Levine to Carol Simkin dated June 19,
20   1998.
21             (Defendants' Exhibit 36 marked.)
22   BY MR. ZISSU:
23        Q   Do you recall seeing this letter at or shortly
24   after the time it was sent?
25        A   Yes.
```

247

**EXHIBIT B**
**252**

1      Q    Do you recall any of this discussion -- strike

2  that.

3           Do you recall having any reaction to this

4  discussion today?  Do you have any recollection of having

5  a reaction, regardless of the basis, relating to the

6  content of this letter?

7      A    I wanted to know what the answers would be to

8  the questions that were asked.

9      Q    So is it fair to say that you were interested in

10 getting this financial information before you would react

11 to DC Comics' proposal?

12     A    We wanted all of the information that we asked

13 for.

14          MR. ZISSU:  Next is Defendants' Exhibit 37.

15          (Defendants' Exhibit 37 marked.)

16          (Discussion held off the record.)

17 BY MR. ZISSU:

18     Q    Did you or your mother ever try to obtain any

19 trademark registrations for Superman or any image of

20 Superman?

21     A    No.

22     Q    Did you or your mother ever try to market or

23 license the Superman property --

24     A    No.

25     Q    -- to anyone?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1            Let's mark as Defendants' Exhibit 38 a letter

2    from Carol Simkin to Arthur Levine dated March 3, 1999.

3            (Defendants' Exhibit 38 marked.)

4    BY MR. ZISSU:

5        Q   I am interested in the third paragraph.  First,

6    did you --

7            MR. TOBEROFF:  Just a second.  I would like her

8    to have the opportunity to look it over.

9            THE WITNESS:  Page 1?

10   BY MR. ZISSU:

11       Q   Yeah.

12           MR. TOBEROFF:  But look it over, so when you

13   look at the third paragraph, it's in context.

14   BY MR. ZISSU:

15       Q   First, did you see this letter on or shortly

16   after it was sent?

17           MR. TOBEROFF:  Just a second.  I'd like her to

18   have the opportunity to read the letter.

19           MR. ZISSU:  I am not asking about that, so

20   you're taking our time here.  It's not fair.  It's one

21   statement I want to ask her about the letter.

22           THE WITNESS:  I have to look it over to know if

23   I got it.

24           MR. ZISSU:  It's not a question of context.

25           THE WITNESS:  I don't recall this letter.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    BY MR. ZISSU:

2        Q    You don't recall seeing it?

3        A    I don't recall it.

4        Q    Was it -- it was Mr. Levine's practice to send

5    you copies of these kinds of things.

6            Correct?

7        A    Yes.

8        Q    In the third paragraph it says, "You recently

9    have indicated that you are only handling the 'copyright'

10   end, that you have no authority to negotiate, and that

11   the Siegels would be represented in the negotiations by

12   someone else."

13           Did you or your mother ever tell Mr. Levine he

14   had no authority to negotiate for you?

15           MR. TOBEROFF:  Objection.  You're asking what

16   she told her attorney.

17           MR. ZISSU:  An instruction as to his authority,

18   which you've put in issue in the case, and I can ask her

19   what authority her attorney was given.

20           MR. TOBEROFF:  We have not put it in issue.

21   You've put it in issue and then claimed we put it in

22   issue, and that's the subject of a motion that's

23   pending.  So I'm -- you can -- I think you can rephrase

24   the question, but you cannot ask her what she

25   communicated to her attorney.

250

**EXHIBIT B**
**255**

1              I am instructing you not to answer a question as

2      to what you communicated to your attorney.

3              (Instruction not to answer.)

4              MR. ZISSU:  Not everything communicated to her

5      attorney is privileged.

6         Q   But did Arthur Levine have authority to

7      negotiate for you?

8         A   No.

9              MR. TOBEROFF:  Vague and...

10     BY MR. ZISSU:

11        Q   And what were the limits of his authority?

12        A   He was in charge of the copyright terminations.

13        Q   But is it your testimony he had no authority to

14     go back and forth discussing the terms of proposals and

15     counterproposals with DC Comics' lawyers?

16        A   Not at this time.

17        Q   Did he have it earlier?

18        A   I think he started receiving materials, and

19     there came a point when he felt that it was something

20     that he was not going to be handling for us.

21        Q   When did it reach that point?

22        A   I'm sorry, I couldn't hear you.

23        Q   When did it reach that point?

24        A   I'm guessing sometime in ~~1991~~ 1999.  Prior to this

25     letter.

251

**EXHIBIT B**
**256**

```
 1              MR. ZISSU:  Let's mark as Defendants' Exhibit 39
 2   a letter from Mr. Marks to John Schulman.
 3              (Defendants' Exhibit 39 marked.)
 4   BY MR. ZISSU:
 5       Q    You received a copy of this letter from
 6   Mr. Ramer -- I'm sorry.  It's not from Mr. Marks.  It's
 7   from Mr. Ramer -- at or about the time it was sent to
 8   Mr. Schulman?
 9       A    Yes.
10       Q    And a cc on the second page was also sent to
11   Dennis Larson.  Why was he getting copies?
12       A    Because he was serving as an attorney.
13       Q    As an attorney.
14            Was Mr. Marks authorized to send this letter --
15   I'm sorry -- Mr. Ramer?
16       A    I don't remember.
17       Q    Did you see a draft of this letter before it was
18   sent?
19       A    I don't remember.
20       Q    Did you agree at the time with the statement
21   that any arrangement should be based on the fair market
22   value of the rights of the Superman property?
23       A    Yes.
24       Q    Do you agree, based on your familiarity with
25   your father's works and the Superman comic books --
```

252

**EXHIBIT B**
**257**

1        A    Excuse me.  Could you speak up, please?

2        Q    Do you agree, based on your familiarity with the

3   Superman property and including the comic books, that his

4   ability to fly was not an action found in Action Comics

5   No. 1?

6        A    It looks like he's flying to me.

7        Q    He is jumping, and you think that's flying?

8   That's the way you see it?

9        A    I see it that way.

10        Q    Was his super vision enabling him to see through

11   walls depicted in Action Comics No. 1?

12        MR. TOBEROFF:  Objection.  Lacks foundation.

13   Vague and ambiguous.

14   BY MR. ZISSU:

15        Q    Would you answer the question?

16        A    I haven't seen it for -- panel by panel for a

17   long time.

18        Q    Do you want to look at Exhibit 21?

19        A    What was the number again?

20        Q    21.

21        A    And the question?

22        Q    The question is, is Superman's super vision,

23   enabling him to see through walls, depicted in this comic

24   book?

25        MR. TOBEROFF:  I think you need to give her time

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1  to read through this whole comic book.

2          THE WITNESS:  Well, he has a number of

3  extraordinary superpowers, and it's hard to tell from one

4  of these drawings, but it appears that he is quite far

5  away from a car, and the doors are closed of the car, and

6  yet he seems to know who's inside it, so -- this is on

7  page 117, bottom right corner -- so he's observing

8  something, and he would need to be able to see at that

9  distance through a car in order to see who was inside the

10  car.

11  BY MR. ZISSU:

12      Q   Isn't that something he could observe because he

13  knew the car?

14      A   There is nothing in the story that would

15  indicate he would know who that car belonged to.

16      Q   You don't think it's implied.

17          Correct?

18      A   No, I don't.

19      Q   You think it's implied that he could see through

20  the car.

21          Correct?

22      A   Yes.

23      Q   Did you see anything in Action No. 1 showing his

24  telescopic vision?

25      A   No.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    Q    Is there anything in Action Comics No. 1 --

2    A    Excuse me.  If by "telescopic vision" you mean

3  seeing all the way to outer space like a telescope, I

4  don't know exactly what you mean by that, but that's how

5  I interpreted what you said.

6    Q    Do you see anything which enables him to hear

7  conversations at great distances from the speakers?

8         MR. TOBEROFF:  Objection.  Vague and ambiguous

9  as to -- vague and ambiguous.

10        THE WITNESS:  Yeah, there were several -- or

11  there was at least one -- where was it -- where he's...

12  Let me find it.

13        Page 121.  He's on the side of a building.  It

14  says, "An eavesdropper listens in on an interesting

15  conversation."  So he must be listening through the walls

16  in order to hear a conversation that's going on inside

17  the building.

18  BY MR. ZISSU:

19    Q    That's it.

20        Correct?

21    A    There are several other times when he's outside

22  of rooms that he seems to be able to pick up through

23  doors and...

24    Q    Is there anything in Action Comics No. 1

25  mentioning the planet Krypton?

255

1        A    The first panel on page 1 depicts the planet

2    Krypton.

3        Q    Does the word "Krypton" appear in this comic

4    book?

5        A    It's referred to as a "distant planet" in this

6    one.

7        Q    But the word "Krypton" does not appear.

8             Correct?

9        A    I don't see it.

10       Q    Does this comic book refer to Superman's

11   adoptive parents?

12       A    No.

13       Q    Does it have anything in this comic book about

14   his relationship with Lois Lane?

15       A    Yes.

16       Q    Where?

17            MR. TOBEROFF:  Before you answer, I would like

18   to object to these questions.  I won't repeat the

19   objection, but I'd like to object that the document

20   speaks for itself.  You're asking her opinion about the

21   document.

22            THE WITNESS:  Lois Lane appears on page 116 and

23   117 and 118 and 120.

24   BY MR. ZISSU:

25       Q    Does the name "Lois Lane" appear or just the

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B

```
 1   name "Lois"?

 2        A    I'd have to read it again.

 3        Q    Is there any reference to the -- any fragments

 4   of the exploded planet Krypton in this comic book?

 5        A    I don't believe so.

 6        Q    Is there a reference to the Fortress of

 7   Solitude?

 8        A    I don't believe so.

 9        Q    To the City of Kandor?

10        A    No.

11        Q    To characters such as Jimmy Olsen?  Is Jimmy

12   Olsen in here?

13        A    No.

14        Q    To Perry White?

15        A    You're referring to the editor of the newspaper

16   that Clark Kent works for?

17        Q    By name.  Is there a Perry White referred to by

18   name?

19             MR. TOBEROFF:  The document speaks for itself

20   whether or not Perry White is in the document.

21   BY MR. ZISSU:

22        Q    Is it?

23             MR. TOBEROFF:  Are you asking if the name

24   appears --

25             MR. ZISSU:  I am asking the witness a question.
```

257

```
 1   You said that before, and you are just repeating it.  Let
 2   her answer the question.
 3           MR. TOBEROFF:  It's unclear as to whether you
 4   are asking does the name appear.
 5   BY MR. ZISSU:
 6       Q   Does the name appear?
 7       A   I don't see the name.
 8       Q   Is there a character identified as Perry White?
 9       A   There is a character that is later identified as
10   Perry White.
11       Q   Later.
12           Is there a character identified as Lex Luthor?
13       A   No.
14       Q   Or is there a character identified as the
15   Prankster?
16       A   No.
17       Q   As the Toy Man?
18       A   No.
19       Q   As Mr. --
20       A   Mxyztplk.
21       Q   Mxyztplk.  Whatever.
22       A   No.
23       Q   As Brainiac?
24       A   No.
25       Q   As Krypto?
```

258

```
1         A    No.

2         Q    Superdog?

3         A    No.

4         Q    Supergirl?

5         A    No.

6         Q    Lana Lang?

7         A    No.

8         Q    Metallo?

9         A    No.

10        Q    Is the phrase, "faster than a speeding bullet,

11   more powerful than a locomotive, able to leap tall

12   buildings in a single bound," is that phrase used in this

13   comic book?

14        A    The phrase in here is, "run faster than an

15   express train."

16        Q    But not the ones I just read to you.

17             Correct?

18        A    It doesn't say that.

19        Q    Does it say, "Look.  Up in the sky.  It's a

20   bird.  It's a plane.  It's Superman"?

21        A    No.

22             MR. ZISSU:  Now let's mark a letter from Kevin

23   Marks dated March 7, 2000, to Carol Simkin, Defendants'

24   Exhibit 40.

25             (Defendants' Exhibit 40 marked.)
```

259

BY MR. ZISSU:

    Q   I don't want you to read the whole letter.  I just want to ask you a question about a footnote on page 8.  Mr. Marks states in footnote 7 --

    A   I am sorry.  Which page?

    Q   Page 8, line 7.  He states, "We acknowledge, however, that in Siegel v. National Periodical Publications, Inc., 508 F.2d 909 (2d Cir. 1974), the court stated, that at some point an employment relationship existed as between Mr. Siegel and D.C. Comic's predecessor, although 'Superman and his miraculous powers were completely developed long before the employment relationship was instituted," underline "were completely developed long before the employment relationship was instituted," and then it says, "Id. at 914 (emphasis added)," close quote.

    Do you see that?

    A   Yes.

    Q   Did you receive a copy of this letter?  I believe you are cc'd.

    A   Then I probably did.

    Q   Yeah, on the last page.

    This letter was sent on your behalf, was it not?

    A   He was my representative.

    Q   Does reading this footnote give you any more

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    understanding of what was stated in this opinion than you

2    have previously testified today?

3        A    No.

4        Q    Did --

5            MR. TOBEROFF:    How we doing on time?

6            MR. ZISSU:    How much do we have left on the

7    clock?

8            (Discussion held off the record.)

9            MR. ZISSU:    Defendants' Exhibit 41.

10           (Defendants' Exhibit 41 marked.)

11   BY MR. ZISSU:

12       Q    This is a letter dated from Laura Siegel Larson

13   and Joanne Siegel to Kevin Marks dated September 21,

14   2002.

15           Are you familiar with this letter?

16       A    Yes.

17       Q    In the -- I think it's the third sentence, it

18   says, "Therefore due to irreconcilable differences, after

19   four years of painful and unsatisfying negotiations, this

20   letter serves as formal notification that we are totally

21   stopping and ending all negotiations with DC Comics,

22   Inc., it's parent company AOL Time Warner and all of its

23   representatives and associates, effective immediately,"

24   and my question is, was there some prior informal

25   notification given to anyone to the same effect?

261

EXHIBIT B
266

```
 1        A    I don't believe so.

 2        Q    Did anyone help you write this letter?

 3        A    My mom and I wrote it together.

 4        Q    Had you met Mr. Toberoff at this point?

 5        A    No.

 6        Q    And you hadn't consulted him about this letter?

 7        A    No.

 8        Q    So what was the answer about -- there was no

 9   prior informal notification?  Was that your testimony?

10        A    I don't believe so.

11        Q    Were you repudiating the October 19, 2001

12   letter?

13             MR. TOBEROFF:  Objection.  Calls for a legal

14   conclusion.

15             THE WITNESS:  I don't know what you mean by

16   that.

17   BY MR. ZISSU:

18        Q    Well, how would you terminate what you were

19   doing in relation to the October 19, 2001 letter?

20        A    Well, the --

21             MR. TOBEROFF:  Objection.  Vague and ambiguous.

22             THE WITNESS:  The October 19th letter was no

23   longer at issue.  What was at issue was this February

24   2002 document.

25   BY MR. ZISSU:
```

262

1        Q    Well, the October 19, 2001 letter at this point

2    was still out there, and nobody had ever told on your

3    behalf DC Comics that it was not.

4             MR. TOBEROFF:  Objection.  Misstates the

5    evidence.  Comment on the evidence.

6    BY MR. ZISSU:

7        Q    Is that correct?

8        A    No, that's not correct.

9        Q    What communication had there been to any

10   representative of DC Comics that the October 19, 2001

11   letter was dead?

12       A    Well, it was our understanding that it was being

13   ignored and that a February 2002 document was a

14   counteroffer in essence to the October 19th letter.

15       Q    It was being ignored by DC Comics?

16       A    Yes.

17       Q    In what respect was it being ignored?

18       A    Well, the two documents speak for themselves.

19   They're so different.

20       Q    Was there some respect in which DC Comics was

21   not honoring the October 19, 2001 letter?

22       A    I --

23            MR. TOBEROFF:  Objection.  Asked and answered.

24   We went over that in great detail.

25            MR. ZISSU:  I haven't asked this question.

263

1         THE WITNESS:  By the drafting of the February

2    2002 document, it became clear that DC Comics was not

3    paying attention to the October 19th letter that

4    contained our understanding of what the deal was, you

5    know, supposed to be.

6    BY MR. ZISSU:

7         Q    Was there anything else besides the sending of

8    the draft on February 1, 2002 --

9         A    I'm sorry, I can't hear you.

10        Q    Was there anything else besides the sending of

11   the draft on February 1, 2002 that you considered to be

12   ignoring the October 19, 2001 letter from Mr. Marks?

13        MR. TOBEROFF:  Objection.  Vague and ambiguous,

14   calls for a narrative, and indefinite as to time.

15        THE WITNESS:  I don't believe so.  I'm not sure

16   I understand your question.

17   BY MR. ZISSU:

18        Q    Well, you cited the sending of that draft as in

19   effect an action by DC Comics ignoring the October 19,

20   2001 letter, and I am asking you, was there any other

21   action that you're aware of that DC Comics took that you

22   considered ignoring the October 19, 2001 letter?

23        MR. TOBEROFF:  Aware of at the time this letter

24   was sent or aware of today?

25   BY MR. ZISSU:

264

1       Q    Aware of on September 21, 2002, when you wrote

2    this letter which is Defendants' Exhibit 41.

3       A    No.

4       Q    Did you ever have any further discussions with

5    Mr. Marks about the February 1, 2002 draft after

6    September 21, 2002?

7            MR. TOBEROFF:  Attorney-client privileged, what

8    she discussed with her clients after -- what she

9    discussed with her attorney after September 21, 2002.

10           THE WITNESS:  No.

11   BY MR. ZISSU:

12      Q    Did Mr. Marks return to you all your files?

13      A    He did not return them to me.  He sent them to

14   my attorney -- my new attorney.

15      Q    To your satisfaction?

16           You're going -- you're giving -- you're going,

17   well...  Yes or no?  I mean, what's your answer?

18      A    I'm waiting --

19      Q    You're waiting for your counsel to tell you --

20      A    No, no, no, not at all.

21           MR. TOBEROFF:  No.  She is waiting to give me

22   time to object.  Excuse me.

23           MR. ZISSU:  Okay, so you have objected.

24           Please read the question.

25           (Record read as follows:

265

EXHIBIT B
270

```
 1              "Q   Did Mr. Marks return to you
 2         all your files?
 3              "A   He did not return them to me.
 4         He sent them to my attorney -- my new
 5         attorney.
 6              "Q   To your satisfaction?")
 7         THE WITNESS:  Then I'd have to ask you to ask me
 8    the question again because I don't know what --
 9    BY MR. ZISSU:
10         Q    The question is did he return -- did he send
11    your files to Mr. Toberoff to your satisfaction?
12              MR. TOBEROFF:  Objection.  That question whether
13    or not she's satisfied can only reveal attorney-client
14    privileged communications.
15              You're laughing, but if I received --
16              MR. ZISSU:  I am laughing because I didn't ask
17    her about any communications to you or anybody else.
18              MR. TOBEROFF:  What are you talking about?  If
19    I'm the only one who received the files, then she doesn't
20    know anything about the files unless she communicates
21    with me.
22              MR. ZISSU:  Has she got any issue with Gang Tyre
23    about the transmittal of those files.  That's my
24    question.
25              MR. TOBEROFF:  You can answer whether you have
```

266

1   any issue, but you can't disclose those issues if it

2   communicates discussions with me.

3           THE WITNESS:  All I can say is I know the firm

4   sent them to Mr. Toberoff.

5   BY MR. ZISSU:

6       Q   Do you have any complaint with them that you've

7   made to them about their doing that?

8           Have you complained to Gang Tyre that they have

9   not sent on all the files?

10          MR. TOBEROFF:  Excuse me.  That's attorney --

11  her comm- --

12          MR. ZISSU:  She --

13          MR. TOBEROFF:  Excuse me.  Her communication --

14  this is what she can attest to, and whether you agree

15  with it or not --

16          MR. ZISSU:  All right.  I understand you.  You

17  don't have to explain it.

18          I want to say something to you.  The attorney-

19  client privilege is a communication -- what's privileged

20  is a communication that's from a client to an attorney

21  for the purpose of obtaining legal advice, and it

22  includes the disclosure of confidences therein.

23          MR. TOBEROFF:  Exactly.

24          MR. ZISSU:  It's not an instruction to return --

25  to send files to somebody, so --

267

1           MR. TOBEROFF:  I agree with your definition but

2    not with your application of the definition, because if

3    I'm the only one who received the files, then any

4    complaints that she may have regarding those files

5    obviously entailed communications with me.

6           MR. ZISSU:  Not necessarily.

7       Q    Did you ever yourself complain to Kevin Marks or

8    anybody at Gang Tyre that they had not sent the files on?

9           MR. TOBEROFF:  And that's privileged as well

10   because that's a communication between her and her prior

11   attorneys with respect to the subject matter of their

12   prior representation.

13          MR. ZISSU:  That's not within the definition.

14   Okay.

15          MR. TOBEROFF:  I believe it is.

16          MR. ZISSU:  You're instructing her not to

17   answer.

18          Correct?

19          MR. TOBEROFF:  That question, you asked her if

20   she had an issue.  She can't tell you what it was, but

21   she can answer that question.

22   BY MR. ZISSU:

23      Q    Did you have an issue with -- do you have an

24   issue with Gang Tyre about the return of your files to

25   Mr. Toberoff?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1          MR. TOBEROFF:  You can answer whether or not you

2    have an issue but not the substance of any issues.

3          THE WITNESS:  Yes.

4    BY MR. ZISSU:

5      Q    And what's the issue?

6          MR. TOBEROFF:  You can't testify as to that.

7          (Instruction not to answer.)

8    BY MR. ZISSU:

9      Q    You can't testify because it's been communicated

10   to Gang Tyre, and so you can't tell anybody else about

11   the issue?

12         MR. TOBEROFF:  No.  Because it's the product of

13   her conversations with me.

14         THE WITNESS:  I don't understand this.

15         MR. TOBEROFF:  Miss Siegel has a question as to

16   why Exhibit 41 says "Redacted" on it.  Why don't you

17   explain it.

18         MR. ZISSU:  You'll have to find out that from

19   another deposition.  I don't have an answer.

20         MR. TOBEROFF:  I believe it says "Redacted"

21   because it's a document produced by Warner Bros. in which

22   they have made -- may have made notes on it, and they

23   took the notes off prior to producing it, but I don't

24   know for sure.

25         MR. ZISSU:  It's possible.

269

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B
274

1      Q   Why didn't you ever communicate any request to

2   Warner Bros. that they revise the February 2, 2002

3   agreement or draft agreement?

4          MR. TOBEROFF:  Objection.  Calls for disclosure

5   of attorney-client privileged information and attorney

6   work product.

7          THE WITNESS:  It's in the hands of my attorney.

8   BY MR. ZISSU:

9      Q   Did you see the redraft which is referred to in

10  the second sentence?

11         The second sentence reads, "We similarly reject

12  your redraft of the February 4" -- I think they mean

13  "1" -- "2002 document which you sent to us on July 15,

14  2002."

15         Did you see that redraft?

16     A   Yes.

17     Q   Did you examine it?

18         MR. TOBEROFF:  Excuse me.  I'm sorry.  I was

19  looking at the clock while you were asking that question,

20  so I didn't --

21         MR. ZISSU:  It has nothing to do with --

22         MR. TOBEROFF:  Wait a second.  Other than the

23  fact that a redraft existed, you cannot testify as to

24  anything regarding that redraft because that redraft

25  constitutes attorney work product, and it's also -- any

1    conversations, communications or things you learned about

2    that redraft through your attorneys, you also can't

3    testify.  We've asserted the privilege.  It's the subject

4    of a pending motion.

5            MR. ZISSU:  I have to object to your statements

6    again.  The question is, the letter says --

7            MR. TOBEROFF:  It's my instruction and my

8    objection.

9    BY MR. ZISSU:

10       Q   The letter says it was sent to you, so my

11   question is, did you read it when it was sent to you?  It

12   has nothing to do with any communication --

13           MR. TOBEROFF:  You can answer whether or not you

14   read it.

15           THE WITNESS:  Yes.

16   BY MR. ZISSU:

17       Q   Why did you reject it?

18           MR. TOBEROFF:  Objection.  Attorney-client

19   privilege.  Attorney work product.  Instruct you not to

20   answer.

21           (Instruction not to answer.)

22           MR. ZISSU:  Marc, it's not attorney -- first of

23   all, it's not attorney-client as to why she rejected it.

24   An attorney was recommending something, and she said no,

25   and he didn't recommend to her to say no to it, so I want

271

EXHIBIT B
276

1    to know why she said no to it.  It has nothing to do with

2    her communication.

3              MR. TOBEROFF:  You have no idea whether an

4    attorney was recommending that.  You are just making

5    things up in the air.

6    BY MR. ZISSU:

7         Q   Did you have any other attorney at the time

8    advising you about rejecting the February 4, 2002

9    redraft?

10        A   At what time?

11        Q   At this time, September 21, 2002.

12        A   No.

13        Q   So I'm asking you why you rejected it.

14        A   Although --

15             MR. TOBEROFF:  You can --

16   BY MR. ZISSU:

17        Q   Kevin Marks didn't tell you to reject his

18   redraft.  I'm asking you why you rejected it.

19             MR. TOBEROFF:  Excuse me.  You cannot testify as

20   to why you -- or you -- why you did or did not reject

21   this redraft.  I instruct you not to answer.

22             (Instruction not to answer.)

23   BY MR. ZISSU:

24        Q   You've already gone way beyond that.  You've

25   testified today about why you terminated the services of

272

**EXHIBIT B**
**277**

1    Gang Tyre.  You've testified that you did terminate them.

2    You've testified that you rejected something.  You've

3    testified that no lawyer was involved in this letter or

4    in your rejection of the redraft.

5           I want to know why you rejected it.  What was

6    it?

7           MR. TOBEROFF:  I instruct you not to answer and

8    object because you're misstating her testimony.  She did

9    not testify as to why she terminated Gang Tyre.

10          (Instruction not to answer.)

11          MR. ZISSU:  She did.

12          MR. TOBEROFF:  No, she didn't.

13          MR. ZISSU:  She testified that she wanted a new

14   lawyer because she distrusted her other lawyers.

15          THE WITNESS:  No, I'm sorry, I did not say that.

16          MR. ZISSU:  She wanted to have somebody she

17   could trust representing her.

18          MR. TOBEROFF:  She didn't say that.

19          MR. ZISSU:  Let's mark as Defendants' Exhibit 42

20   some notes, handwritten notes.  It says at the top -- I

21   can't read it.  Something "K Marks 5/16."  This is 42.

22          (Defendants' Exhibit 42 marked.)

23   BY MR. ZISSU:

24      Q   Have you ever seen this document before or a

25   copy of it?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT B

1     A   No.

2     Q   I'll attempt to read it.

3        Can you read this?  It talks -- I can't read

4 that.  There are a bunch of quotes.  It says, quote,

5 "'Not expect K like that,'" close quote.

6        Then it says, "'K [sic] very aggressive first

7 draft,'" close quote.

8        The next one says, quote, "'can deal with it,'"

9 close quote.

10       Next one says, quote, "'contains a lot of" -- I

11 don't know.  Can you read that?

12       MR. TOBEROFF:  What is this?

13       MR. ZISSU:  These, as I understand it, are notes

14 of John Schulman based on a telephone conversation he had

15 with Kevin Marks on May 16.

16       MR. TOBEROFF:  Is this John Schulman's --

17       MR. ZISSU:  I believe it is.

18       MR. TOBEROFF:  -- notes?

19       MR. ZISSU:  Yes.  Yes, it is.  That's my

20 understanding.

21       MR. TOBEROFF:  So you're representing for

22 purposes of this discussion these are John Schulman's

23 handwriting, his notes?

24       MR. ZISSU:  Yes.

25     Q   It also says -- I couldn't read -- it says,

274

1    "'contains a lot of...'" something.

2           Then another quote says, "'could have been 20

3    not 60 pages,'" unquote.  I think he's purporting to

4    quote Kevin Marks.

5           Then it says, "'contains stuff not agreed to.'"

6           And the next line says, "'not contrary to what

7    agreed to.'"

8           Did you ever hear from Mr. Marks about his

9    conversation with John Schulman on May 16, 2002?

10          MR. TOBEROFF:  Objection.  Are you asking the

11   substance of Mr. Marks' communication to her about a

12   conversation with John Schulman?  Because that, she can't

13   answer.  That's privileged.

14          MR. ZISSU:  I am asking her, did Mr. Marks tell

15   you that he had had a conversation with Mr. Schulman on

16   or about May 16, 2002, after your mother had written

17   letters to Mr. Parsons and Mr. Case?

18          MR. TOBEROFF:  I don't think you can testify as

19   to what Mr. Marks told you.  I wouldn't testify as to

20   what he told you.

21          (Instruction not to answer.)

22   BY MR. ZISSU:

23      Q   Did you ever hear that there had been such a

24   conversation, without regard to what in particular he

25   said about it?

                                                          275

**EXHIBIT B**
**280**

```
 1          MR. TOBEROFF:  You can answer that if it doesn't
 2  reveal a communication with Mr. Marks.
 3          THE WITNESS:  I never heard of it.
 4  BY MR. ZISSU:
 5      Q   Did you have any other knowledge that such a
 6  conversation took place?
 7      A   No.
 8          MR. TOBEROFF:  Vague and ambiguous.
 9          Give me time to object, please.
10          MR. ZISSU:  What do we got left?
11          MR. TOBEROFF:  I have 8:45 was the cutoff.
12          MR. ZISSU:  Okay.  Thank you for your time.
13          MR. TOBEROFF:  You're welcome.
14          MR. ZISSU:  Sorry for the length of it, the
15  annoyance of it and all that goes with that.
16          MR. TOBEROFF:  Do you want to stipulate to the
17  transcript?
18          MR. ZISSU:  We are going to order transcripts
19  for us.  You have to order for yourself.
20          MR. TOBEROFF:  I mean as to witness signing and
21  all that.
22          MR. ZISSU:  The stipulation is you can waive
23  filing and have it signed before a notary public, if
24  that's acceptable.  That's another stipulation that's
25  normal, I believe.
```

276

EXHIBIT B
281

```
1              MR. TOBEROFF:  Any stipulations you want to make
2     regarding the transcript?
3              MR. BERGMAN:  Well, we could waive the notary
4     and just have it signed under penalty of perjury, which
5     is --
6              MR. ZISSU:  That's okay.
7              MR. BERGMAN:  -- pretty customary.
8              MR. TOBEROFF:  I think so.
9              MR. ZISSU:  That's okay.
10             MR. BERGMAN:  And the reporter would be relieved
11    of his responsibilities and will deliver the original
12    directly to Mr. Marks --
13             MR. TOBEROFF:  Toberoff.
14             MR. BERGMAN:  Toberoff.
15             MR. TOBEROFF:  My first name is Marc.
16             MR. ZISSU:  All the other rules as to timing and
17    signing apply.
18             MR. BERGMAN:  Yes.
19             MR. TOBEROFF:  So stipulated.
20
21
22
23
24
25
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**EXHIBIT B**
**282**

1
2
3
4
5
6
7
8        I, LAURA SIEGEL LARSON, do hereby declare under
9   penalty of perjury that I have read the foregoing
10  transcript; that I have made any corrections as appear
11  noted, in ink, initialed by me, or attached hereto; that
12  my testimony as contained herein, as corrected, is true
13  and correct.
14        EXECUTED this 17th day of September,
15  20 06 , at Playa Del Rey, California.
                    (City)                    (State)
16
17
18
19        Laura Siegel Larson
        LAURA SIEGEL LARSON
20
21
22
23
24
25

278

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**EXHIBIT B**
**283**

1

2

3

4      I, the undersigned, a Certified Shorthand

5  Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7  before me at the time and place herein set forth; that

8  any witnesses in the foregoing proceedings, prior to

9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under by

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14          I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19              AUG 1 8 2006

20  Dated: _____

21

22          _____

23          DAVID S. COLEMAN, CSR NO. 4613

24

25

Sep-18-06    02:31pm    From-                                    T-998   P.004/006   F-698

# Errata Sheet

**Pg/Ln**                              **Correction**

5 | 20 *Lil* Change from: _Issue No. 31 of More Fun Comics dated May, 1938_
Change to: _cover and one page from Issue No. 31 of More Fun Comics_
_dated May, 1938, cover and other page from Issue No. 26 of Adventure Comics_
_dated May, 1938 and cover and one page from Issue No. 15 of Detective Comics_

16 | 7 *Lil* Change from: _"1972 "_
Change to: _" 1973 "_

20 | 2 *Lil* Change from: _"I don't remember like that. "_
Change to: _"I don't remember anything like that. "_

25 | 7 *Lil* Change from: _"I don't surf for any email address, "_
Change to: _" I don't surf for an email address. "_

30 | 24-25 *Lil* Change from: _"He was very energetic and passionate about the Siegel and the_    Siegels
Change to: _He was very energetic and passionate about the Siegel — the Siegels_

71 | 7-8 *Lil* Change from: _"It has nothing to do with copyright issue. "_
Change to: _"It has nothing to do with the copyright issue. "_

135 | 1-2 *Lil* Change from: _"I mean that were not in the proposal would appear in a final_    write up"
Change to: _"I mean that no conditions that were not in the original proposal_
_would appear in a final write-up "_

180 | 11-12 *Lil* Change from: _"... is this contract referring to the list of Works,... "_
Change to: _"... is this referring to the list of Works ,,, "_

251 | 24 *Lil* Change from: _"1991 "_
Change to: _"1999 "_

____|____    Change from:_____
            Change to:_____

____|____    Change from:_____
            Change to:_____

____|____    Change from:_____
            Change to:_____

____|____    Change from:_____
            Change to:_____


Signature: _Laura Siegel Larson_        Date: _September 17, 2006_

**EXHIBIT B**
**285**

# EXHIBIT C

JUL 2003 12:03 PM                                    1 310 827 7227          P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to <u>warrant we had no rights</u> which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
- It was a bad and unreasonable deal.

Page 1

EXHIBIT C
286

LSL 00482

-You and Don Bulson stated that you couldn't believe how bad the document was that they
    had written.

**Our opinion as to why this has not been like other "contract negotiations":**
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were
    unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use
    every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
    losing it.
-They want to make an example of us so that other creators and their heirs won't go after
    their rights by Termination or otherwise.

**Marc Toberoff and the Shuster interest:**
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
    reacquire rights as we have via Terminations. Then the Shusters would have to
    negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the
    earliest.

**We went to Marc to talk about him representing the Siegels. Marc did not pursue us:**
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
    deal. You'll remember that you, Don Bulson and we were shocked when Kevin
    Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
    and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer
    and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

**Why the original investor left:**
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

LSL 00483

JUL-11-2003 12:04 PM                                    1 310 827 7227          P.04

**With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:**
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

**Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:**
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

**Why Marc has not been negotiating with Time Warner:**
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

**Why there is a buyout offer from an investor for your interest only:**
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

EXHIBIT C

288

LSL 00484

JUL-31-2003 12:04 PM                                    1 310 827 7227        P.05

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

<u>Your belief that you have something to sell independently:</u>
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

<u>Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):</u>
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an <u>attempt</u> by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

LSL 00485

JUL-11-2003 12:05 PM                                    1 310 827 7227               P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

LSL 00486

# EXHIBIT D

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

November 22, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:     *DC Comics v. Pacific Pictures Corp. et al.*, **CV-10-3633 (ODW) (RZx)**

Dear Marc:

The July 11, 2003 letter from Laura Siegel Larson to Michael Siegel that you recently produced discloses:

> –We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal.  You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.

In addition to the Siegels' other waivers of privilege—including their failure to log the Toberoff Timeline, which describes Mr. Marks's communication with the Siegels, and which the Court held waived the privilege; defendants' disclosure of the Toberoff Timeline documents to the U.S. Attorney's Office; and the Siegels' prior assertion that Mr. Marks lacked the authority to accept DC's settlement offer—by disclosing the contents of her communication with Mr. Marks to Mr. Siegel, Ms. Larson waived whatever privilege might otherwise have existed over this communication.  *See Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996) ("disclosure of privileged communications to someone outside the attorney-client relationship" waives privilege); *U.S. v. Jacobs*, 117 F.3d 82, 91 (2d Cir. 1991) ("disclosure of the substance of a privileged communication" effects waiver); *In re Qwest Comms. Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) ("Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege.").  Your belated objections that this letter was protected by a common-interest privilege were rejected by the Court.

**EXHIBIT D**
**291**

O'MELVENY & MYERS LLP
November 22, 2011 - Page 2


Please immediately produce the communication from Mr. Marks to Ms. Larson identified in her July 11, 2003 letter.  If not, please let us know when you are available to meet and confer pursuant to Local Rule 37.


Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP


cc:    Daniel M. Petrocelli, Esq.
       Richard Kendall, Esq.

# EXHIBIT E

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

November 29, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:   <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dear Matt:

I write in response to your November 22, 2011 letter, wherein DC contends that defendants waived privilege over a purported attorney-client communication between Kevin Marks and Laura Siegel Larson based on the following statement in the July 11, 2003 letter from Laura Siegel Larson to Michael Siegel which was produced pursuant to the Court's October 25, 2011 order, which you quote out of context:   "Kevin Marks said that if asked to, he would testify against us [Joanne Siegel and Laura Siegel Larson] in court…."

The July 11 letter clearly refers to a prior communication by Mr. Marks to the Siegels and Don Bulson/Michael Siegel and reads ("You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us [Joanne Siegel and Laura Siegel Larson] in court…."). The ***numerous*** communications between and among Don Bulson, Esq./Michael Siegel and Kevin Marks. Esq./Laura Siegel Larson that have been duly logged are protected by the attorney-client/joint interest privilege for the relevant period of October 2001-September 2002. *See* December 15, 2011 Privilege Log of Joanne Siegel and Laura Siegel Larson, Entry Nos. 545-546, 548-551, 553, 557, 560-564, 566-569, 571, 575, 588-590, 602, 611-613, 623, 629. DC's contention that the July 11 letter waived privilege on a purported communication by Mr. Marks to his client, Laura Siegel Larson is not well taken, as disclosure of information protected by the common-interest privilege to a party who already possesses such information hardly waives privilege. DC's prior attempt to argue a blanket waiver of privilege as to such 2001-2002 communications was firmly ***rejected.*** *See In re Joanne Siegel,* N.D. Ohio Case No. 1:06 MC 99, Order dated August 13, 2008.

In addition, neither the Court-ordered production of the "Toberoff Timeline," nor the Siegels' withdrawn defense of lack of settlement authority in *Siegel v. Warner Bros. Entertainment Inc.*, nor the production of the "Toberoff Timeline" documents to the USAO pursuant to a grand jury

**EXHIBIT E**
**293**

**TOBEROFF & ASSOCIATES, P.C.**

November 29, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 2

subpoena and confidentiality agreement (currently subject to writ review by the Ninth Circuit), resulted in a subject-matter waiver of the Siegels' privileged communications with Kevin Marks.

Moreover, as the disclosure of the July 11 letter was involuntary, it is not a proper basis for subject-matter waiver.

This would appear to be yet another instance where DC is kicking up a great deal of fuss for very little gain.  Mr. Marks clearly testified at his deposition:  "Well, if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no, but I did believe that we had come to an agreement back on October 19, 2001…. So while I thought we had an agreement on these terms, John [Schulman] evidently didn't, and where you don't have a meeting of the minds, you don't have an agreement."  *See* Deposition of Kevin Marks at 154:14-155:2.  Defendants pointed out that Mr. Marks has been consistent on this point when DC unsuccessfully moved to reopen discovery in *Siegel*.  *See Siegel,* Docket No. 476 at 37-43.

As you may be aware, we are moving into new offices tomorrow, November 30, 2011, and have a pre-scheduled mediation with your client on Thursday, December 1, 2011.  We are available to meet-and-confer Friday, December 2, 2011 after 3 p.m.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

**EXHIBIT E**
**294**

# EXHIBIT F

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 1 | 4/18/1997 | Atty Dennis Larson | Michael Siegel, Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty George Zadorozny | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 2 | 5/14/1997 | Laura Siegel Larson | Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 3 | 6/14/1997 | Laura Siegel Larson | Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 4 | 6/29/1997 | Michael Siegel | Atty Warren Sklar, Atty Himanshu Amin | Letter | Attorney/Client | Renner Otto |
| 5 | 7/15/1997 | Atty Himanshu Amin | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 6 | 7/18/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 7 | 7/18/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 8 | 8/7/1997 | Atty Arthur Levine | Atty Himanshu Amin | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 9 | 10/14/1997 | Atty Himanshu Amin | Atty Dennis Larson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 10 | 10/14/1997 | Atty Himanshu Amin | Atty Dennis Larson, Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 11 | 11/5/1997 | Atty Dennis Larson | Atty Himanshu Amin | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 12 | 11/5/1997 | Atty Dennis Larson | Atty Himanshu Amin | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 13 | 11/5/1997 | Atty Dennis Larson | Atty Himanshu Amin | Letter | Attorney/Client | Renner Otto |
| 14 | 11/5/1997 | Atty Dennis Larson | Atty Himanshu Amin | Letter | Attorney/Client | Renner Otto |
| 15 | 11/12/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 16 | 11/12/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 17 | 12/27/1997 | Atty Don Bulson | Michael Siegel | Agreement | Attorney/Client | Renner Otto |
| 18 | 1/15/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 19 | 1/15/1998 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 20 | 2/2/1998 | Atty Arthur Levine | Atty Don Bulson,Joanne Siegel,Atty Dennis Larson,Atty George Zadorozny | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 21 | 3/11/1998 | Atty Himanshu Amin | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 22 | 3/18/1998 | Atty Don Bulson | Atty Arthur Levine,Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 23 | 3/18/1998 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 24 | 3/18/1998 | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |

# EXHIBIT F
# 295

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|-------------------------|------|-----------|----------|
| 25 | 5/31/1998 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 26 | 6/1/1998 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 27 | 6/17/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 28 | 6/17/1998 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 29 | 6/26/1998 | Atty Arthur Levine | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 30 | 6/26/1998 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 31 | 6/26/1998 | Atty Arthur Levine | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 32 | 8/28/1998 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 33 | 8/31/1998 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 34 | 9/4/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 35 | 11/2/1998 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 36 | 11/3/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 37 | 11/3/1998 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 38 | 11/13/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 39 | 11/13/1998 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 40 | 11/13/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 41 | 12/4/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 42 | 12/4/1998 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 43 | 12/4/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 44 | 12/10/1998 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 45 | 12/14/1998 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 46 | 12/28/1998 | Vinay Joshi | Atty Don Bulson, Atty Himanshu Amin | Memo | Atty Work Product | Renner Otto |
| 47 | 1/19/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**296**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 48 | 1/19/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 49 | 2/24/1999 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 50 | 3/3/1999 | Atty Arthur Levine | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty George Zadorozny | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 51 | 3/3/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 52 | 3/3/1999 | Atty Arthur Levine | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty George Zadorozny | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 53 | 3/10/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 54 | 3/10/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 55 | 3/10/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 56 | 3/17/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 57 | 4/12/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 58 | 4/16/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 59 | 4/16/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 60 | 5/13/1999 | Atty Himanshu Amin | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 61 | 6/3/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 62 | 6/8/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 63 | 6/8/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 64 | 6/9/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 65 | 6/9/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 66 | 6/9/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 67 | 6/9/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 68 | 6/9/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 69 | 6/9/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**297**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 70 | 6/11/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 71 | 6/25/1999 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 72 | 7/8/1999 | Michael Siegel | Atty Don Bulson | Draft | Atty Work Product, Attorney/Client | Renner Otto |
| 73 | 7/9/1999 | Atty Bruce Ramer | Atty John Schulman | Draft | Atty Work Product | Renner Otto |
| 74 | 7/12/1999 | Atty Kevin Marks | Atty Arthur Levine, Atty Don Bulson, Atty Dennis Larson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 75 | 7/20/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 76 | 7/20/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 77 | 7/20/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 78 | 8/2/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 79 | 8/2/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 80 | 8/2/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 81 | 8/3/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 82 | 8/10/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 83 | 8/10/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 84 | 8/24/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 85 | 8/24/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 86 | 8/27/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 87 | 8/27/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 88 | 8/31/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 89 | 8/31/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 90 | 8/31/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 91 | 8/31/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 92 | 9/1/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 93 | 9/1/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 94 | 9/1/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 95 | 9/2/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 96 | 9/2/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**298**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 97 | 9/2/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 98 | 9/2/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 99 | 9/2/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client | Renner Otto |
| 100 | 9/3/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 101 | 9/5/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 102 | 9/7/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 103 | 9/8/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 104 | 9/8/1999 | Atty Don Bulson | Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 105 | 9/9/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 106 | 9/9/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 107 | 9/9/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 108 | 9/9/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 109 | 9/14/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 110 | 9/14/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 111 | 9/14/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 112 | 9/14/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 113 | 9/14/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 114 | 9/14/1999 | Atty Don Bulson | Atty Kevin Marks, Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 115 | 9/15/1999 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Arthur Levine, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 116 | 9/16/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 117 | 9/17/1999 | Atty Arthur Levine | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 118 | 9/17/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 119 | 9/22/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 120 | 9/22/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 121 | 9/22/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |

**EXHIBIT F**

**299**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 122 | 9/22/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 123 | 9/22/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 124 | 9/23/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 125 | 9/23/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 126 | 9/24/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 127 | 9/24/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 128 | 9/27/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 129 | 9/28/1999 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 130 | 9/28/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 131 | 9/28/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 132 | 9/29/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 133 | 10/8/1999 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Bruce Ramer, Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 134 | 10/8/1999 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 135 | 10/8/1999 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Bruce Ramer, Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 136 | 10/8/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 137 | 10/8/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 138 | 10/11/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 139 | 10/11/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 140 | 10/11/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 141 | 10/12/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 142 | 10/17/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 143 | 10/27/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 144 | 10/27/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 145 | 10/31/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 146 | 11/3/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**300**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 147 | 11/3/1999 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 148 | 11/3/1999 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Bruce Ramer, Atty Arthur Levine, Atty Don Bulson | Memo | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 149 | 11/4/1999 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 150 | 11/8/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 151 | 11/8/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 152 | 11/11/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 153 | 11/12/1999 | Atty Kevin Marks | Atty Don Bulson, Atty Dennis Larson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 154 | 11/12/1999 | Atty Kevin Marks | Atty Don Bulson, Atty Dennis Larson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 155 | 12/6/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 156 | 12/6/1999 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 157 | 12/6/1999 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 158 | 12/6/1999 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 159 | 12/6/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 160 | 12/8/1999 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 161 | 12/10/1999 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Arthur Levine, Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 162 | 12/10/1999 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Dennis Larson, Atty Bruce Ramer, Atty Arthur Levine, Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 163 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 164 | 12/22/1999 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 165 | 12/22/1999 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 166 | 12/29/1999 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 167 | 12/30/1999 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 168 | 1/2/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |

11/29/2011

**EXHIBIT F**
**301**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|-------------------------|------|-----------|----------|
| 169 | 1/3/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 170 | 1/3/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 171 | 1/3/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 172 | 1/4/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 173 | 1/4/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 174 | 1/5/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 175 | 1/10/2000 | Atty Kevin Marks | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 176 | 1/10/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 177 | 1/10/2000 | Atty Kevin Marks | Atty Don Bulson, Atty Dennis Larson, Atty Bruce Ramer, Atty Arthur Levine | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 178 | 1/10/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 179 | 1/10/2000 | Atty Kevin Marks | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 180 | 1/11/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 181 | 1/14/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 182 | 1/17/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 183 | 1/18/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 184 | 2/14/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 185 | 2/28/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 186 | 3/1/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 187 | 3/1/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Bruce Ramer, Atty Don Bulson | Memo | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 188 | 3/1/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Bruce Ramer, Atty Don Bulson | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 189 | 3/7/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 190 | 3/8/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**302**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 191 | 3/8/2000 | | | Research | Atty Work Product | Renner Otto |
| 192 | 3/9/2000 | Atty Kevin Marks | Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 193 | 3/9/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 194 | 3/9/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 195 | 3/9/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 196 | 3/13/2000 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 197 | 3/21/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 198 | 3/30/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 199 | 3/30/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Arthur Levine, Atty Don Bulson | Memo | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 200 | 4/3/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 201 | 4/3/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Arthur Levine, Atty Don Bulson | Memo | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 202 | 4/3/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Arthur Levine, Atty Don Bulson | Tolling Agreement (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 203 | 4/5/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson, Atty Arthur Levine | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 204 | 4/5/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson, Atty Bruce Ramer, Atty Arthur Levine | Memo | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 205 | 4/5/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 206 | 4/11/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Arthur Levine, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 207 | 4/12/2000 | Atty Kevin Marks | Atty Don Bulson, Atty Bruce Ramer | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 208 | 4/17/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 209 | 4/17/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 210 | 4/17/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 211 | 4/17/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 212 | 4/18/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |

**EXHIBIT F**
**303**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 213 | 4/18/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 214 | 5/2/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 215 | 5/3/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 216 | 5/3/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 217 | 5/4/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 218 | 5/4/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 219 | 5/5/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 220 | 5/5/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 221 | 5/8/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 222 | 5/8/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 223 | 5/9/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 224 | 5/18/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 225 | 5/18/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 226 | 5/21/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 227 | 5/26/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 228 | 5/30/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 229 | 6/5/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 230 | 6/7/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 231 | 6/7/2000 | Atty Kevin Marks | Atty Don Bulson | Draft Agreement | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 232 | 6/9/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 233 | 6/27/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |

**EXHIBIT F**
**304**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 234 | 7/5/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 235 | 7/6/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 236 | 7/6/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 237 | 7/6/2000 | Atty Kevin Marks | Atty John Schulman, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson, Paul Levitz, Atty Carol Simkin | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 238 | 7/7/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 239 | 7/7/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 240 | 7/7/2000 | Atty Kevin Marks | Atty John Schulman, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson, Paul Levitz, Atty Carol Simkin | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 241 | 7/10/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 242 | 7/10/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 243 | 7/14/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 244 | 7/14/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 245 | 7/17/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 246 | 7/17/2000 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 247 | 7/17/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 248 | 7/17/2000 | Atty Kevin Marks | Atty John Schulman, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson, Paul Levitz, Atty Carol Simkin | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 249 | 7/17/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 250 | 7/18/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 251 | 7/18/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 252 | 7/18/2000 | Atty Kevin Marks | Atty John Schulman, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson, Paul Levitz, Atty Carol Simkin | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**305**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 253 | 7/18/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 254 | 7/19/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 255 | 7/19/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 256 | 7/21/2000 | Atty Kevin Marks | Atty Don Bulson | Memo | Attorney/Client, Common Interest Privilege | Renner Otto |
| 257 | 7/24/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 258 | 7/24/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 259 | 7/24/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 260 | 7/24/2000 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 261 | 7/25/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 262 | 7/26/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 263 | 7/26/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 264 | 7/26/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 265 | 7/26/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 266 | 7/26/2000 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 267 | 7/26/2000 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 268 | 8/7/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 269 | 8/8/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 270 | 8/8/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 271 | 8/8/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 272 | 8/10/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 273 | 8/21/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 274 | 8/25/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 275 | 8/25/2000 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 276 | 9/6/2000 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 277 | 9/6/2000 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 278 | 9/6/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**306**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 279 | 9/11/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 280 | 9/15/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 281 | 9/17/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 282 | 9/18/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 283 | 9/21/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 284 | 10/17/2000 | | | Laura Siegel Larson Expense Documentation | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 285 | 10/17/2000 | | | Joanne Siegel Expense Documentation | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 286 | 10/23/2000 | Atty Kevin Marks | Atty Carol Simkin, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Paul Levitz, Atty John Schulman, Atty Don Bulson, Atty Patrick Perkins | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 287 | 10/26/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 288 | 11/8/2000 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 289 | 11/8/2000 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Cost Summaries | Attorney/Client, Common Interest Privilege | Renner Otto |
| 290 | 11/8/2000 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 291 | 11/8/2000 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 292 | 11/8/2000 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Cost Summaries | Attorney/Client, Common Interest Privilege | Renner Otto |
| 293 | 11/15/2000 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 294 | 11/19/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 295 | 11/27/2000 | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |
| 296 | 11/27/2000 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 297 | 12/4/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 298 | 12/4/2000 | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |
| 299 | 12/4/2000 | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |
| 300 | 12/8/2000 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 301 | 1/3/2001 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 302 | 2/16/2001 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 303 | 2/26/2001 | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |

**EXHIBIT F**
**307**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 304 | 3/9/2001 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 305 | 3/12/2001 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 306 | 3/12/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 307 | 4/30/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 308 | 4/30/2001 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 309 | 5/4/2001 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 310 | 5/4/2001 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 311 | 5/17/2001 | Atty Don Bulson | Atty Kevin Marks | Draft | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 312 | 6/14/2001 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 313 | 6/26/2001 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 314 | 7/3/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 315 | 7/3/2001 | Atty Don Bulson | Atty Kevin Marks | Draft Document | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 316 | 7/9/2001 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 317 | 7/30/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 318 | 7/30/2001 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 319 | 7/30/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 320 | 7/31/2001 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 321 | 7/31/2001 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 322 | 8/2/2001 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 323 | 8/24/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 324 | 8/24/2001 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 325 | 8/24/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 326 | 8/30/2001 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**308**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|-----------------------|--------------------------|------|-----------|----------|
| 327 | 9/12/2001 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 328 | 9/13/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 329 | 9/13/2001 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 330 | 9/13/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 331 | 9/24/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 332 | 9/24/2001 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 333 | 9/24/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 334 | 10/17/2001 | Atty Kevin Marks | Atty Don Bulson, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 335 | 10/17/2001 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 336 | 10/18/2001 | Atty Kevin Marks | Laura Siegel Larson, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 337 | 10/19/2001 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 338 | 10/24/2001 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 339 | 11/17/2001 | Atty Marc Toberoff | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 340 | 11/17/2001 | | | Printout | Attorney/Client | Renner Otto |
| 341 | 11/27/2001 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 342 | 12/6/2001 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 343 | 12/26/2001 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 344 | 1/3/2002 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 345 | 1/10/2002 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 346 | 1/22/2002 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 347 | 1/30/2002 | Michael Siegel | Atty Don Bulson | E-mail (Unrelated) | Attorney/Client | Renner Otto |
| 348 | 1/31/2002 | Atty Don Bulson | Michael Siegel | E-mail (Unrelated) | Attorney/Client | Renner Otto |

**EXHIBIT F**
**309**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 349 | 2/4/2002 | Atty Kevin Marks | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 350 | 2/6/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 351 | 2/7/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 352 | 2/7/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 353 | 3/8/2002 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 354 | 4/8/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 355 | 5/8/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 356 | 5/9/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 357 | 5/10/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 358 | 5/10/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 359 | 5/10/2002 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 360 | 5/10/2002 | Atty Don Bulson | Atty Kevin Marks, Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 361 | 5/11/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 362 | 5/18/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 363 | 5/28/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 364 | 6/27/2002 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 365 | 7/11/2002 | Atty Kevin Marks | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 366 | 7/12/2002 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 367 | 7/12/2002 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 368 | 7/12/2002 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 369 | 7/31/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 370 | 8/9/2002 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson, Atty Bruce Ramer | Letter | Attorney/Client, Atty Work Product, Common Interest Privilege | Renner Otto |
| 371 | 8/9/2002 | Atty Kevin Marks | Joanne Siegel, Laura Siegel Larson, Atty Don Bulson, Atty Bruce Ramer | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 372 | 8/12/2002 | Atty Kevin Marks | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 373 | 8/13/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 374 | 8/14/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |

11/29/2011

**EXHIBIT F**
**310**

PRIVILEGE LOG OF BULSON ARCHIVE

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 375 | 8/22/2002 | Atty Don Bulson | Atty Kevin Marks | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 376 | 8/22/2002 | Atty Don Bulson | Atty Kevin Marks | Fax | Attorney/Client, Common Interest Privilege | Renner Otto |
| 377 | 8/23/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 378 | 8/27/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 379 | 8/28/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 380 | 9/2/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 381 | 9/3/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 382 | 9/4/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 383 | 9/19/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 384 | 9/19/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 385 | 9/21/2002 | Laura Siegel Larson | Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 386 | 9/21/2002 | Joanne Siegel, Laura Siegel Larson | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 387 | 9/21/2002 | Joanne Siegel, Laura Siegel Larson | Atty Kevin Marks, Atty Bruce Ramer, Michael Siegel, Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 388 | 9/22/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 389 | 9/23/2002 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client | Renner Otto |
| 390 | 9/24/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 391 | 9/24/2002 | Atty Don Bulson | Atty Kevin Marks | E-mail | Attorney/Client | Renner Otto |
| 392 | 9/24/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 393 | 9/28/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 394 | 10/1/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 395 | 10/1/2002 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 396 | 10/4/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 397 | 11/1/2002 | Joanne Siegel, Laura Siegel Larson | Atty Don Bulson, Michael Siegel | Letter | Attorney/Client, Common Interest Privilege (Produced) | Renner Otto |
| 398 | 11/1/2002 | Joanne Siegel, Laura Siegel Larson | Atty Don Bulson, Michael Siegel | Letter | Attorney/Client, Common Interest Privilege (Produced) | Renner Otto |
| 399 | 11/2/2002 | Joanne Siegel, Laura Siegel Larson | Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 400 | 11/8/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 401 | 11/19/2002 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 402 | 11/27/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 403 | 12/13/2002 | Atty Don Bulson | Atty Stephen Webster | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |

EXHIBIT F
311

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 404 | 12/19/2002 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 405 | 1/8/2003 | Atty Stephen Webster | Atty Don Bulson | Letter | Atty Work Product, Attorney/Client | Renner Otto |
| 406 | 1/8/2003 | Atty Stephen Webster | Atty Don Bulson | Letter | Atty Work Product, Attorney/Client | Renner Otto |
| 407 | 1/16/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 408 | 1/23/2003 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 409 | 1/23/2003 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 410 | 1/24/2003 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 411 | 1/28/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 412 | 3/24/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 413 | 3/24/2003 | Atty Don Bulson | Atty Stephen Webster | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 414 | 4/2/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 415 | 4/4/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 416 | 4/7/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 417 | 4/7/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 418 | 4/14/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 419 | 4/14/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 420 | 4/16/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 421 | 4/16/2003 | Joanne Siegel, Laura Siegel Larson | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 422 | 4/30/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 423 | 5/6/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 424 | 5/7/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 425 | 5/8/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 426 | 5/12/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 427 | 5/12/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 428 | 5/13/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 429 | 5/27/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 430 | 5/29/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 431 | 6/3/2003 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 432 | 6/9/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 433 | 6/10/2003 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 434 | 6/17/2003 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 435 | 6/18/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |

**EXHIBIT F**
**312**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 436 | 6/18/2003 | Atty Don Bulson | Atty Marc Toberoff | Fax | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 437 | 6/19/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 438 | 6/23/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 439 | 7/11/2003 | Laura Siegel Larson | Michael Siegel | E-mail | Attorney/Client, Common Interest Privilege (Produced) | Renner Otto |
| 440 | 7/14/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 441 | 7/14/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 442 | 7/16/2003 | Atty Marc Toberoff | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 443 | 7/16/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 444 | 7/21/2003 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 445 | 8/6/2003 | Atty Marc Toberoff | Atty Don Bulson | Lettter | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 446 | 8/6/2003 | Atty Marc Toberoff | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 447 | 8/7/2003 | Atty Marc Toberoff | Atty Don Bulson | Fax | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 448 | 8/12/2003 | Atty Don Bulson | Michael Siegel | Letter | Attorney/Client | Renner Otto |
| 449 | 9/17/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 450 | 9/17/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 451 | 10/22/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 452 | 10/22/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 453 | 10/23/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 454 | 10/27/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 455 | 10/28/2003 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 456 | 11/13/2003 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 457 | 11/18/2003 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 458 | 5/3/2004 | Atty Stephen Webster | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 459 | 5/3/2004 | Atty Stephen Webster | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 460 | 5/11/2004 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 461 | 6/3/2004 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 462 | 6/7/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 463 | 6/7/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |

11/29/2011

**EXHIBIT F**
**313**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 464 | 6/9/2004 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 465 | 6/10/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 466 | 6/17/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 467 | 6/21/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 468 | 6/21/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 469 | 7/27/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 470 | 7/28/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 471 | 8/2/2004 | Atty Don Bulson | Atty Stephen Webster | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 472 | 8/4/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 473 | 8/5/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 474 | 8/6/2004 | Atty Don Bulson | | Internal E-mail | Atty Work Product, Attorney/Client | Renner Otto |
| 475 | 8/9/2004 | Atty Don Bulson | Atty Marc Toberoff | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 476 | 8/19/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 477 | 8/19/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 478 | 8/20/2004 | Atty Stephen Webster | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 479 | 10/6/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 480 | 10/6/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 481 | 10/10/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 482 | 10/13/2004 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 483 | 11/12/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 484 | 11/12/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 485 | 11/12/2004 | Atty Stephen Webster | Atty Don Bulson | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |
| 486 | 11/12/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 487 | 11/12/2004 | Atty Don Bulson | Atty Marc Toberoff | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 488 | 11/17/2004 | Atty Marc Toberoff | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 489 | 11/18/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 490 | 11/18/2004 | Atty Marc Toberoff | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 491 | 11/19/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |

11/29/2011

**EXHIBIT F**
**314**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|----------------------|--------------------------|------|-----------|----------|
| 492 | 11/19/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 493 | 11/24/2004 | Atty Don Bulson | Atty Marc Toberoff | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 494 | 11/28/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 495 | 11/29/2004 | Atty Marc Toberoff | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 496 | 12/2/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 497 | 12/6/2004 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 498 | 12/7/2004 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 499 | 12/20/2004 | Atty Thomas Shunk | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege | Renner Otto |
| 500 | 1/17/2005 | Atty Marc Toberoff | Atty Don Bulson | E-mail | Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |
| 501 | 2/4/2005 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 502 | 2/5/2005 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 503 | 2/5/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 504 | 2/6/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 505 | 2/17/2005 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 506 | 2/20/2005 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 507 | 2/26/2005 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 508 | 10/8/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 509 | 10/8/2005 | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |
| 510 | 10/10/2005 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 511 | 10/11/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 512 | 10/11/2005 | Michael Siegel | Atty Don Bulson | Draft | Attorney/Client | Renner Otto |
| 513 | 10/11/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 514 | 10/24/2005 | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 515 | 10/24/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 516 | 10/24/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 517 | 10/24/2005 | Michael Siegel | Gerald Jones | Draft | Attorney/Client | Renner Otto |
| 518 | 10/25/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 519 | 10/31/2005 | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 520 | 11/12/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 521 | 12/3/2005 | Michael Siegel | Atty Don Bulson | E-mail | Attorney/Client | Renner Otto |
| 522 | Date Unclear | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**315**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 523 | Dated 1/19/2000 | Atty Kevin Marks | Atty Don Bulson | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 524 | Dated 10/02 | | | Laura Siegel Larson Expense Documentation | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 525 | Dated 10/02 | | | Joanne Siegel Expense Documentation | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 526 | Dated 10/27/2000 | Atty Kevin Marks | Atty Carol Simkin, Joanne Siegel, Laura Siegel Larson, Atty Bruce Ramer, Paul Levitz, Atty John Schulman, Atty Don Bulson, Atty Patrick Perkins | Letter (Draft) | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 527 | Dated 11/20 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 528 | Dated 11/99 | Atty Don Bulson | | Minutes | Atty Work Product | Renner Otto |
| 529 | Dated 2/02 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 530 | Dated 3/02 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 531 | Dated 5/10/2003 | Michael Siegel | Laura Siegel Larson | Draft Letter | Attorney/Client | Renner Otto |
| 532 | Dated 7/02 | Atty Kevin Marks | | Draft Agreement | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 533 | Dated 7/02 | Atty Kevin Marks | | Draft Agreement | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 534 | Dated 7/08 | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 535 | Undated | Atty Don Bulson | Atty John Schulman | Draft | Attorney/Client, Common Interest Privilege | Renner Otto |
| 536 | Undated | Atty Don Bulson | | Internet Research | Atty Work Product | Renner Otto |
| 537 | Undated | Atty Don Bulson | | Draft | Atty Work Product | Renner Otto |
| 538 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 539 | Undated | Atty Don Bulson | | Chart | Atty Work Product | Renner Otto |
| 540 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 541 | Undated | Atty Don Bulson | | Chart | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 542 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |

11/29/2011

**EXHIBIT F**
**316**

**PRIVILEGE LOG OF BULSON ARCHIVE**

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|-------|------|-----------------------|--------------------------|------|-----------|----------|
| 543 | Undated | Atty Don Bulson | | Chart | Atty Work Product | Renner Otto |
| 544 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 545 | Undated | Atty Don Bulson | Atty Kevin Marks | Draft | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 546 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 547 | Undated | | | Draft | Attorney/Client | Renner Otto |
| 548 | Undated | | | Letter fragment | Attorney/Client | Renner Otto |
| 549 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 550 | Undated | | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 551 | Undated | Michael Siegel | Atty Don Bulson | Letter | Attorney/Client | Renner Otto |
| 552 | Undated | Atty Don Bulson | Michael Siegel | E-mail | Attorney/Client | Renner Otto |
| 553 | Undated | Michael Siegel | Atty Don Bulson | Research | Attorney/Client | Renner Otto |
| 554 | Undated | Michael Siegel | Atty Don Bulson | Research | Attorney/Client | Renner Otto |
| 555 | Undated | Atty Don Bulson | Michael Siegel | Charts | Atty Work Product, Attorney/Client | Renner Otto |
| 556 | Undated | Atty Don Bulson | Michael Siegel | Charts | Atty Work Product, Attorney/Client | Renner Otto |
| 557 | Undated | Atty Don Bulson | Atty Arthur Levine | Draft | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 558 | Undated | Atty Don Bulson | Atty Arthur Levine | Draft | Atty Work Product, Attorney/Client | Renner Otto |
| 559 | Undated | Atty Don Bulson | | Draft | Atty Work Product | Renner Otto |
| 560 | Undated | Atty | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 561 | Undated | Michael Siegel | Laura Siegel Larson | Draft | Attorney/Client, Common Interest Privilege | Renner Otto |
| 562 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 563 | Undated | Michael Siegel | Atty Don Bulson | IMDB Printout | Attorney/Client | Renner Otto |
| 564 | Undated | Michael Siegel | Laura Siegel Larson | Draft Letter | Attorney/Client | Renner Otto |
| 565 | Undated | Michael Siegel | Laura Siegel Larson | Draft | Attorney/Client | Renner Otto |
| 566 | Undated | Atty Don Bulson | | Internet Research | Atty Work Product | Renner Otto |
| 567 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 568 | Undated | Atty Don Bulson | | Internet Research | Atty Work Product | Renner Otto |

11/29/2011

**EXHIBIT F**
**317**

PRIVILEGE LOG OF BULSON ARCHIVE

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 569 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 570 | Undated | Atty Don Bulson | | Internet Research | Atty Work Product | Renner Otto |
| 571 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 572 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 573 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 574 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 575 | Undated | Atty Don Bulson | | Research | Atty Work Product | Renner Otto |
| 576 | Undated | Atty Don Bulson | Atty Patrick Perkins | Letter (Draft) | Atty Work Product | Renner Otto |
| 577 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client, Common Interest Privilege | Renner Otto |
| 578 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client | Renner Otto |
| 579 | Undated | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 580 | Undated | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 581 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Atty/Client | Renner Otto |
| 582 | Undated | Atty Don Bulson | | Notes | Atty Work Product, Attorney/Client | Renner Otto |
| 583 | Undated | Atty Don Bulson | | Notes | Atty Work Product | Renner Otto |
| 584 | Various | | | Expense Documentation | Atty Work Product, Attorney/Client, Common Interest Privilege (Produced in Siegel) | Renner Otto |

11/29/2011

EXHIBIT F
318

# EXHIBIT G

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

December 5, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write to address several issues raised by your November 29, 2011, production of documents, privilege log, and master list relating to the Renner Otto electronic archive, and production of documents and supplemental privilege log by defendant Laura Siegel Larson.

1. We are deeply concerned by the disparity between the "Privilege Log of Bulson Archive" produced in this case and the Don Bulson privilege log produced in *Siegel* on October 23, 2006.  The "Privilege Log of Bulson Archive" contains 584 entries, whereas the *Siegel* log contains only 422 entries.  That is a difference of 162 entries.  Beyond just the numerical difference, the "Privilege Log of Bulson Archive" identifies numerous documents that were not included in the *Siegel* log.[1]  This makes clear that DC was not provided with a complete log in *Siegel*—a log that was prepared by your offices—given that both logs concern the same set of documents:  Renner Otto's files relating to its representation of Michael Siegel, which were returned to defendants after Mr. Siegel's passing in January 2006.  Renner Otto has represented that the electronic archive is simply a copy of the documents returned to defendants.  These additional entries are not simply "inadvertent non-material discrepancies in the prior logs that have been corrected."

---

[1] Privilege Log of Bulson Archive Entry Nos. 1-4, 7, 10, 12, 14, 16, 17, 19, 21, 22, 24-26, 28, 30, 32, 33, 35, 37, 39, 40. 42-44, 48, 49, 51, 52, 54, 55, 57, 58, 60, 61, 63, 66-73, 76, 77, 79-82, 85-94, 96, 99, 104, 106, 107, 110, 112-115, 117, 122, 123, 130, 134, 135, 137, 143, 147, 150, 152, 153, 157, 158, 160, 161, 176, 178, 186, 188, 191, 194, 200, 202, 204, 224, 231, 235, 237, 238, 240, 248, 249, 252, 253, 265, 267, 284-286, 289-292, 295, 299, 303, 305, 308, 314, 318, 321, 324, 325, 329, 332, 336, 339, 340, 347-349, 352, 355, 361, 364-368, 370-372, 375, 376, 385-387, 396-399, 403, 405-406, 413, 428, 439, 442, 447, 458, 459, 471, 474, 484, 485, 499, 509, 512, 517, 520-537, 539, 541, 543, 545, 547, 548, 550-561, 563-566, 568, 570, 573-584.

O'MELVENY & MYERS LLP
December 5, 2011 - Page 2

Defendants' failure to log these documents in the *Siegel* case more than five years ago amounts to a waiver, and DC requests that defendants produce the documents by Friday, December 9. See *U.S. v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002) (A party asserting privilege "must identify specific communications and the grounds supporting the privilege as to each piece of evidence over which privilege is asserted."); *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005); *Am. Dental Ass'n v. Khorrami*, 2003 WL 24141019, at *9 (C.D. Cal. July 14, 2003); *Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*, 136 F.R.D. 179, 184-85 (E.D. Cal. 1991) (failure "to comply with a well settled requirement of specifically identifying the evidence to which a privilege applies" constitutes waiver). In any event, we request a Rule 37 conference concerning these documents without delay. DC has been pressing for these materials for well over a year, the propriety and completeness of defendants' production has been a central issue that entire time, and DC's discovery correspondence and briefing, Docket Nos. 160, 162-8, 162-9, 162-11, 171, 205, 207-10, 207-12, 215, 267-1, repeatedly raised the Michael Siegel/Bulson materials that defendants represented they had in their possession, *e.g.*, Docket Nos. 160 at 34-36, 162-6, 162-7, as an important source of documents.

Defendants have improperly hidden responsive, non-privileged documents behind fax cover sheets and transmittal letters. *E.g.,* Docket No. 336. It appears that defendants are now seeking to separate out each document as required by law in an improper attempt to shield behind privilege documents that were not previously logged. This does not undo the waiver that has resulted from failing to log the documents in the first instance. Moreover, defendants claim many of these documents are subject to an alleged "common interest" privilege that has been rejected by the Ohio court and Judge Wright in this case. Particularly, defendants are seeking to shield correspondence between Ms. Larson and Mr. Siegel.[2]

To take just one example, defendants produced in April 2011 a May 13, 2003, letter from Michael to Laura, pursuant to Court order. The first paragraph of the May 13 letter references a "letter of November 2 of [2002]" from Laura to Michael. Docket No. 225-4. We requested at that time that defendants produce the referenced November 2 letter since it had never been logged or produced in either this case or *Siegel*, and there was no basis for withholding it. Docket No. 230-16. Defendants responded that (1) they could not locate the November 2 letter; and (2) they already produced a November 1, 2002, letter from Laura to Michael and Mr. Bulson. Docket No. 267-2 ¶¶ 4-5. Since the November 1 letter clearly was not the letter referenced in Michael's May 13 letter, DC moved to compel the November 2 letter. Docket No. 267-1. Defendants did not assert the November 2 letter was privileged in opposing DC's motion, *id.* at 18-24, but rather represented in briefing and oral argument that the November 2 letter could not be located, Docket Nos. 267-1 at 23, 285 at 38:22-39:13.

Entry No. 399 of the new "Privilege Log of Bulson Archive" lists a November 2, 2002, letter from Laura to Michael. This letter must be produced immediately. There is no basis for withholding the document, or any of the other documents defendants are improperly withholding

_____

[2] *E.g.,* Privilege Log of Bulson Archive Entry Nos. 2, 3.

**EXHIBIT G**
**320**

on the basis of an alleged "common interest" privilege.  The letter is a non-privileged communication between brother and sister, at a time when their interests had diverged.  Indeed, the letter is part of a chain that the Magistrate and Court in this case ruled was not privileged and must be produced.  Moreover, any privilege that might have applied to this letter (and none ever did) was waived by defendants' repeated failure in the *Siegel* case and this case to log the letter in any of its prior privilege logs or to raise such a claim in response to DC's recent motion.  *E.g.,* *Burlington*, 408 F.3d at 1149.

Two more examples can be found at Entry Nos. 385 and 386, which list two letters:  one from Ms. Larson to Mr. Siegel, and one from Ms. Siegel and Ms. Larson to Mr. Bulson.  These letters are non-privileged communications between the Siegel defendants and Mr. Siegel (or his representative) at a time when their interests had diverged—after the Siegel defendants purportedly terminated settlement discussions with DC.

Again, if you refuse to produce these materials this week, DC will need to move to compel their production, and requests a Rule 37 conference in connection with doing so.

2.  During Mr. Bulson's July 19 deposition, he testified that he believed Renner Otto submitted an expert report in support of its claims for unpaid attorney's fees in Renner Otto's pending litigation against the Estate of Michael Siegel.  Mr. Bulson further testified that the expert submission was based on billing records and other methods of timekeeping relating to Renner Otto's representation of Mr. Siegel.  Bulson Tr. at 13:20-16:4, 25:5-12.  Neither the "Privilege Log of Bulson Archive" nor the "Master List of Bulson Archive" lists Renner Otto calendar/billing entries for its representation of Michael Siegel, despite defendants' representation that the master list identifies "all of the documents in the Renner Otto electronic archive."  Nor have defendants produced these materials or the Renner Otto expert report, which DC requested at Mr. Bulson's July 19 deposition—almost five months ago.  *Id.* at 13:20-16:4.  We exchanged several meet-and-confer correspondence on this issue in August and September of this year.  As DC has advised defendants, Renner Otto has confirmed, and we discussed with you and Mr. Adams on the phone, defendants are in possession or have access to the Renner Otto expert report and calendar/billing entries, particularly through the Estate of Michael Siegel's lawyers.  There is no reason for defendants' failure to review such documents, determine whether the Michael Siegel Estate will assert privilege as to any information contained therein (which they would have no basis to do, given the disclosures that were made), and produce or log the requested documents by now.  If you do not produce these materials this week, we will move to compel them.

3.  Defendants have logged as privileged several documents that have already been produced in this case or the *Siegel* case, including the July 11, 2003, letter from Ms. Larson to Mr. Siegel, which Judge Wright found was not privileged and ordered produced.[3]  There is no reason to list responsive, non-privileged documents that have been produced on a privilege log.

---

[3] Privilege Log of Bulson Archive Entry Nos. 397, 398, 421, 435, 436, 439, 442, 443, 445-447, 475, 487, 488, 490, 493, 495, 500, 584.

O'MELVENY & MYERS LLP
December 5, 2011 - Page 4

How can we trust defendants' privilege claims when such documents continue to be listed on defendants' privilege logs?

Likewise, Entry No. 387 of the new "Privilege Log of Bulson Archive" lists a September 21, 2002, letter from Joanne Siegel and Ms. Larson to Kevin Marks, Bruce Ramer, Michael Siegel, and Don Bulson. We believe this letter was copied by Ms. Siegel and Ms. Larson to Paul Levitz of DC Comics and was produced in the *Siegel* case at WB005768. There is no basis for defendants to withhold this document. Magistrate Zarefsky expressly found in *Siegel* that defendants waived any claims of privilege as to this letter. Case No. CV-04-8400, Docket No. 58 at 4:22-23 ("Here there is no doubt that the privilege, if any exists, has been waived as to this letter."). Why have you listed this document as privileged now?

4. Ms. Larson has once again produced and logged documents concerning Gerry Spence, including internet research they conducted and a web printout of Mr. Spence's firm website. Siegel Supplemental Privilege Log Entry Nos. 3661-3663; LSL 00525-LSL 00548. In addition, Ms. Larson produced several pages listing lawyers the Siegels researched. LSL 00501-LSL 00524. Yet, the Siegel defendants have neither produced nor logged any correspondence or documents relating to the Siegels' initial meetings with Mr. Toberoff and Ari Emanuel, such as emails confirming meetings, calendar entries, research regarding these individuals, or any other documents. We intend to move to compel such materials, and given defendants' misrepresentations in the past about what documents do and do not exist, intend to challenge defendants' assertion that no such documents exist. We request a final Rule 37 meet and confer on this subject.

*        *        *

Please let us know when you are available to meet and confer on these issues, pursuant to Rule 37, in the next 10 days. We propose meeting and conferring tomorrow, December 6, or Thursday, December 8.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.
       Richard Kendall, Esq.

**EXHIBIT G**
**322**

# EXHIBIT H

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22631 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

December 14, 2011

Via E-Mail

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your December 5 and December 6, 2011 letters regarding discovery issues, and to follow-up on my December 14, 2011 meet-and-confer with Cassandra Seto and Jason Tokoro.

***Renner Logs***:  DC's concern over purported "discrepancies" between the December 7, 2011 privilege log (the "December 7 log") and the October 23, 2006 privilege log in *Siegel* (the "*Siegel* log") is completely overblown.

First, as set forth in detail in my November 29, 2011 letter, many of the documents that DC now complains "were not included in the *Siegel* log" were in fact included in the *Siegel* log, and the December 7 log simply corrects inadvertent errors contained in the *Siegel* log.  Second, as also set forth in my November 29, 2011 letter, many of the documents were logged multiple times to "track" their repeated appearances in the electronic archive. Third, as also set forth in my November 29, 2011 letter, many of the documents were not responsive to DC's prior requests. Fourth, as I explained during the meet-and-confer, the remaining discrepancies concern documents which were not logged previously because they were not in the paper file used to generate the initial log, including entries from the SIEG.G104 and SIEG.G105 files.  *See, e.g.,* Log Entry Nos. 2-4,17, 21, 24-26, 28, 32-33, 35, 44, 49, 55, 57, 60-61, 70-72, 77, 81, 85-94, 160, 303, 347-348, 355, 361, 364, 385-87, 396-397, 399, 403, 405-406, 413, 428, 458-459, 471, 474, 484-485, 499, 520-521, 527-528, 552, 557, 558-559, 566.  There was no failure to log these documents; the documents were either not responsive, or not in defendants' possession.  There is no basis to assert a waiver of privilege.

Moreover, while your December 5 letter claims to "identif[y] numerous documents that were not included in the *Siegel* log," it proceeds to cite documents that ***are*** logged in ***identical*** fashion in

**EXHIBIT H**
**323**

**TOBEROFF & ASSOCIATES, P.C.**

December 14, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 3

both logs.  *Compare, e.g.,* December 7 log Entry Nos. 12 and 14 (November 5, 1997 letter from Dennis Larson to Himanshu Amin) *with* October 23, 2006 Log in *Siegel,* Entry No. 5 (November 5, 1997 letter from Dennis Larson to Himanshu Amin); *see also* December 15, 2010 Privilege Log of the Siegels, Entry No. 47 (November 5, 1997 letter from Dennis Larson to Himanshu Amin).

DC then complains that "defendants are now seeking to separate out each document as required by law" by distinguishing between fax cover sheets and underlying letters.  DC improperly frames a "heads-I-win, tails-you-lose" scenario:  if defendants refuse to separate such documents, DC claims defendants are concealing evidence; if defendants separately list such documents, DC uses defendants' prior logs to argue waiver.

DC's assertions that Michael Siegel and Laura Siegel Larson lacked a "common-interest privilege" are misplaced.  The Ohio Court did not, as you state, broadly reject a "common-interest privilege" between Mr. Siegel and Ms. Larson; it only found that a select handful of such communications were not subject to that privilege because they related to an attempt to purchase Michael Siegel's passive termination interest.  As to the remaining majority of communications between Mr. Siegel and Ms. Larson, the Ohio Court denied DC's motion, upholding their privileged status.  Magistrate Zarefsky, in his May 6, 2011 order, as to which DC did not seek review, also found a common interest privilege between Mr. Siegel and Ms. Larson.  Judge Wright, in his summary October 26, 2011 order, did not broadly find against a common-interest privilege between Mr. Siegel and Ms. Larson as you claim; rather, the Court simply ordered the production of one specific July 11, 2011 letter.

**Renner Otto Production:**  Again, DC's statement that "defendants are in possession or have access to the Renner Otto expert report and calendar/billing entries, particularly through the Estate of Michael Siegel's lawyers" does not answer the question of what the Renner Otto firm intends to produce.  As the subpoena was directed at Renner Otto, not the Estate, and because we do not know what documents are in Renner Otto's possession that it deems responsive, we cannot intelligently interpose privilege objections.  For the record, such documents are not included in the "Renner Otto electronic archive."

Despite the lack of cooperation from DC and from Renner Otto on this issue, we will review the files that are in the possession of the Ohio attorneys for the Estate of Michael Siegel.

**Listing of Documents Already Produced:**  DC's complaint, as defendants understand it, is that defendants listed on their privilege log, with a notation stating "(Produced)," documents that they had already been ordered to produce.  As I stated during the meet-and-confer, Defendants did so for the simple reason that they intend to preserve such issues for appeal and to avoid any claims by DC that privilege arguments have been waived due to a failure to assert privilege as to such documents.  In fact, the Estate of Michael Siegel produced such documents again in connection with its receipt of the full Renner Otto archive.  *See, e.g.,* EOMS Production at 568-589.  DC's hyperbolic statement that it cannot "trust" defendants' logs, when defendants logged and

**EXHIBIT H**
**324**

**TOBEROFF & ASSOCIATES, P.C.**

December 14, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 3

produced such documents with appropriate notations, is a *non sequitur*.  As to Log Entry No. 387, the "(Produced)" designation was inadvertently omitted.

***Initial Correspondence***:  Correspondence between the Siegels and Mr. Toberoff has been duly logged as privileged.  *See, e.g.,* December 15, 2011 Log, Entry Nos. 659-662. DC's complaint that the Siegel defendants "have neither produced nor logged … emails confirming meetings, calendar entries, research regarding these individuals, or any other documents" is without merit.

DC simply infers that, because documents were found in Joanne Siegel's possession regarding Mr. Spence, similar documents exists as to Mr. Toberoff.  However, Ms. Larson did not retrieve such documents, which would be privileged in any event.

***Drafts of the July 11, 2003 Letter Communicated to Ms. Larson's Attorneys:***  DC cannot possibly claim that Judge Wright's October 24, 2011 ruling on DC's motion for review of Magistrate Zarefsky's September 15, 2011 order resolved the issue of "drafts" of the July 11, 2003 letter from Ms. Larson to Mr. Siegel.  In sharp contrast to its underlying motion, DC's motion for review made ***no mention whatsoever*** of "drafts" of the letter; in fact, it was directed at ***one, specific*** log entry, which defendants duly produced when so ordered.

Nor did Judge Wright's October 24, 2011 order somehow find that attorney-client privilege as to communications between Ms. Larson and Mr. Toberoff regarding the July 11, 2003 letter had been waived.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

**EXHIBIT H**
**325**