1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
     *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   22631 Pacific Coast Highway #348
4  Malibu, California, 90265
   Telephone:  (310) 246-3333
5  Fax:         (310) 246-3101

6  Attorneys for Defendants Mark
   Warren Peary, as personal
7  representative of the Estate of Joseph
   Shuster, Jean Adele Peavy, and Laura
8  Siegel Larson, individually and as
   personal representative of the Estate of
9  Joanne Siegel

10          **UNITED STATES DISTRICT COURT**

11     **CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION**

12  DC COMICS,                        | Case No: CV 10-03633 ODW (RZx)

13                 Plaintiff,         | Hon. Otis D. Wright II, U.S.D.J.

14      vs.                           | **DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS (KEVIN MARKS COMMUNICATION)**

15  PACIFIC PICTURES
    CORPORATION; IP WORLDWIDE,
16  LLC; IPW, LLC; MARC              | *Declaration of Keith Adams Filed Concurrently Herewith*
    TOBEROFF, an individual; MARK
17  WARREN PEARY, as personal        |
    representative of the ESTATE OF   | Judge:        Hon. Otis D. Wright II
18  JOSEPH SHUSTER; JEAN ADELE       | Magistrate: Hon. Ralph Zarefsky
    PEAVY, an individual; LAURA
19  SIEGEL LARSON, individually and  | Hearing Date:   February 13, 2012
    as personal representative of the | Hearing Time:  10:00 a.m.
20  ESTATE OF JOANNE SIEGEL, and     | Courtroom:      540
    DOES 1-10, inclusive,
21                                    | Discovery Cutoff:    None Set
                                      | Pretrial Conference: None Set
22                 Defendants.        | Trial:               None Set

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................1

II.   BACKGROUND ................................................................3

III.  ARGUMENT ...................................................................6

    A.    The August 2002 Letter is Protected by the Common
          Interest Privilege ....................................................6

          1.    The August 2002 Letter is Privileged on Its Face ...............6

          2.    The July 2003 Letter Did Not Waive Privilege as to
               the August 2002 Letter ........................................7

    B.    None of DC's Other Arguments Support Waiver........................10

          1.    The Unauthorized Anonymous "Timeline" Did Not
               Constitute A Waiver of Privilege .............................10

          2.    The Disclosure of the July 2003 Letter Pursuant to
               Court Order Cannot Waive Privilege ...........................12

          3.    No Express Agreement or Designation is Required
               for the Common-Interest Privilege to Apply....................12

          4.    Courts Have Upheld the Common Interest Privilege
               between Michael Siegel and Laura Siegel Larson .............13

    C.    The "Law of the Case" Doctrine Bars DC's Duplicative
          Attempt to Compel the Production of the August 2002
          Letter ...............................................................13

    D.    The Contents of the August 2002 Letter Are Obviously
          Privileged ..........................................................14

    E.    DC's Aggressive Misrepresentations to the Court
          Warrant Comment ..................................................15

IV.   CONCLUSION .................................................................19

# TABLE OF AUTHORITIES

## Federal Cases

*Bittaker v. Woodford,*
31 F.3d 715 (9th Cir. 2003) ...................................................................12

*Britesmile, Inc. v. Discus Dental, Inc.,*
2004 U.S. Dist. LEXIS 20023 (N.D. Cal. Aug. 10, 2004) ..................................9

*Burden-Meeks v. Welch,*
319 F.3d 897 (7th Cir. 2003) ...................................................................12

*Burroughs v. DeNardi Corp.,*
167 F.R.D. 680 (S.D. Cal. 1996) ..............................................................6

*Dellwood Farms, Inc. v. Cargill, Inc.,*
128 F.3d 1122 (7th Cir. 1997) .................................................................12

*Disimone v. Browner,*
121 F.3d 1262 (9th Cir. 1997) .................................................................14

*Eisenberg v. Gagnon,*
766 F.2d 770 (3d Cir. 1985) ...................................................................7

*Electro Scientific Industries, Inc. v. General Scanning, Inc.,*
175 F.R.D. 539 (N.D. Cal. 1997) ..............................................................9

*Griffith v. Davis,*
161 F.R.D. 687 (C.D. Cal. 1995) ..............................................................7

*Hebbard v. City of Dover,*
2007 U.S. Dist. LEXIS 59966 (D.N.H. Aug. 13, 2007)......................................8

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
115 F.R.D. 308 (N.D. Cal. 1987) ..............................................................9

*Hunydee v. U.S.,*
355 F.2d 183 (9th Cir. 1965) ...................................................................7

*In re Fischel,*
557 F.2d 209 (9th Cir. 1977) ...................................................................15

*In re Grand Jury Proceedings Involving Berkley and Co., Inc.,*
466 F. Supp. 863 (D. Minn. 1979) ............................................................11

*In re Qwest Communications International, Inc.,*
450 F.3d 1179 (10th Cir. 2006)................................................................8

*In re Teleglobe Communications Corporation,*
493 F.3d 345 (3rd Cir. 2007)...................................................................12

*Kenyatta v. Kelly,*
375 F. Supp. 1175 (E.D. Pa. 1974)............................................................11

*McKay v. Commissioner*,
886 F.2d 1237 (9th Cir. 1989) .................................................................15

*Official Committee of Administrative Claimants v. Bricker*,
2011 U.S. Dist. LEXIS 49504 (N.D. Ohio May 9, 2011) ...........................9

*Permian v. United States*,
665 F.2d 1214 (D.C. Cir. 1981) ...............................................................12

*Resolution Trust Corp. v. Dean*,
813 F. Supp. 1426 (D. Ariz. 1993) ...........................................................10

*Ridgeway v. Mont. High School Ass'n*,
858 F.2d 579 (9th Cir. 1988) ...................................................................14

*Sackman v. Ligget Group, Inc.*,
173 F.R.D. 358 (E.D.N.Y. 1997) ......................................................... 10-11

*Siegel v. Warner Bros. Entertainment Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ......................................................4

*Smith v. Armour Pharmaceutical Co.*,
838 F. Supp. 1573 (S.D. Fla. 1993) .........................................................11

*Tennenbaum v. Deloitte & Touche*,
77 F.3d 337 (9th Cir. 1996) ...............................................................8, 10

*Thompson v. Glenmede Trust Co.*,
1995 U.S. Dist. LEXIS 18780 (E.D. Pa. Dec. 19, 1995) ............................9

*Transamerica Computer Co., Inc. v. International Business Machines
Corp.*,
573 F.2d 646 (9th Cir. 1978) ....................................................... 1, 10, 12

*United States v. Bay State Ambulance & Hosp. Rental Serv.*,
874 F.2d 20 (1st Cir. 1989) ......................................................................6

*United States v. Buljubasic*,
808 F.2d 1260 (7th Cir. Ill. 1987) ............................................................8

*United States v. Chen*,
99 F.3d 1495 (9th Cir. 1996) ...................................................................10

*United States v. Freeman*,
519 F.2d 67 (9th Cir. 1975) .....................................................................15

*United States v. Gonzalez*,
__ F.3d __, 2012 U.S. App. LEXIS 1303 (9th Cir. Jan. 25, 2012)..........7, 12-13

*United States v. Hall*,
346 F.2d 875 (2d Cir. 1965) ....................................................................15

*United States v. Jacobs*,
117 F.3d 82 (2d Cir. 1991) ........................................................................8

*United States v. Martin,*
278 F.3d 988 (9th Cir. 2002) .................................................................8

*United States v. Musick,*
534 F. Supp. 954 (N.D. Cal. 1982) ........................................................14

*United States v. Park Place Assocs.,*
563 F.3d 907 (9th Cir. 2009) ............................................................2, 14

*United States v. Ruehle,*
538 F.3d 600 (9th Cir. 2009) .............................................................8-9

*United States v. Under Seal,*
902 F.2d 244 (4th Cir. 1990) .................................................................6

*United States ex rel. Mayman v. Martin Marietta Corp.,*
886 F. Supp. 1243 (D. Md. 1995) ..........................................................10

*Weil v. Investment/Indicators, Research & Mgmt., Inc.,*
647 F.2d 18 (9th Cir. 1981) ...................................................................8

*Westinghouse Electric Corporation v. Republic of the Philippines,*
951 F.2d 1414 (3d Cir. 1991) ................................................................12

**Federal Statutes and Rules**

17 U.S.C. § 304(c)(2)(B) .....................................................................6-7

**State Cases**

*Cooke v. Superior Court,*
147 Cal. Rptr. 915 (Cal. Ct. App. 1978) ................................................11

**Other Authorities**

6-26 Moore's Federal Practice § 26.49[5][b] ...........................................6

## I.     INTRODUCTION

DC's motion to compel the production of a clearly privileged August 9, 2002 letter (Docket No. 362; "Mot.") from attorney Kevin Marks to his clients, Joanne Siegel and Laura Siegel Larson (who owned ¾ of Jerome Siegel's statutory termination interest), and attorney Don Bulson, who represented Michael Siegel (owner of ¼ of Jerome Siegel's termination interest) (the "August 2002 Letter"), is fundamentally misguided.

Privilege was not waived by Laura Siegel's allusion to that August 2002 Letter in a July 11, 2003 letter to Michael Siegel (the "July 2003 Letter"; Declaration of Cassandra Seto (Docket No. 362-1-2; "Seto Decl."), Ex. C). Ms. Larson's mention of the August 2002 Letter to a prior **recipient** of that letter within the circle of privilege hardly waives privilege. As shown by the Siegels' privilege logs, the August 2002 Letter was sent to *both* Laura Siegel and Michael Siegel's attorney at a time when Laura Siegel and Michael Siegel indisputably shared a common interest in negotiating a potential settlement and license to DC of the Siegels' recaptured copyright interests.

DC's prior repeated attempts to affect a blanket waiver of privilege as to all communications between Laura Siegel and Michael Siegel have been firmly rejected, by both this Court and an Ohio federal district court. *See* Docket No. 239; Declaration of Keith Adams ("Adams Decl."), Ex. B (*In re Joanne Siegel*, N.D. Ohio, Case No. 1:06 MC 99, Order dated August 13, 2008). Nor does the involuntary disclosure of the July 2003 Letter pursuant to court order waive privilege. *See, e.g., Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 573 F.2d 646, 651 (9th Cir. 1978).

To somehow justify its motion, DC makes much ado over an anonymous statement in the inadmissible "Timeline" that Marks told the Siegels "he believes there has already been an agreement reached" and would testify to that effect, and trumpets this as an "inconsistency." Docket No. 49, Ex. A at 63.

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

First, this anonymous statement could hardly support an insconsistency.

Second, this does not contradict Marks' deposition testimony:

> [Marks]:  Well, if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no, ***but I did believe that we had come to an agreement back on October 19th, 2001***....  So while I thought we had an agreement on these terms, John [Schulman, Warner's General Counsel] evidently didn't, and where you don't have a meeting of the minds, you don't have an agreement.**"**

Adams Decl., Ex. A at 9:12-10:2 (emphasis added).  DC bases its unsupported arguments on the circular notion that it might "impeach" these witnesses' testimony, based on speculation as to the contents of privileged communications.

DC's motion is little more than yet another rehash of arguments and claims rejected in *Siegel*.  In *Siegel*, DC moved to compel the production of the August 2002 Letter, arguing a purported inconsistency between the "Timeline" and Marks' testimony, and was denied.  *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400, Docket Nos. 476 (motion) (Adams Decl., Ex. C), 478 (denial) (Adams Decl., Ex. D).  This Court should deny DC's motion on that ground alone.  *See United States v. Park Place Assocs.*, 563 F.3d 907, 925 (9th Cir. 2009).

In fact, DC admits that its goal is to re-litigate the judgment in *Siegel* that 2001-2002 settlement negotiations did not result in a binding agreement between DC and the Siegels, notwithstanding that DC is squarely barred by collateral estoppel.  Mot. at 7 n.2.

Lastly, throughout its motion, as in its other pleadings and motions, DC and its counsel consistently misrepresent the facts and make assertions that are unsupported and/or contradicted by the record.

There is no basis to compel the production of the privileged August 2002 Letter.  Accordingly, DC's motion must be denied.

///

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

## II.    BACKGROUND

DC's motion misrepresents the factual background and record, portraying its unsupported allegations as fact.

DC represents that "DC and the Siegels … [reached] an agreement in October 2001 finally settling the Siegels putative claims" and that Mr. Marks sent an October 19, 2001 letter confirming that agreement.  Mot. at 9.  However, the actual chain of events was ably set forth by Judge Larson, in an opinion incorporated in a final judgment by Judge Wright:

> At some point the broad outline of a global settlement concerning the copyright to the Superman material, as well as to other works Siegel either authored or contributed material to Detective Comics (notably, Superboy and The Spectre properties), was reached. Specifically, on October 19, 2001, counsel for Joanne Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General Counsel confirming and summarizing the substance of the settlement. The letter concluded that "if there is any aspect of the above that is somehow misstated, please let me know by [October 22, 2001] at 2:00, as I will be out of the office -- and likely difficult to reach -- for the following four weeks."
>
> A week later, on October 26, 2001, Warner Bros.' General Counsel John Shulman responded with a letter, stating that he had "reviewed" the summary set forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of what we believe the deal we've agreed to is"; the outline was five pages long.  The letter concluded that Warner Bros. was "working on the draft agreement" so as to "have this super-matter transaction in document form."
>
> A few months later, on February 1, 2002, outside counsel for Warner Bros. provided a copy of the promised draft agreement (spanning fifty-six pages), with the proviso that, "[a]s our clients have not seen this latest version of the agreement, I must reserve their right to comment." Mention was also made in the draft agreement for the need of certain "Stand Alone Assignments" that had as yet not been finalized, something which Warner's outside counsel promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).
>
> Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time Warner's Chief Operating Officer Richard Parsons, recounting that she and her daughter had "made painful concessions and reluctantly accepted John Shulman's last [settlement] proposal [in October, 2001]," but upon reading the proposed draft agreement learned that they had been "stabbed in the back," as it "contained new, outrageous demands that were not in the [October, 2001] proposal," such as "condition[ing] recei[pt of] financial compensation for our rights on demands which were not in the proposal we accepted." The letter concluded that "[a]fter four

3

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

1   years we have no deal and this contract makes an agreement
    impossible."
2           Time Warner's CEO quickly responded with a letter of
    his own on May 21, 2002, expressing shock and dismay as
3   "each of the major points covered in the draft agreement . . .
    accurately represented the agreement previously reached" by
4   the parties. (Decl. Michael Bergman, Ex. AA). The letter
    continued by acknowledging that, as with all lengthy
5   negotiations, Time Warner "expected" that the submission of
    the draft agreement would result in further "comments and
6   questions on the draft" by Siegel family's representatives that
    "would need to [be] resolve[d]." The letter concluded by
7   reaffirming Time Warner's continued interest "that this
    agreement can be closed based upon the earlier discussions
8   with [the Siegel family's] lawyers."

9   *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1116-17 (C.D.

10  Cal. 2008) (alterations in original; internal citations omitted); *Siegel*, Docket

11  No. 669 (judgment).

12          The Court found that this exchange did not result in any binding

13  agreement, not on the basis of "deposition testimony" as DC falsely suggests

14  (Mot. at 7 n.2), but on the documentary evidence before it:

15          Defendants [DC and Warner Bros.] further seek to create issues
        of fact through post hoc testimony and rationalizations. ***None
16      of this subjective belief is sufficient to defeat the objective
        manifestation of the parties' intent relayed in the documents
17      referenced above that aptly demonstrate that there was no
        "meeting of the minds" on all material terms... One need only
18      review the language of the parties' correspondence, their
        conduct in reaction thereto, and the numerous material
19      differences between the terms relayed in the October 19 and
        26, 2001 letters and the February 1, 2002, draft to reach the
20      conclusion that the parties failed to come to an agreement on
        all material terms...*** Far from signifying that the parties'
21      "negotiations... result[ed] in a binding contract" leaving
        nothing more than the drafting of more formal documentation
22      memorializing that agreement, these submissions between the
        parties went far beyond that by adding in or further refining
23      areas from what was contained in the October 19 letter... *From
        all of this there is no document or set of documents reflecting
24      agreement by the parties to singular agreed terms.*

25  542 F. Supp. 2d at 1138-1139 (internal citations omitted) (emphasis added).

26  *See also id.* at 1137 (the parties "found themselves in the all-too-familiar

27  situation in which verbal settlement negotiations result in *what the parties*

28  *believe to be an agreement* on all the major points of dispute but which, upon

4

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

1    further discussion, falls short of the agreement needed to resolved the dispute").

2        DC's entire motion is little more than a grasp for straws in its ongoing

3    effort, barred by collateral estoppel, to re-litigate this decision.

4        From April 1999 - February 2002, DC negotiated with Kevin Marks on

5    behalf of the Siegels, and Marks apprised Don Bulson, Michael Siegel's

6    attorney of the status of these negotiations. *See, e.g.,* Seto Decl., Ex. F at 300-

7    11.  As Defendants have long acknowledged, "in early August 2002, Marks held

8    a conference call with Toberoff and [Ari] Emanuel, during which Emanuel

9    made a proposal to purchase the Siegels' rights for $15 million plus a portion of

10   the 'back end,'" and "Marks conveyed this August 2002 offer to the Siegels."

11   *See, e.g.,* Docket No. 75 at 8:22-26.  On August 9, 2002, Marks sent a letter to

12   Joanne Siegel and Laura Siegel Larson and to Don Bulson/Michael Siegel.

13       In early 2003, Toberoff, on behalf of Emanuel, offered to purchase

14   Michael Siegel's Superman interest, to consolidate the Siegels' recaptured

15   Superman copyright interests.  Seto Decl., Exs. A, C.

16       In October **2006**, well after Marks had been fired by the Siegels, and well

17   before DC filed this action, Marks clearly testified that "*I did believe that we

18   had come to an agreement back on October 19th, 2001*," while testifying in the

19   same paragraph that ultimately, "a final, binding, *enforceable* agreement" was

20   not reached as there had been no "meeting of the minds" on all terms.  *See*

21   Adams Decl., Ex. A at 9:13-14, 10:1-2 (emphasis added).

22       In March 2007 in *Siegel*, DC moved to compel the production of ***all*** of

23   the documents stolen from Mr. Toberoff's law offices and anonymously sent to

24   DC Comics/Warner Bros. by the author of the Timeline. This Court denied that

25   motion as to documents listed on the Siegels' privilege logs.  *Siegel,* Docket No.

26   158.  In December 2008, Judge Larson ordered in *Siegel* that the unauthorized

27   "Timeline" be produced, on the grounds it was not listed on a privilege log, but

28   maintained privilege for the documents described therein that had been logged.

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

1  *Siegel,* Docket No. 386.  On March 2, 2009, DC brought a motion to compel the

2  production of the August 2002 letter (*Siegel*, Docket No. 476), on the same or

3  similar grounds as here, which was denied.  *Siegel*, Docket No. 478.

## III.   ARGUMENT

### A.   The August 2002 Letter is Protected by the Common Interest Privilege

#### 1.   The August 2002 Letter is Privileged on Its Face

8  Communications between clients and attorneys, where such clients have a

9  common legal interest, are privileged.  *See* 6-26 Moore's Federal Practice §

10  26.49[5][b] ("The common interest doctrine … provides that parties with a

11  shared interest in actual or potential litigation against a common adversary may

12  share privileged information without waiving the privilege."); *United States v.*

13  *Under Seal*, 902 F.2d 244, 249 (4th Cir. 1990) (collecting cases) ("[T]he

14  rationale for the joint defense rule remains unchanged: persons who share a

15  common interest in litigation should be able to communicate with their

16  respective attorneys and with each other…").

17  A common interest privilege exists where "(1) the communications were

18  made in the course of a joint effort, (2) the statements were designed to further

19  the joint effort, and (3) the privilege has not been waived."  *Burroughs v.*

20  *DeNardi Corp.,* 167 F.R.D. 680, 685 (S.D. Cal. 1996) (citing *United States v.*

21  *Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir. 1989)).

22  Here, all three elements are easily met.  The August 2002 Letter was from

23  Marks to his clients, Joanne Siegel and Laura Siegel, and to Don Bulson,

24  Michael Siegel's attorney.  There was an obvious common interest between

25  Michael Siegel and Laura Siegel Larson as both shared a statutory interest in the

26  Siegels' statutory terminations as a matter of law.  17 U.S.C. § 304(c)(2)(B)

27  ("The author's surviving children … own the author's entire termination interest

28  unless there is a widow or widower, in which case the ownership of one-half of

6

the author's interest is divided among them.").

The August 2002 Letter concerned the Siegels' settlement negotiations with DC of this statutory termination interest, in which the interests of Joanne Siegel, Laura Siegel Larson and Michael Siegel were all aligned, and none of these individuals have voluntarily disclosed the contents of such privileged communications.

Not only were Laura and Michael's interests aligned in August 2002, even if such interests had diverged in some respect, they remained co-owners as a matter of law, and a common interest privilege can exist even where the parties' interests may be "adverse in some respects." *Griffith v. Davis*, 161 F.R.D. 687, 692 n.6 (C.D. Cal. 1995). *See United States v. Gonzalez*, __ F.3d __, 2012 U.S. App. LEXIS 1303, *14 (9th Cir. Jan. 25, 2012) (affirming common interest between parties with some adverse interests); *Hunydee v. U.S.*, 355 F.2d 183, 185 (9th Cir. 1965) (applying common interest doctrine to statements concerning a matter of common concern, even though co-defendants generally had a conflict of interest); *Eisenberg v. Gagnon*, 766 F.2d 770, 787-788 (3d Cir. 1985) (recognizing that "communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests").

## 2. The July 2003 Letter Did Not Waive Privilege as to the August 2002 Letter

Laura Siegel Larson's July 2003 Letter to Michael Siegel did not and could not waive privilege as to the August 2002 Letter. DC contends that Ms. Larson's statement in her July 2003 Letter that "Kevin Marks said that if asked to, he would testify against us [Joanne Siegel and Laura Siegel Larson] in court," meant that "she thereby waived any privilege in the contents of the [August 2002] letter." Mot. at 10.

To the extent Ms. Larson's July 2003 Letter (stating "[y]ou'll remember

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

that you, Don Bulson and we were shocked when Kevin Marks said that if

asked to, he would testify against us in court….") allegedly alluded to the

August 2002 Letter, that was a privileged letter by her attorney Marks to ***both***

the Siegels and Don Bulson/Michael Siegel. Seto Decl., Ex. C.  As Michael

Siegel was a party to the privileged August 2002 Letter sent to his attorney

Bulson,  Michael would have already been aware of this purported

communication. Thus, as Defendants advised DC during the meet-and-confer

process (Seto Decl., Ex. E), the July 2003 Letter did not "disclose" to Michael

Siegel any information that was not already in his possession.  *See United States*

*v. Buljubasic*, 808 F.2d 1260, 1268 (7th Cir. 1987) ("A client does not waive the

privilege by stating facts that [the recipients] already know or could deduce.");

*Hebbard v. City of Dover*, 2007 U.S. Dist. LEXIS 59966 at *8 (D.N.H. Aug. 13,

2007) (holding that "confirmation to a reporter of what the reporter already

knew is not sufficient to waive the privilege allowed the contents of the

document").

        Thus, none of the cases cited by DC as to "waiver" is even remotely

applicable to the situation here, where an individual repeats privileged

information to a third party (sharing a common interest) who already possessed

that information through a privileged communication.  *See Tennenbaum v.*

*Deloitte & Touche,* 77 F.3d 337 (9th Cir. 1996) (express waiver in the course of

settling a lawsuit); *Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647

F.2d 18 (9th Cir. 1981) (voluntary disclosure to opposing side during

deposition); *United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1991) (finding waiver

only as to the communication actually disclosed ); *In re Qwest Communications*

*International, Inc.*, 450 F.3d 1179 (10th Cir. 2006) (same); *United States v.*

*Martin*, 278 F.3d 988, 1000-01 (9th Cir. 2002) (officer of sham corporation has

no attorney-client relationship with the corporation's general counsel); *United*

*States v. Ruehle*, 538 F.3d 600, 610-12 (9th Cir. 2009) (corporate officer's

8

communications to in-house counsel not privileged where it was to be shared with outside accounting firm).

*Electro Scientific Industries, Inc. v. General Scanning, Inc.*, 175 F.R.D. 539 (N.D. Cal. 1997), heavily relied on by DC, supports Defendants' position. There, the defendant asked outside counsel to provide written opinions about disputed patents. *Id.* at 539. The substance of those opinions was later privately sent to potential customers. *Id.* at 541–42. Those disclosures did not result in a waiver, because the defendant and its actual/potential customers shared a "community of interest." *Id.* Privilege was waived only where the defendant voluntarily publicly disclosed the substance of the opinions in a press release. *Id.* at 542.

That the July 2003 letter, unlike the August 2002 letter, was sent by/to a party with a common interest, rather than his attorney, does not change the analysis for the reasons set forth above. Moreover, Courts have emphasized that even direct communications between jointly-interested clients are privileged where both parties, as here, share an interest in potential litigation. *See Thompson v. Glenmede Trust Co.*, 1995 U.S. Dist. LEXIS 18780, at *15–16 (E.D. Pa. Dec. 19, 1995) (common interest privilege existed between relatives who shared an interest in potential litigation); *Britesmile, Inc. v. Discus Dental, Inc.*, 2004 U.S. Dist. LEXIS 20023 (N.D. Cal. Aug. 10, 2004) (common interest privilege applied where seller sent privileged material directly to potential buyer); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987) (same); *Official Committee of Administrative Claimants v. Bricker*, 2011 U.S. Dist. LEXIS 49504, at *10–11 (N.D. Ohio May 9, 2011) (communications between "'individual [committee] members and professionals'" protected by common-interest privilege, even though not sent to an attorney).

///

9

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

**B.**    **None of DC's Other Arguments Support Waiver**

**1.**    **The Unauthorized Anonymous "Timeline" Did Not Constitute A Waiver of Privilege**

In both this case and the closely related *Siegel* litigation, DC's motions to compel the production of documents based on the purported unauthorized disclosures in the illicit Timeline were duly denied.  *See Siegel,* Docket Nos. 158, 374, 386; Docket No. 209 at 11-12, 248, 253, 285.  Both Judge Larson and this Court have expressly upheld privilege as to the logged documents the anonymous Timeline purports to discuss.  *See, e.g., Siegel,* Docket No. 386; Docket No. 209 at 11.  DC provides no basis whatsoever to revisit such rulings.

These rulings were indisputably correct.  Waiver of the attorney-client privilege arises only when the holder of the privilege takes *voluntary* action to waive the privilege – such as by voluntarily disclosing the information or by affirmatively putting attorney-client communications at issue.  *See Transamerica Computer Co., Inc.,* 573 F.2d at 651 (holding that "disclosure of confidential material constitutes a waiver of the attorney-client privilege only if it is voluntary and not compelled.").  Unauthorized disclosure of protected attorney-client communications does not waive the privilege.  *See Tennenbaum,* 77 F.3d at 341 ("[T]he focal point of privilege waiver analysis should be the *holder's* disclosure of privileged communications to someone outside the attorney-client relationship."); *Resolution Trust Corp. v. Dean*, 813 F. Supp. 1426, 1430 (D. Ariz. 1993) (finding that, as the disclosure was unauthorized and possibly criminal, the party "did not voluntarily waive any attorney-client privilege it would have possessed"); *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (an ex-employee "cannot waive the corporation's privilege"); *United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md. 1995) (privilege not waived as to document stolen by fired employee); *Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y.

10

1997) (prohibiting deposition testimony of expert who based his opinion on a stolen privileged document disseminated to the public).[1]

Thus, DC's assertion that the "disclosures [in the Timeline] vitiate any claims of privilege" (Mot at 12) is contrary to both well-established law and multiple orders in this case and *Siegel*.

To evade this, DC and its counsel grossly distort the record. In December 2008, Judge Larson ordered the Timeline produced in *Siegel* over defendants' objections. DC states "when DC finally obtained the [Timeline] in December 2008, defendants took no steps to maintain its confidentiality," and misleadingly repeats the falsehood that "*defendants* chose openly and publicly to file the Timeline on March 2, 2009, as part of a discovery joint stipulation in the *Siegel* case [by DC to compel the August 2002 Letter]." Mot. at 12 (emphasis added). First, there was no longer "confidentiality" to "maintain" as the Timeline was ordered produced to DC. Second, as Defendants previously stated (see Docket No. 65 at 2), DC and Warner filed the Timeline (Docket No. 42-17 at 337-44) over the Siegels' adamant objections (Docket No. 42-16 at 270, 330), just as DC and its counsel willfully publicized this anonymous screed by gratuitously attaching it to their complaint. *See* Docket Nos. 1, 49.

Moreover, DC cannot point to references by Defendants to the Timeline as a waiver, when such references were in defense to DC's motion to compel based on the Timeline or its complaint based on the Timeline. Docket No. 209 at 10 ("Defendants do not waive the privilege by defending themselves.").

---

[1] *See also In re Grand Jury Proceedings Involving Berkley and Co., Inc.*, 466 F. Supp. 863, 870 (D. Minn. 1979) ("To the extent the documents can be viewed as stolen…they should not lose the protection of the privilege.")*; Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla. 1993) (denying use of memorandum widely distributed after its *unauthorized* release); *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (precluding use of documents stolen by a third party from defendants, even though the documents had already been produced by defendants to the plaintiffs); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978) (evidence excluded where stolen and passed to opposing counsel).

11

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

### 2.    The Disclosure of the July 2003 Letter Pursuant to Court Order Cannot Waive Privilege

The July 2003 Letter had been repeatedly upheld as privileged, including by Judge Wright, until Judge Wright summarily ordered its production.  Docket No. 209 at 11, 248, 285, 323, 336; *Siegel,* Docket Nos. 374, 386.  The law in both the Ninth Circuit and California courts is that involuntary production pursuant to Court order does not waive the attorney-client privilege.  *See, e.g., Transamerica Computer Co., Inc.,* 573 F.2d at 651; *Bittaker v. Woodford,* 31 F.3d 715 (9th Cir. 2003).

### 3.    No Express Agreement or Designation is Required for the Common-Interest Privilege to Apply

DC attacks a straw man – that there was no expectation by Laura Siegel Larson that Michael Siegel would keep their communications confidential, purportedly because the letters were not expressly marked "confidential."  Mot. at 10.  In fact, Michael Siegel never disclosed such communications, even after *Siegel* was filed in 2004.

As shown by *In re Teleglobe Communications Corporation,* 493 F.3d 345, 366-67 (3rd Cir. 2007), an express agreement is not required for the common interest privilege to apply, as long as the parties intend that their communications be kept confidential.  Contrary to DC's suggestion (Mot. at 10:6-7), it is the presence or absence of a "common interest," not a "confidential" designation, that controls the analysis, as shown by the cases DC itself cites[2] and as the Ninth Circuit recently affirmed.  *See Gonzalez,* 2012 U.S.

---

[2] *See Burden-Meeks v. Welch,* 319 F.3d 897, 899-900 (7th Cir. 2003) (waiver where document disclosed to entity with no common interest; no indication of whether the documents were marked confidential); *Dellwood Farms, Inc. v. Cargill, Inc.,* 128 F.3d 1122 (7th Cir. 1997) (waiver where materials disclosed to target corporation's directors); *Permian v. United States,* 665 F.2d 1214 (D.C. Cir. 1981) (waiver where target of investigation disclosed material to the government); *Westinghouse Electric Corporation v. Republic of the Philippines,* 951 F.2d 1414 (3d Cir. 1991) (same).

12

App. LEXIS 1303 at *10-11 (holding that "it is clear that no written agreement is required" for the common-interest privilege to apply and citing cases that apply the privilege "'even without an express understanding that the recipient shall not communicate the contents thereof to others'") (citations omitted). Here, the parties intended to keep, and kept their communications private and confidential.

### 4.    Courts Have Upheld the Common Interest Privilege between Michael Siegel and Laura Siegel Larson

DC and its counsel misrepresent that the Ohio court and Judge Wright rejected a "common interest privilege" between Michael Siegel and Laura Siegel Larson. Mot. at 10. However, in response to DC's motion to compel all of the communications between Michael and Laura, the Ohio court found that only a select handful of such communications that related to Emanuel's attempt to purchase Michael Siegel's ¼ termination interest were not subject to the common interest privilege. Adams Decl., Ex. B. As to the remaining communications, the Ohio Court denied DC's motion, upholding their privileged status. *Id*. Similarly, this Court's May 6, 2011 order, which DC conspicuously omits, expressly upheld the joint-interest privilege for "interests that Mr. Siegel and Ms. Larson held in common" (Docket No. 239 at 1) – *e.g.,* the recaptured Siegel copyright interest, in negotiations with third parties (*e.g.*, Warner Bros./DC ) to license that interest. Lastly, Judge Wright's October 26, 2011 order, summarily stamping DC's simple proposed order "Granted," did not broadly find against a common-interest privilege between Mr. Siegel and Ms. Larson, but simply ordered the production of a single July 11, 2011 letter without specifying the grounds. Docket No. 336.

### C.    The "Law of the Case" Doctrine Bars DC's Duplicative Attempt to Compel the Production of the August 2002 Letter

The "law of the case" doctrine stands for the common-sense principle that

13

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

the same *issue* presented a second time in the same court should lead to the same result, as to do otherwise "would create intolerable instability for the parties." *Ridgeway v. Mont. High School Ass'n*, 858 F.2d 579, 587-88 (9th Cir. 1988). As this Court has held:

> From a realistic standpoint, **the present case is so closely related as to be considered properly part of the same case as *Siegel*** for purposes of application of the law of the case principles…. **It is appropriate, under the peculiar facts of these two cases, that applicable rulings made in the original case should govern the outcome here**, unless there is some very good reason to change those rulings.

Docket No. 209 at 4 (emphasis added). *See also Park Place Assocs.*, 563 F.3d at 925 (same); *Disimone v. Browner*, 121 F.3d 1262, 1366-68 (9th Cir. 1997) (applying "law of the case" to related cases).[3] As noted above, DC already brought a motion to compel the production of the August 2002 letter in *Siegel*, on the same and similar grounds as it does here, which motion was denied. *Siegel,* Docket Nos. 476, 478. The July 2003 Letter presents no valid ground to revisit that ruling.

## D.    The Contents of the August 2002 Letter Are Obviously Privileged

DC speculates that the August 2002 Letter contained "facts" as to an August 2002 offer by Ari Emanuel to the Siegels' attorney Kevin Marks, or Marks' opinion about that offer, and on that supposed basis argues that those portions of the letter are not privileged.

This straw man is unpersuasive. Defendants have not claimed privilege as to the Emanuel offer itself. Both Marks and Mr. Toberoff freely testified about this offer, and Defendants have repeatedly pointed to such testimony in their briefing. *See, e.g.,* Docket No. 75 at 8. Marks testified that he conveyed that August 2002 offer to the Siegels, while maintaining privilege as to the

---

[3] *See also United States v. Musick*, 534 F. Supp. 954, 957 (N.D. Cal. 1982) ("[T]he general rule is that a decision in one case is … the law of the case in a related action if it involves the same subject matter and if the points of decision and facts are identical.").

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE: KEVIN MARKS COMMUNICATION

1  substance of his communication, including his privileged opinions and thought

2  process regarding the August 2002 offer.  *See, e.g.,* Docket No. 75 at 8:25-9:1.

3      All privileged attorney-client communications necessarily entail certain

4  "facts," intertwined with the substance of such communications.  This does not

5  render privileged communications discoverable.

6      *In re Fischel*, 557 F.2d 209, 212 (9th Cir. 1977), cited by DC, is

7  instructive on this point.  *Fishel* concerned mere summaries of business

8  transactions between a client and third parties prepared by an attorney and sent

9  to the client, and held that "the facts of each transaction received from third

10 parties are not privileged."  *Id.* at 212.  However, *Fishel* expressly left open

11 whether the summaries themselves (rather than the underlying transactions)

12 were privileged, and stated that where they were "interwoven" with an

13 attorney's advice, they would be protected by the privilege.  *Id.*

14     DC's other cases are wildly off-point.  *See McKay v. Commissioner*, 886

15 F.2d 1237, 1238 (9th Cir. 1989) (fact that an attorney forwarded an IRS notice

16 to his client was not itself privileged); *United States v. Freeman*, 519 F.2d 67

17 (9th Cir. 1975) (same re: court order); *United States v. Hall*, 346 F.2d 875 (2d

18 Cir. 1965) (same re: court order).

19     DC's speculation that the August 2002 letter is not privileged is wholly

20 unsupported, and actually contradicts the rest of DC's motion, which argues that

21 that the August 2002 Letter contains Marks' supposed legal ***opinion*** (which DC

22 now pretends is a "fact") as to whether an "agreement" had been reached with

23 DC.  Mot. at 12:25-26.

24     **E.    DC's Aggressive Misrepresentations to the Court Warrant**

25         **Comment**

26     As in its concurrent motion to compel the further deposition of Dawn

27 Peavy, DC and its counsel egregiously attempt to mislead the Court:

28     • DC states that Toberoff "falsely represented to the Siegels, through

15

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

1    Marks, that a wealthy investor was prepared immediately to pay the
2    Siegels $15 million for their putative Superman rights, plus other
3    consideration" (Mot. at 1; see also *id.* at 4 (same argument)), and refers to
4    an "unnamed" investor (Mot. at 3, 9, 11).  DC omits that from the
5    testimony of all involved witnesses, both in *Siegel* and throughout this
6    case, it is clear that the "investor" was Emanuel and that a straightforward
7    $15 million offer was, in fact, made by Emanuel to Marks.  Docket No.
8    75 at 8.

9    • DC makes numerous representations as to the contents of the August
10   2002 Letter of which it lacks knowledge; *e.g.,* "[Marks] told [the Siegels]
11   they could not accept [the August 2002 Emanuel offer] because they 'had
12   a deal with Time Warner/DC'" (Mot. at 3); [the August 2002 Letter ]
13   "confirm[s] that Marks, in fact, told Toberoff and the Siegels exactly what
14   the Timeline author reported" (Mot. at 12).

15   • As stated above, DC's assertion that Defendants "publicly filed [the
16   Timeline] in *Siegel* in March 2009" (Mot. at 2) is false.

17   • DC represents that "defendants previously asserted the Toberoff Timeline
18   invented" Marks' "communications [to the Siegels.]"  Mot. at 2.
19   Defendants made it crystal clear that the Timeline referred to but
20   misinterpreted the August 2002 Letter.  *See Siegel,* Docket No. 476 at 38
21   (Adams Decl., Ex. C at 74) ("[The Timeline] inaccurately describes both
22   the content and meaning of the August 9[, 2002] letter.").

23   • DC states that Mr. Toberoff "scripted" the July 2003 letter.  *See* Mot. at 5,
24   7, 12.  Ms. Larson testified that she drafted the letter on her own and sent
25   it to her attorney, Mr. Toberoff, for comment, and that she "accepted
26   some of the things [Mr. Toberoff] had said and didn't use some other
27   suggestions he had made."  Docket No. 316-5 at 313:3-10.

28   • DC repeatedly describes the irrelevant offer to purchase Michael Siegel's

16
DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

recaptured copyright interests as "illicit" (Mot. at 9, 12), when there is
nothing "illicit" in an offer to buy rights.

- DC argues that this irrelevant offer to Michael's attorney Don Bulson was
  "worse" than DC's offers and that Toberoff did not disclose that the
  offeror was Emanuel (Mot. at 11), when all involved were well aware of
  DC's moribund offers, Emanuel had no duty to offer a superior deal, and
  Mr. Toberoff had no duty to disclose Emanuel's identity to Bulson.

- DC pretends Mr. Toberoff "secur[ed] half of the Shuster heirs' putative
  Superman copyright interests for himself" (Mot.at 5), when that was
  impossible as a matter of law, 17 U.S.C. § 304(c)(6)(D), as confirmed by
  DC itself in its complaint.  FAC ¶¶ 167-68.

Notably, while DC quotes in full five paragraphs of the anonymous Timeline
written by a thief (Mot. at 6), DC only quotes snippets of the July 2003 Letter,
despite its unrelenting hype that the letter contains "revelations" that
purportedly support DC's claims.  Mot. at 5.  In reality, the July 2003 Letter,
written long before DC filed this bogus lawsuit in 2010, supports ***many*** of
Defendants' factual contentions and directly refutes DC's key allegations:

- DC falsely alleges that the August 2002 offer caused the Siegels to break
  off negotiations with DC.  The July 2003 Letter squarely refutes this,
  outlining the Siegels' disgust with DC's negotiating tactics and egregious
  new terms (Seto Decl., Ex. C at 286-87).  The July 2003 Letter states in
  reference to DC's February 1, 2002 counteroffer:  "It was a bogus offer
  filled with unacceptable land mines"; It was a bad and unreasonable
  deal"; "As a result of Time Warner's hardball tactics we feared we would
  have trouble collecting any future money from them"; "you and Don
  Bulson stated that you couldn't believe how bad the document was that
  they had written."  *Id.* at 287.

- The July 2003 Letter also notes that "[n]either Kevin Marks nor Don

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

1    Bulson had informed us that Marc Toberoff had contacted Marks and you

2    about the Superman rights until months after it had taken place." *Id.* The

3    letter further points out: "Marc [Toberoff] does not control the Superman

4    copyright. He has been hired to do a job"; "Marc does not own the

5    Shuster interest. He is a lawyer hired by Joe Shuster's estate"; "We fired

6    Kevin Marks and Bruce Ramer because they were insisting we take a bad

7    TW/DC deal"; "We went to Marc to talk about him representing the

8    Siegels. Marc did not pursue us"; "Marc did not call my mom or me. My

9    mom called the Shuster family to see what the Shusters were doing. The

10    family gave Marc's number to my mom and she called him after she had

11    fired Ramer and Marks." These statements in the July 2003 Letter also

12    comport with the 2006 deposition testimony of Ms. Larson, her mother

13    Joanne Siegel and their attorney Marks in *Siegel*, well prior to DC's

14    concocted interference claims in 2010.

15    • DC states that "Toberoff also falsely represented that he and his business

16    partner would help the Siegels produce their own Superman movie" (Mot.

17    at 4), tracking its fake complaint allegation (FAC ¶ 78) that merely

18    mimicked the Timeline, which, in turn, mimicked Michael Siegel's wild

19    speculations in his May 13, 2003 letter. *Compare* FAC, Ex. A at 63 *with*

20    Docket No. 225-4. This nonsense is directly contrary to Marks' sworn

21    testimony in this case that this subject *never* came up (Docket No. 98-3 ¶

22    3), Marks' deposition testimony in *Siegel*, and Ms. Larson's July 2003

23    Letter, which clearly responded: "Marc Toberoff has no plans to produce

24    a Superman movie."

25    DC's unrelenting discovery motions based on prejudicial habitual distortions

26    of the record are little more than an effort to garner leverage by harassing

27    Defendants and their counsel and driving up their litigation costs.

28    ///

18

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION

## IV.    CONCLUSION

For all of the above reasons, DC's motion to compel should be denied.

DATED:  January 30, 2012          TOBEROFF & ASSOCIATES, P.C.


By _____
              Marc Toberoff

Attorneys for Defendants Mark Warren Peary,
as personal representative of the Estate of
Joseph Shuster, Jean Adele Peavy, and Laura
Siegel Larson, individually and as personal
representative of the Estate of Joanne Siegel

DEFENDANTS' OPPOSITION TO DC COMICS' MOTION TO COMPEL RE:
KEVIN MARKS COMMUNICATION