ORIGINAL SHIPPED   OCT 1 7 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA          )
SIEGEL LARSON,                   )
                                 )
         Plaintiffs,             )
                                 )
    vs.                          )      No. 04-8400 (RSWL)(RZx)
                                 )
WARNER BROS. ENTERTAINMENT )            -and-
INC., et al.,                    )
                                 )      No. 04-8776 (RSWL)(RZx)
         Defendants.             )
_____ )
AND RELATED COUNTERCLAIMS.

**CERTIFIED COPY**

DEPOSITION OF KEVIN S. MARKS

Beverly Hills, California

Saturday, October 7, 2006

Volume 1

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL** *Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

```
 1          Deposition of KEVIN S. MARKS, taken on

 2      behalf of Defendants and Counterclaimants,

 3      at 9665 Wilshire Boulevard, 9th Floor, Beverly

 4      Hills, California, beginning at 10:05 AM on

 5      Saturday, October 7, 2006, before DAVID S.

 6      COLEMAN, Certified Shorthand Reporter No. 4613.

 7

 8

 9  APPEARANCES:

10

11  For Plaintiffs:

12      LAW OFFICES OF MARC TOBEROFF
        BY:  MARC TOBEROFF
13      Attorney at Law
        2049 Century Park East, Suite 2720
14      Los Angeles, California 90067
        310-246-3333
15

16  For Defendants and Counterclaimant:

17      WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL
        BY:  MICHAEL BERGMAN
18      Attorney at Law
        9665 Wilshire Boulevard, 9th Floor
19      Beverly Hills, California 90212
        310-858-7888
20      mbergman@wwllp.com

21          -and-

22      PERKINS LAW OFFICE
        BY:  PATRICK T. PERKINS
23      Attorney at Law
        1711 Route 9D
24      Cold Springs, New York 10516
        845-265-2820
25
```

                                                        2

**EXHIBIT A-4**

```
1    APPEARANCES (Continued):

2

3    For the Witness:

4        JEFFER MANGELS BUTLER & MARMARO
         BY:  MARC MARMARO
5        Attorney at Law
         1900 Avenue of the Stars, 7th Floor
6        Los Angeles, California 90067-4308
         310-203-8080
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    3
```

```
1                          I N D E X

2


3


4    WITNESS                 EXAMINATION              PAGE

5    KEVIN S. MARKS

6                       BY MR. BERGMAN              8

7                       BY MR. TOBEROFF            203

8


9                          EXHIBITS

10

11   DEPOSITION                                     PAGE

     1     First Amended Privilege Log            11
12
     2     Kevin Marks calendars, Bates Nos.      12
13         GTRB 0506 - 0514

14   3     Kevin Marks call records, Bates        12
           Nos. GTRB 0515 - 0635
15
     4     Letter from Bruce Ramer to Carol       38
16         Simkin and John Schulman dated
           April 30, 1999, Bates Nos. GTRB
17         0009 - 0010

18   5     Letter from John Schulman to Bruce     43
           Ramer dated July 7, 1999, Bates
19         Nos. GTRB 0018 - 0019

20   6     Letter from Bruce Ramer to John        44
           Schulman dated July 9, 1999, Bates
21         Nos. GTRB 0011 - 0013

22   7     Letter from John Schulman to Bruce     46
           Ramer dated July 12, 1999, Bates
23         Nos. GTRB 0016 - 0017

24

25

                                                      4
```

U.S. LEGAL SUPPORT

**EXHIBIT A-6**

INDEX (Continued):

                  EXHIBITS (Continued)

DEPOSITION                                        PAGE

8     Letter from Paul Levitz to Joanne          51
      Siegel and Laura Siegel Larson dated
      October 10, 1997, Bates Nos. GTRB
      0499 - 0504

9     Letter from John Schulman to Bruce         52
      Ramer dated September 13, 1999,
      Bates Nos. GTRB 0020 - 0021

10    Letter from Bruce Ramer to John            58
      Schulman dated September 28, 1999,
      Bates Nos. GTRB 0026 - 0028

11    Letter Kevin Marks to Paul Levitz          59
      dated November 3, 1999, Bates Nos.
      GTRB 0031 - 0032

12    Fax from Patrick Perkins to Kevin          67
      Marks dated January 6, 2000, Bates
      Nos. GTRB 0033 - 0042

13    Letter from Kevin Marks dated Carol        68
      Simkin dated March 7, 2000, Bates
      Nos. GTRB 0043 - 0056

14    Letter from Kevin Marks to John            90
      Schulman dated June 9, 2000, Bates
      Nos. GTRB 0124 - 0129

15    Letter from John Schulman to Kevin         92
      Marks dated July 18, 2000, Bates
      Nos. GTRB 0001 - 0006

16    Letter from Joanne Siegel to Gerald        97
      Levin dated July 24, 2000, Bates
      Nos. WB005977 - 005981

17    Letter from John Schulman to Kevin         98
      Marks dated July 26, 2000, Bates
      Nos. GTRB 0113 - 0114

5

**U.S. LEGAL SUPPORT**

**EXHIBIT A-7**

1    INDEX (Continued):

2                    EXHIBITS (Continued)

3    DEPOSITION                                        PAGE

4    18    Letter from Richard Parsons to        105
           Joanne Siegel dated August 22, 2000,
5          Bates No. WB005976

6    19    Letter from Joanne Siegel to Gerald    105
           Levin dated April 27, 2001, Bates
7          Nos. WB007853 - 007855

8    20    Letter from Kevin Marks to John        132
           Schulman dated October 19, 2001,
9          Bates Nos. GTRB 0302 - 0308

10   21    Letter from John Schulman to Kevin     149
           Marks dated October 26, 2001, Bates
11         Nos. GTRB 0145 - 0152

12   22    Letter from John Schulman to Bruce     176
           Ramer and Kevin Marks dated January
13         22, 2002, Bates Nos. 000000974

14   23    Letter from Patrick Perkins to Kevin   177
           Marks dated February 1, 2002, Bates
15         Nos. GTRB 0350 - 0399

16   24    Handwritten notes, Bates No. WB005972  180

17   25    Letter from Joanne Siegel to Richard   193
           Parsons dated May 9, 2002, Bates Nos.
18         000000676 - 678

19   25A   Fax from John Schulman to Kevin Marks  194
           dated 5-16-02, Bates Nos. GTRB 0474,
20         0475 and 0477

21

22

                 INSTRUCTION NOT TO ANSWER
23
                     Page   Line
24
                     10      17
25                   30      2, 15, 24

                                                          6

04:47 1    objection to -- subject to those objections, having

04:47 2    Mr. Marks answer the question.

04:47 3         MR. TOBEROFF:  I object on work product

04:47 4    privilege, but I think I am not asserting that on behalf

04:47 5    of the clients.  I am not asserting that on behalf of the

04:47 6    Siegels.

04:47 7         MR. MARMARO:  Mr. Marks would be prepared to

04:47 8    answer the question if the Siegels have no objection to

04:47 9    it.

04:4710         MR. TOBEROFF:  As to your personal belief, no

04:4711    objection.

04:4712         THE WITNESS:  Well, if the question is did I

04:4713    think at this point there was a final, binding,

04:4714    enforceable agreement, the answer would be no, but I did

04:4715    believe that we had come to an agreement back on October

04:4716    19th, 2001, that was reflected exactly in the terms that

04:4817    I set out.

04:4818         At the end of that letter I wrote to John in

04:4819    substance and effect, "John, if I've gotten anything

04:4820    wrong, if I've misstated any of these terms, please let

04:4821    me know."  When John writes back on October 26, which I

04:4822    see later, in effect his letter is, "Yeah, you've got

04:4823    terms wrong.  My outline of the deal terms is different

04:4824    than your outline of the deal terms."  So while I thought

04:4825    we had an agreement on these terms, John evidently

                                                               154

**EXHIBIT A-9**

04:48 1    didn't, and where you don't have a meeting of the minds,

04:48 2    you don't have an agreement.

04:48 3    BY MR. BERGMAN:

04:48 4        Q    What portion or with respect to what elements of

04:48 5    the October 19 letter did Mr. Schulman's October 26

04:49 6    letter depart from, were different from?

04:49 7        MR. MARMARO:  Again, the same -- my position is

04:49 8    the same:  Mr. Marks will answer the question as long as

04:49 9    there is no objection from Mr. Toberoff.

04:49 10       MR. TOBEROFF:  Not to the extent you are

04:49 11   comparing the documents.

04:49 12       MR. MARMARO:  Maybe we should have the documents

04:49 13   in front of us.  Do you have any objection to him looking

04:49 14   at Mr. Schulman's letter?

04:49 15       MR. BERGMAN:  Not at all.

04:49 16       THE WITNESS:  I know that one area of difference

04:49 17   was the scope of the rights granted.  In my letter it

04:49 18   referred to -- very specifically to the Superman property

04:49 19   and the Spectre property.  That's what we had been

04:50 20   talking about the whole time of our negotiations going

04:50 21   back to the first meeting in 2 -- 1999.  And, of course,

04:50 22   as you see here, the consideration, at least as set forth

04:50 23   in my letter, for that matter I guess in John's letter,

04:50 24   is based on revenue from the Superman and Spectre

04:50 25   properties, yet John's letter referred more generally to

155

04:50 1    all properties authored by Siegel for DC Comics and was

04:50 2    not limited to the Superman and Spectre properties that

04:50 3    we had been talking about.

04:50 4            Another area where it differed involved

04:50 5    warranties and representations and, in turn, indemnities.

04:50 6    If you recall, we spoke earlier about the view that the

04:51 7    only warranty and representation the Siegel family would

04:51 8    make would be that they have not transferred rights to

04:51 9    any other party, and in John's letter there are broader

04:5110    warranties than that, warranties that go beyond that.

04:5111            Oh, and by the way, that is also reflected in

04:5112    the October 19th letter.  John's warranties go beyond

04:5113    that, and so too in his letter he would have the Siegels

04:5114    indemnifying for areas that were not agreed and, indeed,

04:5115    not even discussed.  So there's broader warranties and

04:5116    representations and, as a result, broader indemnities,

04:5117    and in fact there are additional indemnities added; for

04:5218    example, indemnifying for any claims brought by Dennis

04:5219    Larson.

04:5220            There is, I recall, a provision that talks about

04:5221    furnishing DC Comics with historical information about

04:5222    the properties and rights information about the

04:5223    properties, and I felt from my representation of the

04:5224    client that that was going to be problematic, in fact I

04:5225    knew it was problematic, and it was not a point that had

156

04:52 1    been discussed before, it was not a point that had been

04:52 2    agreed before, and it was not a point that was in my

04:52 3    letter.

04:52 4         I know that there was a right of first

04:52 5    negotiation for any biographical material outlined in

04:52 6    John's letter.  Again, I don't recall ever discussing

04:53 7    that point before, much less agreeing to that point, and

04:53 8    it was not reflected in my letter.

04:53 9         When you get to elsewhere in John's letter, I

04:53 10   know he refers to an affirmative obligation on the part

04:53 11   of the Siegels to positively publicize the property and

04:53 12   to make themselves available or reasonably available for

04:53 13   travel, and what John and I had discussed and I had

04:53 14   believed agreed was that there would be mutual

04:53 15   non-disparagement, neither party would say anything bad

04:53 16   about the other, but we had not discussed and we had not

04:53 17   agreed about an affirmative obligation on the part of the

04:54 18   Siegels to positively publicize.

04:54 19        And in terms of the travel, I thought that was a

04:54 20   problem because we were dealing with a woman of advanced

04:54 21   years and a woman who was ill, and travel on them could

04:54 22   be a burden, notwithstanding that I think there was a

04:54 23   carve-out for -- subject to their health and

04:54 24   availability.  I wouldn't have wanted there to be any

04:54 25   dispute that they were not fulfilling an obligation about

157

04:54 1    going to travel to an event and that the failing to

04:54 2    travel to an event being the basis for claiming breach

04:54 3    and withholding royalty payments and the like.

04:54 4         I recall in this document new terms concerning

04:54 5    how the royalty could be reduced.  My understanding of

04:54 6    our agreement, what I set forth in the October 19th

04:55 7    letter, was that on media and merchandising licenses the

04:55 8    royalty was 6 percent.  If the other DC Comics characters

04:55 9    appeared in the media program or in licensing or

04:55 10   merchandising, that royalty could be reduced to a floor

04:55 11   of 3 percent.

04:55 12        And in our October telephone conversations this

04:55 13   issue was the subject of conversation, and John brought

04:55 14   up two other instances that would give rise to further

04:56 15   reductions of the royalty, and I know those instances

04:56 16   were specifically the use of Superman in conjunction with

04:56 17   properties called The Justice League, Superfriends and

04:56 18   Superheroes.  I recall that John initially said it should

04:56 19   go down to 1 percent, and we agreed that in fact the

04:56 20   floor in that specific instance would be 1.5 percent.

04:56 21        And also in this October period John brought up

04:56 22   a further area where he said sometimes there are very

04:56 23   extraordinary licenses where the Time Warner licenses DC

04:56 24   properties, and, for example, Looney Tunes properties,

04:56 25   and he spoke specifically about Six Flags Magic Mountain

158

**EXHIBIT A-13**

04:56 1  amusement park, where there are strolling characters and

04:57 2  signage and the like that use numerous characters, and he

04:57 3  suggested that the royalty should be further reduced in

04:57 4  that case to 1 percent, which we came to an understanding

04:57 5  on that.

04:57 6      In the October 19th letter there are broader

04:57 7  categories where the royalty --

04:57 8      MR. MARMARO:  Do you mean the October 19th

04:57 9  letter?

04:5710      THE WITNESS:  I'm sorry.  The October 26th

04:5711  letter.  The categories where the 3 percent can be

04:5712  further reduced are broadened.

04:5713      I know we've talked today about intercompany

04:5714  deals and safe harbors as one of the points throughout

04:5715  the discussion, and as I think I testified to earlier, we

04:5816  had agreed, I thought, that -- and I think it's reflected

04:5817  in John's letter, that if the Siegels were to challenge

04:5818  an intercompany deal that was outside a safe harbor,

04:5819  there would be an expedited dispute resolution procedure.

04:5820  That was the only discussion we had about alternative

04:5821  dispute resolution.  We never discussed arbitration in

04:5822  general applying to all of this, and yet John's letter

04:5823  provided for arbitration of disputes.  My letter did not.

04:5824      We talked earlier about the issue about for how

04:5825  long would the 6 percent royalty run and there being

159

04:58  1    disagreement on the parties as to the length of time.

04:59  2    The DC Comics position was the royalty would terminate

04:59  3    when Action Comics No. 1 went into the public domain, and

04:59  4    I believe it was at that July 12th meeting, 2001 meeting

04:59  5    that we sat at John's table and discussed what happens if

04:59  6    a Superman movie, SUPERMAN 18, comes out a year before

04:59  7    Action Comics No. 1 goes into the public domain; there

04:59  8    should be a tail on that, to which John agreed.

04:59  9         So we agreed upon a tail where there was a movie

04:59 10    that was released close to the end of the period that

04:59 11    Action Comics No. 1 was still in copyright.  We agreed

04:59 12    that there would be a tail for television, and we had

04:59 13    agreed that there would be a tail -- at least my

04:59 14    understanding was we'd agreed that there would be a tail

05:00 15    for other substantial projects.  After all, 10 years from

05:00 16    now, 20 years from now it's not clear what media -- in

05:00 17    what media contents will be exploited, so I wanted to be

05:00 18    able to cover that.  John did not include that other

05:00 19    area, other substantial projects in the tail, as I

05:00 20    recall.

05:00 21         We had talked about throughout a full indemnity,

05:00 22    and E&O insurance.  I think the E&O insurance wasn't in

05:00 23    John's letter, and I think the indemnity proposed here

05:00 24    was a partial, what I considered to be a partial

05:01 25    indemnity.

160

05:01 1         On the credit point --

05:01 2    BY MR. BERGMAN:

05:01 3        Q    Before you get to that one, Mr. Marks --

05:01 4        MR. MARMARO:  Can I just interject, because I

05:01 5    think I may have placed a possible ambiguity in the

05:01 6    record when I mentioned before Mr. Marks went into this

05:01 7    explanation of the differences that the letters be placed

05:01 8    before him, and until this very last point he has not

05:01 9    been testifying from the letter.  I just wanted to note

05:0110    that for the record in case -- well, I just wanted to

05:0111    note that for the record.

05:0112        THE WITNESS:  In terms of the credit to be

05:0113    accorded Siegel and Shuster, which was a point that I had

05:0114    as my point C.4, a point that I thought had long been

05:0215    agreed, that there would be a credit in paid ads of

05:0216    motion pictures, which is certainly in my experience is

05:0217    something that's very important to clients.  They want to

05:0218    see the credit in the full-page ads in newspapers and

05:0219    posters, movie theaters and the like, and John's letter

05:0220    provided for credit on screen only and not in paid ads.

05:0221    BY MR. BERGMAN:

05:0222        Q    If I could just ask you a question about that,

05:0223    and I am going, with your indulgence, to go back to some

05:0224    of these --

05:0225        A    Yes.

                                                           161

**U.S. LEGAL SUPPORT**

**EXHIBIT A-16**

STATE OF CALIFORNIA     )
                        ) ss
COUNTY OF LOS ANGELES   )

        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in

the foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

        That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

        I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated: ___OCT 1 7 2006___


                        _____
                        DAVID S. COLEMAN
                        CSR No. 4613


**EXHIBIT A-17**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: SUBPOENA DUCES TECUM | ) | Case No.: 1:06 MC 99 |
| ISSUED BY THE U.S. DISTRICT | ) | |
| COURT FOR THE NORTHERN | ) | |
| DISTRICT OF Ohio in: | ) | Case Nos.    SA CV 04-8400 SJO (RZx) |
| | ) | SA CV 04-8776 SJO (RZx) |
| JOANNE SIEGEL, *et al.*, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WARNER BROS. ENTERTAINMENT | ) | |
| INC., | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Currently pending before the court is the Renewed Motion to Compel Production of Documents and Appear for Deposition (ECF No. 16). For the reasons stated below, the Motion is denied.

## I.  BACKGROUND

Previously, Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications, Inc., Warner Bros. Television Production Inc., and Defendant-Counterclaimant DC Comics (collectively, "Movants"), filed a Motion to Compel Ohio resident Don Bulson, Esq. ("Bulson"), who was counsel for Michael Siegel, the deceased son of Jerry Siegel, to produce documents responsive to a subpoena issued by this court in the above-captioned actions and for other pertinent relief. Jerry Siegel, along with Joseph Schuster, created the first Superman comic story published

in 1938. Plaintiffs in the two actions in California, Joanne Siegel and her daughter, Laura Siegel Larson, are the widow and daughter of Jerry Siegel, respectively.

One California action arises out of a purported termination of the rights of the Warner Bros. Defendants relating to literary works featuring the Superman character. Jerry Siegel's share relative to the grants by Jerry Siegel and Schuster is proportionally owned as follows: 50% by Joanne Siegel; 25% by Laura Siegel Larson; and 25% by Michael Siegel, Jerry Siegel's son from his first marriage.

The second California action involves a notice of termination relating only to comics featuring Super Boy, in which only Jerry Siegel held the copyright. His wife, daughter and son hold proportionate interests in the same percentages that they hold in respect to his rights to Superman. The merits of the underlying cases have been determined, but damages issues are still to be decided.

Warner Brothers issued a subpoena on Don W. Bulson, counsel for Michael Siegel, on August 10, 2006, for a deposition scheduled for September 12, 2006, at 12:00 p.m. Documents sought pursuant to the subpoena were to be produced on August 28, 2006, at 12:00 p.m. The subpoena was wide-ranging. It sought:

1. All documents concerning Superman and/or Superboy.

2. All documents concerning any negotiations concerning Superman and/or Superboy, including, but not limited to, negotiations by or with Defendants, Plaintiffs, Michael Siegel, Dennis Larson, Toberoff and/or the Shuster Representatives.

3. All documents concerning any agreements with Plaintiffs, Michael Siegel, Dennis Larson, Toberoff, and/or the Shuster Representatives concerning Superman and/or Superboy, including, but not limited to, any agreements concerning any ownership interest in and/or revenue from Superman and/or Superboy.

4. All documents concerning any valuation of any current or potential ownership interest in Superman and/or Superboy.

-2-

**EXHIBIT B-19**

5.    All documents evidencing any correspondence with any third person concerning Superman and/or Superboy, including, but not limited to, Plaintiffs, Dennis Larson, Toberoff, and/or the Shuster Representatives.

6.    All documents concerning Michael Siegel's estate, including, but not limited to, any wills, draft wills, and any communications expressing Michael Siegel's wishes with respect to any assets.

7.    All documents concerning any litigation relating to Michael Siegel's estate.

Mr. Bulson filed objections based on vagueness, ambiguity, overbreadth, undue burden and attorney/client privilege. No documents were provided.

After the filing of the privilege log, Defendants produced a log containing 422 items. A large number of the documents were communications between Mr. Bulson and his client, Michael Siegel, though there were a significant number of other documents. In their Motion to Compel Production of Documents, Movants maintained that the documents sought are crucial to their defenses and counterclaims. Movants asserted that the information showing that Plaintiffs Joanne Siegel and Laura Siegel Larson authorized their agent to purchase Michael Siegel's termination interest on their behalf, which might have been in the possession of Siegel's attorney, were relevant to the purported value of Plaintiff's interest, for which they are seeking an accounting in the action. They also argued that "because one of the primary issues in the underlying Capital Actions is an attempt to place a value upon Plaintiff's purposed re-captured share in the Superman copyrights, any agreements Michael Siegel may have made or negotiated regarding his purported copyright interests are directly relevant."

After the filing of the privilege log, Movants focused on certain correspondence, including correspondence between Mr. Bulson and the Plaintiff in the underlying action and their attorneys. The Movants maintained that the joint interests doctrine asserted in regard to those documents by

-3-

**EXHIBIT B-20**

Mr. Bulson was not well-taken, and attorney-client privilege was therefore inapplicable.   They asserted this was clearly the case in regard to documents authored after September 21, 2002, the date on which Plaintiff's repudiated their agreement and announced that settlement discussions with Movants had ended.  Consequently, any potentially legitimate joint interests based on their seeking to reach a joint resolution with Movants had ended.  Movants zeroed in on fifteen communications from the log to which Bulson had asserted attorney/client privilege based on a joint interest with dates ranging from April 16, 2003, to November 18, 2005.

Movants asserted that:

> "First, from a review of the January 21, 2003 agreement between Plaintiffs and IPW in which IPW was to attempt to purchase Michael Siegel's termination interest, Plaintiffs and IPW were concerned about 'various risks and potential problems' regarding Michael Siegel (i.e., that Michael Siegel might have had a different view as to the nature and scope of the termination rights).  Second, any offer made by Toberoff or Emanuel on behalf of IPW to purchase Michael Siegel's interest has a bearing on the valuation issues at stake in the Underlying Actions.  Given the limited nature of the documents (15 letter or emails) sought from Mr. Bulson, and the broad scope of discovery afforded by Rule 26, Bulson should be ordered to produce these documents."

Thereafter, this court ordered Mr. Bulson to provide a more detailed privilege log regarding the fifteen communications identified by Movants so that Movants would be in a better position to evaluate the assertion of the attorney/client privilege claims based on joint interests.  After a more detailed log was provided, Movants reiterated their assertion that these documents were not covered by the attorney/client privilege.   This court then reviewed those documents in-camera and determined they were not covered by the attorney/client privilege based on joint interests.

## II.  CURRENT MOTION

In their Renewed Motion to Compel Production of Documents and Appear for Deposition,

**EXHIBIT B-21**

Movants state:

> In their November 20, 2006 Reply Brief, Movants, in a good faith attempt to compromise, noted that the[sic] despite the fact that the privilege log was produced late, well after the objections were served and after Movants' motion was filed, the majority of documents listed appeared at face value to be arguably subject to the attorney-client privilege. Movants thus focused on 15 specific communications allegedly subject to a joint privilege, and requested that the Court order Plaintiffs to provide more information with respect to these communications so that Movants could better evaluate the claimed privilege. The Court agreed at the February 1, 2008  hearing and confirmed such agreement by its February 6, 2008 Amended Order.

In their Renewed Motion, Movants seek reconsideration of the court's Amended Order by requiring Bulson to submit a supplemental privilege log with respect to the remainder of the 422 documents identified in Bulson's initial privilege log so that they might evaluate the alleged claim of privilege as to each document.  They further request that if they have additional concerns with regard to documents identified on a new supplemental log, that the court order an in-camera review of such documents to determine whether they are in fact privileged.  They assert, among other things, that because counsel for Bulson's arguments were not well-taken in regard to the fifteen documents discussed above, this, as well as the testimony of Bulson, cast doubt on the validity of the assertion of privilege regarding the other documents.

While it is true that counsel for Bulson did not accurately characterize some of the documents and was incorrect regarding his claims of privilege, the court does not find that the circumstances herein are such as to cast the entire process into question.  As Movants acknowledge, the substantive phase of the litigation is over, and they are seeking discovery in regard to valuation issues only.  In this context, the compromise arrived at earlier was, and remains, a reasonable one because it was geared to obtain recent, non-privileged correspondence which might bear on these

**EXHIBIT B-22**

issues.  The date chosen as a starting point, the date after settlement negotiations broke down between Movants and Plaintiff, was also reasonable.  This was especially so when so many of the communications requested were between Mr. Buford and his client, Michael Siegel.

Given the broad nature of the requests in this case, the court is not convinced that it should reconsider its prior decision and allow Movants to proceed with further discovery regarding all of the documents described in the log, in a context where Movants have not pointed to any documents from that list that may bear on valuation issues and which were exchanged by parties that were not in a confidential attorney/client relationship.  This is especially true where the production of documents will now be irrelevant for any other purpose.

For all of these reasons, Movants' Renewed Motion to Compel Production of Documents and Appear for Deposition (ECF No. 16) is denied.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

August 13, 2008

-6-

**EXHIBIT B-23**

1 | WEISSMANN WOLFF BERGMAN
COLEMAN GRODIN & EVALL LLP
2 | Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
3 | Adam Hagen (SBN 218021)
9665 Wilshire Boulevard, Ninth Floor
4 | Beverly Hills, California 90212
Telephone: (310) 858-7888
5 | Fax: (310) 550-7191

6 | FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
7 | James D. Weinberger (Admitted *pro hac vice*)
866 United Nations Plaza
8 | New York, New York 10017
Telephone: (212) 813-5900
9 | Fax: (212) 813-5901

10 | PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
11 | 1711 Route 9D
Cold Spring, New York 10516
12 | Telephone: (845) 265-2820
Fax: (845) 265-2819

13 |

14 | Attorneys for Defendants and Counterclaimant

15 | **UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

16 |

| | |
|---|---|
| 17 JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
| 18    Plaintiffs, | CV 04-8400 SGL (RZx) |
| | CV 04-8776 SGL (RZx) |
| 19 vs. | Hon. Steven G. Larson, U.S.D.J. |
| WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC | Hon. Ralph Zarefsky, U.S.M.J. |
| 20 COMICS; and DOES 1-10, | |
| Defendants. | **NOTICE OF MOTION AND JOINT** |
| 21 JOANNE SIEGEL and LAURA | **STIPULATION RE: DEFENDANTS'** |
| SIEGEL LARSON, | **MOTION TO REOPEN** |
| 22 | **DISCOVERY, TO COMPEL** |
| Plaintiffs, | **PRODUCTION OF DOCUMENTS,** |
| 23 vs. | **AND TO COMPEL THE FURTHER** |
| TIME WARNER INC.; WARNER | **DEPOSITION OF KEVIN MARKS** |
| 24 COMMUNICATIONS INC.; WARNER | |
| BROS. ENTERTAINMENT INC.; | **DISCOVERY MATTER** |
| 25 WARNER BROS. TELEVISION | **LOCAL RULE 37** |
| PRODUCTION INC.; DC COMICS; | |
| 26 and DOES 1-10, | Time: 10:00 a.m. |
| Defendants. | Date: April 20, 2009 |
| 27 AND RELATED COUNTERCLAIMS | Courtroom: 1 |
| | Hon. Stephen G. Larson |
| 28 | Discovery Cutoff: Nov. 17, 2006 |

**EXHIBIT C-24**

1 TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE THAT on April 20, 2009 or as soon thereafter as

3 the matter may be heard in the above-entitled action before the Honorable Stephen

4 G. Larson, United States District Judge, United States District Court for the Central

5 District of California, Eastern Division, 3470 Twelfth Street, Riverside, California,

6 Courtroom 1, defendants Warner Bros. Entertainment Inc., Time Warner Inc.,

7 Warner Communications Inc., Warner Bros. Television Production Inc. and

8 defendant and counterclaimant DC Comics ("Defendants"), will and hereby do

9 move the Court to rule on this jointly filed stipulation pursuant to Local Rule 37-3

10 of the Local Rules of the United States District Court for the Central District of

11 California ("L.R."). Defendants invited counsel for Plaintiffs Joanne Siegel and

12 Laura Siegel Larson ("Plaintiffs" or the "Siegels") to meet and confer in writing on

13 January 14, 2009, in accordance with L.R. 37-1. By letter dated January 22, 2009,

14 Plaintiffs' counsel rebutted Defendants' stated bases for their motion but did not

15 provide a date to meet and confer. By e-mail dated January 23, 2009, Defendants'

16 counsel asked whether Plaintiffs' counsel wished to meet and confer further on the

17 topic by the deadline set by L.R. 37-1 – January 26, 2009 – but Plaintiffs' counsel

18 did not respond.

19    After the close of discovery and after the Court's ruling on Plaintiffs' motion

20 for summary judgment on Defendants' settlement defense, Plaintiffs produced a

21 document indicating that Plaintiffs' former counsel Kevin Marks wrote to Plaintiffs

22 and others on August 9, 2002 to indicate "that he would testify in court against the

23 Siegels" "because he believes there has already been agreement reached." The

24 recently-produced document is titled "Marc Toberoff Timeline," and the quoted

25 language captures the substance of Mr. Marks' August 9, 2002 communication. By

26 this motion, Defendants seek the actual August 9, 2002 communication as well as

27 the further deposition of Mr. Marks.

28

1    The document is relevant to Defendants' settlement defense and likely

2 supports further discovery and a motion for reconsideration. It shows that, long

3 after Plaintiffs attempted to create a dispute about settlement, the person who had

4 negotiated the settlement for Plaintiffs, Mr. Marks, still believed that a settlement

5 existed. No matter how the Court evaluates the impact of evidence concerning

6 conduct and state of mind, the state of mind of the key negotiator on Plaintiffs' side

7 is relevant. Nor is the newly-revealed evidence just about state of mind; it is about

8 conduct, as Mr. Marks acted on his understanding and made it clear that he would

9 testify adversely to his former clients if they were to join with new counsel to upset

10 the settlement. Moreover, in the end the question is not just about the exact impact

11 of the August 9, 2002 communication by Mr. Marks. The record on the settlement

12 issues should be full and complete and should include such a direct statement by a

13 key settlement negotiator, not least because he testified in his deposition that, as of

14 February 6, 2002, he believed there was not a settlement.

15    The August 9, 2002 communication was from Mr. Marks to his former

16 clients, but the attorney-client privilege does not justify keeping it out of the record.

17 First, the "Marc Toberoff Timeline" repeats the substance of the August 9, 2002

18 communication, and its production waives any privilege as to the underlying

19 document. Second, Plaintiffs determined to let Mr. Marks testify at his deposition

20 concerning his understanding about whether there was a settlement as of February 6,

21 2002 – after controversy about whether there was a settlement had arisen – so

22 privilege has been waived as to other evidence concerning Mr. Marks'

23 understanding or state of mind regarding settlement, certainly as to a document in

24 which he so directly contradicts his deposition testimony.

25    Put simply there is now an incomplete record regarding key settlement

26 evidence – deposition testimony says one thing, and the "Marc Toberoff Timeline"

27 says another. There is no good reason for Defendants and the Court not to have, and

28 for the record not to be completed by, Mr. Marks' August 9, 2002 communication.

**EXHIBIT C-26**

2

1  Defendants also seek leave to further depose Mr. Marks concerning the
2  communication.
3         This motion is made pursuant to Rules 26 and 37 of the Federal Rules
4  of Civil Procedure and L.R. 37.  Defendants contend that good cause therefore exists
5  for the discovery sought.
6
7  DATED:  March 2, 2009          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
8                                 PERKINS LAW OFFICE, P.C.
9                                        -and-
10                                 WEISSMANN WOLFF BERGMAN
                                     COLEMAN GRODIN & EVALL LLP
11
12                                 By: _____
13                                     Michael Bergman
14                                 Attorneys for Defendants and Counterclaimant
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT C-27
3

1

# **TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ........................................................................v

3   I.      DEFENDANTS' AUTHORITIES ..........................................................v

4   II.     PLAINTIFFS' AUTHORITIES ..............................................................v

5   JOINT STIPULATION...............................................................................1

6   I.      DEFENDANTS' INTRODUCTORY STATEMENT ...............................1

7   II.     PLAINTIFFS' INTRODUCTORY STATEMENT .................................2

8   III.    DEFENDANTS' CONTENTIONS...........................................................6

9           A.      FACTUAL AND PROCEDURAL BACKGROUND.......................6

10                  1.      DC Comics' Settlement Defense In The Actions ......................6

11                  2.      Warner Bros.' Receipt Of The Escrow Documents...................7

12                  3.      Defendants' Attempts To Obtain The Escrow
                            Documents..........................................................................8

13
14                  4.      The Toberoff Timeline.......................................................10

15                  5.      The Parties' Meet And Confer Efforts...................................14

            B.      LEGAL ARGUMENT ........................................................................14
16
17                  1.      The Newly Discovered Evidence In The "Toberoff Time
                            Line" And The Not-Yet-Discovered Evidence In The August
18                          9, 2002 Communication Contain Discoverable Information
                            Which May Ultimately Support Reconsideration By The
                            Court Of Defendants' Settlement Defense. ..............................14
19
20                  2.      The Evidence That Defendants Now Seek Is Impeachment
                            Evidence That Goes Directly to the Heart of Marks'
                            Credibility on the Settlement Issue. .......................................15
21
22                  3.      Plaintiffs Have Improperly Obscured The Truth Through
                            Selective Use And Waiver Of The Privilege. ..........................16

23                  4.      It Is The "Law Of The Case" That Any Attorney-Client
                            Privilege Applicable To The Toberoff Timeline Has Been
24                          Waived, Which In Turn Serves To Waive Any Privilege In
                            Kevin Marks' August 2002 Communication With Plaintiffs
25                          Concerning Marks' Opinion That The Parties Had Reached
                            A Settlement...........................................................................20

26

27

28

**EXHIBIT C-28**

5.  Defendants Have Been Diligent In Seeking Discovery Of The Escrow Documents And Thus Have "Good Cause" To Reopen Discovery. .................................................................. 22

6.  The Evidence Sought By Defendants In This Motion Is Discoverable Notwithstanding The Court's Ruling On Summary Judgment.................................................................. 23

7.  The Interests Of Justice And The Integrity Of The Judicial Process Strongly Favor The Relief Sought By Defendants..... 24

IV.  PLAINTIFFS' CONTENTIONS ..................................................... 25

A.  FACTUAL AND PROCEDURAL BACKGROUND ........................ 25

1.  The Court Properly Held on Summary Judgment That No Settlement Agreement Was Consummated By the Parties ..... 25

2.  Defendants Improperly Seek to Exploit and Leverage the Theft of Documents from Plaintiffs' Counsel's Office ........... 29

a.  Documents Stolen From Plaintiffs' Legal Files ............ 29

b.  The Court's April 30, 2007 Order .................................. 31

c.  Defendants' Second Motion to Compel ........................ 32

B.  LEGAL ARGUMENT ......................................................... 35

1.  Defendants Improperly Seek Reconsideration of the April 30, 2007 Order ................................................................ 35

2.  Defendants' Veiled Motion for Reconsideration Ignores Black-Letter Contract Law Upheld By The Court's Summary Judgment Order .................................................. 37

a.  The Defamatory Letter Distorts Marks' Beliefs and Does Not Even Mention Marks' August 9 Letter to Plaintiffs ...................................................................... 37

b.  Defendants' Motion Even Mischaracterizes the Defamatory Letter and Kevin Marks' Testimony ......... 38

c.  Marks' Subjective Opinion Is, In Any Event, Extraneous Because the Existence of a Contract Is Based Upon the Objective Manifestation of the Parties' Intent.................................................................. 41

d.  Defendants' Arguments Based on the Parties' Subjective Understanding Have Already Been Rejected by the Court ..................................................... 44

3.  The Defamatory Letter Does Not Waive Attorney-Client Privilege ................................................................ 45

EXHIBIT C-29

Case 2:10-cv-03633-ODW-RZ  Document 368-2  Filed 01/30/12  Page 28 of 105   Page
Case 2:04-cv-08400-ODW-RZ  Document 476  Filed 08/02/09  Page 27 of 185
ID #:24031

a.   There Was No Voluntary Waiver of Attorney-Client Privilege as to the August 9 Letter ................................. 45

b.   There Was No Basis to List the Defamatory Letter on a Privilege Log................................................................. 47

c.   Any Failure to List the Defamatory Letter on a Privilege Log Was Excusable Inadvertence ................. 48

d.   The Cases Cited by Defendants for Waiving Privilege Are Inapplicable............................................................. 49

4.   Defendants' "Work Product" Arguments Are Both Irrelevant to the Protection of the August 9 Letter and Unavailing ........ 50

a.   As Work-Product Protection Was Not Asserted for the August 9 Letter, Waiver of Work-Product is Irrelevant......................................................................... 50

b.   Marks' Testimony Does Not Constitute Work-Product and Would Not Waive Work Product Protection .......... 51

c.   There Is No Connection Between Marks' Testimony and the August 9 Letter.................................................... 52

5.   The Court Should Reconsider Its Conclusion that the Letter "Contains" Conduct By Plaintiffs' Counsel as the Letter is Unethical, Anonymous, Inadmissible and Unsupported ......... 53

6.   The September 26, 2008 Order Should Be Reconsidered Because the April 30 Order Did Not Encompass the Defamatory Letter and In Any Event Plaintiffs Had No Opportunity to "Appeal" the April 30 Order as to this Issue... 55

a.   The April 30 Order Did Not Encompass the Defamatory Letter Because Defendants Had Not Moved to Compel Production of the Letter................... 55

b.   The Issue of Whether the Defamatory Letter Should Be Released to Defendants Was Not Ripe for Appeal Under Local Rule 72-2.1 ............................................... 56

7.   The September 26, 2008 Order for the Production of the Defamatory Letter Should Be Reconsidered In Light of the Record and Defendants' Misuse of the Stolen Documents ..... 57

a.   Magistrate Zarefsky's April 30 Order Was Based on Defendants' Misrepresentation of a Sanitized Protocol ............................................................................. 57

i.   Warner Bros. Engaged in a Substantive Review of the Privileged Stolen Documents ................... 57

**EXHIBIT C-30**
iii

1
2
3
     ii.  Defendants Misrepresented that They Turned the Stolen Documents Over to a "Neutral" and Perpetuated the Fiction that the Documents Were Held by an "Escrow Agent" ...................... 62

4 V.  DEFENDANTS' CONCLUSION ................................. 66

5 VI. PLAINTIFFS' CONCLUSION ...................................... 66

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT C-31

Case 2:10-cv-03633-ODW-RZ Document 368-2 Filed 01/30/12 Page 30 of 105 Page
Case 2:04-cv-08400-ODW-RZ Document 475 Filed 08/02/09 Page 9 of 85 Page
ID #:24033

# TABLE OF AUTHORITIES

## I.   Defendants' Authorities

### Cases

*Atari Corp. v. Sega of Am.*,
161 F.R.D. 417 (N.D. Cal. 1994).................................................................. 16

*Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*,
259 F.3d 1186 (9th Cir. 2001)...................................................................... 16

*In re Kidder Peabody Sec. Litig.*,
168 F.R.D. 459 (S.D.N.Y. 1996) .................................................................. 21

*In re McKesson HBOC, Inc. Secs. Litig.*,
2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005)............................... 16

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992)........................................................................ 22

*Kintera, Inc. v. Convio, Inc.*,
219 F.R.D. 503 (S.D. Cal. 2003)................................................................... 17

*Nidec Corp. v. Victor Co.*,
249 F.R.D. 575 (N.D. Cal. 2007).............................................................. 20-21

*Noyes v. Kelly Servs.*,
488 F.3d 1163 (9th Cir. 2007)...................................................................... 22

*N.Y. Life Ins. Co. v. Morales*,
2008 U.S. Dist. LEXIS 51304 (S.D. Cal. July 1, 2008) ................................ 22

*U.S. v. Jacobs*,
117 F.3d 82 (2d Cir. 1991)........................................................................... 21

*Weil v. Investment/Indicators, Research & Mgmt., Inc.*,
647 F.2d 18 (9th Cir. 1981).......................................................................... 21

### Other Authorities

Fed. R. Civ. P. 16(b) .................................................................................... 16

Fed. R. Civ. P. 26(b)(1)................................................................................ 16

1 Paul R. Rice,
Attorney-Client Privilege in the United States § 4:35 (1999 ed.).................. 20

## II.   Plaintiff's Authorities

### Federal Cases

*Atari Corp. v. Sega of Am.*,
161 F.R.D. 417 (N.D. Cal. 1994).................................................................. 51

**EXHIBIT C-32**
v

*Chevron Corp. v. Pennzoil Co.,*
974 F.2d 1156 (9th Cir.1992).........................................................................48

*City of L.A. v. Santa Monica BayKeeper,*
254 F.3d 882 (9th Cir. 2001).........................................................................57

*Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.,*
259 F.3d 1186 (9th Cir. 2001).......................................................................51

*Cox v. Administrator U.S. Steel & Carnegie,*
17 F.3d 1386 (11th Cir.).........................................................................52-53

*Cunningham v. Connecticut Mut. Life Ins.,*
845 F. Supp. 1403 (S.D. Cal. 1994).............................................................48

*First Savings Bank, F.S.B. v. First Bank System, Inc.,*
902 F. Supp. 1356 (D. Kan. 1995)................................................................48

*Gomez v. Vernon,*
255 F.3d 1118 (9th Cir. 2001).......................................................................58

*Government Guarantee Fund of Republic of Finland v. Hyatt Corp.,*
182 F.R.D. 182 (D.V.I. 1998).......................................................................47

*Hickman v. Taylor,*
329 U.S. 495 (1947).......................................................................................51

*In re Dayco Corp. Derivative Sec. Litig.,*
102 F.R.D. 468 (S.D. Ohio 1984).................................................................46

*In re Echostar Comms. Corp.,*
448 F.3d 1294 (Fed. Cir. 2006)................................................................50-51

*In re Grand Jury Proceedings Involving Berkley and Co., Inc.,*
466 F. Supp. 863 (D. Minn. 1979)................................................................46

*In re Grand Jury Subpoena,*
350 F.3d 1010 (9th Cir. 2003).......................................................................51

*In re Kidder Peabody Sec. Litig.,*
168 F.R.D. 459 (S.D.N.Y. 1996)...................................................................49

*In re Martin Marietta Corp.,*
856 F.2d 619 (4th Cir. 1988).........................................................................52

*In re McKesson HBOC, Inc. Secs. Litig.,*
2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005).............................51

*In re Michigan Boiler & Eng'g Co.,*
87 B.R. 465 (Bankr. E.D. Mich. 1988).........................................................50

*Kenyatta v. Kelly,*
375 F. Supp. 1175 (E.D. Pa. 1974)...............................................................46

**EXHIBIT C-33**
vi

Case 2:10-cv-03633-ODW-RZ Document 268-2 Filed 11/08/12 Page 32 of 105 Page
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 08/02/09 Page 21 of 80 Page
ID #:24035

*Kintera, Inc. v. Convio, Inc.*,
219 F.R.D. 503 (S.D. Cal. 2003).................................................................. 48, 51

*Laxalt v. McClatchy*,
116 F.R.D. 438 (D. Nev. 1987).......................................................................... 47

*Mendenhall v. Barber-Greene Co.*,
531 F. Supp. 948 (N.D. Ill. 1981)..................................................................... 48

*Nidec Corp. v. Victor Co.*,
249 F.R.D. 575 (N.D. Cal. 2007)...................................................................... 49

*Picard Chemical Inc. Profit Sharing v. Perrigo Co.*,
951 F. Supp. 679 (W.D. Mich. 1996) ............................................................... 50

*Resolution Trust Corp. v. Dean*,
813 F. Supp 1426 (D. Ariz. 1993).................................................................... 46

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*,
32 F.3d 851 (3rd Cir. 1994) ............................................................................. 50

*Robinson v. Tex. Auto. Dealers Ass'n*,
214 F.R.D. 432 (E.D. Tex. 2003)...................................................................... 48

*Sackman v. Ligget Group, Inc.*,
173 F.R.D. 358 (E.D.N.Y. 1997) ...................................................................... 46

*Shell Oil Refinery v. Shell Oil Co.*,
143 F.R.D. 105 (E.D. La. 1992)........................................................................ 62

*Siegel v. Warner Bros. Entertainment Inc. ("Siegel II")*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ..................................................... *passim*

*Smith v. Armour Pharmaceutical Co.*,
838 F. Supp. 1573 (S.D. Fla. 1993) ................................................................. 46

*Spacone v. Burke (In re Truck-A-Way)*,
300 B.R. 31 (E.D. Cal. 2003)........................................................................... 62

*Tennenbaum v. Deloitte & Touche*,
77 F.3d 337 (9th Cir. 1996).............................................................................. 46

*Transamerica Computer Co., Inc. v. International Business Machines Corp.*,
573 F.2d 646 (9th Cir. 1978)............................................................................ 45

*United States v. Chen*,
99 F.3d 1495 (9th Cir. 1996)............................................................................ 46

*United States v. Doe*,
219 F.3d 175 (2d Cir. 1999)............................................................................. 51

*United States v. Jacobs*,
117 F.3d 82 (2d Cir. 1997)......................................................................... 49, 51

**EXHIBIT C-34**

vii

*United States v. Nobles,*
422 U.S. 225 (1975) ................................................................. 51

*United States ex rel. Mayman v. Martin Marietta Corp.,*
886 F. Supp. 1243 (D. Md. 1995) ........................................... 46

*Weil v. Investment/Indicators, Research and Management, Inc.,*
647 F.2d 18 (9th Cir. 1981) .............................................. 45, 49

**State Cases**

*Apablasa v. Merritt & Co.,*
176 Cal.App.2d 719 (1959) .................................................... 42

*Cooke v. Superior Court,*
147 Cal. Rptr. 915 (Cal. Ct. App. 1978) ................................. 46

*Grove v. Grove Valve & Reg. Co.,*
4 Cal.App.3d 299 (1970) ........................................................ 42

*Louis Lesser Enterprises, Ltd. v. Roeder,*
209 Cal.App.2d 401 (1962) .................................................... 43

*Meyer v. Benko,*
55 Cal.App.3d 937 (1976) ................................................. 39, 43

*Rico v. Mitsubishi Motors Corp.,*
116 Cal. App. 4th 51 (2004) ................................................... 62

*Rico v. Mitsubishi Motors Corp.,*
171 P.3d 1092 (2007) ............................................................. 58

*State Compensation Insurance Fund v. WPS, Inc. (State Fund),*
70 Cal.App.4th 644 (1999) ................................................. 58-59

*Stewart v. Preston Pipeline Inc.,*
134 Cal.App.4th 1565 (2005) ................................................. 43

*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.,*
27 Cal. 4th 705 (2003) ........................................................... 63

**Other Authorities**

F.R.C.P. 26 ............................................................................. 51

California Civil Code § 1585 .................................................. 42

Local Rule 7 ..................................................................... 57, 63

Local Rule 72 ........................................................................ 56

159 *American Law Reports Federal* 153 ................................ 46

*Matthew Bender Practice Guide:*
*Federal Pretrial Civil Procedure in California* § 24.40 ........... 58

**EXHIBIT C-35**
viii

Jones, Rosen, Wegner & Jones,
Federal Civil Trials and Evidence ¶ 8:3700............................................................. 51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C-36**
ix

1      **JOINT STIPULATION**

2  **I.    DEFENDANTS' INTRODUCTORY STATEMENT**

3          As the Court is aware, in late June 2006, three separate packages of

4  documents (the "Escrow Documents") were anonymously mailed to executives of

5  Defendant Warner Bros. As this Court observed in its Order of September 26, 2008

6  (the "September 26 Order"), the Escrow Documents "contain embarrassing and

7  potentially questionable conduct by plaintiffs' counsel in this case." (September 26

8  Order at 1.) Since their delivery in June 2006, Defendants have played strictly by

9  the rules in an attempt to obtain the Escrow Documents. All the while, Plaintiffs did

10 everything in their power to block production of the embarrassing Escrow

11 Documents. Finally, after more than a year and a half of motion practice, the Court

12 confirmed as "law of the case," the Magistrate Judge's ruling that, due to Plaintiffs'

13 counsel's failure to list certain of the Escrow Documents on a privilege log, any

14 privilege in certain of the Escrow Documents had been waived.

15         Unfortunately, Plaintiffs' obstructionist tactics were temporarily successful as

16 Defendants were prevented from seeing any of the Escrow Documents until

17 December 12, 2008 – well after the close of discovery and well after the Court had

18 ruled on motions for summary judgment.

19         When Defendants finally received the Escrow Documents, they saw that one

20 such document, the so-called "Marc Toberoff Timeline" (the "Toberoff Timeline"),

21 contained the revelation that in August 2002 Plaintiffs' former counsel, Kevin

22 Marks, had advised his clients that he believed that an enforceable settlement

23 agreement with DC Comics had been reached. Even more significant was Kevin

24 Marks' statement that if Plaintiffs did not abide by the settlement agreement, he

25 would testify against them at a trial to enforce the agreement. This revelation of

26 evidence came too late – *after* the October 7, 2006 deposition of Kevin Marks

27 during which Mr. Marks testified in a manner inconsistent with his prior written

28

**EXHIBIT C-37**

1   statement, and *after* this Court's dismissal of Defendants' settlement defense on

2   March 26, 2008, to allow Defendants to develop a full and fair record on the

3   settlement issue. Because the Escrow Documents were not produced until after the

4   Court had ruled, Defendants were deprived of the ability to develop the facts and to

5   put them before the Court on summary judgment. The Court ruled without the

6   benefit of such developed evidence.

7       By this motion, Defendants seek: (i) production of correspondence dated

8   August 9, 2002, the substance of which was revealed in the Toberoff Timeline,

9   containing the now disclosed statement of Kevin Marks that an enforceable

10  settlement had been reached; and (ii) the right to further depose Plaintiffs' former

11  counsel, Kevin Marks in view of the new evidence that has come to light and its

12  inconsistency with his deposition testimony.

13  ## II.   PLAINTIFFS' INTRODUCTORY STATEMENT

14      Defendants' baseless motion is but their latest frivolous attempt to leverage

15  the theft of privileged documents from the offices of Plaintiffs' counsel, and to bias

16  the trier of fact against Plaintiffs and their counsel through a flurry of false,

17  unsupported accusations. Defendants erroneously claim that an unproven statement

18  in a privileged communication by Plaintiffs' former counsel to his clients is enough

19  to overturn the Court's March 26, 2008 summary judgment order, holding that no

20  enforceable agreement was reached between the parties regarding Plaintiffs'

21  recaptured Superman copyrights. *See Siegel v. Warner Bros. Entertainment Inc.*

22  (*"Siegel II"*), 542 F. Supp. 2d 1098, 1136-1138 (C.D. Cal. 2008).

23      The facts underlying this seemingly endless matter are simple: Plaintiffs'

24  legal files were *stolen* from the offices of Plaintiffs' counsel (the "Stolen

25  Documents") and delivered to Defendant Warner Bros. Entertainment Inc. ("Warner

26  Bros.") A majority of the documents were clearly privileged attorney-client

27  communications. Enclosed with the Stolen Documents was an anonymous,

28  unsupported, defamatory cover letter (the "Defamatory Letter"). This conspiratorial

**EXHIBIT C-38**
2

1  rant was written by a disgruntled attorney, employed briefly at the firm of Plaintiffs'
2  counsel, who deliberately ignored his legal and ethical duties to Plaintiffs by
3  stealing their privileged legal files and handing them over to Warner Bros. in the
4  midst of this litigation.

5      We know now that Defendants misrepresented their handling of the Stolen
6  Documents to Magistrate Zarefsky and this Court to obtain approval of their
7  purported procedures and to sanitize their unseemly use of the stolen legal files.
8  Warner Bros.' in-house counsel Wayne Smith claimed to have only briefly
9  "thumbed through" the Stolen Documents to see if they were privileged. Instead of
10 notifying Plaintiffs' counsel immediately and returning clearly privileged
11 documents, Warner Bros. purportedly arranged for a law firm to act as a "neutral"
12 "escrow holder." It was later revealed, however, that the firm, retained and paid by
13 Defendants, was neither "neutral" nor an "escrow holder." Moreover, it is clear
14 from Smith's repeated ability to pinpoint and describe specific documents and to
15 correlate them to specific entries on Plaintiffs' privilege logs (received long after
16 Defendants purportedly turned over all Stolen Documents to a so-called "neutral")
17 that Warner Bros. stepped way over the line in leveraging this theft and exploiting
18 clearly privileged information in this litigation.

19     On April 30, 2007, Magistrate Zarefsky ordered a simple ministerial
20 procedure to deal with the documents: the stolen documents which were listed on
21 privilege logs should be returned to Plaintiffs, while documents not listed on
22 privilege logs should be produced to Defendants. This led to two disputes. The first
23 dispute concerned 9 documents (4 of which are merely fax cover or confirmation
24 sheets) of the 839 pages of the Stolen Documents that fell between the "cracks" of
25 the April 30, 2007 order, but were clearly privileged. These documents included the
26 Defamatory Letter and post-litigation attorney-client communications. The second
27 dispute concerned Defendants' transparent manipulation of their "escrow" protocol.
28 Instead of letting their "escrow" execute the simple disbursal ordered by Magistrate

**EXHIBIT C-39**
3

1   Zarefsky on April 30, 2007 and again by this Court on September 26, 2008, with
2   respect to the 130 documents that remained undisputed, Defendants instructed their
3   "escrow" to retain all the documents and repeatedly attempted to have him "peek"
4   behind the logs to challenge Plaintiffs' assertion of privilege.

5       This Court again resolved the matter in its December 4, 2008 Order.  The 9
6   documents remaining in question, including the Defamatory Letter, were ordered
7   produced, and all other documents – those listed on privilege logs or already
8   produced – were finally returned to Plaintiffs.

9       Now, on the groundless basis of the Defamatory Letter, Defendants once
10  again attempt to re-open this matter and rip away the already upheld attorney-client
11  privilege protecting an August 9, 2002 letter from attorney Kevin Marks ("Marks")
12  to his clients, Laura and Joanne Siegel (the "August 9 Letter") that was among the
13  Stolen Documents.

14      The privileged August 9 Letter *was* properly listed and claimed on a privilege
15  log.  Based on no less than four Court orders, the inquiry should end there.  Ignoring
16  these fatal facts, Defendants attempt to violate the attorney-client privilege on the
17  sole basis that the anonymous, inadmissible Defamatory Letter purportedly
18  describes the privileged August 9 Letter, and that this description allegedly
19  contradicts Marks' sworn deposition testimony regarding the negotiation of a
20  settlement agreement.

21      As an initial matter, the Defamatory Letter neither mentions the August 9
22  Letter, nor any writing, in describing what Marks purportedly believed.  Defendants'
23  entire motion is falsely premised on the unproven contents of the privileged August
24  9 Letter.  Moreover, *even if* Marks subjectively believed (he did not) that a binding
25  agreement had been reached, such a belief would be extraneous because the
26  formation of a contract requires an "objective manifestation" of a "meeting of the
27  minds" on all material terms of agreement.  The Court correctly held this was
28  clearly absent in the well-documented exchange between Plaintiffs and DC of offers

**EXHIBIT C-40**
4

1   and counter-offers containing materially different terms. *See Siegel II*, 542 F. Supp.
2   2d at 1136-1139.

3   Secondly, Defendants mischaracterize both Marks' deposition testimony and
4   the Defamatory Letter to fabricate an inconsistency that, in reality, does not exist.
5   Even if the ranting Defamatory Letter were taken at face value, it simply states:
6   "Marks also tells the Siegels that he would testify in court against the Siegels if they
7   accepted this offer because he believes there has already been an agreement
8   reached." *See* Declaration of Patrick Perkins in Support of Defendants' Motion to
9   Compel ("Perkins Decl."), Ex. 1 at 1. Defendants repeatedly mischaracterize the
10  Defamatory Letter as stating an *"enforceable* agreement" had been reached, when it
11  plainly does not say this. This critical distinction is amply illustrated by Marks'
12  testimony, cited by Defendants (hence Defendants' deceptive insertion of
13  "enforceable"):

14          "A: Well, if the question is did I think at this point there was a final, binding,
            enforceable agreement, the answer would be no, **but I did believe that we had**
15          **come to an agreement back on October 19th, 2001**.... So while I thought we
            had an agreement on these terms, John evidently didn't, and where you don't
16          have a meeting of the minds, you don't have an agreement."

17  *See* Perkins Decl., Ex. 6 at 154:12-155:2 (emphasis added). Marks' testimony is
18  perfectly consistent with the Defamatory Letter's statement that Marks "believes
19  there has already been an agreement reached."

20  Defendants' motion is nothing more than a veiled motion for reconsideration
21  of the Court's summary judgment ruling and is built on a false pretext. Defendants'
22  continuing efforts to exploit Stolen Documents to access Plaintiffs' privileged
23  attorney-client communications taints this case. Moreover, the baseless nature of
24  Defendants' motion suggests that Defendants' real objective is to once again place
25  the Defamatory Letter before the Court to prejudice the trier of fact shortly before
26  trial. Plaintiffs respectfully request that this Court reconsider its prior September 26,
27  2008 ruling that the anonymous, inadmissible and wholly unsupported Defamatory
28  Letter "contained embarrassing and potentially questionable conduct by plaintiffs[']

**EXHIBIT C-41**
5

1  counsel in this case." Plaintiffs further request that Defendants be precluded from
2  using the Defamatory Letter in this litigation or elsewhere. This Court should close
3  this disgraceful chapter of this litigation once and for all.

4  **III.   DEFENDANTS' CONTENTIONS**

5          **A.   FACTUAL AND PROCEDURAL BACKGROUND**

6                  **1.   DC Comics' Settlement Defense In The Actions**

7          In response to Plaintiffs' complaints in the two related cases (the "Actions"),
8  Defendant DC Comics ("DC") filed counterclaims seeking enforcement of a prior
9  settlement agreement between the parties. DC's settlement claim was based on a
10  letter sent by Plaintiffs' prior counsel, Kevin Marks ("Marks"), on October 19,
11  2001, which unequivocally states that the Siegel Family has "accepted D.C. Comics'
12  offer of October 16, 2001" and which outlines all of the material terms of the
13  parties' agreement. (*See, e.g.*, Exhibit 2 to the Declaration of Patrick T. Perkins
14  submitted herewith ("Perkins Decl."), ¶¶ 47-56.)

15         In reply to DC's counterclaims, Plaintiffs denied that the parties reached any
16  valid settlement agreement. In response to Defendants' settlement defense,
17  Plaintiffs initially asserted as an affirmative defense that Marks did not have
18  authority, or exceeded the scope of his authority. (Perkins Decl. ¶ 5; Perkins Ex. 3
19  at ¶ 183.)[1] Additionally, Plaintiffs argued that the subsequent conduct of
20  Defendants after October 19, 2001, including but not limited to (i) an October 26,
21  2001 letter to Marks containing a "more fulsome" outline of the parties' agreement;
22  and (ii) a long-form agreement drafted by Defendants and submitted to Plaintiffs on
23  February 1, 2002, added to and materially changed the terms of the settlement that
24

25  [1] Defendants moved to compel production of documents and testimony regarding
    Plaintiffs' counsel's lack of authority to send the October 19, 2001 letter on the basis that
26  the authority defense served as a waiver of privilege. On May 2, 2007, Magistrate Judge
    Zarefsky granted Defendants' motion but allowed Plaintiffs to withdraw the defense and,
27  in effect, retract their waiver of privilege by striking the affirmative defense in lieu of
    compelling Plaintiffs to produce the documents and provide further testimony. (Perkins
28  Decl. ¶ 7.)

**EXHIBIT C-42**
6

1 they had accepted and thus justified their decision not to consummate their

2 agreement with Defendants. (Perkins Decl. ¶ 5; Perkins Ex. 3 at ¶ 53.)

3 **2. Warner Bros.' Receipt Of The Escrow Documents**

4 On or around June 28, 2006, three sets of the Escrow Documents arrived at

5 the offices of Warner Bros. from an anonymous source, addressed to separate

6 Warner Bros. executives. The executives to whom the Escrow Documents were

7 sent were instructed by Warner Bros.' then General Counsel to deliver them to his

8 office without reviewing the Documents. (Declaration of Wayne M. Smith

9 submitted March 26, 2007 (the "March 2007 Smith Decl. ¶ __") ¶ 2 (attached for the

10 Court's convenience as Perkins Exhibit 4).)

11 The Escrow Documents were provided to in-house litigation counsel Wayne

12 Smith ("Smith") who, after reviewing the unsigned cover letter that accompanied

13 them and after thumbing through the Documents, determined that some of them may

14 have been privileged. (March 2007 Smith Decl. ¶ 4.)

15 Smith researched the issue of what obligations, if any, governed Defendants'

16 handling of the Escrow Documents that Warner Bros. had received. Based on his

17 review of the relevant California authorities, Defendants: (i) reviewed each

18 document but ceased the review once it became apparent that the document was

19 privileged or may have been privileged; (ii) contacted opposing counsel and advised

20 him that the documents have been received; and (iii) refrained from using any

21 information in the documents until there was either an agreement with opposing

22 counsel, or the Court had determined each document's disposition. (March 2007

23 Smith Decl. ¶ 6.) Magistrate Judge Zarefsky found the procedure exercised by Mr.

24 Smith to be appropriate and "professional." (Perkins Ex. 5 at 19:3-7.)

25 During his review, Defendants' in-house counsel identified an August 9, 2002

26 written communication from Marks to his clients (the "August 9, 2002

27 Communication"), as one that related to plaintiffs' contention that Marks lacked

28 authority to bind plaintiffs to any settlement, and he concluded that the privilege

**EXHIBIT C-43**

7

1 attaching to the document had likely been waived. (February 19, 2009 Declaration
2 of Wayne M. Smith ("February 2009 Smith Decl. ¶__") ¶ 5.

3      On June 30, 2006, Defendants provided *all* of the Escrow Documents to an
4 escrow agent, not just those that were clearly or potentially privileged, and retained
5 no copies. (March 2007 Smith Decl. ¶ 13.) On July 18, 2006, the escrow agent
6 supplied a full copy set of the Escrow Documents to Plaintiffs' counsel. (Perkins
7 Decl. ¶ 10.) Meanwhile, neither copies nor the contents of the Escrow Documents
8 were provided to or shared with any of the outside counsel representing the
9 Defendants in this action, nor were any such documents used in the litigations unless
10 they were separately produced by Plaintiffs or by recipients of third-party
11 subpoenas. (March 2007 Smith Decl. ¶ 13.)

12           **3.**     **Defendants' Attempts To Obtain The Escrow**
13                **Documents.**

14      In July 2006, Defendants made multiple attempts to work out with Plaintiffs
15 voluntary production of the non-privileged Escrow Documents. When those efforts
16 failed, on August 7, 2006, Defendants served a document request on Plaintiffs, as
17 well as a subpoena *duces tecum* on Plaintiffs' counsel, Marc Toberoff, seeking a
18 copy of the Escrow Documents. (Perkins Decl. ¶ 11; September 26 Order at 2.) In
19 response, on August 23, 2006, Plaintiffs and Mr. Toberoff served a general
20 objection and refused to produce the Escrow Documents. (Perkins Decl. ¶ 12;
21 September 26 Order at 2.)

22      The objections served by Plaintiffs and Mr. Toberoff relied principally on
23 privilege objections and stated that a log identifying any item withheld on the basis
24 of privilege would be provided. However, Plaintiffs and their counsel ultimately
25 made the tactical decision not to provide the promised privilege logs in response to
26 Defendants' request and subpoena. (Perkins Decl. ¶ 12.)

27      Plaintiffs' failure to serve privilege logs addressing the Escrow Documents
28 was significant because Magistrate Judge Zarefsky had previously ordered Plaintiffs

**EXHIBIT C-44**
8

1  to "produce all privilege logs, including any revisions, by September 29, 2006," well

2  over a month *after* Plaintiffs and Mr. Toberoff responded to the subpoenas. As a

3  consequence, some of the Escrow Documents, which Mr. Toberoff later claimed

4  were privileged, were not identified in any privilege log. (*See* September 26 Order

5  at 2; Smith March 2007 Decl. ¶ 12.)

6  As a result of Plaintiffs' refusal to produce the Escrow Documents, and their

7  failure to list at least some of them on their privilege log, Defendants made a motion

8  to compel. On April 30, 2007, Magistrate Judge Zarefsky conducted a hearing on

9  the motion. (Perkins Decl. ¶ 13.) At the conclusion of the hearing, Magistrate

10 Judge Zarefsky summarized his order, stating, "[p]rivileged documents get returned.

11 The privileged documents that were listed on the privilege log get returned. The

12 others get sent to defense counsel." (Perkins Ex. 5 at 30:22-24.)

13 Notwithstanding Plaintiffs' counsel's representations at the April 2007

14 hearing that all Escrow Documents that had not been produced were listed on a

15 privilege log, Plaintiffs had not in fact listed all allegedly privileged documents on

16 their privilege log. The declaration subsequently served by Plaintiffs' counsel in

17 response to Magistrate Judge Zarefsky's order conceded this, but Plaintiffs did not

18 produce the unlisted documents as the Magistrate Judge had ordered. Instead,

19 Plaintiffs asserted that the unlisted documents were privileged and refused to

20 produce them. (September 26 Order at 4.) As a result, Defendants were required to

21 go back to Court, moving on September 17, 2007 to compel compliance with

22 Magistrate Judge Zarefsky's order. (Perkins Decl. ¶ 14.)

23 Because Defendants' September 17, 2007, motion to compel compliance was

24 not ruled upon, Defendants filed a renewed motion on April 9, 2008, this time with

25 the District Court. Plaintiffs' principal focus in opposing the renewed motion

26 centered on withholding the Toberoff Timeline. Neither Plaintiffs nor Mr. Toberoff

27 had ever listed the Toberoff Timeline on any privilege logs. (*Id.*)

28

**EXHIBIT C-45**
9

On September 26, 2008, the District Court ruled on Defendants' motion to enforce Plaintiffs' compliance with Magistrate Judge Zarefsky's order, a motion that Defendants had filed more than a year before, on September 17, 2007. In the September 26 Order, the District Court confirmed that the Magistrate Judge's prior ruling that for any potentially privileged documents not listed on Plaintiffs' privilege logs, privilege as to those documents was deemed waived and was now the "law of the case" due, in part, to Plaintiffs' failure to timely appeal the Magistrate Judge's ruling. (September 26 Order at 4-5.) The District Court reiterated the Magistrate Judge's finding that the waiver of privilege occurred not by the anonymous delivery of the Escrow Documents to Warner Bros., but instead by virtue of Plaintiffs' failure to include certain of the Escrow Documents, including the Toberoff Timeline, on a privilege log. (*Id.*)

### 4. **The Toberoff Timeline**

On December 12, 2008, more than a year and a half after first moving to compel production, Defendants finally received the subset of the Escrow Documents that had not been produced previously and that were not listed on a privilege log. Of the Escrow Documents finally produced to Defendants, the most explosive is the Toberoff Timeline.

The Toberoff Timeline, which was written by a former lawyer in Plaintiffs' counsel's firm (Perkins Ex. 5 at 9:25-10:8), chronicles the history of Plaintiffs' counsel's involvement in asserting control over the termination rights in Superman. (Perkins Ex. 1.) According to the Toberoff Timeline, which purports to draw its information from other documents included among the Escrow Documents delivered to Warner Bros. in 2006, Plaintiffs' counsel set in motion a plan to gain control over certain copyrights related to Superman, such that the result is that **"Marc Toberoff *personally* [owns] 47.5% of the entire Superman interest."** (Perkins Ex. 1 at 6; bold and italics in original.) The Toberoff Timeline further states that, in August 2002, Mr. Toberoff "approaches the Siegels [through their

**EXHIBIT C-46**
10

1 then counsel Kevin Mark ("Marks")], *not as an attorney but as a film producer*,

2 stating that he is 'allied' with [agent Ari] Emanuel..." and that Toberoff and

3 Emanuel "have a billionaire ready to offer $15 million dollars up front, plus what

4 they promise to be meaningful participation from proceeds for exploitation of the

5 Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in

6 all media."[2] (*Id.* at 2; emphasis in original.)

7          The Toberoff Timeline further states that, in response to Mr. Toberoff's offer,

8 Plaintiffs' then-counsel Marks contemporaneously communicated such offer to

9 Plaintiffs but advised against accepting it, warning them that "he would testify in

10 court against the Siegels if they accepted the offer because he believes there has

11 already been an agreement reached." (*Id.*) Defendants have concluded, based upon

12 the Toberoff Timeline, the recollection of Warner Bros. counsel Wayne Smith who

13 saw the underlying documents, and Plaintiffs' privilege logs, that this statement was

14 communicated by Marks to Plaintiffs in the August 9, 2002 Communication, which

15 Defendants still have not obtained in discovery.[3] (February 2009 Smith Decl. ¶ 5.)

16          Although Magistrate Judge Zarefsky's order of April 30, 2007 required that

17 the Toberoff Timeline be produced in May 2007, Plaintiffs kept Defendants from

18 obtaining access to it until discovery was over and, significantly, until after the

19 motions for summary judgment had been briefed and ruled upon. Defendants

20 respectfully but firmly believe that the statements attributed to Marks, which appear

21 in the August 9, 2002 Communication from Marks to the Siegels, is information that

22 Defendants were entitled to probe and develop during discovery. Defendants submit

23 that such discovery and its resulting evidence would have had a material impact on

24 the Court's view of Defendants' settlement defense.

25 _____

[2] The Toberoff Timeline further alleges that Toberoff later admitted "to Laura Siegel that
26 there never was a billionaire willing to invest $15 million when he first approached them."
(Perkins Ex. 1 at 6.)
27 [3] Significantly, in their response to Defendants' invitation to meet and confer on this
motion, Plaintiffs do not deny that the August 9, 2002 writing from Marks contains, in
28 substance, the statement set forth in the Toberoff Timeline. (Perkins Ex. 8.)

**EXHIBIT C-47**
11

Plaintiffs' failure to produce the August 9, 2002 Communication during the discovery period allowed the Court to rely on Marks' uncontroverted testimony at his deposition:

> Q. [BERGMAN] Did you as of February 6, 2002 believe that you had closed a deal with DC for the Superman interest?
>
> * * * *
> [Objections Deleted]
>
> A. [MARKS] Well, *if the question is did I think at this point there was a final, binding, enforceable agreement, the answer would be no,* but I did believe that we had come to an agreement back on October 19th, 2001, that was reflected exactly in the terms that I have set out. At the end of that letter I wrote to John in substance and effect, "John, if I've gotten anything wrong, if I've misstated any of these terms, please let me know." When John writes back on October 26, which I see later, in effect his letter is yeah, you've got terms wrong. My outline of the deal terms is different than your outline of the deal terms. So while I have thought we had an agreement on these terms, John evidently didn't, and where you don't have a meeting of the minds, you don't have an agreement.

(Perkins Ex. 6 at 153:21-155:2; emphasis added.) The foregoing answer laid the foundation and was the jumping off point for Marks' immediately following testimony regarding the supposed many "differences" between Marks' October 19, 2001 acceptance letter, and Schulman's October 26, 2001 response. (*Id.* at 155:4-164:11.) This follow-on testimony consumed eight pages of deposition transcript and was extensively relied on by Plaintiffs as allegedly objective evidence of the absence of a settlement agreement in seeking summary judgment. (Pltfs' Motion for Summary Judgment (Dkt # 161), at 48-57.) Indeed, in moving for summary judgment, Mr. Toberoff characterized Marks' recitation of differences as "material" and claimed that these differences were evidence that "there never was a 'meeting of the minds'" – precisely the words that Marks invoked in answering the question

**EXHIBIT C-48**
12

1    above. (*Id.* at 48, 58.) Defendants submit that had they been able to confront Mr.

2    Marks at deposition with his statement in the August 9, 2002 Communication, they

3    would have impeached Mr. Marks, and he might have changed his testimony.

4    Moreover, the difference between Marks' testimony at deposition and his statement

5    in the August 9, 2002 Communication would have created a fact issue on Summary

6    Judgment.

7         The Court ultimately accepted Plaintiffs' "material differences"

8    characterization – underpinned by Marks' unrebutted testimony – and found that

9    there were "numerous material differences between the terms relayed in the October

10   19 and 26, 2001, letters." (March 26, 2008 Order at p. 61:6-7.) Adopting the

11   formulations of both Marks and Plaintiff's counsel, the Court also found that "the

12   documents [including the October 19 and 26, 2001 letters] referenced above . . .

13   aptly demonstrate that there was no 'meeting of the minds' on all material terms."

14   (*Id.* at 60:23-25.) But the Court's conclusion that these differences were on

15   "material terms" was made without the benefit of Marks' subsequent advice to his

16   clients in August 2002 that he believed there was an enforceable agreement and that

17   he was prepared to testify to that fact under oath if they tried to breach that

18   agreement.

19        Thus, without the benefit of Plaintiffs' former counsel's statement that he

20   believed that an agreement was in place that was sufficiently enforceable for him to

21   testify against his own clients, the Court on summary judgment dismissed Defendant

22   DC Comics' settlement defense. (March 26, 2008 Order at 57-62.) Not only did the

23   Court rely upon the supposed "material" differences in the parties' correspondence –

24   which are completely undermined by Marks' August 2002 communication – but

25   also on the parties' "*conduct in reaction thereto.*" (*Id.* at 61, emphasis added.) This

26   "conduct in reaction thereto" necessarily included Marks' now-disclosed

27   communications to his clients that an enforceable agreement had in fact been

28   reached, something that the Court never had the opportunity to consider.

**EXHIBIT C-49**
13

1   **5.   The Parties' Meet And Confer Efforts**

2        Pursuant to L.R. 37-1, on January 14, 2009, Defendants' counsel sent

3   Plaintiffs' counsel a letter setting forth Defendants' position on the issues presented

4   in this motion, outlining the relief sought in an attempt to avoid the need for Court

5   intervention, and inviting Plaintiffs' counsel to confer on the issue. (Perkins Decl. ¶

6   16; Ex. 7.) By letter dated January 22, 2009, Plaintiffs' counsel rejected

7   Defendants' position on the issues raised in this motion, but did not provide any

8   dates on which to confer with Defendants' counsel. (*Id.* ¶ 17; Ex. 8.). By e-mail

9   dated January 23, 2009, Defendants' counsel confirmed receipt of Plaintiffs'

10  counsel's letter of January 22, 2009, and confirmed that Plaintiffs considered the

11  "meet and confer" obligation to have been satisfied. (*Id.* ¶ 18; Ex. 9.) Plaintiffs'

12  counsel did not respond. Thus, the parties have not been able to resolve the dispute.

13  **B.   LEGAL ARGUMENT**

14  **1.   The Newly Discovered Evidence In The "Toberoff Time**

15  **Line" And The Not-Yet-Discovered Evidence In The August**

16  **9, 2002 Communication Contain Discoverable Information**

17  **Which May Ultimately Support Reconsideration By The**

18  **Court Of Defendants' Settlement Defense.**

19       Because of the conduct of Plaintiffs and their counsel in this matter, the Court

20  has dismissed on summary judgment a key defense – that the parties had previously

21  reached a settlement of this dispute – on the basis of an incomplete and misleading

22  record. The Court in its ruling relied in part on certain evidence – Marks' deposition

23  testimony – that we now know to be a distorted fragment of the truth because

24  Plaintiffs and their counsel tried, and almost succeeded, in hiding contrary evidence.

25  The full picture in fact shows that Plaintiffs' counsel, when all was said and done,

26  months after the exchange of letters and the long form agreement that Plaintiffs

27  contended on summary judgment demonstrated that there was no meeting of the

28

**EXHIBIT C-50**

14

1  minds, wrote a letter to his client saying that a settlement had in fact been reached

2  and that he would so testify in court if necessary.

3      Because of the tactics of Plaintiffs and their counsel, the Court at the time of

4  its ruling had before it an incomplete record that still is not complete.  Fundamental

5  fairness dictates that Defendants be allowed to discover all of the relevant non-

6  privileged evidence on this issue and to consider whether to ask the Court to revise

7  its ruling on the settlement issue.  The decision on whether to move to reconsider,

8  on any motion to reconsider, or on appeal if any, ought to be made on the basis of a

9  complete record and not on the basis of potentially misleading fragments.

10  Disclosure of the contents of the August 9, 2002 Communication and further

11  discovery on this issue ought to be had.

12          **2.**    **The Evidence That Defendants Now Seek Is Impeachment**

13                **Evidence That Goes Directly to the Heart of Marks'**

14                **Credibility on the Settlement Issue.**

15      Marks testified in 2006 that no settlement had occurred in 2001, in part due to

16  certain actions by Defendants in late 2001 and early 2002.  It would have been

17  critical for Defendants' counsel to have confronted Marks at his deposition with a

18  letter written by Marks to his clients in *August 2002* and providing his then-

19  contemporaneous views and conclusions concerning the events in question, namely,

20  that there had been a settlement and that were he sworn to tell the truth, he would be

21  forced to say so.  Marks was not confronted by that letter – and indeed the Court and

22  counsel do not even today know for sure exactly what that letter contains – because

23  of Plaintiffs' multi-year effort to hide the ball.

24      The question on the settlement defense is whether the parties had a meeting of

25  the minds on the material terms of a settlement back in 2001.  No piece of evidence

26  on this question is more critical than what Marks believed back in 2001 at the time

27  that these events occurred – a subject that Plaintiffs' counsel allowed Marks to

28  testify on at his deposition, in the absence of the August 9, 2002 Communication

**EXHIBIT C-51**
15

1  that provides the *best* evidence on this key issue. To allow the Defendants and the
2  Court to litigate these issues on the basis of Marks' characterization of the events in
3  2006, years after they occurred, when there is written evidence of what Marks
4  contemporaneously believed back in 2002 in the form of a presumably candid
5  assessment by a lawyer to his client, is to risk a substantial miscarriage of justice. In
6  Defendants' view, the Court ought to avoid that risk and allow a complete and
7  searching investigation of the facts.

8      Defendants are entitled to a full account before they are forced to decide
9  whether to ask the Court to reconsider. The Court is entitled to a full account if it is
10  asked to reconsider. And, no matter what, the parties are entitled to a complete
11  record in this case in the event that further proceedings ensue. Discovery of the
12  August 9, 2002 Communication and a resumed deposition of Marks depending on
13  what the August 9, 2002 Communication reveals are the first steps in the process of
14  undoing the damage to this case that Plaintiffs' conduct has caused.

15      **3.    Plaintiffs Have Improperly Obscured The Truth Through**
16      **Selective Use And Waiver Of The Privilege.**

17      Any voluntary disclosure inconsistent with the confidential nature of the work
18  product privilege waives the privilege. *Atari Corp. v. Sega of Am.*, 161 F.R.D. 417,
19  420 (N.D. Cal. 1994). "Disclosure to an actual or potential adversary waives work
20  product protection as to the material disclosed." *In re McKesson HBOC, Inc. Secs.*
21  *Litig.*, 2005 U.S. Dist. LEXIS 7098, 32-33 (N.D. Cal. Mar. 31, 2005). Moreover, a
22  waiver of the privilege may occur even if there is an agreement among parties that
23  disclosure does not constitute waiver. *Id.* Equally important in the rules governing
24  the waiver of privileges is the prevention of "prejudice to a party and distortion of
25  the judicial process by a privilege holder's selective disclosure of privileged
26  information . . . ." *Jacobs*, 117 F.3d at 89. *See also Columbia Pictures Television,*
27  *Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir.
28  2001) (the attorney-client privilege and work product immunity may not be used

**EXHIBIT C-52**
16

1    both as a sword and a shield); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 512

2    (S.D. Cal. 2003).

3        At the deposition of Kevin Marks, Plaintiffs sought to selectively waive the

4    work-product doctrine. Specifically, Defendants' counsel asked Mr. Marks the

5    following question:

6            Q. [BERGMAN] Did you as of February 6, 2002
7        believe that you had closed a deal with DC for the
           Superman interest?

8    (Perkins Ex. 6 at 153:21-22.)

9        At this point in the deposition, Mr. Marks' counsel and Mr. Toberoff

10    interposed the following objections:

11            [MR. MARMARO] The question is vague and
12        ambiguous, calls for a legal conclusion, and again, I am
       going to defer to Mr. Toberoff whether he has any
13        objection to – subject to those objections, having Mr.
       Marks answer the question.
14

15            [MR. TOBEROFF] I object on *work product*
16        *privilege*, but I think I am not asserting that on behalf of
       the clients. I am not asserting that on behalf of the Siegels
17

18            [MR MARMARO] Mr. Marks would be prepared to
19        answer the question if the Siegels have no objection to it.

20            [MR TOBEROFF] As to your personal belief, no
21        objection.

22    (*Id.* at 153:23-154:11; emphasis added.) With the express permission of Plaintiffs'

23    counsel to testify as to his state of mind as to whether he believed there was an

24    agreement, Mr. Marks went on to testify as follows:

25            A. [MARKS] Well, if the question is did I think at
26        this point there was a final, binding, enforceable
       agreement, the answer would be no, but I did believe that
27        we had come to an agreement back on October 19th, 2001,
       that was reflected exactly in the terms that I have set out.
28        At the end of that letter I wrote to John in substance and

**EXHIBIT C-53**

17

1    effect, "John, if I've gotten anything wrong, if I've
2    misstated any of these terms, please let me know." When
     John writes back on October 26, which I see later, in effect
3    his letter is yeah, you've got terms wrong. My outline of
     the deal terms is different than your outline of the deal
4    terms. So while I have thought we had an agreement on
     these terms, John evidently didn't, and where you don't
5    have a meeting of the minds, you don't have an
     agreement.
6

7    (*Id.* at 154:12-155:2)  Of course, what Defendants did not know at the time of Mr.

8    Marks' deposition was that, in a letter in August 2002, Mr. Marks had actually

9    reached a different conclusion than that expressed at deposition.  According to the

10   Toberoff Timeline, Mr. Marks had told his clients that he believed that Plaintiffs had

11   entered into a binding agreement and that if they took Mr. Toberoff's offer, Mr.

12   Marks would testify against the Plaintiffs.  (Perkins Ex. 1 at 2.)  Ironically, Mr.

13   Marks ended up testifying exactly the opposite.

14       Plaintiffs' tactic at the Marks deposition is the very kind of "sword and

15   shield" behavior that the law governing waiver of privilege was designed to

16   prevent.[4]  Mr. Marks was asked for his legal judgments formed as of February 6,

17   2002, shortly after he received Defendants' draft long form agreement.  (Perkins Ex.

18   6 at 153:21-22.)  In other words, Mr. Marks was asked to disclose his mental

19   impressions formed in February 2002.  Such impressions were unquestionably

20   formed in anticipation of litigation because as Mr. Marks testified at deposition

21   "litigation was always looming" when it came to the negotiations regarding the

22   Superman termination interest.  (Perkins Ex. 6 at 45:21-22.)  Plaintiffs' counsel

23   acknowledged that this question called for testimony concerning the attorney work

24   product, but then stated that he was not asserting that objection on behalf of the

25

26

27   [4] Plaintiffs' counsel and/or Mr. Marks' counsel objected on privilege grounds and
     instructed Mr. Marks not to answer on more than 15 separate occasions during the course
28   of the deposition. (Perkins Decl. ¶ 15.)

**EXHIBIT C-54**
18

1  Siegels.  (Perkins Ex. 6 at 154:3-6.)[5]  Plaintiffs' counsel knew what Mr. Marks'

2  answer would be and therefore was anxious to have him answer the question.

3      Plaintiffs' counsel's selective waiver of the work-product privilege, and Mr.

4  Marks' ensuing favorable testimony for Plaintiffs, is troubling in light of the

5  apparent inconsistency between Mr. Marks' deposition testimony and the August 9,

6  2002 Communication in which Mr. Marks apparently told his clients – in writing –

7  that he believed an agreement *had* been reached, and felt sufficiently strongly about

8  this to threaten to testify under oath against Plaintiffs should they renege on the

9  agreement and instead accept Mr. Toberoff's offer.  (Perkins Ex. 1 at 2.)

10  Meanwhile, when Defendants heard Mr. Marks' work product testimony, they were

11  unaware of the contents of the Toberoff Timeline or the contents of the August 9,

12  2002 Communication.  As a result, they were not able to inquire as to the

13  inconsistency in Mr. Marks' view, nor could they even move to compel production

14  of the August 9, 2002 Communication on the basis of Mr. Marks' waiver.

15      In light of what was an obvious waiver of Mr. Marks' work product – his

16  voluntary disclosure of his mental impressions as to whether he believed there was

17  an agreement between the parties in 2002 – as well as the inconsistency between

18  Mr. Marks' deposition testimony on the one hand, and content of the August 9, 2002

19  Communication on the other, the law that governs waiver and that is designed to

20  protect against prejudice to parties and to prevent the distortion of justice requires

21  that Defendants' motion be granted, that the August 9, 2002 Communication be

22  produced, and that Mr. Marks be deposed on the subject matter thereof.

23  ///

24  ///

25  ///

26

27  [5] Of course, this begs the question, on whose behalf *other than the Siegels* he could have
    been asserting a work product privilege?  Of course, the answer is that it could only be the
28  Plaintiffs' privilege.

**EXHIBIT C-55**
19

4. **It Is The "Law Of The Case" That Any Attorney-Client Privilege Applicable To The Toberoff Timeline Has Been Waived, Which In Turn Serves To Waive Any Privilege In Kevin Marks' August 2002 Communication With Plaintiffs Concerning Marks' Opinion That The Parties Had Reached A Settlement.**

In its September 26 Order, the District Court held:

> Pursuant to Magistrate Judge Zarefsky's order, any claim of privilege not previously asserted before that Order was deemed "waived." Although plaintiffs suggest that such a reading of Magistrate Judge's order as not a fair one and lacks common sense, the language of his order is clear and unambiguous: Any escrow document not matching up to the privilege log or the declaration's list of previously-produced documents was to be produced to defendants; any assertion of privilege to such documents to be produced was deemed "waived." That plaintiffs' counsel may have a basis to assert such privilege or otherwise challenge the propriety of producing such material on relevance grounds, etc., is inapposite. If plaintiffs wished to press such new claims of privilege or any other basis for challenging production of the same, Magistrate Zarefsky's Order deemed them waived. What plaintiffs' counsel should have done at that point to preserve such assertions was to appeal Magistrate Judge Zarefsky's Order to this Court, in particular that section of his Order deeming any previously un-asserted grounds of privilege to be "waived." Plaintiffs did not do so, and the time to appeal Magistrate Judge Zarefsky's Order to this Court has long since expired. See Local Rule 72-2.1.

Magistrate Judge Zarefsky's Order is now the law of the case in this matter. (September 26 Order at 4-5.)

"[A]ttorney-client communications made 'in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality.' 1 Paul R. Rice, Attorney-Client Privilege in the United States § 4:35, at 195 (1999 ed.)." *Nidec Corp. v.*

**EXHIBIT C-56**
20

1   *Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). Once disclosure of previously

2   privileged information occurs "it extinguishes the element of confidentiality that one

3   must show in order to claim the privilege." *Weil v. Investment/Indicators, Research*

4   *& Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). Similarly, "'disclosure of the

5   substance of a privileged communication is as effective a waiver as a direct

6   quotation since it reveals the "substance" of the statement.'" *U.S. v. Jacobs*, 117

7   F.3d 82, 91 (2d Cir. 1991) *quoting In re Kidder Peabody Sec. Litig.,* 168 F.R.D.

8   459, 470 (S.D.N.Y. 1996).

9        According to the Toberoff Timeline, in response to an offer from Mr.

10   Toberoff to Plaintiffs for their Superman rights, Plaintiffs' then-counsel, Kevin

11   Marks, "tells the [Plaintiffs] that he would testify in court against the [Plaintiffs] if

12   they accepted [Toberoff's] offer *because he believes there has already been an*

13   *agreement reached.*" (Perkins Ex. 1, at 2, emphasis added.) Defendants have

14   concluded, based upon the Toberoff Timeline, the recollection of Warner Bros.

15   counsel Wayne Smith who saw the underlying documents, and Plaintiffs' privilege

16   logs, that this statement was communicated by Marks to Plaintiffs and others in the

17   August 9, 2002 Communication. (February 2009 Smith Decl. ¶ 5.)[6] Effectively, the

18   "gist" of the August 9, 2002 Communication has already been disclosed and the

19   production of that document will "add literal meaning to that disclosure." *Jacobs*,

20   117 F.3d at 90. Namely, the August 9. 2002 Communication will provide the full

21   context of Mr. Marks' contemporaneous view of a binding agreement and will allow

22   Defendants – and the Court – to view Mr. Marks' position in his own words.

23        As a result of the disclosure of the contents of the August 9, 2002

24   Communication through the production of the Toberoff Timeline pursuant to a

25   finding of privilege waiver which is the law of this case, the privilege in the August

26

27   [6] Significantly, in their response to Defendants' invitation to meet and confer on this motion, Plaintiffs do not deny that the August 9, 2002 writing from Marks contains, in

28   substance, the statement set forth in the Toberoff Timeline. (Perkins Ex. 8.)

**EXHIBIT C-57**

21

1  9, 2002 Communication has been waived.  Thus, Defendants are entitled to the

2  August 9, 2002 Communication (which was called for under Defendants' Document

3  Requests (Perkins Decl. ¶ 11), as well as to depose Mr. Marks further concerning

4  the Document's contents.

5         **5.**    **Defendants Have Been Diligent In Seeking Discovery Of The**

6                   **Escrow Documents And Thus Have "Good Cause" To**

7                   **Reopen Discovery.**

8       "Rule 16(b) provides that a district court's scheduling order may be modified

9  upon a showing of 'good cause,' an inquiry which focuses on the reasonable

10  diligence of the moving party." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 (9th Cir.

11  2007) *citing Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.

12  1992). *See also N.Y. Life Ins. Co. v. Morales*, 2008 U.S. Dist. LEXIS 51304 (S.D.

13  Cal. July 1, 2008) (whether defendant has demonstrated good cause for reopening

14  discovery turns on when defendant learned of new deponents whether he pursued

15  discovery in a reasonably diligent manner).

16       Here, Defendants have been diligent in attempting to obtain first, the Escrow

17  Documents, and now the August 9, 2002 Communication.  Defendants began their

18  effort to receive at least some of the Escrow Documents by voluntary exchange in

19  July 2006.  When those efforts failed, Defendants served formal document requests

20  on Plaintiffs as well as a subpoena *duces tecum* on Plaintiffs' counsel on August 7,

21  2006. (Perkins Decl. ¶ 11.)

22       After Plaintiffs refused to produce any of the Escrow Documents, and well

23  before the close of discovery, on March 26, 2007, Defendants moved to compel

24  production of some of the Escrow Documents.  On April 30, 2007, Magistrate Judge

25  Zarefsky issued an order on the record that should have resulted in Defendants

26  receiving in May 2007 the documents that were finally produced on December 12,

27  2008. (Perkins Ex. 5 at 30:22-24.)  Instead, Plaintiffs simply refused to comply with

28  Magistrate Zarefsky's order, requiring Defendants to again move before the

**EXHIBIT C-58**

22

1   Magistrate Judge on September 12, 2007 prior to the close of discovery. (Perkins

2   Decl. ¶ 14.) Through no fault of Defendants, this motion was not ruled upon until

3   more than a year later, on September 26, 2008 and, because of an outstanding issue,

4   the Escrow Documents were not produced to Defendants until December 12, 2008.

5   (*Id.*)

6       Approximately one month after having received the Escrow Documents

7   (which month included the Christmas and New Year's holidays), Defendants

8   commenced the process of filing the instant motion. (*Id.* ¶ 16.)

9       In light of the foregoing, Defendants have demonstrated diligence in timely

10  seeking the evidence they seek by this Motion, thus demonstrating the "good cause"

11  necessary under Fed. R. Civ. P. 16(b).

12         **6.**   **<u>The Evidence Sought By Defendants In This Motion Is</u>**

13              **<u>Discoverable Notwithstanding The Court's Ruling On</u>**

14              **<u>Summary Judgment.</u>**

15       The standard for what is discoverable is very broad under Rule 26 of the

16  Federal Rules of Civil Procedure:

17          Parties may obtain discovery regarding any matter, not
           privileged, that is relevant to the claim or defense of any
18        party, including the existence, description, nature, custody,
           condition, and location of any books, documents, or other
19        tangible things and the identity and location of persons
           having knowledge of any discoverable matter. For good
20        cause, the court may order discovery of any matter
           relevant to the subject matter involved in the action.
21        Relevant information need not be admissible at the trial if
           the discovery appears reasonably calculated to lead to the
22        discovery of admissible evidence.
23

24  Fed. R. Civ. P. 26(b)(1).[7] There can be no dispute that documents and testimony

25  concerning Plaintiffs' main negotiator and attorney's contemporaneous view as to

26  ―――――――――――――――
[7] The Court reiterated this point at a recent hearing in ordering Defendants to supplement
27  their document production, stating "I'm sure that all counsel in this room understand the
    distinction between the standard of relevancy in the discovery phase versus the standard of
28  relevancy at the trial itself. (Jan. 14, 2009 Trans. at 21:6-9.)

**EXHIBIT C-59**
23

1  whether the parties had an enforceable agreement is probative evidence itself and
2  would lead to the discovery of admissible evidence regarding Defendants'
3  settlement defense.

4       Indeed, in ruling on the settlement defense without the benefit of a letter from
5  Plaintiffs' counsel expressing his contemporaneous opinion that the parties <u>had</u>
6  reached an agreement as of August 9, 2002, the Court found that no such agreement
7  existed. In so ruling, the Court relied on differences in the parties' correspondence
8  and on "conduct in reaction thereto." (March 16, 2008 Order at 61.) The impact of
9  the differences in correspondence, if there were differences, is undermined by the
10 direct evidence now available concerning the state of mind of the negotiator on the
11 Siegels' side. It demonstrates that he believed he had a settlement notwithstanding
12 any differences in the correspondence, something the Court did not know before.
13 Moreover, Mr. Marks' decision to confront his clients and to insist that he would
14 testify to the existence of a settlement is "conduct in reaction thereto," conduct
15 about which the Court was unaware when it ruled on Summary Judgment.

16      Defendants respectfully argue that a contemporaneous letter from Plaintiffs'
17 then counsel expressing a belief that the parties had an agreement is powerful
18 evidence of the very sort of "conduct in reaction" upon which the Court indicated it
19 relied in dismissing Defendants' settlement defense, or at the very least places that
20 "conduct in reaction" under a significantly different light. Such evidence, if
21 developed and presented on summary judgment, should have created a fact issue for
22 trial.

23      **7.**     <u>**The Interests Of Justice And The Integrity Of The Judicial**</u>
24                 <u>**Process Strongly Favor The Relief Sought By Defendants.**</u>

25      Defendants do not, at this time or by this motion, seek reconsideration of the
26 District Court's dismissal of the settlement defense. Rather, Defendants seek only
27 narrow relief – production of the August 9, 2002 Communication and the
28 opportunity to depose Marks thereon. Whether Defendants decide to move for

**EXHIBIT C-60**
24

1 reconsideration will depend, in part, upon the development of the evidence.
2 However, regardless of whether Defendants seek reconsideration, fundamental
3 fairness requires that they must be permitted to develop this newly discovered
4 evidence so that they may have the option to seek reconsideration or simply to have
5 the evidence in the record on appeal at the conclusion of the case.

6     The Toberoff Timeline describes a pattern of deception by Plaintiffs' counsel
7 that has seriously tainted the process to Defendants' detriment. Most germane to
8 this motion, Plaintiffs' improper delay in complying with Magistrate Judge
9 Zarefsky's Order of April 30, 2007, combined with delay in final decisions being
10 rendered on Defendants' motion to compel, conspired to keep powerful evidence of
11 a settlement between the parties from Defendants until after the close of discovery
12 and after the Court ruled on summary judgment. In addition, by selectively waiving
13 the work product privilege and allowing Marks to testify in a way that appears to be
14 directly contradicted by a letter he wrote to his clients in 2002, Plaintiffs' conduct
15 has unfairly affected the merits of the case and has undermined the fundamental
16 fairness of the judicial process. As a result, Defendants respectfully submit that the
17 Court's duty to maintain the integrity of the judicial process and fundamental
18 fairness further favor the granting of the narrow relief sought by Defendants herein.

19
## IV.   PLAINTIFFS' CONTENTIONS
20
### A.   FACTUAL AND PROCEDURAL BACKGROUND
21
#### 1.   The Court Properly Held on Summary Judgment That No Settlement Agreement Was Consummated By the Parties
22

23     On April 30, 2007, Plaintiffs moved for partial summary judgment that no
24 settlement agreement was reached between Plaintiffs and Defendants regarding
25 Plaintiffs' Superman termination, as Defendants had alleged. *See* Defs. First
26 Amended Answer, dated November 1, 2005, at ¶¶ 112-113; Defs. First Amended
27 Counterclaims, dated October 17, 2005, ¶¶ 47-56, 97-105. Plaintiffs demonstrated
28 that the parties' objective manifestations of intent *clearly* indicated no "meeting of

**EXHIBIT C-61**
25

the minds" on all of the material terms of a settlement agreement, as is required under California law.[8]

Three key documents amply showed that, as a matter of law, no settlement agreement was ever consummated due to their differing material terms: (1) a letter dated October 19, 2001 (the "October 19, 2001 Letter"), from Plaintiffs' then counsel, Kevin Marks ("Marks"), to Warner's general counsel, John Schulman ("Schulman"); (2) a reply letter dated October 26, 2001, from Schulman to Marks, with an outline of purported deal terms (collectively, the "October 26, 2001 Letter"); and (3) a proposed first draft of an agreement sent by Defendants' outside counsel to Marks on February 1, 2002 (the "February 1, 2002 Draft"). *See Siegel II*, 542 F. Supp. 2d at 1137.

In 2000 and 2001 the parties had communicated sporadically concerning the potential settlement of this matter through the purchase by Defendants of Plaintiffs' recaptured Superman copyrights. Plaintiffs' Motion for Partial Summary Judgment (filed April 30, 2007) (Pls. MSJ) at 46:10-13. These negotiations became increasingly complex and led to an October 16, 2001 conference between Schulman and Marks in which many different terms, including complicated contingent compensation formulas, were discussed. *Id.* Thereafter, Marks sent Schulman the October 19, 2001 Letter, which stated as follows:

> "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics' offer of October 16, 2001 in respect of the 'Superman' and 'Spectre' properties. The terms are as follows: ...."

Declaration of Marc Toberoff in Support of Plaintiffs' Motion for Partial Summary Judgment ("Toberoff MSJ Decl."), Ex. BB at 1. The October 19, 2001 Letter set forth financial and other terms and concluded by stating:

---

[8] *See* Declaration of Marc Toberoff in Opposition to Defendants' Motion to Reopen Discovery ("Toberoff Decl."), Ex. A; Plaintiffs' Reply in Support of Motion for Partial Summary Judgment (filed June 25, 2007) ("Pls. Reply MSJ") at 55:1- 62:8.

**EXHIBIT C-62**

1  "***John [Schulman], if there is any aspect of the above that is somehow
2  misstated, please let me know…*** I will be out of the office… for the
   following four weeks."

3  *Id.*, at 1-6 (emphasis added).

4       Schulman responded to Marks' October 19, 2001 Letter by his October 26,

5  2001 Letter, stating:

6  "I have received, and have finally had a chance to review, your outline
   fax of October 19… ***I enclose herewith*** for you and Bruce ***a more***
7  ***fulsome outline of what we believe the deal we've agreed to is.*** We're
   working on the ***draft*** agreement so that by the time you [return]… we
8  will have this super-matter transaction in document form."

9  *Id.*, Ex. CC (emphasis added). Schulman's "more fulsome outline," entitled

10 "October 2001 Outline," contained new or different material terms than those

11 contained in Marks' October 19, 2001 Letter, and was therefore never accepted by

12 Marks or Plaintiffs. *Id.*

13      Defendants' outside counsel thereafter furnished to Marks the February 1,

14 2002 Draft – a first draft of a proposed agreement – along with a cover letter dated

15 February 1, 2002, which stated:

16 "I am pleased to enclose a ***draft*** agreement between your clients and
   DC Comics concerning the Superman property. ***As our clients have***
17 ***not seen this latest version of the agreement, I must reserve their***
   ***right to comment***. In addition, you will note that the draft agreement
18 makes reference to certain 'Stand Alone Assignments.' We are
   finalizing those and, as soon as they are ready we will forward them to
19 you."

20 *Id.*, Ex. DD (emphasis added).

21      Defendants' February 1, 2002 Draft contained even more new or changed

22 material terms than those contained in Schulman's October 26, 2001 Letter, and

23 added "trap doors" that effectively minimized key financial terms set forth in

24 Marks' October 19, 2001 Letter. *See* Toberoff Decl., Ex. A.[9]

25      Joanne Siegel, by a letter dated May 9, 2002 to Warner Bros. CEO Richard

26

27 [9] One such "trap door" in the February 1, 2002 Draft was that Plaintiffs royalty was tied to
   DC licensing revenues from *Siegel's* works, and not revenues from all derivative
28 Superman properties. *See also* Toberoff Decl., Ex. A at 48:7-19.

**EXHIBIT C-63**
27

Parsons, expressed great dissatisfaction with Defendants' aggressive negotiating tactics and their February 1, 2002 Draft, in the strongest of terms:

> "Your company's unconscionable contract dated February 4, 2002 [*sic*] contained new, outrageous demands that were not in the proposal. The document is a heartless attempt to rewrite the history of Superman's creation and to strip Laura and me of the dignity and respect that we deserve…. After four years we have no deal and this contract makes an agreement impossible."

*See* Declaration of Michael Bergman in Opposition to Plaintiffs' Motion for Summary Judgment ("Bergman MSJ Opp. Decl."), Ex. Z (May 9, 2002 letter).

Parson's response, dated May 21, 2002, *admitted* that as of that late date an agreement had *not* been consummated: "John [Schulman] and Paul [Levitz] look forward to meeting with your representatives, and *we continue to hope that this agreement can be closed* based upon the earlier discussions with your lawyers." Bergman MSJ. Opp. Decl., Ex. AA (emphasis added).

Plaintiffs formally terminated settlement discussions by letter dated September 21, 2002:

> "We regret to inform you that after many years of difficult negotiations with your representatives culminating in an offer sent to us on February 4, 2002 [February 1, 2002 Draft], irreconcilable differences that cannot be overcome…. Putting outrageous, never discussed, unacceptable demands into DC's February document made it clear that no agreement could ever be reached."

Bergman MSJ Opp. Decl., Ex. DD.

In opposition to Plaintiffs' motion, Defendants insisted that a full and final agreement was reached in the October 19, 2001 Letter, and that the remaining letters and drafts were mere "documentation." The Court rejected Defendants' premise:

> "Defendants argument to the contrary is premised on the notion that they can limit the scope of the legal analysis to the October 19, 2001, letter and call it a contract, regardless of their materially different October 26, 2001, letter in reply ("I enclose…a more fulsome outline of what we believe the deal…is") and their vastly different February 1, 2002 draft which were part and parcel of the same settlement negotiation."

*Siegel II*, 542 F. Supp. 2d at 1138 (emphasis original). Instead, the Court analyzed

**EXHIBIT C-64**
28

the objective manifestation of the parties' intent and granted Plaintiffs' motion:

> "Defendants further seek to create issues of fact through <u>post hoc</u> testimony and rationalizations. *None of this subjective belief is sufficient to defeat the objective manifestation of the parties' intent relayed in the documents referenced above that aptly demonstrate that there was no "meeting of the minds" on all material terms...* One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001 letters and the February 1, 2002, draft to reach the conclusion that the parties failed to come to an agreement on all material terms... Far from signifying that the parties' "negotiations... result[ed] in a binding contract" leaving nothing more than the drafting of more formal documentation memorializing that agreement, these submissions between the parties went far beyond that by adding in or further refining areas from what was contained in the October 19 letter... *From all of this there is no document or set of documents reflecting agreement by the parties to singular agreed terms.*"

*Id.* at 1138-1139 (internal citations omitted) (emphasis added).

### 2. Defendants Improperly Seek to Exploit and Leverage the Theft of Documents from Plaintiffs' Counsel's Office

#### a. Documents Stolen From Plaintiffs' Legal Files

On July 5, 2006, Plaintiffs' counsel Marc Toberoff ("Toberoff") received a letter from the law firm Arnold & Porter LLP ("Arnold & Porter"), notifying Toberoff on behalf of Defendants, and in the vaguest of terms, that Defendants had received three sets of documents from an unidentified source (the "Stolen Documents"). *See* Toberoff Decl., Ex. B. The letter stated that Arnold & Porter was in possession of the documents and suggested a "protocol" for dealing with them. *Id.* Curiously, the letter did not identify the documents and omitted that the documents, including *numerous privileged attorney-client communications*, had obviously been *stolen* from the files of Toberoff's law firm. Nor did the letter offer to return the Stolen Documents or to permit Toberoff to review them. *Id.*

Pursuant to a July 11, 2006 telephone inquiry by Toberoff, he was informed by Arnold & Porter *for the first time* that the documents were from the legal files of his own firm. Toberoff Decl., Ex. M at ¶ 8. Toberoff thereupon demanded that the documents be returned immediately and rejected the "protocol" outlined in the July

**EXHIBIT C-65**
29

1  5 letter as geared to exploiting the documents in this litigation. *Id.*[10]

2  By letter dated July 19, 2006 to Arnold & Porter, Toberoff reiterated his
3  demand for the return of the Stolen Documents, and requested specific information
4  as to the circumstances under which Warner had received hundreds of Stolen
5  Documents.[11] *Id.,* Ex. D. By letter dated July 20, 2006, Defendants' counsel
6  Michael Bergman ("Bergman") insisted that Arnold & Porter retain possession of
7  the Stolen Documents (as it had already done on Defendants' behalf), but
8  conspicuously ignored Plaintiffs' inquiry regarding Warner's curious receipt of the
9  Stolen Documents. *Id.*, Ex. E. By letter dated July 26, 2006, Toberoff reiterated
10 his July 19 request for information regarding Warner's mysterious receipt of the
11 bulk of Plaintiffs' legal files. *Id.*, Ex. F.

12 On July 27, 2006, Bergman finally came up with a response. *Id.*, Exs. G, T at
13 ¶¶ 11-12. He claimed that three apparently identical sets of documents addressed to
14 three highly-placed Warner executives had mysteriously arrived in envelopes on
15 June 28, 2006, that Warner purportedly did not retain any of the three envelopes (or
16 a copy of any envelopes), and that Warner purportedly had no mailroom, security or
17 executive office records, notes or logs of the three heavy packages ever being signed
18 in or received. *Id.*, Exs. G, T at ¶¶ 11-12. In short, Bergman claimed to have no
19 information whatsoever concerning the purportedly anonymous receipt by three
20 high-ranking Warner executives of substantial packages containing numerous
21 privileged documents relating to this lawsuit.

22 ───────────────────────
23 [10] By letter dated July 13, 2006 Arnold & Porter announced that it would Bates stamp the
   documents, send a Bates stamped copy to Plaintiffs' counsel, but, contrary to Plaintiffs'
   wishes, retain the originals with a Bates stamped set. Toberoff Decl., Ex. C . On July 18,
24 2006, Arnold & Porter delivered three Bates stamped sets of the Stolen Documents,
   keeping the originals. *Id.*, Ex. M, ¶ 10.

25 [11] The July 19, 2006 letter requested that Warner furnish: "(1) the date(s) each set of
26 documents was received; (2) copies of all envelopes or packages enclosing the documents;
   (3) the method by which the documents were sent, and in the unlikely event the documents
27 were delivered by hand, the name of the messenger (and messenger service) logged at
   Warner Bros.' security gate; and (4) any other pertinent information regarding Warner
28 Bros.' receipt of these documents." Toberoff Decl., Ex. D.

**EXHIBIT C-66**
30

1    On August 7, 2006, Defendants served a Third Set of Requests for Production
2 seeking the Stolen Documents, to which Plaintiffs objected on September 6, 2006.
3 Toberoff Decl., ¶ 30.

4                    b.    The Court's April 30, 2007 Order

5    On March 23, 2007, Defendants filed a motion to compel the Stolen
6 Documents in the form of a joint stipulation, which was heard by Magistrate
7 Zarefsky on April 30, 2007. *See* Notice of Motion and Joint Stipulation re:
8 Defendants' Motion to Compel Production of Whistle-Blower Documents (filed
9 March 26, 2007) ("Defts. March 2007 Motion to Compel"). At the hearing,
10 Magistrate Zarefsky instructed Plaintiffs' counsel to submit a simple declaration that
11 would identify, by their Bates numbers, those of the Stolen Documents that had
12 been produced and those that had been listed on privilege logs. *See* Perkins Decl.,
13 Ex. 5 at 19:11-15. The Court further clarified:

14        "Then the escrow holder... is to return to plaintiffs any documents which are
          identified in the declaration as being privileged and having been identified on
15        the privilege logs. The others can be delivered to trial counsel for
          defendants...."
16
          "Privilege documents get returned. The privilege documents that were listed
17        on the privilege log get returned. The others get sent to defense counsel."

18 *Id.* at 19:16- 20:3; 30:7-24.

19    On May 18, 2007, David Eisen, Esq., ("Eisen") of Arnold & Porter sent a
20 letter to the parties' counsel stating he would be serving as the custodian of the
21 "Escrow Documents." Toberoff Decl., Ex. L. On May 21, 2007, Toberoff served
22 Eisen and Defendants' counsel with his declaration ("May 21 Declaration")
23 pursuant to, and in full compliance with Magistrate Zarefsky's April 30, 2007 order
24 ("April 30 Order"). *Id.*, Ex. N. Nearly all of the Stolen Documents were either
25 privileged or had already been produced, and were designated as such in Toberoff's
26 declaration. However, nine documents (one of which is the Defamatory Letter and
27 four of which are merely fax cover or fax confirmation sheets) of the 839 pages of
28 Stolen Documents did not fit the Order and had fallen between the "cracks" of the

**EXHIBIT C-67**
31

1 parties' joint stipulation and the hearing.[12]

2    By letter dated May 21, 2007, Plaintiffs asked Eisen *to disburse the Stolen*

3 *Documents pursuant to the April 30 Order*, but to retain the Nine Documents as they

4 were privileged and had not been addressed. *Id.*, Ex. N. However, on May 22, 2007,

5 Defendants sent Eisen a letter improperly disputing Toberoff's declaration and

6 instructing Eisen not to disburse *any* of the Stolen Documents, even those clearly

7 listed on Plaintiffs' privilege logs. *Id.*, Ex. O. Defendants also sent Eisen the

8 produced documents and privilege logs identified in Toberoff's declaration, but did

9 not furnish Plaintiffs with copies of the documents provided to Eisen, despite

10 Plaintiffs' written request for same. *See id.*, Ex. P.

11    Defendants then tried to get Eisen to "peek behind" the privilege logs, review

12 the stolen privileged documents, and search for particular documents to assist

13 Defendants with circumventing or challenging Plaintiffs' privilege logs:

14
15    "To assist you in your review we have compiled the documents Mr. Toberoff
      has identified in his declaration as having previously been produced, which
16    we have enclosed so that you can compare them to the Escrow Documents in
      you file. We have also enclosed the privilege logs he cites to so that you can
17    compare the privilege entries to the Escrow Documents in your file. It is
      Defendants' position that any document that does not match up exactly to an
18    identified entry on the privilege logs should not be returned to Mr. Toberoff,
      but instead should be produced to Defendants."

19 *See id.*, Ex. O at 2. No part of Magistrate Zarefsky's order permitted Defendants to

20 contact Eisen in this fashion – a blatant attempt to influence what Defendants had

21 previously misrepresented as a passive, neutral function. Perkins Decl., Ex. 5 at

22 19:8- 20:5.

23                  c.    Defendants' Second Motion to Compel

24    After instructing Eisen not to disburse *any* of the Stolen Documents pursuant

25 ────────────────────────
   [12] These consisted of: (i) two post-litigation attorney-client communications, which,
26 pursuant to the parties' standing agreement need not have been listed in a privilege log; (ii)
   the Defamatory Letter; (iii) two letters between Toberoff and Don Bulson, the attorney for
27 Michael Siegel, a statutory beneficiary of the Superman termination notices, which had
   been listed on Bulson's privilege log, and (iv) four fax cover or confirmation sheets
28 (collectively, the "Nine Documents"). Toberoff Decl., Exs. N, T at ¶ 6.

**EXHIBIT C-68**

32

1 to the April 30 Order, Defendants brought a motion to compel on September 17,

2 2007, seeking to have the "escrow agent" or the Court undertake a review of the

3 Stolen Documents so as to challenge Plaintiffs' assertion of privilege on their logs.[13]

4     The Court addressed this motion at the September 17, 2007 hearing on the

5 parties' cross-motions for summary judgment. The Court made it abundantly clear

6 that it was not interested in re-hashing this matter with respect to all the Escrow

7 Documents, and would focus instead on the Nine Documents *remaining* at issue:

8     Mr. Perkins: "One of the things we had asked the escrow agent to do was to
take Mr. Toberoff's declaration and to go document number by document

9 number and ensure that the documents that he identified on his declaration
really were what he said they were. In other words, he identifies certain ones

10 that had already been produced."

11     The Court: ***"Let's not talk about the ones that have been done. Let's talk
about the nine that we have left. I want to resolve this. We're going to move***

12 ***on here, counsel."***

13 *See* Toberoff Decl., Ex. R at 120:11-19. The Court's September 17, 2007 minute

14 order described Defendants' motion to compel as "moot," and ordered Plaintiffs to

15 submit the Nine Documents for an *in camera* review, accompanied by a declaration

16 regarding "any claim of privilege relating to said documents." *Id.*, Ex. S at 2.

17     Plaintiffs submitted their declaration on September 20, 2007, arguing, *inter*

18 *alia*, that the Defamatory Letter discusses and purports to disclose privileged

19 attorney-client communications and work product contained within Plaintiffs'

20 confidential legal files, listed on Plaintiffs' and third party privilege logs, and upheld

21 by the April 30 Order. *Id.*, Ex. T. Neither Plaintiffs nor their counsel consented, at

22 any time, to the illicit Defamatory Letter, and, as it was sent anonymously, there

23 would have been no opportunity to list it on a privilege log.

24     On September 26, 2008, the Court ordered Eisen to produce forthwith "any

25 escrow document not previously listed in a privilege log or as having been

26

27 [13] *See* Joint Stipulation Re: Defendants' Motion to Compel Compliance with the Court's
4/30/07 Order and Motion for Sanctions (filed September 17, 2007), at 20:15-22:26;

28 Toberoff Decl., Exs. O, Q.

**EXHIBIT C-69**

33

1 previously produced... [and that] the nine documents... are to be produced to
2 defendants' counsel as those documents were not previously identified in a privilege
3 log provided by plaintiffs." *Id.*, Ex. U at 5.

4      In response to the Court's September 26, 2008 order, Eisen wrote to counsel
5 on October 8, 2008, erroneously stating that he would produce to Defendants'
6 counsel: "(1) post litigation communications, (2) the undated cover letter, and (3)
7 documents identified in the privilege log of a third party." *Id.*, Ex. V.  He also
8 stated he would "compare the privilege logs to the documents, and to produce to Mr.
9 Bergman all escrow documents except those accurately described on the privilege
10 logs." *Id.*  By letter dated October 9, 2008, Plaintiffs reminded Eisen that the
11 Court's September 26, 2008 Order did not call for the release of *all* Stolen
12 Documents listed on third party privilege logs as set forth in Eisen's letter, and that
13 Eisen should not adjudicate whether the Stolen Documents were accurately
14 described in the privilege logs. *Id.*, Ex. W.  Plaintiffs reminded Eisen that as an
15 alleged "escrow agent" he owed a fiduciary duty to both parties. *Id.*

16      In response, Eisen stated:

17    "[N]either... this firm, nor I has suggested that we are formal escrow agents,
   in the legal sense of that term...we do not in my view, owe either party to this
18    litigation any legal duty. We expect to be paid for our time by defendants...."

19 Toberoff Decl., Ex. X. By letter dated October 10, 2008, Bergman, in sync with
20 Eisen, stated: "[We] agree with your interpretation of the Court's Order regarding
21 your obligations to match-up the Escrow Documents to the pertinent privilege logs
22 entries to determine whether the description of date, sender, recipient and type of
23 document corresponds with what the document actually is." *Id.*, Ex. Y.  Moreover,
24 Bergman encouraged Eisen, over Plaintiffs' objections, to communicate *ex parte*
25 with the Court as to this matter. *Id.*

26      By letter dated October 13, 2008, Plaintiffs objected to Defendants' latest
27 attempt to have Eisen look beneath Plaintiffs' privilege logs to adjudicate their
28 sufficiency, and reminded Eisen that the Stolen Documents, with the exception of

**EXHIBIT C-70**
34

1  the Nine Documents remaining in dispute, should have been released immediately

2  pursuant to the April 30 Order. *Id.*, Ex. Z. Plaintiffs pointed out that Eisen's sole

3  reason for not disbursing the documents, as ordered, was *Defendants'* insistence that

4  he engage in an improper substantive review of the Stolen Documents on their

5  behalf. *Id.*

6  Nonetheless, Eisen sent a letter to the Court on October 16, 2008 advocating

7  Defendants' desired "matching up" process. *Id.*, Ex. AA. Plaintiffs objected on

8  October 17, 2008. *See* Plaintiffs' Objection and Response to Attorney David S.

9  Eisen's *Ex Parte* Communication with the Court, filed October 17, 2008. On

10  December 4, 2008, the Court issued an order denying Defendants' and Eisen's

11  request for a substantive review of the asserted privileges:

12  "The escrow holder is not to compare the description of each document to
    Toberoff's declaration to the corresponding escrow document to ensure the

13  description's accuracy. Rather the task of matching up or review is done only
    insofar as the escrow holder is charged with carrying out the task, as set forth

14  in Magistrate Judge Zarefsky's April 30, 2007, Order, of locating (using the
    Bates stamp legend) those documents which appear on Toberoff's May 2007,

15  declaration as having previously been listed on a privilege log and turning
    them over to plaintiffs ..."

16  
17  Toberoff Decl., Ex. BB. Eisen finally released the Stolen Documents on December

    12, 2008, having retained Plaintiffs' privileged documents ***at Defendant's direction***
18  
    for over twenty months after Magistrate Zarefsky had ordered their prompt
19  
    disbursal. *Id.* at ¶ 31. Over a month later, on January 14, 2009, Defendants wrote to
20  
    Plaintiffs and demanded to reopen discovery on the basis of the Defamatory Letter.
21  
    *See* Perkins Decl., Ex. 7. By letter dated January 22, 2009, Plaintiffs pointed out
22  
    that Defendants' motion was baseless and moot. *Id.*, Ex. 8. Defendants served their
23  
    portion of this Joint Stipulation on February 19, 2009.
24  
25  **B.   LEGAL ARGUMENT**

26  **1.   Defendants Improperly Seek Reconsideration of the April 30, 2007 Order**

27  Magistrate Zarefsky's Order of August 18, 2006 upheld Plaintiffs' privilege

28  logs. *See* Toberoff Decl., Ex. H. The Court's Orders of April 30, 2007, September

**EXHIBIT C-71**
35

1 | 26, 2008, and December 4, 2008 upheld privilege as to *all* Stolen Documents listed
2 | on Plaintiffs' privilege logs.  Defendants now seek to circumvent those orders and to
3 | improperly challenge the privileged status of such documents, an issue the Court
4 | clearly considers "closed."

5 | The August 9 Letter was clearly an attorney-client communication listed on
6 | Plaintiffs' privilege log, as Defendants admit, and thus falls within the scope of
7 | Magistrate Zarefsky's original April 30 Order that such documents retained their
8 | privileged status and should be returned to Plaintiffs.  *See* Perkins Decl., Ex. 5 at
9 | 19:16-20:3 ("The escrow holder... is to return to the plaintiffs any documents which
10 | are identified in the declaration as being privileged and having been identified on
11 | the privilege log.").

12 | The Court has already stated that the April 30 Order is "the law of the case in
13 | this matter," and that the time to appeal it "has long since expired" under Local Rule
14 | 72-2.1.  *See* Toberoff Decl., Ex. U at 5; L.R. 72-2.1 (allowing ten days to appeal a
15 | magistrate judge's order).  The Court has further stated that its orders were "meant
16 | to dispose of the <u>one</u> remaining dispute [resolution of the privileged status of the
17 | nine documents] between the parties concerning the escrow documents."
18 | Defendants had already "sought to litigate the propriety of the invocation of
19 | privilege contained in prior privilege logs," and the Court "was not inclined to
20 | entertain" further arguments on this subject.  *Id.* at 2-3.  *See also id.*, Exs. R at
21 | 120:19 ("We're going to move on here, counsel"), BB.

22 | The Court's September 26 and December 4, 2008 Orders also ended
23 | Defendants' repeated attempts to have their purported "escrow agent" adjudicate
24 | Plaintiffs' assertions of privilege on its logs under the guise of a "matching-up"
25 | process.  Once Defendants had obtained Magistrate Zarefsky's blessing of their
26 | handling of the Stolen Documents by misrepresentations of a neutral "escrow"
27 | protocol, they began to abuse it.  After Toberoff submitted the May 2007
28 | Declaration, per Magistrate Zarefsky's April 30 Order, Bergman instructed

**EXHIBIT C-72**
36

1  Defendants' "escrow" agent (an attorney retained and paid by them) to "compare the
2  privilege entries to the Escrow Documents in your file" and to produce to
3  Defendants "any document that does not match up exactly." *See* Toberoff Decl.,
4  Ex. O. Defendants then on *three* separate occasions prior to the Court's September
5  26, 2008 Order, submitted filings to the Court advocating a review of Plaintiffs'
6  privilege assertions.[14] When the Court's September 26, 2008 order clearly did not
7  envisage the re-testing of Plaintiffs' logs, Bergman, over Plaintiffs' objections, then
8  had their "escrow" attorney write to the Court *ex parte* on October 16, 2008 to
9  advocate such a process. *See* Toberoff Decl., Ex. AA. The Court finally ended the
10  matter on December 4, 2008, when it ordered the escrow agent to disburse the
11  documents, and not to adjudicate Plaintiffs' already-upheld assertions of privilege.
12  *Id.*, Ex. BB.

13  While Defendants purport to limit their claim to the August 9 Letter, the
14  implication of Defendants' position is that the unauthorized and anonymous
15  Defamatory Letter operates as a waiver of privilege as to *each and every privileged*
16  *document* referenced therein – documents already upheld as privileged and duly
17  listed on privilege logs. This position is logically and legally incorrect.
18  Defendants' overreaching motion would have the Court override *four* prior orders
19  on this subject, and must be rejected. Toberoff Decl., Exs. H, U, BB; Perkins Decl.,
20  Ex. 5. Accordingly, Defendants' motion should be denied on this ground alone.

21           **2.    Defendants' Veiled Motion for Reconsideration Ignores**
                    **Black-Letter Contract Law Upheld by the Court's Summary**
22                  **Judgment Order**

23                  a.    The Defamatory Letter Distorts Marks' Beliefs and Does
                          Not Even Mention Marks' August 9 Letter to Plaintiffs
24

25  ---
26  [14] *See* Notice of Motion and Joint Stipulation re: Defendants' Motion to Compel
     Compliance with the Court's 4/30/07 Order and Motion for Sanctions (dated September
     17, 2007), at 20:15-22:26; Declaration of Michael Bergman in Response to the Declaration
27  of Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order (filed
     September 25, 2007) at ¶¶ 48-51; Notice of New Evidence re: Defendants Declaration
28  Filed Pursuant to the Court's September 17, 2007 Order (filed April 9, 2008), at 5:11-19.

**EXHIBIT C-73**
37

1   As an initial matter, Defendants' argument falsely presupposes that the

2   Defamatory Letter accurately discloses the August 9 Letter, when it never even

3   mentions the August 9 Letter nor refers to a writing when describing what Marks

4   purportedly told his clients. *See* Perkins Decl., Ex. 1 at 2 ("Marks also tells the

5   Siegels that … he believes there has already been an agreement reached.").

6   Defendants oddly assume that anonymous, inadmissible third party statements in a

7   ranting Defamatory Letter are trustworthy, accurate evidence of the privileged

8   attorney-client communications discussed therein. As one might imagine, the

9   Defamatory Letter inaccurately describes both the content and meaning of the

10  August 9 Letter. The August 9 Letter reveals no inconsistency with Marks'

11  testimony regarding the settlement agreement. Toberoff Decl., ¶ 32. Yet

12  Defendants misleadingly refer to statements in the Defamatory Letter, as if such

13  were statements in the August 9 Letter itself.[15] Defendants also repeatedly refer to

14  the Defamatory Letter, as if its distorted hearsay is somehow, irrefutably, "true."

15

16                     b.    Defendants' Motion Even Mischaracterizes the
                             Defamatory Letter and Kevin Marks' Testimony

17  Defendants' motion is based on their calculated mischaracterization of the

18  contents of the Defamatory Letter. Defendants misleadingly and repeatedly portray

19  the Defamatory Letter as stating that Marks' August 9 Letter says that "an

20  *enforceable* settlement agreement" had been reached.[16] However, the Defamatory

21  _____

    [15] For example, Defendants proclaim "this 'conduct in relation thereto' necessarily
22  included Marks' now-disclosed communications to his clients that an enforceable
    agreement had in fact been reached"; "[the August 9 Letter] demonstrates that he believed
23  he had a settlement notwithstanding any differences in the correspondence, something the
    Court did not know before," and the August 9 Letter shows "if Plaintiffs did not abide by
24  the settlement agreement, he would testify against them at trial to enforce an agreement."
    *Supra* at 13:25-28, 24:11-12, 1:24-25. *See also id.* at 18:8-9 ("in a letter in August 2002,
25  Mr. Marks had actually reached a different conclusion than that expressed at the
    deposition"); *Id.* at 19:17-19 ("the inconsistency between Mr. Marks' deposition testimony
26  on the one hand, and the content of the August 9, 2002 Communication on the other").

27  [16] *See, e.g., supra* at 13:15-17 ("Marks' subsequent advice to his clients in August 2002
    that he believed there was an *enforceable* agreement and that he was prepared to testify to
28  that fact"); 13:19-21 ("[H]e believed that an agreement was in place that was sufficiently

**EXHIBIT C-74**

38

1    Letter says no such thing:  it merely states that "[Marks] believes there has already

2    been an agreement reached" and would testify as such.  Perkins Decl., Ex. 1 at 2.[17]

3           Defendants also pretend that an inconsistency exists between the Defamatory

4    Letter and Marks' testimony regarding the settlement agreement.  This, too, is false.

5    Marks clearly testified at his deposition that "*I did believe that we had come to an*

6    *agreement back on October 19th, 2001*," while testifying in the same paragraph that

7    ultimately, "a final, binding, *enforceable* agreement" was not reached as there had

8    been no "meeting of the minds" on all terms.  *See* Perkins Decl., Ex. 6 at 154:13-14,

9    155:1-2 (emphasis added).[18]  Despite Defendants' claims to the contrary, there is

10   simply no inconsistency between the Defamatory Letter's unsupported statement

11   that Marks would testify that an "agreement" had been reached, and Marks' actual

12   deposition testimony that an "an agreement" or deal had been reached, but that "a

13   final, binding *enforceable* agreement" had **not** been reached.  This is also consistent

14   with the objective manifestation of the parties' intent set forth in the October 19 and

15   26, 2001, and February 1, 2002 letters, which controls.  *See Siegel II*, 542 F. Supp.

16   2d at 1138, *citing Meyer v. Benko*, 55 Cal.App.3d 937, 942-43 (1976).

17          Marks, like the Court, understands the distinction between a deal or

18   "agreement," and a "final, binding, enforceable agreement," with the "meeting of

19   _____

     enforceable for him to testify against his own clients.").

20   [17] Nor are these the only intentional distortions of the record found in Defendants'
21   misguided motion.  For example, Defendants falsely claim that "Plaintiffs' principal focus
     in opposing the[ir prior] renewed motion centered on withholding the Toberoff Timeline."
22   *Supra* at 9:25-26.  This statement is false: (1) there was no "renewed motion," merely a
     "Notice of New Evidence" filed by Defendants on April 9, 2008, relating to a ruling from
23   the Northern District of Ohio; and (2) Plaintiffs' opposition filed on April 16, 2007,
     centered on: (a) the preclusive effect of the Ohio ruling; (b) the common interest privilege;
24   and (c) Defendants' repeated attempts to re-argue the privilege of documents listed on
     third party privilege logs. *It barely mentioned the Defamatory Letter.*

25   [18] Defendants outrageously imply that use by both Plaintiffs' counsel and Marks of the
26   common contract-law concept of "meeting of the minds" is indicative of some sort of
     conspiracy among Plaintiffs and their current and former attorneys. *See supra* at 12:28
27   (quoting "meeting of the minds" from Plaintiffs' Motion for Summary Judgment and
     claiming they were "precisely the words that Marks invoked in answering the question");
28   19:1-2 ("Plaintiffs' counsel knew what Mr. Marks' answer would be...").

**EXHIBIT C-75**
39

1 the minds" on all material terms required to form a contract. *Compare* Perkins

2 Decl., Ex. 6 at 154:12-155:2 ("Well, if the question is did I think at this point there

3 was a final, binding, enforceable agreement, the answer would be no, but I did

4 believe that we had come to an agreement back on October 19th, 2001.... So while I

5 thought we had an agreement on these terms, John evidently didn't, and where you

6 don't have a meeting of the minds, you don't have an agreement.") *with Siegel II*,

7 542 F. Supp. 2d at 1137 (The parties "found themselves in the all-too-familiar

8 situation in which verbal settlement negotiations result in *what the parties believe to*

9 *be an agreement* on all the major points of dispute but which, upon further

10 discussion, falls short of the agreement needed to resolved the dispute.") (emphasis

11 added).

12   Thus, Defendants' motion should additionally be denied, as the purported

13 evidentiary inconsistencies underpinning the motion do not exist.

14   Moreover, Defendants outrageously claim *without a shred of evidence* and

15 contrary to the record, that Kevin Marks, "Plaintiffs and their counsel tried, and

16 almost succeeded, in hiding contrary evidence." *Supra* at 14:24.[19]  This purported

17 conspiracy would have required the active cooperation of Marks, a respected lawyer

18 in the firm Gang, Tyre, Ramer & Brown, who was terminated by Plaintiffs on

19 September 21, 2002, and who retained his own counsel to defend his deposition.

20 *See* Toberoff MSJ Decl., Ex. AA.  When Defendants claim that they could have

21 "impeached" Marks, they are essentially accusing him, an officer of the court, of

22 perjury, solely on the basis of *their* mischaracterization of the Defamatory Letter, a

23 document that Marks did not write and which has ***none*** of the characteristics that

24 indicate reliability in a legal proceeding.  It is not made under oath, it is anonymous,

25

26 [19] *See, e.g., supra* at 15:23 ("multi-year effort to hide the ball"), ("risk a substantial
  miscarriage of justice"); 25:6-7 ("a pattern of deception by Plaintiffs' counsel that has
27 seriously tainted the process"); 25:10-11 (Plaintiffs "conspired to keep powerful evidence
  of a settlement between the parties from Defendants"); 25:15-16 (Plaintiffs have
28 "undermined the fundamental fairness of the judicial process").

**EXHIBIT C-76**

40

1  it is hearsay, and it was written by a disgruntled lawyer, acting against his own

2  clients, in breach of his most fundamental ethical duties.

3      Defendants' unsupported accusation that Plaintiffs and their counsel

4  conspired to secret evidence and "hide the ball" from Defendants and the Court is

5  disgraceful. The Court should not lose sight of the fact that *Plaintiffs* were the

6  victim of a *theft*. Instead of having their documents, many of which are privileged,

7  returned immediately, they have been subjected to a sham "neutral" "escrow"

8  protocol for over two years of this litigation, with no end in sight. In response to

9  such an unspeakable violation of trust, Plaintiffs and their counsel have been

10 nothing but forthcoming. Upon finally receiving copies of the Stolen Documents,

11 they promptly compared these 839 pages to their legal files, finding that *all but two*

12 of the non-privileged documents had long ago been produced.[20] Moreover, every

13 privileged Stolen Document was accounted for on a privilege log, except the two

14 post-litigation attorney-client communications *that need not be listed on a privilege*

15 *log* per the parties' standing agreement (admitted by Defendants), and the

16 Defamatory Letter. Toberoff Decl., Ex. T at ¶¶ 19-22. It is clear that the real

17 objective of Defendants' frivolous motion is to prejudice the trier of fact prior to

18 trial by engaging in a smear campaign against Plaintiffs and their counsel.

19          c.    Marks' Subjective Opinion Is, In Any Event, Extraneous
                  Because the Existence of a Contract Is Based Upon the
20                Objective Manifestation of the Parties' Intent

21     Even if Marks had made the allegedly inconsistent statements (he did not),

22 Defendants' argument still fails, as Marks' subjective state of mind regarding the

23 settlement negotiations (to the extent revealed in the August 9 Letter) is superfluous

24 to the objective record of such negotiations, which demonstrates that a binding

25 agreement was not consummated. *See Siegel II*, 542 F. Supp. 2d at 1136-1139. The

26

27 _____
   [20] These documents, consisting of two letters from Plaintiff Joanne Siegel to DC's
   President, Paul Levitz, were immediately produced, although already in Defendants'
28 possession. *See* Toberoff Decl., Ex. M at ¶ 22.

**EXHIBIT C-77**
41

1 Court's order was based on an objective reading of the relevant documents – the

2 October 19, 2001 letter from Kevin Marks to John Schulman, purporting to "accept"

3 Schulman's offer, Schulman's October 26, 2001 *counteroffer* in response, and a

4 Defendants' further "long-form" counteroffer dated February 1, 2002. *Id.*[21]

5      The Court, after analyzing the documents comprising the negotiation, found

6 that such "did not result in an enforceable agreement." *Id.* The Court relied on

7 applicable California law that "[t]he failure to reach a meeting of the minds on all

8 material points prevents the formation of a contract even if the parties have orally

9 agreed upon some of the terms." *Id.* at 1137.

10      Notably, Schulman's "more fulsome outline" dated October 26, 2001,

11 responding to Marks' October 19, 2001 Letter, contained "numerous material

12 differences," constituting a counter-offer. *Id.* at 1115, 1138. As confirmed by the

13 Court, it is black-letter law that for "mutual [contractual] consent" to exist, there

14 must be an "unequivocal acceptance," and that a qualified acceptance is a counter-

15 offer ending the original offer. *Id* at 1138.[22]

16      Moreover, ***even if*** the parties "believe… an agreement" has been reached,

17 "[n]one of this subjective belief is sufficient to defeat the objective manifestation of

18 the parties' intent relayed in the documents referenced above that aptly demonstrate

19 that there was no "meeting of the minds" on all material terms." *Id.*[23] The Court

20     

[21] *See also id.* at 1138 (additionally noting that Defendants reserved the right to revise their
21 February 1, 2002 Draft, the anticipated submission of related "stand alone agreements"
that had yet to be finalized, and the acknowledgement by Time-Warner's CEO that
22 "comments and questions" from Plaintiffs "would need to be resolved.").

23 [22] *See also* California Civil Code § 1585 ("An acceptance must be absolute and
unqualified, or must include in itself an acceptance of that character which the proposer
24 can separate from the rest, and which will conclude the person accepting. A qualified
acceptance is a new proposal."); *Apablasa v. Merritt & Co.*, 176 Cal.App.2d 719, 726
25 (1959) ("Terms proposed in an offer must be met exactly, precisely and unequivocally for
its acceptance to result in the formation of a binding contract; and a qualified acceptance
26 amounts to a new proposal or counter-offer putting an end to the original offer.") (citations
omitted).

27

[23] *See also Grove v. Grove Valve & Reg. Co.*, 4 Cal.App.3d 299, 312 (1970) ("The
28 California law is clear that there is no contract until there has been a meeting of the minds

**EXHIBIT C-78**
42

1    properly based its conclusion "that the parties' settlement negotiations did not result

2    in an enforceable agreement" on the parties' objective manifestations of their intent:

3    "Far from signifying that the parties' 'negotiations…result[ed] in a binding

4    contract'… these submissions between the parties went far beyond that by adding in

5    or further refining areas from what was contained in the October 19 letter… From

6    all of this there is no document or set of documents reflecting agreement by the

7    parties to singular agreed terms." *Id.* at 1139.[24] *See also* Toberoff Decl., Ex. A.

8        Under California law and the sound logic of the Court's analysis, *even if*

9    Marks had offered testimony that he "believed" the parties had reached an

10    enforceable agreement (he did not), such subjective belief or legal conclusion would

11    be superfluous in light of the parties' "objective manifestations" of their actual

12    negotiations.[25] As Marks' "beliefs" are not decisive or even germane to the issue

13    under California law, there are no grounds to reopen discovery or to invade the

14    attorney-client privilege, especially not on the basis of the anonymous hearsay

15    statement in the Defamatory Letter.

16

17

---

18    on all material points, despite the fact some terms have been agreed orally, or some action has been taken."); *Louis Lesser Enterprises, Ltd. v. Roeder*, 209 Cal.App.2d 401, 405

19    (1962) ("[T]here is no meeting of the minds of the parties while they are still negotiating terms.").

20

   [24] *See also Meyer*, 55 Cal.App.3d at 942-43 (Contracts require "mutual consent…

21    determined by objective rather than subjective criteria," and finding such consent based upon the parties agreeing upon and signing a contract.); *Stewart v. Preston Pipeline Inc.*,

22    134 Cal.App.4th 1565, 1587 (2005) (Consent "is based upon objective and outward manifestations of the parties," and finding such consent based upon the parties agreeing

23    upon and signing a contract.).

24    [25] Defendants, without citing any authority, repeatedly contend that Marks' subjective beliefs somehow constitute "conduct in relation thereto" with respect to the non-existent

25    settlement agreement, and that the Court relied on such belief in its decision. The Court clearly did not. Plaintiffs' motion for summary judgment and the Order relied on the

26    objective differences between the parties various proposals. *See* Toberoff Decl., Ex. A; *Siegel II*, 542 F. Supp. 2d at 1138 ("numerous material differences between the terms

27    relayed in the… letters"). The testimony of Marks, a seasoned entertainment transactional attorney, was submitted by Plaintiffs to explain and illustrate such contractual differences.

28    *Id.*

**EXHIBIT C-79**

43

1
2

        d.    <u>Defendants' Arguments Based on the Parties' Subjective</u>
               <u>Understanding Have Already Been Rejected by the Court</u>

3      Defendants have had every opportunity – through the depositions of Marks,

4  the Plaintiffs, and even Plaintiffs' current attorney, and through written discovery –

5  to develop their theory that a binding settlement agreement had supposedly been

6  reached.

7      Defendants relied heavily on Marks' letter of October 19, 2001 at summary

8  judgment. For instance, Defendants emphasized in their opposition that Plaintiffs

9  "conceded in open court, without qualification, that the [October 19] Marks Letter

10  represented the statements of Plaintiffs themselves." Defendants' Opposition to

11  Plaintiffs' Motion for Partial Summary Judgment (filed May 29, 2007) (Defts. MSJ

12  Opp.) at 70:11-13. The October 19 Letter expressly stated that "the Siegel Family…

13  has accepted D.C. Comics' offer of October 16, 2001 in respect of the 'Superman'

14  and 'Specter' properties." *Id.* at 72 n.52. *See also id.* at 75:8-9 ("Mr. Marks, an

15  experienced transactional lawyer, carefully worded his letter to use the powerful

16  legal language of acceptance.").

17      Defendants argued that Marks' actions were "'outward manifestations' of

18  intent" that supported the purportedly "reasonable inference" that an enforceable

19  settlement agreement had been reached. *Id.* at 79:14. The Court therefore had

20  before it on summary judgment precisely the argument Defendants are making

21  presently: that Plaintiffs' attorney believed that the parties had reached a binding

22  agreement.[26]

23      The Court found such subjective impressions insufficient as a matter of law.

24

25  [26] *See, e.g.,* Defts. MSJ Opp. at 78:22-24 (Marks "at no time expressed any concern, disagreement, or dissatisfaction" with Defendants' counteroffer.), 79:4-6 (Marks "did not

26  challenge the [counteroffer] or seek to correct it, and did not disavow any of its terms or dispute that an agreement had been reached."); 79:7-8 (Marks "did not protest any of its

27  provisions."); 79:11-13 (Marks even "acknowledged… that the February Draft was *not* contrary to the parties' agreement, and undertook a rewrite.").

28

**EXHIBIT C-80**
44

1 │ Whatever Marks allegedly said in the privileged August 9 Letter to his clients as to

2 │ his *beliefs*, it will *not* materially change the "enforceable agreement" argument

3 │ Defendants already put before the Court, and the Court rejected.[27] *See Siegel II*, 542

4 │ F. Supp. 2d at 1138 ("None of this subjective *belief* is sufficient to defeat the

5 │ objective manifestation of the parties' intent relayed in the *documents* referenced

6 │ above that aptly demonstrate that there was no 'meeting of the minds' on all

7 │ material terms.") (emphasis added).

**3.    The Defamatory Letter Does Not Waive Attorney-Client Privilege**

　　　　　　a.    There Was No Voluntary Waiver of Attorney-Client Privilege as to the August 9 Letter

11 │ 　　　　Defendants' motion completely ignores the fact that the August 9 Letter was a

12 │ privileged communication between an attorney and his clients, and was duly listed

13 │ as such on privilege log. Toberoff Decl., Ex. N at 1:17. Plaintiffs have taken no

14 │ action that would waive the privilege of the August 9 Letter. Waiver of the

15 │ attorney-client privilege arises *only* when the holder of the privilege takes voluntary

16 │ action to waive the privilege – such as by *voluntarily* disclosing the information or

17 │ by putting attorney-client communications at issue. *See Transamerica Computer*

18 │ *Co., Inc. v. International Business Machines Corp.*, 573 F.2d 646 (9th Cir. 1978)

19 │ (The "general principle" is that "disclosure of confidential material constitutes a

20 │ waiver of the attorney-client privilege only if it is voluntary and not compelled.").[28]

---

[27] Defendants claim that "[i]t would have been critical for Defendants' counsel to have confronted Marks at his deposition with a letter written by Marks to his clients in *August 2002* and providing his then-contemporaneous views and conclusions regarding the events in question." *Supra* at 15:16-19. Defendants' fantasy of "confronting" Marks is based on their misguided perception that they are *entitled* to privileged attorney-client communications. Defendants imagine impeaching Marks with a privileged communication that was listed on a privilege log when the deposition occurred. The Gang, Tyre privilege log was served on September 29, 2006, prior to Marks' deposition on October 7, 2006. *See* Toberoff Decl., Ex. I; Perkins Decl., Ex. 6. Defendants would have no access whatsoever to such a document in the ordinary course of litigation.

[28] *See also Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) ("[V]oluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege").

**EXHIBIT C-81**
45

1    Moreover, ***unauthorized*** disclosure of protected attorney-client information

2 or documents does not waive attorney-client privilege. *See Tennenbaum v. Deloitte*

3 *& Touche*, 77 F.3d 337, 341 (9th Cir. 1996) ("[T]he focal point of privilege waiver

4 analysis should be the *holder's* disclosure of privileged communications to someone

5 outside the attorney-client relationship."); *Resolution Trust Corp. v. Dean*, 813 F.

6 Supp. 1426, 1430 (D. Ariz. 1993) (finding that, as the disclosure was unauthorized

7 and possibly criminal, the party "did not voluntarily waive any attorney-client

8 privilege it would have possessed."). Courts have consistently held that only those

9 authorized to do so may waive attorney-client privilege, and that unauthorized

10 disclosures or leaks do not waive the privilege, even when the party seeking to use

11 such evidence was "innocent" of any wrongdoing. *See, e.g., United States v. Chen*,

12 99 F.3d 1495, 1502 (9th Cir. 1996) (an ex-employee "cannot waive the

13 corporation's privilege"); *United States ex rel. Mayman v. Martin Marietta Corp.*,

14 886 F. Supp. 1243, 1246 (D. Md. 1995) (privilege not waived as to document stolen

15 by fired employee); *Sackman v. Ligget Group, Inc.*, 173 F.R.D. 358, 365 (E.D.N.Y.

16 1997) (prohibiting the deposition testimony of an expert who would base his opinion

17 on a privileged document that was stolen and disseminated to the public).[29]

18

19 _____

[29] *See also In re Grand Jury Proceedings Involving Berkley and Co., Inc.*, 466 F. Supp
20 863, 870 (D. Minn. 1979) ("To the extent the documents can be viewed as stolen,
following the modern trend mentioned above, they should not lose the protection of the
21 privilege."); *Smith v. Armour Pharmaceutical Co.*, 838 F. Supp. 1573, 1576 (S.D. Fla.
1993) (denying use of memorandum widely distributed after its *unauthorized* release);
22 *Kenyatta v. Kelly*, 375 F. Supp. 1175 (E.D. Pa. 1974) (precluding use of documents stolen
by a third party from defendants, even though the documents had already been produced
23 by defendants to the plaintiffs); *In re Dayco Corp. Derivative Sec. Litig.*, 102 F.R.D. 468,
469-70 (S.D. Ohio 1984) (where no indication that party voluntarily gave privileged diary
24 to reporter, publication of excerpts of diary should not be considered waiver of attorney-
client privilege.); *Cooke v. Superior Court*, 147 Cal. Rptr. 915 (Cal. Ct. App. 1978)
25 (evidence excluded in divorce action when receipt of confidential information about
husband, including confidential communications between husband and his lawyer, was
26 purloined and passed to lawyer by husband's unfaithful agent without complicity of
receiving lawyer); 159 *American Law Reports Federal* 153 (Courts "will not condone
27 conduct which is condemned for public policy reasons, even if the result of judicial action
is to harm the innocent recipient of the unlawfully disclosed information. This is
28 especially so when the information is released as a result of a crime.").

**EXHIBIT C-82**
46

1      The August 9 Letter was duly listed on a privilege log furnished to

2 Defendants on September 29, 2006. Toberoff Decl., Ex. N at 1:17. There was no

3 voluntary waiver of privilege as to the August 9 Letter.[30] Lacking a valid legal

4 argument, Defendants argue that the production of the Defamatory Letter pursuant

5 to Court order somehow operates as a waiver of privilege as to the August 9 Letter.

6 However, it is well accepted and logical that disclosure of information pursuant to a

7 Court order does ***not*** operate as a *voluntary* waiver of privilege.[31]

8

                b.    There Was No Basis to List the Defamatory Letter on a
9                     Privilege Log

10      Defendants erroneously argue that, because the Defamatory Letter was not

11 listed on a privilege log, not only is privilege purportedly waived as to the

12 Defamatory Letter, but also as to any attorney-client communications referenced

13 therein, including the August 9 Letter.

14      Even to the extent the Defamatory Letter purports to discuss and disclose

15 privileged attorney-client communications and attorney work product, *every one of*

16 *such documents was appropriately listed in privilege logs and remains protected*

17 *pursuant thereto and the April 30, 2007 Order*: "The privilege documents that were

18 listed on the privilege log get returned [to Plaintiffs]." Perkins Decl., Ex. 5 at 30:23-

19 24; Toberoff Decl., Ex. N. Furthermore, there was little or no basis for Plaintiffs to

20 have listed the Defamatory Letter, itself, on a privilege log. The Defamatory Letter

21 does not fit within the parameters of a privilege log: it was not created by Plaintiffs

22 

---

[30] Defendants previously brought a motion to compel challenging Plaintiffs' privilege log.
23 Magistrate Zarefsky denied Defendants' challenge and sustained the validity of Plaintiffs'
privilege log. See Toberoff Decl., Ex. H at 5:16-27. Magistrate Zarefsky held that the
24 "descriptions in the log were sufficient" to assert privilege. *Id.* This order was never
appealed to the Court by Defendants under L.R. 72-2.1 and thus is also the "law of the
25 case." *See id.*, Ex. U at 5.

26 [31] *See, e.g., Government Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 182
F.R.D. 182 (D.V.I. 1998) ("The attorney-client privilege is not destroyed by disclosure of
27 protected information… which is done only under the compulsion of a court order.");
*Laxalt v. McClatchy*, 116 F.R.D. 438, 455 (D. Nev. 1987) (Compliance with a court order
28 "will not waive the work product or attorney-client privileges.").

**EXHIBIT C-83**
47

or their counsel; it is not an attorney-client communication; and is not Plaintiffs' attorneys' work-product. The unauthorized letter is written anonymously, and the recipients were Warner Bros. executives. As such, it is entirely proper that Plaintiffs did not list such a peculiar document on a privilege log, especially since the privileged documents referenced therein *were* all duly listed on privilege logs.

The "failure" to list the Defamatory Letter on a privilege log was no failure at all. There is no voluntary act Defendants can point to by which Plaintiffs waived privilege as to the Defamatory Letter and to any privileged documents or information illicitly referenced therein. Even if Plaintiffs not listing the Defamatory Letter on a privilege log was deemed to be the requisite voluntary act, there would still be no basis to expand the scope of the waiver beyond the Defamatory Letter itself to the August 9 Letter. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (refusing to extend the scope of a waiver beyond the privileged document actually disclosed).[32]

        c.      <u>Any Failure to List the Defamatory Letter on a Privilege Log Was Excusable Inadvertence</u>

Even if one argues that Plaintiffs could have listed the Defamatory Letter on a privilege log, despite the peculiar nature of this rogue document, Plaintiffs failure to do so was "excusable inadvertence" preventing any waiver of privilege. *See Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp. 1403, 1409 (S.D. Cal. 1994) (emphasizing "overriding issues of fairness").[33]

---

[32] *See also Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 511 (S.D. Cal. 2003) ("Mere disclosure of the underlying fact would not waive the privilege or protection as to a communication containing that fact."), *citing Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432, 448 (E.D. Tex. 2003); *Mendenhall v. Barber-Greene Co.*, 531 F. Supp 948 (N.D. Ill. 1981) ("The fact that some of the information is thus publicly disclosed does not waive the privilege.").

[33] "The following factors… are applied to determine whether the failure to specifically identify a document or a claim of privilege was excusable inadvertence: (1) the precautions taken to properly assert the privilege, (2) the time taken to rectify the error, (3) the scope of discovery, (4) the extent of the objection or claim of privilege, and (5) overriding issues of fairness." *Id. See also First Savings Bank, F.S.B. v. First Bank System, Inc.*, 902 F. Supp.

EXHIBIT C-84
48

In this case, the "excusable inadvertence" factors weigh heavily in favor of retaining the privilege as to the August 9 Letter. Plaintiffs clearly took proper precautions as to privileged documents. The August 9 Letter and all other attorney-client communications were properly listed in privilege logs. In light of the April 30, 2007 Order, limiting the waiver of privilege to those documents not listed privilege logs, it would be grossly unfair to find a waiver of privilege as to the August 9 Letter that *was* listed on a privilege log – on the basis of an illicit anonymous Defamatory Letter *that does not even reference the August 9 Letter*. Toberoff Decl., Ex. M ¶¶ 17-20.

### d. The Cases Cited by Defendants for Waiving Privilege Are Inapplicable

The cases cited by Defendants for the proposition that Plaintiffs have waived privilege as to the August 9 Letter are inapplicable, as they are all based on *affirmative acts* taken by a party or its counsel that waived the privilege. In *Weil*, an appellee deliberately disclosed the content of its own privileged attorney-client communication to bolster its arguments on the issue of scienter. *Weil*, 647 F.2d at 23. The Ninth Circuit ruled that the appellee could not invoke the privilege for other communications on the same issue. *Id.* at 24–25. In *United States v. Jacobs*, 117 F.3d 82, 90-91 (2d Cir. 1997), the defendant knowingly made representations to third parties of his communications with his attorney to further his own business enterprises, and thereby voluntarily waived the privileged status of those communications. In *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469-470 (S.D.N.Y. 1996), Kidder Peabody voluntarily released a report to the general public and thereby waived any privilege.[34]

---

1356 (D. Kan. 1995) (ruling that a party's failure to assert a privilege claim was excusable inadvertence because of the party's heavy workload, because the party took steps to rectify its error once the opposing party filed a motion to compel, and because the opposing party failed to meaningfully confer and could not show it suffered prejudice from its alleged inability use the documents during deposition).

[34] *See also Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (cited by

**EXHIBIT C-85**
49

1

2

3

4

**4.  Defendants' "Work Product" Arguments Are Both Irrelevant to the Protection of the August 9 Letter and Unavailing**

   a.  As Work-Product Protection Was Not Asserted for the August 9 Letter, Waiver of Work-Product is Irrelevant

5   Defendants' extended discussion of the waiver of work-product protection for

6   the August 9 Letter is no more than a "red herring," used to provide a platform for

7   their baseless motion. Plaintiffs and Marks asserted attorney-client privilege as to

8   the August 9 Letter, not work-product protection, and, as discussed *supra*, the

9   attorney-client privilege plainly remains intact as to the August 9 Letter.

10   Defendants' lead argument is that Plaintiffs and Marks purportedly waived

11   work product protection of Marks' August 9 Letter based on Marks' answer to a

12   single deposition question. This issue is ***moot***, as the August 9 Letter is protected by

13   the attorney-client privilege asserted in Gang, Tyre, Ramer & Brown's privilege log.

14   *See* Toberoff Decl., Exs. I, N.  The attorney-client privilege and the attorney work-

15   product doctrine are separate and distinct, and a purported waiver of work-product

16   protection does not waive the attorney-client privilege. *See In re Echostar Comms.*

17   *Corp.*, 448 F.3d 1294 (Fed. Cir. 2006) ("The attorney-client privilege and the work-

18   product doctrine, though related, are two distinct concepts and waiver of one does

19   not necessarily waive the other.").[35]

20   Even if work-product protection is waived, it "remains necessary to consider

21   what [is] protected by the attorney-client privilege." *In re Michigan Boiler & Eng'g*

22   *Co.*, 87 B.R. 465, 469 (Bankr. E.D. Mich. 1988).  The August 9 Letter is protected

23   by the attorney-client privilege; whether unclaimed work product protection was

24   _____

25   Defendants for the "general rule that… attorney-client communications made 'in the presence of, or shared with, third parties'" are not privileged).

26   [35] *See also Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 866 (3rd Cir. 1994) (With respect to the attorney-client privilege and work-product protection, the

27   waiver of "one does not lead to the [waiver of the] other."); *Picard Chemical Inc. Profit Sharing v. Perrigo Co.*, 951 F. Supp. 679, 688 (W.D. Mich. 1996) ("Separate standards

28   dictate the waiver of the attorney-client privilege and work product immunity.").

**EXHIBIT C-86**

50

somehow "waived" is irrelevant.

      b.    Marks' Testimony Does Not Constitute Work-Product and Would Not Waive Work Product Protection

      The definition of work-product is codified in the Federal Rules of Civil Procedure as "*documents and tangible things* that are prepared in anticipation of litigation or for trial by or for another party or its representative." F.R.C.P. 26(b)(3)(A) (emphasis added). *See In re Grand Jury Subpoena*, 350 F.3d 1010, 1015 (9th Cir. 2003) ("The work product doctrine… protects from discovery *documents and tangible things* prepared… in anticipation of litigation.") (internal quotation omitted) (emphasis added).[36] The work product doctrine is critical to the functioning of the legal system, because it provides lawyers with an essential zone of privacy to work. *Hickman v. Taylor,* 329 U.S. 495, 511 (1947).

      An attorney or party waives work-product protection only through "a deliberate decision to disclose privileged *materials* in a forum where disclosure was voluntary and calculated to benefit the disclosing party." *United States v. Doe*, 219 F.3d 175, 184 (2d Cir. 1999) (emphasis added). This is illustrated by the cases cited by Defendants regarding the waiver of work-product protection, which all involve the voluntary disclosure of tangible materials or writings, not testimony.[37]

---

[36] *See also In re Echostar Communications Corp.*, 448 F.3d at 1301 ("Unlike the attorney-client privilege, which protects all communication whether written or oral, *work-product immunity protects documents and tangible things*, such as memorandums, letters, and e-mails.") (emphasis added); Jones, Rosen, Wegner & Jones, Federal Civil Trials and Evidence ¶ 8:3700 (Rutter 2008) (work product "protects *trial preparation materials* that reveal an attorney's strategy, intended lines of proof, evaluation of strengths and weaknesses, and inferences drawn from interviews.") (emphasis added).

[37] *See Atari Corp. v. Sega of Am.*, 161 F.R.D. 417, 418-19 (N.D. Cal. 1994) (voluntary production of a copy of videotape with non-testifying expert consultant during discovery waived work-product protection for the tape); *In re McKesson HBOC, Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 7098 at *32-33 (N.D. Cal. Mar. 31, 2005) (voluntary disclosure of attorney work-product to the SEC and the United States Attorney's Office waived protection); *Kintera*, 219 F.R.D. at 510-11 (voluntary disclosure of the substance of witness affidavits to the general public on writings on parties' own Web site waived protection); *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (holding that a party could not introduce attorney-client communications as evidence after asserting a privilege for the communications during discovery); *Jacobs*, 117 F.3d at 90-91 (voluntary description in

**EXHIBIT C-87**
51

1   Marks' testimony that, when he sent his October 19, 2001 "acceptance" letter,
2   he believed there was an agreement, but that "a final, binding, enforceable
3   agreement" was never reached due to DC's counter-offers, did not disclose
4   information subject to work-product protection. While summarizing the parties'
5   negotiations, it did not disclose work product materials or other tangible things
6   prepared in anticipation of litigation. *See id.* at 191 (Testimony by an attorney as to
7   the substance of a meeting did not waive work product protection of notes regarding
8   the meeting.).

9
                    c.      There Is No Connection Between Marks' Testimony and
10                          the August 9 Letter

11  Even if Marks' answer to one of Defendants' deposition questions were
12  somehow held to be work product, and even if work product were relevant, the
13  August 9 Letter would remain protected as work product for two reasons.

14  Firstly, Defendants have not proved the contents of the August 9 Letter by an
15  anonymous, untrustworthy and inadmissible Defamatory Letter that does not even
16  mention the August 9 Letter. Marks' testimony also did not discuss or disclose in
17  *any* sense the August 9 Letter. Simply put, Defendants' waiver theory rests on the
18  contents of the August 9 Letter, which Defendants have not established.

19  Secondly, Marks' testimony constituted, at most, "opinion" work product.
20  "Opinion" work product is "materials involving pure legal theory or opinion … pure
21  mental impressions." *In re Martin Marietta Corp.*, 856 F.2d 619, 625 (4th Cir.
22  1988). While disclosing "fact" work product can give rise to "subject matter
23  waiver" as to documents touching on the same subject matter, the disclosure of
24  "opinion" work product does not. *Id.* at 626 (the doctrine of subject matter waiver

25

26  writing of the content of attorney-client communications to attract investors waived
    privilege). *See also United States v. Nobles*, 422 U.S. 225, 227-228, 239-40 (1975)
27  (voluntary use of written work-product report in conducting cross-examination waived
    privilege).
28

**EXHIBIT C-88**

52

1 "does not apply" to opinion work product).[38] As such, Marks' opinion would not

2 provide a basis for waiving work protect protection of the August 9 Letter to the

3 extent it discussed the settlement negotiations.

4     **5.    The Court Should Reconsider Its Conclusion that the Letter
         "Contains" Conduct By Plaintiffs' Counsel as the Letter is**

5     **Unethical, Anonymous, Inadmissible and Unsupported**

6         Notwithstanding Defendants' insidious smear campaign and hyping of the

7 Defamatory Letter as "explosive" new evidence, a "revelation," and a

8 "whistleblower" document, it is clearly none of these things. The rant in the

9 anonymous Defamatory Letter lacks any indicia of trustworthiness. It was written

10 by an attorney who, after hours, surreptitiously photocopied Plaintiffs' entire

11 privileged legal files and privileged documents of related clients, and blithely turned

12 them all over to Defendants in the midst of this litigation. In so doing, the attorney

13 potentially harmed his clients, in violation of the attorney's most fundamental

14 ethical duties. It is hard to imagine a more despicable act by a lawyer. Moreover, to

15 anyone thoroughly familiar with the parties and the facts of this case, the

16 Defamatory Letter reads like an incoherent conspiratorial rant against Plaintiffs'

17 counsel.

18         There was nothing "whistleblower"[39] about this conduct, despite Defendants'

19 constant efforts to elevate it so as to malign Plaintiffs' counsel. If the attorney truly

20 had a shred of evidence or knowledge of *any* unethical conduct by Plaintiffs'

21 counsel, he could and would have informed the California Bar. Instead, he

22 unethically disclosed reams of his clients' privileged documents to Warner Bros.

23

24 [38] *See also Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.
    1994) ("[T]he subject-matter waiver doctrine does not extend to materials protected by the
25 opinion work product privilege."), *mod. on other grounds*, 30 F.3d 1347 (11th Cir.1994).

26 [39] In their original motion to compel before Magistrate Zarefsky, Defendants
    disingenuously promoted the Stolen Documents as "Whistleblower Documents." This
27 characterization was flatly rejected by Magistrate Zarefsky: "And I will say that I don't
    agree with the designation of these as 'whistleblower' documents either...." Perkins Decl.,
28 Ex. 5 at 18:16-18.

**EXHIBIT C-89**

1 Contrary to Defendants' ridiculous allegations of a conspiratorial "cover-up"
2 by Plaintiffs, Plaintiffs' present counsel and prior counsel, Gang, Tyre, Ramer &
3 Brown, it turns out that of the 839 pages of Stolen Documents, all but two non-
4 privileged documents already in Defendants' possession had been produced and all
5 but two privileged post-litigation documents had been listed on privilege logs.[40]

6 The attorney who stole Plaintiffs' privileged files and delivered them to
7 Warner Bros. had worked at Toberoff's law firm for less than three months, without
8 any apparent problem or incident, and then one day disappeared on his lunch break
9 in November 2005 without notice. Toberoff Decl. at ¶¶ 33-34. The attorney did not
10 return the firm's calls. *Id.* He thereafter brazenly contacted Plaintiffs and other
11 clients of the firm in December 2005, and tried to convince them to terminate
12 Toberoff's firm by falsely disparaging Toberoff and offering a "better deal." *Id.*
13 By all accounts, his motives were financial. He was rejected by Plaintiffs and the
14 firm's other clients in December, 2005. *Id.* It is believed that soon thereafter he
15 communicated with Defendants and provided the privileged documents he had
16 stolen from Plaintiffs' legal files – hence, his statement in the Defamatory Letter
17 "consider it an early Holiday present."

18 In light of this unseemly and unethical behavior, and the anonymous,
19 unsupported and inadmissible nature of the letter, itself, *no credence should be given*
20 *to its statements.*

21 Therefore, Plaintiffs respectfully request that the Court reconsider the
22 conclusion in its September 26, 2008 Order that "[t]he documents in question
23 ***contained*** embarrassing and potentially questionable conduct by plaintiffs[']
24 counsel in this case." *Id.*, Ex. U at 1 (emphasis added). This statement appears to
25 accept as fact the anonymous Defamatory Letter's unsupported rant against
26 Toberoff and random characterization of documents, *not before the Court.*

27

28 [40] *See* Toberoff Decl., Exs. M at ¶ 22, T at ¶ 19.

**EXHIBIT C-90**

Defendants, not surprisingly, have seized upon the Court's statement, quoting it in the second line of their motion. Encouraged, Defendants argue that the Defamatory Letter is presumptively "true," and without a shred of evidence or support embark on a further smear campaign in their efforts to prejudice the trier of fact. Accordingly, Plaintiffs respectfully request that the condemnatory statement in the Court's September 26, 2008 Order be eliminated or, in the alternative, modified to reflect that the Defamatory Letter "alleges" conduct, without support.

> **6.** **The September 26, 2008 Order Should Be Reconsidered Because the April 30 Order Did Not Encompass the Defamatory Letter and In Any Event Plaintiffs Had No Opportunity to "Appeal" the April 30 Order as to this Issue**

> a. The April 30 Order Did Not Encompass the Defamatory Letter Because Defendants Had Not Moved to Compel Production of the Letter

Magistrate Zarefsky's April 30, 2007 Order encompassed only those documents that Defendants had moved to compel. Defendants clearly did not move to compel the Defamatory Letter; they moved to compel the so-called "Whistle-blower documents." *See generally* Defts. March 2007 Motion to Compel. At no point did Defendants provide *any* indication that the "Whistle-blower documents" included the Defamatory Letter, and expressly distinguished the Defamatory Letter from the "Whistle-blower documents."[41] Because Defendants had not moved to compel the Defamatory Letter, it was not discussed by *either* party at the April 30, 2007 hearing before Magistrate Zarefsky, nor encompassed by the April 30 Order. *See* Perkins Decl., Ex. 5.

Production of the Defamatory Letter was not before Magistrate Zarefsky, and

---

[41] *See, e.g.,* Defts. March 2007 Motion to Compel at 2:6-14 (requesting production of the "Whistle-blower documents"), 6:13-14 (referring to "the cover letter contained with the documents"), 6:26-27 (characterizing "the 'cover letter' that *came with* the Whistle-blower documents") (emphasis added); 7:9-10 (referring to "Whistle-blower Documents contained with the letter"), 7:17-19 (referring to attorneys' perusal of "the contents of the cover letter and my brief thumbing through the documents"); and 16:17-21:28 (referring repeatedly to the "Whistle-blower Documents" and never mentioning the cover letter).

**EXHIBIT C-91**
55

his April 30 Order should not be misconstrued to include it.

///

///

### b.    The Issue of Whether the Defamatory Letter Should Be Released to Defendants Was Not Ripe for Appeal Under Local Rule 72-2.1

The Court held in the September 26, 2008 Order that Plaintiffs had "waived" any opportunity to preserve privilege in the Nine Documents, because they did not appeal the April 30 Order within ten days pursuant to Local Rule 72-2.1. *Id.* at 4-5. However, such an appeal would not have made sense at the time the April 30 Order was issued.   The April 30 Order, by its own terms, required Plaintiffs' counsel to submit a declaration *twenty-one* days later on May 21, 2007.  In the process of reviewing the Stolen Documents, it became apparent to Plaintiffs that the Nine Documents had not been addressed by Defendants' motion, at the hearing or by the Order.  Plaintiffs' counsel therefore asserted that the Nine Documents remained privileged in his May 2007 Declaration.  *See* Toberoff Decl., Ex. N.

Plaintiffs did not disagree with the straightforward April 30 Order.  Plaintiffs believed that the Nine Documents had "fallen through the cracks," and that, considering the transcript of the April 30, 2007 hearing and the Order, Magistrate Zarefsky had not intended that privilege be waived for the Nine Documents.  In such circumstances, where the issue was not ripe for appeal, an immediate appeal to this Court pursuant to Local Rule 72-2.1 would have been premature.

By the time this issue came to a head, after meet and confer letters between the parties and a round of communications with Arnold & Porter, Magistrate Zarefsky suffered the tragic loss of his wife and was indisposed.  Thereafter, Defendants moved to compel and challenged the privilege claims to the Nine Documents asserted in the May 21 2007 declaration, resulting in the Court's September 26 Order.  Ordinarily, Defendants would have brought this motion to Magistrate Zarefsky.  In the unlikely event Magistrate Zarefsky had granted

**EXHIBIT C-92**
56

1 Defendants' motion, such would have been the order to have been appealed
2 pursuant to Local Rule 72-2.1.

3      Given the above circumstances, Plaintiffs did not waive their opportunity to
4 have Magistrate Zarefsky's Order clarified.

### 7. The September 26, 2008 Order for the Production of the Defamatory Letter Should Be Reconsidered In Light of the Record and Defendants' Misuse of the Stolen Documents

7      Defendants secured the Defamatory Letter based on their misrepresentations
8 to the Court that they followed a proper protocol in handling the Stolen Documents
9 and *immediately* turned them over to a supposed "neutral." As neither is true, the
10 April 30, 2007 and September 26, 2008 Orders should be reconsidered, at least with
11 respect to the Defamatory Letter. For the reasons set forth below, the Defamatory
12 Letter should be returned to Plaintiffs, and Defendants should be barred from further
13 attempting to use it in this litigation or otherwise. *See City of L.A. v. Santa Monica*
14 *BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (Courts have the "plenary power" "to
15 correct mistakes" in prior orders.); Local Rule 7-18(b).

### a. Magistrate Zarefsky's April 30 Order Was Based on Defendants' Misrepresentation of a Sanitized Protocol

17      Throughout this process, Defendants have used terms like "protocol,"
18 "neutral" and "escrow," all in an effort to mask the uneasy appearance of their
19 overzealous conduct. Defendants went to great lengths to create the appearance of a
20 sanitized protocol to deal with the Stolen Documents. However, the record of
21 evidence, which surfaced after Defendants had convinced Magistrate Zarefsky to
22 bless their supposedly "neutral" procedures, reveals their misrepresentations and
23 Defendants' objective to ride roughshod over the attorney-client privilege.

### i. Warner Bros. Engaged in a Substantive Review of the Privileged Stolen Documents

26      Defendants' misconduct began when their attorney Wayne Smith ("Smith"),
27 Warner's Senior VP, Litigation, who oversees this litigation on Defendants' behalf,
28 undertook a detailed review of Plaintiffs' privileged documents, instead of

**EXHIBIT C-93**
57

1   immediately notifying and returning them to Plaintiffs' counsel. A lawyer who

2   receives materials of opposing counsel that are facially privileged or otherwise

3   confidential, when the materials were not intended for the recipient, should refrain

4   from examining them, notify opposing counsel immediately, and abide by his

5   instructions. *See Gomez v. Vernon*, 255 F.3d 1118, 1131–32 (9th Cir. 2001); 3

6   *Matthew Bender Practice Guide: Federal Pretrial Civil Procedure in California* §

7   24.40. Defendants did none of these things – they reviewed the documents in detail,

8   failed to promptly notify Plaintiffs' counsel, and, obviously, did not comply with

9   Plaintiffs' instructions to return the Stolen Documents immediately.

10      Smith claims he relied on *State Compensation Insurance Fund v. WPS, Inc.*

11  (*State Fund*), 70 Cal.App.4th 644 (1999) in deciding how to handle the Stolen

12  Documents. However, the protocol set forth in *State Fund* is more stringent than as

13  depicted by Smith[42]:

14

15      "[T]he lawyer receiving such materials should refrain from examining the
        materials any more than is essential to ascertain if the materials are privileged,
16      and shall immediately notify the sender that he or she possesses material that
        appears to be privileged."

17  70 Cal.App.4th at 656.[43] As demonstrated below, Smith failed to comply with the

18  *State Fund* procedures touted by Defendants to Magistrate Zarefsky and this Court.

19      It is believed from the conduct of the attorney who stole the documents

20  (sudden disappearance in early November, 2005, failed attempt to poach Plaintiffs

21  in late November, 2005) and his statements to Warner Bros. in the Defamatory

22

23  [42] Smith shades the *State Fund* procedures: "(i) to review each document but to cease the

24  review once it became apparent that the document was privileged; (ii) to contact opposing
    counsel and advise that the documents have been received; and (iii) to refrain from using

25  any information in the documents until there was either an agreement with opposing
    counsel, or the court had determined the documents' disposition." Perkins Decl., Ex. 4 at ¶
    6.

26

27  [43] This decision was upheld by the Supreme Court of California, which noted that it
    comports with an attorney's "obligation not only to protect his client's interests but also to

28  respect the legitimate interests of fellow members of the bar, the judiciary, and the
    administration of justice." *Rico v. Mitsubishi Motors Corp.*, 171 P.3d 1092, 1099 (2007).

**EXHIBIT C-94**
58

1 Letter ("consider it an early Holiday gift") that Warner received their early

2 Christmas present in late November or early December, 2005, and waited *seven*

3 *months* before deciding whether or when to disclose this matter to Plaintiffs.[44]

4       Moreover, even if Defendants received the stolen documents in June, 2006, as

5 they say, they did not bring this to Plaintiffs' *immediate* attention as required by

6 *State Fund.* They belatedly mention the "anonymous" receipt of documents in a

7 letter dated July 5, 2006 and then in only the vaguest of terms as "certain

8 documents." Toberoff Decl., Ex. B. Plaintiffs did not learn that the documents

9 were *their* privileged documents, until July 11, 2006, and only after Plaintiffs'

10 counsel pressed Defendants. Toberoff Decl., Ex. M at ¶ 8. Plaintiffs did not receive

11 a copy of the documents until *July 18, 2006. Id.*, ¶ 10.

12       The second fiction Defendants have maintained is that Smith, pursuant to

13 *State Fund,* merely "thumbed through" or just "brief[ly]" glanced at the Stolen

14 Documents to determine their privilege status. *See* Defs. March 2007 Motion to

15 Compel at 7:9-10; Perkins Decl., Ex. 4 at ¶ 3. Smith states in his March 27, 2007

16 declaration that he placed the Stolen Documents in three piles marked "non-

17 privileged," "privileged" and "?" (when he believed privilege had been waived).

18 Perkins Decl., Ex. 4 at ¶¶ 8-12. Smith claimed "where it first appeared to me it was

19 entirely privileged, I ceased reading it, placed the document in the "privileged" pile

20 and did not look at it further." *Id.* Smith professed to have briefly skimmed the

21 documents, upon receipt, on June 28, 2006 and to have turned *all* of them over to

22

---

23 [44] These inferences are further supported by Defendants' evasion of Plaintiffs' requests for information and evidence regarding their receipt of the Stolen Documents. Warner

24 claimed that three identical sets of documents addressed to three high placed Warner executives had mysteriously arrived in envelopes on June 28, 2006, that Warner

25 purportedly did not retain any of the three envelopes (or a copy of any) despite the unusual, sensitive and legal nature of the contents, and that Warner purportedly had no

26 mailroom, security gate, or executive office records, notes or logs of the three heavy packages ever being signed in or received by three top executives, including Warner's

27 General Counsel, John Schulman. Toberoff Decl., Exs. D, F, T at ¶¶ 11-12. All such information commonly kept by Studio security, mailrooms, executive offices and attorneys

28 had purportedly vanished.

EXHIBIT C-95
59

1  Arnold & Porter on June 30, 2006. *Id.*, ¶¶ 8, 13. Smith further stated "[b]ecause I

2  did not conduct a detailed review of the Superman Documents, and because of the

3  passage of time, I do not recall their specific contents." *Id.*

4      Despite this purported very limited review of Stolen Documents (numbering

5  839 pages), stated lack of recollection, and purported turning over of all documents

6  in two days to a "neutral" "escrow agent," Smith has repeatedly in this litigation

7  been able to selectively recall the contents of specific documents, whether they were

8  produced and whether they were listed on privilege logs.[45]

9      In support of Defendants' first motion to compel regarding the Stolen

10  Documents, Smith *falsely* stated in his March 27, 2007 declaration: that none "of the

11  'non-privileged' documents had been produced in the litigation" and that "at least

12  some (and perhaps virtually all) of the privileged documents, as well as those in the

13  "?" pile, were, to the best of my knowledge, never identified in any privilege log

14  served by Plaintiffs." Smith Decl., ¶ 12. This statement is odd as Smith claimed to

15  have received the Stolen Documents on June 28, 2006 and to have turned them *all*

16  over to Arnold & Porter two days later. *Id.*, ¶¶ 8, 13. Plaintiffs did not serve their

17  first privilege log until July 20, 2006 and served their supplemental privilege log on

18  September 29, 2006.[46] Toberoff Decl., Ex. M at ¶¶ 17-18. The privilege logs list

19  the simple information (date, sender, recipient, etc.) in the form approved by the

20  Court's August 18, 2006 order. *Id.* Ex. H.

21

22  [45] Plaintiffs had produced nearly 2000 pages of documents at the time the Stolen Documents were allegedly reviewed by Smith.

23

24  [46] Plaintiffs produced documents responsive to Defendants' requests for production on September 29, 2005 and supplemented their production on October 6, 2006, November 6, 2006 and November 17, 2006. Toberoff Decl., Ex. M at ¶ 16. The privilege log for

25  Plaintiffs' former counsel, Gang Tyre Ramer & Brown, was served on September 29, 2006. *Id.*, Ex. I. Documents were further produced by third parties as follows: Jean

26  Peavy and Warren Peary (the "Shusters") on July 18, August 11 and August 14, with privilege logs on August 11, 2006 and October 16, 2006; IPW, LLC on November 15,

27  2006; Pacific Pictures Corporation on November 15, 2006; and Don Bulson, attorney for Michael Siegel, Plaintiff Laura Siegel Larson's half-brother, produced a privilege log on

28  October 23, 2006 in response to Defendants' subpoena. *Id.*, Exs. J, M at ¶¶ 19-21.

**EXHIBIT C-96**
60

1    It is not credible that after a mere cursory review in June, 2006, Smith could
2    recall in March 2007 (or even in late July or September 2006), the dates, sender and
3    recipients of documents supposedly missing from Plaintiffs' subsequently produced
4    privilege logs (containing hundreds of entries), especially since Smith admitted
5    "because of the passage of time, I do not recall the specific documents" and declared
6    that when it first appeared that a document was privileged, "I ceased reading it,
7    placed the document in the 'privileged' pile and did not look at it further." Smith
8    Decl., ¶ 8.

9    If Smith is taken at his word, he could not possibly have concluded from such
10   a cursory review that the Stolen Documents were not included among the nearly
11   2000 documents produced by Plaintiffs or by subpoenaed third parties, nor could he
12   have reasonably compared them to the hundreds of entries on the *subsequent*
13   privilege logs of Plaintiffs and third parties.[47]

14   In Defendants' May 22, 2007 letter regarding Toberoff's May 21, 2007
15   declaration (per the April 30 Order), Smith is cited as remembering *one* piece of
16   "correspondence concerning the interest in Superman that might be owned by…
17   Michael Siegel [that] has never been produced in this litigation, and does not appear
18   to have been listed in any privilege log." Toberoff Decl., Ex. O.

19   For Defendants' latest motion, Smith's powers of recall are being utilized yet
20   again. Based upon his brief "thumbing through" 839 pages of Stolen Documents in
21   June, 2006, Smith now declares under oath: "I believe the language quoted from the
22   [Defamatory Letter] refers to and is substantially similar to statements made by Mr.
23   Marks to his clients in [the August 9 Letter]." *See* February 19, 2009 Declaration of
24   Wayne Smith, ¶ 5. Incredibly, Smith is able to take a single, unsupported statement
25   ("Marks tells the Siegels…") in the Defamatory Letter and line it up with a specific
26   document, the August 9 Letter, among the 839 pages of Stolen Documents. This is

27   _____
[47] For instance, the privilege log of Don Bulson, Esq., the attorney of Michael Siegel,
28   Laura Siegels' now deceased step-brother, contains 422 entries. Toberoff Decl., Ex. J.

**EXHIBIT C-97**
61

1 all the more revealing as the Defamatory Letter does not refer to the August 9 Letter

2 or even to a writing as the basis for its statement regarding Marks. *See* Perkins

3 Decl., Ex. 1.

4 It is obvious from Smith's incredulous statements that Warner went *far*

5 beyond the mere "sorting" of documents, as represented to Magistrate Zarefsky, and

6 engaged in a substantive analysis of documents to see how they could be exploited

7 by Defendants in this litigation, including documents that were *facially* privileged

8 attorney-client communications.[48] This is immediately apparent even from Smith's

9 testimony that he had sorted the August 9 Letter, clearly an attorney-client

10 communication, into the "?" pile on the basis that he "believed privilege likely had

11 been waived." *Id.*

12 Defendants have cultivated the appearance of acting judiciously with regards

13 to the Stolen Documents. However, it now appears that their calculated

14 representations to Magistrate Zarefsky and this Court were false and misleading.

15 Whenever it is expedient, Smith is able to pinpoint specific Stolen Documents and

16 not only purports to "recall" their contents, but their relation as well to the thousands

17 of documents produced by Plaintiffs or multiple third parties, or subsequently listed

18 on their respective privilege logs.

19
20         ii.    Defendants Misrepresented that They Turned the
Stolen Documents Over to a "Neutral" and
Perpetuated the Fiction that the Documents Were
21                            Held by an "Escrow Agent"

22 Defendants also misrepresented to Magistrate Zarefsky that they had turned

23 the documents over to a purported "neutral" who was acting as an "escrow agent"

24 ─────────────────

[48] *See generally, Rico v. Mitsubishi Motors Corp.*, 116 Cal. App. 4th 51, 71 (2004)

25 (disqualification proper where counsel "studied the [privileged] document carefully, made
his own notes on it…and based his litigation strategy" on it.); *Spacone v. Burke (In re*

26 *Truck-A-Way)*, 300 B.R. 31, 39 (Bankr. E.D. Cal. 2003) (lawyer disqualified because,
upon discovery of an opponent's privileged documents, he conditioned the documents'

27 release upon his opponent providing a privilege log); *Shell Oil Refinery v. Shell Oil Co.*,
143 F.R.D. 105, 108 (E.D. La. 1992) (plaintiff subject to sanctions for improperly

28 obtaining proprietary documents from one of defendant corporation's employees).

**EXHIBIT C-98**
62

1  (the law firm Arnold & Porter) in furtherance of their purported "protocol." *See*

2  Defts. March 2007 Motion to Compel at 1:16-17 ("all copies of the documents were

3  turned over to a neutral third party for preservation and identification"); 10:14-18

4  (Defendants "discussed having a neutral third party hold the documents.").[49]

5  However, as Arnold & Porter was retained and compensated by Defendants, it is not

6  a "neutral," by definition. Moreover, Eisen has expressly *admitted* that neither his

7  law firm, nor he were acting as either a "neutral" or an escrow holder:

8  
9    "[N]either…this firm, nor I has suggested that we are formal escrow agents, in the legal sense of that term… we do not in my view, owe either party to this litigation any legal duty. We expect to be paid for our time by
10    defendants…"

11  Toberoff Decl., Ex. X. *See Summit Financial Holdings, Ltd. v. Continental Lawyers*

12  *Title Co.*, 27 Cal. 4th 705, 711 (2003) ("An escrow holder is an agent and fiduciary

13  of the parties to an escrow.").   It was not until October, 2008, well *after* the April

14  30, 2007 and September 26, 2008 Orders had been issued that this fact was finally

15  admitted. This alone justifies reconsideration. *See* Local Rule 7-18 (b) ("emergence

16  of new material facts … after the time of such decision").

17      After obtaining Magistrate Zarefsky's blessing of their "neutral" procedures

18  on false pretenses, Defendants set about mining for as much privileged information

19  as they could pry loose. Defendants repeatedly attempted to get Mr. Eisen to "peek

20  behind" Plaintiffs' privilege logs, to review the stolen privileged documents, test the

21  sufficiency of the log descriptions, and search for particular documents "recalled"

22  
---
23  [49] Defendants also repeatedly attempted to leverage Eisen as a purported "neutral" in later filings. *See* Notice of Motion and Joint Stipulation re: Defendants' Motion to Compel Compliance with the Court's 4/30/07 Order and Motion for Sanctions at 1:11 ("Defendants
24  turned them over to a neutral third party"); 6:10-11 (Defendants "ultimately concluded that he should turn them over to a neutral third party"); 8:6 (the "original caretaker" of the
25  documents); 8:10 ("escrow services"); 22:10-12 ("[I]t is necessary for Mr. Eisen, in his capacity as a neutral third party, to compare the Escrow Documents with the listed
26  documents and privilege log entries"); and at 1:22, 2:12, 2:16, 10:16, 13:19, 13:22, 20:15 ("escrow holder"); Declaration of Michael Bergman in Response to the Declaration of
27  Marc Toberoff Filed Pursuant to the Court's September 17, 2007 Order at 1:17-18 ("the only neutral party with access to the Escrow Documents").

28

**EXHIBIT C-99**
63

1  by Smith.  It soon became clear from Eisen's written statements to Plaintiffs and the

2  Court that Defendants had enlisted his assistance to circumvent and challenge

3  Plaintiffs' privilege logs.

4      After Plaintiffs' counsel provided his declaration on May 21, 2007 per the

5  April 30 Order, Defendants unilaterally provided Eisen with the produced

6  documents identified therein as well as copies of the referenced privilege logs.

7  Defendants instructed Eisen to "compare the privilege entries to the Escrow

8  Documents in your file… any document that does not match up exactly to an

9  identified entry on the privilege logs should not be returned to Mr. Toberoff, but

10  instead should be produced to Defendants." *See* Toberoff Decl., Ex. O.

11      Despite the clarity of the April 30 Order ("the privilege documents that were

12  listed on the privilege log get returned. The others get sent to defense counsel"),

13  Defendants instructed Eisen not to disburse any documents.  Instead they brought

14  another motion to compel insisting that Eisen be allowed to test each claim of

15  privilege for the Stolen Documents.  The Court denied Defendants' motion to

16  compel as "moot."[50]  With the September 26, 2008 Order,  the Court ordered Eisen,

17  pursuant to the April 30, 2007 Order,  to "produce forthwith any escrow document

18  not previously listed in a privilege log or has having been previously produced… the

19  nine documents… are to be produced to defendants' counsel as those documents

20  were not previously identified in a privilege log provided by plaintiffs."  Toberoff

21  Decl., Ex. U at 5.

22      Despite the clarity of the Court's ruling and the "mootness" of Defendants'

23  "match-up" request, Eisen, at Defendants' behest, *again* did not disburse the Stolen

24  Documents.  Instead, he wrote to Plaintiffs that he would "compare the privilege

25  logs to the documents, and to produce to Mr. Bergman all escrow documents except

26

---

27  [50] "Let's not talk about the ones that have been done. Let's talk about the nine that we
    have left. I want to resolve this. We're going to move on here, counsel." Toberoff Decl.,
28  Ex. R at 120:18-19.

EXHIBIT C-100
64

1 those accurately described on the privilege logs." *Id.*, Ex. V. Not surprisingly,

2 Bergman readily approved of Eisen's plan: "Defendants agree with your

3 interpretation of the Court's Order regarding your obligations to match-up the

4 Escrow Documents to the pertinent privilege log entries to determine whether "the

5 description of date, sender, recipient and type of document" corresponds to what the

6 document actually is." *Id.*, Ex. Y.

7      Bergman further encouraged Eisen (an attorney retained by them), to contact

8 the Court *ex parte. Id.* ("we request that you seek guidance directly from the

9 Court"). Over Plaintiffs' objections, Eisen sent a letter to the Court on October 16,

10 2008, advocating Defendants' objectives in the form of questions:

12     "With respect to the "match up" of the relevant privilege logs and Mr.
Toberoff's declaration, …am I to ascertain whether the escrow document and
privilege log entry actually match and produce the document to defendants if
13     it does not?...Suppose a series of pages among the escrow documents consists
of more than one document (e.g. a cover letter and an enclosed document) but
14     the privilege log entry only references one of the documents. Under those
circumstances, is the document not referenced in the privilege log deemed to
15     be included within the confines of the privilege log protection, or not?"

16 *Id.*, Ex. AA. From these facts, it is more than apparent that Eisen was not "neutral"

17 in any sense, but did as his client requested: retain the Stolen Documents, keep the

18 hopes of a full blown privilege review alive and advance Defendants' position. In

19 the face of two successive orders clearly outlining the simple process by which he

20 was to immediately disburse the Stolen Documents, Eisen refused, instead lobbying

21 to get Defendants' "match-up" process approved, until it was specifically rejected

22 by the Court on December 4, 2008.

23     As evidenced by Defendants' latest motion, they remain committed to

24 chipping away at Plaintiffs' privileged stolen documents, this time under the

25 ridiculous pretext of the anonymous Defamatory Letter. We now know that

26 Defendants' original motion to compel the Stolen Documents was based on

27 fundamental misrepresentations to Magistrate Zarefsky: (i) that Defendants merely

28 "thumbed through" the privileged Stolen Documents and (ii) that they set up a

**EXHIBIT C-101**
65

Case 2:10-cv-03633-ODW-RZ   Document 368-26   Filed 01/30/12   Page 100 of 105
Case 2:04-cv-09484-ODW-RZ   Document 476   Filed 03/02/09   Page 79 of 80
Page ID #:24103

1 │ "neutral" "escrow" procedure to handle the documents. It is obvious from the

2 │ record facts that this is not true. Defendants have crossed the line by reviewing and

3 │ leveraging Plaintiffs' privileged information. Accordingly, sufficient grounds exist

4 │ for this Court to reconsider its ruling and release of the Defamatory Letter to

5 │ Defendants.

6 │ V.  **DEFENDANTS' CONCLUSION**

7 │     For the reasons set forth herein, Defendants respectfully request that their

8 │ motion be granted.

9 │ VI.  **PLAINTIFFS' CONCLUSION**

10 │     For the reasons stated above, (i) Defendants' motion should be denied in its

11 │ entirety, (ii) the Court is respectfully requested to reconsider its September 26, 2008

12 │ order insofar as it states that the anonymous, inadmissible and wholly unsupported

13 │ Defamatory Letter "*contained* embarrassing and potentially questionable conduct by

14 │ plaintiffs['] counsel in this case," instead of "alleged" such conduct, and (iii) to

15 │ reconsider the release of the Defamatory Letter in light of new evidence regarding

16 │ Defendants' misrepresentations to Magistrate Judge Zarefsky and improper

17 │ exploitation of the Stolen Documents, and/or (iv) preclude the further use of the

18 │ Defamatory Letter by Defendants in this litigation or otherwise.

19 │ DATED:  March 2, 2009          FROSS ZELNICK LEHRMAN & ZISSU, P.C.

20 │                               PERKINS LAW OFFICE, P.C.

21 │                                        -and-

22 │                               WEISSMANN WOLFF BERGMAN
   │                               COLEMAN GRODIN & EVALL LLP

23 │

24 │                               By: _____

25 │                                   Michael Bergman

26 │                               Attorneys for Defendants and Counterclaimant

27 │

28 │

**EXHIBIT C-102**
66

Case 2:10-cv-03633-ODW-RZ Document 368-6 Filed 09/30/10 Page 101 of 105
Case 2:04-cv-08400-ODW-RZ Document 476 Filed 09/02/09 Page 80 of 80
Page ID #:24104

1   DATED:  March 2, 2009          TOBEROFF & ASSOCIATES, P.C.

2

3                                  By

4                                      Marc Toberoff

5                                  Attorneys for Plaintiffs/Counterclaim-
                                   Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT C-103**

Case 2:10-cv-03633-ODW-RZ    Document 368-2    Filed 03/30/12    Page 102 of 105
Case 2:04-cv-08400-SGL-RZ    Document 478    Filed 03/13/2009    Page 2 of 19
Page ID #:24105

1

2

3

4

5

6

7               **UNITED STATES DISTRICT COURT**

8       **CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION**

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON, <br><br> Plaintiffs, <br><br> vs. <br><br> WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10, <br><br> Defendants. | Case No. CV 04-8400 SGL (RZx) <br><br> Hon. Stephen G. Larson, U.S.D.J. <br><br> **FINAL PRE-TRIAL CONFERENCE ORDER** <br><br> **Final Pre-Trial Conference** <br> Date:  January 26, 2009 <br> Time:  11:00 a.m. <br> Place:  Courtroom 1 <br><br> **Trial** <br> Date:   April 21, 2009 <br> Time:  9:30 a.m. <br> Place:  Courtroom 1 <br><br> [Complaint filed: October 8, 2004] |
| AND RELATED COUNTERCLAIMS | |

19

20

21

22

23

24

25

26

27

28

**EXHIBIT D-104**

Case 2:10-cv-03633-ODW-RZ   Document 368-2   Filed 03/30/12   Page 103 of 105
Case 2:04-cv-08400-ODW-RZ   Document 478-2   Filed 03/19/2009   Page 2 of 19
Page ID #:24106

# TABLE OF CONTENTS

1.  Parties ...............................................................................................1

2.  Jurisdiction and Venue ...................................................................1

3.  Estimated Time of Trial .................................................................2

4.  Non-Jury Trial ................................................................................2

5.  Admitted Facts ...............................................................................2

6.  Facts Stipulated Without Prejudice to Evidentiary Objections............4

7.  Claims and Defenses .....................................................................7

    A. Claims To Be Tried ................................................................7

    B.  Defenses ...............................................................................8

8.  Discovery.........................................................................................8

9.  F.R.C.P. 26(a)(3) Disclosures .......................................................8

10.  Witness Lists ..................................................................................8

11.  Pending Motions.............................................................................9

12.  Bifurcation......................................................................................16

13.  Conclusion ......................................................................................17

Case 2:10-cv-03633-ODW-RZ    Document 368-2    Filed 01/30/13    Page 104 of 105
Case 2:04-cv-09049-SGL-RZ    Document 478    Filed 03/13/2009    Page 94 of 105
Page ID #:24107

## B. __Defenses__

Defendants will not be asserting any affirmative defenses or counterclaims in this phase of the trial.

## 8. DISCOVERY

Discovery is complete.

Defendants' motion to reopen discovery filed March 2, 2009 is **DENIED**.

## 9. ALL DISCLOSURES UNDER FED.R.CIV.P. 26(A)(3) HAVE BEEN MADE

The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6-1. Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits objected to in the parties' Joint Exhibit Stipulation filed concurrently herewith.

## 10. WITNESS LISTS OF THE PARTIES HAVE BEEN FILED WITH THE COURT

Only the witnesses identified in the parties' joint witness list (as amended) will be permitted to testify (other than solely for impeachment).

Neither party is intending to present evidence by way of deposition testimony (other than for cross-examination or impeachment).

## 11. THE FOLLOWING LAW AND MOTION MATTERS AND MOTIONS *IN LIMINE*, AND NO OTHERS, HAVE BEEN SUBMITTED, HEARD, AND DECIDED BY THE COURT, AS FOLLOWS:

**Plaintiffs' Motions in Limine**

A. <u>Motion in Limine No. 1</u>

9

**EXHIBIT D-106**

Case 2:10-cv-03633-ODW-RZ   Document 368-2   Filed 01/30/12   Page 105 of 105
Case 2:04-cv-09400-SGL-RZ   Document 478-2   Filed 03/13/2009   Page 15 of 105
Page ID #:24108

**13.   CONCLUSION**

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the relevant pleadings relevant to the first phase of trial on April 21, 2009 and govern the course of such trial, unless modified to prevent manifest injustice.

Dated: March 13, 2009

UNITED STATES DISTRICT COURT JUDGE