# EXHIBIT A

1

1

2                        UNITED STATES DISTRICT COURT

3                        CENTRAL DISTRICT OF CALIFORNIA
                                WESTERN DIVISION

4

5

   DC COMICS,                        )
6                                    )
                                     )
7           PLAINTIFF,               )
                                     )
8           VS.                      ) CASE NO. CV 10-03633-ODW(RZX)
                                     )
9                                    )
   PACIFIC PICTURES CORP. ET AL.,)
10                                   ) LOS ANGELES, CALIFORNIA
                                     ) FEBRUARY 13, 2012
11                                   ) (9:52 A.M. TO 11:03 A.M.)
            DEFENDANTS.              )
12   _____)

13                                HEARING
14               BEFORE THE HONORABLE RALPH ZAREFSKY
                    UNITED STATES MAGISTRATE JUDGE

15

16

17

18   APPEARANCES:              SEE NEXT PAGE

19   COURT REPORTER:           RECORDED; COURT SMART

20   COURTROOM DEPUTY:         ILENE BERNAL

21

22   TRANSCRIBER:              DOROTHY BABYKIN
                               COURTHOUSE SERVICES
                               1218 VALEBROOK PLACE
23                             GLENDORA, CALIFORNIA  91740
                               (626) 963-0566

24

25   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
     TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

**EXHIBIT A**
**4**

2

```
 1   APPEARANCES:  (CONTINUED)
     FOR THE PLAINTIFF:        O'MELVENY & MYERS LLP
 2                             BY:  MATTHEW T. KLINE
                                    CASSANDRA L. SETO
 3                                  ASHLEY PEARSON
                                    ATTORNEY AT LAW
 4                             1999 AVENUE OF THE STARS
                               7TH FLOOR
 5                             LOS ANGELES, CALIFORNIA  90067

 6
     FOR SIEGEL AND SHUSTER    TOBEROFF & ASSOCIATES, P.C.
 7   DEFENDANTS:               BY:  MARC TOBEROFF
                                    ATTORNEY AT LAW
 8                             2049 CENTURY PARK EAST
                               SUITE 2720
 9                             LOS ANGELES, CALIFORNIA  90067

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT A**
**5**

3

I N D E X

CASE NO. CV 10-03633-ODW(RZX)                    FEBRUARY 13, 2012

PROCEEDINGS:   1.   PLAINTIFF'S MOTION TO CONDUCT FURTHER
                    DEPOSITION OF DAWN PEAVY;
               2.   PLAINTIFF'S MOTION TO COMPEL PRODUCTION
                    OF CORPORATE RECORDS AND OTHER DOCUMENTS;
               3.   PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF
                    DOCUMENTS.

4

1    LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 13, 2012; 9:52 A.M.

2            THE CLERK:  THE HONORABLE RALPH ZAREFSKY, UNITED

3    STATES MAGISTRATE JUDGE, PRESIDING.

4            MR. KLINE:  GOOD MORNING, YOUR HONOR.

5            THE COURT:  JUST A MOMENT.  LET THE CLERK CALL THE

6    CALENDAR FIRST.

7            THE CLERK:  CALLING CASE NUMBER

8    CV 10-03633-ODW(RZX), DC COMICS VERSUS PACIFIC PICTURES

9    CORPORATION, ET AL.

10            COUNSEL, PLEASE MAKE YOUR APPEARANCES.

11            MR. KLINE:  GOOD MORNING, YOUR HONOR.

12            MATT KLINE, CASSIE SETO AND ASHLEY PEARSON OF

13    O'MELVENY & MYERS ON BEHALF OF DC COMICS.

14            AND I'LL BE ARGUING TWO OF THE MOTIONS, YOUR HONOR,

15    AND MS. SETO WILL BE ARGUING ONE, IF THAT'S OKAY.

16            THE COURT:  ALL RIGHT.  THANK YOU.

17            MR. TOBEROFF:  GOOD MORNING, YOUR HONOR.

18            MARK TOBEROFF.  GOOD MORNING.

19            MARK TOBEROFF ON BEHALF OF THE DEFENDANTS.

20            THE COURT:  STILL NO BUSINESS CARDS, MR. TOBEROFF.

21            MR. TOBEROFF:  I WAS --

22            THE COURT:  WE HAVE TO GET THIS CASE RESOLVED SO

23    YOU CAN BUY BUSINESS CARDS.

24            MR. TOBEROFF:  I'M HAPPY TO SAY THAT WE'VE NOW

25    MOVED, AND NEXT TIME WE'RE BEFORE YOU YOU'LL HAVE BEAUTIFUL

5

1    -- I'LL GIVE YOU EXTRAS.

2              THE COURT:  ALL RIGHT.

3              ALL RIGHT.  WELL, THERE ARE THREE MOTIONS.  I'M NOT

4    SURE WE NEED A WHOLE LOT OF ARGUMENT ON THE PEAVY MOTION AND

5    THE DOCUMENTS MOTION.

6              WHICH TWO WERE YOU PLANNING ON ARGUING, MR. KLINE?

7              MR. KLINE:  PEAVY AND MARKS, THE MARKS MEMORANDUM.

8              THE COURT:  ALL RIGHT.

9              MR. KLINE:  SO, JUST VERY, VERY BRIEFLY ON THE

10   PEAVY MOTION, YOUR HONOR.

11             THE COURT:  GO AHEAD.

12             MR. KLINE:  IN THE BRIEF THAT THEY FILED ON

13   THURSDAY, THE OBJECTIONS, THEY CLAIM THAT MARK PEARY HAD NO

14   INVOLVEMENT WHATSOEVER WITH MS. PEAVY'S WILL SUGGESTING THAT,

15   YOU KNOW, WHATEVER STATEMENTS HE MADE TO ASSIST HER OR NOT

16   WERE NOT MISSTATEMENTS.

17             I'LL ONLY BRING TO THE COURT'S ATTENTION THAT IF

18   YOU LOOK AT EXHIBIT Q, PAGE 236, MARK PEARY IS LISTED AS THE

19   FIRST WITNESS ON THE TWO-PAGE WILL.

20             SO, CLEARLY, HE DID HAVE AN INVOLVEMENT.  HE'D

21   WITNESSED THE WILL.  HE'D READ IT.  HE WAS AWARE OF ITS

22   CONTENTS.  AND WHATEVER STATEMENTS HE MADE TO ASSIST HER

23   ABOUT ITS CONTENTS ARE OBVIOUSLY CENTRAL TO HIS CREDIBILITY

24   IN THIS CASE, WHICH IS AN IMPORTANT ISSUE.

25             AND I'LL ALSO JUST POINT OUT, YOUR HONOR, THAT THE

6

1   OBJECTIONS THAT THEY FILED DID NOT DISPUTE THAT THEY PRODUCED

2   THE SIEGEL'S WILL IN RESPONSE TO THE FIRST SET OF DOCUMENT

3   REQUESTS THAT DC FILED, GOSH, ALMOST 14 MONTHS AGO.  AND THEY

4   SHOULD HAVE PRODUCED THE PEARY WILL AT THE SAME TIME.  THEY

5   DIDN'T DO SO.  AND WE THINK IT'S MORE THAN REASONABLE TO

6   ALLOW 90 MORE MINUTES TO DEPOSE MS. PEAVY ON THESE ISSUES.

7           WE'VE OFFERED TO STIPULATE OR ENTER INTO A

8   STIPULATION REGARDING MS. PEAVY'S COMPETENCY --

9           THE COURT:  I READ ALL THIS.

10          MR. KLINE:  AND THEY WON'T DO THAT.

11          SO, I DON'T WANT TO REPEAT ANY ARGUMENTS.  THAT'S

12  THE ONLY REALLY NEW POINT, YOUR HONOR.

13          THE COURT:  ALL RIGHT.

14          WELL, LET'S HEAR MR. TOBEROFF ON THIS MOTION.

15          MR. KLINE:  OKAY.

16          THE COURT:  IF YOU HAVE ANYTHING TO SAY.  I DON'T

17  THINK IT'S A COMPLICATED MOTION.  I KNOW IT'S NOT A

18  COMPLICATED MOTION.

19          MR. TOBEROFF:  JUST BRIEFLY, IT'S A STRAWMAN.  WE

20  NEVER REPRESENTED THAT MR. PEAVY HAD NO PARTICIPATION

21  WHATSOEVER REGARDING THE WILL.  THAT'S NOT IN OUR PAPERS.

22          WHAT WE DID SAY IS THAT THEY HAD MORE THAN AMPLE

23  OPPORTUNITY TO REQUEST THE WILL PRIOR TO DAWN'S DEPOSITION.

24  THEY, IN FACT -- IF IT'S TECHNICALLY COVERED UNDER AN OLD

25  REQUEST, THEY MADE A MASSIVE MOTION TO COMPEL BASED ON THOSE

**EXHIBIT A**
**9**

7

1   REQUESTS.  THEY NEVER ASKED FOR THE WILL IN ALL THAT TIME.

2          THEY THEN QUESTIONED MR. PEARY ABOUT THE WILL

3   SHOWING THAT IT WAS ON THEIR MIND.  THEY NEVER ASKED FOR THE

4   WILL.  AFTER MARK PEARY'S DEPOSITION, WHEN THEY SPOKE ABOUT

5   THE WILL, THEY COULD HAVE VERY WELL ASKED FOR THE WILL.  WHEN

6   THEY ASKED FOR THE WILL, WE GAVE IT TO THEM.

7          THEY MAKE ALL SORTS OF ACCUSATIONS ABOUT THE WILL,

8   THAT I QUARTERBACKED THE WILL.  THEY DID THE WILL BEFORE I

9   EVEN MET JEAN PEAVY AND HER SON.

10          THE COURT:  IT DOESN'T LOOK LIKE YOU QUARTERBACKED

11   IT.  IT'S A FORM.

12          MR. TOBEROFF:  YEAH.

13          THE COURT:  JUST FILLED IT IN.

14          MR. TOBEROFF:  AND I'M NOT A TRUST AND ESTATES

15   LAWYER.  I WOULD NEVER GET INVOLVED IN THE WILLS.

16          AND, SO, THEY HAD AMPLE OPPORTUNITY TO HAVE

17   REQUESTED THE WILL PRIOR TO DAWN'S DEPOSITION.  THEY COULD

18   HAVE ACTUALLY PUT HER DEPOSITION OFF, AS WE ASKED FOR.  THEY

19   PLANNED THE DEPOSITION RIGHT IN THE MIDDLE OF MY VACATION SO

20   THEY CAN THEN USE MY REQUEST TO MOVE THE DEPOSITION TO -- AS

21   LEVERAGE FOR SOMETHING UNRELATED REGARDING A SLAP MOTION.

22          WE'LL STAND BY OUR PAPERS ON THIS MOTION.

23          THE COURT:  ALL RIGHT.

24          ALL RIGHT.  I DON'T SHARE THE OUTRAGE THAT BOTH

25   SIDES DISPLAY AS TO THIS MATTER.  THE RULE DOES SET A DEFAULT

8

1    STANDARD OF ONE DEPOSITION PER WITNESS.  THAT'S NOT AN

2    INFLEXIBLE STANDARD.  IN FACT, THE RULE ALSO RECOGNIZES THERE

3    ARE TIMES WHEN THE DEFAULT DOES NOT MEET THE NEEDS OF THE

4    CASE.

5            I THINK THERE ARE SOME VALID GROUNDS FOR EXAMINING

6    MS. PEAVY FURTHER.  I DON'T THINK THAT THE ADDITIONAL TIME IS

7    HARASSMENT.

8            YOU KNOW, I'M NOT SURE THAT THESE SUBJECTS ARE

9    RELEVANT IN AN ULTIMATE SENSE, BUT THEY PROBABLY ARE UNDER

10   THE BROAD DISCOVERY STANDARDS.

11           SO, I'M GOING TO GRANT THE MOTION WITH THE

12   FOLLOWING LIMITATIONS:

13           THE EXAMINATION BY DC COMICS IS NOT TO EXCEED 90

14   MINUTES.

15           THE EXAMINATION IS TO TAKE PLACE AT A TIME AND

16   LOCATION ACCEPTABLE TO MS. PEAVY AND HER COUNSEL PROVIDED,

17   MR. TOBEROFF, THAT YOU NOTIFY DC COMIC'S COUNSEL WITHIN 14

18   DAYS OF TODAY OF A SUITABLE TIME AND LOCATION.  OTHERWISE,

19   THEY GET TO SET THE TIME AND DATE -- TIME AND LOCATION.

20           AND THE EXAMINATION IS TO BE LIMITED TO QUESTIONS

21   CONCERNING MS. JEAN PEAVY'S WILL AND THE AUGUST 2011 LETTER

22   AGREEMENT THAT WERE THE SUBJECT OF THIS MOTION AND ANY

23   QUESTIONS THAT ARE NATURALLY RELATED TO THOSE SUBJECTS OR

24   FLOW FROM THEM OR RESPONSES GIVEN TO QUESTIONS ABOUT THEM.

25           MR. TOBEROFF, IF YOU WANT TO EXAMINE AS WELL,

9

1   THAT'S IN ADDITION TO THE 90 MINUTES.

2           ALL RIGHT.

3           HOW ABOUT THE DOCUMENTS.  AGAIN, I DON'T THINK

4   THERE'S A WHOLE LOT THAT NEEDS TO BE ARGUED, BUT I'LL HEAR

5   YOU.

6           MS. SETO:  CERTAINLY, YOUR HONOR.  IF I COULD JUST

7   HELP DISTILL A FEW OF THE KEY ISSUES FROM THE BRIEFING.

8           WHAT WE'RE REALLY SEEKING HERE ARE DOCUMENTS

9   RESPONSIVE TO JUST THREE REQUESTS FOR PRODUCTION.  TWO OF

10  THOSE HAVE TO DO WITH THE CORPORATE RECORDS RELEVANT TO OUR

11  ALTER EGO CLAIMS, MIRROR VERSIONS OF WHICH WERE SERVED AS TO

12  EACH OF THE THREE TOBEROFF COMPANIES.

13          AND ONE OF THOSE REQUESTS CONCERNS THE ARI EMANUEL

14  RELATED DOCUMENTS THAT THIS COURT ORDERED PRODUCED BACK IN

15  MAY OF 2011.

16          AS TO THE -- WE'VE SPENT THE LAST SEVEN MONTHS

17  TRYING TO MEET AND CONFER WITH THE DEFENDANTS TO WORK THIS

18  OUT TO AVOID BURDENING YOUR HONOR WITH THIS MOTION, BUT

19  UNFORTUNATELY WE WERE UNABLE TO DO SO.

20          AS TO THE CORPORATE RECORDS, THE DEFENDANTS HAVE

21  PRODUCED 17 PAGES AND THEY ADMIT THAT MORE EXIST.  WHICH WE

22  KNOW SINCE PACIFIC PICTURES, TO TAKE ONE EXAMPLE, WAS ACTIVE

23  FOR 21 YEARS AND PRODUCED ONLY A ONE-AND-A-HALF-PAGE PRINTOUT

24  FROM THE NEW YORK DEPARTMENT OF STATE WITH VERY BASIC

25  INFORMATION ABOUT ITS STATUS.

10

1        WE ALSO KNOW THAT THE DEFENDANTS HAVE NOW CONCEDED

2   IN THEIR BRIEFING THAT THERE ARE OTHER INDIVIDUALS THAT HELD

3   OWNERSHIP INTEREST IN THESE COMPANIES, BUT WE HAVE NO

4   DOCUMENTS REFLECTING WHAT THOSE INTERESTS WERE, HOW LONG THEY

5   WERE HELD AND SO ON.  THESE DOCUMENTS ARE RELEVANT TO OUR

6   ALTER EGO CLAIMS.  AND THIS COURT HAS RECOGNIZED THAT

7   DEFENDANTS CAN'T PICK AND CHOOSE WHAT CORPORATE RECORDS THEY

8   DECIDE TO PRODUCE.

9        SO, WHAT WE NEED ARE EITHER THESE DOCUMENTS TO BE

10  PRODUCED OR DEFENDANTS TO BE ORDERED TO SUBMIT A SWORN

11  CERTIFICATION EXPLAINING THAT DOCUMENTS LIKE THIS DON'T

12  EXIST.  AND THIS COURT IN BOTH THE COLUMBIA CASE AND THE

13  FARBER CASE CITED IN OUR BRIEFING HAS ORDERED SUCH

14  CERTIFICATIONS.

15       WE THINK IT'S ESPECIALLY APPROPRIATE IN CASES LIKE

16  HERE WHERE THERE ARE ALTER EGO ALLEGATIONS AND THE ABSENCE OF

17  SUCH CORPORATE RECORDS IS, ITSELF, POWERFUL EVIDENCE OF AN

18  ALTER EGO RELATIONSHIP.

19       AS TO THE ARI EMANUEL RELATED DOCUMENTS, THIS COURT

20  ORDERED DEFENDANTS TO PRODUCE ANY DOCUMENTS RELATED TO

21  "SUPERMAN," "SUPERBOY," THE SIEGELS OR THE SHUSTERS.  THE

22  DEFENDANTS DESIGNATED THE PRODUCTION FROM A THIRD-PARTY

23  ENDEAVOR, ARI EMANUEL'S FORMER AGENCY, IN THE SIEGEL CASE SIX

24  YEARS AGO.  THOSE PAGES WERE HEAVILY REDACTED AND WERE JUST

25  DRAFTS OF THE 2002 AND 2004 IP WORLDWIDE AGREEMENTS.

11

1        THE DEFENDANTS HAVE NOT PRODUCED THEIR OWN VERSIONS

2   OF THESE AGREEMENTS OR GIVEN ANY INDICATION THAT THEY'VE

3   REVIEWED THESE REDACTIONS IN LIGHT OF THE NEW CLAIMS, ISSUES

4   AND PRIVILEGE RULINGS IN THIS CASE.

5        SO, WHAT WE'RE SEEKING HERE IS UNREDACTED VERSIONS

6   OF THESE DOCUMENTS AS WELL AS ANY RELATED CORRESPONDENCE AND

7   DRAFTS.  WE KNOW THESE ARE RELEVANT BOTH BECAUSE THE IP

8   WORLDWIDE AGREEMENTS REFLECT THAT PACIFIC PICTURES

9   CONTRIBUTED ITS IP BUSINESS TO THE VENTURE, WHICH AT THE TIME

10  IN 2002 INCLUDED THE SHUSTERS' PUTATIVE "SUPERMAN" RIGHTS.

11  AND WE ALSO KNOW FROM NOTES IN THE MARGINALIA OF SOME OF THE

12  REDACTED DOCUMENTS THAT THE REDACTED TEXT RELATES TO

13  "SUPERMAN."

14       WE WOULD ALSO BE ENTITLED TO ANY OTHER DOCUMENTS

15  CLARIFYING WHAT INTEREST MR. EMANUEL HAS.  THE DEFENDANTS

16  ASSERT, AND THIS IS CAREFULLY WORDED, THAT HE HAS NO INTEREST

17  IN THE SIEGEL OR SHUSTER HEIRS' TERMINATION INTEREST.  BUT WE

18  DON'T KNOW, FOR EXAMPLE, IF HE HAS RECEIVED SOME KIND OF

19  PAYOUT OR A PIECE OF THE COMPANY'S OTHER BUSINESS AS A QUID

20  PRO QUO FOR GIVING HIS MONEY, NAME AND SERVICES TO THE

21  VENTURE FOR OVER THREE YEARS.

22       THE DEFENDANTS ASK THAT WE ACCEPT REPRESENTATIONS

23  IN THEIR BRIEFING THAT MR. EMANUEL HAS NO INTEREST.  BUT,

24  FRANKLY, THAT'S JUST NOT CREDIBLE ESPECIALLY GIVEN THAT THEIR

25  REPRESENTATIONS ABOUT, FOR EXAMPLE, THE 2003 CORRESPONDENCE

12

1   BETWEEN MICHAEL SIEGEL AND LAURA SIEGEL HAVE BEEN PROVEN TO

2   BE FALSE.  AND AS OUR OTHER MOTIONS SET FORTH, WE BELIEVE

3   THERE ARE MORE RELEVANT, NON-PRIVILEGED DOCUMENTS THAT

4   THEY'RE CONTINUING TO WITHHOLD.

5          SO, THE BOTTOM LINE IS WE NEED SOME CERTAINTY HERE.

6   AND WE THINK THE ONLY WAY TO DO THAT IS TO EITHER ORDER THESE

7   DOCUMENTS PRODUCED OR ORDER THE DEFENDANTS TO SUBMIT A

8   DECLARATION EXPLAINING CLEARLY WHAT DOCUMENTS DO AND DO NOT

9   EXIST.

10          SO, WE WOULD ASK THIS COURT TO GRANT THE PROPOSED

11  ORDER SUBMITTED IN CONNECTION WITH OUR MOTION.

12          THE COURT:  THANK YOU.

13          MR. TOBEROFF.

14          MR. TOBEROFF:  I'LL START WITH THE ARI EMANUEL

15  DOCUMENTS FIRST.  THE PLAINTIFFS HAD MADE MUCH IN THEIR

16  PAPERS ABOUT NOT HAVING PRODUCED -- WELL, LET ME BACKTRACK.

17          FIRST OF ALL, WE HAVE AN AGREEMENT THAT WE CAN

18  PRODUCE BY DESIGNATION.  SO, WHEN THEY SPEAK TO A PALTRY

19  PRODUCTION, THEY'RE SPEAKING NOT TO THE PRODUCTION OF

20  THOUSANDS OF PAGES WHICH WE PRODUCED BY DESIGNATION A LONG

21  TIME AGO IN THE CLOSELY RELATED SIEGEL CASE.  THEY'RE TALKING

22  ABOUT ANYTHING SUPPLEMENTARY.

23          AND IT'S NO SURPRISE THAT SINCE THEIR REQUEST IN

24  THE SIEGEL CASE COVERED MUCH THE SAME GROUND AS THEIR REQUEST

25  IN THIS CASE, THAT WE DON'T HAVE A LOT OF ADDITIONAL

**EXHIBIT A**
**15**

13

1    DOCUMENTS TO PRODUCE.

2             AS FAR AS THE ARI EMANUEL DOCUMENTS, WE PRODUCED

3    THOSE BY DESIGNATION.

4             AS FAR AS THE BIG STINK THEY MADE ABOUT NO

5    DOCUMENTS SHOWING THAT ARI EMANUEL RELINQUISHED HIS INTEREST,

6    IP WORLDWIDE, PURSUANT TO THE IP WORLDWIDE AGREEMENT, HAD A

7    10 PERCENT AGENT'S COMMISSION FOR REPRESENTING THE SALE OR

8    LICENSE OF THE SIEGELS' RECAPTURED "SUPERMAN" RIGHTS IN

9    NEGOTIATIONS WITH WARNER BROS. OR POSSIBLY OTHER BUYERS.

10            THAT AGREEMENT HAD A TERM.  THOSE -- THAT EXCLUSIVE

11   REPRESENTATION, THE 10-PERCENT COMMISSION EXPIRES WITH THE

12   EXPIRATION OF THAT TERM.  WE'VE REFERRED TO THAT EXPIRATION

13   IN NUMEROUS BRIEFS THAT HAVE BEEN FILED.

14            IT'S PLAIN FROM THE IP WORLDWIDE AGREEMENT, AND

15   IT'S PLAIN FROM THE WINDING-UP AGREEMENT, WHICH WE PROVIDED

16   TO THEM, WHICH ALSO REFERS TO NOT ONLY THE ORIGINAL DATE OF

17   THE TERM BUT THE EXTENDED DATE TO AUGUST OF 2005.

18            THE ONLY THING THAT WAS MISSING WHICH THEY CLAIM

19   WAS A WITHHELD OR SUPPRESSED DOCUMENT WAS A SHORT,

20   ONE-SENTENCE LETTER WHICH SIMPLY EXTENDED THE TERM TO AUGUST

21   2005.  EVEN THOUGH WE HAD MENTIONED THE EXTENSION IN OUR

22   BRIEFS AND EVEN THOUGH IT WAS MENTIONED IN THE WINDING-UP

23   AGREEMENT, WE DID -- INADVERTENTLY DIDN'T PRODUCE THAT

24   LETTER.  AND WHEN IT WAS BROUGHT UP, WE IMMEDIATELY PRODUCED

25   IT.

**EXHIBIT A**
**16**

14

1          SO, THEY HAVE ALL THE ARI EMANUEL DOCUMENTS, AND

2     THERE'S NO --

3          THE COURT:  I THINK THEY'RE COMPLAINING ABOUT THE

4     REDACTIONS.

5          MR. TOBEROFF:  OKAY.  AS TO THE REDACTIONS, WHAT

6     WAS REDACTED -- WHAT WAS LEFT IN THOSE AGREEMENTS WERE THINGS

7     HAVING TO DO WITH "SUPERMAN," "SUPERBOY," THE SIEGELS AND THE

8     SHUSTERS, AS THIS COURT HAD ORDERED IN RESPONSE TO THEIR

9     PRIOR REQUESTS.  THAT WAS THEIR REDACTIONS.  THEY'RE NOT

10    ENTITLED TO ALL THE BUSINESS THAT WAS ENGAGED IN BY IP

11    WORLDWIDE, AS THIS COURT PREVIOUSLY NOTED.  NOW THOSE ARE THE

12    EXTENT OF THE REDACTIONS.

13         THE NOTE THAT THEY'RE TALKING ABOUT, BECAUSE I

14    INVESTIGATED IT, IT TURNED OUT THERE WAS A POST-IT FROM TOM

15    MC GUIRE, WHO IS ARI EMANUEL'S COUNSEL.  IN REVIEWING A DOC

16     -- REDACTING, IT WAS AN OLD POST-IT HE HAD ON THE AGREEMENT

17    THAT INADVERTENTLY GOT COPIED WITH THE DOCUMENTS WHICH REFERS

18    TO THE FACT THAT THE AGREEMENT HAS A TERM.  AND IT SAYS

19    SOMETHING LIKE "SUPERMAN" ISSUE, BUT --

20         THE COURT:  MAY BE LATER.

21         MR. TOBEROFF:  IT MAY BE -- IT MAY BE LATER.  AND

22    IT WILL BE MOOT BY THE END OF THE TERM.  AND IT ACTUALLY

23    SUPPORTS THE NOTION THAT THERE'S NO INTEREST AFTER THE TERM.

24         SO, THERE'S NO REAL MYSTERY AS TO THE ARI EMANUEL

25    INTEREST, THE WINDING-UP AGREEMENT.  HE HAS NO INTEREST.  I

15

1   CAN REPRESENT TO THE COURT THAT ARI EMANUEL HAS NO INTEREST

2   IN "SUPERMAN" -- IN "SUPERMAN" OR "SUPERBOY" OR THE SIEGELS

3   OR THE SHUSTERS OR ANY OF THIS.  SO, THERE'S NO REAL BASIS IN

4   THE ARI EMANUEL DOCUMENTS.

5            AS FAR AS THE CORPORATE RECORDS ARE CONCERNED, THEY

6   WANT TO KNOW THE CORPORATE -- WHAT THEY DO IN THEIR MOTION IS

7   THERE'S A LOT OF RHETORIC, WHERE THEY TALK ABOUT A LOT OF

8   DIFFERENT DOCUMENTS THAT THEY NEED.  BUT WHEN YOU ACTUALLY GO

9   TO THEIR REQUESTS, THE REQUESTS THEY'RE MOVING ON DON'T MOVE

10  FOR THOSE DOCUMENTS, FOR EXAMPLE, EMPLOYEE LISTS.  THE

11  REQUEST THEY'RE MOVING ON IN THEIR PAPERS DON'T ASK FOR

12  EMPLOYEE LISTS.  THEY ASK FOR A WHOLE BUNCH OF OTHER

13  THINGS.

14            WHAT THEY DID IS THEY TOOK REQUESTS, WHICH THIS

15  COURT NOTED WERE GROSSLY OVERBROAD, AND WHAT THIS COURT ALSO

16  NOTED THEY ESSENTIALLY ASKED FOR EVERY DOCUMENT, FINANCIAL OR

17  BUSINESS AGREEMENT ENTERED INTO BY ANY OF THESE COMPANIES AND

18  DENIED THEIR MOTION AS TO THOSE REQUESTS.

19            SO, THEY SIMPLY TOOK A REQUEST WHICH ASKED FOR SIX

20  THINGS, ALL OF WHICH WERE OVERBROAD, AND BROKE IT UP INTO A

21  THROUGH F.  THAT -- THAT STILL WOULD STAND AS DENIED BY THIS

22  COURT BECAUSE IT'S THE SAME REQUEST.  CUT AND PASTING IT INTO

23  SUB-PARTS DOESN'T MAKE IT ANY NARROWER WHEN THE SUB-PARTS

24  THEMSELVES ARE PART OF AN OVERBROAD REQUEST.

25            SO, THERE'S NO REAL BASIS FOR THEIR MOTION ON THOSE

16

1   REQUESTS, AND IT SHOULD BE DENIED ON THAT ALONE.

2           YOUR COURT'S -- THIS COURT'S RULING THAT THOSE

3   REQUESTS WERE GROSSLY OVERBROAD, THEY NEVER MADE A MOTION OR

4   REVIEW OF THAT, AND THAT'S NOW BINDING.

5           AS FAR AS THEIR CLAIMS THAT THEY NEED TO KNOW THE

6   CORPORATE -- THE CURRENT STATUS OF THESE CORPORATIONS, THEY

7   ALREADY HAVE THAT.  PACIFIC PICTURES WAS LONG DISSOLVED.

8   THEY HAVE THE NEW YORK SECRETARY OF STATE PAPERS THAT SHOW

9   IT'S DISSOLVED.

10          THE OTHER -- IP WORLDWIDE WAS WOUND UP, EVEN THOUGH

11  IT HASN'T BEEN DISSOLVED.  AND IPW IS STILL IN EXISTENCE.

12          THEY TALK ABOUT IPW.  OTHER THAN BEING NAMED AS A

13  PARTY IN THIS CASE, THERE'S NO CONNECTION BETWEEN IPW AND

14  "SUPERMAN" EXCEPT FOR THE SHORT PERIOD WHERE THE IP

15  WORLDWIDE AGREEMENT, WHICH WAS SOON TO EXPIRE, WAS ASSIGNED

16  OVER TO IPW IN THE WINDING-UP AGREEMENT WHICH THEY HAVE.

17          THAT -- ONCE THAT AGREEMENT EXPIRED IN JUNE -- IN

18  APRIL OF 2005, IPW HAD NO CONNECTION WHATSOEVER TO

19  "SUPERMAN," "SUPERBOY," THE SIEGELS OR THE SHUSTERS.  AND

20  THEY HAVE THE DOCUMENTATION WHICH IS SHOWING THAT.

21          SO, I DON'T SEE REALLY ANY BASIS FOR THEIR MOTION.

22  WHAT IT APPEARS TO US THAT THEY'RE DOING IS BASICALLY THIS

23  WHOLE CASE WE BELIEVE IS BROUGHT TO CREATE LEVERAGE OR

24  SETTLEMENT LEVERAGE OR PRESSURE.  AND MANY OF THEIR MOTIONS

25  APPEAR THAT WAY.

**EXHIBIT A**
**19**

17

1          AND THIS IS ANOTHER ASPECT OF THAT.  BECAUSE WHAT

2    THEY WANT TO DO NOW IS CRAWL OVER -- ALL OVER MY BUSINESS,

3    WHICH THERE'S NO RELEVANCE TO THIS CASE WHATSOEVER, TO FIND

4    SOMETHING.  THEY'RE TRYING TO FIND SOME DISCREPANCY WHICH

5    THEY CAN THEN USE TO CREATE LEVERAGE AGAINST THE LAWYER OF

6    THE SIEGELS AND THE SHUSTERS.

7          THE COURT:  ALL RIGHT.  ANYTHING ELSE ON THIS?

8          MR. TOBEROFF:  NO.  BUT I WANTED TO -- WELL, I'LL

9    ASK YOU AT THE END.

10          THE COURT:  ALL RIGHT.

11          MS. SETO:  YOUR HONOR, COULD I BRIEFLY RESPOND?

12          THE COURT:  OKAY.  BRIEFLY, PLEASE.

13          MS. SETO:  THANK YOU.

14          AS TO THE CORPORATE RECORDS REQUESTS, WE ASKED FOR

15    DOCUMENTS CONCERNING THE COMPANIES' FORMATION, OWNERSHIP, MR.

16    TOBEROFF'S ROLE IN THOSE COMPANIES AND THEIR CURRENT STATUS.

17    THAT WOULD CLEARLY SWEEP IN DOCUMENTS SUCH AS EMPLOYMENT

18    RECORDS.  AND IF THERE WERE ANY DOUBT, WE MADE THIS CLEAR IN

19    OUR VOLUMINOUS MEET AND CONFER CORRESPONDENCE.

20          AS TO MR. TOBEROFF'S CLAIM THAT THESE REQUESTS ARE

21    OVERBROAD, WE'VE TRIED MULTIPLE TIMES TO NARROW THESE AS MUCH

22    AS POSSIBLE, TO GIVE SPECIFIC EXAMPLES OF THE TYPES OF

23    DOCUMENTS WE ARE SEEKING AND EXPLAIN HOW THEY'RE DIRECTLY

24    RELEVANT TO OUR ALTER EGO CLAIMS.  MR. TOBEROFF NEVER MADE

25    ANY SUGGESTIONS OR ALTERNATIVE PROPOSALS OF HIS OWN, AS THE

18

1   RULES SUGGEST THAT HE SHOULD.

2           AS FOR THE ROLE OF THE VARIOUS COMPANIES, HE

3   SUBMITS THAT THE ROLE OF IPW AND OTHER COMPANIES ARE CLEAR.

4   BUT THE FACT THAT WE HAVE NO DOCUMENTS TO CONFIRM THAT IS A

5   PERFECT EXAMPLE OF WHY WE NEED THE DOCUMENTS THAT WE'RE

6   ASKING FOR.

7           JUDGE WRIGHT REJECTED THEIR SUGGESTION THAT WE'VE

8   BROUGHT THIS CASE JUST TO BRING SETTLEMENT LEVERAGE.  WE'RE

9   JUST TRYING TO GET THE EVIDENCE TO WHICH WE'RE ENTITLED.

10          AS TO MR. TOBEROFF'S POINTS ABOUT THE EMANUEL

11  RELATED DOCUMENTS, WE DON'T DISPUTE THAT THEY'RE ENTITLED TO

12  DESIGNATE DOCUMENTS FROM THE SIEGEL CASE.

13          BUT THEY HAVE AN INDEPENDENT OBLIGATION TO REVIEW

14  THEIR FILES, TO SUBMIT THEIR OWN COPIES OF THESE DOCUMENTS

15  AND TO CONDUCT AN INDEPENDENT REVIEW OF THE REDACTIONS OF THE

16  IP WORLDWIDE AGREEMENTS TO THE EXTENT THAT THEY'RE RELEVANT

17  IN THIS CASE, OR TO THE CLAIMS AND ISSUES UNIQUE TO THIS

18  CASE, AND THE PRIVILEGE RULINGS MADE IN THIS CASE.

19          IF MR. EMANUEL HAS NO INTEREST IN THE "SUPERMAN" OR

20  "SUPERBOY" RIGHTS OR IN ANY PIECE OF THE TOBEROFF COMPANY'S

21  BUSINESS, THAT'S FINE.  BUT WE'RE ENTITLED TO A SWORN

22  CERTIFICATION TO THAT EFFECT.

23          THAT'S ALL.  THANKS.

24          THE COURT:  ALL RIGHT.

25          MR. TOBEROFF:  YOUR HONOR, MAY I JUST COMMENT?

**EXHIBIT A**
**21**

19

1            THE COURT:  NO.  NO, NO.  WE'VE HAD ENOUGH ON THIS.

2            AS I'VE SAID BEFORE, IT WOULD BE HELPFUL,

3    PARTICULARLY WHEN WE'RE TALKING ABOUT DOCUMENT REQUESTS OR

4    INTERROGATORIES, FOR THE JOINT STIPULATION PROCESS TO BE

5    USED.  AND I WOULD BE JUSTIFIED IN NOT DEALING WITH THIS AT

6    ALL BECAUSE IT HASN'T BEEN.  BUT SINCE IT'S BRIEFED, I'M

7    GOING TO GO AHEAD AND RULE.

8            AS I SEE IT, WE'RE LOOKING AT THREE SETS OF

9    REQUESTS.  THE FIRST IS AS TO REQUEST 56 AND 57 AND 58.

10   SUB-PARTS A THROUGH E APPEAR TO HAVE BEEN RESPONDED TO AND

11   THE MOTION IS DENIED AS TO THEM.

12           SUB-PARTS F AND G CONCERNING CAPITAL STRUCTURE, THE

13   MOTION IS GRANTED LIMITED TO DOCUMENTS SHOWING CAPITAL

14   ACCOUNTS, IF ANY SUCH DOCUMENTS EXIST.

15           AS TO NUMBER 30 AS TO PACIFIC PICTURES, 30 AS TO IP

16   WORLDWIDE AND 25 AS TO IPW -- I THINK I HAVE THOSE NUMBERS

17   CORRECT -- THIS APPEARS TO BE A NON-ISSUE.

18           AS TO IP WORLDWIDE AND IPW, DEFENDANT SAYS IT HAS

19   PRODUCED THE ARTICLES OF INCORPORATION, AND THAT THE

20   CORPORATIONS STILL ARE ACTIVE.  AND, THUS, THE DEFENDANT HAS

21   PRODUCED THE DOCUMENTS FILED WITH THE GOVERNMENT AND SHOWING

22   THE STATUS OF THE CORPORATIONS.

23           I DON'T UNDERSTAND THERE TO BE A DOCUMENT SAYING WE

24   ARE STILL ACTIVE.  USUALLY, THERE ARE DOCUMENTS WHEN YOU

25   DISCONTINUE A CORPORATION, BUT NOT A DOCUMENT THAT SAYS, YES,

**EXHIBIT A**
**22**

20

1   WE'RE STILL IN BUSINESS.

2             AS TO PACIFIC PICTURES, SATISFACTORY DOCUMENTS

3   FILED WITH THE GOVERNMENT APPEAR TO HAVE BEEN PRODUCED.  THE

4   MOTION IS DENIED AS TO THAT GROUP OF REQUESTS.

5             AS TO NUMBERS 35 TO 38, THE COURT'S PREVIOUS ORDER

6   IS CLEAR.  THE COURT ACCEPTS THE REPRESENTATION THAT

7   REDACTIONS THAT WERE MADE PERTAIN TO OTHER MATTERS.  THE

8   MOTION IS DENIED AS TO THOSE REQUESTS.

9             NOW, LET'S MOVE ON TO THE MOTION WHICH IS THE ONLY

10  REAL SUBSTANTIVE MOTION THIS MORNING, WHICH HAS TO DO WITH

11  THIS AUGUST 9TH LETTER, I GATHER.

12            MR. KLINE.

13            MR. KLINE:  YOUR HONOR, AGAIN, I'LL QUOTE FROM

14  THEIR OBJECTIONS THAT THEY FILED ON THURSDAY.

15            THEY SAY THAT THERE'S NOTHING MORE THAN SPECULATION

16  ABOUT THE CONTENTS OF THE MARKS AUGUST 2002 LETTER.

17            THE COURT:  AND YOU SAY THAT'S WHY YOU WANT TO SEE

18  IT.

19            MR. KLINE:  AND WE'LL SAY THE FOLLOWING.  YES, WE

20  WANT TO SEE IT BECAUSE WE DON'T WANT TO BE SPECULATING.

21            BUT, NUMBER TWO, THE JULY 2003 LETTER DESCRIBES ITS

22  CONTENTS, THREE KEY PARTS OF THOSE CONTENTS.

23            ONE, THAT MARKS SAID A DEAL HAD BEEN MADE TO THE

24  HEIRS THEMSELVES.

25            TWO, THAT HE SAID TO MR. TOBEROFF A DEAL HAD BEEN

21

1   MADE; AND

2           THREE, HE SAID, I'LL HAVE TO TESTIFY AGAINST YOU IF

3   YOU TAKE A CONTRARY POSITION.

4           NOW, IT'S NOT JUST THE LETTER ITSELF.  MR.

5   TOBEROFF, HIMSELF, ACCORDING TO MS. LARSON'S TESTIMONY,

6   EDITED THAT LETTER, COMMENTED ON THAT LETTER'S CONTENTS.  AND

7   WE ASKED HER ABOUT THE MARKS MEMORANDUM AT HER DEPOSITION,

8   AND SHE TESTIFIED AS TO THE SAME CONTENTS.

9           SO, IT'S NOT SPECULATION AS TO ITS CONTENTS.  WE

10  HAVE A LOT OF INDEPENDENT EVIDENCE.  THE JULY 2003 LETTER AND

11  HER DEPOSITION TESTIMONY AND, THEN, THE TOBEROFF TIMELINE

12  ITSELF THAT GO TO WHAT ITS CONTENTS ARE.

13          NOW, WHY ARE WE SO INTERESTED IN ITS CONTENTS.

14          BECAUSE THERE IS NO QUALIFIED ADMISSION IN THE WAY

15  THAT IT'S DESCRIBED.  ONE OF THE KEY POSITIONS THEY TAKE HERE

16  IS, NO, WE REALLY DIDN'T HAVE AN ENFORCEABLE DEAL OR -- SUCH

17  THAT, YOU KNOW, WE -- SUCH THAT THE TOBEROFF COMPANIES COULD

18  INTERFERE WITH DC'S RIGHTS VIS-A-VIS THE SIEGELS.

19          ENFORCEABLE DEAL, THEY SAY THAT AGAIN AND AGAIN AND

20  AGAIN.  BUT IF YOU LOOK AT THE JULY 2003 LETTER, IF YOU LOOK

21  AT THE TOBEROFF TIMELINE DOCUMENT THAT QUALIFIER

22  "ENFORCEABLE" NEVER SHOWS UP.

23          THE FIRST TIME IT SHOWS UP IS IN LITIGATING THE

24  ISSUE IN THE SIEGEL CASE AND THEN NOW IN THIS CASE.  AND IF

25  YOU READ MARKS' TESTIMONY FROM THE SIEGEL CASE, HE USES THAT,

**EXHIBIT A**
**24**

22

1    YOU KNOW, ENFORCEABLE QUALIFIER.  BUT WE'RE ENTITLED TO GET

2    HIS MEMORANDUM AND IMPEACH HIM WITH IT.

3            AND WE'LL CERTAINLY TRY TO IMPEACH HIM WITH MS.

4    LARSON'S LETTER.  BUT HE MIGHT SAY, WELL, SHE WAS

5    MISDESCRIBING WHAT I SAID.  AND WE DON'T -- WE'RE NOT --

6    SHOULDN'T BE FORCED TO HAVE THAT SECONDARY PIECE OF EVIDENCE.

7            NOW --

8            THE COURT:  LET ME JUST GET TO SOME OF THE NUB OF

9    THIS, AT LEAST AS I SEE IT.

10           AT THE TIME OF THE AUGUST LETTER, IS IT DC COMIC'S

11   POSITION THAT THERE WAS OR WAS NOT A COMMON INTEREST BETWEEN

12   THE BROTHER AND THE SISTER?

13           MR. KLINE:  BASED ON THEIR PRIVILEGE LOGS, THE ONLY

14   PRIVILEGE ASSERTED, IF YOU LOOK AT THE LOG ENTRY, IS

15   ATTORNEY-CLIENT.  THERE'S NO COMMON-INTEREST PRIVILEGE

16   ASSERTED AS OF AUGUST 2002.

17           SO, IF YOU LOOK AT --

18           THE COURT:  THAT WASN'T MY QUESTION.  MY QUESTION

19   WAS, WHAT DO YOU SAY?  DO YOU SAY THEY'RE -- I MEAN, THEY'VE

20   SAID IN THEIR BRIEFING THAT COMMON INTEREST DID APPLY AT THAT

21   TIME.

22           DO YOU AGREE WITH THAT OR NOT?

23           MR. KLINE:  IT'S HARD FOR ME TO AGREE WITH THAT

24   STATEMENT WHEN THEY DIDN'T EVEN ASSERT THE PRIVILEGE

25   THEMSELVES.  IF YOU LOOK AT ENTRY 623, WHICH IS BEFORE YOUR

23

1    HONOR, THAT PRIVILEGE IS NOT ASSERTED.  IN TERMS OF WHETHER

2    THE PRIVILEGE EXISTED AT THAT POINT IN TIME, WE CERTAINLY

3    KNOW THAT IT DOESN'T EXIST IN 2003.  THERE ARE ARGUMENTS --

4           THE COURT:  THAT'S NOT MY QUESTION.

5           MR. KLINE:  THERE ARE ARGUMENTS --

6           THE COURT:  I'M TALKING ABOUT BACK IN AUGUST.

7           MR. KLINE:  CORRECT, YOUR HONOR.  AND THERE ARE

8    ARGUMENTS THAT WE CAN MAKE I THINK BOTH WAYS.

9           AT THAT POINT IN TIME ARE THEY STILL ENGAGED IN

10   NEGOTIATIONS VIS-A-VIS DC?  YES, THAT APPEARS TO BE THE CASE.

11          AS OF AUGUST 2002, ARE THE SIEGELS, THE SISTER AND

12   THE MOTHER, STARTING TO KIND OF GO THEIR OWN WAY.  ARE THEY

13   ABOUT TO CUT OFF MR. MARKS?  ARE THEY ABOUT TO GO IN A

14   DIFFERENT DIRECTION.  ARE THEIR INTERESTS BEGINNING TO

15   DIVERGE.  I DON'T THINK ANY COURT HAS REACHED THAT -- THAT

16   QUESTION CLEARLY.

17          HAVE THEY ASSERTED ATTORNEY-CLIENT PRIVILEGE OVER

18   THAT DOCUMENT.  YES, THEY HAVE.  BUT THIS INDEPENDENT,

19   COMMON-INTEREST PRIVILEGE WAS NEVER CLIENT.  AND, SO, IT'S

20   HARD FOR ME TO KIND OF --

21          THE COURT:  WELL, I'M NOT SURE IT'S INDEPENDENT.  I

22   THINK IT MAY BE INTERTWINED.

23          MR. KLINE:  NO, THEY'VE ELSEWHERE ASSERTED

24   COMMON-INTEREST PRIVILEGES THROUGHOUT THE CASE.  THEY DIDN'T

25   THERE.  THEY ASSERTED COMMON INTEREST OVER ALL OF THEIR

24

1   COMMUNICATIONS WITH MR. MARKS AFTER THIS CASE WAS FILED, AND

2   YOUR HONOR UPHELD THOSE --

3           THE COURT:  OKAY.  TO SHARPEN MY QUESTION, LET'S

4   ASSUME THAT THEY HAD ASSERTED COMMON-INTEREST PRIVILEGE IN

5   AUGUST, AS TO THE AUGUST DOCUMENT.

6           MR. KLINE:  YES, YOUR HONOR.

7           THE COURT:  ALL RIGHT.  IS IT YOUR POSITION THAT IT

8   DID OR DID NOT APPLY IN AUGUST?

9           MR. KLINE:  IT'S AN ISSUE THAT HAS NOT BEEN

10  BRIEFED.  AND I DON'T WANT TO GET OUT -- AHEAD OF OURSELVES.

11  I THINK AN ARGUMENT COULD BE MADE THAT IT WOULD NOT APPLY.  I

12  THINK --

13          THE COURT:  WELL, THE ARGUMENT IN YOUR PAPER

14  ESSENTIALLY IS WHETHER OR NOT IT APPLIED IT WAS WAIVED IN

15  JULY -- I MEAN, IN --

16          MR. KLINE:  JULY 2003.  CORRECT, YOUR HONOR.

17          THE COURT:  YES, IN JULY.  JULY 2003.

18          SO, I WANT TO FOCUS ON WHETHER -- FIRST, I WANT TO

19  TAKE -- TAKE THIS IN STEPS.

20          SO, THE FIRST STEP IS, DID IT APPLY IN AUGUST 2002?

21          MR. KLINE:  I THINK THAT THEY HAVE TAKEN THE

22  POSITION, AT LEAST IMPLIEDLY, THAT IT SHOULD HAVE APPLIED.

23  THEY CERTAINLY DID NOT --

24          THE COURT:  WELL, I DON'T THINK THEY'RE IMPLYING

25  ANYTHING.  I THINK THEY'RE RIGHT OUT THERE IN FRONT IN SAYING

**EXHIBIT A**

25

1   IT APPLIED IN AUGUST 2002.

2            MR. KLINE:  NOT IN THEIR PRIVILEGE LOGS, YOUR

3   HONOR, WHICH I THINK IS THE FIRST PLACE ONE HAS TO LOOK.

4            THE COURT:  IN THIS BRIEF?  IN THIS BRIEF?

5            MR. KLINE:  YES, IN THIS BRIEF THEY'RE NOW MAKING

6   THAT ARGUMENT.

7            THE COURT:  OKAY.

8            MR. KLINE:  BUT IT'S NOT AN ARGUMENT THEY ASSERTED

9   CONTEMPORANEOUSLY.

10           THE COURT:  ALL RIGHT.  I UNDERSTAND THAT, AND I'VE

11  ASKED YOU TO ASSUME THAT IT -- FOR THE PURPOSE OF THIS

12  DISCUSSION THAT IT WAS.

13           MR. KLINE:  CORRECT.

14           THE COURT:  SO, NOW YOU'RE INTO YOUR WAIVER

15  ARGUMENT, WHICH IS THE ESSENTIAL ARGUMENT YOU'VE MADE IN

16  FRONT OF ME, RIGHT?

17           MR. KLINE:  YES.  AND THERE'S --

18           THE COURT:  OKAY.

19           MR. KLINE:  THERE'S TWO GROUNDS FOR THE WAIVER,

20  YOUR HONOR.

21           THE COURT:  NO.  NO.  NO.  I DON'T WANT TO GET YOU

22  THERE YET.

23           MR. KLINE:  OKAY.

24           THE COURT:  I WANT TO ASK YOU ANOTHER

25  HYPOTHETICAL.

26

1          SUPPOSE -- SUPPOSE THAT THAT JULY LETTER HAD NEVER

2     BEEN WRITTEN.  SO WHAT YOU HAVE NOW IS YOU HAVE THE AUGUST

3     LETTER.

4              MR. KLINE:  YES, YOUR HONOR.

5              THE COURT:  AND YOU GO TO THE BROTHER MICHAEL?

6              MR. KLINE:  MICHAEL.

7              THE COURT:  MICHAEL SIEGEL, RIGHT?

8              MR. KLINE:  CORRECT.

9              THE COURT:  AND YOU REQUEST DOCUMENTS FROM HIM.

10             WOULD MR. SIEGEL IN THOSE CIRCUMSTANCES BE ENTITLED

11    TO ASSERT A PRIVILEGE AGAINST PRODUCING THE DOCUMENTS?

12             MR. KLINE:  IF HE TOOK THE POSITION THAT MR. MARKS

13    WAS PROVIDING HIM WITH LEGAL ADVICE, POTENTIALLY, YES.  IF HE

14    TOOK THE POSITION THAT HE HAD ENTERED INTO A COMMON-INTEREST

15    AGREEMENT WITH HIS SISTER, POTENTIALLY, YES.

16             I MEAN, I THINK ONE OF THE PROBLEMS HERE IS IS

17    THERE HAS NEVER BEEN ANY REPRESENTATION THAT A FORMAL

18    COMMON-INTEREST AGREEMENT WAS REACHED.

19             THE COURT:  OKAY.

20             MR. KLINE:  IT'S BEEN IMPLIED.

21             THE COURT:  RIGHT.  BUT JUST SO I AM CLEAR ON WHERE

22    THE ARGUMENT FOCUSES.  IF THERE WAS A COMMON-INTEREST

23    PRIVILEGE IN AUGUST, THEN MR. MICHAEL SIEGEL WOULD BE ABLE TO

24    ASSERT THAT COMMON-INTEREST PRIVILEGE FOR THE PURPOSE OF

25    WITHHOLDING DOCUMENTS.

**EXHIBIT A**
**29**

27

1          MR. KLINE:  POTENTIALLY.  BUT I MEAN, IT'S PILING

2   THOSE TWO ASSUMPTIONS ON TOP OF EACH OTHER.

3          YES, IF -- IF HE FORMALLY SAID TO HIS SISTER, LOOK,

4   WE HAVE A COMMON INTEREST HERE.  LET'S SHARE INFORMATION

5   PURSUANT TO THE PRIVILEGE.  I MEAN --

6          THE COURT:  THEN HE WOULD BE ABLE TO ASSERT THE

7   PRIVILEGE HIMSELF?

8          MR. KLINE:  CORRECT.  NOW, THE REALITY HERE --

9          THE COURT:  NOW, IF THAT'S THE CASE, HOW DOES A

10  QUESTION OF WAIVER COME IN?  HOW COULD ONE PARTY WAIVE

11  ANOTHER PARTY'S PRIVILEGE?

12         MR. KLINE:  EASILY, YOUR HONOR, BECAUSE THEIR

13  INTERESTS BEGAN TO DIVERGE.  AND THEIR INTERESTS --

14         THE COURT:  SO WHAT.

15         MR. KLINE:  THEIR INTERESTS BEGAN TO DIVERGE MUCH

16  EARLIER ON.

17         THE COURT:  BUT -- BUT SO WHAT.  I MEAN, WHY -- IF

18  TWO PARTIES ORIGINALLY SHARE A PRIVILEGE AND THEN LATER DON'T

19  SHARE IT, I COULD SEE HOW SOMETHING THAT HAPPENS LATER

20  WOULDN'T BE PRIVILEGED.

21         BUT AS TO SOMETHING THAT HAPPENED EARLIER WHEN IT

22  WAS PRIVILEGED AS TO BOTH, HOW COULD A WAIVER -- HOW COULD

23  THERE BE A WAIVER AS TO WHAT HAPPENED EARLIER?  THAT'S THE

24  PART WHERE I'M MISSING THE ARGUMENT.

25         MR. KLINE:  ON THESE FACTS QUITE EASILY, YOUR

28

1   HONOR.  BY THE TIME JULY 2003 COMES AROUND, THERE'S A REAL

2   TENSION BETWEEN THESE TWO PARTIES.

3           THE COURT:  YES.

4           MR. KLINE:  THEY'RE FIGHTING IT OUT.  AND WE

5   EXAMINED MR. BULSON.  HE'S VERY UPSET BY THE FACT THAT HE'S

6   NOT BEING TOLD THE TRUTH ABOUT WHO THIS INVESTOR IS, THE

7   SUITOR WHO'S GOING TO COME BY THESE INTERESTS.  HE'S VERY

8   UPSET.

9           A UNILATERAL LETTER IS SENT FROM MS. SIEGEL TO HER

10  BROTHER ADDRESSING THESE ACCUSATIONS OF FRAUD, GOING THROUGH

11  ALL THESE DIFFERENT ISSUES.  AND THAT LETTER IS NOT MARKED

12  CONFIDENTIAL.  THAT LETTER IS NOT MARKED PURSUANT TO SOME

13  EARLIER AGREEMENT.

14          IT'S OUR PRIMARY SUBMISSION, YOUR HONOR, THAT THERE

15  NEVER WAS THIS COMMON-INTEREST AGREEMENT.  IT'S BEEN KIND OF

16  AN INVENTION THAT'S BEEN APPLIED AFTER THE FACT.

17          I MEAN, THERE'S NEVER AN EMAIL THAT THEY CAN POINT

18  TO CONFIRMING THAT THE PARTIES ORIGINALLY CREATED THIS

19  COMMON-INTEREST AGREEMENT TO BEGIN WITH.  BUT THERE'S NO

20  CONFIDENTIALITY MARKINGS.

21          THERE'S NO -- THERE'S NO SUGGESTION THAT, MICHAEL,

22  THIS IS IN CONTINUATION WITH OUR COMMON INTEREST THAT WE WERE

23  ONCE AND BEFORE.  I'M GOING TO TALK ABOUT SOME REALLY

24  IMPORTANT STUFF FROM THE PAST.  DON'T SHARE THIS WITH ANYONE.

25          WHEN MICHAEL RECEIVES THAT LETTER --

EXHIBIT A
31

29

1          THE COURT:  SUPPOSE IT HAD SAID THAT?

2          MR. KLINE:  THOSE WOULD BE MUCH STRONGER FACTS FOR

3     THEM.

4          THE COURT:  AND IF IT HAD SAID THAT, YOU WOULD SAY

5     THAT THE PRIVILEGE STILL WOULD APPLY?

6          MR. KLINE:  POTENTIALLY, BECAUSE THEN THE OHIO

7     DISTRICT -- NOW, IF MICHAEL --

8          THE COURT:  SO, IT'S NOT REALLY A QUESTION OF

9     WAIVER.  IT'S JUST A QUESTION OF HOW SHE DOCUMENTED IT?

10         MR. KLINE:  IT IS A QUESTION OF WAIVER.  BECAUSE IF

11    SHE TRULY HAD THAT RELATIONSHIP, IF SHE TRULY HAD THAT

12    RELATIONSHIP -- AND JUDGE WRIGHT REJECTED THAT SHE HAD THAT

13    RELATIONSHIP.  THE OHIO DISTRICT COURT REJECTED THAT SHE HAD

14    THAT RELATIONSHIP.

15         BOTH OF THEM SAID IN JULY 2003 WHEN THEY'RE HAVING

16    CONVERSATIONS, SHE'S HAVING CONVERSATIONS AS IF WITH THE

17    ENTIRE REST OF THE WORLD.  THAT IS WHY WE WERE ABLE TO OBTAIN

18    THAT DOCUMENT BECAUSE THAT DOCUMENT IS NOT A PRIVILEGED

19    COMMUNICATION.

20         NOW, WHAT COULD MICHAEL SIEGEL HAVE DONE WITH THAT.

21    MICHAEL SIEGEL COULD HAVE POSTED IT ON THE INTERNET.  TO TAKE

22    YOUR HYPOTHETICAL --

23         THE COURT:  NO.  NO.  NO.  WE AREN'T TALKING ABOUT

24    WHETHER THE JULY DOCUMENT IS PRIVILEGED.  THE QUESTION IS

25    WHETHER THE REFERENCE TO THE AUGUST DOCUMENT SOMEHOW UNSEALS

30

1   THE PRIVILEGE THAT I'VE ASKED YOU TO ASSUME IS APPLIED.

2         MR. KLINE:  OF COURSE, IT DOES, YOUR HONOR.

3   BECAUSE AS SOON AS YOU REPEAT OUTSIDE OF THE UMBRELLA OF THE

4   PRIVILEGE, THE PRIVILEGED CONVERSATION, YOU'VE NOW DISCLOSED

5   IT TO THE REST OF THE WORLD.  THAT'S WHAT ALL THE SELECTIVE

6   WAIVER CASES SAY, BOTH IN THE GOVERNMENT INVESTIGATION

7   CONTEXT AND IN OTHER CONTEXTS.

8         THE SECOND THAT YOU ARE OUTSIDE OF THAT UMBRELLA,

9   OUTSIDE OF THAT SHIELD, AND YOU PUBLISH WHAT YOU ARGUE IS

10  PRIVILEGED INFORMATION -- AND, AGAIN, I'M ASSUMING ALL YOUR

11  ASSUMPTIONS ALONG THE WAY HERE.  AS SOON AS YOU PUBLISH THAT

12  IN A NON-CONFIDENTIAL COMMUNICATION THAT'S NOT SUBJECT TO A

13  PRIVILEGE, THAT IS A WAIVER.

14        AND YOUR POINT, I THINK, AND I'M TRYING TO ADDRESS

15  IT HEAD ON AS BEST AS I CAN, IS, WELL, THERE'S THIS

16  HISTORICAL FACT, THERE'S THIS HISTORICAL PRIVILEGED

17  COMMUNICATION ARGUENDO, AND ALL THEY'RE REALLY DOING IS

18  REPEATING THAT HISTORICAL, PRIVILEGED FACT HERE.

19        THE COURT:  BETWEEN THEMSELVES.

20        MR. KLINE:  BETWEEN THEMSELVES THERE SHOULDN'T BE

21  WAIVER.  BUT THE BETWEEN THEMSELVES --

22        THE COURT:  I'M NOT ASKING.  I'M NOT CONCLUDING.

23        MR. KLINE:  YES.  BUT BETWEEN THEMSELVES, AT THAT

24  POINT, THERE IS NO BETWEEN THEMSELVES.  THE ONLY WAY THAT

25  THERE CAN BE A BETWEEN THEMSELVES IS IF THE PRIVILEGE

31

1   CONTINUES TO EXIST.

2           OTHERWISE, IT'S LIKE HER HAVING A COMMUNICATION

3   WITH ANY THIRD PARTY.  BECAUSE MICHAEL WAS FREE AT THAT POINT

4   IN TIME TO TAKE THAT LETTER TO US IF HE WANTED TO.  HE COULD

5   SHOW IT TO ALL SORTS OF OTHER BUSINESS COMPETITORS.  HE COULD

6   PUT IT ON THE INTERNET.  HE COULD SAY, LOOK, MY SISTER IS

7   TRYING TO RIP ME OFF.

8           NOW --

9           THE COURT:  WELL -- BUT, NO, WAIT A SECOND.  I

10  MEAN, THAT -- THAT DOESN'T PERSUADE BECAUSE AS A HOLDER OF

11  THE PRIVILEGE, HE COULD WAIVE THE PRIVILEGE.  SO THE FACT

12  THAT HE COULD DO SOMETHING WITH IT DOESN'T MEAN THAT IT

13  WASN'T PRIVILEGED.

14          THE QUESTION IS COULD HE PREVENT SOMEBODY FROM

15  SEEING IT.

16          MR. KLINE:  COULD HE PREVENT SOMEBODY FROM SEEING

17  IT.  I DON'T THINK HE COULD.  BECAUSE THE NATURE OF THEIR

18  RELATIONSHIP, AS HELD BY THE OHIO DISTRICT COURT AND JUDGE

19  WRIGHT, IS THAT IN JULY 2003 THAT WAS NOT A PRIVILEGED

20  COMMUNICATION.  THAT'S A COMMUNICATION THAT THE ENTIRE FREE

21  WORLD, ASSUMING YOU MEET RULE 26, IS ENTITLED TO.

22          AND ONCE YOU LOOK AT THE SUBSTANCE OF THAT

23  COMMUNICATION -- WE HAVE IT NOW.  I MEAN, NOBODY'S ARGUING

24  THAT WE IMPROPERLY HAVE THE SUBSTANCE OF THAT JULY

25  COMMUNICATION.

32

1          WHAT IS THE SUBSTANCE OF THAT COMMUNICATION?  THE

2     SUBSTANCE OF THAT COMMUNICATION IS MR. MARKS' BOTTOM LINE

3     LEGAL CONCLUSION.

4          I MEAN, TO ME THE MOST INSTRUCTIVE CASE IN THIS

5     AREA IS JUDGE BRAZIL'S CASE.  I MEAN, JUDGE BRAZIL'S DECISION

6     IN ELECTRO-SCIENTIFIC.  AND I'D DIRECT YOUR HONOR'S ATTENTION

7     TO PAGE 543 THERE.  AND HE SAYS, LOOK, ONCE -- ONCE THE

8     BOTTOM LINE LEGAL CONCLUSION IS OUT THERE -- AND IT'S OUT

9     THERE NOW.  I MEAN, WE HAVE IT.  WE HAVE HIM SAYING, YOU HAD

10    A DEAL.  YOU HAD A DEAL.  AND THIS IS IN LAURA'S OWN WORDS

11    REPEATING WHAT HER LAWYER SAID TO HER.

12         WHAT JUDGE BRAZIL SAID IN THAT CASE IS, YOU'RE NOT

13    ONLY ENTITLED TO THE BOTTOM LINE LEGAL CONCLUSION THAT'S

14    PUBLISHED AND REPEATED IN THAT CASE -- IT'S A PRESS RELEASE,

15    WHICH IS OBVIOUSLY A MORE PUBLIC DISCUSSION THAN WHAT WE'RE

16    TALKING ABOUT HERE.  BUT IT'S STILL A PUBLIC DISCUSSION.

17         HE SAYS, YOU'RE NOT ONLY ENTITLED TO THE BOTTOM

18    LINE LEGAL CONCLUSION, YOU'RE ALSO ENTITLED BECAUSE OF THIS

19    WAIVER TO THE UNDERLYING LEGAL REASONING.  AND THAT'S WHY WE

20    ASKED FOR THE WHOLE MARKS MEMORANDUM.

21         AND WHAT WAS ONE OF THINGS THAT DROVE MR. BRAZIL --

22    OR, I'M SORRY, JUDGE BRAZIL'S DECISION IN THAT CASE.

23         HE SAID, LOOK, WHEN YOU WERE MAKING THAT

24    COMMUNICATION, YOU WERE DOING SO AS PART OF THE PARTY'S

25    COMMERCIAL BUSINESS INTERESTS.  AND HERE THAT'S CLEARLY WHY

**EXHIBIT A**
**35**

33

 1   LAURA SIEGEL LARSON IS ENGAGING IN THAT COMMUNICATION WITH

 2   HER BROTHER.

 3          THAT COMMUNICATION WITH HER BROTHER IS TRYING TO

 4   CONVINCE HIM IN ADVANCE OF HER OWN COMMERCIAL BUSINESS

 5   INTEREST, IN ADVANCE OF HER BUSINESS PARTNER MR. TOBEROFF'S

 6   COMMERCIAL BUSINESS INTEREST, AND IN ADVANCE OF MR. EMANUEL'S

 7   BUSINESS INTERESTS, HEY, HE'S NOT SUCH A BAD GUY.  PLEASE

 8   SELL US YOUR INTERESTS IN "SUPERMAN."

 9          AND I REALLY THINK THAT'S THE MOST INSTRUCTIVE CASE

10   IN THIS AREA THAT TALKS ABOUT THE BROADER WAIVER HERE.

11          NOW, WE OBVIOUSLY THINK OUR PRIMARY SUBMISSION IS

12   THAT WE SHOULD GET THE ENTIRE DOCUMENT.  AND, AGAIN, I THINK

13   JUDGE BRAZIL'S DECISION, WHICH IS WELL REASONED, IS RIGHT ON

14   POINT AND ADDRESSES ALL OF THIS.

15          AT THE VERY MINIMUM, SO THAT WE DON'T HAVE TO DEAL

16   WITH ACCUSATIONS THAT WE'RE SPECULATING ABOUT WHAT'S IN THE

17   MARKS MEMORANDUM, WE SHOULD GET A REDACTED COPY OF THE

18   MEMORANDUM THAT REPEATS THE KIND OF CORE ELEMENTS OF THE

19   MEMORANDUM THAT ARE IN THE JULY 2003 LETTER.  SO THAT MARKS

20   AT HIS DEPOSITION CAN'T RUN AROUND AND SAY, WELL, THEY'RE

21   MISDESCRIBING MY WORDS.

22          THE COURT:  WELL, I DON'T THINK REDACTION MAKES ANY

23   SENSE.  WE'LL JUST BE HAVING FURTHER ARGUMENTS ABOUT WHAT WAS

24   REDACTED.

25          MR. KLINE:  AT THE VERY MINIMUM, I DO THINK YOUR

**EXHIBIT A**
**36**

34

1   HONOR -- AND I APPRECIATE THAT COMMENT.  AT THE VERY MINIMUM,

2   I DO THINK WE SHOULD HAVE A REPEAT OF WHAT IS IN THE JULY

3   2003 LETTER.

4           I MEAN, A THIRD ALTERNATIVE HERE IS THIS -- IT'S

5   NOT CLEAR THAT THIS IS A LENGTHY DOCUMENT, PERHAPS AN IN

6   CAMERA REVIEW.  BUT WE THINK THE EASIEST CLEAREST --

7           THE COURT:  WELL, LET ME ASK YOU ABOUT THAT.  SO I

8   TAKE IT IN CAMERA, WHAT AM I LOOKING FOR?

9           MR. KLINE:  ANYTHING THAT MATCHES UP WITH THE JULY

10  2003 LETTER.  I MEAN, WE'VE --

11          THE COURT:  SO, YOU WANT ME TO REDACT IT IN EFFECT.

12          MR. KLINE:  I DON'T WANT YOU TO, YOUR HONOR.  I

13  THINK THAT'S THE THIRD BEST ALTERNATIVE.  I THINK THE FIRST

14  BEST ALTERNATIVE IS TO HAVE THE WHOLE DOCUMENT PRODUCED.

15          BUT, YES, IN THE THIRD BEST ALTERNATIVE CATEGORY, I

16  THINK THAT IF -- IF YOUR HONOR HAD THE TIME AND THE

17  INCLINATION TO GIVE US THE PORTIONS OF THAT MEMORANDUM THAT

18  ARE REFLECTED IN THE LETTER AND IN THE TOBEROFF TIMELINE

19  WHERE HE SAYS, YOU HAD A DEAL WITH THEM.

20          AND WE'VE TRIED TO FRAME THIS THE BEST WE CAN IN

21  TERMS OF THE RELEVANCE HERE.

22          THEY KEEP ON INCLUDING THIS WORD "ENFORCEABLE,"

23  THIS KEY QUALIFIER THAT THEY SAY IS SOMEHOW, YOU KNOW, THE

24  ESCAPE CLAUSE FOR THEM.  AND WE JUST DON'T THINK THE MARKS

25  MEMORANDUM ITSELF INCLUDES THAT QUALIFIER GIVEN WHAT MS.

35

1   SIEGEL SAYS IN HER LETTER ABOUT IT THREE TIMES.  I MEAN, SHE

2   REFERENCES HIM TALKING ABOUT THE DEAL THREE TIMES IN THE JULY

3   2003 LETTER.  AND NOT ONCE DID THEY USE THE QUALIFIER

4   "ENFORCEABLE."

5          AND, SO, THAT WOULD BE IMPORTANT FOR US, YOUR

6   HONOR, EVEN THOUGH I'M RELUCTANT TO ASK YOUR HONOR TO HAVE TO

7   ENGAGE IN THAT EXERCISE.

8          AND, AGAIN, WE THINK JUDGE BRAZIL'S DECISION --

9          THE COURT:  I HAVE TO SAY I'M INCLINED TO EITHER

10  GRANT OR DENY.  I DON'T THINK THESE OTHER ALTERNATIVES MAKE A

11  WHOLE LOT OF SENSE.

12         MR. KLINE:  AND I APPRECIATE THAT, YOUR HONOR.

13  WE'RE JUST TRYING TO DO THE BEST WE CAN UP HERE.

14         THE COURT:  WELL, I UNDERSTAND THAT.  BUT AS A

15  SOLUTION TO THE PROBLEM, I THINK THEY -- THEY JUST INVITE

16  FURTHER PROBLEMS.

17         MR. KLINE:  I AGREE.  AND WE THINK THAT -- THAT --

18  SO THE FIRST WAIVER THEORY IS OBVIOUSLY THE THEORY HAVING TO

19  DO WITH THE JULY 2003 LETTER.  AND, YOU KNOW, JUDGE WRIGHT

20  AND THE OHIO DISTRICT COURT JUDGE, JUDGE SOLOMON, HAVE BOTH

21  SAID THAT THE JULY 2003 CORRESPONDENCE WAS NOT A PRIVILEGED

22  COMMUNICATION.

23         AND, SO, IF IT'S NOT A PRIVILEGED COMMUNICATION

24  AND, YET, IT IS DISCLOSED IN THE CONTENTS OF UNDERLYING

25  PRIVILEGED COMMUNICATIONS, IT IS OUR SUBMISSION THAT NO

36

1    MATTER WHAT ARGUMENTS MR. SIEGEL MIGHT HAVE MADE OR MS.

2    SIEGEL MIGHT HAVE MADE, IT'S NOW FAIR GAME TO THE ENTIRE

3    WORLD IN THE SAME WAY IT IS IN ANY SELECTIVE WAIVER

4    SITUATION.

5            OUR SECONDARY SUBMISSION HAS TO DO WITH THE

6    TOBEROFF TIMELINE DOCUMENT.  AND THE TOBEROFF TIMELINE

7    DOCUMENT, I MEAN, VERY PLAINLY DISCLOSES THE CONTENTS OF THE

8    MARKS MEMORANDUM.

9            WHEN MS. BRILL WAS IN HERE ARGUING ABOUT WHY WE

10   SHOULDN'T BE ABLE TO USE THE TOBEROFF TIMELINE MEMORANDUM IN

11   THIS CASE, SHE SAID, LOOK, IT'S RIDDLED WITH PRIVILEGED

12   INFORMATION.

13           THE INFORMATION IN THE MARKS LETTER, WE BELIEVE WE

14   SHOULD BE ENTITLED TO IT.  AND WHY IS THAT?  AND ONE COULD

15   ARGUE, WELL, YOU SHOULDN'T FAULT THE DEFENDANTS BECAUSE, YOU

16   KNOW, THIS FELLOW TOOK THE DOCUMENT.  HE PUBLISHED IT.  DC

17   COMICS SHOULD NOT BE ABLE TO GET AN ADVANTAGE THERE.

18           NOW, WE DON'T THINK THAT POSITION IS WELL TAKEN FOR

19   THE FOLLOWING REASON.

20           IN THE SIEGEL CASE, IF DEFENDANTS TRULY WANTED TO

21   KEEP THE DOCUMENT AND ITS CONTENTS AWAY FROM THE PUBLIC, NOT

22   ALLOW IT TO BE PUBLISHED IN THE PUBLIC, THEY HAD THE

23   OPPORTUNITY IN THE SIEGEL CASE TO DESIGNATE THAT DOCUMENT

24   CONFIDENTIAL, TO SEEK A PROTECTIVE ORDER FROM I BELIEVE JUDGE

25   LARSON AT THE TIME BECAUSE HE WAS HANDLING DISCOVERY MATTERS

37

1   THEN -- PLEASE, MARK THIS DOCUMENT CONFIDENTIAL.  DO NOT

2   ALLOW IT TO BE PUBLICLY FILED.  DON'T ALLOW IT TO BE USED IN

3   ANY OTHER LITIGATION.  ONLY ALLOW IT TO BE USED IN THE FOUR

4   CORNERS OF THIS LITIGATION.  AND THERE'S -- THERE'S POINTED

5   CORRESPONDENCE BACK AND FORTH BY OUR PREDECESSOR COUNSEL WHO

6   WAS HANDLING THE SIEGEL CASE AND MR. TOBEROFF.

7           AND THE SIEGELS MADE -- I DON'T KNOW WHETHER TO

8   CALL IT A CHOICE IS THE RIGHT WORD, BUT THEY CHOSE NOT TO

9   FILE SUCH A PROTECTIVE ORDER AND TO TRY TO KEEP THE TOBEROFF

10  TIMELINE DOCUMENT UNDER SEAL.

11          THE TOBEROFF TIMELINE DOCUMENT IS -- IT'S PUBLICLY

12  FILED AS PART OF A JOINT STIPULATION IN MARCH 2009.  AND EVER

13  SINCE THEN, IT'S BEEN, YOU KNOW, OUT THERE IN THE PUBLIC.

14  IT'S OBVIOUSLY AN EXHIBIT IN OUR COMPLAINT IN THIS CASE.

15          THAT, TOO, SHOULD BE DEEMED A WAIVER BECAUSE THEY

16  DID NOT ENGAGE IN ANY EFFORTS TO KEEP THOSE CONTENTS FROM THE

17  PUBLIC AT LARGE.

18          BUT ULTIMATELY WHAT WE THINK IS THE MOST IMPORTANT

19  THING HERE, YOUR HONOR, IS IN ALL THE PRIVILEGE CASES -- AND

20  MR. TOBEROFF AND MR. KENDALL AND I HAD TO READ A LOT OF THEM

21  RECENTLY FOR OUR NINTH CIRCUIT ARGUMENT ON THE WRIT THAT

22  HAPPENED LAST WEEK.

23          THE COURT:  OH, YOU HAD THAT ARGUMENT LAST WEEK?

24          MR. KLINE:  WE HAD IT LAST WEEK.  AND IF YOU HAD 20

25  MINUTES TO KILL, YOU COULD LISTEN TO IT ON THEIR WEBSITE, I'M

38

1  TOLD.

2          BUT, AS I READ THROUGH ALL THOSE CASES AGAIN, ONE

3  OF THE THINGS THAT THE SUPREME COURT TALKED ABOUT IN UPJOHN,

4  AND THE NINTH CIRCUIT'S TALKED ABOUT IN A LOT OF THESE CASES,

5  IS THAT ATTORNEY-CLIENT PRIVILEGE IS NO DOUBT A VERY

6  IMPORTANT AND VALUABLE PROTECTION THAT WE AFFORD INDIVIDUALS

7  TO ENCOURAGE THEM TO TALK TO THEIR LAWYERS AND THE LIKE.

8          BUT, AT THE SAME TIME, ALL THOSE COURTS RECOGNIZED

9  THAT EVERY TIME YOU ALLOW THE PRIVILEGE TO BE ASSERTED YOU'RE

10 KEEPING THE TRUTH FROM EMERGING IN LITIGATION.  AND THEY SAY

11 THAT'S A -- THAT'S A VALUABLE THING THAT WILL ALLOW -- THAT

12 WE'RE GOING TO ALLOW TO HAPPEN BECAUSE WE WANT THE

13 ATTORNEY-CLIENT PRIVILEGE TO EXIST.  WE WANT CLIENTS TO BE

14 ABLE TO ENGAGE IN CONVERSATIONS WITH THEIR LAWYERS.

15         BUT, BUT, BUT YOU HAVE TO JEALOUSLY SAFEGUARD IT.

16 YOU HAVE TO JEALOUSLY SAFEGUARD THE CONTENTS OF THAT

17 PRIVILEGE.  AND IF YOU DON'T, YOU LOSE IT.

18         AND THERE'S A GREATER SOCIETAL GOOD IN CASES OF

19 WAIVER OF LETTING THE TRUTH EMERGE IN THESE CASES.  AND WE

20 THINK IN THIS CASE THE TRUTH JUST SHOULD COME OUT.  WE DO

21 WANT TO STOP FIGHTING THESE DISCOVERY BATTLES OVER THESE

22 ISSUES.  WE THINK THE CONTENTS OF THE MARKS MEMORANDUM WERE

23 DISCLOSED IN THE TIMELINE A LONG TIME AGO.

24         WE WERE TOLD REPEATEDLY THAT THE TIMELINE WAS A

25 PACK OF LIES.  IT WAS AN INACCURATE, UNRELIABLE HIT PIECE.

39

1    AND, YET, TIME AND AGAIN WHEN WE FINALLY FERRET IN THERE AND

2    GET DOCUMENTS LIKE THE JULY 2003 LETTER THAT THEY HELD BACK

3    FROM US FOR SO LONG, IT COMPLETELY VALIDATES WHAT IT'S SAYING

4    THERE.

5            AND, SO, WE'RE SAYING WE JUST WANT TO GO ONE MORE

6    LEVEL DOWN TO MR. MARKS' MEMORANDUM SO THAT WE'RE NOT

7    FIGHTING ABOUT WHAT WAS SAID OR NOT SAID.  I THINK IT'S

8    INDISPUTABLE NOW THAT MR. MARKS TOLD THEM, YES, YOU HAVE A

9    DEAL.  YES, I WILL TESTIFY AGAINST YOU.

10           AND THE NUB OF THE ISSUE NOW IS WHETHER THEY CAN

11   HIDE BEHIND THIS ENFORCEABLE QUALIFIER OR NOT.  AND WE THINK

12   IF YOU LOOK AT THAT ULTIMATE MEMORANDUM IT'S NOT GOING TO BE

13   THERE.  AND THAT'S WHY -- THAT'S WHY WE'RE SEEKING IT HERE,

14   YOUR HONOR.

15           THE COURT:  ALL RIGHT.

16           MR. KLINE:  AND, AGAIN, I'M SORRY TO BE HERE ON YET

17   ANOTHER DISCOVERY MOTION.  WE'VE BEEN DOING OUR BEST TO STAY

18   OUT OF YOUR COURT, BUT WE'RE UNFORTUNATELY BACK.

19           THE COURT:  WELL, I CAN'T IMAGINE WHY.  I MEAN,

20   THAT'S WHAT COURTS ARE FOR.

21           MR. KLINE:  THANK YOU, YOUR HONOR.

22           THE COURT:  ALL RIGHT.

23           MR. TOBEROFF.

24           MR. TOBEROFF:  YES, YOUR HONOR.

25           FIRST, I'D LIKE TO TAKE A STEP BACK AND ASK THE

40

1    COURT TO CONSIDER WHY THEY -- WHAT'S THE RELEVANCE OF THIS

2    MARKS' TESTIMONY.  THAT IN THE OPINION OF A LAWYER, WE HAD A

3    DEAL.

4            THE ONLY POSSIBLE RELEVANCE IS THEIR CLAIM THAT'S

5    ALREADY BEEN RULED ON THAT THERE WAS A BINDING SETTLEMENT

6    AGREEMENT.

7            AND JUDGE LARSON IN A VERY METHODICAL OPINION WENT

8    OVER ALL THE EVIDENCE AND RULED BASED ON THE EXCHANGE OF

9    DOCUMENTS WHICH CONSISTS OF MULTIPLE COUNTEROFFERS IN WHICH

10   THE MATERIAL TERMS OF AN AGREEMENT ARE CHANGING -- THAT THERE

11   WAS NO AGREEMENT.  JUDGE LARSON DIDN'T BASE, NOR SHOULD HE

12   HAVE, HIS RULING ON AN OPINION OF A LAWYER ON ANOTHER -- ON

13   EITHER SIDE.

14           THAT PUBLISHED OPINION OF JUDGE LARSON, AND WE

15   QUOTE FULLY FROM IT IN OUR BRIEFS, WAS MADE A JUDGMENT UNDER

16   RULE 54(B) BY JUDGE --

17           THE COURT:  AND THAT'S ON APPEAL NOW?

18           MR. TOBEROFF:  THAT'S ON -- THAT'S ON APPEAL NOW.

19   AND THEY'RE COLLATERALLY ESTOPPED FROM RELITIGATING.

20           THE ONLY -- THEY'RE NOT ENTITLED TO THIS LETTER.

21   BUT IF THEY -- JUDGE, YOU DON'T HAVE TO MAKE THIS DECISION.

22   I DON'T THINK IT'S A TOUGH DECISION BECAUSE IT'S ONLY

23   RELEVANT TO SOMETHING THEY'RE NOT ALLOWED TO BE RETRYING.

24           AND -- AND IF THEY DID EVER RETRY IT, YOU WOULDN'T

25   GO TO AN OPINION.  YOU'D GO TO THE DOCUMENTARY EVIDENCE FIRST

**EXHIBIT A**
**43**

41

1  TO SEE IF ALL MATERIAL TERMS HAD BEEN AGREED ON.

2          THERE'S NO INCONSISTENT- -- THIS ISN'T --

3  EVERYTHING THAT THEY GET VIA MOTION THEY THEN HYPE AS A

4  REVELATION.  IN FACT, I'D OFTEN SAID TO THEM WHEN WE WERE

5  FIGHTING OVER THIS JULY LETTER, WE DIDN'T BELIEVE THEY WERE

6  ENTITLED TO THE JULY LETTER.  AND IN SOME RESPECTS ON

7  PRINCIPLE WE FOUGHT THEM TOOTH AND NAIL REGARDING THAT

8  LETTER.

9          BUT WHEN WE FINALLY PRODUCED THE LETTER, AND I TOLD

10 THEM THIS WHILE WE FIGHTING OVER IT, THAT, IN FACT, THERE ARE

11 MANY THINGS IN THAT LETTER WHICH ARE ACTUALLY VERY GOOD FOR

12 US.

13         THEY DESCRIBE THE LETTER -- THEY SAY I SCRIPTED THE

14 LETTER, AND THEN THEY DESCRIBE IT AS A REVELATION, WHICH

15 SEEMED TO BE TWO OPPOSING THINGS.

16         THEY SAY I SCRIPTED THE JULY LETTER BECAUSE MY

17 CLIENT, WHO DRAFTED IT AND IS VERY METICULOUS, GAVE IT TO ME

18 FOR COMMENT.  AND I GAVE HER SOME COMMENTS, AND SHE TESTIFIED

19 THAT SOME OF MY COMMENTS SHE FOLLOWED, SOME OF THEM SHE

20 DIDN'T.

21         THERE ARE MANY REASONS WHY THEY -- THE JULY LETTER

22 -- AND LET ME JUST ALSO FOR THE RECORD SAY THAT JUDGE WRIGHT

23 DID NOT RULE AS TO THE COMMON-INTEREST PRIVILEGE.  HE DID

24 NOT, IN FACT, SPECIFICALLY RULE AS TO ANYTHING.  IN HIS ORDER

25 IT WAS STAMPED -- HE STAMPED THEIR PROPOSED ORDER GRANTED.

**EXHIBIT A**
**44**

42

1           PRIOR TO THAT IN ANOTHER MOTION REVIEW -- BECAUSE

2    THEY WENT THROUGH TWO CYCLES OF MOTIONS, BOTH HERE AND WITH

3    MOTIONS 10:38:20 TO REVIEW WITH JUDGE WRIGHT, OVER THAT JULY

4    LETTER.  THERE WAS A PRIOR MOTION REVIEW WHERE HE DID THE

5    OPPOSITE.  HE STAMPED IT DENIED.  THIS TIME HE STAMPED IT

6    GRANTED.  SO, WE DON'T REALLY KNOW WHAT JUDGE WRIGHT WAS

7    THINKING, BUT --

8           THE COURT:  I THINK YOU BETTER ASSUME THAT THE

9    GRANTED HAS SOME FORCE.

10          MR. TOBEROFF:  NO, THE GRANTED HAS FORCE AND WE

11   PRODUCED THE LETTER, BUT WE DON'T -- I DON'T SEE IT AS A

12   SUBSTANTIVE RULING THAT NO COMMON-INTEREST PRIVILEGE EXISTED

13   BETWEEN LAURA SIEGEL --

14          THE COURT:  DID THE ORDER THAT HE STAMPED SAY THAT?

15          MR. TOBEROFF:  NO, IT DID NOT.

16          THE COURT:  I DIDN'T THINK SO.

17          MR. TOBEROFF:  FORTUNATELY.

18          THE INTEREST -- THE COMMON INTEREST BETWEEN LAURA

19   SIEGEL AND MICHAEL SIEGEL DERIVES FROM THE FACT THAT UNDER

20   THE COPYRIGHT ACT EACH HOLD AN INTEREST AS STATUTORY HEIRS.

21   JEROME SIEGEL, A CO-CREATOR OF "SUPERMAN," THEY EACH HOLD AN

22   INTEREST IN THE TERMINATION.

23          ONCE THE TERMINATION NOTICE BECAME EFFECTIVE AND

24   THE RIGHTS REVERTED, MICHAEL HAD A ONE-QUARTER INTEREST.

25   MANY CASES SAY THAT THAT WAS A PASSIVE INTEREST BECAUSE HE

43

1   DIDN'T ACTUALLY SIGN THE TERMINATION NOTICE.  HE HAS A

2   BENEFICIAL INTEREST BUT NOT AN INTEREST IN HOW THE RIGHTS ARE

3   -- DEALS THAT ARE MADE REGARDING THE RIGHTS.  THAT'S AN OPEN

4   QUESTION.

5          BUT THEY WERE DEFINITELY ALIGNED IN INTEREST WHEN

6   IT CAME TO NEGOTIATING WITH DC TO SETTLE AND RELICENSE THESE

7   RIGHTS TO DC.  WHICH IN THE COMMUNICATIONS FROM MARKS, HE

8   WOULD HABITUALLY COMMUNICATE WITH DON BULSON, MICHAEL

9   SIEGEL'S ATTORNEY, AND WITH HIS CLIENTS, LAURA SIEGEL AND

10  JOANNE SIEGEL, REGARDING NEGOTIATIONS WITH DC IN WHICH THE

11  PARTIES WERE CLOSELY ALIGNED AND A COMMON INTEREST EXISTS.

12          WE CITE A CASE IN OUR BRIEF THAT SAYS YOU DON'T

13  NEED A COMMON-INTEREST AGREEMENT FOR THE COMMON-INTEREST

14  PRIVILEGE TO BE ALIGNED.  WHAT'S IMPORTANT IS A COMMUNITY OF

15  INTEREST, THAT THE PARTIES ARE ALIGNED IN INTEREST.

16          THE FACT THAT IN THE FOLLOWING YEAR THERE WERE

17  NEGOTIATIONS TO BUY OUT MICHAEL SIEGEL, OR WHEN SHE SENT A

18  LETTER IN JULY OF 2003, ALMOST A YEAR LATER FROM THE AUGUST

19  2002 LETTER THAT THEY'RE TRYING TO GET, AT THAT TIME THE FACT

20  THAT MICHAEL WAS ASKING QUESTIONS OR WANTED MORE INFORMATION

21  OR SPECULATING, THAT DOESN'T MEAN THAT THERE'S NO COMMON

22  INTEREST AT THE TIME SHE DISCLOSED TO HIM.

23          THE COURT:  YOUR POSITION IS THAT IN JULY 2003, A

24  COMMON INTEREST REMAINED.

25          MR. TOBEROFF:  EXACTLY.

44

1          THE COURT:  AND IF I CONCLUDE THAT EITHER THAT

2     ISN'T SO, OR THAT I MIGHT BE INCLINED THAT WAY, BUT JUDGE

3     WRIGHT'S RULING FORECLOSES THAT FROM CONSIDERATION, THEN WHAT

4     IS YOUR POSITION?

5          MR. TOBEROFF:  WELL, LET ME JUST GO BACK FOR A

6     SECOND BECAUSE I -- I THINK I GOT A LITTLE CONFUSED WITH THE

7     DATES.

8          IN AUGUST OF 2002, THERE WAS A COMMON-INTEREST

9     PRIVILEGE.  BY DON BULSON RECEIVING A COPY OF THE AUGUST 2002

10    LETTER, MICHAEL SIEGEL WAS A RECIPIENT OF THAT LETTER WITHIN

11    THE CIRCLE OF THE COMMON-INTEREST PRIVILEGE.  HE ALREADY HAD

12    THE LETTER ITSELF.

13         SHE DOESN'T WAIVE THE PRIVILEGE WITH RESPECT TO

14    MICHAEL OR EVEN HERSELF BY TELLING MICHAEL SOMETHING,

15    ALLUDING TO SOMETHING THAT MICHAEL ALREADY IS IN POSSESSION

16    OF.

17         THE COURT:  WELL, AND THAT'S THE QUESTION.  THAT'S

18    THE QUESTION.

19         IF IN JULY WHEN SHE TOLD HIM SOMETHING THAT HE

20    ALREADY KNEW OR ALREADY WAS IN POSSESSION OF, AND IF IN JULY

21    THEY NOW NO LONGER HAVE A COMMON INTEREST, ASSUMING THEY HAD

22    ONE TO BEGIN WITH, BUT ARE PERHAPS EVEN ADVERSE TO ONE

23    ANOTHER, DOES THAT CONSTITUTE A WAIVER?

24         MR. TOBEROFF:  FIRST OF ALL, I DON'T BELIEVE IT

25    DOES.  WE CITE A CASE U.S. -- I CAN'T PRONOUNCE THE LAST NAME

45

1    -- BULJUBASIC, 800 F.2D 1260 AT PAGE 1268, SEVENTH CIRCUIT

2    1987, WHICH SPECIFICALLY SAYS, YOU DO NOT WAIVE A COMMON

3    INTEREST -- YOU DO NOT WAIVE PRIVILEGE BY TELLING SOMEONE

4    SOMETHING THEY ALREADY KNOW.

5            THE POINT IS THAT EVEN IN -- THAT EVEN IN JULY

6    2003, IF THEIR INTERESTS WERE DIVERGING, THEIR INTERESTS WERE

7    STILL THE SAME WHEN IT CAME TO NEGOTIATING AN AGREEMENT.  THE

8    ALLUSION TO DON BULSON AND ANYTHING IN THE AUGUST 2002 LETTER

9    WAS REFERENCING SOMETHING WHERE THEY STILL HAD A

10   COMMON-INTEREST PRIVILEGE.

11           STATUTORILY SINCE THEY ARE CO-OWNERS OF THE RIGHTS

12   THAT ARE BEING NEGOTIATED -- OR A LICENSE TO BE NEGOTIATED

13   WITH DC, THEY WOULD ALWAYS HAVE A COMMON INTEREST.  SO EVEN

14   THOUGH THEIR INTEREST DIVERGED IN SOME RESPECTS IN JULY OF

15   2003, AS TO THIS ISSUE IN QUESTION, THEY STILL HAD A COMMON

16   INTEREST.

17           THE OTHER POINT IS THAT -- I THINK WE'VE ALSO CITED

18   CASES, THE GONZALES CASE, 212 U.S. APP. LEXUS 1303 AT PAGES

19   10 THROUGH 11 THAT SAYS, FOR COMMON INTEREST TO EXIST YOU

20   DON'T NEED A WRITING.  YOU DON'T HAVE TO STAMP THE DOCUMENTS

21   "CONFIDENTIAL."

22           IT WAS IMPLICIT FROM THE CORRESPONDENCE -- IF YOU

23   LOOK AT THE JULY 2003 LETTER, IT'S IMPLICIT FROM THE

24   CORRESPONDENCE THAT THEY'RE TALKING ABOUT CONFIDENTIAL

25   MATTERS.  SO YOU DON'T NEED AN AGREEMENT.  YOU DON'T NEED TO

46

1   BE STAMPED "CONFIDENTIAL."  THE REFERENCE --

2          THE COURT:  NO.  ONE WOULD ASSUME YOU DON'T NEED TO

3   DO THOSE THINGS.  ONE WOULD ALSO ASSUME THAT INTENTION IS

4   CLEARER IF THEY ARE DONE.

5          MR. TOBEROFF:  AS TO THEIR TIMELINE ARGUMENT THAT

6   THE TIMELINE WAIVES PRIVILEGE AS TO DOCUMENTS DISCUSSED IN

7   THE TIMELINE, THIS COURT HAS PREVIOUSLY HELD, WITH ALL THE

8   FACTS BEFORE IT THAT THEY'RE NOW REFERENCING, THAT THE

9   TIMELINE DOESN'T WAIVE THE PRIVILEGE IN THE UNDERLYING

10  DOCUMENTS.

11         JUDGE LARSON ALSO HELD THAT THE TIMELINE DOESN'T

12  WAIVE PRIVILEGE AS TO THE UNDERLYING DOCUMENTS THAT THE

13  TIMELINE PURPORTS TO DISCUSS.

14         WOULD YOU MIND IF I JUST GET A DRINK OF WATER?

15  WE'RE OUT OF WATER.

16         THE COURT:  IT'S ALL RIGHT.

17         (PAUSE IN PROCEEDINGS.)

18         THE COURT:  IT'S THE MOST COOPERATION I'VE SEEN

19  AMONG COUNSEL.

20         (LAUGHTER.)

21         THE COURT:  WHEN I WAS A LAW CLERK COMING OUT OF

22  SCHOOL, ONE OF MY JOBS WAS TO FILL THE WATER PITCHERS ON

23  COUNSEL'S TABLE BEFORE COURT PROCEEDINGS.  AND MY LAW CLERK

24  HAPPENS TO BE SICK TODAY SO WE CAN BLAME HIM.

25         GO AHEAD, MR. TOBEROFF.

**EXHIBIT A**
**49**

47

1          MR. TOBEROFF:  AS FAR AS THE TIMELINE IS CONCERNED,

2   THIS COURT HAS ALREADY HELD THAT THE ILLICIT OR INVOLUNTARILY

3   PURPORTED DISCLOSURE IN THE TIMELINE DOESN'T WAIVE PRIVILEGE.

4   FOR THERE TO BE A WAIVER, THE HOLDER OF THE PRIVILEGE HAS TO

5   VOLUNTARILY WAIVE THE PRIVILEGE.  THE TIMELINE DOESN'T DO

6   THAT.  THIS COURT HAS HELD THAT IT DOESN'T DO THAT.  LARSON

7   HELD THAT THE TIMELINE DOESN'T WAIVE PRIVILEGE AS TO THE

8   UNDERLYING DOCUMENTS.  AND THEY DID NOT SEEK A MOTION FOR

9   REVIEW OF THAT RULING.

10          THEIR CLAIMS THAT WE PUBLICLY DISCLOSED THE

11   TIMELINE ARE NONSENSE.  THEY FILED A MOTION TO COMPEL WHICH

12   BECAUSE IT WAS IN THE NATURE OF A JOINT STIPULATION WE PUT IN

13   OUR HALF OF THE MOTION OBJECTING LIKE CRAZY TO -- AT EVERY

14   STEP OF THE WAY WE'VE OBJECTED TO THE DISCLOSURE OF THE

15   TIMELINE.

16          THEY -- TO ACHIEVE THEIR ENDS IN THIS LAWSUIT, THEY

17   -- EVEN THOUGH IT'S AN ANONYMOUS DOCUMENT, AND EVEN THOUGH

18   YOU DON'T NEED TO ATTACH PURPORTED EVIDENCE TO A COMPLAINT.

19   AND YOU WOULD NEVER DO SO, PARTICULARLY IN FEDERAL COURT.

20   EXCEPT PERHAPS IN A BREACH OF CONTRACT CASE YOU WOULD ATTACH

21   THE CONTRACT.

22          THEY WENT AHEAD AND ATTACHED THIS, YOU KNOW, NASTY

23   DOCUMENT TO THEIR COMPLAINT AND PROCEEDED TO PUBLICIZE IT,

24   KNOWING THAT BECAUSE OF THE PUBLIC INTEREST IN THE "SUPERMAN"

25   CASE, THAT THIS NASTY DOCUMENT WOULD NOW BE DISSEMINATED ALL

48

1    OVER THE INTERNET, WHICH IT WAS.

2          SO, NOW ANYBODY WHO GOES TO SEEK MY REPRESENTATION

3    HAS ALL SORTS OF DOUBTS AND QUESTIONS BECAUSE THEY DON'T KNOW

4    WHAT TO THINK OR BELIEVE.

5          AND THAT, I SUBMIT, WAS THE PURPOSE OF COMING -- OF

6    SUING ON THE BASIS OF THIS TIMELINE.  I HAVE IN MANY CASES

7    AGAINST WARNER BROS. IN WHICH I PREVAILED OVER ALL SORTS OF

8    RIGHTS HAVING NOTHING TO DO WITH "SUPERMAN."  AND I BELIEVE

9    PART OF THE REASON FOR THE SUIT WAS TO ATTEMPT TO PUT ME OUT

10   OF BUSINESS.  AND IT HAS DAMAGED ME.

11         SO, WE HAVE OBJECTED AT EVERY STEP OF THE WAY TO

12   THE TIMELINE.  AND THERE'S NO BASIS REGARDING THE PRODUCTION

13   OF THE TIMELINE TO SAY THERE'S A WAIVER OF PRIVILEGE.

14         GOING TO THE AUGUST LETTER ITSELF AND THEIR CLAIM

15   THAT MARKS -- EVERYBODY'S PERJURING THEMSELVES.  MARKS

16   CLAIMING INSTANCE -- THAT MARKS WAS INCONSISTENT IN HIS

17   TESTIMONY WITH STATEMENTS IN THE JULY LETTER.  IT'S NOT

18   INCONSISTENT AT ALL.  MARKS IS VERY STRAIGHTFORWARD IN HIS

19   DEPOSITION TESTIMONY.

20         WHEN ASKED, DO YOU THINK WE HAD A DEAL?  HE SAYS,

21   YES, I DID THINK WE HAVE A DEAL.  AND, OF COURSE, HE THOUGHT

22   THEY HAD A DEAL.  AND EVERYBODY'S SPOKEN VERY OPENLY ABOUT

23   THAT.

24         THE OCTOBER LETTER SAID, "I ACCEPT YOUR OFFER."

25   AND WE LEARNED AT LAW SCHOOL WHEN YOU ACCEPT AN OFFER, WELL,

49

1   THERE SEEMS TO BE A DEAL THERE.

2         AND THEN HE SAYS, WELL, IF I GOT IT WRONG IN ANY

3   RESPECT, JOHN SCHULMAN, GENERAL COUNSEL AT WARNER BROS.,

4   PLEASE, LET ME KNOW.  I'M GOING AWAY TO CHINA FOR FIVE WEEKS,

5   BUT PLEASE LET ME KNOW.

6         WHILE HE WAS AWAY IN CHINA, JOHN SCHULMAN SENT OVER

7   A LETTER SAYING ESSENTIALLY, YES, HERE'S A MORE FULSOME

8   OUTLINE OF OUR DEAL AND WITH MATERIAL TERMS.

9         AND JUDGE LARSON FOUND THEY WERE MATERIAL TERMS

10  THAT DIFFERED FROM HIS SUPPOSED ACCEPTANCE, MAYBE MAKING HIS

11  ACCEPTANCE A COUNTEROFFER AND JOHN SCHULMAN'S LETTER ANOTHER

12  COUNTEROFFER.

13        THEN, SCHULMAN SENDS OVER A VERY LENGTHY AGREEMENT,

14  WHICH THEY SAID IS MERELY A LONG FORM.  BUT IT HAS ALL SORTS

15  OF TRAP DOORS WHICH MARKS WENT THROUGH ONE BY ONE, WHICH

16  MATERIALLY NOT ONLY ADDED NEW MATERIAL TERMS BUT CHANGED THE

17  TERMS IN THE OCTOBER LETTER.  IT'S CLEAR THERE WAS NO

18  AGREEMENT BASED ON THIS DOCUMENTARY EVIDENCE.

19        MARKS' TESTIMONY WAS VERY SIMPLE.  DID I THINK WE

20  HAVE A DEAL?  OF COURSE, I THOUGHT WE HAD A DEAL.  BUT I SAID

21  TO JOHN, IF I'VE MADE ANY MISTAKES, LET ME KNOW.  IF YOU

22  DISAGREE WITH ANY OF THESE TERMS, LET ME KNOW.  AND HE LET ME

23  KNOW.  AND SO WHEREAS I THOUGHT WE HAD A DEAL, IT TURNED OUT

24  WE DIDN'T HAVE A DEAL.

25        AND, SO, THIS IDEA OF THE QUALIFIER VERSUS THE

50

1    NON-QUALIFIER, I DON'T GET IT.  IT'S JUST OVER MY HEAD.  I

2    DON'T GET IT.  AND I DON'T SEE ANY BASIS FOR THE FACT THAT --

3           THE COURT:  WELL, I'M SURE YOU DON'T, MR.

4    TOBEROFF.  AND I'M SURE WHAT THEIR ARGUMENT WILL BE IS

5    WHETHER OR NOT YOU GET IT, IT WILL ALL BE CLEAR TO EVERYBODY

6    IF EVERYBODY HAS THE AUGUST LETTER.

7           MR. TOBEROFF:  BUT IT'S A PRIVILEGED DOCUMENT --

8           THE COURT:  AND THAT'S THE ISSUE.  THAT'S THE

9    ISSUE.

10          MR. TOBEROFF:  WELL, OF COURSE --

11          THE COURT:  IS IT PRIVILEGED OR ISN'T IT.

12          MR. TOBEROFF:  WELL, OF COURSE, IN EVERY LAWSUIT

13   YOU'D WANT -- I'D LOVE ALL THEIR ATTORNEY-CLIENT

14   COMMUNICATIONS.  I'D LIKE TO KNOW WHEN THEY SUED ME WITHOUT

15   ANY EVIDENTIARY BASIS.  I'D LIKE TO BE ABLE TO PROVE BASED ON

16   THEIR CORRESPONDENCE WITH THEIR -- BETWEEN WARNER BROS. AND

17   THEIR COUNSEL THAT THEY DECIDED TO GO AHEAD REGARDLESS OF THE

18   FACT THAT THEY HAD NO EVIDENCE AGAINST ME.  WE AREN'T

19   ENTITLED TO THINGS JUST BECAUSE IT WOULD BE MORE INTERESTING

20   TO KNOW WHAT PEOPLE SAY TO THEIR ATTORNEYS.

21          THE COURT:  LET'S FOCUS ON WHETHER THIS IS

22   PRIVILEGED.

23          MR. TOBEROFF:  OKAY.

24          THE COURT:  ALL RIGHT?  WHETHER IT'S PRIVILEGED TO

25   START WITH.  WHETHER THE PRIVILEGE HAS BEEN WAIVED.

**EXHIBIT A**
**53**

51

1          MR. TOBEROFF:  RIGHT.  I THINK WE -- I THINK IT'S

2    BEEN CONFIRMED THAT IT WAS PRIVILEGED TO START WITH.  IT WAS

3    A COMMON INTEREST BETWEEN THESE PARTIES BY VIRTUE OF BEING

4    CO-OWNERS OF THE RIGHTS.  UNDER THE COPYRIGHT ACT, THEY'RE

5    CO-OWNERS OF RIGHTS WHICH WE'RE BEING NEGOTIATED WITH DISNEY

6    -- WITH DC AND WARNER BROS.  AND DON BULSON WAS

7    COMMUNICATING WITH MICHAEL SIEGEL'S COUNSEL ON A REGULAR

8    BASIS REGARDING THOSE NEGOTIATIONS.

9          THE REFERENCE IN JULY 2003, EVEN IF JULY 2003 SOME

10   OF THEIR INTEREST MAY HAVE DIVERGED, WE'RE FOCUSING IN ON A

11   REFERENCE TO AUGUST 2002 AND TO AN AREA WHERE THEIR INTERESTS

12   DON'T DIVERGE, WHICH IS NEGOTIATIONS WITH WARNER BROS.

13         AND, SO, THAT PRIVILEGE WOULD HAVE BEEN MAINTAINED.

14   IT ALSO WOULD HAVE BEEN MAINTAINED BECAUSE YOU DON'T WAIVE

15   THE PRIVILEGE BY DISCLOSING SOMETHING TO SOMEBODY THEY

16   ALREADY KNOW.  AND WE CITED A GOOD SEVENTH CIRCUIT CASE FOR

17   THAT.

18         THE COURT:  ALL RIGHT.  THANK YOU.

19         MR. KLINE, ANYTHING FURTHER?

20         MR. KLINE:  VERY, VERY BRIEFLY, YOUR HONOR.

21         THE SEVENTH CIRCUIT CASE THEY'RE TALKING ABOUT THE

22   DISCLOSURE WAS -- THIS FELLOWS SAYS, MY SENTENCE HAS BEEN

23   REDUCED.  A LAWYER TOLD ME THAT MY SENTENCE HAD BEEN

24   REDUCED.  AND THE SEVENTH CIRCUIT SAID, THAT'S NOT A

25   DISCLOSURE OF THE BROADER PRIVILEGE BECAUSE IT'S A MATTER OF

52

1   PUBLIC RECORD FILED IN THE COURTS THAT YOUR SENTENCE HAD BEEN

2   REDUCED.

3            AND, SO, BY SAYING THAT AN ATTORNEY TOLD ME MY

4   SENTENCE HAD BEEN REDUCED BASED ON COOPERATION, THAT WAS NOT

5   A WAIVER.  SO THE SEVENTH CIRCUIT CASE GETS NOWHERE.

6            TO ME, THE VERY HEART OF THE RELEVANCE OF THIS

7   ISSUE WAS POINTED OUT BY MR. TOBEROFF WHEN HE'S TALKING ABOUT

8   THE SCHULMAN LETTER AND THE MARKS AND BACK AND FORTH.  BUT

9   VERY BRIEFLY, HERE'S THE TIMELINE.

10           I ACCEPT YOUR OFFER, OCTOBER 2001.  AND THEN HE

11  SAYS THERE'S THE SCHULMAN LETTER OF NOVEMBER AND THE SCHULMAN

12  LETTER OF FEBRUARY 2002.

13           IN AUGUST 2002, AFTER THESE LETTERS, AFTER THESE

14  LETTERS, AFTER THE SO-CALLED SCHULMAN CHANGING THE DEAL,

15  MARKS IS TELLING THESE PEOPLE WE HAVE A DEAL.  WE HAVE A

16  DEAL.  HE'S NOT -- THIS STORY THAT WAS JUST SPUN RIGHT NOW

17  ABOUT HOW THE DEAL FELL APART, THAT IS DIRECTLY REFUTED BY

18  THE MARKS MEMORANDUM SAYING, WE HAVE A DEAL.  I'LL TESTIFY

19  AGAINST YOU.

20           THE COURT:  LET ME ASK YOU, MR. KLINE, WHAT IS YOUR

21  RESPONSE TO THE ARGUMENT THAT ALL WELL AND GOOD, BUT THIS HAS

22  ALL BEEN LITIGATED BEFORE, AND IT'S BEEN RULED AGAINST YOU BY

23  JUDGE LARSON.  GRANTED IT'S ON APPEAL, BUT AT THE MOMENT IT'S

24  A JUDGMENT AGAINST YOU ON THAT POINT.

25           MR. KLINE:  I'M GLAD YOU ASKED BECAUSE IT'S ONE OF

**EXHIBIT A**
**55**

53

1   THE POINTS I WANTED TO BRING.

2         THE COURT:  ALL RIGHT.  GO AHEAD.

3         MR. KLINE:  THREE POINTS IN RESPONSE.

4         NUMBER ONE, WE HAVE A PERSPECTIVE ECONOMIC --

5   INTERFERENCE WITH PERSPECTIVE ECONOMIC ADVANTAGE CLAIM IN

6   THIS CASE, WHICH IS DIFFERENT THAN A BREACH OF CONTRACT

7   CLAIM, WHICH IS DIFFERENT THAN AN INTERFERENCE WITH CONTRACT

8   CLAIM.

9         OUR COMPLAINT ACKNOWLEDGES THAT IN THE SIEGEL CASE

10  LARSON MADE THAT FINDING.  AND WE SAY WE'RE ACTUALLY BRINGING

11  A SEPARATE CLAIM HERE.  NOW -- SO THAT'S POINT NUMBER ONE.

12  THERE'S A SEPARATE STAND-ALONE CLAIM THAT THIS IS RELEVANT

13  TO.

14        NUMBER TWO, THIS IS OBVIOUSLY RELEVANT UNDER RULE

15  26 TO THE CREDIBILITY --

16        THE COURT:  WELL, WAIT.  STAY WITH POINT ONE FOR A

17  SECOND.

18        WHETHER OR NOT IT'S RELEVANT TO IT, THE ISSUE CAN'T

19  BE REDETERMINED UNDER COLLATERAL ESTOPPEL.

20        ISN'T THAT TRUE?

21        MR. KLINE:  THE ISSUE OF WHETHER OR NOT THEY HAD AN

22  ENFORCEABLE CONTRACT WILL NOT BE LITIGATED IN THE SHUSTER

23  CASE.  CORRECT.  RIGHT NOW.  IT'S UP ON APPEAL IN THAT CASE.

24  BUT THERE'S A SEPARATE CLAIM THAT GOES TO PERSPECTIVE

25  ECONOMIC ADVANTAGE THAT THIS -- THE MARKS COMMUNICATION IS

54

1    DIRECTLY RELEVANT TO.  THAT'S POINT NUMBER ONE.

2            THE COURT:  BUT IN PROCESSING OR LITIGATING OR IN

3    TRYING THAT CLAIM, I GUESS, WON'T IT BE AN ACCEPTED FACT,

4    WON'T JUDGE WRIGHT HAVE TO TELL THE JURY OR HOWEVER IT COMES

5    ACROSS TO THE FINDER OF FACT THAT IT HAS BEEN DETERMINED THAT

6    THERE WAS NO CONTRACT BETWEEN THE PARTIES?

7            MR. KLINE:  CORRECT.  BUT ONE OF OUR CLAIMS IS

8    THERE STILL IS THIS ONGOING BUSINESS RELATIONSHIP IN THEIR

9    SLAP BRIEFS, WHICH HAD BEEN REJECTED, AND THEIR RULE 12

10   BRIEFS, WHICH THEY WITHDREW.  THEY TOOK THE POSITION THAT THE

11   DEAL -- THE NEGOTIATIONS BETWEEN DC AND THE SIEGELS WERE

12   MORIBUND, WHICH IS, I GUESS, DEAD OR CLOSE TO DEAD.  THEY DID

13   HAVE TO TELL YOU WHAT --

14           THE COURT:  DYING.

15           MR. KLINE:  DYING.  THEY SAID THEY WERE DEAD.

16           IF MARKS IS SAYING IN AUGUST 2002 -- AFTER THEY SAY

17   THERE'S THIS LETTER THAT SIEGEL SENDS IN MAY 2002 THAT CUT

18   OFF NEGOTIATIONS, THAT MADE THE DEAL MORIBUND BECAUSE

19   SCHULMAN'S OFFER OF FEBRUARY 2002 IS SO OFFENSIVE.

20           IF MARKS IS SAYING IN AUGUST OF 2002, YOU GUYS, YOU

21   HAVE A DEAL.  I'M GOING TO TESTIFY AGAINST YOU.  YOU'VE GOT

22   TO ACCEPT THIS DEAL.  THAT'S POWERFUL EVIDENCE IN FAVOR OF A

23   PERSPECTIVE ECONOMIC ADVANTAGE CLAIM.

24           AND THERE, YES, YOU'RE CORRECT.  WE WOULD NOT BE

25   ASSERTING THAT THERE IS AN EXTANT CONTRACT THAT WE'RE TRYING

**EXHIBIT A**
**57**

55

1    TO ENFORCE.  BUT WE WOULD SAY WE DO HAVE AN ONGOING BUSINESS

2    RELATIONSHIP.  AND WHAT'S POWERFUL EVIDENCE OF THIS.  WELL,

3    GOSH, IT'S MR. MARKS SAYING, YOU HAVE AN EXTANT DEAL THAT YOU

4    HAVE TO HONOR.

5            NOW -- SO THAT'S THEORY OF RELEVANCE NUMBER ONE.

6    THAT, YES, YOU HAVE THIS ONGOING BUSINESS RELATIONSHIP, A

7    DEAL YOU HAVE TO HONOR.  YOU CAN'T GO OUT AND CUT A NEW DEAL

8    WITH MR. --

9            THE COURT:  THE ONGOING BUSINESS RELATIONSHIP IS

10   THE DEAL THEY HAVE THAT JUDGE LARSON WROTE WAS NOT A DEAL?

11           MR. KLINE:  NO, YOUR HONOR.  I APOLOGIZE.  THE

12   ONGOING BUSINESS RELATIONSHIP, WE'VE GOT TO CONTINUE THE

13   NEGOTIATIONS.  YOU'VE GOT A 70-YEAR RELATIONSHIP WITH THESE

14   GUYS.  YOU CAN'T WALK AWAY AND TAKE THE EMANUEL INVESTOR,

15   TOBEROFF OFFER.  YOU HAVE A DEAL WITH THESE GUYS.  IN GOOD

16   FAITH WE'VE GOT TO SIT DOWN AND FINALIZE.

17           LET'S ASSUME HYPOTHETICALLY THAT THERE'S NO

18   AGREEMENT THERE.  THERE STILL WERE ONGOING NEGOTIATIONS.  THE

19   TESTIMONY IS UNDISPUTED, UNDISPUTED, THAT MR. MARKS AND MR.

20   SCHULMAN WERE CONTINUING TO NEGOTIATE AND DISCUSS THE

21   AGREEMENT IN THE SUMMER OF 2002.

22           AND IF MR. MARKS IS SAYING TO THEM, GUYS, WE HAVE A

23   DEAL HERE, YOU COULD ACCEPT THE JUDGE LARSON READING, WHICH

24   IS THAT THERE WASN'T AN ENFORCEABLE DEAL.  BUT YOU WOULD ALSO

25   HAVE TO ACCEPT OUR POSITION THAT THERE WAS STILL AN ONGOING

56

1    DISCUSSION BEING HAD THAT COULD BE INTERFERED WITH.  BUT

2    THAT'S ON ONLY ONE THEORY OF RELEVANCE TO THIS CASE.

3          THE SECOND THEORY OF RELEVANCE TO THIS CASE IS

4    THAT, YES, IN THE SIEGEL CASE IN FRONT OF JUDGE WRIGHT AND IN

5    FRONT OF THE JUDGE -- IN FRONT OF THE NINTH CIRCUIT, WE VERY

6    MUCH INTEND TO TELL THEM -- TIME OUT.  JUDGE LARSON DIDN'T

7    HAVE THIS CRITICALLY IMPORTANT PIECE OF EVIDENCE IN FRONT OF

8    HIM, THE JULY 2003 LETTER.  AND THAT'S REASON ENOUGH ALONE ON

9    THIS INTERLOCUTORY RULE 54(B) APPEAL TO SEND IT BACK DOWN AND

10   RETRY THIS ISSUE.  YOU HAVE THE KEY WITNESS.

11          I KNOW THEY SAY --

12          THE COURT:  YOU MAY WIN ON APPEAL.  IF YOU WIN ON

13   APPEAL, THE SITUATION IS DIFFERENT.  BUT RIGHT NOW, YOU

14   HAVEN'T -- YOU HAVEN'T WON.

15          MR. KLINE:  BUT THE THIRD ONE IS VERY IMPORTANT.

16   MR. -- HERE'S THE THIRD THEORY OF RELEVANCE.

17          MR. TOBEROFF KEEPS ON STANDING UP AND SAYING WE

18   SUED HIM FOR ALL THESE AWFUL REASONS.  THOSE ARGUMENTS WERE

19   DEFINITIVELY REJECTED BY JUDGE WRIGHT, AND THEY WITHDREW

20   THEIR MOTIONS TO DISMISS.

21          WHY DO WE STILL NEED TO DEPOSE MR. MARKS?  MR.

22   MARKS GIVES THIS VERY, VERY, VERY NARROW DECLARATION IN

23   SUPPORT OF THEIR SLAP MOTION WHERE HE SAYS, CERTAIN THINGS

24   WEREN'T SAID TO ME.  AND WE WANT TO GO IN AND DEPOSE MR.

25   MARKS.  AND IF IT TURNS OUT THAT MR. MARKS GAVE TESTIMONY IN

57

1   SIEGEL THAT'S INCONSISTENT WITH THE MEMORANDUM THAT HE WROTE

2   IN AUGUST 2002, THEN HE'LL BE IMPEACHED.  AND THAT'S GOING TO

3   GO DIRECTLY TO HIS CREDIBILITY.

4          AND THEY'VE -- IN THEIR SLAP PAPERS, THEY REACHED

5   OUT TO MR. MARKS AND SAID, HE'S ONE OF OUR KEY WITNESSES IN

6   THE DEFENSE HERE.  AND AS PART OF OUR LITIGATING THIS CASE WE

7   HAVE EVERY -- WE SHOULD HAVE THE RIGHT TO GO OUT AND IMPEACH

8   HIS CREDIBILITY.  AND WE THINK THERE'S NO BETTER PIECE OF

9   EVIDENCE TO IMPEACH MR. MARKS' CREDIBILITY THAN THE ACTUAL

10  UNDERLYING MEMORANDUM THAT HE WROTE.  IF HE'S TRYING TO --

11         THE COURT:  THIS IS ALL KIND OF CIRCULAR.  I MEAN,

12  YOU GET TO IMPEACH HIM IF THE -- WITH THE MEMORANDUM IF THE

13  MEMORANDUM IS NOT PRIVILEGED.  YOU DON'T GET TO IMPEACH HIM

14  WITH IT IF IT IS PRIVILEGED.

15         MR. KLINE:  CORRECT.  I WAS TRYING TO --

16         THE COURT:  OR IF THE PRIVILEGE HAS NOT BEEN

17  WAIVED.

18         MR. KLINE:  I'M SORRY.  I THOUGHT YOUR QUESTION

19  WAS, WHY IS IT RELEVANT TO THIS CASE?  WHY ISN'T IT DISPOSED

20  OF IN THE SIEGEL CASE?

21         I COMPLETELY AGREE WITH YOU.  THAT IF YOU HOLD THAT

22  IT'S PRIVILEGED WE'RE STUCK.

23         BUT IF THE QUESTION IS, WHY IS THIS IMPORTANT IN

24  THIS NEW CASE, I WAS JUST TRYING TO ARTICULATE WHY IT WAS

25  IMPORTANT IN THIS NEW CASE.  HE'S GOING TO BE A KEY WITNESS

58

1   IN THIS CASE.  THEY'VE IDENTIFIED HIM AS A WITNESS TO RESPOND

2   TO THE INTERFERENCE CLAIMS HERE.

3          AND WE THINK THERE'S NO BETTER PIECE OF EVIDENCE TO

4   EXAMINE HIM ON VIS-A-VIS THOSE INTERFERENCE ISSUES THAN THE

5   DOCUMENT WHERE HE'S ACTUALLY DESCRIBING, HEY, I GOT AN OFFER

6   FROM MR. TOBEROFF AND MR. EMANUEL.  HERE'S WHAT THE TERMS OF

7   THE OFFER WERE.  HERE'S WHAT I TOLD THEM.

8          YOU KNOW, THAT'S KIND OF -- THAT'S JUST ONE OF THE

9   CENTRAL PIECES OF EVIDENCE IN THE CASE.  AND I KNOW THEY SAY,

10  WELL, NO, YOU GUYS ARE JUST TRYING TO RE-LITIGATE YOUR

11  SETTLEMENT DEFENSE FROM THE SIEGEL CASE.

12         AND THE ANSWER TO THAT IS, NO.  THIS IS A SEPARATE,

13  TORTIOUS INTERFERENCE OF THE PERSPECTIVE ECONOMIC ADVANTAGE

14  CLAIM.

15         IF WE WIN THE SIEGEL CASE, AND WE GET A JUDGMENT

16  THAT THERE WAS AN UNDERLYING CONTRACT THERE, THEN, YES, AS

17  WE'VE INDICATED IN THE COMPLAINT, WE WOULD AMEND TO ADD A

18  CLAIM FOR TORTIOUS INTERFERENCE WITH THE CONTRACT, NOT JUST

19  PERSPECTIVE ECONOMIC ADVANTAGE.

20         BUT I WAS JUST TRYING TO ADDRESS YOUR HONOR'S

21  QUESTIONS ABOUT, WELL, WHY IS THIS RELEVANT TO THIS NEW CASE.

22  AND IT'S REALLY THOSE THREE THINGS.  IT'S A PERSPECTIVE

23  ECONOMIC ADVANTAGE CLAIM.  IT GOES TO MR. MARKS' CREDIBILITY

24  AS A WITNESS.  WE THINK IT ALSO GOES TO MS. LARSON'S

25  CREDIBILITY AS A WITNESS.  AND THEN IF WE, YOU KNOW, WIN IN

**EXHIBIT A**
**61**

59

1   THE SIEGEL APPEAL, THEN OBVIOUSLY IT COULD AFFECT THE SCOPE

2   OF THE CLAIMS IN THIS CASE.

3         THE COURT:  ALL RIGHT.  ANYTHING ELSE?

4         MR. KLINE:  JUST THE LAST THING, YOUR HONOR.  I

5   THINK LOGICALLY WHERE WE KEEP ON ENDING UP IS JUST FIGHTING

6   JUDGE WRIGHT'S RULING ABOUT THE COMMON-INTEREST PRIVILEGE.

7         BECAUSE I THINK EVERY TIME YOU TEST IT ALONG THAT

8   POINT, HE KEPT ON SAYING, WELL, YOU KNOW, THE JULY 2003

9   LETTER ITSELF WAS PRIVILEGED.  IT'S NOT.  ON ITS FACE IT'S

10  NOT A PRIVILEGED DOCUMENT.  IT'S MS. LARSON RESPONDING TO

11  ACCUSATIONS OF MISCONDUCT BY MR. TOBEROFF.  AND THAT LETTER

12  IS NOT A PRIVILEGED COMMUNICATION.

13        IT'S DURING A TIME PERIOD WHERE THE OHIO COURTS

14  HAVE ALREADY RULED.  THEY DO NOT SHARE A COMMON-INTEREST

15  PRIVILEGE.  WHERE JUDGE LARSON BY DEFINITION -- I MEAN --

16  PARDON ME -- JUDGE WRIGHT, BY DEFINITION HAD TO RULE THAT

17  THERE IS NO COMMON-INTEREST PRIVILEGE.  BECAUSE ON THAT

18  MOTION TO REVIEW, HE WAS APPLYING THIS VERY HEIGHTENED

19  STANDARD AND HE HAD TO READ ALL OF THEIR OBJECTIONS AND GIVE

20  THEM CREDENCE.  AND HE SAID, NO, I'M NOT KEEPING THIS

21  DOCUMENT FROM DC.

22        SO, WE'VE TAKEN A LOT OF YOUR TIME THIS MORNING,

23  AND I THANK YOU FOR HEARING US OUT.

24        THE COURT:  WELL, I WANTED TO HEAR YOU OUT BECAUSE

25  THIS IS -- AS I SAID, THIS WAS THE ISSUE THAT I THINK IS THE

**EXHIBIT A**
**62**

60

1    HARDEST TO DEAL WITH OF THE ONES HERE THIS MORNING.

2            MR. KLINE:  THANK YOU, YOUR HONOR.

3            THE COURT:  ALL RIGHT.  I'M NOT PREPARED TO RULE ON

4    THIS MOTION YET.  I'LL TAKE IT UNDER SUBMISSION.  I'LL GET A

5    RULING OUT AS PROMPTLY AS I CAN.

6            ANYTHING ELSE?

7            MR. KLINE:  THANK YOU, YOUR HONOR.

8            THE COURT:  YES, MR. TOBEROFF?

9            MR. TOBEROFF:  I HAVE ONE QUESTION REGARDING --

10   REGARDING THE PRODUCTION OF DOCUMENTS AS TO CAPITAL ACCOUNTS.

11   I HONESTLY WOULD LIKE TO HAVE SOME CLARIFICATION AS TO WHAT

12   THAT WOULD ENTAIL TO SHOW --

13           THE COURT:  I DON'T KNOW.  I HAVEN'T SEEN ANY

14   DOCUMENTS, MR. TOBEROFF.

15           MR. TOBEROFF:  NO, I MEAN -- I MEAN, JUST TAKE ANY

16   CORPORATION.  DOES THAT MEAN EVERY BANK STATEMENT THAT THE

17   COMPANY HAS EVER HAD SINCE THE BEGINNING OF EXISTENCE OR JUST

18   SHOW THAT THE DOCUMENT WAS CAPITALIZED INITIALLY, AND HOW

19   IT'S CAPITALIZED CURRENTLY.  I JUST KNOW WHAT IT MEANS.

20           THE COURT:  WELL, I'M IN A VACUUM.  AND I'M NOT

21   ABOUT TO SIT DOWN WITH THE DOCUMENTS MYSELF.  I HAVE SEEN

22   CORPORATE DOCUMENTS WHERE, YOU KNOW, THERE IS A SPREADSHEET

23   AND IT SHOWS WHO HAS PUT IN WHAT CAPITAL, THAT SORT OF THING.

24           BUT I DON'T WANT TO BOX MYSELF IN NOT KNOWING WHAT

25   DOCUMENTS EXIST.  I WOULDN'T THINK CHECK STUBS NORMALLY WOULD

61

1  FALL WITHIN THAT, BUT I DON'T KNOW.  I DON'T KNOW WHAT

2  EXISTS.  BUT I WOULD THINK THAT THERE -- IT WOULD NOT

3  SURPRISE ME IF THERE WAS SOME DOCUMENT WHICH INDICATED WHO

4  CAPITALIZED AND IN WHAT AMOUNTS AND WHAT.

5       WHEN I WAS IN THE PARTNERSHIP, AND, YOU KNOW, YOU

6  PROBABLY ARE IN A LAW PARTNERSHIP.  I DON'T THE EXACT NATURE

7  OF YOUR BUSINESS RIGHT NOW, BUT EACH PARTNER HAD A CAPITAL

8  ACCOUNT.  AND WE KNEW WHICH PARTNERS HAD PUT IN WHICH AMOUNT

9  OF CAPITAL.  IT MAY BE DIFFERENT FOR THESE COMPANIES.  I

10 DON'T KNOW.

11       MR. TOBEROFF:  I GUESS TO A CERTAIN DEGREE THE

12 PRODUCTION HERE -- NATURALLY, WHEN WE'RE LOOKING AT THE

13 PRODUCTION WE'RE TRYING TO TAILOR THE PRODUCTION TO THE

14 CLAIMS THAT HAVE BEEN MADE IN THE CASE.  AND, SO, WHEN IT

15 COMES TO, YOU KNOW, CAPITAL ACCOUNTS OF COMPANIES THAT HAVE

16 LONG BEEN DISSOLVED OR -- I JUST DON'T --

17       THE COURT:  IF YOU DON'T HAVE THE DOCUMENTS THEN

18 THAT'S EASY ENOUGH TO SAY.

19       MR. TOBEROFF:  NOT ONLY --

20       THE COURT:  IF THE DOCUMENTS EXIST, THEN I THINK

21 YOU NEED TO PRODUCE THEM.

22       MR. TOBEROFF:  NOT ONLY -- THEY'RE DOCUMENTS THAT

23 WE DON'T HAVE.

24       AND THEN THE OTHER QUESTION IS WHAT -- HOW DOES

25 THIS RELATE TO THIS CASE --

**EXHIBIT A**
**64**

62

1          THE COURT:  WE'RE PAST THAT PART.

2          MR. TOBEROFF:  OKAY.

3          THE COURT:  ALL RIGHT.  ANYTHING ELSE?

4          MR. KLINE:  NO, YOUR HONOR.  THANK YOU VERY MUCH.

5          MS. SETO:  THANK YOU, YOUR HONOR.

6          THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.

7          (PROCEEDINGS ADJOURNED 11:03 A.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

1

2

3               C E R T I F I C A T E

4

5        I CERTIFY THAT THE FOREGOING IS A CORRECT

6  TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

7  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9

10

11  /S/ DOROTHY BABYKIN                    2/22/12

12  _____        _____

13  FEDERALLY CERTIFIED TRANSCRIBER        DATED

14  DOROTHY BABYKIN

15

16

17

18

19

20

21

22

23

24

25