1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone:  (845) 265-2820
10 Facsimile:   (845) 265-2819

11 Attorneys for Plaintiff DC Comics

12

**UNITED STATES DISTRICT COURT**

13

**CENTRAL DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15  DC COMICS, | Case No. CV 10-3633 ODW (RZx) |
| 16         Plaintiff, | **<u>DISCOVERY MATTER</u>** |
| 17    v. | **DC COMICS' *EX PARTE* APPLICATION TO LIFT TEMPORARY STAY ON COURT'S MAY 25, 2011, AND AUGUST 8, 2011, ORDERS** |
| 18  PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive, | |
| 19 | |
| 20 | DECLARATION OF CASSANDRA SETO AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH |
| 21 | |
| 22 | |
| 23 | **Judge**:      Hon. Otis D. Wright II |
| 24 | **Magistrate**:   Hon. Ralph Zarefsky |
| 25         Defendants. | |
| 26 | Requested Hearing Date:  Apr. 30, 2012 Requested Hearing Time:  10:00 a.m. |

27

28

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abbs v. Sullivan*,
    963 F.2d 918 (7th Cir. 1992) .............................................................. 11

*Burden-Meeks v. Welch*,
    319 F.3d 897 (7th Cir. 2003) ........................................................ 10, 12

*Colbert v. Potter*,
    471 F.3d 158 (D.C. Cir. 2006) ............................................................. 8

*Columbia Pictures Indus., Inc. v. Bunnell*,
    2007 WL 4916963 (C.D. Cal. Aug. 10, 2007) .................................... 14

*Cootz v. Gen. Tel. Co.*,
    1988 WL 131672 (9th Cir. Nov. 25, 1988) ......................................... 8

*Dellwood Farms, Inc. v. Cargill, Inc.*,
    128 F.3d 1122 (7th Cir. 1997) ........................................................... 12

*Diversified Indus., Inc. v. Meredith*,
    572 F.2d 596 (8th Cir. 1977) ............................................................. 10

*Equilon Enters. v. Consumer Cause, Inc.*,
    29 Cal. 4th 53 (2002) ........................................................................... 6

*Genentech, Inc. v. U.S. Int'l Trade Comm'n*,
    122 F.3d 1409 (Fed. Cir. 1997) ......................................................... 10

*In re Chrysler Motors Corp.*,
    860 F.2d 844 (8th Cir. 1988) ........................................................ 10, 11

*In re Columbia/HCA Healthcare Cor. Billing Practices Litig.*,
    293 F.3d 289 (6th Cir. 2002) ........................................................ 10, 11

*In re Grand Jury Proc. Subpoena*,
    841 F.2d 230 (8th Cir. 1988) ............................................................. 10

*In re Martin Marietta Corp.*,
    856 F.2d 619 (4th Cir. 1988) ............................................................. 10

*In re Qwest Commc'ns Int'l*,
    450 F.3d 1179 (10th Cir. 2006) .................................................... 10, 11

*In re Steinhardt Partners, L.P.*,
    9 F.3d 230 (2d Cir. 1993) ............................................................. 10, 11

*Johnson v. Rancho Santiago Comm'y College Dist.*,
    623 F.3d 1011 (9th Cir. 2010) ............................................................. 8

*Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*,
    37 Cal. App. 4th 855 (1995) ............................................................... 7

i

*Lowry v. Barnhart*,
    329 F.3d 1019 (9th Cir. 2003) ..................................................................... 8

*Mangini v. U.S.*,
    314 F.3d 1158 (9th Cir. 2003) ..................................................................... 8

*McDaniels v. Hospice of Napa Valley*,
    2006 WL 2038276 (N.D. Cal. July 19, 2006) ........................................... 11

*McKesson HBOC, Inc. v. Super. Ct.*,
    115 Cal. App. 4th 1229 (2004) .................................................................. 10

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,
    883 F. Supp. 488 (C.D. Cal. 1995) ........................................................... 14

*Mohawk Indus., Inc. v. Carpenter*,
    130 S.Ct. 599 (2009) ................................................................................... 9

*More Light Invs. v. Morgan Stanley DW Inc.*,
    415 Fed. Appx. 1 (9th Cir. 2011) ................................................................ 8

*Navellier v. Sletten*,
    29 Cal. 4th 82 (2002) .................................................................................. 6

*Oncale v. Sundowner Offshore Servs. Inc.*,
    83 F.3d 118 (5th Cir. 1996) ...................................................................... 11

*Permian Corp. v. U.S.*,
    665 F.2d 1214 (D.C. Cir. 1981) ................................................................ 10

*Police & Fire Ret. Sys. v. Safenet, Inc.*,
    2010 U.S. Dist. LEXIS 23196 (S.D.N.Y. Mar. 11, 2010) ........................ 12

*Rigsby v. Avenenti*,
    1992 WL 144440 (9th Cir. June 26, 1992) ................................................. 8

*Shropshire v. Fred Rappoport Co.*,
    294 F. Supp. 2d 1085 (N.D. Cal. 2003) ...................................................... 7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
    640 F.3d 1034 (9th Cir. 2011) ..................................................................... 7

*U.S. v. Mass. Inst. of Tech.*,
    129 F.3d 681 (1st Cir. 1997) ............................................................... 10, 11

*U.S. v. Reyes*,
    239 F.R.D. 591 (N.D. Cal. 2006) .............................................................. 10

*Westinghouse Elec. Corp. v. Repub. of the Phil.*,
    951 F.2d 1414 (3d Cir. 1991) .................................................................... 10

**STATUTES**

28 U.S.C. § 2101(c) ........................................................................................ 6

**RULES**

FED. R. APP. P. 40(a)(1) ........................................................................... 6

FED. R. EVID. 502 ................................................................................... 12

C.D. Cal. Local Rule 7.......................................................................*passim*

U.S. Supreme Court Rule 13 .................................................................... 6

**OTHER AUTHORITIES**

E. Phillips, *Court Grants D.C. Comics Documents Access,* DAILY JOURNAL
   (Apr. 18, 2012) ................................................................................. 13

FEDERAL CRIMINAL CODE AND RULES at 327 (West 2011 ed.) ............................. 12

Ninth Circuit General Order 5.4 ................................................................. 6

Ninth Circuit General Order 5.5 ................................................................. 6

R. STERN ET AL., SUPREME COURT PRACTICE 241 (9th ed. 2007)........................... 11

*Warner Gets Victory In Legal Fight With Superman Heirs' Attorney*, L.A
   TIMES (Apr. 17, 2012).......................................................................... 13

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that plaintiff DC Comics hereby applies *ex parte* for an order lifting the temporary stay on this Court's May 25, 2011, and August 8, 2011, orders directing defendants to produce without limitation all of the "Toberoff Timeline" and other documents defendants provided to the U.S. Attorney's Office ("USAO"), as well as all of defendants' and their counsels' communications with the government.  Docket Nos. 262, 287, 309.  DC respectfully requests a hearing on this *ex parte* application, if one is needed, on April 30, 2012, at 10:00 a.m., by the above-entitled Court, located at 255 East Temple Street, Los Angeles, California in Courtroom 540.

On April 17, 2012, the Ninth Circuit issued an opinion (i) affirming this Court's May 25, 2011, and August 8, 2011, orders; and (ii) decisively rejecting all of defendants' arguments why the Timeline documents and USAO communications should not be produced.  (The Ninth Circuit's opinion is attached as Appendix A.)  Even so, defendants refuse to produce these two sets of documents until they have sought further review before the Ninth Circuit (and perhaps the U.S. Supreme Court), thereby unilaterally extending this Court's stay order to an indefinite stay that may last a year longer than the current 11-month stay has already lasted.

This *ex parte* application is made pursuant to Local Rule 7-19 on the ground that DC is being severely prejudiced by defendants' unjustified withholding of the Timeline documents and USAO communications.

- DC has important appellate filings due a few weeks from now on May 24, 2012.  These briefs will reference, discuss, and rely on the Timeline documents—among them Kevin Marks' memo confirming that the Siegels made a "deal" with DC in October 2001—a deal which they were induced to abandon and breach to do business with Marc Toberoff.  If DC were required to follow the motion procedure set forth in Local Rule 7 to seek to lift the Court's current stay, the earliest date such a noticed motion

- 1 -

1    could be heard is June 4, 2012—*weeks after these appellate briefs are*
2    *due*.  Defendants' express aim in seeking this delay is to keep the crucial
3    Timeline documents from the Ninth Circuit.

4    • Defendants' delay tactics are already well underway.  Yesterday, they
5    filed a request for a 30-day extension (until May 31, 2012) to file their
6    rehearing petitions in the Ninth Circuit.  Whenever defendants' petition is
7    filed, the Ninth Circuit can take up to seven months to rule on it.  While
8    rehearing will undoubtedly be denied, defendants will then have close to
9    90 days to file a petition for certiorari, and it will then take several
10   additional months to brief and resolve that cert petition.

11   • All of this causes severe prejudice to DC.  DC needs these documents for
12   its appellate filings and to take and resume discovery in the case, which
13   has been greatly impeded while the writ pended for 11 months.  DC needs
14   to finish litigating this case without further delay, as defendants claim
15   they will have a partial blocking right to bar new Superman content
16   starting in 2013.  In short, defendants are trying to engineer a situation
17   where DC never has access to Timeline documents for any use in this
18   case.  No more delay can nor should be countenanced.

19   DC notified defendants of this *ex parte* application on April 17, 2012.  Decl.
20   of C. Seto ("Seto Decl.") Exs. C, E.  Defendants oppose it.  *Id.* Exs. D, F.

21   This application is made pursuant to Local Rule 7-19 and is based on this
22   application, the attached memorandum of points and authorities, the declaration of
23   Cassandra Seto, such further showing or evidence that DC may present at any
24   hearing on this *ex parte* application, and any other matters before this Court.

25   Dated:        April 25, 2012                Respectfully Submitted,
26                                              O'MELVENY & MYERS LLP

27                                              By:  /s/ Daniel M. Petrocelli
28                                                  Daniel M. Petrocelli
                                                    Attorneys for Plaintiff DC Comics

- 2 -

DC'S *EX PARTE* APPLICATION TO LIFT TEMPORARY STAY

## MEMORANDUM OF POINTS & AUTHORITIES

Enough is enough.  Eleven months ago this Court ordered defendants to produce the "Toberoff Timeline" documents they gave to the U.S. Attorney's Office ("USAO").  Docket No. 262.  Weeks later the Court then ordered defendants to produce all of their communications with the government.  Docket No. 309.

At defendants' request, the Court temporarily stayed the required productions to allow defendants to seek writ review in the Ninth Circuit.  Docket Nos. 287, 309. In seeking and defending the stay, defendants promised to produce the documents once "the Ninth Circuit has the opportunity to weigh in" on their writ petition. Docket No. 286 at 4.  That "opportunity" has now passed.  After full briefing and oral argument, the Ninth Circuit issued a unanimous opinion last week denying defendants' petition, affirming this Court's ruling that defendants waived privilege over the Timeline documents, and affirming this Court's ruling that defendants shared no common-interest privilege with the USAO.  *See* Appendix A.

In a last-ditch effort to suppress the Timeline documents and the devastating facts they disclose, defendants now assert that this Court's stay order should remain in place indefinitely—until defendants seek further review by the Ninth Circuit and perhaps the U.S. Supreme Court.  Even then, defendants refuse to produce the documents unless all remain confidential and are hidden from the public.  These are clear misreadings of this Court's orders and are causing severe prejudice to DC.

DC has two important appellate filings due in the Ninth Circuit on May 24, 2012.  These briefs will reference and discuss the Timeline documents, as those documents are central to the issues being litigated in both appeals, and the Ninth Circuit has the discretion and good reason to consider them.  If DC were required to follow the motion procedure set forth in Local Rule 7 to lift the Court's current stay, the earliest date such a noticed motion could be heard is June 4, 2012—*weeks after DC's appellate filings are due*.  Defendants' express aim in seeking delay is to keep the crucial Timeline documents from DC and the Ninth Circuit.

Indeed, defendants' delay efforts have already begun, full force. Rather than file their petitions for review on May 1, when they are due, they moved yesterday for a 30-day extension to file their rehearing petitions. If this request is granted, defendants will not file their petitions until *after* DC's May 24 appellate briefs are due. But this is not all. The Ninth Circuit can take up to seven months to rule on en banc petitions, and while rehearing will undoubtedly be denied, defendants will have near 90 days to file a petition for certiorari. Months will then be spent briefing and resolving that baseless cert petition. In short, defendants seek to orchestrate a situation where DC *never* has access to the Timeline documents for any use, ever.

No more delay can or should be countenanced. Not only does DC need the Timeline and other documents for pending appellate filings, DC needs to take and resume key discovery in the case. Discovery was greatly impeded (especially on the deposition front) while the writ pended the past 11 months. No more delay in discovery, which is antecedent to a final resolution of this case, should be invited given the direct impact of these lawsuits on the Superman franchise. Defendants say their termination notices take effect in October 2013, and they clearly want to run the clock in this case before the validity of those notices is fully adjudicated.

These are not valid reasons for delay. This Court should order defendants to produce the Timeline documents and USAO communications immediately, without limitation, and by no later than April 30, 2012, at 5 p.m. PDT.

1. The Court's Stay Order and Defendants' Arguments In Support of It. Now that the Ninth Circuit has rejected defendants' writ petition, this Court should lift the stay on its May 25 and August 8, 2011, orders. Docket Nos. 262, 287, 309. In their opposition to DC's motion to compel production of the Timeline documents, defendants told this Court: "[A]t a minimum, any order from this Court requiring the production of privileged material should be *stayed pending writ review* in order to give the district court and *if necessary the Ninth Circuit* the opportunity to address the important privilege issues at stake here before any production is

1    mandated." Docket No. 210 at 10 (emphasis added). This Court stayed production

2    of the Timeline documents, stating: "[T]he Court stays its ruling to allow

3    Defendants to seek review before the District Judge. If the Defendants seek such

4    review, the stay shall continue in effect until all review is exhausted or the District

5    Judge rules to the contrary on the matter." Docket No. 262 at 4.

6        After the district court denied defendants' motion for review, Docket No.

7    279, DC sought clarification from this Court as to the duration of the stay it

8    imposed. Docket No. 283. DC pointed out that if the words "until all review is

9    exhausted" were read broadly, the stay could extend until the conclusion of the

10   case, as interlocutory rulings are always subject to "review." *Id.* at 1. Defendants

11   expressly rejected this interpretation, telling this Court: "*By its terms*, the Order

12   *clearly contemplates* a stay *pending a motion for review and potential writ review*

13   *by the Ninth Circuit*." Docket No. 286 at 2-3 (emphases added).

14       Defendants *never* suggested that the stay they sought would extend beyond

15   the Ninth Circuit's disposition of their writ petition. To the contrary, they affirmed

16   that they would produce the Timeline documents after "the Ninth Circuit has the

17   opportunity to weigh in." *Id.* at 4; *id.* at 1 ("The stay is amply justified *to allow the*

18   *Ninth Circuit the opportunity to address* this important issue"); *id.* ("premature

19   production" would "disrupt any meaningful *review by the Ninth Circuit*")

20   (emphases added).

21       This Court's June 27, 2011, order reiterated that the purpose of the stay was

22   to allow the Ninth Circuit to rule on defendants' writ petition and recognized that

23   any writ review should not be used "for the purpose of delaying the time within

24   which to produce" the required documents:

25       Although the advocates on each side of this question want to paint
         this dispute in black and white tones, the Court sees it as
26       predominantly gray, and the cases finding waiver elucidate the
         competing considerations. *The Ninth Circuit, however, has not*
27       *weighed these considerations in a context like that presented here.*
         While the Court is satisfied with its analysis, the matter is not clear cut,

28

- 3 -

and the consequences of a wrong decision are significant.  It may be true that an erroneous releasing of privileged documents can be repaired through an appellate reversal, as [DC] argues, but the privilege nevertheless in that case will not have been preserved, and the confidence which clients reposed in their attorneys will have been undermined.  This is not a situation the Court takes lightly.

> _It is for that reason that the Court stayed its ruling_ ….

Since Defendants have stated that they intend to seek review by writ from the Ninth Circuit, and since the rules impose no deadline for filing a writ application, the possibility exists in theory—although the Court doubts that it exists in practice—that Defendants will tarry with such review for the purpose of delaying the time within which to produce, if they have to produce.  To foreclose this possibility, the Court modifies its stay; _the stay will expire if Defendants have not filed an application for review with the Ninth Circuit by the close of business on June 30, 2011; if they file such an application by that time, the stay will continue until further order of the Court._  Docket No. 297 at 203 (emphases added).

2. The Ninth Circuit's April 17 Ruling.  Defendants had a full and fair opportunity to challenge this Court's rulings before the Ninth Circuit.  The Ninth Circuit allowed full briefing on the merits and a 36-minute oral argument—double the length permitted by the Court's scheduling order.  Seto Decl. Ex. B.  On April 17, the Ninth Circuit issued a detailed, scholarly opinion decisively rejecting each of defendants' claims and affirming this Court's ruling that they waived privilege by voluntarily producing documents to the government without redacting or withholding them or seeking a protective order.  Appendix A, Slip Op. at 4239-55.

- The Ninth Circuit rejected defendants' contention that because Toberoff disclosed the Timeline documents "to the government, as opposed to a civil litigant, his actions did not waive the privilege as to the world at large."  _Id._ at 4248.  There is no policy justification for such a selective-waiver rule, and "Congress has declined" to adopt such a rule.  _Id._ at 4249-50.  Similarly, there is no policy reason for creating a selective waiver rule for so-called "victims" who provide evidence to the government.  _Id._ at 4252.

- Nor does the fact that the government subpoenaed the documents render their disclosure involuntary.  "Toberoff both solicited the subpoena and" opted not

to assert privilege "even though the subpoena specifically contemplated that Toberoff may choose to redact the privileged materials." *Id.* at 4253.

- Even if Toberoff had a confidentiality agreement with the USAO, there was no policy justification for enforcing it; "recognizing the validity of such a contract 'merely [adds] another brush on an attorney's palette [to be] utilized and manipulated to gain tactical or strategic advantage.'" *Id.* at 4251.

- The court also rejected defendants' claim that they had a common-interest agreement with the USAO, *id.* at 4252-53—this baseless argument on which defendants relied to resist producing both the Timeline documents and their communications with the USAO was without legal or factual support, *id.*

- Finally, the court rejected any suggestions that the documents should remain confidential because the heirs did not consent to their disclosure. Attorneys have authority to waive privilege on behalf of a client, *id.* at 4254, and there was "evidence that the Heirs affirmatively consented to Toberoff's actions," and that Toberoff—as a "co-client"—"had authority unilaterally to waive the privilege on at least some of these documents," *id.* at 4254 & n.6.

3. Defendants' Refusal to Produce the Required Documents and the Immediate Prejudice DC Is Suffering. After the Ninth Circuit's ruling, DC asked defendants to produce the Timeline documents and USAO communications, and even offered to treat them as confidential provisionally. Seto Decl. Ex. C, E. Defendants refused to produce the documents, and contrary to their earlier position, *supra* at 2-3, asserted that this Court's stay order should remain in place until defendants have exhausted "*all*" possible avenues for review, beginning with a petition for "panel rehearing and/or rehearing en banc" and perhaps any possible "other review." *Id.* Ex. F-52, F-53 (emphasis in original).

Such an extension of this Court's stay order is unjustified, could last yet another year, and is a transparent delay tactic, which would greatly prejudice DC. Indeed, defendants' delay tactics are already well underway; yesterday, they filed a

- 5 -

request for a 30-day extension (until May 31) to file their rehearing petitions in the

Ninth Circuit.  Seto Decl. Ex. G.  Whenever defendants' petitions are filed, the

Ninth Circuit can take up to seven months to rule on them.  *See* FED. R. APP. P.

40(a)(1); Ninth Circuit General Orders 5.4(b)-(c), 5.5(a)-(b).  While rehearing will

undoubtedly be denied, *see infra* at 10-13, defendants will then have close to 90

days to file a petition for certiorari, *see* 28 U.S.C. § 2101(c); Supreme Court Rule

13.1, 13.3, and it will then take several additional months to brief and resolve it.

     a.  DC needs the Timeline documents for soon-to-be-filed appellate briefs.

Defendants have appealed the district court's denial of their SLAPP motion, and

DC's answering brief in that appeal is due *May 24, 2012—less than a month from*

*today*.  The Timeline documents are important to this SLAPP briefing.  The

threshold inquiry under the SLAPP statute is whether DC's state-law claims are

based on protected activity.  *See Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002).

According to the detailed descriptions in the Timeline, among the Timeline

documents are Toberoff's correspondence and agreements with the Siegel and

Shuster heirs, as well as a memorandum from an outside law firm advising that

Toberoff that his *business* deals with the heirs raise "questions of legality."  Docket

No. 49, Ex. A at 62-67.  These documents will confirm—as the district court rightly

held, Docket No. 337—that DC's claims *do not* arise out of Toberoff's protected

activities as a lawyer, but are instead based on Toberoff's inducing the heirs to enter

into illicit business agreements with him, *see id.*; Docket No. 307 at 13-22.

     The second step of the SLAPP analysis considers the probability of success

on DC's state-law claims.  *See Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal.

4th 53, 67 (2002).  The Timeline documents directly corroborate DC's claims that

Toberoff improperly interfered with DC's agreements and relationships with the

heirs—including, for example, the memo from Kevin Marks to the Siegels

affirming that they reached a "deal" with DC in 2001 and warning them against

repudiating that agreement in favor of Toberoff's business offer.  *See* Docket No.

307 at 22-25; Docket No. 334 at 17-25.  Moreover, these still-hidden documents will refute defendants' statute-of-limitations and other arguments and demonstrate DC's entitlement to further discovery, which is itself a basis for denying a SLAPP motion.  *See Shropshire v. Fred Rappoport Co.*, 294 F. Supp. 2d 1085, 1100 (N.D. Cal. 2003) (deferring SLAPP ruling until summary judgment because "SLAPP motion raises factual questions that cannot be resolved" without discovery); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal. App. 4th 855, 868 (1995) (court can continue SLAPP hearing so discovery can be completed).

Also on May 24, 2012, DC must file its reply brief in the *Siegel* cross-appeal. A central issue in that appeal—indeed, DC's lead argument on its cross-appeal—is whether the parties reached a binding settlement agreement in 2001 that bars Laura Siegel Larson's claims.  Seto Decl. Ex. H-106-118.  DC has asked the Ninth Circuit to enter judgment for DC as a matter of law, especially given that recent Circuit authority confirms that a settlement agreement is enforceable where, as here, the parties reached agreement on its material terms—even if the settlement later falls apart during finalization of a long-form agreement.  *Id.* Ex. H-106-115 (discussing, *inter alia*, *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011).  At minimum, the new Timeline evidence, including the Marks memo, confirms that there are disputed factual issues that can only be resolved in Larson's favor at trial.  *Id.* Ex. H-115-18.  In fact, the Marks memo, which is among the Timeline documents, confirms that the Siegels had a "deal" with DC.  *Id.* at 18-19, 37; Seto Ex. H-99-100, 118.  This memo is key evidence in the *Siegel* appeal, *id.*, and defendants' refusal to produce it is plainly tactical:  defendants desperately want to deprive the Courts (especially the Ninth Circuit) of this damaging evidence.

If DC were required to follow the Local Rule 7 motion procedure to lift the Court's current stay, the earliest date such a noticed motion could be heard is June 4, 2012—*well after DC's May 24 appellate briefs are due*.  Defendants' efforts to run the clock should be rejected, and the Court's stay order should be lifted.

b.  Defendants seek to undermine the urgent need for the Timeline documents by asserting that DC cannot refer to the documents in appellate briefing. Seto Decl. Ex. F-52.  This argument is specious, and ignores two fundamental facts. First, DC *also* needs the Timeline documents to take and complete discovery, *see infra* at 9; and, second, both appeals are *interlocutory*, and the Ninth Circuit has far greater latitude and reason to consider such evidence.  Indeed, what defendants ignore is that the Ninth Circuit—*and the Ninth Circuit alone*—has complete discretion to determine what evidence it will consider on appeal.[1]

Considering Timeline-related evidence—including the Marks memo and memoranda describing Toberoff's unlawful business dealings—makes a great deal of sense in both appeals, as fairness dictates such long-suppressed evidence be heard.  *E.g.*, *Mangini v. U.S.*, 314 F.3d 1158, 1160-61 (9th Cir. 2003) (granting motion to supplement record with three newly discovered letters that refuted material misstatement in opposing party's affidavits below); *Rigsby v. Avenenti*, 1992 WL 144440, at *4 n.1 (9th Cir. June 26, 1992) (granting motion to supplement record with documents "only recently obtained"); *Cootz v. Gen. Tel. Co.*, 1988 WL 131672, at *5 n.5 (9th Cir. Nov. 25, 1988) (granting motion to supplement record with section of collective bargaining agreement that "was not part of the record below" because it was "material to th[e] appeal" and opposing parties "had possession" of the document during the suit).[2]

---

[1] *See Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003) (court has inherent authority to supplement record); *accord See More Light Invs. v. Morgan Stanley DW Inc.*, 415 Fed. Appx. 1, 2 (9th Cir. 2011); *Johnson v. Rancho Santiago Comm'y College Dist.*, 623 F.3d 1011, 1020 n.3 (9th Cir. 2010).

[2] *Colbert v. Potter*, 471 F.3d 158, 165-66 (D.C. Cir. 2006), is equally instructive. There, a receipt was relevant to whether the statute of limitations had run.  In the district court, appellee submitted a photocopy of the back side of the receipt, and appellant "challenged the sufficiency and significance of [appellee]'s evidence."  *Id.*  The D.C. Circuit allowed appellee to supplement the record with a complete copy because, as here, this evidence "go[es] to the heart of the contested issue, [and] it would be inconsistent *with this court's own equitable obligations ... to pretend that [it does] not exist.*"  *Id.* at 166 (emphasis added).

- 8 -

1    And, in any event, the Timeline documents are very much a part of the record

2  in both the *Siegel* and *Pacific Pictures* cases.  The Court ordered those documents

3  produced on May 25, 2011—*before* defendants filed their notice of appeal in *Siegel*

4  and *five months* before the district court ruled on defendants' SLAPP motion.

5  Docket No. 337; Case No. CV-04-08400 (ODW) (RZ), Docket No. 671.

6    c. DC will also be prejudiced by the second year-long delay defendants seek

7  to engender because DC has an urgent need to complete discovery in this case and

8  obtain a final judgment.  Many parts of discovery, chief among them depositions,

9  ground to a halt after the Court issued its stay order.  Often at the urging of the

10  witnesses' counsel, DC has had to defer depositions for key witnesses, including

11  Toberoff, his three companies, his business partner Ari Emanuel, the Siegels'

12  former counsel Kevin Marks, the Timeline author, and many others.  DC needs the

13  Timeline documents to conduct examinations of these witnesses, to develop other

14  evidence necessary to pursue its rights (including by seeking summary judgment),

15  and to depose the defendant heirs.  Docket No. 364 at 8-10.

16    Defendants want to grind the case to a halt for as long as they can, on the

17  theory that in October 2013 DC's rights will be compromised, as both the Siegels'

18  and Shusters' termination notices purport to take effect then.  This is a bargaining

19  ploy, of course, and DC needs and has the right to proceed to judgment in this case

20  well before 2013.  A critical path item in doing so is completing discovery, and

21  discovery cannot really begin or end until DC has the Timeline documents in hand.

22    Petitioners might wish that the Supreme Court or en banc court will save

23  them.  But as *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 606-07 (2009),

24  made clear, this is not a valid impediment to DC getting the Timeline documents:

25    [P]ostjudgment appeals generally suffice to protect the rights of litigants
    and assure the vitality of the attorney-client privilege.  Appellate courts
26    can remedy the improper disclosure of privileged material in the same
    way they remedy a host of other erroneous evidentiary rulings:  by
27    vacating an adverse judgment and remanding for a new trial….

28

- 9 -

4.  Defendants' Remaining Arguments.  Defendants posit two final arguments for withholding the Timeline documents—that their further appeals are likely to succeed, and that the production of the Timeline documents raises protective order concerns.  Neither claim has merit.

*a.  Defendants' Further Appeals Are Baseless.*  Defendants had their day in court in the Ninth Circuit, they lost, and they have no sound basis for seeking en banc or certiorari review.  While defendants say there is a "circuit split" concerning the selective-waiver rule, Seto Decl. Ex. G-58, G-63, only *one* circuit has ever recognized the rule—*Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977)—and that was 35 years ago, in a few conclusory sentences containing no meaningful analysis, *see id.*; *Westinghouse Elec. Corp. v. Repub. of the Phil.*, 951 F.2d 1414, 1424 (3d Cir. 1991); Slip Op. at 4248-49.[3]  As the Ninth Circuit observed, "*every other circuit* to consider the issue" has held that parties may not selectively disclose privileged materials.  Slip Op. at 4248.[4]  And like the Ninth Circuit panel that heard defendants' writ, the presiding judges in these other cases are (or were) some of the most respected jurists in the country.  *Id.*[5]

Defendants seek to create the illusion of yet another circuit split by asserting that where privileged documents are produced (a) under compulsion and

---

[3] Indeed, the Eighth Circuit itself has since backed away from *Diversified*.  *See In re Grand Jury Proc. Subpoena*, 841 F.2d 230, 234 (8th Cir. 1988) ("[v]oluntary disclosure is inconsistent with the confidential attorney-client relationship *and waives the privilege*") (emphasis added); *In re Chrysler Motors Corp.*, 860 F.2d 844, 846 (8th Cir. 1988) (declining to extend *Diversified*).

[4] *See Permian Corp. v. U.S.*, 665 F.2d 1214, 1216-17 (D.C. Cir. 1981); *In re Martin Marietta Corp.*, 856 F.2d 619, 623-24 (4th Cir. 1988); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993); *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1416-18 (Fed. Cir. 1997); *U.S. v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997); *In re Columbia/HCA Healthcare Cor. Billing Practices Litig.*, 293 F.3d 289, 302 (6th Cir. 2002); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *In re Qwest Commc'ns Int'l*, 450 F.3d 1179, 1201 (10th Cir. 2006); *see also McKesson HBOC, Inc. v. Super. Ct.*, 115 Cal. App. 4th 1229, 1236-41 (2004).

[5] *E.g.*, *Westinghouse*, 951 F.2d at 1424 (Becker, J.); *Permian*, 665 F.2d at 1216-17 (Mikva, J.); *MIT*, 129 F.3d at 686 (Boudin, J.); *In re Qwest*, 450 F.3d at 1201 (Murphy, J.); *U.S. v. Reyes*, 239 F.R.D. 591, 602 (N.D. Cal. 2006) (Breyer, J.).

- 10 -

1   (b) pursuant to a confidentiality agreement, "the Second Circuit, and many other

2   courts, have long found no waiver."  Seto Decl. Ex. A-35; Ex. G-58-59.  But both

3   this Court and the Ninth Circuit conclusively held that Toberoff was *not compelled*

4   to produce anything—rather, "Toberoff asked the [USAO] to investigate Michaels,"

5   he "request[ed]" that the USAO issue a subpoena for the Timeline documents, and

6   he "readily complied with the subpoena, making no attempt to redact anything from

7   the documents."  Slip Op. at 4245; *see also* Docket No. 262 at 2-4.

8        The Ninth Circuit also made clear that "*no* circuit has officially adopted such

9   a rule."  Slip Op. at 4250-51 (emphasis added).  Circuit courts have uniformly

10  rejected selective-waiver claims made on the basis of confidentiality agreements.[6]

11  Those willing to consider the *theoretical* possibility of such a rule call it a "leap," *In*

12  *re Qwest*, 450 F.3d at 1192-94, and the Second Circuit did not "f[i]nd no waiver"

13  based on such an agreement, contrary to defendants' false claim.  Seto Decl. Ex. A-

14  35.  In dicta—which by definition cannot give rise to a circuit split[7]—the Second

15  Circuit said that a confidentiality agreement *might* excuse a selective waiver, but it

16  then rejected the claim of permissible selective-waiver in that case.  *See Steinhardt,*

17

18  [6] *E.g.*, *MIT*, 129 F.3d at 686 ("Anyone who chooses to disclose a privileged document
    to a third party, or does so pursuant to a prior agreement of understanding, has an
19  incentive to do so …. [C]ourts have been unwilling to start down this path [of recognizing
    a selective waiver rule]—which has no logical terminus—and we join in this
20  reluctance."); *In re Columbia*, 293 F.3d at 302 ("any form of selective waiver, even that
    which stems from a confidentiality agreement, transforms the attorney-client privilege
21  into 'merely another brush on an attorney's palette, utilized and manipulated to gain
    tactical and strategic advantage'"); *In re Chrysler*, 860 F.2d at 847 ("Nor does the
22  agreement … not to disclose the computer tape to third-parties change the fact that the
    computer tape has not been kept confidential.").
23
    [7] "[A]n inconsistency in dicta" does not a circuit split make; for a true conflict to exist,
24  "there must be a real or 'intolerable' conflict on the same matter of law or fact."  R. STERN
    ET AL., SUPREME COURT PRACTICE 241 (9th ed. 2007); *see also Oncale v. Sundowner*
25  *Offshore Servs. Inc.*, 83 F.3d 118, 120 n.3 (5th Cir. 1996) (noting "no circuit split yet
    exists" where courts had expressed differing views in dicta only); *McDaniels v. Hospice*
26  *of Napa Valley*, 2006 WL 2038276, at *7 (N.D. Cal. July 19, 2006) (same); *Abbs v.*
    *Sullivan*, 963 F.2d 918, 925 (7th Cir. 1992) ("Dicta are not judgments."); *see also id*. at
27  924 (party "cannot appeal a judgment merely because there are passages in the court's
    opinion that displease him—that may indeed come back to haunt him in a future case").
28

- 11 -

1  9 F.3d at 236; *Police & Fire Ret. Sys. v. Safenet, Inc.*, 2010 U.S. Dist. LEXIS

2  23196, at *7 (S.D.N.Y. Mar. 11, 2010) (confirming *Steinhardt* was "dicta").

3      Defendants also falsely contend that Judge Posner's decision in *Dellwood*

4  *Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997), evidences a

5  "significant" circuit split between the Seventh and Ninth Circuits as to whether

6  "confidentiality agreements between the Government and a party cannot protect

7  privileged documents from a third party."  Seto Decl. Ex. G-58-59, G-63¶ 4.  This

8  claim is frivolous.  By its express terms, *Dellwood* did *not* involve a *confidentiality*

9  agreement, 128 F.3d at 1124; it was the government, *not a private civil litigant like*

10  *Toberoff*, who disclosed the materials in question, *id*. at 1126-27; and the court

11  recognized that other circuits had rejected the selective-waiver rule, but noted those

12  cases did not apply to the government, given that plaintiffs could obtain the same

13  discovery from other sources, *id*.  As Judge Easterbrook and the Seventh Circuit

14  made clear in 2003, the Seventh Circuit has joined every other circuit in rejecting

15  defendants' selective-waiver rule.  "Knowing disclosure to a third party almost

16  invariably surrenders the privilege with respect to the world at large; selective

17  disclosure is not an option."  *Burden-Meeks*, 319 F.3d at 899.

18      If there were doubt on federal policy on this question, well before defendants

19  made their knowing selective waiver in this case in 2010, Congress "declined to

20  adopt even th[e] limited form of selective waiver" that defendants posit.  Slip. Op.

21  at 4251.  As the 2007 Advisory Committee Notes to Federal Rule of Evidence 502

22  make clear, the selective-waiver rule proved too "controversial"; thus, Rule 502, as

23  amended, did "not provide a basis for a court to enable parties to agree to a

24  selective waiver of the privilege, such as to a federal agency conducting an

25  investigation."  FEDERAL CRIMINAL CODE AND RULES at 327 (West 2011 ed.).

26      *b.  Defendants' Protective Order Concerns Are Baseless.*  Defendants refuse

27  to produce the required documents—*even if the stay is lifted*—unless DC agrees to

28  designate all the documents "confidential" and keep them hidden from the public.

1    Seto Decl. Exs. D, F.  This position is also without merit, and defendants have

2    never met *their* burden to move for a protective order to keep the documents sealed.

3    Rather, defendants embarked on a public-relations campaign following the Ninth

4    Circuit's ruling, telling countless media outlets that "nothing in this ruling or the

5    documents at issue will affect the merits of this case."  *E.g.*, *Warner Gets Victory In*

6    *Legal Fight With Superman Heirs' Attorney*, L.A. TIMES, Apr. 17, 2012; E. Phillips,

7    *Court Grants D.C. Comics Documents Access*, DAILY JOURNAL, Apr. 18, 2012.

8         There is no reason or justification for treating all of the Timeline documents

9    and USAO communications as confidential.  The USAO documents are documents

10   shared with a third-party with whom the defendants were not in a common-interest

11   relationship.  Slip Op. at 4252-53.  Defendants produced and openly disclosed *some*

12   of these communications in public filings when it served their tactical purposes,

13   Docket Nos. 231 at 16-19; 269 at 7-11; 368 at 7-9, but have, to date, suppressed the

14   remainder.  All of these documents should be produced without limitation or delay.

15        As for the Timeline documents, many were never privileged or confidential

16   to begin with, as all have now learned.  Good examples are the Michael-Laura

17   Siegel letters that this Court and Judge Wright ordered defendants to produce, and

18   which defendants did not move to designate as confidential.  Docket Nos. 209 at

19   12; 336.   Moreover, the contents of many other Timeline documents are openly

20   disclosed in the Timeline itself, and the Timeline and its descriptions of these

21   documents have been part of the public record since 2009, are not confidential, and

22   defendants never even moved to seal the Timeline document.  *E.g.*, Docket Nos. 42

23   at 43-47; 316 at 16-17; *see also* Case No. CV-04-8400, Docket No. 476-4 at 5-11.

24        In any event, *three courts* have now ruled that defendants waived whatever

25   privilege or secrecy might otherwise obtain in these documents when they

26   voluntarily gave them to the USAO.  Docket Nos. 262, 309, 279; Slip Op. at 4239-

27   55.  Defendants also waived any right to assert additional confidentiality claims in

28   the documents by failing to request such treatment in their opposition to DC's

1  motion to compel before this Court, their briefing concerning this Court's stay

2  order, their motion for review before to the district court, or in any of their Ninth

3  Circuit briefs and filings.  *Cf.* Docket Nos. 269 at 5 n.3; 286 at 5; 361-2 at 48.

4      Despite all this, and to stave off the need for motion practice, DC offered to

5  treat the Timeline documents as provisionally confidential:

> [I]n interest of expediting matters,  and without prejudice to any of
> DC's rights, if defendants produce all of the documents required in the
> time frame Cassie requested yesterday, *DC will treat the Timeline*
> *documents (but not defendants and defense counsels' communications*
> *with the government) as confidential pending our review* of the
> Timeline documents.  We will let you know next week whether we
> agree that any of the Timeline documents should be treated as
> confidential.  *If you disagree with our positions, we can meet and*
> *confer next week on the issue, and you can file a motion for any*
> *protective order you seek, and we will agree to expediting briefing and*
> *hearing on the issue.*

13  Seto Decl. Ex. E (emphasis added).  Defendants refused DC's offer, conditioning

14  any production on DC's agreement to keep all of documents under wraps, sight

15  unseen.  *Id.* Ex. F.  Defendants cannot condition their compliance with court orders

16  on DC's agreement to shield their misconduct from the courts or the public.

17                          *      *      *

18      For the foregoing reasons, DC respectfully requests that the Court lift its stay

19  orders on the required production of the Toberoff Timeline and other documents

20  defendants provided to the USAO, as well as defendants' and their counsels'

21  communications with the USAO over the past two years.  *Defendants should be*

22  *ordered to produce all of these documents without limitation or redaction by 5:00*

23  *pm (PDT) on April 30, 2012*, so DC may use these materials in its soon-to-be-due

24  appellate filings and re-start and commence new discovery without delay.

25      DC has met its burden under Local Rule 7-19 to prove the prejudice needed

26  to grant this application.  *See Columbia Pictures Indus., Inc. v. Bunnell*, 2007 WL

27  4916963, at *1 (C.D. Cal. Aug. 10, 2007) (*ex parte* relief appropriate to compel

28  compliance with discovery orders); *accord Mission Power Eng'g Co. v. Cont'l Cas.*

1  *Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995).  It also proposed a reasonable

2  procedure to address any vestigial and legitimate concerns (if any) that defendants

3  might have concerning confidentiality.

4        If the Court requires hearing on this matter, DC requests that the hearing

5  occur on April 30, 2012, at 10 a.m. PDT.

6  Dated:          April 25, 2012                    Respectfully Submitted,

7                                                    O'MELVENY & MYERS LLP

8                                                    By:   /s/ Daniel M. Petrocelli

9                                                        Daniel M. Petrocelli
                                                         Attorneys for Plaintiff DC Comics
10

11

12  OMM_US:70667349

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In re: PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY; LAURA SIEGEL LARSON; JEAN ADELE PEAVY,

---

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; MARC TOBEROFF, an individual; JEAN ADELE PEAVY; LAURA SIEGEL LARSON, an individual,

        *Petitioners,*

v.

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES,

        *Respondent,*

D.C. COMICS,

        *Real Party in Interest.*

No. 11-71844

D.C. No. 2:10-cv-03633-ODW-RZ

OPINION

Petition for Writ of Mandamus

Argued and Submitted
February 7, 2012—Pasadena, California

Filed April 17, 2012

4239

**APPENDIX A**
**16**

4240                    In re Pacific Pictures
_____

Before: Alex Kozinski, Chief Judge,
Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges.

Opinion by Judge O'Scannlain

4242                    In re Pacific Pictures

---

**COUNSEL**

Richard B. Kendall, Kendall Brill & Klieger LLP, Los Angeles, California, argued the cause and filed the briefs for the petitioners. With him on the briefs were Laura W. Brill, Kendall Brill & Klieger, LLP, Los Angeles, California, as well as Marc Toberoff and Keith G. Adams, Toberoff & Associates, P.C., Los Angeles, California.

Matthew T. Kline, O'Melveny & Myers LLP, Los Angeles, California, argued the cause and filed the brief for the real party in interest. With him on the brief were Daniel M. Petrocelli and Cassandra L. Seto, O'Melveny & Myers LLP as well as Patrick T. Perkins, Perkins Law Office, P.C., Cold Spring, New York.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a party waives attorney-client privilege forever by voluntarily disclosing privileged documents to the federal government.

I

In the 1930s, writer Jerome Siegel and illustrator Joe Shuster joined forces to create the character that would eventually become Superman. They ceded their intellectual property rights to D.C. Comics when they joined the company as independent contractors in 1937.[1] Since the Man of Steel made his first appearance in 1938, he has been fighting for "truth, justice, and the American way." Shuster, Siegel, their heirs ("Heirs"), and D.C. Comics have been fighting for the rights to his royalties for almost as long.

Marc Toberoff, a Hollywood producer and a licensed attorney, stepped into the fray around the turn of the millennium. As one of his many businesses, Toberoff pairs intellectual property rights with talent and markets these packages to movie studios. Having set his sights on Superman, Toberoff approached the Heirs with an offer to manage preexisting litigation over the rights Siegel and Shuster had ceded to D.C. Comics. He also claimed that he would arrange for a new Superman film to be produced. To pursue these goals, Toberoff created a joint venture between the Heirs and an entity he owned. Toberoff served as both a business advisor and an attorney for that venture. The ethical and professional concerns raised by Toberoff's actions will likely occur to many readers, but they are not before this court.

---

[1] The name and corporate structure of the real party in interest has changed a number of times since 1938. For simplicity, we refer to it as "D.C. Comics."

While the preexisting litigation was pending, Toberoff
hired lawyer David Michaels to work for one of his compa-
nies. Michaels remained in Toberoff's employ for only about
three months before absconding with copies of several docu-
ments from the Siegel and Shuster files. Unsuccessful in his
initial attempt to use the documents to solicit business from
the Heirs, Michaels sent the documents to executives at D.C.
Comics. While he did not include his name with the package,
he did append a cover letter, written in the form of a timeline,
outlining in detail Toberoff's alleged master plan to capture
Superman for himself.

This happened no later than June 2006, and the parties have
been battling over what should be done with these documents
ever since. Rather than exploiting the documents, D.C. Com-
ics entrusted them to an outside attorney and sought to obtain
them through ordinary discovery in the two ongoing lawsuits
over Superman. Considering every communication he had
with the Heirs to be privileged—regardless of whether the
communication was in his capacity as a business advisor or an
attorney—Toberoff resisted all such efforts. Ultimately, in
April 2007, a magistrate judge ordered certain documents,
including Michaels' cover letter, turned over to D.C. Comics.
A few months later, Toberoff at long last reported the incident
to the authorities (specifically the Federal Bureau of Investi-
gation). In December 2008, Toberoff finally produced at least
some of the documents.

In 2010, D.C. Comics filed this lawsuit against Toberoff,
the Heirs, and three entities in which Toberoff owned a con-
trolling interest (collectively, the "Petitioners"), claiming that
Toberoff interfered with its contractual relationships with the
Heirs. Michaels' cover letter formed the basis of the lawsuit
and was incorporated into the complaint. Toberoff has contin-
ued to resist the use of any of the documents taken from his
offices, including those already disclosed to D.C. Comics and
especially Michaels' letter.

About a month after the suit was filed, Toberoff asked the Office of the United States Attorney for the Central District of California to investigate Michaels. In response to a request from Toberoff, the U.S. Attorney's Office issued a grand jury subpoena for the documents as well as a letter stating that if Toberoff voluntarily complied with the subpoena the Government would "not provide the . . . documents . . . to non-governmental third parties except as may be required by law or court order." The letter also confirmed that disclosure would indicate that "Toberoff has obtained all relevant permissions and consents needed (if any) to provide the . . . documents . . . to the government." Armed with this letter, Toberoff readily complied with the subpoena, making no attempt to redact anything from the documents.

D.C. Comics immediately requested all documents disclosed to the U.S. Attorney, claiming that the disclosure of these unredacted copies waived any remaining privilege. Examining the weight of authority from other circuits, the magistrate judge agreed that a party may not selectively waive attorney-client privilege. The magistrate judge reasoned that, because a voluntary disclosure of privileged materials breaches confidentiality and is inconsistent with the theory behind the privilege, such disclosure waives that privilege regardless of whether the third party is the government or a civil litigant. Having delivered the documents to the government, the magistrate judge concluded, Petitioners could not rely on the attorney-client privilege to shield them from D.C. Comics.

However, the magistrate judge noted that this circuit has twice declined to decide whether a party may selectively waive the attorney-client privilege, and stayed his order to allow Petitioners to seek review. The district court denied review. Petitioners seek to overturn the magistrate's order through a writ of mandamus.

II

A writ of mandamus is an extraordinary remedy. A party seeking the writ has the "burden of showing that [his] right to the issuance of the writ is clear and indisputable." *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 656 (9th Cir. 1977) (internal quotation marks omitted). In evaluating whether a petitioner has met that burden, we consider: (1) whether he "has no other adequate means" of seeking relief; (2) whether he "will be damaged or prejudiced in a way not correctable on appeal" after final judgment; (3) whether the "district court's order is clearly erroneous as a matter of law"; (4) whether the order "is an oft-repeated error"; and (5) whether the order "raises new and important problems, or issues of first impression." *Id.* at 654-55. We have established no specific formula to weigh these factors, but failure to show what is generally listed as the third factor, error, is fatal to any petition for mandamus. *See Burlington N. & Santa Fe. Ry. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1146 (9th Cir. 2005).**²**

III

**[1]** Under certain circumstances, the attorney-client privilege will protect communications between clients and their attorneys from compelled disclosure in a court of law. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Though this in some way impedes the truth-finding process, we have long recognized that "the advocate and counselor

---

**²**Petitioners assert that, because this case presents an issue of first impression, they must demonstrate simple rather than clear error. We have not always been precise as to whether we look for "error" or "clear error" where our sister circuits have addressed an issue, but we have not. *Compare Anon. Online Speakers v. U.S. Dist. Ct.*, 661 F.3d 1168 (9th Cir. 2011) (applying the clear error standard in a circuit split situation), *with San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096 (9th Cir. 1999) (applying the simple error standard when other circuits had weighed in on parts of an issue). We assume but do not decide that Petitioners need show only error.

[needs] to know all that relates to the client's reasons for seeking representation" if he is to provide effective legal advice. *Trammel v. United States*, 445 U.S. 40, 51 (1980); *see also* 8 John Henry Wigmore, Evidence § 2290 (John T. McNaughton, ed. 1961). As such, we recognize the privilege in order to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389.[3]

**[2]** Nonetheless, because, like any other testimonial privilege, this rule "contravene[s] the fundamental principle that the public has a right to every man's evidence," *Trammel*, 445 U.S. at 50 (internal alterations and quotation marks omitted), we construe it narrowly to serve its purposes, *see, e.g.*, *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[4] In particular, we recognize several ways by which parties may waive the privilege. *See, e.g.*, *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010). Most pertinent here is that voluntarily disclosing privileged documents to third parties will generally destroy the privilege. *Id.* The reason behind this rule is that, " '[i]f clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even without the protection of the privilege.' " Comment, *Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney-Client Privilege in an*

---

[3]Because Petitioners have never challenged the district court's application of federal law, we assume but do not decide that this was correct even though this case involves diversity claims to which state privilege law would apply. *Lewis v. United States*, 517 F.2d 236, 237 n.2 (9th Cir. 1975) (per curiam).

[4]Because no one challenges whether these communications would have been privileged absent waiver, we do not address that issue. For example, we assume but do not decide that these communications were all made for the purpose of obtaining legal as opposed to business advice. *Cf. United States v. Ruehle*, 583 F.3d 600, 608 n.8 (9th Cir. 2009) (noting that business advice does not fall within the purview of attorney-client privilege even if the advisor is a lawyer).

*Administrative Agency Investigation*, 130 U. Pa. L. Rev. 1198, 1207 (1982). Under such circumstances, there simply is no justification to shut off judicial inquiry into these communications.

Petitioners concede that this is the general rule, but they assert a number of reasons why it should not apply to them.

## A

**[3]** Petitioners' primary contention is that because Toberoff disclosed these documents to the government, as opposed to a civil litigant, his actions did not waive the privilege as to the world at large. That is, they urge that we adopt the theory of "selective waiver" initially accepted by the Eighth Circuit, *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc), but rejected by every other circuit to consider the issue since, *see In re Qwest Commc'ns Int'l*, 450 F.3d 1179, 1197 (10th Cir. 2006); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 295 (6th Cir. 2002) [hereinafter "*In re Columbia*"]; *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997); *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416-18 (Fed. Cir. 1997); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1425 (3d Cir. 1991)*; In re Martin Marietta Corp.*, 856 F.2d 619, 623-24 (4th Cir. 1988); *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

As the magistrate judge noted, we have twice deferred judgment on whether we will accept a theory of selective waiver. *United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir. 2005) (per curiam); *Bittaker v. Woodford*, 331 F.3d 715, 720 n.5 (9th Cir. 2003) (en banc). But we share the concerns expressed by many of our sister circuits about the cursory analysis behind the *Diversified* rule. The Eighth Circuit—the

first court of appeals to consider the issue—adopted what has
become a highly controversial rule only because it concluded
that "[t]o hold otherwise may have the effect of thwarting the
developing procedure of corporations to employ independent
outside counsel to investigate and advise them in order to pro-
tect stockholders." *Diversified*, 572 F.2d at 611. This appre-
hension has proven unjustified. Officers of public
corporations, it seems, do not require a rule of selective
waiver to employ outside consultants or voluntarily to cooper-
ate with the government. *See, e.g.*, *Westinghouse Elec. Corp.*,
951 F.2d at 1426.

More importantly, such reasoning does little, if anything, to
serve the public good underpinning the attorney-client privi-
lege. That is, "selective waiver does not serve the purpose of
encouraging full disclosure to one's attorney in order to
obtain informed legal assistance; it merely encourages volun-
tary disclosure to government agencies, thereby extending the
privilege beyond its intended purpose." *Id.* at 1425.

It may well be that encouraging cooperation with the gov-
ernment is an alternative route to the ultimate goal of promot-
ing adherence to the law. *In re Columbia*, 293 F.3d at 311
(Boggs, J., dissenting). And there are those who assert that
"an exception to the third-party waiver rule need [not] be
moored to the justifications of the attorney-client privilege."
*Id.* at 308 (emphasis omitted). We disagree. If we were to
unmoor a privilege from its underlying justification, we
would at least be failing to construe the privilege narrowly.
*Cf. Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (citing
*Trammel*, 445 U.S. at 50; *United States v. Bryan*, 339 U.S.
323, 331) (1950)). And more likely, we would be creating an
entirely new privilege. *In re Qwest Commc'ns Int'l*, 450 F.3d
1179; *Westinghouse*, 951 F.2d at 1425.

It is not beyond our power to create such a privilege. *Univ.
of Pa.*, 493 U.S. at 189 (noting that Fed. R. Evid. 501 pro-
vides certain flexibility to adopt privilege rules on a case-by-

case basis). But as doing so requires balancing competing societal interests in access to evidence and in promoting certain types of communication, the Supreme Court has warned us not to "exercise this authority expansively." *Id.*; *see also United States v. Nixon*, 418 U.S. 683, 710 (1974). Put simply, "[t]he balancing of conflicting interests of this type is particularly a legislative function." *Univ. of Pa.*, 493 U.S. at 189.

**[4]**  Since *Diversified*, there have been multiple legislative attempts to adopt a theory of selective waiver. Most have failed. Report of the Advisory Committee on Evidence Rules, May 15, 2007, at 4, *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/2007-05-Committee_Report-Evidence.pdf (reporting the selective waiver provision separately from the general proposed rule); *SEC Statement in Support of Proposed Section 24(d) of the Securities Exchange Act of 1934*, 16 Sec. Reg. & L. Rep. 461 (Mar. 2, 1984). *But see* H.R. Rep. No. 870, 96th Cong., 1st Sess. (1980), codified at 15 U.S.C. § 1312. Given that Congress has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government, we will not do so here. *Univ. of Pa.*, 493 U.S. at 189 (requiring federal courts to be particularly cautious when legislators have "considered the relevant competing concerns but [have] not provided the privilege").

B

Petitioners next assert that even if we reject selective waiver as a general matter, we should enforce a purported confidentiality agreement based upon the letter from the U.S. Attorney's Office. Though no circuit has officially adopted such a rule, at least two have "left the door open to selective waiver" where there is a confidentiality agreement. *In re Columbia*, 293 F.3d at 301 (discussing *Steinhardt* and *Dellwood Farms, Inc. v. Cargill*, 128 F.3d 1122 (7th Cir. 1997)); *see also In re Qwest Commc'ns Int'l*, 450 F.3d at 1192-94

(describing such a rule as a "leap" but declining to reject it completely).

**[5]** Assuming that this letter constitutes a confidentiality agreement, Petitioners have provided no convincing reason that post hoc contracts regarding how information may be revealed encourage frank conversation at the time of the advice. Indeed, as the Sixth Circuit has noted, while this approach "certainly protects the expectations of the parties to the confidentiality agreement, it does little to serve the 'public ends' of adequate legal representation that the attorney-client privilege is designed to protect." *In re Columbia*, 293 F.3d at 303. Instead, recognizing the validity of such a contract "merely [adds] another brush on an attorney's palette [to be] utilized and manipulated to gain tactical or strategic advantage." *Steinhardt*, 9 F.3d at 235*; cf. Permian Corp.*, 665 F.2d at 1221. And it would undermine the public good of promoting an efficient judicial system by fostering uncertainty and encouraging litigation. *Upjohn*, 449 U.S. at 393 (noting that an "uncertain privilege . . . is little better than no privilege at all").

**[6]** The only justification behind enforcing such agreements would be to encourage cooperation with the government. But Congress has declined to adopt even this limited form of selective waiver. *See Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence*, 154 Cong. Rec. H. 7817 (2008), *reprinted in* Fed. R. Evid. 502 addendum to comm. n subdivision (d) (noting that Rule 502 "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation"). As such, we reject such a theory here.

## C

**[7]** Petitioners next aver that, because Toberoff was the victim of the crime rather than the target of the grand jury

probe, his disclosure should be treated differently. But if it is
unnecessary to adopt a theory of selective waiver to encour-
age potential defendants to cooperate with the government, *In
re Qwest Commc'ns Int'l*, 450 F.3d at 11; *Westinghouse*, 951
F.2d at 1425, it is even less necessary to do so to encourage
victims to report crimes to the government. The desire to see
the crime prosecuted is sufficient impetus to cooperate.

We are unconvinced by Petitioners' argument that adopting
such a rule will drastically impair law enforcement attempts
to investigate espionage against "attorneys, financial institu-
tions, medical providers, national security agencies, judges,
large corporations, or law firms." This has not occurred
despite near universal rejection of a selective waiver rule. Fur-
thermore, most of these documents are not covered by
attorney-client privilege because they do not represent com-
munications between a lawyer and his client for the purpose
of obtaining legal advice. *Cf. Ruehle*, 583 F.3d 608-09 & n.8
(rejecting a presumption of privilege even when a communi-
cation involves a lawyer). And, even if they were originally
covered by the privilege, they would eventually have to be
made public if they are to become evidence in a criminal trial.
To the extent that timing is a concern, it can be ameliorated
by properly seeking a protective order. Fed. R. Evid. 502(d).

We are similarly unpersuaded that, because Toberoff was
a victim of the crime, Petitioners have a common interest with
the government. Rather than a separate privilege, the "com-
mon interest" or "joint defense" rule is an exception to ordi-
nary waiver rules designed to allow attorneys for different
clients pursuing a common legal strategy to communicate
with each other. *See Hunydee v. United States*, 355 F.2d 183,
185 (9th Cir. 1965); *see also In re Grand Jury Subpoenas*,
902 F.2d 244, 249 (4th Cir. 1990) (collecting cases). How-
ever, a shared desire to see the same outcome in a legal matter
is insufficient to bring a communication between two parties
within this exception. *Id.* Instead, the parties must make the
communication in pursuit of a joint strategy in accordance

with some form of agreement—whether written or unwritten. *Cf. Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964).

**[8]** There is no evidence that Toberoff and the Office of the U.S. Attorney agreed before the disclosure jointly to pursue sanctions against Michaels. Toberoff is not strategizing with the prosecution. He has no more of a common interest with the government than does any individual who wishes to see the law upheld. Furthermore, the statements here were not "intended to facilitate representation" of either Toberoff or the government. *Hunydee*, 355 F.2d at 185 (limiting privilege to those circumstances); *accord United States v. BDO Seidman*, 492 F.3d 806, 816 (7th Cir. 2007) (same).

D

**[9]** Petitioners also argue that they should be treated differently because Toberoff produced these documents subject to a subpoena. Involuntary disclosures do not automatically waive the attorney-client privilege. *United States v. De La Jara*, 973 F.2d 746, 749-50 (9th Cir. 1992). But without the threat of contempt, the mere existence of a subpoena does not render testimony or the production of documents involuntary. *Westinghouse Elec. Corp.*, 951 F.2d at 1414; *see also United States v. Plache*, 913 F.2d 1375, 1380 (9th Cir. 1990). Instead, whether the subpoenaed party "chose not to assert the privilege when it was appropriate to do so is [also] relevant to the waiver analysis." *In re Grand Jury Proceedings*, 219 F.3d 175, 187 (2d Cir. 2000); *cf. In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369-70 (D.C. Cir. 1984).

**[10]** Toberoff both solicited the subpoena and "chose not to assert the privilege when it was appropriate to do so. . . ." *In re Grand Jury Proceedings*, 219 F.3d at 187. That is, even though the subpoena specifically contemplated that Toberoff may choose to redact privileged materials, he did not. Petitioners assert that the U.S. Attorney would not have been sat-

isfied with redacted documents, but we will never know because Toberoff never tried. As such, we conclude that the district court properly treated the disclosure of these documents as voluntary.[5]

E

[11] Finally, Petitioners asserted for the first time in oral argument that these documents should remain confidential because the Heirs themselves did not take the affirmative step to disclose the documents. We generally do not consider issues raised for the first time during oral argument, unless "failure to do so would result in manifest injustice" and the appellee would not be prejudiced by such consideration. *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal quotation marks and emphasis omitted). There are several instances in which an attorney's behavior may waive the privilege, even without an explicit act by the client. *See, e.g.*, *Himmelfarb v. United States*, 175 F.2d 924, 939 (9th Cir. 1949); *see generally* 8 Wigmore, Evidence § 2325 (listing actual and implied consent as well as theft of documents from the attorney's office). As many of these documents fall within these situations, we do not consider it a manifest injustice to hold Petitioners to their apparent acceptance of Toberoff's authority to waive the privilege on behalf of his clients, who have never disputed his authority to do so.[6]

---

[5]As these preexisting documents were "sought for [their] own sake rather than to learn what took place before the grand jury" and as their "disclosure will not compromise the integrity of the grand jury process," Petitioners' argument that the disclosure was protected by Federal Rule of Criminal Procedure 6(e)(2)(B) is similarly without merit. *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1411-12 (9th Cir. 1993).

[6]Indeed, there is even circumstantial evidence that the Heirs affirmatively consented to Toberoff's actions. There is also evidence that Toberoff should himself be treated as a co-client. After all, Toberoff represented all of the Petitioners, including a joint venture between the Heirs and himself in which he had a controlling interest. As such, he likely had authority unilaterally to waive the privilege on at least some of these documents. Restatement (Third) of Law Governing Lawyers § 76 cmt. g; *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007).

IN RE PACIFIC PICTURES                                    4255

IV

Because Petitioners have not established error, we need not
discuss the other *Bauman* factors. The petition for mandamus
is **DENIED**.