# EXHIBIT A

CASE NO. _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

IN RE PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, MARK WARREN PEARY, JEAN ADELE PEAVY, AND LAURA SIEGEL LARSON

*Defendants-Petitioners,*

(*caption continued on next page*)

_____

PETITION FOR A WRIT OF MANDAMUS REVERSING WAIVER OF PRIVILEGE ON STOLEN PRIVILEGED DOCUMENTS PRODUCED TO THE UNITED STATES ATTORNEY'S OFFICE PURSUANT TO A GRAND JURY SUBPOENA AND A CONFIDENTIALITY AGREEMENT

From The United States District Court for the Central District of California, Case No. CV-10-3633

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (188547)
Keith G. Adams (240497)
2049 Century Park East, Suite 3630
Los Angeles, California, 90067
Telephone:  (310) 246-3333

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
Laura W. Brill (195889)
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:   (310) 556-2700

*Attorneys for Defendants-Petitioners Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel*

*Attorneys for Defendants-Petitioners Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, and Marc Toberoff*

86356.1

**EXHIBIT A**
**3**

v.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

*Respondent,*

DC COMICS,

*Plaintiff-Real Party in Interest.*

86356.1

**EXHIBIT A**

**4**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners make the following disclosure statements:

Defendant-Petitioner IPW, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IPW, LLC.

Defendant-Petitioner IP Worldwide, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IP Worldwide, LLC.

Defendant-Petitioner Pacific Pictures Corporation does not have a parent corporation, nor does any publicly held corporation own 10% or more of Pacific Pictures Corporation.

Dated: June 30, 2011          /s Marc Toberoff
                              Marc Toberoff
                              TOBEROFF & ASSOCIATES, P.C.

                              Attorneys for Defendants-Petitioners,
                              Mark Warren Peary, as personal
                              representative of the Estate of Joseph
                              Shuster, Jean Adele Peavy, and Laura Siegel
                              Larson, individually and as personal
                              representative of the Estate of Joanne Siegel

Dated: June 30, 2011          /s/ Richard Kendall
                              Richard Kendall
                              KENDALL BRILL & KLIEGER LLP

                              Attorneys for Defendants-Petitioners,
                              Pacific Pictures Corporation, IP Worldwide,
                              LLC, IPW, LLC, and Marc Toberoff

86356.1                              1

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     STATEMENT OF RELIEF SOUGHT AND ISSUES
        PRESENTED .........................................................................................5

III.    BACKGROUND ....................................................................................5

        A.      General Background ...............................................................5

        B.      The Theft Of Privileged Documents From Toberoff &
                Associates ...............................................................................6

        C.      The Criminal Investigation ....................................................8

        D.      DC's Motion To Compel And The May 25 Order .............11

IV.     ARGUMENT .......................................................................................12

        A.      A Writ Of Mandamus Should Issue, As The May 25
                Order Was Erroneous And Is Plainly An Appropriate
                Matter for Writ Review ........................................................12

                1.      Defendants Have No Other Means To Challenge
                        The Order ...................................................................15

                2.      Absent Mandamus Relief, Defendants Will Be
                        Damaged In A Way That Cannot Be Corrected On
                        Appeal ........................................................................15

                3.      The Orders Below Require Correction ....................17

                        a.      The May 25 Order Erred In Finding "No
                                Important Distinction" Between Disclosure
                                To Law Enforcement Authorities By An
                                Alleged Criminal And Disclosure By The
                                Victim Of A Privacy Crime .........................17

**EXHIBIT A**

**6**

b.    The May 25 Order Misapplied Out-Of-Circuit Law To Reach Its Erroneous Conclusion .................................................................20

c.    Privilege Is Preserved When Disclosures Are Made Pursuant To An Express Agreement To Maintain Privilege ...............................23

d.    The District Court Failed To Recognize The Common Interest Between Defendants And The Government ........................................................26

e.    The District Court's Order Raises Important Issues of First Impression In The Ninth Circuit, As This Court Has Never Adopted DC's Waiver Theory In Any Context..........................29

V.    CONCLUSION .............................................................30

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 21(d) ...........................................................32

STATEMENT OF RELATED CASES ................................................33

CERTIFICATE OF SERVICE ..............................................................34

**EXHIBIT A**

**7**

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*,
881 F.2d 1486 (9th Cir. 1989) ........................................................ 14-15

*Anderson v. Torrington Company*,
120 F.R.D. 82 (N.D. Ind. 1987) ...........................................................28

*Barton v. U.S. Dist. Court for Cent. Dist. of Cal.*,
 410 F.3d 1104 (9th Cir. 2005) ............................................................14

*Bauman v. United States District Court*,
557 F.2d 650 (9th Cir. 1977) ................................................. 13-15, 17

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003) ...........................................................4, 29

*Burroughs v. DeNardi Corp.*,
167 F.R.D. 680 (S.D. Cal. 1996) ...................................................10, 28

*City of Las Vegas v. Foley*,
747 F.2d 1294 (9th Cir. 1984) ............................................................15

*Diversified Industries, Inc. v. Meredith*,
572 F.2d 596 (8th Cir. 1978) ........................................................ 4, 29-30

*E.E.O.C. v. Chemtech Intern. Corp.*,
1995 U.S. Dist. LEXIS 21877 (S.D. Tex. 1995) ...................................28

*Ellis v. United States District Court*,
356 F.3d 1198 (9th Cir. 2004) ............................................................13

*Fossyl v. Watson*,
2006 U.S. Dist. LEXIS 98406 (S.D. Ohio Sept. 5, 2006) .....................25

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
115 F.R.D. 308 (N.D. Cal. 1987) ........................................................21

**EXHIBIT A**
**8**

*In re Anonymous Online Speakers*,
09-71265, 2011 WL 61635 (9th Cir. Jan. 7, 2011)................................................14

*In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*,
293 F.3d 289 (6th Cir. 2002) ...............................................................................22

*In re Grand Jury Proceedings*,
851 F.2d 860 (6th Cir. 1988) ...............................................................................25

*In re Grand Jury Subpoenas*,
902 F.2d 244 (4th Cir. 1990) ...............................................................................28

*In re LTV Securities Litigation*,
89 F.R.D. 595 (N.D. Tex. 1981) ..........................................................................28

*In re Leslie Fay Companies, Inc. Sec. Litig.*,
161 F.R.D. 274 (S.D.N.Y. 1995) ................................................................... 24-25

*In re Steinhardt Partners L.P.*,
9 F.3d 230 (2d Cir. 1993)........................................................................4, 23, 27

*In re Qwest Comms. Int'l*,
450 F.3d 1179 (10th Cir. 2006) ...........................................................................22

*Islamic Shura Council of S. Cal. v. FBI*,
635 F.3d 1160 (9th Cir. 2011) .............................................................................16

*Jobin v. Bank of Boulder (In re M & L Bus. Mach. Co.)*,
161 B.R. 689 (D. Colo. 1993)........................................................................20, 24

*Maruzen Co. v. HSBC USA, Inc.*,
2002 U.S. Dist. LEXIS 13288 (S.D.N.Y. 2002)..................................................25

*McKesson HBOC, Inc. v. Superior Court*,
115 Cal. App. 4th 1229 (2004) ............................................................................22

*Medhekar v. United States District Court*,
99 F.3d 325 (9th Cir. 1996) .................................................................................13

86356.1

iv

**EXHIBIT A**

**9**

*Mohawk Indus. v. Carpenter*,
130 S. Ct. 599 (2009) ........................................................................16

*People ex rel Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*,
20 Cal. 4th 1135 (1999) ....................................................................18

*Permian Corp. v. United States*,
665 F.2d 1214 (D.C. Cir. 1981) .........................................................22

*Picard Chemical, Inc. v. Perrigo Co.*,
951 F. Supp. 679 (W.D. Mich. 1996) .................................................25

*Police & Fire Ret. Sys. v. Safenet, Inc.*,
2010 U.S. Dist. LEXIS 23196 (S.D.N.Y. Mar. 11, 2010) ...................24

*Pritchard-Keang Nam Corp. v. Jaworski*,
751 F.2d 277 (8th Cir. 1984) .............................................................30

*Regents of Univ. of Cal. v. Superior Court*,
165 Cal. App. 4th 672 (2008) ............................................................25

*SEC v. Amster & Co.*,
126 F.R.D. 28 (S.D.N.Y. 1989) .........................................................25

*SEC v. Rajaratnam*,
622 F.3d 159 (2d Cir. 2010)........................................................ 16-17

*Schnell v. Schnall*,
550 F. Supp. 650 (S.D.N.Y. 1982)......................................................20

*Sedlacek v. Morgan Whitney Trading Group, Inc.*,
795 F. Supp. 329 (C.D. Cal. 1992) ............................................ 10, 27-28

*Siegel v. Warner Bros. Ent. Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ............................................ 5-6

*Swidler & Berlin v. United States*,
524 U.S. 399 (1998)..........................................................................18

**EXHIBIT A**
**10**

*Teachers Insurance and Annuity Association of America v. Shamrock Broadcasting Co.*,
521 F. Supp. 638 (S.D.N.Y. 1981)..................................................... 23-24

*United States v. Bay State Ambulance & Hosp. Rental Serv.*,
874 F.2d 20 (1st Cir. 1989)........................................................... 28-29

*United States v. Bergonzi*,
403 F.3d 1048 (9th Cir. 2005) .........................................................4, 29

*United States v. Chen*,
99 F.3d 1495 (9th Cir. 1996) ..........................................................13, 18

*United States v. Cisco Sys.*,
2011 U.S. Dist. LEXIS 30902 (E.D. Ark. Mar. 15, 2011) ...................................28

*United States v. Gumbaytay*,
2011 U.S. Dist. LEXIS 47142 (M.D. Ala. Jan. 19, 2011) ....................................28

*United States v. Massachusetts Institute of Technology*,
129 F.3d 681 (1st Cir. 1997)......................................................... 21-22

*United States v. Reyes*,
239 F.R.D. 591 (N.D. Cal. 2006)...........................................................22

*United States v. Shyres*,
898 F.2d 647 (8th Cir. 1990) .............................................................25

*Westinghouse Electric Corporation v. The Republic of the Philippines*,
951 F.2d 1414 (3d Cir. 1991) ....................................................4, 22, 30

## **Other Authorities**

17 U.S.C. § 304 .........................................................................6

Fed. R. Crim. P. 6.......................................................................25

Fed. R. Crim. P. 16......................................................................20

F.R.E. 502 .............................................................................26

**EXHIBIT A**
**11**

Christopher A. Goelz and Meredith J. Watts,  CALIFORNIA PRACTICE
GUIDE: FEDERAL 9TH CIRCUIT CIVIL APPELLATE PRACTICE,
Ch. 13-C ...............................................................................................14

Letter from the Committee on Rules and Practice and Procedure of the
Judicial Conference of the United States to the Committee on the Judiciary
of the U.S. Senate and House of Representatives dated Sept. 26, 2007;
Minutes of Advisory Committee on Evidence Rules Meeting [6], at 15
(April 12-13, 2007) ...............................................................................26

vii

**EXHIBIT A**

**12**

## I.    <u>INTRODUCTION</u>

This petition raises important and recurring questions concerning the preservation of attorney-client privilege in the context of criminal investigations by law enforcement authorities.  Specifically at issue is whether the victims of a theft of privileged documents can show copies thereof to law enforcement, pursuant to a Grand Jury subpoena and a confidentiality agreement, to enable law enforcement to investigate the crime, without waiving privilege as to third parties?

In any rational system of justice that values the attorney-client privilege and seeks to discourage the theft of privileged material, the answer must be yes – such disclosures do not waive privilege.  This is especially true in the instant case, where a young attorney stole privileged client documents from the law firm where he was newly employed and delivered the documents to the clients' litigation adversary.  The theft was designed to destroy the attorney-client privilege to the advantage of the clients' litigation adversary.  It is counterintuitive that theft cannot be investigated unless the victim waives the privilege the thief sought to invade.

Despite the clear intent of the victims and the U.S. Attorney's Office ("USAO")  to preserve the privilege through an extensive confidentiality agreement and the protections of Grand Jury secrecy law, the Magistrate Judge, relying on inapposite out-of-circuit cases involving voluntary disclosures by targets of investigation to prosecutors in the hope of avoiding prosecution, and finding "no

**EXHIBIT A**

**13**

important distinction" (Exhibit ("Ex.") 24 at 3) between a victim's interest in seeking justice  and an investigation target's interest in avoiding prosecution, erroneously found a waiver of privilege and ordered the documents produced.

The underlying lawsuit stems from a dispute between plaintiff DC Comics ("DC"), its effective parent Warner Bros. Entertainment Inc. ("Warner), and the heirs/estate of Jerry Siegel and Joe Shuster, the co-creators of Superman ("Heirs"). On May 14, 2010, DC initiated this retaliatory lawsuit against the Heirs' long-time opposing counsel, Marc Toberoff, who had successfully represented the Heirs in exercising their termination rights under the Copyright Act, and who had vindicated the Siegel copyrights through years of litigation in *Siegel v. Warner Bros. Ent. Inc.*, Case No. 04-CV-08400 ODW (RZx).

In the midst of the *Siegel* case*,* Mr. Toberoff and the Heirs (collectively, with the other defendants, "Defendants") were victimized by the theft of reams of privileged documents stolen from Mr. Toberoff's law firm, by a newly employed attorney, who delivered the privileged material to their litigation opponents at Warner (the "Stolen Privileged Documents").  In both *Siegel* and this case, Warner and DC have sought to exploit the Stolen Privileged Documents.

After Mr. Toberoff and his clients reported the theft to the FBI and the USAO, the USAO informed Mr. Toberoff's counsel that it needed to review copies of the Stolen Privileged Documents in order to investigate the crime.  To safeguard

the attorney-client privilege, the USAO agreed that the material would be

maintained as strictly privileged and confidential, acknowledged that the USAO

shared a common interest with Defendants, issued a Grand Jury subpoena such that

production of the documents to the USAO was pursuant to process, rather than

voluntary, and promised to return the documents after completing its review.

Based on the USAO's confidentiality agreement, the subpoena, the secrecy

surrounding a Grand Jury, the USAO's joint interest in investigating the crime, and

the USAO's representation that it needed to review the Stolen Privileged

Documents to investigate the crime, Mr. Toberoff provided them to the USAO.

Thereafter, DC moved to compel production of the Stolen Privileged

Documents, contending that the mere act of temporarily sharing this privileged

material with law enforcement officials had waived the attorney-client privilege as

to the entire world, regardless of the express understanding to the contrary.  On

May 25, 2011, the Magistrate Judge issued an order (the "May 25 Order") that

defendants had broadly waived privilege on the Stolen Privileged Documents by

showing them to the USAO.  The May 25 Order acknowledged its result could

well be that "perpetrator[s] goes free," but still found a broad waiver, without any

authority compelling this counter-intuitive, anti-law enforcement result.

In so doing, Magistrate Judge relied on out-of-circuit cases dealing not with

victims of crimes, but rather with disclosures to the government by the *targets* of

criminal investigations whose interests were adverse to the government.  Even as to this different fact pattern, there is no Ninth Circuit authority compelling disclosure.  This Court has not yet addressed the issue of waiver by the targets of investigation, and other Circuits are split on the issue.  *See United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir. 2005) (deferring decision); *Bittaker v. Woodford*, 331 F.3d 715, 720 n.5 (9th Cir. 2003) (same); *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978) (privilege is preserved); *Westinghouse Electric Corporation v. The Republic of the Philippines*, 951 F.2d 1414, 1423-27 (3d Cir. 1991) (privilege waived).  Moreover, even cases that found such a waiver by *the target* of an investigation have recognized that when documents are produced, as here, pursuant to an express agreement by the government to maintain them as confidential, the privilege must be preserved.  *See, e.g., In re Steinhardt Partners L.P.*, 9 F.3d 230, 236 (2d Cir. 1993).

The Magistrate Judge acknowledged the critical "importance of the issue," and the lack of authority from this Court, and accordingly stayed the disclosure order to permit further review.  Ex. 24.  As the Magistrate Judge explained, "[t]he Ninth Circuit … has not weighted these considerations in a context like that presented here," and "the consequences of a wrong decision are significant" in that if writ relief is not granted the privilege "will not have been preserved, and the confidence which clients reposed in their attorneys will have been undermined."

86356.1

4

**EXHIBIT A**

**16**

Ex. 32 at 2. As the May 25 Order dramatically undermines the attorney-client privilege and hamstrings the ability of law enforcement to properly investigate thefts of privileged and confidential material, and as this error cannot be meaningfully corrected on appeal from a final judgment, this Court should issue a writ of mandamus, reverse the Order, and confirm that no waiver occurred.

## II.    STATEMENT OF RELIEF SOUGHT AND ISSUES PRESENTED

Should a writ of mandamus issue to correct an erroneous district court ruling that clients, who were the victim of a crime when their privileged documents were stolen from their lawyer's office and delivered to their litigation adversary, waived privilege in the stolen documents when their counsel temporarily provided the documents to federal authorities investigating the crime, in response to a grand jury subpoena and subject to a common-interest/confidentiality agreement with the United States Attorney that was designed to ensure that the privilege would not be waived ?

## III.    BACKGROUND

### A.    General Background

In the mid-1930s, two high school students, Jerome Siegel (an author) and Joseph Shuster (an illustrator), co-created Superman and with it, the superhero genre. *See Siegel v. Warner Bros. Ent. Inc.*, 542 F. Supp. 2d 1098, 1102-11 (C.D. Cal. 2008). In 1938, for a pittance, they signed a publisher's release which was

later held to have granted their entire Superman copyright to DC, which has

exploited it for more than 70 years.  *Id.* at 1107, 1110.

In 1976, Congress amended the Copyright Act to extend the copyright term,

and, in response to the plight of authors who, like Siegel and Shuster, lacked the

bargaining power to retain any financial interest in their copyrights, Congress gave

authors and their heirs the inalienable right to terminate prior grants of copyright

and recapture their copyrights for the extended term.  17 U.S.C. §§ 304(c), (d).

In 1996, Jerome Siegel died.  *Siegel*, 542 F. Supp. 2d at 1113.  He was

survived by his widow, the late Joanne Siegel, and their daughter, defendant Laura

Siegel Larson (the "Siegels").  *Id.* at 1102, 1114.  In 1997, the Siegels served

statutory notices of termination on DC of Jerome Siegel's 1938 Superman

copyright grants, effective as of April 16, 1999.  *Id.* at 1114.  In Fall 2002, the

Siegels contacted and thereafter retained the intellectual property attorney Marc

Toberoff ("Toberoff") in connection with their statutory termination, after a

breakdown of their negotiations with DC.  *Id.*  In October 2004, the Siegels,

represented by Toberoff, filed two federal actions, No. 04-CV-08400 ODW (RZx)

(C.D. Cal.) & 04-CV-08776 ODW (RZx) (C.D. Cal.), seeking to vindicate their

terminations under the Copyright Act.

**B.**     **The Theft Of Privileged Documents From Toberoff & Associates**

On July 18, 2005, Mr. Toberoff's law firm, Toberoff & Associates, P.C.,

was approached by a young attorney named David Michaels ("Michaels"), who was hired as its most junior attorney. *See* Ex. 26, Ex. D at 5. Michaels had access to attorney-client privileged material relating to the *Siegel* case, Joanne Siegel, Laura Siegel Larson, Jean Adele Peavy, Mark Warren Peary, and other clients of Mr. Toberoff. In mid-October 2005, after just three months and without incident or warning, Michaels left work in the middle of the day and never returned. Numerous concerned calls to Michaels went unanswered. *Id.* In November-December 2005, Michaels contacted the Siegels. He had documents stolen from Mr. Toberoff's files, and attempted to divert the Siegels to another firm, with him as their attorney, by accusing Mr. Toberoff of purported unethical conduct, like allegedly charging "unconscionable fees." *Id.* at 6. In December 2005, the Siegels rejected Michaels' overtures. *Id.*

In July 2006, Warner disclosed to Defendants that its General Counsel had allegedly been sent anonymously received a large package of privileged and confidential documents stolen from Mr. Toberoff's law firm, from an allegedly anonymous sender, along with a rambling cover letter, allegedly penned by the thief in the form of a so-called "Timeline," in which the thief expressed opinions supposedly based on the Stolen Privileged Documents. *Id.* at 6-7.[1] In or about

---

[1] The Timeline, written as a hit-piece against Mr. Toberoff, said "consider this an early Holiday present," Docket No. 54, Ex. A at 1, but the documents were not disclosed by Warner until July.

November 2007, Mr. Toberoff met with Stanley Ornellas of the Los Angeles FBI Field Office and reported the theft.  *Id.* at 8.  Eventually, in late 2008, the Stolen Privileged Documents were ordered returned to Mr. Toberoff.  Exs. 1-2.

**C.     The Criminal Investigation**

In May 2010, DC filed the instant lawsuit, which attached and relied heavily upon the thief's Timeline.  *See* Ex. 3, Ex. A. Thereafter, the USAO initiated a Grand Jury Investigation regarding the Stolen Privileged Documents after being contacted by Defendants' counsel.  *Id.* at 8.  As part of that investigation, Assistant U.S. Attorneys Beong-Soo Kim and Brian Klien advised Mr. Toberoff's counsel, Richard Kendall, a former Assistant U.S. Attorney, that "they would need to review the privileged Stolen Privileged Documents as part of any investigation and/or prosecution regarding the theft from Mr. Toberoff's offices" in order to determine the nature and severity of the crime.  *See* Ex. 21, ¶ 4.  Mr. Kendall responded that defendants "would not disclose the documents to the government unless the privilege could be protected."  *Id.*, ¶ 5.

On September 13, 2010, a Grand Jury subpoena was served on Mr. Toberoff requesting copies of the Timeline and the Stolen Privileged Documents.  *See* Ex. 10, Ex. A.  In a letter to Mr. Kendall, the USAO agreed to maintain the confidentiality of the requested documents, recognized the "objective to preserve any and all applicable privileges," and assured Defendants that "nothing in … Mr.

86356.1

8

Toberoff's disclosure of the [Stolen D]ocuments … is intended to waive any applicable privilege or protection under law."  Ex. 10, Ex. B at 2.  The USAO also assured Defendants that it "will maintain the confidentiality of the [Stolen D]ocuments and related information," and that it would "return the [] documents …as soon as we determine that we no longer need them."  *Id.* at 1.

On September 17, 2010, Mr. Kendall produced the Stolen Privileged Documents to the USAO pursuant to the Grand Jury subpoena and the USAO's assurances, together with a letter confirming the understanding that the documents were being provided pursuant to a common interest privilege and without waiver of privilege:

> We are in receipt of the Grand Jury subpoena issued by your office on September 13, 2010. ***As demanded by the subpoena, and in an effort to assist the Government in its ongoing criminal investigation,*** Mr. Toberoff provides hereunder the "SUPERMAN - MARC TOBEROFF TIMELINE" (the "Timeline") and its enclosures . . . .
>
> This response to the Grand Jury's subpoena ***is made subject to and without waiver of the attorney-client privilege, work product immunity, or any other privilege applicable to these documents.*** The Timeline itself and many of the enclosed documents are clearly subject to the attorney-client privilege and/or work-product immunity, and ***we are providing them subject to our mutual understanding that providing such documents in response to your subpoena shall not constitute a waiver of any applicable privilege or immunity.***
>
> Moreover, the provision of these documents is expressly made in reliance upon the Government's representations, in its letter of September 10, 2010, that (i) "***the Government will maintain the confidentiality of the MT documents*** and related information and will not provide the MT documents and related information to non-

86356.1

9

**EXHIBIT A**

**21**

governmental third parties except as may be required by law or court order"; (ii) "***the Government will return the MT documents*** to you and your client as soon as we determine that we no longer need them"; (iii)  "to the extent attorney work product or communications protected by the attorney client privilege are shared with the Government ... Mr. Toberoff is sharing them as a selective and limited disclosure in reliance on the Government's agreement that, in recognition of his objective to preserve any and all applicable privileges, the Government will keep them confidential and not disclose them to any non-governmental third parties (except as may be required by law or court order)"; and (iv) "nothing in Mr. Toberoff's disclosure of the MT documents and related information is intended to waive any applicable privilege or protection available under law."

***Any privileged documents being produced to the Government pursuant to the subpoena are also subject to a common interest/joint prosecutorial privilege.***  *See Sedlacek v. Morgan Whitney Trading Group*, 795 F. Supp. 329, 330 (C.D. Cal. 1992) (communications between civil litigants and government investigating similar wrongdoing subject to joint prosecution/common interest privilege); *United States ex rel. Burroughs v. DeNardi Corp*., 167 F.R.D. 680, 686 (S.D. Cal. 1996) (same). The privilege is particularly applicable here given Mr. Toberoff and the Government's common interest in investigating the wrong committed against Mr. Toberoff and his law firm through the theft of these documents and creation of the Timeline.

Ex. 10, Ex. C (emphasis added).  Based on the above, both Defendants and the

Government agreed that the documents were subject to the USAO's joint assertion

of the "common interest privilege," that the USAO "was willing to be governed by

those conditions [in Mr. Kendall's September 17 letter] in accepting the

documents," and that the documents were being produced subject to an express

agreement to maintain confidentiality and privilege.  Ex. 10, Ex. C; Ex. 21, ¶ 7.

The Stolen Privileged Documents were thereupon produced in response to a Grand

10

**EXHIBIT A**

**22**

Jury subpoena to enable the USAO to conduct its investigation.

### D.    DC's Motion To Compel And The May 25 Order

On April 4, 2011, DC moved to compel the production of the Stolen Privileged Documents, based on a theory that privilege had been waived by such production.  Ex. 9.  On May 25, 2011, the Magistrate Judge acknowledged "the absence of controlling authority from the Ninth Circuit," that "the cases [on which DC relied, dealing with *the targets* of an investigation] do not deal [as here] with victims of crime," and that the result of such a broad waiver doctrine may well be that "the perpetrator goes free," but nonetheless granted DC's motion, finding that there was "no important distinction" between a victim's interest in prosecuting crime, shared by the public and government, and an alleged criminal's interest in avoiding prosecution.  Ex. 24 at 3.  The May 25 Order thus held that "Defendants waived the privileges by producing the documents to a third party, the United States, in response to a grand jury subpoena."  *Id.* at 2-3.  Recognizing the importance of this issue of first impression, the Magistrate Judge expressly stayed his ruling "until all review is exhausted," "to allow Defendants to seek review." *Id.* at 4.

On June 7, 2011, Defendants sought review of the May 25 Order before the District Court.  Ex. 25.  On June 14, 2011, the District Court, perhaps appreciating that this matter would ultimately be resolved by this Court, summarily denied

Defendants' motion by stamping "DENIED" on their proposed order.  Exs. 28, 33.

There was no hearing on the motion, nor any written minute order or opinion

stating the District Court's reasons for its ruling.

Following the District Court's ruling, DC sought to persuade the Magistrate

Judge to modify the May 25 Order's stay to require Defendants to produce the

Stolen Privileged Documents before this Court could review the important

question presented.  Exs. 30.  On June 27, 2011, in response to DC's motion, the

Magistrate Judge issued an order (Ex. 32) underscoring the basis for writ review:

> The Ninth Circuit …. has not weighed these considerations in a
> context like that presented here.  While the Court is satisfied with its
> analysis, the matter is not clear cut, and the consequences of a wrong
> decision are significant.  It may be true that an erroneous releasing of
> privileged documents can be repaired through an appellate reversal, as
> Plaintiff argues, but the privilege nevertheless in that case will not
> have been preserved, and the confidence which clients reposed in their
> attorneys will have been undermined.  This is not a situation the Court
> takes lightly ….  It is for that reason that the Court stayed its ruling.

In light of the importance of this issue and the irreparable harm that would

otherwise result, the stay remains in effect while this Court addresses the writ.

## IV.    ARGUMENT

### A.    A Writ Of Mandamus Should Issue, As The May 25 Order Was
Erroneous And Is Plainly An Appropriate Matter for Writ Review

As recognized by the Magistrate Judge, the May 25 Order is a paradigmatic

ruling for which writ review is appropriate.  It is a matter of first impression,

dealing with a significant privilege, and cannot be corrected on an appeal from a

final judgment.  Writ review will allow this Court to provide guidance with respect to important and recurring issues of law within this Circuit.

Mandamus review of district court rulings is available under the factors identified in *Bauman v. United States District Court*:

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires; … (2) [t]he petitioner will be damaged or prejudiced in a way not correctable on appeal (this guideline is closely related to the first) … (3) [t]he district court's order is clearly erroneous as a matter of law; … (4) [t]he district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules; … [and] (5) [t]he district court's order raises new and important problems, or issues of law of first impression.

557 F.2d 650, 654-55 (9th Cir. 1977).  These five factors are non-exclusive, as each determination of whether to grant review on a petition requires a balancing of these factors, and not all five factors need be satisfied to justify mandamus.  *Id.* at 655.  *See Ellis v. United States District Court*, 356 F.3d 1198, 1210 (9th Cir. 2004) (writ petition granted where three of five *Bauman* factors were present); *Medhekar v. United States District Court*, 99 F.3d 325, 327 (9th Cir. 1996) (same).

Mandamus review is particularly appropriate where a district court's order implicates important privilege issues.  *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1157 (9th Cir. 2010); *Hernandez v. Tanninen*, 604 F.3d 1095, 1101 (9th Cir. 2010).  Such writs are regularly granted to provide guidance to district courts on important recurring issues, especially on "particularly important questions of first impression, [and] especially when called upon to define the scope of an important

privilege." *Perry,* 591 F.3d at 1157. *See also Hernandez,* 604 F.3d at 1101 (granting petition for writ of mandamus where District Court clearly erred in finding a "blanket waiver of the attorney-client and work product privileges"); *Barton v. U.S. Dist. Court for Cent. Dist. of Cal.*, 410 F.3d 1104, 1109 (9th Cir. 2005) (granting writ based upon "fundamental importance of the attorney-client privilege to our adversarial system of justice"); *In re Anonymous Online Speakers*, 09-71265, 2011 WL 61635 (9th Cir. Jan. 7, 2011) (granting writ related to defining scope of attorney-client privilege); *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486 (9th Cir. 1989) (same); Christopher A. Goelz and Meredith J. Watts, CALIFORNIA PRACTICE GUIDE: FEDERAL 9TH CIRCUIT CIVIL APPELLATE PRACTICE, Ch. 13-C ("The most common use of the writ in the discovery context is to protect privileged information. Courts have long recognized that a party can suffer irreparable harm if erroneously required to disclose privileged information (*i.e.*, it is impossible to 'unring the bell').").

Here, a writ of mandamus should be granted under the *Bauman* factors. The orders establish a new and erroneous doctrine whereby the victims of a theft of privileged material cannot provide such material to law enforcement, even if it is necessary for a criminal investigation and provided pursuant to process and a common interest/confidentiality agreement, without waiver of privilege.

The result harms the victims of privacy crimes and chills the administration

of justice.  At the same time, it favors criminals and those like DC that regrettably seek to exploit the lawless acts of others for their own financial gain.  No policy justifies this result, and no principle of law compels it.  The writ should be granted as explained in more detail below.

## 1.    Defendants Have No Other Means To Challenge The Order

The first *Bauman* factor is easily satisfied, as the May 25 Order is a discovery order and it is well-established that "[a] discovery order … is interlocutory and non-appealable."  *Perry*, 591 F.3d at 1157 (quoting *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984)); *see also Admiral Ins. Co.,* 881 F.2d at 1490 (mandamus only method available for review of an order adverse to the attorney-client privilege).

## 2.    Absent Mandamus Relief, Defendants Will Be Damaged In A Way That Cannot Be Corrected On Appeal

The second *Bauman* factor is also satisfied.  In *Admiral Insurance Company*, the Ninth Circuit found that "an appeal after disclosure of the privileged communication is an inadequate remedy" for the "irreparable harm a party likely will suffer if erroneously required to disclose privileged materials or communications."  881 F.2d at 1491.  When the Supreme Court recently affirmed that orders that find privilege waivers are not immediately appealable collateral orders, it also expressly approved of other "discretionary review mechanisms," including mandamus, "for promptly correcting serious errors," especially in

86356.1

15

**EXHIBIT A**
**27**

"particularly injurious or novel privilege ruling[s]." *Mohawk Indus. v. Carpenter*, 130 S. Ct. 599, 607-608 (2009). After *Mohawk,* the Ninth Circuit has emphasized that writ review is appropriate where "discovery orders rais[e] particularly important questions of first impression, especially … [as to] the scope of an important privilege" (*Perry*, 591 F.3d at 1157), or where a court finds a broad "waiver of the attorney-client and work product privileges." *Hernandez*, 604 F.3d at 1101.

Here, the trial court's finding of a waiver was both novel and particularly injurious. The Stolen Privileged Documents include numerous clearly privileged attorney-client communications directly related to this action. Defendants would obviously suffer irreparable injury if such privileged documents were disclosed and review delayed until an appeal of final judgment, as the bell could not be un-rung, nor the disclosures purged from the minds of DC and its counsel. Given the large number and scope of privileged documents at issue, this wrongful disclosure would taint the entire process. Such irreparable harm cannot be corrected absent mandamus relief. *See Islamic Shura Council of S. Cal. v. FBI*, 635 F.3d 1160 (9th Cir. 2011) (unsealing confidential information satisfied second factor because it would make such information "permanently public in a way that is not correctable on later appeal"); *SEC v. Rajaratnam*, 622 F.3d 159, 170 (2d Cir. 2010) ("Once the 'cat is out of the bag,' the right against disclosure cannot later be vindicated."); *see*

*also* cases cited *supra* at pp. 14-15 on writ review of privilege determinations.

> **3.    The Orders Below Require Correction**

The Third through Fifth *Bauman* factors focus on the importance,

persistence, and clarity of errors in a district court's orders.  These factors favor

granting the writ.  The May 25 Order, and the district court's affirmation of that

order, clearly erred on an important issue of first impression.

> **a.    The May 25 Order Erred In Finding "No Important
> Distinction" Between Disclosure To Law Enforcement
> Authorities By An Alleged Criminal And Disclosure By The
> Victim Of A Privacy Crime**

The May 25 Order was based exclusively on out-of-circuit cases finding

waiver where the target of a criminal investigation "selectively" discloses

privileged material to the government.  Ex. 24 at 3.  The Magistrate Judge

acknowledged that "[i]t is true, as Defendants state, that the cases [finding waiver]

do not deal with victims of crime," but dismissed this distinction as unimportant.

*Id.* ("[T]he Court can see no important distinction that applies to victims.").

However, the differences between the victim of a crime, who is seeking justice,

and the target of a criminal investigation, who is seeking to avoid punishment, are

striking, especially where the crime *itself* involves the theft of privileged

information.  Criminals who steal the privileged or confidential records of

attorneys, financial institutions, medical providers, national security agencies,

judges, large corporations or law firms, or who engage in industrial espionage,

necessarily cause an involuntary disclosure of such privileged or confidential

material.  Indeed, invading privilege is the objective of such crimes.  When the

victim reports the crime and cooperates with law enforcement, he does so to

vindicate his privilege and to deter such crimes – a purpose shared by law

enforcement.

Just as with confidential health records, judicial records, financial records,

and national security materials, the privacy interests protected by the attorney-

client privilege are compelling.  "The attorney-client privilege is one of the oldest

recognized privileges for confidential communications ….  The privilege is

intended to encourage full and frank communication between attorneys and their

clients and thereby promote broader public interests in the observance of law and

the administration of justice."  *Swidler & Berlin v. United States*, 524 U.S. 399,

403 (1998) (citations omitted).  *See United States v. Chen*, 99 F.3d 1495, 1500 (9th

Cir. 1996) (observing that "counseling clients" is a "valuable social service [that]

cannot be performed effectively if clients are scared to tell their lawyers what they

are doing"); *People ex rel Dept. of Corporations v. SpeeDee Oil Change Systems,

Inc.*, 20 Cal. 4th 1135, 1146 (1999) ("Protecting the confidentiality of

communications between attorney and client is fundamental to our legal system.").

Here, there is no dispute that the theft and its disclosure of numerous

privileged documents was involuntary.  It is also undisputed that the thief's

**EXHIBIT A**
**30**

objective was to disclose Defendants' privileged documents to their litigation adversaries, DC and Warner Bros., in the midst of a high-profile lawsuit.  The USAO *required* that it review the Stolen Privileged Documents in order to assess the severity of that crime and to properly investigate it.  Ex. 21, ¶ 4 (the USAO stated that it "need[ed] to review the privileged [S]tolen [D]ocuments as part of any investigation and/or prosecution").  The May 25 Order means that Defendants' production of the Stolen Privileged Documents to law enforcement, as required to investigate the theft, waives privilege and results in the documents' involuntary disclosure to DC – the very objective of the thief.  That cannot be the right result.

The Magistrate Judge recognized that pursuant to his Order, either the privilege is maintained and the "perpetrator goes free" or the privilege is waived and the object of the crime is accomplished:

> The salutary policy of promoting the enforcement of the criminal law applies equally to situations where the waiving party is the victim of a crime. Sometimes hard choices need to be made, and whether secrets are disclosed or a perpetrator goes free can be one of those hard choices.

Ex. 24 at 3.  The Hobson's Choice imposed by the Order has far-reaching implications.  The victims of any crimes involving the theft of privileged material and third parties wishing to assist a criminal investigation are forced between a rock and a hard place.  Either the privilege would be maintained, and the crime would go unsolved and unpunished, or the privilege would be waived and the object of the crime accomplished.  Neither the victim of a crime nor the

86356.1

19

government should be placed in this inequitable situation.

The cases avoid this untenable result.  In *Jobin v. Bank of Boulder (In re M & L Bus. Mach. Co.)*, 161 B.R. 689, 691-92 (D. Colo. 1993), for example, a bank provided attorney letters and memoranda to assist the USAO in its criminal investigation of a client of the bank, "subject to the requirement that any information provided … be treated as privileged, subject to protection under Fed. R. Crim. P. 16(a)(2) and [that it] not be disseminated except as required under federal law or the rules of criminal procedure."  Thereafter, the bank asserted privilege, and the Court found that there was no waiver of privilege because the bank took "substantial steps to ensure that its disclosures to the U.S. Attorney would be kept confidential."  *Id.* at 696.  Defendants acted similarly:  they provided documents to assist in a criminal investigation and took reasonable steps to ensure that the documents would be kept confidential, and that their cooperation was not to be deemed a waiver of privilege.  *See also Schnell v. Schnall*, 550 F. Supp. 650 (S.D.N.Y. 1982) (where client testified in SEC proceeding to privileged attorney/client communications to assist the SEC in a prosecution, that "does not constitute a waiver of the attorney-client privilege" in subsequent litigation).

### b. The May 25 Order Misapplied Out-Of-Circuit Law To Reach Its Erroneous Conclusion

In reaching its counter-intuitive, anti-law enforcement result, the May 25 Order relied upon what it called the "majority perspective" that disclosure to the

government waives privilege, based solely on inapplicable cases where the ***targets of a criminal investigation***, not the victims of a crime, disclose privileged information, typically to avoid prosecution or to plea bargain, as the Order acknowledged. *See* Ex. 24 at 3 ("It is true, as Defendants state, that the cases [finding waiver] do not deal with victims of crime.").

However, not only has the "majority perspective" never been adopted by this Court, but it manifestly does not apply to the situation here. In the cases relied upon by the May 25 Order, the relationship between the government and the target of its investigation was adversarial, and it was the target's voluntary attempt to use the privileged documents as both a sword (to challenge the investigation) and a shield (as privileged in subsequent litigation) that created a waiver. *See Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310-11 (N.D. Cal. 1987) (waiver applies to situations where privilege holders use "as a sword or shield, some of the information contained in the subject communication but [] deny their opponents access to the remainder .... It is this 'truth-garbling' risk that justifies the finding of waiver, not the mere fact of disclosure").

For example, in *United States v. Massachusetts Institute of Technology*, 129 F.3d 681, 683-86 (1st Cir. 1997), on which DC and the Magistrate Judge relied, a defense contractor provided privileged information, without any agreement to maintain confidentiality and privilege, to an auditing agency while it was being

audited.  Because the contractor was under investigation, the *MIT* Court recognized

that the relationship was "easily characterized as adversarial," and found a waiver

of privilege on that basis.  *Id.* at 686.

Similarly, in *Westinghouse Electric Corporation v. The Republic of the*

*Philippines*, 951 F.2d 1414, 1423-27 (3d Cir. 1991), also relied on by DC,

Westinghouse waived the attorney-client privilege by providing privileged

materials to the SEC and the Department of Justice while those agencies were

investigating allegations of bribery by the company, and without any express

agreement concerning waiver.  *Westinghouse* expressly limited itself to "whether a

party that discloses information protected by the attorney-client privilege and the

work-product doctrine … [to] a government agency ***that is investigating it*** waives

the privilege …."  *Id.* at 1417 (emphasis added).[2]

Such cases are clearly distinguishable from the situation here, where the

---

[2]  *See also In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293
F.3d 289, 291, 302 (6th Cir. 2002) (health care company subject to fraud
investigation waived privilege when it disclosed privileged materials to the Justice
Department to negotiate settlement of investigation); *Permian Corp. v. United
States*, 665 F.2d 1214, 1226 (D.C. Cir. 1981) (companies subject to securities fraud
investigation waived privilege when they disclosed documents to the SEC during
its investigation); *In re Qwest Comms. Int'l*, 450 F.3d 1179, 1181 (10th Cir. 2006)
(target waived privilege by disclosing protected materials during investigations by
the SEC and the USAO); *United States v. Reyes*, 239 F.R.D. 591, 596 (N.D. Cal.
2006) (waiver of privilege where company disclosed information to the SEC and
the DOJ while under scrutiny); *McKesson HBOC, Inc. v. Superior Court*, 115 Cal.
App. 4th 1229, 1223, 1234 (2004) (company waived privilege by providing
documents during SEC and USAO investigation of company).

**EXHIBIT A**

**34**

crime itself involved the theft and disclosure of privileged material, and the sharing of such material with the government, within the confines of its joint interest and an express confidentiality agreement, was solely for the purpose of investigating and prosecuting that wrongful disclosure.

### c.   Privilege Is Preserved When Disclosures Are Made Pursuant To An Express Agreement To Maintain Privilege

The May 25 Order also ignored clear authority that protects privileged material disclosed to the government pursuant to a confidentiality agreement and Grand Jury subpoena.  Defendants produced the Stolen Privileged Documents only under compulsion of a Grand Jury subpoena, and an express agreement by the USAO to preserve privilege by holding the documents as strictly confidential.  Ex. 10, Ex. C.

Where privileged materials are produced pursuant to an express agreement to protect the privilege, the Second Circuit, and many other courts, have long found no waiver of privilege.  *In re Steinhardt Partners L.P.*, 9 F.3d at 236, held that "establishing a rigid [waiver] rule" would chill cooperation with the government and expressly contemplated that privilege would not be waived if there was an "explicit agreement that the [government] will maintain the confidentiality of the disclosed materials."  *Teachers Insurance and Annuity Association of America v. Shamrock Broadcasting Co.*, 521 F. Supp. 638, 644-45 (S.D.N.Y. 1981) recognized that there would be no waiver of privilege if, as in this case, "the

right to assert the privilege in subsequent litigation is specifically reserved at the time the disclosure is made" pursuant to a "stipulation or other express reservation." *Teachers Insurance* stated that such an express agreement struck an appropriate policy balance, as it would not "substantially curtail the investigatory ability of the" government, but "would make it clear that … the disclosing party has made some effort to preserve the privacy of the privileged communication, rather than having engaged in abuse of the privilege by first making a knowing decision to waive the rule's protection and then seeking to retract that decision in connection with subsequent litigation." *See also Police & Fire Ret. Sys. v. Safenet, Inc.*, 2010 U.S. Dist. LEXIS 23196, at *7 (S.D.N.Y. Mar. 11, 2010) (rejecting waiver based on disclosure to the SEC pursuant to a confidentiality agreement, because "[t]here is a strong public interest in encouraging disclosure and cooperation with law enforcement agencies; [and] violating a cooperating party's confidentiality expectations jeopardizes this public interest"); *Jobin,* 161 B.R. at 691, 696 (no waiver of privilege where disclosures were made "subject to the requirement that any information provided under the Letter Agreement be treated as privileged" as maintaining privilege under such circumstances properly "balance[s] the policy goal of encouraging cooperation with the government … with the strict requirement of confidentiality").[3]

---

[3] *See also In re Leslie Fay Companies, Inc. Sec. Litig.*, 161 F.R.D. 274, 284

**EXHIBIT A**

**36**

Here, Defendants, faced with an involuntary disclosure perpetrated by the thief, took every reasonable step to preserve their privilege: they produced documents solely in response to a Grand Jury subpoena, subject to Fed. R. Crim. P. 6(e)(2)'s Grand Jury secrecy protections, and pursuant to an express agreement with the USAO to protect and maintain privilege. *See In re Grand Jury Proceedings*, 851 F.2d 860, 866 (6th Cir. 1988) (confidential documents produced to grand jury cannot be disclosed pursuant to Fed. R. Crim. P. 6(e), and it would violate such secrecy to permit a party "pursuing a civil action [to ask] a court for all documents obtained pursuant to subpoenas issued by a grand jury"); *United States v. Shyres*, 898 F.2d 647, 657 (8th Cir. 1990) (privilege not waived by production of documents to grand jury), *cert. denied*, 498 U.S. 821.[4]

---

(S.D.N.Y. 1995) (disclosures "pursuant to confidentiality agreements intended to preserve any privilege applicable to the disclosed documents" did not result in a waiver of privilege, because such disclosures were intended "to facilitate disclosure and avoid unnecessary duplication" with court-appointed investigator); *SEC v. Amster & Co.*, 126 F.R.D. 28, 29-30 (S.D.N.Y. 1989) (pursuant to the SEC's agreement to maintain confidentiality of disclosed documents, privilege not waived as to subsequent litigants); *Maruzen Co. v. HSBC USA, Inc.*, 2002 U.S. Dist. LEXIS 13288, at *2 (S.D.N.Y. 2002) (maintaining privilege based on "explicit confidentiality agreements with the authorities").

[4] *See Fossyl v. Watson*, 2006 U.S. Dist. LEXIS 98406, at *7-8 (S.D. Ohio Sept. 5, 2006) (no waiver of privilege on documents produced pursuant to Grand Jury subpoena where the party "took reasonable steps" to protect the privilege); *Picard Chemical, Inc. v. Perrigo Co.*, 951 F. Supp. 679, 689 (W.D. Mich. 1996) (maintaining privilege where a party takes "reasonable steps to protect the privilege"); *Regents of Univ. of Cal. v. Superior Court*, 165 Cal. App. 4th 672 (2008) ("[N]o waiver of the privilege will occur if the holder of the privilege has

The May 25 Order implies that Defendants should have objected to the Grand Jury subpoena, and forced the government to move to compel production of the Stolen Privileged Documents.  However, in *none* of the above-cited cases did a court require that a party object to the government's subpoena or require it to make a motion to compel.  The issuance of a subpoena and an express agreement to maintain the documents as confidential was sufficient to preserve the attorney-client privilege.  Requiring a motion to compel places Defendants in an intolerable Catch-22.  If the court denied such motion based on privilege, law enforcement would be prevented from prosecuting the crime.  If the court granted the motion, it would have had to conclude that the documents were not privileged, mooting the investigation. [5]  There is no rationale for this untenable procedure.

### d.    The District Court Failed To Recognize the Common Interest Between Defendants and the Government

The May 25 Order also erred in summarily finding that Defendants and the

---

taken reasonable steps under the circumstances to prevent disclosure. The law does not require that the holder of the privilege take 'strenuous or Herculean efforts' to resist disclosure.").

[5] Without briefing or notice, DC cited Federal Rule of Evidence 502 at the hearing on its motion, and argued that the rule purportedly requires a court order to preserve confidentiality.  In fact, Rule 502 does not address, or affect, the issue here. The drafters of Rule 502 were explicit that they were leaving the law of "selective waiver" unaffected by the Rule.  *See* Letter from the Committee on Rules and Practice and Procedure of the Judicial Conference of the United States to the Committee on the Judiciary of the U.S. Senate and House of Representatives dated Sept. 26, 2007; Minutes of Advisory Committee on Evidence Rules Meeting [6], at 15 (April 12-13, 2007).  Counsel for DC admitted that Rule 502 did not change the law of selective waiver.  Ex. 20 at 6:22-7:2.

86356.1

**EXHIBIT A**
**38**

Government could not share a protectable common interest because Mr. Toberoff and his clients were victims of a crime, and not themselves prosecutors, when courts find and maintain a common interest privilege in such circumstances.  Ex. 24 at 3.  The Order ignored well-recognized law that private entities and the government "share a common interest in developing legal theories and analyzing information" in enforcement actions or where the private party is the victim of the conduct under investigation.  *In re Steinhardt Partners L.P.*, 9 F.3d at 236.  The USAO accepted such "a common interest/joint prosecutorial privilege" based on "Mr. Toberoff and the government's common interest in investigating the wrong," affirming that it "was willing to be governed by those conditions [in Mr. Kendall's September 17 letter] in accepting the documents."  Ex. 10, Ex. C; Ex. 21, ¶ 7.

Numerous cases have found that when the government and a private party have a joint interest in the prosecution of a crime, the disclosure of privileged material to the government is subject to a joint prosecution privilege and there is no waiver of the attorney-client privilege.  Thus, in *Sedlacek v. Morgan Whitney Trading Group, Inc.*, 795 F. Supp. 329, 331 (C.D. Cal. 1992), the court held that sharing privileged materials between the plaintiff and the Federal Trade Commission did not waive privilege, because both were investigating the same alleged fraud.  The *Sedlacek* Court expressly held that the joint prosecution privilege is applicable "'whether the litigation or potential litigation is civil or

criminal,'" or "'ongoing,'" and "that the privilege is not limited to co-parties." *Id.* at 331. *See also In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (extending common interest privilege to non-parties and "potential co-parties to prospective litigation").[6]  Numerous cases have similarly found that where a private party and the government are involved in closely related litigation, communications between them are subject to a common interest privilege.[7]

A joint-prosecution privilege exists where "(1) the communications were made in the course of a joint effort, (2) the statements were designed to further the joint effort, and (3) the privilege has not been waived." *Burroughs*, 167 F.R.D. at 686 (citing *United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d

---

[6] *See Anderson v. Torrington Company*, 120 F.R.D. 82, 86 (N.D. Ind. 1987) (communications between non-party union and plaintiffs were subject to a "common interest" privilege because plaintiffs were union members and union played active role); *In re LTV Securities Litigation*, 89 F.R.D. 595, 604 (N.D. Tex. 1981) (disclosures "by an attorney to actual or potential co-defendants" is subject to a common interest privilege).

[7] *See Burroughs v. DeNardi Corp.,* 167 F.R.D. 680, 685 (S.D. Cal. 1996) (sharing of work product between government and counsel for *qui tam* relator protected by joint prosecution privilege); *United States v. Gumbaytay*, 2011 U.S. Dist. LEXIS 47142, at *12 (M.D. Ala. Jan. 19, 2011) (recognizing "that the common interest rule protects communications between a governmental agency and persons on whose behalf the governmental agency brings suit"); *United States v. Cisco Sys.*, 2011 U.S. Dist. LEXIS 30902, at *4 (E.D. Ark. Mar. 15, 2011) (recognizing a "Common Interest privilege" between the government and *qui tam* relator); *E.E.O.C. v. Chemtech Intern. Corp.*, 1995 U.S. Dist. LEXIS 21877, at *1 (S.D. Tex. 1995) ("[B]ecause the EEOC and the private citizen have many identical interests, the attorney-client privilege is essentially a joint prosecution privilege that extends to communications between" them).

20, 28 (1st Cir. 1989)).  Here, all three elements are easily met.  The provision of

the Stolen Privileged Documents was made in the course of the government's

ongoing criminal investigation of the theft of privileged legal files for prosecution

and Mr. Toberoff's contemplated legal action against the perpetrator, was designed

to further that common interest, and were provided to the government subject to an

express agreement to preserve confidentiality and privilege.

### e.   The District Court's Order Raises Important Issues of First Impression In The Ninth Circuit, As This Court Has Never Adopted DC's Waiver Theory In Any Context

Finally, the issuance of a writ will clarify critical issues as to the scope of the

waiver doctrine within the Ninth Circuit.  While the May 25 Order stated there was

an "absence of controlling authority from the Ninth Circuit" (Ex. 24 at 3), that

absence goes beyond the fact that this Court (like other courts) has never ruled that

disclosure to law enforcement by the victim of a crime waives privilege.  This

Court has twice declined to determine when disclosure to law enforcement by even

the *target* of investigation (such as a corporation under investigation by the SEC)

constitutes a waiver.  *See United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir.

2005); *Bittaker v. Woodford,* 331 F.3d 715, 720 n.5 (9th Cir. 2003).  Other Circuits

have split as to whether disclosure to law enforcement even by the target of an

investigation waives privilege, and as to whether privilege may be preserved by a

confidentiality agreement with a government agency.  *Compare Diversified*

*Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1978) to *Westinghouse Electric Corporation v. The Republic of the Philippines*, 951 F.2d 1414, 1423-27 (3d Cir. 1991).  Courts have rejected what the May 25 Order miscategorized as the "majority perspective" as to disclosure by the target of an investigation, because such would also have the effect of deterring cooperation with government investigations.  *See Diversified,* 572 F.2d at 611; *Pritchard-Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 284 (8th Cir. 1984) (waiving privilege on a report produced to the SEC "could deter such inquiries, which should not be chilled as a matter of policy").

Such policy considerations apply with even greater force here, where privileged materials were provided to the Government by the victims of a theft and criminal disclosure of such material.  This Circuit should make clear that in such circumstances victims may cooperate with the Government in criminal or civil investigations without waiving critical privileges and privacy protections.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, a writ of mandamus should be issued.  This Court should direct the District Court to reverse the May 25 Order's waiver of privilege.

Dated: June 30, 2011          /s Marc Toberoff
                             Marc Toberoff
                             TOBEROFF & ASSOCIATES, P.C.

                             Attorneys for Defendants-Petitioners,
                             Mark Warren Peary, *et al.*

**EXHIBIT A**
**42**

Dated: June 30, 2011                    /s/ Richard Kendall
                                         Richard Kendall
                                         KENDALL BRILL & KLIEGER LLP

                                         Attorneys for Defendants-Petitioners,
                                          Pacific Pictures Corporation, *et al.*

**EXHIBIT A**
**43**

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 21(d)

Pursuant to Federal Rule of Appellate Procedure 21(d), I certify that

Defendants-Petitioners' brief is proportionately spaced, has a typeface of 14 points

or more and does not exceed 30 pages.


Dated: June 30, 2011                    /s Marc Toberoff
                                        Marc Toberoff
                                        TOBEROFF & ASSOCIATES, P.C.

                                        Attorneys for Defendants-Petitioners,
                                        Mark Warren Peary, *et al.*

Dated: June 30, 2011                    /s/ Richard Kendall
                                        Richard Kendall
                                        KENDALL BRILL & KLIEGER LLP

                                        Attorneys for Defendants-Petitioners,
                                        Pacific Pictures Corporation, *et al.*


86356.1                          32

# EXHIBIT B

FILED

**NOT FOR PUBLICATION**

JAN 30 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re: PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY; LAURA SIEGEL LARSON; JEAN ADELE PEAVY, | No. 11-71844<br><br>D.C. No. 2:10-cv-03633-ODW-RZ<br>Central District of California,<br>Los Angeles |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; MARC TOBEROFF, an individual; JEAN ADELE PEAVY; LAURA SIEGEL LARSON, an individual, | ORDER |
|         Petitioners,<br><br>  v.<br><br>UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES,<br><br>        Respondent,<br><br>DC COMICS,<br><br>        Real Party in Interest. | |

**EXHIBIT B**

**45**

| | |
|---|---|
| DC COMICS,<br><br>   Plaintiff - Appellee,<br><br> v.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF; MARK WARREN<br>PEARY, as personal representative of the<br>Estate of Joseph Shuster; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the Estate of<br>Joanne Siegel; JEAN ADELE PEAVY,<br><br>   Defendants - Appellants. | No. 11-56934<br><br>D.C. No. 2:10-cv-03633-ODW-RZ<br>Central District of California,<br>Los Angeles |

Before: KOZINSKI, Chief Judge, O'SCANNLAIN and N.R. SMITH, Circuit
Judges.

  The time allocated for oral argument in this case shall be reduced.  Each side

shall now have ten minutes to present oral argument in Pasadena, California, on

February 7, 2012.

# EXHIBIT C



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

April 17, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL & U.S. MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265

Re:    ***DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)**

Dear Counsel:

We write regarding the Ninth Circuit's ruling today denying defendants' petition for a writ of mandamus and rejecting on the merits each of defendants' contentions. Now that "the Ninth Circuit has [had] the opportunity to weigh in," Docket No. 286 at 4, defendants must comply with the Court's orders compelling production of all communications with and documents disclosed to the U.S. Attorney's Office. *See* Docket Nos. 262; 309; 232; 310; *see also* Docket No. 210 at 10 (defendants' request that order be "stayed pending writ review"). Please confirm that you will produce these documents to us by 12:00 p.m. PDT on Thursday, April 19, 2012.

If you do not agree, we will file an *ex parte* application to lift Judge Zarefsky's temporary stay on production of these documents. Pursuant to Local Rule 7-19, *ex parte* relief is warranted because, *inter alia*, DC has been severely prejudiced by defendants' continued refusal to produce documents they were compelled to produce almost one year ago; DC needs these documents as soon as possible to respond to defendants' SLAPP appeal; and to continue and resume needed discovery.

**EXHIBIT C**

**47**

O'MELVENY & MYERS LLP
Page 2

       Please let us know your position immediately. If you need to discuss this issue with us, we are available by phone.

                              Very truly yours,

                              Matthew T. Kline
                              of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.

**EXHIBIT C**
**48**

# EXHIBIT D

**From:** Keith Adams <kgadams@ipwla.com>
**Date:** April 17, 2012 9:19:25 PM PDT
**To:** Cassandra Seto <cseto@OMM.com>
**Cc:** Jason Tokoro <jtokoro@omm.com>, Pablo Arredondo <parredondo@ipwla.com>, Matthew Kline <MKline@OMM.com>
**Subject: DC Comics v. Pacific Pictures Corp.**
**Reply-To:** Keith Adams <kgadams@ipwla.com>

Cassie:

Defendants ask that DC agree that documents produced under the 9th Circuit's decision today can be produced and designated as "Confidential" pursuant to the terms of the protective order in *Siegel*, Case No. 04-CV-08400 ODW (RZx), as DC has previously agreed to on multiple occasions. If DC is unwilling to agree to this simple procedure, we will have no choice but to seek a protective order.

Defendants reserve all rights.

Keith G. Adams
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

1

**EXHIBIT D**
**49**

# EXHIBIT E



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

April 18, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Keith Adams
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Keith and Dick:

We write in response to Keith's email (enclosed) sent to a select few of us at 9:19pm last night, and in furtherance of Cassie's letter sent to this entire group at 4:58pm yesterday (enclosed as well).  Defendants need to produce *this week* all of the documents they were ordered to produce in the Court's orders.  *See, e.g.*, Docket Nos. 262; 309; 232; 310.  These include all of the Timeline documents (and other materials) in the exact form defendants and their counsel provided them to the U.S. Attorney's office, as well as all of defendants' and their counsels' communications with the U.S. Attorneys' office over the past two years.

The latter category of documents are not confidential, and should not be marked as such. Defendants publicly filed a sampling of such communications when it served their tactical interests, and all such communications must be produced now without any limitation.

As for the former category of Timeline documents and any other shared materials, the courts have now repeatedly rejected any argument that any privilege or secrecy in those documents still obtains.  DC needs to use the documents to find, interview, and examine witnesses, and many of the documents' contents are already disclosed in the Timeline cover memoranda or other non-confidential correspondence that have come to light, including Laura Larson's long-suppressed July 2003 letter to her half-brother, Michael, and Michael's long-suppressed May 2003 letter to Laura that preceded it.  Defendants did not seek any confidential treatment of any of the Timeline documents in opposing DC's motion to compel or *ex parte*

**EXHIBIT E**
**50**

O'MELVENY & MYERS LLP
Page 2

application to clarify Judge Zarefsky's order requiring that the Timeline documents be produced. Nor did defendants raise this confidentiality concern in in their unsuccessful motion for review to Judge Wright or in their now-rejected Ninth Circuit briefs and filings. Such a demand for confidential treatment was waived long ago. *Cf.* Docket Nos. 269 at 5 n.3; 286 at 5; 361-2 at 48.

All that being said, in interest of expediting matters, and without prejudice to any of DC's rights, if defendants produce all of the documents required in the time frame Cassie requested yesterday, DC will treat the Timeline documents (but not defendants and defense counsels' communications with the government) as confidential pending our review of the Timeline documents. We will let you know next week whether we agree that any of the Timeline documents should be treated as confidential. If you disagree with our positions, we can meet and confer next week on the issue, and you can file a motion for any protective order you seek, and we will agree to expediting briefing and hearing on the issue. In opposing any such motion, however—should one be necessary—we reserve all rights and arguments.

If you disagree with this approach, we will file the *ex parte* application that Cassie noticed yesterday. As discussed in her letter, DC needs all of the documents immediately. DC cannot permit defendants to use belatedly raised confidentiality concerns that they waived last year to delay DC's access to these documents. Among other needs, DC needs to use of the documents in soon-to-be briefed appellate filings, briefs in the district proceedings, and for discovery purposes.

Please call us if you have any questions. All of DC's rights and remedies are reserved.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.
       Cassandra L. Seto, Esq.
       Defendants' Co-Counsel

Enclosures

**EXHIBIT E**
**51**

# EXHIBIT F

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
NICHOLAS C. WILLIAMSON

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

April 19, 2012

<u>Via E-Mail</u>

Matthew Kline
Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:   *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your April 17 and 18, 2012 letters demanding the immediate production "this week" of the Stolen Documents, and effectively refusing defendant's request that they be permitted to designate as "Confidential" documents produced under Magistrate Zarefky's May 25, 2011 Order pursuant to the terms of the protective order in *Siegel*.

As to the production of the documents, defendants are not compelled to produce these documents at this time. Under F.R.A.P. 40, defendants may petition for a panel rehearing or rehearing *en banc*. Defendants intend to seek panel rehearing and/or rehearing *en banc*.

Magistrate Zarefsky's May 25, 2011 Order states that the stay shall continue in effect until "*all* review is exhausted." Docket No. 262 at 4 (emphasis added). Magistrate Zarefsky's June 27, 2011 order similarly confirms that "[t]he stay would expire if the District Judge ruled in a manner contrary to this Court. It would not expire otherwise until review was exhausted." Docket No. 287 at 2. As review of this issue is not exhausted, and it is premature for DC to insist on the documents' immediate production.

Nor is there any basis for reconsideration of Magistrate Zarefsky's May 25 or June 27, 2011 stay orders. Your contention that "DC needs all the documents immediately … to use … in soon-to-be-briefed appellate filings" is erroneous as the record on appeal is limited to documents filed with the district court. *See Tonry v. Security Experts, Inc.*, 20 F.3d 967, 973-74 (9th Cir. 1994); F.R.A.P. 10(a); Circuit Rule 10-2. Moreover, defendants have yet to file their appeal brief in the Anti-SLAPP appeal, which is due April 24, 2012, and DC's brief is not due until May 24, 2012. There is no basis for DC's contemplated *ex parte* application, as Magistrate Zarefsky's order is crystal clear.

**EXHIBIT F**

**52**

**TOBEROFF & ASSOCIATES, P.C.**

April 19, 2012
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 2

As to the issue of the protective order, your position that Defendants' have "waived" the right to seek confidential protection as to these documents is not well-taken.  Defendants have consistently taken the position that these documents are privileged, and thus confidential.  Your assumption that any communications with the U.S. Attorneys' office are "not confidential" is also without basis.

In the event a panel rehearing or *en banc* rehearing is denied, and defendants pursue no other review, we will seek a protective order and produce the documents.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

**EXHIBIT F**
**53**

# EXHIBIT G

CASE NO. 11-71844

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, MARK WARREN PEARY, JEAN ADELE PEAVY, AND LAURA SIEGEL LARSON

*Defendants-Petitioners,*

*(caption continued on next page)*

MOTION OF PETITIONERS FOR AN EXTENSION OF TIME TO FILE PETITION FOR REHEARING AND FOR REHEARING EN BANC; DECLARATION OF LAURA W. BRILL

On Petition for Writ of Mandamus to the United States District Court for the Central District of California, Case No. CV-10-3633, Hon. Otis D. Wright II

| | |
|---|---|
| TOBEROFF & ASSOCIATES, P.C. | KENDALL BRILL & KLIEGER LLP |
| Marc Toberoff (188547) | Richard B. Kendall (90072) |
| 22337 Pacific Coast Hwy, # 348 | Laura W. Brill (195889) |
| Malibu, California, 90265 | 10100 Santa Monica Blvd., Suite 1725 |
| Telephone:  310. 246.3333 | Los Angeles, California  90067 |
| Facsimile:  310.246.3101 | Telephone:   310.556.2700 |
| | Facsimile:   310.556.2705 |

*Attorneys for Defendants-Petitioners Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel*

*Attorneys for Defendants-Petitioners Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, and Marc Toberoff*

106001.1

v.

UNITED STATES DISTRICT COURT,
CENTRAL DISTRICT OF CALIFORNIA

*Respondent,*

DC COMICS,

*Plaintiff-Real Party in Interest.*

106001.1

I.    **Introduction**

On April 17, 2012, the Court denied Petitioners' petition for writ of mandamus ("Writ Petition") by published opinion ("Writ Opinion").  Petitioners respectfully request an extension of time of thirty (30) additional days in which to file a petition for rehearing and rehearing en banc.

The extra time is necessary due to substantial pre-existing scheduling obligations of counsel and to allow for effective briefing.  Such briefing will require substantial legal analysis of complex issues relating to waiver of the attorney-client privilege, as well as a detailed refutation of the numerous factual misstatements in Section I of the Writ Opinion, relating to matters not before the panel, not yet addressed by the District Court, and/or which contradict decisions in prior cases.

Thus, in addition to addressing the Writ Opinion as to the critical waiver of attorney-client privilege issue, Petitioners must also address how Section I deviates from authorities providing that (1) this Court is not the finder of fact in the first instance; (2) the Court's mandamus authority is even more circumscribed; and (3) hearsay and complaint allegations are not admissible evidence.

To address the significant issues raised by the Writ Opinion, Petitioners respectfully request an extension of time of up to thirty (30) additional days for the filing of the petition, such that it would be due on or before May 31, 2012.

106001.1

1

**EXHIBIT G**

**56**

## II.    Argument

### A.    Petitioners Require Additional Time To File Petition For Rehearing Or Rehearing En Banc

Absent leave of court, a party has 14 days to file a combined petition for rehearing and rehearing en banc.  Fed. R. App. Proc. 35(c) & 40.  Here, good cause exists to grant Petitioners additional time due to the substantial scheduling conflicts of counsel and the unusual complexity of the briefing required.

### 1.    <u>Attorney Scheduling Conflicts Require an Extension of Time</u>

Good cause exists for granting an extension of time due to the scheduling conflicts of Petitioners' attorneys.  Both Richard Kendall and Laura Brill, who represent Mr. Toberoff, are in the process of preparing for a final status conference in another matter to be held on May 1 and 2, 2012.  The trial, which begins in late May, is expected to last more than a month, and the trial preparation work involves multiple pre-trial filings, witness and exhibit preparation and numerous out-of-office meetings.  *See* Declaration of Laura Brill in Support of Petitioner's Motion for an Extension of Time, ¶ 6(a).  Beyond this trial preparation, Mr. Kendall and Ms. Brill have additional scheduling conflicts in the immediate future, including depositions, hearings, out-of office meetings and appellate briefing in other

106001.1

2

**EXHIBIT G**

**57**

matters.  *Id.*  Some of these obligations involve out-of-state travel to the East Coast.  *Id.*

Petitioner Toberoff, who will also be involved in preparing the petition on behalf of his clients, the Siegel and Shuster heirs, likewise has multiple conflicting appellate and district court deadlines in the *Pacific Pictures* litigation, two cases before the Second Circuit and in other cases that conflict with the 14-day period in which a combined petition for rehearing and rehearing en banc would be due. These include multiple appellate and district court briefs and hearings for the Siegel and Shuster heirs and other clients.  *Id.*, ¶6(b).

A 30-day extension of time is reasonable and appropriate on the basis of such scheduling conflicts alone.

### 2.    The Complexity Of Issues Provides Further Good Cause For An Extension Of Time.

Additional time is also are needed because  the Court's opinion raises an unusual number of issues that are appropriate for rehearing and rehearing en banc.

First, the Writ Opinion broadly addresses and decides issues of attorney-client privilege and the "selective waiver" doctrine.  The Writ Opinion—in particular, its conclusion that confidentiality agreements between the Government and a party cannot protect privileged documents from a third party—adds to a significant split in authority among the Circuits and is of enormous importance to

**EXHIBIT G**

**58**

the legal community within this Circuit.  The opinion in this case directly conflicts

with the holding of a detailed and well-reasoned opinion of the Seventh Circuit in

*Dellwood Farms Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997),

authored by then-Chief Judge Posner, and is also in conflict with the reasoning of

the Second Circuit in *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 232 (2nd Cir.

1993) (Newman, C.J., Kearse, J., and Tenney, D.J.).

The Ninth Circuit has, twice before this case, noted the importance of this

issue, and declined to rule on it, including in an en banc decision.  *Bittaker v.

Woodford*, 331 F.3d 715, 717 (9th Cir. 2008) (en banc); *United States v. Bergonzi*,

403 F.3d 1048, 1050 (9th Cir. 2004).  Other Circuits have also noted its importance

in detailed published opinions, and academic experts have provided a wealth of

commentary on this issue.  *See, e.g., In re Qwest Communications Int'l Inc.*, 450

F.3d 1179, 1186-1194 (10th Cir. 2006); Katherine M. Weiss, *Upjohn Co. v. United

States as Support for Selective Waiver of the Attorney-Client Privilege in

Corporate Criminal Investigations*, 48 B.C. L. Rev. 501 (2007).

The full Court should have the benefit of adequate briefing on this important

legal issue, and why the victim of a privacy crime should be able to cooperate with

the government's investigation or prosecution of such crime without waiver of the

attorney-client privilege.

3.     **Additional Time Is Further Needed To Address Extensive Misstatements of Fact In The Writ Opinion**

Additional time is also warranted for Petitioners to appropriately seek correction of the numerous misstatements of fact in Section I of the Writ Opinion.

Petitioners will show in their petition that the Writ Opinion includes misstatements that directly conflict with judicial findings from a 1947 lawsuit between Siegel/Shuster and DC, the 1974 decision of the Second Circuit in a lawsuit between Siegel/Shuster and DC, and the district court judgment in the ongoing separate lawsuit between the Siegels and DC/Warner Bros. Entertainment Inc.  *See, e.g., Siegel v. National Periodical Publications*, 508 F.2d 909, 911, 914 (2d Cir. 1974); *Siegel v. Warner Bros. Entertainment Inc.,* 542 F. Supp. 2d 1098, 1116, 1145 (C.D. Cal. 2008); *Siegel v. Warner Bros. Ent. Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal. 2009).

Petitioners will further seek correction of numerous factual statements that (i) were not germane to the privilege issue before the Writ panel; (2) concerned factual issues not before the panel; (3) concerned matters that remain seriously disputed in the underlying *Pacific Pictures* case (C.D. Cal. Case No. CV-10-3633) where the District Court has not yet made factual findings; and (4) were either

106001.1

5

**EXHIBIT G**

**60**

unsupported or directly contradicted by the record.[1]  Such *de novo* fact-finding on appeal was improper.  *See Hormel v. Helvering*, 332 U.S. 552, 536 (1941) ("[O]ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact."); *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (en banc) (Wardlaw, J., concurring) (remand appropriate in the absence of "true finding of fact for us to review"); *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 190 (9th Cir. 1989) (appellate jurisdiction over interlocutory matters limited to orders actually appealed from).

Petitioners will require additional time for their petition to explain as to each of the misstatements why the matter was outside the scope of the petition for writ of mandamus, not addressed below, contradicted by prior rulings, or otherwise worthy of correction.

### 4.    DC's Opposition To The Requested Extension Is Without Legal Merit

DC opposes an extension of time, on the stated grounds that DC desires to use the stolen privileged documents to *supplement* the fixed record in a separate appeal (Appeal No. 11-56934).  That appeal, however, focuses on whether the

---

[1] Petitioners believe these errors will likely also require them to seek an enlargement of the page limit, which Petitioners will address, if necessary, at the time they file their petition for rehearing in keeping with Circuit Rules.

allegations in DC's complaint trigger the protection of California's Anti-SLAPP

statute.  Moreover, documents not before the District Court cannot properly be

introduced for the first time on appeal.  F.R.A.P. 10(a); *Barcamerica Int'l USA*

*Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593-94 (9th Cir. 2002).  Finally, any

legitimate scheduling concerns of DC could appropriately be addressed by the

panel hearing the Anti-SLAPP appeal and is not a basis to deny Petitioners a

reasonable extension of time to address the very serious legal issues and factual

errors in the Writ Opinion.

## III.   Conclusion

For the foregoing reasons, the Court should extend Petitioners' time to file a

petition for rehearing and rehearing en banc in connection with this matter until

May 31, 2012.


Dated:  April 24, 2012                    KENDALL BRILL & KLIEGER LLP


                                          By:  s/Laura W. Brill
                                               _____
                                               Laura W. Brill
                                               Attorneys for Defendants-Petitioners
                                               Pacific Pictures Corporation, IP
                                               Worldwide, LLC, IPW, LLC, and Marc
                                               Toberoff


106001.1                                          7

**EXHIBIT G**

**62**

## DECLARATION OF LAURA W. BRILL

I, Laura W. Brill, declare as follows:

1.      I am an attorney at the law firm of Kendall Brill & Klieger LLP, counsel of record for Defendants-Petitioners Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC and Marc Toberoff ("Petitioners") in the above-captioned action.  I am a member in good standing of the State Bar of California and am admitted to practice before this Court.

2.      Petitioners respectfully request a thirty (30) day extension of the filing date for a Petition for Rehearing and Petition for Rehearing En Banc.  The deadline for the Petition for Rehearing and Rehearing En Banc is currently May 1, 2012, and Petitioners request an extension until and including May 31, 2012.

3.      Petitioners respectfully request this extension o for two reasons, which are explained in more detail in Petitioners' motion.

4.      First, the Court's opinion in this matter has created a significant circuit split with respect to the law of attorney-client privilege between this Circuit and the United States Court of Appeals for the Second and Seventh Circuit.  The subject matter of the Court's opinion is of great significance to the practices of attorneys and the federal and state law enforcement officials throughout this Circuit, and has been the subject of intensive commentary by academics and practitioners.

**EXHIBIT G**

**63**

5.    Second, Petitioners seek review and rehearing relating to the factual recitation in the first section of the Court's opinion.  That section described (without reference to the source of the facts mentioned) numerous matters that were not before the District Court or this Court, that are contested between the parties, that are relevant to the underlying litigation, and that have never been found or established by the District Court or any judicial body.  Petitioners respectfully request additional time to describe these factual issues, to explain why rehearing should be granted as to these factual descriptions.

6.    The three lead counsel for Petitioners, Marc Toberoff, Richard Kendall, and myself, also have had and continue to have significant scheduling conflicts between the date the Court's opinion issued on April 17, 2012 and May 1, 2012 , the date a petition for rehearing or rehearing en banc would otherwise be due in the absence of an extension of time.  Due to these scheduling conflicts, Mr. Toberoff, Mr. Kendall, and I will not have adequate time to prepare a Petition for Rehearing and Rehearing En Banc:

a.    Richard Kendall and I are in preparation for trial in the matter pending in the Los Angeles Superior Court entitled *Jason West, et al. v. Activision Publishing, Inc., et al.*, Case No. SC107041.  We represent cross-defendant Electronic Arts Inc. in this matter, which is scheduled to begin trial on May 29, 2012 and which is expected to last more than one month.  A final status conference

**EXHIBIT G**

**64**

in that matter has been set for May 1 and 2, 2012. Mr. Kendall and I have significant trial preparation responsibilities in advance of these dates, including responding to motions *in limine* (with multiple oppositions due April 23, 2012) and preparing for the May 1-2 final status conference, which we expect will address, in addition to motions *in limine*, complex issues relating to jury instructions, verdict forms, and other pre-trial matters.

In addition, Mr. Kendall and I both have pre-scheduled out-of-office meetings related to trial preparation and other matters between the April 17 issuance of the Court's opinion and the May 29 trial date in the Electronic Arts matter. For Mr. Kendall, these pre-scheduled out-of-office meetings took place or will take place on April 17, 18, 26 and May 3, 10, and 11.

Mr. Kendall's other scheduling obligations include an April 24, 2012 deposition in *Singleton et al. v. Paramount Pictures Corp. et al.*, Los Angeles Superior Court Case No. BC 471534 (Singleton) and another deposition in the same case on May 10, 2012. Mr. Kendall also has a court hearing in the United States District Court for the Southern District of New York in *Paramount Pictures Corp v. Puzo*, S.D.N.Y. Case No. 12 CIV-1268 on May 11, 2012.

I will be out of the office travelling to and attending a non-profit board meeting in New York and attending out of office trial preparation meetings for at least six full days between now and the end of May. I also have a significant brief

10

**EXHIBIT G**

**65**

due in the California Court of Appeal on May 10, 2012 in *Summit Media LLC v. City of Los Angeles*, in which I represent real party in interest CBS Outdoor Inc.

b.    Marc Toberoff has briefing deadlines in the following matters in the relevant time period:  A reply brief due April 23, 2012, in *The Ray Charles Foundation v. Raenee Robinson et al.* (C.D. Cal)  Case No.  CV 12-2725 ABC (FFMx):  an appellate reply brief due April 27, 2012, in *Marvel Characters, Inc. v. Lisa Kirby et al.* (2nd Cir.) Case No. 11-3333-cv: joint discovery stipulations currently due on April 25, 2012, and April 27, 2012, in  *DC Comics v. Pacific Pictures Corp. et al.* (C.D. Cal) Case No. CV- 10-3633 ODW (RZx): an opposition and reply brief due May 10, 2012, in  *Larson v. Warner Bros. Entertainment et al.* (9th Cir.)  Case No. 11-55863 and 11-56034: and an opposition and reply brief due May 18, 2012, in *DiTocco v. Riordan et. al* (2d Cir.) Case No. 11-4438.  Mr. Toberoff also worked on the opening brief on appeal in *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 11-56934 (9th Cir.), due on April 24, 2012.

7.    This is Petitioners' first request for an extension in connection with the petition for rehearing or for rehearing en banc.  I have exercised diligence in connection with this matter, and I will ensure that Petitioner's answering brief is filed within the time requested.

8.    Counsel for Real Party in Interest D.C. Comics has indicated that it will oppose the requested extension.

**EXHIBIT G**
**66**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of April, 2012, at Los Angeles, California

s/ Laura W. Brill
Laura W. Brill

**EXHIBIT G**
**67**

# EXHIBIT H

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee*,

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

————————

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS AND
## APPELLEES WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

————————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, cross-appellants and appellees Warner Bros. Entertainment Inc. and DC Comics, by and through their counsel of record, hereby disclose:

1.  Warner Bros. Entertainment Inc. is a corporation that is an indirect, wholly-owned subsidiary of Time Warner Inc.

2.  DC Comics is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation.  Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC Comics.

Dated:  March 23, 2012                O'MELVENY & MYERS LLP

                                      By:  /s/ Daniel M. Petrocelli
                                           Daniel M. Petrocelli
                                           Attorneys for Warner Bros.
                                           Entertainment Inc. and DC Comics

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION...................................................................1

INTRODUCTION ...........................................................................................1

STATEMENT OF ISSUES PRESENTED........................................................5

STATEMENT OF THE CASE..........................................................................6

STATEMENT OF FACTS ...............................................................................9

      A.    Statutory Background .................................................................9

      B.    Factual Background ..................................................................10

           1.    Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s...........................................................................10

           2.    Litigation Over Superman During The 1940s, 1960s, And 1970s .......................................................14

           3.    Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement.............15

           4.    Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement.................................................................18

      C.    Proceedings Below.................................................................19

STANDARD OF REVIEW ............................................................................22

SUMMARY OF ARGUMENT ......................................................................23

ARGUMENT ................................................................................................25

          <u>DC's Cross-Appeal On Its Second Through Fourth Counterclaims</u>

    I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE ..................25

**EXHIBIT H**

A. Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation ..........................................25

B. The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law ........................28

C. At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter ........................................................................................34

II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM ................................................37

Larson's Appeal Of Her First Claim And
DC's Cross-Appeal On Both Parties' First Claims

I. LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE HER CLAIM HAS NOT BEEN FULLY AND FINALLY ADJUDICATED .............................................................................40

II. THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT FROM TERMINATION....................................................41

A. A Work Is Made-For-Hire Under The 1909 Copyright Act When It Is Created At The "Instance And Expense" Of The Commissioning Party ...................................................42

B. The District Court Correctly Held That *Action Comics #2-3, #5-61*, *Superman #1 (Pages 1-2)-23*, And The Post-McClure Strips Were Works-For-Hire ....................................45

1. *Action Comics #2-3, #5-6* ...............................................48

2. *Action Comics #7-61* And *Superman #1-23*.................51

3. Post-McClure Newspaper Strips ....................................55

ii

C.    The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4*, *Superman #1* (Pages 3-6), And Pre-McClure Strips ........................................................... 61

    1.    *Action Comics #1* ............................................................ 61

          a.    Key Elements Of *Action Comics #1* Were Made-For-Hire ................................................................. 61

          b.    *National* Is Not Preclusive As To The Work-For-Hire Status Of *Action Comics #1* ...................... 68

    2.    Pre-McClure Strips ....................................................... 71

          a.    The Pre-McClure Strips Were Made At DC's Instance And Expense ......................................... 71

          b.    Larson's Failure To List The Pre-McClure Strips In Her Termination Notice Also Precludes Termination ....................................................... 72

    3.    Pages 3-6 Of *Superman #1* ........................................... 77

    4.    Artwork In *Action Comics #4* ....................................... 79

    5.    Promotional Announcements ........................................ 80

CONCLUSION ................................................................... 87

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM

iii

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Almond v. ABB Indus. Sys., Inc.*,
   2001 WL 242548 (S.D. Ohio Mar. 6, 2001) .......................................................78

*Ariz. State Carpenters Pension Trust Fund v. Miller*,
   938 F.2d 1038 (9th Cir. 1991) ...............................................................................40

*Atla-Medine v. Crompton Corp.*,
   2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001) .......................................................36

*Banner Entm't, Inc. v. Super. Ct.*,
   62 Cal.App.4th 348 (1998) ............................................................................ 29, 35

*Beck v. Am. Health Grp. Int'l, Inc.*,
   211 Cal.App.3d 1555 (1989) ..................................................................................29

*Boisson v. Banian, Ltd.*,
   273 F.3d 262 (2d Cir. 2001) ..................................................................................62

*Burroughs v. M-G-M, Inc.*,
   683 F.2d 610 (2d Cir. 1982) ....................................................... 74, 75, 76

*Bustamante v. Intuit, Inc.*,
   141 Cal.App.4th 199 (2006) ......................................................................... 29, 35

*Callie v. Near*,
   829 F.2d 888 (9th Cir. 1987) ................................................................................35

*CCNV v. Reid*,
   490 U.S. 730 (1989) ..............................................................................................43

*Chaffin v. U.S.*,
   176 F.3d 1208 (9th Cir. 1999) ..............................................................................44

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
   538 U.S. 440 (2003) ..............................................................................................43

*Clarke v. Fiedler*,
   44 Cal.App.2d 838 (1941) ............................................................................ 26, 27

**EXHIBIT H**

*Comm'r v. Sunnen*,
    333 U.S. 591 (1948) ........................................................................................68

*Cool Fuel, Inc. v. Connett*,
    685 F.2d 309 (9th Cir. 1982)....................................................................82

*Cuellar de Osorio v. Mayorkas*,
    656 F.3d 954 (9th Cir. 2011)....................................................................22

*Dolman v. Agee*,
    157 F.3d 708 (9th Cir. 1998)......................................................... 42, 43, 44

*Easter Seal Soc'y v. Playboy Enters.*,
    815 F.2d 323 (5th Cir. 1987)....................................................................42

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
    697 F.2d 27 (2d Cir. 1982)................................................................ 63, 64

*Elite Show Servs., Inc. v. Staffpro, Inc.*,
    119 Cal.App.4th 263 (2004) ....................................................................26

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
    122 F.3d 1211 (9th Cir. 1997) .................................................................63

*EPIC, Inc. v. Pac. Lumber Co.*,
    257 F.3d 1071 (9th Cir. 2001) .................................................................71

*Ersa Grae Corp. v. Fluor Corp.*,
    1 Cal.App.4th 613 (1991) ........................................................................26

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
    2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) ...........................................53

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
    342 F.3d 149 (2d Cir. 2003)......................................................... 42, 47, 59

*Estate of Thottam*,
    165 Cal.App.4th 1331 (2008) ..................................................................26

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ........................................................................ 63, 80

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*,
    773 F.2d 1068 (9th Cir. 1985) ............................................................71

*Gaiman v. McFarlane*,
    360 F.3d 644 (7th Cir. 2004) ..............................................................80

*Gausvik v. Perez*,
    392 F.3d 1006 (9th Cir. 2004) ........................................... 22, 51, 81

*Granite Rock Co. v. Teamsters*,
    649 F.3d 1067 (9th Cir. 2011) ..................................................... 68, 70

*Harper & Row, Publishers v. Nation Enters.*,
    471 U.S. 539 (1985) ............................................................................51

*Harris v. Rudin, Richman & Appel*,
    74 Cal.App.4th 299 (1999) ............................................... 26, 27, 29

*In re Smith*,
    964 F.2d 636 (7th Cir. 1992)..............................................................58

*Inamed Corp. v. Kuzmak*,
    275 F.Supp.2d 1100 (C.D. Cal. 2002) .............................................34

*Jachetta v. U.S.*,
    653 F.3d 898 (9th Cir. 2011)..............................................................51

*Jada Toys, Inc. v. Mattel, Inc.*,
    518 F.3d 628 (9th Cir. 2008)..............................................................62

*Jim Henson Prods. v. John T. Brady & Assocs.*,
    16 F.Supp.2d 259 (S.D.N.Y. 1997)....................................................60

*Lamle v. Mattel, Inc.*,
    394 F.3d 1355 (Fed. Cir. 2005)..........................................................29

*Levin v. Knight*,
    780 F.2d 786 (9th Cir. 1986)..............................................................29

*Lin-Brook Builders Hardware v. Gertler*,
    352 F.2d 298 (9th Cir. 1965)................................................. 42, 43, 59

*Lozano v. Ashcroft*,
  258 F.3d 1160 (10th Cir. 2001) ..........................................................83

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch.*
  *of Contemporary Dance, Inc.*,
  380 F.3d 624 (2d Cir. 2004)................................................................55

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002)......................................................... 45, 70

*Marvel Worldwide, Inc. v. Kirby*,
  777 F.Supp.2d 720 (S.D.N.Y. 2011)................................. 44, 49, 53, 78

*Mattel, Inc. v. MGA Entm't, Inc.*,
  2011 WL 3420603 (C.D. Cal. Aug. 4, 2011)......................................35

*Mattel, Inc. v. MGA Entm't, Inc.*,
  616 F.3d 904 (9th Cir. 2010)................................................. 24, 35, 39

*May v. Morganelli-Heumann & Assocs.*,
  618 F.2d 1363 (9th Cir. 1980) .............................................. 42, 43, 45

*Medina v. Ramsey Steel Co.*,
  238 F.3d 674 (5th Cir. 2001)..............................................................36

*Meyer v. Holley*,
  537 U.S. 280 (2003) ...........................................................................44

*Murray v. Gelderman*,
  566 F.2d 1307 (5th Cir. 1978) .................................................... 43, 49

*Music Sales Corp. v. Morris*,
  73 F.Supp.2d 364 (S.D.N.Y. 1999)....................................................75

*Narayan v. EGL, Inc.*,
  616 F.3d 895 (9th Cir. 2010)..............................................................23

*Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.*,
  191 F.2d 594 (2d Cir. 1951)........................................................ 58, 69

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ...........................................................................39

**EXHIBIT H**

*Nike, Inc. v. Just Did It Enters.*,
   6 F.3d 1225 (7th Cir. 1993)....................................................................36

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
   558 F.2d 1090 (2d Cir. 1977)...............................................................62

*Pantone, Inc. v. A. I. Friedman, Inc.*,
   294 F.Supp. 545 (S.D.N.Y. 1968)..........................................................62

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
   347 U.S. 89 (1954) ..............................................................................51

*Patel v. Liebermensch*,
   45 Cal.4th 344 (2008) ..........................................................................27

*Picture Music, Inc. v. Bourne, Inc.*,
   457 F.2d 1213 (2d Cir. 1972)..................................................... *passim*

*Playboy Enters., Inc. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995)............................................... 43, 49, 53

*Recycling Solutions Tech., LLC v. Rosenberg*,
   2011 WL 1696826 (E.D. Ky. May 4, 2011) .......................................36

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
   77 F.3d 309 (9th Cir. 1996)..................................................................29

*S. Cal. Painters v. Best Interiors, Inc.*,
   359 F.3d 1127 (9th Cir. 2004) ..............................................................35

*Samuels v. Holland Am. Line-USA Inc.*,
   656 F.3d 948 (9th Cir. 2011)................................................................22

*Sargent v. Am. Greetings Corp.*,
   588 F.Supp. 912 (N.D. Ohio 1984)......................................................62

*Scherr v. Universal Match Corp.*,
   297 F.Supp. 107 (S.D.N.Y. 1967).........................................................44

*Scherr v. Universal Match Corp.*,
   417 F.2d 497 (2d Cir. 1969) .................................................................79

**EXHIBIT H**

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ............................................................... 40

*Seiler v. Lucasfilm, Ltd.*,
    808 F.2d 1316 (9th Cir. 1986) ............................................................... 82

*Self-Realization Fellowship Church v. Ananda Church of Self-
    Realization*,
    206 F.3d 1322 (9th Cir. 2000) ............................................... 42, 43, 44

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
    161 F.2d 406 (2d Cir. 1946) .................................................................. 80

*Shaw v. Hahn*,
    56 F.3d 1128 (9th Cir. 1995) ................................................................. 70

*Siegel v. Nat'l Periodical Publ'ns*,
    364 F.Supp. 1032 (S.D.N.Y. 1973) ......................................... 15, 68, 69

*Siegel v. Nat'l Periodical Publ'ns*,
    508 F.2d 909 (2d Cir. 1974) .................................................... 11, 15, 68

*St. Paul Water Co. v. Ware*,
    83 U.S. 566 (1872) ............................................................................... 44

*Tex Print Indus., Inc. v. Zayre Corp.*,
    1977 WL 22752 (D. Mass. Feb. 10, 1977) ......................................... 83

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
    640 F.3d 1034 (9th Cir. 2011) ...................................................... *passim*

*Thomas v. Ponder*,
    611 F.3d 1144 (9th Cir. 2010) ............................................................. 23

*Toledano v. O'Connor*,
    501 F.Supp.2d 127 (D.D.C. 2007) ....................................................... 29

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869
    (9th Cir. 2005) ............................................................................. *passim*

*U.S. v. Alexander*,
    326 F.2d 736 (4th Cir. 1964) ............................................................... 83

*U.S. v. Diaz-Lopez,*
625 F.3d 1198 (9th Cir. 2010) ..........................................................................82

*U.S. v. Resnick,*
594 F.3d 562 (7th Cir. 2010).............................................................................78

*Vass v. Compaq Computer Corp.,*
953 F.Supp. 114 (D. Md. 1997) ........................................................................36

*Wallace v. City of San Diego,*
479 F.3d 616 (9th Cir. 2007)............................................................................23

*Warren v. Fox Family Worldwide, Inc.,*
328 F.3d 1136 (9th Cir. 2003) .........................................................................49

*Webster Indus., Inc. v. Northwood Doors, Inc.,*
320 F.Supp.2d 821 (N.D. Iowa 2004).............................................................36

*Weddington Prods., Inc. v. Flick,*
60 Cal.App.4th 793 (1998) ...............................................................................31

## STATUTES

17 U.S.C. §4 (1909) (repealed 1976)......................................................................9

17 U.S.C. §7 (1909) (repealed 1976)....................................................................47

17 U.S.C. §24 (1909) (repealed 1976)......................................................... *passim*

17 U.S.C. §26 (1909) (repealed 1976)............................................................. 9, 41

17 U.S.C. §203 ..................................................................................................... 10, 41

17 U.S.C. §203 .....................................................................................................74

17 U.S.C. §304 ............................................................................................. *passim*

17 U.S.C. §507 .....................................................................................................37

17 U.S.C. §702 .....................................................................................................73

28 U.S.C. §1291 ....................................................................................................1

28 U.S.C. §1331 ....................................................................................................1

28 U.S.C. §1338 ................................................................................1

28 U.S.C. §1367 ................................................................................1

CAL. CIV. CODE §1550 ....................................................................25

## **RULES**

FED. R. CIV. P. 54(b) ................................................................ *passim*

FED. R. CIV. P. 56(a) ......................................................................22

FED. R. EVID. 1002 ........................................................................82

FED. R. EVID. 801(d)(2)(A) ...........................................................78

## **REGULATION**

37 C.F.R. §201.10 ................................................................. *passim*

## **OTHER AUTHORITIES**

42 F.R. 45916-21 ....................................................................74, 77

52 F.R. 23443-46 (1987) ................................................................62

76 F.R. 32320 (June 6, 2011) .........................................................75

1 WILLIAM F. PATRY, PATRY ON COPYRIGHT (1st ed. 2007) ...................76

41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005) ..........44

6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3] (2011) .......................82

Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301 (2003) ...............................................................34

Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101 (2001) .................................28

Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film Agreements*, L.A. LAW. 18 (Apr. 1999) ............................................28

EXHIBIT H
80

Jay M. Spillane,
*Lawsuits over "Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. & SPORTS LAW. 15 (1993) .........................................................................29

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (2011) ...................................................................................... 62, 76

RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-429 (1965).................................44

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975)...........................................................16

EXHIBIT H
81

## STATEMENT OF JURISDICTION

This appeal arises from a partial judgment under FED. R. CIV. P. 54(b) on appellant Laura Siegel Larson's First Claim for Relief and cross-appellants Warner Bros. Entertainment Inc. and DC Comics' (together "DC's") First through Fourth Counterclaims. Larson's First Claim asserts that copyright termination notices she served make her joint owner of several early Superman works. DC's Counterclaims assert that the notices are invalid (First Counterclaim); Larson's lawsuit is time-barred (Second Counterclaim); and Larson's claims are barred by an October 2001 settlement agreement (Third and Fourth Counterclaims).

The district court had jurisdiction over these claims. 28 U.S.C. §§1331, 1338, 1367. This Court has jurisdiction over DC's Second, Third, and Fourth Counterclaims, because they were fully and finally adjudicated below. 28 U.S.C. §1291. This Court lacks jurisdiction over Larson's First Claim and DC's First Counterclaim, which were not fully and finally adjudicated. *Infra* at 40-41.

## INTRODUCTION

This case is about the ownership of copyright in the earliest comics that introduced elements of the iconic Superman character and story, including aspects of his appearance, powers, and background. As it comes before this Court—an appeal and cross-appeal addressing multiple rulings below—the case presents an

**EXHIBIT H**
**82**

unusually broad array of doctrinal, factual, and procedural issues.  But much of the case reduces to a familiar proposition:  a deal is a deal.

The doctrinal issues focus on an intersection between the 1909 Copyright Act and the 1976 amendments to that Act.  The 1976 Act extended existing copyrights under the 1909 Act—including copyrights that had been assigned—while giving the original authors and certain of their heirs the right to terminate previous assignments of their copyrights and to negotiate new assignments with existing rights holders or other parties.

By design, the 1976 Act struck a careful balance.  On the one hand, it gave authors (and certain heirs) a fresh start on their original rights and new leverage to renegotiate old assignments.  On the other hand, it gave rights owners who had acquired and then developed the assigned works—sometimes into exceedingly valuable commercial properties—continuing rights to exploit derivative works created under the assignments, as well as an exclusive, first opportunity to negotiate new deals to reclaim any terminated rights.

At first, the negotiation process contemplated by the 1976 Act worked here just as intended.  The heirs to Superman's original story writer served notices of termination as to certain early Superman works.  While DC contested the notices on various grounds—including that the works at issue were made-for-hire and hence not subject to termination—that dispute was shelved for four years while the

parties worked to negotiate a resolution that would both secure DC's rights, and ensure the family reaped financial benefits from DC's continued exploitation of Superman. The family, represented by a prominent entertainment law firm, ultimately struck a deal with DC—one that included every essential term for a re-grant of rights, provided for various other non-essential terms, and guaranteed the family many millions of dollars in cash, royalties, and other compensation.

But after agreeing to this deal in writing, the family was approached by a self-styled "intellectual property entrepreneur" who dangled the prospect of even more money. In short order the family reneged on its deal with DC, refused to complete discussions over a "long form" contract formalizing the agreement, and fired their lawyers. The family asserted there was no deal without a long form, and the district court agreed, casting aside established California contract law principles—principles essential to the entertainment industry, where many business deals are never formalized. The rule there is simple, however: a deal is a deal, long form or not.

That principle also lies at the core of the underlying copyright dispute here. Superman's creators conceived the Superman character, but no one would publish it. It was only DC, years later, that recognized Superman's commercial potential. DC employed the creators as artists, purchased the entirety of their rights in Superman, and promoted and published the first Superman story. DC developed

Superman not just commercially, but creatively as well, employing many artists—including but not limited to the original creators—to develop many of the now-widely-recognized elements of the Superman mythos.

For their valuable contributions to DC's efforts, DC paid the original creators millions of dollars in today's terms, pursuant to agreements that could not have been clearer: DC paid them to create new Superman material for DC, the exclusive owner of all rights in the character and story. Over the years, the creators tried to undo their original Superman agreements, but the courts repeatedly rejected their efforts. And now it is Larson who contends that her father's 1930s deals with DC, like her own 2001 deal, were not deals at all—she says her father was not creating Superman for DC, as his agreements plainly said, but for himself, and that she should now own rights that her father never did.

The 1976 Act does not sanction her claims. It was intended to allow authors and heirs to "recapture" copyrights they initially owned and then assigned—not copyrights they never owned in the first place.

This long-running dispute should be brought to an end. Enforcing Larson's deal will afford her tens of millions of dollars for which she bargained in 2001, while protecting the deal her own father struck in the 1930s, when DC employed him to create new Superman material on DC's behalf.

**EXHIBIT H**

**85**

# STATEMENT OF ISSUES PRESENTED

## *DC's Cross-Appeal On Its Second Through Fourth Counterclaims*

1.  a.  Whether DC is entitled to entry of judgment on all claims on the basis of an October 2001 settlement agreement, confirmed by a letter from Larson that explicitly "accepted D.C. Comics' offer" and described in detail all essential "terms" of the parties' "monumental accord."

b.  Whether DC is at least entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in Larson's October 2001 letter.

2.  Whether Larson's claims are barred by the Copyright Act's three-year limitations period.

## *Larson's Appeal On Her First Claim And*
## *DC's Cross-Appeal On Both Parties' First Claims*

1.  Whether this Court lacks jurisdiction over the appeal of the parties' respective First Claims because the district court did not fully and finally adjudicate the scope of rights to early Superman works at issue in those claims.

2.  Assuming the Court has jurisdiction to hear these claims:

a.  Whether the district court properly ruled that Superman works created by Larson's father Jerome Siegel and his collaborator Joseph Shuster at DC's instance and expense—after Siegel and Shuster assigned all of their Superman rights to DC and entered into various employment agreements with DC—were works-for-hire.

**EXHIBIT H**
**86**

b.  Whether the district court erred in ruling that Larson was entitled to recapture a handful of early Superman works that were made at DC's instance and expense and/or were not listed in Larson's copyright termination notices.

c.  Whether the district court erred in ruling *sua sponte* on the copyrightable elements in certain promotional announcements owned by DC, without giving DC notice or an opportunity to be heard on the issue, and without examining the actual announcements or a legible copy of them.

## STATEMENT OF THE CASE

Superman was co-created by Siegel and Shuster in the 1930s, and introduced to the world by DC in *Action Comics #1*, published in 1938.  ER-1019; SER-9-10. This copyright dispute arises more than a half-century later because of a 1976 amendment to the Copyright Act, which allows "authors"—within the meaning of that term under the 1909 version of the Act—of copyrighted works (and certain of their heirs) to terminate earlier assignments of their copyrights and reclaim those copyrights for themselves.  Nobody denies that Siegel and Shuster were the authors of certain foundational elements of Superman, but neither does anyone deny that most other elements appeared for the first time in derivative works—comic books, newspaper strips, and other media—created *after* Siegel and Shuster assigned to DC all rights to Superman, and were hired by DC along with many other artists to create new Superman works.  The dispute here centers on whether certain of the

6
**EXHIBIT H**
**87**

earliest derivative works were "made for hire" on DC's behalf, making DC the "author" of the works under the 1909 Act and precluding termination by Siegel's heirs.

During their lifetimes, neither Siegel nor Shuster—despite a long history of litigation against DC—sought to exercise any termination rights in Superman. Within a year of Siegel's death in 1996, however, his widow Joanne (now deceased) and daughter Larson served termination notices seeking to recapture a broad range of Superman works. ER-1024-92. DC disputed most aspects of the termination notices, but sought to resolve the controversy through negotiation with Larson and her lawyer Kevin Marks. ER-16; SER-393, 100-01. The parties reached a settlement agreement on October 19, 2001, in which DC agreed to pay Larson $3 million in up-front cash, annual guarantees worth $5 million, and tens of millions more in future profit sharing, in exchange for which DC would receive all of the putative Superman rights Larson claimed to own. SER-132, 147-48, 434-35, 456-61. A little more than six months later, however, Larson repudiated the agreement, fired Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights. SER-133-34, 182-83, 404, 417-20, 422-25, 819-20, 835-37. No buyer emerged; and in 2004, Larson (now using Toberoff as her lawyer) filed this lawsuit, seeking a declaration that her termination notices were valid and entitled her to an

accounting of Superman-related profits. ER-325. DC counterclaimed asserting, *inter alia*, that the notices were invalid and Larson's claims were barred by the parties' October 2001 agreement and the statute-of-limitations. ER-273-310.

In 2008, the district court granted partial summary judgment against DC on its Second through Fourth Counterclaims, holding Larson's claims were neither time-barred nor precluded by the October 2001 agreement. SER-61-62, 66.

The court also issued a series of partial rulings on Larson's First Claim and DC's First Counterclaim. The court ruled the vast majority of works listed in Larson's termination notices were works-for-hire as a matter of law and thus could not be terminated. ER-43-140. But it held that certain other works were *not* made-for-hire and thus could be terminated. ER-81, 114, 189. The court did not, however, resolve the scope of the rights at issue. *Infra* at 20-21.

Larson now appeals some (not all) of the adverse rulings on her First Claim, asserting that the court erred in finding that the following works were made-for-hire: *Action Comics #2-3, #5-61*; pages 1-2 of *Superman #1*, *Superman #2-23*; and newspaper strips created after the parties entered into a syndication agreement with McClure in 1938. ER-81, 114, 189.

DC cross-appeals the rejection of its threshold limitations and settlement counterclaims. DC also contends that Larson's appeal on her First Claim is unripe because the court did not declare the scope of rights at issue in that claim and thus

did not fully adjudicate it (or DC's First Counterclaim). But assuming this Court has jurisdiction to address the parties' First Claims, DC cross-appeals, asserting that while the court's work-for-hire rulings were correct as to the works contested by Larson, the court erred in rejecting work-for-hire as to the following works (or certain key elements therein): *Action Comics #1* and *#4*; pages 3-6 of *Superman #1*, and two weeks of newspaper strips created before the McClure agreement. DC also cross-appeals the court's ruling that pre-*Action Comics #1* promotional announcements, while owned by DC, do not fully depict certain key Superman elements.

## STATEMENT OF FACTS

### A. Statutory Background

The 1909 Copyright Act governs the copyright in all works—including those at issue here—published before January 1, 1978, the effective date of the 1976 Copyright Act. Under the 1909 Act, copyright could be secured for "all the writings of an author." 17 U.S.C. §4 (1909) (repealed 1976). Under the 1909 Act, an "author" was entitled to a copyright for an initial 28-year period and an additional 28-year "renewal" period. *Id*. §24.

The 1909 Act defined the statutory term "author" to "include an employer in the case of works made for hire." 17 U.S.C. §26 (1909). It also provided that "in the case of … any work copyrighted by … an employer for whom such work is

made for hire," the author/employer was entitled to renewal rights. *Id*. §24. These two sections thus made clear that an "employer" in the case of a "work for hire" was a statutory "author" with full rights in both the original copyright and the renewal term. For this reason, the 1976 Act's provisions addressing "termination" of the extended renewal term—the provisions at issue here—have no application to works that were made-for-hire under the 1909 Act, 17 U.S.C. §§203(a), 304(c)-(d), as Larson concedes, LB-21.

A person or entity who commissions a work is the statutory "author" of that work under the work-for-hire provision of the 1909 Act whenever the work was created at the "instance and expense" of the commissioning party, unless the parties expressly agreed that "the employee or independent contractor retained the copyright in his work." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 881 (9th Cir. 2005); *see infra* at 42-43.

### B. Factual Background

1. <u>*Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s*</u>

Siegel, a young writer in Cleveland, and his high-school friend Shuster, an illustrator, worked together to conceive many fictional characters—including a crime-fighting hero named "Superman." SER-6-7. Between 1933 and 1937, Siegel and Shuster submitted draft Superman comic strips to several publishers, without success. ER-584; SER-12, 678.

In 1937, DC[1] hired Siegel and Shuster to do comic-book work. On December 4, 1937, Siegel and Shuster entered into an employment agreement providing that DC would "employ [Siegel and Shuster] as Artists for a period of two years," pay them $10 per page of material, and, in return, Siegel and Shuster would "give their exclusive services" in producing certain comic features and submit all material for any new features to DC. ER-602-03. This "1937 Employment Agreement" also provided that if Siegel or Shuster left DC's employ, they were prohibited from using or copying "any of the products or work or creations or characters or plots used, made or created by [them] while in the employ of [DC]." ER-602.

Siegel and Shuster submitted various comic strips to DC under this agreement, including their existing black-and-white Superman drafts. SER-12-13, 678. DC chose to include the Superman story in its new *Action Comics* comic book, to be published April 18, 1938, with a June 1938 cover date. DC editor Vin Sullivan directed Siegel and Shuster to "revise[] and expand[]" the unfinished Superman drafts into a "full-length 13-panel production suitable for magazine publication." ER-957; *see Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 911 (2d Cir. 1974). At Sullivan's direction, Siegel and Shuster revised the material and

---

[1] "DC" refers to DC Comics as well as its predecessors and successors (including Detective Comics and National Comics Publications).

added "several additional pictures to illustrate the story continuity"—including a
new picture showing Superman with a distinct "S" on his chest, which DC's own
artists colored red. ER-654; SER-385-86. DC's artists colorized the strips,
choosing and adding the iconic blue-and-red color scheme to Siegel's and
Shuster's black-and-white drafts. SER-441-43. DC's artists also created a cover
for *Action Comics #1* based on a panel that featured Superman in his DC-colorized
costume—red cape and boots, blue leotard, and heraldic red "S" crest—and
exhibiting super-strength by lifting a car. SER-14, 234-35, 728.

DC artists also created "Promotional Announcements"—a black-and-white
version of its artists' cover art—to promote *Action Comics #1*. SER-15, 678, 730.
These Promotional Announcements were published beginning on April 5, 1938,
before *Action Comics #1* was published on April 18, 1938. ER-1019; SER-572,
579-580. DC has filed a motion to lodge an original version of one comic book
containing a Promotional Announcement (*Detective Comics #15*, published on
April 10, 1938) with the Court for its review. *See also* SER-729-96.

On March 1, 1938, before the publication of *Action Comics #1*, Siegel and
Shuster assigned to DC in writing all of their rights in Superman and agreed "not to
employ said characters or said story ... without obtaining [DC's] written consent"
("1938 Assignment"). ER-917. Superman was a success, and after *Action Comics
#1* was published, Siegel and Shuster continued to supply DC with draft Superman

material, for which they were paid $10 per page.  ER-83, 960.

The parties memorialized their arrangement in a September 22, 1938, agreement ("1938 Employment Agreement"), which provided that Siegel and Shuster "have been doing the art work and continuity for [Superman and other comics] for us.  We wish you to continue to do said work and hereby employ and retain you for said purposes."  ER-605.  DC maintained the "right to reasonably supervise the editorial matter of all features," and agreed to continue paying Siegel and Shuster $10 per page.  ER-606-07.  The agreement also gave DC the right to terminate Siegel and Shuster and retain other artists to produce new Superman works.  ER-606.  The same day, DC entered into an agreement with the McClure Syndicate ("Syndication Agreement") giving McClure permission to publish Superman strips in newspapers in exchange for royalties.  ER-609-11.

DC exercised "constant editorial supervision" over Siegel and Shuster's creation of new material, requiring them to send all drafts to DC's editors for review, giving detailed instructions on story elements and illustrations, and even suggesting that the pair move "to New York where we can be at a moment's touch with everything that you do."  SER-219-49, 264-66.  This relationship continued throughout most of the 1940s, during which time Superman's popularity grew and expanded into other media.  ER-858-86.  Broad newspaper syndication, successful merchandising, and effective exploitation of Superman in movie serials, animated

cartoons, and merchandising resulted in royalty payments, bonuses, and other compensation for Siegel and Shuster amounting to $5.4 million (in today's terms) from 1938 to 1946 alone.  ER-466, 585-86, 945.

### 2.  *Litigation Over Superman During The 1940s, 1960s, And 1970s*

DC's relationship with Siegel and Shuster became contentious.  Other artists and editors brought Superman to new media, including radio and film, and created many of the now-familiar story-lines and catch phrases—*e.g.*, "Up, up, and away," or "It's a bird, it's a plane, it's Superman."  SER-680-81.  Siegel also left to serve in World War II; and while gone, DC, working with Shuster, published "Superboy" stories that Siegel argued DC had no permission to publish.  SER-590-95, 603-07, 680.

In 1947, Siegel and Shuster filed an action against DC in New York state court seeking to invalidate the 1938 Assignment ("Westchester Action").  SER-20, 597.  The Westchester court issued an interlocutory ruling concluding, *inter alia*, that the 1938 Assignment granted "all" Superman rights to DC, but that publishing the Superboy stories was improper.  ER-939-93.  In May 1948, DC, Shuster, and Siegel entered into a stipulation and consent judgment under which Siegel and Shuster acknowledged that the 1938 Assignment transferred to DC all rights in Superman, including "the title, names, characters, concept and formula" as set forth in *Action Comics #1*.  ER-995-1017.

By the late 1950s, Siegel, Shuster, and DC had reconciled their differences. Siegel again wrote Superman stories for DC, and Shuster received a stipend. SER-294-96. But in 1965, Siegel and Shuster challenged DC's copyright renewal rights in Superman, and in 1969 they filed a lawsuit seeking a declaration that they owned the Superman renewal copyrights. The court held that Siegel and Shuster assigned to DC *all* rights in Superman, including renewal rights. *Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d at 913-14.

After this loss, Siegel and Shuster approached DC for financial help. In 1975, DC agreed to provide them a lump sum of $17,500 each, annual payments of $20,000 each, lifetime medical benefits, and benefits and payments to their heirs. SER-641-75. In return, Siegel and Shuster acknowledged DC was the exclusive owner of "all right, title and interest" in Superman. SER-641. DC increased its annual payments to more than $125,000 annually, paid special bonuses, and provided other benefits to Siegel, Shuster, and their families. *See* SER-390, 427-31, 448, 641-75, 680.

3. *Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement*

Congress amended the Copyright Act in 1976 to extend the copyright term and give authors and certain heirs limited rights to terminate prior copyright grants for works subject to the extension term. The Act struck a careful "compromise" between the interests of authors and grantees, the latter of whom often invested

15

**EXHIBIT H**

**96**

decades of effort to develop copyrighted works into successful properties. SECOND SUPP. REG. REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975).

In 1997, after Siegel's death, his widow and daughter served notices purporting to terminate, as of 1999, various of Siegel's Superman copyright grants to DC ("Notices"). ER-1018-83. DC disputed the Notices' validity; but rather than litigate, the parties spent the next four years trying to reach a business deal. Larson was represented by Kevin Marks of the leading entertainment law firm Gang Tyre, which represents the likes of Clint Eastwood and Steven Spielberg. SER-98-99, 433-34. DC's lead negotiator was then-General Counsel of Warner Bros., John Schulman. SER-433-34.

Negotiations progressed, and when expectations grew that a deal would be reached, DC paid Larson a non-refundable advance of $250,000. SER-416. On October 16, 2001, DC made a settlement offer to Larson. SER-105, 434. On October 19, Marks called Schulman to accept the offer and report "we are closed." SER-107-08. Later that day, he sent Schulman a letter (1) confirming that Larson had "accepted D.C. Comics' offer"; (2) documenting the deal's material terms in six, single-spaced pages; and (3) thanking Schulman for his "help and patience in reaching this monumental accord." SER-25, 61-62, 456-61, 111-12.

Under the parties' October 19 agreement, Larson was to assign to DC all of her rights "in the 'Superman' and 'Spectre' properties (including 'Superboy')," in

exchange for, *inter alia*, $3 million, an annual guarantee of $500,000 per year for 10 years, and 6% of gross revenues from all media and merchandising revenues (*e.g.*, television, movies, and toys). SER-456-61. Almost all the money would be Larson's alone—Gang Tyre's fee was 5%. SER-798-99.

On October 26, 2001, Schulman wrote back, confirmed the parties' agreement, set forth "a more fulsome outline of what we believe the deal we've agreed to is," and indicated DC would begin drafting a long-form document so "we will have this super-matter transaction in document form." SER-118-19, 397-98, 463-70. Neither Marks nor Larson objected to Schulman's letter. ER-435. DC began performing its obligations under the October 19 agreement, including establishing a significant reserve for monies owed, which quickly grew to $20 million. SER-397, 399.

DC's outside counsel worked on the separate long-form document for three months and sent Marks a draft on February 1, 2002. SER-125, 435, 472-528. Neither Marks nor Larson raised any objection until May 9, 2002, when Larson's mother sent DC a letter acknowledging that Larson had "accepted" DC's October 16, 2001, offer, but objecting to unspecified portions of the long-form document and concluding that "we have no deal[,] and this [long-form] contract makes an agreement impossible." SER-412-14. Marks told DC the long-form was "aggressive," but "not contrary to what had been agreed to," and the parties would

**EXHIBIT H**
**98**

"deal with it." SER-126-27, 130, 436, 439. For the next two months, Marks

reworked the draft, which he sent to Larson on July 15, 2002. SER-131-32.

>    4.    *Larson Allies With A New Business Partner Who Induces Her To*
>          *Repudiate The 2001 Settlement Agreement*

Starting in 2001, Toberoff, the self-described "rights-hunter," "movie

producer," and "intellectual property entrepreneur," began pursuing Siegel's and

Shuster's heirs. SER-115-16, 182-84, 404, 817-23, 835-36, 859-63. In November

2001, he induced the Shusters to become his business partners and to repudiate

their existing contractual arrangements with DC. SER-183, 858-61.[2] Thereafter,

the Shusters served a termination notice purporting to recapture certain Superman

rights as of October 26, 2013. SER-844-56.

Toberoff targeted the Siegels as well. SER-115-16, 182-83. He wrote

Larson's brother and called Marks seeking to secure the Siegels' Superman rights

for himself. SER-814. Marks rebuffed Toberoff, telling him in February, July,

and August 2002 that Larson had made a deal with DC. SER-115-16, 119-24, 182-

83, 811. Toberoff insisted in August 2002 that Marks communicate to Larson that

he and agent Emanuel had an unnamed "investor" willing to purchase her rights for

$15 million cash and generous "back-end" compensation. SER-122-24, 811, 875-

76. Marks conveyed this offer to Larson, but admonished her that she had a "deal"

---

[2] Toberoff's business misconduct is the subject of another lawsuit and two
appellate matters before this Court. Appeal Nos. 11-56934, 11-71844 ("*Shuster*").

with DC, and if she repudiated it, Marks would have to "testify against [her] in court." SER-183, 811.

On September 21, 2002, Larson fired Marks, and sent a letter to DC stating she was "ending negotiations." SER-418-20. A month later, Larson signed an agreement with Toberoff's production company, IP Worldwide, to act as her agent to exploit her putative Superman rights. SER-184, 422-25. But the promised $15 million investor never materialized, and Toberoff never produced any other buyers. SER-122-23, 184-87, 811-13, 875-76. Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery. SER-187, 839-44, 860-63.[3]

## C.    Proceedings Below

Larson filed suit on October 8, 2004. Her First Claim sought a declaration that her termination notices were valid and effective as of 1999, entitling her to an accounting of Superman-related profits from 1999 forward. ER-338. DC's First Counterclaim sought a declaration that the Notices were invalid; its Second Counterclaim alleged Larson's claims were time-barred; and its Third and Fourth Counterclaims asserted that Larson's claims were barred by the parties' 2001 settlement agreement. ER-293-301.

---

[3] Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee. SER-186, 860-63.

In March 2008, the district court issued a partial summary judgment order. SER-5-90. It held that Larson recaptured certain unspecified rights in *Action Comics #1*, but did not recapture the Promotional Announcements containing the first appearance of Superman. SER-43-44. The order rejected DC's settlement counterclaims, holding that while the parties had formed "an agreement on all major points of dispute," the terms in Marks' October 19, 2001, letter "differ in substance from those set forth in [DC's] later letter of October 26, 2001 … such that there was no unequivocal acceptance of an offer and, thus, no agreement." SER-63. The court rejected DC's limitations counterclaim as well, accepting Larson's representations that she did not terminate settlement negotiations until September 21, 2002, making her claims timely by four days. ER-198.

The parties submitted briefing to resolve remaining work-for-hire issues. In August 2009, the court ruled that the vast majority of works at issue—including *Action Comics #2-3, #5-61*; pages 1-2 of new material in *Superman #1* (which reprinted the stories in *Action Comics #1-4*, with some changes to the *Action Comics #1* story); *Superman #2-23*; and the newspaper strips created after the Syndication Agreement—were works-for-hire and thus exempt from termination. ER-43-140. But the court also ruled that *Action Comics #4*, *Superman #1* (pages 3-6), and two weeks of strips created before Syndication Agreement were *not* works-for-hire and thus were recaptured. ER-80-81, 140.

**EXHIBIT H**
**101**

The district court expressly reserved ruling on key issues concerning the scope of rights Larson recaptured.  It did not determine the extent to which Larson's recaptured rights were diminished by DC's rights in the Promotional Announcements.  SER-298-305, 310-13, 321-24, 2-3.  It left open whether its enumeration of the limited Superman elements in *Action Comics #1*—as compared to the universe of elements DC owns outright—was intended to be "dicta," as Larson had argued.  SER-305-08, 313-19, 325-26, 2-3.  And it deferred ruling on these and other open issues "until shortly before the time of" a later accounting trial.  SER-198.

That accounting trial never occurred, and the open questions flagged by the court were never answered.  In 2009, the judge presiding over the Superman cases resigned, and the cases were reassigned.  The parties submitted a joint status report agreeing that the "promotional announcement" and "dicta" questions had to be answered before Larson's First Claim could be fully resolved.  SER-146-70.

DC filed *Shuster*, and Larson and Toberoff responded by moving to stay that case, and seeking an interlocutory appeal here.  SER-143-45.  The district court denied Larson's Rule 54 and stay motions, listing seven open issues—including the "promotional announcement" and "dicta" issues—that "foreclosed a finding that [Larson's First Claim] … is final."  SER-141.  Larson amended her complaint to remove the request for an accounting of profits from the First Claim, but she did

not eliminate the request for a scope of rights declaration.  Dkt. No. 5-1 at 12-14.

She moved again for entry of Rule 54(b) judgment, and on May 17, 2011, the court

entered partial final judgment on Larson's First Claim and DC's First through

Fourth Counterclaims.  ER-235-41.

Larson appealed and DC cross-appealed.  ER-228, 230.[4]  DC moved to

dismiss Larson's appeal, and the Appellate Commissioner denied the motion

without prejudice to its reargument in merits briefing.  Dkt. Nos. 5-1, 9.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's grant of summary

judgment."  *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011).

Summary judgment is appropriate if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  "In considering a motion for summary judgment, [the court] must draw all

reasonable inferences in favor of the nonmoving party."  *Samuels v. Holland Am.*

*Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011).  The "non-moving party's

evidence is to be believed, and all justifiable inferences are to be drawn in [its]

---

[4] Larson's brief does not challenge (and thus waives the right to challenge, *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004)), several adverse rulings on her First Claim, including that she did not recapture the Promotional Announcements, that certain pre-1938 material created by Siegel was *not* copyrightable, and that she was not entitled to profits from foreign exploitation of Superman.  ER-76-77, 180-81, 207.

EXHIBIT H
103

favor," such that its "version of any disputed issue of fact is … presumed correct."
*Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010).  The court must make
"[c]redibility determinations" and "weigh[] … the evidence" in favor of the non-
moving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must
disregard all evidence favorable to the moving party that the jury is not required to
believe," *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

*DC's Cross Appeal On Its Second Through Fourth Counterclaims*

DC's Second, Third, and Fourth Counterclaims allege that Larson's claims
below are barred by the parties' 2001 settlement agreement and the Copyright
Act's three-year limitations period.  These threshold claims were fully adjudicated
by the district court's Rule 54(b) judgment and are ripe for appeal.

I.  Marks' October 19, 2001, letter reflects a legally enforceable agreement
to resolve all claims at issue here, because it details all the essential terms of an
agreement:  the scope of rights at issue, a significant cash payment, and generous
royalty terms, amounting to tens of millions of dollars for Larson.  The letter
expressly stated that Larson "accepted" DC's offer and referred to the parties'
"monumental accord."  Both parties' representatives testified that they understood
an agreement had been reached.  Given the parties' agreement on the essential
terms detailed in the October 19, 2001, letter, it is irrelevant that the parties

subsequently failed to conclude a formalized deal document.  *E.g.*, *The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011).  At a minimum, DC is entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in the October 19 letter.  *E.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010).

II.  DC was entitled to factfinding on its limitations counterclaim.  Under the parties' tolling agreement, the limitations period restarted ten days after either party "terminat[ed]" negotiations in writing.  Larson herself has taken conflicting positions as to when negotiations were terminated.  Under the theory she asserted below—which the district court accepted on summary judgment—her claims were timely.  But in *Shuster*, to avoid a tortious interference claim, she asserted a theory of termination that would make her claims here time-barred.  Her conflicting positions confirm the existence of a factual dispute only a jury can resolve.

### *Larson's And DC's Appeals On Their Respective First Claims*

I.  The district court entered Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, but the judgment did not fully and fairly adjudicate those claims, because the court never conclusively determined all "rights and obligations" in the Superman works at issue.

II.  Assuming the judgment on the parties' First Claims is ripe for appeal, the judgment should be affirmed in part and reversed in part.  The court held that the

vast majority of works at issue were created as works-for-hire, including *Action
Comics #2-3, #5-61*, pages 1-2 of new material in *Superman #1*, *Superman #2-23*,
and all strips created after the Syndication Agreement with McClure. Those
rulings all involve Superman works created entirely after Siegel and Shuster
assigned all Superman rights to DC and entered into employment agreements with
DC to produce new Superman work under DC's direction. Those works are
obviously and unambiguously works-for-hire. But the court also held that *Action
Comics #1* and *#4*, *Superman #1* (pages 3-6), and the two weeks of Strips created
before the Syndication Agreement were not works-for-hire and thus could be
recaptured. Those rulings were incorrect. The district court also erred in ruling on
rights contained within certain Promotional Announcements without examining the
best visual evidence of their contents.

**ARGUMENT**

**DC'S CROSS-APPEAL ON ITS
SECOND THROUGH FOURTH COUNTERCLAIMS**

**I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
      JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT
      AGREEMENT ISSUE**

**A.    Under California Law, A Contract Is Enforceable So Long As
       Parties Agree On Its Essential Terms, Even Absent Formalized
       Documentation**

Under California law, an enforceable agreement is formed where one party

accepts another party's offer in exchange for consideration. CAL. CIV. CODE

25

**EXHIBIT H
106**

§1550.  And once a party accepts an offer, an enforceable agreement may arise

even if subsequent documentation is contemplated, or additional terms and

conditions are subsequently raised.  *See Facebook*, 640 F.3d at 1037-38; *Estate of*

*Thottam*, 165 Cal.App.4th 1331, 1340-41 (2008); *Elite Show Servs., Inc. v.*

*Staffpro, Inc.*, 119 Cal.App.4th 263, 268-69 (2004); *Harris v. Rudin, Richman &*

*Appel*, 74 Cal.App.4th 299, 307 (1999); *Ersa Grae Corp. v. Fluor Corp.*, 1

Cal.App.4th 613, 624 & n.3 (1991).

   The question is simply whether the agreed-upon terms are "sufficiently

definite that a court can ascertain the parties' obligations thereunder and determine

whether those obligations have been performed or breached."  *Elite*, 119

Cal.App.4th at 268.  So long as "the parties have agreed to its existing terms," and

those terms are definite, the "fact that an agreement contemplates subsequent

documentation does not invalidate the agreement."  *Ersa*, 1 Cal.App.4th at 624 n.3;

*see Facebook*, 640 F.3d at 1037-38; *Thottam*, 165 Cal.App.4th at 1340-41.

   "Any other rule" would allow a party to repudiate a contract "whenever the

understanding was that it should be reduced to another written form, by simply

suggesting other and additional terms and conditions."  *Clarke v. Fiedler*, 44

Cal.App.2d 838, 847 (1941).  "If this were the rule, the contract would never be

completed in cases where, by changes in the market, or other events … it became

the interest of either party to adopt that course in order to escape or evade

obligations incurred in the ordinary course of commercial business." *Id.* Put simply, "few contracts would be enforceable if ... subsequent disputes were taken as evidence that an agreement was never reached." *Patel v. Liebermensch*, 45 Cal.4th 344, 352 (2008). Accordingly, "[w]here the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one,'" the parties' "failure to follow it with a more formal writing does not negate the existence of the prior contract." *Harris*, 74 Cal.App.4th at 307.

*Facebook* illustrates this rule. After one day of settlement negotiations, the parties signed a handwritten, one-and-a-third page term sheet reflecting basic terms of a corporate acquisition, including cash and stock consideration and mutual releases. 640 F.3d at 1037. The settlement subsequently foundered during negotiation over documents that Facebook said were "required to finalize" the agreement, including a stock agreement and release form. *Id.*

This Court held that the parties had formed an enforceable agreement, because the existing writing showed that the parties "meant to bind themselves and each other, even though everyone understood that some material aspects of the deal would be papered later." *Id.* at 1038. An informal agreement is not enforceable, the Court explained, if it lacks "necessary term[s]," but it will be enforced "so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred" and fashion an appropriate remedy. *Id.* at 1037-38.

EXHIBIT H
108

The test for enforceability, this Court remarked, is not "very demanding," and was "easily" passed by the term sheet: "The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives." *Id.*

Much the same is true here, as the following sections show.

### B. The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law

The uncontradicted, documentary evidence establishes that Larson accepted DC's offer on October 19, 2001, in a written letter that identifies all the essential terms of the settlement.

1. The October 19 letter explicitly stated: "The Siegel Family … has accepted D.C. Comics' offer of October 16, 2001." SER-456. The letter congratulated DC on "this monumental accord." SER-461. And it detailed "[t]he terms" of the agreement in six, single-spaced, typewritten pages, *id.*—a much more thorough and detailed writing than the one-and-a-third page handwritten sheet enforced in *Facebook*. SER-456-61.

In the entertainment industry, it is standard for parties to recognize and perform contractual obligations in the absence of a formalized, long-form contract (or, sometimes, any written contract). *See* Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101, 117-20 (2001); Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film*

*Agreements*, L.A. LAW. 18, 19 (Apr. 1999); Jay M. Spillane, *Lawsuits over*

*"Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily*

*Avoided)*, 11 ENT. & SPORTS LAW. 15, 15 (1993). The question, as in *Facebook*, is

simply whether the essential terms of the agreement can be identified. Here the

October 19 letter specified every term "deemed essential as a matter of law" in a

copyright assignment, *i.e.*, "the subject matter, the price, and the party against

whom enforcement is sought." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986);

*see Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361-62 (Fed. Cir. 2005); *Toledano v.*

*O'Connor*, 501 F.Supp.2d 127, 142 (D.D.C. 2007). The letter identified:

> • the full scope of rights assigned: "all of [their] rights in the 'Superman'
> and 'Spectre' properties (including 'Superboy'), resulting in 100%
> ownership to D.C. Comics"
>
> • the precise cash terms: an "advance of $2,000,000" and a "signing bonus
> of $1,000,000"
>
> • the specific royalty terms: "6% of Superman/Spectre Gross Revenues"
> from "all media" other than publications and "1% of the cover price of DC
> Comics' publications." SER-456-58.

Nowhere did the letter contain any suggestion that Larson's acceptance was

tentative or contingent on formal documentation.[5] The extrinsic record confirms

---

[5] Under California law, an initial writing is not enforceable if it *clearly*
demonstrates that the parties did *not* intend to be bound until other documents were
executed. *See Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208-11 (2006);
*Harris*, 74 Cal.App.4th at 307; *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th
348, 358 (1998); *Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal.App.3d 1555, 1562-
63 (1989); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996).

the opposite. Marks testified he worked through "the last open point" of the
agreement with Schulman on October 16, which "closed the deal," and he
"believed that an accord had been reached on the terms exactly set forth in this
letter." SER-105-06, 111-12. Schulman testified the October 19 letter "accurately
set forth all material terms of our agreement." SER-435. DC manifested its
understanding that an agreement was reached by beginning performance, setting
aside a reserve account for the Siegels and including in its license agreement with
Warner Bros. a requirement that the Siegel family be given screen credit in an
upcoming Superman movie—both terms required by the October 19 writing. SER-
397, 399, 435-36, 459.

2.  The district court nevertheless held that no agreement was formed on
October 19, finding that the terms of Marks' October 19 acceptance letter were
"materially different" from DC's five-page letter of October 26, 2001, and "vastly
different" from the 56-page "long form" draft of February 1, 2002. SER-64.
These differences, the court found, showed that the parties "had not passed the
threshold where they had finalized and assented to all material terms," because "as
they attempted to sketch in the finer details of a settlement from the broad outlines
contained in the October 19 letter, more and more issues arose upon which they
could not reach agreement, resulting in the negotiations falling apart." SER-63-64.

**EXHIBIT H**
**111**

Case 2:10-cv-03683-ODW-RZ Document 391-3 Filed 04/25/12 Page 118 of 190
Case 1:11-cv-05886-09/25/2012 Document 391-3 Dkt Entry 4/25/12 Page 45 of 91
Page ID #:24625

That analysis misses the point. Marks' October 19 acceptance of DC's offer settled the matter, and none of the subsequent discussions undid that contract. The fact that the parties did not reach agreement on issues that "arose" as they attempted to formalize the deal has no bearing on whether the parties had previously agreed on the *essential* terms of the deal, while understanding "that some material aspects of the deal would be papered later." *Facebook*, 640 F.3d at 1038. And the court nowhere identified in the October 26 letter any disagreement over any *essential* term specified in the October 19 letter—*i.e.*, the scope of rights transferred or key financial terms.[6]

Rather than revealing a disagreement over essential terms, DC's October 26 letter expressly confirms its understanding that a binding agreement had been reached. The letter states that Schulman was merely providing a "more fulsome outline of what we believe the deal *we've agreed to* is," and that DC would begin "working on the draft agreement" to put "this super-matter transaction *in document form*." SER-463 (emphasis added). The October 26 letter itself was thus neither

---

[6] The court wrongly suggested that this case is like *Weddington Prods., Inc. v. Flick*, 60 Cal.App.4th 793 (1998), because in both cases "the parties had agreed to a rough outline of an agreement, but were thereafter unable to reach agreement on the finer details and the negotiations fell apart." SER-62. In fact, *Weddington* held the settlement agreement at issue unenforceable only because the parties had failed to agree on *the most essential matter in dispute between them*—the terms of a license for a "sound library," which "was a material issue to both sides" and thus not "a minor, immaterial or separable issue." 60 Cal.App.4th at 815.

**EXHIBIT H**
**112**

an "acceptance" nor a "rejection" of an "offer" by the Siegels—it was instead a confirmation of terms *already agreed to*, as set forth in the October 19 letter, with further recognition that the deal would be "papered." *Facebook*, 640 F.3d at 1038.

The district court's focus on the "vastly different" February 2002 long-form agreement was even more misplaced. It was, of course, vastly different in the sense that it was a 56-page, detailed, formal draft contract, rather than a listing of terms—just the kind of formal documentation that was attempted without success in *Facebook*. But, again, nowhere did the court identify any essential term in the long-form agreement that differed from the essential terms in the October 19 letter. Marks himself did not express any reservations about the February 2002 long-form until three months later, after he learned that Larson had complained about it. SER-436. Even then, Marks told Schulman the draft was "not contrary to what [had been] agreed to" and the parties could "deal with it." SER-126-27, 130, 436.

In any event, even if the February 2002 draft included different terms, it is the *new* terms that would be unenforceable, not the October 19 terms. As this Court explained in holding that Facebook's duty to draft deal documents did not render the preexisting term sheet unenforceable: "[I]f Facebook should draft terms that are unfair or oppressive, or that deprive the Winklevosses of the benefit of their bargain, the district court could reject them as a breach of the implied covenant of good faith and fair dealing …. The district court got it exactly right

32
**EXHIBIT H**
**113**

Case 2:10-cv-03683-ODW-RZ Document 391-3 Filed 04/25/12 Page 120 of 190
Case 1:11-cv-08683-ODW-RZ Document 391-3 Filed 04/25/12 Entry 4/25/12 Page 120 of 11
Page ID #:24627

when it found the Settlement Agreement enforceable but refused to add the stack of documents drafted by Facebook's deal lawyers." 640 F.3d at 1038. The same analysis applies here. The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers. A binding contract already existed, in the essential terms the Siegels accepted on October 19.

3. Although the district court itself identified no disagreements over essential terms reflected in the correspondence and drafts following the October 19 letter, Larson offered up some 10 pages of differences. But none were raised at the time (*i.e.*, six years earlier, in 2001), nor did they reflect material differences over an essential term. For example, Larson contended the October 19 and October 26 letters described the rights transfer differently, but both merely used different lawyerly phrases to say that DC would receive 100% of the rights in all Superman properties. *Compare* SER-458, *with* SER-464. Larson also asserted that the letters state different terms for royalty reductions in "extraordinary cases" involving the use of Superman rights with other properties, but the only difference is that while the October 19 letter gives one *example* of such a use, the October 26 letter provides additional examples; the basic contractual term is identical. *Compare* SER-457-58, *with* SER-467-68. Larson also pointed to language about Superman "cameo" appearances in other characters' stories, SER-553-54, but both letters provide that royalties for "cameos" will be zero, *compare* SER458, *with* SER-467,

consistent with industry standards, SER-172-75; Benjamin A. Goldberger, *How the
"Summer of the Spinoff" Came to Be: The Branding of Characters in American
Mass Media*, 23 LOY. L.A. ENT. L. REV. 301, 320, 371 (2003).[7]

Other purported differences Larson identified—*e.g.*, representations and
warranties, an obligation to provide certain historical documents, a right of first
refusal on biographical works, publicity obligations, advertising credits, dispute-
resolution procedures, and indemnities—likewise do not represent material
differences concerning essential terms.  *See Inamed Corp. v. Kuzmak*, 275
F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002) (terms concerning license termination,
indemnification, sublicenses, transfer of rights, confidentiality, and dispute
resolution not essential).  The differences in language thus do not undermine the
basic agreement that is reflected in the plain terms of the October 19 letter and
confirmed by the parties' contemporaneous conduct and subsequent testimony.

### C.    At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter

At minimum, if there were any genuine dispute as to whether the parties

intended to be bound by the essential terms identified in the October 19 letter, that

---

[7] As Schulman explained, the different language in his letter concerned the
precise definition of "cameo," SER-437, which would have been worked out in the
long form.  Marks did not object to Schulman's description of "cameos" at the
time, and when asked at his deposition to identify all differences between his letter
and Schulman's, he did not mention "cameos."  SER-118-19, 435, 533-44.

dispute should have been resolved by a jury. The question whether parties

intended to be bound by terms expressed in an informal agreement is one of fact,

*see Bustamante*, 141 Cal.App.4th at 208; *Banner*, 62 Cal.App.4th at 358, and thus

"summary judgment is inappropriate" where that question is materially contested,

*S. Cal. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004); *see*

*Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("summary enforcement

inappropriate" where there is "conflicting evidence" as to whether parties agreed

on "material terms" of settlement agreement).[8]

The record described above, especially when viewed favorably to DC,

plainly precludes summary judgment against DC on this question. In *Mattel*, this

Court reversed the same district court for making improper determinations

concerning contractual intent on summary judgment, where they "turn[ed] in part

on the credibility of conflicting extrinsic evidence." 616 F.3d at 910; *see Mattel,*

*Inc. v. MGA Entm't, Inc.*, 2011 WL 3420603, *2 (C.D. Cal. Aug. 4, 2011) (jury

finding on remand opposite of what court held on summary judgment).

The district court made the same mistake here. Rather than accepting all

inferences and making all credibility determinations in DC's favor, it engaged in

its own factfinding as to the parties' intent, and rejected inferences favoring DC.

---

[8] The district court said *Callie* found "no enforceable agreement" because of
disagreements over its "finer details," SER-64, but *Callie* actually found disputed
factual issues concerning agreement on *essential* terms, *see* 829 F.2d at 890-91.

For example, the court speculated that DC's post-agreement conduct "could as much be seen as goodwill gestures on defendants' part while the negotiations continued as [they] could reflect an indication on [DC's] part that they thought they were contractually bound to do the same." SER-65. But on summary judgment, the court was required to adopt the inference favorable to DC.

Similarly, in analyzing the differences among the letters and February draft agreement, the court observed that "materiality is in the eye of the beholder," and then held that the differences were material enough to establish that there was no agreement on October 19, 2001. SER-63. But any question whose answer depends on "the eye of the beholder" is a classic jury question. *Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, *6 (S.D.N.Y. Nov. 7, 2001) (where issues are "in the eyes of the beholder," "[r]are is the case where summary judgment would be appropriate").[9] The district court also appeared to credit Marks' subsequent

---

[9] *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681-82 (5th Cir. 2001) ("what constitutes 'substantial sales experience' is in the eye of the beholder" and thus "the trier-of-fact's duty to determine"); *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment ruling on parody defense because "[h]umor … is in the eyes of the beholder"); *Recycling Solutions Tech., LLC v. Rosenberg*, 2011 WL 1696826, *1 (E.D. Ky. May 4, 2011) ("Beauty may be in the eye of the beholder, but summary judgment requires something a bit more concrete."); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 824-25 (N.D. Iowa 2004) (though "fraud, like beauty, is in the eye of the beholder … this court's task on motions for partial summary judgment [is to] determine only whether the resisting parties have generated genuine issues of material fact"); *Vass v. Compaq Computer Corp.*, 953 F.Supp. 114, 119 (D. Md. 1997) ("judgment made through the eyes of the beholder" is "not to be summarily determined").

**EXHIBIT H**
**117**

testimony about the relevant events over testimony from DC witnesses, including

testimony concerning the "goodwill gesture" point, which DC witness Paul Levitz

disputed, and the materiality of differences between the October 19 and 26 letters,

which Schulman addressed.  SER-67, 397-99, 435-37.

Beyond the record evidence already discussed, new evidence has come to

light further indicating that Larson knew she was bound by the October 19 terms.

In *Shuster*, the district court compelled Larson to produce a July 2003 letter she

wrote to her brother, in which she repeatedly states that Marks insisted, in August

2002, that Larson had a "deal with Time Warner/DC."  SER-810-14, 824-25.  The

letter states that Marks would "testify against [her] in court" if she repudiated the

deal and accepted Toberoff's offer.  SER-811.  The letter confirms that Marks told

Toberoff that Larson had a "deal" with DC.  SER-811.  Given this letter, there is *at

least* a jury question as to whether Larson understood she was bound to the

October 19 terms.

## II.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM

The district court's order granting summary judgment against DC on its

limitations counterclaim also erroneously resolves factual disputes against DC.

Copyright claims must be filed "within three years after the claim accrued,"

or 1,095 days.  17 U.S.C. §507(b).  Larson's claims accrued on April 16, 1999—

the day her Notices purport to take effect.  SER-62.  Accordingly, Larson was

required to file her claim by April 16, 2002.  The parties, however, entered into a

tolling agreement on April 6, 2000—356 days into the 1,095-day limitations

period, with 739 days left to run—providing that it would expire, as relevant here,

"10 business days after … either party terminat[es] negotiations, in writing,

relating to the Notices."  SER-348-51.

There are two possible termination "triggers" for this provision.  One

occurred on May 9, 2002, when Larson's mother sent DC a letter stating that the

February 2002 draft long-form contract "makes an agreement impossible."  SER-

234.  If that letter terminated negotiations, then the limitations period restarted on

May 20, 2002, and ended May 28, 2004—five months before Larson filed suit.

The other possible event occurred on September 21, 2002, when the Siegels

sent a letter to DC stating that "we are totally stopping and ending negotiations."

SER-420.  If that letter terminated negotiations for purposes of the tolling

agreement, then the limitations period restarted 10 days later, on October 4, 2002,

and closed on October 11, 2004—four days after Larson filed suit.

Larson herself has taken conflicting positions as between these two

possibilities.  In the district court below, she contended that negotiations were not

terminated until the later date of September 21, 2002.  The court agreed, holding

her claims to be timely.  SER-60-61.

Since that ruling, however, Larson has argued the opposite in *Shuster*. In *Shuster*, DC alleges that Toberoff interfered with DC's business relationship with Larson by wrongfully inducing her to repudiate the 2001 settlement and cut ties with DC. SER-816-19. Toberoff and Larson filed an unsuccessful motion to strike this claim, arguing he "had [nothing] to do with the May 9[, 2002] letter that ended DC's purported 'prospective economic advantage'" and made settlement discussions "moribund." SER-825, 868, 878-79; *see* Appeal Nos. 11-55863, 11-71844 .

Larson cannot have it both ways. Either the parties' settlement negotiations "ended" on May 9, 2002—in which case Larson's claims here are time-barred—or on September 21, 2002—in which case Larson has essentially conceded Toberoff's liability for DC's interference claim in *Shuster*. Settled principles of estoppel prevent Larson (and Toberoff) from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). At the very least, her shifting positions demonstrate that a jury, too, could go either way. *See Mattel*, 616 F.3d at 910.

**EXHIBIT H**

**120**

## LARSON'S APPEAL OF HER FIRST CLAIM AND
## DC'S CROSS-APPEAL ON BOTH PARTIES' FIRST CLAIMS

## I.   LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE HER CLAIM HAS NOT BEEN FULLY AND FINALLY ADJUDICATED

Before this Court can exercise jurisdiction over an interlocutory appeal, it must determine *de novo* whether the claim on appeal has been fully adjudicated. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1084 (9th Cir. 2010).  Rule 54(b) requires final judgment on an *entire* claim.  *Ariz. State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991).

The Rule 54(b) judgment on DC's Second through Fourth Counterclaims was proper, as those claims were fully adjudicated.  The Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, however, was invalid and thus not appealable.  *See* Dkt. No. 5-1.

Larson's First Claim seeks a declaration regarding the parties' "respective *rights and obligations* with respect to the Termination and the *copyright interests thereby recaptured*."  ER-338-39 ¶¶53-55 (emphasis added).  The district court's judgment did not fully determine the parties' "rights and obligations" or the scope of the "copyright interests" assertedly recaptured by Larson.  For example, the judgment does not establish the extent to which Larson's recaptured rights—if any—are diminished by the Promotional Announcements owned by DC, which feature key story elements from *Action Comics #1*.  Dkt. No. 5-1, at 11-17.  The

**EXHIBIT H**
**121**

court also left open whether its description of the limited elements in *Action Comics #1* was intended to be "dicta," as Larson argued below.  SER-305-08, 313-19, 325-26, 2-3.

As discussed *supra* at 20-22, both Larson and the district court acknowledged that the court's summary judgment rulings left open key legal and factual questions concerning the "scope of [Larson's] recaptured copyrights." SER-198, 298-305, 310-13, 321-24, 2-3.  Larson sought finality on the First Claim by amending it to remove a request for an accounting, but the accounting request was only *one* of the unresolved matters.  The First Claim will be finally adjudicated only when the parties' "rights and obligations" and "copyright interests" are fully determined.

## II.   THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT FROM TERMINATION

Assuming the Court has jurisdiction to consider the remainder of this appeal, the questions largely concern whether certain early Superman works qualify as "works for hire" under the 1909 Copyright Act, 17 U.S.C. §§24, 26 (1909) (repealed 1976).  As Larson acknowledges, LB-21, a work made-for-hire under the 1909 Act is not subject to the termination provisions created by the 1976 Act, 17 U.S.C. §§203(a), 304(c)-(d).  The district court held that the vast majority of works

**EXHIBIT H**
**122**

at issue were created as works-for-hire, but it held a few works were not, and thus could be recaptured.  The first category of rulings was correct, the second was not.

### A.  A Work Is Made-For-Hire Under The 1909 Copyright Act When It Is Created At The "Instance And Expense" Of The Commissioning Party

1.  It has been "the well-established law of this circuit"—and others—for decades that a work qualifies as made-for-hire under the 1909 Act whenever it was created at the "instance and expense" of another party.  *Fox*, 429 F.3d at 879-81.[10] The instance-and-expense test embodies a presumption "when one person engages another … to produce a work of an artistic nature … the title to the copyright shall be in" the employer.  *Lin-Brook*, 352 F.3d at 300.

The "instance" requirement is met where the hiring party was the "motivating factor in producing the work."  *Fox*, 429 F.3d at 879.  What matters is "the degree to which the 'hiring party had the right to control or supervise the artist's work,'" irrespective of whether it was actually exercised.  *Id.*  The "expense" requirement can be satisfied in different ways:  (1) the hiring party may assume "the financial risk of the [work's] success," *id.* at 881, or (2) "simply

---

[10] *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000); *Dolman v. Agee*, 157 F.3d 708, 711-12 (9th Cir. 1998); *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158-63 (2d Cir. 2003); *Easter Seal Soc'y v. Playboy Enters.*, 815 F.2d 323, 325-27 (5th Cir. 1987).

**EXHIBIT H**
**123**

Case:2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 130 of 190
Case 1:01-cv-03583-ODW-RZ Document 391-3 Filed 04/25/12 Page 130 of 190
Page ID #:24637

pay[]" a sum for its creation, *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d

Cir. 1995), or (3) the hired party may "expect[] to be compensated" for his work,

*Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978).

If the "instance and expense" test is satisfied, the court must presume the

parties agreed the copyright "lies *ab initio* with the commissioning party." *Fox*,

429 F.3d at 881; *see Self-Realization*, 206 F.3d at 1326; *Dolman*, 157 F.3d at 711-

12. That presumption is rebutted *only* if the party seeking to defeat work-for-hire

status adduces evidence proving that the parties expressly agreed the

commissioning party would *not* own the copyright. *Fox*, 429 F.3d at 881; *Dolman*,

157 F.3d at 712-13; *May*, 618 F.2d at 1368-69; *Lin-Brook*, 352 F.2d at 300.

2. In a tacit concession that she cannot prevail under the settled instance-

and-expense test, Larson labors to escape it. She first complains the test has been

"criticized," but concedes it has been this Circuit's controlling law for decades.

LB-23.[11]

---

[11] Although the criticism is therefore irrelevant, it is also wrong. The
commentators Larson cites would limit work-for-hire to traditional "employees"—
excluding works made by independent contractors at the "instance and expense" of
another—on the theory that the 1909 Act refers to the "employer" in the case of a
work-for-hire. LB-26-27. But the word "employer" plainly does *not* limit work-
for-hire to the "more conventional master-servant relationship." LB-26; *see* LB-
57-58. The cases Larson cites refer only to use of the word "employee," which
*does* generally refer to common-law master-servant relationships. *See Clackamas
Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003); *CCNV v.
Reid*, 490 U.S. 730, 738-40 (1989). The term "employer" has no such connotation,
because it is perfectly conventional to refer to the "employer of an independent

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 131 of 190
Case 1:11-cv-03683-ODW-RZ Document 591-3 Filed 04/25/12 Page 533 of 1.1
Page ID #:24638

Larson also suggests that the instance-and-expense test should be applied differently in the context of termination rights under the 1976 Act (LB-27-28), but she cites nothing in the Act's text or history supporting such a rule,[12] and it makes no sense. A work is either made-for-hire or it is not—it cannot be a work-for-hire for all purposes *except* termination rights. In the termination context as in any other, if the work was made at the instance and expense of the employer—whether by a traditional employee or an independent contractor—then the employer was the statutory "author" *ab initio*, leaving no authorship rights for anyone else to recapture. *E.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (applying instance-and-expense test in termination context to find work-for-hire).[13]

---

contractor." *See Meyer v. Holley*, 537 U.S. 280, 290 (2003); *St. Paul Water Co. v. Ware*, 83 U.S. 566, 576-77 (1872); *Chaffin v. U.S.*, 176 F.3d 1208, 1212 (9th Cir. 1999); Restatement (Second) of Torts ch. 15, §§409-29 (1965); 41 Am. Jur. 2d *Independent Contractors* §§8, 14, 19, 47 (2005).

[12] Indeed, leading cases like *Picture Music* and *Lin-Brook* had already applied work-for-hire beyond traditional employer-employee relationships by 1976, and Congress did nothing to alter the doctrine as it applied to works governed by the 1909 Act. What is more, this Court's precedents largely solidified the instance-and-expense test *after* 1976—starting with *May* in 1980, *supra* n.10—refuting any suggestion that the 1976 Act somehow undermined the test.

[13] Larson also errs in asserting that the instance-and-expense test is "ill-suited for summary adjudication due to its inherently fact-intensive nature." LB-57. Courts frequently apply the test on summary judgment where, as here, there are no disputes of historical fact. *E.g.*, *Self-Realization*, 206 F.3d at 1324, 1330; *Dolman*, 157 F.3d at 711; *Kirby*, 777 F.Supp.2d at 738, 743; *Scherr v. Universal Match Corp.*, 297 F.Supp. 107, 113 (S.D.N.Y. 1967), *aff'd*, 417 F.2d 497 (2d Cir. 1969).

**EXHIBIT H**
**125**

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 132 of 190
Case 1:11-cv-58683-ODW-RZ Document 591-3 Direntry:4/25/12 Page 53 of 91
Page ID #:24639

## B. The District Court Correctly Held That *Action Comics #2-3, #5-61, Superman #1 (Pages 1-2)-23*, And The Post-McClure Strips Were Works-For-Hire

In the time period at issue here, DC published and distributed Superman stories in various formats, including:  as part of *Action Comics*, as the standalone comic *Superman*, and in "strips" syndicated in daily newspapers.  The district court held that the following works were made-for-hire:  the Superman works in *Action Comics #2-3* and *#5-61*, pages 1-2 of *Superman #1* and *Superman #2-23*, and newspapers strips created after DC entered into the Syndication Agreement with McClure ("Strips").

All of the foregoing works were both created and published after Siegel and Shuster entered into two relevant agreements with DC:  the 1937 Employment Agreement of December 7, 1937, and the 1938 Assignment, pursuant to which Siegel and Shuster assigned all rights in all aspects of Superman.  *Supra* at 11-12.

Under those agreements, DC possessed complete control over creation of new Superman stories and elements.  Nothing could be done without DC's consent.  DC warned Siegel and Shuster that DC would "not tolerate or accept slipshod work," and that if their new Superman stories and artwork did not "show a marked improvement," DC would "make other arrangements to have it done."

---

In the cases cited by Larson, summary judgment was precluded by credible, admissible, direct evidence that the parties did not intend the commissioning work to be made-for-hire.  *See Fox*, 429 F.3d at 875; *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002); *May*, 618 F.2d at 1368.

SER-223, 249.  Given the 1938 Assignment, DC had the right to employ other artists to create new Superman works if Siegel and Shuster could not meet DC's quality and timing demands.  The parties' correspondence further shows that DC:

- advised Siegel and Shuster that they "need[ed] constant editorial supervision and an alter-ego who can criticize and point out small details … which may make or break the strip," SER-220;

- required them to submit their draft material far enough "in advance" that DC could go over it "with a fine tooth comb," SER-220, 224, 228-35;

- made substantive revisions to the draft material, SER 223-24, 231, 242;

- demanded that Siegel "re-write" scripts and sent him synopses to "elaborate in detail," SER 223-24, 231, 237-38;

- provided detailed instructions for the illustrations, SER-234-35, 242, 244-45;

- directed Siegel as to story elements and themes, SER-223-24, 234-38; and

- insisted that Siegel and Shuster submit sketches of cover art for DC to "okay," SER-224, 234-35, 242.

The record also established without ambiguity that DC incurred significant expense to create new Superman works after retaining Siegel and Shuster and requiring their assignment of all rights in the character and story.  DC made a major financial investment in commissioning Siegel and Shuster to create new Superman material—DC compensated them significantly for that material, and bore all the costs of printing, distributing, and promoting the Superman works, which itself suffices to satisfy the expense requirement.  ER-425-27, 960; SER-223-24, 678-79; *Fox*, 429 F.3d at 881.

After Siegel and Shuster spent years unsuccessfully trying to sell their nascent character and story, DC was the one party willing to take the "tremendous gamble" of purchasing the rights to Superman, hiring Siegel and Shuster to create new Superman works, and developing those works into a successful property. ER-425-27. Further, DC assumed a significant financial risk in relying entirely on Siegel and Shuster, rather than hiring additional artists to meet the demands of producing daily copy for syndicated newspaper comic pages. If Siegel and Shuster did not satisfy their obligations to provide quality work on a timely basis, the result would be empty pages in *Action Comics*, blank space in daily newspaper funny pages, and financial loss to DC's brand and bottom line.

Finally, it bears emphasis that after the 1938 Assignment, DC owned the Superman character and story outright. ER-917. When the commissioning party owns the copyright in the underlying work, that party necessarily has full authority to control and develop the work, thus making any derivative work a work-for-hire. *See Hogarth*, 342 F.3d at 163; *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); 17 U.S.C. §7 (1909) (derivative works "produced with the consent of the proprietor of copyright … shall be regarded as new works").[14]

---

[14] It is true that an artist *can* own the copyright in his contributions to a derivative work (LB-31), but *not* if the derivative work is made-for-hire.

Nothing in the foregoing factual record is disputed, and it plainly establishes that all new Superman stories and elements published after the 1937 Employment Agreement and 1938 Assignment were created because DC employed and paid Siegel and Shuster to create them.  If DC at any point became dissatisfied with their work, DC could have terminated the relationship and paid someone else to develop DC's exclusive rights in Superman.  ER-427, 917.  The undisputed record shows, in short, that the new, derivative Superman works created after March 1938 were created at DC's instance and expense, and thus it is presumed that the parties agreed that DC would own the copyright in those works *ab initio*, unless Larson can establish an express agreement to the contrary.  *Supra* at 43.

Larson does not even *attempt* to identify any such agreement, because none exists.  That should end the matter.  Larson instead proffers a litany of arguments with respect to each category of works, in an effort to show that the works were not created at DC's instance, or expense, or both.  Those efforts are futile.

1.  *Action Comics #2-3, #5-6*

a.  The district court correctly held that *Action Comics #2-3, #5-6*, which were published between May and September 1938, were "done at the instance of" DC.  ER-83.  Before *Action Comics #1* was published, DC made clear that Superman would be a "new feature" requiring Siegel and Shuster regularly to supply DC with new material.  ER-423.  Consistent with their agreement, DC set

Case 2:10-cv-03633-ODW-RZ Document 591-3 Filed 04/25/12 Page 136 of 190
Case 1:11-cv-58683-ODW-RZ Document 591-3 Filed 04/25/12 Page 136 of 190
Page ID #:24643

aside space for the Superman feature in its comic books, including "every succeeding monthly issue of Action Comics for the period in question," ER-83, which was "published at regular intervals." ER-960. For each installment, Siegel and Shuster submitted Superman strips to DC and were paid $10 per page. *Id.*

      b.  Larson's arguments that *Action Comics #2-3, #5-6* were not created at DC's instance and expense are meritless. Larson first contends the works cannot be works-for-hire because DC did not commit to accepting new material, and thus there was no "guaranteed compensation" and the expense factor is not satisfied. LB-29. That argument has been "roundly rejected." *Kirby*, 777 F.Supp.2d at 742. No court has ever held that the "expense" factor requires guaranteed compensation. *See Murray*, 566 F.2d at 1311 n.7 ("neither the form of compensation, nor the amount, is determinative"); *Picture Music*, 457 F.2d at 1216 (lack of fixed payment "is never conclusive"). To the contrary, courts have found work-for-hire where there was *no* obligation to pay an artist for unpublished works. *E.g.*, *Playboy*, 53 F.3d at 555; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003); *Picture Music*, 457 F.2d at 1216. In fact, the lack of a long-term guarantee "is not something which is atypical" in a work-for-hire situation. ER-86. The expense requirement is satisfied, for example, where an artist is paid only in royalties, which may amount to nothing if the work does not succeed. *Warren*, 328 F.3d at 1142.

Larson next argues that the 1938 Employment Agreement undermines the work-for-hire status of *Action Comics #2-3, #5-6* because it states that DC "*hereby* employ[s] and retain[s] you." LB-30 (emphasis added). But that language simply signifies that Siegel and Shuster were now subject to the particular terms of the 1938 Employment Agreement—it does nothing to establish that Siegel and Shuster were not already producing Superman work at DC's instance and expense. The 1938 Employment Agreement, in fact, expressly states that Siegel and Shuster "*have been* doing the art work and continuity *for us*" and that DC wanted the pair "to *continue* to do said work." ER-605 (emphasis added). The new written agreement thus simply "formalized what had informally been ongoing beforehand." ER-85.

Finally, Larson contends that "Siegel had already written" the Superman stories in *Action Comics #2-3, #5-6*, before 1938. LB-32. Larson's first theory is that because the district court held that certain elements of *Action Comics #4* and *Superman #1* were created before 1938—which is erroneous in any event, *infra* at 61-68—it must be true that the other *Action Comics* contained preexisting elements. LB-32. But Larson has pointed to absolutely no *evidence* that *Action Comics #2-3, #5-6* were based on preexisting materials. Absent such evidence,

there is no basis for any inference that they were.[15]  Larson's second theory is that

the new works were based on a paragraph written by Siegel in 1934 that

"previewed" Superman's future exploits (LB-32), but the district court rejected that

argument, holding that the so-called "preview" paragraph "constitutes mere *ideas*

for future works rather than *expressions* of those ideas, and thus contains no

copyrightable material."  ER-75; *see Harper & Row, Publishers v. Nation Enters.*,

471 U.S. 539, 547 (1985) ("no author may copyright facts or ideas").  Larson did

not appeal that ruling, thereby waiving this contention.  *See Partmar Corp. v.

Paramount Pictures Theatres Corp.*, 347 U.S. 89, 99 (1954); *Gausvik*, 392 F.3d at

1008 n.1.

     2.    *Action Comics #7-61 And Superman #1-23*

    a.  *Action Comics #7-61* and *Superman #1-23* were produced by Siegel and

Shuster not only after the 1938 Assignment gave DC exclusive rights in Superman,

but after the 1938 Employment Agreement formalized the artists' working

relationship.  ER-87.  The 1938 Employment Agreement confirmed that the works

were created at DC's instance:

- Siegel and Shuster "will supply us each and every month …, in sufficient
  time for publication …, sufficient copy and art";

- "The standard of said comics shall be equal to the present standards";

---

[15] As for *Action Comics #6*, Larson never argued below that this work was
based on pre-existing material, so the argument is waived.  *See Jachetta v. U.S.*,
653 F.3d 898, 906 (9th Cir. 2011).

- "[I]f at any time the art and continuity of any feature shall not be up to the standard …, [DC] may terminate this agreement and substitute other artists";
- DC "shall have the right to reasonably supervise the editorial matter of all features." ER-605-07.

These works were also created at DC's expense. All three means of satisfying the expense requirement, *supra* at 42-43, were present here: DC assumed the financial risk of Superman's success and bore responsibility for printing, distributing, and promoting these works; DC paid Siegel and Shuster for these works; and Siegel and Shuster expected to be compensated pursuant to the 1938 Agreement, which provided that DC would "pay you on publication, for any and all of said comics," according to a fixed pay scale. ER-606.

Because *Action Comics #7-61* and *Superman #1-23* were plainly created at DC's instance and expense, they are works-for-hire as a matter of law.

b. None of Larson's barrage of contrary arguments has merit. Larson first contends that these works were not created at DC's "expense" because DC was obligated to pay only for works DC decided to publish. LB-49. But Larson did not below and does not now seek to recapture any unpublished, unpaid-for, non-copyrighted work (nor could she)—making this issue irrelevant. And she was paid for the works that were published, and no work-for-hire precedent requires *fixed compensation* for every possible submission to satisfy the "expense" test. *Supra* at

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 140 of 190
Case 1:11-cv-05888-DNW-RZ Document 591-3 DI Entry 4/25/12 Page 54 of 91
Page ID #:24647

49.  The *Kirby* court correctly described Larson's argument to the contrary (advanced by her same counsel here) as "roundly rejected."  777 F.Supp.2d at 742.

It is beside the point that Siegel and Shuster *also* incurred costs to create these new Superman works.  LB-48.  It is undisputed that they were more than compensated for those costs under the payment schedule established by the 1938 Agreement—they both became wealthy as a result of those payments.  ER-466, 585-86, 605-07; *see Playboy*, 53 F.3d at 555 (fact that artist provided own tools and studio, hired assistants, paid taxes and benefits, and set his own work schedule had "no bearing on whether the work was made at the hiring party's expense"); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 WL 398696, *20 (S.D.N.Y. Mar. 15, 2002) (artist cannot "unilaterally … disrupt a work for hire arrangement by paying certain costs of the project that he was not contractually bound to pay").

Larson says DC's payments under the 1938 Employment Agreement were "by law" not payments for work produced at DC's instance, but "a discretionary *purchase* of completed material."  LB-49.  Larson cites no "law" so holding, and the facts preclude that conclusion.  DC *already owned all rights to Superman*, so there was nothing for DC to "purchase."  *Supra* at 47.[16]  Under the 1938

---

[16] Larson says that testimony of DC expert Mark Waid proves DC did not own the rights in not-yet-published Superman material, because Waid sought the "blessing" of the Siegels to publish a newly discovered, unpublished Superman work.  LB-52-53.  There is no evidence that Waid did so because he thought it was legally required—indeed, a "blessing" is obviously not equivalent to a "license."

Employment Agreement, DC paid the artists for work they were obligated to create on a specified timely basis, under quality standards enforced by DC.[17] ER-605-07.

Larson next contends that *Action Comics #7-61* and *Superman #1-23* were not made at DC's instance because DC did not exercise complete control over Siegel's and Shuster's creative processes. LB-55. "All [DC] really had," Larson says, "was the purchasing power of any buyer." *Id.* No. DC had much more— most significantly, it had the power to terminate Siegel and Shuster outright if they did not produce publishable-quality work, to retain other artists to create Superman works and, as the sole owner of Superman, to bar Siegel and Shuster from ever creating any more Superman works of any kind. *Supra* at 12-13. DC also had the right to supervise their work to determine whether it satisfied "present standards" of publication. *See Fox*, 429 F.3d at 880 ("complete control over the author's work is not necessary"). The law does not require the employer to insert itself directly

---

And whatever Waid personally thought does not bind DC as a corporation, nor could his personal state of mind create or eliminate rights that existed as a matter of law in 1938 based on contractual agreements. Finally, rights in unpublished works are not at issue here. *Supra* at 52.

[17] The district court concluded that Larson "failed to present evidence that Siegel and Shuster were not, in any given instance, paid for their work." ER-89. Rather, the court held, a 1939 agreement between the parties suggested that the "pattern and practice" was for DC to pay Siegel and Shuster even for Superman material they had *not* created. ER-90; *see* ER-965. Larson addresses the court's inference at great length (LB-51-54), but her entire discussion misses the point: even if Siegel and Shuster were *not* paid for unpublished work, the works that *were* published plainly were created at DC's instance and expense.

into the artist's creative process—after all, the whole point of commissioning an artist is to engage the artist's creative talents. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch. of Contemporary Dance, Inc.*, 380 F.3d 624, 635 (2d Cir. 2004). The employer need not dictate or shape how works are made: "talented people … are expected by their employers to produce the sort of work for which they were hired," *id.* at 640-41—exactly as Siegel and Shuster did here.[18]

### 3.   *Post-McClure Newspaper Strips*

a.   Siegel and Shuster created many Strips after executing the 1938 Employment and Syndication Agreements. It is plain they were created at DC's instance—Siegel and Shuster were engaged by DC for the express purpose of creating them, as the district court held. ER-103. The Syndication Agreement provided: "Detective agrees to permit [Siegel and Shuster] to supply 'Superman' strip exclusively to us for syndication…." ER-609. The Syndication Agreement also reaffirmed DC's exclusive ownership of Superman: "[T]he title 'Superman' shall always remain the property of [DC]." ER-610. And the 1938 Employment Agreement reinforced that Siegel and Shuster would timely "furnish … all of the

---

[18] Larson asserts in passing that the parties "could not have intended" these works to be made-for-hire because courts in this time period applied the work-for-hire doctrine only to "traditional employees." LB-56. This Court rejected the identical argument in *Fox*, holding that General Eisenhower's war memoir, written during the same time period at issue here, was a work-for-hire even though he was not a traditional employee. *Compare* 429 F.3d at 877, *with id.* at 881 (Nelson, D.W., J., dissenting).

EXHIBIT H
136

Case 2:10-cv-03683-ODW-RZ Document 591-3 Filed 04/25/12 Page 143 of 190
Case 1:11-cv-05886-ODW-RZ Document 591-3 Filed 04/25/12 Page 704 of 11
Page ID #:24650

art and continuity for the newspaper strip entitled 'Superman'" to McClure. ER-
605. That Agreement also gave DC the express "right to reasonably supervise the
editorial matter of all features." ER-607. And again, the 1938 Employment
Agreement authorized DC to terminate Siegel and Shuster and retain other artists
to produce the Strips. *Supra* at 12-13.

As the parties' correspondence establishes, DC gave Siegel and Shuster
"constant editorial supervision," insisting that the pair "send all the [newspaper]
material here before it goes to the syndicate for release" so its editors could review
the draft strips, make substantive revisions to the script and artwork, correct "any
mistakes," and "okay" the final strip before sending it to McClure. ER-431-40,
445-56, 453, 460. In a January 23, 1940, letter, an editor reminded Siegel:
"[P]lease do not forget that all copy must clear though our office … You've got to
give us plenty of time for okaying, so get busy." ER-435. DC made clear that if
the newspaper strips did not meet its editorial standards, "we shall have to consider
it 'unacceptable', and make other arrangements to have it done." ER-460.

As the court below observed, the facts of this case are "eerily similar" to
those in *Picture Music*, 457 F.2d at 1214, and compel the same work-for-hire
conclusion. ER-104. As in *Picture Music*, the artists (Siegel and Shuster) worked
with another party (McClure) to create derivative works owned by a third party
(DC). As in *Picture Music*, the employer here (DC) owned the original work, per

the 1938 Assignment. As in *Picture Music*, the artists here exercised substantial creative license in creating the work, but as in *Picture Music*, the employer here had a right to accept, reject, or modify the pair's work. *Id.* at 1217. As in *Picture Music*, it is irrelevant whether they operated as independent contractors.

The Strips also were created at DC's expense. Siegel and Shuster were handsomely compensated for their work pursuant to the 1938 Employment Agreement. As explained, it is irrelevant that they were not paid a guaranteed amount. *Supra* at 49. Further, DC assumed the financial risk of Superman's newspaper syndication; while DC did not expect syndication to be tremendously profitable, it owned all of the underlying rights, and stood to lose the value of those rights if the syndication failed. *See Fox*, 429 F.3d at 881. The Post-McClure Strips were clearly works-for-hire.

b. Larson contends otherwise, but her arguments are meritless. *First*, she says that Siegel's involvement in soliciting newspaper syndication proves the Strips were made at his own "instance." LB-37. But there can be no dispute that the Strips were created pursuant to Siegel's and Shuster's *contractual obligation to create them for DC*. *Supra* at 55-56. And DC itself also actively sought newspaper syndication. *E.g.*, SER-290.

*Second*, Larson tries to distinguish *Picture Music*, saying the employer-artist relationship there was a traditional employer-employee arrangement, while the

**EXHIBIT H**
**138**

Case 2:10-cv-03633-ODW-RZ Document 591-3 Filed 04/25/12 Page 145 of 190
Page ID #:24652
Case 1:11-cv-05688-GBD-RZ Document 591-3 Filed 04/25/12 Page 72 of 117

relationship between Siegel, Shuster, and DC was more akin to a joint venture. LB-34, 40. But again, it is settled that the work-for-hire doctrine applies equally to independent contractors and traditional employees. *Supra* at 42-43 & n.11.[19]

*Third*, Larson argues that a finding in *Fawcett* that McClure owned the "proprietor" copyright in the Strips precludes a finding that the Strips were made-for-hire pursuant to an obligation to DC. But the work-for-hire status of the Strips was *never* before the *Fawcett* court, which considered the limited question whether Superman rights had fallen into the public domain due to McClure's failure to properly affix copyright notices to certain newspaper strips, and if so, whether those errors were chargeable to DC. 191 F.2d at 599. As the district court concluded, "to imply Judge Hand [the judge in *Fawcett*] sought to extend the reach of his ruling to questions beyond the narrow confines of the case before him to those now before this Court fifty years later is simply misdirected." ER-40.

*Fourth*, Larson says McClure and DC owned the Strips not as works-for-hire but by an "implied assignment of Siegel and Shuster's common law copyrights in

---

[19] In any event, as the district court explained, the right of control held by both DC and McClure was "reflective of a more traditional employment engagement." ER-104. Larson notes that the district court in *Nat'l Comics Pubs., Inc. v. Fawcett Pubs., Inc.*—a lawsuit DC filed in the 1940s alleging that the Captain Marvel comic books infringed its rights in Superman—likened the parties' syndication arrangement to a joint venture, but on appeal the Second Circuit did *not* accept that formulation, 191 F.2d 594, 599 (2d Cir. 1951), so it carries no weight. *In re Smith*, 964 F.2d 636, 638 (7th Cir. 1992).

the strips." LB-43.  But even if Larson were correct that there was an assignment (she is not), this Court has held that an assignment of rights is not "inimical with the work-for-hire doctrine." *Fox*, 429 F.3d at 881.  Once the instance-and-expense test has been satisfied, the work-for-hire "presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire"—an assignment "is insufficient to rebut the presumption." *Id.*; *Lin-Brook*, 352 F.2d at 300.

*Fifth*, Larson says a work-for-hire conclusion is contrary to McClure's copyright registrations for the Strips, which identify Siegel and Shuster as the "author" and McClure as the "owner."  LB-43.  But the sole case she cites *rejects* her position, holding that a publisher's reference to the hired party as an "author" did *not* change the work-for-hire status of its book, because "author" "was being used, not as a 'legal conclusion,' but 'colloquially.'" *Hogarth*, 342 F.3d at 166-67 & n.24; *see Picture Music*, 457 F.2d at 1214 & n.1.  There is no evidence McClure intended to use "author" in anything other than its colloquial sense.  ER-610.

*Sixth*, Larson notes that in 1944, McClure assigned to DC "all its right, title and interest in all copyrights in Superman," which she says was unnecessary if DC owned the copyright in the Strips.  LB-45.  But DC only allowed McClure to register copyrights in its name for practical purposes—the Syndication Agreement

made clear that DC retained beneficial ownership of all Superman rights and the
copyrights in the Strips would "revert" back to DC. ER-610.[20]

    *Finally*, Larson argues that DC's ownership of rights is inconsistent with the
Syndication Agreement's allowing DC to use the Strips in its comic books "six
months after newspaper release." LB-46. But DC could grant McClure a six-
month exclusive license in the Strips—in exchange for 40-50% of the net proceeds
from the Strips—precisely *because* DC owned their rights. ER-609-10.[21]

    The conclusion that the Strips were created at DC's instance-and-expense,
pursuant to the 1938 Employment and Syndication Agreements, is unassailable.

---

[20] Larson similarly argues that if DC owned the Strips as works-for-hire, then
Siegel and Shuster would not have needed to execute the Syndication Agreement.
LB-46. But that agreement imposed obligations on Siegel and Shuster, so their
execution was necessary. Notably, the agreement took care to reaffirm that the
pair had *no* rights in the Strips, were employees of DC, and could be replaced at
any time. *E.g.*, ER-610.

[21] Nothing about the "indivisibility" doctrine would have precluded DC from
granting such a license, as the very case cited by Larson shows. LB-47 (citing *Jim
Henson Prods. v. John T. Brady & Assocs.*, 16 F.Supp.2d 259, 288 (S.D.N.Y.
1997) ("indivisible" right means "the transfer of anything less than all rights was
deemed a license rather than an assignment")). Nor does the holding in *Fawcett*
(LB-47) preclude that result. *Supra* at 58.

**C.    The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4, Superman #1* (Pages 3-6), And Pre-McClure Strips**

The district court incorrectly held that *Action Comics #1* and *#4, Superman #1* (pages 3-6), and the two weeks of strips created before the Syndication Agreement ("Pre-McClure Strips") were not works-for-hire.

1.    Action Comics #1

a.    *Key Elements Of* Action Comics #1 *Were Made-For-Hire*

The undisputed record shows that key graphic and story elements from the Superman story in *Action Comics #1* were made-for-hire for DC. Indeed, some elements were not even created by Siegel and Shuster, but by other DC artists.

DC's Colorization. DC colorist Jack Adler testified that, in keeping with industry custom, Siegel and Shuster submitted black-and-white panels to DC for use in *Action Comics #1*. SER-442. DC's other artists decided what colors to use and applied those colors to the story, including Superman's iconic blue leotard, red cape, and red S-crest. *Id.* The unique combination of these colors with the story elements in *Action Comics #1* will always be DC's property—meaning that DC has an irrevocable joint-ownership stake in *Action Comics #1* even if Larson is able to recapture certain story elements.

The district court erroneously assumed that DC's use of color in *Action Comics #1* was *not* independently copyrightable. SER-49-51. In fact, "adding

colors to a previously black and white picture may constitute an original

copyrightable contribution." MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON

COPYRIGHT §2.14 (2011); *see Boisson v. Banian, Ltd.*, 273 F.3d 262, 271 (2d Cir.

2001); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 n.6

(2d Cir. 1977); 52 F.R. 23443-46 (1987) (colorization of black-and-white motion

pictures is copyrightable and may be registered).  While color alone may not be

copyrightable, the selection and use of color in combination with other protectable

elements can be sufficiently creative to warrant copyright protection.  *See Boisson*,

273 F.3d at 271; *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 n.6 (9th Cir.

2008); *Sargent v. Am. Greetings Corp.*, 588 F.Supp. 912, 919 (N.D. Ohio 1984);

*Pantone, Inc. v. A. I. Friedman, Inc.*, 294 F.Supp. 545, 547 (S.D.N.Y. 1968).

DC's unique selection and application of colors to the *Action Comics #1*

story far exceeds the minimal standard for copyrightability.  Larson's own expert

acknowledged that "Superman's distinctive iconic costume is very much about its

colors," SER-370, and the story was promoted as being in "***Color!***," *infra* at 84.

DC's Cover Art.  DC's artists also created the cover of *Action Comics #1*,

which introduces the Superman story that immediately follows.  ER-388; SER-

728.  A February 22, 1938, letter from DC editor Vin Sullivan to Siegel provided:

"I'm enclosing a silverprint of the cover of Action Comics.  You'll note that we

already used one of those panel drawings of SUPERMAN, as you suggested in

your recent letter." SER-388. In other words, per Siegel's suggestion, DC used one of the panel drawings from the Superman story as a template to create the cover art. Siegel confirmed these events in his memoir. SER-803-04. The court below suggested, however, that Sullivan's letter *could* be read to imply that Siegel created the cover art and enclosed it with his "letter" to Sullivan. SER-51. That reading is at odds with the plain language of the letter and Siegel's own account.

Larson argued below that DC's cover was not independently copyrightable because it was derivative of Siegel and Shuster's preexisting creation. A derivative work is independently copyrightable if it contains "non-trivial" variations from the original work, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997)—*i.e.*, it possesses "more than a de minimis degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991).

In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir. 1982), the court considered these two illustrations:

 

*Original Illustration*       *Derivative Illustration*

**EXHIBIT H**
**144**

While the individual distinctions are minimal, the court found that "the numerous changes made by [the second artist]—the changed proportions of the hat, the elimination of individualized fingers and toes, the overall smoothing of lines— combine to give the [second] drawing a different, cleaner 'look'" than the original sketch. *Id.* The second illustration was thus independently copyrightable. *Id.*

Here, there are numerous non-trivial distinctions between the cover of *Action Comics #1* and the panel that inspired it:

- On the cover, Superman has distinguishable facial features and musculature, bears a visible S-crest on his chest, and wears the now-iconic red boots. In the panel, Superman's face, musculature, and S-crest are obscured, and he wears socks.
- The cover depicts a man under the car who was shaken out of the car by Superman—the panel does not.
- The man featured on the bottom left foreground of the cover has different hair, facial features, and clothing than the man in the panel. He is touching his temples in disbelief and his tie is blowing in the wind. In the panel, the man is covering his ears and his tie is stationary.
- The man featured in the left background of the cover has different hair and clothes than the version in the panel, and has discernible facial features.
- In the cover, Superman appears larger than the closest figure(s). In the panel, he appears to be the same size.
- The car featured on the cover is fully visible and contains different rear wheel wells, headlights, and other details than the car in the panel. On the

cover, the tire that flew off the car is angled differently than the panel, emphasizing the force with which Superman smashed the car into the rocks.

- The scale, layout, and background landscape of the two images are different.
- Even the rocks in the background of the two images are different; they are less detailed and prominent in the cover art.



*Panel in* Action Comics #1

65

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 153 of 190
Case 1:11-cv-05863 09/23/2012 ID: 8815991-3 DktEntry: 35-12 Page 30 of 211
Page ID #:24660



*Cover of* Action Comics #1

These differences warrant independent copyright protection for the cover.

Siegel and Shuster's 1938 Material. Siegel and Shuster created certain elements of the Superman story in *Action Comics #1* ("Preexisting Material") before entering into employment with DC. That Preexisting Material is not at issue here. Siegel and Shuster testified, however, that in early 1938, they made key additions to the Preexisting Material, including: (1) "several additional pictures to illustrate the story continuity," which appear on the first page of *Action Comics #1*, ER-654; SER-386; (2) the last panel, which features Superman in his cape, leotard, and S-crest breaking through a chain with his chest, ER-654; SER-386; and (3) "the scientific explanation on page 1 … and the last panel," ER-654.

These additions were made at DC's instance and expense, further making *Action Comics #1* and the Superman story therein a joint work that will always be co-owned by DC. Siegel's sworn affidavit avers that he and Shuster created this material *only after* DC told the pair they "could proceed" and agreed to publish their work. ER-654. DC also had the "right to control or supervise" Siegel and Shuster's work, and in fact exercised that right. *See Fox*, 429 F.3d at 879. DC sent Siegel and Shuster a letter on February 1, 1938, directing them to "[s]tart immediately on the thirteen (13) page feature of SUPERMAN for the new Action Comics Magazine." SER-379. DC instructed the pair to adapt the Preexisting Material "into a full length … strip suitable for magazine production," demanding

that their work be "the very best" and "without imperfections." ER-957; SER-381.

Siegel and Shuster "compli[ed] with the said request of DC" and submitted the

revised and expanded material on February 22, 1938. ER-957. DC later chastised

the pair for failing to comply with the formatting requirements, saying that if DC

were not so pressed for time, it "would have rejected" their submission. SER-383.

Siegel and Shuster's additions were also created at DC's expense—Siegel

and Shuster were paid for their *Action Comics #1* contributions, and DC assumed

the financial risk and burden of publishing, distributing, and marketing *Action*

*Comics #1*. ER-75, 425-27, 917, 958, 960; SER-383, 804.

> b.  National *Is Not Preclusive As To The Work-For-Hire Status Of* Action
>     Comics #1

The court below erroneously held that the "thrust" of DC's argument that

key elements of *Action Comics #1* were made-for-hire "was made and rejected" in

*National* "and is thus precluded as a matter of collateral estoppel." SER-46.

Collateral estoppel applies only where "the matter raised in the second suit is

identical in all respects with that decided in the first proceeding." *Comm'r v.*

*Sunnen*, 333 U.S. 591, 599-600 (1948); *see Granite Rock Co. v. Teamsters*, 649

F.3d 1067, 1070 (9th Cir. 2011). That threshold requirement is not satisfied here.

The issue in *National* was whether Siegel and Shuster owned the renewal

copyright in the Superman story in *Action Comics #1*. 364 F.Supp. at 1033. That

publication, which contained multiple comic features, was considered a periodical

magazine under the 1909 Act.  17 U.S.C. §24 (1909).  That Act provided that the owner of a copyright in a periodical magazine (*i.e.*, DC) could obtain a renewal copyright for the entirety of the magazine, and the author of a discrete portion of that magazine could obtain a renewal copyright for its discrete contribution—unless it was a work-for-hire.  *Id.*  DC's predecessor, National, renewed the copyright in the entirety of *Action Comics #1* in 1965 "as a proprietor of a work for hire."  ER-1018.  In 1969, Siegel and Shuster sued National for a declaration that they owned the renewal copyright for the Superman story in *Action Comics #1*.

The district court in *National* found against Siegel and Shuster on two separate, independent grounds.  First, the parties' prior agreements assigned all of their rights in Superman to DC, including any copyright renewal rights.  *Nat'l*, 364 F.Supp. at 1037-38.  Second, the Westchester Court's prior findings concerning the creation of *Action Comics #1* were binding and compelled the conclusion that Siegel and Shuster's contribution was a work-for-hire.  *Id.* at 1035-37.

The Second Circuit affirmed on the sole basis that Siegel and Shuster had assigned their renewal rights to DC.  *Nat'l*, 508 F.2d at 914.  As such, the Second Circuit did not need to reach the second basis for the district court's ruling.  In dicta, however, the Second Circuit disagreed with that ruling, stating that "there was no conclusion of law in the [Westchester Action] that the comic strip was a work for hire so as to create the presumption that the employer was the author."

Case 2:10-cv-03683-ODW-RZ Document 391-3 Filed 04/25/12 Page 157 of 190
Case 1:11-cv-05988-DAB Document 5991-3 Filed 4/25/12 Page 157 of 11
Page ID #:24664

*Id.* The Second Circuit also commented that the evidence was not otherwise "sufficient to create the presumption that the strip was a work for hire" as to Siegel and Shuster's contribution to *Action Comics #1*. *Id.* But neither the district court nor the Second Circuit reached the opposite conclusion, much less considered whether Superman elements in *Action Comics #1* that were created by DC other artists or added by Siegel and Shuster at DC's instance and expense were works-for-hire—the questions now before this Court. This alone forecloses application of collateral estoppel. *Granite Rock*, 649 F.3d at 1070.

It is irrelevant that, as the court below found, "much of the evidence" cited in DC's motion to prove that the Additional Material was made-for-hire "could have been admitted [in *National*]," but was not. SER-46-48. Collateral estoppel applies only where the identical issue was "actually litigated" and "necessarily decided." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002); *Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995).

Nor was the Second Circuit's limited discussion of the work-for-hire issue "necessary to support a valid and final judgment on the merits," as is also required. *Simon*, 310 F.3d at 288-89; *see Shaw*, 56 F.3d at 1132 n.5. The Second Circuit's ruling was based on its finding that Siegel and Shuster assigned all of their rights to DC. Its rejection of the district court's alternative work-for-hire ruling clearly was not "necessary" to its judgment *in DC's favor* affirming that Siegel and Shuster did

not own any renewal copyright in *Action Comics #1*. Such dicta has "no preclusive

effect," *EPIC, Inc. v. Pac. Lumber Co.*, 257 F.3d 1071,1077 (9th Cir. 2001), just as

"determination[s] adverse to the winning party do not have preclusive effect,"

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985).

The district court's ruling should be reversed, and this Court should rule as a

matter of law that DC owns the color elements and cover art in *Action Comics #1*,

as well as the material added by Siegel and Shuster in 1938.

### 2.   *Pre-McClure Strips*

#### a.   *The Pre-McClure Strips Were Made At DC's Instance And Expense*

After entering into the 1937 Employment Agreement and assigning all of

their Superman rights to DC in the 1938 Assignment, but before the parties'

business relationship with McClure was formalized in the Syndication Agreement,

Siegel and Shuster drafted two weeks of newspaper strips on behalf of DC. ER-

615; SER-582-89. The court below wrongly concluded that these Pre-McClure

Strips were not made-for-hire because they were created before the Syndication

Agreement. ER-109-14.

The Syndication Agreement was not necessary to establishing that the Pre-

McClure Strips were made at DC's instance and expense. The Pre-McClure Strips

were created during the term of the 1937 Employment Agreement and, even more

significantly, after DC became 100% owner of all rights in Superman pursuant to

the 1938 Assignment.  *Supra* at 11-12.  Given that assignment, DC had full

authority to control the development of Superman by artists of its choosing,

making any resulting derivative work a work-for-hire.  *Supra* at 47.

The district court erroneously assumed that "Siegel created the script and

Shuster created the artwork for the [Pre-McClure Strips] without any indication

that they received permission to do so beforehand from Detective Comics."  ER-

111.  As Siegel's own account makes clear, these strips were only completed *after*

DC gave its consent.  ER-615-17, 620.  Siegel created a "script"—which did not

include any artwork—and sent it to McClure.  ER-615.  He then approached DC to

request permission to proceed.  ER-616.  DC responded that Siegel needed a

"definite offer" from a syndicate.  *Id.*  It was only then that Shuster "illustrat[ed

Siegel's] script" and Siegel sent the completed strips to McClure.  *Id.*

DC also incurred the expense of compensating Siegel and Shuster for their

work on the Strips, and (along with McClure) bore the financial risk of the Strips'

success.  ER-609-11, 466.  The Pre-McClure Strips were, in short, made at DC's

instance and expense, just like other derivative Superman works produced under

similar conditions during the same time period.

   b.   *Larson's Failure To List The Pre-McClure Strips In Her Termination*
        *Notice Also Precludes Termination*

Wholly apart from their status as works-for-hire, there is a separate reason

Larson cannot terminate DC's rights in the Pre-McClure Strips:  Larson did not

identify them in her termination notice, as the Copyright Act requires.  ER-1023-92.

The Act requires that a termination notice "comply, in form, content, and manner of service, with requirements" that the Copyright Office prescribes.  17 U.S.C. §304(c)(4)(B); *see id.* §702.  The Copyright Office's regulations provide that such a notice must "include a clear identification" of "[t]he title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number."  37 C.F.R. §201.10(b)(1)(ii).  It is undisputed that Larson's Notices provide *none* of this information for the Pre-McClure Strips—no title, author, copyright date, or registration number.

The court below nevertheless held that this violation of §201.10(b)(1)(ii) was "harmless error," because the Notices include a "catch-all" footnote:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories ….  Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created.  Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

ER-132-33; SER-1026.  Under 37 C.F.R. §201.10(e)(1), however, an error in a termination notice is harmless only when it "do[e]s not materially affect the

adequacy of the information required to serve the purposes of [17 U.S.C. §304(c)]." Section 201.10(e)(2) identifies the types of immaterial mistakes covered by this rule: good-faith errors made in (1) "giving the date or registration number," (2) identifying the "effective date of termination," (3) "or in describing the precise relationships" between deceased authors and their statutory heirs. The C.F.R. comments confirm that the harmless error rule applies only to mistakes concerning those "specific items" of information. 42 F.R. 45917-19.

None of that applies to the error here, which involves the *complete omission* of *all* information required by §201.10(b)(1)(ii) concerning the Pre-McClure Strips. Larson's Notice deprived DC of any "reasonable opportunity to identify the affected grant and work from the information given in the notice," 42 F.R. 45916-21, 45918, and denied the public its right under the Act to "constructive notice of the facts stated in the recorded document," which is supposed to "specifically identif[y] the work to which it pertains," 17 U.S.C. §§304(c)(4), 205.

The only case to consider this issue confirmed that the complete omission of a work from a termination notice bars recapture of that work. In *Burroughs v. M-G-M, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982), the heirs of Tarzan's creator served a termination notice listing 35 Tarzan stories, including the first, but omitting five later Tarzan works. The Second Circuit affirmed the district court's conclusion that the notice was invalid as to the unlisted works, even though their omission was

"undoubtedly inadvertent," and even though the works contained elements in

common with other Tarzan works that were listed and could be recaptured.  *Id.*

Although *Burroughs* did not use the words "harmless error." ER-36-37, the

necessary implication was that the heirs' "inadvertent" omission was not harmless.

Rather than follow *Burroughs*, the district court relied on *Music Sales Corp.*

*v. Morris*, 73 F.Supp.2d 364 (S.D.N.Y. 1999), but that case actually supports DC's

position.  *Morris* considered whether a termination notice's vague description of

the grant to be terminated was sufficient to satisfy §201.10(b)(1)(iv)'s notice

requirement.  *Morris* did not hold that the failure to identify a *work* was harmless.

To the contrary, it acknowledged that a notice "must list all the works in which the

grantee's rights are to be terminated," and twice emphasized that "only the works

specified in a termination notice are terminated."  *Id.* at 378, 380 & 380 n.29.[22]

The district court cited four additional reasons that Larson's omission of the

Pre-McClure Strips from her termination notice was harmless.  None is persuasive.

---

[22] As for the vague grant definition *Morris* addressed, the court held it adequate because "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights" for recordation.  *Id.* at 378.  The court read that statement to demonstrate "how little concrete information need be conveyed and yet still be considered adequate."  ER-18.  But 37 C.F.R. §201.10(f)(6) (formerly (f)(5)) provided at the time that mere recordation of a termination notice by the Copyright Office "does not mean that it is otherwise sufficient under the law," and that recordation "is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met."  The Copyright Office has recently reaffirmed that "recordation of a notice does not mean that the notice meets the requirements of the law." 76 F.R. 32320 (June 6, 2011).

Case 2:10-cv-03683-ODW-RZ Document 391-3 Filed 04/25/12 Page 163 of 190
Case 1:11-cv-08683-ODW-RZ Document 591-3 D Entry 4/25/12 Page 90 of 117
Page ID #:24670

*First*, it found that the Pre-McClure Strips were inextricable from the works listed in the Notices because "the Superman character exists as a conglomerate."  ER-28, 31.  Larson, however, is only entitled to recapture rights in certain *works*, not an entire character.  *See Burroughs*, 683 F.2d at 622-23; 1 WILLIAM F. PATRY, PATRY ON COPYRIGHT §3:164 (1st ed. 2007).

*Second*, the district court found that the catch-all footnote's reference to "Krypton" pointed to the Pre-McClure Strips, which contained the first use of "Krypton."  ER-16, 17.  But the footnote listed *dozens* of common Superman elements, the vast majority of which were undeniably created by DC and thus not subject to termination—including, *e.g.*, "Smallville," the town where Superman grew up; "Kryptonite," fragments of Krypton that have the power to harm Superman; Clark Kent's co-workers "Jimmy Olsen" and "Perry White"; villain "Lex Luthor"; Superman's adoptive parents, the Kents; love interest "Lana Lang"; and allies like "Supergirl."  ER-1026, 2036.  The unsurprising fact that the long list of elements in the Notices included *one* element that appeared in the Pre-McClure Strips hardly suffices to give notice that Larson sought to terminate those strips.

*Third*, the district court cited the relatively low number of works omitted from the voluminous Notices.  ER-28-29, 132.  This makes no sense.  Of the more than 15,000 works listed in the Notices, only 15 were deemed subject to termination by the court below: *Action Comics #1*, *Action Comics #4*, portions of

*Superman #1*, and the 12 Pre-McClure Strips. ER-80, 189. The remaining 15,000-plus works reflect obvious overreaching. The 12 Pre-McClure Strips, which represent 80% of the works held to be terminated, were completely omitted from the Notices. The district court's rule would create a perverse incentive to waste hundreds of pages listing non-terminable works to preserve the argument that the notice was intended to encompass all potentially terminable works.

*Fourth*, the court said the "amount of effort" Larson took to prepare the Notices weighed in favor of harmless error. ER-4. But weighing the terminating party's effort in the harmlessness analysis would override the essential balance struck by §201.10(b)(1)(ii). In crafting the provision, the Copyright Office adopted authors' requests to delete certain requirements as unduly burdensome, while accepting movie studios' request to ensure that notices contain "information necessary to give notice" to grantees. 42 F.R. 45917-18. The "amount of effort" required to file a proper notice, in other words, is reflected in the notice requirements themselves—it cannot excuse the failure to meet those requirements.

3. *Pages 3-6 Of* Superman #1

*Superman #1* contains the Superman stories published in *Action Comics #1-#4*, plus some new material. As for the story based on *Action Comics #1*, DC revised the first two pages (which the district court held were made-for-hire, ER-81), and added four new pages. ER-761. The court below erroneously concluded

that these four new pages—which became pages 3-6 of *Superman #1*—were not

made-for-hire based on hearsay speculation by commentator James Steranko in a

foreword to DC's 1989 reprinting of *Superman #1*.  ER-81.

Steranko opined that, "according to legend," these pages were part of the

original Superman story created by Siegel and Shuster in 1935—before their

employment by DC—but were cut from *Action Comics #1*.  SER-272.  Siegel

himself debunked this theory in his memoir, explaining:  "[Commentators] state

Superman magazine No. 1 contains pages omitted from the Action Comics No. 1

origin story.  *The truth is that the additional pages were specifically created for*

*use in Superman Magazine No. 1*."  SER-803 (emphasis added).  Siegel also

recounted in *The Story Behind Superman No. 1* that a DC editor sent him a letter

on March 27, 1939 specifying in detail the contents of "the first six pages,"

including specific panels and headings.  ER-761. That is, pages 3-6 were created

along with the rest of *Superman #1* in 1939—*after* Siegel was employed by DC—

and were thus made as a work-for-hire.[23]

---

[23] Even beyond Siegel's direct repudiation of the "legend," the law requires
evidence, not folklore.  *See Fox*, 429 F.3d at 880 n.3 (rejecting hearsay statements
in magazine that Eisenhower wrote portions of manuscript before being retained by
Doubleday); *accord U.S. v. Resnick*, 594 F.3d 562, 570 n.4 (7th Cir. 2010); *Kirby*,
777 F.Supp.2d at 729; *Almond v. ABB Indus. Sys., Inc.*, 2001 WL 242548, *7-8
(S.D. Ohio Mar. 6, 2001).  The district court appeared to assume that the party-
admission rule would apply because DC published the reprint of *Superman #1*
containing Steranko's foreword.  ER-81.  But there is no evidence that Steranko
was speaking on DC's behalf, *cf.* FED. R. EVID. 801(d)(2)(A) (party-admission rule

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 166 of 190
Case 1:11-cv-05880 QB/23/2012 Document 591-3 DktEntry: 4-5-12 Page 306 of 1
Page ID #:24673

4.   *Artwork In* Action Comics #4

The district court held that Siegel wrote a script in 1934 "telling the story of

Superman interceding in a college football game and using his superpowers on the

field," which was incorporated into *Action Comics #4*.  ER-51-52, 77-80.  It is

undisputed that Siegel did not create *any* artwork to accompany his 1934 script.

Even so, the district court held that Larson could recapture the artwork created for

*Action Comics #4*.  ER-77-90.

That conclusion was wrong for two reasons.  First, DC created the artwork

and thus owns it as a work-for-hire.  *See Scherr v. Universal Match Corp.*, 417

F.2d 497 (2d Cir. 1969).  In *Scherr*, a soldier created a "small clay table model" of

an infantryman, and an officer asked him to create a large statue based on the

model.  417 F.2d at 499.  The court held that the large statue was made-for-hire,

because "[w]hile the idea for the statue originated from the smaller clay model, the

statue differs from the model." *Id.*  Here, the distinction between Siegel's 1934

script and *Action Comics #4* is equally or more substantial—unlike the script,

*Action Comics #4* contains 99 panels of detailed artwork illustrating the story.  ER-

551-58.  That artwork did not exist at all prior to Siegel's employment by DC.

Because the artwork possesses "more than a *de minimis* quantum of creativity," it

---

applies to statements made "in an individual or representative capacity"), and even
if he were, the foreword obviously contains multiple levels of hearsay.

is independently copyrightable, *Feist*, 499 U.S. at 363, and because it was created at DC's instance and expense, it is owned by DC.

Second, DC is at least joint owner of the overall Superman story in *Action Comics #4*, including its artwork. *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("The contents of a comic book are typically the joint work of four artists—the writer, the penciler[,] the inker[,] … and the colorist who colors it."). Under the 1909 Act, a joint work was created where multiple authors made contributions to be integrated into a single work. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 410 (2d Cir. 1946). Siegel obviously intended the football-story script to be combined with illustrations to form a comic strip, and DC of course intended its artwork to be combined with Siegel's story. Accordingly, DC is at least a joint owner of the entire *Action Comics #4* story.

5.    *Promotional Announcements*

While the district court correctly held that Promotional Announcements published prior to *Action Comics #1* were not recaptured, SER-43-44, it erred in describing the copyrightable elements encompassed therein, SER-44-45.

The court's ruling arose from partial summary judgment motions that were never intended to address the *scope* of rights at issue in the Announcements, but only threshold questions concerning the validity of Larson's Notices as to those works. DC argued—and the district court agreed—that Larson failed to recapture

the Announcements published before *Action Comics #1* because they fell outside

the Notice's statutory time limit.  SER-43-44; 699-712.  Larson has not appealed

that holding, waiving any right to challenge it.  *See Gausvik*, 392 F.3d at 1008 n.1.

The court's order, however, made gratuitous and inaccurate comments

concerning the copyrightable elements in the Announcements, based on the court's

review of a poor, multiple-generation photocopy.  SER-44-45.  DC filed a motion

for clarification asserting that these statements could not be binding because

neither party moved for summary judgment as to the scope of the Announcements.

SER-328-343.  The district court found otherwise, on the ground that Larson's

opposition to DC's motion raised "questions concerning the scope of the

copyrightable material contained in those announcements."  SER-1.  Larson's

opposition, however, contended only that DC's motion raised "classic issues of

fact" concerning the scope of rights in the Announcements, "precluding summary

judgment" on the very scope question the court then decided.  SER-356-57.

Indeed, an entire section of Larson's brief was titled "The Question Of What

Literary Elements Are Actually Contained In The Ad [Is] A Genuine Issue Of

Material Fact."  SER-356.  On reply, DC fully agreed that this issue should be

reserved for trial and was *not* an issue for summary judgment.  ER-353.

Before a court can grant summary judgment *sua sponte*, the moving party

must have "reasonable notice" and "a full and fair opportunity to ventilate the

issues." *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982).  DC had

neither.  The only issue on summary judgment was whether the Announcements

were covered by Larson's Notices.  While the scope question came up in briefing,

both parties agreed it was a disputed issue for trial.

The court below also denied DC an opportunity to be heard.  Because the

only issue properly before the court was when the Announcements were first

published—and not their copyrightable content—DC did not present original

versions of them.  Instead, DC appended a multiple-generation photocopy from

*More Fun Comics #31* and a photocopied printout of a photo of *Detective Comics*

*#15*.  *See* SER-329-43.  After reviewing these poor copies, the district court stated

at oral argument:  "[Y]ou can hardly make out whether it's an 'S' or a '5' or what

it is on his chest."  SER-339-340 .  Rather than reserving the issue for trial or

reviewing an original version, the court's summary judgment order concluded that

"the 'S' crest" is not "recognizable."  SER-44.

That ruling was incorrect.  Where, as here, the content of a work is at issue,

"[a]n original writing … is required in order to prove its content."  FED. R. EVID.

1002; *see Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986).  Given

"the hazards of inaccurate or incomplete duplication," *id.*; *see U.S. v. Diaz-Lopez*,

625 F.3d 1198, 1201 (9th Cir. 2010), a copy of lesser quality than the original is

not an adequate substitute, *see* 6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3]

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 170 of 190
Case 1:11-cv-08688-ODW-RZ Document 391-3 Entry: 04/25/12 Page 1 of 21
Page ID #:24677

(2011); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001); *U.S. v. Alexander*, 326 F.2d 736, 742-43 (4th Cir. 1964); *Tex Print Indus., Inc. v. Zayre Corp.*, 1977 WL 22752, *1 n.1 (D. Mass. Feb. 10, 1977).

The court's failure to review an original version of the Announcements resulted in multiple errors. As is clear from the copy of *Detective Comics #15* DC seeks to lodge and from the true-to-scale image on the next page below, the Announcements, in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features. Indeed, the S-shield is as recognizable in the Announcements as in the original *Action Comics #1* cover[24]:

---

[24] The cover reproduced in the summary judgment order was not the version that appeared in 1938—it is from the DC Comics Archive Edition published in 1997. This special edition completely reconstructed the original, which had low color registration making the "S" difficult to discern.

Case 2:10-cv-03683-ODW-RZ Document 391-3 Filed 04/25/12 Page 171 of 190
Case 1:01-cv-53683-ODW-RZ Document 591-1 Filed 04/25/12 Page 98 of 211
Page ID #:24678



# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR --

Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

**10c at all Newsstands**

## SPECIAL PRIZES AND AWARDS!

---

## MORE FUN COMICS

*The National Comics Magazine*

**VINCENT A. SULLIVAN**

*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.

*Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle*



*Version Electronically Filed By DC Below*



*Version Delivered to Chambers By DC Below*

This Court should reverse the district court's ruling and remand so the

copyrightable elements in the Announcements can be determined at trial.

# CONCLUSION

This Court should grant judgment as a matter of law on DC's settlement and statute-of-limitations counterclaims and dismiss the remainder of this appeal on that basis.  Alternatively, this Court should remand so the district court can hold a trial on these counterclaims and fully adjudicate Larson's First Claim and DC's First Counterclaim as well.  If this Court decides to reach the merits of the parties' First Claims now, it should affirm in part and reverse in part, as described above.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated:  March 23, 2003

**EXHIBIT H**
**168**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief is accompanied by an unopposed motion for leave to file an oversize brief pursuant to Fed. R. App. P. 27, 28.1, and 32 and Circuit Rules 27-1 and 32-2 and is 19,862 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: March 23, 2012

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
      Daniel M. Petrocelli
      Attorneys for Warner Bros.
      Entertainment Inc. and DC Comics

## **STATEMENT OF RELATED CASES**

Pursuant to Ninth Circuit Rule 28-2.6, DC identifies the following related cases currently pending before this Court:

1. *Pacific Pictures Corp. v. U.S. Dist. Ct.*, Appeal No. 11-71844 (9th Cir.) (filed June 30, 2011) (argued Feb. 7, 2012) (Kozinski, C.J.; O'Scannlain, J.; Smith, J.); and

2. *Pacific Pictures Corp. v. DC Comics*, Appeal No. 11-56934 (9th Cir.) (filed Nov. 2, 2011).

DC has filed concurrently herewith a motion requesting assignment of these appeals to the same panel that is presiding over Appeal No. 11-71844.

Dated:  March 23, 2012

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
   Daniel M. Petrocelli
   Attorneys for Warner Bros.
   Entertainment Inc. and DC Comics

**EXHIBIT H**
**170**

## ADDENDUM

Except for the following, all applicable statutes, rules, and regulations, are contained in the Statutory Addendum of Appellant Laura Siegel Larson's First Brief On Cross-Appeal.

### 17 U.S.C. § 4 (1909) (repealed 1976)

§ 4. ALL WRITINGS OF AUTHOR INCLUDED.—The works for which copyright may be secured under this title shall include all the writings of an author.

### 17 U.S.C. § 7 (1909) (repealed 1976)

§ 7. COPYRIGHT ON COMPILATIONS OF WORKS IN PUBLIC DOMAIN OR OF COPYRIGHTED WORKS; SUBSISTING COPYRIGHTS NOT AFFECTED.— Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with, the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

A-1

No copyright shall subsist in the original text of any work which is in the public

domain, or in any work which was published in this country or any foreign country

prior to July 1, 1909, and has not been already copyrighted in the United States, or

in any publication of the United States Government, or any reprint in whole or in p

art, thereof, except that the Postmaster General may secure copyright on behalf of

the United States in the whole or any part of the publications authorized by section

2506 of title 39.

The publication or republication by the Government, either separately or in a

public document, of any material in which copyright is subsisting shall not be

taken to cause any abridgment or annulment of the copyright or to authorize any

use or appropriation of such copyright material without the consent of the

copyright proprietor.

## **37 C.F.R. § 201.10**

This section covers notices of termination of transfers and licenses under sections

203, 304(c) and 304(d) of title 17, of the United States Code. A termination under

section 304(d) is possible only if no termination was made under section 304(c),

and federal copyright was originally secured on or between January 1, 1923, and

October 26, 1939.

(a) Form. The Copyright Office does not provide printed forms for the use of

persons serving notices of termination.

A-2

**EXHIBIT H**

Case 2:10-cv-03633-ODW-RZ Document 391-3 Dkt Entry 345/12 Page 96 of 11
Page ID #:24686

(b) Contents.

    (1) A notice of termination covering the extended renewal term under sections 304(c) and 304(d) of title 17, U.S.C., must include a clear identification of each of the following:

        (i) Whether the termination is made under section 304(c) or under section 304(d);

        (ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

        (iii) The title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number;

        (iv) A brief statement reasonably identifying the grant to which the notice of termination applies;

        (v) The effective date of termination;

        (vi) If termination is made under section 304(d), a statement that termination of renewal term rights under section 304(c) has not been previously exercised; and

A-3

**EXHIBIT H**
**173**

(vii) In the case of a termination of a grant executed by a person or persons other than the author, a listing of the surviving person or persons who executed the grant. In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author of all of the following, together with specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest: That author's surviving widow or widower; and all of that author's surviving children; and, where any of that author's children are dead, all of the surviving children of any such deceased child of that author; however, instead of the information required by this paragraph (vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently available to the person or persons signing the notice, with a brief explanation of the reasons why full information is or may be lacking; together with

(B) A statement that, to the best knowledge and belief of the person or persons signing the notice, the notice has been signed

A-4

**EXHIBIT H**
**174**

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 181 of 190
Page ID #:24688
Case 2:11-cv-05886-ODW-RZ Document 91-3 Dkt Entry 325/12 Page 108 of 190

by all persons whose signature is necessary to terminate the grant under section 304 of title 17, U.S.C., or by their duly authorized agents.

(2) A notice of termination of an exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, under section 203 of title 17, U.S.C., must include a clear identification of each of the following:

(i) A statement that the termination is made under section 203;

(ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

(iii) The date of execution of the grant being terminated and, if the grant covered the right of publication of a work, the date of publication of the work under the grant;

(iv) For each work to which the notice of termination applies, the title of the work and the name of the author or, in the case of a joint work, the authors who executed the grant being terminated; and, if possible and practicable, the original copyright registration number;

(v) A brief statement reasonably identifying the grant to which the notice of termination applies;

A-5

(vi) The effective date of termination; and

(vii) In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author of all of the following, together with specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest: That author's surviving widow or widower; and all of that author's surviving children; and, where any of that author's children are dead, all of the surviving children of any such deceased child of that author; however, instead of the information required by this paragraph (b)(2)(vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently available to the person or persons signing the notice, with a brief explanation of the reasons why full information is or may be lacking; together with

(B) A statement that, to the best knowledge and belief of the person or persons signing the notice, the notice has been signed by all persons whose signature is necessary to terminate the

A-6

grant under section 203 of title 17, U.S.C., or by their duly

authorized agents.

(3) Clear identification of the information specified by paragraphs (b)(1) and

(b)(2) of this section requires a complete and unambiguous statement of

facts in the notice itself, without incorporation by reference of information in

other documents or records.

(c) Signature.

(1) In the case of a termination of a grant under section 304(c) or section

304(d) executed by a person or persons other than the author, the notice shall

be signed by all of the surviving person or persons who executed the grant,

or by their duly authorized agents.

(2) In the case of a termination of a grant under section 304(c) or section

304(d) executed by one or more of the authors of the work, the notice as to

any one author's share shall be signed by that author or by his or her duly

authorized agent. If that author is dead, the notice shall be signed by the

number and proportion of the owners of that author's termination interest

required under section 304(c) or section 304(d), whichever applies, of title

17, U.S.C., or by their duly authorized agents, and shall contain a brief

statement of their relationship or relationships to that author.

A-7

**EXHIBIT H**
**177**

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 184 of 190
Case 2:10-cv-03633-ODW-RZ Document 391-3 Dkt Entry 425/12 Page 184 of 190
Page ID #:24691

(3) In the case of a termination of a grant under section 203 executed by one or more of the authors of the work, the notice shall be signed by each author who is terminating the grant or by his or her duly authorized agent. If that author is dead, the notice shall be signed by the number and proportion of the owners of that author's termination interest required under section 203 of title 17, U.S.C., or by their duly authorized agents, and shall contain a brief statement of their relationship or relationships to that author.

(4) Where a signature is by a duly authorized agent, it shall clearly identify the person or persons on whose behalf the agent is acting.

(5) The handwritten signature of each person effecting the termination shall either be accompanied by a statement of the full name and address of that person, typewritten or printed legibly by hand, or shall clearly correspond to such a statement elswhere in the notice.

(d) Service.

(1) The notice of termination shall be served upon each grantee whose rights are being terminated, or the grantee's successor in title, by personal service, or by first-class mail sent to an address which, after a reasonable investigation, is found to be the last known address of the grantee or successor in title.

A-8

**EXHIBIT H**
**178**

(2) The service provision of section 203, section 304(c) or section 304(d) of title 17, U.S.C., whichever applies, will be satisfied if, before the notice of termination is served, a reasonable investigation is made by the person or persons executing the notice as to the current ownership of the rights being terminated, and based on such investigation:

> (i) If there is no reason to believe that such rights have been transferred by the grantee to a successor in title, the notice is served on the grantee; or
>
> (ii) If there is reason to believe that such rights have been transferred by the grantee to a particular successor in title, the notice is served on such successor in title.

(3) For purposes of paragraph (d)(2) of this section, a reasonable investigation includes, but is not limited to, a search of the records in the Copyright Office; in the case of a musical composition with respect to which performing rights are licensed by a performing rights society, a "reasonable investigation" also includes a report from that performing rights society identifying the person or persons claiming current ownership of the rights being terminated.

(4) Compliance with the provisions of paragraphs (d)(2) and (d)(3) of this section will satisfy the service requirements of section 203, section 304(c),

A-9

or section 304(d) of title 17, U.S.C., whichever applies. However, as long as the statutory requirements have been met, the failure to comply with the regulatory provisions of paragraph (d)(2) or (d)(3) of this section will not affect the validity of the service.

(e) Harmless errors.

(1) Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of section 203, section 304(c), or section 304(d) of title 17, U.S.C., whichever applies, shall not render the notice invalid.

(2) Without prejudice to the general rule provided by paragraph (e)(1) of this section, errors made in giving the date or registration number referred to in paragraph (b)(1)(iii), (b)(2)(iii), or (b)(2)(iv) of this section, or in complying with the provisions of paragraph (b)(1)(vii) or (b)(2)(vii) of this section, or in describing the precise relationships under paragraph (c)(2) or (c)(3) of this section, shall not affect the validity of the notice if the errors were made in good faith and without any intention to deceive, mislead, or conceal relevant information.

(f) Recordation.

A-10

**EXHIBIT H**
**180**

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 187 of 190
Case 2:10-cv-03633-ODW-RZ Document 381-3 Dkt Entry: 385/12 Page 148 of 11
Page ID #:24694

(1) A copy of the notice of termination will be recorded in the Copyright Office upon payment of the fee prescribed by paragraph (2) of this paragraph (f) and upon compliance with the following provisions:

(i) The copy submitted for recordation shall be a complete and exact duplicate of the notice of termination as served and shall include the actual signature or signatures, or a reproduction of the actual signature or signatures, appearing on the notice; where separate copies of the same notice were served on more than one grantee or successor in title, only one copy need be submitted for recordation; and

(ii) The copy submitted for recordation shall be accompanied by a statement setting forth the date on which the notice was served and the manner of service, unless such information is contained in the notice. In instances where service is made by first-class mail, the date of service shall be the day the notice of termination was deposited with the United States Postal Service.

(iii) The copy submitted for recordation must be legible per the requirements of §201.4(c)(3).

(2) The fee for recordation of a document is prescribed in §201.3(c).

(3) The date of recordation is the date when all of the elements required for recordation, including the prescribed fee and, if required, the statement

A-11

**EXHIBIT H**
**181**

Case 2:10-cv-03633-ODW-RZ Document 391-3 Filed 04/25/12 Page 188 of 190
Page ID #:24695

referred to in paragraph (f)(1)(ii) of this section, have been received in the Copyright Office. After recordation, the document, including any accompanying statement, is returned to the sender with a certificate of record.

(4) Notwithstanding anything to the contrary in this section, the Copyright Office reserves the right to refuse recordation of a notice of termination as such if, in the judgment of the Copyright Office, such notice of termination is untimely. Conditions under which a notice of termination will be considered untimely include: the effective date of termination does not fall within the five-year period described in section 203(a)(3) or section 304(c)(3), as applicable, of title 17, United States Code; or the documents submitted indicate that the notice of termination was served less than two or more than ten years before the effective date of termination. If a notice of termination is untimely or if a document is submitted for recordation as a notice of termination on or after the effective date of termination, the Office will offer to record the document as a "document pertaining to copyright" pursuant to §201.4(c)(3), but the Office will not index the document as a notice of termination.

(5) In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or

A-12

**EXHIBIT H**
**182**

after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created.

(6) A copy of the notice of termination shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect. However, the fact that the Office has recorded the notice does not mean that it is otherwise sufficient under the law. Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction.

(7) Notices of termination should be submitted to the address specified in §201.1(b)(2).

A-13

**EXHIBIT H**
**183**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2012, I caused to be electronically filed the Principal And Response Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on March 23, 2012, at Los Angeles, California.

/s/ Cassandra Seto
_____
Cassandra Seto

OMM_US:70649074

**EXHIBIT H**
**184**
