1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA 90067-6035
   Telephone: (310) 553-6700
6  Facsimile: (310) 246-6779

7  PATRICK T. PERKINS (admitted *pro hac vice*)
     pperkins@ptplaw.com
8  PERKINS LAW OFFICE, P.C.
   1711 Route 9D
9  Cold Spring, NY 10516
   Telephone: (845) 265-2820
10 Facsimile: (845) 265-2819

11 Attorneys for Plaintiff DC Comics

12                **UNITED STATES DISTRICT COURT**

13               **CENTRAL DISTRICT OF CALIFORNIA**

14 DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

15          Plaintiff,                 **DISCOVERY MATTER**

16     v.                             **DC COMICS' NOTICE OF MOTION
                                        AND MOTION TO COMPEL THE**
17 PACIFIC PICTURES                   **PRODUCTION OF DOCUMENTS**
   CORPORATION, IP                    **AND FOR RECONSIDERATION OF**
18 WORLDWIDE, LLC, IPW, LLC,          **THE COURT'S JUNE 27, 2011,**
   MARC TOBEROFF, an individual,      **RULING**
19 MARK WARREN PEARY, as
   personal representative of the
20 ESTATE OF JOSEPH SHUSTER,          DECLARATION OF CASSANDRA
   JEAN ADELE PEAVY, an               SETO AND ASHLEY PEARSON, AND
21 individual, LAURA SIEGEL           [PROPOSED] ORDER FILED
   LARSON, an individual and as       CONCURRENTLY HEREWITH
22 personal representative of the
   ESTATE OF JOANNE SIEGEL,
23 and DOES 1-10, inclusive,          **Judge**:      Hon. Otis D. Wright II
                                      **Magistrate**: Hon. Ralph Zarefsky
24          Defendants.

25                                    **Hearing Date**:   May 21, 2012
                                      **Hearing Time**:   10:00 a.m.
26                                    **Courtroom**:      540
                                      **Discovery Cutoff**: None Set
27                                    **Pretrial Conference**: None Set
                                      **Trial**:          None Set
28
                                                   DC'S NOTICE OF MOT. AND
                                                MOT. TO COMPEL & FOR RECON.

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ........................................................................................ 1

4    II.   STATEMENT OF ISSUES IN DISPUTE ................................................... 3

5          Issue 1:  The November 17, 2001, Email From Toberoff To Michael
          Siegel ........................................................................................................... 3

6
          A.    Relevant Factual Background ............................................................. 3

7
          B.    Toberoff's November 17, 2001, Email Should be Produced ............... 5

8
          Issue 2:  Renner Otto Expert Report & Bulson Calendars and Billing

9          Entries ....................................................................................................... 10

10         A.    Relevant Factual Background ........................................................... 10

11         B.    Bulson's Billing Records Should be Produced ................................. 12

12         Issue 3:  November 2, 2002 Letter ............................................................ 14

13         A.    Relevant Factual Background ........................................................... 14

14         B.    The November 2, 2002 Letter Must be Produced ............................. 15

15         C.    Conclusion ....................................................................................... 17

16

17

18

19

20

21

22

23

24

25

26

27

28

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

# TABLE OF AUTHORITIES

**Page**

CASES

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*,
    408 F.3d 1142 (9th Cir. 2005) ........................................................................... 9

*Clarke v. Am. Commerce Nat'l Bank*,
    974 F.2d 127 (9th Cir. 1992) ........................................................................... 12

*Colton v. U.S.*,
    306 F.2d 633 (2d Cir. 1962) ........................................................................... 12

*Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*,
    2010 U.S. Dist. LEXIS 57880 (S.D. Cal. June 11, 2010) ....................................... 9

*In re Grand Jury Subpoenas*,
    803 F.2d 493 (9th Cir. 1986) ............................................................................. 5

*Leach v. Quality Health Servs.*,
    162 F.R.D. 499 (E.D. Pa. 1995) ....................................................................... 13

*Liew v. Breen*,
    640 F.2d 1046 (9th Cir. 1981) ........................................................................... 5

*Matter of Fischel*,
    557 F.2d 209 (9th Cir. 1977) ........................................................................... 12

*Olender v. U.S.*,
    210 F.2d 795 (9th Cir. 1954) ............................................................................. 5

*Renner Otto Boiselle & Sklar LLP v. Estate of Michael Siegel*,
    Case No. CV-07-620856 ........................................................................... 3, 9, 10

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ........................................................................... 15

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
    106 F.R.D. 187 (D.C. Ill. 1985) ..................................................................... 12

*U.S. v. Huberts*,
    637 F.2d 630 (9th Cir. 1980) ............................................................................. 5

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

# TABLE OF AUTHORITIES
(continued)

**Page**

*U.S. v. Martin*,
    278 F.3d 988 (9th Cir. 2002) ........................................................................ 8, 12

*U.S. v. Ruehle*,
    583 F.3d 600 (9th Cir. 2009) ............................................................................. 5

*Upjohn Co. v. U.S.*,
    449 U.S. 383 (1981) ......................................................................................... 12

*Vieste, LLC v. Hill Redwood Dev.*,
    2010 U.S. Dist. LEXIS 126607 (N.D. Cal. Nov. 18, 2010) ...................................... 9

## OTHER AUTHORITIES

W. SCHWARZER, ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL
    PROCEDURE BEFORE TRIAL § 11:659 (2011) ................................................... 12

1   TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2       PLEASE TAKE NOTICE that on May 21, 2012, at 10:00 a.m., or as soon

3   thereafter as the matter may be heard by the above-entitled court, located at 255

4   East Temple Street, Los Angeles, California in Courtroom 540, plaintiff DC

5   Comics will and hereby does move the Court for an order compelling defendants  to

6   produce to DC (1) the November 17, 2001, email from defendant Marc Toberoff to

7   Michael Siegel identified as Entry No. 339 of the Privilege Log of Bulson Archive,

8   Docket No. 362-2 at 309; and (2) Don Bulson's calendars and billing entries, and

9   the expert report based on them, prepared and submitted by Renner Otto in the

10  firm's litigation against the Estate of Michael Siegel; and (3) for reconsideration of

11  its June 27, 2011, ruling denying DC's motion to compel the production of the

12  November 2, 2002, letter from defendant Laura Siegel Larson to Michael Siegel,

13  recently identified as Entry No. 399 of the Privilege Log of Bulson Archive, Docket

14  No. 362-2 at 311.

15      This motion is made pursuant to Rules 26, 34, and 37 of the Federal Rules of

16  Civil Procedure and Rule 37-2 of the Local Rules of this Court on the grounds that

17  defendants have no proper grounds to resist producing them, as set forth in DC

18  Comic's portion of the accompanying joint stipulation.

19      Pursuant to Local Rule 37-1, the parties have attempted unsuccessfully to

20  resolve their disputes and therefore respectfully seek the assistance of the Court.

21  Pursuant to Central District Local Rule 37-2.4, and as explained in the Declaration

22  of Cassandra Seto filed concurrently herewith, DC is forced to submit this as a

23  motion rather than a joint stipulation because defendants have improperly refused to

24  provide their opposition in a timely manner in accordance with Local Rule 37-2.2.

25      This motion is based on this Notice of Motion and Motion; DC Comics'

26  portion of the accompanying Joint Stipulation Regarding DC Comics' Motion To

27  Compel The Production Of Documents And For Reconsideration Of The Court's

28  June 27, 2011, Ruling; the accompanying Declaration of Ashley K. Pearson and

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1    exhibits in support thereof; any supplemental memoranda that may be filed

2    pursuant to Local Rule 37; all exhibits, files, and records on file in this action;

3    matters of which judicial notice may be taken; and such additional submissions and

4    argument as may be presented at or before the hearing on this motion.

5

6    Dated:        April 26, 2012                    Respectfully Submitted,

7                                                    O'MELVENY & MYERS LLP

8

9                                                    By:  /s/ Daniel M. Petrocelli
                                                         Daniel M. Petrocelli
10                                                       Attorneys for Plaintiff DC Comics

1  **I.    INTRODUCTION**

2          This motion presents three issues—all of which came to light when, after

3  years of litigation, defendants finally produced what they now claim is a complete

4  privilege log for Michael Siegel's attorney, Don Bulson.

5          *Issue 1*:  The recently produced Bulson Privilege Log reveals a November

6  2001 email from Marc Toberoff to Michael Siegel, which defendants *never*

7  disclosed before, *never* listed on any log, and yet they now claim is privileged.

8  Docket No. 362-2 at 311 (Entry 339).  This November 2001 email—which

9  defendants kept hidden from DC for years, *despite the fact that Toberoff himself*

10  *authored and sent it*—is key evidence that disproves Toberoff's false claim that he

11  had no contact with the Siegel family until October 2002, and thus, could not have

12  interfered with Michael, Laura, and Joanne Siegel's October 2001 settlement

13  agreement and business relationship with DC.

14          The email is not privileged.  As Michael stated in his May 2003 letter to

15  Laura, which this Court ordered defendants to produce:  "when [Toberoff] first

16  contacted me, he *wanted to buy my share of the copyright*."  Docket No. 225-4 at 3.

17  As Judge Wright made clear in denying defendants' SLAPP motion, and as

18  controlling case law establishes, such communications—*seeking to purchase*

19  *copyright interests*—are not privileged.  Indeed, the Ninth Circuit made this plain in

20  its recent writ petition ruling in this very case.[1]  Defendants should be ordered to

21  produce the November 2001 email without delay.

22  _____

23          [1] On April 17, 2012, the Ninth Circuit denied defendants' writ petition seeking to overturn this Court's 2011 ruling that defendants waived privilege over documents attached to the Toberoff Timeline by voluntarily disclosing them to the U.S. Attorney's

24  Office.  Case No. 11-71844, Docket No. 27-1 ("Writ Decision").  A copy of the Writ Decision is Exhibit A to the accompanying Declaration of Ashley K. Pearson ("Pearson

25  Decl.").  DC expects defendants to produce all of the Timeline and related documents shortly pursuant to this Court's orders, *e.g.*, Docket Nos. 212 at 10-13, 262 at 2-4, and DC

26  will notify the Court of any impact this expected document production has on this motion, including possibly mooting parts of it.  To DC's knowledge (which is limited by

27  defendants' opaque privilege logs) the November 2001 email is not among the Timeline documents, and nor are the other documents being sought by this motion.

28

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1         *Issue 2*:  Bulson kept billing records of the times he spoke to Toberoff on

2    Michael's behalf.  These records as well as their contents about the substance of

3    Bulson's talks with Toberoff are not privileged and are relevant to piece together

4    when Toberoff communicated with the Siegels and when his relationship with

5    Bulson and Michael soured.  They, too, should be ordered produced.

6         *Issue 3*:  On June 27, 2011, this Court denied DC's motion to compel the

7    production of a November 2, 2002, letter from Laura to Michael based on

8    Toberoff's representation that defendants did not possess the letter.  The new

9    Bulson Privilege Log, which defendants resisted providing for six months, reveals

10   that defendants possessed the letter all along.  The November 2002 letter should be

11   ordered produced.  It is the predecessor to two later letters discussing Toberoff's

12   attempts to control the Siegel's Superman rights, and like those May 2003 and July

13   2003 letters that followed it, this November 2002 letter is relevant, not privileged,

14   and should be ordered produced to DC without delay.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

## II.    STATEMENT OF ISSUES IN DISPUTE

### Issue 1:  The November 17, 2001, Email From Toberoff To Michael Siegel

#### A.    Relevant Factual Background

For months before and after Don Bulson's deposition in the summer of 2011, DC pressed defendants for a full and complete privilege log of documents and records maintained by Michael Siegel and his attorney, Don Bulson.  *E.g.*, Pearson Decl. Exs. B-J.  In motions and elsewhere, DC sought correspondence between defendants and Bulson and/or Michael.  *E.g.*, *id.*; Docket Nos. 160 at 37-38; 253 at 6-9; 267-1; 316 at 14-20.   When defendants denied such records existed, DC pressed defendants to check Michael's and Bulson's files, *e.g.*, Docket No. 267-1 at 8-11—which defendants and Bulson's law firm, Renner Otto, represented that *defendants* possessed because Laura Siegel Larson was his sole heir and had demanded Michael's files when he died, *e.g.*, Pearson Decl. Exs. F at 44-45; L at 56.  Defendants claimed to have checked all their files (including the Bulson/ Michael Siegel files) and represented that all responsive documents had been produced or logged.  *E.g.*, *id.* Ex. M at 96-97.  That claim repeatedly has been shown not to be the case, and defendants have been ordered to produce, for example, two important letters between Michael and Laura dated May and July 2003.  *E.g.*, Docket Nos. 209 at 11-12; 225-4; 336 at 1; 362-2 at 286-290.

Finally, in late 2011—after all SLAPP briefing had been closed, and after DC had to send four letters, *id.* Exs. C, D, F, J, and hold multiple meet-and-confers on the subject—defendants finally produced a new privilege log for the electronic archive of Bulson's files.  Docket No. 362-2 at 295-318.  The Bulson Privilege Log contains 162 entries that appear *nowhere* on the 2006 Bulson Privilege Log produced in *Siegel*.  Docket No. 362-2 at 319-20.[2]  Entry 339 of the Bulson Log is

---

[2] Defendants claim the discrepancy is because Renner Otto's electronic archive contains documents that were not included in Michael's hard copy file provided to defendants in 2006.  Docket No. 362-2 at 324.  But Renner Otto told DC that the electronic archive is an exact replica of the documents returned to defendants.  Docket No.

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1   an email sent by Marc Toberoff to Michael Siegel, dated November 17, 2001, over

2   which defendants now claim attorney-client privilege.  Docket No. 362-2 at 311

3   (Entry 339).  But Toberoff never was Michael Siegel's lawyer.  And when Michael

4   described his first contact with Toberoff—which must have happened around when

5   Toberoff sent the November 2001 email—Michael made clear that Toberoff

6   approached him in a *business capacity*, not as a lawyer:

> I really wish to discuss Marc Toberoff.  I learned from Marks and
> Ramer that Marc was the attorney on record for the Shuster half of the
> Superman copyright, has Marc ever informed you of this?  Now that
> you have signed with him, he is in control of the whole Superman
> copyright.  *I told you when he first contacted me, **he wanted to buy my
> share of the copyright.**  Marc had a mysterious billionaire who wanted
> to invest in the Superman copyright, put 15 million dollars up front
> plus participation.  When you signed with Marc the billionaire invested
> elsewhere.  Marc has his own production company, he was going to
> team with Emmanuel and make a movie.  This has not happened.

13  Docket No. 225-4 at 3 (emphases added).

14          This November 2001 email was also sent during a time—the fall of 2001—

15  when DC alleges that Toberoff and Pacific Pictures entered into their first

16  interfering business deal with the Shusters and contacted the Siegels and began a

17  campaign to induce them to repudiate their ties with DC.  Docket Nos. 49, FAC

18  ¶¶ 71-78 & Ex. A at 63; 307 at 9-10; 308 ¶¶ 19-22, 28-36.  In SLAPP briefing and

19  elsewhere, defendants have denied that Toberoff was in contact with the Siegel

20  family until *late 2002*, asserting in their SLAPP motion:

> [T]he first time Toberoff had any contact with a member of the Siegel
> family was in early October 2002.  Accordingly, there is simply no
> evidence that Toberoff interfered with DC's "prospective economic
> advantage" in settlement negotiations with the Siegels that had expired.

24  Docket No. 145-1 at 23-24 (internal citations omitted; emphasis added).

25          Toberoff's November 2001 email to Michael, which he refuses to produce,

26  casts even further doubt on Toberoff's claims of non-interference.  It also will

27  corroborate the ways in which Toberoff induced the Siegels to cut their ties with

28  _____

362-2 at 319; Pearson Decl. Exs. F at 44, L at 58.

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1  DC—including by showing, in writing, the sorts of promises Toberoff made to the

2  Siegels to induce them to do business with him and not DC.

3          **B.      Toberoff's November 17, 2001, Email Should be Produced.**

4          Defendants do not dispute that the November 2001 email is responsive or

5  relevant; nor could they.  The only argument they make in support of not producing

6  it—but refuse to explain fully—is to say that the email is covered by attorney-client

7  privilege.  Docket No. 362-2 at 309 (Entry 339).  However, Michael's statement to

8  Laura that "when [Toberoff] first contacted [him], he wanted to buy [his] share of

9  the copyright," Docket No. 225-4 at 3, completely undermines this claim.

10         1.  Attorney-client privilege applies only to confidential communications in

11  the context of an attorney-client relationship.  "[C]ommunications to an attorney in

12  the course of seeking business rather than legal advice are not privileged." *Olender*

13  *v. U.S.*, 210 F.2d 795, 806 (9th Cir. 1954).  An offer from a film producer to

14  purchase a purported copyright holder's intellectual property in no way falls within

15  the "limited circumstances" of this protection.  *In re Grand Jury Subpoenas*, 803

16  F.2d 493, 498 (9th Cir. 1986) (attorney-client privilege not applicable where

17  attorney engaged to convey money, not to provide legal services); *see Liew v.*

18  *Breen*, 640 F.2d 1046, 1050 (9th Cir. 1981) (attorney-client privilege not invoked

19  where "clients did not approach [attorney] for legal advice and assistance, but rather

20  with the aim of finding [investment opportunities]"); *U.S. v. Huberts*, 637 F.2d 630,

21  640 (9th Cir. 1980) ("an attorney who serves as a business agent to a client may not

22  assert the attorney-client privilege, because no confidential relationship attaches").

23         Indeed, the Ninth Circuit explicitly made this point in its April 17 Writ

24  Decision.  The Court pointed out the obvious "ethical and professional concerns

25  raised by Toberoff's actions" as "both a business advisor and an attorney," Writ

26  Decision at 4243, and made clear that the law does not tolerate Toberoff's attempts

27  to manipulate this dual role to shield his business communications with the heirs,

28  *e.g.*, *id.* at 4252 (citing *U.S. v. Ruehle*, 583 F.3d 600, 609 n.8 (9th Cir. 2009), which

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1   "reject[ed] a presumption of privilege even when a communication involves a

2   lawyer").  Specifically, the court noted that because Toberoff acted as a business

3   man in his dealings with the heirs, "most of these [Timeline] documents are not

4   covered by the attorney-client privilege because they do not represent

5   communications between a lawyer and his client for the purpose of obtaining legal

6   advice."  *Id.*  Toberoff cannot now claim that his November 17 email to Michael

7   conveying a *business offer* is privileged under this analysis or the rules on which

8   the Writ Decision relies.

9        2.  Defendants' attempts to blanket their business communications like the

10  November 2001 email in privilege are the very same arguments that Judge Wright

11  rejected in denying defendants' SLAPP motion.  In their SLAPP briefs, defendants

12  asserted that Toberoff contacted the Siegels "to induce them to become his clients"

13  and that his allegedly interfering communications "relate directly to the

14  establishment of an attorney-client relationship."  Docket No. 145-1 at 18, 19.

15  Judge Wright rejected this, holding, *inter alia*:

16       Here, Plaintiffs allege they had an agreement with the Shusters
         to settle the parties' rights …. [Toberoff] then allegedly interfered
17       with this agreement by reaching out to, and forming a joint venture
         between the Shusters and Pacific Pictures Corporation (helmed by
18       Toberoff) to exploit the Shusters' copyrights…. This is the gravamen
         of Plaintiffs' claim, a business tort.
19
         Defendants attempt to invoke the Anti-SLAPP statute by
20       bootstrapping protected activity to this claim…. Unlike Defendants,
         the Court finds logic in [DC's] argument.  By inducing the Shusters to
21       sign the Pacific Pictures Agreements, which purport to assign Toberoff
         the same rights they already assured DC by the 1992 Agreement, [DC]
22       argue[s] that Toberoff interfered with DC's rights under the 1992
         Agreement. This makes sense, as the Pacific Pictures Agreements
23       essentially gut the 1992 Agreement, purporting to assign to Toberoff
         those rights which were already assigned to DC Comics.
24
         As for the protected activity advanced by Defendants, such
25       activity is not itself the act of interference. The interference was
         Toberoff s inducement of the Shusters to repudiate the 1992
26       Agreement and otherwise encumber the subject copyrights, all in
         derogation of DC's own interests in those very copyrights.  The
27       protected activities advanced by Defendants, while relevant to be sure,
         are not the material facts underlying the alleged interference…. And,
28

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

while such protected activity may evidence the alleged interference, it does not shield it….

      Defendants contend the "agreements at issue [were] expressly entered into with respect to Toberoff's legal services regarding the Siegel Termination and Shuster Termination, respectively." Not quite. To begin, said agreements engage Pacific Pictures "as [the Shusters'] exclusive advisor for the purpose of retrieving, enforcing and exploiting . . . Joe Shuster's creations." And, "in furtherance of this exclusive agreement, [Pacific Pictures] (which is not a law firm) shall engage the services of attorney Mark Toberoff [the President of Pacific Pictures]…." Plainly, this was not an agreement for the provision of legal services, but one concerning the exploitation of Joe Shuster's creations. Merely referencing an intent to engage a particular attorney in the future does not transform this into an agreement for legal services.

      As [DC offer[s], moreover, other agreements [including the Siegels'] specifically disclaim any suggestion that they encompass legal services. ("[T]his Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any….")

      …. [DC has] established a long-lasting economic relationship with the Siegels, and allege[s] that Toberoff's nonprotected conduct interfered with this relationship. Under the facts before the Court, Defendants have simply not met their burden of demonstrating that this claim arises from protected activity. . . . Defendants have not established—through the haze of details—that Toberoff's alleged misconduct is protected.

Docket No. 337 at 2-6 (citations omitted).

    This careful ruling made eminent sense, and its impact here is clear. Toberoff, a self-described "movie producer," Docket No. 308-3 at 84, told the *Wall Street Journal* he "keeps a defined firewall between producing and legal matters," Docket No. 305-4 at 91. Defendants concede Toberoff's early interactions with Kevin Marks and the Siegels fell on the *producing* side of that wall. *E.g.*, Docket No. 145-1 at 7-8. Toberoff testified he initially contacted the Siegels' attorney, Kevin Marks, in November 2001 because Toberoff "was interested in the rights, and [] wanted to know if the rights were available or not, and, if they were available, would make an offer with respect to those rights." Docket No 305-17 at 513:16-515:4 , 518:16-520:9, 522:10-525:19. As Judge Wright noted, the October 3, 2002, agreement that Toberoff induced the Siegels to sign was a contract with his

DC'S NOTICE OF MOT. AND MOT. TO COMPEL & FOR RECON.

1  entertainment company to act as the Siegels' *business agent* for a *business agent's*
2  *fee* in marketing their rights.  It specifically "does not include legal services and/or
3  expenses in connection with litigation…, if any…." Docket No 305-56 at 2076.

4      3.  Defendants cannot pretend their early contacts with the Siegels were not
5  business-directed and motivated.  Nor can they re-litigate these issues and make an
6  end-run around Judge Wright's SLAPP ruling.  Toberoff has made no showing that
7  he acted as Michael's lawyer in November 2001 or was solely offering to act as his
8  lawyer then.  *Cf. U.S. v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002) ("the
9  burden is on the party asserting the privilege to establish all the elements of the
10  privilege").  Indeed, he has been silent on any actual facts supporting such a claim.
11  And such a claim would make no sense—and not be worthy of any credit—given
12  the express comments in Michael's May 2003 letter, describing that initial contact
13  as a business offer "to buy my share of the copyright."  Docket No. 225-4 at 3.  Nor
14  would it make sense given that this was the same time period in which Toberoff
15  first began pressing Michael's half-sister and mother to do *business* with Toberoff's
16  company—and sell him and his business partner their putative rights.   *Supra* at 7.

17      Later interactions between Toberoff and Bulson only confirm that Toberoff's
18  motivation in seeking out Michael was to promote Toberoff's own business
19  interests.  *E.g.,* Docket No. 305-52 at 65:5-21.  In his May 2003 letter to Laura,
20  Michael describes Toberoff's attempts to undersell him, complaining that "[t]he
21  amount Marc's investor is offering is less than half of what DC showed as my
22  share."  Docket No. 225-4 at 3.  And Bulson testified that Toberoff concealed his
23  personal business interest in the transaction from Bulson and Michael, Docket No.
24  305-52 at 1863:5-11, 1863:18-1867:2, 1877:21-1878:3, and Laura's July 2003 letter
25  confirms that she did as well when she allied with Toberoff  to convince Michael to
26  take Toberoff's offer, Docket No. 362-2 at 286-290.

27      4.  Even assuming defendants could make out a plausible showing of
28  privilege, their extraordinary delay in logging the November 2001 email—*i.e.*, six

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1   years after DC requested the document in *Siegel*,[3] a year and a half after it did so in

2   this case,[4] and six months after the Bulson subpoena—constitutes waiver of any

3   possible privilege claim.  *E.g.*, *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*,

4   408 F.3d 1142, 1149-50 (9th Cir. 2005) (waiver given five-month delay in

5   producing privilege logs); *Vieste, LLC v. Hill Redwood Dev.*, 2010 U.S. Dist.

6   LEXIS 126607, at *27-29 (N.D. Cal. Nov. 18, 2010) (waiver when documents

7   added to privilege log six months after initial production); *Hoot Winc, LLC v. RSM

8   McGladrey Fin. Process Outsourcing, LLC*, 2010 U.S. Dist. LEXIS 57880, at *8-

9   11 (S.D. Cal. June 11, 2010) (same; one year).

10          Defendants cannot dispute that they had access to the document, as it was

11  written and sent by Toberoff himself, and, according to Renner Otto, was part of

12  Michael's file returned to Laura in 2006.  *Supra* at 3 & n.2.  Nor have defendants

13  asserted that the document was destroyed or lost in good faith.  *Cf.* Docket No. 161-

14  15 at 162.  Defendants have produced and logged other documents from this time

15  period, making any claim that they lost it even more unlikely.  *E.g.,* Pearson Decl.

16  Ex. P; Docket Nos. 162-6 at 419 (Entries 554-58); 163-17 at 883 (Entries 554-57);

17  308-54.  In short, the November 2001 email should be ordered produced.

18

19

20

21

22

23

24

25

26

27          [3] *E.g.,* Docket Nos. 161-15 at 164 (Larson Request for Production No. 11); 296-3 at 17
28  (Siegel Request for Production No. 59).
            [4] *E.g.,* Docket No. 296-3 at 17-18 (Requests Nos. 59, 61).

- 9 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Issue 2:  Renner Otto Expert Report & Bulson Calendars and Billing*
*Entries*

### A.    Relevant Factual Background

DC requested documents relating to Toberoff's communications with Bulson
in its May 2011 subpoena, Pearson Decl. Ex. N at 113 (Request No. 3), but
defendants produced none.  At Bulson's July 2011 deposition, DC asked Bulson
whether he maintained records documenting his communications with Toberoff,
and he testified that he kept an electronic calendar that would reflect this
information:

> Q. Do you keep a daily calendar, sir?
> A. Want to be more specific?
> Q. If you have a scheduled appointment, do you log that in a computer
> calendar or paper calendar or a conference call?
> A. I have a computer calendar now.
> …
> Q. If you made certain calls during the day, spoke to another lawyer or
> spoke to a business person on a matter, would your time entries for the
> day reflect that?
> A. Yes, in many instances.
> Q. Okay.
> …
> And would you note that on the calendar or just in your daily time
> entries?
> A. My electronic time book.
> …
> Q. Is that a searchable database of information?
> A. It would be searchable.

Docket No. 305-52 at 1795:11-16, 1795:22-1796:12.

Bulson also testified that the dates and times he met with Toberoff were
recorded in his billing entries and in an expert report based on them, which was
prepared for litigation against the Estate of Michael Siegel for unpaid legal fees.
*See Renner Otto Boiselle & Sklar LLP v. Estate of Michael Siegel*, Case No. CV-
07-620856, Court of Common Pleas, Cuyahoga County, Ohio.

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

Q. Has your law firm made any submission documenting what its fees are or what it would be entitled to on a quantum meruit basis?
A. Yes. Yes.
…
Q. Did you help prepare that document?
A. Yes.
Q. Does that document recount the number of hours that you spent working on the Siegel matter?
A. I think it does.
Q. Does that document include dates on which you would have had conversations with Mr. Toberoff concerning negotiations?
A. I think it does.
…
Q. How did you prepare the submission you made in the lawsuit against [the Estate of Michael Siegel]--
A. From our billing records.
Q. So the billing records reflect [any meetings or calls with Toberoff]?
A. (Nods head.)
Q. And the actual bills would say spoke to so and so on such and such date?
A. That would often be the case.

Docket No. 305-52 at 1786:21-1787:18, 1798:5-12.

*Nine months ago* during Bulson's deposition, DC requested production of the calendars, billing entries, and expert report. Docket No. 305-52 at 1787:11-1788:4, 1797:5-1799:4. Toberoff's only response was that he had requested the documents from Renner Otto, but had not yet received them—even though he had access to a copy of them through the electronic archive of Bulson's files he received well before. Pearson Decl. Ex. C at 30. Six months later, when defendants produced the Bulson Privilege Log, they refused again to produce the expert report, calendars, and billing entries or even to log them. Docket No. 362-2 at 295-318. When DC pressed for their production, Docket No. 362-2 at 321, Toberoff for the first time claimed the documents were privileged. On December 14, 2011, Toberoff then agreed to review the documents and provide DC with a log. Docket No. 362-2 at 324. Four months later, Toberoff has *never* produced the log. *Id.* Ex. O at 118.

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

**B.      Bulson's Billing Records Should be Produced.**

Defendants' blanket assertion that Renner Otto's expert report and Bulson's calendars and billing entries are protected by the attorney-client privilege is unsupported.  It is well-established that the privilege extends "only to the substance of matters communicated to an attorney in professional confidence," *Colton v. U.S.*, 306 F.2d 633, 637 (2d Cir. 1962), and not to the facts underlying a communication, *Upjohn Co. v. U.S.*, 449 U.S. 383, 395-396 (1981).  Applied to attorney billing entries, only information that "reveal[s] the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall[s] within the privilege."  *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).

Defendants cannot meet their burden of establishing that the attorney-client privilege applies to the entirety of the Bulson billing records.  *See Martin*, 278 F.3d at 999-1000.  As Bulson's testimony makes clear, those records contain factual information, such as dates of when he "spoke to another lawyer or spoke to a business person on a matter," which the Ninth Circuit has recognized is not subject to privilege.  *E.g.*, *Clarke*, 974 F.2d at 129 (9th Cir. 1992) (attorney billing records not privileged where they only contained date, fee, and information regarding general nature of services provided); *Matter of Fischel*, 557 F.2d 209, 212 (9th Cir. 1977) (attorney's accounting statements recording client's business transactions with third parties not privileged); *see also* W. SCHWARZER, ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 11:659 (2011) ("billing statements that merely provide a general description of the work done are not privileged"); *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 106 F.R.D. 187, 192 (D.C. Ill. 1985) (billing statements containing general description of legal services provided "are clearly unprivileged").

DC has limited its request to this non-privileged material from Bulson's files: the time, date, client name, fee, and "general description" of work done sufficient to

1   determine, *e.g.,* whether Bulson met or spoke with Toberoff concerning Michael

2   Siegel, or an investor interested in the Siegel Superman rights.  *E.g., Leach v.*

3   *Quality Health Servs.*, 162 F.R.D. 499, 501-502 (E.D. Pa. 1995) (privilege applies

4   only to description of actual legal services performed, but not to attorney's name,

5   client's name, general matter being worked on, and the date and time of services

6   provided).[5]  And again, even if defendants could make out a valid privilege claim—

7   and they cannot—their failure to list the documents on *any* privilege log, *ever*—

8   constitutes a waiver of that privilege, *supra* at 8-9.

9       The Bulson billing records should be ordered produced.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[5] To the extent records kept by other Renner Otto attorneys include non-privileged and responsive information, DC is also entitled to discover those documents as well.

- 13 -

1  ***Issue 3:  November 2, 2002 Letter***

2      A.    <u>**Relevant Factual Background**</u>

3          The November 2, 2002, letter is a missing link in a chain of correspondence

4  between Michael and Laura discussing Michael's objections to Toberoff's business

5  conduct.  DC first learned about the November 2002 letter after this Court ordered

6  defendants to produce Michael's May 13, 2003 to Laura, Docket No 209 at 12,

7  which begins:  "Thank you for your *November 2 letter of last year*.  I would have

8  written sooner but. …"  Docket No. 225-4 at 3 (emphasis added).  The May 2003

9  letter goes on to criticize Toberoff for making empty promises to the Siegels, and

10  expresses skepticism about the offer Toberoff conveyed to Bulson to purchase

11  Michael's rights on behalf of an unnamed investor:

12      Marc had a mysterious billionaire who wanted to invest in the
    Superman copyright, put 15 million dollars up front plus participation.
13      When you signed with Marc the billionaire invested elsewhere.  Marc
    has his own production company, he was going to team with
14      Emmanuel and make a movie.  This has not happened.  You
    mentioned Marc had a number of innovative, proactive ideas that
15      could bring all members of the Siegel interest both justice and many
    times more than the amount DC's representatives wanted to throw our
16
    way to get rid of us.  Marc has chosen not to open any dialog with
17      Time Warner or anyone else.  How can he negotiate a contact if he is
    not talking to anyone?
18
    …
19      How can he find someone to buy me out and not negotiate for the
20      entire Siegel interest?.... The amount Marc's investor is offering is less
    than half of what DC showed as my share…. Marc seems to have an
21      agenda of someone buying me out….
22

23  Docket No. 225-4 at 3.  Laura's July 2003 response defends Toberoff, encourages

24  Michael to take Marc's business offer, and does not reveal Toberoff's, Emanuel's,

25  or her own secret role in trying to buy Michael's putative rights.  Docket No. 357-4

26  at 272-76.

27          When DC first asked defendants to produce the November 2002 letter, they

28  asserted they were "unable to locate a November 2, 2002 letter."  Docket No. 267-7

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

1    at 18.  Defendants then suggested the letter DC sought was actually a November 1,

2    2002, letter from Laura to Michael that defendants had produced.  Docket No. 267-

3    1 at 2; 267-2 at ¶ ¶ 4-5; 267-9 at 187.  When DC pointed out that no November 1

4    letter had been produced and that the November 1 letter was to *Bulson, not*

5    *Michael*, Docket Nos. 267-2 at ¶ 5, 267-9 at 187, defendants told the Court: "there's

6    no November 2nd letter as described"; that they "weren't provided a copy"; and

7    that they "[couldn't] produce a document that [they can't] find."  Pearson Decl. Ex.

8    M at 97.  On June 27, 2011, the Court denied DC's motion to compel production of

9    the November 2002 letter, relying on defendants' claim that they could not find it.

10   *Id.* Ex. M at 101-102.

11        Five months later, and after all briefing was closed on DC's SLAPP motion,

12   defendants listed the November 2002 letter on the Bulson Privilege Log and

13   claimed attorney-client privilege over it.  Docket No. 362-2 at 311 (Entry 399).

14   They now refuse to produce the document.  Docket No. 362-2 at 324.

15        **B.       The November 2, 2002 Letter Must be Produced.**

16        The Court should revisit its June 2011 ruling.  *Sch. Dist. No. 1J, Multnomah*

17   *Cnty., Or. v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir. 1993) (reconsideration

18   appropriate based on new evidence).  Defendants told the Court "there's no

19   November 2nd letter," Pearson Decl. Ex. M at 96, but that representation was false,

20   and if one believes the Renner Otto firm, Toberoff possessed the November 2002

21   letter since Michael's passing in 2006.  *Supra* at 3 & n.2.

22        Defendants' claim that the November 2002 letter is subject to the common-

23   interest privilege is without basis.  Courts have ruled on the discoverability of

24   communications between Michael and Laura in five prior disputes.  This Court

25   ruled that Michael's May 2003 response to Laura's November 2002 letter must be

26   produced.  Docket No. 209 at 11-12.  Judge Wright ruled that Laura's July 2003

27   response to the May 2003 letter must be produced.  Docket No. 336 at 1.  The Ohio

28   district court ruled that 15 communications between Michael and Laura's

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.

representatives—dated 2003—were not privileged and must be produced, finding:

> the interest of Michael Siegel … is separate and apart from those of Joanne and Laura Siegel.  These documents relate to offers back and forth between Toberoff, on behalf of an investor who wishes to purchase Michael Siegel's interest and Bulson on behalf of Michael….

Docket No. 161-5 at 30-31.  The Ohio court refused to find that *any and all* communications between Michael and Laura were not privileged, Docket No. 368-2 at 23, and this Court held that that Laura had not waived privilege over an August 9, 2002, memo to her from Kevin Marks, on grounds that Laura and Michael shared a common interest in August 2002.  Docket No. 378 at 3.  However, that ruling was tied to Laura and Michael's shared interests in their negotiations vis-à-vis DC:

> The Court finds that Ms. Larson and Mr. Siegel shared a common legal interest in August 2002.  At that time negotiations with Plaintiff [DC] were on-going, and disputes were arising, and each of the heirs of Superman's creator had similar interests, from a legal standpoint, *in respect of those negotiations* and disputes, notwithstanding that they had different counsel.

Docket No. 378 at 3 (emphasis added).

The Ninth Circuit recently confirmed in its April 17 ruling that the common-interest privilege should be narrowly construed.  Writ Decision at 4252.  In rejecting defendants' claim that Toberoff and his companies shared a common-interest with the government, the Court explained that "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception."  *Id.*  Rather, the privilege only applies "to allow attorneys for different clients pursuing a common legal strategy to communicate with each other," and parties  "must make the communication … in accordance with some form of agreement."  *Id.* at 4252-53.

Even if Michael and Laura shared a common interest in negotiating with DC in August 2002, that interest diverged at the latest on September 21, 2002, when the Siegels sent a letter to DC "ending negotiations" with DC.  Docket No. 305-23 at 717.  The letter ending discussions with DC was sent *two months before* Laura

1    wrote her November 2002 letter to Michael, which precipitated his May 2003

2    response that this Court has already held is not privileged.[6]

3        Finally, as this Court acknowledged, "[p]arties can even be adverse for some

4    purposes and share a community of legal interest for other purposes."  Docket No.

5    378 at 5.  Michael's May 2003 letter—which is a direct response to Laura's

6    November 2002 letter—addresses Toberoff's attempts to purchase Michael's

7    rights—an issue that the Ohio court ruled was a point of dispute between Michael

8    and Laura.  *Supra* at 15-16.  Laura's urgings that Michael engage in business with

9    Toberoff, which is surely a subject of the November 2002 letter, is equally not

10   privileged.  And even if defendants could claim-common interest privilege over the

11   November 2002 letter, their failure to do so for years constitutes a waiver.  *Supra* at

12   8-9.  The November 2002 letter should be ordered produced.

13   **C.    Conclusion**

14       DC's motion should be granted.

15

16   Dated:        April 26, 2012              Respectfully Submitted,

17                                            O'MELVENY & MYERS LLP

18

19                                            By:  /s/ Daniel M. Petrocelli
                                                   Daniel M. Petrocelli
20                                                 Attorneys for Plaintiff DC Comics

21

22

23

---

24   [6] If one believes what the Siegels have said in their SLAPP briefing in this case, their
     negotiations with DC actually ended in *May 2002*—months earlier than this Court
25   believed.  On May 9, 2002, Larson's mother sent DC a letter stating that the February
     2002 draft long-form contract that DC had prepared "ma[de] an agreement impossible."
26   Docket No. 305-22 at 716.  To deflect DC's tortious interference claims in this case,
     Larson and Toberoff have argued that Toberoff "had [nothing] to do with the May 9[,
27   2002] letter that ended DC's purported 'prospective economic advantage,'" Docket No.
     145-1 at 23, and that the May 2002 letter rendered DC's business dealings with the
28   Siegels "moribund," as of that date.  Docket No. 312 at 10-11.

DC'S NOTICE OF MOT. AND
MOT. TO COMPEL & FOR RECON.