# EXHIBIT A

Case 2:10-cv-03633-ODW-RZ Document 395-1 Filed 04/26/12 Page 2 of 138 Page
ID #:24737
Case: 11-71844 04/17/2012 ID: 8142866 DktEntry: 17-1 Page: 1 of 86 Page (1 of 21)

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: PACIFIC PICTURES
CORPORATION; IP WORLDWIDE,
LLC; IPW, LLC; MARC TOBEROFF;
MARK WARREN PEARY; LAURA
SIEGEL LARSON; JEAN ADELE PEAVY,

---

PACIFIC PICTURES CORPORATION; IP
WORLDWIDE, LLC; IPW, LLC;
MARK WARREN PEARY, as personal
representative of the Estate of
Joseph Shuster; MARC TOBEROFF,
an individual; JEAN ADELE PEAVY;
LAURA SIEGEL LARSON, an
individual,

No. 11-71844
D.C. No.
2:10-cv-03633-
ODW-RZ
OPINION

*Petitioners,*

v.

UNITED STATES DISTRICT
COURT FOR THE CENTRAL
DISTRICT OF CALIFORNIA, LOS
ANGELES,

*Respondent,*

D.C. COMICS,

*Real Party in Interest.*

Petition for Writ of Mandamus

Argued and Submitted
February 7, 2012—Pasadena, California

Filed April 17, 2012

4239

IN RE PACIFIC PICTURES

Before: Alex Kozinski, Chief Judge,
Diarmuid F. O'Scannlain and N. Randy Smith,
Circuit Judges.

Opinion by Judge O'Scannlain

Case 2:10-cv-03633-ODW-RZ   Document 395-1   Filed 04/26/12   Page 4 of 138   Page
ID #:24739
Case: 11-56034   04/17/2012   ID: 8142866   DktEntry: 17-1   Page: 3 of 86   (3 of 21)

4242 IN RE PACIFIC PICTURES

---

## COUNSEL

Richard B. Kendall, Kendall Brill & Klieger LLP, Los Ange-
les, California, argued the cause and filed the briefs for the
petitioners. With him on the briefs were Laura W. Brill, Ken-
dall Brill & Klieger, LLP, Los Angeles, California, as well as
Marc Toberoff and Keith G. Adams, Toberoff & Associates,
P.C., Los Angeles, California.

Matthew T. Kline, O'Melveny & Myers LLP, Los Angeles,
California, argued the cause and filed the brief for the real
party in interest. With him on the brief were Daniel M. Petro-
celli and Cassandra L. Seto, O'Melveny & Myers LLP as well
as Patrick T. Perkins, Perkins Law Office, P.C., Cold Spring,
New York.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a party waives attorney-client privilege forever by voluntarily disclosing privileged documents to the federal government.

I

In the 1930s, writer Jerome Siegel and illustrator Joe Shuster joined forces to create the character that would eventually become Superman. They ceded their intellectual property rights to D.C. Comics when they joined the company as independent contractors in 1937.[1] Since the Man of Steel made his first appearance in 1938, he has been fighting for "truth, justice, and the American way." Shuster, Siegel, their heirs ("Heirs"), and D.C. Comics have been fighting for the rights to his royalties for almost as long.

Marc Toberoff, a Hollywood producer and a licensed attorney, stepped into the fray around the turn of the millennium. As one of his many businesses, Toberoff pairs intellectual property rights with talent and markets these packages to movie studios. Having set his sights on Superman, Toberoff approached the Heirs with an offer to manage preexisting litigation over the rights Siegel and Shuster had ceded to D.C. Comics. He also claimed that he would arrange for a new Superman film to be produced. To pursue these goals, Toberoff created a joint venture between the Heirs and an entity he owned. Toberoff served as both a business advisor and an attorney for that venture. The ethical and professional concerns raised by Toberoff's actions will likely occur to many readers, but they are not before this court.

---

[1]The name and corporate structure of the real party in interest has changed a number of times since 1938. For simplicity, we refer to it as "D.C. Comics."

While the preexisting litigation was pending, Toberoff hired lawyer David Michaels to work for one of his companies. Michaels remained in Toberoff's employ for only about three months before absconding with copies of several documents from the Siegel and Shuster files. Unsuccessful in his initial attempt to use the documents to solicit business from the Heirs, Michaels sent the documents to executives at D.C. Comics. While he did not include his name with the package, he did append a cover letter, written in the form of a timeline, outlining in detail Toberoff's alleged master plan to capture Superman for himself.

This happened no later than June 2006, and the parties have been battling over what should be done with these documents ever since. Rather than exploiting the documents, D.C. Comics entrusted them to an outside attorney and sought to obtain them through ordinary discovery in the two ongoing lawsuits over Superman. Considering every communication he had with the Heirs to be privileged—regardless of whether the communication was in his capacity as a business advisor or an attorney—Toberoff resisted all such efforts. Ultimately, in April 2007, a magistrate judge ordered certain documents, including Michaels' cover letter, turned over to D.C. Comics. A few months later, Toberoff at long last reported the incident to the authorities (specifically the Federal Bureau of Investigation). In December 2008, Toberoff finally produced at least some of the documents.

In 2010, D.C. Comics filed this lawsuit against Toberoff, the Heirs, and three entities in which Toberoff owned a controlling interest (collectively, the "Petitioners"), claiming that Toberoff interfered with its contractual relationships with the Heirs. Michaels' cover letter formed the basis of the lawsuit and was incorporated into the complaint. Toberoff has continued to resist the use of any of the documents taken from his offices, including those already disclosed to D.C. Comics and especially Michaels' letter.

Case 2:10-cv-03633-ODW-RZ Document 395-1 Filed 04/26/12 Page 7 of 188 Page
ID #:24742
Case: 11-36384  04/27/2012  ID: 8153866  DktEntry: 27-1  Page: 6 of 56  (6 of 21)

About a month after the suit was filed, Toberoff asked the Office of the United States Attorney for the Central District of California to investigate Michaels. In response to a request from Toberoff, the U.S. Attorney's Office issued a grand jury subpoena for the documents as well as a letter stating that if Toberoff voluntarily complied with the subpoena the Government would "not provide the . . . documents . . . to non-governmental third parties except as may be required by law or court order." The letter also confirmed that disclosure would indicate that "Toberoff has obtained all relevant permissions and consents needed (if any) to provide the . . . documents . . . to the government." Armed with this letter, Toberoff readily complied with the subpoena, making no attempt to redact anything from the documents.

D.C. Comics immediately requested all documents disclosed to the U.S. Attorney, claiming that the disclosure of these unredacted copies waived any remaining privilege. Examining the weight of authority from other circuits, the magistrate judge agreed that a party may not selectively waive attorney-client privilege. The magistrate judge reasoned that, because a voluntary disclosure of privileged materials breaches confidentiality and is inconsistent with the theory behind the privilege, such disclosure waives that privilege regardless of whether the third party is the government or a civil litigant. Having delivered the documents to the government, the magistrate judge concluded, Petitioners could not rely on the attorney-client privilege to shield them from D.C. Comics.

However, the magistrate judge noted that this circuit has twice declined to decide whether a party may selectively waive the attorney-client privilege, and stayed his order to allow Petitioners to seek review. The district court denied review. Petitioners seek to overturn the magistrate's order through a writ of mandamus.

II

A writ of mandamus is an extraordinary remedy. A party seeking the writ has the "burden of showing that [his] right to the issuance of the writ is clear and indisputable." *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 656 (9th Cir. 1977) (internal quotation marks omitted). In evaluating whether a petitioner has met that burden, we consider: (1) whether he "has no other adequate means" of seeking relief; (2) whether he "will be damaged or prejudiced in a way not correctable on appeal" after final judgment; (3) whether the "district court's order is clearly erroneous as a matter of law"; (4) whether the order "is an oft-repeated error"; and (5) whether the order "raises new and important problems, or issues of first impression." *Id.* at 654-55. We have established no specific formula to weigh these factors, but failure to show what is generally listed as the third factor, error, is fatal to any petition for mandamus. *See Burlington N. & Santa Fe. Ry. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1146 (9th Cir. 2005).[2]

III

**[1]** Under certain circumstances, the attorney-client privilege will protect communications between clients and their attorneys from compelled disclosure in a court of law. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Though this in some way impedes the truth-finding process, we have long recognized that "the advocate and counselor

---

[2]Petitioners assert that, because this case presents an issue of first impression, they must demonstrate simple rather than clear error. We have not always been precise as to whether we look for "error" or "clear error" where our sister circuits have addressed an issue, but we have not. *Compare Anon. Online Speakers v. U.S. Dist. Ct.*, 661 F.3d 1168 (9th Cir. 2011) (applying the clear error standard in a circuit split situation), *with San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096 (9th Cir. 1999) (applying the simple error standard when other circuits had weighed in on parts of an issue). We assume but do not decide that Petitioners need show only error.

Case 2:10-cv-03633-ODW-RZ   Document 395-1   Filed 04/26/12   Page 9 of 138   Page
ID #:24744
Case: 11-56366   04/27/2012   ID: 8152866   DktEntry: 22-1   Page: 9 of 336   (8 of 21)

[needs] to know all that relates to the client's reasons for seeking representation" if he is to provide effective legal advice. *Trammel v. United States*, 445 U.S. 40, 51 (1980); *see also* 8 John Henry Wigmore, Evidence § 2290 (John T. McNaughton, ed. 1961). As such, we recognize the privilege in order to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389.[3]

**[2]** Nonetheless, because, like any other testimonial privilege, this rule "contravene[s] the fundamental principle that the public has a right to every man's evidence," *Trammel*, 445 U.S. at 50 (internal alterations and quotation marks omitted), we construe it narrowly to serve its purposes, *see, e.g.*, *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[4] In particular, we recognize several ways by which parties may waive the privilege. *See, e.g.*, *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010). Most pertinent here is that voluntarily disclosing privileged documents to third parties will generally destroy the privilege. *Id.* The reason behind this rule is that, " '[i]f clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even without the protection of the privilege.' " Comment, *Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney-Client Privilege in an*

---

[3]Because Petitioners have never challenged the district court's application of federal law, we assume but do not decide that this was correct even though this case involves diversity claims to which state privilege law would apply. *Lewis v. United States*, 517 F.2d 236, 237 n.2 (9th Cir. 1975) (per curiam).

[4]Because no one challenges whether these communications would have been privileged absent waiver, we do not address that issue. For example, we assume but do not decide that these communications were all made for the purpose of obtaining legal as opposed to business advice. *Cf. United States v. Ruehle*, 583 F.3d 600, 608 n.8 (9th Cir. 2009) (noting that business advice does not fall within the purview of attorney-client privilege even if the advisor is a lawyer).

IN RE PACIFIC PICTURES

*Administrative Agency Investigation*, 130 U. Pa. L. Rev. 1198, 1207 (1982). Under such circumstances, there simply is no justification to shut off judicial inquiry into these communications.

Petitioners concede that this is the general rule, but they assert a number of reasons why it should not apply to them.

A

**[3]** Petitioners' primary contention is that because Toberoff disclosed these documents to the government, as opposed to a civil litigant, his actions did not waive the privilege as to the world at large. That is, they urge that we adopt the theory of "selective waiver" initially accepted by the Eighth Circuit, *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc), but rejected by every other circuit to consider the issue since, *see In re Qwest Commc'ns Int'l*, 450 F.3d 1179, 1197 (10th Cir. 2006); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 295 (6th Cir. 2002) [hereinafter "*In re Columbia*"]; *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997); *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416-18 (Fed. Cir. 1997); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1425 (3d Cir. 1991)*; In re Martin Marietta Corp.*, 856 F.2d 619, 623-24 (4th Cir. 1988); *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

As the magistrate judge noted, we have twice deferred judgment on whether we will accept a theory of selective waiver. *United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir. 2005) (per curiam); *Bittaker v. Woodford*, 331 F.3d 715, 720 n.5 (9th Cir. 2003) (en banc). But we share the concerns expressed by many of our sister circuits about the cursory analysis behind the *Diversified* rule. The Eighth Circuit—the

Case 2:10-cv-03633-ODW-RZ   Document 395-1   Filed 04/26/12   Page 11 of 188   Page
ID #:24746
Case: 11-31384   04/27/2012   ID: 8142866   DktEntry: 9-1   Page: 11 of 356   (20 of 21)

first court of appeals to consider the issue—adopted what has
become a highly controversial rule only because it concluded
that "[t]o hold otherwise may have the effect of thwarting the
developing procedure of corporations to employ independent
outside counsel to investigate and advise them in order to pro-
tect stockholders." *Diversified*, 572 F.2d at 611. This appre-
hension has proven unjustified. Officers of public
corporations, it seems, do not require a rule of selective
waiver to employ outside consultants or voluntarily to cooper-
ate with the government. *See, e.g.*, *Westinghouse Elec. Corp.*,
951 F.2d at 1426.

More importantly, such reasoning does little, if anything, to
serve the public good underpinning the attorney-client privi-
lege. That is, "selective waiver does not serve the purpose of
encouraging full disclosure to one's attorney in order to
obtain informed legal assistance; it merely encourages volun-
tary disclosure to government agencies, thereby extending the
privilege beyond its intended purpose." *Id.* at 1425.

It may well be that encouraging cooperation with the gov-
ernment is an alternative route to the ultimate goal of promot-
ing adherence to the law. *In re Columbia*, 293 F.3d at 311
(Boggs, J., dissenting). And there are those who assert that
"an exception to the third-party waiver rule need [not] be
moored to the justifications of the attorney-client privilege."
*Id.* at 308 (emphasis omitted). We disagree. If we were to
unmoor a privilege from its underlying justification, we
would at least be failing to construe the privilege narrowly.
*Cf. Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (citing
*Trammel*, 445 U.S. at 50; *United States v. Bryan*, 339 U.S.
323, 331) (1950)). And more likely, we would be creating an
entirely new privilege. *In re Qwest Commc'ns Int'l*, 450 F.3d
1179; *Westinghouse*, 951 F.2d at 1425.

It is not beyond our power to create such a privilege. *Univ.
of Pa.*, 493 U.S. at 189 (noting that Fed. R. Evid. 501 pro-
vides certain flexibility to adopt privilege rules on a case-by-

case basis). But as doing so requires balancing competing societal interests in access to evidence and in promoting certain types of communication, the Supreme Court has warned us not to "exercise this authority expansively." *Id.*; *see also United States v. Nixon*, 418 U.S. 683, 710 (1974). Put simply, "[t]he balancing of conflicting interests of this type is particularly a legislative function." *Univ. of Pa.*, 493 U.S. at 189.

**[4]** Since *Diversified*, there have been multiple legislative attempts to adopt a theory of selective waiver. Most have failed. Report of the Advisory Committee on Evidence Rules, May 15, 2007, at 4, *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/2007-05-Committee_Report-Evidence.pdf (reporting the selective waiver provision separately from the general proposed rule); *SEC Statement in Support of Proposed Section 24(d) of the Securities Exchange Act of 1934*, 16 Sec. Reg. & L. Rep. 461 (Mar. 2, 1984). *But see* H.R. Rep. No. 870, 96th Cong., 1st Sess. (1980), codified at 15 U.S.C. § 1312. Given that Congress has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government, we will not do so here. *Univ. of Pa.*, 493 U.S. at 189 (requiring federal courts to be particularly cautious when legislators have "considered the relevant competing concerns but [have] not provided the privilege").

B

Petitioners next assert that even if we reject selective waiver as a general matter, we should enforce a purported confidentiality agreement based upon the letter from the U.S. Attorney's Office. Though no circuit has officially adopted such a rule, at least two have "left the door open to selective waiver" where there is a confidentiality agreement. *In re Columbia*, 293 F.3d at 301 (discussing *Steinhardt* and *Dellwood Farms, Inc. v. Cargill*, 128 F.3d 1122 (7th Cir. 1997)); *see also In re Qwest Commc'ns Int'l*, 450 F.3d at 1192-94

(describing such a rule as a "leap" but declining to reject it completely).

**[5]** Assuming that this letter constitutes a confidentiality agreement, Petitioners have provided no convincing reason that post hoc contracts regarding how information may be revealed encourage frank conversation at the time of the advice. Indeed, as the Sixth Circuit has noted, while this approach "certainly protects the expectations of the parties to the confidentiality agreement, it does little to serve the 'public ends' of adequate legal representation that the attorney-client privilege is designed to protect." *In re Columbia*, 293 F.3d at 303. Instead, recognizing the validity of such a contract "merely [adds] another brush on an attorney's palette [to be] utilized and manipulated to gain tactical or strategic advantage." *Steinhardt*, 9 F.3d at 235; *cf. Permian Corp.*, 665 F.2d at 1221. And it would undermine the public good of promoting an efficient judicial system by fostering uncertainty and encouraging litigation. *Upjohn*, 449 U.S. at 393 (noting that an "uncertain privilege . . . is little better than no privilege at all").

**[6]** The only justification behind enforcing such agreements would be to encourage cooperation with the government. But Congress has declined to adopt even this limited form of selective waiver. *See Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence*, 154 Cong. Rec. H. 7817 (2008), *reprinted in* Fed. R. Evid. 502 addendum to comm. n subdivision (d) (noting that Rule 502 "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation"). As such, we reject such a theory here.

## C

**[7]** Petitioners next aver that, because Toberoff was the victim of the crime rather than the target of the grand jury

Case 2:10-cv-03633-ODW-RZ  Document 395-1  Filed 04/26/12  Page 14 of 138  Page
ID #:24749
Case: 11-56634  04/27/2012  ID: 8153856  DktEntry: 5-1  Page: 13 of 36  (13 of 21)

probe, his disclosure should be treated differently. But if it is
unnecessary to adopt a theory of selective waiver to encour-
age potential defendants to cooperate with the government, *In
re Qwest Commc'ns Int'l*, 450 F.3d at 11; *Westinghouse*, 951
F.2d at 1425, it is even less necessary to do so to encourage
victims to report crimes to the government. The desire to see
the crime prosecuted is sufficient impetus to cooperate.

We are unconvinced by Petitioners' argument that adopting
such a rule will drastically impair law enforcement attempts
to investigate espionage against "attorneys, financial institu-
tions, medical providers, national security agencies, judges,
large corporations, or law firms." This has not occurred
despite near universal rejection of a selective waiver rule. Fur-
thermore, most of these documents are not covered by
attorney-client privilege because they do not represent com-
munications between a lawyer and his client for the purpose
of obtaining legal advice. *Cf. Ruehle*, 583 F.3d 608-09 & n.8
(rejecting a presumption of privilege even when a communi-
cation involves a lawyer). And, even if they were originally
covered by the privilege, they would eventually have to be
made public if they are to become evidence in a criminal trial.
To the extent that timing is a concern, it can be ameliorated
by properly seeking a protective order. Fed. R. Evid. 502(d).

We are similarly unpersuaded that, because Toberoff was
a victim of the crime, Petitioners have a common interest with
the government. Rather than a separate privilege, the "com-
mon interest" or "joint defense" rule is an exception to ordi-
nary waiver rules designed to allow attorneys for different
clients pursuing a common legal strategy to communicate
with each other. *See Hunydee v. United States*, 355 F.2d 183,
185 (9th Cir. 1965); *see also In re Grand Jury Subpoenas*,
902 F.2d 244, 249 (4th Cir. 1990) (collecting cases). How-
ever, a shared desire to see the same outcome in a legal matter
is insufficient to bring a communication between two parties
within this exception. *Id.* Instead, the parties must make the
communication in pursuit of a joint strategy in accordance

with some form of agreement—whether written or unwritten. *Cf. Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964).

**[8]** There is no evidence that Toberoff and the Office of the U.S. Attorney agreed before the disclosure jointly to pursue sanctions against Michaels. Toberoff is not strategizing with the prosecution. He has no more of a common interest with the government than does any individual who wishes to see the law upheld. Furthermore, the statements here were not "intended to facilitate representation" of either Toberoff or the government. *Hunydee*, 355 F.2d at 185 (limiting privilege to those circumstances); *accord United States v. BDO Seidman*, 492 F.3d 806, 816 (7th Cir. 2007) (same).

D

**[9]** Petitioners also argue that they should be treated differently because Toberoff produced these documents subject to a subpoena. Involuntary disclosures do not automatically waive the attorney-client privilege. *United States v. De La Jara*, 973 F.2d 746, 749-50 (9th Cir. 1992). But without the threat of contempt, the mere existence of a subpoena does not render testimony or the production of documents involuntary. *Westinghouse Elec. Corp.*, 951 F.2d at 1414; *see also United States v. Plache*, 913 F.2d 1375, 1380 (9th Cir. 1990). Instead, whether the subpoenaed party "chose not to assert the privilege when it was appropriate to do so is [also] relevant to the waiver analysis." *In re Grand Jury Proceedings*, 219 F.3d 175, 187 (2d Cir. 2000); *cf. In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369-70 (D.C. Cir. 1984).

**[10]** Toberoff both solicited the subpoena and "chose not to assert the privilege when it was appropriate to do so. . . ." *In re Grand Jury Proceedings*, 219 F.3d at 187. That is, even though the subpoena specifically contemplated that Toberoff may choose to redact privileged materials, he did not. Petitioners assert that the U.S. Attorney would not have been sat-

Case 2:10-cv-03633-ODW-RZ Document 395-1 Filed 04/26/12 Page 16 of 138 Page
ID #:24751
Case: 11-56306 04/27/2012 ID: 8155856 DktEntry: 5-1 Page: 16 of 56 (16 of 21)

isfied with redacted documents, but we will never know because Toberoff never tried. As such, we conclude that the district court properly treated the disclosure of these documents as voluntary.[5]

E

[11] Finally, Petitioners asserted for the first time in oral argument that these documents should remain confidential because the Heirs themselves did not take the affirmative step to disclose the documents. We generally do not consider issues raised for the first time during oral argument, unless "failure to do so would result in manifest injustice" and the appellee would not be prejudiced by such consideration. *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal quotation marks and emphasis omitted). There are several instances in which an attorney's behavior may waive the privilege, even without an explicit act by the client. *See, e.g.*, *Himmelfarb v. United States*, 175 F.2d 924, 939 (9th Cir. 1949); *see generally* 8 Wigmore, Evidence § 2325 (listing actual and implied consent as well as theft of documents from the attorney's office). As many of these documents fall within these situations, we do not consider it a manifest injustice to hold Petitioners to their apparent acceptance of Toberoff's authority to waive the privilege on behalf of his clients, who have never disputed his authority to do so.[6]

---

[5]As these preexisting documents were "sought for [their] own sake rather than to learn what took place before the grand jury" and as their "disclosure will not compromise the integrity of the grand jury process," Petitioners' argument that the disclosure was protected by Federal Rule of Criminal Procedure 6(e)(2)(B) is similarly without merit. *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1411-12 (9th Cir. 1993).

[6]Indeed, there is even circumstantial evidence that the Heirs affirmatively consented to Toberoff's actions. There is also evidence that Toberoff should himself be treated as a co-client. After all, Toberoff represented all of the Petitioners, including a joint venture between the Heirs and himself in which he had a controlling interest. As such, he likely had authority unilaterally to waive the privilege on at least some of these documents. Restatement (Third) of Law Governing Lawyers § 76 cmt. g; *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007).

IV

Because Petitioners have not established error, we need not discuss the other *Bauman* factors. The petition for mandamus is **DENIED**.

**United States Court of Appeals for the Ninth Circuit**

**Office of the Clerk**
95 Seventh Street
San Francisco, CA 94103

**Information Regarding Judgment and Post-Judgment Proceedings**
(December 2009)

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)    A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

**EXHIBIT A**
**19**

► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or

► The proceeding involves a question of exceptional importance; or

► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)  Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory  Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)  Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)  Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

Post Judgment Form - Rev. 12/2009                                                      2

- • The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at   under *Forms.*
- • You may file a petition electronically via the appellate ECF system.  No paper copies are required unless the Court orders otherwise.  If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper.  No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- • The Bill of Costs must be filed within 14 days after entry of judgment.
- • See Form 10 for additional information, available on our website at   under *Forms.*

**Attorneys Fees**
- • Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- • All relevant forms are available on our website at  under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- • Please refer to the Rules of the United States Supreme Court at

**Counsel Listing in Published Opinions**
- • Please check counsel listing on the attached decision.
- • If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► West Publishing Company; 610 Opperman Drive; PO Box  64526; St. Paul, MN 55164-0526 (Attn: Kathy Blesener, Senior Editor);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

**EXHIBIT A**
**21**

Form 10. Bill of Costs ................................................................................................................(Rev. 12-1-09)

# United States Court of Appeals for the Ninth Circuit

## BILL OF COSTS

**Note:** If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with 9th Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. § 1920, and 9th Circuit Rule 39-1 when preparing your bill of costs.

[_____]  v.  [_____]   9th Cir. No. [_____]

The Clerk is requested to tax the following costs against: [_____]

| Cost Taxable under FRAP 39, 28 U.S.C. § 1920, 9th Cir. R. 39-1 | REQUESTED Each Column Must Be Completed | | | | ALLOWED To Be Completed by the Clerk | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST | No. of Docs. | Pages per Doc. | Cost per Page* | TOTAL COST |
| Excerpt of Record | | | $ | $ | | | $ | $ |
| Opening Brief | | | $ | $ | | | $ | $ |
| Answering Brief | | | $ | $ | | | $ | $ |
| Reply Brief | | | $ | $ | | | $ | $ |
| Other** | | | $ | $ | | | $ | $ |
| | | | TOTAL: | $ | | | TOTAL: | $ |

\* Costs per page may not exceed .10 or actual cost, whichever is less. 9th Circuit Rule 39-1.

\*\* Other: Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to 9th Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

Attorneys' fees **cannot** be requested on this form.

**EXHIBIT A**
**22**

*Continue to next page.*

**Form 10. Bill of Costs -** *Continued*

I, [                    ] , swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed.

Signature [                    ]

("s/" plus attorney's name if submitted electronically)

Date [                    ]

Name of Counsel: [                    ]

Attorney for: [                    ]

(To Be Completed by the Clerk)

Date [                    ]    Costs are taxed in the amount of $ [                    ]

Clerk of Court

By: [                    ] , Deputy Clerk

**EXHIBIT A**
**23**

# EXHIBIT B



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 3, 2011

OUR FILE NUMBER
· 905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Gerald A. Berk
Steuer Escovar Berk Brown
55 Public Square, Suite 1475
Cleveland, Ohio 44113

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

    We write to follow up on several issues raised during Don Bulson's deposition—all of which we hope to resolve before taking the second day of his deposition, per his agreement, this Fall:

    1. <u>Withdrawn Objections</u>.  At the end of Mr. Bulson's deposition Mr. Berk stated that he would be withdrawing many of the objections and instructions not to answer that he made during the deposition.  Dep. of Don Bulson ("Tr.") at 163:13-21.  As Mr. Berk promised he would do, *see id.* at 163:22-164:4, please review the enclosed transcript and specifically identify each objection that counsel for the defendants and the Estate of Michael Siegel wish to withdraw.  We need to meet and confer this week or next week on any remaining objections that you have, so that we can address them in any necessary motion.

    2. <u>Objections re: Documents Conveyed to Mr. Bulson by Mr. Siegel</u>.  Throughout the deposition both Mr. Berk and Mr. Toberoff instructed Mr. Bulson not to answer questions regarding non-privileged documents or information conveyed to Mr. Bulson by Mr. Siegel. *E.g.,* Tr. at 24:22-30:23; 52:1-3; 55:11-20, 60:13-62:1.  We requested that you identify what authority you were relying on to take that position, but you did not have any specific authorities at hand. *See id.* at 27:2-29:10.  The law is clear that non-privileged documents do not become privileged because they are sent to an attorney or reside in his files. *E.g., U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977); *In re Rupert*, 309 F.2d 97, 99 (6th Cir. 1962); *Suezaki v. Super. Ct.*, 58 Cal.

O'MELVENY & MYERS LLP
August 3, 2011 - Page 2

2d 166, 176 (1962) (mere transmission to counsel of non-privileged communication "cannot create the privilege if none, in fact, exists"); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638 (1994); *Davies v. Columbia Gas & Elec. Co.*, 68 N.E.2d 571, 579 (Ohio C.P. 1938), *order aff'd*, 68 N.E.2d 231 (Ct. App. 1939) (non-privileged documents received by "attorney for the purposes of consultation ... could not be regarded as privileged communications.").[1]  Please provide us with citations to the authorities you are relying on in asserting that non-privileged documents and information become privileged simply because they were conveyed to an attorney.  We need to meet and confer this issue this week or next week, so that we can address any remaining disputes in a motion.

    2. <u>Expert Report</u>.  Mr. Bulson testified that he believes an expert report was submitted in the Renner Otto litigation against the Estate of Michael Siegel containing billing records and/or time entries reflecting when Mr. Bulson spoke with Mr. Toberoff.  Tr. at 20:5-24:3.  Mr. Ryland has indicated that Renner Otto can produce such responsive documents to DC but needs to go through you regarding privilege assertions before doing so.  Please confirm that Mr. Ryland is authorized to produce Renner Otto's expert report.  We hope to avoid having to serve subpoenas on your offices seeking this document, which is readily available to Mr. Ryland.  If you are unwilling to allow these documents to be produced, we need to meet and confer on the issue this week or next week.

    3. <u>Calendar and/or Billing Entries</u>.  In addition to the expert report, DC requests that non-privileged portions or calendars and billing entries maintained by Mr. Bulson and/or Renner Otto regarding the representation of Michael Siegel be produced.  Tr. at 18:12-24:3.  Please confirm that Mr. Ryland is authorized to produce these documents (redacted, as need be).  We are not seeking the disclosure of attorney-client or work product information that may be contained in Mr. Bulson's calendars or billing entries, but we are entitled to discover the dates on which Mr. Bulson spoke or corresponded with Mr. Toberoff.  The timeline of Mr. Bulson and Mr. Toberoff's interactions is directly relevant to our claims in this case.  If you are unwilling to allow these documents to be produced, we need to meet and confer on the issue this week or next week.

    4. <u>Michael Siegel File</u>.  As you are aware, as Mr. Ryland informed us, *see* July 15, 2011, Ryland Letter to Kline, and as Mr. Bulson testified, Tr. at 14:25-18:11, Renner Otto is in

---

    [1] *Accord U.S. v. Ruehle*, 583 F.3d 600, 608-09 (9th Cir. 2009) (district court's presumption of privilege over all communications during attorney-client relationship was error); *U.S. v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir.), *cert. denied*, 377 U.S. 976 (1964) (attorney-client relationship does not create an automatic "cloak of protection ... draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (statements made in meeting not necessarily privileged simply because legal counsel present); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4 (N.D. Ill. 1980) ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with an attorney.").

O'MELVENY & MYERS LLP
August 3, 2011 - Page 3

possession of a digital copy of Mr. Siegel's files. Renner Otto is lawfully in possession of those documents and is entitled to retain a copy of Mr. Siegel's files as well as review them. *E.g.*, OH Adv. Op. 1992-8 (Ohio Bd. Com. Griev. Disp.); *In re Int'l Corp.*, 2004 WL 5507905, at *1 (S.D. Ohio Oct. 1, 2004); OH. Prof. Cond. R. 1.15(a), 1.16(d); *Disc. Counsel v. Noel*, 894 N.E.2d 31, 34 (Ohio 2008). We understand that Mr. Ryland intends to defer to you regarding claims of attorney-client privilege and work product. However, Renner Otto is obligated to respond to DC's subpoena for production of documents—which requires it to produce responsive, non-privileged documents in these digital files and produce a privilege log. FED. R. CIV. P. 45(d), (e); *e.g, Heilman v. Vojkufka*, 2011 WL 677877, at * 18 (E.D. Cal. Feb. 17, 2011); *U.S. v. Martin*, 278 F.3d 988. 1000 (9th Cir. 2002); *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992); *see also* William W. SCHWARZER ET AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL ("RUTTER") §§ 11:2220-2318 (2011).

As an interim step to Renner Otto making this full production or making any privilege calls, and so that our disputed document issues may be framed, we propose that the Renner Otto firm (at DC's expense) take the first step of preparing a log of all documents in their Michael Siegel file. This log would identify who authored the document, to whom it was sent (if anyone), the date of the document, when it was received by Renner Otto (if that date is known), and the total number of pages for each individual document. All attachments and enclosures would be listed separately, as would each part of email chains.[2] Such a log is necessary to identify each document in Mr. Siegel's file, since Mr. Toberoff's privilege assertions over the Michael Siegel file and other documents—in this and related cases—have been adjudged to be erroneous and overbroad, and given that he has admitted clipping privileged and non-privileged documents together and listing them as a single privilege log entry. Case No. 1:06 MC 99, Docket No. 15 at 2-3 (April 1, 2008, Order of the U.S. District Court for the Northern District of Ohio) ("[T]he court finds that none of the 15 documents are subject to the attorney/client privilege … [N]one of the 15 communications … are for the purpose of giving legal advice."); June 20, 2011, Hearing Tr. at 16:19-18:15 ("[T]he letter we believe was part of a larger communication from the client wanting to discuss these communications with her brother … It appeared paper clipped with the other documents.").

If you are unwilling to agree to this procedure, we need to meet and confer on the issue this week or next week.

---

[2] *E.g., Narayan v. EGL, Inc.*, 2006 WL 3050851, at *1 (N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to include separate listing for attachments); *In re Heritage Bond Litig.*, 2004 WL 1970058, at *5 (C.D. Cal. July 23, 2004) (same); *Mold-Masters Ltd. v. Husky Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001) ("Since a document with an attachment constitutes two separate documents, a party objecting to the disclosure of a document with an attachment must prove that both the document and the attachment individually satisfy the requirements of the applicable privilege or doctrine."); RUTTER § 11:1919 ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

O'Melveny & Myers LLP
August 3, 2011 - Page 4

    5.  "Confidentiality" Designations.  During the deposition, you refused to allow us to examine Mr. Bulson regarding two exhibits: (1) a February 12, 2002, memorandum of agreement between Pacific Pictures Corporation, Ari Emanuel, and Endeavor (Ex. 44 - EN00001-7), Tr. at 88:8-92:14; and (2) a May 12, 2005, letter from Mr. Toberoff to Patrick Perkins responding to DC's April 28, 2005, proposal to the Shusters (Ex. 52 - SHU 109-111), Tr. at 137:12-139:25.  You objected to both exhibits on the grounds that they were marked "confidential" and therefore governed by the protective order in the *Siegel* case, which you argued applied in this case because the parties purportedly always anticipated entering into a protective order.  First, there is no protective order in this case, and defendants produced both exhibits by designation, without reservation of any rights or claims of confidentiality.  *See* Dec. 7, 2010, Toberoff Letter to Petrocelli (attached).  Second, neither of the two exhibits was marked "confidential" when the bates stamps were applied prior to production, as required by the protective order in *Siegel.*  The "confidential" label exists on the underlying document—and the person whom affixed it could not have labeled the document confidential with the parties' protective order in Siegel in mind.  That order did not enter until April 5, 2006.  Please confirm your agreement that DC may proceed to examine Mr. Bulson regarding both exhibits when his deposition is re-commenced.  If you disagree, we need to meet and confer on these issues without delay.

    As for your threats that defendants will disclose DC's confidential documents, *e.g.*, Tr. at 152:2-153:1 ("Warner Brothers and DC have marked thousands of documents confidential with all sorts of financial information.  And if DC is not abiding by when we mark things confidential and abiding by the protective order we're not going to abide by that order either."), these threats are improper and be advised that DC will seek full relief against you and defendants if you act out on them.

    6.  Protective Order re: Deposition.  During the deposition, Mr. Ryland requested that Mr. Bulson's deposition be marked "attorney's eyes only" and be subject to a protective order between the parties, specifically with respect to portions of the deposition that deal with the business practices of Renner Otto Boisselle & Sklar, LLP.  Tr. at 20:14-21:24.  Please confirm your agreement to Mr. Ryland's request and we will prepare a protective order for your review.

**EXHIBIT B**
**27**

O'MELVENY & MYERS LLP
August 3, 2011 - Page 5

*        *        *

Please provide us with the earliest possible date this or next week that you are available to meet and confer on these issues.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

Enclosure(s)
cc:    Daniel M. Petrocelli, Esq.
       Jason Tokoro, Esq.
       Josh Ryland, Esq.
       Richard Kendall, Esq.

**EXHIBIT B**
**28**

# EXHIBIT C

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 11, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Matt:

I write on behalf of defendants and the Estate of Michael Siegel (the "Estate") in response to your August 3, 2011 letter regarding Don Bulson's deposition.

1.    <u>Withdrawn Objections:</u>  Mr. Berk stated at the end of Mr. Bulson's deposition that he would consider withdrawing certain of his objections made early on in the deposition.

The Estate hereby withdraws its objections to DC's questioning on the following topics:  (1) communications between Mr. Bulson and Mr. Toberoff concerning the purchase of the Michael Siegel interest (Rough Transcript ("Trns.") at 31:5-13, 43:12-45:3); (2) whether Mr. Bulson discussed the May 13, 2003 letter from Michael Siegel to Laura Siegel Larson with Marc Toberoff (Trns. at 55:11-56:16); and (3) whether Mr. Bulson would have "wanted to know" the identity of the potential investor in the Michael Siegel interest (Trns. at 85:19-86:15).  However, topic (3) is moot as it was answered later without objection. Trns. at 98:9-16.  The Estate maintains its objections to the extent DC's questioning concerns or implicates the substance of any communications between Mr. Bulson and Michael Siegel.

The Estate also maintains its objections as to communications between Michael Siegel and Don Bulson regarding Mr. Siegel's communications with Laura Siegel Larson.  Trns. at 60:13-66:3, 72:21-75:8, 76:18-80:17.

2.    <u>Documents Conveyed to Mr. Bulson:</u>  Your assertion that we improperly instructed Mr. Bulson not to answer questions concerning certain alleged "non-privileged documents" is a straw man.  The Estate clearly stated that "[Mr. Bulson] can answer concerning whether he sent these documents, but any conversations he had with Michael Siegel concerning these documents are privileged." Trns. at 51:16-20.  Defendants also never asserted, as you claim, that non-privileged

**EXHIBIT C**
**29**

**TOBEROFF & ASSOCIATES, P.C.**

August 11, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 4

documents become privileged through their transmission to an attorney, and none of DC's examples involve such assertions:

- Trns. at 24:22-30:23:  The Estate did not assert the May 13, 2003 letter from Michael Siegel to Laura Siegel Larson itself was privileged.  The Estate merely instructed Mr. Bulson not to answer a question about whether he had previously seen the document to the extent that he had seen it during privileged communications with Michael Siegel.  Mr. Bulson clearly testified that he had never seen the May 13 letter "independent of Michael [Siegel] giving [him] this document."  Trns. at 26:21-23.
- Trns. at 52:1-3:  The Estate clearly and properly asserted privilege as to "communications between Mr. Bulson and Michael Siegel."
- Trns. at 55:11-20:  The Estate did not assert privilege as to the May 13 letter. Nonetheless, the instruction not to answer the question of whether Mr. Bulson ever communicated with Mr. Toberoff about the May 13 letter is withdrawn as stated above.
- Trns. at 60:13-62:1:  The Estate clearly and properly instructed Mr. Bulson not to answer questions regarding his attorney-client communications with Michael Siegel about Marc Toberoff.

3.    <u>Expert Report/Calendar & Billing Entries:</u>  We have asked Renner Otto for a copy of the expert report and its calendar and billing entries so that we can review such documents and determine whether the Estate will assert privilege as to any information contained therein.  The Estate needs to review such documents as they are produced to enable it to assert privilege where appropriate.  DC cannot possibly object to this, as it states that it is "not seeking the disclosure of attorney-client or work product information" contained in such documents, but merely "the dates on which Mr. Bulson spoke or corresponded with Mr. Toberoff."

DC's claim that the "timeline of Mr. Bulson and Mr. Toberoff's interactions is directly relevant to our claims in this case" is incorrect, as the discovery sought by DC is entirely collateral.  DC's complaint makes no allegations whatsoever concerning the purchase of the Michael Siegel interest and does not *once* mention Mr. Siegel.

4.    <u>The Michael Siegel File:</u>  Your demand that Renner Otto prepare what amounts to a privilege log and to include information far beyond that which is required is improper.

The privilege as to these files is for the Estate to assert.  Renner Otto stated "unequivocally [that] we will not make any determinations with respect to privilege on our own judgment, because we do not hold the privilege, nor can we assert it or waive it." Trns. at 53:5-8.

Moreover, your proposal to "log" "all" documents in Renner Otto's Michael Siegel archive regardless of whether they are even responsive to the subpoena makes no sense whatsoever.  You demand that the log must identify "the date of the document" *and* the date "when it was received by Renner Otto (if that date is known)," as well as "the total number of pages for each individual

**EXHIBIT C**
**30**

**TOBEROFF & ASSOCIATES, P.C.**

August 11, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:  3 of 4

document" and that "[a]ll attachments and enclosures would be listed separately, as would each part of email chains." DC is not entitled to all these details in a standard log unless otherwise ordered by a court. DC's February 7, 2011 motion to compel such details  (Docket No. 160 at 40-44) was denied on April 11, 2011 (Docket No. 209 at 13); its April 25, 2011 motion for review of that April 11 order on that subject (Docket No. 225 at 17-20) was denied on May 11, 2011 (Docket No. 248); *and* its motion for reconsideration of that April 11 order on that subject (Docket No. 253 at 9-10) was denied on June 20, 2011 (Docket No. 285). Each time, DC claimed that defendants' privilege logs were "deficient" and that defendants were required to list such details, particularly with respect to "Michael Siegel" documents, and the Courts denied DC's demands and upheld defendants' privilege logs.

Your offer to pay Renner Otto is a transparent and improper attempt to motivate Renner Otto to act contrary to its former client's and now the Estate's interest by divulging information that the Courts have consistently held DC is not entitled to.

5.     Confidentiality Designations:  The entire dispute as to this issue of documents marked "Confidential" from the *Siegel* litigation could be easily avoided if DC would agree to a protective order in this case similar in substance to the one entered into by the parties in *Siegel*, which permitted witnesses to be examined as to documents designated "confidential." *See Siegel v. Warner Bros. Entertainment, Inc.*, Docket No. 50, ¶¶ 5-8.

DC's claim that "the 'confidential' label exists on the underlying document," and that therefore the *Siegel* protective order does not apply, is disingenuous.  The *Siegel* protective order applies to "any writing produced in any Document Production by any party or non-party witness marked as 'CONFIDENTIAL.'" *Id.*, ¶ 4.  Nowhere does the protective order require that such a "CONFIDENTIAL" designation be affixed at the time of production.

DC's hypocrisy on this subject is notable; on one hand, it asserts that no protective order was entered into in this case, while threatening, on the other hand, that it will "seek full relief against you and defendants" if defendants disclose confidential documents produced by DC in *Siegel*.

You also falsely contend that I "refused" to allow you to examine Mr. Bulson on a May 12, 2005 letter from me to Patrick Perkins.  You asked several questions about that letter, I did not instruct Mr. Bulson not to answer any questions on the basis of my objections, and you chose not to ask any further questions after I objected.  Trns. at 137:2-138:19.

6.     Protective Order re: Depositions:  We will agree in principle to Mr. Ryland's request for a protective order concerning Renner Otto's business practices, subject to approving the particular terms and language of any such order.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

**EXHIBIT C**
**31**

**TOBEROFF & ASSOCIATES, P.C.**

August 11, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   4 of 4

Very truly yours,

Marc Toberoff

cc:     Josh Ryland

**EXHIBIT C**
**32**

# EXHIBIT D

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

August 29, 2011

**VIA E-MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Gerald A. Berk
Steuer Escovar Berk Brown
55 Public Square, Suite 1475
Cleveland, Ohio 44113

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write in response to your August 11, 2011, letter addressing issues raised in our August 3 letter regarding Don Bulson's deposition and production of documents. For purposes of clarity if DC is required to file a motion to resolve the issues discussed below, enclosed is a final version of Mr. Bulson's deposition transcript, subject to his review and corrections, if any (referred to herein as, "Tr.").

1. Withdrawn Objections. On the enclosed deposition transcript, DC has bracketed the objections identified in your August 11 letter as being withdrawn by Mr. Berk on behalf of the Estate of Michael Siegel (the "Estate"): Tr. at 36:9-17, 48:20-50:10, 60:22-62:2, 92:15-93:11 (Rough Tr. at 31:5-13, 43:12-45:3, 55:11-56:16, 85:19-86:15). Please confirm the Estate's withdrawal of these objections. Additionally, if the Estate intends to withdraw any further objections to DC's examination of Mr. Bulson, please identify those objections by page and line number on a question-by-question basis. We do not want to have any ambiguity as to which objections were withdrawn or not, as given the positions asserted in your letter motion practice is very likely, and we only want to have to move once.

2. Objections re: Documents or Information Conveyed to Mr. Bulson by Michael Siegel. We disagree with the Estate's continued objection to examination of Mr. Bulson that "concerns or implicates the substance of *any communications* between Mr. Bulson and Michael Siegel," including "communications between Michael Siegel and Don Bulson regarding Mr. Siegel's

**EXHIBIT D**
**33**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 2

communications with Laura Siegel Larson." You have cited no authority to support this overbroad objection to all communications between Mr. Bulson and Mr. Siegel, nor could you.

The attorney-client privilege, which is "strictly construed," is restricted to communications relating to the seeking or provision of legal advice, not simply the conveyance of factual information. *See, e.g., U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). If Ms. Larson said something to Mr. Siegel, and Mr. Siegel subsequently conveyed the fact to Mr. Bulson, Ms. Larson's recounted statements would not be privileged. *E.g., Upjohn v. U.S.*, 449 U.S. 383, 395-96 (1981) ("The privilege … does not protect disclosure of the underlying facts."); *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977); *State ex rel. Dudek v. Circuit Court*, 34 Wis.2d 559, 580 (1967) ("the courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer"); *In re Seagate Tech.*, 497 F.3d 1360, 1375 (Fed. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008) (work product doctrine does not protect from discovery factual information contained within an attorney's papers; rather, only an attorney's "mental impressions, conclusions, opinions, or legal theories" are protected); PAUL W. VAPNEK ET AL., CALIFORNIA PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY § 7:211.1 (2011). Furthermore, it is the Estate's burden to establish all the elements of the privilege, and no showing has been made here. *See U.S. v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000).

Similarly, and despite our explicit request to do so, the Estate has identified no authority to support its instructions to Mr. Bulson to not answer questions regarding non-privileged documents conveyed to Mr. Bulson by Mr. Siegel. *E.g.,* Tr. 30:1-36:2, 57:9-10, 60:22-61:6, 65:24-67:12 (Rough Tr. 24:22-30:23, 52:1-3, 55:11-20, 60:13-62:1). By contrast, DC has cited to overwhelming case law making clear that non-privileged documents do not become privileged because they are sent to an attorney or reside in his files. *E.g., U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977); *In re Rupert*, 309 F.2d 97, 99 (6th Cir. 1962); *Suezaki v. Super. Ct.*, 58 Cal. 2d 166, 176 (1962) (mere transmission to counsel of non-privileged communication "cannot create the privilege if none, in fact, exists"); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638 (1994); *Davies v. Columbia Gas & Elec. Co.*, 68 N.E.2d 571, 579 (Ohio C.P. 1938), *order aff'd*, 68 N.E.2d 231 (Ct. App. 1939) (non-privileged documents received by "attorney for the purposes of consultation … could not be regarded as privileged communications").[1]

---

[1] *Accord U.S. v. Ruehle*, 583 F.3d 600, 608-09 (9th Cir. 2009) (district court's presumption of privilege over all communications during attorney-client relationship was error); *U.S. v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir.), *cert. denied*, 377 U.S. 976 (1964) (attorney-client relationship does not create an automatic "cloak of protection … draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (statements made in meeting not necessarily privileged simply because legal counsel present); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4 (N.D. Ill. 1980) ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with an attorney.").

**EXHIBIT D**
**34**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 3

  The Estate's claim that it "never asserted ... that non-privileged documents become privileged through their transmission to an attorney" is contradicted by Mr. Berk and Mr. Toberoff's objections during the deposition, *e.g.*, Tr. 30:1-36:2 (Rough Tr. 24:22-30:23), Tr. 65:24-67:12 (Rough Tr. 60:13-62:1)—none of which you withdrew.  For example:

- Mr. Berk said "[a]ny documents Mr. Bulson received concerning his representation of Michael Siegel is *privileged*, ... any letter that he received from Michael Siegel is privileged.  I don't care where it came from or whatever, it's *privileged* as to Michael Siegel and him."  Tr. 84:11-87:7.

- As to the May 13, 2003, letter from Mr. Siegel to Ms. Larson, Mr. Berk explicitly argued it would become privileged if Mr. Siegel sent it to Mr. Bulson.  *See* Tr. 30:8-13 ("This would be privileged, unless he was to get this from Laura Siegel or someone else.  But if he got this from Michael Siegel, it would be part of -- be a *privileged document* as to Mr. Bulson.") (emphasis added).[2]  Defendants have admitted that the May 13 letter, by itself, is not a communication over which they are asserting a claim of privilege.  There is simply no basis for the Estate's objection— whether Mr. Bulson received the May 13 letter from Mr. Siegel is not privileged.

- Contrary to Mr. Berk and Mr. Toberoff's objections, the fact whether Mr. Siegel communicated with Mr. Toberoff prior to Mr. Siegel's May 13 letter does not become privileged because he conveyed that fact to Mr. Bulson. *E.g., Upjohn*, 449 U.S. at 395-96; *see also Diversified Indus., Inc.*, 572 F.2d at 611; *State ex rel. Dudek*, 34 Wis.2d at 580.  Mr. Berk and Mr. Toberoff's objections were not limited to "questions regarding [Mr. Bulson's] *attorney-client communications* with Michael Siegel," but to *any and all* communications with Mr. Siegel.  Tr. 66:2-15.  The attorney-client privilege does not shield all communications between an attorney and a client, specifically not where non-privileged facts are conveyed.  *See Upjohn*, 449 U.S. at 395-96; *Martin*, 278 F.3d at 999.

  We need to meet and confer as soon as possible to address these issues.  We intend to file a motion concerning these objections, unless they are withdrawn.

  3.  <u>Expert Report/Calendar & Billing Entries</u>.  You represented in your letter that the Estate has "asked Renner Otto for a copy of the expert report and its calendar and billing entries so that [the Estate] can review such documents and determine whether the Estate will assert privilege as to any information contained therein."  You did not, however, provide a date certain

---

  [2] *See also* Tr. 33:14-25 ("If the document was given by Michael Siegel to Mr. Bulson it becomes part of his file, it also becomes part of the *privileged file* and part of the litigation or representation by Mr. Bulson of Michael Siegel, and is therefore *privileged*. ...  It's basic privilege.  It's part of the file."); Tr. 62:8-11 (I'm going to object to that as well, because first of all, if [the May 13 letter] exists and it's in his file, it becomes a privilege, and therefore not discoverable.") (emphasis added to all).

O'MELVENY & MYERS LLP
August 29, 2011 - Page 4

by when you will complete your review and produce (redacted if need be) or log the requested
documents. DC made its request for Renner Otto's expert report and calendar and billing entries
during Mr. Bulson's deposition on July 19—over one month ago. Tr. 23:11-29:7, 25:5-29:7.
There is no reason for the Estate's failure to have produced the documents by now. Please
confirm that the Estate will produce or log the requested documents by Tuesday, September 6.

Your contention that the discovery sought by DC is not directly relevant to its claims in
this case and is "entirely collateral" is without merit. The timeline of Mr. Bulson and
Mr. Toberoff's interactions is directly relevant to, among other things, establishing when
Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing Ms. Siegel's purported
Superman interest (the date of Toberoff's first contacts with the heirs is a hotly disputed issue in
the case); determining whether communications exchanged between Mr. Toberoff and
Mr. Bulson occurred but have neither been produced not logged (similar to defendants' failure to
produce or log Mr. Siegel's May 13 letter); and disproving defendants' assertion of a common
interest with Mr. Siegel.

4. <u>Michael Siegel File</u>. Defendants do not dispute that Renner Otto is lawfully in
possession of a digital copy of Mr. Siegel's files and is entitled to retain a copy of Mr. Siegel's
files as well as review them. *E.g.*, OH Adv. Op. 1992-8 (Ohio Bd. Com. Griev. Disp.); *In re
Int'l Corp.*, 2004 WL 5507905, at *1 (S.D. Ohio Oct. 1, 2004); OH. Prof. Cond. R. 1.15(a),
1.16(d); *Disc. Counsel v. Noel*, 894 N.E.2d 31, 34 (Ohio 2008). Nor do defendants dispute that
Renner Otto is obligated to respond to DC's subpoena for production of documents—which
requires it to produce responsive, non-privileged documents in these digital files and produce a
privilege log. FED. R. CIV. P. 45(d), (e); *e.g., Heilman v. Vojkufka*, 2011 WL 677877, at * 18
(E.D. Cal. Feb. 17, 2011); *Martin*, 278 F.3d at 1000; *Clarke v. Am. Commerce Nat'l Bank*, 974
F.2d 127, 129 (9th Cir. 1992); *see also* William W. SCHWARZER ET AL., FEDERAL CIVIL
PROCEDURE BEFORE TRIAL ("RUTTER") §§ 11:2220-2318 (2011).

Mr. Bulson's representation of Mr. Siegel began shortly after the Siegel heirs served their
Superman termination notice in April 1997, and represented Mr. Siegel solely with respect to his
purported Superman interest. There is no indication that documents retained by Renner Otto in
Mr. Siegel's file would not be responsive to DC's subpoena, and defendants' speculation
otherwise is not grounds for preventing Renner Otto from preparing a log of all documents in
their possession.

Defendants only true disagreement with DC's August 3 proposal is the level of detail DC
is requesting Renner Otto include in generating a log of Mr. Siegel's file. DC is entitled to
discover the information it seeks in the proposed log,[3] especially here, where Mr. Toberoff's

---

[3] *E.g., Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) (A log should identify the
primary addressee; "[s]econdary addressee(s); persons copied and recipient (and the relationship
of that person(s) to the client and/or author)."); *Narayan v. EGL, Inc.*, 2006 WL 3050851, at *1
(N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to include separate listing for
attachments; *In re Heritage Bond Litig.*, 2004 WL 1970058, at *5 (C.D. Cal. July 23, 2004)

O'MELVENY & MYERS LLP
August 29, 2011 - Page 5

privilege assertions over the Michael Siegel file have been adjudged erroneous and overbroad, and given his admissions regarding claims of privilege over non-privileged documents clipped to purportedly privileged communications. Case No. 1:06 MC 99, Docket No. 15 at 2-3 (April 1, 2008, Order of the U.S. District Court for the Northern District of Ohio) ("[T]he court finds that none of the 15 documents are subject to the attorney/client privilege … [N]one of the 15 communications … are for the purpose of giving legal advice."); June 20, 2011, Hearing Tr. at 16:19-18:15 ("[T]he letter we believe was part of a larger communication from the client wanting to discuss these communications with her brother … It appeared paper clipped with the other documents."). DC should be permitted to discover the scope of Mr. Siegel's file, which can only be accomplished through a log listing each document separately. We want and are entitled to discover things like whether Ms. Larson's non-privileged letter in response to Mr. Siegel's May 13 letter is in Renner Otto's file.

The Court's prior orders regarding the adequacy of the information contained in defendants' privilege logs are no bar to DC's proposal. DC's offer to pay Renner Otto's expenses in preparing the proposed log is not "a transparent and improper attempt to motivate Renner Otto to act contrary to its former client's and not the Estate's interest," but is rather intended to alleviate Renner's asserted burden in appropriately responding to DC's subpoena. We are not asking Renner Otto to make any privilege calls or make different privilege determinations than Mr. Toberoff did in the *Siegel* case. Nor are we asking Renner Otto to harm its former client's interest. All we are asking for is a fair, simple, and accurate accounting of what documents Renner Otto possesses in its files related to its representation of Mr. Siegel concerning his purported Superman rights. DC is willing to pay for preparation of the log to avoid any dispute regarding who is responsible for the associated costs and expenses.

We request a final meet-and-confer on this issue.

5. "Confidentiality" Designations. Upon further review of Mr. Bulson's deposition transcript, we identified a third exhibit you refused to allow us to examine Mr. Bulson with on the grounds that it was marked "confidential" and therefore governed by the protective order in the *Siegel* case: (3) an October 3, 2004, letter from Mr. Toberoff to Joanne Siegel and Ms. Larson regarding "Engagement for Professional Services" (Ex. 51 LSL 00213-218), Tr. 158:1-160:7. We assume based on your August 11 letter that you intend to maintain that objection, but please advise us if we are mistaken in that assumption.

Defendants do not dispute that no protective order exists in this case; in fact, they admit as much. Nor do they dispute that they produced documents in this case—including the two

---

(same); *Mold-Masters Ltd. v. Husky Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001) ("Since a document with an attachment constitutes two separate documents, a party objecting to the disclosure of a document with an attachment must prove that both the document and the attachment individually satisfy the requirements of the applicable privilege or doctrine."); RUTTER § 11:1919 ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

O'Melveny & Myers llp
August 29, 2011 - Page 6

exhibits DC identified in its August 3 letter and the third exhibit identified herein—without reservation of any rights or claims of confidentiality. Defendants instead seek to re-frame the issue by arguing that this "entire dispute … could easily be avoided if DC would agree to a protective order in this case similar in substance to the one entered into by the parties in *Siegel*." Whether DC later agrees to a protective order in this case—and we invite defendants to propose or produce a draft of one—does not change the fact that none currently exists that would operate to protect the documents defendants have thus far produced.

DC disputes defendants' claim that the protective order in the *Siegel* case applies in this case because the parties purportedly always anticipated entering into a protective order. Even if that were the case—and it is not—defendants' arguments and objections are not well-taken. First, the protective order in the *Siegel* case defines the categories of documents that fall within its protections, and can therefore be marked "CONFIDENTIAL":

> [D]ocuments may be marked "CONFIDENTIAL" if the marking or requesting party reasonably believes:
>
> > (a) the Writing contains confidential proprietary information; or
> >
> > (b) disclosure of such commercially sensitive Writing could reasonably harm competitive advantage, or foster a competitive disadvantage; or
> >
> > (c) the disclosure of such confidential Writing could impair or disrupt future or current business relationships.

Docket No. 50 ¶ 4. This limited definition of documents subject to the protective order in the *Siegel* case requires the producing party to evaluate whether the underlying document can be marked "CONFIDENTIAL" under this three-part test and to so mark it as "CONFIDENTIAL" at the time of production. An underlying document that happens to have a "confidential" label affixed to it is not automatically protected because whoever applied that stamp previously, by definition, did not have this three-part test for marking documents before him or her.

Second, and as defendants admit, the protective order in the *Siegel* case permits witnesses to be examined as to documents marked "confidential." *Id.* ¶ 5. If, as defendants contend, the protective order in the *Siegel* case applied in this case, there is no basis for your objections to the use of the three exhibits.

Third, there is no "hypocrisy" in DC making clear that it will seek full relief against you and defendants if you act on your threats to disclose confidential documents produced by DC in *Siegel*. Tr. 161:12-162:20 (Rough Tr. 152:2-153:1). Unlike defendants, DC has not produced any documents in this case—defendants have not requested any to date—and, therefore, all of DC's confidential documents in defendants' possession were produced pursuant to and subject to the *Siegel* protective order.

**EXHIBIT D**
**38**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 7

Finally, your claim that you did not refuse to allow us to examine Mr. Bulson regarding a May 12, 2005, letter from you to Patrick Perkins (Ex. 52) is disingenuous.  Tr. 146:10-148:24 (Rough Tr. 137:2-138:19).  You objected to our use of the document on the grounds that it is subject to the protective order in *Siegel* since it is marked "confidential," and deals with "settlement negotiations which should not be used or disclosed in litigation."  You also threatened to hold us and DC "accountable" for purportedly breaching the *Siegel* protective order.  We did not "cho[o]se not to ask any further questions after [Mr. Toberoff] objected," as you claim; we were forced to discontinue our examination of Mr. Bulson based on your misguided threats.  Moreover, we reserved all rights to ask questions on this and other topics during the second day of Mr. Bulson's deposition.  Tr. at 181:16-182:3.

We need to conduct a final meet-and-confer on these issues as well—and need a date certain to do so with both of you.

6.  <u>Protective Order re: Deposition</u>.  On our call, we should discuss a protective order concerning Renner Otto's business practices.  We are happy to draft such a document and submit it to Mr. Ryland as well.

\*        \*        \*

Please let us know if you are available to meet and confer on these issues tomorrow, Tuesday, August 30.  Otherwise, please provide a date certain when you are available to conduct a final meet-and-confer on these issues.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

Enclosure(s)
cc:    Daniel M. Petrocelli, Esq.
       Jason Tokoro, Esq.
       Josh Ryland, Esq.
       Richard Kendall, Esq.

**EXHIBIT D**
**39**

# EXHIBIT E

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 8, 2011

Via E-Mail

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Matt:

I write on behalf of defendants and the Estate of Michael Siegel (the "Estate") in response to your August 29, 2011 letter regarding Don Bulson's deposition.

1.      Withdrawn Objections:  The objections stated in my August 11, 2011 letter, set forth in section 1 of your August 29, 2011 letter, have been withdrawn.

2.      Documents Conveyed to Mr. Bulson:  DC's ongoing argument that "non-privileged documents do not become privileged because they are sent to an attorney," and that therefore the Estate's objections as to Mr. Siegel's communications with Mr. Bulson about the May 13 letter were improper, continues to miss the mark.

The cases cited by DC concern whether underlying documents are privileged; they do ***not*** concern whether a client's communications with an attorney about such documents are privileged.  *See U.S. v. Osborn,* 561 F.2d 1334, 1339 (9th Cir. 1977) (concerning "business documents" in an attorney's possession); *In re Rupert,* 309 F.2d 97, 99 (6th Cir. 1962) (stating merely that "if the client may be compelled to produce documents in his possession then the attorney may be compelled to produce the same documents when they are in his custody"); *Suezaki v. Super. Ct.,* 58 Cal. 2d 166, 176 (1962) (films made by private investigator, retained by a party's attorney without the party's knowledge, and delivered to the attorney by the investigator were not covered by the attorney-client privilege); *Moskovitz v. Mt. Sinai Med. Ctr.,* 69 Ohio St. 3d 638 (1994) (attorney-client privilege did not cover all of the contents of an insurer's claims file under specific Ohio statute).[1]  None of these cases stand for the proposition

---

[1] DC's repeated citations to state law on privilege are baffling in light of DC's insistence that this litigation is governed by Federal, not state, law on privilege.  *See, e.g.,* Docket No. 160 at 14 ("Federal

**EXHIBIT E**
**40**

**TOBEROFF & ASSOCIATES, P.C.**

September 8, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 3

that an attorney can properly be questioned about the context in which non-privileged documents
were transmitted to him during attorney-client communications. Nor do DC's out-of-context
quotations of Mr. Berk's objections change this analysis. Mr. Berk clearly asserted privilege as
to Mr. Siegel's communications with Mr. Bulson about the May 13, 2003 letter, not the May 13
letter itself.

3.    <u>Expert Report/Calendar & Billing Entries:</u>  As to the Renner Otto expert report and
calendar/billing entries, we requested those documents from Renner Otto on August 11 for
privilege review on behalf of the estate. As we have not yet received the documents, we sent a
second request to Renner Otto today, September 8, requesting such documents.

DC's claim that the expert report and calendar entries are relevant towards "establishing when
Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing *Ms. Siegel's* purported
Superman interest" does not make sense, as Mr. Bulson did not represent Ms. Siegel's interest.
Even if DC meant to refer to the Michael Siegel interest, DC is well-aware that Laura and Joanne
Siegel authorized Mr. Emanuel to attempt to purchase Michael Siegel's Superman interest in
January 2003; DC is also aware that such offers on behalf of Mr. Emanuel, including the
communications between Mr. Toberoff and Mr. Bulson, have no bearing on any of DC's claims
for relief in this case and that Mr. Siegel was not even mentioned in DC's complaint.

4.    <u>Michael Siegel File:</u>  DC's assumption that Renner Otto "represented Mr. Siegel solely
with respect to his purported Superman interest," and that therefore any documents in Renner
Otto's files would be responsive to DC's subpoena, is inaccurate. DC's demand for a detailed
"log of all documents in [Renner Otto's] possession" – whether or not they are responsive or
non-responsive, privileged or non-privileged, produced or not-produced – is improper and not
required by *any* discovery rule or practice, nor does DC cite any authority that a subpoenaed
party is required to produce such a log.

Notably, DC claims that "[t]he Court's prior orders regarding the adequacy of the information
contained in defendants' privilege log are no bar to DC's proposal" is nonsense. DC claims that
it is "entitled to discover the information it seeks in the proposed log" – when that is ***exactly*** the
proposition that Magistrate Zarefsky rejected when he twice upheld defendants' privilege logs,
and Judge Wright rejected when he denied DC's motion for review of Magistrate Zarefsky's
rulings. DC's offer to "reimburse" Renner Otto to produce such a log is a transparent and
improper attempt to buy its way out of adverse discovery rulings.

5.    <u>Confidentiality Designations:</u>  DC's argument that the *Siegel* protective order does not
apply because the documents were produced by designation does not comport with that
protective order, which clearly states that it applies to "any writing produced in any Document

---

law governs the disposition of this issue: in 'federal question cases where pendent state law claims are
raised, the [federal rules] govern all claims of privilege.'")

**TOBEROFF & ASSOCIATES, P.C.**

September 8, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  3 of 3

Production by any party or non-party witness marked as 'CONFIDENTIAL'" (¶ 4) and binds the parties going forward.

Furthermore, DC's arguments about when and how documents were marked "Confidential" in *Siegel* are disingenuous.  Contrary to DC's assertions, the *Siegel* protective order does not require a party to mark a document as "Confidential" in any particular way, nor does it require a party to re-label a document as "Confidential" if the document was already marked as "Confidential."  Nor does DC dispute that the documents in question were produced and marked "Confidential" after the entry of the *Siegel* protective order.  Such documents are properly subject to such protective order.

Nonetheless, if DC will agree that the protective order in *Siegel* applies to documents marked "Confidential" that have been produced in this case by designation, defendants and the Estate will withdraw their objections and permit DC to question witnesses based on such documents subject to the terms of such protective order.

6.    <u>Protective Order re: Deposition:</u>  DC's position that the parties "should discuss a protective order concerning Renner Otto's business practices" is mystifying, considering that DC *publicly filed* the entire deposition transcript on August 8, 2011, as an exhibit to the declaration of Daniel Petrocelli.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

cc:    Josh Ryland

**EXHIBIT E**
**42**

# EXHIBIT F



## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 15, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Gerald A. Berk
Steuer Escovar Berk Brown
55 Public Square, Suite 1475
Cleveland, Ohio 44113

Re:  ***DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)**

Dear Counsel:

We write in response to your September 8, 2011, letter addressing issues raised in our August 29 letter regarding Don Bulson's deposition and production of documents.

1.  <u>Withdrawn Objections.</u>   Thank you for confirming the Estate's withdrawal of the objections identified in our August 29 letter regarding Mr. Bulson's deposition.

2.  <u>Objections re: Documents or Information Conveyed to Mr. Bulson by Michael Siegel.</u> You still cite to no authority to support your objection to examination of Mr. Bulson that "concerns or implicates the substance of *any communications* between Mr. Bulson and Michael Siegel," including "communications between Michael Siegel and Don Bulson regarding Mr. Siegel's communications with Laura Siegel Larson."  Nor has the Estate has identified any authority to support its instructions to Mr. Bulson to not answer questions regarding non-privileged documents conveyed to Mr. Bulson by Mr. Siegel.  *E.g.*, Tr. 30:1-36:2, 57:9-10, 60:22-61:6, 65:24-67:12.

The record is clear that Mr. Berk did not limit "communications" between Mr. Bulson and Mr. Siegel relating to the seeking or provision of legal advice.  To take an example, defendants claim, "Mr. Berk clearly asserted privilege as to Mr. Siegel's communications with Mr. Bulson about the May 13, 2003 letter, not the May 13 letter itself."  Mr. Berk explicitly argued the May 13 letter would become privileged if Mr. Siegel sent it to Mr. Bulson.  *See* Tr.

**EXHIBIT F**

**43**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 2

30:8-13 ("This would be privileged, unless he was to get this from Laura Siegel or someone else.
But if he got this from Michael Siegel, it would be part of -- be a *privileged document* as to
Mr. Bulson.") (emphasis added).[1]

It is apparent the Estate does not intend to withdraw it objections, so DC will file a
motion concerning them. Please let us know if you wish to discuss them further; we can do so
this week or next week.

3. <u>Expert Report/Calendar & Billing Entries</u>. You represent in your letter that the Estate
requested the "Renner Otto expert report and calendar/billing entries" from Renner Otto for the
first time on August 11. First, as we stated before, DC made it request for those documents
during Mr. Bulson's deposition on July 19. Tr. 23:11-29:7, 25:5-29:7. You have not provided
any explanation for why it took almost one month before you requested the documents from
Renner Otto. Nor have you explained why you waited almost a month before following up with
Renner Otto by sending a second request on September 8—especially given our letter of August
29. DC requests that the Estate produce the August 11 and September 8 requests to Renner Otto
since DC was not copied. Second, we have spoken with Mr. Ryland and he informed us that you
or Mr. Berk either are in possession of the report and calendar/billing entries, or have access to
them, as the Estate of Michael Siegel's lawyers. This means you had the documents when we
requested them on July 22, and have failed to produce them.

We disagree with your contentions regarding the relevance of the documents sought by
DC and see no point in further debating the issue. As we previously advised you, the timeline of
Mr. Bulson and Mr. Toberoff's interactions is directly relevant to, among other things,
establishing when Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing
Ms. Siegel's purported Superman interest (the date of Toberoff's first contacts with the heirs is a
disputed issue in the case); determining whether communications exchanged between
Mr. Toberoff and Mr. Bulson occurred but have neither been produced not logged (similar to
defendants' failure to produce or log Mr. Siegel's May 13 letter); and disproving defendants'
erroneous assertions of common interest.

Please let us know if you will commit to providing these materials by the end of next
week. If not, DC will have to file a motion. Please let us know if you wish to discuss the issue
further; we can do so this week or early next week.

4. <u>Michael Siegel File</u>. Defendants provide no support beyond conclusory statements
that documents exist in Renner Otto's digital copy of Mr. Siegel's files that are not responsive to

---

[1] *See also* Tr. 33:14-25 ("If the document was given by Michael Siegel to Mr. Bulson it
becomes part of his file, it also becomes part of the *privileged file* and part of the litigation or
representation by Mr. Bulson of Michael Siegel, and is therefore *privileged.* ... It's basic
privilege. It's part of the file."); Tr. 62:8-11 ("I'm going to object to that as well, because first of
all, if [the May 13 letter] exists and it's in his file, it becomes a privilege, and therefore not
discoverable.") (emphasis added to all).

**EXHIBIT F**
**44**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 3

DC's requests. There is no indication—and defendants cite to nothing—that Mr. Bulson represented Mr. Siegel in any matters beyond his purported Superman interest. Regardless, defendants' speculation is not grounds for preventing Renner Otto from preparing a log of all documents in their possession.

The true disagreement between the parties boils down to the level of detail DC is requesting Renner Otto including in generating a log of Mr. Siegel's file. Defendants do not explain how the Court's prior orders regarding defendants' privilege logs acts as a bar to DC's request of Renner Otto to prepare a comprehensive log of Mr. Siegel's file, assuming Renner Otto is willing to prepare it, and given that the detail DC seeks is fully consistent with that provided for under the rules.[2] No court in this case or the *Siegel* case has had the opportunity to address this specific request.

DC's offer to pay Renner Otto's expenses in preparing the proposed log is not "a transparent and improper attempt to buy its way out of adverse discovery rulings." As previously stated, DC's offer is intended to alleviate Renner Otto's asserted burden in appropriately responding to DC's subpoena and to avoid any dispute regarding who is responsible for the associated costs and expenses.

It is apparent the Estate does not intend to yield on this issue, so DC will file a motion. Please let us know if you wish to discuss the issue further; we can do so this week or early next week.

5. "Confidentiality" Designations. Defendants' continued attempts to extend the protections of the *Siegel* protective order to this case, absent an agreement, are unavailing. The parties expressly limited the *Siegel* protective order to the *Siegel* cases: The parties "hereby stipulate to and jointly request that the Court enter a Protective Order governing *this consolidated action* as follows." Case No. CV-04-8400, Docket No. 50 at 6 (emphasis added). Absent our express agreement, the *Siegel* protective order has no application here, and defendants do not dispute that they produced documents in this case by designation, without reservation of any rights or claims of confidentiality.

---

[2] *E.g., Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) (A log should identify the primary addressee; "[s]econdary addressee(s); persons copied and recipient (and the relationship of that person(s) to the client and/or author)."); *Narayan v. EGL, Inc.*, 2006 WL 3050851, at *1 (N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to include separate listing for attachments); *In re Heritage Bond Litig.*, 2004 WL 1970058, at *5 (C.D. Cal. July 23, 2004) (same); *Mold-Masters Ltd. v. Husky Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001) ("Since a document with an attachment constitutes two separate documents, a party objecting to the disclosure of a document with an attachment must prove that both the document and the attachment individually satisfy the requirements of the applicable privilege or doctrine."); RUTTER § 11:1919 ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

**EXHIBIT F**
**45**

O'MELVENY & MYERS LLP
September 15, 2011 - Page 4

Defendants' assertion that the *Siegel* protective order "does not require a party to mark a document as 'Confidential' in any particular way, nor does it require a party to re-label a document as 'Confidential' if the document was already marked 'Confidential,'" is equally without merit. The protective order in the *Siegel* cases limits the categories of documents that fall within its protections, and can therefore be marked "CONFIDENTIAL." *Id.* at ¶ 4. This requires the producing party to evaluate whether the underlying document can be marked "CONFIDENTIAL" under a several-part test and to so mark it as "CONFIDENTIAL" at the time of production. An underlying document that happens to have a "confidential" label affixed to it is not automatically protected because whoever applied that stamp previously, by definition, did not have this several-part test for marking documents before him or her.

Whether or not the *Siegel* protective order applies in this case has no impact on DC's ability to examine Mr. Bulson with the documents at issue since the protective order permits witnesses to be examined with documents marked "confidential." *See id.* ¶ 5. Therefore, DC does not agree to defendants' improper condition for withdrawing their objections.

Please let us know if you will withdraw the instructions and objections you made at Mr. Bulson' deposition on these confidentiality grounds. Tr. 95:3-99:22, 146:10-148:24, 158:1-160:7. If not, DC will have to file a motion. Please let us know if you wish to discuss the issue further; we can do so this week or early next.

6. <u>Protective Order re: Deposition</u>. Mr. Ryland requested that the parties' discuss a protective order concerning Renner Otto's business practices in advance of Mr. Bulson's further deposition later this fall. Tr. 25:14-26:4. Since Renner Otto's business practices were not the subject of any examination during Mr. Bulson's July 22 deposition, Mr. Ryland authorized DC to file the entire transcript as an exhibit to Mr. Petrocelli's declaration. We repeat our offer to draft a proposed protective order concerning Renner Otto's business practices and submit it to you and Mr. Ryland for review.

All of DC's rights are reserved.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

Enclosure(s)
cc:    Daniel M. Petrocelli, Esq.
       Jason Tokoro, Esq.
       Josh Ryland, Esq.
       Richard Kendall, Esq.

**EXHIBIT F**
**46**

# EXHIBIT G

Subject:            FW: DC v. PPC
Attachments:        9-15-11 M. Kline Ltr to Toberoff & Berk.pdf

**From:** Tokoro, Jason
**Sent:** Wednesday, September 21, 2011 6:34 PM
**To:** Marc Toberoff; 'Keith Adams'; Gerald A. Berk (gberk@sebblaw.com)
**Cc:** Petrocelli, Daniel; Kline, Matthew; 'jryland'; 'rkendall@kbkfirm.com'; 'lbrill@kbkfirm.com'
**Subject:** FW: DC v. PPC

Please see correspondence below sent on behalf of Matthew T. Kline.

*          *          *

Counsel,

We have not received a response to the attached correspondence sent last week Thursday, September 15.  You are not complying with your obligations timely to meet and confer or to produce documents and privilege logs in a timely manner.

All of DC's rights are reserved.

Very Truly Yours,

Matt

**From:** Tokoro, Jason
**Sent:** Thursday, September 15, 2011 4:32 PM
**To:** Keith Adams; Marc Toberoff; Gerald A. Berk (gberk@sebblaw.com)
**Cc:** Petrocelli, Daniel; Kline, Matthew; jryland; rkendall@kbkfirm.com; lbrill@kbkfirm.com
**Subject:** RE: DC v. PPC

Counsel,

Please see attached correspondence sent on behalf of Matthew T. Kline.

Very Truly Yours,

Jason H. Tokoro

**From:** Keith Adams [mailto:kgadams@ipwla.com]
**Sent:** Thursday, September 08, 2011 7:17 PM
**To:** Kline, Matthew; Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason
**Cc:** Joshua Ryland; Marc Toberoff
**Subject:** Re: DC v. PPC

Counsel:

Please see the attached correspondence from Marc Toberoff.

Keith G. Adams
Toberoff & Associates, P.C.

1

**EXHIBIT G**
**47**

2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read,
copy, distribute or use this information. If you have received this transmission in error, please notify the sender
immediately by reply e-mail and then delete this message.

--- On **Mon, 8/29/11, Tokoro, Jason <_jtokoro@OMM.com_>** wrote:

From: Tokoro, Jason <jtokoro@OMM.com>
Subject: DC v. PPC
To: "'Marc Toberoff'" <mtoberoff@ipwla.com>, "'Keith Adams'" <kgadams@ipwla.com>, "Gerald A. Berk (gberk@sebblaw.com)" <gberk@sebblaw.com>
Cc: "Petrocelli, Daniel" <DPetrocelli@OMM.com>, "Kline, Matthew" <MKline@OMM.com>, "Hayden, Aaron" <AHayden@OMM.com>, "jryland" <jryland@rennerotto.com>, "rkendall@kbkfirm.com" <rkendall@kbkfirm.com>, "lbrill@kbkfirm.com" <lbrill@kbkfirm.com>
Date: Monday, August 29, 2011, 2:57 PM

Counsel,


Please see attached correspondence sent on behalf of Matthew T. Kline.

**Jason H. Tokoro**
**O'Melveny & Myers LLP - Century City**
1999 Avenue of the Stars, Suite 700
Los Angeles, California 90067
Direct Dial: (310) 246-6707
Fax: (310) 246-6779
Email: jtokoro@omm.com

_This message and any attached documents contain information from the law firm
of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are
not the intended recipient, you may not read, copy, distribute, or use this
information. If you have received this transmission in error, please notify the
sender immediately by reply e-mail and then delete this message._

 please consider the environment - do you really need to print this email?

**EXHIBIT G**
**48**

# EXHIBIT H

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 22, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Matt:

I write on behalf of defendants and the Estate of Michael Siegel (the "Estate") in response to your September 15, 2011 letter regarding Don Bulson's deposition.

<u>Documents Conveyed to Mr. Bulson:</u>  DC continues to repeat the straw man argument that "non-privileged documents do not become privileged because they are sent to an attorney," and that therefore the Estate's objections as to Mr. Siegel's communications with Mr. Bulson about the May 13 letter were improper.  Mr. Berk's colloquy regarding whether the May 13 letter is privileged is irrelevant given that the May 13 letter was produced and neither the Estate nor defendants have claimed privilege on that letter.  Nor has DC addressed the Estate's point that a client's communications with an attorney about non-privileged documents are privileged.

<u>Expert Report/Calendar & Billing Entries:</u>  We have still not received these documents from Renner Otto for privilege review on behalf of the Estate of Michael Siegel.  We sent e-mails to Renner Otto on August 11 and again on September 8, but have not yet received a response.  We look forward to reviewing these documents when we receive them.

DC's vague response that Mr. Ryland "informed us [*i.e.,* DC] that you or Mr. Berk either are in possession of the report and calendar/billing entries, or have access to them, as the Estate of Michael Siegel's lawyers" is not responsive to the fact that we requested and have still not received for privilege review the documents Renner Otto believes are responsive to DC's request.  We will renew our request to Renner Otto and hopefully this matter can be expeditiously resolved.

**EXHIBIT H**
**49**

**TOBEROFF & ASSOCIATES, P.C.**

September 22, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 3

DC's complaints about the timing of our requests to Mr. Ryland is odd given DC's lengthy delays in responding to our letters on this topic – for example, DC did not respond to my August 11 letter until August 29, 2011.

As previously pointed out in my September 8, 2011 letter,  DC's ongoing argument that the documents are relevant to "establishing when Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing *Ms.* Siegel's purported Superman interest" makes no sense because such inquiry never took place, and Mr. Bulson did not represent Ms. Siegel's interest.

As far as the routine e-mails between defendants' counsel and Mr. Ryland, DC has no outstanding discovery requests that seek such communications.  Moreover, as at Mr. Bulson's deposition itself, DC continues to have communications with Mr. Ryland to which defendants are not copied or otherwise privy.  Lastly, such documents are clearly privileged pursuant to Magistrate Zarefsky's May 5, 2011 order.  Docket No. 239.

Michael Siegel File:  As stated previously, DC's assumption that the entire Michael Siegel file in Renner Otto's possession is relevant and solely limited to Mr. Siegel's "purported Superman interest" is inaccurate.  This is not "speculation," as DC asserts.

DC's claim that this dispute "boils down to the level of detail DC is requesting Renner Otto to includ[e]" in a privilege log and that "[n]o court … has had the opportunity to rule on this specific request" is sophistry.

DC litigated the issue of how much detail was required on logs with specific reference to "Michael Siegel" documents on no fewer than three occasions, and was denied each time. *See* Docket Nos. 209, 248, 285.  Magistrate Zarefsky clearly ruled as to the level of detail to be included in a privilege log in his April 25, 2011 order.

Magistrate Zarefsky's September 15, 2011 order (Docket No. 323) on DC's motion to compel correspondence between Ms. Larson and Mr. Siegel also addressed this issue:

> Perhaps there has in fact been a difficulty in knowing what is contained in the privilege logs, but the descriptions are in keeping with Ninth Circuit case law on the subject, as the Court has ruled in both the prior case and the present case, in response to motions that [DC] has made, several times, for elaborations on such logs.
> At some point a matter has to be set aside, and parties go on to other issues.

Confidentiality Designations:  DC's position – that documents marked "Confidential" and protected under a stipulated protective order in *Siegel* are no longer confidential/ protected because such documents were designated by their Bates numbers as responsive to DC's requests in this case – is extremely unreasonable on its face.  This matter does not warrant burdensome motion practice.

**EXHIBIT H**
**50**

**TOBEROFF & ASSOCIATES, P.C.**

September 22, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 3

<u>Protective Order re: Depositions:</u>  The protective order we proposed to you would cover depositions as well as other discovery.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

cc:     Josh Ryland

**EXHIBIT H**
**51**

# EXHIBIT I

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

November 9, 2011

<u>Via E-Mail</u>

Dan Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dan:

I write to follow up on certain outstanding discovery issues.

As to your October 19 and November 4, 2011 letters, those letters simply re-stated the erroneous factual contentions originally set forth in your October 7, 2011 letter, which were addressed in my October 14, 2011 letter. In fact, while your October 7, October 19 and November 4, 2011 letters vaguely allude to "issues" and DC's desire to re-depose Dawn Peavy and Mark Warren Peary, there does not appear to be any concrete dispute for the parties to address.

In response to the inquiry in Mr. Tokoro's November 4, 2011 letter, Ms. Larson will complete her review of her mother's documents, and any relevant, responsive documents will be produced to DC by no later than November 25, 2011. Ms. Larson was in the process of completing her review when her building's mangers announced that they will be fumigating the entire premises, which will require her to pack her belongings, etc., and will delay her by a couple of weeks.

Lastly, please be advised that, in addition to the log already produced by Renner Otto and incorporated in defendants' privilege logs, defendants anticipate that they will produce a log of the "Bulson" electronic archive at the same time that Ms. Larson produces any remaining "Joanne Siegel" documents.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

**EXHIBIT I**
**52**

# EXHIBIT J



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH
NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
SINGAPORE
TOKYO
WASHINGTON, D.C.

November 11, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Re:    ***DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)**

Dear Marc:

We write in response to your letter of yesterday addressing various outstanding discovery issues.

1. <u>Jean Peavy Will</u>.  You have not responded to the issues we raised in our October 7, October 19, and November 4 letters.  Your assertion that "there does not appear to be any concrete dispute for the parties to address" is contradicted by the record.

First, you do not address the fact that at his June 29 deposition, defendant Mark Warren Peary testified that he believed Dawn Peavy would share with him under the Peavy Will.  M. Peary Tr. at 76:14-80:4.  At Dawn Peavy's August 3 deposition, she also testified that it was her understanding that she would benefit under the will, as discussed with Mr. Peary.  D. Peavy Tr. at 49:14-51:3.  The Peavy Will contradicts these assertions and discloses that Mr. Peary is the sole beneficiary of the estate.  Neither Mr. Peary nor Dawn Peavy testified that Dawn would share in her mother's estate's assets only if her mother first set up a trust, otherwise amended her will, or Mr. Peary pre-deceased his mother.  We are entitled to examine Dawn Peavy and Mr. Peary regarding this inconsistency.  In addition, you have nowhere addressed DC's right to depose both Dawn Peavy and Mr. Peary concerning the recent agreement between Mr. Peary and Pacific Pictures that you produced in September.

Second, we remain concerned about the conduct and credibility of your client, and the conflicts of interest on your part, especially since you represent also Ms. Peavy.  This concern is highlighted by Ms. Peavy and Mr. Peary's inconsistent testimony about the distribution of the estate and ensuing failure to correct their testimony.  We need to address these issues promptly.

O'MELVENY & MYERS LLP
November 11, 2011 - Page 2

    2. <u>Laura Siegel Larson Review</u>.  We requested that defendant Laura Siegel Larson review her mother's files and produce or log responsive documents at her July 22, 2011, deposition, almost four months ago.  We cannot wait any longer.

    3. <u>Bulson Log</u>.  It is unclear what you mean in saying that "defendants anticipate that they will produce a log of the 'Bulson' electronic archive."  Please confirm that defendants will be providing DC with a log of Renner Otto's entire digital copy of Mr. Siegel's files identifying who authored the document, to whom it was sent (if anyone), the date of the document, when it was received by Renner Otto (if that date is known), and the total number of pages for each individual document.  Also, please confirm that attachments and enclosures will be listed separately, as would each part of an email chain.

    4. <u>Bulson Document Production</u>.  You letter once again does not provide a date certain when you will complete your review and produce or log Renner Otto's expert report and its calendar and billing entries.  It has been four months since we made our request at Mr. Bulson's July 19, 2011, deposition, and there is no justification for defendants' delay.  Please confirm that you will complete your review no later than next Friday, November 18.

                  Very truly yours,

                  /s/ Daniel M. Petrocelli

                  Daniel M. Petrocelli
                  of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline, Esq.
       Richard Kendall, Esq.

**EXHIBIT J**
**54**

# EXHIBIT K

**From:** Keith Adams [mailto:kgadams@ipwla.com]
**Sent:** Friday, November 25, 2011 6:29 PM
**To:** Seto, Cassandra; Kline, Matthew; Petrocelli, Daniel
**Subject:** DC Comics v. Pacific Picture Corp.


Counsel:, we had originally intended produce (i) the "Bulson Log" for the files from the Renner Otto electronic archive, (ii) any responsive non-privileged materials from the Renner Otto electronic archive, and (iii) any materials from Laura Siegel Larson's review of her late mother's files today.  However, due to conflicts earlier this week and the intervening Thanksgiving holiday, we are unable to produce the materials today and will produce them Monday or Tuesday of next week.

Keith G. Adams
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
Email: kgadams@ipwla.com
http://www.ipwla.com

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

1

**EXHIBIT K**
**55**

# EXHIBIT L

LAW OFFICES
## RENNER, OTTO, BOISSELLE & SKLAR, LLP
1621 EUCLID AVENUE, NINETEENTH FLOOR
CLEVELAND, OHIO 44115-2191
TEL: (216) 621-1113   FAX: (216) 621-6165
EMAIL: MailRoom@RennerOtto.com

JOSHUA M. RYLAND
JRYLAND@RENNEROTTO.COM

July 15, 2011

**VIA EMAIL**

Matthew Kline
MKline@OMM.com
Jason Tokoro
jtokoro@OMM.com
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re: ***Third-Party Subpoena of Don W. Bulson, Esq. in the matter of DC Comics v. Pacific Pictures, et al.***

Dear Counsel,

I am writing to follow up on our conversations regarding the subpoenas served on Don Bulson on or about May 10, 2011. As you are aware, neither Mr. Bulson nor Renner Otto represent Michael Siegel, his estate, or any other party relating to the matter listed above. As you are also aware, Renner Otto provided Michael Siegel's entire case file to the lawyers for his estate in 2006. That same year, Warner Brothers Entertainment, Inc. filed a motion to compel Mr. Bulson's production of certain documents and his deposition in the United States District Court for the Northern District of Ohio. In 2008, the Northern District of Ohio ruled on that motion and Mr. Bulson provided his deposition. (*See JoAnne Siegel, et al. v. Warner Bros. Entertainment, Inc.*, Case No. 06-MC-99.)

While the May 2011 subpoenas appear to cover the same ground as the production and deposition requests made in 2006, Mr. Bulson's sole interest in this matter is complying fully with any properly issued subpoena. To that end, Mr. Bulson will appear for his deposition, as agreed, on July 19, 2011 in Renner Otto's offices. As we discussed, both Mr. Bulson and I have 5PM commitments that day that we intend to keep. Given that

**EXHIBIT L**
**56**

Matthew Kline
Jason Tokoro
July 15, 2011

Mr. Bulson testified to the same subject matter in 2008, and given his cooperation, I trust that these commitments will not be a problem.  If we need to move the deposition's start time (9AM) to accommodate those commitments, please let me know.

Mr. Bulson's desire to cooperate with the parties certainly also extends to the document subpoenas.  In response to the document subpoena Mr. Bulson received, Mr. Bulson's files were searched.  That search produced the following: (1) an electronic archive of the files provided to Mr. Siegel's estate's lawyers, and (2) miscellaneous documents relating to the 2006 motion to compel.

As we discussed, however, Mr. Bulson is in a unique position with respect to producing the documents that remain in his possession.  Mr. Siegel is Mr. Bulson's former client.  After he died, Mr. Siegel's estate terminated that Mr. Bulson's (and Renner Otto's) representation.  As such, while Mr. Bulson may possess documents relating to Mr. Siegel that may contain information subject to privileges and/or immunities, neither Mr. Bulson nor Renner Otto can assert or waive any privilege or immunity relating to these remaining archives.  That decision, of course, needs to come from the parties having the proper authority—namely, the estate of Mr. Siegel.

At the same time, Mr. Bulson has a duty to comply with any properly served subpoena.  Without waiving any objections he may have (which will be provided), Mr. Bulson indentified potentially responsive documents, maintained them, and informed both parties as to the broad categories of information in his possession.  As we discussed, these items will also be burned to a disk and provided to Mr. Toberoff with a copy to the lawyers for Mr. Siegel's estate (both copied on this letter).  In addition, there were several documents not within the electronic archive that Mr. Bulson was willing to produce subject to the appropriate privilege review.

Renner Otto provided those documents to Mr. Toberoff to ensure that no issues of privilege or immunity would be implicated by their production.  As the attached letter from Mr. Toberoff indicates, Mr. Toberoff instructed Renner Otto that two items—the 2006 letter to Mr. Siegel's estate's lawyer (Mr. Banchek) and the screen capture—were not appropriate for production.  Given that Mr. Bulson has no authority to make any decisions with respect to privilege, Mr. Toberoff's requests will be honored.  Accordingly, also attached to this letter are the non-privileged documents that remain after Mr. Toberoff's review.

This circuitous review and production only underscores Mr. Bulson's challenge in responding to the parties' various demands.  To be clear, we do not think it is appropriate that Mr. Bulson is being asked to resolve these document issues by dealing with the

2

**EXHIBIT L**
**57**

Matthew Kline
Jason Tokoro
July 15, 2011

parties separately.  Both parties are aware that (1) Mr. Bulson is not free to make any decisions with respect to production, privilege, and the like, and (2) that the archive documents at Renner Otto are a duplicate of the files possessed by the Michael Siegel's estate.   Given these facts, Mr. Bulson has identified what is in his possession in a forthright manner, agrees to preserve those documents for the time being, and asks that the parties work together to resolve any remaining issues.  Provided that no undue burden is placed on Mr. Bulson or Renner Otto, Mr. Bulson remains fully willing to comply with the parties' resolution—and certainly with any court order.

I look forward to meeting with you all on July 19.  Please let me know if you have any questions or concerns in the meantime.

Very truly yours,

Joshua M. Ryland

cc:   Don Bulson (via email)
      Marc Toberoff (via email)
      Gerald Berk (via U.S. mail)

3

**EXHIBIT L**

**58**

# EXHIBIT M

1

1

2          UNITED STATES DISTRICT COURT

3          CENTRAL DISTRICT OF CALIFORNIA
              WESTERN DIVISION

4

5

DC COMICS,                    )
6                             )
                              )
7      PLAINTIFF,             )
                              )
8          VS.                ) CASE NO. CV 10-03633-ODW(RZX)
                              )
9                             )
PACIFIC PICTURES CORP.,       )
10 ET AL.,                    )
                              ) LOS ANGELES, CALIFORNIA
11                            ) JUNE 20, 2011
                              ) (10:38 A.M. TO 11:32 A.M.)
12     DEFENDANTS.            )
   _____)

13

14                    HEARING
      BEFORE THE HONORABLE RALPH ZAREFSKY
15       UNITED STATES MAGISTRATE JUDGE

16

17

18 APPEARANCES:         SEE NEXT PAGE

19 COURT REPORTER:      RECORDED; COURT SMART

20 COURTROOM DEPUTY:    ILENE BERNAL

21 TRANSCRIBER:         DOROTHY BABYKIN
                        COURTHOUSE SERVICES
22                      1218 VALEBROOK PLACE
                        GLENDORA, CALIFORNIA  91740
23                      (626) 963-0566

24 PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

25

2

```
 1    APPEARANCES:  (CONTINUED)
      FOR THE PLAINTIFF:        O'MELVENY & MYERS LLP
 2                              BY:  MATTHEW T. KLINE
                                     JASON TOKORO
 3                                   CASSANDRA L. SETO
                                     ATTORNEYS AT LAW
 4                              1999 AVENUE OF THE STARS
                                7TH FLOOR
 5                              LOS ANGELES, CALIFORNIA  90067

 6
      FOR SIEGEL AND SHUSTER    TOBEROFF & ASSOCIATES, P.C.
 7    DEFENDANTS:               BY:  MARC TOBEROFF
                                     KEITH GREGORY ADAMS
 8                                   ATTORNEYS AT LAW
                                2049 CENTURY PARK EAST
 9                              SUITE 2720
                                LOS ANGELES, CALIFORNIA  90067
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT M**
**60**

3

```
 1                          I N D E  X

 2    CASE NO. CV 10-03633-ODW(RZX)                  JUNE 20, 2011

 3    PROCEEDINGS:   1.   PLAINTIFF'S MOTION FOR RECONSIDERATION OF
                          APRIL 11, 2011 ORDER
 4                   2.   PLAINTIFF'S MOTION TO COMPEL THE FURTHER
                          PRODUCTION OF DOCUMENTS
 5                   3.   DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT M**
**61**

4

```
1        LOS ANGELES, CALIFORNIA; MONDAY, JUNE 20, 2011; 10:38 A.M.

2              THE CLERK:  ITEM NUMBER 3, CASE NUMBER

3    CV 10-03633-ODW(RZX), DC COMICS VERSUS PACIFIC PICTURES CORP.,

4    ET AL.

5              COUNSEL, PLEASE MAKE YOUR APPEARANCES.

6              MR. TOBEROFF:  GOOD MORNING, YOUR HONOR.

7              MARC TOBEROFF FOR THE DEFENDANTS.

8              THE COURT:  NOW, MR. TOBEROFF, THE LAST TIME YOU WERE

9    HERE I TEASED YOU ABOUT THE FACT THAT YOU DIDN'T HAVE BUSINESS

10   CARDS.  AND YOU SAID, WELL, I'VE JUST MOVED.  AND STILL ALL I

11   GET IS A POST-IT.

12             MR. TOBEROFF:  WE STILL DON'T HAVE CARDS.  WE HAVEN'T

13   MOVED YET.  WE WERE SUPPOSED TO MOVE, BUT WE HAVEN'T MOVED YET.

14             THE COURT:  ALL RIGHT.

15             MR. TOBEROFF:  I WAS GOING TO GET THEM MADE SPECIALLY

16   UP FOR YOU, BUT IT --

17             THE COURT:  WELL, MAYBE THAT'S WHAT YOU SHOULD DO.

18             MR. TOBEROFF:  -- SLIPPED MY MIND.

19             THE COURT:  ALL RIGHT.  LET'S GET THE OTHER

20   APPEARANCES.

21             MR. KLINE:  YOUR HONOR, MATT KLINE ON BEHALF OF DC

22   COMICS FROM O'MELVENY & MYERS ALONG WITH MY COLLEAGUES

23   CASSANDRA SETO AND JASON TOKORO.

24             THE COURT:  ALL RIGHT.

25             OKAY.  WE HAVE THREE MOTIONS HERE.
```

**EXHIBIT M**
**62**

5

1          MR. KLINE:  WE DO, YOUR HONOR.  AND WITH YOUR

2     INDULGENCE, I'D LIKE TO START WITH THE MOTION FOR

3     RECONSIDERATION.

4          THE COURT:  WELL, THAT'S THE ONE I WAS GOING TO START

5     WITH.  SO, YOU GO AHEAD.

6          MR. KLINE:  REALLY TWO ISSUES PRESENTED HERE.

7          THE FIRST IS SEEKING JULY CORRESPONDENCE FROM MS.

8     LARSON TO HER BROTHER MICHAEL SIEGEL.

9          AND THE REASON WHY WE'RE HERE ON THIS MOTION FOR

10    RECONSIDERATION IS THERE'S PRETTY POWERFUL NEW EVIDENCE THAT

11    SUCH A JULY LETTER EXISTS.  AND THE POWERFUL NEW EVIDENCE FOR

12    THAT IS THE MAY 13TH, 2003 DOCUMENT THAT YOU ORDERED PRODUCED

13    IN APRIL.

14         AND JUST TO FRAME THE ISSUE, YOUR HONOR, THIS IS

15    DOCKET NUMBER 162-6 AT 47.  THIS IS ONE OF THE PIECES OF

16    EVIDENCE WE'VE CITED IN OUR BRIEF.

17         THERE ARE FIVE PRIVILEGE LOG ENTRIES ON DEFENDANT'S

18    LOGS FROM JULY 2003 THAT INCLUDE THE IDENTITY OF THE AUTHOR IS

19    LAURA SIEGEL LARSON.  IT GOES TO ATTORNEY MARC TOBEROFF.  IT'S

20    CLAIMED TO BE A FACSIMILE.  AND THEN THE PRIVILEGE CLAIM IS

21    ATTORNEY-CLIENT PRIVILEGE.

22         AND IF YOU BELIEVE THE TOBEROFF TIME LINE DOCUMENT,

23    THEY SAY THAT THERE'S A JULY 5TH, 2003 LETTER THAT MS. LARSON

24    SENT TO HER BROTHER.

25         IF YOU LOOK AT SOME OF THE "Q" NUMBERS AND THE ESCROW

**EXHIBIT M**
**63**

6

1   NUMBERS AND MR. SMITH'S DECLARATION FROM WAY BACK WHEN, WE

2   THOUGHT IT WAS AROUND JULY 11TH THAT THIS LETTER IS SENT FROM

3   SISTER TO BROTHER, A NON-PRIVILEGED LETTER.

4           AND TO BE REALLY CLEAR, IN YOUR LAST RULING YOU SAID

5   A COUPLE OF THINGS.  YOU SAID, ONE, DEFENDANTS HAVE BEEN

6   CRYPTIC ABOUT WHETHER THIS SISTER-TO-BROTHER LETTER EXISTS.

7   BUT I'M NOT GOING TO RECONSIDER THAT BECAUSE YOU DON'T HAVE ANY

8   NEW EVIDENCE FOR ME TO CONSIDER -- RECONSIDER JUDGE LARSON'S

9   RULING IN SIEGEL.  AND I'M GOING TO TREAT THIS AS LAW OF THE

10  CASE.

11          WE THINK THAT THE NEW EVIDENCE IS OBVIOUSLY THE MAY

12  2013 LETTER -- I'M SORRY, MAY 2003 LETTER BECAUSE IT ASKED

13  THESE 12 QUESTIONS OF THE SISTER.  THERE'S NEVER BEEN A

14  RESPONSE PRODUCED.  THERE'S NO DECLARATION FROM MR. TOBEROFF.

15  THERE'S NO DECLARATION FROM MS. LARSON HERSELF SAYING I NEVER

16  SENT SUCH A LETTER.  I DON'T KNOW WHAT THEY'RE TALKING ABOUT.

17  THAT'S NOT WHAT THESE PRIVILEGE LOG ENTRIES ARE.

18          AND I THINK WHAT'S REALLY IMPORTANT HERE TO THINK

19  ABOUT IS THE FOLLOWING.

20          AND, JASON, CAN YOU HOLD UP THE OTHER DOCUMENT.

21          (PAUSE IN PROCEEDINGS.)

22          MR. KLINE:  WAY BACK IN MAY 2003 -- NO, SORRY, MAY

23  2007, THE ISSUE OF THE TOBEROFF TIME LINE DOCUMENT CAME UP.

24  AND DC WAS SAYING WE DON'T THINK ALL THE DOCUMENTS THAT ARE

25  ATTACHED TO THE TOBEROFF TIME LINE DOCUMENT HAVE EITHER BEEN

**EXHIBIT M**
**64**

7

1    PRODUCED OR LOGGED.

2            AND YOU SAID AT A HEARING, MR. TOBEROFF, I THINK

3    YOU'VE LOST SOME WIGGLE ROOM HERE.  PLEASE SUBMIT A DECLARATION

4    TO ME THAT GOES THROUGH EVERY SINGLE ONE OF THE ENTRIES.

5            AND IF YOU LOOK OVER HERE, HERE ARE THE BATES NUMBERS

6    THAT THE ESCROW AFFIXED TO THE DOCUMENTS.

7            -- AND TELL ME WHETHER -- WHERE IT IS.

8            AND IN SOME INSTANCES THEY SAID, WELL, IT'S AT

9    PRIVILEGE LOG ENTRY NUMBER 325.  OTHER TIMES THEY SAID, WELL,

10   HERE IT'S BEEN PRODUCED.

11           THIS OBVIOUSLY WAS THE TOBEROFF TIME LINE DOCUMENT.

12           THEY HAVE NOW ADMITTED IN THEIR RESPONSES --

13   RESPONSIVE BRIEFINGS ON THE BRIEFS FOR TODAY'S HEARING THAT THE

14   MAY 13TH, 2003 LETTER IS AMONG THE STOLEN DOCUMENTS.  BUT IF

15   YOU READ THIS LOG BEGINNING TO END, THERE'S ABSOLUTELY NO

16   INDICATION OF WHERE THAT MAY 13TH, 2000 DOCUMENT EXISTS.

17           AND, SO, THERE'S TWO PROBLEMS PRESENTED THERE.  ONE

18   IS, A LOT OF WIGGLE ROOM WAS LEFT.  AND A DOCUMENT LIKE THE MAY

19   13TH, 2003 DOCUMENT, DESPITE THE COURT'S ORDERS, EITHER PRODUCE

20   THE DOCUMENTS THAT YOU HAVEN'T LOGGED BEFORE OR TELL ME WHERE

21   THERE'S LOGGED -- WAS SLOTTED, NUMBER ONE.

22           AND, NUMBER TWO, I KNOW WE KEEP ON RAISING THIS

23   POINT, BUT THE PRIVILEGE LOGS IN THIS CASE ARE JUST -- THEY'RE

24   TOO OPAQUE.  AND I UNDERSTAND THAT THERE'S NO HARD AND FAST

25   RULE ABOUT HOW MUCH DETAIL ONE MUST REQUIRE.  AND I UNDERSTAND

**EXHIBIT M**
**65**

8

1    THE SIEGEL CASE AND IN THE RUTTER GUIDE ITSELF, IT BLESSES

2    CERTAIN FORM USES OF PRIVILEGE LOGS.

3         BUT I THINK IF YOU LOOK AT RUTTER AND SPECIFICALLY

4    SECTION 11:1918, IT SAYS VERY SPECIFICALLY THAT THE BEST

5    PRACTICE IS TO SEPARATELY LIST ATTACHMENTS TO DOCUMENTS.

6         AND DOUBTLESS, THE MAY 13TH, 2003 LETTER IS AN

7    ATTACHMENT TO ONE OF THESE DOCUMENTS OVER WHICH THEY CLAIM

8    PRIVILEGE.  WE ALSO BELIEVE THAT THE JULY 2003 CORRESPONDENCE

9    FROM THE SISTER TO HER BROTHER IS AN ATTACHMENT AS WELL.

10        AND, SO, WE'RE REALLY SEEKING TWO ORDERS ON THIS

11   MOTION.  THE FIRST IS GO THROUGH ALL THE JULY CORRESPONDENCE

12   THAT YOU HAVE, DEFENDANTS.  AND IF SUCH A LETTER FROM SISTER TO

13   BROTHER EXISTS OR DRAFTS OF IT, YOU MUST PRODUCE IT.

14        AN ALTERNATIVE WAY OF GETTING AT THAT ISSUE, YOUR

15   HONOR, IS FOR YOU TO ORDER THE IN CAMERA INSPECTION OF THOSE

16   FIVE PRIVILEGE LOG ENTRIES FROM MS. LARSON TO MR. TOBEROFF

17   DURING THAT RELEVANT TIME PERIOD.  AND, AGAIN, THOSE PRIVILEGE

18   LOG ENTRIES ARE 7/12 THROUGH 7/15.

19        BUT I THINK THE THIRD AND MOST IMPORTANT THING IS

20   WE'RE JUST GOING TO BE BACK HERE AGAIN AND AGAIN AND AGAIN

21   UNLESS THERE IS AN ORDER THAT MORE SPECIFIC PRIVILEGE LOGS BE

22   PRODUCED IN THIS CASE.  I THINK ONCE THE TOBEROFF TIME LINE

23   DOCUMENTS COME PRODUCED, WE'RE GOING TO FIND MANY, MANY MORE

24   DOCUMENTS THAT WERE NOT PRIVILEGED THAT WERE IMPROPERLY

25   WITHHELD AND WERE BURIED BEHIND OPAQUE PRIVILEGE LOG ENTRIES

9

1    LIKE THIS.  AND I THINK THERE'S A NEED NOW TO DO THAT.

2            NOW, WHAT'S -- I KNOW YOU HAVE TO BALANCE THE

3    EQUITIES IN THINKING ABOUT ISSUING A DISCOVERY ORDER LIKE THAT.

4    ON THE ONE HAND, I THINK IT WOULD REQUIRE THEM SEVERAL DAYS TO

5    GO THROUGH THEIR CURRENT PRIVILEGE LOGS AND UPDATE THEM TO

6    INCLUDE THE FOLLOWING:

7            IF A DOCUMENT IS A SEPARATE ATTACHMENT, LIST IT AS A

8    SEPARATE ATTACHMENT.

9            IF THERE ARE SEVEN EMAILS IN A CHAIN, AND YOU'RE

10   CLAIMING ONE IS PRIVILEGED OR TWO ARE PRIVILEGED OR ALL SEVEN

11   ARE PRIVILEGED, LIST THEM OUT SEPARATELY.

12           NUMBER THREE, WHO ARE THE TRUE AUTHORS AND RECIPIENTS

13   OF THESE DOCUMENTS.  IF IT'S A LETTER FROM SISTER TO BROTHER,

14   THAT'S A LETTER COMMUNICATED TO THE ATTORNEY, THE SENDER IS THE

15   SISTER.  THE RECIPIENT IS THE BROTHER.  AND THE ATTORNEY IS A

16   LATER C.C.

17           AND IF YOU LOOK AT THE RUTTER GUIDE, IT'S VERY CLEAR

18   THAT THESE ARE THE BETTER PRACTICES TO FOLLOW HERE.  WE'RE NOT

19   ASKING FOR SOME NOVEL EXCEPTION HERE.  RUTTER SAYS THESE ARE

20   THE BETTER PRACTICES TO FOLLOW TO AVOID DISPUTES LIKE THIS.

21           AND, SO, ON THE OTHER HALF OF THE EQUATION IS WHAT IS

22   THE PREJUDICE TO DC OF NOT HAVING THIS INFORMATION.  THE

23   PREJUDICE TO DC IS NOT HAVING ACCESS TO RELEVANT, PERTINENT,

24   PROBATIVE INFORMATION LIKE THE MAY 2003 LETTER OR THE JULY 2003

25   LETTER THAT WE CURRENTLY DON'T HAVE.

10

1          THAT'S THE NUB OF OUR ARGUMENT ON THE MOTION FOR

2     RECONSIDERATION.

3          I KNOW THAT THE DEFENDANTS HAVE MADE A PROCEDURAL

4     ARGUMENT THAT THIS MOTION IS MOOT OR SOMEHOW BARRED BY JUDGE

5     WRIGHT'S ONE-WORD DENIAL OF OUR MOTION TO REVIEW IN FRONT OF

6     HIM.  THAT JUST CAN'T BE THE CASE FOR TWO REASONS.

7          NUMBER ONE, VERY DISTINCT LEGAL STANDARDS AND

8     DIFFERENT ONES.  ON THE ONE HAND, HE WAS REVIEWING YOUR RULING

9     FOR CLEAR ERROR BASED ON THE RECORD IN FRONT OF YOU.  THAT

10    RECORD DID NOT INCLUDE THE MAY 13TH, 2003 LETTER.

11         MOTION FOR RECONSIDERATION:  DIFFERENT STANDARD.

12    HAVE NEW FACTS EMERGED.  AND CLEARLY, THIS IS A NEW FACT THAT

13    WAS NOT BEFORE THE COURT.

14         AND, YOUR HONOR, I WANT TO BE VERY CLEAR ABOUT THIS.

15         THERE WERE TWO COURT ORDERS, ONE FROM 2007 --

16         THE COURT:  NO.  I'VE READ --

17         MR. KLINE:  -- AND ONE FROM 2000- --

18         THE COURT:  -- ALL THIS.

19         MR. KLINE:  OKAY.  SO, I DON'T WANT TO RETREAD THAT

20    GROUND.  BUT THAT'S BASICALLY OUR SUBMISSION ON THE MOTION FOR

21    RECONSIDERATION.

22         THE COURT:  ALL RIGHT.  LET ME HEAR FROM MR.

23    TOBEROFF.

24         MR. TOBEROFF:  GOOD MORNING, YOUR HONOR.

25         THE COURT:  GOOD MORNING.

11

1        MR. TOBEROFF:  THE SOLE BASIS -- THE PURPORTED BASIS

2  FOR THEIR BRINGING THIS MOTION FOR RECONSIDERATION IS THE MAY

3  13TH LETTER, WHICH THEY HAVE DECLARED IS A STUNNING REVELATION.

4  AND IT'S BARELY, IF AT ALL, RELEVANT TO THIS CASE.

5        THEY MADE THE EXACT SAME ARGUMENTS REGARDING THE --

6  AND IT DOESN'T -- BY THE WAY, THE MAY 13TH LETTER HAS NO

7  BEARING ON THE VERACITY OF OUR PRIVILEGE LOGS BECAUSE THE MAY

8  13TH LETTER WAS NOT LOGGED.  AND WHEN THIS BECAME AN ISSUE AND

9  THE FOCUS WAS ON THE MAY 13TH LETTER, WE NEVER SAID IT WAS

10  LOGGED.  SO, IT COULDN'T THROW INTO QUESTION THE VERACITY OF

11  THE ENTRIES ON OUR PRIVILEGE LOG.  THEY'RE JUST BOOTSTRAPPING

12  THAT.

13        THEY WENT TO JUDGE WRIGHT AND ASKED -- SAID THIS

14  COURT WAS WRONG AND ASKED FOR JUDGE WRIGHT TO REVIEW ITS RULING

15  IN WHICH THEY FEATURED THE MAY 13TH LETTER JUST LIKE THEY'RE

16  TRYING TO FEATURE IT NOW.  AND THEY ACTUALLY CALLED IT -- I

17  WASN'T BEING SARCASTIC -- I MEAN, I WAS BEING SARCASTIC, BUT

18  THEY ACTUALLY CALLED IT A STUNNING -- STUNNING -- THEY CALLED

19  IT ABSOLUTELY STUNNING, THIS LETTER.  AND IT WAS DENIED.

20  WHETHER IT'S DENIED WITH A ONE-WORD DENIAL OR A LENGTHY

21  OPINION, IT'S STILL DENIED.  AND THAT RENDERS YOUR DISCOVERY

22  RULING A FINAL RULING.  AND IT'S LAW OF THE CASE.

23        THE COURT:  MAYBE I SHOULD TAKE A LESSON FROM JUDGE

24  WRIGHT AND I SHOULD JUST ISSUE ONE-WORD RULINGS.

25        MR. TOBEROFF:  IN THIS CASE, THIS PROCEDURE -- THIS

**EXHIBIT M**
**69**

12

1   IS A PROCEDURAL MESS AND IT'S CIRCULAR.  AND IT'S A MESS OF

2   THEIR OWN MAKING BECAUSE WHAT THEY COULD HAVE DONE IS WITHIN

3   THE TIME LIMITS TO BRING A MOTION FOR REVIEW, THEY COULD HAVE

4   FILED THEIR MOTION FOR REVIEW BUT SET THE HEARING DATE FAR IN

5   ADVANCE TO ALLOW THEM TO COME TO YOU WITH A MOTION FOR

6   RECONSIDERATION.  THAT WOULD HAVE -- WE WOULD HAVE OPPOSED THAT

7   AS WELL AS BRINGING SIMULTANEOUS MOTIONS FOR REVIEW AND

8   RECONSIDERATION.  BUT AT LEAST IT WOULDN'T CREATE THIS PROBLEM

9   WHERE YOU GET A FINAL ORDER FROM THE DISTRICT COURT.  AND

10  THEY'RE ESSENTIALLY ASKING YOU NOW TO NOT ONLY RECONSIDER --

11          THE COURT:  OKAY.  THE PROCEDURAL MATTER I CAN DEAL

12  WITH.  TELL ME ABOUT THE SUBSTANCE.

13          MR. TOBEROFF:  AS FAR AS THE SUBSTANCE IS CONCERNED,

14  THE BASIS FOR THIS COURT'S RULING THAT THE -- THEY DON'T GET

15  THE JULY -- WE'LL CALL THEM THE JULY LETTERS, THE JULY 5TH

16  LETTER AND THE JULY 11TH LETTER, WAS THE FACT THAT THEY HAD

17  BROUGHT UP THESE JULY LETTERS NO LESS THAN FIVE TIMES.  AND

18  THAT'S ALL DOCUMENTED IN OUR ORIGINAL OPPOSITION TO THE MOTION

19  IN FRONT -- IN THE SIEGEL CASE.

20          AND THEY BROUGHT IT UP SPECIFICALLY BASED ON THE

21  RECOLLECTIONS OF WAYNE SMITH, EVEN THOUGH TO YOU HE SAID HE

22  ONLY THUMBED THROUGH THESE DOCUMENTS, HE WAS ABLE TO

23  SPECIFICALLY DESCRIBE LETTERS IN DETAIL FOR WHICH PRIVILEGE HAD

24  BEEN ASSERTED, WHICH MEANS HE WAS GOING THROUGH PRIVILEGED

25  DOCUMENTS AND MOST PROBABLY EITHER KEPT COPIES OF THOSE

**EXHIBIT M**
**70**

13

1    DOCUMENTS OR TOOK EXTENSIVE NOTES.  OTHERWISE, IT WOULD HAVE

2    BEEN IMPOSSIBLE FOR HIM YEARS LATER TO BE DESCRIBING THESE

3    DOCUMENTS.

4           EVEN AFTER THEY DID THAT IN FRONT OF JUDGE LARSON,

5    SPECIFICALLY CALLING OUT THESE JULY LETTERS, JUDGE LARSON

6    DENIED THEIR MOTION.  THEY THEN TOOK THEIR PURPORTEDLY NEUTRAL

7    ESCROW AGENT, AND THEY HAD THAT ESCROW AGENT MAKE AN EX PARTE

8    COMMUNICATION TO JUDGE LARSON ASKING -- SAYING THAT HE WANTS TO

9    PEEK BEHIND THE PRIVILEGE LOGS AND DO EXACTLY WHAT THEY'RE

10   ASKING TO DO HERE, WHICH IS TO MATCH UP BY BATES NUMBERS

11   ENTRIES ON THE LOGS IN ORDER TO TEST THE VERACITY OF THE LOGS.

12   AND ONCE AGAIN JUDGE LARSON PUT HIS FOOT DOWN AND SAID NO.

13          AND I DON'T THINK WE SHOULD LOSE SIGHT OF THE CONTEXT

14   OF THESE DISCOVERY MOTIONS.  AND THAT CONTEXT IS A TREMENDOUSLY

15   UNFAIR ADVANTAGE THAT DC AND WARNER BROTHERS ARE OBTAINING HERE

16   BY VIRTUE OF REVIEWING STOLEN DOCUMENTS.  AND THAT PROBLEM

17   INFILTRATES, YOU KNOW, THIS ENTIRE ISSUE IN THIS CASE.

18          THE ONLY REASON THEY'RE ABLE TO -- I MEAN, WE WOULD

19   HAVE A FIELD DAY IF WE WERE GIVEN ACCESS TO THEIR FILES.  YOU

20   COULD BE SURE WE WOULD BE HERE NOT JUST ON ONE OR TWO LETTERS,

21   WHICH THEY ARE -- THIS IS IN THE COURSE OF A SIX-YEAR

22   LITIGATION THEY'RE COMING MAKING ALL THESE ACCUSATIONS THAT

23   WE'RE SECRETING EVIDENCE, WE'RE DOING THESE TERRIBLE THINGS,

24   WITH NO BASIS WHATSOEVER.  THEY'RE SAYING IF THEY GET THE

25   STOLEN DOCUMENTS, THAT THAT WILL REVEAL MANY OTHER DOCUMENTS

14

1    THAT HAVE BEEN SUPPRESSED --

2             THE COURT:  LET'S JUST FOCUS ON THE MOTION FOR THE

3    MOMENT.

4             MR. TOBEROFF:  OKAY.

5             THE COURT:  DOES THE MAY 13TH LETTER GIVE GROUNDS FOR

6    RECONSIDERATION.  THAT'S THE ISSUE.

7             MR. TOBEROFF:  NO, IT DOESN'T GIVE GROUNDS FOR

8    RECONSIDERATION BECAUSE IT REALLY DOESN'T -- FIRST OF ALL,

9    THEY'RE PROCEDURALLY BARRED FROM HAVING RECONSIDERATION --

10            THE COURT:  RIGHT.  THAT'S YOUR ARGUMENT AS TO JUDGE

11   WRIGHT.

12            MR. TOBEROFF:  AND, SECONDLY, IT DOESN'T REALLY GIVE

13   GROUNDS FOR RECONSIDERATION BECAUSE IT DOESN'T ILLUMINATE OR

14   CHANGE THE BASIS FOR YOUR HONOR'S RULING, WHICH HAD TO DO WITH

15   THE FACT THAT THIS WAS SPECIFICALLY BROUGHT BEFORE JUDGE

16   LARSON.  AND HE RULED AGAINST THEM MORE THAN ONCE.  AND THEN ON

17   THAT BASIS YOU WERE NOT GOING TO RECONSIDER THOSE RULINGS OF

18   JUDGE LARSON.

19            AND, YOU KNOW, I SHOULD POINT OUT WHEN A MATTER OF

20   TREMENDOUS IMPORTANCE TO OUR SIDE CAME UP WHERE WE BELIEVED

21   THAT JUDGE LARSON HAD MISREAD YOUR ORDER REGARDING THE STOLEN

22   DOCUMENTS WHERE YOU ORIGINALLY HAD US DO A DECLARATION, AND YOU

23   UPHELD THOSE DOCUMENTS THAT WERE KEY TO THE PRIVILEGE LOG, AND

24   THAT THE TIME LINE WASN'T LISTED ON OUR PRIVILEGE LOGS BECAUSE

25   WE DIDN'T AUTHOR THE TIME LINE.

15

1    IT WASN'T A COMMUNICATION BETWEEN US AND OUR CLIENTS.

2    SO, WE DIDN'T THINK OF LISTING IT ON THE PRIVILEGE LOG.  AND IT

3    WASN'T THE BASIS OF THEIR MOTION BECAUSE THEY DEFINE THE ESCROW

4    DOCUMENTS AS NOT INCLUDING THE TIME LINE.

5    WE BELIEVE THAT JUDGE LARSON HAD MISREAD -- AND I

6    BELIEVE IT'S CLEAR THAT HE HAD MISREAD YOUR ORDER.  AND WHEN WE

7    WERE DISCUSSING THIS YOU SAID, YOU UNDERSTAND THAT WE'RE TRYING

8    TO GET YOU TO WEIGH IN ON THAT BUT YOU REFUSED TO DO SO.

9    THE COURT:  AND DON'T THROW ME IN THAT BRIAR PATCH.

10    MR. TOBEROFF:  RIGHT.  BUT, YOU KNOW, WE CAN ALL

11    READ, YOU KNOW, EXPRESSIONS.  AND FROM THAT, YOU KNOW, I GOT

12    THE FEELING THAT IF YOU DID RULE ON THAT, THAT YOU WOULD COME

13    OUT THAT, IN FACT, HE HAD MISREAD THE ORDER.  BUT YOU WERE NOT

14    GOING TO OVERRULE HIS RULINGS.  AND WHAT'S GOOD FOR THE GOOSE

15    IS GOOD FOR THE GANDER.  AND THAT'S A MATTER OF MUCH GREATER

16    IMPORTANCE THAN THIS SINGLE LETTER.  AS DEMONSTRATED BY THE MAY

17    13TH LETTER --

18    THE COURT:  MR. TOBEROFF, WE HAVE THREE MOTIONS, AND

19    YOU KEEP WANDERING OFF.

20    MR. TOBEROFF:  OKAY.

21    THE COURT:  I JUST WANT TO KNOW, DO YOU HAVE AN

22    ARGUMENT, A FURTHER ARGUMENT?  IF NOT, I'M PREPARED TO RULE.

23    IF YOU HAVE A FURTHER ARGUMENT ABOUT THE MAY 13TH LETTER,

24    WHETHER IT GIVES GROUNDS FOR RECONSIDERATION OR NOT, THEN, I'LL

25    HEAR YOU.

**EXHIBIT M**
**73**

16

1       BUT, YOU KNOW, THERE'S A LOT OF MATERIAL HEAR.  AND

2   WHILE I DON'T KNOW AS MUCH ABOUT THIS CASE AS YOU FOLKS, I'M

3   NOT UNFAMILIAR WITH IT EITHER.

4       MR. TOBEROFF:  I CAN EXPLAIN TO YOU WHAT HAPPENED

5   WITH THE MAY 13TH LETTER.  THE MAY 13TH LETTER -- OUR SOLE COPY

6   OF THE MAY 13TH LETTER IN OUR FILES IS A -- AND THIS -- I THINK

7   THIS IS RELEVANT BECAUSE THEY'RE USING THE MAY 13TH LETTER AS A

8   BASIS FOR MAKING ALL SORTS OF FALSE CLAIMS ABOUT OUR PRACTICES

9   IN DISCOVERY, THE SINGLE LETTER.

10       THE MAY 13TH LETTER, THE SOLE COPY THAT WE HAD IN OUR

11   FILES HAD ATTORNEY MARGINALIA --

12       THE COURT:  AND THAT'S THE SUBJECT OF ANOTHER MOTION.

13       MR. TOBEROFF:  RIGHT, RIGHT.

14       THE COURT:  WE'LL SOON DEAL WITH THAT SHORTLY.

15       MR. TOBEROFF:  WE KNOW IT'S NOT IN THE HANDWRITING OF

16   LAURA SIEGEL OR JOANNE SIEGEL --

17       THE COURT:  JUST RECONSIDERATION.  JUST ON THE

18   GROUNDS FOR RECONSIDERATION.

19       MR. TOBEROFF:  I'M GOING TO FOCUS ON THAT.

20       I'M TALKING ABOUT THE MAY 13TH LETTER, YOUR HONOR,

21   BECAUSE THEY'RE USING THE MAY 13TH LETTER IN THIS PARADE OF

22   HORRORS BASED ON THE MAY 13TH LETTER.  SO, I'M GOING TO TAKE

23   THE STINK AWAY THAT THEY'VE CREATED ABOUT THIS MAY 13TH LETTER

24   BY DESCRIBING TO YOU WHAT HAPPENED.

25       THE MAY 13TH LETTER, THE SOLE COPY IN OUR FILES HAD

**EXHIBIT M**
**74**

17

1    ATTORNEY NOTATIONS -- OR SOMEBODY IN OUR LAW FIRM -- NOTATIONS

2    IN THE MARGINS AND UNDERLINING ON IT.  THAT WAS THE SOLE COPY

3    THAT WE HAD.

4            AND IT WAS ORIGINALLY IN THE SIEGEL LITIGATION

5    BELIEVED THAT THAT LETTER HAD BEEN LOGGED AND THAT PRIVILEGE

6    HAD BEEN ASSERTED BECAUSE THE LETTER -- THERE WERE A LOT OF

7    ISSUES ABOUT JOINT INTEREST PRIVILEGE BETWEEN MICHAEL SIEGEL

8    AND LAURA SIEGEL.  AND, ALSO, THE LETTER WE BELIEVE WAS PART OF

9    A LARGER COMMUNICATION FROM THE CLIENT WANTING TO DISCUSS THESE

10   COMMUNICATIONS WITH HER BROTHER -- IT'S ACTUALLY HER

11   STEPBROTHER.

12           AND, SO, WE INTENDED TO ASSERT PRIVILEGE AND BELIEVE

13   WE HAD ASSERTED PRIVILEGE.  AND THAT IT HAD BEEN LOGGED WITH

14   OTHER DOCUMENTS FROM THE CLIENT ON THE PRIVILEGE LOG.

15           BUT NOBODY WAS FOCUSED IN THE SIEGEL LITIGATION ON

16   THAT MAY 13TH LETTER.

17           IN THIS CASE WHEN THEY BROUGHT UP THE MAY 13TH

18   LETTER, AND WE WENT BACK TO THE FILES AND WE PULLED THAT SAME

19   DOCUMENT, IT WAS NOTICED -- BECAUSE WE WERE CHECKING IT BECAUSE

20   THERE WAS A MICRO FOCUS NOW ON THAT LETTER -- IT WAS NOTICED

21   THAT THE FAX HEADER FROM LAURA SIEGEL TO MY OFFICE HAD A

22   DIFFERENT DATE.  IT APPEARED PAPER CLIPPED WITH THE OTHER

23   DOCUMENTS AS PART OF THIS ATTORNEY-CLIENT COMMUNICATION, BUT WE

24   NOTICED THAT THE FAX HEADER DIFFERED FROM THE FAX HEADER ON THE

25   OTHER DOCUMENTS, AND, THAT, THEREFORE, AN INADVERTENT MISTAKE

**EXHIBIT M**
**75**

18

1   HAD BEEN MADE.  AND IT ACTUALLY DIDN'T COME IN AS PART OF THAT

2   OTHER COMMUNICATION AND, THEREFORE, HAD BEEN MISLOGGED, HADN'T

3   BEEN PROPERLY LOGGED IN THE SIEGEL LITIGATION.

4        AND BECAUSE IT WASN'T LOGGED, WE NEVER CLAIMED IT WAS

5   -- WE DIDN'T CLAIM PRIVILEGE, AND WE DIDN'T CLAIM IT DIDN'T

6   EXIST.  AND THEY HAD MADE A MOTION REGARDING THE MAY 13TH

7   LETTER.  THE WAY THEY MEET AND CONFER IS THEY TELL US ON, YOU

8   KNOW, ON A WEDNESDAY OR A THURSDAY THAT THEY'RE MAKING A MOTION

9   ON A MONDAY.

10       SO, THEY HAD -- I BELIEVE THEY HAD ALREADY MADE THEIR

11  MOTION WHEN WE DISCOVERED THIS DISCREPANCY IN THE FAX HEADER

12  LEGENDS.  AND AT THAT POINT WE DIDN'T DENY ITS EXISTENCE.  WE

13  DIDN'T SAY IT WAS PRIVILEGED BECAUSE WE KNEW IT HADN'T BEEN

14  LOGGED.  WE THOUGHT IT HAD BEEN LOGGED.  AND WHEN YOUR HONOR

15  ORDERED IT PRODUCED, WE IMMEDIATELY PRODUCED IT.

16       THE COURT:  I READ ALL THIS.

17       MR. TOBEROFF:  WAS THAT IN -- I'M NOT SURE THE FAX

18  HEADER, WAS THAT IN --

19       THE COURT:  NO, THE FAX HEADER IS NEW TO ME, BUT I

20  READ ALL THE REST OF IT.

21       MR. TOBEROFF:  THANK YOU, YOUR HONOR.

22       THE COURT:  ALL RIGHT.  THANK YOU, MR. TOBEROFF.

23       I DON'T REALLY SEE THE NEED -- SEE A NEED FOR REPLY,

24  DO YOU?

25       MR. KLINE:  NOT IF YOU DON'T WANT IT AT THIS MOMENT.

**EXHIBIT M**
**76**

19

1          THE COURT:  ALL RIGHT.

2          FIRST, ON THE PROCEDURAL MATTER, IN MY VIEW JUDGE

3     WRIGHT'S RULING DOES NOT BAR RECONSIDERATION.  JUDGE WRIGHT

4     DENIED THE MOTION FOR REVIEW BASED ON THE RECORD BEFORE HIM.

5     AND HE COULD NOT REVIEW FOR ABUSE OF DISCRETION SOMETHING THE

6     COURT HAD NOT CONSIDERED AT ALL.

7          AND, SO, IF RECONSIDERATION OTHERWISE IS APPROPRIATE,

8     THEN, IN MY VIEW THE FACT THAT JUDGE WRIGHT DENIED THE MOTION

9     FOR REVIEW WOULD NOT BAR THIS COURT FROM LOOKING AT THE MATTER.

10          THE COURT FEELS, HOWEVER, THAT RECONSIDERATION IS NOT

11     APPROPRIATE AS TO THE JULY 11TH LETTER.  KNOWING THE SPECIFIC

12     LANGUAGE OF THE MAY 13TH LETTER DOES NOT TELL MUCH ABOUT THE

13     JULY 11TH LETTER.  THERE'S NOTHING TO DEMONSTRATE THAT THE

14     PRIOR ORDERS LONG AGO UPHELD ON THE GROUNDS THAT DC COMICS DID

15     NOT SEEK REVIEW OF THIS COURT'S EARLIER RULING WERE MATERIALLY

16     WRONG.

17          EVEN MORE SO, THE MAY 13TH LETTER DOES NOT JUSTIFY A

18     DIFFERENT RULING ON THE JULY 5TH LETTER.  AS THE COURT

19     PREVIOUSLY STATED, THE DEFENDANTS CLEARLY STATED THAT SUCH A

20     LETTER DID NOT EXIST.

21          PLAINTIFF ASSERTS THAT MAYBE IT EXISTS IN A DIFFERENT

22     FORM OR WITH A DIFFERENT DATE, BUT THE COURT DECLINES TO ORDER

23     DEFENDANTS TO UNDERTAKE A VAGUE OR AMORPHOUS FURTHER SEARCH.

24          FINALLY, THE COURT DECLINES TO RECONSIDER ITS RULING

25     ON THE FORM OF THE PRIVILEGE LOGS.  THAT FORM HAS BEEN APPROVED

**EXHIBIT M**
**77**

20

1   BY THE NINTH CIRCUIT.  AND THE MAY 13TH LETTER IN THE COURT'S

2   VIEW PROVIDES NO CONVINCING BASIS ON THE NEED TO CHANGE THAT

3   RULING.

4           THE MOTION FOR RECONSIDERATION IS DENIED.

5           NOW, MR. TOBEROFF, LET'S PROCEED TO YOUR MOTION FOR A

6   PROTECTIVE ORDER.  THIS IS NOT A COMPLICATED MOTION.

7           MR. TOBEROFF:  FIRST, THERE'S AN INITIAL ISSUE WHERE

8   I DON'T BELIEVE THERE IS AN ISSUE.  DEFENDANTS HAVE BROUGHT IT

9   UP, AND THEY HAVE ACTED AS IF THE -- YOUR STAY WAS LIMITED

10  SOLELY TO JUDGE WRIGHT'S REVIEW OF YOUR ORDER REGARDING WAIVER

11  OF THE STOLEN DOCUMENTS.

12          I THINK IT'S CLEAR FROM YOUR ORDER THAT THE STAY WAS

13  NOT LIMITED TO JUDGE WRIGHT'S REVIEW.  BASED ON ITS PLAIN

14  WORDING, IT SAID, QUOTE:

15          "THE STAY SHALL CONTINUE IN EFFECT UNTIL

16          ALL REVIEW IS EXHAUSTED, OR THE DISTRICT

17          JUDGE RULES TO THE CONTRARY ON THE MATTER."

18          SO, THERE ARE REALLY TWO REASONS WHY IT WOULDN'T BE

19  LIMITED TO JUDGE WRIGHT'S REVIEW.  THE FIRST IS, THE PLAIN

20  WORDING, "SHALL CONTINUE IN EFFECT UNTIL ALL REVIEW."  IT'S AS

21  IF YOU WENT OUT OF YOUR WAY TO SAY THAT WHEN YOU COULD HAVE

22  EASILY SAID AFTER JUDGE WRIGHT HAS RULED.

23          AND, SECONDLY, BY YOUR USE OF THE WORDS "TO THE

24  CONTRARY."  BECAUSE THERE'S AN IMPLICATION WHEN YOU SAY "OR

25  UNTIL" JUDGE WRIGHT -- "THE DISTRICT JUDGE RULES TO THE

**EXHIBIT M**
**78**

1  CONTRARY" THAT IF HE AFFIRMS, THE STAY WOULD STILL BE IN

2  EXISTENCE SHOULD WE SEEK A WRIT TO THE NINTH CIRCUIT, WHICH IS

3  EXACTLY WHAT WE'RE DOING.

4           YOUR ORDER, YOU KNOW, I BELIEVE INVITED SUCH REVIEW.

5  AND I THINK THERE IS GOOD REASON, AND WE HAVE A DECENT SHOT OF

6  HAVING OUR PETITION FOR A WRIT ACCEPTED BY THE NINTH CIRCUIT.

7  AND THE REASON FOR THAT IS --

8           THE COURT:  TALK ABOUT OPTIMISM.  ALREADY YOU'RE

9  PLANNING ON LOSING IN FRONT OF JUDGE WRIGHT.

10          MR. TOBEROFF:  NO.  NO, OUR MOTION -- I'M MISSING

11  SOMETHING.  OUR MOTION FOR --

12          THE COURT:  HAS JUDGE WRIGHT RULED ON THIS MATTER?

13          MR. TOBEROFF:  YES.

14          THE COURT:  THAT'S NEWS TO ME.

15          MR. TOBEROFF:  WE -- WE MADE A MOTION --

16          EXCUSE ME?

17          (COUNSEL BRIEFLY CONFERRING.)

18          MR. TOBEROFF:  WE MADE A MOTION FOR REVIEW WHICH WAS

19  STAMPED "DENIED" BEFORE THEY EVEN PUT IN THEIR OPPOSITION.

20          THE COURT:  OH, ALL RIGHT.  NOBODY TOLD ME THAT.

21          MR. KLINE:  YOUR HONOR, BOTH SIDES FILED A

22  SUPPLEMENTAL PAPER ON WEDNEDSAY OF LAST WEEK.  IT PROBABLY

23  DIDN'T GET TO YOUR CHAMBERS --

24          THE COURT:  ALL RIGHT.  THAT WOULD BE THE PROBLEM.

25          ALL RIGHT.  I'M SORRY.

**EXHIBIT M**
**79**

22

1          ALL RIGHT.  SO, JUDGE WRIGHT HAS DENIED THE MOTION.

2              MR. TOBEROFF:  YEAH.  JUDGE WRIGHT --

3              THE COURT:  DENIED YOUR MOTION FOR REVIEW.  ALL

4    RIGHT.

5              MR. TOBEROFF:  DENIED THE MOTION BEFORE --

6              THE COURT:  OKAY.

7              MR. TOBEROFF: -- HE STAMPED IT "DENIED" AS HE STAMPED

8      --

9              THE COURT:  BUT IN ANY EVENT --

10             MR. TOBEROFF: -- THEIR MOTION IS DENIED.

11             THE COURT: -- BEFORE ME IS WHETHER THE DEPOSITION

12   SHOULD BE STAYED.

13             MR. TOBEROFF:  SO --

14             THE COURT:  SO, LET'S ADDRESS THAT AND ONLY THAT.

15   OKAY.

16             MR. TOBEROFF:  OKAY.  SO, GIVEN THAT THE STAY APPLIES

17   PENDING THE REVIEW BY THE NINTH CIRCUIT, WE BELIEVE THERE'S

18   GOOD REASON TO AT LEAST PUT OFF THE DEPOSITIONS TILL WE HEAR

19   WHETHER THE NINTH CIRCUIT WILL ACCEPT THIS WRIT.

20             AND THE BACKGROUND IS AS FOLLOWS.  WE OFFERED TO

21   PRODUCE THE PARTIES LAURA SIEGEL AND WARREN PEARY A LONG TIME

22   AGO.  WE SAID THEY'RE IMMEDIATELY AVAILABLE.  YOU CAN TAKE

23   THEIR DEPOSITIONS.  BUT WE ASK -- BECAUSE AS YOUR HONOR HAS

24   RULED, BECAUSE THIS CASE IS SO CLOSELY RELATED TO THE SIEGEL

25   CASE, TO BE CONSIDERED ONE OF THE SAME CASE, AND BECAUSE LAURA

23

1    SIEGEL HAS BEEN DEPOSED TWICE IN THE SIEGEL CASE, AND MR. PEARY

2    WAS DEPOSED ONCE IN THE SIEGEL CASE, IF THEY GET THE STOLEN

3    DOCUMENTS AFTER THEY TAKE THE DEPOSITION -- IF OUR PETITION IS

4    DENIED BY THE NINTH CIRCUIT, AND THEY GET THE STOLEN DOCUMENTS,

5    WE ALL KNOW THAT DESPITE THEIR CLAIMING THAT THIS IS UNRIPE,

6    THAT THEY WILL IMMEDIATELY MOVE TO TAKE CARE -- TO RETAKE THE

7    DEPOSITIONS OF LAURA SIEGEL AND MARK WARREN PEARY.

8         EVEN IF IT WAS A SINGLE DOCUMENT, THEY WOULD DO SO.

9    BUT HERE WE'RE DEALING WITH, YOU KNOW, A WHOLE FILE FULL OF

10   PRIVILEGED STOLEN DOCUMENTS.  SO, WE KNOW THAT THEY WOULD TAKE

11   THE DEPOSITION.  AND WE HAVE SAID TO THEM -- BECAUSE AT THE

12   TIME WE ORIGINALLY SAID TO THEM, LOOK, YOU CAN TAKE THE

13   DEPOSITION NOW OR YOU CAN PUT IT OFF, THEY HAD SOMETHING LIKE

14   FIVE MOTIONS TO COMPEL PENDING.

15        AND SINCE THERE IS NO DISCOVERY CUTOFF IN THIS CASE,

16   WE HAVE -- THE JUDGE HASN'T EVEN SET A SCHEDULE IN THIS CASE

17   YET, THEY'RE NOT REALLY PREJUDICED BY WAITING.  AND OUR CLIENTS

18   WILL BE PREJUDICED BY HAVING THEIR -- EXPOSING THEM TO HAVING

19   THEIR DEPOSITION TAKEN, IN THE CASE OF LAURA SIEGEL, FOUR TIMES

20   -- TWICE IN THE OTHER CASE AND TWICE IN THIS CASE.

21        SO, WE SAID, LOOK, IT'S YOUR CHOICE.  YOU CAN TAKE

22   HER DEPOSITION NOW OR YOU CAN WAIT UNTIL SOME OF THESE

23   DISCOVERY ISSUES ARE RESOLVED.  SO, YOU ARE TAKING HER

24   DEPOSITION BASED -- YOU KNOW, DEALING WITH A FULL DECK OF

25   DOCUMENTS, WHAT'S YOUR CHOICE.

**EXHIBIT M**
**81**

24

1           AND EACH TIME THEY REFUSED TO COMMIT TO NOT RETAKING

2    HER DEPOSITION, WHICH IS CLEAR THAT THEY WILL.

3           AND, SO, THE BASIS IS -- AND I'M TRYING TO SORT OF

4    SEE IF THERE'S A BASIS TO SORT OF CUT THE BABY HERE BY SAYING

5    SINCE WE ARE DEFINITELY BRINGING THIS WRIT, WHAT ABOUT WAITING

6    UNTIL TO SEE IF WRIT REVIEW IS GRANTED.

7           AND IT'S HARD TO GET THE NINTH CIRCUIT TO GRANT, YOU

8    KNOW, WRIT REVIEW.  I THINK WE HAVE A FIGHTING CHANCE HERE, BUT

9    IT'S HARD.  IF THE NINTH CIRCUIT DENIES OUR PETITION FOR A

10   WRIT, THEN, THERE'S NO DISPUTE.  WE'LL PRODUCE THE STOLEN

11   DOCUMENTS.  THEY'LL TAKE DEPOSITIONS WITHOUT HAVING TO GO BACK

12   IN THIS COURT AND MOVE TO TAKE THE DEPOSITIONS AGAIN.

13          IF THE NINTH CIRCUIT ACCEPTS REVIEW, THEN, THIS COURT

14   IN ITS DISCRETION CAN DECIDE EITHER THAT WE MUST TAKE THE

15   DEPOSITIONS WITHOUT THE STOLEN DOCUMENTS, OR THAT WE SHOULD

16   WAIT WITH THE DEPOSITIONS UNTIL THE NINTH CIRCUIT HAS COMPLETED

17   ITS REVIEW OF THIS IMPORTANT ISSUE.

18          WE'RE ALSO GOING TO ASK THE NINTH CIRCUIT TO EXPEDITE

19   ITS REVIEW.

20          THE COURT:  HAVE YOU FILED A WRIT PETITION YET?

21          MR. TOBEROFF:  NOT YET.  WE HOPE TO DO SO THIS WEEK.

22          THE COURT:  ALL RIGHT.  THEY MAKE TAKE IT.  I DON'T

23   KNOW.  YOU KNOW, THERE'S NO WAY OF KNOWING.  AS YOU SAY, A WRIT

24   IS ALWAYS DIFFICULT TO OBTAIN.  BUT THIS IS AN ISSUE OF SOME

25   IMPORTANCE.  AND IT'S UNDECIDED.

**EXHIBIT M**
**82**

25

1          MR. TOBEROFF:  YES.  IT'S A VERY -- IT'S A VERY

2     INTERESTING ISSUE.  AND IT'S A VERY IMPORTANT ISSUE.

3          THE COURT:  ALL RIGHT.  LET ME HEAR FROM THE

4     PLAINTIFF.

5          MR. KLINE:  YOUR HONOR, YOU ENTERED AN ORDER ON JUNE

6     2ND, WHICH WAS APPROVING A STIPULATION THAT PLAINTIFFS SIGNED

7     VOLUNTARILY THAT SAID,

8              "DEFENDANT MARK PEARY SHALL APPEAR FOR DEPOSITION ON

9              JUNE 29TH, 2011.

10             DEFENDANT LAURA SIEGEL SHALL APPEAR FOR DEPOSITION ON

11             JULY 1, 2011."

12         THEN, IN PARAGRAPH 3,

13             "AND ENTERING INTO THE STIPULATION, NO PARTY WAIVES

14             ANY RIGHTS TO SEEK OR OPPOSE ADDITIONAL DEPOSITION

15             DAYS FOR MR. PEARY OR MS. LARSON AS PROVIDED IN THE

16             FEDERAL RULES."

17         SO, THIS LITERALLY IS A BAIT AND SWITCH.  THEY

18    COMMITTED TO CERTAIN DEPOSITION DATES.  THEY SHALL APPEAR ON

19    THOSE DATES.

20         WE'LL LEAVE FOR ANOTHER DAY A MOTION ON WHETHER WE

21    GET A SECOND DAY BASED ON THE EMERGENCE OF NEW EVIDENCE.  THEY

22    SAY THAT, YOU KNOW, THE BIG REVELATORY CHANGE WAS JUDGE WRIGHT

23    DENYING LAST WEDNESDAY THEIR MOTION FOR REVIEW, BUT IT WAS

24    ALWAYS POSSIBLE THAT YOU WOULD GRANT THE MOTION TO ORDER THEM

25    TO PRODUCE THOSE DOCUMENTS AND THAT JUDGE WRIGHT WOULD DENY

**EXHIBIT M**
**83**

26

1    THAT MOTION FOR REVIEW.

2              THE COURT:  I DON'T THINK THEY THOUGHT THERE WAS EVER

3    THAT POSSIBILITY --

4              MR. KLINE:  WELL, YOU DIDN'T SAY --

5              THE COURT:  -- THAT I WOULD GRANT THE MOTION.  NO,

6    I'M JUST JOKING.  OF COURSE, THERE WAS ALWAYS THE POSSIBILITY.

7              MR. KLINE:  NO.  I HEAR YOU.  BUT I MEAN, THAT'S

8    WHERE WE ARE.  THAT'S THE EXISTING ORDER THAT THEY'RE ASKING

9    YOU TO REWRITE.

10             NOW, IN TERMS OF WHETHER THEIR WRIT IS GOING TO BE

11   GRANTED, I MEAN, MR. TOBEROFF WAS TALKING ABOUT SOMETHING

12   PRETTY IMPORTANT AT THE BEGINNING.  AND THIS IS ADDRESSED IN

13   THE WEDNESDAY FILINGS THAT BOTH SIDES MADE.  AS I READ YOUR

14   STAY ORDER, IT SAYS THE FOLLOWING:

15             "HOWEVER, THE" -- AND THIS IS AT THE FIRST PAGE OF

16   THEIR SUPPLEMENTAL FILING.

17             "HOWEVER, THE COURT STAYS ITS RULING TO ALLOW

18             DEFENDANTS TO SEEK REVIEW BEFORE THE DISTRICT

19             JUDGE.  IF THE DEFENDANTS SEEK SUCH REVIEW,

20             I.E., IN FRONT OF THE DISTRICT JUDGE, THE STAY

21             SHALL CONTINUE IN EFFECT UNTIL ALL REVIEW IS

22             EXHAUSTED OR THE DISTRICT COURT RULES TO THE

23             CONTRARY."

24             NOW, THE DISTRICT COURT DENIED THEIR MOTION FOR

25   REVIEW.  AS WE UNDERSTAND YOUR ORDER, THAT MEANS, OKAY.  WE'RE

**EXHIBIT M**
**84**

27

1   DONE.  PRODUCE THE DOCUMENTS.  GO TAKE THESE DEPOSITIONS.

2            THEY'RE TAKING THE POSITION THAT LITERALLY UNTIL ALL

3   REVIEW IS COMPLETED, THEY DON'T HAVE TO PRODUCE THE DOCUMENTS,

4   THAT THE STAY REMAINS IN EFFECT.

5            NOW, THAT'S HIGHLY PROBLEMATIC FOR A NUMBER OF

6   REASONS.

7            NUMBER ONE, THEY DIDN'T ASK JUDGE WRIGHT TO ENTER A

8   STAY AFTER HIS REVIEW.  THEY WERE REQUIRED TO DO SO.  UNDER

9   1292(B) -- 28 U.S.C. 1292(B) THE WAY YOU GET A STAY PENDING

10  NINTH CIRCUIT REVIEW IS YOU ASK THE DISTRICT COURT FOR A STAY.

11           THE COURT:  LET'S JUST FOCUS --

12           MR. KLINE:  HE DENIES IT OR GRANTS IT.

13           THE COURT: -- ON THIS MOTION.  BECAUSE NOBODY HAS

14  BROUGHT A MOTION BEFORE ME ASKING FOR WHAT DID YOU MEAN BY YOUR

15  ORDER.  SO, LET'S JUST FOCUS ON THE PROTECTIVE ORDER MOTION.

16           MR. KLINE:  I THINK IT'S PRETTY SIMPLE.  THESE

17  WITNESSES SHOULD BE ORDERED TO COME TESTIFY.  AND IF THEY

18  REFUSE TO PRODUCE DOCUMENTS IN THE INTERVENING WEEKS BEFORE --

19  THE DEPOSITIONS ARE SCHEDULED TO TAKE NEXT WEEK.  IF THEY

20  REFUSE TO PRODUCE THE DOCUMENTS THAT THEY WERE ORDERED TO

21  PRODUCE, THEN, YES, WE MIGHT HAVE TO TAKE A SECOND DEPOSITION.

22           BUT THAT'S WHAT THE PARTIES' STIPULATION AND THIS

23  COURT'S JUNE 2ND ORDER ALWAYS CONTEMPLATED.

24           AND IN TERMS OF -- SO, THE MAIN THRUST OF THEIR

25  ARGUMENT IS, HEY, WE'VE GOT A FIGHTING CHANCE ON GETTING A WRIT

**EXHIBIT M**
**85**

28

1    GRANTED.

2              I DON'T THINK THAT'S POSSIBLE.  WHY IS THAT.  BECAUSE

3    THE MOHAWK CASE THE SUPREME COURT HANDED DOWN IN 2009 SAYS THE

4    FOLLOWING.  IT SAYS:

5              "EVEN WHERE PRIVILEGE IS INVOLVED, THE NORMAL RULES

6              OF APPEAL APPLY."

7              AND IF YOU OR JUDGE WRIGHT MADE AN ERROR IN ORDERING

8    THESE DOCUMENTS PRODUCED, AND WE WIN AT TRIAL, AND THEY APPEAL,

9    AND THE JUDGE -- THE COURT OF APPEAL DECIDES THAT, HEY, YOU

10   SHOULDN'T HAVE ORDERED THOSE DOCUMENTS PRODUCED, THERE'S A

11   SIMPLE REMEDY.  IT'S CALLED A REMAND FOR A NEW TRIAL.  THAT'S

12   WHAT THE SUPREME COURT IN MOHAWK SAID.

13             NOW, THEY CITE ONE CASE IN THIS WEDNESDAY FILING THAT

14   THEY MADE SAYING, OH, BUT, YOU KNOW, WRIT REVIEW IS GRANTED ALL

15   THE TIME IN PRIVILEGE CASES.

16             THAT'S NOT SO.  THERE ARE NUMEROUS CASES WHERE THE

17   NINTH CIRCUIT IN PRIVILEGE CASES HAS SAID, WE'RE NOT GOING TO

18   HEAR THIS CASE.  WE'RE GOING TO DEAL WITH IT LATER.

19             THE COURT:  YOU KNOW, THE ONE THING I'M DEFINITELY

20   NOT GOING TO DO IS HANDICAP THE CHANCES IN THE NINTH CIRCUIT.

21   I NEVER HAD A GOOD RECORD ON DOING THAT WHEN I WAS A

22   PRACTITIONER, AND I DON'T HAVE A GOOD RECORD DOING IT AS A

23   JUDGE.  SO, LET'S JUST -- I MEAN, I THINK I UNDERSTAND YOUR

24   ARGUMENT.  I THINK I UNDERSTAND MR. TOBEROFF'S ARGUMENT.

25             MR. KLINE:  WE'RE BUTTING UP AGAINST A REAL PRACTICAL

**EXHIBIT M**
**86**

29

 1    IMPEDIMENT HERE.  JUDGE WRIGHT HAS ASKED US TO REBRIEF OUR RULE

 2    12 OPPOSITIONS AND OUR SLAP OPPOSITIONS ON AUGUST 8TH.  AND

 3    WE'RE FACING A FOUR-CORNERS OFFENSE HERE.  THEY'RE TRYING TO

 4    PUSH OUT ANY PRODUCTION OF THESE DOCUMENTS UNTIL LATE JULY.

 5    AND, THEN, WE'RE GOING TO HAVE A HARD TIME SCHEDULING THOSE

 6    DEPOSITIONS IN LATE JULY.  AND IF THEY ASSERT A BUNCH OF

 7    OBJECTIONS AT THOSE DEPOSITIONS, WE'VE HAVE ABSOLUTELY NO TIME

 8    TO COME IN HERE AND GET ANY RELIEF.  AND, YET, WE'LL BE FORCED

 9    BY AUGUST 8TH TO FILE THESE NEW OPPOSITIONS.

10         AND, SO, WE THINK WE ARE BEING SIGNIFICANTLY

11    PREJUDICED BY THEIR REQUEST TO MOVE THESE DEPOSITIONS TO SOME

12    UNDETERMINED DATE WHEN THE NINTH CIRCUIT RULES.

13         THE COURT:  ALL RIGHT.  THAT'S A VALID ARGUMENT.

14         MR. KLINE:  BUT THE ONE THING --

15         THE COURT:  THAT'S A DIFFERENT ARGUMENT.

16         MR. KLINE:  THE ONE THING THAT WE CAN WORRY ABOUT IS

17    THAT EVEN THOUGH THEY SAY THIS IS THIS EMERGENCY PROBLEM, THIS

18    EMERGENCY SITUATION, IT'S BEEN FIVE, SIX DAYS NOW AND THERE'S

19    NO FILING.

20         IN THE PAST WHEN THEY IMMEDIATELY WANTED TO GET A

21    WRIT ON FILE, THEY GOT IT ON FILE.  BUT NOW THAT IT SUITS THEIR

22    INTEREST THEY'RE TRYING TO DRAG THIS THING OUT AS LONG AS THEY

23    CAN.  THEY HAVEN'T GONE IN AND SOUGHT EX PARTE RELIEF FROM

24    JUDGE WRIGHT SAYING, WE UNDERSTAND YOU DENIED OUR ORDER, BUT

25    HERE'S THE PROPER PROCEDURE.  YOU KNOW, WE WANT A 1292(B) STAY

30

1   PENDING THE WRIT WE'RE GOING TO FILE.  THEY HAVEN'T GONE IN AND

2   FILED AN EMERGENCY STAY MOTION LIKE THEY DID LAST DECEMBER IN

3   FRONT OF THE NINTH CIRCUIT SAYING DON'T LET THESE DEPOSITIONS

4   PROCEED.

5        THEY'RE HOPING JUST TO KIND OF DRAG THIS THING OUT TO

6   RELY ON WHAT THEY PERCEIVE AS AN AMBIGUITY IN YOUR ORDER SO

7   THAT THEY DON'T HAVE TO -- THEY'RE NOT GOING TO REQUEST A STAY.

8   I DON'T HEAR THEM SAYING WE'RE GOING TO GO TO THE NINTH CIRCUIT

9   AND ASK FOR A STAY.  THEY'RE HOPING THAT THEY CAN RELY ON THE

10  AMBIGUITY IN YOUR ORDER AND PREVENT ANY DISCOVERY FROM

11  HAPPENING FOR THE NEXT MONTH.  AND THAT'S A PROBLEM.

12        SO, WE THINK THE MOTION FOR A PROTECTIVE ORDER SHOULD

13  BE DENIED.

14        THE COURT:  ALL RIGHT.

15        RULE 26(C) DOES ALLOW THE COURT TO ISSUE A PROTECTIVE

16  ORDER TO PREVENT UNDUE BURDEN AND EXPENSE.  THE UNDUE BURDEN

17  AND EXPENSE ARE SAID TO ARISE HERE IF THIS COURT'S ORDER

18  PROVIDING FOR DISCLOSURE OF CERTAIN DOCUMENTS CONTINUES TO BE

19  UPHELD.

20        I DON'T AGREE WITH THAT.  THE PARTIES ARE IN THE SAME

21  POSITION NOW AS IF THE PREVIOUS MOTION NEVER HAD BEEN MADE.

22  AND IT'S THE SAME SITUATION EXISTING AT THE TIME THE

23  DEPOSITIONS WERE SCHEDULED.  THEY WERE SCHEDULED AT A TIME

24  WHEN DOCUMENTS HAD NOT BEEN PRODUCED.  IT WAS ANTICIPATED BY

25  BOTH SIDES THAT THE DEPOSITIONS WOULD GO FORWARD ON THAT

**EXHIBIT M**
**88**

31

1    SCHEDULE.

2              NOW, I'VE EXPRESSED BEFORE MY RELUCTANCE ABOUT

3    MULTIPLE DEPOSITIONS OF THE SAME WITNESS.  AND I'M NOT RULING

4    NOW ON A MOTION THAT MIGHT BE MADE IN THE FUTURE.  BUT, IN

5    GENERAL, COURTS, AND THIS COURT IS ONE OF THEM, DISFAVOR REPEAT

6    DEPOSITIONS.  THE PLAINTIFF KNOWS THIS.  AND THE PLAINTIFF IS

7    FOREWARNED AND THE PLAINTIFF CAN ADJUST ITS SCHEDULE IF IT SO

8    CHOOSES.  BUT THE PLAINTIFF IS NOT REQUIRED TO AS THERE MAY

9    WELL BE COUNTERVAILING CONSIDERATIONS.

10              THE BOTTOM LINE FOR ME IS THAT WHILE I BELIEVE I DO

11   HAVE DISCRETION TO ADJUST THE SCHEDULING OF THE DEPOSITIONS,

12   NOTWITHSTANDING THE STIPULATION, I DON'T SEE ANY BASIS FOR

13   UPSETTING THE SCHEDULE HERE.

14              AND, SO, THE MOTION FOR A PROTECTIVE ORDER IS DENIED.

15              LET'S MOVE TO THE LAST MOTION AND SEE IF WE CAN WRAP

16   THAT ONE UP QUICKLY BECAUSE I DO HAVE A MEETING I HAVE TO GET

17   TO.

18              MR. KLINE:  YES, YOUR HONOR.

19              THE COURT: THERE ARE THREE ISSUES THAT ARE PRESENTED

20   -- RIGHT? -- ISSUES 12, 13, AND 14.

21              MR. KLINE:  YES, YOUR HONOR.  AND I'LL BE AS BRIEF AS

22   I CAN.

23              THE FIRST ISSUE IS THE NOVEMBER 2ND LETTER THAT HAS

24   NOT BEEN PRODUCED.  A COUPLE OF POINTS ABOUT THAT.

25              NUMBER ONE, THE DECLARATION THAT THEY SUBMITTED THAT

Case 2:10-cv-03633-ODW-RZ   Document 395-1   Filed 04/26/12   Page 101 of 138
Page ID #:24836
Case 2:10-cv-03633-ODW -RZ   Document 288   Filed 06/27/11   Page 32 of 46   Page ID
#:17465

32

 1    I CAUSED MY OFFICE TO RECHECK OUR RELEVANT CASE FILES AND COULD

 2    NOT FIND THE NOVEMBER 2ND LETTER DOES NOT COMPLY WITH WHAT

 3    RUTTER AND THE WATERBURY CASE REQUIRE.  THESE ARE CASES THAT WE

 4    CITED IN OUR REPLY BRIEFS THAT SAY, NO, YOU NEED TO GO INTO

 5    SOME MORE DETAIL ABOUT THE TYPE OF SEARCH YOU CONDUCTED, WHICH

 6    FILES YOU ACTUALLY CONSULTED, AND WHY YOU COULD NOT FIND THESE

 7    DOCUMENTS.

 8            OR IN THE ALTERNATIVE, IF THIS DOCUMENT DID NOT

 9    EXIST, YOU NEED A DECLARATION EITHER FROM THE CLIENT OR COUNSEL

10    SAYING THIS DOCUMENT DOES NOT EXIST.  AND THAT COMES RIGHT OUT

11    OF THE WATERBURY CASE AND RUTTER.  AND WE THINK THEY'RE JUST

12    BEING TOO VAGUE HERE.

13            I DON'T WANT TO RECOVER GROUND THAT I COVERED BEFORE,

14    YOUR HONOR, BUT THE MARCH -- THE MAY 2007 DECLARATION THAT THEY

15    SUBMITTED IS STUNNING IN THE FOLLOWING RESPECT.  WHERE ON IT

16    CAN ONE FIND THE MAY 2003 LETTER.

17            AND AS WE HEARD THE EXPLANATION FOR THE MAY 2003

18    LETTER, THERE ARE ALL THESE DOCUMENTS THAT ARE STAPLED TOGETHER

19    THAT MAY BE PRIVILEGED DOCUMENTS, THAT MAY NOT BE PRIVILEGED

20    DOCUMENTS.

21            THAT'S NOT A SATISFYING EXPLANATION.  AND WHEN MY

22    CLIENT READS THE TRANSCRIPT, THEY'RE GOING TO SAY TO ME WHY

23    CAN'T WE GET SOME MORE SPECIFICITY FROM THESE PRIVILEGE LOGS.

24            THEY JUST ADMITTED THAT THEY STAPLED A BUNCH OF STUFF

25    TOGETHER.  SOME OF IT'S PRIVILEGED; SOME OF IT'S NOT.  NOBODY

33

1    IS ARGUING IT'S NOT RESPONSIVE.  WE'VE HEARD ABSOLUTELY NO

2    REPRESENTATION FROM THEIR COUNSEL THAT THERE IS NOT A JULY 2003

3    LETTER FROM MS. SIEGEL TO HER BROTHER.

4            WE NEED SPECIFICITY, FOR EXAMPLE, ON THINGS LIKE THE

5    NOVEMBER 2ND LETTER.  SO, I THINK YOU'VE READ OUR PAPERS.

6    YOU'VE SEEN WHAT WE'VE HAD TO SAY ABOUT THE NOVEMBER 2ND

7    LETTER.  BUT WE NEED SOME SPECIFICITY HERE.

8            WE WERE TOLD IN AN UNQUALIFIED WAY IN A JANUARY 8TH

9    LETTER FROM COUNSEL THAT THE MAY 13TH DOCUMENT DID NOT EXIST.

10   IT WAS NON-EXISTENT.  WE ASKED FOR IT SPECIFICALLY IN TWO

11   LETTERS.  WHERE'S THE MAY 13TH, 2003 LETTER.

12           THEIR FIRST RESPONSE, AND I'LL POINT YOU TO THE --

13           THE COURT:  YOU'RE NOW MOVING TO ISSUE 13?

14           MR. KLINE:  YES.

15           THE COURT:  OKAY.

16           MR. KLINE:  BUT I THINK IT ALSO HAS TO DO WITH ISSUE

17   12.  THESE KIND OF -- THESE BLAND ASSURANCES THAT, HEY, THE

18   DOCUMENT'S NOT OUT THERE CANNOT BE TRUSTED.

19           I WROTE A LETTER ON JANUARY 5, 2011, AND I SAY:

20           "THERE WERE TWO OTHER COMMUNICATIONS MENTIONED

21           IN THE TOBEROFF TIME LINE THAT YOU DID NOT

22           ADDRESS IN JANUARY 4TH LETTER.

23           THEY ARE, ONE, A MAY 13, 2003 LETTER FROM

24           MICHAEL SIEGEL TO LAURA SIEGEL LARSON."  AND THEN THE

25   SECOND LETTER.

**EXHIBIT M**
**91**

34

1          AND IT'S FOUR DAYS LATER ON JANUARY 8TH THAT THEY

2   WRITE BACK:

3               "AS TO YOUR CLAIMS THAT WE HAVE NOT PRODUCED

4               CERTAIN DOCUMENTS ALLUDED TO IN THE RANTING

5               ANONYMOUS TIME LINE, WE HAVE REPEATEDLY STATED

6               THAT THE INADMISSIBLE TIME LINE IS EXTREMELY

7               UNTRUSTWORTHY.  TO THE EXTENT THAT RELEVANT

8               DOCUMENTS EXIST, THEY HAVE EITHER BEEN

9               PRODUCED OR DESIGNATED AS PRIVILEGED."

10          THEY TOLD US IN AN UNQUALIFIED WAY THE MAY LETTER

11   DOES NOT EXIST.

12          NOW, WE LOOK AT -- I'M TALKING ABOUT THE NOVEMBER 2ND

13   LETTER HERE FOR THE MOMENT -- THIS VERY VAGUE REFERENCE IN A

14   DECLARATION THAT, HEY, THE RELEVANT FILES WERE SEARCHED.  WE

15   COULDN'T FIND THEM.

16          WE NEED MORE THAN THAT.  WE NEED REPRESENTATIONS THAT

17   WE SEARCHED THE MICHAEL SIEGEL FILES, THE DON BULSON FILES.  WE

18   TALKED TO OUR CLIENT.  SHE SAID SUCH A LETTER DOESN'T EXIST.  THERE

19   NEEDS TO BE MORE DILIGENCE HERE TO SEE WHETHER THAT NOVEMBER

20   2ND LETTER EXISTS.

21          IN TERMS OF THEM -- MOVING NEXT TO ISSUE NUMBER 13,

22   AND THAT'S WHETHER WE GET AN UNREDACTED COPY OF THE MAY 13TH

23   LETTER.  IT IS VITALLY IMPORTANT THAT WE GET AN UNREDACTED COPY

24   OF THE MAY 13TH LETTER.  THEY SAY IN THEIR BRIEFS THAT IT IS

25   AMONG THE TOBEROFF TIME LINE DOCUMENTS.  AND WE WANT TO SEE THE

35

1    "Q" BATES STAMPS ON THAT DOCUMENT.  WE WANT TO SEE HOW IT GETS

2    BURIED IN MR. TOBEROFF'S MAY 2007 DECLARATION.  WE'RE ENTITLED

3    TO THAT.  WE'RE ENTITLED TO SEE WHAT THE "Q" NUMBERS ARE SO

4    THAT WE CAN TRY TO PUZZLE HOW DID THIS DOCUMENT GET BURIED IN

5    THAT DECLARATION, HOW IS IT NOT APPEARING ANYWHERE IN ANY

6    PRIVILEGE LOGS, HOW IS IT NOT PRODUCED.  THAT'S NUMBER ONE.

7            NUMBER TWO, THEY KEEP SAYING THAT THERE ARE THESE

8    ATTORNEY NOTATIONS ON THE DOCUMENT.  BUT THEY DON'T SAY WHO THE

9    ATTORNEY WAS AND WHEN THEY WROTE THEM AND WHAT THE PURPOSE FOR

10   WRITING THEM WAS, HOW THE CONFIDENTIAL NATURE OF THOSE

11   COMMUNICATIONS WAS MAINTAINED.  THEY'VE DONE UTTERLY NOTHING TO

12   MEET THE REQUIREMENT OF PROVING PRIVILEGE.

13           NUMBER THREE, ANY CLAIM OF PRIVILEGE WAS WAIVED.

14   THIS DOCUMENT WAS RESPONSIVE TO REQUESTS SERVED ON SIEGEL MANY,

15   MANY, MANY YEARS AGO.

16           IN RESPONSE TO YOUR HONOR'S MAY 2007 -- OR APRIL 2007

17   ORDER THEY HAD TO LIST IT IN THE MAY 2007 DECLARATION.  THEY

18   DID NOT.

19           SO, WE GET THAT DOCUMENT.

20           LASTLY, UNDER "RETAINER AGREEMENTS" -- SORRY.  I WANT

21   TO BACK UP ONE STEP, YOUR HONOR, IF YOU'D INDULGE ME FOR A

22   SECOND.

23           WE ALSO HAVE REQUESTED A VERY SPECIFIC ORDER.  WE

24   WERE TOLD BY MR. TOBEROFF IN HIS ARGUMENT HERE WE WITHHELD

25   CERTAIN DOCUMENTS BECAUSE THERE WERE ATTORNEY WRITINGS ON THEM.

36

1   THAT IS HIS EXPLANATION FOR WHY THE MAY 13TH, 2003 DOCUMENT WAS

2   NOT PRODUCED.  AN ATTORNEY WRITING ON A NON-PRIVILEGED DOCUMENT

3   IS NOT A BASIS TO WITHHOLD DOCUMENTS.

4           WE HAVE ASKED THE COURT FOR A VERY CLEAR ORDER TO

5   REQUIRE PLAINTIFFS TO GO BACK TO THEIR FILES -- SORRY -- TO

6   REQUIRE DEFENDANTS TO GO BACK TO THEIR FILES AND MAKE SURE

7   THEY'RE NOT WITHHOLDING ANY OTHER DOCUMENTS ON THAT GROUND.

8           AND WE THINK WE'RE ENTITLED TO THAT GIVEN THE

9   ADMISSION -- WE DIDN'T SPRING THIS MOTION ON THEM.  WE HAD A

10  MEET AND CONFER IN DECEMBER.  WE WROTE A LETTER.  WE HAD A MEET

11  AND CONFER IN JANUARY.  WE WROTE A LETTER.  WE FILED OUR MOTION

12  IN EARLY FEBRUARY.

13          THEY NEVER CAME OUT TO US AND SAID, HEY, HERE'S THE

14  MAY 13TH DOCUMENT.  THEY NEVER SAID, HEY, BACK OFF YOU DON'T

15  NEED TO MOVE ON THAT GROUND.  WE HAVE FOUND THE MAY 13TH

16  DOCUMENT.  IT'S GOT THESE REDACTIONS ON IT.  WE'RE SO SORRY.

17  HERE'S THE DOCUMENT.

18          THEY NEVER DID THAT.  THEY ROLLED THE DICE.  THEY

19  HOPED THAT YOU WOULD NOT ORDER THEM TO PRODUCE THAT DOCUMENT.

20  AND, YET, THEY HAD TO.

21          AND WE NEED SIMILAR RELIEF HERE.  WE JUST NEED A VERY

22  CLEAR ORDER THAT SAYS, IF YOU'RE WITHHOLDING A DOCUMENT ON THE

23  GROUND THAT IT HAS ATTORNEY NOTATIONS ON IT, YOU NEED TO

24  PRODUCE THAT DOCUMENT IN UNREDACTED FORM.

25          LASTLY, WE LOOK AT THE RETAINER AGREEMENTS.  AND THE

**EXHIBIT M**
**94**

Case 2:10-cv-03633-ODW-RZ   Document 395-1   Filed 04/26/12   Page 106 of 138
Page ID #:24841
Case 2:10-cv-03633-ODW -RZ   Document 288   Filed 06/27/11   Page 37 of 46   Page ID
#:17470

37

1   RETAINER AGREEMENTS THEY'RE IN FRONT OF YOU.  I THINK IN TOTAL

2   THEY'RE ABOUT 15 PAGES LONG.  CHIEF JUDGE KLINE -- NO RELATION

3   TO ME ALTHOUGH I EXTERNED FOR HIM AND WE SPELL OUR NAME THE

4   SAME WAY -- UP IN SAN FRANCISCO JUST ISSUED A VERY IMPORTANT

5   DECISION IN THE FAIR CASE SETTING SOME VERY CLEAR PARAMETERS ON

6   WHAT TYPES OF LANGUAGE RESTRICTIONS LAWYERS CAN PUT IN BUSINESS

7   ARRANGEMENTS WITH THEIR CLIENTS.

8           AND WE NEED TO SEE THE RETAINER AGREEMENTS HERE.  MR.

9   TOBEROFF DOES NOT DENY THAT THERE ARE IMPEDIMENTS BETWEEN

10  HIMSELF AND HIS CLIENTS IN THE SETTLEMENT AGREEMENTS THAT

11  IMPEDE THEIR ABILITY TO SETTLE.

12          THERE ARE SOME CRYPTIC LANGUAGE AT THE END OF THEIR

13  OPPOSITION PAPERS THAT SAY, HEY, THERE'S NO DEAL BETWEEN THE

14  SHUSTERS AND THE SIEGELS HERE ABOUT SETTLEMENT AND DC'S OTHER

15  FANCIFUL CLAIMS OR SOME PEJORATIVE LIKE THAT.  HE SAYS THOSE

16  DON'T EXIST.

17          WE JUST WANT YOU TO LOOK THROUGH THOSE RETAINER

18  AGREEMENTS AND SEE IF THERE'S ANY LIMITATION ON THE HEIRS'

19  ABILITY TO SETTLE THIS CASE.  I MEAN, ONE OF THE BIG ISSUES IN

20  THE CASE -- IN THE SIEGEL CASE, FOR EXAMPLE, IS THEY'RE SAYING,

21  OH, GOSH, YOU KNOW, SETTLEMENT IS REALLY GOING TO BE MOVED

22  ALONG IN THIS CASE IF THIS RULE 54(B) APPEAL THAT THEY'RE

23  PURSUING IN THE SIEGEL CASE IS ALLOWED TO GO FORWARD.

24          WE WANT TO SETTLE THIS CASE TOO.  AND IF MR. TOBEROFF

25  HAS AN ILLEGAL AGREEMENT WITH HIS CLIENTS THAT SAYS HE GETS TO

38

1    APPROVE THEIR SETTLEMENTS OR NOT, WE WANT TO KNOW THAT BECAUSE

2    ONE OF OUR CLAIMS FOR RELIEF IS TO DECLARE THAT INVALID.  AND

3    IT'S CLEARLY INVALID UNDER CALIFORNIA LAW, INCLUDING RECENT

4    CASES LIKE FAIR.

5         MOREOVER, MR. RUTTENBERG, WHO'S SERVING AS PROBATE

6    COUNSEL FOR THE SIEGEL FAMILY, LODGED THIS DOCUMENT, ONE OF THE

7    SIEGEL RETAINER AGREEMENT DOCUMENTS IN THE STATE TRIAL COURT.

8         I THINK ANYONE KNOWS THAT IF YOU PRACTICE IN STATE

9    TRIAL COURT YOU HAVE TO FILE A MOTION TO SEAL, OR, OTHERWISE,

10   YOUR DOCUMENTS ARE DEEMED TO BE PUBLIC AND ANY PRIVILEGE IS

11   WAIVED.  AND I'M AWARE OF NO PROCEDURE KNOWN AS "THE

12   CONFIDENTIAL LODGING" PROCEDURE WHERE YOU HOPE THAT THE JUDGE

13   GIVES YOU YOUR COPY OF YOUR DOCUMENT BACK.

14        AND, SO, WE THINK A WAIVER HAS BEEN MADE AT LEAST AS

15   TO THE SIEGEL RETAINER AGREEMENT.  TO BE CLEAR, THE SHUSTER

16   RETAINER AGREEMENT WAS NOT SUBMITTED TO THE PROBATE JUDGE IN

17   THAT CASE.

18        SO, WE THINK THIS MOTION SHOULD BE GRANTED.  AND I'LL

19   SUBMIT ON THAT, YOUR HONOR.

20        THE COURT:  ALL RIGHT.  THANK YOU.

21        MR. TOBEROFF.

22        MR. TOBEROFF:  I'LL, FIRST OF ALL, START WITH THE

23   NOVEMBER 2ND LETTER.  AS WE SAID IN OUR PAPERS, WE DID PERFORM

24   A DILIGENT SEARCH OF OUR RECORDS, ALL OF OUR RECORDS, AND

25   THERE'S NO NOVEMBER 2ND LETTER AS DESCRIBED.  THERE'S NO

39

1  NOVEMBER 2ND LETTER APPEARING IN OUR FILES.

2         NOW, I HATE TO RELY ON THEIR TIME LINE BECAUSE OF THE

3  NATURE OF THAT DOCUMENT WRITTEN BY A THIEF, BUT THE AUTHOR OF

4  THAT TIME LINE OBVIOUSLY HAD ACCESS TO OUR LEGAL FILES, AND HE

5  DIDN'T MENTION THE NOVEMBER 2ND LETTER EITHER, WHICH IN A

6  PERVERSE WAY LENDS SOME CREDIBILITY TO THE FACT THAT IT ISN'T

7  IN OUR LEGAL FILES.

8         WE WEREN'T PROVIDED A COPY.  WE ALSO, OF COURSE,

9  ASKED OUR CLIENT WHETHER SHE HAD A COPY AND TO RESEARCH HER

10 RECORDS.  AND SHE DIDN'T HAVE A COPY EITHER.  AND WE INFORMED

11 THEM THAT THEIR MOTION TO COMPEL WOULD BE MOOT.  AND THEY

12 BROUGHT IT ANYWAY.  I CAN'T PRODUCE A DOCUMENT THAT WE CAN'T

13 FIND.  THAT'S THE NOVEMBER 2ND LETTER.

14        I BELIEVE IT'S NOT A PROPER -- I BELIEVE MR. KLINE

15 MISCHARACTERIZES THE RECORD WHEN HE WAS SPEAKING, USING THIS AS

16 AN OPPORTUNITY TO ASK YOU TO RECONSIDER YOUR PRIOR RULINGS

17 REGARDING THE JULY LETTER.  AND HE STARTED TALKING AGAIN ABOUT

18 THE MAY 13TH LETTER AND SAID THAT WE DENIED ITS EXISTENCE.

19        WE DID NOT DENY ITS EXISTENCE.  THE COURT, IN FACT,

20 NOTED THAT IN OUR BRIEF WE DID NOT DENY ITS EXISTENCE.  AND ON

21 THAT BASIS SINCE WE DIDN'T SAY IT WAS PRIVILEGED OR DENIED ITS

22 EXISTENCE, THE COURT ORDERED US TO PRODUCE IT, ORDERED US TO

23 GIVE A DECLARATION THAT IT DIDN'T EXIST.  AND WE PRODUCED IT

24 IMMEDIATELY.

25        SO, THEIR WHOLE PREMISE THAT WE WERE SECRETING

**EXHIBIT M**
**97**

Case 2:10-cv-03633-ODW-RZ    Document 395-1    Filed 04/26/12    Page 109 of 138
Page ID #:24844
Case 2:10-cv-03633-ODW -RZ    Document 288    Filed 06/27/11    Page 40 of 46    Page ID
#:17473

40

1    EVIDENCE IS NOT TRUE.  THERE ARE -- YOU KNOW, WE ARE DEALING --

2    HE'S ISOLATING THIS ONE LETTER, BUT WE ARE DEALING IN RAPID

3    FIRE WITH THEM ON MANY, MANY, AND MANY DISCOVERY ISSUES.

4            AS HAS --

5            THE COURT:  MR. TOBEROFF, LET ME JUST ASK YOU

6    SOMETHING.  ON THE MAY 13TH LETTER I THINK YOU TOLD ME THAT YOU

7    ONLY HAD ONE COPY OF IT.

8            MR. TOBEROFF:  OKAY.  YES.  ACTUALLY -- ACTUALLY, LET

9    ME -- WE HAVE ONE COPY -- WHAT I SAID WAS, WE HAVE ONE COPY IN

10   OUR FILE -- I'M GOING TO GET TO THE BATES STAMP ISSUE.  WE HAVE

11   ONE COPY IN OUR FILES WITH ATTORNEY NOTATIONS.  WHEN WE

12   PRODUCED THE MAY 13TH LETTER WE PRODUCED THE COPY IN OUR FILE.

13   DOESN'T HAVE -- WE DIDN'T GO TO A COPY OF THAT COPY, WHICH IS

14   THE STOLEN DOCUMENTS WITH THE BATES NUMBER ON IT.  AND THAT'S

15   WHY -- AND, SO, WE DIDN'T -- WE DIDN'T REDACT THE BATES NUMBER.

16            IN RETROSPECT, WHAT WE COULD HAVE DONE IS PRODUCED

17   OUR TWO COPIES, ONE WITH THE BATES NUMBER, ONE WITHOUT THE

18   BATES NUMBER.  WE DIDN'T -- WE DIDN'T -- THAT WAS NOT

19   INTENTIONAL.  WE JUST PRODUCED OUR -- WE WENT TO OUR FILE, AND

20   WE PRODUCED THE COPY IN THE FILE.  AND ALL THAT WE REDACTED IS

21   THE ATTORNEY MARGINALIA.  AND WE DIDN'T -- MARGINALIA, EXCUSE

22   ME.

23            WE DIDN'T -- THOSE ATTORNEY NOTATIONS ARE NOT LISTED

24   IN THE PRIVILEGE LOG BECAUSE OF TWO AGREEMENTS THAT WE HAVE.

25   ONE IN THIS CASE WE HAVE A STIPULATION WITH THE OTHER SIDE THAT

41

1   I BELIEVE YOUR HONOR SIGNED, WHICH SAID THAT THE

2   POST-LITIGATION INTERNAL COMMUNICATIONS, WHICH ATTORNEY

3   UNDERLINING OR MARGINALIA WOULD BE, NEED NOT BE LOGGED.  SO,

4   THERE'S NO WAIVER IN THIS CASE.

5            IN THE SIEGEL CASE WE HAD AN AGREEMENT WITH THEM THAT

6   POST-LITIGATION DOCUMENTS -- NO POST-LITIGATION DOCUMENTS NEED

7   BE LOGGED.

8            AND THAT AGREEMENT WAS ACKNOWLEDGED BY THE PRIOR

9   COUNSEL MICHAEL BERGMAN IN A DECLARATION TO JUDGE LARSON THAT

10   WE'VE CITED BEFORE TO THIS COURT.

11            SO, THERE WAS NO WAIVER WITH RESPECT TO THE

12   MARGINALIA, BUT I CAN TELL YOU THAT WE'RE FIGHTING OVER -- AS

13   THE COURT SAID, THIS IS ONE OF THOSE MUCH ADO ABOUT NOTHING

14   ARGUMENTS.

15            STILL, WE DON'T BELIEVE WE SHOULD PRODUCE PRIVILEGED

16   NOTATIONS OR UNDERLINING BY AN ATTORNEY.

17            THE COURT:  ALL RIGHT.  WHY DON'T YOU MOVE ON TO

18   ISSUE 14, THE RETAINER AGREEMENTS.

19            MR. TOBEROFF:  AS FAR AS THE RETAINER AGREEMENTS,

20   THEY'RE MAKING A MOTION BASED ON SPECULATION.  THEY'RE

21   BASICALLY SAYING THIS DOCUMENT IS IMPROPERLY REDACTED BECAUSE

22   IT COULD HAVE A -- LIMITING THE CLIENT'S ABILITY TO SETTLE THE

23   CASE WHERE THE ATTORNEY NEEDS TO APPROVE SETTLEMENT.

24            OF COURSE, THERE IS NO SUCH LIMITATION IN THE

25   RETAINER AGREEMENT.  AND I CAN REPRESENT TO YOUR HONOR THERE'S

**EXHIBIT M**
**99**

Case 2:10-cv-03633-ODW-RZ    Document 395-1    Filed 04/26/12    Page 111 of 138
Page ID #:24846
Case 2:10-cv-03633-ODW -RZ   Document 288    Filed 06/27/11   Page 42 of 46    Page ID
#:17475

42

1    NO REPRESENTATION IN THE AGREEMENT, AND THERE'S NO BASIS FOR

2    THEM TO SAY THAT IT'S IN THIS LEGAL RETAINER AGREEMENT.  IT IS

3    NOT.

4            THE PROBATE ATTORNEY -- I DON'T THINK MR. KLINE --

5    WHICH I DON'T BELIEVE ANYBODY WOULD CONFUSE WITH THE JUDGE THAT

6    HE MENTIONED BECAUSE KLINE IS A FAIRLY COMMON NAME.  BUT I

7    DON'T BELIEVE HE KNOWS THE INS AND OUTS OF HOW THEY WORK IN

8    PROBATE COURT.  IN PROBATE COURT THERE ARE A LOT OF THINGS THAT

9    ARE HANDLED ON A MUCH LESS FORMAL BASIS.  AND ONE OF THEM IS

10   THIS CONFIDENTIAL LODGING IN WHICH THE PROBATE ATTORNEY

11   ACTUALLY WITHOUT MY KNOWLEDGE HAD CONFIDENTIALLY LODGED FOR AN

12   HOUR AND 45 MINUTES WITH THE COURT FOR THE COURT TO JUST REVIEW

13   SOME DOCUMENTS, INCLUDING THE RETAINER AGREEMENT.  AND I DON'T

14   BELIEVE THAT WOULD CONSTITUTE A WAIVER.  IT WASN'T FILED.  IT

15   WASN'T AVAILABLE TO THE PUBLIC.  AND IT WAS SIMPLY REVIEWED BY

16   THE COURT ON A CONFIDENTIAL BASIS SIMILAR TO AS IF YOU REVIEWED

17   A DOCUMENT IN CAMERA.

18           THE COURT:  ALL RIGHT.

19           MR. TOBEROFF:  THAT DOESN'T CONSTITUTE WAIVER.  AND

20   THEY HAVEN'T BEEN ABLE TO CITE A SINGLE CASE SAYING THAT THAT

21   CONSTITUTES A WAIVER.

22           WHAT WE REDACTED IN THEIR RETAINER AGREEMENT WERE

23   PURSUANT TO THE COURT'S ORDER ASPECTS OF THE RETAINER AGREEMENT

24   THAT PERTAINED TO THE SCOPE OF OUR SERVICES THAT CONNOTED LEGAL

25   ADVICE AND OTHER ASPECTS IN A RETAINER AGREEMENT THAT DEALS

**EXHIBIT M**
**100**

Case 2:10-cv-03633-ODW-RZ    Document 395-1    Filed 04/26/12    Page 112 of 138
Page ID #:24847
Case 2:10-cv-03633-ODW -RZ  Document 288    Filed 06/27/11    Page 43 of 46    Page ID
#:17476

43

1    WITH DIFFERENT POTENTIAL OUTCOMES OF THE CASE, WHICH WE BELIEVE

2    WERE PROPERLY REDACTED AND IMPLICATE ATTORNEY WORK-PRODUCT AND

3    ATTORNEY-CLIENT PRIVILEGE.

4         ALSO, THEY HAVE SORT OF STRETCHED THOSE CASES THAT

5    SAY YOU CAN -- THE CASES THAT THEY RELIED ON TO GET THE

6    RETAINER AGREEMENT TO BEGIN WITH ARE NOT CASES THAT SAY IT'S

7    COMMON PRACTICE TO GET THE OTHER SIDE'S RETAINER AGREEMENT IN A

8    CASE AND IT'S NOT PRIVILEGED.  THOSE CASES SAY THE FEE

9    ARRANGEMENT IS NOT PRIVILEGED.  THE FEE ARRANGEMENT IS NOT

10   PROTECTED.

11        THEY HAVE OUR FEE ARRANGEMENT.  AFTER SIMILAR

12   BASELESS SPECULATION THAT I IN PLEADING -- WHERE THEY SAY THAT

13   I OWN A PIECE OF THE SUPERMAN RIGHTS AND I PROPERLY OWN THIS IN

14   CONTRAVENTION OF THEIR RIGHTS UNDER THE COPYRIGHT ACT AND SO ON

15   AND SO ON.

16        AND I ALWAYS SAID WE HAVE THE RETAINER AGREEMENT.

17   ALL I HAVE IS A CONTINGENCY, WHICH THE LAST TIME I CHECKED WAS

18   LEGAL IN THE STATE OF CALIFORNIA.  NOW THEY HAVE THAT, AND

19   THEY'RE STILL COMPLAINING.

20        THE COURT:  ALL RIGHT.  I DON'T SEE A NEED FOR REPLY,

21   MR. KLINE.

22        MR. KLINE:  THANK YOU, YOUR HONOR.

23        THE COURT:  ALL RIGHT.  ON ISSUE 13, IN MY VIEW THE

24   RECORD ESTABLISHES THAT THE DEFENDANTS HAVE CONDUCTED A

25   DILIGENT AND REASONABLE SEARCH, AND THEY HAVE REPRESENTED THAT

Case 2:10-cv-03633-ODW-RZ   Document 395-1   Filed 04/26/12   Page 113 of 138
Page ID #:24848
Case 2:10-cv-03633-ODW -RZ   Document 288   Filed 06/27/11   Page 44 of 46   Page ID
#:17477

44

1    SUCH A SEARCH DISCLOSED NO NOVEMBER 2ND, 2002 LETTER.  IN THE

2    COURT'S VIEW THAT'S SUFFICIENT.

3            AS TO ISSUE NUMBER 13, AGAIN, WE DEAL WITH THE MAY

4    13TH LETTER.  THE COURT AGREES THAT THE FACE OF THE LETTER

5    ITSELF DISCLOSES NO REDACTIONS.  BASED ON THE TERMS OF THE

6    DECEMBER 2010 STIPULATION IT DOES NOT APPEAR TO THE COURT THAT

7    THE DEFENDANTS HAVE WAIVED CLAIMS OF PRIVILEGE OR OTHER

8    PROTECTION.

9            NOR DOES THE FACT THAT AN ATTORNEY IS NOT IDENTIFIED

10   MEAN THAT THE DEFENDANTS CANNOT SUSTAIN A WORK-PRODUCT CLAIM.

11   MARGINALIA ITSELF CLEARLY CAN INDICATE THE NATURE AS TO AN

12   ATTORNEY'S COMMENTS.

13           AS TO ISSUE NUMBER 14, THE ISSUE AS TO THE RETAINER

14   AGREEMENTS I BELIEVE -- I AGREE HERE IS PURE SPECULATION.  THE

15   COURT AUTHORIZED REDACTION OF THE AGREEMENTS.  AND THE FACT

16   THAT PLAINTIFF THINKS THE DEFENDANTS USED A PRACTICE GUIDE AS A

17   MODEL IS NO BASIS FOR THE COURT TO DOUBT THE APPROPRIATENESS OF

18   THE CLAIM OF PRIVILEGE.  NOR DOES THE LODGING OF THE SIEGEL

19   RETAINER AGREEMENT WITH THE PROBATE COURT IN ORDER TO RECEIVE

20   TESTAMENTARY LETTERS A BASIS FOR THE WAIVER.

21           THE MOTION IS DENIED.

22           MR. KLINE:  YOUR HONOR, MAY I ASK ONE THING?

23           CAN WE ASK TO AT LEAST GET A COPY OF THE "Q" BATES

24   STAMPED VERSION OF THE MAY 13TH, 2003 LETTER?  THERE'S UTTERLY

25   NO CLAIM THAT THAT'S A PRIVILEGED DOCUMENT, AND THERE'S NO

**EXHIBIT M**
**102**

Case 2:10-cv-03633-ODW-RZ    Document 395-1    Filed 04/26/12    Page 114 of 138
Page ID #:24849
Case 2:10-cv-03633-ODW -RZ   Document 288   Filed 06/27/11   Page 45 of 46   Page ID
#:17478

45

1   REASON WHY WE SHOULDN'T GET A COPY OF IT --

2          THE COURT:  MR. KLINE, YOU FOLKS ARE VERY GOOD AT

3   FILING PAPER.  I THINK I'VE DEALT WITH EVERYTHING THAT HAS BEEN

4   PRESENTED AS A MOTION.  SO, I'M NOT GOING TO START TAKING ORAL

5   MOTIONS.

6          MR. KLINE:  THANK YOU, YOUR HONOR.

7          THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS.

8          (PROCEEDINGS CONCLUDED 11:32 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:10-cv-03633-ODW-RZ    Document 395-1    Filed 04/26/12    Page 115 of 138
Page ID #:24850
Case 2:10-cv-03633-ODW -RZ   Document 288    Filed 06/27/11   Page 46 of 46   Page ID
#:17479

46

1

2                      C E R T I F I C A T E

3

4          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5    FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE

6    ABOVE-ENTITLED MATTER.

7

8

9

10   /S/ DOROTHY BABYKIN                        6/27/11

11   _____        _____

12   FEDERALLY CERTIFIED TRANSCRIBER            DATED

13   DOROTHY BABYKIN

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT N

1   DANIEL M. PETROCELLI (S.B. #97802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11

12  Attorneys for Plaintiff DC Comics

13              **UNITED STATES DISTRICT COURT**

14             **CENTRAL DISTRICT OF CALIFORNIA**

15  DC COMICS,                          | Case No. CV-10-3633 ODW (RZx)

16              Plaintiff,              | **DISCOVERY MATTER**

17        v.                            | **PLAINTIFF DC COMICS'**
                                        | **NOTICE OF SUBPOENA FOR**
18  PACIFIC PICTURES                    | **PRODUCTION OF DOCUMENTS**
    CORPORATION, IP WORLDWIDE,          | **TO DON W. BULSON, ESQ.**
19  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          | **Judge**: Hon. Otis D. Wright II
20  PEARY, as personal representative of | **Magistrate**: Hon. Ralph Zarefsky
    the ESTATE OF JOSEPH SHUSTER,
21  JEAN ADELE PEAVY, an individual,
    JOANNE SIEGEL, an individual,
22  LAURA SIEGEL LARSON, an
    individual, and DOES 1-10, inclusive,
23
              Defendants.
24

25

26

27

28

                                        NOTICE OF SUBPOENA FOR
                                        PRODUCTION OF DOCS TO
                                        DON W. BULSON, ESQ.

**EXHIBIT N**
**105**

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2        PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure

3    45, a subpoena for the production of documents, as set forth in attachment "A"

4    hereto, has been served on Don W. Bulson, Esq. of Renner Otto Boiselle & Sklar,

5    LLP, 1621 Euclid Avenue, Ninth Floor, Cleveland, Ohio 44115.  The production

6    will take place at the offices of O'Melveny & Myers LLP, 1999 Avenue of the

7    Stars, Suite 700, Los Angeles, California 90067 on June 9, 2011 at 10:00 a.m.

8        A list of all parties or attorney on whom this Notice of Subpoena is being

9    served is shown on the accompanying Proof of Service.

10

11        Dated:  May 10, 2011          Respectfully submitted,

12                                     O'MELVENY & MYERS LLP

13

14                                     By: _____

15                                         Daniel M. Petrocelli

16                                   Attorneys for Plaintiff DC Comics

17    CC1:843801

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF SUBPOENA FOR
PRODUCTION OF DOCS TO
DON W. BULSON, ESQ.

**EXHIBIT N**
**106**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Ohio

| | | |
|---|---|---|
| DC Comics | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   CV 10-3633 ODW (RZx) |
| Pacific Pictures Corp., et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Central District of California   ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Don W. Bulson, c/o Renner Otto Boiselle & Sklar, LLP
      1621 Euclid Avenue, Ninth Floor, Cleveland, Ohio 44115

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Attachment

| Place: O'MELVENY & MYERS LLP 1999 Avenue of the Stars, Suite 700 Los Angeles, CA  90067 | Date and Time: 06/09/2011 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___05/10/2011___

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*       DC Comics
_____ , who issues or requests this subpoena, are:

Daniel M. Petrocelli, O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor, Los Angeles, CA  90067
Email: dpetrocelli@omm.com, Phone: (310) 246-6850

**EXHIBIT N**
**107**

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  CV 10-3633 ODW (RZx)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*    Don W. Bulson

was received by me on *(date)*    05/10/2011

☑ I served the subpoena by delivering a copy to the named person as follows:    Don W. Bulson

Renner Otto Boiselle & Sklar, LLP, 1621 Euclid Avenue, Ninth Floor, Cleveland, Ohio 44115

on *(date)*                                    ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $                    for travel and $                    for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    05/10/2011

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**EXHIBIT N**
**108**

## ATTACHMENT A
## DEFINITIONS AND INSTRUCTIONS

1.    "DOCUMENT" shall be interpreted in its broadest sense to include any and all "documents" and "other tangible things" as those terms are understood in Federal Rule of Civil Procedure 34, including, without limitation, any "writing," "recording," or "photograph" as those terms are defined in Federal Rule of Evidence 1001. This shall include, but is not limited to: e-mail, audio or video recordings, correspondence, letters, phone messages, notes, memoranda, facsimiles, publications, contracts, agreements, calendars, drafts of proposed contracts or agreements, papers, and photographs.

2.    "COMMUNICATION" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, including without limitation any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.

3.    "REFER" or "RELATE" means, without limitation, evidence, reflect, summarize, constitute, contain, study, analyze, explain, mention, show, discuss, describe, or comment upon.

4.    "PERSON" means any natural person, firm, association, corporation, partnership, or other legal entity or organization separately identifiable, and any department(s) or division(s) therein.

5.    "YOU" or "YOUR" means Don W. Bulson, Esq. and the law firm of Renner Otto Boiselle & Sklar, LLP, and their past and present employees, associates, partners, attorneys, representatives, predecessors and successors.

6.    "DEFENDANT" or "DEFENDANTS" means, collectively and severally, any defendant in the above-entitled action, including Pacific Pictures

Corporation; IP Worldwide, LLC; IPW, LLC; Marc Toberoff; Joanne Siegel;
Laura Siegel Larson; Mark Warren Peary, as personal representative of the Estate
of Joseph Shuster; Jean Adele Peavy; and, as applicable, any PERSON acting on
their behalf, including but not limited to their agents, employees, attorneys, and
representatives.

      7.    "SHUSTER HEIRS" means, collectively and severally, Mark
Warren Peary, Jean Peavy, Dawn Peavy, Frank Shuster, or any other executor,
administrator, heir, relative, or representative of Joseph Shuster and, as
applicable, any PERSON acting on their behalf, including but not limited to their
agents, employees, attorneys, and representatives.

      8.    "SIEGEL HEIRS" means, collectively and severally, Joanne Siegel,
Laura Siegel Larson, Dennis Larson, Michael Siegel, or any other executor,
administrator, heir, relative, or representative of Jerome Siegel and, as applicable,
any PERSON acting on their behalf, including but not limited to their agents,
employees, attorneys, and representatives.

      9.    "MARKS" means Kevin S. Marks, Esq. and the law firm of Gang,
Tyre, Ramer & Brown, Inc., prior counsel for defendants Joanne Siegel and
Laura Siegel Larson, as well as their past and present employees, associates,
partners, attorneys, representatives, predecessors and successors

      10.    "TOBEROFF" means Marc Toberoff, Esq. and the Law Office of
Marc Toberoff, PLC, current attorneys of record for defendants Joanne Siegel,
Laura Siegel Larson, Mark Warren Peary, as personal representative of the Estate
of Joseph Shuster, and Jean Adele Peavy, as well as their past and present
employees, associates, partners, representatives, predecessors and successors.

      11.    "EMANUEL" means Ariel Emanuel and William Morris Endeavor,
as well as their past and present employees, associates, representatives,
predecessors and successors.

**EXHIBIT N**
**110**

12.    "KENDALL" means Richard Kendall, Esq. and the law firm of Kendall Brill Klieger, current attorneys of record defendants Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, and Marc Toberoff, as well as their past and present employees, associates, partners, representatives, predecessors and successors.

13.    "SUPERMAN" means the Superman character as delineated in literary works such as comic books, newspapers, novels, radio programs, television programs, and motion pictures, and any of the works in which he appears, including but not limited to *Action Comics. No. 1.*

14.    "SUPERBOY" means the Superboy character as delineated in literary works such as comic books, newspapers, novels, radio programs, television programs, and motion pictures, and any of the works in which he appears, including but not limited to *More Fun Comics #101.*

15.    "INCLUDING" means "including, but not limited to."

16.    "Any" and "All" are interchangeable.

17.    The singular form includes the plural form, and vice versa.

18.    YOU are instructed to produce all DOCUMENTS that are responsive to these Requests and that are in YOUR possession, custody, or control. A DOCUMENT is in YOUR "possession, custody, or control" if it is in YOUR physical possession, or if, as a practical matter, YOU have the ability, upon request, to obtain possession of the DOCUMENT or a copy thereof from another person or entity that has physical possession of the DOCUMENT.

19.    If any DOCUMENT or category of DOCUMENTS is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, the DOCUMENT or portions of the DOCUMENT that are not being produced.

**EXHIBIT N**
**111**

20.    Each DOCUMENT is to be produced as it is kept in the usual course of business, including all file folders, binders, notebooks, and other devices by which such DOCUMENTS may be organized or separated.

21.    If YOU withhold any DOCUMENT, or portion of a DOCUMENT, on grounds that it is protected from discovery by the attorney-client privilege, work-product doctrine, or other privilege or immunity from discovery, please set forth, for each DOCUMENT or portion of a DOCUMENT withheld:

(a)    The place, approximate date, and manner of recording, creating or otherwise preparing the DOCUMENT;

(b)    The names and organization position, if any, of each author, sender, and recipient of the DOCUMENT;

(c)    A general description of the subject matter of the DOCUMENT;

(d)    The basis of any claim of privilege; and

(e)    If work-product is asserted, the proceeding for which the DOCUMENT was created.

22.    For any DOCUMENT or category of DOCUMENTS that was, but no longer is, in YOUR possession, custody or control, please describe each such DOCUMENT as completely as possible and provide the following information:

(a)    The reason the DOCUMENT is no longer in YOUR possession, custody or control;

(b)    The person or entity, if any, who has possession, custody or control or, if unknown, so state; and

(c)    If the DOCUMENT was destroyed or otherwise disposed of, state (i) the manner of disposal (*i.e.*, destruction, loss, discarding or other means of disposal); (ii) the date of disposal; (iii) the reason for disposal; (iv) the person authorizing

disposal; (v) the person disposing of the DOCUMENT; and (vi) the name and address of the most recent custodian of the DOCUMENT.

23.     Each Request shall be construed independently and no Request shall be viewed as limiting the scope of any other Request.

24.     All responsive DOCUMENTS maintained or stored in electronic format shall be produced in native file format with all associated metadata preserved.  All responsive DOCUMENTS maintained in hard copy shall be produced in TIFF.

25.     The collection and production of DOCUMENTS shall be performed in a manner that ensures that the source of each DOCUMENT may be determined, if necessary.

26.     DOCUMENTS attached to each other shall not be separated.

27.     These Requests impose a continuing obligation subsequent to YOUR initial production within thirty days of the service date of these Requests, or other date mutually agreed upon by the parties, to timely supplement YOUR response or production if YOU determine that YOUR response or production is incomplete or incorrect.

## DOCUMENT REQUESTS

1.     All DOCUMENTS RELATING to SUPERMAN and/or SUPERBOY.

2.     All DOCUMENTS RELATING to any agreements between the SIEGEL HEIRS, the SHUSTER HEIRS, TOBEROFF, and/or EMANUEL RELATING to SUPERMAN and/or SUPERBOY.

3.     All DOCUMENTS RELATING to COMMUNICATIONS between YOU and TOBEROFF, including but not limited to, all drafts, outlines, and/or notes.

4.    All DOCUMENTS RELATING to COMMUNICATIONS between YOU and EMANUEL, including but not limited to, all drafts, outlines, and/or notes.

5.    All DOCUMENTS RELATING to COMMUNICATIONS between YOU and KENDALL, including but not limited to, all drafts, outlines, and/or notes.

6.    All DOCUMENT RELATING to COMMUNICATIONS between YOU and MARKS, including but not limited to, all drafts, outlines, and/or notes.

7.    All DOCUMENTS RELATING to the potential sale, license, or other disposition of any rights RELATING to SUPERMAN and/or SUPERBOY, including but not limited to any solicitation, offer, option, or proposed agreement.

8.    All DOCUMENTS RELATING to any potential investors or other PERSONS who have expressed interest in purchasing or otherwise investing in the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

9.    All DOCUMENTS RELATING to the valuation of any past, current, or potential ownership interest in SUPERMAN and/or SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

10.    All DOCUMENTS RELATING to negotiations between the SIEGEL HEIRS and DC Comics RELATING to SUPERMAN and/or SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

11.    All DOCUMENTS RELATING to the October 16, 2001 COMMUNICATION between MARKS and John A. Schulman, Esq., including drafts, outlines, and/or notes.

12.    All DOCUMENTS RELATING to the letter dated October 19, 2001 from MARKS to John A. Schulman, Esq., including but not limited to, all drafts, outlines, and/or notes.

**EXHIBIT N**
**114**

13.    All DOCUMENTS RELATING to the letter dated October 26, 2001 from John A. Schulman, Esq. to MARKS, including but not limited to, all drafts, outlines, and/or notes.

14.    All DOCUMENTS RELATING to the November 29, 2001 COMMUNICATION between MARKS and TOBEROFF RELATING to the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

15.    All DOCUMENTS RELATING to the letter dated February 1, 2002 from Patrick T. Perkins, Esq. to MARKS, including but not limited to, all drafts, outlines, and/or notes.

16.    All DOCUMENTS RELATING to the "Draft Long Form Agreement" enclosed with the February 1, 2002 letter from Patrick T. Perkins, Esq. to MARKS, including but not limited to, all drafts, outlines, and/or notes.

17.    All DOCUMENT RELATING to the February 6, 2002 COMMUNICATION between MARKS and TOBEROFF RELATING to the SIEGEL HEIRS' purported rights in SUPERMAN and/or SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

18.    All DOCUMENTS RELATING to the letter dated May 9, 2002 from DEFENDANT Joanne Siegel to Richard D. Parsons, Co-Chief Operating Officer of AOL Time Warner Inc., including but not limited to, all drafts, outlines, and/or notes.

19.    All DOCUMENTS RELATING to the May 16, 2002 COMMUNICATION between MARKS and John A. Schulman, Esq., including but not limited to, all drafts, outlines, and/or notes.

20.    All DOCUMENTS RELATING to the letter dated July 15, 2002 from MARKS to DEFENDANTS Joanne Siegel and/or Laura Siegel Larson, including but not limited to, all drafts, outlines, and/or notes.

21.    All DOCUMENTS RELATING to the redraft of the "Draft Long
Form Agreement" enclosed with the July 15, 2002 letter from MARKS to
DEFENDANTS Joanne Siegel and/or Laura Siegel Larson, including but not
limited to, all drafts, outlines, and/or notes.

22.    All DOCUMENTS RELATING to the COMMUNICATION between
MARKS and TOBEROFF and/or EMANUEL in or around August 2002
RELATING to acquiring the SIEGEL HEIRS' purported rights in SUPERMAN
and/or SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

23.    All DOCUMENTS RELATING to the August 9, 2002
COMMUNICATION from MARKS to DEFENDANTS Joanne Siegel and/or
Laura Siegel Larson RELATING to the SIEGEL HEIRS' settlement with DC
Comics and consequences for acceptance of TOBEROFF and/or EMANUEL's
offer to acquire the SIEGEL HEIRS' purported rights in SUPERMAN and/or
SUPERBOY, including but not limited to, all drafts, outlines, and/or notes.

24.    All DOCUMENTS RELATING to the letter dated September 21,
2002 from DEFENDANTS Joanne Siegel and Laura Siegel Larson to MARKS and
Bruce M. Ramer, Esq., including but not limited to, all drafts, outlines, and/or
notes.

25.    All DOCUMENTS RELATING to the letter dated September 21,
2002 from DEFENDANTS Joanne Siegel and Laura Siegel Larson to Paul Levitz,
including but not limited to, all drafts, outlines, and/or notes.

26.    All DOCUMENTS RELATING to any COMMUNICATION between
or among DEFENDANTS Joanne Siegel and/or Laura Siegel Larson and Michael
Siegel, including but not limited to, all drafts, outlines, and/or notes.

27.    All DOCUMENTS RELATING to the Notice of Termination of
Transfer Covering Extended Copyright Renewal Term of SUPERMAN served on

behalf of the SIEGEL HEIRS on or around April 3, 1997, including but not limited to, all drafts, outlines, and/or notes.

28.    All DOCUMENTS RELATING to the Notice of Termination of Transfer Covering Extended Copyright Renewal Term of SUPERBOY served on behalf of the SIEGEL HEIRS on or around November 8, 2002, including but not limited to, all drafts, outlines, and/or notes.

29.    All DOCUMENTS RELATING to Michael Siegel's estate, including but not limited to, any wills, draft wills, and/or COMMUNICATIONS expressing Michael Siegel's instructions with respect to any assets.

CC1:843802

# EXHIBIT O

**Subject:**                     FW: DC v. PPC

**From:** Tokoro, Jason
**Sent:** Monday, February 06, 2012 3:30 PM
**To:** 'Keith Adams'; 'mtoberoff@ipwla.com'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra
**Subject:** FW: DC v. PPC

Keith,

We have not received any response to my email below, sent nearly four weeks ago.  Defendants' continued refusal to produce documents or a privilege log In response to DC's requests made at Don Bulson's July 2011 deposition is nothing more than a delay tactic.  DC has no choice but to seek the assistance of the court.

All of DC's rights are reserved.

Very truly yours,

Jason H. Tokoro

**From:** Tokoro, Jason
**Sent:** Wednesday, January 11, 2012 9:27 PM
**To:** 'Keith Adams'; 'mtoberoff@ipwla.com'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra
**Subject:** DC v. PPC

Keith,

When we spoke on December 14, 2011, you stated defendants' intention to review the Renner Otto expert report and calendar/billing entries in your possession and provide DC with a privilege log by the Friday of the following week (December 23).  You stated that defendants would be providing a privilege log to DC and not producing any documents because it was your position that the expert report and all calendar/billing entries are privileged.  It has now been four weeks since our conversation and nothing has been provided to us.

DC requested these documents at Don Bulson's deposition in July 2011.  There is no excuse for defendants' refusal to substantively respond to DC's request for close to six months.

Please confirm that defendants will either produce the Renner Otto expert report and calendar/billing entries (redacted if necessary) or provide a privilege log to DC by no later than next week Wednesday, January 18.  Otherwise, DC will be forced to seek the assistance of the court.

All of DC's rights are reserved.

Very truly yours,

Jason H. Tokoro

1

**EXHIBIT O**
**118**

# EXHIBIT P

# GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD S. PASSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILBERBUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1988)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

**VIA TELECOPIER and U.S. MAIL**

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA  91522-0022

   Re:  <u>Siegel Family – "Superman"</u>

Dear John:

   This is to confirm our telephone conversation of October 19, 2001.  The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties.  The terms are as follows:

   A.  <u>Definitions</u>.

      1.  "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

      2.  "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

   B.  <u>Financial Terms</u>.

      1.  A non-returnable, but recoupable advance of $2,000,000.

236172.1

**000000693**

**EXHIBIT P**
**119**

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2.  A non-returnable, non-recoupable signing bonus of 1,000,000.

3.  D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4.  There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5.  A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6.  A royalty of 1% of the cover price of DC Comics' publications. This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

000000694

**EXHIBIT P**
**120**

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 3

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7.    Recoupment begins as of January 1, 2000.

8.    During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9.    Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C.    Other Terms.

1.    The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2.    If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

000000695

**EXHIBIT P**
**121**

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3.    Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4.    D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5.    The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6.    In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75% to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7.    Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8.    D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

**000000696**

**EXHIBIT P**
**122**

# GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 5

9.      DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.      Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11.      At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.      The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13.      Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14.      Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

000000697

**EXHIBIT P**
**123**

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By _____

Kevin S. Marks

KSM:ljl

cc:    Joanne Siegel
       Laura Siegel Larson
       Bruce Ramer
       Don Bulson

236172.1

000000698

**EXHIBIT P**
**124**