# EXHIBIT

# A

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

November 29, 2011

<u>Via E-Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     *DC Comics v. Pacific Pictures Corp., et al.,* Case No. 10-CV-03633 ODW (RZx)

Dan:

Enclosed herewith please find defendant Laura Siegel Larson's production of documents from her review after cleaning out the house of her deceased mother Joanne Siegel, as well as a supplemental privilege log for Ms. Larson.

Also please find enclosed herewith, on behalf of the Estate of Michael Siegel, a privilege log of the documents from the Renner Otto electronic archive, as well as an accompanying document production from the archive. Although not required to do so, we have also generated and enclose a complete master list of all of the documents in the Renner Otto electronic archive to avoid burdening a court with unnecessary disputes.

To avoid any confusion, please also take note of the following:

The master list contains numerous pieces of correspondence and other documents that have already been produced or are otherwise in your clients' possession, but that we nonetheless produce herewith. *See* Master List Entry Nos. 3, 7-10, 22, 24, 44, 72, 107-109, 232, 234, 330-332, 344, 380, 382-383, 388, 390, 395, 398, 417, 419, 422, 426, 431-432, 440-442, 448, 451, 469-470, 490-491, 493-501, 504-507, 514-515, 517-519, 524, 530, 535-536, 539-540, 543-544, 562, 569-570, 581, 589-597, 600-601, 603-618, 620, 622-623, 660, 662, 675, 678-683, 687-689, 691-694, 703-705.

As the master list sets forth the documents as they appear in the archive, it contains numerous duplicate entries. *See, e.g.,* Master List Entry Nos. 33-34.

When comparing the documents in the electronic archive to the defendants' previously-produced logs, which incorporated five-year-old privilege logs from the *Siegel v. Warner Bros.*

EXHIBIT A

**TOBEROFF & ASSOCIATES, P.C.**

November 29, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 2

*Entertainment Inc.* case, it appears that there are certain inadvertent non-material discrepancies in the prior logs that have been corrected in the enclosed privilege log. *See, e.g.,* Bulson Log Entry Nos. 1, 50, 52, 133, 135, 162, 204, 207, 236, 267, 319, 323, 325 (omission of certain "cc" recipients, usually attorneys); No. 5 (dated August 15, 1997 instead of July 15, 1997); Nos. 170, 472 (sender and recipient reversed); Nos. 214, 216 (recipient omitted); No. 400 (listed as "Michael Siegel-Michael Siegel" e-mail instead of "Michael Siegel-Don Bulson" e-mail); Nos. 434, 448 (listed as attorney work-product "drafts" instead of attorney-client letters); No. 415 (facsimile listed as an e-mail).

The master list includes numerous documents that are not responsive to DC's requests and/or that are otherwise not relevant to this case and that have therefore not been produced. *See, e.g.,* Master List Entry Nos. 285-286 (IRS correspondence), Nos. 624-647 (Estate of Bella Siegel), 648 (Estate of Isabel Spellman), Nos. 666-67 (attempt to sell a piece of memorabilia to third party), Nos. 669, 671 (guardianship of Michael Siegel).

Copies of Jerome Siegel's will were also found in the Renner Otto archive. We will produce those documents subject to the protective order entered into in the *Siegel* case.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

Enclosures

# EXHIBIT

# B



January 21, 2003

*Privileged & Confidential*

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Dear Joanne and Laura:

This is to confirm the agreement and understanding in connection with our recent discussion and disclosure to you of various risks and potential problems regarding Michael Siegel, and the mitigation of possible conflicts of interest with respect to the following proposed remedial actions:

1.      Ariel Emanuel ("AE") will attempt to purchase all of Michael Siegel's rights, title and interest in *Superman, Superboy* and *The Spectre* ("MS Interests") to be financed by AE.

2.      The proposed purchase will be subject to Michael Siegel entering into a formal written settlement agreement, settling and releasing each of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding *Superman, Superboy and The Spectre*. The settlement agreement will specifically disclose the separate *Superboy* termination, recently served and filed.

3.      In the event Michael Siegel agrees to the above purchase and settlement, the following conditions will apply to and bind AE, any designee entity owned or controlled by him and his heirs, successors or assigns with respect to the MS Interests:

        (a)      The MS Interests will only be sold or assigned to a separate third party (i.e., not owned or controlled by AE) in conjunction with the sale or assignment of your interests in *Superman, Superboy* and/or *The Spectre*, respectively, to said third party and not independently of your interests.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz
EXHIBIT B
7

IPWW 00003

# Ip worldwide

Page 2
Joanne Siegel and Laura Siegel Larson
January 21, 2003

    (b)    You retain full and complete decision making authority with respect to the disposition of the copyright termination interests in *Superman*, *Superboy* and *The Spectre* arising from Jerome Siegel's copyright interest therein.

    (c)    AE will fully indemnify you and hold you completely harmless against any and all claims, causes of action, damages, costs or loss (including attorney's fees), if any, arising out of the purchase of the MS Interests and the settlement agreement.

    (d)    AE will reimburse you for twenty-five percent (25%) of any expenses paid by you after October 17, 2000 in connection with the Jerome Siegel copyright termination interests in *Superman*, *Superboy* or *The Spectre* , including without limitation, the filing cost of the Superboy Copyright Termination, upon and subject to your providing him with an itemized list of such expenses.

    (e)    AE will also pay twenty-five percent (25%) of the following sums: (i) fees, commission or settlement amounts, if any, to the law firm of Gang, Tyre, Ramer & Brown and/or its attorneys regarding their alleged services in connection with Jerome Siegel's copyright termination interests; (ii) fees, costs or expenses of any audit, if any, of revenues or profits derived from *Superman*, *Superboy* or *The Spectre* and (iii) fees, costs or expenses of any other actions to protect, enforce or enhance Jerome Siegel's copyright termination interests in *Superman*, *Superboy* or *The Spectre*.

    (f)    If , after the sale or assignment of the *Superman/Superboy/The Spectre* rights is made and royalties are being paid to the Siegel interest, AE chooses to offer his royalty interest for sale, you, or in the event of your death, your heirs, will have the right of first refusal to purchase said royalty interest.

4.    This letter contains the full and complete understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by each party. This letter shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this letter shall be valid

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

EXHIBIT B

IPWW 00004

# Ip worldwide

Page 3
Joanne Siegel and Laura Siegel Larson
January 21, 2003

acceptable substitutes for executed originals.

If the above comports with your understanding please indicate this by your signatures below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Agreed, Understood and Accepted:

_____        Date: 1/23/03
Ariel Z. Emanuel

_____        Date: 1/22/3
Joanne Siegel

_____        Date: 1/22/03
Laura Siegel Larson

IPWW 00005

# EXHIBIT

# C

 **Gmail**

**Marc Toberoff <marc.toberoff@gmail.com>**

## DC v. Pacific Pictures Corp.

**Marc Toberoff** <mtoberoff@ipwla.com>                    Thu, Aug 11, 2011 at 2:48 PM
To: jryland <jryland@rennerotto.com>
Cc: Keith Adams <kgadams@ipwla.com>

Hi Josh:

In order for the Michale Siegel estate to assert privilege where appropriate we will need to review copies of the following documents referred to in Matt Kline's August 3, 2011 letter to me and Mr. Berk on which you were copied:

(1) the expert report in the litigation with the Estate; and (2) the calendar and billing entries maintained by Mr. Bulson and you regarding the representation of Michael Siegel.

Thank-you.

Regards


--
Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 3630
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

EXHIBIT C

# EXHIBIT

# D



**Marc Toberoff <marc.toberoff@gmail.com>**

## DC v. Pacific Pictures Corp.

**Marc Toberoff** <mtoberoff@ipwla.com>                     Thu, Sep 8, 2011 at 1:18 PM
To: jryland <jryland@rennerotto.com>
Cc: Keith Adams <kgadams@ipwla.com>

Hi Josh:

I just returned from vacation and realized that we have still not received the materials from Renner Otto for privilege review set forth in my August 11 email below and demanded in Matt Kline's August 3, 2011 letter (cc'ed to you).

I am so sorry to have to bother you with this.

Thanks

Marc Toberoff

[Quoted text hidden]

# EXHIBIT

# E

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    728

SIEG.ZG0101:Mr. Mike Siegel (continued)



11/27/2001 DWS
    24457  Service

Mark Toberoff                                          , tel. conf. with

EOMS 00151

Exhibit E

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:47 AM                                    Pre-bill Worksheet                                        Page    721

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date | Lawyer | | Rate | Hours | Amount | Total |
|------|--------|--|------|-------|--------|-------|
| ID | Task | | Markup % | DNB Time | DNB Amt | |

Total: January 2002

Date: February 2002
    2/11/2002 DWB
        35125 Service
            Tel. conf. with Marc Toberoff,

    3/22/2002 DWB
        37342 Service
            Tel. conf. with Marc Toberoff

Total: March 2002

EOMS 00152

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    722

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|



7/30/2002  DWB
51850  Service
Tel. conf. with Mark Tobaroff

EOMS 00153

Exhibit E

17

11/22/2007
3:41 AM

Renner, Otto, Boisselie, & Sklar, LLP
Pre-bill Worksheet

Page    724

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date | Lawyer | | Rate | Hours | Amount | Total |
|---|---|---|---|---|---|---|
| ID | Task | | Markup % | DNB Time | DNB Amt | |



Date: November 2002
11/11/2002 DWB
    65290 Service
        ████████████████, place call to Toberoff

11/19/2002 DWB
    65347 Service
        Tel. conf. with Mark Toberoff

EOMS 00154

Exhibit E

18



11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    725

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|---|

1/16/2003 DWB
71853 Service
Email to Toberoff

1/23/2003 DWB
71923 Service
Tel. conf. with Marc Toberoff

1/24/2003 DWB
71947 Service
Tel. conf. with Marc Toberoff

Date: March 2003
3/4/2003 DWB
78829 Service
Tel. conf. with Marc Toberoff

EOMS 00155

Exhibit E

19

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:4° AM                                     Pre-bill Worksheet                                    Page    726

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|

Total: March 2003

Date: April 2003
   4/4/2003  DWB
     81944  Service
       Tel. conf. with Marc Toberoff

Date: May 2003
   5/2/2003  DWB
     84972  Service
       Tel. conf. with Marc Toberoff

Total: May 2003

Date: June 2003
   6/3/2003  DWB
     88053  Service
       Tel. conf. with Toberoff

EOMS 00156

Exhibit E



11/22/2007                    Renner, Otto, Boisselle, & Skier, LLP
3:41 AM                              Pre-bill Worksheet                                      Page    727

SIEG ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|

6/19/2003  DWB
   88194  Service
          Tel. conf. with Marc Toberoff

7/21/2003  DWB
   92834  Service
          Tel. conf. with Marc Toberoff

Total: July 2003

EOMS 00157

Exhibit E

21



11/22/2007
3:47 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    729

SIEG ZG0101: Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|

Date: June 2004
6/3/2004 DWB
'127248 Service
Tel. conf. with Marc Toberoff

EOMS 00158

Exhibit E

22



11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                   Pre-bill Worksheet                                    Page    731

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date | Lawyer | | Rate | Hours | Amount | Total |
|------|--------|--|------|-------|--------|-------|
| ID | Task | | Markup % | DNB Time | DNB Amt | |

Date: February 2005
    2/17/2005 DWB
        155843 Service
            Tel. conf. with Marc Toberoff

EOMS 00160



11/22/2007
3 41 AM

Renner, Otto, Boissella, & Sklar, LLP
Pro-bill Worksheet

Page    732

SIEG ZG0101:Mr. Mike Siegel (continued)

Resomun

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|

10/31/2005  DWB
 184158  Service
    Tel conf. with Marc Toberoff.

EOMS 00161

Exhibit E

25

**Renn** Otto, Boisselle, & Sklar, LLP
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending November 30, 2001



11/27/2001  DWB                                    tel. conf.
with Mark Toberoff

EOMS 00162

Exhibit E

26

 

**Re____r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending July 31, 2002



7/30/2002  DWB  Tel. conf. with Mark Toberoff

EOMS 00163

Exhibit E

27

 

**Re...r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending November 30, 2002

 

place call to Toberoff

11/19/2002 DWB  Tel. conf. with Mark Toberoff

For professional services rendered

EOMS 00164

Exhibit E

28

r, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1521 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106



For Period En

1/16/2003 DWB  Email to Toberoff

1/23/2003 DWB  Tel. conf. with Marc Toberoff

1/24/2003 DWB  Tel. conf. with Marc Toberoff

EOMS 00165

 

**Re___r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending March 31, 2003



3/4/2003  DWB  Tel. conf. with Marc Toberoff

EOMS 00166

 

**Ren___r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1821 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending April 30, 2003



4/4/2003 DWB  Tel. conf. with Marc Toberoff

EOMS 00167

Exhibit E

 

**Re___r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  May 31, 2003



5/2/2003 DWB  Tel. conf. with Marc Toberoff

EOMS 00168

Exhibit E

 

**Re**_ _**r. Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44105

For Period Ending  June 30, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services



6/3/2003 DWB  Tel. conf. with Toberoff

6/19/2003 DWB  Tel. conf. with Marc Toberoff

EOMS 00169



**Re     er, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106

For Period Ending  July 31, 2003



7/21/2003 DWB  Tel. conf. with Marc Toberoff

EOMS 00170

Exhibit E

34



**Re____r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  February 28, 2002



2/11/2002  DWB  Tel. conf. with Marc Toberoff, review agreement

Exhibit E

35

 

**Reer, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44116
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending June 30, 2004



6/3/2004 DWB  Tel. conf. with Marc Toberoff

6/8/2004 DWB                voice mail message
from Mr. Toberoff

EOMS 00172

Exhibit E

 **Re___r, Otto, Boisselle, & Sklar, LLP** 
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandsmeer Rd
Cleveland Heights OH 44106

For Period Ending  July 31, 2004



7/6/2004 DWB  Place call to Toberoff

EOMS 00173

Exhibit E

37

  

**Re●●●r, Otto, Boisselle, & Sklar, LLP** 🌑
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  September 30, 2004



9/30/2004  DWB   Tel. conf. with Marc Toberoff

EOMS 00174

Exhibit E

 

**Re___r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending October 31, 2004



10/11/2004 DWB Tel. conf. with Marc Toberoff

10/27/2004 DWB Tel. conf. with Marc Toberoff

EOMS 00175

Exhibit E

 

**Ren____, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

November 14, 2007                    Invoice #    90477

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106



11/12/2004 DWB                                        email to Toberoff

EOMS 00176

Exhibit E

40

 **Re, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  March 31, 2002



3/22/2002  DWB  Tel. conf. with Marc Toberoff

EOMS 00177

Exhibit E

41



**Renn**  **Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  February 28, 2005



2/17/2005 DWB  Tel. conf. with Marc Toberoff

EOMS 00178

Exhibit E

42



**Re___r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44108

For Period Ending October 31, 2005



10/31/2005 DWB  Tel. conf. with Marc Toberoff

EOMS 00179



2/21/2008
5 32 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    701

Nickname        SIEG.L0102 | 38877
Full Name       Mr. Mike Siegel
Address         3605 Bendemeer Rd
                Cleveland Heights OH 44106
Phone 1                         Phone 2
Phone 3                         Phone 4
In Ref To       L0102;  RENNER, OTTO, BOISSELLE & SKLAR vs. ESTATE OF MICHEAL SIEGEL - CASE NO.
                CV-07-620856

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|



1/31/2008  JMR
  283041  Service
          Call with Toberoff

EOMS 00180

Exhibit E

44



11/22/2007                          Ranner, Otto, Boiselle, & Sklar, LLP
3:41 AM                                      Pre-bill Worksheet                                    Page    716

Nickname          SIEG.ZG0100 | 13840
Full Name         Mr. Mike Siegel
Address           3805 Bandemeer Rd
                  Cleveland Heights OH 44106
Phone 1                                           Phone 2
Phone 3                                           Phone 4
In Ref To         G0100; General Matters

| Date | Lawyer | | Rate | Hours | Amount | Total |
|---|---|---|---|---|---|---|
| ID | Task | | Markup % | DNB Time | DNB Amt | |

Date: November 2006
    11/2/2006 DWB
    229529   Service
             Tel. conf. with Marc Toberoff

EOMS 00181

Exhibit E

45



11/22/2007　　　　　　　　　　Renner, Otto, Boisselle, & Sklar, LLP
3:42 AM　　　　　　　　　　　　Pre-bill Worksheet　　　　　　　　　　　　　　Page　734

Nickname　　　SIEG.ZG0108 | 33237
Full Name　　　Mr. Melvin H. Banchek
Address　　　　55 Public Square, Suite 918
　　　　　　　　　Cleveland OH 44113
Phone　　　　　　　　　　　　　　　Phone 2
Phone 3　　　　　　　　　　　　　　Phone 4
In Ref To　　　G0108; Michael Siegel's Death and Estate

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|

Date  August 2006
　8/21/2006  DWB
　　219736  Service
　　　　　　　　　　　　　conf. with Toberoff's office

　8/23/2006  DWB
　　219748  Service
　　　　　　　　　　　　　email to Toberoff's office

Total, August 2006

EOMS 00182

Exhibit E

46

# EXHIBIT

# F

APPELLATE CASE NO. 11-56934

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

———————

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

———————

## APPELLANTS' OPENING BRIEF

———————

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

———————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@ipwla.com*
Keith G. Adams (240497)
 *kgadams@ipwla.com*
Pablo D. Arredondo (241142)
 *parredondo@ipwla.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants, Mark Warren Peary, as personal representative of the Estate of Joseph Shuster Shuster, and Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel*

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
 *rkendall@kbkfirm.com*
Laura W. Brill (195889)
 *lbrill@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:   (310) 556-2700

*Attorneys for Defendants-Appellants, Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, and Marc Toberoff*

EXHIBIT F

48

# F.R.A.P. 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners make the following disclosure statements:

Defendant-Petitioner IPW, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IPW, LLC.

Defendant-Petitioner IP Worldwide, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IP Worldwide, LLC.

Defendant-Petitioner Pacific Pictures Corporation does not have a parent corporation, nor does any publicly held corporation own 10% or more of Pacific Pictures Corporation.

Dated:  April 24, 2012        TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, and Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel

/s/ Laura W. Brill
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC and Marc Toberoff

## <u>TABLE OF CONTENTS</u>

STATEMENT OF JURISDICTION...........................................................................1

ISSUES PRESENTED.............................................................................................1

STATEMENT OF THE CASE..................................................................................2

INTRODUCTION. ...................................................................................................2

STATEMENT OF FACTS ........................................................................................6

      A.    The Termination Right ..........................................................6

      B.    Joseph Shuster's Death And The 1992 Agreement ..............7

      C.    Marc Toberoff's Representation Of The Shusters .................7

      D.    The Siegels' Terminations And Settlement Negotiations.....................9

      E.    The Siegels Grow Dissatisfied .............................................11

      F.    The Ari Emanuel Offer ........................................................11

      G.    The Siegels Regroup ............................................................12

      H.    The Siegel Litigations .........................................................13

      I.    The Instant Action ...............................................................14

STANDARD OF REVIEW ......................................................................................15

SUMMARY OF ARGUMENT .................................................................................15

ARGUMENT ...........................................................................................................19

I.    CALIFORNIA'S ANTI-SLAPP STATUTE PROTECTS CITIZENS' RIGHT TO PETITION ..............................................19

II.    DC'S CLAIMS FALL UNDER THE ANTI-SLAPP STATUTE ................20

EXHIBIT F

A.    Claims That Entail Any Non-Incidental Protected Activity
      Are Subject To The Anti-SLAPP Law..................................................20

B.    Filings To Establish A Statutory Property Right, Legal
      Proceedings, Settlement And Other Litigation-Related
      Activities Are All Protected By The Anti-SLAPP Statute ................22

      1.    DC's Fourth Claim Implicates Protected Activity...................24

            a.    The Fourth Claim Arises From Mr. Toberoff's
                  Assistance Of The Shuster Executor To Exercise
                  His Right To Petition........................................................25

            b.    The Fourth Claim Also Concerns Protected
                  Conduct In Anticipation Of Litigation ...........................28

      2.    DC's Fifth Claim Implicates Protected Activity .....................30

            a.    The Fifth Claim Concerns Statutory Termination
                  Implicating The Anti-SLAPP Law ..................................31

            b.    The Fifth Claim Concerns Settlement,
                  Anticipated And Actual Litigation Implicating
                  The Anti-SLAPP Law .....................................................32

      3.    The Initial Lack Of A Formal Legal Retainer
            Agreement Between The Heirs and Toberoff Does Not
            Change The Analysis ...............................................................34

C.    The Sixth Claim Falls Within § 425.16(e) ..........................................35

D.    The District Court Ignored The Realities Of DC's Claims ...............36

III.   DC'S SLAPP CLAIMS HAVE NO REASONABLE
       PROBABILITY OF SUCCESS ....................................................................40

      A.    DC's Fourth Claim Has No Probability Of Success ...........................40

1.    The Fourth Claim Is Barred By The Statute Of Limitations ...............................................................40

2.    The Fourth Claim Is Also Barred By The Litigation Privilege ...................................................................42

3.    DC's Fourth Claim Fails Because The 1992 Agreement Has No Effect On Termination Rights...................43

    a.    The 1992 Agreement Did Not Assign Superman Rights .............................................................44

    b.    No Breach Of The 1992 Agreement...............................44

    c.    The 1992 Agreement Could Not Waive Termination As A Matter Of Law ..................................45

    d.    No "Revocation And Regrant".......................................46

B.    DC's Fifth Claim Has No Probability Of Success .............................47

    1.    The Fifth Claim Is Barred By The Statute of Limitations .................................................................47

    2.    The Fifth Claim Is Barred By The Litigation Privilege...........49

    3.    There Is No Evidence That Mr. Toberoff Interfered With DC's Purported Prospective Economic Advantage ...................................................................51

    4.    DC Has Shown No "Wrongful Act".........................................53

C.    DC's Sixth Claim Has No Probability of Success ...............................54

    1.    The Sixth Claim Is Barred By The Statute of Limitations .................................................................54

    2.    DC's Sixth Claim Is Premised On A Non-Existent "Right" To Negotiate .................................................55

3. The Sixth Claim Is Barred By The Litigation Privilege ...........57

4. DC's Sixth Claim Is Preempted By The Copyright Act..........58

5. DC's Sixth Claim Fails To Plead Conduct That
Violates The UCL ...................................................................60

CONCLUSION ............................................................................................61

STATEMENT OF RELATED CASES ..................................................63

CERTIFICATE OF COMPLIANCE ....................................................64

STATUTORY ADDENDUM .................................................................65

CERTIFICATE OF SERVICE .............................................................75

# TABLE OF AUTHORITIES

## Cases

*Abogados v. AT&T, Inc.*,
223 F.3d 932 (9th Cir. 2000) .................................................................15

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ...............................................................................57

*Altera Corp. v. Clear Logic, Inc.*,
424 F.3d 1079 (9th Cir. 2005) ...............................................................59

*Aronson v. Kinsella*,
58 Cal. App. 4th 254 (1997) ...................................................................58

*Asia Inv. Co. v. Borowski*,
133 Cal. App. 3d 832 (1982) .............................................................51, 58

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ...............................................1, 2, 20, 40

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*,
52 Cal. App. 4th 867 (1997) ...................................................................45

*Bourne Co. v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987).........................................................56

*Brandlin v. Belcher*,
67 Cal. App. 3d 997 (1977) ....................................................................34

*Briggs v. Eden Council for Hope & Opportunity*,
19 Cal. 4th 1106 (1999) ................................................................ 23, *passim*

*Cabral v. Martins*,
177 Cal. App. 4th 471 (2009) .................................................................43

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal. 4th 163 (1999) ......................................................................60, 61

*Chang v. Lederman*,
172 Cal. App. 4th 67 (2009) ...................................................................43

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
532 F.3d 978 (9th Cir. 2008) ............................................................ 46-47

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) ...............................................................38

*Crowley v. Katleman*,
8 Cal. 4th 666 (1994) .............................................................................50

*Del Madera Properties v. Rhodes & Gardner, Inc.*,
820 F.2d 973 (9th Cir. 1987) .................................................................60

*Drum v. Bleau, Fox & Associates*,
107 Cal. App. 4th 1009 (2003) ..............................................................43

*E.E.O.C. v. Waffle House, Inc.*,
534 U.S. 279 (2002)................................................................................45

*Flatley v. Mauro*,
39 Cal.4th 299 (2006) ............................................................................39

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ...........................................................................49

*Fox Searchlight Pictures, Inc. v. Paladino* ("*Fox*"),
89 Cal. App. 4th 294 (2001) ....................................................... 21, 36-37

*GeneThera, Inc. v. Troy & Gould Prof. Corp.*,
171 Cal. App. 4th 901 (2009) ................................................................23

*Hilton v. Hallmark Cards*,
580 F.3d 874 (9th Cir. 2009) ...................................................20-21, 23, 27

*Jespersen v. Zubiate-Beauchamp*,
114 Cal. App. 4th 624 (2003) ........................................................21, 34

EXHIBIT F

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) ......................................................................41, 49

*Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*,
285 F.3d 848 (9th Cir. 2002) ...............................................................54

*Kashian v. Harriman*,
98 Cal. App. 4th 892 (2002) ......................................................23, 39, 50

*Kodadek v. MTV Networks*,
152 F.3d 1209 (9th Cir. 1998) .............................................................59

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) .......................................................................53

*Ludwig v. Superior Court*,
37 Cal. App. 4th 8 (1995) ...............................................................23, 34

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002)..................................................................46

*Mindys Cosmetics, Inc. v. Dakar* ("*Mindys*"),
611 F.3d 590 (9th Cir. 2010) ................................................ 19, *passim*

*Moonrunners L.P. v. Time Warner*,
2005 U.S. Dist. LEXIS 41244 (C.D. Cal. June 17, 2005) ........................3

*Motown Record Corp. v. George A. Hormel & Co.*,
657 F. Supp. 1236 (C.D. Cal. 1987) .....................................................59

*Nasr v. Geary*,
2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003) ........................58

*Navellier v. Sletten*,
29 Cal. 4th 82 (2002) .....................................................................20, 23

*Norgart v. Upjohn Co.*,
21 Cal. 4th 383 (1999) ........................................................................49

*Olszewski v. Scripps Health*,
30 Cal. 4th 798 (2003) ...................................................................................60

*Pacific Gas & Electric Co. v. Bear Stearns & Co.* ("*PG&E*"),
50 Cal. 3d 1118 (1990) .......................................................................27, 43, 51

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985).......................................................................................57

*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*,
20 Cal. 4th 1135 (1999) .................................................................................34

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*,
133 Cal. App. 4th 658 (2005) ........................................................................35

*Ritchie v. Williams*,
395 F.3d 283 (6th Cir. 2005) ..........................................................................58

*Rothman v. Jackson*,
49 Cal. App. 4th 1134 (1996) .........................................................................58

*Rubin v. Green*,
4 Cal. 4th 1187 (1993) .......................................................................24, *passim*

*Rusheen v. Cohen*,
37 Cal. 4th 1048 (2006) ..................................................................................42

*Salma v. Capon*,
161 Cal. App. 4th 1275 (2008) .......................................................................21

*Samuels v. Forest*,
2007 WL 3149285 (Cal. App. Oct. 30, 2007) ...............................................41

*Seltzer v. Barnes*,
182 Cal. App. 4th 953 (2010) ...............................................................21, *passim*

*Shroyer v. New Cingular Wireless Servs.*,
606 F.3d 658 (9th Cir. 2010) ..........................................................................61

*Siegel v. National Periodical Publications,*
508 F.2d 909 (2d Cir. 1974)....................................................................44

*Siegel v. Warner Bros. Entertainment Inc.* ("*Siegel I*")*,*
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...................................... 3, *passim*

*Siegel v. Warner Bros. Entertainment Inc.,*
658 F. Supp. 2d 1036 (C.D. Cal. 2009) ..............................................3, 14

*Silberg v. Anderson,*
50 Cal. 3d 205 (1990) ............................................................................42

*Slater v. Blackwood,*
15 Cal. 3d 791 (1975) ............................................................................22

*Sole Energy Co. v. Petrominerals Corp.*,
128 Cal. App. 4th 212 (2005) ................................................................52

*South Sutter, LLC v. LJ Sutter Partners, L.P.*,
193 Cal. App. 4th 634 (2011) ..........................................................22, 27

*Stewart v. Abend,*
495 U.S. 207 (1990)...............................................................................46

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
2006 WL 5441237 (C.D. Cal. Sept. 14, 2006) ......................................41

*Stutz Motor Car of Am. v. Reebok Int'l,*
909 F. Supp. 1353 (C.D. Cal. 1995) ......................................................54

*United States v. Lockheed Missiles & Space Co.*,
190 F.3d 963 (9th Cir. 1999) .................................................................19

*Taheri Law Group v. Evans,*
160 Cal. App. 4th 482 (2008) ................................................... 24, *passim*

*Trembath v. Digardi,*
43 Cal. App. 3d 834 (2000) ...................................................................40

*Varian Med. Sys., Inc. v. Delfino,*
35 Cal.4th 180 (2005) ........................................................................20

*Wilcox v. Superior Court,*
27 Cal. App. 4th 809 (1994) ................................................................4

*Wilton v. Mountain Wood Homeowners Assn.,*
18 Cal.App.4th 565 (1993) ................................................................43

*Youst v. Longo,*
43 Cal. 3d 64 (1987) .................................................................... 51-52

*Zamani v. Carnes,*
491 F.3d 990 (9th Cir. 2007) .............................................................15

## **Statutes**

17 U.S.C. § 301(a) ...........................................................................58

17 U.S.C. § 304(c)(2) .....................................................................7, 45

17 U.S.C. § 304(c)(2)(D) ................................................................7, 45

17 U.S.C. § 304(c)(5) .........................................................................45

17 U.S.C. § 304(c)(6)(D) ........................................................ 18, *passim*

17 U.S.C. § 304(d) ..............................................................................9

17 U.S.C. § 304(d)(1) ........................................................................26

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1338 .................................................................................1

28 U.S.C. § 1367 .................................................................................1

Cal. Bus. & Prof. Code § 17208 .........................................................54

Cal. Civil Code § 47(b) ............................................................ 17, *passim*

California Code of Civil Procedure ("CCP"),
CCP § 339(1) .........................................................................40, 47

CCP § 425.16(a).......................................................................19

CCP § 425.16(b) ................................................................ 20, 22-23

CCP § 425.16(e)(1)...............................................................22, 25

CCP § 425.16(e)(4) ............................................................. 21-22

CCP § 425.16(f) .................................................................1, 15

CCP § 425.16(g) ........................................................................1

F.R.C.P. 9(b) ..........................................................................61

## **Other Authorities**

61 Cal. Jur. 3d Unfair Competition § 3 (2008) ........................................60

H.R. Rep. No. 94-1476 (1976) .........................................................6

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2010) ("*Nimmer*"),
3 *Nimmer* § 11.01 .....................................................................6

3 *Nimmer* § 11.08[A], n.6 ............................................................56

W. Patry, *Patry on Copyright* (2010)
3 *Patry on Copyright* § 7:47 ........................................................56

3 *Patry on Copyright* § 21:18 ......................................................57

## STATEMENT OF JURISDICTION

Plaintiff-Appellee DC Comics ("DC") brought suit for declaratory relief under the Copyright Act and state-law claims against defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC (the "Toberoff Defendants"), defendants Joanne Siegel and Laura Siegel Larson (heirs of Jerome Siegel; the "Siegels") and defendants Mark Warren Peary and Jean Peavy (relatives of Joseph Shuster; the "Shusters") (collectively, "Defendants"). The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367.

This Court has jurisdiction pursuant to the collateral order doctrine. *See Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003); California Code of Civil Procedure ("CCP") § 425.16(f)-(g).

## ISSUES PRESENTED

1. Did the district court err in finding that DC's Fourth, Fifth and Sixth Claims did not fall within California's Anti-SLAPP statute, where such claims were based on the Siegels' and Shusters' exercise of their right to petition via the filing and enforcement of Notices of Termination under the Copyright Act, settlement negotiations, the filing of probate proceedings, and their choice of defendant Mr. Marc Toberoff as counsel?

2. Did the district court err in failing to find that DC's Fourth, Fifth and

EXHIBIT F

Sixth Claims did not have a "reasonable probability" of success on the merits,

where such claims are all barred by the statutes of limitations and litigation

privilege, and are substantively meritless as a matter of law?

## STATEMENT OF THE CASE

This is an appeal, authorized by *Batzel*, 333 F.3d at 1025, from the district

court's collateral order, dated October 25, 2011 (ER 1-7), denying Defendants'

motion to strike DC's state-law claims pursuant to California's Anti-SLAPP

statute, CCP § 425.16. It was timely filed on November 2, 2011. ER 13-26.

## INTRODUCTION

High school students Jerry Siegel and Joe Shuster created Superman in the

throes of the Great Depression. In 1938, as a condition to publication, they were

required to sign a "release," and were later held in a 1947 lawsuit to have assigned

away their copyright to DC. In 1997, Siegel's elderly widow, Joanne Siegel, and

daughter, Laura Siegel Larson, exercised their inalienable rights under section

304(c) of the Copyright Act to restore Siegel's copyrights to his family by

terminating such grants. In 2003, the Shuster estate followed suit, filing

comparable statutory "notices of termination."

Congress established the "termination right" due to significant concerns that

an author's unequal bargaining power often resulted in the loss of their copyrights

to publishers, without ever realizing their value. In practice, this imbalance

continues, and this legislative objective is thwarted unless it is enforced; a process that, as here, can involve years of litigation.  Without effective legal advocacy, Congress' complicated termination scheme is illusory.

This case centers on the efforts of DC and its parent Warner Bros. Entertainment Inc. ("Warner") to thwart the Copyright Act's termination right by attacking the attorneys who vindicate it.  Mr. Toberoff has long represented the Shusters and the Siegels (the "Heirs") in drafting and filing their statutory notices of termination with the Copyright Office and in their litigation and settlement negotiations with Warner/DC.

Mr. Toberoff, representing the Siegels, filed suit against Warner/DC in 2004 to vindicate their termination notices and copyrights.  *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx).  In 2008-09, Warner/DC suffered significant setbacks, as Toberoff secured partial summary judgment that the Siegels had successfully recaptured their original Superman copyrights, in what is perhaps the highest-profile case on statutory termination. *Siegel v. Warner Bros. Entertainment Inc.,* 542 F. Supp. 2d 1098, 1116, 1145 (C.D. Cal. 2008) ("*Siegel I*"), 658 F. Supp. 2d 1036 (C.D. Cal. 2009) ("*Siegel II*").

Nor was this the first time that Toberoff, a well-known artists' rights attorney, had prevailed against Warner regarding copyrights.  *See Moonrunners L.P. v. Time Warner,* 2005 U.S. Dist. LEXIS 41244 (C.D. Cal. June 17, 2005).

3
EXHIBIT F

In 2010, Warner fired their outside counsel, and through DC embarked on a campaign to attack the Heirs by attacking their counsel. DC filed meritless state-law claims against Mr. Toberoff, recasting protected activity as purported tortious interference and unfair competition. Yet the alleged "interference" arises fundamentally from the Heirs' exercise and Toberoff's vindication of their federal termination right.

California's Anti-SLAPP law was designed to protect citizens from such claims – "meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816 (1994). The Anti-SLAPP law allows courts swiftly to dispose of state-law claims implicating such rights, unless the plaintiff demonstrates a "reasonable probability" that it will prevail. As DC could not meet this burden, its retaliatory claims should have been struck by the district court.

DC's state-law claims, while masked with rhetoric, are directed at activity protected under California's Anti-SLAPP law.

DC's Fourth Claim, for tortious interference with contract, is built on a theory that Mr. Peary's retention of Mr. Toberoff, to help probate Joe Shuster's estate and to file termination notices amounts, to "interference" with a 1992 Agreement between DC and Shuster's siblings. Claims like this, arising from the

4
EXHIBIT F

filing of probate proceedings and statutory notices, unequivocally fall within the Anti-SLAPP law.

DC's Fifth Claim, for interference with prospective economic advantage, centers on the Siegels temporarily ending settlement negotiations regarding their termination notices and retention of Mr. Toberoff to file a Superboy termination notice, resume settlement negotiations, and enforce their rights in court.  As with the Fourth Claim, such claims of "interference" that arise from settlement negotiations, the filing of statutory notices and the enforcement of legal rights are clearly subject to the Anti-SLAPP law.

DC's Sixth Claim alleges that a *litigation* agreement between the Heirs to collectively negotiate settlement somehow violated California's unfair competition laws.  Such litigation and settlement-related activity plainly falls under the Anti-SLAPP law.

The district court failed to appreciate that these are protected petition activities, and that DC's state-law claims fall squarely within the Anti-SLAPP law. Having made this fundamental error, the district court never addressed DC's total inability to establish a *prima facie* case as to any of its retaliatory claims.  All of DC's state-law claims are barred by the statutes of limitations and the litigation privilege, and are otherwise meritless, as demonstrated below.

Due to these errors, and Warner's tactics, the Heirs and their counsel have

suffered and continue to suffer precisely the harms that the Anti-SLAPP law was designed to prevent.  Sadly, Joanne Siegel, who fought for more than a decade to see her late husband's rights restored to his family, has recently passed away,[1] her efforts at a fair resolution thwarted by Warner/DC's resource-rich retaliation.

This Court, the California Legislature and state courts throughout California have deemed similar tactics to be against public policy, swiftly striking such claims, as is necessary and appropriate here.

## STATEMENT OF FACTS

### A.     The Termination Right

In 1976, Congress amended the Copyright Act to extend the copyright renewal term.  To compensate for authors' unequal bargaining position, it gave authors and their surviving spouses, children, and grandchildren, the right to terminate prior grants of copyright, without cause, so as to benefit from this extension and remedy the author/publisher imbalance.  ER 1003 ¶49; 17 U.S.C. § 304 (c)(5); H.R. Rep. No. 94-1476 at 140 (1976); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 11.01.

To safeguard this important "termination right," Congress ensured that it could not be waived or circumvented:  "[t]ermination of the grant may be effected

---

[1] Ms. Larson was substituted as personal representative of Joanne Siegel's estate. Excerpts of Record ("ER"), 750-51, 793-94.

notwithstanding any agreement to the contrary" and "[a] further grant … is valid only if it is made after the effective date of termination … [or as to] the original grantee … after the notice of termination has been served…."  17 U.S.C. §§ 304(c)(5), (c)(6)(D).

### B.    Joseph Shuster's Death And The 1992 Agreement

Joe Shuster died on July 30, 1992, and had no widow or child.  ER 1004 ¶51.  Although he was survived by his siblings (*id.*), Frank Shuster (died in 1996) and Jean Peavy ("Peavy"), siblings hold no termination rights.  17 U.S.C. § 304(c)(2).  On October 2, 1992, DC, entered into a one-page agreement with Frank and Jean ("1992 Agreement") (ER 1005 ¶55), which raised their pension to $25,000, and stated:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which ***you*** [Frank Shuster and Jean Peavy] may have … regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, ***you*** now grant to us any such rights and release us… and covenant not to assert any claim of right….

ER 671 (emphasis added).

### C.    Marc Toberoff's Representation Of The Shusters

In 1998, Congress amended the 1976 Copyright Act, extending termination rights to an author's estate.  17 U.S.C. § 304(c)(2)(D).  In mid-to-late 2001, Joe Shuster's nephew, Mark Warren Peary ("Peary"), spurred by the well-publicized Siegel termination, sought the advice of an attorney, and contacted Marc Toberoff.

ER 682:7-21, 819:9-25, 852:5-22.  In November 2001, Peary and his mother,

Peavy, chose Mr. Toberoff as their counsel and since then he has continuously

provided legal advice to them.  ER 821:1-822:22, 853:18-854:3.

Peavy and Peary entered into a November 23, 2001 agreement with Mr.

Toberoff's "loan-out" company Pacific Pictures ("2001 PPC Agreement") "to

investigate, retrieve, enforce and exploit the Rights ['Joe Shuster and his estate's

rights, claims, copyrights']…via the establishment of Joe Shuster's estate and the

estate's termination pursuant to Section 304(c) of the U.S. Copyright Law (Title

17, U.S.C. )...."  ER 725.  The agreement provided for "Marc Toberoff, Esq. to

render legal services … to implement, enforce and prosecute" the above (ER 726

¶7) and for "a suitable replacement attorney experienced in copyright litigation and

willing to enforce the Rights on solely a contingent fee basis" "in the event that

Marc Toberoff dies or is disabled."  ER 727 ¶9.

As contemplated, Mr. Toberoff arranged for an estates attorney to probate

the estate of Joseph Shuster ("Shuster Estate"), and Mr. Peary was appointed as its

personal representative ("Shuster Executor").  ER 771-91.  In October 2003, the

2001 PPC Agreement was modified ("2003 PPC Agreement") (ER 730-33), and

confirmed Mr. Toberoff's continued engagement as counsel "to furnish all legal

services directly to Client [Shuster Executor] as shall be required."  ER 730 ¶2.

In November 2003, Mr. Toberoff, on behalf of the Shuster Executor, served

and filed with the U.S. Copyright Office a 17 U.S.C. § 304(d) notice of termination of Joe Shuster's Superman copyright grants ("Shuster Termination").  ER 865-81.  Toberoff prepared and signed the notice as "counsel for the Estate of Joseph Shuster."  ER 878, 881.

In September 2004, Toberoff, Peary and Peavy cancelled and revoked the 2001/2003 PPC Agreements, replacing them with a legal retainer agreement to clarify Mr. Toberoff's engagement, and their long-standing attorney-client relationship.  ER 695-98, 820:9-14, 825:19-826:23, 849.  To ensure that this retainer agreement, rather than the PPC Agreements, would govern the entire term of their relationship, they made it effective as of November 23, 2001, and it remains in effect today.  ER 695-98.

On April 28, 2005, DC sent the Shuster Executor a low-ball settlement offer to settle all legal claims and buy out his termination interest, referencing DC's purported defenses and lengthy *Siegel* litigations, which he rejected.  ER 766, 861:18-20, 883-89.

## D. The Siegels' Terminations And Settlement Negotiations

Jerry Siegel died in 1996, survived by his widow, Joanne Siegel, their daughter, Laura Siegel Larson, and his son from a prior marriage, Michael Siegel (died in 2006).  *Siegel I*, 542 F. Supp. 2d at 1113-1114; ER 493 ¶111, 1008-09 ¶67.  On April 3, 1997, Joanne and Laura, represented by attorney Arthur Levine,

exercised their rights under 17 U.S.C. § 304(c) by serving and filing with the
Copyright Office notices of termination (the "Siegel Termination") of Jerry
Siegel's Superman grants.  ER 1008-09 ¶67.

The parties engaged in settlement negotiations.  *Siegel I,* 542 F. Supp. 2d at
1115.  On April 15, 1999, the day before the Siegel Termination was to take effect,
DC contested its "validity and scope."  *Id.*; ER 808-10.  Thereafter, the Siegels
retained attorney Kevin Marks, signed a "tolling agreement" regarding
contemplated litigation, and continued negotiations in 2000-2001.  *Siegel I*, 542 F.
Supp. 2d at 1115; ER 1009 ¶68.

On October 19, 2001, Marks sent DC a "letter outlining the substance of a
settlement offer."  *Siegel I*, 542 F. Supp. 2d at 1136.  DC did not agree to that
proposal.  *Id.*  Instead, on October 26, 2001, DC responded with a materially
different outline and counter-offer.  *Id.*  Months later, on February 1, 2002, DC
sent the Siegels' a 56-page settlement proposal, loaded with "trap doors" and many
new and changed material terms not in Marks' October 19 offer or DC's October
26 counter-offer.  *Id.* at 1115, 1137-40; ER 319:21-330:1, 535-51, 581-638.

As Mr. Toberoff was advising the Shusters, he naturally wanted to know the
status of the Siegel Termination.  ER 827:1-828:4.  He left a phone message for
Marks on November 29, 2001, which Marks did not return.  ER 317:4-11.  On
February 6, 2002, Mr. Toberoff tried again, and the two had a brief conversation

wherein Marks stated that the Siegels were negotiating with DC.  ER 317:18-

319:20, 559, 829:16-830:25.

### E.     The Siegels Grow Dissatisfied

Angered by DC's aggressive February 1, 2002 proposal, and dissatisfied

with Marks' representation, the Siegels began looking for new counsel, contacting

noted trial lawyer Gary Spence in March 2002 for representation.  ER 38-67.

On May 9, 2002, Joanne Siegel, with no involvement by Mr. Toberoff or

any other counsel (ER 895:17-896:1), sent a letter to DC's parent company, stating

"we were stabbed in the back …. [y]our company's unconscionable contract dated

February [1], 2002 contained new, outrageous demands that were not in the

proposal….   After four years we have no deal and this contract makes an

agreement impossible."  ER 640-42.

Aware of the Siegels' extreme dissatisfaction, Marks drafted a new proposal,

which he never sent to DC.  ER 343:18-349:4, 1011-12 ¶¶77-81.  Nor did DC ever

attempt to modify or retract its two counter-proposals.  ER 1009-12 ¶¶69-81.

### F.     The Ari Emanuel Offer

In early August 2002, months *after* Joanne Siegel had declared an agreement

with DC "impossible," Mr. Toberoff, who had not been in contact with Marks

since February 6, and had had no contact with the Siegels, spoke with Marks

regarding the Siegel Termination.  ER 831:10-834:24, 897:1-3, 904:6-13.

As Marks was now open to discussion, Toberoff inquired whether the Siegels were interested in licensing their rights.  ER 332:10-333:6; 834:14-836:1.

In August 2002, Marks, Toberoff and Ari Emanuel, head of William Morris Endeavor, held a conference call during which Emanuel offered to purchase the Siegels' rights for $15 million on terms to be negotiated.  ER 334:1-336:8; 835:5-836:1.  Marks conveyed Emanuel's August 2002 offer to the Siegels, but neither they nor Marks responded to it.  ER 335:23-340:21; 837:24-838:23.

### G.    The Siegels Regroup

On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC, terminating Marks and providing "notification that we are totally stopping and ending all negotiations with DC."  ER 908:17-909:7; 929; *see Siegel I*, 542 F. Supp. 2d at 1136.  After years of grinding negotiations, the Siegels had had enough.

Seeking new counsel, Joanne Siegel was referred by her friend Peavy to Mr. Toberoff, whom she initially contacted in late September 2002 for legal representation (ER 838:1-839:24; 904:6-13), and Mr. Toberoff soon began providing legal advice to the Siegels.  ER 840:14-841:9, 897:1-3, 904:6-13.

Earlier in 2002, Toberoff and Emanuel had formed a joint venture, IP Worldwide, LLC, to focus on intellectual property.  ER 816:4-16.  The Siegels entered into an agreement with IP Worldwide  ("IPWW Agreement"), dated as of

October 3, 2002, which provides for "the legal services of Marc Toberoff, Esq. and the business services of Ariel Emanuel to market and negotiate the sale, license [or] settlement … of the [Siegel Termination] Rights" for 10% of any proceeds. ER 735-36 ¶¶1, 6.

In November 2002, Mr. Toberoff prepared and filed for the Siegels a statutory notice of termination regarding Superboy.  ER 914-27, 1013-16 ¶¶86, 89.

In 2003-2004 Mr. Toberoff held settlement negotiations with DC/Warner regarding Superman/Superboy, but again the parties were unable to reach an agreement.  ER 719-21.

On January 21, 2003, the Siegels agreed that Emanuel could attempt to buy-out Michael Siegel's 25% termination interest, but this was unsuccessful.  ER 969.

The IPWW Agreement was briefly extended in 2004, and expired on April 23, 2005.  ER 736 ¶5, 969.

## H.    The *Siegel* Litigations

After Mr. Toberoff's negotiations with DC/Warner did not result in settlement, the Siegels signed a litigation retainer agreement with him dated October 3, 2004.  ER 664, 844:15-18.  In October 2004, Toberoff filed two legal actions against Warner/DC to validate the contested Siegel terminations and enforce their copyrights.  C.D. Cal. Case No. 04-CV-08400 ODW RZx (Superman), No. 04-CV-08776 (Superboy) ("*Siegel* litigations"); ER 1017 ¶91.

On March 26, 2008, after extensive discovery, the district court granted the
Siegels' motion for summary judgment in dominant part, holding that "all the
Superman material contained in <u>Action Comics</u>, Vol. 1 [first published Superman
comic-book] is not a work-made-for-hire and is therefore subject to termination."
*Siegel I*, 542 F. Supp. 2d at 1130. The court rejected DC's defenses – most
notably, DC's dubious assertion that the parties had a binding settlement
agreement. *Id.* at 1139. The court later held that the Siegels had recaptured other
key *Superman* works. *Siegel II*, 658 F. Supp. 2d at 1063-83.

The *Siegel* litigations were thereafter transferred to a new district judge,
who, in May 2011, entered a Rule 54(b) judgment that is currently under appeal.
Case Nos. 11-55863, 11-56034.

## I.     The Instant Action

In early 2010, Warner/DC fired their outside counsel, hired new counsel and
embarked on a belligerent new strategy. After the Heirs did not accept Warner's
offer in a settlement mediation (Document 3-1 at 2), DC filed the instant action, on
May 14, 2010, against its long-time opposing counsel Mr. Toberoff and his clients,
containing state-law claims for purported tortious interference with prospective
economic advantage (Fourth Claim), tortious interference with contract (Fifth
Claim) and unfair competition (Sixth Claim). ER 1057.

On September 20, 2010, defendants filed an Anti-SLAPP motion and

motions to dismiss DC's state-law claims. ER 1142-43. Under CCP § 425.16(f), an Anti-SLAPP motion is to be heard within 30 days as part of the statute's protections. However, the motions were repeatedly vacated/postponed *sua sponte*, delaying their resolution. ER 29, 741, 746, 792, 795, 977, 982. On October 25, 2011, the district court denied the Anti-SLAPP motion on the grounds that DC's claims were purportedly not subject to the Anti-SLAPP statute. ER 1-7 ("Order"). This appeal followed, rendering it unnecessary for the district court to resolve the motions to dismiss. ER 13-26.[2]

## STANDARD OF REVIEW

A district court's grant or denial of a motion to strike under California's Anti-SLAPP statute is reviewed *de novo*. *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

It is well-established that a defendant targeted for protected speech or petition activity does not lose the protections of the Anti-SLAPP statute due to clever pleading. No matter how a plaintiff recasts its allegations to mask attacks on protected activity, the Anti-SLAPP statute applies. Case law dismisses such

---

[2] On April 17, 2012, a panel denied a writ petition regarding a discovery order below. In *dicta*, the panel recited facts not before the Court, contradicted prior judgments, and accepted disputed factual allegations that had yet to be adjudicated by the district court. Appellants will petition to correct these misstatements.

routine maneuvers, and dictates that where, as here, protected conduct is "more than merely incidental" to claims, the Anti-SLAPP statute applies and the plaintiff must show by admissible evidence that its claims have a "reasonable probability of success," or they will be stricken.

DC's state-law claims unmistakably target Mr. Toberoff's support and enforcement of the Heirs' termination rights under the Copyright Act, which is far from "incidental," and DC has failed to show by admissible evidence any probability of success.

Fourth Claim:  This claim is saturated with protected activity.  It alleges Mr. Toberoff induced Jean Peavy and Mark Warren Peary to enter into 2001/2003 PPC Agreements, expressly to probate Joseph Shuster's estate and file the Shuster Termination.  ER 1040-41 ¶¶177-78.  DC alleges that the pursuit of these legal proceedings breached the 1992 Agreement between DC and Jean Peavy, and that Mr. Toberoff tortiously interfered by encouraging the Shusters to pursue this petition activity.  *Id.*

The probate proceeding squarely constitutes protected activity.  The Shuster Termination – an attempt to establish a property right under a comprehensive statutory scheme – is also protected activity.  The PPC Agreements are likewise protected as entered into in furtherance of such activity, and in anticipation of litigation, given DC's challenges to the Siegel Termination.  This claim also

16
EXHIBIT F

attacks the Shusters' protected choice of counsel.

Fifth Claim: This claim alleges that, after the Siegels served their termination notices and engaged in settlement discussions, Mr. Toberoff solicited them as clients and induced them to end those discussions, to file additional termination notices, and to enforce their terminations in litigation. This claim unambiguously falls within the Anti-SLAPP statute as it is based on terminations, settlement negotiations, alleged solicitation, and anticipated and actual litigation.

Sixth Claim: This claim is based on allegations that the Heirs have agreed to collectively negotiate any settlement with DC, and that this purportedly impedes DC's alleged right "to negotiate settlement." Defendants' tactical choices as to the settlement are unequivocally protected activity under the Anti-SLAPP law.

DC also cannot show any probability of success on its state-law claims:

Fourth Claim: This claim is barred by the applicable two-year statute of limitations, which ran from the date DC had inquiry notice. DC knew in 2003 of the alleged breach of its 1992 Agreement, when it was served with the Shuster Termination, and in 2006 DC received the PPC Agreements that form the basis of its claim.

It is barred by the litigation privilege (Cal. Civil Code § 47(b)) as it based on Mr. Toberoff's supposed inducement of the Shusters to probate the Shuster estate and file the Shuster Termination.

The claim is also meritless because (a) the perfunctory 1992 Agreement with Joe Shuster's siblings did not transfer Superman rights *long ago assigned* by Siegel and Shuster to DC, and (b) the Shuster Termination could have not breached the 1992 Agreement because termination rights cannot be waived or encumbered.

<u>Fifth Claim</u>:  This claim is similarly barred by the applicable two-year statute of limitations.  DC knew <u>in 2006</u> from discovery in *Siegel* the details of the August 2002 offer to the Siegels' attorney that allegedly "interfered;" and received <u>in 2006</u> a copy of the IPWW Agreement it relies upon.  DC's in-house counsel also read the anonymous "Toberoff Timeline" <u>in 2006</u>.

The Fifth Claim is also barred by the litigation privilege as DC's core allegations concern the rejection of settlement offers and alleged "solicitation" of clients.

Furthermore, this interference claim requires a "wrongful act" and a "reasonable probability" of economic advantage.  DC had no probability of "prospective economic advantage" from negotiations after Joanne Siegel unequivocally rejected DC's proposals in May 2002, well before Mr. Toberoff's alleged "interference" in August 2002.  And after two years of discovery, DC has no admissible evidence of the "wrongful acts" it alleged.

<u>Sixth Claim</u>:  This claim is meritless as it is premised on a fictitious "right" to negotiate with the Heirs under 17 U.S.C. § 304(c)(6)(D) that appears nowhere in

the statute, and it fails to plead any "unlawful, unfair or fraudulent" act under the UCL.  DC's claim is also preempted, barred by the statute of limitations, and barred by the litigation privilege because it targets litigation-related activity.

## **ARGUMENT**

## I.     **CALIFORNIA'S ANTI-SLAPP STATUTE PROTECTS CITIZENS' RIGHT TO PETITION**

California's Anti-SLAPP law, CCP § 425.16, provides substantive immunity against claims that interfere with the rights of free speech and petition.  It was enacted "in response to the legislature's concern about civil actions aimed at private citizens for exercising their political or legal rights."  *United States v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970 (9th Cir. 1999); *see* CCP § 425.16(a) ("[T]here has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition ….").

"The hallmark of a [SLAPP claim] is that it lacks merit and is brought with the goals of obtaining an economic advantage over a citizen party by increasing the cost of litigation … and of deterring future litigation."  *Id.* at 970-71.  "The statute was designed to allow courts 'to promptly expose and dismiss meritless and harassing claims seeking to chill protected expression.'"  *Mindys Cosmetics, Inc. v. Dakar* ("*Mindys*"), 611 F.3d 590, 595 (9th Cir. 2010) (quotation omitted).  *See*

*Varian Med. Sys., Inc. v. Delfino*, 35 Cal.4th 180, 193 (2005) ("The point of the

anti-SLAPP statute is that you have a right *not* to be dragged through the courts

because you exercised your constitutional rights.").

     The Anti-SLAPP law is to be "construed broadly." *Hilton v. Hallmark*

*Cards*, 580 F.3d 874, 882-83 (9th Cir. 2009). "Nothing in the statute itself

categorically excludes any particular type of action from its operation." *Navellier*

*v. Sletten*, 29 Cal. 4th 82, 92 (2002). The Anti-SLAPP law applies to state-law

claims brought in federal court, and a ruling on an Anti-SLAPP motion is subject

to immediate appeal. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).

     To prevail on an Anti-SLAPP motion, a defendant makes a *prima*

*facie* showing that the claims arise from activity protected under the Anti-SLAPP

law. *Neville*, 160 Cal. App. 4th at 1261-62. "The burden then shifts to the plaintiff

to establish a reasonable probability that the plaintiff will prevail on [the]

claim." *Batzel*, 333 F.3d at 1024.

## II.    DC'S CLAIMS FALL UNDER THE ANTI-SLAPP STATUTE

### A.    <u>Claims That Entail Any Non-Incidental Protected Activity Are</u>
       <u>Subject To The Anti-SLAPP Law</u>

     The Anti-SLAPP statute applies to any "cause of action against a person

arising from any act of that person in furtherance of the person's right of petition or

free speech." CCP §§ 425.16(b). Thus, the Anti-SLAPP law "includes not merely

20
EXHIBIT F

actual exercises of" such rights "but also conduct that furthers such rights."  *Hilton*,

599 F.3d at 903; *see id.* at 888 (that this is a "dispute over who can profit from ['a

commercial product'] does not defeat" the Anti-SLAPP law); CCP § 425.16(e)(4)

(protecting conduct "in connection with a public issue").

 In determining whether a cause of action entails protected activity, courts

attempt to obtain a complete picture of the claims.  *See Jespersen v. Zubiate-*

*Beauchamp*, 114 Cal. App. 4th 624, 630 (2003) (court refused to "wear the

blinders that appellants have fashioned" by insisting it look only at the complaint).

 A defendant need not show that the entirety of a state-law cause of action is

premised on protected activity, as a "a plaintiff cannot frustrate the purpose of the

SLAPP statute through a pleading tactic of combining allegations of protected and

non-protected activity under the label of one 'cause of action.'"  *Fox Searchlight*

*Pictures, Inc. v. Paladino* ("*Fox*"), 89 Cal. App. 4th 294, 308 (2001).

Consequently, "a mixed cause of action [with protected and unprotected activity] is

subject to section 425.16 if at least one of the underlying acts is protected, unless

the allegations of protected conduct are merely incidental to the unprotected

activity."  *Salma v. Capon*, 161 Cal. App. 4th 1275, 1288 (2008); *see Seltzer v.*

*Barnes*, 182 Cal. App. 4th 953, 962-963 (2010) (same).

 For example, protected activity is not "incidental" where it is central to the

injury or harm a plaintiff alleges.  *See South Sutter, LLC v. LJ Sutter Partners,*

*L.P.*, 193 Cal. App. 4th 634, 660 (2011) (holding that for purposes of the Anti-

SLAPP law a "cause of action" is defined by the "injury suffered" by

plaintiff); *Slater v. Blackwood*, 15 Cal. 3d 791, 795 (1975) ("[T]he 'cause of

action' is based upon the harm suffered, as opposed to the particular theory

asserted ….").

> **B.**     **Filings To Establish A Statutory Property Right, Legal**
>
> **Proceedings, Settlement And Other Litigation-Related Activities**
>
> **Are All Protected By The Anti-SLAPP Statute**

The right to petition protected by the Anti-SLAPP statute includes "any

written or oral statement or writing made before a legislative, executive, or judicial

proceeding, or any other official proceeding authorized by law."  CCP §

425.16(e)(1).  This Circuit has held that the Anti-SLAPP law thus clearly applies to

filings with government agencies such as the Patent and Trademark Office or the

Copyright Office.  *See Mindys,* 611 F.3d at 597.

This Circuit has also found that matters "in the public eye" fall under section

425.16(e)(4)'s protections "in connection with a public issue." *Hilton,* 580 F.3d at

886 (9th Cir. 2009); FAC ¶¶ 34-37 ("Superman has remained constantly in the

public's eye").

Furthermore, "[t]he constitutional right of petition encompasses the basic act

of filing litigation," *Navellier*, 29 Cal. 4th at 90, and because section 425.16(b)

applies to "any act … in furtherance of the [] right of petition," it applies to any

"litigation-related activities."  *Kashian v. Harriman*, 98 Cal. App. 4th 892, 908

(2002).  Courts adopt an "expansive view of what constitutes litigation-related

activities" (*id*.), as the Anti-SLAPP law is to be "construed broadly." *Hilton*, 580

F.3d at 882-83, 903.

   If a communication "concern[s] the subject of the dispute" and is made "in

anticipation of litigation," it falls within section 426.16(e).  *Neville*, 160 Cal. App.

4th at 1268.  Therefore, communications regarding the settlement of anticipated

litigation are protected.  *See id.*; *GeneThera, Inc. v. Troy & Gould Prof. Corp.,* 171

Cal. App. 4th 901, 907-908 (2009) (interference claim regarding settlement

negotiations barred by Anti-SLAPP law); *Seltzer*, 182 Cal. App. 4th at 963 (tort

claims based on settlement arose from protected activity under §425.16(e)(2)).

   Even where a *non-attorney* supports litigation-related activity, Courts will

strike the claims.  *See Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 12-13 (1995)

(Anti-SLAPP law applies to both those who "formally fil[e] a lawsuit" and those

"who support[ed] and encourag[ed] the filing of a lawsuit"); *Briggs v. Eden*

*Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1110, 1115 (1999)  (non-

attorney's assistance "in prosecuting a … court action" protected by §425.16(e)).

   A citizen's choice of counsel "in furtherance of [her] right of petition," is

equally protected.  CCP §§ 425.16(b). The Anti-SLAPP law thus applies to

allegedly improper solicitation by an attorney.  *See Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 489 (2008) (holding "it is difficult to conjure a clearer scenario than the case before us of a lawsuit arising from [Anti-SLAPP] protected activity" than an action involving "improper solicitation" by an opposing attorney). "Any other conclusion … would conflict with the client's fundamental right to access the courts, which necessarily includes the right to be represented by the attorney of his or her choice."  *Id.* at 490.  *See also Rubin v. Green*, 4 Cal. 4th 1187, 1196-98 (1993).

### 1.     DC's Fourth Claim Implicates Protected Activity

The thrust of DC's Fourth Claim is that Mr. Toberoff supposedly "interfered" with DC's 1992 Agreement by causing the Shuster estate to be probated and by thereafter drafting, serving, and filing the estate's statutory termination notices with the U.S. Copyright Office:

- Toberoff "induced the Shuster heirs to serve a notice of termination ...."  ER 987-88 ¶6.
- "Toberoff then filed a termination notice on behalf of the Shusters …."  ER 989-90 ¶10.
- "The 2001 [PPC] Agreement provided that this purpose would be realized in part 'via the establishment of Joe Shuster's estate … and the estate's termination ….'"  ER 1006-07 ¶60.
- "After entering into the 2001 [PPC] Agreement, the Shuster Heirs filed a probate action … to establish the Shuster Estate."  ER 1008 ¶65.
- "On November 10, 2003, one week after the 2003 [PPC] Agreement was signed, defendant Mark Peary [Shuster Executor] served on DC Comics a 'Notice of Termination ….'"  ER 1017

Case 2:10-cv-03633-ODW-RZ Document 412-2 Filed 05/07/12 Page 83 of 169 Page
Case 2:10-cv-03633-ODW-RZ Document 162-266 04/24/2012 Page 33 of 169 Page
ID #:25103

¶92.

- "[The 1992 Agreement] allowed DC Comics to continue freely… *without the risk of termination of the alleged Shuster rights* or expensive and protracted legal disputes …." ER 1040 ¶176 (emphases added).

- "Toberoff knew that his actions in having his company enter into a joint venture with the Shusters *for the purpose of terminating DC Comics' rights* were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters…." ER 1040-41 ¶177 (emphases added).

- "As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees …." ER 1041 ¶179.

a.  <u>The Fourth Claim Arises From Mr. Toberoff's</u>

<u>Assistance Of The Shuster Executor To Exercise His</u>

<u>Right To Petition</u>

As alleged by DC, the purported "breach" of the 1992 Agreement "induced" by Mr. Toberoff was the Shuster Termination. ER 1040-41 ¶¶176-179. The 2001 PPC Agreement was expressly entered into so as to probate the Shuster estate and execute that termination. ER 1040 ¶177.

In *Mindys,* this Circuit recently held that the Anti-SLAPP law is clearly implicated where, as with the Shuster Termination, an individual "attempt[s] to establish a property right under a comprehensive federal statutory scheme," as such is part of a protected legal proceeding. 611 F.3d at 597 (filing an application with trademark office is protected); *see* CCP § 425.16(e)(1) (right to petition includes "any written or oral statement or writing made before a legislative, executive, or

judicial proceeding, or any other official proceeding authorized by law"); *Plumley v. Mockett*, 164 Cal. App. 4th 1031 (2008) (granting Anti-SLAPP motion to strike claims against attorney for filing with patent office); *Briggs*, 19 Cal. 4th at 1109-10 (granting Anti-SLAPP motion based on filing with government agency and assisting in litigation).

The express purpose of the 2001 PPC Agreement was "the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.)." ER 725 ¶1; *see* ER 726 ¶7 ("the Estate of Joseph Shuster (to be established hereunder).").  Under the 2001 PPC Agreement, PPC/Mr. Toberoff paid the "legal fees and costs of setting up Joe Shuster's estate" (ER 725-26 ¶3), so the estate could exercise its termination right.  ER 1006-07 ¶60.

The PPC Agreement also expressly designated "Marc Toberoff, Esq., to render legal services" and required him "to implement" the Shuster estate's termination.  ER 726 ¶7.  Pursuant thereto, he prepared and served a formal "Notice of Termination" signed by "Marc Toberoff, Esq., Counsel for the Estate of Joseph Shuster."  ER 878.  It was a legally operative document, complete with case citations, proofs of service and other indicia of a lawyer's draftsmanship.  ER 869-81.  As required by the agreement and statute, the Notice was filed and recorded by Mr. Toberoff with the U.S. Copyright Office.  ER 866-68; 17 U.S.C. §§ 304(c)(4), 304(d)(1).

Thus, even if one views the alleged "interference" as relating only to the

2001 PPC Agreement, like the district court (ER 3), the claim still falls within the

Anti-SLAPP statute, which "includes not merely actual exercises of" the right of

petition "but also conduct that furthers such rights."  *Hilton*, 599 F.3d at 903.

The damages alleged in the Fourth Claim all arise from the Shuster

Executor's exercise of his right to petition by the Shuster Termination.  DC falsely

alleges that the 1992 Agreement enabled it to exploit Superman "without the risk

of termination of the alleged Shuster rights" (ER 1040 ¶176), and that this was

breached by the Shuster Termination, "causing DC Comics to lose the value of the

Agreement and forcing DC Comics to incur substantial attorneys' fees …."  ER

1041 ¶179.  But for the Shuster Termination, DC would have no "resulting

damages," a requisite element of any tortious interference claim.  *Pacific Gas &*

*Electric Co. v. Bear Stearns & Co.* ("*PG&E*"), 50 Cal. 3d 1118, 1126 (1990).  *See*

*South Sutter, LLC*, 193 Cal. App. 4th at 660 (for Anti-SLAPP purposes, a cause of

action is defined by the "injury suffered").

The Fourth Claim, viewed from every angle – DC's allegations, the 2001

PPC Agreement and/or DC's alleged damages – arises from protected activity.

b.   <u>The Fourth Claim Also Concerns Protected Conduct In</u>

<u>Anticipation Of Litigation</u>

The Fourth Claim also implicates litigation-related activity.  The Shuster

Termination was conducted in anticipation of litigation or settlement.  Before Mark

Warren Peary reached out to Mr. Toberoff for legal assistance, the Shusters knew

the Siegels were involved in a legal dispute with DC.  ER 684:2-691:17, 950

(March 2001 letter from Jean Peavy to Joanne Siegel:  "There was so much

injustice done that I am hoping that the wrongs will be righted and that your

attorney [Marks] will get a fair deal for you.").  Aware of the Siegel Termination,

Peary researched copyright attorneys on the internet, and contacted Mr. Toberoff in

2001 for legal advice.  ER 852:5-23.

The 2001/2003 PPC Agreements expressly contemplate litigation:  both state

that PPC will pay "any and all attorneys' fees, costs and disbursements in

connection with any legal actions or disputes concerning the enforcement and/or

defense of the [Termination] Rights" and that Mr. Toberoff would be retained "to

render legal services … in connection with all legal disputes, litigation, arbitration

and/or mediation …."  ER 725-26 ¶¶3, 7; 730-31 ¶¶3, 7.

The probate action filed with Mr. Toberoff's assistance and the Shuster

Termination it enabled (ER 1008 ¶65; 1017 ¶93; 1040-41 ¶177) were both

protected petition activity and a prelude to this litigation, as is apparent from the

*Siegel* litigations. *Briggs*, 19 Cal. 4th at 1115 (§ 425.16 includes "communications preparatory to or in anticipation of the bringing of an action or other official proceeding").

In response to the Shuster Termination, DC sent a letter to the Shuster Executor that referenced its protracted litigation with the Siegels and DC's purported defenses, and made a "settlement" offer that was rejected, leading to this lawsuit. ER 766, 883-889.

DC also attacks Mr. Toberoff for the alleged litigation strategy of choosing not to pursue Superboy on behalf of the Shuster estate so that the Siegels could sue for copyright infringement (ER 1016 ¶89, 1041 ¶178) – clearly protected litigation-related activity under section 425.16.

The Shusters entered into an attorney-client relationship with Mr. Toberoff in 2001, and subsequently into a formal retainer agreement dated as of 2001, and he has consistently provided legal advice and services to them. ER 695-98, 726 ¶7, 849, 853:18-855:20. DC's Fourth Claim accuses Mr. Toberoff of soliciting the Shusters and challenges their choice of Mr. Toberoff as their counsel to assist in probating the Shuster estate, the estate's Shuster Termination, and anticipated litigation, all subject to the Anti-SLAPP law. ER 725-26 ¶¶2-3, 7; 730 ¶¶2-3; 866-81; 987-90 ¶6, 10; *see Taheri Law Group*, 160 Cal. App. 4th at 489.

## 2.    DC's Fifth Claim Implicates Protected Activity

DC's Fifth Claim is also premised on protected activity:  Mr. Toberoff's

purported improper solicitation of the Siegels allegedly caused them to end

settlement negotiations with DC (ER 1012 ¶80; 1043-44 ¶186) that DC contends

would have "resolv[ed] their claims to the Superman and Superboy rights" (ER

1042-43 ¶182); enter into the IPWW Agreement with Mr. Toberoff (ER 1012 ¶81),

file a Superboy termination notice (ER 1013 ¶86); enter into a litigation retainer

agreement with Mr. Toberoff (ER 664); and file suit against DC (ER 1017 ¶91),

with Toberoff as their counsel, to vindicate their Superman and Superboy rights

ER 1043-44 ¶¶184, 186.  DC alleges:

- "***When a dispute arose in 1997 over the Siegel Heirs' attempt to
  terminate prior grants of Siegel's share of Superman rights, DC
  Comics and Siegel [sic] commenced negotiations***…resolving their
  claims to the Superman and Superboy rights."  ER 1042 ¶182
  (emphasis added).
- "The economic relationship that the Siegel Heirs and DC Comics
  had contemplated and agreed to …. avoid[ed] the possibility of an
  expensive and protracted lawsuit regarding ownership of those
  [Superman and Superboy] rights."  ER 1043 ¶183.
- "In or around August 2002 … Toberoff contacted Marks again
  regarding the Siegel-DC Comics [Settlement] Agreement."  ER
  1011 ¶77.
- "On or around September 21, 2002, based on Toberoff's
  inducements and other acts of interference described above, the
  Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC
  Comics Agreement."  ER 1012 ¶80 (incorporated by reference).
- "On October 23, 2002, the Siegel Heirs formalized an agreement
  with defendant IP Worldwide for the purpose of 'arrang[ing] and
  negotiat[ing] the sale, lease, license and all other dispositions or

exploitations' of the Siegel Heirs' Superman rights."  ER 1012
¶81.

- "After Toberoff induced the Siegel Heirs to repudiate the Siegel-
  DC Comics Agreement, on November 8, 2002, the Siegel Heirs
  served a second copyright termination notice on DC Comics
  directed at the character Superboy."  ER 1013 ¶86 (incorporated by
  reference).

- "As a direct result of Toberoff's misdeeds, the Siegel Heirs…
  ended all further discussions, causing DC Comics … *to incur
  millions of dollars in subsequent legal fees in disputes [the
  lawsuit]with the Siegel heirs*."  ER 1043-44 ¶ 186.

a. <u>The Fifth Claim Concerns Statutory Termination</u>

<u>Implicating The Anti-SLAPP Law</u>

DC emphasizes that the basis of its Fifth Claim is supposed interference with

a purported agreement "resolving [the Siegels'] claims to Superman and Superboy

rights." ER 1042-43  ¶¶182-83.[3]  DC alleges that Mr. Toberoff induced "the Siegel

Heirs [to] serve[] a second copyright termination notice on DC Comics directed at

the character Superboy" (ER 1013-16 ¶¶86, 89), and that DC "incurred millions of

dollars in subsequent legal fees" in the Siegels' suits to enforce their Superman and

Superboy terminations, in which Mr. Toberoff served as their counsel.  ER 1043-

44 ¶186.

Both the Siegels' filing of their Superboy termination notices and

---

[3] DC's central allegations flatly contradict the district court's detailed ruling and
subsequent Rule 54(b) judgment in the *Siegel* litigations that no such agreement
existed.  *Siegel I*, 542 F. Supp. 2d at 1136-40.

enforcement of the Superboy and Superman terminations are clearly protected

activity and hardly "incidental" to DC's Fifth Claim. *See Mindys,* 611 F.3d at 597;

*Plumley,* 164 Cal. App. 4th 1031; *Briggs,* 19 Cal. 4th at 1109-10.

> b.    <u>The Fifth Claim Concerns Settlement, Anticipated And</u>
>         <u>Actual Litigation Implicating The Anti-SLAPP Law</u>

Litigation between DC and the Siegels was contemplated as early as 1997,

after the Siegel Termination was served. ER 1008-09 ¶67. In April 1999, DC told

the Siegels that it would litigate if the parties failed to settle. ER 808-10. The

Siegels and DC thereafter entered into a tolling agreement, and agreed not to

"assert any statute of limitations … defense" for the period up to the formal end of

settlement negotiations, and agreed to treat their settlement communications as

confidential. *See Siegel I*, 548 F. Supp. 2d at 1136; ER 211:17-212:6 (referring to

litigation "looming over" such negotiations), 811-13. Extremely disappointed by

DC's February 2002 settlement proposal, the Siegels began searching for new

counsel in March 2002. ER 38-67.

All of DC's alleged damages arise out of the Siegels' decision to temporarily

cease settlement negotiations with DC, retain Mr. Toberoff, and to ultimately file

suit to enforce their rights. ER 1012 ¶¶80-81; 1042-44 ¶¶182-185, 186 ("the

[Siegels]… ended all further discussions, causing DC Comics … to incur millions

of dollars in subsequent legal fees in disputes with the Siegel[s].").

In Fall 2002, after Joanne Siegel was referred to Mr. Toberoff by her friend
Peavy, she contacted him seeking legal representation. ER 838:1-839:24; 904:6-
13. The Siegels and Mr. Toberoff formed an attorney-client relationship and he
has represented them ever since, including in over seven years of litigation with
DC. ER 840:14-841:9, 897:1-3, 904:6-13. The Siegels' IPWW Agreement with
Mr. Toberoff, attacked by DC (ER 1011-14 ¶¶78, 81-84; 1043 ¶185), explicitly
provided for "the legal services of Marc Toberoff, Esq.," entailed his legal services
regarding "settlement," and contemplated his retention in litigation. ER 735-37
¶¶2, 10. Mr. Toberoff resumed settlement talks with Warner/DC in 2003-04, and
when such failed, he and the Siegels signed a standard litigation retainer
agreement, pursuant to which he enforced the Siegel Termination in years of hard-
fought litigation. ER 664-69, 719-21, 737 ¶7, 844:15-18, 969.

As DC's Fifth Claim is inextricably based on the Siegels' decision to
temporarily end settlement negotiations, and on anticipated and actual litigation, it
unambiguously falls within section 425.16(e). DC's Fifth Claim is also subject to
the Anti-SLAPP law because it is premised on Mr. Toberoff's alleged wrongful
solicitation of the Siegels and on their choice of him as counsel. ER 1043-44 ¶¶
185-86; *Taheri*, 160 Cal. App. 4th at 489.

To allow DC's complaint to obscure this reality is to fall prey to the very
"blinders" courts have cautioned against in applying the Anti-SLAPP law.

*Jespersen*, 114 Cal. App. 4th at 630.

>    **3.    The Initial Lack Of A Formal Legal Retainer Agreement**
>
>    **Between The Heirs and Toberoff Does Not Change The**
>
>    **Analysis**

DC's allegation (ER 1007-13 ¶¶64, 83), adopted by the district court (ER 6),

that the Heirs choice of Mr. Toberoff and the legal advice/services he rendered

were not protected because he did not at first have a formal "legal retainer

agreement" is erroneous.  The Heirs clearly testified that Toberoff acted at all

times as their lawyer (ER 838:1-839:7, 840:14-841:9, 846:1-6, 853:18-854:3,

891:1-3, 904:6-13), as confirmed by the record evidence.  ER 726 ¶7, 731 ¶7, 735

¶2.  Moreover, "neither a retainer nor formal agreement is required to establish the

attorney-client relationship."  *Brandlin v. Belcher*, 67 Cal. App. 3d 997, 1001

(1977).  *See People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems,*

*Inc.*, 20 Cal. 4th 1135, 1147 (1999) ("'When a party seeking legal advice consults

an attorney at law and secures that advice, the relation of attorney and client is

established *prima facie*.'") (citation omitted).  Moreover, even conduct by

nonlawyers that facilitates petition activity is protected by the Anti-SLAPP Law.

Whether he acted as an attorney or merely "support[ed] and encourag[ed]"

litigation, Mr. Toberoff's assistance in the Heirs' assertion of statutory termination

rights is protected.  *Ludwig*, 37 Cal. App. 4th at 12-13; *see Briggs,* 19 Cal. 4th at

1110, 1115.

### C.     The Sixth Claim Falls Within § 425.16(e)

DC's Sixth Claim also concerns activity protected by the Anti-SLAPP law,

as it alleges that agreements between the Defendants violate California's unfair

competition laws by impeding DC's *settlement* negotiations with the Siegels and

Shusters.  ER 1044 ¶¶187-188.

It is clear that DC's Sixth Claim, like its closely-related Third Claim,

focuses, as DC later clarified, on an alleged "[consent] agreement [the Heirs] made

in 2008, in advance of a [settlement] mediation with DC in the *Siegel* litigation" to

collectively negotiate settlement.  ER 367.  On its face, the Sixth Claim challenges

protected settlement activity during litigation.  *See Seltzer*, 182 Cal. App. 4th at

962; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133

Cal. App. 4th 658, 672 (2005) (Anti-SLAPP statute applies to "litigation tactics"

supporting a "position in an ongoing lawsuit").

As set forth above, the PPC and IPWW Agreements, which the Sixth Claim

references, are also protected because such expressly provided for Mr. Toberoff's

legal services regarding the Heirs' statutory terminations, he in fact rendered such

services, and the Heirs both sought and relied upon his legal advice in anticipation

of litigation, actual litigation and settlement negotiations with DC.  ER 664-69,

695-698, 725-26 ¶¶2-3, 7; 730 ¶¶2-3; 735 ¶2.

## D.     <u>The District Court Ignored The Realities Of DC's Claims</u>

The district court erred in accepting DC's mischaracterization of its
complaint and by failing to apply well-established caselaw that the Anti-SLAPP
statute applies where protected activity is more than incidental to a claim.

<u>Fourth Claim:</u>  The district court found, contrary to both DC's complaint and
a complete picture of the record, that the "protected activity advanced by
Defendants, while relevant to be sure, are not the material facts underlying the
alleged interference." ER 3.  It held that the purported "interference was Mr.
Toberoff's inducement of the Shusters to repudiate the 1992 Agreement" and that
"while such protected activity [the Shuster Termination] may *evidence* the alleged
interference, it does not shield it." *Id.* (emphasis in original).

As interpreted by the court, the alleged "interference" was the 2001 PPC
Agreement that purportedly induced the Shuster Termination. *Id.*; ER 1040-
41¶177.  As shown above, the objective of the 2001 PPC Agreement was classic
protected petition activity, namely probate proceedings and the filing of statutory
termination notices.  ER 725-26 ¶¶1, 3, 7; 1006-08 ¶¶60, 65.

The district court ignored that supposedly "unprotected" activity was
inextricably linked *in both DC's FAC and reality* to clearly protected activity,
despite DC's "pleading tactic of combining allegations of protected and
nonprotected activity" under one cause of action. *Fox,* 89 Cal.App.4th at 308.

The court's Order was further premised on the critical misconception that "the Pacific Pictures Agreements essentially gut the 1992 Agreement, purporting to assign to Toberoff those rights which were already assigned to DC Comics." ER 3. As shown below, the PPC Agreements could do no such thing as a matter of law (17 U.S.C. § 304(c)(6)(D)), and therefore had no effect on the 1992 Agreement.

In any event, the district court erred by assuming interference and that, because DC pled a "business tort," it fell outside the Anti-SLAPP statute. ER 2. This circularity begs and "confuses the threshold question of whether the SLAPP statute applies with the question of whether [the plaintiff] has established a probability of success on the merits." *Fox,* 89 Cal.App.4th at 305. It also defeats the underlying purpose of the Anti-SLAPP statute, as "[t]he favored causes of action in SLAPP suits are … business torts such as interference with prospective economic advantage." *Briggs,* 19 Cal. 4th at 1125. Ironically, by conflating and assuming the merits to deny application of the Anti-SLAPP law, the district court never reached the merits, or Defendants' demonstration that DC's claims are barred and frivolous as a matter of law. ER 3, 6.

<u>Fifth Claim:</u> The district court held that the Fifth Claim was not subject to the Anti-SLAPP statute because it was unclear whether "'Toberoff's communications with the Siegels occurred in connection with settlement

negotiations and anticipated litigation.'"  ER 4.  This lack of clarity arose from DC's allegations that "'at the time Toberoff approached the Siegel Heir[s] in 2001 [*sic*], DC Comics and the Siegel Heirs had finally reached an agreement'" (ER 4), contrary to all the record evidence and the detailed ruling in *Siegel*, 542 F. Supp. 2d at 1136-40, that no agreement was consummated.

The Order's flawed reasoning appeared to be: (1) if there was no agreement between DC and the Siegels, Toberoff's communications would have been protected as "'occurr[ing] in connection with settlement negotiations and anticipated litigation;'" but (2) as it could not be determined whether there was an agreement, (3) Toberoff's communications fell outside the Anti-SLAPP statute. *See Seltzer*, 182 Cal. App. 4th at 965 ("The burden is on the party opposing a section 425.16 motion to strike to show that no factual dispute exists.").

Critically, the Order contradicted the district court's own judgment in *Siegel*, which incorporated the ruling that no settlement agreement had been reached, binding DC and the district court.  *See Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).

The Order also contained numerous misstatements of basic facts.  For example, it gave great weight to the proximity of Mr. Toberoff's "November 28, 2001" agreement with the Shusters "a month or so *after* DC Comics and the Shusters had reached a 'settlement in principle'" as "counsel[ing] against striking

[DC's] claims," when DC's alleged 2001 settlement in principle was with the
Siegels, not the Shusters – who had not even engaged in settlement negotiations.
ER 6 (emphasis in original).

Again, the district court found that the claim fell outside the Anti-SLAPP
statute by improperly conflating the merits and assuming interference. ER 4-5; *see*
*Flatley v. Mauro*, 39 Cal.4th 299, 316 (2006) ("If, however, a factual dispute exists
about the legitimacy of the defendant's conduct, it cannot be resolved within the
first step but must be raised by the plaintiff in connection with the plaintiff's
burden to show a probability of prevailing on the merits"); *Kashian*, 98 Cal. App.
4th at 910–911 ("[C]onduct that would otherwise come within the scope of the
anti-SLAPP statute does not lose its coverage … simply because it is alleged to
have been unlawful or unethical.").

Sixth Claim: The Order ignored the protected 2008 Consent Agreement
regarding litigation settlement at the heart of DC's Sixth Claim. It also ignored
that both the PPC and IPWW agreements *expressly* provided for Mr. Toberoff's
legal services; that the Heirs both sought and relied upon his legal advice; and that
Mr. Toberoff has consistently provided legal advice/services to the Heirs. Instead,
the district court found that the Sixth Claim fell outside the Anti-SLAPP law
because (i) the 2003 PPC Agreement stated PPC "is not a law firm," and (ii) the
IPWW Agreement, though expressly providing for "the legal services of Marc

Toberoff, Esq." in connection with the "settlement … of the [Siegels' Termination]
Rights" (ER 730 ¶2), stated that it "did not include legal services in connection
with litigation…. [to be rendered] subject to good faith negotiation of a mutually
acceptable agreement" (ER 6, 732 ¶10), which was thereafter done.  ER 664-69.

## III.   DC'S SLAPP CLAIMS HAVE NO REASONABLE PROBABILITY OF SUCCESS

As DC's state-law claims fall within the Anti-SLAPP statute, it has the
"burden … to establish a reasonable probability that [it] will prevail."  *Batzel*, 333
F.3d at 1024.  DC can make no such showing.

### A.   DC's Fourth Claim Has No Probability Of Success

#### 1.   The Fourth Claim Is Barred By The Statute Of Limitations

DC's initial complaint was filed on May 14, 2010.  ER 1057.  As claims for
tortious interference with a contract accrue upon the alleged breach of contract,
DC's Fourth Claim is barred by the two-year statute of limitations.  *See* CCP §
339(1); *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (2000) ("[T]he accrual date
could not be later than the actual breach of the contract by the party who was
wrongfully induced to breach").

Both DC and the district court argued that the 2001/2003 PPC Agreements
constitute the alleged tortious interference and breach.  ER 2, 365.  DC knew about
the 2001 and 2003 PPC Agreements by no later than November 15, **2006,** when

unredacted copies of *both* agreements were produced in the *Siegel* action, and DC
used such agreements in depositions.  ER 724-33, 959.  *See Samuels v. Forest*,
2007 WL 3149285, at *8 (Cal. App. Oct. 30, 2007) (plaintiff on notice of
interference claim once he saw allegedly interfering agreement).

    DC's Fourth Claim also relies on allegations that the November 10, **2003**
service on DC and filing of the Shuster Termination, signed by Mr. Toberoff, itself
*breached* the 1992 Agreement, triggering the statute.  *See* FAC 1006-1018, ¶¶ 58,
60-65, 90, 92, 99, 1040-41 ¶177 ("terminating DC Comics rights w[as]
substantially certain to interfere with DC Comics' 1992 Agreement"), 1041 ¶178;
*Streamcast Networks, Inc. v. Skype Techs., S.A.*, 2006 WL 5441237, at *10 (C.D.
Cal. Sept. 14, 2006) (interference claim accrued once plaintiff knew that
counterparty sought to "terminate the [contract]").

    DC's Fifth Claim is unequivocally barred by the two-year statute of
limitations because DC was on "notice" of its purported claim in 2003, *seven years*
earlier, or, at the very latest, by 2006, *three years* before DC filed its complaint.

    California's "discovery rule" cannot save DC's Fourth Claim because "the
limitations period begins once the plaintiff 'has notice or information of
circumstances to put a reasonable person on inquiry.'  A plaintiff need not be
aware of the specific 'facts' necessary to establish the claim …."  *Jolly v. Eli Lilly
& Co.*, 44 Cal. 3d 1103, 1110-11 (1988) (citation omitted).  Given DC's receipt of

the Shuster Termination in 2003 and receipt of the 2001 and 2003 PPC

Agreements in 2006, DC cannot invoke the discovery rule.

### 2. The Fourth Claim Is Also Barred By The Litigation Privilege

California Civil Code § 47(b) provides absolute immunity against tort claims

based on any communication in any "judicial proceeding" or "any other official

proceeding authorized by law" (*Silberg v. Anderson*, 50 Cal. 3d 205, 211-12

(1990)), and all "noncommunicative actions which are necessarily related to that

communicative act." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1052 (2006) ("[The

litigation privilege] is not limited to statements made during … proceedings, but

may extend to steps taken prior thereto, or afterwards.").

The analysis is comparable to that for determining whether the Anti-SLAPP

law applies. *See Briggs*, 19 Cal.4th at 1115 (noting overlap between the litigation

privilege and Anti-SLAPP law).

DC's Fourth Claim is barred by the litigation privilege on three grounds:

*First*, the Fourth Claim alleges conduct protected by the litigation privilege

as it is based on allegations that Mr. Toberoff "induce[d] the Shuster Heirs" to

become his clients. ER 726 ¶ 7 (Mr. Toberoff is "to render legal services …

including in connection with all legal disputes…."), 1040-41 ¶¶178-79; *Rubin*, 4

Cal. 4th at 1196-98.

42

EXHIBIT F

*Second*, as admitted by DC, the clear and express purpose of the PPC Agreements was "'the establishment of Joe Shuster's estate … and the estate's termination pursuant to Section 304(c) of the U.S. Copyright [Act].'" ER 1006-07 ¶60. *See* ER 1039-41 ¶¶175-179. Acts supporting probate proceedings "are all absolutely protected by the litigation privilege." *Cabral v. Martins*, 177 Cal. App. 4th 471, 485 (2009); *see Chang v. Lederman*, 172 Cal. App. 4th 67, 87 (2009) (letter "sent to further the objectives of the probate proceedings" privileged).

*Third*, Mr. Toberoff's drafting, service and filing of the Shuster Termination, central to the PPC Agreements and DC's "interference" allegations (ER 1040-41 ¶ 177), is protected. *See Drum v. Bleau, Fox & Associates*, 107 Cal. App. 4th 1009, 1028 (2003) (filing with a government agency of "a notice … of a potential interest in property" is protected); *Wilton v. Mountain Wood Homeowners Assn.*, 18 Cal.App.4th 565, 569-70 (1993) (filing of lien protected).

### 3. DC's Fourth Claim Fails Because The 1992 Agreement Has No Effect On Termination Rights

Tortious interference with contract requires "a valid contract" and an "actual breach or disruption of the contractual relationship." *PG&E*, 50 Cal. 3d at 1126. DC alleges, and the district court accepted (ER 3), that the 1992 Agreement was interfered with because "terminating DC Comics' rights was substantially certain to interfere with DC Comics' 1992 Agreement." ER 1040-41 ¶177. However, the

perfunctory 1992 Agreement was ***irrelevant*** to both the Shuster Termination and DC's long extant ownership of Superman.

### a. The 1992 Agreement Did Not Assign Superman Rights

DC's "interference" claim is based on a totally erroneous premise, namely that the 1992 Agreement granted Superman rights to DC. On its face, it did no such thing. The one-page 1992 Agreement does not purport to revoke or replace Siegel and Shuster's longstanding Superman copyright grants to DC, under which DC has owned and exploited Superman for decades. ER 671, 996-1002 ¶¶32, 37, 44, 46-47; *Siegel v. National Periodical Publications,* 508 F.2d 909 (2d Cir. 1974). The 1992 Agreement does not even mention Superman. ER 671. DC simply added a form quitclaim of Frank Shuster and Jean Peavy's rights, *if any*, in raising their annual pension by a few thousand dollars. *Id.*

### b. No Breach Of The 1992 Agreement

DC makes no cognizable allegation of any breach of any term of the 1992 Agreement. The parties to the agreement are DC, and Joe Shuster's siblings, Frank Shuster (who died in 1996) and Jean Peavy. ER 1005-06 ¶¶55, 57. It contains only three obligations of Frank and Jean: they settled any claim to payment, quitclaimed to DC and covenanted not to assert any rights that <u>they</u> held relating to Joe Shuster's works. ER 671. The 1992 Agreement does not pertain to any right, remedy or claim of anyone <u>other</u> than Frank or Jean.

44
EXHIBIT F

104

A deceased author's siblings, like Frank and Jean, have *never* held

termination rights under the Copyright Act. 17 U.S.C. § 304(c)(2). In 1992, no

one held Joe Shuster's termination rights as he left no widow or child. ER 1004

¶51. It was not until 1998, when Congress extended termination rights to "the

author's executor [or] personal representative," 17 U.S.C. § 304(c)(2)(D), that it

became possible to exercise such rights by probating Joe Shuster's estate, which

was not done until 2003. ER 1008 ¶65.

The sole party with the power to exercise the termination right is the Shuster

Executor. As neither the Shuster Executor nor the estate were parties to the 1992

Agreement, it has no bearing on them. *See E.E.O.C. v. Waffle House, Inc.*, 534

U.S. 279, 294 (2002) ("[A] contract cannot bind a nonparty.").

      c.    The 1992 Agreement Could Not Waive Termination As
               A Matter Of Law

In order for a claim for interference with a contract to stand, the underlying

contract must be enforceable. *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla*

*Village Square Venture Partners*, 52 Cal. App. 4th 867, 877-80 (1997). If the 1992

Agreement were construed to waive, prohibit or encumber the Shuster

Termination, it would be void under the Copyright Act, which gives the right to

terminate "notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5).

To further protect the termination right, Congress specified that "an agreement to

grant rights covered by a terminated grant is not valid if entered before notice of termination," 17 U.S.C. § 304(c)(6)(D), which was not done here until 2003. *See Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("[1976 Act] provides an inalienable termination right"); *Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.").

Accordingly, even if the 1992 Agreement were somehow construed as transferring or impeding the Shuster Executor's termination right, it would be unenforceable.

### d. No "Revocation And Regrant"

*Milne v. Stephen Slesinger, Inc.,* 430 F.3d 1036, 1040 n.5, 1042-45 (9th Cir. 2005), recognized a narrow exception to the above rule of inalienability where there is no longer an operative pre-1978 copyright grant to terminate because a party, with the leverage of a then-current termination right, expressly *revoked* a pre-1978 copyright grant, and replaced it with a non-terminable post-1978 copyright *re-grant*. The Ninth Circuit limited *Milne* in *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 986-89 (9th Cir. 2008), where the plaintiff publisher tried to evade termination by mischaracterizing a redundant post-January 1, 1978 grant as a "revocation and regrant" to artificially invoke *Milne's* narrow exception. This Circuit held that the post-January 1, 1978 grant was a "nullity,"

Case: 11-56034 04/24/2012 ID: 7146266 DktEntry: 9-6 Page: 105 of 169

because it purported to grant copyright interests that had already been granted to the publisher, and did not expressly revoke that operative pre-1978 grant. *Id.*

DC's Fourth Claim and the 1992 Agreement clearly fall within *Mewborn.* As in *Mewborn*, the purported grantee, DC, already long owned Joe Shuster's Superman rights at the time of the 1992 Agreement, which itself contained no language of revocation and did not mention statutory termination as the purported grantors (Jean and Frank) were not eligible. ER 671. If anything, DC's claim is even weaker than that rejected in *Mewborn*, where the grantor had a future termination right.

In sum, DC's 1992 Agreement with Jean Peavy and Frank Shuster was completely irrelevant to the Shuster Termination as a matter of law. Therefore, the 1992 Agreement could not have been breached by the PPC Agreements/Shuster Termination, as assumed by the district court.

**B.**      **DC's Fifth Claim Has No Probability Of Success**

**1.**      **The Fifth Claim Is Barred By The Statute of Limitations**

Like DC's Fourth Claim, DC's Fifth Claim for interference with prospective economic advantage is barred by the applicable two-year statute of limitations. CCP § 339(1). The alleged interference by Mr. Toberoff occurred in **2002**, when the Siegels fired their then-attorney Marks and ended his settlement negotiations on their behalf with DC. ER 1011-12 ¶¶78-80; 1041-44 ¶¶180-86.

Case-2:-11-56034-ODW-RZ 04/24/2012 Document 412-6 ID:Entry 7672 Page 91 of 88

DC cannot possibly meet its burden of showing facts sufficient to invoke the "discovery rule," because DC had more than ample facts to have put it on inquiry notice regarding its claim by 2006, at the latest. DC alleges that a September 21, 2002 letter from the Siegels ended DC's negotiations and its prospective economic advantage. ER 1012 ¶80. On October 7, 2006, DC deposed the Siegels' former attorney Kevin Marks, who testified that in August 2002, Mr. Emanuel offered to purchase the Siegels' Superman rights. ER 335:1-5. On November 17, 2006, a copy of the IPWW Agreement dated as of October 3, 2002 was produced to DC in *Siegel*, which provided for Toberoff and Emanuel to "arrange and negotiate the sale, lease, license, and all other dispositions" of the Siegels' Superman rights. ER 737 ¶7, 959.

Thus, by 2006, DC indisputably knew that its supposed economic relationship had allegedly been disrupted (ER 1012 ¶80); and that shortly thereafter Toberoff and Emanuel entered into the IPWW agreement with the Siegels (ER 1012-13 ¶¶81-84) to represent the Superman rights DC had been negotiating to buy. ER 1008-12 ¶¶67-69, 81; 1042-43 ¶¶182-85.

All that information was more than sufficient to have raised a reasonable suspicion as to the allegations of DC's Fifth Claim. ER 1039 ¶¶ 171-72. The law is crystal-clear that claims accrue when the plaintiff "at least 'suspects … that someone has done something wrong' to him," and that the plaintiff "need not know

the 'specific facts'" involved in the allegations. *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397-398 (1999) (citations omitted). *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807-08 (2005) (same); *Jolly*, 44 Cal. 3d at 1110-11 (plaintiff has enough information "to put a reasonable person on inquiry").

DC has argued that it only became aware of the alleged "wrongful acts" through the anonymous "Toberoff Timeline." DC's in-house legal team at its parent company, Warner Bros., admitted that they read and knew the contents of the Timeline in mid-2006. ER 760-61 ¶3 ("I [Wayne Smith, Warner's in-house counsel] looked at what might be characterized as the 'cover letter' [Timeline] that came with the Superman Documents," and Smith summarizes its contents), ¶4 ("Mr. Schulman [Warner's General Counsel] … advised me that he had only looked at the cover letter [Timeline] ….").

The two-year limitations period was indisputably triggered in 2006, nearly *four years* before DC filed its complaint.

### 2. The Fifth Claim Is Barred By The Litigation Privilege

The thrust of DC's Fifth Claim is that it was negotiating a settlement "to avoid the possibility of an expensive and protracted lawsuit regarding ownership of [Superman] rights" (ER 1043 ¶183) and that supposedly Mr. Toberoff wrongfully solicited the Siegels, caused them to reject DC's settlement proposal, and DC "to incur millions of dollars in subsequent legal fees in disputes with the Siegel[s];"

namely, the *Siegel* litigations in which Mr. Toberoff is DC's long-time opposing

counsel. ER 1009-13, ¶¶70-84; 1043-44 ¶¶184-86.

This claim is barred by Civil Code § 47(b)'s litigation privilege for three

independent reasons.

*First*, § 47(b) has long provided immunity against third-party actions for

wrongful solicitation of opposing parties:

> Plaintiff's claims, however styled, are founded essentially upon
> alleged misrepresentations made by the law firm … [about the]
> possibility of being retained to prosecute … Whether these acts
> amounted to wrongful attorney solicitation or not, they were
> communicative in their essential nature and therefore within the
> privilege of section 47(b)….

*Rubin*, 4 Cal. 4th at 1196. Such claims cannot serve as the basis for a lawsuit by

anyone other than the attorney's client. *Id.* at 1196-98. *See Crowley v. Katleman*,

8 Cal. 4th 666, 681 n.9 (1994) (a party "cannot maintain a retaliatory action

charging the attorneys for the opposing party with 'soliciting' the suit"); *Taheri*

*Law Group*, 160 Cal. App. 4th at 490 (same).

*Second*, the Fifth Claim's core allegation that Mr. Toberoff purportedly

caused the Siegels to reject an alleged "[settlement] agreement resolving their

claims" (ER 1042-43 ¶182) and to "end[] all further [settlement] discussions" (ER

1043-44 ¶186) is barred by the litigation privilege. *See Rosenthal*, 135 Cal. App.

3d at 126 (applying litigation privilege to bar alleged tortious interference with

settlement negotiations); *Kashian*, 98 Cal. App. 4th at 920 (pre-suit

Case 2:10-cv-03633-ODW-RZ Document 412-3 Filed 05/07/12 Page 109 of 169
Case 2:10-cv-03633-ODW-RZ Document 415-6 Filed 05/07/12 Page 96 of 88
Page ID #:25129

communications by an attorney protected even if "they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal," so long as they are "'logically related'" to the ensuing action) (citations omitted).

Where, as here, alleged conduct regards "settlement … [the] Civil Code section 47 litigation privilege applies as a matter of law." *Seltzer*, 182 Cal. App. 4th at 972. *See Asia Inv. Co. v. Borowski*, 133 Cal. App. 3d 832, 842 (1982) (holding that an alleged "threat to coerce" via legal action, during settlement negotiations, was privileged under § 47(b)).

*Third*, even if Mr. Toberoff was not acting as an attorney – and he expressly was – there can be <u>no</u> liability for tortious interference based on a non-attorney's inducement of a party to file suit. *PG&E*, 50 Cal. 3d at 11273-24, 1136 (litigation privilege applies where a non-attorney convinced a party to seek declaratory relief to terminate a contract, paid costs, and retained and paid for outside counsel).

### 3. There Is No Evidence That Mr. Toberoff Interfered With DC's Purported Prospective Economic Advantage

To prevail on a claim for tortious interference with economic advantage, DC must show that it is "reasonably probable that [its] prospective economic advantage would have been realized but for the defendant's interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987). The record establishes that Mr. Toberoff did not cause the Siegels to reject DC's proposal.

DC alleges that Mr. Toberoff's purported "wrongful acts" occurred "[i]n or around August, 2002," and it is clear from the record evidence that the first substantive contact between Toberoff and the Siegels' attorney, Marks, was in early August 2002. ER 1011 ¶77. August 2002 was three months <u>after</u> Joanne Siegel had sent her May 9, 2002 letter to DC's parent company, stating: "[a]fter four years we have no deal and this [February 1, 2002 draft] contract makes an agreement impossible." ER 642. *Siegel I*, 542 F. Supp. 2d at 1139, held that by this letter the Siegels had "clearly and unequivocally" rejected DC's proposals.

The record also demonstrates that after receiving DC's egregious February 1, 2002 proposal, the Siegels began looking for new counsel in March 2002 to replace Marks, well before any contact with Toberoff. ER 38-67, 656:20-657:17.

Moreover, in the subsequent ***seven*** months, the Siegels did not bother to make a counter-proposal. ER 1009-12 ¶¶69, 75-80. Nor did DC take any action to rectify this dire situation, such as modifying or withdrawing its egregious proposal. Under these circumstances, neither side had any reason to believe an agreement was "probable." *See Youst,* 43 Cal.3d at 71 ("reasonable probability" of prospective economic advantage required); *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243 (2005) (no "probability of future economic benefit" because the parties were merely engaged in negotiations with the possibility of an agreement).

It is clear from this record that DC "disrupted" its own negotiations by continuing to grind the Siegels, and that by August 2002, it had no reasonable probability of "prospective economic advantage."

### 4.     DC Has Shown No "Wrongful Act"

Claims for "interference with a prospective economic advantage," also require a "wrongful act."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003).  The sole such allegation in the Fifth Claim is that purportedly in August 2002, "Toberoff falsely misrepresent[ed] to the Siegel heirs that he had a billionaire investor ready to purchase their Superman rights" for $15 million and "falsely represent[ed] to the Siegels he would help them produce a competing Superman motion picture."  ER 1043 ¶185.

This squarely contradicts the record evidence, and after two years of discovery DC has no evidence to support such allegations, or that Mr. Toberoff had anything to do with the failure of DC's protracted negotiations.

As DC is aware, Emanuel, who made the $15 million offer, was the wealthy "investor."  ER 332:6-335:25.  DC offered no evidence that the highly successful Emanuel (who DC has not bothered to depose herein) was not sincere in offering $15 million for the Siegels' valuable Superman copyrights.  As Marks testified, there was no mention of a "billionaire investor" or of producing a Superman movie.  ER 164-65 ¶¶2-5.  Nor can DC show that the Siegels relied on Emanuel's

offer, or that it caused them to end their already moribund negotiations with DC.

Simply put, there is no "wrongful act" to support DC's interference claim.

**C.** **DC's Sixth Claim Has No Probability Of Success**

DC's Sixth Claim for declaratory relief under California's UCL focuses on a 2008 agreement between the Heirs to collectively negotiate with DC prior to a settlement mediation in *Siegel* ("Consent Agreement"). ER 1038-39 ¶170. DC erroneously claims that such agreement(s) "interfered" with a non-existent "right" of DC to negotiate with the Heirs regarding their terminations.

### 1. The Sixth Claim Is Barred By The Statute of Limitations

"Any action to enforce any cause of [UCL] action shall be commenced within four years after the cause of action accrued." Cal. Bus. & Prof. Code § 17208. The Sixth Claim is expressly based on the **2001/2003** PPC Agreements and **2002** IPWW Agreement. ER 1044 ¶188. In *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002), this Circuit clearly held that under Cal. Bus. & Prof. Code § 17208, UCL claims "are subject to a four-year statute of limitations [] which [begins] to run on the date the cause of action accrued [*i.e.,* the conduct occurred], not on the date of discovery." *See Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1363 (C.D. Cal. 1995) (claims accrue at moment of alleged injury "irrespective of whether plaintiff knew of its accrual").

54
EXHIBIT F

Therefore, to the extent DC's Sixth Claim is based on the 2001/2003 PPC

Agreements and/or 2002 IPWW Agreement, it expired in **2007**.  Nor is the Sixth

Claim saved by its inclusion of the 2008 Consent Agreement, because it provides

DC with no basis for relief as shown below.

### 2.     DC's Sixth Claim Is Premised On A Non-Existent "Right" To Negotiate

DC's Sixth Claim is premised on the erroneous legal position that DC has a

"right" under 17 U.S.C. § 304(c)(6)(D) to negotiate the purchase of the Heirs'

recaptured copyrights.  ER 1037-44 ¶¶168-170, 188.  The statute provides no such

right, and the cases and authorities confirm that none exists.

17 U.S.C. § 304(c)(6)(D) simply provides:

> A further grant, or agreement to make a further grant, of any
> right covered by a terminated grant is valid only if it is made
> after the effective date of the termination. As an exception,
> however, an agreement for such a further grant may be made
> between the [author/heirs] … and the original grantee or such
> grantee's successor in title, after the notice of termination has
> been served ….

DC alleges that § 304(c)(6)(D) gives it an exclusive "right" to negotiate the

purchase of the Heirs' copyrights, when the statute says no such thing.  ER 1037-

44 ¶¶168-71, 187-88.  The statute does not provide any "right" of negotiation to a

terminated grantee, nor mandate any action by the terminating party; it simply

invalidates certain agreements prior to the termination date.

The theory DC advances was expressly addressed and rejected in *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987):

> Nor does the statute [17 U.S.C. § 304(c)(6)(D)] provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else. All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights.

*Bourne* further noted that "[i]ndeed, the statute merely provides that a grant to someone other than the original grantee is valid 'only if it is made after the effective date of termination,' not that such a grant is valid only if *negotiated* after the termination date." *Id.* at n.11 (emphasis in original). *See* 3 *Nimmer* § 11.08[A], n.6 (2010) ("It is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an exclusive period of negotiation.'").

If Congress had intended to give a terminated party a "right" of negotiation or first refusal, rather than a mere competitive advantage, it would have done so in the statute. *See Milne,* 430 F.3d at 1048 (holding, with respect to termination rights, "if Congress intended [a requirement] it would have clearly said so"); *Bourne*, 675 F. Supp. at 866 ("If Congress had intended to create a right of first refusal, it would have done so..."); 3 W. Patry, *Patry on Copyright* § 7:47 (2010) ("[Section 304(c)(6)(D)], sometimes erroneously described as a 'right of first refusal,' does not give the original grantee [this] right…").

The Siegels and the Shuster Executor were not compelled to negotiate with DC before or after they served their termination notices. DC's Sixth Claims fails because it contravenes the statute's unambiguous language. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).

DC has no basis nor standing to sue for an alleged "violat[ion] of section 304(c)(6)(D)" because it has no "rights" thereunder. ER 1038-44 ¶¶170, 188. *See* 3 *Patry on Copyright* § 21:18 (terminated grantee has "no rights under [§ 304(c)(6)(D)], cannot sue for failure to comply, and the provision therefore does not provide a basis for standing."); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (no claim unless Congress showed "an intent to create not just a private right but also a private remedy").

Furthermore, as pled, the Consent Agreement, requiring both the Siegels' and Shusters' "approval" to enter into further agreements (ER 1038-39 ¶170), is not "a further grant, or agreement to make a further grant" and therefore would not violate section 304(c)(6)(D) in any event.

### 3. The Sixth Claim Is Barred By The Litigation Privilege

The Consent Agreement was entered into *during* the *Siegel* litigations in connection with settlement negotiations. ER 367. Both the PPC Agreements and the IPWW Agreement likewise reference litigation regarding the Siegel and Shuster Terminations, which was in the air due to the Siegels' protracted

settlement negotiations. ER 1006-17 ¶¶60-65, 90. Such "'communications which have some relation to an anticipated lawsuit'" are protected by the litigation privilege. *Nasr v. Geary*, 2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003) (quoting *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 262 (1997)); *Rubin*, 4 Cal. 4th at 1194 (same); *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1145 (1996) (same).

DC itself alleges that all these agreements relate to ***settlement*** of litigation. *See* ER 1038-39 ¶170 (such "agreements … impede [DC's] ability to settle"); 1044 ¶188 (such agreements purportedly "strip the Siegels and Shusters of their right freely to settle their claims"). Such conduct is unequivocally protected by Civil Code § 47. *Seltzer*, 182 Cal. App. 4th at 972; *Asia Inv. Co.*, 133 Cal. App. 3d at 842. The California Supreme Court has clearly held that unfair competition allegations may not be used as an end-run around the litigation privilege. *Rubin*, 4 Cal. 4th at 1203 ("[P]lacing in the hands of a litigation adversary a weapon with the tactical potential of a statutory unfair competition claim [] would promote all of the evils we have described above as accompanying retaliatory suits …."). DC's claim is thus barred by the litigation privilege.

### 4. DC's Sixth Claim Is Preempted By The Copyright Act

The Copyright Act "broadly preempts state law claims" like DC's Sixth Claim. *Ritchie v. Williams*, 395 F.3d 283, 285 (6th Cir. 2005); 17 U.S.C. § 301(a). If a "state law unfair competition claim is based solely on rights equivalent to those

protected by the federal copyright laws," it is preempted. *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998). *See Trenton v. Infinity Broadcast'g Corp.*, 865 F. Supp. 1416, 1428 (C.D. Cal. 1994) ("'The fact that the state-created right is either broader or narrower than its federal counterpart will not save it from preemption.'") (citation omitted).

To avoid preemption, the plaintiff must demonstrate that its "state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90 (9th Cir. 2005).

Here, DC's state-law claim merely reformulates DC's Third Claim under the Copyright Act. *Compare* ER 1039 ¶172 (Third Claim: "to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material") *with* 1044 ¶189 (Sixth Claim: to "establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material"). DC's Sixth Claim simply incorporates by reference allegations of a supposed violation of the Copyright Act and makes no additional allegations. ER 1044 ¶¶187-88. *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987) (dismissing UCL claim that incorporated by reference copyright allegations).

As DC's UCL claim is inextricably intertwined with its Copyright Act

claim, it is preempted.  *See Del Madera Properties v. Rhodes & Gardner, Inc.*, 820

F.2d 973, 977 (9th Cir. 1987) (UCL claim preempted where "constructed upon the

premise" of a Copyright Act violation").

5.    <b>DC's Sixth Claim Fails To Plead Conduct That Violates The UCL</b>

DC's Sixth Claim fails as a matter of law as it does not plead any "unlawful,

unfair, or fraudulent business practice" under the UCL.  *Olszewski v. Scripps*

*Health*, 30 Cal. 4th 798, 827 (2003).

<u>Unlawful</u>:  "A business practice is unlawful [under the UCL] 'if it is

forbidden by any law….'"  *Id.* at 827.  Conduct "neither required nor proscribed by

law does not constitute an 'unlawful' business activity."  61 Cal. Jur. 3d Unfair

Competition § 3 (2008).  As section 304(c)(6)(D) does not "require" or "proscribe"

any conduct, but merely states when a transfer of the termination interest is valid, it

cannot support a claim of "unlawful" business activity.

<u>Unfair</u>:  If a "practice" is not "unlawful," it is only considered to be "unfair"

if it "threatens an incipient violation of an antitrust law … or otherwise

significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. Los*

*Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999).  DC alleges that

"consent agreements" somehow "strip the Siegels and Shusters of their right freely

to settle their claims and violate [DC's] concomitant right freely to negotiate

60<br>EXHIBIT F

settlement of such claims."  ER 1044 ¶188.  This is not "conduct that threatens an incipient violation of an antitrust law" and will not sustain an unfair competition claim.  *Cel-Tech*, 20 Cal. 4th at 187.

Fraud:  A claim of fraudulent practices must be pled with specificity.  *See* F.R.C.P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."); *Shroyer v. New Cingular Wireless Servs.*, 606 F.3d 658, 665-67 (9th Cir. 2010) (applying Rule 9(b) to dismiss UCL "fraud" claim as "conclusory allegations do not suffice").  DC's Sixth Claim does not even allege fraud.

## CONCLUSION

This case is against public policy and has inflicted real and abiding harm on the Heirs by interfering with their relationship with counsel in the exercise and enforcement of their statutory termination right.  Congress specifically sought to benefit authors and their statutory heirs through the termination right.  Superman is a national icon, and the Siegels and Shusters are exemplars of those meant to benefit from such right, and they should not be subject to attack, directly or through their counsel, for reclaiming what is theirs.  A core policy of the State of California is to protect the right of petition and the attorney-client relationship essential to that right against baseless suits such as this.  If opposing counsel can be freely attacked with meritless tort claims for supporting the termination right, then

EXHIBIT F

the policies of the Copyright Act and of California's Anti-SLAPP law will be

severely compromised.

The district court's Order denying the Anti-SLAPP motion should be

reversed, and this case should be remanded with instructions to enter an order

granting Defendants' Anti-SLAPP motion, and for further proceedings consistent

with this Court's ruling.

Dated:  April 24, 2012          TOBEROFF & ASSOCIATES, P.C.

_/s/ Marc Toberoff_____
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

_/s/ Laura W. Brill_____
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC,
IPW, LLC and Marc Toberoff

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants identify the writ proceeding *In re Pacific Pictures Corp.*, 9th Circuit Case No. 11-71844, in which a decision recently issued, as related to this case as it arises out of the same district court case as the instant appeal. Defendants further identify the appeal and cross-appeal in *Larson v. Warner Bros. Entertainment Inc., et al.*, 9th Circuit Case Nos. 11-55863, 11-56034, are related to this case as they arise out of the related district court case, *Larson v. Warner Bros. Entertainment Inc., et al.*, Case No. 04-CV-08400 ODW (RZx).

Dated:  April 24, 2012        TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

/s/ Laura W. Brill
_____
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC,
IPW, LLC and Marc Toberoff

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that the appellant Laura Siegel Larson's attached opening brief is proportionately

spaced, has a typeface of 14 points or more, and does not exceed 14,000 words.

Dated: April 24, 2012         TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

/s/ Laura W. Brill
_____
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC,
IPW, LLC and Marc Toberoff

## STATUTORY ADDENDUM

### 17 U.S.C. § 304

(c) Termination of Transfers and Licenses Covering Extended Renewal Term. – In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless

there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly

authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were

covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2)

of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) Termination Rights Provided in Subsection (c) Which Have Expired on or before the Effective Date of the Sonny Bono Copyright Term Extension Act. — In

the case of any copyright other than a work made for hire, subsisting in its renewal

term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for

which the termination right provided in subsection (c) has expired by such date,

where the author or owner of the termination right has not previously exercised

such termination right, the exclusive or nonexclusive grant of a transfer or license

of the renewal copyright or any right under it, executed before January 1, 1978, by

any of the persons designated in subsection (a)(1)(C) of this section, other than by

will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this

section apply to terminations of the last 20 years of copyright term as provided by

the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years

beginning at the end of 75 years from the date copyright was originally secured.

## California Code of Civil Procedure – Section 425.16.

(a) The Legislature finds and declares that there has been a disturbing increase in

lawsuits brought primarily to chill the valid exercise of the constitutional rights of

freedom of speech and petition for the redress of grievances. The Legislature finds

and declares that it is in the public interest to encourage continued participation in

matters of public significance, and that this participation should not be chilled

through abuse of the judicial process. To this end, this section shall be construed

Case 2:10-cv-03633-ODW-RZ Document 412-2 Filed 05/07/12 Page 129 of 169
Page ID #:25149
Case 2:11-cv-53033-ODW-RZ Document 412-6 Filed May 7/12 Page 04 of 80

broadly.

(b) (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. (3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

(c) (1) Except as provided in paragraph (2), in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5. (2) A defendant who prevails on a special motion to

strike in an action subject to paragraph (1) shall not be entitled to attorney's fees and costs if that cause of action is brought pursuant to Section 6259, 11130, 11130.3, 54960, or 54960.1 of the Government Code. Nothing in this paragraph shall be construed to prevent a prevailing defendant from recovering attorney's fees and costs pursuant to subdivision (d) of Section 6259, 11130.5, or 54690.5.

(d) This section shall not apply to any enforcement action brought in the name of the people of the State of California by the Attorney General, district attorney, or city attorney, acting as a public prosecutor.

(e) As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

(f) The special motion may be filed within 60 days of the service of the complaint

or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

(g) All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

(h) For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and "defendant" includes "cross-defendant" and "respondent."

(i) An order granting or denying a special motion to strike shall be appealable under Section 904.1.

(j) (1) Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by e-mail or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion

Case: 11-56034   04/24/2012   ID: 8152266   DktEntry: 6   Page: 93 of 96

to strike, discovery, or fees. (2) The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

# **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was served electronically

by the Court's ECF system and by first class mail on those parties not registered

for ECF pursuant to the rules of this court. Pursuant to Circuit Rule 31-1,

submission of one original and seven copies of the brief was deferred. Pursuant to

Circuit Rule 30-1.3, four copies of the excerpts of the record have been mailed to

the Court, and one copy of the excerpts of the record have been mailed to opposing

counsel on the date this brief was electronically filed.

Dated: April 24, 2012      TOBEROFF & ASSOCIATES, P.C.

/s/ Pablo Arredondo

Pablo Arredondo

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

# EXHIBIT

# G

CASE NO. 11-71844

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

IN RE PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, MARK WARREN PEARY, JEAN ADELE PEAVY, AND LAURA SIEGEL LARSON

*Defendants-Petitioners,*

*(caption continued on next page)*

————————

PETITION FOR REHEARING AND FOR REHEARING EN BANC

On Petition for Writ of Mandamus to the United States District Court for the Central District of California, Case No. CV-10-3633, Hon. Otis D. Wright II

————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (188547)
Keith G. Adams (240497)
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone: (310) 246-3333

*Attorneys for Defendants-Petitioners*
*Mark Warren Peary, as personal*
*representative of the Estate of Joseph*
*Shuster, Jean Adele Peavy, and Laura*
*Siegel Larson, individually and as*
*personal representative of the Estate of*
*Joanne Siegel*

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
Laura W. Brill (195889)
Nicholas F. Daum (236155)
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

*Attorneys for Defendants-Petitioners*
*Pacific Pictures Corporation, IP*
*Worldwide, LLC, IPW, LLC, and Marc*
*Toberoff*

106459.1

v.

UNITED STATES DISTRICT COURT,
CENTRAL DISTRICT OF CALIFORNIA

*Respondent,*

DC COMICS,

*Plaintiff-Real Party in Interest.*

# <u>TABLE OF CONTENTS</u>

I.    Introduction & F.R.A.P. 35 Statement ............................................1

II.   Background And Petition ...............................................................4

III.  Rehearing Or Rehearing En Banc Should Be Granted To Correct
      Numerous Misstatements As To Matters Not Before The Court...................7

      A.    Siegel Authorship And Ownership Issues...........................................9

      B.    Representation Of The Heirs...............................................10

      C.    Evidence Improperly In The Writ Record .........................................16

IV.   The Opinion Is Of Exceptional Importance And Is Contrary To
      Existing Ninth Circuit Privilege Law And The Law Of Other Circuits........17

      A.    The Panel's Ruling Is Exceptionally Broad .......................................17

            1.    Under the Court's En Banc Ruling in *Bittaker*, Any
                  Waiver of Privilege Here Should Not Extend Beyond A
                  Criminal Enforcement Action...................................................19

            2.    The Court Ignored The Common Interest Between
                  Petitioner And The Government And The Controlled
                  Disclosure To The Government................................................21

V.    Conclusion ..................................................................26

i

EXHIBIT G

Case 2:10-cv-03633-ODW-RZ   Document 412-2   Filed 05/07/12   Page 138 of 169
Case 1:12-cv-03640-DDC   Document 106942   Dkt Entry 05/07/12   Page 138 of 95
Page ID #:25158

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*,
880 F.2d 176 (9th Cir. 1989) ....................................................................8

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985)..................................................................................8

*Argenyi v. Creighton Univ.*,
2011 WL 3497489 (D. Neb. Aug. 10, 2011) ...........................................22

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2008) ............................................................*passim*

*Calderon v. U.S. Dist. Court for Cent. Dist. of California*,
137 F.3d 1420 (9th Cir. 1998) ...................................................................8

*Dellwood Farms Inc. v. Cargill, Inc.*,
128 F.3d 1122 (7th Cir. 1997) ...................................................3, 19, 24

*Diversified Indus., Inc. v. Meredith*,
572 F.2d 596 (8th Cir. 1977) ...................................................................25

*Greater Newburyport Clamshell Alliance v. Pub. Serv. Co.*,
838 F.2d 13 (1st Cir. 1988).......................................................................20

*Hormel v. Helvering*,
332 U.S. 552 (1941)......................................................................... 4, 7-8

*In re Steinhardt Partners, L.P.*,
9 F.3d 230 (2nd Cir. 1993).................................................... 3, 22, 24-25

*Maruzen Co. v. HSBC USA, Inc.*,
2002 U.S. Dist. LEXIS 13288 (S.D.N.Y. 2002)......................................25

*Miller, Anderson, Nash, Yerke & Wiener v. U.S. Dept. of Energy*,
499 F. Supp. 767 (D. Ore. 1980).............................................................23

*Panaview Door & Window Co. v. Reynolds Metals Co.*,
255 F.2d 920 (9th Cir. 1958) ....................................................................4

*Police & Fire Ret. Sys. v. Safenet, Inc.*,
2010 U.S. Dist. LEXIS 23196 (S.D.N.Y. Mar. 11, 2010) ......................25

*Siegel v. National Periodical Publications*,
508 F.2d 909, 911 (2d Cir. 1974)........................................................5, 10

*Siegel v. Warner Bros. Entertainment Inc.*,
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ........................................5, 10, 11

*Siegel v. Warner Bros. Ent. Inc.*,
658 F. Supp. 2d 1036 (C.D. Cal. 2009) ....................................................5

*Solid Waste Agency v. United States Army Corps of Eng'rs*,
531 U.S. 159 (2001)................................................................................25

*United States v. Am. Tel. & Tel. Co.*,
642 F.2d 1285 (D.C. Cir. 1980) ..............................................................23

*United States v. Dynavac, Inc.*,
6 F.3d 1407 (9th Cir. 1993) ....................................................................23

*United States v. Gumbaytay*,
2011 U.S. Dist. LEXIS 47142 (M.D. Ala. Jan. 19, 2011) ................. 22-23

*United States v. Lang*,
149 F.3d 1044 (9th Cir. 1998) ..................................................................8

*United States v. Meek*,
366 F.3d 705 (9th Cir. 2004) ..................................................................25

*United States v. Stauffer Chem. Co.*,
464 U.S. 165 (1984)..................................................................................8

*United States v. Ziegler*,
497 F.3d 890 (9th Cir. 2007) ....................................................................7

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) ...................................................................................23

## **Other Authorities**

17 U.S.C. § 304(c) ....................................................................................5

18 U.S.C. § 3771 ......................................................................................22

Fed. R. Civ. P. 52(a) .................................................................................8

Federal Rule of Criminal Procedure 6(e)(2) ...........................................23

Christopher T. Hines,
*Returning to First Principles of Privilege Law: Focusing on the Facts in Internal Corporate Investigations*, 60 U. Kan. L. Rev. 33, 88 (2011) ...................................25

## I. Introduction & F.R.A.P. 35 Statement

On April 17, 2012, a panel of this Court (Kozinski, C.J., O'Scannlain, J., and N.R. Smith, J.) denied Petitioners' petition for writ of mandamus ("Writ Petition") by published opinion ("Opinion" or "Op."). The Opinion contains two fundamental errors that warrant rehearing or rehearing en banc.

First, the Opinion's holding is of exceptional importance because it creates the following unprecedented rule: a party to a civil suit whose privileged material is stolen effects a blanket waiver of privilege by providing copies needed by law enforcement to investigate the crime. The Opinion further holds that privilege is waived even when the privileged documents are provided to the government pursuant to a common-interest / confidentiality agreement to preserve privilege and a grand jury subpoena. No court has gone so far in holding that the victim of the theft of privileged or work product material cannot provide copies to law enforcement, under circumstances designed to preserve confidentiality/privilege, without broadly waiving the privilege as to civil litigation adversaries. The Opinion is in conflict with the reasoning of this Court's en banc decision in *Bittaker v. Woodford*, 331 F.3d 715, 717 (9th Cir. 2008), which recognized that a party who discloses privileged documents only to preserve an important legal right, or to a receiving party that is bound by the privilege, does not thereby effect a blanket waiver as to other legal proceedings.

106459.1

1

EXHIBIT G

143

The Opinion has crafted a draconian rule of federal common law that will severely impede the government's investigation of crimes involving privileged/confidential materials and leave the victims of such crimes with no redress. The Opinion imposes on victims an intolerable Hobson's choice: waive privilege by cooperating with law enforcement, compounding one's injury, or as the District Court recognized, "the perpetrator goes free." Writ Petition, Ex. 24 at 1483. En banc rehearing should be granted to avoid this counterintuitive result.

The Opinion conflicts with numerous decisions recognizing that a private party and the government may share a common interest sufficient to support the privilege in connection with a government investigation. The Opinion rules as a matter of law that commonality between a crime victim and the government does not exist unless the parties have agreed "to jointly pursue sanctions" against a target. The Opinion offers no explanation why other joint interests, such as pursuing an investigation, are insufficient to support maintenance of the privilege.

The Opinion bases its exceptionally harsh rule on out-of-circuit decisions that reject the "selective waiver" doctrine when *targets* of criminal investigations, who are adverse to the government, elect to waive privilege in the hopes of mitigating or avoiding punishment. Even as to a suspected criminal, selective waiver is extremely controversial and the subject of a Circuit split, with the Eighth Circuit recognizing selective waiver generally, the Second and Seventh Circuits

recognizing that confidentiality agreements with government can protect privilege, *Dellwood Farms Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1127 (7th Cir. 1997); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 232 (2nd Cir. 1993), and the Ninth Circuit, repeatedly declining, until now, to resolve the issue.

Second, and independently, rehearing either by the panel or by the Court en banc is also warranted because the "factual" discussion in Section I of the Opinion misstates facts not before the Writ panel, invades the province of the District Court and conflicts with well-established rules of appellate review.

Section I includes numerous misstatements of facts. Many of the facts are vigorously disputed, and have not been addressed by the District Court in the first instance. They are not germane to the Writ Petition, not properly before the Court and highly prejudicial to Petitioners. Other misstatements relate to copyright issues between the parties resolved decades ago, and conflicts with binding rulings by other courts. Such are also wholly unnecessary to the Writ Petition and conflict with basic norms regarding the finality of judgments.

As to these misstatements, Section I contains no citations to the record, and appear, in large degree, to be based on the complaints unproven allegations and/or rank hearsay to which Petitioners have objected. Neither the District Court nor the panel, however, has ruled on the objections or on the admissibility of DC's submission, again in conflict with core procedural requirements such as FRE 802.

If not corrected on rehearing, Section I so substantially departs from this Court's appellate function on a discovery-related Writ Petition as to warrant en banc review. Among other things, Section I conflicts with binding Supreme Court and Ninth Circuit precedent regarding the impropriety of first-instance appellate fact finding, the limited scope of mandamus review, principles of issue preclusion, and the constitutional right to trial by jury. *See*, *e.g.*, *Hormel v. Helvering*, 332 U.S. 552, 536 (1941), *Panaview Door & Window Co. v. Reynolds Metals Co.*, 255 F.2d 920, 926 (9th Cir. 1958) ("The Federal Rules of Civil Procedure give this Court no power to make new independent findings upon evidence which this Court did not hear. Trial de novo is not permitted under our present system"); Section III(D), below.

## II. Background Of Petition

This matter is before this Court on a Writ Petition concerning a significant discovery order finding a waiver of attorney-client privilege as to numerous privileged documents stolen from a law firm and delivered to the litigation adversaries of its clients ("Writ Proceeding"). The victims were the heirs of Superman co-creators Jerome Siegel and Joseph Shuster (collectively, "Heirs") and their long-time counsel Marc Toberoff. The perpetrator was an attorney formerly employed by Mr. Toberoff's law firm.

The underlying litigations relate to the Heirs' exercise of their rights under

17 U.S.C. § 304(c) to terminate prior copyright grants to DC Comics' predecessors
(collectively, "DC"). The following published opinions detail that dispute and
earlier disputes relating to Superman that were not subject to review in this Writ
proceeding. *See, e.g., Siegel v. National Periodical Publications*, 508 F.2d 909,
911, 914 (2d Cir. 1974) ("*Siegel*") (relying on findings from a 1947 action (the
"1947 action") between Siegel/Shuster and DC); *Siegel v. Warner Bros.
Entertainment Inc.,* 542 F. Supp. 2d 1098, 1116, 1145 (C.D. Cal. 2008) ("*Siegel
I*"); *Siegel v. Warner Bros. Ent. Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal. 2009)
("*Siegel II*").

After rulings in *Siegel I* and *Siegel II*, favorable to the Heirs, DC brought a
new action, *DC Comics v. Pacific Pictures*, C.D. Cal. Case No. 10-CV-03633
ODW (RZx), which seeks to undo the *Siegel* decisions and attacks the Heirs by
attacking their counsel (Mr. Toberoff) who had filed their termination notices and
successfully litigated their claims against DC. The District Court in *Pacific
Pictures* has made **no findings of fact** regarding DC's disputed allegations.[1]

During the litigation involving *Siegel I* and *Siegel II*, a newly employed
attorney at Mr. Toberoff's law firm, working on the case, stole reams of privileged

---

[1] The District Court denied Petitioners' motion to strike DC's state law
claims pursuant to California's anti-SLAPP law, holding it inapplicable to DC's
complaint. No factual findings were made. A separate appeal of that denial is
pending before this Court in Case No. 11-56934.

and work product documents, and provided them to the Siegels' litigation
adversaries, Warner Bros. and its affiliate, DC ("Warner/DC").  *See* Writ Petition
at 7-9.  Petitioners argued that it was improper for Warner/DC to leverage this
crime to gain an unfair litigation advantage. The bulk of the stolen documents
responsive to Warner/DC's discovery requests had either already been produced or
logged as privileged.  The *Siegel* district court denied numerous motions to compel
by DC/Warner and consistently confirmed that the stolen documents listed on the
Heirs' privilege logs remained privileged.  *See generally* Toberoff Reply
Declaration Re Writ Petition (Oct. 4, 2011) (Dkt 4-2 & 4-3) ("Writ Reply
Declaration"), Ex. E (supplemental memorandum re motion for protective order).

However, the *Siegel* district court ordered produced an *anonymous* cover
letter to Warner Bros., allegedly written by the perpetrator (the so-called
"Timeline"),[2] which DC attached to its complaint in *Pacific Pictures.*  The
inadmissible Timeline contains numerous defamatory allegations that Petitioners
vigorously dispute and that have not yet been adjudicated.

Mr. Toberoff provided the stolen documents to the U.S. Attorney's Office
pursuant to a grand jury subpoena, and the government's promise, based on its
common interests, to maintain the confidentiality of the documents and not to use

---

[2] The order to produce the Timeline is contested by Petitioners and remains
subject to review on appeal once the *Siegel* litigation concludes in full.

them for purposes other than its investigation of the crime.  Writ Petition at 8-11.

On May 25, 2011, the Magistrate Judge presiding over discovery in *Pacific
Pictures*, held that this waived privileged as to the stolen documents and ordered
them produced, but stayed its order to allow for appellate review of the important
question presented.  On April 17, 2012, a panel of this Court affirmed.

## III.    Rehearing Or Rehearing En Banc Should Be Granted To Correct Numerous Misstatements As To Matters Not Before The Court

Section I of the Opinion contains numerous misstatements of fact as to
matters in serious dispute in the underlying *Pacific Pictures* case, not yet
adjudicated or ruled on by the District Court, not supported by the record, and not
raised by or germane to the Writ petition.  It also includes misstatements that
conflict with earlier Superman decisions cited above.  Respectfully, the panel
should delete the misstatements or clarify that its recitation is of DC's unproven
allegations, disputed by Petitioners, and does not reflect the findings or conclusions
of this Court.

If not corrected, the above contravenes established law.  This Court is a
reviewing court, not a finder of fact on matters undecided by the trial court.  "We
may not find facts on appeal; we may only review findings made by the courts
below us."  *United States v. Ziegler,* 497 F.3d 890, 900 (9th Cir. 2007) (Kozinski,
J., dissenting from order denying rehearing en banc); *see also Hormel v. Helvering*,

7

EXHIBIT G

149

332 U.S. 552, 536 (1941) (parties' evidence on factual matters are "issues which the trial tribunal is alone competent to decide"); *Anderson v. City of Bessemer,* 470 U.S. 564, 574 (1985) ("The trial judge's major role is the determination of fact"); *United States v. Lang,* 149 F.3d 1044, 1046 (9th Cir.1998); Fed. R. Civ. P. 52(a) ("[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").[3]

The scope of review as to this petition for an interlocutory writ of mandamus relating to a discovery motion is even more circumscribed. Indeed, writ relief is inappropriate to determine the underlying merits of an action, since "[m]andamus is not to be used as a substitute for an appeal." *Calderon v. U.S. Dist. Court for Cent. Dist. of California*, 137 F.3d 1420, 1421 (9th Cir. 1998). Notably, in the related area of appeals from interlocutory orders, this Court has repeatedly emphasized that it has jurisdiction *solely* over the order actually appealed from and issues "inextricably intertwined" with such orders. *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 190 (9th Cir. 1989).

---

[3] Petitioners also have an interest in correct application of principles of collateral estoppel that prohibit re-litigation of issues that have already been decided against DC in *Siegel*, *Siegel I*, and *Siegel II*. *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170-71 (1984). Petitioners likewise have an interest in the correct application of rules of evidence and the fundamental requirement that a plaintiff prove its case by admissible evidence, not through unproven pleading allegations, inadmissible hearsay and innuendo. Fed. R. Evid. 802. Finally, Petitioners have a right to trial by jury as to legal claims raising disputed issues of fact. U.S. Const. amend. VII.

8
EXHIBIT G

The Opinion's factual recitation, if left uncorrected, would negate these fundamental principles. At a minimum, the Court should clarify, where applicable, that it was reciting DC's unproven allegations based on the anonymous Timeline, and that nothing in this Court's opinion should be taken as a finding of fact as to the truth of those allegations.

If the misstatements detailed below are not corrected by panel rehearing, they are appropriate subjects for en banc review, given the procedural safeguards against appellate fact-finding in the first instance.

## A. Siegel Authorship And Ownership Issues

The Opinion includes a factual description relating to the separate *Siegel* cases that contradicts prior binding decisions and is not germane to the Writ petition.

The first paragraph of the Opinion states:

> In the 1930s, writer Jerome Siegel and illustrator Joe Shuster joined forces to create the character that would eventually become Superman. They ceded their intellectual property rights to D.C. Comics when they joined the company as independent contractors in 1937.

Entirely different factual findings appear in the published opinions in *Siegel* and *Siegel I*. Siegel and Shuster did not merely "create the character that *would eventually become* Superman" before granting rights to DC (Op. at 4243, emphasis added), but created and are credited with creating a fully developed Superman character and comic strip story long before they had any dealings with DC. *See*

*Siegel,* 508 F.2d at 914 ("Superman and his miraculous powers were ***completely
developed*** long before the employment relationship was instituted."; Siegel and
Shuster were "'the originators and authors" of the SUPERMAN character)
(emphasis added); *Siegel I,* 542 F. Supp. 2d at 1101-11 (describing their creation of
"the character" Superman in 1934).

Siegel and Shuster also did not transfer any Superman rights to DC "in
1937". Op. at 4243. Rather, prior judicial findings establish that they conveyed
Superman to DC in a March 1, **1938** grant. A 1937 contract between DC and
Siegel/Shuster regarded two different characters. *See Siegel,* 508 F.2d at 914
(rejecting relevance of the 1937 agreement to ); *Siegel I,* 542 F. Supp. 2d at 1107
(describing the 1938 grant), 1112 (describing preclusive findings of 1947 case).
While such issues were not pertinent to the Writ Petition, which may explain the
error, they are highly material to ongoing disputes in *Siegel,* which were not before
the panel. These errors should be corrected.

## B.    Representation Of The Heirs

The Opinion also contains misstatements regarding the Heirs' relationship
with their counsel, Mr. Toberoff, a highly disputed factual matter still before the
District Court, which has made no factual findings. For example:

> Having set his sights on Superman, Toberoff approached the Heirs
> with an offer to manage preexisting litigation over the rights Siegel
> and Shuster had ceded to D.C. Comics.

Op. at 4243.  This is both incorrect and not pertinent to the Writ petition.

The reference to "preexisting litigation" is incorrect, as no court action regarding the Heirs' statutory terminations was pending at the time of Mr. Toberoff's first contact with any of the Heirs.  The first lawsuit was filed by the Siegel heirs in 2004, with Mr. Toberoff as their counsel.  *Siegel I,* 542 F. Supp. 2d at 1116.

Similarly, as to DC's allegations that Mr. Toberoff "approached" the Heirs the District Court record on motions not within the scope of the Writ panel's review includes substantial evidence that shows Mr. Toberoff became involved after he was contacted in 2001 by one of the Shuster heirs, and that he was thereafter contacted in late 2002 by the Siegels, who had been referred by the Shusters.  *See* C.D. Cal. Case No. 10-CV-03633, Docket No. 145 at 6-9 (setting forth relevant evidence, including a detailed description of timing and substance of initial contacts with the Siegels' former attorney).  The District Court has made no factual determination as to the timing or nature of Mr. Toberoff's initial contact with the Heirs.

For the same reasons the Writ panel could also not properly determine that Mr. Toberoff contacted the Heirs "having set his sights on Superman."  Op. at 4243.

The Opinion also misstates that "[Toberoff] claimed that he would arrange

for a new Superman film to be produced."  Op. at 4243.  The District Court made

no findings as to this disputed DC allegation, and it is irrelevant to the waiver issue

before the Writ panel.  DC can cite no admissible evidence in the record that Mr.

Toberoff made such an assertion.  The "Timeline," attached to DC's complaint, is

pure hearsay (and often, double and triple hearsay) that has never been held

admissible.  Petitioners' objected to its admissibility, as well as to the voluminous

other material DC improperly shoved into the Writ record that was not before the

District Court in ruling on the underlying discovery motion.  *See* Writ Reply

Declaration Ex. G.

 The allegation that Mr. Toberoff "claimed that he would arrange for a new

Superman film to be produced" is also contrary to the sworn testimony of every

relevant witness, before the District Court, including the Siegels' former attorney,

Kevin Marks (to whom this statement was supposedly made) who denied its

occurrence.  Case No. 10-CV-03633, Docket No. 312-2.

 Further statements in the Opinion, asserting that "[t]o pursue these goals,

Toberoff created a joint venture between the Heirs and an entity he owned," and

that "Toberoff served as both a business advisor and an attorney for that venture,"

also concern disputed factual issues not addressed in the Discovery Order and not

properly before the Writ panel.  Such statements conflate Mr. Toberoff's initial

representation agreement with the Siegels, which was not a joint venture, with his

initial agreement with the Shusters, and again concern disputed factual issues

before the District Court that have not yet been adjudicated.  Op. at 4243.

As to the Opinion's reference to "business advice," Mr. Toberoff has

represented the Heirs as their counsel in over seven straight years of litigation with

DC (during which the Heirs privileged legal files were stolen) and prior to that

oversaw probate proceedings, drafted, served and filed statutory termination

notices and conducted settlement negotiations on the Heirs' behalf.  Writ Petition

at 6.  The Opinion adopts DC's allegations as to purported "business" motives and

assumed that Mr. Toberoff provided "business advice," when these disputed

factual issues were not before the Writ panel and are still before the District Court.

DC has never met its burden of proof, and Petitioners must be afforded an

opportunity to address DC's self-serving conclusions at the district court level, in

the first instance.

Petitioners also request that the Court delete the Opinion's statement:

"ethical and professional concerns raised by Toberoff's actions will likely occur to

many readers."  As the panel correctly noted, such issues "are not before this

court."  Op. at 4243.  Mr. Toberoff is a member in good standing of both the

California and New York State Bars, with no record of discipline.  *See generally*

Writ Reply Declaration Ex. G at 50-51, ¶ 17.  The Heirs continue to choose Mr.

Toberoff as their counsel despite DC's strategic attacks.  As DC's allegations  have

106459.1

13

EXHIBIT G

155

never been adjudicated, and are not before the Court, reprobation was

unwarranted.

    Additional factual errors that require correction are set forth below.

| Opinion Statement | Statement/Response |
|---|---|
| "While the preexisting litigation was pending, Toberoff hired lawyer David Michaels to work for one of his companies."  Op. at 4243. | **Disputed; No District Court Finding**<br><br>The opinion implies that Michaels was hired by an entertainment "company" when Michaels was hired as a junior attorney by Mr. Toberoff's law firm, Toberoff & Associates which represented the Siegel and Shuster Heirs Writ Petition, Ex. 10 at 909.<br><br>There is no District Court finding that Michaels was hired by any other entity. |
| "Considering every communication he had with the Heirs to be privileged – regardless of whether the communication was in his capacity as a business advisor or an attorney – Toberoff resisted all such efforts."  Op. at 4244. | **Disputed; No District Court Finding**<br><br>Numerous communications (*e.g.,* Mr. Toberoff's initial agreements with the Siegels and the Shusters) were freely produced without privilege claims.  *See* Writ Reply Declaration, Ex. A.  On behalf of his clients, Mr. Toberoff properly logged  their privileged communications and their assertion of privilege was repeatedly upheld by the District Court in both *Siegel* and in this case.<br><br>The Writ Opinion statement does not comport with any finding of the District Court in connection with the Discovery Order or otherwise.  Writ Petition, Ex. 24 at 1481-86. |
| "Ultimately, in April 2007, a magistrate judge ordered certain documents, including Michaels' | **Disputed; Not Before The Panel.**<br><br>The April 2007 order in the *Siegel* case simply |

| | |
|---|---|
| cover letter, turned over to D.C. Comics." Op. at 4244. | required Toberoff to "match up" the documents stolen from Toberoff's law firm to documents already produced or previously listed on privilege logs, as this accounted for nearly all the stolen documents, which he did. Writ Reply Declaration, Ex. A.<br><br>The April 2007 order applied to the "stolen documents" not the anonymous cover letter. The Timeline was produced pursuant to a December 2008 decision, which Petitioners contend improperly applied the law of the case doctrine. *See generally* Writ Reply Declaration, Ex. E. That decision remains subject to review, and is not within the scope of the Writ Petition. |
| "Toberoff has continued to resist the use of any of the documents taken from his offices, including those already disclosed to D.C. Comics." Op. at 4244. | **Disputed; No District Court Finding**<br><br>Numerous non-privileged documents stolen from Mr. Toberoff's law firm had been voluntarily produced by his clients. Writ Reply Declaration, Ex. A. Mr. Toberoff and his clients have not resisted the use of such documents. |
| "Rather than exploiting the documents, D.C. Comics entrusted them to an outside attorney and sought to obtain them through ordinary discovery in the two ongoing lawsuits over Superman." Op. at 4244. | **Disputed; Discovery Ongoing**<br><br>Discovery is ongoing in *Pacific Pictures* as to this issue. The Writ panel has no adequate record as to Warner/DC's review and exploitation of the documents in litigation against the Heirs |
| "Toberoff represented all of the Petitioners, including a joint venture between the Heirs and himself in which he had a controlling interest." Op. at 4254 n.6. | **Disputed; No District Court finding.**<br><br>None of the Petitioners was a "joint venture between the Heirs and [Toberoff]." To the extent the opinion was referring to a single joint venture between Mark Warren Peary, Jean |

15
EXHIBIT G

157

| | Adele Peavy, and Pacific Pictures Corporation (long defunct) in 2001/2003 agreements, such agreements/venture were cancelled in 2004. *See* Case No. 10-CV03633, Docket No. 145 at 6, 10 (same).  The cancelled 2001/2003 agreements also did not give Mr. Toberoff "a controlling interest." |
|---|---|

## C.     Evidence Improperly In The Writ Record

Much of the factual description of the Writ Opinion appears to rely on the August 9, 2011 declaration of Daniel Petrocelli, which was not before the District Court on May 25, 2011, when it ruled on the privilege issue that is subject of the Writ Petition.  That August 9, 2011 declaration was submitted to the District Court in connection with an entirely separate motion.  Without seeking leave of the Court, DC improperly included in the Writ record this 65-page declaration as an attachment to a new Declaration of Daniel Petrocelli in Support of DC's Response to the Petition.  Petitioners objected in the District Court to the Petrocelli declaration in general and to the exhibits attached to it.  These objections span nearly 90 pages due to the enormous amount of improper material submitted by DC.  *See* Writ Reply Declaration at Ex. G.  The District Court has never ruled on those objections.  Petitioners further objected to DC's use of non-evidentiary material in DC's opposition to the Writ Petition.  Defendants-Petitioners' Reply In Support of Petition for Writ of Mandamus at 23 (Oct. 4, 2011).

The Opinion did not acknowledge those objections or that the District Court had not ruled on them. Nor does it identify any evidence supporting its findings.

## IV. The Opinion Is Of Exceptional Importance And Is Contrary To Existing Ninth Circuit Privilege Law And The Law Of Other Circuits

### A. The Panel's Ruling Is Exceptionally Broad

The Opinion creates a novel and unprecedented rule of broad significance to the legal community and to anyone whose privileged or confidential material is stolen and misused. The Opinion provides that the victim must either refuse to cooperate with law enforcement's investigation of the crime by withholding confidential material the government requires, or provide the information and involuntarily effect a waiver as to third parties in civil litigation.

The Opinion found such waiver even though: (1) the crime, itself, involved the theft and *involuntary* disclosure of privileged documents; (2) the government needed to review the privileged stolen documents as part of its investigation and any subsequent prosecution of the theft (Writ Petition, Ex. 21, 1469-70, ¶¶ 4-5); (3) the government agreed to maintain the documents as confidential pursuant to its shared common interest with the victim in investigating the theft (*id.* at 1470-71, ¶¶ 6-7; Writ Petition, Ex. 13 at 1041-42); (4) the production was pursuant to judicial process, *i.e.*, a grand jury subpoena (*id.* at 1030-1036); (5) the government made clear that the investigation itself was secret and that any disclosure of "the

existence of or compliance with the subpoena . . . could impede the investigation and interfere with the enforcement of law" (*id.* at 1033-1034); and (6) the victim has otherwise maintained the documents as privileged and made no attempt to use them in litigation or otherwise.

The Opinion adopted and expanded out-of-circuit decisions relating to an entirely different factual scenario: disclosures to the government by *targets* of a criminal investigation who hope to forestall prosecution. The panel dismissed the differences between suspected criminals and victims of crime, and the different policy considerations such entail, noting only: "if it is unnecessary to adopt a theory of selective waiver to encourage potential defendants to cooperate with the government, it is even less necessary to do so to encourage victims to report crimes to the government." Op. at 4252.

This misses the critical issue presented when a thief steals and discloses privileged material. If privilege must be waived to prosecute such a crime, the *victim* is left without a remedy – either the criminal is prosecuted, accomplishing the object of the crime by waiver, or, as the District Court put it, the "perpetrator goes free." Writ Petition, Ex. 24 at 1483. By contrast, in the cases relied upon in the Opinion, the *target* of a governmental investigation strategically chooses to disclose privileged material *to an adverse party* to mitigate its sentence or avoid prosecution.

Case 2:10-cv-03633-ODW-RZ Document 412 Filed 05/07/12 Page 159 of 169
Case 1:11-cv-09633-ODW-RZ Document 412 Filed 05/07/12 Page 159 of 169
Page ID #:25179

No authority requires the Opinion's rule, nor has gone so far in broadly

eroding the attorney-client privilege.  No "selective waiver" case addresses a crime

victim subject to an entirely *involuntary* theft of privileged material.  As the

Seventh Circuit found, in an apt, well-reasoned decision by Judge Posner declining

to find a waiver of privilege, application of waiver doctrines requires close

attention to why privilege has purportedly been waived:

> [Selective waiver is not] waiver in the standard sense in which the word is
> used in the law: the deliberate relinquishment of a right.  When [a general]
> "waiver" is found . . . [in a selective waiver case] it is in order ***to punish the
> person claiming the privilege*** for a mistake, rather than to prevent him from
> changing his mind and retracting a benefit that he had consciously granted to
> the person from whom he wants to retract it.

*Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1127 (7th Cir. 1997)

(declining to find a waiver of privilege).  There is no policy basis "to punish" the

victim of a theft of privileged documents for cooperating with the government's

investigation of the offense.

## 1.     Under the Court's En Banc Ruling in *Bittaker*, Any Waiver of Privilege Here Should Not Extend Beyond A Criminal Enforcement Action

In *Bittaker*, this Court en banc addressed a similar issue: whether a waiver of

attorney-client privilege based on the assertion of an ineffective assistance of

counsel claim also waives privilege as to third parties in a civil litigation.  The

Court concluded that due to the involuntary nature of the disclosure there was an

"implied" waiver limited to the proceeding in which the disclosure was made, but not extending to the world at large, including other litigation. 331 F.3d at 719-20.

The en banc Court in *Bittaker* distinguished between "express" and "implied" waivers: "[a]n express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Id.* at 719. Where these circumstances do not exist, "the court must impose a waiver no broader than needed to ensure the fairness of the proceedings" in which the disclosure is made. *Id.* at 720.

A central issue in determining the scope of waiver is the extent to which the waiver is truly voluntary. As the Court reasoned in *Bittaker*, "one may be a 'voluntary' party only because there is no other means of protecting legal rights….'" *Bittaker*, 331 F.3d at 724 (quoting *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co.*, 838 F.2d 13, 22 (1st Cir. 1988)). If so, waiver is not considered voluntary and does not expand to other proceedings. *Id.* ("The scope of required disclosure should not be so broad as to effectively eliminate any incentive to vindicate [one's] constitutional right[s]."). *Bittaker* thus limits waiver of the privilege to the proceeding in which a disclosure is made, if, as here, (1) disclosing privileged information is necessary to vindicate a legal right, or (2) the disclosure is made only to a third party who agrees to maintain the privilege.

Any other rule would put litigants to an unfair dilemma between exercising

their constitutional right to petition and subjecting themselves to unwarranted

discovery by third parties in civil litigation:

> [R]equiring the petitioner to enter such a broad waiver would force
> him to the painful choice of, on the one hand, asserting his ineffective
> assistance claim and risking a trial where the prosecution can use
> against him every statement he made to his first lawyer and, on the
> other hand, retaining the privilege but giving up his ineffective
> assistance claim. . . .

*Bittaker,* 331 F.3d at 723-24.  Just as it was "no answer" for Bittaker to be forced

to "chose" between asserting a claim for ineffective assistance of counsel and

waiving the privilege in other proceedings, *id.*, it is also "no answer" that

Petitioners here must forgo their right to seek redress for a crime (an exercise of

the petition right guaranteed by the First Amendment) and forgo access to law

enforcement and the protection of the law or forever waive the privilege as to the

rest of the world.  The Opinion's broad contrary determination conflicts with

*Bittaker* and should be reheard.

### 2. The Court Ignored The Common Interest Between Petitioner And The Government And The Controlled Disclosure To The Government

In another important and controversial part of the Opinion, the panel

concluded that Petitioners and the Government could not share a "common

interest" as a matter of law, on the grounds that Petitioners "ha[ve] no more of a

common interest with the government than does any individual who wishes to see the law upheld." Op. at 4253. The panel was mistaken. *See*, *e.g.*, 18 U.S.C. § 3771 (numerous rights of crime victims). The victim of a theft of privileged material clearly shares a greater interest with the government that the general public in maintaining the integrity of the privilege, investigating the crime, and redressing the theft.

In addition, despite uncontradicted evidence that the documents were disclosed pursuant to the government's agreement that it shared a common interest with the victims in investigating the theft, Writ Petition Exhibit 21 at 1470-71, ¶¶ 6-7, the panel held this agreement insufficient because the government had not yet agreed "to pursue sanctions against [the perpetrator]."[4] Op. at 4253. A common interest privilege, however, has often been recognized in situations where sharing privileged material is necessary in order to *investigate* a crime or a tort, as when private entities and the government "share a common interest in developing legal theories and analyzing information" in enforcement actions or where the private party is the victim of the conduct under investigation. *In re Steinhardt Partners L.P.*, 9 F.3d at 236. *See also Argenyi v. Creighton Univ.*, 2011 WL 3497489 at *2 (D. Neb. Aug. 10, 2011); *United States v. Gumbaytay,* 2011 U.S. Dist. LEXIS

---

[4] DC argued in the District Court and to the panel that government never agreed to maintain the documents as confidential. Neither court accepted this argument.

Case 2:10-cv-03633-ODW-RZ Document 412 Filed 05/07/12 Page 163 of 169
Case 1:11-cv-08441-CM-RLE Document 542 Filed 05/07/12 Page 29 of 35
Page ID #:25183

47142, Civ. A. No. 2:08cv573–MEF at *10–12 (M.D. Ala. Jan. 19, 2011); *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980); *Miller, Anderson, Nash, Yerke & Wiener v. U.S. Dept. of Energy*, 499 F. Supp. 767, 770-771 (D. Ore. 1980).

Indeed, one would ordinarily expect that when the theft at issue is of privileged material, both the crime victim and the government share a common interest in protecting the privilege. *Bittaker*, 331 F.3d at 721 (privilege "vital"); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (privilege promotes "broader public interests in the observance of law and administration of justice").

The Opinion offered no rationale for why such interests could not be shared, or why the government should be so restricted in reaching valid agreements to preserve the privilege of cooperating crime victims before deciding to prosecute.

Moreover, the protections afforded by the government here went *beyond* a common interest/confidentiality agreement. The documents were also subject to Federal Rule of Criminal Procedure 6(e)(2), which limits the government's ability to disclose matters occurring before a grand jury.[5] The government itself had warned that the mere disclosure of the subpoena could "impede the investigation

---

[5] The panel observed that documents produced prior to the grand jury hearing are not automatically barred from disclosure by Fed. R. Crim. P. 6(e). Op. at 4254 n.5 (citing *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1411 (9th Cir. 1993)). *Dynavac*, however, does not address otherwise privileged documents.

and interfere with the enforcement of the law" and that no such disclosure should be made "for an indefinite period of time." Thus there was no reasonable risk of disclosure at the time—or at any time before the government ultimately concluded its investigation and returned the documents to Petitioners, eliminating the risk of public disclosure through a criminal proceeding. Had the government initiated a prosecution, Petitioners could have sought a protective order at that time to limit the scope of any waiver to the criminal proceeding, without jeopardizing the investigation.

All of these safeguards run contrary to a broad voluntary waiver. In short, Petitioners had every reasonable expectation that disclosure to the government, for these limited purposes, would *not* constitute a waiver of the privilege as to the entire world.

The Opinion's broad conclusion that the victim of a crime shares no protectable common interest with law enforcement, and that waiver is mandatory despite an express confidentiality agreement to safeguard the privilege, also conflicts with the more cautious approach taken by other Circuit and District Courts, which have found that such agreements can preserve the attorney-client privilege. *See Dellwood Farms*, 128 F.3d at 1127 (waiver of privilege may be avoided "by obtaining an agreement by the person to whom they made the disclosure not to spread it further"); *In re Steinhardt Partners L.P.*, 9 F.3d at 236

(privilege not waived if there was an "explicit agreement that the [government] will maintain the confidentiality of the disclosed materials"); *Police & Fire Ret. Sys. v. Safenet, Inc.*, 2010 U.S. Dist. LEXIS 23196 at *7 (S.D.N.Y. Mar. 11, 2010) (rejecting waiver based on disclosure to the SEC pursuant to a confidentiality agreement, because "[t]here is a strong public interest in encouraging disclosure and cooperation with law enforcement agencies; [and] violating a cooperating party's confidentiality expectations jeopardizes this public interest"); *Maruzen Co. v. HSBC USA, Inc.*, 2002 U.S. Dist. LEXIS 13288, at *2 (S.D.N.Y. 2002) (maintaining privilege based on "explicit confidentiality agreements with the authorities"). The Eight Circuit has adopted an even broader rule allowing for selective waivers in disclosing privileged information to the government. *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977).[6] This conflict of authority provides yet a further reason for en banc review.

---

[6] The academic literature on this conflict of authority is exhaustive, demonstrating its broad significance. *See*, *e.g.*, Christopher T. Hines, *Returning to First Principles of Privilege Law: Focusing on the Facts in Internal Corporate Investigations*, 60 U. Kan. L. Rev. 33, 88 (2011). Congress has considered legislation to address it, but no bill has passed. The panel regarded this as relevant, Op. at 4250, however, the legislation in question did not address waiver as to crime victims, and its failure to pass (for any number of reasons) merely leaves the issue for ongoing development in the courts. *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 169-170 (2001) (cautioning against relying on "failed legislative proposals"); *United States v. Meek*, 366 F.3d 705, 719 (9th Cir. 2004) ("unadopted amendment" does not mean Congress rejected the underlying principle).

Much of the Opinion focuses on this conflict of authority involving *targets*. Other aspects of the Opinion focus on privilege in the abstract. Op. at 4249 ("selective disclosure does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance."), 4247 (if clients divulge information to third parties, "chances are that they would also have divulged it to their attorneys, even without the protection of the privilege."). Such statements have no persuasive force as applied to the victims of a theft of privileged materials. Clients are far less likely to engage in full and frank communications with their counsel if a theft of their privileged materials cannot be properly investigated/prosecuted without waiving their privilege.

The Opinion's unprecedented and draconian waiver rule as to the victim of a crime affords parties, the government and district courts no discretion, runs contrary to this Court's en banc decision in *Bittaker* and to other Circuit decisions, and is entirely unnecessary.

## V.    Conclusion

For all the reasons stated above, the numerous factual misstatements in the Opinion require correction, and the Court should grant either rehearing or rehearing en banc to address the Opinion's unprecedented waiver rule as it is of exceptional and far-reaching importance.

Dated: May 1, 2012               KENDALL BRILL & KLIEGER LLP

By: /s/ _____

Laura W. Brill
Attorneys for Defendants-Petitioners
Pacific Pictures Corporation, IP
Worldwide, LLC, IPW, LLC, and Marc
Toberoff

TOBEROFF & ASSOCIATES, P.C

_____

Marc Toberoff
Attorneys for Defendants-Petitioners,
Mark Warren Peary, as personal
representative of the Estate of Joseph
Shuster, Jean Adele Peavy, Joanne Siegel
and Laura Siegel Larson

## <u>CERTIFICATE OF COMPLIANCE</u>

In lieu of Form 11 (Circuit Rules 35-4 and 40-1), I certify that this oversized

petition is accompanied by a motion for leave to exceed the word limitation for

petition for rehearing and for rehearing en banc, and contains 6,339 words.  The

petition's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated:  May 1, 2012                    KENDALL BRILL & KLIEGER LLP


                        By:  /s/
                             _____
                             Laura W. Brill
                             Attorneys for Defendants-Petitioners
                             Pacific Pictures Corporation, IP
                             Worldwide, LLC, IPW, LLC, and Marc
                             Toberoff

# <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court.

Dated:  May 1, 2012                KENDALL BRILL & KLIEGER LLP


By: /s/ _____
Laura W. Brill
Attorneys for Defendants-Petitioners
Pacific Pictures Corporation, IP
Worldwide, LLC, IPW, LLC, and Marc
Toberoff