Marc Toberoff (State Bar No. 188547)
  *mtoberoff@ipwla.com*
Keith G. Adams (State Bar No. 240497)
  *kgadams@ipwla.com*
Pablo D. Arredondo (State Bar No. 241142)
  *parredondo@ipwla.com*
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Fax:         (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>            Plaintiff,<br><br>    vs.<br><br>PACIFIC PICTURES CORPORATION;<br>IP WORLDWIDE, LLC; IPW, LLC;<br>MARC TOBEROFF, an individual;<br>MARK WARREN PEARY, as personal<br>representative of the ESTATE OF<br>JOSEPH SHUSTER; JEAN ADELE<br>PEAVY, an individual; LAURA<br>SIEGEL LARSON, individually and as<br>personal representative of the ESTATE<br>OF JOANNE SIEGEL,<br>and DOES 1-10, inclusive,<br><br>            Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF MARC TOBEROFF IN SUPPORT OF DEFENDANTS' *EX PARTE* APPLICATION FOR A PROTECTIVE ORDER REGARDING THE PRODUCTION OF "STOLEN DOCUMENTS"**<br><br>Complaint filed: May 14, 2010<br>Trial Date: None Set<br><br>Proposed Hearing Date: May 11, 2012<br>Proposed Hearing Time:10:00 a.m<br>Courtroom: 540 |

## DECLARATION OF MARC TOBEROFF

I, Marc Toberoff, declare as follows:

1.     I am an attorney at the law firm of Toberoff & Associates, P.C., counsel of record for defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, in the above-captioned action, and submit this declaration in support of Defendants' *Ex Parte* Application For A Protective Order Regarding The Production Of "Stolen Documents" ("Application"). I am a member in good standing of the State Bar of California and am admitted to practice before this Court.

2.     Attached hereto as Exhibit "A" is a true and correct copy of an email exchange dated May 7 and May 8, 2012 between myself and Daniel Petrocelli, counsel for DC Comics.

3.     Attached hereto as Exhibit "B" is a true and correct copy of the Declaration of Marc Toberoff Pursuant to Magistrate Zarefsky's April 30, 2007 Order.

4.     Attached hereto as Exhibit "C" are true and correct copies of an online article entitled "Superman & 'The Toberoff Timeline Part II'" which was downloaded from http://ohdannyboy.blogspot.com/2012/04/superman-toberoff-timeline-part-ii.html on May 8, 2012.

5.     Attached hereto as Exhibit "D" is a true and correct copy of a portion of Warner Bros' official Twitter feed, which was downloaded from www.twitter.com/#!/warnerbrosent.com.  On this Twitter feed, Warner Bros. disseminates links to two articles covering this case, one entitled "Court Slams Ethics of Rival in Superman Copyright Case" and one entitled "Warner Bros. Wins Big Superman Ruling Against Creators, Can use key documents" to 143, 283 followers.

6.     Attached hereto as Exhibit "E" is a true and correct copy of an article entitled "O'Melveny's Sweeping Defeat of Dismissal Motion in Superman Suit On

Behalf of Warner Bros Receives Wide Media Coverage" which was downloaded from http://www.omm.com/newsroom/News.aspx?news=2195 on May 8, 2012.

7.    Attached hereto as Exhibit "F" is a true and correct copy of an article entitled "Superman Case Takes a Positive Turn For Warner Bros." which was downloaded from http://thelazygeeks.com/2012/04/18/superman-case-takes-a-positive-turn-for-warner-bros/ on May 8, 2012.

8.    Attached hereto as Exhibit "G" is a true and correct copy of an article entitled "What's In the Marc Toberoff – Superman Stolen Document?" which was downloaded from http://www.bleedingcool.com/2011/05/28/what%E2%80%99s-in-the-marc-toberoff-%E2%80%93-superman-stolen-document/ on May 8, 2012.

9.    Attached hereto as Exhibit "H" is a true and correct copy of an article entitled "Warner Brothers Wins Key Component In Superman Copyright Case" which was downloaded from http://sciencefiction.com/2012/04/18/warner-brothers-wins-key-component-in-superman-copyright-case/ on May 8, 2012.

10.    Attached hereto as Exhibit "I" is a true and correct copy of a webpage printed on May 8, 2012 from http://smallvilletalk.com/court-slams-ethics-of-warner-bros-rival-in-superman-copyright-case-deadline-com/

11.    Attached hereto as Exhibit "J" is a true and correct copy of the stipulated protective order entered and approved by the Court in *Siegel v. Warner Bros. Entertainment Inc.*, Case No. 04-CV-08400 ODW (RZx), at Docket No. 50.

12.    Other than the theft and disclosure to government of the stolen privileged documents under circumstances designed to keep these documents confidential, there was no other known disclosure of such privileged documents.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on May 9, 2012, at Malibu, California.

<u>    /s/ Marc Toberoff    </u>
Marc Toberoff

## Pablo Arredondo

| | |
|---|---|
| **From:** | Petrocelli, Daniel [DPetrocelli@OMM.com] |
| **Sent:** | Tuesday, May 08, 2012 8:44 PM |
| **To:** | 'mtoberoff@ipwla.com' |
| **Cc:** | Kline, Matthew; 'kgadams@ipwla.com'; 'parredondo@ipwla.com'; Seto, Cassandra |
| **Subject:** | Re: Re: |

Marc, I would need to know more about the document(s) that you claim contain sensitive medical information. Feel free to call Matt or me to discuss. Otherwise, we will oppose your ex parte application.

Dan

**From**: Marc Toberoff [mailto:mtoberoff@ipwla.com]
**Sent**: Tuesday, May 08, 2012 08:13 PM
**To**: Petrocelli, Daniel
**Cc**: Kline, Matthew; Keith Adams <kgadams@ipwla.com>; Pablo Arredondo <parredondo@ipwla.com>; Seto, Cassandra
**Subject**: Re: Re:

Dan:

As I said below, I have yet to hear back from you or Matt Kline on the reasonable procedure I proposed, which would permit defendants to provisionally designate documents as confidential and place the burden on defendants to seek a protective order as to such documents under an expedited schedule, while avoiding at the same time burdening Magistrate Zarefsky with an ex parte application.

If DC is unwilling to agree to this simple procedure, Defendants will have no other option but to bring a Local Rule 7-19.1 ex parte application tomorrow, Wednesday, May 9, 2012, seeking a protective order requiring that DC's counsel keep such documents confidential, that their use be restricted to this case and any related case, and that any filing of such documents be made under seal.

As to why such documents are confidential, the reasons vary depending on the document in question and include, but are not limited to, sensitive medical information; personal  information; and candid opinions that could cause unnecessary embarrassment or annoyance and were made with the expectation of privacy.  Given the media attention that this case has attracted, a protective order is warranted.

Marc

On Tue, May 8, 2012 at 2:57 PM, Marc Toberoff <mtoberoff@ipwla.com> wrote:
Dan:

As is clear from my e-mail, I am not interested in debating your contentions either, but I would like a straight answer to the reasonbale procedure I proposed which would avoid the necessity of burdening the Court with an *ex parte* application this week while our motion to the Ninth Circuit is pending.

Marc

On Tue, May 8, 2012 at 2:45 PM, Petrocelli, Daniel <DPetrocelli@omm.com> wrote:

1

**EXHIBIT A-3**

Marc, I returned your call this morning and left a message with your assistant.   If you call back and I am not available, please feel free to talk to Matt Kline.

As for our email exchange below, I see no reason to engage in needless debate.  As I said, if you can identify any basis for confidentiality other than the rejected claims of privilege, we would be happy to re-consider our position.

Please include this email correspondence in any filing related to this issue.

Many thanks.

Dan

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Tuesday, May 08, 2012 11:34 AM
**To:** Petrocelli, Daniel
**Cc:** Seto, Cassandra; Keith Adams; Pablo Arredondo
**Subject:** Re:

Dan:

We disagree with the many erroneous factual contentions in your May 7 email below .

Nonetheless, in the event that the Ninth Circuit denies defendants' motion for a stay (we will be asking for a decision by May 11, 2012), and does not otherwise stay the production, we suggest a compromise wherein we produce the stolen privileged documents, designated and marked "confidential," and that DC provisionally treat the documents as "confidential" pursuant to a stipulated schedule, during the pendency of a motion for a protective order before Magistrate Judge Zarefsky, regarding any disputed confidentiality designation.

We propose that parties meet-and-confer as to any "confidential" designations DC objects to by no later than May 15, 2012, that defendants would serve their portion of any joint stipulation for a protective order as to such document(s) by no later than May 18, 2012, and we would also stipulate to an expedited hearing. We are amenable to reviewing any alternative expedited schedule that you may propose.

This way the parties follow a more orderly process and avoid unnecessarily burdening Magistrate Judge Zarefsky with an ex parte application this week while the matter of the stay is still pending before the Ninth Circuit.

I look forward to your thoughts.

**EXHIBIT A-4**

Sincerely,

Marc Toberoff

On Mon, May 7, 2012 at 4:02 PM, Petrocelli, Daniel <DPetrocelli@omm.com> wrote:

Marc, after this morning's court hearing and thereafter by telephone, you asked if DC would agree to treat as confidential pursuant to the stipulated protective order in the related Siegel case the documents defendants have been ordered to produce by noon this Friday.   I am reminded that in addition to your resisting agreement on a protective order in this case for over a year, you declined to agree to treat these very documents as confidential when, after receiving the Ninth Circuit's decision a couple of weeks ago, we suggested it as an approach to avoid further litigation over your continued efforts to maintain the stay.  You likewise elected not to agree to such an approach in the course of briefing and argument of our ex parte application to terminate the stay, which the Magistrate granted this morning.  In any event, now that the Court has ruled that DC is entitled to the documents without further delay and having now reviewed the Siegel stipulation, we cannot agree to stipulate to treat the documents as confidential.  In view of the judicial decisions of the Magistrate, District Court, and Ninth Circuit all rejecting defendants' assertion of privilege, there is no remaining justification for treating these documents as confidential.  In addition, many of the documents -- such as the correspondence with the USAO and documents related to business dealings -- were never privileged in the first place.  If you can identify a basis for confidentiality other than the rejected claims of privilege, I would be willing to re-consider our position.

You also indicated in our telephone call that defendants planned to imminently file both an emergency application with the Ninth Circuit to overturn today's order terminating the stay and an ex parte application to the Magistrate for a protective order regarding the documents at issue.  In our view, both applications are unwarranted.  We will oppose them.

Dan

--
**Marc Toberoff**
Toberoff & Associates, PC
22337 Pacific Coast Highway, # 348
Malibu, CA 90265
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

**EXHIBIT A-5**

--
**Marc Toberoff**
Toberoff & Associates, PC
22337 Pacific Coast Highway, # 348
Malibu, CA 90265
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com


--
**Marc Toberoff**
Toberoff & Associates, PC
22337 Pacific Coast Highway, # 348
Malibu, CA 90265
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

**EXHIBIT A-6**

1 | Marc Toberoff (CA State Bar No. 188547)
  | Nicholas C. Williamson (CA State Bar No. 231124)
2 | LAW OFFICES OF MARC TOBEROFF, PLC
  | 2049 Century Park East, Suite 2720
3 | Los Angeles, CA 90067
  | Telephone: (310) 246-3333
4 | Facsimile: (310) 246-3101

5 | Attorneys for Plaintiffs and Counterclaim Defendants
  | JOANNE SIEGEL and LAURA SIEGEL LARSON

6

7 | **UNITED STATES DISTRICT COURT**

  | **CENTRAL DISTRICT OF CALIFORNIA**
8

9  | JOANNE SIEGEL, an individual; and        Case Nos.:
10 | LAURA SIEGEL LARSON, an                  CV 04-08400 SGL (RZx)
   | individual,                               CV 04-08776 SGL (RZx)
11 |              Plaintiffs,
12 |        vs.                                [Hon. Stephen G. Larson, U.S.D.J.]
   |                                           [Hon. Ralph Zaresky, U.S.M.J.]
13 | TIME WARNER INC., a corporation;
14 | WARNER COMMUNICATIONS              **DECLARATION OF MARC**
   | INC., a corporation; WARNER         **TOBEROFF PURSUANT TO**
15 | BROS. ENTERTAINMENT INC., a         **MAGISTRATE ZAREFSKY'S**
   | corporation; WARNER BROS.           **APRIL 30, 2007 ORDER**
16 | TELEVISION PRODUCTION INC.,
17 | a corporation; DC COMICS, a general
   | partnership; and DOES 1-10,
18 |
19 |              Defendants.

20 | DC COMICS,
21 |
22 |              Counterclaimant,
   |        vs.
23 |
24 | JOANNE SIEGEL, an individual; and
   | LAURA SIEGEL LARSON, an
25 | individual,
26 |
27 |              Counterclaim Defendants.
28 |

Declaration Of Marc Toberoff

45

**EXHIBIT B-7**

I, Marc Toberoff, declare as follows:

1.    I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration pursuant to Magistrate Zarefsky's order at the April 30, 2007 hearing ("Order") on defendants' motion to compel the production of documents stolen from my law offices ("Documents"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.    Pursuant to the Order, I have accounted for each of the Documents as bate stamped by John Quinn, Esq. (designated by "Q") and identified by bates numbers the Documents produced to defendants by Plaintiffs or third party witnesses, as applicable, or listed in a privilege log furnished to defendants by Plaintiffs and/or such third parties:

| | |
|---|---|
| Q 0001- 7 | Un-dated defamatory cover letter |
| Q 0008-9 | Plaintiffs' Kevin Marks ("Marks") Privilege Log # 325 |
| Q 0010 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0011-13 | Produced by Plaintiffs- 000001888-90 |
| Q 0014-18 | Produced by IPW, LLC- 17-20 |
| Q 0019-20 | Produced by Plaintiffs- 000001883-1884 |
| Q 0021-24 | Produced by Pacific Pictures Corporation.- 00001- 4 |

1

Declaration Of Marc Toberoff

46

**EXHIBIT B-8**

| | |
|---|---|
| Q 0025 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0026 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0027-33 | Plaintiffs' supplemental privilege log # 82 |
| Q 0034-35 | Produced by Jean Peavy and Warren Peary ("Shusters")-142-43 |
| Q 0036-39 | Produced by Shusters- 125-28 |
| Q 0040 | Attorney Don Bulson ("Bulson") privilege log #319 |
| Q 0041 | Produced by Shusters- 119 |
| Q 0042-50 | Produced by Shusters-113- 118 |
| Q 0051 | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |
| Q 0052 | Variety.com article by Claude Brodesser; not in Plaintiffs' file. |
| Q 0053-54 | Produced by Shusters-140-141 |
| Q 0055-56 | Produced by Shusters- 138-139 |
| Q 0057-58 | Bulson privilege log # 327 |
| Q 0059-74 | Produced by Shusters- 63-78 |
| Q 0075-76 | Bulson privilege log # 327 |
| Q 0077-81 | Produced  by Shusters- 79- 83 |
| Q 0082-85 | Produced by Shusters- 105- 108 |
| Q 0083-85 | Produced by Shusters- 106 |
| Q 0086 | Produced by Plaintiffs- 000002050 |

2

**EXHIBIT B-9**

| Q 0087-0089 | Plaintiffs' supplemental privilege log # 69 |
| Q 0090-95 | Plaintiffs' supplemental privilege log # 76 |
| Q 0096-104 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0105-127 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0128-31 | Plaintiffs' supplemental privilege log # 98 |
| Q 0132-37 | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0138-45 | Plaintiffs' supplemental privilege log # 79 |
| Q 0146-51 | Plaintiffs' supplemental privilege log #80, 81 |
| Q 0152-57 | Plaintiffs' supplemental privilege log #80, 81 |
| Q 0158-63 | Plaintiffs' supplemental privilege log #82, 83 |
| Q 0164- 171 | Plaintiffs' supplemental privilege log # 182 |
| Q 0172-175 | Plaintiffs' supplemental privilege log # 181 |
| Q 0176-94 | Shusters' supplemental privilege log # 2 |
| Q 0195-199 | Shusters' supplemental privilege log # 3 |
| Q 0200 | Shusters' supplemental privilege log # 5 |
| Q 0201-222 | Shusters' supplemental privilege log # 4 |
| Q 0223 | Produced by Shusters- 103 |
| Q 0224-42 | Shusters' supplemental privilege log # 4 |
| Q 0243-44 | Shusters' supplemental privilege log # 9 |
| Q 0245-49 | Produced by Shusters- 79-83 |

3

Declaration Of Marc Toberoff

**48**

**EXHIBIT B-10**

| | |
|---|---|
| Q 0250-254 | Plaintiffs' supplemental privilege log # 98 |
| Q 0255-273 | Shusters' supplemental privilege log # 2 |
| Q 0274-5 | Shusters' supplemental privilege log # 8 |
| Q 0276 | Shusters' supplemental privilege log # 6 |
| Q 0277 | Shusters' supplemental privilege log # 7 |
| Q 0278 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August 13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0279-80 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0281-82 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0283 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0284 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0285-289 | Privileged communication between Law Offices of Marc Toberoff and Plaintiffs Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0290-0296 | Un-dated defamatory cover letter (duplicate) |
| Q 0297-299 | Produced by Plaintiffs- 000001888-90 |
| Q 0300 | Wall Street Journal article by John Lippman; not in Plaintiffs' file. |
| Q 0301-303 | Produced by Pacific Pictures Corp- 1-4 |
| Q 0304-305 | Produced by Shusters- 142-143 |

4

Declaration Of Marc Toberoff

49

**EXHIBIT B-11**

| | |
|---|---|
| Q 0306-309 | Produced by Shusters- 125- 128 |
| Q 0310-13 | Plaintiffs' supplemental privilege log #175 |
| Q 0314 | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0315 | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0316-23 | Plaintiffs' supplemental privilege log # 79 |
| Q 0324-32 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0333-35 | Plaintiffs' supplemental privilege log # 69 |
| Q 0336-340 | Produced by IPW, LLC 17- 20, Plaintiffs- 000001882 |
| Q 0341-42 | Produced by Plaintiffs- 000001883-84 |
| Q 0343-44 | Produced by Plaintiffs- 000002048-49 |
| Q 0343-44 | Produced by Plaintiffs- 000002048-9 |
| Q 0345-50 | Plaintiffs' supplemental privilege log # 76 |
| Q 0351 | Variety.com article by Claude Brodesser; not in Plaintiffs' file. |
| Q 0352 | Bulson privilege log # 319 |
| Q 0353-360 | Plaintiffs' supplemental privilege log # 182 |
| Q 0361 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. |
| Q 0362-63 | Produced by Shusters- 140-41 |

5

**50**

**EXHIBIT B-12**

| 1 | Q 0364-382 | Shusters' supplemental privilege log #2 |
| 2 | Q 0383-87 | Shusters' supplemental privilege log #3 |
| 3 4 | Q 0388-93 | Plaintiffs' supplemental privilege log #80, 81 |
| 5 | Q 0394-399 | Plaintiffs' supplemental privilege log #82, 83 |
| 6 | Q 0400-01 | Bulson privilege log # 327 |
| 7 8 | Q 0402-408 | Shusters' privilege log # 9 |
| 9 | Q 0409-424 | Produced by Shusters- 63-78 |
| 10 | Q 0425-29 | Plaintiffs' supplemental privilege log # 98 |
| 11 12 | Q 0430-52 | Plaintiffs' supplemental privilege log # 77, 78 |
| 13 | Q 0453-71 | Shusters' supplemental privilege log # 2 |
| 14 | Q 0472-76 | Shusters' supplemental privilege log # 3 |
| 15 16 | Q 0477-82 | Plaintiffs' supplemental privilege log # 80 |
| 17 | Q 0483-88 | Plaintiffs' supplemental privilege log # 82, 83 |
| 18 | Q 0489-90 | Bulson privilege log # 327, 328 |
| 19 20 | Q 0491-95 | Produced by Shusters- 79-83 |
| 21 | Q 0496-99 | Plaintiffs' supplemental privilege log # 98 |
| 22 | Q 0500-1 | Shusters' supplemental privilege log # 8 |
| 23 24 | Q 0502-05 | Produced by Shusters- 105-08 |
| 25 | Q 0506-30 | Shusters' supplemental privilege log # 5 |
| 26 | Q 0531-32 | Produced by Shusters- 138-139 |
| 27 28 | Q 0533-46 | Shusters' supplemental privilege log # 4 |

6

Declaration Of Marc Toberoff

51

**EXHIBIT B-13**

| | |
|---|---|
| Q 0547 | Produced by Plaintiffs- 000002050 |
| Q 0548 | Shusters' supplemental privilege log # 6 |
| Q 0549 | Shusters' supplemental privilege log # 7 |
| Q 0550 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August 13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0278). |
| Q 0551-52 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0553-4 | 8/11/05 litigation letter from David Burg to M. Toberoff |
| Q 0555 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0556 | 8/12/05 litigation letter from M. Toberoff to David Burg |
| Q 0557-61 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0285-289) |
| Q 0562-569 | Un-dated defamatory cover letter (duplicate) |
| Q 0570-72 | Produced by Plaintiffs- 000001888-90 |
| Q 0573-74 | Produced by Plaintiffs- 000001883-84 |
| Q 0575-76 | Produced by Plaintiffs- 000002048-49 |
| Q 0577-80 | Produced by Shusters- 125-128 |
| Q 0581-582 | Produced by Shusters- 142-143 |
| Q 0583-586 | Produced by Shusters- 125-128 |

7

Declaration Of Marc Toberoff

**EXHIBIT B-14**

| | | |
|---|---|---|
| Q 0587 | | Internet listing for Pacific Pictures Corp. from California Business Portal; not in Plaintiffs' files. |
| Q 0588 | | Internet listing for Pacific Pictures Corp. from New York Department of State; not in Plaintiffs' files. |
| Q 0589- 596 | | Plaintiffs' supplemental privilege log # 79 |
| Q 0597- 0605 | | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0606- 0609 | | Plaintiffs' supplemental privilege log # 175 |
| Q 0610-0617 | | Plaintiffs' supplemental privilege log # 182 |
| Q 0618 | | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated October 10, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0361). |
| Q 0619-20 | | Produced by Shusters- 140-141 |
| Q 0621-23 | | Plaintiffs' supplemental privilege log # 69 |
| Q 0624-28 | | Produced by IPW, LLC- 17- 20; Produced by Plaintiffs- 000001882 |
| Q 0629-0634 | | Plaintiffs' supplemental privilege log # 76 |
| Q 0635 | | Bulson privilege log # 318 |
| Q 0636- 654 | | Shusters' supplemental privilege log # 2 |
| Q 0655-659 | | Shusters' supplemental privilege log # 3 |
| Q 0660-65 | | Plaintiffs' supplemental privilege log # 80, 81 |
| Q 0666-71 | | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0672-73 | | Bulson's privilege log # 327, 328 |

8

Declaration Of Marc Toberoff

**53**

| | |
|---|---|
| Q 0674-680 | Shusters' supplemental privilege log # 9 |
| Q 0681-696 | Produced by Shusters- 63- 78 |
| Q 0697-701 | Plaintiffs' supplemental privilege log # 98 |
| Q 0702-724 | Plaintiffs' supplemental privilege log # 77, 78 |
| Q 0725-743 | Shusters' supplemental privilege log # 2 |
| Q 0744-748 | Shusters' supplemental privilege log # 3 |
| Q 0749- 754 | Plaintiffs' supplemental privilege log # 80, 81 |
| Q 0755-760 | Plaintiffs' supplemental privilege log # 82, 83 |
| Q 0761-762 | Bulson privilege log # 327, 328 |
| Q 0763-767 | Produced by Shusters- 79-83 |
| Q 0768-771 | Plaintiffs' supplemental privilege log # 98 |
| Q 0772-773 | Shusters' supplemental privilege log # 8 |
| Q 0774-777 | Produced by Shusters- 105- 108 |
| Q 0778-802 | Shusters' supplemental privilege log # 5 |
| Q 0803-804 | Produced by Shusters 138-39 |
| Q 0805-823 | Shusters' supplemental privilege log # 4 |
| Q 0824 | Produced by Plaintiffs- 000002050 |
| Q 0825 | Shusters' supplemental privilege log #6 |
| Q 0826 | Shusters' supplemental privilege log #7 |
| Q 0827 | Privileged communication between Law Offices of Marc Toberoff and Plaintiff Laura Siegel Larson dated August |

9

**EXHIBIT B-16**

13, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0278).

Q 0828-29       8/11/05 litigation letter from David Burg to M. Toberoff

Q 0830-31       8/11/05 litigation letter from David Burg to M. Toberoff

Q 0832          8/12/05 litigation letter from M. Toberoff to David Burg

Q 0833          8/12/05 litigation letter from M. Toberoff to David Burg

Q 0836-38       Privileged communication between Law Offices of Marc Toberoff and Plaintiffs Laura Siegel Larson and Joanne Siegel dated August 12, 2005, after the start of this litigation. This document is *not* required to be listed in a privilege log pursuant to the parties' standing agreement. (Duplicate of Q 0285-289)

Q 0839          Wall Street Journal article by John Lippman; not in Plaintiffs' file.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on May 21, 2007 in Los Angeles, California.

_____
Marc Toberoff

Declaration Of Marc Toberoff                                    55

**EXHIBIT B-17**

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On May 21, 2007, I served the attached documents described as **DECLARATION OF MARC TOBEROFF PURSUANT TO MAGISTRATE ZAREFSKY'S APRIL 30, 2007 ORDER** as follows:

[X] :<u>BY FACSIMILE</u>:

As follows: I caused the transmission of the above named documents to the fax number set forth below, or on the attached service list.

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Facsimile No. 212-813-5901

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Facsimile No. 845-265-2819

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile No. 310-550-7191

[X] :<u>BY MAIL</u>:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. I placed _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

56

**EXHIBIT B-18**

1          :(STATE) - I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

2

[X]  :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at
3    whose direction the service was made.

4          I declare under penalty of perjury that the foregoing is true and correct.

5          EXECUTED on May 21, 2007, in Los Angeles, California.

6

7                                                    _____
                                                     Nicholas C. Williamson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B-19**



Share   Report Abuse   Next Blog»                                        Create Blog   Sign In

# 20th Century Danny Boy

Controversial! Fun And Also Games! First Comic Book related blog to be featured in the National Library's Pandora' archive. Even 'A Current Affair' get in on the act. Home Of The Books 'Andru & Esposito: Partners For Life', Jim Mooney' and the forthcoming 'Newton Comics'. The Spectacular Rise And Amazing Fall. I'm also a committee member of the Inkwell Awards - I'm more famous outside of Australia...weirdly enough.

Monday, April 23, 2012

## Superman & The "Toberoff Timeline" Part II



Now that the Ninth Circuit has ruled that documents contained in the 'Toberoff Timeline' can be introduced into the DC Comics vs Pacific Pictures case, things will begin to get far more interesting.  To summarise the situation, in June 2011 I wrote, "On May 10, 2010, a suit was filed detailing the exact carve up of the potential non-DC Superman copyright. Whereas the carve up was, originally, 50% to the Siegels and 50% to the Shuster estate, the reality is that it's now completely different.  The suit detailed who now owns what and featured a detailed time-line which had the DC lawyers running to file.  The document that launched it all is called the "Superman – Marc Toberoff Timeline" and was prepared by an ex-employee of Toberoff, and submitted to DC in 2008. According to the court filing, Toberoff, "...asserted to the federal court that it was privileged, but his position was rejected," which meant that the timeline was now able to be studied in detail. And the document is damning, detailing as it does a series of Machiavellian moves that now sees Toberoff own 47.5% of the non-DC Superman copyright, against the Siegel Heirs, who own 27.5% and the Shuster Heirs, who own 25%. Thus the real winner in this case is the Siegels, or the Shusters, but rather Marc Toberoff, who will cash in with his 47.5% of the copyright and all monies to be awarded, plus future earnings, plus more money for his work on behalf of the Siegels. In short Toberoff, already a very rich man, will become even richer for pursuing a lawsuit, purportedly on behalf of the Siegels, but all the time with the full knowledge, and initial non-disclosure, that he would be benefiting more."

Now it remains to be seen if the documents in the Timeline will be introduced into the public record, of it they'll be subject to confidentiality - there'll be no doubt that they'll be redacted at some point.  Having said that there are some documents and letters that are mentioned in the Timeline that we do have access to.  These are as follows:  first up, the Toberoff Timeline itself.

Spod and Gimes were behind the fire that burned in the chemical's year. (Page 325)

## SUPERMAN – MARC TOBEROFF TIMELINE

*Please read closely.  We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, — if not ultimately disbarred — from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that; he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can.  And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation.  We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights.   Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.



PANDO
20th Century D
Australia


BLAQ
Visit Our Store


Th

Cov

Compiled. ed

F

Downlo

i

EXHIBIT C-20

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Joan Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" — that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2





EXHIBIT C-21



The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself *the Siegels' attorney of record while he* solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double *violation* of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%, Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 – MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel.

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light billionaire MT's utter lack of opening a

3

Links Of Intere

Adelaide Comi

Alan Kupperbe

Armando Gil

Brian Postman

Dave Simons

Inkwell Awards

Norm Breyfogl

Rich Buckler

Trevor Von Ee

Follow by Ema

SHARE

Blogs Worth R
Wanna Be Hen

Mayerson
Sheridan A
6 hours ago

Big Glee!
The History
Special Fea
7 hours ago

Those Fab
11 hours ago

Mike Sterl
Oh, nothing
playing fam
11 hours ago

A Distant :
05/08/2012

**EXHIBIT C-22**

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.  Also that MT has not even made contact with Time Warner.  Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. STATUE OF LIMITATIONS is coming close up for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.  MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California. Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest.  Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated at *all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything else other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael — MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, but *MT has failed to disclose this.*  The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft —— in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights," (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately —— not for the exploitation of rights as he initially asserted, but to gain an unconscionable fee from a very large possible settlement with Time** Warner.

August 7, 2003 —— Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 —— Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN _PERSONALLY_ BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.  He is trying to get Michael to lower the price.

MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.  In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*."  MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.

Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.

October 2, 2004 — MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.  MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.***** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case. MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).  According to the settlement amount, he received an unconscionable 50% contingency fee.

6

20th Century Danny Boy: Superman & The "Toberoff Timeline" Part II                    Page 7 of 33

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held.   It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million).  He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak.  MT did it himself to attract more business in town.  At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.

And lastly, MT is charging 50% in another Allison Giannini case involving real estate.  The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

******************

cc:    Alan F. Horn
       Jeff Robinov
       John Schulman
       Patti Connolly

Pubisher

Dynamic Duo (
Shop

Arnold Height

The Oracle Of

Let's Speak Gos

Haunted Austr

The Goodies

The Silent Film

American Lync

Hollywood Los
Scream

Popular Posts



handed down a
Marvel (Ghost
full amount, .

New York Scar
Be warned - re
why - we've be
people who res



of the more un



can't climb tree





who collects ar



after spending



money would b



Depending on



7

As you'd be able to see, the Timeline paints a damning picture of what Marc Toberoff is alleged to have done in his pursuit of the Superman copyright. Toberoff has denied all of the allegations, claiming that the lawyer who is reported to have stolen the documents, prepared the Timeline and presented it to the DC Comics lawyers was attempting to discredit him with the view of luring Joanne and Laura Siegel away from Toberoff and representing them himself.   What is known, mainly due to Laura Siegels depositions (which you can read in their entity in The Trials Of Superman, Vol II, link opposite this posI), is that Michaels contacted the Siegels in 2005 and informed them that he had documentation explaining their case.  The Siegels met with Michaels, as Laura stated, "...we were curious  We wanted to know what this guy had to say"  The crux of the meeting soon became apparent  again, from Laura Siegel's deposition, " ..when he was at the meeting and then in this follow-up e-mail that he sent to us that it was a bold attempt on his part to steal my mom and I away from Mr. Toberoff as clients, and he wanted us to sign with him for him to be our attorney."  Later Laura went a step further, "On his way out the door he turned and said, "I've got an idea. You know, why don't you guys just, you know, come with me and I'll introduce you to another firm"

After the meeting Michaels and the Siegels corresponded by email  during that time the Siegels told Michaels that they did not want to hire him.  As Laura again explained, "It was -- it was like -- first of all, we were shocked because we thought it was pretty outrageous, and, you know, we felt that he had, you know, come -- come in to talk to us under false pretences. But he was -- he was on the way out the door, and my mom and I, you know, didn't have to kick him out because he was already leaving, but, you know, we wanted to talk about it afterwards and figure out what had just happened.  My mom and I said we didn't have a good feeling about it  you know, but we just -- we wanted to, you know, to kind of think, just as we do about everything, think about things, talk about things, and what could this guy's motivations possibly be."  During the email exchange Michaels presented the Siegels with a letter that he wanted them to sign, stating that they were firing Toberoff due to 'unconscionable fees'.  At this point they contacted Toberoff and told him of the encounter - or so it is claimed.

The main point of interest surrounding the Timeline is an exchange of letters between Michael and Laura Siegel.  Clearly there was some bad blood between Michael and Joanne and Laura Siegel, and one of the bones of contention was Superman and Toberoff.  Michael had been attempted to sell his portion of the Superman trademark and, through his own lawyer, Marc Toberoff approached him with an offer from an agent, Ari Emanuel, who was either portrayed as being an 'un-named billionaire' or a mere 'investor'  Negotiations went nowhere with Michael asking too much and the investor offering too little.  Once Toberoff began to represent Joanne and Laura Siegel, negotiations fell through.  Michael Siegel's letter was described in the Toberoff Timeline as a warning to Laura and Joanne.

EXHIBIT C-26

20th Century Danny Boy: Superman & The "Terror Timeline" Part II                    Page    of 33

Recent Comme

Michael Siegel

Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives would throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contract if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have had disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

This procedure has taken way too long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for years at a time. I want a united Siegel interest, but I might be forced to act on my own. I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

*Michael*

Laura, described Michael in her deposition as such, "Michael was the child of a very upsetting divorce, and he -- you know, it hurts me to have to say this, but, you know, he was a very kind of confused guy and he really kind of couldn't keep things straight. It was very difficult to communicate with him, and it was very upsetting to receive communications from him that were kind of all over the place, things that didn't really make any sense, and he was very secretive, and he just couldn't really grasp legal principles. So discussions with -- directly with him really didn't work. It really required attorneys to explain things to him, and that's why he had his own attorney, who was, of course, interpreting things, you know, for Michael and explaining things to him. But he didn't -- he didn't have any -- any background in understanding the history of, you know, the Superman litigations or - you know." With that in mind Laura responded to his letter as such, and this is the letter that DC have fought to introduce to the court for nearly two years now

Twitter Updat

- Question:
  their own
  makes me
  amount of

- Now the f
  around the
  WANKER

- @LittleRe
  folk, he m
  about 6 hou

- @LittleRe
  hes slow a
  around tra



86,104
30 Aug 20
ClustrMaps

THE COPYRIC

All characters,
companies and

All material © t
otherwise note

All written and
Best, with exc
from other auth
reprinted or lift
or any means
of the author o

Website © 200
Don't say you
listen.

Paste

Comment

What? You Mi
Archive, Same

▼ 2012 (461

Laura Siegel Larson

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
-It was a bogus offer filled with unacceptable land mines.
-They wanted us to <u>warrant we had no rights</u> which is completely false.
-They insisted on a deal that included characters that had nothing to do with Superman.
-They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
-They even wanted us to sign away the public domain rights we'd one day have.
-As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
-It was a bad and unreasonable deal.


This work is lic...
Licence.

EXHIBIT C-28

-You and Don Bulson stated that you couldn't believe how bad the document was that they
    had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were
    unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use
    every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
    losing it.
-They want to make an example of us so that other creators and their heirs won't go after
    their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
    reacquire rights as we have via Terminations. Then the Shusters would have to
    negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the
    earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
    deal. You'll remember that you, Don Bulson and we were shocked when Kevin
    Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
    and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer
    and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Case 2:10-cv-03633-ODW-RZ     Document 420-1     Filed 05/09/12     Page 31 of 64     Page
ID #:25298
20th Century Danny Boy: Superman & The "Theft of a Timeline" Part II          Page 11 of 33

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

EXHIBIT G-30

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

Why I think any investor would offer less than Time Warner did in its last offer:
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to me to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

Your belief that you have something to sell independently:
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

EXHIBIT C-31

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

                                                            Sincerely,

                                                            *Laura*

                                                            Laura


Enclosure


The letter was followed up by a claim for monies owed by Michael Siegel for his share of litigation undertaken on his behalf by Marc Toberoff.

EXHIBIT C-32

20th Century Danny Boy: Superman & The "Imperfect Timeline" Part II                    Page 14 of 33

LAW OFFICES OF
**MARC TOBEROFF**

July 16, 2003

Via facsimile: 216-621-6165 and US Mail

Don W. Bulson, Esq.
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Ave., 19th Floor
Cleveland, Ohio 44115

Dear Don:

On April 16, 2003, Joanne and Laura Siegel submitted the following documents to
Michael Siegel:

1. Money Advanced By Joanne Siegel On Behalf Of The Jerry Siegel Family Through
October 17, 2000.

2. Money Advanced By Laura Siegel Larson On Behalf Of The Jerry Siegel Family
Through October 17, 2000.

3. Money Advanced By Joanne Siegel On Behalf Of The Jerry Siegel Family October
18, 2000 Through October 2002.

4. Money Advanced By Joanne Siegel On Behalf Of The Jerry Siegel Family October
18, 2000 Through October 2002.

On November 8, 2002, Joanne advanced $4,000 on behalf of the Siegel interest
to the Register of Copyrights. This was the filing fee for an additional Termination of
prior transfers of copyright for Superboy. The Register of Copyright Office was slow in
its processing and the cancelled check has only recently been returned to Joanne by her
bank. A copy of the check is enclosed. Michael Siegel's 25% of this fee is $1,000. This
should be added to the $165.67 Michael owed Joanne per the proof submitted in April,
2003 bringing the total Michael owes Joanne to $1,165.67. The amount Michael owes to
Laura remains $1,035.12.

These amounts will be deducted from the funds being held in trust for Michael
Siegel and the balance will be forwarded to you once you have reviewed the April
accounting and the parties execute the settlement referenced by me in my prior
correspondence on this matter. As of today, I have still not heard from you regarding the
April accounting.

I look forward to hearing from you. Please feel free to contact me with any questions
regarding the above.

Very truly yours,

Marc Toberoff

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101

The April accounting was exhaustive. Naturally this didn't make Michael Siegel happy at all. In effect he'd been told that the deal for his share had fallen through and he could not make another deal unless it was to a third party monitored by Marc Toberoff. As for the investor, here's the correspondence from Michael Siegel's lawyer, Don Bulson, to Toberoff regarding that deal:

LAW OFFICES
**RENNER, OTTO, BOISSELLE & SKLAR, LLP**
1621 EUCLID AVENUE, NINETEENTH FLOOR
CLEVELAND, OHIO 44115-2191
TEL: (216) 621-1113  FAX: (216) 621-6165
Email: MailRoom@RennerOtto.com

June 18, 2003

Via facsimile (1 page)
310-246-3101
No confirmation

Marc Toberoff, Esq.
10th Floor
9701 Wilshire Boulevard
Beverly Hills, CA 90212

Re:    Michael Siegel

Dear Marc:

I have discussed with Michael the offer you passed on from a potential investor
who is interested in purchasing Michael's interest in the Superman copyright.  The
amount offered is not acceptable to Michael.

Michael would be willing to entertain an offer that will pay him $200,000/year for
the rest of his life, with a guaranteed minimum of 10 years.  This could be structured as
a guaranteed annuity or otherwise, with the hope of minimizing taxes while assuring
that such payments will be made when due.

Contrary to what I had mentioned during one of our telephone conversations,
Michael is 59.

Please let me know if this proposal is of interest to your potential investor.

Very truly yours,

Don W. Bulson

DWB/jam

EXHIBIT C-33

20th Century Danny Boy: Superman & The "Terror Timeline" Part II                    Page 15 of 33

LAW OFFICES OF
**MARC TOBEROFF**

August 6, 2003

Via facsimile: (216) 621-6165 and US Mail

Don Bulson, Esq.
Renner, Otto, Boiselle & Sklar, LLP
1621 Euclid Ave., 19th Floor
Cleveland, OH 44115-2191

Re: Michael Siegel

Dear Don:

I had a high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegel's long awaited June 18, 2003 counter-offer regarding a buy-out.

The lowest price for such an annuity was **$3,476,727** (feel free to check this out).

The net present value of the last Warner Bros. ("WB") offer is between $1.5 - $1.6 million (depending on how conservative one is in one's choice of the interest rate in calculating net present value).

Michael's counter-offer was therefore well over twice (210%) the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB offer, rejected by the Siegel's.

It was therefore not surprising that the investor rejected your counter-offer as unrealistic. The counter-offer was so high that it may have scared away a strong potential investor (exactly what I mentioned when I asked you whether you were sure that I should communicate such a high counter-offer).

As previously explained any investor would see the obvious risks of this transaction and want to come in somewhere lower than the WB offer as a hedge or buffer against the risks of this investment (even though there is no guarantee that the Siegel's will ever settle with Warner Bros.).

To the extent you and Michael are not already aware of this, any investor will view the risks as follows:

1. Risk of costly drawn-out litigation with WB as a condition to receiving any serious participation in "profits" (subject to notorious Studio accounting practices and definitions; net profits are commonly denoted in the entertainment industry as "monkey points");

2. Risks associated with no control over the Siegel Termination Interest Michael's interest unfortunately is a passive 25% interest in what Joanne and

9560 Wilshire Boulevard, Suite 811 Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
Email: MToberoff@ipwla.biz

Page 2
Don Bulson, Esq.
August 6, 2003

LAW OFFICES OF
**MARC TOBEROFF**

Laura Siegel negotiate and receive, and therefore there are major risks associated with this lack of control (a good reason why Michael may be interested in an investor in the first place);

3. Risk that Joanne and Laura Siegel may never arrive at a mutually acceptable settlement with Warner Bros;

4. Risk that the interest may not be monetized or bear fruit for a long time to come (a long term investment);

5. Risk that Superman will lose as opposed to gain value (there hasn't been a Superman movie since 1978 (compare the Bond franchise) and the recent failure to launch and talent package a new Superman film (lost their director and can't cast the lead) is well publicized.

I personally believe, despite the above, that this could be a smart long term investment for someone very wealthy who can afford to hold the investment for an unpredictable, and potentially very lengthy period of time. However, that doesn't mean that an investor will not weigh the reasonableness of the price against the above risks.

Please convey this letter to Michael and let me know what you and Michael suggest I do to salvage this situation.

Best regards,

Yours sincerely,

Marc Toberoff

**EXHIBIT G-34**

**Don Bulson**

From:   Don Bulson
Sent:   Friday, November 12, 2004 1:40 PM
To:     Marc Toberoff
Subject: Superman

Marc,

I have now had the opportunity to meet with Mike Siegel and discuss your "investor's" latest proposal. Summarizing our past discussions, Mike originally proposed:

1.   Initial payment of $300,000
2.   Annual payments of about $123,000 for 20 years

As understood, the investor countered with:

1.   Initial payment of $200,000
2.   Annual payments of $100,000 for about 22 years
3.   Investor's recoupment of one-half of any monies paid if reversion occurs

In a follow up to the above, the investor indicated he would consider:

4.   Some participation

In return, Mike Siegel would be amenable to:

1.   Initial payment of $250,000
2.   Annual payments of $112,000 for 25 years
3.   Investor's recoupment of one-half of monies paid if reversion occurs, subject to an appropriate payback schedule from proceeds received by Mike Siegel
4.   Participation at 10% after full recoupment of monies paid to investor

Please let me know if this is acceptable to the investor.

Don


From:   mtoberoff
Sent:   Wednesday, November 17, 2004 3:06 PM
To:     Don Bulson
Subject: RE: Superman

Don:

Thank-you for your counter.

The problem is that when you compare the net present value (NPV) of your first proposal with that of your second proposal it is nearly the same
(only 1.5% less) , the two offers (months apart) really re-shuffle of the numbers a bit, however your counter additionally asks for a significant percentage of the upside (without really lowering the NPV of the fixed compensation).

In addition, your two proposals still amount to 25% of Warner Bros. offer 2 years ago. The problem with this as stated is that an investor rightly views this as risky (for all the reasons set forth in my prior correspondence, e.g., inertia, litigation, that this is passive and subject to what the Joanne and Laura Siegel's decide regarding the termination interest, etc., etc.). In addition, there is a legal cost to make Warner Bros. pay up (for instance with a contingency lawyer at least 33.33% – 40% would be taken off the top plus costs and disbursements). For these reasons an investor would never buy this at a cost equal to 25% of WB's highly negotiated last offer that was rejected. The fact that the NPV of your counter is nearly identical to your original proposal is exacerbated by the fact that the counter was a long time in the waiting (another thing that frustrates any interested buyer that is real).

I'm really trying, but I need some help from your end if your client wants to do this.

Marc Toberoff
IPW
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
(310) 246-3100
Fax (310) 246-3101
MToberoff

EXHIBIT C-35

**From:** Don Bulson
**Sent:** Wednesday, November 24, 2004 2:57 PM
**To:** 'mtoberoff@ipwla.com'
**Subject:** RE: Superman

Marc,

I appreciate your efforts to put together a deal acceptable to your "investor". Michael has considered your comments and he considers his last offer a fair offer, given the potential for substantial income to be generated by the Superman property. The Warner Bros. offer was basically a 6% deal as I recall. The base for the royalty included all worldwide revenue paid to or derived by DC Comics from the Superman property. My calculations of the value of Warner Bros. last offer were based on numbers provided by Warner Bros. for a five year period that did not include any revenue booster like a movie. Since then, the Lois and Clark television series has gone into syndication and the Smallville television series has now entered syndication. According to comments you have previously made, a television property starts generating significant profits when it goes into syndication.

In addition, the next Superman movie now appears to be a reality.

Regarding Michael's last offer, the upfront money has been reduced as you have observed, the NPV is less as well. In addition, Michael is agreeable to the 50% recoupment if rights revert, and Michael has agreed to reduce his originally desired participation from 25% to 10%.

Consequently, at the beginning the investor is putting in less money. Within the next few years, I would anticipate some movement by the parties toward reaching an agreement, so the investor should be able to see how things are going to shake out within the next few years.

DC/Warner Bros. still views Superman as one of their gems and at some point they will have to address the loss of rights that occurs in 2013. I seem to recall reading that Warner Bros. negotiated a commitment from the new Superman for three or four movies. I suspect those will be timed to come out every two years or thereabouts.

I suggest you run this all past the investor. Perhaps he will find the new terms acceptable. If not, then perhaps he can indicate what he would like to see Michael yield on and what he would be willing to give Michael in return.

Thanks for you cooperation.

Don

Email: dbulson@rennerotto.com
Tel:     216-621-1113
Fax:     216-621-6165

Don W. Bulson
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Avenue - 19th Floor
Cleveland, Ohio  44115

**From:** mtoberoff@ipwla.com
**Sent:** Monday, November 29, 2004 7:55 PM
**To:** Don Bulson
**Subject:** RE: Superman

Don:

I hope you had a good Thanksgiving. I likewise appreciate your and Michael's efforts and consideration in trying to reach a mutually satisfactory deal.

I have fully informed the investor and he is well aware of all the developments you mention regarding Superman, Smallville, etc. However, the investor is also conservative, experienced and cynical with regard to the entertainment industry and Studio "accounting" and knows the following:

(1) The rights are totally passive and subject to the actions of Joanne Siegel and Laura Siegel in their discretion;

(2) In over 5 ½ years Warner Bros. / DC haven't accounted for or paid a dime for the 50% Superman copyright interest which reverted via termination in 1999 (of which Michael's interest amounts to 12.5% , i.e., 25% of 50%) even though WB/DC are required by law to do so;

(3) WB and DC's attorneys have vigorously refuted the termination;

(4) WB/DC's attorneys have also asserted many legal argument is (e.g. apportionment, DC's revenues vs. WB's trademark) and defenses (statute of limitations, waiver, estoppel, etc.) to negate or significantly lessen the value of the termination interest;

(5) Standard Studio practice (as demonstrated in this case) is to wage a war of attrition and to only pay the real money after prolonged litigation and then, just prior to trial of the action, and with respect to any % of "profits" or revenues to engage in dubious Studio accounting practices;

(6) Enforcing the termination interest in very very expensive (attorneys fees, forensic accounting fees, costs and disbursements ) increasing the cost/risk of this investment and further diluting the value of Michael's 12.5% by anywhere from one-third to 50%;

(7) Litigation is always very very risky, the Siegels could get a burn legal decision wiping out their interest at any turn.

(8) Your proposals and counter-proposals over a lengthy period of time have an NPV that is stayed virtually the same and it is an NPV very close to WB's old offer over 2 ½ years ago. However, the WB offer was ultimately rejected by the Siegels (the reason Michael is interested in selling and a further demonstration of risk) and may not still be on the table. Further, even if it was on the table it would make no sense to incur all this risk only to buy something at what you can ultimately sell it for (i.e. WB's last offer).

(8) The 6.5% revenue participation in WB's old rejected settlement proposal is not as significant as you might think because (a) the cash was an advance against it, (b) it was DC's revenues based on licensing fees paid internally by WB, its parent, in WB sole discretion and thus subject to manipulation, (c) but WB not DC is the one making all the money from film and TV exploitation and (d) the 6.5% was subject to deductions and "Studio accounting."

In hard business terms although this is Superman and there's only one Superman, this is not the rosy sexy picture one might think. Yes, they will likely produce a Superman movie or movies, yes they have syndicated Smallville, but DC doesn't participate in a big way in that. WB/DC have refuted the termination interest and stonewalled any accounting or payments for over 5 1/2 years!

For all of the above reasons, no matter how hard I try and how much I want to make this happen I will not be able

**EXHIBIT C-36**

20th Century Danny Boy: Superman & The "Toberoff Timeline" Part II                    Page 1   of 33

to do so at a price with an NPV the same or similar to that of WB's 2002 offer which is what you've been
proposing. Given all of the above, I believe the investors last offer was pretty decent, particularly if I can get him to
add a backend % (that offer has an NPV that is less but not so far off from the old WB offer or your counter-
proposals). Otherwise, I'm afraid I may be stuck. I also don't believe the investor will stay with this past the end of
the year. Please let me know if you or Michael have any additional thoughts or ideas.

Best regards.

Marc Toberoff
IPW
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
(310) 246-3100
Fax (310) 246-3101
MToberoff@ipwla.com

At this point the deal collapsed, if there ever was a deal  DC's contention is that there was no deal on the table. Toberoff denies this claim.  Another claim that
was made in the Toberoff Timeline that was disputed was Toberoff attempting to shop Superman around as a movie project.  Here's the evidence of that:

Laura,

I understand....I thought it was a great strategic move, however I don't want to put too much work
into this if you remain quite hesitant.

Re: licensing opportunities – although possible in the right situation with people who really "get it"
I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products
in the licensing industry; 2. perception that WB owns S and that to understand what you own
requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in
litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
        -----Original Message-----
    From :                                    om]
    Sent: Monday, October 10, 2005 1:48 AM
    To: MToberoff
    Subject: Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people
regarding a movie based on Action Comics #1. However, we do not give permission for
you to enter into any oral or written commitments for anyone to work on such a movie.
Please let us know who you plan to speak with before you make contact with them and
inform us of all activity on this matter as it develops. We also want to know of any
publicity that may occur as a result of the inquiries, in advance, and we reserve the right
to stop the inquiries at any time.  If too many people get involved, we believe it will
generate more headaches than we are willing to deal with.  So to reiterate, you may
proceed with a full inquiry but we do not want you to commission a script or enter into any
employment agreements with anyone at this time.  After the inquiries have been made,
we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals
regarding use of the names Superman, Clark Kent, Lois Lane or other elements
contained in Action Comics #1 and are willing to explore other commercial possibilities
that may exist in connection with our ownership rights.

Thanks for your idea.  We believe it is time for us to take matters into our own hands and
to exercise the rights we obtained through the Copyright Act.  However, we want to
proceed cautiously.  Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Before Michael Siegel passed away he sent his ideas for a will to his lawyer:

EXHIBIT C-37

From:     msiegel_____)
Sent:     Saturday, November 12, 2008 3:44 PM
To:       _____
Subject:  will

Don,

These are my thoughts on a will.

Jolan Kovacs AKA Joanne Carter Siegel.  Ignored me my entire life.
When you came to Cleveland refused to contact me.  I leave nothing.

Laura Siegel Larson.  You wrote that you wanted to contact me your entire
life.  You never wrote to me until after I wrote to you.  When our father
died you never wrote to tell me.  I never knew you were alive until I saw
you on TV saying how hard life had been.  You and your mother made sure I
had added expenses instead of acting like a family.
I leave nothing.

My mother had an older sister.  She had 2 boys.  I leave them nothing.

I own 50 acres in Huntsburg, Ohio.  If possible I would like to see the
land developed in the following manner:
1.  a park for jewish people to enjoy.  It will not be orthodox.  It will
not be kosher.
2.  a jewish cemetery.  It will be orthodox and kosher.  non jews will not
be buried anywhere on this property.  there will not be a non jewish
section.
3.  a rose garden will be planted and maintained.  teas, hybred teas,
floriba, and gladiflora will be planted.  The name will be  The Bella
Siegel Memorial Rose Garden.

My mother's jewelry, furs, and Superman memorablia shall go to Murray and
Shirley Lipton.
_____

everything else
Murray and Chirley Lipton
_____                90%

Arthur and Julee Chan
_____                10%

I have just the house on Bendemeer and the land in Huntsburg.  I am going
through my money because I can not get employment.  If the land can not be
developed because of lack of money, sell the land and use the 90% - 10%
split.  The house is worth about $120,000.  The land is worth about
$100,000.  If and when there is ever any Superman money things will change.


It looks complete to me, tell me your opinion.

Mike
--
CoreComm Webmail.
http://home.core.com


Laura Siegel now controls Michael Siegel's portion of the Siegel Superman copyright.

This means that, via proxy, Marc Toberoff has control over it as well.  As he has the Shuster estate signed up, and Laura Siegel, he has, potentially, control
over all of the non-DC Comics Superman trademark.  New contracts have been drawn up between the Shuster estate and Laura Siegel, and it has been put to
Laura that she could have earned a minimum of $10,000,000 from the Superman name during the time of the lawsuit, a claim that she had no response to.
Once other relevant documents detailed in the Toberoff Timeline become public it'll help people understand the complexities of this case a lot better.  It's easy
to state that DC are the evil corporation trying to wrest Superman away from the families of his creators - and in a way, that's exactly right - but these
documents, and more, also reveal dealings being done, behind closed doors and behind backs, that present the so called 'White Knight' lawyer, Marc
Toberoff, in an entirely different light.  As with any classic comic book saga, the true villain isn't clearly defined, and that might be because the true villain has
yet to rear their head.

Posted by Daniel Best at 10:20:00 AM

Labels: lawyers, legal, superman, the trials of superman

Reactions:       funny (0)        interesting (0)        cool (0)

## 2 comments:

   The Seditionist said...

I'm old and slow-witted and clarification: All this Toberoff-bashing (interesting). What exactly does it have to do with the issue of the estates regaining rights to Superman? WB wants Toberoff
off the board, which is their business. But what does it have to do with the ultimate issue? The relevance of Toberoff's (apparent) scumbaggery has essentially nothing to do with the main
issue: Or does it? And if so, why?

Saturday, April 28, 2012 7:51:00 PM

Jay Andrews said...

Wow! You have a class Comic Book site my friend. When you have the chance, please check out my comic site at - http://www.comicbookandmoviereviews.com

Also, connect to me via Google Friend Connect, you may get some more visitors.

Thanks for reading my message. Jay

EXHIBIT C-38

P.S. I read about the Superman trials on Roy Thomas's site. Interesting stuff.

Sunday, April 29, 2012 10:33:00 AM

Post a Comment

## Links to this post

Create a Link

| Newer Post | Home | Older Post |
|---|---|---|

Subscribe to: Post Comments (Atom)

Blog © 2011 Daniel Best. Awesome Inc. template. Powered by Blogger.

EXHIBIT C-39

5/9/12                                Warner Bros. (warnerbrosent) on Twitter

*Variety*

17 Apr    Variety  @Variety

Rosenblum: 'Men' will be back on CBS: TV News: WB TV Group chief says succession issues won't distr... vsb.li/ErnK.sg

Retweeted by Warner Bros.
Expand Collapse

- Reply
- RetweetedRetweet
- Delete
- FavoritedFavorite

 17 Apr    Warner Bros.  @WarnerBrosEnt

RT @NikkiFinke: Court Slams Ethics Of Warner Bros Rival In Superman Copyright Case dlvr.it/1S1g6M

Expand Collapse

- Reply
- RetweetedRetweet
- Delete
- FavoritedFavorite

 17 Apr    Warner Bros.  @WarnerBrosEnt

Which is your fave? RT @DCComics: New Release Cover Art Photo Album! on.fb.me/IWXumi

View conversation Hide conversation

- Reply
- RetweetedRetweet
- Delete
- FavoritedFavorite

 17 Apr    Warner Bros.  @WarnerBrosEnt

RT @THR: Warner Bros. Wins Big Superman Ruling Against Creators, Can Use Key Documents bit.ly/HQUKqH

Expand Collapse

- Reply
- RetweetedRetweet
- Delete
- FavoritedFavorite

 17 Apr    Warner Bros.  @WarnerBrosEnt

RT @wbpictures: Ah, young love and rockstar dreams. New photo of @JulianneHough and @DiegoBoneta #RockofAges! twitpic.com/9b0tz2

View photo Hide photo

- Reply
- RetweetedRetweet
- Delete
- FavoritedFavorite

 17 Apr    Warner Bros.  @WarnerBrosEnt

Do! RT @coureliz: I HAVE TO BOOK A TRIP TO LA BEFORE 2015. I'd probably spend my whole trip here: @TVOutoftheBox @paleycenter @WarnerBrosEnt

View conversation Hide conversation

- Reply
- RetweetedRetweet
- Delete
- FavoritedFavorite



O'MELVENY & MYERS LLP

# O'Melveny's Sweeping Defeat of Dismissal Motion in Superman Suit on Behalf of Warner Bros Receives Wide Media Coverage

A recent key ruling from a California federal judge issued in favor of O'Melveny's clients Warner Bros and DC Comics in litigation over rights to the Superman comic book character was covered by numerous news outlets, including *Law360* and *Deadline Hollywood*.

US District Judge Otis Wright denied a defendant's motion to dismiss the case brought by O'Melveny on behalf of Warners and DC Comics which charges that, acting as a legal representative and competing business owner, lawyer Marc Toberoff tortiously interfered with longstanding agreements between the companies and the Superman creators' heirs for his own profit. In his motion to dismiss the current case, Toberoff claims that his actions as lawyer for the heirs were protected against legal interference. By denying the motion, Judge Wright allowed Warners' lawsuit to move forward.

Warners and DC Comics, represented by an O'Melveny team led by Business Trial and Litigation Practice Group Leader and partner Daniel Petrocelli, have sued the heirs of Jerome Siegel and Joseph Shuster as well as Toberoff, who represented the heirs in previous litigation that recovered their rights to the comic book hero from DC. The plaintiffs are seeking to undo Toberoff's relationship with the heirs, invalidate all agreements between Toberoff and the heirs related to Superman rights, and in turn to set aside a court decision based on those agreements that terminated 60-year-old copyright agreements between the companies and the heirs.

As *Deadline Hollywood* reported on October 26, 2011 in its article, "Warner Bros Wins Round In 'Superman' Suit Against Copyright Lawyer," Judge Wright was persuaded by the studio's argument. "He ruled that because Toberoff had established business arrangements through his own company Pacific Pictures with heirs of Siegel and Shuster, he was not protected under California's anti-SLAAP (strategic lawsuit against public participation) statute that protects rights owners against legal intimidation. Wright rejected Toberoff's anti-SLAPP argument, ruling that he was acting in his capacity as a businessman, not a lawyer, through Pacific Pictures — specifically concerning exploitation of Joe Shuster's creations."

In addition, *Deadline Hollywood* reported that "the court ruled Toberoff interfered with an existing 1992 agreement with DC Comics by inducing the Shusters to sign the Pacific Pictures

agreements, which purport to assign Toberoff the same rights the Shusters had already assured DC. Wright agreed because the Pacific Pictures Agreements essentially gut the 1992 Agreement, and reassign to Toberoff those rights that had already been granted to DC Comics. The judge also granted Warner Bros. access to a July 2003 letter from Laura Siegel to her late brother Michael. The letter appears to give even more weight to the studio's claim that Toberoff tortiously interfered with WB's separate 2001 settlement with the Siegels to persuade them to sign new agreements with him."

Under the headline, "DC Comics' Superman Rights Suit Withstands Dismissal Bid," *Law360* on October 26, 2011 noted that Judge Wright was skeptical about the timing of Toberoff's agreement with the Shuster heirs. "It gives the court great pause that a business relationship lasting over 60 years (between DC Comics and the Shusters) came undone at around the time of the alleged interference, after those parties had apparently reached a settlement in principle," the Judge Wright wrote.

October 28, 2011

Superman Case Takes A Positive Turn For Warner Bros. « The Lazy Geeks    http://thelazygeeks.com/2012/04/18/superman-case-takes-a-positive-tu...

<u>The Lazy Geeks</u>

# Superman Case Takes A Positive Turn For Warner Bros.

<u>April 18, 2012</u> by <u>Steven Vargas</u>



In the never ending legal battle between Warner Bros and the estates of *Superman* creators Jerry Siegel and Joe Shuster seemed to take a turn toward Warners' side after a slew of judgments that were making their case weaker and weaker by the moment. It seems that one piece of evidence that Warner Bros. has been using in their case against their lawyer, Marc Toberoff, may get pulled into court after all.

The sensitive papers, according to *ComicBookResources*, deals with, what Warner Bros believes, Toberoff has "orchestrated a web of collusive agreements" with the Siegel and Shuster heirs, leading them to reject "mutually beneficial" longtime deals with DC Comics and seek to recapture the Superman copyright. In addition, the studio claims Toberoff schemed to secure "a majority and controlling financial stake" in the Superman rights.

There have been rumors flying around that he has a personal invested interest in this case, most likely an incentive for him to win the case would make him a wealthy man. The 9th Circuit Court of Appeals has ordered Toberoff to hands these sensitive papers to the court. The history behind these papers is a confusing one but I will do my best to explain it.

These documents were believed to be a plan for the *Superman* co-creators estates to regain copyright rights to the iconic comic character and lays out how Toberoff will do it and his potential interest in the case. After stolen by a former disgruntled associate, David Michaels, they anonymously landed in the hands of Warner Bros., which then resulted in their 2010 lawsuit against Toberoff.

Still with me? However, a judge ruled that the documents were attorney-client privilege and needed to be returned to Toberoff. The 9th Circuit saw that since he had to produce the documents for a grand jury subpoena in 2010, he waived his right to privilege. If you managed to follow all of that, kudos to you, but it seems that Toberoff's problems are just beginning much to Warner Bros. sheer delight.

**EXHIBIT F-43**

5/9/2012 10:42 AM

Superman Case Takes A Positive Turn For Warner Bros. « The Lazy Geeks http://thelazygeeks.com/2012/04/18/superman-case-takes-a-positive-tu...

## BRAIN TRAINING GAMES

| | |
|---|---|
| Memory | Spatial Reasoning |
| Attention | Problem Solving |
| Focus | Fluid Intelligence |
| Speed | Stress |
| Language | Reaction Time |

▸ **Play Games**

Ⓛ lumosity - Reclaim Your Brain™

Category : Comics
Tags : copyright lawsuit, jerry siegel, joe shuster, superman, Warner Bros

Blog at WordPress.com. Theme: Triton Lite by Towfiq I.

**EXHIBIT F-44**



## What's In The Marc Toberoff – Superman Stolen Document?

Hollywood Reporter has revelaed what's in the stolen documents that DC Comics is now being allowed to use in its case against Marc Toberoff, who is suing DC and Warner on behalf of the Siegel and Shuster estates for the return of copyright ownership of Superman. It reports;

One of those documents is a letter dated May 13, 2003, from **Michael Siegel**, son of Jerry, to his half-sister, **Laura Siegel Larson**, who now is in charge of the estate after her mother's death. According to sources, Michael Siegel was never close with his father, but as a member of the family was due a certain share of the proceeds from the outcome in the Superman case. Toberoff is said to have tried to bring Michael Siegel on board, but instead was rebuffed.

Instead, Michael warned Laura about getting involved with Toberoff.

In his letter to his half-sister, he describes Toberoff as a "mysterious billionaire" who was teaming with super-agent **Ari Emanuel** at WME on a secret agenda to control Superman for themselves. The letter contains some details about Toberoff's dealings and many disparaging characterizations of Toberoff. Interestingly, the letter's language seemed to become the basis for the cover document that Toberoff's ex-associate sent Warner Bros. with those heisted documents.

That Toberoff wants control of Superman for himself has been a central tenet in Warners' case against Toberoff, and that he poisoned the relationship between the parties leading to these court cases.

http://superman.bz/what%E2%80%99s-in-the-marc-toberoff-%E2%80%93-superman-stolen-document/

**EXHIBIT G-45**



## **Warner Brothers Wins Key Component In Superman Copyright Case**

Posted 20 days ago by Scott West2



Marc Toberoff

The case between Warner Brothers and the estates of Jerry Siegel and Joe Shuster over exactly who owns the rights to the character of Superman has been raging for years. In 2008, it seemed as if there was the possibility that Warner Brothers, who in turn owns DC Comics, would lose the publishing rights to their flagship superhero when some of the rights to the character's origin reverted to the estate of Siegel with the remainder set to go to Shuster's estate in 2013.

However, Warner Brothers and DC weren't about to give up so easily. One of the major attacks in WB's lawsuit was that Siegel and Shuster's lawyer Marc Toberoff was in an unethical position as he was allegedly in the lawsuit for personal gain. You see... Toberoff is also the owner of Pacific Pictures. Warner Brothers claims that Pacific Pictures had a deal with the Superman creators' estates to make Superman films when and if they should win back the rights to the character. This information came to Warner Brothers attention in 2010 when documents concerning the Pacific Pictures deal were leaked to them by a man named David Michaels, a former associate of Toberoff's. Those same documents were allegedly stolen from Pacific Pictures offices in 2006.

With this new information, Warner Brothers filed a lawsuit directly against Toberoff. Toberoff claimed that this was bullying on the part of Warner Brothers and that he was protected by an anti-SLAPP (strategic lawsuit against public participation) law. A judge <u>overturned</u> Toberoff's complaint and WB continued their attack.



Now, in the primary case with the Siegel and Shuster estates, Warner Brothers has won yet another key item. Until now, those documents that detail the deal between Pacific Pictures and the Superman creators estates has been kept in confidentiality in the courts. But, in a ruling yesterday, Judge Diarmuid O'Scannlain ruled that the documents were admissible in court stating the "ethical and professional concerns raised by Toberoff's actions."

Toberoff had vehemently fought against the inclusion of these documents, citing a confidentiality issue since the documents were still being investigated for theft. However, O'Scannlain and his fellow two judges on the case unanimously agreed that this was not an issue. In his opinion on the documents, O'Scannlain wrote, "given that Congress has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government, we will not do so here."

An unnamed source close to the case told <u>Deadline</u> that "a huge trove of evidence is going to emerge based on today's ruling, and if our deal with the heirs gets upheld, they will get a big check from us but they will have gotten nothing from their relationship with Toberoff but seven years of litigation."

So it seems the tide may have turned in Warner Brothers and DC Comics' favor at last. Only time will tell what those documents actually contain and what, if anything, they will mean in the Superman copyright battle.

# Smallvilletalk.com | A Place for all Superman Smallville fans.

## Court Slams Ethics Of Warner Bros Rival In Superman Copyright Case – Deadline.com

Posted on April 18, 2012

More news on the whole SUPERMAN Copyright trial from Deadlinehollywooddaily.com:



"Warner Bros got big judicial boost today in the case about who really owns the rights to Superman. First, the Court of Appeals Ninth Circuit unanimously rejected an attempt by Marc Toberoff, the lawyer for the estates of Superman's co-creators, to use attorney-client privilege to keep documents pertinent to the long-ongoing copyright case secret. Then, while noting it wasn't a matter before the court in this instance, Judge Diarmuid O'Scannlain took the rare step of specifically noting the "ethical and professional concerns raised by Toberoff's actions" in playing the role of both lawyer and business adviser for the estates of Superman creators Joe…"

READ MORE…via Court Slams Ethics Of Warner Bros Rival In Superman Copyright

**EXHIBIT I-48**

<table>
<tr><td>

1

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
</td></tr>
</table>

1 | FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted pro hac vice)
2 | James D. Weinberger (Admitted pro hac vice)
Justin Deabler (Admitted pro hac vice)
3 | 866 United Nations Plaza
New York, New York 10017
4 | Telephone:  212-813-5900
Fax:          212-813-5901
5
6 | PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (admitted pro hac vice)
7 | 1711 Route 9D
Cold Spring, New York 10516
8 | Telephone:  845-265-2820
Fax:          845-265-2819
9 | WEISSMANN WOLFF BERGMAN
   COLEMAN GRODIN & EVALL LLP
10 | Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
11 | Adam Hagen (SBN 218021)
9665 Wilshire Boulevard, Ninth Floor
12 | Beverly Hills, California 90212
Telephone:  310-858-7888
13 | Fax:          310-550-7191

14 | Attorneys for Defendants/Counterclaimant

15 | UNITED STATES DISTRICT COURT

16 | CENTRAL DISTRICT OF CALIFORNIA

17 | JOANNE SIEGEL and LAURA SIEGEL LARSON,

18 |              Plaintiffs,

19 |      vs.

20 | WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,
21 |              Defendants.

22 | JOANNE SIEGEL and LAURA SIEGEL LARSON,

23 |              Plaintiffs,
         vs.
24 | TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER
25 | BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION
26 | PRODUCTION INC.; DC COMICS; and DOES 1-10,
27 |              Defendants.

28 | AND RELATED COUNTERCLAIMS

FILED
CLERK U.S. DISTRICT COURT

APR - 5 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

SCANNED

Priority ___
Send      ✓
Enter     ___
Closed    ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

Case Nos. [Consolidated for Discovery]:

CV  04-8400 RSWL (RZx)
CV  04-8776 RSWL (RZx)

Hon. Ronald S.W. Lew, U.S.D.J.
Hon. Ralph Zarefsky, U.S.M.J.

STIPULATION RE: ~~PROPOSED~~ PROTECTIVE ORDER

DOCKETED ON CM

APR - 5 2006

BY                    005

50

STIPULATION RE: PROTECTIVE ORDER
**EXHIBIT J-49**

1  Plaintiffs/counterclaim-defendants Joanne Siegel and Laura Siegel Larson

2  (collectively "Plaintiffs"), and defendants Warner Brothers Entertainment Inc., Time

3  Warner Inc. and Warner Brothers Television Production Inc. and

4  defendant/counterclaimant DC Comics Inc. (collectively, "Defendants"), by and

5  through their respective counsel of record, hereby stipulate as follows:

6  WHEREAS, these actions (consolidated for discovery purposes only) relate to

7  Plaintiffs' alleged terminations pursuant to section 304(c) of the United States

8  Copyright Act of a number of copyright grants relating to "Superman" (Case No.

9  CV-04-8400) and "Superboy" (Case No. CV-04-8776) thereby entitling them to

10  relief, including but not limited to, an accounting of profits from Defendants'

11  exploitation thereof;

12  WHEREAS, Plaintiffs in the actions have requested in discovery the

13  production of documents, a portion of which in Defendants' view are highly

14  sensitive and confidential, the dissemination of which could be commercially

15  damaging to them;

16  WHEREAS, Plaintiffs have expressed a willingness to accommodate

17  Defendants' concerns about confidentiality;

18  WHEREAS, the parties negotiated and agreed upon a mutually acceptable

19  stipulated protective order, which sought to balance (a) Defendants' concerns about

20  confidentiality, (b) Plaintiffs' concerns about access to documents and any burdens

21  associated with the use of Defendants' confidential documents in these actions, and

22  (c) the need expressed by courts in this circuit to allow public access to documents

23  filed in pending litigation. Notably, the parties' originally proposed protective order

24  did not provide for automatic sealing of any documents designated as confidential,

25  but incorporated a mechanism by which the parties must advise each other in

26  advance of filing any confidential document to give the producing party an

27  opportunity to seek a sealing order pursuant to Local Rule 79-5;

28

1    WHEREAS, the parties believe that there was thus good cause for entry of this

2    protective order pursuant to Fed. R. Civ. P. 26(c);

3    WHEREAS, the parties lodged their proposed protective order to the Court for

4    approval on February 7, 2006;

5    WHEREAS, the Honorable Ralph Zarefsky, U.S. Magistrate Judge, by order

6    entered February 16, 2006, denied the parties' proposed protective order on the

7    grounds that (a) the parties had not shown good cause justifying its entry pursuant to

8    Fed. R. Civ. P. 26(c) and (b) that documents to be designated confidential were not

9    identified with particularity;

10   WHEREAS, in accordance with and based upon the Court's February 16,

11   2006 Order, the parties have revised paragraph 4 of their proposed protective order, a

12   copy of which is attached as Exhibit 1 to this Stipulation, to narrow the definition of

13   documents which may be designated confidential by the parties;

14   WHEREAS, the revised proposed protective order *does not provide for*

15   *automatic sealing of any documents designated as confidential*, but merely

16   incorporates a mechanism by which the parties must advise each other in advance of

17   filing any confidential document to give the producing party an opportunity to seek a

18   sealing order pursuant to Local Rule 79-5;

19   WHEREAS, all other aspects of the proposed protective order lodged with the

20   Court on February 7, 2006 remain the same; and

21   WHEREAS, the parties believe, for the reasons set forth herein, that good

22   cause exists for entry of the revised protective order attached as Exhibit 1 hereto

23   pursuant to Fed. R. Civ. P. 26(c).

24   ///

25   ///

26   ///

27

28

STIPULATION RE: PROTECTIVE ORDER
**EXHIBIT J-51**

1        NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, subject

2  to the approval of the Court, that the proposed protective order attached hereto as

3  <u>Exhibit 1</u> be entered by the Court.

4  Respectfully submitted,

5  DATED: _April 3_, 2006    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                               Roger L. Zissu

6                                 James D. Weinberger
                                 Justin Deabler

7

8                                 PERKINS LAW OFFICE, P.C.
                                 Patrick T. Perkins

9                                       -and-

10                                WEISSMANN WOLFF BERGMAN
                                   COLEMAN GRODIN & EVALL LLP

11                                Michael Bergman
                                 Anjani Mandavia

12                                Adam Hagen

13

14                      By: _____
                              Anjani Mandavia

15

16                      Attorneys for Defendants and Counterclaimant

    DATED: _March 31_, 2006    LAW OFFICES OF MARC TOBEROFF, PLC

17                                Marc Toberoff
                                Nicholas C. Williamson

18

19                      By: _____

20                              Marc Toberoff

21                      Attorneys for Plaintiffs/Counterclaim-
                      Defendants

22

    **SO ORDERED:**

23

24       RONALD S.W. LEW

25  ~~Ralph Zaretsky, U.S.M.J.~~

26  Ronald S. W. Lew

27  U.S. District Judge

28

                                   4

STIPULATION RE: PROTECTIVE ORDER

Star Office Supplies, Inc.

Recycled Paper

**EXHIBIT 1**

**EXHIBIT J-53**

1  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted pro hac vice)
2  James D. Weinberger (Admitted pro hac vice)
   Justin Deabler (Admitted pro hac vice)
3  866 United Nations Plaza
   New York, New York 10017
4  Telephone:  212-813-5900
   Fax:        212-813-5901
5
   PERKINS LAW OFFICE, P.C.
6  Patrick T. Perkins (admitted pro hac vice)
   1711 Route 9D
7  Cold Spring, New York 10516
   Telephone:  845-265-2820
8  Fax:        845-265-2819

9  WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
10 Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
11 Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
12 Beverly Hills, California 90212
   Telephone:  310-858-7888
13 Fax:        310-550-7191

14 Attorneys for Defendants/Counterclaimant

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 17  JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case Nos. [Consolidated for Discovery]: |
| 18         Plaintiffs, | 04-8400 RSWL (RZx) |
| 19         vs. | 04-8776 RSWL (RZx) |
| 20  WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10, | Hon. Ronald S.W. Lew, U.S.D.J. |
| 21         Defendants. | Hon. Ralph Zarefsky, U.S.M.J. |
| 22  JOANNE SIEGEL and LAURA SIEGEL LARSON, | [PROPOSED] STIPULATED PROTECTIVE ORDER |
| 23         Plaintiffs, | |
|      vs. | |
| 24  TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10, | |
| 25 | |
| 26 | |
| 27         Defendants. | |
| 28  AND RELATED COUNTERCLAIMS | |

                    STIPULATED PROTECTIVE ORDER
                         **EXHIBIT J-54**

1    Plaintiffs/counterclaim-defendants Joanne Siegel and Laura Siegel Larson,

2  and defendants Warner Brothers Entertainment Inc., Time Warner Inc. and Warner

3  Brothers Television Production Inc. and defendant/counterclaimant DC Comics Inc.,

4  by and through their respective counsel of record, hereby stipulate to and jointly

5  request that the Court enter a Protective Order governing this consolidated action as

6  follows:

7    1.    For purposes of this Order, a "Writing" means any tangible expression

8  or communication – however created, recorded, embodied, maintained, filed, or

9  stored in any medium, mode, form, or technology – including, without limitation, as

10  defined by Rule 1001 of the Federal Rules of Evidence.

11    2.    For purposes of this Order, a "Document Production" means the

12  production of any Writing by any party or non-party witness pursuant to any

13  procedure set forth in the Federal Rules of Civil Procedure, including, without

14  limitation, any initial disclosure pursuant to Rule 26(a)(1), any deposition notice

15  pursuant to Rule 30, any request for production of documents pursuant to Rule 34,

16  and any subpoena pursuant to Rule 45.

17    3.    Except as provided in Paragraph 13 below, each Writing produced by

18  any party or non-party witness in any Document Production – whether or not

19  designated "CONFIDENTIAL" pursuant to Paragraph 4 below – shall be used solely

20  for purposes of this action.

21    4.    Except as provided in Paragraph 13 below, the additional provisions of

22  this Order shall apply to (1) any Writing produced in any Document Production by

23  any party or non-party witness marked as "CONFIDENTIAL," and (2) any Writing

24  produced in any Document Production by any party or non-party witness which any

25  other party requests be marked as "CONFIDENTIAL" and so notifies all other

26  parties within twenty-one days (21) days of its production, in which case the original

27  and all copies of the Writing shall be promptly marked "CONFIDENTIAL." The

28  following categories of documents may be marked as "CONFIDENTIAL": (i)

STIPULATED PROTECTIVE ORDER
**EXHIBIT J-55**

documents containing non-public commercially sensitive, confidential financial information, including reports, records and projections; (ii) documents including financial and developmental information that would assist a competitor; (iii) unpublished creative materials, such as scripts, artwork and the like; (iv) non-public, private agreements, Writings disclosing the terms of such agreements and documentation relating to the negotiation thereof; and (v) information which the party is contractually or otherwise by law required to maintain as confidential (*e.g.*, due to a non-disclosure agreement). Such documents may be marked "CONFIDENTIAL" if the marking or requesting party reasonably believes:

> (a) the Writing contains confidential proprietary information; or
>
> (b) disclosure of such commercially sensitive Writing could reasonably harm competitive advantage, or foster a competitive disadvantage; or
>
> (c) the disclosure of such confidential Writing could impair or disrupt future or current business relationships.

Any such Writing, and every copy thereof, is referred to herein as a "Protected Writing."

5. The following persons are collectively referred to herein as "Covered Recipients":

> a. A party to this action, and each of her or its agents and employees;
>
> b. Counsel for a party to this action and such counsel's support employees;
>
> c. A deposition or trial witness who testifies in this action, or any other person reasonably believed by counsel for any party to this action to have relevant knowledge or information, that person's counsel, and such counsel's support employees;

7

STIPULATED PROTECTIVE ORDER
**EXHIBIT J-56**

d.    An expert witness, consultant, or investigator engaged by a party to this action and that person's support employees;

e.    The Court and its support employees;

f.    A mediator, arbitrator, or other settlement officer who renders service in this action, and that person's support employees;

g.    A court reporter transcribing any proceeding in this action and that person's support employees; and

h.    Any other person as to whom all parties agree in writing.

6.    Except as expressly permitted by this Order, neither a Protected Writing nor any of its contents shall ever be viewed by or disclosed to, directly or indirectly, any person who is not a Covered Recipient. Except as required by law or pursuant to subpoena, no Covered Recipient shall ever disclose to any person who is not a Covered Recipient, directly or indirectly, the existence or contents of any Protected Writing. A Protected Writing may be viewed by or disclosed to a Covered Recipient solely for purposes of and as is necessary for these related actions.

7.    Notwithstanding any other provision herein, a Protected Writing may be filed or lodged with the Court or offered as evidence at trial in this action without placing the Protected Writing under seal, unless the Court grants an order permitting the Protected Writing to be filed under seal pursuant to Local Rule 79-5. Counsel for any party that intends to file or lodge with the Court any Protected Writing, or to offer any Protected Writing as evidence at trial, shall, prior to such use, endeavor in good faith to notify counsel for all other parties and (as applicable) any non-party witness that produced the Protected Writing of such intended use sufficiently early to permit any party to file and obtain a ruling on a motion for a sealing order pursuant to Local Rule 79-5.

8.    Except solely for a Covered Recipient who is (1) a party to this action, her or its counsel, or such counsel's support employee, (2) a witness during deposition or at trial, (3) a court reporter transcribing any proceeding in this action or

8

1   that person's support employee, or (4) the Court or its support employee, prior to the

2   disclosure of any Protected Writing or any of its contents to a Covered Recipient

3   that Covered Recipient shall be given a copy of this Order and shall execute a

4   Certificate of Compliance in the form of Exhibit A hereto.

5        9.    If a Protected Writing is marked and attached as an exhibit to a

6   deposition transcript, then that portion of the transcript discussing or disclosing

7   information contained in the Protected Writing shall be designated as "Confidential"

8   pursuant to the terms of this Order.

9        10.    Except as provided in Paragraph 13 below, no copy shall be made of

10  any Protected Writing except for use in and as is necessary for this action.  Promptly

11  following the conclusion of this action, the original and all copies of each Protected

12  Writing shall be destroyed or returned to counsel for the party or non-party witness

13  that produced it, provided, however, that counsel for any party to this action may

14  permanently retain one copy of each Protected Writing, and the original and one

15  copy of each pleading, brief, deposition transcript, and exhibit which attaches or

16  includes any Protected Writing, for insurance, tax, risk management, or archival

17  purposes.

18       11.    If any party to this action believes that any Writing designated by

19  another party (the "Designating Party") hereunder as CONFIDENTIAL does not

20  reasonably merit such designation (the "Objecting Party") it may inform the

21  Designating Party of such by written notice stating with particularity for each

22  challenged Writing the grounds why such designation is improper hereunder.  The

23  parties will promptly confer pursuant to Local Rule 37-1 regarding such notice in a

24  good faith effort to resolve the matter.  However, if an agreement is not reached

25  within seven (7) days from the Designating Party's receipt of such notice, the

26  Designating Party may within twenty-one (21) days from its receipt of the notice

27  serve on the Objecting Party its portion of a Local Rule 37-1 joint stipulation on a

28  motion for a protective order regarding the designation(s) in question.  The

STIPULATED PROTECTIVE ORDER
**EXHIBIT J-58**

1  challenged CONFIDENTIAL designation(s) will be deemed to be removed from the

2  information and/or document(s) in question only if: (a) the Designating Party fails

3  within such time period to serve its portion of a joint stipulation on a motion for a

4  protective order pursuant to Local Rule 37-1 or (b) if upon such motion the

5  challenged designation(s) is/are not upheld by the Court.

6       12.    The Court will retain jurisdiction over all persons necessary to enforce

7  this Order, and to modify this Order upon the application and demonstration of good

8  cause by any person, even after the termination of these related actions. The Court

9  may impose a monetary sanction against any person who willfully violates this

10  Order in an amount which the Court deems appropriate. Additionally, if any person

11  threatens to violate any provision of this Order, then any potentially aggrieved

12  person may apply to the Court for injunctive relief and the respondent shall not

13  assert as a defense that the potentially aggrieved person has an adequate remedy at

14  law.

15       13.    Notwithstanding any other provision herein, and without prejudice to

16  the right of any person to seek any additional protective order, this Order is not

17  intended to be and shall not be construed as (1) a ruling on the admissibility of any

18  Writing, (2) a waiver of any objection to the production or use of any Writing on

19  grounds of confidentiality or otherwise, (3) a ruling requiring the production of any

20  Writing, (4) a limitation on the right of any party to disclose a Protected Writing to

21  any person who authored that Writing, or (5) a limitation on the right of any party or

22  non-party witness to use in this action or otherwise any Writing that she or it

23  authored or obtained in any manner other than through a Document ///

24  Production, even if an original or duplicate of that Writing is produced in a

25  Document Production.

26

27

28

STIPULATED PROTECTIVE ORDER
**EXHIBIT J-59**

1    DATED: _April 3_, 2006       FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                   Roger L. Zissu
2                                  James D. Weinberger
                                   Justin Deabler
3
                                   PERKINS LAW OFFICE, P.C.
4                                  Patrick T. Perkins

5                                              -and-

6                                  WEISSMANN WOLFF BERGMAN
                                     COLEMAN GRODIN & EVALL LLP
7                                  Michael Bergman
                                   Anjani Mandavia
8                                  Adam Hagen

9

10                                 By: _Anjani Mandavia_
                                        Anjani Mandavia
11
                                   Attorneys for Defendants and Counterclaimant
12
     DATED: _March 31_, 2006       LAW OFFICES OF MARC TOBEROFF, PLC
13                                 Marc Toberoff
                                   Nicholas C. Williamson
14

15                                 By: _Marc Toberoff_
                                        Marc Toberoff
16

17                                 Attorneys for Plaintiffs/Counterclaim-
                                   Defendants
18

     SO ORDERED:
19

20

21   Ralph Zarefsky, U.S.M.J.

22

23

24

25

26

27

28

                                          11

SCANNED

**EXHIBIT A**

**CERTIFICATE OF COMPLIANCE**

1

2

3

4      I, _____, certify that I have received a copy of the

5 Protective Order entered by the United States District Court for the Central District of

6 California (the "Court") in the consolidated action entitled, "*Joanne Siegel v. Warner*

7 *Bros. Entertainment Inc., et al*," Case Nos. 04-8400 and 04-8776 RSWL (RZx) (the

8 "Protective Order").

9      I further certify that I have read and understand each provision of the Protective

10 Order, that I agree to be bound by each of those provisions, and that I irrevocably

11 submit to the jurisdiction of the Court for the purpose of securing compliance with the

12 Protective Order.

13      I declare under penalty of perjury that the foregoing is true and correct.

14

15 DATED:

16

17                           _____

18

19

20 I:\jweinberger\dcc\Siegel Litigation\Pleadings\04cv8400\060324-0425344-Stipulation re Proposed Protective Order-jdw.doc

21

22

23

24

25

26

27

28

12

# PROOF OF SERVICE

STATE OF CALIFORNIA       )
                               ) ss.

COUNTY OF LOS ANGELES     )

      I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9665 Wilshire Blvd, Ninth Floor, Beverly Hills, California 90212. On the date shown below, I served the documents described as: **STIPULATION RE: PROPOSED PROTECTIVE ORDER** on the interested parties in said action, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Marc Toberoff
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
**Fax No.: (310) 246-3101**

<u>XX</u>     **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___     **(FACSIMILE SERVICE)** I caused such document to be transmitted via facsimile to the offices of the addressees at the numbers listed above.

___     **(PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the addressees above.

___     **(BY FEDERAL EXPRESS)** I caused a copy of such document(s) to be delivered to the offices of the addressee(s) via Federal Express, next business day delivery service.

Executed on **April 4, 2006**, at Beverly Hills, California.

___     **STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

<u>XX</u>     **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_Janet Andre_
Janet Andre

**EXHIBIT J-63**