FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAY 10 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY; LAURA SIEGEL LARSON; JEAN ADELE PEAVY, | No. 11-71844<br><br>D.C. No. 2:10-cv-03633-ODW-RZ<br>Central District of California, Los Angeles<br><br>ORDER AMENDING OPINION |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; MARC TOBEROFF, an individual; JEAN ADELE PEAVY; LAURA SIEGEL LARSON, an individual,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES,<br><br>Respondent,<br><br>DC COMICS,<br><br>Real Party in Interest. | <br><br>RECEIVED<br>CLERK, U.S. DISTRICT COURT<br><br>MAY 10 2012<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

Before: KOZINSKI, Chief Judge, O'SCANNLAIN and N.R. SMITH, Circuit Judges.

In the opinion filed in this case on April 17, 2012, we referred to allegations of misconduct made against an attorney by the name of David Michaels. That opinion is hereby amended to reflect that there has been no finding of wrongdoing on the part of Mr. Michaels. The amended opinion is filed concurrently with this order. This order does not affect any petitions for rehearing currently before the court, but no further petitions for rehearing will be accepted.

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAY 10 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY; LAURA SIEGEL LARSON; JEAN ADELE PEAVY, | No. 11-71844<br><br>D.C. No. 2:10-cv-03633-ODW-RZ<br><br>AMENDED OPINION |
| PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; MARC TOBEROFF, an individual; JEAN ADELE PEAVY; LAURA SIEGEL LARSON, an individual,<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES,<br><br>Respondent,<br><br>DC COMICS,<br><br>Real Party in Interest. | |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted February 7, 2012
Pasadena, California

Filed April 17, 2012
Amended May 10, 2012

Before: KOZINSKI, Chief Judge, O'SCANNLAIN and N.R. SMITH, Circuit Judges.

Opinion by Judge O'SCANNLAIN, Circuit Judge:

We must decide whether a party waives attorney-client privilege forever by voluntarily disclosing privileged documents to the federal government.

I

In the 1930s, writer Jerome Siegel and illustrator Joe Shuster joined forces to create the character that would eventually become Superman. They ceded their intellectual property rights to D.C. Comics when they joined the company as independent contractors in 1937.[1] Since the Man of Steel made his first appearance in 1938, he has been fighting for "truth, justice, and the American

---

[1] The name and corporate structure of the real party in interest has changed a number of times since 1938. For simplicity, we refer to it as "D.C. Comics."

way." Shuster, Siegel, their heirs ("Heirs"), and D.C. Comics have been fighting for the rights to his royalties for almost as long.

Marc Toberoff, a Hollywood producer and a licensed attorney, stepped into the fray around the turn of the millennium. As one of his many businesses, Toberoff pairs intellectual property rights with talent and markets these packages to movie studios. Having set his sights on Superman, Toberoff approached the Heirs with an offer to manage preexisting litigation over the rights Siegel and Shuster had ceded to D.C. Comics. He also claimed that he would arrange for a new Superman film to be produced. To pursue these goals, Toberoff created a joint venture between the Heirs and an entity he owned. Toberoff served as both a business advisor and an attorney for that venture. The ethical and professional concerns raised by Toberoff's actions will likely occur to many readers, but they are not before this court.

While the preexisting litigation was pending, Toberoff hired a new lawyer to work for one of his companies. This attorney remained in Toberoff's employ for only about three months before allegedly absconding with copies of several documents from the Siegel and Shuster files. Unsuccessful in his alleged attempt to use the documents to solicit business from the Heirs, this attorney sent the documents to executives at D.C. Comics. While he did not include his name with

3

the package, he did append a cover letter, written in the form of a timeline, outlining in detail Toberoff's alleged master plan to capture Superman for himself.

This happened no later than June 2006, and the parties have been battling over what should be done with these documents ever since. Rather than exploiting the documents, D.C. Comics entrusted them to an outside attorney and sought to obtain them through ordinary discovery in the two ongoing lawsuits over Superman. Considering every communication he had with the Heirs to be privileged—regardless of whether the communication was in his capacity as a business advisor or an attorney—Toberoff resisted all such efforts. Ultimately, in April 2007, a magistrate judge ordered certain documents, including the attorney's cover letter, turned over to D.C. Comics. A few months later, Toberoff at long last reported the incident to the authorities (specifically the Federal Bureau of Investigation). In December 2008, Toberoff finally produced at least some of the documents.

In 2010, D.C. Comics filed this lawsuit against Toberoff, the Heirs, and three entities in which Toberoff owned a controlling interest (collectively, the "Petitioners"), claiming that Toberoff interfered with its contractual relationships with the Heirs. The attorney's cover letter formed the basis of the lawsuit and was incorporated into the complaint. Toberoff has continued to resist the use of any of

the documents taken from his offices, including those already disclosed to D.C. Comics and especially the cover letter.

About a month after the suit was filed, Toberoff asked the Office of the United States Attorney for the Central District of California to investigate the theft. In response to a request from Toberoff, the U.S. Attorney's Office issued a grand jury subpoena for the documents as well as a letter stating that if Toberoff voluntarily complied with the subpoena the Government would "not provide the . . . documents . . . to non-governmental third parties except as may be required by law or court order." The letter also confirmed that disclosure would indicate that "Toberoff has obtained all relevant permissions and consents needed (if any) to provide the . . . documents . . . to the government." Armed with this letter, Toberoff readily complied with the subpoena, making no attempt to redact anything from the documents.

D.C. Comics immediately requested all documents disclosed to the U.S. Attorney, claiming that the disclosure of these unredacted copies waived any remaining privilege. Examining the weight of authority from other circuits, the magistrate judge agreed that a party may not selectively waive attorney-client privilege. The magistrate judge reasoned that, because a voluntary disclosure of privileged materials breaches confidentiality and is inconsistent with the theory

behind the privilege, such disclosure waives that privilege regardless of whether the third party is the government or a civil litigant. Having delivered the documents to the government, the magistrate judge concluded, Petitioners could not rely on the attorney-client privilege to shield them from D.C. Comics.

However, the magistrate judge noted that this circuit has twice declined to decide whether a party may selectively waive the attorney-client privilege, and stayed his order to allow Petitioners to seek review. The district court denied review. Petitioners seek to overturn the magistrate's order through a writ of mandamus.

II

A writ of mandamus is an extraordinary remedy. A party seeking the writ has the "burden of showing that [his] right to the issuance of the writ is clear and indisputable." *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 656 (9th Cir. 1977) (internal quotation marks omitted). In evaluating whether a petitioner has met that burden, we consider: (1) whether he "has no other adequate means" of seeking relief; (2) whether he "will be damaged or prejudiced in a way not correctable on appeal" after final judgment; (3) whether the "district court's order is clearly erroneous as a matter of law"; (4) whether the order "is an oft-repeated error"; and (5) whether the order "raises new and important problems, or issues of first

impression." *Id.* at 654–55. We have established no specific formula to weigh these factors, but failure to show what is generally listed as the third factor, error, is fatal to any petition for mandamus. *See Burlington N. & Santa Fe. Ry. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1146 (9th Cir. 2005).[2]

### III

Under certain circumstances, the attorney-client privilege will protect communications between clients and their attorneys from compelled disclosure in a court of law. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Though this in some way impedes the truth-finding process, we have long recognized that "the advocate and counselor [needs] to know all that relates to the client's reasons for seeking representation" if he is to provide effective legal advice. *Trammel v. United States*, 445 U.S. 40, 51 (1980); *see also* 8 John Henry Wigmore, Evidence § 2290 (John T. McNaughton, ed. 1961). As such, we recognize the privilege in order to "encourage full and frank communication between attorneys and their

---

[2] Petitioners assert that, because this case presents an issue of first impression, they must demonstrate simple rather than clear error. We have not always been precise as to whether we look for "error" or "clear error" where our sister circuits have addressed an issue, but we have not. *Compare Anon. Online Speakers v. U.S. Dist. Ct.*, 661 F.3d 1168 (9th Cir. 2011) (applying the clear error standard in a circuit split situation), *with San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096 (9th Cir. 1999) (applying the simple error standard when other circuits had weighed in on parts of an issue). We assume but do not decide that Petitioners need show only error.

clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389.[3]

Nonetheless, because, like any other testimonial privilege, this rule "contravene[s] the fundamental principle that the public has a right to every man's evidence," *Trammel*, 445 U.S. at 50 (internal alterations and quotation marks omitted), we construe it narrowly to serve its purposes, *see, e.g., United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[4] In particular, we recognize several ways by which parties may waive the privilege. *See, e.g., Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010). Most pertinent here is that voluntarily disclosing privileged documents to third parties will generally destroy the privilege. *Id.* The reason behind this rule is that, "'[i]f clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even without the protection of the privilege.'" Comment,

---

[3] Because Petitioners have never challenged the district court's application of federal law, we assume but do not decide that this was correct even though this case involves diversity claims to which state privilege law would apply. *Lewis v. United States*, 517 F.2d 236, 237 n.2 (9th Cir. 1975) (per curiam).

[4] Because no one challenges whether these communications would have been privileged absent waiver, we do not address that issue. For example, we assume but do not decide that these communications were all made for the purpose of obtaining legal as opposed to business advice. *Cf. United States v. Ruehle*, 583 F.3d 600, 608 n.8 (9th Cir. 2009) (noting that business advice does not fall within the purview of attorney-client privilege even if the advisor is a lawyer).

*Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney-Client Privilege in an Administrative Agency Investigation*, 130 U. Pa. L. Rev. 1198, 1207 (1982). Under such circumstances, there simply is no justification to shut off judicial inquiry into these communications.

Petitioners concede that this is the general rule, but they assert a number of reasons why it should not apply to them.

### A

Petitioners' primary contention is that because Toberoff disclosed these documents to the government, as opposed to a civil litigant, his actions did not waive the privilege as to the world at large. That is, they urge that we adopt the theory of "selective waiver" initially accepted by the Eight Circuit, *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc), but rejected by every other circuit to consider the issue since, *see In re Qwest Commc'ns Int'l*, 450 F.3d 1179, 1197 (10th Cir. 2006); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 295 (6th Cir. 2002) [hereinafter "*In re Columbia*"]; *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997); *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416–18 (Fed. Cir. 1997); *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993); *Westinghouse Elec.*

*Corp. v. Republic of Philippines*, 951 F.2d 1414, 1425 (3d Cir. 1991); *In re Martin Marietta Corp.*, 856 F.2d 619, 623–24 (4th Cir. 1988); *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981).

As the magistrate judge noted, we have twice deferred judgment on whether we will accept a theory of selective waiver. *United States v. Bergonzi*, 403 F.3d 1048, 1050 (9th Cir. 2005) (per curiam); *Bittaker v. Woodford*, 331 F.3d 715, 720 n.5 (9th Cir. 2003) (en banc). But we share the concerns expressed by many of our sister circuits about the cursory analysis behind the *Diversified* rule. The Eighth Circuit—the first court of appeals to consider the issue—adopted what has become a highly controversial rule only because it concluded that "[t]o hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders." *Diversified*, 572 F.2d at 611. This apprehension has proven unjustified. Officers of public corporations, it seems, do not require a rule of selective waiver to employ outside consultants or voluntarily to cooperate with the government. *See, e.g., Westinghouse Elec. Corp.*, 951 F.2d at 1426.

More importantly, such reasoning does little, if anything, to serve the public good underpinning the attorney-client privilege. That is, "selective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to

government agencies, thereby extending the privilege beyond its intended purpose." *Id.* at 1425.

It may well be that encouraging cooperation with the government is an alternative route to the ultimate goal of promoting adherence to the law. *In re Columbia*, 293 F.3d at 311 (Boggs, J., dissenting). And there are those who assert that "an exception to the third-party waiver rule need [not] be moored to the justifications of the attorney-client privilege." *Id.* at 308 (emphasis omitted). We disagree. If we were to unmoor a privilege from its underlying justification, we would at least be failing to construe the privilege narrowly. *Cf. Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (citing *Trammel*, 445 U.S. at 50; *United States v. Bryan*, 339 U.S. 323, 331) (1950)). And more likely, we would be creating an entirely new privilege. *In re Qwest Commc'ns Int'l*, 450 F.3d 1179; *Westinghouse*, 951 F.2d at 1425.

It is not beyond our power to create such a privilege. *Univ. of Pa.*, 493 U.S. at 189 (noting that Fed. R. Evid. 501 provides certain flexibility to adopt privilege rules on a case-by-case basis). But as doing so requires balancing competing societal interests in access to evidence and in promoting certain types of communication, the Supreme Court has warned us not to "exercise this authority expansively." *Id.*; *see also United States v. Nixon*, 418 U.S. 683, 710 (1974). Put simply, "[t]he balancing of conflicting interests of this type is particularly a

legislative function." *Univ. of Pa.*, 493 U.S. at 189.

Since *Diversified*, there have been multiple legislative attempts to adopt a theory of selective waiver. Most have failed. Report of the Advisory Committee on Evidence Rules, May 15, 2007, at 4, *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/2007-05-Committee_Report-Evidence.pdf (reporting the selective waiver provision separately from the general proposed rule); *SEC Statement in Support of Proposed Section 24(d) of the Securities Exchange Act of 1934*, 16 Sec. Reg. & L. Rep. 461 (Mar. 2, 1984). *But see* H.R. Rep. No. 870, 96th Cong., 1st Sess. (1980), codified at 15 U.S.C. § 1312. Given that Congress has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government, we will not do so here. *Univ. of Pa.*, 493 U.S. at 189 (requiring federal courts to be particularly cautious when legislators have "considered the relevant competing concerns but [have] not provided the privilege").

B

Petitioners next assert that even if we reject selective waiver as a general matter, we should enforce a purported confidentiality agreement based upon the letter from the U.S. Attorney's Office. Though no circuit has officially adopted such a rule, at least two have "left the door open to selective waiver" where there is a confidentiality agreement. *In re Columbia*, 293 F.3d at 301 (discussing

*Steinhardt* and *Dellwood Farms, Inc. v. Cargill*, 128 F.3d 1122 (7th Cir. 1997)); *see also In re Qwest Commc'ns Int'l*, 450 F.3d at 1192–94 (describing such a rule as a "leap" but declining to reject it completely).

Assuming that this letter constitutes a confidentiality agreement, Petitioners have provided no convincing reason that post hoc contracts regarding how information may be revealed encourage frank conversation at the time of the advice. Indeed, as the Sixth Circuit has noted, while this approach "certainly protects the expectations of the parties to the confidentiality agreement, it does little to serve the 'public ends' of adequate legal representation that the attorney-client privilege is designed to protect." *In re Columbia*, 293 F.3d at 303. Instead, recognizing the validity of such a contract "merely [adds] another brush on an attorney's palette [to be] utilized and manipulated to gain tactical or strategic advantage." *Steinhardt*, 9 F.3d at 235; *cf. Permian Corp.*, 665 F.2d at 1221. And it would undermine the public good of promoting an efficient judicial system by fostering uncertainty and encouraging litigation. *Upjohn*, 449 U.S. at 393 (noting that an "uncertain privilege . . . is little better than no privilege at all").

The only justification behind enforcing such agreements would be to encourage cooperation with the government. But Congress has declined to adopt even this limited form of selective waiver. *See Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence*, 154 Cong. Rec. H. 7817

13

(2008), *reprinted in* Fed. R. Evid. 502 addendum to comm. n subdivision (d) (noting that Rule 502 "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation"). As such, we reject such a theory here.

## C

Petitioners next aver that, because Toberoff was the victim of the crime rather than the target of the grand jury probe, his disclosure should be treated differently. But if it is unnecessary to adopt a theory of selective waiver to encourage potential defendants to cooperate with the government, *In re Qwest Commc'ns Int'l*, 450 F.3d at 11; *Westinghouse*, 951 F.2d at 1425, it is even less necessary to do so to encourage victims to report crimes to the government. The desire to see the crime prosecuted is sufficient impetus to cooperate.

We are unconvinced by Petitioners' argument that adopting such a rule will drastically impair law enforcement attempts to investigate espionage against "attorneys, financial institutions, medical providers, national security agencies, judges, large corporations, or law firms." This has not occurred despite near universal rejection of a selective waiver rule. Furthermore, most of these documents are not covered by attorney-client privilege because they do not represent communications between a lawyer and his client for the purpose of obtaining legal advice. *Cf. Ruehle*, 583 F.3d 608–09 & n.8 (rejecting a

presumption of privilege even when a communication involves a lawyer). And, even if they were originally covered by the privilege, they would eventually have to be made public if they are to become evidence in a criminal trial. To the extent that timing is a concern, it can be ameliorated by properly seeking a protective order. Fed. R. Evid. 502(d).

We are similarly unpersuaded that, because Toberoff was a victim of the crime, Petitioners have a common interest with the government. Rather than a separate privilege, the "common interest" or "joint defense" rule is an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other. *See Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965); *see also In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (collecting cases). However, a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. *Id.* Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten. *Cf. Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964).

There is no evidence that Toberoff and the Office of the U.S. Attorney agreed before the disclosure jointly to pursue sanctions against Toberoff's former employee. Toberoff is not strategizing with the prosecution. He has no more of a

common interest with the government than does any individual who wishes to see the law upheld. Furthermore, the statements here were not "intended to facilitate representation" of either Toberoff or the government. *Hunydee*, 355 F.2d at 185 (limiting privilege to those circumstances); *accord United States v. BDO Seidman*, 492 F.3d 806, 816 (7th Cir. 2007) (same).

### D

Petitioners also argue that they should be treated differently because Toberoff produced these documents subject to a subpoena. Involuntary disclosures do not automatically waive the attorney-client privilege. *United States v. De La Jara*, 973 F.2d 746, 749–50 (9th Cir. 1992). But without the threat of contempt, the mere existence of a subpoena does not render testimony or the production of documents involuntary. *Westinghouse Elec. Corp.*, 951 F.2d at 1414; *see also United States v. Plache*, 913 F.2d 1375, 1380 (9th Cir. 1990). Instead, whether the subpoenaed party "chose not to assert the privilege when it was appropriate to do so is [also] relevant to the waiver analysis." *In re Grand Jury Proceedings*, 219 F.3d 175, 187 (2d Cir. 2000); *cf. In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369–70 (D.C. Cir. 1984).

Toberoff both solicited the subpoena and "chose not to assert the privilege when it was appropriate to do so. . . ." *In re Grand Jury Proceedings*, 219 F.3d at 187. That is, even though the subpoena specifically contemplated that Toberoff

may choose to redact privileged materials, he did not. Petitioners assert that the U.S. Attorney would not have been satisfied with redacted documents, but we will never know because Toberoff never tried. As such, we conclude that the district court properly treated the disclosure of these documents as voluntary.[5]

E

Finally, Petitioners asserted for the first time in oral argument that these documents should remain confidential because the Heirs themselves did not take the affirmative step to disclose the documents. We generally do not consider issues raised for the first time during oral argument, unless "failure to do so would result in manifest injustice" and the appellee would not be prejudiced by such consideration. *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal quotation marks and emphasis omitted). There are several instances in which an attorney's behavior may waive the privilege, even without an explicit act by the client. *See, e.g., Himmelfarb v. United States*, 175 F.2d 924, 939 (9th Cir. 1949); *see generally* 8 Wigmore, Evidence § 2325 (listing actual and implied consent as well as theft of documents from the attorney's office). As many of these

---

[5] As these preexisting documents were "sought for [their] own sake rather than to learn what took place before the grand jury" and as their "disclosure will not compromise the integrity of the grand jury process," Petitioners' argument that the disclosure was protected by Federal Rule of Criminal Procedure 6(e)(2)(B) is similarly without merit. *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1411–12 (9th Cir. 1993).

## COUNSEL

Richard B. Kendall, Kendall Brill & Klieger LLP, Los Angeles, California, argued the cause and filed the briefs for the petitioners. With him on the briefs were Laura W. Brill, Kendall Brill & Kleiger, LLP, Los Angeles, California as well as Marc Toberoff and Keith G. Adams, Toberoff & Associates, P.C., Los Angeles, California.

Matthew T. Kline, O'Melveny & Myers LLP, Los Angeles, California, argued the cause and filed the brief for the real party in interest. With him on the brief were Daniel M. Petrocelli and Cassandra L. Seto, O'Melveny & Myers LLP as well as Patrick T. Perkins, Perkins Law Office, P.C., Cold Spring, New York.