# EXHIBIT A

-----Original Message-----
From: Josh Ryland [mailto:jryland@rennerotto.com]
Sent: Monday, May 14, 2012 2:47 PM
To: Kline, Matthew
Subject: DC Comics v. Pacific Pictures Corporation et al.

Mr. Kline,

I appreciate you making us aware of Mr. Toberoff's 5/7/12 filing.  I've spoken to Don Bulson and consulted the "Renner Otto archive" referenced in the brief.  To the best of my knowledge, the "Renner Otto archive" was the product of scanning Mr. Siegel's paper files before they were forwarded to the attorneys for Mr. Siegel's estate, and the documents in the "Renner Otto archive" and the paper file should be the same.

Best regards,

-jmr

Josh Ryland
Partner
Renner, Otto, Boisselle & Sklar LLP
216-621-1113

1

**EXHIBIT A**

**4**

# EXHIBIT B

**Ip** worldwide

EXHIBIT

64

November 26, 2002

_Privileged & Confidential_

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Re: Potential Conflict Disclosure

Dear Joanne and Laura:

With reference to our Agreements dated as of October 3, 2002 pertaining to _Superman_
and _Superboy_, this is to confirm that we have disclosed to you and discussed the
following proposed actions that may pose potential conflicts of interest or the appearance
of potential conflicts of interest and that following our disclosure, discussion and our
answering of your questions with regard thereto, you freely acknowledged and agreed
that you have no objection to our taking said actions as set forth below.

IPW will enter into negotiations with Michael Siegel and/or his representative to
purchase all of Michael Siegel's rights, title and interest in _Superman_ and _Superboy_,
including his 25% share of the copyright termination interests arising from Jerome
Siegel's interest in the copyrights thereto. This purchase, if any, will be directly financed
by Ariel Emanuel. To eliminate potential disputes, if any, which might cloud or hamper
the interests subject to purchase, the proposed purchase of Michael Siegel's interests will
be contingent upon Michael Siegel expressly settling and releasing both of you, your
representatives, successors and assigns from any and all disputes, claims or causes of
actions regarding _Superman_ and _Superboy_.

If the above comports with your understanding please indicate same by your signatures
below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Acknowledged and Agreed:

_____     Date: _____
Joanne Siegel


_____     Date: _____
Laura Siegel Larson

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

000001894

**EXHIBIT B**

**5**

# EXHIBIT C

Oct-23-06  03:46pm  From-

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

## FACSIMILE COVER PAGE

| TO: James Weinberger, Esq., Patrick Perkins, Esq., Michael Bergman, Esq. | FAX: (212)-813-5901; (845)-265-2819; (310)-550-7191 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 33 |
| DATE : 10/23/06 | RE: Superman/Superboy Litigations, Case Nos. 04-CV-8400, 04-CV-8776 |

COMMENTS:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.



DEFENDANT'S
EXHIBIT
D-3
4/22/08

**EXHIBIT C**
**6**

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

October 23, 2006

<u>Via Facsimile and US Mail</u>

James Weinberger, Esq.
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, New York 10017

<u>Re: Superman/Superboy Litigations, Case Nos. 04-CV-8400, 04-CV-8776 RSWL (RZx)</u>

Dear James:

Enclosed please find the privilege log for Don Bulson's files.

Very truly yours,

Marc Toberoff

cc: Michael Bergman, Esq. (via facsimile)
Patrick Perkins, Esq. (via facsimile)

**EXHIBIT C**

**7**

Oct-23-09   09:46pm   From-   -077   3583   4493

## PRIVILEGE LOG

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 1 | 7/18/1997 | Michael Siegel | Atty Himanshu Amin | Letter | Atty/Client | Plaintiffs' Counsel |
| 2 | 8/7/1997 | Atty Himanshu Amin | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 3 | 8/15/1997 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 4 | 10/14/1997 | Atty Dennis Larson | Atty Himanshu Amin | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 5 | 11/5/1997 | Atty Himanshu Amin | Atty Dennis Larson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 6 | 11/12/1997 | Michael Siegel | Atty Himanshu Amin | Letter | Atty/Client | Plaintiffs' Counsel |
| 7 | 1/15/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 8 | 2/2/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 9 | 3/18/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 10 | 6/17/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 11 | 6/26/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 12 | 6/26/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**8**

| | | | | | |
|---|---|---|---|---|---|
| 13 | 9/4/1998 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 14 | 11/3/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 15 | 11/13/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 16 | 12/4/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 17 | 12/14/1998 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 18 | 12/28/1998 | Atty Don Bulson | Atty Vinay Joshi | Memorandum | Atty Work Product | Plaintiffs' Counsel |
| 19 | 1/19/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 20 | 3/3/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 21 | 3/10/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 22 | 3/17/1999 | Atty Don Bulson | Atty Arthur Levine | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 23 | 4/16/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 24 | 6/8/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 25 | 6/9/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 26 | 6/9/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**9**

| No. | Date | | | Type | Privilege | |
|---|---|---|---|---|---|---|
| 27 | 7/12/1999 | Atty Arthur Levine, Atty Don Bulson | Atty Kevin Marks | Memorandum | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 28 | 7/20/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 29 | 8/2/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 30 | 8/10/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 31 | 8/24/1999 | Atty Don Bulson | Atty Arthur Levine | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 32 | 9/2/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 33 | 9/2/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 34 | 9/2/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 35 | 9/3/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 36 | 9/5/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 37 | 9/7/1999 | | Atty Don Bulson | Notes | Atty/Work Product | Plaintiffs' Counsel |
| 38 | 9/8/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 39 | 9/9/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 40 | 9/9/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**10**

| # | Date | From | To | Type | Privilege | Party |
|---|------|------|-----|------|-----------|-------|
| 41 | 9/14/1999 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 42 | 9/14/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 43 | 9/16/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 44 | 9/17/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 45 | 9/17/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 46 | 9/20/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 47 | 9/22/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 48 | 9/22/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 49 | 9/22/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 50 | 9/23/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 51 | 9/23/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 52 | 9/23/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 53 | 9/24/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 54 | 9/24/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**11**

Oct-23-06    09:47pm    From-                                    T-077    P 007    F-893

| # | Date | | | | |
|---|---|---|---|---|---|
| 55 | 9/27/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 56 | 9/28/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 57 | 9/28/1999 | Joanne & Laura Siegel; Atty Dennis Larson, Atty Arthur Levine, Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 58 | 9/29/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 59 | 10/8/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client - Joint Interest | Plaintiffs' Counsel |
| 60 | 10/8/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client - Joint Interest | Plaintiffs' Counsel |
| 61 | 10/11/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 62 | 10/11/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 63 | 10/11/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 64 | 10/11/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 65 | 10/12/1999 | Atty Don Bulson | Michael Siegel | Notes | Atty Work Product | Plaintiffs' Counsel |
| 66 | | | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 67 | 10/27/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 68 | 10/31/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**12**

| 69 | 11/3/1999 | Joanne & Laura Siegel; Atty Dennis Larson; Atty Bruce Ramer; Atty Arthur Levine; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
|---|---|---|---|---|---|---|
| 70 | 11/3/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 71 | 11/4/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 72 | 11/5/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 73 | 11/8/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 74 | 11/12/1999 | Atty Don Bulson, Atty Dennis Larson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 75 | 12/6/1999 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 76 | 12/6/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 77 | 12/6/1999 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 78 | 12/10/1999 | Joanna & Laura Siegel, Atty Don Bulson, Atty Arthur Levine | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 79 | 12/22/1999 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 80 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 81 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**13**

Oct-23-06   09:47pm   From-                    T-077   P 009   F-893

| No. | Date | From | To | Type | Category | |
|---|---|---|---|---|---|---|
| 82 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 83 | 12/29/1999 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 84 | 12/29/1999 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 85 | 12/30/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 86 | 1/2/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 87 | 1/3/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 88 | 1/3/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 89 | 1/3/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 90 | 1/3/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 91 | 1/4/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 92 | 1/4/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 93 | 1/5/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 94 | 1/10/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 95 | 1/10/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**14**

Oct-23-06 09:47pm From- T-077 P 010 F-893

| No. | Date | From | To | Type | Privilege | Party |
|---|---|---|---|---|---|---|
| 96 | 1/10/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 97 | 1/11/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 98 | 1/14/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 99 | 1/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 100 | 1/18/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 101 | 2/14/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 102 | 2/28/2000 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 103 | 3/1/2000 | Joanna & Laura Siegel; Atty Arthur Levine; Atty Bruce Ramer; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 104 | 3/7/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 105 | 3/8/2000 | Joanna & Laura Siegel; Atty Arthur Levine, Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client | Plaintiffs' Counsel |
| 106 | 3/9/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 107 | 3/9/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 108 | 3/13/2000 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 109 | 3/21/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**15**

| | | | | | |
|---|---|---|---|---|---|
| 110 | 3/30/2000 | Joanne & Laura Siegel; Atty Bruce Ramer; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 111 | 3/30/2000 | Joanne & Laura Siegel; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 112 | 4/3/2000 | Joanne & Laura Siegel; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 113 | 4/5/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 114 | 4/5/2000 | Joanne & Laura Siegel; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 115 | 4/11/2000 | Joanne & Laura Siegel; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 116 | 4/12/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 117 | 4/12/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 118 | 4/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 119 | 4/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 120 | 4/17/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 121 | 4/17/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 122 | 4/18/2010 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 123 | 4/18/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**16**

| 124 | 5/2/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 125 | 5/3/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 126 | 5/3/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 127 | 5/4/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 128 | 5/4/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 129 | 5/5/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 130 | 5/5/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 131 | 5/8/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 132 | 5/8/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 133 | 5/9/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 134 | 5/10/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 135 | 5/18/2000 | Joanne & Laura Siegel; Atty Bruce Ramer; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 136 | 5/21/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 137 | 5/26/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**
**17**

| | | | | | |
|---|---|---|---|---|---|
| 138 | 5/30/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 139 | 6/5/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 140 | 6/7/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 141 | 6/9/2000 | Joanne & Laura Siegel; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 142 | 6/27/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 143 | 7/5/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 144 | 7/6/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 145 | 7/7/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 146 | 7/10/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 147 | 7/10/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 148 | 7/14/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 149 | 7/14/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 150 | 7/17/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 151 | 7/17/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**18**

| 152 | 7/17/2000 | Joanne & Laura Siegel; Atty Bruce Ramer; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
|-----|-----------|---------|---------|-------|-------|-------|
| 153 | 7/18/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 154 | 7/18/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 155 | 7/18/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 156 | 7/19/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 157 | 7/19/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 158 | 7/21/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 159 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 160 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 161 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 162 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 163 | 7/24/2000 | Michael Siegel | Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 164 | 7/25/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 165 | 7/25/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**
**19**

| No. | Date | From | To | Type | Privilege | Party |
|---|---|---|---|---|---|---|
| 166 | 7/26/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 167 | 7/26/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 169 | 7/26/2000 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 170 | 8/8/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 171 | 8/8/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 172 | 8/8/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 173 | 8/10/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 174 | 8/21/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 175 | | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 176 | 8/25/2000 | Michael Siegel | Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 177 | 9/6/2000 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 178 | 9/6/2000 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 179 | 9/6/2000 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**
**20**

Oct-23-06    09:47pm    From-    T-077    P.016/033    F-693

| | | | | | |
|---|---|---|---|---|---|
| 180 | 9/8/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 181 | 9/11/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 182 | 9/15/2000 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 183 | 9/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 184 | 9/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 185 | 9/18/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 186 | 9/21/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 187 | 10/26/2000 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 188 | 11/2/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 189 | 11/8/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 190 | 11/8/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 191 | 11/15/2000 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 192 | 11/19/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 193 | 11/27/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**21**

Oct-23-06   09:48pm   From-                                    T-077   P 017/033   F-893

| No. | Date | From | To | Type | Privilege | Party |
|---|---|---|---|---|---|---|
| 194 | 11/28/2000 | Atty Don Bulson | Michael Siegel | Letter | Atty/Client | Plaintiffs' Counsel |
| 195 | 12/4/2000 | Atty Don Bulson | Michael Siegel | Letter | Atty/Client | Plaintiffs' Counsel |
| 196 | 12/4/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 197 | 12/5/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 198 | 12/8/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 199 | 1/3/2001 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 200 | 1/16/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 201 | 1/30/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 202 | 1/30/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 203 | 1/31/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 204 | 2/16/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 205 | 3/9/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 206 | 3/12/2001 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 207 | 4/30/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

EXHIBIT C

22

| | | | | |
|---|---|---|---|---|
| 208 | 5/4/2001 | Michael Siegel | | Email | Atty/Client | Plaintiffs' Counsel |
| 209 | 5/4/2001 | Atty Don Bulson | Atty/Client | Email | Atty/Client | Plaintiffs' Counsel |
| 210 | 5/4/2001 | Michael Siegel | Atty/Client | Letter | Atty/Client | Plaintiffs' Counsel |
| 211 | 5/17/2001 | | Atty Don Bulson | Letter (Draft) | Atty Work Product | Plaintiffs' Counsel |
| 212 | 6/14/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 213 | 6/28/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 214 | 7/3/2001 | Michael Siegel | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 215 | 7/9/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 216 | 7/30/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 217 | 7/30/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 218 | 7/31/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 219 | 7/31/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 220 | 8/22/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 221 | 8/24/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**
**23**

Oct-23-06    09:48pm    From-    T-077    P.019/033    F-893

| 222 | 8/30/2001 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 223 | 9/12/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 224 | 9/13/2001 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 225 | 9/13/2001 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 226 | 9/24/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 227 | 9/24/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 228 | 10/17/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 229 | 10/17/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 230 | 10/19/2001 | Laura Siegel & Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 231 | 10/19/2001 | Laura Siegel & Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 232 | 10/19/2001 | Atty Don Bulson | Atty Kevin Marks | E-mail | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 233 | 10/24/2001 | Atty Don Bulson | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 234 | 11/27/2001 | Michael Siegel | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 235 | 11/27/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |

**EXHIBIT C**

**24**

| 236 | 12/8/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 237 | 12/26/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 238 | 1/3/2002 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 239 | 1/3/2002 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 240 | 1/3/2002 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 241 | 1/10/2002 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 242 | 1/22/2002 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 243 | 2/5/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 244 | 2/6/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 245 | 2/7/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 246 | 2/8/2002 | Atty Don Bulson | Atty Kevin Marks | Memorandum | Atty Work Product - Joint Interest | Plaintiffs' Counsel |
| 247 | 3/2/2002 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 248 | 3/8/2002 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 249 | 4/1/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**
**25**

Oct-23-06   09:48pm   From-                                                                T-077   P 021/033   F-893

| No. | Date | From | To | Type | Privilege | Party |
|---|---|---|---|---|---|---|
| 250 | 4/8/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 251 | 5/9/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 252 | 5/10/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 253 | 5/10/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 254 | 5/10/2002 | Atty Kevin Marks & Michael Siegel | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 255 | 5/10/2002 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 256 | 5/18/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 257 | 5/28/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 258 | 7/31/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 259 | 6/13/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 260 | 8/14/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 261 | 8/14/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 262 | 8/23/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 263 | 8/27/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**26**

| | | | | | | |
|---|---|---|---|---|---|---|
| 264 | 8/28/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 265 | 9/2/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 266 | 9/2/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 267 | 9/3/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 268 | 9/4/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 269 | 9/19/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 270 | 9/19/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 271 | 9/22/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 272 | 9/23/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 273 | 9/23/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 274 | 9/24/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 275 | 9/24/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 276 | 9/24/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 277 | 9/28/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**27**

| 278 | 9/28/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
|---|---|---|---|---|---|---|
| 279 | 10/1/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 280 | 10/1/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 281 | 11/8/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 282 | 11/19/2002 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 283 | 11/25/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 284 | 11/27/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 285 | 12/19/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 286 | 1/16/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 287 | 1/23/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 288 | 1/23/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 289 | 1/24/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 290 | 1/28/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 291 | 3/24/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**
**28**

Oct-23-06   09:48pm   From-                                              T-077   P 024/033   F-893

| 292 | 4/2/2003 | Michael Siegel | | Email | Atty/Client | Plaintiffs' Counsel |
| 293 | 4/2/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 294 | 4/4/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 295 | 4/7/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 296 | 4/7/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 297 | 4/14/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 298 | 4/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 299 | 4/16/2003 | Atty Don Bulson | Joanne & Laura Siegel | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 300 | 4/16/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 301 | 4/30/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 302 | 5/6/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 303 | 5/6/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 304 | 5/7/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 305 | 5/8/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**
**29**

| No. | Date | From | To | Type | Privilege | Party |
|---|---|---|---|---|---|---|
| 306 | 5/8/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 307 | 5/12/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 308 | 5/12/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 309 | 5/1/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 310 | 5/27/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 311 | 5/27/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 312 | 5/29/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 313 | 6/3/2003 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 314 | 6/9/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 315 | 6/10/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 316 | 6/13/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 317 | 6/17/2003 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 318 | 6/18/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 319 | 6/18/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

EXHIBIT C
30

| 320 | 6/19/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 321 | 6/23/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 322 | 7/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 323 | 7/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 324 | 7/14/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 325 | 7/16/2003 | Atty Don Bulson | Atty Marc Toberoff | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 326 | 7/21/2003 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 327 | 8/6/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 328 | 8/6/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 329 | 8/12/2003 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 330 | 9/17/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 331 | 9/17/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 332 | 9/17/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 333 | 9/17/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**31**

Oct-23-06    09:48pm    From-                                          T-077    P 027/033    F-893

| No. | Date | From | To | Type | Privilege | |
|---|---|---|---|---|---|---|
| 334 | 10/22/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 335 | 10/22/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 336 | 10/23/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 337 | 10/27/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 338 | 10/28/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 339 | 11/13/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 340 | 11/13/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 341 | 11/18/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 342 | 5/11/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 343 | 5/11/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 344 | 6/3/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 345 | 6/7/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 346 | 6/7/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 347 | 6/7/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

EXHIBIT C
32

Oct-23-06   09:48pm   From-                                    T-077   P 028/033   F-893

| | | | | | |
|---|---|---|---|---|---|
| 348 | 6/8/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 349 | 6/9/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 350 | 6/10/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 351 | 6/15/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 352 | 6/17/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 353 | 6/21/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 354 | 6/21/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 355 | 6/21/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 356 | 6/24/2004 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 357 | 6/27/2004 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 358 | 7/27/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 359 | 7/27/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 360 | 7/28/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 361 | 8/4/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**
**33**

Oct-23-06   09:48pm   From-                                          T-077   P.029/033   F-893

| No. | Date | From | To | Type | Privilege | Party |
|---|---|---|---|---|---|---|
| 362 | 8/5/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 363 | 8/9/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 364 | 8/18/2004 | Atty Don Bulson | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 365 | 8/19/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 366 | 8/22/2004 | Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 367 | 8/22/2004 | Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 368 | 10/5/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 369 | 10/5/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 370 | 10/6/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 371 | 10/6/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 372 | 10/10/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 373 | 10/12/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 374 | 10/12/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 375 | 10/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT C**

**34**

| # | Date | | | Notes | | |
|---|---|---|---|---|---|---|
| 376 | 10/13/2004 | | Atty Don Bulson | | Atty Work Product | Plaintiffs' Counsel |
| 377 | 11/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 378 | 11/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 379 | 11/17/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 380 | 11/17/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 381 | 11/18/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 382 | 11/18/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 383 | 11/19/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 384 | 11/19/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 385 | 11/19/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 386 | 11/24/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 387 | 11/28/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 388 | 11/29/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 389 | 12/2/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**
**35**

| 390 | 12/5/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 391 | 12/6/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 392 | 12/7/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 393 | 1/17/2005 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 394 | 2/4/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 395 | 2/4/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 396 | 2/5/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 397 | 2/5/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 398 | 2/5/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 399 | 2/6/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 400 | 2/17/2005 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 401 | 2/20/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 402 | 2/26/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 403 | 10/8/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT C**

**36**

| 404 | 10/10/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 405 | 10/11/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 406 | 10/11/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 407 | 10/24/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 408 | 10/24/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 409 | 10/24/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 410 | 10/25/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 411 | 10/31/2005 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 412 | 11/18/2005 | Atty Marc Tobroff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 413 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 414 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 415 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 416 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 417 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |

**EXHIBIT C**

**37**

Oct-23-06   09:49pm   From-                                    T-077   P.033/033   F-893

| 418 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 419 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 420 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 421 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 422 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |

EXHIBIT C
38

# EXHIBIT D

Feb-11-08    06:49pm    From-                                              T-771    P.001/008    F-805

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

\* ALSO ADMITTED IN NEW YORK

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

### FACSIMILE COVER PAGE

| **TO:** Meggan A. Rawlin, Esq., James Weinberger, Esq., Patrick Perkins, Esq., Michael Bergman, Esq. | **FAX:** (216)-579-0212, (212)-813-5901; (845)-265-2819; (310)-550-7191 |
| --- | --- |
| **FROM:** Marc Toberoff | **PAGES ( including cover ): 8** |
| **DATE :** 2/11/08 | **RE:** In Re: Subpoena Duces Tecum, Misc. Case No. 00099-SO |

**COMMENTS:**

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.



DEFENDANT'S
EXHIBIT
B-4
4/22/08

**EXHIBIT D**
**39**

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

February 11, 2008

Via Facsimile and US Mail

Roger L. Zissu, Esq.
James D. Weinberger, Esq.
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

David A. Kutik, Esq.
Meggan A. Rawlin, Esq.
Jones Day
North Point
901 Lakeside Drive
Cleveland, Ohio 44114-1190

Re:  In Re: Subpoena Duces Tecum- Misc. Case No. 00099-SO

Dear Counsel:

Pursuant to Judge Oliver's February 5, 2008 discovery order, enclosed please find
respondent Don Bulson's revised privilege log regarding the documents listed on page 8
of the movant's Reply Memorandum filed November 20, 2006.  Please note entry 412
was originally listed as being dated "11/18/05"; this was a typographical error. The
correct date of the document is "11/18/04" and has been corrected in the revised log.

Very truly yours,

Marc Toberoff

cc:  Michael Bergman, Esq.(via Facsimile)
     Patrick Perkins, Esq. (via Facsimile)

**EXHIBIT D**
**40**

Feb-11-08    06:49pm    From-                                    T-771    P.003/008    F-805

# REVISED PRIVILEGE LOG

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 299 | 4/18/2003 | Atty Don Bulson | Joanne & Laura Siegel | Letter discussing accounting issues as they relate to Michael Siegel re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 301 | 4/30/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter discussing accounting issues as they relate to Michael Siegel re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 319 | 6/18/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright. | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 325 | 7/16/2003 | Atty Don Bulson | Atty Marc Toberoff | Facsimile discussing accounting issues as they relate to Michael Siegel re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT D**
**41**

| | | | | |
|---|---|---|---|---|
| 327 | 8/6/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest    Plaintiffs' Counsel |
| 328 | 8/6/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest    Plaintiffs' Counsel |
| 377 | 11/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email regarding offer and counteroffers to sell Michael Siegel's termination interest in light of Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest    Plaintiffs' Counsel |

**EXHIBIT D**

**42**

Feb-11-08    06:50pm    From-                                    T-771    P.005/008    F-805

| No. | Date | Author | Recipient | Description | Privilege | |
|---|---|---|---|---|---|---|
| 378 | 11/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email regarding offer and counteroffers to sell Michael Siegel's termination interest in light of Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 379 | 11/17/2004 | Atty Don Bulson | Atty Marc Toberoff | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 380 | 11/17/2004 | Atty Don Bulson | Atty Marc Toberoff | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |

EXHIBIT D
43

| 381 | 11/18/2004 | Atty Don Bulson | Atty Marc Toberoff | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 386 | 11/24/2004 | Atty Marc Toberoff | Atty Don Bulson | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 388 | 11/29/2004 | Atty Don Bulson | Atty Marc Toberoff | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 393 | 1/17/2005 | Atty Don Bulson | Atty Marc Toberoff | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT D**

**44**

Feb-11-08    06:50pm    From-                                    T-771    P.007/008    F-805

| 412 | 11/18/2004 | Atty Marc Toberoff | Atty Don Bulson | Email discussing Warner Bros.' settlement offers and the risks of litigation re: Joanne & Laura Siegel's 17 U.S.C. § 304(c) termination regarding Jerome Siegel's "Superman" copyright | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT D**

**45**

## CERTIFICATE OF SERVICE

Respondent Don W. Bulson, Esq., hereby certifies that a copy of the forgoing Revised

Privilege Log was served on February 11, 2008 via U.S. Mail and facsimile on the following

counsel:

> Meggan A. Rawlin, Esq.
> Jones Day
> North Point
> 901 Lakeside Avenue
> Cleveland, OH 44114
> Fax: 216-579-0212
>
> James D. Weinberger, Esq.
> Fross Zelnick Lehrman & Zissu, P.C.
> 866 United Nations Plaza
> New York, NY 10017
> Fax: 212-813-5901
>
> Patrick T. Perkins
> Perkins Law Office, P.C.
> 1711 Route 9D
> Cold Spring, NY 10516
> Fax: 845-265-2819
>
> Michael Bergman
> Weissman Wolff Bergman Coleman
>    Grodin & Evall LLP
> 9665 Wilshire Boulevard, Ninth Floor
> Beverly Hills, CA 90212
> Fax: 310-550-7191
>
> Nicholas C. Williamson
> Attorney for Respondent

# EXHIBIT E

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                       CENTRAL DISTRICT OF CALIFORNIA
2

3

    JOANNE SIEGEL and                    )
4   LAURA SIEGEL LARSON,                 )
                                         )
5            Plaintiffs,                 ) Case Nos.
    vs.                                  ) SA CV 04-8400SGL(RZx)
6                                        ) SA CV 04-8776SGL(RZx)
    WARNER BROS. ENTERTAINMENT           )
7   INC., et al.,                        )
                                         )
8            Defendants.                 )
9

                         - - - - -
10          THE DEPOSITION OF DON W. BULSON
              TUESDAY, APRIL 22, 2008
11                       - - - - -
12

13       The deposition of DON W. BULSON, called by
14   the Defendants for examination pursuant to the
15   Federal Rules of Civil Procedure, taken before me,
16   the undersigned, Barbara J. Sedlak, Registered
17   Professional Reporter and Notary Public within and
18   for the State of Ohio, taken at the offices of
19   Renner Otto Boisselle & Sklar, 1621 Euclid Avenue,
20   19th Floor, Cleveland, Ohio, commencing at 9:00
21   a.m., the day and date above set forth.
22

23

24

25

**EXHIBIT E**
**47**

Page 2

1    APPEARANCES:

2         On behalf of the Plaintiffs:

3              Marc Toberoff, Esq.
               Law Offices of Marc Toberoff

4              2049 Century Park East, Suite 2720
               Los Angeles, California 90067

5              310.246.3333

6

         On behalf of Defendants:

7

               James D.  Weinberger, Esq.

8              Fross Zelnick Lehrman & Zissu, P.C.
               866 United Nations Plaza

9              At First Avenue & 48th Street
               New York, New York 10017

10             212.813.5952
               jweinberger@frosszelnick.com

11

12        On behalf of the Witness:

13             Joshua A. Ryland, Esq.
               Renner, Otto, Boisselle & Sklar

14             1621 Euclid Avenue
               Cleveland, Ohio 44115

15             216.621.1113

16

17

18

19

20

21

22

23

24

25

**EXHIBIT E**
**48**

Page 3

1            DEPOSITION OF DON W. BULSON INDEX
2     EXAMINATION                                    PAGE
3     BY MR. WEINBERGER:                              5
4     EXHIBIT                                        PAGE
5     Defendants' Exhibit B-1                         7
      Defendants' Exhibit B-2                         9
6     Defendants' Exhibit B-3                        12
      Defendants' Exhibit B-4                        15
7     Defendants' Exhibit B-5                        39
      Defendants' Exhibit B-6                        50
8     Defendants' Exhibit B-7                        52
      Defendants' Exhibit B-8                        63
9     Defendants' Exhibit B-9                        64
      Defendants' Exhibit B-10                       65
10    Defendants' Exhibit B-11                       66
      Defendants' Exhibit B-12                       66
11    Defendants' Exhibit B-13                       66
      Defendants' Exhibit B-14                       69
12    Defendants' Exhibit B-15                       72
      Defendants' Exhibit B-16                       77
13    Defendants' Exhibit B-17                       82
      Defendants' Exhibit B-18                       83
14    Defendants' Exhibit B-19                       83
      Defendants' Exhibit B-20                       83
15    Defendants' Exhibit B-21                       83
      Defendants' Exhibit B-22                       84
16    Defendants' Exhibit B-23                       90
      Defendants' Exhibit B-24                       95
17    Defendants' Exhibit B-25                       96
      Defendants' Exhibit B-26                       99
18    Defendants' Exhibit B-27                      105
      Defendants' Exhibit B-28                      106
19    Defendants' Exhibit B-29                      111
      Defendants' Exhibit B-30                      118
20    Defendants' Exhibit B-31                      129
      Defendants' Exhibit B-32                      130
21    Defendants' Exhibit B-33                      137
      Defendants' Exhibit B-34                      139
22    Defendants' Exhibit B-35                      144
      Defendants' Exhibit B-36                      147
23    Defendants' Exhibit B-37                      158
      Defendants' Exhibit B-38                      164
24    Defendants' Exhibit B-39                      170
      Defendants' Exhibit B-40                      171
25    Defendants' Exhibit B-41                      172

**EXHIBIT E**
**49**

Page 4

1         Defendants' Exhibit B-42         178

         Defendants' Exhibit B-43         179

2         Defendants' Exhibit B-44         189

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT E**
**50**

Page 5

1              DON W. BULSON

2    of lawful age, called by the Defendants for

3    examination pursuant to the Federal Rules of Civil

4    Procedure, having been first duly sworn, as

5    hereinafter certified, was examined and testified

6    as follows:

7              EXAMINATION OF DON W. BULSON

8    BY MR. WEINBERGER:

9    Q    Good morning.

10   A    Good morning.

11   Q    Mr. Bulson, can you tell me your full name for

12        the record?

13   A    Don William Bulson.

14   Q    You are employed with the Renner Otto firm in

15        Cleveland?

16   A    That's correct.

17   Q    Have you ever been deposed before?

18   A    Yes.

19   Q    How many times?

20   A    I don't remember.

21   Q    More than ten?

22   A    Well, probably on the order of about ten.

23   Q    What kind of matters were you deposed in?

24   A    In mostly with defending infringement opinions

25        or noninfringement opinions, I should say.

EXHIBIT E
51

1    Q    In patent cases?

2    A    Yes.

3    Q    How recently was the last deposition?

4    A    About a year and a half ago.

5              MR. RYLAND:        I'd say

6        longer.

7    A    Longer.

8    Q    Have you taken depositions?

9    A    Yes.

10   Q    Are you a litigator by trade?

11   A    Not anymore.

12   Q    Not anymore.  When did you switch over to

13       opinion?

14   A    This would be about 20 years ago.

15   Q    I assume the majority of the depositions you

16       took ended around that time?

17   A    Yes.

18   Q    Even though I'm sure you are well aware of the

19       rules of the game, I'll go over them very

20       quickly.

21            If you could, make sure that you answer

22       questions yes or no or in some type of audible

23       fashion so the court reporter can get them down

24       as opposed to nodding your head.

25   A    Yes.

1    Q    Please answer questions to the best of your

2         ability.  The fact that an answer to a question

3         may call for you to speculate, if you are able

4         to speculate, you should.  For example, if you

5         are able to guess how large the table is,

6         please do so.  Obviously, you cannot be able to

7         guess the size of the table in my office,

8         because you have never seen it.

9                        - - - - -

10            (Defendants' Exhibit No. B-1 was marked.)

11                        - - - - -

12   Q    We've previously marked Exhibit B-1.  Exhibit

13        B-1 is the subpoena dated August 10, 2006.  Do

14        you recognize this document, Mr. Bulson?

15   A    I suspect I have seen it in the past.

16   Q    Can you confirm that you are appearing pursuant

17        to the subpoena?

18   A    Yes.

19   Q    And I don't know about you, but this is a

20        personal record for me in terms of date and

21        time, date of the subpoena and the actual date

22        of the deposition, but have you reviewed the

23        document categories starting on -- I apologize

24        that the pages are not numbered -- but it's the

25        second to the last page of the document?

Page 8

1    A    I believe I have perused that, yes.

2    Q    Did you make any effort to search for the

3         documents called for by the various categories?

4    A    All of the documents that were requested where

5         sent to Mr. Banchek who is the -- I guess

6         technically he would be called the

7         administrator of the estate of Michael Siegel.

8    Q    So you pulled your files relating to Michael

9         Siegel?

10   A    And I sent them all to Mr. Banchek.

11   Q    Do you know what Mr. Banchek did with those

12        files?

13   A    No.

14   Q    Did you keep a copy?

15   A    We have an archive copy somewhere.

16   Q    So once your forwarded the documents to

17        Mr. Banchek, did you otherwise have any

18        involvement with responding to the subpoena?

19   A    No.

20   Q    And again, if you could look back over the

21        document categories.  Were there any

22        materials -- strike that.

23            Did you look through the specific

24        categories to see if there were specific

25        documents in your files that related to them or

**EXHIBIT E**

**54**

Page 9

1      you just simply turned over the files?

2  A   I just turned over all the files and then it

3      was the responsibility of Mr. Banchek to have

4      provided anything that was appropriate.

5                    - - - - -

6      (Defendants' Exhibit No. B-2 was marked.)

7                    - - - - -

8  Q   I'm going to introduce what's been marked as

9      B-2.  Mr. Bulson, do you recognize this

10     document?

11 A   Well, I don't recall it in detail, but I

12     understand what it is.

13 Q   What is it?

14 A   It's objections to defendants' subpoena.

15 Q   The subpoena to you that we previously marked

16     as Exhibit B-1?

17 A   Yes, that's correct.

18 Q   So I take it you were not involved in the

19     preparation of this document?

20 A   No.

21 Q   Did you review it before it was served?

22 A   I believe I did review it, but I don't recall

23     at the moment.

24 Q   If you can remember.

25 A   Basically this was -- I was deferring to

**EXHIBIT E**

**55**

1    Mr. Toberoff with respect to the issues

2    regarding privilege.

3    Q    As your counsel in connection with responding

4    to the subpoena?

5    A    Yes.

6    Q    So I take it --

7    A    In his capacity he basically -- I was

8    instructed by Mr. Banchek to let Mr. Toberoff

9    object with respect to any issues of privilege.

10   Q    And with respect to issue of privilege relating

11   to Michael Siegel?

12   A    Yes.

13   Q    And how did Mr. Banchek come to be involved?

14   A    He is the administrator of Michael Siegel's

15   estate.

16   Q    Was he appointed by the court?

17   A    Yes.

18   Q    The Ohio Probate?

19   A    Right.

20   Q    Is he still the administrator of the estate?

21   A    As far as I know.

22   Q    Has there been any adjudication of the assets

23   under the estate, that you are aware of?

24   A    I don't know.

25   Q    Do you know if there is any dispute over any of

1          the assets?

2     A    I don't know.

3     Q    So if you did review these, and I think you

4          said that you may have, you are not sure?

5     A    I don't recall.  I mean, I presume it was

6          provided -- a copy was provided to me and I

7          perused it.

8     Q    But if you reviewed it, it was not with the

9          documents in front of you?

10    A    Indeed not.

11    Q    If you go to page 5 of the objections, Exhibit

12         B-2, go to category 2.

13    A    Where now?

14    Q    Exhibit B-2, page 5, category 2?

15    A    Okay.

16    Q    Line 7.  The request called for documents

17         concerning negotiations concerning Superman or

18         Superboy.  Do you recall whether there were any

19         such documents in your files that were

20         responsive to this category?

21    A    There most likely were.

22    Q    Do you recall if any of those documents were

23         not communications between you and your client,

24         Michael Siegel?

25    A    I don't recall.

Page 12

1    Q    How about category three, which relates to any

2         agreements between Joanne and Laura Larson,

3         Michael Siegel, Dennis Larson, Mr. Toberoff or

4         any representative of the Shuster name

5         concerning Superman and/or Superboy, do you

6         recall if there were any such agreements in the

7         files?

8    A    That I can't recall.

9    Q    Category 4, page 6.  The request calls for any

10        documents concerning valuation of any ownership

11        interest in Superman or Superboy.  Do you

12        recall if there were any documents relating to

13        that in your file?

14   A    What do you mean by valuation?

15   Q    Any attempt to put a monetary value on any

16        property interest in Superman or Superboy.

17   A    There would be documents to that effect in

18        there, yes.  I believe I had copies -- well, I

19        know I had copies of proposed agreements

20        between the Siegel family and DC Comics.

21   Q    Anything else that you can remember?

22   A    That's what comes to mind at the moment.

23   Q    You can put number B-2 aside for the moment.

24                        - - - - -

25        (Defendants' Exhibit No. B-3 was marked.)

**EXHIBIT E**

**58**

Page 13

1                      - - - - -

2    Q    I show you what's been marked as Exhibit B-3.

3         Do you recognize this document?

4    A    No.

5    Q    You have never seen it before?

6    A    I don't think so.

7    Q    According to the cover letter under the fax

8         transmission page, the second page of the

9         exhibit, you agree that it purports to be a

10        privilege log?

11   A    That's what it says.

12   Q    Sent to me by Mr. Toberoff for your files?

13   A    This is a cover letter or a facsimile

14        transmittal from Mr. Toberoff to you and then a

15        cover letter indicating that the enclosed is a

16        privilege log.

17   Q    For your files?

18   A    For my files, yes.

19   Q    And these would be the files that were sent to

20        Mr. Banchek in response to the subpoena?

21   A    Correct.

22   Q    But --

23   A    I would assume that's the case, since those are

24        the only files that I'm aware of that would be

25        attributable to me.

Page 14

1    Q    So you didn't review this document before it

2         was sent?

3    A    No, I personally did not.

4    Q    Did someone else in your firm?

5    A    I don't know the answer to that.

6    Q    Do you have any sense of the volume of the

7         files that you forwarded to Mr. Banchek in

8         response to the subpoena?

9    A    That wouldn't be considered privileged, I

10        wouldn't think.   I know there were at least

11        two, three, four banker's boxes.

12   Q    Four banker's boxes?

13   A    Well, I wouldn't say there is four.  I don't

14        recall the exact number, but there were --

15                  MR. TOBEROFF:      Two to four is

16        his answer.

17   A    Probably two to four would be my best

18        recollection.

19   Q    How long did you represent Mr. Siegel?

20   A    For quite a long time.  This would have been

21        back to -- the dates are a bit hazy, but this

22        would have been shortly after the termination

23        notices were filed and he was notified of those

24        and then he came -- then we represented him

25        after that point in time.

**EXHIBIT E**

**60**

Page 15

1   Q    So did you have any -- I believe the notices

2        were served -- the Superman notices were served

3        in 1997.  Did you represent him before that?

4   A    No, not before then.

5   Q    And then let me show you -- I think this should

6        be Exhibit B-4.

7                          - - - - -

8        (Defendants' Exhibit No. B-4 was marked.)

9                          - - - - -

10  Q    Then let me show you Exhibit B-4.  Have you

11       seen this document before?  I don't mean

12       necessarily the cover page, but starting with

13       the letter and the accompanying document.

14  A    I personally have not.

15  Q    So you did not review what --

16  A    Oh, let me look at this.  I can't recall.  I

17       may have perused it.  Are these the documents

18       that -- let's see.  I'm not sure which

19       documents these are.  I can't be sure.  I don't

20       know which document this is.

21  Q    Okay.  My understanding is this is the revised

22       privilege log that the court requested you

23       produce in response to a dispute that arose as

24       a result of claims of joint privilege or common

25       interest?

**EXHIBIT E**
**61**

1    A    I personally did not look at it.

2    Q    As a lawyer who does patent opinions, I assume

3         you have an understanding of the

4         attorney-client privilege?

5    A    To some extent.

6    Q    How long have you been practicing?

7    A    Over 30 years.

8    Q    Do you have an understanding of the common

9         interest exception to the privilege waiver?

10   A    Yes.

11   Q    Sorry.  I didn't mean to --

12   A    To some extent, yes.

13   Q    To some extent.

14                  MR. WEINBERGER:    Well, in going

15        through this, other than the documents that the

16        court asked to be produced, there have been

17        no -- there has been no production of any kind

18        of nonprivileged documents and I don't know

19        what the position is as to whether there were

20        any.  But other than the documents that were

21        produced as a result of the court order, we

22        have nothing from Mr. Bulson's file, so we

23        would like to reiterate the request for

24        production.  I think the objection made it

25        clear that nonprivileged documents would be

1       privileged.   I don't have anything.

2                    MR. TOBEROFF:      Any and all

3       privileged documents would have been produced.

4   Q   Mr. Bulson, have you done anything to prepare

5       for the deposition today?

6   A   Not really.

7   Q   Did you look at any documents?

8   A   No.

9   Q   Did you speak to your attorney?

10  A   Yes.

11  Q   Mr. Toberoff?

12  A   Yes.

13  Q   When?

14  A   Yesterday.

15  Q   For about how long?

16  A   Five minutes.

17  Q   Did you confer with Mr. Ryland or another

18      member of your firm?

19  A   Yes.

20  Q   Mr. Ryland?

21  A   Yes.

22  Q   For about how long?

23  A   Maybe a total of 20 minutes over the course of

24      the day.

25  Q   Glad to see I'm not causing too much of a

1    disruption.

2         Did you speak to Joanne Siegel?

3    A    No.  Well, put a time frame.

4    Q    About this deposition?

5    A    No.

6    Q    Laura Siegel Larson?

7    A    No.

8    Q    Have you spoken to anyone else outside of

9         Mr. Toberoff, Mr. Ryland or another member of

10        your firm about the deposition today?

11   A    No.  Not aside from someone saying what are you

12        doing tomorrow.

13   Q    I understand.  Can you give me a brief summary

14        of your education after high school?

15   A    After high school I went to two years of

16        undergraduate studies at Rensselaer Polytechnic

17        Institute leading towards a bachelor's degree

18        in mechanical engineering.  After that I

19        attended Ohio University for two years where I

20        was awarded my bachelor's degree and my --

21        well -- my master's degree followed about three

22        years later, but I completed my course studies

23        at that point in time.  Then I went to law

24        school at Ohio State University.  And it was

25        while at Ohio State University that I completed

**EXHIBIT E**
**64**

Page 19

1          my master's requirements and received that

2          degree in 1975 and my law degree in 1976.

3     Q    What was your master's in again?  I'm sorry.

4     A    Mechanical engineering.

5     Q    And at that point after getting your law

6          degree, did you enter the workforce?

7     A    Yes.

8     Q    Can you briefly describe your employment

9          history?

10    A    I've been employed at Renner Otto since June of

11         1976.

12    Q    Your first job out of law school?

13    A    Yes.

14    Q    You started as an associate?

15    A    Yes.

16    Q    And at some point did you become a partner in

17         the firm?

18    A    Yes.

19    Q    Or a shareholder?  I'm not sure what the --

20    A    Partner.

21    Q    Partner.  When was that?

22    A    I don't recall.

23    Q    I think you referred to it a little bit when we

24         started, but can you briefly describe your

25         practice area, what kind of work you do?

EXHIBIT E
65

Page 20

1    A    Intellectual property law, counseling in

2         matters relating to patents, copyrights and

3         trademarks.

4    Q    Has that been your chief area of practice since

5         you started?

6    A    Only area.

7    Q    Is that your firm's exclusive practice area?

8    A    Yes.  We are intellectual property lawyers.

9    Q    I think you said before when you were first out

10        of law school you started as a litigator?

11   A    Well, I started as a prosecutor and also was

12        involved in litigation.

13   Q    And then you made a transition to providing

14        mostly counseling work?

15   A    Yes.  And --

16   Q    Patent prosecution?

17   A    And patent prosecution and overseeing patent

18        prosecution and other matters including

19        litigation.

20   Q    What percentage of your work would you say is

21        copyright over the course of your practice?

22   A    Five percent.

23   Q    What kind of copyright matters have you

24        handled?

25   A    Registration disputes, terminations.

**EXHIBIT E**
**66**

Page 21

1   Q   And that was on behalf of Michael Siegel?

2   A   Yes, that is the only termination matter.

3   Q   I was just about to ask, have you been involved

4       in any termination matters?

5   A   No.

6   Q   So around 1997 Michael Siegel became a client

7       of the firm.  How did he find you or how did

8       you find him?

9   A   I don't recall.

10  Q   Was he referred to you?

11              MR. TOBEROFF:     I think that's

12      privileged.

13              MR. WEINBERGER:    He was

14      referred.

15              MR. TOBEROFF:     How he came to

16      have Mr. Siegel as a client is privileged.

17              MR. WEINBERGER:    So you are

18      instructing him not to answer?

19              MR. TOBEROFF:     Yes.

20  Q   The scope of your work for Mr. Siegel was

21      advising him with respect to the copyright

22      termination --

23  A   Yes.

24  Q   -- of Superman?

25              MR. RYLAND:      We're getting

**EXHIBIT E**
**67**

Page 22

1      into the scope of his representation of a

2      client.

3                  MR. WEINBERGER:    Just the

4      general subject matter.  I'm not looking for

5      specific advice.

6                  MR. TOBEROFF:    You can answer

7      as to the general scope.

8   A  General scope involved the representation with

9      respect to the termination.

10  Q  And when -- did that representation conclude at

11     some point?

12  A  I don't think it has concluded.

13  Q  Is Mr. Siegel still living?

14  A  No.  Obviously, we cannot directly represent

15     Mr. Siegel, but we are now acting on behalf of

16     the estate heir with respect to our function as

17     local counsel in the litigation.

18  Q  Who is the estate heir?

19  A  As far as I understand, Laura Siegel is the

20     sole heir.

21  Q  During the course of your representation of

22     Mr. Siegel, and I think for purposes of the

23     deposition you can assume that if I'm asking

24     you about representation, it's during the time

25     that he was living, I'm not asking about after

**EXHIBIT E**

**68**

Page 23

1       the fact.

2  A   Okay.

3  Q   Did you communicate regularly?  I'm only asking

4       for the fact of the communication, not the

5       substance.

6               MR. RYLAND:      I'm not going

7       to instruct him not to answer.

8               MR. TOBEROFF:     You can

9       answer.

10  A   Yes.

11  Q   In what manner?  Again, I'm talking about form

12       of communication, not substance.

13               MR. RYLAND:      To the extent

14       that you can answer without divulging

15       privileged matter.

16  A   Personal meetings, telephone, e-mail, and

17       letters.

18  Q   Did you have a representation agreement?

19               THE WITNESS:      No problem?

20               MR. RYLAND:       Well, to the

21       extent that --

22  A   There is an agreement.

23  Q   And were the terms of your representation on an

24       hourly basis?

25               MR. TOBEROFF:      Object to

**EXHIBIT E**
**69**

1    that.  With a -- you can answer that.

2  A  No.  We have a contingency agreement.

3  Q  Contingent upon receipt of funds relating to

4     the termination?

5  A  Yes.  I mean, that's stating the obvious.

6  Q  What was the percentage?

7              MR. TOBEROFF:    I'm going to

8     object to that.  I'm going to object on the

9     basis of attorney-client privilege, because I

10    am not specifically aware of the laws on that

11    issue in Ohio.

12             MR. WEINBERGER:    Don't worry

13    about the law.  You can either instruct not to

14    answer or --

15             MR. TOBEROFF:    I will

16    instruct him not to answer.

17  Q  Do you recall when you entered into the

18     representation agreement with Mr. Siegel?

19             THE WITNESS:    Okay to

20    answer?

21             MR. TOBEROFF:    Yes.

22  A  This would have been -- I don't know the exact

23     date, but it would have been after the

24     termination -- after the termination notice had

25     been served on DC Comics.

Page 25

1    Q    What is your understanding of copyright

2         termination?

3                        MR. RYLAND:        Objection.

4         Vague.

5                        MR. TOBEROFF:      Calls for a

6         legal conclusion.

7    A    At this point in time it's hazy.  When I was

8         representing Mr. Siegel, I had a pretty good

9         understanding of the law relating to

10        termination.

11   Q    Again, I'm not asking for the substance of

12        specific advice you gave to Mr. Siegel during

13        the representation, but your general

14        understanding of termination.

15                       MR. TOBEROFF:      Same

16        objection.

17                       MR. RYLAND:        Same

18        objection.

19   A    As of several years ago, I thought I had a very

20        good understanding of the law relating to

21        termination.

22   Q    What was that understanding, if you can

23        remember?

24   A    Well, that's what is hazy now.

25   Q    Do you have an understanding of what, if any,

**EXHIBIT E**
**71**

1    rights Michael Siegel has or had with respect

2    to the termination?

3                 MR. RYLAND:        I'm going to

4    assert the attorney-client privilege.

5                 MR. TOBEROFF:        I'm asserting

6    attorney-client privilege, attorney work

7    product.  I will instruct him not to answer.

8  Q  Do you have any understanding -- do you have

9    any understanding of the present situation of

10   any rights of Michael Siegel with respect to

11   copy right termination?

12                MR. TOBEROFF:        Same

13   objection.  Instruct you not to answer.

14 Q  Do you have any understanding of the -- well,

15   do you know whether there is a litigation going

16   on involving --

17 A  Yes.

18 Q  -- termination rights?

19 A  Yes.

20 Q  Do you have any understanding of what is

21   happening in that case?

22 A  Just very peripherally.

23 Q  What is that understanding?

24 A  I read in the newspaper the other day that

25   there was a summary judgment in favor of the

Page 27

1       Siegels with respect to the validity of the

2       termination notices.

3   Q   What paper was that?

4   A   The Cleveland Plain Dealer.

5   Q   As a result of the contingency agreement that

6       you had or that you have with Mr. Siegel or the

7       estate, do you have a stake in the outcome of

8       the lawsuit personally?

9                   MR. TOBEROFF:       Objection.

10      Attorney-client privilege.   Instruct you not to

11      answer.

12  Q   Were you ever on behalf of Michael Siegel

13      involved in negotiations relating to certain

14      termination rights?

15  A   Yes.

16  Q   With who?

17  A   With DC Comics.

18  Q   And --

19  A   And Time Warner.

20  Q   And various Warner entities?

21  A   Well, I met with representatives of DC Comics

22      and I met with representatives of Time Warner.

23  Q   Who did you meet from DC Comics, if you can

24      remember?

25  A   I should remember his name.

**EXHIBIT E**

**73**

Page 28

1    Q    Paul Levitz?

2    A    Paul Levitz was one, yes.  And then there was a

3         lady.

4    Q    An attorney?

5    A    She -- I can't remember.

6    Q    Lillian Lasserson?

7    A    I think that was it.

8    Q    How about anyone else from DC Comics?

9    A    I believe there were others at the meeting, but

10        I can't recall the names.

11   Q    How about from Time Warner?

12   A    Schulman.

13   Q    When I say Time Warner, are you --

14   A    Well, he was with Warner Bros.

15   Q    Anyone else you can recall?

16   A    That's about it right now.

17   Q    Do you know when this was?

18   A    I can't pinpoint the dates.

19   Q    Do you know how many meetings there were?

20   A    We had one meeting in New York and one in

21        California.

22   Q    Do you have an understanding as to when the

23        termination purported to be effective?

24   A    I did.  I can't tell you what the date is.  I

25        don't recall the date.

EXHIBIT E
74

Page 29

1    Q    I can tell you that it was sometime in 1999 as

2         to Superman.  Do you know whether these

3         meetings -- I'm just trying to get the meetings

4         into a time frame.  I assume the meetings took

5         place after the termination notices were served

6         which is --

7    A    Definitely after the terminations were served.

8    Q    So the question is, do you recall whether these

9         meetings took place before the notices became

10        effective?

11   A    I don't recall.

12   Q    What was the nature of these meetings?

13   A    Well, the first meeting was for -- I think the

14        primary purpose of that meeting was for

15        Mr. Levitz and company to explain the basis for

16        the offer they had made to the Siegels.

17   Q    When you say "the Siegels," do you include

18        Michael Siegel in that group?

19   A    Uh-huh.  As an heir.

20   Q    Do you recall --

21   A    Michael and Joanne and Laura were the heirs to

22        Jerome Siegel.

23   Q    Do you recall anything about what the offer

24        was?

25   A    The specifics?

**EXHIBIT E**
**75**

Page 30

1    Q   Yes.

2    A   I can't tell you what the specifics are right

3         off the top of my head, no.

4    Q   Do you have any recollection of the terms or

5         dollar numbers, anything like that?

6    A   I think -- I believe there was an upfront

7         payment and then ongoing payments.

8    Q   That's the meeting in New York?

9    A   That's the meeting in New York, yes.

10   Q   Was your client present?

11   A   No.

12   Q   Were Joanne and Laura Siegel Larson there?

13   A   No.

14   Q   Were they represented by counsel?

15   A   Yes.

16   Q   That's the Gang Tyre firm?

17   A   Yes.

18   Q   And then I think you said there was a second

19        meeting in California?

20   A   Yes.

21   Q   Do you know about what the time frame was

22        between the two meetings?

23   A   California was later.

24   Q   And what happened at that meeting?

25   A   I don't have a really good recollection at this

**EXHIBIT E**
**76**

Page 31

1          point in time.

2     Q    The general subject matter was further

3          discussions as to the potential settlement?

4     A    I would presume.

5     Q    On behalf of Michael Siegel have you ever had

6          any separate negotiations with DC Comics

7          independent of Joanne and Laura Siegel?

8     A    Not that I can recall.

9     Q    Or with any other Time Warner entities?

10    A    Not that I can recall.

11    Q    How about with Joanne and Laura Siegel?

12    A    I believe that might be subject to privilege.

13                   THE WITNESS:      Yes?  No?

14                   MR. RYLAND:       Can you repeat

15         the question, please?

16                   MR. TOBEROFF:     It's vague and

17         ambiguous.

18    Q    Have you ever had negotiations on behalf of

19         Michael Siegel, Joanne and Laura Siegel

20         regarding the termination interest?

21                   MR. RYLAND:       Same

22         objection.   Vague.

23                   MR. TOBEROFF:     You can answer

24         as long as it's clear to you what he's asking.

25    A    What do you mean by negotiations?

Page 32

1    Q    Have you -- in connection with your

2         representation of Mr. Siegel, has Joanne and/or

3         Laura Siegel -- I'm going to call them

4         collectively the Siegels.  If there is a need

5         for me to break it out, please let me know.

6         Have the Siegels ever offered to purchase

7         Michael Siegel's termination interest?

8                   MR. TOBEROFF:    You can answer

9         that.

10   A    No.  Not to my knowledge.

11   Q    Would the answer be the same if it was Joanne

12        or Laura individually?

13   A    Yes.

14   Q    Is the same answer with respect to

15        Mr. Toberoff -- well, let me restate the

16        question.

17            Has Mr. Toberoff ever made an attempt

18        either on his own behalf or on behalf of

19        somebody else to purchase Mike Siegel's

20        termination interest?

21                   MR. TOBEROFF:    Compound.  Are

22        you asking whether I personally have ever asked

23        to purchase his termination interest?

24   Q    I'm asking whether Mr. Toberoff has contacted

25        you with respect to an offer to purchase

**EXHIBIT E**
**78**

Page 33

1     Michael's termination interest.

2             MR. TOBEROFF:    But the way

3     you phrased the question --

4             THE WITNESS:    That's two

5     different questions.

6             MR. WEINBERGER:   I don't know

7     the answer yet.

8  Q  Have you been contacted by Mr. Toberoff with

9     respect to an offer to purchase Michael

10    Siegel's termination interest?

11           MR. TOBEROFF:    By anyone?

12  A  Yes.

13  Q  Yes, by anyone or yes, by Mr. Toberoff.

14  A  Now I'm confused.

15  Q  The question was --

16           MR. WEINBERGER:   Mr. Toberoff,

17    I think you said by anyone. But my question

18    was as to Mr. Toberoff.

19           MR. TOBEROFF:    Excuse me.

20    There's an easier way to ask the question.

21    Don't ask it in an awkward fashion. Ask it so

22    the record is clear. If you want to know

23    whether he's been contacted by me with respect

24    to a purchase by me of Michael Siegel's

25    beneficial interest in the termination, then

EXHIBIT E

79

1    ask that question.  If you want to know whether

2    he's been contacted with respect to the

3    purchase by somebody else, ask that question.

4    Don't leave it in an ambiguous fashion.

5             MR. WEINBERGER:    I did not

6    leave the question in an ambiguous fashion.

7             MR. TOBEROFF:    I believe you

8    did.

9             MR. WEINBERGER:    I asked the

10   question with respect to you personally.  Has

11   he been contacted by you.  However, please

12   don't make speeches on the record with respect

13   to objections.  Stated an objection or instruct

14   him not to answer and that's it.  I'm asking

15   the questions, please.

16        Can you read back the question?

17             (Record was read.)

18   A    Do you want to restate that?

19   Q    I'll restate that.  Have you ever been

20   contacted by Mr. Toberoff where an offer was

21   conveyed to purchase Michael's interest in the

22   termination?

23   A    Yes.

24             MR. TOBEROFF:    Any offer?

25             MR. WEINBERGER:    Any offer.

Page 35

1    Q    And when was that?

2    A    I don't recall.

3    Q    Do you know on whose behalf the offer was made?

4    A    No.

5    Q    Was that an investor?

6    A    That's how it was referred to.

7    Q    Do you know the identity of the investor?

8    A    No.

9    Q    Were there ever any other offers?

10               MR. TOBEROFF:       Vague and

11       ambiguous.

12   Q    Let me step back.  As with any negotiation

13       there is an initial offer and then a discussion

14       and there is either a resolution or there is

15       not.  So I'm trying to treat the investor's

16       offer as one negotiation.  The question is

17       whether there were any separate negotiations.

18   A    I recall that there was one.  I can't recall at

19       the moment if there was another one.  I know

20       there was one.

21   Q    Have you ever heard of a company called

22       Intellectual Property Worldwide?

23   A    I don't think so.

24   Q    Or IP Worldwide?

25   A    I don't think so.

Page 36

1    Q    Have you ever heard of Ariel Emanuel?

2    A    I have heard the name.

3    Q    Where?

4    A    From where?  I think in discussions with

5         Mr. Toberoff.

6    Q    Do you recall in what context?

7    A    No.

8    Q    Do you know who Mr. Emanuel is?

9    A    I think I looked him up on the Internet once

10        and I can't recall really exactly what I

11        learned at that point in time.

12   Q    Have you ever heard of a company called Pacific

13        Pictures?

14   A    I don't recall.

15   Q    In your capacity of representing Mr. Siegel,

16        were you ever contacted by anyone else with

17        respect to an offer to purchase the termination

18        interest?

19             MR. TOBEROFF:       Anyone other

20        than me?

21   Q    Anyone other than the people we've discussed,

22        the Siegels, Mr. Toberoff, DC Comics, Time

23        Warner.

24             MR. TOBEROFF:      That misstates

25        the testimony.

EXHIBIT E
82

Page 37

1           MR. WEINBERGER:    I asked if

2      there is anybody else that we have not

3      discussed.  I'm not suggesting that he was

4      contacted by some of the people I mentioned.

5      I'm just asking whether I have missed anybody.

6           MR. TOBEROFF:      Misstates the

7      testimony.  You can answer.

8   A  No.

9   Q  So with respect to the negotiations with

10     respect Mr. Toberoff, which I think was on

11     behalf of an investor, a nondisclosed investor,

12     do you recall whether an offer was made to

13     purchase Michael Siegel's termination interest?

14  A  I believe there were preliminary numbers

15     proposed, yes.

16  Q  Do you have a recollection of what those

17     numbers were?

18  A  No.

19  Q  Do you have a recollection in general terms of

20     the proposal outside of the numbers?

21  A  It's very hazy.

22  Q  Do you recall whether there was -- whether the

23     proposal was an outright purchase?

24  A  I'm better off not speculating

25  Q  That's fine.  But the general scope of the

**EXHIBIT E**
**83**

1    discussion was Michael Siegel's termination

2    interest?

3  A   Right.  His rights.

4  Q   In Superman or Superboy?

5  A   Right.  That is correct.

6  Q   Did Michael Siegel ever inter into an agreement

7    to sell his termination interest?

8              MR. TOBEROFF:     You can answer

9    that.

10 A   No.

11 Q   Do you know if --

12             MR. TOBEROFF:     For purposes

13    of clarification, when you refer to Michael

14    Siegel's termination interest, what are you

15    referring to?

16             MR. WEINBERGER:    Well, the

17    witness has not -- I've not been -- I'm

18    referring to the 25 percent passive interest

19    held by Mr. Siegel when he was alive.

20 A   That's what I assumed to be the case.

21             MR. TOBEROFF:     In the

22    termination filed by Joanne and Laura Siegel?

23             MR. WEINBERGER:    Yes.  That's

24    for both Superman and Superboy, and for

25    purposes of the deposition going forward --

Page 39

1       well, forget that.  We'll deal with it as it

2       comes up.

3  Q   Were you aware if Michael Siegel ever made any

4       attempt to value his termination interest?

5             MR. RYLAND:        Objection.

6       Vague.  To the extent that it calls for

7       attorney-client privilege material, I ask you

8       not to answer.  But if you can answer without

9       disclosing it, well, I'll defer to

10      Mr. Toberoff.

11           MR. TOBEROFF:     I'll object on

12      the basis of attorney-client privilege,

13      attorney work product, and instruct him not to

14      answer.

15           MR. WEINBERGER:    The question

16      was whether he was aware of whether his client

17      ever made an attempt to put a monetary value on

18      the interest.

19           MR. TOBEROFF:      It reveals the

20      substance of those conversations.

21           MR. RYLAND:        I'll defer to

22      Mr. Toberoff on that.

23            - - - - -

24      (Defendants' Exhibit No. B-5 was marked.)

25            - - - - -

**EXHIBIT E**
**85**

Page 40

1    Q    You've been given a copy of Exhibit B-5.   Do

2         you recognize this document?

3    A    I don't recall.

4    Q    Please look at the second page of the letter.

5         Do you see you're named as a c.c. at the

6         bottom?

7    A    Yes.

8    Q    Did you receive this?

9    A    I don't recall.

10   Q    If you go back to the first page and look at

11        the first large paragraph.   Do you see that the

12        letter references a meeting with Paul Levitz in

13        New York?

14   A    Yes.

15   Q    Is this the meeting that you referred to in New

16        York?

17   A    Since there was only one meeting with Paul

18        Levitz in New York, I think that the assumption

19        would be that would be the same meeting.

20   Q    Well, the reason I'm asking is, if you look at

21        the letter, it talks about the meeting would be

22        for the purpose of reviewing and discussing

23        worldwide income generated by the Superman

24        property.   And --

25   A    I'm not telling you I have not seen this

1      letter.  I just don't recall.

2    Q  No, I understand that.  It's a number of years

3      ago.  But I think you said before that the

4      meeting in New York that you attended was to

5      discuss the settlement proposal?

6    A  My recollection was that most of the time was

7      spent by DC Comics explaining why their offer

8      was fair.

9    Q  Were you ever given an opportunity to review DC

10     Comics' books and records as was proposed in

11     this letter?

12   A  DC Comics never presented their books and

13     records to me.

14   Q  Do you know if they were presented to Michael

15     Siegel?

16   A  I don't know.  To Michael Siegel?

17   Q  Yeah.

18   A  I have no knowledge of that happening.

19   Q  In the second full paragraph there is a note

20     that says, "John."  Starting with paragraph

21     that starts "John."

22   A  Yes.

23   Q  In the second line there is a discussion about

24     if there is an agreement, it ought to be based

25     on fair market valuation of the rights at

Page 42

1    issue.  Do you know if ever such a valuation

2    was even undertaken?

3                    MR. TOBEROFF:      You are asking

4    whether any valuation was undertaken or a fair

5    market valuation was undertaken?

6                    MR. WEINBERGER:    I'll start

7    with undertaken.

8                    MR. TOBEROFF:      Undertaken by

9    who?

10                    MR. WEINBERGER:    The letter is

11   discussing -- at least I read it as discussing

12   a collective effort between the Siegel family

13   and DC/Time Warner to undertake a fair market

14   valuation, so I'm asking in the broadest sense

15   as possible.

16                    MR. TOBEROFF:      Objection.

17   Attorney work product to the extent whether you

18   undertook a valuation.

19                    MR. WEINBERGER:    I'm asking

20   whether he's aware whether a valuation was

21   undertaken.

22                    MR. TOBEROFF:      By anyone

23   other than him?

24                    MR. WEINBERGER:    Yeah, in

25   connection with the negotiations.

EXHIBIT E
88

Page 43

1          MR. TOBEROFF:      You can answer

2     except by anyone other than you on behalf of

3     Michael Siegel.

4  A  By anyone other than me?  I suspect there were

5     valuations made because it was involved in the

6     negotiations between DC Comics and the Siegel

7     family.  And when you are negotiating,

8     obviously, you are going to make some

9     valuation.  It's part and parcel of the

10    negotiation process.

11 Q  Do you have any specific recollection during

12    the negotiations of a valuation having been

13    made?

14 A  There were proposals and counterproposals made,

15    so those would reflect valuations at that point

16    in time.

17 Q  Did the parties make any effort to take the

18    numbers to an outside accountant or --

19          MR. TOBEROFF:      Which parties?

20 Q  All of the parties together; DC, Time Warner,

21    the Siegel family.

22          MR. TOBEROFF:      Objection.

23    Attorney work product.  Joint interest

24    privilege.

25          MR. WEINBERGER:    The question

**EXHIBIT E**
**89**

Page 44

1      is together DC, Time Warner entities, the
2      Siegels altogether not on their own.
3   A  I'm not aware of that.  I'm not aware of
4      anything.
5   Q  Thank you.  Do you know if -- do you recall if
6      you had previously received any correspondence,
7      any nonprivileged correspondence, relating to
8      the termination prior to this letter?
9   A  Nonprivileged?
10            MR. TOBEROFF:      Calls for a
11     legal conclusion.
12  A  I don't recall that.
13  Q  Well, do you recall from the outset of your
14     representation of Michael Siegel -- and I don't
15     want you to reveal any privileged
16     communications -- but how did you come to be
17     involved in the negotiations with the Time
18     Warner entities?
19  A  As we've indicated before, I was retained by
20     Michael to represent him in connection with
21     the -- his ownership interest in the Superman
22     copyright.
23  Q  Right.  So on behalf of Mr. Siegel, did you
24     then call Time Warner?
25  A  Well, Mr. Siegel --

**EXHIBIT E**
**90**

Page 45

1   Q   I'm just trying to get a sense of how you came

2       into --

3   A   My hesitation is whether or not that simply

4       would be considered privileged.

5            MR. TOBEROFF:    If your answer

6       involves communications with Laura or Joanne

7       Siegel or their counsel, then I object on the

8       attorney-client, attorney work production basis

9       and instruct him not to answer.

10           MR. RYLAND:    Just to be

11      clear on the record, I don't know if there is a

12      letter with the court reflecting this, that

13      Mr. Toberoff's client is the presumptive holder

14      of the privilege.  I instruct you not to

15      answer.

16           MR. WEINBERGER:   No, I

17      understand the instruction.

18           MR. RYLAND:    When I say I

19      defer to Mr. Toberoff, I just want it to be

20      clear.

21           MR. WEINBERGER:   I understand.

22           MR. TOBEROFF:    I'm here

23      representing the estate of Michael Siegel as

24      well as Laura and Joanne Siegel.

25           MR. WEINBERGER:   And Mr. Bulson

**EXHIBIT E**
**91**

Page 46

1   as well, right?  Because the subpoena is not to

2   the estate, it's to Mr. Bulson.

3                    MR. TOBEROFF:      I understand.

4                    MR. WEINBERGER:    I just want to

5   make sure.

6   A   But the estate is the privilege holder.

7   Q   I understand that's your position.  So are you

8   not -- do you not have an answer?

9   A   I don't know how to formulate an answer that

10  might not run afoul of divulging information I

11  was instructed not to provide.

12  Q   So again, without getting into the privilege,

13  were you ever contacted by representatives of

14  Time Warner or DC Comics with respect to

15  becoming involved in the negotiations?

16  A   Who do you mean by you?  Me personally?

17  Q   You as Michael Siegel's counsel, were you

18  contacted by anyone?

19  A   No.

20                    MR. RYLAND:       Vague and

21  ambiguous.

22  A   I was not contacted -- well, it is vague and

23  ambiguous.

24  Q   At the outset?

25  A   At the outset I was not contacted by Time

EXHIBIT E
92

1       Warner or DC Comics.

2   Q   And then I said, did you contact any

3       representative of Time Warner and DC Comics?

4   A   No.  No.

5                   MR. TOBEROFF:      Same

6       objection.

7   Q   Was there anyone else other than the Time

8       Warner entities and the Siegel family or their

9       representatives with whom you discussed --

10  A   Well, the Siegel family was represented, I

11      believe, initially by Mr. Levine.

12  Q   Right.  So putting aside the Siegels or their

13      lawyers and the Time Warner entities and their

14      lawyers, did you discuss or -- what I'm trying

15      to get at is, whether there was any other party

16      that brought you into these negotiations?

17  A   Well, the question is ambiguous.  I believe the

18      answer you are looking for is no.

19                  MR. TOBEROFF:       Vague and

20      ambiguous.

21  Q   I was not looking for it, but I suspected it

22      was no.

23      Do you recall how long the New York

24      meeting was?

25  A   I believe it lasted a day.

1    Q    Any progress come from that meeting?

2    A    I don't remember.

3                  MR. TOBEROFF:        Vague and

4         ambiguous.

5    Q    During the course of negotiations between the

6         Siegel family and the Time Warner entities, did

7         Michael Siegel have regular communications with

8         Joanne and Laura either on their own or through

9         representatives?  I'm not asking for the

10        substance.

11                 MR. TOBEROFF:        Objection on

12        the basis of the joint privilege.  Instruct you

13        not to answer.

14                 MR. WEINBERGER:    As to whether

15        or not communications took place?

16                 MR. TOBEROFF:        He can answer

17        as to whether or not communications took place.

18                 MR. WEINBERGER:    That's all I'm

19        asking.

20   A    Between whom?

21   Q    I'm asking the question to include legal

22        counsel, so Michael Siegel and his

23        representatives on the one hand, and Joanne and

24        Laura on the other?

25   A    Yes, communications did take place, yes.

Page 49

1    Q    Weekly?  Monthly?

2    A    I can't recall the specifics.  I would suspect

3         it varied over the course of time.

4    Q    Was there ever an -- I know there has been an

5         exercise of common interest on behalf of the

6         estate and Joanne and Laura Siegel with respect

7         to the settlement negotiations between the

8         Siegel family and the Time Warner entities.

9         Was there ever a written agreement relating to

10        that?

11              MR. RYLAND:        Objection.

12        Vague.

13   Q    Relating to the common interest?

14              MR. TOBEROFF:       Object.

15        Attorney-client privilege.  Work product.

16        Instruct you not to answer.

17        You are referring to a written agreement

18        regarding?

19              MR. WEINBERGER:     Common

20        interest.

21              MR. TOBEROFF:       Common

22        interest vis-a-vis the defendants in this case?

23              MR. WEINBERGER:     Vis-a-vis the

24        settlement negotiations.

25              MR. TOBEROFF:       Concerning

EXHIBIT E
95

1          the settlement negotiations with the defendants

2          in this case?

3                         MR. WEINBERGER:      Yes.  Yes.

4                         MR. TOBEROFF:       Same

5          objection.  Same instruction.

6                         MR. WEINBERGER:     I assume

7          you'll give the same instruction if the

8          question is if there was ever a discussion

9          about the common interest between the Siegel

10         family members?

11                        MR. TOBEROFF:       Same

12         objection.  Same instruction.

13                         - - - - -

14          (Defendants' Exhibit No. B-6 was marked.)

15                         - - - - -

16    Q    Mr. Bulson, I've put -- we've marked Exhibit

17         B-6.  Do you recognize this document?

18    A    Not really.

19    Q    Do you know who Carol Simkin is?

20    A    I believe she's an attorney at Fross Zelnick.

21    Q    Did you ever speak with her by phone?

22    A    I think so.

23    Q    Did you meet her in person?

24    A    I can't recall if she was at the meeting at DC

25         Comics or not.  She may have been.  I don't

Page 51

1              recall.

2        Q     Is she someone you dealt with during the

3              negotiations?

4        A     I don't recall specific conversations with her,

5              but based on the contents of this letter, we

6              obviously -- or we appeared to have had a

7              telephone conference.

8        Q     I don't know if you have any specific

9              recollection of that conference.  If you have

10             to read the letter to refresh your

11             recollection, that's fine.

12       A     No.  This, I think, actually reflects an

13             understanding that we had that the confidential

14             information that was provided by DC Comics

15             would be maintained in confidence.

16       Q     By you on behalf of Michael Siegel?

17       A     That's correct.

18       Q     Do you know if your client signed any

19             confidentiality agreement relating to the

20             subject matter that's discussed in the letter?

21       A     I don't recall.

22       Q     Do you know if you received this letter?

23       A     I don't recall.

24       Q     Do you see in the second paragraph it requests

25             that you send a confirmatory response?  Do you

**EXHIBIT E**
**97**

Page 52

1        know if you did that?

2    A   I don't recall.

3                    - - - - -

4        (Defendants' Exhibit No. B-7 was marked.)

5                    - - - - -

6    Q   A copy of Exhibit B-7 I have handed to you.  Do

7        you recognize this document?

8    A   I have no present recollection other than what

9        I'm seeing in front of me at the moment.

10   Q   If you look at last page of the exhibit, the

11       Bates number is 567.

12   A   It shows that I was copied, yes.

13   Q   Do you know if you were in fact copied?

14   A   I can't tell you for sure.  I suspect I was.

15   Q   The only reason I'm asking is, this letter did

16       not come from -- we didn't get -- we had a very

17       small production from what was your file.  This

18       comes from the plaintiff's production, but you

19       don't -- do you specifically recall having this

20       letter?

21   A   It looks vaguely familiar.

22   Q   Were you involved in the preparation of this

23       letter?

24   A   I don't recall.

25   Q   Did you see it before it was sent?

**EXHIBIT E**
**98**

Page 53

1   A    I better not answer too quickly.

2               MR. TOBEROFF:      I'm sorry.  I

3   was perusing the letter.

4               MR. WEINBERGER:     I asked if he

5   had seen it before it was sent.

6               MR. TOBEROFF:      I think

7   that's privileged.

8          I instruct you not to answer.

9   Q    Stepping back from this specific

10  correspondence -- we'll go back to the letter

11  in a second -- did Michael Siegel take an

12  active role in these negotiations?

13              MR. TOBEROFF:      Vague and

14  ambiguous.  Also privilege.

15         I'm instructing you not to answer.

16         I mean, let me rephrase that.

17         You can answer to the extent it refers to

18  communications with third parties other than

19  the attorneys representing Joanne and Laura

20  Siegel.

21  A    If qualified in that respect, he did not take

22  an active participation.

23  Q    Is that because his termination interest was

24  passive?

25              MR. TOBEROFF:   Attorney-client.

Page 54

1    Attorney work product.

2         Instruct you not to answer.

3              MR. RYLAND:        Legal

4    conclusion.

5    Q    What was he like, Michael Siegel?

6    A    To what extent do I answer that?

7    Q    His personality.

8              MR. TOBEROFF:        Vague.  His

9    mental impressions of his clients are

10   privileged.

11        I instruct you not to answer.

12        I don't know if I'd go so far as to say

13   it's work product.

14              THE WITNESS:        I think your

15   comment was correct.

16   Q    If you would look at -- sorry.  If you would

17   look at Bates number page 560 of Exhibit 7.

18   This is a March 7, 2000 letter from Gang Tyre

19   and Carol Simkin.  Do you see the apportionment

20   issue?

21   A    Yes.

22   Q    Do you have an understanding of what that

23   means?

24   A    I remember the apportionment issue that was

25   discussed at DC Comics, yes.

EXHIBIT E
100

Page 55

1    Q    What is your recollection of that discussion?

2    A    About the intertwining of the Superman property

3         with other properties that belonged to DC

4         Comics.

5    Q    It was specifically about Superman versus other

6         properties?

7    A    Yes.

8    Q    If you look at --

9    A    How to apportion the revenues.  For example,

10        this sticks in my mind, that one of the points

11        that DC Comics was making is that if we

12        generate profits from the sale of a collection

13        of action figures such as Superman and Batman,

14        DC felt that there had to be an apportionment

15        made.  So you were not entitled to all of the

16        profit was the position taken by DC Comics.

17   Q    If you look at the paragraph just below that

18        second heading, do you see where it says, "The

19        thrust of your letter, insofar as the

20        apportionment issue is concerned, is that the

21        Siegel interests are limited to the material in

22        Action Comics No. 1."  Do you see that?

23   A    Yes.

24   Q    Do you recall discussions about an

25        apportionment on this basis?

**EXHIBIT E**
**101**

Page 56

1            MR. TOBEROFF:        Vague and

2      ambiguous.

3   Q   Meaning --

4   A   During the discussions with DC Comics?

5   Q   Yes.

6   A   Yes.  As I just mentioned.

7   Q   Well, I think there is a separate issue.

8   A   Oh, DC's position was that, you know, it had to

9      be the properties that arose from Action Comics

10     No. 1, because their position was that the

11     termination was effective only with respect to

12     Action Comics No. 1.

13  Q   Was that a point of contention in the

14     negotiations, if you can recall?

15  A   I don't recall that.

16  Q   Do you ever recall discussing with any

17     representative of Time Warner or DC Comics that

18     particular issue?

19  A   This issue was most likely discussed at that

20     meeting and perhaps at the meeting in Los

21     Angeles as well.

22  Q   Do recall any specifics?

23  A   I don't remember the specifics, no.

24  Q   Do you recall anything at all about those

25     discussions other than --

EXHIBIT E
102

Page 57

1    A    Yes.

2    Q    -- they occurred?

3    A    Yes.

4    Q    What is that?

5    A    That they took place and I mean one issue was

6         apportionment.  That was a topic that was

7         being -- DC Comics wanted to explain with

8         respect to their opinion of apportionment.

9    Q    I take it this letter is a response to that

10        position with respect to apportionment?

11   A    It would appear.

12   Q    You don't recall their --

13   A    I don't recall, no.

14   Q    Have you ever seen the termination notices?

15   A    Yes.

16   Q    Did you keep a copy of them in your files?

17   A    I believe they were turned over to Mr. Banchek.

18   Q    There are seven Superman notices?

19   A    Let's qualify that.  Which termination notices?

20   Q    The Superman notices.

21   A    The original ones, I did have a copy.

22   Q    And there was a subsequent Superboy

23        termination.  Did you ever see that?

24   A    I don't remember if I had a copy of that or

25        not.

EXHIBIT E
103

Page 58

1    Q    In your capacity of representing Michael

2         Siegel, have you ever had discussions regarding

3         the termination interest with any person who

4         represented -- this is getting a little

5         convoluted -- who identified themselves as a

6         representative of the Shuster family?

7                        MR. TOBEROFF:       You can

8         answer that question.

9    A    What was the question?

10   Q    The question was as Michael Siegel's lawyer

11        were you ever contacted about the termination

12        by someone who represented -- who identified

13        themselves as a representative of the Shuster

14        family?

15   A    Contacted by a representative?  Yes.

16   Q    And who was that?

17   A    Mr. Toberoff.

18   Q    Anyone else?

19   A    No.

20   Q    Did the Shuster family make any offer with

21        respect to Michael Siegel's termination

22        interest?

23                        MR. TOBEROFF:       Without

24        waiver of any objections, I would just like to

25        say for the record that if I allow him to

EXHIBIT E
104

Page 59

1    answer any questions in that regard, that that

2    might be regarded as borderline.  It should not

3    be deemed, in any event, as a waiver of the

4    privilege.  Is that acceptable to you?

5                MR. WEINBERGER:    I understand

6    your position.  I mean, it depends on what he

7    says.  I can't agree to -- I mean, I don't

8    think there is any privilege implicated in that

9    question.

10               MR. TOBEROFF:       There is.

11   Sometimes we have an agreement with counsel at

12   depositions, as you know, that allows the

13   witness to answer and the answer should not be

14   deemed as a waiver of the privilege.

15               MR. WEINBERGER:    I am not

16   construing your allowing to him to answer as a

17   waiver of privilege, but if he says something

18   that I'm not expecting, I can't --

19               MR. TOBEROFF:      I am only

20   referring to when I allow him to answer if he

21   answers and don't bring up the fact of

22   privilege.

23               MR. WEINBERGER:    That's fine.

24  A  What was the question?  To me?

25  Q  Yes.

**EXHIBIT E**
**105**

Page 60

1  A  No.

2  Q  Do you know if they made an offer to Michael

3     Siegel?

4  A  I have no knowledge of that.

5         MR. WEINBERGER:    Can you read

6     back the question and previous answer?

7         (Record was read.)

8  Q  What was the substance of the communication

9     between Mr. Toberoff as a representative of the

10    Shuster family and you on behalf of Michael

11    Siegel?

12        MR. TOBEROFF:      Objection.

13    Joint interest privilege.  Instruct him not to

14    answer.

15 Q  When were you contacted by Mr. Toberoff on

16    behalf of the Shuster family?

17 A  I don't believe I ever -- you are assuming a

18    fact that is not in testimony.

19 Q  I thought you said yes, you were contacted.

20 A  You said -- when you say -- it goes to the

21    ambiguity of your original question.  When you

22    say on behalf of the Shusters --

23 Q  The original question was, were you contacted

24    by someone who identified themselves as a

25    representative of the Shuster family?

EXHIBIT E
106

1    A    Was I contacted with respect to the termination

2         notices by someone who indicated they

3         represented the Shusters?  And the answer to

4         that question was yes.

5    Q    This is not overcomplicated.  I'm trying to

6         understand what was the substance of that

7         communication.

8                   MR. TOBEROFF:      I think the

9         problem is -- I'm not trying to lead the

10        witness.  The problem is, when you are saying

11        contact by somebody on behalf, it suggests --

12        the way you've phrased it, it suggests that the

13        nature of the contact was to talk about the

14        Shusters.  Where what he's saying is --

15                   MR. WEINBERGER:    I got it.  I

16        got it.

17                   MR. TOBEROFF:      -- he knows

18        we're representing them.

19                   MR. WEINBERGER:    I got it.

20   Q    So putting aside the fact that Mr. Toberoff

21        represents the Shusters and certain members of

22        the Siegel family, have you, as Michael

23        Siegel's representative, been contacted by the

24        Shuster family either on their own or through

25        their representative with respect to the

1     Superman termination?  So the question is

2     not -- the question is not -- you have spoken

3     to Mr. Toberoff, he happens to represent them.

4     The question is whether they have contacted

5     Michael Siegel either on their own or through a

6     representative?

7                    MR. TOBEROFF:      You can answer

8     that question.

9    A    Not to my recollection.

10                    MR. TOBEROFF:     Before we

11    continue on, I'll withdraw my objection and

12    allow the witness to answer the question you

13    asked regarding his contingency fee agreement.

14    You had asked him what is the contingency.

15                    MR. WEINBERGER:    Thank you.

16   Q    Please answer.

17   A    What was the question?

18   Q    What was the contingency fee arrangement with

19    Michael Siegel?

20   A    My recollection is it was 30 or 33 percent of

21    any proceeds received by Michael.

22   Q    And is it your understanding that that

23    agreement survives his death?

24   A    That's our position, yes.

25   Q    You said you have not been following the

1          lawsuit?

2     A    What happens happens, right?

3     Q    Fair enough.

4                    - - - - -

5          (Defendants' Exhibit No. B-8 was marked.)

6                    - - - - -

7     Q    The reporter has marked Exhibit B-8.  It's a

8          March 21, 2000 letter to you from Carol Simkin.

9          Do you recall receiving this letter?

10    A    I don't recall the letter, no.  That doesn't

11         mean I didn't receive it.  I presume I did.

12    Q    Do you recall this issue about a

13         confidentiality agreement?

14    A    I know there was discussions with respect to

15         keep confidential information that was provided

16         to us with respect to the negotiations with DC

17         Comics.

18    Q    I think you can see that Ms. Simkin is

19         referencing a January 19, 2000 meeting and I

20         think previously we had marked Exhibit 6, a

21         February 1, 2000 letter, and that is a March

22         21, 2000 letter on this issue.  You know, I

23         read this to have Ms. Simkin asking you for

24         written confirmation about the confidentiality.

25    A    Yes, that appears to be the case.

EXHIBIT E
109

Page 64

1    Q    Do you have an understanding as to why there

2         had not been a written understanding provided?

3    A    I don't recall.

4                        - - - - -

5         (Defendants' Exhibit No. B-9 was marked.)

6                        - - - - -

7    Q    And then Exhibit 9, do you recognize this

8         document?

9    A    No.

10   Q    This is a letter from you to Ms. Simkin dated

11        March 22, 2000?

12   A    It appears to be the case.

13   Q    And would you agree, sir, that this is your

14        written confirmation with respect to the

15        confidentiality issue?

16   A    I'd have to read both letters to answer that,

17        but it does indicate that, confirm your

18        understanding set forth in your letter of

19        February 1, 2000.

20   Q    It's Exhibit 6?

21   A    Exhibit 6.  And an apology for the delay.

22   Q    But you don't recall the reason for the delay?

23   A    No.

24   Q    You can put that down.  Do you recall being

25        involved in discussions with Time Warner and DC

**EXHIBIT E**
**110**

Page 65

1      Comics with respect to a Tolling Agreement?

2  A   I believe a Tolling Agreement went into effect,

3      yes.

4  Q   Do you know why?

5  A   I don't recall the specifics at this point in

6      time.

7  Q   Do you recall whether Michael Siegel signed the

8      Tolling Agreement?

9  A   I don't recall.

10 Q   I'm sorry.  You said you were involved in

11     discussions about a Tolling Agreement?

12 A   I remember that there was -- there were

13     discussions regarding a Tolling Agreement, but

14     not much more beyond that.

15 Q   You have been handed a series of four exhibits.

16     This would be 10 through 13.

17             MR. WEINBERGER:    And unless

18     there is an objection, I would like to have him

19     look at all four and try and move through the

20     process.

21             MR. TOBEROFF:    I'm okay with

22     that.

23                 - - - - -

24     (Defendants' Exhibit No. B-10 was marked.)

25                 - - - - -

Page 66

1          MR. WEINBERGER:    For the

2    record, Exhibit 10 is an April 6, 2000 letter

3    from Kevin Marks to Roger Zissu.

4          MR. TOBEROFF:    April 5th.

5          MR. WEINBERGER:    It says April

6    6th on my copy.  No, I'm sorry.  I have it

7    backwards.

8       Exhibit 10 is an April 5, 2000 letter

9    from Kevin Marks to Carol Simkin, Roger Zissu

10   and Patrick Perkins at the Fross Zelnick firm.

11             - - - - -

12   (Defendants' Exhibit No. B-11 was marked.)

13             - - - - -

14          MR. WEINBERGER:    Exhibit 11 is

15   a second April 5, 2000 letter from Mr. Marks to

16   the Fross Zelnick firm.

17             - - - - -

18   (Defendants' Exhibit No. B-12 was marked.)

19             - - - - -

20          MR. WEINBERGER:    Exhibit 12 is

21   an April 6th letter from Mr. Marks to Roger

22   Zissu at the Fross Zelnick firm.

23             - - - - -

24   (Defendants' Exhibit No. B-13 was marked.)

25             - - - - -

**EXHIBIT E**
**112**

Page 67

1           MR. WEINBERGER:    And Exhibit 13

2     is a copy of the April 6 Tolling Agreement.

3   Q   Do these documents refresh your recollection as

4     to the issue relating to the Tolling Agreement?

5           MR. TOBEROFF:    Vague and

6     ambiguous.

7           MR. RYLAND:    Objection.

8     Vague.

9   A   They refresh -- I mean, I see these documents

10    in front of me.

11  Q   If you look at Exhibit 10, which is the first

12    April 5th letter with the attachment?

13  A   Okay.

14  Q   Were you involved -- you were copied on this

15    letter?

16  A   It indicates that, yes.

17  Q   Do you recall receiving it?

18  A   Not at this time.

19  Q   If you -- well, did there come a time when

20    Michael Siegel or you on behalf of Michael

21    Siegel expressed an interest in being bound by

22    this agreement or a willingness to be bound by

23    the agreement, the Tolling Agreement, that was

24    negotiated?

25  A   I don't recall the specifics.

Page 68

1  Q   If you would go to Exhibit 13, which is the

2      agreement itself.  And I apologize for the

3      quality of the document.  That's all there is.

4      The second to the last page of the document,

5      Bates number DCC 57468, if you can make out

6      paragraph 8?

7  A   Assuming that's an eight, yes, I see that.

8  Q   I think it's an eight.

9  A   After the --

10 Q   After the notice?

11 A   After the contact information.

12 Q   It says, "The terms of this agreement apply to

13     Michael Siegel as between Michael Siegel and

14     DC;" is that correct?

15 A   Yes.

16 Q   So it's your understanding that Mr. Siegel

17     benefited from this agreement?

18 A   It would appear to be the case, yes.

19 Q   Do you know why he was not a signatory?

20 A   I don't have any recollection.

21 Q   Do you recall being involved in negotiations of

22     this agreement?

23              MR. TOBEROFF:     You can

24     answer.

25 A   I don't recall.

**EXHIBIT E**
**114**

Page 69

1    Q    When I said negotiations, I meant between the

2         DC entities.

3    A    If indeed the April 5 letter is correct,

4         Exhibit 11, then it would appear that I had

5         some involvement.

6    Q    That's to suggest that the --

7    A    As it indicates, I suggested that the Tolling

8         Agreement extend to Michael.

9    Q    You have no other recollection of your

10        involvement?

11   A    No.  Not at this point.

12   Q    You can put those down.

13                    - - - - -

14        (Defendants' Exhibit No. B-14 was marked.)

15                    - - - - -

16   Q    The reporter has given you what's been marked

17        as Exhibit B-14.  It's a June 9, 2000 letter

18        from the Gang Tyre firm to John Schulman at

19        Warner Bros. Pictures.  Do you recall receiving

20        this letter?

21   A    I don't recall.

22   Q    Do you recognize it?

23   A    It looks familiar.

24   Q    Would you agree that it's a counteroffer from

25        the Siegel family?

1                    MR. TOBEROFF:        It calls for a

2       legal conclusion.

3   A   According to the cover letter, this was a

4       counterproposal.

5   Q   And on the second page of the document, Bates

6       1153, it says Siegel family counteroffer?

7   A   Yes.

8   Q   Was Michael Siegel part of this offer?  Was

9       this an offer he was making to your client?

10                   MR. TOBEROFF:        Attorney-client

11      privilege.  Joint interest privilege.

12          I instruct you not to answer.  Let me

13      specify.  You can answer whether this was an

14      offer being made by your client to DC Warner

15      Bros.

16                   MR. WEINBERGER:        That's what

17      the question was.

18  A   Well, there was an offer being made on behalf

19      of the Siegel family.

20  Q   From DC Comics?

21  A   Yes.

22  Q   Was it your understanding that Michael Siegel

23      was included in the Siegel family?

24  A   Michael would have been covered by this, yes.

25  Q   Thank you.  Were you involved in drafting this

1      proposal?

2   A   I mean, assuming Michael would ultimately agree

3      to -- no.  I think Michael would be subject to

4      this, yes.

5   Q   Were you involved in drafting this proposal?

6                  MR. TOBEROFF:     You can

7      answer.

8   A   I don't recall.

9   Q   Generally in the course of the negotiations

10      between the Siegel family and DC Comics and the

11      Time Warner entities, do you have a

12      recollection of whether you put offers

13      together?

14                  MR. TOBEROFF:     Vague and

15      ambiguous.  That's privileged.  Attorney-client

16      privilege.

17          Instruct you not to answer.

18                  MR. WEINBERGER:     Is that a

19      Michael Siegel instruction or a joint privilege

20      instruction?  I just want to make sure the

21      record is clear.

22                  MR. TOBEROFF:     Both.  Both.

23      In other words, I don't want him testifying as

24      to the behind-the-scenes workings of the

25      parties together fashioning counterproposals to

Page 72

1    defendants in settlement negotiations.

2                    MR. WEINBERGER:    When you say

3    parties, you mean the Siegel family?

4                    MR. TOBEROFF:    The Siegel

5    family.  The how.  The who.

6                    MR. WEINBERGER:    I'm just

7    trying to understand.  Make sure the record is

8    clear.

9                    MR. TOBEROFF:    I also

10   correctly noted that entails Michael Siegel's

11   indications to him.

12                   MR. WEINBERGER:    That's fine.

13   That's fine.

14   Q    Do you have an understanding of what portion of

15        any settlement Michael Siegel was to retain?

16   A    By law Michael would be entitled to a quarter.

17                    - - - - -

18        (Defendants' Exhibit No. B-15 was marked.)

19                    - - - - -

20   Q    Mr. Bulson, the reporter has handed you Exhibit

21        B-15, a July 18, 2000 letter from Kevin Marks

22        to John Schulman.  Do you recall receiving this

23        letter?

24   A    No, I don't have any present recollection.

25   Q    Do you believe that you received a copy of this

EXHIBIT E
118

Page 73

1          letter?

2    A     Probably.

3    Q     Do you have an understanding from reviewing it

4          now of where the negotiations were at this

5          point?

6    A     I don't recall where this fits in the time

7          line.

8    Q     If you will look at the second paragraph, there

9          is a discussion of a $500,000 sum -- on the

10         order of $500,000 is what it says, accounting

11         due?

12   A     Yes.

13   Q     What is your understanding of that in terms of

14         the termination?

15                    MR. RYLAND:          Objection.

16         Vague.

17   A     I don't understand the question.

18   Q     Well, do you have an understanding of why an

19         accounting would have been required?

20   A     Yes.

21   Q     What's that understanding?

22   A     Because the Siegel families are entitled to 50

23         percent of the profits attributable to the

24         Superman copyright.  Copyrights.

25   Q     And do you have an understanding of the other

Page 74

1        50 percent, who owns that?

2    A   At this point in time, my understanding was

3        that was held by DC Comics.

4    Q   Do you know if an accounting was made?

5                    MR. TOBEROFF:      By who?

6    Q   By DC Comics to the Siegel family interest.

7    A   There were monies paid to -- DC did make a

8        payment to the Siegel family, yes.

9    Q   What was that?

10   A   I forget the amount.

11   Q   Was that as part of an accounting?

12   A   I don't know.

13   Q   Did Michael Siegel receive any portion?

14   A   I mean I don't recall.  I knew, but I don't

15       recall.

16   Q   Don't worry, we'll get there.  Did Michael

17       Siegel receive any payments from DC Comics?

18                    MR. TOBEROFF:      You can answer

19       whether he received payments from DC Comics.

20   A   Yes.

21   Q   Do you remember how much?

22   A   I don't recall.

23   Q   I may have asked this before, but I just want

24       to make sure I have a record.  Were you in

25       regular communication with Joanne and Laura

**EXHIBIT E**
**120**

Page 75

1          Siegel's counsel during this time?

2                      MR. RYLAND:      Mischaracterizes

3      previous testimony.

4      Q   I don't want to get into details or substance.

5      A   During the course of my representation of

6          Michael Siegel I had, over the years, numerous

7          communications with the Gang Tyre firm.

8      Q   Was it Gang Tyre?  I don't know if it's Gang

9          Tyre.

10     A   Whoever.  Primarily with Mr. Marks.  He was my

11         primary.

12     Q   Did you ever deal with Mr. Levine?

13     A   Mr. Levine?

14     Q   Arthur Levine --

15     A   Arthur Levine?

16     Q   -- in this matter?

17                     MR. TOBEROFF:      You can

18     answer.

19     A   I did have communications with Mr. Levine.

20     Q   But that was early on in the process?

21     A   That's correct.

22     Q   And your communications between the Gang Tyre

23         firm, were those predominantly telephone

24         communications?

25                     MR. TOBEROFF:      You can

EXHIBIT E
121

Page 76

1          answer.

2    A    Telephone, e-mail, letters.

3    Q    And to the extent there were written

4          communications, would those documents be

5          retained in your files?

6    A    They would be in the documents that were sent

7          to Mr. Banchek.

8    Q    In the usual course of business in your

9          practice you retain communications relating to

10         client matters?

11   A    Yes.

12   Q    Do you have any reason to believe that

13         communications were not retained relating to

14         this matter?

15   A    I have no reason -- well, which communications?

16   Q    Between your office and Kevin Marks' firm?

17   A    Following my normal course of practice, if

18         there was a communication, it would be included

19         in the documents that were submitted or were

20         sent over to Mr. Banchek.

21   Q    How about your communications on behalf of

22         Michael Siegel with Mr. Toberoff?

23   A    They would be in those files as well.

24   Q    If you can tell me without disclosing

25         privileged communications, and I think we have

EXHIBIT E
122

Page 77

1      probably an agreement to disagree about what is

2      subject to the attorney-client privilege, my

3      view is the communications about legal advice

4      between lawyer and client, but can you, without

5      disclosing privileged communications, give me a

6      sense of Michael Siegel's financial situation

7      around this time?

8                   MR. TOBEROFF:      That's

9      privileged to the extent that you know of his

10     financial situation from communications with

11     Michael Siegel.

12                  THE WITNESS:      That would be

13     my sole source.

14                  MR. TOBEROFF:      Instruct you

15     not to answer.

16                  - - - - -

17     (Defendants' Exhibit No. B-16 was marked.)

18                  - - - - -

19  Q  The reporter has marked and handed to you

20     Exhibit B-16.  Do you recognize this document?

21  A  No.  I have no specific recollection, but it

22     does appear to be a letter that I sent to

23     Mr. Schulman.

24  Q  On page 2 that's your signature?

25  A  Yes.

EXHIBIT E
123

Page 78

1    Q    Had you previously corresponded with

2         Mr. Schulman directly?

3    A    I don't know the answer to that.

4                    MR. TOBEROFF:    Seeing that

5         this was disclosed to a third party, you can

6         answer.

7                    THE WITNESS:    But I don't

8         know the answer.

9                    MR. TOBEROFF:    But I'm saying

10        you can answer the prior question I instructed

11        you not to answer to the extent of the

12        disclosure in this letter.  The question as to

13        Michael Siegel's --

14   Q    Financial condition.

15                   MR. TOBEROFF:    -- financial

16        condition.

17   Q    You might want to take a minute to look at the

18        document.  You are welcome to.

19   A    Okay.

20                   MR. TOBEROFF:    In other

21        words, you can answer solely to the extent as

22        to what is disclosed in this letter.

23   Q    Going back to the prior question.  Upon reading

24        this letter, can you tell me about Mr. Michael

25        Siegel's financial condition as of around

Page 79

1     September 18, 2000?

2   A   This letter would be an accurate reflection of

3     that.

4   Q   And that he had been -- he had lost his

5     employment and was concerned about being able

6     to gain future employment?

7   A   He was laid off from his job as a plumber and

8     most likely would not be able to secure

9     employment because of his age and medical

10    condition.

11  Q   Do you know what his medical condition was?

12           MR. WEINBERGER:   If there is an

13    instruction on privilege, we'll agree that it

14    won't be a waiver.

15           MR. TOBEROFF:   You could

16    disclose the medical condition that's referred

17    to in the letter.

18  A   I don't recall the specific medical condition

19    at this point in time.  Well, I don't recall

20    the specific one at this time.

21  Q   Do you recall him having a medical condition at

22    any time?

23  A   Yes.

24  Q   Do you know what that was?

25  A   I can't recall.  I mean obviously, he had a

EXHIBIT E
125

Page 80

1    serious one when he died.

2  Q  Do you know what that was?

3           MR. WEINBERGER:    Do you want to

4    take a break, Marc?

5           MR. TOBEROFF:    That's okay.

6  A  I really can't remember at the moment.  I think

7    he was in for bypass surgery.  I believe it was

8    bypass and things did not go well.

9  Q  Do you see in the fourth paragraph of this

10    letter you are making a proposal on behalf of

11    Michael Siegel for Warner Bros or the Time

12    Warner entities to make advanced payments to

13    Michael Siegel?

14  A  Yes.

15  Q  And to also provide medical insurance?

16  A  Yes.  I think that's in there, isn't it?  Yes.

17  Q  And if you go to the top of the second page,

18    does this refresh your recollection about

19    whether Michael Siegel was not happy with how

20    the negotiations were going?

21  A  I have no doubt that everything I said in this

22    letter was correct and accurate at that time.

23  Q  So that he was dismayed about the slowness and

24    lack of progress in negotiations?

25  A  Yes.

Page 81

1    Q    And then finally, the last paragraph before

2         the, "I look forward to hearing from you,"

3         there is a request that DC Comics provide

4         Michael Siegel with some sort of employment?

5                    MR. TOBEROFF:      The document

6         speaks for itself.

7    A    In the pen ultimate paragraph there is an

8         inquiry made as to whether or not DC Comics

9         might have a role for Michael to play.

10   Q    Do you know if any advanced payments were made

11        to Michael Siegel?

12   A    Clarify.

13   Q    Well, there is a request for money back on the

14        first page of the letter in the fourth full

15        paragraph, a payment as an advance against an

16        agreement relating to the termination interest,

17        and he asked that you consider making similar

18        payments to Michael as an advance.  Do you know

19        if payments were made?

20   A    I think he did receive one paycheck from DC

21        Comics for medical insurance.  I think he did.

22   Q    And so he -- the request for insurance, which

23        is the next paragraph, that was provided, there

24        was some money for insurance?

25   A    I think there was money paid for insurance.

Page 82

1    Q    Do you know if he was added to DC's company

2         policy?

3    A    My recollection is, that according to

4         Mr. Levitz, I believe, indicated that that was

5         not possible.

6    Q    And --

7    A    Because of whatever the corporate insurance

8         policy was.

9    Q    Did Michael Siegel ever gain any employment or

10        any work from DC Comics, to your knowledge?

11   A    Not to my knowledge.

12   Q    Did you hear from Mr. Schulman in response to

13        this letter?

14   A    I don't recall.

15   Q    Did you ever speak to any of the Fross Zelnick

16        attorneys about these requests?

17   A    I don't recall.

18   Q    I'm going to mark a series of letters.  I'm

19        going to try to get through this stuff the same

20        way we did with the Tolling Agreement.

21             Sir, Exhibits B-17 through B-22 are a

22        series of communications.  I'm just going to

23        identify them on the record.

24                   - - - - -

25        (Defendants' Exhibit No. B-17 was marked.)

**EXHIBIT E**
**128**

Page 83

1                          - - - - -

2                    MR. WEINBERGER:     B-17 is an

3      October 24, 2000 letter from Kevin Marks to

4      Carol Simkin and Patrick Perkins.

5                          - - - - -

6      (Defendants' Exhibit No. B-18 was marked.)

7                          - - - - -

8                    MR. WEINBERGER:     Exhibit 18 is

9      an October 26, 2000 letter from Kevin Marks

10     to -- from Carol Simkin to Kevin Marks.

11                         - - - - -

12     (Defendants' Exhibit No. B-19 was marked.)

13                         - - - - -

14                   MR. WEINBERGER:     Exhibit 19 is

15     a November 22, 2000 letter from Kevin Marks to

16     Patrick Perkins.

17                         - - - - -

18     (Defendants' Exhibit No. B-20 was marked.)

19                         - - - - -

20                   MR. WEINBERGER:     Exhibit 20 is

21     a December 8, 2000 letter from the witness to

22     Patrick Perkins.

23                         - - - - -

24     (Defendants' Exhibit No. B-21 was marked.)

25                         - - - - -

**EXHIBIT E**
**129**

Page 84

1                    MR. WEINBERGER:    Exhibit 21 is

2       a December 18, 2000 letter from Patrick Perkins

3       to Kevin Marks.

4                         - - - - -

5       (Defendants' Exhibit No. B-22 was marked.)

6                         - - - - -

7                    MR. WEINBERGER:     And Exhibit 22

8       is a January 12, 2001 letter from Kevin Marks

9       to Patrick Perkins.  And this also has some

10      signatures of Joanne Siegel, Laura Siegel

11      Larson, and Michael Siegel and DC Comics.

12   Q  And unless there is any objection to these

13      letters, if you look at them together, do these

14      refresh your recollection about payments

15      made -- advanced payments made by DC Comics to

16      Michael Siegel?

17   A  As I mentioned before, there was an advanced

18      payment made.  Yes, this appears -- this

19      correspondence appears to represent that

20      payment.

21   Q  Were you involved in the negotiation of Exhibit

22      22, which is the letter agreement that -- why

23      don't we start with that?  Go to B-22.  Would

24      you agree that this is the letter agreement

25      covering the terms of payments that were made?

EXHIBIT E
130

Page 85

1     A     It appears to be the case.

2     Q     And on the third page of the document, Bates

3           DCC 115945, is that Michael Siegel's signature?

4     A     To the best of my knowledge.

5     Q     On the next page, do you see a check there in

6           the amount of $25,827.35?

7     A     Yes.

8     Q     Do you recall -- you can see the check is to

9           Michael in care of you?

10    A     Yes.

11    Q     Do you recall receiving this?

12    A     I don't recall, but I suspect I did.

13    Q     Do you recall receiving any of the documents in

14          this collection?

15    A     Obviously, I did receive them.

16    Q     Or send them?

17    A     I did receive the agreement letter since I

18          would have proffered that to Michael for

19          execution.

20    Q     Were you involved in the negotiation of the

21          agreement letter on behalf of your client?

22                    MR. TOBEROFF:     You are

23          referring to Exhibit B-19?

24                    MR. WEINBERGER:     22, I think,

25          is the final document.  19 may be as well, but

**EXHIBIT E**
**131**

Page 86

1    22 is the signed -- no, 19 is as well.  I'm

2    sorry.  Well, 19 is missing.  Well, let's go

3    through these.

4                   MR. TOBEROFF:      The signed

5    document is 22.

6    Q   There was a second signed document at 19

7        without Michael Siegel's signature, so let's go

8        back to the beginning starting at 17.

9                   Did there come a time when you were aware

10       that DC Comics or the Time Warner entities had

11       agreed to make an advance payment of $250,000

12       to the Siegel family?

13   A   Yes.

14   Q   Do you recall when that was?

15   A   No.  But based on this correspondence, I

16       suspect that it's in the October 2000 time

17       frame.

18   Q   It doesn't look like you were copied on this.

19       Do you recall receiving a draft of this

20       agreement around October 24, 2000 -- this is

21       Exhibit 17 -- from the representatives of DC

22       and Time Warner?

23   A   It doesn't say I was copied on that letter, on

24       Exhibit B-18.

25                   MR. TOBEROFF:      I would like

Page 87

1          to object to this, understandably a little

2          late, but I object to the mischaracterization

3          in the question of his payment, his advanced

4          payment.  The documents speak for themselves as

5          to the nature of the payment.

6     Q    Does reviewing these documents refresh your

7          recollection about how Mr. Michael Siegel came

8          to be provided with the $25,000?

9     A    Well, without divulging any privileged

10         information, it's quite apparent that Michael

11         was aware of the offer and the acceptance

12         reflected in the January 12, '01 letter, which

13         he signed.  And attached to that is a check

14         that apparently was made payable to Michael

15         Siegel and he did receive funds from, I

16         believe, it was from DC Comics.  Yes.

17    Q    Based on your review of the January 12, 2001

18         agreement, it's Exhibit 22, was the payment

19         made based on the division of the termination

20         interest or was there some separate

21         arrangement?

22              MR. RYLAND:         Objection.

23         Assumes facts.

24    Q    Meaning Michael Siegel held the 25 percent

25         share of the termination interest?

EXHIBIT E
133

Page 88

1    A    That's correct.

2    Q    And at least based on my very rough math,

3         25,827 is not 25 percent of the total that was

4         paid.

5    A    That's correct.

6    Q    So my question is, was there a separate

7         arrangement relating to how much Mr. Siegel was

8         going to get from these payments?

9    A    Having perused these, I believe it is reflected

10        in the attachment to the October 26 letter.  If

11        the amounts match up -- no, it's not that

12        letter.  One of these letters indicated a

13        payment schedule.

14   Q    Yeah, it is the October --

15   A    It didn't break it down by individuals.

16   Q    The last page of Exhibit --

17   A    It was Exhibit B-17 that had the breakdown.

18        And there it's identified as Michael's.

19   Q    Is that 17 or 18?

20   A    B-17.  And the amount of the check, well,

21        corresponds approximately to the amount

22        indicated in paragraph 5 on the first page of

23        that letter.

24   Q    So a portion of this payment was direct to

25        Joanne and Laura Siegel to reimburse for

**EXHIBIT E**
**134**

Page 89

1          out-of-pocket expenses in connection with the

2          termination?

3     A    That's what is reflected here.

4     Q    And the remainder was divided up along the

5          percentage lines?

6     A    Yes.

7     Q    Do you know why the agreement -- this Exhibit

8          22 was not -- well, why Michael Siegel was not

9          a direct signatory?  And you can see from the

10         document that he has agreed except as to

11         certain paragraphs.  Do you know why there is a

12         difference?

13    A    I don't recall.

14    Q    Do you recall any discussions with Time

15         Warner/DC Comics' counsel about his payment

16         separate from these correspondence?

17    A    The only discussion was reflected in -- you

18         gave me another exhibit here dealing with the

19         request for insurance money, and that appears

20         to have been the difference in the amount

21         because according --

22    Q    That's the extra $4,000?

23    A    Yes.

24    Q    Did you ever discuss this payment to your

25         client directly with any employees of Time

**EXHIBIT E**
**135**

1    Warner or DC Comics, or was it always through

2    counsel?

3    A    Say that again.

4    Q    Did you have any discussions -- other than the

5    correspondence, I think you just said that you

6    don't recall speaking with any of the attorneys

7    on the telephone -- the DC or Time Warner

8    attorneys -- about this issue, the payments?

9    A    About this issue?  I don't recall.

10   Q    How about anyone employed directly by Time

11   Warner or DC Comics?

12   A    I don't recall.

13   Q    Do you recall where the settlement discussions

14   went after this point?

15                MR. RYLAND:        Objection.

16   Vague.

17   A    I don't recall.

18   Q    Do you know if your -- strike that.

19                    - - - - -

20   (Defendants' Exhibit No. B-23 was marked.)

21                    - - - - -

22   Q    The next exhibit is an October 19, 2001 letter

23   from Kevin Marks to John Schulman.  If you will

24   turn to the last page.  Do you recall being

25   copied on this letter?

1    A    No.

2    Q    Do you recall receiving it?

3    A    I probably did at that time to review it.    I

4         received a letter on something like this.    This

5         is probably it.

6    Q    Before we get to the letter itself, go back to

7         Exhibit 22.    Do you notice the agreement with

8         respect to the $250,000 payment that was made

9         on January 12, 2001 and Exhibit 23 was dated

10        October 19, 2001?    Do you have any recollection

11        of what happened in the settlement negotiations

12        between this time, between January and October

13        of 2001?

14             MR. RYLAND:        You can only

15        answer with respect to knowledge that you have

16        obtained directly from the third parties, not

17        from communications between Gang Tyre or the

18        Siegels and you regarding the settlement

19        negotiations.

20    A    Well, as reflected in the letter, from Gang

21        Tyre.

22    Q    I'm sorry.    I want to know which one.

23    A    B-23.    As reflected in B-23, there were

24        telephone communications between Time Warner,

25        DC Comics or whoever, Mr. Schulman, and the

Page 92

1    Siegel family, with respect to the subject

2    matter of this letter.

3  Q  Right.  And if you look closely at the first

4    paragraph it says, "The Siegel family through

5    Joanne Siegel and Laura Siegel Larson the

6    majority owners of the terminated copyright

7    interest."  What I'm trying to find out is

8    whether Michael Siegel was part of this letter?

9  A  Excuse me.  I did get a copy of the letter,

10    which I believe I did -- Michael Siegel would

11    have been made aware of it.

12  Q  Do you recall if he was aware of this letter

13    before it was sent?

14              MR. TOBEROFF:     It's

15    privileged.  Attorney-client privilege.

16        I instruct you not to answer.

17  Q  Were you, on behalf of Michael Siegel, involved

18    in any telephone conversations with John

19    Schulman during this time period?

20  A  I can't recall any.

21  Q  During this time period were you in

22    communications with --

23  A  We're talking.

24  Q  Between January and October of 2001?

25  A  I don't recall any.

Page 93

1   Q   Do you recall ever having spoken to

2       Mr. Schulman on the phone?

3   A   I might have, but I can't recall.

4   Q   Were you, during the January to October 2001

5       time period, in contact with representatives of

6       the Gang Tyre firm?  Not as to substance.

7   A   There were communications, yes.

8   Q   Do you have an understanding as to the import

9       of this letter?

10                  MR. TOBEROFF:      Vague and

11      ambiguous.

12                  MR. RYLAND:        Objection.

13      Vague.

14  A   It says what it says.

15  Q   Did you have any role in its preparation?

16  A   Pardon?

17  Q   Did you have any role in the preparation of

18      this letter?

19                  MR. TOBEROFF:      Attorney-client

20      privilege.

21          Instruct you not to answer.

22  Q   Was Michael Siegel -- strike that.

23          Did you speak to John Schulman after this

24      letter was -- after you received this letter?

25  A   I have no recollection of any such

1           conversation.

2     Q     Was your client aware of this letter?  I'm

3           sorry.  I think you already said that.

4     A     The answer is yes.

5     Q     Do you recall what happened after you received

6           this letter with respect to the settlement

7           negotiations?

8                         MR. TOBEROFF:      Objection.

9           Calls for a narrative.  Vague and ambiguous.

10    A     My recollection is is that this was followed by

11          a proposed agreement from DC Comics, and that

12          agreement was rejected by the Siegels.

13    Q     Do you recall any interim communications

14          between the October 19 letter and the DC Comics

15          draft agreement?

16    A     I don't recall.

17                        MR. TOBEROFF:      Between who?

18    Q     Between Time Warner and a representative of the

19          Siegel family?

20    A     I don't recall.

21    Q     Upon reviewing this letter, did you believe

22          that there was an agreement between Time Warner

23          and DC on the one hand and the Siegel family

24          interest on the other?

25                        MR. TOBEROFF:      That's

Page 95

1          privileged.   Attorney-client privilege.

2          Attorney work product.

3               I instruct you not to answer.

4     Q    Without asking about the substance of

5          communications, do you recall speaking to Kevin

6          Marks or anyone at Gang Tyre around this time

7          frame?

8                    MR. TOBEROFF:      You can

9          answer.

10    A    There would have been communications, yes.

11    Q    Do you recall receiving a draft contract from

12         DC Comics?

13                   MR. TOBEROFF:      You can

14         answer.

15    A    I'm pretty sure I have a copy -- I received a

16         copy of the draft agreement.

17    Q    Did you undertake -- we'll get to that in a

18         second.

19                        - - - - -

20         (Defendants' Exhibit No. B-24 was marked.)

21                        - - - - -

22    Q    You are being handed an exhibit marked as B-24.

23         This is a letter and attachment from John

24         Schulman to Kevin Marks.  Do you see whether

25         you are copied on this letter?

1    A    It does not appear that I was.

2    Q    Do you ever recall receiving this letter?

3    A    I don't have a present recollection.

4    Q    Any recollection at all after having reviewed

5         it?  Take as much time as you need.

6                        MR. RYLAND:        Take your

7         time.

8    A    I believe I had a copy.

9    Q    Without trying to get into substantive

10        communication --

11   A    I'm pretty sure I had copy of this, because I

12        mean some of the numbers reflect -- I think --

13        I can't -- I thought there was a formal

14        agreement prepared by DC, but maybe this was

15        what was objected to by the Siegels.

16   Q    Let me introduce another document that will

17        help.

18                     - - - - -

19        (Defendants' Exhibit No. B-25 was marked.)

20                     - - - - -

21   Q    Okay.  The reporter has marked Exhibit B-25.

22        It's a February 1, 2002 letter with a draft

23        agreement attached.

24   A    I'm reasonably confident that I did have a copy

25        of the -- of Exhibit B-25, but my best

Page 97

1      recollection is I believe I also had a copy of

2      B-24.

3   Q   Without -- without getting into substantive

4      communications between you and your client,

5      Mr. Siegel, do you recall having forwarded

6      these documents to your client?  We'll start

7      with 24.

8   A   I can safely say that any document I received

9      from opposing counsel would have been forwarded

10      to my client.

11   Q   The same answer for 25?

12   A   Across the board.

13   Q   So let me make sure I have this straight.  You

14      are not sure about 24 or you believe you did

15      have 24?

16   A   I suspect that I did.

17   Q   And 25?

18   A   I'm pretty confident.  I'm almost certain I had

19      25.

20   Q   Looking at 25 do you recall having reviewed

21      this document?

22   A   Did I review it?

23   Q   Yes, in detail.

24   A   My recollection is I did.

25   Q   Did you provide any comments to counsel for DC

EXHIBIT E
143

Page 98

1    or Time Warner, Patrick Perkins?

2  A  I don't believe so.

3  Q  I'm only asking to complete the record, but did

4    you provide comments to counsel for Joanne and

5    Laura Siegel?

6              MR. TOBEROFF:    Attorney-client

7    privilege.

8        Instruct you not to answer.

9  Q  Did you ever receive or see any other versions

10    of the agreement?

11  A  I don't recall there were any others.

12              MR. TOBEROFF:    Proposed

13    agreement.

14  A  Yeah, of this proposed agreement.  I'm sorry.

15    The draft agreement.

16              MR. WEINBERGER:    I understand

17    your position, Marc.

18  A  I misspoke.

19  Q  Do you recall whether there were any

20    provisions, terms in this draft agreement that

21    jumped out at you or you took particular note

22    of?

23              MR. TOBEROFF:    Attorney work

24    product.

25        Instruct you not to answer.

**EXHIBIT E**
**144**

Page 99

1    Q    Do you recall speaking to anyone other than

2         Michael Siegel or representatives of Joanne and

3         Laura Siegel about this agreement, the document

4         that was marked as Exhibit 25?

5    A    Yes.

6    Q    Who is that?

7    A    Members of my firm.

8    Q    Anyone else?

9    A    No, not to my recollection.

10   Q    Were there other lawyers involved in

11        representing Michael Siegel?

12   A    Peripherally.

13   Q    You were the main contact?

14   A    Yes.

15                    - - - - -

16        (Defendants' Exhibit No. B-26 was marked.)

17                    - - - - -

18   Q    Mr. Bulson, have you ever seen this document

19        before, what's been marked as Exhibit B-26?

20                    MR. RYLAND:        Take your

21        time.

22                    THE WITNESS:       Go ahead and

23        answer?

24                    MR. TOBEROFF:      Yes.

25   A    I believe I did receive a copy of this.

**EXHIBIT E**
**145**

1    Q    Was it sent to you directly by Joanne Siegel,

2         if you can recall?

3                        MR. TOBEROFF:      You can

4         answer.

5    A    I doubt it.

6    Q    By her lawyers?

7    A    Yes.

8    Q    And consistent with your prior testimony, was

9         this the kind of document you would have

10        forwarded to your client?

11   A    Yes.

12   Q    Do you know if you did in fact forward this

13        letter to your client?

14   A    I don't recall the specifics, but that's my

15        standard practice.

16   Q    Did you do anything upon reading this letter

17        with respect to the negotiations?

18                        MR. TOBEROFF:      You can answer

19        with respect to third parties.

20   A    Not with respect to any third parties.

21   Q    Without getting into the substance of any

22        communications, did you speak to Joanne and

23        Laura Siegel's counsel following receipt of

24        this letter?

25   A    I think based on -- I have had communications

Page 101

1          throughout the whole process.

2     Q    I understand that.  But specifically following

3          receipt of this letter.

4     A    I would assume that to be true.

5     Q    Do you recall any specific discussion?

6                         MR. TOBEROFF:      You can

7          answer whether you recall specific discussions

8          after receipt of the letter.

9     A    Yes.  Well, I remember there were discussions,

10         the specific details of the discussions I do

11         not recall.

12    Q    Did -- having reviewed the letter, do you have

13         a view -- separate and apart from any

14         communications between the Siegel family's

15         lawyers, did you have a view that the Siegels

16         were rejecting the agreement, Exhibit 25?

17    A    I thought that was the import of this letter,

18         if I'm not mistaken.  Do you want me to read it

19         to confirm that?

20    Q    It's up to you.

21    A    I mean the letter speaks for itself.

22    Q    Did -- was that also -- did this letter reflect

23         Michael Siegel's views?

24                         MR. TOBEROFF:      Objection.

25         Attorney-client privilege.

1           Instruct you not to answer.

2    Q    Did Michael Siegel ever tell you to communicate

3         to DC or Time Warner representatives that he

4         did not agree with this letter?

5                    MR. TOBEROFF:      Same

6    objection.

7    Q    Exhibit 26?

8                    MR. TOBEROFF:      Same

9    objection.  Same instruction.

10                   MR. WEINBERGER:    That question

11   is whether his client told him to tell somebody

12   else, so I don't think that's covered by any

13   privilege.

14                   MR. TOBEROFF:      I'm objecting.

15   That question is artfully phrased.  You are

16   essentially, by that question, trying to get

17   into the substance of the attorney-client

18   communication.

19   Q    Did you on behalf of --

20                   MR. TOBEROFF:      I don't agree

21   with that, we've been through that in

22   discovery.  I don't believe with that legal

23   analysis.

24   Q    On behalf of Michael Siegel upon receipt of

25        this letter, Exhibit 26, did you speak to

Page 103

1          anyone at DC or Time Warner or their lawyers?

2     A    I don't recall.

3     Q    Did you send any correspondence to someone at

4          DC Comics or Time Warner?

5     A    I don't recall.

6     Q    Did -- did you speak to Kevin Marks or another

7          representative of Joanne and Laura Siegel about

8          your client's disagreement with the letter --

9          with the position set forth in the May 9

10         letter, Exhibit 26?

11                    MR. RYLAND:       Objection.

12                    MR. TOBEROFF:      Objection.

13         Attorney-client privilege.  Joint interest

14         privilege.

15                    MR. WEINBERGER:    As to

16         disagreement?

17                    MR. TOBEROFF:      Regarding

18         communications, regarding settlement

19         negotiations vis-a-vis settlement negotiations.

20         Parties have agreements, disagreements.  That

21         doesn't mean they are not aligning vis-a-vis

22         the defendants in the case in which they both

23         have a beneficial interest in the termination.

24                    MR. WEINBERGER:    Well, we have

25         a ruling about there was a point in time

**EXHIBIT E**
**149**

Page 104

1      whether there was a break in any

2      common interest that may have existed at the

3      time.  Obviously, I'm not conceding there was a

4      common interest, assuming there was.  I'm

5      trying to get to when there was a break.

6                  MR. TOBEROFF:     I understand

7      what you are getting at.  We have a ruling that

8      applies to 15 specific documents that were

9      reviewed in camera.  Upon that review, the

10     determination of the court was made only to the

11     15 specific documents, not a broad sweeping

12     general ruling.

13                 MR. WEINBERGER:    Is that the

14     position of everybody or just the Siegel --

15     Michael Siegel estate, the plaintiffs?  I just

16     want to make sure I know what I'm dealing with,

17     because you do represent them both.

18                 MR. TOBEROFF:     That's the

19     position I'm talking on behalf of the Siegels

20     and on behalf of the Michael Siegel estate.

21  Q  Mr. Bulson, are you following counsel's

22     instruction?

23  A  Yes.  I feel compelled to.

24  Q  Do you recall whether there were any documents

25     and negotiations -- and obviously, this is

Page 105

1    between you or the Gang Tyre firm on behalf of

2    Joanne and Laura on one hand and the Time

3    Warner entities on the other -- after this

4    letter was received?

5    A    I don't recall.

6                   - - - - -

7         (Defendants' Exhibit No. B-27 was marked.)

8                   - - - - -

9    Q    You have been handed a document marked as

10        Exhibit B-27.

11   A    Uh-huh.

12   Q    Do you recognize this document?

13   A    I mean that's my signature on it, so I

14        recognize that.

15   Q    Do you recall sending this letter?

16   A    Yes.  Well, I recall the content of the letter.

17   Q    It's a request for additional money for medical

18        insurance for Michael Siegel?

19   A    Yes, correct.

20   Q    Do you recall whether it was paid?

21   A    I don't believe it was.

22   Q    This letter is dated May 22, 2002.

23   A    I don't believe there were any further payments

24        made to Michael for medical insurance aside

25        from the additional $4,000 payment.

Page 106

1    Q    As in addition to his portion?

2    A    That was in addition to, I believe.

3    Q    To his portion of the $250,000 minus expenses?

4    A    Right.

5    Q    Do you recall a follow-up call to Patrick

6         Perkins about this letter?

7    A    I don't recall.

8    Q    Do you recall any discussion with DC Comics

9         about the subject matter of this letter,

10        Exhibit 27?

11   A    I don't recall.

12   Q    About the status of the settlement?

13   A    I don't recall.

14   Q    Do you know if your client contacted anyone at

15        DC Comics with regard to the settlement?

16   A    I don't recall.  I can't -- I doubt it, because

17        pretty much communications were through me.

18                      - - - - -

19        (Defendants' Exhibit No. B-28 was marked.)

20                      - - - - -

21   Q    You have been handed a document marked as

22        Exhibit B-28.  This is a September 21, 2002

23        letter from Joanne Siegel and Laura Siegel

24        Larson to DC Comics?

25   A    Yes.

**EXHIBIT E**
**152**

Page 107

1    Q    Do you recognize this letter?

2    A    I don't have a present recollection, but I mean

3         it looks familiar to me.

4    Q    Do you see that you were copied on this letter?

5    A    Yes.

6    Q    As was your client?

7    A    Yes.

8    Q    Does this letter reflect a communication of

9         Michael Siegel to DC Comics?

10   A    No.  The letter was signed by Laura and Joanne

11        Siegel.  Well, Laura Siegel Larson and Joanne

12        Siegel.

13   Q    Did Michael Siegel send DC Comics a letter

14        similar to this?

15   A    Not to my -- I don't recall.  I doubt it.

16   Q    In your view, was your client attached to this

17        letter?  Was he part of this?  It says that the

18        Siegel family is terminating -- I'm sorry.  I

19        apologize.  I'm ahead of myself.  In the first

20        full paragraph it advises that, "We are totally

21        stopping and ending negotiations with DC

22        Comics, the parent company of AOL Time Warner

23        and all of its representatives and associates

24        concerning the Jerry Siegel Family's rights to

25        Superman, Superboy, the Spectre and all related

Page 108

1       characters and entities."  In your view, is

2       Michael Siegel or his rights implicated by the

3       Jerry Siegel's family's rights?  Do those

4       include his rights?

5                       MR. TOBEROFF:       Objection.

6       The document speaks for itself.  Calls for a

7       legal opinion.

8    A   It says what it says.  The negotiations were

9       being terminated and those negotiations would

10      have had an impact on Michael Siegel.

11   Q   What impact would that have been?

12   A   Well, he was entitled to 25 percent of the

13      profit and these negotiations related to

14      resolving issues relating to the profits to be

15      paid to the Siegel family.

16   Q   Did Michael Siegel ever try and make a separate

17      deal on his own with DC Comics or Time Warner?

18   A   Not to my recollection.

19   Q   Could he have?

20                      MR. TOBEROFF:       Calls for a

21      legal conclusion.

22   A   Yes.

23   Q   Did DC Comics or any of the Time Warner

24      entities ever contact Michael Siegel with

25      respect to acquiring his termination interest?

Page 109

1    A    Not to my recollection.

2    Q    Upon receipt of this letter, do you recall

3         speaking to any representative of Joanne or

4         Laura Siegel?

5    A    Again, I would have had communications with

6         their -- well, possibly even with Mr. Marks.

7    Q    Did you have a communication with Mr. Marks?

8    A    I don't recall specifics.  I can't tell you

9         specifically.

10   Q    Did you speak to Joanne Siegel upon receipt of

11        this letter?

12   A    I can't recall.

13   Q    Laura Siegel Larson?

14   A    I can't recall.  I have had conversations with

15        Laura Siegel subsequent to this, subsequent to

16        Michael Siegel's death.

17   Q    What do those conversations relate to?

18   A    The estate.

19   Q    Was Michael disappointed upon receiving this

20        letter?

21                    MR. TOBEROFF:    Attorney-client

22        privilege.

23            Instruct you not to answer.

24   Q    Did you and Michael Siegel discuss this letter?

25                    MR. RYLAND:    To the extent

Page 110

1    that it's nonprivileged communication, you can

2    answer.

3  Q    Just the fact of communication, not substance.

4  A    Yes.

5                    MR. RYLAND:          The fact

6    itself is fine.

7  A    I can't recall the specific conversation, but

8    I'm sure we discussed it.

9  Q    As a result of any conversation you had with

10    Michael Siegel about this letter, did you

11    contact any representative of DC Comics or Time

12    Warner?

13                    MR. TOBEROFF:      I object to

14    the question as to as a result of the

15    conversation, because that's -- that's styled

16    to actually reveal the substance of the

17    conversation.  So you can ask whether

18    subsequent to talking --

19                    MR. WEINBERGER:      I got your

20    objection.  I understand your objection.  You

21    don't have to go on.

22  Q    I think you have already testified, so it may

23    be late, that you did not contact any

24    representative of DC Comics or Time Warner

25    following receipt of this letter?

1    A    I have no recollection of that having occurred.

2    Q    Any third party?

3    A    What time frame?

4    Q    Any time frame.

5              MR. RYLAND:         Objection.

6         Vague.

7    Q    Between the receipt of this letter, September

8         21, 2002 and now?

9    A    I don't recall.

10   Q    Would it help you recall if I narrow the time

11        frame?

12   A    No.

13                   - - - - -

14        (Defendants' Exhibit No. B-29 was marked.)

15                   - - - - -

16   Q    You have been handed a document marked as B-29.

17        Do you recognize this document?

18              MR. RYLAND:         Take your

19        time.

20   A    I don't have a specific recollection, but it

21        indicates I was copied and I would assume I

22        probably received a copy of this letter.

23   Q    And do you recall having forwarded this letter

24        to your client?

25   A    I don't have any recollection of that other

Page 112

1      than that would have been my standard practice.

2  Q   Upon receipt of this letter, did you contact

3      any representative of the DC Comics, Time

4      Warner entities?

5  A   I don't have a present recollection.

6  Q   And the same question with respect to any

7      representative of the Siegel family.  I'm only

8      asking whether there was contact, not what the

9      substance was.

10 A   I don't recall.

11 Q   Did your client attempt to contact any

12     representative of DC Comics, Time Warner?

13 A   Not to my knowledge.

14 Q   Or the Siegel family?

15 A   I don't recall.

16 Q   Were there any discussions between either you

17     or Michael Siegel and any representative of DC

18     Comics or Time Warner after this letter,

19     October 28, 2002?

20 A   I don't recall any.

21 Q   What about communications between Michael

22     Siegel through you or on his own and Joanne and

23     Laura Siegel either on their own or through

24     counsel?

25 A   Again, I believe there were communications,

EXHIBIT E
158

1      yes.

2   Q  Do you recall when?

3   A  No.

4   Q  Do you recall the substance of any

5      communications?

6   A  Nothing pops into my head.

7   Q  Did there come a time when Joanne Siegel and

8      Laura Siegel Larson made an offer to acquire

9      Michael Siegel's termination interest?

10              MR. TOBEROFF:    You can

11     answer.  The question is whether.

12  A  I'm not aware of any offer of them for Michael

13     Siegel's interest.

14  Q  What about an offer communicated through a

15     representative of Laura Siegel Larson and

16     Joanne Siegel?

17  A  You got to be more specific with your question.

18  Q  The question I'm asking is whether there was an

19     offer from Joanne Siegel or Laura Siegel Lawson

20     either individually or collectively for Michael

21     Siegel to purchase or otherwise make an

22     arrangement with respect to Michael Siegel's

23     termination interest?  I was trying to ask two

24     questions.  One, whether or not they

25     communicated an offer directly.  The answer was

1      no.  The second question was whether they

2      communicated an offer through somebody else?

3  A   No.

4  Q   Did you, following October 2002, receive any

5      offer with respect to Michael Siegel's

6      termination interest?

7  A   I don't know.

8  Q   Did you receive an offer that was communicated

9      through Mr. Toberoff?

10  A   Yes.

11  Q   To acquire Michael Siegel's termination

12      interest?  I'm sorry.  I assume the answer is

13      still yes?

14  A   Yes.

15  Q   Do you recall receiving an offer through anyone

16      else to acquire Michael Siegel's termination

17      interest?

18  A   No.

19  Q   So the only offer you can recall was one

20      communicated through Mr. Toberoff or by

21      Mr. Toberoff?

22  A   Yes.

23  Q   And what can you tell me about that offer?

24  A   There was an offer.

25  Q   Do you recall the time frame?

Page 115

1    A    No.

2    Q    Do you recall the terms?

3    A    No.

4    Q    Do you recall whether there was a lot of money

5         involved?

6    A    There was a fair amount of money involved, yes.

7    Q    Do you know who the offer was on behalf of?

8                        MR. TOBEROFF:      Asked and

9         answered.

10   A    An investor.

11   Q    Were you ever told who the investor was?

12   A    No.

13                       MR. TOBEROFF:      Asked and

14        answered.

15   Q    Did you have a guess?

16                       MR. RYLAND:        Objection.

17        Speculation.

18   A    I'm not going to speculate.  That's attorney

19        work product.

20   Q    Do you have any idea?

21   A    No.

22   Q    Did you believe the investor was Laura Siegel

23        Larson and Joanne Siegel?

24                       MR. TOBEROFF:     Are you asking

25        what his beliefs were in working for his client

EXHIBIT E
161

Page 116

1      Michael Siegel?

2            MR. RYLAND:      Objection.

3  Q  Did you ever ask Mr. Toberoff who the investor

4      was?

5  A  Yes.

6  Q  Did he tell you?

7  A  No.

8  Q  Did he tell you anything about the investor?

9            MR. TOBEROFF:     Overbroad.

10  A  He did not tell me anything about the investor.

11  Q  Other than that there was an investor --

12  A  Yes.

13  Q  -- who was interested in acquiring Michael

14      Siegel's termination interest?

15  A  Correct.

16  Q  Do you recall the time frame that the offer was

17      made?

18  A  No.

19  Q  Did you --

20            MR. TOBEROFF:     Asked and

21      answered.

22  Q  Did you keep any records of the offer that was

23      made?  Well, I'm sorry.  Strike that.

24            MR. RYLAND:      Objection.

25      Assumes facts.

Page 117

1   Q   Was the offer made in writing?

2   A   I believe there may have been an offer in

3       writing.

4   Q   By letter?

5   A   I don't recall.

6   Q   By e-mail?

7   A   I don't recall.

8   Q   You don't recall?

9   A   No.

10  Q   Is it the kind of correspondence you would

11      normally retain in connection with your

12      practice?

13  A   Yes.

14  Q   And if such a letter existed, it would be in

15      your files?

16  A   It would be in the files transferred to

17      Mr. Banchek.

18  Q   And then were forwarded to Mr. Toberoff?

19  A   Yes.  Well, I'm assuming.

20  Q   Well, do you know that they were forwarded to

21      Mr. Toberoff?

22              THE WITNESS:      Were they

23      forwarded to you?

24              MR. TOBEROFF:      Yes.  To my

25      knowledge.

EXHIBIT E
163

1    Q    Are you aware of any agreement between Joanne

2         Siegel and Laura Siegel Larson on the one hand

3         and any third party with respect to the

4         termination?  And I can be a little more clear.

5         I'm including the DC and Time Warner entities

6         in that question.

7    A    Yes.

8    Q    What are you aware of?

9    A    I think these documents here reflect that there

10        was a contingency agreement with -- what was

11        the name of the firm?  Gang Tyre.

12   Q    Any other agreement?

13   A    Not that I can recall.

14   Q    Are you aware of an individual name Gerald

15        Jones?

16   A    Doesn't ring any bells.

17   Q    You never heard of him?

18   A    I can't recall at the moment.

19   Q    Does it help if he was a comic book historian?

20   A    I can't recall.

21   Q    Are you aware of Michael Siegel speaking to

22        Mr. Jones?

23   A    I can't recall.

24                        - - - - -

25        (Defendants' Exhibit No. B-30 was marked.)

EXHIBIT E
164

1                           - - - - -

2    Q    Mr. Bulson, have you ever seen this document

3         before?

4    A    I don't recall having seen this before.

5    Q    Are you done reviewing it?

6    A    What?

7    Q    Are you done looking at it?

8    A    Yes.

9    Q    Have you ever heard of a company called IP

10        Worldwide?

11   A    I don't recall having heard of them, no.

12   Q    If you look at the first paragraph of the

13        letter of agreement, whatever it is?

14   A    Uh-huh.

15   Q    Do you see where it talks about a recent

16        discussion and disclosure to you of various

17        risks and potential problems regarding Michael

18        Siegel?

19   A    I see that.

20   Q    You see that the letter is addressed to Joanne

21        and Laura Siegel Larson?

22   A    I see that.

23   Q    Are you aware of any conflicts between Michael

24        Siegel on the one hand and Joanne Siegel and

25        Laura Siegel Larson at this time?

Page 120

1    A    I have no idea what this letter is referring to

2         at that time.

3    Q    Did Michael Siegel ever make any claims to

4         Joanne Siegel and Laura Siegel Larson with

5         respect to the termination interest?

6                        MR. TOBEROFF:      You can

7         answer.

8    A    Yes.

9    Q    What were those claims?

10                       MR. TOBEROFF:      You can

11        answer.

12   A    He wanted to make sure he got his share of what

13        he was entitled to.

14   Q    I'm not sure I follow.  Is that a -- what did

15        he -- what did he claim other than that he was

16        entitled to his share?

17                       MR. RYLAND:       Are you

18        talking about formal claims, counsel?

19                       MR. WEINBERGER:    I'm talking

20        about any kind of claim.

21                       THE WITNESS:      What's my

22        latitude here?  I'm not sure.

23                       MR. TOBEROFF:      You can

24        answer.  Don't reveal the substance of your

25        communications with Michael Siegel.  You can

EXHIBIT E
166

Page 121

1        reveal the substance of your communications to

2        Laura Siegel or Laura Siegel Larson or Joanne

3        Siegel or their counsel regarding any adverse

4        claims by Michael Siegel.

5    A   Okay.  I recall there was a dispute regarding

6        the expenses that were charged by the Siegels

7        against the monies received from DC.

8    Q   So this is with respect to the $250,000

9        payment?

10   A   Right.

11   Q   And I think we've previously discussed there

12       was a chunk held back for expense amounts.  The

13       rest was identified 50/50, and 25 percent going

14       Michael, right?  Do you recall any specifics

15       about that claim?

16   A   I think the only specifics I recall at this

17       point in time is an objection to the sweat

18       equity that was being claimed.

19   Q   Do you recall that?

20   A   And then there was a request for support for

21       some of the other expenses, just documentation

22       to support.

23   Q   What do you mean by sweat equity?

24   A   For their -- they were charged -- Laura and

25       Joanne were charging for their time expended in

Page 122

1    preparing the termination notices.

2  Q  Did they claim an hourly rate?

3  A  I think there was an hourly rate that they set

4     forth.

5  Q  And Michael either on his own or through you

6     communicated to them that he did not think that

7     was fair?

8  A  I communicated that the sweat equity was

9     improper -- an improper charge against the

10    proceeds.

11  Q  Can you think of any other claims made by

12     Michael Siegel or any other issues that were in

13     dispute between Michael Siegel and Joanne

14     Siegel and Laura Siegel Larson at this time?

15  A  Yes.

16  Q  What else?

17  A  The other one was the widow -- the so-called

18     widow's benefit because of a letter by

19     Mr. Schulman to the Siegels indicating that the

20     amounts being paid were no longer pursuant to

21     the original agreement pertaining to the

22     widow's benefits.  That they would be

23     considered this is the amounts being paid to

24     Joanne Siegel.  That they would be treated

25     as -- as part of the monies paid pursuant to

Page 123

1        their 50 percent, you know, the 50 percent of

2        the copyright.  And consequently, we said in

3        view of that letter from Mr. Schulman, that

4        Michael Siegel should be entitled to 25 percent

5        of the proceeds.

6    Q   Which letter are you talking about?

7    A   There was a letter from -- I can't recall the

8        specifics, but it -- there was a letter from

9        Mr. Schulman to probably Joanne Siegel or to

10       their attorney recharacterizing the monies that

11       were being paid to her.

12   Q   And this is a document that you were -- that

13       you had seen?

14   A   I had a copy of that document.

15   Q   Is it one of the documents that we looked at

16       today?

17   A   I have not seen it today.

18   Q   Was that a letter that you were sent directly

19       by Mr. Schulman or was it --

20   A   It was not directly to me.

21   Q   It was forwarded to you by somebody else?

22   A   Right.

23   Q   I think you said before you had heard of Ariel

24       Emanuel?

25   A   The name sounds familiar.

Page 124

1    Q    Do you remember from where?

2              MR. TOBEROFF:      Asked and

3         answered.

4    A    I think from Mr. Toberoff.  I'm not sure.  Yes,

5         he probably mentioned this guy, but it's very

6         hazy.

7    Q    Did he tell you that he was the investor?

8    A    No.

9    Q    Were you aware as of January 21, 2002 of any

10        termination with regard to Superboy as opposed

11        to Superman?

12   A    I don't recall.

13   Q    Are you aware of it now?

14   A    I'm aware that the termination notices were

15        filed with respect to Superboy, yes.

16   Q    Were there any disagreements between Michael on

17        the one hand and Joanne and Laura and Michael

18        with respect to Superboy?

19              MR. TOBEROFF:      You can

20        answer.

21   A    Not that I'm aware of.  I don't recall any.

22   Q    If you look at paragraph 2 of the document in

23        front of you, Exhibit 30, the last sentence,

24        the paragraph is contemplating if there is a

25        resolution or if there is a purchase of Michael

Page 125

1       Siegel's termination interest, it would also be

2       accompanied with the settlement agreement.

3       Which if you look at the last sentence, "Will

4       specifically disclose the separate Superboy

5       termination, recently served and filed."

6    A  I see that.

7    Q  Do you have any understanding as to why that

8       would be in there?

9    A  No.

10   Q  Can you guess?

11   A  What do you mean by why?  I guess I don't

12      understand the question.

13   Q  Well --

14                  MR. TOBEROFF:      Calls for a

15      legal opinion.

16                  MR. RYLAND:      Calls for

17      speculation.

18   Q  Why would there need to be any agreement?

19   A  I mean whoever authored this letter, I don't

20      know why they put this in there.

21   Q  Based on your understanding, there was no

22      dispute between Michael on the one hand and

23      Joanne and Laura?

24   A  I don't understand this letter.

25   Q  I think you testified, correct me if I'm wrong,

EXHIBIT E
171

Page 126

1    that you were not aware of any dispute between

2    Michael on the one hand and Joanne and Laura on

3    the other with respect to Superboy?

4    A    That's correct.

5                    MR. TOBEROFF:    Asked and

6    answered.

7    Q    Were you ever contacted by Ariel Emanuel?

8    A    No.

9                    MR. TOBEROFF:    Directly?

10                   MR. WEINBERGER:    I was not

11   being specific.

12   A    No.  Neither by him nor anyone that I knew was

13   acting on his behalf.

14   Q    Was Michael?

15   A    Not to my knowledge.

16   Q    I'm not meaning to be discourteous by using

17   first names.

18   A    No, that's fine.  That's how I will typically

19   refer to him as well.

20   Q    Was there ever a settlement agreement drafted

21   as between Michael and Joanne and Laura that

22   you are aware of, meaning --

23   A    Not that I'm aware of.

24   Q    To your knowledge, were you -- you may have

25   just answered this.  I apologize.  Were you

EXHIBIT E
172

Page 127

1      ever contacted by a representative of

2      Mr. Emanuel?

3   A  Not to my knowledge.

4   Q  Were you ever contacted by representative of IP

5      Worldwide?

6   A  Not to my knowledge.

7   Q  Were you contacted with respect to Michael

8      Siegel's termination interest?  And again, I'm

9      talking in this post -- after the settlement

10     with the Siegels and DC and Time Warner fell

11     apart, which was in the end of 2000, the Fall

12     of 2002, I'm talking post October 2002, were

13     you contacted by Mr. Toberoff with respect

14     to --

15  A  I don't recall the time frame.

16  Q  Were you contacted by Mr. Toberoff with respect

17     to a purchase of Michael Siegel's termination

18     interest?

19  A  Yes.

20  Q  And did he in connection with those contacts

21     identify himself as representing any particular

22     entity?

23  A  An investor.

24  Q  Did he identify himself as representing the

25     Siegels, Joanne and Laura Siegel?

Page 128

1    A    No.

2    Q    Did you know that he represented Joanne Siegel

3         and Laura Siegel?

4    A    Yes.

5    Q    How did you know that?

6    A    He told me.

7    Q    Did he also tell you that --

8    A    Maybe we need to clarify your earlier question.

9    Q    I think I've I gotten the clarification of the

10        earlier question.

11   A    I had assumed from our chain of discussion here

12        that you were referring to with respect to an

13        offer to purchase Michael Siegel's interest.

14   Q    No, I understand.  Well, why don't you, if you

15        can recall, tell me how you first came in

16        contact with Mr. Toberoff.

17   A    I can't recall.

18   Q    Was the first contact with Mr. Toberoff a

19        telephone call?

20   A    I can't recall.

21   Q    A letter?

22   A    I can't recall.

23   Q    An e-mail?

24   A    I can't recall.

25   Q    Do you recall the circumstances in which you

EXHIBIT E
174

Page 129

1    were conveyed an offer with respect to Michael

2    Siegel's termination interest?

3                        MR. TOBEROFF:        Vague and

4    ambiguous.

5    A    I believe there were discussions regarding the

6         purchase of Michael Siegel's interest.

7    Q    With Mr. Toberoff?

8    A    With Mr. Toberoff.

9    Q    On behalf of an investor?

10   A    Yes.

11   Q    But you don't have any recollection as to how

12        that got started?

13   A    Not at the moment, no.

14   Q    And do you have any recollection as to the time

15        frame?

16   A    No.

17   Q    As to the terms of the offer or at least the

18        initial terms of the offer?

19                        MR. TOBEROFF:        Asked and

20   answered.

21   A    I don't remember specifics.  I can't remember

22        the specifics.

23                        - - - - -

24   (Defendants' Exhibit No. B-31 was marked.)

25                        - - - - -

**EXHIBIT E**
**175**

Page 130

1    Q    Just take a minute to look at this document,

2         please.

3                        MR. WEINBERGER:    For the

4         record, while the witness is reviewing it, it's

5         a document dated as of October 3, 2002 on IP

6         Worldwide letterhead to Joanne Siegel and Laura

7         Siegel Larson.

8    A    I have perused it.

9    Q    Are you done?

10   A    Done.

11   Q    Have you ever seen this before?

12   A    I don't believe so.

13   Q    Are you familiar with the terms in the

14        document?

15   A    I am now.

16                       MR. TOBEROFF:       Vague and

17        ambiguous.

18   Q    You are now, but not before?

19   A    I don't believe so.

20   Q    Okay.  Put that down.  Thanks.

21                        - - - - -

22        (Defendants' Exhibit No. B-32 was marked.)

23                        - - - - -

24   Q    The reporter has handed you Exhibit B-32.  Take

25        your time, Mr. Bulson.

EXHIBIT E
176

Page 131

1    A    I remember a letter of this import, yes.

2    Q    Did you receive this document?

3    A    Probably.

4    Q    I just direct your attention to the DB Bates

5         number.   This is actually from your files.

6    A    Okay.   That's why I said I assumed it probably

7         was.

8    Q    Well, at least I'm informed that it is.

9    A    I'm assuming it was not fabricated.   It looks

10        like something I did receive.

11   Q    Do you recall upon reading this the substance

12        of this communication?

13   A    This was relating to documentation supporting

14        the expenses incurred with respect to the

15        termination notices.

16   Q    This is the expenses that were withheld from

17        the $250,000 before it was distributed to the

18        family members?

19   A    Right.

20   Q    Now, had Michael, either on his own or through

21        you, requested a statement to this effect from

22        the Siegels?

23   A    Yes.

24   Q    Do you recall when such a request was made?

25   A    I would presume prior to April 16, 2003.

**EXHIBIT E**
**177**

Page 132

1    Q    After the January 2001 payment was made?

2    A    Yes.

3    Q    But not --

4    A    Well, I don't know that for a fact.  I mean, I

5         don't know.  I just know it was prior to this.

6    Q    Obviously, it happened after the prospect of

7         the $250,000 payment existed?

8    A    Probably.

9    Q    Does that help place in the time frame when

10        your client either on his own or through you

11        first raised these issues with Joanne and

12        Laura?

13   A    Well, the specific issues with respect to the

14        amounts that were charged as expenses would

15        have been after the agreement with Time Warner

16        to pay certain amounts of funds.

17   Q    The first sentence of the letter says,

18        "Enclosed are the long awaited volumes of

19        itemized documentation regarding expenses."

20        Does that help refresh your memory as to when

21        in the time frame?

22   A    When was the check?  When was the money paid to

23        the decedent?

24   Q    I think it's January 2001.  January 2001 is

25        when your client received --

Page 133

1   A   It would have fallen into that area somewhere.

2   Q   So shortly after the money came in or after the

3       agreement was made?

4   A   I don't recall.

5   Q   Do you recall how any objections by Michael

6       Siegel were communicated to Joanne and Laura?

7   A   That would have been by me.

8   Q   By letter?

9   A   I don't recall.

10  Q   Buy e-mail?

11  A   I don't recall.

12  Q   Or telephone call?

13  A   One of the above.

14  Q   And if it was a letter, it would have been

15      signed, you would have retained it in your

16      files?

17  A   It should be in the file, yes.

18  Q   Did your client either on his own or -- well,

19      did your client communicate with Joanne and

20      Laura on his own, to your knowledge, about

21      these issues?

22              MR. TOBEROFF:      Asked and

23      answered.

24  Q   That was a very poor question.  Do you have

25      knowledge as whether your client dealt directly

EXHIBIT E
179

Page 134

1      with Laura or Joanne with respect to the

2      expense issue?

3  A   I have no recollection of that.

4  Q   How about with respect to the termination

5      interest?

6               MR. TOBEROFF:      Asked and

7      answered.

8  A   I can't recall.

9  Q   Did you provide a response to this letter?

10  A   I can't recall.

11  Q   I think --

12  A   I mean, what I would have provided is we had a

13      dispute in issue of sweat equity.

14  Q   Did this letter address that issue?

15  A   Just quickly looking at it.  I'm just looking

16      at the chart.

17  Q   Which chart?  Because there are two of them, I

18      believe.  If you could give us a page number.

19  A   I'd have to study this.

20  Q   Take your time.

21  A   Just skimming it, it looks like it's just

22      dealing with expenses.

23  Q   I want to make sure.  You are looking at it,

24      right?

25  A   Yes.  This appears to be only dealing with the

1    expenses, not the amounts that were charged for

2    money expended.

3    Q   Do you recall providing a response to this

4    letter?

5    A   I don't recall any specific response.

6    Q   Did this issue ever get resolved?

7    A   No.

8              MR. TOBEROFF:      What issue?

9              MR. WEINBERGER:     The issue

10   about expenses.

11   Q   That's what you --

12   A   Thank you for the clarification.

13   Q   That's what you understood?

14   A   Yes.

15   Q   So as to the expenses issue, Michael was not

16   paid any additional money by Joanne and Laura?

17   A   That's correct.

18   Q   Did you discuss the substance of this letter

19   with Mr. Toberoff?

20   A   I don't recall.

21   Q   Do you consider this letter to be covered by

22   any privilege?

23              MR. TOBEROFF:      Calls for a

24   legal conclusion.

25   Q   And you can disregard confidentiality as an

Page 136

1    issue.

2                    MR. TOBEROFF:     It's attorney

3    work product.

4    Q    If you were -- if you had been asked -- strike

5        that.

6                    MR. WEINBERGER:    So you are

7    instructing him not to answer that question?

8                    MR. TOBEROFF:      Yes.  As to

9    what his -- as to his attorney work product,

10    yes.  And I also object to it calls for a legal

11    opinion.

12    Q    With respect to the dispute relating to

13        expenses, did you consider Mr. Michael Siegel

14        to be adverse to Joanne and Laura?

15                    MR. TOBEROFF:      Calls for a

16    legal conclusion.

17            You can answer.

18    A    They had a difference of opinion, yes.

19    Q    There was a dispute over this money, right?

20    A    With respect to the sweat equity and then with

21        respect to the expenses that are identified in

22        this letter.  It was just a question of making

23        sure there was adequate documentation to

24        support them.

25    Q    Were you ever provided an opportunity -- in

EXHIBIT E
182

Page 137

1    connection with this issue, did you ever look

2    at the legal bills of Gang Tyre or Arthur

3    Levine?

4  A  Not that I can recall.

5  Q  Or Dennis Larson?

6  A  Not that I can recall.

7                    - - - - -

8    (Defendants' Exhibit No. B-33 was marked.)

9                    - - - - -

10  Q  The reporter has handed you Exhibit B-33.  It's

11    an April 30, 2003 letter from Marc Toberoff to

12    you.  Do you recognize this document?

13  A  I don't recall the specific document, but I

14    assume it's probably one that is in my -- that

15    was in the files transferred to Mr. Banchek.

16  Q  And it purports to enclose an itemized

17    documentation of expenses --

18  A  Uh-huh.

19  Q  -- advanced by Joanne and Laura in connection

20    with the termination.  Do you recall whether

21    Exhibit 32 is that itemized documentation or

22    whether there was something else?

23  A  I don't recall.

24  Q  If you go down to the third paragraph, the

25    letter states that Joanne and Laura had

Page 138

1      informed Mr. Toberoff that in the past

2      unjustified claims were made by you on behalf

3      of Michael Siegel challenging their

4      entitlement -- Joanne and Laura's entitlement

5      to deduct their expenses prior to distribution

6      of proceeds from the termination interest;

7      challenging the amount of such expenses; and

8      arguing that Joanne's widow benefits from

9      DC/Warner Bros. should be deemed proceeds of

10     the termination interest."

11   A    Yes.

12   Q    Does that --

13   A    Those were the two issues that I testified to

14        previously.

15   Q    Were there any other issues, that you can

16        recall?

17   A    No, not that I can recall.

18   Q    And again, as to both the question of the

19        expenses, both what was included and the

20        amount, meaning the sweat equity and the

21        specific information about what the expenses

22        were, that was not resolved for before

23        Mr. Siegel died?

24   A    No.

25   Q    What about the question of whether widow

EXHIBIT E
184

1        benefits related to the termination interest?

2    A   No.

3                        - - - - -

4        (Defendants' Exhibit No. B-34 was marked.)

5                        - - - - -

6    Q   Mr. Bulson, do you recognize this document,

7        what's been marked as Exhibit B-34?

8    A   I don't have a specific recollection, but

9        again, this appears to be a letter I sent to

10       Mr. Toberoff.

11   Q   And it relates to an offer made by the

12       potential investor to purchase Michael Siegel's

13       termination interest?

14   A   That is correct.

15   Q   And the Superman copyright?

16   A   That is correct.

17   Q   You note in the first paragraph -- you advise

18       Mr. Toberoff that the amount offered was not

19       acceptable to Michael.  Do you recall what

20       the initial -- or what the amount was?

21   A   I don't have a recollection, no.

22   Q   Do you recall whether this is the first -- this

23       is a response to an initial offer?

24   A   I don't recall.

25   Q   Does reviewing the letter help refresh your

Page 140

1    recollection as to the timing of an initial

2    offer?

3  A  Well, the offer that was advanced by

4    Mr. Toberoff would have been prior to June 18,

5    2003.

6  Q  Do you recall about how much earlier?

7  A  No.

8  Q  Was it months?

9  A  I don't recall.

10           MR. TOBEROFF:    Calls for

11   speculation.

12           MR. RYLAND:     Calls for

13   speculation.

14  Q  If you look at the next paragraph, it says that

15   Mike would be willing to entertain an offer to

16   pay him $200,000 a year for the rest of his

17   life, with a guaranteed minimum of ten years.

18   I take it from this statement that Michael

19   Siegel was interested in selling his

20   termination interest?

21  A  The letter speaks for itself.  Beyond that I

22   would be getting into, I think, privileged

23   communication.

24  Q  Well, if he was interested in selling his

25   termination interest and you are in

Page 141

1    correspondence to a third party expressing that

2    interest, I don't think there is anything

3    privileged about it.  It's a discussion with a

4    third party.  So the question was, was

5    Michael --

6                    MR. TOBEROFF:    Conversations

7    with his client regarding negotiations with

8    third parties would be privileged.

9  Q  So your only testimony with respect to the

10    issue is that -- is to point to the letter,

11    that Michael would be willing to entertain an

12    offer that will pay him $200,000 a year for the

13    rest of his life?

14  A  I don't believe I'm at liberty to go beyond

15    that.

16  Q  But do you recall writing this specific letter?

17  A  I don't recall, but that's my signature.

18  Q  Do you believe it to be accurate?

19  A  As best as I can tell.

20  Q  You were not in the habit of sending letters to

21    third parties about settlement terms without

22    authorization from your client, were you?

23  A  No.

24                    MR. TOBEROFF:    Misstates the

25    terms.

EXHIBIT E
187

Page 142

1    Q    Sorry.  A buyout term.

2    A    Yeah.  I apologize for jumping the gun.

3    Q    No.  No.  That's all right.  Do you recall

4         whether Mr. Toberoff responded to this letter?

5    A    I don't recall any specific -- I mean I know

6         there was a response, but I don't recall the

7         specifics.

8    Q    And you don't recall the specifics of what the

9         initial offer was that was not acceptable to

10        Michael Siegel?

11   A    Not at the moment, no.

12   Q    Presumedly it was no less than $200,000 a year

13        for the rest of life?

14                   MR. RYLAND:        Calls for

15        speculation.  Presumes facts.

16   A    One would presume that, yes.

17   Q    But you don't recall specifically?

18   A    I don't recall that.

19   Q    Now, did you inquire as to who the investor

20        was, the investor that is identified in this

21        letter?

22   A    Yes.

23   Q    And what were you told in response?

24   A    I was given no name.

25   Q    Were you given any information about the

**EXHIBIT E**
**188**

Page 143

1       investor?

2   A   No.  Not that I can recall.

3   Q   About the investor's financial wherewithal?

4   A   Not that I can recall.

5   Q   Were you told any information about the nature

6       of the business that the investor was in?

7   A   Not that I can recall.

8   Q   Were you ever contacted directly by Joanne or

9       Laura Siegel with respect to these

10      negotiations?

11  A   What negotiations?

12  Q   The negotiations with Mr. Toberoff on behalf of

13      a potential investor to buyout Michael Siegel's

14      interest?

15  A   Not that I can recall.

16  Q   Do you know if Michael was?

17  A   I have no knowledge of that.

18  Q   I apologize if we have been over this before,

19      but was there any direct offer from Joanne or

20      Laura to purchase Michael Siegel's interest for

21      themselves?

22  A   Not to my knowledge.

23              MR. TOBEROFF:     Asked and

24      answered.

25                  - - - - -

Page 144

1          (Defendants' Exhibit No. B-35 was marked.)

2                        - - - - -

3    Q    The court reporter has handed you what's been

4         marked as Exhibit B-35.  This is a July 16,

5         2003 letter from Marc Toberoff to you.  Do you

6         recognize this letter?

7    A    I don't have any present recollection, but it

8         appears to be a letter that I received from

9         Mr. Toberoff.

10   Q    This further relates to the disputed expenses?

11   A    The documentation for the expenses, yes.

12   Q    And do you -- strike that.

13            If you look at the last paragraph before

14        "I look forward to hearing from you."  I'm

15        sorry.  The first paragraph after the numbered

16        entries.  After number four it starts, "On

17        November 8, 2002."

18   A    Uh-huh.

19   Q    Do you see that it is describing expenses

20        related to the termination of Superboy, the

21        registered copyrights?

22   A    Yes, I see that.  Yes, I see that.

23   Q    Were you aware of a Superboy termination before

24        this letter?

25   A    I don't recall.

Page 145

1   Q   Did Michael dispute that he owed any money with

2       respect to a Superboy termination or that this

3       was -- well, did he have any dispute with

4       respect to monies relating to the Superboy

5       termination?

6                   MR. TOBEROFF:      That's

7       privileged.  You can ask were you conveyed.

8                   MR. WEINBERGER:     That's what I

9       meant.

10  A   What was the question again?

11  Q   Did you, on behalf of your client, convey any

12      dispute about the notion that he was -- that

13      Michael Siegel was obligated to pay expenses

14      relating to a Superboy termination?

15  A   Nothing separate and apart with respect to

16      Superboy, no.

17  Q   Do you know why this is being raised -- this

18      Superboy issue was being raised in this letter

19      and not before?

20  A   I suspect -- well --

21                  MR. TOBEROFF:      It calls for

22      speculation.

23  A   Yeah.  I mean I -- I mean the Superboy

24      termination notices were filed subsequent to

25      the original notices and perhaps subsequent to

Page 146

1      the original accounting, so.

2  Q   Did you ever discuss that issue with

3      Mr. Toberoff?

4  A   With respect to Superboy?

5  Q   Yeah.

6  A   Not that I recall.

7  Q   And does the letter in the second to the last

8      paragraph indicate that you had not responded

9      to Mr. Toberoff with respect to the expense

10     issue?

11 A   I have no recollection.

12 Q   Did you ever provide a formal response?

13 A   I don't recall.

14 Q   If you look at second to the last paragraph it

15     starts, "These Amounts."  "These amounts will

16     be distributed from the funds being held in

17     trust for Michael Siegel and the balance will

18     be forwarded to you once you have reviewed the

19     April accounting and the parties execute the

20     settlement referenced by me in my prior

21     correspondence in this matter."  Were you aware

22     of any trust of Michael Siegel?

23 A   I was aware that there had been funds being

24     held, set aside for him, yes.

25 Q   Was there a formal trust set up?

**EXHIBIT E**
**192**

Page 147

1   A   Not to my knowledge.

2   Q   Do you know who would have administered those?

3   A   I have no idea.

4   Q   Did you ever do any -- strike that.

5           Was the question of whether the funds

6       were being held in trust ever discussed between

7       you and Mr. Toberoff?

8   A   I don't recall.

9                    - - - - -

10      (Defendants' Exhibit No. B-36 was marked.)

11                   - - - - -

12  Q   The court reporter has marked as Exhibit B-36 a

13      letter from Marc Toberoff to you dated August

14      6, 2003.  Do you recall seeing this letter?

15  A   I don't have a present recollection of it, but

16      it does appears to be a letter that I received.

17  Q   And now that you have had a chance to look it

18      over, if you have had time to do so, does it

19      refresh your recollection?

20  A   The contents look familiar.

21  Q   And what is the -- what's it about?

22  A   Well, Mr. Toberoff indicated that he had a

23      high-end accountant get quotes for an annuity

24      paying out the sums as set forth in a

25      counteroffer presented on June 18, 2003

**EXHIBIT E**
**193**

Page 148

1    regarding a buyout of Michael's interest in the

2    Superman copyright.

3  Q   And before you go on, that was the $250,000 a

4    year for the rest of his life for a minimum of

5    ten years?  That was the offer?  If you want to

6    pull it out, it's Exhibit 34.

7  A   I believe so.

8  Q   Go ahead.

9  A   I believe so.

10  Q   Okay.  Continue.  I interrupted you.

11              MR. RYLAND:        Is there a

12    question?

13              MR. WEINBERGER:    I'd asked him

14    the subject matter of the letter.

15  A   That Mr. Toberoff indicated in the second

16    paragraph that an annuity would cost $3,476,727

17    asking me to check this out.

18  Q   Did you check it out?

19  A   I believe that would be work product, but you

20    can -- I defer to Mr. Toberoff as to whether or

21    not I should answer that question.

22              MR. TOBEROFF:      Without waiver

23    of the privilege, he can answer.

24              MR. WEINBERGER:    That's fine.

25  A   I believe I did some rough calculations of my

EXHIBIT E
194

Page 149

1      own going on the Internet to the annuities

2      calculators.  Now, as far as confirming that

3      amount, I don't recall.

4    Q   Okay.  Please continue.

5    A   Then Mr. Toberoff indicates the net present

6      value of the last Warner Bros offer is $1.5 to

7      $1.6 million.  I presume that he was referring

8      to Michael's share of the offer that was being

9      proposed by Warner Bros at the time.

10   Q   You just answered my next question.  Thank you.

11   A   And then he indicated that --

12                   MR. TOBEROFF:     I'm sorry.

13     What is -- I don't quite follow this line of

14     questions.  Are you having him read the

15     document?

16                   MR. WEINBERGER:    No.  I asked

17     him upon having had a chance to read the August

18     6, 2003 letter, what his understanding was of

19     what was occurring.

20   A   Well, it's what is reflected in the document.

21                   MR. TOBEROFF:     It's mental

22     impression.  It goes to work product.

23                   MR. WEINBERGER:   He's just

24     reading it.

25                   MR. TOBEROFF:     You are asking

Page 150

1    him what his understanding is or mental

2    impression is regarding this letter.  It's work

3    product.

4         You need not answer those questions.

5    Q  Did Mr. Toberoff communicate to you that the

6    investor was rejecting the offer conveyed in

7    the June 18, 2003 letter that's Exhibit 34 --

8    A  It indicates in here that Mr. Toberoff --

9    Q  -- because it was too high?

10   A  Mr. Toberoff states that he was not surprised

11   that the investor rejected the counteroffer as

12   unrealistic.

13   Q  Because the annuity of 3.476 million was too

14   high for the investor?

15   A  It's whatever the letter says.

16        MR. TOBEROFF:    The letter

17   speaks for itself.

18   Q  But you agree that the letter says that the

19   counteroffer was so high it may have scared

20   away a potential investor?

21        MR. TOBEROFF:    That's work

22   product.  It calls for speculation.

23   A  That's what the letter states, yes.

24   Q  And it references a communication that I don't

25   think is reflected in the correspondence.  It

EXHIBIT E
196

Page 151

1    says exactly what I mentioned when I asked you

2    whether you were sure I should communicate such

3    a high offer.  Did you and Mr. Toberoff speak

4    on the telephone in between the June 28, 2003

5    letter and August 6, 2003 letter?

6    A    I don't recall, but one might suspect that to

7         be the case.

8    Q    Do you recall it being asked by Mr. Toberoff

9         whether you were sure you wanted to convey this

10        offer on behalf of Michael Siegel?

11   A    I don't recall.

12   Q    The next portion of the letter -- the rest of

13        the letter, if I'm characterizing it

14        improperly, please feel free to correct me --

15        talks about the risks that the investor viewed

16        as associated with acquiring the termination

17        interest.  Would you agree with that?

18   A    The letter says what it says.

19   Q    And did you and Mr. Toberoff discuss any of

20        these risks?  Let me go through them one by

21        one.

22              MR. TOBEROFF:    Misstates the

23        document.  It does talk about the risks.  It

24        says any investor, not the investor.

25              MR. WEINBERGER:    Fair enough.

Page 152

1    Q    So go to the bottom of the letter, the first

2         page of the letter before the numbered

3         paragraphs.  It says, "To the extent you,

4         Michael, are not already aware of this, any

5         investor would view the risks as follows:

6              1.  Risk of costly drawn-out litigation

7         with Warner Bros. is a condition to receiving

8         any serious participation in "profits"."  And

9         then there is a parenthetical.  Did you and

10        Mr. Toberoff discuss litigation risks on the

11        telephone?

12   A    I don't recall the specifics of what we

13        discussed.

14   Q    If you look at bullet number two, that

15        discusses risks associated with no control over

16        the Siegel termination interest.  Michael's

17        interest is unfortunately a passive 25 percent

18        from what Joanne and Laura negotiate and

19        receive, and therefore there are major risks

20        associated with this lack of control.  Did you

21        and Mr. Toberoff, in connection with the

22        investor's offer, discuss the passive interest

23        and the risks associated with that?

24   A    Well, they are subject to discussion by virtue

25        of the fact that they are put forth in this

Page 153

1        letter.

2    Q   Did you have any other communications with

3        Mr. Toberoff?

4    A   I don't recall specific communications.

5    Q   Do you recall generally?

6    A   It would not surprise me if we had discussed

7        these items.

8    Q   Do you recall general discussion over risks of

9        litigation with Warner Bros.?

10   A   That was probably discussed, yes.

11   Q   Do you recall anything about those discussions?

12   A   Not specifics, no.

13   Q   If you look at Paragraph 3 it says, "Risk that

14       Joanne and Laura Siegel may never arrive at a

15       mutually acceptable settlement with Warner

16       Bros."  Did you discuss with Mr. Toberoff any

17       of the negotiations that had happened in the

18       past?

19   A   I imagine that our discussions reflected the

20       fact that the negotiations had ceased.  I

21       believe they had ceased by this time.

22   Q   To your knowledge, were there any other

23       negotiations between the Siegel family and

24       Warner Bros. that were ongoing or that --

25   A   I don't remember any.

**EXHIBIT E**
**199**

1   Q   Skipping to number 5.  It says, "Risk that

2       Superman will lose as opposed to gain value.

3       There hasn't been a Superman movie since 1978.

4       Compare the Bond franchise and the recent

5       failure to launch and talent package, a new

6       Superman film lost their director, and can't

7       cast the lead is well publicized."  Did you and

8       Mr. Toberoff discuss the risk to the investor

9       or any investor -- excuse me -- that the

10      property would lose money?

11  A   Well, this letter reflects the fact that these

12      were discussed.

13  Q   Did you discuss it with the terms of this

14      letter?

15  A   That I can't recall.  I would presume that the

16      discussions equally went to potential return

17      that an investor would receive, I'm sure, if

18      they purchased Mr. Siegel's interest.

19  Q   Did you convey to Mr. Toberoff in connection

20      with this negotiation any information

21      supporting the value of the Superman franchise?

22  A   I did not have any information to convey to

23      Mr. Toberoff beyond what he already had

24      possession of.

25  Q   And essentially you were communicating to him

Page 155

1       that you felt the franchise had value on behalf

2       of your client?

3   A   Indeed.

4   Q   Great value?

5   A   Yes.

6   Q   Do you recall what followed this communication?

7                   MR. RYLAND:         Objection.

8       Vague.

9   Q   In connection with your negotiations with

10      Mr. Toberoff?

11  A   What followed B-36?

12  Q   Yes.

13  A   I don't recall specifics.  I can say there was

14      no agreement reached.

15  Q   Keep 36 in front of you.  Did you undertake any

16      effort to confirm whether the first page of

17      Mr. Toberoff's representation of the last

18      Warner Bros. offer was accurate?

19  A   Did I communicate that to Mr. Toberoff?

20  Q   Yes.

21  A   I don't recall.

22  Q   Do you have any recollection as to whether it

23      was accurate?

24  A   No.

25  Q   Going back again to the first numbered item on

1    the list.  Do you recall any specific

2    discussion about litigation risks with Warner

3    Bros.?

4  A  Specific discussion?

5  Q  Yes.

6  A  Not that I can recall.

7              MR. RYLAND:        Objection.

8  Q  As to the ability to obtain profits from

9    foreign exploitation?

10 A  I don't recall any specific discussion on that.

11   I know that was an issue with respect to the

12   original discussions with DC Comics.

13 Q  What about apportionment?

14 A  DC Comics was taking the position that foreign

15   profits shouldn't be included in the royalty

16   base, but their original offer did include

17   them.

18 Q  Do you know why?

19 A  I forget the explanation of that.

20              MR. TOBEROFF:       Out of the

21   goodness of their hearts.

22 A  Probably to avoid an accounting nightmare, but

23   I don't remember.

24 Q  Going back to your discussions with

25   Mr. Toberoff relating to the risks that an

1    investor would have in acquiring Michael

2    Siegel's termination interest.  And again,

3    focusing on number one on B-36, the risks of

4    litigation.  Did you discuss with Mr. Toberoff

5    questions relating to apportionment?

6  A   I don't recall.

7  Q   Exploitation of derivative works prepared prior

8    to the termination?

9  A   I doubt that that was discussed.

10 Q   Trademarks?

11 A   I don't recall.

12 Q   What about recovery of profits from the Warner

13   Bros. Studio?

14 A   I don't know if that was discussed with

15   Mr. Toberoff or not.

16 Q   Did you and Mr. Toberoff discuss what is

17   identified here as notorious studio accounting

18   practices and definitions?

19 A   Well, where is that at?

20 Q   It's in number one.  It's part of the

21   litigation risk.

22           MR. TOBEROFF:    You mean other

23   than as set forth in the letter?

24 Q   Yes, other than as set forth in the letter.

25 A   I don't recall.

Page 158

1  Q   Have you ever handled litigation against a

2      movie studio?

3  A   No.

4              - - - - -

5      (Defendants' Exhibit No. B-37 was marked.)

6              - - - - -

7  Q   You have been handed what's been marked as

8      B-37.  Mr. Bulson, do you recognize this

9      document?

10  A   It appears to be an e-mail -- a copy of an

11      e-mail that I sent to Mr. Toberoff on November

12      12, 2004.

13  Q   And if you go back to Exhibit B-36, which was

14      dated August 6, 2003, would you agree that over

15      a year has passed in between those two

16      documents?

17  A   Uh-huh.

18  Q   Do you know if there was any discussion between

19      you and Mr. Toberoff relating to the investor's

20      interest in purchasing Michael Siegel's

21      termination share that occurred in between

22      these two documents?

23  A   There may have been.  I don't recall.

24  Q   Do you recall a gap in the discussions?

25  A   No.

EXHIBIT E
204

1    Q    Had you on behalf of Michael Siegel ever

2         expressed to Mr. Toberoff that -- well, strike

3         that.

4              I believe there was some previous

5         testimony about how Michael Siegel -- strike

6         that, too.

7              If I recall correctly, you wrote in a

8         letter to DC Comics representatives that

9         Michael was unhappy with the pace of the

10        negotiations with DC Comics?

11   A    I forget right now.  Short memory span here.

12   Q    Let me see if I can find it.

13   A    I think there was a letter here dealing with

14        his medical expenses, right?

15   Q    Yeah, I think that's what it was.

16   A    It's B-16.

17   Q    Thank you.  The top of page 2 of Exhibit B-16.

18   A    Uh-huh.

19   Q    Is it accurate that at least as of September

20        18, 2000, Michael was not pleased the slowness

21        and lack of progress in the negotiations?

22              MR. TOBEROFF:     The letter

23        speaks for itself.

24   Q    Other than as conveyed in the letter that --

25   A    What was conveyed in the letter?

Page 160

1          MR. TOBEROFF:      I instruct him

2      not to answer.

3   Q   In answer to this later negotiation for sale of

4      his termination interest to Mr. Toberoff's

5      investor, did Michael Siegel similarly convey

6      an urgency?

7          MR. RYLAND:        Objection.

8      Assumes facts.

9   A   What was the question again?

10          MR. TOBEROFF:      Privilege.

11  Q   I'm asking whether Michael either through you

12      or on his own conveyed to Mr. Toberoff that he

13      wanted these negotiations to conclude quickly?

14          MR. TOBEROFF:      You can answer

15      with respect to communications to me.

16  Q   That's the question.

17  A   I have no recollection.  I'm looking at B-37.

18      There wasn't anything indicating there in that

19      letter that the matter needed to be immediately

20      urgently resolved, at least I can't see it.

21  Q   You are talking about the e-mail or the --

22  A   B-37 e-mail.

23  Q   You don't recall whether there were any

24      communications between November 12, 2004 and

25      August 16?

Page 161

1    A    I can't remember.

2    Q    August 6, 2003?

3    A    I can't recall.

4    Q    But if there were such communications, it would

5         be in your files?

6    A    Yes.

7    Q    If you would go back to Exhibit 34.  I think

8         those are the only two you need in front of you

9         right now, 37 and 34.

10   A    Okay.

11   Q    If you look at 34, it conveys an offer of

12        $200,000 a year for the rest of his life,

13        minimum of ten years.  And then you look at 37,

14        which is the November 12, 2004 e-mail, and it

15        says that Mike originally proposed an initial

16        payment of $300,000 and annual payments of

17        about 123,000 for 20 years.  I'm trying to

18        reconcile the two letters because I don't -- I

19        don't follow the offer and counteroffer.  I'm

20        not sure whether the initial offer was conveyed

21        in the later e-mail.

22                  MR. RYLAND:       Objection.

23                  MR. WEINBERGER:   Perhaps he can

24        explain it.

25   A    Is that a question?

Page 162

1              MR. RYLAND:          Objection.

2    Calls for speculation.

3  Q  I'm asking you if you are able to reconcile the

4     offer conveyed in the June 18, 2003 letter

5     which proposes $200,000 a year for the rest of

6     his life with a guaranteed minimum of ten

7     years.  I'm trying to see whether Exhibit 37,

8     if you'll agree, presents a summary of the

9     negotiations up until this point, right?

10 A  Uh-huh.  It seems to be.

11 Q  I'm trying to see whether the June 18, 2003

12    proposal fits in.  I'm asking you if you can

13    explain that.

14 A  I'm not able to explain that at this time.  I

15    can't remember.

16 Q  Do you believe that the substance of your

17    e-mail summarizing the past discussions, if you

18    look at the first paragraph, is accurate?

19 A  Of the e-mail?

20 Q  Yes, the e-mail.  Sorry.  Exhibit 37.

21 A  I would have no reason to believe it was not

22    accurate.

23 Q  So as of November 12, 2004, this kind of sets

24    the table for where things were, Exhibit 37?

25 A  That would appear to be the case, yes.

**EXHIBIT E**
**208**

Page 163

1    Q    And in this e-mail, you on behalf of Michael

2         Siegel, made a counterproposal?

3    A    Yes.

4    Q    And that proposal was for an initial payment of

5         $250,000, annual payments of $112,000 for 25

6         years.  The investor's recoupment of one-half

7         of monies paid if reversion occurs, subject to

8         an appropriate payback schedule subject to

9         payments received by Mr. Siegel at

10        participation at 10 percent of full recoupment

11        of monies paid by the investor?

12   A    That's what it says.

13   Q    Do you recall whether this proposal was

14        accepted?

15   A    I'm confident it was not.

16   Q    Did you and Mr. Toberoff discuss this proposal?

17   A    I don't recall specific discussions, but it

18        would not surprise me if we did.

19   Q    Well, you can't recall specific discussions

20        with Mr. Toberoff about this offer or any of

21        the others, can you?  Can you recall any of the

22        substance of those communications with regard

23        to whether it was in response to e-mail or the

24        previous letter?

25   A    No, not really.

EXHIBIT E
209

1    Q    Is there any reason why you have in the first

2         paragraph investor in quotes?

3    A    Because Mr. Toberoff would never tell us who

4         the investor was.

5    Q    Did you push him on that issue?

6    A    Yes.

7    Q    And were you ever able to learn who it was?

8    A    No.

9                        - - - - -

10        (Defendants' Exhibit No. B-38 was marked.)

11                        - - - - -

12   Q    This is 38, B-38.  This document is a November

13        17, 2004 e-mail from Mr. Toberoff to you.  It

14        appears to be in response to your November 12

15        e-mail that was Exhibit B-37, would you agree?

16   A    I would agree.

17   Q    And is this the investor's rejection of the

18        proposal that was made in your November 12

19        e-mail?

20   A    I think the import of this letter is a

21        rejection, yes.

22   Q    And if I'm reading this right, the tenor or the

23        response is that the offer -- the

24        counterproposal made on November 12, 2004 was

25        essentially the same offer as previously made?

Page 165

1    A    It says what it says.

2    Q    Well, in your view, was the November 12, 2004

3         proposal the same as the prior offers?

4                   THE WITNESS:       He's asking

5         for my view?

6                   MR. TOBEROFF:       I believe he

7         is.

8    A    That would be work product.

9                   MR. TOBEROFF:       It's work

10        product.

11   Q    Did you communicate to Mr. Toberoff any

12        position with respect to the offer being the

13        same as those previously offered?

14   A    I don't recall.

15                  MR. TOBEROFF:       You can answer

16        that.

17   Q    In this e-mail does Mr. Toberoff make a

18        counterproposal with respect to the

19        negotiations?

20   A    I don't think there is one in there.

21   Q    Do you recall whether one was ever made?

22   A    I don't recall.

23   Q    If you look in the middle of the second long

24        paragraph, the November 17, '04 e-mail, it

25        says, "There is a legal cost to make Warner

1    Bros. pay up (for instance with a contingency

2    lawyer at least 33.33 percent to 40 percent

3    would be taken off the top plus costs and

4    disbursements.)"  Did you ever discuss this

5    before the Siegels had retained a contingency

6    lawyer?

7    A    No, I don't remember that.

8    Q    Do you know who it's referring to?

9    A    No.

10   Q    Do you know now?

11   A    I don't think so.  I'd have to read that other

12        correspondence more carefully.  Maybe it's

13        reflected in there, that IP, whatever.  That

14        seemed to have set forth some kind of an

15        agreement.

16   Q    I think you testified earlier that you had done

17        some investigation -- and this was obviously

18        without waiver of privilege -- as to

19        Mr. Toberoff's calculation of the 3.4 million

20        for the annuity offer, the initial offer or at

21        least the earlier offer.  Do you recollect this

22        was the $200,000 a year for life, minimum ten

23        years, do you recall that?

24   A    Sort of.

25   Q    I think the correspondence reflected that

1     Mr. Toberoff, on behalf of his investor, had

2     gone to an accountant to get an annuity for

3     that amount?

4  A  Or he got it from somebody.

5  Q  And I think you testified that you checked

6     those numbers or at least --

7  A  I didn't think I testified -- I think I did

8     some looking.  I'm not sure if it was with

9     respect to that particular number.

10 Q  Did you --

11 A  I know I was plugging numbers in to get present

12    value using various interest rates.

13 Q  Had your client expressed through you to

14    Mr. Toberoff that he was interested in

15    understanding the present value of the offers?

16    Was the present value important to him?

17 A  To who?

18 Q  Strike that.

19        As part of your negotiations with

20    Mr. Toberoff on behalf of Michael Siegel, had

21    you discussed a present value that was going to

22    be agreeable?

23              MR. TOBEROFF:    Discuss with

24    me?

25              MR. WEINBERGER:    Yes.

1    A    What was going to be agreeable?  What was going

2         to be agreeable from Mr. Siegel's standpoint

3         was reflected, for example, in the e-mail dated

4         November 12, 2004.

5    Q    But it's not like you and Mr. Toberoff

6         discussed we want a present value of 3 million.

7         You were still working on the --

8    A    No.  I think the extent of those discussions --

9         I think the extent of those discussions were

10        probably this is what was thought to be the

11        present value of the DC Comics original offer,

12        which was kind of an important point with

13        respect to an investor saying, well, maybe

14        that's all I'm going to be able to walk away

15        with, so how can I justify paying more.  And

16        then relating that to the other offers as best

17        as you can based upon the numbers that were

18        provided by DC Comics.  I mean, that's the only

19        numbers that I had with respect to what the

20        revenues were generated by the Superman

21        property.

22   Q    What numbers were those?

23   A    These go back to the original meetings with DC

24        Comics where they provided the basis for their

25        calculation, I think, over a five-year term

Page 169

1          period.

2     Q    That was the initial meeting in New York?

3     A    Yes.

4     Q    Did you keep a record of any documentation?

5     A    I would have had a copy of that, yeah.

6     Q    Well, would that have been in your file?

7     A    Uh-huh.  That was supplied by DC Comics.

8     Q    So when you were working -- you said you were

9          trying to evaluate the offer in terms of the

10         numbers, the current offer as of November 2004

11         in terms of the dollar amounts that had

12         previously been disclosed?

13    A    That's all you really had to work with.

14    Q    And also comparing it to the settlement offers,

15         that seems to be discussed in here as well?

16    A    I'm kind of lost with the question.

17    Q    Well, you have a dollar basis from your

18         meetings in New York as for what -- how much

19         money the property generated, right?

20    A    Over a certain period of time.

21    Q    Over a certain period of time.  And then you

22         have settlement negotiations that fell through

23         in some of the correspondence with Mr. Toberoff

24         referring to the investor's offer where there

25         is a comparison to the last WB offer?

Page 170

1   A    Right.

2   Q    And do you know what that meant?  Was that the

3        October 19 letter or the long form agreement?

4   A    I would imagine that would be the most recent

5        offer.

6   Q    Do know specifically?

7   A    No.  But the only data that I had was for -- I

8        think it was something like that, like the '95

9        through '98-'99, '94 to '99.  And even that

10       data was incomplete, because they didn't have

11       the full effect of the TV show in it.

12  Q    Which TV show?

13  A    Lois and Clark, which was just coming on line

14       at the end of that date, I do believe.  That's

15       my hazy recollection.

16                   - - - - -

17       (Defendants' Exhibit No. B-39 was marked.)

18                   - - - - -

19  Q    This is B-39.  Would you agree, Mr. Bulson,

20       that this exhibit evidences a response by you

21       that you would follow up with your client and

22       get back to him on November 18, 2004 and

23       Mr. Toberoff's acknowledgement?

24  A    It does appear to be the case, yes.

25                   - - - - -

EXHIBIT E
216

Page 171

1      (Defendants' Exhibit No. B-40 was marked.)

2              - - - - -

3    Q   Exhibit 40 has been marked.  B-40, this is the

4        November -- a November 24, 2004 e-mail from you

5        to Marc Toberoff, would you agree?

6    A   Uh-huh.  It appears to be what it is.

7    Q   Do you recognize this document?

8    A   I mean I don't have a specific recollection,

9        but it looks like one I would have sent.  I

10       presume it came from my records.

11   Q   I presume, too.  Did you propose an additional

12       counteroffer or any offer to -- well, did you

13       propose another offer to Mr. Toberoff's

14       investor through this e-mail?

15   A   I don't think this conveyed a new offer.

16   Q   Were these negotiations kind of grinding to a

17       halt at this point?

18   A   I don't recall.

19   Q   Does the e-mail suggest to you that they were?

20   A   Well, I recall that there was never an

21       agreement reached.

22   Q   Were you aware at this time whether litigation

23       had been commenced by the Siegels, Joanne and

24       Laura Siegel, against the DC and Time Warner

25       entities?

**EXHIBIT E**
**217**

Page 172

1    A    As of -- I don't know for sure.

2    Q    Was there a time when you became aware that

3         there was a litigation?

4    A    Yes.

5    Q    Do you know when that was?

6    A    No.

7    Q    Was it before you received the subpoena in the

8         litigation?

9    A    Yes.

10   Q    And do you recall how you learned that there

11        was litigation?

12   A    I think I saw a report on it.

13   Q    It was not communicated to you by Mr. Toberoff?

14   A    I don't believe so.

15                   - - - - -

16        (Defendants' Exhibit No. B-41 was marked.)

17                   - - - - -

18   Q    The reporter has handed you what's been marked

19        as Exhibit B-41.  Do you recognize this

20        document, Mr. Bulson?

21   A    I don't have a present recollection of it, no.

22        But it appears to be a copy of the document

23        that came out of my records, a copy of an

24        e-mail from Mr. Toberoff to myself.

25   Q    And it's in response to a November 24 e-mail

**EXHIBIT E**
**218**

Page 173

1       that we have previously looked at, Exhibit 40?

2       You can see that on the next page.

3    A  Oh, yes.

4    Q  Just going through the e-mail, did you have any

5       discussions with Mr. Toberoff on the telephone

6       regarding whether his investor was

7       conservative?

8    A  I don't recall.

9    Q  Or experienced with regard to the entertainment

10      industry?

11   A  I don't recall.

12   Q  Cynical with regard to the entertainment

13      industry?

14   A  I don't recall.  Obviously, it was a topic of

15      discussion in this correspondence.

16   Q  Do you recall anything about those discussions

17      with Mr. Toberoff other than in this

18      correspondence?

19   A  I don't recall.

20   Q  Did you discuss as what is set out in item

21      number 3 in Exhibit 41 that WB and DC's

22      attorneys have vigorously disputed the

23      termination -- did you discuss this with

24      Mr. Toberoff?

25   A  I don't recall.  We may have discussed it.

Page 174

1        Obviously, it was a topic of this particular

2        communication.

3    Q   Did you have any discussions off line about it?

4    A   We may have.  I don't recall.

5    Q   Do you remember any specifics?

6    A   No.  I was aware that that was in dispute.

7    Q   What was in dispute?

8    A   I mean my understanding was that Warner Bros.

9        and DC always had taken the position that the

10       termination notices may not be effective.

11   Q   Did you discuss as set forth in number 7 the

12       concern that the Siegels could get a bum legal

13       decision?

14   A   I don't recall.

15   Q   Number 8, in the middle of the paragraph, the

16       e-mail from Mr. Toberoff suggests that the --

17       I'll read it to you.  "However, the WB offer

18       was ultimately rejected by the Siegels.  (The

19       reason Michael is interested in selling and a

20       further demonstration of risk) and may not

21       still be on the table."  Was this the reason

22       that Michael was interested in selling?

23   A   I cannot answer that question because of

24       attorney-client privilege.  I can probably

25       answer it to the extent that information was

1    communicated to Mr. Toberoff.

2  Q  Well, I mean here it suggests that he knows

3     that this is why, but I don't see the

4     communication going any other way.  This e-mail

5     to me suggests that you had that communication

6     off line on the telephone.

7              MR. TOBEROFF:     What's the

8     question?

9  Q  Was Michael interested in selling his share

10    because the settlement fell through?

11             MR. TOBEROFF:     That's

12    privileged.

13          You don't have to answer.

14  Q  In Exhibit 41, paragraph 8, it's reflected that

15    Mr. Toberoff and Mr. Bulson were discussing

16    that, so I would assume that it was conveyed.

17    And I ask Mr. Bulson whether he can answer --

18    whether it was conveyed?

19  A  I don't know.  I mean it's conveyed.  Whatever

20    it says is this.

21  Q  Does that accurately characterize something you

22    told Mr. Toberoff?

23  A  I don't know this myself.  Well, I'm not sure.

24    What I can -- I'm reasonably confident that

25    during discussions with Mr. Toberoff it was

Page 176

1    mentioned that one of the -- that it was

2    communicated that one of the motivations for

3    settling is that Michael's 59 and not in the

4    greatest of health.  And the legal proceedings,

5    to the extent there were any, I mean a

6    resolution of the issue could go on for a long

7    time.  So the money isn't going do to Michael

8    any good 20 years from now if he's dead.

9  Q   Unfortunately, four years from now.

10 A   So I think that's kind of stating the obvious

11     motivation for Mr. Siegel to have --

12 Q   I agree.  I'm just trying to -- I'm trying to

13     get -- I'm trying to understand if that was

14     communicated between the parties.  It sounds

15     like it was.

16         There is a second number 8 paragraph

17     below the one we were just looking at in the

18     e-mail.  It talks about the revenue projection

19     in the old projected settlement proposal which

20     was the DC revenue proposal as opposed to a WB

21     or Warner Bros. proposal.  Did you and

22     Mr. Toberoff ever discuss the import of that

23     difference?

24 A   Well, I believe there were discussions -- well,

25     I can't recall.  I'd be speculating as to what

EXHIBIT E
222

Page 177

1          I discussed with Mr. Toberoff.

2     Q    You have no memory of what --

3     A    I mean I recall that there was an issue

4          regarding the fact that Warner Bros. could

5          manipulate numbers.

6     Q    Do you recall discussing whether DC could

7          manipulate numbers?

8     A    No.  I think it came up in the context of the

9          licenses granted to Warner Bros.

10    Q    If you go to the last paragraph of the e-mail,

11         this is the bottom of page DB 042.  I think

12         it's accurate to suggest that Mr. Toberoff is

13         telling you that the last offer was a good one

14         and you might be able to get a little more, but

15         essentially that was it.  Would you agree?

16                   MR. TOBEROFF:      The document

17         speaks for itself.  I don't believe he could

18         testify as to his mental impressions.

19    A    I mean it says what it says.

20    Q    And this is what was communicated to you?

21    A    Obviously.

22    Q    If you look at the last sentence of the e-mail

23         before it gets to the forwarded message it

24         says, "Please let me know if you or Michael

25         have any additional thoughts or ideas."  Did

EXHIBIT E
223

Page 178

1    either you or Michael communicate any

2    additional thoughts or ideas to Mr. Toberoff?

3    A    I don't remember.

4             MR. TOBEROFF:    The second

5    paragraph 8 should be paragraph 9.  That's a

6    typographical error.

7             MR. WEINBERGER:    I think you

8    passed the statute of limitations on the typo.

9             MR. TOBEROFF:    But I do

10   sometimes repeat myself.

11             - - - - -

12   (Defendants' Exhibit No. B-42 was marked.)

13             - - - - -

14   Q    Mr. Bulson, do you recognize the document?  I

15   know we are getting closer and closer to the

16   present.

17   A    Yes.  It does appear to be an e-mail that I

18   received from Mr. Toberoff.

19   Q    On January --

20   A    January 17, 2005.

21   Q    And does the e-mail accurately state that you

22   had not responded to Mr. Toberoff following

23   your exchange in November of 2004?

24   A    That's what it states.

25   Q    Do you recall whether you did respond to that?

Page 179

1    A    I don't recall.  I suspect not.

2    Q    Did you respond to this Exhibit 42?

3    A    I don't recall.

4    Q    Do you recall whether there were any further

5         substantive discussions on the potential buyout

6         of Mr. Siegel's interest by the investor?

7    A    I don't recall.

8    Q    I think you testified no agreement was reached?

9    A    Well, I'm trying to think.  When did Michael

10        pass away?

11   Q    We'll get to that next.

12   A    This is after this?

13   Q    Yes.

14   A    Probably a year after.

15                    - - - - -

16        (Defendants' Exhibit No. B-43 was marked.)

17                    - - - - -

18   Q    I hand you a document that's been marked as

19        Exhibit B-43.  Do you recognize B-43?

20   A    Yes.

21   Q    And what is B-43?

22   A    It's an e-mail from Michael to me.

23   Q    Dated when?

24   A    Dated November 12, 2005.

25   Q    And what is the substance of this e-mail?

Page 180

1   A   Well, it says what it says.

2   Q   It says that these were his thoughts on a will?

3   A   It reflects the content that he might want to

4       put into a will, or maybe it could be viewed as

5       a legal will.  I don't know.

6   Q   Was there a further -- well, is there a legal

7       will, that you are aware of?

8   A   Not that I'm aware of.

9   Q   Separate from this document?

10  A   Not that I'm aware of.

11  Q   Did you represent Mr. Siegel in trust and

12      estate matters?

13  A   I provided general representations.  I mean my

14      assistance to him did expand a little bit

15      beyond the original purview of our contingency

16      agreement.  With respect to his will, I gave

17      him the -- I had introduced him to an attorney

18      who could do the will for him.

19  Q   That was after you received this e-mail?

20  A   Oh, no.  This was --

21              THE WITNESS:      Am I allowed

22      to --

23              MR. TOBEROFF:      I'm sorry.  I

24      was reading the document.

25              MR. WEINBERGER:    Referral to

**EXHIBIT E**
**226**

1     a -- I'm asking -- he stated that he referred

2     Michael to a trust and estate lawyer.  I'm

3     trying to find out whether that happened before

4     or after this e-mail was sent.

5               MR. TOBEROFF:     Just the bare

6     bones you can testify.

7   A   Well, before this e-mail.

8   Q   Okay.  Did you have any discussions with

9     Michael about the contents of Exhibit B-43 on

10    the telephone or in person?

11  A   Not that I can recall.  I do recall this -- I

12    received this e-mail just as I was heading off

13    for Europe.

14  Q   Had you previously discussed with him his

15    stated feelings toward Joanne Siegel?

16             MR. TOBEROFF:     I don't think

17    he can go into any of the substance of any of

18    his communications.  It was, I believe,

19    disclosed during the course of proceedings

20    regarding whether or not there was a will.  And

21    I don't believe, just because there was

22    disclosed conversations surrounding it, it's

23    open season.  I instruct him not to answer.

24             MR. WEINBERGER:     Well, we have

25    a different viewpoint on this, obviously.  The

**EXHIBIT E**
**227**

1    substance of the communications is that --

2    well, it provides a few statements about

3    Michael Siegel's relationship with Joanne

4    Siegel and then reaches a conclusion and I

5    think once the document is turned over, the

6    subject matter of that discussion is out in the

7    open if it was discussed between counsel.

8              MR. TOBEROFF:    There are

9    communications not turned over.

10             MR. WEINBERGER:    This is a

11   communication with his attorney.  That's what

12   this is.

13             MR. TOBEROFF:    This

14   communication has been revealed in the

15   testamentary process of examining whether or

16   not this constitutes a will.

17             MR. WEINBERGER:    Right.  You

18   want to rely on a document that contains an

19   attorney-client document in open court.  There

20   is a waiver of privilege as to those

21   communications.  So I'm asking him, did you

22   discuss this.

23             MR. TOBEROFF:    The waiver of

24   privilege as to this communication, not

25   communications related to this.

Page 183

1          MR. WEINBERGER:    I'm asking him

2     whether they discussed this statement.  Joanne

3     Carter Siegel ignored me my entire life.  When

4     you came to Cleveland refused to contact me.  I

5     leave you nothing.

6          MR. TOBEROFF:    Other than as

7     set forth in this e-mail, is that the question?

8          MR. WEINBERGER:    Well, I'll ask

9     it generally and then specifically as to the

10    e-mail.

11         MR. TOBEROFF:    You can answer

12    only as set forth in the e-mail, not additional

13    communications.

14  Q  Are you going to follow the instruction?

15  A  I'm trying to decipher what I can do here.

16         MR. TOBEROFF:    Let's just

17    take a break on this.

18         MR. WEINBERGER:    There is a

19    pending question.

20         MR. RYLAND:        We can take a

21    break.

22         MR. TOBEROFF:    I just want to

23    discuss with him -- since I was not handling

24    the estate of Michael Siegel, I want to discuss

25    and find out how in fact this was disclosed and

EXHIBIT E
229

Page 184

1    the circumstances.  I'm doing that in an effort

2    to resolve any dispute.

3  A    I can answer without violating any privilege to

4    the extent privilege applies.  I mean Michael

5    communicated in this e-mail to me that Joanne

6    Siegel ignored him his entire life and when she

7    came to Cleveland she refused to contact him

8    and he did not want her to receive anything.

9    And then that with respect to Laura Siegel

10   Larson, she had written to him, according to

11   this, to contact -- let's see.  You wrote that

12   you wanted to contact me your entire life.  You

13   never wrote to me until after I wrote to you.

14   When our father died, you never wrote to tell

15   me.  I never knew you were alive until I saw

16   you on TV.  I'm just reading this.

17  Q    I understand.

18  A    It goes on --

19  Q    So specifically limiting it to this

20   communication, Exhibit 43, did you have any

21   telephone discussion with Michael Siegel about

22   this e-mail, Exhibit 43?

23  A    I don't think so, because this came at a time

24   when I was leaving for Europe and I believe he

25   was scheduled to go into the --

**EXHIBIT E**
**230**

Page 185

1    Q    For his operation?

2    A    For his operation.

3    Q    Did you discuss this with him beforehand, this

4         particular communication?

5    A    Well, I couldn't, because I didn't know he was

6         going to write this.

7    Q    Well, that's what I'm asking.  Did you know

8         that he was going to write this?

9    A    No.

10                   MR. WEINBERGER:  So if I ask

11        him any questions with respect to the e-mail,

12        are you going to instruct him not to answer?

13                   MR. TOBEROFF:     I don't know.

14        We'll look at the questions.  If the question

15        is moot, it's silly for us to have a dispute

16        over privilege.

17                   MR. WEINBERGER:   No, I

18        understand.

19                   MR. TOBEROFF:     So I'm trying

20        to --

21    Q    Based on your relationship with Michael, do you

22        believe that this e-mail represented his

23        feelings?

24                   MR. TOBEROFF:     I think that's

25        privileged.  It's his client's e-mail.  It's

Page 186

1    work product.

2   Q   Did you have a social relationship or a

3       personal relationship with Michael outside of

4       your legal representation?

5   A   No.

6   Q   Do you know what, if anything, became of this

7       e-mail?

8                   MR. TOBEROFF:      Vague and

9       ambiguous.

10  A   It was in my documents passed on to

11      Mr. Banchek.

12  Q   Do you know if there was any claims on the

13      estate asserted by Murray and Shirley Lipton?

14  A   I have no firsthand knowledge.

15  Q   What about Arthur and Julee Chan?

16  A   I have no knowledge.

17  Q   Do you have any secondhand knowledge?

18  A   I'd been contacted by an attorney representing

19      I forget who, that there might be a claim

20      asserted, but I really don't have much more

21      than that.

22  Q   Have you spoken to Mr. Banchek subsequent to

23      you forwarding the documents?

24  A   No.

25  Q   Generally about the estate?

EXHIBIT E
232

```
 1   A   Actually, I think we may be going into -- let's

 2       see.

 3                   MR. TOBEROFF:      What was the

 4       question?

 5                   MR. WEINBERGER:    I asked him if

 6       he had spoken to Mr. Banchek about the estate

 7       subsequent to this e-mail being sent.

 8                   MR. TOBEROFF:      You can answer

 9       that.

10   A   I have had discussions with Mr. Banchek since

11       this.

12   Q   And I don't want to mischaracterize your prior

13       testimony, but I believe you said there has

14       been litigation relating to the estate and your

15       understanding is that Laura Larson is the

16       beneficiary?

17   A   I don't think I said that.

18                   MR. RYLAND:        Objection.

19   Q   What did you say?

20   A   I said I was contacted by an attorney

21       representing somebody.

22   Q   No, I understand that.  I'm sorry.

23   A   They might have raised an issue.

24   Q   No, I understand that.  I was not asking you to

25       answer that question.  I was asking you to
```

Page 188

1 answer a separate question relating to the

2 resolution of rights of the estate, whether you

3 have an understanding of the current status of

4 Michael Siegel's estate?

5 A No.

6     MR. RYLAND:  Objection.

7 Q You don't?

8 A Well, yeah.  I don't.  As far as I know, it's

9 still open.

10     MR. WEINBERGER: Why don't we

11 take a break?  I'm going to go through my

12 notes.

13     (Recess taken.)

14     MR. WEINBERGER: Back on the

15 record.

16 Q What happened following the e-mail in which --

17 the e-mail that was marked as Exhibit B-43 --

18 in which Michael Siegel expressed his thoughts

19 on a will?  Can you, generally speaking, let me

20 know what happened to him?  You said he was

21 having an operation shortly thereafter?

22 A Yeah.  He survived the operation, but because

23 of complications, passed away.

24 Q In early 2006?

25 A Yeah, I believe that's correct.

**EXHIBIT E**
**234**

1                    - - - - -

2          (Defendants' Exhibit No. B-44 was marked.)

3                    - - - - -

4    Q    I've handed you -- the court reporter has

5         handed you Exhibit B-44.  It's an October 2005

6         article in the Cleveland Plain Dealer.  Are you

7         familiar with this article?

8    A    I think I read it once.

9    Q    Were you involved at all in the interview that

10        the author had with Michael Siegel?  Not the

11        author.  I'm sorry.  There is a writer who

12        interviewed Michael Siegel.  Were you involved

13        at all in the interview?

14   A    To the extent I'm testifying with respect to

15        communications with Mr. Sangiacomo, I didn't

16        have any discussions with him.

17   Q    What about Mr. Jones who is identified in the

18        article?

19   A    No.  Not to my recollection.

20                    MR. WEINBERGER:    That's all I

21        have with the following reservations:  I know,

22        Marc, that you have represented that the

23        nonprivileged documents from Mr. Bulson's files

24        were turned over.  I think Mr. Bulson has

25        testified there were a number of other

1    documents which were in his files which were

2    not privileged and which were not identified on

3    the privilege log.  For example, notices of

4    termination, correspondence that was pulled --

5    that I pulled from DC's production, which he

6    was copied on, which I, from the testimony,

7    would believe that's in his files.  Obviously,

8    if we otherwise have copies of those, I'm not

9    asking for duplicates.

10            MR. TOBEROFF:      I understand.

11            MR. WEINBERGER:     If there is

12    anything additional though.

13            MR. TOBEROFF:      We, to my

14    knowledge, received a package from Michael

15    Siegel's estate that we went through and that

16    was the -- we assumed that was the entirety of

17    the files.  I'm double-checking.

18            MR. WEINBERGER:     Yeah, please.

19    It may be that Mr. Banchek had checked.  I'll

20    to have do the same, because I spoke to --

21    Mr. Banchek had given me a list of the

22    materials he had of which we said we were not

23    interested in, because we had them already.

24    But I just want to make sure there was nothing

25    that fell through the cracks.

EXHIBIT E
236

1          MR. TOBEROFF:     I'm not sure,

2     because this may have been handled with Meggan

3     Rawlin in my office.  I'm not sure.  There may

4     have been an agreement as to like all the

5     copies of the terminations and things like

6     that, that you already had.

7          MR. WEINBERGER:    I just wanted

8     to make sure there is nothing else out there.

9          MR. TOBEROFF:     I will

10     double-check.

11          MR. WEINBERGER:    Subject to

12     that, obviously, we have a filing with Judge

13     Oliver.  To the extent that he orders the

14     production of any further documents, we reserve

15     the right to ask the witness about them at that

16     point in time.

17          MR. TOBEROFF:     Okay.

18          MR. RYLAND:       To the extent

19     that we are not redeposing on the topics and

20     documents that we have done today.

21          MR. WEINBERGER:   No.  Only what

22     would come out of the newly-produced materials.

23          MR. RYLAND:       Understood.

24

25

**EXHIBIT E**
**237**

Page 192

1    THE STATE OF OHIO,        )      SS:

     COUNTY OF CUYAHOGA.       )

2

3        I, Barbara J. Sedlak, a Notary Public within

4    and for the State of Ohio, duly commissioned and

5    qualified, do hereby certify that DON W. BULSON,

6    was first duly sworn to testify the truth, the

7    whole truth and nothing but the truth in the cause

8    aforesaid; that the testimony then given by him was

9    by me reduced to stenotypy in the presence of said

10   witness, afterwards transcribed on a

11   computer/printer, and that the foregoing is a true

12   and correct transcript of the testimony so given by

13   him as aforesaid.

14       I do further certify that this deposition was

15   taken at the time and place in the foregoing

16   caption specified.  I do further certify that I am

17   not a relative, counsel or attorney of either

18   party, or otherwise interested in the event of this

19   action.

20       IN WITNESS WHEREOF, I have hereunto set my

21   hand and affixed my seal of office at Cleveland,

22   Ohio, on this 2nd day of May, 2008.

23

                  Barbara J. Sedlak, Notary Public

24                within and for the State of Ohio

25       My Commission expires August 24, 2010.

**EXHIBIT E**
**238**

Page 193

THE STATE OF                          )

                                     )      SS:

COUNTY OF                            )


        Before me, a Notary Public in and for said
state and county, personally appeared the
above-named DON W. BULSON, who acknowledged that he
did sign the foregoing transcript and that the same
is a true and correct transcript of the testimony
so given.

        IN TESTIMONY WHEREOF, I have hereunto
affixed my name and official seal at

                                this  6th  day of

June        , 2008.


                    DON W. BULSON



                    Notary Public

My Commission expires:

**EXHIBIT E**
**239**

Page 194

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5          1.   To clarify the record.

6          2.   To conform to the facts.

7          3.   To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____

**EXHIBIT E**
**240**

# EXHIBIT F

**From**: Petrocelli, Daniel
**Sent**: Friday, May 11, 2012 02:51 PM
**To**: 'lbrill@kbkfirm.com' <lbrill@kbkfirm.com>; 'mtoberoff@ipwla.com' <mtoberoff@ipwla.com>
**Cc**: 'kgadams@ipwla.com' <kgadams@ipwla.com>; Seto, Cassandra; 'parredondo@ipwla.com' <parredondo@ipwla.com>
**Subject**: Re: Re:

The Court will make that determination. Dan

---

**From**: Laura Brill [mailto:lbrill@kbkfirm.com]
**Sent**: Friday, May 11, 2012 02:17 PM
**To**: Petrocelli, Daniel; 'mtoberoff@ipwla.com' <mtoberoff@ipwla.com>
**Cc**: 'kgadams@ipwla.com' <kgadams@ipwla.com>; Seto, Cassandra; 'parredondo@ipwla.com' <parredondo@ipwla.com>
**Subject**: RE: Re:

Dan,

Your allegations are completely inappropriate.  We are complying with the Court's order.

Laura

Kendall Brill Klieger

Laura W. Brill
Kendall Brill & Klieger LLP

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside information.  Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.  Thank you.

---

**From**: Petrocelli, Daniel [mailto:DPetrocelli@OMM.com]
**Sent**: Friday, May 11, 2012 2:08 PM
**To**: 'mtoberoff@ipwla.com'
**Cc**: 'kgadams@ipwla.com'; Laura Brill; Seto, Cassandra; 'parredondo@ipwla.com'
**Subject**: Re:

Counsel, there is a Court-ordered deadline of noon today, and defendants' decision not to produce the documents to us by noon or at any time today is an outright violation of the Court's order. It is also highly unprofessional. We will address the matter to the Court.

Dan

---

**From**: Marc Toberoff [mailto:mtoberoff@ipwla.com]
**Sent**: Friday, May 11, 2012 01:55 PM
**To**: Petrocelli, Daniel
**Cc**: kgadams@ipwla.com <kgadams@ipwla.com>; lbrill@kbkfirm.com <lbrill@kbkfirm.com>; Seto, Cassandra; Pablo Arredondo <parredondo@ipwla.com>
**Subject**: Re:

Dan:

1

**EXHIBIT F**
**241**

DC's proposed order submitted in support of its *ex parte* application (Docket No. 391-1) asked for the following relief:

"The temporary stay on production of the "Toberoff Timeline" and other documents defendants provided to the U.S. Attorney's Office, as well as all of defendants' and their counsels' communications with the U.S. Attorney's Office over the past two years, see Docket Nos. 262, 309, is lifted. By no later than 5:00 pm (PDT) on April 30, 2012, defendants are ordered to produce those documents by hand to DC's counsel, without limitation and without redaction or any other alteration."

The Magistrate's Order (Docket No. 416) did not grant this relief, and instead, ordered the following:

"The Court orders the previously ordered stays lifted, effective May 11, 2012 at 12:00pm."

Nowhere did it order the immediate production of the documents by 12:00pm. Nor did you, who were present at the hearing, object or address the issues you now raise.

We are still in the process of assembling and bates stamping the numerous stolen documents for production. Consistent with the Federal Rules of Civil Procedure 5(a)(1)(C) and 5(b)(2), defendants will serve the documents today.

I see no point in belaboring this further.

Marc Toberoff

On Fri, May 11, 2012 at 1:03 PM, Petrocelli, Daniel <DPetrocelli@omm.com> wrote:
Counsel, this is unacceptable. DC's motion to compel asked that the documents be "produced to DC's counsel, by no later than May 2, 2011." The stay imposed was lifted as of noon today without qualification. All prior productions in this case have been accomplished by email or personal service. The documents should be made available to us now -- we'll send a messenger to your offices to pick up the documents, if you prefer. Please confirm.

Dan

---

**From:** Marc Toberoff [mailto:mtoberoff@ipwla.com]
**Sent:** Friday, May 11, 2012 12:55 PM
**To:** Petrocelli, Daniel
**Cc:** Keith Adams <kgadams@ipwla.com>; rkendall@kbkfirm.com <rkendall@kbkfirm.com>; lbrill@kbkfirm.com <lbrill@kbkfirm.com>; Kline, Matthew; Seto, Cassandra
**Subject:** Re:

Dan:

You misstate the Court's order. Magistrate Judge Zarefsky lifed his stay effective at noon today, he did not order defendants "to produce by noon today," notwithstanding DC's proposed order.

All of the stolen documents will be served today.

Defendants reserve all rights.

Marc Toberoff

On Fri, May 11, 2012 at 12:08 PM, Petrocelli, Daniel <DPetrocelli@omm.com> wrote:

2

**EXHIBIT F**
**242**

Counsel:


It is now past 12.00 p.m. and we have yet to receive the Timeline and USAO documents the Court ordered you to produce by noon today.    Please immediately deliver them.


Thank you.


Dan




--
**Marc Toberoff**
Toberoff & Associates, PC
22337 Pacific Coast Highway, # 348
Malibu, CA 90265
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com



--
**Marc Toberoff**
Toberoff & Associates, PC
22337 Pacific Coast Highway, # 348
Malibu, CA 90265
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

3

**EXHIBIT F**
**243**