# EXHIBIT G
# Part 1 of 9

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
NICHOLAS C. WILLIAMSON

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

parredondo@ipwla.com

May 11, 2012

<u>Via U.S. Mail</u>

Daniel Petrocelli
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:   <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dear Mr. Petrocelli:

Enclosed please find defendants' production of documents bates-stamped SD0001-00917. As will readily be apparent, many of these documents were long ago produced in *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-CV-08400 ODW (RZx), and have already been produced in this case, either directly or by designation of those documents produced in *Siegel* pursuant to the parties' stipulation.

Certain documents have been marked "Privileged & Confidential: All Rights Reserved." These documents are being produced under protest and involuntarily pursuant to Magistrate Zarefsky's May 25, 2011, August 8, 2011 and May 10, 2012 Orders, and this production does not constitute a waiver of the attorney-client and common-interest privileges or of the attorney work product doctrine, or of any of defendants' rights or remedies, all of which are reserved. In producing these documents, defendants also do not waive privilege more generally, as to these or any other documents or subject matter.

As we have stated previously, defendants firmly object to any public filing or dissemination of the documents marked "Privileged and Confidential," as such constitutes a harmful and unnecessary invasion of the attorney-client privilege and defendants' right to privacy. Defendants reiterate their request that DC Comics and its counsel not publicly disseminate such documents, and that any filing of any document marked "Privileged & Confidential" be made under seal. Defendants specifically reserve all rights to seek review and/or reconsideration of Magistrate Zarefsky's May 10, 2012 order, pursuant to F.R.C.P. 72(a), Local Rule 72-2, or otherwise.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

**EXHIBIT G**
**244**

**TOBEROFF & ASSOCIATES, P.C.**

May 11, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 2


Very truly yours,

Pablo Arredondo

# SUPERMAN – MARC TOBEROFF TIMELINE

*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

Q 0002

SD 00002

**EXHIBIT G**
**247**

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

Q 0003

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.   Also that MT has not even made contact with Time Warner.  Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest.  Estate attorney is only receiving an hourly rate.  MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement.  The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights.  MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. *(please see enclosed letter)*

4

Q 0004

SD 00004

**EXHIBIT G**
**249**

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...".    In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50.  **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN <u>PERSONALLY</u> BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.**   MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

Q 0005

SD 00005

EXHIBIT G
250

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.    He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party.  MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.   In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*."  MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times.  They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee.   MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would...). In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

**\*\*\*\*In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.\*\*\*\*\*** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).   According to the settlement amount, he received an unconscionable 50% contingency fee.

6

SD 00006

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

cc:    Alan F. Horn
       Jeff Robinov
       John Schulman
       Patti Connolly

7

# GANG, TYRE, RAMER & BROWN, INC.
## MEMORANDUM

From: Kevin S. Marks                    Date: August 9, 2002

To: Joanne Siegel                       Re: "Superman"
    Laura Siegel Larson
    Don Bulson

cc: Bruce Ramer

On August 8, 2002, I received a call from Mark Toberoff and Ari Emanuel. Toberoff is a lawyer; Emanuel is one of the founding partners of the Endeavor Talent Agency.

They have formed a group (with other investors, I am sure) that is interested in acquiring intellectual property rights, exploiting those rights in all media, and attaching Endeavor clients to projects that evolve from those rights. We do not know who the other investors are or what other funding sources are available to this group. They are aware of the Siegel termination rights.

In a previous telephone conversation (initiated by Mr. Toberoff), I told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics (subject to documentation), but that all aspects of the agreement and the negotiations were confidential. Mr. Toberoff asked me if I would make an offer to him and his group that the Siegel Family would consider in lieu of the D.C. Comics deal. I told him that I did not feel that it was appropriate to be making offers while I was in the process of documenting an existing deal.

On August 8, the Toberoff/Emanuel Group took the initiative and made an offer. Their offer is $15 million up-front, plus what they promise to be a meaningful participation from proceeds from the exploitation of "Superman" in all media on an ongoing basis. They said they have already done their "due diligence" and that such an arrangement would not be subject to further legal or other research on their part.

Having received this proposal, I am obliged to pass it on to you.

I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation. (If called to testify, I would have to testify as much.) The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for

245415.1

Privileged & Confidential
All Rights Reserved

Q 0008

SD 00008

SENT BY:                        8-12-  2  11:18AM         -310 827 7227          ;# 3/ 3
P. 03

# GANG, TYRE, RAMER & BROWN, INC.

Joanne Siegel
Laura Siegel Larson
Don Bulson
August 9, 2002
Page 2

that matter) by D.C. Comics. I would also not be surprised if existing benefits (such as insurance reimbursement and widow's benefits) were cut off.

This new offer (which has significant blanks to fill in) looks like it could be better than the D.C. deal. I believe the Toberoff/Emanuel group attaches enhanced value to the property because it has brokered a confidential arrangement with the Shuster estate and is trying to put together the Siegel and Shuster termination pieces. (As we have discussed previously, the Shuster estate will have termination rights in approximately 2013 if the U.S. Supreme Court upholds the recent law extending the copyright term). I, of course, cannot assure you that this is a real deal, and undisclosed investors sometimes disappear just when you think you are close to concluding an arrangement.

My recommendation ultimately is to stay the course with D.C. Comics. I do not say that as a matter of economics; it is candidly what I think to be the right thing to do under the circumstances.

Therefore, I would send D.C. Comics the revised draft that I have prepared (as it may be modified with your input). We should continue to negotiate the documentation in good faith with D.C. Comics, and make every genuine effort to come up a written agreement that is true to the deal that was made. I believe the deal will be finalized with D.C. Comics, even if the process is not entirely smooth. If, despite all these good faith efforts, the parties cannot reach final agreement, then the negotiations would be terminated and then (and only then) would there would be a clear parting of ways which would open up your exploring other possibilities.

I will be out of the office the week of August 12th. If you would like to discuss this matter in my absence, please feel free to call Bruce Ramer.

Best regards.

K.S.M.

245415.1

Privileged & Confidential
All Rights Reserved

Q 0009

SD 00009

EXHIBIT G
254

EJ140635574US

Laura:

I understand...I thought it was a great strategic move, however I don't want to put too much work into this if you remain quite hesitant.

Re: licensing opportunities -- although possible in the right situation with people who really "get it" I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products in the licensing industry; 2. perception that WB owns S and that to understand what you own requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101

-----Original Message-----
**From:** Mistylight3@cs.com [mailto:Mistylight3@cs.com]
**Sent:** Monday, October 10, 2005 1:48 AM
**To:** MToberoff@ipwla.com
**Subject:** Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people regarding a movie based on Action Comics #1.  However, we do not give permission for you to enter into any oral or written commitments for anyone to work on such a movie. Please let us know who you plan to speak with before you make contact with them and inform us of all activity on this matter as it develops.  We also want to know of any publicity that may occur as a result of the inquiries, in advance, and we reserve the right to stop the inquiries at any time.  If too many people get involved, we believe it will generate more headaches than we are willing to deal with.  So to reiterate, you may proceed with a full inquiry but we do not want you to commission a script or enter into any employment agreements with anyone at this time.  After the inquiries have been made, we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals regarding use of the names Superman, Clark Kent, Lois Lane or other elements contained in Action Comics #1 and are willing to explore other commercial possibilities that may exist in connection with our ownership rights.

Thanks for your idea.  We believe it is time for us to take matters into our own hands and to exercise the rights we obtained through the Copyright Act.  However, we want to proceed cautiously.  Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Q 0010

SD 00010

**EXHIBIT G**
**255**

# Ip worldwide

January 21, 2002

*Privileged & Confidential*

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Dear Joanne and Laura:

This is to confirm the agreement and understanding in connection with our recent discussion and disclosure to you of various risks and potential problems regarding Michael Siegel, and the mitigation of possible conflicts of interest with respect to the following proposed remedial actions:

1.     Ariel Emanuel ("AE") will attempt to purchase all of Michael Siegel's rights, title and interest in *Superman*, *Superboy* and *The Spectre* ("MS Interests") to be financed by AE.

2.     The proposed purchase will be subject to Michael Siegel entering into a formal written settlement agreement, settling and releasing each of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding *Superman*, *Superboy and The Spectre*. The settlement agreement will specifically disclose the separate *Superboy* termination, recently served and filed.

3.     In the event Michael Siegel agrees to the above purchase and settlement, the following conditions will apply to and bind AE, any designee entity owned or controlled by him and his heirs, successors or assigns with respect to the MS Interests:

(a)     The MS Interests will only be sold or assigned to a separate third party (i.e., not owned or controlled by AE) in conjunction with the sale or assignment of your interests in *Superman*, *Superboy* and/or *The Spectre*, respectively, to said third party and not independently of your interests.

9701 Wilshire Boulevard, 10ᵗʰ Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

Q 0011

SD 00011

FROM : SIEGEL                    FAX NO. : 13108215894              Jan. 22 2003 05:22PM P2
    Jan-21-03    07:50pm    From-                                        T-422  P.006/010  F-060

# Ip worldwide

Page 2
Joanne Siegel and Laura Siegel Larson
January 21, 2002

    (b)    You retain full and complete decision making authority with respect to the disposition of the copyright termination interests in *Superman, Superboy* and *The Spectre* arising from Jerome Siegel's copyright interest therein.

    (c)    AE will fully indemnify you and hold you completely harmless against any and all claims, causes of action, damages, costs or loss (including attorney's fees), if any, arising out of the purchase of the MS Interests and the settlement agreement.

    (d)    AE will reimburse you for twenty-five percent (25%) of any expenses paid by you after October 17, 2000 in connection with the Jerome Siegel copyright termination interests in *Superman, Superboy or The Spectre* , including without limitation, the filing cost of the Superboy Copyright Termination, upon and subject to your providing him with an itemized list of such expenses.

    (e)    AE will also pay twenty-five percent (25%) of the following sums: (i) fees, commission or settlement amounts, if any, to the law firm of Gang, Tyre, Ramer & Brown and/or its attorneys regarding their alleged services in connection with Jerome Siegel's copyright termination interests; (ii) fees, costs or expenses of any audit, if any, of revenues or profits derived from *Superman, Superboy or The Spectre* and (iii) fees, costs or expenses of any other actions to protect, enforce or enhance Jerome Siegel's copyright termination interests in *Superman, Superboy or The Spectre*.

    (f)    If , after the sale or assignment of the *Superman/Superboy/The Spectre* rights is made and royalties are being paid to the Siegel interest, AE chooses to offer his royalty interest for sale, you, or in the event of your death, your heirs, will have the right of first refusal to purchase said royalty interest.

4.    This letter contains the full and complete understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by each party. This letter shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this letter shall be valid

///
///
///
///
///
///
///
///

Q 0012

SD 00012

FROM : SIEGEL                    FAX NO. :3106274894            Jan. 22 2003 05:23PM  P3
   Jan-21-03   08:00pm  From-                                    T-482  P.007/010  F-068

# Ip worldwide

Page 3
Joanne Siegel and Laura Siegel Larson
January 21, 2002

acceptable substitutes for executed originals.

If the above comports with your understanding please indicate this by your signatures
below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Agreed, Understood and Accepted:

_____          Date: _____
Ariel Z. Emanuel

_____          Date: 1/22/03
Joanne Siegel

_____          Date: 1/22/03
Laura Siegel Larson

Q 0013

SD 00013

# Ip worldwide

9701 Wilshire Blvd., 10th Floor
Beverly Hills, CA 90212
Ph: (310) 246-3333 · Fx: (310) 246-3101

---

## FACSIMILE COVER PAGE

| TO: Joanne Siegel<br>Laura Siegel Larson | FAX: (310) 821-5894<br>(310) 827-7227 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 11/26/02 | RE: Potential Conflict Disclosure |

**COMMENTS:**

Dear Joanne & Laura:

As discussed, enclosed please find a disclosure and acknowledgement of potential conflicts for your review. Please bear in mind that the wording of this document is not hyper-critical, since it is really an internal document for our protection to evidence that we have followed appropriate protocol.

Feel free to call me with any further questions.

---

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0014

SD 00014



November 26, 2002

_Privileged & Confidential_

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Re: Potential Conflict Disclosure

Dear Joanne and Laura:

With reference to our Agreements dated as of October 3, 2002 pertaining to _Superman_ and _Superboy_, this is to confirm that we have disclosed to you and discussed the following proposed actions that may pose potential conflicts of interest or the appearance of potential conflicts of interest and that following our disclosure, discussion and our answering of your questions with regard thereto, you freely acknowledged and agreed that you have no objection to our taking said actions as set forth below.

IPW will enter into negotiations with Michael Siegel and/or his representative to purchase all of Michael Siegel's rights, title and interest in _Superman_ and _Superboy_, including his 25% share of the copyright termination interests arising from Jerome Siegel's interest in the copyrights thereto. This purchase, if any, will be directly financed by Ariel Emanuel. To eliminate potential disputes, if any, which might cloud or hamper the interests subject to purchase, the proposed purchase of Michael Siegel's interests will be contingent upon Michael Siegel expressly settling and releasing both of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding _Superman_ and _Superboy_.

If the above comports with your understanding please indicate same by your signatures below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Acknowledged and Agreed:

_____         Date: _____
Joanne Siegel


_____         Date: _____
Laura Siegel Larson

Q 0015

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

SD 00015

EXHIBIT G
260

Confirmation Report — Memory Send

Page       : 001
Date & Time: Nov-26-02  08:17pm
Line 1     :
Machine ID :

Job number              :   922

Date                    :   Nov-26 08:16pm

To                      : ☎98277227

Number of pages         :   002

Start time              :   Nov-26 08:16pm

End time                :   Nov-26 08:17pm

Pages sent              :   002

Status                  :   OK

Job number    : 922

\*\*\* SEND SUCCESSFUL \*\*\*

**Ip**worldwide

9701 Wilshire Blvd., 10ᵗʰ Floor
Beverly Hills, CA  90212
Ph: (310) 246-3333 · Fx: (310) 246-3101

## FACSIMILE COVER PAGE

| TO:  Joanne Siegel        | FAX:   (310) 821-5894 |
|---------------------------|-----------------------|
|       Laura Siegel Larson |        (310) 827-7227 |
| FROM:  Marc Toberoff      |                       |
| DATE : 11/26/02           | PAGES ( including cover ): 2 |
|                           | RE: Potential Conflict Disclosure |

**COMMENTS:**

Dear Joanne & Laura:

As discussed, enclosed please find a disclosure and acknowledgement of potential conflicts for your review.  Please bear in mind that the wording of this document is not hyper-critical, since it is really an internal document for our protection to evidence that we have followed appropriate protocol.

Feel free to call me with any further questions.

THIS INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0016

SD 00016

**EXHIBIT G**
**261**

Confirmation Report

Page       : 001
Date & Time: Nov-26-02  08:21pm
Line 1     :
Machine ID :

| Nbr. | Job | Date | Time | Duration | pgs | To | Dept.nbr | Account | Comm. code | Status |
|------|-----|------|------|----------|-----|-----|----------|---------|-----------|--------|
| 362 | 923 | Nov-26 | 08:19pm | 01/37 | 002 | 98215894 | | | G3 301 | OK |

Q 0017

SD 00017

# Confirmation Report

Page      : 001
Date & Time: Nov-26-02  08:26pm
Line 1    :
Machine ID :

| Nbr. | Job | Date | Time | Duration | pgs | To | Dept.nbr | Account | Comm. code | Status |
|------|-----|------|------|----------|-----|------|----------|---------|-----------|--------|
| 363 | 924 | Nov-26 | 08:24pm | 01/38 | 002 | 98215894 | | | G3 301 | OK |

Q 0018

SD 00018

**EXHIBIT G**

**263**

# Ip worldwide

December 16, 2002

_Privileged & Confidential_

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Ariel Emanuel
9701 Wilshire Boulevard, 10th Floor
Beverly Hills, CA 90265

Dear Joanne, Laura and Ari:

This is confirm the agreement and understanding in connection with our recent discussion and disclosure to you of various risks and potential problems regarding Michael Siegel, and the mitigation of possible conflicts of interest with respect to the following proposed remedial actions:

1.    IPW/Ariel Emanuel will enter into negotiations with Michael Siegel to purchase all of Michael Siegel's rights, title and interest in _Superman_ and _Superboy_ ("MS Interests") to be financed by Ariel Emanuel.

2.    The proposed purchase will be subject to Michael Siegel entering into a formal written settlement agreement, settling and releasing each of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding _Superman_ and _Superboy_. The settlement agreement will specifically disclose the separate _Superboy_ termination, recently served and filed.

3.    In the event, Michael Siegel agrees to the above purchase and settlement, the following conditions will apply to and bind Ariel Emanuel, IPW (or any designee thereof) with respect to the MS Interests:

   (a)    The MS Interests will only be sold or assigned to a separate third party in conjunction with the sale or assignment of your interests in _Superman_ and _Superboy_, respectively, to said third party and will not be sold or assigned independently of your interests.

   (b)    You retain full and complete decision making authority with respect to the disposition of the copyright termination interests in _Superman_ and _Superboy_ arising from Jerome Siegel's copyright interest therein.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

Q 0019

SD 00019

**EXHIBIT G**
**264**

# Ip worldwide

Page 2
Joanne Siegel, Laura Siegel Larson and Ariel Emanuel
December 16, 2002

    (c)    Ari Emanuel will fully indemnify you and hold you completely harmless against any and all claims, causes of action, damages, costs or loss (including reasonable attorney's fees), if any, arising out of the purchase of the MS Interests and the settlement agreement.

    (d)    In the event a future profit participation or royalty interest ("MS Royalty") is retained in connection with the sale or transfer of the MS Interests to a third party along with your interests as set forth above, and the MS Royalty is thereafter offered for sale, you, or in the event of death, your heirs, will have a right of first refusal to purchase the MS Royalty.

If the above comports with your understanding please indicate this by your signatures below and returning a copy of this letter to me.

Yours sincerely,


Marc Toberoff

Agreed, Understood and Accepted:



_____    Date: _____
Ariel Z. Emanuel


_____    Date: _____
Joanne Siegel


_____    Date: _____
Laura Siegel Larson

Q 0020

SD 00020

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508.

Dear Warren:

        We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

        1.      Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

        2.      In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

        3.      PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _MP_, _MWP_

Q 0021

SD 00021

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.    The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.    Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.    All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.    The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____

Q 0022

SD 00022

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MT, MWP_

Q 0023

SD 00023

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

Date: _10-30-03_

By: Mark Warren Peary, Executor
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my interests are concerned.

Date: _10 -30-03_

Jean A. Peavy

Q 0024

SD 00024

# California Business Portal

**Secretary of State BRUCE MCPHERSON**

SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS

**Business Search Corporations**

- **Printer Friendly Page**
- **New Search**
- **Search Tips**
- **Field Definitions**
- **Status Definitions**
- **Name Availability**
- **Corporate Records**
- **Business Entities Records Order Form**
  - **Certificates**
  - **Copies**
  - **Status Reports**
- **FAQS**
- **Corporations Main Page**
- **Site Search**

# Corporations

The information displayed here is current as of "APR 28, 2006" and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| PACIFIC PICTURES CORPORATION | | |
| Number: C2198479 | Date Filed: 9/25/2000 | Status: forfeited |
| Jurisdiction: NEW YORK | | |
| Address | | |
| 23852 PACIFIC COAST HWY STE 555 | | |
| MALIBU, CA 90265 | | |
| Agent for Service of Process | | |
| MARK TOBEROFF | | |
| 23852 PACIFIC COAST HWY STE 555 | | |
| MALIBU, CA 90265 | | |

Printer Friendly

**New Search**

- For information about certification of corporate records or for additional corporate information, please refer to **Corporate Records**.
- Blank fields indicate the information is not contained in the computer file.
- If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code **Section 2114** for information relating to service upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

Q 0025

SD 00025

**EXHIBIT G**
**270**

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: PACIFIC PICTURES CORPORATION

Selected Entity Status Information

Current Entity Name: PACIFIC PICTURES CORPORATION
Initial DOS Filing Date: AUGUST 26, 1988
County: NEW YORK
Jurisdiction: NEW YORK
Entity Type: DOMESTIC BUSINESS CORPORATION
Current Entity Status: ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Q 0026

JUL-11-2003 12:03 PM                                        1 310 827 7227         P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13ᵗʰ letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
    -It was a bogus offer filled with unacceptable land mines.
    -They wanted us to <u>warrant we had no rights</u> which is completely false.
    -They insisted on a deal that included characters that had nothing to do with Superman.
    -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain.
    -They even wanted us to sign away the public domain rights we'd one day have.
    -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them.
    -It was a bad and unreasonable deal.

Page 1

Q 0027

SD 00027

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0028

SD 00028

1-2003 12:04 PM

1 310 827 7227       P.6

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

<u>Why Marc has not been negotiating with Time Warner:</u>
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3                    Q 0029

EXHIBIT G
274

SD 00029

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

Why I think any investor would offer less than Time Warner did in its last offer:
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

Your belief that you have something to sell independently:
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

SD 00030

JUL-11-2003 12:05 PM                                    1 310 827 7227                    P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Page 5                                    Q 0031

SD 00031

**EXHIBIT G**
**276**

JUL-06-2003 11:07 PM                                                1 710 827 7227                  P.0:

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Q 0032

SD 00032

EXHIBIT G
277

JUN-06-2003 11:08 PM                                    1  10 827 7227           P.0

This procedure has taken way to long.  I have been on contract negotiation teams and have never seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Q 0033

SD 00033

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We successfully completed the first step of probating Joe Shuster's Estate and appointing you as Executor for purposes of implementing the termination of prior assignments of Joe's copyrights pursuant to the Copyright Act. Enclosed please find a certified copy of the Letters Testamentary appointing you as the Executor. Congratulations.

As discussed, I've enclosed three original copies of an agreement for your review between this newly formed Estate of Joseph Shuster and my company, Pacific Pictures Corp., and incorporating the material terms of our standing agreement dated as of November 23, 2001. If all is in order please initial pages 1-3, sign page 4 (and have your mom sign page 4 as well, she doesn't need to initial) of each original. Please keep one original for your files and return the other two to me.

Upon receipt we will proceed full speed ahead with the Termination. This is quite exciting, if not historic.

Best regards.

Sincerely,

Marc Toberoff

Q 0034

SD 00034

**EXHIBIT G**
**279**

ORIGINAL

DE-150

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | TELEPHONE AND FAX NOS.: | FOR COURT USE ONLY |
|---|---|---|

213-895-4900    213-895-4921 fax

RODI, POLLOCK, PETTKER, GALBRAITH
& CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901

ATTORNEY FOR (Name): MARK WARREN PEARY, Petitioner

**FILED**
LOS ANGELES SUPERIOR C.

OCT 21 2003

JOHN A. [illegible]

BY [illegible]
DEP[illegible]

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

ESTATE OF (Name): JOSEPH SHUSTER, also known as
JOE SHUSTER
                                                    DECEDENT

| LETTERS | | CASE NUMBER: |
|---|---|---|
| [x] TESTAMENTARY | [ ] OF ADMINISTRATION | BP080635 |
| [ ] OF ADMINISTRATION WITH WILL ANNEXED | [ ] SPECIAL ADMINISTRATION | |

## LETTERS

1. [x] The last will of the decedent named above having been proved, the court appoints (name):
   MARK WARREN PEARY
   a. [x] executor.
   b. [ ] administrator with will annexed.

2. [ ] The court appoints (name):

   a. [ ] administrator of the decedent's estate.
   b. [ ] special administrator of decedent's estate
      (1) [ ] with the special powers specified in the Order for Probate.
      (2) [ ] with the powers of a general administrator.
      (3) [ ] letters will expire on (date):

3. [x] The personal representative is authorized to administer the estate under the Independent Administration of Estates Act [ ] with full authority [x] with limited authority (no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).

4. [ ] The personal representative is not authorized to take possession of money or any other property without a specific court order.

## AFFIRMATION

1. [ ] PUBLIC ADMINISTRATOR: No affirmation required (Prob. Code, § 7621(c)).

2. [x] INDIVIDUAL: I solemnly affirm that I will perform the duties of personal representative according to law.

3. [ ] INSTITUTIONAL FIDUCIARY (name):

   I solemnly affirm that the institution will perform the duties of personal representative according to law. I make this affirmation for myself as an individual and on behalf of the institution as an officer. (Name and title):

4. Executed on (date): September 30, 2003
   at (place): Santa Fe, New Mexico. ~~xxCalifornia~~

   ► _Mark Warren Peary_ (SIGNATURE)

   Mark Warren Peary

### CERTIFICATION

I certify that this document is a correct copy of the original on file in my office and the letters issued the personal representative appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

WITNESS, Clerk of the court, with seal of the court affixed.

Date: OCT 21 2003

Clerk, by _____ JOHN A. CLARKE
                              (DEPUTY)

Date: OCT 21 2003

Clerk, by _____ John A. Clark
                              (DEPUTY)

LETTERS
(Probate)

Probate Code, §§ 1001, 8403,
8405, 8544, 8545;
Code of Civil Procedure, § 2015.6

Q 0035

SD 00035

EXHIBIT G
280

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1.      Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2.      In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3.      PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _MT_, ____,

Q 0036

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.     The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.     Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peary and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.     All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.     The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____.

Q 0037

SD 00037

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.      To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.      All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.     This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _HT_ , _____ .

Q 0038

SD 00038

**EXHIBIT G**
283

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

_____          Date: _____
By: Mark Warren Peary, Executor
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my interests are concerned.

_____          Date: _____
Jean A. Peavy

Q 0039

SD 00039

LAW OFFICES

## RENNER, OTTO, BOISSELLE & SKLAR, LLP

1621 EUCLID AVENUE, NINETEENTH FLOOR
CLEVELAND, OHIO 44115-2191
TEL: (216) 621-1113  FAX: (216) 621-6165
EMAIL: MailRoom@RennerOtto.com

June 18, 2003

Via facsimile (1 page)
310-246-3101
No confirmation

Marc Toberoff, Esq.
10th Floor
9701 Wilshire Boulevard
Beverly Hills, CA 90212

Re:  Michael Siegel

Dear Marc:

I have discussed with Michael the offer you passed on from a potential investor who is interested in purchasing Michael's interest in the Superman copyright.  The amount offered is not acceptable to Michael.

Michael would be willing to entertain an offer that will pay him $200,000/year for the rest of his life, with a guaranteed minimum of 10 years.  This could be structured as a guaranteed annuity or otherwise, with the hope of minimizing taxes while assuring that such payments will be made when due.

Contrary to what I had mentioned during one of our telephone conversations, Michael is 59.

Please let me know if this proposal is of interest to your potential investor.

Very truly yours,

Don W. Bulson

DWB/jam

Q 0040

SD 00040

**EXHIBIT G**
285

# CERTIFICATE OF DEATH
## STATE OF CALIFORNIA
### USE BLACK INK ONLY

STATE FILE NUMBER

LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER

**DECEDENT PERSONAL DATA**

| | | |
|---|---|---|
| 1A. NAME OF DECEDENT—First (GIVEN) JOSEPH | 1B. MIDDLE | 1C. LAST (FAMILY) SHUSTER |
| 4. RACE CAUCASIAN | 5. HISPANIC—SPECIFY ☐ Yes  ☒ | 6. DATE OF BIRTH—MO. DAY. YR. JULY 10, 1914 |

2A. DATE OF DEATH—MO. DAY. YR. Fnd July 30, 1992   2B. HOUR 1106   3. SEX MALE

7. AGE IN YEARS 78 | 7B. IF UNDER 1 YEAR MONTHS DAYS | 7C. IF UNDER 24 HOURS HOURS MINUTES

8. STATE OF BIRTH CANADA | 9. CITIZEN OF WHAT COUNTRY USA

10A. FULL NAME OF FATHER JULIUS SHUSTER | 10B. STATE OF BIRTH HOLLAND | 11A. FULL MAIDEN NAME OF MOTHER IDA KAKLARSKY | 11B. STATE OF BIRTH RUSSIA

12. MILITARY SERVICE? 19 ___ TO 19 ___  ☒ NONE | 13. SOCIAL SECURITY NO. 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 | 14. MARITAL STATUS NEVER MARRIED | 15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME) NONE

16A. USUAL OCCUPATION ARTIST | 16B. USUAL KIND OF BUSINESS OR INDUSTRY COMIC BOOKS | 16C. USUAL EMPLOYER DC COMICS | 16D. YEARS IN OCCUPATION 60 | 17. EDUCATION—YEARS COMPLETED 14

**USUAL RESIDENCE**

18A. RESIDENCE—STREET AND NUMBER OR LOCATION 11944 MONTANA AVENUE #305 | 18B. CITY W. LOS ANGELES | 18C. ZIP CODE 90049

18D. COUNTY LOS ANGELES | 18E. NUMBER OF YEARS IN THIS COUNTY 14 | 18F. STATE OR FOREIGN COUNTRY CALIFORNIA

**PLACE OF DEATH**

19A. PLACE OF DEATH Residence | 19B. IF HOSPITAL SPECIFY ONE IP, ER/OP, DOA | 19C. COUNTY Los Angeles

19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION 11944 Montana Avenue #305 | 19E. CITY W. Los Angeles

20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT JEAN PEAVY—SISTER 316 HORTON LANE N.W ALBUQUERQUE, NEW MEXICO 87114

**CAUSE OF DEATH**

21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C)

IMMEDIATE CAUSE (A) Congestive Heart Failure

DUE TO (B) Arteriosclerotic Cardiovascular Disease

DUE TO (C)

TIME INTERVAL BETWEEN ONSET AND DEATH: Unk, Years

22. WAS DEATH REPORTED TO CORONER? REFERRAL NUMBER ☒ Yes 92-06897  ☐ No

23. WAS BIOPSY PERFORMED? ☐ Yes  ☒ No

24A. WAS AUTOPSY PERFORMED? ☐ Yes  ☒ No

25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21 Hypertension

24B. WAS IT USED IN DETERMINING CAUSE OF DEATH? ☐ Yes  ☒ No

26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 25? IF YES, LIST TYPE OF OPERATION AND DATE. No

**PHYSICIAN'S CERTIFICATION**

27A. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.

27A. DECEDENT ATTENDED SINCE MONTH, DAY, YEAR | DECEDENT LAST SEEN ALIVE MONTH, DAY, YEAR | 27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER | 27C. CERTIFIER'S LICENSE NUMBER | 27D. DATE SIGNED

27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS

**CORONER'S USE ONLY**

I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.

28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER Deputy Coroner Mary T. Mason | 28B. DATE SIGNED 8-07-92

29. MANNER OF DEATH—(specify nat. natural, accident, suicide, homicide, pending investigation or could not be determined) Natural | 30A. PLACE OF INJURY | 30B. INJURY AT WORK ☐ Yes ☐ No | 30C. DATE OF INJURY MONTH, DAY, YEAR | 31. HOUR

32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY) | 33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY)

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

34A. DISPOSITION CR/RES | 34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS RES: 11944 MONTANA AVE. #305 W.LOS ANGELES, CA 90049 | 34C. DATE MO. DAY. YEAR 8/14/92 | 35A. SIGNATURE OF EMBALMER NOT EMBALMED | 35B. LICENSE NUMBER NONE

36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING AS SUCH) PIERCE BROS. WESTWOOD VILLAGE | 36B. LICENSE NO. FD-951 | 37. SIGNATURE OF LOCAL REGISTRAR Robert C. Matz | 38. REGISTRATION DATE AUG 10 1992

STATE REGISTRAR A. B. C. D. E.

11 (REV. 3-91)

CENSUS TRACT

MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARTMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

LOS ANGELES COUNTY · STATE OF CALIFORNIA

70

Director of Health Services and Registrar

Q 0041

SD 00041

# Last Will and Testament of

**KNOW ALL PERSONS BY THESE PRESENTS:**

That, I ____JOSEPH SHUSTER____

of _____ W. Los Angeles, California _____

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

### I.

I hereby declare that I am the ____brother____ of ____JEAN ADELE PEAVY____

at the time of the execution of this Will.

### II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their ____N/A____ will provide for them.
____(mother, or father)____

### III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my execut_rix_ as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

### IV.

I give, devise and bequeath unto ____JEAN ADELE PEAVY____ all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that ____Jean Adele Peavy____ shall predecease me, or in the event that both ____Jean Adele Peavy____ and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, ____MARK WARREN PEARY____.

### V.

I hereby nominate and appoint my ____sister____, ____Jean Adele Peavy____ executrix of this my Last Will and Testament, to act without bond. In the event that my ____sister____ is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint ____Mark Warren Peary____ to act as executor, also without bond.

Q 0042

## VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my executrix settle my estate in such a manner as shall seem best and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

Q 0043

SD 00043

**EXHIBIT G**

**288**

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this _28_ day of _June_ 19 _88_.

_Joseph Shuster_
Testator

STATE OF CALIFORNIA

County of _Los Angeles_ } ss.

Each of the undersigned, being first duly sworn on oath, states that on this _28_ day of _June_, 19 _88_:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of _JOSEPH SHUSTER_ (the Testator );

(2) The Testator , in my presence and in the presence of the other Witnesses whose signatures appear below:

(a) Declared the foregoing instrument consisting of _one_ pages, of which this is the last to be _his_ Will;

(b) Requested me and the other Witnesses to act as Witnesses to _his_ Will and to make this affidavit; and

(c) Signed such instrument;

(3) I believe the Testator to be of sound mind, and that in so declaring and signing, _he_ was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testator and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

_Tom Fenaughty_
Witness
_3374 Overland Ave #1_
Address
_L.A. Ca. 90064_

_Robert E Williams_
Witness
_3545 Mentone Ave #3_
Address
_Los Angeles California 90034_

Witness

Address

_went to notary public office in Brentwood on one Montana_

SUBSCRIBED & SWORN to before me this _28_ day of _June_, 19 _88_.

_F. Patrick Hagerty_

Notary Public in and for the State of California, residing at _SANTA MONICA, CALIF._

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991.

Q 0044

SD 00044

**EXHIBIT G**
**289**



THE

Last Will and Testament of

*Joseph Shuster*

Dated *June 28* 19 88

Q 0045

SD 00045

**EXHIBIT G**

**290**

Revocable Living Trust

This trust agreement is made this day of *April 11, 1988* between  Joseph Shuster  , the Grantor, and  Joseph Shuster  and  Jean A. Peavy  , the Trustees.

Upon my death or incapacity, I name  Jean A. Peavy  successor.

The Grantor,  Joseph Shuster  , hereby transfers to the Trustees and to the Trustees' successor the property described in the attached Schedule A.  Such property and any other property that may be received by the Trustees shall be held and may be disposed of by the Trustees and the Trustees' successors.

The Grantor may, by signed instruments delivered to the Trustees, revoke the Trust in whole or in part, or amend this Agreement from time to time in any manner.

To the extent that any such requirements can be legally waived, no Trustee shall ever be required to give any bond as Trustee or qualify before, be appointed by, or in absence of breach of trust, account to any court, or obtain the order or approval of any court in the exercise of any power or discretion herein given.

IN WITNESS WHEREOF, the parties hereto have signed this on the above-written date.

GRANTOR:         *Joseph Shuster*
                 Joseph Shuster

WITNESS:         *Elvin Vivian*          *Carole Garthright*

TRUSTEES:        *Joseph Shuster*        *Jean A. Peavy*
                 Joseph Shuster          Jean A. Peavy

SUCCESSOR TRUSTEE:   *Mark W. Peary*
                     Mark W. Peary

Q 0046

Attachment To Living Trust

SCHEDULE "A"

STATE OF <u>California</u> , COUNTY OF <u>Los Angeles</u>

<u>4-11-88</u>
Date

<u>J.S.</u>
Grantor's Initial

     The following is my property, both real and personal, included in the attached Revocable Living Trust.

1. Stock certificates

     Company _____

     No. of shares <u>50</u>

     Name(s) on certificates or account

2. Furniture and appliances

Q 0047

SD 00047

## AFFIDAVIT OF JEAN PEAVY UNDER
## CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.    The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.    The decedent died on July 30, 1992 in Los Angeles County, California.

3.    At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.    No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.    The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.    The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.    The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Time Warner Inc. Common Stock

116 Time Warner Rights

8.    No other person has a right to the interest of the decedent in the described property.

9.    The affiant requests that the described property be paid, delivered or transferred to her.

10.    The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:    August 17_____, 1992

_Jean Peavy_
JEAN PEAVY

Q 0048

SD 00048

## EXHIBIT G
## 293

STATE OF    NEW MEXICO              )
                                    )   ss.
COUNTY OF    BERNALILLO             )


    On    August 17             , 1992, before me, a notary
public for the State of   New Mexico            , personally
appeared JEAN PEAVY (___) known to me or ( ✗ ) proved to me based
on satisfactory evidence to be the person whose name is subscribed
to the above instrument, and she acknowledged to me that she
executed the same.


    **IN WITNESS WHEREOF**, I have hereunto set my hand and affixed
my official seal on the day and year first above written.


SEAL:

_Barbara Hewson_
_____
Notary Public for the
State of   New Mexico

2.

Q 0049

SD 00049

**EXHIBIT G**
**294**



Q 0050

SD 00050

**EXHIBIT G**
**295**

## HOLLYWOOD REPORT / By John Lippman

# The Rights Stuff

*'Hazzard' Legal Issues Lead To $17.5 Million Payday; Discovery on a Treadmill*

FOR THE NEW MOVIE "The Dukes of Hazzard," the biggest payout didn't go to the actors or even the movie's director and producer. It went to clouds of Marc Toberoff, an attorney who's made a reputation suing big studios on behalf of TV show creators who claim they've owed money for the movie rights.

The film, which opens Aug. 5, is based on the popular 1980s early '80s TV comedy about two Southern buddies who drive around getting into trouble and outwitting some local buffoons. It stars MTV personality Johnny Knoxville and reality TV diva Jessica Simpson.

But before reaching the screen, the movie was tied up as a group of people who held rights related to the "Hazzard" TV show sued Warner Bros., the studio making the film. Last month, in an out-of-court settlement, the studio paid them $17.5 million, according to people familiar with the situation. It is believed to be the largest sum ever to arise out of a case involving movie rights for a TV show. It amounts to about one-third of the film's original budget. Mr. Toberoff, who usually takes his cases on a contingency-fee basis, declined to say how much he made from the "Hazzard" case. Warner Bros. declined to comment on any aspect of separated-rights issues.

For years, Hollywood has been besieged by lawsuits from people who claim studios stole their ideas. But those cases generally are about alleged copyright infringement. This lawsuit involves the "separated rights" clause in the Writers Guild of America's contract with the Hol-

## The lawyer says he isn't an 'ambulance chaser': 'I don't take on a case unless I believe in it.'

lywood studios. (It also includes copyright-infringement claims.) The Writers Guild contract stipulates that the creator of a TV show retains the show's movie rights. A studio—or an independent producer—can acquire those rights separately only under narrow guidelines. Separated-rights cases deal with whether a producer has the right to make the material into a movie.

### Coming to the Fore

The issue has come to the fore in recent years as studios increasingly rely on versions of popular TV shows from the 1960s and 1970s. This summer has already seen "The Honeymooners" and "Bewitched." "Miami Vice" is coming up next year, and "Father Knows Best," "The A-Team," "Magnum, P.I." and "The Man from U.N.C.L.E." are in development. It couldn't be determined whether any of those projects are facing separated-rights challenges; the Writers Guild of America says separated-rights disputes are confidential. Studios have increasingly sought such subjects, like old hit series, because they have a track record of success and sometimes don't cost much to develop into a film script. But in some cases, the plans for saving money can backfire, and the studios

have ended up paying large amounts because of litigation tied to TV-series rights.

For example, in 1999, the family of Gilbert Ralston, the creator of the 1960s TV series "The Wild, Wild West," sued Warner on a separated-rights case. (Mr. Toberoff represented them.) The studio was about to release a $150-million-budget movie based on the TV series. The suit was settled, and Warner ended up paying the Ralston family between $900,000 and $1.5 million, people involved in the case say. (The film was a disappointment at the box office.)

In the 1960s and 1970s, creators of series often sold certain TV rights to networks. But because big studios weren't generally in the market for making movies of these shows at that time, studios didn't always try to buy the movie rights. As a result, they must now go back and acquire them from the creators or their heirs—or risk being sued. "Since the whole idea of making a movie out of a TV series was highly speculative, by and large producers and studios didn't bother to acquire the separated rights," says attorney William Grantham. He represented United Artists a few years back when the studio wanted to turn the 1960s TV series "Rat Patrol" into a movie. The Writers Guild arbitrated issues involving those rights, though the movie hasn't been made.

In the case of "Hazzard," the TV series itself was based on a 1975 United Artists movie, "Moonrunners." Producer Bob Clark acquired a script by Gy Waldron, which Mr. Waldron also directed. In 1978, Warner Bros. acquired the rights to make "Moonrunners" into the "Hazzard" TV series. But according to Mr. Clark's lawsuit, the studio never acquired the movie rights. (Mr. Clark claimed copyright issues in the lawsuit, filed in Los Angeles Superior Court last February: specifically, that the "Hazzard" movie appears to rely to a large extent on "Moonrunners." The lawsuit details 25 points in the "Hazzard" movie, from plot to characters, in which the two movies possess "glaring and substantial similarities.")

On the inside of Mr. Clark's claims, the judge issued a preliminary injunction ordering Warner to withdraw marketing materials and postpone release of the movie until the parties could settle. A big delay would have been a serious setback

for the studio, since the movie cost about $53 million to make, was a major summer entry for Warner and had been widely publicized. The studio had also started rolling out its estimated $30 million advertising campaign. Within days of the judge's ruling, Warner lawyers holed up in a conference room at Mr. Toberoff's offices, and agreed to pay Mr. Clark and his partners. A settlement was reached June 21.

### 'A Market to Be Tapped'

Mr. Toberoff, who says he's never lost a case, estimates he's handled rights issues related to 10 shows on behalf of their creators when producers wanted to make them into movies. The lawyer says most of the issues involved "cleaning up" the separated rights of the shows." In only three cases, he says, has he gone to court. (Other disputes are arbitrated by the Writers Guild.)

After winning one settlement, "he was selling himself as an expert," says Grace Reiner, assistant executive director at the Writers Guild, who works on the arbitration of disputes over separated rights. "He saw a market to be tapped, and he tapped it," she says. Regarding his work representing TV-show rights holders, Mr. Toberoff says, "People call me an 'ambulance chaser' that I don't take on a case unless I believe in it."

Mr. Toberoff first got into the field of TV-series rights by way of the son of Robert Pirosh, the creator of the 1960s TV series "Combat." While on the treadmill at his health club in 1994, Mr. Toberoff read an ad, placed by the son, seeking help in sorting through his father's papers. Mr. Toberoff researched what rights had, and hadn't, been sold. When it was announced a couple of weeks later that Bruce Willis was going to star in a movie version of "Combat," Mr. Toberoff was ready to press a claim the producer did not have the movie rights to the old TV series. Mr. Toberoff says a settlement was reached, though he won't say for how much. (That movie was never made.)

Meanwhile, Mr. Toberoff has pursued another line of work: producing. His Intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle," as well as such old TV shows as "Ironside," "Police Woman," "Hart to Hart" and "F-Troop." This could theoretically



Seann William Scott, left, and Johnny Knoxville, right, in 'The Dukes of Hazzard.'

put him in a delicate position, since he's representing TV-show creators suing studios, while his production company seeks the cooperation of studios that's required to fund and distribute Hollywood films. Mr. Toberoff says he is aware of the potential conflict and "keeps a definite firewall between producing and legal matters."

## Bonhams
& BUTTERFIELDS

**Fine and Rare Wines**
Saturday July 30, 9am
San Francisco
Simulcast Los Angeles

Pre-auction Wine Tasting
Thursday July 28, 6:30pm
Los Angeles

Inquiries
Frank Martell +1 (415) 4 16 54 11
frank.martell@bonhams.com
Mariam Cebalo +1 (415) 503 3365
mariam.cebalo@bonhams.com

To attend our pre-auction wine
tasting please contact:
+1 (800) 223 2854 ext. 3390
events.us@bonhams.com
*Registration fee for wine tasting

Bonhams & Butterfields
220 San Bruno Avenue
San Francisco, California 94103
www.bonhams.com/us
© 2005, Bonhams & Butterfields Auctioneers Corp.
All rights reserved. Bond No. 57BSBBZ2253

---

**INTERESTED
IN BORDEAUX
FUTURES?**
*You can't afford
not to check out:*

www.goodygoody.com



Home > Warners ponies up 'Hazzard' pay

http://www.variety.com/index.asp?layout=print_story&articleid=VR1117925363&categoryid=1236

To print this page, select "PRINT" from the File Menu of your browser.

Posted: Wed., Jun. 29, 2005, 10:00pm PT

# Warners ponies up 'Hazzard' pay

## Studio settles with producer Clark for $17.5 mil

By CLAUDE BRODESSER

Chalk one up for the little guy.

Warner Bros. Pictures has agreed to pay a Georgia-based producer at least $17.5 million for infringing on the copyright to his even-more-obscure 1974 United Artists film, "Moonrunners," which became the basis of the hit Warners TV skein, "The Dukes of Hazzard."

The amount paid to the producer, Robert B. Clark, is more than what the studio spent in talent salaries on the new "Hazzard" pic.

However, Warners was faced with federal judge Gary Allen Feess' preliminary injunction, which would have canceled the Aug. 13 release of Warner's new "Dukes of Hazzard" feature and seen all copies of the $55 million Johnnie Knoxville-starrer impounded by federal marshals.

What's more, the film's DVD release would have been delayed indefinitely, and its $40 million theatrical marketing budget -- much of that spent on spot TV ads -- would have gone down the drain.

Marc Toberoff, the attorney who represented Clark in U.S. District Court, would only reiterate his previous statement of last week that "the parties have reached a settlement of all claims in the litigation," adding that "the terms of that settlement are confidential." (*Daily Variety*, July 23)

Scott Rowe, a spokesman for Warner Bros. Entertainment, said on Thursday afternoon that the studio declined to comment.

In winning a preliminary injunction, Toberoff demonstrated to the judge's satisfaction that Clark was likely to win at trial and would suffer irreparable harm if the movie opened. Irreparable harm is presumed in copyright infringement cases, based on a 1999 lawsuit by Sun Microsystems against Microsoft.

Now that a settlement has been reached, Warners will premiere the new "The Dukes of Hazzard" feature July 28 at the Mann Chinese Theater on Hollywood Boulevard.

Still unclear is whether Clark will be getting an invitation.

Read the full article at:
http://www.variety.com/story.asp?l=story&a=VR1117925363&c=1236

*MT received $8 Million dollars from the lawsuit.*

1 of 2

1/8/06 9:13 PM

Q 0052

SD 00052

# MARC TOBEROFF
## ATTORNEY AT LAW

December 3, 2001

New York Supreme Court, Westchester County
Attn: Legal Division, Rm. 330
110 Dr. Martin Luther King Blvd.
White Plains, NY 10601

Re: Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

To Whom It May Concern:

I am writing to request copies of the documents set forth below, which I cannot obtain in person since I am located in California. Enclosed please find my check for $5.00 to cover research costs per my telephone conversation today with the filing clerk of your Court.

The documents are from the 1947 lawsuit entitled Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc. (which concerned "SUPERMAN"). It was commenced in 1947 before Judge Addison Young. (Unfortunately, I do not have the case number , but the clerk suggested you would be able to retrieve the documents based on this description.)

The documents I am requesting are as follows:

1.  **Opinion** of Official Referee J. Addison Young **dated November 21, 1947** (or November 1, 1947) in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

2.  **Finding of Facts and Conclusions of Law** by Judge Addison Young dated April 12, 1948 and **Interlocutory Judgment dated April 12, 1948** in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

3.  **Final Consent Judgment dated May 21, 1948** signed by Judge Addison Young in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

Q 0053

23852 PACIFIC COAST HIGHWAY, SUITE 555, MALIBU, CALIFORNIA 90265-4879
TELEPHONE (310) 589-5151    FACSIMILE (310) 589-5152

Page 2
12/03/01
NY Supreme Court, Westchester County

As suggested by the Clerk, I have enclosed a self-addressed Express Mail envelope and
pre-paid Express Mail label to send the above document to me at your earliest
convenience.  EJ140635588US

Thank-you very much for your kind attention this important matter. Please telephone me
at (310) 589-5151 if there are any problems or questions concerning the above.

Very truly yours,

Marc Toberoff

Q 0054

# BOND SERVICES OF CALIFORNIA, LLC

900 Wilshire Blvd., Suite 1400 Los Angeles, CA 90017-4700 (213) 628-2970 (213) 628-2977

| | |
|---|---|
| INVOICE NO: 185293 | BOND NO: 415223 |
| INVOICE DATE: 10/23/2003 | CASE NO: BP080635 |
| DUE DATE: Due Upon Receipt | FILE NO: 1054553 |
| BOND CLASS: PROBATE | ATTY PHONE: (213) 895-4900 |

ATTN: JOHN D. PETTKER
RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
444 S. FLOWER ST., #1700
LOS ANGELES, CA 90071

TO: MARK WARREN PEARY
51 CAMINO CABO
SANTA FE, NM 87508-

| Company:<br>AMERICAN CONTRACTORS INDEMNITY COMPANY | Effective Date:<br>08/25/2003 | Anniversary Date:<br>08/25/2004 |
|---|---|---|

| BOND NO.<br>415223 | AMOUNT OF BOND<br>$6,000.00 | PREMIUM<br>$100.00 | | |
|---|---|---|---|---|

Description

| | | |
|---|---|---|
| 1st Year Premium on bond as Executor of the estate of Joseph Shuster, deceased. | 100.00 | |
| TRW Charges | 10.00 | |
| Cert. Charges | 13.97 | |

Total Due     123.97

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

TO ENSURE PROPER CREDIT, PLEASE DETACH THIS PORTION AND RETURN WITH REMITTANC
Please Send Payment to:
BOND SERVICES OF CALIFORNIA, LLC
P.O. Box 51408 Los Angeles, CA 90051-5708

| BOND NO: 415223 | PRINCIPAL NAME: MARK WARREN PEARY |
|---|---|
| CASE NO: BP080635 | |
| FILE NO: 1054553 | ESTATE OF: JOSEPH SHUSTER |
| INVOICE NO: 185293 | If you have a new address or telephone number please provide us with the new information: |
| INVOICE DATE: 10/23/2003 | |
| TOTAL DUE: 123.97 | |

AMOUNT ENCLOSE

# INVOICE

Q 0055

SD 00055

**PACIFIC PICTURES CORPORATION**
23852 PACIFIC COAST HWY #555
MALIBU, CA 90265

601

16-66/1220
39

Date _15-27-03_

Pay to the
Order of _Bond Service of California_                        $ _123.22_

_One Hundred Twenty Three 22_                              Dollars

**Bank of America.**
Westwood Village
930 Westwood Blvd
Los Angeles CA
310.247.2080        _Case no. BD 080635_

For _Bond # 415 223   A/c 1054 553_

⑈122000661⑈0601 00994 25284⑈

Q 0056

SD 00056

**EXHIBIT G**
**301**

LAW OFFICES OF
# MARC TOBEROFF

August 6, 2003

<u>Via facsimile: (216) 621-6165 and US Mail</u>

Don Bulson, Esq.
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Ave., 19th Floor
Cleveland, OH 44115-2191

<u>Re: Michael Siegel</u>

Dear Don:

I had a high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegel's long awaited June 18, 2003 counter-offer regarding a buy-out.

The lowest price for such an annuity was **$3,476,727** (feel free to check this out).

The net present value of the last Warner Bros. ("WB") offer is between $1.5 - $1.6 million (depending on how conservative one is in one's choice of the interest rate in calculating net present value).

Michael's counter-offer was therefore well over twice (230%) the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB offer, rejected by the Siegel's.

It was therefore not surprising that the investor rejected your counter-offer as unrealistic. The counter-offer was so high that it may have scared away a strong potential investor (exactly what I mentioned when I asked you whether you were sure that I should communicate such a high counter-offer).

As previously explained any investor would see the obvious risks of this transaction and want to come in somewhere lower than the WB offer as a hedge or buffer against the risks of this investment (even though there is no guarantee that the Siegel's will ever settle with Warner Bros.).

To the extent you and Michael are not already aware of this, any investor will view the risks as follows:

1.  Risk of costly drawn-out litigation with WB as a condition to receiving any serious participation in "profits" (subject to notorious Studio accounting practices and definitions; net profits are commonly denoted in the entertainment industry as "monkey points");

2.  Risks associated with no control over the Siegel Termination Interest. Michael's interest unfortunately is a passive 25% interest in what Joanne and

9595 Wilshire Boulevard, Suite 811 Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
Email: Mtoberoff@ipww.biz

Q 0057

SD 00057

EXHIBIT G
302

Page 2
Don Bulson, Esq.
August 6, 2003

LAW OFFICES OF
## MARC TOBEROFF

Laura Siegel negotiate and receive, and therefore there are major risks associated with this lack of control (a good reason why Michael may be interested in an investor in the first place);

3. Risk that Joanne and Laura Siegel may never arrive at a mutually acceptable settlement with Warner Bros;

4. Risk that the interest may not be monetized or bear fruit for a long time to come (a long term investment);

5. Risk that Superman will lose as opposed to gain value (there hasn't been a Superman movie since 1978 (compare the Bond franchise) and the recent failure to launch and talent package a new Superman film (lost their director and can't cast the lead) is well publicized.

I personally believe, despite the above, that this could be a smart long term investment for someone very wealthy who can afford to hold the investment for an unpredictable, and potentially very lengthy period of time. However, that doesn't mean that an investor will not weigh the reasonableness of the price against the above risks.

Please convey this letter to Michael and let me know what you and Michael suggest I do to salvage this situation.

Best regards.

Yours sincerely,

Marc Toberoff

Q 0058

SD 00058



RECORDED DOCUMENTS                    FL-10A

**DATE:** March 12, 2004

IP Worldwide
9595 Wilshire Blvd. Suite 811
Beverly Hills, CA  90212

ATTN:  MARC TOBEROFF

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| VOLUME | 3505 |
| DOC. NO. | 773-774 |

The recording fee has been handled as follows:

| | |
|---|---|
| RECEIVED | $ |
| APPLIED | $ |
| REFUNDED (under separate cover) | $ |
| CHARGED TO YOUR DEPOSIT ACCOUNT | $ |

Sincerely yours,

Register of Copyrights

ENCL(S):
DOC(S):   2

Library of Congress
U.S. Copyright Office
101 Independence Ave, SE
Washington, DC 20559-6000
www.copyright.gov

Q 0059

FL-10A  01/2004  12,000

SD 00059

**EXHIBIT G**
**304**



# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

DATE OF RECORDATION

8Dec03

| VOLUME | DOC. NO. |
|---|---|
| 3505 | 773 |
| VOLUME | DOC. NO. |

*Marybeth Peters*

Register of Copyrights and
Associate Librarian for Copyright Services

(·762   JANUARY 2004 — 4.000

Q 0060

SD 00060

EXHIBIT G
305

Copyright Office fees are subject to change.
For current fees, check the Copyright Office
website at www.copyright.gov, write the Copy-
right Office, or call (202) 707-3000.

**DOCUMENT COVER SHEET**
For Recordation of Documents
UNITED STATES COPYRIGHT OFFICE

DATE OF RECORDATION
(Assigned by Copyright Office)    **DEC 0 8 2003**

_____ _____ _____
Month    Day    Year

Volume __3505__ Page __773__

Volume _____ Page _____

FUNDS RECEIVED _____

---

Do not write above this line.

**To the Register of Copyrights:**

*Please record the accompanying original document or copy
thereof.*

FOR OFFICE USE ONLY

**1** Name of the party or parties to the document spelled as they
appear in the document (List up to the first three)

Time Warner Inc.

Time Warner

Warner Bros. Entertainment Inc.

**2** Date of execution and/or
effective date of the
accompanying document    Dec. 1 2003
(month) (day) (year)

**3** Completeness of document
☒ Document is complete by its own terms.
☐ Document is not complete. Record "as is."

**4** Description of document
☐ Transfer of Copyright    ☒ Termination of Transfer(s) [Section 304]
☐ Security Interest         ☐ Shareware
☐ Change of Name of Owner   ☐ Life, Identity, Death Statement [Section 302]
                            ☐ Transfer of Mask Works

☐ Other _____
_____
_____

**5** Title of first work
as given in the
document _____

"Superman"

**6** Total number
of titles
in document __8__

**7** Amount of fee
calculated
$ 100

**8** Fee
enclosed
☒ Check
☐ Money Order

☐ Fee authorized to be charged to :
Copyright Office
Deposit Account number _____    Q 0061

Account name _____

**9** Affirmation*: I hereby affirm to the Copyright Office that the
information given on this form is a true and correct representation
of the accompanying document. This affirmation will not suffice as
a certification of a photocopy signature on the document.
(Affirmation *must* be signed even if you are also signing Space
10.)

Signature _____
Date 12/1/03
Phone Number (310) 246-3100    Fax Number (310) 246-3101

**10** Certification*: Complete this certification in addition to the Affirma-
tion if a photocopy of the original signed document is substituted for
a document bearing the actual signature.
NOTE: This space *may not* be used for an official certification.
I certify under penalty of perjury under the laws of the United
States of America that the accompanying document is a true copy of
the original document.

Signature _____
Duly Authorized Agent of IP Worldwide/Estate of Joseph Shuster
Date 12/1/03

YOU MUST:
• Complete all necessary spaces
• Sign your Cover Sheet in Space 9
SEND ALL 3 ELEMENTS TOGETHER:
1. Two copies of the Document Cover Sheet
2. Check/money order payable to *Register
   of Copyrights*
3. Document
MAIL TO:
Library of Congress, Copyright Office
Documents Recordation Section, LM-462
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

Recordation
will be mailed
in window
envelope to
this address:

Name▼
IP Worldwide/Marc Toberoff, Esq.
Number/Street/Apt▼
9595 Wilshire Blvd., Suite 811
City/State/ZIP▼
Beverly Hills, CA 90212

*Knowingly and willfully falsifying material facts on this form may result in criminal liability. 18 U.S.C §1001

Rev: June 2002—20,000    Web Rev: June 2002    ♻ Printed on recycled paper

U.S. Government Printing Office: 2000-461-113/20,021

SD 00061

V3505 D773



# NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED COPYRIGHT RENEWAL TERM
## OF "SUPERMAN"

To: Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappuccio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O.

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen, President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz, E.V.P. & Publisher

V3505 D773  Page 1



Q 0062

SD 00062

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co.

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr. Chairman

Marvel Entertainment Group, Inc.
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O.

Golden Books Publishing
1540 Broadway ____
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group, (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO



V3005 D773  Page 2

2

Q 0063

SD 00063

**EXHIBIT G**
**308**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. §304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. §201.10, the undersigned Mark Warren Peary, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Joseph Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted work(s) entitled "SUPERMAN" made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:

1.    The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Richard D. Parsons, Chief Executive Officer; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019, Attn: Barry M. Meyer, Chairman & C.E.O.; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Communications Inc., c/o Time Warner, Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Paul T. Cappucio, E.V.P. & General Counsel; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Peter Roth, President; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019, Attn: Roger Ames, Chairman & C.E.O.; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Dan Romanelli, President; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020, Attn: Rich Jacobsen, President; Time Warner Book Group, Inc., 1271 Avenue of

3                                    Q 0064

EXHIBIT G
309

SD 00064

the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; Warner

Books, Inc., 1271 Avenue of the Americas, New York, NY 10020, Attn: Laurence J.

Kirshbaum, C.E.O.; Little, Brown, and Company, 1271 Avenue of the Americas, New

York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; DC Comics Inc., 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, Executive V.P. &

Publisher; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, Executive V.P. & Publisher; DC Direct, c/o DC Comics, 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levtiz, E.V.P. & Publisher; Milton

Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028,

Attn: David E. Wilson, President; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI

02861, Attn: Alan Hassenfeld, Chief Executive Officer; Wildstorm Productions, 888

Prospect Street, Suite 240, La Jolla, CA 92037, Attn: Jim Lee, Editor & Director;

Wildstorm Productions, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, President & Publisher; Dark Horse Publications, 10956 S.E.

Main St., Milwaukie, OR 97222, Attn: Michael Richardson, President; Cantharus

Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819, Attn: Ilya Salkind; Ilya

Salkind and Pierre Spengler, 12 Chiswick Lane, London W4 2JE, England, Attn: Albion

Gee, Esq., Albion Gee & Co.; Hallmark Entertainment, Inc., 1325 Avenue of the

Americas, 21st Floor, New York, NY 10019, Attn: Robert Halmi, Jr., Chairman; Marvel

Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016, Attn: F.

Peter Cuneo, President & C.E.O.; Golden Books Publishing, 1540 Broadway, New

York, NY 10036, Attn: Amy Jarashow, Associate Publisher; Random House Golden

Books for Young Readers, 1540 Broadway, New York, NY 10036, Attn: Kate Kilmo,

Vice President & Publisher; Random House, Inc., 1745 Broadway, New York, NY

V3505 D773 Page 4

4

Q 0065

SD 00065

10019, Attn: Katherine J. Trager, Senior V.P. & General Counsel; Inkworks, 4320 Delta

Lake Drive, Raleigh, NC 27612, Attn: Allan Caplan, President & C.E.O.; Penguin Group

(USA) Inc., 375 Hudson Street, New York, NY 10014, Attn: David Shanks, C.E.O.; DK

Publishing, Inc., 375 Hudson Street, New York, NY 10014, Attn: Christopher Davis,

Publisher; Scholastic, Inc., 557 Broadway, New York, NY 10012, Attn: Richard

Robinson, Chairman & C.E.O.  Pursuant to 37 C.F.R. Section 201.10(d), service of this

notice is being made by first class mail, and additionally service of this notice is being

made by certified mail, return receipt requested, to the above grantees or successors at

the addresses shown.

2.       The works (individually, "Work;" collectively, the "Works") to which this

Notice of Termination applies are as follows[1]: The title of the original copyrighted Work

to which this Notice of Termination applies is SUPERMAN, an illustrated comic book

story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics,

Vol. 1, No. 1, June, 1938 issue, which was published on April 18, 1938. This Work was

registered for copyright under registration No. B379787 and copyright was originally

---

[1] This Notice of Termination applies as well to each and every element of each Work,  including
without limitation, the story or stories, character or characters, the interplay of such characters,
theme or themes, settings or locales, and includes, but is not limited to, Superman, his origins
and escape as an infant to Earth in a rocket ship, his super strength, his invulnerability (bullets
bounce off his chest and he's impervious to fire), his super speed, his ability to leap great
distances in a single bound, his telescopic vision, his super hearing and sense of smell,  his
sense of humor, his clean-cut good looks, his high morals, ethics and compassion, his mission
as a crime fighter and as a champion of the underdog, his stylized costume and cape, the
diamond shaped "S" insignia on his chest, his secret identity / alter ego as the mild mannered
bespectacled newspaper reporter, Clark Kent, the feisty and attractive female reporter love
interest, Lois Lane, the love triangle between Superman, Lois Lane and Clark Kent, Clark Kent's
boss / newspaper Editor (a.k.a. Perry White), the Daily Planet newspaper (f.k.a. the Daily Star)
where Clark Kent, Lois Lane and the Editor work, the great skyscraper metropolis where these
characters live (a.k.a. Metropolis), Superman's scientist father (a.k.a. Jor L) and Superman's
birthplace --a highly advanced but doomed distant planet (a.k.a. Krypton).

V3505 D773 Page 5

Q 0066

SD 00066

secured in this Work as of its April 18, 1938 publication date. This Work was written by

Jerome Siegel and illustrated by Joseph Shuster.  Renewal of the copyright in and to

this Work was made on June 1, 1965, in the name of National Periodical Publications,

Inc. claiming as proprietor of copyright, under renewal registration No. R362188.  This

Work was based upon, incorporated, and constituted a slightly revised version of, the

following Works to which this Notice of Termination also applies: twenty-four days (i.e.,

four six day weeks) of previously unpublished SUPERMAN newspaper comic strips,

created c. 1934, written by Jerome Siegel and illustrated by Joseph Shuster.[2] The

remaining Works to which this Notice of Termination applies are:

| Title | Name of Author | Date Copyright Secured | Copyright  Reg. No. |
|---|---|---|---|
| SUPERMAN story in comic book form | Jerome Siegel Joseph Shuster | Work created c.1933 | N/A[3] |

---

[2] In Siegel and Shuster v. National Comics Pub., Inc. et al., the court found that Jerome Siegel and Joseph Shuster were "the originators and authors of the cartoon character Superman and of the title Superman and first created cartoon material in which said character and title first appeared in 1934...," and further found that this material as incorporated in Action Comics No. 1 constituted: "the formula for the continuing SUPERMAN series to come. It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance." Findings of Fact and Conclusions of Law by Referee J. Addison Young, ¶¶ 8, 22 (November 1, 1947); See also Siegel and Shuster v. National Comics Pub., Inc. et al., Opinion of Referee J. Addison Young, page 9 ("[the aforementioned material] certainly contained the full delineation of the character Superman and though the story or continuity might vary in the future from time to time, it did, I believe constitute a formula for the continuing series to come..."). In Siegel v. National Periodical Publications, Inc, the Second Circuit Court of Appeals reversed the District Court's determination that Action Comics No. 1 was a work-for-hire and held: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accomodate Superman to a magazine format." 508 F.2d 909, 914 (2nd Circuit 1974).

[3] The second and third Works listed in this table as well as the above-referenced 24 days of previously unpublished SUPERMAN newspaper comic strips were first published in a somewhat revised form on April 18, 1938 as Action Comics, Vol. 1, No. 1, June, 1938, which was registered for copyright under registration No. B379787 and renewed under registration No. R362188.

V3505 D773 Page 6

Q 0067

SD 00067



| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| 15 SUPERMAN daily comic strips (12 strips and 3 scripts) | Jerome Siegel Joseph Shuster | Work created c.1934 | N/A |
| Action Comics #2 [4] | Jerome Siegel Joseph Shuster | May 25, 1938 | B379788 |
| Action Comics #3 | Jerome Siegel Joseph Shuster | June 25, 1938 | B385466 |
| Action Comics #4 | Jerome Siegel Joseph Shuster | July 25, 1938 | B387907 |
| Action Comics #5 | Jerome Siegel Joseph Shuster | August 25, 1938 | B394784 |
| Action Comics # 6 | Jerome Siegel Joseph Shuster | September 26, 1938 | B394866 |
| Action Comics # 7 | Jerome Siegel Joseph Shuster | October 25, 1938 | B399214 |

3.     This Notice of Termination applies to the following grants, assignments, transfers and/or agreements to the extent each grants, transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)     A one page agreement between Detective Comics, Inc., on the one hand and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about March 1, 1938;

---

[4] Action Comics Nos. 2-6 were reprinted in Superman Nos. 1 and 3 (Copyright Reg. Nos. AA299871 and B443035, respectively) to which this Notice of Termination, therefore, also applies.

Q 0068

SD 00068

**EXHIBIT G**
**313**

(b)     A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 4, 1937;

(c)     A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(d)     A three page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(e)     A two page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 19, 1939;

(f)     A seven page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about May 19, 1948;

(g)     A twelve page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 23, 1975.

4.     The effective date of termination shall be October 26, 2013.



8

Q 0069

5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304 (c) of the United States Copyright Act (17 U.S.C. §304(c)).

6.    Joseph Shuster died on July 30, 1992.  There is no living widow, child or grandchild of Mr. Shuster. The undersigned, Mark Warren Peary is the Executor of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304 (d), incorporating without limitation 17 U.S.C. § 304 (c)(2)(D), as to the grants of the transfers described herein. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code.

Dated: November 7, 2003

Mark Warren Peary
Executor of the Estate of Joseph Shuster
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

V3505 D773 Page 9

9

Q 0070

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE

OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM OF

"SUPERMAN", and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable

investigation to be made as to the current ownership of the rights being terminated,

including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed

this 10TH day of November, 2003, at Los Angeles, California.


Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505 D773 Page 10

10

Q 0071

SD 00071

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM OF "SUPERMAN" to be served this *10th* day of November, 2003, by First Class

Mail, postage prepaid, upon the following:

To:  Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappucio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group.
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen
President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher



V3505 D773 Page 11

11

Q 0072

SD 00072

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

Ilya Salkind and Pierre Spengler.
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
E.V.P. & Publisher

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr.
Chairman

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Marvel Entertainment Group, Inc..
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson,
President

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Penguin Group (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

V3505 D773 Page 12

12

Q 0073

DK Publishing, Inc.                          Scholastic, Inc.
375 Hudson Street                            557 Broadway
New York, NY 10014                           New York, NY 10012
Attn: Christopher Davis, Publisher           Attn: Richard Robinson
                                             Chairman & CEO

I declare under penalty of perjury that the foregoing is true and correct. Executed

this *10* day of November, 2003, at Los Angeles, California.

Marc Toberoff, Esq.
9595 Wilshire Blvd., Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505 D773 Page 13

13                                          Q 0074

SD 00074

EXHIBIT G
319

LAW OFFICES OF
# MARC TOBEROFF

August 6, 2003

<u>Via facsimile: (216) 621-6165 and US Mail</u>

Don Bulson, Esq.
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Ave., 19th Floor
Cleveland, OH 44115-2191

<u>Re: Michael Siegel</u>

Dear Don:

I had a high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegel's long awaited June 18, 2003 counter-offer regarding a buy-out.

The lowest price for such an annuity was **$3,476,727** (feel free to check this out).

The net present value of the last Warner Bros. ("WB") offer is between $1.5 - $1.6 million (depending on how conservative one is in one's choice of the interest rate in calculating net present value).

Michael's counter-offer was therefore well over twice (230%) the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB offer, rejected by the Siegel's.

It was therefore not surprising that the investor rejected your counter-offer as unrealistic. The counter-offer was so high that it may have scared away a strong potential investor (exactly what I mentioned when I asked you whether you were sure that I should communicate such a high counter-offer).

As previously explained any investor would see the obvious risks of this transaction and want to come in somewhere lower than the WB offer as a hedge or buffer against the risks of this investment (even though there is no guarantee that the Siegel's will ever settle with Warner Bros.).

To the extent you and Michael are not already aware of this, any investor will view the risks as follows:

1. Risk of costly drawn-out litigation with WB as a condition to receiving any serious participation in "profits" (subject to notorious Studio accounting practices and definitions; net profits are commonly denoted in the entertainment industry as "monkey points");

2. Risks associated with no control over the Siegel Termination Interest. Michael's interest unfortunately is a passive 25% interest in what Joanne and

9595 Wilshire Boulevard, Suite 811 Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
Email: Mtoberoff@ipwww.biz

Q 0075

SD 00075

**LAW OFFICES OF**
# MARC TOBEROFF

Laura Siegel negotiate and receive, and therefore there are major risks associated with this lack of control (a good reason why Michael may be interested in an investor in the first place);

3. Risk that Joanne and Laura Siegel may never arrive at a mutually acceptable settlement with Warner Bros;

4. Risk that the interest may not be monetized or bear fruit for a long time to come (a long term investment);

5. Risk that Superman will lose as opposed to gain value (there hasn't been a Superman movie since 1978 (compare the Bond franchise) and the recent failure to launch and talent package a new Superman film (lost their director and can't cast the lead) is well publicized.

I personally believe, despite the above, that this could be a smart long term investment for someone very wealthy who can afford to hold the investment for an unpredictable, and potentially very lengthy period of time. However, that doesn't mean that an investor will not weigh the reasonableness of the price against the above risks.

Please convey this letter to Michael and let me know what you and Michael suggest I do to salvage this situation.

Best regards.

Yours sincerely,

Marc Toberoff

Q 0076

SD 00076

1   RODI, POLLOCK, PETTKER, GALBRAITH
    & CAHILL, A Law Corporation
2   JOHN D. PETTKER (SBN 42346)
    444 South Flower Street, Suite 1700
3   Los Angeles, CA 90071-2901
    Telephone: 213-895-4900
4   Facsimile: 213-895-4750

5   Attorneys for MARK WARREN PEARY,
    Petitioner

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF LOS ANGELES

10

11  In the Matter of the Estate of          NO. BP-080635

12  JOSEPH SHUSTER, also known as JOE       ORDER ADMITTING WILL TO
    SHUSTER,                                PROBATE, APPOINTING EXECUTOR
13                                          AND AUTHORIZING INDEPENDENT
                              Deceased.     ADMINISTRATION OF ESTATE WITH
14                                          LIMITED AUTHORITY

15                                          Hearing Date: 8-25-03
                                            Dept. 5 at 9:15 a.m.
16

17

18       Petitioner, MARK WARREN PEARY, filed his petition for probate of will and for letters

19  testamentary and for authorization to administer estate under the Independent Administration of

20  Estates Act with limited authority of the estate of Joseph Shuster, also known as Joe Shuster,

21  deceased (the "decedent"), and such petition came on regularly for hearing and approval by the

22  Court at 9:15 a.m. on August 25, 2003, in Department 5 of the above-entitled Court, the

23  Honorable H. RONALD HAUPTMAN, Judge Pro Tem presiding.  JOHN D. PETTKER of Rodi,

24  Pollock, Pettker, Galbraith & Cahill, A Law Corporation, appeared as the attorney for petitioner,

25  and no one appeared in opposition.

26       On evidence given to the satisfaction of the Court, THE COURT FINDS THAT:

27       1.    All notices required by law have been given.

28  /  /  /                                                      Q 0077

    RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
    A LAW CORPORATION
    444 SOUTH FLOWER STREET, SUITE 1700
    LOS ANGELES, CALIFORNIA 90071-2901
    TELEPHONE (213) 895-4900

                                          1
    ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

SD 00077

1    2.    The decedent died on July 30, 1992, a resident of the County of Los Angeles, State

2    of California.

3    3.    The decedent died testate, leaving a will dated June 28, 1988.  This will has never

4    been revoked but was lost or inadvertently destroyed.  Such will is admitted to probate by Minute

5    Order on August 25, 2003, as the decedent's last Will, and its provisions are as follows:

6    # LAST WILL AND TESTAMENT OF

7    KNOW ALL PERSONS BY THESE PRESENTS:

8    I

9    That, I  JOSEPH SHUSTER, of W. Los Angeles, California, being of sound and disposing mind

10    and memory, and not acting under duress, menace, fraud or the undue influence of any person

11    whomsoever, do make, publish and declare this my Last Will and Testament.

12

13    I hereby declare that I am the brother of JEAN ADELE PEAVY at the time of the

14    execution of this Will.

15    II

16    I make no bequest, gift or devise to my children named in Paragraph I, or to any other

17    child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their

18    ____N/A____ will provide for them.

19    III

20    I hereby direct and order that all just debts for which proper claims are filed against my

21    estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my

22    death as is practicable; provided, however, that this direction shall not authorize any creditor to

23    require payment of any debt or obligation prior to its normal maturity in due course.

24    IV

25    I give devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and

26    remainder of my estate, whether real or personal, and wheresoever situated.  In the event that Jean

27    Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a

28    / / /

Q 0078

2

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AU

RODI, POLLOCK, PETKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

SD 00078

1    result of a common accident, illness or disaster, then I give, devise and bequeath the residue and

2    remainder of my estate to my nephew, MARK WARREN PEARY.

3                                              V

4          I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will

5    and Testament, to act without bond.  In the event that my sister is for any reason unable or

6    unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor,

7    also without bond.

8                                              VI

9          I further direct that my estate be settled without the intervention of any court, except to the

10   extent required by law, and that my executrix settle my estate in such a manner as shall seem best

11   and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell,

12   exchange and convey the personal and real property of my estate without an order of court for that

13   purpose and without notice, approval or confirmation and in all other respects to administer and

14   settle my estate without the intervention of court.

15                                             VII

16         I hereby revoke any and all former Wills and Codicils thereto made by me and declare this

17   my Last Will and Testament.

18         In Witness Whereof I have hereunto set my hand this 28th day of June, 1988.

19

20                                              JOSEPH SHUSTER
                                                Testator
21   STATE OF CALIFORNIA        )
                                )  ss.
22   COUNTY OF LOS ANGELES      )

23         Each of the undersigned, being first duly sworn on oath, states that on this 28th day of June,

24   1988:

25         (1)    I am over the age of eighteen (18) years and competent to be a Witness to the Will

26   of JOSEPH SHUSTER (the Testator);

27         (2)    The Testator, in my presence and in the presence of the other Witnesses whose

28   signatures appear below:

                                                               Q 0079

                                              3
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUT

RODI, POLLOCK, PETKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1          (a) Declared the foregoing instrument consisting of one pages, of which this is the

2   last to be his Will;

3          (b) Requested me and the other Witnesses to act as Witnesses to his Will and to

4   make this affidavit; and

5          (c) Signed such instrument;

6      (3)    I believe the Testator to be of sound mind, and that in so declaring and signing, he

7   was not acting under any duress, menace, fraud, or undue influence;

8      (4)    The other witnesses and I, in the presence of the Testator and of each other now

9   affix our signatures as Witnesses to the Will and make this affidavit.

10  Tom Fenaughty                          Robert Williams

11  3374 Overland Ave., #1                 3545 Mentone Ave. #3

12  Los Angeles, CA 90064                  Los Angeles, California 90034

13  SUBSCRIBED & SWORN to before me this 28th day of June, 1988.

14          [NOTARIAL SEAL]                F. PATRICK HAGERTY
                                           Notary Public in and for the State of California,
15                                         residing at Santa Monica, Calif.

16  **THE COURT ORDERS:**

17      1.     MARK WARREN PEARY is appointed Executor of the decedent's Will recited

18  above, and letters testamentary shall issue on qualification.

19      2.     The Executor is granted limited authority to administer the estate under the

20  Independent Administration of Estates Act (there is no authority, without court supervision, to (1)

21  sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money

22  with the loan secured by an encumbrance upon real property).

23      3.     The Executor is also granted the following special power in addition to the general

24  powers conferred upon him by law and under the Independent Administration of Estates Act:

25  The power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d)

26  of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C.

27  §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings

28  necessary or appropriate in connection with this action.

Q 0080

4

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUT

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1    4.    Bond is fixed at $6,000.00.

2    Dated: _____

3

4

5    _____
     Judge Pro Tem of the Superior Court

6    264438_1.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                Q 0081

5

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTH

# AMERICAN CONTRACTORS INDEMNITY COMPANY

BOND NO. _____

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR COUNTY OF LOS ANGELES

### IN THE MATTER OF

**The Estate of**

JOSEPH SHUSTER, also known as JOE SHUSTER,

**Deceased**

Case Number BP080635

SUPERIOR COURT
SUPERIOR COURT
OCT 2 1 2003

All Papers and notices may be sent to
AMERICAN CONTRACTORS INDEMNITY COMPANY
9841 AIRPORT BLVD SUITE 1414 LOS ANGELES, CA 90045

**ORIGINAL FILED**

☑ Bond upon Qualifying    ☐ Additional Bond

Premium ___100___
Per Annum

**KNOWN ALL MEN BY THESE PRESENTS:**
That we, MARK WARREN PEARY as Principal, and the AMERICAN CONTRACTORS INDEMNITY COMPANY as Surety, are held and firmly bound unto The State of California in the sum of SIX  THOUSAND  DOLLARS ($6,000.00) for which payment, well and truly be made, we bind ourselves, our heirs, executors, successors, and assigns jointly and severally, firmly by these presents.

**THE CONDITION OF THE ABOVE OBLIGATION IS SUCH THAT,**
**WHEREAS,** an order was duly made and entered by the Superior Court of the State of California, for the County of LOS ANGELES ON AUGUST 25, 2003.

☑ Appointing the above Principal, Executor of the estate of JOSEPH  SHUSTER Deceased.

☐ Directing the said Principal to execute an additional bond according to law in the sum above named.

**NOW, THEREFORE,** if the said Principal shall faithfully execute the duties of the trust according to law, then this obligation shall be void, otherwise to remain in full force and effect.

Signed and dated at_____Santa Fe, New Mexico_____ >California on _September 30, 2003_
          (Place)                                                    (Date)

_____
MARK WARREN PEARY, as Principal

### AMERICAN CONTRACTORS INDEMNITY COMPANY

**IN  WITNESS  WHEREOF,** The corporate seal and name of said Surety Company is hereto affixed and attested by JEFF  AASE, who declares under penalty of perjury that he is duly authorized Attorney-in-Fact acting under an unrevoked power of attorney on file with the Clerk of the County in which above entitled Court is located.

By: _____
    JEFF AASE                              Attorney-in-Fact

## BOND UPON QUALIFYING

Q 0082

SD-00082



DE-147

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):
RODI, POLLOCK, PETTKER, GALBRAITH
& CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
TELEPHONE NO.: 213-895-4900    FAX NO. (Optional): 213-895-4921 fax
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): MARK WARREN PEARY, Petitioner

SUPERIOR COURT OF CALIFORNIA, COUNTY OF    LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

ESTATE OF (Name): JOSEPH SHUSTER, also known as
JOE SHUSTER
DECEDENT

DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE
and Acknowledgment of Receipt

FOR COURT USE ONLY

SUPERIOR COURT
OCT 21 2003
ORIGINAL FILED

CASE NUMBER:
BP080635

## DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE

When the court appoints you as personal representative of an estate, you become an officer of the court and assume certain duties and obligations. An attorney is best qualified to advise you about these matters. You should understand the following:

### 1. MANAGING THE ESTATE'S ASSETS

**a. Prudent investments**
You must manage the estate assets with the care of a prudent person dealing with someone else's property. This means that you must be cautious and may not make any speculative investments.

**b. Keep estate assets separate**
You must keep the money and property in this estate separate from anyone else's, including your own. When you open a bank account for the estate, the account name must indicate that it is an estate account and not your personal account. Never deposit estate funds in your personal account or otherwise mix them with your or anyone else's property. Securities in the estate must also be held in a name that shows they are estate property and not your personal property.

**c. Interest-bearing accounts and other investments**
Except for checking accounts intended for ordinary administration expenses, estate accounts must earn interest. You may deposit estate funds in insured accounts in financial institutions, but you should consult with an attorney before making other kinds of investments.

**d. Other restrictions**
There are many other restrictions on your authority to deal with estate property. You should not spend any of the estate's money unless you have received permission from the court or have been advised to do so by an attorney. You may reimburse yourself for official court costs paid by you to the county clerk and for the premium on your bond. Without prior order of the court, you may not pay fees to yourself or to your attorney, if you have one. If you do not obtain the court's permission when it is required, you may be removed as personal representative or you may be required to reimburse the estate from your own personal funds, or both. You should consult with an attorney concerning the legal requirements affecting sales, leases, mortgages, and investments of estate property.

### 2. INVENTORY OF ESTATE PROPERTY

**a. Locate the estate's property**
You must attempt to locate and take possession of all the decedent's property to be administered in the estate.

**b. Determine the value of the property**
You must arrange to have a court-appointed referee determine the value of the property unless the appointment is waived by the court. You, rather than the referee, must determine the value of certain "cash items." An attorney can advise you about how to do this.

**c. File an inventory and appraisal**
Within four months after Letters are first issued to you as personal representative, you must file with the court an inventory and appraisal of all the assets in the estate.

Q 0083

Page 1 of 2

Form Adopted for Mandatory Use.
Judicial Council of California
DE-147 [Rev. January 1, 2002]
DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE
(Probate)

Legal Solutions Plus
Probate Code, § 8404

SD 00083

**EXHIBIT G**
328

| ESTATE OF *(Name):* JOSEPH S. STER, also known as JOE SHUSTER  DECEDENT | CASE NUMBER: BP080635 |
|---|---|

**d. File a change of ownership**
At the time you file the inventory and appraisal, you must also file a change of ownership statement with the county recorder or assessor in each county where the decedent owned real property at the time of death, as provided in section 480 of the California Revenue and Taxation Code.

### 3. NOTICE TO CREDITORS
You must mail a notice of administration to each known creditor of the decedent within four months after your appointment as personal representative. If the decedent received Medi-Cal assistance, you must notify the State Director of Health Services within 90 days after appointment.

### 4. INSURANCE
You should determine that there is appropriate and adequate insurance covering the assets and risks of the estate. Maintain the insurance in force during the entire period of the administration.

### 5. RECORD KEEPING
**a. Keep accounts**
You must keep complete and accurate records of each financial transaction affecting the estate. You will have to prepare an account of all money and property you have received, what you have spent, and the date of each transaction. You must describe in detail what you have left after the payment of expenses.

**b. Court review**
Your account will be reviewed by the court. Save your receipts because the court may ask to review them. If you do not file your accounts as required, the court will order you to do so. You may be removed as personal representative if you fail to comply.

### 6. CONSULTING AN ATTORNEY
If you have an attorney, you should cooperate with the attorney at all times. You and your attorney are responsible for completing the estate administration as promptly as possible. **When in doubt, contact your attorney.**

NOTICE: 1. This statement of duties and liabilities is a summary and is not a complete statement of the law. Your conduct as a personal representative is governed by the law itself and not by this summary.
2. If you fail to perform your duties or to meet the deadlines, the court may reduce your compensation, remove you from office, and impose other sanctions.

## ACKNOWLEDGMENT OF RECEIPT

1. I have petitioned the court to be appointed as a personal representative.

2. My address and telephone number are *(specify):*    51 Camino Cabo, Santa Fe, New Mexico 87508
Telephone:   505-466-4551

3. I acknowledge that I have received a copy of this statement of the duties and liabilities of the office of personal representative.

Date: September 30, 2003

MARK WARREN PEARY
(TYPE OR PRINT NAME)

*[signature]*
(SIGNATURE OF PETITIONER)

Date:

_____
(TYPE OR PRINT NAME)

(SIGNATURE OF PETITIONER)

**CONFIDENTIAL INFORMATION:** If required to do so by local court rule, you must provide your date of birth and driver's license number on supplemental Form DE-147S. (Prob. Code, § 8404(b).)

DE-147 [Rev. January 1, 2002]    **DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE** (Probate)    Page 2 of 2

Q 0084

SD 00084

**EXHIBIT G**
**329**



**CONFIDENTIAL**

DE-147S

| ESTATE OF *(Name):*  JOSEPH SHUSTER, also known as<br><br>JOE SHUSTER                                        DECEDENT | CASE NUMBER:<br>BP080635 |
|---|---|

## CONFIDENTIAL STATEMENT OF BIRTH DATE
## AND DRIVER'S LICENSE NUMBER

**(Supplement to *Duties and Liabilities of Personal Representative* (Form DE-147))**

*(NOTE:- This supplement is to be used if the court by local rule requires the personal representative to provide a birth date and driver's license number. Do **not** attach this supplement to Form DE-147.)*

This separate *Confidential Statement of Birth Date and Driver's License Number* contains confidential information relating to the personal representative in the case referenced above. This supplement shall be kept separate from the *Duties and Liabilities of Personal Representative* filed in this case and shall not be a public record.

INFORMATION ON THE PERSONAL REPRESENTATIVE:

1. Name:  MARK WARREN PEARY

2. Date of birth:  01 - 14 - 62

3. Driver's license number:  537150487          State:  New Mexico

<table>
<tr><td align="center"><b>TO COURT CLERK:</b><br>THIS STATEMENT IS <b>CONFIDENTIAL.</b> DO NOT FILE<br>THIS CONFIDENTIAL STATEMENT IN A PUBLIC COURT FILE.</td></tr>
</table>

Q 0085

Form Adopted for Mandatory Use
Judicial Council of California
DE-147S [New January 1, 2001]

**CONFIDENTIAL SUPPLEMENT TO DUTIES AND
LIABILITIES OF PERSONAL REPRESENTATIVE**
**(Probate)**



Probate Code, § 8404

FROM : SIEGEL    FAX NO. : 13105215094    Mar. 13 2003 10:02AM P1

**JOANNE SIEGEL**
**13929 MARQUESAS WAY #201A**
**MARINA DEL REY, CA 90292**

March 12, 2003

Paul Levitz
President and Publisher
DC Comics
1700 Broadway
New York, New York 10019

Dear Paul,

Thank you for your letter of March 3, 2003. Our new attorneys will be in touch with you at the appropriate time. At such time, please direct all further communications to them.

Best,

Joanne

Joanne Siegel

Q 0086

SD 00086

LAURA SIEGEL LARSON
6400 PACIFIC AVENUE #106
PLAYA DEL REY, CA 90293
(310) 827-8136
FAX (310) 827-7227
November 6, 2002

## FAX TRANSMITTAL

TO:       Marc Toberoff
FAX#:     (310) 246-3101
FROM:     Laura Siegel Larson and Joanne Siegel
PHONE:    (310) 827-8136

Page 1 of 3

MESSAGE:

Dear Marc,

Attached, for your records, please find the Kevin Marks memo of August 9, 2002. It makes reference to the contact you had with his office. Although your initial contact with him had been in late 2001, this August, 2002 letter was the first time he notified us of your interest in the Siegel rights.

Please note that we had been unhappy with the representation that the Ramer firm had been giving us for some time. We went to a meeting at Kevin's office in May, 2002 prepared to terminate them as our representatives. At that same meeting between my mother, Kevin Marks and myself, Marks told us that if we did not accept the February 1, 2002 DC proposed contract or a redraft that he wanted to write, that he and his firm could no longer represent us. DC's document had been totally unacceptable and while we were ready to terminate Marks and Ramer right then and there, we gave conditional approval to Kevin to make one last attempt at a redraft. When delivered to us in July, we found his draft unacceptable as well and followed through on our earlier desire to terminate Gang, Tyre, Ramer & Brown as our representatives.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0087

Privileged & Confidential
All Rights Reserved

SD 00087

## GANG, TYRE, RAMER & BROWN, INC.
## MEMORANDUM

From:  Kevin S. Marks                    Date:  August 9, 2002

To:  Joanne Siegel                       Re:  "Superman"
     Laura Siegel Larson
     Don Bulson

cc:  Bruce Ramer


On August 8, 2002, I received a call from Mark Toberoff and Ari Emanuel.  Toberoff is a lawyer; Emanuel is one of the founding partners of the Endeavor Talent Agency.

They have formed a group (with other investors, I am sure) that is interested in acquiring intellectual property rights, exploiting those rights in all media, and attaching Endeavor clients to projects that evolve from those rights.  We do not know who the other investors are or what other funding sources are available to this group.   They are aware of the Siegel termination rights.

In a previous telephone conversation (initiated by Mr. Toberoff), I told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics (subject to documentation), but that all aspects of the agreement and the negotiations were confidential.  Mr. Toberoff asked me if I would make an offer to him and his group that the Siegel Family would consider in lieu of the D.C. Comics deal.  I told him that I did not feel that it was appropriate to be making offers while I was in the process of documenting an existing deal.

On August 8, the Toberoff/Emanuel Group took the initiative and made an offer.  Their offer is $15 million up-front, plus what they promise to be a meaningful participation from proceeds from the exploitation of "Superman" in all media on an ongoing basis.  They said they have already done their "due diligence" and that such an arrangement would not be subject to further legal or other research on their part.

Having received this proposal, I am obliged to pass it on to you.

I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation.  (If called to testify, I would have to testify as much.)  The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for

245415.1

Q 0088

Privileged & Confidential
All Rights Reserved

SD 00088

**EXHIBIT G**
333

# GANG, TYRE, RAMER & BROWN, INC.

Joanne Siegel
Laura Siegel Larson
Don Bulson
August 9, 2002
Page 2

that matter) by D.C. Comics. I would also not be surprised if existing benefits (such as insurance reimbursement and widow's benefits) were cut off.

This new offer (which has significant blanks to fill in) looks like it could be better than the D.C. deal. I believe the Toberoff/Emanuel group attaches enhanced value to the property because it has brokered a confidential arrangement with the Shuster estate and is trying to put together the Siegel and Shuster termination pieces. (As we have discussed previously, the Shuster estate will have termination rights in approximately 2013 if the U.S. Supreme Court upholds the recent law extending the copyright term). I, of course, cannot assure you that this is a real deal, and undisclosed investors sometimes disappear just when you think you are close to concluding an arrangement.

My recommendation ultimately is to stay the course with D.C. Comics. I do not say that as a matter of economics; it is candidly what I think to be the right thing to do under the circumstances.

Therefore, I would send D.C. Comics the revised draft that I have prepared (as it may be modified with your input). We should continue to negotiate the documentation in good faith with D.C. Comics, and make every genuine effort to come up a written agreement that is true to the deal that was made. I believe the deal will be finalized with D.C. Comics, even if the process is not entirely smooth. If, despite all these good faith efforts, the parties cannot reach final agreement, then the negotiations would be terminated and then (and only then) would there would be a clear parting of ways which would open up your exploring other possibilities.

I will be out of the office the week of August 12th. If you would like to discuss this matter in my absence, please feel free to call Bruce Ramer.

Best regards.

K.S.M.

245415.1

Q 0089

Privileged & Confidential
All Rights Reserved

SD 00089

**EXHIBIT G**

334

RECEIVED

MAY 2 8 2003

Marc Toberoff

## TELECOPIER COVER PAGE

| | |
|---|---|
| **DATE:** | May 28, 2003 |
| **RECIPIENT:** | Marc Toberoff |
| **SENDER:** | James R. Jackoway |
| **FAX NUMBER:** | 310-246-3101 |
| **NUMBER OF PAGES:** | 6(including cover page) |

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0090

**Privileged & Confidential**
**All Rights Reserved**

SD 00090

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER
## MEMORANDUM

TO:        Jim Jackoway

FROM:      Gerry Hemmerling

DATE:      May 27, 2003

RE:        Marc Toberoff -- Superman rights

CC:        Michele Mulrooney
           Kurt Harrison

---

Michele asked me to give you the citations for the statutes we discussed last week about the Toberoff matter.

The Joint Venture Agreement regarding the Superman rights provides for Toberoff's corporation, PPC, to deal with the Superman rights and to pay all costs and disbursements with respect to the rights.  It also provides for PPC to pay all costs and legal fees of "setting up" Joe Shuster's estate.  PPC will then recoup its "out of pocket expenses", excluding contingent legal fees, from the proceeds of the Joint Venture prior to distribution.  The Agreement also provides for PPC to retain Toberoff to render all legal services regarding the rights and the Joint Venture and to handle the negotiation of contracts regarding the exploitation of the rights.  Under the Agreement, the parties are to approve the appointment of Michael Catron as administrator of the estate and to instruct him to disburse the proceeds from the rights in accordance with the Agreement.

-1-

Q 0091

Privileged & Confidential
All Rights Reserved

SD 00091

EXHIBIT G
336

In essence, under the Agreement, PPC and not Shuster's
heir, would be controlling the probate of Shuster's estate, and
Toberoff personally would be controlling the exploitation of the
rights.  Pursuant to the Agreement, we would be handling the pro-
bate estate for PPC and your role in negotiating contracts for
exploitation of the rights would not be independent of Toberoff.

The purpose of the probate laws is generally to protect the
estate and the heirs of the decedent.  They restrict the amount
of fees paid to lawyers and executors for the estate, including
fees for negotiating and enforcing contracts dealing with estate
interests, and also allow the court to examine contracts dealing
with disposition of estate interests.

In addition to ethical problems that Toberoff may have and
that we may have indirectly through Toberoff or PPC, there are
some specific probate problems under the Agreement.  Lawyers for
an estate cannot have any conflicts of interest with regard to
estate matters or estate heirs.  There is a potential conflict
of interest that the firm might have if we handled the probate
matters, with PPC advancing all probate costs and in effect con-
trolling the probate, and your being involved with the estate in
negotiating contracts that would benefit both PPC and the estate.

The court can examine the Agreement pursuant to Probate Code
Section 11604, a copy of which is attached, and can refuse dis-
tribution of the Joint Venture proceeds pursuant to the Agreement
or can order distribution in a different manner if the court
finds that the arrangement was inequitable.  It can also limit

*what is
it ?*

-2-

Q 0092

Privileged & Confidential
All Rights Reserved

SD 00092

EXHIBIT G
337

the attorneys' fees paid to lawyers for the estate in connection with the rights pursuant to Probate Code Sections 10810 and 10811, copies of which are attached. In particular, if we represented the estate, the court must determine that any contingent fee arrangements that benefited the firm must be in the best interests of the estate and the heirs.

I am asking Kurt to discuss with you and give you the appropriate sections of the Business and Professions Code and State Bar Rules regarding other ethical problems that are applicable to the matter.

002-mem
attachments

-3-

Q 0093

Privileged & Confidential
All Rights Reserved

§ 11604. Distribution to person other than beneficiary

(a) This section applies where distribution is to be made to any of the following persons:

(1) The transferee of a beneficiary.

(2) Any person other than a beneficiary under an agreement, request, or instructions of a beneficiary or the attorney in fact of a beneficiary.

(b) The court on its own motion, or on motion of the personal representative or other interested person or of the public administrator, may inquire into the circumstances surrounding the execution of, and the consideration for, the transfer, agreement, request, or instructions, and the amount of any fees, charges, or consideration paid or agreed to be paid by the beneficiary.

(c) The court may refuse to order distribution, or may order distribution on any terms that the court deems just and equitable, if the court finds either of the following:

(1) The fees, charges, or consideration paid or agreed to be paid by a beneficiary are grossly unreasonable.

(2) The transfer, agreement, request, or instructions were obtained by duress, fraud, or undue influence.

(d) Notice of the hearing on the motion shall be served on the beneficiary and on the persons described in subdivision (a) at least 15 days before the hearing in the manner provided in Section 415.10 or 415.30 of the Code of Civil Procedure.

Enacted Stats 1990 ch 79 § 14 (AB 759), operative July 1, 1991.

Privileged & Confidential
All Rights Reserved

Q 0094

SD 00094

EXHIBIT G
339

§ 10810.   Compensation of estate attorney

(a) Subject to the provisions of this part, for ordinary services the attorney for the personal representative shall receive compensation based on the value of the estate accounted for by the personal representative, as follows:

(1) Four percent on the first one hundred thousand dollars ($100,000).

(2) Three percent on the next one hundred thousand dollars ($100,000).

(3) Two percent on the next eight hundred thousand dollars ($800,000).

(4) One percent on the next nine million dollars ($9,000,000).

(5) One-half of 1 percent on the next fifteen million dollars ($15,000,000).

(6) For all amounts above twenty-five million dollars ($25,000,000), a reasonable amount to be determined by the court.

(b) For the purposes of this section, the value of the estate accounted for by the personal representative is the total amount of the appraisal of property in the inventory, plus gains over the appraisal value on sales, plus receipts, less losses from the appraisal value on sales, without reference to encumbrances or other obligations on estate property.

Added Stats 1991 ch 82 § 30(SB 896), effective June 30, 1991 opera.

Q 0095

Privileged & Confidential
All Rights Reserved

SD 00095

RECEIVED

MAY 3 0 2003

Marc Toberoff

## TELECOPIER COVER PAGE

DATE:                               May 30, 2003

RECIPIENT:                          Marc Toberoff

SENDER:                             James R. Jackoway

FAX NUMBER:                         310-246-3101

NUMBER OF PAGES:                    25(Including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305.  Thank you

Q 0096

**Privileged & Confidential**
**All Rights Reserved**

SD 00096

**EXHIBIT G**
341

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER

## MEMORANDUM

**TO:**     James R. Jackoway, Esq.

**FROM:**   Kurt L. Harrison

**DATE:**   May 29, 2003

**RE:**     Marc Toberoff -- Ethical Issues

**cc:**     Gerry Hemmerling, Esq.
            Michele M. Mulrooney, Esq.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Gerry Hemmerling informs me that this Firm has been asked to assist Mr. Marc Toberoff and his corporation, Pacific Pictures Corporation ("PPC"), by providing legal services in connection with a joint venture between PPC, on the one hand, and Jean Peavy and her son, Mark Peary, (collectively, the "Peavys") on the other. Ms. Hemmerling requested that I examine some of the ethical issues that might confront Mr. Toberoff and this Firm, if the Firm were to agree to assist Mr. Toberoff and PPC in the joint venture.

I understand that Mr. Toberoff formed PPC and that PPC entered into a Joint Venture Agreement (the "Agreement") with the Peavys to exploit certain copyrights held, assigned, or transferred by the late Joe Shuster. The Peavys are Shuster's heirs. Among other things, the Agreement requires the parties to

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC                -1-                              Q 0097

**Privileged & Confidential**
**All Rights Reserved**

SD 00097

engage Mr. Toberoff to perform legal services for the Peavys, and
entitles Mr. Toberoff, through PPC, to receive 50% of all profits
realized from the exploitation of the copyrights.  We do not know
at present how Mr. Toberoff came in contact with the Peavys.

## RULE 1-200

As you know, Rule 1-200 of the California Rules of
Professional Conduct prohibits any member of the California State
Bar from knowingly assisting in, soliciting, or inducing any
violation of the Rules of Professional Conduct or the State Bar
Act (Cal. Bus. & Prof. Code § 6000 et seq.).  In essence, this
Rule makes any potential ethical problems confronting Mr.
Toberoff this Firm's potential problems as well, if the Firm
agrees to assist Mr. Toberoff and PPC in the transaction with the
Peavys.  Hence, this Memorandum examines both potential issues
confronting Mr. Toberoff in his relationship with the Peavys and
the transaction in question and potential issues that would
confront this Firm were it to agree to assist Mr. Toberoff and
PPC.

## RULE 1-400

The first potential problem raised by Mr. Toberoff's
relationship with the Peavys arises from the prohibition against
certain forms of advertising and solicitation by attorneys.  Rule
1-400 prohibits certain types of "communications" and
"solicitations."  With respect to prohibited solicitations, an

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-2-

Q 0098

Privileged & Confidential
All Rights Reserved

SD 00098

Thus, even if Mr. Toberoff contacted the Peavys by mail, rather than in person or by telephone, the communication would presumably violate Rule 1-400, unless Mr. Toberoff had made the required disclosures on the first page and envelope of the letter. Again, without knowing exactly how and why Mr. Toberoff contacted the Peavys, it is difficult to know whether he violated Rule 1-400. However, given the circumstances here, there is reason for concern in connection with any potential involvement of this Firm.

### BUSINESS AND PROFESSIONS CODE §6150 ET SEQ.

Mr. Toberoff's use of a corporate entity to acquire business also raises concerns about "capping." The State Bar Act (the "Act") broadly defines a "capper" or "runner" as any person, firm, association, or corporation acting in any manner or in any capacity as an agent for an attorney in the solicitation or procurement of business for the attorney. Bus. Prof. Code § 6151. The Act makes it unlawful for any person, firm, corporation, partnership, or association to act as runner or capper for any attorney. Bus. & Prof. Code § 6152.

In this case, PPC appears to be soliciting or procuring business for Mr. Toberoff. Indeed, presumably at the suggestion or insistence of PPC, the Agreement requires the Peavys to engage the legal services of Mr. Toberoff, who then gets paid from the proceeds of the copyright exploitation. Of course, "capping" also requires that the corporation soliciting or procuring

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-4-

Q 0099

Privileged & Confidential
All Rights Reserved

SD 00099

business for the attorney act for consideration.  However, given the broad definition of consideration and the close relationship of Mr. Toberoff and PPC, it would probably not be difficult to find consideration.  See Civ. Code § 1605 (broadly defining consideration as any benefit conferred or prejudice suffered by the promisor as inducement for the promise).

Furthermore, if this Firm were to engage in a long-term relationship with Mr. Toberoff by participating in other similar ventures, Mr. Toberoff, PPC, or whatever other entity Mr. Toberoff employs also appears to be soliciting or procuring business for the Firm.  Hence, it might appear that the Firm itself were "joining" in the capping activity, which is also a violation of the Act.  Bus. & Prof. Code § 6152.  Such activity would also independently violate Rule 1-200, which, as mentioned above, prohibits attorneys from inducing, soliciting, or assisting in the violation of the Act.

## RULE 2-200

Aside from the questions raised above, if this Firm agreed to assist Mr. Toberoff in the joint venture with the Peavys, the Firm's involvement would also raise ethical issues regarding the financial relationship between Mr. Toberoff and the Firm.  Rule 2-200(A) prohibits attorneys from dividing fees for legal services unless (1) the client consents in writing after full disclosure and (2) the total fee charged by all lawyers is not unconscionable.  Even if all other ethical concerns were

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC                     -5-                                    Q 0100

Privileged & Confidential
All Rights Reserved

SD 00100

satisfied, this Rule would require that a full written disclosure be made both to the Peavys and to the personal representative of the Shuster Estate. Furthermore, as discussed below, it is questionable whether the second prong of requirement can be met because of the 50% fee being charged by Mr. Toberoff through PPC.

## RULE 3-300

The Agreement also raises issues concerning Rule 3-300 regarding avoiding interests adverse to a client. Rule 3-300 prohibits an attorney from entering into a business transaction or knowingly acquiring an ownership or other pecuniary interest adverse to a client unless (1) the transaction and its terms are fair and reasonable to the client; (2) the transaction and its terms are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; (3) the client is advised in writing that the client may seek the advice of an independent lawyer and is given a reasonable opportunity to seek that advice; and (4) the client consents to the transaction in writing. Furthermore, the written disclosure requires more than just presenting the client with a written agreement. Decisions interpreting this Rule require the lawyer to fully advise the client in writing of all disadvantages and legal obligations of the transaction.[1]

In this case, the Agreement itself would unlikely suffice as the required written disclosure. Furthermore, there

---

[1] For the sake of brevity, I have not cited these cases here.

G:\XLH\PPC_TOBEROFF\MEMO.REV1.DOC

–6–

Q 0101

**Privileged & Confidential**
**All Rights Reserved**

SD 00101

**EXHIBIT G**
**346**

appears to be no writing advising the Peavys of their right to
seek independent legal advice, and we do not know whether the
Peavys were given an opportunity to seek such advice. Finally,
as discussed below, there is a significant question as to whether
50% of all net profits is objectively fair and reasonable under
the circumstances.

Mr. Toberoff's use of a corporate entity, PPC, as the
party to the joint venture with the Peavys would most likely make
no difference in the application of Rule 3-300. As a policy
matter, if an attorney could circumvent Rule 3-300 by the simple
expedient of forming a corporate entity to engage in the
transaction with the client, the Rule would have no vitality.
This suggests that a court would most likely disregard the
corporate entity for the purposes of applying Rule 3-300 under
the circumstances presented here.


### RULE 3-310

Ms. Hemmerling has discussed the potential conflicts
that this Firm would have in representing the Shuster Estate,
while being paid by a party whose pecuniary interests are adverse
to the Estate and its heirs, the Peavys. The issues discussed by
Ms. Hemmerling implicate Rule 3-310, and in particular
Subdivisions (B), (C), and (F). You should note, however, that
Rule 3-310 can be satisfied by obtaining the client's written
informed consent. In this case, prudence would suggest that the

Privileged & Confidential
All Rights Reserved

SD 00102

**EXHIBIT G**
**347**

written informed consent should be obtained from both the Peavys and the personal representative of the Shuster Estate.

## RULE 4-200

Finally, Rule 4-200 prohibits an attorney from entering into agreement for, charging, or collecting an illegal or unconscionable fee. The Rule lists eleven factors that are among the factors to be considered. Without engaging in an extensive analysis of each factor here, it appears far from clear whether the 50% net profit fee charged by Mr. Toberoff through PPC[2] is conscionable. As you know, contingent fees in most cases typically run between 20% and 40% of net recovery. Looking at the factors, it is difficult to see how a fee well in excess of the usual upper limit of contingent fee agreements can be justified in this case. Ultimately, however, there is no bright line standard for determining this issue. Furthermore, this issue is difficult to evaluate without some appreciation for the discounted value of the rights in question. Nonetheless, as noted above, this issue raises concerns both in the near- and far-term as to Rule 4-200 and, as discussed above, as to Rules 2-200 and 3-300.

---

[2] As with the application of Rule 3-300, it is unlikely that Mr. Toberoff's use of PPC would shield him from the requirements of Rule 4-200.

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC          -8-                    Q 0103

Privileged & Confidential
All Rights Reserved

SD 00103

EXHIBIT G
348

For your review, I have included all of the rules and
statutes cited in this Memorandum.  If you wish me to pursue
further any of the issues discussed herein, please let me know.

ATTACHMENTS

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

Q 0104

**Privileged & Confidential**
**All Rights Reserved**

SD 00104

**EXHIBIT G**
**349**

RECEIVED

MAY 3 0 2003

Marc Toberoff

## TELECOPIER COVER PAGE

**DATE:**              May 30, 2003

**RECIPIENT:**         Marc Toberoff

**SENDER:**            James R. Jackoway

**FAX NUMBER:**        310-246-3101

**NUMBER OF PAGES:**    25(including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0105

**Privileged & Confidential**
**All Rights Reserved**

SD 00105

**EXHIBIT G**
**350**

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER

## MEMORANDUM

**TO:**     James R. Jackoway, Esq.

**FROM:**   Kurt L. Harrison

**DATE:**   May 29, 2003

**RE:**     Marc Toberoff -- Ethical Issues

**cc:**     Gerry Hemmerling, Esq.
            Michele M. Mulrooney, Esq.

**********************************************************************

     Gerry Hemmerling informs me that this Firm has been asked to assist Mr. Marc Toberoff and his corporation, Pacific Pictures Corporation ("PPC"), by providing legal services in connection with a joint venture between PPC, on the one hand, and Jean Peavy and her son, Mark Peary, (collectively, the "Peavys") on the other. Ms. Hemmerling requested that I examine some of the ethical issues that might confront Mr. Toberoff and this Firm, if the Firm were to agree to assist Mr. Toberoff and PPC in the joint venture.

     I understand that Mr. Toberoff formed PPC and that PPC entered into a Joint Venture Agreement (the "Agreement") with the Peavys to exploit certain copyrights held, assigned, or transferred by the late Joe Shuster. The Peavys are Shuster's heirs. Among other things, the Agreement requires the parties to

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-1-

Q 0106

**Privileged & Confidential**
**All Rights Reserved**

SD 00106

**EXHIBIT G**
**351**

engage Mr. Toberoff to perform legal services for the Peavys, and
entitles Mr. Toberoff, through PPC, to receive 50% of all profits
realized from the exploitation of the copyrights.  We do not know
at present how Mr. Toberoff came in contact with the Peavys.

## RULE 1-200

        As you know, Rule 1-200 of the California Rules of
Professional Conduct prohibits any member of the California State
Bar from knowingly assisting in, soliciting, or inducing any
violation of the Rules of Professional Conduct or the State Bar
Act (Cal. Bus. & Prof. Code § 6000 et seq.).  In essence, this
Rule makes any potential ethical problems confronting Mr.
Toberoff this Firm's potential problems as well, if the Firm
agrees to assist Mr. Toberoff and PPC in the transaction with the
Peavys.  Hence, this Memorandum examines both potential issues
confronting Mr. Toberoff in his relationship with the Peavys and
the transaction in question and potential issues that would
confront this Firm were it to agree to assist Mr. Toberoff and
PPC.

## RULE 1-400

        The first potential problem raised by Mr. Toberoff's
relationship with the Peavys arises from the prohibition against
certain forms of advertising and solicitation by attorneys.  Rule
1-400 prohibits certain types of "communications" and
"solicitations."  With respect to prohibited solicitations, an

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC.

-2-

Q 0107

Privileged & Confidential
All Rights Reserved

SD 00107