# EXHIBIT G
# Part 2 of 9

Thus, even if Mr. Toberoff contacted the Peavys by mail, rather than in person or by telephone, the communication would presumably violate Rule 1-400, unless Mr. Toberoff had made the required disclosures on the first page and envelope of the letter. Again, without knowing exactly how and why Mr. Toberoff contacted the Peavys, it is difficult to know whether he violated Rule 1-400. However, given the circumstances here, there is reason for concern in connection with any potential involvement of this Firm.

## BUSINESS AND PROFEESIONS CODE §6150 ET SEQ.

Mr. Toberoff's use of a corporate entity to acquire business also raises concerns about "capping." The State Bar Act (the "Act") broadly defines a "capper" or "runner" as any person, firm, association, or corporation acting in any manner or in any capacity as an agent for an attorney in the solicitation or procurement of business for the attorney. Bus. Prof. Code § 6151. The Act makes it unlawful for any person, firm, corporation, partnership, or association to act as runner or capper for any attorney. Bus. & Prof. Code § 6152.

In this case, PPC appears to be soliciting or procuring business for Mr. Toberoff. Indeed, presumably at the suggestion or insistence of PPC, the Agreement requires the Peavys to engage the legal services of Mr. Toberoff, who then gets paid from the proceeds of the copyright exploitation. Of course, "capping" also requires that the corporation soliciting or procuring

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC                    -4-                    Q 0108

**Privileged & Confidential**
**All Rights Reserved**

SD 00108

**EXHIBIT G**
**353**

business for the attorney act for consideration.  However, given the broad definition of consideration and the close relationship of Mr. Toberoff and PPC, it would probably not be difficult to find consideration.  See Civ. Code § 1605 (broadly defining consideration as any benefit conferred or prejudice suffered by the promisor as inducement for the promise).

Furthermore, if this Firm were to engage in a long-term relationship with Mr. Toberoff by participating in other similar ventures, Mr. Toberoff, PPC, or whatever other entity Mr. Toberoff employs also appears to be soliciting or procuring business for the Firm.  Hence, it might appear that the Firm itself were "joining" in the capping activity, which is also a violation of the Act.  Bus. & Prof. Code § 6152.  Such activity would also independently violate Rule 1-200, which, as mentioned above, prohibits attorneys from inducing, soliciting, or assisting in the violation of the Act.

## RULE 2-200

Aside from the questions raised above, if this Firm agreed to assist Mr. Toberoff in the joint venture with the Peavys, the Firm's involvement would also raise ethical issues regarding the financial relationship between Mr. Toberoff and the Firm.  Rule 2-200(A) prohibits attorneys from dividing fees for legal services unless (1) the client consents in writing after full disclosure and (2) the total fee charged by all lawyers is not unconscionable.  Even if all other ethical concerns were

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

Q 0109

Privileged & Confidential
All Rights Reserved

SD 00109

**EXHIBIT G**
**354**

satisfied, this Rule would require that a full written disclosure
be made both to the Peavys and to the personal representative of
the Shuster Estate.  Furthermore, as discussed below, it is
questionable whether the second prong of requirement can be met
because of the 50% fee being charged by Mr. Toberoff through PPC.

### RULE 3-300

The Agreement also raises issues concerning Rule 3-300
regarding avoiding interests adverse to a client.  Rule 3-300
prohibits an attorney from entering into a business transaction
or knowingly acquiring an ownership or other pecuniary interest
adverse to a client unless (1) the transaction and its terms are
fair and reasonable to the client; (2) the transaction and its
terms are fully disclosed and transmitted in writing to the
client in a manner which should reasonably have been understood
by the client; (3) the client is advised in writing that the
client may seek the advice of an independent lawyer and is given
a reasonable opportunity to seek that advice; and (4) the client
consents to the transaction in writing.  Furthermore, the written
disclosure requires more than just presenting the client with a
written agreement.  Decisions interpreting this Rule require the
lawyer to fully advise the client in writing of all disadvantages
and legal obligations of the transaction.[1]

In this case, the Agreement itself would unlikely
suffice as the required written disclosure.  Furthermore, there

---

[1] For the sake of brevity, I have not cited these cases here.

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-6-

Q 0110

**Privileged & Confidential**
**All Rights Reserved**

SD 00110

appears to be no writing advising the Peavys of their right to seek independent legal advice, and we do not know whether the Peavys were given an opportunity to seek such advice. Finally, as discussed below, there is a significant question as to whether 50% of all net profits is objectively fair and reasonable under the circumstances.

Mr. Toberoff's use of a corporate entity, PPC, as the party to the joint venture with the Peavys would most likely make no difference in the application of Rule 3-300. As a policy matter, if an attorney could circumvent Rule 3-300 by the simple expedient of forming a corporate entity to engage in the transaction with the client, the Rule would have no vitality. This suggests that a court would most likely disregard the corporate entity for the purposes of applying Rule 3-300 under the circumstances presented here.

RULE 3-310

Ms. Hemmerling has discussed the potential conflicts that this Firm would have in representing the Shuster Estate, while being paid by a party whose pecuniary interests are adverse to the Estate and its heirs, the Peavys. The issues discussed by Ms. Hemmerling implicate Rule 3-310, and in particular Subdivisions (B), (C), and (F). You should note, however, that Rule 3-310 can be satisfied by obtaining the client's written informed consent. In this case, prudence would suggest that the

S:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-7-

Q 0111

Privileged & Confidential
All Rights Reserved

EXHIBIT G
356

SD 00111

written informed consent should be obtained from both the Peavys and the personal representative of the Shuster Estate.

## RULE 4-200

Finally, Rule 4-200 prohibits an attorney from entering into agreement for, charging, or collecting an illegal or unconscionable fee.  The Rule lists eleven factors that are among the factors to be considered.  Without engaging in an extensive analysis of each factor here, it appears far from clear whether the 50% net profit fee charged by Mr. Toberoff through PPC[2] is conscionable.  As you know, contingent fees in most cases typically run between 20% and 40% of net recovery.  Looking at the factors, it is difficult to see how a fee well in excess of the usual upper limit of contingent fee agreements can be justified in this case.  Ultimately, however, there is no bright line standard for determining this issue.  Furthermore, this issue is difficult to evaluate without some appreciation for the discounted value of the rights in question.  Nonetheless, as noted above, this issue raises concerns both in the near- and far-term as to Rule 4-200 and, as discussed above, as to Rules 2-200 and 3-300.

---

[2] As with the application of Rule 3-300, it is unlikely that Mr. Toberoff's use of PPC would shield him from the requirements of Rule 4-200.

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-8-

Q 0112

**Privileged & Confidential**
**All Rights Reserved**

SD 00112

**EXHIBIT G**
**357**

For your review, I have included all of the rules and statutes cited in this Memorandum.  If you wish me to pursue further any of the issues discussed herein, please let me know.


ATTACHMENTS

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

Q 0113

**Privileged & Confidential**
**All Rights Reserved**

SD 00113

**EXHIBIT G**
**358**

The State Bar of California - ...les of Professional Conduct

Page 1 of 3



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 1-400. Advertising and Solicitation**

(A) For purposes of this rule, "communication" means any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client, including but not limited to the following:

(1) Any use of firm name, trade name, fictitious name, or other professional designation of such member or law firm; or

2) Any stationery, letterhead, business card, sign, brochure, or other comparable written material describing such member, law firm, or lawyers; or

(3) Any advertisement (regardless of medium) of such member or law firm directed to the general public or any substantial portion thereof; or

(4) Any unsolicited correspondence from a member or law firm directed to any person or entity.

(B) For purposes of this rule, a "solicitation" means any communication:

(1) Concerning the availability for professional employment of a member or a law firm in which a significant motive is pecuniary gain; and

(2) Which is;

(a) delivered in person or by telephone, or

(b) directed by any means to a person known to the sender to be represented by counsel in a matter which is a subject of the communication.



(C) A solicitation shall not be made by or on behalf of a member or law firm to a prospective client with whom the member or law firm has no family or prior professional relationship, unless the solicitation is protected from abridgment by the Constitution of the United States or by the Constitution of the State of California. A solicitation to a former or present client in the discharge of a member's or law firm's professional duties is not prohibited.

(D) A communication or a solicitation (as defined herein) shall not:

(1) Contain any untrue statement; or

(2) Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public; or

(3) Omit to state any fact necessary to make the statements made, in the light of circumstances under which they are made, not misleading to the public; or

(4) Fail to indicate clearly, expressly, or by context, that it is a communication or solicitation, as the case may be; or

(5) Be transmitted in any manner which involves intrusion, coercion, duress, compulsion, intimidation, threats, or vexatious or harassing conduct.

Q 0114

**Privileged & Confidential**
**All Rights Reserved**

SD 00114

**EXHIBIT G**

**359**

The State Bar of California — Rules of Professional Conduct

Page 2 of 3



(6) State that a member is a "certified specialist" unless the member holds a current certificate as a specialist issued by the Board of Legal Specialization, or any other entity accredited by the State Bar to designate specialists pursuant to standards adopted by the Board of Governors, and states the complete name of the entity which granted certification.

(E) The Board of Governors of the State Bar shall formulate and adopt standards as to communications which will be presumed to violate this rule 1-400. The standards shall only be used as presumptions affecting the burden of proof in disciplinary proceedings involving alleged violations of these rules. "presumption affecting the burden of proof" means that presumption defined in Evidence Code sections 605 and 606. Such standards formulated and adopted by the Board, as from time to time amended, shall be effective and binding on all members.

(F) A member shall retain for two years a true and correct copy or recording of any communication made by written or electronic media. Upon written request, the member shall make any such copy or recording available to the State Bar, and, if requested, shall provide to the State Bar evidence to support any factual or objective claim contained in the communication.

(Former rule 1-400 (D)(6) repealed by order of the Supreme Court effective November 30, 1992. New rule 1-400 (D)(6) added by order of the Supreme Court effective June 1, 1997.)

*Standards:*

Pursuant to rule 1-400(E) the Board of Governors of the State Bar has adopted the following standards, effective May 27, 1989, unless noted otherwise, as forms of "communication" defined in rule 1-400(A) which are presumed to be in violation of rule 1-400:

(1) A "communication" which contains guarantees, warranties, or predictions regarding the result of the representation.

(2) A "communication" which contains testimonials about or endorsements of a member unless such communication also contains an express disclaimer such as "this testimonial or endorsement does not constitute a guarantee, warranty, or prediction regarding the outcome of your legal matter."

(3) A "communication" which is delivered to a potential client whom the member knows or should reasonably know is in such a physical, emotional, or mental state that he or she would not be expected to exercise reasonable judgment as to the retention of counsel.

(4) A "communication" which is transmitted at the scene of an accident or at or en route to a hospital, emergency care center, or other health care facility.

(5) A "communication," except professional announcements, seeking professional employment for pecuniary gain, which is transmitted by mail or equivalent means which does not bear the word "Advertisement," "Newsletter" or words of similar import in 12 point print on the first page. If such communication, including firm brochures, newsletters, recent legal development advisories, and similar materials, is transmitted in an envelope, the envelope shall bear the word "Advertisement," "Newsletter" or words of similar import on the outside thereof.

(6) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies a relationship between any member in private practice and a government agency or instrumentality or a public or non-profit legal services organization.

(7) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies that a member has a relationship to any other lawyer or a law firm as a partner or associate, or officer or shareholder pursuant to Business and professions Code sections 6160-6172 unless such relationship in fact exists.

(8) A "communication" which states or implies that a member or law firm is "of counsel" to another lawyer or a law firm unless the former has a relationship with the latter (other than as a partner or associate, or officer or shareholder pursuant to Business and professions Code sections 6160-6172) which is close, personal, continuous, and regular.

(9) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation used by a member or law firm in private practice which differs materially from any other such designation used by such member or law firm

Q 0115

**Privileged & Confidential**
**All Rights Reserved**

https://www.calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkllekfbemgcfk...  5/27/2003

SD 00115

The State Bar of California - Rules of Professional Conduct



at the same time in the same community.

(10) A "communication" which implies that the member or law firm is participating in a lawyer referral service which has been certified by the State Bar of California or as having satisfied the Minimum Standards for Lawyer Referral Services in California, when that is not the case.

(11) A "communication" which states or implies that a member is a "certified specialist" unless such communication also states the complete name of the entity which granted the certification as a specialist. (Repealed by order of the Supreme Court, effective June 1, 1997. See rule 1-400(D)(6).)

(12) A "communication," except professional announcements, in the form of an advertisement primarily directed to seeking professional employment primarily for pecuniary gain transmitted to the general public or any substantial portion thereof by mail or equivalent means or by means of television, radio, newspaper, magazine or other form of commercial mass media which does not state the name of the member responsible for the communication. When the communication is made on behalf of a law firm, the communication shall state the name of at least one member responsible for it.

(13) A "communication" which contains a dramatization unless such communication contains a disclaimer which states "this is a dramatization" or words of similar import.

(14) A "communication" which states or implies "no fee without recovery" unless such communication also expressly discloses whether or not the client will be liable for costs.

(15) A "communication" which states or implies that a member is able to provide legal services in a language other than English unless the member can actually provide legal services in such language or the communication also states in the language of the communication (a) the employment title of the person who speaks such language and (b) that the person is not a member of the State Bar of California, if that is the case.

(16) An unsolicited "communication" transmitted to the general public or any substantial portion thereof primarily directed to seeking professional employment primarily for pecuniary gain which sets forth a specific fee or range of fees for a particular service where, in fact, the member charges a greater fee than advertised in such communication within a period of 90 days following dissemination of such communication, unless such communication expressly specifies a shorter period of time regarding the advertised fee. Where the communication is published in the classified or "yellow pages" section of telephone, business or legal directories or in other media not published more frequently than once a year, the member shall conform to the advertised fee for a period of one year from initial publication, unless such communication expressly specifies a shorter period of time regarding the advertised fee.

(Amended by order of Supreme Court, operative September 14, 1992. Standard (5) amended by the Board of Governors, effective May 11, 1994. Standards (12) - (16) added by the Board of Governors, effective May 11, 1994.)

© 2003 State Bar of California

Q 0116

Privileged & Confidential
All Rights Reserved

http://www.calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...    5/27/2003

SD 00116

EXHIBIT G
361

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 2-200. Financial Arrangements Among Lawyers**

(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:

> (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and

> (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.

(B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forthcoming or that referrals would be made or encouraged in the future.

© 2003 State Bar of California

Q 0117

Privileged & Confidential
All Rights Reserved



The State Bar of California - Rules of Professional Conduct                    Page 1 of 1

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct



# CURRENT RULES

### Rule 3-300. Avoiding Interests Adverse to a Client

A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

*Discussion:*

Rule 3-300 is not intended to apply to the agreement by which the member is retained by the client, unless the agreement confers on the member an ownership, possessory, security, or other pecuniary interest adverse to the client. Such an agreement is governed, in part, by rule 4-200.

Rule 3-300 is not intended to apply where the member and client each make an investment on terms offered to the general public or a significant portion thereof. For example, rule 3-300 is not intended to apply where A, a member, invests in a limited partnership syndicated by a third party. B, A's client, makes the same investment. Although A and B are each investing in the same business, A did not enter into the transaction "with" B for the purposes of the rule.

Rule 3-300 is intended to apply where the member wishes to obtain an interest in client's property in order to secure the amount of the member's past due or future fees. (Amended by order of Supreme Court, operative September 14, 1992.)

© 2003 State Bar of California



**Privileged & Confidential**
**All Rights Reserved**

http://www.calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk... 5/27/2003

SD 00118

**EXHIBIT G**
**363**

The State Bar of California    ...ules of Professional Conduct     Page 1 of 3

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 3-310. Avoiding the Representation of Adverse Interests**

(A) For purposes of this rule:

(1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

(2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

(3) "Written" means any writing as defined in Evidence Code section 250.

(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

(F) A member shall not accept compensation for representing a client from one other than the client unless:

(1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

Q 0119

**Privileged & Confidential**
**All Rights Reserved**



SD 00119

**EXHIBIT G**
**364**

(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

    (a) such nondisclosure is otherwise authorized by law; or

    (b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

*Discussion:*

Rule 3-310 is not intended to prohibit a member from representing parties having antagonistic positions on the same legal question that has arisen in different cases, unless representation of either client would be adversely affected.

Other rules and laws may preclude making adequate disclosure under this rule. If such disclosure is precluded, informed written consent is likewise precluded. (See, e.g., Business and Professions Code section 6068, subdivsion (e).)

Paragraph (B) is not intended to apply to the relationship of a member to another party's lawyer. Such relationships are governed by rule 3-320.

Paragraph (B) is not intended to require either the disclosure of the new engagement to a former client or the consent of the former client to the new engagement. However, both disclosure and consent are required if paragraph (E) applies.

While paragraph (B) deals with the issues of adequate disclosure to the present client or clients of the member's present or past relationships to other parties or witnesses or present interest in the subject matter of the representation, paragraph (E) is intended to protect the confidences of another present or former client. These two paragraphs are to apply as complementary provisions.

Paragraph (B) is intended to apply only to a member's own relationships or interests, unless the member knows that a partner or associate in the same firm as the member has or had a relationship with another party or witness or has or had an interest in the subject matter of the representation.

Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners or a corporation for several shareholders, the preparation of an ante-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution. In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., Evid. Code, §962) and must obtain the informed written consent of the clients pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2).

Subparagraph (C)(3) is intended to apply to representations of clients in both litigation and transactional matters.

In *State Farm Mutual Automobile Insurance Company v. Federal Insurance Company* (1999) 72 Cal.App. 4th 1422 [86 Cal.Rptr.2d the court held that subparagraph (C)(3) was violated when a member, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent. Notwithstanding State Farm, subparagraph (C)(3) is not intended to apply with respect to the relationship between an insurer and a member when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the action.

There are some matters in which the conflicts are such that written consent may not suffice for non-disciplinary purposes. (See *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr. 185]; *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *Ishmael v. Millington* (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 592].)

Paragraph (D) is not intended to apply to class action settlements subject to court approval.

Q 0120

Privileged & Confidential
All Rights Reserved

http://www.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk... 5/27/2003

The State Bar of California    Rules of Professional Conduct

Paragraph (F) is not intended to abrogate existing relationships between insurers and insureds whereby the insurer has the contractual right to unilaterally select counsel for the insured, where there is no conflict of interest. (See *San Diego Navy Federal Credit Union v. Cumis Insurance Society* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].) (Amended by order of Supreme Court; operative September 14, 1992; operative March 3, 2003.)



© 2003 State Bar of California

Q 0121

**Privileged & Confidential**
**All Rights Reserved**

...a.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...    5/27/2003

The State Bar of California Rules of Professional Conduct

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

# CURRENT RULES

**Rule 4-200. Fees for Legal Services**

(A) A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.

(B) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:

   (1) The amount of the fee in proportion to the value of the services performed.

   (2) The relative sophistication of the member and the client.

   (3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

   (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.

   (5) The amount involved and the results obtained.

   (6) The time limitations imposed by the client or by the circumstances.

   (7) The nature and length of the professional relationship with the client.

   (8) The experience, reputation, and ability of the member or members performing the services.

   (9) Whether the fee is fixed or contingent.

   (10) The time and labor required.

   (11) The informed consent of the client to the fee.

© 2003 State Bar of California

Q 0122

Privileged & Confidential
All Rights Reserved

http://...calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk... 5/27/2003

SD 00122



# BUSINESS AND PROFESSIONS CODE
# SECTION 6150-6156

6150.   This article is a part of Chapter 4 of this division of the
Business and Professions Code, but the phrase "this chapter" as used
in Chapter 4 does not apply to the provisions of this article unless
expressly made applicable.

6151.   As used in this article:
   (a) A runner or capper is any person, firm, association or
corporation acting for consideration in any manner or in any capacity
as an agent for an attorney at law or law firm, whether the attorney
or any member of the law firm is admitted in California or any other
jurisdiction, in the solicitation or procurement of business for the
attorney at law or law firm as provided in this article.
   (b) An agent is one who represents another in dealings with one or
more third persons.

6152.   (a) It is unlawful for:
   (1) Any person, in an individual capacity or in a capacity as a
public or private employee, or for any firm, corporation, partnership
or association to act as a runner or capper for any attorneys or to
solicit any business for any attorneys in and about the state
prisons, county jails, city jails, city prisons, or other places of
detention of persons, city receiving hospitals, city and county
receiving hospitals, county hospitals, superior courts, or in any
public institution or in any public place or upon any public street
or highway or in and about private hospitals, sanitariums or in and
about any private institution or upon private property of any
character whatsoever.
   (2) Any person to solicit another person to commit or join in the
commission of a violation of subdivision (a).
   (b) A general release from a liability claim obtained from any
person during the period of the first physical confinement, whether
as an inpatient or outpatient, in a clinic or health facility, as
defined in Sections 1203 and 1250 of the Health and Safety Code, as a
result of the injury alleged to have given rise to the claim and
primarily for treatment of the injury, is presumed fraudulent if the
release is executed within 15 days after the commencement of
confinement or prior to release from confinement, whichever occurs
first.
   (c) Nothing in this section shall be construed to prevent the
recommendation of professional employment where that recommendation
is not prohibited by the Rules of Professional Conduct of the State
Bar of California.
   (d) Nothing in this section shall be construed to mean that a
public defender or assigned counsel may not make known his or her
services as a criminal defense attorney to persons unable to afford
legal counsel whether those persons are in custody or otherwise.

Q 0123

Privileged & Confidential
All Rights Reserved
http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156   5/27/2003

SD 00123

6153.  Any person, firm, partnership, association, or corporation
violating subdivision (a) of Section 6152 is punishable, upon a first
conviction, by imprisonment in a county jail for not more than one
year or by a fine not exceeding fifteen thousand dollars ($15,000),
or by both that imprisonment and fine.  Upon a second or subsequent
conviction, a person, firm, partnership, association, or corporation
is punishable by imprisonment in a county jail for not more than one
year, or by imprisonment in the state prison for two, three, or four
years, or by a fine not exceeding fifteen thousand dollars ($15,000),
or by both that imprisonment and fine.
    Any person employed either as an officer, director, trustee,
clerk, servant or agent of this state or of any county or other
municipal corporation or subdivision thereof, who is found guilty of
violating any of the provisions of this article, shall forfeit the
right to his office and employment in addition to any other penalty
provided in this article.


6154.  (a) Any contract for professional services secured by any
attorney at law or law firm in this state through the services of a
runner or capper is void.  In any action against any attorney or law
firm under the Unfair Practices Act, Chapter 4 (commencing with
Section 17000) of Division 7, or Chapter 5 (commencing with Section
17200) of Division 7, any judgment shall include an order divesting
the attorney or law firm of any fees and other compensation received
pursuant to any such void contract.  Those fees and compensation
shall be recoverable as additional civil penalties under Chapter 4
(commencing with Section 17000) or Chapter 5 (commencing with Section
17200) of Division 7.
    (b) Notwithstanding Section 17206 or any other provision of law,
any fees recovered pursuant to subdivision (a) in an action involving
professional services related to the provision of workers'
compensation shall be allocated as follows:  if the action is brought
by the Attorney General, one-half of the penalty collected shall be
paid to the State General Fund, and one-half of the penalty collected
shall be paid to the Workers' Compensation Fraud Account in the
Insurance Fund; if the action is brought by a district attorney,
one-half of the penalty collected shall be paid to the treasurer of
the county in which the judgment was entered, and one-half of the
penalty collected shall be paid to the Workers' Compensation Fraud
Account in the Insurance Fund; if the action is brought by a city
attorney or city prosecutor, one-half of the penalty collected shall
be paid to the treasurer of the city in which the judgment was
entered, and one-half of the penalty collected shall be paid to the
Workers' Compensation Fraud Account in the Insurance Fund.  Moneys
deposited into the Workers' Compensation Fraud Account pursuant to
this subdivision shall be used in the investigation and prosecution
of workers' compensation fraud, as appropriated by the Legislature.


6155.  (a) An individual, partnership, corporation, association, or
any other entity shall not operate for the direct or indirect
purpose, in whole or in part, of referring potential clients to
attorneys, and no attorney shall accept a referral of such potential
clients, unless all of the following requirements are met:
    (1) The service is registered with the State Bar of  California
and (a) on July 1, 1988, is operated in conformity with minimum
standards for a lawyer referral service established by the State Bar,



Privileged & Confidential
All Rights Reserved

SD 00124

EXHIBIT G
369

or (b) upon approval by the Supreme Court of minimum standards for a
lawyer referral service, is operated in conformity with those
standards.

(2) The combined charges to the potential client by the referral
service and the attorney to whom the potential client is referred do
not exceed the total cost that the client would normally pay if no
referral service were involved.

(b) A referral service shall not be owned or operated, in whole or
in part, directly or indirectly, by those lawyers to whom,
individually or collectively, more than 20 percent of referrals are
made.  For purposes of this subdivision, a referral service that is
owned or operated by a bar association, as defined in the minimum
standards, shall be deemed to be owned or operated by its governing
committee so long as the governing committee is constituted and
functions in the manner prescribed by the minimum standards.

(c) None of the following is a lawyer referral service:

(1) A plan of legal insurance as defined in Section 119.6 of the
Insurance Code.

(2) A group or prepaid legal plan, whether operated by a union,
trust, mutual benefit or aid association, public or private
corporation, or other entity or person, which meets both of the
following conditions:

(A) It recommends, furnishes, or pays for legal services to its
members or beneficiaries.

(B) It provides telephone advice or personal consultation.

(3) A program having as its purpose the referral of clients to
attorneys for representation on a pro bono basis.

(d) The following are in the public interest and do not constitute
an unlawful restraint of trade or commerce:

(1) An agreement between a referral service and a participating
attorney to eliminate or restrict the attorney's fee for an initial
office consultation for each potential client or to provide free or
reduced fee services.

(2) Requirements by a referral service that attorneys meet
reasonable participation requirements, including experience,
education, and training requirements.

(3) Provisions of the minimum standards as approved by the Supreme
Court.

(4) Requirements that the application and renewal fees for
certification as a lawyer referral service be determined, in whole or
in part, by a consideration of any combination of the following
factors:  a referral service's gross annual revenues, number of
panels, number of panel members, amount of fees charged to panel
members, or for-profit or nonprofit status; provided that the
application and renewal fees do not exceed ten thousand dollars
($10,000) or 1 percent of the gross annual revenues, whichever is
less.

(5) Requirements that, to increase access to the justice system
for all Californians, lawyer referral services establish separate
ongoing activities or arrangements that serve persons of limited
means.

(e) A violation or threatened violation of this section may be
enjoined by any person.

(f) With the approval of the Supreme Court, the State Bar shall
formulate and enforce rules and regulations for carrying out this
section, including rules and regulations which do the following:

(1) Establish minimum standards for lawyer referral services.  The
minimum standards shall include provisions ensuring that panel
membership shall be open to all attorneys practicing in the
geographical area served who are qualified by virtue of suitable

Q 0125

Privileged & Confidential
All Rights Reserved http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156  5/27/2003

SD 00125

experience, and limiting attorney registration and membership fees to
reasonable sums which do not discourage widespread attorney
membership.

(2) Require that an entity seeking to qualify as a lawyer referral
service register with the State Bar and obtain from the State Bar a
certificate of compliance with the minimum standards for lawyer
referral services.

(3) Require that the certificate may be obtained, maintained,
suspended, or revoked pursuant to procedures set forth in the rules
and regulations.

(4) Require the lawyer referral service to pay an application and
renewal fee for the certificate in such reasonable amounts as may be
determined by the State Bar.  The State Bar shall adopt rules
authorizing the waiver or reduction of the fees upon a demonstration
of financial necessity.  The State Bar may require that the
application and renewal fees for certification as a lawyer referral
service be determined, in whole or in part, by a consideration of any
combination of the following factors:  a referral service's gross
annual revenues, number of panels, number of panel members, amount of
fees charged to panel members, or for-profit or nonprofit status;
provided that the application and renewal fees do not exceed ten
thousand dollars ($10,000) or 1 percent of the gross annual revenues,
whichever is less.

(5) Require that, to increase access to the justice system for all
Californians, lawyer referral services establish separate ongoing
activities or arrangements that serve persons of limited means.

(6) Require each lawyer who is a member of a certified lawyer
referral service to comply with all applicable professional
standards, rules, and regulations, and to possess a policy of errors
and omissions insurance in an amount not less than one hundred
thousand dollars ($100,000) for each occurrence and three hundred
thousand dollars ($300,000) aggregate, per year.  By rule, the State
Bar may provide for alternative proof of financial responsibility to
meet this requirement.

(g) Provide that cause for denial of certification or
recertification or revocation or certification of a lawyer referral
service shall include, but not be limited to:

(1) Noncompliance with the statutes or minimum standards governing
lawyer referral services as adopted and from time to time amended.

(2) Sharing common or cross ownership, interests, or operations
with any entity which engages in referrals to licensed or unlicensed
health care providers.

(3) Direct or indirect consideration regarding referrals between
an owner, operator, or member of a lawyer referral service and any
licensed or unlicensed health care provider.

(4) Advertising on behalf of attorneys in violation of the Rules
of Professional Conduct or the Business and Professions Code.

(h) This section shall not be construed to prohibit attorneys from
jointly advertising their services.

(1) Permissible joint advertising, among other things, identifies
by name the advertising attorneys or law firms whom the consumer of
legal services may select and initiate contact with.

(2) Certifiable referral activity involves, among other things,
some person or entity other than the consumer and advertising
attorney or law firms which, in person, electronically, or otherwise,
refers the consumer to an attorney or law firm not identified in the
advertising.

(i) A lawyer referral service certified under this section and
operating in full compliance with this section, and in full
compliance with the minimum standards and the rules and regulations

Q 0126

Privileged & Confidential
All Rights Reserved
http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156  5/27/2003

of the State Bar governing lawyer referral services, shall not be
deemed to be in violation of Section 3215 of the Labor Code or
Section 750 of the Insurance Code.

   (j) The payment by an attorney or law firm member of a certified
referral service of the normal fees of that service shall not be
deemed to be in violation of Section 3215 of the Labor Code or
Section 750 of the Insurance Code, provided that the attorney or law
firm member is in full compliance with the minimum standards and the
rules and regulations of the State Bar governing lawyer referral
services.

   (k) Certifications of lawyer referral services issued by the State
Bar shall not be transferable.


6156.   (a) Any individual, partnership, association, corporation, or
other entity, including, but not limited to, any person or entity
having an ownership interest in a lawyer referral service, which
engages, has engaged, or proposes to engage in violations of Section
6155, shall be liable for a civil penalty as defined in Sections
17206, 17206.1, and 17536, respectively, which shall be assessed and
recovered in a civil action brought:
   (1) In the manner specified in subdivision (a) of Section 17206 or
Section 17536.
   (2) By the State Bar of California.
   (b) If the action is brought pursuant to subdivision (a), the
court shall determine the reasonable expenses, if any, incurred by
the State Bar in its investigation and prosecution of the action.  In
these cases, before any penalty collected is paid out pursuant to
subdivision (b) of Section 17206 or 17536, the amount of the
reasonable expenses incurred by the State Bar shall be paid to the
State Bar and shall be deposited and used as provided in subdivision
(c).
   (c) If the action is brought pursuant to paragraph (2) of
subdivision (a), the civil penalty shall be paid to the State Bar and
shall be deposited into a special fund to be used first for the
investigation and prosection of other such cases by the State Bar,
with any excess to be used for the investigation and prosecution of
attorney discipline cases.

Q 0127

Privileged & Confidential
All Rights Reserved

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156  5/27/2003

SD 00127

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVE. #106**
**PLAYA DEL REY, CA  90293**

**June 1, 2004**

## CONFIDENTIAL
## FAX TRANSMITTAL

TO:         **Marc Toberoff**
FAX#:       **(310) 246-3101**

FROM:       **Laura Siegel Larson**
FAX#:       **(310) 827-7227**

RE:         **Research from Arthur Levine**

**Page 1 of 4**

MESSAGE:

Dear Marc,

Attached is the fax I received today from Arthur Levine.  I am sending you an email regarding it.

Sincerely,

*Laura*

**Laura Siegel Larson**

Q 0128

**Privileged & Confidential**
**All Rights Reserved**

SD 00128

JUN-01-2004 02:22 PM

JUN 01 2004 12:54 FR FIN GHN HENDER

1 310 827 7227    P.02

---

LAW OFFICES

**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.**

1300 I Street, NW
Washington, DC 20005

Telephone
(202) 408-4000

Facsimile
(202) 408-4400

---

**FACSIMILE TRANSMITTAL**

<u>**TO**</u>

Name:    Laura Siegel Larson

Firm:

Fax No.:    310-827-7227

Phone No.:

Date:    June 1, 2004

Subject:

<u>**FROM**</u>

Name:    Arthur J. Levine

Phone No.:    (202) 408-4032

Fax # Verified by:    R. McGolrick

# Pages (incl. this):    8

Our File No.:    06589.0001

---

**Confirmation Copy to Follow: No**

---

Message:

Dear Laura:

    Attached is the research which my associate conducted. Marc Toberoff called me on Thursday and explained his reasoning. Our research suggests that his reasoning is correct, and that it would be exceedingly risky to not file by the September date. Marc and I both agree that the burden is on the other side to disprove the validity of the Notices, and that it is highly unlikely that they can meet that burden.

Sincerely,

Art

---

If there is a problem with this transmission, notify fax room at (202) 408-4174 or the sender at the number above.

This facsimile is intended only for the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If you have received this facsimile in error, please notify the sender immediately by telephone (collect), and return the original message by first-class mail to the above address.

**Privileged & Confidential**
**All Rights Reserved**

Q 0129

SD 00129

From:        Naresh KILARU
To:          Levine, Arthur
Date:        Thu, May 27, 2004 11:07 AM
Subject:     Siegel issues

Art,

Here is a brief summary of the research issues relating to the Siegel matter:

**1. When does the Statute of Limitations begin to run against a co-owner seeking an accounting?**

Section 507(b) of the Copyright Act provides that "no civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The key problem is of course determining the point at which the claim accrued. There are only a handful of cases discussing this issue in the context of a co-owner seeking an accounting. The leading Ninth Circuit case is summarized below.

In Zuill v. Shanahan, 80 F.3d 1366 (9th Cir. 1996), the defendant Shanahan created what became "Hooked on Phonics". To improve the music in the program, the defendant brought in Zuill and Rossi (the plaintiffs). The plaintiffs later sued the defendant for a declaratory judgment that they each owned one-third interests in "Hooked on Phonics." The issue before the court was whether the plaintiffs' suit was time-barred under Section 507(b).

The plaintiffs had filed suit in 1991. The court noted that the defendant had expressly repudiated any claims of co-ownership by Zuill and Rossi in 1987. In interpreting the statutory language of when the claim accrued under Section 507(b), the court held, "We conclude that claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." 80 F.3d at 1369. The court's rationale for such an interpretation was largely based on equitable principles: "It is inequitable to allow the putative co-owner to lie in the weeds for years after his claim has been repudiated, while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize after it has been brought in by another's effort." 80 F.3d at 1371. Because the plaintiffs had brought suit more than three years after their claims of co-ownership had been expressly repudiated by the defendant, the court held that the plaintiffs' suit was time-barred under Section 507(b).

My guess is that it is the Zuill case to which Marc Toberoff is referring when he puts 4/16/1999 as the date on which the statute of limitations began to run, as this is the date Time Warner rejected the validity of Siegel's Notices of Termination. While I could not find any case law interpreting Section 507(b) specifically in the context of a party asserting co-ownership through a Notice of Termination (as opposed to asserting co-ownership through joint creation), it seems that the holding in Zuill would be equally applicable to our situation.

**2. Which party has the burden of proving the validity (or invalidity) of a termination notice?**

I found no cases discussing which party has the ultimate burden of proving the validity (of invalidity) of a termination notice. But based on Zuill, it seems clear the party claiming co-ownership (either through joint creation or via a termination notice) has the burden of at least bringing a lawsuit within the statute of limitations period. Thus, Marc Toberoff's conclusion that the statute of limitations runs against Siegel (and not against Time Warner) is likely correct.

Finally, I did find one case clearly holding that "when a termination is effected, all rights covered by the terminated grant revert, on the effective date of termination, to the author or his statutory successor." Bourne v. MPL Communications, Inc., 675 F. Supp. 859, 861 (S.D.N.Y. 1987). Thus, assuming that the Notices of Termination were proper, it seems that 50% of the rights to Superman did in fact revert to Siegel upon the effective date of the terminations in April 1999. Because Time Warner rejected the

Q 0130

**Privileged & Confidential**
**All Rights Reserved**

SD 00130

JUN-01-2004 02:25 PM FR FINNEGAN HENDERSON

JUN 01 2004 12:55 FR FINNEGAN HENDERSON 4400 TO 13136271

validity of the Notices of Termination (and hence repudiated Siegel's status as co-owner) on April 15, 1999, it seems that the Statute of Limitations began to run against Siegel on April 15, 1999 for her to bring a declaratory judgment action establishing her as co-owner and entitling her to an accounting.

CC:        McGolrick, Robin

Q 0131

\*\* TOTAL PAGE.06 \*\*

Privileged & Confidential
All Rights Reserved

**EXHIBIT G**
**376**

SD 00131

JUL-11-2003 12:02 PM                            1 310 827 7227              P.01

**LAURA SIEGEL LARSON**
6400 PACIFIC AVE. #106
PLAYA DEL REY, CA 90293
(310) 827-8136

July 11, 2003

# FAX TRANSMITTAL

**TO:**        Marc Toberoff
**FAX#:**      (310) 246-3101

**FROM:**      Laura Siegel Larson
**PHONE:**     (310) 827-8136

**RE:**        Letter Sent to Michael Siegel

                                Page 1 of 6

**MESSAGE:**

Dear Marc,

Enclosed is the final letter sent to Michael Siegel today.

Sincerely,

*Laura*

Q 0132

Privileged & Confidential
All Rights Reserved

SD 00132

**EXHIBIT G**
377

JUL 11 2003 12:03 PM                                    1 310 827 7227      P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to <u>warrant we had no rights</u> which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law
    changes to give creators and their families additional rights or if an extension of time
    is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble
    collecting any future money from them.
- It was a bad and unreasonable deal.

Page 1

Q 0133

**Privileged & Confidential**
**All Rights Reserved**

SD 00133

**EXHIBIT G**
378

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Privileged & Confidential
All Rights Reserved

SD 00134

JUL 11-2003 12:04 PM                                    1 310 827 7227              P.04

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is
  enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we
  sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be
  included in the settling of the account before the money being held in trust is
  forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
  copyright filing while he was negotiating with Time Warner. He said she shouldn't
  waste thousands of dollars of her money for the filing fees because Time Warner/DC
  was going to include payment for The Spectre in a deal. She told him several times
  that she wanted to send in the fees but he kept telling her it wasn't a good time and
  it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late
  to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is,
  unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off
  negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take
  a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a
  Superman movie with a top director. TW was trying to sign the director and actors
  to a three picture deal. Now even a single film appears to be on hold indefinitely.
  The director left the project and stars are repeatedly turning down offers to play the
  role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating
  leverage with Time Warner is less than when they offered us that bad deal. Right
  now, there's nothing really happening so there is no motivation for them to wrap up
  a deal with us.

Why there is a buyout offer from an investor for your interest only:
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to
  stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0135

Privileged & Confidential
All Rights Reserved

EXHIBIT G
380

SD 00135

JUL 11 2003 12:04 PM                    1 310 827 7227    P.05

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

<u>Your belief that you have something to sell independently:</u>
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

<u>Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):</u>
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an attempt by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Q 0136

Page 4

Privileged & Confidential
All Rights Reserved

SD 00136

**EXHIBIT G**
**381**

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Privileged & Confidential
All Rights Reserved

SD 00137

EXHIBIT G
382



96-2003 11:06 PM                                    1  10 827 7227          P.01

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVE. #106**
**PLAYA DEL REY, CA 90293**
**(310) 827-8136**

**July 5, 2003**

# FAX TRANSMITTAL

**TO:**     Marc Toberoff

**FAX#:**   (310) 246-3101

**FROM:**   Laura Siegel Larson

**PHONE:**  (310) 827-8136

**RE:**     Michael Siegel Letter and Meeting with You

### Page 1 of 8

**MESSAGE:**

Dear Marc,

Attached is the most recent letter I received from Michael Siegel and the draft of the response I am planning to send to him.

My mother tells me the two of you spoke by phone the other day and we need to schedule a meeting. Are you available this Tuesday, July 8th anytime between 11am and 1pm? Please let us know how long a meeting you feel we need to bring matters up to date. If Tuesday does not work for you, we could be available this Thursday or Friday. I will not be able to meet this Wednesday or, after this week, until the first week of August, so I hope you can fit us in on Tuesday, Thursday or Friday.

We look forward to meeting with you soon.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

**Privileged & Confidential**
**All Rights Reserved**

Q 0138

SD 00138

**EXHIBIT G**
**383**

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Privileged & Confidential
All Rights Reserved

Q 0139

SD 00139

JUN-06-2003 11:08 PM                                              1  18 027 7227              P.03

This procedure has taken way to long.  I have been on contract negotiation teams and have never
seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for
years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have
something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

*Michael*

Privileged & Confidential
All Rights Reserved

Q 0140

SD 00140

EXHIBIT G
385

JUL-06-2003 11:08 PM                                          1  10 827 7227            P.04

Laura Siegel Larson
6400 Pacific Avenue #106          DRAFT
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

### Outline of Topics:

Opinion re:
~~Facts regarding the~~ Time Warner-DC offer ~~and why it sucked~~:
-It was a bogus offer filled with land mines and things they knew we'd never agree to
-They wanted us to ~~warrant we had no rights~~
-~~As a result, we could have had trouble collecting money had we signed with them~~
-They wanted us to sign away the right to get anything additional if the copyright law changed, giving creators and their families additional rights or an extension of the time before it went into the public domain.

Page 1

Q 0141

Privileged & Confidential
All Rights Reserved

SD 00141

EXHIBIT G
386

JUL-06-2003 11:08 PM                                    1 `10 827 7227        P.05

*DRAFT*

-They even wanted us to sign away the public domain rights we'd one day have
-You and Don Bulson stated that you couldn't believe how bad the contract they had
   written was
-It was a bad deal ~~and a rip off~~ and we had to walk away *from*
   *(MT)*

## Marc Toberoff and the Shuster interest:
-He does not "control" the Superman copyright. He has been hired to do a job.
-He does not own the Shuster interest. He is a lawyer hired by ~~Jean Peavy~~ Shuster, Joe
   Shuster's ~~sister~~ estate. *Such*
-In 2013, he doesn't "take" the copyright from Time Warner, Shuster's heirs could
   reacquire rights as we have ~~as a result of our~~ Terminations. Then the Shusters
   would have to negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take the bad
   TW-DC deal. You'll remember that you, Don Bulson and we were shocked when
   Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted
   Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away ~~falsely~~ saying we had a deal with DC
-Marc did not call my mom nor me
-My mom called ~~Jean Peavy~~ to see what the Shusters were doing  *the Shuster's family*
-Peavy gave Marc's number to my mom and she called him after we had fired Ramer and
   Marks  *has no plan to produce a Superman movie. nor is this feasible*
-We felt he grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff ~~does not have a production company and we have never heard anything
   about him planning to make a movie~~  *given the dividing of ownership of the rights.*

## Why the original (~~$15 million~~) investor left:
-Kevin Marks falsely told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

## With Marc's assistance, new Notices of Termination regarding Superboy were sent out:
-We did this to further assert the Siegel rights to this character, ~~separately created from
   Superman.~~
-My mom advanced the $4,000 filing fees immediately to the Copyright Office when the
   Notices were sent in October 2002
-A copy of the $4,000 check recently processed by the Copyright Office is enclosed with
   this letter to you.

Page 2

Q 0142

Privileged & Confidential
All Rights Reserved

SD 00142

EXHIBIT G
387

JUL-06-2003 11:09 PM                              1 ~10 827 7227        P.06

*DRAFT*

-The canceled check was not sent to my mom by her bank until recently. This was after
we sent the itemization of other expenses to Don Bulson.
-Your 25% of this expense is $1,000. We are also sending this to Don and it will be
included in the settling of the account before the money being held in trust is
forwarded to you by Marc.

**Unfortunately we've discovered that The Spectre Terminations did not vest for the Siegel family:**
-Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
copyright filing while he was negotiating although she told him several times that
she wanted to send in the fees.
-Kevin did not tell us there was a time limit on when the fees could be paid
-When negotiations were terminated, we found out from the Copyright Office it was too
late to pay the fees
-The Spectre rights are a dead issue

**Marc has a limited negotiation period to represent the Siegel interest:**
-For Superman: 18 months from Oct. 23, 2002 (until April 23, 2004)
-For the newly filed Superboy Terminations: 30 months from Oct.23, 2002 (until April
23, 2005) This is longer because there is a two year waiting period from the time
the Notices were served to the date the rights vest.
-If we are not pleased with the results, he will no longer represent us after that time

**Why Marc has not been negotiating with Time Warner (TW)**
-The fact that DC doesn't know what to expect from us since we broke off negotiations
and turned down their last offer gives us strength
-By not running to them right away, we do not appear desperate and needy, willing to take
a bad deal
-Timing the negotiations is an art
-It may be better not to deal with Time Warner at all but to go elsewhere

**Why there is a buyout offer from a venture capitalist for your interest only:**
-You have been saying you needed money badly, were out of work and had big bills
-The venture capitalist doesn't want to invest more than the amount to buy your interest
-My interests are too entangled due to my divorce
-Marc asked our permission to present an offer to you and we decided not to stand in your
way if you want to accept it. We do not know the amount that the investor is
offering to you

**Why any investor would offer less than Time Warner did in its last offer:**
-It is a risky investment
-No immediate payback
-The investor and we may face legal expenses and conflict with DC in the future if we
have to sue to get what's already owed or if we eventually make a deal with them
and they withhold payment due to "creative bookkeeping" or for other reasons

Page 3

Privileged & Confidential
All Rights Reserved

Q 0143

SD 00143

**EXHIBIT G**
388

JUL-06-2003 11:09 PM                                  1  710 927 7227        P.07

*DRAFT*

-The investor wants a worthwhile profit on his investment
-It is a situation similar to one in which businesses that give immediate money to
beneficiaries of Wills who do not want to wait until the Will goes through Probate
for them to receive their money. The beneficiaries always get less than if they
wait for the Will to go through Probate.

<u>Why you cannot ask Time Warner/DC for a buyout:</u>
-It destroys the possibility of us negotiating a fair deal
-It shows weakness which TW will take advantage of.
-As the controlling interest, we do not give you approval to do it
-If it damaged our ability to later make a better deal, we would have no choice but to ~~sue
you~~ hold you accountable for such damages.

<u>Why this has not been like other "contract negotiations":</u>
-Time Warner is a huge, arrogant company
-They took months to respond to each issue all along the way and their responses were
unacceptable
-Time Warner has nothing to gain by settling this, they keep on making millions
-Their lawyers are particularly heartless, masters at screwing people. They have a bad
reputation for this
-They delight in playing off what they see as the Siegel interest's weakness--our need for
money
-If that wasn't enough, they want to include additional characters created by our father in
one settlement. (They apparently do not yet realize that The Spectre rights did not
vest to the Siegels.)
-They want to win this David and Goliath matter so that the rich and powerful will
triumph over the little guy
-They want to make an example of us so that other creators and their heirs won't go after
their rights.

<u>Your belief that you have something to sell independently:</u>
-You can only sell your rights to a third party with my mom's and my approval because
we are the majority interest holders and you have a passive interest only.
-We will not give approval for a sale to Time Warner because it would damage the
overall Siegel interest
-We will give approval for a sale to a third party ~~found by Marc Toberoff~~ as long as it is
not Time Warner, DC, or any ~~part of the Time Warner family of businesses and~~
providing the sale does not damage our ability to make a deal for our portion of
the Siegel interest

Although a united Siegel front would be best, we won't stand in your way if you decide
you want to take the buyout from the investor that Marc has found. The decision has to be yours
and yours alone. However, for the reasons listed above, we will not give approval for you to go
to Time Warner regarding a buyout,

Privileged & Confidential
All Rights Reserved

Q 0144

SD 00144

**EXHIBIT G**
**389**

JUL-06-2003 11:10 PM                                    1  10 827 7227           P.09

*fair*                    DRAFT

The Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a settlement. ~~If the 15 million-dollar offer from the other investor hadn't fallen through, we probably would have taken it. Unfortunately, offers like that are rare and we do not expect any offers to come our way that would include my mom and me.~~

If you don't like the offer, Don Bulson should tell Marc. There's no point in dragging it out. Marc says he's been waiting for an answer for months and he told Don if you don't like the offer you should make a counteroffer. Did Don tell you this? If you do take the offer, your wait is over, you have instant money and can go on with your life.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your letter. ~~Please let us know what you decide regarding a buyout through Marc.~~

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure: Xerox of my mom's $4,000 check to the Copyright Office for the Superboy Notices of Termination

Q 0145

Privileged & Confidential
All Rights Reserved

SD 00145

EXHIBIT G
390

JUL-38-2003,11:27 PM                                      1  310  827  7227    P.01

# LAURA SIEGEL LARSON
**6400 PACIFIC AVENUE #106**
**PLAYA DEL REY, CA  90293**
**(310) 827-8136**
**FAX  (310) 827-7227**
July 8, 2003

## FAX TRANSMITTAL

**TO:**        Marc Toberoff

**FAX#:**      (310) 246-3101

**FROM:**      Laura Siegel Larson

**PHONE:**     (310) 827-8136

**Page 1 of 6**

**MESSAGE:**

Dear Marc,

Please see attached.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0146

**Privileged & Confidential**
**All Rights Reserved**

SD 00146

JUL-08-2003 11:27 PM                                    1 310 827 7227          P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

Outline of Topics:

Our opinion regarding the Time Warner-DC offer:
- It was a bogus offer filled with unacceptable land mines
- They wanted us to warrant we had no rights which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1

Q 0147

Privileged & Confidential
All Rights Reserved

SD 00147

EXHIBIT G
392

JUL-08-2003 11:28 PM                    1 310 827 7227    P.09

-You and Don Bulson stated that you couldn't believe how bad the document was that they
    had written

<u>Our opinion as to why this has not been like other "contract negotiations":</u>
-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were
    unacceptable,
-We believe their lawyers are particularly heartless and they have a bad reputation for
    grinding individuals in negotiations
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
    losing it.
-They want to make an example of us so that other creators and their heirs won't go after
    their rights

<u>Marc Toberoff and the Shuster interest:</u>
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
    reacquire rights as we have via Terminations. Then the Shusters would have to
    negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

<u>We went to Marc to talk about him representing the Siegels. Marc did not pursue us:</u>
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
    deal. You'll remember that you, Don Bulson and we were shocked when Kevin
    Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
    and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did
    not have
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer
    and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

<u>Why the original investor left:</u>
-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

Page 2

Privileged & Confidential
All Rights Reserved

Q 0148

SD 00148

EXHIBIT G
393

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees.
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.
- We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- My interests are too entangled due to my divorce
- You have been saying you needed money badly, were out of work and had big bills
- We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Privileged & Confidential
All Rights Reserved

Q 0149

SD 00149

EXHIBIT G
394

JUL-08-2003 11:29 PM                                1 310 827 7224                    P.09

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>

- It is a risky investment
- No immediate or guaranteed payback
- The investor may well face legal expenses and ongoing litigation with Time Warner in the future.  For instance, we may have to sue to have a Court define the "profits" we participate in.  If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- Any investor would want some protection and a worthwhile profit on his investment
- It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money.  The beneficiaries always get less if they do this than if they wait for the Will to go through Probate.  And that's more certain than this.

<u>Your belief that you have something to sell independently:</u>

- Since you did not take part in the actual Termination, you do not have legal title to the copyrights
- You therefore have no right to sell any copyright interest
- You only have a right to receive a portion of the money that we receive, if any.
- Your right to receive money is known as a passive financial interest.
- In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

<u>Why you cannot ask Time Warner/DC for a buyout:</u>

- As the controlling interest, we do not give you approval to do it
- It damages the possibility of us negotiating a fair deal
- It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- Because Time Warner would get so little from you--a 12-1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you
- If it damaged our ability to later make a better deal, we would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found.  That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4

Q 0150

Privileged & Confidential
All Rights Reserved

SD 00150

<b>EXHIBIT G</b>
395

JUL-08-2003 11:29 PM

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Q 0151

Privileged & Confidential
All Rights Reserved

SD-00151

**EXHIBIT G**
**396**

**LAURA SIEGEL LARSON**
6400 PACIFIC AVENUE #106
PLAYA DEL REY, CA 90293
(310) 827-8136
FAX (310) 827-7227
July 8, 2003

# FAX TRANSMITTAL

**TO:**      **Marc Toberoff**

**FAX#:**    **(310) 246-3101**

**FROM:**    **Laura Siegel Larson**

**PHONE:**   **(310) 827-8136**

Page 1 of 6

**MESSAGE:**

**Dear Marc,**

**Please see attached.**

**Sincerely,**

*Laura Siegel Larson*

**Laura Siegel Larson**

Q 0152

Privileged & Confidential
All Rights Reserved

SD 00152

**EXHIBIT G**
**397**

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1

Q 0153

Privileged & Confidential
All Rights Reserved

SD 00153

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written

## Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were unacceptable, *self-serving and one-sided*, *that ~~evil~~ it is their common practice*
-We believe their lawyers are particularly heartless and ~~they have a bad reputation for~~ grinding individuals in negotiations *to use every ounce of their leverage to*
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it. *which is particularly repulsive when*
-They want to make an example of us so that other creators and their heirs won't go after their rights *via Terminations or otherwise.* *important not just for our family.*

## Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal or handle things as they choose. *with Time Warner*
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest in 2013 *with the Shuster estate at the earliest*
-We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did *had closed* not have
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

## Why the original investor left:
-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

*Marc was also unable to get back to the investor with any anything concrete regarding your interest because apparently neither you nor Don Bulson specifically responded to his interest for a very long time.*

Page 2

Q 0154

Privileged & Confidential
All Rights Reserved

SD 00154

**EXHIBIT G**
**399**



With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Buison.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating although she told him several times that she wanted to send in the fees. (asking since nothing it would hurt the negotiations)
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.
- We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- My interests are too entangled due to my divorce
- You have been saying you needed money badly, were out of work and had big bills
- We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Q 0155

Privileged & Confidential
All Rights Reserved

SD-00155

**EXHIBIT G**
**400**



**Why I think any investor would offer less than Time Warner did in its last offer:**

- It is a risky investment
- No immediate or guaranteed payback
- The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- Any investor would want some protection and a worthwhile profit on his investment
- It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

**Your belief that you have something to sell independently:**

- Since you did not take part in the actual Termination, you do not have legal title to the Siegel copyrights
- You therefore have no right to sell any copyright interest
- You only have a right to receive a portion of the money that we receive, if any.
- Your right to receive money is known as a passive financial interest.
- In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

**Why you cannot ask Time Warner/DC for a buyout:**

- As the controlling interest, we do not give you approval to do it
- It damages the possibility of us negotiating a fair deal
- It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- Because Time Warner would get so little from you—a 12-1/2% passive financial interest in the character—that would be reflected in a low amount of money paid to you
- If it damaged our ability to later make a better deal, We would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4

Q 0156

Privileged & Confidential
All Rights Reserved

SD 00156

**EXHIBIT G**
**401**

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Page 5                                                    Q 0157

Privileged & Confidential
All Rights Reserved

EXHIBIT G
402

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVE. #106**
**PLAYA DEL REY, CA  90293**
**(310) 827-8136**

July 11, 2003

# FAX TRANSMITTAL

TO:        Marc Toberoff
FAX#:      (310) 246-3101

FROM:     Laura Siegel Larson
PHONE:    (310) 827-8136

RE:        Letter Sent to Michael Siegel

**Page 1 of 6**

MESSAGE:

Dear Marc,

Enclosed is the final letter sent to Michael Siegel today.

Sincerely,

*Laura*

Q 0158

**Privileged & Confidential**
**All Rights Reserved**

SD 00158

**EXHIBIT G**
**403**

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
  -It was a bogus offer filled with unacceptable land mines.
  -They wanted us to <u>warrant we had no rights</u> which is completely false.
  -They insisted on a deal that included characters that had nothing to do with Superman.
  -They wanted us to sign away the ability to get anything additional if the copyright law
        changes to give creators and their families additional rights or if an extension of time
        is one day given to rights holders before the property goes into the public domain.
  -They even wanted us to sign away the public domain rights we'd one day have.
  -As a result of Time Warner's hardball tactics, we feared that we would have trouble
        collecting any future money from them.
  -It was a bad and unreasonable deal.

Page 1                                            Q 0159

**Privileged & Confidential**
**All Rights Reserved**

SD 00159

**EXHIBIT G**
**404**



-You and Don Bulson stated that you couldn't believe how bad the document was that they
  had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were
  unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use
  every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
  losing it.
-They want to make an example of us so that other creators and their heirs won't go after
  their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
  reacquire rights as we have via Terminations. Then the Shusters would have to
  negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the
  earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
  deal. You'll remember that you, Don Bulson and we were shocked when Kevin
  Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
  and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer
  and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0160


Privileged & Confidential
All Rights Reserved

SD 00160

**EXHIBIT G**
**405**

**With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:**
- -We did this to further assert the Siegel rights to this character.
- -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- -A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- -The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- -Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

**Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:**
- -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- -Kevin did not tell us there was a time limit on when the fees could be paid.
- -When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- -The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

**Why Marc has not been negotiating with Time Warner:**
- -The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- -By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- -Timing the negotiations is an art.
- -When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- -We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

**Why there is a buyout offer from an investor for your interest only:**
- -You have been saying you needed money badly, were out of work and had big bills.
- -Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- -My interests are too entangled due to my divorce.

Page 3

Q 0161

**Privileged & Confidential**
**All Rights Reserved**

SD 00161

-We have not received an offer from the investor.  Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future.  For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money.  The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

<u>Your belief that you have something to sell independently:</u>
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

<u>Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):</u>
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an <u>attempt</u> by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Page 4                                                        Q 0162

**Privileged & Confidential**
**All Rights Reserved**

SD 00162

**EXHIBIT G**
**407**

JUL-11-2003 12:05 PM

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Page 5

Q 0163

Privileged & Confidential
All Rights Reserved

**EXHIBIT G**
**408**

SD 00163

Yahoo! Mail - mtoberoff@ipwla.com

**YAHOO!** SMALL BUSINESS
*Email*

Small Business Home - Yahoo! - Help

| Mail ▾ | Addresses ▾ | Calendar ▾ | Notepad ▾ | | mtoberoff@ipwla.com [Sign Out] |

| Check Mail | Compose | Search Mail | | Mail Options | Manage My Services |

**Mail Accounts**
ipwla.com
yahoo.com

**Folders**      [Add - Edit]
  **Inbox (3)**
  Draft
  Sent
  Bulk       [Empty]
  Trash      [Empty]

### View Attachment [Back to Original Message - Printable View]

*powered by*
OUTSIDE IN
HTML EXPORT

File name: LAURA__2.WPD | File type: application/octet-stream

Save to my Yahoo! Briefcase - Download File - Need Help?

October 2, 2004

Joanne Siegel

13929 Marquesas Way, Apt. 201A

Marina Del Rey, CA 90292

Laura Siegel Larson

6400 Pacific Avenue, #106

Playa Del Rey, CA 90293

Re: Engagement for Professional Services

Dear Joanne and Laura:

I am pleased that you (the "Client") have decided to retain my law firm (the "Firm") as your counsel. The Firm is committed to providing efficient and responsive services to its clients. This letter will confirm our understanding and agreement regarding the terms and conditions of our engagement.

1. Scope of Engagement: The Firm will represent the Client with respect to the prosecution and defense of all rights, causes of actions and claims arising from the Client*s termination of Jerome Siegel*s prior grants of rights pursuant to section 304 (c) of the U.S. Copyright Act (the "Claims") which became effective on April 16, 1999, including Client*s Claims against Time-Warner, Warner Bros., D.C. Comics their licensees, agents and affiliates (collectively, "Time-Warner"). The scope of services provided for under this Agreement includes the prosecution and defense of the Claims up through trial and legal services on appeal and through final disposition of the Claims as reasonably required.

2. Conditions Precedent: This Agreement will not take effect and the Firm will have no obligation to provide legal services, until the Firm

Q 0164

Privileged & Confidential
All Rights Reserved

http://us.f506.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765_...   10/3/2004

SD 00164

receives this Agreement signed by the Client.

3. General Responsibilities of Attorney and Client: It will be the Firm*s responsibility to perform the legal services reasonably required in connection with the full prosecution and defense of the Claims, to take reasonable steps to keep you informed of progress and developments and to respond promptly to your enquiries and communications.

It will be the Client*s responsibility to cooperate fully with the Firm in its work by, among other things, providing us with relevant information and copies of documents within Client*s control, keeping the Firm up to date with respect to any relevant developments and by making yourselves reasonably available for consultation. The Client*s responsibilities also include: (a) approving decisions involving risk (given that Client acknowledges that litigation is inherently risky); (b) approving legal and

Initials: _____ , _____, _____

Page 2

Joanne Siegel and Laura Siegel Larson

October 2, 2004

negotiation strategy; (c) determining acceptable settlement terms and figures, and (d) advising us whether any document we have prepared or received and sent to you for your approval or review is consistent with your expectations, as the case may be.

4. Disclaimer of Guarantee: From time to time, through the course of the Firm*s representation of you, we may express beliefs or opinions concerning the effectiveness of various strategies and courses of action or concerning the merits or potential results of any course of action. However, the Firm necessarily cannot make any promises or give any guarantees regarding the outcome of any matter, and the statements of any of the Firm*s attorneys are not intended, nor should they be construed, as any such promise or guarantee. In addition, although we may from time to time, for your convenience, furnish you with estimates or projections and the information on which such are based, such estimates or projections are by their nature inexact and shall not be binding on us.

5. Legal Fees: It is understood that the attorney's fees hereunder are not set by law but are negotiable between attorney and client and have been negotiated by Client with the Firm.

(a) In consideration of the services rendered by the Firm hereunder the Firm shall be ~~entitiled~~ entitled to and you hereby agree to pay to the

Q 0165

Privileged & Confidential
All Rights Reserved

SD 00165

**EXHIBIT G**
**410**

Firm: one-third (33.33%) ("Percentage Fee") of one hundred percent (100%) of any and all gross sums of money or other consideration recovered, confirmed or awarded by reason of or in connection with the above Claims ("Gross Proceeds") prior to the deduction of any costs, fees, liens or disbursements, whether recovered by suit, arbitration, mediation or other form of dispute resolution, verdict, judgment, settlement or otherwise. Sixty (60) days before trial the Firm*s one-third Percentage Fee shall increase to forty percent (40%), and thereafter this will be the applicable Percentage Fee from that point forward through appeals, if any, and final disposition of the Claims. Gross Proceeds include, without limitation, all fixed or contingent proceeds, [whether payable or received during or after the Firm*s engagement, in perpetuity,] ** *Note to Marc*the preceeding phrase may be changed subject to a conversation George will have with you. He will email you about it tonight.* and any form of consideration, whether upfront or future fees, advances, guarantees, bonuses, deferments, royalties or profit participations of any kind. In computing the Firm*s fee, the total sums payable, including without limitation, interest upon a judgment, shall be deemed part of the amount recovered. For the avoidance of doubt, in calculating the Firm*s Percentage Fee, such Percentage Fee will be applied to Gross Proceeds, prior to any deduction from proceeds of payments to Michael Siegel or his designee on account of Michael Siegel*s 25% passive financial interest, as the son of Jerome Siegel, of the Siegel termination interest under 17 U.S.C. * 304 (c).

In the event that IP Worldwide (IPW, LLC) receives its contractual percentage fee of ten percent (10%) of Gross Proceeds ("IPW Percentage") with respect

Page 3

Joanne Siegel and Laura Siegel Larson

October 2, 2004

to any Claim(s) pursuant to the agreement between it and you dated October 3, 2002 (as extended by you on April 12, 2004), five (5%) percent will be deducted from the Firm*s Percentage Fee applicable to such Gross Proceeds.

It is understood that the Claims involve multiple rights/claims against multiple defendants and accordingly the above Percentage Fee calculation shall be applicable to each Claim to the extent that there is any recovery (whether through trial, arbitration or settlement) on any such Claim, at the time of such recovery, and are not in any way contingent on the prosecution or maintenance of any other Claims or

Q 0166

Privileged & Confidential
All Rights Reserved

...m/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ... 10/3/2004

SD 00166

EXHIBIT G
411

actions.

Any attorney*s fees awarded by the Court, pursuant to statute or contract, in connection with the subject matter of this representation, shall be paid to the Firm and shall be applied against the fee obligation under this Agreement but shall not discharge nor limit Client*s fee obligation under this Agreement. Any Costs awarded by the Court, in connection with the subject matter of this representation, shall be paid to the Firm and shall be applied against the Client*s obligation to reimburse the Firm*s Costs under this Agreement but shall not discharge nor limit Client*s Cost reimbursement obligation under this Agreement.

Notwithstanding anything to the contrary contained herein, the Firm*s Percentage Fee will not apply to the following consideration: (i) the non-refundable $250,000 advanced by Time Warner to ~~Joanne Siegel~~ the Siegels [**_Note to Marc: Joanne, Laura and Michael Siegel all received percentages of this_] in November, 2000 against the resolution of the Superman Claim; (ii) Joanne Siegel*s annual <u>non-advance</u> "pension" payment by Time Warner [**_Note to Marc: my mom would feel more secure if the words "non-advance" would be inserted for the following reason: although this agreement should be confidential between us and you, Michael Siegel has been threatening to sue my mother for a portion of her pension for years claiming that it is an advance on an eventual settlement. That is of course not true. My mother feels that if Michael ever got a copy of this agreement and mention of the pension is lumped in with other items such as the $250,000 advance, medical insurance, etc., he would try to use it as proof that we all consider it an advance. Since adding "non advance" does not effect you under the fee agreement, we ask you to please include those words to give my mother peace of mind_] of ~~$125,000~~ $126,148 per year, plus the cost of living increases to such payment and (iii) medical, dental or life insurance provided to ~~the Client~~ Joanne Siegel, Laura Siegel Larson, Michael Siegel, and Laura*s children Michael Larson and James Larson. [**_Note to Marc: As I mentioned in my email to you earlier today, Time Warner has made long-standing promises to provide these benefits to Michael Siegel and my children in addition to my mom and me._] Although the Percentage Fee applies to other non-cash in kind consideration (excluding (iii) above), if any, paid as part of a recovery on a Claim, it does not apply to minor non-cash perks such as tickets to movie premieres, conventions, dinners, free or discounted merchandise.

The Firm will be compensated for its legal services and reimbursed for the costs and disbursements advanced by it (as set forth below) only if Gross Proceeds are recovered, subject to paragraph 9 below.

Notwithstanding anything to the contrary in this Agreement, Client shall only be responsible and/or liable for the payment to the Firm of its Percentage Fee of

Q 0167

Privileged & Confidential
All Rights Reserved

https://us.f311.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...   10/3/2004

SD 00167

Yahoo! Mail - mtoberoff@ipwla.com

Gross Proceeds as and when such Gross Proceeds are actually received by or credited to Client or Client*s designee. For the avoidance of doubt, if a recovery involves future payments of Gross Proceeds by any adverse party to Client, Client shall not be liable to the Firm for its Percentage Fee on Gross Proceeds that are payable by such adverse party which is not in fact paid to or credited to Client or Client*s designee. Accordingly, in the event of any adverse party*s failure to make payments of Gross Proceeds to the Client pursuant to a judgment or settlement agreement, it is understood and agreed that the Firm will have the right, but not the obligation, as a third party beneficiary to directly enforce such judgment or settlement agreement against such adverse party to the extent of the

Page 4

Joanne Siegel and Laura Siegel Larson

October 2, 2004

Firm*s Percentage Fee hereunder payable on Gross Proceeds from such judgment or settlement agreement.

The Firm will be solely responsible for the legal fees of any outside attorneys retained by the Firm, if any, in connection with its prosecution of the Claims hereunder. In the event the Firm wishes to retain such outside attorney(s), the Firm will furnish Client with the identity and credentials of such attorney(s). Such retention of outside attorneys, if any, shall in each instance be subject to Client*s prior written approval.

(b) The 33.33% Percentage Fee set forth in paragraph 5 (a) above will apply upon the filing of a complaint, if any, in the U.S. District Court for the Central District of California (or other Court of competent jurisdiction) with respect to any Claim(s). Prior to such filing, the Firm will research and prepare the complaint regarding the Claims, plus any required accompanying documents, for filing an action ~~in federal court~~ on the Claims, in consideration for a reduced Percentage Fee equal to two and one-half percent (2.5 %) of Gross Proceeds. This reduced fee shall be payable in addition to the IPW Percentage of Gross Proceeds. However, upon the filing of the complaint, if any, the Firm*s reduced fee will be deemed part of and absorbed in the Percentage Fee applicable pursuant to Paragraph 4(a) above.

6. Costs and Disbursements: The Firm will advance all costs and disbursements ("Costs") expended or incurred in connection with its prosecution or defense of the Claims. Such Costs shall include, without limitation, filing fees, investigation expenses, expert witness fees, consultant fees, accountant fees, investigator fees, subpoena and service of process fees, jury fees, transcript costs, third-party photocopying, photocopying at the Firm (at the agreed rate of five cents per page),

Q 0168

**Privileged & Confidential**
**All Rights Reserved**
http://us.f514.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765 ...   10/3/2004

SD 00168

**EXHIBIT G**
**413**

Yahoo! Mail - mtoberoff@ipwla.com

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, parking, travel costs, and messenger fees. No attorney*s fees shall be construed as Costs under this Agreement. Client authorizes the Firm to incur all Costs reasonably necessary in the Firm*s judgment, subject to the Client*s prior approval of any individual cost item exceeding $3,000. All Costs advanced by the Firm shall be reimbursed to the Firm from Gross Proceeds in addition to and after payment of the Percentage Fee pursuant to paragraph 5 above and

shall not be included in or deducted from such fee. The Firm will furnish Client with a reasonably detailed statement of the Costs on a quarterly basis.

7. Lien for Attorney*s Fees and Costs: The Firm will have a lien for attorney*s fees and Costs advanced applicable to all Claims and/or Gross Proceeds that are the subject of the Firm*s representation under this Agreement.

8. Payment and Notices: Client hereby authorizes and appoints the Firm as their attorney-in-fact to collect and receive all Gross Proceeds due relating to the Claims,

Page 5

Joanne Siegel and Laura Siegel Larson

October 2, 2004

to endorse and deposit into a client trust account all checks and other moneys payable, to deduct the Firm*s compensation as set forth above, and to pay the remainder to Client within seven (7) days of the Firm*s receipt of such proceeds. A statement of all deductions including the applicable Percentage Fee and itemized Costs, if any, shall be

sent by the Firm to Client with each such payment. All notices and payments hereunder shall be made to the parties at their respective address set forth on page 1 hereof unless and until either party gives the other party prior written notice of an address change.

9. Discharge of Firm*s Services: It is understood that Client may discharge the Firm at any time by written notice to the Firm, effective upon receipt by the Firm. However, such discharge of the Firm, if any, shall not relieve the Client of the obligation to compensate the Firm for services rendered, and to reimburse Costs advanced by the Firm~~, all prior to such discharge~~. In the event of Client*s discharge of the Firm, the Firm*s Percentage Fee for legal services will be reasonably computed pro-rata in proportion to the totality of legal services rendered by subsequent attorneys, if any, leading to the resolution of the Claims

Q 0169

Privileged & Confidential
All Rights Reserved

SD 00169

by trial, arbitration, settlement or otherwise. Upon the Firm*s discharge, if any, all Costs advanced by the Firm shall become due and payable to the Firm within ninety (90) days of the date of the discharge notice, notwithstanding anything to the contrary herein. The Firm will return the Client*s files to Client no later than ten (10) days after the Firm*s receipt of written notice of discharge by the Client, if any.

10. Full Understanding: In signing this Agreement each of you acknowledge that your engagement of the Firm on the above Percentage Fee basis is a fair and reasonable method to compensate us for our legal services. We have advised you to seek independent legal and business advice with respect to this agreement. By signing this Agreement you represent to us that you have had a reasonable opportunity to seek such advice and that you have either sought and received such independent legal and business advice or knowingly refrained from doing so.

11. Miscellaneous: This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. This Agreement shall be deemed to have been mutually drafted by the

parties and no drafting presumption shall apply for or against either party. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall be binding upon and inure to the benefit of the parties* heirs, executors, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

Page 6

Joanne Siegel and Laura Siegel Larson

October 2, 2004

This Agreement shall be governed by the Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased to represent you in connection with this matter. If the foregoing terms meet with your approval, kindly so indicate by signing four originals of this engagement letter and returning them to us for counter-signature, and we will return two fully executed originals to you.

Q 0170

Privileged & Confidential
All Rights Reserved

http://b1.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...   10/3/2004

SD 00170

**EXHIBIT G**
**415**

Very truly yours,


Marc Toberoff


Agreed, understood and accepted:


_____ Date:_____

Joanne Siegel


_____ Date:_____

Laura Siegel Larson

| Check Mail | Compose | Search Mail |

Mail Options  [ Manage My Services ]

Copyright © 1994-2004 Yahoo! Inc. All rights reserved. Terms of Service - Copyright Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

Q 0171

Privileged & Confidential
All Rights Reserved

http://f1.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765_... 10/3/2004

SD 00171

EXHIBIT G
416

LAW OFFICES OF
# MARC TOBEROFF

June 13, 2003

John D. Peftker, Esq.
444 South Flower Street
Los Angeles, CA 90071

Re: Probate of Joseph Shuster Estate

Dear Jack:

As discussed enclosed please find the following:

(1) Copy of Joseph Shuster's Will dated June 28, 1988 (they can not find the original);
(2) Revocable Living Trust (plus Schedule A where assigned property = only stock and furniture) dated April 11, 1988. I have original;
(3) Affidavit of Jean Peavy per §13101 dated August 17, 1992 that decedent's property is under $60,000. I have original;
(4) Death certificate of Joseph Shuster, resident of Los Angeles, CA, died on August 14, 1992. I have original;
(5) Family tree.

The Trust does not appear to be a problem due to the limited property assigned to it per Schedule A which I located after we spoke today.

I 've also enclosed §304(c)(2)(D) of the US Copyright Act which gives executors, etc. a right to terminate prior transfers of copyright within delineated time windows. Previously, only a spouse, children and grandchildren had this right. So when Joe Shuster died in 1992 without spouse or children his Estate was worth under $60K. Then, on October 27, 1998 the Sonny Bono Copyright Act added subparagraph (D) giving the right to the executor, personal representative, etc. (see amendment enclosed).

We therefore want the Probate Court to approve in addition to the normal executor powers something like "the executor is empowered, without limitation, to terminate prior transfers of Joseph Shuster's copyrights [possibly even better if we can add, "including "Superman"] pursuant to 17 U.S.C. §304(c)(2)(D). Alternatively, the papers could state that Estate is being probated for this purpose.

I apologize for the delay in getting the above to you. Anything, you can do from here on to expedite the probate would be greatly appreciated. As discussed, please fax or e-mail me a retainer agreement whereupon I will send you the $2,500 retainer you requested.

Regards,

Marc Toberoff

Q 0176

9595 Wilshire Boulevard, 8th Floor, Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
MToberoff@ipww.biz

**Privileged & Confidential**
**All Rights Reserved**

SD 00176

# CERTIFICATE OF DEATH
## STATE OF CALIFORNIA
### USE BLACK INK ONLY

STATE FILE NUMBER

| | | | | | LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER |
|---|---|---|---|---|---|

**1A. NAME OF DECEDENT—FIRST (GIVEN):** JOSEPH
**1B. MIDDLE:**
**1C. LAST (FAMILY):** SHUSTER
**2A. DATE OF DEATH—MO., DAY, YR.:** Fnd July 30, 1992
**2B. HOUR:** 1106
**3. SEX:** MALE

**DECEDENT PERSONAL DATA**

**4. RACE:** CAUCASIAN
**5. HISPANIC—SPECIFY:** Yes ☐  No ☒
**6. DATE OF BIRTH—MO. DAY, YR.:** JULY 10, 1914
**7. AGE IN YEARS:** 78
**8. UNDER 1 YEAR — MONTHS / DAYS:**
**9. UNDER 24 HOURS — HOURS / MINUTES:**

**8. STATE OF BIRTH:** CANADA
**9. CITIZEN OF WHAT COUNTRY:** USA
**10A. FULL NAME OF FATHER:** JULIUS SHUSTER
**10B. STATE OF BIRTH:** HOLLAND
**11A. FULL MAIDEN NAME OF MOTHER:** IDA KAKLARSKY
**11B. STATE OF BIRTH:** RUSSIA

**12. MILITARY SERVICE:** 19 ___ TO 19 ___   None ☒
**13. SOCIAL SECURITY No.:** 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
**14. MARITAL STATUS:** NEVER MARRIED
**15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME):** NONE

**16A. USUAL OCCUPATION:** ARTIST
**16B. USUAL KIND OF BUSINESS OR INDUSTRY:** COMIC BOOKS
**16C. USUAL EMPLOYER:** DC COMICS
**16D. YEARS IN OCCUPATION:** 60
**17. EDUCATION—YEARS COMPLETED:** 14

**USUAL RESIDENCE**

**18A. RESIDENCE—STREET AND NUMBER OR LOCATION:** 11944 MONTANA AVENUE #305
**18B. CITY:** W. LOS ANGELES
**18C. ZIP CODE:** 90049

**18D. COUNTY:** LOS ANGELES
**18E. NUMBER OF YEARS IN THIS COUNTY:** 14
**18F. STATE OR FOREIGN COUNTRY:** CALIFORNIA
**20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT:** JEAN PEAVY-SISTER, 316 HORTON LANE N.W, ALBUQUERQUE, NEW MEXICO 87114

**PLACE OF DEATH**

**19A. PLACE OF DEATH:** Residence
**19B. IF HOSPITAL, SPECIFY ONE IP, ER/OP, DOA:**
**19C. COUNTY:** Los Angeles

**19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION:** 11944 Montana Avenue #305
**19E. CITY:** W. Los Angeles

**TIME INTERVAL BETWEEN ONSET AND DEATH**
**22. WAS DEATH REPORTED TO CORONER?** Yes ☒  No ☐   **REFERRAL NUMBER:** 92-06897

**CAUSE OF DEATH**

**21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C)**

**IMMEDIATE CAUSE (A)** Congestive Heart Failure — Unk
**23. WAS BIOPSY PERFORMED?** Yes ☐  No ☒

**DUE TO (B)** Arteriosclerotic Cardiovascular Disease — Years
**24A. WAS AUTOPSY PERFORMED?** Yes ☐  No ☒

**DUE TO (C)**
**24B. WAS IT USED IN DETERMINING CAUSE OF DEATH?** Yes ☐  No ☒

**25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21:** Hypertension

**26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 25? IF YES, LIST TYPE OF OPERATION AND DATE:** No

**PHYSICIAN'S CERTIFICATION**

**I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.**

**27A. DECEDENT ATTENDED SINCE DECEDENT LAST SEEN ALIVE MONTH, DAY, YEAR:**
**27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER:**
**27C. CERTIFIER'S LICENSE NUMBER:**
**27D. DATE SIGNED:**
**27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS:**

**CORONER'S USE ONLY**

**I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED.**

**28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER:** Deputy Coroner Mary T. Macri
**28B. DATE SIGNED:**

**29. MANNER OF DEATH—specify one: natural, accident, suicide, homicide, pending investigation or could not be determined:** Natural
**30A. PLACE OF INJURY:**
**30B. INJURY AT WORK:**
**30C. DATE OF INJURY MONTH, DAY, YEAR:**
**31. HOUR:**

**32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY):**
**33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY):**

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

**34A. DISPOSITION(S):** CR/RES
**34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS:** RES: 11944 MONTANA AVE., #305 W. LOS ANGELES, CA 90049
**34C. DATE MO, DAY, YEAR:** 8/14/92
**35A. SIGNATURE OF EMBALMER:** NOT EMBALMED
**35B. LICENSE NUMBER:** NONE

**36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING AS SUCH):** PIERCE BROS WESTWOOD VILLAGE
**36B. LICENSE NO.:** FD–951
**37. SIGNATURE OF LOCAL REGISTRAR:** Robert C. Getz
**38. REGISTRATION DATE:** AUG 1 0 1992

**STATE REGISTRAR:** A. ___ B. ___ C. ___ D. ___ E. ___   **F. CENSUS TRACT:**

S-11 (REV. 3-91)

**MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS**

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

70

Director of Health Services and Registrar

Q 0177

SD 00177

# Last Will and Testament

KNOW ALL PERSONS BY THESE PRESENTS:

That, I ___JOSEPH SHUSTER___

of _____ W. Los Angeles, California _____
being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the
undue influence of any person whomsoever, do make, publish and declare this my Last Will and
Testament.

## I.

I hereby declare that I am the ___brother___ of JEAN ADELE PEAVY

at the time of the execution of this Will.

## II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or
children hereafter born to or adopted by me, except as hereinafter stated, knowing their
___N/A___ will provide for them.
[mother, or father]

## III.

I hereby direct and order that all just debts for which proper claims are filed against my estate,
and the expenses of my last illness and funeral, be paid by my execut___rix___ as soon after my death
as is practicable; provided, however, that this direction shall not authorize any creditor to require
payment of any debt or obligation prior to its normal maturity in due course.

## IV.

I give, devise and bequeath unto ___JEAN ADELE PEAVY___ all of the rest, residue and
remainder of my estate, whether real or personal, and wheresoever situated. In the event that
___Jean Adele Peavy___ shall predecease me, or in the event that both
___Jean Adele Peavy___ and I shall die as a result of a common accident, illness or
disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew,
___MARK WARREN PEARY___.

## V.

I hereby nominate and appoint my ___sister___, ___Jean Adele Peavy___
execut___rix___ of this my Last Will and Testament, to act without bond. In the event that my
___sister___, is for any reason unable or unwilling to act as execut___rix___ hereof, I nominate
and appoint ___Mark Warren Peary___ to act as
execut___or___, also without bond.

Q 0178

SD 00178

VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my executrix settle my estate in such a manner as shall seem best and most conveniently to her    , and I hereby empower my executrix to mortgage, lease sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

Q 0179

SD 00179

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament

In Witness Whereof I have hereunto set my hand this __28__ day of __June__ 19_88_

_Joseph Shuster_
Testator

STATE OF CALIFORNIA

County of _Los Angeles_ } ss.

Each of the undersigned, being first duly sworn on oath, states that on this __28__ day of __June__, 19_88_:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of ____JOSEPH SHUSTER____ (the Testat_or_ );

(2) The Testat_or_, in my presence and in the presence of the other Witnesses whose signatures appear below:

    (a) Declared the foregoing instrument consisting of __one__ pages, of which this is the last to be _his_ Will;

    (b) Requested me and the other Witnesses to act as Witnesses to _his_ Will and to make this affidavit; and

    (c) Signed such instrument;

(3) I believe the Testat_or_ to be of sound mind, and that in so declaring and signing, _he_ was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testat_or_ and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

_Tom Fenaughty_
Witness
_3374 Overland Ave #1_
Address
_L.A.   Ca.   90064_

_Robert E Williams_
Witness
_3545 Mentone Ave #3_
Address
_Los Angeles California 90034_

_____
Witness

_____
Address

_went to notary public office in Brentwood now Montana_

SUBSCRIBED & SWORN to before me this __28__ day of __June__ 19_88_

_F. Patrick Hagerty_

Notary Public in and for the State of _California_, residing at _Santa Monica, Calif._

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991

Q 0180

SD 00180

**EXHIBIT G**
**421**

THE

Last Will and Testament of

Joseph Shuster

Dated June 28 19o 88

Q 0181

SD 00181

Revocable Living Trust

This trust agreement is made this day of *April 11, 1988* between  Joseph Shuster  , the Grantor, and  Joseph Shuster  and  Jean A. Peavy  , the Trustees.

Upon my death or incapacity, I name  Jean A. Peavy  successor.

The Grantor,  Joseph Shuster  , hereby transfers to the Trustees and to the Trustees' successor the property described in the attached Schedule A.  Such property and any other property that may be received by the Trustees shall be held and may be disposed of by the Trustees and the Trustees' successors.

The Grantor may, by signed instruments delivered to the Trustees, revoke the Trust in whole or in part, or amend this Agreement from time to time in any manner.

To the extent that any such requirements can be legally waived, no Trustee shall ever be required to give any bond as Trustee or qualify before, be appointed by, or in absence of breach of trust, account to any court, or obtain the order or approval of any court in the exercise of any power or discretion herein given.

IN WITNESS WHEREOF, the parties hereto have signed this on the above-written date.

GRANTOR:        *Joseph Shuster*
                Joseph Shuster

WITNESS:        *Elisa Vivian*              *Carole Carthright*

TRUSTEES:       *Joseph Shuster*            *Jean A. Peavy*
                Joseph Shuster              Jean A. Peavy

SUCCESSOR TRUSTEE:   *Mark W. Peary*
                     Mark W. Peary

Q 0182

SD 00182

Attachment To Living Trust

SCHEDULE "A"

STATE OF _California_ , COUNTY OF _Los Angeles_

_4-11-88_
Date

_T.S._
Grantor's Initial

The following is my property, both real and personal, in-cluded in the attached Revocable Living Trust.

1. Stock certificates

Company _____

No. of shares _50_

Name(s) on certificates or account _____

2. Furniture and appliances

Q 0183

SD 00183

**EXHIBIT G**
**424**

## AFFIDAVIT OF JEAN PEAVY UNDER
## CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.    The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.    The decedent died on July 30, 1992 in Los Angeles County, California.

3.    At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.    No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.    The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.    The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.    The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Time Warner Inc. Common Stock

116 Time Warner Rights

8.    No other person has a right to the interest of the decedent in the described property.

9.    The affiant requests that the described property be paid, delivered or transferred to her.

10.    The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:    August 17        , 1992

_JEAN PEAVY_

Q 0184

SD 00184

STATE OF    NEW MEXICO          )
                               )    ss.
COUNTY OF __BERNALILLO_____ )


On ___August 17_____, 1992, before me, a notary public for the State of _New Mexico_____, personally appeared JEAN PEAVY (___) known to me or (_X_) proved to me based on satisfactory evidence to be the person whose name is subscribed to the above instrument, and she acknowledged to me that she executed the same.


IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year first above written.


SEAL:

_Barbara Hewson_____
Notary Public for the
State of _New Mexico_____

Commission Expires 3-13-94

2.

Q 0185

SD 00185

EXHIBIT G
426

<u>Yasef-Golda Katlarsky</u>
(Maternal Grandparents)

<u>Jacob-Rosa Shuster</u>
(Paternal Grandparents)

<u>Yasef-Golda K.</u>

<u>Bessie-Jack Shuster</u>
(Aunt-Uncle)

<u>Julius –Ida Shuster</u>
(Parents)

<u>Frank</u> <u>Rose</u> <u>Geraldine</u>
(First Cousins)

<u>Frank Shuster</u>
(Brother)
Deceased
No Wife
No Children

**Joe Shuster**

Deceased
No Wife
No Children

<u>Jean Shuster Peavy</u>
(Sister)
Beneficiary of Will
Executress

<u>Rosie</u> – Lorne Michaels (*Divorced*)
(Second Cousin)

<u>Mark Warren Peavy</u>
(Nephew)
Contingent Beneficiary
Successor Executor

<u>Dawn Peavy</u>
(Niece)

Q 0186

SD 00186

**EXHIBIT G**
**427**

US Code as of: 01/05/99

Sec. 304. Duration of copyright: Subsisting copyrights

* (a) Copyrights in Their First Term on January 1, 1978. - (1)(A) Any
  copyright, the first term of which is subsisting on January 1, 1978,
  shall endure for 28 years from the date it was originally secured.
    o (B) In the case of -
        + (i) any posthumous work or of any periodical, cyclopedic, or
          other composite work upon which the copyright was originally
          secured by the proprietor thereof, or
        + (ii) any work copyrighted by a corporate body (otherwise than

          as assignee or licensee of the individual author) or by an
          employer for whom such work is made for hire, the proprietor
          of such copyright shall be entitled to a renewal and
          extension of the copyright in such work for the further term
          of 67 years.
    o (C) In the case of any other copyrighted work, including a
      contribution by an individual author to a periodical or to a
      cyclopedic or other composite work -
        + (i) the author of such work, if the author is still living,
        + (ii) the widow, widower, or children of the author, if the
          author is not living,
        + (iii) the author's executors, if such author, widow, widower,

          or children are not living, or
        + (iv) the author's next of kin, in the absence of a will of
          the
          author, shall be entitled to a renewal and extension of the
          copyright in such work for a further term of 67 years.
        + (2)
            + (A) At the expiration of the original term of copyright
              in a work specified in paragraph (1)(B) of this
              subsection, the copyright shall endure for a renewed and
              extended further term of 67 years, which -
    o (i) if an application to register a claim to such further term
      has been made to the Copyright Office within 1 year before the
      expiration of the original term of copyright, and the claim is
      registered, shall vest, upon the beginning of such further term,
      in the proprietor of the copyright who is entitled to claim the
      renewal of copyright at the time the application is made; or
    o (ii) if no such application is made or the claim pursuant to
      such application is not registered, shall vest, upon the
      beginning of such further term, in the person or entity that was
      the proprietor of the copyright as of the last day of the
      original term of copyright.

* (B) At the expiration of the original term of copyright in a work
  specified in paragraph (1)(C) of this subsection, the copyright shall
  endure for a renewed and extended further term of 67 years, which -
    o (i) if an application to register a claim to such further term
      has been made to the Copyright Office within 1 year before the
      expiration of the original term of copyright, and the claim is
      registered, shall vest, upon the beginning of such further term,
      in any person who is entitled under paragraph (1)(C) to the
      renewal and extension of the copyright at the time the
      application is made; or
    o (ii) if no such application is made or the claim pursuant to
      such application is not registered, shall vest, upon the
      beginning of such further term, in any person entitled under
      paragraph (1)(C), as of the last day of the original term of
      copyright, to the renewal and extension of the copyright.
    o (3)

Q 0187

SD 00187

+ (A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office -

* (i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and
(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

* (B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

* (4)
   o (A) If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.
   o (B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

* (b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act. - Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.

* (c) **Termination of Transfers and Licenses Covering Extended Renewal Term.** - In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:
   o (1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.
   o (2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

Q 0188

SD 00188



> + (A) the widow or widower owns the author's entire termination
> interest unless there are any surviving children or
> grandchildren of the author, in which case the widow or
> widower
> owns one-half of the author's interest;
> + (B) the author's surviving children, and the surviving
> children of any dead child of the author, own the author's
> entire termination interest unless there is a widow or
> widower, in which case the ownership of one-half of the author's
> interest is divided among them;
> + (C) the rights of the author's children and grandchildren are
> in all cases divided among them and exercised on a per
> stirpe basis according to the number of such author's children
> represented; the share of the children of a dead child in a
> termination interest can be exercised only by the action of a
> majority of them. [1]
> + **(D) In [2] the event that the author's widow or**
> **widower, children, and grandchildren are not living, the**
> **author's executor, administrator, personal representative, or**
> **trustee shall own the author's entire termination interest.**
> [2] So in original. Probably should not be capitalized.

o (3) Termination of the grant may be effected at any time during
a period of five years beginning at the end of fifty-six years
from the date copyright was originally secured, or beginning on
January 1, 1978, whichever is later.

o (4) The termination shall be effected by serving an advance
notice in writing upon the grantee or the grantee's successor in
title. In the case of a grant executed by a person or persons
other than the author, the notice shall be signed by all of those
entitled to terminate the grant under clause (1) of this
subsection, or by their duly authorized agents. In the case of a
grant executed by one or more of the authors of the work, the
notice as to any one author's share shall be signed by that
author or his or her duly authorized agent or, if that author is
dead, by the number and proportion of the owners of his or her
termination interest required under clauses (1) and (2) of this
subsection, or by their duly authorized agents.

> + (A) The notice shall state the effective date of the
> termination, which shall fall within the five-year period
> specified by clause (3) of this subsection, or, in the case
> of a termination under subsection (d), within the five-year
> period specified by subsection (d)(2), and the notice shall be
> served not less than two or more than ten years before that date.
> A copy of the notice shall be recorded in the Copyright Office.
> before the effective date of termination, as a condition to
> its taking effect.
> + (B) The notice shall comply, in form, content, and manner of
> service, with requirements that the Register of Copyrights
> shall prescribe by regulation.

o **(5) Termination of the grant may be effected notwithstanding**
**any agreement to the contrary, including an agreement to make a**
**will or to make any future grant.**

o (6) In the case of a grant executed by a person or persons
other than the author, all rights under this title that were
covered by the terminated grant revert, upon the effective date
of termination, to all of those entitled to terminate the grant
under clause (1) of this subsection. In the case of a grant
executed by one or more of the authors of the work, all of a
particular author's rights under this title that were covered by
the terminated grant revert, upon the effective date of
termination, to that author or, if that author is dead, to the
persons owning his or her termination interest under clause (2)
of this subsection, including those owners who did not join in
signing the notice of termination under clause (4) of this

Q 0189

SD 00189

subsection. In all cases the reversion of rights is subject to
the following limitations:
+ (A) A derivative work prepared under authority of the grant
before its termination may continue to be utilized under the
terms of the grant after its termination, but this privilege
does not extend to the preparation after the termination of
other derivative works based upon the copyrighted work
covered
by the terminated grant.
+ (B) The future rights that will revert upon termination of
the grant become vested on the date the notice of termination

has been served as provided by clause (4) of this subsection.
+ (C) Where the author's rights revert to two or more persons
under clause (2) of this subsection, they shall vest in those

persons in the proportionate shares provided by that clause.
In such a case, and subject to the provisions of subclause
(D)
of this clause, a further grant, or agreement to make a
further
grant, of a particular author's share with respect to any
right
covered by a terminated grant is valid only if it is signed
by
the same number and proportion of the owners, in whom the
right
has vested under this clause, as are required to terminate
the
grant under clause (2) of this subsection. Such further grant

or agreement is effective with respect to all of the persons
in
whom the right it covers has vested under this subclause,
including those who did not join in signing it. If any person

dies after rights under a terminated grant have vested in him

or her, that person's legal representatives, legatees, or
heirs
at law represent him or her for purposes of this subclause.
+ (D) A further grant, or agreement to make a further grant, of

any right covered by a terminated grant is valid only if it
is
made after the effective date of the termination. As an
exception, however, an agreement for such a further grant may

be made between the author or any of the persons provided by
the first sentence of clause (6) of this subsection, or
between
the persons provided by subclause (C) of this clause, and the

original grantee or such grantee's successor in title, after
the notice of termination has been served as provided by
clause
o (4) of this subsection.
    + (E) Termination of a grant under this subsection affects only

    those rights covered by the grant that arise under this
    title,
    and in no way affects rights arising under any other Federal,

    State, or foreign laws.

Q 0190

SD 00190

     + (F) Unless and until termination is effected under this
      subsection, the grant, if it does not provide otherwise,
      continues in effect for the remainder of the extended renewal

      term.

* (d) Termination Rights Provided in Subsection (c) Which Have Expired on
or Before the Effective Date of the Sonny Bono Copyright Term Extension
Act. - In the case of any copyright other than a work made for hire,
subsisting in its renewal term on the effective date of the Sonny Bono
Copyright Term Extension Act for which the termination right provided
in subsection (c) has expired by such date, where the author or owner
of the termination right has not previously exercised such termination
right, the exclusive or nonexclusive grant of a transfer or license of
the renewal copyright or any right under it, executed before January 1,
1978, by any of the persons designated in subsection (a)(1)(C) of this
section, other than by will, is subject to termination under the
following conditions:
    o (1) The conditions specified in subsections (c)(1), (2), (4),
        + () The conditions specified in subsections (c)(1), (2), (4),
        years of copyright term as provided by the amendments made by
        the
        Sonny Bono Copyright Term Extension Act.
        + (2) Termination of the grant may be effected at any time
        during
        a period of 5 years beginning at the end of 75 years from the

        date copyright was originally secured.
-------------------------------------------------------------------------

Footnotes

[1] So in original. The period probably should be a semicolon.

Q 0191

SD 00191



LEXSEE 112 stat 2827

UNITED STATES PUBLIC LAWS
105th Congress -- 2nd Session
(c) 1998, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER PROPERTIES INC.

PUBLIC LAW 105-298 [S. 505]

OCT. 27, 1998

[SONNY BONO COPYRIGHT TERM EXTENSION ACT; FAIRNESS IN MUSICAL LICENSING ACT OF 1998]

*105 P.L. 298; 112 Stat. 2827; 1998 Enacted S. 505; 105 Enacted S. 505*

BILL TRACKING REPORT:        105 Bill Tracking S. 505
FULL TEXT VERSION(S) OF BILL:  105 S. 505
CIS LEGIS. HISTORY DOCUMENT:   105 CIS Legis. Hist. P.L. 298

An Act

To amend the provisions of title 17, United States Code, with respect to the duration of copyright, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

TITLE I--COPYRIGHT TERM EXTENSION

[*101] SEC. 101. <17 USC 101 note> --SHORT TITLE.

This title may be referred to as the "Sonny Bono Copyright Term Extension Act".

[*102] SEC. 102. DURATION OF COPYRIGHT PROVISIONS.

(a) Preemption With Respect to Other Laws.--Section 301(c) of title 17, United States Code, is amended by striking "February 15, 2047" each place it appears and inserting "February 15, 2067".

(b) Duration of Copyright: Works Created on or After January 1, 1978.--Section 302 of title 17, United States Code, is amended--

(1) in subsection (a) by striking "fifty" and inserting "70";

(2) in subsection (b) by striking "fifty" and inserting "70";

(3) in subsection (c) in the first sentence--

(A) by striking "seventy-five" and inserting "95"; and

(B) by striking "one hundred" and inserting "120"; and

(4) in subsection (e) in the first sentence--

(A) by striking "seventy-five" and inserting "95";

(B) by striking "one hundred" and inserting "120"; and

(C) by striking "fifty" each place it appears and inserting "70".

Q 0192

SD-00192

Page 2

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(c) Duration of Copyright: Works Created but Not Published or Copyrighted Before January 1, 1978.--Section 303 of title 17, United States Code, is amended in the second sentence by striking "December 31, 2027" and inserting "December 31, 2047".

(d) Duration of Copyright: Subsisting Copyrights.--

(1) In general.-- Section 304 of title 17, United States Code, is amended--

(A) in subsection (a)--

(i) in paragraph (1)--

(I) in subparagraph (B) by striking "47" and inserting "67"; and

(II) in subparagraph (C) by striking "47" and inserting "67";

[**2828]  (ii) in paragraph (2)--

(I) in subparagraph (A) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67"; and

(iii) in paragraph (3)--

(I) in subparagraph (A)(i) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67";

(B) by amending subsection (b) to read as follows:

"(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act.--Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.";

(C) in subsection (c)(4)(A) in the first sentence by inserting "or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2)," after "specified by clause (3) of this subsection,"; and

(D) by adding at the end the following new subsection:

"(d) Termination Rights Provided in Subsection (c) Which Have Expired on or Before the Effective Date of the Sonny Bono Copyright Term Extension Act.--In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

"(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

"(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.".

(2) Copyright amendments act of 1992.-- Section 102 of the Copyright Amendments Act of 1992 (Public Law 102-307; 106 Stat. 266; 17 U.S.C. 304 note) is amended--

(A) in subsection (c)--

(i) by striking "47" and inserting "67";

(ii) by striking "(as amended by subsection (a) of this section)"; and

(iii) by striking "effective date of this section" each place it appears and inserting "effective date of the Sonny Bono Copyright Term Extension Act"; and

Q 0193

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(B) in subsection (g)(2) <17 USC 101 note> in the second sentence by inserting before the period the following: ", except each reference to forty-seven years in such provisions shall be deemed to be 67 years".

[**2829]    [*103]  SEC. 103. TERMINATION OF TRANSFERS AND LICENSES COVERING EXTENDED RENEWAL TERM.

Sections 203(a)(2) and 304(c)(2) of title 17, United States Code, are each amended--

(1) by striking "by his widow or her widower and his or her children or grandchildren"; and

(2) by inserting after subparagraph (C) the following:

"(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.".

[*104]  SEC. 104. REPRODUCTION BY LIBRARIES AND ARCHIVES.

Section 108 of title 17, United States Code, is amended--

(1) by redesignating subsection (h) as subsection (i); and

(2) by inserting after subsection (g) the following:

"(h)(1) For purposes of this section, during the last 20 years of any term of copyright of a published work, a library or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display, or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.

"(2) No reproduction, distribution, display, or performance is authorized under this subsection if--

"(A) the work is subject to normal commercial exploitation;

"(B) a copy or phonorecord of the work can be obtained at a reasonable price; or

"(C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.

"(3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such library or archives.".

[*105]  SEC. 105. VOLUNTARY NEGOTIATION REGARDING DIVISION OF ROYALTIES.

It is the sense of the Congress that copyright owners of audiovisual works for which the term of copyright protection is extended by the amendments made by this title, and the screenwriters, directors, and performers of those audiovisual works, should negotiate in good faith in an effort to reach a voluntary agreement or voluntary agreements with respect to the establishment of a fund or other mechanism for the amount of remuneration to be divided among the parties for the exploitation of those audiovisual works.

[*106]  SEC. 106. <17 USC 108 note> EFFECTIVE DATE.

This title and the amendments made by this title shall take effect on the date of the enactment of this Act.

[**2830]    TITLE    II--MUSIC    LICENSING    EXEMPTION    FOR    FOOD    SERVICE    OR DRINKINGESTABLISHMENTS

[*201]  SEC. 201. <17 USC 101 note> --SHORT TITLE.

This title may be cited as the "Fairness In Music Licensing Act of 1998".

[*202]  SEC. 202. EXEMPTIONS.

(a) Exemptions for Certain Establishments.--Section 110 of title 17, United States Code, is amended--

(1) in paragraph (5)--

(A) by striking "(5)" and inserting "(5)(A) except as provided in subparagraph (B),"; and

Q 0194

SD 00194

## RODI·POLLOCK

JOHN D. CAHILL
JOHN D. PETTKER
WILLIAM R. CHRISTIAN
HENRY P. PRAMOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
TIMOTHY G. CEPERLEY
ALFRED KLEIN
KENNETH A. FRANKLIN
WADE E. NORWOOD
PRIYA G. BHATT
ANDREW W. BODEAU
JEAN M. BEASLEY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 695-4900

KARL B. RODI (1908-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1896-1973)

OF COUNSEL
JOHN P. POLLOCK
ROBERT A. YAHIRO
DAVID K.W. CHANG

TELECOPIERS
(213) 895-4921
(213) 895-4922
(213) 895-4750

OUR FILE NUMBER

June 30, 2003

Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

Jean Peavy
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

*[handwritten: First Draft (Later Modified After MT Comments) Not Executed]*

Re:  Agreement for Professional Services

Dear Marc and Jean:

We are pleased to confirm that Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), will represent Jean in connection with her petition for appointment as personal representative of the estate of Joseph Shuster, deceased. You have informed us that Mr. Shuster died on July 30, 1992. We understand that, at this point, our representation will be limited to seeking the appointment of Jean as personal representative so that she, in such capacity, may terminate prior transfers of Mr. Shuster's copyrights pursuant to 17 U.S.C. §304(c)(2)(D). Our representation will not involve general administration of the estate, because, at the present time, there are no assets that require probate administration.

The Firm will render legal services to Jean in accordance with the enclosed Standard Terms of Retention, which are incorporated herein by this reference, and which we ask you to carefully review. If we subsequently perform any additional services for either of you, these terms will apply to such services as well, unless a new agreement is made.

It is our understanding that Marc has agreed to pay our fees for legal services and to reimburse us for costs advanced. We are aware that there are no assets within the estate to pay our fees and expenses. We have agreed, therefore, that it would be inappropriate to base our fees as statutorily determined under the California Probate Code as a percentage of the value of the estate. As we discussed with Marc, the rate of fees for legal services rendered by the Firm will be calculated on the basis of the time expended. While I expect that I will be performing most of the legal services on your behalf, instances may arise where I delegate duties to other individuals who will perform services or where we seek the expertise of one or more other principals within the Firm. My current hourly rate is $325.00. The current hourly rates for services rendered by other lawyers in the Firm range from $200.00 to $350.00 per hour, and paralegals are currently billed at $125.00 to $175.00 per hour. These rates are subject to change from time to time without notice:

Privileged & Confidential
All Rights Reserved

Q 0195

SD 00195

**EXHIBIT G**
**436**

Marc Toberoff, Esq.
Jean Peavy
June 24, 2003
Page 2

In addition, we request that Marc pay the Firm a retainer of $2,500.00 which will be placed in our client trust account and will be applied against attorneys' fees and costs incurred by you. A retainer is a deposit against fees and costs that will be incurred in the representation, and it is not, and should not be considered as, either an estimate of total fees or a flat fee for the work to be done.

This amount will be deposited by the Firm in an interest-bearing trust account. You hereby authorize the Firm to withdraw the principal from the trust account to pay attorneys' fees and costs as they are incurred by you or, as to costs, by us on your behalf. In accordance with state law and the requirements of the State Bar of California, any interest earned will be paid to the State Bar to fund legal services for indigent persons. If, at the termination of service under this agreement, the total amount incurred by you for attorneys' fees and costs is less than the amount of the deposit, the difference will be refunded to you.

Also enclosed with this letter is a copy of our Firm's Privacy Policy, which we ask you to review. Please confirm your agreement to the terms of this letter and the Standard Terms of Retention by dating and signing in the spaces provided below and returning this letter to me as soon as possible. If you have any questions about the terms of this agreement, including the Standard Terms of Retention or the Firm's Privacy Policy, please contact me as soon as possible to discuss them. Enclosed is a copy of this letter for your records.

We look forward to working with you on this matter.

Very truly yours,



John D. Pettker

Attachments:
    Standard Terms of Retention
    Notice of Privacy Policy

**AGREED TO AND ACCEPTED:**

_____
Marc Toberoff, Esq.        Date: _____, 2003

_____
Jean Peavy        Date: _____, 2003

Q 0196

**Privileged & Confidential**
**All Rights Reserved**

SD 00196

**EXHIBIT G**
**437**