# EXHIBIT G
# Part 4 of 9

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million.
MT tells him that "no investor is going to go for that." MT says Warners' estimation was
$2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after
the 12.5%, and of course, the investor MT "has" is himself. He is trying to get Michael
to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another
outside party. MT is lying to Michael Siegel to make sure he can still draw a fee
from Michael's 12.5% interest. If Michael went away, he would only draw from
remaining 37.5%, instead of 50%. In the final letter, MT tells Michael Siegel that
he cannot sell without our approval because Michael did not take part in the
termination, but "we will give you (Michael Siegel) approval, if you sell it to a third
party, *monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's
ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to
invest $15 million when he first approached them. But by then the Siegels were
concerned about appearing flaky for changing lawyers a few times. They decide to
stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is
disgruntlement in the Siegel camp, regarding the contingency fee. MT pushes hard for
33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of
course, he would make sure that it would...). In the contingency agreement they signed
for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received
a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement
from Time Warner as well). Thus, Toberoff used the "film production arm" of his
company to use as a shell to elicit larger contingency fees from his clients despite the fact
that Toberoff maintains that there is a "firewall" between his law firm and his production
company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the
firm's % fee, applicable to the gross proceeds of any settlement or outcome of the
litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting
50%, he will get 45%. Combined with the Schuster interest, the aggregate of any
outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of
the entire Superman interest.***** It becomes clear at this juncture that MT thwarted
the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally,
more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7
million). According to the settlement amount, he received an unconscionable 50%
contingency fee.

Q 0295                    6

Privileged & Confidential
All Rights Reserved

SD 00295

EXHIBIT G
536

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit -- that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*****************

Q 0296

7

Privileged & Confidential
All Rights Reserved

SD 00296

FROM :SIEGEL                                    FAX NO. :13108215894              Jan. 22 2003 05:21PM P1



January 21, 2002

*Privileged & Confidential*

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Dear Joanne and Laura:

This is to confirm the agreement and understanding in connection with our recent discussion and disclosure to you of various risks and potential problems regarding Michael Siegel, and the mitigation of possible conflicts of interest with respect to the following proposed remedial actions:

1.      Ariel Emanuel ("AE") will attempt to purchase all of Michael Siegel's rights, title and interest in *Superman, Superboy* and *The Spectre* ("MS Interests") to be financed by AE.

2.      The proposed purchase will be subject to Michael Siegel entering into a formal written settlement agreement, settling and releasing each of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding *Superman, Superboy and The Spectre*. The settlement agreement will specifically disclose the separate *Superboy* termination, recently served and filed.

3.      In the event Michael Siegel agrees to the above purchase and settlement, the following conditions will apply to and bind AE, any designee entity owned or controlled by him and his heirs, successors or assigns with respect to the MS Interests:

        (a)     The MS Interests will only be sold or assigned to a separate third party (i.e., not owned or controlled by AE) in conjunction with the sale or assignment of your interests in *Superman, Superboy* and/or *The Spectre*, respectively, to said third party and not independently of your interests.

9701 Wilshire Boulevard, 10ᵗʰ Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3835
E-mail: MToberoff@IPWW.biz

Q 0297

Privileged & Confidential
All Rights Reserved

SD 00297

FROM :SIEGEL                          FAX NO. :3106215894

Jan-21-03    07:59pm    From-                    Jan. 22 2003 05:22PM  P2
                                                          T-422  P.006/010  F-060

# **Ip**worldwide

Page 2
Joanne Siegel and Laura Siegel Larson
January 21, 2002

      (b)    You retain full and complete decision making authority with respect to the disposition of the copyright termination interests in *Superman*, *Superboy* and *The Spectre* arising from Jerome Siegel's copyright interest therein.

      (c)    AE will fully indemnify you and hold you completely harmless against any and all claims, causes of action, damages, costs or loss (including attorney's fees), if any, arising out of the purchase of the MS Interests and the settlement agreement.

      (d)    AE will reimburse you for twenty-five percent (25%) of any expenses paid by you after October 17, 2000 in connection with the Jerome Siegel copyright termination interests in *Superman*, *Superboy or The Spectre* , including without limitation, the filing cost of the Superboy Copyright Termination, upon and subject to your providing him with an itemized list of such expenses.

      (e)    AE will also pay twenty-five percent (25%) of the following sums: (i) fees, commission or settlement amounts, if any, to the law firm of Gang, Tyre, Ramer & Brown and/or its attorneys regarding their alleged services in connection with Jerome Siegel's copyright termination interests; (ii) fees, costs or expenses of any audit, if any, of revenues or profits derived from *Superman, Superboy or The Spectre* and (iii) fees, costs or expenses of any other actions to protect, enforce or enhance Jerome Siegel's copyright termination interests in *Superman, Superboy or The Spectre*.

      (f)    If , after the sale or assignment of the *Superman/Superboy/The Spectre* rights is made and royalties are being paid to the Siegel interest, AE chooses to offer his royalty interest for sale, you, or in the event of your death, your heirs, will have the right of first refusal to purchase said royalty interest.

4.    This letter contains the full and complete understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by each party. This letter shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this letter shall be valid.

    ///
    ///
    ///
    ///
    ///
    ///
    ///
    ///

Q 0298

Privileged & Confidential
All Rights Reserved

SD 00298

# **Ip** worldwide

Page 3
Joanne Siegel and Laura Siegel Larson
January 21, 2002

acceptable substitutes for executed originals.

If the above comports with your understanding please indicate this by your signatures
below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Agreed, Understood and Accepted:

_____          Date: _____
Ariel Z. Emanuel

_____          Date: 1/22/03
Joanne Siegel

_____          Date: 1/22/03
Laura Siegel Larson

Q 0299

Privileged & Confidential
All Rights Reserved

SD 00299

**EXHIBIT G**
**540**

region in northeastern Spain. It's made    wine to give it undertones...

## HOLLYWOOD REPORT / By John Lippman

# The Rights Stuff

*'Hazzard' Legal Issues Lead To $17.5 Million Payday; Discovery on a Treadmill*



*Seann William Scott, left, and Johnny Knoxville, right, in 'The Dukes of Hazzard'*

FOR THE NEW MOVIE "The Dukes of Hazzard," the biggest payout didn't go to the actors or even to the movie's director and producer. It went to clients of Marc Toberoff, an attorney who's made a reputation suing big studios on behalf of TV-show creators who claim they're owed money for the movie rights.

The film, which opens Aug. 5, is based on the popular 1970s-early '80s TV comedy about two Southern buddies who drive around getting into trouble and outwitting some local buffoons. It stars MTV personality Johnny Knoxville and reality-TV diva Jessica Simpson.

But before reaching the screen, the movie was tied up as a group of people who held rights related to the "Hazzard" TV show sued Warner Bros., the studio making the film. Last month, in an out-of-court settlement, the studio paid them $17.5 million, according to people familiar with the situation. It is believed to be the largest sum ever to arise out of a case involving movie rights for a TV show. It amounts to about one-third of the film's original budget. Mr. Toberoff, who usually takes his cases on a contingency-fee basis, declined to say how much he made from the "Hazzard" case. Warner Bros. declined to comment on any aspect of separated-rights issues.

For years, Hollywood has been besieged by lawsuits from people who claim studios stole their ideas. But those cases generally are about alleged copyright infringement. This lawsuit involves the "separated rights" clause in the Writers Guild of America's contract with the Hol-

> The lawyer says he isn't an 'ambulance chaser': 'I don't take on a case unless I believe in it.'

lywood studios. (It also includes copyright-infringement claims.) The Writers Guild contract stipulates that the creator of a TV show retains the show's movie rights. A studio—or an independent producer—can acquire those rights separately only under narrow guidelines. Separated-rights cases deal with whether a producer has the right to make the material into a movie.

### Coming to the Fore

The issue has come to the fore in recent years as studios increasingly rely on versions of popular TV shows from the 1960s and 1970s. This summer has already seen "The Honeymooners" and "Bewitched." "Miami Vice" is coming up next year, and "Father Knows Best," "The A-Team," "Magnum, P.I." and "The Man from U.N.C.L.E." are in development. It couldn't be determined whether any of those projects are facing separated-rights challenges; the Writers Guild of America says separated-rights disputes are confidential. Studios have increasingly sought big subjects, like old hit series, because they have a track record of success and sometimes don't need to develop into a film script. But in some cases, the plans for saving money can backfire, and the studios

have ended up paying large amounts because of litigation tied to TV-series rights.

For example, in 1999, the family of Gilbert Ralston, the creator of the 1960s TV series "The Wild, Wild West," sued Warner on a separated-rights case. (Mr. Toberoff represented them.) The studio was about to release a $150-million-budget movie based on the TV series. The suit was settled, and Warner ended up paying the Ralston family between $800,000 and $1.5 million, people involved in the case say. (The film was a disappointment at the box office.)

In the 1960s and 1970s, creators of series often sold certain TV rights to networks. But because big studios weren't generally in the market for making movies of these shows at that time, studios didn't always try to buy the movie rights. As a result, they must now go back and acquire them from the creators or their heirs—or risk being sued. "Since the whole idea of making a movie out of a TV series was highly speculative, by and large producers and studios didn't bother to acquire the separated rights," says attorney William Grantham. He represented United Artists a few years back when the studio wanted to turn the 1960s TV series "Rat Patrol" into a movie. The Writers Guild arbitrated issues involving those rights, though the movie hasn't been made.

In the case of "Hazzard," the TV series itself was based on a 1975 United Artists movie, "Moonrunners." Producer Bob Clark acquired a script by Gy Waldron, which Mr. Waldron also directed. In 1978, Warner Bros. acquired the rights to make "Moonrunners" into the "Hazzard" TV series. But according to Mr. Clark's lawsuit, the studio never acquired the movie rights. (Mr. Clark claimed copyright issues in the lawsuit, filed in Los Angeles Superior Court last February; specifically, that the "Hazzard" movie appears to rely to a large extent on "Moonrunners." The lawsuit details 25 points in the "Hazzard" movie, from plot to characters, in which the two movies possess "glaring and substantial similarities.")

On the basis of Mr. Clark's claims, the judge issued a preliminary injunction ordering Warner to withdraw marketing materials and postpone release of the movie until the parties could settle. A big delay would have been a serious setback

for the studio, since the movie cost about $53 million to make, was a major summer entry for Warner and had been widely publicized. The studio had also started rolling out its estimated $30 million advertising campaign. Within days of the judge's ruling, Warner lawyers holed up in a conference room at Mr. Toberoff's offices, and agreed to pay Mr. Clark and his partners. A settlement was reached June 21.

### 'A Market to Be Tapped'

Mr. Toberoff, who says he's never lost a case, estimates he's handled eight issues related to 10 shows on behalf of their creators when producers wanted to make them into movies. The lawyer says most of the issues involved "cleaning up" the separated rights of the shows. In only three cases, he says, has he gone to court. (Other disputes are arbitrated by the Writers Guild.)

After winning one settlement, "he was selling himself as an expert," says Grace Reiner, assistant executive director of the Writers Guild, who works on the arbitration of disputes over separated rights. "He saw a market to be tapped, and he tapped it," she says. Regarding his work representing TV-show rights holders, Mr. Toberoff says, "People call me an 'ambulance chaser.' But I don't take on a case unless I believe in it."

Mr. Toberoff first got into the field of TV-series rights by way of the son of Robert Pirosh, the creator of the 1960s TV series "Combat." While on the treadmill at his health club in 1994, Mr. Toberoff read an ad, placed by the son, seeking help in sorting through his father's papers. Mr. Toberoff researched what rights had, and hadn't, been sold. When it was announced a couple of weeks later that Bruce Willis was going to star in a movie version of "Combat," Mr. Toberoff was ready to press a claim the producer did not have the movie rights to the old TV series. Mr. Toberoff says a settlement was reached, though he won't say for how much. (That movie was never made.)

Meanwhile, Mr. Toberoff has pursued another line of work: producing. His Intellectual Properties Worldwide has acquired remake rights to classics like "High Sierra" and "The Asphalt Jungle," as well as such old TV shows as "Ironside," "Police Woman," "Hart to Hart" and "F-Troop." This could theoretically

**Bonhams & BUTTERFIELDS**
AUCTIONEERS & APPRAISERS

**Fine and Rare Wines**
Saturday July 30, 9am
San Francisco
Simulcast Los Angeles

Pre-auction Wine Tasting
Thursday July 28, 6:30pm
Los Angeles

Inquiries:
Frank Martel +1 (123) 4 56 7311
frank.martel@bonhams.com
Mariam Cebalo +1 (415) 503 3365
mariam.cebalo@bonhams.com

To attend our pre-auction wine tasting please contact:
+1 (800) 223 2854 ext. 3390
events.us@bonhams.com
*Registration fee for wine tasting

Bonhams & Butterfields
220 San Bruno Avenue
San Francisco, California 94103
www.bonhams.com/us

---

**INTERESTED IN BORDEAUX FUTURES?**
*You can't afford not to check out:*
www.goodygoody.com

put him in a delicate position, since he is representing TV-show creators suing studios, while his production company seeks the cooperation of studios that's required to fund and distribute Hollywood films. Mr. Toberoff says he is aware of the potential conflict and "keeps a defined firewall between producing and legal matters."

Privileged & Confidential
All Rights Reserved

Q 0300

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508.

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1.    Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2.    In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3.    PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _HT, MWP_

Q 0301

**Privileged & Confidential**
**All Rights Reserved**

SD 00301

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _MS_, _MWP_

Q 0302

Privileged & Confidential
All Rights Reserved

SD 00302

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MS, MMS_

Q 0303

**Privileged & Confidential**
**All Rights Reserved**

SD 00303

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor           Date: 10-30-03
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my
interests are concerned.

Jean A. Peavy                             Date: 10 –30–03

Privileged & Confidential
All Rights Reserved

SD 00304

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We successfully completed the first step of probating Joe Shuster's Estate and appointing you as Executor for purposes of implementing the termination of prior assignments of Joe's copyrights pursuant to the Copyright Act. Enclosed please find a certified copy of the Letters Testamentary appointing you as the Executor. Congratulations.

As discussed, I've enclosed three original copies of an agreement for your review between this newly-formed Estate of Joseph Shuster and my company, Pacific Pictures Corp., and incorporating the material terms of our standing agreement dated as of November 23, 2001. If all is in order please initial pages 1-3, sign page 4 (and have your mom sign page 4 as well, she doesn't need to initial) of each original. Please keep one original for your files and return the other two to me.

Upon receipt we will proceed full speed ahead with the Termination. This is quite exciting, if not historic.

Best regards.

Sincerely,

Marc Toberoff

Q 0304

**Privileged & Confidential**
**All Rights Reserved**

SD 00305

DE-150

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | TELEPHONE AND FAX NOS.: | FOR COURT USE ONLY |
|---|---|---|
| RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL, A Law Corporation JOHN D. PETTKER (SBN 42346) 444 South Flower Street, Suite 1700 Los Angeles, California 90071-2901 | 213-895-4900 213-895-4921 fax | |

**ORIGINAL**

ATTORNEY FOR *(Name)*: MARK WARREN PEARY, Petitioner

FILED
LOS ANGELES SUPERIOR C...

OCT 2 1 2003

JOHN A. ...
BY
DE... 7

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   LOS ANGELES
STREET ADDRESS:  111 North Hill Street
MAILING ADDRESS:  111 North Hill Street
CITY AND ZIP CODE:  Los Angeles, CA 90012
BRANCH NAME:  Central District

ESTATE OF *(Name)*:   JOSEPH SHUSTER, also known as
JOE SHUSTER

DECEDENT

**LETTERS**

| [x] | TESTAMENTARY | [ ] | OF ADMINISTRATION |
| [ ] | OF ADMINISTRATION WITH WILL ANNEXED | [ ] | SPECIAL ADMINISTRATION |

CASE NUMBER:
BP080635

**LETTERS**

1. [x] The last will of the decedent named above having been proved, the court appoints *(name)*:
   MARK WARREN PEARY
   a. [x]  executor.
   b. [ ]  administrator with will annexed.

2. [ ] The court appoints *(name)*:

   a. [ ]  administrator of the decedent's estate.
   b. [ ]  special administrator of decedent's estate.
     (1) [ ]  with the special powers specified in the *Order for Probate.*
     (2) [ ]  with the powers of a general administrator.
     (3) [ ]  letters will expire on *(date)*:

3. [x] The personal representative is authorized to administer the estate under the Independent Administration of Estates Act [ ] with full authority [x] with limited authority (no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).

4. [ ] The personal representative is not authorized to take possession of money or any other property without a specific court order.

**AFFIRMATION**

1. [ ] PUBLIC ADMINISTRATOR: No affirmation required (Prob. Code, § 7621(c)).

2. [x] INDIVIDUAL: I solemnly affirm that I will perform the duties of personal representative according to law.

3. [ ] INSTITUTIONAL FIDUCIARY *(name)*:

   I solemnly affirm that the institution will perform the duties of personal representative according to law. I make this affirmation for myself as an individual and on behalf of the institution as an officer. *(Name and title)*:

4. Executed on *(date)*: September 30, 2003 at *(place)*: Santa Fe, New Mexico. xx California.

▶ *[signature]* Mark Warren Peary
            (SIGNATURE)
Mark Warren Peary

**CERTIFICATION**

I certify that this document is a correct copy of the original on file in my office and the letters issued the personal representative appointed above have not been revoked, annulled, or set aside, and are still in full force and effect.

WITNESS, clerk of the court, with seal of the court affixed.

Date:  OCT 2 1 2003
Clerk, by  *[signature]*  JOHN A. CLARKE
        (DEPUTY)

Date:  OCT 2 1 2003
Clerk, by  John A. Clarke
        (DEPUTY)  S. W...

Form Approved by the Judicial Council of California DE-150 [Rev. January 1, 1998]

Q 0305

**LETTERS**
(Probate)

Legal Solutions Plus

Probate Code, §§ 1001, 8403, 8405, 8544, 8545; Code of Civil Procedure, § 2015.6

Privileged & Confidential
All Rights Reserved

SD 00306

**EXHIBIT G**
547

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1.    Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2.    In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3.    PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _MP_, _____.

Q 0306

Privileged & Confidential
All Rights Reserved

SD 00307

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peary and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____.

Q 0307

Privileged & Confidential
All Rights Reserved

SD 00308

## PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

8.    To cover the unlikely event that Marc Toberoff dies or is disabled, PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

///
///
///
///

Initials: _HS_, _____.

Q 0308

Privileged & Confidential
All Rights Reserved

SD 00309

EXHIBIT G
550

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

_____                    Date: _____
By: Mark Warren Peary, Executor
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my
interests are concerned.

_____                    Date: _____
Jean A. Peavy

Q 0309

Privileged & Confidential
All Rights Reserved

SD 00310

California Secretary of State - California Business Search Corporation Search Results        Page 1 of 1

# California Business Portal

### Secretary of State BRUCE McPHERSON

| SECRETARY OF STATE | ELECTIONS & VOTER INFO | POLITICAL REFORM | CA BUSINESS PORTAL | ARCHIVES & MUSEUM | SPECIAL PROGRAMS |

## Corporations

Business Search
Corporations

- **Printer Friendly Page**
- **New Search**
- **Search Tips**
- **Field Definitions**
- **Status Definitions**
- **Name Availability**
- **Corporate Records**
- **Business Entities**
  **Records Order Form**
  - Certificates
  - Copies
  - Status Reports
- **FAQS**
- **Corporations Main Page**
- **Site Search**

The information displayed here is current as of "APR 28, 2006" and is
updated weekly. It is not a complete or certified record of the Corporation.

| Corporation |
|---|
| PACIFIC PICTURES CORPORATION |
| Number: C2198479 | Date Filed: 9/25/2000 | Status: forfeited |
| Jurisdiction: NEW YORK |

| Address |
|---|
| 23852 PACIFIC COAST HWY STE 555 |
| MALIBU, CA 90265 |

| Agent for Service of Process |
|---|
| MARK TOBEROFF |
| 23852 PACIFIC COAST HWY STE 555 |
| MALIBU, CA 90265 |

Printer Friendly

**New Search**

- For information about certification of corporate records or for
  additional corporate information, please refer to **Corporate
  Records**.
- Blank fields indicate the information is not contained in the computer
  file.
- If the status of the corporation is "Surrender", the agent for service
  of process is automatically revoked. Please refer to California
  Corporations Code **Section 2114** for information relating to service
  upon corporations that have surrendered.

Copyright ©2001 California Secretary of State. **Privacy Statement**.

Q 0314

Privileged & Confidential
All Rights Reserved

....ca.gov/corpdata/ShowAllList?QueryCorpNumber=C2198479                    5/4/2006

SD 00315

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: PACIFIC PICTURES CORPORATION

Selected Entity Status Information

**Current Entity Name:** PACIFIC PICTURES CORPORATION
**Initial DOS Filing Date:** AUGUST 26, 1988
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Q 0315

Privileged & Confidential
All Rights Reserved

http://appsext5.dos.state.ny.us/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_...    5/4/2006

SD 00316

**EXHIBIT G**
**553**

JUL-05-2003 11:06 PM                                    1   10 827 7227           P.01

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVE. #106**
**PLAYA DEL REY, CA  90293**
**(310) 827-8136**

**July 5, 2003**

# FAX TRANSMITTAL

**TO:**       **Marc Toberoff**

**FAX#:**     **(310) 246-3101**

**FROM:**     **Laura Siegel Larson**

**PHONE:**    **(310) 827-8136**

**RE:**       **Michael Siegel Letter and Meeting with You**

**Page 1 of 8**

**MESSAGE:**

**Dear Marc,**

        Attached is the most recent letter I received from Michael Siegel and the draft of the response I am planning to send to him.

        My mother tells me the two of you spoke by phone the other day and we need to schedule a meeting.  Are you available this Tuesday, July 8th anytime between 11am and 1pm?  Please let us know how long a meeting you feel we need to bring matters up to date. If Tuesday does not work for you, we could be available this Thursday or Friday.  I will not be able to meet this Wednesday or, after this week, until the first week of August, so I hope you can fit us in on Tuesday, Thursday or Friday.

        We look forward to meeting with you soon.

                                        Sincerely,

                                        *Laura Siegel Larson*

                                        **Laura Siegel Larson**

                                                                Q 0316

**Privileged & Confidential**
**All Rights Reserved**

                                                                SD 00317

JUL-06-2003 11:07 PM                                          1 ˜18 827 7227          P.02

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have
endured much sadness. My mother passed away last year and I am particularly saddened by her
not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the
attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of
this? Now that you have signed with him, he is in control of the whole Superman copyright. I
told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a
mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up
front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has
his own production company, he was going to team with Emmanuel and make a movie. This has
not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring
all members of the Siegel interest both justice and many times more than the amount DC's
representatives wanted to throw our way to get rid of us. Marc has chosen not to open any
dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to
anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law
Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do
you know who owns the Shuster interest in the Superman copyright? Has Marc bought the
Shuster interest himself? For a long time now, Marks and Rammer said there should be a united
Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me
out. How can he find someone to buy me out and not negotiate for the entire Siegel interest?
Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave
you with less than half of the Superman copyright and not all of the Siegel interest in the
Superman copyright. This would weaken your position? The amount Marc's investor is offering
is less than half of what DC showed as my share, There is a very real possibility I will contact
Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying
me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to
the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters
of Termination on Superman and The Spectre, have any other letters of Termination been filed or
will there be more? Regarding an old item, I would very much appreciate the release of the funds
I understand are being held in escrow for me by Marc. If it turns out that we have no
disagreement regarding your expenses and too much money was released, that certainly can be
dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not
had time to review them yet.

Q 0317

Privileged & Confidential
All Rights Reserved

SD 00318

EXHIBIT G
555

JUL-06-2003 11:00 PM                                    1  18 827 7227                    P.03

This procedure has taken way to long.  I have been on contract negotiation teams and have never seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

*Michael*

Q 0318

Privileged & Confidential
All Rights Reserved

SD 00319

**EXHIBIT G**
**556**

JUL-06-2003 11:08 PM                                    1  10 827 7227              P.04

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

*DRAFT*

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

*Opinion re:*
~~Facts regarding the Time Warner-DC offer and why it sucked:~~
   -It was a bogus offer filled with land mines and things they knew we'd never agree to
   -They wanted us to ~~warrant we had no rights~~
   -~~As a result, we could have had trouble collecting money had we signed with them~~
   -They wanted us to sign away the right to get anything additional if the copyright law changed, giving creators and their families additional rights or an extension of the time before it went into the public domain .

Q 0319

Page 1

Privileged & Confidential
All Rights Reserved

SD 00320

EXHIBIT G
557

JUL-06-2003 11:00 PM                                   1 '10 827 7227          P.05

*DRAFT*

-They even wanted us to sign away the public domain rights we'd one day have
-You and Don Bulson stated that you couldn't believe how bad the contract they had
  written was
-It was a bad deal ~~and a trap and~~ we had to walk away from.
  (MT)

## Marc Toberoff and the Shuster interest:
-He does not "control" the Superman copyright. He has been hired to do a job.
-He does not own the Shuster interest. He is a lawyer hired by ~~Jean Peavy~~ Shuster, Joe
  Shuster's ~~sister~~ Estate.            (via)
-In 2013, he doesn't "take" the copyright from Time Warner, Shuster's *Estate* ~~heirs~~ could
  reacquire rights as we have ~~as a result of our~~ Terminations. Then the Shusters
  would have to negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

## We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take the bad
  TW-DC deal. You'll remember that you, Don Bulson and we were shocked when
  Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted
  Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away ~~likely~~ saying we had a deal with DC
-Marc did not call my mom nor me
-My mom called ~~Jean Peavy~~ *the Shuster's family* to see what the Shusters were doing
-~~Peavy~~ *the Shuster family* gave Marc's number to my mom and she called him after we had fired Ramer and
  Marks
-We felt he grasped our situation very well and was sympathetic to author's rights *has no plan to produce a Superman movie, nor is his desire to*
-Marc Toberoff ~~does not have a production company and we have never heard anything~~ *give the*
  ~~about him planning to make a movie~~ *division of ownership of the rights.*

## Why the original (~~$15 million~~) investor left:
-Kevin Marks ~~falsely~~ told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

## With Marc's assistance, new Notices of Termination regarding Superboy were sent out:
-We did this to further assert the Siegel rights to this character, ~~separately created from~~
  ~~Superman.~~
-My mom advanced the $4,000 filing fees immediately to the Copyright Office when the
  Notices were sent in October 2002
-A copy of the $4,000 check recently processed by the Copyright Office is enclosed with
  this letter to you.

Q 0320

**Privileged & Confidential**
**All Rights Reserved**

SD 00321

JUL-06-2003 11:09 PM                                    1 ˜10 827 7227              P.06

*DRAFT*

-The canceled check was not sent to my mom by her bank until recently. This was after
   we sent the itemization of other expenses to Don Bulson.
-Your 25% of this expense is $1,000. We are also sending this to Don and it will be
   included in the settling of the account before the money being held in trust is
   forwarded to you by Marc.

**Unfortunately we've discovered that The Spectre Terminations did not vest for the Siegel family:**
-Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
   copyright filing while he was negotiating although she told him several times that
   she wanted to send in the fees.
-Kevin did not tell us there was a time limit on when the fees could be paid
-When negotiations were terminated, we found out from the Copyright Office it was too
   late to pay the fees
-The Spectre rights are a dead issue

**Marc has a limited negotiation period to represent the Siegel interest:**
-For Superman: 18 months from Oct. 23, 2002 (until April 23, 2004)
-For the newly filed Superboy Terminations: 30 months from Oct.23, 2002 (until April
   23, 2005) This is longer because there is a two year waiting period from the time
   the Notices were served to the date the rights vest.
-If we are not pleased with the results, he will no longer represent us after that time

**Why Marc has not been negotiating with Time Warner**
-The fact that DC doesn't know what to expect from us since we broke off negotiations
   and turned down their last offer gives us strength
-By not running to them right away, we do not appear desperate and needy, willing to take
   a bad deal
-Timing the negotiations is an art
-It may be better not to deal with Time Warner at all but to go elsewhere

**Why there is a buyout offer from a venture capitalist for your interest only:**
-You have been saying you needed money badly, were out of work and had big bills
-The venture capitalist doesn't want to invest more than the amount to buy your interest
-My interests are too entangled due to my divorce
-Marc asked our permission to present an offer to you and we decided not to stand in your
   way if you want to accept it. We do not know the amount that the investor is
   offering to you.

**Why any investor would offer less than Time Warner did in its last offer:**
-It is a risky investment
-No immediate payback
-The investor and we may face legal expenses and conflict with DC in the future if we
   have to sue to get what's already owed or if we eventually make a deal with them
   and they withhold payment due to "creative bookkeeping" or for other reasons

Page 3

Privileged & Confidential
All Rights Reserved

Q 0321

EXHIBIT G
559

SD 00322

JUL-06-2003 11:09 PM                                    J  *10 827 7227        P.07

*DRAFT*

-The investor wants a worthwhile profit on his investment
-It is a situation similar to one in which businesses that give immediate money to
 beneficiaries of Wills who do not want to wait until the Will goes through Probate
 for them to receive their money.  The beneficiaries always get less than if they
 wait for the Will to go through Probate.

Why you cannot ask Time Warner/DC for a buyout:
-It destroys the possibility of us negotiating a fair deal
-It shows weakness
-As the controlling interest, we do not give you approval to do it
-If it damaged our ability to later make a better deal, we would have no choice but to sue
 you

Why this has not been like other "contract negotiations":
-Time Warner is a huge, arrogant company
-They took months to respond to each issue all along the way and their responses were
 unacceptable
-Time Warner has nothing to gain by settling this, they keep on making millions
-Their lawyers are particularly heartless, masters at screwing people.  They have a bad
 reputation for this
-They delight in playing off what they see as the Siegel interest's weakness—our need for
 money
-If that wasn't enough, they want to include additional characters created by our father in
 one settlement.  (They apparently do not yet realize that The Spectre rights did not
 vest to the Siegels.)
-They want to win this David and Goliath matter so that the rich and powerful will
 triumph over the little guy
-They want to make an example of us so that other creators and their heirs won't go after
 their rights.

Your belief that you have something to sell independently:
-You can only sell your rights to a third party with my mom's and my approval because
 we are the majority interest holders and you have a passive interest
-We will not give approval for a sale to Time Warner because it would damage the
 overall Siegel interest
-We will give approval for a sale to a third party found by Marc Toberoff as long as it is
 not Time Warner, DC, or any part of the Time Warner family of businesses and
 providing the sale does not damage our ability to make a deal for our portion of
 the Siegel interest

Although a united Siegel front would be best, we won't stand in your way if you decide
you want to take the buyout from the investor that Marc has found.  The decision has to be yours
and yours alone.  However, for the reasons listed above, we will not give approval for you to go
to Time Warner regarding a buyout,

Q 0322

Privileged & Confidential
All Rights Reserved

SD 00323

EXHIBIT G
560

JUL-06-2003 11:18 PM                              1  10 827 7227              P.09

DRAFT

The Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a settlement. If the 15 million-dollar offer from the other investor hadn't fallen through, we probably would have taken it. Unfortunately, offers like that are rare and we do not expect any offers to come our way that would include my mom and me.

If you don't like the offer, Don Bulson should tell Marc. There's no point in dragging it out. Marc says he's been waiting for an answer for months and he told Don if you don't like the offer you should make a counteroffer. Did Don tell you this? If you do take the offer, your wait is over, you have instant money and can go on with your life.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your letter. Please let us know what you decide regarding a buyout through Marc.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure: Xerox of my mom's $4,000 check to the Copyright Office for the Superboy Notices of Termination

Q 0323

Page 5

Privileged & Confidential
All Rights Reserved

SD 00324

EXHIBIT G
561

RECEIVED

MAY 3 0 2003

Marc Toberoff

## TELECOPIER COVER PAGE

DATE:               May 30, 2003

RECIPIENT:          Marc Toberoff

SENDER:             James R. Jackoway

FAX NUMBER:         310-246-3101

NUMBER OF PAGES:    25(including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305.  Thank you

Q 0324

**Privileged & Confidential**
**All Rights Reserved**

SD 00325

**EXHIBIT G**
**562**

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER
## MEMORANDUM

**TO:**     James R. Jackoway, Esq.

**FROM:**   Kurt L. Harrison

**DATE:**   May 29, 2003

**RE:**     Marc Toberoff -- Ethical Issues

**cc:**     Gerry Hemmerling, Esq.
            Michele M. Mulrooney, Esq.

*************************************************************

        Gerry Hemmerling informs me that this Firm has been asked to assist Mr. Marc Toberoff and his corporation, Pacific Pictures Corporation ("PPC"), by providing legal services in connection with a joint venture between PPC, on the one hand, and Jean Peavy and her son, Mark Peary, (collectively, the "Peavys") on the other.  Ms. Hemmerling requested that I examine some of the ethical issues that might confront Mr. Toberoff and this Firm, if the Firm were to agree to assist Mr. Toberoff and PPC in the joint venture.

        I understand that Mr. Toberoff formed PPC and that PPC entered into a Joint Venture Agreement (the "Agreement") with the Peavys to exploit certain copyrights held, assigned, or transferred by the late Joe Shuster.  The Peavys are Shuster's heirs.  Among other things, the Agreement requires the parties to

G:\KLH\PPC.TOBEROFF\MEMO.REV1.DOC

-1-

Q 0325

Privileged & Confidential
All Rights Reserved

SD 00326

**EXHIBIT G**
**563**

engage Mr. Toberoff to perform legal services for the Peavys, and entitles Mr. Toberoff, through PPC, to receive 50% of all profits realized from the exploitation of the copyrights.  We do not know at present how Mr. Toberoff came in contact with the Peavys.

## RULE 1-200

As you know, Rule 1-200 of the California Rules of Professional Conduct prohibits any member of the California State Bar from knowingly assisting in, soliciting, or inducing any violation of the Rules of Professional Conduct or the State Bar Act (Cal. Bus. & Prof. Code § 6000 et seq.).  In essence, this Rule makes any potential ethical problems confronting Mr. Toberoff this Firm's potential problems as well, if the Firm agrees to assist Mr. Toberoff and PPC in the transaction with the Peavys.  Hence, this Memorandum examines both potential issues confronting Mr. Toberoff in his relationship with the Peavys and the transaction in question and potential issues that would confront this Firm were it to agree to assist Mr. Toberoff and PPC.

## RULE 1-400

The first potential problem raised by Mr. Toberoff's relationship with the Peavys arises from the prohibition against certain forms of advertising and solicitation by attorneys.  Rule 1-400 prohibits certain types of "communications" and "solicitations."  With respect to prohibited solicitations, an

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC                    -2-                        Q 0326

Privileged & Confidential
All Rights Reserved

EXHIBIT G
564

Thus, even if Mr. Toberoff contacted the Peavys by mail, rather than in person or by telephone, the communication would presumably violate Rule 1-400, unless Mr. Toberoff had made the required disclosures on the first page and envelope of the letter.  Again, without knowing exactly how and why Mr. Toberoff contacted the Peavys, it is difficult to know whether he violated Rule 1-400.  However, given the circumstances here, there is reason for concern in connection with any potential involvement of this Firm.

### BUSINESS AND PROFESSIONS CODE §6150 ET SEQ.

Mr. Toberoff's use of a corporate entity to acquire business also raises concerns about "capping."  The State Bar Act (the "Act") broadly defines a "capper" or "runner" as any person, firm, association, or corporation acting in any manner or in any capacity as an agent for an attorney in the solicitation or procurement of business for the attorney.  Bus. Prof. Code § 6151.  The Act makes it unlawful for any person, firm, corporation, partnership, or association to act as runner or capper for any attorney.  Bus. & Prof. Code § 6152.

In this case, PPC appears to be soliciting or procuring business for Mr. Toberoff.  Indeed, presumably at the suggestion or insistence of PPC, the Agreement requires the Peavys to engage the legal services of Mr. Toberoff, who then gets paid from the proceeds of the copyright exploitation.  Of course, "capping" also requires that the corporation soliciting or procuring

**Privileged & Confidential**
**All Rights Reserved**

TOBEROFF\MEMO.REV1.DOC

-4-

Q 0327

SD 00328

EXHIBIT G
565

business for the attorney act for consideration. However, given the broad definition of consideration and the close relationship of Mr. Toberoff and PPC, it would probably not be difficult to find consideration. See Civ. Code § 1605 (broadly defining consideration as any benefit conferred or prejudice suffered by the promisor as inducement for the promise).

Furthermore, if this Firm were to engage in a long-term relationship with Mr. Toberoff by participating in other similar ventures, Mr. Toberoff, PPC, or whatever other entity Mr. Toberoff employs also appears to be soliciting or procuring business for the Firm. Hence, it might appear that the Firm itself were "joining" in the capping activity, which is also a violation of the Act. Bus. & Prof. Code § 6152. Such activity would also independently violate Rule 1-200, which, as mentioned above, prohibits attorneys from inducing, soliciting, or assisting in the violation of the Act.

## RULE 2-200

Aside from the questions raised above, if this Firm agreed to assist Mr. Toberoff in the joint venture with the Peavys, the Firm's involvement would also raise ethical issues regarding the financial relationship between Mr. Toberoff and the Firm. Rule 2-200(A) prohibits attorneys from dividing fees for legal services unless (1) the client consents in writing after full disclosure and (2) the total fee charged by all lawyers is not unconscionable. Even if all other ethical concerns were

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

−5−

Q 0328

Privileged & Confidential
All Rights Reserved

SD 00329

**EXHIBIT G**
**566**

satisfied, this Rule would require that a full written disclosure
be made both to the Peavys and to the personal representative of
the Shuster Estate.  Furthermore, as discussed below, it is
questionable whether the second prong of requirement can be met
because of the 50% fee being charged by Mr. Toberoff through PPC.

## RULE 3-300

The Agreement also raises issues concerning Rule 3-300
regarding avoiding interests adverse to a client.  Rule 3-300
prohibits an attorney from entering into a business transaction
or knowingly acquiring an ownership or other pecuniary interest
adverse to a client unless (1) the transaction and its terms are
fair and reasonable to the client; (2) the transaction and its
terms are fully disclosed and transmitted in writing to the
client in a manner which should reasonably have been understood
by the client; (3) the client is advised in writing that the
client may seek the advice of an independent lawyer and is given
a reasonable opportunity to seek that advice; and (4) the client
consents to the transaction in writing.  Furthermore, the written
disclosure requires more than just presenting the client with a
written agreement.  Decisions interpreting this Rule require the
lawyer to fully advise the client in writing of all disadvantages
and legal obligations of the transaction.[1]

In this case, the Agreement itself would unlikely
suffice as the required written disclosure.  Furthermore, there

---

[1] For the sake of brevity, I have not cited these cases here.

Privileged & Confidential
All Rights Reserved

SD 00330

**EXHIBIT G**
**567**

appears to be no writing advising the Peavys of their right to seek independent legal advice, and we do not know whether the Peavys were given an opportunity to seek such advice. Finally, as discussed below, there is a significant question as to whether 50% of all net profits is objectively fair and reasonable under the circumstances.

Mr. Toberoff's use of a corporate entity, PPC, as the party to the joint venture with the Peavys would most likely make no difference in the application of Rule 3-300. As a policy matter, if an attorney could circumvent Rule 3-300 by the simple expedient of forming a corporate entity to engage in the transaction with the client, the Rule would have no vitality. This suggests that a court would most likely disregard the corporate entity for the purposes of applying Rule 3-300 under the circumstances presented here.

## RULE 3-310

Ms. Hemmerling has discussed the potential conflicts that this Firm would have in representing the Shuster Estate, while being paid by a party whose pecuniary interests are adverse to the Estate and its heirs, the Peavys. The issues discussed by Ms. Hemmerling implicate Rule 3-310, and in particular Subdivisions (B), (C), and (F). You should note, however, that Rule 3-310 can be satisfied by obtaining the client's written informed consent. In this case, prudence would suggest that the

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-7-

Q 0330

**Privileged & Confidential**
**All Rights Reserved**

SD 00331

written informed consent should be obtained from both the Peavys
and the personal representative of the Shuster Estate.

## RULE 4-200

Finally, Rule 4-200 prohibits an attorney from entering
into agreement for, charging, or collecting an illegal or
unconscionable fee. The Rule lists eleven factors that are among
the factors to be considered. Without engaging in an extensive
analysis of each factor here, it appears far from clear whether
the 50% net profit fee charged by Mr. Toberoff through PPC[2] is
conscionable. As you know, contingent fees in most cases
typically run between 20% and 40% of net recovery. Looking at
the factors, it is difficult to see how a fee well in excess of
the usual upper limit of contingent fee agreements can be
justified in this case. Ultimately, however, there is no bright
line standard for determining this issue. Furthermore, this
issue is difficult to evaluate without some appreciation for the
discounted value of the rights in question. Nonetheless, as
noted above, this issue raises concerns both in the near- and
far-term as to Rule 4-200 and, as discussed above, as to Rules 2-
200 and 3-300.

---

[2] As with the application of Rule 3-300, it is unlikely that Mr.
Toberoff's use of PPC would shield him from the requirements of
Rule 4-200.

**Privileged & Confidential**
**All Rights Reserved**

G:\KLM\PPC_TOBEROFF\MEMO-REV1.DOC                -8-                Q 0331

SD 00332

For your review, I have included all of the rules and statutes cited in this Memorandum.  If you wish me to pursue further any of the issues discussed herein, please let me know.


ATTACHMENTS

Q 0332

G:\KLH\PBC TOBEROFF\MEMO.REV1.DOC

Privileged & Confidential
All Rights Reserved

SD 00333

EXHIBIT G
570

**LAURA SIEGEL LARSON**
6400 PACIFIC AVENUE #106
PLAYA DEL REY, CA  90293
(310) 827-8136
FAX  (310) 827-7227
November 6, 2002

# FAX TRANSMITTAL

TO:       Marc Toberoff
FAX#:    (310) 246-3101
FROM:   Laura Siegel Larson and Joanne Siegel
PHONE:  (310) 827-8136

**Page 1 of 3**

MESSAGE:

Dear Marc,

Attached, for your records, please find the Kevin Marks memo of August 9, 2002.
It makes reference to the contact you had with his office.  Although your initial
contact with him had been in late 2001, this August, 2002 letter was the first time he
notified us of your interest in the Siegel rights.

Please note that we had been unhappy with the representation that the Ramer firm
had been giving us for some time.  We went to a meeting at Kevin's office in
May, 2002 prepared to terminate them as our representatives.  At that same
meeting between my mother, Kevin Marks and myself, Marks told us that if we did
not accept the February 1, 2002 DC proposed contract or a redraft that he wanted
to write, that he and his firm could no longer represent us.  DC's document had
been totally unacceptable and while we were ready to terminate Marks and Ramer
right then and there, we gave conditional approval to Kevin to make one last
attempt at a redraft.  When delivered to us in July, we found his draft unacceptable
as well and followed through on our earlier desire to terminate Gang, Tyre, Ramer
& Brown as our representatives.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0333

Privileged & Confidential
All Rights Reserved

SD 00334

# GANG, TYRE, RAMER & BROWN, INC.
## MEMORANDUM

From:  Kevin S. Marks                    Date:  August 9, 2002

    To:  Joanne Siegel                      Re:  "Superman"
        Laura Siegel Larson
        Don Bulson

    cc:  Bruce Ramer

      On August 8, 2002, I received a call from Mark Toberoff and Ari Emanuel. Toberoff is a lawyer; Emanuel is one of the founding partners of the Endeavor Talent Agency.

      They have formed a group (with other investors, I am sure) that is interested in acquiring intellectual property rights, exploiting those rights in all media, and attaching Endeavor clients to projects that evolve from those rights. We do not know who the other investors are or what other funding sources are available to this group.  They are aware of the Siegel termination rights.

      In a previous telephone conversation (initiated by Mr. Toberoff), I told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics (subject to documentation), but that all aspects of the agreement and the negotiations were confidential.  Mr. Toberoff asked me if I would make an offer to him and his group that the Siegel Family would consider in lieu of the D.C. Comics deal.  I told him that I did not feel that it was appropriate to be making offers while I was in the process of documenting an existing deal.

      On August 8, the Toberoff/Emanuel Group took the initiative and made an offer.  Their offer is $15 million up-front, plus what they promise to be a meaningful participation from proceeds from the exploitation of "Superman" in all media on an ongoing basis.  They said they have already done their "due diligence" and that such an arrangement would not be subject to further legal or other research on their part.

      Having received this proposal, I am obliged to pass it on to you.

      I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation. (If called to testify, I would have to testify as much.)  The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for

245415.1

Q 0334

Privileged & Confidential
All Rights Reserved

SD 00335

## GANG, TYRE, RAMER & BROWN, INC.

Joanne Siegel
Laura Siegel Larson
Don Bulson
August 9, 2002
Page 2

that matter) by D.C. Comics. I would also not be surprised if existing benefits (such as insurance reimbursement and widow's benefits) were cut off.

This new offer (which has significant blanks to fill in) looks like it could be better than the D.C. deal. I believe the Toberoff/Emanuel group attaches enhanced value to the property because it has brokered a confidential arrangement with the Shuster estate and is trying to put together the Siegel and Shuster termination pieces. (As we have discussed previously, the Shuster estate will have termination rights in approximately 2013 if the U.S. Supreme Court upholds the recent law extending the copyright term). I, of course, cannot assure you that this is a real deal, and undisclosed investors sometimes disappear just when you think you are close to concluding an arrangement.

My recommendation ultimately is to stay the course with D.C. Comics. I do not say that as a matter of economics; it is candidly what I think to be the right thing to do under the circumstances.

Therefore, I would send D.C. Comics the revised draft that I have prepared (as it may be modified with your input). We should continue to negotiate the documentation in good faith with D.C. Comics, and make every genuine effort to come up a written agreement that is true to the deal that was made. I believe the deal will be finalized with D.C. Comics, even if the process is not entirely smooth. If, despite all these good faith efforts, the parties cannot reach final agreement, then the negotiations would be terminated and then (and only then) would there would be a clear parting of ways which would open up your exploring other possibilities.

I will be out of the office the week of August 12th. If you would like to discuss this matter in my absence, please feel free to call Bruce Ramer.

Best regards.

K.S.M.

245415.1

Q 0335

Privileged & Confidential
All Rights Reserved

SD-00336

EXHIBIT G
573



# Ip worldwide

9701 Wilshire Blvd., 10ᵗʰ Floor
Beverly Hills, CA 90212
Ph: (310) 246-3333 · Fx: (310) 246-3101

---

## FACSIMILE COVER PAGE

| TO: Joanne Siegel Laura Siegel Larson | FAX: (310) 821-5894 (310) 827-7227 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 11/26/02 | RE: Potential Conflict Disclosure |

**COMMENTS:**

Dear Joanne & Laura:

As discussed, enclosed please find a disclosure and acknowledgement of potential conflicts for your review.  Please bear in mind that the wording of this document is not hyper-critical, since it is really an internal document for our protection to evidence that we have followed appropriate protocol.

Feel free to call me with any further questions.

---

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

---

Q 0336

Privileged & Confidential
All Rights Reserved

SD 00337

# Ip worldwide

November 26, 2002

*Privileged & Confidential*

Joanne Siegel                                    Laura Siegel Larson
13929 Marquesas Way, Apt. 201A                   6400 Pacific Avenue, #106
Marina Del Rey, CA 90292                         Playa Del Rey, CA 90293

Re: Potential Conflict Disclosure

Dear Joanne and Laura:

With reference to our Agreements dated as of October 3, 2002 pertaining to *Superman* and *Superboy*, this is to confirm that we have disclosed to you and discussed the following proposed actions that may pose potential conflicts of interest or the appearance of potential conflicts of interest and that following our disclosure, discussion and our answering of your questions with regard thereto, you freely acknowledged and agreed that you have no objection to our taking said actions as set forth below.

IPW will enter into negotiations with Michael Siegel and/or his representative to purchase all of Michael Siegel's rights, title and interest in *Superman* and *Superboy*, including his 25% share of the copyright termination interests arising from Jerome Siegel's interest in the copyrights thereto. This purchase, if any, will be directly financed by Ariel Emanuel. To eliminate potential disputes, if any, which might cloud or hamper the interests subject to purchase, the proposed purchase of Michael Siegel's interests will be contingent upon Michael Siegel expressly settling and releasing both of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding *Superman* and *Superboy*.

If the above comports with your understanding please indicate same by your signatures below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Acknowledged and Agreed:


_____        Date: _____
Joanne Siegel


_____        Date: _____        Q 0337
Laura Siegel Larson

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

**Privileged & Confidential**
**All Rights Reserved**

SD 00338

EXHIBIT G
575

## Confirmation Report — Memory Send

Page       : 001
Date & Time: Nov-26-02  08:17pm
Line 1     :
Machine ID :

| | | |
|---|---|---|
| Job number | : | 922 |
| Date | : | Nov-26 08:16pm |
| To | : | ☎98277227 |
| Number of pages | : | 002 |
| Start time | : | Nov-26 08:16pm |
| End time | : | Nov-26 08:17pm |
| Pages sent | : | 002 |
| Status | : | OK |

Job number    : 922               *** SEND SUCCESSFUL ***



**Ip** worldwide

9701 Wilshire Blvd., 10ᵗʰ Floor
Beverly Hills, CA  90212
Ph: (310) 246-3333 · Fax (310) 246-3101

### FACSIMILE COVER PAGE

| TO:  Joanne Siegel<br>Laura Siegel Larson | FAX:  (310) 821-5894<br>(310) 827-7227 |
|---|---|
| FROM: Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 11/26/02 | RE: Potential Conflict Disclosure |

**COMMENTS:**

Dear Joanne & Laura:

As discussed, enclosed please find a disclosure and acknowledgement of potential conflicts for your review.  Please bear in mind that the wording of this document is not hyper-critical, since it is really an internal document for our protection to evidence that we have followed appropriate protocol.

Feel free to call me with any further questions.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT  THE  ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0338

**Privileged & Confidential**
**All Rights Reserved**

SD-00339

**EXHIBIT G**
576

Confirmation Report

```
                                    Page      : 001
                                    Date & Time: Nov-26-02  09:21pm
                                    Line 1    :
                                    Machine ID :
```

| Nbr. | Job | Date | Time | Duration | pgs | To | Dept.nbr | Account | Comm. code | Status |
|------|-----|------|------|----------|-----|-----|----------|---------|-----------|--------|
| 362 | 923 | Nov-26 | 08:19pm | 01/37 | 002 | 98215894 | | | G3 301 | OK |

Q 0339

**Privileged & Confidential**
**All Rights Reserved**

SD 00340

**EXHIBIT G**
**577**

Confirmation Report

```
                                        Page      : 001
                                        Date & Time: Nov-26-02  08:26pm
                                        Line 1    :
                                        Machine ID :
```

| Nbr. | Job | Date | Time | Duration | pgs | To | Dept.nbr | Account | Comm. code | Status |
|------|-----|------|------|----------|-----|----|----------|---------|-----------|--------|
| 363 | 924 | Nov-26 | 08:24pm | 01/38 | 002 | 99215894 | | | G3 301 | OK |

Q 0340

**Privileged & Confidential**
**All Rights Reserved**

SD 00341

**EXHIBIT G**
578

# Ip worldwide

December 16, 2002

_Privileged & Confidential_

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Ariel Emanuel
9701 Wilshire Boulevard, 10th Floor
Beverly Hills, CA 90265

Dear Joanne, Laura and Ari:

This is confirm the agreement and understanding in connection with our recent discussion and disclosure to you of various risks and potential problems regarding Michael Siegel, and the mitigation of possible conflicts of interest with respect to the following proposed remedial actions:

1.    IPW/Ariel Emanuel will enter into negotiations with Michael Siegel to purchase all of Michael Siegel's rights, title and interest in _Superman_ and _Superboy_ ("MS Interests") to be financed by Ariel Emanuel.

2.    The proposed purchase will be subject to Michael Siegel entering into a formal written settlement agreement, settling and releasing each of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding _Superman_ and _Superboy_. The settlement agreement will specifically disclose the separate _Superboy_ termination, recently served and filed.

3.    In the event, Michael Siegel agrees to the above purchase and settlement, the following conditions will apply to and bind Ariel Emanuel, IPW (or any designee thereof) with respect to the MS Interests:

    (a)    The MS Interests will only be sold or assigned to a separate third party in conjunction with the sale or assignment of your interests in _Superman_ and _Superboy_, respectively, to said third party and will not be sold or assigned independently of your interests.

    (b)    You retain full and complete decision making authority with respect to the disposition of the copyright termination interests in _Superman_ and _Superboy_ arising from Jerome Siegel's copyright interest therein.

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

Privileged & Confidential
All Rights Reserved

Q 0341

SD 00342

EXHIBIT G
579

# Ip worldwide

Page 2
Joanne Siegel, Laura Siegel Larson and Ariel Emanuel
December 16, 2002

(c)     Ari Emanuel will fully indemnify you and hold you completely harmless against any and all claims, causes of action, damages, costs or loss (including reasonable attorney's fees), if any, arising out of the purchase of the MS Interests and the settlement agreement.

(d)     In the event a future profit participation or royalty interest ("MS Royalty") is retained in connection with the sale or transfer of the MS Interests to a third party along with your interests as set forth above, and the MS Royalty is thereafter offered for sale, you, or in the event of death, your heirs, will have a right of first refusal to purchase the MS Royalty.

If the above comports with your understanding please indicate this by your signatures below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Agreed, Understood and Accepted:

_____        Date: _____
Ariel Z. Emanuel

_____        Date: _____
Joanne Siegel

_____        Date: _____
Laura Siegel Larson

Q 0342

**Privileged & Confidential
All Rights Reserved**

SD 00343

**EXHIBIT G**
**580**

FROM :SIEGEL                    FAX NO. :3106619554           Mar. 13 2003 10:20AM P1



DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail: paul.levitz@dccomics.com

Paul Levitz - President & Publisher

March 3, 2003

Joanne Siegel
13929 Marquesas Way
Apartment 201A
Marina Del Rey  CA  90202

Dear Joanne,

I'm writing to follow up on our conversation at the end of last month.  I regret deeply that you remained unwilling to accept my repeated invitation to get together (accompanied by whatever representatives you chose, of course) to try to resolve matters.  But even more deeply, I regret not having a more personal way to react to your last letter, which I've been trying to arrange since its receipt in the fall.

After almost three decades of friendship, and many, many occasions on which you and Jerry saw fit to express your fond feelings for me, I'm saddened that you could write a letter which describes me as trying to "wear down" you and Laura.  At no point in this complicated problem has that been anyone's strategy, at DC, at Warner Bros., or at AOL Time Warner.  It is the real and sincere desire of all concerned on our side to settle this fairly, generously and to honor Jerry and Joe's memory in a manner consistent with our responsibilities under the law and to our shareholders.  Every person who has worked on this matter for our side has repeatedly expressed frustration that we have been unable to reach resolution – not because of any cost of difficulty created for our company, but because you and Laura and the boys should be enjoying the fruits of Jerry's creativity, not being frustrated by them.

You mentioned in congratulating me on my promotion that I now have 'the power.'  The reality is, the person with the most power to resolve this matter is you.  If you will sit down and guide us through your concerns which undid the deal your representatives agreed to a year ago, issues which have never been explained to us, I would hope we could solve them.  I will be happy to meet with you in any place or manner you prefer to work towards a solution that is satisfactory to you...and whatever power I have will be devoted to a solution that honors Jerry, as it has been in whatever position I've held at DC, or in fandom before that.



A division of Warner Bros. - An AOL Time Warner Company

Q 0343

**Privileged & Confidential**
**All Rights Reserved**

SD 00344

FROM :SIEGEL                    FAX NO. :                    Mar. 13 2003 10:23AM P1

Alternatively, we remain open to constructive paths to resolution you may prefer. A suggestion from members of our team familiar with the process is to attempt non-binding mediation. The selection of the mediator would be subject to both your approval and ours, and neither of us would be required to continue the process if it seemed unhelpful. The presence of a skilled mediator might enable us to understand, directly, what is important to you and where the previous negotiation went wrong, and for you to understand the reasons certain issues are important to us. Together we would work to find answers. For this to succeed, I believe it would require your personal involvement, as well as the support and protection of your advisors and lawyers.

Please give some consideration to these approaches, or let us know how you would prefer to proceed towards the amicable resolution that has been our shared goal. Pass a copy of this to your new lawyer, if he or she is in place, and consider the possibilities. Our lawyers are also sending follow up documents to your notices and letters, which will be sent to you since we have no representative identified to receive them, and we would appreciate you sending them on as well.

Joanne, I will not claim to have had as many sleepless nights over this matter as you and Laura must have, but I assure you my inability to resolve it properly weighs heavily on me. Please consider the best way for us to get together and get this done, so you can go on to happier and more prosperous days.

Best,

Paul Levitz

:lf

cc: John Schulman

Q 0344

Privileged & Confidential
All Rights Reserved

SD 00345

EXHIBIT G
582

RECEIVED

MAY 2 8 2003

Marc Toberoff

## TELECOPIER COVER PAGE

DATE:                      May 28, 2003

RECIPIENT:             Marc Toberoff

SENDER:                James R. Jackoway

FAX NUMBER:        310-246-3101

NUMBER OF PAGES:        6(Including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0345

Privileged & Confidential
All Rights Reserved

SD 00346

EXHIBIT G
583

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER
## MEMORANDUM

TO:       Jim Jackoway

FROM:     Gerry Hemmerling

DATE:     May 27, 2003

RE:       Marc Toberoff -- Superman rights

CC:       Michele Mulrooney
          Kurt Harrison

---

Michele asked me to give you the citations for the statutes we discussed last week about the Toberoff matter.

The Joint Venture Agreement regarding the Superman rights provides for Toberoff's corporation, PPC, to deal with the Superman rights and to pay all costs and disbursements with respect to the rights.  It also provides for PPC to pay all costs and legal fees of "setting up" Joe Shuster's estate.  PPC will then recoup its "out of pocket expenses", excluding contingent legal fees, from the proceeds of the Joint Venture prior to distribution.  The Agreement also provides for PPC to retain Toberoff to render all legal services regarding the rights and the Joint Venture and to handle the negotiation of contracts regarding the exploitation of the rights.  Under the Agreement, the parties are to approve the appointment of Michael Catron as administrator of the estate and to instruct him to disburse the proceeds from the rights in accordance with the Agreement.

Q 0346

-1-

**Privileged & Confidential
All Rights Reserved**

SD 00347

**EXHIBIT G
584**

In essence, under the Agreement, PPC and not Shuster's heir, would be controlling the probate of Shuster's estate, and Toberoff personally would be controlling the exploitation of the rights.  Pursuant to the Agreement, we would be handling the probate estate for PPC and your role in negotiating contracts for exploitation of the rights would not be independent of Toberoff.

The purpose of the probate laws is generally to protect the estate and the heirs of the decedent.  They restrict the amount of fees paid to lawyers and executors for the estate, including fees for negotiating and enforcing contracts dealing with estate interests, and also allow the court to examine contracts dealing with disposition of estate interests.

In addition to ethical problems that Toberoff may have and that we may have indirectly through Toberoff or PPC, there are some specific probate problems under the Agreement.  Lawyers for an estate cannot have any conflicts of interest with regard to estate matters or estate heirs.  There is a potential conflict of interest that the firm might have if we handled the probate matters, with PPC advancing all probate costs and in effect controlling the probate, and your being involved with the estate in negotiating contracts that would benefit both PPC and the estate.

*what is it?*

The court can examine the Agreement pursuant to Probate Code Section 11604, a copy of which is attached, and can refuse distribution of the Joint Venture proceeds pursuant to the Agreement or can order distribution in a different manner if the court finds that the arrangement was inequitable.  It can also limit

Q 0347

Privileged & Confidential
All Rights Reserved

—2—

SD 00348

the attorneys' fees paid to lawyers for the estate in connection with the rights pursuant to Probate Code Sections 10810 and 10811, copies of which are attached. In particular, if we represented the estate, the court must determine that any contingent fee arrangements that benefited the firm must be in the best interests of the estate and the heirs.

I am asking Kurt to discuss with you and give you the appropriate sections of the Business and Professions Code and State Bar Rules regarding other ethical problems that are applicable to the matter.

002-mem
attachments

Privileged & Confidential
All Rights Reserved

—3—

Q 0348

SD 00349

EXHIBIT G
586

§ 11604.  Distribution to person other than beneficiary

(a) This section applies where distribution is to be made to any of the following persons:

(1) The transferee of a beneficiary.

(2) Any person other than a beneficiary under an agreement, request, or instructions of a beneficiary or the attorney in fact of a beneficiary.

(b) The court on its own motion, or on motion of the personal representative or other interested person or of the public administrator, may inquire into the circumstances surrounding the execution of, and the consideration for, the transfer, agreement, request, or instructions, and the amount of any fees, charges, or consideration paid or agreed to be paid by the beneficiary.

(c) The court may refuse to order distribution, or may order distribution on any terms that the court deems just and equitable, if the court finds either of the following:

(1) The fees, charges, or consideration paid or agreed to be paid by a beneficiary are grossly unreasonable.

(2) The transfer, agreement, request, or instructions were obtained by duress, fraud, or undue influence.

(d) Notice of the hearing on the motion shall be served on the beneficiary and on the persons described in subdivision (a) at least 15 days before the hearing in the manner provided in Section 415.10 or 415.30 of the Code of Civil Procedure.

Enacted Stats 1990 ch 79 § 14 (AB 759), operative July 1, 1991.

Privileged & Confidential
All Rights Reserved

Q 0349

SD 00350

EXHIBIT G
587

§ 10810.   Compensation of estate attorney

(a) Subject to the provisions of this part, for ordinary services the attorney for the personal representative shall receive compensation based on the value of the estate accounted for by the personal representative, as follows:

(1) Four percent on the first one hundred thousand dollars ($100,000).

(2) Three percent on the next one hundred thousand dollars ($100,000).

(3) Two percent on the next eight hundred thousand dollars ($800,000).

(4) One percent on the next nine million dollars ($9,000,000).

(5) One-half of 1 percent on the next fifteen million dollars ($15,000,000).

(6) For all amounts above twenty-five million dollars ($25,000,000), a reasonable amount to be determined by the court.

(b) For the purposes of this section, the value of the estate accounted for by the personal representative is the total amount of the appraisal of property in the inventory, plus gains over the appraisal value on sales, plus receipts, less losses from the appraisal value on sales, without reference to encumbrances or other obligations on estate property.

Added Stats 1991 ch 82 § 30(SB 896), effective June 30, 1991  *****

Q: if I hire someone to probate will for $1k can he demand his interest rate?

Q 0350

Privileged & Confidential
All Rights Reserved

SD 00351



Home > Warners ponies up 'Hazzard' pay

http://www.variety.com/index.asp?layout=print_story&articleid=VR1117925363&categoryid=1236

To print this page, select "PRINT" from the File Menu of your browser.

Posted: Wed., Jun. 29, 2005, 10:00pm PT

# Warners ponies up 'Hazzard' pay

## Studio settles with producer Clark for $17.5 mil

### By CLAUDE BRODESSER

*MT received $8 Million dollars from the lawsuit.*

Chalk one up for the little guy.

Warner Bros. Pictures has agreed to pay a Georgia-based producer at least $17.5 million for infringing on the copyright to his even-more-obscure 1974 United Artists film, "Moonrunners," which became the basis of the hit Warners TV skein, "The Dukes of Hazzard."

The amount paid to the producer, Robert B. Clark, is more than what the studio spent in talent salaries on the new "Hazzard" pic.

However, Warners was faced with federal judge Gary Allen Feess' preliminary injunction, which would have canceled the Aug. 13 release of Warner's new "Dukes of Hazzard" feature and seen all copies of the $55 million Johnnie Knoxville-starrer impounded by federal marshals.

What's more, the film's DVD release would have been delayed indefinitely, and its $40 million theatrical marketing budget -- much of that spent on spot TV ads -- would have gone down the drain.

Marc Toberoff, the attorney who represented Clark in U.S. District Court, would only reiterate his previous statement of last week that "the parties have reached a settlement of all claims in the litigation," adding that "the terms of that settlement are confidential." (*Daily Variety*, July 23)

Scott Rowe, a spokesman for Warner Bros. Entertainment, said on Thursday afternoon that the studio declined to comment.

In winning a preliminary injunction, Toberoff demonstrated to the judge's satisfaction that Clark was likely to win at trial and would suffer irreparable harm if the movie opened. Irreparable harm is presumed in copyright infringement cases, based on a 1999 lawsuit by Sun Microsystems against Microsoft.

Now that a settlement has been reached, Warners will premiere the new "The Dukes of Hazzard" feature July 28 at the Mann Chinese Theater on Hollywood Boulevard.

Still unclear is whether Clark will be getting an invitation.

Read the full article at:
http://www.variety.com/story.asp?t=story&a=VR1117925363&c=1236

1 of 2                                    Q 0351                    1/8/06 9:13 PM

Privileged & Confidential
All Rights Reserved

06/18/03  15:24 FAX                    RENNER OTTO                              ☑001

LAW OFFICES

# RENNER, OTTO, BOISSELLE & SKLAR, LLP

1621 EUCLID AVENUE, NINETEENTH FLOOR
CLEVELAND, OHIO 44115-2191
TEL: (216) 621-1113    FAX: (216) 621-6165
EMAIL: MailRoom@RennerOtto.com

June 18, 2003

Via facsimile (1 page)
310-246-3101
No confirmation

Marc Toberoff, Esq.
10th Floor
9701 Wilshire Boulevard
Beverly Hills, CA 90212

Re:   Michael Siegel

Dear Marc:

I have discussed with Michael the offer you passed on from a potential investor
who is interested in purchasing Michael's interest in the Superman copyright.  The
amount offered is not acceptable to Michael.

Michael would be willing to entertain an offer that will pay him $200,000/year for
the rest of his life, with a guaranteed minimum of 10 years.  This could be structured as
a guaranteed annuity or otherwise, with the hope of minimizing taxes while assuring
that such payments will be made when due.

Contrary to what I had mentioned during one of our telephone conversations,
Michael is 59.

Please let me know if this proposal is of interest to your potential investor.

Very truly yours,

Don W. Bulson

DWB/jam

Q 0352

Privileged & Confidential
All Rights Reserved

SD 00353

EXHIBIT G
590

# YAHOO! SMALL BUSINESS
### *Email*

Small Business Home - Yahoo! - Help

| Mail ▾ | Addresses ▾ | Calendar ▾ | Notepad ▾ | | mtoberoff@ipwla.com [Sign Out] |

| Check Mail | Compose | Search Mail | | Mail Options | Manage My Services |

**Mail Accounts**
  ipwla.com
  yahoo.com

**Folders**    [Add - Edit]
  Inbox (3)
  Draft
  Sent
  Bulk      [Empty]
  Trash     [Empty]

## View Attachment [Back to Original Message - Printable View]

OUTSIDE IN

**File name: LAURA__2.WPD | File type: application/octet-stream**

Save to my Yahoo! Briefcase - Download File - Need Help?

October 2, 2004

Joanne Siegel

13929 Marquesas Way, Apt. 201A

Marina Del Rey, CA 90292

Laura Siegel Larson

6400 Pacific Avenue, #106

Playa Del Rey, CA 90293

Re: Engagement for Professional Services

Dear Joanne and Laura:

I am pleased that you (the "Client") have decided to retain my law firm (the "Firm") as your counsel. The Firm is committed to providing efficient and responsive services to its clients. This letter will confirm our understanding and agreement regarding the terms and conditions of our engagement.

1. Scope of Engagement: The Firm will represent the Client with respect to the prosecution and defense of all rights, causes of actions and claims arising from the Client*s termination of Jerome Siegel*s prior grants of rights pursuant to section 304 (c) of the U.S. Copyright Act (the "Claims") which became effective on April 16, 1999, including Client*s Claims against Time-Warner, Warner Bros., D.C. Comics their licensees, agents and affiliates (collectively, "Time-Warner"). The scope of services provided for under this Agreement includes the prosecution and defense of the Claims up through trial and legal services on appeal and through final disposition of the Claims as reasonably required.

2. Conditions Precedent: This Agreement will not take effect and the Firm will have no obligation to provide legal services, until the Firm

Q 0353

**Privileged & Confidential**
**All Rights Reserved**

SD-00354

**EXHIBIT G**
**591**

receives this Agreement signed by the Client.

3. General Responsibilities of Attorney and Client: It will be the Firm*s responsibility to perform the legal services reasonably required in connection with the full prosecution and defense of the Claims, to take reasonable steps to keep you informed of progress and developments and to respond promptly to your enquiries and communications.

It will be the Client*s responsibility to cooperate fully with the Firm in its work by, among other things, providing us with relevant information and copies of documents within Client*s control, keeping the Firm up to date with respect to any relevant developments and by making yourselves reasonably available for consultation. The Client*s responsibilities also include: (a) approving decisions involving risk (given that Client acknowledges that litigation is inherently risky); (b) approving legal and

Initials: _____ , _____ , _____

Page 2

Joanne Siegel and Laura Siegel Larson

October 2, 2004

negotiation strategy; (c) determining acceptable settlement terms and figures, and (d) advising us whether any document we have prepared or received and sent to you for your approval or review is consistent with your expectations, as the case may be.

4. Disclaimer of Guarantee: From time to time, through the course of the Firm*s representation of you, we may express beliefs or opinions concerning the effectiveness of various strategies and courses of action or concerning the merits or potential results of any course of action. However, the Firm necessarily cannot make any promises or give any guarantees regarding the outcome of any matter, and the statements of any of the Firm*s attorneys are not intended, nor should they be construed, as any such promise or guarantee. In addition, although we may from time to time, for your convenience, furnish you with estimates or projections and the information on which such are based, such estimates or projections are by their nature inexact and shall not be binding on us.

5. Legal Fees: It is understood that the attorney's fees hereunder are not set by law but are negotiable between attorney and client and have been negotiated by Client with the Firm.

(a) In consideration of the services rendered by the Firm hereunder the Firm shall be ~~entitiled~~ entitled to and you hereby agree to pay to the

Q 0354

Privileged & Confidential
All Rights Reserved

SD 00355

Firm: one-third (33.33%) ("Percentage Fee") of one hundred percent (100%) of any and all gross sums of money or other consideration recovered, confirmed or awarded by reason of or in connection with the above Claims ("Gross Proceeds") prior to the deduction of any costs, fees, liens or disbursements, whether recovered by suit, arbitration, mediation or other form of dispute resolution, verdict, judgment, settlement or otherwise. Sixty (60) days before trial the Firm*s one-third Percentage Fee shall increase to forty percent (40%), and thereafter this will be the applicable Percentage Fee from that point forward through appeals, if any, and final disposition of the Claims. Gross Proceeds include, without limitation, all fixed or contingent proceeds, [whether payable or received during or after the Firm*s engagement, in perpetuity.] ** *Note to Marc*the preceeding phrase may be changed subject to a conversation George will have with you. He will email you about it tonight.* and any form of consideration, whether upfront or future fees, advances, guarantees, bonuses, deferments, royalties or profit participations of any kind. In computing the Firm*s fee, the total sums payable, including without limitation, interest upon a judgment, shall be deemed part of the amount recovered. For the avoidance of doubt, in calculating the Firm*s Percentage Fee, such Percentage Fee will be applied to Gross Proceeds, prior to any deduction from proceeds of payments to Michael Siegel or his designee on account of Michael Siegel*s 25% passive financial interest, as the son of Jerome Siegel, of the Siegel termination interest under 17 U.S.C. * 304 (c).

In the event that IP Worldwide (IPW, LLC) receives its contractual percentage fee of ten percent (10%) of Gross Proceeds ("IPW Percentage") with respect

Page 3

Joanne Siegel and Laura Siegel Larson

October 2, 2004

to any Claim(s) pursuant to the agreement between it and you dated October 3, 2002 (as extended by you on April 12, 2004), five (5%) percent will be deducted from the Firm*s Percentage Fee applicable to such Gross Proceeds.

It is understood that the Claims involve multiple rights/claims against multiple defendants and accordingly the above Percentage Fee calculation shall be applicable to each Claim to the extent that there is any recovery (whether through trial, arbitration or settlement) on any such Claim, at the time of such recovery, and are not in any way contingent on the prosecution or maintenance of any other Claims or

Q 0355

Privileged & Confidential
All Rights Reserved
SD 00356

actions.

Any attorney*s fees awarded by the Court, pursuant to statute or
contract, in connection with the subject matter of this representation,
shall be paid to the Firm and shall be applied against the fee obligation
under this Agreement but shall not discharge nor limit Client*s fee
obligation under this Agreement. Any Costs awarded by the Court, in
connection with the subject matter of this representation, shall be paid to
the Firm and shall be applied against the Client*s obligation to reimburse
the Firm*s Costs under this Agreement but shall not discharge nor limit
Client*s Cost reimbursement obligation under this Agreement.

Notwithstanding anything to the contrary contained herein, the Firm*s
Percentage Fee will not apply to the following consideration: (i) the non-
refundable $250,000 advanced by Time Warner to ~~Joanne Siegel~~ the
Siegels [**Note to Marc: Joanne, Laura and Michael Siegel all received
percentages of this] in November, 2000 against the resolution of the
Superman Claim; (ii) Joanne Siegel*s annual non-advance "pension"
payment by Time Warner [**Note to Marc: my mom would feel more
secure if the words "non-advance" would be inserted for the following
reason: although this agreement should be confidential between us and
you, Michael Siegel has been threatening to sue my mother for a portion
of her pension for years claiming that it is an advance on an eventual
settlement. That is of course not true. My mother feels that if Michael
ever got a copy of this agreement and mention of the pension is lumped
in with other items such as the $250,000 advance, medical insurance,
etc., he would try to use it as proof that we all consider it an advance.
Since adding "non advance" does not effect you under the fee agreement,
we ask you to please include those words to give my mother peace of
mind] of ~~$125,000~~ $126,148 per year, plus the cost of living increases to
such payment and (iii) medical, dental or life insurance provided to ~~the
Client~~ Joanne Siegel, Laura Siegel Larson, Michael Siegel, and Laura*s
children Michael Larson and James Larson. [**Note to Marc: As I
mentioned in my email to you earlier today, Time Warner has made long-
standing promises to provide these benefits to Michael Siegel and my
children in addition to my mom and me.] Although the Percentage Fee
applies to other non-cash in kind consideration (excluding (iii) above), if
any, paid as part of a recovery on a Claim, it does not apply to minor
non-cash perks such as tickets to movie premieres, conventions, dinners,
free or discounted merchandise.

The Firm will be compensated for its legal services and reimbursed for
the costs and disbursements advanced by it (as set forth below) only if
Gross Proceeds are recovered, subject to paragraph 9 below.

Notwithstanding anything to the contrary in this Agreement, Client shall
only be responsible and/or liable for the payment to the Firm of its
Percentage Fee of

Q 0356

Privileged & Confidential
All Rights Reserved
SD 00357

EXHIBIT G
594

Gross Proceeds as and when such Gross Proceeds are actually received
by or credited to Client or Client*s designee. For the avoidance of doubt,
if a recovery involves future payments of Gross Proceeds by any adverse
party to Client, Client shall not be liable to the Firm for its Percentage
Fee on Gross Proceeds that are payable by such adverse party which is
not in fact paid to or credited to Client or Client*s designee.
Accordingly, in the event of any adverse party*s failure to make
payments of Gross Proceeds to the Client pursuant to a judgment or
settlement agreement, it is understood and agreed that the Firm will have
the right, but not the obligation, as a third party beneficiary to directly
enforce such judgment or settlement agreement against such adverse
party to the extent of the

Page 4

Joanne Siegel and Laura Siegel Larson

October 2, 2004

Firm*s Percentage Fee hereunder payable on Gross Proceeds from such
judgment or settlement agreement.

The Firm will be solely responsible for the legal fees of any outside
attorneys retained by the Firm, if any, in connection with its prosecution
of the Claims hereunder. In the event the Firm wishes to retain such
outside attorney(s), the Firm will furnish Client with the identity and
credentials of such attorney(s). Such retention of outside attorneys, if
any, shall in each instance be subject to Client*s prior written approval.

(b) The 33.33% Percentage Fee set forth in paragraph 5 (a) above will
apply upon the filing of a complaint, if any, in the U.S. District Court for
the Central District of California (or other Court of competent
jurisdiction) with respect to any Claim(s). Prior to such filing, the Firm
will research and prepare the complaint regarding the Claims, plus any
required accompanying documents, for filing an action in federal court
on the Claims, in consideration for a reduced Percentage Fee equal to
two and one-half percent (2.5 %) of Gross Proceeds. This reduced fee
shall be payable in addition to the IPW Percentage of Gross Proceeds.
However, upon the filing of the complaint, if any, the Firm*s reduced fee
will be deemed part of and absorbed in the Percentage Fee applicable
pursuant to Paragraph 4(a) above.

6. Costs and Disbursements: The Firm will advance all costs and
disbursements ("Costs") expended or incurred in connection with its
prosecution or defense of the Claims. Such Costs shall include, without
limitation, filing fees, investigation expenses, expert witness fees,
consultant fees, accountant fees, investigator fees, subpoena and service
of process fees, jury fees, transcript costs, third-party photocopying,
photocopying at the Firm (at the agreed rate of five cents per page),

Q 0357

Privileged & Confidential
All Rights Reserved
http://us.f614.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...    10/3/2004

SD 00358

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, parking, travel costs, and messenger fees. No attorney*s fees shall be construed as Costs under this Agreement. Client authorizes the Firm to incur all Costs reasonably necessary in the Firm*s judgment, subject to the Client*s prior approval of any individual cost item exceeding $3,000. All Costs advanced by the Firm shall be reimbursed to the Firm from Gross Proceeds in addition to and after payment of the Percentage Fee pursuant to paragraph 5 above and

shall not be included in or deducted from such fee. The Firm will furnish Client with a reasonably detailed statement of the Costs on a quarterly basis.

7. Lien for Attorney*s Fees and Costs: The Firm will have a lien for attorney*s fees and Costs advanced applicable to all Claims and/or Gross Proceeds that are the subject of the Firm*s representation under this Agreement.

8. Payment and Notices: Client hereby authorizes and appoints the Firm as their attorney-in-fact to collect and receive all Gross Proceeds due relating to the Claims,

Page 5

Joanne Siegel and Laura Siegel Larson

October 2, 2004

to endorse and deposit into a client trust account all checks and other moneys payable, to deduct the Firm*s compensation as set forth above, and to pay the remainder to Client within seven (7) days of the Firm*s receipt of such proceeds. A statement of all deductions including the applicable Percentage Fee and itemized Costs, if any, shall be

sent by the Firm to Client with each such payment. All notices and payments hereunder shall be made to the parties at their respective address set forth on page 1 hereof unless and until either party gives the other party prior written notice of an address change.

9. Discharge of Firm*s Services: It is understood that Client may discharge the Firm at any time by written notice to the Firm, effective upon receipt by the Firm. However, such discharge of the Firm, if any, shall not relieve the Client of the obligation to compensate the Firm for services rendered, and to reimburse Costs advanced by the Firm, all prior to such discharge. In the event of Client*s discharge of the Firm, the Firm*s Percentage Fee for legal services will be reasonably computed pro-rata in proportion to the totality of legal services rendered by subsequent attorneys, if any, leading to the resolution of the Claims

Q 0358

Privileged & Confidential
All Rights Reserved

http://us.mg1.mail.yahoo.com/ym/ipwla/ShowLetter?box=Inbox&MsgId=7055_1324765_...   10/3/2004

SD 00359

Case 2:10-cv-03633-ODW-RZ    Document 427-6    Filed 05/14/12    Page 63 of 99   Page
ID #:26088

Yahoo! Mail - mtoberoff@ipwla com
Page 7 of 8

by trial, arbitration, settlement or otherwise. Upon the Firm*s discharge, if any, all Costs advanced by the Firm shall become due and payable to the Firm within ninety (90) days of the date of the discharge notice, notwithstanding anything to the contrary herein. The Firm will return the Client*s files to Client no later than ten (10) days after the Firm*s receipt of written notice of discharge by the Client, if any.

10. <u>Full Understanding</u>: In signing this Agreement each of you acknowledge that your engagement of the Firm on the above Percentage Fee basis is a fair and reasonable method to compensate us for our legal services. We have advised you to seek independent legal and business advice with respect to this agreement. By signing this Agreement you represent to us that you have had a reasonable opportunity to seek such advice and that you have either sought and received such independent legal and business advice or knowingly refrained from doing so.

11. <u>Miscellaneous</u>: This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. This Agreement shall be deemed to have been mutually drafted by the

parties and no drafting presumption shall apply for or against either party. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall be binding upon and inure to the benefit of the parties* heirs, executors, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

Page 6

Joanne Siegel and Laura Siegel Larson

October 2, 2004

This Agreement shall be governed by the Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased to represent you in connection with this matter. If the foregoing terms meet with your approval, kindly so indicate by signing four originals of this engagement letter and returning them to us for counter-signature, and we will return two fully executed originals to you.

Q 0359

**Privileged & Confidential**
**All Rights Reserved**

us.mc451.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765_...   10/3/2004

SD 00360

Yahoo! Mail - mtoberoff@ipwla com                                        Page 8 of 8

Very truly yours,


Marc Toberoff


Agreed, understood and accepted:


_____ Date:_____

Joanne Siegel


_____ Date:_____

Laura Siegel Larson

| Check Mail | Compose | Search Mail |

Mail Options   | Manage My Services |

Copyright © 1994-2004 Yahoo! Inc. All rights reserved. Terms of Service - Copyright Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

Q 0360

**Privileged & Confidential**
**All Rights Reserved**

http://us.f134.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...   10/3/2004

SD 00361

EJ140635574US

Laura:

I understand...I thought it was a great strategic move, however I don't want to put too much work into this if you remain quite hesitant.

Re: licensing opportunities – although possible in the right situation with people who really "get it" I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products in the licensing industry; 2. perception that WB owns S and that to understand what you own requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101

-----Original Message-----
**From:** Mistylight3@cs.com [mailto:Mistylight3@cs.com]
**Sent:** Monday, October 10, 2005 1:48 AM
**To:** MToberoff@ipwla.com
**Subject:** Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people regarding a movie based on Action Comics #1. However, we do not give permission for you to enter into any oral or written commitments for anyone to work on such a movie. Please let us know who you plan to speak with before you make contact with them and inform us of all activity on this matter as it develops. We also want to know of any publicity that may occur as a result of the inquiries, in advance, and we reserve the right to stop the inquiries at any time. If too many people get involved, we believe it will generate more headaches than we are willing to deal with. So to reiterate, you may proceed with a full inquiry but we do not want you to commission a script or enter into any employment agreements with anyone at this time. After the inquiries have been made, we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals regarding use of the names Superman, Clark Kent, Lois Lane or other elements contained in Action Comics #1 and are willing to explore other commercial possibilities that may exist in connection with our ownership rights.

Thanks for your idea. We believe it is time for us to take matters into our own hands and to exercise the rights we obtained through the Copyright Act. However, we want to proceed cautiously. Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Q 0361

**Privileged & Confidential**
**All Rights Reserved**

SD 00362

EXHIBIT G
599

# MARC TOBEROFF
### ATTORNEY AT LAW

December 3, 2001

New York Supreme Court, Westchester County
Attn: Legal Division, Rm. 330
110 Dr. Martin Luther King Blvd.
White Plains, NY 10601

Re: Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

To Whom It May Concern:

I am writing to request copies of the documents set forth below, which I cannot obtain in person since I am located in California. Enclosed please find my check for $5.00 to cover research costs per my telephone conversation today with the filing clerk of your Court.

The documents are from the 1947 lawsuit entitled Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc. (which concerned "SUPERMAN"). It was commenced in 1947 before Judge Addison Young. (Unfortunately, I do not have the case number , but the clerk suggested you would be able to retrieve the documents based on this description.)

The documents I am requesting are as follows:

1.    **Opinion** of Official Referee J. Addison Young **dated November 21, 1947** (or November 1, 1947) in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

2.    **Finding of Facts and Conclusions of Law** by Judge Addison Young dated April 12, 1948 and **Interlocutory Judgment dated April 12, 1948** in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

3.    **Final Consent Judgment dated May 21, 1948** signed by Judge Addison Young in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

Q 0362

**Privileged & Confidential**
**All Rights Reserved**    23852 PACIFIC COAST HIGHWAY, SUITE 555, MALIBU, CALIFORNIA 90265-4879
TELEPHONE (310) 589-5151      FACSIMILE (310) 589-5152

SD 00363

**EXHIBIT G**
**600**

Page 2
12/03/01
NY Supreme Court, Westchester County

As suggested by the Clerk, I have enclosed a self-addressed Express Mail envelope and pre-paid Express Mail label to send the above document to me at your earliest convenience. EJ140635588US

Thank-you very much for your kind attention this important matter. Please telephone me at (310) 589-5151 if there are any problems or questions concerning the above.

Very truly yours,

Marc Toberoff

Q 0363

Privileged & Confidential
All Rights Reserved

SD 00364

EXHIBIT G
601



LAW OFFICES OF
# MARC TOBEROFF

June 13, 2003

John D. Peftker, Esq.
444 South Flower Street
Los Angeles, CA 90071

Re: Probate of Joseph Shuster Estate

Dear Jack:

As discussed enclosed please find the following:

(1) Copy of Joseph Shuster's Will dated June 28, 1988 (they can not find the original);
(2) Revocable Living Trust (plus Schedule A where assigned property = only stock and furniture) dated April 11, 1988. I have original;
(3) Affidavit of Jean Peavy per §13101 dated August 17, 1992 that decedent's property is under $60,000. I have original;
(4) Death certificate of Joseph Shuster, resident of Los Angeles, CA, died on August 14, 1992. I have original;
(5) Family tree.

The Trust does not appear to be a problem due to the limited property assigned to it per Schedule A which I located after we spoke today.

I 've also enclosed §304(c)(2)(D) of the US Copyright Act which gives executors, etc. a right to terminate prior transfers of copyright within delineated time windows. Previously, only a spouse, children and grandchildren had this right. So when Joe Shuster died in 1992 without spouse or children his Estate was worth under $60K. Then, on October 27, 1998 the Sonny Bono Copyright Act added subparagraph (D) giving the right to the executor, personal representative, etc. (see amendment enclosed).

We therefore want the Probate Court to approve in addition to the normal executor powers something like "the executor is empowered, without limitation, to terminate prior transfers of Joseph Shuster's copyrights [possibly even better if we can add, "including "Superman"] pursuant to 17 U.S.C. §304(c)(2)(D). Alternatively, the papers could state that Estate is being probated for this purpose.

I apologize for the delay in getting the above to you. Anything, you can do from here on to expedite the probate would be greatly appreciated. As discussed, please fax or e-mail me a retainer agreement whereupon I will send you the $2,500 retainer you requested.

Regards,

Marc Toberoff

Q 0364

9595 Wilshire Boulevard, 8th Floor, Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
M.Toberoff@ipww.biz

**Privileged & Confidential**
**All Rights Reserved**

SD 00365

**EXHIBIT G**
602

# CERTIFICATE OF DEATH
## STATE OF CALIFORNIA
### USE BLACK INK ONLY

STATE FILE NUMBER

| | | |
|---|---|---|
| 1A. NAME OF DECEDENT—FIRST (GIVEN) JOSEPH | 1B. MIDDLE | 1C. LAST (FAMILY) SHUSTER |
| 2A. DATE OF DEATH—MO., DAY, YR. Fnd July 30, 1992 | 2B. HOUR 1106 | 3. SEX MALE |
| 4. RACE CAUCASIAN | 5. HISPANIC—SPECIFY YES [ ] [X] | 6. DATE OF BIRTH—MO., DAY, YR. JULY 10, 1914 | 7. AGE IN YEARS 78 | IF UNDER 1 YEAR MONTHS DAYS | IF UNDER 24 HOURS HOURS MINUTES |

DECEDENT PERSONAL DATA

| | | | |
|---|---|---|---|
| 8. STATE OF BIRTH CANADA | 9. CITIZEN OF WHAT COUNTRY USA | 10A. FULL NAME OF FATHER JULIUS SHUSTER | 10B. STATE OF BIRTH HOLLAND | 11A. FULL MAIDEN NAME OF MOTHER IDA KAKLARSKY | 11B. STATE OF BIRTH RUSSIA |
| 12. MILITARY SERVICE? 19___ TO 19___ NONE [X] | 13. SOCIAL SECURITY NO. 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 | 14. MARITAL STATUS NEVER MARRIED | 15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME) NONE |
| 16A. USUAL OCCUPATION ARTIST | 16B. USUAL KIND OF BUSINESS OR INDUSTRY COMIC BOOKS | 16C. USUAL EMPLOYER DC COMICS | 16D. YEARS IN OCCUPATION 60 | 17. EDUCATION—YEARS COMPLETED 14 |

USUAL RESIDENCE

| | | | |
|---|---|---|---|
| 18A. RESIDENCE—STREET AND NUMBER OR LOCATION 11944 MONTANA AVENUE #305 | | 18B. CITY W. LOS ANGELES | 18C. ZIP CODE 90049 |
| 18D. COUNTY LOS ANGELES | 18E. NUMBER OF YEARS IN THIS COUNTY 14 | 18F. STATE OR FOREIGN COUNTRY CALIFORNIA | 20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT JEAN PEAVY-SISTER 316 HORTON LANE N.W ALBUQUERQUE, NEW MEXICO 87114 |

PLACE OF DEATH

| | | |
|---|---|---|
| 19A. PLACE OF DEATH Residence | 19B. IF HOSPITAL SPECIFY ONE: IP, ER/OP, DOA | 19C. COUNTY Los Angeles |
| 19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION 11944 Montana Avenue #305 | 19E. CITY W. Los Angeles | |

CAUSE OF DEATH

| | | |
|---|---|---|
| 21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C) | | TIME INTERVAL BETWEEN ONSET AND DEATH | 22. WAS DEATH REPORTED TO CORONER? REFERRAL NUMBER [X] Yes 92-06897 [ ] NO |
| IMMEDIATE CAUSE (A) Congestive Heart Failure | Unk | 23. WAS BIOPSY PERFORMED? YES [ ] [X] NO |
| DUE TO (B) Arteriosclerotic Cardiovascular Disease | Years | 24A. WAS AUTOPSY PERFORMED? YES [ ] [X] NO |
| DUE TO (C) | | 24B. WAS IT USED IN DETERMINING CAUSE OF DEATH YES [ ] [X] NO |
| 25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21 Hypertension | | 26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 25? IF YES, LIST TYPE OF OPERATION AND DATE. No |

PHYSICIAN'S CERTIFICATION

| | | | |
|---|---|---|---|
| 27A. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER | 27C. CERTIFIER'S LICENSE NUMBER | 27D. DATE SIGNED |
| 27A. DECEDENT ATTENDED SINCE MONTH, DAY, YEAR | DECEDENT LAST SEEN ALIVE MONTH, DAY, YEAR | 27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS | |

CORONER'S USE ONLY

| | | |
|---|---|---|
| I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER Deputy Coroner Mary T. Macon | 28B. DATE SIGNED 8-07-92 |
| 29. MANNER OF DEATH—(specify one: natural, accident, suicide, homicide, pending investigation or could not be determined) Natural | 30A. PLACE OF INJURY | 30B. INJURY AT WORK YES [ ] NO [ ] | 30C. DATE OF INJURY MONTH, DAY, YEAR | 31. HOUR |
| 32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY) | 33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY) | |

FUNERAL DIRECTOR AND LOCAL REGISTRAR

| | | | |
|---|---|---|---|
| 34A. DISPOSITION(S) CR/RES | 34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS RES: 11944 MONTANA AVE. #305 W. LOS ANGELES, CA 90049 | 34C. DATE MO. DAY, YEAR 8/14/92 | 35A. SIGNATURE OF EMBALMER NOT EMBALMED | 35B. LICENSE NUMBER NONE |
| 36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING AS SUCH) PIERCE BROS WESTWOOD VILLAGE | 36B. LICENSE NO. FD-951 | 37. SIGNATURE OF LOCAL REGISTRAR Robert C. Katz | 38. REGISTRATION DATE AUG 10 1992 |

STATE REGISTRAR

| A. | B. | C. | D. | E. | F. | CENSUS TRACT |
|---|---|---|---|---|---|---|

J-11 (REV. 3-91)

MAKE NO ERASURES, WHITEOUTS, OR ALTERATIONS

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

70

Director of Health Services and Registrar

Privileged & Confidential
All Rights Reserved

Q 0365

SD 00366

# Last Will and Testament

**KNOW ALL PERSONS BY THESE PRESENTS:**

That, I ___JOSEPH SHUSTER___

of _____ W. Los Angeles, California

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

### I.

I hereby declare that I am the ___brother___ of ___JEAN ADELE PEAVY___

at the time of the execution of this Will.

### II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their ___N/A___ (mother, or father) will provide for them.

### III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my execut___rix___ as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

### IV.

I give, devise and bequeath unto ___JEAN ADELE PEAVY___ all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that ___Jean Adele Peavy___ shall predecease me, or in the event that both ___Jean Adele Peavy___ and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, ___MARK WARREN PEARY___.

### V.

I hereby nominate and appoint my ___sister___, ___Jean Adele Peavy___ executrix of this my Last Will and Testament, to act without bond. In the event that my ___sister___ is for any reason unable or unwilling to act as execut___rix___ hereof, I nominate and appoint ___Mark Warren Peary___ to act as executor also without bond.

Q 0366

Privileged & Confidential
All Rights Reserved

SD 00367

## VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my executrix settle my estate in such a manner as shall seem best and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

Q 0367

**Privileged & Confidential**
**All Rights Reserved**

SD 00368

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this _28_ day of _June_ 19__88__

_Joseph Shuster_
Testator

STATE OF CALIFORNIA
County of _Los Angeles_ } ss.

Each of the undersigned, being first duly sworn on oath, states that on this _28_ day of _June_ 1988:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of _JOSEPH SHUSTER_ (the Testator___);

(2) The Testator___, in my presence and in the presence of the other Witnesses whose signatures appear below:

    (a) Declared the foregoing instrument consisting of _one_ pages, of which this is the last to be _his_ Will;

    (b) Requested me and the other Witnesses to act as Witnesses to _his_ Will and to make this affidavit; and

    (c) Signed such instrument;

(3) I believe the Testator___ to be of sound mind, and that in so declaring and signing, _he_ was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testator___ and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

_Tom Fenaughty_
Witness
_9374 Overland Ave #1_
Address
_L.A. Ca. 90064_

_Robert H____ & Williams_
Witness
_3545 MENTONE AVE #3_
Address
_Los Angeles Cal.fornia 90034_

Witness

Address

_went to notary public office in Brentwood around Montana_

Witness

Address

SUBSCRIBED & SWORN to before me this _28_ day of _June_ 19__88__

_F. Patrick Hagerty_
Notary Public in and for the State of California, residing at _SANTA MONICA, Calif._

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991

Q 0368

Privileged & Confidential
All Rights Reserved

SD 00369



THE

Last Will and Testament of

*Joseph L. Shuster*

Dated *June 28* 19 *88*

Privileged & Confidential
All Rights Reserved

Q 0369

SD 00370

**EXHIBIT G**
**607**

Revocable Living Trust

This trust agreement is made this day of *April 11, 1988* between ___Joseph Shuster___, the Grantor, and ___Joseph Shuster___ and ___Jean A. Peavy___, the Trustees.

Upon my death or incapacity, I name ___Jean A. Peavy___ successor.

The Grantor, ___Joseph Shuster___, hereby transfers to the Trustees and to the Trustees' successor the property described in the attached Schedule A. Such property and any other property that may be received by the Trustees shall be held and may be disposed of by the Trustees and the Trustees' successors.

The Grantor may, by signed instruments delivered to the Trustees, revoke the Trust in whole or in part, or amend this Agreement from time to time in any manner.

To the extent that any such requirements can be legally waived, no Trustee shall ever be required to give any bond as Trustee or qualify before, be appointed by, or in absence of breach of trust, account to any court, or obtain the order or approval of any court in the exercise of any power or discretion herein given.

IN WITNESS WHEREOF, the parties hereto have signed this on the above-written date.

GRANTOR: _____
                    Joseph Shuster

WITNESS: _____    _____
                Elsin Virian                              Carole Garthright

TRUSTEES: _____    _____
                    Joseph Shuster                            Jean A. Peavy

SUCCESSOR TRUSTEE: _____
                                      Mark W. Peary

Q 0370

Privileged & Confidential
All Rights Reserved

SD 00371

EXHIBIT G
608

Attachment To Living Trust

SCHEDULE "A"

STATE OF  California  ,  COUNTY OF  Los Angeles

_7-11-88_                    _J. S._
Date                    Grantor's Initial

The following is my property, both real and personal, included in the attached Revocable Living Trust.

1. Stock certificates

Company _____

No. of shares _50_

Name(s) on certificates or account _____

2. Furniture and appliances

Q 0371

Privileged & Confidential
All Rights Reserved

SD 00372

## AFFIDAVIT OF JEAN PEAVY UNDER
## CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

      1.     The name of the decedent is JOSEPH SHUSTER (the "decedent").

      2.     The decedent died on July 30, 1992 in Los Angeles County, California.

      3.     At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

      4.     No proceeding is now being or has been conducted in California for administration of the decedent's estate.

      5.     The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

      6.     The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

      7.     The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Time Warner Inc. Common Stock

    116 Time Warner Rights

      8.     No other person has a right to the interest of the decedent in the described property.

      9.     The affiant requests that the described property be paid, delivered or transferred to her.

      10.     The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:    August 17      , 1992

                                                      JEAN PEAVY

Q 0372

Privileged & Confidential
All Rights Reserved

EXHIBIT G
610

SD 00373

STATE OF    NEW MEXICO              )
                                    )   ss.
COUNTY OF    BERNALILLO             )


       On     August 17                    , 1992, before me, a notary
public  for  the  State  of  New Mexico                    , personally
appeared JEAN PEAVY (____) known to me or (_X_) proved to me based
on satisfactory evidence to be the person whose name is subscribed
to  the  above  instrument,  and  she  acknowledged  to  me  that  she
executed the same.


       **IN WITNESS WHEREOF,** I have hereunto set my hand and affixed
my official seal on the day and year first above written.


SEAL:

                                    _Barbara Hewson_
                                    Notary Public for the
                                    State of  New Mexico

**Privileged & Confidential**
**All Rights Reserved**

                                    2.

                                                    Q 0373

                                                    SD 00374

**EXHIBIT G**
**611**



Q 0374

Privileged & Confidential
All Rights Reserved

SD 00375

EXHIBIT G
612



US Code as of: 01/05/99

Sec. 304. Duration of copyright: Subsisting copyrights

* (a) Copyrights in Their First Term on January 1, 1978. - (1)(A) Any
  copyright, the first term of which is subsisting on January 1, 1978,
  shall endure for 28 years from the date it was originally secured.
    o (B) In the case of -
        + (i) any posthumous work or of any periodical, cyclopedic, or
          other composite work upon which the copyright was originally
          secured by the proprietor thereof, or
        + (ii) any work copyrighted by a corporate body (otherwise than

          as assignee or licensee of the individual author) or by an
          employer for whom such work is made for hire, the proprietor
          of such copyright shall be entitled to a renewal and
          extension of the copyright in such work for the further term
          of 67 years.
    o (C) In the case of any other copyrighted work, including a
      contribution by an individual author to a periodical or to a
      cyclopedic or other composite work -
        + (i) the author of such work, if the author is still living,
        + (ii) the widow, widower, or children of the author, if the
          author is not living,
        + (iii) the author's executors, if such author, widow, widower,

          or children are not living, or
        + (iv) the author's next of kin, in the absence of a will of
          the
          author, shall be entitled to a renewal and extension of the
          copyright in such work for a further term of 67 years.
        + (2)
            + (A) At the expiration of the original term of copyright
              in a work specified in paragraph (1)(B) of this
              subsection, the copyright shall endure for a renewed and
              extended further term of 67 years, which -
    o (i) if an application to register a claim to such further term
      has been made to the Copyright Office within 1 year before the
      expiration of the original term of copyright, and the claim is
      registered, shall vest, upon the beginning of such further term,
      in the proprietor of the copyright who is entitled to claim the
      renewal of copyright at the time the application is made; or
    o (ii) if no such application is made or the claim pursuant to
      such application is not registered, shall vest, upon the
      beginning of such further term, in the person or entity that was
      the proprietor of the copyright as of the last day of the
      original term of copyright.

* (B) At the expiration of the original term of copyright in a work
  specified in paragraph (1)(C) of this subsection, the copyright shall
  endure for a renewed and extended further term of 67 years, which -
    o (i) if an application to register a claim to such further term
      has been made to the Copyright Office within 1 year before the
      expiration of the original term of copyright, and the claim is
      registered, shall vest, upon the beginning of such further term,
      in any person who is entitled under paragraph (1)(C) to the
      renewal and extension of the copyright at the time the
      application is made; or
    o (ii) if no such application is made or the claim pursuant to
      such application is not registered, shall vest, upon the
      beginning of such further term, in any person entitled under
      paragraph (1)(C), as of the last day of the original term of
      copyright, to the renewal and extension of the copyright.
    o (3)

Q 0375

Privileged & Confidential
All Rights Reserved

SD 00376



+ (A) An application to register a claim to the renewed and
extended term of copyright in a work may be made to the
Copyright Office –

* (i) within 1 year before the expiration of the original term of
copyright by any person entitled under paragraph (1)(B) or (C) to
such further term of 67 years; and
(ii) at any time during the renewed and extended term by any
person in whom such further term vested, under paragraph (2)(A)
or (B), or by any successor or assign of such person, if the
application is made in the name of such person.

* (B) Such an application is not a condition of the renewal and extension
of the copyright in a work for a further term of 67 years.

* (4)
  o (A) If an application to register a claim to the renewed and
  extended term of copyright in a work is not made within 1 year
  before the expiration of the original term of copyright in a work,
  or if the claim pursuant to such application is not registered,
  then a derivative work prepared under authority of a grant of a
  transfer or license of the copyright that is made before the
  expiration of the original term of copyright may continue to be
  used under the terms of the grant during the renewed and extended
  term of copyright without infringing the copyright, except that
  such use does not extend to the preparation during such renewed
  and extended term of other derivative works based upon the
  copyrighted work covered by such grant.
  o (B) If an application to register a claim to the renewed and
  extended term of copyright in a work is made within 1 year before
  its expiration, and the claim is registered, the certificate of
  such registration shall constitute prima facie evidence as to the
  validity of the copyright during its renewed and extended term and
  of the facts stated in the certificate. The evidentiary weight to
  be accorded the certificates of a registration of a renewed and
  extended term of copyright made after the end of that 1-year
  period shall be within the discretion of the court.

* (b) Copyrights in Their Renewal Term at the Time of the Effective Date
of the Sonny Bono Copyright Term Extension Act. – Any copyright still
in its renewal term at the time that the Sonny Bono Copyright Term
Extension Act becomes effective shall have a copyright term of 95 years
from the date copyright was originally secured.

* (c) **Termination of Transfers and Licenses Covering Extended Renewal
Term.** – In the case of any copyright subsisting in either its first or
renewal term on January 1, 1978, other than a copyright in a work made
for hire, the exclusive or nonexclusive grant of a transfer or license
of the renewal copyright or any right under it, executed before January
1, 1978, by any of the persons designated by subsection (a)(1)(C) of
this section, otherwise than by will, is subject to termination under
the following conditions:
  o (1) In the case of a grant executed by a person or persons
  other than the author, termination of the grant may be effected
  by the surviving person or persons who executed it. In the case
  of a grant executed by one or more of the authors of the work,
  termination of the grant may be effected, to the extent of a
  particular author's share in the ownership of the renewal
  copyright, by the author who executed it or, if such author is
  dead, by the person or persons who, under clause (2) of this
  subsection, own and are entitled to exercise a total of more than
  one-half of that author's termination interest.
  o (2) Where an author is dead, his or her termination interest is
  owned, and may be exercised, as follows:

Q 0376

**Privileged & Confidential
All Rights Reserved**

SD 00377



+ (A) the widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower
    owns one-half of the author's interest;
+ (B) the author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them;
+ (C) the rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpe basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them. [1]
+ (D) In [2] the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.
    [2] So in original. Probably should not be capitalized.

o (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.
o (4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.
    + (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.
    + (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.
o (5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.
o (6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this

Q 0377

**Privileged & Confidential**
**All Rights Reserved**

SD 00378



subsection. In all cases the reversion of rights is subject to
the following limitations:
+ (A) A derivative work prepared under authority of the grant
  before its termination may continue to be utilized under the
  terms of the grant after its termination, but this privilege
  does not extend to the preparation after the termination of
  other derivative works based upon the copyrighted work
  covered
  by the terminated grant.
+ (B) The future rights that will revert upon termination of
  the grant become vested on the date the notice of termination

  has been served as provided by clause (4) of this subsection.
+ (C) Where the author's rights revert to two or more persons
  under clause (2) of this subsection, they shall vest in those

  persons in the proportionate shares provided by that clause.
  In such a case, and subject to the provisions of subclause
  (D)
  of this clause, a further grant, or agreement to make a
  further
  grant, of a particular author's share with respect to any
  right
  covered by a terminated grant is valid only if it is signed
  by
  the same number and proportion of the owners, in whom the
  right
  has vested under this clause, as are required to terminate
  the
  grant under clause (2) of this subsection. Such further grant

  or agreement is effective with respect to all of the persons
  in
  whom the right it covers has vested under this subclause,
  including those who did not join in signing it. If any person

  dies after rights under a terminated grant have vested in him

  or her, that person's legal representatives, legatees, or
  heirs
  at law represent him or her for purposes of this subclause.
+ (D) A further grant, or agreement to make a further grant, of

  any right covered by a terminated grant is valid only if it
  is
  made after the effective date of the termination. As an
  exception, however, an agreement for such a further grant may

  be made between the author or any of the persons provided by
  the first sentence of clause (6) of this subsection, or
  between
  the persons provided by subclause (C) of this clause, and the

  original grantee or such grantee's successor in title, after
  the notice of termination has been served as provided by
  clause
o (4) of this subsection.
  + (E) Termination of a grant under this subsection affects only

    those rights covered by the grant that arise under this
    title,
    and in no way affects rights arising under any other Federal,

    State, or foreign laws.

Q 0378

**Privileged & Confidential**
**All Rights Reserved**

SD 00379




  + (F) Unless and until termination is effected under this
      subsection, the grant, if it does not provide otherwise,
      continues in effect for the remainder of the extended renewal

      term.

* (d) Termination Rights Provided in Subsection (c) Which Have Expired on
  or Before the Effective Date of the Sonny Bono Copyright Term Extension
  Act. - In the case of any copyright other than a work made for hire,
  subsisting in its renewal term on the effective date of the Sonny Bono
  Copyright Term Extension Act for which the termination right provided
  in subsection (c) has expired by such date, where the author or owner
  of the termination right has not previously exercised such termination
  right, the exclusive or nonexclusive grant of a transfer or license of
  the renewal copyright or any right under it, executed before January 1,
  1978, by any of the persons designated in subsection (a)(1)(C) of this
  section, other than by will, is subject to termination under the
  following conditions:
      o (1) The conditions specified in subsections (c)(1), (2), (4),
          + () The conditions specified in subsections (c)(1), (2), (4),
              years of copyright term as provided by the amendments made by
              the
              Sonny Bono Copyright Term Extension Act.
          + (2) Termination of the grant may be effected at any time
              during
              a period of 5 years beginning at the end of 75 years from the

              date copyright was originally secured.
--------------------------------------------------------------------------

Footnotes

[1] So in original. The period probably should be a semicolon.

Q 0379

Privileged & Confidential
All Rights Reserved

SD 00380

EXHIBIT G
617




LEXSEE 112 stat 2827

UNITED STATES PUBLIC LAWS
105th Congress -- 2nd Session
(c) 1998, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER PROPERTIES INC.

PUBLIC LAW 105-298 [S. 505]

OCT. 27, 1998

[SONNY BONO COPYRIGHT TERM EXTENSION ACT; FAIRNESS IN MUSICAL LICENSING ACT OF 1998]

*105 P.L. 298; 112 Stat. 2827; 1998 Enacted S. 505; 105 Enacted S. 505*

BILL TRACKING REPORT:        105 Bill Tracking S. 505
FULL TEXT VERSION(S) OF BILL:  105 S. 505
CIS LEGIS. HISTORY DOCUMENT:   105 CIS Legis. Hist. P.L. 298

An Act

To amend the provisions of title 17, United States Code, with respect to the duration of copyright, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

TITLE I--COPYRIGHT TERM EXTENSION

[*101] SEC. 101. <17 USC 101 note> --SHORT TITLE.

This title may be referred to as the "Sonny Bono Copyright Term Extension Act".

[*102] SEC. 102. DURATION OF COPYRIGHT PROVISIONS.

(a) Preemption With Respect to Other Laws.--Section 301(c) of title 17, United States Code, is amended by striking "February 15, 2047" each place it appears and inserting "February 15, 2067".

(b) Duration of Copyright: Works Created on or After January 1, 1978.--Section 302 of title 17, United States Code, is amended--

(1) in subsection (a) by striking "fifty" and inserting "70";

(2) in subsection (b) by striking "fifty" and inserting "70";

(3) in subsection (c) in the first sentence--

(A) by striking "seventy-five" and inserting "95"; and

(B) by striking "one hundred" and inserting "120"; and

(4) in subsection (e) in the first sentence--

(A) by striking "seventy-five" and inserting "95";

(B) by striking "one hundred" and inserting "120"; and

(C) by striking "fifty" each place it appears and inserting "70".

Q 0380

Privileged & Confidential
All Rights Reserved

SD 00381



105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(c) Duration of Copyright: Works Created but Not Published or Copyrighted Before January 1, 1978.--Section 303 of title 17, United States Code, is amended in the second sentence by striking "December 31, 2027" and inserting "December 31, 2047".

(d) Duration of Copyright: Subsisting Copyrights.--

(1) In general.-- Section 304 of title 17, United States Code, is amended--

(A) in subsection (a)--

(i) in paragraph (1)--

(I) in subparagraph (B) by striking "47" and inserting "67"; and

(II) in subparagraph (C) by striking "47" and inserting "67";

[**2828] (ii) in paragraph (2)--

(I) in subparagraph (A) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67"; and

(iii) in paragraph (3)--

(I) in subparagraph (A)(i) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67";

(B) by amending subsection (b) to read as follows:

"(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act.--Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.";

(C) in subsection (c)(4)(A) in the first sentence by inserting "or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2)," after "specified by clause (3) of this subsection,"; and

(D) by adding at the end the following new subsection:

"(d) Termination Rights Provided in Subsection (c) Which Have Expired on or Before the Effective Date of the Sonny Bono Copyright Term Extension Act.--In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

"(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

"(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.".

(2) Copyright amendments act of 1992.-- Section 102 of the Copyright Amendments Act of 1992 (Public Law 102-307; 106 Stat. 266; *17 U.S.C. 304* note) is amended--

(A) in subsection (c)--

(i) by striking "47" and inserting "67";

(ii) by striking "(as amended by subsection (a) of this section)"; and

(iii) by striking "effective date of this section" each place it appears and inserting "effective date of the Sonny Bono Copyright Term Extension Act"; and

Q 0381

Privileged & Confidential
All Rights Reserved

SD 00382



Page 3

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(B) in subsection (g)(2) <17 USC 101 note> in the second sentence by inserting before the period the following:
", except each reference to forty-seven years in such provisions shall be deemed to be 67 years".

[**2829]    [*103]  SEC. 103. TERMINATION OF TRANSFERS AND LICENSES COVERING EXTENDED
RENEWAL TERM.

Sections 203(a)(2) and 304(c)(2) of title 17, United States Code, are each amended--

(1) by striking "by his widow or her widower and his or her children or grandchildren"; and

(2) by inserting after subparagraph (C) the following:

"(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's
executor, administrator, personal representative, or trustee shall own the author's entire termination interest.".

[*104]  SEC. 104. REPRODUCTION BY LIBRARIES AND ARCHIVES.

Section 108 of title 17, United States Code, is amended--

(1) by redesignating subsection (h) as subsection (i); and

(2) by inserting after subsection (g) the following:

"(h)(1) For purposes of this section, during the last 20 years of any term of copyright of a published work, a library
or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display, or
perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of
preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable
investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.

"(2) No reproduction, distribution, display, or performance is authorized under this subsection if--

"(A) the work is subject to normal commercial exploitation;

"(B) a copy or phonorecord of the work can be obtained at a reasonable price; or

"(C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of
Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.

"(3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such
library or archives.".

[*105]  SEC. 105. VOLUNTARY NEGOTIATION REGARDING DIVISION OF ROYALTIES.

It is the sense of the Congress that copyright owners of audiovisual works for which the term of copyright
protection is extended by the amendments made by this title, and the screenwriters, directors, and performers of those
audiovisual works, should negotiate in good faith in an effort to reach a voluntary agreement or voluntary agreements
with respect to the establishment of a fund or other mechanism for the amount of remuneration to be divided among the
parties for the exploitation of those audiovisual works.

[*106]  SEC. 106. <17 USC 108 note> EFFECTIVE DATE.

This title and the amendments made by this title shall take effect on the date of the enactment of this Act.

[**2830]      TITLE   II--MUSIC   LICENSING   EXEMPTION   FOR   FOOD   SERVICE   OR
DRINKINGESTABLISHMENTS

[*201]  SEC. 201. <17 USC 101 note> --SHORT TITLE.

This title may be cited as the "Fairness In Music Licensing Act of 1998".

[*202]  SEC. 202. EXEMPTIONS.

(a) Exemptions for Certain Establishments.--Section 110 of title 17, United States Code, is amended--

(1) in paragraph (5)--

(A) by striking "(5)" and inserting "(5)(A) except as provided in subparagraph (B),"; and

Q 0382

Privileged & Confidential
All Rights Reserved

SD 00383



### RODI·POLLOCK

**RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL**
A LAW CORPORATION

JOHN D. CAHILL
JOHN D. PETTKER
WILLIAM R. CHRISTIAN
HENRY P. PRAMOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
TIMOTHY G. GEPERLEY
ALFRED KLEIN
KENNETH A. FRANKLIN
WADE E. NORWOOD
PRIYA G. SHATT
ANDREW W. BODEAU
JEAN M. BEASLEY

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 895-1900

KARL B. RODI (1908-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1896-1973)

OF COUNSEL
JOHN P. POLLOCK
ROBERT A. YAHIRO
DAVID K.W. CHANG

TELECOPIERS
(213) 895-4921
(213) 895-4922
(213) 895-4750

OUR FILE NUMBER

June 30, 2003

Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

Jean Peavy
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

*FIRST DRAFT (LATER MODIFIED AFTER MT COMMENTS) NOT EXECUTED*

Re:     Agreement for Professional Services

Dear Marc and Jean:

We are pleased to confirm that Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), will represent Jean in connection with her petition for appointment as personal representative of the estate of Joseph Shuster, deceased. You have informed us that Mr. Shuster died on July 30, 1992. We understand that, at this point, our representation will be limited to seeking the appointment of Jean as personal representative so that she, in such capacity, may terminate prior transfers of Mr. Shuster's copyrights pursuant to 17 U.S.C. §304(c)(2)(D). Our representation will not involve general administration of the estate, because, at the present time, there are no assets that require probate administration.

The Firm will render legal services to Jean in accordance with the enclosed Standard Terms of Retention, which are incorporated herein by this reference, and which we ask you to carefully review. If we subsequently perform any additional services for either of you, these terms will apply to such services as well, unless a new agreement is made.

It is our understanding that Marc has agreed to pay our fees for legal services and to reimburse us for costs advanced. We are aware that there are no assets within the estate to pay our fees and expenses. We have agreed, therefore, that it would be inappropriate to base our fees as statutorily determined under the California Probate Code as a percentage of the value of the estate. As we discussed with Marc, the rate of fees for legal services rendered by the Firm will be calculated on the basis of the time expended. While I expect that I will be performing most of the legal services on your behalf, instances may arise where I delegate duties to other individuals who will perform services or where we seek the expertise of one or more other principals within the Firm. My current hourly rate is $325.00. The current hourly rates for services rendered by other lawyers in the Firm range from $200.00 to $350.00 per hour, and paralegals are currently billed at $125.00 to $175.00 per hour. These rates are subject to change from time to time without notice.

**Privileged & Confidential**
**All Rights Reserved**

Q 0383

SD 00384



Marc Toberoff, Esq.
Jean Peavy
June 24, 2003
Page 2

In addition, we request that Marc pay the Firm a retainer of $2,500.00 which will be placed in our client trust account and will be applied against attorneys' fees and costs incurred by you. A retainer is a deposit against fees and costs that will be incurred in the representation, and it is not, and should not be considered as, either an estimate of total fees or a flat fee for the work to be done.

This amount will be deposited by the Firm in an interest-bearing trust account. You hereby authorize the Firm to withdraw the principal from the trust account to pay attorneys' fees and costs as they are incurred by you or, as to costs, by us on your behalf. In accordance with state law and the requirements of the State Bar of California, any interest earned will be paid to the State Bar to fund legal services for indigent persons. If, at the termination of service under this agreement, the total amount incurred by you for attorneys' fees and costs is less than the amount of the deposit, the difference will be refunded to you.

Also enclosed with this letter is a copy of our Firm's Privacy Policy, which we ask you to review. Please confirm your agreement to the terms of this letter and the Standard Terms of Retention by dating and signing in the spaces provided below and returning this letter to me as soon as possible. If you have any questions about the terms of this agreement, including the Standard Terms of Retention or the Firm's Privacy Policy, please contact me as soon as possible to discuss them. Enclosed is a copy of this letter for your records.

We look forward to working with you on this matter.

Very truly yours,

John D. Pettker

Attachments:
    Standard Terms of Retention
    Notice of Privacy Policy

**AGREED TO AND ACCEPTED:**

_____        Date: _____, 2003
Marc Toberoff, Esq.

_____        Date: _____, 2003
Jean Peavy

Q 0384

Privileged & Confidential
All Rights Reserved

SD-00385

## STANDARD TERMS OF RETENTION
### RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
### A LAW CORPORATION

Except as modified in writing, the following provisions will apply to the relationship between Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), and you:

1.    Fees. Fees for our services will be based on time spent and hourly billing rates current at the time that the services are performed. The billing rates of our attorneys and legal assistants vary, depending generally on the experience and capabilities of the attorney or legal assistant involved, and we adjust these rates from time to time. The time for which you will be charged will include, but will not be limited to, time spent in telephone and office conferences with you and with other counsel, witnesses, consultants, court personnel and others; factual investigation; legal research; responding to your requests for us to provide information to auditors in connection with reviews or audits of financial statements; drafting of letters, agreements, pleadings, briefs and other documents; traveling; court appearances, including waiting in court; and depositions and other discovery proceedings.

2.    Costs. In addition to our fees, we will bill you separately, and typically monthly, for costs and expenses incurred and ancillary services provided such as photocopying, messenger and delivery service, computerized research, travel (including mileage, parking, airfare, lodging, meals and ground transportation), telephone, telecopying, secretarial overtime, court costs and filing fees. Unless special arrangements are made, we do not take responsibility for paying fees and expenses of others, which will be the responsibility of and may be billed directly to you.

3.    Retainer. In addition to any retainer to which you have agreed, the Firm reserves the right, as a condition to providing further services, to request an increase in the retainer in the event that the amount of work which we are called upon to perform, or expenses we are required to incur or advance, exceeds this Firm's current expectation.

4.    Estimates Not Binding. Although we may furnish estimates of fees or costs that we anticipate will be incurred, these estimates are not intended to be binding, are subject to unforeseen circumstances, and are by their nature inexact.

5.    Billing and Payment. Fees and expenses will generally be billed monthly and are payable upon presentation. We expect prompt payment. We reserve the right to postpone or defer providing additional services or to discontinue our representation if billed amounts are not paid when due. We will be entitled to assume that you have raised any questions you have about a bill within 20 days of receipt.

6.    Cooperation. You will cooperate fully in our efforts on your behalf.

7.    Termination By You. You have the right at any time, in your sole discretion, to terminate our services and representation. Upon our termination, you will remain obligated to pay for all services rendered and costs or expenses paid or incurred on your behalf prior to the date of such termination or which are reasonably necessary thereafter.

8.    Termination By Us. We reserve the right to withdraw from representing you if, among other things, you fail to honor the terms of our engagement letter, you fail to cooperate or follow our advice on a material matter, or any fact or circumstance occurs that would, in our view, render our continuing representation unlawful or unethical. If we elect to withdraw, you will take all steps necessary to free us of any obligation to perform further services, including the execution of any documents necessary to complete our withdrawal, and we will be entitled to be paid at the time of withdrawal for all services rendered and costs and expenses paid or incurred on your behalf.

9.    Date of Termination. Our representation of you will be considered terminated at the earlier of (i) your termination of our representation, (ii) our withdrawal from our representation of you, or (iii) the substantial completion of our substantive work for you.

10.    Related Activities. If any claim or action is brought against us or any personnel of the Firm based on your negligence or misconduct, or if we are asked to testify as a result of our representation of you or must defend the confidentiality of your communications in any proceeding, you agree to pay us for any resulting costs or damages, including our time, even if our representation of you has ended.

11.    No Guarantee of Outcome. We do not and cannot guarantee any outcome in a matter.

1

Q 0385

Privileged & Confidential
All Rights Reserved

SD-00386

**EXHIBIT G**
**623**

12.    _Conflicts._  Our ethical obligations will require us, while this representation is ongoing, to decline any other engagements which conflict directly with this representation unless you otherwise consent.  When this representation is concluded, however, you understand that we will not be excluded from accepting a representation adverse to you, except where there is a substantial relationship between that representation and our present representation of you.  Naturally, we will not disclose any confidential information received in the course of our representation of you in any future representation without your consent, just as we will not disclose to you the confidences of our other clients even if that might be to your advantage.

13.    _Client._  As set forth in our letter accompanying these Standard Terms of Retention, you are the Firm's client for purposes of our representation.  Unless expressly agreed otherwise, we are not undertaking the representation of (i) any person or entity related or affiliated with you; (ii) any of your relatives (including parents, children or brothers/sisters), subsidiaries, or affiliated corporations or entities; and (iii) any members, officers, directors, agents or employees of you or of any related or affiliated entities.

14.    _Payment Notwithstanding Dispute._  In the event of any dispute that relates to our entitlement to any payment from you, all undisputed amounts shall be paid by you.  Any amounts in any client trust account held on your behalf, sufficient to pay the disputed amounts, shall continue to be held in such trust account until the final disposition of the dispute.

15.    _Document Retention and Destruction._  In the course of our representation of you, we are likely to come into possession of copies or originals of documents or other materials belonging to you or others (collectively "materials").  Once the particular matter to which those materials relate has been concluded, this Firm will have no further responsibility to maintain such materials.  If you have not sought the return of such materials within one year of the closing of the matter to which such materials relate, we will thereupon have the right to destroy such materials.

16.    _Interest._  All statements are due and payable within thirty days.  We reserve the right to charge simple interest at 10% per annum on all sums, whether for fees or reimbursement of costs, not paid within thirty days of the rendering of our statement.  Our failure to impose this interest charge on any occasion, or on multiple, numerous, and even repetitive occasions, is not a waiver of our right to thereafter impose this charge on unpaid amounts from the thirty-first day after each unpaid amount was initially billed.

17.    _Application to Subsequent Matters._  The agreement reflected in these Terms of Retention, and in the accompanying letter, apply to our present representation of you and to any subsequent matters which we agree to undertake on your behalf.

18.    _Attorney's Lien._  The Firm will have a lien for attorneys' fees and costs advanced on all claims and causes of action that are the subject of the Firm's representation of you under the agreement reflected in these Terms of Retention and in the accompanying letter, and on all proceeds of any recovery obtained (whether by settlement, arbitration award, or court judgment).

19.    _ARBITRATION._  IN THE EVENT OF A DISPUTE BETWEEN YOU AND THE FIRM REGARDING FEES, COSTS, OR ANY OTHER MATTER RELATED TO OR ARISING OUT OF OUR ENGAGEMENT BY YOU, OR ARISING OUT OF YOUR OR OUR PERFORMANCE OF THE AGREEMENT PURSUANT TO WHICH OUR SERVICES ARE PERFORMED (INCLUDING THE QUALITY OF THE SERVICES WHICH WE RENDER), YOU HAVE THE RIGHT TO HAVE THE DISPUTE DETERMINED, SETTLED AND RESOLVED BY CONFIDENTIAL ARBITRATION PURSUANT TO CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 6200-6206 WHICH PROVIDE PROCEDURES FOR ARBITRATION BEFORE THE STATE BAR OF CALIFORNIA OR BEFORE THE ATTORNEY-CLIENT RELATIONS DEPARTMENT OF THE LOS ANGELES COUNTY BAR ASSOCIATION.  ARBITRATION UNDER THE CODE IS VOLUNTARY FOR CLIENTS BUT MANDATORY FOR LAW FIRMS.  IF YOU SELECT ARBITRATION, ANY AWARD SHALL BE FINAL, BINDING AND CONCLUSIVE UPON THE PARTIES, AND A JUDGMENT RENDERED THEREON MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.  IF YOU DO NOT SELECT ARBITRATION, ANY DISPUTE MAY BE DETERMINED BY A COURT OF LAW ON AN ACTION BROUGHT BY EITHER PARTY.  THE PREVAILING PARTY IN ANY SUCH ARBITRATION OR COURT ACTION SHALL BE ENTITLED TO REASONABLE ATTORNEYS' FEES AND COSTS.  YOU AND THE FIRM AGREE THAT VENUE FOR ANY SUCH ARBITRATION OR COURT ACTION SHALL BE IN LOS ANGELES COUNTY, CALIFORNIA, AND FURTHER AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE ARBITRATOR OR THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES.

Q 0386

2

**Privileged & Confidential**
**All Rights Reserved**

SD 00387

## RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
### A LAW CORPORATION

### NOTICE OF PRIVACY POLICY

Law firms that provide tax planning and tax preparation services to individuals are now required by law[1] to inform their tax clients of the law firm's policies regarding privacy of client information.  As attorneys, we have been and continue to be bound by rules of professional conduct that mandate more stringent rules of confidentiality of client matters and information than those required by law.  Consequently, it has always been our policy to protect your right to privacy.  The purpose of this Notice is to advise you with respect to what nonpublic information we collect, and how we use it.

#### TYPES OF NONPUBLIC PERSONAL INFORMATION WE COLLECT

Generally, nonpublic personal information is personally identifiable financial information that is not publicly available.  We collect nonpublic personal information about you that you provide to us, or that is obtained by us with your authorization.

#### PARTIES TO WHOM WE DISCLOSE INFORMATION

**For current or former clients, we do not disclose any nonpublic personal information obtained in the course of our practice to anyone except as required or permitted by law, or as may be authorized by you.**  Permitted disclosures include, for example, providing information to our employees and, in limited situations, to unrelated third parties, who need to know such information to assist us in providing services to you.  In all such situations, such information is disclosed to process, administer, carry out or enforce your rights or to facilitate the transaction we are working on for you, and we stress the confidential nature of the information being shared with such parties.

#### PROTECTING THE CONFIDENTIALITY AND SECURITY OF CLIENT'S INFORMATION

We retain records relating to professional services that we provide so that we are better able to assist you with your professional needs, and in some cases to comply with professional guidelines.  We maintain physical, electronic, and procedural safeguards that comply with federal regulations and applicable state law, as well as our professional standards, in order to protect and safeguard your nonpublic personal information and privacy.

#### IF YOU HAVE QUESTIONS

Please call if you have any questions, because your privacy, our professional ethics, and the ability to provide you with quality financial services are very important to us.  You can reach us at:  Elizabeth Blakely (213) 895-4900 x 237 [ebb@rodipollock.com] or Maureen Varnes (213) 895-4900 x 234 [mov@rodipollock.com].

Document7

---

[1] Section 504(a) of the Gramm-Leach-Bliley Act (Public Law 106-102) and Title 16, Part 313 of the Code of Federal Regulations

Q 0387

**Privileged & Confidential**
**All Rights Reserved**

SD 00388

**EXHIBIT G**
**625**

**LAURA SIEGEL LARSON**
6400 PACIFIC AVENUE #106
PLAYA DEL REY, CA 90293
(310) 827-8136
FAX (310) 827-7227
July 8, 2003

# FAX TRANSMITTAL

**TO:**        Marc Toberoff

**FAX#:**      (310) 246-3101

**FROM:**      Laura Siegel Larson

**PHONE:**     (310) 827-8136

                              **Page 1 of 6**

**MESSAGE:**

Dear Marc,

Please see attached.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0388

Privileged & Confidential
All Rights Reserved

SD 00389

JUL-05-2003 11:27 PM                                    1 310 827 7227          P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13ᵗʰ letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Q 0389

Privileged & Confidential
All Rights Reserved

                                    SD 00390

JUL-08-2003 11:26                                                                      1 319 827 7227              P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they
   had written

<u>Our opinion as to why this has not been like other "contract negotiations":</u>
   -Time Warner is a huge, and we believe, arrogant company
   -They took months to respond to each issue all along the way and their responses were
      unacceptable, *self - serving and one-sided.* ~~that~~ *evidently it is their common practice*
   -We believe their lawyers are particularly heartless and ~~they have a bad reputation for~~ *to use every ounce of their leverage to* ~~grinding~~ individuals in negotiations
   -This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
      losing it. *which is particularly depressing above*
   -They want to make an example of us so that other creators and their heirs won't go after *"Superman"*
      their rights. *via Termination or otherwise.*

<u>Marc Toberoff and the Shuster interest:</u>                *by both 1st & 2nd Shuster family.*
   -Marc does not control the Superman copyright.  He has been hired to do a job.
   -Marc does not own the Shuster interest.  He is a lawyer hired by Joe Shuster's estate
   -In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
      reacquire rights as we have via Terminations.  Then the Shusters  would have to *with Time - Warner*
      negotiate a deal or handle things as they choose.
   -The Shuster rights are completely separate from the Siegel rights. *with no Shuster estate at the earliest.*
   -Time Warner/DC will own the Shuster rights until they vest in 2013
   -We have no intention of waiting until 2013 to do something with the Siegel rights

<u>We went to Marc to talk about him representing the Siegels.  Marc did not pursue us:</u>
   -We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
      deal.   You'll remember that you, Don Bulson and we were shocked when Kevin
      Marks said that if asked to, he would testify against us in court.
   -Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
      and you about the Superman rights until months after it had taken place.
   -Kevin Marks had turned Marc ~~Toberoff~~ away saying we had a deal with DC which *then* we did ~~had~~ *closed*
      not ~~have~~
   -Marc did not call my mom nor me
   -My mom called the Shuster family to see what the Shusters were doing
   -The family gave Marc's number to my mom and she called him after we had fired Ramer
      and Marks
   -We felt Marc grasped our situation very well and was sympathetic to author's rights
   -Marc Toberoff has no plans to produce a Superman movie

<u>Why the original investor left:</u>                                                          Q 0390
   -Kevin Marks told Marc we had a deal with DC
   -Marc told this to the investor who found another place to invest his money
   -Marc did not know we did not have a deal with DC until later when we contacted him

*Marc was also unable to get back to that investor with anything concrete regarding your interest because apparently neither you nor Don Bulson, specifically responded to his interest for a very long time.*

                                    Page 2

**Privileged & Confidential**
**All Rights Reserved**

                                                                              SD 00391

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- -We did this to further assert the Siegel rights to this character
- -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- -A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- -The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- -Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating, although she told him several times that she wanted to send in the fees. (*early ~ time well filing it would hurt the negotiating time*)
- -Kevin did not tell us there was a time limit on when the fees could be paid
- -When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- -The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

<u>Why Marc has not been negotiating with Time Warner:</u>
- -The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- -By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- -Timing the negotiations is an art   *with a single*   *indefinitely*
- -When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.   *the project*
- -We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.   *won't some studios in superman but doesn't*

<u>Why there is a buyout offer from an investor for your interest only:</u>
- -My interests are too entangled due to my divorce
- -You have been saying you needed money badly, were out of work and had big bills
- -We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- -Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.   *also*   *the investor's*   *$2 mil.*

Page 3

Q 0391

Privileged & Confidential
All Rights Reserved

SD 00392

**EXHIBIT G**
**629**



*(handwritten annotation top)* Your interest is a passive beneficial (25% of what we get) ... no sole decision making power (regarding the Siegel interest)

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>
- -It is a risky investment
- -No immediate or guaranteed payback
- -The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- -Any investor would want some protection and a worthwhile profit on his investment
- -It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

<u>Your belief that you have something to sell independently:</u>
- -Since you did not take part in the actual Termination, you do not have legal title to the Siegel copyrights interest
- -You therefore have no right to sell any copyright interest
- -You only have a right to receive a portion of the money that we receive, if any.
- -Your right to receive money is known as a passive financial interest.
- -In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- -We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- -We will give approval for a sale by you of your passive financial interest to a third party *an investor* monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

<u>Why you cannot ask Time Warner/DC for a buyout:</u>
- -As the controlling interest, we do not give you approval to do it
- -It damages the possibility of us negotiating a fair deal
- -It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- -Because Time Warner would get so little from you—a 12 1/2% passive financial interest in the character—that would be reflected in a low amount of money paid to you
- -If it damaged our ability to later make a better deal, We would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4                                                    Q 0392

Privileged & Confidential
All Rights Reserved

SD 00393

JUL-08-2003 11:29 PM                                                          P.06

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure

Q 0393

Privileged & Confidential
All Rights Reserved

SD 00394

EXHIBIT G
631

**LAURA SIEGEL LARSON**
6400 PACIFIC AVE. #106
PLAYA DEL REY, CA  90293
(310) 827-8136

July 11, 2003

# FAX TRANSMITTAL

TO:          Marc Toberoff
FAX#:        (310) 246-3101

FROM:        Laura Siegel Larson
PHONE:       (310) 827-8136

RE:          Letter Sent to Michael Siegel

                              Page 1 of 6

MESSAGE:

Dear Marc,

Enclosed is the final letter sent to Michael Siegel today.

Sincerely,

*Laura*

Q 0394

SD 00395

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

### Outline of Topics:

Our opinion regarding the Time Warner-DC offer:
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to warrant we had no rights which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
- It was a bad and unreasonable deal.

Page 1                                                    Q 0395

EXHIBIT G
633