# EXHIBIT G
# Part 7 of 9

JUL-06-2003 11:10 PM                                     10 827 7227        P.08

DRAFT

The Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a settlement. If the 15 million dollar offer from the other investor hadn't fallen through, we probably would have taken it. Unfortunately, offers like that are rare and we do not expect any offers to come our way that would include my mom and me.

If you don't like the offer, Don Bulson should tell Marc. There's no point in dragging it out. Marc says he's been waiting for an answer for months and he told Don if your don't like the offer you should make a counteroffer. Did Don tell you this? If you do take the offer, your wait is over, you have instant money and can go on with your life.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your letter. Please let us know what you decide regarding a buyout through Marc.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure: Xerox of my mom's $4,000 check to the Copyright Office for the Superboy Notices of Termination

Page 5

Q 0596

Privileged & Confidential
All Rights Reserved

EXHIBIT G
834

SD 00597

RECEIVED

MAY 3 0 2003

Marc Toberoff

TELECOPIER COVER PAGE

DATE:

RECIPIENT:

SENDER:

FAX NUMBER:

NUMBER OF PAGES:

May 30, 2003

Marc Toberoff

James R. Jackoway

310-246-3101

25(Including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0597

Privileged & Confidential
All Rights Reserved

SD 00598

EXHIBIT G

835

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER

## MEMORANDUM

**TO:**      James R. Jackoway, Esq.

**FROM:**    Kurt L. Harrison

**DATE:**    May 29, 2003

**RE:**      Marc Toberoff -- Ethical Issues

**cc:**      Gerry Hemmerling, Esq.
            Michele M. Mulrooney, Esq.

*******************************************************************

        Gerry Hemmerling informs me that this Firm has been asked to assist Mr. Marc Toberoff and his corporation, Pacific Pictures Corporation ("PPC"), by providing legal services in connection with a joint venture between PPC, on the one hand, and Jean Peavy and her son, Mark Peary, (collectively, the "Peavys") on the other. Ms. Hemmerling requested that I examine some of the ethical issues that might confront Mr. Toberoff and this Firm, if the Firm were to agree to assist Mr. Toberoff and PPC in the joint venture.

        I understand that Mr. Toberoff formed PPC and that PPC entered into a Joint Venture Agreement (the "Agreement") with the Peavys to exploit certain copyrights held, assigned, or transferred by the late Joe Shuster. The Peavys are Shuster's heirs. Among other things, the Agreement requires the parties to

Q 0598

**Privileged & Confidential**
**All Rights Reserved**

SD 00599

**EXHIBIT G**
**836**

engage Mr. Toberoff to perform legal services for the Peavys, and entitles Mr. Toberoff, through PPC, to receive 50% of all profits realized from the exploitation of the copyrights.  We do not know at present how Mr. Toberoff came in contact with the Peavys.

## RULE 1-200

    As you know, Rule 1-200 of the California Rules of Professional Conduct prohibits any member of the California State Bar from knowingly assisting in, soliciting, or inducing any violation of the Rules of Professional Conduct or the State Bar Act (Cal. Bus. & Prof. Code § 6000 et seq.).  In essence, this Rule makes any potential ethical problems confronting Mr. Toberoff this Firm's potential problems as well, if the Firm agrees to assist Mr. Toberoff and PPC in the transaction with the Peavys.  Hence, this Memorandum examines both potential issues confronting Mr. Toberoff in his relationship with the Peavys and the transaction in question and potential issues that would confront this Firm were it to agree to assist Mr. Toberoff and PPC.

## RULE 1-400

    The first potential problem raised by Mr. Toberoff's relationship with the Peavys arises from the prohibition against certain forms of advertising and solicitation by attorneys.  Rule 1-400 prohibits certain types of "communications" and "solicitations."  With respect to prohibited solicitations, an

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-2-

Q 0599

**Privileged & Confidential**
**All Rights Reserved**

SD 00600

**EXHIBIT G**
**837**

Thus, even if Mr. Toberoff contacted the Peavys by mail, rather than in person or by telephone, the communication would presumably violate Rule 1-400, unless Mr. Toberoff had made the required disclosures on the first page and envelope of the letter.  Again, without knowing exactly how and why Mr. Toberoff contacted the Peavys, it is difficult to know whether he violated Rule 1-400.  However, given the circumstances here, there is reason for concern in connection with any potential involvement of this Firm.

### BUSINESS AND PROFESSIONS CODE §6150 ET SEQ.

Mr. Toberoff's use of a corporate entity to acquire business also raises concerns about "capping."  The State Bar Act (the "Act") broadly defines a "capper" or "runner" as any person, firm, association, or corporation acting in any manner or in any capacity as an agent for an attorney in the solicitation or procurement of business for the attorney.  Bus. Prof. Code § 6151.  The Act makes it unlawful for any person, firm, corporation, partnership, or association to act as runner or capper for any attorney.  Bus. & Prof. Code § 6152.

In this case, PPC appears to be soliciting or procuring business for Mr. Toberoff.  Indeed, presumably at the suggestion or insistence of PPC, the Agreement requires the Peavys to engage the legal services of Mr. Toberoff, who then gets paid from the proceeds of the copyright exploitation.  Of course, "capping" also requires that the corporation soliciting or procuring

-4-

Q 0600

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

Privileged & Confidential
All Rights Reserved

SD 00601

**EXHIBIT G**
838

business for the attorney act for consideration. However, given the broad definition of consideration and the close relationship of Mr. Toberoff and PPC, it would probably not be difficult to find consideration. See Civ. Code § 1605 (broadly defining consideration as any benefit conferred or prejudice suffered by the promisor as inducement for the promise).

Furthermore, if this Firm were to engage in a long-term relationship with Mr. Toberoff by participating in other similar ventures, Mr. Toberoff, PPC, or whatever other entity Mr. Toberoff employs also appears to be soliciting or procuring business for the Firm. Hence, it might appear that the Firm itself were "joining" in the capping activity, which is also a violation of the Act. Bus. & Prof. Code § 6152. Such activity would also independently violate Rule 1-200, which, as mentioned above, prohibits attorneys from inducing, soliciting, or assisting in the violation of the Act.

## RULE 2-200

Aside from the questions raised above, if this Firm agreed to assist Mr. Toberoff in the joint venture with the Peavys, the Firm's involvement would also raise ethical issues regarding the financial relationship between Mr. Toberoff and the Firm. Rule 2-200(A) prohibits attorneys from dividing fees for legal services unless (1) the client consents in writing after full disclosure and (2) the total fee charged by all lawyers is not unconscionable. Even if all other ethical concerns were

Privileged & Confidential
All Rights Reserved

SD 00602

**EXHIBIT G**
**839**

satisfied, this Rule would require that a full written disclosure be made both to the Peavys and to the personal representative of the Shuster Estate. Furthermore, as discussed below, it is questionable whether the second prong of requirement can be met because of the 50% fee being charged by Mr. Toberoff through PPC.

### RULE 3-300

The Agreement also raises issues concerning Rule 3-300 regarding avoiding interests adverse to a client. Rule 3-300 prohibits an attorney from entering into a business transaction or knowingly acquiring an ownership or other pecuniary interest adverse to a client unless (1) the transaction and its terms are fair and reasonable to the client; (2) the transaction and its terms are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; (3) the client is advised in writing that the client may seek the advice of an independent lawyer and is given a reasonable opportunity to seek that advice; and (4) the client consents to the transaction in writing. Furthermore, the written disclosure requires more than just presenting the client with a written agreement. Decisions interpreting this Rule require the lawyer to fully advise the client in writing of all disadvantages and legal obligations of the transaction.[1]

In this case, the Agreement itself would unlikely suffice as the required written disclosure. Furthermore, there

---

[1] For the sake of brevity, I have not cited these cases here.

Privileged & Confidential
All Rights Reserved

SD 00603

**EXHIBIT G**
**840**

appears to be no writing advising the Peavys of their right to
seek independent legal advice, and we do not know whether the
Peavys were given an opportunity to seek such advice.  Finally,
as discussed below, there is a significant question as to whether
50% of all net profits is objectively fair and reasonable under
the circumstances.

Mr. Toberoff's use of a corporate entity, PPC, as the
party to the joint venture with the Peavys would most likely make
no difference in the application of Rule 3-300.  As a policy
matter, if an attorney could circumvent Rule 3-300 by the simple
expedient of forming a corporate entity to engage in the
transaction with the client, the Rule would have no vitality.
This suggests that a court would most likely disregard the
corporate entity for the purposes of applying Rule 3-300 under
the circumstances presented here.

RULE 3-310

Ms. Hemmerling has discussed the potential conflicts
that this Firm would have in representing the Shuster Estate,
while being paid by a party whose pecuniary interests are adverse
to the Estate and its heirs, the Peavys.  The issues discussed by
Ms. Hemmerling implicate Rule 3-310, and in particular
Subdivisions (B), (C), and (F).  You should note, however, that
Rule 3-310 can be satisfied by obtaining the client's written
informed consent.  In this case, prudence would suggest that the

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC                                    Q 0603

Privileged & Confidential
All Rights Reserved

SD 00604

EXHIBIT G
841

written informed consent should be obtained from both the Peavys
and the personal representative of the Shuster Estate.

## RULE 4-200

Finally, Rule 4-200 prohibits an attorney from entering
into agreement for, charging, or collecting an illegal or
unconscionable fee. The Rule lists eleven factors that are among
the factors to be considered. Without engaging in an extensive
analysis of each factor here, it appears far from clear whether
the 50% net profit fee charged by Mr. Toberoff through PPC[2] is
conscionable. As you know, contingent fees in most cases
typically run between 20% and 40% of net recovery. Looking at
the factors, it is difficult to see how a fee well in excess of
the usual upper limit of contingent fee agreements can be
justified in this case. Ultimately, however, there is no bright
line standard for determining this issue. Furthermore, this
issue is difficult to evaluate without some appreciation for the
discounted value of the rights in question. Nonetheless, as
noted above, this issue raises concerns both in the near- and
far-term as to Rule 4-200 and, as discussed above, as to Rules 2-
200 and 3-300.

---

[2] As with the application of Rule 3-300, it is unlikely that Mr.
Toberoff's use of PPC would shield him from the requirements of
Rule 4-200.

**Privileged & Confidential**
**All Rights Reserved**

**EXHIBIT G**
**842**

SD 00605

For your review, I have included all of the rules and statutes cited in this Memorandum.  If you wish me to pursue further any of the issues discussed herein, please let me know.

ATTACHMENTS

Q 0605

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

Privileged & Confidential
All Rights Reserved

–9–

**EXHIBIT G**
**843**

SD 00606

Yahoo! Mail - mtoberoff@ipwla.com                                          Page 1 of 8

# YAHOO! SMALL BUSINESS
### Email

Small Business Home - Yahoo! - Help

| Mail ▼ | Addresses ▼ | Calendar ▼ | Notepad ▼ |

mtoberoff@ipwla.com [Sign Out]

| Check Mail | Compose | Search Mail |

Mail Options [ Manage My Services ]

**Mail Accounts**
ipwla.com
yahoo.com

**Folders**    [Add - Edit]
**Inbox (3)**
Draft
Sent
Bulk        [Empty]
Trash       [Empty]

## View Attachment [Back to Original Message - Printable View]

POWERED BY
OUTSIDE IN®
HTML EXPORT

File name: LAURA__2.WPD | File type: application/octet-stream

Save to my Yahoo! Briefcase - Download File - Need Help?

October 2, 2004

Joanne Siegel

13929 Marquesas Way, Apt. 201A

Marina Del Rey, CA 90292

Laura Siegel Larson

6400 Pacific Avenue, #106

Playa Del Rey, CA 90293

Re: Engagement for Professional Services

Dear Joanne and Laura:

I am pleased that you (the "Client") have decided to retain my law firm (the "Firm") as your counsel. The Firm is committed to providing efficient and responsive services to its clients. This letter will confirm our understanding and agreement regarding the terms and conditions of our engagement.

1. Scope of Engagement: The Firm will represent the Client with respect to the prosecution and defense of all rights, causes of actions and claims arising from the Client*s termination of Jerome Siegel*s prior grants of rights pursuant to section 304 (c) of the U.S. Copyright Act (the "Claims") which became effective on April 16, 1999, including Client*s Claims against Time-Warner, Warner Bros., D.C. Comics their licensees, agents and affiliates (collectively, "Time-Warner"). The scope of services provided for under this Agreement includes the prosecution and defense of the Claims up through trial and legal services on appeal and through final disposition of the Claims as reasonably required.

2. Conditions Precedent: This Agreement will not take effect and the Firm will have no obligation to provide legal services, until the Firm

Q 0610

**Privileged & Confidential**
**All Rights Reserved**

http://us.f611.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765_...   10/3/2004

SD 00611

receives this Agreement signed by the Client.

3. General Responsibilities of Attorney and Client: It will be the Firm*s responsibility to perform the legal services reasonably required in connection with the full prosecution and defense of the Claims, to take reasonable steps to keep you informed of progress and developments and to respond promptly to your enquiries and communications.

It will be the Client*s responsibility to cooperate fully with the Firm in its work by, among other things, providing us with relevant information and copies of documents within Client*s control, keeping the Firm up to date with respect to any relevant developments and by making yourselves reasonably available for consultation. The Client*s responsibilities also include: (a) approving decisions involving risk (given that Client acknowledges that litigation is inherently risky); (b) approving legal and

Initials: _____ , _____ , _____

Page 2

Joanne Siegel and Laura Siegel Larson

October 2, 2004

negotiation strategy; (c) determining acceptable settlement terms and figures, and (d) advising us whether any document we have prepared or received and sent to you for your approval or review is consistent with your expectations, as the case may be.

4. Disclaimer of Guarantee: From time to time, through the course of the Firm*s representation of you, we may express beliefs or opinions concerning the effectiveness of various strategies and courses of action or concerning the merits or potential results of any course of action. However, the Firm necessarily cannot make any promises or give any guarantees regarding the outcome of any matter, and the statements of any of the Firm*s attorneys are not intended, nor should they be construed, as any such promise or guarantee. In addition, although we may from time to time, for your convenience, furnish you with estimates or projections and the information on which such are based, such estimates or projections are by their nature inexact and shall not be binding on us.

5. Legal Fees: It is understood that the attorney's fees hereunder are not set by law but are negotiable between attorney and client and have been negotiated by Client with the Firm.

(a) In consideration of the services rendered by the Firm hereunder the Firm shall be ~~entitled~~ entitled to and you hereby agree to pay to the

Q 0611

Privileged & Confidential
All Rights Reserved

https://us.f314.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765 ...   10/3/2004

SD 00612

**EXHIBIT G**
**845**

Firm: one-third (33.33%) ("Percentage Fee") of one hundred percent
(100%) of any and all gross sums of money or other consideration
recovered, confirmed or awarded by reason of or in connection with the
above Claims ("Gross Proceeds") prior to the deduction of any costs,
fees, liens or disbursements, whether recovered by suit, arbitration,
mediation or other form of dispute resolution, verdict, judgment,
settlement or otherwise. Sixty (60) days before trial the Firm*s one-third
Percentage Fee shall increase to forty percent (40%), and thereafter this
will be the applicable Percentage Fee from that point forward through
appeals, if any, and final disposition of the Claims. Gross Proceeds
include, without limitation, all fixed or contingent proceeds, [whether
payable or received during or after the Firm*s engagement, in
perpetuity.] ** _Note to Marc*the preceeding phrase may be changed
subject to a conversation George will have with you. He will email you
about it tonight._ and any form of consideration, whether upfront or future
fees, advances, guarantees, bonuses, deferments, royalties or profit
participations of any kind. In computing the Firm*s fee, the total sums
payable, including without limitation, interest upon a judgment, shall be
deemed part of the amount recovered. For the avoidance of doubt, in
calculating the Firm*s Percentage Fee, such Percentage Fee will be
applied to Gross Proceeds, prior to any deduction from proceeds of
payments to Michael Siegel or his designee on account of Michael
Siegel*s 25% passive financial interest, as the son of Jerome Siegel, of
the Siegel termination interest under 17 U.S.C. * 304 (c).

In the event that IP Worldwide (IPW, LLC) receives its contractual
percentage fee of ten percent (10%) of Gross Proceeds ("IPW
Percentage") with respect

Page 3

Joanne Siegel and Laura Siegel Larson

October 2, 2004

to any Claim(s) pursuant to the agreement between it and you dated
October 3, 2002 (as extended by you on April 12, 2004), five (5%)
percent will be deducted from the Firm*s Percentage Fee applicable to
such Gross Proceeds.

It is understood that the Claims involve multiple rights/claims against
multiple defendants and accordingly the above Percentage Fee
calculation shall be applicable to each Claim to the extent that there is
any recovery (whether through trial, arbitration or settlement) on any
such Claim, at the time of such recovery, and are not in any way
contingent on the prosecution or maintenance of any other Claims or

Q 0612

**Privileged & Confidential**
**All Rights Reserved**

http://us.f834.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055  1324765 ...   10/3/2004

SD 00613

actions.

Any attorney*s fees awarded by the Court, pursuant to statute or contract, in connection with the subject matter of this representation, shall be paid to the Firm and shall be applied against the fee obligation under this Agreement but shall not discharge nor limit Client*s fee obligation under this Agreement. Any Costs awarded by the Court, in connection with the subject matter of this representation, shall be paid to the Firm and shall be applied against the Client*s obligation to reimburse the Firm*s Costs under this Agreement but shall not discharge nor limit Client*s Cost reimbursement obligation under this Agreement.

Notwithstanding anything to the contrary contained herein, the Firm*s Percentage Fee will not apply to the following consideration: (i) the non-refundable $250,000 advanced by Time Warner to ~~Joanne Siegel~~ the Siegels [**Note to Marc: Joanne, Laura and Michael Siegel all received percentages of this] in November, 2000 against the resolution of the Superman Claim; (ii) Joanne Siegel*s annual non-advance "pension" payment by Time Warner [**Note to Marc: my mom would feel more secure if the words "non-advance" would be inserted for the following reason: although this agreement should be confidential between us and you, Michael Siegel has been threatening to sue my mother for a portion of her pension for years claiming that it is an advance on an eventual settlement. That is of course not true. My mother feels that if Michael ever got a copy of this agreement and mention of the pension is lumped in with other items such as the $250,000 advance, medical insurance, etc., he would try to use it as proof that we all consider it an advance. Since adding "non advance" does not effect you under the fee agreement, we ask you to please include those words to give my mother peace of mind] of ~~$125,000~~ $126,148 per year, plus the cost of living increases to such payment and (iii) medical, dental or life insurance provided to ~~the Client~~ Joanne Siegel, Laura Siegel Larson, Michael Siegel, and Laura*s children Michael Larson and James Larson. [**Note to Marc: As I mentioned in my email to you earlier today, Time Warner has made long-standing promises to provide these benefits to Michael Siegel and my children in addition to my mom and me.] Although the Percentage Fee applies to other non-cash in kind consideration (excluding (iii) above), if any, paid as part of a recovery on a Claim, it does not apply to minor non-cash perks such as tickets to movie premieres, conventions, dinners, free or discounted merchandise.

The Firm will be compensated for its legal services and reimbursed for the costs and disbursements advanced by it (as set forth below) only if Gross Proceeds are recovered, subject to paragraph 9 below.

Notwithstanding anything to the contrary in this Agreement, Client shall only be responsible and/or liable for the payment to the Firm of its Percentage Fee of

Q 0613

**Privileged & Confidential**
**All Rights Reserved**

http://br.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...   10/3/2004

SD 00614

**EXHIBIT G**
**847**

Gross Proceeds as and when such Gross Proceeds are actually received by or credited to Client or Client*s designee. For the avoidance of doubt, if a recovery involves future payments of Gross Proceeds by any adverse party to Client, Client shall not be liable to the Firm for its Percentage Fee on Gross Proceeds that are payable by such adverse party which is not in fact paid to or credited to Client or Client*s designee. Accordingly, in the event of any adverse party*s failure to make payments of Gross Proceeds to the Client pursuant to a judgment or settlement agreement, it is understood and agreed that the Firm will have the right, but not the obligation, as a third party beneficiary to directly enforce such judgment or settlement agreement against such adverse party to the extent of the

Page 4

Joanne Siegel and Laura Siegel Larson

October 2, 2004

Firm*s Percentage Fee hereunder payable on Gross Proceeds from such judgment or settlement agreement.

The Firm will be solely responsible for the legal fees of any outside attorneys retained by the Firm, if any, in connection with its prosecution of the Claims hereunder. In the event the Firm wishes to retain such outside attorney(s), the Firm will furnish Client with the identity and credentials of such attorney(s). Such retention of outside attorneys, if any, shall in each instance be subject to Client*s prior written approval.

(b)   The 33.33% Percentage Fee set forth in paragraph 5 (a) above will apply upon the filing of a complaint, if any, in the U.S. District Court for the Central District of California (or other Court of competent jurisdiction) with respect to any Claim(s). Prior to such filing, the Firm will research and prepare the complaint regarding the Claims, plus any required accompanying documents, for filing an action ~~in federal court~~ on the Claims, in consideration for a reduced Percentage Fee equal to two and one-half percent (2.5 %) of Gross Proceeds. This reduced fee shall be payable in addition to the IPW Percentage of Gross Proceeds. However, upon the filing of the complaint, if any, the Firm*s reduced fee will be deemed part of and absorbed in the Percentage Fee applicable pursuant to Paragraph 4(a) above.

6. Costs and Disbursements: The Firm will advance all costs and disbursements ("Costs") expended or incurred in connection with its prosecution or defense of the Claims. Such Costs shall include, without limitation, filing fees, investigation expenses, expert witness fees, consultant fees, accountant fees, investigator fees, subpoena and service of process fees, jury fees, transcript costs, third-party photocopying, photocopying at the Firm (at the agreed rate of five cents per page),

Q 0614

Privileged & Confidential
All Rights Reserved

http://f1.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...   10/3/2004

SD 00615

EXHIBIT G
848

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, parking, travel costs, and messenger fees. No attorney*s fees shall be construed as Costs under this Agreement. Client authorizes the Firm to incur all Costs reasonably necessary in the Firm*s judgment, subject to the Client*s prior approval of any individual cost item exceeding $3,000. All Costs advanced by the Firm shall be reimbursed to the Firm from Gross Proceeds in addition to and after payment of the Percentage Fee pursuant to paragraph 5 above and

shall not be included in or deducted from such fee. The Firm will furnish Client with a reasonably detailed statement of the Costs on a quarterly basis.

7. Lien for Attorney*s Fees and Costs: The Firm will have a lien for attorney*s fees and Costs advanced applicable to all Claims and/or Gross Proceeds that are the subject of the Firm*s representation under this Agreement.

8. Payment and Notices: Client hereby authorizes and appoints the Firm as their attorney-in-fact to collect and receive all Gross Proceeds due relating to the Claims,

Page 5

Joanne Siegel and Laura Siegel Larson

October 2, 2004

to endorse and deposit into a client trust account all checks and other moneys payable, to deduct the Firm*s compensation as set forth above, and to pay the remainder to Client within seven (7) days of the Firm*s receipt of such proceeds. A statement of all deductions including the applicable Percentage Fee and itemized Costs, if any, shall be

sent by the Firm to Client with each such payment. All notices and payments hereunder shall be made to the parties at their respective address set forth on page 1 hereof unless and until either party gives the other party prior written notice of an address change.

9. Discharge of Firm*s Services: It is understood that Client may discharge the Firm at any time by written notice to the Firm, effective upon receipt by the Firm. However, such discharge of the Firm, if any, shall not relieve the Client of the obligation to compensate the Firm for services rendered, and to reimburse Costs advanced by the Firm, all prior to such discharge. In the event of Client*s discharge of the Firm, the Firm*s Percentage Fee for legal services will be reasonably computed pro-rata in proportion to the totality of legal services rendered by subsequent attorneys, if any, leading to the resolution of the Claims

Q 0615

Privileged & Confidential
All Rights Reserved
http://f6.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055 1324765 ...   10/3/2004

SD 00616

by trial, arbitration, settlement or otherwise. Upon the Firm*s discharge, if any, all Costs advanced by the Firm shall become due and payable to the Firm within ninety (90) days of the date of the discharge notice, notwithstanding anything to the contrary herein. The Firm will return the Client*s files to Client no later than ten (10) days after the Firm*s receipt of written notice of discharge by the Client, if any.

10. Full Understanding: In signing this Agreement each of you acknowledge that your engagement of the Firm on the above Percentage Fee basis is a fair and reasonable method to compensate us for our legal services. We have advised you to seek independent legal and business advice with respect to this agreement. By signing this Agreement you represent to us that you have had a reasonable opportunity to seek such advice and that you have either sought and received such independent legal and business advice or knowingly refrained from doing so.

11. Miscellaneous: This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. This Agreement shall be deemed to have been mutually drafted by the

parties and no drafting presumption shall apply for or against either party. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall be binding upon and inure to the benefit of the parties* heirs, executors, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

Page 6

Joanne Siegel and Laura Siegel Larson

October 2, 2004

This Agreement shall be governed by the Laws of the State of California applicable to agreements made in and to be performed therein.

We are very pleased to represent you in connection with this matter. If the foregoing terms meet with your approval, kindly so indicate by signing four originals of this engagement letter and returning them to us for counter-signature, and we will return two fully executed originals to you.

Q 0616

Privileged & Confidential
All Rights Reserved

http://b1.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055  1324765 ...  10/3/2004

SD 00617

EXHIBIT G
850

Yahoo! Mail - mtoberoff@ipwla.com

Very truly yours,


Marc Toberoff


Agreed, understood and accepted:


_____ Date:_____

Joanne Siegel


_____ Date:_____

Laura Siegel Larson


| Check Mail | Compose | Search Mail |

Mail Options [ Manage My Services ]

Copyright © 1994-2004 Yahoo! Inc. All rights reserved. Terms of Service - Copyright Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

Q 0617

Privileged & Confidential
All Rights Reserved

http://us.f1.mail.yahoo.com/ym/ipwla.com/ShowLetter?box=Inbox&MsgId=7055_1324765_...   10/3/2004

SD 00618

EXHIBIT G
851

EJ14D635574US

Laura:

I understand…I thought it was a great strategic move, however I don't want to put too much work
into this if you remain quite hesitant.

Re: licensing opportunities -- although possible in the right situation with people who really "get it"
I believe key licensees will be hesitant for three reasons: 1. the clout of WB Consumer Products
in the licensing industry; 2. perception that WB owns S and that to understand what you own
requires an understanding of the nuances of copyright law; 3. fear of being sued or embroiled in
litigation.

Best,

Marc Toberoff
Law Offices of Marc Toberoff
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101

-----Original Message-----
**From:** Mistylight3@cs.com [mailto:Mistylight3@cs.com]
**Sent:** Monday, October 10, 2005 1:48 AM
**To:** MToberoff@ipwla.com
**Subject:** Inquiry

Dear Marc,
After much consideration we have decided to permit you to make inquiries of key people
regarding a movie based on Action Comics #1. However, we do not give permission for
you to enter into any oral or written commitments for anyone to work on such a movie.
Please let us know who you plan to speak with before you make contact with them and
inform us of all activity on this matter as it develops. We also want to know of any
publicity that may occur as a result of the inquiries, in advance, and we reserve the right
to stop the inquiries at any time. If too many people get involved, we believe it will
generate more headaches than we are willing to deal with. So to reiterate, you may
proceed with a full inquiry but we do not want you to commission a script or enter into any
employment agreements with anyone at this time. After the inquiries have been made,
we will evaluate what you have learned and decide how to proceed.

We are also in favor of approaching product manufacturers about merchandising deals
regarding use of the names Superman, Clark Kent, Lois Lane or other elements
contained in Action Comics #1 and are willing to explore other commercial possibilities
that may exist in connection with our ownership rights.

Thanks for your idea. We believe it is time for us to take matters into our own hands and
to exercise the rights we obtained through the Copyright Act. However, we want to
proceed cautiously. Please confirm whether you wish to do this or not.

Sincerely,
Joanne Siegel and Laura Siegel Larson

Q 0618

SD 00619

**EXHIBIT G**
852

# MARC TOBEROFF
### ATTORNEY AT LAW

December 3, 2001

New York Supreme Court, Westchester County
Attn: Legal Division, Rm. 330
110 Dr. Martin Luther King Blvd.
White Plains, NY 10601

Re: Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

To Whom It May Concern:

I am writing to request copies of the documents set forth below, which I cannot obtain in person since I am located in California. Enclosed please find my check for $5.00 to cover research costs per my telephone conversation today with the filing clerk of your Court.

The documents are from the 1947 lawsuit entitled Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc. (which concerned "SUPERMAN"). It was commenced in 1947 before Judge Addison Young. (Unfortuately, I do not have the case number , but the clerk suggested you would be able to retrieve the documents based on this description.)

The documents I am requesting are as follows:

1.  **Opinion** of Official Referee J. Addison Young **dated November 21, 1947** (or November 1, 1947) in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

2.  **Finding of Facts and Conclusions of Law** by Judge Addison Young dated April 12, 1948 and **Interlocutory Judgment dated April 12, 1948** in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

3.  **Final Consent Judgment dated May 21, 1948** signed by Judge Addison Young in Jerome Siegel and Joe Shuster vs. National Periodical Publications, Inc.

Q 0619

**Privileged & Confidential**
**All Rights Reserved**

23852 PACIFIC COAST HIGHWAY, SUITE 555, MALIBU, CALIFORNIA 90265-4879
TELEPHONE (310) 589-5151    FACSIMILE (310) 589-5152

SD 00620

Page 2
12/03/01
NY Supreme Court, Westchester County

As suggested by the Clerk, I have enclosed a self-addressed Express Mail envelope and pre-paid Express Mail label to send the above document to me at your earliest convenience. EJ140635588US

Thank-you very much for your kind attention this important matter. Please telephone me at (310) 589-5151 if there are any problems or questions concerning the above.

Very truly yours,

Marc Toberoff

Q 0620

Privileged & Confidential
All Rights Reserved

SD 00621

**LAURA SIEGEL LARSON**
6400 PACIFIC AVENUE #106
PLAYA DEL REY, CA  90293
(310) 827-8136
FAX  (310) 827-7227
November 6, 2002

## FAX TRANSMITTAL

TO:        Marc Toberoff
FAX#:      (310) 246-3101
FROM:      Laura Siegel Larson and Joanne Siegel
PHONE:     (310) 827-8136

Page 1 of 3

MESSAGE:

Dear Marc,

Attached, for your records, please find the Kevin Marks memo of August 9, 2002. It makes reference to the contact you had with his office. Although your initial contact with him had been in late 2001, this August, 2002 letter was the first time he notified us of your interest in the Siegel rights.

Please note that we had been unhappy with the representation that the Ramer firm had been giving us for some time. We went to a meeting at Kevin's office in May, 2002 prepared to terminate them as our representatives. At that same meeting between my mother, Kevin Marks and myself, Marks told us that if we did not accept the February 1, 2002 DC proposed contract or a redraft that he wanted to write, that he and his firm could no longer represent us. DC's document had been totally unacceptable and while we were ready to terminate Marks and Ramer right then and there, we gave conditional approval to Kevin to make one last attempt at a redraft. When delivered to us in July, we found his draft unacceptable as well and followed through on our earlier desire to terminate Gang, Tyre, Ramer & Brown as our representatives.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0621

Privileged & Confidential
All Rights Reserved

SD 00622

**EXHIBIT G**
855

NC '06-2002 03:11? PM
SENT·BY:                    8-12- 2 :11:19AM
Case 2:10-cv-03633-ODW-RZ    Document 427-9    Filed 05/14/12    Page 24 of 95    Page
ID #:26350
310 827 7227
-310 827 7227        ;# 2/ 3

# GANG, TYRE, RAMER & BROWN, INC.
## MEMORANDUM


From:  Kevin S. Marks          Date:  August 9, 2002

To:  Joanne Siegel          Re:  "Superman"
     Laura Siegel Larson
     Don Bulson

cc:  Bruce Ramer


On August 8, 2002, I received a call from Mark Toberoff and Ari Emanuel. Toberoff is a lawyer; Emanuel is one of the founding partners of the Endeavor Talent Agency.

They have formed a group (with other investors, I am sure) that is interested in acquiring intellectual property rights, exploiting those rights in all media, and attaching Endeavor clients to projects that evolve from those rights. We do not know who the other investors are or what other funding sources are available to this group. They are aware of the Siegel termination rights.

In a previous telephone conversation (initiated by Mr. Toberoff), I told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics (subject to documentation), but that all aspects of the agreement and the negotiations were confidential. Mr. Toberoff asked me if I would make an offer to him and his group that the Siegel Family would consider in lieu of the D.C. Comics deal. I told him that I did not feel that it was appropriate to be making offers while I was in the process of documenting an existing deal.

On August 8, the Toberoff/Emanuel Group took the initiative and made an offer. Their offer is $15 million up-front, plus what they promise to be a meaningful participation from proceeds from the exploitation of "Superman" in all media on an ongoing basis. They said they have already done their "due diligence" and that such an arrangement would not be subject to further legal or other research on their part.

Having received this proposal, I am obliged to pass it on to you.

I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation. (If called to testify, I would have to testify as much.) The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for

245415.1

Q 0622

Privileged & Confidential
All Rights Reserved

SD 00623

# GANG, TYRE, RAMER & BROWN, INC.

Joanne Siegel
Laura Siegel Larson
Don Bulson
August 9, 2002
Page 2

that matter) by D.C. Comics. I would also not be surprised if existing benefits (such as insurance reimbursement and widow's benefits) were cut off.

This new offer (which has significant blanks to fill in) looks like it could be better than the D.C. deal. I believe the Toberoff/Emanuel group attaches enhanced value to the property because it has brokered a confidential arrangement with the Shuster estate and is trying to put together the Siegel and Shuster termination pieces. (As we have discussed previously, the Shuster estate will have termination rights in approximately 2013 if the U.S. Supreme Court upholds the recent law extending the copyright term). I, of course, cannot assure you that this is a real deal, and undisclosed investors sometimes disappear just when you think you are close to concluding an arrangement.

My recommendation ultimately is to stay the course with D.C. Comics. I do not say that as a matter of economics; it is candidly what I think to be the right thing to do under the circumstances.

Therefore, I would send D.C. Comics the revised draft that I have prepared (as it may be modified with your input). We should continue to negotiate the documentation in good faith with D.C. Comics, and make every genuine effort to come up a written agreement that is true to the deal that was made. I believe the deal will be finalized with D.C. Comics, even if the process is not entirely smooth. If, despite all these good faith efforts, the parties cannot reach final agreement, then the negotiations would be terminated and then (and only then) would there would be a clear parting of ways which would open up your exploring other possibilities.

I will be out of the office the week of August 12th. If you would like to discuss this matter in my absence, please feel free to call Bruce Ramer.

Best regards.

K.S.M.

245415.1

Q 0623

Privileged & Confidential
All Rights Reserved

SD 00624



9701 Wilshire Blvd., 10th Floor
Beverly Hills, CA 90212
Ph: (310) 246-3333 · Fx: (310) 246-3101

---

### FACSIMILE COVER PAGE

| TO:    Joanne Siegel<br>Laura Siegel Larson | FAX:  (310) 821-5894<br>(310) 827-7227 |
|---|---|
| FROM:  Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 11/26/02 | RE: Potential Conflict Disclosure |

**COMMENTS:**

Dear Joanne & Laura:

As discussed, enclosed please find a disclosure and acknowledgement of potential conflicts for your review.  Please bear in mind that the wording of this document is not hyper-critical, since it is really an internal document for our protection to evidence that we have followed appropriate protocol.

Feel free to call me with any further questions.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0624

SD 00625

# **Ip** worldwide

November 26, 2002

_Privileged & Confidential_

Joanne Siegel
13929 Marquesas Way, Apt. 201A
Marina Del Rey, CA 90292

Laura Siegel Larson
6400 Pacific Avenue, #106
Playa Del Rey, CA 90293

Re: Potential Conflict Disclosure

Dear Joanne and Laura:

With reference to our Agreements dated as of October 3, 2002 pertaining to _Superman_ and _Superboy_, this is to confirm that we have disclosed to you and discussed the following proposed actions that may pose potential conflicts of interest or the appearance of potential conflicts of interest and that following our disclosure, discussion and our answering of your questions with regard thereto, you freely acknowledged and agreed that you have no objection to our taking said actions as set forth below.

IPW will enter into negotiations with Michael Siegel and/or his representative to purchase all of Michael Siegel's rights, title and interest in _Superman_ and _Superboy_, including his 25% share of the copyright termination interests arising from Jerome Siegel's interest in the copyrights thereto. This purchase, if any, will be directly financed by Ariel Emanuel. To eliminate potential disputes, if any, which might cloud or hamper the interests subject to purchase, the proposed purchase of Michael Siegel's interests will be contingent upon Michael Siegel expressly settling and releasing both of you, your representatives, successors and assigns from any and all disputes, claims or causes of actions regarding _Superman_ and _Superboy_.

If the above comports with your understanding please indicate same by your signatures below and returning a copy of this letter to me.

Yours sincerely,

Marc Toberoff

Acknowledged and Agreed:

_____    Date: _____
Joanne Siegel


_____    Date: _____        Q 0625
Laura Siegel Larson

9701 Wilshire Boulevard, 10th Floor Beverly Hills, CA 90212 Tel: (310) 246-3100; Fax: (310) 246-3335
E-mail: MToberoff@IPWW.biz

SD 00626

Confirmation Report - Memory Send

Page       : 001
Date & Time: Nov-26-02  08:17pm
Line 1     :
Machine ID :

| | | |
|---|---|---|
| Job number | : | 922 |
| Date | : | Nov-26 08:16pm |
| To | : | ☎98277227 |
| Number of pages | : | 002 |
| Start time | : | Nov-26 08:16pm |
| End time | : | Nov-26 08:17pm |
| Pages sent | : | 002 |
| Status | : | OK |

Job number    : 922              *** SEND SUCCESSFUL ***

# Ip worldwide

9701 Wilshire Blvd., 10ᵗʰ Floor
Beverly Hills, CA  90212
Ph: (310) 246-3333 · Fax (310) 246-3101

## FACSIMILE COVER PAGE

| TO:   Joanne Siegel | FAX:  (310) 821-5894 |
|---|---|
|        Laura Siegel Larson |           (310) 827-7227 |
| FROM:  Marc Toberoff | PAGES ( including cover ): 2 |
| DATE : 11/26/02 | RE: Potential Conflict Disclosure |

COMMENTS:

Dear Joanne & Laura:

As discussed, enclosed please find a disclosure and acknowledgement of potential conflicts for your review.  Please bear in mind that the wording of this document is not hyper-critical, since it is really an internal document for our protection to evidence that we have followed appropriate protocol.

Feel free to call me with any further questions.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT  THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.

Q 0626

SD 00627

## Confirmation Report

```
Page       : 001
Date & Time: Nov-26-02  08:21pm
Line 1     :
Machine ID :
```

| Nbr. | Job | Date | Time | Duration | pgs | To | Dept.nbr | Account | Comm. code | Status |
|------|-----|------|------|----------|-----|-----|----------|---------|------------|--------|
| 362 | 923 | Nov-26 | 08:19pm | 01/37 | 002 | 98215894 | | | G3 301 | OK |

Q 0627

SD 00628

Confirmation Report

```
                              Page      : 001
                              Date & Time: Nov-26-02  08:26pm
                              Line 1    :
                              Machine ID :
```

| Nbr. | Job | Date | Time | Duration | pgs | To | Dept.nbr | Account | Comm. code | Status |
|------|-----|------|------|----------|-----|-----|----------|---------|------------|--------|
| 363 | 924 | Nov-26 | 08:24pm | 01/38 | 002 | 98215894 | | | G3 301 | OK |

Q 0628

SD 00629

RECEIVED

MAY 2 8 2003

Marc Toberoff

## TELECOPIER COVER PAGE

DATE:                    May 28, 2003

RECIPIENT:               Marc Toberoff

SENDER:                  James R. Jackoway

FAX NUMBER:              310-246-3101

NUMBER OF PAGES:         6(including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0629

Privileged & Confidential
All Rights Reserved

SD 00630

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER
## MEMORANDUM

TO:        Jim Jackoway

FROM:      Gerry Hemmerling

DATE:      May 27, 2003

RE:        Marc Toberoff -- Superman rights

CC:        Michele Mulrooney
           Kurt Harrison

---

Michele asked me to give you the citations for the statutes we discussed last week about the Toberoff matter.

The Joint Venture Agreement regarding the Superman rights provides for Toberoff's corporation, PPC, to deal with the Superman rights and to pay all costs and disbursements with respect to the rights. It also provides for PPC to pay all costs and legal fees of "setting up" Joe Shuster's estate. PPC will then recoup its "out of pocket expenses", excluding contingent legal fees, from the proceeds of the Joint Venture prior to distribution. The Agreement also provides for PPC to retain Toberoff to render all legal services regarding the rights and the Joint Venture and to handle the negotiation of contracts regarding the exploitation of the rights. Under the Agreement, the parties are to approve the appointment of Michael Catron as administrator of the estate and to instruct him to disburse the proceeds from the rights in accordance with the Agreement.

Q 0630

-1-

Privileged & Confidential
All Rights Reserved

SD 00631

**EXHIBIT G**
**864**

In essence, under the Agreement, PPC and not Shuster's heir, would be controlling the probate of Shuster's estate, and Toberoff personally would be controlling the exploitation of the rights. Pursuant to the Agreement, we would be handling the probate estate for PPC and your role in negotiating contracts for exploitation of the rights would not be independent of Toberoff.

The purpose of the probate laws is generally to protect the estate and the heirs of the decedent. They restrict the amount of fees paid to lawyers and executors for the estate, including fees for negotiating and enforcing contracts dealing with estate interests, and also allow the court to examine contracts dealing with disposition of estate interests.

In addition to ethical problems that Toberoff may have and that we may have indirectly through Toberoff or PPC, there are some specific probate problems under the Agreement. Lawyers for an estate cannot have any conflicts of interest with regard to estate matters or estate heirs. There is a potential conflict of interest that the firm might have if we handled the probate matters, with PPC advancing all probate costs and in effect controlling the probate, and your being involved with the estate in negotiating contracts that would benefit both PPC and the estate.

*what is it?*

The court can examine the Agreement pursuant to Probate Code Section 11604, a copy of which is attached, and can refuse distribution of the Joint Venture proceeds pursuant to the Agreement or can order distribution in a different manner if the court finds that the arrangement was inequitable. It can also limit

-2-

Q 0631

Privileged & Confidential
All Rights Reserved

SD 00632

the attorneys' fees paid to lawyers for the estate in connection with the rights pursuant to Probate Code Sections 10810 and 10811, copies of which are attached. In particular, if we represented the estate, the court must determine that any contingent fee arrangements that benefited the firm must be in the best interests of the estate and the heirs.

I am asking Kurt to discuss with you and give you the appropriate sections of the Business and Professions Code and State Bar Rules regarding other ethical problems that are applicable to the matter.

002-mem
attachments

Q 0632

-3-

Privileged & Confidential
All Rights Reserved

SD 00633

§ 11604.  Distribution to person other than beneficiary

(a) This section applies where distribution is to be made to any of the following persons:

(1) The transferee of a beneficiary.

(2) Any person other than a beneficiary under an agreement, request, or instructions of a beneficiary or the attorney in fact of a beneficiary.

(b) The court on its own motion, or on motion of the personal representative or other interested person or of the public administrator, may inquire into the circumstances surrounding the execution of, and the consideration for, the transfer, agreement, request, or instructions, and the amount of any fees, charges, or consideration paid or agreed to be paid by the beneficiary.

(c) The court may refuse to order distribution, or may order distribution on any terms that the court deems just and equitable, if the court finds either of the following:

(1) The fees, charges, or consideration paid or agreed to be paid by a beneficiary are grossly unreasonable.

(2) The transfer, agreement, request, or instructions were obtained by duress, fraud, or undue influence.

(d) Notice of the hearing on the motion shall be served on the beneficiary and on the persons described in subdivision (a) at least 15 days before the hearing in the manner provided in Section 415.10 or 415.30 of the Code of Civil Procedure.

Enacted Stats 1990 ch 79 § 14 (AB 759), operative July 1, 1991.

Q 0633

Privileged & Confidential
All Rights Reserved

SD 00634

EXHIBIT G
867

## § 10810.  Compensation of estate attorney

(a) Subject to the provisions of this part, for ordinary services the attorney for the personal representative shall receive compensation based on the value of the estate accounted for by the personal representative, as follows:

(1) Four percent on the first one hundred thousand dollars ($100,000).

(2) Three percent on the next one hundred thousand dollars ($100,000).

(3) Two percent on the next eight hundred thousand dollars ($800,000).

(4) One percent on the next nine million dollars ($9,000,000).

(5) One-half of 1 percent on the next fifteen million dollars ($15,000,000).

(6) For all amounts above twenty-five million dollars ($25,000,000), a reasonable amount to be determined by the court.

(b) For the purposes of this section, the value of the estate accounted for by the personal representative is the total amount of the appraisal of property in the inventory, plus gains over the appraisal value on sales, plus receipts, less losses from the appraisal value on sales, without reference to encumbrances or other obligations on estate property.

Added Stats 1991 ch 82 § 30(SB 896), effective June 30, 1991 mars.

Q 0634

Privileged & Confidential
All Rights Reserved

SD 00635

LAW OFFICES

## RENNER, OTTO, BOISSELLE & SKLAR, LLP

1621 EUCLID AVENUE, NINETEENTH FLOOR
CLEVELAND, OHIO 44115-2191
TEL: (216) 621-1113   FAX: (216) 621-6165
EMAIL: MAILROOM@RENNEROTTO.COM

June 18, 2003

Via facsimile (1 page)
310-246-3101
No confirmation

Marc Toberoff, Esq.
10th Floor
9701 Wilshire Boulevard
Beverly Hills, CA 90212

Re:   Michael Siegel

Dear Marc:

I have discussed with Michael the offer you passed on from a potential investor who is interested in purchasing Michael's interest in the Superman copyright. The amount offered is not acceptable to Michael.

Michael would be willing to entertain an offer that will pay him $200,000/year for the rest of his life, with a guaranteed minimum of 10 years. This could be structured as a guaranteed annuity or otherwise, with the hope of minimizing taxes while assuring that such payments will be made when due.

Contrary to what I had mentioned during one of our telephone conversations, Michael is 59.

Please let me know if this proposal is of interest to your potential investor.

Very truly yours,

Don W. Bulson

DWB/jam

Q 0635

SD 00636

LAW OFFICES OF
## MARC TOBEROFF

June 13, 2003

John D. Peftker, Esq.
444 South Flower Street
Los Angeles, CA 90071

Re: Probate of Joseph Shuster Estate

Dear Jack:

As discussed enclosed please find the following:

(1) Copy of Joseph Shuster's Will dated June 28, 1988 (they can not find the original);
(2) Revocable Living Trust (plus Schedule A where assigned property = only stock and furniture) dated April 11, 1988. I have original;
(3) Affidavit of Jean Peavy per §13101 dated August 17, 1992 that decedent's property is under $60,000. I have original;
(4) Death certificate of Joseph Shuster, resident of Los Angeles, CA, died on August 14, 1992. I have original;
(5) Family tree.

The Trust does not appear to be a problem due to the limited property assigned to it per Schedule A which I located after we spoke today.

I 've also enclosed §304(c)(2)(D) of the US Copyright Act which gives executors, etc. a right to terminate prior transfers of copyright within delineated time windows. Previously, only a spouse, children and grandchildren had this right. So when Joe Shuster died in 1992 without spouse or children his Estate was worth under $60K. Then, on October 27, 1998 the Sonny Bono Copyright Act added subparagraph (D) giving the right to the executor, personal representative, etc. (see amendment enclosed).

We therefore want the Probate Court to approve in addition to the normal executor powers something like "the executor is empowered, without limitation, to terminate prior transfers of Joseph Shuster's copyrights [possibly even better if we can add, "including "Superman"] pursuant to 17 U.S.C. §304(c)(2)(D). Alternatively, the papers could state that Estate is being probated for this purpose.

I apologize for the delay in getting the above to you. Anything, you can do from here on to expedite the probate would be greatly appreciated. As discussed, please fax or e-mail me a retainer agreement whereupon I will send you the $2,500 retainer you requested.

Regards,

Marc Toberoff

Q 0636

9595 Wilshire Boulevard, 8th Floor, Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
MToberoff@ipww.biz

SD 00637

**EXHIBIT G**
**870**

# CERTIFICATE OF DEATH
## STATE OF CALIFORNIA
### USE BLACK INK ONLY

| STATE FILE NUMBER | | | | |
|---|---|---|---|---|

**DECEDENT PERSONAL DATA**

| 1A. NAME OF DECEDENT—FIRST (GIVEN) | 1B. MIDDLE | 1C. LAST (FAMILY) | LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER |
|---|---|---|---|
| JOSEPH | — | SHUSTER | 2A. DATE OF DEATH—MO. DAY. YR. 2B. HOUR — Fnd July 30, 1992 1106 / 3. SEX MALE |

| 4. RACE | 5. HISPANIC—SPECIFY | 6. DATE OF BIRTH—MO. DAY. YR. | 7. AGE IN YEARS | IF UNDER 1 YEAR | IF UNDER 24 HOURS |
|---|---|---|---|---|---|
| CAUCASIAN | YES [X] No | JULY 10, 1914 | 78 | MONTHS DAYS | HOURS MINUTES |

| 8. STATE OF BIRTH | 9. CITIZEN OF WHAT COUNTRY | 10A. FULL NAME OF FATHER | 10B. STATE OF BIRTH | 11A. FULL MAIDEN NAME OF MOTHER | 11B. STATE OF BIRTH |
|---|---|---|---|---|---|
| CANADA | USA | JULIUS SHUSTER | HOLLAND | IDA KAKLARSKY | RUSSIA |

| 12. MILITARY SERVICE? | 13. SOCIAL SECURITY NO. | 14. MARITAL STATUS | 15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME) |
|---|---|---|---|
| 19___ TO 19___ [X] NONE | 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 | NEVER MARRIED | NONE |

| 16A. USUAL OCCUPATION | 16B. USUAL KIND OF BUSINESS OR INDUSTRY | 16C. USUAL EMPLOYER | 16D. YEARS IN OCCUPATION | 17. EDUCATION—YEARS COMPLETED |
|---|---|---|---|---|
| ARTIST | COMIC BOOKS | DC COMICS | 60 | 14 |

**USUAL RESIDENCE**

| 18A. RESIDENCE—STREET AND NUMBER OR LOCATION | 18B. CITY | 18C. ZIP CODE |
|---|---|---|
| 11944 MONTANA AVENUE #305 | W. LOS ANGELES | 90049 |

| 18D. COUNTY | 18E. NUMBER OF YEARS IN THIS COUNTY | 18F. STATE OR FOREIGN COUNTRY | 20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT |
|---|---|---|---|
| LOS ANGELES | 14 | CALIFORNIA | JEAN PEAVY-SISTER 316 HORTON LANE N.W ALBUQUERQUE, NEW MEXICO 87114 |

**PLACE OF DEATH**

| 19A. PLACE OF DEATH | 19B. IF HOSPITAL SPECIFY ONE IP. ER/OP. DOA | 19C. COUNTY |
|---|---|---|
| Residence | | Los Angeles |

| 19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION | 19E. CITY |
|---|---|
| 11944 Montana Avenue #305 | W. Los Angeles |

| | TIME INTERVAL BETWEEN ONSET AND DEATH | 22. WAS DEATH REPORTED TO CORONER? 92-06897 [X] YES REFERRAL NUMBER No |
|---|---|---|

**CAUSE OF DEATH**

| 21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C) | |
|---|---|
| IMMEDIATE CAUSE (A) Congestive Heart Failure | ▶ Unk |
| DUE TO (B) Arteriosclerotic Cardiovascular Disease | ▶ Years |
| DUE TO (C) | ▶ |

| 23. WAS BIOPSY PERFORMED? YES [X] No |
|---|
| 24A. WAS AUTOPSY PERFORMED? YES [X] No |
| 24B. WAS IT USED IN DETERMINING CAUSE OF DEATH? YES [X] No |

| 25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21 | 26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 25? IF YES, LIST TYPE OF OPERATION AND DATE |
|---|---|
| Hypertension | No |

**PHYSICIAN'S CERTIFICATION**

| I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER | 27C. CERTIFIER'S LICENSE NUMBER | 27D. DATE SIGNED |
|---|---|---|---|
| 27A. DECEDENT ATTENDED SINCE (MONTH, DAY, YEAR) | DECEDENT LAST SEEN ALIVE (MONTH, DAY, YEAR) | 27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS | |

**CORONER'S USE ONLY**

| I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER ▶ Deputy Coroner Mary T. Macan | 28B. DATE SIGNED 8-07-92 |
|---|---|---|

| 29. MANNER OF DEATH—specify one: natural, accident, suicide, homicide, pending investigation or could not be determined | 30A. PLACE OF INJURY | 30B. INJURY AT WORK? YES [ ] No [ ] | 30C. DATE OF INJURY MONTH, DAY, YEAR | 31. HOUR |
|---|---|---|---|---|
| Natural | | | | |

| 32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY) | 33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY) |
|---|---|

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

| 34A. DISPOSITION(S) CR/RES | 34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS RES: 11944 MONTANA AVE. #305 W.LOS ANGELES,CA 90049 | 34C. DATE MO. DAY. YEAR 8/14/92 | 35A. SIGNATURE OF EMBALMER NOT EMBALMED | 35B. LICENSE NUMBER NONE |
|---|---|---|---|---|
| 36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING AS SUCH) PIERCE BROS WESTWOOD VILLAGE | 36B. LICENSE NO. FD-951 | 37. SIGNATURE OF LOCAL REGISTRAR ▶ Robert C. Mata | | 38. REGISTRATION DATE AUG 1 0 1992 |

**STATE REGISTRAR**

| A. | B. | C. | D. | E. | F. | CENSUS TRACT |
|---|---|---|---|---|---|---|

| -11 (REV. 3-91) | MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS | |
|---|---|---|

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARTMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

70

Director of ... Services and Register

Q 0637

SD 00638

# Last Will and Testament

KNOW ALL PERSONS BY THESE PRESENTS:

That, I ___JOSEPH SHUSTER___

of _____ W. Los Angeles, California_____

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

### I.

I hereby declare that I am the ___brother___ of ___JEAN ADELE PEAVY___

at the time of the execution of this Will.

### II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their ___N/A___ will provide for them.
___(mother, or father)___

### III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my execut_rix_ as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

### IV.

I give, devise and bequeath unto ___JEAN ADELE PEAVY___ all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that ___Jean Adele Peavy___ shall predecease me, or in the event that both ___Jean Adele Peavy___ and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, ___MARK WARREN PEARY___.

Q 0638

### V.

I hereby nominate and appoint my ___sister___ ___Jean Adele Peavy___

SD 00639

EXHIBIT G
872

## VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my execut_rix_ settle my estate in such a manner as shall seem best and most conveniently to _her_, and I hereby empower my execut_rix_ to mortgage, lease sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

Q 0639

SD 00640

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this _28_ day of _June_ 19__.

_Joseph Shuster_
Testator

STATE OF CALIFORNIA

County of _Los Angeles_ } ss.

Each of the undersigned, being first duly sworn on oath, states that on this _28_ day of _June_, 1988:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of _JOSEPH SHUSTER_ (the Testator__);

(2) The Testator__, in my presence and in the presence of the other Witnesses whose signatures appear below:

(a) Declared the foregoing instrument consisting of _one_ pages, of which this is the last to be _his_ Will;

(b) Requested me and the other Witnesses to act as Witnesses to _his_ Will and to make this affidavit; and

(c) Signed such instrument;

(3) I believe the Testator__ to be of sound mind, and that in so declaring and signing, _he_ was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testator__ and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

_Tom Fenaughty_
Witness
_3374 Overland Ave #1_
Address
_L.A. Ca. 90064_

_Robert ___ E Williams_
Witness
_3545 Mentone Ave #3_
Address
_Los Angeles California 90034_

Witness

Address

_went to notary public office in Brentwood on Montana_

SUBSCRIBED & SWORN to before me this _28_ day of _June_ 19__.

_F. Patrick Hagerty_

Notary Public in and for the State of California, residing at _Santa Monica, Calif._

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991

Q 0640

SD 00641

**EXHIBIT G**
**874**

THE

Last Will and Testament of

Joseph Shuster

Dated June 28, 1988

Q 0641

SD 00642

EXHIBIT G
875

## Revocable Living Trust

This trust agreement is made this day of *April 11, 1988* between _Joseph Shuster_ , the Grantor, and _Joseph Shuster_ and _Jean A. Peavy_ , the Trustees.

Upon my death or incapacity, I name _Jean A. Peavy_ successor.

The Grantor, _Joseph Shuster_ , hereby transfers to the Trustees and to the Trustees' successor the property described in the attached Schedule A. Such property and any other property that may be received by the Trustees shall be held and may be disposed of by the Trustees and the Trustees' successors.

The Grantor may, by signed instruments delivered to the Trustees, revoke the Trust in whole or in part, or amend this Agreement from time to time in any manner.

To the extent that any such requirements can be legally waived, no Trustee shall ever be required to give any bond as Trustee or qualify before, be appointed by, or in absence of breach of trust, account to any court, or obtain the order or approval of any court in the exercise of any power or discretion herein given.

IN WITNESS WHEREOF, the parties hereto have signed this on the above-written date.

GRANTOR: _Joseph Shuster_
Joseph Shuster

WITNESS: _Elsa Vivian_          _Carole Garthright_

TRUSTEES: _Joseph Shuster_      _Jean A. Peavy_
Joseph Shuster                  Jean A. Peavy

SUCCESSOR TRUSTEE: _Mark W. Peary_
Mark W. Peary

Q 0642

SD 00643

**EXHIBIT G**
876

Attachment To Living Trust

SCHEDULE "A"

STATE OF ___California___ , COUNTY OF ___Los Angeles___

___7-11-88___
Date

_J. S._
Grantor's Initial

The following is my property, both real and personal, included in the attached Revocable Living Trust.

1. Stock certificates

Company _____

No. of shares ___50___

Name(s) on certificates or account _____

2. Furniture and appliances

Q 0643

SD 00644

## AFFIDAVIT OF JEAN PEAVY UNDER
## CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.     The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.     The decedent died on July 30, 1992 in Los Angeles County, California.

3.     At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.     No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.     The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.     The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.     The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Time Warner Inc. Common Stock

116 Time Warner Rights

8.     No other person has a right to the interest of the decedent in the described property.

9.     The affiant requests that the described property be paid, delivered or transferred to her.

10.    The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:     August 17        , 1992

_Jean Peavy_
JEAN PEAVY

Q 0644

SD 00645

**EXHIBIT G**
878

STATE OF   NEW MEXICO          )
                              )  ss.
COUNTY OF   BERNALILLO_____  )


    On ___August 17_____, 1992, before me, a notary public for the State of _New Mexico_____, personally appeared JEAN PEAVY (___) known to me or (_X_) proved to me based on satisfactory evidence to be the person whose name is subscribed to the above instrument, and she acknowledged to me that she executed the same.

    **IN WITNESS WHEREOF**, I have hereunto set my hand and affixed my official seal on the day and year first above written.


SEAL:

_Barbara Hewson_____
Notary Public for the
State of _New Mexico_____

Commission Expires 3-13-94

2.

Q 0645

SD 00646

**EXHIBIT G**
879



Yasef-Golda Katlarsky
(Maternal Grandparents)

Jacob-Rosa Shuster
(Paternal Grandparents)

Yasef-Golda K.

Bessie-Jack Shuster
(Aunt-Uncle)

Julius –Ida Shuster
(Parents)

Frank  Rose  Geraldine
(First Cousins)

Frank Shuster——— Joe Shuster ———Jean Shuster Peavy
(Brother)                                          (Sister)
Deceased                                         Beneficiary of Will
No Wife          Deceased                  Executress
No Children    No Wife
                      No Children

Rosie - Lorne Michaels (*Divorced*)
(Second Cousin)

Mark Warren Peavy
(Nephew)
Contingent Beneficiary
Successor Executor

Dawn Peavy
(Niece)

Q 0646

SD 00647

US Code as of: 01/05/99

Sec. 304. Duration of copyright: Subsisting copyrights

* (a) Copyrights in Their First Term on January 1, 1978. - (1)(A) Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.
  o (B) In the case of -
    + (i) any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or
    + (ii) any work copyrighted by a corporate body (otherwise than

      as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.
  o (C) In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work -
    + (i) the author of such work, if the author is still living,
    + (ii) the widow, widower, or children of the author, if the author is not living,
    + (iii) the author's executors, if such author, widow, widower,

      or children are not living, or
    + (iv) the author's next of kin, in the absence of a will of the
      author, shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.
    + (2)
        + (A) At the expiration of the original term of copyright in a work specified in paragraph (1)(B) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which -
  o (i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in the proprietor of the copyright who is entitled to claim the renewal of copyright at the time the application is made; or
  o (ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in the person or entity that was the proprietor of the copyright as of the last day of the original term of copyright.

* (B) At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which -
  o (i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or
  o (ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.
  o (3)

Q 0647

SD 00648

EXHIBIT G
881

+ (A) An application to register a claim to the renewed and
extended term of copyright in a work may be made to the
Copyright Office -

* (i) within 1 year before the expiration of the original term of
copyright by any person entitled under paragraph (1)(B) or (C) to
such further term of 67 years; and
(ii) at any time during the renewed and extended term by any
person in whom such further term vested, under paragraph (2)(A)
or (B), or by any successor or assign of such person, if the
application is made in the name of such person.

* (B) Such an application is not a condition of the renewal and extension
of the copyright in a work for a further term of 67 years.

* (4)
    o (A) If an application to register a claim to the renewed and
    extended term of copyright in a work is not made within 1 year
    before the expiration of the original term of copyright in a work,
    or if the claim pursuant to such application is not registered,
    then a derivative work prepared under authority of a grant of a
    transfer or license of the copyright that is made before the
    expiration of the original term of copyright may continue to be
    used under the terms of the grant during the renewed and extended
    term of copyright without infringing the copyright, except that
    such use does not extend to the preparation during such renewed
    and extended term of other derivative works based upon the
    copyrighted work covered by such grant.
    o (B) If an application to register a claim to the renewed and
    extended term of copyright in a work is made within 1 year before
    its expiration, and the claim is registered, the certificate of
    such registration shall constitute prima facie evidence as to the
    validity of the copyright during its renewed and extended term and
    of the facts stated in the certificate. The evidentiary weight to
    be accorded the certificates of a registration of a renewed and
    extended term of copyright made after the end of that 1-year
    period shall be within the discretion of the court.

* (b) Copyrights in Their Renewal Term at the Time of the Effective Date
of the Sonny Bono Copyright Term Extension Act. - Any copyright still
in its renewal term at the time that the Sonny Bono Copyright Term
Extension Act becomes effective shall have a copyright term of 95 years
from the date copyright was originally secured.

* (c) Termination of Transfers and Licenses Covering Extended Renewal
Term. - In the case of any copyright subsisting in either its first or
renewal term on January 1, 1978, other than a copyright in a work made
for hire, the exclusive or nonexclusive grant of a transfer or license
of the renewal copyright or any right under it, executed before January
1, 1978, by any of the persons designated by subsection (a)(1)(C) of
this section, otherwise than by will, is subject to termination under
the following conditions:
    o (1) In the case of a grant executed by a person or persons
    other than the author, termination of the grant may be effected
    by the surviving person or persons who executed it. In the case
    of a grant executed by one or more of the authors of the work,
    termination of the grant may be effected, to the extent of a
    particular author's share in the ownership of the renewal
    copyright, by the author who executed it or, if such author is
    dead, by the person or persons who, under clause (2) of this
    subsection, own and are entitled to exercise a total of more than
    one-half of that author's termination interest.
    o (2) Where an author is dead, his or her termination interest is
    owned, and may be exercised, as follows:

Q 0648

SD 00649

+ (A) the widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower
owns one-half of the author's interest;

+ (B) the author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them;

+ (C) the rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpe basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them. [1]

+ (D) **In** [2] **the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.** [2] So in original. Probably should not be capitalized.

o (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

o (4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

+ (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

+ (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

o (5) **Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.**

o (6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this

Q 0649

SD 00650



subsection. In all cases the reversion of rights is subject to the following limitations:

+ (A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered
by the terminated grant.

+ (B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination

has been served as provided by clause (4) of this subsection.

+ (C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those

persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D)
of this clause, a further grant, or agreement to make a further
grant, of a particular author's share with respect to any right
covered by a terminated grant is valid only if it is signed by
the same number and proportion of the owners, in whom the right
has vested under this clause, as are required to terminate the
grant under clause (2) of this subsection. Such further grant

or agreement is effective with respect to all of the persons in
whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person

dies after rights under a terminated grant have vested in him

or her, that person's legal representatives, legatees, or heirs
at law represent him or her for purposes of this subclause.

+ (D) A further grant, or agreement to make a further grant, of

any right covered by a terminated grant is valid only if it is
made after the effective date of the termination. As an exception, however, an agreement for such a further grant may

be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between
the persons provided by subclause (C) of this clause, and the

original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause

o (4) of this subsection.

+ (E) Termination of a grant under this subsection affects only

those rights covered by the grant that arise under this title,
and in no way affects rights arising under any other Federal,

State, or foreign laws.

Q 0650

SD 00651

      + (F) Unless and until termination is effected under this
        subsection, the grant, if it does not provide otherwise,
        continues in effect for the remainder of the extended renewal

        term.

* (d) Termination Rights Provided in Subsection (c) Which Have Expired on
or Before the Effective Date of the Sonny Bono Copyright Term Extension
Act. - In the case of any copyright other than a work made for hire,
subsisting in its renewal term on the effective date of the Sonny Bono
Copyright Term Extension Act for which the termination right provided
in subsection (c) has expired by such date, where the author or owner
of the termination right has not previously exercised such termination
right, the exclusive or nonexclusive grant of a transfer or license of
the renewal copyright or any right under it, executed before January 1,
1978, by any of the persons designated in subsection (a)(1)(C) of this
section, other than by will, is subject to termination under the
following conditions:
   o (1) The conditions specified in subsections (c)(1), (2), (4),
      + () The conditions specified in subsections (c)(1), (2), (4),
        years of copyright term as provided by the amendments made by
        the
        Sonny Bono Copyright Term Extension Act.
      + (2) Termination of the grant may be effected at any time
        during
        a period of 5 years beginning at the end of 75 years from the

        date copyright was originally secured.
------------------------------------------------------------------------

Footnotes

[1] So in original. The period probably should be a semicolon.

Q 0651

SD 00652

LEXSEE 112 stat 2827

UNITED STATES PUBLIC LAWS
105th Congress – 2nd Session
(c) 1998, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER PROPERTIES INC.

PUBLIC LAW 105-298 [S. 505]

OCT. 27, 1998

[SONNY BONO COPYRIGHT TERM EXTENSION ACT; FAIRNESS IN MUSICAL LICENSING ACT OF 1998]

*105 P.L. 298; 112 Stat. 2827; 1998 Enacted S. 505; 105 Enacted S. 505*

BILL TRACKING REPORT:        105 Bill Tracking S. 505
FULL TEXT VERSION(S) OF BILL:  105 S. 505
CIS LEGIS. HISTORY DOCUMENT:   105 CIS Legis. Hist. P.L. 298

An Act

To amend the provisions of title 17, United States Code, with respect to the duration of copyright, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

TITLE I--COPYRIGHT TERM EXTENSION

[*101] SEC. 101. <*17 USC 101* note> --SHORT TITLE.

This title may be referred to as the "Sonny Bono Copyright Term Extension Act".

[*102] SEC. 102. DURATION OF COPYRIGHT PROVISIONS.

(a) Preemption With Respect to Other Laws.--Section 301(c) of title 17, United States Code, is amended by striking "February 15, 2047" each place it appears and inserting "February 15, 2067".

(b) Duration of Copyright: Works Created on or After January 1, 1978.--Section 302 of title 17, United States Code, is amended--

(1) in subsection (a) by striking "fifty" and inserting "70";

(2) in subsection (b) by striking "fifty" and inserting "70";

(3) in subsection (c) in the first sentence--

(A) by striking "seventy-five" and inserting "95"; and

(B) by striking "one hundred" and inserting "120"; and

(4) in subsection (e) in the first sentence--

(A) by striking "seventy-five" and inserting "95";

(B) by striking "one hundred" and inserting "120"; and

(C) by striking "fifty" each place it appears and inserting "70".

Q 0652

Page 2

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(c) Duration of Copyright: Works Created but Not Published or Copyrighted Before January 1, 1978.--Section 303 of title 17, United States Code, is amended in the second sentence by striking "December 31, 2027" and inserting "December 31, 2047".

(d) Duration of Copyright: Subsisting Copyrights.--

(1) In general.-- Section 304 of title 17, United States Code, is amended--

(A) in subsection (a)--

(i) in paragraph (1)--

(I) in subparagraph (B) by striking "47" and inserting "67"; and

(II) in subparagraph (C) by striking "47" and inserting "67";

[**2828] (ii) in paragraph (2)--

(I) in subparagraph (A) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67"; and

(iii) in paragraph (3)--

(I) in subparagraph (A)(i) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67";

(B) by amending subsection (b) to read as follows:

"(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act.--Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.";

(C) in subsection (c)(4)(A) in the first sentence by inserting "or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2)," after "specified by clause (3) of this subsection,"; and

(D) by adding at the end the following new subsection:

"(d) Termination Rights Provided in Subsection (c) Which Have Expired on or Before the Effective Date of the Sonny Bono Copyright Term Extension Act.--In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

"(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

"(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.".

(2) Copyright amendments act of 1992.-- Section 102 of the Copyright Amendments Act of 1992 (Public Law 102-307; 106 Stat. 266; 17 U.S.C. 304 note) is amended--

(A) in subsection (c)--

(i) by striking "47" and inserting "67";

(ii) by striking "(as amended by subsection (a) of this section)"; and

(iii) by striking "effective date of this section" each place it appears and inserting "effective date of the Sonny Bono Copyright Term Extension Act"; and

Q 0653

SD 00654

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(B) in subsection (g)(2) <17 USC 101 note> in the second sentence by inserting before the period the following: ", except each reference to forty-seven years in such provisions shall be deemed to be 67 years".

[**2829]   [*103]  SEC. 103. TERMINATION OF TRANSFERS AND LICENSES COVERING EXTENDED RENEWAL TERM.

Sections 203(a)(2) and 304(c)(2) of title 17, United States Code, are each amended--

(1) by striking "by his widow or her widower and his or her children or grandchildren"; and

(2) by inserting after subparagraph (C) the following:

"(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.".

[*104]  SEC. 104. REPRODUCTION BY LIBRARIES AND ARCHIVES.

Section 108 of title 17, United States Code, is amended--

(1) by redesignating subsection (h) as subsection (i); and

(2) by inserting after subsection (g) the following:

"(h)(1) For purposes of this section, during the last 20 years of any term of copyright of a published work, a library or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display, or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.

"(2) No reproduction, distribution, display, or performance is authorized under this subsection if--

"(A) the work is subject to normal commercial exploitation;

"(B) a copy or phonorecord of the work can be obtained at a reasonable price; or

"(C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.

"(3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such library or archives.".

[*105]  SEC. 105. VOLUNTARY NEGOTIATION REGARDING DIVISION OF ROYALTIES.

It is the sense of the Congress that copyright owners of audiovisual works for which the term of copyright protection is extended by the amendments made by this title, and the screenwriters, directors, and performers of those audiovisual works, should negotiate in good faith in an effort to reach a voluntary agreement or voluntary agreements with respect to the establishment of a fund or other mechanism for the amount of remuneration to be divided among the parties for the exploitation of those audiovisual works.

[*106]  SEC. 106. <17 USC 108 note> EFFECTIVE DATE.

This title and the amendments made by this title shall take effect on the date of the enactment of this Act.

[**2830]    TITLE   II--MUSIC   LICENSING   EXEMPTION   FOR   FOOD   SERVICE   OR DRINKINGESTABLISHMENTS

[*201]  SEC. 201. <17 USC 101 note> --SHORT TITLE.

This title may be cited as the "Fairness In Music Licensing Act of 1998".

[*202]  SEC. 202. EXEMPTIONS.

(a) Exemptions for Certain Establishments.--Section 110 of title 17, United States Code, is amended--

(1) in paragraph (5)--

(A) by striking "(5)" and inserting "(5)(A) except as provided in subparagraph (B),"; and

Q 0654

SD 00655

# RODI·POLLOCK

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 895-1900

JOHN D. CAHILL
JOHN L. CARRAN
WILLIAM R. CHRISTIAN
HENRY P. PRAMOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
TIMOTHY G. CEPERLEY
ALFRED KLEIN
KENNETH A. FRANKLIN
WADE E. NORWOOD
PRIYA G. SHATT
ANDREW W. BODEAU
JEAN M. BEASLEY

KARL B. RODI (1908-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1896-1973)

OF COUNSEL
JOHN P. POLLOCK
ROBERT A. YAHIRO
DAVID K.W. CHANG

TELECOPIERS
(213) 895-4921
(213) 895-4922
(213) 895-4750

OUR FILE NUMBER

June 30, 2003

Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

*FIRST DRAFT (LATER*
*MODIFIED AFTER*
*MT COMMENTS)*

Jean Peavy
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

*NOT EXECUTED*

Re:    Agreement for Professional Services

Dear Marc and Jean:

We are pleased to confirm that Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), will represent Jean in connection with her petition for appointment as personal representative of the estate of Joseph Shuster, deceased. You have informed us that Mr. Shuster died on July 30, 1992. We understand that, at this point, our representation will be limited to seeking the appointment of Jean as personal representative so that she, in such capacity, may terminate prior transfers of Mr. Shuster's copyrights pursuant to 17 U.S.C. §304(c)(2)(D). Our representation will not involve general administration of the estate, because, at the present time, there are no assets that require probate administration.

The Firm will render legal services to Jean in accordance with the enclosed Standard Terms of Retention, which are incorporated herein by this reference, and which we ask you to carefully review. If we subsequently perform any additional services for either of you, these terms will apply to such services as well, unless a new agreement is made.

It is our understanding that Marc has agreed to pay our fees for legal services and to reimburse us for costs advanced. We are aware that there are no assets within the estate to pay our fees and expenses. We have agreed, therefore, that it would be inappropriate to base our fees as statutorily determined under the California Probate Code as a percentage of the value of the estate. As we discussed with Marc, the rate of fees for legal services rendered by the Firm will be calculated on the basis of the time expended. While I expect that I will be performing most of the legal services on your behalf, instances may arise where I delegate duties to other individuals who will perform services or where we seek the expertise of one or more other principals within the Firm. My current hourly rate is $325.00. The current hourly rates for services rendered by other lawyers in the Firm range from $200.00 to $350.00 per hour, and paralegals are currently billed at $125.00 to $175.00 per hour. These rates are subject to change from time to time without notice.

Privileged & Confidential
All Rights Reserved

Q 0655

SD 00656


Marc Toberoff, Esq.
Jean Peavy
June 24, 2003
Page 2

In addition, we request that Marc pay the Firm a retainer of $2,500.00 which will be placed in our client trust account and will be applied against attorneys' fees and costs incurred by you.   A retainer is a deposit against fees and costs that will be incurred in the representation, and it is not, and should not be considered as, either an estimate of total fees or a flat fee for the work to be done.

This amount will be deposited by the Firm in an interest-bearing trust account.  You hereby authorize the Firm to withdraw the principal from the trust account to pay attorneys' fees and costs as they are incurred by you or, as to costs, by us on your behalf.  In accordance with state law and the requirements of the State Bar of California, any interest earned will be paid to the State Bar to fund legal services for indigent persons.  If, at the termination of service under this agreement, the total amount incurred by you for attorneys' fees and costs is less than the amount of the deposit, the difference will be refunded to you.

Also enclosed with this letter is a copy of our Firm's Privacy Policy, which we ask you to review.  Please confirm your agreement to the terms of this letter and the Standard Terms of Retention by dating and signing in the spaces provided below and returning this letter to me as soon as possible.  If you have any questions about the terms of this agreement, including the Standard Terms of Retention or the Firm's Privacy Policy, please contact me as soon as possible to discuss them.  Enclosed is a copy of this letter for your records.

We look forward to working with you on this matter.

Very truly yours,

John D. Pettker

Attachments:
    Standard Terms of Retention
    Notice of Privacy Policy

**AGREED TO AND ACCEPTED:**


_____
Marc Toberoff, Esq.                Date: _____, 2003


_____
Jean Peavy                      Date: _____, 2003

Q 0656

Privileged & Confidential
All Rights Reserved

SD 00657

**STANDARD TERMS OF RETENTION**
**RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL**
**A LAW CORPORATION**



Except as modified in writing, the following provisions will apply to the relationship between Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), and you:

1.      Fees.  Fees for our services will be based on time spent and hourly billing rates current at the time that the services are performed.  The billing rates of our attorneys and legal assistants vary, depending generally on the experience and capabilities of the attorney or legal assistant involved, and we adjust these rates from time to time.  The time for which you will be charged will include, but will not be limited to, time spent in telephone and office conferences with you and with other counsel, witnesses, consultants, court personnel and others; factual investigation; legal research; responding to your requests for us to provide information to auditors in connection with reviews or audits of financial statements; drafting of letters, agreements, pleadings, briefs and other documents; traveling; court appearances, including waiting in court; and depositions and other discovery proceedings.

2.      Costs.  In addition to our fees, we will bill you separately, and typically monthly, for costs and expenses incurred and ancillary services provided such as photocopying, messenger and delivery service, computerized research, travel (including mileage, parking, airfare, lodging, meals and ground transportation), telephone, telecopying, secretarial overtime, court costs and filing fees.  Unless special arrangements are made, we do not take responsibility for paying fees and expenses of others, which will be the responsibility of and may be billed directly to you.

3.      Retainer.  In addition to any retainer to which you have agreed, the Firm reserves the right, as a condition to providing further services, to request an increase in the retainer in the event that the amount of work which we are called upon to perform, or expenses we are required to incur or advance, exceeds this Firm's current expectation.

4.      Estimates Not Binding.  Although we may furnish estimates of fees or costs that we anticipate will be incurred, these estimates are not intended to be binding, are subject to unforeseen circumstances, and are by their nature inexact.

5.      Billing and Payment.  Fees and expenses will generally be billed monthly and are payable upon presentation.  We expect prompt payment.  We reserve the right to postpone or defer providing additional services or to discontinue our representation if billed amounts are not paid when due.  We will be entitled to assume that you have raised any questions you have about a bill within 20 days of receipt.

6.      Cooperation.  You will cooperate fully in our efforts on your behalf.

7.      Termination By You.  You have the right at any time, in your sole discretion, to terminate our services and representation.  Upon our termination, you will remain obligated to pay for all services rendered and costs or expenses paid or incurred on your behalf prior to the date of such termination or which are reasonably necessary thereafter.

8.      Termination By Us.  We reserve the right to withdraw from representing you if, among other things, you fail to honor the terms of our engagement letter, you fail to cooperate or follow our advice on a material matter, or any fact or circumstance occurs that would, in our view, render our continuing representation unlawful or unethical.  If we elect to withdraw, you will take all steps necessary to free us of any obligation to perform further services, including the execution of any documents necessary to complete our withdrawal, and we will be entitled to be paid at the time of withdrawal for all services rendered and costs and expenses paid or incurred on your behalf.

9.      Date of Termination.  Our representation of you will be considered terminated at the earlier of (i) your termination of our representation, (ii) our withdrawal from our representation of you, or (iii) the substantial completion of our substantive work for you.

10.     Related Activities.  If any claim or action is brought against us or any personnel of the Firm based on your negligence or misconduct, or if we are asked to testify as a result of our representation of you or must defend the confidentiality of your communications in any proceeding, you agree to pay us for any resulting costs or damages, including our time, even if our representation of you has ended.

11.     No Guarantee of Outcome.  We do not and cannot guarantee any outcome in a matter.





1

Q 0657

**Privileged & Confidential**
**All Rights Reserved**

SD 00658

**EXHIBIT G**
**891**



12.    Conflicts. Our ethical obligations will require us, while this representation is ongoing, to decline any other engagements which conflict directly with this representation unless you otherwise consent. When this representation is concluded, however, you understand that we will not be excluded from accepting a representation adverse to you, except where there is a substantial relationship between that representation and our present representation of you. Naturally, we will not disclose any confidential information received in the course of our representation of you in any future representation without your consent, just as we will not disclose to you the confidences of our other clients even if that might be to your advantage.

13.    Client. As set forth in our letter accompanying these Standard Terms of Retention, you are the Firm's client for purposes of our representation. Unless expressly agreed otherwise, we are not undertaking the representation of (i) any person or entity related or affiliated with you; (ii) any of your relatives (including parents, children or brothers/sisters), subsidiaries, or affiliated corporations or entities; and (iii) any members, officers, directors, agents or employees of you or of any related or affiliated entities.

14.    Payment Notwithstanding Dispute. In the event of any dispute that relates to our entitlement to any payment from you, all undisputed amounts shall be paid by you. Any amounts in any client trust account held on your behalf, sufficient to pay the disputed amounts, shall continue to be held in such trust account until the final disposition of the dispute.

15.    Document Retention and Destruction. In the course of our representation of you, we are likely to come into possession of copies or originals of documents or other materials belonging to you or others (collectively "materials"). Once the particular matter to which those materials relate has been concluded, this Firm will have no further responsibility to maintain such materials. If you have not sought the return of such materials within one year of the closing of the matter to which such materials relate, we will thereupon have the right to destroy such materials.

16.    Interest. All statements are due and payable within thirty days. We reserve the right to charge simple interest at 10% per annum on all sums, whether for fees or reimbursement of costs, not paid within thirty days of the rendering of our statement. Our failure to impose this interest charge on any occasion, or on multiple, numerous, and even repetitive occasions, is not a waiver of our right to thereafter impose this charge on unpaid amounts from the thirty-first day after each unpaid amount was initially billed.

17.    Application to Subsequent Matters. The agreement reflected in these Terms of Retention, and in the accompanying letter, apply to our present representation of you and to any subsequent matters which we agree to undertake on your behalf.

18.    Attorney's Lien. The Firm will have a lien for attorneys' fees and costs advanced on all claims and causes of action that are the subject of the Firm's representation of you under the agreement reflected in these Terms of Retention and in the accompanying letter, and on all proceeds of any recovery obtained (whether by settlement, arbitration award, or court judgment).

19.    ARBITRATION. IN THE EVENT OF A DISPUTE BETWEEN YOU AND THE FIRM REGARDING FEES, COSTS, OR ANY OTHER MATTER RELATED TO OR ARISING OUT OF OUR ENGAGEMENT BY YOU, OR ARISING OUT OF YOUR OR OUR PERFORMANCE OF THE AGREEMENT PURSUANT TO WHICH OUR SERVICES ARE PERFORMED (INCLUDING THE QUALITY OF THE SERVICES WHICH WE RENDER), YOU HAVE THE RIGHT TO HAVE THE DISPUTE DETERMINED, SETTLED AND RESOLVED BY CONFIDENTIAL ARBITRATION PURSUANT TO CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 6200-6206 WHICH PROVIDE PROCEDURES FOR ARBITRATION BEFORE THE STATE BAR OF CALIFORNIA OR BEFORE THE ATTORNEY-CLIENT RELATIONS DEPARTMENT OF THE LOS ANGELES COUNTY BAR ASSOCIATION. ARBITRATION UNDER THE CODE IS VOLUNTARY FOR CLIENTS BUT MANDATORY FOR LAW FIRMS. IF YOU SELECT ARBITRATION, ANY AWARD SHALL BE FINAL, BINDING AND CONCLUSIVE UPON THE PARTIES, AND A JUDGMENT RENDERED THEREON MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. IF YOU DO NOT SELECT ARBITRATION, ANY DISPUTE MAY BE DETERMINED BY A COURT OF LAW ON AN ACTION BROUGHT BY EITHER PARTY. THE PREVAILING PARTY IN ANY SUCH ARBITRATION OR COURT ACTION SHALL BE ENTITLED TO REASONABLE ATTORNEYS' FEES AND COSTS. YOU AND THE FIRM AGREE THAT VENUE FOR ANY SUCH ARBITRATION OR COURT ACTION SHALL BE IN LOS ANGELES COUNTY, CALIFORNIA, AND FURTHER AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE ARBITRATOR OR THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES.





2

Q 0658

Privileged & Confidential
All Rights Reserved

SD 00659

## RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
### A LAW CORPORATION

### NOTICE OF PRIVACY POLICY

Law firms that provide tax planning and tax preparation services to individuals are now required by law[1] to inform their tax clients of the law firm's policies regarding privacy of client information. As attorneys, we have been and continue to be bound by rules of professional conduct that mandate more stringent rules of confidentiality of client matters and information than those required by law. Consequently, it has always been our policy to protect your right to privacy. The purpose of this Notice is to advise you with respect to what nonpublic information we collect, and how we use it.

#### TYPES OF NONPUBLIC PERSONAL INFORMATION WE COLLECT

Generally, nonpublic personal information is personally identifiable financial information that is not publicly available. We collect nonpublic personal information about you that you provide to us, or that is obtained by us with your authorization.

#### PARTIES TO WHOM WE DISCLOSE INFORMATION

**For current or former clients, we do not disclose any nonpublic personal information obtained in the course of our practice to anyone except as required or permitted by law, or as may be authorized by you.** Permitted disclosures include, for example, providing information to our employees and, in limited situations, to unrelated third parties, who need to know such information to assist us in providing services to you. In all such situations, such information is disclosed to process, administer, carry out or enforce your rights or to facilitate the transaction we are working on for you, and we stress the confidential nature of the information being shared with such parties.

#### PROTECTING THE CONFIDENTIALITY AND SECURITY OF CLIENT'S INFORMATION

We retain records relating to professional services that we provide so that we are better able to assist you with your professional needs, and in some cases to comply with professional guidelines. We maintain physical, electronic, and procedural safeguards that comply with federal regulations and applicable state law, as well as our professional standards, in order to protect and safeguard your nonpublic personal information and privacy.

#### IF YOU HAVE QUESTIONS

Please call if you have any questions, because your privacy, our professional ethics, and the ability to provide you with quality financial services are very important to us. You can reach us at: Elizabeth Blakely (213) 895-4900 x 237 [ebb@rodipollock.com] or Maureen Varnes (213) 895-4900 x 234 [mov@rodipollock.com].

Document7

---

[1] Section 504(a) of the Gramm-Leach-Bliley Act (Public Law 106-102) and Title 16, Part 313 of the Code of Federal Regulations

Q 0659

**Privileged & Confidential
All Rights Reserved**

SD 00660

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVENUE #106**
**PLAYA DEL REY, CA 90293**
**(310) 827-8136**
**FAX (310) 827-7227**
**July 8, 2003**

## FAX TRANSMITTAL

**TO:**      Marc Toberoff

**FAX#:**    (310) 246-3101

**FROM:**    Laura Siegel Larson

**PHONE:**   (310) 827-8136

                                        Page 1 of 6

**MESSAGE:**

**Dear Marc,**

**Please see attached.**

**Sincerely,**

*Laura Siegel Larson*

**Laura Siegel Larson**

Q 0660

**Privileged & Confidential**
**All Rights Reserved**

SD 00661

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1

Q 0661

Privileged & Confidential
All Rights Reserved

SD 00662

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written

<u>Our opinion as to why this has not been like other "contract negotiations":</u>
-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were unacceptable, *self serving and one-sided.* *that ~~customarily~~ it is their common practice*
-We believe their lawyers are particularly heartless and ~~they have a had reputation for~~ grinding individuals in negotiations
*to use every ounce of their leverage to*
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it. *which is particularly significant and*
-They want to make an example of us so that other creators and their heirs won't go after *"Superman"* their rights *via Termination or otherwise.*

<u>Marc Toberoff and the Shuster interest:</u>   *in both Just and Shuster's and our family.*
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal or handle things as they choose.
*with Time Warner*
-The Shuster rights are completely separate from the Siegel rights.   *with the Shuster claim at the earliest*
-Time Warner/DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

<u>We went to Marc to talk about him representing the Siegels. Marc did not pursue us:</u>
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc ~~Toberoff~~ away saying we had a deal with DC which we did *had* not ~~have~~   *closed*
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

<u>Why the original investor left:</u>
-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

*Marc ~~was~~ also unable to get back to that investor with ~~my~~ anything concrete regarding your interest because apparently neither you nor Don Bulson, specifically responded to his interest for a very ~~long~~ long time.*

Q 0662

Page 2

Privileged & Confidential
All Rights Reserved

SD 00663

**EXHIBIT G**
**896**

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
- We did this to further assert the Siegel rights to this character
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating, although she told him several times that she wanted to send in the fees. (at the time it would hurt the negotiations)
- Kevin did not tell us there was a time limit on when the fees could be paid
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open

<u>Why Marc has not been negotiating with Time Warner:</u>
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal
- Timing the negotiations is an art (with a hinge) (indefinitely)
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director, Brett Ratner. TW was trying to sign the director and actors to a three picture deal. Now the film appears to be on hold, the director left and stars are repeatedly turning down offers to play the role of Superman in the three projected films.
- We believe that with far less happening on the Superman movie right now, our negotiating power is even less with Time Warner than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
- My interests are too entangled due to my divorce
- You have been saying you needed money badly, were out of work and had big bills
- We have not received an offer from the investor. Apparently the investor does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).
- Marc first asked our permission to present an offer to you and we decided not to stand in your way if you want to accept it.

Page 3

Privileged & Confidential
All Rights Reserved

Q 0663

SD 00664



**Why I think any investor would offer less than Time Warner did in its last offer:**

-It is a risky investment

-No immediate or guaranteed payback

-The investor may well face legal expenses and ongoing litigation with Time Warner in the
    future. For instance, we may have to sue to have a Court define the "profits" we
    participate in. If we eventually make a deal with TW/DC, they may withhold
    payment due to "creative bookkeeping" or for other reasons that we can't currently
    predict

-Any investor would want some protection and a worthwhile profit on his investment

-It is a situation that sounds similar to one in which businesses give immediate money to
    beneficiaries of Wills who do not want to wait until the Will goes through Probate
    to receive their money. The beneficiaries always get less if they do this than if they
    wait for the Will to go through Probate. And that's more certain than this.

**Your belief that you have something to sell independently:**

-Since you did not take part in the actual Termination, you do not have legal title to the
    copyrights

-You therefore have no right to sell any copyright interest

-You only have a right to receive a portion of the money that we receive, if any.

-Your right to receive money is known as a passive financial interest.

-In addition, we believe that since my mom and I hold legal title to the Copyright
    Termination Interest, you cannot sell even your passive financial interest to a third
    party without approval from my mom and me

-We will not give approval for a sale by you of your passive financial interest to Time
    Warner because it would damage the overall Siegel interest

-We will give approval for a sale by you of your passive financial interest to a third party
    monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any
    affiliated company and providing the sale does not damage our ability to make a deal
    for our portion of the Siegel interest

**Why you cannot ask Time Warner/DC for a buyout:**

-As the controlling interest, we do not give you approval to do it

-It damages the possibility of us negotiating a fair deal

-It shows weakness which Time Warner will take full advantage of and grind you in any
    deal.

-Because Time Warner would get so little from you--a 12 1/2% passive financial interest in
    the characters--that would be reflected in a low amount of money paid to you

-If it damaged our ability to later make a better deal, We would have no choice but to hold
    you accountable for any harm to us

    We won't stand in your way if you decide you want to take the buyout from the investor that
Marc has found. That decision has to be yours and yours alone.

    However, for the reasons listed above, we will not give approval for you to go to Time
Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake
from any point of view.

Q 0664

Privileged & Confidential
All Rights Reserved

SD 00665

**EXHIBIT G**
**898**

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,


Laura


Enclosure

Page 5                                            Q 0665

Privileged & Confidential
All Rights Reserved

SD 00666

LAURA SIEGEL LARSON
6400 PACIFIC AVE. #106
PLAYA DEL REY, CA  90293
(310) 827-8136

July 11, 2003

# FAX TRANSMITTAL

TO:         Marc Toberoff
FAX#:       (310) 246-3101

FROM:       Laura Siegel Larson
PHONE:      (310) 827-8136

RE:         Letter Sent to Michael Siegel

Page 1 of 6

MESSAGE:

Dear Marc,

Enclosed is the final letter sent to Michael Siegel today.

Sincerely,

*Laura*

Q 0666

Privileged & Confidential
All Rights Reserved

SD-00667

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

### Outline of Topics:

Our opinion regarding the Time Warner-DC offer:
- It was a bogus offer filled with unacceptable land mines.
- They wanted us to warrant we had no rights which is completely false.
- They insisted on a deal that included characters that had nothing to do with Superman.
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
- They even wanted us to sign away the public domain rights we'd one day have.
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
- It was a bad and unreasonable deal.

Page 1

Q 0667

Privileged & Confidential
All Rights Reserved

SD 00668



-You and Don Bulson stated that you couldn't believe how bad the document was that they
had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were
unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use
every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
losing it.
-They want to make an example of us so that other creators and their heirs won't go after
their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
reacquire rights as we have via Terminations. Then the Shusters would have to
negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the
earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
deal. You'll remember that you, Don Bulson and we were shocked when Kevin
Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer
and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0668

Privileged & Confidential
All Rights Reserved



SD-00669

**EXHIBIT G**
**902**

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0669

Privileged & Confidential
All Rights Reserved

EXHIBIT G
903

SD 00670

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

<u>Why I think any investor would offer less than Time Warner did in its last offer:</u>
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

<u>Your belief that you have something to sell independently:</u>
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

<u>Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer):</u>
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an <u>attempt</u> by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Page 4

Q 0670

Privileged & Confidential
All Rights Reserved

EXHIBIT G
904

SD 00671

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Page 5

Q 0671

Privileged & Confidential
All Rights Reserved

SD 00672

**EXHIBIT G**
**905**

LAW OFFICES OF
## MARC TOBEROFF

August 6, 2003

Via facsimile: (216) 621-6165 and US Mail

Don Bulson, Esq.
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Ave., 19th Floor
Cleveland, OH 44115-2191

Re: Michael Siegel

Dear Don:

I had a high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegel's long awaited June 18, 2003 counter-offer regarding a buy-out.

The lowest price for such an annuity was **$3,476,727** (feel free to check this out).

The net present value of the last Warner Bros. ("WB") offer is between $1.5 - $1.6 million (depending on how conservative one is in one's choice of the interest rate in calculating net present value).

Michael's counter-offer was therefore well over twice (230%) the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB offer, rejected by the Siegel's.

It was therefore not surprising that the investor rejected your counter-offer as unrealistic. The counter-offer was so high that it may have scared away a strong potential investor (exactly what I mentioned when I asked you whether you were sure that I should communicate such a high counter-offer).

As previously explained any investor would see the obvious risks of this transaction and want to come in somewhere lower than the WB offer as a hedge or buffer against the risks of this investment (even though there is no guarantee that the Siegel's will ever settle with Warner Bros.).

To the extent you and Michael are not already aware of this, any investor will view the risks as follows:

1. Risk of costly drawn-out litigation with WB as a condition to receiving any serious participation in "profits" (subject to notorious Studio accounting practices and definitions; net profits are commonly denoted in the entertainment industry as "monkey points");

2. Risks associated with no control over the Siegel Termination Interest. Michael's interest unfortunately is a passive 25% interest in what Joanne and

9595 Wilshire Boulevard, Suite 811 Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
Email: Mtoberoff@ipww.biz

Q 0672

SD 00673

LAW OFFICES OF
## MARC TOBEROFF

Laura Siegel negotiate and receive, and therefore there are major risks associated with this lack of control (a good reason why Michael may be interested in an investor in the first place);

3. Risk that Joanne and Laura Siegel may never arrive at a mutually acceptable settlement with Warner Bros;

4. Risk that the interest may not be monetized or bear fruit for a long time to come (a long term investment);

5. Risk that Superman will lose as opposed to gain value (there hasn't been a Superman movie since 1978 (compare the Bond franchise) and the recent failure to launch and talent package a new Superman film (lost their director and can't cast the lead) is well publicized.

I personally believe, despite the above, that this could be a smart long term investment for someone very wealthy who can afford to hold the investment for an unpredictable, and potentially very lengthy period of time. However, that doesn't mean that an investor will not weigh the reasonableness of the price against the above risks.

Please convey this letter to Michael and let me know what you and Michael suggest I do to salvage this situation.

Best regards.

Yours sincerely,

Marc Toberoff

Q 0673

SD 00674

**EXHIBIT G**
**907**



## RODI·POLLOCK

JOHN D. CAHILL
JOHN D. PETTKER
WILLIAM R. CHRISTIAN
HENRY P. PRAMOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
ROBERT C. NORTON
TIMOTHY G. CEPERLEY
ALFRED KLEIN
ROBERT A. YAHIRO
KENNETH A. FRANKLIN
WADE E. NORWOOD
PRIYA G. BHATT
ANDREW W. BODEAU
JEAN M. BEASLEY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 895-4900

KARL B. RODI (1908-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1896-1973)

OF COUNSEL
JOHN P. POLLOCK
JAMES M. GALBRAITH
DAVID K.W. CHANG

TELECOPIERS
(213) 895-4921
(213) 895-4922
(213) 895-4750

OUR FILE NUMBER

5891-P1

August 7, 2003

Mr. Marc Toberoff
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

    Re:   <u>Estate of Joseph Shuster</u>

Dear Marc:

    Please be advised that the hearing to appoint Mark W. Peary as executor of Joseph Shuster's Will is scheduled for *August 25, 2003*, in Department "5" of the Los Angeles Superior Court. Although we anticipate Mark will not be required to attend the hearing on that day, we will notify you a few days in advance if it becomes a requirement of the court.

    Also, I am enclosing a conformed copy of the filed Supplement to the Petition for Probate of (Lost) Will, et seq., for your information and files.

    Please feel free to call me if you have any questions.

            Sincerely,

            John D. Pettker

JDP:muc
Enclosures
262648_1.doc

Q 0674

**Privileged & Confidential**
**All Rights Reserved**

**EXHIBIT G**
**908**

SD 00675

# RODI POLLOCK

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CA 90071-2901
(213) 895-4900 • FAX (213) 895-4921

DATE: 10.2.03

To: Marc Toberoff

FROM: LINDA L. HARRISON

☐ FOR YOUR REVIEW

☐ FOR YOUR INFORMATION AND FILES

☐ IN RESPONSE TO YOUR REQUEST

☐ PLEASE SIGN AND RETURN

☐ PLEASE CALL AND DISCUSS

☐ I WILL CALL YOU TO DISCUSS

☑ Sorry for the oversight!

REMARKS:

Q 0675

Privileged & Confidential
All Rights Reserved

**EXHIBIT G**
**909**

SD 00676

1    **RODI, POLLOCK, PETTKER, GALBRAITH**
     **& CAHILL, A Law Corporation**
2    **JOHN D. PETTKER (SBN 42346)**
     444 South Flower Street, Suite 1700
3    Los Angeles, CA 90071-2901
     Telephone: 213-895-4900
4    Facsimile: 213-895-4750

5    Attorneys for MARK WARREN PEARY,
     Petitioner
6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF LOS ANGELES

10

11   In the Matter of the Estate of          NO. BP-080635

12   JOSEPH SHUSTER, also known as JOE       **ORDER ADMITTING WILL TO**
     SHUSTER,                                **PROBATE, APPOINTING EXECUTOR**
13                                           **AND AUTHORIZING INDEPENDENT**
                      Deceased.              **ADMINISTRATION OF ESTATE WITH**
14                                           **LIMITED AUTHORITY**

15                                           **Hearing Date: 8-25-03**
                                             **Dept. 5 at 9:15 a.m.**
16

17

18        Petitioner, MARK WARREN PEARY, filed his petition for probate of will and for letters

19   testamentary and for authorization to administer estate under the Independent Administration of

20   Estates Act with limited authority of the estate of Joseph Shuster, also known as Joe Shuster,

21   deceased (the "decedent"), and such petition came on regularly for hearing and approval by the

22   Court at 9:15 a.m. on August 25, 2003, in Department 5 of the above-entitled Court, the

23   Honorable H. RONALD HAUPTMAN, Judge Pro Tem presiding. JOHN D. PETTKER of Rodi,

24   Pollock, Pettker, Galbraith & Cahill, A Law Corporation, appeared as the attorney for petitioner,

25   and no one appeared in opposition.

26        On evidence given to the satisfaction of the Court, THE COURT FINDS THAT:

27        1.    All notices required by law have been given.

28   / / /                                                            Q 0676

                                            1
     ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

*(left vertical margin)* RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL, A LAW CORPORATION, 444 SOUTH FLOWER STREET, SUITE 1700, LOS ANGELES, CALIFORNIA 90071-2901, TELEPHONE (213) 895-4900

**EXHIBIT G**
**910**

SD 00677

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

1    2.    The decedent died on July 30, 1992, a resident of the County of Los Angeles, State

2 of California.

3    3.    The decedent died testate, leaving a will dated June 28, 1988. This will has never

4 been revoked but was lost or inadvertently destroyed. Such will is admitted to probate by Minute

5 Order on August 25, 2003, as the decedent's last Will, and its provisions are as follows:

6                       LAST WILL AND TESTAMENT OF

7 KNOW ALL PERSONS BY THESE PRESENTS:

8                               I

9 That, I  JOSEPH SHUSTER, of W. Los Angeles, California, being of sound and disposing mind

10 and memory, and not acting under duress, menace, fraud or the undue influence of any person

11 whomsoever, do make, publish and declare this my Last Will and Testament.

12

13    I hereby declare that I am the brother of JEAN ADELE PEAVY at the time of the

14 execution of this Will.

15                            II

16    I make no bequest, gift or devise to my children named in Paragraph I, or to any other

17 child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their

18    ___ N/A ___ will provide for them.

19                           III

20    I hereby direct and order that all just debts for which proper claims are filed against my

21 estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my

22 death as is practicable; provided, however, that this direction shall not authorize any creditor to

23 require payment of any debt or obligation prior to its normal maturity in due course.

24                           IV

25    I give devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and

26 remainder of my estate, whether real or personal, and wheresoever situated. In the event that Jean

27 Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a

28 / / /

Q 0677

2

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AU

EXHIBIT G
911

SD 00678

1  result of a common accident, illness or disaster, then I give, devise and bequeath the residue and

2  remainder of my estate to my nephew, MARK WARREN PEARY.

V

4      I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will

5  and Testament, to act without bond.  In the event that my sister is for any reason unable or

6  unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor,

7  also without bond.

VI

9      I further direct that my estate be settled without the intervention of any court, except to the

10  extent required by law, and that my executrix settle my estate in such a manner as shall seem best

11  and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell,

12  exchange and convey the personal and real property of my estate without an order of court for that

13  purpose and without notice, approval or confirmation and in all other respects to administer and

14  settle my estate without the intervention of court.

VII

16      I hereby revoke any and all former Wills and Codicils thereto made by me and declare this

17  my Last Will and Testament.

18      In Witness Whereof I have hereunto set my hand this 28th day of June, 1988.

19

20                          JOSEPH SHUSTER
                            Testator

21  STATE OF CALIFORNIA    )
                           )  ss.
22  COUNTY OF LOS ANGELES )

23      Each of the undersigned, being first duly sworn on oath, states that on this 28th day of June,

24  1988:

25      (1)    I am over the age of eighteen (18) years and competent to be a Witness to the Will

26  of JOSEPH SHUSTER (the Testator);

27      (2)    The Testator, in my presence and in the presence of the other Witnesses whose

28  signatures appear below:

                                Q 0678

ROOL, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

3
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUT

ROD, POLLOCK, PETKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

1     (a) Declared the foregoing instrument consisting of one pages, of which this is the

2 last to be his Will;

3     (b) Requested me and the other Witnesses to act as Witnesses to his Will and to

4 make this affidavit; and

5     (c) Signed such instrument;

6     (3)   I believe the Testator to be of sound mind, and that in so declaring and signing, he

7 was not acting under any duress, menace, fraud, or undue influence;

8     (4)   The other witnesses and I, in the presence of the Testator and of each other now

9 affix our signatures as Witnesses to the Will and make this affidavit.

10 Tom Fenaughty                Robert Williams

11 3374 Overland Ave., #1         3545 Mentone Ave. #3

12 Los Angeles, CA 90064        Los Angeles, California 90034

13 SUBSCRIBED & SWORN to before me this 28th day of June, 1988.

14                       F. PATRICK HAGERTY

15     [NOTARIAL SEAL]        Notary Public in and for the State of California,
residing at Santa Monica, Calif.

16 **THE COURT ORDERS:**

17     1.     MARK WARREN PEARY is appointed Executor of the decedent's Will recited

18 above, and letters testamentary shall issue on qualification.

19     2.     The Executor is granted limited authority to administer the estate under the

20 Independent Administration of Estates Act (there is no authority, without court supervision, to (1)

21 sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money

22 with the loan secured by an encumbrance upon real property).

23     3.     The Executor is also granted the following special power in addition to the general

24 powers conferred upon him by law and under the Independent Administration of Estates Act:

25 The power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d)

26 of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C.

27 §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings

28 necessary or appropriate in connection with this action.

Q 0679

4

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUT'

**EXHIBIT G**
**913**

SD 00680

1    4.    Bond is fixed at $6,000.00.

2    Dated: _____

3

4                                        _____
                                         Judge Pro Tem of the Superior Court
5

6    264438_1.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                      Q 0680

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

5

SD 00681

EXHIBIT G
914



RECORDED DOCUMENTS                    FL-10A

DATE: March 12, 2004

IP Worldwide
9595 Wilshire Blvd. Suite 811
Beverly Hills, CA  90212

ATTN:  MARC TOBEROFF

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| VOLUME | 3505 |
| DOC. NO. | 773-774 |

The recording fee has been handled as follows:

| | |
|---|---|
| RECEIVED | $ |
| APPLIED | $ |
| REFUNDED (under separate cover) | $ |
| CHARGED TO YOUR DEPOSIT ACCOUNT | $ |

Sincerely yours,

Register of Copyrights

ENCL(S):
DOC(S):   2

Library of Congress
U.S. Copyright Office
101 Independence Ave, SE
Washington, DC 20559-6000
www.copyright.gov

Q 0681

FL-10A  01/2004: 12,000

**EXHIBIT G**
**915**

SD 00682



# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

| DATE OF RECORDATION | |
|---|---|
| 8Dec03 | |
| VOLUME | DOC. NO. |
| 3505 | 773 |
| VOLUME | DOC. NO. |

*Marybeth Peters*

Register of Copyrights and
Associate Librarian for Copyright Services

Q 0682

(-762   JANUARY 2004 — 4,000

SD 00683

**EXHIBIT G**
**916**

Copyright Office fees are subject to change.
For current fees, check the Copyright Office website at *www.copyright.gov*, write the Copyright Office, or call (202) 707-3000.

**DOCUMENT COVER SHEET**
For Recordation of Documents
UNITED STATES COPYRIGHT OFFICE

DATE OF RECORDATION
(Assigned by Copyright Office)

DEC 0 8 2003

| Month | Day | Year |

Volume __3505__ Page __773__

Volume _____ Page _____

FUNDS RECEIVED _____

*Do not write above this line.*

**To the Register of Copyrights:**

*Please record the accompanying original document or copy thereof.*

FOR OFFICE USE ONLY

**1** Name of the party or parties to the document spelled as they appear in the document (List up to the first three)

Time Warner Inc.

Time Warner

Warner Bros. Entertainment Inc.

**2** Date of execution and/or effective date of the accompanying document    Dec. 1 2003
(month) (day) (year)

**3** Completeness of document
☒ Document is complete by its own terms.
☐ Document is not complete. Record "as is."

**4** Description of document
☐ Transfer of Copyright
☐ Security Interest
☐ Change of Name of Owner
☒ Termination of Transfer(s) [Section 304]
☐ Shareware
☐ Life, Identity, Death Statement [Section 302]
☐ Transfer of Mask Works
☐ Other _____

**5** Title of first work as given in the document _____ "Superman"

**6** Total number of titles in document _____ 8  11

**7** Amount of fee calculated $ __100__

**8** Fee enclosed
☒ Check
☐ Money Order

☐ Fee authorized to be charged to :
Copyright Office
Deposit Account number _____ Q 0683

Account name _____

**9** Affirmation*: I hereby affirm to the Copyright Office that the information given on this form is a true and correct representation of the accompanying document. This affirmation will not suffice as a certification of a photocopy signature on the document.
(Affirmation *must* be signed even if you are also signing Space 10.)

Signature
Date 12/1/03
(310) 246-3100    (310) 246-3101
Phone Number    Fax Number

**10** Certification*: Complete this certification in addition to the Affirmation if a photocopy of the original signed document is substituted for a document bearing the actual signature.
NOTE: This space *may not* be used for an official certification.
I certify under penalty of perjury under the laws of the United States of America that the accompanying document is a true copy of the original document.

Signature
IP Worldwide/Estate of Joseph Shuster
Duly Authorized Agent of
Date 12/1/03

Recordation will be mailed in window envelope to this address:

Name▼ IP Worldwide/Marc Toberoff, Esq.

Number/Street/Apt▼ 9595 Wilshire Blvd., Suite 811

City/State/ZIP▼ Beverly Hills, CA 90212

**YOU MUST:**
• Complete all necessary spaces
• Sign your Cover Sheet in Space 9
**SEND ALL 3 ELEMENTS TOGETHER:**
1. Two copies of the Document Cover Sheet
2. Check/money order payable to *Register of Copyrights*
3. Document
**MAIL TO:**
Library of Congress, Copyright Office
Documents Recordation Section, LM-462
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

*Knowingly and willfully falsifying material facts on this form may result in criminal liability. 18 U.S.C § 1001.*

Rev. June 2002—20,000   Web Rev. June 2002   ♻ Printed on recycled paper

U.S. Government Printing Office: 2000-461-113/20,021

**EXHIBIT G**
**917**

SD 00684


V3505 D773

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED COPYRIGHT RENEWAL TERM
## OF "SUPERMAN"

To:  Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappuccio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O.

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen, President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz, E.V.P. & Publisher

V3505 D773 Page 1

Q 0684

SD 00685

## EXHIBIT G
## 918

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co.

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr. Chairman

Marvel Entertainment Group, Inc.
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O.



Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group, (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO

V3905 D773 Page 2

Q 0685

2



SD 00686

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright

Act (17 U.S.C. §304(d)) and the regulations issued thereunder by the Register of

Copyrights, 37 C.F.R. §201.10, the undersigned Mark Warren Peary, being the person

entitled to terminate transfers pursuant to said statutory provisions, hereby terminates

the grant of the transfer of renewal copyright(s) (to the extent of author Joseph

Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted work(s)

entitled "SUPERMAN" made in those certain agreements all as identified below, and the

undersigned sets forth in connection therewith the following:


1.      The names and addresses of the grantees and/or successors in title

whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller

Plaza, New York, NY 10019, Attn: Richard D. Parsons, Chief Executive Officer; Time

Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019, Attn:

Barry M. Meyer, Chairman & C.E.O.; Warner Bros. Entertainment Inc., 4000 Warner

Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel;

Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A.

Schulman, V.P. & General Counsel; Warner Communications Inc., c/o Time Warner,

Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Paul T. Cappucio, E.V.P. &

General Counsel; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA

91522, Attn: Peter Roth, President; Warner Music Group, 75 Rockefeller Plaza, New

York, NY 10019, Attn: Roger Ames, Chairman & C.E.O.; Warner Bros. Worldwide

Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Dan Romanelli,

President; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y.

10020, Attn: Rich Jacobsen, President; Time Warner Book Group, Inc., 1271 Avenue of

3

Q 0686

SD 00687

**EXHIBIT G**
**920**

the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; Warner

Books, Inc., 1271 Avenue of the Americas, New York, NY 10020, Attn: Laurence J.

Kirshbaum, C.E.O.; Little, Brown, and Company, 1271 Avenue of the Americas, New

York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; DC Comics Inc., 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, Executive V.P. &

Publisher; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, Executive V.P. & Publisher; DC Direct, c/o DC Comics, 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levtiz, E.V.P. & Publisher; Milton

Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028,

Attn: David E. Wilson, President; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI

02861, Attn: Alan Hassenfeld, Chief Executive Officer; Wildstorm Productions, 888

Prospect Street, Suite 240, La Jolla, CA 92037, Attn: Jim Lee, Editor & Director;

Wildstorm Productions, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, President & Publisher; Dark Horse Publications, 10956 S.E.

Main St., Milwaukie, OR 97222, Attn: Michael Richardson, President; Cantharus

Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819, Attn: Ilya Salkind; Ilya

Salkind and Pierre Spengler, 12 Chiswick Lane, London W4 2JE, England, Attn: Albion

Gee, Esq., Albion Gee & Co.; Hallmark Entertainment, Inc., 1325 Avenue of the

Americas, 21st Floor, New York, NY 10019, Attn: Robert Halmi, Jr., Chairman; Marvel

Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016, Attn: F.

Peter Cuneo, President & C.E.O.; Golden Books Publishing, 1540 Broadway, New

York, NY 10036, Attn: Amy Jarashow, Associate Publisher; Random House Golden

Books for Young Readers, 1540 Broadway, New York, NY 10036, Attn: Kate Kilmo,

Vice President & Publisher; Random House, Inc., 1745 Broadway, New York, NY

4

Q 0687

SD 00688

**EXHIBIT G**
**921**

10019, Attn: Katherine J. Trager, Senior V.P. & General Counsel; Inkworks, 4320 Delta

Lake Drive, Raleigh, NC 27612, Attn: Allan Caplan, President & C.E.O.; Penguin Group

(USA) Inc., 375 Hudson Street, New York, NY 10014, Attn: David Shanks, C.E.O.; DK

Publishing, Inc., 375 Hudson Street, New York, NY 10014, Attn: Christopher Davis,

Publisher; Scholastic, Inc., 557 Broadway, New York, NY 10012, Attn: Richard

Robinson, Chairman & C.E.O.  Pursuant to 37 C.F.R. Section 201.10(d), service of this

notice is being made by first class mail, and additionally service of this notice is being

made by certified mail, return receipt requested, to the above grantees or successors at

the addresses shown.

      2.     The works (individually, "Work;" collectively, the "Works") to which this

Notice of Termination applies are as follows[1]: The title of the original copyrighted Work

to which this Notice of Termination applies is SUPERMAN, an illustrated comic book

story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics,

Vol. 1, No. 1, June, 1938 issue, which was published on April 18, 1938. This Work was

registered for copyright under registration No. B379787 and copyright was originally

---

[1] This Notice of Termination applies as well to each and every element of each Work, including without limitation, the story or stories, character or characters, the interplay of such characters, theme or themes, settings or locales, and includes, but is not limited to, Superman, his origins and escape as an infant to Earth in a rocket ship, his super strength, his invulnerability (bullets bounce off his chest and he's impervious to fire), his super speed, his ability to leap great distances in a single bound, his telescopic vision, his super hearing and sense of smell, his sense of humor, his clean-cut good looks, his high morals, ethics and compassion, his mission as a crime fighter and as a champion of the underdog, his stylized costume and cape, the diamond shaped "S" insignia on his chest, his secret identity / alter ego as the mild mannered bespectacled newspaper reporter, Clark Kent, the feisty and attractive female reporter love interest, Lois Lane, the love triangle between Superman, Lois Lane and Clark Kent, Clark Kent's boss / newspaper Editor (a.k.a. Perry White), the Daily Planet newspaper (f.k.a. the Daily Star) where Clark Kent, Lois Lane and the Editor work, the great skyscraper metropolis where these characters live (a.k.a. Metropolis), Superman's scientist father (a.k.a. Jor L) and Superman's birthplace –a highly advanced but doomed distant planet (a.k.a. Krypton).

Q 0688

V3505 D773 Page 5

SD 00689

secured in this Work as of its April 18, 1938 publication date. This Work was written by

Jerome Siegel and illustrated by Joseph Shuster.  Renewal of the copyright in and to

this Work was made on June 1, 1965, in the name of National Periodical Publications,

Inc. claiming as proprietor of copyright, under renewal registration No. R362188.  This

Work was based upon, incorporated, and constituted a slightly revised version of, the

following Works to which this Notice of Termination also applies: twenty-four days (i.e.,

four six day weeks) of previously unpublished SUPERMAN newspaper comic strips,

created c. 1934, written by Jerome Siegel and illustrated by Joseph Shuster.[2] The

remaining Works to which this Notice of Termination applies are:

| Title | Name of Author | Date Copyright Secured | Copyright  Reg. No. |
|---|---|---|---|
| SUPERMAN story in comic book form | Jerome Siegel Joseph Shuster | Work created c.1933 | N/A[3] |

---

[2] In Siegel and Shuster v. National Comics Pub., Inc. et al., the court found that Jerome Siegel and Joseph Shuster were "the originators and authors of the cartoon character Superman and of the title Superman and first created cartoon material in which said character and title first appeared in 1934...," and further found that this material as incorporated in Action Comics No. 1 constituted:  "the formula for the continuing SUPERMAN series to come. It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance." Findings of Fact and Conclusions of Law by Referee J. Addison Young, ¶¶ 8, 22 (November 1, 1947); See also Siegel and Shuster v. National Comics Pub., Inc. et al., Opinion of Referee J. Addison Young, page 9 ("[the aforementioned material] certainly contained the full delineation of the character Superman and though the story or continuity might vary in the future from time to time, it did, I believe constitute a formula for the continuing series to come..."). In Siegel v. National Periodical Publications, Inc, the Second Circuit Court of Appeals reversed the District Court's determination that Action Comics No. 1 was a work-for-hire and held: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accomodate Superman to a magazine format." 508 F.2d 909, 914 (2nd Circuit 1974).

[3] The second and third Works listed in this table as well as the above-referenced 24 days of previously unpublished SUPERMAN newspaper comic strips were first published in a somewhat revised form on April 18, 1938 as Action Comics, Vol. 1, No. 1, June, 1938, which was registered for copyright under registration No. B379787 and renewed under registration No. R362188.

Q 0689

V3505 D773 Page 6

SD 00690

**EXHIBIT G**
**923**

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| 15 SUPERMAN daily comic strips (12 strips and 3 scripts) | Jerome Siegel Joseph Shuster | Work created c.1934 | N/A |
| Action Comics #2 [4] | Jerome Siegel Joseph Shuster | May 25, 1938 | B379788 |
| Action Comics #3 | Jerome Siegel Joseph Shuster | June 25, 1938 | B385466 |
| Action Comics #4 | Jerome Siegel Joseph Shuster | July 25, 1938 | B387907 |
| Action Comics #5 | Jerome Siegel Joseph Shuster | August 25, 1938 | B394784 |
| Action Comics # 6 | Jerome Siegel Joseph Shuster | September 26, 1938 | B394866 |
| Action Comics # 7 | Jerome Siegel Joseph Shuster | October 25, 1938 | B399214 |

3.      This Notice of Termination applies to the following grants, assignments, transfers and/or agreements to the extent each grants, transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)      A one page agreement between Detective Comics, Inc., on the one hand and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about March 1, 1938;

---

[4] Action Comics Nos. 2-6 were reprinted in Superman Nos. 1 and 3 (Copyright Reg. Nos. AA299871 and B443035, respectively) to which this Notice of Termination, therefore, also applies.

7

Q 0690

V3505 D773 Page 7

(b)    A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 4, 1937;

(c)    A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(d)    A three page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(e)    A two page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 19, 1939;

(f)    A seven page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about May 19, 1948;

(g)    A twelve page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 23, 1975.

4.    The effective date of termination shall be October 26, 2013.

8

Q 0691

SD 00692

**EXHIBIT G**
**925**

5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304 (c) of the United States Copyright Act (17 U.S.C. §304(c)).

6.    Joseph Shuster died on July 30, 1992. There is no living widow, child or grandchild of Mr. Shuster. The undersigned, Mark Warren Peary is the Executor of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304 (d), incorporating without limitation 17 U.S.C. § 304 (c)(2)(D), as to the grants of the transfers described herein. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code.

Dated: November 7, 2003

*Mark Warren Peary*

Mark Warren Peary
Executor of the Estate of Joseph Shuster
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

V3505 D773 Page 9

Q 0692

**EXHIBIT G**
**926**

SD 00693

## CERTIFICATE OF INVESTIGATION

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM OF "SUPERMAN", and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made as to the current ownership of the rights being terminated, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10th_ day of November, 2003, at Los Angeles, California.


_____
Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3305 D773  Page 10

Q 0693

10

SD 00694

**EXHIBIT G**
**927**