# EXHIBIT G
# Part 8 of 9

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM OF "SUPERMAN" to be served this 10th day of November, 2003, by First Class

Mail, postage prepaid, upon the following:

To:  Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappucio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group.
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen
President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

V3505 D773 Page 11

11

Q 0694

SD 00695

**EXHIBIT G**
**928**

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
E.V.P. & Publisher

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson,
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler.
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr.
Chairman

Marvel Entertainment Group, Inc..
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O

Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

V3505 D773 Page 12

12

Q 0695

SD 00696

**EXHIBIT G**
**929**

DK Publishing, Inc.                     Scholastic, Inc.
375 Hudson Street                       557 Broadway
New York, NY 10014                      New York, NY 10012
Attn: Christopher Davis, Publisher      Attn: Richard Robinson
                                        Chairman & CEO

I declare under penalty of perjury that the foregoing is true and correct. Executed

this _10th_ day of November, 2003, at Los Angeles, California.


_[signature]_

Marc Toberoff, Esq.
9595 Wilshire Blvd., Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505  D773  Page 13

Q 0696

SD 00697

**EXHIBIT G**
**930**

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVE. #106**
**PLAYA DEL REY, CA 90293**

**June 1, 2004**

# CONFIDENTIAL
## FAX TRANSMITTAL

**TO:**      **Marc Toberoff**
**FAX#:**    **(310) 246-3101**

**FROM:**    **Laura Siegel Larson**
**FAX#:**    **(310) 827-7227**

**RE:**      **Research from Arthur Levine**

**Page 1 of 4**

**MESSAGE:**

**Dear Marc,**

Attached is the fax I received today from Arthur Levine.  I am sending you an email
regarding it.

Sincerely,

*Laura*

Laura Siegel Larson

Privileged & Confidential
All Rights Reserved

Q 0697

SD 00698

**EXHIBIT G**
931

## LAW OFFICES
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.**
1300 I Street, NW
Washington, DC 20005

Telephone
(202) 408-4000

Facsimile
(202) 408-4400

### FACSIMILE TRANSMITTAL

**TO**

Name: Laura Siegel Larson

Firm:

Fax No.: 310-827-7227

Phone No.:

Date: June 1, 2004

Subject:

**FROM**

Name: Arthur J. Levine

Phone No.: (202) 408-4032

Fax # Verified by: R. McGolrick

# Pages (incl. this): 3

Our File No.: 06589.0001

### Confirmation Copy to Follow: No

Message:

Dear Laura:

Attached is the research which my associate conducted. Marc Toberoff called me on Thursday and explained his reasoning. Our research suggests that his reasoning is correct, and that it would be exceedingly risky to not file by the September date. Marc and I both agree that the burden is on the other side to disprove the validity of the Notices, and that it is highly unlikely that they can meet that burden.

Sincerely,

Art

If there is a problem with this transmission, notify fax room at (202) 408-4174 or the sender at the number above.

This facsimile is intended only for the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law. If you have received this facsimile in error, please notify the sender immediately by telephone (collect), and return the original message by first-class mail to the above address.

Q 0698

Privileged & Confidential
All Rights Reserved

SD 00699

**EXHIBIT G**
932

JUN .01  2004  12:55 FR FINNEGAN HENDERSON                4408  TO  13106677221#

From:      Naresh KILARU
To:        Levine, Arthur
Date:      Thu, May 27, 2004 11:07 AM
Subject:   Siegel issues

Art:

Here is a brief summary of the research issues relating to the Siegel matter:

1. When does the Statute of Limitations begin to run against a co-owner seeking an accounting?

Section 507(b) of the Copyright Act provides that "no civil action shall be maintained under the provisions
of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  The
key problem is of course determining the point at which the claim accrued.  There are only a handful of
cases discussing this issue in the context of a co-owner seeking an accounting.  The leading Ninth Circuit
case is summarized below.

In Zuill v. Shanahan, 30 F.3d 1366 (9th Cir. 1995), the defendant Shanahan created what became
"Hooked on Phonics".  To improve the music in the program, the defendant brought in Zuill and Rossi (the
plaintiffs).  The plaintiffs later sued the defendant for a declaratory judgment that they each owned
one-third interests in "Hooked on Phonics."  The issue before the court was whether the plaintiffs' suit was
time-barred under Section 507(b).

The plaintiffs had filed suit in 1991.  The court noted that the defendant had expressly repudiated any claim
claims of co-ownership by Zuill and Rossi in 1987.  In interpreting the statutory language of when the claim
accrued under Section 507(b), the court held, "We conclude that claims of co-ownership, as distinct from
claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to
the claimant, and are barred three years from the time of repudiation."  30 F.3d at 1369.  The court's
rationale for such an interpretation was largely based on equitable principles:  "It is inequitable to allow the
putative co-owner to lie in the weeds for years after his claim has been repudiated, while large amounts of
money are spent developing a market for the copyrighted material, and then pounce on the prize after it
has been brought in by another's effort."  30 F.3d at 1371.  Because the plaintiffs had brought suit more
than three years after their claims of co-ownership had been expressly repudiated by the defendant, the
court held that the plaintiffs' suit was time-barred under Section 507(b).

My guess is that it is the Zuill case to which Marc Toberoff is referring when he puts 4/16/1999 as the date
on which the statute of limitations began to run, as this is the date Time Warner rejected the validity of
Siegel's Notice of Termination.  While I could not find any case law interpreting Section 507(b)
specifically in the context of a party asserting co-ownership through a Notice of Termination (as opposed
to asserting co-ownership through joint creation), it seems that the holding in Zuill would be equally
applicable to our situation.

2. Which party has the burden of proving the validity (or invalidity) of a termination notice?

I found no cases discussing which party has the ultimate burden of proving the validity (of invalidity) of a
termination notice.  But based on Zuill, it seems clear the party claiming co-ownership (either through joint
creation or via a termination notice) has the burden of at least bringing a lawsuit within the statute of
limitations period.  Thus, Marc Toberoff's conclusion that the statute of limitations runs against Siegel (and
not against Time Warner) is likely correct.

Finally, I did find one case clearly holding that "when a termination is effected, all rights covered by the
terminated grant revert, on the effective date of termination, to the author or his statutory successor."
Bourne v. MPL Communications, Inc., 675 F. Supp. 859, 861 (S.D.N.Y. 1987).  Thus, assuming that the
Notices of Termination were proper, it seems that 50% of the rights to Superman did in fact revert to
Siegel upon the effective date of the terminations in April 1999.  Because Time Warner rejected the

Q 0699

Privileged & Confidential
All Rights Reserved

SD 00700

JUN 01 2004 12:05 FR ...

validity of the Notices of Termination (and hence repudiated Siegel's status as co-owner) on April 15, 1999, it seems that the Statute of Limitations began to run against Siegel on April 15, 1999 for her to bring a declaratory judgment action establishing her as co-owner and entitling her to an accounting.

CC:        McGoirick, Robin

Q 0700

** TOTAL PAGE.00 **

Privileged & Confidential
All Rights Reserved

**EXHIBIT G**
**934**

SD 00701

The State Bar of California - Rules of Professional Conduct                    Page 1 of 1

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

### Rule 1-120. Assisting, Soliciting, or Inducing Violations

A member shall not knowingly assist in, solicit, or induce any violation of these rules or the State Bar Act.

© 2003 State Bar of California

Q 0701

**Privileged & Confidential**
**All Rights Reserved**
http://www.calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...  5/27/2003

SD 00702

RECEIVED

MAY 3 0 2003

Marc Toberoff

## TELECOPIER COVER PAGE

| | |
|---|---|
| **DATE:** | May 30, 2003 |
| **RECIPIENT:** | Marc Toberoff |
| **SENDER:** | James R. Jackoway |
| **FAX NUMBER:** | 310-246-3101 |
| **NUMBER OF PAGES:** | 25(including cover page) |

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0702

Privileged & Confidential
All Rights Reserved

SD 00703

**EXHIBIT G**
**936**

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER

## MEMORANDUM

TO:        James R. Jackoway, Esq.

FROM:      Kurt L. Harrison

DATE:      May 29, 2003

RE:        Marc Toberoff -- Ethical Issues

cc:        Gerry Hemmerling, Esq.
           Michele M. Mulrooney, Esq.

**********************************************************************

Gerry Hemmerling informs me that this Firm has been asked to assist Mr. Marc Toberoff and his corporation, Pacific Pictures Corporation ("PPC"), by providing legal services in connection with a joint venture between PPC, on the one hand, and Jean Peavy and her son, Mark Peary, (collectively, the "Peavys") on the other. Ms. Hemmerling requested that I examine some of the ethical issues that might confront Mr. Toberoff and this Firm, if the Firm were to agree to assist Mr. Toberoff and PPC in the joint venture.

I understand that Mr. Toberoff formed PPC and that PPC entered into a Joint Venture Agreement (the "Agreement") with the Peavys to exploit certain copyrights held, assigned, or transferred by the late Joe Shuster. The Peavys are Shuster's heirs. Among other things, the Agreement requires the parties to

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-1-

Q 0703

**Privileged & Confidential**
**All Rights Reserved**

SD 00704

**EXHIBIT G**
**937**

engage Mr. Toberoff to perform legal services for the Peavys, and
entitles Mr. Toberoff, through PPC, to receive 50% of all profits
realized from the exploitation of the copyrights.  We do not know
at present how Mr. Toberoff came in contact with the Peavys.

## RULE 1-200

As you know, Rule 1-200 of the California Rules of
Professional Conduct prohibits any member of the California State
Bar from knowingly assisting in, soliciting, or inducing any
violation of the Rules of Professional Conduct or the State Bar
Act (Cal. Bus. & Prof. Code § 6000 et seq.).  In essence, this
Rule makes any potential ethical problems confronting Mr.
Toberoff this Firm's potential problems as well, if the Firm
agrees to assist Mr. Toberoff and PPC in the transaction with the
Peavys.  Hence, this Memorandum examines both potential issues
confronting Mr. Toberoff in his relationship with the Peavys and
the transaction in question and potential issues that would
confront this Firm were it to agree to assist Mr. Toberoff and
PPC.

## RULE 1-400

The first potential problem raised by Mr. Toberoff's
relationship with the Peavys arises from the prohibition against
certain forms of advertising and solicitation by attorneys.  Rule
1-400 prohibits certain types of "communications" and
"solicitations."  With respect to prohibited solicitations, an

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-2-

Q 0704

**Privileged & Confidential
All Rights Reserved**

SD 00705

**EXHIBIT G
938**

Thus, even if Mr. Toberoff contacted the Peavys by mail, rather than in person or by telephone, the communication would presumably violate Rule 1-400, unless Mr. Toberoff had made the required disclosures on the first page and envelope of the letter. Again, without knowing exactly how and why Mr. Toberoff contacted the Peavys, it is difficult to know whether he violated Rule 1-400. However, given the circumstances here, there is reason for concern in connection with any potential involvement of this Firm.

## BUSINESS AND PROFESSIONS CODE §6150 ET SEQ.

Mr. Toberoff's use of a corporate entity to acquire business also raises concerns about "capping." The State Bar Act (the "Act") broadly defines a "capper" or "runner" as any person, firm, association, or corporation acting in any manner or in any capacity as an agent for an attorney in the solicitation or procurement of business for the attorney. Bus. Prof. Code § 6151. The Act makes it unlawful for any person, firm, corporation, partnership, or association to act as runner or capper for any attorney. Bus. & Prof. Code § 6152.

In this case, PPC appears to be soliciting or procuring business for Mr. Toberoff. Indeed, presumably at the suggestion or insistence of PPC, the Agreement requires the Peavys to engage the legal services of Mr. Toberoff, who then gets paid from the proceeds of the copyright exploitation. Of course, "capping" also requires that the corporation soliciting or procuring

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-4-

Q 0705

Privileged & Confidential
All Rights Reserved

SD 00706

business for the attorney act for consideration.  However, given the broad definition of consideration and the close relationship of Mr. Toberoff and PPC, it would probably not be difficult to find consideration.  <u>See Civ. Code</u> § 1605 (broadly defining consideration as any benefit conferred or prejudice suffered by the promisor as inducement for the promise).

Furthermore, if this Firm were to engage in a long-term relationship with Mr. Toberoff by participating in other similar ventures, Mr. Toberoff, PPC, or whatever other entity Mr. Toberoff employs also appears to be soliciting or procuring business for the Firm.  Hence, it might appear that the Firm itself were "joining" in the capping activity, which is also a violation of the Act.  <u>Bus. & Prof. Code</u> § 6152.  Such activity would also independently violate Rule 1-200, which, as mentioned above, prohibits attorneys from inducing, soliciting, or assisting in the violation of the Act.

## RULE 2-200

Aside from the questions raised above, if this Firm agreed to assist Mr. Toberoff in the joint venture with the Peavys, the Firm's involvement would also raise ethical issues regarding the financial relationship between Mr. Toberoff and the Firm.  Rule 2-200(A) prohibits attorneys from dividing fees for legal services unless (1) the client consents in writing after full disclosure and (2) the total fee charged by all lawyers is not unconscionable.  Even if all other ethical concerns were

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-5-

Q 0706

**Privileged & Confidential**
**All Rights Reserved**

SD 00707

**EXHIBIT G**
**940**

satisfied, this Rule would require that a full written disclosure be made both to the Peavys and to the personal representative of the Shuster Estate. Furthermore, as discussed below, it is questionable whether the second prong of requirement can be met because of the 50% fee being charged by Mr. Toberoff through PPC.

## RULE 3-300

The Agreement also raises issues concerning Rule 3-300 regarding avoiding interests adverse to a client. Rule 3-300 prohibits an attorney from entering into a business transaction or knowingly acquiring an ownership or other pecuniary interest adverse to a client unless (1) the transaction and its terms are fair and reasonable to the client; (2) the transaction and its terms are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; (3) the client is advised in writing that the client may seek the advice of an independent lawyer and is given a reasonable opportunity to seek that advice; and (4) the client consents to the transaction in writing. Furthermore, the written disclosure requires more than just presenting the client with a written agreement. Decisions interpreting this Rule require the lawyer to fully advise the client in writing of all disadvantages and legal obligations of the transaction.[1]

In this case, the Agreement itself would unlikely suffice as the required written disclosure. Furthermore, there

---

[1] For the sake of brevity, I have not cited these cases here.

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

−6−

Q 0707

**Privileged & Confidential
All Rights Reserved**

**EXHIBIT G
941**

SD 00708

appears to be no writing advising the Peavys of their right to seek independent legal advice, and we do not know whether the Peavys were given an opportunity to seek such advice. Finally, as discussed below, there is a significant question as to whether 50% of all net profits is objectively fair and reasonable under the circumstances.

Mr. Toberoff's use of a corporate entity, PPC, as the party to the joint venture with the Peavys would most likely make no difference in the application of Rule 3-300. As a policy matter, if an attorney could circumvent Rule 3-300 by the simple expedient of forming a corporate entity to engage in the transaction with the client, the Rule would have no vitality. This suggests that a court would most likely disregard the corporate entity for the purposes of applying Rule 3-300 under the circumstances presented here.

RULE 3-310

Ms. Hemmerling has discussed the potential conflicts that this Firm would have in representing the Shuster Estate, while being paid by a party whose pecuniary interests are adverse to the Estate and its heirs, the Peavys. The issues discussed by Ms. Hemmerling implicate Rule 3-310, and in particular Subdivisions (B), (C), and (F). You should note, however, that Rule 3-310 can be satisfied by obtaining the client's written informed consent. In this case, prudence would suggest that the

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

Q 0708

Privileged & Confidential
All Rights Reserved

SD 00709

EXHIBIT G
942

written informed consent should be obtained from both the Peavys
and the personal representative of the Shuster Estate.

## RULE 4-200

Finally, Rule 4-200 prohibits an attorney from entering
into agreement for, charging, or collecting an illegal or
unconscionable fee. The Rule lists eleven factors that are among
the factors to be considered. Without engaging in an extensive
analysis of each factor here, it appears far from clear whether
the 50% net profit fee charged by Mr. Toberoff through PPC[2] is
conscionable. As you know, contingent fees in most cases
typically run between 20% and 40% of net recovery. Looking at
the factors, it is difficult to see how a fee well in excess of
the usual upper limit of contingent fee agreements can be
justified in this case. Ultimately, however, there is no bright
line standard for determining this issue. Furthermore, this
issue is difficult to evaluate without some appreciation for the
discounted value of the rights in question. Nonetheless, as
noted above, this issue raises concerns both in the near- and
far-term as to Rule 4-200 and, as discussed above, as to Rules 2-
200 and 3-300.

---

[2] As with the application of Rule 3-300, it is unlikely that Mr.
Toberoff's use of PPC would shield him from the requirements of
Rule 4-200.

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC                                    Q 0709

Privileged & Confidential
All Rights Reserved

SD 00710

EXHIBIT G
943

For your review, I have included all of the rules and statutes cited in this Memorandum. If you wish me to pursue further any of the issues discussed herein, please let me know.

ATTACHMENTS

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

–9–

Q 0710

Privileged & Confidential
All Rights Reserved

SD 00711

The State Bar of California - ...les of Professional Conduct                                    Page 1 of 3

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

# CURRENT RULES

## Rule 1-400. Advertising and Solicitation

(A) For purposes of this rule, "communication" means any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client, including but not limited to the following:

(1) Any use of firm name, trade name, fictitious name, or other professional designation of such member or law firm; or

2) Any stationery, letterhead, business card, sign, brochure, or other comparable written material describing such member, law firm, or lawyers; or

(3) Any advertisement (regardless of medium) of such member or law firm directed to the general public or any substantial portion thereof; or

(4) Any unsolicited correspondence from a member or law firm directed to any person or entity.

(B) For purposes of this rule, a "solicitation" means any communication:

(1) Concerning the availability for professional employment of a member or a law firm in which a significant motive is pecuniary gain; and

(2) Which is:

(a) delivered in person or by telephone, or

(b) directed by any means to a person known to the sender to be represented by counsel in a matter which is a subject of the communication.

(C) A solicitation shall not be made by or on behalf of a member or law firm to a prospective client with whom the member or law firm has no family or prior professional relationship, unless the solicitation is protected from abridgment by the Constitution of the United States or by the Constitution of the State of California. A solicitation to a former or present client in the discharge of a member's or law firm's professional duties is not prohibited.

(D) A communication or a solicitation (as defined herein) shall not:

(1) Contain any untrue statement; or

(2) Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public; or

(3) Omit to state any fact necessary to make the statements made, in the light of circumstances under which they are made, not misleading to the public; or

(4) Fail to indicate clearly, expressly, or by context, that it is a communication or solicitation, as the case may be; or

(5) Be transmitted in any manner which involves intrusion, coercion, duress, compulsion, intimidation, threats, or vexatious or harassing conduct.

Q 0711

Privileged & Confidential
All Rights Reserved

The State Bar of California   Rules of Professional Conduct                                    Page 2 of 3



(5) State that a member is a "certified specialist" unless the member holds a current certificate as a specialist issued by the Board of Legal Specialization, or any other entity accredited by the State Bar to designate specialists pursuant to standards adopted by the Board of Governors, and states the complete name of the entity which granted certification.

(E) The Board of Governors of the State Bar shall formulate and adopt standards as to communications which will be presumed to violate this rule 1-400. The standards shall only be used as presumptions affecting the burden of proof in disciplinary proceedings involving alleged violations of these rules. "presumption affecting the burden of proof" means that presumption defined in Evidence Code sections 605 and 606. Such standards formulated and adopted by the Board, as from time to time amended, shall be effective and binding on all members.

(F) A member shall retain for two years a true and correct copy or recording of any communication made by written or electronic media. Upon written request, the member shall make any such copy or recording available to the State Bar, and, if requested, shall provide to the State Bar evidence to support any factual or objective claim contained in the communication.

(Former rule 1-400 (D)(6) repealed by order of the Supreme Court effective November 30, 1992. New rule 1-400 (D)(6) added by order of the Supreme Court effective June 1, 1997.)

*Standards:*

Pursuant to rule 1-400(E) the Board of Governors of the State Bar has adopted the following standards, effective May 27, 1989, unless noted otherwise, as forms of "communication" defined in rule 1-400(A) which are presumed to be in violation of rule 1-400:

(1) A "communication" which contains guarantees, warranties, or predictions regarding the result of the representation.

(2) A "communication" which contains testimonials about or endorsements of a member unless such communication also contains an express disclaimer such as "this testimonial or endorsement does not constitute a guarantee, warranty, or prediction regarding the outcome of your legal matter."

(3) A "communication" which is delivered to a potential client whom the member knows or should reasonably know is in such a physical, emotional, or mental state that he or she would not be expected to exercise reasonable judgment as to the retention of counsel.

(4) A "communication" which is transmitted at the scene of an accident or at or en route to a hospital, emergency care center, or other health care facility.

(5) A "communication," except professional announcements, seeking professional employment for pecuniary gain, which is transmitted by mail or equivalent means which does not bear the word "Advertisement," "Newsletter" or words of similar import in 12 point print on the first page. If such communication, including firm brochures, newsletters, recent legal development advisories, and similar materials, is transmitted in an envelope, the envelope shall bear the word "Advertisement," "Newsletter" or words of similar import on the outside thereof.

(6) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies a relationship between any member in private practice and a government agency or instrumentality or a public or non-profit legal services organization.

(7) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies that a member has a relationship to any other lawyer or a law firm as a partner or associate, or officer or shareholder pursuant to Business and professions Code sections 6160-6172 unless such relationship in fact exists.

(8) A "communication" which states or implies that a member or law firm is "of counsel" to another lawyer or a law firm unless the former has a relationship with the latter (other than as a partner or associate, or officer or shareholder pursuant to Business and professions Code sections 6160-6172) which is close, personal, continuous, and regular.

(9) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation used by a member or law firm in private practice which differs materially from any other such designation used by such member or law firm

Privileged & Confidential
All Rights Reserved

Q 0712

http://...bar.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=badchfkflekfbemgcfk... 5/27/2003

SD 00713



at the same time in the same community.

(10) A "communication" which implies that the member or law firm is participating in a lawyer referral service which has been certified by the State Bar of California or as having satisfied the Minimum Standards for Lawyer Referral Services in California, when that is not the case.

(11) A "communication" which states or implies that a member is a "certified specialist" unless such communication also states the complete name of the entity which granted the certification as a specialist. (Repealed by order of the Supreme Court, effective June 1, 1997. See rule 1-400(D)(6).)

(12) A "communication," except professional announcements, in the form of an advertisement primarily directed to seeking professional employment primarily for pecuniary gain transmitted to the general public or any substantial portion thereof by mail or equivalent means or by means of television, radio, newspaper, magazine or other form of commercial mass media which does not state the name of the member responsible for the communication. When the communication is made on behalf of a law firm, the communication shall state the name of at least one member responsible for it.

(13) A "communication" which contains a dramatization unless such communication contains a disclaimer which states "this is a dramatization" or words of similar import.

(14) A "communication" which states or implies "no fee without recovery" unless such communication also expressly discloses whether or not the client will be liable for costs.

(15) A "communication" which states or implies that a member is able to provide legal services in a language other than English unless the member can actually provide legal services in such language or the communication also states in the language of the communication (a) the employment title of the person who speaks such language and (b) that the person is not a member of the State Bar of California, if that is the case.

(16) An unsolicited "communication" transmitted to the general public or any substantial portion thereof primarily directed to seeking professional employment primarily for pecuniary gain which sets forth a specific fee or range of fees for a particular service where, in fact, the member charges a greater fee than advertised in such communication within a period of 90 days following dissemination of such communication, unless such communication expressly specifies a shorter period of time regarding the advertised fee. Where the communication is published in the classified or "yellow pages" section of telephone, business or legal directories or in other media not published more frequently than once a year, the member shall conform to the advertised fee for a period of one year from initial publication, unless such communication expressly specifies a shorter period of time regarding the advertised fee.

(Amended by order of Supreme Court, operative September 14, 1992. Standard (5) amended by the Board of Governors, effective May 11, 1994. Standards (12) - (16) added by the Board of Governors, effective May 11, 1994.)

© 2003 State Bar of California



Q 0713

Privileged & Confidential
All Rights Reserved

SD 00714

EXHIBIT G
947

The State Bar of California — Rules of Professional Conduct



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

### Rule 2-200. Financial Arrangements Among Lawyers

(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:

(1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and

(2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.

(B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forthcoming or that referrals would be made or encouraged in the future.



© 2003 State Bar of California

Q 0714

Privileged & Confidential
All Rights Reserved

SD 00715

EXHIBIT G
948



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 3-300. Avoiding Interests Adverse to a Client**

A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

*Discussion:*

Rule 3-300 is not intended to apply to the agreement by which the member is retained by the client, unless the agreement confers on the member an ownership, possessory, security, or other pecuniary interest adverse to the client. Such an agreement is governed, in part, by rule 4-200.

Rule 3-300 is not intended to apply where the member and client each make an investment on terms offered to the general public or a significant portion thereof. For example, rule 3-300 is not intended to apply where A, a member, invests in a limited partnership syndicated by a third party. B, A's client, makes the same investment. Although A and B are each investing in the same business, A did not enter into the transaction "with" B for the purposes of the rule.

Rule 3-300 is intended to apply where the member wishes to obtain an interest in client's property in order to secure the amount of the member's past due or future fees. (Amended by order of Supreme Court, operative September 14, 1992.)

© 2003 State Bar of California

Q 0715



Privileged & Confidential
All Rights Reserved

The State Bar of California    _ules of Professional Conduct

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct



# CURRENT RULES

**Rule 3-310. Avoiding the Representation of Adverse Interests**

(A) For purposes of this rule:

    (1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

    (2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

    (3) "Written" means any writing as defined in Evidence Code section 250.

(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

    (1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

    (2) The member knows or reasonably should know that:

        (a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

        (b) the previous relationship would substantially affect the member's representation; or

    (3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

    (4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C) A member shall not, without the informed written consent of each client:

    (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

    (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

    (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

(F) A member shall not accept compensation for representing a client from one other than the client unless:

    (1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

Q 0716

**Privileged & Confidential**
**All Rights Reserved**

(2) information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

    (a) such nondisclosure is otherwise authorized by law; or

    (b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

*Discussion:*

Rule 3-310 is not intended to prohibit a member from representing parties having antagonistic positions on the same legal question that has arisen in different cases, unless representation of either client would be adversely affected.

Other rules and laws may preclude making adequate disclosure under this rule. If such disclosure is precluded, informed written consent is likewise precluded. (See, e.g., Business and Professions Code section 6068, subdivision (e).)

Paragraph (B) is not intended to apply to the relationship of a member to another party's lawyer. Such relationships are governed by rule 3-320.

Paragraph (B) is not intended to require either the disclosure of the new engagement to a former client or the consent of the former client to the new engagement. However, both disclosure and consent are required if paragraph (E) applies.

While paragraph (B) deals with the issues of adequate disclosure to the present client or clients of the member's present or past relationships to other parties or witnesses or present interest in the subject matter of the representation, paragraph (E) is intended to protect the confidences of another present or former client. These two paragraphs are to apply as complementary provisions.

Paragraph (B) is intended to apply only to a member's own relationships or interests, unless the member knows that a partner or associate in the same firm as the member has or had a relationship with another party or witness or has or had an interest in the subject matter of the representation.

Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners or a corporation for several shareholders, the preparation of an ante-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution. In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., Evid. Code, §962) and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2).

Subparagraph (C)(3) is intended to apply to representations of clients in both litigation and transactional matters.

In *State Farm Mutual Automobile Insurance Company v. Federal Insurance Company* (1999) 72 Cal.App. 4th 1422 [86 Cal.Rptr.2d the court held that subparagraph (C)(3) was violated when a member, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent. Notwithstanding State Farm, subparagraph (C)(3) is not intended to apply with respect to the relationship between an insurer and a member when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the litigation.

There are some matters in which the conflicts are such that written consent may not suffice for non-disciplinary purposes. (See *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr. 185]; *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *Ishmael v. Millington* (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 582].)

Paragraph (D) is not intended to apply to class action settlements subject to court approval.

Q 0717

Privileged & Confidential
All Rights Reserved

http://...data.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...  5/27/2003

SD 00718

The State Bar of California  ules of Professional Conduct                                              Page 3 of 3

Paragraph (F) is not intended to abrogate existing relationships between insurers and insureds whereby the insurer has the contractual right to unilaterally select counsel for the insured, where there is no conflict of interest. (See *San Diego Navy Federal Credit Union v. Cumis Insurance Society* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].) (Amended by order of Supreme Court; operative September 14, 1992; operative March 3, 2003.)



© 2003 *State Bar of California*

Q 0718

Privileged & Confidential
All Rights Reserved

SD 00719

**EXHIBIT G**
**952**

The State Bar of California - Rules of Professional Conduct                    Page 1 of 1

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 4-200. Fees for Legal Services**

(A) A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.

(B) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:

    (1) The amount of the fee in proportion to the value of the services performed.

    (2) The relative sophistication of the member and the client.

    (3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

    (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.

    (5) The amount involved and the results obtained.

    (6) The time limitations imposed by the client or by the circumstances.

    (7) The nature and length of the professional relationship with the client.

    (8) The experience, reputation, and ability of the member or members performing the services.

    (9) Whether the fee is fixed or contingent.

    (10) The time and labor required.

    (11) The informed consent of the client to the fee.

© 2003 State Bar of California

Q 0719



**Privileged & Confidential**
**All Rights Reserved**

http://...calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...    5/27/2003

SD 00720

**EXHIBIT G**
**953**



# BUSINESS AND PROFESSIONS CODE
## SECTION 6150-6156

6150.  This article is a part of Chapter 4 of this division of the
Business and Professions Code, but the phrase "this chapter" as used
in Chapter 4 does not apply to the provisions of this article unless
expressly made applicable.


6151.  As used in this article:
    (a) A runner or capper is any person, firm, association or
corporation acting for consideration in any manner or in any capacity
as an agent for an attorney at law or law firm, whether the attorney
or any member of the law firm is admitted in California or any other
jurisdiction, in the solicitation or procurement of business for the
attorney at law or law firm as provided in this article.
    (b) An agent is one who represents another in dealings with one or
more third persons.


6152.  (a) It is unlawful for:
    (1) Any person, in an individual capacity or in a capacity as a
public or private employee, or for any firm, corporation, partnership
or association to act as a runner or capper for any attorneys in and about the state
prisons, county jails, city jails, city prisons, or other places of
detention of persons, city receiving hospitals, city and county
receiving hospitals, county hospitals, superior courts, or in any
public institution or in any public place or upon any public street
or highway or in and about private hospitals, sanitariums or in and
about any private institution or upon private property of any
character whatsoever.
    (2) Any person to solicit another person to commit or join in the
commission of a violation of subdivision (a).
    (b) A general release from a liability claim obtained from any
person during the period of the first physical confinement, whether
as an inpatient or outpatient, in a clinic or health facility, as
defined in Sections 1203 and 1250 of the Health and Safety Code, as a
result of the injury alleged to have given rise to the claim and
primarily for treatment of the injury, is presumed fraudulent if the
release is executed within 15 days after the commencement of
confinement or prior to release from confinement, whichever occurs
first.
    (c) Nothing in this section shall be construed to prevent the
recommendation of professional employment where that recommendation
is not prohibited by the Rules of Professional Conduct of the State
Bar of California.
    (d) Nothing in this section shall be construed to mean that a
public defender or assigned counsel may not make known his or her
services as a criminal defense attorney to persons unable to afford
legal counsel whether those persons are in custody or otherwise.

Q 0720

Privileged & Confidential
All Rights Reserved

CA Codes (bpc:6150-6156)

6153. Any person, firm, partnership, association, or corporation violating subdivision (a) of Section 6152 is punishable, upon a first conviction, by imprisonment in a county jail for not more than one year or by a fine not exceeding fifteen thousand dollars ($15,000), or by both that imprisonment and fine. Upon a second or subsequent conviction, a person, firm, partnership, association, or corporation is punishable by imprisonment in a county jail for not more than one year, or by imprisonment in the state prison for two, three, or four years, or by a fine not exceeding fifteen thousand dollars ($15,000), or by both that imprisonment and fine.

Any person employed either as an officer, director, trustee, clerk, servant or agent of this state or of any county or other municipal corporation or subdivision thereof, who is found guilty of violating any of the provisions of this article, shall forfeit the right to his office and employment in addition to any other penalty provided in this article.


6154. (a) Any contract for professional services secured by any attorney at law or law firm in this state through the services of a runner or capper is void. In any action against any attorney or law firm under the Unfair Practices Act, Chapter 4 (commencing with Section 17000) of Division 7, or Chapter 5 (commencing with Section 17200) of Division 7, any judgment shall include an order divesting the attorney or law firm of any fees and other compensation received pursuant to any such void contract. Those fees and compensation shall be recoverable as additional civil penalties under Chapter 4 (commencing with Section 17000) or Chapter 5 (commencing with Section 17200) of Division 7.

(b) Notwithstanding Section 17206 or any other provision of law, any fees recovered pursuant to subdivision (a) in an action involving professional services related to the provision of workers' compensation shall be allocated as follows: if the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the State General Fund, and one-half of the penalty collected shall be paid to the Workers' Compensation Fraud Account in the Insurance Fund; if the action is brought by a district attorney, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half of the penalty collected shall be paid to the Workers' Compensation Fraud Account in the Insurance Fund; if the action is brought by a city attorney or city prosecutor, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half of the penalty collected shall be paid to the Workers' Compensation Fraud Account in the Insurance Fund. Moneys deposited into the Workers' Compensation Fraud Account pursuant to this subdivision shall be used in the investigation and prosecution of workers' compensation fraud, as appropriated by the Legislature.


6155. (a) An individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients, unless all of the following requirements are met:

(1) The service is registered with the State Bar of California and (a) on July 1, 1988, is operated in conformity with minimum standards for a lawyer referral service established by the State Bar,

Q 0721

Privileged & Confidential
All Rights Reserved

EXHIBIT G
955

SD 00722

or (b) upon approval by the Supreme Court of minimum standards for a lawyer referral service, is operated in conformity with those standards.

(2) The combined charges to the potential client by the referral service and the attorney to whom the potential client is referred do not exceed the total cost that the client would normally pay if no referral service were involved.

(b) A referral service shall not be owned or operated, in whole or in part, directly or indirectly, by those lawyers to whom, individually or collectively, more than 20 percent of referrals are made. For purposes of this subdivision, a referral service that is owned or operated by a bar association, as defined in the minimum standards, shall be deemed to be owned or operated by its governing committee so long as the governing committee is constituted and functions in the manner prescribed by the minimum standards.

(c) None of the following is a lawyer referral service:

(1) A plan of legal insurance as defined in Section 119.6 of the Insurance Code.

(2) A group or prepaid legal plan, whether operated by a union, trust, mutual benefit or aid association, public or private corporation, or other entity or person, which meets both of the following conditions:

(A) It recommends, furnishes, or pays for legal services to its members or beneficiaries.

(B) It provides telephone advice or personal consultation.

(3) A program having as its purpose the referral of clients to attorneys for representation on a pro bono basis.

(d) The following are in the public interest and do not constitute an unlawful restraint of trade or commerce:

(1) An agreement between a referral service and a participating attorney to eliminate or restrict the attorney's fee for an initial office consultation for each potential client or to provide free or reduced fee services.

(2) Requirements by a referral service that attorneys meet reasonable participation requirements, including experience, education, and training requirements.

(3) Provisions of the minimum standards as approved by the Supreme Court.

(4) Requirements that the application and renewal fees for certification as a lawyer referral service be determined, in whole or in part, by a consideration of any combination of the following factors: a referral service's gross annual revenues, number of panels, number of panel members, amount of fees charged to panel members, or for-profit or nonprofit status; provided that the application and renewal fees do not exceed ten thousand dollars ($10,000) or 1 percent of the gross annual revenues, whichever is less.

(5) Requirements that, to increase access to the justice system for all Californians, lawyer referral services establish separate ongoing activities or arrangements that serve persons of limited means.

(e) A violation or threatened violation of this section may be enjoined by any person.

(f) With the approval of the Supreme Court, the State Bar shall formulate and enforce rules and regulations for carrying out this section, including rules and regulations which do the following:

(1) Establish minimum standards for lawyer referral services. The minimum standards shall include provisions ensuring that panel membership shall be open to all attorneys practicing in the geographical area served who are qualified by virtue of suitable

Q 0722

Privileged & Confidential
All Rights Reserved

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156    5/27/2003

SD 00723

CA Codes (bpc:6150-6156)

experience, and limiting attorney registration and membership fees to reasonable sums which do not discourage widespread attorney membership.

(2) Require that an entity seeking to qualify as a lawyer referral service register with the State Bar and obtain from the State Bar a certificate of compliance with the minimum standards for lawyer referral services.

(3) Require that the certificate may be obtained, maintained, suspended, or revoked pursuant to procedures set forth in the rules and regulations.

(4) Require the lawyer referral service to pay an application and renewal fee for the certificate in such reasonable amounts as may be determined by the State Bar.  The State Bar shall adopt rules authorizing the waiver or reduction of the fees upon a demonstration of financial necessity.  The State Bar may require that the application and renewal fees for certification as a lawyer referral service be determined, in whole or in part, by a consideration of any combination of the following factors:  a referral service's gross annual revenues, number of panels, number of panel members, amount of fees charged to panel members, or for-profit or nonprofit status; provided that the application and renewal fees do not exceed ten thousand dollars ($10,000) or 1 percent of the gross annual revenues, whichever is less.

(5) Require that, to increase access to the justice system for all Californians, lawyer referral services establish separate ongoing activities or arrangements that serve persons of limited means.

(6) Require each lawyer who is a member of a certified lawyer referral service to comply with all applicable professional standards, rules, and regulations, and to possess a policy of errors and omissions insurance in an amount not less than one hundred thousand dollars ($100,000) for each occurrence and three hundred thousand dollars ($300,000) aggregate, per year.  By rule, the State Bar may provide for alternative proof of financial responsibility to meet this requirement.

(g) Provide that cause for denial of certification or recertification or revocation of certification of a lawyer referral service shall include, but not be limited to:

(1) Noncompliance with the statutes or minimum standards governing lawyer referral services as adopted and from time to time amended.

(2) Sharing common or cross ownership, interests, or operations with any entity which engages in referrals to licensed or unlicensed health care providers.

(3) Direct or indirect consideration regarding referrals between an owner, operator, or member of a lawyer referral service and any licensed or unlicensed health care provider.

(4) Advertising on behalf of attorneys in violation of the Rules of Professional Conduct or the Business and Professions Code.

(h) This section shall not be construed to prohibit attorneys from jointly advertising their services.

(1) Permissible joint advertising, among other things, identifies by name the advertising attorneys or law firms whom the consumer of legal services may select and initiate contact with.

(2) Certifiable referral activity involves, among other things, some person or entity other than the consumer and advertising attorney or law firms which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified in the advertising.

(i) A lawyer referral service certified under this section and operating in full compliance with this section, and in full compliance with the minimum standards and the rules and regulations

Q 0723

Privileged & Confidential
All Rights Reserved

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156   5/27/2003

SD 00724

of the State Bar governing lawyer referral services, shall not be deemed to be in violation of Section 3215 of the Labor Code or Section 750 of the Insurance Code.

(j) The payment by an attorney or law firm member of a certified referral service of the normal fees of that service shall not be deemed to be in violation of Section 3215 of the Labor Code or Section 750 of the Insurance Code, provided that the attorney or law firm member is in full compliance with the minimum standards and the rules and regulations of the State Bar governing lawyer referral services.

(k) Certifications of lawyer referral services issued by the State Bar shall not be transferable.


6156.   (a) Any individual, partnership, association, corporation, or other entity, including, but not limited to, any person or entity having an ownership interest in a lawyer referral service, which engages, has engaged, or proposes to engage in violations of Section 6155, shall be liable for a civil penalty as defined in Sections 17206, 17206.1, and 17536, respectively, which shall be assessed and recovered in a civil action brought:

(1) In the manner specified in subdivision (a) of Section 17206 or Section 17536.

(2) By the State Bar of California.

(b) If the action is brought pursuant to subdivision (a), the court shall determine the reasonable expenses, if any, incurred by the State Bar in its investigation and prosecution of the action.  In these cases, before any penalty collected is paid out pursuant to subdivision (b) of Section 17206 or 17536, the amount of the reasonable expenses incurred by the State Bar shall be paid to the State Bar and shall be deposited and used as provided in subdivision (c).

(c) If the action is brought pursuant to paragraph (2) of subdivision (a), the civil penalty shall be paid to the State Bar and shall be deposited into a special fund to be used first for the investigation and prosecution of other such cases by the State Bar, with any excess to be used for the investigation and prosecution of attorney discipline cases.

Q 0724

Privileged & Confidential
All Rights Reserved

SD 00725

EXHIBIT G
958

LAW OFFICES OF
# MARC TOBEROFF

June 13, 2003

John D. Peftker, Esq.
444 South Flower Street
Los Angeles, CA 90071

Re: Probate of Joseph Shuster Estate

Dear Jack:

As discussed enclosed please find the following:

(1) Copy of Joseph Shuster's Will dated June 28, 1988 (they can not find the original);
(2) Revocable Living Trust (plus Schedule A where assigned property = only stock and furniture) dated April 11, 1988. I have original;
(3) Affidavit of Jean Peavy per §13101 dated August 17, 1992 that decedent's property is under $60,000. I have original;
(4) Death certificate of Joseph Shuster, resident of Los Angeles, CA, died on August 14, 1992. I have original;
(5) Family tree.

The Trust does not appear to be a problem due to the limited property assigned to it per Schedule A which I located after we spoke today.

I 've also enclosed §304(c)(2)(D) of the US Copyright Act which gives executors, etc. a right to terminate prior transfers of copyright within delineated time windows. Previously, only a spouse, children and grandchildren had this right. So when Joe Shuster died in 1992 without spouse or children his Estate was worth under $60K. Then, on October 27, 1998 the Sonny Bono Copyright Act added subparagraph (D) giving the right to the executor, personal representative, etc. (see amendment enclosed).

We therefore want the Probate Court to approve in addition to the normal executor powers something like "the executor is empowered, without limitation, to terminate prior transfers of Joseph Shuster's copyrights [possibly even better if we can add, "including "Superman"] pursuant to 17 U.S.C. §304(c)(2)(D). Alternatively, the papers could state that Estate is being probated for this purpose.

I apologize for the delay in getting the above to you. Anything, you can do from here on to expedite the probate would be greatly appreciated. As discussed, please fax or e-mail me a retainer agreement whereupon I will send you the $2,500 retainer you requested.

Regards,

Marc Toberoff

9595 Wilshire Boulevard, 8ᵗʰ Floor, Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
MToberoff@ipww.biz

Privileged & Confidential
All Rights Reserved

Q 0725

SD 00726

## CERTIFICATE OF DEATH
### STATE OF CALIFORNIA
USE BLACK INK ONLY

STATE FILE NUMBER

LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER

| | | | | |
|---|---|---|---|---|
| 1A. NAME OF DECEDENT—FIRST (GIVEN) JOSEPH | 1B. MIDDLE | 1C. LAST (FAMILY) SHUSTER | 2A. DATE OF DEATH—MO., DAY, YR. Fnd July 30, 1992 1106 | 2B. HOUR | 3. SEX MALE |

**DECEDENT PERSONAL DATA**

| 4. RACE CAUCASIAN | 5. HISPANIC—SPECIFY ☐ YES  ☒ NO | 6. DATE OF BIRTH—MO., DAY, YR. JULY 10, 1914 | 7. AGE IN YEARS 78 | 8. UNDER 1 YEAR MONTHS / DAYS | 8. UNDER 24 HOURS HOURS / MINUTES |
|---|---|---|---|---|---|

| 8. STATE OF BIRTH CANADA | 9. CITIZEN OF WHAT COUNTRY USA | 10A. FULL NAME OF FATHER JULIUS SHUSTER | 10B. STATE OF BIRTH HOLLAND | 11A. FULL MAIDEN NAME OF MOTHER IDA KAKLARSKY | 11B. STATE OF BIRTH RUSSIA |
|---|---|---|---|---|---|

| 12. MILITARY SERVICE? 19___ TO 19___  ☒ NONE | 13. SOCIAL SECURITY NO. 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 | 14. MARITAL STATUS NEVER MARRIED | 15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME) NONE |
|---|---|---|---|

| 16A. USUAL OCCUPATION ARTIST | 16B. USUAL KIND OF BUSINESS OR INDUSTRY COMIC BOOKS | 16C. USUAL EMPLOYER DC COMICS | 16D. YEARS IN OCCUPATION 60 | 17. EDUCATION—YEARS COMPLETED 14 |
|---|---|---|---|---|

**USUAL RESIDENCE**

| 18A. RESIDENCE—STREET AND NUMBER OR LOCATION 11944 MONTANA AVENUE #305 | | 18B. CITY W. LOS ANGELES | 18C. ZIP CODE 90049 |
|---|---|---|---|

| 18D. COUNTY LOS ANGELES | 18E. NUMBER OF YEARS IN THIS COUNTY 14 | 18F. STATE OR FOREIGN COUNTRY CALIFORNIA | 20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT JEAN PEAVY-SISTER 316 HORTON LANE N.W ALBUQUERQUE, NEW MEXICO 87114 |
|---|---|---|---|

**PLACE OF DEATH**

| 19A. PLACE OF DEATH Residence | 19B. IF HOSPITAL SPECIFY ONE: IP, ER/OP, DCA | 19C. COUNTY Los Angeles | |
|---|---|---|---|

| 19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION 11944 Montana Avenue #305 | | 19E. CITY W. Los Angeles | |
|---|---|---|---|

**CAUSE OF DEATH**

21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C)

| IMMEDIATE CAUSE | (A) Congestive Heart Failure | ▶ | TIME INTERVAL BETWEEN ONSET AND DEATH Unk | 22. WAS DEATH REPORTED TO CORONER? ☒ YES 92-06897 ☐ NO HOSPITAL NUMBER |
|---|---|---|---|---|
| DUE TO | (B) Arteriosclerotic Cardiovascular Disease | ▶ | Years | 23. WAS BIOPSY PERFORMED? ☐ YES  ☒ NO |
| DUE TO | (C) | ▶ | | 24A. WAS AUTOPSY PERFORMED? ☐ YES  ☒ NO |

24B. WAS IT USED IN DETERMINING CAUSE OF DEATH? ☐ YES  ☒ NO

| 25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21 Hypertension | 26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 23? IF YES, LIST TYPE OF OPERATION AND DATE. No |
|---|---|

**PHYSICIAN'S CERTIFICATION**

| 27. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER ▶ | 27C. CERTIFIER'S LICENSE NUMBER | 27D. DATE SIGNED |
|---|---|---|---|
| 27A. DECEDENT ATTENDED SINCE MONTH, DAY, YEAR | DECEDENT LAST SEEN ALIVE MONTH, DAY, YEAR | 27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS | |

**CORONER'S USE ONLY**

| I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER Deputy Coroner Mary T. Macan | 28B. DATE SIGNED 8-07-92 |
|---|---|---|

| 29. MANNER OF DEATH—specify one: natural, accident, suicide, homicide, pending investigation or could not be determined Natural | 30A. PLACE OF INJURY | 30B. INJURY AT WORK ☐ YES  ☐ NO | 30C. DATE OF INJURY MONTH, DAY, YEAR | 31. HOUR |
|---|---|---|---|---|

| 32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY) | 33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY) |
|---|---|

**FUNERAL DIRECTOR AND LOCAL REGISTRAR**

| 34A. DISPOSITION(S) CR/RES | 34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS RES: 11944 MONTANA AVE. #305 W.LOS ANGELES, CA 90049 | 34C. DATE MO., DAY, YEAR 8/14/92 | 35A. NAME OF EMBALMER NOT EMBALMED | 35B. LICENSE NUMBER NONE |
|---|---|---|---|---|

| 36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING AS SUCH) PIERCE BROS WESTWOOD VILLAGE | 36B. LICENSE NO. FD-951 | 37. SIGNATURE OF LOCAL REGISTRAR ▶ Robert C. Mata 64 | 38. REGISTRATION DATE AUG 10 1992 |
|---|---|---|---|

**STATE REGISTRAR**

| A. | B. | C. | D. | E. | F. | CENSUS TRACT |
|---|---|---|---|---|---|---|

S-11 (REV. 3-91)

MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARTMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

70

Director of Health Services and Registrar

Q 0726

SD 00727

**EXHIBIT G**
**960**

# Last Will and Testament of

**KNOW ALL PERSONS BY THESE PRESENTS:**

That, I ___JOSEPH SHUSTER___

of _____W. Los Angeles, California_____

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

### I.

I hereby declare that I am the ___brother___ of ___JEAN ADELE PEAVY___

at the time of the execution of this Will.

### II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their ___N/A___ [mother, or father] will provide for them.

### III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my execu_trix_ as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

### IV.

I give, devise and bequeath unto ___JEAN ADELE PEAVY___ all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that ___Jean Adele Peavy___ shall predecease me, or in the event that both ___Jean Adele Peavy___ and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, ___MARK WARREN PEARY___.

### V.

I hereby nominate and appoint my ___sister___, ___Jean Adele Peavy___ executrix of this my Last Will and Testament, to act without bond. In the event that my ___sister___ is for any reason unable or unwilling to act as execu_trix_ hereof, I nominate and appoint ___Mark Warren Peary___ to act as execu_or_, also without bond.

Q 0727

SD 00728

**EXHIBIT G**

**961**

## VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my execut_rix_ settle my estate in such a manner as shall seem best and most conveniently to _her_, and I hereby empower my execut_rix_ to mortgage, lease sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

Q 0728

SD 00729

EXHIBIT G
962

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this _28_ day of _June_ 19_88_.

_Joseph Shuster_
Testator

STATE OF CALIFORNIA

County of _Los Angeles_ } ss.

Each of the undersigned, being first duly sworn on oath, states that on this _28_ day of _June_, 19_88_:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of JOSEPH SHUSTER _____ (the Testat_or_);

(2) The Testat_or_, in my presence and in the presence of the other Witnesses whose signatures appear below:

(a) Declared the foregoing instrument consisting of _one_ pages, of which this is the last to be _his_ Will;

(b) Requested me and the other Witnesses to act as Witnesses to _his_ Will and to make this affidavit; and

(c) Signed such instrument;

(3) I believe the Testat_or_ to be of sound mind, and that in so declaring and signing, _he_ was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testat_or_ and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

_Tom Fenaughty_                      _Robert ___ & Williams_
Witness                               Witness
_3374 Overland Ave #1_                _3545 Mentone Ave #3_
Address                               Address
_L.A.  Ca.    90064_                  _Los Angeles California 90034_

Witness                               _went to_
                                      _notary public office_
Address                               _in Brentwood_
                                      _and Montana_

SUBSCRIBED & SWORN to before me this _28_ day of _June_, 19_88_.

_F. Patrick Hagerty_

Notary Public in and for the State of California, residing at _Santa Monica, Calif._

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991

Q 0729



Q 0730

SD 00731

Revocable Living Trust

This trust agreement is made this day of *April 11, 1988*

between __Joseph Shuster__, the Grantor, and __Joseph Shuster__

and __Jean A. Peavy__, the Trustees.

Upon my death or incapacity, I name __Jean A. Peavy__ successor.

The Grantor, __Joseph Shuster__, hereby transfers to the

Trustees and to the Trustees' successor the property described

in the attached Schedule A. Such property and any other property

that may be received by the Trustees shall be held and may be

disposed of by the Trustees and the Trustees' successors.

The Grantor may, by signed instuments delivered to the Trustees,

revoke the Trust in whole or in part, or amend this Agreement

from time to time in any manner.

To the extent that any such requirements can be legally waived,

no Trustee shall ever be required to give any bond as Trustee or

qualify before, be appointed by, or in absence of breach of

trust, account to any court, or obtain the order or approval of any

court in the exercise of any power or discretion herein given.

IN WITNESS WHEREOF, the parties hereto have signed this

on the above-written date.

GRANTOR:        *Joseph Shuster*
                Joseph Shuster

WITNESS:        *Elvin Vivian*              *Carole Garthright*

TRUSTEES:       *Joseph Shuster*            *Jean A. Peavy*
                Joseph Shuster              Jean A. Peavy

SUCCESSOR TRUSTEE:     *Mark W. Peary*
                       Mark W. Peary

Q 0731

SD 00732

**EXHIBIT G**
**965**

Attachment To Living Trust

SCHEDULE "A"

STATE OF ___California___, COUNTY OF ___Los Angeles___

___7-11-88___
Date

___J. S.___
Grantor's Initial

The following is my property, both real and personal, in-cluded in the attached Revocable Living Trust.

1. Stock certificates

Company _____

No. of shares ___50___

Name(s) on certificates or account _____

2. Furniture and appliances

Q 0732

SD 00733

## AFFIDAVIT OF JEAN PEAVY UNDER
## CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.    The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.    The decedent died on July 30, 1992 in Los Angeles County, California.

3.    At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.    No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.    The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.    The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.    The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Time Warner Inc. Common Stock

116 Time Warner Rights

8.    No other person has a right to the interest of the decedent in the described property.

9.    The affiant requests that the described property be paid, delivered or transferred to her.

10.    The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:    August 17    , 1992

JEAN PEAVY

Q 0733

SD 00734

EXHIBIT G
967

STATE OF    NEW MEXICO            )
                                  )   ss.
COUNTY OF   BERNALILLO            )


On   August 17              , 1992, before me, a notary public for the State of  New Mexico              , personally appeared JEAN PEAVY (____) known to me or ( X ) proved to me based on satisfactory evidence to be the person whose name is subscribed to the above instrument, and she acknowledged to me that she executed the same.

**IN WITNESS WHEREOF**, I have hereunto set my hand and affixed my official seal on the day and year first above written.

SEAL:

_Barbara Dawson_
Notary Public for the
State of  New Mexico

2.

Q 0734

SD 00735

**EXHIBIT G**
**968**



Q 0735

SD 00736

**EXHIBIT G**
**969**

US Code as of: 01/05/99

Sec. 304. Duration of copyright: Subsisting copyrights

* (a) Copyrights in Their First Term on January 1, 1978. - (1)(A) Any
  copyright, the first term of which is subsisting on January 1, 1978,
  shall endure for 28 years from the date it was originally secured.
    o (B) In the case of -
        + (i) any posthumous work or of any periodical, cyclopedic, or
          other composite work upon which the copyright was originally
          secured by the proprietor thereof, or
        + (ii) any work copyrighted by a corporate body (otherwise than

          as assignee or licensee of the individual author) or by an
          employer for whom such work is made for hire, the proprietor
          of such copyright shall be entitled to a renewal and
          extension of the copyright in such work for the further term
          of 67 years.
    o (C) In the case of any other copyrighted work, including a
      contribution by an individual author to a periodical or to a
      cyclopedic or other composite work -
        + (i) the author of such work, if the author is still living,
        + (ii) the widow, widower, or children of the author, if the
          author is not living,
        + (iii) the author's executors, if such author, widow, widower,

          or children are not living, or
        + (iv) the author's next of kin, in the absence of a will of
          the
          author, shall be entitled to a renewal and extension of the
          copyright in such work for a further term of 67 years.
        + (2)
            + (A) At the expiration of the original term of copyright
              in a work specified in paragraph (1)(B) of this
              subsection, the copyright shall endure for a renewed and
              extended further term of 67 years, which -
    o (i) if an application to register a claim to such further term
      has been made to the Copyright Office within 1 year before the
      expiration of the original term of copyright, and the claim is
      registered, shall vest, upon the beginning of such further term,
      in the proprietor of the copyright who is entitled to claim the
      renewal of copyright at the time the application is made; or
    o (ii) if no such application is made or the claim pursuant to
      such application is not registered, shall vest, upon the
      beginning of such further term, in the person or entity that was
      the proprietor of the copyright as of the last day of the
      original term of copyright.

* (B) At the expiration of the original term of copyright in a work
  specified in paragraph (1)(C) of this subsection, the copyright shall
  endure for a renewed and extended further term of 67 years, which -
    o (i) if an application to register a claim to such further term
      has been made to the Copyright Office within 1 year before the
      expiration of the original term of copyright, and the claim is
      registered, shall vest, upon the beginning of such further term,
      in any person who is entitled under paragraph (1)(C) to the
      renewal and extension of the copyright at the time the
      application is made; or
    o (ii) if no such application is made or the claim pursuant to
      such application is not registered, shall vest, upon the
      beginning of such further term, in any person entitled under
      paragraph (1)(C), as of the last day of the original term of
      copyright, to the renewal and extension of the copyright.
    o (3)

Q 0736

**EXHIBIT G**
**970**

+ (A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office –

* (i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and
(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

* (B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

* (4)
    o (A) If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.
    o (B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

* (b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act. - Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.

* (c) Termination of Transfers and Licenses Covering Extended Renewal Term. - In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:
    o (1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.
    o (2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

Q 0737

SD 00738

+ (A) the widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower
owns one-half of the author's interest;

+ (B) the author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them;

+ (C) the rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpe basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them. [1]

+ **(D) In [2] the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.**
  **[2] So in original. Probably should not be capitalized.**

o (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

o (4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

+ (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

+ (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

o **(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.**

o (6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this

Q 0738

SD 00739

**EXHIBIT G**
**972**

subsection. In all cases the reversion of rights is subject to the following limitations:

+ (A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered
by the terminated grant.

+ (B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination

has been served as provided by clause (4) of this subsection.

+ (C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those

persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D)
of this clause, a further grant, or agreement to make a further
grant, of a particular author's share with respect to any right
covered by a terminated grant is valid only if it is signed by
the same number and proportion of the owners, in whom the right
has vested under this clause, as are required to terminate the
grant under clause (2) of this subsection. Such further grant

or agreement is effective with respect to all of the persons in
whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person

dies after rights under a terminated grant have vested in him

or her, that person's legal representatives, legatees, or heirs
at law represent him or her for purposes of this subclause.

+ (D) A further grant, or agreement to make a further grant, of

any right covered by a terminated grant is valid only if it is
made after the effective date of the termination. As an exception, however, an agreement for such a further grant may

be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between
the persons provided by subclause (C) of this clause, and the

original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause

o (4) of this subsection.

   + (E) Termination of a grant under this subsection affects only

   those rights covered by the grant that arise under this title,
   and in no way affects rights arising under any other Federal,

   State, or foreign laws.

Q 0739

SD 00740

+ (F) Unless and until termination is effected under this
   subsection, the grant, if it does not provide otherwise,
   continues in effect for the remainder of the extended renewal

   term.

* (d) Termination Rights Provided in Subsection (c) Which Have Expired on
or Before the Effective Date of the Sonny Bono Copyright Term Extension
Act. - In the case of any copyright other than a work made for hire,
subsisting in its renewal term on the effective date of the Sonny Bono
Copyright Term Extension Act for which the termination right provided
in subsection (c) has expired by such date, where the author or owner
of the termination right has not previously exercised such termination
right, the exclusive or nonexclusive grant of a transfer or license of
the renewal copyright or any right under it, executed before January 1,
1978, by any of the persons designated in subsection (a)(1)(C) of this
section, other than by will, is subject to termination under the
following conditions:
   o (1) The conditions specified in subsections (c)(1), (2), (4),
      + () The conditions specified in subsections (c)(1), (2), (4),
      years of copyright term as provided by the amendments made by
      the
      Sonny Bono Copyright Term Extension Act.
      + (2) Termination of the grant may be effected at any time
      during
      a period of 5 years beginning at the end of 75 years from the

      date copyright was originally secured.
---------------------------------------------------------------------

Footnotes

[1] So in original. The period probably should be a semicolon.

Q 0740

SD 00741

EXHIBIT G
974

LEXSEE 112 stat 2827

UNITED STATES PUBLIC LAWS
105th Congress -- 2nd Session
(c) 1998, LEXIS-NEXIS, A DIVISION OF REED ELSEVIER INC. AND REED ELSEVIER PROPERTIES INC.

PUBLIC LAW 105-298 [S. 505]

OCT. 27, 1998

[SONNY BONO COPYRIGHT TERM EXTENSION ACT; FAIRNESS IN MUSICAL LICENSING ACT OF 1998]

*105 P.L. 298; 112 Stat. 2827; 1998 Enacted S. 505; 105 Enacted S. 505*

BILL TRACKING REPORT:        105 Bill Tracking S. 505
FULL TEXT VERSION(S) OF BILL:  105 S. 505
CIS LEGIS. HISTORY DOCUMENT:    105 CIS Legis. Hist. P.L. 298

An Act

To amend the provisions of title 17, United States Code, with respect to the duration of copyright, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

TITLE I--COPYRIGHT TERM EXTENSION

[*101]  SEC. 101. <17 USC 101 note> --SHORT TITLE.

This title may be referred to as the "Sonny Bono Copyright Term Extension Act".

[*102]  SEC. 102. DURATION OF COPYRIGHT PROVISIONS.

(a) Preemption With Respect to Other Laws.--Section 301(c) of title 17, United States Code, is amended by striking "February 15, 2047" each place it appears and inserting "February 15, 2067".

(b) Duration of Copyright: Works Created on or After January 1, 1978.--Section 302 of title 17, United States Code, is amended--

(1) in subsection (a) by striking "fifty" and inserting "70";

(2) in subsection (b) by striking "fifty" and inserting "70";

(3) in subsection (c) in the first sentence--

(A) by striking "seventy-five" and inserting "95"; and

(B) by striking "one hundred" and inserting "120"; and

(4) in subsection (e) in the first sentence--

(A) by striking "seventy-five" and inserting "95";

(B) by striking "one hundred" and inserting "120"; and

(C) by striking "fifty" each place it appears and inserting "70".

Q 0741

SD 00742

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(c) Duration of Copyright: Works Created but Not Published or Copyrighted Before January 1, 1978.--Section 303 of title 17, United States Code, is amended in the second sentence by striking "December 31, 2027" and inserting "December 31, 2047".

(d) Duration of Copyright: Subsisting Copyrights.--

(1) In general.-- Section 304 of title 17, United States Code, is amended--

(A) in subsection (a)--

(i) in paragraph (1)--

(I) in subparagraph (B) by striking "47" and inserting "67"; and

(II) in subparagraph (C) by striking "47" and inserting "67";

[**2828] (ii) in paragraph (2)--

(I) in subparagraph (A) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67"; and

(iii) in paragraph (3)--

(I) in subparagraph (A)(i) by striking "47" and inserting "67"; and

(II) in subparagraph (B) by striking "47" and inserting "67";

(B) by amending subsection (b) to read as follows:

"(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act.--Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.";

(C) in subsection (c)(4)(A) in the first sentence by inserting "or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2)," after "specified by clause (3) of this subsection,"; and

(D) by adding at the end the following new subsection:

"(d) Termination Rights Provided in Subsection (c) Which Have Expired on or Before the Effective Date of the Sonny Bono Copyright Term Extension Act.--In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

"(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

"(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.".

(2) Copyright amendments act of 1992.-- Section 102 of the Copyright Amendments Act of 1992 (Public Law 102-307; 106 Stat. 266; 17 U.S.C. 304 note) is amended--

(A) in subsection (c)--

(i) by striking "47" and inserting "67";

(ii) by striking "(as amended by subsection (a) of this section)"; and

(iii) by striking "effective date of this section" each place it appears and inserting "effective date of the Sonny Bono Copyright Term Extension Act"; and

Q 0742

SD 00743

105 P.L. 298, *; 112 Stat. 2827, **;
1998 Enacted S. 505; 105 Enacted S. 505

(B) in subsection (g)(2) <17 USC 101 note> in the second sentence by inserting before the period the following: ", except each reference to forty-seven years in such provisions shall be deemed to be 67 years".

[**2829]   [*103] SEC. 103. TERMINATION OF TRANSFERS AND LICENSES COVERING EXTENDED RENEWAL TERM.

Sections 203(a)(2) and 304(c)(2) of title 17, United States Code, are each amended--

(1) by striking "by his widow or her widower and his or her children or grandchildren"; and

(2) by inserting after subparagraph (C) the following:

"(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.".

[*104] SEC. 104. REPRODUCTION BY LIBRARIES AND ARCHIVES.

Section 108 of title 17, United States Code, is amended--

(1) by redesignating subsection (h) as subsection (i); and

(2) by inserting after subsection (g) the following:

"(h)(1) For purposes of this section, during the last 20 years of any term of copyright of a published work, a library or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display, or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.

"(2) No reproduction, distribution, display, or performance is authorized under this subsection if--

"(A) the work is subject to normal commercial exploitation;

"(B) a copy or phonorecord of the work can be obtained at a reasonable price; or

"(C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.

"(3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such library or archives.".

[*105] SEC. 105. VOLUNTARY NEGOTIATION REGARDING DIVISION OF ROYALTIES.

It is the sense of the Congress that copyright owners of audiovisual works for which the term of copyright protection is extended by the amendments made by this title, and the screenwriters, directors, and performers of those audiovisual works, should negotiate in good faith in an effort to reach a voluntary agreement or voluntary agreements with respect to the establishment of a fund or other mechanism for the amount of remuneration to be divided among the parties for the exploitation of those audiovisual works.

[*106] SEC. 106. <17 USC 108 note> EFFECTIVE DATE.

This title and the amendments made by this title shall take effect on the date of the enactment of this Act.

[**2830]     TITLE   II--MUSIC   LICENSING   EXEMPTION   FOR   FOOD   SERVICE   OR DRINKINGESTABLISHMENTS

[*201] SEC. 201. <17 USC 101 note> --SHORT TITLE.

This title may be cited as the "Fairness In Music Licensing Act of 1998".

[*202] SEC. 202. EXEMPTIONS.

(a) Exemptions for Certain Establishments.--Section 110 of title 17, United States Code, is amended--

(1) in paragraph (5)--

(A) by striking "(5)" and inserting "(5)(A) except as provided in subparagraph (B),"; and

Q 0743

SD 00744

# RODI·POLLOCK

JOHN O. CAHILL
JOHN D. PETTKER
WILLIAM R. CHRISTIAN
HENRY P. PRAMOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
TIMOTHY G. CEPERLEY
ALFRED KLEIN
KENNETH A. FRANKLIN
WADE E. NORWOOD
PRIYA G. BHATT
ANDREW W. BODEAU
JEAN M. BEASLEY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 895-4900

KARL B. RODI (1908-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1896-1973)

OF COUNSEL
JOHN P. POLLOCK
ROBERT A. YAHIRO
DAVID K.W. CHANG

TELECOPIERS
(213) 895-4921
(213) 895-4922
(213) 895-4750

OUR FILE NUMBER

June 30, 2003

Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

*FIRST DRAFT LETTER*
*MODIFIED AFTER*
*MT COMMENTS )*
*NOT EXECUTED*

Jean Peavy
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

Re:    Agreement for Professional Services

Dear Marc and Jean:

We are pleased to confirm that Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), will represent Jean in connection with her petition for appointment as personal representative of the estate of Joseph Shuster, deceased. You have informed us that Mr. Shuster died on July 30, 1992. We understand that, at this point, our representation will be limited to seeking the appointment of Jean as personal representative so that she, in such capacity, may terminate prior transfers of Mr. Shuster's copyrights pursuant to 17 U.S.C. §304(c)(2)(D). Our representation will not involve general administration of the estate, because, at the present time, there are no assets that require probate administration.

The Firm will render legal services to Jean in accordance with the enclosed Standard Terms of Retention, which are incorporated herein by this reference, and which we ask you to carefully review. If we subsequently perform any additional services for either of you, these terms will apply to such services as well, unless a new agreement is made.

It is our understanding that Marc has agreed to pay our fees for legal services and to reimburse us for costs advanced. We are aware that there are no assets within the estate to pay our fees and expenses. We have agreed, therefore, that it would be inappropriate to base our fees as statutorily determined under the California Probate Code as a percentage of the value of the estate. As we discussed with Marc, the rate of fees for legal services rendered by the Firm will be calculated on the basis of the time expended. While I expect that I will be performing most of the legal services on your behalf, instances may arise where I delegate duties to other individuals who will perform services or where we seek the expertise of one or more other principals within the Firm. My current hourly rate is $325.00. The current hourly rates for services rendered by other lawyers in the Firm range from $200.00 to $350.00 per hour, and paralegals are currently billed at $125.00 to $175.00 per hour. These rates are subject to change from time to time without notice.

Q 0744

**Privileged & Confidential**
**All Rights Reserved**

SD 00745

Marc Toberoff, Esq.
Jean Peavy
June 24, 2003
Page 2

In addition, we request that Marc pay the Firm a retainer of $2,500.00 which will be placed in our client trust account and will be applied against attorneys' fees and costs incurred by you. A retainer is a deposit against fees and costs that will be incurred in the representation, and it is not, and should not be considered as, either an estimate of total fees or a flat fee for the work to be done.

This amount will be deposited by the Firm in an interest-bearing trust account. You hereby authorize the Firm to withdraw the principal from the trust account to pay attorneys' fees and costs as they are incurred by you or, as to costs, by us on your behalf. In accordance with state law and the requirements of the State Bar of California, any interest earned will be paid to the State Bar to fund legal services for indigent persons. If, at the termination of service under this agreement, the total amount incurred by you for attorneys' fees and costs is less than the amount of the deposit, the difference will be refunded to you.

Also enclosed with this letter is a copy of our Firm's Privacy Policy, which we ask you to review. Please confirm your agreement to the terms of this letter and the Standard Terms of Retention by dating and signing in the spaces provided below and returning this letter to me as soon as possible. If you have any questions about the terms of this agreement, including the Standard Terms of Retention or the Firm's Privacy Policy, please contact me as soon as possible to discuss them. Enclosed is a copy of this letter for your records.

We look forward to working with you on this matter.

Very truly yours,

John D. Pettker

Attachments:
    Standard Terms of Retention
    Notice of Privacy Policy

**AGREED TO AND ACCEPTED:**

_____
Marc Toberoff, Esq.                    Date: _____, 2003

_____
Jean Peavy                             Date: _____, 2003

Q 0745

**Privileged & Confidential**
**All Rights Reserved**

SD 00746

**EXHIBIT G**
**979**

**STANDARD TERMS OF RETENTION**
**RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL**
**A LAW CORPORATION**

Except as modified in writing, the following provisions will apply to the relationship between Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation (the "Firm"), and you:

1.    Fees.  Fees for our services will be based on time spent and hourly billing rates current at the time that the services are performed.  The billing rates of our attorneys and legal assistants vary, depending generally on the experience and capabilities of the attorney or legal assistant involved, and we adjust these rates from time to time.  The time for which you will be charged will include, but will not be limited to, time spent in telephone and office conferences with you and with other counsel, witnesses, consultants, court personnel and others; factual investigation; legal research; responding to your requests for us to provide information to auditors in connection with reviews or audits of financial statements; drafting of letters, agreements, pleadings, briefs and other documents; traveling; court appearances, including waiting in court; and depositions and other discovery proceedings.

2.    Costs.  In addition to our fees, we will bill you separately, and typically monthly, for costs and expenses incurred and ancillary services provided such as photocopying, messenger and delivery service, computerized research, travel (including mileage, parking, airfare, lodging, meals and ground transportation), telephone, telecopying, secretarial overtime, court costs and filing fees.  Unless special arrangements are made, we do not take responsibility for paying fees and expenses of others, which will be the responsibility of and may be billed directly to you.

3.    Retainer.  In addition to any retainer to which you have agreed, the Firm reserves the right, as a condition to providing further services, to request an increase in the retainer in the event that the amount of work which we are called upon to perform, or expenses we are required to incur or advance, exceeds this Firm's current expectation.

4.    Estimates Not Binding.  Although we may furnish estimates of fees or costs that we anticipate will be incurred, these estimates are not intended to be binding, are subject to unforeseen circumstances, and are by their nature inexact.

5.    Billing and Payment.  Fees and expenses will generally be billed monthly and are payable upon presentation.  We expect prompt payment.  We reserve the right to postpone or defer providing additional services or to discontinue our representation if billed amounts are not paid when due.  We will be entitled to assume that you have raised any questions you have about a bill within 20 days of receipt.

6.    Cooperation.  You will cooperate fully in our efforts on your behalf.

7.    Termination By You.  You have the right at any time, in your sole discretion, to terminate our services and representation.  Upon our termination, you will remain obligated to pay for all services rendered and costs or expenses paid or incurred on your behalf prior to the date of such termination or which are reasonably necessary thereafter.

8.    Termination By Us.  We reserve the right to withdraw from representing you if, among other things, you fail to honor the terms of our engagement letter, you fail to cooperate or follow our advice on a material matter, or any fact or circumstance occurs that would, in our view, render our continuing representation unlawful or unethical.  If we elect to withdraw, you will take all steps necessary to free us of any obligation to perform further services, including the execution of any documents necessary to complete our withdrawal, and we will be entitled to be paid at the time of withdrawal for all services rendered and costs and expenses paid or incurred on your behalf.

9.    Date of Termination.  Our representation of you will be considered terminated at the earlier of (i) your termination of our representation, (ii) our withdrawal from our representation of you, or (iii) the substantial completion of our substantive work for you.

10.    Related Activities.  If any claim or action is brought against us or any personnel of the Firm based on your negligence or misconduct, or if we are asked to testify as a result of our representation of you or must defend the confidentiality of your communications in any proceeding, you agree to pay us for any resulting costs or damages, including our time, even if our representation of you has ended.

11.    No Guarantee of Outcome.  We do not and cannot guarantee any outcome in a matter.

1

Q 0746

SD 00747

**EXHIBIT G**
**980**

12.  Conflicts.  Our ethic  obligations will require us, while this repres  ntation is ongoing, to decline any other engagements which conflict directly with this representation unless you otherwise consent.  When this representation is concluded, however, you understand that we will not be excluded from accepting a representation adverse to you, except where there is a substantial relationship between that representation and our present representation of you.  Naturally, we will not disclose any confidential information received in the course of our representation of you in any future representation without your consent, just as we will not disclose to you the confidences of our other clients even if that might be to your advantage.

13.  Client.  As set forth in our letter accompanying these Standard Terms of Retention, you are the Firm's client for purposes of our representation.  Unless expressly agreed otherwise, we are not undertaking the representation of (i) any person or entity related or affiliated with you; (ii) any of your relatives (including parents, children or brothers/sisters), subsidiaries, or affiliated corporations or entities; and (iii) any members, officers, directors, agents or employees of you or of any related or affiliated entities.

14.  Payment Notwithstanding Dispute.  In the event of any dispute that relates to our entitlement to any payment from you, all undisputed amounts shall be paid by you.  Any amounts in any client trust account held on your behalf, sufficient to pay the disputed amounts, shall continue to be held in such trust account until the final disposition of the dispute.

15.  Document Retention and Destruction.  In the course of our representation of you, we are likely to come into possession of copies or originals of documents or other materials belonging to you or others (collectively "materials").  Once the particular matter to which those materials relate has been concluded, this Firm will have no further responsibility to maintain such materials.  If you have not sought the return of such materials within one year of the closing of the matter to which such materials relate, we will thereupon have the right to destroy such materials.

16.  Interest.  All statements are due and payable within thirty days.  We reserve the right to charge simple interest at 10% per annum on all sums, whether for fees or reimbursement of costs, not paid within thirty days of the rendering of our statement.  Our failure to impose this interest charge on any occasion, or on multiple, numerous, and even repetitive occasions, is not a waiver of our right to thereafter impose this charge on unpaid amounts from the thirty-first day after each unpaid amount was initially billed.

17.  Application to Subsequent Matters.  The agreement reflected in these Terms of Retention, and in the accompanying letter, apply to our present representation of you and to any subsequent matters which we agree to undertake on your behalf.

18.  Attorney's Lien.  The Firm will have a lien for attorneys' fees and costs advanced on all claims and causes of action that are the subject of the Firm's representation of you under the agreement reflected in these Terms of Retention and in the accompanying letter, and on all proceeds of any recovery obtained (whether by settlement, arbitration award, or court judgment).

19.  ARBITRATION.  IN THE EVENT OF A DISPUTE BETWEEN YOU AND THE FIRM REGARDING FEES, COSTS, OR ANY OTHER MATTER RELATED TO OR ARISING OUT OF OUR ENGAGEMENT BY YOU, OR ARISING OUT OF YOUR OR OUR PERFORMANCE OF THE AGREEMENT PURSUANT TO WHICH OUR SERVICES ARE PERFORMED (INCLUDING THE QUALITY OF THE SERVICES WHICH WE RENDER), YOU HAVE THE RIGHT TO HAVE THE DISPUTE DETERMINED, SETTLED AND RESOLVED BY CONFIDENTIAL ARBITRATION PURSUANT TO CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 6200-6206 WHICH PROVIDE PROCEDURES FOR ARBITRATION BEFORE THE STATE BAR OF CALIFORNIA OR BEFORE THE ATTORNEY-CLIENT RELATIONS DEPARTMENT OF THE LOS ANGELES COUNTY BAR ASSOCIATION.  ARBITRATION UNDER THE CODE IS VOLUNTARY FOR CLIENTS BUT MANDATORY FOR LAW FIRMS.  IF YOU SELECT ARBITRATION, ANY AWARD SHALL BE FINAL, BINDING AND CONCLUSIVE UPON THE PARTIES, AND A JUDGMENT RENDERED THEREON MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.  IF YOU DO NOT SELECT ARBITRATION, ANY DISPUTE MAY BE DETERMINED BY A COURT OF LAW ON AN ACTION BROUGHT BY EITHER PARTY.  THE PREVAILING PARTY IN ANY SUCH ARBITRATION OR COURT ACTION SHALL BE ENTITLED TO REASONABLE ATTORNEYS' FEES AND COSTS.  YOU AND THE FIRM AGREE THAT VENUE FOR ANY SUCH ARBITRATION OR COURT ACTION SHALL BE IN LOS ANGELES COUNTY, CALIFORNIA, AND FURTHER AGREE TO SUBMIT TO THE PERSONAL JURISDICTION OF THE ARBITRATOR OR THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES.

Q 0747

SD 00748

**EXHIBIT G**
981

# RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
## A LAW CORPORATION

### NOTICE OF PRIVACY POLICY

Law firms that provide tax planning and tax preparation services to individuals are now required by law[1] to inform their tax clients of the law firm's policies regarding privacy of client information. As attorneys, we have been and continue to be bound by rules of professional conduct that mandate more stringent rules of confidentiality of client matters and information than those required by law. Consequently, it has always been our policy to protect your right to privacy. The purpose of this Notice is to advise you with respect to what nonpublic information we collect, and how we use it.

### TYPES OF NONPUBLIC PERSONAL INFORMATION WE COLLECT

Generally, nonpublic personal information is personally identifiable financial information that is not publicly available. We collect nonpublic personal information about you that you provide to us, or that is obtained by us with your authorization.

### PARTIES TO WHOM WE DISCLOSE INFORMATION

**For current or former clients, we do not disclose any nonpublic personal information obtained in the course of our practice to anyone except as required or permitted by law, or as may be authorized by you.** Permitted disclosures include, for example, providing information to our employees and, in limited situations, to unrelated third parties, who need to know such information to assist us in providing services to you. In all such situations, such information is disclosed to process, administer, carry out or enforce your rights or to facilitate the transaction we are working on for you, and we stress the confidential nature of the information being shared with such parties.

### PROTECTING THE CONFIDENTIALITY AND SECURITY OF CLIENT'S INFORMATION

We retain records relating to professional services that we provide so that we are better able to assist you with your professional needs, and in some cases to comply with professional guidelines. We maintain physical, electronic, and procedural safeguards that comply with federal regulations and applicable state law, as well as our professional standards, in order to protect and safeguard your nonpublic personal information and privacy.

### IF YOU HAVE QUESTIONS

Please call if you have any questions, because your privacy, our professional ethics, and the ability to provide you with quality financial services are very important to us. You can reach us at: Elizabeth Blakely (213) 895-4900 x 237 [ebb@rodipollock.com] or Maureen Varnes (213) 895-4900 x 234 [mov@rodipollock.com].

Document7

---

[1] Section 504(a) of the Gramm-Leach-Bliley Act (Public Law 106-102) and Title 16, Part 313 of the Code of Federal Regulations

Q 0748

SD 00749

JUL-08-2003 11:27 PM                                    1 310 827 7227                    P.01

**LAURA SIEGEL LARSON**
6400 PACIFIC AVENUE #106
PLAYA DEL REY, CA  90293
(310) 827-8136
FAX  (310) 827-7227
July 8, 2003

## FAX TRANSMITTAL

**TO:**       Marc Toberoff

**FAX#:**     (310) 246-3101

**FROM:**     Laura Siegel Larson

**PHONE:**    (310) 827-8136

Page 1 of 6

**MESSAGE:**

Dear Marc,

Please see attached.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0749

**Privileged & Confidential**
**All Rights Reserved**

SD 00750

**EXHIBIT G**
**983**

JUL-08-2003 11:27 PM                                    1 310 827 7227    P.02

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 5, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
- It was a bogus offer filled with unacceptable land mines
- They wanted us to <u>warrant we had no rights</u> which is completely false
- They insisted on a deal that included characters that had nothing to do with Superman
- They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain
- They even wanted us to sign away the public domain rights we'd one day have
- As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them
- It was a bad and unreasonable deal

Page 1                                                      Q 0750

**Privileged & Confidential**
**All Rights Reserved**

SD 00751

**EXHIBIT G**
**984**

JUL-08-2003 11:28 PM                                    1 310 827 7227          P.03

-You and Don Bulson stated that you couldn't believe how bad the document was that they
    had written

<u>Our opinion as to why this has not been like other "contract negotiations":</u>
-Time Warner is a huge, and we believe, arrogant company
-They took months to respond to each issue all along the way and their responses were
    unacceptable,
-We believe their lawyers are particularly heartless and they have a had reputation for
    grinding individuals in negotiations
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as
    losing it.
-They want to make an example of us so that other creators and their heirs won't go after
    their rights.

<u>Marc Toberoff and the Shuster interest:</u>
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could
    reacquire rights as we have via Terminations. Then the Shusters would have to
    negotiate a deal or handle things as they choose.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest in 2013
-We have no intention of waiting until 2013 to do something with the Siegel rights

<u>We went to Marc to talk about him representing the Siegels. Marc did not pursue us:</u>
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC
    deal. You'll remember that you, Don Bulson and we were shocked when Kevin
    Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks
    and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc Toberoff away saying we had a deal with DC which we did
    not have.
-Marc did not call my mom nor me
-My mom called the Shuster family to see what the Shusters were doing
-The family gave Marc's number to my mom and she called him after we had fired Ramer
    and Marks
-We felt Marc grasped our situation very well and was sympathetic to author's rights
-Marc Toberoff has no plans to produce a Superman movie

<u>Why the original investor left:</u>
-Kevin Marks told Marc we had a deal with DC
-Marc told this to the investor who found another place to invest his money
-Marc did not know we did not have a deal with DC until later when we contacted him

                            Page 2

Privileged & Confidential
All Rights Reserved

                                                        Q 0751

                                                        SD 00752

                    EXHIBIT G
                        985

JUL 08 2003 11:28 PM                                                        1 310 827 7227              P.04

<u>With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:</u>
   -We did this to further assert the Siegel rights to this character
   -My mom advanced the $4,000 filing fees to the Copyright Office in November 2002
   -A copy of the $4,000 check which was recently processed by the Copyright Office is
      enclosed
   -The canceled check was not sent to my mom by her bank until recently. This was after we
      sent the itemization of other expenses to Don Bulson.
   -Your 25% of this expense is $1,000. We are also sending this to Don and it will be
      included in the settling of the account before the money being held in trust is
      forwarded to you by Marc.

<u>Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:</u>
   -Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the
      copyright filing while he was negotiating although she told him several times that she
      wanted to send in the fees. (handwritten note)
   -Kevin did not tell us there was a time limit on when the fees could be paid
   -When negotiations were terminated, we found out from the Copyright Office it was too late
      to pay the fees
   -The window to reacquire our share of the Spectre rights through Termination is,
      unfortunately, no longer open

<u>Why Marc has not been negotiating with Time Warner:</u>
   -The fact that Time Warner doesn't know what to expect from us since we broke off
      negotiations and turned down their last offer gives us strength
   -By not running to them right away, we do not appear desperate and needy, willing to take
      a bad deal
   -Timing the negotiations is an art
   -When we were in our last negotiations with Time Warner, they were moving ahead on a
      Superman movie with a top director, Brett Ratner. TW was trying to sign the director
      and actors to a three picture deal. Now the film appears to be on hold, the director
      left and stars are repeatedly turning down offers to play the role of Superman in the
      three projected films.
   -We believe that with far less happening on the Superman movie right now, our negotiating
      power is even less with Time Warner than when they offered us that bad deal. Right
      now, there's nothing really happening so there is no motivation for them to wrap up
      a deal with us.

<u>Why there is a buyout offer from an investor for your interest only:</u>
   -My interests are too entangled due to my divorce
   -You have been saying you needed money badly, were out of work and had big bills
   -We have not received an offer from the investor. Apparently the investor does not want to
      pay the higher amount that would be required to buy 100% of the Siegel interest (as
      opposed to your 25%)
   -Marc first asked our permission to present an offer to you and we decided not to stand in
      your way if you want to accept it.

Page 3

Q 0752

Privileged & Confidential
All Rights Reserved

EXHIBIT G
986

SD 00753

JUL-08-2003 11:29 PM

**Why I think any investor would offer less than Time Warner did in its last offer:**

- It is a risky investment
- No immediate or guaranteed payback
- The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in. If we eventually make a deal with TW/DC, they may withhold payment due to "creative bookkeeping" or for other reasons that we can't currently predict
- Any investor would want some protection and a worthwhile profit on his investment
- It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate. And that's more certain than this.

**Your belief that you have something to sell independently:**

- Since you did not take part in the actual Termination, you do not have legal title to the copyright
- You therefore have no right to sell any copyright interest
- You only have a right to receive a portion of the money that we receive, if any.
- Your right to receive money is known as a passive financial interest.
- In addition, we believe that since my mom and I hold legal title to the Copyright Termination Interest, you cannot sell even your passive financial interest to a third party without approval from my mom and me
- We will not give approval for a sale by you of your passive financial interest to Time Warner because it would damage the overall Siegel interest
- We will give approval for a sale by you of your passive financial interest to a third party monitored by Marc Toberoff as long as it is not Time Warner, DC Comics, or any affiliated company and providing the sale does not damage our ability to make a deal for our portion of the Siegel interest

**Why you cannot ask Time Warner/DC for a buyout:**

- As the controlling interest, we do not give you approval to do it
- It damages the possibility of us negotiating a fair deal
- It shows weakness which Time Warner will take full advantage of and grind you in any deal.
- Because Time Warner would get so little from you--a 12 1/2% passive financial interest in the character--that would be reflected in a low amount of money paid to you
- If it damaged our ability to later make a better deal, We would have no choice but to hold you accountable for any harm to us

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found. That decision has to be yours and yours alone.

However, for the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from any point of view.

Page 4                                                    Q 0753

Privileged & Confidential
All Rights Reserved

SD 00754

JUL 08-2003 11:29 PM                                    1 310 827 7227        P.08

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the reality of dealing with Time Warner we must all face.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincerely condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

Laura

Enclosure

Q 0754

Privileged & Confidential
All Rights Reserved

SD 00755

EXHIBIT G
988

**LAURA SIEGEL LARSON**
6400 PACIFIC AVE. #106
PLAYA DEL REY, CA 90293
(310) 827-8136

July 11, 2003

# FAX TRANSMITTAL

TO:        Marc Toberoff
FAX#:      (310) 246-3101

FROM:      Laura Siegel Larson
PHONE:     (310) 827-8136

RE:        Letter Sent to Michael Siegel

                          Page 1 of 6

MESSAGE:

Dear Marc,

Enclosed is the final letter sent to Michael Siegel today.

Sincerely,

*Laura*

Q 0755

Privileged & Confidential
All Rights Reserved

SD 00756

EXHIBIT G
989

Laura Siegel Larson
6400 Pacific Avenue #106
Playa Del Rey, CA 90293

July 11, 2003

Dear Michael,

Thank you for your May 13th letter. I hope you received the sympathy card from my mother and me with our condolences over the loss of your mother.

This is my first opportunity to answer your letter due, in part, to my health but also to the extremely time-consuming and complex nature of my divorce which is far from over. In fact, I have to work on aspects of it every day. It is especially difficult because my ex-husband is a lawyer representing himself and he is using every trick in the legal system to complicate matters.

One of the many issues I am dealing with involves the Copyright Terminations. He is trying to get the Court to award him half of my rights to Superman and other properties created by our father, claiming they should be treated as community property. This is a particularly difficult fight because there are no legal precedents for a case like mine and finding a lawyer who knows both Copyright Termination Law and California Divorce and Family Law is like looking for a needle in a haystack. My divorce attorney is doing her best but it's a tough fight. The Judge doesn't know anything about Copyright Law. The decision that will be made in my case in a few weeks will set the precedent for all heirs of author-creators who receive intellectual property rights through Termination and later go through a divorce. It would be a tragedy not only for me but for all intellectual property creators and their heirs if the true intent of the Copyright Law is ignored and this issue is lost.

Now to the issues you raised in your letter. There are many so I will try to group my answers so I don't miss anything. Because I am still pressed for time I am writing the following in outline form. It is simpler for me that way and, I hope, clearer.

<u>Outline of Topics:</u>

<u>Our opinion regarding the Time Warner-DC offer:</u>
-It was a bogus offer filled with unacceptable land mines.
-They wanted us to <u>warrant we had no rights</u> which is completely false.
-They insisted on a deal that included characters that had nothing to do with Superman.
-They wanted us to sign away the ability to get anything additional if the copyright law changes to give creators and their families additional rights or if an extension of time is one day given to rights holders before the property goes into the public domain.
-They even wanted us to sign away the public domain rights we'd one day have.
-As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them.
-It was a bad and unreasonable deal.

Page 1

Q 0756

Privileged & Confidential
All Rights Reserved

SD 00757

EXHIBIT G
990

-You and Don Bulson stated that you couldn't believe how bad the document was that they had written.

Our opinion as to why this has not been like other "contract negotiations":
-Time Warner is a huge, and we believe, arrogant company.
-They took months to respond to each issue all along the way and their responses were unacceptable, self-serving and one-sided.
-We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations.
-This conflict has a long, tortured history and Time Warner doesn't want to be viewed as losing it.
-They want to make an example of us so that other creators and their heirs won't go after their rights by Termination or otherwise.

Marc Toberoff and the Shuster interest:
-Marc does not control the Superman copyright. He has been hired to do a job.
-Marc does not own the Shuster interest. He is a lawyer hired by Joe Shuster's estate.
-In 2013, Marc doesn't "take" the copyright from Time Warner, Shuster's estate could reacquire rights as we have via Terminations. Then the Shusters would have to negotiate a deal with Time Warner.
-The Shuster rights are completely separate from the Siegel rights.
-Time Warner/DC will own the Shuster rights until they vest with the Shusters in 2013 at the earliest.

We went to Marc to talk about him representing the Siegels. Marc did not pursue us:
-We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal. You'll remember that you, Don Bulson and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.
-Neither Kevin Marks nor Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.
-Kevin Marks had turned Marc away saying we had a deal with DC when we did not.
-Marc did not call my mom nor me.
-My mom called the Shuster family to see what the Shusters were doing.
-The family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.
-We felt Marc grasped our situation very well and was sympathetic to author's rights.
-Marc Toberoff has no plans to produce a Superman movie.

Why the original investor left:
-Kevin Marks told Marc we had a deal with Time Warner/DC.
-Neither Kevin Marks nor Don Bulson responded to the interest of the investor.
-Marc told the above to the investor who found another place to invest his money.
-Marc did not know we did not have a deal with TW/DC until later when we contacted him.

Q 0757

Privileged & Confidential
All Rights Reserved

SD-00758

EXHIBIT G
991

With Marc's assistance, a new Notice of Termination regarding Superboy was sent out:
- We did this to further assert the Siegel rights to this character.
- My mom advanced the $4,000 filing fees to the Copyright Office in November 2002.
- A copy of the $4,000 check which was recently processed by the Copyright Office is enclosed.
- The canceled check was not sent to my mom by her bank until recently. This was after we sent the itemization of other expenses to Don Bulson.
- Your 25% of this expense is $1,000. We are also sending this to Don and it will be included in the settling of the account before the money being held in trust is forwarded to you by Marc.

Unfortunately we've discovered that The Spectre Termination did not vest for the Siegel family:
- Kevin Marks repeatedly told my mom not to pay the fees to the Copyright Office for the copyright filing while he was negotiating with Time Warner. He said she shouldn't waste thousands of dollars of her money for the filing fees because Time Warner/DC was going to include payment for The Spectre in a deal. She told him several times that she wanted to send in the fees but he kept telling her it wasn't a good time and it was unnecessary.
- Kevin did not tell us there was a time limit on when the fees could be paid.
- When negotiations were terminated, we found out from the Copyright Office it was too late to pay the fees.
- The window to reacquire our share of the Spectre rights through Termination is, unfortunately, no longer open.

Why Marc has not been negotiating with Time Warner:
- The fact that Time Warner doesn't know what to expect from us since we broke off negotiations and turned down their last offer gives us strength.
- By not running to them right away, we do not appear desperate and needy, willing to take a bad deal.
- Timing the negotiations is an art.
- When we were in our last negotiations with Time Warner, they were moving ahead on a Superman movie with a top director. TW was trying to sign the director and actors to a three picture deal. Now even a single film appears to be on hold indefinitely. The director left the project and stars are repeatedly turning down offers to play the role of Superman.
- We believe that with far less happening on the Superman movie right now, our negotiating leverage with Time Warner is less than when they offered us that bad deal. Right now, there's nothing really happening so there is no motivation for them to wrap up a deal with us.

Why there is a buyout offer from an investor for your interest only:
- You have been saying you needed money badly, were out of work and had big bills.
- Marc asked our permission to present the investor's offer to you and we decided not to stand in your way if you want to accept it.
- My interests are too entangled due to my divorce.

Page 3

Q 0758

Privileged & Confidential
All Rights Reserved

SD 00759

EXHIBIT G
992

-We have not received an offer from the investor. Apparently the investor wants some stake in Superman but does not want to pay the higher amount that would be required to buy 100% of the Siegel interest (as opposed to your 25%).

<u>Why I think any investor would offer less than Time Warner did in its last offer</u>:
-It is a risky investment.
-Any investor would want some protection and a worthwhile profit on his investment.
-There is no immediate or guaranteed payback.
-Your interest is only a passive financial interest (25% of what we get) with no decision making power.
-The investor may well face legal expenses and ongoing litigation with Time Warner in the future. For instance, we may have to sue to have a Court define the "profits" we participate in, to combat Time Warner/DC's "creative bookkeeping" or for other reasons that we can't currently predict.
-It is a situation that sounds similar to one in which businesses give immediate money to beneficiaries of Wills who do not want to wait until the Will goes through Probate to receive their money. The beneficiaries always get less if they do this than if they wait for the Will to go through Probate and Wills are more certain than this.

<u>Your belief that you have something to sell independently</u>:
-We empathize with the fact that this will be upsetting to you, but we have recently learned that under the law, you do not have the right to sell a copyright interest because since you did not take part in the actual Termination, you do not have legal title to the Siegel copyright interest.
-You only have a right to receive 25% of the money that we receive, if any.
-In addition, we believe that you are not allowed to sell that passive financial interest to a third party without our approval.
-We can't approve even an attempt to sell your passive financial interest to Time Warner because we believe it would be destructive to the overall Siegel interest.
-We would, therefore, have no choice and would be forced to hold you accountable for any harm to us.
-We will, however, give approval for a sale by you to a third party monitored by Marc Toberoff, if you want it, as long as it is not Time Warner, DC Comics, or any affiliated company.

<u>Why Time Warner/DC will not buy your interest (or would offer you far less than 25% of their last offer)</u>:
-Since Time Warner would know that we wouldn't give approval for you to approach them, they might see dealing with you as subjecting them to additional liability.
-If you approached them, it would show weakness and a division among us which Time Warner would take full advantage of and use against all of us.
-Even an <u>attempt</u> by you to separately sell to Time Warner would weaken us all in their eyes.
-Because Time Warner would get so little from you--a passive financial interest (25% of what we receive, if anything)--that would be reflected in a very low-ball amount of money offered to you.

Q 0759

Page 4

Privileged & Confidential
All Rights Reserved

SD 00760

EXHIBIT G
993

In conclusion, the Termination process and the unsuccessful negotiations with Time Warner have taken a long time and we have no idea when or if we will ever reach a fair and acceptable settlement. I know you are not happy about this. It doesn't make my mom and me happy either but this is the unfortunate reality of dealing with Time Warner which we all face.

For the reasons listed above, we will not give approval for you to go to Time Warner/DC Comics or its affiliates regarding a buyout which, we believe, would be a grave mistake from both your and our points of view.

We won't stand in your way if you decide you want to take the buyout from the investor that Marc has found but that decision has to be yours and yours alone.

On another matter, we are surprised that you have not yet made the arrangements to get the money that is being held in trust for you. We completed the very detailed volumes of the proof of expenses for you on April 16, 2003. Marc sent them to Don Bulson to give to you but Don recently told Marc that you and he still haven't looked at them. We put a lot of time and work into finding and xeroxing all our bills for you. We hope you will look at the materials soon so that we can put that behind us.

I hope this letter has answered your questions and clarified key points that you raised in your last letter. Please let us know what you decide to do.

Best regards from my mom and me and once again, our sincere condolences on the loss of your mother. It must have been very hard for you. We are so sorry.

Sincerely,

*Laura*

Laura

Enclosure

Q 0760

Page 5

Privileged & Confidential
All Rights Reserved

SD 00761

EXHIBIT G
994

LAW OFFICES OF
# MARC TOBEROFF

August 6, 2003

Via facsimile: (216) 621-6165 and US Mail

Don Bulson, Esq.
Renner, Otto, Boisselle & Sklar, LLP
1621 Euclid Ave., 19th Floor
Cleveland, OH 44115-2191

Re: Michael Siegel

Dear Don:

I had a high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegel's long awaited June 18, 2003 counter-offer regarding a buy-out.

The lowest price for such an annuity was **$3,476,727** (feel free to check this out).

The net present value of the last Warner Bros. ("WB") offer is between $1.5 - $1.6 million (depending on how conservative one is in one's choice of the interest rate in calculating net present value).

Michael's counter-offer was therefore well over twice (230%) the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB offer, rejected by the Siegel's.

It was therefore not surprising that the investor rejected your counter-offer as unrealistic. The counter-offer was so high that it may have scared away a strong potential investor (exactly what I mentioned when I asked you whether you were sure that I should communicate such a high counter-offer).

As previously explained any investor would see the obvious risks of this transaction and want to come in somewhere lower than the WB offer as a hedge or buffer against the risks of this investment (even though there is no guarantee that the Siegel's will ever settle with Warner Bros.).

To the extent you and Michael are not already aware of this, any investor will view the risks as follows:

1. Risk of costly drawn-out litigation with WB as a condition to receiving any serious participation in "profits" (subject to notorious Studio accounting practices and definitions; net profits are commonly denoted in the entertainment industry as "monkey points");

2. Risks associated with no control over the Siegel Termination Interest. Michael's interest unfortunately is a passive 25% interest in what Joanne and

Q 0761

SD 00762

**EXHIBIT G**
**995**

Page 2
Don Bulson, Esq.
August 6, 2003

LAW OFFICES OF
# MARC TOBEROFF

Laura Siegel negotiate and receive, and therefore there are major risks associated with this lack of control (a good reason why Michael may be interested in an investor in the first place);

3.  Risk that Joanne and Laura Siegel may never arrive at a mutually acceptable settlement with Warner Bros;

4.  Risk that the interest may not be monetized or bear fruit for a long time to come (a long term investment);

5.  Risk that Superman will lose as opposed to gain value (there hasn't been a Superman movie since 1978 (compare the Bond franchise) and the recent failure to launch and talent package a new Superman film (lost their director and can't cast the lead) is well publicized.

I personally believe, despite the above, that this could be a smart long term investment for someone very wealthy who can afford to hold the investment for an unpredictable, and potentially very lengthy period of time. However, that doesn't mean that an investor will not weigh the reasonableness of the price against the above risks.

Please convey this letter to Michael and let me know what you and Michael suggest I do to salvage this situation.

Best regards.

Yours sincerely,

Marc Toberoff

Q 0762

1 | **RODI, POLLOCK, PETTKER, GALBRAITH**
**& CAHILL, A Law Corporation**
2 | **JOHN D. PETTKER (SBN 42346)**
444 South Flower Street, Suite 1700
3 | Los Angeles, CA 90071-2901
Telephone: 213-895-4900
4 | Facsimile: 213-895-4750
5 | Attorneys for MARK WARREN PEARY,
Petitioner
6 |
7 |
8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
9 | FOR THE COUNTY OF LOS ANGELES
10 |
11 | In the Matter of the Estate of
12 | JOSEPH SHUSTER, also known as JOE SHUSTER,
13 |
14 | Deceased.
15 |
16 |
17 |
18 | Petitioner, MARK WARREN PEARY, filed his petition for probate of will and for letters

**NO. BP-080635**

**ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING INDEPENDENT ADMINISTRATION OF ESTATE WITH LIMITED AUTHORITY**

**Hearing Date: 8-25-03**
**Dept. 5 at 9:15 a.m.**

19 | testamentary and for authorization to administer estate under the Independent Administration of

20 | Estates Act with limited authority of the estate of Joseph Shuster, also known as Joe Shuster,

21 | deceased (the "decedent"), and such petition came on regularly for hearing and approval by the

22 | Court at 9:15 a.m. on August 25, 2003, in Department 5 of the above-entitled Court, the

23 | Honorable H. RONALD HAUPTMAN, Judge Pro Tem presiding. JOHN D. PETTKER of Rodi,

24 | Pollock, Pettker, Galbraith & Cahill, A Law Corporation, appeared as the attorney for petitioner,

25 | and no one appeared in opposition.

26 | On evidence given to the satisfaction of the Court, THE COURT FINDS THAT:

27 | 1. All notices required by law have been given.

28 | / / /

Q 0763

1
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

*(left margin, vertical text:)* RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL, A LAW CORPORATION, 444 SOUTH FLOWER STREET, SUITE 1700, LOS ANGELES, CALIFORNIA 90071-2901, TELEPHONE (213) 895-4900

**SD 00764**

2.    The decedent died on July 30, 1992, a resident of the County of Los Angeles, State of California.

3.    The decedent died testate, leaving a will dated June 28, 1988.  This will has never been revoked but was lost or inadvertently destroyed.  Such will is admitted to probate by Minute Order on August 25, 2003, as the decedent's last Will, and its provisions are as follows:

# LAST WILL AND TESTAMENT OF

KNOW ALL PERSONS BY THESE PRESENTS:

I

That, I  JOSEPH SHUSTER, of W. Los Angeles, California, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

I hereby declare that I am the brother of JEAN ADELE PEAVY at the time of the execution of this Will.

II

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their _____N/A_____ will provide for them.

III

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

IV

I give devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated.  In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a

/    /    /

Q 0764

2
ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AU‾

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2601
TELEPHONE (213) 895-4900

SD 00765

1    result of a common accident, illness or disaster, then I give, devise and bequeath the residue and

2    remainder of my estate to my nephew, MARK WARREN PEARY.

V

4        I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will

5    and Testament, to act without bond.  In the event that my sister is for any reason unable or

6    unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor,

7    also without bond.

VI

9        I further direct that my estate be settled without the intervention of any court, except to the

10   extent required by law, and that my executrix settle my estate in such a manner as shall seem best

11   and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell,

12   exchange and convey the personal and real property of my estate without an order of court for that

13   purpose and without notice, approval or confirmation and in all other respects to administer and

14   settle my estate without the intervention of court.

VII

16       I hereby revoke any and all former Wills and Codicils thereto made by me and declare this

17   my Last Will and Testament.

18       In Witness Whereof I have hereunto set my hand this 28th day of June, 1988.

19

20                                                  JOSEPH SHUSTER
                                                    Testator
21   STATE OF CALIFORNIA        )
                                )  ss.
22   COUNTY OF LOS ANGELES )

23       Each of the undersigned, being first duly sworn on oath, states that on this 28th day of June,

24   1988:

25       (1)    I am over the age of eighteen (18) years and competent to be a Witness to the Will

26   of JOSEPH SHUSTER (the Testator);

27       (2)    The Testator, in my presence and in the presence of the other Witnesses whose

28   signatures appear below:

Q 0765

3

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUT

SD 00766

EXHIBIT G
999

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA, 90071-2901
TELEPHONE: (213) 895-4900

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

1        (a) Declared the foregoing instrument consisting of one pages, of which this is the

2    last to be his Will;

3        (b) Requested me and the other Witnesses to act as Witnesses to his Will and to

4    make this affidavit; and

5        (c) Signed such instrument;

6        (3)   I believe the Testator to be of sound mind, and that in so declaring and signing, he

7    was not acting under any duress, menace, fraud, or undue influence;

8        (4)   The other witnesses and I, in the presence of the Testator and of each other now

9    affix our signatures as Witnesses to the Will and make this affidavit.

10   Tom Fenaughty                  Robert Williams

11   3374 Overland Ave., #1          3545 Mentone Ave. #3

12   Los Angeles, CA 90064          Los Angeles, California 90034

13   SUBSCRIBED & SWORN to before me this 28th day of June, 1988.

14                       F. PATRICK HAGERTY

15       [NOTARIAL SEAL]      Notary Public in and for the State of California, residing at Santa Monica, Calif.

16   **THE COURT ORDERS:**

17       1.   MARK WARREN PEARY is appointed Executor of the decedent's Will recited

18   above, and letters testamentary shall issue on qualification.

19       2.   The Executor is granted limited authority to administer the estate under the

20   Independent Administration of Estates Act (there is no authority, without court supervision, to (1)

21   sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money

22   with the loan secured by an encumbrance upon real property).

23       3.   The Executor is also granted the following special power in addition to the general

24   powers conferred upon him by law and under the Independent Administration of Estates Act:

25   The power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d)

26   of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C.

27   §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings

28   necessary or appropriate in connection with this action.        **Q 0766**

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUT"

SD 00767

**EXHIBIT G**
**1000**

1    4.    Bond is fixed at $6,000.00.

2    Dated: _____

3

4

5    _____
     Judge Pro Tem of the Superior Court

6    264438_1.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

Q 0767

5

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTH

SD 00768

**EXHIBIT G**
**1001**

JUN-01-2004 02:21 PM                                      1 310 827 7227      P.01

**LAURA SIEGEL LARSON**
6400 PACIFIC AVE. #106
PLAYA DEL REY, CA 90293

June 1, 2004

# CONFIDENTIAL
# FAX TRANSMITTAL

TO:        Marc Toberoff
FAX#:      (310) 246-3101

FROM:      Laura Siegel Larson
FAX#:      (310) 827-7227

RE:        Research from Arthur Levine

Page 1 of 4

MESSAGE:

Dear Marc,

Attached is the fax I received today from Arthur Levine.  I am sending you an email
regarding it.

Sincerely,

Laura Siegel Larson

Q 0768

Privileged & Confidential
All Rights Reserved

SD 00769

EXHIBIT G
1002

JUN-01-2004 02:22 PM                                           1 310 827 7227    P.02
JUN 01 2004 12:54 FR FIN HGHN HENDERSON 4400                          TO

## LAW OFFICES
## FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
1300 I Street, NW
Washington, DC 20005

Telephone                                                      Facsimile
(202) 408-4000                                                 (202) 408-4400

### FACSIMILE TRANSMITTAL

**TO**                                        **FROM**

**Name:**  Laura Siegel Larson              **Name:**  Arthur J. Levine

**Firm:**                                     **Phone No.:**  (202) 408-4032

**Fax No.:**  310-827-7227                   **Fax # Verified by:**  R. McGolrick

**Phone No.:**                               **# Pages (incl. this):**  3

**Date:**  June 1, 2004                      **Our File No.:**  06589.0001

**Subject:**

### Confirmation Copy to Follow: No

**Message:**

Dear Laura:

    Attached is the research which my associate conducted.  Marc Toberoff called me on Thursday and explained his reasoning.  Our research suggests that his reasoning is correct, and that it would be exceedingly risky to not file by the September date.  Marc and I both agree that the burden is on the other side to disprove the validity of the Notices, and that it is highly unlikely that they can meet that burden.

Sincerely,

Art

If there is a problem with this transmission, notify fax room at (202) 408-4174 or the sender at the number above.

This facsimile is intended only for the individual to whom it is addressed and may contain information that is privileged, confidential, or exempt from disclosure under applicable law.  If you have received this facsimile in error, please notify the sender immediately by telephone (collect), and return the original message by first-class mail to the above address.

Q 0769

**Privileged & Confidential**
**All Rights Reserved**

SD 00770

**EXHIBIT G**
**1003**

JUN-01-2004 02:22 PM                                        1 310 827 7227        P.08
JUN 01 2004 12:55 FR FIN~~GAN HENDERSON #202 408 4400 T~ 1310067/224M        F.02

From:       Naresh KILARU
To:         Levine, Arthur
Date:       Thu, May 27, 2004 11:07 AM
Subject:    Siegel issues

Art,

Here is a brief summary of the research issues relating to the Siegel matter:

**1. When does the Statute of Limitations begin to run against a co-owner seeking an accounting?**

Section 507(b) of the Copyright Act provides that "no civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The key problem is of course determining the point at which the claim accrued. There are only a handful of cases discussing this issue in the context of a co-owner seeking an accounting. The leading Ninth Circuit case is summarized below.

In Zuill v. Shanahan, 30 F.3d 1366 (9th Cir. 1995), the defendant Shanahan created what became "Hooked on Phonics". To improve the music in the program, the defendant brought in Zuill and Rosal (the plaintiffs). The plaintiffs later sued the defendant for a declaratory judgment that they each owned one-third interests in "Hooked on Phonics." The issue before the court was whether the plaintiffs' suit was time-barred under Section 507(b).

The plaintiffs had filed suit in 1991. The court noted that the defendant had expressly repudiated any claims of co-ownership by Zuill and Rosal in 1987. In interpreting the statutory language of when the claim accrued under Section 507(b), the court held, "We conclude that claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." 80 F.3d at 1369. The court's rationale for such an interpretation was largely based on equitable principles: "it is inequitable to allow the putative co-owner to lie in the weeds for years after his claim has been repudiated, while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize after it has been brought in by another's effort." 80 F.3d at 1371. Because the plaintiffs had brought suit more than three years after their claims of co-ownership had been expressly repudiated by the defendant, the court held that the plaintiffs' suit was time-barred under Section 507(b).

My guess is that it is the Zuill case to which Marc Toberoff is referring when he puts 4/16/1999 as the date on which the statute of limitations began to run, as this is the date Time Warner rejected the validity of Siegel's Notices of Termination. While I could not find any case law interpreting Section 507(b) specifically in the context of a party asserting co-ownership through a Notice of Termination (as opposed to asserting co-ownership through joint creation), it seems that the holding in Zuill would be equally applicable to our situation.

**2. Which party has the burden of proving the validity (or invalidity) of a termination notice?**

I found no cases discussing which party has the ultimate burden of proving the validity (of invalidity) of a termination notice. But based on Zuill, it seems clear the party claiming co-ownership (either through joint creation or via a termination notice) has the burden of at least bringing a lawsuit within the statute of limitations period. Thus, Marc Toberoff's conclusion that the statute of limitations runs against Siegel (and not against Time Warner) is likely correct.

Finally, I did find one case clearly holding that "when a termination is effected, all rights covered by the terminated grant revert, on the effective date of termination, to the author or his statutory successor." Bourne v. MPL Communications, Inc., 675 F. Supp. 859, 861 (S.D.N.Y. 1987). Thus, assuming that the Notices of Termination were proper, it seems that 50% of the rights to Superman did in fact revert to Siegel upon the effective date of the terminations in April 1999. Because Time Warner rejected the

Q 0770

Privileged & Confidential
All Rights Reserved

EXHIBIT G
1004

SD 00771

JUN-01-2004 02:23 PM
JUN 01 2004 12:55 FR FIN GHN HENDERSON 202 406 4488 TO 13100571117    P.04

validity of the Notices of Termination (and hence repudiated Siegel's status as co-owner) on April 15, 1999, it seems that the Statute of Limitations began to run against Siegel on April 15, 1999 for her to bring a declaratory judgment action establishing her as co-owner and entitling her to an accounting.

CC:        McGoirick, Robin

Q 0771

** TOTAL PAGE.04 **

Privileged & Confidential
All Rights Reserved

**EXHIBIT G**
**1005**

SD 00772



LAW OFFICES OF
# MARC TOBEROFF

July 21, 2003

Jack Pettker, Esq.
444 South Flower Street, Suite 1700
Los Angeles, CA 90071-2901

Re: Joseph Shuster Probate

Dear Jack:

Enclosed please find my check no. 1007 in the amount of $2,500 as the retainer per the agreement for your firm's services with respect to the above.

Please excuse the short delay -- my wife gave birth to our second baby boy last Thursday.

Thank-you.

Very truly yours,

Marc Toberoff

Q 0772

9595 Wilshire Boulevard, Suite 811, Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
MToberoff@ipww.biz

Privileged & Confidential
All Rights Reserved

SD-00773

**EXHIBIT G**
**1006**



Privileged & Confidential
All Rights Reserved

Q 0773

SD 00774

**EXHIBIT G**
1007

# AMERICAN CONTRACTORS INDEMNITY COMPANY

BOND NO. _____

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR COUNTY OF LOS ANGELES

IN THE MATTER OF

**The Estate of**

JOSEPH SHUSTER, also known as JOE SHUSTER,

**Deceased**

Case Number BP080635

**SUPERIOR COURT**

OCT 21 2003

**ORIGINAL FILED**

All Papers and notices may be served on
AMERICAN CONTRACTORS INDEMNITY COMPANY
9841 AIRPORT BLVD SUITE 1414 LOS ANGELES, CA 90045

☑ Bond upon Qualifying  ☐ Additional Bond

Premium  100
Per Annum

**KNOWN ALL MEN BY THESE PRESENTS:**
That we, MARK WARREN PEARY as Principal, and the AMERICAN CONTRACTORS INDEMNITY COMPANY as Surety, are held and firmly bound unto The State of California in the sum of SIX THOUSAND DOLLARS ($6,000.00) for which payment, well and truly be made, we bind ourselves, our heirs, executors, successors, and assigns jointly and severally, firmly by these presents.

**THE CONDITION OF THE ABOVE OBLIGATION IS SUCH THAT,**
**WHEREAS,** an order was duly made and entered by the Superior Court of the State of California, for the County of LOS ANGELES ON AUGUST 25, 2003.

☑ Appointing the above Principal, Executor of the estate of JOSEPH SHUSTER Deceased.

☐ Directing the said Principal to execute an additional bond according to law in the sum above named.

**NOW, THEREFORE,** if the said Principal shall faithfully execute the duties of the trust according to law, then this obligation shall be void, otherwise to remain in full force and effect.

Signed and dated at ___Santa Fe, New Mexico___ California on September 30, 2003
(Place)    (Date)

_Mark Warren Peary_
MARK WARREN PEARY, as Principal

**AMERICAN CONTRACTORS INDEMNITY COMPANY**
IN WITNESS WHEREOF, The corporate seal and name of said Surety Company is hereto affixed and attested by JEFF AASE, who declares under penalty of perjury that he is duly authorized Attorney-in-Fact acting under an unrevoked power of attorney on file with the Clerk of the County in which above entitled Court is located.

By: ___/S___
JEFF AASE    Attorney-in-Fact

**BOND UPON QUALIFYING**    Q 0774

**EXHIBIT G**
**1008**

SD 00775

COPY

DE-147

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
RODI, POLLOCK, PETTKER, GALBRAITH
& CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
TELEPHONE NO.: 213-895-4900    FAX NO. (Optional): 213-895-4921 fax
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): MARK WARREN PEARY, Petitioner

FOR COURT USE ONLY

SUPERIOR COURT
OCT 2 1 2003
ORIGINAL FILED

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   LOS ANGELES
STREET ADDRESS:   111 North Hill Street
MAILING ADDRESS:   111 North Hill Street
CITY AND ZIP CODE:   Los Angeles, CA 90012
BRANCH NAME:   Central District

ESTATE OF (Name):   JOSEPH SHUSTER, also known as
JOE SHUSTER
                                                        DECEDENT

DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE
and Acknowledgment of Receipt

CASE NUMBER:
BP080635

# DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE

When the court appoints you as personal representative of an estate, you become an officer of the court and assume certain duties and obligations. An attorney is best qualified to advise you about these matters. You should understand the following:

## 1. MANAGING THE ESTATE'S ASSETS

**a. Prudent investments**
You must manage the estate assets with the care of a prudent person dealing with someone else's property. This means that you must be cautious and may not make any speculative investments.

**b. Keep estate assets separate**
You must keep the money and property in this estate separate from anyone else's, including your own. When you open a bank account for the estate, the account name must indicate that it is an estate account and not your personal account. Never deposit estate funds in your personal account or otherwise mix them with your or anyone else's property. Securities in the estate must also be held in a name that shows they are estate property and not your personal property.

**c. Interest-bearing accounts and other investments**
Except for checking accounts intended for ordinary administration expenses, estate accounts must earn interest. You may deposit estate funds in insured accounts in financial institutions, but you should consult with an attorney before making other kinds of investments.

**d. Other restrictions**
There are many other restrictions on your authority to deal with estate property. You should not spend any of the estate's money unless you have received permission from the court or have been advised to do so by an attorney. You may reimburse yourself for official court costs paid by you to the county clerk and for the premium on your bond. Without prior order of the court, you may not pay fees to yourself or to your attorney, if you have one. If you do not obtain the court's permission when it is required, you may be removed as personal representative or you may be required to reimburse the estate from your own personal funds, or both. You should consult with an attorney concerning the legal requirements affecting sales, leases, mortgages, and investments of estate property.

## 2. INVENTORY OF ESTATE PROPERTY

**a. Locate the estate's property**
You must attempt to locate and take possession of all the decedent's property to be administered in the estate.

**b. Determine the value of the property**
You must arrange to have a court-appointed referee determine the value of the property unless the appointment is waived by the court. You, rather than the referee, must determine the value of certain "cash items." An attorney can advise you about how to do this.

**c. File an inventory and appraisal**
Within four months after Letters are first issued to you as personal representative, you must file with the court an inventory and appraisal of all the assets in the estate.

Q 0775

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
DE-147 [Rev. January 1, 2002]

DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE
(Probate)


Legal
Solutions
Plus

Probate Code, § 8404

SD 00776

| ESTATE OF (Name):   JOSEPH S. .STER, also known as | CASE NUMBER: |
|---|---|
| JOE SHUSTER                                        DECEDENT | BP080635 |

**d. File a change of ownership**
At the time you file the inventory and appraisal, you must also file a change of ownership statement with the county recorder or assessor in each county where the decedent owned real property at the time of death, as provided in section 480 of the California Revenue and Taxation Code.

### 3. NOTICE TO CREDITORS
You must mail a notice of administration to each known creditor of the decedent within four months after your appointment as personal representative. If the decedent received Medi-Cal assistance, you must notify the State Director of Health Services within 90 days after appointment.

### 4. INSURANCE
You should determine that there is appropriate and adequate insurance covering the assets and risks of the estate. Maintain the insurance in force during the entire period of the administration.

### 5. RECORD KEEPING
**a. Keep accounts**
You must keep complete and accurate records of each financial transaction affecting the estate. You will have to prepare an account of all money and property you have received, what you have spent, and the date of each transaction. You must describe in detail what you have left after the payment of expenses.

**b. Court review**
Your account will be reviewed by the court. Save your receipts because the court may ask to review them. If you do not file your accounts as required, the court will order you to do so. You may be removed as personal representative if you fail to comply.

### 6. CONSULTING AN ATTORNEY
If you have an attorney, you should cooperate with the attorney at all times. You and your attorney are responsible for completing the estate administration as promptly as possible. **When in doubt, contact your attorney.**

| NOTICE:  1. This statement of duties and liabilities is a summary and is not a complete statement of the law. Your conduct as a personal representative is governed by the law itself and not by this summary. |
|---|
| 2. If you fail to perform your duties or to meet the deadlines, the court may reduce your compensation, remove you from office, and impose other sanctions. |

### ACKNOWLEDGMENT OF RECEIPT

1. I have petitioned the court to be appointed as a personal representative.

2. My address and telephone number are (specify):   51 Camino Cabo, Santa Fe, New Mexico 87508
Telephone:  505-466-4551

3. I acknowledge that I have received a copy of this statement of the duties and liabilities of the office of personal representative.

Date: September 30, 2003

MARK WARREN PEARY
(TYPE OR PRINT NAME)                                         (SIGNATURE OF PETITIONER)

Date:

_____                                         _____
(TYPE OR PRINT NAME)                                         (SIGNATURE OF PETITIONER)

| CONFIDENTIAL INFORMATION: If required to do so by local court rule, you must provide your date of birth and driver's license number on supplemental Form DE-147S. (Prob. Code, § 8404(b).) |
|---|

DE-147 [Rev. January 1, 2002]       **DUTIES AND LIABILITIES OF PERSONAL REPRESENTATIVE**       Page 2 of 2
(Probate)

Q 0776

SD 00777

**EXHIBIT G**
**1010**



**CONFIDENTIAL**

DE-147S

| ESTATE OF *(Name):*  JOSEPH SHUSTER, also known as | CASE NUMBER: |
|---|---|
| JOE SHUSTER                                 DECEDENT | BP080635 |

## CONFIDENTIAL STATEMENT OF BIRTH DATE
## AND DRIVER'S LICENSE NUMBER

**(Supplement to *Duties and Liabilities of Personal Representative* (Form DE-147))**

*(NOTE:- This supplement is to be used if the court by local rule requires the personal representative to provide a birth date and driver's license number. Do **not** attach this supplement to Form DE-147.)*

This separate *Confidential Statement of Birth Date and Driver's License Number* contains confidential information relating to the personal representative in the case referenced above. This supplement shall be kept separate from the *Duties and Liabilities of Personal Representative* filed in this case and shall not be a public record.

INFORMATION ON THE PERSONAL REPRESENTATIVE:

1. Name:  MARK WARREN PEARY

2. Date of birth:  01 - 14 - 62

3. Driver's license number:  537150487          State:  New Mexico

```
                    TO COURT CLERK:
        THIS STATEMENT IS CONFIDENTIAL. DO NOT FILE
    THIS CONFIDENTIAL STATEMENT IN A PUBLIC COURT FILE.
```

Q 0777

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>DE-147S [New January 1, 2001] | CONFIDENTIAL SUPPLEMENT TO DUTIES AND<br>LIABILITIES OF PERSONAL REPRESENTATIVE<br>(Probate) | Legal<br>Solutions<br>& Plus | Probate Code, § 8404 |

SD 00778

**EXHIBIT G**
**1011**

OFFICES OF
# MARC TOBEROFF

July 10, 2003

*Privileged & Confidential*

<u>Via Federal Express</u>

Jean Peavy
Warren Peary
51 Camino Cabo
Sante Fe, NM 87508

Dear Jean and Warren:

Enclosed please find for your review the documents to probate the Estate of Joseph Shuster and to appoint Warren as Executor of such Estate. The documents have been prepared by John Pettker, Esq. of the Rodi, Pollock law firm (the Trusts and Estates specialist we retained) with my input regarding relevant copyright matters.

Please follow very carefully the directions set forth in the Rodi Pollock cover letter dated July 8, 2003 in executing the documents as indicated and check both front and back of each document enclosed. The Declination by Dawn Peavy only relates to her not wanting to be the Executor, not to her entitlement to any share of any assets or moneys under Joe Shuster's or Jean Peavy's will. (I have timed the sending of these documents so that Dawn can execute the Declination while she is visiting you this weekend and thus I will receive for filing all the required executed documents together.)

I have also enclosed the legal retainer agreement requested by Rodi Pollock for Warren's signature along with mine. Although I am covering this legal expense pursuant to our Agreement (and this is referenced in the Rodi Pollock agreement) they have asked for your signature as well on their retainer agreement to reflect that you have authorized them to probate the Estate.

Once you have reviewed and fully executed the enclosed documents as indicated, please federal express the documents to me (feel free to use my account number) whereupon I will forward them to Rodi Pollock for filing with Court.

Please call me immediately to confirm receipt of this important package and to ask me any questions regarding the enclosed.

Best regards,

Marc Toberoff

Q 0778

9595 Wilshire Boulevard, Suite 811, Beverly Hills, CA 90212 Tel: (310) 246-3333; Fax: (310) 246-3101
MToberoff@ipww.biz

Privileged & Confidential
All Rights Reserved

**EXHIBIT G**
**1012**

SD 00779

Jul-08-03  02:27pm  From-                                    T-749  P.01  F-604

# RODI·POLLOCK

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL: (213) 895-4900

JOHN D. CAHILL
JOHN D. PETTKER
WILLIAM R. CHRISTIAN
HENRY P. PRAMOV, JR.
ALLAN E. CERAN
C. STEPHEN DAVIS
CRIS K. O'NEALL
THOMAS CURTISS, JR.
ELIZABETH B. BLAKELY
ROBERT C. NORTON
TIMOTHY G. CEPERLEY
ALFRED KLEIN
ROBERT A. YAHIRO
KENNETH A. FRANKLIN
WADE E. NORWOOD
PRIYA G. BHATT
ANDREW W. BODEAU
JEAN M. BEASLEY

KARL S. RODI (1906-1982)
DANIEL C. BOND (1942-1977)
PAUL E. SCHWAB (1898-1975)

OF COUNSEL
JOHN P. POLLOCK
JAMES M. GALBRAITH
DAVID K.W. CHANG

TELECOPIERS
(213) 895-4921
(213) 895-4922
(213) 895-4750

OUR FILE NUMBER

5891-P1

July 8, 2003

Mr. Marc Toberoff
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

    Re:    Estate of Joseph Shuster

Dear Marc:

        Pursuant to our conversation yesterday afternoon, I am enclosing the following revised original probate documents appointing Mark Warren Peary as Executor, in place of Jean Adele Peavy, along with a complete copy for your files:

    a.    Petition for Probate of Lost Will with Attachments 2c, 2d(1), 3(c) and 3(d)(1), (2) and (3); 3e(2); 3g; and Attachment 8;

    b.    Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peary as Personal Representative;

    c.    Nomination of Personal Representative, Declination to Act, and Waiver of Bond of Mark Warren Peary;

    d.    Letters Testamentary;

    e.    Duties and Liabilities of Personal Representative; and

    d.    Bond Application.

        Both Mr. Peary and you should review the Petition for Probate carefully. If the Petition is correct, please have Mr. Peary sign and date it where provided on the reverse side. The Duties and Liabilities of Personal Representative and the Letters Testamentary should be read and signed, but please do not date either of these documents.

        Also enclosed is the Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peary as Personal Representative for Jean Adele Peavy's review and

Q 0779

Privileged & Confidential
All Rights Reserved

SD 00780

Jul-08-03  02:27pm  From-                                   T-749   P.02   F-604

Marc Toberoff
July 8, 2003
Page 2

signature, along with the Nomination of Personal Representative for Dawn L. Peavy's signature and return.

I will be petitioning the court for limited authority for Mr. Peary to administer the estate under the Independent Administration of Estates Act. In view of the fact that there is a possibility that the court may not accept the Will for probate, and that Mr. Peary is not a resident of California, the court may require that he furnish a minimum bond. Therefore, I have also enclosed bonding documents to be completed and signed by Mr. Peary.

Upon our receipt of these documents we will submit the Petition for Probate to the court and publish the initiation of the probate in the appropriate newspaper. The court hearing on the Petition will be scheduled to occur approximately 4 weeks after our filing of these documents.

Thank you for giving our firm the opportunity to assist you in this probate matter. Please feel free to call me if you have any questions.

Sincerely,

John D. Pettker

JDP:muc
Enclosures
261509_1.doc

Q 0780

Privileged & Confidential
All Rights Reserved

SD 00781

EXHIBIT G
1014

Confirmation Report — Memory Send

```
                              Page      : 001
                              Date & Time: Jul-15-03  02:11pm
                              Line 1    :
                              Machine ID :
```

| | | |
|---|---|---|
| Job number | : | 035 |
| Date | : | Jul-15 02:09pm |
| To | : ☎915054664551 |
| Number of pages | : | 002 |
| Start time | : | Jul-15 02:09pm |
| End time | : | Jul-15 02:11pm |
| Pages sent | : | 002 |
| Status | : | OK |

| Job number   : 035 | *** SEND SUCCESSFUL *** |

Jul-08-03  02:27pm  From-          ·                              T-749   P.01    F-604



**RODI·POLLOCK**

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION

444 SOUTH FLOWER STREET
SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TEL (213) 895-4900

July 8, 2003

Mr. Marc Toberoff
9595 Wilshire Boulevard, 8th Floor
Beverly Hills, CA 90212

Re:    Estate of Joseph Shuster

Dear Marc:

Pursuant to our conversation yesterday afternoon, I am enclosing the following revised original probate documents appointing Mark Warren Peavy as Executor, in place of Jean Adele Peavy, along with a complete copy for your files:

a.    Petition for Probate of Lost Will with Attachments 2c, 2d(1), 3(c) and 3(d)(1), (2) and (3); 3c(2); 3g; and Attachment 8;

b.    Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peavy as Personal Representative;

c.    Nomination of Personal Representative, Declination to Act, and Waiver of Bond of Mark Warren Peavy;

d.    Letters Testamentary;

e.    Duties and Liabilities of Personal Representative; and

d.    Bond Application.

Both Mr. Peavy and you should review the Petition for Probate carefully. If the Petition is correct, please have Mr. Peavy sign and date it where provided on the reverse side. The Duties and Liabilities of Personal Representative and the Letters Testamentary should be read and signed, but please do not date either of these documents.

Also enclosed is the Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peavy as Personal Representative for Jean Adele Peavy's review and

Q 0781

Privileged & Confidential
All Rights Reserved

SD 00782

DE-111

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | TELEPHONE AND FAX NOS. | FOR COURT USE ONLY |
|---|---|---|

(213) 895-4900          (213) 895-4921

JOHN D. PETTKER, Esq. (SBN 42346)
RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A Law Corporation
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901

ATTORNEY FOR (Name):   MARK WARREN PEARY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
  STREET ADDRESS: 111 N. Hill Street
  MAILING ADDRESS: 111 N. Hill Street
  CITY AND ZIP CODE: Los Angeles, CA 90012
  BRANCH NAME: Central District

ESTATE OF (Name):   JOSEPH SHUSTER, also known as JOE SHUSTER

/lost                                        DECEDENT

| PETITION FOR | [X] Probate of Will and for Letters Testamentary<br>[ ] Probate of Will and for Letters of Administration<br>    with Will Annexed<br>[ ] Letters of Administration<br>[ ] Letters of Special Administration<br>[X] Authorization to Administer Under the Independent<br>    Administration of Estates Act [X] with limited authority | CASE NUMBER:<br><br>HEARING DATE:<br><br>DEPT:        TIME: |
|---|---|---|

1. Publication will be in (specify name of newspaper):  DAILY JOURNAL
   a. [X] Publication requested.    b. [ ] Publication to be arranged.
2. Petitioner (name of each):    MARK WARREN PEARY                                        requests
   a. [X] decedent's will and codicils, if any, be admitted to probate.
   b. [X] (name):   MARK WARREN PEARY
      be appointed  (1) [X] executor                    (3) [ ] administrator
                         (2) [ ] administrator with will annexed    (4) [ ] special administrator
      and Letters issue upon qualification.
   c. [X] that [ ] full [X] limited   authority be granted to administer under the Independent Administration of Estates Act.
   d. (1) [X] bond not be required for the reasons stated in item 3d.
      (2) [ ] $                    bond be fixed. It will be furnished by an admitted surety insurer or as otherwise provided by law.
                          (Specify reasons in Attachment 2 if the amount is different from the maximum required by Probate Code section 8482.)
      (3) [ ] $                    in deposits in a blocked account be allowed. Receipts will be filed. (Specify institution and location):

3. a. Decedent died on (date):   July 30, 1992          at (place):   West Los Angeles, California
      (1) [X] a resident of the county named above.
      (2) [ ] a nonresident of California and left an estate in the county named above located at (specify location permitting
                  publication in the newspaper named in item 1):
   b. Street address, city, and county of decedent's residence at time of death (specify):   11944 Montana Avenue #305, West Los
      Angeles, County of Los Angeles, California 90049
   c. Character and estimated value of the property of the estate:
      (1) Personal property:           $        None
      (2) Annual gross income from
           (a) real property:          $        None                                    Q 0782
           (b) personal property:      $        None
                    Total:            $        None
      (3) Real property: $  None              (If full authority under the Independent Administration of Estates Act is requested,
                                                state the fair market value of the real property less encumbrances.)
   d. (1) [X] Will waives bond.   [ ] Special administrator is the named executor and the will waives bond.
      (2) [X] All beneficiaries are adults and have waived bond, and the will does not require a bond. (Affix waiver as Attachment
                  3d(2).)
      (3) [X] All heirs at law are adults and have waived bond. (Affix waiver as Attachment 3d(3).)
      (4) [ ] Sole personal representative is a corporate fiduciary or an exempt government agency.
   e. (1) [ ] Decedent died intestate.
      (2) [X] Copy of decedent's will dated: 6/28/1988 [ ] codicils dated:              are affixed as Attachment 3e(2).
           [X] The will and all codicils are self-proving (Prob. Code, § 8220).
                                          (Continued on reverse)

| Form Approved by the<br>Judicial Council of California<br>DE-111 [Rev. January 1, 1998]<br>Mandatory Use [1/1/2000] | PETITION FOR PROBATE | Legal<br>Solutions<br>Plus | Probate Code, §§ 8002, 10450 |
|---|---|---|---|

EXHIBIT G
1016

SD 00783

| ESTATE OF *(Name):* JOSEPH SHUST also known as JOE SHUSTER | CASE NUMBER: |
|---|---|
| | DECEDENT |

3. f. **Appointment of personal representative** *(check all applicable boxes):*

> Include in Attachment 3e(2) a typed copy of a handwritten will and a translation of a foreign language will.

  (1)  Appointment of executor or administrator with will annexed:
    (a) [X] Proposed executor is named as executor in the will and consents to act.
    (b) [ ] No executor is named in the will.
    (c) [ ] Proposed personal representative is a nominee of a person entitled to Letters. *(Affix nomination as Attachment 3f(1)(c).)*
    (d) [X] Other named executors will not act because of [ ] death [X] declination [ ] other reasons *(specify in Attachment 3f(1)(d)).*

  (2)  Appointment of administrator:
    (a) [ ] Petitioner is a person entitled to Letters. *(If necessary, explain priority in Attachment 3f(2)(a).)*
    (b) [ ] Petitioner is a nominee of a person entitled to Letters. *(Affix nomination as Attachment 3f(2)(b).)*
    (c) [ ] Petitioner is related to the decedent as *(specify):*

  (3) [ ] Appointment of special administrator requested. *(Specify grounds and requested powers in Attachment 3f(3).)*

  g.  Proposed personal representative is a [ ] resident of California [X] nonresident of California *(affix statement of permanent address as Attachment 3g)* [X] resident of the United States [ ] nonresident of the United States.

4. [X] Decedent's will does not preclude administration of this estate under the Independent Administration of Estates Act.

5. a. The decedent is survived by *(check at least one box in each of items (1) - (3))*
  (1) [ ] spouse [X] no spouse as follows: [X] divorced or never married [ ] spouse deceased
  (2) [ ] child as follows: [ ] natural or adopted [ ] natural adopted by a third party [X] no child
  (3) [ ] issue of a predeceased child [X] no issue of a predeceased child
  b. Decedent [ ] is [X] is not survived by a stepchild or foster child or children who would have been adopted by decedent but for a legal barrier. *(See Prob. Code, § 6454.)*

6. *(Complete if decedent was survived by (1) a spouse but no issue (only a or b apply), or (2) no spouse or issue. Check the first box that applies):*
  a. [ ] Decedent is survived by a parent or parents who are listed in item 8.
  b. [X] Decedent is survived by issue of deceased parents, all of whom are listed in item 8.
  c. [ ] Decedent is survived by a grandparent or grandparents who are listed in item 8.
  d. [ ] Decedent is survived by issue of grandparents, all of whom are listed in item 8.
  e. [ ] Decedent is survived by issue of a predeceased spouse, all of whom are listed in item 8.
  f. [ ] Decedent is survived by next of kin, all of whom are listed in item 8.
  g. [ ] Decedent is survived by parents of a predeceased spouse or issue of those parents, if both are predeceased, all of whom are listed in item 8.
  h. [ ] Decedent is survived by no known next of kin.

7. *(Complete only if no spouse or issue survived decedent)* Decedent [X] had no predeceased spouse [ ] had a predeceased spouse who (1) [ ] died not more than 15 years before decedent owning an interest in **real property** that passed to decedent, (2) [ ] died not more than five years before decedent owning **personal property** valued at $10,000 or more that passed to decedent, (3) [ ] neither (1) nor (2) apply. *(If you check (1) or (2), check only the first box that applies):*
  a. [ ] Decedent is survived by issue of a predeceased spouse, all of whom are listed in item 8.
  b. [ ] Decedent is survived by a parent or parents of the predeceased spouse who are listed in item 8.
  c. [ ] Decedent is survived by issue of a parent of the predeceased spouse, all of whom are listed in item 8.
  d. [ ] Decedent is survived by next of kin of the decedent, all of whom are listed in item 8.
  e. [ ] Decedent is survived by next of kin of the predeceased spouse, all of whom are listed in item 8.

8. Listed in Attachment 8 are the names, relationships, ages, and addresses, so far as known to or reasonably ascertainable by petitioner, of (1) all persons named in decedent's will and codicils, whether living or deceased, (2) all persons named or checked in items 2, 5, 6, and 7, and (3) all beneficiaries of a devisee trust in which the trustee and personal representative are the same person.

9. [XX] Number of pages attached: ___9___

Date: _____

&blacktriangleright; _____
    (SIGNATURE OF ATTORNEY*)
    JOHN D. PETTKER, Esq. (SBN 42346)

* (Signature of all petitioners also required (Prob. Code, § 1020).)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____

MARK WARREN PEARY
(TYPE OR PRINT NAME)

&blacktriangleright; _____
    (SIGNATURE OF PETITIONER)

_____
(TYPE OR PRINT NAME)

&blacktriangleright; _____
    (SIGNATURE OF PETITIONER)

DE-111 [Rev. January 1, 1998]    **PETITION FOR PROBATE**    Page two

Q 0783

SD 00784

**EXHIBIT G**
**1017**

In the Matter of the Estate of JOSEPH SHUSTER, Decedent
Los Angeles County, California, Superior Court – Central District

ATTACHMENT 2c
Requested Additional Power

Requested Additional Power
    Petitioner requests that the court grant him the following power in addition to the general powers conferred upon him by law and under the Independent Administration of Estates Act: *the power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings necessary or appropriate in connection with this action.*

Q 0784

261503_1.doc

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

### ATTACHMENT 2d(1), 3(c) and 3(d)(1), (2) and (3)

No bond should be required of petitioner to act as Executor, or if a bond is required by the Court, it should be for a nominal amount, for the following reasons:

1.    The first named Executor, Jean Adele Peavy, has signed and filed a Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peary as Personal Representative. Jean Adele Peavy, who is the sister of the decedent, is also the sole beneficiary under the decedent's Will and the sole heir at law of the decedent's estate under the laws of intestacy.

2.    Petitioner is the alternate named Executor under the decedent's Will, and the decedent's Will waives bond.

3.    Petitioner, who is the son of Jean Adele Peavy, is the nephew of the decedent.

4.    A probate proceeding with respect to the decedent's estate would be unnecessary but for the fact that a personal representative of his estate needs to be appointed for the purpose of *terminating prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(c)(2)(D)*. This right of the personal representative of the decedent's estate to terminate prior transfers of the decedent's copyright(s) was enacted into federal law as part of the Sonny Bono Copyright Act effective October 27, 1998. The purpose of such new law, enacted over six years after the decedent's death, is to give authors and their estates the power to recover previously assigned copyrights within time limits delineated in the statute.

5.    All assets of the decedent, with the exception of the decedent's interest in and to *the copyrights*, which currently have an undetermined value, were of minimal value and transferred through a §13101 affidavit by Jean Adele Peavy shortly after the decedent's death on July 30, 1992.

Dated: _____, 2003

_____
MARK WARREN PEARY



Q 0785

SD 00786

**EXHIBIT G**
**1019**

In the Matter of the Estate of JOSEPH SHUSTER, Decedent
Los Angeles County, California, Superior Court -- Central District

## ATTACHMENT 3e(2)
### *(Lost)* Last Will and Testament

Grounds for Admission of *Lost* Will

The decedent died more than 10 years ago on July 30, 1992. Petitioner and other family members have made a diligent and extensive search for the original Will executed by the decedent on June 28, 1988, but have been unable to find it. Petitioner has only found a copy of such Will, which he is submitting for probate as the decedent's lost Will. Petitioner believes that the original of such Will has been lost or inadvertently destroyed. There would be no reason for the decedent to have revoked such Will by destroying it, because the terms of the Will replicate the result if the decedent died intestate. Under both the Will and the laws on intestacy, petitioner's mother, Jean Adele Peavy, who is the decedent's sister and sole surviving heir at law, would be the sole beneficiary of the decedent's estate and, but for her declination to act, would be entitled to be appointed personal representative. Further, under both the decedent's Will and the laws of intestacy, by reason of the declinations to act that have been filed concurrently with this petition, petitioner is entitled to be appointed personal representative.

The decedent never married and never had any issue.

Q 0786

261503_1.doc

SD 00787

THE

Last Will and Testament of

*Joseph J. Shuster*

Dated *June 28* 19 *88*

Q 0787

SD 00788

**EXHIBIT G**
**1021**

# Last Will and Testament of

**KNOW ALL PERSONS BY THESE PRESENTS:**

That, I   JOSEPH SHUSTER

of _____ W. Los Angeles, California _____

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

I.

I hereby declare that I am the ___brother___ of JEAN ADELE PEAVY

at the time of the execution of this Will.

II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their _____N/A_____ will provide for them.
(mother, or father)

III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my execut_rix_ as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

IV.

I give, devise and bequeath unto   JEAN ADELE PEAVY   all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that _____Jean Adele Peavy_____ shall predecease me, or in the event that both _____Jean Adele Peavy_____ and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, _____MARK WARREN PEARY_____.

V.

I hereby nominate and appoint my __sister__, _____Jean Adele Peavy_____ executrix of this my Last Will and Testament, to act without bond. In the event that my __sister__, is for any reason unable or unwilling to act as execut_ix_ hereof, I nominate and appoint   Mark Warren Peary   to act as execut_or_ also without bond.

Q 0788

SD 00789