# EXHIBIT A

**Laura Siegel Larson**
**6400 Pacific Avenue #106**
**Playa Del Rey, CA 90293**

November 2, 2002

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

Dear Michael,

Thank you for your very nice letter of October 2nd. I truly appreciate your understanding of the difficulty of my divorce. You did not mention how your mother is doing. I hope that means she has improved and is home with you again.

This has been a very busy month involving various aspects of the Superman and Superboy rights. Enclosed you will find a copy of a letter my mother and I have sent to Lillian Laserson, the General Counsel of DC Comics and Roger Zissu and Carol Simkin of DC's outside law firm, Fross Zelnick Lerhman & Zissu, P.C. Under the terms of the Tolling Agreement, these letters had to be sent at the conclusion of negotiations with DC so that the Tolling Agreement is terminated as well.

We were shocked by the change of attitude we saw in Bruce Ramer and Kevin Marks from the time we retained them to recent months. In the beginning they appeared to be very much on our side, determined to get justice for us and they vowed to work hard for us in negotiations versus DC and AOL Time Warner. Toward the end of 2001, there was a shift. They started pressuring us to lower our expectations and to take an offer we did not want. They increasingly seemed to be siding with DC against our interests. We never made any outright acceptance of the DC deal. Kevin tried to scare us by saying if we didn't take DC's "final offer" they'd probably sue us.

Between February and May of this year we became so dissatisfied with their representation and the revolting offer from DC that we asked for a meeting with Kevin on May 22nd planning to fire them then and there. In the meeting, we decided to give Kevin one last chance. He wanted to redraft DC 's February 1st proposal along the lines of the last discussion he had had with John Schulman. We gave Kevin conditional permission to do just that but it was not to be sent out if we did not approve of it. As you know it was unacceptable and we fired Gang, Tyre, Ramer & Brown and notified DC, etc. that negotiations were over.

That terrible letter from Kevin in which he threatened to testify against us if called into court was the last straw. We are glad to be rid of them.

It came as quite a surprise to my mother and me that everyone but us--Arthur Levine, Kevin Marks, you, and Don Bulson--knew about the interest of Marc Toberoff and Ari Emmanuel in the properties as far back as 2001 and no one ever mentioned it to us until Kevin's letter of August, 2002. It was very interesting to hear from you that you and Don Bulson were contacted in Nov., 2001. It's a shame that Kevin kept them from contacting us and that he did

EOMS 00215

**EXHIBIT A**

**3**

Page 2
Nov. 2, 2002

not inform us of them or their offer until August 2002.

My mother and I have had extensive meetings with Toberoff and Emmanuel in the past few weeks. We learned that due to the delays and the misinformation Kevin had given them that there was a deal with DC, the billionaire investor who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere. We were very impressed with Toberoff and Emmanuel, however, and have signed them as our new representatives. Not only do they have a first hand knowledge of the real value of properties that are adapted to TV and film, it is possible that the top talent that Emmanuel's Endeavor Agency represents (top stars, directors, producer-writers) could be successfully packaged with Siegel properties. They have other ideas as well. In addition, Toberoff, the attorney, has a successful track record of representing creator-writers and their heirs who have been screwed by the studios. This makes them a good fit with Superman and other Siegel creations. They consider DC's last offer to us ridiculous. They are currently putting together a strategy that will be much more aggressive than anything that Marks or Ramer ever did. We are hopeful that they will bring matters to a satisfying conclusion.

I now have two new divorce lawyers and my ex is continuing to represent himself. He doesn't care how much this costs me or that it's taking money away from the children. The latest on that front is that he didn't like a ruling the judge made in my favor by extending the restraining order against him. So he's taking it to the Court of Appeals and trying to get it dismissed on a technicality. This is, of course, time consuming, upsetting and very expensive.

I have boxes and boxes of divorce, copyright and financial paperwork everywhere in my small place--even all over my bed--including the records of Superman expenses I xeroxed for you a long time ago. When my ceilings had to be ripped out and replaced, and I had to pack things up and move out for awhile, things got even harder to locate. As soon as I find the papers that pertain to you, I'll put them in the mail along with my mother's.

I hope you will stay well as the weather changes and that the increasing cold doesn't make your arthritis act up. We're all sick here. I've had a throat and sinus infection for three weeks now. The antibiotics I've taken haven't worked and I have a lot of pounding headaches. I'm also having a flare-up of my Multiple Sclerosis with increased numbness and tingling. I fell down three times in the last few days, once onto a pile of carton boxes. I also suffer from chronic fatigue and need rest badly. My mom has bronchitis, Michael's asthma has been bothering him and James fractured his wrist playing flag football. His cast just came off this week. Here's hoping it won't be a bad winter and we'll all be better soon.

Best wishes for the holidays,

*Laura*

Laura

EOMS 00216

**EXHIBIT A**
**4**

# EXHIBIT B



11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    720

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 10/24/2001 | DWB | 275.00 | 3.50 | 962.50 | Billable |
| 20643 | Service | | | | |
| | letter to Mike Siegel | | | | |
| 10/25/2001 | DWB | 275.00 | 1.25 | 343.75 | Billable |
| 20697 | Service | | | | |
| | Tel. conf. with Mr. Siegel, | | | | |
| 10/29/2001 | DWB | 275.00 | 0.75 | 206.25 | Billable |
| 20720 | Service | | | | |
| | Confer with John Del Col | | | | |
| 10/30/2001 | DWB | 275.00 | 1.00 | 275.00 | Billable |
| 20724 | Service | | | | |
| | Meeting with Mike Siegel | | | | |

Total: October 2001

9.10    $2,502.50

Date: November 2001
11/21/2001
24441

| 11/27/2001 | DWB | 275.00 | 1.20 | 330.00 | Billable |
|---|---|---|---|---|---|
| 24457 | Service | | | | |

Review email from Mike Siegel, tel. conf. with Mike Siegel, tel. conf. with Mark Toberoff

11/29/2001
24467

Total: November 2001

2.80    $770.00

Date: December 2001
| 12/5/2001 | DWB | 275.00 | 0.10 | 27.50 | Billable |
|---|---|---|---|---|---|
| 27832 | Service | | | | |
| | Place call to Kevin Marks | | | | |

Total: December 2001

0.10    $27.50

Date: January 2002
1/23/2002
30796

EOMS 00183
Apr.29. 2012  04:06 PM

**EXHIBIT B**
**5**

Received    May-01-12  04:35pm    From-    -To-    Page 022

11/22/2007                     Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                              Pre-bill Worksheet                              Page   721

SIEG.2G0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Total: January 2002 | | | 0.35 | | $96.25 |
| Date: February 2002 | | | | | |
| 2/11/2002 35125 | DWB Service Tel. conf. with Marc Toberoff, ■■■ | 275.00 | 1.45 | 398.75 | Billable |
| 2/12/2002 35128 | DWB Service Tel. conf. with Mr. Siegel | 275.00 | 0.70 | 192.50 | Billable |
| 2/23/2002 35200 | ■■■■■■■■■■■■■■ | | | | |
| 2/25/2002 35213 | DWB Service Tel. conf. with Steve Webster, prepare for meeting, meeting with Mike Siegel | 275.00 | 6.75 | 1,856.25 | Billable |
| Total: February 2002 | | | 15.90 | | $4,372.50 |
| Date: March 2002 | | | | | |
| 3/8/2002 37015 | DWB Service Tel. conf. with Kevin Marks | 275.00 | 1.50 | 412.50 | Billable |
| 3/12/2002 37049 | ■■■■■■■■■■■■■■ | | | | |
| 3/14/2002 37158 | DWB Service Tel. conf. with Mr. Siegel, ■■■ | 275.00 | 0.45 | 123.75 | Billable |
| 3/15/2002 37161 | DWB Service Tel. conf. with Ms Siegel | 275.00 | 0.35 | 96.25 | Billable |
| 3/22/2002 37342 | DWB Service Tel. conf. with Marc Toberoff | 275.00 | 0.70 | 192.50 | Billable |
| Total: March 2002 | | | 3.40 | | $935.00 |

**EOMS 00184**

**EXHIBIT B**
**6**

Received   May-01-12   04:35pm     From-     -To-     Page 023

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page     722

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| **Date: May 2002** | | | | | |
| 5/8/2002 44646 | DWB Service Prepare letter to Marks, email to Mike Siegel | 290.00 | 0.80 | 232.00 | Billable |
| 5/9/2002 44654 | DWB Service Prepare report | 290.00 | 0.75 | 217.50 | Billable |
| 5/10/2002 44660 | DWB Service Revise and sent letter to Malks, reply to correspondence from Mr. Siegel | 290.00 | 1.20 | 348.00 | Billable |
| 5/20/2002 44954 | DWB Service Review and reply to email from Mike Siegel | 290.00 | 0.40 | 116.00 | Billable |
| 5/21/2002 44866 | DWB Service Email report to Mike Siegel | 290.00 | 0.20 | 58.00 | Billable |
| 5/22/2002 44874 | DWB Service Letter to attorney for DC Comics re medical insurance | 290.00 | 0.30 | 87.00 | Billable |
| 5/23/2002 44891 | DWB Service Tel. conf. with Kevin Marks | 290.00 | 0.40 | 116.00 | Billable |
| Total  May 2002 | | | 4.05 | | $1,174.50 |
| **Date: July 2002** | | | | | |
| 7/8/2002 51678 | DWB Service Tel. conf. with Mike Siegel | 290.00 | 0.30 | 87.00 | Billable |
| 7/15/2002 51740 | ████████████████ | | | | |
| 7/19/2002 51767 | DWB Service ███████ tel. conf. with Mike Siegel | 290.00 | 3.00 | 870.00 | Billable |
| 7/30/2002 51850 | DWB Service Tel. conf. with Mark Tobaroff, tel. conf. with Kevin Marks | 290.00 | 0.90 | 261.00 | Billable |

**EOMS 00185**

Apr.29.2012  04:06 PM

**EXHIBIT B**
**7**

11/22/2007                                    Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                              Pre-bill Worksheet                                    Page    724

SIEG-ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 9/24/2002 59767 | DWB Service | 280.00 | 0.40 | 116.00 | Billable |
| | Email to Marks re status, review email from Mike Siegel | | | | |
| 9/26/2002 59800 | DWB Service | 290.00 | 1.10 | 319.00 | Billable |
| | Tel. conf. with Kevin Marks, tel. conf. with Mike Siegel | | | | |
| 9/27/2002 59808 | DWB Service | 290.00 | 1.30 | 377.00 | Billable |
| | Review letters from Joanne Siegel, tel. conf. with Mike Siegel | | | | |
| 9/29/2002 59831 | DWB Service | 290.00 | 0.35 | 101.50 | Billable |
| | Review letter from Laura Siegel | | | | |
| Total September 2002 | | | 6.05 | | $1,754.50 |
| Date: October 2002 | | | | | |
| 10/1/2002 62797 | ██████████████████████████████ | | | | |
| 10/5/2002 62831 | DWB Service | 290.00 | 2.25 | 652.50 | Billable |
| | Meeting with Mike Siegel | | | | |
| 10/7/2002 62840 | DWB Service | 290.00 | 1.40 | 406.00 | Billable |
| | Mike Siegel | | | | |
| 10/29/2002 63032 | DWB Service | 290.00 | 1.00 | 290.00 | Billable |
| | Meeting with Mike Siegel | | | | |
| Total: October 2002 | | | 6.65 | | $1,928.50 |
| Date: November 2002 | | | | | |
| 11/11/2002 65290 | DWB Service ████████ place call to Toberoff | 290.00 | 0.40 | 116.00 | Billable |
| 11/19/2002 65347 | DWB Service | 290.00 | 1.00 | 290.00 | Billable |
| | Tel. conf. with Mark Toberoff | | | | |

EOMS 00186

**EXHIBIT B**

**8**

Received  May-01-12  04:36pm    From—    —To—    Page 026

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                    Pre-bill Worksheet                                    Page    726

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 1/25/2002 65409 | ████████████████ | ██████ | ██████ | ██████ | ████ |
| **Total: November 2002** | | | 1.70 | | $493.00 |
| **Date: January 2003** | | | | | |
| 1/15/2003 71840 | DWB Service<br>Review file, correspondence with Mr. Siegel | 290.00 | 0.40 | 116.00 | Billable |
| 1/16/2003 71853 | DWB Service<br>Email to Toberoff, review and reply to email from Mike Siegel | 290.00 | 0.35 | 101.50 | Billable |
| 1/22/2003 71912 | ████████████████ | ██████ | ██████ | ██████ | ████ |
| 1/23/2003 71923 | DWB Service<br>Tel. conf. with Marc Toberoff | 290.00 | 0.60 | 174.00 | Billable |
| 1/24/2003 71947 | DWB Service<br>Tel. conf. with Marc Toberoff | 290.00 | 0.50 | 145.00 | Billable |
| 1/28/2003 71978 | DWB Service<br>Legal research, report to Mike Siegel | 290.00 | 1.00 | 290.00 | Billable |
| 1/29/2003 71991 | DWB Service<br>Tel. conf. with Mike Siegel | 290.00 | 0.60 | 174.00 | Billable |
| **Total: January 2003** | | | 9.45 | | $2,740.50 |
| **Date: March 2003** | | | | | |
| 3/4/2003 78629 | DWB Service<br>Tel. conf. with Marc Toberoff | 290.00 | 0.45 | 130.50 | Billable |

PAGE. 26/34          Apr. 29 2012 04:07 PM

EOMS 00187



Received  May-01-12  04:35pm    From-    To-    Page 027

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pro-bill Worksheet

Page    726

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Total: March 2003 | | | 0.45 | | $130.50 |
| Date: April 2003 | | | | | |
| 4/4/2003 DWB 81944 Service | Tel. conf. with Marc Toberoff | 305.00 | 0.35 | 106.75 | Billable |
| 4/14/2003 81994 | | | | | |
| 4/15/2003 DWB 82001 Service | Reply to email from Mike Siegel | 305.00 | 0.25 | 76.25 | Billable |
| Total, April 2003 | | | 2.30 | | $701.50 |
| Date: May 2003 | | | | | |
| 5/2/2003 DWB 84972 Service | Tel. conf. with Marc Toberoff | 305.00 | 0.30 | 91.50 | Billable |
| 5/7/2003 85003 | | | | | |
| 5/8/2003 DWB 85007 Service | Tel. conf. with Steve Webster, report to Mr. Siegel | 305.00 | 0.40 | 122.00 | Billable |
| 5/12/2003 85044 | | | | | |
| Total, May 2003 | | | 1.90 | | $579.50 |
| Date: June 2003 | | | | | |
| 6/3/2003 DWB 88053 Service | Tel. conf. with Toberoff re offer for rights | 305.00 | 0.40 | 122.00 | Billable |

EOMS 00188

Apr. 29. 2012  04:07 PM

**EXHIBIT B**
**10**

Received May-01-12 04:36pm    From—    —To-    Page 028



11/22/2007
3:4· AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page  727

SIE3 ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 6/10/2003 88115 | DWB | | | | |
| 6/17/2003 88176 | | | | | |
| 6/18/2003 88185 | | | | | |
| 6/19/2003 88194 | | | | | |
| 6/23/2003 88203 | DWB Service Report to Mr. Siegel | 305.00 | 0.30 | 91.50 | Billable |
| Total: June 2003 | | | 2.90 | | $884.50 |
| Date: July 2003 | | | | | |
| 7/14/2003 92810 | | | | | |
| 7/21/2003 92834 | DWB Service Tel. conf. with Marc Toberoff | 305.00 | 0.40 | 122.00 | Billable |
| Total: July 2003 | | | 1.80 | | $549.00 |
| Date: August 2003 | | | | | |
| 8/11/2003 94820 | | | | | |
| Total: August 2003 | | | 0.60 | | $163.00 |

PAGE. 28/34    Apr.29 2012 04:07 PM
EOMS 00189

Received   May-01-12   04:36pm   From-   -To-   Page 030

LEGAL RESEARCH

11/22/2007                    Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                            Pre-bill Worksheet                          Page   729

SIEG ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 4/9/2004 119416 | | | | | |
| 4/12/2004 119417 | | | | | |
| 4/15/2004 119418 | | | | | |
| 4/16/2004 119419 | | | | | |
| 4/19/2004 119421 | | | | | |
| 4/20/2004 119422 | | | | | |
| Total April 2004 | | | 18.70 | | $1,840.50 |
| Date: May 2004 | | | | | |
| 5/10/2004 123457 | DWB Service Tel. conf. with Mike Siegel | 315.00 | 0.30 | 94.50 | Billable |
| Total May 2004 | | | 0.30 | | $94.50 |
| Date: June 2004 | | | | | |
| 6/3/2004 127249 | DWB Service Tel. conf. with Marc Toberoff | 315.00 | 0.60 | 189.00 | Billable |
| 6/8/2004 127267 | DWB Service Review and reply to emails from Mr. Siegel and voice mail message from Mr. Toberoff | 315.00 | 0.60 | 189.00 | Billable |
| 6/21/2004 127366 | DWB Service Review and reply to email, prepare for meeting , meeting with Mr. Siegel | 315.00 | 3.40 | 1,071.00 | Billable |

Apr.29 2012  04:08 PM

**EOMS 00190**

**EXHIBIT B**
**12**

Received  May-01-12  04:36pm       From-       -To-       Page 031

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                   Pre-bill Worksheet                                    Page    730

SIEG ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Total: June 2004 | | | 4.60 | | $1,449.00 |
| **Date: July 2004** | | | | | |
| 7/6/2004 DWB | | 315.00 | 0.10 | 31.50 | Billable |
| 130901 Service | Place call to Toberoff | | | | |
| Total: July 2004 | | | 0.10 | | $31.50 |
| **Date: August 2004** | | | | | |
| 8/2/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 134042 Service | Forward estate papers to Steve Webster | | | | |
| Total: August 2004 | | | 0.30 | | $94.50 |
| **Date: September 2004** | | | | | |
| 9/30/2004 DWB | | 315.00 | 0.60 | 189.00 | Billable |
| 138716 Service | Tel. conf. with Marc Toberoff re purchase offer | | | | |
| Total: September 2004 | | | 0.60 | | $189.00 |
| **Date: October 2004** | | | | | |
| 10/5/2004 DWB | | 315.00 | 0.90 | 283.50 | Billable |
| 141958 Service | Review file, prepare report, email to Mike Siegel | | | | |
| 10/11/2004 DWB | | 315.00 | 0.40 | 126.00 | Billable |
| 141993 Service | Tel. conf. with Marc Toberoff re offer | | | | |
| 10/13/2004 DWB | | 315.00 | 0.80 | 252.00 | Billable |
| 142008 Service | ▮▮▮▮▮ tel. confs. with Marc Toberoff | | | | |
| 10/27/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 142106 Service | Tel. conf. with Marc Toberoff | | | | |
| 10/28/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 142122 Service | Tel. conf. with Mike Siegel | | | | |

11/22/2007                              Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                       Pre-bill Worksheet                                          Page    731

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Total: October 2004 | | | 2.70 | | $850.50 |
| **Date: November 2004** | | | | | |
| 11/4/2004 145609 | ████████████ | | | | |
| 11/12/2004 145666 | ████████████ | | | | |
| Total: November 2004 | | | 2.40 | | $756.00 |
| **Date: December 2004** | | | | | |
| 12/6/2004 DWB 147974 Service | Review and reply to email from Mike Siegel | 315.00 | 0.30 | 94.50 | Billable |
| Total: December 2004 | | | 0.30 | | $94.50 |
| **Date: February 2005** | | | | | |
| 2/17/2005 DWB 155843 Service | Tel. conf. with Marc Toberoff | 315.00 | 0.50 | 157.50 | Billable |
| Total: February 2005 | | | 0.50 | | $157.50 |
| **Date: May 2005** | | | | | |
| 5/8/2005 DWB 165782 Service | Review and reply to email from Mike Siegel | 330.00 | 0.30 | 99.00 | Billable |
| Total: May 2005 | | | 0.30 | | $99.00 |
| **Date: July 2005** | | | | | |
| 7/25/2005 DWB 173249 Service | Review pleadings schedule and request copies | 330.00 | 0.50 | 165.00 | Billable |
| Total: July 2005 | | | 0.50 | | $165.00 |

EOMS 00192



11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    732

SIEG ZG0101:Mr. Mike Siegel (continued)    RESOMUM

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| **Date: August 2005** | | | | | |
| 8/2/2005 176556 | ████████ | | | | |
| 8/3/2005 176573 | ████████ | | | | |
| **Total August 2005** | | | 14.00 | | $1,400.00 |
| **Date: September 2005** | | | | | |
| 9/30/2005 180768 | KMG Service Created Motion to Intervene. | 100.00 | 0.80 | 80.00 | Billable |
| **Total September 2005** | | | 0.80 | | $80.00 |
| **Date: October 2005** | | | | | |
| 10/3/2005 184480 | KMG Service Created Motion to Intervene. | 100.00 | 1.00 | 100.00 | Billable |
| 10/4/2005 184489 | KMG Service Created Motion to Intervene. | 100.00 | 1.00 | 100.00 | Billable |
| 10/12/2005 184524 | KMG Service Created Motion to Intervene. | 100.00 | 1.00 | 100.00 | Billable |
| 10/31/2005 184158 | DWB Service Tel conf. with Marc Toberoff, meeting with Mike Siegel | 330.00 | 1.90 | 627.00 | Billable |
| **Total October 2005** | | | 4.90 | | $927.00 |
| **Date: November 2005** | | | | | |
| 11/2/2005 185612 | KMG Service Created Motion to Intervene. | 100.00 | 1.80 | 180.00 | Billable |

EOMS 00193

**Renno Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  November 30, 2001

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 11/27/2001 DWB | Review email from Mike Siegel, tel. conf. with Mike Siegel, tel. conf. with Mark Toberoff | $275.00/hr  1.20 | 330.00 |
| 11/29/2001 | | $275.00/hr | |
| | For professional services rendered | $275.00/hr  2.80 | $770.00 |

**EXHIBIT B**
**16**

**Re___er, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  July 31, 2002

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 7/8/2002 DWB | Tel. conf. with Mike Siegel | 0.30 $290.00/hr | 87.00 |
| 7/15/2002 | ████████████████████████ | $290.00/hr | |
| 7/19/2002 | ████████████████████████ | $290.00/hr | |
| 7/30/2002 DWB | Tel. conf. with Mark Toberoff, tel. conf. with Kevin Marks | 0.90 $290.00/hr | 261.00 |
| 7/31/2002 DWB | Review statements and outstanding charges, confer with Accountant | 0.75 $290.00/hr | 217.50 |
| | For professional services rendered | 5.45 | $1,580.50 |

**EXHIBIT B**
**17**

**Renner, Otto, Boisselle, & Sklar, LLP** 
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending November 30, 2002

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 11/11/2002  DWB  Review Siegel letter, place call to Toberoff | 0.40<br>$290.00/hr | 116.00 |
| 11/19/2002 DWB  Tel. conf. with Mark Toberoff | 1.00<br>$290.00/hr | 290.00 |
| 11/26/2002 ▇▇▇▇▇▇▇▇▇▇▇▇ | 0.30<br>$290.00/hr | 87.00 |
| For professional services rendered | 1.70 | $493.00 |

**EXHIBIT B**
**18**

Apr.29.2012  07:16 PM                                                    PAGE. 25/ 46

**Reiter, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

Invoice submitted to:
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  January 31, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 1/15/2003 | DWB | Review file, correspondence with Mr. Siegel | 0.40 $290.00/hr | 116.00 |
| 1/16/2003 | DWB | Email to Toberoff, review and reply to email from Mike Siegel | 0.35 $290.00/hr | 101.50 |
| 1/22/2003 | | ████████████████████ | | |
| 1/23/2003 | DWB | Tel. conf. with Marc Toberoff | 0.60 $290.00/hr | 174.00 |
| 1/24/2003 | DWB | Tel. conf. with Marc Toberoff | 0.50 $290.00/hr | 145.00 |
| 1/28/2003 | DWB | Legal research, report to Mike Siegel | 1.00 $290.00/hr | 290.00 |
| 1/29/2003 | DWB | Tel. conf. with Mike Siegel | 0.60 $290.00/hr | 174.00 |
| | | For professional services rendered | 9.45 | $2,740.50 |

Received  May-01-12  07:47pm    From-                    To-            Page  025
EOMS 00197

**EXHIBIT B**
**19**

Rei███r, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending  March 31, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  | Hrs/Rate | Amount |
|---|---|---|
| 3/4/2003 DWB  Tel. conf. with Marc Toberoff | 0.45 $290.00/hr | 130.50 |
| For professional services rendered | 0.45 | $130.50 |



**Rerer, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44105

For Period Ending  April 30, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 4/4/2003 DWB  Tel. conf. with Marc Toberoff | 0.35 $305.00/hr | 108.75 |
| 4/14/2003 ████████████████████████████ | | |
| 4/15/2003 DWB  Reply to email from Mike Siegel | 0.25 $305.00/hr | 76.25 |
| For professional services rendered | 2.30 | $701.50 |

**Re... er, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

Invoice submitted to:
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  May 31, 2003

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 5/2/2003 | DWB | Tel. conf. with Marc Toberoff | 0.30 $305.00/hr | 91.50 |
| 5/7/2003 | | | | |
| 5/8/2003 | DWB | Tel. conf. with Steve Webster report to Mr. Siegel | 0.40 | 122.00 |
| 5/12/2003 | | | | |
| | | For professional services rendered | 1.90 | $579.50 |

**EXHIBIT B**
**22**

 

### Rer, Otto, Boisselle, & Sklar, LLP
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending  June 30, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 6/3/2003 DWB | Tel. conf. with Toberoff re offer for rights | 0.40<br>$305.00/hr | 122.00 |
| 6/10/2003 | ██████████████████████████████ | | |
| 6/17/2003 | ██████████████████████████████ | | |
| 6/18/2003 | ██████████████████████████████ | $305.00/hr | |
| 6/19/2003 DWB | Tel. conf. with Marc Toberoff regarding proposal | 0.40<br>$305.00/hr | 122.00 |
| 6/23/2003 DWB | Report to Mr. Siegel | 0.30<br>$305.00/hr | 91.50 |
| | For professional services rendered | 2.90 | $864.50 |

Apr.29.2012  07:17 PM                                                PAGE. 32/ 46

**Re....er, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106

For Period Ending July 31, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 7/14/2003 | DWB | ██████████████ | 1.40<br>$305.00/hr | 427.00 |
| 7/21/2003 | DWB | Tel. conf. with Marc Toberoff | 0.40<br>$305.00/hr | 122.00 |
| | | For professional services rendered | 1.80 | $549.00 |

Apr.29.2012  07:15 PM                                            PAGE. 12/ 46

### Re*or, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending February 28, 2002

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|            |     |                                                                          | Hrs/Rate             | Amount    |
|------------|-----|--------------------------------------------------------------------------|----------------------|-----------|
| 2/11/2002  | DWB | Tel. conf. with Marc Toberoff, ███████████████                           | 1.45 $275.00/hr      | 398.75    |
| 2/12/2002  | DWB | Tel. conf. with Mr. Siegel                                               | 0.70 $275.00/hr      | 192.50    |
| 2/23/2002  | ██████████████████████████████████████████████████████████████████████ | $275.00/hr           |           |
| 2/25/2002  | DWB | Tel. conf. with Steve Webster, prepare for meeting, meeting with Mike Siegel | 6.75 $275.00/hr   | 1,856.25  |
|            |     | For professional services rendered                                       | 15.90                | $4,372.50 |

**EXHIBIT B**
**25**

Apr.29.2012  07:18 PM                                                    PAGE. 39/ 46

 **Re er, Otto, Boisselle, & Sklar, LLP** 
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3805 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  June 30, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 6/3/2004 DWB | Tel. conf. with Marc Toberoff |  | 0.60 $315.00/hr | 189.00 |
| 6/8/2004 DWB | Review and reply to emails from Mr. Siegel and voice mail message from Mr. Toberoff |  | 0.60 $315.00/hr | 189.00 |
| 6/21/2004 DWB | Review and reply to email, prepare for meeting , meeting with Mr. Siegel |  | 3.40 $315.00/hr | 1,071.00 |
| | For professional services rendered | | 4.60 | $1,449.00 |

**EOMS 00204**

**EXHIBIT B**
**26**

### Reiner, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106

#### For Period Ending  July 31, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 7/6/2004 DWB  Place call to Toberoff | 0.10 $315.00/hr | 31.50 |
| For professional services rendered | 0.10 | $31.50 |

**EXHIBIT B**
**27**

**Re⬤er, Otto, Boisselle, & Sklar, LLP** ⬤
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  September 30, 2004

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 9/30/2004 DWB  Tel. conf. with Marc Toberoff re purchase offer | | 0.60 $315.00/hr | 189.00 |
| For professional services rendered | | 0.60 | $189.00 |

**EXHIBIT B**
**28**

## Re██ar, Otto, Boisselle, & Sklar, LLP ●
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3805 Bandemeer Rd
Cleveland Heights OH 44106

### For Period Ending October 31, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

**Professional Services**

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 10/5/2004 DWB | Review file, prepare report, email to Mike Siegel | | 0.90<br>$315.00/hr | 283.50 |
| 10/11/2004 DWB | Tel. conf. with Marc Toberoff re offer | | 0.40<br>$315.00/hr | 126.00 |
| 10/13/2004 DWB | ▮▮▮▮▮▮▮▮▮▮ tel. confs. with Marc Toberoff | | 0.80<br>$315.00/hr | 252.00 |
| 10/27/2004 DWB | Tel. conf. with Marc Toberoff | | 0.30<br>$315.00/hr | 94.50 |
| 10/28/2004 DWB | Tel. conf. with Mike Siegel | | 0.30<br>$315.00/hr | 94.50 |
| | For professional services rendered | | 2.70 | $850.50 |

**EXHIBIT B**
**29**

## Renner, Otto, Boisselle, & Sklar, LLP
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

November 14, 2007        Invoice #    90477

Invoice submitted to:
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  November 30, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  | | Hrs/Rate | Amount |
|---|---|---|---|
| 11/4/2004 | | | |
| 11/12/2004 | | | |
| For professional services rendered | | 2.40 | $756.00 |

**EXHIBIT B**
**30**

### Re████r, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

#### For Period Ending March 31, 2002

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

**Professional Services**

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 3/8/2002 | DWB  Tel. conf. with Kevin Marks | 1.50 $275.00/hr | 412.50 |
| 3/12/2002 | ████████████████████ | $275.00/hr | ████ |
| 3/14/2002 | ████████████████████ | ████████ | ████ |
| 3/15/2002 | DWB  Tel. conf. with Ms. Siegel | 0.35 $275.00/hr | 96.25 |
| 3/22/2002 | DWB  Tel. conf. with Marc Toberoff | 0.70 $275.00/hr | 192.50 |
| | **For professional services rendered** | **3.40** | **$935.00** |

Received    May-01-12    05:38pm    From-        -To-        -00 Page    007

## Renn Otto, Boisselle, & Sklar, LLP 

The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending February 28, 2005

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 2/17/2005 DWB  Tel. conf. with Marc Toberoff | 0.50 $315.00/hr | 157.50 |
| For professional services rendered | 0.50 | $157.50 |

EOMS 00210

**EXHIBIT B**

**32**

Received  May-01-12  05:38pm          From—          -To-          Page 012

### Rennor, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH  44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  October 31, 2005

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 10/3/2005 | KMG | Created Motion to Intervene. | 1.00 $100.00/hr | 100.00 |
| 10/4/2005 | KMG | Created Motion to Intervene. | 1.00 $100.00/hr | 100.00 |
| 10/12/2005 | KMG | Created Motion to Intervene. | 1.00 $100.00/hr | 100.00 |
| 10/31/2005 | DWB | Tel. conf. with Marc Toberoff, meeting with Mike Siegel | 1.90 $330.00/hr | 627.00 |
| | | For professional services rendered | 4.90 | $927.00 |

Apr. 29 2013  05:06 PM

EOMS 00211

Received    May-01-12  05:38pm    From-    -To-    Page 014

| | |
|---|---|
| 2/21/2008<br>5:32 AM | Renner, Otto, Boisselle, & Sklar, LLP<br>Pre-bill Worksheet |

Page    701

Nickname    SIEG.L0102 | 38877
Full Name    Mr. Mike Siegel
Address    3605 Bendemeer Rd
Cleveland Heights OH 44106

Phone 1    Phone 2
Phone 3    Phone 4
In Ref To    L0102; RENNER, OTTO, BOISSELLE & SKLAR vs. ESTATE OF MICHEAL SIEGEL - CASE NO.
CV-07-620856

| Date<br>:D | Lawyer<br>Task | Rate<br>Markup % | Hours<br>DNB Time | Amount<br>DNB Amt | Total |
|---|---|---|---|---|---|
| **Date: May 2006** | | | | | |
| 5/31/2006 | DWB | 345.00 | 0.20 | 69.00 | Billable |
| 208070 | Service | | | | Hold |
| | Review and sign engagement letter, email to counsel | | | | |
| **Total  May 2006** | | | 0.00 | | $0.00 |
| | Hold | | 0.20 | $69.00 | |
| **Date: November 2007** | | | | | |
| 11/7/2007 | DWB | 360.00 | 1.50 | 540.00 | Billable |
| 276613 | Service | | | | Hold |
| | Assemble documentation | | | | |
| **Total: November 2007** | | | 0.00 | | $0.00 |
| | Hold | | 1.50 | $540.00 | |
| **Date: January 2008** | | | | | |
| 1/11/2008 | DWB | 360.00 | 3.00 | 1,080.00 | Billable |
| 282904 | Service | | | | |
| | Work on declaration | | | | |
| 1/14/2008 | EAB | 120.00 | 0.20 | 24.00 | Billable |
| 282284 | Service | | | | |
| | Attention to case law research. | | | | |
| 1/17/2008 | DWB | 360.00 | 2.00 | 720.00 | Billable |
| 282931 | Service | | | | |
| | Prepare expert report | | | | |
| 1/29/2008 | JMR | 285.00 | 0.75 | 213.75 | Billable |
| 283035 | Service | | | | |
| | Attention to hearing issues; call with court re scheduling; call to Siegel<br>counsel | | | | |
| 1/31/2008 | JMR | 285.00 | 1.00 | 285.00 | Billable |
| 283041 | Service | | | | |
| | Call with Toberoff firm re hearing on 2/1; review reply and opposition brief re<br>same. | | | | |

Apr-29-2012 05-07 PM

**EOMS 00212**

**EXHIBIT B**
**34**

Received May-01-12 05:38pm    From-    -To-    Page 022

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    716

Nickname         SIEG.ZG0100 | 13840
Full Name        Mr. Mike Siegel
Address          3605 Bandemeer Rd
                 Cleveland Heights OH 44106
Phone 1                              Phone 2
Phone 3                              Phone 4
In Ref To        G0100; General Matters

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| Date: November 2006 | | | | | |
| 11/2/2006 DWB | | 346.00 | 0.30 | 103.50 | Billable |
| 229529 Service | | | | | |
| | Tel. conf. with Marc Toberoff | | | | |
| Total: November 2006 | | | 0.30 | | $103.50 |
| TOTAL | Billable Fees | | 0.30 | | $103.50 |

| Date ID | Lawyer Expense | Price Markup % | Quantity | Amount | Total |
|---------|----------------|----------------|----------|--------|-------|
| Date: July 2002 | | | | | |
| 7/22/2002 EXPENSE | | 60.99 | 1.000 | 60.99 | Billable |
| 54322 Misc. | | | | | |
| | Flowers for Ms. Bella Siegel. [71332] | | | | |
| Total  July 2002 | | | | | $60.99 |
| TOTAL | Billable Costs | | | | $60.99 |

| | | | | Amount | Total |
|--|--|--|--|--------|-------|
| Total of Fees (Time Charges) | | | | | $103.50 |
| Total of Costs (Expense Charges) | | | | | $60.99 |
| Total new charges | | | | | $164.49 |
| Total New Balance | | | | | $164.49 |

EOMS 00213

PAGE 22/37    Apr-29-2012  05:08 PM

Received    May-01-12   05:38pm    From-    -To-    Page 023

| | | | | | | | |
|---|---|---|---|---|---|---|---|

11/22/2007    Renner, Otto, Boisselle, & Sklar, LLP    Page    734
3:42 AM    Pre-bill Worksheet

Nickname    SIEG.ZG0108 | 33237
Full Name    Mr. Melvin H. Banchek
Address    55 Public Square, Suite 918
            Cleveland OH 44113

Phone    Phone 2
Phone 3    Phone 4
In Ref To    G0108; Michael Siegel's Death and Estate

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| **Date: May 2006** | | | | | |
| 5/31/2006 DWB | Service | 345.00 | 0.20 | 69.00 | Billable |
| 208070 | Review and sign engagement letter, email to counsel | | | | |
| Total: May 2006 | | | 0.20 | | $69.00 |
| **Date August 2006** | | | | | |
| 8/21/2006 DWB | Service | 345.00 | 0.50 | 172.50 | Billable |
| 219738 | Tel. conf. with Steve Ott, tel. conf. with Toberoff's office | | | | |
| 8/23/2006 DWB | Service | 345.00 | 0.80 | 276.00 | Billable |
| 219748 | Tel. conf. with Mel Banchek, email to Toberoff's office, tel. conf. with Toberoff's office, office conference re representation | | | | |
| Total. August 2006 | | | 1.30 | | $448.50 |
| TOTAL | Billable Fees | | 1.50 | | $517.50 |

| Date ID | Lawyer Expense | Price Markup % | Quantity | Amount | Total | |
|---|---|---|---|---|---|---|
| **Date: July 2006** | | | | | | |
| 7/31/2006 EXPENSE | | 230.04 | 1.000 | 230.04 | Billable | *Duplicate of P.703 + 715* |
| 216351 | O/S Prof. Serv | | | | | |
| | Outside Professional Services rendered by Ott & Associates. [2000666] | | | | | |
| Total July 2006 | | | | | $230.04 | |
| TOTAL | Billable Costs | | | | $230.04 | |
| | | | | Amount | Total | |
| Total of Fees (Time Charges) | | | | | $517.50 | |

PAGE. 23/ 37    Apr. 29 2013  05:09 PM    **EOMS 00214**

# EXHIBIT C

Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

LAURA SIEGEL LARSON,

*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee,*

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,

*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZX)

———————

## REPLY BRIEF OF CROSS-APPELLANTS AND APPELLEES
## WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

———————

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

**EXHIBIT C**

**37**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION ........... 3

    A.    Larson And DC Formed An Agreement On October 19, 2001 .......... 3

    B.    Contemplating A Long-Form Document Does Not Defeat A Deal ........................................................................................... 7

    C.    Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings .......... 10

        1.    Scope Of Rights ..................................................................... 10

        2.    Monetary Terms ..................................................................... 11

        3.    "Other" Non-Essential Terms ................................................ 13

        4.    The February 2002 Long-Form ............................................. 14

    D.    Marks' August 2002 Memo Confirms A Deal Was Made ............... 14

II.    DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM ................................................. 16

III.    LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS ..... 17

    A.    Elements Of *AC#1* Were Made-For-Hire ......................................... 17

        1.    *National* Is Not Preclusive ...................................................... 17

        2.    The 1938 Additions Were Made-for-Hire .............................. 19

            a.    New Content ................................................................. 20

            b.    Colorization .................................................................. 21

            c.    Cover Art ...................................................................... 22

    B.    DC Owns The Pre-McClure Strips .................................................... 23

        1.    The Strips Were Made-for-Hire .............................................. 23

        2.    Larson's Failure To Terminate The Strips Is Dispositive ....... 24

    C.    Pages 3-6 Of *S#1* Are Works-For-Hire ............................................ 25

    D.    Artwork In *AC#4* Is Work-For-Hire .................................................. 26

    E.    Copyrightable Elements In DC's Promotional Announcements ........ 27

CONCLUSION ..................................................................................... 28

**EXHIBIT C**
**38**

# TABLE OF AUTHORITIES

**Cases**

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 1999) ......................................................... 19, 20

*Banner Entm't, Inc. v. Super. Ct.,*
  62 Cal.App.4th 348 (1998) ................................................................. 7

*Blix St. Records, Inc. v. Cassidy,*
  191 Cal.App.4th 39 (2010) ................................................................. 7

*Burroughs v. M-G-M, Inc.,*
  491 F.Supp. 1320 (S.D.N.Y. 1980) .................................................. 23

*Burroughs v. M-G-M, Inc.,*
  683 F.2d 610 (2d Cir. 1982) ............................................................ 23

*Chicot County Drainage Dist. v. Baxter County Bank,*
  308 U.S. 371 (1940) ......................................................................... 18

*Clarke v. Fiedler,*
  44 Cal.App.2d 838 (1941) .................................................................. 5

*Comm'r v. Sunnen,*
  333 U.S. 591 (1948) ......................................................................... 18

*Davis & Cox v. Summa Corp.,*
  751 F.2d 1507 (9th Cir. 1985) .......................................................... 18

*Digerati Holdings, LLC v. Young Money Entm't, LLC,*
  194 Cal.App.4th 873 (2011) ............................................................. 13

*Dolman v. Agee,*
  157 F.3d 708 (9th Cir. 1998) ............................................................ 21

*Duran v. Duran,*
  150 Cal.App.3d 176 (1983) ............................................................ 5, 8

*Effects Assocs., Inc. v. Cohen,*
  908 F.2d 555 (9th Cir. 1990) .............................................................. 6

i

**EXHIBIT C**
**39**

*Elite Show Servs., Inc. v. Staffpro, Inc.,*
    119 Cal.App.4th 263 (2004) .................................................................. 4-5

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,*
    122 F.3d 1211 (9th Cir. 1997) ................................................................22

*Ersa Grae Corp. v. Fluor Corp.,*
    1 Cal.App.4th 613 (1991) ....................................................................6, 7

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
    342 F.3d 149 (2d Cir. 2003) ....................................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991) ...............................................................................26

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place,*
    773 F.2d 1068 (9th Cir. 1985) ................................................................19

*Gaiman v. McFarlane,*
    360 F.3d 644 (7th Cir. 2004) ............................................................ 19, 26

*Granite Rock Co. v. Teamsters,*
    649 F.3d 1067 (9th Cir. 2011) ................................................................18

*Harris v. Rudin, Richman & Appel,*
    74 Cal.App.4th 299 (1999) ..................................................................5, 7

*In re Pacific Pictures Corp.,*
    2012 WL 1640627 (9th Cir. May 10, 2012) ......................................16

*Inamed Corp. v. Kuzmak,*
    275 F.Supp.2d 1100 (C.D. Cal. 2002) ................................................13

*Leather v. Eyck,*
    180 F.3d 420 (2d Cir. 1999) ....................................................................18

*Levin v. Knight,*
    780 F.2d 786 (9th Cir. 1986) ......................................................... 4, 6, 10

*Marvel Worldwide, Inc. v. Kirby,*
    777 F.Supp.2d 720 (S.D.N.Y. 2011) ....................................................24

ii

**EXHIBIT C**
**40**

*Mattel, Inc. v. MGA Entm't, Inc.,*
    616 F.3d 904 (9th Cir. 2010) .................................................................. 4

*Murray v. Gelderman,*
    566 F.2d 1307 (5th Cir. 1978) ............................................................... 24

*Norris v. Grosvenor Mktg. Ltd.,*
    803 F.2d 1281 (2d Cir. 1986) ............................................................... 18

*O'Brien v. R.J. O'Brien & Assocs., Inc.,*
    998 F.2d 1394 (7th Cir. 1993) ............................................................... 16

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.,*
    107 Cal.App.4th 516 (2003) ................................................................. 11

*Picture Music, Inc. v. Bourne, Inc.,*
    457 F.2d 1213 (2d Cir. 1972) ............................................................... 23

*Playboy Enters., Inc. v. Dumas,*
    53 F.3d 549 (2d Cir. 1995) .................................................................. 24

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
    77 F.3d 309 (9th Cir. 1996) ................................................................... 7

*Sanborn v. Fed. Crop Ins. Corp.,*
    93 Cal.App.2d 59 (1949) ...................................................................... 16

*Siegel v. Nat'l Periodical Publ'ns,*
    508 F.2d 909 (2d Cir. 1974) ..................................................... 17, 18, 19

*Stephan v. Maloof,*
    274 Cal.App.2d 843 (1969) .................................................................... 7

*The Facebook, Inc. v. Pac. Nw. Software, Inc.,*
    640 F.3d 1034 (9th Cir. 2011) ...................................................... *passim*

*Twentieth Century Fox Film Corp. v. Entm't Distrib.,*
    429 F.3d 869 (9th Cir. 2005) ..................................................... 20, 21, 24

*Valente-Kritzer Video v. Callan-Pinckney,*
    881 F.2d 772 (9th Cir. 1989) .................................................................. 9

iii

**EXHIBIT C
41**

**Statutes**

17 U.S.C § 204(a) ...............................................................................6

37 C.F.R. § 201.10(e)(1)-(2) ............................................................24

Cal. Civ. Code § 1624 .........................................................................6

**Rules**

Fed. R. Evid. 1002 ............................................................................27

iv

**EXHIBIT C**
**42**

# INTRODUCTION

This case should have ended long before it began. The parties all agreed on October 19, 2001, that they had a deal permanently resolving their dispute. Laura Siegel Larson said so, authorizing Kevin Marks to tell DC that her family accepted DC's offer. Marks said so, both when he told DC Larson accepted, and a year later when he told Larson "an agreement was reached last October with D.C." RER-13. DC said so, both in October 2001, and in the case below, affirming it was bound to the terms of Marks' October 19 letter. Even now, Larson tells the Court: "the parties thought they had arrived at terms" in October 2001. LOR-14.

And indeed they had arrived at terms. The October 19 agreement—set forth in DC's offer on October 16 and Marks' acceptance on October 19—covered every essential term of a copyright transfer and resolved every material issue that divided the parties. Under California law, that deal became binding the moment Marks expressed Larson's acceptance, notwithstanding the parties' contemplation that the deal would also be "papered" in a long-form. As Larson's agent, Marks signed a written acceptance on October 19, satisfying any signature requirements.

Under the deal, Larson would receive tens of millions of dollars in cash and future royalties, which DC has fully reserved and remains ready to pay. DC would receive peace with Larson and certainty in its Superman rights. The deal went bad

1

EXHIBIT C
43

only when—and only because—Hollywood businessman Marc Toberoff entered

the picture, seeking to reopen the dispute and obtain the Superman rights himself.

But Toberoff's theory for escaping the 2001 deal is unavailing. Under

Toberoff's guidance, Larson asserts that, although all parties said they reached

agreement on October 19, they were mistaken about essential terms. Her only

evidence is an October 26 letter sent by DC's negotiator, John Schulman—which

Larson says differs materially from the October 19 letter. She is incorrect, and

neither she nor Marks took this position at the time. Every essential term in

Schulman's letter is identical in substance to those in Marks' letter. Any

difference either involves a non-essential term or is one of semantics. If any

material difference does exist, DC has long agreed: the October 19 letter controls.

DC also owns the large majority of Superman copyrights addressed in the

2001 agreement (save for parts of *Action Comics #1*), under the work-for-hire

rules. Those rules and deals Larson's father made with DC control here, assuming

the Court reaches these issues. Each of the disputed Superman works was created

by Siegel or other DC artists that DC employed, directed, and paid to create them.

DC's deals with the Siegels should be honored, and "[a]t some point,

litigation must come to an end. That point [is] now…." *The Facebook, Inc. v.

Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011). Judgment should be

entered in DC's favor, and the 2001 settlement agreement should be enforced.

2

**EXHIBIT C
44**

## I.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE SETTLEMENT QUESTION

After two-and-a-half years of negotiation, Marks and Schulman agreed, during an October 16, 2001, call, on all terms essential to settle this dispute, including a copyright transfer.  SER-105, 434.  Larson accepted DC's terms on October 19—in a call Marks made that day and in a signed, six-page letter he sent.  SER-107-08, 456-61.  A contract was formed on October 19; its terms stated in Marks' letter.  While Larson now recites a list of alleged differences among *later* communications, those differences do not speak to, and cannot alter, the terms of the October 19 deal.  And none reflects a disagreement on a material term.

### A.  Larson And DC Formed An Agreement On October 19, 2001

Between 1999 and 2001, Schulman and Marks spent many hours negotiating the parties' dispute.  SER-434.  By October 16, 2001, all crucial elements of the deal, including the scope of rights to be transferred and all monetary terms, were settled, save one.  SER-105-08, 434-35.  The remaining issue was Larson's right to claim an interest in Superman once certain early works entered the public domain; Marks and Schulman discussed that final point on October 16.  SER-105-07, 434-35.  DC made an offer on that final point and all other material terms.  *Id.*  On October 19, Marks telephoned Schulman to communicate Larson's acceptance and report "we are closed."  SER-107-08.  Marks sent a letter confirming Larson had "accepted D.C. Comics' offer," as detailed in a six-page term sheet.  SER-456-61.

3

**EXHIBIT C**
**45**

Marks' October 19 call and letter sealed the deal. The letter contained all material terms for a copyright transfer, specifically, "the subject matter [and] the price." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986); SER-456-61. The letter unequivocally accepted DC's offer. SER-456 ("The Siegel Family… has accepted D.C. Comics offer of October 16, 2001…."). The acceptance was signed by Larson's agent, "the party against whom enforcement is sought." *Levin*, 780 F.2d at 787. A binding agreement was formed. *Facebook*, 640 F.3d at 1037-38.

Larson does not argue *she* did not consent to be bound by the terms of Marks' October 19 letter. Rather, she suggests Marks misunderstood DC's offer, and thus his letter was a "counteroffer." LOR-14-17. But according to Marks' and Schulman's unrebutted testimony, Marks' letter was consistent with every material term of DC's October 16 offer. SER-110, 435. That testimony alone precludes the summary judgment order issued below, and justifies this Court entering judgment in DC's favor. Larson does not dispute this Court may enter judgment for DC. DCB-28. At a minimum, the issue must be remanded for trial. *Id.* at 34. For if a jury credited Marks' and Schulman's testimony that Marks' October 19 acceptance tracked DC's October 16 offer—as it easily could—then the Marks letter correctly states all essential terms agreed to by the parties, and a contract was formed.[1]

---

[1] *See Facebook*, 640 F.3d at 1037; *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119

4

**EXHIBIT C**
**46**

The only evidence Larson offers to suggest that Marks' October 19 acceptance letter did not match the terms of DC's offer is Schulman's October 26 letter. SER-463-70. Larson argues the contract terms described in Schulman's letter vary so markedly from those described in Marks' letter that no jury could reasonably find that Marks accurately understood DC's offer when he unequivocally accepted it on Larson's behalf. LOR-13-24.

That supposed variance comes nowhere close to justifying summary judgment on the issue of contract formation in Larson's favor. First, the variance does not *eliminate* a factual dispute whether Marks understood DC's offer when he accepted it—at the very most, it *creates* a dispute. Second, the supposed variance is not a variance at all—there is no difference between two letters on any material term. *Infra* at 10-14. Third, even if Schulman's letter reflected a difference on a material term, that difference could not alter or supersede the *already-existing* October 19 agreement. If the law allowed a writing like Schulman's to undermine an earlier agreement, any party could repudiate a contract "by simply suggesting other and additional terms…." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941).

Through her agent, Larson provided a signed, written acceptance of DC's offer. No additional writing or signature was required. *Id.* at 846 (enforcing contract when there was no agreement signed by either party); *Ersa Grae Corp. v.*

Cal.App.4th 263, 268 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 308-09 (1999); *Duran v. Duran*, 150 Cal.App.3d 176, 181 (1983).

5

**EXHIBIT C**

*Fluor Corp.*, 1 Cal.App.4th 613, 624 n.3 (1991); *Levin*, 780 F.2d at 787-88; CAL. CIV. CODE § 1624 (statute of frauds requires only that contract be "in writing and subscribed by the party to be charged *or by the party's agent*") (emphasis added); DCB-26-27.

Larson invokes the Copyright Act, and its rule that copyright assignments be "signed by the owner" of the copyright, or her "agent." 17 U.S.C § 204(a). Larson concedes Marks was her agent, RER-9, and his letter clearly expresses her "acceptance" to "transfer all of [her] rights in ... 'Superman,'" SER-456, 458. "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Marks' signed, six-page letter qualifies.

Finally, the parties' actions show they agreed to be bound. They negotiated for two years, and resolved their last deal point on October 16. SER-456, 463-64. Larson suggests the October 16 deal was so hastily made that within days Marks and Schulman could not remember its terms; exchanged conflicting term sheets; and then let those conflicts fester. LOR-16-17. This account is unsupported. The parties stopped negotiating in October because they had a deal, and Marks *never* objected to Schulman's letter or called it a counter-offer. DC undertook the separate task of preparing a long-form, SER-435, and began performing on the

6

**EXHIBIT C**
**48**

2001 deal, reserving amounts due.  These are all acts of parties who had a deal.[2]

### B.    Contemplating A Long-Form Document Does Not Defeat A Deal

Larson argues Marks' October 19 acceptance is not enforceable because it

"was subject to documentation and would need to be reduced to a mutually-

acceptable written contract."  LOR-26.  But (i) Marks' October 19 letter contains

no such condition, and (ii) the rule in California could not be clearer:

> The fact that an agreement contemplates subsequent documentation
> does not invalidate the agreement if the parties have agreed to its
> existing terms.

*Ersa*, 1 Cal.App.4th at 624 n.3; *accord Harris*, 74 Cal.App.4th at 307; *Stephan v.*

*Maloof*, 274 Cal.App.2d 843, 848 (1969); *Facebook*, 640 F.3d at 1037; *Blix St.*

*Records, Inc. v. Cassidy*, 191 Cal.App.4th 39, 48-49 (2010).

Larson's cases, LOR-27, show that California law requires an *express*

*reservation* to make a contract unenforceable for lack of later documentation,

*Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996) (letter of

intent not binding because it expressly stated it was "of no binding effect on any

party hereto"); *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th 348, 359 (1998)

(draft expressly disclaimed it constituted "legal and binding obligation" until

---

[2] Toberoff calls the reserve "Hollywood accounting," LOR-7 n.2—and may
need to say this to mislead Larson about the deal he induced her to abandon—but
the *record fact* remains that a reserve was set; it totals more than $20 million, SER-
397-99; and the funds will be paid to Larson if this Court enforces the 2001
agreement.  Larson gets all of this money, though Marks may have a claim to 5%;
only Toberoff loses his improperly obtained 40% (or more) cut.  DCB-16-19.

7

**EXHIBIT C**
**49**

"signed by the parties"). Indeed, in *Duran*, 150 Cal.App.3d at 181, the party said she must "approve" the final written terms before being bound, but the court held that a jury must determine whether an enforceable agreement had been made.

Here no party ever made any such reservation, either in Marks' letter or in the months that followed during efforts to finalize the long form. SER-114-15, 435, 456. Everyone continued to refer to the deal the parties had made—even Larson's mother in her letter to Time Warner, in its response, and in Marks' later communications with DC and Larson. SER-412-14, 416, 435-36; RER-13-14. If the question of contract formation was for the jury in *Duran*, where one party said her approval of formal documentation *was required*, DC is surely, at the very least, entitled to the same jury determination here, where no reservation was ever made.

Larson wrongly suggests Marks' letter contained "clear reservations" that Larson did not consider the deal done until finally documented. LOR-28. The language she cites, SER-461, does not bear this out:

> John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office — and likely difficult to reach — for the following four weeks.
>
> Many thanks for help and patience in reaching this monumental accord.
>
> Sincerely,
>
> GANG, TYRE, RAMER & BROWN, INC.
>
> By
>
> Kevin S. Marks

8

EXHIBIT C
50

Marks never reserves Larson's rights pending a final agreement. That is especially clear when read in conjunction with the first paragraph of Marks' letter, which contain an unambiguous "acceptance" by Larson on defined "terms":

> Dear John:
>
> This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

SER-456.[3]

Finally, while Schulman's October 26 letter does not matter—since an agreement had already been reached—nothing in it constitutes a "clear reservation" either. Just the opposite: it expressly confirms "the deal we've agreed to." *Id.* SER-463. It notes that DC will undertake the task of putting together the contemplated long-form. And there is no reservation, clear or otherwise, of a right by DC to change the October 19 deal.[4]

---

[3] Larson relies on *Valente-Kritzer Video v. Callan-Pinckney*, 881 F.2d 772, 775 (9th Cir. 1989), but there, the lawyer said his client had not seen or accepted the newly drafted contract. While his letter contained a "congratulations" for reaching a deal, the fact that his client had not reviewed it "undercuts the hint of finality that emanates" from his comment. *Id.* Here, Marks affirmed: Larson "accepted."

[4] DC's reservation to comment on the 50-plus-page long-form document its outside counsel first circulated in February 2002 is quite different, *cf.* LOR-29, and the reservation says nothing about re-opening the October 2001 deal, SER-463.

9

**EXHIBIT C**

**51**

### C.    Larson Has Not Raised Any Material Difference On Any Essential Term Between The Marks And Schulman Writings

Larson does not dispute the only essential terms to a copyright transfer are "the subject matter, the price, and the party against whom enforcement is sought." *Levin*, 780 F.2d at 787; LOR-29.  But she spends pages of her brief citing places where, in her view, Marks' October 19 and Schulman's October 26 letters differ. Some of the purported differences result from Larson's misapplication of the rules of contract interpretation.  Others result from her failure to read the entire letters. The remainder are at most minor differences on non-essential terms.  Even if any one met the high test for materiality (and none does), it would not matter.  Sworn testimony from Schulman and Marks establishes that Marks precisely understood DC's October 16 offer, and set forth and accepted its terms.  SER-110, 112, 435. Inconsistent terms DC tried to add—if there are any—must be ignored.  *Facebook*, 640 F.3d at 1037-38.  And while Larson says Schulman tried to get a better deal for DC, DC's position has been throughout: *if* there are any material differences in Schulman's letter, Marks' letter controls.  RER-6; DCB-31; SER-435-37.

1.  *Scope Of Rights*.  Larson asserts that a material difference exists as to the scope of the properties—that Marks' letter applies to Superman, Superboy, Spectre, and related properties, but Schulman's supposedly expands the coverage to unnamed other properties.  LOR-17.  But in eight years of litigation, Larson has never identified a single property or work that she believes is covered by

10

EXHIBIT C

52

Schulman's supposedly more expansive language, and DC has never asserted any rights over these mystery properties.  That is because no such rights exist.

2. *Monetary Terms*.  Larson asserts that Marks' letter does not allow DC to recover interest on the advances it provides, while the Schulman draft provides that interest "at 100% of prime" can be recovered after December 31 "of year of payment." LOR-18 (citing SER-458, 467).  Larson is incorrect.  Paragraph 8 of *Marks'* letter provides that "beginning January 1 of the following year," after DC pays an advance, "there shall be interest at the prime lending rate." SER-458.  This provision, which Larson fails to mention, shows no difference exists at all.

Larson also suggests that "6% of DC's receipts from all Media licenses" is materially different from "6% of DC's 'gross revenues' derived from 'use of the property in any and all media,'" because "media licenses" is not defined in the Schulman letter, and thus might exclude direct sales or assignments.  LOR-18-19.  But the Schulman letter plainly uses the term "media license" in the broader sense to include such revenues.  It lists revenue from sales of "merchandise actually produced by DC" as an example of revenue from "merchandising licenses." SER-467.  Because his term "license" includes direct sales, it has the broader meaning that Larson says only Marks' letter included.  *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal.App.4th 516, 526 (2003).

11

**EXHIBIT C**
**53**

Larson also points to semantic differences between the letters without assigning any weight to their materiality other than her own conclusory statements. For instance, she focuses on the fact that Marks' letter specifies three instances where the 6% media license fee would be reduced to 1.5%, whereas the Schulman draft cited these three instances as "examples." SER-457-58, 467-68, 495. In years of litigation, Larson has never pointed to a fourth property that was swept in.

Larson also suggests Schulman's letter allows DC to pay royalties below 1% in certain cases. LOR-20. Larson never raised this interpretation in her briefing or testimony below. Marks did not read the language that way, SER-536-37, nor did DC's later long-form draft, which clearly set the floor at 1%, SER-497. Even if Larson's new interpretation were correct, she cannot show it materially altered the agreement—particularly since it would permit *more* than 1% royalty in cases where Marks' letter capped the royalty at 1%. LOR-20.

Larson also says Schulman's letter departed Marks' letter by defining the term "extraordinary cases." SER 457, 467. It is hardly surprising that a vague term would be given a more precise definition, and the definition Schulman gave tracks the purpose articulated in the Marks draft, which stated that Six Flags would serve as an example because it "involves numerous characters." SER 457.

Along the same vein, Larson says Schulman's letter amended Marks' by defining "cameo" to mean stories where the subject "characters do not appear in

12

**EXHIBIT C**
**54**

the title of the publication or feature." SER-468. This definition accords with custom, DCB-33-34, and applied reciprocally—DC would not reduce Larson's royalties if one of its other characters (*e.g.*, Batman) made a cameo in Superman. Noting an accepted definition for a vague term is hardly a material change.

3. *"Other" Non-Essential Terms.* Larson also complains of differences in language concerning warranties, indemnification, publicity, and credit, but none are essential terms to a copyright transfer. DCB-34; *Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002). Even if there were disagreement over such non-essential terms, a contract arose on October 19 when agreement on all *essential* terms was reached. *Facebook*, 640 F.3d at 1037-38.

In any event, Larson does not identify material differences as to these non-essential terms. As to the warranties, Larson would have been required to provide "100% ownership" to DC and be subject to a duty of good faith and fair dealing not to interfere with the contract, which is an implied provision of every contract in California. *See Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal.App.4th 873, 885 (2011). The trivial difference in language concerning warranties thus could hardly give rise to "significant potential liability." LOR-22.

Similarly, the so-called "indemnification" provision merely implements the requirement that the "Siegel Family would transfer all of its rights ... resulting in 100% ownership to D.C.," SER-458, and that the "Siegel Family" acted "through

13

**EXHIBIT C**
**55**

Joanne Siegel and Laura Siegel Larson," SER-456, in providing these rights. Far

from being "significant obligations of the Siegels to indemnify," LOR-23, the

Siegel Family was asked to indemnify DC against suits by the Siegel Family.[5]

    4. *The February 2002 Long-Form.* Larson also points to so-called "vast

differences" between Marks' letter and DC's February 2002 long-form, LOR-24,

but she identifies only a few provisions in that draft that even arguably conflict.

As explained above and in DC's principal brief, DCB-32-33, even if DC proposed

materially different terms in the February 2002 draft long-form, those differences

cannot erase the October 19 agreement. *Facebook*, 640 F.3d at 1038.[6]

**D.    Marks' August 2002 Memo Confirms A Deal Was Made**

    A document this Court recently ordered Larson to produce confirms the

parties made a binding agreement in October 2001. In an August 2002 memo,

---

[5] Larson's remaining items scarcely merit mention. She says Schulman required travel for Joanne Siegel and this was a material difference given her poor health. LOR-23. But Schulman's letter made clear any travel was "subject to [her] health." SER-464. Larson also cites a divergence as to credits in paid ads. LOR-23. But Schulman's letter requires credit on all "works where credit to creators is customary," SER-469, and Larson presents no evidence such credit was otherwise.

[6] Any differences are not material and are typical of clarifications in a long-form. Larson says the draft excluded services from the royalty sums. LOR-19. But because services were never addressed in the prior drafts, this is not a different term. The same is true of units, *e.g.*, returned or lost, for which there would be no revenue to pay royalties. LOR-21. Larson also says the draft excludes cash advances, LOR-19, but it does no such thing—it states a time when sums paid to DC would vest, SER-481. Unsurprisingly, Marks told Schulman the February long-form was "consistent" with the October deal. SER-125-28, 436, 440.

14

**EXHIBIT C**
**56**

Marks reminds Larson *four times* that she made a "deal" or "agreement" with DC in October 2001, and said he might have to testify against her if she repudiated it. RER-13. Even though Marks drafted his memo long after receiving Schulman's October 26 letter and after DC sent its February long-form, Marks never suggested that either altered the binding effect of the October 19 deal. Marks never said the parties viewed these two later documents as "counter-offers." Nor did he suggest that these post-agreement documents revealed a "mistake" about the terms of the deal. Rather, Marks stressed again and again that "an agreement was reached" between DC and Larson, and breaching it would subject her to suit. RER-13-14.

As both sides understood at the time, Schulman's October 26 letter and DC's draft long-form were simply parts of hammering out the formal documentation for an agreement that had already been reached. SER-435; RER-13-14. Had Larson worked with DC to document the fine points of their agreement, this matter could have long ago been resolved. But instead, lured by Toberoff's false promises, Larson reneged.

\*    \*    \*

The 2001 deal should be enforced, judgment should be entered in DC's favor, and this case should end. At a minimum, the district court's summary judgment order should be reversed, and the case remanded for a trial on DC's settlement defense.

15

**EXHIBIT C**
**57**

## II.    DISPUTED FACTUAL ISSUES REMAIN AS TO DC'S STATUTE-OF-LIMITATIONS COUNTERCLAIM

DC's limitations defense turns on one disputed fact—whether settlement talks were terminated by a May 9, 2002, letter from Larson's mother to DC (making this action untimely), or a September 2002 letter from the Siegels to DC. DCB-37-39. While Larson argued below that settlement talks ended in September, she recently argued in the related *Pacific Pictures* case that the May 9 letter "ended" any chance of settling the matter. SER-827, 878-79. A jury should have a chance to hear this evidence and decide which letter ended settlement talks.

Larson contends the May 9 letter did not meet the requirements of the parties' tolling agreement, but that is a jury question. *Sanborn v. Fed. Crop Ins. Corp.*, 93 Cal.App.2d 59, 65 (1949). She also says that in *Pacific Pictures*, she described the May 9 letter as making negotiations "moribund," which means "dying," not dead. But she argued in *Pacific Pictures* the May 9 letter "ended" any prospect of resolving the matter, SER-825—which is possible only if the letter did, in fact, terminate negotiations.

Larson may have taken her new factual position to shield Toberoff from tort liability in *Pacific Pictures*—casting even more doubt on his relationship with her. *Cf. In re Pacific Pictures Corp.*, 2012 WL 1640627, at *1 (9th Cir. May 10, 2012). But whatever her motive, if it is credible for Larson to argue in *Pacific Pictures*

16

EXHIBIT C
58

that the May 9 letter ended any prospect of completing negotiations, then a jury in this case could find the same thing, and thus find that her lawsuit was untimely.

## III.    LARSON CANNOT DENY DC OWNS KEY SUPERMAN WORKS

DC's cross-appeal challenges the district court's summary-judgment ruling that four Superman works were not made-for-hire: portions of *Action Comics #1* ("*AC#1*"); *Action Comics #4* ("*AC#4*"); *Superman #1* (pages 3-6) ("*S#1*"); and two weeks of "Pre-McClure Strips." Larson's opposition is unavailing.

### A.    Elements Of *AC#1* Were Made-For-Hire

Key elements of *AC#1*, added in 1938, were made-for-hire. *Compare* ER-706, *with* SER-78; *see also* ER-654, 917, 957-59; SER-379-88, 442, 803. The court in *Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909 (2d Cir. 1974), did not hold otherwise, and Larson's preclusion and merits arguments are without basis.

#### 1.    National *Is Not Preclusive*

Larson argues *National* precludes DC from making its work-for-hire arguments about the 1938 additions to *AC#1*, but she is mistaken. The sole issue in *National* was whether Siegel and Shuster owned the renewal copyright in *AC#1*. *National* never considered the issue now before this Court: whether the 1938 additions in *AC#1* were made-for-hire and thus are not subject to termination. Larson's suggestion (LOR-43) that *National* ruled on the work-for-hire status of the 1938 additions is inaccurate. It merely concluded that these "revisions" were

17

EXHIBIT C
59

not "sufficient to create the presumption that *the strip* [*i.e.*, the *AC#1* Superman strip *in toto*] was a work for hire." 508 F.2d at 914 (emphasis added).

Larson concedes this case involves "evidence [and] argument not presented in [*National*]," but says issue-preclusion applies to any issue DC "could have" raised in *National*. LOR-44. Larson conflates issue-preclusion with claim-preclusion—it is only the latter doctrine that precludes litigating a claim that could have been raised. *Comm'r v. Sunnen*, 333 U.S. 591, 598 (1948); *Leather v. Eyck*, 180 F.3d 420, 426 (2d Cir. 1999). Larson offers seemingly contrary quotations from *Chicot County Drainage Dist. v. Baxter Cnty. Bank*, 308 U.S. 371, 378 (1940), and *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518 (9th Cir. 1985), but the quotes refer specifically to *res judicata* (or claim-preclusion).

Under settled *issue*-preclusion rules, a ruling in a prior case is preclusive only if the issue previously resolved is *identical* to the issue now raised, the issue was *actually litigated* before, and resolving it was *necessary*. *Sunnen*, 333 U.S. at 599-600; *Granite Rock Co. v. Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011); DCB-70. Larson's cases confirm this, *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986), and she fails all three elements of the test.

Here, new evidence and argument is presented concerning a new issue—the standalone work-for-hire status of the 1938 additions. And *National*'s comments about work-for-hire were "unnecessary" to its decision. *National* affirmed the

18

EXHIBIT C
60

district court's ruling that Siegel transferred his rights in *AC#1*, and, thus, it did not

need to address the district court's alternative ruling that *AC#1* was made-for-hire.

Additional "determination[s] adverse to the winning party [*i.e.*, DC] do[] not have

preclusive effect." *Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068,

1069 (9th Cir. 1985). Larson disagrees, saying *National* could only reach the

transfer-of-rights issue because it found *AC#1* was not a work-for-hire. LOR-44.

*National* belies that reading: its comments on work-for-hire are *four sentences* at

the end of the opinion, *after* affirming the district court's transfer-of-rights ruling.

2.    <u>*The 1938 Additions Were Made-for-Hire*</u>

Larson's merits arguments are equally unpersuasive. The disputed *AC#1*

elements were all added in 1938, after DC employed Siegel and Shuster as artists

to create new and derivative works for DC. Because these elements were added at

DC's "instance and expense," they are either works-for-hire in their own right, or

DC is a joint owner of the works that contain them. DCB-42-43, 61-68.[7]

---

[7] Larson concedes "authors of derivative works … own the copyright to their
added material." LOR-55. DC thus at least owns the copyright in the 1938
elements. Larson denies DC can be a joint owner because there was no intent "that
DC or its staff be considered 'coauthors.'" LOR-53. But her own case—
*Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 1999)—confirms that a joint
work is created where multiple authors make independent contributions intending
that their contributions be integrated into a single work. Here, that was plainly the
case. DC exercised control over the creation and merging of the new elements into
*AC#1*. DCB-67-68. "[C]omic book[s] are typically the joint work of four artists—
the writer, the penciler[,] the inker[,] … and the colorist," *Gaiman v. McFarlane*,
360 F.3d 644, 659 (7th Cir. 2004), and DC staff artists did the latter work. Larson

19

EXHIBIT C
61

*a. New Content.* Pursuant to the 1937 Employment Agreement, DC instructed Siegel and Shuster to adapt their preexisting Superman story "into a full length ... strip" to be included in *AC#1.* ER-957; SER-379, 381. Siegel and Shuster "compli[ed]," ER-957, and "revised and expanded" their story to include new panels, text, and illustrations. ER-654, 957; SER-385-86. DC paid Siegel and Shuster for their contributions, ER-917, 958; SER-383, 804, and had the right to control and supervise them, ER-957; SER-379, 381, 383. These facts are undisputed, and easily satisfy the instance-and-expense test. DCB-67-68.

Larson quotes Shuster's testimony that DC did not give them specific directions "as to what to do or what to include in Superman," LOR-47, but the instance-and-expense test does not require particular directions—only that the work itself be ordered and paid for by the employer, DCB-54-55. It is the *right* to dictate substance that matters, *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879-80 (9th Cir. 2005), and DC owned and did exercise the rights one would expect an employer to exercise, ER-957, SER-379, 381, 383.

---

touts that Siegel and Shuster's names appear on the byline, LOR-53, but this is a custom not remotely dispositive of authorship. Indeed, the pair's names appear on many works made-for-hire that Larson did not seek to terminate, and DC's name appears on *AC#1*, the Promotional Announcements (which make no reference to Siegel or Shuster), and *all* Superman publications. Finally, the Announcements feature the cover art DC created and tout *AC#1*'s "*Color!*," SER-370, making clear these DC-created elements were instrumental to *AC#1*'s "appeal," *Aalmuhammed*, 202 F.3d at 1234.

20

**EXHIBIT C**
**62**

Larson also argues the 1938 Assignment proves that the new material—created before the Assignment—was not work-for-hire. LOR-46. This is wrong for many reasons. Among them, the 1938 Assignment assigned to DC the parts of *AC#1* that Siegel and Shuster created *before* working for DC; it is the work the pair did on the new elements that was made-for-hire. *Fox*, 429 F.3d at 881, also rejects Larson's claim about the assignment. Because the instance-and-expense test is satisfied for the 1938 additions, *supra* at 19-20, the presumption that DC owned all copyright in those works may be overcome only by evidence proving the parties *expressly agreed* Siegel would own the copyright, DCB-43. Larson has no such evidence, and *Fox* holds the mere existence of a later assignment does not qualify.[8]

    *b. Colorization.* DC colorist Jack Adler—the only percipient witness—testified that Siegel and Shuster submitted the *AC#1* panels in black-and-white, and other DC artists selected colors to add. DCB-61. Larson does not defend the trial court's erroneous ruling that colorization cannot be copyrighted. *Id.* at 61-62. But she does cite the court's equally erroneous criticism of Adler. LOR-48-49. The court said Adler only "describe[d] procedures generally employed in the printing process," rather than "what actually occurred with respect to" *AC#1*, SER-50, when, in fact, Adler addressed those specifics. He testified it was industry custom

---

    [8] Larson rewrites *Dolman v. Agee*, 157 F.3d 708, 712-13 (9th Cir. 1998), as holding, contrary to *Fox*, that an assignment alone rebuts the work-for-hire presumption. LOR-46. *Dolman*,157 F.3d at 713, cited an assignment as but one of *numerous* factors that *together* sufficed. None of the other factors is present here.

21

**EXHIBIT C**

**63**

for artists to submit "comic book work … in black and white," and that this "*was the case with Action Comics No. 1*." SER-442 (emphasis added). He elaborated: "Siegel and Shuster provided the artwork in black and white. Color was applied as part of the regular printing process," and he even identified, by name, the DC artist who "selected the color for Superman's 'S.'" *Id.* Larson speculates Siegel or Shuster submitted "color guides," LOR-49, but no evidence supports this claim.

    *c. Cover Art.* DC's February 22, 1938, letter to Siegel makes clear—and Siegel's memoir confirms—that DC's artists "used one of those panel drawings of SUPERMAN" as a template to create "the cover" of *AC#1*. SER-388, 803. Larson says the cover was based on Shuster's "large promotional panel-drawings," LOR-50, but whatever drawing was used as a "template," what matters is that the cover was created *by DC artists* and thus is owned by DC, DCB-62-67.

    Larson asserts DC's cover art is not independently copyrightable because it is "closely derived" from an interior panel and any differences are "de minimis." LOR-51. But Larson concedes that the cover features Superman with "a visible S-crest on his chest" as well as "facial features and musculature," LOR-51 n.8, while the interior panel does not.[9] Those differences satisfy the test in *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220, 1226 (9th Cir. 1997), that a derivative work is copyrightable if it contains "non-trivial" variations

---

    [9] DC did not use a "low-resolution copy" of the panel. LOR-51n.8. In fact, it enlarged the panel to make it more visible. *Compare* DCB-65-66, *with* SER-86.

22

**EXHIBIT C**
**64**

from the original work. Larson says the different S-crest, facial features, and musculature appear in *other* panels in *AC#1*, LOR-51 n.8, but those elements first appeared in the Promotional Announcements that DC owns, DCB-80-81, 84. And, in any event, DC's cover contains *seven other* non-trivial variations, DCB-64-65— all of which meet the *Genesis* test, and none of which Larson disputes.

**B.    DC Owns The Pre-McClure Strips ("Strips")**

1.    *The Strips Were Made-for-Hire*

The Strips were created *after* Siegel and Shuster entered into the 1937 employment agreement with DC, and *after* the pair assigned all of their Superman rights to DC in 1938. ER-602-03, 615, 917; SER-582-89. DC does not "ignore" the "instance and expense" test because of these agreements. LOR-55. Just the opposite: the agreements are what *satisfy* the "instance" prong, because they mean the Strips were *necessarily* created at DC's instance. DCB-71-72. Since DC was the sole owner of all rights in Superman properties, it had complete control over the creation of new Superman material. *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); DCB-47, 56-57. It is thus irrelevant that Siegel and Shuster exercised creative independence. LOR-55.[10]

---

[10] While authors of authorized derivative works "own the copyright to their added material" (LOR-55), where—as here—the derivative work is made-for-hire, the statutory "author" is the hiring party. *Fox*, 429 F.3d at 881; DCB-9-10, 42-43.

23

**EXHIBIT C**
**65**

Larson concedes "Siegel and Shuster were compensated" for their work, LOR-55, which is enough to satisfy the "expense" prong. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995). And she concedes they created the Strips *expecting* to be compensated for their work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978), and that DC and McClure bore "the financial risk," *Fox*, 429 F.3d at 881—again establishing "expense." But she says the "expense" factor is not satisfied, because Siegel and Shuster were paid a royalty on net profits, rather than guaranteed compensation. LOR-55. Courts "roundly reject[]" that asserted distinction, as Toberoff well knows. *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (collecting cases).

   2.    *Larson's Failure To Terminate The Strips Is Dispositive*

Larson does not deny that her termination notice omitted *all* information concerning the Strips required by federal law—title, author, copyright date, and registration number. Rather, she argues the omission was harmless, because her notice included a "catch-all" footnote indicating an intent to recapture "every ... omitted work." LOR-57. That theory contradicts the plain terms of the rule, which treats as harmless *only* those mistakes that "do[] not materially affect the adequacy of the information" in the notice. 37 C.F.R. §201.10(e)(1)-(2). The *complete omission* of all required information obviously *does* materially affect the adequacy of the notice—even with a catch-all, the required information is nonexistent.

24

EXHIBIT C
66

*Burroughs v. M-G-M, Inc.*, 491 F.Supp. 1320, 1326 (S.D.N.Y. 1980) (omission of five Tarzan works "'materially affect(s)' the adequacy of the Notice").[11]

If a termination notice could simply refer to "all works, including omitted works," there would be no point in requiring *any* information concerning particular works. The rules specifically define errors that are harmless, Larson's error is not among them, and courts cannot engraft new exceptions, especially given the careful "compromise" the Copyright Act strikes between the rights of heirs and grantees like DC. DCB-15-16 (citing legislative history).[12]

### C.     Pages 3-6 Of *S#1* Are Works-For-Hire

Larson maintains that pages 3-6 of *S#1* were created as part of the original Superman story in 1935—before Siegel and Shuster entered into a work-for-hire relationship with DC—and says there is "no evidence" to the contrary. LOR-53. Incredibly, Larson has no response (other than to ask the Court not to read it) to Siegel's refutation of this theory in his memoir: "[Commentators] state Superman magazine No. 1 contains pages omitted from the Action Comics No. 1 origin story. The truth is that the additional pages were specifically created for use in Superman

---

[11] Larson's effort to distinguish *Burroughs* fails. It held the omission was "not harmless," 491 F.Supp. at 1326, and the Second Circuit ruled the "incomplete notice left [the grantee] with license to use" the works. 683 F.2d 610, 622.

[12] Larson complains about DC's "math," LOR-59, but the numbers do not lie: of the 15 Superman works deemed subject to termination, the 12 Strips—80%—were completely omitted from her notices. DCB-76-77. That Larson wildly "over-noticed" other Superman works cannot turn a *nonexistent* notice of the Strips into an *adequate* one.

25

EXHIBIT C
67

Magazine No. 1." SER-805. Siegel's admission and DC's other evidence confirms these pages were made-for-hire on behalf of DC. DCB-78; SER-761.

**D.     Artwork In *AC#4* Is Work-For-Hire**

It is undisputed Siegel created *no* artwork to accompany the 1934 script that DC later incorporated into *AC#4*—a story illustrated by DC's staff artists. DCB-79-80. Larson's contention that DC cannot simultaneously own these illustrations as the author of a work-for-hire and as a joint author (LOR-54) misunderstands DC's argument. DC's primary submission is that the artwork is owned outright by DC as a work-for-hire, as the 99 panels of illustrations possess far more than the "*de minimis* quantum of creativity" necessary to be copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991). The artwork is also a joint work between Siegel and DC, as both intended the script and illustrations to be combined into a comic strip. *Gaiman*, 360 F.3d at 659; *supra* n.7. Larson has no response, except to assert—without explanation—that the ownership of the *AC#4* artwork is "not before the Court." LOR-54. It is. DC claimed ownership below, RER-3, and the district court considered but "decline[d] to address" it in its August 2009 order being appealed, ER-78-79. The issue is preserved. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1397 n.1 (7th Cir. 1993).

**EXHIBIT C**
**68**

E.    Copyrightable Elements In DC's Promotional Announcements

Larson does not dispute the only issue before the district court on summary judgment concerning the Promotional Announcements was whether they fell outside the time-limit to terminate. The court held the Announcements were not subject to termination—and Larson does not challenge this ruling. LOR-71 n.14. The district court then made inaccurate statements concerning the visible elements in the Announcements based on its review of a poor, multiple-generation photocopy. SER-44-45. Because the "visibility" issue was not before the court, DC did not present briefing, evidence, or expert testimony addressing it. DCB-82.

Larson says DC nevertheless had "adequate notice" and a "fair opportunity" to be heard because the scope question was briefly raised during the summary judgment hearing. LOR-72. Not so. DC's counsel specifically said at the hearing—without objection or contradiction—that "the scope of what's in these ads … is something for another day." LSL-RER-80-81.

Larson offers no defense of the district court's refusal to review an original version of the Announcements, as explicitly required by FED. R. EVID. 1002. *See* DCB-82-83 (collecting cases). And while she says the Announcements contain "no new copyrightable elements," LOR-73, that is, at best, an issue for trial. In any event, a cursory review of an original Announcement shows it includes many, key copyrightable elements. DCB-84; Docket Nos. 30-1, 36-1.

27

EXHIBIT C
69

## CONCLUSION

The Court should enter judgment in DC's favor on its settlement defense, or, at the least, reverse and remand on that defense and DC's limitations defense for trial. If the Court finds it has jurisdiction on the copyright issues presented, and it finds it needs to reach them, it should affirm and reverse in part, as DC has shown.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: June 19, 2012

28

EXHIBIT C
70

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(C) because it contains 6,796 words, excluding the portions exempted by FED. R. APP. P. 32(a)(7)(B)(iii). This brief's type size and type face comply with FED. R. APP. P. 32(a)(5) and (6).

Dated: June 19, 2012

O'MELVENY & MYERS LLP

By: /s/ Matthew T. Kline

Matthew T. Kline
Attorneys for Warner Bros.
Entertainment Inc. and DC Comics

**EXHIBIT C**
**71**

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2012, I caused to be electronically filed the Reply Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.  Executed on June 19, 2012, at Los Angeles, California.


_____/s/  Cassandra Seto_____
Cassandra Seto

**EXHIBIT C**
**72**

# EXHIBIT D

| | |
|---|---|
| **From:** | Seto, Cassandra |
| **Sent:** | Wednesday, June 27, 2012 3:42 PM |
| **To:** | Pablo Arredondo |
| **Cc:** | Petrocelli, Daniel; mtoberoff@ipwla.com; dharris@ipwla.com; Pearson, Ashley; Tokoro, Jason; Kline, Matthew; rkendall@kbkfirm.com; lbrill@kbkfirm.com |
| **Subject:** | RE: DC v. PPC |

Pablo:

Matt's emails made clear that our meet and confer would address "all of the open issues" on which you improperly refused to engage. My e-mail -- sent six minutes after Matt's last email -- confirmed that these "open issues" include our motion for review of Judge Zarefsky's June 21 ruling. If you again refuse to engage on this issue, we will proceed with our motion and advise the Court of your failure to comply with the Local Rules and your professional obligations.

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Wednesday, June 27, 2012 2:57 PM
**To:** Seto, Cassandra
**Cc:** Petrocelli, Daniel; mtoberoff@ipwla.com; dharris@ipwla.com; Pearson, Ashley; Tokoro, Jason; Kline, Matthew
**Subject:** RE: DC v. PPC

Cassie:

No, this topic was not on either Matt's or our list of items to be discussed at today's meet-and-confer. We just received notice on Monday afternoon that DC "may" bring a motion for review, citing correspondence that we believe DC mischaracterizes. We will retrieve that correspondence and respond to you in writing, following which we will be happy to schedule a meet-and-confer within a reasonable time period.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

1

**EXHIBIT D**
**73**

**From:** Seto, Cassandra [mailto:cseto@OMM.com]
**Sent:** Tuesday, June 26, 2012 5:28 PM
**To:** 'parredondo@ipwla.com'
**Cc:** Petrocelli, Daniel; 'mtoberoff@ipwla.com'; 'dharris@ipwla.com'; Pearson, Ashley; Tokoro, Jason; Kline, Matthew
**Subject:** RE: DC v. PPC

To be clear, we also need to meet and confer on our motion for review of Judge Zarefsky's June 21, 2012, ruling.  We will call your office tomorrow.

**From:** Kline, Matthew
**Sent:** Tuesday, June 26, 2012 5:22 PM
**To:** 'parredondo@ipwla.com'
**Cc:** Petrocelli, Daniel; Seto, Cassandra; 'mtoberoff@ipwla.com'; 'dharris@ipwla.com'; Pearson, Ashley; Tokoro, Jason
**Subject:** Re: DC v. PPC

Pablo,

Let's have the discussion tomorrow. We disagree with the balance of your email.
Matt

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Tuesday, June 26, 2012 03:48 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; mtoberoff@ipwla.com <mtoberoff@ipwla.com>; dharris@ipwla.com <dharris@ipwla.com>; Pearson, Ashley; Tokoro, Jason
**Subject:** RE: DC v. PPC


Matt:

As stated, Defendants are available to meet-and-confer Wednesday, June 27 or Thursday, June 28, at any time between 3 - 5 p.m..  At this time we can meet-and-confer on: 1) DC's Motion for Partial Summary Judgment; 2) DC's request for even more "capital account" documents; and 3) DC's request for a copy of the letter Defendants sent to Mr. Drooks.

As for the role of Mr. Kendall's firm, he has answered you substantively on this issue in an email sent yesterday at 2:53 p.m, in which he asked DC to advise defendants as to what if any motion DC wants to bring with respect to the allocation of responsibilities between Mr. Toberoff's firm and Kendall Brill & Klieger, the grounds for the motion, what relief your client would be seeking from the court, and any authorities that support said motion.  We will schedule a separate meet and confer regarding this purported issue.

As to Mr. Drooks, it was your, not Mr. Drooks' proposal that the parties enter into a stipulation, which is entirely gratuitous as both counsel for Defendants and Mr. Drooks stated that they would, of course, comply with any court order on the subject of privilege.

The "etc." in your list of topics is not well taken as you were asked to specify the issues to be discussed so that counsel could come prepared to the meet-and-confer.

Finally, as to your false assertion that Defendants are "looking to run the clock" regarding these issues, I ask that you please stop attributing base motives to every position with which you disagree.  It is highly unprofessional.

2

**EXHIBIT D**
**74**

Please let us know if DC would prefer to meet-and-confer on Wednesday or Thursday afternoon.

Pablo


Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101



This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Kline, Matthew [mailto:MKline@OMM.com]
**Sent:** Tuesday, June 26, 2012 2:09 PM
**To:** 'parredondo@ipwla.com'
**Cc:** Petrocelli, Daniel; Seto, Cassandra; 'mtoberoff@ipwla.com'; 'dharris@ipwla.com'; Pearson, Ashley; Tokoro, Jason
**Subject:** Re: DC v. PPC

The ones we raised last week and at yesterday's meet and confer and that you decline to engage on--our msj; the tax form you omitted from your production; the letter your firm sent to Mr. Drooks; whether you will agree to the reasonable stipulation that Mr. Drooks proposed, etc. You've not given us final answers on any of these items, but instead seem to be looking to run the clock.

We also, in a separate meeting, if need be, need to address the issues of a special master and the role of Dick's firm.

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Tuesday, June 26, 2012 01:55 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; mtoberoff@ipwla.com <mtoberoff@ipwla.com>; dharris@ipwla.com <dharris@ipwla.com>; Pearson, Ashley; Tokoro, Jason
**Subject:** RE: DC v. PPC

Matt:

We are unavailable today.  Please briefly specify the allegedly open issues you are referring to.

Pablo


Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333

3

**EXHIBIT D**
**75**

(f) 310.246.3101

This message and any attached documents may contain information from
Toberof & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Kline, Matthew [mailto:MKline@OMM.com]
**Sent:** Tuesday, June 26, 2012 1:24 PM
**To:** 'parredondo@ipwla.com'
**Cc:** Petrocelli, Daniel; Seto, Cassandra; 'mtoberoff@ipwla.com'; 'dharris@ipwla.com'; Pearson, Ashley; Tokoro, Jason
**Subject:** Re: DC v. PPC

Pablo,

Let's discuss all of our open issues today at 5:30 or 6. We can set up a dial in.

Matt

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Tuesday, June 26, 2012 01:11 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; 'Marc Toberoff' <mtoberoff@ipwla.com>; 'David Harris' <dharris@ipwla.com>; Pearson, Ashley; Tokoro, Jason
**Subject:** RE: DC v. PPC

Matt:

We propose that the parties meet-and-confer on this issue on Wednesday, June 27, or Thursday, June 28, at 3 p.m.  Please let us know which time you prefer.

Pablo


Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101


This message and any attached documents may contain information from
Toberof & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Thursday, June 21, 2012 5:05 PM

4

**EXHIBIT D**
**76**

**To:** Pablo Arredondo
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; 'Marc Toberoff'; 'David Harris'; Keith Adams; Pearson, Ashley; Richard Kendall; Laura Brill; Nicholas Daum
**Subject:** RE: DC v. PPC

Counsel,

Please see below correspondence sent on behalf of Matthew T. Kline.

*        *        *

Pablo:

The rhetoric in your letter is not helpful.  The form (a copy of which we attach, and which you should not have omitted from the production) contains all sorts of important information along the lines the Judge permitted to be discovered, and there would be no burden in producing it.  Let us know if you want to meet and confer by phone Monday or Tuesday.

Matt

---

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Thursday, June 21, 2012 3:18 PM
**To:** Tokoro, Jason
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; 'Marc Toberoff'; 'David Harris'; Pearson, Ashley
**Subject:** RE: DC v. PPC

Jason:

In the Court's May 25, 2012 Order (Dkt. 439)("Order"), the Court: (i) stated that "Defendants have complied with this Court's order to produce documents that evidence capital accounts"; (ii) noted that it had *twice* "largely denied" DC's motion to compel the production of capital account documents; (iii) rejected DC's attempt to have "routine alter ego allegations in the pleadings. . . take over this lawsuit"; and (iv) warned DC not to "create undue burden or harassment."

Despite this admonishment, despite having had its overbroad requests rejected multiple times, and despite having had every opportunity to raise these meritless concerns during the previous meet-and-confers and DC's repetitive motion practice, DC again insists on more financial information wholly irrelevant to DC's complaint in this case.

Your requests abuse the discovery process and are contrary to the Court's orders, which are law of the case.  The Court stated that "DC Comics is entitled to know who capitalized the companies, and in what amounts." Order at 3.  As noted by the Court, the capital account documents already provided by defendants inform DC of this.

Notwithstanding the above, and in an attempt to avoid burdening the Court with yet another abusive motion on this issue, please find attached as requested the second page of the 2002 and 2003 IP Worldwide K-1s, bates-stamped IPWW 00048-49.

Defendants do not possess the 2011 K-1s, as it is my understanding that the 2011 tax returns are subject to an extension and will not be filed until September 17, 2012.

5

**EXHIBIT D**
**77**

Defendants will not be producing the IRS Form 1065 (U.S. tax return for a partnership) for IP Worldwide, LLC and IPW, LLC that DC has demanded as these are well beyond the scope of the Court's order, and DC is not entitled to this.  Please be advised that if DC brings a motion to compel such documents, Defendants will seek sanctions.

Defendants reserve all rights.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read,
copy, distribute or use this information. If you have received this transmission in error, please notify the sender
immediately by reply e-mail and then delete this message.

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Monday, June 18, 2012 6:36 PM
**To:** Pablo Arredondo
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Richard Kendall; Laura Brill; Nicholas Daum; Keith Adams; Marc Toberoff
**Subject:** RE: DC v. PPC

Pablo,

We have received no response to our email below.   Please immediately produce the requested documents, or let us know when you are available to meet and confer to address these issues.  We propose tomorrow, June 19, or Wednesday, June 20.  Please also know we will need to discuss and share what you have produced with counsel for Ari Emanuel.

Best and thanks,

Jason

**From:** Tokoro, Jason
**Sent:** Monday, June 11, 2012 4:05 PM
**To:** Pablo Arredondo
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Richard Kendall; Laura Brill; Nicholas Daum; Keith Adams; Marc Toberoff
**Subject:** RE: DC v. PPC

Pablo,

6

**EXHIBIT D**
**78**

We are in receipt of defendants' May 29, 2012, production of unredacted versions of the capital account documents for IP Worldwide, LLC and IPW, LLC.  The capital account documents, however, are incomplete.

First, the second page of the IP Worldwide IRS Schedule K-1 forms for 2002 and 2003 have never been produced.  Prior to 2004, the Schedule K-1 forms included 2 pages as shown by the attached 2002 and 2003 examples.  Please produce the missing pages for IP Worldwide's 2002 and 2003 Schedule K-1 forms by Wednesday, June 13.

Second, defendants have never produced the IRS Form 1065 forms to which each of the Schedule K-1 forms for IP Worldwide and IPW were attached.  As the attached Form 1065 example shows, the Schedule K-1 is an attachment to Form 1065.  Please produce the Form 1065 forms for IP Worldwide and IPW for all years by Wednesday, June 13.

Finally, defendants without reason or explanation limited their production of capital account documents to the time period up to 2010 for IP Worldwide and IPW.  Please produce by Wednesday, June 13, the IRS 1065 Form and Schedule K-1 forms for IP Worldwide and IPW for 2011.

All of DC's rights and remedies are hereby reserved.

Best,

Jason

---

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Tuesday, May 29, 2012 4:11 PM
**To:** Seto, Cassandra
**Cc:** Tokoro, Jason; 'Marc Toberoff'; 'Keith Adams'
**Subject:** DC v. PPC

Counsel:

Per Magistrate Judge Zarefsky's May 25, 2012 order, please find attached unredacted versions of the capital account documents Defendants' served on May 4, 2012, which per such order are to be treated by DC as "Confidential."

As to the Renner Otto expert report, this is to confirm that the report is not in Defendants' possession.

Pablo


Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

**EXHIBIT D**
**79**

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**EXHIBIT D**
**80**

# EXHIBIT E



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

June 25, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265

> **Re:** **_DC Comics v. Pacific Pictures Corp. et al., CV-10-3633 (ODW) (RZx)_**

Dear Counsel:

Pursuant to Local Rule 72-2.1, DC may seek review of Judge Zarefsky's June 21, 2012, ruling that defendants did not waive privilege over the November 17, 2001, e-mail from Marc Toberoff to Michael Siegel. Docket No. 451 at 2. The Renner Otto firm confirmed that it gave Mr. Toberoff the email 6 years ago, Docket No. 427-2 at 4—a material fact that his Honor's opinion did not address. Please let us know when you are available to meet and confer this week. DC reserves all rights.

Very truly yours,

/s/ Matthew T. Kline

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:     Daniel M. Petrocelli, Esq.

**EXHIBIT E**
**81**

# EXHIBIT F

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348
MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

parredondo@ipwla.com

June 29, 2012

Via E-Mail

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your letter dated June 25, 2012, regarding Magistrate Judge Zarefsky's June 21, 2012 order ("Order"). After reviewing the November 17, 2001 email from Mr. Toberoff to Michael Siegel *in camera*, Magistrate Judge Zarefsky ruled that the email was protected by the attorney-client privilege, and that this privilege had not been waived. Dkt. No. 451. DC now states that it will seek review of this ruling on the sole ground that "[t]he Renner Otto firm confirmed that it gave Mr. Toberoff the email 6 years ago," and points to only a May 14, 2012 email from Josh Ryland to Matt Klein.

Defendants have reviewed Mr. Ryland's May 14, 2012 email. As expected, it nowhere states that Renner Otto provided the November 17, 2001 email or any other documents in its client's (Michael Siegel) files to Mr. Toberoff. It simply states that Renner Otto provided Michael Siegel's files to his estate – a third party.

As soon as this firm received a copy of the actual Renner Otto archive, which included the November 17, 2001 email, it properly listed this document on a privilege log.

DC is incorrect in asserting that Magistrate Judge Zarefsky did not address DC's waiver argument. His Order specifically notes that "[t]he print-out comes from Mr. Siegel's files after those were sent to counsel for Defendants" and that "[t]he Court accepts the representation that the email was from a discontinued email account and thus not readily available for production earlier." Order at 1-2.

DC and your firm have already misrepresented the contents of the November 17 email to both the District Court (Dkt. No. 394 at 6) and to the Ninth Circuit (Appeal No. 11-56934, Dkt. No. 16 at 13). After reviewing the November 17 email *in camera*, Magistrate Judge Zarefsky's

**TOBEROFF & ASSOCIATES, P.C.**

June 29, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 2

Order made clear that DC's emphatic mischaracterization of the email was completely wrong. Order at 1-2.

There is no colorable basis for DC to bring this wasteful motion, particularly as Magistrate Judge Zarefsky found that the November 17, 2001 email is clearly subject to the attorney-client privilege.  If DC nonetheless persists in filing this improper motion, please be advised that Defendants will seek sanctions equal to their fees and costs.

Defendants are available to meet-and-confer on this issue Monday, Tuesday or Wednesday of next week, after 3 p.m.

Very truly yours,

Pablo Arredondo

**EXHIBIT F**
**83**

# EXHIBIT G

**From:** Tokoro, Jason
**Sent:** Monday, July 02, 2012 8:22 AM
**To:** 'Pablo Arredondo'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Pearson, Ashley; Richard Kendall; Laura Brill; Nicholas Daum; Keith Adams; David Harris; Marc Toberoff
**Subject:** RE: DC v. PPC

Counsel,

Please see the below correspondence sent on behalf of Matthew T. Kline.

\*        \*        \*

Pablo,

We disagree and will file our motion.

Matt

---

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Friday, June 29, 2012 4:02 PM
**To:** Kline, Matthew
**Cc:** Seto, Cassandra; Tokoro, Jason; Petrocelli, Daniel; Pearson, Ashley; 'Marc Toberoff'; 'David Harris'
**Subject:** DC v. PPC

Matt:

Please see the attached correspondence.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

1

**EXHIBIT G**
**84**