# EXHIBIT 1

AGREEMENT OF EMPLOYMENT entered into the Fourth day of December, 1937, by and between DETECTIVE COMICS, INC., a domestic corporation having its offices at 480 Lexington Avenue, New York City, hereinafter referred to as the Employer, and Jerome Siegel and Joe Shuster residing at Cleveland, Ohio, hereinafter referred to as the Employees.

1. The Employer hereby agrees to employ, and does hereby employ the Employees as Artists, for a period of two years, commencing with December 4, 1937 and terminating December 3, 1939, and to pay them for such services and for all of the matters hereinafter set forth, the sum of Ten Dollars ($10) per page.

2. The Employees agree to give their exclusive services as artists in producing features known as "Slam Bradley " and "The Spy " during said period of employment , to the Employer, and agrees that all of these products and work done by said Employee for said Employer during said period of employment, shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creator thereof, the Employee acting entirely as the Employer's employee.

3. In the event that the Employee leaves the service of the Employer prior to the termination date set forth in this Agreement or subsequent thereto, and for any reason whatsoever, the Employees agree that they will not, directly or indirectly, and through any means whatsoever, use, duplicate, simulate or bring into being any of the products or work or creations or characters or plots used, made or created by him while in the employ of the Employer.

EXHIBIT B

DCC00045543

**EXHIBIT 1**

**8**

---2---

4. It is understood that any new and additional features which the Employee produce for use in a comic magazine are to be first submitted to the Employer, who reserves the right to accept or reject same within a period of sixty days.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

In Presence of:

DETECTIVE COMICS, INC.

_Shelby M. Siegel_
Witness

BY _J. Liebowitz_
        Employer---

_Herbert M. Siegel_
Witness

_Jerome Siegel_ L.S.
        Employee

_____
        Witness

_____ L.S.
        Employee

DCC00045544

**EXHIBIT 1**
**9**

# EXHIBIT 2

EXHIBIT  2 4
U. S. Dist. Court
S. D. of N. Y.
APR  6 1939

*Phil b 11*

*3 l l b r*

Detective Comics, Inc.
480 Lexington Avenue
New York, N. Y.

   I, the undersigned, am an artist or author and
have performed work for strip entitled "SUPERMAN"

   In consideration of $150.00 agreed to be paid me
by you, I hereby sell and transfer such work and strip, all
good will attached thereto and exclusive right to the use of
the characters and story, continuity and title of strip contained
therein, to you and your assigns to have and hold forever and to
be your exclusive property and I agree not to employ said
characters or said story in any other strips or sell any like
strip or story containing the same characters by their names
contained therein or under any other names at any time hereafter
to any other person, firm or corporation, or permit the use
thereof by said other parties without obtaining your written
consent therefor.  The intent hereof is to give you exclusive
right to use and acknowledge that you own said characters or
story and the use thereof, exclusively.  I have received the
above sum of money.

        *Joe Shuster*
        *Jerome Siegel*

Accepted:

DETECTIVE COMICS, INC.

By *[signature]*

       *File*
      *SHUSTER/*
      *SIEGEL*

Confidential

WB005794

**EXHIBIT 2**
**10**

# EXHIBIT 3

EXHIBIT 26

U. S. Dist. Court
S. D. of N. Y.
APR 6 1939

September 22, 1938

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberly Avenue
Cleveland, Ohio

Gentlemen:

This letter, when signed by you, will serve as our agreement.

We, Detective Comics, Inc., are the exclusive owners of comic strips known by the titles "Superman", "Slam Bradley", "Spy", "Radio Squad" and "Federal Men", and to the rights to publish comics carrying said titles and characters contained therein and continuity thereof.

You have been doing the art work and continuity for said comics for us. We wish you to continue to do said work and hereby employ and retain you for said purposes for the period of this contract.

You agree that you will supply us each and every month hereafter, in sufficient time for publication in our monthly magazines, sufficient copy and art for each of said features each month hereafter.

All of said comic features consist of approximately 46 pages per month. The standard of the said comics shall be equal to the present standards.

You shall also furnish in sufficient time to properly perform the terms of an agreement we are executing together with you with the McClure Newspaper Syndicate, all of the art and continuity for the newspaper strip entitled "Superman" called for by said agreement.

You agree that you will not hereafter at any place in the United States or in any foreign country, furnish to any other person, firm, corporation, newspaper or magazine any art or copy for any comics to be used in any strip or comic or newspaper or magazine containing the above titles or the characters or continuity thereof or in any wise similar thereto, but you shall furnish such matter exclusively to us for the duration of this agreement as such matter may be required by us or as designated by us in writing.

In the event you shall do or make any other art work or continuity suitable for use as comics or comic strips, you shall first give us the right to first refusal thereof by submitting said copy and continuity ideas to us. We shall have the right to exercise that option for six weeks after submission to us at a price no greater than offered to you by any other party.

WB008008

EXHIBIT 3
11

-2-                    9/22/38

We agree to pay you on publication, for any and all of said comics published by us and supplied by you, the following rates:

| | |
|---|---|
| Superman | $10.00 per page |
| Slam Bradley | 10.00 per page |
| Spy | 10.00 per page |
| Radio Squad | 9.00 per page |
| Federal Men | 9.00 per page |

You agree that the number of panels to each montly feature shall be approximately equal to the panels contained in previous publications of the comics.

We further agree to pay you for the McClure Newspaper Syndicate strips which you may hereafter furnish pursuant to the above-mentioned contract with McClure, on the following basis:

When we receive payment from McClure on the 40% basis mentioned in the contract, we shall retain 7½% and pay you 32½% of the "net proceeds" as defined in the McClure contract.
When we receive payment from McClure on the 45% basis mentioned in the contract, we shall retain 9% and pay you 36% of the "net proceeds" as defined in the McClure contract.
When we receive payment from McClure on the 50% basis mentioned in the contract, we shall retain 10% and pay you 40% of the "net proceeds" as defined in the McClure contract.

All material, art and copy shall be owned by us and at our option, copyrighted or registered in our name or in the names of the parties designated by us.

This agreement shall be for a period of five years from the date hereof and shall thereafter be continued for an additional five years at our option. However, if at any time the art and continuity of any feature shall not be up to the standard required for the magazines, we at our option, then may terminate this agreement and substitute other artists for the unsatisfactory feature or features but not otherwise.

According to the abovementioned McClure contract, we have the right to use the material furnished for syndicate purposes without charge by McClure. However, in the event we shall use any of said syndicate matter in our magazines, you shall be compensated at the abovementioned page rate less the percentage which McClure receives for said page or pages. When using such syndicate matter, we shall of course not be required to use original copy as called for by this contract.

WB008009

**EXHIBIT 3**

12

-3-                        9/22/38

At any time, if we believe any feature is economically un-
successful, we may discontinue the further publishing of
said feature.

We shall have the right to reasonably supervise the editorial
matter of all features.

Your signature to this agreement is one of the inducements
to us to execute the abovementioned McClure contract and we
agree to use our best efforts to continue the publishing of
magazines containing the abovementioned features.

Very truly yours,

DETECTIVE COMICS, INC.

By: *Harry Schuenfeld*

                                            *Prs.*

*Jerome Siegel*

*Joseph Shuster*

WB008010

**EXHIBIT 3**
**13**

# EXHIBIT 4

September 22, 1938

Detective Comics, Inc.
480 Lexington Avenue
New York City

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberley Avenue
Cleveland, Ohio

Gentlemen:

This letter, when signed by each of you, will serve as our agreement.

Hereafter, Detective Comics, Inc., is called "Detective" and Messrs. Siegel and Shuster are called the "Artists".

In line with our discussions, we are prepared to go ahead with newspaper syndication of a daily strip, six days a week, entitled "Superman" and owned by Detective, on the following terms and conditions:

We are to have an eight month option from Detective, dating from October 1, 1938, to enable us to make a preliminary survey of the newspaper field in relation to this specific feature, which survey we agree to make at our own expense and to furnish Detective with a report thereof.

If this preliminary canvass indicates the possibility for successful newspaper syndication of this feature, as we anticipate it will, and providing we give Detective notice in writing by registered mail before June 1, 1939 of our exercise of said option, Detective agrees to permit the Artists to supply "Superman" strip exclusively to us for syndication in newspapers in the United States, Canada and all other parts of the world, for a minimum period of five years from June 1, 1939, in consideration of the payment to Detective of forty (40%) per cent of the net proceeds from such syndication during the first year, forty-five (45%) per cent during the second year and fifty (50%) per cent thereafter. "Net proceeds" is hereby defined to mean gross receipts for the feature from newspapers using the feature, less cost of cuts, mats, and proofs. All other expenses, including billing, promotion and selling expenses, are ours and are not deductible in arriving at net proceeds.

If during the third year and continuing to the end of the above mentioned initial five year period, the weekly net share of Detective from the proceeds reaches $100. or more, per week, we shall have the option to renew this agreement for a further period of five years beginning June 1, 1944, on the same terms as provided above, for the final three years of the 1939-1944 period, providing, however, we give Detective notice in writing by registered mail before February 1, 1943, of our renewal.

000000823

**EXHIBIT 4**

**14**

-2-                                     9/22/38

We are to have reasonable editorial supervision of the feature which the Artists agree to maintain at the standard shown in the sample submitted. In turn, we agree to use our best efforts to sell this feature to as large a list of newspapers as possible, and at the best prices obtainable in each case.

Detective and Artists agree to cooperate with us in our sales efforts by supplying on request, any information and assistance, without cost to you however, that we may require for promotion purposes.

Statements will be made to Detective and a copy to Artists, between the 25th and 30th of each month, covering sales of the month previous and will be accompanied by check for its abovementioned share of the amount collected to the date of the statement. Detective and the Artists or their authorized representative may inspect our books of account in reference to the feature, at any reasonable time.

The material contained in the feature which we syndicate will be copyrighted in our name, but copyright reverts to Detective at the termination of this contract. The title "Superman" shall always remain the property of Detective and the feature may be used by Detective for any other purpose except daily or weekly newspaper publication. Our agreement covers newspaper rights only. Radio, motion picture, silent and talkie, book and all other rights are retained and owned by Detective.

The Artists agree to supply the feature required for the newspaper syndicate publications to us, on an advanced schedule of at least six weeks, or such other reasonable period as may be determined by us to insure ample time for distribution prior to release dates. In the event the Artists shall at any time fail to furnish the feature, and so breach this agreement, in addition to any other remedies Detective may appoint other artists to do the feature and strip.

It is agreed that should it be determined at any time during the life of this contract, that it would be advisable to release a Sunday feature of "Superman" Strip, we are to have exclusive rights to such a Sunday feature, on the same terms as outlined herein for the daily strip.

The Artists are to be paid for their work solely by Detective.

Detective agrees that during the life of this contract, before it shall submit any other comics for newspaper syndicate purposes, it shall offer said comics to us for first refusal for a six week period.

We agree to provide Detective with all the original drawings of the "Superman" strip, so that said drawings may be used by Detective in the publication "Action Comics", six months after newspaper release, without charge or for any substituted magazines.

000000824

**EXHIBIT 4**

**15**

-3-                          9/22/38

This agreement does not prohibit Detective from selling to foreign country newspapers rights to use any material which may appear in any magazines published by Detective containing and including "Superman".

It is understood that in the event of an outbreak of a European war, in which Great Britain should become involved during the period of October 1, 1938 to February 1, 1939, the McClure Syndicate has the right to cancel this agreement.

Very truly yours,

THE McCLURE NEWSPAPER SYNDICATE

By: _Richard H. Waldo, Pres._

DETECTIVE COMICS, INC.

BY: _Harry Donenfeld_

_Jerome Siegel_

_Joseph Shuster_

000000825

EXHIBIT 4
16

# EXHIBIT 5



# DETECTIVE COMICS
### INCORPORATED

**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

September 28, 1938

480 LEXINGTON AVE.
NEW YORK, N. Y.

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

Your letter of the 26th reached me yesterday afternoon, just as Mr. Gaines and I were going over the syndicate contract and making the changes which you discussed with him the last day you were in New York, That is, an 8 months' option instead of 4 months, with the further provision that if a war should break out in Europe, in which England should be involved during the first 4 months of this 8 months option period, Mc Clure would have the right to cancel the agreement.

I am sending you herewith three copies of the contract with the corrections indicated thereon, as well as the contract between ourselves. Please note that you and Joe are to sign all three contracts between McClure, Detective Comics and yourselves and you are also to initial the changes where I have already put my initials on all three copies.  Please return these three signed copies together with the two copies of our agreement signed by both of you by return mail, so that when Mr. Donenfeld comes back to New York in the next day or two, he can then sign them and I will then have Mr. Gaines get the McClure Syndicate signature on your copy and return your copy of each contract.

Now, in reply to your letter.  Frankly, when I got through reading it, it took my breath away.  I did not anticipate that when I asked you to come to New York to discuss this matter of newspaper syndication, that you would want to take advantage of this visit and try to boost up your price on "Superman". You must bear in mind, Jerry, that when we started Action Comics, we agreed to give you $10.00 a page, which is $4.00 a page more than anyone else is getting for any feature in any of our four books.

In addition, we're paying you $9.00 and $10.00 a page for the other four features you are drawing for us - again $5.00 and $4.00 a page more than we are paying any other artist.  Where you got the idea that anyone was receiving $15.00 a page I'd like to know.  As regard your mention that other features contain 6 panels, I beg you to be a little more observant.  You will find that all contain 8, with the exception of where the action calls for a double spread.  You, who have been the most flagrant violator in this particular respect, should have the least to say about such matters.

000000463

EXHIBIT 5

17



**DETECTIVE COMICS**
*INCORPORATED*

Publishers of
**DETECTIVE COMICS**
**MORE FUN COMICS**
**NEW ADVENTURE COMICS**
**ACTION COMICS**
**NEW BOOK COMICS**

480 LEXINGTON AVE.
NEW YORK, N. Y.

-2-

Also, take into consideration that when we decided to come out with Action Comics, we were taking a tremendous gamble involving many thousands of dollars. We have no assurance from anybody that Action Comics would not be a losing proposition - you took no such gamble.

As far as the rate of $25.00 for reprint material is concerned, when "Superman" reaches the same popularity as Dick Tracy, Orphan Annie, Skippy, Mutt & Jeff and dozens of other top-notch features, you will be in a position to ask for more money - and we will be more than happy to compensate you accordingly.

As far as the popularity poll is concerned, we have approximately 500 letters in reply to this contest. If you were so observant, you may have seen that the majority of these letters have not been opened as yet and I don't know whether "Superman" heads the list or "Zatara" and I don't in this book. If you base the popularity of your strip on the basis of 500 replies, you are grossly exaggerating the importance of "Superman". Don't forget that there are 64 pages in the magazine and that there isn't any magazine being published today that can sell on the basis of any one feature, whether that feature is Pop-Eye, Mickey Mouse, or any other top-notch strip and if I thought for a moment that our magazine depended on your strip, I would certainly make every effort to avoid any such situation.

As a matter of fact, we have today opened the other mail on the poll and we have found that about 25% indicate "Zatara" to be their favorite feature, 20% like "Pep Morgan", 15% like "Tex Thomson" and only 30% have designated "Superman" as their favorite, the balance being scattered among the other features in the magazine, so come off your high horse.

Is it possible that because we treated you like a human being - you suddenly got a swell head? It may also be that you are under the mistaken delusion that because you came into town to a large organization, which gave you time and showed you every courtesy which would be accorded to any big personage, you construed all these actions in the wrong light, that we were trying to get something from you. The case is distinctly the reverse. We were trying to give you, an inexperienced young man, the benefit of our experience and good will, in order that you get ahead in your ambition to become somebody in the comic field.

Don't get the idea that everyone in New York is a "gyp" and a highbinder and because you are treated as a gentleman and an equal, not only by ourselves but by Mr. Gaines and the McClure people, that we are seeking to take advantage of you.

000000464

As I have pointed out to you many times, our company has very little to gain in a monetary sense from the syndication of this material. Also

**EXHIBIT 5**
18



**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

—5—

480 LEXINGTON AVE.
NEW YORK, N. Y.

bear in mind, that we own the feature "Superman" and that we can at any time replace you in the drawing of that feature and that without our consent this feature would not be syndicated and therefore you would be the loser in the entire transaction.

The amount of increase you demand does not hurt me as much as your attitude in the entire matter. I don't want to be too harsh about it, because I realise that because of your inexperience you have made an unfair request. In time, if our association continues, you will learn that you have been very fortunate in meeting up with people who are looking out for your interest as well as their own.

Don't forget Jerry, you and Joe are still young men. When we started to work with you, you were getting very little from Nicholson – when you got it, and not getting anywhere. We have more than doubled your revenue in the last six or seven months and only the future can tell how much farther you will go.

Please give the entire matter your serious thought. It is entirely up to you and Joe, whether you wish our pleasant relationship to continue and whether you wish the strip "Superman" to be syndicated.

Very truly yours,
DETECTIVE COMICS, INC.

JSL:MN

J. S. LIEBOWITZ

P.S. As there were too many changes in the contract, we decided to re-type it, therefore there will be nothing to initial.

000000465

**EXHIBIT 5**
19

# EXHIBIT 6



**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

December 19, 1939

480 LEXINGTON AVE.
NEW YORK, N. Y.

Jerome Siegel and Joseph Shuster,
New York, N. Y.

Dear Sirs:

We have discussed with you certain changes of procedure and compensation which we feel it advisable to set forth in a written modification so as to bring our agreement of September 22, 1938 down to date.

In the 1938 agreement we had agreed to pay both of you for the art work and continuity for the comic strips entitled "SUPERMAN," "SLAM BRADLEY", "SPY", "RADIO SQUAD" and "FEDERAL MEN" at certain rates per page. Since that time, however, while both of you have continued to furnish art work and continuity for "SUPERMAN", only Mr. Siegel has continued to furnish the continuity for the remaining comic strips. Mr. Shuster no longer furnishes the art work for "SLAM BRADLEY", "SPY", "RADIO SQUAD" and "FEDERAL MEN". Also, we have discussed with both of you a change of your page rate compensation with respect to "SUPERMAN".

Effective, therefore, upon the signing of this modification, we agree to pay to both of you for all art work and continuity for "SUPERMAN" at the rate of $20. per page, and both of you agree that you will at such rate continue to furnish all art and continuity work for "SUPERMAN" to us in accordance with the agreement of September 22, 1938. As to the remaining comic strips, we shall be free to make other arrangements with Mr. Siegel personally as to the furnishing of continuity for them and also make other arrangements for the furnishing of art work for them in view of the fact that Mr. Shuster no longer furnishes the same.

We have also informed you of our activities in promoting the commercial exploitation of "SUPERMAN" in other fields in addition to magazine publication and newspaper syndication. Such other fields include radio, motion pictures, the toy and novelty field and others and we have indicated to you our willingness that both of you receive some portion of the proceeds which may be realized from these additional activities. We, therefore, hereby agree to pay to you 5% of all net proceeds which may be derived by us from all commercial exploitation of "SUPERMAN" outside of magazine and book publication and newspaper syndication. Such net proceeds shall be arrived at by deducting from the gross proceeds from any such additional sources (except magazine and book publication and newspaper syndication) all expenses incurred by us in the course of such promotion and exploitation.

By your signatures below, you hereby confirm the foregoing arrangements and you hereby further confirm the following:

1. That we, Detective Comics, Inc., are the sole and exclusive owners of the comic strip entitled "SUPERMAN" and the other comic strips entitled as above mentioned, and to all rights of reproduction of all said comic strips and the titles

DCC00007181

**EXHIBIT 6**
**20**

# DETECTIVE COMICS
## INCORPORATED

**Publishers of**
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

Jerome Siegel & Joseph Shuster                    December 19, 1939

-2-

and characters contained therein and the continuity thereof, including but not limited to the fields of magazine or other book publication, newspaper syndication, radio broadcast, television, motion picture reproduction and all other form of reproduction. We have all right of copyright and all rights to secure copyright registration in respect of all such forms of reproduction either in our own names or others at our exclusive option.

2. That you have not done or permitted any act or thing which might impair any of our aforesaid rights with respect to any of the aforesaid comic strips and that so far as you are concerned our full and complete ownership thereof and of all reproduction rights in connection therewith are vested in us free and clear of the rights of any other persons or parties whatsoever.

3. That we have the unrestricted right to adapt, arrange, change, transpose, add to and otherwise deal with any or all said comic strips and the titles, characters and continuity thereof as we in our sole discretion may deem it necessary or advisable to do so.

4. That we have the unrestricted right to grant to others upon such bases as we in our sole discretion shall determine, any of the foregoing rights of reproduction with respect to any of theaforesaid comic strips and the titles, characters and continuity thereof.

You hereby agree to execute any and all further instruments which may at any time be necessary or advisable in connection with any of the foregoing rights and property now vested in us and for that purpose and for all other purposes hereunder you hereby designate us and our successors and assigns your agents and attorneys in fact irrevocably.

This modification shall become effective immediately upon your signing the same below and continue in full force and effect throughout the life of the agreement dated September 22, 1938 as the same has been modified by this letter. Both you and ourselves hereby ratify and confirm the foregoing agreement dated September 22, 1938 as the same has been modified by this letter.

Very truly yours,
DETECTIVE COMICS, INC.

By _Harry Donenfeld_
Pres.

APPROVED AND ACCEPTED:

_Jerome Siegel_
Jerome Siegel

_Joseph Shuster_
Joseph Shuster

DCC00007182

**EXHIBIT 6**
21

# EXHIBIT 7



*FILE Siegel + Shuster*

*It has been 50 years since Superman, the creation of two kids from Cleveland, made his debut in the pages of Action Comics No. 1. In honor of this anniversary, we reprint this article from The Saturday Evening Post of June 21, 1941 (© 1941 The Curtis Publishing Co.). On the next five pages, we are reprinting the actual pages from the 47-year-old magazine, so don't try to cash in on any of the nifty ads.*

14

## UP, UP AND AWA-A-Y!

### The Rise of Superman, Inc.

#### By John Kobler

ONE afternoon last June, shortly after the owners moved into the new house on Cleveland's University Heights, a delegation of small boys rang the doorbell. At sight of the short, plump, heavily spectacled young man of twenty-six who answered it, their faces fell.

"Aw, I told you Superman doesn't live here." the oldest one fretted.

"Oh, yes, he does," insisted another. "My pop told me so."

"Hold on, boys," put in the plump twenty-six-year-old. "Just wait here a minute."

He bobbed back into the house, returning an instant later with an outfit familiar to millions of boys the country over: the red boots, blue tights and flowing red cape, embroidered with an enormous S, which Superman, America's No. 1 Comic Magazine hero, wears whenever he swings into action.

The boys' faces brightened again. Hopping up and down excitedly, they squealed, "Where is he? We wanna see him!"

"Well, right now," explained the plump youth, "he's engaged on one of his mysterious missions."

 

At twenty-six, the genie they created has brought them super-success. Jerry Siegel, who does the writing, watches Joe Shuster at the drawing table.

*"None of the Shusters can quite grasp what has happened to them." Joe (center left) is a bountiful provider for Brother Frank, Mamma, Papa, Sister Jeanette. Right—Siegel invented Superman in a less luxurious bed, likes to read biographies of factual supermen.*

But he's not far away. He ought to be landing on the roof any minute."

Until dusk fell, the boys kept circling the house, their eyes glued to the roof.

Superman failed to show up that day. But when their mothers called them for supper, the plump young man managed to send them home satisfied that Superman was hovering somewhere in the neighborhood.

In the three years that Jerry Siegel, the plump youth, has been writing the Superman saga, and Joe Shuster, his neighbor, partner and boyhood crony of the same age, has been illustrating it, they have assumed a solemn obligation to instill faith, wherever possible, in the physical reality of Superman. They have done this in the same spirit in which old-fashioned parents encourage belief in Santa Claus. Indeed, Siegel and Shuster are suspected by many of their friends of believing in Superman themselves.

And to their deep satisfaction, material considerations aside, their Man of Steel, with his superbearing, super-sight and super-vitality, has become all things to all boys. He has shaken the pedestal of many a classic boyhood idol: Tarzan, whom he can outleap and outfight; Nick Carter, whom he can outsleuth; Galahad, whose purity is as tarnished brass compared to his. More than this, Superman accomplishes with casual ease feats that are common to every boy's daydreams. He kayoes eleven prize fighters in one second flat, leaps an eighth of a mile in any direction, runs faster than a locomotive and swims faster than a fish. His eyes are so keen that they can see through the thickest walls, his ears so acute that he is, willy-nilly, an eavesdropper on any conversation within a hundred yards. His skin is so tough that nothing short of an exploding grenade can even tickle it. Bullets bounce off it like spitballs; cold steel crumples against it like matchwood. And to top it all, his motivating traits are "super-courage, super-goodness and super-justice"; his mission in life "to go to the rescue of persecuted people and deserving persons."

Perhaps the greatest of all Superman's achievements is that he is a miracle man in fact as well as in fancy. No other cartoon character ever has been such an all-around success at the age of three. No other cartoon character ever has carried his creators to such an accomplishment as Siegel and Shuster enjoy at the age of twenty-six.

Three times a week, millions of young spines tingle as Superman thunders hollowly over the air waves. "Up, up and awa-a-y!" then soars into space to wreck an enemy Zeppelin in full flight or extinguish a forest fire by huffing at it, as the crisis may demand. His noble profile confronts them in two magazines and 230 newspapers with a com-

DCC00006849

**EXHIBIT 7**

22

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*



*Superman crashes the movies—a scene from his first animated cartoon, about to be released. Below—The businessmen who have made an even better thing of Superman than have his authors. Harry Donenfeld is the man in the center.*

bined circulation of nearly 25,000,000. That boy is growing rare who has no Superman dungarees in his wardrobe or no Superman Krypto-Raygun in his play chest.

When R. H. Macy & Co. staged a Superman exhibit in its New York store last Christmas, it took in $30,000 in thirty-cent admissions. Superman Day at the World's Fair cracked all attendance records for any single children's event, drawing 36,000 of them at ten cents a head. Certificates, code cards and buttons, setting them apart as members of the Superman Club of America, are proudly carried by some quarter of a million youngsters, including Mickey Rooney, Spanky McFarland, Farina, a du Pont, a La Follette, Mayor La Guardia's two children, and six Annapolis midshipmen. The 33rd Bombardment Squadron, Air Corps Reserve, has adopted Superman as its insignia.

### Bomb-Shelter Divertissement

AN AMERICAN newspaper correspondent, touring London's bomb shelters during a heavy raid, observed a cockney boy immersed in the pages of Superman. Neither the din of antiaircraft fire nor shells exploding near by could distract his attention, and in his rapture he began squirming and jostling his neighbors. After a particularly violent detonation, his mother snatched the magazine out of his hands. "Give over," she bawled, "and pay attention to the air raid."

Among the intellectuals, Superman has been acclaimed the first authentic culture hero since Paul Bunyan. The New Republic recently analyzed him in terms of Nietzschean philosophy, a concept neither Siegel nor Shuster could ever understand.

Although many a parent-teacher group has objected to Superman, Dr. Lauretta Bender, the psychiatrist, addressing the American Orthopsychiatric Association, declared that he provides an inexpensive form of therapy for unhappy children. She cited the case history of a boy, ignored by a flighty mother and an alcoholic father, who believed he would soon die. He found relief by identifying himself with the imperinhable Superman. "(He) would seem to offer the same type of mental catharsis," Doctor Bender concluded, "that Aristotle claimed was an attribute of the drama."

Governments have taken official note of Superman. In a special strip drawn for a magazine, Siegel and Shuster had him demolish the Siegfried Line, seize both Hitler and Stalin by the napes of their necks and whisk them off for judgment before the League of Nations. Das Schwarze Korps, official newspaper of Hitler's Elite Guards, took note of their Jewish blood and counterblasted: "The clever creator of Superman is a Colorado beetle (sic). . . . He stinks."

Translations used to carry Superman all over Europe—yes, including Scandinavia. But, banned wherever the swastika waves, he is now confined to the British Empire, the

(Continued on Page 70)



*page 64*

DCC00006850

**EXHIBIT 7**

**23**

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*



70           THE SATURDAY EVENING POST           June 21, 1941

## GOOEY PIPE SINKS MARINE

*...but he's out of the dog house now!*





**SERGEANT FRANKLIN'S** pipe was rankin' the bimbo in back of the boat. "Head for the shore," she gasped. "That briar of yours smells like burning celluloid! I'm getting dizzy!"

**OUT SHE JUMPED** and off she stalked. And there he stood. "Well," said the fisherman, "I see the Marines have landed, but don't have the situation well in hand. Get wise, Mister!"




**"THAT HANDSOME UNIFORM** will win us women till you clean out your pipe and switch to a tobacco that smells good. Like this here Sir Walter blend of fine mild barleys. Try a load."

**PUFF ENDS NUFF.** The sergeant took that good advice—switched to Sir Walter Raleigh—and won her back in a sniff. Try this mildest tobacco yourself. It smells grand to everyone!

KEEP OUT OF THE DOG HOUSE WITH SIR WALTER



SIR WALTER RALEIGH

UNION MADE

*New!* Cellophane tape around lid seals flavor in, brings you tobacco 100% factory-fresh!

*Tune in...* UNCLE WALTER'S DOG HOUSE
EVERY FRIDAY NIGHT ★ NBC ★ PRIZES FOR YOUR "DOG HOUSE" EXPERIENCE

---

## UP, UP AND AWA-A-Y!

(Continued from Page 13)

United States, Latin America (Superhombre), Hawaii and the Philippines.

The young creators of the Man of Steel would have been hailed by Doctor Freud as perfect clinical illustrations of psychological compensation. For here are two small, shy, nervous, myopic lads, who can barely cope with ordinary body-building contraptions, let alone tear the wings of a stratoliner in mid-air. As the puniest kids in school, picked on and bullied by their huskier classmates, they continually moped off into what Doctor Freud termed "infantile phantasies," wherein they became colossi of brute strength, capable of flattening whole regiments of class bullies by a flick of their pinkies.

Siegel's parents are old-time Clevelanders. His father, Michael, who died six years ago, ran a hole-in-the-wall men's furnishing shop and his mother helped behind the counter. There are three sisters, now all married, and two older brothers—Leo, a dentist, and Harry, a mailman.

Never a shining scholar, Siegel daydreamed through Oliver Wendell Holmes Public School, landing uneasily in Glenville High. Everybody in the struggling Siegel family had to pull his own weight. Between classes Jerry made deliveries for a printing plant, averaging four dollars a week. At all leisure moments, however, he nurtured his ingrown soul on an undiluted diet of dime novels and comic strips, especially the Man-From-Mars category.

"It inspired me to devote myself henceforth to writing science fiction literature," says Siegel, who often talks like that.

Presently he was devoting himself to it so wholeheartedly that it sometimes took two years to move him from one grade into the next.

### A Cosmic Meeting

It was in the corridors of Glenville High that a classmate pointed out to him a pale, pitcher-eared lad named Joe Shuster, whose head was also in the clouds above Mars. Siegel sought him out.

"I understand," he said, "that you draw science fiction stuff."

"Uh-huh," Shuster admitted, his eyes blinking behind double-thick lenses.

By the noon recess the boys had formed a partnership which has progressed, uninterrupted by a single dispute, to this day.

The Dutch-Russian-Jewish Shusters were harder up than even the Siegels. Julius Shuster, a work-worn little tailor, had started life in Toronto forty years earlier and emigrated to Cleveland when Joe was ten. The family, consisting, in addition, of Mamma Shuster, brother Frank who now works as a letterer on the Siegel-Shuster staff and sister Jeanetta, crowded into a twenty-dollar-a-month flat in a down-at-the-heels district. Some days they skipped a meal. One winter they had no coal and Joe had to work at his drawing board wearing cotton gloves.

By the time he entered Glenville High he was a wage earner of experience, having peddled newspapers, hawked ice-cream cones in summer, and worked as an apprentice in a sign painter's shop. He earned as much as five dollars a week, which he dutifully

handed over to his parents. He also found time to win a scholarship at the Cleveland School of Art and attend night classes at John Huntington Art School, where the tuition was ten cents a lesson.

Five minutes after Siegel and Shuster met they were breathlessly discussing Buck Rogers, Tarzan of the Apes, and other exemplars of the contemporary comic strip. As soon as school was out they repaired to Shuster's unheated workroom, barely twelve blocks from the Siegel home, and plunged into an editorial conference, resuming in every night and as much of the daytime as they could snatch from school for the next several years.

### The Birth of Superman

They were years of struggle and discouragement. The partners brewed many a strong potion—Doctor Occult, a sort of astral Nick Carter who kept tangling with zombis, werewolves and such; Henri Duval, a doughty musketeer in the image of D'Artagnan—but no editor hastened to press riches on them. What few continuities they did place were bought by Major Malcolm Wheeler-Nicholson, a grand-mannered, bespatted ex-Army officer, who in February of 1935 had published New Fun Comics, first original comic magazine and forerunner of some 108 which now festoon the newsstands. [For the record, the first Comic Magazine of any description—it contained reprints only—was published by M. Charles Gaines, a schoolteacher who became production manager of McClure Syndicate.] But the major couldn't see Superman for two pins.

How, one hot night in 1932, the Man of Steel had sprung practically full-blown into Jerry Siegel's head is an experience he never tires of describing.

"I am lying in bed counting sheep when all of a sudden it hits me. I conceive a character like Samson, Hercules and all the strong men I ever heard tell of rolled into one. Only more so. I hop right out of bed and write this down, and then I go back and think some more for about two hours and get up again and write that down. This goes on all night at two-hour intervals, until in the morning I have a complete script."

As the dawn rose over Cleveland, Siegel, shirttail flying and script clutched in his fevered hands, raced through the empty streets to the Shuster home—one of the few violent exertions he has ever permitted himself and roused his partner. Shuster took fire at once. Without pausing for either food or rest, they spent the rest of the day polishing off the first twelve Superman strips. The story told therein is now as familiar to the average American boy as George Washington and the cherry tree.

How, split seconds before the planet Krypton, abode of a super-race, is destroyed by earthquakes, Jerl-l, the great Kryptonian scientist, pops his first-born into a rocket ship and launches him into interplanetary space. Some 3,000,000,000 light-years later the rocket ship lands safely on a roadside near Metropolis, U. S. A., where a passing motorist extricates tiny Jorl-l, Jr., and delivers him to an orphanage. Here, in an unforgettable

(Continued on Page 23)

---

page 65

DCC00006851

**EXHIBIT 7**

**24**

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*

THE SATURDAY EVENING POST                                                    73

*(Continued from Page 70)*

panel, the diapered super-tot merrily balances a huge armchair on his hand while doctor and nurse look on, bug-eyed.

We next see him grown to super-manhood, a broad-shouldered, Greek-profiled titan. In the process he has acquired a dual personality. Part of the time the world knows him as Clark Kent, a distinctly prissy reporter for the Daily Planet, who tends to shy away from unpleasantness. But let evil show its fangs and he ducks into privacy, shucks his college-cut clothes and stands forth, bold as truth, in the gaudy working clothes of Superman. This Doctor-Jekyll-and-Mr.-Hyde arrangement enables Clark Kent to hand his paper some extraordinary scoops on Superman's latest coups.

Most of them are brought off in behalf of Lois Lane, the Planet's toothsome girl reporter, whose nose for news is constantly landing her in dire straits.

If Major Wheeler-Nicholson's judgment in passing up this Homeric figure was faulty, it was no worse than the judgment of practically every syndicate and comic-magazine editor in the country. During the next six years all of them rejected it, some not once but two or three times.

"Frankly," wrote the editor of the Ledger Syndicate, "we feel that the public have had their fill of super-human subjects." The Bell Syndicate explained that "we are in the market only for strips likely to have the most extraordinary appeal and we do not feel Superman gets into that category." United Feature thought that Superman was "a rather immature piece of work," and Esquire Features, Inc., suggested, "Pay a little more attention to actual drawing. . . . Yours seems crude and hurried."

To keep eating regularly, the partners had to turn their hands to comic valentines and cut-rate advertising layouts.

But 500 miles away, in a New York office building, blind chance suddenly staggered in the partners' direction. Here, on the ninth floor of 480 Lexington Avenue, Harry Donenfeld, owner of a printing plant, partner in a distributing company and an irrepressible prankster who once gave Jack Dempsey a hot foot, had taken over the major's interests, which now embraced three comic magazines. And on the well-known pulp-publishing theory that it is practically as cheap to run four as three, he had decided to bring out a new ten-cent monthly, Action Comics. But how to stock up on new material? Charlie Gaines figured that McClure Syndicate ought to have some stuff lying about. McClure did and Gaines sent over a batch of it, including the original Superman strips, which McClure had been on the verge of rejecting for the third time.

**Selling a Brain Child**

Without great enthusiasm Donenfeld asked Siegel and Shuster to paste up their original strips into a single thirteen-page story and offered them ten dollars a page. Before payment, however, his far-seeing general manager, Jack Liebowitz, mailed them a release form, explaining, "It is customary for all our contributors to release all rights to us. This is the businesslike way of doing things."

Meaning that for $130 the partners would be relinquishing their equity in all possible future profits from syndication, radio, movies, and so on, and

that Donenfeld, as sole owner of Superman, could even hire some other team to draw him.

The partners, who by this time had abandoned hope that Superman would ever amount to much, mulled this over gloomily. Then Siegel shrugged, "Well, at least this way we'll see him in print." They signed the form.

Superman appeared in the first issue of Action Comics, June, 1938. Nothing happened. Nor the second issue, for which the partners received another $130. Nor the third. But with the fourth, Action Comics spurted mysteriously ahead of its fellow publications. Donenfeld heard the rumble of distant drums. "We better have a newsstand survey," said he.

**The Golden Touch**

The survey quickened this brightest hopes. Children were clamoring, not for Action Comics, but for "that magazine with Superman in it." Quivering with excitement, Donenfeld ordered Superman splashed all over the cover of succeeding issues. They sold out.

In May of 1939 he tested a quarterly consisting of four thirteen-page Superman stories. It, too, was a sellout. The following July, Superman Magazine bowed in as a bimonthly. It has been sipping along ever since at a lively 1,300,000, while Action Comics, featuring only one Superman story, soared to 900,000. Today Superman leads all other comic-magazine characters, one of the few within even hailing distance being The Bat Man—800,000—a bimonthly also owned by Donenfeld. Last year the Superman magazine grossed $950,000.

From the fall of '38 on, it was all sail and no anchor. Amid the piteous sounds of syndicate editors kicking themselves, McClure negotiated with Donenfeld to handle the newspaper rights, Donenfeld to receive 40 per cent. Superman was eventually placed in 230 daily and Sunday newspapers scattered throughout the Western Hemisphere. Donenfeld's 1940 cut was $100,000.

The McClure negotiations were preceded by considerable unhappiness for the partners. They sensed—correctly—that syndicate editors, who had once turned Superman down, would soon come to them, hat in hand. They begged Donenfeld to give back the syndicate rights.

"We can't do that," he replied, "but if one of you will come to New York, I'm sure we can work something out."

Sitting up all-night in the coach for lack of sleeper fare, Siegel arrived, rumpled and yawning, to receive the proposition: If the partners would confine all their services to Donenfeld for ten years, he would permit them to do strips for McClure, himself retaining an agent's 10 per cent of McClure's gross, however, not his own 40 per cent net. In the heat of discussion Siegel was frenziedly reminded that Donenfeld owned all rights and could freeze the partners out. The boys signed a contract, which for the first year brought them an increase of less than $100 a month.

Back in Cleveland, Siegel and Shuster rented a thirty-dollar-a-month office in a remote office building. "The idea was to work where nobody would be likely to interrupt us," says Shuster.

They had the telephone ripped out and kept the frosted-glass door blank, lest curiosity seekers swamp them. As it is, a few of the more persistent ones



*[advertisement:]* You're among Friends— When you come to **Ontario**

CANADA'S PLEASURE PROVINCE

● FISHING   ● RIDING
● GOLFING   ● BOATING
● SWIMMING  ● LOAFING

—every form of holiday fun awaits

WHETHER you want a rest or a lively vacation, you will find it at its best in Ontario. Marvelous highways will carry you to beauty spots where you can holiday with an enjoyment you have never experienced before. Your money will go further, too, in Ontario ...there's a handsome premium on U.S. funds.

This year there is a prize contest for the best vacation snapshots, and a contest for the biggest fish caught in each of six different classes. Write for full information about these contests.

If you would like information about visiting the great Ontario goldfields, about canoe trips, or about the rental of Crown lands for cottage or camp sites, it will be furnished gladly on request.

Plan now to enjoy this year's vacation in Ontario. Let us send you full information about the kind of holiday you want. Write now, or use the coupon below.

● No passport is required by U.S. citizens, simple identification papers only. There is no fuss or formality when entering or leaving Canada. No taxes on meals, no amusement taxes, no local sales taxes, and no toll bridge charges to pay within Ontario. Travel in this lovely Province is absolutely unrestricted . . . go where you please, and enjoy yourself to the full . . . you will be very welcome.

Ontario Travel and Publicity Bureau
31 Parliament Buildings
Toronto, Ontario, Canada

Please send me your free 80-page book on Ontario, also official road map.

Name _____

Address _____

Town _____ State _____

**NO PASSPORT REQUIRED**

DCC00006852

**EXHIBIT 7**

25

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*



"My Sun Glasses are Better than Yours"

**IT MAY BE TRUE!** Awkward and ugly, of course. But the primitive Eskimo's slit fishbone is better, safer glare-protection than you'll get from some sun glasses. * * * How can you be sure the sun glasses you buy are scientifically safe and efficient? What makes the difference between correct and incorrect glare-protection? Scientists of American Optical Company give the answers in the vital truths presented here.

**FOR YOUR EYES' SAKE . . . KNOW THESE FACTS**

LENS QUALITY is the first consideration. Some sun glass lenses are bent or blown glass containing invisible, but eye-taxing defects. AO Sun Glass lenses are made only of fine quality ophthalmic glass, to high optical standards.

ABSORPTIVE POWER or ability to stop rays that cause strain and discomfort may be very low in inferior lenses. All AO Sun Glass lenses shut out excessive ultra-violet (sunburn) rays, and some also absorb excess infra-red (heat) rays.

LENS COLOR may be guesswork in poor sun glasses. AO scientifically determine what color shades cut overbrilliant light, yet admit adequate "seeing" light...affect colors least, and blend with complexions.

FRAMES of inferior products may interfere with vision, chafe or bind. AO frames are optical quality, smart, finely finished, designed for efficient seeing.

IF YOUR EYES BURN or ache, have them examined. Even the finest sun glasses are not the answer for eye trouble. Personal sun glasses, with lenses ground to prescription, add to outdoor pleasures of wearers of eyeglasses . . . are available through the optical profession.

**SAY "AO" . . . AND BE SURE!**

Four Types, Many Styles . . . $1.00 and up. Choose out glasses that carry the famous AO mark. It made these more than 100 years of leadership—pioneering in absorptive lenses...recognized service to the optical professions, Army, Navy and Industry.

AO CALOBAR Sun Glass lenses meet specifications of U. S. Army Air Corps. Considered by many optical experts the finest lens of its kind, Calobar absorbs excess ultra-violet and infra-red rays. $2.00 up.

AO COOL-RAY Sun Glasses afford complete protection. The exceptionally fine lenses meet U. S. Army Air Corps specifications for infra-red and ultra-violet absorption. $2.50 up.

AO POLAROID Sun Glasses employ the sensational Polaroid light control that stops reflected glare. Also they over-brilliant light and absorb excess ultra-violet rays. Adult and children's . . . $1.95 up.

AO SUN-VUE, Sun Glasses have lenses made to the specifications of genuine Cruober glass, that absorb excess ultra-violet. Truly fine glare protection that anyone can afford . . . $1.00 up.



**American Optical Company**

Southbridge, Mass.—Branches in Principal Cities

manage to break in. They invariably expect to see something pretty awesome. What they do see is five young artists, hired by Siegel and Shuster, jammed cheek-by-jowl into one of the world's tiniest rooms, furiously penciling and lettering Superman panels at the rate of one thirteen-page story, one Sunday page and six daily strips a week.

The staff reports for work five days a week at 9:30 and knocks off around 5:00. Their salaries range from $50 to $200 a week, which is more than Siegel and Shuster got during the early years of Superman's rise. Nobody but Shuster, however, is allowed to draw Superman's facial expressions, which run the gamut from sublime vacuity to steely determination, depending upon what expression Shuster has subconsciously screwed his own face into at the moment of creation. He also indicates the color scheme, though the actual water coloring is applied in New York.

Siegel's schedule is more irregular. He seldom visits the office, hanging out his contribution, three or four at a crack, in his own glossy study at home, a Benny Goodman record swinging at his elbow to stimulate inspiration. He sends the first draft to New York for suggestions, corrections and general editing. A highly individual stylist, he is partial to phrases like "within the room," prefers "commences" to "begins" and has been known to split an infinitive three ways. To Whitney Ellsworth, one of the harassed Donenfeld editors, falls the delicate task of curbing these tendencies without diluting Superman's fruity mode of speech: "So Luthor is still alive and plotting the downfall and subjugation of present-day civilization! The world will never be safe until that fiend is destroyed—and somehow I've got to accomplish it."

Besides being the greatest soliloquizer since Hamlet, Superman is also a humorist full of whimsey and light banter. No matter how rough the action or how grim the crisis, he is always ready to toss off some blithe gaiety. "May I get in on this?" he inquires with elaborate mock courtesy, as he slams himself through brick and glass into Luthor's hide-out. Dangling from the underside of a speeding auto and bouncing his head against the curb at every turn, he observes airily, "Just a good scalp massage." When an artillery squad fires a Big Bertha at him, he catches the shell in his bare hands, chuckles, "Oh, wanna play, eh?" and hurls it right back at them.

**Pen-and-Ink Morals**

When Ellsworth returns his continuity, Siegel prepares a final draft and runs through it with the entire staff. Shuster then blueprints the main sequence of action and allots the drawing chores, each to its proper specialist.

Every two or three months Siegel flies to New York to sit in on a policy conference. With millions of parents ready to ban Superman from the house should ever his high moral sense falter, the company takes its civic responsibility seriously.

Superman is never allowed, for example, to destroy property belonging to anybody except the villain, and then only when absolutely unavoidable. He will readily project himself through a building, rendering it utterly uninhabitable, but only when Lois Lane's predicament inside is so desperate that to use the conventional entrance might mean a fatal delay. Superman never kills anybody and

never uses a weapon other than his bare fists. He knocks evildoers silly at the drop of a hat, tosses them clear into the stratosphere and generally scares the daylights out of them. But those who get killed are always hoist by their own petards, as when a gangster whams Superman on the skull with a crowbar, only to have the crowbar rebound and shatter his own noggin.

Rarely by so much as a word or a glance is the tender passion suggested between Superman and Lois Lane. For one thing, Superman himself has shyly confessed that he would never embrace a girl, lest he inadvertently crack her ribs. It is a curious evidence of children's precocity that most of them sense how Superman and Lois feel about each other anyway.

**The Air Wave of Prosperity**

With Superman, Inc.'s, many extra-literary enterprises neither Shuster nor Siegel has any direct connection. Radio, for instance. In 1939, Bob Maxwell, one of Donenfeld's brain-trusters, sat down with a script writer to whip together a series of fifteen-minute recorded cliff-hangers. The project dragged along for six months. The toughest problem was sound effects. What sort of noise would Superman make taking off, anyway? They finally solved that one by mixing a newsreel recording of a bomb falling in the Spanish war, a fifty-mile gale and a hand-operated wind machine. The result was a gratifying "Who-o-osh."

They found a sponsor and on the evening of February 12, 1940, over ten scattered stations, was first heard: "Up in the sky! Look! It's a bird! It's a plane! It's Superman!"

Ten weeks later it had a Crossley rating of 5.6, establishing it as the most popular children's program wherever broadcast.

At this writing it is being broadcast three to five times a week on sixty-three stations, its sponsors including an Atlanta, Georgia, wet-wash laundry and a Hawaiian Swim-watch firm, bringing the total annual radio income to $75,000. A nationally known sponsor, whose identity is still a closely guarded secret, has just bid double that for exclusive ownership and plans to release it in the fall over a coast-to-coast hookup.

Of the 250 people employed in Superman enterprises, the only one who approaches the physical and spiritual ideal is Superman's radio voice, Clayton (Bud) Collyer, an extravagantly handsome young Williams graduate, six feet tall, weighing 210 pounds, most of it in his chest and shoulders, who superintends his community church and neither smokes nor drinks.

When first offered the role of Superman, Collyer, a $300-a-week performer on such programs as Cavalcade of America and Battle of the Boroughs, thought it sounded pretty silly. Now he loves it. He gets twenty dollars a recording and usually records three episodes at a single session. He takes a lot of ribbing from his adult friends. The elevator starter in the recording studio building never fails to hoot, "Why don't you fly up?" But Collyer takes comfort from the hordes of kids who wait for him to get off the train nights in Jackson Heights, Long Island, and follow him, shouting, "Hi-ya, Superman! Make like Superman, will ya?" (Collyer uses a tenor for Clark Kent, a basso profundo for Superman.)

(Continued on Page 76)

DCC00006853

**EXHIBIT 7**

**26**

*Reprinted from the June 21, 1941 Saturday Evening Post (©1941 The Curtis Publishing Co.)*

76      THE SATURDAY EVENING POST      June 21, 1941



# "A QUIET REVOLUTION"

**R**OARING guns, screaming planes and rumbling tanks have had no part in a revolution that has taken place all around you during the past ten years. Quietly, steadily, new types of machine tools have been developed and produced to meet modern manufacturing conditions, until now, in thousands of factories and shops throughout the world, hundreds of thousands of these new tools have displaced older, slower and much more expensive machines!

Behind this quiet revolution lies an unusual story of inventive ingenuity and manufacturing skill. More than ten years ago, Delta engineers set out to design and produce wood and metalworking machines that would be lighter, more flexible, handier and more efficient than any machines then on the market—*which would cost only one fourth to one third as much as older machines*—yet would accomplish the same work. Today, so low in cost are these Delta machines, produced by modern manufacturing methods, that they can be purchased by the very smallest of "one-man" shops!

Behind these Delta light machine tools—now used so successfully and economically by thousands of the finest of American shops—lie years of research and experiment; years of development and patient testing in the field.

As a result, practically every word-while improvement in light wood and metal-working machinery, for the past fourteen years, has come from the drafting boards of Delta engineers. Today, from the largest airplane and armament plants to the smallest home-workshop, Delta machines are recognized as the standard of high quality and performance.

Let us tell you about Delta machines, and how they can serve your needs.

**The Delta Manufacturing Company**
740 E. Vienna Avenue · Milwaukee, Wisconsin



# DELTA
## MILWAUKEE

World's largest exclusive manufacturers of low-cost, high quality drill presses · grinders · abrasive finishing machines · cut off machines · circular saws · band saws · scroll saws · lathes · jointers and shapers

---

(Continued from page 74)

In October, Paramount Pictures will release the first of a series of twelve Fleischer technicolor cartoons. Under a guaranty-and-percentage contract, Superman, Inc., will net an estimated $120,000. Another healthy source of profit, developed only within the last six months, is thirty-three licensed products, which have poured $100,000 more into the till, bringing the company's 1940-41 income to a jolly total of approximately $1,500,000—and this exclusive of the $1,500,000 from Donenfeld's other publications.

It was only after anguished appeals that Siegel and Shuster finally managed, in 1940, to wangle sizable profits for themselves; $75,000, of which $15,000 goes in staff salaries and overhead. At the end of the first year, when they were still making $130 on a purely salaried basis, they had asked Liebowitz for a five-dollar raise per page. He professed to be shocked, but, as Liebowitz later expressed it, "An artist must be happy," and he granted the raise. The following year, after learning that Superman profits were skyrocketing, the boys again complained, and won a brand-new contract, whereby they got another five-dollar raise, or twenty dollars a page, and 5 per cent of all other Superman revenues.

In the same year Superman was proclaimed by editors almost everywhere tops among comic magazines. This emboldened the boys to plead for still more money. They are now making thirty-five dollars a page.

Meantime, their syndicate profits had mounted to $600 a week. They will soon be doubling, then quadrupling their weekly output, with an eye to bringing out Superman monthly and, if possible, twice a month. Next year, with revenues from radio, movies and licenses coming in, they stand to make $150,000. Their ten-year term of service, however, is not reciprocal. Donenfeld remains free at any time to discharge them.

How much he has personally pockets from Superman is a question much debated in New York publishing circles. In his various publishing corporations he owns 75 per cent of the stock, an old business associate, Paul Sampliner, owns the rest. Liebowitz cautiously admits that his boss last year paid an income tax on "more than $100,000." Donenfeld himself, in an expansive mood, once told a reporter that he netted $500,000 from Superman alone. The best available estimates come to about half that.

## Living Up to a Character

Siegel and Shuster sometimes fall to brooding about now nice it would have been had they held out for a fat percentage of all future profits. But in the end they always reach the same Pollyannaism: "Even if we were making three or four times as much, we wouldn't be doing anything very different than we're doing now. As it is, we have to keep pinching ourselves."

Money has not added their brains. They have read too many horror stories depicting the plight of improvident celebrities not to salt away a fair slice of their incomes. As good provider for his whole family, Shuster recently moved them into a better neighborhood and a ten-room, wooden-frame house at seventy-five dollars a month. One of its few extravagances has been filling it with shiny new furniture, including a sixteen-tube radio-phonograph console, so that he and Mamma Shuster can share their favorite pastime—listening to classical music. He has also bought a fancy automobile, shelves of detective stories and a camera. But Mamma Shuster still cooks and waits on table, the only concession to her improved status being a colored maid who comes in twice a week to house-clean. Joe wants his father to retire, but Papa Shuster insists on going downtown every day, where, for something to do, he operates an elevator. None of the Shusters can quite grasp what has happened to them.

To Joe Shuster the most important thing money has brought is the chance to build up his body. For years he tried Lionel Strongfort correspondence-school methods, dynamic tension and scores of physical-culture magazines—without result. Now he lifts weights three times a week in Barney Kofron's gym—he can handle 175 pounds—consumes a T-bone steak and two quarts of milk a day. This regimen has increased his weight from 112 to 128 pounds. To increase his height of five-feet-two, he wears built-up shoes. But he still looks like an undernourished, bewildered schoolboy of sixteen.

Last December in Miami Beach, where he liked to loiter, hatless and in shabby clothes, along uppity Lincoln Road, gawking at the expensive automobiles, a policeman approached Shuster, bristling with dark suspicions. Probably nothing would have happened had Shuster not protested that he was Superman's co-creator and flashed $147 in large bills to show he was no derelict. The policeman arrested him and a magistrate sentenced him to thirty days in the pen for vagrancy. A local reporter had the wit to suggest that Shuster establish his identity by drawing Superman. Face crimson, the court let him go.

## Aladdin's Lamp

Jerry Siegel has spread himself economically a little bit more. With no dependents save the buxom, twenty-year-old sweetheart of high-school days, whom he married last year, he put $15,000 into an air-conditioned, rock-wool-insulated, weather-stripped house with so many laboresaving gadgets that Bella Siegel has little to do all day except flip switches. Their pride and joy is a paneled playroom in the basement, complete with dart game, ping-pong table and bar, though neither drinks or even knows how to mix a cocktail. Every room has a radio and gleams with silken drapes and chromium fixings. Jerry has bought Bella a mink coat and a diamond bracelet.

Four months younger than Shuster, Siegel is an inscrutable jitterer, who hums softly to himself during conversational lulls and rolls reams of paper into little pellets. Four inches taller than Shuster, he weighs forty-two pounds more. Up in his attic he keeps a lazy man's hip-reducing machine which shakes itself and him silly when he pushes the button. He doesn't use it much. He and Bella spend half their waking lives in the movies. Siegel's pockets always crammed with four or five candy bars. Next to movies, he likes best to stretch out on his capacious bed and read history or biography.

Shortly after Siegel received his last check from New York he telephoned Liebowitz for an advance of $500.

"But we just mailed you a check," exclaimed Liebowitz.

"I know," replied Siegel, "but I have nineteen thousand five hundred dollars in my bank account and I want to round it out to an even twenty."

He got the advance.

Messrs. Shuster and Siegel are now in the throes of creating another comic strip.

It will be called Superboy and will confine itself to Superman's adolescence, when his supermuscles—the mind recoils from the possibilities—were employed in practical jokes.

"It will be," Siegel explains, "about Superman before he developed a social conscience."

---

DCC00006854

## EXHIBIT 7
## 27

# EXHIBIT 8

Page 3

## Certificate of Registration of a Claim to Renewal Copyright

**FORM R**

REGISTRATION NO.

R 362187

DO NOT WRITE HERE

This Is To Certify that the statements set forth on this certificate have been made a part of the records of the Copyright Office.   In witness whereof the seal of the Copyright Office is hereto affixed.

*Abraham L. Kaminstein*

Register of Copyrights
United States of America

**1. Renewal Claimant(s), Address(es), and Statement of Claim:**

(a) Name  NATIONAL PERIODICAL PUBLICATIONS, INC.

Address  575 Lexington Avenue, New York 22, New York

Claiming as  Proprietor of copyright in a composite work

(b) Name

Address

Claiming as

(c) Name

Address

Claiming as

**2. (a) Title:**

ACTION COMICS, Vol. 1, No. 1

June 1938 Issue

(b) Renewable Matter:

(c) Contribution to Periodical or Other Composite Work:

(Title of periodical or composite work)

If a periodical, give Vol. _____ No. _____ ; Date _____

**3. Authors of Renewable Matter:**

**4. Facts of Original Registration:**

Original registration number: Class  C I B ; No. B  379,787

If registered as published, give date of publication  April 18, 1938

If registered as unpublished, give date of registration

Original copyright claimant  DETECTIVE COMICS, INC.

*Complete all applicable spaces on next page*

EXAMINER

EXHIBIT H

DCC00045628

**EXHIBIT 8**

**28**

5. Deposit account:

6. Send correspondence to:

Name WILLIAM K. FRIEDMAN ............................ Add 11 East 44th St., New York,N.Y. 10017

7. Send certificate to:

(Type or
print     Name      WILLIAM K. FRIEDMAN
name and
address)  Address   11 East 44th Street
                    _____
                         (Number and street)
                    New York     New York     10017
                    _____
                    (City)         (State)      (ZIP code)

## Information concerning renewal copyright

Two important points must be kept in mind with respect to renewal copyright: (1) there are strict time limits for securing it, and (2) it can be claimed only by certain specified persons named in the law.

*When to renew.* The original term of copyright in a published work lasts for 28 years from the date of publication; in the case of a work originally registered in unpublished form, the copyright term lasts for 28 years from the date of registration in the Copyright Office. In either case, the copyright may be renewed for a second 28-year term only if a claim is registered in the Copyright Office within the last (28th) year of the original copyright term. For example, a work copyrighted on June 15, 1940, would be eligible for renewal between June 15, 1967, and June 15, 1968.

*Caution:* Unless a valid renewal claim and fee are *received in* the Copyright Office before the first copyright term expires, copyright protection is lost permanently and the work enters the public domain. The Copyright Office has no discretion to extend the renewal time limits.

## How to register your claim

*Procedure to follow.* Complete an application for renewal registration on Form R and send it to the Register of Copyrights, Washington, D.C., 20540. The application should be accompanied by the registration fee of $2. Do not send copies of the work.

## Who may claim renewal

Except in the case of five specific types of works, the law gives the right to claim renewal to the individual author of the work, regardless of who owned the copyright during the original term. If the author is deceased, the statute gives the right to claim renewal to certain of his statutory beneficiaries as explained below. The present owner (proprietor) of a copyright is entitled to claim renewal *only* in the five cases listed in Paragraph B, below.

**A.** The following persons may claim renewal in all types of works except those enumerated in Paragraph B, below:

1. The author, if living. State the claim as: *the author.*

2. The widow, widower, and/or children of the author, if the author is not living. State the claim as: *the widow (widower) of the author* .................... and/or *the child*
.......................................................
                    (Name of author)

*(children) of the deceased author* ..................
                              (Name of author)

3. The author's executor(s), if the author left a will and

if there is no surviving widow, widower, or child. State the claim as: *the executor(s) of the author*
.......................................................
                    (Name of author)

4. The next of kin of the author, if the author left no will and if there is no surviving widow, widower, or child. State the claim as: *the next of kin of the deceased author*
................................. *there being no will.*
                    (Name of author)

**B.** In the case of the following five types of works, the proprietor (owner of the copyright at the time of renewal registration) may claim renewal:

1. Posthumous work (work first published and copyrighted after the death of the author). State the claim as: *proprietor of copyright in a posthumous work.*

2. Periodical, cyclopedic, or other composite work. State the claim as: *proprietor of copyright in a composite work.*

3. "Work copyrighted by a corporate body otherwise than as assignee or licensee of the individual author." State the claim as: *proprietor of copyright in a work copyrighted by*

*a corporate body otherwise than as assignee or licensee of the individual author.* (This type of claim is considered appropriate in relatively few cases.)

4. Work copyrighted by an employer for whom such work was made for hire. State the claim as: *proprietor of copyright in a work made for hire.*

5. Print or label originally registered in the Patent Office prior to July 1, 1940. State the claim as: *proprietor of copyright in a print or label.*

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received | |
| JUN - 1 1965 | |
| Fee received | |
| 97425 JUN-1'65 | |

DCC00045629

**EXHIBIT 8**
**29**

Page 3

FORM R

REGISTRATION NO.

R  362188

DO NOT WRITE HERE

# Certificate of Registration of a Claim to Renewal Copyright

This Is To Certify that the statements set forth on this certificate have been made a part of the records of the Copyright Office.   In witness whereof the seal of the Copyright Office is hereto affixed.

*Abraham L. Kaminstein*

Register of Copyrights
United States of America

**1. Renewal Claimant(s), Address(es), and Statement of Claim:**

*(a)* Name ........NATIONAL PERIODICAL PUBLICATIONS, INC.

Address .....575 Lexington Avenue, New York, N.Y. 10022

Claiming as ..Proprietor of copyright in a work made for hire

*(b)* Name ..........................................................................

Address ..........................................................................

Claiming as ......................................................................

*(c)* Name ..........................................................................

Address ..........................................................................

Claiming as ......................................................................

**2. (a) Title:**

"Superman" a comic strip..........constituting front cover and pages 1-

13 inclusive in body of ACTION COMICS - Vol.1,No.1,June 1938 issue.

**(b) Renewable Matter:**

..........................................................................

**(c) Contribution to Periodical or Other Composite Work:**

..........................................................................

(Title of periodical or composite work)

If a periodical, give: Vol. .................; No. .................; Date ..................

**3. Authors of Renewable Matter:**

..........................................................................

..........................................................................

**4. Facts of Original Registration:**

Original registration number: Class ...G.I.D....; No. B.379,787...

If registered as published, give date of publication ........April 18, 1938......

If registered as unpublished, give date of registration .........................

Original copyright claimant  DETECTIVE COMICS, INC.

EXAMINER

*Complete all applicable spaces on next page*

EXHIBIT I

DCC00045630

EXHIBIT 8

30

**5. Deposit account:**

**6. Send correspondence to:**

Name WILLIAM K. FRIEDMAN          Address 11 East 44th St., New York, N.Y. 10017

**7. Send certificate to:**

(Type or print name and address)

Name   WILLIAM K. FRIEDMAN

Address   11 East 44th Street
(Number and street)

New York        New York        10017
(City)          (State)         (ZIP code)

## Information concerning renewal copyright

Two important points must be kept in mind with respect to renewal copyright: (1) there are strict time limits for securing it, and (2) it can be claimed only by certain specified persons named in the law.

NATIONAL PERIODICAL PUBLICATIONS, INC.

### Time limits

*When to renew.* The original term of copyright in a published work lasts for 28 years from the date of publication; in the case of a work originally registered in unpublished form, the copyright term lasts for 28 years from the date of registration in the Copyright Office. In either case, the copyright may be renewed for a second 28-year term only if a claim is registered in the Copyright Office within the last (28th) year of the original copyright term. For example, a work copyrighted on June 15, 1940, would be eligible for renewal between June 15, 1967, and June 15, 1968.

*Caution:* Unless a valid renewal claim and fee are *received* in the Copyright Office before the first copyright term expires, copyright protection is lost permanently and the work enters the public domain. The Copyright Office has no discretion to extend the renewal time limits.

### How to register your claim

*Procedure to follow.* Complete an application for renewal registration on Form R and send it to the Register of Copyrights, Washington, D.C., 20540. The application should be accompanied by the registration fee of $2. Do not send copies of the work.

### Who may claim renewal

Except in the case of five specific types of works, the law gives the right to claim renewal to the individual author of the work, regardless of who owned the copyright during the original term. If the author is deceased, the statute gives the right to claim renewal to certain of his statutory beneficiaries as explained below. The present owner (proprietor) of a copyright is entitled to claim renewal *only* in the five cases listed in Paragraph B, below.

A. The following persons may claim renewal in all types of works except those enumerated in Paragraph B, below:

1. The author, if living. State the claim as: *the author.*

2. The widow, widower, and/or children of the author, if the author is not living. State the claim as: *the widow (widower) of the author* .................... *and/or the child*
(Name of author)

*(children) of the deceased author* ....................
(Name of author)

3. The author's executor(s), if the author left a will and

if there is no surviving widow, widower, or child. State the claim as: *the executor(s) of the author*
....................
(Name of author)

4. The next of kin of the author, if the author left no will and if there is no surviving widow, widower, or child. State the claim as: *the next of kin of the deceased author*
.................... *there being no will.*
(Name of author)

B. In the case of the following five types of works, the proprietor (owner of the copyright at the time of renewal registration) may claim renewal:

1. Posthumous work (work first published and copyrighted after the death of the author). State the claim as: *proprietor of copyright in a posthumous work.*

2. Periodical, cyclopedic, or other composite work. State the claim as: *proprietor of copyright in a composite work.*

3. "Work copyrighted by a corporate body otherwise than as assignee or licensee of the individual author." State the claim as: *proprietor of copyright in a work copyrighted by*

a corporate body otherwise than as assignee or licensee of the individual author. (This type of claim is considered appropriate in relatively few cases.)

4. Work copyrighted by an employer for whom such work was made for hire. State the claim as: *proprietor of copyright in a work made for hire.*

5. Print or label originally registered in the Patent Office prior to July 1, 1940. State the claim as: *proprietor of copyright in a print or label.*

| FOR COPYRIGHT OFFICE USE ONLY | |
|---|---|
| Application received<br><br>JUN - 1 '65<br>Fee received<br>97425 JUN-1 '65 | |

U. S. GOVERNMENT PRINTING OFFICE : 1964 O - 731 - 469          (May 1964—50,000)          Page 4

DCC00045631

**EXHIBIT 8**
**31**

# EXHIBIT 9

SUPREME COURT : wESTCHESTER COUNTY

- - - - - - - - - - - - - - - - - - x

JEROME SIEGEL AND JOSEPH SHUSTER,

Plaintiffs,

- against -

NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC. THE MC
CLURE NEWSPAPER SYNDICATE, HARRY
DONENFELD, JACOB LIEBOWITZ, and
PAUL H. SAMPLINER, and WAYNE BORING,
Defendants.

- - - - - - - - - - - - - - - - - - x

Plaintiffs, by their attorneys, SLONIM, WEKST
& FRIEDMAN, for their complaint, respectfully show to the
court and allege:-

### FOR A FIRST CAUSE OF ACTION

FIRST:  That the defendant, NATIONAL COMICS
PUBLICATIONS, INC., was and still is a domestic corporatio
duly organized and existing under and by virtue of the lav
of the State of New York.

SECOND:  That the defendant, INDEPENDENT NEWS
CO., INC., was and still is a domestic corporation duly or
ganized and existing under and by virtue of the laws of th
State of New York.

THIRD:  That the defendant, THE MC CLURE NEWS-
PAPER SYNDICATE was and still is a domestic corporation du
organized and existing under and by virtue of the laws of
the State of New York.

FOURTH:  That Detective Comics, Inc. was a cor
poration duly organized and existing under and by virtue o
the laws of the State of New York.

FIFTH:  Upon information and belief Superman, I
was a corporation duly organized and existing under and by
virtue of the laws of the State of New York and that the
said corporation was organized by Detective Comics, Inc.
and the defendants, HARRY DONENFELD, JACOB LIEBOWITZ and
PAUL H. SAMPLINER, and at all the times hereinafter mentio

(1)

43

000000192

**EXHIBIT 9**
**32**

the officers and directors of Superman, Inc. were the same
persons who were the officers and directors of Detective
Comics, Inc., and that all facts known to Detective Comics
Inc., were known to Superman, Inc. and that at all times
hereinafter mentioned Superman, Inc. was completely contro
led by Detective, Comics, Inc. and the defendants, HARRY
DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER.

SIXTH:  That on or about the 22nd day of Septem
ber, 1938, for a valuable consideration Detective Comics,
Inc., and the defendant, THE MC CLURE NEWSPAPER SYNDICATE,
entered into a contract in writing with the plaintiffs, a
true copy of which is hereto annexed and marked Exhibit "A
and made part of this complaint as if here incorporated at
length.

SEVENTH:  That on or about the 19th day of De-
cember, 1939, for a valuable consideration, Detective Comi
Inc. entered into an agreement with the plaintiffs to modi:
the contract hereinabove set out in paragraph "SIXTH" and
whereby the said contract was modified, and the said agree.
ment was in writing and a true copy of the same is hereto
annexed and marked Exhibit "B" and made part of this com-
plaint as if here incorporated at length.

EIGHTH:  That on or about August 30, 1943, De-
tective Comics, Inc. did notify each of the plaintiffs in
writing of its election to extend the existence of the con-
tract hereinabove set forth according to the terms thereof
for an additional five year period from September 22, 1943,
of which said notices in writing true copies are hereto an-
nexed, marked Exhibit "C" and "D" and made part of this
complaint as if here incorporated at length.

NINTH:  Upon information and belief, that the de
fendant, THE MC CLURE NEWSPAPER SYNDICATE, did notify Detec
tive Comics, Inc. of its election to extend for five years
from June 1, 1944, its participation in the contract herein

(2)

000000193

**EXHIBIT 9**
**33**

above set forth according to the terms thereof.

TENTH: That on or about June 21, 1943, Detect Comics, Inc. for a valuable consideration did enter into agreement with the plaintiffs whereby the contract herein above set forth was modified, in that in place of the ra of compensation therein provided for material furnished by the plaintiffs and accepted by Detective Comics, Inc., fo magazine publication, as previously modified from time to time theretofore, the said Detective Comics, Inc. agreed pay to each of the plaintiffs five hundred ($500.00) doll for each group of cartoon strips and continuity, of the s and nature known in the comic magazine trade as a "releas

ELEVENTH: That heretofore and on or about Jun 21, 1943, Detective Comics, Inc., for a valuable consider tion entered into an agreement with the plaintiffs whereby the contract hereinabove set forth was modified so as to provide that in the event that the plaintiffs or either of them should for any reason be unable to supply continuity or cartoons or to supply sufficient continuity or cartoons for the requirements of Detective Comics, Inc., in magazine publication, and Detective Comics, Inc., should hire write or artists or both, for the above reason or any other reas to supply continuity or cartoons or both relating to carto features of which the plaintiffs are or were the originato the said Detective Comics, Inc. would pay to the plaintiff the current agreed compensation per release paid to the plaintiffs for material completely furnished by the plain- tiffs, less a fixed amount agreed upon to be applied as compensation for artists or writers hired by the said Dete tive Comics, Inc. to supply material as above, the said fi sum being one hundred ($100.00) dollars per release for cor tinuity and one hundred fifty ($150.00) dollars per release for cartoons.

TWELFTH: That the plaintiffs have duly performe

(3)

45

000000194

**EXHIBIT 9**
**34**

all the terms and conditions of the contract hereinabove set forth and each and every obligation on their part to performed.

THIRTEENTH: That the plaintiffs are the exclus originators and authors of the cartoon character "Superma: and of the title Superman and first created cartoon mater in which the said character and title first appeared in 1' and have created such cartoon material ever since, and th; the plaintiffs are the authors and originators of all of other cartoon characters which have appeared in the carto( strip entitled Superman , chief among which are "Superman' also known as "Clark Kent", "Lois Lane"and "Perry White" ; that the plaintiffs are universally and in the various na- tions of the world known to the public as the authors and creators of all cartoon material in which the character "Superman" appears and of the character "Superman" and of all other cartoon characters which appear and have appear( in cartoons entitled Superman.

FOURTEENTH: That Detective Comics, Inc., Super man, Inc. and the defendants have, since the execution and delivery of the contract hereinabove set forth, published, sold and distributed, and are now publishing, selling and distributing to the public in large volume serially in mont ly and bi-monthly magazines and in the daily press numerou comic strips other than Superman in which the conception, characters, idea, plot and action are deliberate imitation of the character and conception of Superman and of the plo and actionof comic or cartoon strips in which Superman ap- pears and has appeared, and that the said comic strips pub lished in imitation of Superman are entitled Batman, Super boy, Lois Lane, Girl Reporter, Johnny Quick, The Flash, Green Lantern, Aquaman, Airwave, and there are many other and that the defendants have not engaged the plaintiffs to write the continuity or draw the cartoons for any of the s;

(4)

46

000000195

**EXHIBIT 9**
**35**

comic strips other than <u>Superman</u>, and have not paid plaintiffs anything on account of the sale of the said various comic strips and have not permitted the plaintiffs to share the profits thereof, except that the plaintiff, JOSEPH SHUSTER, has created certain cartoon material for the comic strip <u>Superboy</u> and has been paid therefor.

FIFTEENTH:  That the publication of the said divers comic strips other than <u>Superman</u> is publication in direct competition with <u>Superman</u> and the publication of the said comic strips has lessened and will continue to lessen the market for the plaintiffs' comic strip <u>Superman</u>.

SIXTEENTH:  That the said publication by Detective Comics, Inc. and Superman, Inc. and the defendants of the various comic strips in close and deliberate imitation of <u>Superman</u> as herein set forth did divert and is now diverting from the plaintiffs revenue and profits belonging to them as the authors and originators of Superman and belonging to them under the contract hereinabove set forth and that the said diversion of profits was in violation of the duty of the defendant, THE MC CLURE NEWSPAPER SYNDICATE, and of Detective Comics, Inc. under the contract to sell and distribute the comic strip Superman for the mutual benefit of the plaintiff and the said defendant and the said Detective Comics, Inc., and is in violation of the relationship of trust existing between the plaintiffs and the said defendant, THE MC CLURE NEWSPAPER SYNDICATE, and the said Detective Comics, Inc. arising out of the contract hereinabove set forth.

SEVENTEENTH:  That heretofore and on or about the 1st day of October, 1946, Detective Comics, Inc.,All American Comics, Inc., Superman, Inc., Jolaine Publications, Inc, Wonderwoman Publishing, Inc., Hop Harrigan Enterprise, Inc. Gainlee Publishing Co., Inc., J. R. Publishing Co., Inc., Worlds Best Comics, Inc., Trafalgar Printing Co., Inc., duly consolidated into a single corporation pursuant to the provisions of Sections 85 to 90 of the Stock Corporation/or the Law

(5)

000000196

EXHIBIT 9
36

State of New York, the same being the defendant, NATIONAL
COMICS PUBLICATIONS, INC.

EIGHTEENTH:  That the defendant, NATIONAL COMICS
PUBLICATIONS, INC. from the 1st day of October, 1946, did
continue the wrongful publication, sale and distribution
theretofore carried on by Detective Comics, Inc. and Super
man, Inc. of the various comic strips in violation of the
rights of the plaintiffs as heretofore alleged, and is at
present carrying on the said wrongful publication, sale ar
distribution and threatens to carry on the same in the fu-
ture.

NINETEENTH:  That the acts of Superman, Inc., De
tective Comics, Inc., and the defendants as hereinabove se
forth have caused, and are causing and will hereafter cont
ue to cause the plaintiffs irreparable loss, injury and da
mage for which the plaintiffs have no adequate remedy at l

FOR A SECOND CAUSE OF ACTION

TWENTIETH:  Plaintiffs repeat and reallege each
every allegation contained in the paragraphs of this compla
marked, "FIRST", "SECOND", "THIRD", "FOURTH", "FIFTH", "SI
"SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH
"THIRTEENTH" and "SEVENTEENTH" as if they were herein fully
set forth, and incorporate the same in this second cause of
action.

TWENTY-FIRST:  That the defendants, HARRY DONENFE
JACOB LIEBOWITZ, PAUL H. SAMPLINER and INDEPENDENT NEWS CO.
INC., at all times herein mentioned had due notice andknowl
edge of aforesaid agreement between the plaintiffs and the
Detective Comics, Inc., and the defendant, THE MC CLURE NEW
PAPER SYNDICATE, and of all modifications thereof, as the
said contract and modifications are hereinabove set forth.

TWENTY-SECOND:  That heretofore and after the tim
of the execution of the contract hereinabove set forth, the
defendants, HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H. SAM-
PLINER and INDEPENDENT NEWS CO.INC., conspired together with

(6)

000000197

**EXHIBIT 9**
**37**

each other and with Detective Comics, Inc., Superman, Inc. and THE MC CLURE NEWSPAPER SYNDICATE, and entered into an agreement wrongfully, corruptly and maliciously to injure the plaintiffs by depriving them of their rights under the contract as hereinabove set forth and to interfere with, hinder and impair the performance of the said contract by the said Detective Comics, Inc., and THE MC CLURE NEWSPAPER SYNDICATE.

TWENTY-THIRD:  That pursuant to the said wrongful corrupt and malicious conspiracy the said defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER did induce the said Detective Comics, Inc., Superman, Inc., and THE MC CLURE NEWSPAPER SYNDICATE wrongfully to publish, sell and distribute to the public the comic strips, Batman, Superboy, Lois Lane, Girl Reporter, Johnny Quick, The Flash Green Lantern, Aquaman, Airwave and many others, as herein above set out, and did procure and induce the defendant, INDEPENDENT NEWS CO., INC., to market, advertise and distribute the said comic strips in violation of the rights of the plaintiffs, and that all of the said defendants did advertise and represent to the public that the said comic strips published in derogation of the plaintiffs' rights, were the same as the plaintiffs' comic strip Superman, and did deceive the public thereby, and did market the said comic strips in competition with the said comic strip Superman.

TWENTY-FOURTH:  That the acts of Detective Comics Inc., Superman, Inc., and the defendants as aforesaid have caused and are causing, and will hereafter continue to cause the plaintiffs irreparable loss, injury and damage for which the plaintiffs have no adequate remedy at law.

FOR A THIRD CAUSE OF ACTION

TWENTY-FIFTH:  Plaintiffs repeat and reallege each and every allegation contained in the paragraphs of this co

(7)

49

000000198

EXHIBIT 9
38

plaint marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVEN
"EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-
TEENTH" and SEVENTEENTH" with the same force and effect a
if they were herein fully set forth, and incorporate the
in this third cause of action.

TWENTY-SIXTH:  That during the year 1938 and aft
the execution and delivery of the contract hereinabove set
forth the plaintiff, SIEGEL, pursuant to the terms of the
said contract delivered to Detective Comics, Inc., for it
consideration a scenario or synopsis containing the con-
tinuity plan and dialogue for the first "release" of a new
comic strip known as Superboy.

TWENTY-SEVENTH:  That the said synopsis contained
within itself the entire plan for the future publication
the said comic strip Superboy, and the conception of the
character, Superboy, all set forth with detail and particu
larity.

TWENTY-EIGHTH:  That Detective Comics, Inc., did
not within six weeks indicate its election to publish the
said comic strip Superboy, as required by the contract her
inabove set forth.

TWENTY-NINTH:  That Detective Comics, Inc. on or
about December 2, 1938, by its letter in writing to the
plaintiffs did declare that it elected not to publish the
said comic strip Superboy under the terms of the contract
hereinabove set forth.

THIRTIETH:  That thereafter and during January,19
Detective Comics, Inc., did publish without the consent of
the plaintiff, SIEGEL, a certain comic strip release entitl
Superboy, which release was based entirely upon the synops
submitted to the said Detective Comics, Inc., by the plain-
tiff, SIEGEL, and contained in detail the same characters,
incidents and plot.

THIRTY-FIRST:  That from January, 1945, until Oc-
tober, 1st, 1946, the said Detective Comics, Inc., without
the consent of the plaintiff, SIEGEL, did publish serially

(8)

000000199

EXHIBIT 9
39

sell and distribute numerous releases of a comic strip en titled Superboy, which said serial comic strip appeared b monthly in magazines until February, 1946, and monthly thereafter, which said comic strip did use and was based upon the conception and idea as submitted in writing and detail by the plaintiff, SIEGEL, and submitted as aforesa

THIRTY-SECOND:  That from October 1, 1946, until the present, the defendant, NATIONAL COMICS PUBLICATIONS, INC., did without the consent of the plaintiff, SIEGEL, publish serially in monthly magazines and sell and distri bute numerous releases of the said comic strip Superboy i violation of the rights of the plaintiff, SIEGEL, as afor said, and the defendant does propose to and will continue in the future to publish numerous releases of the said co strip Superboy.

THIRTY-THIRD:  That the plaintiff, SIEGEL, has never consented to the publication of the said comic stri Superboy, as aforesaid, and has never been paid, received accepted anything of value or consideration therefor.

THIRTY-FOURTH:  That the acts of Detective Comics Inc., and the defendants as aforesaid have caused, and are causing, and will hereafter continue to cause the plaintif SIEGEL, irreparable loss, injury and damage for which the plaintiffs have no adequate remedy at law.

FOR A FOURTH CAUSE OF ACTION

THIRTY-FIFTH:  Plaintiffs repeat and reallege eac and every allegation contained in the paragraphs of this complaint marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFT "THIRTEENTH", and "SEVENTEENTH", with the same force and e fect as if they were herein fully set forth, and incorpora the same in this fourth cause of action.

THIRTY-SIXTH: That Detective Comics, Inc. from January 1945 until October 1, 1946, did without the consen

(9)

000000200

EXHIBIT 9
40

the plaintiff, SIEGEL, publish serially, sell and distribu

numerous releases of a comic strip entitled Superboy, whic

said serial comic strip appeared bi-monthly in magazines u

til February,1946 and monthly thereafter and that the prin

pal character of the said comic strip was represented to b

Superman as a child, and whose plot, conception and incide

were based upon and copied from the plot, conception and i

cidents of the plaintiff's comic strip Superman and that t

said Detective Comics, Inc. did intend by the said publica

tion to deceive the public and did by the said publication

deceive the public in that the public was led to believe

that the plaintiff, SIEGEL, was the author of the continui

dialogue and action of each of the individual releases of

the said comic strip whereas in truth the plaintiff, SIEGE

was not the author of each of the individual releases and

not invited nor permitted by the said Detective Comics, In

to create the continuity for each of the individual releas

THIRTY-SEVENTH:  That Detective Comics, Inc. fro

May 1945 until October 1, 1946 did, without the consent of

the plaintiff, SIEGEL, as aforesaid, publish, sell and dis-

tribute the said comic strip Superboy and did affix to the

individual releases of the said comic strip the name of the

plaintiff, SIEGEL, as author of the said releases, and that

the said Detective Comics, Inc. did represent to the public

and advertise that the plaintiff, SIEGEL, was the author of

the individual releases of the said comic strip Superboy whe

as in truth and in fact the plaintiff, SIEGEL, was not the

author of the individual releases of the said comic strip a

was not invited nor permitted by the said Detective Comics,

Inc. to create the continuity for said individual releases.

THIRTY-EIGHTH:  That thereafter from October 1, 1

to the present the wrongful publication, sale and distribu-

tion of monthly magazine releases of the said comic strip

Superboy as aforesaid were continued by the defendant,

NATIONAL COMICS PUBLICATIONS, INC., in violation of the

(10)

000000201

**EXHIBIT 9**

**41**

plaintiff, SIEGEL, and with intent to injure the said plai
tiff; and that the said defendant, by its publication of t
said comic strip Superboy, which it represented to be
Superman as a child, and by its affixing to the said indiv
dual releases of the said comic strip the name of the plai
tiff, SIEGEL, as author, when in fact the said plaintiff w
not the author of the said releases, did deceive the publi
to the grave and irreparable injury of the plaintiff, SIEG
and that the said defendant is continuing and proposes to
continue in the future to so deceive the public to the inj
of the plaintiff, SIEGEL.

THIRTY-NINTH:  That the acts of Detective Comi
Inc. and the defendants as aforesaid have caused, and are
causing, and will hereafter continue to cause the plaintif
SIEGEL, irreparable loss, injury and damage, for which the
plaintiffs have no adequate remedy at law.

<u>FOR A FIFTH CAUSE OF ACTION</u>

FORTIETH:  Plaintiffs repeat and reallege as
part of this cause of action each and every allegation con-
tained in paragraphs marked "FIRST", "THIRD", "FOURTH",
"FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH",
"ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEENTH" of tl
complaint, and like effect as if herein fully realleged anc
plaintiffs incorporate herein all the facts therein set for

FORTY-FIRST:  That Superman, Inc., Detective
Comics, Inc., and the defendants, THE MC CLURE NEWSPAPER
SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER, with full knowledge of the rights of the plainti
under the contract hereinabove set forth, and with malice a
intent to deprive the plaintiffs of their rights under the
said contract did from the latter part of 1943 until October
1, 1946, without the consent of the plaintiffs, publish
serially, sell and distribute in monthly and bi-monthly maga
zines and in the daily press numerous releases of a comic
strip entitled <u>Lois Lane, Girl Reporter</u> and that the princi

(11)

53

000000202

**EXHIBIT 9**
**42**

pal characters of the said cartoon were and are Clark Kent
also known as _Superman_, Lois Lane, and Perry White, all of
which characters are the chief characters in the plaintiff
comic strip _Superman_ as is hereinabove set forth, and that
the plot, conception and incidents presented in the said
comic strip _Lois Lane, Girl Reporter_ were and are based up
copied and taken from the comic strip originated and creat
by the plaintiffs, known as _Superman_, and that the said
Superman, Inc., Detective Comics, Inc., and the defendants
THE MC CLURE NEWSPAPER SYNDICATE, HARRY DONENFELD, JACOB
LIEBOWITZ and PAUL H. SAMPLINER did intend by the said pu-
blication to deceive the public and did by said publicatio
deceive the public in that the public was led to believe
that the plaintiffs were the authors and creators of the c
tinuity, dialogue and action of each of the individual re-
leases of the said comic strips, whereas in fact and in tr
the plaintiffs were not the authors of each of the individ
releases, and the plaintiffs were not invited nor permitte
by the said Superman, Inc. or the defendants, THE MC CLURE
NEWSPAPER SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and
PAUL H. SAMPLINER to create the said individual releases.

FORTY-SECOND: That Superman, Inc., Detective
Comics, Inc. and the defendants, THE MC CLURE NEWSPAPER
SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER from the latter part of 1943 until October 1, 19
did, without the consent of the plaintiffs, publish, sell
and distribute the said comic strip _Lois Lane, Girl Reporte_
and did affix to the individual releases thereof the names
of the plaintiffs as authors of the said releases, and the
said Superman, Inc., Detective Comics, Inc., and the defen-
dants, THE MC CLURE NEWSPAPER SYNDICATE, HARRY DONENFELD,
JACOB LIEBOWITZ and PAUL H. SAMPLINER did represent to the
public and advertise that the plaintiffs were the authors
of the individual releases of the said _Lois Lane, Girl Re-_
_porter_, whereas in truth and in fact the plaintiffs were not

(12)

54

000000203

EXHIBIT 9
43

authors of the individual releases as heretofore set forth.

FORTY-THIRD:  That thereafter and from October 1, 1946, to the present the wrongful publication, sale and distribution of further releases of the said Lois Lane, Girl Reporter, were continued by the defendants, NATIONAL COMICS PUBLICATIONS, INC., THE MC CLURE NEWSPAPER SYNDICATE, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, in violation of the rights of the plaintiffs as aforesaid and with intent to injure the said plaintiffs; and that the said defendants, by their publication of the said releases of the said comic strip in close imitation of the plaintiffs' comic strip Superman, and by affixing to the said releases the names of the plaintiffs as authors thereof, when in fact the plaintiffs were not the authors thereof, did deceive the public to the grave and irreparable injury of the plaintiffs; and that the said defendants are continuing and propose to continue in the future to so deceive the public to the injury of the plaintiffs.

FORTY-FOURTH:  That the acts of the said defendants and of Detective Comics, Inc., and Superman, Inc., has caused and are causing and will hereafter continue to cause the plaintiffs irreparable loss, injury and damage, for which the plaintiffs have no adequate remedy at law.

<u>FOR A SIXTH CAUSE OF ACTION</u>

FORTY-FIFTH:  Plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEENTH" of the complaint, with like effect as if herein fully realleged, and plaintiffs incorporate herein all the facts therein set forth.

FORTY-SIXTH:  From July 1, 1943, to the present Detective Comics, Inc., published in magazines 120 releases of the comic strip Superman for which the plaintiff, SIEGEL did not create the continuity.

(13)

**EXHIBIT 9**
**44**

FORTY-SEVENTH:  That the said Detective Comics Inc., has paid to the plaintiff, SIEGEL, the sum of $200.00 per release although there was due and owing under the contract above set forth the sum of $400.00 per release.

FORTY-EIGHTH:  That though the plaintiff, SIEGEL has duly demanded payment of the said additional sums of $200.00 per release, the said Detective Comics, Inc., and the defendant, NATIONAL COMICS PUBLICATIONS, INC., have neglected to and refuse to pay any portion of the said sums.

### FOR A SEVENTH CAUSE OF ACTION

FORTY-NINTH:  Plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH," "TENTH", "ELEVENTH" "TWELFTH", THIRTEENTH", and "SEVENTEENTH" of the complaint, with like effect as if herein fully realleged, and plaintiffs incorporate herein all the facts therein set forth.

FIFTIETH:  From July 1, 1943 to the present, Detective Comics, Inc., published in magazines 130 releases of the comic strip Superman for which the plaintiff, SHUSTER, did not create the "art work".

FIFTY-FIRST:  That the said Detective Comics, Inc., has paid to the plaintiff, SHUSTER, the sum of $150.00 per release for 80 of the said releases and the sum of $200.00 for the remaining 50 of the said releases although there was due and owing under the contract hereinabove set forth the sum of $350.00 per release.

FIFTY-SECOND:  That although the plaintiff, SHUSTER, has duly demanded payment of the additional sums due under the said contract, the said Detective Comics, Inc and the defendant, NATIONAL COMICS PUBLICATIONS, INC. have neglected to and refuse to pay any portion of the said sums

(14)

**EXHIBIT 9**
**45**

## FOR AN EIGHTH CAUSE OF ACTION

FIFTY-THIRD:  The plaintiffs repeat and realled as part of this cause of action each and every allegation contained in paragraphs marked "FIRST", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH" "TWELFTH", "THIRTEENTH" and "SEVENTEENTH" of the complaint with like effect as if herein fully realleged and plaintif incorporate herein all the facts therein set forth.

FIFTY-FOURTH:  That pursuant to the terms of th contract hereinabove set forth, Superman, Inc., Detective Comics, Inc., and the defendant, NATIONAL COMICS PUBLICATI INC , from the date of the said contract to the present, h acquired and received large sums of money by the productio of radio features and moving pictures entitled Superman, based upon the characters, conception, plot and incidents created by the plaintiffs, and by the sale of licenses to various persons engaged in commercial enterprises permitti the said persons to affix to their products and to use in furtherance of the said commercial enterprises, the name o pictorial representation of "Superman".

FIFTY-FIFTH:  That, upon information and belief Superman, Inc., Detective Comics, Inc. and the defendant, N TIONAL COMICS PUBLICATIONS, INC. have derived large profit above all costs and expenses from the motion picture and radio production and from the sale of licenses as hereinabo set forth and that they have failed and refused to make any payments to the plaintiffs on account thereof though the same have been duly demanded.

FIFTY-SIXTH:  That Superman, Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATION INC , have had during the term of the contract hereinabove set forth and have at present control of all books, records and papers relating to the matters set forth in this cause of action, and have in the past and do now refuse to permit

(15)

57

000000206

**EXHIBIT 9**

**46**

the plaintiffs to examine the said books, records and paper and that the plaintiffs therefor have no access to the infc mation contained in the said books, records and papers.

FIFTY-SEVENTH: That from the inception of the cc tract herein set forth, the plaintiffs repeatedly demanded Superman, Inc., Detective Comics, Inc. and the defendant, N TIONAL COMICS PUBLICATIONS, INC, an account of the income a expenditures relating to the matters set forth in this caus of action and that the said Superman, Inc., Detective Comic Inc., and the defendant, NATIONAL COMICS PUBLICATIONS, INC. did neglect and refuse to furnish such an account until on about July 8, 1946, at which time the said persons did furn what purported to be an account of the said matters for the years 1942, 1943, 1944, 1945, and that thereafter and durin January, 1947, the said persons furnished what purported to be an account for the said matters for 1946.

FIFTY-EIGHTH: Upon information and belief the sa purported statements of account furnished by the said Super Inc., Detective Comics, Inc. and NATIONAL COMICS PUBLICATIO INC. were false and fraudulent and contained numerous de- liberate intentional and fraudulent mis-statements as to the income and expenditures relating to production of motion pi tures and radio features and the sale of licenses as herein above set forth.

FIFTY-NINTH: That although the same have been dul demanded the said Detective Comics, Inc., Superman, Inc. and the defendant NATIONAL COMICS PUBLICATIONS, INC., have ne- glected and refused and do now neglect and refuse to furnish to the plaintiffs an account of income and expenditures re- lating to production of motion pictures and radio features and the sale of licenses for the years 1940 and 1941.

SIXTIETH: That the acts of Superman, Inc., Detectiv Comics, Inc. and NATIONAL COMICS PUBLICATIONS, INC. as afore said have caused, and are causing and will hereafter continu to cause the plaintiffs irreparable loss, injury and damage, for which the plaintiffs have no adequate remedy at law.

(16)

000000207

**EXHIBIT 9**

**47**

<u>FOR A NINTH CAUSE OF ACTION</u>

SIXTY-FIRST:  The plaintiffs repeat and realle,
as part of this cause of action each and every allegation
contained in paragraphs marked "FIRST", "FOURTH", "FIFTH",
"SIXTH," SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH",
"TwELFTH", "THIRTEENTH", "SEVENTEENTH" ~~and NINETEENTH~~
of the complaint, with like effect as if herein fully re-
alleged, and plaintiffs incorporate herein all the facts
therein set forth.

SIXTY-SECOND:  Upon information and belief that
Random House, Inc. is a domestic corporation organized and
existing under and by virtue of the laws of the State of Ne
York.

SIXTY-THIRD:  Upon information and belief that
during 1942, Superman, Inc. and Detective Comics, Inc. for
valuable consideration entered into an agreement with Rando
House, Inc., granting the said Random House, Inc. the right
to publish, and whereby the said Superman, Inc., Detective
Comics, Inc., and Random House, Inc. agreed mutually and in
cooperation with each other to publish a work of fiction
bearing the name <u>Superman</u> and based upon the character, con
ception and incidents created and originated by the plainti

SIXTY-FOURTH:  That upon information and belief
pursuant to the said agreement, the said Superman, Inc., De
tective Comics, Inc. and Random House, Inc. did publish, se
and distribute a work of fiction entitled <u>The Adventures of</u>
<u>Superman</u>, which was based upon the character, conception and
incidents created and originated by the plaintiffs, and whi
said book bears upon the outside cover thereof the statement
"Based on the famous character created by Joe Shuster and
Jerry Siegel" and which said book bears upon the title page
thereof the statements "Based on the cartoon character creat
by Jerry Siegel and Joe Shuster" and "Illustrations by Joe
Shuster".

SIXTY-FIFTH:  That the said Superman, Inc., De-
(17)

59                                          000000208

**EXHIBIT 9**
**48**

tective Comics, Inc. did not invite or permit the plaintif
to work on or create any portions of the said book, and th
plaintiffs did not work on or create any portions of the s
book or any illustrations therein, except that the plainti
SHUSTER, was invited to and did create four color illustra
tions included therein.

SIXTY-SIXTH:  That upon information and belief
that Detective Comics, Inc., Superman, Inc., and the defen
NATIONAL COMICS PUBLICATIONS, INC. have received large sum
of money on account of the said agreement and on account o
the publication of the said work of fiction, no part of
which has been paid to the plaintiffs.

SIXTY-SEVENTH:  That Superman, Inc., Detective
Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATIO
INC., have had during the term of the contract hereinabove
set forth and have at present control of all books, record;
and papers relating to the matters set forth in this cause
of action, and have in the past and do now refuse to permi
the plaintiffs to examine the said books, records and pape;
and that the plaintffs therefor have no access to the infor
mation contained in the said books, records and papers.

SIXTY-EIGHTH:  That although the same have beer
duly demanded, the said Detective Comics, Inc., Superman,
Inc. and the defendant, NATIONAL COMICS PUBLICATIONS, INC.
have neglected and refused and do now neglect and refuse to
furnish to the plaintiffs an account of income and expendi-
tures relating to the publication and sale of the said work
of fiction, The Adventures of Superman.

SIXTY-NINTH:  That the acts of the said Superms
Inc., Detective Comics, Inc. and the defendant, NATIONAL
COMICS PUBLICATIONS, INC., as aforesaid, have caused, and s
causing and will hereafter continue to cause the plaintiffs
irreparable loss, injury and damage, for which the plaintif
have no adequate remedy at law.

(18)

60

000000209

EXHIBIT 9
49

FOR A TENTH CAUSE OF ACTION

SEVENTIETH:  That the plaintiffs repeat and re-
allege as part of this cause of action each and every alle
gation contained in paragraphs of the complaint marked,
"FIRST", "THIRD", "FOURTH", "FIFTH", "SIXTH", "SEVENTH",
"EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-
TEENTH" and "SEVENTEENTH" with like effect as if herein
fully realleged, and plaintiffs incorporate herein all the
facts therein set forth.

SEVENTY-FIRST:  That on or about the 1st day of
February, 1940, the plaintiff, SHUSTER, entered into a con
tract with the defendant, WAYNE BORING, a copy of which is
hereto annexed marked Exhibit "E" and made a part of this
complaint as if here incorporated at length.

SEVENTY-SECOND:  That the plaintiff, SHUSTER, ha
duly performed all the conditions of the said contract on
his part to be performed.

SEVENTY-THIRD:  That the defendant, BORING, dur-
ing July of 1943, left the employ of the plaintiff, SHUSTE
and entered the employ of Detective Comics, Inc. and Super.
man, Inc., on whose behalf he drew without the consent of
the plaintiff, SHUSTER, cartoons for comic strips entitled
Superman and Batman and many others based upon the concep-
tion, idea, plot, incidents and character of the plaintiff
comic strip Superman which said employment and furnishing
cartoons continued until October 1, 1946.

SEVENTY-FOURTH:  That on and after October 1, 19
the said defendant entered the employ of the defendant, NA-
TIONAL COMICS PUBLICATIONS, INC., and there continued to d
the cartoons for comic strips entitled Superman and Batman
and others in violation of the plaintiff, SHUSTER'S, rights
under the contract hereinabove set forth, and threatens to
continue in the future to draw the said cartoons in viola-
tion of the rights of the plaintiff, SHUSTER.

SEVENTY-FIFTH:  That the acts of the defendant,
(19)

61

000000210

EXHIBIT 9
50

BORING, have caused and are causing and will hereafter co
tinue to cause to the plaintiff irreparable loss, injury
damage, in that the said wrongful furnishing of cartoons
in competition with the plaintiff's cartoons and uses up
and lessens the market therefor; and that the preparation
of cartoons by the defendant, BORING, which were and are
sold to the public as the cartoons of the plaintiff, SHUS
which said cartoons were and are prepared without any su-
pervision and control by the plaintiff, SHUSTER, has re-
sulted in inferior and unskillful work being passed off a
the work of the plaintiff, SHUSTER, and has injured and i
now injuring the reputation of the plaintiff, SHUSTER.

SEVENTY-SIXTH:  That the plaintiff, SHUSTER, h
no adequate remedy at law.

FOR AN ELEVENTH CAUSE OF ACTION

SEVENTY-SEVENTH:  That the plaintiffs repeat ar
reallege as part of this cause of action each and every al
legation contained in paragraphs of the complaint marked
"FIRST", "THIRD", "FOURTH", "FIFTH", "SIXTH", " SEVENTH",
"EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR-
TEENTH", "SEVENTEENTH", "SEVENTY-FIRST" and "SEVENTY-SECON
with like effect as if herein fully realleged, and plainti
incorporate herein all the facts therein set forth.

SEVENTY-NINTH:  During June and July of 1943 the
defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H.
SAMPLINER, Detective Comics, Inc. and Superman, Inc. con-
spired to and with each other to injure the plaintiff,
SHUSTER, by inducing the defendant, BORING, to break his a-
greement with the plaintiff, SHUSTER, and to interfere with
the performance of the said agreement.

EIGHTIETH: That during June and July of 1943 the
said defendants, HARRY DONENFELD, JACOB LIEBOWITZ and PAUL
SAMPLINER, Detective Comics, Inc. and Superman, Inc. did in
duce the said defendant, BORING, to break and repudiate his
obligations under his agreement with the plaintiff, SHUSTER
(20)

EXHIBIT 9
51

and did interfere with and render impossible the performar of the said agreement in that they induced the said defend BORING to leave the employ of the plaintiff, SHUSTER, and enter the employ of Detective Comics, Inc. and Superman, 1 in whose employ the said defendant, BORING, engaged in cop ing, composing, editing and drawing comic strips based on themes similar to Superman, to wit; the preparation of car toons for the comic strips, Superman, Batman and many othe which are based upon the conception, idea, plot, incidents and character of the plaintiff's comic strip, Superman.

EIGHTY-FIRST: That the said interference with the contractual rights of the plaintiffs' by the defendant DONENFELD, LIEBOWITZ and SAMPLINER, Detective Comics, Inc. and Superman, Inc. was continued until October 1, 1946, an was thereafter continued in like manner thereafter by the said defendants and the defendant, NATIONAL COMICS PUBLICA TIONS, INC., by whom the defendant, BORING, is now employe and is continued by them at the present time, and that the threaten to continue the same in the future.

EIGHTY-SECOND: That the aforementioned acts o the part of Detective Comics, Inc., Superman, Inc., and the defendants, NATIONAL COMICS PUBLICATIONS, INC., DONENFELD, LIEBOWITZ and SAMPLINER were wrongful, corrupt and malicio and were known so to be by them at the time they were com- mitted, and were committed by them in pursuance of their plan and conspiracy as aforementioned, and with full knowl- edge of the agreement between the plaintiff, SHUSTER, and the defendant, BORING.

EIGHTY-THIRD: That the said acts of Detective Comics, Inc., Superman, Inc. and the said defendants have caused and are causing and will continue to cause the plain tiff, SHUSTER, irreparable loss, injury and damage, in tha: the said wrongful furnishing of cartoons is in competition with the plaintiff's cartoons and uses up and lessens the market therefor; and that the preparation of cartoons by th

(21)

000000212

**EXHIBIT 9**
**52**

defendant, BORING, which were and are sold to the public a
the cartoons of the plaintiff, SHUSTER, which said cartoon
were and are prepared without any supervision and control
the plaintiff, SHUSTER, has resulted in inferior and unski
ful work being passed off as the work of the plaintiff,
SHUSTER, and has injured and is now injuring the reputatio
of the plaintiff, SHUSTER.

EIGHTY-FOURTH:  That the plaintiff, SHUSTER, ha
no adequate remedy at law.

### FOR A TWELFTH CAUSE OF ACTION

EIGHTY-FIFTH:  The plaintiffs repeat and realle
as part of this cause of action each and every allegation
contained in paragraphs of the complaint marked "FIRST",
"FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH",
"TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEE
of the complaint with like effect as if herein fully real-
leged and plaintiff incorporates herein all the facts ther
set forth.

EIGHTY-SIXTH:  That Detective Comics, Inc.,
Superman, Inc., and the defendant, NATIONAL COMICS PUBLICA-
TIONS, INC. have wrongfully and unlawfully from the date o
the contract hereinbefore set forth to the present, publish
numerous releases of the comic strip <u>Superman</u> and numerous
releases of other comic strips created by the plaintiffs fo
Detective Comics, Inc., Superman, Inc. and the defendant,
NATIONAL COMICS PUBLICATIONS, INC., which said releases wer
created by the servants and employees of the said "Detectiv
Comics, Inc., Superman, Inc. and NATIONAL COMICS PUBLICATIO
INC., and were published by the said corporations secretly
and without any notice to the plaintiffs and without the pe
mission of the plaintiffs, and that the defendant, NATIONAL
COMICS PUBLICATIONS, INC., and Detective Comics, Inc. and
Superman, Inc., have not paid the plaintiffs any money
or thing of value on account of the publication of the said
releases.

(22)

64                                   000000213

EXHIBIT 9
53

EIGHTY-SEVENTH:  That Superman, Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATIO INC , have had during the term of the contract hereinabove set forth and have at present control of all books, recor and papers relating to the matters set forth in this cause of action and have in the past and do now refuse to permit the plaintiffs to examine the said books, records and pape

EIGHTY-EIGHTH:  That the plaintiffs know of the own knowledge of divers comic strip releases wrongfully and secretly published without any notification of the plaintiffs, but upon information and belief that there are many more of such releases so wrongfully and secretly published concerning which the plaintiffs have no definite in formation and concerning which they can acquire no such de finite information since as has been alleged above the plaintiffs have no access to the above mentioned books, records and papers.

EIGHTY-NINTH: That the acts of the said Superma Inc., Detective Comics, Inc. and the defendant, NATIONAL COMICS PUBLICATIONS, INC., as aforesaid have caused, and are causing and will hereafter continue to cause the plain tiffs, irreparable loss, injury and damage, for which the plaintiffs have no adequate remedy at law.

FOR A THIRTEENTH CAUSE OF ACTION

NINETIETH: Plaintiffs repeat and reallege each and every allegation contained in paragraphs of the com plaint marked "FIRST", "FOURTH", "FIFTH","SIXTH", "SEVENTH "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIR- TEENTH" and "SEVENTEENTH" as part of this cause of action, with the same force and effect as if herein fully realleged and plaintiffs incorporate herein all the facts therein se: forth.

NINETY-FIRST:  That from November 1945 to the pr sent, Detective Comics, Inc., Superman, Inc. and the defen dant, NATIONAL COMICS PUBLICATIONS, INC., have published 20 releases of comics strips for which the plaintiff, SHUSTER,

(23)

65

000000214

EXHIBIT 9
54

created and executed the art work, and for which the said

Detective Comics, Inc., Superman, Inc. and NATIONAL COMICS

PUBLICATIONS, INC. had paid the plaintiff, SHUSTER, the su

of $380.00 per release.

NINETY-SECOND:  That though the same have be

duly demanded payment of the additional sums due under the

contract has been refused by the said Detective Comics, In

Superman, Inc. and the defendant, NATIONAL COMICS PUBLICA-

TIONS, INC.

## FOR A FOURTEENTH CAUSE OF ACTION

NINETY-THIRD:  That the plaintiffs repeat an

allege as part of this cause of action each and every alle

gation contained in paragraphs of the complaint marked

"FIRST", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH",

"TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVEN-

TEENTH" with the same force and effect as if herein fully

realleged and plaintiffs incorporate herein all the facts

therein set forth.

NINETY-FOURTH:  That during 1946 Detective

Comics, Inc. pursuant to the contract hereinabove set fort

published four certain releases of the comic strip, Superma

upon which the plaintiff, SIEGEL, did not furnish the con-

tinuity and on account of which the said Detective Comics,

Inc. has made no payment whatsoever.

NINETY-FIFTH:  That though the plaintiff,

SIEGEL, has duly demanded the same the said Detective Comic

Inc. has failed, neglected and refused to pay the sum due

under the contract for the said four releases.

## FOR A FIFTEENTH CAUSE OF ACTION

NINETY-SIXTH:  Plaintiffs repeat and reallege

as part of this cause of action each and every allegation

contained in paragraphs of the complaint marked "FIRST", "SE

"THIRD"

"FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH",

"TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH" and "SEVENTEEN

with like effect as if fully realleged, and plaintiffs in-

corporate herein all the facts therein set forth.

(24)

000000215

EXHIBIT 9
55

NINETY-SEVENTH:  Upon information and belief that on or about March 1, 1938, Detective Comics, Inc. and the plaintiffs entered into an agreement which purported to grant to the said Detective Comics, Inc. certain rights of the plaintiffs with respect to the comic strip Superman, which agreement is not in the possession of the plaintiffs and whose exact terms are unknown to the plaintiffs.

NINETY-EIGHTH:  That previous to March 1, 1938, there was due and owing by Detective Comics, Inc. to the plaintiffs the sum of One Hundred Thirty ($130.00) Dollars.

NINETY-NINTH:  That the agreement entered by the plaintiffs on or about March 1, 1938, as hereinabove alleged was for the sole purpose of procuring the payment to the plaintiffs of the above mentioned sum of One Hundred Thirty ($130.00) Dollars and for no other consideration whatsoever

ONE-HUNDREDTH:  That on or about September 22,193 the plaintiffs entered into an agreement in writing with De tective Comics, Inc. and the defendant, THE MC CLURE NEWS- PAPER SYNDICATE, as is hereinabove set forth, which agree- ment is hereto annexed and marked Exhibit "A".

ONE HUNDRED FIRST:  That thereafter from time to time the plaintiffs entered into numerous modifications of the said agreement as hereinabove set forth.

ONE HUNDRED SECOND:  That to induce the plaintiffs to enter into the agreement of 1938 and the various modifi- cations thereof and to induce the plaintiffs to continue to perform the said agreement in the face of numerous vital breaches thereof by the said Detective Comics, Inc. and THE MC CLURE NEWSPAPER SYNDICATE, the said Detective Comics, Inc and the defendants, HARRY DONENFELD and JACOB LIEBOWITZ falsely and fraudulently stated and represented that under the agreement of March 1, 1938, the said Detective Comics, Inc. had the sole and exclusive right to publish cartoon material to be originated in the future entitled Superman and depicting the character Clark Kent, and that under said

(25)

000000216

**EXHIBIT 9**

**56**

agreement the plaintiffs had lost all right to ever again create comic strips entitled <u>Superman</u> and depicting the character <u>Clark Kent</u>, except as specifically permitted by Detective Comics, Inc. and that the said Detective Comics, I could terminate the employment of the plaintiffs at any tim and continue to publish the said comic strip <u>Superman</u>, depicting the character <u>Clark Kent</u>, and that the plaintiffs would thereafter be unable to create or publish any cartoon material bearing said title and depicting said character.

ONE HUNDRED THIRD:  That the said statements and representations so made were false and were known to Detective Comics, Inc., the defendants, HARRY DONENFELD and JACO LIEBOWITZ, to be false when made.

ONE HUNDRED FOURTH:  That the said Detective Com Inc. did not acquire by the instrument of March 1, 1938, th sole and exclusive right as against the plaintiffs or as against the public at large to create and publish future com strip material entitled <u>Superman</u> and depicting the characte <u>Clark Kent</u>, and the plaintiffs did not by the said instrumer lose the rights which they had heretofore had with respect such rights.

ONE HUNDRED FIFTH:  That plaintiffs relied upon said statements and representations and believed them to be true, and as a result thereof were induced and did enter int the agreement aforesaid of September 22, 1938, and did enter divers modifications thereof and did continue to perform the same despite numerous vital breaches thereof by Detective Comics, Inc.

ONE HUNDRED SIXTH:  That plaintiffs elect to rescind the said contract and hereby offer to release and discharge the said Detective Comics, Inc., THE MC CLURE NEWS-PAPER SYNDICATE and the defendant, NATIONAL COMICS PUBLICA-TIONS, INC., from any further obligation to perform the same and to return to the said Detective Comics, Inc., THE MC CLU NEWSPAPER SYNDICATE and the defendant, NATIONAL COMICS PUBLI

(26)

68

000000217

**EXHIBIT 9**
**57**

CATIONS, INC. rightfully become theirs upon such a rescissi

ONE HUNDRED SEVENTH:  Plaintiffs have no adequate remedy at law.

### FOR A SIXTEENTH CAUSE OF ACTION

ONE HUNDRED EIGHTH:  That the plaintiffs repeat ar reallege as part of this cause of action each and every al-legation contained in paragraphs marked "FIRST", "SECOND", "THIRD", "FOURTH", "FIFTH", "SIXTH", "SEVENTH", "EIGHTH", "NINTH", "TENTH", "ELEVENTH", "TWELFTH", "THIRTEENTH", and "SEVENTEENTH" of this complaint with like effect as if here in fully realleged, and plaintiffs incorporate herein all t facts therein set forth.

ONE HUNDRED NINTH:  That the agreement of Septembe 22, 1938, as modified, provides that the same may be cancel led and terminated by Detective Comics, Inc.at its sole optio

ONE HUNDRED TENTH:  That the plaintiffs elect to rescind the said contract as illusory, and as a contract lacking mutuality, and offer to release and discharge the said Detective Comics, Inc. and THE MC CLURE NEWSPAPER SYN-DICATE from any further obligation to perform the same and to return to the said Detective Comics, Inc. and THE MC CLUI NEWSPAPER SYNDICATE all things which rightfully become thei: upon such a rescission.

ONE HUNDRED ELEVENTH:  Plaintiffs have no adequate remedy at law.

### FOR A SEVENTEENTH CAUSE OF ACTION

ONE HUNDRED TWELFTH:  That the plaintiffs repeat and reallege as part of this cause of action each and every allegation contained in paragraphs marked in the complaint, "FIRST" through "ONE HUNDRED ELEVENTH" inclusive, with like effect as if herein fully realleged, and plaintiff incor-porate herein all the facts therein set forth.

ONE HUNDRED THIRTEENTH:  That the defendant, NA-TIONAL COMICS PUBLICATIONS, INC. and Detective Comics, Inc.

(27)

**EXHIBIT 9**
**58**

have further failed and refused to perform the conditions
of the aforementioned contract in that after the return of
the plaintiff, SIEGEL, from two and one half years in the
United States Army, they refused and do still refuse to pe
mit the plaintiffs to undertake and carry on the full pro-
duction of continuity and cartoon material for all the nee
of newspaper and magazine publishing of the cartoon featur
Superman as the plaintiffs had previously done.

ONE HUNDRED FOURTEENTH:  That the plaintiffs have
repeatedly demanded of the said Detective Comics, Inc. and
of the defendant, NATIONAL COMICS PUBLICATIONS, INC. that
the plaintiffs be permitted to carry on the entire produc-
tion of material for publication of Superman as aforesaid,
but the said defendant and the said Detective Comics, Inc.
have refused to permit the same.

ONE HUNDRED FIFTEENTH:  That Detective Comics, Inc
and the defendant, NATIONAL COMICS PUBLICATIONS, INC. have
without the consent of the plaintiffs hired their own ser-
vants and employees to create a major portion of the materi
published under the title Superman, despite the fact that
the plaintiffs are capable of producing sufficient material
for all the needs of magazine and newspaper publishing.

ONE HUNDRED SIXTEENTH:  That in furtherance of the
unlawful and corrupt scheme to prevent the plaintiffs from
producing all of the material necessary for publication und
the title Superman as aforesaid, as is their right under th
contract as aforesaid, and in order therefor to cause it to
falsely appear that the plaintiffs are unable to produce al
the necessary material, Detective Comics, Inc. and the de-
fendant, NATIONAL COMICS PUBLICATIONS, INC. have since the
return of the plaintiff, SIEGEL, from the Army adopted a
course of conduct whereby they have rejected under the guis
of editorial supervision the major portion of the material
created by the plaintiffs, and that the said rejections are
corruptly, falsely, and maliciously made without right or

(28)

000000219

**EXHIBIT 9**
**59**

reason, and solely to injure the production of the said ma-
terial by the plaintiffs and pursuant to the scheme as abo
set out to prevent the plaintiffs resuming full supervisio
and control of the production of the comic strip Superman.

ONE HUNDRED SEVENTEENTH:  That the continuity an
cartoons created by the servants and employees were and ar
inferior to continuity and cartoons created by the plainti
and that the publication of such inferior material with th
representation that the said material is the work of the
plaintiffs has injured and is injuring and will continue t
injure in the future the reputation of the plaintiffs in t
trade and with the general public, and has lessened and de-
preciated the sale of the comic Superman and will continue
in the future to do so.

ONE HUNDRED EIGHTEENTH:  That the plaintiffs ele
to rescind the said contract, because of the numerous vital
and material breaches thereof, failure of consideration
therein, and numerous frauds in the inducement, the incepti
and performance thereof, as hereinabove set forth, and here
by offer to release and discharge the said Detective Comics
Inc., THE MC CLURE NEWSPAPER SYNDICATE, and the defendant
NATIONAL COMICS PUBLICATIONS, INC. from any further obliga-
tion to perform the same and to return to the said Detectiv
Comics, Inc., THE MC CLURE NEWSPAPER SYNDICATE, and the de-
fendant, NATIONAL COMICS PUBLICATIONS, INC., all things
which rightfully become theirs upon such a rescission.

ONE HUNDRED NINETEENTH:  Plaintiffs have no
adequate remedy at law.

WHEREFORE, plaintiffs demand judgment:-

1. That the defendants, their agents, servants an
employees be perpetually enjoined and restrained from crea-
ing, publishing, selling or distributing any comic strip ma-
terial of the nature now and heretofore sold under the
titles Batman, Superboy, Lois Lane, Girl Reporter, Johnny
Quick, The Flash, Green Lantern, Aquaman, Airwave, or any

(29)

**EXHIBIT 9**
**60**

other comic strip material made in imitation of the conception, character, nature, incidents, action or plot of the plaintiffs' comic strip <u>Superman</u>, or in competition with th said <u>Superman</u>, and from using any title so imitative of <u>Superman</u> as to be calculated to deceive the public so that it would believe the so entitled material to have been created by the plaintiffs.

2. That the plaintiffs have an accounting of income, expenditures and profits of the defendants, derived from the publication, sale and distribution of <u>Batman</u>, <u>Superboy</u>, <u>Lois Lane,Girl Reporter</u>, <u>Johnny Quick</u>, <u>The Flash</u>, <u>Green Lantern</u>, <u>Aquaman</u>, <u>Airwave</u> and any other comic strip material made in imitation of conception, character, nature incidents, action or plot of the plaintiffs' comic strip <u>Superman</u> or in competition with the said Superman, and that the profits derived from the said publication, sale and distribution be divided according to law and that the plainti have their just share thereof.

3. That the plaintiffs have an accounting of the income, expenditures and profits acquired by the defendants through the production of radio features and moving picture entitled <u>Superman</u>, and by the sale of commercial licenses o all kinds and the receipt of commercial royalties of all kinds, and that the profits derived from the said publication, sale and distribution be divided according to law, an that the plaintiffs have their just share thereof.

4. That the plaintiffs have an accounting of the income, expenditures, and profits acquired by the defendant as a result of the publication, sale and distribution by Random House, Inc., or the defendants, of the book <u>The Adventures of Superman</u>, and that the profits derived from the said publication, sale and distribution be divided accordin to law and that the plaintiffs have their just share thereof

5. That the plaintiffs have an accounting of all cartoon or comic strip material published under the title or any comic strip feature created by the plaintiffs or furnish

(30)

000000221

EXHIBIT 9

61

by the plaintiffs pursuant to contract, and of all material published in imitation of any of the said comic strip features, and of the income, profits and expenditures relating to such publication and that the profits thereof be divided according to law, and that the plaintiffs have their just share thereof.

6. That the Court declare the rights and other legal relations of the plaintiffs and the defendants by reason of the written instrument dated March 1, 1938; and that the Court declare the said instrument void; and that the Court declare the said instrument ineffectual to convey to the defendants any property in, or the future rights to publish, the comic strip feature Superman, or any property in the use of the title thereto or of the comic strip character "Clark Kent" also known as Superman.

7. That the Court declare the rights and other legal relations of the plaintiffs and the defendants by reason of the written instrument dated September 22, 1938 and the modifications thereof; that the Court declare that the plaintiffs have the right to rescind the said contract; and that the plaintiffs have the sole right hereafter to the use of the title Superman, and to create and cause to be published cartoon or comic strip material containing the character "Clark Kent" also known as "Superman", "Lois Lane", and "Perry White", and containing the conception and idea of the cartoon feature Superman.

8. That the defendants, their agents, servants and employees be perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material under the title Superman, or any material containing the idea, conception, plot or in any wise resembling the comic strip feature heretofore published as Superman, or containing any of the characters hereinbefore presented in the said feature Superman or resembling the said characters and from making, selling, licensing, or distributing any radio, or motion picture or talking picture features, or any

(31)

73

000000222

EXHIBIT 9
62

dramatic or stage features and from granting any commercial licenses of any kind or nature whatsoever, and from accepting hereafter any money or consideration on account of any licenses heretofore granted, and from using the names of Superman or of the plaintiffs for any commercial purpose whatsoever.

9. That the plaintiffs have judgment against th defendants for all sums of money due to the plaintiffs pursuant to the terms of the contract of September 22, 1938, as modified and otherwise due and owing.

10. That the plaintiffs may have such other and further relief as to the court may seem just and proper.

SLONIM, WEKSTEIN & FRIEDMAN
Attorneys for Plaintiffs
Office & P. O. Address
20 South Broadway
Yonkers, New York (2)

(32)

74

000000223

EXHIBIT 9
63

EXHIBIT "A"

Sept. 22. 193

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberly Avenue
Cleveland, Ohio

Gentlemen:-

This letter, when signed by you, will serve as our agreemen

We, Detective Comics, Inc., are the exclusive owners of com
strips known by the titles "Superman", "Slam Bradley", "Spy
"Radio Squad" and "Federal Men", and to the rights to publi
comics carrying said titles and characters contained therei
and continuity thereof.

You have been doing the art work and continuity for said
comics for us. We wish you to continue to do said work and
hereby employ and retain you for said purposes for the peri
of this contract.

You agree that you will supply us each and every month here
after, in sufficient time for publication in our monthly
magazines, sufficient copy and art for each of said features
each month hereafter.

All of said comic features consist of approximately 46 page
per month. The standard of the said comics shall be equal
to the present standards.

You shall also furnish in sufficient time to properly perfo
the terms of an agreement we are executing together with yo
with the McClure Newspaper Syndicate, all of the art and
continuity for the newspaper strip entitled "Superman" call
for by said agreement.

You agree that you will not hereafter at any place in the
United States or in any foreign country, furnish to any oth
person, firm, corporation, newspaper or magazines any art o
copy for any comics to be used in any strip or comic or new
paper or magazine containing the above titles or the charac
ters or continuity thereof or in any wise similar thereto,
but you shall furnish such material exclusively to us for th
duration of this agreement as such matter may be required by
us or as designated by us in writing.

In the event you shall do or make any other art work or con-
tinuity suitable for use as comics or comic strips, you sha
first give us the right to first refusal thereof by submit-
ting said copy and continuity ideas to us. We shall have th
right to exercise that option for six weeks after submission
to us at a price no greater than offered to you by any othe
party.

We agree to pay you on publication, for any and all of said
comics published by us and supplied by you, the following
rates:

|  |  |
|---|---|
| Superman | $10.00 per page |
| Slam Bradley | $10.00 per page |
| Spy | $10.00 per page |
| Radio Squad | $ 9.00 per page |
| Federal Men | $ 9.00 per page |

You agree that the number of panels to each monthly feature
shall be approximately equal to the panels contained in pre-
vious publications of the comics.

(1)

000000224

**EXHIBIT 9**

**64**

We further agree to pay you for the McClure Newspaper Syndi-
cate strips which you may hereafter furnish pursuant to the
abovementioned contract with McClure, on the following basis

When we receive payment from McClure
on the 40% basis mentioned in the con-
tract, we shall retain 7½% and pay you
32½% of the "net proceeds" as defined
in the McClure contract.
When we receive payment from McClure
on the 45% basis mentioned in the con-
tract, we shall retain 9% and pay you
36% of the "net proceeds" as defined
in the McClure contract.
When we receive payment from McClure
on the 50% basis mentioned in the con-
tract, we shall retain 10% and pay you
40% of the "net proceeds" as defined
in the McClure contract.

All material, art and copy shall be owned by us and at our
option, copyrighted or registered in our name or in the
names of the parties designated by us.

This agreement shall be for a period of five years from the
date hereof and shall thereafter be continued for an addi-
tional five years at our option.  However, if at any time
the art and continuity of a feature shall not be up to th
standard required for the magazines, we at our option, then
may terminate this agreement as to and substitute other ar-
tists for the unsatisfactory feature or features but not
otherwise.

According to the above mentioned McClure contract, we shall
have the right to use the material furnished for syndicate
purposes without charge by McClure.  However, in the event
we shall use any of said syndicate matter in our magazines,
you shall be compensated at the above mentioned page rate
less the percentage which McClure receives for said syndica-
tion.  When using such syndicate matter we shall of course
not be required to use original copy as called for by this
contract.

At any time, if we believe any feature is economically un-
successful, we may discontinue the further publishing of
said feature.

We shall have the right to reasonably supervise the editoria
matter of all features.

Your signature to this agreement is one of the inducements
us to execute the above mentioned McClure contract and we
agree to use our best efforts to continue the publishing of
magazines containing the above mentioned features.

Very truly yours,

DETECTIVE COMICS, INC.

BY:   Harry Donenfeld
          Pres.

Jerome Siegel

Joseph Shuster

(2)

76

000000225

EXHIBIT 9
65

<u>EXHIBIT "A"</u>

Sept. 22. 1938

Detective Comics, Inc.
480 Lexington Avenue
New York City

Jerome Siegel and Joseph Shuster
c/o American Artists League
10622 Kimberley Avenue
Cleveland, Ohio

Gentlemen:

This letter, when signed by each of you, will serve as our agreement.

Hereafter, Detective Comics, Inc., is called "Detective" and Messers. Siegel and Shuster are called the "Artists".

In line with our discussions, we are prepared to go ahead with newspaper syndication of a daily strip, six days a week entitled "Superman" and owned by Detective Comics, on the following terms and conditions:

We are to have an eight month option from Detective, dating from October 1, 1938, to enable us to make a preliminary survey of the newspaper field in relation to this specific feature, which survey we agree to make at our own expense and to furnish Detective with a report thereof.

If this preliminary canvass indicates the possibility for successful newspaper syndication of this feature, as we anticipate it will, and providing we give Detective notice in writing by registered mail before June 1, 1939, of our exercise of said option, Detective agrees to permit the Artist to supply "Superman" strip exclusively to us for syndication in newspapers in the United States, Canda, and all other part of the world, for a minimum period of five years from June 1 1939, in consideration of the payment to Detective of forty (40%) per cent of the net proceeds from such syndication during the first year, forty-five (45%) per cent during the second year and fifty (50%) per cent thereafter. "Net procee is hereby defined to mean gross receipts for the feature from newspapers using the feature, less cost of cuts, mats, and proofs. All other expenses, including billing, promotion and selling expenses, are ours and are not deductible in arriving at net proceeds.

If during the third year and continuing to the end of the above mentioned initial five year period, the weekly net share of Detective from the proceeds reaches $100. or more, per week, we shall have the option to renew this agreement for a further period of five years beginning June 1, 1944, on the same terms as procided above, for the final three years of the 1939-1944 period, providing, however, we give Detective notice in writing by registered mail before Februar 1, 1943, of our renewal.

We are to have reasonable editorial supervision of the feature which the Artists agree to maintain at the standard shown in the sample submitted. In turn, we agree to our best efforts to sell this feature to as large a list of newspapers as possible, and at the best prices obtainable in each case.

Detective and Artists agree to cooperate with us in our sales efforts by supply on request, any information and assis-

(1)

000000226

**EXHIBIT 9**
**66**

tance, without cost to you however, that we may require for
promotion purposes.

Statements will be made to Detective and a copy to Artists
tween the 25th and 30th of each month, covering sales of th
month previous and will be accompanied by check for its abo
mentioned share of the amount collected to the date of the
statement.  Detective and the Artists or their authorized r
presentatives may inspect our books of account in reference
to the feature, at any reasonable time.

The material contained in the feature which we syndicate wil
be copyrighted in our name, but copyright reverts to Detecti
at the termination of this contract.  The title "Superman"
shall always remain the property of Detective and the featu
may be used by Detective for any other purpose except daily
or weekly newspaper publication. Our agreement covers news-
paper right only.  Radio, motion picture, silent and talkie
book and all other rights are retained and owned by Detecti

The Artists agree to supply the feature required for the ne
paper syndicate publications to us, on an advanced schedule
of at least six weeks, or such other reasonable period as m
be determined by us to insure amply time for distribution
prior to release dates.  In the event the Artists shall at
time fail to furnish the feature, and so breach this agree-
ment, in addition to any other remedies Detective may appoi
other artists to do the feature and strip.

It is agreed that should it be determined at any time durin
the life of this contract, that it would be advisable to re
lease a Sunday feature of "Superman" strip, we are to have
exclusive rights to such a Sunday feature, on the same terms
as outlined herein for the daily strip.

The Artists are to be paid for their work solely by Detecti

Detective agrees that during the life of this contract, be-
fore it shall submit any other comics for newspaper syndicat
purposes, it shall offer said comics to us for first refusal
for a six week period.

We agree to provide Detective with all the original drawing
of the "Superman" strip, so that said drawings may be used
by Detective in the publication "Action Comics" six months
after newspaper release, without charge or for any substi-
tuted magazines.

This agreement does not prohibit Detective from selling to
foreign country newspapers rights to use any material which
may appear in any magazines published by Detective containir
and including "Superman".

It is understood that in the event of an outbreak of a
European war, in which Great Britain should become involved
during the period of October 1, 1938 to February 1, 1939, th
McClure Newspaper Syndicate has the right to cancel this
agreement.

                    Very truly yours,

                    THE MC CLURE NEWSPAPER SYNDICATE

                    By:    Richard H. Waldo, Pres.

DETECTIVE COMICS, INC.

By:    HARRY DONENFELD

JEROME Siegel

JOseph Shuster                (2)

000000227

**EXHIBIT 9**
**67**

DETECTIVE COMICS
INCORPORATED

480 Lexington Ave.
New York, N.Y.

EXHIBIT "B"

December 19, 1939

Jerome Siegel and Joseph Shuster,
New York, N.Y.

Dear Sirs:

We have discussed with you certain changes of procedure
and compensation which we feel it advisable to set forth in
written modification so as to bring our agreement of Septem-
ber 22, 1938 down to date.

In the 1938 agreement we had agreed to pay both of you
for the art work and continuity for the comic strips entitle
"SUPERMAN", "SLAM BRADLEY", "SPY", "RADIO SQUAD" and "FEDER/
MEN" at certain rates per page. Since that time, however,
while both of you have continued to furnish art work and con
tinuity for "SUPERMAN", only Mr. Siegel has continued to fur
nish the continuity for the remaining comic strips. Mr.
Shuster no longer furnishes the art work for "SLAM BRADLEY",
"SPY", "RADIO SQUAD" and "FEDERAL MEN". Also, we have dis-
cussed with both of you a change of your page rate compensa-
tion with respect to "SUPERMAN".

Effective therefore, upon the signing of this modifica-
tion, we agree to pay to both of you for all art work and
continuity for "SUPERMAN" at the rate of $20. per page, and
both of you agree that you will at such rate continue to fur
nish all art and continuity work for "SUPERMAN" to us in ac-
cordance with the agreement of September 22, 1938. As to th
remaining comic strips, we shall be free to make other ar-
rangements with Mr. Siegel personally as to the furnishing of
continuity for them and also make other arrangements for the
furnishing of art work for them in view of the fact that Mr.
Shuster no longer furnishes the same.

We have also informed you of our activities in promotin
the commercial exploitation of "SUPERMAN" in other fields in
addition to magazine publication and newspaper syndication.
Such other fields include radio, motion pictures, the toy an
novelty field and others and we have indicated to you our
willingness that both of you receive some portion of the pro
ceeds which may be realized from these additional activities.
We, therefore, hereby agree to pay to you 5% of all net pro-
ceeds which may be derived by us from all commercial exploit
tion of "SUPERMAN" outside of magazine and book publication
and newspaper syndication. Such net proceeds shall be arriv
at by deducting from the gross proceeds from any such addi-
tional sources (except magazine and book publication and new
paper syndication) all expenses incurred by us in the course
of such promotion and exploitation.

By your signature below, you hereby confirm the follow-
ing arrangements and you hereby further confirm the followin

1. That we, Detective Comics, Inc., are the sole and ex
slusive owners of the comic strip entitled "SUPERMAN" and th
other comic strips entitled as above mentioned, and to all
rights of reproduction of all said comic strips and the titl
and characters contained therein and the continuity thereof,
including but not limited to the fields of magazine or other
book publication, newspaper syndication, radio broadcast,
television, motion picture reproduction and all other form
of reproduction. We have all right of copyright and all
rights to secure copyright registration in respect of all
such forms of reproduction either in our own name of others

(1)

000000228

EXHIBIT 9
68

at our exclusive option.

2. That you have not done or permitted any act or thing which might impair any of our aforesaid rights with respect to any of the aforesaid comic strips and that so far as you are concerned our full and complete ownership thereof and of all reproduction rights in connection therewith are vested in us free and clear of the rights of any other persons or parties whatsoever.

3. That we have the unrestricted right to adapt, arrange change, transpose, add to and otherwise deal with any or all said comic strips and the titles, characters and continuity thereof as we in our sole discretion may deem it necessary or advisable to do so.

4. That we have the unrestricted right to grant to othe upon such bases as we in our sole discretion shall determin any of the foregoing rights of reproduction with respect to any of the aforesaid comic strips and the titles, character and continuity thereof.

You hereby agree to execute any and all further instru- ments which may at any time be necessary or advisable in connection with any of the foregoing rights and property no vested in us and for that purpose and for all other purpose hereunder you hereby designate us and our successors and as signs your agents and attorneys in fact irrevocably.

This modification shall become effective immediately upon your signing the same below and continue in full force and effect throughout the life of the agreement dated Sep- tember 22, 1938 as the same has been modified hereby. Both you and ourselves hereby ratify and confirm the foregoing agreement dated September 22, 1938 as the same has been mo- dified by this letter.

Very truly yours,

DETECTIVE COMICS, INC.

By: __Harry Donenfeld__

Pres.

APPROVED AND ACCEPTED:

Jerome Siegel_____

Joseph Shuster_____

000000229

**EXHIBIT 9**

**69**

EXHIBIT "C"

DETECTIVE COMICS
INCORPORATED

480 Lexington Ave.
New York, N.Y.

August 30, 1943

Pvt. Jerome Siegel
39th Special Service Company
Fort George G. Meade, Md.

Dear Mr. Siegel:

As provided in our agreement of September 22, 1938, wherein we agree to employ and retain you for the purposes mentioned therein, we hereby advise you that we have decided to and do hereby exercise our option mentioned in said agreement to continue said agreement for an additional five year period on all the terms and conditions mentioned therein.

Very truly yours,

DETECTIVE COMICS, INC.

By: ___J. S. Liebowitz___
(Treasurer)

JSL*DS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBIT "D"

DETECTIVE COMICS
INCORPORATED

480 Lexington Ave.
New York, N.Y.

September 8, 1943
One day closer to Victory.

Mr. Joseph Shuster
98-120 Queens Boulevard
Forest Hills, N.Y.

Dear Mr. Shuster:

As provided in our agreement of September 22, 1938, wherein we agree to employ and retain you for the purposes mentioned therein, we hereby advise you that we have decided to and do hereby exercise our option mentioned in said agreement to continue said agreement for an additional five year period on all the terms and conditions mentioned therein.

Very truly yours

DETECTIVE COMICS, INC.

By: ___J. S. Liebowitz___
(Treasurer)

JSL*DS

000000230

EXHIBIT 9
70

EXHIBIT "E"

A G R E E M E N T

This Agreement, made at Cleveland, Ohio this first day of February 1940 by and between Joseph Shuster hereinafter called the party of the first part and Wayne Boring, hereinafter called party of the second part.

WITNESSETH, for and in consideration of the mutual promises and mutual terms contained herein, the parti· hereto do agree as follows:

1. Party of the first part agrees to employ party of the second part, and party of the second part agr· to be employed by party of the first part as artist for a period of two (2) years and seven (7) months from the date of this contract.  It is further understood and agreed tha· said party of the first part shall and hereby does, have t· option to renew this agreement for an additional period of five (5) years after the expiration of the two (2) year seven (7) month period and under the same terms and conditions as herein set forth.  Said party of the first part shall notify said party of the second part of his intentio· to exercise said option and renew said contract by written notice to said party of the second part at least thirty (3C days prior to the expiration of the original term of this contract.

2. It is understood and agreed that said party of the second part shall devote all of his time to the work and business of said party of the first part; and said party of the second part, shall at all times, maintain a good sta· dard of work; that during the term of this contract, or any renewal period, said party of the second part shall devote his entire time and skill to the work of the party of the first part and shall not engage in any other work of any ki· or nature whatsoever without first obtaining the written co· sent of said party of the first part.

3. It is understood and agreed that said party o· the second part shall not in any way publicise or take com-

000000231

82

EXHIBIT 9
71

mercial advantage of his employment or connection with the comic strip work of said party of the first part and agrees that upon leaving the employment of the party of the first part, he will not engage in the copying, composing, editing or similar work in any comic strip, which is based on a theme or motive similar to "Superman" or any other comic strip produced by said party of the first part.

4. It is understood and agreed that all of the work as artist and assistant to said party of the first part shall be performed at the office of said party of the first part now located at 10609 Euclid Avenue or any other place designated by said party of the first part.

5. For and in consideration of the services rendered by said party of the second part, to said party of the first part, it is understood and agreed that the salary of said party of the second part shall be as follows:  Fifty Dollars ($50.00) per week as long as the percentage of the Syndicate work paid to said party of the first part is less than Two Hundred Fifty Dollars ($250.00) per week.  That when said percentage received by said party of the first part is Two Hundred Fifty Dollars ($250.00) per week, party of the second part shall receive Ninety Dollars ($90.00) per week; when said percentage reaches Three Hundred Fifty Dollars ($350.00) per week, then party of the second part shall receive One Hundred Ten Dollars ($110.00) per week; when said percentage reaches Four Hundred Fifty Dollars ($450.00) per week, then party of the second part shall receive One Hundred Thirty Dollars ($130.00) per week; when said percentage reaches Five Hundred Dollars ($500.00) per week, then party of the second part shall receive One Hundred Forty Dollars ($140.00) per week.

It is understood and agreed that the above salary arrangement has reference only to the amount received by party of the first part as his share or percentage of the

83                         000000232

**EXHIBIT 9**
**72**

Syndicate work only; that it refers to original or first appearances only as distinguished from reprints and that it does not include, and is not intended to include, income from any other sources.

6. It is further understood and agreed that party of the second part, as artist, shall produce not less than six (6) daily and one (1) Sunday comic strip each week and in addition, thereto, he shall produce two (2) thirteen (13) page "Superman" magazine releases per month in time to meet deadlines. It is understood and agreed that in addition to the salary provided in Section 5 of this Agreement, party of the second part shall receive One Hundred Dollars ($100.00) per month for said magazine releases providing two (2) releases are produced each month and in the event only one (1) release is produced in any month, then in that even said party of the second part shall receive Forty Dollars ($40.00) for said one (1) release.

7. It is understood and agreed that upon the violation of any of the terms of this agreement, or if at any time during the term of this agreement, or any renewal period, the work of said party of the second part shall, in the judgment of said party of the first part, and Jerome Siegel, continuity writer for said comic strip, "Superman", become below the good standard of work necessary and requir. in the production of said comic strip, then in that event, said party of the first part may terminate this agreement upon thirty (30) days written notice to said party of the second part. In the event of such termination, this contra. or any renewal thereof, shall become null and void and of no effect whatsoever.

IN WITNESS WHEREOF, the parties hereto sign the names the day and year first above written.

Witnesses:                     JOE SHUSTER
                               Party of the first part
Leo N. Ascherman
Jerome Siegel                  WAYNE BORING
                               Party of the second part

84

000000233

EXHIBIT 9

73

STATE OF NEW YORK          )
COUNTY OF WESTCHESTER      )      SS.


      JOSEPH SHUSTER, being duly sworn, deposes and
says that he is one of the plaintiffs in the within action;
that he has read the foregoing Complaint and knows the con-
tents thereof; that the same is true to his own knowledge,
except as to the matters therein stated to be alleged on in-
formation and belief, and that as to those matters he believ
it to be true.

                                JOSEPH SHUSTER

Sworn to before me this
5th day of March, 1947.


        MORTON N. WEINSTEIN
      Notary Public, State of New York
       I Reside in Westchester County
    My Commission Expires March 30, 1948

000000234

**EXHIBIT 9**
**74**

# EXHIBIT 10



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

1099-1947

- - - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

        Plaintiffs, : 203

  -against-      : 305

NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT :
NEWS CO., INC., THE MC CLURE NEWSPAPER SYNDICATE,
HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H.
SAMPLINER and WAYNE BORING,     :

        Defendants.

- - - - - - - - - - - - - - - - - - -x

   The above-entitled action having been duly referred
to the undersigned, pursuant to stipulation of the parties
herein, as Referee to hear, try and determine with findings
of fact and conclusions of law, and the said matter having
duly come on to be heard before the undersigned, and the
plaintiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN, ESQS
their attorneys (MORTON WEKSTEIN, ESQ., of counsel, and the de-
fendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT NEWS
CO., INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINE
having appeared by WEIL, GOTSHAL & MANGES, ESQS., their attor-
neys (HORACE S. MANGES, ESQ., EDWARD C. WALLACE, ESQ., and
ABRAHAM I. MENIN, ESQ., of counsel), and the defendant THE
MC CLURE NEWSPAPER SYNDICATE, having appeared by JOHN L.
MC CORMICK, ESQ., its attorney (JAMES L. BROWN, ESQ., of counsel
and the defendant WAYNE BORING having appeared by his attorney
SIDNEY H. REICH, ESQ., and the Referee's oath having first been
taken, and the proofs and allegations of the parties having
been heard, and due deliberation having been had, I do find
and decide as follows, stating my findings of fact and con-
clusions of law:

DCC00046146

**EXHIBIT 10**
75

## FINDINGS OF FACT

1. Defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT NEWS CO., INC. and THE MC CLURE NEWSPAPER SYNDICATE are corporations duly organized and existing under the laws of the State of New York; DETECTIVE COMICS, INC. was a corporation duly organized and existing under the laws of the State of New York, and was one of the constituent corporations consolidated on September 30, 1946 into defendant NATIONAL COMICS PUBLICATIONS, INC.

2. Defendant NATIONAL COMICS PUBLICATIONS, INC., at all times hereinafter mentioned, was and still is a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

3. Defendant INDEPENDENT NEWS CO., INC., at all times hereinafter mentioned, was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York.

4. Defendant THE MC CLURE NEWSPAPER SYNDICATE, at all times hereinafter mentioned, was and still is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York.

5. Previous to September 30, 1946, DETECTIVE COMICS, INC. was a corporation duly organized and existing under and by virtue of the laws of the State of New York.

6. Previous to October 1, 1946, SUPERMAN, INC. was a corporation duly organized and existing under and by virtue of the laws of the State of New York, and the said corporation was organized by DETECTIVE COMICS, INC. and the defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER, and at all times hereinafter mentioned the officers and directors of SUPERMAN, INC. were the same persons who were the officers and directors of DETECTIVE COMICS, INC.

2

DCC00046147

**EXHIBIT 10**

76

and all facts known to DETECTIVE COMICS, INC. were known to SUPERMAN, INC., and at all times hereinafter mentioned SUPERMAN, INC. was completely controlled by DETECTIVE COMICS, INC., and the defendants HARRY DONENFELD, JACOB LIEBOWITZ and PAUL H. SAMPLINER.

7.  On or about the 30th day of September, 1946, Detective Comics, Inc., All American Comics, Inc., Superman, Inc., Jolaine Publications, Inc., Wonderwoman Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc., and Trafalgar Printing Co., Inc. consolidated into a single corporation pursuant to the provisions of Sections 85 to 90 of the Stock Corporation Law of the State of New York, the same being the defendant NATIONAL COMICS PUBLICATIONS, INC.

8.  Plaintiffs are the originators and authors of the cartoon character SUPERMAN and of the title SUPERMAN and first created cartoon material in which the said character and title first appeared in 1934 and continued to create such cartoon material until the institution of the present action, and the plaintiffs are the authors and originators of other cartoon characters which have appeared in the cartoon strip entitled SUPERMAN, chief among which are SUPERMAN, also known as Clark Kent, Lois Lane and Perry White, and the plaintiffs are known to the public as the authors and creators of the cartoon material in which the character SUPERMAN appears and of the character SUPERMAN and of other cartoon characters which appear and have appeared in cartoons entitled SUPERMAN.

9.  Some time in 1933 plaintiff SIEGEL conceived the idea of a cartoon strip, the general character of which

3

DCC00046148

**EXHIBIT 10**

would be a man of superhuman strength and power, who would perform feats of great magnitude for the public good.

10.  Plaintiff SIEGEL, together with plaintiff SHUSTER, an artist, prepared a comic strip containing separate panels embodying SIEGEL'S idea which was submitted to numerous publishers and newspaper syndicates, but was uniformly rejected.

11.  After the joint creation of the SUPERMAN strip panels in 1933, plaintiffs collaborated in creating other cartoon strips, some of which were purchased by Nicholson Publishing Company for resale to DETECTIVE COMICS, INC.

12.  In the latter part of 1937, Nicholson Publishing Company went out of business and DETECTIVE COMICS, INC. acquired some of its magazine properties.

13.  On December 4, 1937, defendant LIEBOWITZ, representing DETECTIVE COMICS, INC., met plaintiff SIEGEL in New York City.

14.  At the said conference defendant LIEBOWITZ proposed to plaintiff SIEGEL that the $9. page rate which Nicholson Publishing Company had been paying plaintiffs for certain comic strips, be increased to $10.

15.  At the said conference DETECTIVE COMICS, INC. entered into a written contract of employment (Def. Ex. C), with plaintiffs with reference to two comic features known as "Slam Bradley" and "The Spy", the material for which

4

DCC00046149

**EXHIBIT 10**
**78**

plaintiffs had been furnishing Nicholson Publishing Company; said contract provided in part as follows:

> "2. The Employees agree to give their exclusive services as artists in producing features known as "Slam Bradley" and "The Spy" during said period of employment, to the Employer, and agrees that all of these products and work done by said Employee for said Employer during said period of employment, shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creator thereof, the Employee acting entirely as the Employer's employee.

> "3. In the event that the Employee leaves the service of the Employer prior to the termination date set forth in this Agreement or subsequent thereto, and for any reason whatsoever, the Employees agree that they will not, directly or indirectly, and through any means whatsoever, use, duplicate, simulate or bring into being any of the products or work or creations of characters or plots used, made or created by him while in the employ of the Employer.

> "4. It is understood that any new and additional features which the Employees produce for use in a comic magazine are to be first sub-...... to accept or reject same within a period of Sixty days."

16. At the said conference defendant LIEBOWITZ and plaintiff SIEGEL discussed the possibility of DETECTIVE COMICS, INC. publishing a new magazine and plaintiffs furnishing new comic strips for such magazine; defendant LIEBOWITZ told plaintiff SIEGEL that if DETECTIVE COMICS, INC. published such a magazine and accepted and published any comic features created by plaintiffs, they would be paid at the increased rate of $10. per page, but that DETECTIVE COMICS, INC. would have to own all rights to such comic features.

17. Early in 1938, DETECTIVE COMICS, INC. decided to publish a new comic magazine to be called "Action Comics".

18. Thereupon, DETECTIVE COMICS, INC. inquired of defendant THE MC CLURE NEWSPAPER SYNDICATE as to whether the

5

DCC00046150

EXHIBIT 10
79

latter had any available material suitable for the proposed magazine "Action Comics".

19.  Defendant THE MC CLURE NEWSPAPER SYNDICATE, then submitted to DETECTIVE COMICS, INC. the SUPERMAN comic strip created by plaintiffs, which strip consisted of a few panels suitable for newspaper syndication (Pl. Ex. 2).

20.  The said SUPERMAN comic strip material had been rejected by defendant THE MC CLURE NEWSPAPER SYNDICATE, but had remained in its custody for a long time.

21.  DETECTIVE COMICS, INC. examined the said SUPERMAN material and returned it to plaintiffs for revision and expansion into a full length thirteen page comic strip release suitable for magazine publication.

22.  Plaintiffs revised and expanded the said SUPERMAN material in compliance with the said request of resubmitted such revised and expanded material to DETECTIVE COMICS, INC. Said material, consisting of ninety-nine separate panels, constituted the formula for the continuing SUPERMAN series to come.  It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance.

6

DCC00046151

EXHIBIT 10
80

23. Previous to March 1, 1938, there was due and owing by DETECTIVE COMICS, INC. to the plaintiffs the sum of $130.00, and the $130.00 recited as consideration in Plaintiffs' Exhibit 11 is the same $130.00 which was previously due and owing by DETECTIVE COMICS, INC. to the plaintiffs on or about February 22, 1938.

24. On March 1, 1938, prior to the printing of the first issue of "Action Comics", DETECTIVE COMICS, INC. wrote to plaintiff SIEGEL at Cleveland, Ohio, where he and plaintiff SHUSTER both resided, enclosing a check in the sum of $412. which included $130. in payment of the first thirteen page SUPERMAN release at the agreed rate of $10. per page, and a written instrument for plaintiffs' signatures (Pl. Ex. 11).

25. Said instrument, dated March 1, 1938, read as follows:

"Detective Comics, Inc.
430 Lexington Avenue
New York, N.Y.

"I, the undersigned, am an artist or author and have performed work for strip entitled "SUPERMAN".

"In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer such work and strip, all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and hold forever and to be your exclusive property and I agree not to employ said characters or said story in any other strips or sell any like strip or story containing the same characters by their names contained therein or under any other names at any time hereafter to any other . . . . . . . . . . . . . . . . . . . . . . . . . the use thereof by said other parties without obtaining your written consent therefor. The intent hereof is to give you exclusive right to use and acknowledge

7

DCC00046152

**EXHIBIT 10**
**81**

that you own said characters or story and the use thereof, exclusively. I have received the above sum of money.

Sgd. Joe Shuster

Sgd. Jerome Siegel

Accepted:

DETECTIVE COMICS, INC.

By Sgd. J.S. Liebowitz"

26. The instrument of March 1, 1938 (Pl. Ex. 11) was duly received by mail at Cleveland, Ohio, by plaintiffs, who thereupon executed it, and on March 3, 1938 returned it by mail to DETECTIVE COMICS, INC.

27. On or about the 3rd day of March, 1938, the plaintiffs executed an instrument dated March 1, 1938, which granted to DETECTIVE COMICS, INC. certain rights with respect to the comic strip SUPERMAN, which instrument has been received in evidence and marked Plaintiffs' Exhibit 11.

28. The instrument of March 1, 1938 (Pl. Ex. 11) was executed by plaintiffs by reason of their desire to see SUPERMAN in print and in order to induce its publication by DETECTIVE COMICS, INC.

29. The instrument of March 1, 1938 (Pl. Ex. 11) represented the exercise by DETECTIVE COMICS, INC. of the option granted to it by the said agreement of December 4, 1937 (Def. Ex. C).

30. Upon receipt by DETECTIVE COMICS, INC. of the instrument of March 1, 1938 (Pl. Ex. 11), it published the first SUPERMAN release in the June, 1938 issue of "Action Comics", which magazine was issued for sale on April 18, 1938.

8



DCC00046153

**EXHIBIT 10**

**82**

31.   The first thirteen pages of SUPERMAN material were published on April 18, 1938, in the June, 1938 issue of "Action Comics" magazine.

32.   The first thirteen pages of SUPERMAN material mentioned in paragraph 31 hereof were in existence and were in the possession of DETECTIVE COMICS, INC. before the execution of the instrument of March 1, 1938, Plaintiffs' Exhibit

33.   The said first thirteen pages of SUPERMAN material mentioned in paragraphs 31 and 32 hereof and the panels submitted in Plaintiffs' Exhibit 2 were the only SUPERMAN material which had been submitted by the plaintiffs to DETECTIVE COMICS, INC. and which had come into the possession of DETECTIVE COMICS, INC. previous to the execution and delivery of the instrument of March 1, 1938, Plaintiffs' Exhibit 11.

34.   Plaintiffs' desire to see SUPERMAN in print and the realization of that desire by DETECTIVE COMICS, INC.'S acceptance of the SUPERMAN strip for publication and actually publishing it, were vital elements of consideration supporting the instrument of March 1, 1938 (Pl. Ex. 11).

35.   Between March, 1938 and March, 1947 DETECTIVE COMICS, INC. expended large sums of money and devoted much time and effort in the promotion and popularization of the comic strip SUPERMAN and the names and characters appearing therein.

36.   The said June, 1938 issue of "Action Comics" was followed by further issues published at regular intervals, each succeeding issue having a SUPERMAN comic strip prepared by plaintiffs, who continue to be paid by DETECTIVE COMICS, INC. at the agreed rate of $10. per page.

9

DCC00046154

**EXHIBIT 10**
83

37. During September of 1938, DETECTIVE COMICS,
INC. and the defendants HARRY DONENFELD and JACOB LIEBOWITZ
made oral representations to the plaintiffs that DETECTIVE
COMICS, INC. owned SUPERMAN and had the power to discharge
the plaintiffs at any time and to cease receiving at the
hands of the plaintiffs any comic strip material depicting
SUPERMAN, and to cease publishing any such material created
by the plaintiffs and could thereafter legally continue to
produce literary and artistic material depicting SUPERMAN,
and the plaintiffs would be powerless to thereafter create
and publish any material depicting SUPERMAN  and powerless
to receive any revenue from SUPERMAN.

38. In September, 1938 DETECTIVE COMICS, INC.
represented to plaintiffs that it owned all rights to
SUPERMAN. Said representation was believed by DETECTIVE
COMICS, INC. to be true, and was, in fact, true.

39. On September 22, 1938, two agreements were
simultaneously executed, one of which was between DETECTIVE
COMICS, INC. and plaintiffs, and the other was between
DETECTIVE COMICS, INC., plaintiffs and THE MC CLURE NEWSPAPER
SYNDICATE.

40. Both of said agreements were forwarded by mail
by DETECTIVE COMICS, INC. to plaintiff SIEGEL at Cleveland,
Ohio, for signature by both plaintiffs; they were duly exe-
cuted by both plaintiffs and returned by plaintiff SIEGEL
by mail to DETECTIVE COMICS, INC. on September 30, 1938. In
all negotiations leading to the execution of said agreements
of September 22, 1938, plaintiff SIEGEL acted for himself
and for plaintiff SHUSTER and was duly authorized so to do
by plaintiff SHUSTER.

10

DCC00046155

**EXHIBIT 10**
**84**

41. On or about September 28, 1938, DETECTIVE COMICS, INC. mailed to the plaintiffs for the purpose of execution by the plaintiffs the documents herein received in evidence and marked Plaintiffs' Exhibits 14 and 15, and enclosed in the same wrapper was the letter herein received in evidence and marked Plaintiffs' Exhibit 12.

42. In the said letter, Plaintiffs' Exhibit 12, DETECTIVE COMICS, INC. made in writing to the plaintiffs the representation that DETECTIVE COMICS, INC. owned SUPERMAN and that the said DETECTIVE COMICS, INC. had the right to any time replace the plaintiffs in the creation of material depicting SUPERMAN and to continue to publish such material without receiving the same at the hands of the plaintiffs, and that the plaintiffs would be "the loser in the entire transaction".

43. In the same letter, Plaintiffs' Exhibit 12, DETECTIVE COMICS, INC. and the defendant JACOB LIEBOWITZ represented that in a certain popularity poll held immediately before September 28, 1938, 30% of the returns from the readers designated SUPERMAN as the favorite comic strip feature.

44. The agreement dated September 22, 1938 (Pl. Ex. 14), between plaintiffs and DETECTIVE COMICS, INC. provided for plaintiffs' employment for five years from September 22, 1938 with an option in favor of DETECTIVE COMICS, INC. for an additional five years.

45. By said agreement, plaintiffs expressly confirmed that DETECTIVE COMICS, INC. was the exclusive owner

11

DCC00046156

**EXHIBIT 10**
**85**

of the comic strip known as SUPERMAN and of the right to publish said comic strip and the characters contained therein and the continuity thereof, and further provided that plaintiffs would not,

"hereafter at any place in the United States or in any foreign country, furnish to any other person, firm, corporation, newspaper or magazine any art or copy for any comics to be used in any strip or comic or newspaper or magazine containing the above titles or the characters or continuity thereof or in any wise similar thereto, but you shall furnish such material exclusively to us for the duration of this agreement as such matter may be required by us or as designated by us in writing."

46.  By the terms of said agreement, DETECTIVE COMICS, INC. agreed to pay plaintiffs for SUPERMAN magazine strips (referred to by the parties as "releases") at the rate of $10. per page and to pay them from 65% to 80% of any income received by DETECTIVE COMICS, INC. from defendant THE MC CLURE NEWSPAPER SYNDICATE, under the newspaper syndication agreement of the same date.

47.  By the terms of said newspaper syndication agreement (Pl. Ex. 15), defendant THE MC CLURE NEWSPAPER SYNDICATE, was given an eight months option dating from October 1, 1938 for newspaper syndication of SUPERMAN.

48.  Defendant THE MC CLURE NEWSPAPER SYNDICATE availed itself of said option.

49.  By the terms of said newspaper syndication agreement, defendant THE MC CLURE NEWSPAPER SYNDICATE agreed to pay DETECTIVE COMICS, INC. 40% to 50% of the net proceeds from such syndication; this agreement was for a period of five years from June 1, 1939 with the right in defendant THE MC CLURE NEWSPAPER SYNDICATE to renew for a further period of five years.

12


DCC00046157

**EXHIBIT 10**
**86**

50.   Defendants HARRY DONENFELD, JACOB LEIBOWITZ and PAUL H. SAMPLINER were the officers and directors of DETECTIVE COMICS, INC. until October 1, 1946, and have been since October 1, 1946, and are as of the date of the trial herein, the officers and directors of NATIONAL COMICS PUBLICATIONS, INC. and at all times mentioned in these findings were and are the officers and directors of the defendant INDEPENDENT NEWS CO., INC.

51.   Defendants HARRY DONENFELD, JACOB LIEBOWITZ, PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. at all times mentioned in these findings knew the terms of the plaintiffs' contracts with DETECTIVE COMICS, INC., Plaintiffs' Exhibit 14 and 15.

52.   On December 19, 1939, a modification agreement (Pl. Ex. 22), was entered into between plaintiffs and DETECTIVE COMICS, INC. by which plaintiffs' compensation for SUPERMAN magazine releases was increased to $20. per page, and in addition DETECTIVE COMICS, INC. agreed to pay to plaintiffs 5% of the net proceeds to be derived from commercial exploitation of SUPERMAN other than from magazine and book publication and newspaper syndication.

53.   On or about the 19th day of December, 1939, the plaintiffs and the defendant DETECTIVE COMICS, INC. entered into an agreement to modify the contract dated September 22, 1938, and the said agreement to modify the said contract was received in evidence and marked Plaintiffs' Exhibit 22.

13

DCC00046158

EXHIBIT 10
87

54. During December of 1939 and immediately pre-
vious to the execution of Plaintiffs' Exhibit 22, DETECTIVE
COMICS, INC. and the defendant JACOB LIEBOWITZ represented
to the plaintiffs that DETECTIVE COMICS, INC. owned the
character SUPERMAN and was therefore under no obligation to
pay the plaintiffs anything on account of commercial licensing.

55. Commencing with the July, 1940 magazine
releases, DETECTIVE COMICS, INC. increased plaintiff's
compensation for SUPERMAN magazine releases to $35. per page,
which, for the usual thirteen page release, amounted to
$455. per release.

56. In February, 1942, DETECTIVE COMICS, INC.
increased plaintiffs' compensation for SUPERMAN magazine
releases to $500. per release.

57. In August, 1942, DETECTIVE COMICS, INC. in-
creased plaintiffs' compensation for SUPERMAN magazine
releases to $600. per release.

58. In March, 1943, by reason of the fact that
plaintiffs were not always able to fulfill their commitments
for production of the art work and continuity for both
magazine use and newspaper syndication, DETECTIVE COMICS,INC.
agreed with plaintiff SIEGEL to pay him the sum of $200. per
release for each SUPERMAN magazine release for which he did
not furnish the continuity and agreed with plaintiff SHUSTER
to pay him the sum of $150. per release for each SUPERMAN
magazine release for which he did not furnish the art work.

14

DCC00046159

**EXHIBIT 10**
**88**

59.  In June, 1943, DETECTIVE COMICS, INC. increased plaintiffs' compensation for SUPERMAN magazine releases to $1,000. per release.

60.  In or about June, 1943, plaintiff SHUSTER commenced to submit his art work for SUPERMAN magazine releases in pencil instead of in ink as he had theretofore done.

61.  The cost of having said releases inked was $180.

62.  Plaintiff SHUSTER was paid for a time $500. less the sum of $180., or the sum of $320., for each SUPERMAN magazine release submitted in pencil.

63.  In July, 1943, plaintiff SIEGEL ceased to submit any continuity to DETECTIVE COMICS, INC. by reason of his induction into the Army of the United States.

64.  In December, 1944, DETECTIVE COMICS, INC. increased the compensation of plaintiff SHUSTER for each magazine release of SUPERMAN for which he did not furnish the art work to the sum of $200.

65.  In March, 1946, DETECTIVE COMICS, INC. increased the compensation of plaintiff SHUSTER for each magazine release of SUPERMAN for which he furnished the art work in pencil to $380.

66.  On December 12, 1946, defendant NATIONAL COMICS PUBLICATIONS, INC. increased the compensation of plaintiff SHUSTER for each magazine release of SUPERMAN for which he furnished the art work in pencil to $500.

15

DCC00046160

**EXHIBIT 10**
**89**

67. Commencing in 1946, DETECTIVE COMICS, INC. turned over to plaintiffs all of the income received by it from THE MC CLURE NEWSPAPER SYNDICATE from newspaper syndication of SUPERMAN.

68. In connection with outside commercial exploitation of SUPERMAN during the year 1941, DETECTIVE COMICS, INC. paid plaintiffs a bonus of $500. in lieu of 5% of the net income from that source.

69. In connection with outside commercial exploitation of SUPERMAN during the year 1942, DETECTIVE COMICS, INC. and SUPERMAN, INC., on its behalf, paid plaintiffs a bonus of $7,000.

70. SUPERMAN, INC. paid to each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1942, the sum of $2,000.00

71. In connection with outside commercial exploitation of SUPERMAN during the year 1943, DETECTIVE COMICS, INC. and SUPERMAN, INC., on its behalf, paid plaintiffs a bonus of $6,000.

72. SUPERMAN, INC. paid each of the plaintiffs on account of royalties from commercial exploitation of SUPERMAN for the year 1943 the sum of $1,500.

73. In connection with outside commercial exploitation of SUPERMAN during the year 1944, DETECTIVE COMICS, INC. and SUPERMAN, INC. on its behalf, paid plaintiffs a bonus of $6,000.

16

DCC00046161

EXHIBIT 10
90

74. SUPERMAN, INC. paid to each of the pl on account of royalties from commercial exploitation o. SUPERMAN for the year 1944 the sum of $1,500.

75. In connection with outside commercial exploitation of SUPERMAN during the year 1945, DETECTIVE COMICS, INC. paid plaintiffs a bonus of $10,000.

76. SUPERMAN, INC. paid the plaintiffs nothing on account of royalties for commercial exploitation of SUPERMAN, for the year 1945.

77. In connection with outside commercial exploitation of SUPERMAN during the year 1946, defendant NATIONAL COMICS PUBLICATIONS, INC. paid plaintiffs the sum of $3,069.56.

78. During the period commencing in December, 1937 and ending March, 1947, plaintiffs received in excess of $400,000. as compensation from DETECTIVE COMICS, INC., SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC.

79. During the period commencing December 1, 1937 and ending March 1947, the plaintiffs received from DETECTIVE COMICS, INC., SUPERMAN, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC., in compensation for magazine publication and all outside exploitation including money received as bonuses the sum of $195,196.64.

80. During the period commencing December 19, 1939 and ending March 1947, the plaintiffs received from the defendants NATIONAL COMICS PUBLICATIONS, INC. and DETECTIVE COMICS, INC. the sum of $205,998.21 as compensation for the newspaper publication of SUPERMAN.

17

DCC00046162

**EXHIBIT 10**

**91**

81. On or about August 30, 1943, DETECTIVE
COMICS, INC. duly notified each of the plaintiffs in writing
of its election to extend the term of the employment con-
tract of September 22, 1938 for an additional five year
period from September 22, 1943.

82. Defendant THE MC CLURE NEWSPAPER SYNDICATE
duly notified DETECTIVE COMICS, INC. of its election to
extend for five years from June 1, 1944, the term of the
newspaper syndication agreement dated September 22, 1938.

83. Plaintiff SIEGEL upon his return to civilian
life in January of 1946 was willing and able to supply the
full complement of continuity for all of the needs of news-
paper and magazine publication exactly as he had done before
the war.

84. Plaintiff SHUSTER has not established that
DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-
TIONS, INC. has rejected any SUPERMAN art work prepared by
him, pursuant to any scheme to prevent him from producing
SUPERMAN material.

85. Plaintiff SIEGEL has not established that
DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-
TIONS, INC. has rejected any SUPERMAN continuity prepared
by him, pursuant to any scheme to prevent him from producing
SUPERMAN material.

86. Some of the continuity furnished by plaintiff
SIEGEL after his return to civilian status was deemed by

18

DCC00046163

EXHIBIT 10
92

DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICA-
TIONS, INC. to be unsuitable for publication in comic
magazines designed for juvenile readers and was rejected in
good faith.

87.  During the period commencing in June, 1943
down to January, 1946, plaintiff SHUSTER failed to furnish
art work for the SUPERMAN comic strip in sufficient quanti-
ties to meet the requirements of DETECTIVE COMICS, INC.

88.  Defendants HARRY DONENFELD, JACOB LIEBOWITZ,
PAUL H. SAMPLINER and INDEPENDENT NEWS CO., INC. did not
agree with each other or with DETECTIVE COMICS, INC.,
SUPERMAN, INC. or THE MC CLURE NEWSPAPER SYNDICATE, to
injure plaintiffs by depriving them of their rights under
their employment contract, or to interfere with, hinder
or impair the performance of such contract by the said
DETECTIVE COMICS, INC., or THE MC CLURE NEWSPAPER SYNDICATE.

89.  Plaintiffs elected in their complaint to
rescind the contract dated September 22, 1938, and herein
marked in evidence as Plaintiffs' Exhibits 14 and 15, and
the various modifications thereof, and offered in their com-
plaint to release and discharge DETECTIVE COMICS, INC., THE
MC CLURE NEWSPAPER SYNDICATE and the defendant NATIONAL COMICS
PUBLICATIONS, INC. from any further obligation to perform
the same and did offer in their complaint to return to the
said DETECTIVE COMICS, INC., the defendant THE MC CLURE
NEWSPAPER SYNDICATE and the defendant NATIONAL COMICS PUBLICA-
TIONS, INC. all things which rightfully become theirs upon
such a rescission.

19

DCC00046164

EXHIBIT 10
93

90. LOIS LANE is and at all times was a character in the SUPERMAN comic strip and was and is dep__ as a girl reporter.

91. The comic strip LOIS LANE, GIRL REPORTER, was supplied by DETECTIVE COMICS, INC. to defendant THE MC CLURE NEWSPAPER SYNDICATE, without charge for use as a filler by newspapers which carried the comic strip SUPERMAN in order to prevent said newspapers from terminating their syndication agreements with defendant THE MC CLURE NEWSPAPER SYNDICATE as to the comic strip SUPERMAN.

92. From June 1, 1943 to March, 1947, DETECTIVE COMICS, INC. published in magazines, 120 releases of the comic strip SUPERMAN, for which plaintiff SIEGEL did not create the continuity.

93. DETECTIVE COMICS, INC. paid to plaintiff SIEGEL the sum of $200. per release for each of said 120 releases, which sum was accepted by plaintiff SIEGEL in full payment.

94. From July 1, 1943 to March, 1947, DETECTIVE COMICS, INC. published in magazines 130 releases of the comic strip SUPERMAN for which plaintiff SHUSTER did not create the art work.

95. DETECTIVE COMICS, INC. paid to plaintiff SHUSTER the sum of $150. per release for 80 of said releases, and the sum of $200. per release for 50 of said releases, which sums were accepted by plaintiff SHUSTER in full payment.

20

DCC00046165

EXHIBIT 10
94

96.  On or about September 22, 1943, DETECTIVE COMICS, INC. entered into an agreement, Plaintiffs' Exhibit 56, with the defendant THE MC CLURE NEWSPAPER SYNDICATE, with reference to the comic strip entitled, LOIS LANE, GIRL REPORTER.

97.  Thereafter DETECTIVE COMICS, INC. and the said defendant THE MC CLURE NEWSPAPER SYNDICATE did furnish to a newspaper "THE CLEVELAND PLAIN DEALER" various releases of the said comic strip LOIS LANE, GIRL REPORTER.

98.  Affixed to the various individual releases of the said comic strip material LOIS LANE, GIRL REPORTER, which was furnished to a newspaper were the names of the plaintiffs as authors of the said individual releases of the said comic strip as published in the newspaper.

99.  Plaintiffs were not the authors of the said individual releases of the comic strip LOIS LANE, GIRL REPORTER as published in the newspaper.

100.  Plaintiffs did not give their permission for the use of their names as authors of the said releases of the said comic strip material LOIS LANE, GIRL REPORTER as published in the newspaper.

101.  DETECTIVE COMICS, INC., the defendant THE MC CLURE NEWSPAPER SYNDICATE and the plaintiffs agreed in Plaintiffs' Exhibit 15 that "net proceeds" for the purposes of computing the plaintiffs' return from the newspaper publication of SUPERMAN should be the entire gross receipts, deducting therefrom only the cost of cuts, mats and proofs

21

DCC00046166

**EXHIBIT 10**
**95**

and it was specifically provided that no other expen-soever should be deductible from gross receipts in order to arrive at "net proceeds".

102.  In the agreement, Plaintiffs' Exhibit 56, DETECTIVE COMICS, INC. and the defendant THE MC CLURE NEWS-PAPER SYNDICATE agreed to and with each other that the compensation of the artists engaged by DETECTIVE COMICS, INC. to draw the releases of LOIS LANE, GIRL REPORTER to be fur-nished by DETECTIVE COMICS, INC. to the defendant THE MC CLURE NEWSPAPER SYNDICATE for newspaper publication, was to be deducted from the gross receipts of the SUPERMAN syndication as "mechanical costs" in computing "net proceeds".

103.  Defendant THE MC CLURE NEWSPAPER SYNDICATE and DETECTIVE COMICS, INC. did during the period of publica-tion in said newspaper of LOIS LANE, GIRL REPORTER deduct from the gross receipts from newspaper syndication of SUPERMAN the compensation of the artists engaged by DETECTIVE COMICS, INC. to draw LOIS LANE, GIRL REPORTER, in computing "net proceeds".

104.  Plaintiffs were not parties to Plaintiffs' Exhibit 56 and were given no notice by DETECTIVE COMICS, INC. and the defendant THE MC CLURE NEWSPAPER SYNDICATE of the existence thereof or the terms thereof.

105.  The existence of the provision in Plaintiffs' Exhibit 56 for deducting the compensation of the artists en-gaged by DETECTIVE COMICS, INC. to draw LOIS LANE, GIRL REPORTER from gross receipts from publication of SUPERMAN

22

DCC00046167

EXHIBIT 10
96

in newspapers in computing net proceeds was unknown to the
plaintiffs until May, 1947, when the plaintiffs received the
answer in this action of THE MC CLURE NEWSPAPER SYNDICATE,
with a true copy of Plaintiffs' Exhibit 56 attached thereto.

106.  Plaintiffs did not know until May of 1947,
at the time they received the answer of the defendant THE
MC CLURE NEWSPAPER SYNDICATE, that DETECTIVE COMICS, INC. and
the defendant THE MC CLURE NEWSPAPER SYNDICATE had deducted
from gross receipts in computing "net proceeds" from the
newspaper publication of SUPERMAN, the compensation of the
artists who drew the newspaper comic strips LOIS LANE, GIRL
REPORTER.

107.  DETECTIVE COMICS, INC. authorized Random
House, Inc., an independent book publisher, to publish a
book entitled "The Adventures of Superman", for which
plaintiffs did not supply the material, except for four il-
lustrations prepared by plaintiff SHUSTER.

108.  Random House, Inc. is a domestic corporation
duly organized and existing under and by virtue of the laws
of the State of New York.

109.  The book entitled "The Adventures of Superman"
is not a collection of SUPERMAN comic strips, but a work of
fiction in the form of a full length novel.

110.  The modification agreement dated December
19, 1939, expressly excludes book publication as an item
of income in which plaintiffs were entitled to participate.



23

DCC00046168

**EXHIBIT 10**

**97**

111. DETECTIVE COMICS, INC. received payments from Random House, Inc. which it included (without obligation so to do) in the gross receipts applicable to commercial exploitation of SUPERMAN.

112. "Superman-Tim" was a booklet printed by Diamond Sales Corporation pursuant to a license from DETECTIVE COMICS, INC., which contained SUPERMAN material.

113. "Superman-Tim" was sold to various department stores whose names were printed on said booklet and was distributed gratis to their customers.

114. "Pyco-Pay" was a booklet distributed to dentists by Pyco-Pay Company, which contained SUPERMAN material pursuant to a license from DETECTIVE COMICS, INC.

115. The booklet "Pyco-Pay" was designed to teach children the proper care of their teeth and was distributed by dentists gratis to their young patients.

116. "The Christmas Book" was a booklet printed by Diamond Sales Corporation, which contained SUPERMAN material pursuant to a license from DETECTIVE COMICS, INC.

117. "The Christmas Book" was sold to department stores, which printed their names thereon and distributed it gratis to their customers.

118. The booklets "Superman-Tim", "Pyco-Pay" and "The Christmas Book" were not sold to the public and were not SUPERMAN comic magazine releases.

24

DCC00046169

**EXHIBIT 10**

98

119.   The Kellogg Company, sponsor of the SUPERMAN radio program, printed SUPERMAN material upon cartons of its breakfast food, with the consent of DETECTIVE COMICS, INC.

120.   The Kellogg Company made no payment for said SUPERMAN material.

121.   R.H. Macy & Co., Inc. caused an advertisement containing SUPERMAN material to be printed in the New York Journal-American on one occasion, in connection with a Thanksgiving Day parade held by R.H. Macy & Co., Inc., which material was printed with the consent of DETECTIVE COMICS, INC.

122.   R. H. Macy & Co., Inc. made no payment for said SUPERMAN material.

123.   The two agreements of September 22, 1938 between plaintiffs and DETECTIVE COMICS, INC. (Pl. Ex. 14), and plaintiffs, DETECTIVE COMICS, INC. and THE MC CLURE NEWSPAPER SYNDICATE (Pl. Ex. 15), respectively, referred specifically to magazine releases and newspaper syndication, and made no reference to the publication of promotional material.

124.   The commercial exploitation of SUPERMAN was first referred to in the modification agreement of December 19, 1939, which agreement expressly provided that DETECTIVE COMICS, INC. had the unrestricted right to grant to others, upon such basis as DETECTIVE COMICS, INC., in its sole discretion, should determine, any rights to repro-

25

DCC00046170

**EXHIBIT 10**

**99**

duction with respect to the comic strip SUPERMAN, and the titles and characters and continuity thereof.

125. From November, 1945 to March, 1947, DETECTIVE COMICS, INC., SUPERMAN, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. published 20 releases of comic strips for which plaintiff SHUSTER created and executed the art work in pencil and for which he accepted the sum of $380. per release in full payment.

126. In the year 1946 DETECTIVE COMICS, INC. published four releases of the comic strip SUPERMAN, for which plaintiff SIEGEL did not furnish the continuity and for which DETECTIVE COMICS, INC. sent to him its check in full payment, at the rate of $200. per release.

127. Plaintiff SIEGEL has retained the said check.

128. During 1946 DETECTIVE COMICS, INC. published four certain releases of the comic strip SUPERMAN entitled "Malten World", "Mad Weather in Metropolis", "Superself" and "Mxyz and the Wonderful Lamp", for which the plaintiff SIEGEL did not furnish the continuity.

129. DETECTIVE COMICS, INC. delivered to the plaintiff SIEGEL a check in the amount of $1,000. Plaintiffs' Exhibit 59, which was given as payment for the four releases mentioned in paragraph 128 hereof and the additional release entitled "Old Gang of Superboy's".

26

DCC00046171

**EXHIBIT 10**
**100**

130.  The said check, Plaintiff's Exhibit was given on March 15, 1946.

131.  Plaintiff SIEGEL advised DETECTIVE COMICS,INC. that he did not desire to cash the check, Plaintiffs' Exhibit 59, since it included a payment for a release of SUPERMAN bearing in its title the word "SUPERBOY" and that hecould not do anything which would call into question in any way his rightful ownership of the comic strip SUPERBOY.

132.  DETECTIVE COMICS, INC. on July 9, 1946, by letter, Plaintiffs' Exhibit 63, agreed to furnish a new check to plaintiff in place of Plaintiffs' Exhibit 59, which would cover the four releases other than "Old Gang of Superboy's".

133.  Although the same has been duly demanded no other check has ever been given in payment for the four releases mentioned in paragraph 128 of these findings.

134.  Since December 19, 1939 SUPERMAN, INC., DETECTIVE COMICS, INC. and defendant NATIONAL COMICS PUBLICATIONS, INC. received various sums of money from the production of radio programs and motion pictures entitled SUPERMAN, and by the sale of licenses to various persons engaged in commercial enterprises and incurred expenses in connection therewith.

135.  SUPERMAN, INC.; DETECTIVE COMICS, INC. and NATIONAL COMICS PUBLICATIONS, INC. from December 19, 1939 to date have acquired and received large sums of money by

27

DCC00046172

**EXHIBIT 10**
**101**

the production of radio features and moving pictures entitled SUPERMAN, based upon the characters, conception, plot and incidents created by the plaintiffs, and by the sale of licenses to various persons engaged in commercial enterprises permitting the said persons to affix to their products and to use in the furtherance of the said commercial enterprises the name and pictorial representation of SUPERMAN.

136. From December 19, 1939 until the present time, SUPERMAN, INC., DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. have had complete control of all books, records and papers relating to the matters set forth in paragraph 135 of these findings and have at all times refused to permit the plaintiffs to examine said books, records and papers.

137. During the years 1940, 1941, 1942, 1943, 1944 and 1945 SUPERMAN, INC. and DETECTIVE COMICS, INC. failed to render any account of the income and expenditures relating to matters set forth in paragraph 135 hereof and did refuse to furnish such account during the years 1940, 1941, 1942, 1943, 1944 and 1945.

138. Plaintiffs during the years 1940, 1941, 1942, 1943, 1944 and 1945 did duly demand the rendering of an account of the matters set forth in paragraph 135 of these findings.

139. On July 8, 1946, SUPERMAN, INC. and DETECTIVE COMICS, INC. furnished what purported to be an account of the matters set forth in paragraph 135 hereof for the years 1942,

28

DCC00046173

EXHIBIT 10
102

1943, 1944 and 1945 and that the said account was as claimed by plaintiffs without substantial information and was insufficient to constitute an account of the matters dealt with in paragraph 135 of these findings.

140.  DETECTIVE COMICS, INC. and SUPERMAN, INC. and the defendants NATIONAL COMICS PUBLICATIONS, INC. have failed and refused to furnish any account whatsoever of the matters dealt with in paragraph 135 of these findings for the years 1940 and 1941.

141.  Defendant NATIONAL COMICS PUBLICATIONS, INC. during January, 1947 furnished a purported account of the matters dealt with in paragraph 135 hereof for the year 1946.

142.  The said purported account described in paragraph 141 was as claimed by plaintiffs incomplete and furnished insufficient information to constitute an account of the matters dealt with in paragraph 135 hereof.

143.  Plaintiffs have duly demanded that DETECTIVE COMICS, INC., SUPERMAN, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. furnish a true and sufficient account of the matters mentioned in paragraph 135 of these findings for the years 1940, 1941, 1942, 1943, 1944, 1945 and 1946.

144.  Plaintiffs have duly performed all the terms and conditions of the contract, Plaintiffs' Exhibits 14 and 15, as modified by Plaintiffs' Exhibit 22, on their part to be performed up to the commencement of this action.

29

30

DCC00046174

EXHIBIT 10

103

145.  Plaintiffs have not established any fraud
or duress on the part of any of the defendants.

146.  Defendants HARRY DONENFELD, JACOB LIEBOWITZ
and PAUL H. SAMPLINER, and DETECTIVE COMICS, INC. and
SUPERMAN, INC., did not induce or agree to induce defendant
WAYNE BORING to breach an employment agreement with plaintiff
SHUSTER.

147.  Defendants HARRY DONENFELD, JACOB LIEBOWITZ
and PAUL H. SAMPLINER, and DETECTIVE COMICS, INC. and SUPERMAN,
INC., did not interfere with or render impossible the per-
formance of any agreement between defendant WAYNE BORING and
plaintiff SHUSTER or agree so to do.

148.  Defendant WAYNE BORING did not breach his
contract of employment with plaintiff SHUSTER.

149.  Defendant WAYNE BORING did not violate
any rights of plaintiff SHUSTER.

150.  Defendant WAYNE BORING did not wrongfully
furnish art work to any of defendants.

151.  Defendant WAYNE BORING has not, in any
way, injured or damaged plaintiff SHUSTER.

152.  During the term of the agreement set forth
in paragraph 153 of plaintiffs' proposed findings, the de-
fendant BORING created cartoon material for DETECTIVE COMICS,
INC. and SUPERMAN, INC. portraying the character SUPERMAN
and entitled SUPERMAN, and the comic strip LOIS LANE, GIRL
REPORTER, which comic strips were both based upon the

30

DCC00046175

EXHIBIT 10
104

conception, idea, plot, incidents and characters of the comic strip SUPERMAN, as therefore created by the plaintiffs.

153.   Since the expiration of the employment of WAYNE BORING by the plaintiff SHUSTER, the defendant BORING, in the employ of DETECTIVE COMICS, INC., SUPERMAN, INC. and NATIONAL COMICS PUBLICATIONS, INC., created cartoon material entitled SUPERMAN which presented the character SUPERMAN and was based upon the conception, idea, plot, incidents and character of the comic strip SUPERMAN as theretofore created by the plaintiffs.

154.   Defendants DETECTIVE COMICS, INC. and SUPERMAN, INC. knew of the plaintiff SHUSTER'S contract with the defendant BORING, Plaintiffs' Exhibit 101, as subsequently modified.

155.   On November 30, 1938, plaintiff SIEGEL wrote to DETECTIVE COMICS, INC. and suggested that the latter publish a comic strip under the title of SUPERBOY, which would narrate the adventures of SUPERMAN as a youth.

156.   On or about November 30, 1938, the plaintiff SIEGEL, in writing and by mail, submitted to DETECTIVE COMICS, INC. for its consideration and acceptance or rejection, for publication, under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14, a synopsis or summary of the idea and conception and plan of a new comic strip to be known as SUPERBOY, the said letter having been received in evidence and marked Plaintiffs' Exhibit 16.

157.   On December 2, 1938, DETECTIVE COMICS, INC. deferred consideration of a SUPERBOY comic strip until some future time. (See Plffs. Ex. 17).

31

DCC00046176

EXHIBIT 10
105

158. DETECTIVE COMICS, INC. did not within six weeks indicate its election to publish the said new comic strip SUPERBOY.

159. DETECTIVE COMICS, INC. on or about December 2, 1938, by its letter in writing to the plaintiff SIEGEL did elect not to publish the said comic strip SUPERBOY under the terms of the contract dated September 22, 1938, Plaintiffs' Exhibit 14.

160. During the month of December, 1940, the plaintiff SIEGEL submitted to DETECTIVE COMICS, INC. for its further consideration a complete script or scenario, Plaintiffs' Exhibit 36, containing the continuity, plan and dialogue for the first "release" or "releases" of the proposed new comic strip SUPERBOY, and that the said synopsis contained within itself the entire plan for the future publication of the said comic strip SUPERBOY and the conception of the character SUPERBOY, all set forth with detail and particularity.

161. The officer and Director of DETECTIVE COMICS, INC. who received on behalf of DETECTIVE COMICS, INC. at the hands of the plaintiff SIEGEL the submission of the letter concerning SUPERBOY, Plaintiffs' Exhibit 16, and the scenario or script, Plaintiffs' Exhibit 36, was JACOB LIEBOWITZ.

162. DETECTIVE COMICS, INC. did not within six weeks after the submission of the said script or scenario indicate its election to publish the said comic strip SUPERBOY.

32

DCC00046177

EXHIBIT 10
106

163. Thereafter and during December of 1944 DETECTIVE COMICS, INC. did publish a certain comic strip release entitled SUPERBOY in a magazine entitled "More Fun Comics".

164. The said comic strip release entitled SUPERBOY embodied and was based upon the idea, plan and conception contained in the plaintiffs, SIEGEL'S letter to DETECTIVE COMICS, INC. dated November 30, 1938, Plaintiffs' Exhibit 16.

165. The said release of the said comic strip SUPERBOY published in December of 1944 embodied and was based upon the idea, conception and plan contained in the script or scenario submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in December of 1940, the said script being Plaintiffs' Exhibit 36.

166. Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC. in Plaintiffs' Exhibit 16 and Plaintiffs' Exhibit 36.

167. Said first thirteen pages of SUPERMAN material mentioned in paragraphs 31, 32 and 33 hereof did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as published by DETECTIVE COMICS, INC. and the defendant NATIONAL COMICS PUBLICATIONS, INC. from December, 1944, until the date of the trial herein.

33

DCC00046178

EXHIBIT 10
107

168. The said publication was without the permission of the plaintiff SIEGEL.

169. Thereafter DETECTIVE COMICS, INC. did publish releases of the said comic strip entitled SUPERBOY in magazines bi-monthly until February of 1946, and monthly thereafter until on or about October 1, 1946.

170. From the 1st day of October, 1946, until the date of the trial herein, the defendant NATIONAL COMICS PUBLICATIONS, INC. has published monthly in magazines a comic strip entitled SUPERBOY.

171. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the letter, Plaintiffs' Exhibit 16.

172. All of the comic strip material published under the title SUPERBOY was based upon the idea, plan, conception and direction contained in the scenario or script, Plaintiff's Exhibit 36, submitted by the plaintiff SIEGEL to DETECTIVE COMICS, INC.

173. The publication of all comic strip material entitled SUPERBOY was at all times without the permission of the plaintiff SIEGEL.

174. Plaintiff SIEGEL has received no payment on account of the publication of any of the material entitled SUPERBOY.

175. All publications of SUPERBOY by DETECTIVE COMICS, INC. from April, 1945 until the 1st day of October,

34



DCC00046179

**EXHIBIT 10**

**108**

1946, and by the defendant NATIONAL COMICS PUBLICATIONS, INC.
from October 1, 1946, until the date of the trial herein,
contained affixed thereto the name of the plaintiffs SIEGEL
and SHUSTER.

176. The use of the name of the plaintiff SIEGEL,
as alleged in paragraph 175 was without the consent of the
plaintiff SIEGEL.

177. The officer and director of DETECTIVE COMICS,
INC., who on behalf of DETECTIVE COMICS, INC. caused the
material entitled SUPERBOY to be published as hereinbefore
set forth in these findings was JACOB LIEBOWITZ.

178. The officer and director of NATIONAL COMICS
PUBLICATIONS, INC., who on behalf of NATIONAL COMICS
PUBLICATIONS, INC. caused the material entitled SUPERBOY
to be published as hereinbefore set forth in these findings,
was JACOB LIEBOWITZ.

179. Defendant INDEPENDENT NEWS CO., INC. know-
ing of the rights of the plaintiff SIEGEL, under the con-
tracts, Plaintiffs' Exhibits 14 and 15, sold and distributed
to newsdealers for resale to the public throughout the
United States, magazines containing the material entitled
SUPERBOY as hereinabove described and set forth.

180. All the art work for the SUPERBOY releases
was prepared by plaintiff SHUSTER under the direction of
DETECTIVE COMICS, INC.

35

DCC00046180

EXHIBIT 10
109

181. Plaintiff SHUSTER was paid in full by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. for all the art work furnished by him in connection with said SUPERBOY comic strip releases.

182. At the time that publication of the SUPERBOY comic strip was commenced, plaintiff SIEGEL was unavailable to furnish any of the continuity therefor being absent in military service.

183. Upon the return of plaintiff SIEGEL to civilian status in January, 1946, DETECTIVE COMICS, INC. entered into negotiations with him regarding SUPERBOY, proposing certain payments to him and affording him the opportunity of supplying the continuity for SUPERBOY releases.

184. No agreement was reached between DETECTIVE COMICS, INC. and plaintiff SIEGEL as a result of the aforesaid negotiations; however, defendant NATIONAL COMICS PUBLICATIONS, INC. has offered to pay plaintiff SIEGEL for SUPERBOY releases heretofore published, the same rate as he was paid for SUPERMAN magazine releases for which he did not furnish the continuity, i. e., at the rate of $200. per release of standard length of thirteen pages.

185. That the defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT NEWS CO., INC., have continued to publish, sell or distribute the said comic strip SUPERBOY and threaten to continue to so publish the same.

36

DCC00046181

EXHIBIT 10
110

# EXHIBIT 11

80 a

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

- - - - - - - - - - - - - - - - - - - -x

JEROME SIEGEL and JOSEPH SHUSTER,

Plaintiffs,

-against-

NATIONAL COMICS PUBLICATIONS, INC.,
INDEPENDENT NEWS CO., INC., THE MC
CLURE NEWSPAPER SYNDICATE, HARRY
DONENFELD, JACOB LIEBOWITZ, PAUL H.
SAMPLINER and WAYNE BORING,

Defendants.

STIPULATION

- - - - - - - - - - - - - - - - - - - -x

IT IS HEREBY STIPULATED AND AGREED between the above named parties and their respective attorneys, as follows:

1.  The interlocutory judgment entered herein on the 13th day of April, 1948, shall be in all respects vacated.

2.  The complaint herein shall be dismissed as to each and every cause of action alleged therein as to all defendants.

3.  The plaintiffs shall be paid by the defendant NATIONAL COMICS PUBLICATIONS, INC., the sum of NINETY FOUR THOUSAND THIRTEEN DOLLARS AND SIXTEEN CENTS ($94,013.16) as and for all sums due and owing to them under and pursuant to the terms of the following agreements, as modified:

(a)  Agreement dated December 4, 1937 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

(b)  Agreement dated September 22, 1938 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

000000385

**EXHIBIT 11**

111

(c)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC., JEROME SIEGEL,
JOSEPH SHUSTER and THE MC CLURE NEWSPAPER
SYNDICATE.

(d)  Agreement dated December 19, 1939
between DETECTIVE COMICS, INC. and JEROME SIEGEL
and JOSEPH SHUSTER.

4.  All of the said agreements as
originally made and as modified, are valid.

5.  All of said agreements as originally
made and as modified, are terminated insofar as
plaintiffs may have any rights under and by virtue
of said agreements, or any of them.

6.  By virtue of the instrument of
March 1, 1938, plaintiffs validly transferred to
DETECTIVE COMICS, INC., one of the constituent corpora-
tions of defendant NATIONAL COMICS PUBLICATIONS, INC.,
all of their rights in and to the comic strip
SUPERMAN, including the title, names, characters,
concept and formula, as same were set forth in
the first release of said comic strip published in the
June, 1938 issue of the magazine "Action Comics"
and by virtue of said instrument, said DETECTIVE
COMICS, INC. became the absolute owner of the comic
strip SUPERMAN, including the title, names,
characters, concept and formula as the same were set
forth in the said first release.

7.  Defendant NATIONAL COMICS          000000386
PUBLICATIONS, INC. is the sole and exclusive owner
of and has the sole and exclusive right to the use
of the title SUPERMAN and to the conception, idea,
continuity, pictorial representation and formula

**EXHIBIT 11**
**112**

82 a

of the cartoon feature SUPERMAN as heretofore
portrayed and published, and to create, publish,
sell and distribute and to cause to be created,
published, sold and distributed cartoon or other
comic strip material containing the characters
SUPERMAN (also known as "Clark Kent"), LOIS LANE,
PERRY WHITE and all other characters which have
heretofore appeared in said cartoon or other comic
strip material, and such sole and exclusive owner-
ship includes, but is not limited to, the fields of
book and magazine publications, newspaper syndica-
tion, radio broadcasts, dramatic presentations,
television, motion picture reproduction and all
other forms of reproduction and presentation,
whether now in existence or that may hereafter be
created, together with the absolute right to
license, sell, transfer or otherwise dispose of
said rights.

8. Plaintiffs shall and do hereby
consent to a judgment enjoining and restraining them,
their agents, servants and employees, from creating,
publishing, selling or distributing, or permitting
or causing to be created, published, sold or distri-
buted any material of the nature heretofore created,
produced or published under the title SUPERMAN, or
any material created, produced or published in
imitation thereof, or from using, permitting or caus-
ing to be used in connection with any comic strip or
other material created by them the title SUPERMAN or
any title imitative of the title SUPERMAN, or which
shall contain as part thereof the word "SUPER".

000000387

**EXHIBIT 11**

83 a

9.   Defendant NATIONAL COMICS PUBLICATIONS,
INC. is the sole and exclusive owner of and has the
sole and exclusive right to the use of the title
SUPERBOY and to create, publish, sell and distribute and
to cause to be created, published, sold and distributed
cartoon or other comic strip material containing the
character SUPERBOY and all other characters which
have heretofore appeared in said cartoon or other
comic strip material and such sole and exclusive
ownership includes, but is not limited to, the
fields of book and magazine publications, newspaper
syndication, radio broadcasts, dramatic presentation,
television, motion picture reproduction and all other
forms of reproduction and presentation whether now
in existence or that may hereafter be created, to-
gether with the absolute right to license, sell,
transfer or otherwise dispose of said rights.

10.   Plaintiffs shall and do hereby consent to
a judgment enjoining and restraining them, their
agents, servants and employees, from creating, pub-
lishing, selling or distributing, or permitting or
causing to be created, published, sold or distributed
any material of the nature heretofore created, pro-
duced or published under the title SUPERBOY, or any
material created, produced or published in imitation
thereof, or from using, permitting or causing to be
used in  connection with any comic strip or other
material created by them the title SUPERBOY or any
title imitative of the title SUPERBOY.

000000388

**EXHIBIT 11**
**114**

84 a

9.   Defendant NATIONAL COMICS PUBLICATIONS,
INC. is the sole and exclusive owner of and has the
sole and exclusive right to the use of the title
SUPERBOY and to create, publish, sell and distribute and
to cause to be created, published, sold and distributed
cartoon or other comic strip material containing the
character SUPERBOY and all other characters which
have heretofore appeared in said cartoon or other
comic strip material and such sole and exclusive
ownership includes, but is not limited to, the
fields of book and magazine publications, newspaper
syndication, radio broadcasts, dramatic presentation,
television, motion picture reproduction and all other
forms of reproduction and presentation whether now
in existence or that may hereafter be created, to-
gether with the absolute right to license, sell,
transfer or otherwise dispose of said rights.

10.   Plaintiffs shall and do hereby consent to
a judgment enjoining and restraining them, their
agents, servants and employees, from creating, pub-
lishing, selling or distributing, or permitting or
causing to be created, published, sold or distributed
any material of the nature heretofore created, pro-
duced or published under the title SUPERBOY, or any
material created, produced or published in imitation
thereof, or from using, permitting or causing to be
used in  connection with any comic strip or other
material created by them the title SUPERBOY or any
title imitative of the title SUPERBOY.

000000389

**EXHIBIT 11**
**115**

85 a

11.  Plaintiffs shall and do hereby consent to a judgment enjoining and restraining them, their agents, servants and employees, from

(a)  Representing their past connection with the comic strips SUPERMAN and/or SUPERBOY in such manner as may be likely to induce the belief that such past connection still exists;

(b)  Making any representation as to such past connection in conjunction with any material, comic or otherwise, hereafter issued by plaintiffs or either of them, or with their consent or on their behalf, more than half as conspicuous as to size, or more conspicuous as to color, type of lettering or style of print than the name or title of any such hereafter issued material, or in any other manner as may be likely to induce the belief that defendant NATIONAL COMICS PUBLICATIONS, INC. is or may be associated with such hereafter issued material; and

(c)  Using any colors, lettering and/or printing in referring to the words SUPERMAN and/or SUPERBOY imitative of the colors, lettering and/or printing now or hereafter used by defendant NATIONAL COMICS PUBLICATIONS, INC. in portraying said words or either of them.

12.  Defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner, with all rights of absolute ownership thereto appertaining,

000000390

**EXHIBIT 11**

**116**

86 a

in and to the comic strips entitled Batman; Lois
Lane, Girl Reporter; Slam Bradley; Johnny Quick;
The Flash; Green Lantern, Aquaman; Air Wave; Hour-
Man; Wonder Woman; Star-Man; Dr. Fate; Hawkman;
Crimson Avenger; The Ultra-Man; TNT and Dan the
Dyna-Mite; Manhunter; The Gay Ghost; Newsboy
Legion starring the Guardian; Tarantula; Mr.
Terrific; Sandman; The Atom; The Green Arrow;
Dr. Mid-Nite; Genius Jones; Scribbly and The Red
Tornado; Robin, the Boy Wonder; and Liberty Belle.

Dated: New York, N.Y.
May 11, 1948.

Document Signed
By the Parties and
Their attorneys
and their signatures
Were acknowledged
By a notary public

_____
Jerome Siegel

_____
Joseph Shuster

NATIONAL COMICS PUBLICATIONS, INC.

By _____
Vice-President

INDEPENDENT NEWS CO., INC.

By _____
President

THE MC CLURE NEWSPAPER SYNDICATE

By _____
Treasurer

_____
Harry Donenfeld

_____
Jacob Liebowitz

_____
Paul H. Sampliner

000000391

**EXHIBIT 11**

**117**

# EXHIBIT 12

At a Term of the Supreme Court
of the State of New York, held
in and for the County of
Westchester, at the Official
Referee's Chambers, 542 Main
Street, in the City of New
Rochelle and State of New York,
on the 21 day of May, 1948.

*1099 - 1947*

PRESENT:

    HON. J. ADDISON YOUNG,

                  Official Referee.

- - - - - - - - - - - - - - - - - *203 x / 305*

JEROME SIEGEL and JOSEPH SHUSTER,

               Plaintiffs,  :

    -against-

NATIONAL COMICS PUBLICATIONS, INC.,   :    FINAL JUDGMENT
INDEPENDENT NEWS CO., INC., THE MC CLURE
NEWSPAPER SYNDICATE, HARRY DONENFELD,   :
JACOB LIEBOWITZ, PAUL H. SAMPLINER and
WAYNE BORING,   :

               Defendants.  :

- - - - - - - - - - - - - - - - - -x

       This action having been referred to HON. J.

ADDISON YOUNG, an Official Referee in and for the Ninth

Judicial District, by an order duly made and entered herein

the 19th day of May, 1947, to hear, try and determine the

issues in this matter, with the same force and effect as if

they were tried at a regular term of this Court, and plain-

tiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN, ESQS.,

their attorneys (MORTON WEKSTEIN, ESQ., of counsel), and

defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT

NEWS CO., INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL

H. SAMPLINER, having appeared by WEIL, GOTSHAL & MANGES,

ESQS., their attorneys (HORACE S. MANGES, ESQ., EDWARD C.

WALLACE, ESQ., and ABRAHAM I. MENIN, ESQ., of counsel),

and defendant THE MC CLURE NEWSPAPER SYNDICATE having

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES

Confidential

**EXHIBIT 12**
**118**

WB008306

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES L. BROWN, ESQ., of counsel), and defendant WAYNE BORING having appeared by SIDNEY H. REICH, ESQ., his attorney, and after trial had, and said Official Referee having on the 12th day of April, 1948 duly made and filed his decision stating his findings of fact herein and conclusions of law thereon, and directing interlocutory judgment, which said interlocutory judgment was duly entered in the office of the Clerk of this Court on the 13th day of April, 1948, and defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT NEWS CO., INC. having duly served and filed a notice of appeal dated April 27, 1948 from certain parts of said interlocutory judgment and plaintiffs having duly served and filed a notice of appeal dated May 10, 1948, from certain parts of said interlocutory judgment, and said notices of appeal having been withdrawn, and the parties hereto and their respective attorneys having duly consented to the vacating of said interlocutory judgment and to the entry of final judgment as hereinafter set forth, it is

ORDERED AND ADJUDGED that the said interlocutory judgment entered herein on the 13th day of April, 1948, be and the same hereby is in all respects vacated; and it is further

ORDERED AND ADJUDGED that the complaint be and it hereby is dismissed as to each and every cause of action alleged therein as to all defendants; and it is further

DECLARED AND ADJUDGED that the following agreements as originally made and as modified, are valid;

2.

(a)  Agreement dated December 4, 1937 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

(b)  Agreement dated September 22, 1938 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER.

(c)  Agreement dated September 22, 1938 between DETECTIVE COMICS, INC., JEROME SIEGEL, JOSEPH SHUSTER and THE MC CLURE NEWSPAPER SYNDICATE.

(d)  Agreement dated December 19, 1939 between DETECTIVE COMICS, INC. and JEROME SIEGEL and JOSEPH SHUSTER;

and it is further

DECLARED AND ADJUDGED that all of said agreements as originally made and as modified, be and they hereby are terminated insofar as plaintiffs may have any rights under and by virtue of the said agreements, or any of them; and it is further

DECLARED AND ADJUDGED that by virtue of the instrument of March 1, 1938, plaintiffs validly transferred to DETECTIVE COMICS, INC., one of the constituent corporations of defendant NATIONAL COMICS PUBLICATIONS, INC., all of their rights in and to the comic strip SUPERMAN, including the title, names, characters, concept and formula, as same were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine "Action Comics" and that by virtue of said instrument, said DETECTIVE COMICS, INC. became the absolute owner of the comic strip SUPERMAN, including the title, names, characters, concept and formula as the same were set forth in the said first release; and it is further

DECLARED AND ADJUDGED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive

3.

**EXHIBIT 12**
**120**

WB008308

owner of and has the sole and exclusive right to the use of the title SUPERMAN and to the conception, idea, continuity, pictorial representation and formula of the cartoon feature SUPERMAN as heretofore portrayed and published, and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the characters SUPERMAN (also known as "Clark Kent"), LOIS LANE, PERRY WHITE and all other characters which have heretofore appeared in said cartoon or other comic strip material, and that such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentations, television, motion picture reproduction and all other forms of reproduction and presentation, whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer, or otherwise dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their agents, servants and employees, be and they hereby are enjoined and restrained from creating, publishing, selling or distributing or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERMAN, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERMAN or any title imitative of the title SUPERMAN or which shall contain as part thereof the word "SUPER"; and it is further

4.

Confidential

**EXHIBIT 12**
**121**

WB008309

DECLARED AND ADJUDGED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner of and has the sole and exclusive right to the use of the title SUPERBOY and to create, publish, sell and distribute and to cause to be created, published, sold and distributed cartoon or other comic strip material containing the character SUPERBOY and all other characters which have heretofore appeared in said cartoon or other comic strip material and that such sole and exclusive ownership includes, but is not limited to, the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentation, television, motion picture reproduction and all other forms of reproduction and presentation whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their agents, servants and employees be and they hereby are enjoined and restrained from creating, publishing, selling or distributing, or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERBOY or any material created, produced or published in imitation thereof or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERBOY or any title imitative of the title SUPERBOY; and it is further

ORDERED AND ADJUDGED that the plaintiffs, their agents, servants and employees, be and they hereby are enjoined and restrained from

5.

Confidential

**EXHIBIT 12**
**122**

WB008310

(a)  Representing their past connection with the comic strips SUPERMAN and/or SUPERBOY in such manner as may be likely to induce the belief that such past connection still exists;

(b)  Making any representation as to such past connection in conjunction with any material, comic or otherwise, hereafter issued by plaintiffs or either of them, or with their consent or on their behalf, more than half as conspicuous as to size, or more conspicuous as to color, type of lettering or style of print than the name or title of any such hereafter issued material, or in any other manner as may be likely to induce the belief that defendant NATIONAL COMICS PUBLICATIONS, INC. is or may be associated  with such hereafter issued material; and

(c)  Using any colors, lettering and/or printing in referring to the words SUPERMAN and/or SUPERBOY imitative of the colors, lettering and/or printing now or hereafter used by defendant NATIONAL COMICS PUBLICATIONS, INC.  in portraying said words or either of them;

and it is further

ORDERED AND DECLARED that defendant NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive owner, with all the rights of absolute ownership thereto appertaining, in and to the comic strips entitled Batman; Lois Lane, Girl Reporter; Slam Bradley; Johnny Quick; The Flash; Green Lantern; Aquaman; Air Wave; Hour-Man; Wonder

6.

EXHIBIT 12
123

WB008311

Woman; Star-Man; Dr. Fate; Hawkman; Crimson Avenger; The
Ultra-Man; TNT and Dan the Dyna-Mite; Manhunter; The Gay
Ghost; Newsboy Legion starring the Guardian; Tarantula;
Mr. Terrific; Sandman; The Atom; The Green Arrow; Dr. Mid-
Nite; Genius Jones; Scribbly and The Red Tornado; Robin,
the Boy Wonder; and Liberty Belle.

ENTER

*[signature]*

Official Referee of the Supreme
Court of the State of New York.

*[signature]*

7.

Confidential

**EXHIBIT 12**
**124**

WB008312

consented to.

Entry of the foregoing judgment is hereby

_Jerome Siegel_

Jerome Siegel

_Joseph Shuster_

Joseph Shuster

NATIONAL COMICS PUBLICATIONS, INC.

By _____
Vice-President

INDEPENDENT NEWS CO., INC.

By _____
President

THE MC CLURE NEWSPAPER SYNDICATE

By _____
TREASURER

_Harry Donenfeld_

Harry Donenfeld

_Jacob Liebowitz_

Jacob Liebowitz

_Paul H. Sampliner_

Paul H. Sampliner

_Wayne Boring_

Wayne Boring

_____
Attorneys for Plaintiffs

_____
Attorneys for Defendants National
Comics Publications, Inc., Inde-
pendent News Co., Inc., Harry
Donenfeld, Jacob Liebowitz and
Paul H. Sampliner

_____
Attorney for Defendant The McClure
Newspaper Syndicate

_____
Attorney for Defendant Wayne Boring

7.

**EXHIBIT 12**
**125**

WB008313

STATE OF *New York* )
COUNTY OF *New York* } SS.:

On the *19* day of May, 1948, before me personally came JEROME SIEGEL, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co.Clk's No.429,Reg.No.1110-C-9
Commission Expires March 30, 1949


STATE OF NEW YORK )
COUNTY OF *New York* } SS.:

On the *19* day of May, 1948, before me personally came JOSEPH SHUSTER, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the  same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co.Clk's No.429,Reg.No.1110-C-9
Commission Expires March 30, 1949

Confidential

**EXHIBIT 12**
**126**

WB008314

STATE OF NEW YORK   )ss.:
COUNTY OF NEW YORK )

On the 20 day of May, 1948, before me
came JACOB S. LIEBOWITZ, to me known, who being by me duly
sworn, did depose and say that he resides at Great Neck,
New York; that he is the Vice-President of NATIONAL COMICS
PUBLICATIONS, INC., the corporation described in, and which
executed the foregoing instrument; that he knows the seal of
said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the Board of Directors of said corporation; and that he
signed his name thereto by like order.

                                    _____
                                    ALFRED B. YAFFE
                                    Notary Public in the State of New York

STATE OF NEW YORK   )
COUNTY OF NEW YORK ) ss.:

On the 20 day of May, 1948, before me came
PAUL H. SAMPLINER, to me known, who being by me duly sworn,
did depose and say that he resides at 975 Fifth Avenue,
New York, N.Y.; that he is the President of THIRD DIMENSION
COMICS CO., INC., the corporation described in, and which
executed the foregoing instrument; that he knows the seal
of said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the Board of Directors of said corporation; and that he
signed his name thereto by like order.

                                    _____
                                    ALFRED B. YAFFE
                                    Notary Public in the State of New York

STATE OF New York )
COUNTY OF New York ) ss.:

William On the 2 day of May, 1948, before me came
_____, to me known, who being
by me duly sworn, did depose and say that he resides at
St. Albans, New York; that he is the Treasurer
of THE MC CLURE NEWSPAPER SYNDICATE, the corporation
described in, and which executed the foregoing instrument;
that he knows the seal of said corporation; that the seal
affixed to said instrument is such corporate seal; that it
was so affixed by order of the Board of Directors of said
corporation; and that he signed his name thereto by like
order.

                                    _____
                                    GEORGE J. McCARTIN, Jr.
                                    Notary Public, State of New York
                                    Residing in Queens County

STATE OF NEW YORK
COUNTY OF NEW YORK } SS.:

On the ~ day of May, 1948, before me
personally came HARRY DONENFELD, to me known, and known to
me to be the individual described in, and who executed the
foregoing instrument, and duly acknowledged to me that he
executed the same.

STATE OF NEW YORK }
COUNTY OF NEW YORK } SS.:

ALFRED E. TAFFS
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 4, Reg. No. 14-Y-8
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-8
Commission expires March 30, 1958

On the ~ day of May, 1948, before me
personally came JACOB LIEBOWITZ, to me known, and known
to me to be the individual described in, and who executed
the foregoing instrument, and duly acknowledged to me that
he executed the same.

STATE OF NEW YORK }
COUNTY OF NEW YORK } SS.:

ALFRED E. TAFFS
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 4, Reg. No. 14-Y-8
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-8
Commission expires March 30, 1958

On the ~ day of May, 1948, before me
personally came PAUL H. SAMPLINER, to me known, and known
to me to be the individual described in, and who executed
the foregoing instrument, and duly acknowledged to me that
he executed the same.

STATE OF NEW YORK }
COUNTY OF NEW YORK } SS.:
Westchester

ALFRED E. TAFFS
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 4, Reg. No. 14-Y-8
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-8
Commission expires March 30, 1958

On the 21 day of May, 1948, before me
personally came WAYNE BORING, to me known, and known to me
to be the individual described in, and who executed the
foregoing instrument, and duly acknowledged to me that he
executed the same.

ADELE JAMPOL
Notary Public in the State of New York
Appointed for Westchester County
Commission expires March 30, 1949

Confidential

**EXHIBIT 12**
**128**

WB008316

# EXHIBIT 13

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

JEROME SIEGEL and JOSEPH SHUSTER,          :

                      Plaintiffs,   :          69 Civ. 1429

      -against-                    :

NATIONAL PERIODICAL PUBLICATIONS,          :          AFFIDAVIT
INC., JACOB S. LIEBOWITZ, IRWIN
DONENFELD and PAUL H. SAMPLINER,           :

                 Defendants.  :

- - - - - - - - - - - - - - - x

STATE OF CALIFORNIA   )
                 : ss.:
COUNTY OF LOS ANGELES )

        JEROME SIEGEL, being duly sworn, deposes and says:
I am one of the plaintiffs and submit this affidavit in opposition
to the defendants' motion for summary judgment.

<u>Superman In Years Prior To Our Association With Detective Comics</u>

        In 1933 Joe Shuster, my co-plaintiff, and I, put
Superman in form suitable for comic book publication.  In about
mid-1934 we directed our attention to the newspaper comic strip
market.  More particularly, we prepared one week of daily strips,
the art work for which was completely inked.  These strips, suf-
ficient for a six day newspaper run, were in all respects ready
for reproduction and ultimate publication.

        We also prepared three additional weeks of "Super-
man" newspaper comic strip material.  These differed from the
first week's material only in that the art work, dialogue and
the balloons in which the dialogue appeared had not been inked,

**EXHIBIT 13**

**129**

DCC00003479

a step essential for reproduction.  In all other respects the
additional three weeks of strips were ready for publication.  In
all material the characters were drawn and the story continuity
and dialogue were set.

In addition, I prepared a synopsis of the story
continuity appearing in the three weeks of penciled daily strips.
Because we did not want to risk the loss of all the art work we
had done, either through the mails or a failure to return it, the
synopsis was sent to prospective out-of-town newspaper syndicates
and publishers, in lieu of the three weeks of penciled strips,
together with the first week of inked strips.  The synopsis just
described is annexed as Exhibit A.

All of this had been done more than three years
before Joe Shuster and I had any contact with the defendant's
predecessor, Detective Comics, Inc.

The Superman material was taken by us to a number
of prospective purchasers.  It is not true as the defendants
state, that the property was uniformly rejected.  In 1935
Malcolm Wheeler-Nicholson, a publisher of comic books, expressed
interest in Superman and tried to persuade us that the property
would be more successful if published in comic book form where
it would be seen in color, than it would be in a black and white
daily strip.  Our experience with him had been such that we did
not consider him the publisher to entrust with the property and
his proposal was rejected.  A copy of his proposal is annexed
as Exhibit B.

<u>Our Association With Detective Comics</u>

In 1936 and 1937 Joe Shuster was doing the art
work and I was writing the continuity for several comic strips

-2-

**EXHIBIT 13**
**130**

DCC00003480

two of which in 1937 appeared in Detective Comics. This arrangement called for the strips upon which we collaborated to be submitted to the publisher of Detective Comics, Mr. Wheeler-Nicholson, and we were paid by him. In 1937 Mr. Wheeler-Nicholson had an interest in Detective Comics.

Toward the end of 1937 the publisher fell behind in its payments for the strips we supplied. Early in December of 1937 I received a letter from Mr. Liebowitz, who introduced himself as the half owner and treasurer of Detective Comics. Mr. Liebowitz proposed that Detective Comics assume the publisher's obligation of paying the money due us for the strips we furnished for publication in Detective Comics. In return he wanted us to sign a contract which would assure him of receiving art work and continuity for these specific features for a length of time to be agreed upon.

In response I came to New York and executed the agreement annexed to the defendants' answer as Exhibit "B". The agreement related specifically to two features we were doing which were published by Detective called "Slam Bradley" and "The Spy". I was told to return to Cleveland, have Joe Shuster execute the agreement, and then mail it to Mr. Liebowitz in New York. With the agreement I enclosed a letter, a copy of which has been annexed to Mr. Wallace's affidavit as Exhibit 1. Contrary to his suggestion, my letter does not indicate that we regarded Detective as our employer whose direction we would follow with respect to any new strip. I would have written and had in the past written, the same type of letter to any publisher I was trying to interest in my work. I considered Detective as a potential market only.

-3-

**EXHIBIT 13**
131

DCC00003481

Later on in December of 1937 I wrote to a Mr. Gaines at McClure Syndicate (McClure was a newspaper syndicate to whom I submitted properties, including Superman) and referred to two strips I was submitting for consideration by McClure: "Snoopy and Smiley" and "Reggie Van Twerp". In that same letter I asked Mr. Gaines to consider as well certain features I had submitted to Detective for possible use in Action Comics. I told Mr. Gaines that he should feel free to visit Detective's offices and examine this material himself. A copy of this letter is annexed as Exhibit "C".

Detective, I am sure, was aware of the foregoing but never expressed any reservation or took exception to it. Clearly, neither we nor Detective regarded our relationship as one of employer-employee.

Earlier in this affidavit I stated that "Superman" had been submitted to McClure. McClure did not, as Mr. Wallace states, reject Superman, rather it decided not to proceed at that time with its proposed syndicated newspaper.

Early in 1938 Mr. Gaines informed me that it might be a good idea to furnish Detective with the "Superman" material I left with him. This, to my best recollection, consisted of the one week's supply of inked daily strips and three weeks of penciled strips. Mr. Gaines sought my permission to furnish this Superman material to Detective and I gave that permission.

At no time did Detective direct or even request that this material be revised. In fact it was published as we submitted it. The Wallace affidavit makes much of the fact that the number of panels per page were of interest to editor

-4-

**EXHIBIT 13**
132

DCC00003482

Vin Sullivan. This was the most inconsequential of considera-
tions, his only concern being that there be enough panels per
page to make a thirteen page feature. Detective had its own
internal policy regarding the number of panels that were to
appear on each page and may have been concerned by the "Superman"
format we submitted. Some of our panels were narrow and others
rather large. But in any event the number of panels per page
assumed but minor importance.

It must be remembered, too, that we had no respon-
sibility to Detective regarding "Superman". We could well have
ignored its requests and placed the property elsewhere. Indeed,
we were under no obligation to submit it to Detective in the
first instance.

The Sullivan letters, to which Mr. Wallace makes
constant reference, merely reflect normal editorial correspondence
and this the defendants know. There simply can be no question
about that.

Upon receiving word from Detective that we could
proceed, Joe Shuster, under my supervision, inked the illustra-
tions, lettering and dialogue balloons in the three weeks of
daily strips that had been previously penciled. In addition,
he trimmed certain pictures to meet Detective's panel specifica-
tions and extended others. To assure ourselves of having the
proper number of panels we added several pictures to illustrate
the story continuity, I had already written. Added as well
for this reason was the scientific explanation on page 1 of the
release and the last panel at the foot of page 13. These minor
additions were done on our initiative without any assistance
or direction from Detective.

-5-

**EXHIBIT 13**
133

DCC00003483

Because we were under the pressure of an early deadline, Mr. Shuster had time only to retouch or cover the chemically produced Ben Day dots effect on Superman's costume with a fine line shading. These darker tones were clearly evident when "Superman" first appeared in Action Comics. This should be conclusive proof that "Superman" was published in the form it was submitted to Detective. How the defendants can say, as they do at pages 17 and 18 of their memorandum of law, that drawings of Superman made by plaintiffs before they became involved with Detective were never used or published is something I just cannot understand.

My attorneys advise me that to an affidavit prepared by them there will be annexed a copy of the thirteen page "Superman" release which appeared in the first issue of Action Comics. This can be compared with the first week of inked daily strips which was marked as an exhibit at my examination before trial and compared with the synopsis, Exhibit "A" to the affidavit, and it will readily be seen that Superman as rendered by Joe Shuster and I, years before our association with Detective, was in fact used in that first issue of Action Comics.

Following the inking, trimming, etc. Mr. Shuster cut the panels prepared for newspaper form and pasted them in a form suitable for a comic magazine. These were then returned to Detective.

The events just narrated have been previously reported in certain national media. For example, in "Up, Up and Awa-a-y!" an article by John Kobler published in the June 21, 1941 issue of the Saturday Evening Post, the author stated:

> Without great enthusiam Donenfeld asked Siegel and Shuster to paste up their original strips into a single thirteen-page story and offered them ten dollars a page.

-6-

**EXHIBIT 13**
**134**

DCC00003484

Reference is made to this article lest it be thought that our
version is of but recent vintage.

<u>The March 1, 1938 Release</u>

This document, Exhibit A to the defendants'
answer, was sent to us for execution after "Superman" had been
submitted to Detective for publication but prior to its actual
publication.  Accompanying the document was a letter dated
March 1, 1938 from Mr. Liebowitz which in part read as follows:
I am also enclosing a form of release for your feature entitled
"Superman", which is scheduled for our new book ACTION COMICS.
Will you please have same signed by yourself and Mr. Schuster
and return to us.  As soon as we can get ourselves adjusted, I
will prepare releases for all your features now appearing in
our magazines.  I have no knowledge of what releases you may
have signed for Major Nicholson and as long as we have taken
over these magazines, we would like them conducted in a more
business-like manner.  Therefore, I think you will agree that
releases are necessary.
I think these magazine properly managed can grow and the artists
will be in a position to better themselves. I would therefore
like you to give our work your best efforts."
A transcript of this letter was marked as an exhibit at my
examination before trial.

At the time I was twenty-three years old.  Prior
to that I had dealings with the Nicholson publishing firm, the
principal of which, Mr. Wheeler-Nicholson, was associated with
Mr. Liebowitz at Detective Comics.  He had written to me that I
should not be concerned with the effect of language of release
included on the back of checks given me in payment for features

-7-

**EXHIBIT 13**
**135**

DCC00003485

I wrote.  Indeed he assured me that such language did not divest me of my rights in these features except for first serial rights. Annexed as Exhibit "D" is a copy of such a letter dated May 13, 1936.

I believed that the March 1, 1938 agreement would be given the same effect and never consulted an attorney or spoke to anyone else, except Mr. Shuster, before signing it.  Mr. Liebowitz at this time was constantly assuring us that we would be fairly treated and Detective seemed to us to be a responsible firm.  We signed for these reasons; not merely to see "Superman" in print, an opportunity afforded us by Mr. Wheeler-Nicholson in the past.

### The Westchester Action

The Westchester action was in no way concerned with the ownership of the renewal copyright to "Superman".  It resulted in a finding that a feature I had created and submitted to Detective Comics, "Superboy" had been illegally appropriated and published by the defendants.  The Court ruled that because of that illegal appropriation the defendants were obligated to pay such actual damages as were sustained, render an accounting as to the income derived from the publication of "Superboy", and, the Court enjoined the defendants from further publishing Superboy.

In addition, the Court ruled that the defendants were obligated to account to Joe Shuster and me for all moneys received by them from the exploitation of "Superman" in radio and motion pictures and from the licensing of "Superman" to third parties for merchandising purposes.

-8-

**EXHIBIT 13**
**136**

DCC00003486

Although I understand that a Notice of Appeal was served and filed, the matter was ultimately settled when the defendants paid $94,013.16 to Joe and I.  According to exhibits filed in the Westchester action, prepared, I believe, by the defendants, the net profits derived from the use of Superman in radio and for licensing purposes only during the years 1942-1945 inclusive only was in excess of $94,000.

In addition "Superboy" was a very valuable property in its own right.

The settlement sum paid by the defendants in the Westchester action was solely referable to "Superboy" and the use of "Superman" in radio, motion pictures and for licensing purposes.

That we were enjoined from using "Superman" or seeking to exploit Superman is entirely consistent with the defendants' interest in the property for the initial term of copyright.  But this has nothing to do with the renewal copyright, a subject that is not even raised in all of the papers annexed to the defendants' answer in this case.

Finally, Superman at the time was an overwhelming success, an established success, and surely, if the renewal copyright to the property were an element, the amount of the settlement would have been substantially higher and the words "renewal copyright" would have specifically been mentioned in the settlement documents.

The Leo Rosen Letter

To his affidavit Mr. Wallace has appended Exhibit 7, a letter dated April 15, 1952 from Mr. Leo Rosen of the firm of

-9-

EXHIBIT 13
137

DCC00003487

Greenbaum, Wolf and Ernst to Mr. Gabriel Kaslow of the firm of Weil, Gotshal & Manges, attorneys for the defendants.

Contrary to Mr. Wallace's statement in paragraph 22 of his affidavit, I did not retain the firm of Greenbaum, Wolf and Ernst to represent me in any claim I might have against the defendants. In 1952 I was, as the defendant well knows, literally financially destitute. I wrote to National for assistance but was turned down. I then wrote a veritable blitzkrieg of letters to publishers, etc., openly informing them of my situation. Soon I was contacted by a lawyer who had done some work for National at one time, a Mr. Alterbaum. He told me to stop writing letters and gave me enough money to last two weeks. He later told me this money had come from National.

When this was spent I called Mr. Liebowitz who told me to call Mr. Kaslow. Mr. Kaslow suggested I work through an intermediary and I approached the Greenbaum firm which had per-formed some services at the conclusion of the Westchester action.

Given my then financial situation and my inability to provide even necessities for my family, I signed the letter. However, I went to that firm not to prosecute any claim, nor to seek their assistance or advice on any claim I might have. I went there solely because it was an avenue that offered hope of receiving some financial assistance.

### Income received from exploitation of Superman

Although Joe Shuster and I did receive something in the area of $400,000 from all sources on account of the ex-ploitation of Superman, some $200,000 of this amount was derived solely from the newspaper syndication of the property. Income from Detective's employment of the character in its comic books

-10-

EXHIBIT 13
138

DCC00003488

probably amounted to something like $200,000 over a nine year period, or an average of $11,000 a year for each of us.  Out of his share Joe Shuster had to compensate his art staff.

Although Mr. Wallace seeks to make much of the fact that I was paid for releases, I did not write while I was away in the Army, it was while I was so engaged that the defendants appropriated "Superboy".

It may be that Joe Shuster after 1943 could not meet all the demands of his work but this was due to failing eyesight. Although he did receive compensation he had, in turn, to compensate artists working for him.

For all of the foregoing reasons, I respectfully request that the motion for summary judgment be in all respects denied.

*Jerome Siegel*
Jerome Siegel

Sworn to before me this
1st. day of March , 1913.

*Signature*
Notary Public

-11-

**EXHIBIT 13**
139

DCC00003489

# EXHIBIT 14

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

JEROME SIEGEL and JOSEPH SHUSTER,          :

                      Plaintiffs,    :

           -against-          :          69 Civ. 1429

NATIONAL PERIODICAL PUBLICATIONS,          :
INC., JACOB S. LIEBOWITZ, IRWIN                      AFFIDAVIT
DONENFELD and PAUL H. SAMPLINER,          :

                   Defendants.  :

- - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK   )
                  :  ss.:
COUNTY OF NEW YORK  )

         JOSEPH SHUSTER, being duly sworn, deposes and says:
I am a co-author of the Superamn comic strip.  More particularly,
I drew the art work and lettering that appeared in the original
strip.  I make this affidavit in opposition to the defendants'
motion for summary judgment.

         I have read the affidavit of Jerome Siegel sub-
mitted in opposition to the motion and confirm the accuracy of
its contents.  There are, however, several points that I would
like to make independent of Mr. Siegel's affidavit.

         I signed the March 1, 1938 agreement because Jerry
Siegel impressed me when he said that Mr. Liebowitz would treat
us fairly and that the property would be successful if he was
handling it.  Jerry, at this time, handled all business matters
such as this and I was largely guided by what he had to say.

         I am aware that the defendants on this motion have
taken the position that they directed Jerry and I to revise and

**EXHIBIT 14**
**140**

DCC00003477

expand the Superman material submitted to them. This contention
is false. The only thing I had to do to prepare Superman for
comic book publication was to ink the last three weeks of
daily strips which I had previously completely penciled in detail.
In addition, I inked the lettering and the dialogue and story
continuity and inked in the balloons containing the dialogue.
Certain panels I trimmed to conform to Detective's page size.
I drew several additional pictures to illustrate the story con-
tinuity and these appear on page 1 of the first Superman release.
This was done so that we would be certain of having a sufficient
number of panels to make a thirteen page release. Finally, I
drew the last panel appearing on the thirteenth page. We were
given no instructions or directions by Detective as to what to
do or what to include in Superman. Detective's only concern
was that there would be panels sufficient for thirteen complete
pages. Jerry told me that Detective preferred having eight panels
per page but in our judgment this would hurt the property. I
specifically refer to the very large panel appearing on what would
be page 9 of the thirteen page release. We did not want to alter
this because of its dramatic effect. Accordingly, on this page
but six panels appeared.

   For the foregoing reasons and for the reasons set
forth in Mr. Siegel's affidavit, I request that the defendants'
motion be denied.

*Joseph Shuster*
      Joseph Shuster

Sworn to before me this
7ᵗʰ day of March, 1973.

*Ernest F. Barnes*
  Notary Public

ERNEST F. BARNES
Notary Public, State of New York
No. 24-5194165  Qual. in Kings Co.
Certificate Filed in New York County
Term Expires March 30, 1974

-2-

**EXHIBIT 14**
**141**

DCC00003478