# EXHIBIT 42

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.   CV 04-08400-SGL (RZx)                          Date:  September 26, 2008

Title:      JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual -v-
            WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a
            corporation; DC COMICS INC., a corporation; and DOES 1-10
===============================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Jim Holmes                                    None Present
            Courtroom Deputy Clerk                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

None present                                None present

PROCEEDINGS:    ORDER REGARDING ESCROW DOCUMENTS

        The Court has been called upon to resolve a dispute over the disposition of certain
documents (hereinafter "escrow documents") in the possession of attorney Mr. David Eisen at the
law firm Arnold & Porter.  Given the passage of time, some background is in order.

        In June, 2006, three employees at Warner Bros. Entertainment, Inc. (including the
company's then general counsel, Mr. John Schulman) received packages containing documents
relating to the present litigation (the aforementioned escrow documents) from an anonymous
source.  The documents in question contained embarrassing and potentially questionable conduct
by plaintiffs counsel in this case.  The Vice President for Warner Bros., Mr. Wayne Smith,
thereafter undertook the following steps: (1) He reviewed each document but ceased such review
when it became apparent that the document was privileged, (2) contacted plaintiffs' counsel and
advised him that the documents had been received, and (3) refrained from using any information in
the documents unless and until there was either an agreement with opposing counsel or the court
had determined how to proceed with the document's disposition.  Moreover, Mr. Smith and Mr.
Schulman further decided to turn the documents over to a neutral third party pending resolution of
the disposition of the escrow documents, either pursuant to the agreement of the parties or order
of the Court.

MINUTES FORM 90                                          Initials of Deputy Clerk: jh
CIVIL -- GEN                        1

**EXHIBIT 42**
**422**

Magistrate Judge Zarefsky was the discovery judge in this matter at the time the escrow documents in question were received by company employees at Warner Bros.  On June 30, 2006, the escrow documents were turned over to the escrow agent. The escrow agent thereafter Bates-stamped a set of the escrow documents and then sent a copy of the same to plaintiffs' counsel, Mr. Toberoff.  The originals remained in the agent's possession in escrow.

On August 7, 2006, defendants served a request on plaintiffs for the production of the escrow documents, requesting, in particular, "[a]ll Writings referenced in the July 5, 2006 letter from [the escrow agent] to, among others, Marc Toberoff, Esq. and which were attached to or enclosed with the July 18, 2006, letter from [the escrow agent] to Marc Toberoff, Esq."  Plaintiffs' thereafter filed a response on September 6, 2006.  Subsequently, in connection with another discovery matter, Magistrate Judge Zarefsky ordered that plaintiffs "produce all privilege logs, including any revisions, by September 29, 2006."  In the subsequently-produced privilege log, plaintiffs' counsel allegedly did not assert privilege in the escrow documents.  At this point, defendants filed a motion to compel plaintiffs and their counsel to produce all non-privileged escrow documents not identified on any privilege log.

Defendants' motion to compel was heard by Magistrate Judge Zarefsky on April 30, 2007. During the hearing, plaintiffs' counsel asserted that, except for two documents, all of the escrow documents had been either previously produced to defendants or had been listed on a privilege log:

> COURT: The question is: Have you otherwise produced [the documents]?  That's all that's all at issue, isn't it?

> MR. TOBEROFF: I have, your Honor.  I have put in a declaration unequivocally that even though I'm not obliged to do so, and jump through hoops of having to respond and own up to documents stolen from my legal files, an obligation that does not apply to the defendants in this case and does not apply to parties under Rule 34, I nonetheless went through every single one of those documents, which they, instead of returning the originals, returned to me with Bate stamps, checked it against our production, and found two documents that were non-privileged that hadn't been produced that consisted of letters from plaintiffs to DC Comics, which I produced.

> COURT: See, your declaration doesn't quite say that, Mr. Toberoff.  I read your declaration.

> MR. TOBEROFF: The intention of the declaration is to say exactly what I'm saying now; that I went through my files, not just the plaintiffs' files, which is all the motion pertains to, but all my files, all the third-party witness files —

**EXHIBIT 42**
**423**

COURT: Forgive me for interrupting.  Your declaration does say that.  What your declaration doesn't say is that you went through these, let's call them [escrow] documents, even though that may not be an accurate statement, you went through these [escrow] documents, and that you verified that each of the [escrow] documents either had been produced or had been listed on the privilege log.  It doesn't say that.

MR. TOBEROFF: That is the case, your Honor, and that was certainly my intention to say that, and I'm saying that now.

COURT: All right, then we can get that cleared up immediately.

MR. TOBEROFF: I'd be happy to take an oath and say that, because that is precisely what I did.

That during the hearing, Magistrate Judge Zarefsky, noting that the previously provided declaration was unclear, issued the following Order:

COURT: Now I told you, Mr. Toberoff, that I saw a little wiggle room in your declaration.  You tell me you didn't mean for there to be any.  So, here's what I'm going to do.  Not later than May 7th, that's a week from today, I want you to submit a declaration that does identify by the Bates numbers of the escrow documents and the corresponding Bates numbers of documents already produced, those among the escrow documents which are unprivileged and have already been produced.

So, you take the Bates numbers of the escrow documents and say, "Here are the corresponding Bates numbers of the documents that have already been pro and correspond to the listings on the privilege log of the documents which have not been produced because they were privileged. All right?  So, put that in your declaration.

Then the escrow holder . . . is to return to the plaintiffs any documents which are identified in the declaration as being privileged and having been identified on the privilege logs.

The others can be delivered to trial counsel for defendants because they're either unprivileged, or, if they were privileged, privilege has been waived because they weren't listed on the privilege log

. . . .

Do you understand what I've ordered you to put in the

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN                              3

**EXHIBIT 42**
**424**

declaration?

MR. TOBEROFF: I do, your Honor.

(emphasis added). Magistrate Judge Zarefsky then repeated the outline of his Order to plaintiffs' counsel towards the end of the hearing: "Privileged documents get returned. <u>The privilege documents that were listed on the privilege log get returned</u>. The others get sent to defense counsel." (emphasis added).

On May 21, 2007, plaintiffs' counsel produced the declaration required by Magistrate Judge Zarefsky. The declaration asserted privilege for the first time for a number of documents in escrow that had neither been listed previously on a privilege log nor had been previously produced. That plaintiffs' counsel's declaration went beyond the bounds of Magistrate Judge Zarefsky's order was made plain by a cover letter attached to his May 21, 2007, declaration: "Any documents not identified in my declaration as listed in a privilege log or as previously produced to defendants are to be produced to defendants, <u>with the exception of the clearly privileged litigation communications identified in my declaration</u>." (emphasis added).

Not surprisingly a dispute quickly ensued between the parties over whether plaintiffs' counsel's declaration sought to exclude from production to defendants categories of escrow documents ordered to be produced by Magistrate Judge Zarefsky's Order. The matter was presented to this Court when Magistrate Judge Zarefsky had to step aside from serving as the discovery judge in this matter due to attend to personal matters.

The Court ordered the escrow agent to submit the particular escrow documents in question (the ones plaintiffs' counsel was asserting privilege for the first time) for an <u>in camera</u> review and ordered plaintiffs' counsel to submit a declaration "setting forth the grounds for any claim of privilege relating to said documents." Both steps were eventually done and the Court is now in the possession of both.

Upon reflection the Court finds that plaintiffs' counsel's newly asserted claims for privilege are not well-taken. Pursuant to Magistrate Judge Zarefsky's order, any claim of privilege not previously asserted before that Order was deemed "waived." Although plaintiffs suggest that such a reading of Magistrate Judge's order as not a fair one and lacks common sense, the language of his order is clear and unambiguous: Any escrow document not matching up to the privilege log or the declaration's list of previously-produced documents was to be produced to defendants; any assertion of privilege to such documents to be produced was deemed "waived." That plaintiffs' counsel may have a basis to assert such privilege or otherwise challenge the propriety of producing such material on relevance grounds, etc., is inapposite. If plaintiffs wished to press such new claims of privilege or any other basis for challenging production of the same, Magistrate Judge Zarefsky's Order deemed them waived. What plaintiffs' counsel should have done at that point to preserve such assertions was to appeal Magistrate Judge Zarefsky's Order to this Court, in particular that section of his Order deeming any previously un-asserted grounds of privilege to be "waived." Plaintiffs did not do so, and the time to appeal Magistrate Judge Zarefsky's Order to this

MINUTES FORM 90
CIVIL -- GEN                                    4                          Initials of Deputy Clerk: jh

**EXHIBIT 42**
**425**

CV 04-08400-SGL (RZx)
JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON; an individual v WARNER BROS.
ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS INC., a
corporation; and DOES 1-10
MINUTE ORDER of September 26, 2008

Court has long since expired.  See Local Rule 72-2.1.

     Magistrate Judge Zarefsky's Order is now the law of the case in this matter.  Plaintiffs'
argument that the parties had reached an agreement beforehand that any post-litigation attorney-
client communications did not have to be listed in a privilege log to preserve its privilege status is,
as explained in defendants' supplemental declaration to the Court's Order, simply mistaken.

     Accordingly, pursuant to the terms of Magistrate Judge Zarefsky's Order, the escrow agent
is **ORDERED** to produce to defendants' counsel forthwith any escrow document not previously
listed in a privilege log or as having been previously been produced.  That is to say, the escrow
agent is to match up the escrow documents with the privilege log entries and production
documents listed in Mr. Toberoff's May 21, 2007, declaration.  Thus, the nine documents produced
by the escrow agent to the Court for in camera review are to be produced to defendants' counsel
as those documents were not previously identified in a privilege log provided by plaintiffs.

     **IT IS SO ORDERED.**

**EXHIBIT 42**
**426**

# EXHIBIT 43

# SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright <u>personally</u> as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

**As it stands right now, the single ~~person who~~ would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.**

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

**EXHIBIT 43**
427

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

**EXHIBIT 43**

**428**

Q 0002

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. (*please see enclosed letter; this letter lays out well MT's scheme*). Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

**EXHIBIT 43**
**429**

Q 0003

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel. Also that MT has not even made contact with Time Warner. Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint. Both Joanne and Laura Siegel are now very ill.** MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest. Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value. So, the court writes the will for him, and includes the rights to proceed with the termination. And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation.
Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.* The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had. MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership. MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitimize his claims. (*please see enclosed letter*)

4

**EXHIBIT 43**
**430**

Q 0004

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately ---- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ....any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

**EXHIBIT 43**
**431**

Q 0005

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself.  He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party. MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%.  In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*."  MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times.  They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner.  There is disgruntlement in the Siegel camp, regarding the contingency fee.  MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would…).  In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well).  Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

**\*\*\*\*In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.\*\*\*\*\*** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million).  According to the settlement amount, he received an unconscionable 50% contingency fee.

6

**EXHIBIT 43**
**432**

Q 0006

Very strong likelihood that Marc <u>created an entity for the purposes of the lawsuit</u> (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction.  Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held.  It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million).  He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak.  MT did it himself to attract more business in town.  At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

******************

cc:   Alan F. Horn
       Jeff Robinov
       John Schulman
       Patti Connolly

7

**EXHIBIT 43**
**433**

Q 0007

# EXHIBIT 44

1   Marc Toberoff (State Bar No. 188547)
    Nicholas C. Williamson (State Bar No. 231124)
2   Keith G. Adams (State Bar No. 240497)
    TOBEROFF & ASSOCIATES, P.C.
3   2049 Century Park East, Suite 2720
    Los Angeles, California, 90067
4   Telephone:   (310) 246-3333
    Fax:         (310) 246-3101
5   MToberoff@ipwla.com

6   Attorneys for Defendants Mark Warren
    Peary, as personal representative of the
7   Estate of Joseph Shuster, Jean Adele Peavy,
    Joanne Siegel, Laura Siegel Larson

8

                    **UNITED STATES DISTRICT COURT**
9
           **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**
10
    DC COMICS,                        | Case No: CV 10-03633 ODW (RZx)
11
                    Plaintiff,        |
12                                    | Hon. Otis D. Wright II, U.S.D.J.
           vs.                        | Hon. Ralph Zarefsky, U.S.M.J.
13
    PACIFIC PICTURES CORPORATION;     | **DISCOVERY MATTER**
14  IP WORLDWIDE, LLC; IPW, LLC;      |
    MARC TOBEROFF, an individual;     | **DECLARATION OF ADAM
15  MARK WARREN PEARY, as personal    | RONAN, MD, IN OPPOSITION
    representative of the ESTATE OF   | TO PLAINTIFF'S MOTION TO
16  JOSEPH SHUSTER; JEAN ADELE        | INITIATE DISCOVERY AND
    PEAVY, an individual; JOANNE      | TAKE IMMEDIATE, LIMITED
17  SIEGEL, an individual; LAURA      | DISCOVERY OF TWO
    SIEGEL LARSON, an individual,     | ELDERLY WITNESSES**
18  and DOES 1-10, inclusive,         |
                                      | Complaint filed:  May 14, 2010
19                                    | Trial Date:  None Set
                    Defendants.       |
20                                    | Date:      September 20, 2010
                                      | Time:      10:00 a.m.
21                                    | Place:     Courtroom 11

22

23

24

25

26

27

28

                    DECLARATION OF ADAM RONAN, MD

**EXHIBIT 44**
**434**

### DECLARATION OF ADAM RONAN

I, Adam Ronan, declare as follows:

1.    I am a resident of New Mexico, and am a Medical Doctor (MD), licensed to practice medicine in New Mexico.  The facts set forth herein are known to me of my own firsthand knowledge and, if called as a witness, I could and would testify competently to such facts under oath.

2.    I received my medical degree from the Medical College of Wisconsin, and then completed my medical training at the Loyola University Medical Center and the University of Chicago Medical Center.  I underwent fellowship training at the Loyola University Medical Center.  I am board-certified in Internal Medicine, Echocardiography, Vascular Interpretation and Nuclear Cardiology.

3.    I currently practice at the New Mexico Heart Institute, located at 502 Elm Street NE, Albuquerque, NM, 87102.

4.    Jean Adele Peavy is under my care.

5.    Jean suffered a stroke in May, 2009.  Due to her stroke, she has an aphasia.  Due to this condition, Jean has difficulty speaking and also has difficulty understanding spoken words.  When I last saw Jean on August 5, 2010, she also suffered from atrial fibrillation and hypertension.

6.    I understand that a deposition involves providing live testimony before a court reporter and often a videographer.  I further understand that, in the absence of a protective order, a deposition can last several hours, with only limited breaks, that it involves sitting for long periods, and that it is often stressful for the deponent, who is asked to recall numerous events and to review many documents.

7.    It is my professional medical opinion that Jean is likely unable from a neurological standpoint to participate in a legal deposition due to her aphasia.  As Jean is the victim of a recent stroke, the stress of a second deposition may also pose a

///

///

1
DECLARATION OF ADAM RONAN, MD

**EXHIBIT 44**
**435**

10-SEP-10   08:04   FROM
Sep-09-10   03:07pm   From-                                              T-283   P.004/005   F-279

1  serious health risk. It is my recommendation that she should not be subjected to a

2  second deposition of any duration.

3      I declare under penalty of perjury of the laws of the United States of America

4  that the foregoing is true and correct.

5      Executed on September 9, 2010, in Albuquerque, New Mexico.

6

7      _____

8          Adam Ronan, MD

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2
DECLARATION OF ADAM RONAN, MD

Received   Sep-09-10   03:37pm   From-                    To-               Page  009

EXHIBIT 44
436

# EXHIBIT 45

1   DANIEL M. PETROCELLI (S.B. #097802)
       dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
       mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
       cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
       pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:   (845) 265-2819

11  Attorneys for Plaintiff DC Comics

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14  DC COMICS,                              Case No. CV 10-3633 ODW (RZx)

15              Plaintiff,                   **PLAINTIFF DC COMICS'**
                                            **RENEWED OPPOSITION TO**
16          v.                              **DEFENDANTS JOANNE SIEGEL**
                                            **AND LAURA SIEGEL**
17  PACIFIC PICTURES                        **LARSON'S RENEWED MOTION**
    CORPORATION, IP WORLDWIDE,              **TO DISMISS AND/OR STRIKE**
18  LLC, IPW, LLC, MARC TOBEROFF,           **PLAINTIFF'S FIRST AMENDED**
    an individual, MARK WARREN              **COMPLAINT PURSUANT TO**
19  PEARY, as personal representative of    **FED. R. CIV. P. 12(b)(6)**
    the ESTATE OF JOSEPH SHUSTER,           **(DOCKET NO. 147) (RE: THIRD**
20  JEAN ADELE PEAVY, an individual,        **AND SIXTH CLAIMS FOR**
    JOANNE SIEGEL, an individual,           **RELIEF)**
21  LAURA SIEGEL LARSON, an
    individual, and DOES 1-10, inclusive,
22                                          Hon. Otis D. Wright II
                Defendants.
23                                          **Hearing Date**:   TBD
                                            **Hearing Time**:   TBD
24

25

26

27

28
                                            DC COMICS' RENEWED OPP. TO DEFS'
                                                     RENEWED MOTION TO
                                            DISMISS/STRIKE THIRD & SIXTH CLAIMS

**EXHIBIT 45**
**437**

1   *Hartzheim v. Valley Land & Cattle Co.*, 153 Cal. App. 4th 383, 389 (2007);

2   *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239 (1969) ("The existence of a

3   statutory right implies the existence of all necessary and appropriate remedies.").

4   Where, as here, Congress has demonstrated its clear intent to create such a right,

5   *supra* at 7-10, the beneficiary of this right has standing to enforce it, *CBOCS West,*

6   *Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  Congress' intent to confer such a

7   right can be inferred from "the language and focus of the statute, its legislative

8   history, and its purpose," *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76

9   (1979)—*all* of which supports DC Comics' third and sixth claims.  *Supra* at 7-10.

10   **IV.   DC COMICS' CLAIMS ARE NOT TIME-BARRED.**

11       <u>Third Claim.</u>  Defendants argue that DC Comics' third claim is time-barred

12   because DC Comics knew about the Pacific Pictures agreements no later than

13   November 15, 2006, yet filed suit six months after the three-year limitations period

14   ended in November 2009.  Mot. at 10.  Not only does this assertion raise factual

15   questions, defendants are mistaken on the law and in describing DC's actual claim.

16       DC Comics' third claim expressly is premised on defendants' *continuing*

17   *course of conduct*, which violated and continues to violate DC Comics' rights under

18   the Copyright Act—and will continue to harm DC Comics though 2013 and

19   beyond.  FAC ¶¶ 3, 101, 169-70.  The statute of limitation only commences when

20   such a continuing harm ceases.  *E.g.*, *Suh v. Yang*, 987 F. Supp. 783, 795 (N.D. Cal.

21   1997) ("continuing wrong" doctrine delays accrual); *Flowers v. Carville*, 310 F.3d

22   1118, 1126 (9th Cir. 2002); *Wyatt v. Union Mort. Co.*, 24 Cal. 3d 773, 788 (1979).

23   What DC Comics seeks in this case is a declaration bringing this *course of*

24   *misconduct to a halt*—invalidating all illicit consent agreements between and

25   among the Toberoff defendants and the Siegel and Shuster heirs.  Defendants say

26   nothing about the continuing harm that DC Comics expressly alleges, FAC ¶¶ 3,

27   101, 169-70; instead, they misrepresent DC's complaint and focus exclusively on

28   the Pacific Pictures agreements, Mot. at 10.  But these agreements still affect DC

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO
DISMISS/STRIKE THIRD & SIXTH CLAIMS

**EXHIBIT 45**
**438**

1  Comics' rights today, *supra* at 2-4, are part of a pattern of misconduct, and all such
2  agreements will continue to harm DC through 2013 unless judicially declared void.

3  In addition, as DC Comics' complaint makes clear, Toberoff's overall pattern
4  of misconduct only came to light when Judge Larson ordered the Toberoff Timeline
5  produced to DC Comics in December 2008—less than two years ago. FAC ¶¶ 102-
6  04. The discovery rule postpones accrual of a cause of action until the plaintiff
7  discovers the facts underlying its claims. *E.g.*, *Polar Bear Prods., Inc. v. Timex*
8  *Corp.*, 384 F.3d 700, 707 (9th Cir. 2004); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383,
9  393 (1999). Defendants' factual assertion that DC Comics knew of its claim no
10  later than November 2006—without any explanation how DC Comics' receipt of
11  the Pacific Pictures agreements put it on notice of defendants' continuing and
12  multi-faceted course of interference—is not proper argument on a Rule 12 motion.
13  *Cf. In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)
14  (statute-of-limitations question cannot be resolved on motion to dismiss because it
15  requires determination of fact-intensive issues); *Fox v. Ethicon Endo-Surgery, Inc.*,
16  35 Cal. 4th 797, 810 (2005) ("statute of limitations … normally a question of fact").
17  Important facts about Toberoff's misconduct only came to light as recently as this
18  year, *infra* at 16-19, and doubtless more still will be uncovered in discovery.

19  <u>Sixth Claim.</u> Knowing the discovery rule is a fatal to their statute-of-
20  limitation arguments, defendants assert the rule does not apply to DC Comics' sixth
21  claim for unfair competition. Mot. at 10. Defendants cite *Stutz Motor Car of Am.*
22  *v. Reebok Int'l*, 909 F. Supp. 1353 (C.D. Cal. 1995), for this point, but shortly after
23  *Stutz* was decided, the California Supreme Court and Ninth Circuit both said it was
24  an open question whether the discovery rule applies. *Grisham v. Philip Morris*
25  *U.S.A., Inc.*, 40 Cal. 4th 623, 635 n.7 (2007); *Betz v. Trainer Wortham & Co.*, 236
26  Fed. Appx. 253, 256 (9th Cir. May 11, 2007). Since then, courts have held that the
27  discovery rule *does* apply in 17200 cases when fraud is alleged, as here. *E.g.,*
28  *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009)

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO
DISMISS/STRIKE THIRD & SIXTH CLAIMS

**EXHIBIT 45**
**439**

consideration." This inquiry into a party's intent is "an issue of fact." *Id.* at 1251.
DC's sixth claim for unfair competition is based in part on the illegal agreements
Toberoff engineered. FAC ¶¶ 187-88. Defendants assert that because DC Comics
learned of the consent agreements during a "Court-ordered settlement mediation"
on May 2, 2008, such communications are "absolutely privileged." Mot. at 17.

This argument fails for three reasons. <u>First</u>, defendants ignore the PPC and
IP Worldwide Agreements, which contain the same illicit consent provisions—and
were never at issue in the mediation. Thus, the sixth claim survives. *Bylin Heating
Sys., Inc. v. M & M Gutters, LLC*, 2008 WL 744706, at *5 (E.D. Cal. March 18,
2008) (denying Rule 12 motion when defense applied only to *part* of claim).

<u>Second</u>, DC Comics does not sue defendants based on their conduct at the
May 2008 mediation or any related communication. The gravamen of DC's claim
is contracts that illegally "traffic" in its rights. Because defendants are not being
sued for speaking words that revealed their misdeeds, their reliance on litigation-
privilege cases involving conduct *at settlement talks* is misplaced. Mot. at 16-18.

<u>Third</u>, defendants cannot immunize their consent agreements by asserting
they are "clearly communications made in the course of 'judicial or quasi-judicial
proceedings….'" Mot. at 18. The agreements are rights-impairing contracts
designed to harm DC's and the heirs' interests—their purpose is not to advance
legitimate issues of public concern or litigation objectives, no matter what
defendants may now say to escape liability. Defendants' assertions about their
intent are at best contested "issue[s] of fact," unfit for resolution now. *Supra* at 25.

## IX. CONCLUSION

Defendants' motion should be denied.

Dated: March 21, 2011                    Respectfully Submitted,

                                         By: /s/ Daniel M. Petrocelli
                                         Daniel M. Petrocelli

CC1:846319

**EXHIBIT 45**
**440**

DC COMICS' RENEWED OPP. TO DEFS'
RENEWED MOTION TO
DISMISS/STRIKE THIRD & SIXTH CLAIMS

# EXHIBIT 46

MARK WARREN PEARY 6/29/2011

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CERTIFIED
COPY

| | |
|---|---|
| DC COMICS,                                )<br>                                           )<br>          Plaintiff,                        ) No. CV-10-3633 ODW (RZx)<br>                                           )<br>     VS.                                    )<br>                                           )<br>PACIFIC PICTURES CORPORATION,)<br>IP WORLDWIDE, LLC, IPW, LLC, )<br>MARC TOBEROFF, an individual,)<br>Laura Siegel Larson, as       )<br>personal representative of    )<br>the ESTATE OF JOSEPH SHUSTER,)<br>JEAN ADELE PEAVY, an          )<br>individual, JOANNE SIEGEL,    )<br>an individual, LAURA SIEGEL   )<br>LARSON, an individual, and    )<br>DOES 1-10, inclusive,         )<br>                                           )<br>          Defendants.                       )<br>     _____) | |

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by:  SHANDA GABRIEL

CSR No. 10094

Merrill  Corporation  -  Los Angeles
800-826-0277                                www.merrillcorp.com/law

**EXHIBIT 46**
**441**

MARK WARREN PEARY  6/29/2011

Page 9

| | | |
|---|---|---|
| 1 | MR. TOKORO:  Jason Tokoro for plaintiff DC | 10:29:57 |
| 2 | Comics. | 10:29:59 |
| 3 | MR. TOBEROFF:  Marc Toberoff for defendants | 10:30:00 |
| 4 | Laura Siegel Larson and Mark Warren Peary. | 10:30:02 |
| 5 | THE VIDEOGRAPHER:  Our court reporter today | 10:30:06 |
| 6 | is Shanda Gabriel of Merrill.  Would the reporter | 10:30:09 |
| 7 | please swear in the witness. | 10:30:11 |
| 8 | | 10:30:12 |
| 9 | MARK WARREN PEARY, | 10:30:12 |
| 10 | having been first duly sworn, was | 10:30:12 |
| 11 | examined and testified as follows: | 10:30:12 |
| 12 | | 10:30:19 |
| 13 | THE VIDEOGRAPHER:  Please begin. | 10:30:19 |
| 14 | | 10:30:19 |
| 15 | EXAMINATION | 10:30:19 |
| 16 | BY MR. PETROCELLI: | 10:30:19 |
| 17 | Q.  Good morning, Mr. Peary. | 10:30:21 |
| 18 | A.  Good morning. | 10:30:24 |
| 19 | Q.  We're starting at 10:30 rather than the | 10:30:25 |
| 20 | noticed time of 9:30 because Mr. Toberoff informed | 10:30:27 |
| 21 | me this morning of car problems.  So we'll probably | 10:30:33 |
| 22 | have to go later than anticipated but hopefully | 10:30:38 |
| 23 | we'll get through this today. | 10:30:42 |
| 24 | Marc, all the defendants' counsel were | 10:30:43 |
| 25 | noticed for the deposition.  The other counsel is | 10:30:50 |

EXHIBIT 46
442

MARK WARREN PEARY   6/29/2011

Page 10

| | | |
|---|---|---|
| 1 | not present but we're going to proceed in their | 10:30:54 |
| 2 | absence.  They were given full notice. | 10:30:58 |
| 3 | MR. TOBEROFF:  They're not attending today. | 10:30:59 |
| 4 | MR. PETROCELLI:  Okay. | 10:31:01 |
| 5 | Q.  Let me mention to you, Mr. Peary, that I've | 10:31:04 |
| 6 | reviewed the deposition that you gave in the Siegel | 10:31:10 |
| 7 | case on November 11, 2006 and it was a somewhat | 10:31:13 |
| 8 | brief deposition.  This will be lengthier.  It's not | 10:31:23 |
| 9 | my intention to duplicate what you were already | 10:31:26 |
| 10 | asked, although I will be, from time to time, | 10:31:34 |
| 11 | picking up on things that were touched upon in that | 10:31:36 |
| 12 | deposition and following up. | 10:31:39 |
| 13 | So I do want you to know that I'm mindful | 10:31:41 |
| 14 | of what your prior testimony is and if you want a -- | 10:31:45 |
| 15 | I think you have a copy in front of you, Marc, but | 10:31:48 |
| 16 | if you need to consult a copy I have one. | 10:31:51 |
| 17 | So first let me start by expanding a bit on | 10:32:01 |
| 18 | your background. | 10:32:04 |
| 19 | You were born on January 14, 1962. | 10:32:05 |
| 20 | Is that right? | 10:32:05 |
| 21 | A.  Yes. | 10:32:08 |
| 22 | Q.  And so you're 49 years old right now? | 10:32:08 |
| 23 | A.  Yes. | 10:32:10 |
| 24 | Q.  And you have never been married, correct? | 10:32:12 |
| 25 | A.  Correct. | 10:32:12 |

EXHIBIT 46
443

MARK WARREN PEAVY - 6/29/2011

Page 11

| | | |
|---|---|---|
| 1 | Q.  And you have no children. | 10:32:15 |
| 2 | Is that right? | 10:32:15 |
| 3 | A.  Correct. | 10:32:18 |
| 4 | Q.  You live in Albuquerque? | 10:32:18 |
| 5 | A.  Santa Fe. | 10:32:20 |
| 6 | Q.  Santa Fe, New Mexico? | 10:32:21 |
| 7 | Do you live alone? | 10:32:23 |
| 8 | A.  No. | 10:32:25 |
| 9 | Q.  With whom do you reside? | 10:32:25 |
| 10 | A.  I share a house with my family, other | 10:32:27 |
| 11 | family members. | 10:32:31 |
| 12 | Q.  Who are they? | 10:32:32 |
| 13 | A.  My mother and sister. | 10:32:33 |
| 14 | Q.  And your mother is Jean Peavy. | 10:32:36 |
| 15 | Is that right? | 10:32:38 |
| 16 | A.  Yes. | 10:32:38 |
| 17 | Q.  And your sister is Dawn Peavy? | 10:32:39 |
| 18 | A.  Yes. | 10:32:42 |
| 19 | Q.  D-a-w-n, right? | 10:32:44 |
| 20 | A.  Right. | 10:32:45 |
| 21 | Q.  Anyone else reside with you? | 10:32:45 |
| 22 | A.  No. | 10:32:48 |
| 23 | Q.  Okay.  Dawn was born October 1965. | 10:32:51 |
| 24 | Is that right? | 10:32:51 |
| 25 | A.  Yes. | 10:32:51 |

| | | |
|---|---|---|
| 1 | Q. Okay. She has three -- three children? | 10:32:55 |
| 2 | A. Yes. | 10:32:58 |
| 3 | Q. Do they reside with you? | 10:33:00 |
| 4 | A. She has a -- her youngest is -- is there | 10:33:02 |
| 5 | sometimes. | 10:33:06 |
| 6 | Q. Do you know the ages of her children and | 10:33:09 |
| 7 | their names? | 10:33:11 |
| 8 | A. Let's see, the youngest one is 19, and -- | 10:33:13 |
| 9 | Q. And what's the 19 year old's name? | 10:33:16 |
| 10 | A. Jake. | 10:33:18 |
| 11 | Q. Jake? | 10:33:20 |
| 12 | A. Jake. | 10:33:20 |
| 13 | Q. Last name? | 10:33:21 |
| 14 | A. He uses -- I think he uses his -- his | 10:33:21 |
| 15 | father's last name, Anderson, I believe. | 10:33:28 |
| 16 | Q. Okay. | 10:33:30 |
| 17 | A. I don't use it that much. | 10:33:30 |
| 18 | Q. Jake Anderson, 19 years old. And who are | 10:33:32 |
| 19 | the other two? | 10:33:35 |
| 20 | A. Other, 20 -- you want their age or -- | 10:33:36 |
| 21 | Q. Both name and age. | 10:33:40 |
| 22 | A. Okay. Nicole and -- let me see, I haven't | 10:33:42 |
| 23 | seen them in a long time. They live in different | 10:33:51 |
| 24 | cities and I haven't seen them in a very long time. | 10:33:54 |
| 25 | So let's see, Nicole and -- | 10:33:57 |

MARK WARREN PEART - 6/29/2011

Page 13

| | | |
|---|---|---|
| 1 | Q. Starting with Nicole, how old is Nicole? | 10:34:02 |
| 2 | A. Yeah, she's something like 23 or -4. | 10:34:05 |
| 3 | Q. And where -- what's Nicole's last name? | 10:34:06 |
| 4 | A. She uses her mother's last name. | 10:34:09 |
| 5 | Q. Peavy? | 10:34:11 |
| 6 | A. Yes. Yeah. | 10:34:12 |
| 7 | Q. And who is the third child? | 10:34:15 |
| 8 | A. Let me see. I haven't seen him in such a | 10:34:17 |
| 9 | long time. You're making my -- what is his name? I | 10:34:20 |
| 10 | haven't seen him in a long time. He lives far away. | 10:34:29 |
| 11 | Q. You don't know his name? | 10:34:31 |
| 12 | A. I do, but I'm not recalling it at the | 10:34:33 |
| 13 | moment. | 10:34:35 |
| 14 | Q. Do you know his age? | 10:34:35 |
| 15 | A. He is something -- I -- I don't know, late | 10:34:36 |
| 16 | twenties. | 10:34:38 |
| 17 | Q. I take it it's a male? | 10:34:39 |
| 18 | A. Yes. | 10:34:40 |
| 19 | Q. Okay. | 10:34:42 |
| 20 | A. Yes. | 10:34:42 |
| 21 | Q. And where does Jake Anderson live? What | 10:34:42 |
| 22 | city? | 10:34:47 |
| 23 | A. The youngest, Jake, he's -- sometimes he's | 10:34:47 |
| 24 | with us and sometimes he's elsewhere. | 10:34:50 |
| 25 | Q. Elsewhere meaning where? | 10:34:58 |

MARK WARREN PEARY  6/29/2011

Page 14

| | | |
|---|---|---|
| 1 | A.  I -- I -- I think he has a girlfriend that | 10:34:58 |
| 2 | he stays with if you want -- | 10:35:01 |
| 3 | Q.  In Santa Fe? | 10:35:02 |
| 4 | A.  Yes, if you want the details. | 10:35:03 |
| 5 | Q.  No, I just want to know the city. | 10:35:04 |
| 6 | A.  Okay. | 10:35:06 |
| 7 | Q.  And Nicole lives in what city? | 10:35:06 |
| 8 | A.  She's in Denver. | 10:35:08 |
| 9 | Q.  Denver.  And the older boy, you don't | 10:35:09 |
| 10 | remember? | 10:35:12 |
| 11 | A.  He -- he's -- he's in El Paso. | 10:35:12 |
| 12 | Q.  How long have you resided with your sister, | 10:35:19 |
| 13 | Dawn? | 10:35:26 |
| 14 | A.  She's been with us since 2001 or '-2, | 10:35:28 |
| 15 | somewhere in there. | 10:35:40 |
| 16 | Q.  Continuously to the present? | 10:35:40 |
| 17 | A.  Yes. | 10:35:42 |
| 18 | Q.  Okay.  And how long have you resided with | 10:35:44 |
| 19 | your mother, Jean? | 10:35:45 |
| 20 | A.  We -- we've been there since -- since 1999. | 10:35:47 |
| 21 | Q.  How old is your mom now? | 10:36:00 |
| 22 | A.  90. | 10:36:01 |
| 23 | Q.  And how is her health? | 10:36:04 |
| 24 | A.  It's -- it's fair.  She had a stroke two | 10:36:05 |
| 25 | years ago. | 10:36:09 |

**EXHIBIT 46**
**447**

MARK WARREN PEARY - 6/29/2011

Page 15

| 1 | Q. Do you have full-time healthcare for her, | 10:36:13 |
| 2 | like a caretaker? | 10:36:17 |
| 3 | A. I'm -- I serve as a caretaker quite often. | 10:36:19 |
| 4 | Q. Okay. But other than the family members, | 10:36:22 |
| 5 | is there a professional caretaker? | 10:36:25 |
| 6 | A. No. | 10:36:26 |
| 7 | Q. Okay. Your father was William Peavy? | 10:36:30 |
| 8 | A. Yes. | 10:36:33 |
| 9 | Q. And he passed away in 1996? | 10:36:33 |
| 10 | A. That's correct. | 10:36:35 |
| 11 | Q. And your dad wrote books and was a teacher? | 10:36:49 |
| 12 | A. Well, he -- he did. He had -- he had a | 10:36:52 |
| 13 | long career. | 10:36:57 |
| 14 | Q. As a -- as a teacher and an author? | 10:36:58 |
| 15 | A. You want his last position before he | 10:37:00 |
| 16 | retired or -- | 10:37:05 |
| 17 | Q. Just a general idea of his -- | 10:37:06 |
| 18 | A. -- in general? | 10:37:07 |
| 19 | Q. -- professional background. | 10:37:08 |
| 20 | A. Yeah, he was a civil servant. | 10:37:09 |
| 21 | Q. Working for whom? | 10:37:11 |
| 22 | A. He worked for the Texas A&M extension | 10:37:12 |
| 23 | service. | 10:37:17 |
| 24 | Q. What is that? | 10:37:17 |
| 25 | A. Texas A&M extension service. | 10:37:18 |

Merrill  Corporation  -  Los Angeles
800-826-0277                                    www.merrillcorp.com/law

**EXHIBIT 46**
**448**

MARK WARREN PEARY - 6/29/2011

Page 16

| | | |
|---|---|---|
| 1 | Q.  Oh, the university? | 10:37:20 |
| 2 | A.  It's a branch of the university. | 10:37:21 |
| 3 | Q.  Okay.  Now, what about your employment? | 10:37:23 |
| 4 | Can you briefly trace it for me? | 10:37:26 |
| 5 | A.  I've been doing investment work. | 10:37:28 |
| 6 | Q.  I saw from your prior -- your deposition in | 10:37:31 |
| 7 | the Siegel case that you have a two-year degree from | 10:37:35 |
| 8 | I think it's Texas El Paso. | 10:37:39 |
| 9 | Is that right? | 10:37:39 |
| 10 | A.  Yes. | 10:37:39 |
| 11 | Q.  And you went there right out of high | 10:37:42 |
| 12 | school? | 10:37:44 |
| 13 | A.  Yes. | 10:37:45 |
| 14 | Q.  And so what have you been doing | 10:37:46 |
| 15 | occupationally from the time you left college, Texas | 10:37:49 |
| 16 | El Paso, to the present? | 10:37:53 |
| 17 | A.  You want everything I've done or just -- | 10:37:55 |
| 18 | Q.  If you can summarize it that would be | 10:37:58 |
| 19 | helpful. | 10:38:00 |
| 20 | A.  Summarize it. | 10:38:00 |
| 21 | I've done a lot of different things.  I | 10:38:03 |
| 22 | built -- | 10:38:05 |
| 23 | Q.  Can you do it in chronological order for | 10:38:05 |
| 24 | me? | 10:38:08 |
| 25 | A.  I can try. | 10:38:08 |

**EXHIBIT 46**
**449**

MARK WARREN PEARY - 6/29/2011

Page 22

| | | |
|---|---|---|
| 1 | Los Angeles with your mom? | 10:43:44 |
| 2 | A.  Yes. | 10:43:46 |
| 3 | Q.  And did you then take possession of some of | 10:43:48 |
| 4 | his papers and library of comic book materials, | 10:43:55 |
| 5 | whatever he had, drawings, things like that? | 10:44:01 |
| 6 | A.  There were -- there were very limited | 10:44:04 |
| 7 | papers and we didn't find any vintage comics, | 10:44:06 |
| 8 | unfortunately, which would have been worth a lot. | 10:44:10 |
| 9 | He didn't have any.  There were some limited papers, | 10:44:13 |
| 10 | but nothing -- nothing significant.  Mostly personal | 10:44:19 |
| 11 | items. | 10:44:22 |
| 12 | Q.  Where did you get the materials that you | 10:44:24 |
| 13 | used for your book? | 10:44:26 |
| 14 | A.  The book? | 10:44:27 |
| 15 | Q.  Excuse me, the screenplay. | 10:44:30 |
| 16 | A.  The materials, it came from historical | 10:44:34 |
| 17 | research. | 10:44:37 |
| 18 | Q.  About Joe? | 10:44:38 |
| 19 | A.  Yes.  I had a lot of -- a lot of vintage | 10:44:39 |
| 20 | articles that came from the -- the era, which is | 10:44:46 |
| 21 | probably unusual to have a lot of material.  That's | 10:44:51 |
| 22 | where most of it came from. | 10:44:55 |
| 23 | Q.  You collected this on your own? | 10:44:57 |
| 24 | A.  Yes. | 10:44:58 |
| 25 | Q.  By doing public record searches? | 10:44:59 |

**EXHIBIT 46**
**450**

MARK WARREN PEARY  6/29/2011

| | | |
|---|---|---|
| 1 | A.   Yes.   And family files. | 10:45:02 |
| 2 | Q.   Who -- who had possession of the family | 10:45:05 |
| 3 | files? | 10:45:07 |
| 4 | A.   My mother had collected articles throughout | 10:45:07 |
| 5 | the years. | 10:45:11 |
| 6 | Q.   And those articles are in your home where | 10:45:12 |
| 7 | you and your mother now live, right? | 10:45:14 |
| 8 | A.   Oh, I -- I guess so.   It's just old | 10:45:17 |
| 9 | magazine articles. | 10:45:23 |
| 10 | Q.   Did you retrieve any materials from Joe's | 10:45:28 |
| 11 | apartment after his death that you put in your file | 10:45:32 |
| 12 | for use in writing your screenplay? | 10:45:37 |
| 13 | A.   I -- I don't recall getting any papers from | 10:45:39 |
| 14 | his apartment.   He didn't have much. | 10:45:42 |
| 15 | Q.   What about during his lifetime?   Did he | 10:45:46 |
| 16 | ever give you any material, any papers, any | 10:45:50 |
| 17 | writings, any of his drawings, any comic books, | 10:45:53 |
| 18 | things like that, that you've collected and saved? | 10:45:56 |
| 19 | A.   We -- we had a vintage drawing, a few | 10:45:59 |
| 20 | mementos is all. | 10:46:05 |
| 21 | Q.   Were you close to him? | 10:46:06 |
| 22 | A.   Somewhat. | 10:46:08 |
| 23 | Q.   So you were about 30 when he passed, right? | 10:46:11 |
| 24 | You were born in '62, right? | 10:46:14 |
| 25 | A.   Yeah, that sounds correct. | 10:46:15 |

**EXHIBIT 46**
**451**

MARK WARREN PEARY - 6/29/2011

Page 24

| | | |
|---|---|---|
| 1 | Q. And you had known him since you were a | 10:46:18 |
| 2 | small boy? | 10:46:21 |
| 3 | A. Yes. Not real closely, but I did know him. | 10:46:21 |
| 4 | Q. He had no children, right? | 10:46:28 |
| 5 | A. Correct. | 10:46:28 |
| 6 | Q. But he had been married once? | 10:46:30 |
| 7 | A. Briefly. | 10:46:31 |
| 8 | Q. What years was he married? | 10:46:36 |
| 9 | A. 1979, I believe. | 10:46:37 |
| 10 | Q. Did you attend his wedding? | 10:46:43 |
| 11 | A. No. | 10:46:45 |
| 12 | Q. Did he and his wife elope? | 10:46:46 |
| 13 | A. Excuse me? | 10:46:49 |
| 14 | Q. Did they elope, they went off on their own | 10:46:50 |
| 15 | and got married without a cere- -- you know, a | 10:46:53 |
| 16 | ceremony for the family? | 10:46:56 |
| 17 | A. I'm not aware of the circumstances of their | 10:46:57 |
| 18 | marriage. | 10:47:01 |
| 19 | Q. What was his wife's name? | 10:47:01 |
| 20 | A. I'm not sure I can recall. I never met | 10:47:02 |
| 21 | her. | 10:47:11 |
| 22 | Q. Never spoke with her? | 10:47:11 |
| 23 | A. No. | 10:47:12 |
| 24 | Q. Ever communicate at all with her in | 10:47:13 |
| 25 | writing? | 10:47:16 |

**EXHIBIT 46**
**452**

MARK WARREN PEART - 6/29/2011

Page 25

1          A.  No, I did not.  It's like 1979, '80, last                10:47:16

2    time they were together.                                           10:47:20

3          Q.  Did you ever see her?                                    10:47:22

4          A.  I never met her.                                         10:47:23

5          Q.  Did you ever see a picture of her?                       10:47:24

6          A.  Yes.                                                      10:47:26

7          Q.  Where?                                                   10:47:26

8          A.  Somehow we had -- we had a picture that I                10:47:31

9    had -- I had seen from -- I don't know what it was.                10:47:33

10   It was -- maybe it was -- I -- I don't remember.                   10:47:38

11   Somewhere I did see a picture of them, but I never                 10:47:40

12   met her.                                                           10:47:42

13         Q.  And Joe had how many nieces and nephews?                 10:47:44

14         A.  Just myself and my sister.                               10:47:49

15         Q.  Now, you -- I've seen his will or at least               10:47:59

16   a copy of the will and it names your mom, Jean, as                 10:48:03

17   his sole beneficiary but identifies you as an                      10:48:08

18   alternate beneficiary, as well as executor in the                 10:48:10

19   event that she is unwilling or unable to serve.                    10:48:17

20   You're generally familiar with that?                              10:48:19

21         A.  Yes.                                                     10:48:20

22         Q.  And I notice that your sister wasn't in                 10:48:21

23   there.                                                            10:48:24

24              Did your sister, to your knowledge, not               10:48:25

25   have a good relationship with -- with your uncle                  10:48:30

**EXHIBIT 46**
**453**

MARK WARREN PERRY - 6/29/2011

Page 35

| | | |
|---|---|---|
| 1 | That's about the only involvement I had at the -- | 10:59:55 |
| 2 | after he died. | 10:59:56 |
| 3 | BY MR. PETROCELLI: | 10:59:56 |
| 4 | Q.  And after he died, were you assisting your | 11:00:03 |
| 5 | mom in her discussions with either DC Comics or | 11:00:11 |
| 6 | Time-Warner about financial arrangements? | 11:00:17 |
| 7 | MR. TOBEROFF:  Lacks foundation.  Assumes | 11:00:22 |
| 8 | facts. | 11:00:24 |
| 9 | THE WITNESS:  I -- no, I really had nothing | 11:00:30 |
| 10 | to do with what she was saying. | 11:00:32 |
| 11 | BY MR. PETROCELLI: | 11:00:32 |
| 12 | Q.  Okay.  I'll come back to that in a bit. | 11:00:34 |
| 13 | You are aware that DC Comics has filed a | 11:00:39 |
| 14 | lawsuit against you and other defendants, including | 11:00:47 |
| 15 | Mr. Toberoff? | 11:00:55 |
| 16 | A.  Yes. | 11:00:56 |
| 17 | Q.  Let me show you a copy of the complaint | 11:01:02 |
| 18 | which is Exhibit 1. | 11:01:03 |
| 19 | (The document referred to was | 11:01:06 |
| 20 | marked for identification by the | 11:01:06 |
| 21 | C.S.R. as Exhibit 1 and attached to | 11:01:06 |
| 22 | this deposition.) | 11:01:16 |
| 23 | MR. PETROCELLI:  Actually the first amended | 11:01:16 |
| 24 | complaint. | 11:01:19 |
| 25 | MR. TOBEROFF:  Is this -- I thought this -- | 11:01:19 |

MARK WARREN PEAKS - 6/29/2011

Page 36

| | | |
|---|---|---|
| 1 | the other blog was Exhibit 1. | 11:01:21 |
| 2 | MR. PETROCELLI:  No, no, I premarked them, | 11:01:23 |
| 3 | as I said.  So that was -- I identified that on the | 11:01:25 |
| 4 | record as Exhibit 24. | 11:01:28 |
| 5 | You have a copy of that blog that's been | 11:01:40 |
| 6 | marked by the reporter, Marc?  This one right here? | 11:01:43 |
| 7 | Why don't you put that over there so we can keep the | 11:01:47 |
| 8 | exhibits organized.  That's for the reporter.  Thank | 11:01:50 |
| 9 | you. | 11:01:56 |
| 10 | Q.  When this -- this lawsuit was first filed | 11:01:56 |
| 11 | on I believe it was May 14, 2010 and a copy of the | 11:01:58 |
| 12 | complaint at the time was served on you, did you | 11:02:04 |
| 13 | read the complaint? | 11:02:07 |
| 14 | A.  I scanned it. | 11:02:09 |
| 15 | Q.  Scanned it? | 11:02:11 |
| 16 | A.  Yes. | 11:02:12 |
| 17 | Q.  Did you discuss it with your mom? | 11:02:14 |
| 18 | A.  Her -- not -- not -- not really.  She -- | 11:02:22 |
| 19 | faculties are not -- not very good because of her | 11:02:28 |
| 20 | stroke.  She's -- she's perhaps aware -- she's | 11:02:34 |
| 21 | probably aware of it, I'm sure. | 11:02:38 |
| 22 | Q.  When the lawsuit was served on you and you | 11:02:40 |
| 23 | became aware of it, did you have any discussion at | 11:02:42 |
| 24 | all with your mother about it, even -- even in the | 11:02:45 |
| 25 | most general terms, like, you know, "They filed a | 11:02:48 |

MARK WARREN PEARY - 6/29/2011

Page 37

| | | |
|---|---|---|
| 1 | case against us" or anything like that? | 11:02:50 |
| 2 | A. That would be the only extent of it.  I | 11:02:52 |
| 3 | would have mentioned something.  That's it. | 11:02:56 |
| 4 | Q. Do you recall what, if anything, she said | 11:03:00 |
| 5 | to you? | 11:03:02 |
| 6 | A. Her -- her faculties are such that I don't | 11:03:06 |
| 7 | think she completely understands what's going on | 11:03:09 |
| 8 | with this. | 11:03:11 |
| 9 | Q. "With this" meaning -- | 11:03:13 |
| 10 | A. This. | 11:03:14 |
| 11 | Q. -- all the legal issues? | 11:03:14 |
| 12 | A. This legal -- yes. | 11:03:16 |
| 13 | Q. Did you discuss it with your sister, Jean, | 11:03:18 |
| 14 | with whom you were living at the time? | 11:03:26 |
| 15 | A. You mean -- | 11:03:27 |
| 16 | Q. Your sister, Dawn, excuse me. | 11:03:28 |
| 17 | A. -- Dawn? | 11:03:29 |
| 18 | Q. What -- what is Dawn's last name?  Does she | 11:03:30 |
| 19 | go by Peary? | 11:03:35 |
| 20 | A. She uses Peavy right now. | 11:03:37 |
| 21 | Q. Peavy.  Excuse me.  Okay.  And what is your | 11:03:38 |
| 22 | address? | 11:03:46 |
| 23 | A. 51 Camino Cabo, Santa Fe, New Mexico, | 11:03:46 |
| 24 | 87508. | 11:03:58 |
| 25 | Q. Who owns the house? | 11:04:00 |

**EXHIBIT 46**
**456**

MARK WARREN PEARY 6/29/2011

| 1 | A. | Perhaps a lock box. | 11:20:37 |
| 2 | Q. | What's -- | 11:20:43 |
| 3 | A. | A lock box. | 11:20:44 |
| 4 | Q. | What do you mean by "a lock box"? | 11:20:45 |
| 5 | A. | Just a fireproof lock box. | 11:20:46 |
| 6 | Q. | In your house? | 11:20:48 |
| 7 | A. | Yes. | 11:20:49 |
| 8 | Q. | And how big is it? | 11:20:50 |
| 9 | A. | Very small.  Hand-held. | 11:20:51 |
| 10 | Q. | What do you have in there? | 11:20:53 |

11    A.   Oh, original documents of all kinds;    11:20:56
12 titles, house, car titles, everything like that.    11:21:02
13    Q.   As -- as pertains to Joe Shuster, what do    11:21:06
14 you have?    11:21:14
15    A.   Oh.  The -- the original -- original signed    11:21:14
16 agreements, legal agreements and retainers that I    11:21:19
17 have with my attorney.    11:21:24
18    Q.   Anything else?    11:21:30
19    A.   There might be -- the original will might    11:21:30
20 be in there.  I would have -- I'm not sure.    11:21:40
21    Q.   Anything else?    11:21:44
22    A.   Not pertaining to the case, no.    11:21:44
23    Q.   How many agreements are there in your lock    11:21:48
24 box between you and Mr. Toberoff or any of his    11:21:51
25 companies?    11:21:56

| | | | |
|---|---|---|---|
| 1 | A. | There is -- there's only one. | 11:21:57 |
| 2 | Q. | Which one is that? | 11:22:02 |
| 3 | A. | That's the legal retainer. | 11:22:03 |
| 4 | Q. | What's the date of it? | 11:22:07 |
| 5 | A. | It is -- it is active as of 2001. | 11:22:08 |
| 6 | Q. | But created after the fact? | 11:22:19 |
| 7 | A. | Yes. | 11:22:20 |
| 8 | Q. | When was it created? | 11:22:23 |
| 9 | A. | 2004, I believe. | 11:22:24 |
| 10 | Q. | And is that the last document you have | 11:22:32 |
| 11 | | signed with Mr. Toberoff or any of his entities? | 11:22:39 |
| 12 | A. | With Mr. Toberoff. | 11:22:44 |
| 13 | | MR. TOBEROFF:  You mean last agreement or | 11:22:45 |
| 14 | | any document? | 11:22:47 |
| 15 | | BY MR. PETROCELLI: | 11:22:47 |
| 16 | Q. | Is that the last agreement, contract, that | 11:22:49 |
| 17 | | you have signed with Mr. Toberoff or any of his | 11:22:54 |
| 18 | | entities, the one in 2004 that you said goes back to | 11:22:56 |
| 19 | | 2001? | 11:23:03 |
| 20 | A. | Yes. | 11:23:05 |
| 21 | Q. | Have you signed any other agreements at any | 11:23:07 |
| 22 | | time since 2004 relating to legal representation | 11:23:13 |
| 23 | | relating to this case in any way? | 11:23:20 |
| 24 | A. | Yes. | 11:23:22 |
| 25 | Q. | What have you signed? | 11:23:24 |

MARK WARREN PEARY - 6/29/2011

Page 54

| | | |
|---|---|---|
| 1 | A.  It's a -- | 11:23:25 |
| 2 | MR. TOBEROFF:  Don't go into -- just -- | 11:23:28 |
| 3 | just give a very -- the title or -- don't go into | 11:23:36 |
| 4 | details of the document. | 11:23:40 |
| 5 | THE WITNESS:  It's -- it's called a consent | 11:23:40 |
| 6 | agreement. | 11:23:42 |
| 7 | BY MR. PETROCELLI: | 11:23:42 |
| 8 | Q.  Is that in your lock box? | 11:23:45 |
| 9 | A.  Yes. | 11:23:46 |
| 10 | Q.  Why didn't you mention it earlier when I | 11:23:50 |
| 11 | asked you about the agreements in your lock box? | 11:23:52 |
| 12 | MR. TOBEROFF:  Argumentative. | 11:23:55 |
| 13 | THE WITNESS:  I -- I mentioned what I had | 11:24:01 |
| 14 | recalled. | 11:24:07 |
| 15 | BY MR. PETROCELLI: | 11:24:07 |
| 16 | Q.  So you're now recalling additional | 11:24:10 |
| 17 | documents that you signed? | 11:24:12 |
| 18 | A.  I -- I recall -- I stated what -- the | 11:24:12 |
| 19 | documents I recalled. | 11:24:18 |
| 20 | Q.  You now recall that you signed something | 11:24:20 |
| 21 | called a consent agreement and that's also in your | 11:24:22 |
| 22 | lock box? | 11:24:24 |
| 23 | A.  Yes. | 11:24:25 |
| 24 | Q.  Okay.  When was that signed? | 11:24:26 |
| 25 | A.  That was 2008, I believe. | 11:24:30 |

**EXHIBIT 46**
**459**

Page 55

```
 1        Q.   When is the last time you saw it, or a copy      11:24:38
 2   of it?                                                     11:24:42
 3        A.   Fairly recently I reviewed it last, I don't      11:24:46
 4   know, maybe in the last month or so I might have           11:24:51
 5   reviewed it.                                               11:24:53
 6        Q.   Why?                                             11:24:54
 7        A.   Because I was thinking about this case           11:24:54
 8   because of this.                                           11:25:00
 9        Q.   This deposition?                                 11:25:02
10        A.   Yes.                                             11:25:03
11        Q.   Besides the 2008 consent agreement, what        11:25:06
12   else did you review in connection with this               11:25:09
13   deposition?                                                11:25:13
14        A.   I reviewed my prior deposition for the          11:25:13
15   Siegel case and exhibits.  That's -- that's what          11:25:19
16   I've reviewed.                                             11:25:30
17        Q.   Did you have a copy of your prior               11:25:32
18   deposition?                                                11:25:34
19        A.   Yes.                                             11:25:36
20        Q.   And the exhibits?                               11:25:37
21        A.   Yes.                                             11:25:38
22        Q.   Besides the 2008 consent agreement and your     11:25:42
23   deposition in the Siegel case together with the           11:25:45
24   exhibits of that deposition, what else did you            11:25:48
25   review in connection with this deposition?                11:25:51
```

**EXHIBIT 46**
**460**

MARK WARREN PERRY, 6/29/2011

Page 56

| | | |
|---|---|---|
| 1 | A.   That's -- that's pretty much it. | 11:25:55 |
| 2 | Q.   Where did you get the consent agreement to | 11:26:02 |
| 3 | review, from the lock box? | 11:26:04 |
| 4 | A.   I -- I -- I -- yes or -- or it could have | 11:26:10 |
| 5 | been a copy. | 11:26:15 |
| 6 | Q.   Where -- where was the copy? | 11:26:16 |
| 7 | A.   The copy is -- it could be in a separate | 11:26:18 |
| 8 | folder. | 11:26:22 |
| 9 | Q.   What -- what's the name of the folder? | 11:26:24 |
| 10 | A.   The folder is "Legal." | 11:26:26 |
| 11 | Q.   Where is the folder maintained? | 11:26:29 |
| 12 | A.   The folder, there could be a copy in there, | 11:26:30 |
| 13 | in the -- in the filing cabinet. | 11:26:35 |
| 14 | Q.   Is the 2008 consent agreement the last | 11:26:40 |
| 15 | agreement of any kind that you have signed in | 11:26:44 |
| 16 | connection with either this case or anything having | 11:26:49 |
| 17 | to do with the Joe Shuster termination issue? | 11:26:52 |
| 18 | A.   Yes. | 11:26:55 |
| 19 | Q.   Okay.  Who else signed the 2008 consent | 11:26:57 |
| 20 | agreement? | 11:27:07 |
| 21 | A.   Would have been the -- Laura, Joanne | 11:27:07 |
| 22 | Siegel. | 11:27:17 |
| 23 | Q.   Laura Siegel and Joanne Siegel? | 11:27:17 |
| 24 | A.   Yes. | 11:27:20 |
| 25 | Q.   Anyone else? | 11:27:20 |

**EXHIBIT 46**
**461**

MARK WARREN PEARY - 6/29/2011

Page 57

1      A.  I think there was -- and -- and my attorney          11:27:21

2  signed it.                                                   11:27:28

3      Q.  You mean Mr. Toberoff?                               11:27:28

4      A.  Yes.                                                 11:27:29

5      Q.  And did your mother, Jean Peavy, sign it?            11:27:30

6      A.  I don't recall if she did.  I just -- I             11:27:33

7  didn't read it.  I just scanned the -- the pages.  I        11:27:44

8  didn't -- I don't recall the signature page.  She           11:27:48

9  might have.                                                 11:27:51

10     Q.  Do you know where you were when you signed           11:27:53

11 the document in -- in 2008?                                  11:27:55

12     A.  Yeah.  When -- when I signed it, I -- I was          11:27:57

13 at home.                                                     11:28:01

14     Q.  And what did you do after you signed it?             11:28:05

15 What did you do with it?                                     11:28:08

16     A.  Well, an original was FedExed to                     11:28:09

17 Mr. Toberoff and I kept another original.                    11:28:14

18     Q.  You signed two copies?                               11:28:18

19     A.  Yes.                                                 11:28:20

20     Q.  And you put the other original in your lock          11:28:21

21 box?                                                         11:28:25

22     A.  Yes.                                                 11:28:25

23     Q.  Did you ever get back from Mr. Toberoff a            11:28:26

24 version that had more signatures on it?                      11:28:29

25     A.  Well, yes, the version in the lock box              11:28:30

MARK WARREN PEARY - 6/29/2011

Page 58

| | | |
|---|---|---|
| 1 | would have all the original signatures. | 11:28:35 |
| 2 | Q.  Why did you review -- why did you pick the | 11:28:48 |
| 3 | 2008 consent agreement to review? | 11:28:51 |
| 4 | A.  Well, before I came I -- I brought out my | 11:28:53 |
| 5 | folder and it says "Legal, Shuster case" and I | 11:28:59 |
| 6 | flipped through documents, just looked at them and | 11:29:06 |
| 7 | said what do I want to bring, what don't I want to | 11:29:08 |
| 8 | bring and -- and that's all.  It was just a cursory | 11:29:10 |
| 9 | review of what I had in there.  And I left most of | 11:29:15 |
| 10 | it at home, so it was just a cursory review of what | 11:29:18 |
| 11 | I had. | 11:29:21 |
| 12 | Q.  What did you bring with you? | 11:29:23 |
| 13 | A.  I brought a copy of the legal retainer as | 11:29:25 |
| 14 | of 2001 and I brought a -- a copy of the first page | 11:29:28 |
| 15 | of the consent agreement and a -- with a cover | 11:29:41 |
| 16 | letter that was a communication between Mr. Toberoff | 11:29:43 |
| 17 | and another attorney, so it was just like the first | 11:29:48 |
| 18 | page of it, just to jog my memory.  And -- | 11:29:53 |
| 19 | Q.  Who was the other attorney? | 11:29:56 |
| 20 | A.  It was -- can I say that?  Just -- it was a | 11:29:57 |
| 21 | communication.  I don't know if that's privileged. | 11:30:04 |
| 22 | MR. TOBEROFF:  Well -- | 11:30:07 |
| 23 | THE WITNESS:  Just -- | 11:30:07 |
| 24 | MR. TOBEROFF:  I -- I think you can -- I | 11:30:08 |
| 25 | think you can give the name of the attorney. | 11:30:12 |

**EXHIBIT 46**
**463**

MARK WARREN PEARY - 6/29/2011

Page 67

| | | |
|---|---|---|
| 1 | A.   Yes, but I'll have to follow my attorney's | 11:50:09 |
| 2 | advice. | 11:50:11 |
| 3 | Q.   Well, based on your reading of the | 11:50:12 |
| 4 | document, what did you understand the purpose of | 11:50:14 |
| 5 | your signing it to be? | 11:50:16 |
| 6 | MR. TOBEROFF:   I instruct you not to answer | 11:50:18 |
| 7 | if you -- put it this way:  You can only answer the | 11:50:19 |
| 8 | question if you have an understanding independent of | 11:50:23 |
| 9 | your conversations with me. | 11:50:24 |
| 10 | THE WITNESS:  Well, all my understanding is | 11:50:28 |
| 11 | based on my communication with my attorney, so I | 11:50:30 |
| 12 | can't say anything. | 11:50:32 |
| 13 | (Unanswered question.) | 11:50:33 |
| 14 | BY MR. PETROCELLI: | 11:50:33 |
| 15 | Q.   Are you saying that when -- when you read | 11:50:34 |
| 16 | the document, you derived absolutely no | 11:50:36 |
| 17 | understanding from reading the words? | 11:50:39 |
| 18 | A.   My understanding is intricately bound with | 11:50:41 |
| 19 | my communications with Marc Toberoff. | 11:50:43 |
| 20 | Q.   Can you answer my question? | 11:50:46 |
| 21 | A.   I don't believe I can. | 11:50:47 |
| 22 | MR. TOBEROFF:   He did. | 11:50:49 |
| 23 | MR. PETROCELLI:   It wasn't responsive to my | 11:50:52 |
| 24 | question. | 11:50:53 |
| 25 | Q.   My question was, when you read the document | 11:50:54 |

| | | |
|---|---|---|
| 1 | are you saying that you drew no understanding at all | 11:50:57 |
| 2 | from reading the words on the page of the document? | 11:51:00 |
| 3 | A.  It's -- it's all based upon -- my | 11:51:07 |
| 4 | understanding is intricately bound to my | 11:51:10 |
| 5 | communications with my attorney. | 11:51:14 |
| 6 | Q.  Are you saying that had you not spoken to | 11:51:19 |
| 7 | your attorney, you would have had no idea what -- | 11:51:20 |
| 8 | what you were signing? | 11:51:26 |
| 9 | A.  What, if I had no idea? | 11:51:28 |
| 10 | Q.  Right.  You signed a -- a document together | 11:51:30 |
| 11 | with other individuals.  Are you saying that you did | 11:51:34 |
| 12 | not understand what you were signing except for what | 11:51:38 |
| 13 | Marc Toberoff had to tell you? | 11:51:41 |
| 14 | MR. TOBEROFF:  Asked and answered. | 11:51:42 |
| 15 | Misstates his testimony. | 11:51:43 |
| 16 | THE WITNESS:  My understanding is -- is | 11:51:47 |
| 17 | bound up, what -- whatever I have is bound up. | 11:51:52 |
| 18 | BY MR. PETROCELLI: | 11:51:52 |
| 19 | Q.  I appreciate you keep repeating that phrase | 11:51:56 |
| 20 | that your understanding is bound up or intricately | 11:52:00 |
| 21 | bound up.  I'm asking you something different than | 11:52:03 |
| 22 | that.  I'm not required to simply accept that | 11:52:05 |
| 23 | phrase. | 11:52:07 |
| 24 | A.  Uh-huh. | 11:52:07 |
| 25 | Q.  Did you understand that you were entering | 11:52:08 |

**EXHIBIT 46**
**465**

MARK WARREN PEARY - 6/29/2011

Page 69

```
 1    into a contract, an agreement, with the Siegels when      11:52:12
 2    you signed the document?                                  11:52:17
 3       A.  Yes.                                                11:52:23
 4       Q.  Did you understand that the agreement that         11:52:24
 5    you were entering into required that you could not        11:52:25
 6    settle any claim with DC Comics without the consent       11:52:32
 7    of the Siegels?                                            11:52:38
 8          MR. TOBEROFF:  I instruct you not to               11:52:39
 9    answer.  The document has been held to be privileged      11:52:41
10    and off limits and they can't ask you questions           11:52:44
11    about the contents of the document.  Instruct you         11:52:47
12    not to answer.                                            11:52:49
13          (Unanswered question.)                              11:52:50
14          MR. PETROCELLI:  I don't agree with that as        11:52:50
15    you well know.                                            11:52:53
16       Q.  Is there any arrangement whereby you would         11:52:54
17    have the authority to approve any kind of settlement      11:52:57
18    that Joanne Siegel might enter into with DC Comics?       11:52:59
19          MR. TOBEROFF:  Instruct you not to answer.          11:53:03
20          (Unanswered question.)                              11:53:07
21          MR. PETROCELLI:  Marc, you allowed that             11:53:07
22    verbatim question to be answered at the first -- at       11:53:09
23    the Siegel session of his deposition.                     11:53:12
24          MR. TOBEROFF:  I'm instructing him not to          11:53:13
25    answer and as you suggested we shouldn't debate           11:53:15
```

MARK WARREN PEARY - 6/29/2011

Page 70

1    these things in the deposition.                    11:53:17

2    BY MR. PETROCELLI:                                 11:53:17

3        Q.  So is it possible for Joanne Siegel --     11:53:22

4        MR. TOBEROFF:  I'm going to instruct           11:53:23

5    him not to -- just to shorten -- shorten this, I   11:53:25

6    will instruct him not to answer any questions      11:53:27

7    regarding the substance of the consent agreement.  11:53:29

8    BY MR. PETROCELLI:                                 11:53:29

9        Q.  So is it possible for Joanne Siegel and    11:53:33

10   Laura Siegel-Larson to settle their case with DC   11:53:36

11   Comics and you would have no say so in that?       11:53:40

12        Is that accurate?                             11:53:41

13        MR. TOBEROFF:  I instruct you not to answer   11:53:42

14   on the basis of attorney-client privilege.         11:53:48

15        (Unanswered question.)                        11:53:48

16   BY MR. PETROCELLI:                                 11:53:48

17       Q.  And if they were to settle -- and if they  11:53:50

18   were to settle and receive money from DC Comics, is 11:53:50

19   there any arrangement by which you would receive any 11:53:53

20   of that money?                                     11:53:56

21        MR. TOBEROFF:  Same instruction.              11:53:57

22        (Unanswered question.)                        11:53:57

23   BY MR. PETROCELLI:                                 11:53:57

24       Q.  Are you able right now, on behalf of the   11:54:06

25   Joe Shuster estate, to enter into an agreement with 11:54:09

**EXHIBIT 46**
**467**

MARK WARREN PEARY - 6/29/2011

Page 71

| | | |
|---|---|---|
| 1 | DC regarding the Shuster termination interests | 11:54:12 |
| 2 | without the consent of any -- anyone else? | 11:54:17 |
| 3 | MR. TOBEROFF:  Same instruction. | 11:54:22 |
| 4 | Attorney-client privilege. | 11:54:24 |
| 5 | (Unanswered question.) | 11:54:25 |
| 6 | THE WITNESS:  I'll have to follow my | 11:54:26 |
| 7 | attorney's advice. | 11:54:27 |
| 8 | BY MR. PETROCELLI: | 11:54:27 |
| 9 | Q.  Do you have a current agreement to share | 11:54:32 |
| 10 | with any member of the Siegel family any settlement | 11:54:36 |
| 11 | or other recoveries having to do with the Superman | 11:54:39 |
| 12 | termination interests? | 11:54:43 |
| 13 | MR. TOBEROFF:  I instruct you not to answer | 11:54:47 |
| 14 | based on privilege. | 11:54:48 |
| 15 | (Unanswered question.) | 11:54:49 |
| 16 | MR. PETROCELLI:  When you say "based on | 11:54:57 |
| 17 | privilege," to be clear, what privilege, Mr. -- are | 11:54:59 |
| 18 | you talking about the attorney-client privilege? | 11:55:02 |
| 19 | MR. TOBEROFF:  Attorney-client privilege, | 11:55:04 |
| 20 | work product, the privilege that was upheld by | 11:55:05 |
| 21 | Magistrate Suresky, Judge Larson in your motion that | 11:55:10 |
| 22 | was denied as to obtaining the consent agreement. | 11:55:14 |
| 23 | If you can't obtain the consent agreement because | 11:55:17 |
| 24 | you're not entitled to view the substance of the | 11:55:21 |
| 25 | consent agreement, you're not entitled to get at | 11:55:24 |

**EXHIBIT 46**

**468**

| | | |
|---|---|---|
| 1 | that substance through questioning my client. | 11:55:27 |
| 2 | MR. PETROCELLI:  We -- we disagree. | 11:55:28 |
| 3 | MR. TOBEROFF:  That's fine. | 11:55:33 |
| 4 | BY MR. PETROCELLI: | 11:55:33 |
| 5 | Q.  Is the consent agreement that you signed in | 11:55:34 |
| 6 | 2008 still in effect? | 11:55:36 |
| 7 | A.  Yes. | 11:55:39 |
| 8 | Q.  Have you had any discussions with any | 11:55:48 |
| 9 | member of the Siegel family about it at any time | 11:55:50 |
| 10 | both before or after signing it? | 11:55:55 |
| 11 | A.  Not directly. | 11:55:59 |
| 12 | Q.  What does that mean? | 11:56:00 |
| 13 | A.  All my discussions are through my attorney. | 11:56:01 |
| 14 | Q.  How do you have a discussion with the | 11:56:04 |
| 15 | Siegels through the attorney? | 11:56:08 |
| 16 | A.  Then the answer is no. | 11:56:09 |
| 17 | Q.  What did you mean when you said not | 11:56:11 |
| 18 | directly, through your attorney? | 11:56:13 |
| 19 | A.  All -- all my communication about the | 11:56:14 |
| 20 | agreement is -- is through my discussions with my | 11:56:15 |
| 21 | attorney and what he has told me the Siegels have | 11:56:19 |
| 22 | communicated.  That's what I mean. | 11:56:26 |
| 23 | Q.  Have you ever had a -- a discussion with | 11:56:28 |
| 24 | your mom about the consent agreement? | 11:56:43 |
| 25 | A.  She -- she -- I may have -- she has a -- | 11:56:56 |

MARK WARREN PEARY--6/29/2011

Page 73

| | | |
|---|---|---|
| 1 | little interest in this.  Her faculties, as I said, | 11:57:04 |
| 2 | are -- are poor and I don't recall if I've mentioned | 11:57:08 |
| 3 | it to her or not because of its detail. | 11:57:14 |
| 4 | Q.  Back in 2008 she was of sound mind, | 11:57:19 |
| 5 | correct? | 11:57:19 |
| 6 | A.  That's when she had her stroke. | 11:57:25 |
| 7 | Q.  Before or after the consent agreement? | 11:57:27 |
| 8 | A.  I don't -- I don't recall.  I don't -- I | 11:57:29 |
| 9 | don't know if I've ever discussed it with her or | 11:57:38 |
| 10 | not.  I mean, she's not -- she's not that interested | 11:57:41 |
| 11 | in legal matters.  I know that she -- she -- she | 11:57:46 |
| 12 | knows about it.  I don't know if she understands it. | 11:57:53 |
| 13 | Q.  How do you know she knows about it? | 11:58:00 |
| 14 | A.  I -- I -- she would have been aware of it. | 11:58:01 |
| 15 | Q.  How do you know that? | 11:58:05 |
| 16 | A.  Well, I -- as far as I know, she -- as far | 11:58:05 |
| 17 | as -- as far as I can remember, I probably have said | 11:58:10 |
| 18 | something.  That's all I can say.  I mean, that's -- | 11:58:14 |
| 19 | Q.  What did you say to her? | 11:58:17 |
| 20 | A.  I -- if I had said anything, it would just | 11:58:20 |
| 21 | have been that there's -- I don't remember what I | 11:58:23 |
| 22 | said to her, frankly.  I mean, I don't know what to | 11:58:29 |
| 23 | say because I don't -- I don't remember my words. | 11:58:31 |
| 24 | She doesn't really -- | 11:58:33 |
| 25 | MR. TOBEROFF:  Don't speculate. | 11:58:34 |

MARK WARREN PEARY - 6/29/2011

| | | |
|---|---|---|
| 1 | A.  No.  We haven't got into that. | 12:07:03 |
| 2 | Q.  For example, have you said, you know, it | 12:07:10 |
| 3 | would be in -- approximately 5 million or 10 million | 12:07:12 |
| 4 | or 100 million or any numbers, discussed in your | 12:07:15 |
| 5 | conversations with your mother? | 12:07:22 |
| 6 | A.  I don't recall getting into figures with | 12:07:23 |
| 7 | her.  We just -- no, I don't. | 12:07:29 |
| 8 | Q.  Have you ever had anybody try to do an | 12:07:34 |
| 9 | estimate for you as to how much you might recover | 12:07:38 |
| 10 | one day as a result of Joe Shuster's asserted | 12:07:40 |
| 11 | termination interests? | 12:07:44 |
| 12 | A.  I -- I know -- | 12:07:48 |
| 13 | MR. TOBEROFF:  You -- you could answer that | 12:07:49 |
| 14 | ... solely if it's outside of the | 12:07:51 |
| 15 | attorney-client relationship. | 12:07:57 |
| 16 | THE WITNESS:  All I know is that my | 12:08:00 |
| 17 | attorney, Marc Toberoff, has -- | 12:08:04 |
| 18 | MR. TOBEROFF:  Don't -- don't discuss what | 12:08:06 |
| 19 | your attorney has done. | 12:08:07 |
| 20 | THE WITNESS:  Okay.  Okay. | 12:08:08 |
| 21 | MR. TOBEROFF:  The -- | 12:08:09 |
| 22 | THE WITNESS:  I don't have any -- no, I | 12:08:10 |
| 23 | don't have any idea of economic value outside of my | 12:08:12 |
| 24 | discussions, no. | 12:08:16 |
| 25 | BY MR. PETROCELLI: | 12:08:16 |

**EXHIBIT 46**
**471**

MARK WARREN PEARY, 6/29/2011

Page 82

| | | |
|---|---|---|
| 1 | Q.  Have you ever met or spoken or communicated | 12:08:17 |
| 2 | with anybody who you understood to be estimating the | 12:08:20 |
| 3 | value of the termination interest? | 12:08:26 |
| 4 | A.  No. | 12:08:27 |
| 5 | Q.  Have you ever provided any information to | 12:08:29 |
| 6 | any such person? | 12:08:31 |
| 7 | A.  No. | 12:08:31 |
| 8 | Q.  Did you tell your mother in your | 12:08:38 |
| 9 | conversations over the years, and in particular | 12:08:42 |
| 10 | about the consent agreement, that any agreement with | 12:08:46 |
| 11 | DC or settlement with DC requires the consent of the | 12:08:52 |
| 12 | Siegels? | 12:08:56 |
| 13 | THE WITNESS:  Am I allowed to answer that? | 12:09:05 |
| 14 | Is that -- | 12:09:07 |
| 15 | BY MR. PETROCELLI: | 12:09:07 |
| 16 | Q.  You are. | 12:09:09 |
| 17 | MR. TOBEROFF:  Actually, I'll let you | 12:09:09 |
| 18 | answer that question without waiver of any privilege | 12:09:27 |
| 19 | that could apply. | 12:09:31 |
| 20 | THE WITNESS:  Okay.  So the question being | 12:09:31 |
| 21 | she -- | 12:09:34 |
| 22 | MR. PETROCELLI:  Can you repeat the | 12:09:50 |
| 23 | question. | 12:09:51 |
| 24 | (The reporter read the record | 12:09:51 |
| 25 | as follows: | 12:09:51 |

MARK WARREN PEARY - 6/29/2011

Page 83

| | | |
|---|---|---|
| 1 | "QUESTION:  Did you tell your | 12:08:40 |
| 2 | mother in your conversations over | 12:08:41 |
| 3 | the years and in particular about | 12:08:44 |
| 4 | the consent agreement that any | 12:08:46 |
| 5 | agreement with DC or settlement | 12:08:51 |
| 6 | with DC requires the consent of the | 12:08:54 |
| 7 | Siegels?") | 12:08:56 |
| 8 | THE WITNESS:  Yes. | 12:09:52 |
| 9 | BY MR. PETROCELLI: | 12:09:52 |
| 10 | Q.  What did you say in that regard? | 12:09:54 |
| 11 | A.  Pretty much what -- what you said there. | 12:09:59 |
| 12 | Q.  Did you discuss with her what would happen | 12:10:04 |
| 13 | if, for example, you wanted to do a settlement or an | 12:10:12 |
| 14 | agreement with DC but the Siegels did not, how you | 12:10:16 |
| 15 | would deal with that circumstance? | 12:10:19 |
| 16 | A.  I don't recall going into that detail of | 12:10:27 |
| 17 | what-ifs. | 12:10:30 |
| 18 | Q.  Did your mom ask you, "Well, what if we | 12:10:32 |
| 19 | can't agree with the Siegels?  I mean, what happens | 12:10:35 |
| 20 | then?"  Did she put that -- | 12:10:37 |
| 21 | A.  No. | 12:10:40 |
| 22 | Q.  -- question to you in so many words? | 12:10:41 |
| 23 | A.  No. | 12:10:42 |
| 24 | Q.  Do you -- did -- if she had put that | 12:10:46 |
| 25 | question to you, could you have answered it? | 12:10:48 |

Merrill   Corporation  -  Los Angeles
800-826-0277                                   www.merrillcorp.com/law

**EXHIBIT 46**
**473**

MARK WARREN PEARY - 6/29/2011

Page 84

1          MR. TOBEROFF:  Again, don't testify based          12:10:53

2    on knowledge and communications you received --          12:10:56

3    don't testify based on knowledge you received          12:11:00

4    through your communications with your attorney.          12:11:02

5          THE WITNESS:  I -- all I can --          12:11:07

6          MR. TOBEROFF:  And I also, when he asks you          12:11:08

7    about conversations, if you understand the substance          12:11:11

8    of the conversation you can give him that substance.          12:11:14

9    If you understand the exact words you used, you can          12:11:17

10   give him the exact words.  But if you don't remember          12:11:19

11   the exact words you used, don't make up the words to          12:11:21

12   fill in the blanks.  That would be speculating.          12:11:25

13         THE WITNESS:  Uh-huh.  The question again          12:11:27

14   being?          12:11:33

15   BY MR. PETROCELLI:          12:11:33

16      Q.  Did you have an understanding in          12:11:33

17   discussions with your mom about the consent          12:11:38

18   agreement what would happen if the Siegels and you          12:11:40

19   could not agree?          12:11:43

20         MR. TOBEROFF:  Asked and answered.          12:11:45

21         THE WITNESS:  I didn't discuss that with          12:11:49

22   her.          12:11:51

23   BY MR. PETROCELLI:          12:11:51

24      Q.  Did you have an awareness in your own mind          12:11:52

25   of what would happen?          12:11:57

MARK WARREN PEARY - 6/29/2011

Page 71

```
1    DC regarding the Shuster termination interests          11:54:12

2    without the consent of any -- anyone else?               11:54:17

3            MR. TOBEROFF:  Same instruction.                 11:54:22

4    Attorney-client privilege.                               11:54:24

5            (Unanswered question.)                           11:54:25

6            THE WITNESS:  I'll have to follow my             11:54:26

7    attorney's advice.                                       11:54:27

8    BY MR. PETROCELLI:                                       11:54:27

9       Q.  Do you have a current agreement to share          11:54:32

10   with any member of the Siegel family any settlement      11:54:36

11   or other recoveries having to do with the Superman       11:54:39

12   termination interests?                                   11:54:43

13           MR. TOBEROFF:  I instruct you not to answer      11:54:47

14   based on privilege.                                      11:54:48

15           (Unanswered question.)                           11:54:49

16           MR. PETROCELLI:  When you say "based on          11:54:57

17   privilege," to be clear, what privilege, Mr. -- are     11:54:59

18   you talking about the attorney-client privilege?         11:55:02

19           MR. TOBEROFF:  Attorney-client privilege,        11:55:04

20   work product, the privilege that was upheld by           11:55:05

21   Magistrate Suresky, Judge Larson in your motion that     11:55:10

22   was denied as to obtaining the consent agreement.        11:55:14

23   If you can't obtain the consent agreement because        11:55:17

24   you're not entitled to view the substance of the         11:55:21

25   consent agreement, you're not entitled to get at         11:55:24
```

MARK WARREN PEARY   6/29/2011

Page 72

| | | |
|---|---|---|
| 1 | that substance through questioning my client. | 11:55:27 |
| 2 | MR. PETROCELLI:  We -- we disagree. | 11:55:28 |
| 3 | MR. TOBEROFF:  That's fine. | 11:55:33 |
| 4 | BY MR. PETROCELLI: | 11:55:33 |
| 5 | Q.  Is the consent agreement that you signed in | 11:55:34 |
| 6 | 2008 still in effect? | 11:55:36 |
| 7 | A.  Yes. | 11:55:39 |
| 8 | Q.  Have you had any discussions with any | 11:55:48 |
| 9 | member of the Siegel family about it at any time | 11:55:50 |
| 10 | both before or after signing it? | 11:55:55 |
| 11 | A.  Not directly. | 11:55:59 |
| 12 | Q.  What does that mean? | 11:56:00 |
| 13 | A.  All my discussions are through my attorney. | 11:56:01 |
| 14 | Q.  How do you have a discussion with the | 11:56:04 |
| 15 | Siegels through the attorney? | 11:56:08 |
| 16 | A.  Then the answer is no. | 11:56:09 |
| 17 | Q.  What did you mean when you said not | 11:56:11 |
| 18 | directly, through your attorney? | 11:56:13 |
| 19 | A.  All -- all my communication about the | 11:56:14 |
| 20 | agreement is -- is through my discussions with my | 11:56:15 |
| 21 | attorney and what he has told me the Siegels have | 11:56:19 |
| 22 | communicated.  That's what I mean. | 11:56:26 |
| 23 | Q.  Have you ever had a -- a discussion with | 11:56:28 |
| 24 | your mom about the consent agreement? | 11:56:43 |
| 25 | A.  She -- she -- I may have -- she has a -- | 11:56:56 |

Merrill   Corporation   -   Los Angeles
800-826-0277                                      www.merrillcorp.com/law

**EXHIBIT 46**

MARK WARREN PEARY 6/29/2011

Page 73

1    little interest in this. Her faculties, as I said,    11:57:04

2    are -- are poor and I don't recall if I've mentioned    11:57:08

3    it to her or not because of its detail.    11:57:14

4        Q. Back in 2008 she was of sound mind,    11:57:19

5    correct?    11:57:19

6        A. That's when she had her stroke.    11:57:25

7        Q. Before or after the consent agreement?    11:57:27

8        A. I don't -- I don't recall. I don't -- I    11:57:29

9    don't know if I've ever discussed it with her or    11:57:38

10    not. I mean, she's not -- she's not that interested    11:57:41

11    in legal matters. I know that she -- she -- she    11:57:46

12    knows about it. I don't know if she understands it.    11:57:53

13        Q. How do you know she knows about it?    11:58:00

14        A. I -- I -- she would have been aware of it.    11:58:01

15        Q. How do you know that?    11:58:05

16        A. Well, I -- as far as I know, she -- as far    11:58:05

17    as -- as far as I can remember, I probably have said    11:58:10

18    something. That's all I can say. I mean, that's --    11:58:14

19        Q. What did you say to her?    11:58:17

20        A. I -- if I had said anything, it would just    11:58:20

21    have been that there's -- I don't remember what I    11:58:23

22    said to her, frankly. I mean, I don't know what to    11:58:29

23    say because I don't -- I don't remember my words.    11:58:31

24    She doesn't really --    11:58:33

25        MR. TOBEROFF: Don't speculate.    11:58:34

**EXHIBIT 46**

**477**

MARK WARREN PEARY - 6/29/2011

Page 154

| | | |
|---|---|---|
| 1 | broke?  Superman has made billions." | 14:31:49 |
| 2 | A.  Yeah, might have -- might have asked her | 14:31:52 |
| 3 | about it. | 14:31:58 |
| 4 | Q.  What did she say? | 14:31:58 |
| 5 | A.  That it's -- just expressed that it was | 14:32:02 |
| 6 | just an injustice and it was just -- it wasn't | 14:32:07 |
| 7 | right, that type of thing. | 14:32:14 |
| 8 | Q.  How did you know as early as 1992 when Joe | 14:32:19 |
| 9 | Shuster died that Superman had, as you put it, | 14:32:23 |
| 10 | generated billions of dollars in revenue? | 14:32:26 |
| 11 | A.  Well, I had seen Superman all my life.  I | 14:32:28 |
| 12 | grew up -- grew up with Superman and the -- the big | 14:32:32 |
| 13 | movie in '79, the big Superman movie, or '78, I was | 14:32:37 |
| 14 | aware that was the first big blockbuster superhero | 14:32:44 |
| 15 | movie that started the whole genre of superhero | 14:32:48 |
| 16 | movies that is just the rage.  So I'm just aware | 14:32:53 |
| 17 | of -- of how widespread it is and popular. | 14:32:55 |
| 18 | Q.  You were aware of this in 1992 when Joe | 14:32:58 |
| 19 | died broke, right? | 14:33:00 |
| 20 | A.  Yeah, just in general of how -- the history | 14:33:02 |
| 21 | of Superman and how big it is. | 14:33:06 |
| 22 | Q.  And when you had this conversation with | 14:33:13 |
| 23 | your mother right after Joe's death, you're telling | 14:33:15 |
| 24 | us that she agreed with you? | 14:33:23 |
| 25 | A.  Well, she expressed to me that she thought | 14:33:24 |

Merrill  Corporation  -  Los Angeles
800-826-0277
www.merrillcorp.com/law

**EXHIBIT 46**
**478**

MARK WARREN PEARY 6/29/2011

Page 155

| | | |
|---|---|---|
| 1 | it was an injustice.  And did I agree with her?  Is | 14:33:31 |
| 2 | that what you're asking? | 14:33:34 |
| 3 | Q.  Yes. | 14:33:35 |
| 4 | A.  Well, yes. | 14:33:36 |
| 5 | Q.  The injustice that she expressed to you was | 14:33:39 |
| 6 | that Joe had so little money when Superman had | 14:33:41 |
| 7 | generated so much? | 14:33:44 |
| 8 | A.  Yes. | 14:33:45 |
| 9 | Q.  So did it come as a surprise to you then | 14:33:53 |
| 10 | that she entered into an agreement after that | 14:33:55 |
| 11 | conversation with DC and Time-Warner in which she | 14:33:59 |
| 12 | gave up any copyright interest that the family might | 14:34:06 |
| 13 | have? | 14:34:10 |
| 14 | A.  I don't know what her thinking was. | 14:34:10 |
| 15 | MR. TOBEROFF:  Sorry.  Assumes facts. | 14:34:13 |
| 16 | Lacks foundation. | 14:34:16 |
| 17 | BY MR. PETROCELLI: | 14:34:16 |
| 18 | Q.  She didn't consult with you, right? | 14:34:18 |
| 19 | A.  No. | 14:34:18 |
| 20 | Q.  She was certainly of sound mind in 1992, | 14:34:20 |
| 21 | right? | 14:34:20 |
| 22 | A.  Yes. | 14:34:20 |
| 23 | Q.  When she was expressing to you the | 14:34:24 |
| 24 | injustice after Joe's death, you didn't think she -- | 14:34:26 |
| 25 | she was mentally infirm, you thought that she was | 14:34:30 |

**EXHIBIT 46**
**479**

MARK WARREN PEARY, 6/29/2011

Page 156

| | | |
|---|---|---|
| 1 | healthy and sound and knew exactly what she was | 14:34:34 |
| 2 | saying, right? | 14:34:35 |
| 3 | A.  Yes. | 14:34:36 |
| 4 | Q.  And in -- and she didn't consult with you | 14:34:36 |
| 5 | when she signed that agreement, Exhibit 5, as of | 14:34:41 |
| 6 | August 31, 1992, correct? | 14:34:46 |
| 7 | A.  That's correct. | 14:34:48 |
| 8 | Q.  And when you saw it, were you surprised | 14:34:50 |
| 9 | that she had signed that agreement given her | 14:34:52 |
| 10 | statements to you that it was an injustice? | 14:34:54 |
| 11 | A.  Well, yes. | 14:34:57 |
| 12 | Q.  Do you think that she felt like the | 14:34:59 |
| 13 | injustice had been rectified by virtue of her having | 14:35:00 |
| 14 | obtained that agreement from DC? | 14:35:05 |
| 15 | MR. TOBEROFF:  Calls for speculation. | 14:35:07 |
| 16 | THE WITNESS:  Can I answer? | 14:35:09 |
| 17 | BY MR. PETROCELLI: | 14:35:09 |
| 18 | Q.  Did you discuss that with her when you saw | 14:35:17 |
| 19 | the letter? | 14:35:18 |
| 20 | A.  Yeah, what was the original question? | 14:35:20 |
| 21 | Q.  When you saw the letter, the agreement, | 14:35:21 |
| 22 | Exhibit 5, and I misspoke, I said August 31, it's | 14:35:23 |
| 23 | August 1, 1992, when you found it and you saw it, | 14:35:28 |
| 24 | did you have a discussion with her to the effect | 14:35:36 |
| 25 | that -- about whether she felt better now that the | 14:35:38 |

**EXHIBIT 46**
**480**

1          A.  Well --                                    15:58:27

2          Q.  Not in the proceeds, but in the actual    15:58:27

3  rights?                                                15:58:29

4          A.  My -- my understanding is you can't        15:58:29

5  transfer something you have rights in.                15:58:31

6          Q.  And that's something that you learned after 15:58:34

7  you signed this agreement, correct?                   15:58:37

8          A.  Well, I believe I had some awareness of   15:58:41

9  that before I signed it.                              15:58:44

10         Q.  You learned that after you signed this     15:58:45

11  agreement when you tried to fix the problem by       15:58:47

12  entering into the legal agreement in 2004 which you  15:58:51

13  then backdated back to 2001, correct?                15:58:55

14         MR. TOBEROFF:  Also, let me just interject.    15:59:02

15  I don't want you answering questions that are based  15:59:03

16  on any legal understanding that you've received or   15:59:07

17  knowledge or -- he is asking you information that    15:59:11

18  you just know all on your own.  I know it's hard to  15:59:16

19  distinguish between the two, but -- but I'm going to 15:59:17

20  ask you to try and do that and not answer questions  15:59:22

21  based on conversations with attorneys.               15:59:24

22         THE WITNESS:  Okay.                            15:59:28

23  BY MR. PETROCELLI:                                    15:59:28

24         Q.  Can you look at paragraph 2?  It says in   15:59:47

25  the middle, "In consideration for PPC's" -- that's   15:59:54

| | | |
|---|---|---|
| 1 | Pacific Pictures Corporation's -- "contributions to | 15:59:57 |
| 2 | the Venture" -- and you see "venture" is capital V, | 16:00:00 |
| 3 | right? | 16:00:00 |
| 4 | A.  Which line are you on?  Oh, yes, okay. | 16:00:07 |
| 5 | Q.  And that's the venture between Pacific | 16:00:09 |
| 6 | Pictures and you and your mother, correct? | 16:00:12 |
| 7 | A.  Yes. | 16:00:12 |
| 8 | Q.  Okay.  It says: | 16:00:15 |
| 9 | "In consideration for PPC's | 16:00:16 |
| 10 | contributions to the Venture in the | 16:00:18 |
| 11 | mutual covenants contained herein, | 16:00:19 |
| 12 | claimants hereby transfer and | 16:00:22 |
| 13 | assign to the Venture their rights, | 16:00:24 |
| 14 | titles and -- title and interests | 16:00:27 |
| 15 | in the rights." | 16:00:29 |
| 16 | Do you see that? | 16:00:31 |
| 17 | A.  Yes. | 16:00:31 |
| 18 | Q.  So you understood when you signed this that | 16:00:32 |
| 19 | all of the Joe Shuster rights, termination rights, | 16:00:36 |
| 20 | to the extent they existed, were being transferred | 16:00:40 |
| 21 | and assigned to the venture just as it says, | 16:00:43 |
| 22 | correct? | 16:00:43 |
| 23 | A.  Yes. | 16:00:43 |
| 24 | Q.  Now, are you saying you signed this | 16:00:50 |
| 25 | believing it was invalid because you can't make such | 16:00:52 |

MARK WARREN PEARY - 6/29/2011

Page 212

| | | |
|---|---|---|
| 1 | an assignment or transfer of the rights?  Are you | 16:00:56 |
| 2 | telling me -- | 16:00:59 |
| 3 | A.  No. | 16:00:59 |
| 4 | Q.  -- now that it's something you learned | 16:01:00 |
| 5 | afterwards? | 16:01:01 |
| 6 | A.  I learned it afterwards. | 16:01:04 |
| 7 | Q.  Okay.  Let's continue.  How did you learn | 16:01:07 |
| 8 | it, by the way? | 16:01:11 |
| 9 | A.  Discussions with my attorney. | 16:01:15 |
| 10 | Q.  Who is that? | 16:01:17 |
| 11 | MR. TOBEROFF:  I'll let you answer without | 16:01:20 |
| 12 | waiver. | 16:01:22 |
| 13 | MR. PETROCELLI:  I just need to know who | 16:01:22 |
| 14 | the attorney is.  I'd rather have you say | 16:01:23 |
| 15 | "Mr. Toberoff." | 16:01:26 |
| 16 | THE WITNESS:  Mr. Toberoff. | 16:01:26 |
| 17 | MR. TOBEROFF:  But I'm saying I'm letting | 16:01:28 |
| 18 | him answer that question -- | 16:01:29 |
| 19 | MR. PETROCELLI:  Oh, okay. | 16:01:29 |
| 20 | MR. TOBEROFF:  -- without waiver of the | 16:01:31 |
| 21 | privilege. | 16:01:31 |
| 22 | BY MR. PETROCELLI: | 16:01:31 |
| 23 | Q.  The reason I ask you that question is | 16:01:32 |
| 24 | because you may be referring to some other attorney | 16:01:34 |
| 25 | and I just have to have the record be clear. | 16:01:35 |

EXHIBIT 46
483

1          MR. PETROCELLI:  Again, I don't think these          16:13:36

2    questions are -- these instructions are proper.          16:13:39

3          Q.  Look at paragraph 4.          16:13:39

4          MR. TOBEROFF:  I'm not going to allow him          16:13:42

5    to answer how he is assessing potential litigation          16:13:44

6    after he has retained me.          16:13:49

7          MR. PETROCELLI:  It's just going to have to          16:13:49

8    get sorted out in court.          16:13:52

9          Q.  Go to paragraph 4.  It says:          16:13:55

10              "The terms of any and all          16:13:59

11              agreements regarding any of the          16:14:00

12              rights in any respect shall be          16:14:02

13              subject to the express written          16:14:04

14              approval of claimants and PPC.  The          16:14:06

15              parties each warrant and represent          16:14:10

16              that after signing this agreement          16:14:11

17              they will not, without the express          16:14:13

18              written consent of all the parties,          16:14:15

19              transfer, limit or encumber the          16:14:16

20              rights in any respect."          16:14:18

21          When you signed this, you understood that          16:14:20

22    you could not enter into any agreement with DC          16:14:24

23    Comics or any affiliate of DC Comics without the          16:14:30

24    express written consent of Pacific Pictures,          16:14:35

25    correct?          16:14:35

| | | |
|---|---|---|
| 1 | A.  Yes. | 16:14:35 |
| 2 | Q.  And in your mind who is Pacific Pictures? | 16:14:40 |
| 3 | A.  Marc Toberoff. | 16:14:45 |
| 4 | Q.  And so you understood that you -- you and | 16:14:50 |
| 5 | your family could not enter into a contract with DC | 16:14:54 |
| 6 | Comics no matter how badly you wanted, unless Marc | 16:14:58 |
| 7 | Toberoff consented, correct? | 16:15:03 |
| 8 | A.  Yes. | 16:15:03 |
| 9 | Q.  Did you think that that was an appropriate | 16:15:09 |
| 10 | power for a lawyer to have over a client? | 16:15:17 |
| 11 | A.  I thought it was in his best interest to -- | 16:15:24 |
| 12 | Q.  That's not what I asked you. | 16:15:35 |
| 13 | MR. TOBEROFF:  He's trying to answer your | 16:15:36 |
| 14 | question. | 16:15:37 |
| 15 | MR. PETROCELLI:  Yes. | 16:15:37 |
| 16 | Q.  Did you think -- did you think that it was | 16:15:38 |
| 17 | proper for lawyers to impose that -- to have such | 16:15:44 |
| 18 | a -- an agreement with a client that the client | 16:15:52 |
| 19 | can't settle without the lawyer's consent no matter | 16:15:54 |
| 20 | how much the client wants to settle? | 16:15:58 |
| 21 | A.  At the time I didn't consider it | 16:16:04 |
| 22 | unreasonable. | 16:16:05 |
| 23 | Q.  Did you think it was appropriate?  Did you | 16:16:08 |
| 24 | have any knowledge on that subject whether the | 16:16:11 |
| 25 | lawyers are even permitted under the law to have | 16:16:13 |

MARK WARREN PEARY - 6/29/2011

Page 225

| | | |
|---|---|---|
| 1 | such arrangements? | 16:16:17 |
| 2 | A. No, I -- I was not aware. | 16:16:21 |
| 3 | Q. Did you do any research on that subject? | 16:16:22 |
| 4 | A. Not specifically this, no. | 16:16:27 |
| 5 | Q. Were you aware that it's not lawful for a | 16:16:30 |
| 6 | lawyer to have such a -- an agreement with a client? | 16:16:33 |
| 7 | A. Not at the time. | 16:16:39 |
| 8 | Q. Have you since become aware of that? | 16:16:40 |
| 9 | A. Yes. | 16:16:42 |
| 10 | Q. When? | 16:16:46 |
| 11 | A. Sometime 2003. | 16:16:55 |
| 12 | Q. How? | 16:16:57 |
| 13 | A. Discussions with Marc Toberoff. | 16:17:01 |
| 14 | Q. What led to -- what prompted those | 16:17:11 |
| 15 | discussions? | 16:17:13 |
| 16 | A. We -- we both realized that this format was | 16:17:13 |
| 17 | not -- not the best approach to take. | 16:17:20 |
| 18 | Q. Why was it not the best approach? | 16:17:25 |
| 19 | A. We decided a legal retainer, a standard | 16:17:30 |
| 20 | legal retainer was a preferred association. | 16:17:33 |
| 21 | Q. You said in 2001 when you signed this, | 16:17:36 |
| 22 | you -- you were not even able to appreciate the | 16:17:42 |
| 23 | difference between a standard legal retainer and a | 16:17:44 |
| 24 | joint venture agreement. | 16:17:46 |
| 25 | Do you recall giving that testimony? You | 16:17:48 |

MARK WARREN PEARY - 6/29/2011

Page 226

| | | |
|---|---|---|
| 1 | said you were not even in a position to note that | 16:17:53 |
| 2 | there was anything unusual about it.  Do you recall | 16:17:55 |
| 3 | giving me that answer? | 16:17:57 |
| 4 | MR. TOBEROFF:  I believe that misstates his | 16:17:58 |
| 5 | testimony. | 16:17:59 |
| 6 | MR. PETROCELLI:  I don't think so. | 16:17:59 |
| 7 | THE WITNESS:  What -- what did I say? | 16:18:01 |
| 8 | BY MR. PETROCELLI: | 16:18:01 |
| 9 | Q.  So you were aware in 2001 when you signed | 16:18:02 |
| 10 | the agreement that you were agreeing to a -- an | 16:18:04 |
| 11 | arrangement that was different from the standard | 16:18:08 |
| 12 | lawyer-client agreement in setting up a joint | 16:18:11 |
| 13 | venture with Pacific Pictures? | 16:18:15 |
| 14 | MR. TOBEROFF:  Misstates his testimony. | 16:18:16 |
| 15 | BY MR. PETROCELLI: | 16:18:16 |
| 16 | Q.  I'm asking you now. | 16:18:18 |
| 17 | A.  What did I say before? | 16:18:20 |
| 18 | Q.  Let's not get hung up on what you said | 16:18:22 |
| 19 | before.  It's a new question. | 16:18:25 |
| 20 | A.  Okay. | 16:18:26 |
| 21 | Q.  Okay? | 16:18:26 |
| 22 | Can you read it back, please? | 16:18:27 |
| 23 | (The reporter read the record | 16:18:27 |
| 24 | as follows: | 16:18:27 |
| 25 | "QUESTION:  So you were aware | 16:18:02 |

**EXHIBIT 46**
**487**

MARK WARREN PEARY - 6/29/2011

Page 227

| | | |
|---|---|---|
| 1 | in 2001 when you signed the | 16:18:03 |
| 2 | agreement that you were agreeing to | 16:18:05 |
| 3 | an arrangement that was different | 16:18:08 |
| 4 | from the standard lawyer-client | 16:18:10 |
| 5 | agreement in setting up a joint | 16:18:12 |
| 6 | venture with Pacific Pictures?") | 16:18:15 |
| 7 | THE WITNESS:  Was I aware that it was | 16:18:43 |
| 8 | different than the standard -- standard legal | 16:18:45 |
| 9 | retainer? | 16:18:46 |
| 10 | BY MR. PETROCELLI: | 16:18:47 |
| 11 | Q.   In 2001 when you signed Exhibit 10 -- | 16:18:48 |
| 12 | A.   2001. | 16:18:50 |
| 13 | Q.   -- were -- were -- were you -- | 16:18:51 |
| 14 | A.   I was. | 16:18:53 |
| 15 | Q.   -- aware that you were signing a contract | 16:18:53 |
| 16 | that was different from the standard lawyer-client | 16:18:57 |
| 17 | agreement? | 16:19:01 |
| 18 | A.   I was not keenly aware of that. | 16:19:03 |
| 19 | Q.   But you became keenly aware of it in 2003, | 16:19:06 |
| 20 | correct? | 16:19:06 |
| 21 | A.   Sometime in there. | 16:19:10 |
| 22 | Q.   Okay.  You said that you and Mr. Toberoff | 16:19:12 |
| 23 | decided that this approach was not the best approach | 16:19:14 |
| 24 | and you should revert to a lawyer- -- a standard | 16:19:19 |
| 25 | lawyer-client agreement, right? | 16:19:22 |

MARK WARREN PEARY - 6/29/2011

Page 228

| | | |
|---|---|---|
| 1 | A.   Yes. | 16:19:24 |
| 2 | Q.   Okay.  What prompted that? | 16:19:25 |
| 3 | A.   I -- I don't remember.  We just discussed | 16:19:32 |
| 4 | things over time. | 16:19:36 |
| 5 | Q.   You said you learned that the -- it was not | 16:19:40 |
| 6 | lawful for a lawyer to be able to withhold his | 16:19:46 |
| 7 | consent to a client settlement. | 16:19:49 |
| 8 | A.   I did -- at the time I didn't know that -- | 16:19:53 |
| 9 | that was the case. | 16:19:56 |
| 10 | Q.   But you knew that in '03, right? | 16:19:56 |
| 11 | A.   Whenever -- whenever we started discussing | 16:19:59 |
| 12 | changing the form, then at some point after that we | 16:20:02 |
| 13 | agreed we needed to change it, I became aware of | 16:20:09 |
| 14 | that. | 16:20:11 |
| 15 | Q.   Was it -- did he just call you up one day | 16:20:14 |
| 16 | and say, "We have to make a change"?  What brought | 16:20:16 |
| 17 | the change about? | 16:20:19 |
| 18 | A.   I don't remember. | 16:20:20 |
| 19 | Q.   Did you get any legal advice from someone | 16:20:30 |
| 20 | other than Mr. Toberoff when he told you that a | 16:20:32 |
| 21 | change was required? | 16:20:37 |
| 22 | A.   No. | 16:20:38 |
| 23 | Q.   Did it cause you any concern after you | 16:20:43 |
| 24 | learned that you had signed an agreement that had | 16:20:45 |
| 25 | legal problems associated with it? | 16:20:47 |

MARK WARREN PEARY - 6/29/2011

Page 106

| | | |
|---|---|---|
| 1 | A.  Yes. | 13:28:08 |
| 2 | Q.  And after that phone conversation did you | 13:28:10 |
| 3 | have a meeting? | 13:28:12 |
| 4 | A.  A face-to-face -- | 13:28:14 |
| 5 | Q.  Face-to-face meeting, right. | 13:28:19 |
| 6 | A.  Not at that time. | 13:28:20 |
| 7 | Q.  How long thereafter until you first met | 13:28:23 |
| 8 | him? | 13:28:28 |
| 9 | A.  When I first met him it was -- it was after | 13:28:28 |
| 10 | we had signed the original legal agreement. | 13:28:32 |
| 11 | Q.  So you had not met him prior to signing the | 13:28:36 |
| 12 | document. | 13:28:40 |
| 13 | Is that correct? | 13:28:42 |
| 14 | A.  Not face to face. | 13:28:43 |
| 15 | Q.  Okay.  Had your sister met him? | 13:28:44 |
| 16 | A.  No. | 13:28:48 |
| 17 | Q.  Had your mother? | 13:28:49 |
| 18 | A.  No. | 13:28:50 |
| 19 | Q.  Had you spoken to anybody who had met him | 13:28:53 |
| 20 | or worked with him prior to signing the document, | 13:28:57 |
| 21 | the first document? | 13:29:01 |
| 22 | A.  I don't believe so. | 13:29:02 |
| 23 | Q.  Did you -- did you have more than one | 13:29:11 |
| 24 | telephone call? | 13:29:12 |
| 25 | A.  Yes. | 13:29:13 |

MARK WARREN PEARY - 6/29/2011

Page 107

1        Q.   About how many?                          13:29:16

2        A.   Boy, before signing the first agreement I   13:29:22

3    would have had to -- I -- I don't know exactly, but   13:29:28

4    it -- it was a number of times.  I don't know to   13:29:30

5    characterize.  I don't -- I don't have a log, but I   13:29:35

6    talked to him quite a bit.                         13:29:38

7        Q.   Okay.  The agreement that you did sign   13:29:41

8    which I'll show you in a bit, were there drafts of   13:29:43

9    that that went back and forth or -- as you recall or   13:29:48

10   did you get a document, sign it and return it?   13:29:51

11       A.   There were drafts.                        13:29:54

12       Q.   Did you keep copies of the drafts?        13:29:56

13       A.   No.                                        13:29:57

14       Q.   On your end, who was reviewing the drafts?   13:30:01

15       A.   I was.                                     13:30:07

16       Q.   Did you feel competent and capable to   13:30:09

17   understand what you were reading and made changes   13:30:11

18   and comments?                                      13:30:15

19       A.   Yes.                                       13:30:16

20       Q.   Okay.  Did you consult with anybody?      13:30:18

21       A.   Like another lawyer?                      13:30:26

22       Q.   Yes.                                       13:30:26

23       A.   No.                                        13:30:26

24       Q.   Did you discuss with your mother in 2001   13:30:29

25   these -- your talking to Mr. Toberoff, your        13:30:34

**EXHIBIT 46**
**491**

MARK WARREN PEARY - 6/29/2011

Page 108

| | | |
|---|---|---|
| 1 | telephone calls with him, receiving the draft | 13:30:40 |
| 2 | agreements, working on them, this whole activity, | 13:30:44 |
| 3 | did you share all of that with your mother? | 13:30:46 |
| 4 | A.  I'm sure I did. | 13:30:52 |
| 5 | Q.  Did she ask you to undertake this effort? | 13:30:54 |
| 6 | A.  No.  I -- I was doing all of this research | 13:30:57 |
| 7 | on my own.  She didn't know anything about it. | 13:30:59 |
| 8 | Q.  At what point did you disclose to her what | 13:31:03 |
| 9 | you were doing? | 13:31:06 |
| 10 | A.  Probably when I decided to work, retain | 13:31:06 |
| 11 | Mr. Toberoff, it's probably when I really discussed | 13:31:15 |
| 12 | it. | 13:31:20 |
| 13 | Q.  Did you have a one-on-one conversation with | 13:31:20 |
| 14 | your mother or was your sister involved? | 13:31:23 |
| 15 | A.  Boy, I -- | 13:31:26 |
| 16 | Q.  Family meeting? | 13:31:28 |
| 17 | A.  I can't actually visualize that in my mind. | 13:31:30 |
| 18 | I know I talked with Jean.  I don't recall talking | 13:31:33 |
| 19 | to Dawn at that time. | 13:31:38 |
| 20 | Q.  You -- why did you decide not to share with | 13:31:43 |
| 21 | your mother your -- your activities until just | 13:31:47 |
| 22 | before you were ready to sign the document? | 13:31:52 |
| 23 | A.  I was doing research on my own and she -- | 13:31:58 |
| 24 | she had no interest or knowledge of any of -- of | 13:32:01 |
| 25 | that, any of the rights or anything.  It was | 13:32:04 |

| | | |
|---|---|---|
| 1 | something I did completely on my own because I | 13:32:09 |
| 2 | wanted to be thorough, so that's the reason. | 13:32:11 |
| 3 | Q.  And did you come to a point when you | 13:32:19 |
| 4 | thought, like, you had sufficient, thorough | 13:32:20 |
| 5 | information that you could then talk with her? | 13:32:23 |
| 6 | A.  Yes. | 13:32:25 |
| 7 | Q.  And -- and when you did talk with her, was | 13:32:26 |
| 8 | it in that conversation that you first identified to | 13:32:30 |
| 9 | her that you had contacted Mr. Toberoff and you were | 13:32:33 |
| 10 | recommending him? | 13:32:36 |
| 11 | A.  I believe so. | 13:32:36 |
| 12 | Q.  Had she ever heard of Mr. Toberoff, to your | 13:32:42 |
| 13 | knowledge? | 13:32:45 |
| 14 | A.  No. | 13:32:45 |
| 15 | Q.  Did you put Mr. Toberoff in touch with the | 13:32:54 |
| 16 | Siegel family? | 13:32:57 |
| 17 | A.  If I recall, after we had signed a legal | 13:33:01 |
| 18 | agreement, at some point we were -- we were happy | 13:33:05 |
| 19 | that my mother had talked with Joanne and mentioned | 13:33:13 |
| 20 | his name. | 13:33:16 |
| 21 | Q.  Were you present when your mother first | 13:33:24 |
| 22 | mentioned Mr. Toberoff to Joanne? | 13:33:28 |
| 23 | A.  No. | 13:33:32 |
| 24 | Q.  It's a telephone call? | 13:33:34 |
| 25 | A.  Yes. | 13:33:35 |

MARK WARREN PEARY - 6/29/2011

Page 110

1        Q.   Okay.  You said that you had contacted a          13:33:40

2    lawyer at some time before Mr. Toberoff.                   13:33:43

3             Was that a fellow in Albuquerque?                 13:33:46

4        A.   Yes.  There was a lawyer in Albuquerque.          13:33:49

5        Q.   And what was that person's name?                 13:33:52

6        A.   I don't think I remember it because I            13:33:53

7    didn't do any -- I didn't sign anything with him.         13:33:58

8        Q.   What year was that?                              13:34:02

9        A.   Would have first been, I believe, 1999.          13:34:03

10       Q.   Is 1999 the first time that you started to       13:34:15

11   think about researching copyright issues related to       13:34:20

12   Mr. Shuster or his estate?                                13:34:25

13       A.   Boy, the first time I started thinking           13:34:27

14   about that.  Probably I thought about it earlier.         13:34:33

15       Q.   When is the first time you actually did          13:34:39

16   anything on that subject?                                 13:34:40

17       A.   As far as research?                              13:34:42

18       Q.   You said you probably thought about it           13:34:46

19   earlier, right?                                           13:34:47

20       A.   Uh-huh.                                          13:34:51

21       Q.   So when is the first time you decided to do      13:34:51

22   something, whether it be start looking things up on       13:34:53

23   the Internet, start making inquiries to friends,          13:34:55

24   maybe look for a lawyer regarding the subject of his      13:34:59

25   copyright and whether he had a termination interest       13:35:03

**EXHIBIT 46**

**494**

MARK WARREN PEARY - 6/29/2011

Page 362

DECLARATION

1

2

3

4

5

6        I hereby declare I am the deponent in the

7    within matter; that I have read the foregoing

8    deposition and know the contents thereof, and I

9    declare that the same is true of my knowledge except

10   as to the matters which are therein stated upon my

11   information or belief, and as to those matters, I

12   believe it to be true.

13        I declare under the penalties of perjury of

14   the State of California that the foregoing is true

15   and correct.

16        Executed on the _____ day of

17   _____ 2011, at

18   _____,

19   California.

20

21

22

23

24   _____

25              W I T N E S S

EXHIBIT 46
495

```
 1    STATE OF CALIFORNIA     )
                              )   ss.
 2    COUNTY OF LOS ANGELES   )

 3

 4           I, Shanda Gabriel, Certified Shorthand

 5    Reporter, Certificate No. 10094, for the State of

 6    California, hereby certify:

 7           I am the deposition officer that

 8    stenographically recorded the testimony in the

 9    foregoing deposition;

10           Prior to being examined the witness was by

11    me first duly sworn;

12           The foregoing transcript is a true record

13    of the testimony given.

14

15    Dated  July 14, 2011            .

16

17                   _____

18                        Shanda Gabriel
                          CSR 10094

19

20

21

22

23

24

25
```

EXHIBIT 46

496

Aug 12 11 04:49p    M. Warren Peary                              505-466-4551                p.1

## ERRATA SHEET

| Page | Line | | |
|------|------|--------|----|
| 54 | 23 | Change: | From "Yes." to "Yes, but it's not called that." |
| | | Reason: | Clarification |
| 61 | 13 | Change: | From "No." to "No, except for the letter between Mr. Toberoff and Mr. Bergman." |
| | | Reason: | Clarification |
| 61 | 15 | Change: | From "Yes." to "Yes, including the letter between Mr. Toberoff and Mr. Bergman." |
| | | Reason: | Clarification |
| 95 | 7-8 | Change: | From "I believe that — that I am and the Siegels and Mr. Toberoff." to "I am and Mr. Toberoff." |
| | | Reason: | Clarification |
| 95 | 10 | Change: | From "2010, I believe." to "2008." |
| | | Reason: | Clarification |
| 95 | 12 | Change: | From "Yeah, if my memory is right." to "No." |
| | | Reason: | Clarification |
| 100 | 19 | Change: | From "Yes." to "No, by me and Mr. Toberoff." |
| | | Reason: | Clarification |
| 101 | 15 | Change: | From "I don't recall." to "Yes." |
| | | Reason: | Clarification |
| 101 | 18 | Change: | From "I don't recall, no, having done so." to "I signed a conflict waiver in 2008." |
| | | Reason: | Clarification |
| 235 | 9 | Change: | From "2003" to "2002" |
| | | Reason: | Clarification |
| 141 | 24 | Change: | From "other than that" to "other than that and the conflict waivers." |
| | | Reason: | Clarification |

_____  Subject to the above changes, I certify that the transcript is true and correct

\_\_✓\_\_  No changes have been made. I certify that the transcript is true and correct.

_Mark Warren Peary_ (Signature)

_8-12-11_ (Date)

Received    Aug-12-11   02:18pm    From-505 466 4551         To-              Page  001

**EXHIBIT 46**
**497**

# EXHIBIT 47

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,                          )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )    Case No.
                                    )
PACIFIC PICTURES CORPORATION,       )    CV-10-3633 ODW (RZx)
IP WORLDWIDE, LLC, IPW, LLC,        )
MARC TOBEROFF, an individual,       )
MARK WARREN PEARY, as               )
personal representative of          )
the ESTATE OF JOSEPH SHUSTER,       )
JEAN ADELE PEAVY, an                )
individual, JOANNE SIEGEL,          )
an individual, LAURA SIEGEL         )
LARSON, an individual, and          )
DOES 1-10, inclusive,               )
                                    )
                    Defendants.     )
                                    )
_____   )

DEPOSITION OF:

        LAURA SIEGEL LARSON

        FRIDAY, JULY 22, 2011

        9:45 A.M.

Reported by:

        Kathleen E. McCarthy

        CSR No. 4483

EXHIBIT 47
498

| | | |
|---|---|---|
| 1 | documents? | 10:01:04 |
| 2 | A. Yes. | 10:01:05 |
| 3 | Q. How do you know that? | 10:01:05 |
| 4 | A. My mother told me. | 10:01:07 |
| 5 | Q. Do you know how much he charged? | 10:01:10 |
| 6 | A. It was a very low hourly rate. | 10:01:12 |
| 7 | Q. After this litigation document in 2004 that | 10:01:17 |
| 8 | you entered into -- when I say "you," you know I'm | 10:01:22 |
| 9 | talking about really you and your mother. | 10:01:24 |
| 10 | A. Correct. | 10:01:28 |
| 11 | Q. Joanne Siegel. | 10:01:29 |
| 12 | A. Us as the Siegels. | 10:01:30 |
| 13 | Q. But I'm not talking about Michael Siegel. | 10:01:31 |
| 14 | A. No, no. He wasn't -- he had nothing to do | 10:01:33 |
| 15 | with that. | 10:01:36 |
| 16 | Q. We'll deal with him separately. | 10:01:37 |
| 17 | MR. TOBEROFF: I just want to for clarity, | 10:01:39 |
| 18 | when "you" does not refer to her and her mother and | 10:01:41 |
| 19 | refers just to her, you need to tell her. | 10:01:45 |
| 20 | MR. PETROCELLI: Fair enough. Fair enough. | 10:01:47 |
| 21 | I will try to be clear. | 10:01:50 |
| 22 | I forgot what I was asking. So it was a | 10:01:55 |
| 23 | clever device by good lawyers to get you off track. | 10:01:59 |
| 24 | What was I asking? Senior moment here. | 10:02:06 |
| 25 | (The record was read.) | 10:02:22 |

**EXHIBIT 47**
**499**

| | | |
|---|---|---|
| 1 | MR. PETROCELLI: Okay. There you go. | 10:02:22 |
| 2 | THE WITNESS: Okay. | 10:02:24 |
| 3 | BY MR. PETROCELLI: | |
| 4 | Q. So after the litigation document that you and | 10:02:25 |
| 5 | your family entered into with Mr. Toberoff in 2004, | 10:02:27 |
| 6 | were there any other documents, to your knowledge, | 10:02:31 |
| 7 | that were sent to Mr. Zadrozny for his review related | 10:02:34 |
| 8 | to Superman? | 10:02:40 |
| 9 | A. I don't recall. | 10:02:41 |
| 10 | Q. You signed a document sometime in or about | 10:02:44 |
| 11 | 2008 that the Shusters also signed, some agreement; | 10:02:49 |
| 12 | correct? | 10:02:52 |
| 13 | A. Yes. | 10:02:53 |
| 14 | Q. And Mr. Toberoff also signed that; correct? | 10:02:54 |
| 15 | A. Yes. | 10:02:57 |
| 16 | Q. Did Mr. Zadrozny, to your knowledge, review | 10:02:59 |
| 17 | that document? | 10:03:05 |
| 18 | A. Yes. | 10:03:05 |
| 19 | Q. Did he review that document prior to the time | 10:03:07 |
| 20 | you signed it? | 10:03:10 |
| 21 | A. Yes. | 10:03:11 |
| 22 | Q. How do you know he reviewed it? | 10:03:14 |
| 23 | A. Because he and I spoke about it. | 10:03:20 |
| 24 | Q. How long before you signed it -- withdrawn. | 10:03:27 |
| 25 | Did you send him a copy of it before signing | 10:03:33 |

| | | |
|---|---|---|
| 1 | it? | 10:03:35 |
| 2 | A.   Yes. | 10:03:36 |
| 3 | Q.   Was he here in town with you or -- | 10:03:37 |
| 4 | A.   No. | 10:03:40 |
| 5 | Q.   He was living in Florida? | 10:03:40 |
| 6 | A.   Yes. | 10:03:42 |
| 7 | Q.   Has he lived in Florida the whole time you've | 10:03:42 |
| 8 | been dealing with him? | 10:03:45 |
| 9 | A.   Yes. | 10:03:45 |
| 10 | Q.   Okay.  Did any other attorney besides | 10:03:51 |
| 11 | Mr. Zadrozny review that document, to your knowledge, | 10:03:53 |
| 12 | before you or your mother signed it? | 10:03:57 |
| 13 | A.   Which document are you speaking of? | 10:03:58 |
| 14 | Q.   This 2008 -- we've been calling it a consent | 10:04:00 |
| 15 | agreement. | 10:04:04 |
| 16 | A.   Oh.  The -- no. | 10:04:05 |
| 17 | Q.   How many documents have you or your mother | 10:04:11 |
| 18 | signed that the Shusters also signed, one or more | 10:04:15 |
| 19 | Shuster people? | 10:04:19 |
| 20 | A.   Only one. | 10:04:20 |
| 21 | Q.   Was the 2008 consent agreement the last | 10:04:32 |
| 22 | document you asked or your mother asked, to your | 10:04:41 |
| 23 | knowledge, Mr. Zadrozny to review related to Superman? | 10:04:44 |
| 24 | A.   I believe so. | 10:04:49 |
| 25 | Q.   Have you signed any other documents related | 10:04:52 |

**EXHIBIT 47**
**501**

| | | |
|---|---|---|
| 1 | to Superman after the 2008 consent agreement that you | 10:04:56 |
| 2 | signed together with the Shusters and Mr. Toberoff and | 10:05:02 |
| 3 | your mother? | 10:05:05 |
| 4 | A. I don't remember any other document. | 10:05:07 |
| 5 | Q. How did you obtain a copy -- withdrawn. | 10:05:22 |
| 6 | Did you or your mother send the draft of the | 10:05:26 |
| 7 | 2008 consent agreement to Mr. Zadrozny, or did someone | 10:05:29 |
| 8 | else send it on your behalf? | 10:05:33 |
| 9 | A. I believe my mother sent it. | 10:05:36 |
| 10 | Q. And do you know how long before your signing | 10:05:40 |
| 11 | it your mother sent it to him? | 10:05:48 |
| 12 | A. I don't know. I would be guessing, but, you | 10:05:52 |
| 13 | know -- | 10:05:54 |
| 14 | MR. TOBEROFF: Don't guess. | 10:05:55 |
| 15 | THE WITNESS: You know. | 10:05:56 |
| 16 | BY MR. PETROCELLI: | |
| 17 | Q. On the subject of guessing, your lawyer said | 10:05:57 |
| 18 | don't guess, and I concur with that except that you | 10:06:00 |
| 19 | need to understand that there's a wild guess, which we | 10:06:02 |
| 20 | don't want to know about. Wild speculation we don't | 10:06:06 |
| 21 | want to know about. But if you have some basis to | 10:06:08 |
| 22 | estimate something or approximate something based on | 10:06:12 |
| 23 | your overall knowledge, we are entitled to that, just | 10:06:14 |
| 24 | so you keep that in mind. Okay? | 10:06:19 |
| 25 | A. Um-hum. Yes. You pointed -- | 10:06:22 |

**EXHIBIT 47**
**502**

| | | |
|---|---|---|
| 1 | MR. PETROCELLI: And to be clear, with | 10:29:38 |
| 2 | respect to the last several questions on which you | 10:29:40 |
| 3 | have instructed, you decline to allow the witness to | 10:29:45 |
| 4 | answer even were I to agree that it would not | 10:29:52 |
| 5 | constitute a waiver of any privilege? | 10:29:55 |
| 6 | MR. TOBEROFF: If you would agree -- in some | 10:29:59 |
| 7 | instances if you agree that it doesn't constitute a | 10:30:02 |
| 8 | waiver of privilege, I could allow her to answer | 10:30:04 |
| 9 | certain questions. | 10:30:10 |
| 10 | MR. PETROCELLI: Okay. | 10:30:11 |
| 11 | MR. TOBEROFF: But -- | 10:30:12 |
| 12 | MR. PETROCELLI: I notice you didn't extend | 10:30:12 |
| 13 | the offer with respect to some of those questions, but | 10:30:14 |
| 14 | you did on the Superboy, so -- | 10:30:16 |
| 15 | MR. TOBEROFF: You know, there are a number | 10:30:18 |
| 16 | of issues here surrounding, you know -- also, you | 10:30:20 |
| 17 | know, when the answer to something is no, you're not | 10:30:25 |
| 18 | revealing the content, so it wouldn't actually be | 10:30:27 |
| 19 | privileged, but I don't necessarily know how the | 10:30:30 |
| 20 | witnesses is going to answer. | 10:30:34 |
| 21 | MR. PETROCELLI: Okay. Well, with respect | 10:30:35 |
| 22 | to -- with respect to my question, then, about | 10:30:38 |
| 23 | arrangements that you have with the Shusters regarding | 10:30:40 |
| 24 | the sharing in any Superman recoveries or proceeds, I | 10:30:43 |
| 25 | would like the witness to answer, and I will agree | 10:30:49 |

EXHIBIT 47
503

| | | |
|---|---|---|
| 1 | that her answer is not a waiver of any privilege. | 10:30:52 |
| 2 | MR. TOBEROFF: She already answered that | 10:30:54 |
| 3 | question. She said no. | 10:30:55 |
| 4 | MR. PETROCELLI: Not with respect to | 10:30:57 |
| 5 | Superman. She did with respect to Superboy. | 10:30:58 |
| 6 | MR. TOBEROFF: I thought you said -- | 10:31:01 |
| 7 | MR. PETROCELLI: Did I misspeak? | 10:31:02 |
| 8 | THE WITNESS: I kind of lost track for a | 10:31:03 |
| 9 | minute. | 10:31:06 |
| 10 | MR. PETROCELLI: Let me put it again for the | 10:31:06 |
| 11 | record, then. | 10:31:08 |
| 12 | MR. TOBEROFF: As to that question, we are | 10:31:08 |
| 13 | asserting privilege, and I'm instructing her not to | 10:31:11 |
| 14 | answer. | 10:31:13 |
| 15 | MR. PETROCELLI: Okay. So even though I | 10:31:13 |
| 16 | would agree that the answer would not affect the | 10:31:15 |
| 17 | waiver. | 10:31:17 |
| 18 | MR. TOBEROFF: Yes. | 10:31:18 |
| 19 | MR. PETROCELLI: Okay. | 10:31:19 |
| 20 | Q. And does the -- did you discuss with your | 10:31:51 |
| 21 | mother at any time whether or not to enter into an | 10:31:55 |
| 22 | agreement with the Shusters regarding the sharing of | 10:32:04 |
| 23 | recoveries or proceeds from Superman? | 10:32:09 |
| 24 | A. I believe we talked about it. | 10:32:18 |
| 25 | Q. Can you relate that discussion to me? | 10:32:21 |

**EXHIBIT 47**
**504**

```
 1              MR. TOBEROFF:  I instruct you not to answer        10:32:23

 2    based on the attorney-client privilege, joint client        10:32:25

 3    privilege.                                                   10:32:28

 4    BY MR. PETROCELLI:

 5         Q.   And these were conversations just between         10:32:30

 6    your mother and you; is that correct?                       10:32:32

 7         A.   Yes.                                               10:32:33

 8              Excuse me.  May I take a bathroom break for a     10:32:41

 9    moment?                                                      10:32:43

10              MR. PETROCELLI:  Sure.  Let's stop right now.     10:32:44

11              THE VIDEOGRAPHER:  Off the record.  The time      10:32:48

12    is 10:32.                                                   10:32:48

13              (A recess was taken.)                             10:33:54

14              THE VIDEOGRAPHER:  We're back on the record       10:46:52

15    at 10:46.                                                   10:46:54

16    BY MR. PETROCELLI:

17         Q.   I just want to follow up a bit on that last       10:46:57

18    area that we covered about the consent agreements and       10:47:01

19    the arrangements with the Shusters.  Does -- do the         10:47:04

20    consent agreements -- I may have asked you this             10:47:10

21    already, but let me ask you again.  Do the consent          10:47:17

22    agreement documents -- does the consent agreement           10:47:22

23    document make any reference at all to Superboy?             10:47:25

24         A.   You did ask me that.                              10:47:31

25              MR. TOBEROFF:  Asked and answered.  And I         10:47:32
```

**EXHIBIT 47**
**505**

| | | |
|---|---|---|
| 1 | instruct you not to answer. | 10:47:34 |
| 2 | MR. PETROCELLI:  If I agree that it's not a | 10:47:37 |
| 3 | waiver, do you continue to instruct on that? | 10:47:39 |
| 4 | MR. TOBEROFF:  Yes. | 10:47:41 |
| 5 | MR. PETROCELLI:  Okay. | 10:47:42 |
| 6 | Q.   Are you currently able to enter into an | 10:47:59 |
| 7 | agreement with DC Comics without the consent of the | 10:48:04 |
| 8 | Shuster side, the Shuster family? | 10:48:15 |
| 9 | MR. TOBEROFF:  I instruct you not to answer | 10:48:22 |
| 10 | that. | 10:48:25 |
| 11 | MR. PETROCELLI:  Same objection?  Privilege? | 10:48:25 |
| 12 | MR. TOBEROFF:  Same objection.  Privilege. | 10:48:30 |
| 13 | BY MR. PETROCELLI: | |
| 14 | Q.   Have you had any discussions with any member | 10:48:35 |
| 15 | of the Shuster family since 2008 when the both of you | 10:48:38 |
| 16 | signed the consent agreement about the marketing of | 10:48:45 |
| 17 | the Superman rights? | 10:48:50 |
| 18 | A.   I can't recall any discussion. | 10:48:54 |
| 19 | Q.   Are -- have any efforts been made on your | 10:49:02 |
| 20 | behalf or your family's behalf to market the Superman | 10:49:05 |
| 21 | rights since 2008? | 10:49:10 |
| 22 | MR. TOBEROFF:  You can -- you could answer | 10:49:15 |
| 23 | that yes or no, a yes or no question, and you can also | 10:49:23 |
| 24 | answer it to the extent your knowledge does not reveal | 10:49:28 |
| 25 | the substance of your communications with counsel. | 10:49:31 |

**EXHIBIT 47**
**506**

| | | |
|---|---|---|
| 1 | THE WITNESS: Okay. | 10:49:35 |
| 2 | MR. TOBEROFF: So -- | 10:49:37 |
| 3 | MR. PETROCELLI: To be clear, Marc, and we're | 10:49:39 |
| 4 | not going to settle this on the record, but I do want | 10:49:41 |
| 5 | to make clear that I disagree that all conversations | 10:49:43 |
| 6 | with you are privileged. They have to involve the | 10:49:46 |
| 7 | rendition of legal advice at the very minimum. | 10:49:48 |
| 8 | MR. TOBEROFF: Well, the marketing of her -- | 10:49:51 |
| 9 | the subject of a litigation for the past six now going | 10:49:55 |
| 10 | to the seventh year of rights wouldn't necessarily | 10:49:58 |
| 11 | entail legal advice. | 10:50:01 |
| 12 | MR. PETROCELLI: If you meet with Paramount | 10:50:03 |
| 13 | Pictures about the sale of Superman or you go to Fox | 10:50:05 |
| 14 | and you then report on the meeting, that's hardly the | 10:50:08 |
| 15 | rendition of legal advice. | 10:50:11 |
| 16 | MR. TOBEROFF: It's totally intertwined with | 10:50:12 |
| 17 | legal advice. Any studio would want to know the state | 10:50:15 |
| 18 | of the litigation, the odds of the litigation, the | 10:50:18 |
| 19 | odds on appeal. There's so much going on in this case | 10:50:21 |
| 20 | that would be relevant to the status of those rights | 10:50:25 |
| 21 | and which would -- it's just very closely intertwined. | 10:50:28 |
| 22 | If she has knowledge of that independent of her | 10:50:34 |
| 23 | discussions with me, I will allow her to answer. | 10:50:37 |
| 24 | Otherwise I would instruct you not to answer. | 10:50:38 |
| 25 | MR. PETROCELLI: It seems like it's | 10:50:40 |

**EXHIBIT 47**
**507**

| | |
|---|---|
| 1 | of them, have already been disclosed to us with | 12:02:48 |
| 2 | respect to the litigation retainer agreement. | 12:02:51 |
| 3 | A.   Oh, okay.  Sometimes it gets confusing | 12:02:53 |
| 4 | because we're talking about so many agreements, you | 12:02:55 |
| 5 | know. | 12:02:57 |
| 6 | Q.   Okay.  So let me see if I can break it down | 12:02:58 |
| 7 | for you. | 12:03:00 |
| 8 | A.   All right. | 12:03:00 |
| 9 | Q.   If there were a transaction today for the | 12:03:01 |
| 10 | sale of your Superman rights, you would have to pay | 12:03:03 |
| 11 | Mr. Toberoff 33 to 40 percent based on your agreement; | 12:03:10 |
| 12 | is that correct? | |
| 13 | A.   I believe so. | 12:03:14 |
| 14 | Q.   And would that be 33 or 40 percent?  Do you | 12:03:15 |
| 15 | know?  What range applies as of today? | 12:03:21 |
| 16 | A.   I believe because we had an initial trial | 12:03:36 |
| 17 | before -- was that considered a trial with Judge | 12:03:45 |
| 18 | Larson? | 12:03:50 |
| 19 | Q.   Well, Mr. Toberoff has -- would certainly | 12:03:51 |
| 20 | suggest that it was. | 12:03:55 |
| 21 | A.   I mean, you know, what's the definition of a | 12:03:57 |
| 22 | trial, yes.  Okay. | 12:04:00 |
| 23 | Q.   So an argument could be made that the current | 12:04:02 |
| 24 | percentage of 40 percent is owed; correct?  If that | 12:04:05 |
| 25 | were a trial? | 12:04:10 |

EXHIBIT 47
508

| | | |
|---|---|---|
| 1 | A. If it were a trial, yes. | 12:04:10 |
| 2 | Q. Okay. So besides that 40 percent to | 12:04:12 |
| 3 | Mr. Toberoff, is there any other percent that would | 12:04:22 |
| 4 | have to be paid to Mr. Toberoff? | 12:04:26 |
| 5 | A. No. | 12:04:31 |
| 6 | Q. Is there any other fee that would have to be | 12:04:32 |
| 7 | paid to Mr. Toberoff? | 12:04:35 |
| 8 | A. No. I can't think of any. | 12:04:38 |
| 9 | O. Any other type of remuneration of any kind | 12:04:39 |
| 10 | that would be paid to Mr. Toberoff? | 12:04:42 |
| 11 | A. You know, I think that there were some -- | 12:04:44 |
| 12 | some costs that were advanced. | 12:04:47 |
| 13 | Q. Besides that. | 12:04:49 |
| 14 | A. Other than costs, no. | 12:04:50 |
| 15 | Q. Okay. Is there anything in the 2008 consent | 12:04:51 |
| 16 | agreement that would trigger additional remuneration | 12:04:56 |
| 17 | to Mr. Toberoff based on a transaction of the Siegel | 12:05:01 |
| 18 | rights? | 12:05:05 |
| 19 | MR. TOBEROFF: I -- I will allow you to | 12:05:06 |
| 20 | answer as to -- because what is not in the agreement | 12:05:09 |
| 21 | would not be privileged. Did I say that right? | 12:05:13 |
| 22 | MR. PETROCELLI: You did. | 12:05:18 |
| 23 | MR. TOBEROFF: Some things not in the | 12:05:18 |
| 24 | agreement we are not asserting privilege. We are | 12:05:20 |
| 25 | asserting privilege to what is in the agreement. So | 12:05:24 |

**EXHIBIT 47**
**509**

| | | |
|---|---|---|
| 1 | to that extent, you can answer the question. | 12:05:25 |
| 2 | THE WITNESS:  Well, there's no -- I can never | 12:05:27 |
| 3 | say the word.  What is it?  Remuneration?  There's | 12:05:28 |
| 4 | no -- you know what I'm talking about.  There's no | 12:05:33 |
| 5 | additional percentage. | 12:05:35 |
| 6 | BY MR. PETROCELLI: | |
| 7 | Q.  To Mr. Toberoff. | 12:05:38 |
| 8 | A.  To Mr. Toberoff. | 12:05:39 |
| 9 | Q.  As a result of anything in the consent | 12:05:40 |
| 10 | agreement. | 12:05:42 |
| 11 | A.  Correct. | 12:05:43 |
| 12 | Q.  Correct? | 12:05:43 |
| 13 | A.  Correct. | 12:05:45 |
| 14 | Q.  Okay.  And to your knowledge, would there be | 12:05:46 |
| 15 | any percentage -- in addition to the 40 to | 12:05:50 |
| 16 | Mr. Toberoff, would there be any percentage or any fee | 12:05:56 |
| 17 | payable to Ari Emanuel or any of his companies? | 12:05:59 |
| 18 | A.  No. | 12:06:05 |
| 19 | Q.  So to your knowledge, he would not | 12:06:06 |
| 20 | participate at all in any current transaction. | 12:06:08 |
| 21 | MR. TOBEROFF:  Asked and answered. | 12:06:12 |
| 22 | BY MR. PETROCELLI: | |
| 23 | Q.  Is that correct? | 12:06:13 |
| 24 | A.  Correct. | 12:06:13 |
| 25 | Q.  Out of the 60 percent or other proceeds that | 12:06:18 |

**EXHIBIT 47**
**510**

| | | |
|---|---|---|
| 1 | you would receive, putting aside Mr. Toberoff's 40 | 12:06:22 |
| 2 | percent, would you have to share any of those proceeds | 12:06:27 |
| 3 | with anyone else as a result of any contractual | 12:06:31 |
| 4 | arrangements that you currently have? | 12:06:34 |
| 5 | MR. TOBEROFF: I instruct you not to answer | 12:06:36 |
| 6 | to the extent your answer would necessarily reveal the | 12:06:38 |
| 7 | substance of the consent agreement held to be | 12:06:45 |
| 8 | privileged. | 12:06:48 |
| 9 | MR. PETROCELLI: May I just take one shot at | 12:06:50 |
| 10 | you on this, Marc, because what the court held was | 12:06:51 |
| 11 | that a particular document, at least on that record, | 12:06:56 |
| 12 | was not discoverable at this time. But the court did | 12:07:03 |
| 13 | not hold that any and all financial arrangements or | 12:07:07 |
| 14 | contractual arrangements between the parties or | 12:07:11 |
| 15 | between witnesses, and these parties are also | 12:07:18 |
| 16 | witnesses, are barred from discovery. It goes | 12:07:22 |
| 17 | directly, among other things, to motive and -- | 12:07:26 |
| 18 | MR. TOBEROFF: I think -- | 12:07:31 |
| 19 | MR. PETROCELLI: -- a host of other | 12:07:32 |
| 20 | credibility issues. | 12:07:33 |
| 21 | MR. TOBEROFF: I think I stated my | 12:07:34 |
| 22 | instruction, and if I wasn't clear -- I thought it was | 12:07:36 |
| 23 | clear. | 12:07:38 |
| 24 | MR. PETROCELLI: The existence of those | 12:07:39 |
| 25 | arrangements are relevant and would be discoverable in | 12:07:41 |

**EXHIBIT 47**
**511**

```
 1    any case.                                              12:07:45

 2           MR. TOBEROFF:  I said she can't disclose to     12:07:47

 3    the extent there is another agreement out there in     12:07:49

 4    which she's sharing her proceeds.  Other than anything 12:07:54

 5    that speaks to that in the consent agreement she can   12:07:59

 6    testify.                                               12:08:02

 7           MR. PETROCELLI:  I'm suggesting to you that     12:08:02

 8    the court did not issue an order categorically ruling  12:08:03

 9    that we are unable to discover financial or            12:08:15

10    contractual arrangements between the parties even if   12:08:19

11    reflected in the consent agreement.                    12:08:25

12           MR. TOBEROFF:  I -- the court doesn't have to   12:08:28

13    use those exact words.                                 12:08:29

14           MR. PETROCELLI:  I didn't say it had to use     12:08:31

15    those exact words, but that's the essence of your      12:08:32

16    position.                                              12:08:34

17           MR. TOBEROFF:  I disagree.  There are           12:08:35

18    certain -- the court held that the contents of that    12:08:37

19    document are privileged, and that therefore, if your   12:08:40

20    question by necessity requires her to divulge -- or it 12:08:44

21    may or may not, but to the extent it requires her to   12:08:48

22    divulge contents of the consent agreement, I'm         12:08:52

23    instructing her not to answer.                         12:08:55

24           MR. PETROCELLI:  Okay.  Well, to the            12:09:04

25    extent --                                              12:09:04
```

**EXHIBIT 47**
**512**

```
 1    STATE OF CALIFORNIA          )

 2                                 ) ss.

 3    COUNTY OF LOS ANGELES        )

 4

 5

 6         I, LAURA SIEGEL LARSON, declare under the

 7    penalties of perjury under the laws of the United

 8    States that the foregoing is true and correct.

 9         Executed this      day of                   ,

10    2011, at                        , California.

11

12

13

14

15                          LAURA SIEGEL LARSON

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 47**
**513**

```
1   STATE OF CALIFORNIA        )

2                             )   ss.

3   COUNTY OF LOS ANGELES     )

4        I, Kathleen E. McCarthy, Certified Shorthand Reporter

5   No. 4483 for the State of California, do hereby certify:

6        That prior to being examined, the witness named in the

7   foregoing deposition was duly sworn to testify the truth,

8   the whole truth, and nothing but the truth;

9        That said deposition was taken down by me in shorthand

10  at the time and place therein named and thereafter reduced

11  by me to typewritten form and that the same is a true,

12  correct, and complete transcript of said proceedings.

13        Before completion of the deposition, review of

14  the transcript [ ] was [ ] was not requested.  If

15  requested, any changes made by the deponent (and provided

16  to the reporter) during the period allowed are appended

17  hereto.

18        I further certify that I am not interested in the

19  outcome of the action.

20  Witness my hand this 3rd day of August ,2011 .

21

22

23        Kathleen E. McCarthy, CSR No. 4483

24

25
```

**EXHIBIT 47**
**514**

# EXHIBIT 48

DAWN PEAVY - 8/3/2011

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DC COMICS,

        Plaintiffs,

ORIGINAL

  vs.          NO:  CV-10-3633 ODW (RZx)

PACIFIC PICTURES CORPORATION, et al.,

        Defendants.


      VIDEOTAPED DEPOSITION OF DAWN PEAVY
            August 3, 2011
            9:09 a.m. MST
         Santa Fe Hilton Hotel
         100 Sandoval Street
        Santa Fe, New Mexico


        PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  MR. MATTHEW T. KLINE
          Attorney for Plaintiff

REPORTED BY: Mary Abernathy Seal, RDR, CRR, NM CCR 69
          Bean & Associates, Inc.
          Professional Court Reporting Service
          201 Third Street, Northwest, Suite 1630
          Albuquerque, New Mexico 87102


(1729K) MAS

**EXHIBIT 48**

**515**

DAWN PEAVY - 8/3/2011

Page 6

1    and honest testimony?

2         A.   No.

3         Q.   I don't want you to give any speculative

4    answers today, or wild guesses, but if I do ask you

5    for a question for your best estimate, I'm entitled

6    to that.  So I don't want you to speculate as to

7    answers, but if you can estimate or give a best

8    estimate, I will ask you to do that today.  Okay?

9         A.   Yes.

10         MR. TOBEROFF:  That's so long as you have

11   a basis for making an estimation.

12         Q.   I'm not certain how long we'll go today,

13   but obviously, if we come to the lunch hour, we'll

14   probably take a short lunch break and then resume

15   afterwards.

16         I just want to talk a little bit about any

17   preparation you did in advance of your deposition

18   today.  Did you talk to anybody about coming here

19   for your deposition?

20         A.   No.

21         Q.   You didn't talk to your brother at all

22   about today's deposition?

23         A.   Well, yes.  My brother.  I spoke to him.

24         Q.   And what did you talk about with Mark

25   about the deposition today?

DAWN PEAVY - 8/3/2011

1       A.    Just that I was coming to the deposition.

2       Q.    Did he give you any advice on the

3  deposition?

4       A.    No.

5             THE REPORTER:  I'm sorry?

6       A.    Not really.  No.

7       Q.    Did he talk to you about the lawyers

8  involved in the case?

9       A.    No.

10       Q.    Did he talk to you about the claims

11  involved in the case?

12       A.    No.

13       Q.    Did you talk to your mother about coming

14  here for today's deposition?

15       A.    I told her that I was coming, but she --

16  she doesn't speak real well.  I mean, you can't...

17       Q.    And I know this is a hard subject to talk

18  about.  Your mother's health is not good right now;

19  correct?

20       A.    No.

21       Q.    She's 90 years old?

22       A.    (Witness nods.)

23       Q.    Okay.  And again, if there's something

24  that is a bothersome area of testimony and you want

25  to take a break and not talk about it, you know, for

**EXHIBIT 48**

**517**

DAWN PEAVY — 8/3/2011

```
 1    a while, I'm happy to do that.  I know your mother

 2    had a stroke a couple of years ago and has been

 3    pretty sick.

 4         A.   (Witness nods.)

 5         Q.   So just let me know if you want to take a

 6    break to do that.  Okay?

 7         A.   Okay.

 8         Q.   Did you meet with Mr. Toberoff at all

 9    about today's deposition?

10         A.   Yes.

11         Q.   When was that?

12         A.   Last night.

13         Q.   Where did you meet?

14         A.   Hotel Santa Fe.

15         Q.   Okay.  How long did you meet with him?

16         A.   About an hour.

17         Q.   Did you review any documents with him?

18         A.   Other than the deposition papers, nothing.

19         Q.   That was it?

20         A.   The one that --

21              THE REPORTER:  I'm sorry, the one --

22         A.   The deposition papers, right?  Oh, I guess

23    the paper that --

24         Q.   Was it a document --

25         A.   Not only --
```

DAWN PEAVY - 8/3/2011

Page 20

1       Q.   I'm going to give you another letter.  I'm

2   going to mark it as Exhibit 66.

3            (Exhibit 66 marked.)

4       Q.   Ms. Peavy, it's actually marked a new

5   exhibit there, marked as Exhibit 66.

6            MR. TOBEROFF:  I want to instruct my

7   client for a second.  Before you -- when you answer

8   questions, you're here to testify as to what you

9   know.

10            THE WITNESS:  Know.

11            MR. TOBEROFF:  The facts.  Not to

12   speculate, not to guess, and not to make any

13   assumptions.  That's all I want you to testify.

14       Q.   (By Mr. Kline)  I'm showing you another

15   letter that we have marked as Exhibit 66.  It's

16   dated February 9, 2008.  Do you see that at the top

17   there?

18       A.   The date?

19       Q.   Yes.

20       A.   Yes.

21       Q.   And do you see at the end of the second

22   page it says, "Love from the Joe Shuster family,

23   Jean, Dawn, and Warren"?

24       A.   Yes.

25       Q.   Have you seen this letter before?

**EXHIBIT 48**
**519**

1        A.    No.

2        Q.    I know your mom had a stroke in -- I think

3    it was 2008; correct?

4        A.    Correct.

5        Q.    Was it later than February 9, 2008?

6        A.    Yes.

7        Q.    Before then, did she have a computer that

8    she typed letters on?

9        A.    No.

10       Q.    Did she have a typewriter that she typed

11   letters on?

12       A.    Yes.

13       Q.    Would you or your brother help her type

14   those letters?

15       A.    No.

16       Q.    She did it on her own?

17       A.    Yes.

18       Q.    Do you know if she kept copies of the

19   letters that she wrote?

20       A.    No.

21       Q.    Did she ever talk to you about letters

22   that she was sending to Dave Sim?

23       A.    No.

24       Q.    When did you meet Dave Sim?

25       A.    I don't recall.

DAWN PEAVY - 8/3/2011

1        Q.    You said you did meet him, though;

2    correct?

3        A.    Yes.

4        Q.    Was it at the "Superman" premiere?

5        A.    No.

6        Q.    Was it at the Toronto Comic Con?

7        A.    Yes.

8        Q.    Does that sound familiar?  So you have

9    attended "Superman" related events with your mother

10   in recent years; correct?

11       A.    One.

12       Q.    Well --

13       A.    Or two.

14       Q.    You went to the premiere in Los Angeles;

15   correct?

16       A.    (Witness nods.)

17       Q.    Yes?

18       A.    Yes.

19       Q.    And you went to the Toronto Comic Con --

20       A.    Yes.

21       Q.    -- correct?  Did you also go to Cleveland

22   at any point in time --

23       A.    Yes.

24       Q.    -- for a celebration of Joe Schuster's

25   life?  So that's three; correct?

DAWN PEAVY - 8/3/2011

Page 50

```
 1        A.   I don't know.

 2        Q.   Do you know if that will names any of your

 3   children as beneficiaries?

 4        A.   No.

 5        Q.   You don't know, one way or the other,

 6   or --

 7        A.   No.

 8        Q.   Okay.  Do you think that it does, or you

 9   just don't know at all?

10        A.   Don't know.

11        Q.   Have you discussed with your brother and

12   your mother setting up a trust that would receive

13   the benefits of your mother's estate, and that trust

14   would pay out monies to you and your brother?

15        A.   Yes.

16        Q.   Can you describe those discussions,

17   please?

18        A.   I asked my brother -- or he told me, I

19   guess, I didn't ask him -- that the estate is set

20   up, and that there will be a trust in both of our

21   names.  That's about it.  And I did ask.

22        Q.   And you say this is a conversation you

23   think he prompted?

24        A.   No, maybe I asked what was -- how it was

25   going to work out.
```

DAWN PEAVY - 8/3/2011

```
1        Q.    Do you know if those trusts, formal
2   documents, have been set up and signed?
3        A.    No.
4        Q.    Do you know if your mother -- I mean, is
5   your mother in a state right now where she could be
6   signing legal documents like that?
7        A.    She can sign her name.
8        Q.    But she has a hard time communicating with
9   you verbally?
10       A.    Yes.
11       Q.    Does she have a hard time understanding
12   things?
13       A.    (Witness nods.)
14       Q.    Again I'm sorry, I know this is a --
15       A.    I don't want to talk about my mom.
16       Q.    I know.  And I want to make this as brief
17   as possible, and I think you nodded yes.  You want
18   to take a break?
19       A.    (Witness nods.)
20             (Recess from 10:02 a.m. to 10:11 a.m.)
21             (Exhibit 12, previously marked.)
22       Q.    Ms. Peavy, I'm going to switch topics for
23   a moment, because talking about your mom is tough.
24   What I have put in front of you is Exhibit 12, which
25   was used at your brother's deposition.  And
```

```
 1    unfortunately, this is not a consecutively paginated

 2    document, but if you look about, I don't know, 15

 3    pages in, there's a document that you signed called

 4    "Waiver of notice and consent, petition for probate

 5    of (lost) will."  I think if you turn to the page

 6    with your signature on it --

 7              MR. TOBEROFF:  Assumes facts.

 8         Q.   -- is that your signature, Ms. Peavy?

 9         A.   Yes.

10         Q.   And do you remember in 2003 signing this

11    document?

12              THE VIDEOGRAPHER:  Pardon me,

13    Mr. Toberoff.  Your microphone is currently off.

14         A.   I guess I don't remember when, but I guess

15    I signed it.  It's my signature.

16         Q.   Do you have any recollection -- it says,

17    "Signed, executed this 20th day of August, 2003, in

18    Santa Fe, New Mexico."  Were you living in Santa Fe

19    at the time?

20         A.   In August?  No.

21         Q.   You were not?

22         A.   No, I don't think I was living here.

23         Q.   Do you remember receiving and signing this

24    document?

25         A.   I don't remember.  I don't remember.
```

112

1              IN THE UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3   DC COMICS,

4                    Plaintiffs,

5       vs.            NO:  CV-10-3633 ODW (RZx)

6   PACIFIC PICTURES CORPORATION, et al.,

7                    Defendants.

8                REPORTER'S CERTIFICATE

9          I, MARY ABERNATHY SEAL, New Mexico CCR
    #69, DO HEREBY CERTIFY that on August 3, 2011, the
10  deposition of DAWN PEAVY was taken before me at the
    request of, and sealed original thereof retained by:

11
          Attorney for the Plaintiff
12        Mr. Matthew T. Kline
          O'MELVENY & MYERS, LLP
13        1999 Avenue of the Stars, Suite 700
          Los Angeles, California 90067-6033
14        (310) 553-6700

15         I FURTHER CERTIFY that copies of this
    Certificate have been mailed or delivered to all
16  Counsel, and parties to the proceedings not
    represented by counsel, appearing at the taking of
17  the Deposition.

18         I FURTHER CERTIFY that examination of this
    transcript and signature of the witness were
19  required by the witness and all parties present.  On
    _____ , a letter was mailed or
20  delivered to Ms. Dawn Peavy regarding obtaining
    signature of the witness, and corrections, if any,
21  were appended to the original and each copy of the
    Deposition.

22
           I FURTHER CERTIFY that the recoverable
23  cost of the original and one copy of the Deposition,
    including exhibits, to Mr. Matthew T. Kline is
24  $_____ .

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**EXHIBIT 48**
**525**

113

1         I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking

2   of this Deposition; that I did thereafter report in stenographic shorthand the questions and answers set

3   forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the

4   taking of this Deposition to the best of my ability.

5         I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with

6   (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest

7   whatsoever in the final disposition of this case in any court.

8

9



10   Mary Abernathy Seal
      BEAN & ASSOCIATES, INC.

11   NM Certified Court Reporter #69
      License Expires: 12/31/11

12

13  (1729K) MAS
      Date taken:  August 3, 2011
      Proofread by:   KW

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

EXHIBIT 48

526

DAWN PEAVY - 8/3/2011

```
 1    DC COMICS v. PACIFIC PICTURES CORP., et al.

 2            WITNESS SIGNATURE/CORRECTION PAGE

 3            If there are any typographical errors to
              your deposition, indicate them below:
 4

 5    PAGE   LINE

 6    _____  Change to _____

 7    _____  Change to _____

 8    _____  Change to _____

 9    _____  Change to _____

10            Any other changes to your deposition are
              to be listed below with a statement as to
11            the reason for such change.

12    PAGE   LINE  CORRECTION            REASON FOR CHANGE

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19            I, DAWN PEAVY, do hereby certify that I
      have read the foregoing pages of my testimony as
20    transcribed and that the same is a true and correct
      transcript of the testimony given by me in this
21    deposition on August 3, 2011, except for the changes
      made.
22

23            _____
              DAWN PEAVY
24
      (1729K) MAS Proofread by:  KW
25
```

**EXHIBIT 48**
**527**

# EXHIBIT 49

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:  Time Warner Inc.
     One Time Warner Center
     New York, NY 10019-8016
     Attn: Jeffrey L. Bewkes
     Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

## EXHIBIT 49
## 528

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Mark Warren Peary, personal representative of the estate of Joseph Shuster, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Joseph Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted "SUPERMAN" works made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:[1]

1.      The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group, 400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260 Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard, Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019.  Pursuant to

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the Notice of Termination (Document # V3505D773) served November 10, 2003 by Mark Warren Peary on behalf of the estate of Joseph Shuster, that was recorded at the U.S. Copyright Office on December 8, 2003.

2

**EXHIBIT 49**

**529**

37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, postage pre-paid to the above grantees or successors at the addresses shown.

2.      The works (individually, "Work"; collectively, the "Works") to which this Notice of Termination applies are as follows:  the illustrated front cover of the SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, as depicted in a reduced black and white form in the advertisements for the first Superman comic book story in Action Comics, Vol. 1, No. 1, appearing in the following magazines:[2]

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1,1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |
| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |

3.      This Notice of Termination applies to the following grants, assignments,

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notice of termination dated November 10, 2003 previously served pursuant to 17 U.S.C. § 304(d) by Mark Warren Peary on behalf of the estate of Joseph Shuster. Every reasonable effort has been made to find and list herein every such work. Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

**EXHIBIT 49**
**530**

and transfers and/or agreements to the extent, if any, each grant transfers or assigns

the renewal copyright (or any interest in or to the renewal copyright) to any Work

identified hereinabove:

    (a)    A one page agreement between Detective Comics, Inc., on the one hand,

and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on

the other, executed on or about March 1, 1938;

    (b)    A two page agreement of purported employment between Detective

Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, on the other,

executed on or about December 4, 1937;

    (c)    A three page letter agreement between Detective Comics, Inc., on the one

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about

September 22, 1938;

    (d)    A three-page letter agreement between Detective Comics, Inc. and The

McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph

Shuster, on the other, executed on or about September 22, 1938;

    (e)    A two-page letter agreement between Detective Comics, Inc., on the one

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about

December 19, 1939;

    (f)    A seven-page agreement or stipulation between National Comics

Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate,

Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May

19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by

the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of

Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (*see Siegel v. Warner Bros Entertainment Inc.*, 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

      (g)    A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

      4.    The effective date of termination shall be March 12, 2014.

      5.    No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the Author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

      6.    Joseph Shuster died on July 30, 1992. There is no living widow, child or grandchild of Mr. Shuster.  The undersigned, Mark Warren Peary, is the personal representative of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein.  To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March 6, 2012

Mark Warren Peary
Personal Representative of the Estate of
Joseph Shuster
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

5

**EXHIBIT 49**

**532**

**CERTIFICATE OF INVESTIGATION**

We hereby certify that before serving the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable

investigation to be made on our behalf as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of

the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this __6__ day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, California 90265
Counsel for the Estate of Joseph Shuster

6

**EXHIBIT 49**
**533**

## CERTIFICATE OF SERVICE

We hereby certify that we caused a true copy of the foregoing document

described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED

RENEWAL TERM to be served this ⁄⁶ day of March, 2012, by First Class Mail,

postage prepaid, upon the following:

To:  Time Warner Inc.
One Time Warner Center
New York, NY 10019-8016
Attn: Jeffrey L. Bewkes
Chairman & C.E.O.

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

7

**EXHIBIT 49**
**534**

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, California 90265

**EXHIBIT 49**

**535**

# EXHIBIT 50

## NOTICE OF TERMINATION OF TRANSFER
## COVERING EXTENDED RENEWAL TERM

To:  Time Warner Inc.
One Time Warner Center
New York, NY 10019-8016
Attn: Jeffrey L. Bewkes
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 50**
**536**

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States

Copyright Act (17 U.S.C. § 304(d)) and the regulations issued thereunder by the

Register of Copyrights, 37 C.F.R. section 201.10, the undersigned, Laura Siegel

Larson, being the person entitled to terminate transfers pursuant to said statutory

provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the

extent of author Jerome Siegel's ownership share of the renewal copyright(s)) in and to

the copyrighted "SUPERMAN" work(s) made in those certain agreements all as

identified below, and the undersigned sets forth in connection therewith the following:[1]

1.      The names and addresses of the grantees and/or successors in title

whose rights are being terminated are as follows:  Time Warner Inc., One Time Warner

Center, New York, NY 10019-8016; Time Warner Entertainment Company, L.P., c/o

Time Warner Cable, 60 Columbus Circle, 16th Floor, New York, NY 10023; Warner

Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros.

Inc., 4000 Warner Boulevard, Burbank, CA 91522; Warner Communications Inc., c/o

Time Warner Inc., One Time Warner Center, New York, NY 10019; Warner Bros.

Television, 4000 Warner Boulevard, Burbank, CA 91522; Warner Bros. Pictures Group,

400 Warner Boulevard, Burbank, CA 91522; Warner Bros. Consumer Products, 4000

Warner Boulevard, Burbank, CA 91522; Time/Warner Retail Sales & Marketing, 260

Cherry Hill Road, Parsippany, N.J. 07054; DC Entertainment, 4000 Warner Boulevard,

Burbank, CA 91522; DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019; DC

---

[1] This Notice of Termination of Transfer is independent of and does not supersede, alter, or amend the
notices of termination (Document Nos. V3410 D577, V3410 D607, V3410 D630, V3410 D653, V3410
D807, V3410 D830, V3410 D853) served April 3, 1997, by Joanne Siegel and Laura Siegel Larson, that
were recorded at the U.S. Copyright Office on February 2, 1998, or the notice of termination (Document
No. V3491 D823) served November 8, 2002 by Joanne Siegel and Laura Siegel Larson, that was
recorded at the U.S. Copyright Office on November 20, 2002.

Direct, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY 10019.  Pursuant to

37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail,

postage pre-paid to the above grantees or successors at the addresses shown.

   2.   The works (individually, "Work"; collectively, the "Works") to which this

Notice of Termination applies are as follows:  the illustrated front cover of the

SUPERMAN comic book story in Action Comics, Vol. 1, No. 1, June 1938 issue, <u>as</u>

<u>depicted</u> in a reduced black and white form in the advertisements for Action Comics,

Vol. 1, No. 1, appearing in the following magazines:[2]

| <u>Title</u> | <u>Name of Author</u> | <u>Date Copyright Secured</u> | <u>Copyright Reg. No.</u> |
|---|---|---|---|
| More Fun Comics #31 | Jerome Siegel Joseph Shuster | April 5, 1938 | B258595 |
| More Fun Comics #32 | Jerome Siegel Joseph Shuster | May 1, 1938 | B262725 |
| New Adventure Comics #26 | Jerome Siegel Joseph Shuster | April 8, 1938 | Unknown |
| New Adventure Comics #27 | Jerome Siegel Joseph Shuster | May 1938 | Unknown |
| Detective Comics #15 | Jerome Siegel Joseph Shuster | April 10, 1938 | B379783 |

---

[2] This Notice of Termination applies as well to each and every element of each such Work, and to each and every work which includes any illustration, image, prose, character, plotline, setting, story element, and/or any other elements of or reasonably associated with the Work, including any advertisement or promotional material, and which was registered with the United States Copyright Office and/or published within the applicable Termination time window (as such window is defined by 17 U.S.C. § 304(d) and the effective date of this Notice), and which was not listed in or terminated by the notices of termination dated April 3, 1997 regarding "Superman" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson or the notice of termination dated November 8, 2002 regarding "Superboy" previously served pursuant to 17 U.S.C. § 304(c) by Joanne Siegel and Laura Siegel Larson.  Every reasonable effort has been made to find and list herein every such work.  Nevertheless, if any such work has been omitted, including any related materials published prior to the date the work first secured statutory copyright, such omission is unintentional and involuntary, and this Notice of Termination also applies to each and every such omitted work.

3

**EXHIBIT 50**

**538**

| Detective Comics #16 | Jerome Siegel Joseph Shuster | May 10, 1938 | B379784 |

3.      This Notice of Termination applies to the following grants, assignments, and transfers and/or agreements to the extent, if any, each grant transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a)      A one page agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip Superman, on the other, executed on or about March 1, 1938;

(b)      A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 4, 1937;

(c)      A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(d)      A three-page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about September 22, 1938;

(e)      A two-page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 19, 1939;

(f)      A seven-page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one

hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about May 19, 1948, and an eleven-page consent judgment entered pursuant to this stipulation by the Hon. J. Addison Young, in the Supreme Court of the State of New York, County of Westchester, on or about May 21, 1948, although this is not a grant that need be listed in a notice of termination (see Siegel v. Warner Bros Entertainment Inc., 542 F. Supp. 2d 1098 (C.D. Cal. 2008)); and

(g)     A twelve-page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, on the other, executed on or about December 23, 1975.

4.     The effective date of termination shall be March 12, 2014.

5.     No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the Author, Jerome Siegel, or his statutory heirs or representatives pursuant to Section 304(c) of the United States Copyright Act (17 U.S.C. § 304(c)).

6.     Jerome Siegel died on January 28, 1996. There is no living widow of Jerome Siegel, and Laura Siegel Larson is the only living child of Jerome Siegel. Michael Siegel, Jerome Siegel's other child, is deceased and had no children. As such, the undersigned, Laura Siegel Larson, is the sole person entitled to exercise Jerome Siegel's termination interest pursuant to 17 U.S.C. § 304(d), incorporating without limitation 17 U.S.C. § 304(c)(2)(D), as to the grants of the transfers of rights in the aforementioned Works described herein. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary

to terminate said grant under Sections 304(c) and (d) of Title 17, United States Code.

Dated: March 6, 2012

_Laura Siegel Larson_
Laura Siegel Larson
c/o Marc Toberoff, Esq.
22631 Pacific Coast Highway #348
Malibu, California 90265

6

**EXHIBIT 50**
**541**

## CERTIFICATE OF INVESTIGATION

We hereby certify that before serving the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL

TERM, and pursuant to 37 C.F.R. Section 201.10(d), we caused a reasonable

investigation to be made on our behalf as to the current ownership of the rights being

terminated, by commissioning a search of U.S. copyright records, including a search of

the records in the U.S. Copyright Office.

We declare under penalty of perjury that the foregoing is true and correct.

Executed this _6th_ day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C,
22631 Pacific Coast Highway #348
Malibu, California 90265
Counsel for Laura Siegel Larson

## CERTIFICATE OF SERVICE

We hereby certify that we caused a true copy of the foregoing document

described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED

RENEWAL TERM to be served this 6th day of March, 2012, by First Class Mail,

postage prepaid, upon the following:

To:  Time Warner Inc.
     One Time Warner Center
     New York, NY 10019-8016
     Attn: Jeffrey L. Bewkes
     Chairman & C.E.O.

Time Warner
Entertainment Company, L.P.
c/o Time Warner Cable
60 Columbus Circle, 16th Floor
New York, NY 10023

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Barry M. Meyer
Chairman & C.E.O

Warner Communications Inc.
c/o Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attn: Jeffrey L. Bewkes
Chairman and C.E.O.

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Bros. Pictures Group
4000 Warner Boulevard
Burbank, CA 91522
Attn: Jeff Rabinov, President

Warner Bros. Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Brad Globe, President

Time/Warner Retail Sales &
Marketing
260 Cherry Hill Road,
Parsippany NJ 07054
Attn: Rich Jacobsen, President

DC Entertainment
4000 Warner Boulevard
Burbank, CA 91522
Attn: Diane Nelson, President

DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Diane Nelson, President

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019

**EXHIBIT 50**
**543**

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 6th day of March, 2012, at Los Angeles, California.

Marc Toberoff, Esq.
Toberoff & Associates, P.C,
22631 Pacific Coast Highway #348
Malibu, California 90265

**EXHIBIT 50**
**544**

# EXHIBIT 51

**From:** Seto, Cassandra
**Sent:** Friday, July 13, 2012 1:34 PM
**To:** mtoberoff@ipwla.com; Pablo Arredondo (parredondo@ipwla.com); 'dharris@ipwla.com' (dharris@ipwla.com)
**Cc:** Petrocelli, Daniel; Kline, Matthew
**Subject:** MSJ Timing

Marc,

Please see the email below sent on Matt's behalf.

\*        \*        \*

The schedule you proposed does not work on our end.  We plan to file Monday and notice DC's motion for August 20.  If and when you file your cross motion or are unavailable for a hearing on August 20, we can discuss a possible revised hearing date.  Matt

1

**EXHIBIT 51**
**545**

# EXHIBIT 52

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

June 21, 2012

**VIA E-MAIL**

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Marc Toberoff
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:   *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

Pursuant to Federal Rule of Civil Procedure 56, DC is considering moving for partial summary judgment on its First Claim for Relief for the reasons discussed in the parties' January 23, 2012, Joint Status Report, Docket No. 364 at 8-10, and is considering moving for partial summary judgment on its Third Claim for Relief for the reasons that have been extensively discussed and briefed, *see* Docket No. 90 at 4-13; Docket No. 185 at 4-13; Docket No. 334 at 11-17.  These issues have been thoroughly discussed in prior briefs and meet and confers, *see id.*; Docket No. 89 at 5-17, 20-21; Docket No. 186 at 5-17, 20-21; Docket No. 334 at 5-10; Docket No. 364 at 8-10, but if you wish to meet and confer further, please let us know when you are available to do so Monday or Tuesday.

**EXHIBIT 52**
**546**

O'MELVENY & MYERS LLP
Page 2

DC reserves all rights.

Very truly yours,

/s/ Matthew T. Kline

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.

**EXHIBIT 52**
**547**