## Superman's Creators, Nearly Destitute, Invoke His Spirit

By MARY BREASTED

*New York Times (1923-Current file);* Nov 22, 1975;
ProQuest Historical Newspapers: The New York Times (1851-2008)
pg. 62

# Superman's Creators, Nearly Destitute, Invoke His Spirit

By MARY BREASTED



The New York Times/David Scott
The New York Times/William E. Sauro
Jerry Siegel, left, and Joseph Shuster invented Superman, but are now nearly destitute. Mr. Siegel is a clerk in California. Mr. Shuster, legally blind, lives in Queens.

Two 61-year-old men, nearly destitute and worried about how they will support themselves in their old age, are invoking the spirit of Superman for help.

Joseph Shuster, who sits amidst his threadbare furniture in Queens, and Jerry Siegel, who waits in his cramped apartment in Los Angeles, share the hope that they each will get pensions from the Man of Steel.

They have survived by odd jobs and sometimes through the sale of valuable old comic books. They have tried to fight for rights to percentages of the Superman products in the courts, but always they have lost.

The last court case took 12 years to complete, and in that entire period Mr. Shuster and Mr. Siegel refused to discuss their problems with the press, on advice of their lawyers.

**Idea Born in 30's**

Finally this year they lost in the Second Circuit Federal Court of Appeals here, and their law firm, Coudert Brothers, advised them not to take the case to the Supreme Court. National Periodical Publications, Inc., the company that published Superman Comics, might work out some financial settlement, their lawyer told them, if they dropped the case.

That was in April.

Nothing has happened in the intervening months, and Mr. Shuster and Mr. Siegel have tired of their silent waiting. They have decided to tell the public what happened to them.

In 1933, with the country in the gloom of the Depression, Mr. Siegel decided the public might take to a comic strip about an inspiring fictional character with super powers.

Douglas Fairbanks Sr., the silent film star who never let a stunt man stand in for him in the acrobatically dazzling scenes in which he played Robin Hood and other swashbuckling heroes, was an idol to both Mr. Siegel and Mr. Schuster, who were then high school students in Cleveland.

And one night, the actor's acrobatics gave Mr. Siegel an idea. A creature born to another planet, impervious to the laws of gravity and stronger than an Army tank, would come to earth as a baby, be reared in an orphanage and grow up into a Superman whose consuming passion would be to right the wrongs of the world.

The next day, Mr. Siegel rushed over to see his friend Mr. Shuster, who liked to draw, and together they began to work on a comic strip about the new character.

For five years, they tried to sell their comic strip to newspaper syndicates, but none would buy it.

**Copyright Signed Away**

Then, in 1938, Detective Comics, Inc. bought the concept for inclusion in one of its comic strip magazines. The first Superman episode appeared in a new magazine called Action Comics in June 1938. (The first issue of that magazine is now a collector's item worth about $3,000.)

The two young men were paid $10 a page which they split between them, earning about $15 a week each.

They had sold the character of Superman to the company in an act that was, in effect, the signing away of the copyright for their invention.

As the years passed, and Superman comics proved ever more popular, Mr. Siegel and Mr. Schuster decided they should get more of the profits. They sued Detective Comics, Inc., and got some money but not the rights to Superman.

The company dropped them and used other writers and cartoonists to carry on the strip. Mr. Schuster, who was always afflicted with poor eyesight, could get only manual jobs. Now he is unemployed and being supported by his 57-year-old bachelor brother, Frank, who lives with him in Queens.

**The Irony of It**

Mr. Siegel, who at one point six years ago was unemployed and so hopelessly in debt that he sold his treasured old comic books to survive, now works for the state of California as a clerk-typist, earning about $7,000 a year. On that salary he supports himself and his wife.

"For years I've been waiting for Superman to crash in and do something about it all," Mr. Siegel said the other day. "Perhaps he would reveal a new superpower. He might have a new ray which is capable of stimulating a corporation's conscience."

Jay Emmett, executive vice-president of Warner Communications, Inc., which now owns National, said recently that he had told the lawyers for Mr. Siegel and Mr. Shuster that the company intended to give them some kind of an annual stipend.

"There is no legal obligation," Mr. Emmett said, "but I sure feel that there is a moral obligation on our part."

Mr. Siegel and Mr. Shuster say they have not yet heard what they may be offered by the company.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**Exhibit-1**

THE NEW YORK TIMES, WEDNESDAY, DECEMBER 10, 1975                                    L+          31

## Larchmont Board Ends Creche Display

By JAMES FERON
Special to The New York Times

LARCHMONT, N.Y. — The Christmas creche will be missing this year from the lawn of the Larchmont Village Hall.

Responding to growing pressure from residents who objected to the religious symbol on municipal property, the Village Board decided quietly a week ago to end the two-decade-old tradition.

The late-afternoon final decision, although somewhat less decisively, at a turbulent meeting last night. Paul Anderson, a trustee who abstained on the first vote, said in favor of the creche without explicitly forcing the outcome.

But the board refused demands by several residents to identify those who had favored removal of the creche. One resident complained that "because when you say 'they' you are creating a divisiveness that will take generations to heal."

A woman who said she was Jewish asked: "Who is that 'they' and themselves of the Jewish faith?"

Possibly, she said, although "many fair-minded Christians may join with us in seeing this as a breach of the tradition separating church and state."

Mayor Kenneth H. Wanderer spoke of the rights of the minorities and said, "When we do something by majority the rights of individuals, we are minimizing ourselves."

A bitter discussion that began in the homes and shops of this quiet old and established community...

## Metropolitan Briefs

### Gas Main Explodes on East Side

A gas main exploded into flames at 1 P.M. on 86th Street between First and Second Avenues, caused when Con Edison workers digging in the street hit the pipe. One worker, Richard Barry, was treated for superficial burns at Metropolitan Hospital and released. About 20 residents of two three-story buildings, 327 and 329 East 86th Street, were temporarily evacuated as a precautionary measure, according to the police.

### Dutchess Jail Inmates Sue Sheriff

Inmates at the Dutchess County Jail in Poughkeepsie submitted a motion in Federal District Court here to hold Sheriff Lawrence M. Quinlan in contempt of court for failing to improve conditions at the jail. The inmates contend that the sheriff has not lived up to an agreement to clear up unconstitutional conditions, including health, food, recreation and discipline at the jail.

### City Upheld on Bullhorn Permits

The United States Court of Appeals for the Second District decided that the city could charge a $5 fee to permit the use of sound amplification equipment, or bullhorns, without violating freedom of speech. The ruling overturned a decision by Judge Jack B. Weinstein, who, acting on a complaint by the United States Labor Party in Federal District Court in Brooklyn, found that the fee was unconstitutional.

### 13 Children Hurt in School-Bus Crash

Thirteen children were given first aid for cuts and bruises after their school bus, according to the police, crashed into the rear of a dump truck at 8:15 A.M. at Long Beach Road and Howard Place in Oceanside, L.I. There were 30 students aboard the bus, which was on the way to the North Oceanside Road Elementary School, the Nassau police said.

### Carey Names an Appellate Justice

Governor Carey announced the appointment of Supreme Court Justice Vincent D. Damiani of Brooklyn as an associate justice of the Appellate Division. Mr. Carey said Justice Damiani, who is 56 years old, would serve in the $51,637 appellate post until Dec. 31, 1978, when his Supreme Court term expires. Mr. Damiani was first appointed to Municipal Court in 1955 and now serves in the Second Judicial District and as administrative judge of the Supreme Court Integrated Drug Parts.

### Bearns Reappoints 2 Judges

Mayor Beame reappointed and swore in two judges the two 10-year terms: Family Court Judge Harold J. Felix and Criminal Court Judge Joseph A. Martinis, who is currently serving as an acting justice with the Supreme Court. Each will receive $42,451 a year.

### From the Police Blotter

A 32-year-old New York City officer shot and killed himself inside his home in Uniondale, L.I., according to the Nassau County police. The dead policeman, Howard Karins, had been a member of the department for five years and was assigned to the Midtown North Precinct. — A Brooklyn man, identified as Carmelo Galarza, 35, of 4006 Third Avenue, was shot twice in a street quarrel outside his home with what the police described as his estranged wife, Julia Martinez. The victim was later reported in good condition at a hospital.



Superman, in a drawing by Neal Adams, holds Jerry Siegel, left, and Joseph Shuster, who invented the cartoon character. The scene is at The New York Times Club.

## Mild-Mannered Cartoonists Go To Aid of Superman's Creators

By DAVID VIDAL

In his outstretched left arm he supported Joseph Shuster. In his right, Jerry Siegel. In the middle was the man who came to Earth "with powers and abilities far beyond those of mortal men," in his familiar confident posture, flying skyward.

"Does Superman have the power to save his creators?"

In front of a blackand-white cartoon poster with his question, Mr. Shuster and Mr. Siegel sat yesterday at a news conference at which the National Cartoonists Society and the Cartoonists Guild expressed "full backing" for their attempt to gain some more modest compensation of Superman's 42 years ago.

The men are both 61 years old and nearly destitute today. Jerry Siegel earns $7,000 a year as a mail clerk in Los Angeles where he lives with a daughter and his wife, Joanne, the original model for Lois Lane.

Joe Shuster, a bachelor and legally blind, lives in Forest Hills, Queens, with his younger brother, Frank, who supports him.

Superman's creators have made no settlings off their invention since 1948. They signed off their rights "forever" in 1938 the instant they sold Superman to what is now Warner Communications Inc., the owner of Superman 42 years ago...

### Theft of $200,000 Is Laid to a Lawyer in Westchester

WHITE PLAINS, Dec. 9 — Westchester County law-enforcement authorities said today that a prominent lawyer, Daniel H. Ribons, would be charged later this week with stealing more than $200,000 from the estate of his former client, the late Miss Maude J. Kornrich.

Carmine Anthony Carl A. Vergari confirmed that Mr. Ribons, who was a member of the Westchester County Bar committee on grievances of the Bronx Bar Association, would surrender and be arraigned in Yonkers on Friday.

Mr. Vergari said Mr. Ribons would be charged with "numerous counts, including grand larceny in the second degree." In addition to the fee, an owner of a towed vehicle will continue to receive a $55 parking summons and be docked $10 a day for storage.

Arthur Del Negro, head of the bureau, said yesterday that Harold Reynolds, chief counsel to the grievance committee of the Ninth Judicial District, and Mr. Reynolds, who declined comment, began inquiries at the...

### Police Towaway Fee Will Go Up to $65

The fee for towing away illegally parked cars in Manhattan will be raised from $50 to $65 next month, Police Commissioner Michael J. Codd announced yesterday.

The announcement is in the City Record, and the purpose of the increase was "to reconcile revenue for departmental costs," Mr. Codd said.

The current fee of $45, owner of a towed vehicle will continue to receive a $55 parking summons and be docked $10 a day for storage.

#### LOTTERY NUMBERS
Dec. 9, 1975

N. J. Daily—92798
N. J. Pick-It Lottery—711

a judicial ombudsman about a year ago, and has reportedly established nearly $50 files in investigating complaints against lawyers.

Mr. Ribons, who was Miss Kornrich's lawyer, was named in a document issued by the state Appellate Division charged with receiving $50,000 from the estate and $18,000 which came to her through false representation "as collateral" for a $6,500 loan he had placed himself. Both transfers of money were made, the portions of the Superman formula...

REMEMBER THE MENMETS

## Lie Tests Are Postponed For Head of Slain Family

By JOSEPH F. SULLIVAN

HACKENSACK, N.J., Dec. 9 — The polygraph tests of Wesley R. Diggs, the 45-year-old New York City businessman found his wife and four children slain in their $90,000 ranch home Saturday, were postponed because of Diggs's emotional state, according to Joseph C. Woodcock Jr., the Bergen County Prosecutor.

Mr. Woodcock said early today that further tests would be put off until after the burial of the slain mother and children. He later said it was indefinite when new test would be conducted.

This evening, Mr. Diggs informed investigators for the County Prosecutor's office that he had obtained the services of counsel and was still willing to undergo further tests.

"Now that he has an attorney, the timing of the tests will be his responsibility," said Mr. Woodcock.

Mr. Diggs had volunteered to take the tests to clear himself of any suspicion in the slaying of his wife, Janice, and their four children. His wife, Janice, and their four children, and that aspect of the case behind them.

The prosecutor has emphasized that investigators have turned up no indication to support any suspicion of Mr. Diggs.

Mr. Diggs, who owns four taverns and a stationery store in Harlem, found the bodies of his wife, 38 years old, and their children, Audrey, 11; Allison, 10; Wesley Jr., 13, and Nanette, 15, in various rooms of the house Saturday at 9:30 P.M. when he returned home Friday morning and stayed in New York Friday night. The victims were all slain by 22-caliber bullets between 11:30 P.M. Friday and 2 A.M. Saturday as they watched television or prepared for bed. Diggs were no signs of a struggle nor of forced entry by the killer.

Because the investigation thus far has ruled out robbery or a sexual assault as a basis for the murders the Prosecutor has asked New York City police to look into Mr. Diggs's personal and financial dealings. His business partners have been questioned and the possible revenge motive to commit the crime.

Mr. Diggs has not be able to offer any theories on why anyone would want to murder his family, according to Mr. Woodcock. And has not intimated any concern that his own life may be in danger. He continued to express his grief over the murders of his wife and children.



WHAT WAS THE WEATHER LIKE HERE? Don't ask.

## Nassau County Enters Entente With Soviet

MINEOLA, L.I., Dec. 9—Nassau has entered the field of local planning.

The Nassau County Planning Commission has received a letter from the Soviet Union's National Library for Science and Technology in Moscow asking for copies of its planning reports and newsletter.

Benjamin Frank, commission chairman, revealed the Russians had become interested in planning on Long Island. But, in the spirit of detente, he decided to cooperate.

"It's a puzzlement," Mr. Frank said. "But we've decided to approve the request and put the Soviet library on our mailing list. After all, the Planning and Science Department of the State have proclaimed a policy of detente with the Soviet Union."

Thus, the Soviet Union will be the first Communist nation to receive the report, which deals with such matters as population, transportation, recreation, topography and resources.

Mr. Frank said he had thought of sending the material, which ran to more than 2,000 municipalities and planning agencies four times a year, "postage due."

But he decided that in the interest of detente, the material will be sent third-class, postage paid.

## 17 Women on Rikers I. Receive Certificates for Secretarial Skills

By EDITH EVANS ASBURY

Seventeen graduates of a class in secretarial skills and typing at the Women's House of Detention on Rikers Island received certificates and praise yesterday as friends, relatives, fellow inmates and former graduates of the course applauded and cheered.

The Junior League women who sponsored the project had a hard time getting into the jail for the ceremony because of the security measures in force. But they brought with them an array of prizes and gifts for the women who had completed the course, and who had enrolled with mixed feelings and had stayed on to earn their certificates in a program that extended over several weeks...



Graduates of secretarial skills program holding roses at a ceremony yesterday in the Rikers Island detention center

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

### Public Library Begins A Fund-Raising Drive

The New York Public Library has opened a campaign to raise $3 million in private contributions to support its research collections.

The city's fiscal problems have resulted in severe cuts for the public library system, and spokesman have said that the bulk of the institution's operating budget for research...

Exhibit-2

6

# Los Angeles Times

CIRCULATION: 1,034,329 DAILY / 1,332,875 SUNDAY          SUNDAY, FEBRUARY 25, 1979          ★ /482 PAGES/ ⎯⎯ / SUNDAY 50c / ⎯⎯

## ENERGY DRIVE

## Wyoming— a Dilemma of Minerals

BY GAYLORD SHAW
Times Staff Writer

CHEYENNE, Wyo.—The rancher-turned-state official propped his boots on his desk as he argued that Wyoming should be extracting a greater price for its coal, uranium and other mineral riches.

He told a story to illustrate his point:

"We're a little like the ol' gal 40 years old who woke up one morning, found a $20 bill pinned to her pillow, and wondered why the hell she had been giving away her favors free all these years.

"We've just about been giving it away, but that's got to change," he said. "These companies are going to have to pay a price if they want our minerals, and they are going to have to do it on our terms, which means slower than they like."

Across town, Stanley K. Hathaway, former governor and interior secretary who represents mineral companies now as attorney, waved his cigar as he made just the opposite argument—that mining operations already are paying their fair share.

He said mineral companies now produce 65% of the state's revenue and, as a result, Wyoming has the nation's lowest per-capita tax rate and the third highest standard of living.

Besides, Hathaway argued, accelerated development of Wyoming's minerals "is going to happen whether we like it or not. It has to happen for the nation's benefit. We don't have an independent choice.

Those are two sides of what Hathaway termed the big philosophical debate now raging in Wyoming which, although it is the nation's fastest-growing state, is described in the Almanac of American Politics as "the closest thing we have left of the old Wild West."

At issue in the Wyoming debate is the pace—and the price—of developing the minerals needed to meet the U.S. energy crisis.

Somewhat similar debates are under way elsewhere in the Rocky Mountain West. In Colorado, the issue is the opening of a molybdenum mine near Crested Butte; in New Mexico, it is the future of uranium mining near Grants; in Utah it is the construction of coal-fired power plants.

But in Wyoming, battle lines are broader, perhaps because so much is at stake.

The state has such vast coal reserves that, if it were a country, it would be the fourth-largest-coal-producing nation in the world. Currently it has 21 active coal mines—including one that is the largest in the United States. The state is expected to have 58 mines by 1985.

It also is the second-leading uranium producer in the United States (behind New Mexico), and its uranium output is expected to double in five years. It also has large deposits of oil, gas and a dozen other minerals.

"By the turn of the century, we'll be the No. 1 energy state," Hathaway predicted.

Environmentalists are concerned that energy development will turn Wyoming into what one called "another Appalachia" at the expense of the state's pristine water, air and abundant wildlife.

"I look at what is happening now
Please Turn to Page 18, Col. 1

## 20 MAY DIE IN ONE CRASH

## Black Africa Discovers Automobiles Can Kill

BY DAVID LAMB
Times Staff Writer

NAIROBI, Kenya—Black Africa has discovered a "weapon" long familiar to the Western world—the automobile. The results are often a bit frightening.

Accidents involving as many as 30 deaths are not uncommon on Kenya's roads when two packed vehicles collide head-on, usually on a curve or hill. Even in congested cities, driving often resembles a carnival game of bumper cars.

In Zaire, the road from the airport to Kinshasa is littered with a dozen or more smashed cars left to rust. In Nigeria the new freeway linking Lagos and Abidan can be a white-knuckle experience. In Uganda, army trucks roar down the middle of country roads and oncoming traffic is expected to bend obediently for the shoulders.

"The problem," one safety official

said, "lies with inexperience. There were few African driving cars before independence and, for many people, the car is still something of a toy."

Few African countries publish statistics on traffic accidents. One exception is Kenya, where 1,286 people were killed last year and 10,700 were injured—alarmingly high figures in a country that still moves largely by foot and has less than 2,000 miles of paved roads.

In response to the rising death toll, the Kenyan police commissioner, Ben Gethi, said last week that his force would recruit a campaign to reduce speeding, get unsafe vehicles off the roads and educate pedestrians on the use of footpaths and crosswalks and the "control of drinking habits when using roads."

One factor making it difficult to re-
Please Turn to Page 29, Col. 3


L.A. HARBOR—Oil tanker Sansinena was ripped in two by explosion in L.A. Harbor in 1976.

## U.S. Inspections of Foreign Tankers Getting Results

### Program Forcing Substandard Vessels to Avoid American Ports or Retire Early to Scrap Yards

BY WILLIAM C. REMPEL
Times Staff Writer

The Greek oil tanker Athenian Victory II entered Salem Harbor dressed in rust and oil—a nautical nightmare to the Boston Coast Guard inspectors who boarded it.

Oil oozed through its badly corroded hull leaving a slick in its wake. Rust and scales covered the deck and the rows of cargo pipes.

"It was the shabbiest tanker I've ever seen—a steel version of the Flying Dutchman," one Coast Guard inspector recalled, alluding to the legendary ghost ship.

The 26-year-old vessel was seized by the Coast Guard and ordered to make repairs—for the safety of the crew and the environment. It was permitted to sail to a Jacksonville shipyard in legal custody of the Greek consulate.

But only minor repairs were made in Jacksonville. And with Greek government approval that the ship was seaworthy, it set out to sea again, under orders to stay out of U.S. waters until repairs were completed.

That was a year ago. Four months later, the rusty tanker ran aground in the Gulf of Aden where it was stranded for 26 days. Last fall—nine months after being hounded out of the United States by costly repair demands—the tanker was scrapped in Pakistan.

The case of Athenian Victory II is one example of the impact of the U.S. Coast Guard's foreign tanker examination program—an inspection program born Dec. 17, 1976, in Los Angeles Harbor with the explosion of the tanker Sansinena.

A day after the Liberian-flag tanker blew up—killing nine and causing $21.6 million damage to a wide area of San Pedro and the waterfront—the Coast Guard began inspecting all foreign tankers arriving in Los Angeles and Long Beach harbors.

In a month, the practice was a national policy. Now, two years later, there are signs the inspection program has forced substandard tankers to avoid U.S. ports or retire early to the scrap yards.

In 1977, during the first month of nationwide inspections, the Liberian-flag Golden Jason was towed into the open sea.

Please Turn to Page 12, Col. 1

## Campaign Fund Leftovers: a Gap in Ethics Code

BY PAUL HOUSTON
Times Staff Writer

WASHINGTON—When U.S. Rep. John E. Moss retired from the House last month, his campaign committee still had $3,881.76 sitting in the bank. What to do with it? Give it to other political candidates or party organizations? Donate it to charity? Or simply transfer it to the Moss family bank account?

The Sacramento Democrat chose to keep the money himself, federal records show. He also decided to keep the $4,400 automobile that had been purchased with campaign funds in February, 1977—one month before he announced that he would not run for reelection.

To congressional reformers, the Moss case points up a loophole in the law that needs closing.

Two years ago, in an effort to deter bribery, the Senate and House adopted new ethics codes that forbade members of Congress from converting campaign funds to personal use. But a campaign reform bill that would have extended the ban to former members was scuttled last year.

Federal law now allows former members of Congress to use excess campaign funds for any "lawful purpose"—including personal use, so long as income taxes are paid.

"Most people giving money do it to finance campaigns, not to help candidate buy helicopters, which is what former Congressman Ken Gray (D-Ill.) did with part of his excess campaign funds after he left office," Fred Wertheimer, vice president of Common Cause, the citizens lobby, said Friday.

Permitting personal pocketing of campaign funds "undermines some people's view of what the political process should be and gives the wrong kind of encouragement to others" who have bribery in mind, Wertheimer said.

In recent months, seven House members from California retired voluntarily and three were defeated for reelection. A Times survey found
Please Turn to Page 8, Col. 1

## Iranian Marxists Shout for Reform

### Khomeini Calls Them Enemies of Revolution

TEHRAN, Iran (AP)—Fifty thousand Marxist guerrillas demanded quick, radical reforms in Iran Friday in a strong challenge to the Ayatollah Ruhollah Khomeini's revolutionary government.

Khomeini condemned the Fedayeen guerrillas as "Communists and enemies of the revolution" in what appeared to be a complete break with the leftists after the two groups had fought side by side to bring down Shah Mohammed Reza Pahlavi.

The Marxists' demands were made in a rally on the campus of Tehran University, a frequent staging area for bloody street protests that eventually led to the end of the Pahlavi monarchy.

Spokesmen for the Fedayeen said the primary purpose of the rally was to make Khomeini realize that "not all Iranians want an orthodox Islamic republic."

"We are young, educated and liberated. A strict Moslem nation would only create more problems for the people," a Fedayeen spokesman said.

Khomeini, patriarch of Iran's 32 million Shiite Moslems, has scheduled a referendum in two weeks for Iranians to decide whether they want an Islamic republic.

At the Fedayeen rally, which consist
Please Turn to Page 8, Col. 1

# Israelis View Danger as Worst Since '73

## Believe Revolution Threatens Saudis; Dependence on U.S. Found Increasing

BY LOUIS B. FLEMING
Times Staff Writer

TEL AVIV—Israeli defense planners regard the strategic situation in the Middle East as more dangerous than at any time since the 1973 war.

Peace with Egypt would ease pressure on the western front but is expected to increase pressure on the eastern front, where the threat of massive Iraqi intervention is seen as a possibility.

The present assessment by Israeli defense officials is made all the gloomier by a feeling among many that Saudi Arabia faces a serious revolutionary threat, although of a form different from the religious uprising in Iran.

In these circumstances, Israelis find themselves more dependent on the United States than ever before. This accounts for the importance attached to the visit here earlier this month by U.S. Secretary of Defense Harold Brown, and the anxiety with which the U.S. response to old requests is being awaited.

"We do not yet know where we stand," one source said.

Israeli defense sources say they urgently need two forms of assistance from the United States.

—An estimated $3 billion to cover the cost of relocating Israeli military installations from the Sinai, when it is returned to Egypt, to the Negev Desert, which will become the basic western front defense line.

—About $1 billion a year for the next five or more years for arms to close what Israelis call the "quality gap" with the Arab states. While most observers believe that Israel has the edge in weapons quality, the Israelis point to sophisticated Soviet arms recently supplied to some Arab states.

In all of this, the United States is regarded as the key. There is no other source.

This is why Israel added aid as well as oil to the agenda at Camp David when talks resumed last Tuesday.

"It would be impossible for us on our own, in the three years provided by the agreements, to relocate the military facilities in the Negev to the Negev," a defense source said. "This country might collapse."

An officer smiled and said, with a touch of irony:

"So what do you want us to do, make peace and have an economic collapse?"

Defense sources report a positive response from U.S. officials on relocation of the two Sinai airfields to the Negev. Further, a "positive spirit" has been shown by the Americans for helping with a warning system to compensate for the loss territory to be given back to Egypt. But conversations indicate that the United States has not yet agreed to provide all that the Israelis feel they need for the expensive infrastructure of the new facilities in the Negev.

On the eastern front, the Israeli defense continues to rely on quick mobilization.

"This front is dangerous," one source said, noting that Israel cannot afford to maintain fully manned forces on the front at all times.

"Our strength comes from our ability to mobilize," another said.

"There is no strategic or even operational depth," an officer explained. "On the eastern front, territory plays a dominant part in the balance of forces."

The official position within the defense establishment is that Israel cannot risk giving up military positions in the Golan Heights and on the West Bank of the Jordan River.

The risk has been aggravated by several factors.

—The modernization of the Arab armies, largely converted from heavy infantry emphasis in 1973 to mechanized armored armies today.

—The new accords between Syria and Iraq which raise the likelihood of
Please Turn to Page 8, Col. 1

## China Reportedly Overruns 2 Viet Cities, Loses One

By United Press International

Chinese troops overran two Vietnamese provincial capitals and pushed 20 miles into Vietnam Friday, but U. S. government sources said counterattacking Vietnamese forces apparently recaptured one capital and have even pushed the Chinese back to the border at some points along the 480-mile front.

Sources in Bangkok, Thailand, and in Washington said reinforced Chinese troops and tanks had captured the capital cities of Lao Cai and Cao Bang, 120 miles north of Hanoi and more than 15 miles inside the border.

But a U.S. government source in Washington said Lao Cai apparently was retaken by the Vietnamese in a successful counterattack.

The source also said the fighting has intensified all along the front and added that new rite provincial capital of Mong Cai the Chinese appear to have been driven back, possibly across the now-porous border.

The Chinese, sources in Bangkok and Washington said, we ' amassing their strength for a drive provincial capital of Lang Son.

Those sources said that, in the past 24 hours, the Chinese air force has

flown about 400 sorties—each a single flight by one aircraft—but that the flights appear to be aimless, "simply flying around," in the words of one source.

That source added that reports that the Chinese aircraft struck targets in the area of Haiphong are wrong, as far as U.S. intelligence can tell.

Besides Lang Son, a key rail, highway and waterway junction, the provincial capitals of Quang Ninh and Lai Chau are under fierce attack, the Bangkok and Washington sources said.

"It looks like the Chinese want to take the capital of every province on the border," one Western source said.

In the first comprehensive U.S. assessment of the battle, the sources said that the Chinese had about 200,-000 men on hand when the battle began Feb. 17. That involved, the sources said, 14 or 15 divisions. Since then, the number has increased by about 25,000.

The Vietnamese forces number between 75,000 and 100,000, but they appear to be well-trained border troops and not militia, as earlier reported.

## LED BY FOOD, GASOLINE COSTS

## Consumers Hit by 0.9% Price Surge

WASHINGTON (AP)—Consumers were jolted by a 0.9% increase in prices last month as the cost of food, gasoline and medical care jumped sharply, the Labor Department said Friday.

Shoppers paid higher prices for beef, poultry, fish, fruit and vegetables as food prices rose 1.4% during the month. That was the biggest increase for food since a 1.6% gain last April.

Transportation costs rose 1.1% due to a 2% increase in gasoline prices and higher prices for new and used cars, the department said.

Rising charges by doctors and hospitals contributed to a 1.1% increase in medical costs.

The 0.9% increase in the consumer price index was the largest since October 1978 gain last September and would amount to almost 12% if it continued for an entire year.

However, the increase fell short of the gain of 1% or more that many analysts had predicted. In December, prices rose 0.6%.

In January, the average worker's purchasing power declined by 0.1% because of higher prices and a decrease in hours worked.

The Labor Department said the cost of housing went up 0.6% after increasing 0.5% in November and December. The cost of owning a home rose 0.8% while hotel and motel rates climbed 2.4%. The cost of new clothes rose 0.2%.

American consumers were paying 9.3% more in January than they were a year earlier for the same products, the department said.

The consumer price index for urban consumers and urban wage earners stood at 204.7, meaning that goods

costing $100 in 1967 cost $204.70 last month. The figures are adjusted to account for seasonal variations.

The National Cattlemen's Assn. said retail beef prices jumped at least 5% in January because of severe winter weather, increased costs and a decline in beef production.

Average retail prices of choice-grade beef rose to a record $2.04 a pound in January, up 6.6% from $1.94 a pound in December.

The government's producer price report for January released earlier showed wholesale prices of all products rising 1.2%. Although beef showed the biggest increase, the gains were widespread and included steel, automobiles, tobacco and gasoline.

Alfred E. Kahn, chief of the Carter Administration's anti-inflation program, called these developments "troublesome."

# FEATURE INDEX

ART, Calendar.
BOOK REVIEW, Calendar, Pages 2-3, 5.
BOOK REVIEW, Calendar.
BRIDGE, Home Magazine.
CHESS, Part 2, Page 4.
CLASSIFIED SECTION.
CROSSWORD, Book Review.
DEATHS, Part 2, Page 6.
DRAMA, Calendar.
FOOD GAME, Part 3, Pages 26-27.
HOME MAGAZINE.
INTERNATIONAL NEWS, Part 2.
MOVIES, Calendar.
MUSIC, Calendar.
OPINION, EDITO RIALS, Part 6.
OUTLOOK, BUSINESS, Part 5.
RADIO, Calendar.
REAL ESTATE, Part 8.
RELIGIOUS NEWS, Calendar.
SPORTS, Part 3.
TELEVISION, TV Times.
TRAVEL, Part 7.
VITALS, WEATHER, Part 2, Page 16.
WOMEN'S, View, Part 4.

# CALENDAR



*Superman, the character created by Jerry Siegel, left, and Joe Shuster, symbolizes for them a shattered American dream.*

PHOTO BY ULLI ALBERS

## MAN OF STEEL SPLINTERS AN AMERICAN DREAM

### BY EIRIK KNUTZEN

Superman's continual quest for "truth, justice and the American way" seems something of a cruel joke to the two men who created the Man of Steel.

As 19-year-old Cleveland youth with big dreams in 1934, writer Jerry Siegel and cartoonist Joe Shuster created what was to become the most successful superhero in history. At the time, during the Great Depression, Superman represented their one-way ticket to fame and fortune. Now they're battle-scarred and weary at 64 and their Man of Steel seems to symbolize a shattered American dream.

While remaining in virtual seclusion for 30 years, Siegel and Shuster have kept close tabs on the Man of Steel's incredible financial successes. Now they seem fearful that Warner Communications Inc., parent company of the Superman comic book publishers, may cut off their $20,000-a-year each "pension" for life—gained in late 1975 —if they protest too loudly.

They went to court twice to test legal points with the comic book publishers, seeking to protect what they considered to be their rights as literary creators. They came out on top in the first case in 1947—splitting a $100,000 settlement—but it also was the beginning of financial ruin.

They lost the second in 1975, after a 12-year fight to obtain Superman copyright renewal rights. The court ruled that they had lost all rights to their character after signing the publishers' release form and endorsing a check for $130 in 1938.

The media publicized their dire economic straits, more or less prompting Warner Communications to offer some assistance.

Signing all copyrights over to the comic book publishers, according to Jack C. Harris, an editor and publicist at DC Comics, Inc., "was standard practice back then. It still is. Everyone who does art work for us signs a release saying we own the copyright, though we have a more open contract in that whoever creates a character for us now does get a percentage."

Siegel and Shuster live in quiet middle-class residential sections of Los Angeles'

West Side. Shuster, apparently embarrassed by his small, cluttered one-bedroom apartment, prefers to conduct his infrequent interviews at Siegel's place. A short, pudgy man with thinning gray hair, Shuster wears thick glasses. He is legally blind due to a progressive eye disease since childhood. Married late in life, he is going through divorce and has no children.

Siegel shares his sparsely furnished three-bedroom apartment with Joanne, his wife of 30 years, and his daughter, Laura, a newscaster and director in a local radio.

Plaid blankets cover the sofa and easy chairs as if to hide the wear and tear. Mass-reproduced art lines the walls. The apartment and most of the budget furniture was acquired after the deal with Warner Communications.

Siegel is of slighter build and sports a shock of longish gray hair. Intense blue eyes are set in a craggy, lined face. A recently developed heart condition is a source of chronic anxiety. Like Shuster, Siegel considers himself "semiretired"—meaning he writes comic book scripts and TV treatments while working on an autobiographical book.

They published one of the original Superman versions in their own mimeographed "fanzine." After nearly four unsuccessful years of trying to sell Superman as a comic strip, they went to work as independent artists in 1937 under a 10-year contract to Detective Comics, the first forerunner of DC Comics. After about a year, the publishers decided to take a chance on their superhero in Action Comics No. 1.

Siegel and Shuster deny that they were aware of selling the Superman character outright for $130 at the time. "We were

paid $10 a page for that 13-page story—a total of $130. Along with the check, we were sent a release form which was releasing all rights to the character. We did not receive any special amount for the character itself," Siegel explained.

When the McClure Syndicate decided to distribute Superman as a newspaper strip in 1939, the creators asked for their rights back. "We were told that we had parted with all our rights, that they owned the character, and if we wanted a syndicated strip, we could be associated with them in a pleasant manner," Siegel recalled.

A revised contract during the '40s also gave them a small percentage from merchandising. "But we were never given an accounting," Shuster said. "At the end of the year they would give us a Christmas bonus and say, 'That's the money due—just forget about everything else.' It was a lump sum to keep us quiet. I think it was something like a few thousand (dollars)."

Besides contractual salaries up to 1948, Siegel estimates that Superman in various forms generated approximately $420,000 for them. "It was mostly from newspapers, not from the comics where millions were made," he smiled. But take the $420,000, split it between us, and spread it over all those years . . . and Joe had to pay about half of that to his staff." After paying his staff, Shuster claims, he never took home more than $150 to $200 per week. And he needed a staff of artists because of the work load and due to his eye condition.

In 1947, toward the end of their 10-year contract period with the comic book publishers, they went to court over a spin-off character, Superboy. The litigation lasted a

year, revolving around the fact that the creators of big-money-earner Superman were now ready to go into competition with Detective Comics with their own Superboy magazine. "There was a settlement out of court which is a little complicated, but they regained Superboy in exchange for $100,000. Part of the money was already due us for some work we had done over a period of years," Shuster explained.

"After that first lawsuit, we were completely broke. I went into debt because I didn't have an income (all ties with the publishers were severed once the suit was initiated)—and all the debts had to be repaid. And to pay our attorneys."

Severe times followed, especially after their efforts with a strip called "Funnyman" failed to amuse readers. "It got worse and worse for me free-lancing scripts for comic books—soon I found it impossible to make a living as a writer."

With Siegel's mental condition deteriorating, and a child to feed, his wife began to make appeals to the publishers: "We were without funds with only baby food in the house, the diaper service was cut off, along with the milk service, and we got an eviction notice from the landlord for our one-bedroom apartment.

Friends and neighbors in Great Neck, Long Island, extended credit for food and necessities while Mrs. Siegel repeatedly appealed to the president of the comic book publishers and Siegel wrote letters to the media concerning his plight. When he received some publicity in the New York area, he also went on a hunger strike. As a result of that, according to his wife, the publishing company sent one of their attorneys to their house with $50.

Somehow, after years of appeals, Mrs. Siegel persuaded the publisher to hire Siegel back on a free-lance basis and he began writing Superman stories again in 1959—without a by-line. (Their by-lines as creators of Superman had been removed after the 1947-48 litigation, restored after the 1975 case.) Siegel wrote hundreds of stories "developing Superman's emotional life" at $10 per page that paid better than the litigation, he had received $50 a page) until the middle '60s, when again he severed the ties with the publishers and became involved with the 12-year litigation to gain Superman's copyright renewal.

His wife's physical condition dictated a move to the West Coast in 1966, where for the next three years he again had problems finding employment. "Then I got a job for the State of California's Public Utilities Commission as a clerk/typist. My salvation was that as a writer, I knew how to type."

Shuster, meanwhile, moved in with his invalid mother in Forest Hills a few years after the 1947 lawsuit had left him penniless in victory.

Unable to function as an artist, Shuster spent the next 15 years at menial labor as a stockroom clerk, sales clerk: "In 1965, I was the oldest messenger boy in New York City," he laughed. "And one day I had to deliver a message to an office located in the same building as the publisher of DC Comics. Someone from their office saw me in the hall, asked me what I was doing there, then told the publisher about it later. He called me that night—very upset—and asked me to come into his office so he could help me out a little. 'How does it look,' he said, 'for the artist/creator of Superman to be running around delivering messages—you're giving us a bad name!' " □

---

**Calendar Movie Section, Page 36**

*Knutzen is a free-lance writer.*

SUNDAY, FEBRUARY 25, 1979    CALENDAR    PAGE 7

**Exhibit-3**

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

8



Dated:  October  10, 1980

DC Comics, Inc.
75 Rockefeller Plaza
New York, New York 10019

Re:  "SWAMP THING"

Gentlemen:

This is to confirm the terms of the Agreement between you (hereinafter referred to as the "Owner") and us (hereinafter referred to as the "Purchaser") regarding that certain comic book series entitled "SWAMP THING" solely owned by Owner (said comic book series, together with the title thereof and all characters, representations, situations, translations, arrangements, and adaptations thereof, and all literary, dramatic and photographic material relating to the foregoing as created for the said comic magazines and the themes, plots, situations, sequences, pictorial action, dialogue, drawings and sketches contained in and depicted in comic magazines published by Owner, and each and every part of all the aforesaid, whether now or hereafter written, are herein collectively referred to as the "Work").

1. (a)  Owner hereby grants to Purchaser the sole and exclusive option (hereinafter called the "Option") to acquire, exclusively and forever, pursuant to the terms and conditions hereof, all rights of whatsoever kind and nature, under copyright and otherwise, throughout the universe in and to the Work (except for those rights specifically reserved to Owner pursuant to Paragraph 4 below) including, without limitation, all motion picture and television and allied rights (including all silent, sound, dialogue; musical, sequel, and remake motion picture rights, and all television series, special, movie-of-the-week rights); all rights pertaining to, incident to, or deriving from the exercise of the rights acquired by Purchaser pursuant to this Agreement and/or from the advertising and/or exploitation and/or turning to account of any productions, publications, sound recordings or other products produced in the exercise of such rights and/or from the exploitation and/or turning to account of any and all other rights acquired by Purchaser pursuant to this Agreement; all musical rights (including, without limitation, soundtrack album and music publishing rights) pertaining to, incident to, or deriving from the other rights granted to Purchaser pursuant to this Agreement; the right to publish or cause to be published books and publications (but not comic books) based upon or relating to the motion picture based upon the Work (hereinafter

**Exhibit-4**

DCC00147516
CONFIDENTIAL

referred to as the "Picture") and/or to the Work; provided, however, subject to Paragraph 3A below, Warner Books (hereinafter referred to as "WB") shall have a right of first refusal with respect to the publishing of said books, as more particularly set forth in said Paragraph 3A below; the right, in connection with or incident to Purchaser's exercise of its other rights under this Agreement, to publish synopses, excerpts and summaries of the Work or the productions based thereon (but no such synopsis, excerpt, or summary shall contain more than 7,500 words from the Work); but, although Owner may be identified as the author of the Work, Owner shall not be identified as the author of any such synopsis, excerpt or summary unless Owner actually has caused the same to be written; the right, for the purpose of advertising and exploiting any motion pictures or other versions of the Work, to broadcast and/or transmit by means of television or radio or any process analogous thereto, whether now known or hereafter invented or devised, excerpts from the Work or any adaptation or versions thereof (such excerpts not to exceed ten [10] minutes in length, nor shall such excerpts be broadcast in serialized form), including any motion picture or other version or versions thereof and announcements of or concerning said motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions, or by video cassettes, video discs, or by any other means, whether now known or hereafter invented or devised, together with all copyrights and extensions and renewals of copyrights in and to each and all of the foregoing; the right, insofar as Owner has the right to grant same, to use for all purposes all titles by which the Work, characters depicted therein, or any chapter, or part thereof is now or hereafter known, including but not limited to the right to sell, license and otherwise exploit motion pictures produced hereunder in all forms of paid or cable television in conjunction with the exercise of rights acquired hereunder; the right to distribute, exhibit and otherwise turn to account all motion pictures and other products produced in the exercise of rights acquired hereunder by any means, method, device or format, whether now or hereafter known or invented; as well as all rights now known or hereafter created which may be necessary to effectuate any or all of said rights. The aforesaid rights are hereinafter collectively called the "Optioned Rights". It is hereby agreed that the first motion picture based upon the Work, produced by Purchaser, shall be what is customarily referred to in the motion picture industry generally as a "feature-length theatrical" motion picture.

**Exhibit-4**

DCC00147517
CONFIDENTIAL

(b)   As full consideration for the Option, Purchaser agrees to pay or cause to be paid a sum of not less than Fifteen Thousand Dollars ($15,000.00) (hereinafter referred to as the "Development Sum") to a writer or writers for purposes of developing a treatment for a motion picture screenplay based upon the Work and/or for a motion picture screenplay based upon the Work. It is agreed that any such treatment shall be written and delivered to Purchaser within four (4) months from the date of this Agreement, and that any such motion picture screenplay shall be written and delivered to Purchaser within six (6) months from the date of this Agreement. Said six-month period shall hereinafter be referred to as the "Initial Option Period".

(c)   Provided Purchaser has paid or caused to be paid the Development Sum to a writer or writers as set forth in subparagraph (b) above within the Initial Option Period and provided that either a treatment is delivered to Purchaser within four (4) months from the date of this Agreement or a screenplay is delivered to Purchaser within six (6) months from the date of this Agreement, the Initial Option Period shall be deemed automatically extended to the date which is one (1) year from the date of this Agreement.

(d)   In the event Purchaser has not paid or caused to be paid the Development Sum to a writer or writers as set forth in subparagraph (b) above within the Initial Option Period, then provided Purchaser pays the sum of Fifteen Thousand Dollars ($15,000.00) to Owner by the end of the Initial Option Period, the Initial Option Period shall be automatically extended to the date which is one (1) year from the date of the Agreement.

(e)   The extension of the Initial Option Period, pursuant to either subparagraphs (c) or (d) above, shall be hereinafter referred to as the "Extended Option Period".

(f)   The Option may be exercised by Purchaser by written notice to Owner at any time on or before the date of expiration of the Initial Option Period, unless the Initial Option Period has been extended pursuant to either subparagraphs (c) or (d) above. In such event, the Option may be exercised by Purchaser by written notice to Owner at any time on or before the date of expiration of the Extended Option Period.

(g)   If, prior to the giving to Owner of written notice of exercise of the Option, principal photography of the first motion picture to be produced hereunder in the exercise of the Optioned Rights is commenced, such commencement of principal photography shall constitute exercise of the Option.

**Exhibit-4**

i

-3-

DCC00147518
CONFIDENTIAL

(h)  If Purchaser does not exercise the Option hereunder within the Initial Option Period, or the Extended Option Period, whichever is applicable, any rights granted revert to Owner, and Purchaser hereby agrees to execute such documents as are reasonably necessary to effect such reversion.

2. Purchaser shall have the right to write or cause to be written screen treatments, scenarios and/or screenplay versions of the Work and to do all other things which it maydeem necessary for preparation of the Work as a motion picture.  Neither the writing thereof, nor the engagement of performers or other personnel in connection with the production of a motion picture based on the Work, nor the public announce-- ement thereof, shall be deemed to constitute an exercise of the Option, which may be exercised only by written notice to Owner, as hereinabove provided, or by the sooner commencement of principal photography of the first motion picture (if any) produced hereunder in the exercise of the Optioned Rights.

3. (a)  Owner hereby reserves all comic book publication rights in the Work, except only those rights granted to Purchaser pursuant to Paragraph 1(a) above.

(b)  Owner hereby reserves all rights of production and use upon the regular spoken stage with living actors appearing and speaking in person solely in the actual and immediate presence of the audience; provided, however, that Owner shall not have the right to use or license any stage rights in favor of any party other than Purchaser prior to three (3) years after the date of the first general release of the first motion picture produced in the exercise of the Optioned Rights, or five (5) years from the date of the exercise of the Option by Purchaser, whichever first occurs, except that if, prior to the expiration of the said three (3) or five (5) year period, or thereafter but prior to Owner's use or licensing of such rights, Purchaser sells or causes the Picture to be sold to a U.S. television network for prime time exhibition, then at such time the holdback periods set forth herein and in subparagraph (c) below shall be extended to five (5) years after the date of such sale to a U.S. television network, or seven (7) years from the date of the exercise of the Option by Purchaser, whichever first occurs.  Any proposed sale, license, disposition or use by Owner of any such stage rights after such period shall be subject to the provisions of Paragraph 5(e) hereof.

(c)  Owner hereby reserves all radio rights in the Work, except only those rights granted to Purchaser pursuant to Paragraph 1(a) above if the Option is exercised; provided, however, that Owner shall not have the right to use or license any such rights prior to three (3) years after the

**Exhibit-4**

DCC00147519
CONFIDENTIAL

date of the first general release of the first motion picture produced in the exercise of the Optioned Rights or five (5) years from the exercise of the Option by Purchaser, whichever first occurs.

(d)  Owner may enter into agreements regarding the rights set forth in subparagraphs (b) and (c) above prior to the expiration of the respective holdback periods; provided, however, that such rights shall not be exercised by any party until the dates of termination of said respective holdback periods.

(e)  Owner hereby reserves all merchandising rights in and to the Work, subject to the following terms and conditions:

(i)  Licensing Corporation of America ("LCA") shall be the licensing agent on behalf of Owner with respect to merchandising;

(ii)  LCA shall be entitled to deduct a fee of thirty-three and one-third percent (33-1/3%) of all gross receipts from United States merchandising licenses, and, with respect to foreign merchandising licenses, a fee of fifteen percent (15%) of "net receipts" (i.e., gross receipts remaining after deduction of foreign agents' commissions, if any, and of taxes deducted by foreign governments), except that if the deduction of LCA's fifteen percent (15%) fee, when combined with the deduction of foreign taxes and foreign agents' commissions, would reduce the remaining receipts below sixty percent (60%) of the original amount prior to any such deductions, then LCA's fee shall be reduced to such lower percentage of net receipts as may be necessary to result in an amount remaining after all such deductions equal to sixty percent (60%) of such original gross receipts; provided, however, that in no event shall LCA's fee on foreign merchandising licenses be reduced below twelve and one-half percent (12-1/2%) of net receipts.

(iii)  All amounts remaining after the deductions permitted pursuant to subparagraph (e)(ii) above, shall be shared fifty percent (50%) thereof to Owner and fifty percent (50%) thereof to Purchaser (hereinafter referred to as "Purchaser's Share").

(iv)  Owner shall provide to Purchaser statements, indicating gross receipts from each territory or country, deduction of LCA's fee, and other information customarily included in same.  Such statements shall be sent to Purchaser by Owner not less frequently than quarterly for  e first two (2) years after the first general release of

DCC00147520
CONFIDENTIAL
Exhibit-4

ii

Picture and any sequel, remake, television series, pilot, mini-series, or movie-of-the-week, and semiannually thereafter;

(v)  Purchaser shall be paid the Purchaser's Share derived from all articles, items and commodities licensed by LCA in connection with the Work and/or the Picture, except, however, that Purchaser shall not be entitled to the Purchaser's Share derived from those certain articles, items, and commodities licensed by LCA pursuant to deals substantially negotiated by LCA and any licensees after the date which is eighteen (18) months from the first general release of the Picture in the United States (hereinafter referred to as the "Merchandise Date") (said certain articles, items and commodities hereinafter referred to as "Post Picture Merchandising").  Notwithstanding anything to the contrary contained herein, if Purchaser shall at any time (whether prior to or following the conclusion of such eighteen (18) month period) grant rights for any remake, sequel, television series, pilot, or movie-of-the-week, hereunder which is thereafter actually produced (hereinafter collectively referred to as the "Subsequent Pictures"), then Purchaser shall be paid the Purchaser's Share derived from merchandising licenses substantially negotiated within the period commencing upon the date of such grant and ending [except as may be extended pursuant to this subparagraph 3 (e)(v)] upon the date eighteen (18) months following general release or broadcast in the United States of any such Subsequent Picture.  With respect to deals which are substantially negotiated by LCA and any licensee after the Merchandise Date and prior to any such grant, all net receipts remaining after the deduction by LCA of its fee pursuant to subparagraph (e)(ii) above, shall be paid one hundred percent (100%) to Owner.

The procedure outlined above shall be repeated with respect to each motion picture or television program produced and released pursuant to this Agreement.

3A.    Purchaser agrees to first offer to WB any book proposals based upon or relating to the Picture and/or to the Work (except for a "making of the Picture" type book which Purchaser may publish or cause to be published without offering such to WB).  WB shall have ten (10) business days to accept such proposal(s).  If WB rejects such proposal(s) or is silent, then all rights in and to such proposal(s) and the books, based upon such proposal(s), shall be exclusively owned free and clear by Purchaser, and Purchaser shall be free to offer and conclude deals for same with any third party for greater compensation than that offered by WB to Purchaser without any participation whatsoever by Owner or WB.

**Exhibit-4**

DCC00147521
CONFIDENTIAL

4. (a) If Purchaser exercises the Option, Purchaser agrees to pay to Owner, concurrently with such exercise, a sum equal to two and one-half percent (2-1/2%) of the cash production budget of the Picture (said sum, as adjusted pursuant to the provisions of Paragraph 4(b) below, shall hereinafter be referred to as the "Cash Purchase Price"), less all sums paid to Owner pursuant to Paragraph 1(d) above. Upon the exercise of the Option and payment to Owner of the Cash Purchase Price by Purchaser, the Optioned Rights shall automatically vest in Purchaser as Purchaser's sole and absolute property.

(b) If after the receipt of the negative cost statement by Owner pursuant to Paragraph 4(g) below, it appears that the negative cost exceeds the cash production budget, then in such event, the Purchaser shall promptly pay to Owner two and one-half percent (2-1/2%) of said excess. If on the other hand, it appears that the cash production budget exceeds the negative cost, the Owner shall promptly repay the Purchaser two and one-half percent (2-1/2%) of such excess.

(c) In respect to the first feature-length motion picture, if any, based upon the Work and produced in the exercise of the Optioned Rights hereunder, Owner shall be entitled to receive the contingent compensation referred to in Paragraph 4(e)(i) below.

(d) (i) In respect of each sequel and/or remake motion picture (as such terms are hereinafter defined), if any, produced in the exercise of the Optioned Rights hereunder, Owner shall be entitled to receive a sum equal to one-half (1/2) the Cash ~~Purchase Price~~, payable to Owner upon commencement of principal photography of each sequel and/or remake motion picture, plus the contingent compensation referred to in Paragraph 4(e)(ii) below, it being agreed that nothing in this Agreement shall obligate Purchaser ever to produce a sequel or remake motion picture.

*[handwritten margin note: production budget of said sequel and/or remake, as pursuant to the provisions of Paragraph 4(b) above]*

*[handwritten initials: MW / WS]*

(ii) As used herein, the term "sequel motion picture" means a motion picture other than a television motion picture using one or more of the major characters of the Work participating in different events from those found in the Work, whether such events are prior to, concurrent with or subsequent to the events of any prior motion picture(s) and whose plot is substantially new, it being understood that the first motion picture produced hereunder is not a sequel motion picture. Purchaser's obligation to make the payment provided for in Paragraph 4(d)(i) above shall only be in respect of sequel motion pictures written by Purchaser, its successors, assignees, or licensees, or written by persons engaged or employed by Purchaser, its successors, assignees, or licensees, to write such sequel motion pictures.

Exhibit-4

iii                              -7-

DCC00147522
CONFIDENTIAL

(iii)  As used herein, the term "remake motion picture" means a motion picture other than a television motion picture and other than the first motion picture produced hereunder which is based upon the plot or story of the Work or of a prior motion picture produced hereunder.  The term "remake motion picture" does not include (a) a sequel motion picture, (b) versions (such as foreign language versions or shortened or expanded versions) of the first theatrical motion picture produced by Purchaser based on the Work or any sequel motion picture, or (c) a motion picture based upon some part of the plot or story of the Work which was not used for a prior motion picture.  Purchaser's obligation to make payments provided for in Paragraph 4(d)(i) above shall only be in respect of remake motion pictures written by Purchaser, its successors, assignees or licensees, or written by persons engaged or employed by Purchaser, its successors, assignees, or licensees, to write such remake motion pictures.

(e)  Owner shall be entitled to receive directly from the distributor(s):

(i)  contingent compensation of a sum equal to five percent (5%) of the gross receipts after "artificial breakeven", if any, derived from the first feature length motion picture, if any, produced in the exercise of the Optioned Rights.

For all purposes of this Paragraph 4(e)(i), the term "artificial breakeven" shall mean that point in time when the gross receipts derived by the Picture shall reach a sum equal to two and one-half (2-1/2) times the negative cost of the Picture (hereinafter referred to as the "Multiple"); however, in the event the negative cost of the Picture is Five Million Dollars ($5,000,000) or greater, the Multiple shall be reduced as follows:

| Negative Cost | Multiple |
| --- | --- |
| $5,000,000 - $6,250,000 | 2.4 times |
| $6,250,000 - $7,500,000 | 2.3 times |
| $7,500,000 - $8,750,000 | 2.2 times |
| $8,750,000 - $10,000,000 | 2.1 times |
| $10,000,000 and over | 2.0 times |

Notwithstanding the foregoing, in the event the distribution rights for the world are granted to two separate distributors (one with respect to the domestic

**Exhibit-4**

DCC00147523
CONFIDENTIAL

*for the purpose of the calculation by each such distributor of Owner's participation, if any, in such distributor's gross receipts,*

territory and one with respect to the foreign territory) then ~~in connection with the amounts due Owner from each such distributor,~~ the term "artificial breakeven" shall mean that point in time when the gross receipts derived by the Picture *from each such distributor* shall reach a sum equal to the Multiple, as such may be reduced *null* as set forth above, times fifty percent (50%) of the negative cost of the Picture.

The term "negative cost of the Picture", as used herein, shall be defined as the aggregate amount referred to in Exhibit "A" of this Agreement, attached hereto and made a part hereof; and

(ii)  contingent compensation of a sum equal to two and one-half percent (2-1/2%) of the gross receipts after "artificial breakeven", if any, derived from each sequel and each remake motion picture, if any, produced in the exercise of the Optioned Rights.

(f)  The term "gross receipts" shall be defined as either the standard definition(s) of the actual distributor(s) of the respective motion picture(s) or, if Purchaser obtains another definition which is more advantageous to ~~Owner,~~ *null* us then as such other definition.

(g)  Purchaser shall provide Owner with its itemized certified negative cost statement for the Picture within ninety (90) days after Purchaser delivers the Picture to the distributor(s).  Owner shall have the right to audit Purchaser's certified negative cost statement at Owner's sole expense.

(b)  With respect to a television program produced by Purchaser and based upon the Work, Owner shall be entitled to receive:

(i)  a royalty in the sum of One Thousand Dollars ($1,000.00) for each program of thirty (30) minutes in length or less;

(ii)  a royalty in the sum of One Thousand Two Hundred Fifty Dollars ($1,250.00) for each program of not more than sixty (60) minutes in length but greater than thirty (30) minutes in length;

(iii)  a royalty in the sum of One Thousand Five Hundred Dollars ($1,500.00) for each program of more than sixty (60) minutes in length; and

(iv)  a rerun royalty equal to twenty percent (20%) of the applicable royalty set forth in subsections (i),

**Exhibit-4**

ii                              -9-

DCC00147524
CONFIDENTIAL

(ii), and (iii) above, respectively, for the first, second, third, fourth, and fifth reruns, respectively, in the United States or Canada for each such program. For purposes hereof, the term "rerun" shall have the meaning customarily attributed to such term in the television industry in the United States.

The royalty payments, if any, set forth in subparagraphs (h) (i), (ii), and (iii) above, shall be automatically increased by twenty percent (20%) each on the date which is five (5) years from the first telecast of each such television program. Said royalty payments, if any, shall thereafter be increased by twenty percent (20%) every five years hence.

Purchaser agrees to make such royalty payments, if any, to Owner within ten (10) business days of Purchaser's receipt of such television monies.

(i) It is understood that Owner shall be furnished with settlement statements from the distributor(s) at the same time as such are furnished to Purchaser, and Owner shall be furnished with a copy of the audit provisions of Purchaser's agreement(s) with the distributor(s) of the Picture. Furthermore, Owner shall be accorded the right to join with Purchaser in the conduct of any such audit (and if Owner does so join with Purchaser, then the cost of the relative audit shall be shared equally by Purchaser and Owner) or, if Purchaser determines not to exercise its rights of audit in any ~~particular instance~~, to exercise such right of audit in Purchaser's place and stead (and if Owner does exercise such right, then the cost of the relative audit shall be borne by Owner). If as to any period in which an audit may be conducted, Purchaser intends to conduct such audit, then Purchaser shall notify Owner in writing of its intention, such notice to be in sufficient time to enable Owner to exercise its rights under this subparagraph (i). Purchaser agrees to respond promptly to any inquiry by Owner as to Purchaser's intention to conduct any such audit.

(j) With respect to television "movies-of-the-week", television "mini-series", or television pilots of ninety (90) minutes or more in length, as such terms are commonly understood in the motion picture industry generally, Owner shall be entitled to receive:

(i) a royalty in the sum of Twenty Thousand Dollars ($20,000.00) for the first television movie-of-the-week, television mini-series, or television pilot of ninety (90) minutes or more in length, if any, produced in the exercise of the Optioned Rights; or

**Exhibit-4**

DCC00147525
CONFIDENTIAL

(ii)    a royalty in the sum of Ten Thousand Dollars ($10,000.00) for each sequel or remake television movie-of-the-week, television mini-series, or television pilot of ninety (90) minutes or more in length, if any, produced in the exercise of the Optioned Rights, and a rerun royalty equal to twenty percent (20%) of such royalty payment for the first, second, third, fourth, and fifth reruns, respectively, in the United States and Canada for each such television program.  For purposes hereof, the term "rerun" shall have the meaning customarily attributed to such term in the television industry in the United States.  The said royalty payment of Ten Thousand Dollars ($10,000.00) shall be automatically increased by twenty percent (20%) on the date which is five (5) years from the first telecast of each such television program.  Said royalty payment shall thereafter be increased by twenty percent (20%) every five (5) years hence.

5. (a)    Nothing herein contained shall be construed to obligate Purchaser to exercise the Option or to produce, release, distribute, exhibit, advertise or exploit any motion picture or other production or authorize any other person, firm, or corporation to do so.  Purchaser has not made nor is the distributor(s) of any motion picture produced hereunder required to make any representation or warranty with respect to the amount of gross receipts or net profits which will or may be derived from any motion picture.

(b)    It is fully understood that Owner does not have nor shall Owner have any right, title, or interest of any kind in or to any gross receipts or net profits derived from any motion pictures or other productions produced in the exercise of the rights granted by Owner hereunder, it being agreed that the share of the gross receipts, if any, payable to Owner with respect to any motion picture produced hereunder shall be computed, determined, and paid in the manner herein provided, but shall not in any way constitute a lien or claim on or against the said motion picture or its gross receipts or net profits, or an assignment or transfer thereof or of any interest therein.  It is further fully understood that, insofar as Owner is concerned, Purchaser and/or the financier and/or the distributor of any motion picture or other production produced hereunder shall have the unrestricted right to sell or assign, and to pledge, mortgage or otherwise hypothecate such motion pictures and other productions and/or the gross receipts or net profits thereof, either in whole or in part, without obtaining Owner's consent.  Should Purchaser and/or the financier and/or the distributor sell or otherwise dispose of any motion picture produced hereunder or its gross receipts or net profits (as distinguished from a so-called outright or flat sale for a particular territory), then such sale or other disposition shall be made subject to the obligation on the part

**Exhibit-4**

DCC00147526
CONFIDENTIAL

of the Purchaser or assignee to pay Owner's share of the gross receipts, if any, hereunder to the same extent and computed in the same manner and subject to the same limitations as though gross receipts and net profits, if any, were continued to be received by Purchaser and/or the financier and/or the distributor.  Any assignment, pledge, mortgage, sale, disposition or hypothecation shall be subject to Owner's rights hereunder.

(c)  Nothing herein contained shall be construed to create a partnership or joint venture by or between Owner and Purchaser or make either party the agent of the other. Each of the parties hereto agree not to hold themselves out as the partner or agent of the other or otherwise in any manner contrary to the terms of this Agreement, and neither of the parties hereto shall be or become liable or bound by any representation, act, omission or agreement whatsoever of the other which may be contrary to the provisions of this Agreement.

(d)  Insofar as Owner is concerned, it is expressly agreed that Purchaser and/or the financier and/or the distributor of any motion picture or other production produced in the exercise of the rights granted by Owner hereunder shall have full and exclusive charge and control of the production, distribution, sale, exploitation, marketing, advertising, reissuing, or other distribution or use thereof and that said motion pictures and productions may be distributed, sold outright, exploited, marketed, advertised, or otherwise disposed of by Purchaser and/or the financier and/or the distributor throughout the world and universe in perpetuity, and Purchaser and/or the financier and/or the distributor may, in Purchaser's and/or said financier's and/or said distributor's sole discretion, withhold or withdraw such motion picture or other productions from distribution either entirely or with respect to any country or territory in the world or portion thereof.  It is the intent and purpose hereof that absolute and sole control with reference to all matters involving the production, distribution, sale, exploitation, marketing, advertising, reissuing, or other distribution or use of said motin pictures and other productions shall be exercised by Purchaser and/or the financier and/or the distributor in such manner as Purchaser and/or the financier and/or the distributor in its sole and absolute discretion and judgment may deem proper and that Owner shall not have any voice or control whatsoever in connection therewith.

(e)  If Owner desires to sell, license, or otherwise dispose of any of the rights referred to in Paragraphs 3(b) or 3(c) above, at any time when any such sale, license or disposition would be permitted by such paragraphs, Owner shall first offer such right to Purchaser setting forth the terms and conditions on which the Owner is willing to sell,

**Exhibit-4**

ii

-12-

DCC00147527
CONFIDENTIAL

license, or otherwise dispose of such rights, and Purchaser shall have twenty-one (21) days (exclusive of Saturdays, Sundays, and holidays) after receipt of said notice to accept said offer. Such offer shall not contain any non-monetary terms or conditions which by their nature cannot be met as easily by Purchaser as by any other party (e.g., the required employment or use of a certain director, writer, star, etc.). If Purchaser does not accept said offer within said twenty-one (21) day period, then Owner shall have the right to dispose of said rights to any third party; provided, however, that Owner shall not dispose of said rights on terms and conditions set forth in the offer submitted to Purchaser without first notifying Purchaser and giving Purchaser the opportunity within twenty-one (21) days (exclusive of Saturdays, Sundays, and holidays) after receipt to acquire such rights upon such less favorable terms and conditions.

Notwithstanding anything to the contrary contained herein, if prior to the expiration of such holdback period, Purchaser sells or causes the Picture to be sold to a U. S. television network for prime time exhibition, then at such time the holdback periods set forth herein shall be extended to five (5) years after the date of said sale to a U.S. television network, or seven (7) years from the date of the exercise of the Option by Purchaser, whichever first occurs.

(e)  Purchaser agrees to affix or cause to be affixed on each motion picture produced hereunder, and on all advertising, promotional, and other such materials of any kind or nature created by or pursuant to the authority of Purchaser and containing the name or any graphic or pictorial representa- tion of "SWAMP THING", a copyright and trademark notice in a form designated by Owner, designating Owner as the copyright and trademark owner and proprietor of such name and character.

6. The Owner represents and warrants that:

(a). The Owner is the sole author of and has sole, exclusive, unlimited and unencumbered motion picture rights throughout the world in the Work, and the full and sole authority to convey the rights herein granted as well as those rights which Purchaser may hereafter acquire under this Agreement; that each of the foregoing rights are and will be sole and exclusive to the Purchaser, and that no part of the Work is in the public domain, but all is or may be validly copyrighted and registered in the United States and likewise protected elsewhere as far as the laws of the United States and other countries provide for protection.

(b)  The said title may be legally used by Purchaser for motion pictures and television programs based

**Exhibit-4**

DCC00147528
CONFIDENTIAL

upon the Work and in the exercise of any other of Purchaser's
rights hereunder; that Owner has not granted nor will Owner
grant to any third party the rights granted to Purchaser
pursuant to this Agreement in respect of the said title; that
Owner has not copied the said title from any other work, and
Owner further agrees not to grant the use of said title for
motion pictures and television programs based on the Work or
for any other purposes for which Purchaser has acquired rights
hereunder.

(c)  All the Work is wholly original with Owner
and its full use, as herein granted, and the full exercise by
Purchaser of all rights it acquires hereunder will not infringe
upon or violate the copyright, right of privacy, right of
publicity, personal, common law, or other rights of others or
constitute a defamation, libel, or slander against any person,
firm, or corporation.

(d)  Owner has not granted nor will Owner grant
to others any rights herein purported to be conveyed, or which
may hereafter be conveyed, and such rights and the full
exercise thereof have not been in any way encumbered, limited,
or diminished by act or omission.

(e)  There are no claims or litigation pending or
threatened concerning or purporting to affect adversely Owner's
rights or title as herein represented or conveyed.

(f)  No motion picture or television program has
ever been authorized by Owner nor to the best of Owner's
knowledge has any motion picture or television program ever
been made nor has any play been produced on the spoken stage
nor has any other work been made based upon any part of the
Work, and no right, license, or privilege to do so has
heretofore been granted by Owner or under Owner's authority.

7. The Owner agrees to defend, indemnify, and hold
the Purchaser and its assignees and licensees, and their
respective officers, agents and associates, harmless from and
against any charges, damages, costs, expenses (including
reasonable counsel fees), judgments, penalties, liabilities, or
losses of any other kind or nature whatsoever which may be
sustained or suffered by or secured against or imposed upon the
Purchaser, or its assignees or licensees, or their respective
officers, agents or associates by reason of the breach or
failure of any of the representations, warranties, covenants or
agreements herein made by Owner.  Purchaser agrees to defend,
indemnify, and hold the Owner harmless from and against any
charges, damages, costs (including reasonable counsel fees),
judgments, penalties, liabilities, or losses of any kind or
nature whatsoever which may be sustained or suffered by or
secured against or imposed upon the Owner arising out of

**Exhibit-4**

ii                        -14-

DCC00147529
CONFIDENTIAL

22

material added by the Purchaser which infringes upon or violates the right of privacy of, or constitutes a libel against or violates any copyright, common law right or any other right of any party whatsoever.

8. Owner agrees to prevent the Work and any versions or part thereof from falling into the public domain anywhere in the world and will cause to be affixed to each published copy of the Work, or any version thereof, such notice and will do or cause to be done such other acts and deeds as may be required to obtain or maintain copyright in the work and all versions and parts thereof in each country in the world where such rights are capable of being obtained or maintained.

9. Owner hereby grants Purchaser the right to use Owner's name in or in connection with the advertising, publicity, and/or other turning to account of any of the rights herein granted or agreed to be granted to Purchaser, it being agreed that Purchaser shall not, without Owner's consent, authorize any advertiser to advertise or announce that Owner corporately endorses any product, commodity, or service.

10. (a)  The Purchaser agrees to accord Owner credit on screen in the main titles of any theatrical motion picture or television program made by it and based on the Work, as follows:

"Based upon characters appearing in magazines published by DC Comics, Inc."

Said credit, upon the film itself of any theatrical motion picture or feature length television motion picture based upon the Property, shall appear on a separate card.

The said credit shall appear in a size of type which is not less than the size of type used for the credit accorded to the screenplay writer(s) for such motion picture.

(b)  In addition, Owner shall be accorded the credit, provided for in Paragraph 10(a) above, in paid advertising issued, ordered, or placed by Purchaser or by the distributor, with respect to any theatrical motion picture or feature length television motion picture made by Purchaser hereunder and based upon the Work, except that Purchaser shall be under no obligation to accord Owner such credit in:

**Exhibit-4**

DCC00147530
CONFIDENTIAL

(i) teaser or special advertising or publicity;

(ii) advertising or publicity relating to members of the cast, the director, producers, writers, other than Owner, and material written by them, or similar matters;

(iii) group, list, or institutional advertising or publicity;

(iv) any advertising or publicity written in narrative form, or commercial or merchandising tie-ups, merchandising by-products, phonograph records, phonograph record album covers, advertising accessories, or products of any kind;

(v) advertising of eight (8) column inches or less;

(vi) trailers or advertising on the screen;

(vii) radio or television advertising or publicity;

(viii) so-called 24 sheets, 6 sheets, 30 x 40's and 40 x 60's; and

(ix) advertising of such a nature that consent to the use of Owner's name in connection therewith has not been granted.

(c) No casual or inadvertent failure to comply with the provisions of this Paragraph 10 shall constitute a breach of this Agreement. In the event of a failure or omission by Purchaser constituting a breach of Publisher's obligations under this Paragraph 10, Owner must give Purchaser written notice thereof and afford Purchaser the opportunity to remedy such breach within a reasonable time. It is further agreed that Owner's rights and remedies in the event of a failure or omission by Purchaser constituting a breach of Purchaser's obligations under this Paragraph 10 (which failure or omission is not remedied within a reasonable time after Purchaser's receipt of notice from Owner) shall be limited to Owner's right, if any, to recover damages in an action at law, and in no event shall Owner be entitled by reason of any such breach to terminate this Agreement or to enjoin or restrain the distribution or exhibition of any motion picture produced in the exercising of rights granted hereunder or the advertising or publicizing of any such motion picture.

**Exhibit-4**

ii                              -16-

DCC00147531
CONFIDENTIAL

11. (a)  Any and all payments required to be made pursuant hereto shall be made payable to Owner at the address set forth above.

(b)  All notices, which Purchaser is required to or may desire to serve upon Owner in connection with this Agreement, shall be in writing and shall be served by personally delivering same or by addressing same to Owner at the address above, or at such other address as may be designated from time to time by Owner in writing by depositing the same, so addressed, by certified mail or registered mail, or at Purchaser's option, by telegraph, cable, or telex. If Purchaser elects to send any notice hereunder by telegraph or cable, such notice shall be deemed to have been served upon Owner at the time of delivery thereof to the telegraph or cable office. If Purchaser elects to mail such notice, such notice shall be deemed to be served upon Owner forty-eight (48) hours after the mailing thereof by Purchaser. If Purchaser elects to send such notice by telex, such notice shall be deemed to be served upon Owner upon transmission by telex.

(c)  All notices, which Owner is required or may desire to serve upon Purchaser in connection with this Agreement, shall be in writing and shall be served by personally delivering same or by addressing same to Purchaser c/o Benjamin Melniker, Esq., Suite 1104, 1350 Avenue of the Americas, New York, New York 10019, or at such other address as may be designated from time to time by Purchaser in writing, by depositing the same, so addressed, by certified mail or registered mail or, at Owner's option, by telegraph, cable, or telex. If Owner elects to send any notice hereunder by telegraph or cable, such notice shall be deemed to have been served upon Purchaser at the time of delivery thereof to the telegraph or cable office. If Owner elects to mail such notice, such notice shall be deemed to be served upon Purchaser forty-eight (48) hours after the mailing thereof by Owner. If Owner elects to send such notice by telex, such notice shall be deemed to be served upon Purchaser upon transmission by telex.

12.  Owner hereby grants to Purchaser the right, at Purchaser's expense, to institute in the name and on behalf of Purchaser, or Owner and Purchaser jointly, any and all suits and proceedings in law or in equity to enjoin and restrain any infringements of any of the rights herein granted or agreed to be granted to Purchaser, and Owner hereby assigns to Purchaser any and all causes of action resulting from or based upon any such infringement, and the net amount of such damages (i.e., after the recoupment from such damages of Purchaser's and/or Owner's costs and expenses) shall be included in the gross receipts of the Picture. Owner will not compromise, settle, or in any manner interfere with any such action or litigation, if brought.

**Exhibit-4**

DCC0014 7532
CONFIDENTIAL

If, however, Purchaser fails or refuses to take any such actions described above, then Purchaser hereby appoints Owner or Owner's nominee, irrevocably, as Purchaser's attorney-in-fact with the right, but not the obligation to bring and prosecute suits, actions, and proceedings against third parties with respect to any infringement or alleged infringement by any third party of the copyright in any motion picture or television program produced hereunder, and to take such action as Owner may deem advisable to enforce, protect, and defend any such copyright, if Purchaser fails or refuses to do so. Any such action may be taken by Owner in the name of Purchaser or otherwise. Further, Owner, at its own cost and expense, may join Purchaser as a party plaintiff or defendant in any such suit, action or proceeding. If, as a result of any suit, action, or proceeding taken or instituted by Owner, there is an award of damages to Purchaser and/or to Owner, then the net amount of such damages (i.e., after the recoupment from such damages of Purchaser's and/or Owner's costs and expenses) shall be added to the gross receipts of the Picture.

13. (a) Concurrently with Owner's execution hereof, Owner shall complete, execute and deliver to Purchaser the short form of option grant, set forth as Exhibit "B" attached hereto and by this reference made a part thereof, and Owner acknowledges that Purchaser shall have the right to detach the said Exhibit "B" and forward it to the United States Copyright Office for recording.

(b) Concurrently with Owner's execution hereof, Owner shall complete, execute, and deliver to Purchaser the short form of agreement, set forth as Exhibit "C" attached hereto and by this reference made a part hereof, and Owner understands and acknowledges that if Purchaser exercises the Option, Purchaser shall have the right to detach the said Exhibit "C" and forward it to the United States Copyright Office for recording.

(c) Purchaser shall have the right to fill in, on Exhibits "B" and "C", the date of registration of the Work in the United States Copyright Office, the name of the copyright proprietor, and the Entry Number of such registration.

(d) Owner agrees, upon Purchaser's request, to procure for Purchaser signed documents and other proof, if such is reasonably required and if such is available to Purchaser, to establish a clear chain of title in Purchaser in and to the rights acquired by Purchaser hereunder.

14. If Owner fails to do or cause to be done any act or thing required to be done or caused to be done by Owner hereunder in order to effectuate the transfer of the rights

**Exhibit-4**

DCC00147533
CONFIDENTIAL

herein contemplated within a reasonable time after notice from Purchaser, then, in such event, Owner hereby appoints Purchaser as its irrevocable attorney-in-fact for such limited purposes with the right, but not the obligation so to do in the name of and on Owner's behalf for the benefit of Purchaser, which appointment Owner acknowledges is coupled with an interest.

15. If the Work or any portion thereof shall ever be or become in the public domain, then nothing contained in this Agreement shall be construed to be prejudicial to or operate in derogation of any rights, licenses, privileges or properties which Purchaser may enjoy or be entitled to as a member of the public, and Purchaser may exercise such rights, privileges, or properties as if this Agreement were not in existence. If the Work or any portion thereof shall ever be or become in the public domain not due to any act or failure to act of Owner, its licensees and assigns hereunder, then Owner shall nevertheless be entitled to receive the payments under this Agreement Owner otherwise would be entitled to receive.

16. (a)  No sums, other than those hereinabove specifically provided as being payable to Owner, shall accrue or be payable to Owner in respect of any use or exercise of the Optioned Rights.

(b)  Purchaser intends to produce a motion picture or motion pictures, or television program or television programs, based upon the Work, but is not obligated to do so or to make any other use of the Work.

17.  This Agreement may not be assigned by Purchaser without Owner's prior written consent, except only to: (i) any "major" motion picture company; (ii) any of the following independent production or financing companies: Avco-Embassy Pictures, Filmways, Orion Pictures, Lorimar Productions, The Ladd Company, Polygram Pictures, Melvin Simon Productions, Marble Arch Productions, EMI Films, Time-Life Films, ABC Films, or CBS Films; (iii) any other independent production or financing company having experience, financial responsibility, and a reputation comparable to any of the companies set forth in subparagraph (ii) above; (iv) a bank, or (v) any other person, firm, or corporation, with the prior written approval (such approval not to be unreasonably withheld or delayed) of Owner.  Any assignments inconsistent with this paragraph shall be void.

18.  Owner agrees that solely in connection with the exercise of the Optioned Rights, and any other rights which Purchaser may hereafter acquire hereunder, Purchaser shall have the unlimited right to revise, vary, change, alter, or modify the Work, add to and/or delete from the Work, and to arrange,

**Exhibit-4**

DCC00147534
CONFIDENTIAL

rearrange, and/or transpose the Work, and change the sequence thereof and the characters and descriptions of the characters contained in the Work, and to use a portion or portions of the Work or the characters, plots, or theme thereof in conjunction with any other literary, dramatic, or other material of any kind. Owner hereby waives any so-called "moral" rights of author. It is agreed that the character of "Swamp Thing" shall not be portrayed in the Picture in a manner that will degrade said character in society or bring him into public hatred, contempt, or that will shock, insult, and offend the community, public morals, and decency.

19. No waiver by Purchaser or Owner of any breach by Owner or Purchaser of any of the provisions of this Agreement shall be construed to be a waiver of any preceding or succeeding breach of the same or any other term or provision hereof. Each of the rights and remedies granted to Purchaser or Owner under this Agreement are cumulative, and the exercise of one shall not limit, diminish, or otherwise affect Purchaser's or Owner's right, concurrently or subsequently, to exercise any other rights and remedies as Purchaser or Owner may have, at law or in equity, under this Agreement or otherwise.

20. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, applicable to agreements executed and to be wholly performed therein.

21. This Agreement contains the full and complete understanding between Owner and Purchaser with reference to the within subject matter, supersedes all prior agreements and understandings (if any) between the parties, whether written or oral, with respect to the within subject matter and cannot be modified or amended except by a written instrument executed by Owner and by Purchaser.

Our signature at the foot hereof, together with yours underneath the words "Agreed to and Accepted", shall constitute this a valid, binding, and enforceable agreement between us.

Very truly yours,

SWAMPFILMS, INC.

By: _Michael Uslan_

Its V-P

Agreed to and Accepted:

DC COMICS, INC.

By: _____

Its _____

**Exhibit-4**

i

-20-

DCC00147535
CONFIDENTIAL

Exhibit "A"

The term "negative cost of the Picture" shall, for all purposes of this Agreement, be defined as:

The aggregate of all out-of-pocket costs, charges, and expenses paid or incurred in connection with the development, preparation, production, completion and delivery of the Picture, calculated according to the Purchaser's method of accounting, but in accordance with customary motion picture accounting practices, and shall include, but shall not be limited to: (i) all amounts (other than contingent compensation) paid or payable for services of performers, writers, directors, producers and all other "above-the-line" personnel; (ii) all charges and expenses of production facilities, materials, equipment, personnel, insurance, taxes (other than net income taxes), legal and accounting charges and royalties attributable to the Picture, advertising and publicity incurred in connection with the production of the Picture, or any charges or expenses paid or incurred which are customarily included in the negative cost of the Picture; (iii) any fixed items of cost, payment of which may be deferred; (iv) any sums heretofore paid to Owner in connection with the Picture; (v) the overhead charge, if any, to the Picture; and (vi) any interest [at a rate of two percent (2%) over the prime rate, except that if the prime rate is greater than eleven percent (11%), then the interest rate shall be equal to two and one-half percent (2-1/2%) over prime] on any moneys borrowed and used in financing the production thereof.  In no event shall the overhead and interest charges set forth in subparagraphs (v) and (vi) above exceed the standard of such charges which iscustomarily included in calculating the negative cost of the Picture.

**Exhibit-4**

ii

DCC00147536
CONFIDENTIAL

Exhibit "B"

## KNOW ALL MEN BY THESE PRESENTS

That for a good and valuable consideration, receipt of which is hereby acknowledged, the undersigned has granted to SWAMPFILMS INC., its successors and assigns, the picture, television, and allied rights in and to that certain work solely owned by the undersigned and entitled "SWAMP THING" and in and to the copyrights thereof throughout the world and all renewals and extensions of such copyrights. The said work was registered on _____, 19__ in the name of _____

under Entry No. _____

The grant hereunder is upon and subject to the terms and provisions of a certain Option Agreement between SWAMP-FILMS, INC. and the undersigned dated October ____, 1980.

Dated:

DC COMICS, INC.

By: _____
    Its

STATE OF *New York* )
                     : ss.:
COUNTY OF *New York* )

On this *10* day of *October*, 1980, before me came *William Sarnoff* to me known, who, being by me duly sworn, did depose that he did execute the foregoing instrument.

SHELDON J. KORN
Notary Public, State of New York
No. 31-7339380
Qualified in New York County
Commission Expires March 30, 1982

**Exhibit-4**

ii

DCC00147537
CONFIDENTIAL

Exhibit "C"

## KNOW ALL MEN BY THESE PRESENTS

The undersigned, for One Dollar ($1.00) in hand paid and for other valuable considerations now received, hereby sells and assigns unto SWAMPFILMS, INC. (herein termed "Purchaser"), its successors and assigns forever, all MOTION PICTURE, TELEVISION AND ALLIED RIGHTS in and to the literary and/or dramatic work entitled "SWAMP THING" written by the undersigned and all MOTION PICTURE, TELEVISION AND ALLIED RIGHTS in all copyrights thereof (and in any renewals or extensions thereof) including copyrights registered in the United States on                    , 1980, in the name of

under Entry No.              , together with the sole and exclusive right to use, adapt, change, translate, add to and take from said work and the title in the making of motion picture photoplays of every kind or character and to lease, vend, exploit and exhibit the same throughout the world and to copyright the same in Purchaser's name.

The undersigned agrees to cause renewals of all copyrights in the work duly to be obtained, and the MOTION PICTURE, TELEVISION AND ALLIED RIGHTS herein granted are now assigned to Purchaser for the renewal term and during any extensions of copyright and, after such renewals or extensions, a further or like document of confirmation of assignment will be given to Purchaser if requested. The undersigned hereby appoints Purchaser its irrevocable attorney-in-fact with the right, but not the obligation, to execute and file all such documents and to do all acts necessary for the obtaining of such extensions or renewals and evidencing the continuation of the same rights in Purchaser for such renewed or extended terms as are now vested in Purchaser.

AND the said Purchaser, its successors and assigns, are hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning said copyrights or their renewals, or concerning any infringement thereof, and particularly infringement of or interference with any of the MOTION PICTURE, TELEVISION AND ALLIED RIGHTS now granted under said copyright or renewals in the name of the copyright proprietor but at the sole cost and expense of said Purchaser which will indemnify the undersigned therein. The net amount of damages from infringement or violation of any copyright or its renewal (i.e., after the recoupment from such damages of Purchaser's and/or Owner's

**Exhibit-4**

ii

DCC00147538
CONFIDENTIAL

costs and expenses) or costs from infringement or violation of any copyright or its renewals, so far as it arises from any violation of MOTION PICTURE, TELEVISION AND ALLIED RIGHTS hereby assigned, is now assigned to and shall be paid to said Purchaser, its successors and assigns.

The terms and conditions of this Assignment are subject to that certain agreement between Purchaser and the undersigned dated as of October    , 1980.

DC COMICS, INC.

By: _____
Its _____

STATE OF New York )
                          ) ss.:
COUNTY OF New York )

On this 10 day of October , 1980, before me came William Sarnoff to me known, who, being by me duly sworn, did depose that he did execute the foregoing instrument.

SHELDON J. KORN
Notary Public, State of New York
No. 31-7592380
Qualified in New York County
Commission Expires March 30, 1982

Notary _____

**Exhibit-4**

ii

Exhibit "C"
Page 2 of 2 pages

# Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78

**By BRUCE LAMBERT**

Joseph Shuster, a co-creator of Superman who sold the rights to the character for $130, never dreaming it would become a legendary figure in popular culture reaping billions of dollars, died on Thursday at his home in Los Angeles. He was 78 years old.

He died of congestive heart failure, the Los Angeles County coroner's office said.

One night in 1934, Jerry Siegel conceived a superhuman hero, and the next day, he asked his buddy, Mr. Shuster, to draw it. Syndicators repeatedly rejected their comic strip until 1938, when Detective Comics bought the 13-page story for $10 a sheet.

"We were young kids," Mr. Shuster said later. "What did we know?"

Published as a booklet under the name Action Comics, Superman was an instant hit. His popularity helped establish comic books as a format and spawned a genre of bizarrely costumed superheroes, from Spiderman to Wonder Woman.

## The Industry

Superman reigned as king of the realm and an industry unto himself. Almost faster than a speeding bullet, the Man of Steel appeared in newspaper comics, a radio show, animated cartoons, movie-theater serials, a television series, a Broadway musical, a novel, feature films and a stream of franchised goods, from lunch boxes and toys to bubble gum. In the 1970's alone, Superman sales exceeded $1 billion.

Superman was the baby alien from outer space, reared as a normal American boy and growing up to become Clark Kent, mild-mannered reporter. But when danger loomed, he transformed into the crusader for Truth, Justice and the American Way, ducking into the nearest phone booth, doffing his glasses and stripping to a blue bodysuit. Red cape flowing, he flew off, using X-ray vision and other powers to thwart the latest evil menace or global disaster. He leaped over tall buildings, gallantly kept the admiring and curious Lois Lane at arm's length and feared only kryptonite.

For several years, the Shuster-Siegel team earned a modest living as Superman's cartoonist and writer. But when they pressed for a share of the profits, they were dumped. They tried other story lines, including a character called Funnyman, which flopped.

## Poverty, Then a Pension

Protracted litigation seeking money from Superman's owners also failed. By the 1970's, both men were nearly destitute. Mr. Shuster, partly blind and unemployed, lived in a threadbare Queens apartment.

Finally he and Mr. Siegel appealed to the court of public opinion. In 1975, Warner Communications, which then owned Superman, volunteered to give each a pension of $20,000 a year. In 1981 the figure was raised to $30,000, plus a $15,000 bonus after the first film in the "Superman" series grossed $275 million.

Mr. Shuster was born in Toronto. As a youngster, he moved with his family to Cleveland, where he met Mr. Siegel. No information on survivors was available.



Joseph Shuster with a vintage Superman comic book in 1975.

---

# Judge Nils Boe, 78; S. Dakota Governor And Aide to Nixon

**By BRUCE LAMBERT**

Former Gov. Nils A. Boe of South Dakota, whom President Richard M. Nixon appointed as a White House aide and later as chief judge of the United States Customs Court, died Thursday at Sioux Valley Hospital in Sioux Falls, S.D. He was 78 years old and lived in Sioux Falls.

His family said he died of cancer.

On the United States Customs Court, Judge Boe issued several notable decisions, including a sharply worded rebuke of Mr. Nixon in 1974. The President had ordered a 10 percent surcharge on all import duties to reduce the nation's trade deficit, a move that generated $569 million in four months. But a three-judge panel led by Judge Boe ruled that the power to impose such a surcharge rested with Congress and that Mr. Nixon had overstepped his authority.

"Expedience cannot justify the means by which a deserving and beneficial national result is accomplished," Judge Boe wrote in that case. "To indulge in judicial rationalization in order to sanction the exercise of power where no power in fact exists is to invite the deadliest of blows to our Constitution."

Three years later, he was on a three-judge panel that ordered the Carter Administration to comply with laws imposing duties of 5 percent to 49 percent on an array of popular Japanese electronic products, including televisions, radios, tape recorders and record players. The judges dismissed warnings from the Administration that the duties would upset international relations and trade.

The son of Nils N. Boe, a Lutheran bishop for a synod covering four states, Mr. Boe was born in Baltic, S.D., and grew up in Parker, S.D., after graduating from the University of Wisconsin and its law school, he worked as a private lawyer and as Deputy State Attorney for Minnehaha County. He served as a Navy lieutenant in World War II.

A Republican, he won election to the State House of Representatives for four two-year terms and became Speaker. He was elected Lieutenant Governor in 1962 and Governor in 1964 and was re-elected in 1966.

As Governor, he increased aid to



Nils A. Boe

education, advocated property-tax cuts, promoted industrial development and helped start the state's educational television system.

In 1969 President Nixon appointed him director of the new White House Office of Intergovernmental Relations and in 1971 named him to the Customs Court, in Manhattan. He retired from the court in 1984.

Surviving are two sisters, Borghild Boe of Sioux Falls and Lois Hyslop of State College, Pa.

---

# Frank Yatsu
### Internment Survivor, 108

SEATTLE, Aug. 2 (AP) — Frank Yatsu, one of the oldest survivors of the internment of Japanese-Americans during World War II, died July 24 at a nursing home here, his son Charles said today. He was 108 years old.

Mr. Yatsu was among 120,000 Japanese-Americans who were sent to internment camps in 1942 after the Japanese attack on Pearl Harbor. In 1988 Congress passed a bill apologizing for the internment and authorizing payments of $20,000 to survivors. Mr. Yatsu was one of the first to receive checks and letters of apology.

Mr. Yatsu was born in Japan and immigrated to California in 1906. He spent three years in an Arizona relocation camp with his wife and family. He later moved to Seattle and worked for a window company.

Besides Charles, Mr. Yatsu is survived by two other sons, a daughter and five grandchildren.

---

# Nicanor Costa Méndez, 69, Aide In Argentina in the Falklands War

BUENOS AIRES, Aug. 2 (AP) — Nicanor Costa Méndez, a former Argentine Foreign Minister and a leading figure in the war for the Falkland Islands in 1982, died today, his family said. He was 69 years old.

He died of lung cancer, his family said.

A lawyer linked to right-wing nationalist groups, Mr. Costa Méndez gained prominence 10 years ago as one of the planners of Argentina's invasion of the Falkland Islands in the South Atlantic, a British colony since 1832 that Argentina calls the Malvinas.

He was then appointed Foreign Minister and the principal civilian counselor to Gen. Leopoldo F. Galtieri, then the President.

The United Nations Security Council urged Argentina to withdraw its forces, but it resisted. British forces sailed to the islands and an 11-week war ensued that ended in Argentina's surrender in June 1982.

The armed forces ousted President Galtieri immediately after the surrender, and Mr. Costa Méndez was dismissed as Foreign Minister.

"Regarding the Malvinas war," Mr. Costa Méndez said in 1985, "all I have to say is that I fought in defense of the Argentine national interest and of my country's sovereignty."

## From a Wealthy Family

A member of a wealthy, patrician Argentine family, Mr. Costa Méndez was born on Oct. 30, 1922, in Buenos Aires. He attended the University of Buenos Aires, graduating with a law degree in 1943. He went on to receive his doctorate in jurisprudence and opened a law practice here.

He served as Foreign Minister from 1966 through 1969 in another military Government, when Gen. Juan Carlos Onganía was President. An avowed anti-Communist, Mr. Costa Méndez favored close ties with the United States.

But when the United States and Western Europe sided with Britain during the Falkland war, he did not hesitate to seek the support of the Communist bloc. He flew to Cuba to attend a meeting of non-aligned nations and was received by President Fidel Castro.

In 1991, Mr. Costa Méndez was again active in politics as an international adviser.

---

# Geoffrey W. Lewis, 82, Ambassador in Africa

Geoffrey W. Lewis, a retired career diplomat who served as the United States Ambassador to Mauritania and the Central African Republic, died Saturday at a hospital in Rockland, Me. He was 82 years old and lived in nearby Cushing.

He died of complications from heart and kidney disease, his family said.

Mr. Lewis was appointed to Mauritania in 1965 and the Central African Republic in 1967, where he stayed till his retirement in 1970. His other overseas posts included assignments in Pakistan, Jordan and France and with the North Atlantic Treaty Organization.

Mr. Lewis was born in Brookline, Mass. After graduating from Harvard and studying at Trinity College in England, he became headmaster of the Browne and Nichols School in Cambridge, Mass., in 1937.

In World War II he was a United States Army colonel in London, working on post-war plans. He stayed in Germany in 1946 and soon became acting chief of its German affairs section, specializing in war reparations, and was also the coordinator of displaced persons.

His survivors include his wife of 55 years, the former Elizabeth Locke; a son, Geoffrey Jr. of Washington; a daughter, Margaret Herbert Llanerch, Wales; a brother, David, and sisters, Edith Richards, both of Dover, Mass., six grandchildren and one great-grandchild.

---

# Rae Dalven, 87, Former Professor And a Historian of Jews in Greece

**By BRUCE LAMBERT**

Rae Dalven, a translator of modern Greek poets and historian of Greek Jews, died on July 30 at Beth Israel Medical Center in Manhattan. She was 87 years old and lived in Manhattan.

Friends said she had been in declining health but they did not know the cause of death.

Dr. Dalven was retired as a professor of English literature and department chairwoman at Ladycliff College in Highland Falls, N.Y.

Born in Preveza, Greece, she immigrated to the United States with her family as a youngster. She graduated from Hunter College and earned a doctorate in English at New York University.

## Translated Greek Poetry

Among her translations was "Modern Greek Poetry" (Gaer, 1949). In a review, W. H. Auden wrote, "we should be very grateful to Miss Dalven for introducing us to a world of poetry which has been closed to us" by the language barrier. Mr. Auden later wrote the introductions to her "The Complete Poems of Cavafy" (Harcourt, Brace, 1961) and "The Fourth Dimension" (Godine, 1977), translating Yannis Ritsos.

Dr. Dalven also wrote two plays, the first of which, "A Season in Hell," about the French poets Rimbaud and Verlaine, was produced Off Broadway in 1950.

Last year she finished "Our Kind of People," an autobiographical play about a family of Greek-Jewish immigrants. It was performed at a synagogue in Manhattan and is scheduled for presentation this fall at a Brooklyn theater and the Greek Orthodox Cathedral in Manhattan.

## Studied Greek Jewish Group

Dr. Dalven's special interest was the history of Jews in Greece, especially the community in Ioannina in northern Greece, most of whose members were

driven out during World War II. They were Romaniotes, who traced their ancestry to Palestinians and who migrated as early as 300 B.C. They retained their customs and liturgy, which differed from those of the more numerous Sephardim whose ancestors were expelled from Spain.

Dr. Dalven was the editor of "The Sephardic Scholar," a journal; a board member of the American Friends of the Jewish Museum of Greece and a past president of the American Society of Sephardic Studies and of the Sisterhood of Janina, a Romaniote group.

Her marriage to Jack Negrin ended in divorce. She is survived by several nieces and nephews.



GET THE
CROSSWORD
ANSWER
THAT'LL HELP
YOU GET THROUGH
TODAY'S PUZZLE.
JUST CALL
1-900-884-CLUE.
Get answers for up to three clues.
Use a touch-tone telephone only.
75¢ for the first minute,
50¢ for each additional minute.
The New York Times

---

At home or on the job...
start each day with
The New York Times.
Call
1-800-631-2500
toll free.

Exhibit 5
33

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.