Case 2:10-cv-03633-ODW-RZ   Document 463-2   Filed 07/30/12   Page 1 of 101   Page

# A Debate Over 2 Boys In Prison

Continued from Page A1

legislator who helped push through a package of tougher Illinois juvenile justice laws in 1994, shortly after the two boys were arrested, said in an interview that such youngsters were more like "predators" and "hardened criminals" than children.

Before Eric Morse was killed, children under 13 in Illinois could not be sent to a juvenile prison. Afterwards, the law was quickly changed to make children as young as 10 eligible to be locked up. Juvenile prisons are similar to adult ones, but they hold far fewer inmates and provide for mandatory schooling.

"I think all of us agree that hardened criminals should be punished," Mr. Hoffman said. "If you do an adult crime, you should be treated like an adult criminal. That's my sense of what the public very much wants."

Dr. Bruce Perry, a psychiatrist at the Baylor College of Medicine in Houston who studies violence in children, agreed that juvenile criminals should be punished. But at the same time, he said, they must receive intensive psychiatric care and oldfashioned nurturing that most have never found in their homes.

Dr. Perry said the best place for such deeply troubled and violent children is in a well-secured residential treatment center, where there are fewer inmates, where more intensive rehabilitation therapy is available and where the staff generally is trained in counseling.

"There are places that have shown good success rates," he said. "It's not easy, and it's expensive. And because of that, much of the public considers such placements a waste of time and emotion. But do you want a child who was capable of terrible violence at a young age to be put into a cell, receive little or no intervention, and then simply be sent home five years later? I know I don't want to meet that child then."

The Illinois Department of Children and Family Services said it could not find an appropriate residential center to take the boys, whom a spokeswoman described as "very disruptive" and involved in several fights while in a detention center since their arrest. The boy's lawyers said they found an out-of-state program willing to take them.

"He's not a monster," said David Hirschboeck, a public defender representing the 13-year-old. "I suppose some people will say he is. But one thing is certain now, we are barreling down the road to making him one."

Jack O'Malley, the Cook County State's Attorney, whose office prosecuted the boys, said he was confident the boys would receive adequate counseling at either a juvenile prison or a residential center. "But what particularly concerns me is that these kids are going to get out," he said. "They're going to be very young men at that time. There is a tremendous responsibility to go to whatever lengths necessary to rehabilitate them. These two kids are as risky as they get."

In sentencing the boys to prison on Monday, the judge in the case, Carol Kelly of Cook County Juvenile Court, tried to balance treatment and punishment but tipped the scales toward punishment because, "these two held a 5-year-old out a window and then dropped him to a terrifying death."

Corrections officials scanned the court that the necessary psychiatric services were available for the boys in juvenile prison. Still, Judge Kelly was taking no chances.

As part of the sentence, she said, the department must provide her within the next two months with a detailed treatment plan and full psychiatric evaluation of the boys. Eventually, she said, if they do well, they could be transferred to a residential treatment center.

But Michael Mahoney, executive director of the John Howard Association, which monitors the Cook County justice system, said he was worried that the boys would not receive the kind of treatment they need because the programs at juvenile prisons are limited, if they exist at all.

Both boys have been preyed on for most of their lives. They grew up in one of the city's roughest housing development, Ida B. Wells, where gangs, guns and death at an early age are part of everyday life.

Michelle Kaplan, the lawyer for the 13-year-old, said her client would probably end up in a medium-security prison with 263 inmates and one psychiatrist who only works a few hours a week.

"You cannot compare that with what he could get at a residential treatment facility," she said.

Ms. Kaplan said the boy had been ignored and failed by almost every adult in his life. He was passed through school even though he could barely read or write. He was picked up by the police several times for theft and disorderly conduct but never saw a social worker. His neighborhood was infested with violence.

"There's this history leading up to this child being in crisis, and no one has ever intervened," Ms. Kaplan said. "Now the system has finally intervened, and they want to throw him away. They're children. They're not animals."

## Army to Seek Death Penalty in Shooting

Prosecutors will seek the death penalty in the court-martial of Sgt. William Kreutzer, 26, who is accused of killing one soldier and wounding 18 in a sniper attack on an exercise field at Fort Bragg, N.C., on Oct. 27. Sergeant Kreutzer arrived for arraignment yesterday.


*Associated Press*

## Judge Voids an Alabama Law Against Gay Campus Groups

**By DAVID W. DUNLAP**

An Alabama law barring gay and lesbian groups on college campuses from receiving public money or other official support has been declared unconstitutional by a Federal judge.

The judge, Myron H. Thompson of Federal District Court in Montgomery, Ala., ruled on Monday that the law violated the guarantees of free speech and association and reflected "an open effort by the State Legislature to limit the sexuality discussion in institutions of higher learning to only one viewpoint: that of heterosexual people."

The Gay Lesbian Bisexual Alliance at the University of South Alabama, in Mobile, brought the case after it was denied financing from the university administration. Alan Clampett, the group's president, said

*Overturning limits on the discussion of sexuality.*

yesterday that the outcome was a victory for gay and lesbian students and more broadly for the exercise of First Amendment rights by any student in Alabama.

There are no other such statewide prohibitions in the nation, said Ruth E. Harlow, associate director of the lesbian and gay rights project at the American Civil Liberties Union in New York, which represented the alliance. But, Ms. Harlow said, many local governments and school boards are considering restrictions on gay and lesbian groups and programs. She said the ruling by Judge Thompson would be "quite useful everywhere."

Judge Thompson's decision comes as Attorney General Jeff Sessions of Alabama is trying to cancel a conference of gay, lesbian and bisexual students that is scheduled for next

month at the University of Alabama, in Tuscaloosa.

Mr. Sessions, a Republican, is considering a run for the United States Senate. Before Judge Thompson's ruling, on Jan. 25, Mr. Sessions told the president of the university that the conference "would appear to violate the express mandate of the legislature" and had no place on a taxpayer-financed campus because it promoted values contrary to those held by most Alabamians.

A spokeswoman for Mr. Sessions, Claire Austin, said yesterday that he was likely to appeal Judge Thompson's ruling to the United States Court of Appeals for the 11th Circuit, in Atlanta.

As for the conference, it is "very much a go," said F. Keith Ayers, a spokesman for the University of Alabama. The organizers followed appropriate procedures, Mr. Ayers said, and the "university was inclined to respect their constitutional rights and not intervene."

"It looks like the court has concurred with that point of view," he added.

Judge Thompson relied heavily on an opinion by the United States Supreme Court, which ruled last year that the University of Virginia was required to subsidize the publication of a Christian student newspaper. "The university may not silence the expression of selected viewpoints," the Court declared.

The Alabama law was enacted in 1992 after officials at Auburn University, over the objection of the student government association, granted recognition to the Gay and Lesbian Association, of which Mr. Clampett was president. (He later transferred to the University of South Alabama.)

The law declares that no public money or facilities may be used by any college or university to "sanction, recognize or support the activities or existence of any organization or group that fosters or promotes a life style or actions prohibited by the sodomy and sexual misconduct laws."

## Subjects in Radiation Experiment Were Not Informed, Panel Says

**By WARREN E. LEARY**

The Air Force failed to properly inform the human subjects of experiments carried out in Alaska in the 1950's that they were being exposed to small amounts of radiation, a committee of the National Research Council said yesterday.

The expert panel said that the thyroid research, which was done on 102 Alaska native men, women and teenagers and 19 servicemen, did not involve enough radioactivity to pose health risks.

"Even so, we believe that the informed consent process was flawed," the five-member committee said in a report.

Dr. Kenneth L. Mossman of Arizona State University in Tempe, a member of the panel, said that many subjects were not aware the research involved radioactive material and that few of the Alaska native subjects even understood they were participating in research rather than receiving medical treatment.

The committee acknowledged that the researchers were conducting legitimate research, believed the radiation doses they were using were harmless and followed common

rules of the day for experimentation. However, the panel said, the principles of the 1947 Nuremberg Code, which defined morally and legally permissible human experimentation, should have been followed.

The research, carried out from 1955 to 1957 by the now-defunct Arctic Aeromedical Laboratory in Fairbanks, involved giving people low doses of radioactive iodine-131, a common medical tracer of the day, to determine whether the thyroid gland helped people adapt to Arctic climates. At the time, many American troops were stationed in frigid climates near the Soviet Union.

The scientists found no evidence of increased thyroid stimulation as a result of exposure to cold, and no ethnic difference in the thyroid uptake and excretion of the tracer.

Dr. Mossman said in a telephone interview that the researchers were good people who did what seemed to be appropriate for the times.

The Air Force, in a statement, disagreed with the conclusion that the experiments were conducted without informed consent according to the standards of the time.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

---

# OBITUARIES

## Jerry Siegel, Superman's Creator, Dies at 81

**By ROBERT McG. THOMAS Jr.**

Jerry Siegel, whose teen-age yearning for girls gave the world Superman, died in Los Angeles on Sunday. He was 81 but was remembered less as the Cleveland visionary who dreamed up the greatest superhero of all time than as the naïve young man who sold the rights to a billion-dollar cultural and commercial juggernaut for $130.

It was Mr. Siegel's partner, Joe Shuster, who eventually gave Superman his familiar skin-tight costume and accompanying cape, but it was Mr. Siegel who had imagined Superman whole, from his birth on the doomed planet Krypton and his rocket arrival on Earth to his superhuman powers and his mild-mannered alter ego, Clark Kent.

The vision, as he later told it, came to him in a jumble all at once, during a sleepless summer night in Cleveland in 1934 after his graduation from Glenville High School, where he and Mr. Shuster had already teamed up to produce a stream of comic strip characters, including an earlier Superman, whom Mr. Siegel had imagined as a bald mad scientist.

But for all of the instant-imagined detail of the second Superman's extraterrestrial origins, his upbringing by doting foster parents and his decision to dedicate his awesome powers "to assist humanity," Mr. Siegel made no secret that the focus of his creative vision, the real creature of his dreams, was Lois Lane, Kent's fellow reporter on The Daily Planet.

She was the woman who would yearn for Superman even as the shunned Kent, not knowing that beneath that mild-mannered exterior was in fact the very man of steel, not to mention the longing heart of Jerry Siegel.

Even discussing Superman's origins 40 years later, Mr. Siegel, who said he had thought of becoming a reporter, seemed still to feel the stings he had suffered as a scrawny, bespectacled high school student:

"I had crushes on several attractive girls who either didn't know I existed or didn't care I existed," he said. "It occurred to me: what if I had something going for me, like jumping over buildings or throwing cars around or something like that?"

Even after Mr. Shuster had rendered Mr. Siegel's fantasy in ink, it took the partners several years to find a publisher willing to accept their creation.

And when they did, in New York, where they had been hired to produce other comic book characters, their dream of cashing in was quickly shattered.

In March 1938, in exchange for $130 in cash, they signed away all rights to Superman to DC Comics, the company that brought Superman

to commercial life that June.

When the character proved an immediate sensation and the partners sought a share of the profits, they were dismissed and lived the rest of their lives near the poverty line. After a series of lawsuits to recover their creative property failed, Mr. Shuster was eventually reduced to becoming a messenger in Manhattan and Mr. Siegel worked as a clerk typist in Los Angeles for $7,000 a year.

In 1978, after the first Superman movie made more than $80 million, DC, which over the years has received more than $250 million of the more than $1 billion that Superman has earned from movies, television and an incredible array of commercial products, bowed to public opinion, restored their bylines and gave



*Jerry Siegel and the first Superman cover from 1938.*

each man a $20,000-a-year annuity, later raised to $30,000.

In their final years, the two men lived within a few blocks of each other in Los Angeles, where Mr. Shuster, blind in the last years of his life, died in 1992.

Mr. Siegel may have been the man who created Superman, but his failure to safeguard his rights soured him on the man from another planet.

"I can't stand to look at a Superman comic book," he said in 1975. "It makes my physically ill. I love Superman, and yet to me he has become an alien thing."

He is survived by his wife, Joanne, their daughter, Laura Carter Larson of Los Angeles; a son, Michael, by a previous marriage, and two grandchildren.

## Julius Posener, 91, an Architect And Critic of Modern Movement

**By PAUL GOLDBERGER**

Julius Posener, an architect, critic and teacher who was an active figure in the European Modernist movement for much of the 20th century, died on Monday in his home in Berlin. He was 91.

Mr. Posener studied architecture at the Technische Hochschule Berlin in the 1920's but designed relatively few buildings himself. Uncomfortable with the narrow focus of so many modern architects, he came quickly to see his primary role as one of interpreter and teacher of the developing modern movement. His focus was more open-minded and humanistic than that of many Modernists, and in his writings and teaching he sought to connect architecture to the quality of life by looking as deeply into political, economic and social concerns as into purely esthetic ones.

He was a protégé and later a biographer of Hans Poelzig, the great German Expressionist architect, though he was never associated entirely with that school, or even solely with German architecture. He lived and worked in Paris, Jerusalem, London, Berlin and Kuala Lumpur, Malaysia at various points in his career, which continued actively un-

til the end of his life. Last year he won the Heinrich Mann Literary Prize in Germany for his final book, "What Architecture Can Be — Newer Essays," published by Birkhauser in Germany.

Julius Posener was born in Berlin on Nov. 4, 1904, into a wealthy and cultivated Jewish family. He moved to Paris in 1929 and became the first paid employee of L'Architecture d'Aujourd'hui (Architecture Today), the celebrated French journal, when it began publication in 1930. Later he returned briefly to Germany but, uncomfortable with growing anti-Semitism, began a 28-year exile that took him first to Paris, to Jerusalem, to London and to Kuala Lumpur, where he founded an architecture school in 1956.

In 1961 Mr. Posener, on the verge of moving permanently to Haifa, instead returned to Berlin, where he took the city's own architectural history as a subject, living through the rise and fall of the Berlin wall and writing numerous essays and books on the city's development and becoming a prominent civic advocate of historic preservation.

He is survived by his second wife, Margarete, and by three children, Alan and Ben, of Berlin, and Jill, of San Francisco.

## San Yu, 74, Former Leader Of Myanmar

U San Yu, who was President of Myanmar — formerly Burma — from 1981 to 1988, died on Sunday in a military hospital in Yangon. He was 78 and lived near the capital.

The cause of death was not certain but Reuters reported that he had a heart ailment.

Mr. San Yu was a longtime army officer and a faithful co-worker of U Ne Win, who commanded Mr. San Yu's old army unit and went on to rule Myanmar, under various titles, for more than two decades after he seized power in a coup in 1962.

Mr. Ne Win allied democracy in Myanmar, nationalized the economy and fostered the country's international isolation.

He was President and in ill health in 1981, when Mr. San Yu succeeded him, assuming the ceremonial duties of the presidency. Mr. San Yu was thought to have little power until 1988, when Mr. Ne Win, in his key post of chairman of the ruling Burma Socialist Program Party, named him deputy chairman and in effect his heir apparent.

As President, Mr. San Yu presided over a repressive military Government that imprisoned its opponents and outlawed trade unions.

Early in 1988, despite violent countermeasures by the police, and government rioting extended to the heart of Yangon, the Burmese capital formerly known as Rangoon. In August, Mr. Ne Win, Mr. San Yu and other leaders resigned from state and party posts but were believed to have remained in control. But economic problems worsened, demonstrations for democracy continued, and the Government's grip on power began to slip.

Late that year, the military restored order in a violent crackdown and imposed martial law. Mr. Ne Win and his associates remained a power behind the scenes.

By then, Duva had left the practice of law to return to the sport he had been raised in by his father, who is 73 years old and still training such champions as Pernell Whitaker, who holds a welterweight title.

In 1984, Dan Duva saw a new

## Dan Duva, 44, Boxing Promoter Who Guided Many Champions

**By GERALD ESKENAZI**

Dan Duva, who was raised in boxing's buccaneering world, left it to become a lawyer and then returned as one of its major promoters, died yesterday at Columbia-Presbyterian Medical Center. He was 44.

Duva had undergone surgery for brain cancer in 1994, but the illness recurred last November.

Duva, whose father, Lou, is a trainer who has been part of the sport's fabric for 60 years, enjoyed the irreverence, illogic and just plain nuttiness associated with boxing. He often described himself as "incorrigibly optimistic," observing, "I'm a Jets fan, too."

His company, Main Events, successfully competed with other major promoters in the sport like Don King and Bob Arum. Typically, negotiations often included screaming and posturing and broken promises.

Among the 12 heavyweight title fights Duva promoted was the 1994 meeting of Evander Holyfield and Michael Moorer. To wring some added excitement out of it, Duva arranged for Moorer, the challenger, to smash the hubcap at one of the prefight rituals. Television networks, not knowing it was a set-up, showed the angry Moorer that night, which helped to hype the fight.

Duva, a graduate of Rutgers and the Seton Hall School of Law, promoted more than 100 world title bouts. His first mega-fight was the 1981 meeting in Las Vegas, Nev., between Sugar Ray Leonard and Thomas Hearns.

breed of fighter emerging, from the Olympics, and that year he signed Holyfield, Whitaker, Mark Breland, Tyrell Biggs and Meldrick Taylor, all of whom had won Olympic medals. All but Biggs went on to win professional championships.

"Dan was a man who gave me an opportunity, and I'll never forget him for that," Holyfield, who has earned more than $100 million in the ring, said yesterday.

Besides his father, Duva is survived by his wife, Kathy; two daughters, Lisa and Nicole; a son, Bryan; a brother, Dino, and three sisters, Donna Brooks, Denise MacPhail and Deanne Boorman.

## Joseph De Rugeris
*Opera Conductor, 48*

Joseph De Rugeris, an opera conductor and administrator, died on Jan. 23 at St. Vincent's Hospital in Manhattan. He was 48 and lived in San Francisco.

The cause was AIDS, said William Purves, a friend.

Mr. De Rugeris, who was a native of Philadelphia and a graduate of Columbia University, performed a variety of administrative jobs in the course of his career at opera houses in Baltimore, Chicago, San Antonio, San Francisco and San Diego. In 1971-72 he was executive assistant to the composer Gian Carlo Menotti.

He also conducted operas in the United States and abroad, including productions at the Washington Opera and at the Festival of Two Worlds in Spoleto, Italy.

He is survived by his stepmother, Virginia, of Philadelphia, and two half-brothers, Mark and James, both of New York City.

Do you have The Times delivered?

Exhibit-6

34

 # Copyright Research Report

Client Name:  George Zadorozny, Esq.

Attention:

Date Received:  2/23/96

Date Mailed:  2/29/96


Property Searched:  **SUPERMAN**

For:  Comic Magazine


Analyst:  Jerry L. Robb

Scope of Search:  Full

Service:  __X__ Reg.      ____ Expedited

Acceptance and reliance upon this report by the client constitutes an acceptance of its terms, conditions and limitations. Any liability arising out of the preparation of this report is limited to a refund of the search fee paid.

We have taken all reasonable steps to ensure the completeness and accuracy of this report; however, due to the highly subjective nature of copyright and title searching we cannot otherwise guarantee these results. This search is valid only for the property or title noted above. If the property or title which was the subject of this search is changed, even slightly, a new search should be conducted. Please note that this report in no way constitutes a legal opinion.

COPYRIGHT RESEARCH GROUP, 1750 K St., N.W., Suite 200, Washington, DC 20006-2305
Thomson & Thomson      Telephone: (202) 835-0240 (800) 356-8630 FAX: (202) 728-0744

Redacted

**Exhibit-7**

Thomson & Thomson

February 29, 1996

**VIA TELECOPIER**
**VIA OVERNIGHT DELIVERY**

George Zadorozny, Esq.
Business Center
3780 Tampa Road
Oldsmar, Florida 34677

### Copyright Report - SUPERMAN

Dear Mr. Zadorozny:

A search of the records of the Copyright Office and the records and files of this office reveals that the character known as **SUPERMAN** created by Jerry Siegel and Joe Shuster, first appeared in <u>Action Comics</u>, No. 1, issue of June 1938, with copyright secured on the blanket copyright on this periodical in the name of Detective Comics, Inc. as of a publication date of April 18, 1938, under entry No. B: 379787. The copyright in the story entitled **SUPERMAN** was separately renewed in the names of Jerome Siegel and Joe Shuster, claiming as authors, April 19, 1965, under entry No. R: 361642. It was also renewed in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire, June 1, 1965, under entry No. R: 362188.

The story as originally published in <u>Action Comics</u> was reportedly incomplete, but was later republished in its entirety in the summer of 1939 as the comic book **SUPERMAN**, Vol. 1, No. 1. Although we find no record of copyright registration or subsequent renewal of a work identified as Vol. 1, No. 1 of this periodical, the records do contain a registration for a work entitled **SUPERMAN (THE COMPLETE STORY OF THE DARING EXPLOITS OF THE ONE AND ONLY SUPERMAN)**, by Jerome Siegel and Joe Shuster, which was registered for copyright in the name of Detective Comics Inc., as of a publication date of May 18, 1939, under entry No. AA: 299871. This copyright was renewed in the name of National Periodical Publications, Inc., claiming as proprietor of copyright in a work made for hire, July 1, 1966, under entry No. R: 388937.

1750 K Street NW, Suite 200   Washington, D.C. 20006-2305   Telephone: 800-356-8630, 202-835-0240   Fax: 800-822-8823, 202-728-0744

Washington, D.C. • Boston • New York • Chicago • Los Angeles • Antwerp • London • Paris • Montreal • Toronto

**Exhibit-7**

36

## COPYRIGHT REPORT - SUPERMAN

The character SUPERMAN made its debut as a daily comic strip on January 16, 1939, and as a Sunday strip on November 5, 1939.  It was distributed by and registered for copyright in the name of the McClure Newspaper Syndicate, through September 30, 1949.  Beginning in October 1949, the strip was drawn by Wayne Boring, and registered for copyright in the name of National Comics Publications, Inc.  Beginning in 1958, the strip was drawn by Curt Swann, and registered for copyright in the name of Superman, Inc.  In 1961, the strip was registered for copyright in the name of National Periodical Publications Inc.  It was discontinued in 1967.  These copyrights were renewed in the names of Jerome Siegel and Joe Shuster, claiming as authors.  The copyrights in the comic strips originally published through 1943 were renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications Inc., claiming as proprietors of copyright in a work made for hire.  Thereafter, renewals were made in the name of National Periodical Publications Inc., and later, beginning with the 1950 releases, in the name of DC Comics Inc.

The character SUPERMAN continued to be presented in <u>Action Comics</u>, issues of which were registered for copyright in the name of Detective Comics, Inc., with the story entitled SUPERMAN renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire, through the 1943 issues.

The comic book SUPERMAN was published quarterly and registered for copyright in the name of Detective Comics Inc. through the issue of Spring 1940.  Beginning in the summer of 1940, the comic book was published bimonthly, and registered for copyright in the name of Superman Inc.  Beginning in February of 1946, the comic book was registered for copyright in the name of National Comics Publications Inc. through 1949, when it was again registered for copyright in the name of Superman Inc.  Beginning in 1950, registrations began in the name of National Periodical Publications Inc.; beginning in 1976, issues were registered for copyright in the name of DC Comics Inc.  In 1986, the title of the comic book was changed to THE ADVENTURES OF SUPERMAN.  The copyrights in the issues published through 1943 were renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications, claiming as proprietor of copyright in a work made for hire.  Thereafter, renewals were made only in the name of National Periodical Publications Inc., and, beginning with issues published in 1950, in the name of DC Comics Inc, claiming as proprietor of copyright in a work made for hire.  Renewal registrations continue to be made in the name of DC Comics, Inc., through the present.

2

Exhibit-7

37

COPYRIGHT REPORT - SUPERMAN

A series of 14 prints by Jerry Siegel and Joe Shuster, with titles such as **SUPERMAN ATTACKING AN AEROPLANE IN MIDAIR, SUPERMAN CARRYING A MAN UNDER EACH ARM**, were **registered for copyright** in the name of Superman Inc. as of a publication date of July 26, 1940. We find no record of renewal for these copyright registrations.

A comic book entitled **SUPERMAN-TIM** commenced publication on August 1, 1942, and was **registered for copyright** in the name of Superman Inc. From 1947 through 1950, this periodical was **registered for copyright** in the name of National Comics Publications Inc. These copyrights were renewed in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire.

In addition to the above-referenced comic books, several other comic books featuring the character have been published, including **SUPERMAN ANNUAL**, later **SUPERMAN - THE MAN OF STEEL ANNUAL** (1964 - present); **SUPERMAN'S GIRLFRIEND, LOIS LANE** (1958-1974); and **SUPERMAN'S PAL, JIMMY OLSEN** (1954 - 1974), retitled **THE SUPERMAN FAMILY** (1974 - until at least 1984), which were originally **registered for copyright** in the name of National Periodical Publications Inc., and later in the name of DC Comics Inc. Renewals are being made as they come due in the name of DC Comics Inc. A comic book entitled **SUPERMAN: THE MAN OF STEEL** commenced publication in 1991, with issues **registered for copyright** in the name of DC Comics Inc.

A novel entitled **SUPERMAN**, by George Lowther, based on the cartoon character, and illustrated by Joe Shuster, was **registered for copyright** in the name of Superman, Inc., as of a publication date of November 2, 1942, under entry No. A: 168596. We find no record of renewal for this copyright registration.

An anthology entitled **SUPERMAN - FROM THE THIRTIES TO THE SEVENTIES**, with an introduction by E. Nelson Bridwell, was published by Crown Publishers and **registered for copyright** in the name of National Periodical Publications Inc., as of a publication date of December 14, 1971, under entry No. A: 303583. The application authors are E. Nelson Bridwell and Carmine Infantino. Copyright is claimed on dedication, introduction and compilation.

A book entitled **THE DEATH OF SUPERMAN**, by Dan Jurgens, Jerry Ordway, Louise Simonson, and Roger Sterm, was created in 1992, published December 1, 1992, and **registered for copyright** in the name of DC Comics (employer for hire), February 22, 1993, under entry No. TX: 3-496-004. Copyright is claimed on selection and compilation.

Exhibit-7

38

**COPYRIGHT REPORT - SUPERMAN**

A novel entitled THE DEATH AND LIFE OF SUPERMAN, by Roger Stern, was created in 1992, published by Bantam Books, August 2, 1993, and registered for copyright in the name of DC Comics (employer for hire), September 28, 1993, under entry No. TX: 3-640-100.

A work entitled SUPERMAN (spine title: SUPERMAN STYLE GUIDE) was created in 1991, published November 11, 1991, and registered for copyright in the name of DC Comics, Inc., December 18, 1991, under entry No. TX: 3-221-758. Copyright is claimed on new graphics of old and new characters, new artwork and text.

Another work, entitled SUPERMAN BETTER THAN EVER (application title SUPERMAN, BETTER THAN EVER STYLE GUIDE), containing text and illustrations, was created in 1993 and registered for copyright as an unpublished work in the name of DC Comics, July 16, 1993, under entry No. TXU: 579-563. Copyright is claimed on new graphics of old and new characters, new art and new text.

Numerous other "Superman" works, including books, single-issue comic books, coloring books, cut-out books, puzzles, etc., have been published and registered for copyright over the years, generally in the name of Superman, Inc., National Comics Publications Inc., National Periodical Publications, Inc., and most recently in the name of DC Comics Inc.

The comic magazine entitled SUPERMAN is still being registered for copyright in the name of D.C. Comics, Inc.

## Derivative Works

The records disclose a radio program, several motion pictures and several television series featuring the character SUPERMAN.

## Recorded Instruments

By instrument dated September 12, 1946, recorded February 18, 1948, in Vol. 659, pages 48-77, it is recited that by an agreement dated August 15, 1940, Detective Comics Inc. had granted a license to Fleisher Studios to produce and release one-reel cartoons based on the comic strip SUPERMAN, but by a supplemental document, Paramount recites that it failed to exercise the option provided under an agreement dated April 22, 1941, relating to these cartoons and, accordingly, that

4

Exhibit-7

39

COPYRIGHT REPORT · SUPERMAN

Superman, Inc. had the right to produce and release motion pictures of any kind, based on the "**Superman**" material. Paramount reserved from this declaration such rights as it originally had acquired in the seventeen one-reel cartoons produced under the earlier agreement.  The 1946 instrument thereupon recites the terms of the agreement between Detective Comics Inc. and Columbia Pictures Corporation, whereby Columbia was granted the right to produce a serial photoplay of not more than fifteen episodes based on the "**Superman**" material, both present and future, and the right to produce a feature photoplay therefrom for release in Europe, the United Kingdom and certain other countries abroad with such rights to endure exclusively for a period of two and one-half years after the release of the first episode of the serial and for an additional three years thereafter.

By instrument dated **February 24, 1947**, recorded March 25, 1947, in Vol. 626, pages 5-10, Superman, Inc., Detective Comics Inc. and other publishing companies were merged into National Comics Publications, Inc. and all the copyrights in the cartoon strips published by such earlier companies were assigned to National Comics Publications, Inc.

There is of record a Final Judgment dated **May 21, 1948**, recorded June 1, 1965, in Vol. 1207, pages 1-12, wherein the New York court dismissed the complaint of Jerome Siegel and Joe Shuster, and adjudged that National Comics Publications, Inc. was the sole and exclusive owner of the **SUPERMAN** comic strip material and certain related rights.  (See the "Litigation" section of this report for additional information.)

Redacted

By Assignment and Consolidation dated **January 20, 1966**, recorded February 4, 1966, in Vol. 1222, pages 348-369, National Periodical Publications Inc., successor in interest to Detective Comics Inc. and National Comics Publications, Inc., reciting that by an instrument (attached as "Exhibit A") dated July 3, 1944, McClure Newspaper Syndicate assigned to Detective Comics, Inc. all its right, title and interest in all copyrights in **SUPERMAN**, including the copyrights and all renewals and extensions thereof; that by an instrument (attached as "Exhibit B") dated September 30, 1946, Detective Comics, Inc., was consolidated with other corporations into National Comics Publications, Inc.; that by an instrument (attached as "Exhibit C") dated June 29, 1961, National Comics Publications Inc. was consolidated with another corporation into National Periodical Publications, Inc.; that National Periodical Publications, Inc., thereby became vested with all the properties of Detective Comic, Inc., and National Comics Publications, Inc.; thereby stated that it is the owner of and is vested with title to all of the copyrights (and renewals and extensions thereof) in the artistic and literary works

5

Exhibit-7

40

COPYRIGHT REPORT - SUPERMAN

Redacted

consisting of newspaper cartoon strips or continuities entitled **SUPERMAN** which the McClure Newspaper Syndicate had from the first day of publication to July 3, 1944.

By Mortgage and Assignment of Copyright dated **December 21, 1979** and **May 2, 1980**, recorded May 6, 1980, in Vol. 1786, pages 201-214, Film Export A.G. mortgaged and assigned to N.V. Slavenburg's Bank all its right, title and interest in the copyrights and other property listed on an attached Schedule A, and all renewals and extensions of such copyrights, as security for a loan pursuant to the terms of a Loan agreement and Security Assignment dated December 21, 1979 among Film Export AG, International Film Production, Inc., Dovemead Limited, Mr. Alexander Salkind, and N.V. Slavenburg's Bank, to which this instrument is subject.  The document further states that the assignor's rights derive from the Agreement between National Periodical Publications, Inc., and Film Export AG dated November 6, 1974, and that, pursuant to an agreement made January 15, 1975, Film Export AG granted to Film Trust S.A. the sole and exclusive right and license to exercise such rights of Film Export AG under the License Agreement to produce two films entitled **SUPERMAN** and **SUPERMAN II**; by an assignment dated January 31, 1977, Film Trust S.A. assigned to International Film Production Inc. all of its right, title, and interest under the Film Trust Agreement; by agreement dated January 31, 1977, as subsequently modified, International Film Production Inc. granted to Film Export AG the exploitation rights in the two films; pursuant to an Agreement dated May 10, 1978 between International Film Production Inc. and Dovemead Limited, International Film Production Inc. engaged Dovemead Ltd. to make the films, and Dovemead granted to International Film Production Inc. the entire copyright and all rights therein. Schedule A enumerates the collateral, including all right, title and interest of Film Export A.B. in and to a license to produce, exhibit and distribute any number of motion picture based on the name, title, characterizations of **SUPERMAN** and other characters as part of the "Superman family", on radio, television and other entertainment media.  Attached to the document is a list of Warner distribution agreements relating to **SUPERMAN I** and **SUPERMAN II**.

By Mortgage and Assignment of Copyright dated **December 21, 1979** and **May 2, 1980**, recorded May 6, 1980, in Vol. 1786, pages 215-228, International Film Production, Inc., executed a similar document to N.V. Slavenburg's Bank.

By Mortgage and Assignment of Copyright dated **December 21, 1979**, and **May 1, 1980**, recorded May 6, 1980, in Vol. 1786, pages 229-242, Dovemead, Ltd. executed a similar document to N.V. Slavenburg's Bank.

6

**Exhibit-7**

**COPYRIGHT REPORT - SUPERMAN**

By Short-Form Collateral Assignment of Rights dated **December 31, 1985**, recorded January 9, 1986, in Vol. 2159, pages 293-295, Cantharus Productions, N.V. assigned to Tri-Star Pictures, Inc., (1) all of its rights in and to that certain Rights Agreement regarding film right to the character **SUPERMAN** and other characters between Tri-Star's predecessor-in-interest, Film Export A.G., and D.C. Comics, Inc. (formerly known as National Periodical Publishing Inc.) dated November 6, 1974, and any motion pictures produced after November 5, 1985 under the authority of and based on the rights granted in that Rights Agreement, but excluding all rights subject to options in favor of Warner Bros, Inc. and any agreements between Warner and Cantharus or its predecessors-in-interest previously entered into and all rights and options in favor of The Cannon Group Inc. or Cannon Productions N.V. under that memorandum agreement dated May 21, 1985 between Alexander Salkind, on behalf of Cantharus, and Yoram Globus and Menahem Golan, on behalf of Cannon, and (2) all of its right, title and interest in or to the Cannon Agreement and all benefits accruing thereunder, all sums or other distributions paid or payable to and rights and options reverting to or held by Cantharus pursuant to the Cannon Agreement, and all motion pictures produced pursuant to the Cannon Agreement to the extent that Cantharus has any interests therein, all as more fully described in that certain Indemnity Agreement dated as of July 1, 1985.

Redacted

There is recorded an undated statement recorded September 20, 1994 in Vol. 3029, page 75, from Warner Brothers, a division of Time Warner Entertainment Company, L.P. (by Nils Victor Montan, assistant secretary) declaring that it is the sole and exclusive owner of all rights in and to the **SUPERMAN** motion pictures, television programs, etc. and owns sole and exclusive rights to any and all future **SUPERMAN** motion pictures, television programs, animated cartoons, etc. whether or not they are deemed sequels to the currently titled **SUPERMAN** V motion picture.

No further document affecting any right, title or interest in the comic magazine or the character entitled **SUPERMAN** is found of record in the Copyright Office. However, the records disclose numerous documents recorded in connection with the various adaptations of the comic magazine.

## Biographical Information

Joseph Schuster died in August 1992 at the age of 78. We have no information with regard to his heirs and the records of the Copyright Office do not disclose an address for them.

7

**Exhibit-7**

42

**COPYRIGHT REPORT - SUPERMAN**

Jerome Siegel was born in Cleveland, Ohio on October 17, 1914 and died in Los Angeles, California on January 30, 1996. According to his obituary, he was married and had one son and one daughter.  The records of the Copyright Office do not disclose an address for his heirs.  In 1986 he was living at 11928 Darlington Avenue, Apartment 102, Los Angeles, CA 90049.

## Notes

If we may be of any further assistance to you, or if you have any questions regarding this report, please do not hesitate to contact me at 1-800-356-8630 (ext. 3312).

Sincerely yours,


Jerry L. Robb

JLR/kah/dms

8

**Exhibit-7**

**43**

# AGREEMENT

THIS AGREEMENT dated December 18, 1998 between WARNER BROS., a division of Time Warner Entertainment Company, L.P., a Delaware corporation (herein called "Purchaser") and HASBRO, INC., a Rhode Island corporation, and HASBRO INTERNATIONAL, INC., a Massachusetts corporation (herein collectively called "Owner"):

## W I T N E S S E T H:

1.    Option:

(a)    In consideration of the sum of Fifty Thousand Dollars ($50,000) payable to Owner upon execution hereof, Owner hereby grants to Purchaser the sole, irrevocable and exclusive option (the "Option") for the period commencing on the date hereof and continuing until eighteen (18) months after the date of Purchaser's receipt of an executed copy of this Agreement (the "Initial Option Period") to acquire upon and pursuant to the terms and conditions of this Agreement, the rights specified in Paragraph 3 hereof in and to the "Property" (as such term is defined in Paragraph 2 below). For purposes of calculating the Initial Option Period, the date of Purchaser's receipt of the executed copy of the Agreement shall be deemed to be the date which is six (6) weeks prior to the date of Purchaser's actual receipt. The Initial Option Period may be extended by Purchaser for an additional twelve (12) months (the "Extended Option Period") by the payment to Owner of an additional $50,000 at any time prior to expiration of the Initial Option Period. The Initial Option Period and the Extended Option Period (if applicable) shall be referred to herein collectively as the "Option Period." The payment for the Initial Option Period shall be applicable against, and deducted from, the Purchase Price set forth in paragraph 9 below.

(b)    Purchaser may exercise the Option at any time during the Option Period by giving Owner written notice accompanied by the payment specified in subparagraph 9(a) hereof. Subject to Owner's consultation and approval rights hereunder, Purchaser shall have the right during the Option Period to cause screenplays, scenarios, treatments, scripts and other material based in whole or in part upon the Property to be written, developed and/or composed by such person or persons as Purchaser may in its sole discretion determine, and to conduct such other preproduction and development activity as Purchaser may desire. If Purchaser does not exercise the Option, Purchaser shall not have the right for any purpose to use or authorize others to use any material so developed by or for Purchaser based in whole or in part upon the Property.

**Exhibit-8**

WB136189
CONFIDENTIAL

1A.    <u>Progress to Production</u>:  Purchaser acknowledges that it has entered into that certain Producer Loanout Agreement (the "Producer Agreement") dated March 17, 1999 with Threshold Entertainment, Inc. (f/s/o Larry Kasanoff) ["Employer"].  Purchaser further acknowledges that subparagraph 1(c) of the Producer Agreement contains a progress to production whereby Employer may provide Purchaser with a written notice after any consecutive sixty (60) day period during which Purchaser is not in active development of Picture #1 (as such term is defined in subparagraph 2(b) below).  "Active development" is specifically defined in subparagraph 1(c) of the Producer Agreement.  If Purchaser fails to resume active development of Picture #1 within thirty (30) days of Employer's written notice, then Picture #1 shall be put into turnaround to Employer and Purchaser shall have no further rights in and to the Property.

2.    <u>Definition of Certain Terms</u>:

(a)    "Property" as used herein shall mean the following:

(i)    The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters comprising the line of toys known as "G.I. JOE" created or manufactured and exploited by Owner, its affiliates, licensees and agents before or during the "Production Period" (as such term is defined in Paragraph 5 below) as set forth in Exhibit "A" attached hereto and incorporated herein by reference.  In the event Purchaser wishes to use characters not set forth on Exhibit "A", Owner shall use reasonable good faith efforts to obtain the necessary clearances and other third party consents so that such other characters may be used by Purchaser upon the same terms as provided herein.

(ii)    The names, titles, characterizations, literary descriptions, artwork and three dimensional representations of all fictional locations, fictional vehicles and other conveyances and devices depicted, contained and/or relating to the "G.I. JOE" line of toys referred to in (a) above, as set forth in Exhibit "A".  In the event Purchaser wishes to use locations, fictional vehicles and other conveyances and devices not set forth on Exhibit "A", Owner shall use reasonable good faith efforts to obtain the necessary clearances and other third party consents so that such other locations, fictional vehicles and other conveyances and devices may be used by Purchaser upon the same terms as provided herein.

(iii)    Except for any elements originated in any animated series based on the Property, including, without limitation, the series produced by Gunther-Wahl, Sunbow and DIC, all literary, dramatic, photographic, artwork and physical replications, descriptions and other material relating to the foregoing, and the themes, plots, situations, sequences, pictorial action,

**Exhibit-8**

WB136190
CONFIDENTIAL

dialogue lines, sketches, figurines, models and replicas contained in such line of toys and related materials and any future versions or adaptations thereof to the extent Owner or an affiliate of Owner owns or controls such future versions or adaptations (Owner being obligated to advise Purchaser of any restrictions).

(b)    "Picture" means any live action feature-length theatrical motion picture produced hereunder, whether based on the Property or a prior Picture or any element thereof.  The first Picture is referred to as "Picture #1" and subsequent motion pictures are referred to as "Picture #2," "Picture #3," etc.

(c)    "New Character" means a character, vehicle or accessory created by or for Purchaser.

(d)    "Sequel" means any Picture produced after Picture #1 which contains:

(i)    one or more "G.I. JOE" characters, vehicles or accessories; and/or

(ii)    A "New Character" which makes use of an identifying characteristic of a "G.I. JOE" character, vehicle or accessory;

whether or not such Picture has a substantially different story than that contained in Picture #1.

3.    Rights Granted:  Without limiting the generality hereof, Owner hereby grants the following rights to Purchaser, solely and exclusively, but subject to Purchaser's exercise of the Option and Purchaser's payment of the sum due under subparagraph 9(a) and subject further to the other terms, conditions and limitations of this Agreement, including the restrictions on the grant of rights to Purchaser and the exclusions from the grant hereunder and from the Property of those items and properties as set forth in Exhibit "B" attached hereto and incorporated herein by reference:

(a)    The right, but only during the Production Period, to produce first class, live action, theatrical motion pictures based upon, incorporating and/or adapted from the Property and recorded originally in the English language. Notwithstanding the foregoing, any Picture produced hereunder may contain animated titles, animated effects and other incidental animation.

(b)    The right in perpetuity to distribute and exploit Pictures produced hereunder in any and all media (whether now known or hereafter devised), in any and all languages throughout the universe.

**Exhibit-8**

WB136191
CONFIDENTIAL

    (c)     Solely in connection with motion pictures based upon the Property produced hereunder and the advertising and exploitation thereof, the right to produce sound recordings of or based upon all or any part of the Property, including, without limitation, motion picture soundtrack albums; and the right in its sole discretion to synchronize original music (whether or not based upon the Property) with any Picture produced hereunder and to exploit such original music (whether or not in connection with motion pictures produced hereunder) in all media now known or hereafter devised, including, without limitation, motion picture soundtrack albums. Purchaser hereby grants to Owner at no cost, to the extent of Purchaser's rights in such music (Purchaser making no representation that it will be the exclusive owner thereof), a non-exclusive synchronization and master use license for any original music owned or controlled by Purchaser and used in any Picture (or soundtrack album therefor) to be used by Owner in connection with the advertising and/or promotion of Owner's (as opposed to Owner's licensees') line of products relating to the Property or in connection with Owner's merchandising rights in the Pictures set forth in subparagraph 4(b) below. (The parties acknowledge and agree that Owner does not generally control the right to use music from previous productions based on the Property and the rights to use such music are not included in the grant to Purchaser herein.)

    (d)     Solely in connection with Pictures based upon the Property produced hereunder and the advertising, publicity and exploitation thereof, the right to adapt, use, dramatize, arrange, change, vary, modify, alter, transpose and make musical or non-musical versions of the Property and any parts thereof; to add to, interpolate in and subtract or omit from the Property, characters, language, plot, theme, scenes, incidents, situations, action, titles, dialogue, songs, music and lyrics; to translate any of the foregoing into all languages; to include in Pictures, sound records and other items provided for in this Paragraph 3 such language, speech, songs, music, lyrics, dancing, choreography, sound effects, action, situations, scenes, plot, dialogue, incidents, characters, characterizations, and other material (whether or not based upon or taken from the Property) as Purchaser in its uncontrolled discretion may deem advisable, it being the intention hereof that, except as otherwise expressly stated herein, Purchaser shall have the exclusive, absolute and unlimited right to use the Property and each and every part thereof for live action, theatrical motion picture purposes and all other purposes granted hereunder in connection with such Pictures and the advertising and exploitation thereof as Purchaser in its uncontrolled discretion deems advisable, specifically including, without limitation, the right, subject to Paragraph 5 hereof, to produce live action, theatrical motion pictures which are remakes of or sequels to Pictures previously produced hereunder.  Owner waives the benefits of any provision of law known as "droit moral" or any similar laws, and agrees not to institute, support, maintain or authorize any action or lawsuit on the ground that any motion pictures or sound records, or other items produced hereunder in any way constitute any of Owner's droit moral or a defamation or mutilation of any part

**Exhibit-8**

WB13619247
CONFIDENTIAL

thereof, or (subject to Paragraph 8 below) contain unauthorized variations, alterations, modifications, changes or translations. Subject to subparagraphs 3(c), 4(b) and 4(e) hereof (and notwithstanding the expiration of the Production Period) and subject to all of the terms and conditions of this agreement, Owner shall not have any right, title or interest whatsoever in or to any plot, story, character, music, lyrics, dialogue, screenplay, logo or other material of any kind created by or for Purchaser in the exercise of its rights hereunder, or in or to any Picture produced hereunder.

(e)     Solely in connection with the advertising, publicity and exploitation of Pictures produced hereunder, the right to broadcast excerpts from the Property and all or any part of any motion picture or sound record produced hereunder by radio and television, or otherwise, whether by living actors, electrical transcription, film, tape or otherwise, in any language.

(f)     The right, solely for the purpose of advertising and promoting the Pictures produced hereunder, to produce and publish as serials or otherwise (with or without illustrations) stories, synopses, excerpts, summaries, fictionalizations and novelizations, not to exceed 7,500 words in length, of and from the Property; and, subject to all of the other terms and conditions of this agreement, the right to utilize drawings, pictorial actions or expressions and physical replications of any characters or other elements of the Property in connection with advertising, publicizing and exploiting Pictures produced hereunder.

(g)     Subject to Owner's consultation and approval rights hereunder, the right to write and prepare screenplays, teleplays, treatments, storyboards, plans specifications and designs for Pictures and sound records produced hereunder, and to cause musical compositions, including both original music and words and music utilizing or based upon or adapted from all or any part of the Property or any title or titles thereof (subject to subparagraph 3(c) above) to be written and composed and to include such musical compositions solely (except in the case of original music, which may be exploited by Purchaser in all media) in Pictures and sound records produced hereunder.

(h)     Subject to the terms and conditions of this agreement, including without limitation subparagraphs 4(b) and 4(e) hereof (and except for "G.I. JOE" characters, devices and accessories and New Characters), the right to copyright Pictures, sound records, musical compositions, screenplays, teleplays, and all other items created by or for Purchaser pursuant to this Paragraph 3, and to secure copyright and/or trademark registration and protection thereof in all countries and territories where such protection is available in Purchaser's own name, or otherwise, together with the right to manufacture copies thereof and to distribute, sell, lease, license, exhibit, transmit, broadcast, project, reproduce, publish, use, perform, advertise, publicize, market, exploit, turn to account and

**Exhibit-8**

WB136193 48
CONFIDENTIAL

derive revenue in any form or manner therefrom without any territorial restriction whatsoever by any and all media, methods, systems and processes now or hereafter known, invented, used or contemplated, and the right to import or export such copies into or out of any territory without restrictions. It is further expressly understood and agreed that Pictures, sound records and all other items produced hereunder shall constitute independent derivative works, and Purchaser and its successors, permitted assigns and licensees shall have the perpetual right to exercise the rights granted in this subparagraph (h) with respect to Pictures produced hereunder irrespective of the expiration, termination, transfer or renewal of any copyright owned or controlled by Owner or any assigns of Owner or the reversion of any rights in the Property to Owner hereunder; provided, however, that if the Property reverts to Owner pursuant to Paragraph 5 hereof, Purchaser shall have no right to exploit any material produced or created by it hereunder which is in any manner identifiable with the Property.

(i)     The right to use the title, titles, names and/or logo (subject to Paragraph 10 hereof) by which the Property and the elements of the Property are now known or identified or hereafter may be known or identified as the title or titles and/or log of live action, Pictures produced hereunder based upon or adapted from the Property and the right to exploit and exhibit any such motion pictures produced hereunder under any other title or titles and/or log (subject to subparagraph 8(f) and Paragraph 10 hereof) that Purchaser may deem proper in its uncontrolled discretion.

Except as otherwise set forth in this Agreement, including subparagraph (a) above, all rights granted pursuant to this Paragraph 3 are in perpetuity. Subject to the terms and conditions of this Agreement, Purchaser shall have for use in connection with Pictures, all rights herein granted to it in all existing and future characters, devices, versions, translations, dramatizations, arrangements, revisions, continuations, supplements and reissues of the Property designed, manufactured, developed, written or published with the authority of Owner and owned or controlled by Owner or its parents, subsidiaries or affiliates, and their respective successors and assigns, as well as all prior material and other works owned or controlled by Owner upon which the Property is based and from which the Property is adapted. All rights granted Purchaser under this Agreement shall be cumulative, and Purchaser may exercise or refrain from exercising any one or more of said rights separately or simultaneously or in connection with any other rights granted to Purchaser hereby or obtained by Purchaser from other sources, and regardless of whether said rights are granted in the disjunctive or conjunctive. Notwithstanding anything to the contrary herein, Purchaser agrees that the initial exploitation of any Picture produced by it hereunder shall be as a live action, theatrical motion picture.

4.     Reservation of Rights: All rights in the Property not specifically granted to Purchaser herein, including, without limitation, the following rights, are reserved to Owner

**Exhibit-8**

WB1361949
CONFIDENTIAL

for Owner's use and disposition, subject, however, to the other provisions of this Agreement:

(a)    Subject to the exceptions set forth in Paragraphs 3 and 7 hereof, all rights to publish the Property and any Pictures produced hereunder as follows: (i) the right to publish print editions of the Property and/or the Picture(s) in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise; (ii) the right to publish recorded readings by a single narrator of the text of published print editions of the Property and/or the Picture(s) in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of published print editions of the Property and/or the Picture(s) in the form of CD-Rom, videocassette tape or similar electronically-read devices individually purchased by the end-user. Such electronically-read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property and/or Picture(s) but may not contain audio tracks of any kind.

(b)    All merchandising rights.  The term "merchandising rights" shall mean the exclusive right to produce, sell and license, or grant others the exclusive right to produce, sell and license, or enter into any agreements with respect to the manufacturing privileges under which a commodity, product or service is manufactured or distributed under the name of or using a representation of "G.I. Joe" or any other character or thing included in the Property or under the name of or using a representation thereof, including but not limited to accessories, mailing pieces, toys, games, figurines, video games or other items or devices.  Included in merchandising rights shall be the exclusive right in Owner to use and/or license merchandisers of products and services to reproduce and/or use any New Character.  Owner shall consult in good faith with Purchaser regarding any merchandising arrangements relating to New Characters, but Owner's decision shall be final.  Owner agrees to advise Purchaser from time to time of the kind and nature of licensed products which have been licensed for production in the exercise by Owner of its merchandising rights hereunder.  Further, upon Purchaser's request, Owner agrees to ask that its licensing agent meet with Purchaser to discuss such ideas as Purchaser may have for the exercise of merchandising rights hereunder.  Any and all revenues from any such merchandising shall belong solely to Owner;  Owner shall be free to exploit such New Characters without any obligation of any kind to Purchaser except with respect to Purchaser's consultation rights as set forth in this subparagraph (b).  In addition thereto, any New Character shall be copyrighted in Owner's name. However, Purchaser shall have the right to use New Characters in Pictures produced hereunder.  In the event that Owner wishes to produce, or license the right to produce, a video game based upon any Picture hereunder, Purchaser agrees to license to Owner a reasonable amount of footage from the applicable Picture at no charge to Owner.

**Exhibit-8**

WB136195
CONFIDENTIAL

Notwithstanding the foregoing, Owner's merchandising rights hereunder shall be subject to all applicable third party approvals and all applicable third party royalties which are incorporated in any contracts negotiated by Purchaser in connection with any Picture hereunder; provided, however, that Purchaser shall not provide any third party with a merchandising royalty other than in connection with the use of a performer's likeness in Purchaser's standard 5%-2½% royalty (with Owner entitled to the 50% distribution fee) unless a higher royalty is approved in advance by Owner or if Owner separately negotiates a higher royalty for a third party and then requests that Purchaser include such higher royalty in the applicable contract; and further provided that Owner shall have no obligation to use any performer's likeness.

(c)     All animated television rights in and to the Property.

(d)     All live action television rights in and to the Property; provided, however, that if Owner desires to produce, or grant to third parties the right to produce, live action television motion pictures or live action episodic television shows based on the Property or based on any Hasbro New Character, Owner shall accord Purchaser a right of First Negotiation/First Refusal upon the same terms and conditions as set forth in Paragraph 6 below.

(e)     The right to produce and distribute theatrical feature-length animated motion pictures based upon the Property; provided, however, that subject to Owner's licensee's right to continue to exploit "G.I. Joe - The Movie," an existing animated feature-length motion picture, Owner shall not exercise or authorize any other person to exercise the right of production and distribution of animated feature-length theatrical motion pictures prior to the end of the Production Period.

(f)     Subject to all of the rights and licenses granted to Purchaser hereunder, Owner shall retain ownership of and shall be entitled to copyright and trademark in its name or the name of its designee all characters, vehicles, accessories, logos and designs which are presently a part of the Property or are hereafter created by or acquired by Owner in connection with the Property, or are created by Purchaser but are New Characters, and Owner shall be entitled to depict and use all such characters, vehicles, accessories, logos and designs in any of its animated productions based upon the Property and the advertising and exploitation thereof and to use the same for any other purpose not expressly prohibited under this Agreement.

(g)     The parties acknowledge and agree that the property entitled "Action Man" is a separate property from the property entitled "G.I. Joe". Owner shall retain sole and exclusive ownership and all right, title and interest in and to the trademark and property "Action Man", and Owner's rights to exploit "Action Man"

**Exhibit-8**

WB136196
CONFIDENTIAL
51

shall not be restricted in any way by the terms of this Agreement, and Purchaser acknowledges that no rights in and to the "Action Man" property are being optioned, licensed or otherwise transferred to Purchaser pursuant to this Agreement.

5.    Production Period:  Purchaser shall not commence principal photography of any Picture hereunder after expiration of the Production Period.  The Production Period shall commence on the exercise of Purchaser's Option hereunder and shall continue thereafter until such time as any of the following shall occur:

(a)    Commencement of principal photography of Picture #1 has not commenced within three (3) years from execution of this Agreement; provided, however, that if Purchaser has engaged the principal cast member of Picture #1 on a "pay-or-play" basis, said three (3) year period shall be extended for a maximum period of twelve (12) additional months so that Purchaser may set a start date which would permit said principal cast member to render services for Picture #1; or

(b)    Four (4) years shall have passed from the date of initial general theatrical release of any Picture in the Domestic Territory and Purchaser shall not have commenced principal photography of the next Picture; provided, however, that if Purchaser has engaged the principal cast member of the next Picture, said four (4) period shall be extended for a maximum period of twelve (12) additional months so that Purchaser may set a start date which would permit said principal cast member to render services for the applicable Picture; or

(c)    Purchaser shall not have initially generally theatrically released any Picture in the Domestic Territory within twenty-four (24) months after commencement of principal photography thereof.

"Domestic Territory" as used in this Paragraph 5 and in Paragraph 6 below, shall mean the Continental United States of America.

Purchaser shall advise Owner in writing of the date of commencement of principal photography of any Picture hereunder immediately following such commencement, and shall advise Owner in writing of the date of the initial general domestic theatrical release of each such Picture immediately following such release.  However, Purchaser's inadvertent failure to do so shall not be a breach hereof.  If the Production Period shall expire, all rights granted Purchaser revert to Owner except that:  Purchaser shall continue to have in perpetuity with respect to all existing Pictures all of the exploitation rights set forth in subparagraphs 3(b) through (i); and Purchaser shall retain all rights in New Characters to the extent set forth in this Agreement without any restriction relating to the Production Period.

**Exhibit-8**

WB136197_2
CONFIDENTIAL

6.    <u>First Negotiation; First Refusal</u>:  If the Production Period shall expire but
Purchaser shall have completed and generally released Picture #1 for theatrical exhibition
in the Domestic Territory, and if Owner shall thereafter desire to produce or grant to third
parties the right to produce live action feature-length theatrical motion picture and/or
feature-length animated theatrical motion pictures based on the Property or utilizing in
any such motion picture any New Character (the "Rights"), Owner shall do so only in
accordance with the following procedure:

(a)    At such time as Owner elects to exercise or dispose of any of such
Rights, Owner shall offer in writing to negotiate in good faith with Purchaser
regarding such Rights prior to any exercise of such Rights itself and prior to
negotiating with any third party.  If Purchaser gives written notice that Purchaser
does not wish to negotiate or if such good faith negotiations do not result in a
written agreement between Purchaser and Owner within a period of thirty (30)
calendar days from Purchaser's receipt of Owner's written offer to negotiate, then
Owner may exercise such Rights itself or may negotiate elsewhere for the
disposition of such Rights, subject to (b) and (c) below.

(b)    If Owner proposes to accept an offer in respect of the Rights which
incorporates a material term which is less favorable to Owner (whether or not such
offer in its entirety is less favorable to Owner) than Owner's last proposal to
Purchaser, then Owner shall give Purchaser written notice of such offer specifying
the particulars thereof, including the name of the Offeror, and Purchaser shall have
a period of seven (7) business days from receipt of such notice within which to
meet said offer; provided, however, that Purchaser shall not be required to meet
any terms which cannot be met as easily by one party as another.  Purchaser's
right to meet said offer shall be exercised by Purchaser, if at all, by giving Owner
written notice of Purchaser's election to do so within the aforesaid seven (7)
business day period.  In the event Purchaser exercises its right to meet such offer,
then Purchaser and Owner shall promptly execute an agreement conveying to
Purchaser the rights involved upon the terms and conditions of said offer.

(c)    In the event Purchaser does not acquire such Rights in accordance
with the provisions of (b) above, then Owner shall have the right to sell or
otherwise dispose of such Rights but only to the Offeror and upon the terms and
conditions specified in such notice; otherwise the provisions of (b) above shall
apply again.  If Owner enters into a written agreement with a third party whereby
such third party acquires the theatrical motion picture rights, either live and/or
animated, in and to the Property and/or the right to produce or cause the
production of live action theatrical motion pictures and/or feature-length animated
theatrical motion pictures based on the Property and/or the right to use a Hasbro
New Character in any motion picture, then Purchaser's rights under this Paragraph
6 shall terminate.

**Exhibit-8**

WB136198
CONFIDENTIAL

7.     Product Placement; Tie-ins:

(a)     All decisions, arrangements and agreements with respect to so-called "product placement" in connection with Pictures produced hereunder shall be at the sole discretion of Purchaser, subject only to good faith consultation with Owner; provided, however, that Purchaser agrees that no products which are directly competitive with the Property or with any product manufactured, distributed and/or sold by Owner, Milton Bradley, Playskool and/or Playskool Baby subsidiaries shall be placed in the Picture and that no product placement arrangements shall be made with competitors of those persons or entities with which Owner already has ongoing product placement, premium or similar arrangements ("Owner Licensees") unless the Owner Licensees are unwilling or unable to enter into a product placement arrangement with Purchaser on reasonable and customary terms.  Any and all revenues derived from any such product placement shall belong solely to Purchaser.

(b)     All decisions, arrangements and agreements relating to so-called premiums and commercial tie-ins in connection with any Picture produced hereunder shall be subject to the mutual approval of Owner and Purchaser. Revenues derived from any premium or tie-in arrangement shall be divided 50/50 between Owner and Purchaser without any deductions or offsets from the gross amount of such revenues.

8.     Standards; Consultations:  The following requirements and procedures apply to Picture #1 and any Sequels:

(a)     No Picture, or any advertising or publicity therefor, shall depict the Property in a manner substantially different from the way it is generally depicted by Owner.  The various characters, relationships to other characters, their reaction to any given set of circumstances, and their behavior and language shall in general be consistent with that of the Property.  Any new or additional character or element introduced in the Pictures which is not contained in the Property will, in general, be consistent with the nature, subject matter, quality and standards of the Property.

(b)     No Picture produced and released hereunder shall have a rating issued by the Motion Picture Rating Administration of the Motion Picture Association of America, Inc. which is more restrictive than a "PG-13" rating without the prior written consent of Owner.

(c)     All Pictures shall be consistent with the following:

(i)     All characters shall be heterosexual;

**Exhibit-8**

WB136199    54
CONFIDENTIAL

(ii)    There shall be no war or other conflict utilizing nuclear weapons of any type;

(iii)    No war or conflict against a real country will be depicted; provided, however, that Owner agrees that new and imaginary fictional countries and/or villains may be created and depicted, but no such fictional country shall be given characteristics which suggest that a real country is being referred to;

(iv)    No "G.I. Joe" characters shall be depicted smoking or drinking alcoholic beverages;

(v)    No "G.I. Joe" characters shall be depicted engaging in sexual intercourse;

(vi)    At least some of the then existing characters and vehicles from the Property shall be depicted in Picture #1.

(d)    Purchaser shall consult in good faith with Owner with respect to the actors to be hired to portray the lead roles in each Picture and with respect to the director for each Picture. Each lead actor for a Picture shall be credible to the public in his or her role. Purchaser acknowledges that it has entered into a Producer Loanout Agreement with Larry Kasanoff in connection the first theatrical motion picture project based upon the Property. Purchaser acknowledges that it has agreed to consult with Larry Kasanoff as to the selection of the writer for such screenplay.

(dd)    Purchaser agrees to consult with Owner regarding any names chosen by Purchaser for the characters, vehicles or devices if such name does not appear on Exhibit "A", or is not supplied by Owner pursuant to Paragraph 2(a)(i) or 2(a)(ii) above. If Owner notifies Purchaser that the selection of any such name in Owner's good faith business judgment is likely to violate the trademark rights of a third party with respect to one or more of Owner's product categories, Purchaser agrees to select a substitute name for any such conflicting name and to resubmit such substitute name to Owner for consultation as set forth in this paragraph. Owner agrees that it must notify Purchaser of any such conflict within ten (10) business days (reducible to 5 in the event of production emergencies) from Owner's or Owner's representatives' receipt of Purchaser's request therefor or such name shall be deemed approved.

(e)    Purchaser may, but shall not be obligated to, commission a treatment for a particular Picture hereunder prior to commissioning a screenplay. If Purchaser does commission a treatment prior to the writing of a screenplay, Purchaser shall furnish Owner with such treatment and such treatment shall be

**Exhibit-8**

WB136200
CONFIDENTIAL55

subject to Owner's written approval, not to be unreasonably withheld. Disapproval of the treatment on any of the following grounds shall not be deemed unreasonable:

      (i)     Countries or villains described in the treatment are identifiable as actual existing countries, persons or organizations;

      (ii)     The number of characters and vehicles taken from the Property (as opposed to newly created characters and vehicles) is insufficient;

      (iii)     Excessive violence or foul language.

Owner's said approval rights shall be exercised in good faith and shall be deemed given if no written notice of disapproval is received by Purchaser within thirty (30) calendar days of receipt by Owner of said treatment. In the event Owner disapproves the treatment in writing within said thirty (30) calendar-day period, Owner shall in its notice expressing disapproval give specific reasons for such disapproval with Owner's detailed suggested changes, referring to specific scenes, language and characterizations for such treatment to meet Owner's approval.

Purchaser shall then revise the treatment, giving good faith consideration to Owner's requested changes, and shall submit such revised treatment to Owner for its approval, again not to be unreasonably withheld and to be exercised in good faith. The procedure for approval and/or disapproval outlined above shall apply to the revised treatment and shall continue to apply until Owner has approved a revised treatment submitted to it by Purchaser.

The procedure set forth for treatment approval in this subparagraph 8(e) shall apply to any Sequels produced hereunder. The script for the applicable Picture, and the Picture itself, will be consistent in all material respects with the approved treatment therefor.

Whether or not Purchaser has first commissioned a treatment for a particular Picture hereunder, Purchaser shall submit to Owner, prior to commencement of principal photography, the proposed screenplay for such Picture, which screenplay shall be subject to Owner's written approval, not to be unreasonably withheld. The procedure for approval of such screenplay shall be the same as outlined above for treatment approval; provided, however, that if Purchaser complies with the changes in the screenplay requested by Owner and Owner thereafter disapproves such screenplay, Owner's disapproval shall automatically be deemed unreasonable. Each Picture will be photographed and recorded in a manner consistent with the screenplay approved or deemed approved by Owner.

**Exhibit-8**

WB136201
CONFIDENTIAL

Notwithstanding anything to the contrary contained herein, so long as Purchaser has complied with the provisions of this subparagraph 8(e), Owner may not exercise its approval right over the screenplay of any Picture hereunder in a manner which frustrates the production of such Picture.

(f)    The title of all Pictures produced hereunder will contain the phrase "G.I. Joe," either in the main title or as a subtitle (but appearing in the main titles of the picture) in Purchaser's sole discretion. If "G.I. Joe" appears as a subtitle, it shall be no less than 50% of the size of the main title.

(g)    The parties acknowledge that vehicles are integral to the "G.I. Joe" property and that it is Purchaser's intent that unique vehicles with unusual characteristics will be featured prominently in the Picture including, without limitation, in action sequences. Purchaser will consult fully and meaningfully with Owner with regard to the design of said vehicles and at Purchaser's request, Owner will provide at least two proposed designs for each vehicle.

9.    Consideration: Purchaser agrees to pay, and Owner agrees to accept, as full consideration for all rights granted herein and for Owner's warranties and agreements herein contained, the following:

(a)    The sum of Five Hundred Thousand Dollars ($500,000) (the "Purchase Price"), (less the amount paid to Purchaser for the Initial Option Period pursuant to Paragraph 1 hereof), payable upon exercise of the Option.

(b)    For each Picture subsequent to Picture #1 including Spinoffs, Purchaser shall pay Owner the sum of Five hundred Thousand Dollars ($500,000) upon the commencement of principal photography of the applicable Picture.

In the event Purchaser shall fail to make payments under subparagraph 9(b) within the time and in the manner hereinabove set forth, Owner acknowledges and agrees that Owner's sole remedy shall be an action at law to recover such payments, and in no event shall any of said rights revert to Owner, nor shall Owner have or be deemed to have any lien, charge or other encumbrance upon said rights to secure payment of said sums; provided, however, that if Purchaser fails to timely make the payment required under subparagraph 9(a) hereof, Owner shall be entitled to seek equitable relief.

10.    Credits, Trademark, Title:

(a)    Subject to Owner's reasonable prior written approval, Purchaser shall have the right to publish, advertise, announce and use in any manner or medium the name of Owner in connection with any exercise by Purchaser of its rights hereunder; provided, however, that Purchaser may not use Owner's name in commercial tie-ins without Owner's prior written consent which Owner may

**Exhibit-8**

WB136202
CONFIDENTIAL57

withhold in its sole discretion.  If Owner does not disapprove any such request within ten (10) business days following submission thereof to Owner by Purchaser, Owner shall be deemed to have approved same.  Owner shall (subject to the provisions of the applicable Writers Guild of America Basic Agreement) receive credit on all positive prints and tapes of each Picture, in the end titles on a separate card, in a size of type no less than that accorded other technical credits and in a position no later than the last separate card on which a single credit appears, substantially as follows: "Based in part on Hasbro's characters."  In addition, if one or more of Owner's employees or representatives render services as consultants on a Picture, they shall be accorded an appropriate consultation credit in the end titles of said Picture, the size, position and manner of such credit to be in Purchaser's discretion.

(b)    Purchaser agrees to affix or cause to be affixed a copyright notice and/or trademark notice, as applicable, in form to be designated by Owner, designating Owner as the copyright and trademark owner and proprietor thereof on any graphic or pictorial representation of any character, device or log contained in the Property or to be contained in the Property, when and if any of the foregoing is depicted by Purchaser in any advertising, promotion and other materials relating to any Picture produced hereunder.  With respect to each Picture produced hereunder, Purchaser shall furnish Owner with a copy of the final main and end title screen credits schedule and the final advertising billing schedule prepared by Purchaser when the same are distributed to Purchaser's departmental personnel, but in no event later than five (5) days prior to the delivery of any answer print of any Picture or publication of any advertisement, as the case may be, in order that Owner may insure that Purchaser has complied with the provisions of subparagraphs (a) and (b) hereof.  If Owner does not notify Purchaser within three (3) business days after receipt thereof of any errors therein, then Owner shall be deemed to have approved said matters.

(c)    No casual or inadvertent failure to comply with credit, copyright or trademark requirements hereunder shall be deemed a breach of this Agreement, and the sole remedy for breach of any of the foregoing provisions of this Paragraph 10 shall be an action at law for damages, it being agreed that in no event shall owner seek or be entitled to injunctive or other equitable relief on account of any breach of any of the billing requirements hereof; provided, however, that Owner shall be entitled to seek equitable relief if there is a material failure by Purchaser to comply with the copyright or trademark requirements hereunder; and provided further that upon any notice by Owner to Purchaser of any inadvertent failure by Purchaser to comply with the provisions of this Paragraph 10, Purchaser shall promptly prospectively cure any such failure.

(d)    Purchaser acknowledges that "G.I. Joe" is a registered trademark of Owner in the United States and certain other territories, and that any and all use of

**Exhibit-8**

WB1362035**8**
CONFIDENTIAL

such trademark shall inure solely to the benefit of Owner and shall create no right, title or interest therein or thereto in Purchaser.

(e)    (i)    Subject to subparagraph 10(e)(ii) below, Purchaser may create and use a new logo in connection with any Picture produced hereunder and all advertising and publicity in connection therewith so long as Purchaser uses such logo in a manner consistent with the protection of Owner's logo under applicable trademark laws.  Any such new logo shall be trademarked in Owner's name and may be used by Owner and its licensees at no cost solely in connection with Owner's advertising and exploitation of the Property so long as such use is in a manner consistent with the protection of Owner's logo under applicable trademark laws.

(ii)    Any logo created hereunder by Purchaser shall be subject to the approval of Owner, but Owner shall not disapprove any such logo created by Purchaser unless Owner reasonably believes that the use of such logo will impair Owner's trademark rights with respect to any existing logo of Owner.  Notwithstanding the foregoing, if any Picture produced hereunder and/or the advertising and publicity therefor has an artwork title which is composed of more than just the phrase "G.I. Joe," but which contains the phrase "G.I. Joe" in a manner and style of print which is the same as the manner and style of print of the rest of such artwork title, then the use of the phrase "G.I. Joe" in such artwork title shall not be considered a logo and shall not be subject to Owner's approval.  Any such artwork shall belong to and be copyrighted in the name of Purchaser, but Purchaser acknowledges that Owner remains the sole and exclusive owner and proprietor of the name "G.I. Joe" and all logos, artwork, vehicles and accessories relating thereto.

(f)    Notwithstanding anything contained in this Paragraph 10, Owner acknowledges that Purchaser shall have the right to use the name "G.I. Joe" in connection with any Picture and the advertising and publicity therefor, so long as Purchaser shall have the right under this Agreement to produce and/or distribute any such Picture produced hereunder.

11.    Owner's Warranties and Indemnities:  Owner hereby represents and warrants that:

(a)    It is the sole owner of or exclusively controls all rights herein granted; it has full power and authority to enter into and perform this Agreement; the Property does not constitute a libel or defamation of and does not infringe upon the copyright, right of privacy or any other right of any person or entity; the Property is copyrighted in the United States of America and to the best of its knowledge in all countries which are signatories to the Universal Copyright Convention; it knows of

Exhibit-8
WB136204
CONFIDENTIAL59

no claims made against it which if true would adversely affect its rights in and to the Property or the rights granted to Purchaser under this Agreement; and the names of the characters, devices and other elements contained in the Property and the title of the Property may be used by Purchaser in the exercise of all or any of its rights hereunder.

(b)    Owner has not heretofore assigned or encumbered any of the rights granted hereunder, or if Owner has so assigned or encumbered such rights, such assignment or encumbrance shall be terminated, relinquished or satisfied prior to the execution hereof and shall have no adverse effect on the rights granted hereunder.

(c)    Neither the Property nor any element thereof or the exercise by Purchaser pursuant to this Agreement of any of the rights granted to it herein will violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, right of privacy or any other right of any person or constitute a libel or slander of any person.

(d)    "G.I. Joe" is a registered trademark of Owner in the United States and certain other territories. Owner shall at its own expense take any and all action reasonably necessary to maintain the continued existence and legal validity of the "G.I. Joe" trademark, including the registrations and pending applications set forth on Exhibit "C", attached hereto and incorporated herein by reference, and any new logo created by Purchaser and trademarked in the name of Owner (the parties acknowledging that Owner's obligation to register such marks is limited to Owner's product categories and Owner is not hereby agreeing to pay for registrations required solely by Purchaser). Owner represents and warrants that to the best of Owner's knowledge (including that which Owner should have known in the exercise of reasonable prudence) there are no adverse claims as of the date hereof that might jeopardize Purchaser's right to use such trademarks as are licensed hereunder. Owner shall notify Purchaser promptly in writing of any adverse claims which arise after the date hereof and agrees that it shall, at its own expense, take all steps necessary in its good faith judgment to enforce its rights in and to the trademarks of the Property and the New Characters and defend and/or prosecute any and all third party claims adverse thereto and conflicting with the rights granted to Purchaser hereunder. Notwithstanding anything contained in this Agreement to the contrary including this Paragraph 11, Owner makes no representations or warranties with respect to New Characters, and any trademarks relating thereto.

Owner will defend, indemnify, make good, save and hold harmless Purchaser, its successors and assigns, from and against any damages, costs, charges, reasonable attorneys' fees, recoveries, judgments, penalties and expense whatsoever which may be obtained against, imposed upon or suffered by Purchaser, its successors and assigns, by

**Exhibit-8**

**WB136205**
**CONFIDENTIAL** 60

reason of the breach of any warranty, covenant, agreement or representation herein made by Owner.

11A.    Purchaser's Warranties:  Purchaser has full power and authority to enter into and perform this Agreement and has taken all corporate and other action necessary to do so.  Material contained in any Picture which is not in the Property or material which is added to the Property including New Characters does not and will not constitute a libel or defamation of and does not infringe upon the copyright, right or privacy or any other right of any person or entity; the aforementioned material will not violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, or any other right of any person or entity.

12.    Purchaser's Indemnities:  Purchaser will defend, indemnify, make good, save and hold harmless Owner, its successors and assigns, from and against any damages, costs, charges, reasonable attorneys' fees, recoveries, judgments, penalties and expenses whatsoever which may be obtained against, imposed upon or suffered by Owner, its successors and assigns, by reason of the breach of any warranty, covenant, agreement or representation herein made by Purchaser, or by reason of incorporation of any material including New Characters into any Picture produced hereunder other than material taken from the Property.

13.    Copyright:  Purchaser shall affix or cause to be affixed an appropriate copyright notice in the name of Purchaser on each of the Pictures produced hereunder in order to afford copyright protection for said Pictures and the Property in the United States of America and in all countries of the world which are member of the Universal Copyright Convention or any other copyright convention.  Purchaser shall cause each Picture to be registered for copyright in the U.S. Copyright Office.

Owner will, at the request of Purchaser, execute and deliver, or procure the execution and delivery of, any and all documents consistent herewith which are reasonably necessary or proper to license to Purchaser the rights herein licensed, and Owner agrees to execute and procure any other and further instruments consistent herewith which are necessary to grant, confirm and license the rights in the Property herein licensed to Purchaser in any country throughout the world.  If it shall be necessary by the laws of any country that copyright registration for any Picture produced hereunder or any version or adaptation thereof be made in the name of Owner, Purchaser is hereby authorized by Owner to apply for said copyright registration in the name of Owner and in such event, Owner shall and does hereby grant the same to Purchaser.  Owner further agrees, upon request, duly to execute, acknowledge, procure and deliver to Purchaser short form instruments consistent herewith for the purpose of recording in the United States and elsewhere.  Owner shall execute separate short-form assignments for each Picture.  Purchaser shall hold the executed short-form assignments in trust and shall not record such instrument with respect to Picture #1 unless and until Purchaser exercises its Option hereunder, and with respect to subsequent Pictures Purchaser shall record an

**Exhibit-8**

WB136206
CONFIDENTIAL

assignment only upon commencement of principal photography of the applicable Picture. If the Option lapses, Purchaser shall, upon request, return all signed copies of the assignments.

If the Owner shall undertake legal action to protect the rights, licenses and privileges hereby granted to Purchaser or for the recovery of damages and penalties for any infringement of such rights, licenses and privileges, Purchaser may join in any such action or proceeding at its own cost and expense. If Owner fails to prosecute or defend as aforesaid (Owner having no obligation to do so), Purchaser is hereby authorized to do so, and insofar as may be necessary, shall have the right to use the name of Owner for or in connection with such purpose; and Owner shall, in any such proceedings, afford Purchaser all reasonable assistance in proving and defending the rights, licenses and privileges held by Purchaser under this Agreement. Owner and Purchaser hereby agree to hold each other harmless from and against any costs, expenses or liability (including reasonable outside attorneys' fees and disbursements) incurred by either as a result of any action or proceeding instituted by the other pursuant to this Paragraph, unless and to the extent arising out of a matter which constitutes a breach of the applicable party's representations and warranties.

14.    Force Majeure:  In the event that the preparation, commencement, production or completion of any of the Pictures hereunder is prevented, delayed, or interrupted by reason of any act or occurrence beyond the control of Purchaser, including without limitation by reason of any fire, flood, earthquake, explosion, epidemic, casualty, accident, war, civil disturbance, statutory enactment or order, local or national government decree, pestilence, national calamity, act of God, lockout, strike, labor disturbance or conditions, inability to obtain essential materials, power or transportation, or delay of a common carrier, or death, illness or incapacity of the director or principal member of the cast of each and any of the Pictures, Purchaser shall, by written notice given to Owner during the continuance of such prevention, delay or interruption, be entitled to suspend the term of this Agreement, including, without limitation, the Option Period (if the force majeure event affects development of Picture #1) and all dates otherwise applicable in the determination of the Production Period, but in any event, with respect to each Picture hereunder, no suspension (except with respect to subparagraph 5(a) as to which there shall be no time limit on the suspension) shall continue for a period of more than three months.

15.    Assignment:  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, heirs, administrators, successors and permitted assigns. Without the prior written approval of Purchaser, not to be unreasonably withheld, Owner may not assign its rights hereunder to any party other than a parent or subsidiary or affiliate or any entity into which Owner may merge or which acquires all or substantially all of its assets, which shall not require Purchaser's approval. Owner may also assign all or any part of the consideration it receives hereunder. Purchaser may not assign, transfer, license, delegate and/or grant any or all of its rights,

**Exhibit-8**

WB136207
CONFIDENTIAL    **62**

obligations, privileges and property hereunder to any person or entity other than (i) in connection with any tax or other financing arrangements if Purchaser is still involved as the major distributor of the applicable Picture(s), and/or (ii) to any subsidiary or affiliate or any entity into which Purchaser may merge or which may acquire all or substantially all of its assets, without the prior written approval of Owner not to be unreasonably withheld. Any such assignment, delegation and/or grant by Purchaser shall be subject to all of the terms and conditions of this Agreement and Purchaser shall continue to remain liable for all of its obligations under this Agreement.

16.    Miscellaneous:  This instrument and instruments executed pursuant hereto includes the entire understanding between the parties and replaces all former agreements and representations with respect to the subject matter hereof.  No modification, alteration or amendment of this Agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification, alteration or amendment.  No officer, employee or representative of Purchaser or Owner has any authority to make any representation or promise not contained in this Agreement, and Owner and Purchaser acknowledge that neither Owner nor Purchaser has executed this Agreement in reliance on any such promise or representation not expressly set forth in this Agreement.

No waiver by either party of any breach hereof shall be deemed a waiver of any preceding or succeeding breach hereof.  Neither Purchaser nor Owner shall be liable for any breach of this Agreement unless it shall have received written notice from the other of such breach and shall not, within a reasonable time after receipt of such notice, have cured such breach.

Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other.  Neither party shall hold itself out contrary to the terms of this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any third party, whether referred to herein or not.

Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order, or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this Agreement shall be affected thereby and such other provisions shall continue in full force and effect. .

17.    Notices:  All notices which either party hereto is required or may desire to give to the other shall be given by addressing the same to the other at the address

**Exhibit-8**

WB136208
CONFIDENTIAL

hereinafter in this paragraph set forth or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph.  All such notices shall be sufficiently given when the same shall be received in the U.S. mail, personally delivered, telexed, telecopied and/or when the same shall have been delivered, so addressed, to a telegraph or cable company, toll prepaid.  The addresses to which any such notices, accountings or statements shall be given are the following:

To Purchaser:       Warner Bros., a division of
                    Time Warner Entertainment Company, L.P.
                    4000 Warner Boulevard
                    Burbank, CA 91522
                    Attn:  Business and Legal Affairs Dept.

To Owner:           Hasbro, Inc.
                    1027 Newport Avenue
                    Pawtucket, Rhode Island   02862
                    Attn: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS., a division of Time
Warner Entertainment Company, L.P.

By:    /S/  Pamela Kirsh
   Its: Vice President

HASBRO, INC.

By:    /S/  Harold P. Gordon
   Its:

HASBRO INTERNATIONAL, INC.

By:    /S/   Harold P. Gordon
   Its:

**Exhibit-8**

WB136209
CONFIDENTIAL
64

"G.I. JOE"

OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 18, 1998 and continuing for a period of 18 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Effective Execution Date of the Option Purchase Agreement:  April 8   , 1999 (i.e., six weeks prior to Purchaser's actual receipt).

HASBRO, INC.


By:   /S/   Harold P. Gordon
     Its:

HASBRO INTERNATIONAL, INC.


By:   /S/   Harold P. Gordon
     Its:

**Exhibit-8**

WB136210
**CONFIDENTIAL**

## ALL-PURPOSE ACKNOWLEDGMENT

State of _____ )
                              )
County of _____ )


On _____ before me, _____,
personally appeared

_____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.


___/S/   Sandra Marks_____
Signature of Notary


**Exhibit-8**

WB136211
CONFIDENTIAL

"G.I. JOE"

## ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement.  The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of _____, effective on _____, the date of exercise of the option.

HASBRO, INC.


By:  __/S/   Harold P. Gordon_____
  Its:

HASBRO INTERNATIONAL, INC.


By:  __/S/   Harold P. Gordon_____
  Its:

**Exhibit-8**

WB1362157
CONFIDENTIAL

ALL-PURPOSE ACKNOWLEDGMENT

State of _____)
                            )
County of _____)


On _____ before me, _____, personally appeared _____

_____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.


    /S/   Sandra Marks_____
Signature of Notary


**Exhibit-8**

WB136213
CONFIDENTIAL
68

EXHIBIT "B"
EXCLUDED RIGHTS


Notwithstanding anything to the contrary in the Agreement to which this Exhibit "B" is attached and incorporated, the following items are excluded from the Property and the rights granted pursuant to the Agreement:

1.    TRADEMARKS AND COPYRIGHTS

The Fridge
Fridge Fever
The Refrigerator
William Perry
Slaughter
Sgt. Slaughter
Slaughter's Marauder Vehicle
Slaughter's Marauders


2.    EXISTING OR COMMITTED PRODUCTIONS

G.I. Joe – The Movie (animated feature-length movie)
G.I. Joe – A Real American Hero (95 commercial half-hour animated episodes including live-action wraparounds; produced by Sunbow Productions, Inc.)
G.I. Joe – Extreme (13 commercial half-hour episodes (?) produced by Sunbow Productions, Inc.)
G.I. Joe – Extreme (13 commercial half-hour episodes (?) produced by Gunther-Wahl Productions, Inc.)
G.I. Joe – Animated programs (44 commercial half-hour episodes; produced by DIC Animation City, Inc.)
The above may be utilized by Owner, Owner's distributors and Owner and its distributors' licensees anywhere, without restrictions of any kind.


3.    LITERARY AND DRAMATIC MATERIAL

The literary or dramatic material or other characters or elements originated in any of the productions referred to in Paragraph 2 above or originated in any other animation television program or animated theatrical motion picture, and also any literary or dramatic material or other characters or elements originated in any comic books or strips (e.g., the Marvel Comics comic book series) or originated in other literary embodiments.


**Exhibit-8**

WB136214
CONFIDENTIAL 09

To Owner:    Hasbro, Inc.
             1027 Newport Avenue
             Pawtucket, Rhode Island   02862
             Attn: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS., a division of Time
Warner Entertainment Company, L.P.

By: _____
Its:    VP

HASBRO, INC.

By: _____
Its:

HASBRO INTERNATIONAL, INC.

By: _____
Its:

981223D4.DOC/EMH: 4/27/99

23

**Exhibit-8**

**"G.I. JOE"**

**OPTION AGREEMENT**

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 18, 1998 and continuing for a period of 18 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing) based on that certain property described as follows:

The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Effective Execution Date of the Option Purchase Agreement: _April 8_, 1999 (i.e., six weeks prior to Purchaser's actual receipt).

HASBRO, INC.

By: _____
Its:

HASBRO INTERNATIONAL, INC.

By: _____
Its:

981223D4.DOC/EMH; 4/27/99
Short Form Option Agreement

**Exhibit-8**

WB136216
CONFIDENTIAL

**ALL-PURPOSE ACKNOWLEDGMENT**

State of Rhode Island

County of Providence

On 5/17/99 before me, _Sandra Marks_, personally appeared _Harold R. Gordon_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_Sandra Marks_
Notary Public
Signature of Notary

981223D4.DOC/EMH  4/27/99
Short Form Option Agreement

**Exhibit-8**

WB136217
CONFIDENTIAL

"G.I. JOE"

## ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain property described as follows:

The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement. The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of _____, effective on _____, the date of exercise of the option.

HASBRO, INC.

By: _____

Its: _____

HASBRO INTERNATIONAL, INC.

By: _____

Its: _____

981223D4.DOC/EMH; 4/27/99
Short Form Assignment

**Exhibit-8**

Exhibit "B"

WB136218
CONFIDENTIAL

73

**ALL-PURPOSE ACKNOWLEDGMENT**

State of _Rhode Island_

County of _Providence_

On _5/12/99_ before me, _Sandra Marks_, personally

appeared _Harold P Gordon_

_____, personally

known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_Sandra Marks_
Signature of Notary _Notary Public_

981223D4.DOC/EMH;  4/27/99
Short Form Assignment

**Exhibit-8**

WB136219
CONFIDENTIAL

SEE PC DOC 10483 FOR EXHIBITS.

**Exhibit-8**

WB136220
CONFIDENTIAL

981223D4.DOC/EMH;  4/27/99

Exhibit "B"

**ORIGINAL**

## LICENSE AGREEMENT

Dated: as of **August 2**, 2001

The following sets forth the material terms of the agreement dated as of **August 2**, 2001 ("Agreement") for the license of literary material between Katja Motion Picture Corp. (" Company") and Marvel Characters, Inc. ("Marvel") with respect to the comic book property "*Iron Man*."

1.  **CONDITIONS PRECEDENT/CHAIN OF TITLE:**

    (a)  **Conditions Precedent:**  All of the Company's obligations hereunder are subject to satisfaction of the following conditions precedent:

    (i)  Signature by Marvel and delivery to Company of this Agreement;

    (ii)  Company's receipt and approval of all chain-of-title documentation to the Property (Company acknowledges receipt of and hereby approves the chain of title to the Property);

    (iii)  Company's receipt of a list which is to the best of Marvel's knowledge and belief after reasonable due diligence, a complete and accurate list of all illustrators and writers to the Property, as defined below (collectively, "Contributors"), which list shall include a description of the contribution and the date thereof for each Contributor; (Company acknowledges and agrees that the Exhibit "E" attached hereto satisfies this condition) and

    (b)  **Chain of Title Documentation:**  It is the essence of this Agreement that Marvel deliver to Company, to the extent in Marvel's possession and control, chain-of-title documentation to the Company promptly following the execution of the Agreement. Company shall approve or reject Marvel's chain of title to the Property within ten (10) business days following Company's receipt of a fully copy signed copy of this Agreement. If Company  fails to approve the chain of title, Company shall elect either to (a) to waive the condition precedent regarding the Company's approval of the chain of title and thereby be deemed to approve the chain of title; or (b) terminate this Agreement, and then the Property shall revert to Marvel free and clear of any claims, liens or encumbrances from Company.  In addition, Company agrees that Marvel is not responsible for any agreements entered into by Company for or with respect to the Property.

2.  **LICENSE PERIODS:**

    (a)  **Initial License Period:**   Eighteen months, commencing upon signature of this Agreement ("Initial License Period") and payment of the First Installment Payment.

    (b)  **Second License Period(s):** Subject to subparagraph 3(b) below, an additional twelve months ("Second License Period") upon payment of the Second Installment Payment prior to the expiration of the Initial License Period.  The Initial License Period and/or

**Exhibit-9**

**WB136598
CONFIDENTIAL**

the Second License Period (if any) may be extended according to the terms of this Agreement if Company timely pays Marvel the Final Payment in accordance with and as defined in Paragraph 3 below.

(c)    General:  References to the "License Period" hereunder shall refer to the Initial License Period and any extensions thereof.  During the License Period, Company shall have the right to have one or more screenplays written based on the Property and to engage in development,  pre-production and production activities with respect to any production to be based on the Property, except if there is a reversion pursuant to Paragraph 8 below.  If the date to make a payment hereunder is on a Saturday or Sunday, then the date to make such payment shall be extended until the next business day, or if the date to make a payment hereunder is during the Christmas-New Year's week, then the date to make such payment is extended until five (5) business days following New Year's Day.  Payments shall be sent to the address set forth in Paragraph 21 below.  All payments shall be deemed made when placed in the U.S. mail, or sent by courier or messenger. The Initial License Period and/or the Second License Period (if any) shall be deemed suspended, and thus extended during any of the following:

(i)    Events of Force Majeure:  For the duration of any event of force majeure, including, but not limited to, an industry wide labor dispute, which materially hinders or prevents Company's development or production of a Picture, to a maximum of six months.

(ii)    Marvel's Material Default:  For the duration of any material default of this Agreement by Marvel.

(iii)    Rights Claims:  During the pendency of any written rights claim asserted (by written claim letter, demand for arbitration, commencement of litigation, etc.) in connection with the Property which materially hinders or prevents Company's development or production of a Picture, to a maximum of six months unless arbitration, litigation or other type of judicial proceeding is actually commenced (and if an arbitration or litigation is commenced then to a maximum of one year), which time period will "roll" if any significant new activity occurs with respect to such claim or if an arbitration or litigation is ongoing. Notwithstanding the preceding sentence, if an extension hereunder has continued for three months and Marvel believes that the rights claim which is the basis for the extension is frivolous, Marvel shall so notify Company.  If Company agrees that the claim is frivolous or if Company engages new writers to render writing services or engages a director or elects to continue with preproduction or production activities in connection with the Picture notwithstanding the claim, the extension set forth above shall end. Company shall be required to advise Marvel of such events.  If Company does not agree that the claim is frivolous, Company shall request a determination from its E&O carrier (if Company has an E&O carrier) as to the carrier's position with respect to coverage of the claim, including, if necessary, submitting the claim to outside counsel approved by the carrier or if Company does not have an E&O carrier, independent outside counsel that has expertise in this area such as those firms representing E&O carriers.  If

Exhibit-9
WB136599
CONFIDENTIAL

the E&O carrier agrees with Company, Marvel shall pay the costs of the legal opinion. If retained, Company will request such outside counsel to render an opinion as to the merits of the claim, the potential damages, if any, and the possibility, if any, of injunctive relief being obtained. Thereafter, the extension set forth above will continue unless and until the occurrence of any of the following:

(A)     A favorable opinion from outside counsel and coverage by Company's E&O carrier, if any, with respect to the Picture is without exclusion for the claim, at customary premiums and deductibles for Company's other pictures.

(B)     A favorable opinion from outside counsel and coverage by Company's E&O carrier, if any, with respect to the Picture is without exclusion for the claim, but at a higher premium and/or greater deductible, with Marvel's payment of any such increase.

3.     LICENSE FEE: $900,000, subject to subparagraph 3(b) below ("License Fee"). This Paragraph 3 (as well as Paragraphs 4 through 23 and Paragraph 27 below) will apply to each theatrical motion picture based on the Property or based on character(s) which first appear in a motion picture which was originally based on the Property (each such motion picture referred to herein as a "Picture"), including, Subsequent Productions. If a "Subsequent Production" (as defined in Paragraph 8 below) is based on a "New Character" (as defined in Paragraph 5(a)(ii) below), and if neither the Iron Man Character or any of the Additional Iron Man Characters appear therein (as such terms are defined in Paragraph 5 below) then Company shall instead be obligated to pay Marvel 40% of both the License Fee and contingent compensation for each Subsequent Production based on a New Character(s). However, with respect to each Picture, including all Subsequent Productions, whether or not the Iron Man Character or the Additional Iron Man Characters appear in the Subsequent Production, the producing fee set forth in Paragraph 12 shall be 100% of the monies set forth therein for producing services in connection with the Picture. Marvel shall have merchandising and commercial tie-in rights to Subsequent Productions, including those utilizing New Characters in accordance with Paragraph 6 below. The License Fee is payable as follows in accordance with subparagraphs 3(a) or 3(b), as determined by Company in its sole discretion:

(a)     Company shall pay Marvel:

(i)     Two Hundred Fifty Thousand Dollars ($250,000) for the Initial License Period payable upon execution of this Agreement by Marvel and satisfaction of the conditions precedent ("First Installment Payment"); and

(ii)    Six Hundred Fifty Thousand Dollars ($650,000) payable, if ever, upon the earlier of the first day of principal photography of the First Picture (defined in subparagraph 8(a)) and eighteen (18) months after Company pays the First Installment Payment ("Second Installment Payment"),

(b)     or in lieu of the payment schedule set forth in this subparagraph 3(a), the following:

Exhibit-9
WB136600
CONFIDENTIAL
78

(i) Payment of the First Installment Payment upon execution of this Agreement by Marvel and satisfaction of the conditions precedent which conditions Company deems satisfied;

(ii) Two Hundred Fifty Thousand Dollars ($250,000) ("Second Installment Payment") for the Second License Period payable, if ever, eighteen (18) months after Company pays the First Installment Payment; and

(iii) Six Hundred Fifty Thousand Dollars ($650,000) ("Third Installment Payment") payable, if ever, upon the earlier of the first day of principal photography of the First Picture and twelve (12) months after Company pays the Second Installment Payment. Notwithstanding the foregoing, if a director has been engaged in connection with the Picture at the time the Third Installment Payment is payable, the Third Installment payment shall be Five Hundred Twenty Five Thousand Dollars ($525,000).

(c) The payment in subparagraph 3(a)(ii) or 3(b)(iii) above, as the case may be, shall be referred to as the "Final Payment".

The License Fee shall be an advance against the contingent compensation payable to Marvel pursuant to Paragraph 4 below. As between Marvel and Company, the amount of the License Fee shall not be deemed a cost of production or any other type of cost charged to Marvel since it will be recouped as an advance against Marvel's contingent compensation.

4. CONTINGENT COMPENSATION: Marvel shall be entitled to receive the following Contingent Compensation:

(a) Gross Participations:

(i) 5% of the Gross Receipts of the Picture, if any, commencing from and after Defined Net Proceeds with no distribution fee; plus

(ii) An additional 5% of the Gross Receipts of the Picture, if any, commencing from and after Defined Net Proceeds with no distribution fee, such additional amount to be paid only until the aggregate of monies payable to Marvel hereunder is equal to 2 ½ % of the Gross Receipts of the Picture calculated from the first dollar of such Gross Receipts; escalating to

(iii) 7 ½ % of the Gross Receipts of the Picture commencing from and after Defined Net Proceeds with a 20% distribution fee; escalating to

(iv) 10% of the Gross Receipts of the Picture commencing from and after Defined Net Proceeds with a 25% distribution fee; escalating to

(v) 50% of the Defined Net Proceeds of the Picture at full distribution fees, such participation to be reduced by all other third party participations in the Picture, but subject to a hard floor of 5% of the Gross Receipts commencing from and after the first time Defined Net Proceeds are reached with no distribution fees.

**Exhibit-9**

**WB136601**
**CONFIDENTIAL**

(b)   <u>Definitions:</u>

(i)   "Gross Receipts" shall be defined in accordance with the Company Exhibit DNP with attached Rider thereto (which Rider shall be the same Rider which is attached to the agreement dated as of February 2, 1996 between Company and A Good Day To Die, Inc.), copies of which are attached hereto. Monies derived from the sale of the actual props of the Picture (as opposed to replicas) shall also be included in Gross Receipts. With respect to Home Video Gross Receipts (including DVD, laser discs, and videocassettes and similar formats now known or hereafter invented), an amount equal to 30% for units sold for rental and 15% for sell-through units shall be included in Gross Receipts for purposes of determining Gross Receipts and Defined Net Proceeds with no video distribution expenses except residuals. This is in lieu of the traditional 20%/10% video royalty. As between Company and Marvel, there will be no interest on overhead nor overhead on interest charged to the Picture. In addition, to the extent there are any type of gross participations or other participations which are prior to "net proceeds," such participations shall not bear interest nor overhead. The aggregate amount charged with respect to the so-called "Supervisory Fee" and Company's Overhead Charge shall be 12½%. The maximum amount to be charged as advertising overhead shall be $1,000,000.

(ii)   "Defined Net Proceeds" shall be defined in accordance with Company's Exhibit DNP and the Riders attached thereto. Nothing contained herein shall be construed as an undertaking by Company to maximize the "Defined Net Proceeds" of the Picture.

5.   <u>GRANTED RIGHTS:</u>

(a)   <u>Exclusive Rights:</u>   Subject to Paragraphs 6 through 8 and Paragraph 27 below, Marvel hereby grants sells, assigns, conveys, and transfers to Company exclusively and in perpetuity all rights in the "IRON MAN" comic book series ("Property") which Company may require in order to develop, produce, distribute, exploit, advertise, promote and publicize, throughout the universe, in and by any and all manner, media, devices, processes and technology now or hereafter known or created, theatrical motion pictures based on the Property (including, as ancillary rights ,the exploitation in all media of clips and excerpts from the Picture, EPK's, stills and other materials created during the production of the Picture), the right to exploit the copyright in all music in the Picture, music video rights, the right to utilize the name of the "Iron Man" character as or in  the title of a live action theatrical motion picture and in connection with all other rights specifically granted in this paragraph, the literary publishing rights described in Paragraph 6(d), all music publishing and  record rights, and the right to auction and sell the actual props utilized in the Picture (but not replicas or other copies thereof )(collectively, "Rights").

(i)   <u>Property:</u> The "Property" shall include, without limitation, the title "Iron Man" (to the limited extent granted above), all plots, stories (including the

**Exhibit-9**

**WB136602**
**CONFIDENTIAL**

"Origin Story" as defined below), themes and incidents appearing in the "Iron Man" comic book series ("Individual Storylines"), including, but not limited to, entries in the "Marvel Universe Handbook" ("Handbook"). However, the rights granted in any so-called "generic" plots, stories, themes and incidents appearing in the "Iron Man" comic book series shall be non-exclusive (as more particularly articulated in Paragraph 5(a)(iii) below). The definition of Property does not include any characters that appear in said plots, stories, themes and incidents except as follows:

(A)    the comic book character Iron Man as he is drawn and depicted in said comics; and

(B)    the characters set forth in Exhibit "A" attached hereto as they are drawn and depicted in said comics ("Additional Iron Man Characters").

(ii)    <u>Origin Story:</u> The "Origin Story" shall mean the origin stories of the character "Iron Man" (the "Iron Man Character") which Marvel represents is contained in "TALES OF SUSPENSE" number 39, published in 1962; "IRON MAN" volume 1, number 1, published in 1968; "IRON MAN" volume 1, number 46, published in 1972; "IRON MAN" volume 1, number 122, published in 1979; "IRON MAN" volume 1, numbers 268 and 269, published in 1991; "IRON MAN" volume 2, number 1, published in 1996; "IRON MAN", volume 3, number 1, published in 1997; "IRON MAN: THE IRON AGE" numbers 1 and 2, published in 1998, provided, however, Company acknowledges that the only characters contained in the Property, including, without limitation, the Origin Story as to which Company's "Granted Rights" under this Agreement apply, are the Iron Man Character and Additional Iron Man Characters (collectively, "Marvel Characters"). Notwithstanding the foregoing, Company may, subject to the terms and conditions of this Agreement, create its own characters for use in the Picture(s) as substitutes for characters contained in the Origin Story other than the Iron Man Character or in addition to the characters contained in the Origin Story (including both incidental or minor characters) ("New Characters), as long as any such character(s) so created by Company (and which is not a Marvel Character) does not contain the same name as any Marvel Character's name as it appears in the Origin Story or any and all other elements relating to the Property and the Marvel Characters and the New Character is not based upon or related to a pre-existing character within the Marvel Universe. If Company desires to create its own characters, Company shall first consult with Marvel to determine whether or not there are preexisting characters within the Marvel Universe that can be substituted for such proposed new characters or to determine if a composite character can be created (which would be owned by Marvel) that is based upon one or more preexisting character(s) within the Marvel Universe. The purpose of the procedure is to maintain the integrity of the Marvel Universe and Marvel's ownership of characters.

**Exhibit-9**

WB13660381
CONFIDENTIAL

(iii)   For purpose of clarification, the Rights granted are exclusive to Company (i.e., Marvel cannot grant a third party the same theatrical motion picture and other rights granted hereunder prior to the expiration or termination of Company's rights in accordance with the terms hereof); but the Rights are limited to certain uses and restrictions.  Notwithstanding anything to the contrary herein contained, Marvel shall have the unrestricted right to grant to third parties rights in so called "generic" plots, stories, themes and incidents that may appear in the "IRON MAN" comic book series, provided the foregoing are granted to third parties other than in connection with Marvel Characters and their Origin Stories.

(b)   <u>Non-exclusive Rights</u>: Subject to Paragraph 27 below, in addition to the Rights to the Property set forth in Paragraph 5(a) above, Marvel also hereby grants, sells, assigns, conveys and licenses to Company a non-exclusive, one picture license to have the characters set forth in Exhibit "F" attached hereto ("SHIELD Characters"), as they are drawn and depicted in Marvel comic books, make a guest appearance only in the First Picture. For purposes of clarification, no rights with respect to the SHIELD Characters are granted other than the right to make a guest appearance in the first Picture produced hereunder and the Property shall be deemed to include the SHIELD Characters and the Rights shall apply to the SHIELD Characters; Company shall not have the right to use any of the SHIELD Characters in any Subsequent Production, without Marvel's prior written consent (such consent may be withheld in Marvel's sole discretion); Company shall not have the right to use any of the SHIELD Characters in connection with any merchandising or commercial tie-ins and shall not have any allied and/or ancillary rights whatsoever with respect thereto, without Marvel's prior written consent (such consent may be withheld in Marvel's sole discretion); and all rights not granted to Company with respect to the SHIELD Characters are reserved by Marvel, and Marvel shall have the unqualified, unrestricted right to license the SHIELD Characters to third parties. Notwithstanding the foregoing, the representations and warranties set forth in paragraph 18 below shall not apply to the SHIELD Characters; provided, that Marvel agrees to provide all documentation in their possession or control evidencing ownership thereof upon request by New Line.

6.   <u>RESERVED RIGHTS:</u>   All rights not specifically granted are reserved to Marvel. These include, without limitation, the following:

(a)   <u>Merchandising</u>:  Merchandising rights are reserved to Marvel.  To the extent of Company's rights, Marvel shall have merchandising rights in any animation cels created for the Picture but may not alter or change the cels without Company's consent.  Company will own all rights, perpetually, in characters created by or for Company in connection with the Property or any Picture which are not part of the Iron Man or Marvel universe (subject to the terms and conditions of this Agreement) and not included in the Rights (i.e., the New Character(s)). Company shall also own all rights, perpetually, in the characters, artwork, logos, phrases and other materials created as works for hire for Company or which Company licensed or acquired the rights to in connection with the Picture which do not originally appear in the Property, that first appear in or are associated with the Picture, such as the likenesses of the actors portraying characters from the Property, materials which are exploited in

Exhibit-9
WB136604
CONFIDENTIAL

connection with the logo, artwork or unique title, title lettering created specifically for the Picture (and are easily distinguishable from pre-existing Marvel logos, artwork, titles or title lettering) and merchandise based thereon (as opposed to being based on the Property and not containing such new Company additions) or which is sold in connection with the Company created logo, artwork or the artwork title of the Picture ("New Line Materials"). The term "New Line Materials" also includes the term New Characters. Marvel will have exclusive, worldwide perpetual rights to merchandise the New Characters and the New Line Materials (and Company will receive a perpetual royalty in connection therewith pursuant to Paragraph 6(a)(iv)), such rights owned by Marvel will include the right to make or exploit interactive games or other home, arcade or mall games and rides utilizing the New Characters and New Line Materials. However, Marvel may not make or exploit interactive games or other home, arcade or mall games and rides or in theme park attractions which include New Line Materials (e.g., footage, soundtrack, EPK materials, etc., created by Company or a third party engaged by Company) without Company's written consent. However, both Company and Marvel may use New Line Materials to promote the exploitation of their respective rights to the Pictures and ancillary rights set forth herein (e.g., Marvel can use EPK materials to promote merchandise in which New Line shares merchandising revenue, but not merchandise which Company does not share). Each party will be responsible for the appropriate clearances in connection with their exploitation of the New Line Materials. All theme park rights in and to the Marvel Characters are reserved to Marvel for its sole use and benefit. Theme park, live touring show and amusement attraction rights to the New Characters and New Line Materials are frozen. Marvel does not have the right to utilize the New Line Materials except as provided in this Agreement. Notwithstanding anything to the contrary contained in this Agreement, but subject to the next sentence, Company may not, without Marvel's prior written consent, exploit the New Characters other than in live action theatrical motion pictures and in connection with the Rights specifically granted in this Agreement in conjunction with exploiting such theatrical motion pictures. Company may also exploit Company's film clips, music publishing and record rights independent of such theatrical motion picture rights as long as the revenues derived therefrom are included in Gross Receipts. In connection with the Company's exploitation of its film clips, music publishing and record rights, Company may, if it so elects, include the New Characters. As to music publishing and record rights, the appropriate riders attached to Company's Exhibit DNP apply but with respect to sound records, the soundtrack rider attached to Company's Exhibit DNP applies regardless of whether the compositions and/or tracks in such sound records are from the soundtrack of the Picture so long as the name of the Picture and/or the Iron Man Character, and/or the Additional Iron Man Characters, and/or New Characters, and/or the Property is utilized in connection with such exploitation.

Notwithstanding anything contained elsewhere in this Agreement, but subject to Paragraphs 6(a)(vii), 6(d), 6(i) and 6(j) below, Marvel does not have the right to utilize New Line Materials unless provisions are made in this Agreement for Company to be entitled to financially participate in such use but Company recognizes that there is no guarantee any revenue will be generated that Company is entitled to receive or that Marvel is obligated to maximize Marvel's worldwide gross

Exhibit-9

WB136605
CONFIDENTIAL

merchandising revenue or that Marvel has any obligations or fiduciary duty to Company to exploit any of the Reserved Rights.

(i)    <u>Company Participation in Sharing Period Revenue</u>: Company will participate in Marvel's worldwide gross merchandising revenue from the Property as follows: First, Marvel's annual base of such revenue will be determined by reference to the average annual revenue, relative to the characters in which Company will share pursuant to Paragraph 6(a)(iii) (which characters shall be referred to as the "Qualifying Characters"), for the two years immediately preceding the commencement of the Sharing Period. Then, to the extent Marvel's annual (or annualized) revenue from such Qualifying Characters during the Sharing Period ("Sharing Period Revenue") exceeds the annual base, the excess will be allocated as follows: first, Marvel will deduct a distribution fee (25% if Marvel distributes directly; or, if Marvel uses a licensing agent outside the U.S. and Canada, a 15% "override" distribution fee in addition to the agent's fee, subject, however to an overall cap on distribution fees of 40%); then, on a pro rata basis, Marvel will deduct its actual costs and concurrently therewith Marvel and Company will deduct their talent payments (i.e., all parties furnishing rights or performing services with regard to the Picture or the Property) paid to unrelated third parties; (subject to subparagraphs 6(a)(v) and 6(a)(vi) below) and then, Marvel and Company will split the remainder 50/50.

(ii)    <u>Sharing Period</u>: The "Sharing Period" will commence six months prior to the initial U.S. theatrical release date of each Picture and continue for a period which is the longer of the period Company has the right to produce a Picture or Subsequent Productions pursuant to Paragraph 8 below, or the period 30 months after U.S. theatrical release or 12 months after the initial U.S. video release (whichever is longest); provided that the Sharing Period shall be rounded up to the nearest quarter. "Sharing Period Revenue" will consist of Marvel's worldwide gross revenue (i.e., all moneys or other things of value actually received by Marvel, as long as such sums are non-refundable) derived from the sale by Marvel, or by Marvel's licensee if Marvel does not distribute directly, during the Sharing Period of any and all merchandising items utilizing the Qualifying Characters, net of trade discounts, cash discounts actually taken, cooperative advertising allowances and returns and credits issued in lieu of returns (with Marvel's return reserves to be liquidated no later than 12 months from the creation of the reserve). With respect to sales by a licensee which is also an affiliate of Marvel (including the Toy Biz division of Marvel Enterprises Inc.) and which is more than 50% owned by Marvel ("Marvel Affiliate"), Marvel shall be deemed to receive a royalty of 3 ½% for sales direct to the public and a royalty of 10% (escalating to 12½% for letter of credit sales FOB ASIA) of the gross wholesale selling price, net of actual returns or markdowns in lieu of returns (with return reserves to be liquidated by 12 months from the creation of the reserve) for toys, trading cards and video games when the Marvel Affiliate actually receives the sale proceeds from the sale of said merchandise and an arms' length royalty as to any other sales. When deemed royalties of a Marvel Affiliate (such as Toy Biz) are included in gross merchandising

Exhibit-9
WB136606
CONFIDENTIAL

revenue, then such Marvel Affiliate will not also deduct its expenses. For purposes of this Paragraph 6(a)(ii), a "sale" shall be defined as set forth in the agreement between Marvel and the applicable licensee. Sales will include revenues received by Marvel derived from rentals, licensing or other exploitation of merchandising rights relating to the Picture, including Picture related merchandise sold at theme parks. Company shall receive statements accompanied by applicable payments due, if any, of the Sharing Period Revenue (inclusive of merchandising and Marvel commercial tie-in revenue and Company's portion thereof), on a quarterly basis, commencing with the first full calendar quarter following the commencement of the Sharing Period . Company will have the right to audit Marvel's books and records once per calendar year with respect to such Sharing Period Revenue upon fifteen days prior notice. Notwithstanding the foregoing, after the period which is 18 months following the initial theatrical release of the Picture, Marvel will account to Company with the same frequency (e.g., quarterly, semi-annually, annually, etc.) as Company accounts to Marvel with respect to the Gross Receipts of the Picture. Company's share of Sharing Period Revenue under this Paragraph 6(a) will not be included in Gross Receipts.

(iii)     Qualifying Characters:  All revenue from merchandising uses and items utilizing the following characters ("Qualifying Characters") shall be included in Marvel's worldwide gross revenue for purposes of calculating Sharing Period Revenue:

(A)     Marvel Characters, New Characters and New Line Materials  that appear in the applicable Picture.

(B)     The Iron Man Character, but only in the event that Company uses such character names (or variations thereof) in or as the title of the applicable Picture(s).

(C)     Additional Iron Man Characters, if any.

(iv)     Post Sharing Period Participation in New Characters and New Line Materials: After the Sharing Period and in perpetuity, Company will receive its share of Marvel's worldwide gross merchandising revenue from exploitation of  the New Characters and the New Line Materials and any Marvel Character that Marvel has materially modified to resemble the actor who portrayed such character in a Company Picture or which is marketed, sold or packaged using New Line Materials ("Resembling Character") and/or in connection with merchandise which incorporates the title logo from the Picture or any of the main artwork created by or on behalf of Company as "work for hire" for the Picture or acquired or licensed by Company specifically for the Picture such as the one sheet for the Picture including, New Line Materials (but excluding the Property and Marvel Characters which do not include New Line Materials  but subject to Paragraphs 6(a)(vii), 6(d), 6(i), and 6(j) below), in accordance with the 50/50 net concept described in Paragraphs 6(a)(i) and 6(a)(ii) above; it being understood, however, that the "annual base" concept will not apply; and it being further understood that both the New Line Materials and Resembling Characters shall only be included for purposes of calculating

**Exhibit-9**

WB136607
**CONFIDENTIAL**
85

Company's post-Sharing Period participation to the extent that such New Line Materials and Resembling Characters (as opposed to Marvel Characters which are not Resembling Characters) continue to be exploited after the Sharing Period.

(v)  <u>Merchandising Rights Obtained from Talent:</u> Company shall use all reasonable efforts to obtain commercial tie-in and merchandising rights from all cast members engaged on a Picture. Company will approach the merchandising rights negotiations with the principal cast members engaged on a Picture in the same manner Company would if Company owned and controlled all merchandising rights therein. Upon Marvel's request, Company will provide to Marvel the first and last drafts of the applicable provisions from each principal cast member's agreement. If Company obtains commercial tie-in rights and merchandising rights from a principal cast member engaged on a Picture but Marvel is not able to meaningfully exploit the merchandising rights from such principal cast member because insufficient merchandising rights have been acquired by Company and the character portrayed by such principal cast member, then, for purposes of calculating Sharing Period Revenue, Marvel's gross revenue derived from the merchandising of the character portrayed by such principal cast member will be deemed to be reduced by one-half (and for purposes of calculating post-Sharing Period Revenue, Marvel's gross revenue derived from the merchandising of the character portrayed by such principal cast member will be deemed to be reduced by one-third) (in either case, a "Reduction"). However, even if there are such restrictions, there will be no such Reduction if, following Company's receipt of reasonable advance notice of Marvel's intention to merchandise items within a restricted category, Company is able to secure the requisite approval from the principal cast member within Marvel's reasonable time constraints. Also, it is understood that neither restrictions such as those relating to real firearms (as opposed to toys), tobacco products, alcoholic beverages and personal hygiene products, nor restrictions relating to product categories not merchandised by Marvel, shall cause such a Reduction. In addition, the customary likeness approvals and still approval rights of a principal cast member will not cause a Reduction if Marvel is able to meaningfully exploit its merchandising rights to the character portrayed by such principal cast member. So that Company may attempt to avoid any such Reduction, upon Company's request at the time the agreements with the principal cast members are being negotiated, Marvel will provide Company with a "courtesy" list of the products/categories then merchandised by Marvel or which Marvel has a firm intention to merchandise within the relevant time frame (i.e., up to and including the anticipated initial release date of the Picture).

(vi)  <u>Merchandising Royalties Payable to Third Parties:</u> If Company grants participations for an item of merchandising resulting in an aggregate participation which exceeds industry standards taking into account the stature of the talent involved (e.g., Arnold Schwarzenegger's participation in the item per se increases the "industry standard"), Company will bear two-thirds of the

**Exhibit-9**

**WB136608**
**CONFIDENTIAL** 86

excess out of Company's share of Sharing Period Revenue; provided, however, that if, in accounting for Company's participation Marvel intends to so reduce Company's share of Sharing Period Revenue, Marvel will advise Company prior to so accounting and will consider fully and in good faith Company's position as to whether such aggregate third party participations are so excessive (and even if Marvel then rejects Company's position, Company shall not be deemed to have waived any of Company's rights to contest Marvel's accounting in this area).

(vii)    Excluded Merchandising Revenues: Company shall not be entitled to share in revenue earned by Marvel with respect to Qualifying Characters from its exploitation of the following: (A) subject to Paragraph 6(b) and 6(d), comic book publishing, including electronic publishing of comic books, bound copies of compilations of comic books or comic strips, or hardcover editions of comic books based on Marvel Characters; (B) merchandise bearing a Marvel Mania logo (or such other name used for Marvel-Affiliated restaurants) which is sold at Marvel-affiliated restaurants or through other channels; (C) merchandise bearing a Marvel logo (or such other logo used in connection with theme parks) sold at Theme Parks or through other similar channels. Notwithstanding the foregoing, Company shall be entitled to its share in gross merchandising revenue calculated pursuant to this Paragraph 6(a) derived from items enumerated in subparagraphs (B) and (C) above if the items sold include New Line Materials.

(b)    Commercial Tie-Ins: Subject to this Paragraph 6(b) and Paragraph 6(c), commercial tie-in rights are reserved to Marvel. However, commencing with the period which is 12 months prior to the scheduled initial U.S. theatrical release of the Picture and continuing for the period which is 4 months after the initial U.S. video release of the Picture, but in no event more than 24 months in the aggregate ("Company Window"), Company shall control all commercial tie-ins relating specifically to Qualifying Characters. Marvel agrees that it will not enter any new commercial tie-in agreements during Company's Window, subject to this Paragraph 6(b). In addition, Marvel's preexisting commercial tie in arrangements may continue throughout the Company Window but Marvel may not renew expiring commercial tie-in licenses which would continue through the Company Window. Marvel shall notify Company of its preexisting commercial tie-in licenses once Company notifies Marvel that the Company Window has commenced in accordance with the provisions hereof. Notwithstanding the foregoing, if Company has not also set a start date, Company's Window will open only if Company also submits to Marvel a screenplay approved by Company; and if, within 90 days thereafter, Company still has not set a start date, Company's Window will close until Company does so. Marvel also agrees that if Company produces a Subsequent Production, Company shall have an additional window within which to control commercial tie-ins in connection with rereleases of the prior Picture(s) or rereleases of the videocassettes, laser discs and DVDs (and other similar formats now known or hereafter invented ) of the prior Picture(s) commencing 2 months prior to the rerelease and ending 2 months after the rerelease ("Company Rerelease Window") provided, however, in connection with a theatrical

Exhibit-9

WB1366087
CONFIDENTIAL

rerelease, Company shall be required to release the prior Picture(s) in at least 750 first run theaters in the U.S. in order to have a Company Rerelease Window. Company shall notify Marvel in writing at least ninety (90) days before the rerelease of a Picture. In connection with Company's control of commercial tie-in rights during the Company Window: (A) Company must provide for prominent placement of the Marvel logo or such other Marvel related logo as Marvel shall designate, if any, in connection with such tie-ins; (B) Company will require Marvel's approval, not to be unreasonably withheld, if the tie-in calls for the sale of merchandise ("Commercial Tie-In Merchandise") which would, in Marvel's judgment, compete (or would likely compete) with preexisting Marvel merchandise; (C) if, prior to the commencement of Company's Window, Marvel has entered into an exclusive commercial tie-in agreement which, by its terms, continues during Company's Window, then, provided that Company receives appropriate prior written notice of the terms of any such agreement, Company will not violate such exclusivity; provided, further, however, that, except with respect to institutional arrangements (such as the current Disney/McDonald's arrangement) Marvel shall not enter into commercial tie-in agreements with a term of exclusivity in excess of 18 months from the date such agreement is entered into (however, Marvel agrees that with respect to any exclusive commercial tie arrangement entered into by Marvel, Marvel agrees to use all reasonable efforts to carve out an exception that such arrangement will not apply during the period of the Company Window and/ or Company Rerelease Window with respect to commercial tie-ins specifically related to the Qualifying Characters); and (D) Company will have good faith discussions with Marvel's promotional partners in connection with involving them in Commercial Tie-In arrangements. With respect to any type of Commercial Tie-In Merchandise that is manufactured, produced or distributed by Marvel Enterprises, Inc. or any of its subsidiaries or affiliated entities, Company must request that its promotional partners and/or sponsors with whom Company has entered into commercial tie-in arrangements for the Company Window, meet with Marvel's designated representatives to discuss in good faith the opportunity and desire of Marvel to manufacture, produce and/or distribute such items and material (as applicable), taking into account such factors as the Company's promotional partner(s) and/or sponsor(s), pre-existing manufacturing, producing and distribution arrangements and relationships, Marvel's expertise in the area concerned and whether or not Marvel's financial offer to manufacture, produce and/or distribute such items or materials is competitive with the other arrangements that Company's promotional partner(s) and/or sponsor(s) is considering. Marvel acknowledges that Company cannot promise or agree that Company's promotional partner(s) and/or sponsor(s) will enter into an arrangement with Marvel to manufacture, produce and/or distribute any such items or materials, as applicable. All revenues derived by Company from the exploitation of Commercial Tie-In rights (as opposed to advertising commitment expenditures or revenues) during the Company Window and/or Company Rerelease Window shall be treated as merchandising revenue for purposes of this Agreement and be divided as set forth in subparagraph (iv) below. Marvel acknowledges that Company has the perpetual right to utilize videograms (i.e., cassettes, DVD's, Laser Discs and similar formats) of its motion pictures, including the Picture and Subsequent Productions, as commercial tie-ins to be given away or sold with videograms of other Company motion pictures. To the extent videograms of a Picture are used as a commercial tie-

**Exhibit-9**

**WB136610**
**CONFIDENTIAL**

in with videograms of other pictures, the applicable sell through royalty shall be applied to the total amount received by Company from all pictures divided by the number of pictures. For example, in a commercial tie-in of three pictures, the applicable sell through royalty would apply to the total amount received in connection with the sale of all three units in the commercial tie-in divided by three. Such amounts shall be credited to Gross Receipts of the Picture. Notwithstanding anything to the contrary set forth herein, there shall be no restriction on, or payments due to Company with respect to Marvel "Family Promotions". A Marvel Family Promotion shall be defined as any promotion or commercial tie-in utilizing 5 or more characters from the Marvel Universe (but not New Line Characters or the Marvel Characters as uniquely depicted in the New Line Materials or Pictures if they are materially and substantially different than the manner in which such characters are depicted in Marvel comic books prior to the date hereof) and which includes no more than one of the Marvel Characters included in the Property; provided, that Marvel shall notify Company prior to any use of a Marvel Character as depicted in the New Line Materials or Pictures in a Marvel Family Promotion. If Company in its good faith opinion believes that such Marvel Character contained in the New Line Materials or Pictures is materially and substantially different than the depiction in Marvel comic books prior to the date hereof and the difference is based on a characteristic of such Marvel Character attributed to or created or modified by New Line, the dispute shall be resolved by the arbitration procedure set forth in paragraph 9 below. After the expiration of the Company Window, neither Marvel nor Company shall be entitled to exploit commercial tie ins utilizing the New Line Materials. Notwithstanding anything to the contrary set forth herein, on a non precedential basis, Marvel agrees not to enter into any commercial tie in arrangements for the Property once this Agreement is fully executed and continuing through the period terminating with the expiration of the Company Window other than as part of a Marvel Family Promotion.

(i)   Abandonment or Delay in Domestic Release:   If, at any time during Company's Window, Company abandons production or post-production of a Picture, or if Company has not released a Picture domestically within 2 years following the completion of post-production of a Picture, then, upon written notice to Company, Company's Window in the domestic territory for that Picture will close. However, if, within 90 days following such notice, Company recommences production or post-production of the Picture or releases the Picture, Company's Window in the domestic territory will re-open and continue as provided in Paragraph 6(b).

(ii)   Delay in Foreign Release:   If, at any time during Company's Window, Company has not released a Picture in a country other than the U.S. within 2 years following the completion of post-production of the Picture, Company's Window in the applicable country will close.

(iii)   Japanese Souvenir Books:   If Company's theatrical licensee in Japan does not have an existing obligation to, or standing relationship with, a publisher of souvenir books, Company will request that its theatrical licensee consider

Exhibit-9
WB136611
CONFIDENTIAL

contacting Marvel's publishing licensee concerning the creation of such books.

(iv)    Commercial Tie-In Revenue: In the event there is any gross commercial tie-in revenue received by Marvel (other than from a Marvel Family Promotion) or by Company during the Company Window and/or Company Rerelease Window as permitted herein, including revenue derived from New Line Materials, such amounts shall be included in the separate pot which is not cross collateralized with the Gross Receipts of the Picture. Such monies will be accounted for on a quarterly basis for the first 18 months after the initial U.S. theatrical release of the Picture, then with the same frequency (e.g., quarterly, semi-annually, annually, etc.) as Company accounts to Marvel with respect to the Gross Receipts of the Picture. Monies spent by third party sponsors, barter arrangements and advertising monies spent by bona fide third parties solely in connection with the advertising, marketing or promotion of the Picture and consideration from other "in kind" arrangements which are not received in cash by or credited to the account of Company or Company's subsidiaries (for which Company or Company's subsidiaries receive no monetary consideration) shall not go into this separate pot and shall not be treated as monies to be shared by Marvel and Company. For purposes of calculating revenue received or credited to the account of Company, Company shall mean New Line Cinema Corp. and all its subsidiary companies, including Company and all entities owned more than 50% by New Line Cinema Corp. The commercial tie-in revenue shall be divided as follows: The party negotiating the deal (either Company or Marvel (as applicable) shall deduct a distribution fee of 25% if the party making the deal distributes directly; or if the party uses a licensing agent outside of the U.S. and Canada, a 15% "override" distribution fee in addition to the agent's fee, subject, however to an overall cap of 40%); then, the actual out-of-pocket costs and participations paid to unrelated third parties paid by Marvel and/or Company, as applicable; and then Marvel and Company will split the remaining 50/50. If Marvel is the party negotiating the deal, Marvel's commercial tie-in revenue shall be included in Marvel's merchandising revenue for accounting purposes.

(v)    Commercial Tie-Ins to New Line Materials: After the Company Window closes, Marvel shall not have the right to utilize New Line Materials in connection with commercial tie-ins to the Property unless it receives express written permission from Company.

(c)    Consultation, Etc.: In connection with Marvel's exercise of the rights described in Paragraphs 6(a) and 6(b), Marvel will consult and coordinate with Company (fully, in advance and in good faith) so as to minimize the likelihood of conflict with Company's marketing strategy. In connection with the depiction of Marvel Characters in Commercial Tie-In Merchandise, Marvel shall have the same approval rights as it has with respect to the depiction of Marvel Characters in the Picture pursuant to Paragraph 9 below. Marvel will not be permitted to disapprove of the depiction of the Marvel Characters in commercial tie-ins if the depiction in the

Exhibit-9
WB136612
CONFIDENTIAL

commercial tie in(s) is the same depiction that has been previously approved pursuant to Paragraph 9 below.

(d)    <u>Publication Rights:</u>    Publication rights are reserved to Marvel, subject to this Paragraph 6(d). Such reserved rights exclude and Company is hereby affirmatively granted as part of the Rights, screenplay novelization, screenplay publication and books on sound record rights relating to the aforesaid screenplay novelizations and screenplay publications, (provided that such publications shall not include, in relation to text, more than 10% of comic book form illustrations); and Marvel's reservation of such rights will not limit Company's usual publication rights in connection with advertising and publicizing Pictures, which publication rights shall, however, not permit Company to serialize or to offer advertising or publicity materials for sale to the public. If Company intends to create advertising and/or publicity materials which include more than one page in comic book form, Company will coordinate with Marvel as to the creation of such materials, with Marvel to have ultimate approval thereof. Marvel shall have the right, in perpetuity, to publish the New Characters and New Line Materials in the "Iron Man" comic book series (as that term is understood in the publishing industry) but Company shall not be entitled to a royalty in connection therewith. Marvel shall have the right to "plant" New Characters and the New Line Materials into the existing "Iron Man" comic book series but shall not have the right to create a new comic book series with the New Characters or plant the New Characters or New Line Materials in a series other than the "Iron Man" comic book series. Marvel shall have no other publishing rights to the New Line Materials except to the extent, if any, Marvel and Company agree in writing.

(e)    <u>Radio and Live Stage Rights:</u> Reserved to Marvel, subject to Company's usual rights to advertise and publicize Pictures on radio but limited to not more than 90 second commercial spots. However, Marvel agrees to "freeze" live stage rights commencing upon signature of this Agreement and ending six (6) months after the date Company no longer has the right to produce a Picture or Subsequent Production pursuant to this Agreement. Notwithstanding the foregoing, Marvel may create so-called live "arena" shows (stages or theaters seating more than 1,000 people) provided that the Iron Man Character and the Additional Iron Man Characters do not comprise more than 25% of the Marvel character(s) appearing in such arena type live shows. Marvel's other business of "walk around" or "meet and greet" type appearances shall be unrestricted except that Marvel may not use any title created by Company for a Picture other than "Iron Man" or the name(s) of any of the Additional Iron Man Characters. Unless the Rights have reverted to Marvel pursuant to Paragraph 8, Marvel shall not license motion picture rights in any live stage show and if, during the three year period following such reversion, Marvel intends to license motion picture rights in any such live stage show, Company shall have a right of first negotiation to license such rights. Marvel agrees that it cannot utilize New Line Materials in connection with the reserved rights set forth in this subparagraph.

(f)    <u>Animated TV Series, MOW, Internet and other Animated Production Rights:</u> Reserved to Marvel but Marvel agrees that during the period that Company has the right to produce a Picture and/or a Subsequent Production, Marvel shall not produce

**Exhibit-9**

**WB136613
CONFIDENTIAL**

or authorize to be produced animated TV Series, MOW'S and Internet productions (or on comparable delivery systems) or other animated productions in other media now known or hereafter devised where the program length (excluding main and end titles) of the applicable production is 90 minutes or more. Marvel shall have the right to produce or cause to be produced animated TV Series, MOW's, Internet productions (or on comparable delivery systems) and/or other animated productions in any other media now known or hereafter devised (including those set forth in subparagraph (g) below) of less than 90 minutes in length excluding main and end titles. With respect to animated television programs, Marvel agrees that the 90 minutes in length of the program includes all lead-in, lead-outs, titles, credits and commercials.

(g)   <u>Animated Direct To Home Video Rights</u>:   Reserved to Marvel but Marvel agrees that during the period that Company has the right to produce a Picture and/or Subsequent Productions, Marvel shall not produce or authorize to be produced animated direct to home video, CD ROM, and CD-I productions and/or other animated productions in any other media now known or hereafter devised where the program length (excluding main and end titles) of the applicable production is 90 minutes or more. Marvel shall have the right to produce animated programming in any and all media now known or hereafter devised (including those set forth in subparagraph (f) above) of less than 90 minutes in length excluding main and end titles.

(h)   <u>Live Action Television (free, pay or otherwise) Live Action direct to Home Video Rights, Live Action Internet and Live Action productions in other media not otherwise identified</u>:   Reserved to Marvel but Marvel agrees that during the period that Company has the right to produce a Picture and/or Subsequent Production, Marvel shall not produce or authorize to be produced live action productions in any and all media now known or hereafter devised (other than arena and live touring shows).

(i)   <u>Theme Park, Etc.</u>:   Theme Park, live touring (provided that the Iron Man Character and the Additional Iron Man Characters shall not comprise more than 25% of the Marvel Characters appearing in such live touring show) and amusement attraction (including, without limitation, stroller rights and in-park stage show rights), fan festival and convention rights and location based entertainment rights (including, without limitation, Marvel-Mania restaurants and in-restaurant stage shows) are reserved to Marvel. Marvel agrees that it shall not be permitted to use the New Characters or the New Line Materials as a theme park ride or attraction, for live touring shows and amusement attractions. Pursuant to Paragraph 6(a) above, such rights are frozen. Company acknowledges and agrees that Marvel has the right, without payment of additional consideration to Company, to use New Characters or New Line Materials in connection with stroller rights for and in theme parks, fan festivals and conventions. However, merchandise revenue derived from items sold at theme parks, live touring shows, fan festivals and conventions, and amusement attractions that include the New Characters or New Line Materials shall be included in gross merchandise revenue pursuant to Paragraph 6(a) above

Exhibit-9
WB136614
CONFIDENTIAL
92

(j)    <u>Film Clip, Etc., Rights:</u> Marvel shall be granted a royalty-free right by Company to use or license third parties to use up to thirty (30) seconds of clips (and/or music) from the Pictures in it or in connection with articles, venues or services (including in its Marvel-Mania restaurants, in on-line services, the worldwide web and other electronic means of distribution) licensed by Marvel; provided that Company has the right to grant such rights, and provided, further, that Marvel shall pay promptly all third party fees and royalties (including, but not limited to, reuse fees, residuals and any and all third party fees related to the music) and indemnify Company for a breach of these obligations. Company shall be entitled to receive the merchandising royalty set forth in Paragraph 6(a) for all articles of merchandise in which such clips appear, regardless of whether Company is otherwise excluded from participating in the revenue from such articles or merchandise under Paragraph 6(a)(vii). Marvel agrees to include the copyright information furnished by Company to Marvel on all such clips. Notwithstanding the foregoing, during the period which is two (2) months prior to and two (2) months following the initial U. S. theatrical release of the Picture, Marvel agrees that it shall obtain the prior approval of Company to utilize Company's film clips from the Picture, however, such approval by Company shall not be unreasonably withheld nor delayed .

7.    <u>OTHER RIGHTS:</u> The Rights granted to Company will include all animated theatrical motion picture rights. However, Company may not exercise such rights without Marvel's written consent, which consent may be withheld in Marvel's sole discretion, except that (i) the titles of the theatrical motion picture may be wholly or partially animated, in Company's sole discretion; and (ii) Company may include incidental animation in the theatrical motion picture, such as computer generated animation for special effects purposes, provided, however, that the theatrical motion picture is not a hybrid live action/animated theatrical motion picture (e.g., "Roger Rabbit"). Subject to the provisions of Paragraph 6(f), 6(g) and 6(h) above, Marvel reserves all television rights (other than the right to broadcast the Pictures produced hereunder on television).

8.    <u>REVERSION OF RIGHTS:</u>

(a)    <u>First Picture:</u>    In order to avoid a reversion of the Rights granted hereunder, Company must commence principal photography of the first Picture (the "First Picture") within twelve months from the date the Final Payment is due and payable pursuant to Paragraph 3 above, and initially release the First Picture theatrically within two and one half years from such commencement, subject to extension for an event of force majeure which prevents or materially interferes with production or post production of the First Picture, up to a maximum extension of six (6) months.

*See 9(c)*

(b)    <u>Subsequent Productions:</u> With respect to each remake or sequel Picture subsequent to the First Picture (the "Subsequent Production"): (i) initiate development and engage and commence a writer to start writing a screenplay within 12 months from the date of the initial U.S. theatrical release of the immediately preceding Picture. In this connection, Company shall be required to notify Marvel in writing of the name of the writer and the actual start date of the writer's writing services; (ii) pay Marvel $250,000, on the earlier of Company proceeding to the first optional step with the first writer or engaging a second writer; (iii) commence principal photography, and pay $900,000, less the $250,000, within three years from the date of the initial U.S. theatrical release of the immediately preceding Picture; and (iv) initially release the Subsequent Production in the U.S. theatrically within three years from such

Exhibit-9
WB136615
CONFIDENTIAL
93

commencement. If Company fails to initially release a Subsequent Production in the United States theatrically within three years from commencement of principal photography, Company shall lose the right to develop, produce and exploit any additional Subsequent Productions, however, if Company has complied with the below-the-line budget requirement outlined in Paragraph 11 below, Company shall nevertheless have all Rights granted to such Subsequent Production if Company releases such Subsequent Production in the United States theatrically within five years from completion of principal photography.

(c)    Reversion:  With respect to the First Picture, if Company has not timely satisfied the requirements set forth in Paragraph 8(a) above, all right, title and interest in and to the Property, the Iron Man Character and the Additional Iron Man Characters shall revert free and clear to Marvel without any liens or encumbrances on the Property, the Iron Man Character and the Additional Iron Man Character(s). With respect to each Subsequent Production, if Company fails to timely satisfy the requirements of Paragraph 8(b) above, Company shall thereupon lose all rights granted in this Agreement with respect to such Subsequent Production (except as permitted in the last sentence of Paragraph 8(b) above), and the right to develop, produce, distribute and otherwise exploit additional Subsequent Production and all right, title and interest in and to the Property, the Iron Man Character and the Additional Iron Man Characters shall revert free and clear to Marvel without any liens or encumbrances on the Property. However, it is acknowledged by Marvel that to the extent Company has actually produced a Picture in accordance with the terms of this Agreement, Company shall, despite the reversion, nevertheless, have the right in perpetuity to exploit any such Picture produced prior to such reversion in any and all media as set forth in this Agreement and the right to receive its share of merchandising revenues pursuant to Paragraph 6(a) above. For purposes of clarification, Company's right to share in Marvel's merchandising revenue related to the Picture is not affected by this reversion. For purposes of clarification, with respect to any rights that were "frozen" or on hold during the period that Company has the right to develop and produce a Picture, then after the expiration of such period, Marvel shall have the encumbered right to exercise those frozen rights (as well as those rights which have reverted) without restriction. Notwithstanding anything contained herein to the contrary, in the event of any reversion, Marvel shall not be deemed to have acquired any right, title or interest in or to any of the material prepared by or at Company's direction and Company shall own in perpetuity all such material.

9.    APPROVAL RIGHTS:  Company intends to engage a writer or writers to write a detailed treatment ("Treatment") setting forth the story for the Picture("Story"). Marvel shall have the right to approve every element of the Treatment, in its absolute discretion, including without limitation, to approve the Story and the following non-changeable elements of the Iron Man Character and the Additional Iron Man Characters as they appear in the Handbook (as opposed to specific comic book appearances of any such characters which may be referred to in the Handbook) (collectively "Non Changeable Elements"): the portrayal of the basic powers, basic personality traits and the physical appearance in its material aspects of the Iron Man Character and the Additional Iron Man Characters as these are described in the Handbook, and the general habitat, environment or setting in which the Iron Man Character and the Additional Iron Man Characters are portrayed in the Property, as specifically described in the Handbook. Company may change incidents in the Treatment and Story but may not materially or substantially alter or deviate from the approved Treatment, including without limitation, the Story as it appears in the Treatment and Company may not alter or deviate

Exhibit-9

WB136616
CONFIDENTIAL94

from the Non Changeable Elements. However, Company may alter or deviate from Non Changeable elements only if Marvel approves of such alterations or deviations when it approves the "Treatment" and/or "Final Screenplay". To the extent that the Story and Treatment and/or Final Screenplay do not specifically alter or deviated from (or is silent with regards thereto) the Non Changeable Elements, the parties agree that the point of reference and the standards for the Non Changeable Elements shall be as they appear in the Handbook. Marvel shall also have the right to approve the final version of the screenplay written under the supervision of Company and/or its assigns with respect to ensuring that such final screenplay has not materially or substantially altered or deviated from the approved Treatment and Story as it appears in the Treatment, and has not altered or deviated from the approved Non Changeable Elements. Company may select which Non Changeable Elements to include or not to include in the Treatment. Marvel agrees that if Company requests Marvel to discuss or clarify what constitutes a Non Changeable Elements, Marvel shall discuss such matters in good faith with Company and shall use reasonable efforts to be available when requested by Company to partake in such discussions. In order to insure that Company has specific and timely notice of Marvel's disapproval, as well as of any claimed breach of the approval provisions of this Paragraph 9, and to expeditiously resolve any dispute regarding same, Company and Marvel agree to the procedure set forth below. For purposes of exercising its approval rights hereunder, Marvel shall designate a single individual (the "Marvel Designee") who shall be subject to replacement from time to time by Marvel.

(a)     Upon completion of the Treatment to Company's satisfaction, Company will supply Marvel with a written copy of the Treatment. Within five (5) business days after Marvel's receipt of the detailed Treatment, Marvel will inform Company orally, stating whether the Treatment, Story and the elements and other aspects thereof are approved or disapproved by Marvel. Marvel has the absolute right to approve all aspects of the Treatment and Story as it appears in the Treatment. If Marvel disapproves the Treatment or Story, representatives of Marvel and Company shall meet to discuss the problems and objections that Marvel has to the submitted Treatment, Story and elements and other aspects thereof. Marvel further agrees that within five (5) business days after Marvel has orally informed Company of elements of the Treatment and Story that it has approved or disapproved, Marvel shall provide Company with a letter which summarizes the points that Marvel has informed Company of orally. If Marvel fails to respond to the Treatment and Story within the time periods set forth above, the Treatment and Story shall be deemed approved. After receiving Marvel's comments, Company shall cause the Treatment and Story to be revised and rewritten ("Second Treatment") and shall submit a revised detailed treatment to Marvel for its approval, provided that Company shall have no obligation to submit the Second Treatment if the Treatment is approved or deemed approved. The same process shall be repeated until Marvel approves or has been deemed to have approved the Treatment and the Story as it appears in the Treatment ("Approved Treatment") and the Non Changeable Elements as they appear in the Approved Treatment ("Approved Non Changeable Elements"). It is agreed, however, that if the Story and Treatment do not alter or deviate from (or is silent with respect thereto) the Non Changeable Elements, the point of reference and the standards for the Approved Non Changeable Elements shall be as they appear in the Handbook.

(b)     Notwithstanding anything to the contrary contained herein Company agrees that it will not commence principal photography of the Picture without first obtaining Marvel's prior written approval of that version of the Screenplay that Company shall utilize as the final screenplay upon which the Picture is to be based ("Final

Exhibit-9

WB136617
CONFIDENTIAL 95

Screenplay"). Marvel acknowledges that the sole purpose of this approval right is to insure that the Final Screenplay does not materially or substantially alter or deviate from the Approved Treatment except for incidental and non-material changes, and that Company has not altered or deviated from the Approved Non Changeable Elements. Marvel will have five (5) business days after Marvel's actual receipt of the Final Screenplay (provided that if Company determines that the exigencies of production so require, and if Company delivers written notice to such effect to Marvel concurrently with the Final Screenplay, then the foregoing five (5) business day period shall be reduced to three (3) business days), within which to inform Company in writing of its contention that the Final Screenplay contains new elements and/or changes to the Approved Treatment which materially or substantially alter or deviate from the Approved Treatment excluding incidental or non-material changes ("Changed or Unapproved Elements") or alters or deviates from the Approved Non Changeable Elements. Marvel agrees to inform Company with specificity: which Changed or Unapproved Element(s) substantially or materially alter or deviate from the Approved Treatment; the manner in which such Changed or Unapproved Element(s) are not acceptable to Marvel; any modification which will render such Changes or Unapproved Element(s) acceptable to Marvel; and any changes that altered or deviated from the Approved Non Changeable Elements. Marvel further agrees that if, in Marvel's opinion, Company altered or deviated from the Approved Non Changeable Elements, Marvel shall identify and specify to Company what has been altered or deviated to make such changes unacceptable to Marvel. If and to the extent that Marvel shall fail to object in writing as aforesaid within said five (5) (or three (3), as applicable) business day period, then each Changed or Unapproved Element in the Final Screenplay so submitted not so objected to shall be deemed to be approved by Marvel and Marvel shall thereafter forever be foreclosed and precluded from objecting to same and to the Final Screenplay or the Picture except only, if and to the extent that the Picture, as photographed, alters or deviates from Final Screenplay approved or deemed approved by Marvel, in a manner which is more than incidental and non-material. If Marvel contends that the Final Screenplay contains Changed or Unapproved Elements (excepting incidental and non-material changes) or contains alterations or deviations to the Approved Non Changeable Element and if Marvel notifies Company as required in this subparagraph, Company shall have a period of thirty (30) days to revise the Final Screenplay in order to cure and modify the objectionable Changed or Unapproved Elements (and/or Approved Non Changeable Elements) which are not acceptable to Marvel (provided that such cure period may be waived by Company in the event Company elects to institute arbitration proceedings pursuant to Paragraph 9(f) below). If Marvel and Company disagree as to whether or not the Final Screenplay in fact contains Changed or Unapproved Elements or if Company altered or deviated from the Approved Non Changeable Elements and if the parties do not amicably resolve their dispute, the parties agree that Company shall not commence principal photography on the Picture until the dispute has been resolved by an arbitration award in favor of Company or otherwise resolved in accordance with Paragraph 9 (f) below.

(c)     Subject to the approval of the director of the Picture, Marvel may, at its sole cost and expense, have the Marvel Designee be present on the set during principal photography and to watch dailies as the same are available. Company shall provide the Marvel Designee the opportunity to attend screening of dailies provided that the

Exhibit-9

WB136618
CONFIDENTIAL

Marvel Designee shall in no way materially interfere with the production of the Picture.

(d)    Company shall invite the Marvel Designee to attend one screening of the final cut of the Picture at least thirty five (35) business days prior to the initial release, theatrically or otherwise, of the Picture anywhere in the world, which initial release shall be deemed to include any public previews but excluding market research test screenings. The foregoing thirty five (35) business day period shall be subject to reduction if the exigencies of Company's release schedule so requires. If the Marvel Designee attends any such screening of the final cut of the Picture to which he/she is so invited by Company, then Marvel shall have five (5) business days following such screening (provided that if Company determines that the exigencies of its release schedule so require, and if Company so informs the Marvel Designee prior to the screening, then the foregoing five (5) business day period shall be reduced to three (3) business days) within which to inform Company, in writing and with specificity: whether any material in the final cut of the Picture contains alterations or deviations from the previously approved or deemed approval Final Screenplay except for incidental and non-material changes made due to the exigencies of production, and any modifications which will render such alterations or deviations acceptable to Marvel, excluding incidental and non-material changes made due to the exigencies of production. If and to the extent that Marvel shall fail to object in writing as aforesaid within said five (5) (or three (3) as applicable) business day period; then each such alteration or deviation from the approved or deemed approved Final Screenplay as scripted not so objected to shall be deemed to be approved by Marvel and Marvel shall thereafter forever be foreclosed and precluded from objecting to same. If the Marvel Designee fails or is otherwise unable to attend the scheduled screening of the final cut of the Picture, Company shall arrange an alternative screening at Marvel's representative's convenience in a timely and prompt manner but, at Marvel's election, no later than five (5) business days from the date of the previously scheduled screening and failure of the Marvel Designee to so attend shall be deemed approval by Marvel hereunder.

(e)    (i)    All objections by Marvel hereunder shall only be deemed received by Company if tendered in writing to the creative executive designated by Company, to the Senior Executive Vice President of Legal and Business Affairs, Benjamin Zinkin or their successors, addressed to each of them in the manner set forth in Paragraph 21 below.

        (ii)    If and when Company submits any material to the Marvel Designee for approval pursuant to this Paragraph 9 (e.g., Treatment and final Screenplay), Company shall concurrently send to Allen S. Lipson, Executive Vice President of Business and Legal Affairs of Marvel and Mark S. Temple, Esq. ( at the address set forth in Paragraph 21 below), or his successor(s), a copy of the transmittal letter sent to Marvel accompanying such material (but Company shall not be required to send Allen S. Lipson, Executive Vice President of Business and Legal Affairs of Marvel or Mark S. Temple the material).

**Exhibit-9**
**WB136619**
**CONFIDENTIAL**

(f)    Any dispute between Marvel and Company (1) as to whether Marvel has valid grounds for disapproval and/or Company has violated Marvel's approval rights as set forth in this Paragraph 9 with respect to the Final Screenplay and the Picture, and/or (2) as to Company's obligations or permitted activities after such disapproval which Marvel and Company are not able to resolve between themselves shall be resolved by binding, final expedited arbitration in Los Angeles, California in accordance with the procedures set forth in this subparagraph (f) and (to the extent not inconsistent with the provisions of this subparagraph) in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then in effect for Expedited Procedures, to the extent not inconsistent with California law.   For purposes of clarification, the arbitration proceedings set forth herein only apply to Marvel's approval rights to (1) the Final Screenplay insofar as it alters or deviates from the Approved Non Changeable Elements or materially or substantially alters or deviates from the Approved Treatment and/or (2) the Picture insofar as it deviates or alters the approved Final Screenplay (including the Approved Non Changeable Elements as same were approved or deemed approved in the Final Screenplay) except for incidental and non material changes made due to the exigencies of production. Any and all other types of breaches or alleged breaches under this Agreement shall be resolved pursuant to litigation proceedings instituted in a court of competent jurisdiction.  The arbitrator shall determine whether Marvel has valid grounds for disapproval and/or whether Company has violated Marvel's approval rights and which changes, if any, Company must make in the Final Screenplay or the Picture in order to proceed with the commencement of principal photography or the release of the Picture.  In respect of an arbitration relating to Marvel's approval rights with respect to the Final Screenplay, the arbitrator shall make specific finding as to : which Changed or Unapproved Elements substantially or materially alter or deviate from the Approved Treatment and the specific manner in which such alterations or deviations are manifested; what specific changes will render such Changed or Unapproved Elements consistent with Marvel's approval rights hereunder; which changes altered or deviated from the Approved Non Changeable Elements; what specific changes should be made in the Final Screenplay in order to render the foregoing changes acceptable or remove such changes in order to accord the Final Screenplay and the Approved Non Changeable Elements. In respect of an arbitration relating to Marvel's approval rights with respect to the final cut of the Picture, the arbitrator shall make specific findings as to the specific cuts and/or reshoots which will render the final cut of the Picture consistent with the Final Screenplay.   In making the foregoing findings, the arbitrator will endeavor to specify the required changes which would be most economically practicable and feasible in the light of Company's production and release schedule which are consistent with Marvel's approval rights hereunder.  Until and unless the arbitrator determines that Marvel does not have valid grounds for disapproval and/or Company did not violate Marvel's approval rights and/or Company changes the Final Screenplay or the final cut of the Picture in accordance with arbitrator's findings, Company shall not release the Picture theatrically or otherwise.  The arbitration award must be based on, and accompanied by, a written statement explaining the factual basis of the award as to each of the principal controverted issues at the hearing. The arbitrator shall not have the authority to issue a provisional injunction or to award damages.  During the pendency of the arbitration, either party may seek provisional relief from a court to compel each party and the arbitrator to abide by the provisions of this Paragraph 9. If the Court subsequently determines that the parties, including the arbitrator, have

Exhibit-9
WB136620
CONFIDENTIAL

failed to comply with the court's prior order, then the parties may seek whatever remedies such parties deem appropriate. Either party may seek injunctive relief in connection with a proceeding to correct, vacate or confirm the award, under Title 9 of the California Code of Civil Procedure, which action shall be taken promptly after the arbitration award which may be by a separate action for an injunction. This agreement to arbitrate shall be governed by the procedural and substantive laws of the State of California. Either party may commence an arbitration (such commencing party is referred to as the "First Party") by written notice to the other party ("Other Party"), which notice shall specify the factual circumstances underlying the First Party's claim (and, if Marvel is the First Party, such notice shall set forth the specifics of the alleged violations by Company of Marvel's approval rights)  If Marvel is the First Party, Marvel agrees to institute such proceedings prior to the scheduled date of principal photography if Marvel fails to approve the Final Screenplay (provided however that Marvel must institute such proceeding no later than five (5) business days after the expiration of the thirty (30) day cure period provided in Paragraph 9(b) but if Company notifies Marvel in writing that Company elects to waive the thirty (30) day cure period, Marvel shall commence the arbitration proceeding within five (5) business days after receipt of such waiver notice) or Marvel approved or is deemed to have approved the Final Screenplay, then at least fifteen (15) business days prior to the initial release, theatrically or otherwise, of the Picture (excluding private screenings but including any public previews but not market research test screenings) if Marvel believes that the Picture contains alterations or deviations from the previously approved or deemed approved Final Screenplay except incidental or non material changes made due to the exigencies of production, provided, however, that Marvel must institute such proceeding no later that five (5) business days from the date on which Marvel gave Company objections in writing concerning the Picture under Paragraph 9 or Marvel approved or is deemed to have approved the final cut of the Picture.  The arbitrator shall be appointed in accordance with the Expedited Procedures of the Commercial Arbitration Rules of the AAA (or the parties may mutually agree to an arbitrator), provided that if the Expedited Procedures are used, the AAA shall give telephonic notice of the list of five (5) proposed arbitrators, the list shall be returnable to the AAA within three (3) days from the date of notice, and the parties shall have only three (3) days within which to notify the AAA by telephone of any objection to the arbitrator appointed.  The arbitrator shall be a disinterested person with experience in the motion picture industry.  The parties' preference is for an arbitrator on the approved list for Los Angeles arbitrators under the Writers Guild of America 1998 Theatrical and Television Basic Agreement. The AAA shall include such persons on the list of five (5) proposed arbitrators to the extent they are available for an expedited arbitration.  The arbitration award shall be rendered within three (3) business days following the conclusion of the arbitration hearing and shall be binding upon and adhered to by the parties hereto, and may be confirmed in any court of competent jurisdiction.  Marvel and Company agree that the arbitration award may be confirmed in the courts of the Superior Court for Los Angeles County, State of California and United States District Court for the Central District of California and in such event, and solely for the purposes of this Paragraph 9, the parties hereto irrevocably submit themselves to the non-exclusive in personam jurisdiction and  venue of such courts and agree not to assert that the California courts are an inconvenient or improper forum for such confirmation. With respect to the arbitration, any confirmation proceeding, and any related equitable proceeding, the prevailing party shall be entitled to recover costs and expenses, including

**Exhibit-9**

**WB136621**
**CONFIDENTIAL** 99

reasonable legal fees. With respect to the arbitration, the fees and expenses of the arbitration and the AAA administrative fees shall also be paid by the party that does not prevail. With respect to an arbitration regarding the Final Screenplay or the final cut of the Picture, if Marvel prevails in the arbitration, then either: (i) Company shall resubmit the Final Screenplay and/or final cut or the Picture for Marvel's determination that it has been corrected to Marvel's satisfaction as required hereunder, or (ii) Company shall make the changes in the Final Screenplay or the Picture set forth in the award of the arbitrator and after the arbitrator has agreed that the changes have been made, thereafter shall have the right to proceed with the production and/or release of the Picture. During the pendency of the arbitration with respect to the Final Screenplay, the obligation of Company to make further payments hereunder shall be extended for a time equal to the period commencing with the institution of such arbitration through the period required to cure the defects in the Final Screenplay to Marvel's satisfaction (provided such extension during the cure period shall not exceed ninety (90) days).

10.    MARKETING STRATEGY AND ADVERTISING CAMPAIGN:    During the initial development and creation of Company's marketing strategy and advertising campaign in connection with the initial U.S. theatrical release of the Picture, Company shall meet and consult with the designated Marvel representatives in an effort to give Marvel ample opportunity to coordinate its merchandising and related campaigns with respect to the Picture and accord Marvel good faith consultation with respect to the advertising campaign for the initial U.S. theatrical release of the Picture, however, Company's decisions shall be controlling.

11.    BELOW-THE-LINE SPENDING COMMITMENT:    Prior to the commencement of photography of each Picture produced hereunder, Company will advise Marvel of the amount of the direct charges budget for the below-the-line accounts (including, without limitation, visual and special effects costs but not including overhead) ("Below-the-Line Budget") thereof. If the amount is less that $15,000,000, Company, as provided above, may not proceed with production of the applicable Picture unless Company obtains Marvel's prior written consent (or until Company increases the Below-the-Line Budget to $15,000,000, which Company reserves the right to do at any time).

12.    PRODUCING SERVICES: With respect to each Picture produced hereunder, Company will engage two (2) individuals designated by Marvel and approved by Company (such approval not be unreasonably withheld) to render non-exclusive services as a producer and/or as executive producer, for an aggregate fee of $350,000, however, only Avi Arad is preapproved to render services as a producer; and while each designee is rendering services required by Company on location, Company will furnish him or her with first-class round-trip transportation, if available, plus $1,750/$2000/$2500 for all living and incidental expenses. Such producer and/or executive producing agreements will be in accordance with Company's standard producer and/or executive producer and  Agreements (subject, however, to such changes as are agreed to in writing following good faith negotiation within Company's usual parameters taking into account Marvel's stature). Avi Arad is pre-approved by Company to render either producing and/or executive producing services (as Avi Arad so elects) and Stan Lee is pre-approved to render executive producing services. Provided a Picture is actually greenlighted, Company agrees to pay the sum of $350,000 directly to Avi Arad (which is  the $350,000 aggregate fee set forth earlier in this Paragraph 12).

**Exhibit-9**

WB136622
CONFIDENTIAL

13.  <u>CREDITS:</u>

(a)  <u>Producer and Executive Producer:</u>  With respect to each Picture produced hereunder, Marvel may designate up to one individual to receive "Producer" credit (only Avi Arad is approved to receive a producer credit ) and/or up to two individuals to receive "executive producer" credit on screen and (subject to Company's usual exceptions) in the billing block portion of paid advertising, which credit may be shared if Company so elects.  Marvel acknowledges that the total number of individuals to receive credit that are Marvel designees are two (2).  The size of type of the credit will be 50%/25% of the size of type used to display the regular title on screen/in the billing block portion of paid ads, but will in no event be smaller than the size of type used to display the individual credit, on screen/in paid ads, of any other individual or entity (other than Company or a financier) rendering producer-type services on the Picture. On screen, the credits will be on a separate card (on which the Marvel designees' names may appear) in the main titles, if main title credits are utilized, which separate card shall appear before the respective cards according producer and/or executive producer credit(s) to any individual(s) other than the Marvel designees, however, if Avi Arad elects to receive an Executive Producer's credit (instead of a Producer credit), then such Executive Producer credit shall be on the same shared card with Stan Lee's credit, with Avi Arad's credit in first position.  If any other producer is accorded an individual producer credit in an Excepted Ad (as customarily defined by Company) (other than ads related to awards, nomination, congratulations and the like), the aforesaid credits shall also be accorded in such Excepted Ad.  Avi Arad is hereby designated by Marvel and approved by Company to receive a "producer" or "Executive producer" credit, as Marvel elects.  Stan Lee is hereby designated by Marvel and approved by Company to receive an "executive producer" credit.

(b)  <u>"In Association With":</u>  Marvel will receive a credit in the form "in association with Marvel Enterprises"(or such other Marvel affiliated entity as Marvel may designate) on screen and (subject to Company's usual exceptions) in the billing block portion of paid ads (the "Association Credit").  The size of type of the Association Credit will be equal to that of Company's presentation credit on screen and in the billing block portion of paid ads, excluding Company's (i.e., New Line) full on screen solo logo presentation credit which appears at the beginning of each Company (i.e., New Line) theatrical motion picture.  On screen, the Association Credit will appear on a separate card immediately following the Company presentation credit, excluding Company's full on screen solo logo presentation credit which appears at the beginning of each Company theatrical motion picture.  Marvel's distinctive static logo will also appear on screen (in the end titles) and in paid ads (subject to Company's usual ad exclusions) (in a position, etc. to be determined by Company).  If the director's "Film By" credit or any other Company's production credit is accorded in any Excepted Ad (other than ads related to awards, nominations, congratulation and the like), Marvel's Association Credit shall be accorded in the billing block portion of such Excepted Ad; provided however, that if such "Film By" or other Company's production credit and Company's presentation credit are accorded in connection with the artwork title in an Excepted Ad (collectively, "Artwork Credits"), Marvel's Association Credit will also be accorded in connection with the artwork title in such Excepted Ad in a size of type at least equal to the size of type used to display the smallest of the Artwork Credits.  If the "Film By" credit or any other Company's production credit is accorded audibly ad well as visually in an Excepted Ad Marvel's Association Credit shall be

**Exhibit-9**

WB13662101
**CONFIDENTIAL**

accorded audibly in addition to its being accorded visually in such Excepted Ad. Notwithstanding the foregoing sentence, if the Excepted Ad is solely an audio ad, then an audible mention of the "Film By" credit or any other Company's production credit will not trigger Marvel's Association Credit unless there is also an audible presentation credit accorded to Company in such Excepted Ad.

(c)   No casual or inadvertent failure by Company to comply with the credit obligations shall be a breach of this Agreement nor shall any failure by any third party to comply with such obligations constitute a breach of this Agreement by Company. In the event of any failure by Company to comply with the foregoing credit obligations, and upon such written notice from Marvel hereof, Company shall take reasonable steps to prospectively cure any such failure which is economically practical to cure. Company shall advise its licensees of the foregoing credit obligations in writing.

14.   PREMIERES AND SCREENINGS: If Company elects to have one or more premiere(s) of the Picture in the United States, Marvel shall be entitled to receive not less than fifteen (15) tickets to each premiere. However, Company is under no obligation to hold a premiere. Company agrees that it shall be obligated to hold, at its sole cost and expense, two (2) private screenings for Marvel's affiliates and subsidiary companies, executives, business partners and others designated by Marvel. One (1) screening will be required to be held in New York City and one (1) in Los Angeles, however the timing of such screenings shall be determined by Company after consultation with Marvel's Representatives.

15.   NEW CHARACTERS: If Company exploits the New Characters other than in the media permitted herein, Company agrees that Marvel shall be presumed to be entitled to injunctive and equitable relief as well as any other remedies and damages permitted by a court of law. With respect to a Subsequent Production based primarily on a New Character, the parties shall have the same rights set forth in Paragraphs 9 through 14 as if such Subsequent Production was based primarily on a Marvel Character.

16.   CONFIDENTIALITY: Company and Marvel agree to take any and all reasonable steps to maintain the confidentiality of the terms of this Agreement; it being understood, however, that this Paragraph 16 shall not apply to any disclosures made for Company's and/or Marvel's internal purposes or to any disclosures which may be required by any applicable law, or by order or decree by any court of competent jurisdiction. The foregoing shall not preclude either party from releasing customary publicity concerning the existence of the Agreement provided that such publicity does not disclose the financial terms thereof.

17.   NO OBLIGATION TO PROCEED:   Nothing contained herein shall be construed to obligate Company to produce, release, distribute, exhibit, advertise or exploit any motion picture based on the Property or to otherwise authorize any person, firm or corporation to do so.

18.   REPRESENTATIONS, WARRANTIES AND INDEMNITIES:

(a)   Marvel represents, warrants and agrees that:

(i)   Marvel is the sole owner of all rights of every kind and nature throughout the world in and to the Property and has full power and authority to enter into this Agreement and grant the Rights herein granted to Company as more

Exhibit-9

WB136624
CONFIDENTIAL102

particularly set forth in Paragraph 5(a) hereof as well as the right granted under Paragraph 5(b) hereof;

(ii) None of the Rights granted herein are currently granted to any other party or are presently encumbered or otherwise disposed of in any manner to any person.

(iii) No Picture based in whole or part upon the Property has been produced or authorized by or with the knowledge or consent of Marvel;

(iv) There are no claims or litigation pending which will or might adversely affect any of the rights herein granted to Company;

(v) Neither the Property nor any part thereof, or the exercise by Company of any of the rights herein granted, will violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, right of privacy or publicity, or any other right of any person, or constitute a libel or slander against, or violate any common law or any other rights of any person, firm or corporation;

(vi) The Property is not in the public domain and enjoys, and will enjoy, either statutory or common law copyright protection in the United States and all countries adhering to the Berne and Universal Copyright Conventions and that the rights granted to Company hereunder are and will be exclusive;

(vii) Marvel is the sole and exclusive owner and author of the Origin Story for copyright purposes. To the best of Marvel's knowledge and belief after reasonable due diligence, no writers or illustrators contributed to the creation of the Iron Man Character or the visual representation, graphic, and pictographic material thereof other than the creative teams on the comic book issues that compromise the Origin Story as set forth in Paragraph 5(a)(ii) above, as follows:

(A) "Tale of Suspense" # 39: written by Stan Lee and illustrated by Don Heck (Stan Lee created the origin story for the Iron Man Character and Don Heck and Jack Kirby created the first visual representation, graphic, and pictographic material for the Iron Man Character);

(B) "Iron Man" (vol. 1) #1: written by Stan Lee and Archie Goodwin and illustrated by Gene Colan;

(C) "Iron Man" (vol. 1) #46: written by Gary Friedrich and illustrated by George Tuska;

(D) "Iron Man" (vol. 1) #122: written by David Michelinie and illustrated by Carmine Infantino;

(E) "Iron Man" (vol. 1) #269 and #270: written by John Byrne and illustrated by Paul Ryan;

Exhibit-9
WB136625
CONFIDENTIAL03

(F)     "Iron Man" (vol. 2) #1: written by Scott Lobdell and Jim Lee and pencilled by Whilce Portacio;

(G)     "Iron Man" (vol. 3) #1: written by Kurt Busiek and pencilled by Sean Chen (this issue contained a "Special Thanks" credit to Alex Ross and Allen Bujack for their armor design contributions);

(H)     "Iron Man: The Iron Age" #1: written by Kurt Busiek and pencilled by Patrick Zircher; and

(I)     "Iron Man: The Iron Age" #2: written by Kurt Busiek and Richard Howell and pencilled by Patrick Zircher.

(viii)   To the best of Marvel's knowledge and belief after reasonable due diligence, Exhibit "D" is a complete and accurate list of (i) the first appearance issue of each character listed on Exhibit "A" ("Exhibit 'A' Characters"); (ii) the cover date of the first appearance issue for each of the Exhibit "A" Characters; (iii) the date of publication of the first appearance issue for each of the Exhibit "A" Characters; (iv) all writer(s) of the issues for each of the Exhibit "A" Characters; and (v) all illustrator(s) that created the visual representation, graphic and pictographic material for each of the Exhibit "A" Characters, and to the best of Marvel's knowledge and belief after reasonable due diligence, no other writer(s) or illustrator(s) contributed to the initial representation of the characters or the visual representation, graphic or pictographic material thereof.

(ix)    Marvel is the sole and exclusive owner and author of all characters set forth on Exhibit "A" for copyright purposes and has the sole and exclusive right to grant the "Rights" herein granted.

(x)     To the best of Marvel's knowledge and belief after reasonable due diligence, the Property was written and illustrated solely by Contributors and is wholly original with Contributors;

(xi)    Marvel has not done or omitted to do, nor will Marvel do or omit to do, any act or thing which would materially impair, encumber or diminish Company's enjoyment of the Rights and all other rights and privileges granted and to be granted to Company under this Agreement;

(xii)   Marvel has not entered into any agreement (written or oral, implied or express) with any third party which relates to any production based on the Rights granted to Company with respect to the Property nor have they made any promises to any third party in connection with any production based on the Rights granted to Company with respect to Property;

(xiii)  With respect to elements of the Property which first secured statutory copyright prior to 1978, the Contributors, as creators of the characters set forth on Exhibit "A" and their respective traits, were at all times acting as employees of Marvel within the scope of their employment, or if, acting as independent contractors, such creators were acting at Marvel's instance and expense and subject to Marvel's right to control the results.

**Exhibit-9**

WB136626
CONFIDENTIAL104

(xiv)   With respect to elements of the Property which first secured statutory copyright after 1977, the Contributors, as creators of the characters set forth on Exhibit "A" and their respective traits, were at all times acting as employees of Marvel within the scope of their employment.

(xv)    Property has been published and registered for statutory copyright for more than three (3) years.

(xvi)   Marvel has no information that neither any person who participated in the creation of the Property nor any other party has ever claimed to have authored the work on their own behalf, or claimed any ownership or co-authorship of the Property, contended that Marvel should not be treated as the sole and exclusive author and owner under the copyright laws, or filed copyright registration with respect to any portion of the Property or the characters contained therein.

(xvii)  To the extent that the Property was not created as a "work made for hire", the Contributors have no rights in the Property and all rights have been assigned to Marvel.

(xviii) The final confirmation order with respect to Marvel's bankruptcy removed all pre-bankruptcy security interests in connection with the Property and the rights granted to New Line hereunder and that all parties that needed to be served with notice thereof in connection therewith were properly served.

(b)     Marvel will defend, indemnify, make good, save and hold harmless Company, its successors, licensees and assigns and their respective officers, agents and employees (collectively, "Company Indemnities") from all liabilities, damages, costs, charges, reasonable outside attorney's fees, recoveries, actions, judgments, penalties, expenses and other losses whatsoever (collectively, "Expenses") which may be obtained against, imposed upon or suffered by the Company Indemnities arising from a breach of any of Marvel's representations, warranties or agreements hereunder unless the claim arises from Company's tortious or criminal conduct or arises from a breach by Company of a third party agreement between Company and such third party.

(c)     Company will also defend, indemnify, make good and hold harmless Marvel, its successors, licensees and assigns and their respective officers, agents and employees (collectively, "Marvel Indemnities") from all Expenses which may be obtained against, imposed upon or suffered by the Marvel Indemnities by reason of a breach of any representation, warranty, undertaking or agreement of the Company hereunder and/or by reason of the fact that material added or alternations to the Property by or pursuant to Company's authority, violates, conflicts with or infringes upon a right of any third party and/or from any third party claim resulting from the development, production, distribution or other exploitation of the Property by or pursuant to Company's authority except if such claim is based on a matter that would entitle Company indemnification from Marvel pursuant to Paragraph 18(b) above or unless the claim arises from Marvel's tortious or criminal conduct or arises from a breach by Marvel of a third party agreement between Marvel and such third party.

**Exhibit-9**
WB136627
CONFIDENTIAL

(d)     With respect to a claim that is subject to or covered by Company's indemnity of Marvel pursuant to Paragraph 18(c) above, Marvel shall have the right as well as the obligation to consult and cooperate with Company in connection with any claim, subject to the indemnity set forth in Paragraph 18(c) above and, upon Company's request, to furnish Company with any and all evidence, materials, or other information relevant thereto. Marvel shall have the right (at Marvel's sole expense) to have Marvel's own counsel present in connection with the defense of such claim, provided that such counsel fully cooperates with Company's counsel and does not interfere with the reasonable handling of the case by Company's counsel. Subject to the limitations contained in Paragraph 18(f) below, the aspects of the defense of such claim, whether as part of any litigation, negotiation or otherwise (including, without limitation, any decision regarding any settlement), shall be controlled by Company, Company shall be free to use counsel of Company's choice in connection therewith, and such control shall in no way abrogate or diminish Marvel's obligations under Paragraph 18(b) above.

(e)     With respect to a claim that is subject to or covered by Marvel's indemnity of Company pursuant to Paragraph 18(b) above, Company shall have the right as well as the obligation to consult and cooperate with Marvel in connection with any claim, subject to the indemnity set forth in Paragraph 18(b) above and, upon Marvel's request, to furnish Marvel with any and all evidence, materials, or other information relevant thereto. Company shall have the right (at Company's sole expense) to have Company's own counsel present in connection with the defense of such claim, provided that such counsel fully cooperates with Marvel's counsel and does not interfere with the reasonable handling of the case by Marvel's counsel. Subject to the limitations contained in Paragraph 18(f) below, the aspects of the defense of such claim, whether as part of any litigation, negotiation or otherwise (including, without limitation, any decision regarding any settlement), shall be controlled by Marvel, Marvel shall be free to use counsel of Marvel's choice in connection therewith, subject to Company's approval of such counsel (such approval shall not be unreasonably withheld), and such control shall in no way abrogate or diminish Company's obligations under Paragraph 18(c) above.

(f)     The indemnifying party (either Marvel or Company) shall not settle any third party claim, the defense, appeal or settlement of which is controlled by it without the indemnified party's prior written consent (which consent will not be unreasonably withheld or delayed), unless the terms of such settlement or compromise (a) involves only the payment of money damages and (b) releases such indemnified party from any and all liability with respect to such third party claim and/or the indemnifying party pays all obligations under such settlement. In this connection, it is specifically acknowledged that neither party has the right to dispose of or settle a claim, without the indemnified party's prior written consent, which would compromise or encumber the copyright, trademark, title to the Property or the Rights granted or reserved by Marvel to the Property or the Picture or any New Line Material.

(g)     Notwithstanding anything to the contrary contained in Paragraphs 18(a)(i), 18(a)(ii), 18(a)(v), 18(a)(vi) and 18(a)(x) above, the representations and warranties contained therein shall not apply to stories (the "Stories") contained in the comic books (other than the Origin Story, the Handbook and all aspects of the "Iron Man" character); provided, however, that in the event that Company intends to include elements from

WB136628
CONFIDENTIAL
706

the Stories in the Picture, Marvel agrees to use reasonable efforts to provide all documentation evidencing ownership of such Stories to Company and, if Marvel is not the owner of any of the Rights therein, Marvel shall use reasonable good faith efforts to obtain such Rights for the benefit of Company provided that Marvel shall not be required to expend any money to obtain such Rights.

19.   ADDITIONAL DOCUMENTS:   Concurrently with the execution of this Agreement Marvel will execute a Short Form License Agreement attached hereto as Exhibit "B" and the Assignment attached hereto as Exhibit "C". The Assignment shall be dated and effective as of and only if the Final Payment is timely paid pursuant to the terms hereof. Marvel shall execute and deliver any further and additional documents which Company may deem reasonably necessary to carry out and effectuate the purpose and intent of this Agreement. If Marvel fails within a reasonable time after written request therefore to execute and deliver to Company any such further documents required of Marvel under this Agreement or Marvel fails within a reasonable time after written request therefore to take any action reasonably necessary or desirable to effectuate the purposes of this Agreement (including, without limitation, renewing copyrights and initiating and maintaining actions of infringement), then Marvel hereby irrevocably appoints Company as Marvel's attorney-in-fact to execute such documents and take any such actions. Said appointment shall be coupled with an interest and shall be irrevocable. Company shall provide Marvel with the opportunity to comment on any such documents and will furnish Marvel any and all documents executed as attorney-in-fact, provided that any inadvertent failure to do so shall not be deemed a breach of this Agreement.

20.   ASSIGNMENT:   Marvel agrees that Company may assign this Agreement at any time, to another corporation, partnership, individual, or entity; provided, that Company shall remain secondarily liable in respect of its obligations to Marvel hereunder if Company elects to assign the Agreement unless such assignment is to a "major" (which for purposes hereof is limited to Disney, Fox, Warner Bros., Universal, Sony, Paramount and Dreamworks), Miramax, MGM/UA, an affiliate of Company, another similarly financially responsible party whose net worth is or exceeds $750,000,000, or a purchaser of all or substantially all of New Line Cinema Corp's stock or assets; and which entity assumes all of Company's obligations hereunder in writing.

21.   NOTICES: All notices hereunder shall be in writing and shall be given by personal delivery, or given by telegram or facsimile transmission, or by registered or certified mail (postage prepaid), or by overnight delivery verified by a receipt, and shall be deemed given hereunder on the date delivered, sent by overnight delivery verified by a receipt, telegraphed or faxed or a date forty eight (48) hours after the date mailed. The time to respond to notices given during the Christmas-New Year's week shall be tolled until five (5) business days following New Year's Day. Until further notice the address of the parties shall be as follows:

|  |  |
|---|---|
| MARVEL | COMPANY |
| Marvel Enterprises, Inc. | Katja Motion Picture Corp. |
| 387 Park Avenue South | c/o New Line Cinema Corp. |
| 11th Floor | 116 North Robertson Blvd. |
| New York, NY 10016 | Suite 200 |
| Attention:  Allen S. Lipson, | Los Angeles, CA 90048 |
| Executive Vice President | Attention: Sonya Thompson |
| Business and Legal Affairs |  |
|  | and |

with a copy to:
Mark S. Temple, Esq.
9000 Sunset Blvd., Suite 800
Los Angeles, CA 90069

New Line Cinema Corp.
Benjamin Zinkin
Senior Executive Vice President
New Line Cinema
888 Seventh Avenue, 20th Floor
New York, NY 10106

22.    WAIVER OF "DROIT MORAL": Except as specifically set forth in Paragraph 9 above, Marvel hereby waives, for itself and, to the extent such rights are controlled by Marvel, on behalf of Contributors and their heirs, executors, administrators and assigns, all right of "droit moral" or any similar laws or legal principles, and agrees, for itself and, to the extent such rights are solely controlled by Marvel, on behalf of Contributors and their heirs, executors, administrators and assigns, to the extent permitted by applicable law, not to institute, support, maintain or permit directly or indirectly any litigation or proceedings instituted or maintained on the ground that Company's exercise of its rights in the Property in any way constitutes an infringement or violation of any right of "droit moral" or is in any way a defamation or mutilation of the Property, or any part thereof, or contains unauthorized variations, alterations, modifications, changes or translations.

23.    INSTITUTION OF LEGAL ACTION: If Company desires to institute in the name and on behalf of Marvel suits and proceedings at law or in equity to enjoin and restrain any infringements of the Rights granted herein, Company shall request Marvel to do so in writing. If Marvel fails or refuses to institute such action(s), Marvel hereby grants to Company the free and unrestricted right, exercisable at Company's sole cost and expense, to institute in the name and on behalf of Marvel suits and proceedings at law or in equity to enjoin and restrain any infringement(s) of the "Rights" herein granted; Marvel herein assigns to Company any and all causes of action arising from any such infringement(s) and any and all recoveries obtained in any such action. However, Company cannot dispose of or settle any action which would compromise or defame the copyright, trademark, title to the Property or the Rights granted or the rights reserved by Marvel to the Property. Net recoveries (i.e., gross recoveries less attorneys' fees and court costs) from such actions shall be included in the Gross Receipts.

24.    COPYRIGHT OF LITERARY PROPERTY: Marvel shall take and complete any steps and proceedings required by the law of any country in the world in which the Property is hereafter published to secure copyright in the Property and to prevent the Property from falling into the public domain by reason of any such publication. Marvel shall take such steps as may be reasonably necessary to renew or extend, insofar as possible, any and all copyrights now or hereafter secured upon the Property. As a material part of the consideration moving to Company for its execution of this Agreement, Marvel agrees that in the event the termination of transfer provisions of Section 203 of the United States Copyright Act shall be applicable prior to the termination of Company's Rights hereunder, Company shall have a right of first negotiation and right of last refusal with respect to the renewal of the Rights granted to Company hereunder. If Marvel fails to do any of the things specified in this paragraph and which failure would adversely effect the Rights granted to Company hereunder, Company is hereby irrevocably granted the power coupled with any interest to perform such acts and take such proceedings in the name and on behalf of Marvel as its attorney-in fact. Company shall furnish Marvel with copies of any documents so executed; provided, that any failure to do so shall not be deemed to be a breach of this Agreement.

25.    NAME/LIKENESS/VOICE: Marvel hereby grants to Company, its successors and assigns, the irrevocable nonexclusive right, forever and throughout the world, to use, for no additional consideration, Marvel's logo and Avi Arad's, Stan Lee's, and, to the extent such rights are assignable

MST:7:120500
Marvel/MarvelAgreements/IronManLicenseAgreement                    33

**Exhibit-9**

WB136630
CONFIDENTIAL

without additional compensation and controlled by Marvel, Contributors' (as applicable) logos, names, images, likenesses, voices and/or biographical data but solely in connection with the production, exhibition, advertising, publicity, and other exploitation of any Picture(s) produced hereunder and, to the extent granted the Rights in this Agreement, all subsidiary, ancillary, and derivative rights therein and thereto with respect to the Picture(s), and/or any other use or exploitation of any of the Rights herein granted to Company with respect to the Property.

26.    LIMITATION OF REMEDIES: Except as specifically set forth in Paragraph 9 and Paragraph 15 above, Marvel acknowledges that in the event of a breach of any of Company's obligations under this Agreement, the damages (if any) caused to Marvel thereby is not irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief; and Marvel's rights and remedies in the event of a breach of this Agreement by Company shall be limited to the right, if any, to recover damages in an action at law and Marvel shall not be entitled to any equitable relief to restrict or interfere with Company's right to produce, distribute, market or exploit all motion pictures or other productions produced pursuant to this Agreement or contemplated herein (including, but not limited to, derivative works) and the ancillary rights therein or to otherwise exploit or exercise any of the rights granted to Company hereunder.

27.    FAILURE TO MAKE PAYMENT:

(a)    In the event that Company has not commenced principal photography of the First Picture and Company does not timely pay to Marvel the First Installment Payment, the Second Installment Payment (if any) or the Final Payment (if any), as applicable, in accordance with Paragraph 3 above, Marvel's sole remedy and recourse shall be that the Property and Rights shall automatically revert to Marvel with the understanding that Marvel legally shall not be required to take any further action to effectuate such reversion, and Company shall have no further rights in and to the Property and the Rights; provided, that notwithstanding anything which might by construed to the contrary in this Agreement, Marvel shall not be deemed to have acquired any right, title or interest in or to any of the material prepared by or at Company's direction and Company shall own in perpetuity all such material. If Company has not commenced principal photography of the First Picture, Marvel shall have no right to Installment Payments not made.

(b)    In the event that Company has commenced principal photography of the First Picture, Company's failure pay to Marvel the First Installment Payment, the Second Installment Payment (if any) or the Final Payment, as applicable, in accordance with Paragraph 3 above, shall not be deemed a breach of this Agreement unless and until Company fails to cure such failure within ten (10) business days after written notice by Marvel of such failure to perform.

28.    PUBLIC RIGHTS:  Nothing contained in this Agreement shall be construed to be or operate in derogation or limitation of any rights to which Company may be entitled as a member of the public if this Agreement were not in existence.

29.    RENTAL AND LENDING RIGHTS AND PERFORMERS' PROPERTY RIGHTS:

(a)    "Rental and Lending Rights" means all rights of Marvel or, to the extent such rights are controlled by Marvel, Contributors to authorize, prohibit, control or receive money (other than as provided in this Agreement) from the rental, lending, fixation, reproduction or other exploitation of the results and proceeds of services, but solely in connection with the Picture(s) and the Rights granted hereunder, by any media or means now known or hereafter devised as may be conferred upon Marvel, to the

WB136631109
CONFIDENTIAL

extent such rights are controlled by Marvel, or Contributors under applicable laws, regulations or directives, in any jurisdiction throughout the world, including any so-called rental and lending rights pursuant to any European Community directives or enabling or implementing legislation, laws or regulations enacted by member nations of the European Community.

(b)  "Performers' Property Rights" means performers' rights to authorize or prohibit the making of copies of a recording of the whole or a substantial part of a performance, the issuing of copies of such a recording and the right, if any, to authorize or prohibit the rental or lending of copies of such a recording under applicable laws, regulations or directives, in any jurisdiction throughout the world, including any so-called performers' property rights pursuant to any European Community directives or enabling or implementing legislation, laws or regulations enacted by member nations of the European Community, but solely in connection with the Picture(s) and the Rights granted hereunder.

(c)  Marvel acknowledges that the compensation payable under this Agreement includes, to the extent Marvel controls such rights or if and to the extent Marvel has the authority to grant these rights, adequate and equitable remuneration for the Rental and Lending Rights and Performers' Property Rights and to the fullest extent permitted by applicable law, constitutes a complete worldwide buyout and assignment to Company of all Rental and Lending Rights and Performers' Property Rights, in perpetuity. To the extent Marvel has the authority and power to grant this right to Company, Marvel hereby irrevocably grants to Company throughout the world in perpetuity, the right to collect and retain for Company's own account all amounts payable to Company in respect of Rental and Lending Rights and irrevocably directs any collecting societies or other persons or entities receiving such amounts to pay them to Company. To the extent Marvel has the authority and power to grant this right to Company, Marvel hereby irrevocably gives to Company all consents which may be required in respect of performances under the 1988 Copyright Designs and Patents Act of the United Kingdom and any comparable laws in any jurisdiction and amendments or reenactments thereof to enable Company to use and authorize the use of Marvel's services under this Agreement and of the results and proceeds thereof in any place and in any jurisdiction by any means and in all media now known or hereafter devised.

30.  NOTICE FOR COMPANY'S FAILURE TO PERFORM: No failure on the part of Marvel or Company to perform any of its obligations hereunder (other than with respect to timely paying the First Installment Payment, the Second Installment Payment (if any) and the Final Payment, as applicable, of the License Fee or a breach of a representation or warranty) shall be deemed a breach of this Agreement unless and until Company or Marvel fails to cure such failure within thirty (30) calendar days after written notice by the other party of such failure to perform.

31.  INSURANCE: Marvel agrees to name Company, AOL Time Warner, Inc., Turner Broadcasting Systems, Inc. and each of their successors, assigns, parents, subsidiaries, affiliates, agents, and co-venturers, and their respective directors, officers, employees and agents as named insureds on Marvel's Errors and Omissions insurance policy with respect to Company's use and exploitation of the Property. Such policy shall specifically waive any exclusions for claims brought by persons alleged to be creators of any of the material acquired by Company from Marvel, whether those individuals are characterized as former employees of Marvel or as independent contractors of Marvel who furnished material in

WB 1366320
CONFIDENTIAL

connection with the Property. Company agrees to name Marvel, and its successors, assigns, parents, subsidiaries, affiliates, agents, and co-venturers, and their respective directors, officers, employees and agents as named insureds on Company's Errors and Omissions insurance policy, in accordance with the terms and subject to the conditions and limitations of such policies, including subrogation, for so long as, and only to such extent as such policy is carried by Company. The errors and omissions coverage provided to Marvel pursuant to this paragraph shall not apply to claims arising from the Property or any part thereof except to the extent a claim arises from material added or inserted by Company. The provisions of this Paragraph shall not be construed so as to limit or otherwise affect any obligation, representation or agreement by Marvel hereunder.

32.   COMPLETE UNDERSTANDING: This Agreement sets forth the complete understanding between Marvel and Company with respect to the subject matter hereof, and all prior agreements have been merged herein, whether written or oral, and may not be modified except by written instrument signed by the party to be charged. Marvel and Company each acknowledge that no representation or promise not expressly contained in this Agreement has been made by the other or any of their agents, employees or representatives.

33.   AMENDMENTS:  This Agreement contains the entire understanding between the parties and supercedes any other agreement, oral or written, regarding this subject matter and may not be modified or amended except by written instrument signed by all parties hereto.

34.   GOVERNING LAW:  This Agreement shall be governed by the laws of the State of California applicable to agreements entered into and to be wholly performed therein. Except as otherwise provided in Paragraph 9 hereof, all disputes arising out of this Agreement shall be exclusively resolved and adjudicated in the Federal and State Courts in Los Angeles, California. Each of the parties hereby submits to the exclusive jurisdiction and venue of said courts and waives its rights to have disputes arising out of this Agreement adjudicated in any other forum.

35.   APPROVALS/CONSENTS: With respect to any approvals or consents required of Marvel herein, if disapproval is not received within five (5) business days (unless a different time period is provided herein) following Company's request therefor, such approval shall be deemed granted.

If the foregoing accurately reflects your understanding, please sign in the space provided below.

KATJA MOTION PICTURE CORP. ("Company")

By_____

Its_____

MARVEL CHARACTERS, INC. ("Marvel")

By_____

Its_ EVP (Business & Legal AFFAIRS

Marvel/iron man license agreement 061301

WB 136633
CONFIDENTIAL

EXHIBIT "A"

<u>IRON MAN</u>

<u>ADDITIONAL CHARACTERS</u>

<u>ALLIES</u>

1.    Virginia "Pepper" Potts
2.    Harold "Happy" Hogan
3.    Anton Vanko (Crimson Dynamo)
4.    Edward "Eddie" March
5.    Kevin O'Brien (Guardsman I)
6.    Abraham Klein
7.    Krissy Longfellow (Madam Masque in disguise)
8.    Bethany Cabe
9.    Bambina Arbogast
10.   Yvette Avril
11.   James Rupert Rhodes
12.   Roderick Withers
13.   Victor Martinelli
14.   Artemus Pithins
15.   Carl Walker
16.   Erica Sondheim
17.   Morley Erwin
18.   Clytemnestra Erwin
19.   Marcy Pearson
20.   Phillip (Raven) Grant
21.   Abraham Zimmer
22.   Bertram Hindel
23.   Felix Ricardo Alvarez

Marvel/iron man license agreement 061301

Exhibit-9
WB 136634
CONFIDENTIAL
112

ENEMIES

1.    Mandarin
2.    Crimson Dynamo
3.    Justin Hammer
4.    BlackLash
5.    Blizzard
6.    Controller
7.    Unicorn
8.    Firebrand
9.    Spymaster
10.   The Ghost
11.   Fin Fang Foom
12.   Ultimo
13.   Living Laser
14.   Dreadknight
15.   Titanium Man
16.   Obodiah Stane (Iron Monger)

EXHIBIT "B"

SHORT FORM LICENSE

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby grants, sells, assigns, conveys and licenses to KATJA MOTION PICTURE CORP. and its successors and assigns ("Company") the sole and exclusive license to certain specific rights, title and interest in the literary material described as follows:

(a)  Property: The "Property" shall include, without limitation, the title "Iron Man" (to the limited extent granted above), all plots, stories (including the "Origin Story" as defined below), themes and incidents appearing in the "Iron Man" comic book series ("Individual Storylines"), including, but not limited to, entries in the "Marvel Universe Handbook" ("Handbook").  However, the rights granted in any so-called "generic" plots, stories, themes and incidents appearing in the "Iron Man" comic book series shall be non-exclusive (as more particularly articulated in Paragraph 5(c) below).  The definition of Property does not include any characters that appear in said plots, stories, themes and incidents except as follows:

  (i)  the comic book character Iron Man as he is drawn and depicted in said comics; and

  (ii)  the characters set forth in Exhibit "A" of that certain License Agreement dated as of May 28, 2001 between Assignor and Company as they are drawn and depicted in said comics ("Additional Iron Man Characters").

(b)  Origin Story: The "Origin Story" shall mean the origin stories of the character "Iron Man" (the "Iron Man Character") which Marvel represents are contained in "TALES OF SUSPENSE" number 39, published in 1962; "IRON MAN" volume 1, number 1, published in 1968; "IRON MAN" volume 1, number 46, published in 1972; "IRON MAN" volume 1, number 122, published in 1979; "IRON MAN" volume 1, numbers 268 and 269, published in 1991; "IRON MAN" volume 2, number 1, published in 1996; "IRON MAN", volume 3, number 1, published in 1997; "IRON MAN: THE IRON AGE" numbers 1 and 2, published in 1998, provided, however, Company acknowledges that the only characters contained in the Property, including, without limitation, the Origin Story as to which Company's "Granted Rights" under this Agreement apply, are the Iron Man Character and Additional Iron Man Characters (collectively, "Marvel Characters").

This instrument is executed in accordance with and is subject to the License Agreement dated as of Aug 2   , 2001 between Assignor and Company relating to the license granted to Company to purchase the above-mentioned rights in the property, which "Rights" are more fully described in said License Agreement

WB 136636
CONFIDENTIAL

DATED: August 2, 2001

MARVEL CHARACTERS, INC.

By: _____

Its: EVP Business & Legal Affairs

Fed I.D. #: 13-3841782

ACKNOWLEDGED:
KATJA MOTION PICTURE CORP.

By: _____

Its: _____

Exhibit-9
WB 136637
CONFIDENTIAL
118

STATE OF                                    )
                                           )   ss:
COUNTY OF                                   )


On this  2ⁿᵈ            day of  August         , 2001  before me, the undersigned, a
Notary Public in and for said State, personally appeared  Allen S. Lipson       ,
personally known to me or proved to me on the basis of satisfactory evidence to be the person(s)
whose name is (are) subscribed to the foregoing instrument as the
EVP Business & Legal Affairs of Marvel Characters, Inc., the corporation that executed
the within instrument and acknowledged to me that such corporation executed the same pursuant
to By-Laws of authorization of its Board of Directors and that such corporation executed the
same.
IN WITNESS WHEREOF, I have hereunto set my have and affixed my official seal this day of
2 August         , 2001 .


                                    Notary Public


Witness


NOTARY P:                 New York
    No.              393
Qualified in Westchester County
Commission Expires Feb 12, 20__

NOTARY PUBLIC, State of New York
    No. 02ST4962393
Qualified in Westchester County
Commission Expires Feb 12, 2002

Exhibit-9

WB 136638
CONFIDENTIAL

EXHIBIT "C"

ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, MARVEL CHARACTERS, INC. (the "Assignor"), grants, sells, assigns, conveys and licenses to KATJA MOTION PICTURE CORP. and its successors and assigns ("Company"), exclusively and throughout the world, certain specific rights, title and interest in the original literary material described as follows:

(a)  Property: The "Property" shall include, without limitation, the title "Iron Man" (to the limited extent granted above), all plots, stories (including the "Origin Story" as defined below), themes and incidents appearing in the "Iron Man" comic book series ("Individual Storylines"), including, but not limited to, entries in the "Marvel Universe Handbook" ("Handbook"). However, the rights granted in any so-called "generic" plots, stories, themes and incidents appearing in the "Iron Man" comic book series shall be non-exclusive (as more particularly articulated in Paragraph 5(c) below). The definition of Property does not include any characters that appear in said plots, stories, themes and incidents except as follows:

    (i)  the comic book character Iron Man as he is drawn and depicted in said comics; and

    (ii)  the characters set forth in Exhibit "A" of that certain License Agreement dated as of May 28, 2001 between Assignor and Company as they are drawn and depicted in said comics ("Additional Iron Man Characters").

(b)  Origin Story: The "Origin Story" shall mean the origin stories of the character "Iron Man" (the "Iron Man Character") which Marvel represents are contained in "TALES OF SUSPENSE" number 39, published in 1962; "IRON MAN" volume 1, number 1, published in 1968; "IRON MAN" volume 1, number 46, published in 1972; "IRON MAN" volume 1, number 122, published in 1979; "IRON MAN" volume 1, numbers 268 and 269, published in 1991; "IRON MAN" volume 2, number 1, published in 1996; "IRON MAN", volume 3, number 1, published in 1997; "IRON MAN: THE IRON AGE" numbers 1 and 2, published in 1998, provided, however, Company acknowledges that the only characters contained in the Property, including, without limitation, the Origin Story as to which Company's "Granted Rights" under this Agreement apply, are the Iron Man Character and Additional Iron Man Characters (collectively, "Marvel Characters").

This assignment is executed in accordance with and is subject to that certain License Agreement dated as of **Aug 2**, 2001 between Assignor and Company relating to the sale and assignment to Company of the "Rights" in the "Property", which "Rights" are more fully described in the License Agreement.

MST:7:120500
/Marvel/MarvelAgreements/IronManTermSheet                    1                    **Exhibit-9**

WB 136639
CONFIDENTIAL

DATED: _August 2 , 2001_

MARVEL CHARACTERS, INC.

By: _____

Its: _EVP Business & Legal Affairs_

Fed I.D. #: _13-3841782_

ACKNOWLEDGED:
KATJA MOTION PICTURE CORP.

By: _____

Its: _____

Exhibit-9
WB 136640
CONFIDENTIAL

STATE OF            )

                                    )    ss:

COUNTY OF         )

On this _2ⁿᵈ_ day of _August_ , 2001 before me, the undersigned, a Notary Public in and for said State, personally appeared _Allen S Lipson_ , personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name is (are) subscribed to the foregoing instrument as the _EVP Business & Legal Affairs_ of Marvel Characters, Inc., the corporation that executed the within instrument and acknowledged to me that such corporation executed the same pursuant to By-Laws of authorization of its Board of Directors and that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my have and affixed my official seal this day of _2ⁿᵈ August , 2001_ .

                                   Notary Public

                                            ALLEN L. STAFF
                                  NOTARY PUBLIC, State of New York
                                  No. 02ST4962393
                                  Certified in Westchester County
                                  Commission Expires Feb. 12, 2002

Witness

**Exhibit-9**

WB 136641
CONFIDENTIAL

IRON MAN - EXHIBIT "D"

| | CHARACTER | 1ST APPEARANCE | COVER DATE | PUBLICATION DATE | ARTIST | WRITER | COMMENTS |
|---|---|---|---|---|---|---|---|
| | ALLIES | | | | | | |
| 1. | Virginia "Pepper" Potts | Tales of Suspense #45 | 9/63 | 6/11/63 | Don Heck | Stan Lee, Robert Bernstein | |
| 2. | Harold "Happy" Hogan | Tales of Suspense #45 | 9/63 | 6/11/63 | Don Heck | Stan Lee, Robert Bernstein | |
| 3. | Anton Vanko (Crimson Dynamo) | Tales of Suspense #46 | 10/63 | 7/9/63 | Don Heck | Stan Lee, Robert Bernstein | Anton Vanko was the original Crimson Dynamo there have been many others. |
| 4. | Eddie March | IRON MAN #21 | JANUARY 1970 | SEPTEMBER 9, 1969 | George Tuska | Archie Goodwin | |
| 5. | Kevin O'Brian Guardsman I | As Kevin O'Brian: IRON MAN #31 in Guardsman armor: IRON MAN #43 named as orig. Guardsman: IRON MAN #45 | #31: November '70 #43: November '71 #45: March 1972 | #31: 7/7/70 #43: 7/6/71 #45: 11/2/71 | Don Heck George Tuska George Tuska | Allyn Brodsky Gerry Conway Gary Freidrich | |

1

00000797 CGP

WB 136642
CONFIDENTIAL
120

**Exhibit-9**

| | CHARACTER | 1ST APPEARANCE | COVER DATE | PUBLICATION DATE | ARTIST | WRITER | COMMENTS |
|---|---|---|---|---|---|---|---|
| 6. | Abraham Klein | Iron Man #82 | 1/76 | 7/7/66 | Herb Trimpe & Marie Severin (pencils), Marie Severin & Jack Abel (inks) | Len Wein | |
| 7. | Krissy Longfellow (Madam Masque in disguise) | Tales of Suspense #98 | 1/68 | 11/2/67 | Gene Colan (pencils), Frank Giacoia (inks) | Stan Lee | |
| 8. | Bethany Cabe | Iron Man #117 | 12/78 | 8/22/78 | John Romita Jr. (pencils), Bob Layton (inks) | David Michelinie (co-plot, script), Bob Layton (co-plot) | |
| 9. | Bambina Arbogast | Iron Man #118 | 1/79 | 9/26/78 | John Byrne (layouts), BobLayton (finishes, inks) | David Michelinie (co-plot, script), Bob Layton (co-plot) | |
| 10. | Yvette Avril | Iron Man #119 | 2/79 | 10/24/78 | John Romita Jr. (pencils), Bob Layton (inks) | David Michelinie (co-plot, script), Bob Layton (co-plot) | |
| 11. | James Rupert Rhodes | Iron Man #120 | 4/79 | 11/28/78 | John Romita Jr. (pencils), Bob Layton (inks) | David Michelinie (co-plot, script), | |

00000797 CGP)

2

**Exhibit-9**

WB 136643
CONFIDENTIAL

| | CHARACTER | 1ST APPEARANCE | COVER DATE | PUBLICATION DATE | ARTIST | WRITER | COMMENTS |
|---|---|---|---|---|---|---|---|
| | | | | | | Bob Layton (co-plot) | |
| 12. | Roderick Withers | Iron Man #249 | 11/89 | 9/29/89 | Bob Layton | David Michelinie (co-plot, script), Bob Layton (co-plot) | |
| 13. | Victor Martinelli | Iron Man #132 | 4/80 | 12/4/79 | Jerry Bingham (pencils), Bob Layton (finished Arts) | David Michelinie (co-plot), Bob Layton (co-plot) | |
| 14. | Arternus Pithins | Iron Man #124 | 7/79 | 3/27/79 | John Romita Jr. (pencils), Bob Layton (finished arts) | David Michelinie (co-plot), Bob Layton (co-plot) | |
| 15. | Carl Walker | Iron Man #224 | 11/87 | 7/24/87 | Bob Layton | David Michelinie (co-plot,script), BobLayton (co-plot) | |
| 16. | Erica Sondheim | Marvel Premiere #47 | 5/79 | 12/26/78 | John Byrne (pencils), Bob Layton (inks) | David Michelinie | |
| 17. | Morley Erwin | Iron Man #168 | 4/83 | 11/23/80 | Luke McDonnell (pencils), Steve Mitchell (inks) | Denny O'Neil | |
| 18. | Clytemnestra | Iron Man | 6/83 | 2/22/83 | Luke | Denny O'Neil | |

3

00000797 CGP)

Exhibit 9

WB 136122
CONFIDENTIAL

| | CHARACTER | 1ST APPEARANCE | COVER DATE | PUBLICATION DATE | ARTIST | WRITER | COMMENTS |
|---|---|---|---|---|---|---|---|
| | Erwin | #171 | | | McDonnell (pencils), Bob Layton (inks) | | |
| 19. | Marcy Pearson | Iron Man #217 | 5/87 | 11/23/86 | Mark Bright (pencils), Bob Layton (inks) | David Michelinie (co-plot, script), Bob Layton(co-plot) | |
| 20. | Phillip (Raven) Grant | Iron Man #299 | 12/93 | 10/26/93 | Kevin Hopwood (pencils), Steve Mitchell (inks) | Len Kaminski | |
| 21. | Abraham Zimmer | Iron Man #219 | 6/87 | 2/24/87 | Bob Layton | David Michelinie  Bob Layton | |
| 22. | Bertram Hindel | Iron Man #225 | 12/87 | 8/26/87 | Mark Bright, Bob Layton | David Michelinie, Bob Layton | |
| 23. | Felix Ricardo Alvarez | Iron Man #238 | 1/89 | 9/27/88 | Bob Layton | David Michelinie (co-plot, script), BobLayton (co-plot) | |
| | ENEMIES | | | | | | |
| 1. | Mandarin | TALES OF SUSPENSE #50 | FEBRUARY 1964 | NOVEMBER 12, 1963 | DON HECK | STAN LEE | |

4

Exhibit-9

000000797 CGP)

| | CHARACTER | 1ST APPEARANCE | COVER DATE | PUBLICATION DATE | ARTIST | WRITER | COMMENTS |
|---|---|---|---|---|---|---|---|
| 2. | Crimson Dynamo (see Anton Vanko #3 above) | | | | | | |
| 3. | Justin Hammer | IRON MAN #120 | MARCH 1979 | NOVEMBER 28, 1978 | JOHN ROMITA, JR & BOB LAYTON | DAVID MICHELINE & BOB LAYTON | |

| | CHARACTER | 1ST APPEARANCE | COVER DATE | PUBLICATION DATE | ARTIST | WRITER | COMMENTS |
|---|---|---|---|---|---|---|---|
| 4. | Blacklash (1st appeared as Whiplash) | BLACKLASH-IRON MAN # 146 | MAY 1981 | JANUARY 27, 1981 | JOHN ROMITA, JR & BOB LAYTON | DAVID MICHELINE & BOB LAYTON | WHIPLASH 1ST APPEARANCE- TALES OF SUSPENSE #97 |
| 5. | Blizzard | Iron Man #86 | 5/76 | 11/10/66 | George Tuska (pencils), Vince Colletta (inks) | Bill Mantlo | |
| 6. | The Controller | IRON MAN #12 | APRIL 1969 | FEBRUARY 2, 1969 | GEORGE TUSKA | STAN LEE | |
| 7. | The Unicorn | TALES OF SUSPENSE #56 | AUGUST 1964 | MAY 12, 1964 | DON HECK | STAN LEE | |

00000797 CGF)

5

**Exhibit-9**

WB 136646
CONFIDENTIAL

| | TITLE | ISSUE #s | Range of COVER DATES | | | ARTISTS | WRITERS | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 8. | Firebrand I | IRON MAN #27 | JULY 1970 | MARCH 10, 1970 | | DON HECK | ARCHIE GOODWIN | |
| 9. | Spymaster | IRON MAN #33 | JANUARY 1971 | SEPTEMBER 8, 1970 | | DON HECK | ALLYN BRODSKY | |
| 10. | The Ghost | IRON MAN #219 | JUNE 1987 | FEBRUARY 24, 1987 | | BOB LAYTON | DAVID MICHELINE & BOB LAYTON | |
| 11. | Fin Fang Foom | Strange Tales #181 | 10/61 | | | Jack Kirby | Stan Lee | |
| 12. | Ultimo | Tales of Suspense #76 | 4/66 | 1/11/66 | | Gene Colan (pencils), Jack Abel (inks) | Stan Lee | |
| 13. | Living Laser | Avenger #34 | 11/66 | | | Don Heck | Stan Lee | |
| 14. | Dreadknight | Iron Man #101 | 8/77 | 4/26/77 | | George Tuska (pencils), Mike Esposito (inks) | Bill Mantlo | |
| 15. | Titanium Man | TALES OF SUSPENSE # 69 | SEPTEMBER 1965 | JUNE 8, 1965 | | DON HECK & VINCE COLLETTA | STAN LEE | |
| 16. | Obadiah Stane (Iron Monger) | IRON MAN #166 | JANUARY 1983 | SEPTEMBER 28, 1982 | | LUKE McDONNELL | DENNY O'NEILL | Appeared in shadows prior to this issue, but face never shown and never named. |

IRON MAN  --  EXHIBIT "E"

| TITLE | ISSUE #s | Range of COVER DATES | ARTISTS | WRITERS | COMMENTS |
|---|---|---|---|---|---|
| TALES OF | 39 – 50 | MARCH 1963 – FEB | DON HECK | STAN LEE & LARRY | JACK KIRBY |

2

[0000000797 CGP]

WB 136[illegible]
CONFIDENTIAL

**Exhibit-9**

| TITLE | ISSUE #s | Range of COVER DATES | ARTISTS | WRITERS | COMMENTS |
|---|---|---|---|---|---|
| SUSPENSE | | 1964 | JACK KIRBY<br>STEVE DITKO | LIEBER<br>ROBERT BERNSTEIN | CREDITED WITH DESIGN OF IRON MAN |
| THE INVINCIBLE IRON MAN | 1 – 118 plus annuals & specials | MAY 1968 – JANUARY 1979 | GENE COLAN<br>JOHN CRAIG<br>GEORGE TUSKA<br>DON HECK<br>HERB TRIMPE<br>BARRY SMITH<br>JIM STARLIN<br>BILL EVERETT<br>CRAIG RUSSELL<br>ARVELL JONES<br>KEITH POLLARD<br>CHIC STONE<br>MARIE SEVERIN<br>CARMINE INFANTINO<br>KEITH GIFFIN<br>JOHN ROMITA, JR.<br>JOHN BYRNE<br>BOB LAYTON<br>SAL BUSCEMA<br>JACK ABEL | ARCHIE GOODWIN<br>MIMI GOLD<br>ALLYN BRODSKY<br>GERARD CONWAY<br>ROBERT KANIGHER<br>GARY FRIEDRICH<br>ROY THOMAS<br>MIKE FRIEDRICH<br>BILL EVERETT<br>JIM STARLIN<br>STEVE GERBER<br>BARRY ALFONSO<br>TOM ORZECHOWSKI<br>BILL MANTLO<br>STEVE ENGLEHART<br>LEN WEIN<br>ROGER SLIFER<br>JIM SHOOTER<br>HERB TRIMPE<br>BOB LAYTON<br>DAVID MICHELINIE | |
| THE INVINCIBLE IRON MAN | 119 – 200 | FEBRUARY 1979 – NOVEMBER 1985 | JOHN ROMITA, JR.<br>CARMINE INFANTINO | DAVID MICHELINIE<br>BOB LAYTON<br>JIM SHOOTER | |

3

WB 00900(00800 CGP)

**Exhibit-9**

WB 1366426<br>CONFIDENTIAL

| | | | |
|---|---|---|---|
| THE INVINCIBLE IRON MAN | 201 - 300 | DECEMBER 1985 – JANUARY 1994 | MARK BRIGHT<br>PAUL RYAN<br>RICK HOBERG<br>ALEX SAVIUK<br>DWAYNE TURNER<br>JAVIER SALTARES<br>PAUL NEARY<br>TOM MORGAN<br>DOC BRIGHT<br>BARRY WINDSOR-SMITH<br>JACKSON GUICE<br>HERB TRIMPE<br>GENE COLAN<br>BOB LAYTON<br>JOHN ROMITA, JR.<br>RICH YANIZESKI | DENNY O'NEIL<br>DANNY FINGEROTH<br>DENNIS MALLONEE<br>HOWARD MACKIE<br>BOB HARRAS<br>DAVID MICHELINIE<br>BOB LAYTON<br>BARRY WINDSOR-SMITH<br>DWAYNE McDUFFIE<br>GLENN HERDLING<br>FABIAN NICIEZA<br>RANDALL FRENZ<br>JOHN BYRNE<br>ROY THOMAS<br>DANN THOMAS<br>EVAN SKOLNICK |
| | | | SAL BUSCEMA<br>JERRY BINGHAM<br>ALAN WEISS<br>LUKE McDONNELL<br>ALAN KUPPERBERG<br>PAUL SMITH STEVE DITKO<br>MIKE VOSBURG<br>DON PERLIN<br>RICH BUCKLER<br>HERB TRIMPE<br>MARK BRIGHT | D. MINDS<br>PETER JOHN PALMER<br>ALAN KUPPERBERG<br>DENNIS (DENNY) O'NEIL<br>ROGER McKENZIE PETER GILLIS<br>RALPH MACCHIO<br>BOB HARRAS |

4

[00000800 CGP]

Exhibit-9

WB 136649
CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| THE INVINCIBLE IRON MAN | 301 – 332 | FEBRUARY 1994 - SEPTEMBER 1996 | GAVIN CURTIS RICHARD HOWELL STEVE DITKO ROB TOKAR BARRY KITSON JOHN STANISCI KEVIN HOPGOOD DAVID JOHNSON ANDY CURRIE COOPER SMITH CHUCK WOSTKIEWICZ KRIS RENKEWITZ JOHN CZOPELIOT BROWN TOM TENNEY | CARRIE BARRE ROB TOKAR LEN KAMINSKI DWIGHT J. ZIMMERMAN GAVIN CURTIS RICHARD ASHFORD JOHN TOMLINSON TOM BREVOORT MIKE KANTEROVICH SCOTT BENSON ELIOT BROWN |
| | | | KEVIN HOPGOOD TOM MORGAN GENE COLAN MARK BRIGHT DAVE CHLYSTEK HEITOR OLIVEIRA ADRIANA MELO MARCOS TETELLI JIM CHEUNG LABAT MARK CAMPOS JOE BENNETT HECTOR COLLAZO STEVE ELLIS | LEN KAMINSKI SCOTT BENSON TERRY KAVANAGH DAN ABNETT JAMES FELDER |
| IRON MAN | VOLUME 2 | OCTOBER 1996 – JANUARY 1998 | TERRY SHOEMAKER WHILCE PORTACIO | JEPH LOEB JIM LEE |

5

000000800 CGP)

Exhibit 9

| | | | ED BENES<br>MIKE MILLER<br>LARRY STROMAN<br>RYAN BENJAMIN<br>JIM LEE | JAMES ROBINSON<br>SCOTT LOBDELL | |
|---|---|---|---|---|---|
| IRON MAN | VOLUME 3<br>#1 – 29 | FEBRUARY 1998 –<br>JUNE 2000 | SEAN CHEN<br>PATRICK ZIRCHER<br>SALVADOR<br>LAROCCA<br>TERRY SHOEMAKER<br>ANTHONY<br>WILLIAMS<br>MARK BAGLEY<br>ALITHA MARTINEZ | KURT BUSIEK<br>MARK WAID<br>ROGER STERN<br>JOE QUESADA | |
| IRON MAN | VOLUME 3<br>#30 – 36 | JULY 2000 –<br>JANUARY 2001 | SEAN CHEN<br>ALITHA MARTINEZ<br>PAUL RYAN | JOE QUESADA<br>FRANT TIERI<br>CHUCK DIXON | |
| IRON MAN: IRON<br>AGE<br>(2-issue limited<br>series) | #1 – 2 | AUGUST 1998 –<br>SEPTEMBER 1998 | PATRICK ZIRCHER | KURT BUSIEK<br>RICHARD HOWELL | |
| IRON MAN: BAD<br>BLOOD<br>(4-issue limited<br>series) | #1 – 4 | SEPTEMBER 2000 –<br>DECEMBER 2000 | BOB LAYTON | DAVID MICHELINIE | |

6

Exhibit 9

700000800 CGP)

WB 136529
CONFIDENTIAL

EXHIBIT "I"

**Subsidiary S.H.I.E.L.D. Characters:**

Eric Koenig – Regional Director

Laura Brown – Field Agent

Barth Bukowski – L.A. Regional Director

Gail Runciter – Field Agent

Richard Rennselaer - Field Agent

Roger Dooley – Special Officer

Karl Delandan – Manhattan Regional Director (corrupt)

Sidney E. Levine – Technician

Jack Rollins – Field Agent

Rico Santana – Rio De Janeiro Regional Director (corrupt)

7

00000800 CGP)

**Exhibit-9**

**WB 136652    130**
**CONFIDENTIAL**

# JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001 by and between Pacific Pictures Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu, CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively, "Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505) 466-4551, regarding the formation of a joint venture for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights").

    1.    The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy," "Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

    2.    In consideration of the mutual covenants contained herein and other good and valuable consideration, PPC and Claimants hereby form a joint venture (the "Venture") to investigate, retrieve, enforce and exploit the Rights, including without limitation, via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all grant or transfers by Joe Shuster of any copyright interest in his creations. In consideration for PPC'S contributions to the Venture and the mutual covenants contained herein Claimants hereby transfer and assign to the Venture their rights, title and interests in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's office address shall be the California address set forth above.

    3.    PPC will pay any and all costs and expenses of the Venture, including the legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: _____

**Exhibit-10**

**EXHIBIT B**
9

PPC 0005

Page 2
Joint Venture Agreement / Joe Shuster
11/23/01

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

4.      The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.      Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

6.      All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.      The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials _____

**Exhibit-10**

Page 3
Joint Venture Agreement / Joe Shuster
11/23/01

8.     The term ("Term" ) of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9.     To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Claimants.

10.     All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation an irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11.     This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

**Exhibit-10**

PPC 00007

133

Page 4
Joint Venture Agreement / Joe Shuster
11/23/01

and shall not affect the validity of the remaining provisions hereof. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11.  This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation


_____
By: Marc Toberoff, President                    Date: _Nov. 28, 2001_


_____
Jean A. Peavy                                            Date: _Nov. 28, 2001_


_____
Mark Warren Peary
(f/k/a Mark Warren Peavy)                        Date: _Nov. 28, 2001_


**Exhibit-10**

PPC 00008