## "TARZAN (2003)"
## OPTION PURCHASE AGREEMENT

DATE:         December 2, 2002

PURCHASER:   Warner Bros., a division of
Time Warner Entertainment Company, L.P.
4000 Warner Boulevard
Burbank, California 9l522

OWNER:      Edgar Rice Burroughs, Inc.
a California corporation  Federal I.D. #95-0586620
c/o Ziffren, Brittenham, Branca, Fischer et al
1801 Century Park West
Los Angeles, California  90067
Attention:  David Nochimson

This confirms the agreement between WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser") and  EDGAR RICE BURROUGHS, INC. ("Owner") with respect to certain rights in the series of published novels and stories ("Stories") written by Edgar Rice Burroughs ("ERB") listed on Exhibit "A" attached hereto featuring the character created by ERB known as "TARZAN".  Those works, and the titles, themes, stories and all other contents thereof, and the characters therein, and all translations, adaptations and other versions thereof now or hereafter owned by Owner, whether now existing or hereafter created, are herein referred to collectively as the "Property".  Purchaser's obligations hereunder are subject to its receipt, in form and pursuant to terms and conditions satisfactory to Purchaser, of copies of all chain-of-title documents with respect to the Property.

    1.  Option:  Owner hereby grants to Purchaser an exclusive and irrevocable option to purchase all rights in the Property as set forth in Paragraph 4 hereof (the "Rights") upon and subject to the following terms and conditions:

        (a)  Option Period:  The initial option period ("Initial Period") shall commence on the date hereof and shall continue for a period of 24 months following the date of receipt by Purchaser of this Agreement signed by Owner ("Execution Date") as indicated below and, if Purchaser has during the Initial Period hired a screenwriter to write a screenplay based on the Property, the Initial Period may be extended by Purchaser for an additional period of 12 months ("Extension Period") consecutive to the Initial Period by written notice and the payment to Owner of the sum provided in subparagraph 1(b)(ii) below at

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

1

35493

**Exhibit-11**

WB136016135
CONFIDENTIAL

any time prior to expiration of the Initial Period. The Initial Period and Extension Period are hereafter referred to collectively as the "Option Period".

(b) Option Payments: Purchaser shall pay to Owner the following sums in consideration of the option herein granted:

(i) For the Initial Period, Two Hundred Fifty Thousand Dollars ($250,000) ("Initial Option Payment"), payable promptly upon delivery of this Agreement to Purchaser executed by Owner.

(ii) For the Extension Period, if applicable, One Hundred Twenty-Five Thousand Dollars ($125,000) ("Extension Option Payment").

(c) Development Activities: During the Option Period, Purchaser may engage in customary development and preproduction activities with respect to motion pictures and/or other productions based on the Property. If in connection with such development or preproduction activities Owner or another party is engaged by or on behalf of Purchaser to write revisions of the Property, all such revisions shall be and remain Purchaser's sole and exclusive property, whether or not Purchaser exercises the option hereunder; provided, however, that if Purchaser does not exercise said option, Purchaser's use (if any) of such revisions shall be subject to Owner's rights in the Property.

(d) Automatic Extensions: The Initial Period and/or Extension Period, as applicable, shall be extended without notice for periods equal to the length of time necessary to settle or otherwise resolve any third party claims arising during the Option Period which in Purchaser's reasonable good faith judgment would materially and adversely affect Purchaser's acquisition and/or exercise of the Rights and of industry-wide labor disputes and other force majeure events which substantially interfere with Purchaser's development and preproduction of the Property, but no such force majeure extension(s) of the Option Period hereunder shall exceed an aggregate of 6 months, and no such extension(s) of the Option Period due to third party claims shall exceed an aggregate of 6 months unless formal legal action has been initiated and is actively being pursued and/or defended. Purchaser shall promptly, as soon as practicable under the circumstances, confirm any such extension by written notice to Owner, provided that such notice shall be furnished as a courtesy only and shall not be deemed a condition subsequent to the effectiveness of any such extension. In the event that the Initial Period or Extension Period would otherwise expire on a Saturday, Sunday or national holiday, said period shall be extended without notice until the end of the next following business day.

2. Purchase Price/Exercise of Option: If Purchaser exercises its option, the Initial Option Payment will apply toward the purchase price of the Rights which shall be

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

2

35493

Exhibit-11

WB1360136
CONFIDENTIAL

a total of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Purchase Price"). The balance of the Purchase Price shall be paid upon exercise of the option. The option, if exercised, shall be exercised by written notice or by commencement of principal photography of the first live action feature-length theatrical motion picture based on the Property produced pursuant to the Rights (the "Picture"). The first project produced hereunder shall be the Picture.

2A. Reversion:

(a) Reversion of Picture Rights: Notwithstanding the foregoing, the Rights granted hereunder shall automatically revert to Owner if Purchaser does not commence principal photography of the Picture within a period of four years following the date of exercise of the option; provided that, Purchaser may elect to extend such four year period for one additional year (to a total of five years) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said four year period, and if Purchaser does extend such four year period then Purchaser may subsequently elect to extend such five year period for one additional year (to a total of six years) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said five year period. In the event of such reversion, Owner shall have no obligation to repay to Purchaser any sums paid to Owner hereunder.

(b) Reversion of Live Action Remake and Sequel Rights: If Purchaser produces the Picture, the rights granted hereunder to produce remakes and sequels shall revert to Owner if Purchaser does not theatrically release the Picture in the United States within four years after commencement of principal photography of the Picture. In connection with each remake or sequel Purchaser produces, the rights granted hereunder to produce additional remakes and sequels shall revert to Owner if Purchaser does not commence principal photography of the next remake or sequel prior to the date which is the earlier of either: (i) the last day of a period of four years after initial theatrical release of the immediately preceding remake or sequel; or (ii) the last day of a period of five years following delivery of the answer print of the immediately preceding sequel or remake. In the case of each such four or five year period (as the case may be), Purchaser shall have the right, at Purchaser's election, to extend such period for one additional year (to a total of five or six years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of the applicable four year period, and if Purchaser does extend such four year period then Purchaser may subsequently elect to extend such five year period for one additional year (to a total of six or seven years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said five year period, and if Purchaser does extend such five year period then Purchaser

35493

Exhibit-11

WB136918
CONFIDENTIAL

may subsequently elect to extend such six year period for one additional year (to a total of seven or eight years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars (250,000) no later than the end of said six year period. It is acknowledged that, thereafter, if Purchaser does not commence principal photography of the next remake or sequel before the end of such seven or eight years (as applicable), the rights granted hereunder to produce additional remakes and sequels shall revert to Owner, and Purchaser shall have no further right to extend the period.

3. <u>Additional Payments/Participation</u>: Owner shall be paid the following additional amounts subject to the conditions specified:

(a) <u>Defined Gross Participation</u>: If the Picture is produced and released, the following amounts (less an amount equal to the Purchase Price):

(i) an amount equal to 2½% of 100% of the Defined Gross of the Picture, defined, accounted for and paid in accordance with the definition contained in Schedule 1 of Exhibit "C" attached hereto, as modified by the Rider thereto. Said participation shall be payable only until such time (if any) as the aggregate amount paid under this subparagraph 3(a)(i) equals Two Million Dollars ($2,000,000).

(ii) thereafter, an amount equal to 2½% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on a moving basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "B" as modified by the Rider thereto but computed with a 12½% distribution fee on Defined Gross from all sources. Said participation shall be payable only until such time as the participation under subparagraph 3(a)(iii) below becomes payable.

(iii) thereafter, an amount equal to 5% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on an initial basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "C" as modified by the Rider thereto, but computed with a 17½% distribution fee on Defined Gross from all sources.

(a)(a) <u>Box Office Advances</u>: As used in this Agreement the term "DBO" shall mean domestic (United States and Canada) box office receipts as reported from time-to-time in the motion picture industry trade newspaper known as "Daily Variety" (or, if "Daily Variety" ceases publication of such reports, then as reported from time-to-time by E.D.I.), and the term "WWBO" shall mean world-wide box office receipts as reported from time-to-time in "Daily Variety" (or E.D.I., as the case may be). If the Picture is produced and released, Purchaser shall pay

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

4

35493

Exhibit-11

WB130819
CONFIDENTIAL

Owner the following non-refundable advances against amounts otherwise becoming payable pursuant to subparagraphs 3(a)(ii) and 3(a)(iii) above:

      (i)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the Picture reaches One Hundred Fifty Million Dollars ($150,000,000) or if WWBO of the Picture reaches Three Hundred Million Dollars ($300,000,000); and

      (ii)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the Picture reaches One Hundred Seventy-Five Million Dollars ($175,000,000) or if WWBO of the Picture reaches Three Hundred Fifty Million Dollars ($350,000,000).

    (b)  <u>Theatrical Sequels and Remakes</u>:  As to each live action feature-length theatrical sequel or remake motion picture based on the Property produced pursuant to the Rights, a non-refundable sum equal to the Purchase Price, payable within 10 days following the commencement of principal photography of each such sequel or remake; plus the following sums (less an amount equal to the Purchase Price):

      (i)  an amount equal to 2½% of 100% of the Defined Gross of the applicable sequel or remake, defined, accounted for and paid in accordance with the definition contained in Schedule 1 of Exhibit "C" attached hereto, as modified by the Rider thereto.  Said participation shall be payable only until such time (if any) as the aggregate amount paid under this subparagraph 3(b)(i) equals Two Million Dollars ($2,000,000).

      (ii)  thereafter, an amount equal to 2½% of 100% of the Defined Gross of the applicable sequel or remake in excess of the Contractual Start Point on a moving basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "B" as modified by the Rider thereto but computed with a 12½% distribution fee on Defined Gross from all sources.  Said participation shall be payable only until such time as the participation under subparagraph 3(b)(iii) below becomes payable.

      (iii)  thereafter, an amount equal to 5% of 100% of the Defined Gross of the applicable sequel or remake in excess of the Contractual Start Point on an initial basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "C" as modified by the Rider thereto, but computed with a 17½% distribution fee on Defined Gross from all sources.

FL206
021026MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.       5

35493

Exhibit-11

WB13 0220
CONFIDENTIAL

(b)(b)  <u>Box Office Advances</u>:  If the applicable sequel or remake is produced and released, Purchaser shall pay Owner the following non-refundable advances against amounts otherwise becoming payable pursuant to subparagraphs 3(b)(ii) and 3(b)(iii) above:

(i)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the applicable sequel or remake reaches One Hundred Fifty Million Dollars ($150,000,000) or if WWBO of the applicable sequel or remake reaches Three Hundred Million Dollars ($300,000,000); and

(ii)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the applicable sequel or remake reaches One Hundred Seventy-Five Million Dollars ($175,000,000) or if WWBO of the applicable sequel or remake reaches Three Hundred Fifty Million Dollars ($350,000,000).

4.  <u>Grant of Rights</u>:  If the option is exercised, Purchaser shall own, and subject only to such exercise Owner assigns and sells to Purchaser, exclusively, in perpetuity (subject only to the reversion provisions in Paragraph 2A above) and throughout the universe, all live action theatrical motion picture rights and (subject to subparagraph 4A(c)(c)(c)(c) below) live action television series rights in the Property.  All rights not specifically granted hereunder, including without limitation Reserved Rights, Trademark Rights and Copyrights specified below, are reserved to Owner.  Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

(a)  <u>Live Action Theatrical Motion Pictures and Allied Rights</u>:  The right to produce all types of live action theatrical motion pictures and (subject only to the reversion provisions in Paragraph 2A above) sequels thereto and remakes thereof (except made for television programs and television motion pictures), intended for initial exploitation in motion picture theatres and secondary exploitation in any medium now or hereafter devised (including by way of illustration only, any form of theatrical, television, non-theatrical or homevideo exploitation) and all music and music publishing rights, soundtrack album and other soundtrack exploitation rights, and promotional and advertising rights.  Said rights shall be exclusive, subject to the right previously granted to the Walt Disney Company ("Disney") to produce one theatrical musical motion picture as set forth in paragraph 6 of Schedule 1 attached hereto.  Notwithstanding the foregoing grant of soundtrack exploitation rights, it is agreed that Purchaser shall not use more than 10 minutes of the talking (non-singing) soundtrack of the Picture (or any production produced pursuant to the Rights granted hereunder) on any soundtrack album derived therefrom; provided, however, there is no such length limit on Purchaser's use of any songs contained in the Picture (or any other production produced pursuant to the rights granted hereunder) even if the lyrics of such song(s) are taken in whole or in part from the text of the Property.

35493

Exhibit-11

WB136020
CONFIDENTIAL

(b)  Copyrights/Exploitation Rights:  With respect to works produced pursuant to the rights granted in subparagraph 4(a) above, all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in such works (subject to Paragraph 7 below) now or hereafter recognized in any and all territories and jurisdictions (including by way of illustration only, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public) and the right to exploit such works in all media, markets and languages and in any manner now known or hereafter devised subject to Owner's Reserved Rights.

(c)  Alteration Rights:  The right to change, add to, delete or take from, translate, or otherwise modify the Property in any manner Purchaser may in its discretion determine in connection with the Picture and other works that will embody all or part of the Property, but subject in each case to the Character Standards provisions below.  To the fullest extent allowable under any applicable law, Owner hereby irrevocably waives or assigns to Purchaser its so-called "moral rights" or "droit moral".  Owner expressly acknowledges that many parties will contribute to the Picture and other works that will embody all or part of the Property.  Accordingly, if under any applicable law the above waiver or assignment by Owner of "moral rights" or "droit moral" is not effective, then Owner agrees to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(d)  Name, Likeness and Biography:  The right to use, in a reasonable and customary manner, ERB's name, approved likeness and approved biography in and in connection with the Picture and any other works that will embody all or part of the Property; provided, however, that ERB's name, likeness and/or biography shall not be used to endorse any entity, product or service.  Owner shall exercise its approval right over likenesses and biographies reasonably and within 5 days after receipt of written request by Purchaser, or such approvals shall be deemed given.

(e)  Rental Right:  Purchaser and Owner acknowledge and agree that the following sums are in consideration of, and constitute equitable remuneration for, the rental right granted to Purchaser in subparagraph 4(b) hereof: an agreed allocation to the rental right of 3.8% of the Purchase Price and, if applicable, 3.8% of any contingent compensation provided for in this Agreement.  If under the applicable law of any territory or jurisdiction, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Purchaser of the rental right shall nevertheless be fully effective, and Purchaser shall pay Owner such compensation or, if necessary, the parties shall in good faith negotiate the amount and nature

35493

**Exhibit-11**

WB136022
CONFIDENTIAL

141

thereof in accordance with applicable law.  Since Purchaser has already paid or agreed to pay Owner equitable remuneration for the rental right, Owner hereby assigns to Purchaser all compensation for the rental right payable or which may become payable to Owner on account or in the nature of a tax or levy, through a collecting society or otherwise.  Owner shall cooperate fully with Purchaser in the collection and payment to Purchaser of such compensation.  Further, since under this Agreement Purchaser has already paid or agreed to pay Owner full consideration for all rights granted by Owner hereunder, Owner hereby assigns to Purchaser all other compensation payable or which may become payable to Owner on account or in the nature of a tax or levy, through a collecting society or otherwise, under the applicable law of any territory or jurisdiction, including by way of illustration only, so-called blank tape and similar levies.  Owner shall cooperate fully with Purchaser in connection with the collection and payment to Purchaser of all such compensation.

    (f)  <u>Intentionally Omitted</u>.

    (g)  <u>No Obligation To Proceed</u>:  Nothing contained in this Agreement shall be construed as requiring Purchaser to exercise or exploit, or continue to exercise or exploit, any of the rights herein granted.

    4A.  <u>Reserved Rights</u>:  Owner reserves all rights not expressly granted hereunder, including without limitation the following rights (the "Reserved Rights") in the Property, subject to the terms and conditions set forth below, it being expressly acknowledged and agreed that Owner shall have no right to utilize any elements from any work produced by Purchaser pursuant to the Rights or any new or changed material created by or for Purchaser in the exercise of the Reserved Rights or otherwise, provided that if Purchaser does not exercise the option hereunder, Purchaser's use (if any) of such new or changed material shall be subject to Owner's rights in the Property.  In connection with the exercise by Owner of any of the Reserved Rights hereunder, Owner shall have the right (notwithstanding anything to the contrary contained in Paragraph 4 above) to advertise and publicize same in all media, including without limitation radio and television.

    (a)  <u>Publishing Rights</u>:  All publishing rights in the Property, including but not limited to the publishing rights set forth in subdivisions 4A(a)(i), 4A(a)(ii) and 4A(a)(iii) below, except that Purchaser shall have the right to publish excerpts from and summaries of the Property, or any motion picture or other versions thereof based upon the Property, for advertising and/or publicizing purposes only (not for sale or resale) of any work produced pursuant to the Rights and the right to publish souvenir booklets (for release only at those theaters exhibiting the Picture or other productions produced pursuant to the Rights granted hereunder) and "making-of-the-movie" type books relating to the Picture (provided such souvenir booklets and "making of the movie" type books are for publicizing

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.        8

35493

**Exhibit-11**

WB136023
**CONFIDENTIAL**

purposes, and not for sale or resale), provided that no such publication shall contain excerpts or summaries in excess of 7,500 words in the aggregate (not to be serialized) taken from the Property. The foregoing limitation on serializing is not intended to and shall not preclude Purchaser's publication of advertising and/or publicity materials in installments. With respect to any "making-of-the-movie" type books, such book(s) shall be titled differently than the Property (but such title may contain the title of the Property such as "The Making of the Film TARZAN"), and Owner's name will not appear on the cover, the title page or the spine thereof other than as part of the billing block or credit list, if any, for the underlying picture.

(i) <u>Print Editions</u>:  The right to publish print editions of the Property in book form (including, without limitation, in comic book form), whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise.

(ii) <u>Recorded Readings</u>:  The right to publish recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user.

(iii) <u>Electronically Read Editions</u>:  The right to publish the text of published print editions of the Property in the form of CD-ROM, videocassette tape or similar electronically read devices individually purchased by the end-user.  Such electronically read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property but may not contain audio tracks of any kind.

As further set forth below, Purchaser shall take all steps necessary to protect the copyright in the Property as it may be contained in any publication by Purchaser. With respect to excerpts from the Property (if any) used by Purchaser as aforesaid, Purchaser shall identify ERB as the author of the Property from which the excerpts were taken, but any summaries of the Property (as distinguished from actual excerpts) shall not be attributable to ERB.  Purchaser acknowledges that, due to the reservation of publishing rights hereunder, Purchaser shall have no right to, and shall not, publish any publications not specifically enumerated in this subparagraph (specifically but without limitation Purchaser shall not publish the screenplay of, or a novelization of, the Picture or any production produced pursuant to the Rights granted hereunder).

(b) <u>Stage Rights</u>:  The right to perform the Property or adaptations thereof on the live stage with actors appearing in person in the immediate presence of the audience (including the right to record a cast album) provided no broadcast,

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

9

35493

Exhibit-11

WB1360143
CONFIDENTIAL

telecast, photography or reproduction of such performance is made, except for archival purposes and for the use of customary minor excerpts in award programs and for advertising and publicity purposes solely in connection with the exploitation of such stage rights. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted stage rights to Disney, the details of such grant of stage rights are listed on Schedule 1 and, in the event of conflict with this subparagraph 4A(b), the details listed on Schedule 1 will control.

(c) Theme Parks: Theme park rights in the Property including, without limitation, the sole right to license 'TARZAN' trademarks and copyrights to theme parks.

(c)(c) Merchandising: The right to license, manufacture and/or sell merchandise and consumer products based on the 'TARZAN' character. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted certain merchandising rights to Disney, the details of which are listed on Schedule 1 attached hereto and, in the event of conflict with this subparagraph 4A(b), the details listed on Schedule 1 will control. In the event that Disney's merchandising rights lapse, and provided Purchaser exercised the Option, Owner shall appoint Purchaser as Owner's merchandising agent on terms to be negotiated in good faith in connection with merchandising rights related to the theatrical motion pictures or direct to video motion pictures produced by Purchaser (but in no event shall such terms be less favorable to Purchaser than the terms of Disney's agreement with Owner for merchandising rights are to Disney). Purchaser shall not have the right to exploit generic merchandising rights.

(c)(c)(c) Animation Rights: All rights to produce animated motion pictures and series for movies and television. Notwithstanding the foregoing, Purchaser acknowledges that Owner previously granted theatrical and television animation rights to Disney.

(c)(c)(c)(c) Television Rights: The right to produce and telecast made-for-television motion pictures and television series. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted to Warner Bros. Television an exclusive option to acquire live action television series rights. Provided none of the Rights granted hereunder have reverted to Owner pursuant to the terms hereof, Purchaser shall have the right of first negotiation with respect to live action long-form television rights pursuant to subparagraph 4A(e), except that if no agreement is reached within the time set forth therein and Owner subsequently is prepared to enter into an agreement for live action long-form television rights with a third party on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall be required to offer the proposed terms to Purchaser, and Purchaser shall then have 10

35493

Exhibit-11

WB1360284
CONFIDENTIAL

business days in which to elect to acquire the rights involved on the terms contained in the notice but shall not be required to offer to Purchaser any modification of such terms offered to such third party.  In connection with the foregoing, if and when Warner Bros. Television's rights terminate, Owner agrees not to option or otherwise grant said rights until Purchaser's rights under this Agreement terminate or revert.  If Purchaser produces the Picture, Purchaser shall have the right to produce a live action television series based thereon (the "Series"), subject to the following terms:

(i)  To keep the Series rights alive, Purchaser must start principal photography on the first episode of the Series by the date which is the earlier of either: (A) 4 years after release of the Picture, or (B) 5 years after delivery of the answer print of the Picture; provided, however, that Purchaser has the right to extend such reversion date by an additional year by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

(ii)  Purchaser may thereafter extend the reversion date set forth in subdivision 4A(c)(c)(c)(c)(i) above by one additional year by paying to Owner the additional non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

(iii)  Purchaser may thereafter extend the reversion date set forth in subdivision 4A(c)(c)(c)(c)(ii) above by one additional year by paying to Owner the additional non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

Notwithstanding the foregoing, in order to avoid a reversion at the reversion date described above, Purchaser must (prior to such reversion date) either: (i) receive a firm order of 13 episodes of the Series from a network, or (ii) commit to the production of 13 episodes of the Series, and must timely produce and continue to produce the Series.  In connection with the Series, Owner will receive Thirty-Five Thousand Dollars ($35,000) per episode (with 5% cumulative annual increases), plus 7.5% of 100% of the modified adjusted gross computed according to the same definition of modified adjusted gross as set forth in Owner's agreement with Warner Bros. Television for said option of live action television series rights.

(c)(c)(c)(c)(c)  Touring Rights:  Touring rights in the Property for the purpose of putting on live action arena shows based on the Property.

(d)  Live Action Made-For-Homevideo Rights:  The right to produce and distribute live action motion pictures for direct-to-video distribution. Notwithstanding the foregoing, provided none of the Rights granted hereunder

35493

**Exhibit-11**

WB136025
CONFIDENTIAL

have reverted to Owner pursuant to the terms hereof, Purchaser shall have the right of first negotiation with respect to live action made-for-homevideo rights pursuant to subparagraph 4A(f) without regard to subparagraph 4A(e), except that if no agreement is reached within the time set forth therein and Owner subsequently is prepared to enter into an agreement with a third party on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall be required to offer the proposed terms to Purchaser, and Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice but shall not be required to offer to Purchaser any modification of such terms offered to such third party.

(e)  <u>First Negotiation</u>:  If Owner at any time proposes to negotiate with any party for the license, exercise or other disposition of any or all of the live action DTV and/or live action long-form television rights, Owner shall give Purchaser notice thereof and an opportunity to so negotiate prior to Owner so negotiating with any third party.  If Purchaser elects to so negotiate, Owner and Purchaser shall negotiate in good faith for a period of not less than 30 days from the commencement of such negotiations, and if Purchaser elects not to negotiate, Owner may enter into an agreement for the license, exercise or other disposition of such Reserved Rights with any third party with no further obligation to Purchaser with respect thereto.  If Purchaser elects to negotiate and if an agreement does not result therefrom Owner may thereafter negotiate with any third party.  If Owner is at any time prepared to enter into an agreement with a third party for the license, exercise or other disposition of any or all of the live action DTV and/or live action long-form television rights, on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall, before entering into such agreement, give Purchaser notice of the proposed terms thereof (and all modifications of such terms) and the party involved.  In each instance, Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice.  If such notice sets forth a reason for a quicker response (e.g., imminent withdrawal of the offer by such third party upon which such third party agreement is to be based), Purchaser shall use best efforts to make such election within 5 business days.

5.  <u>Representations and Warranties</u>:  Owner hereby represents and warrants:

(a)  That Owner has the right to enter into this Agreement and grant the Rights granted hereunder and that Owner has not heretofore assigned or encumbered any of the rights granted hereunder, except as otherwise set forth in this Agreement.

(b)  That the Stories are original with ERB; that neither the Stories nor any part thereof are taken from or based upon any other material or any motion picture; that to the best of Owner's knowledge (including that which Owner in

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                    12

35493

Exhibit-11

WB136027A6
CONFIDENTIAL

exercise of reasonable prudence should have known) neither the Stories nor any part thereof, or the exercise by Purchaser of any of the rights herein granted, will violate or infringe upon the trademark, tradename, copyright or patent right of any person; and that to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) neither the Stories nor any part thereof, or the exercise by Purchaser of any of the rights herein granted, will violate or infringe upon any other literary, dramatic, musical or artistic right, or to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) any personal, private, civil or property right, right of privacy or any other right of any person or to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) constitute a libel or slander of any person.  Owner makes no warranty hereunder, however, with respect to any material added to any motion picture.

(c)  That, except as otherwise set forth in this Agreement, Owner is the sole owner of all Rights herein granted and has full power and authority to grant said Rights to Purchaser, as more particularly set forth in Paragraph 4 hereof; that except as set forth in this Agreement, none of said rights have been granted, encumbered, or otherwise disposed of in any manner to any person; that no motion picture based in whole or in part on the Property has been produced or authorized by or with the knowledge or consent of Owner, except as set forth in subparagraph 5(f) below; that except as set forth in subparagraph 5(f) below, neither the Property nor any version thereof nor any play or dramatic adaptation based thereon in whole or in part have been published or presented or authorized on the spoken stage by or with the knowledge or consent of Owner, except pursuant to an agreement, dated April 18, 1920, between Owner and Arthur Gibbons (dealing with stage rights) and an agreement, dated 1973, between Owner and Michael White Limited (dealing with stage rights); that Owner has not by license, grant or otherwise done and will not by license, grant, or otherwise do any act or thing which will impair or encumber any of the Rights herein granted or materially interfere with the full enjoyment of said Rights; and that, so far as Owner is aware, there are no claims or litigation pending or threatened which will adversely affect any of the Rights herein granted to Purchaser.

(d)  That the Stories set forth on page 1 of Exhibit "A" attached hereto enjoy copyright protection in the United States; and that the Stories set forth on pages 2 and 3 of Exhibit "A" attached hereto enjoy copyright protection in all countries outside of the United States which adhere to the Berne Copyright Convention (applying a copyright term of "life plus seventy [70] years").

(e)  That ERB died on March 29, 1950, and accordingly, for purposes of the Berne Copyright Convention (as such Convention applies to countries

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    13

35493

Exhibit-11

WB130028
CONFIDENTIAL

outside of the United States which adhere to such Convention), the "life of said author (ERB) plus seventy (70) years" extends to December 31, 2020.

(f)  That motion pictures and television programs set forth in Exhibit "D" attached hereto, all based in whole or in part on the Property, have been heretofore produced, in which productions Purchaser acknowledges there exists a continuing right to exploit, but aside from the productions specified in Exhibit "D", no other theatrical or television motion pictures or television programs have been produced or authorized by or with the knowledge or consent of Owner.

(g)  That TARZAN is a registered trademark of Owner in the United States and certain other territories.

(h)  That the Property is not based in whole or in part on the life of any real person except as approved in writing by Purchaser.

(i)  That, without limiting Purchaser's rights to do so in the event Owner fails to do so, Owner will maintain copyright protection in the Reserved Rights.

(j)  That, except as set forth in Exhibit "A", and except as set forth in subparagraph 5(k) below, to the best of Owner' knowledge, there are no other stories authorized by Owner or its predecessors in interest in which the TARZAN character appears.  If there are any other Stories in which Owner has an interest, such stories shall be deemed Stories hereunder to the extent of Owner' rights therein, if any.

(k)  That none of the publishers listed on Exhibit "A" has any present, continuing, or vested theatrical or homevideo live-action motion picture rights in the character of TARZAN or in any of the Stories.

(l)  Owner has, over the years, licensed various comic book publishers to prepare, create and publish comic books based upon the Property.  The current licensee with respect to comic book rights is Dark Horse.  All of such licensees (including Dark Horse) have been authorized by Owner to prepare stories for use in connection with the exploitation of the licensed comic book rights.  None of the comic book licensees, including Dark Horse, have the motion picture or television rights in the stories created for the comic books.

(m)  If Owner authorizes the writing and publication of any new Stories based upon the Property, then so long as Purchaser has any production rights hereunder, Owner shall not authorize the exploitation of the motion picture and television rights therein and the Property shall be deemed to include any such new Stories.

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

14

35493

**Exhibit-11**

WB1360268
CONFIDENTIAL

The term "person" as used in this Agreement shall mean any person, firm, corporation or other entity.

5A.  Indemnification:  Owner shall indemnify Purchaser against any liability, damages, costs and expenses (including outside reasonable attorneys' fees) incurred by reason of any claim arising in connection with any breach of Owner's representations, warranties or agreements herein.  Purchaser will indemnify Owner against any liability, loss, damage, cost or expenses (including reasonable attorneys' fees) Owner may incur as a result of any claim or action respecting material incorporated into or added to the Property by Purchaser in the exercise of any of Purchaser's rights hereunder or otherwise in connection with Purchaser's exercise of any of the Rights granted hereunder (provided such claim or action does not arise on account of any breach of warranty or agreement made by Owner hereunder or any wrongful or negligent act of Owner).  The parties hereto, upon presentation of any such claim to either of the parties, or the institution of any such action naming either or both of the parties as defendants, shall promptly notify the other of the presentation of such claim or the institution of any such action giving such other party full details thereof.  In any such claim or action, Owner may have independent counsel, at Owner's sole cost and expense, and said counsel may participate on Owner's behalf, provided that Purchaser shall be entitled to maintain control of the conduct of the defense of any such claim or action.  Purchaser shall have the right to adjust or settle any such claim or action as it may determine in its sole discretion in good faith without affecting the foregoing indemnity; provided, however, that if Owner makes bonding arrangements reasonably satisfactory to Purchaser assuring Purchaser of reimbursements of all payments and expenses in connection with any such claim or action, Purchaser will not settle such claim or action without Owner's prior written consent (so long as Owner does not withhold its consent in bad faith); provided, further, that the preceding proviso shall not apply and Purchaser's right to settle any claim or action and Owner's indemnity obligation shall remain where Purchaser deems advisable a settlement of a lawsuit in which a claim or action for an injunction is made against the production, distribution and/or exploitation of the Picture or any other motion picture or television production which may be produced pursuant to the Rights granted hereunder.  To the extent any such settlement would affect Owner's Reserved Rights, same shall be made only with Owner's prior written consent (so long as Owner does not withhold its consent in bad faith).

5B.  E&O Insurance:  If Purchaser exercises its option hereunder, then commencing from the time Purchaser's errors and omissions insurance policy applicable to the Picture becomes effective, Purchaser agrees to cover Owner as an additional insured under such errors and omissions policy applicable to the Picture and any other production produced by Purchaser pursuant to the rights granted hereunder, but only with respect to claims or liabilities arising out of Purchaser's production, distribution or exploitation of the Picture (and not from a breach by Owner of any representation, warranty or agreement hereunder), subject to applicable deductibles

35493

**Exhibit-11**

149
WB136030
CONFIDENTIAL

and exclusions. Purchaser shall not be obligated to maintain errors and omissions insurance for any particular period of time, it being expressly agreed that coverage of Owner hereunder shall continue only during the period of time provided herein and only during such time as Purchaser elects to carry such insurance.

6. <u>Additional Documents</u>: At Purchaser's request, Owner will execute, acknowledge and deliver to Purchaser any and all additional documents consistent herewith which Purchaser may reasonably deem necessary to evidence and effectuate the purposes of this Agreement including, without limitation short-form options and assignments in the form attached hereto. Owner hereby irrevocably appoints Purchaser as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office and elsewhere any and all such documents which Owner fails to execute within 10 business days after Owner's receipt of Purchaser's written request therefor (unless a shorter period of time is reasonably required by Purchaser, but in any event at least 5 business days). Upon Owner's request, Purchaser shall furnish to Owner copies of all such documents which Purchaser so executes on behalf of Owner. The appointment shall be a power coupled with an interest. Concurrently with or promptly after execution by Owner of this Agreement, and as a condition to payment by Purchaser hereunder, Owner will deliver to Purchaser a Publisher's Release in the form attached hereto (or such other form as Purchaser has approved in writing), executed by an authorized signatory of each party to whom Owner has granted publishing rights in the Property.

6A. <u>Character Standards</u>: The following shall apply with respect to motion pictures produced under this Agreement:

(a) Purchaser agrees that it shall exercise a high degree of care so as to insure that the selection of themes and content for such motion pictures, the treatments, screenplays and presentations of such motion pictures, and the advertising and publicity thereof are made in good faith for the entertainment value thereof (taking into account their suitability for children as well as adults) rather than solely for the purposes of sensationalism or to appeal to prurient interests. In this connection, in the portrayal of the TARZAN and JANE characters in such motion pictures and advertising and publicity, Purchaser shall: (1) not portray the TARZAN and JANE characters as not being fundamentally good; (2) not be inconsistent with TARZAN'S and JANE'S basic characters and basic characteristics set forth in the Stories; (3) not depict TARZAN and JANE as unconcerned for the sanctity and well being of human and animal life; and (4) not depict TARZAN or JANE as being contemptuous of race, color, religion, creed or national origin.

Without limiting the generality of the foregoing, Purchaser agrees that in no event shall TARZAN or JANE be portrayed in such motion pictures or advertising and publicity as:

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    16

35493

Exhibit-11
459
WB136031
CONFIDENTIAL

(i)  losing life or limb or suffering any permanent physical or mental disability of any kind;

(ii)  advocating or participating in any wanton killing of any human or animal other than for purposes of obtaining food, self-protection or the protection of other humans or animals, and in order to obtain knowledge;

(iii)  advocating the use of, or intentionally and knowingly using for himself (except for medicinal or anthropologically accurate ceremonial purposes), alcohol, tobacco products or drugs; and

(iv)  advocating or engaging in illicit sexual activity.

(b)  No later than thirty (30) days prior to the scheduled commencement of principal photography of any motion picture, Purchaser shall furnish to Owner the screenplay therefor in order to ensure observance of the provisions of this Paragraph 6A, and if Owner has any comments thereon, they must be furnished to Purchaser in writing within five (5) business days after the screenplay is received by Owner, and if Owner fails to furnish its comments within such period, Owner shall be deemed to have accepted such screenplay and waived its right to claim that such screenplay failed to comply with the provisions of subparagraphs 6A(a) above and 6A(d) below; provided that the applicable motion picture is consistent with said screenplay.

(c)  Purchaser shall not change the name of the characters TARZAN and JANE, but if Purchaser elects to change the name of any other character(s) in the Stories, it shall first consult with Owner (with Purchaser having the final say) and the fact that Purchaser changes the name of any character(s) shall not in any way alter or affect the status of such character(s) as still being part of the Property and not owned by Purchaser (other than with respect to Purchaser's rights to use the character in and in connection with the Picture and sequels to and remakes of the Picture), and Purchaser's right to exploit such character(s) shall be governed by the terms of this Agreement.

(d)  Purchaser may not change the basic nature of any character in the Stories, it being understood that for purposes of this subparagraph 6A(d), the basic nature is deemed to mean whether a character is fundamentally "good" or "evil," and Purchaser shall not change a character in the Stories who is fundamentally "good" to fundamentally "evil" or vice-versa.  Nothing herein shall limit Purchaser's ability to create and introduce new characters into motion pictures produced hereunder (i.e. characters which do not appear in the Stories).

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                        17

35493

Exhibit-11

WB136032
CONFIDENTIAL                              151

(e)  Without limiting the provisions of subparagraphs 6A(a), 6A(b), 6A(c) and 6A(d) above, Purchaser shall obtain an MPAA rating for each motion picture produced hereunder no more restrictive than "PG-13".

6B.  Credit, Trademark, Title:

(a)  Credit:  Purchaser shall accord credit to ERB on the positive prints of all motion pictures produced hereunder, on a separate card, in the main titles (meaning the credits, whether before or after the body of the Picture, where the "directed by" credit appears), in a size of type not less than fifty percent (50%) of the size of type used to display the title of the applicable motion picture and, subject to Purchaser's customary exclusions (set forth below), in all paid advertisements issued by or under Purchaser's control, in a size of type not less than that used to accord credit to the screenplay writer(s); provided that notwithstanding said exclusions, ERB will be accorded such credit in all paid advertisements issued by or under Purchaser's control (other than award, nomination, congratulatory advertisements and advertisements announcing personal appearances) in which the screenplay writer(s) for the applicable motion picture is accorded credit, in the following form, all subject to Purchaser's agreement with the Writer's Guild of America (the "WGA") and any other union requirements which may apply:

(i)  "Based on the Story '[name of Story or Stories]' by Edgar Rice Burroughs", if the motion picture is based upon a Story or Stories; or

(ii)  "Based on the 'TARZAN' stories created by Edgar Rice Burroughs", if the motion picture is not based upon a Story or Stories but is based upon the character TARZAN, subject to Purchaser not being precluded from according such credit by the WGA; and if the WGA so precludes said credit, then in the form "Based on the TARZAN character created by Edgar Rice Burroughs".

With respect to each motion picture produced hereunder, Purchaser shall furnish Owner with a copy of the final main and end title screen credits schedule and the final advertising billing schedule prepared by Purchaser when the same are distributed to Purchaser's departmental personnel, but in no event later than five (5) days prior to the delivery of any answer print of any motion picture or publication of any advertisement, as the case may be, in order that Owner may insure that Purchaser has complied with the provisions of subparagraphs 6B(a) and 6B(b) hereof.  If Owner does not notify Purchaser within seventy-two (72) hours (exclusive of Saturdays, Sundays and holidays) after receipt thereof of any errors therein, then Owner shall be deemed to have approved said matters. Tentative credits may be substituted for final credits if the credit accorded ERB is not changed after Owner's approval thereof, or if changed, subject to furnishing

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                    18

35493

Exhibit-11
WB136028
CONFIDENTIAL

Owner such changed credit in the form of another tentative or final credit in accordance with the foregoing procedure.  In paid advertising, the following shall apply:  any reference to the size of the title shall refer to the regular as opposed to the artwork title; the foregoing credit provisions shall apply only to the billing portion (excluding artwork and advertising copy) of advertisements issued by Purchaser or under Purchaser's direct control relating to the Picture, and shall not apply at any time to teasers, trailers, billboards and other outdoor advertising, radio and television advertising, group, list or special advertisements, commercial tie-ins or by-products, any advertisements of 8 column inches or less, or any advertisements which would be excepted advertisements under the Directors Guild of America Basic Agreement.  No casual or inadvertent failure to comply with credit requirements hereunder shall be deemed a breach of this Agreement, and the sole remedy for breach of any of the foregoing provisions shall be an action at law for damages, it being agreed that in no event shall Owner be entitled to injunctive or other equitable relief on account of any breach of any of the provisions of this subparagraph 6B(a); provided, however, that upon any notice by Owner to Purchaser of any inadvertent failure by Purchaser to comply with the provisions of this subparagraph 6B(a), Purchaser shall prospectively cure any such failure, but Purchaser shall not be required to recall prints or re-do advertisements which have been prepared and run.  Purchaser shall require in Purchaser's contracts with the subdistributors of the Picture that ERB shall receive the credits required hereunder; provided, however, that any failure by a subdistributor to comply therewith shall not be a breach of this Agreement.

(b)  Trademark:

(i)  Purchaser shall insert the Trademark (of which Owner notifies Purchaser in writing of Owner' ownership thereof) together with the following legend, on the prints of each motion picture produced hereunder, in paid advertising relating to each motion picture produced hereunder, and (1) on the jacket or cover (or other wrapping) or label of any soundtrack recording relating to any motion picture produced hereunder, and (2) on any musical compositions relating to any motion picture produced hereunder:

TARZAN ®

"Trademark TARZAN owned by
Edgar Rice Burroughs, Inc. and used by Permission."

Such trademark symbol and legend shall be in legible size.

35493

Exhibit-11
WB136034
CONFIDENTIAL

(ii)  Purchaser acknowledges that Owner has advised Purchaser that TARZAN is a registered trademark of Owner in the United States and certain other territories, that any and all use of the Trademark shall inure solely to the benefit of Owner and shall create no right, title or interest therein or thereto in Purchaser.

(iii)  Purchaser warrants and confirms that it will not obtain in its name or in the name of any agent or representative, any ownership interest in and to the Trademark and that it will not obtain any registration pertaining to such trademark nor will it file any application pertaining thereto.

(iv)  Purchaser agrees that it shall not attack the validity of the Trademark whether prior to or after any reversion to Owner of Purchaser's right to produce any motion pictures hereunder.

(v)  Subject to the other requirements of this subparagraph 6B(b), Purchaser shall be obligated to incorporate the Trademark as part of the title of any motion picture produced hereunder.

(vi)  Purchaser shall not utilize any other trademark, trade name or service mark in connection with the Trademark (it being understood that Purchaser may use its own corporate logo and/or trademark or any of its other applicable corporate logos and/or trademarks or the logos and/or trademarks of any third party manufacturer of soundtrack recordings or music publisher or contributor of production services or equipment) in connection with any motion picture, soundtrack recording or musical composition produced hereunder provided such use,  if it is on the same item as the Trademark, is distinct and separate from the Trademark and shall not vary, modify or change in any manner the Trademark whether by way of translation or otherwise, it being understood that Purchaser may translate the Trademark legends referred to in this Paragraph 6B into foreign languages in connection with the foreign exhibition of any motion picture produced hereunder as well as the foreign distribution or publication, as the case may be, of any soundtrack recording or musical composition produced hereunder.  Purchaser shall, upon Owner' request, execute and deliver any and all documents furnished to Purchaser by Owner which Owner may reasonably require to facilitate Owner' registration, renewal and protection of the Trademark, including, but not limited to recordation of Purchaser as a user of the Trademark. Purchaser furthermore undertakes upon the termination (if any) of Purchaser's right to use the Trademark hereunder, to execute all reasonable and necessary documents furnished to Purchaser by Owner for the purpose of effecting cancellation of the registered user entry or

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                    20

35493

Exhibit-11

W8446035
CONFIDENTIAL

other recordation. In connection with the foregoing, when Owner notifies Purchaser in which territories the Trademark is registered and requests Purchaser to advise Owner whether the Trademark is then being used in any territory, Purchaser shall comply with such request, and upon requests by Owner, Purchaser shall furnish Owner with an affidavit (in the form to be furnished to Purchaser by Owner) that it is using the Trademark in motion pictures in any specific territory.

(vii) Anything to the contrary notwithstanding, Owner acknowledges that Purchaser shall have the right to use the name TARZAN in conjunction with motion pictures based on the TARZAN character and in connection with the exercise of any other rights granted hereunder so long as Purchaser shall have the right under this Agreement to produce and/or distribute such motion pictures.

(viii) Purchaser hereby agrees to indemnify and hold Owner, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable attorneys' fees) arising out of any unauthorized use by Purchaser of the Trademark. Notwithstanding the foregoing, Owner shall have the right, but not the obligation, to assume the defense of any claim or action arising hereunder, subject to the provisions of subparagraph 7(d) below.

(c) Owner hereby grants Purchaser the exclusive right to use the word TARZAN and/or the title of any Story as the title of and in connection with any motion picture produced, and, subject to the following sentence, the nonexclusive right to use such words and/or title(s) in the exercise of any other right hereunder. Purchaser may use the title of the Story or the Stories solely for the following purposes: (i) as the title of such motion picture produced hereunder as may be based on such Story or the Stories; (ii) in the advertising and publicity relating to any motion picture produced hereunder, and (iii) as the title of any soundtrack recording and/or musical composition relating to any motion picture produced hereunder.

7. Copyright:

(a) As a condition of the grant of rights by Owner hereunder, Purchaser shall incorporate (and shall cause the respective record company and music publishing company to incorporate) the following form of copyright notice, which shall be in legible size, in the joint names of Owner and Purchaser (or its designee), among the credits on the negative and prints (and tapes if applicable) of motion pictures produced hereunder and on copies of all treatments, screenplays and all advertising or promotional materials issued by Purchaser or under its control in connection with any motion picture produced hereunder, as

35493

Exhibit-11

WB136036.5
CONFIDENTIAL

well as on the jacket or cover (or other packaging) or label of any soundtrack recording and on any treatment, screenplay and musical composition relating to any motion picture produced hereunder:

> COPYRIGHT © [Year of first publication] Edgar Rice Burroughs, Inc. and [Purchaser or Purchaser's designee]. All Rights Reserved.

In addition, the following form of copyright notice shall appear on the jacket or cover (or other packaging) or label of any soundtrack recording in legible size:

> P [Year of first publication] Edgar Rice Burroughs, Inc. and [Purchaser or Purchaser's designee].

The form of copyright notice shall be submitted to Owner no later than five (5) days prior to the preparation of the credits for the answer print of any motion picture produced hereunder (as well as prior to the manufacture of any soundtrack recording and publication of any musical composition produced hereunder) in order that Owner may insure that Purchaser has complied with the provisions of this Paragraph 7. If Owner does not notify Purchaser within seventy-two (72) hours (exclusive of Saturdays, Sundays and holidays) after receipt of such form of copyright notice, then Owner shall be deemed to have approved said form of copyright notice.

Notwithstanding anything to the contrary contained in this subparagraph 7(a), in the event Purchaser inadvertently omits to incorporate the requisite copyright notice as provided for herein, Purchaser shall not be deemed to be in breach of this subparagraph 7(a) if Purchaser complies with the provisions of Section 405(a)(2) of the United States Copyright Act.

(b) Purchaser shall apply, on behalf of Owner and Purchaser, for Registration of Claim of Copyright in the name of Owner and Purchaser for any motion picture produced hereunder, as well as any screenplay, teleplay, soundtrack recording and musical composition, within ninety (90) days after the date of initial release, exhibition, or publication, as the case may be, and shall concurrently therewith furnish Owner with a copy of the applicable Application to Register Claim of Copyright, and shall instruct the United States Copyright Office to mail a certificate of Registration of Claim of Copyright in respect of said Application to Owner. The Application for Registration of Claim of Copyright shall bear the inscription: "By Agreement Between Warner Bros., a division of Time Warner Entertainment Company, L.P. and Edgar Rice Burroughs, Inc." Purchaser further agrees that the release, exhibition or publication, as the case may be, of any motion picture produced hereunder, as well as any soundtrack recording and musical composition, shall be with such notice of copyright and in such a manner as shall afford to said motion picture copyright protection in the

35493

Exhibit-11

WB136057
CONFIDENTIAL

United States of America and all countries adhering to the Berne Convention and the Universal Copyright Convention.  References to motion pictures hereunder shall include, but not be limited to, the soundtrack thereof and any dubbed versions, subtitled versions, and any other version thereof.

(c)  Purchaser shall have the right, but not the obligation, at Purchaser's expense, to bring, prosecute, defend and appear in suits, actions and proceedings concerning all copyrights in and to any motion pictures produced hereunder, or concerning any infringement of any such copyright, or any interference with any of the rights herein granted to Purchaser, and to take such action as Purchaser may deem advisable to enforce, protect and/or defend any of the rights, privileges and property herein granted to Purchaser under any and all such copyrights; and to litigate, collect and receive all damages arising from any infringement of any such rights.  Any such action may be taken by Purchaser and Purchaser may, if required by law, join Owner as a party plaintiff or defendant in any such suit, action or proceeding, in which event, Purchaser agrees to indemnify and hold Owner, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable attorneys' fees) resulting from Purchaser joining Owner as a party plaintiff or defendant in any such suit, action or proceeding, except to the extent attributable to the fault of Owner or predecessor or successor in interest of Owner.  If required by Purchaser, Owner shall execute a power of attorney in favor of Purchaser within five (5) business days of the request therefor by Purchaser, so as to enable Purchaser to proceed with any such suits, actions and proceedings. Notwithstanding anything to the contrary set forth in this subparagraph 7(c), if Owner shall notify Purchaser in writing of an infringement with respect to a soundtrack recording and request Purchaser to take action with respect to such infringement, and if Purchaser does not proceed in accordance with such request within five (5) business days of such notice, Owner shall have the right to proceed against the infringement involved at its own expense and shall indemnify and hold harmless Purchaser, its successors and assigns, from and against any loss, liability, damage or expense (including reasonable outside attorneys' fees) resulting from so proceeding.

(d)  Nothing herein shall affect Owner's right to assert or otherwise use its copyright interest in any motion picture produced hereunder, in connection with any suit, action or proceeding of any nature in respect of any matters other than the enforcement, protection and/or defense of the copyright in any motion picture produced hereunder, or other product resulting from Purchaser's exercise of its rights hereunder, it being understood and agreed that no such assertion or use by Owner of its copyright interest shall in any way limit, impair, derogate from, or otherwise restrict Purchaser's sole and exclusive distribution rights in and to any motion picture produced hereunder.  Owner may, if required by law, join Purchaser as a party plaintiff or defendant in any such suit, action or proceeding,

35493

Exhibit-11

WB136898
CONFIDENTIAL

in which event Owner agrees to indemnify and hold Purchaser, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable outside attorneys' fees) resulting from Owner's joining Purchaser as a party plaintiff or defendant in any such suit, action or proceeding.

(e) Owner, as a condition of any grant of print publication rights to any third party, agrees to cause to be affixed to each copy of the Stories or any part thereof hereafter published or offered for sale by or with the authority of Owner notice of copyright in the same form as has been previously affixed to each copy of the Stories or any part thereof, and not to cause any publication of the Stories or any arrangement, revision or reissue thereof in any form without duly copyrighting the same in every country where such publication occurs.

(f) Wherever Purchaser is referred to in the last grammatical paragraph of subparagraph (a) of this subparagraph 7 or subparagraph (b) through (d) of this Paragraph 7, it shall be deemed to mean Purchaser, or, in the event Purchaser's designee is the co-copyright proprietor of the applicable motion picture, then it shall be deemed to mean Purchaser's designee.

8. Irrevocability and No Equitable Relief:  Subject to any reversion rights and/or sequel reversion rights set forth herein, all rights granted and agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser in perpetuity, including without limitation, for the full term of copyright protection everywhere in the world and any and all renewals, extensions and revivals thereof.  No breach by Purchaser of this Agreement shall entitle Owner to equitable relief, whether injunctive or otherwise, against or with respect to the Picture or any other works produced pursuant to the Rights granted hereunder or their exploitation, it being acknowledged and agreed that Owner's remedy of money damages in accordance with the dispute resolution provisions set forth below is adequate.  If the rights granted to Purchaser hereunder should revert to Owner pursuant to the provisions of any copyright law or similar law, and if Owner is at any time thereafter prepared to enter into an agreement with a third party for the license, exercise or other disposition of all or any of such rights, Owner shall, before entering into such agreement, give Purchaser notice of the proposed terms thereof (and all modifications of such terms) and the party involved.  In each instance, Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice.

9. Assignment:  Purchaser shall have the right to assign any or all of its rights under this Agreement to any person, and upon such assignment Purchaser shall have no further obligations to Owner hereunder; provided, however, that unless such assignment is to a so-called major or so-called mini-major motion picture company or a United States television network (as those terms are commonly understood in the motion picture or television industries at the time) which assumes such obligations in

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                            24

35493

Exhibit-11

WB136038
CONFIDENTIAL

writing, or unless Owner approves of such assignment, such assignment shall not relieve Purchaser of its payment obligations to Owner under this Agreement.

9A.  Videocassette/Videodisc Copy:  At such time, if at all, as videocassette and videodisc copies of the Picture and/or any sequel or remakes thereto produced by Purchaser shall be manufactured for distribution in the homevideo market, Purchaser shall furnish Owner, upon request, with 5 such videocassette copies and 5 such videodisc copies at no cost to Owner.  Owner shall use said videocassette and videodisc copies solely for personal, library and reference purposes, and in no event shall said videocassette and videodisc  copies be duplicated or used for any commercial purpose or for profit, including but not limited to the making of public exhibitions of the Picture or such sequel or remake (as applicable).

9B.  One-Sheets:  At such time as one-sheets advertising the Picture (and/or each sequel to or remake of the Picture) become available, Purchaser shall furnish Owner, upon Owner's timely request, with 5 copies of each such one-sheet at no cost to Owner.  Owner shall use such copies solely for personal, library and reference purposes, and in no event shall said copies be duplicated or used for any commercial purpose or for profit.

10.  Miscellaneous:

(a)  Entire Agreement:  Except as herein expressly provided, this Agreement cancels and supersedes all prior negotiations and undertakings relating to the Property and contains all terms and conditions, pertaining to the subject hereof.  If there is any conflict between any provision of this Agreement and any present or future statute, law, ordinance, regulation or collective bargaining agreement the latter shall prevail; provided, that the provision hereof so affected shall be limited only to the extent necessary and no other provision shall be affected.

(b)  Notices:  All written notices which either party hereto is required or may desire to give to the other shall be given by delivering or mailing the same to the other at the address shown on the face hereof, or at such other address as may be designated in writing in a notice to the other given as aforesaid.  Notices to Purchaser shall be addressed to the specific attention of Purchaser's Legal Department.  Notices shall be sufficiently given when hand-delivered or when the same shall be deposited so addressed, postage prepaid, in the United States mail and/or when the same shall have been transmitted by facsimile or similar means and the date of said delivery, mailing or transmission shall be the date of the giving of such notice.

(c)  Governing Law/Dispute Resolution:  This Agreement shall be governed and construed in accordance with the laws of the State of California

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                              25

35493

**Exhibit-11**

WB136049
CONFIDENTIAL

applicable to contracts entered into and fully performed therein.  Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of this agreement to arbitrate ("Dispute"), except as otherwise set forth below, shall be resolved according to the following procedures which shall constitute the sole dispute resolution mechanism hereunder:  In the event that the parties are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules").  The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules.  The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute.  The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages.

The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct  or vacate the award.  Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry.  If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County.  The party seeking enforcement of any arbitration award shall be entitled to an award of all costs, fees and expenses, including reasonable outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.

Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Agreement) in the state and federal courts of Los Angeles County.  Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a California court (state or federal) of competent jurisdiction in Los Angeles County.  Any process in such proceeding may be served by, among other methods, delivering it or mailing it, by registered or certified mail, directed to, as applicable, Owner's

35493

**Exhibit-11**

WB1360460
CONFIDENTIAL

or Purchaser's address as designated in this Agreement.  Any such delivery or mail service shall have the same effect as personal service within the State of California.

(d)  Relationship of the Parties:  This Agreement is not a partnership between or joint venture of the parties hereto and neither party is the agent of the other.  This Agreement is not for the benefit of any third party, whether or not referred to herein.  Captions and organization are for convenience only and shall not be used to construe meaning.  A waiver of any breach shall not waive a prior or subsequent breach.  All remedies shall be cumulative and pursuit of any one shall not waive any other.  This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

WARNER BROS., a division of Time Warner Entertainment Company, L.P.

by WARNER BROS. PICTURES INC. (its successor-in-interest)

("Purchaser")

By: /s/ MARSHALL M. SILVERMAN
Its: Vice President

Date signed by Warner Bros. Pictures Inc:
7-17-03

EDGAR RICE BURROUGHS, INC.

/s/ Illegible

("Owner")

Execution Date:  as of March 1, 2003

35493

Exhibit-11

WB1360461
CONFIDENTIAL

## SCHEDULE 1

### "TARZAN" – Merchandising/Television/Stage Rights

1.  **General:**

    (a)    Disney merchandising rights are limited to the merchandising rights in the Disney pictures utilizing Disney-created materials. Disney does not have the right to exploit generic non-Disney picture related merchandising rights.

    (b)    For purposes of the following, a "picture" includes a theatrical motion picture or direct to video motion picture.

2.  **Basic Structure:**

    (a)    Disney controls merchandising rights starting eighteen (18) months prior to release of a picture and ending two (2) years after the release date (but in the case of a television series, the term expires one (1) year after the date upon which the last original episode is broadcast), provided, however, that with respect to any category of merchandising goods (such category being defined in the applicable trademark regulations) in which Disney is actively exploiting merchandising rights at the end of such two (2) or one (1) year period, the term with respect to such category of goods shall be extended by one (1) additional year.

    (b)    If a Disney television series is a spin-off series and the term would have otherwise expired but for the production of such spin-off series, then Disney's merchandising rights for such spin-off series shall be on a non-exclusive basis.

    (c)    If Disney theatrically re-releases a picture after the term, then the merchandising license to Disney shall be reactivated for an additional term of three (3) years from the date of such theatrical re-release, provided that with respect to the second and third years of such three (3) year term, Disney's merchandising rights shall be on a non-exclusive basis.

3.  **Extension Right:**

    (a)    Disney has the right (which it exercised with respect to the first picture) to extend the merchandising term until six (6) years after the release of the first picture (which, in the case of the first picture, would be June, 2005) with the sixth year being non-exclusive. If a television series is produced within such term, the term shall be extended until one (1) year after the date upon which the last original episode of the television series is first broadcast.

842.0
October 21, 2002

DN/&am
187003 3

FL206
021028MMS/bib  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

1

35493

**Exhibit-11**

WB136043    **162**
CONFIDENTIAL

(b)     After the end of the extended term, Disney, on a non-exclusive basis, can exercise merchandising rights at Disney theme parks and Disney retail stores (and through Disney catalogue sales).

(c)     The extension right can be exercised (within six (6) months after release) for any additional picture produced after the term.

(d)     If any picture is theatrically re-released, then the term of Disney's merchandising rights shall be reactivated for a period of three (3) years after said re-release (with the last two (2) years being on a non-exclusive basis).

4.     Restrictions on Edgar Rice Burroughs' Exploitation of Generic Merchandising Rights:  During the period that Disney has exclusive rights, Burroughs cannot exploit generic merchandising rights, and during the period that it can exploit generic merchandising rights, it must limit the terms of its licenses (and any renewals thereof) to one (1) year.

5.     Warner Television Series Option:  Warner has an option to acquire the live-action television series rights in the "TARZAN" property, and if it does so, merchandising rights are reserved by Burroughs, provided, however, that upon expiration of the merchandising exclusivity held by Disney regarding the merchandising rights, Warner has a right of first negotiation to acquire the merchandising rights in its television series, provided that if Burroughs and Warner are unable to reach an agreement after good faith negotiations, Warner shall have no merchandising rights in the series.

6.     Stage Rights:  The stage rights in "TARZAN" are under option to Disney.  If the stage play is produced and runs for at least four (4) consecutive months, then Disney can produce one (1) live-action musical theatrical production and one (1) live-action musical television production based on the musical play.  In this connection, Disney has agreed not to release its film during the period commencing one (1) year before and ending one (1) year after the release of a third party (e.g., Warner) film, provided Burroughs gives Disney notice of the commencement of production, intended release date and actual release date of the third party film (updated as required).

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

2

35493

Exhibit-11
WB136044
163
CONFIDENTIAL

<u>EXHIBIT A</u>

| | | |
|---|---|---|
| AN EYE FOR AN EYE | ) | |
| WHEN THE LION FED | ) | |
| THE GOLDEN LOCKET | ) | TARZAN THE UNTAMED |
| THE DEBT | ) | |
| WHEN BLOOD TOLD | ) | |
| THE BLACK FLYER | ) | |

TARZAN, LORD OF THE JUNGLE

TARZAN AND THE LOST EMPIRE

TARZAN AND THE IMMORTAL MEN        )    TARZAN'S QUEST

THE RED STAR OF TARZAN        )    TARZAN AND THE FORBIDDEN CITY

TARZAN AND THE MAGIC MEN        )    TARZAN THE MAGNIFICENT
TARZAN AND THE ELEPHANT MEN        )

TARZAN AND THE FOREIGN LEGION

TARZAN AND THE MADMAN

THE QUEST OF TARZAN        )
TARZAN AND THE CHAMPION        )    TARZAN AND THE CASTAWAYS
TARZAN AND THE JUNGLE MURDER        )

TARZAN AND THE TARZAN TWINS WITH JAD-BAL-JA, THE GOLDEN LION

1

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

1

35493

**Exhibit-11**

WB136045
CONFIDENTIAL

TARZAN OF THE APES

THE RETURN OF TARZAN

THE BEASTS OF TARZAN

THE SON OF TARZAN

TARZAN AND THE JEWELS OF OPAR

| | | |
|---|---|---|
| TARZAN'S FIRST LOVE | ) | |
| THE CAPTURE OF TARZAN | ) | |
| THE FIGHT FOR THE BALU | ) | |
| THE GOD OF TARZAN | ) | |
| TARZAN AND THE BLACK BOY | ) | |
| THE WITCH DOCTOR SEEKS VENGEANCE | ) | JUNGLE TALES OF TARZAN |
| THE END OF BUKAWAI | ) | |
| THE LION | ) | |
| THE NIGHTMARE | ) | |
| THE BATTLE FOR TEEKA | ) | |
| A JUNGLE JOKE | ) | |
| TARZAN RESCUES THE MOON | ) | |

| | | |
|---|---|---|
| AN EYE FOR AN EYE | ) | |
| WHEN THE LION FED | ) | |
| THE GOLDEN LOCKET | ) | TARZAN THE UNTAMED |
| THE DEBT | ) | |
| WHEN BLOOD TOLD | ) | |
| THE BLACK FLYER | ) | |

TARZAN THE TERRIBLE

TARZAN AND THE GOLDEN LION

TARZAN AND THE ANT MEN

TARZAN, LORD OF THE JUNGLE

TARZAN AND THE LOST EMPIRE

TARZAN AT THE EARTH'S CORE

TARZAN THE INVINCIBLE

TARZAN TRIUMPHANT

2

35493

**Exhibit-11**

WB136085
CONFIDENTIAL

TARZAN AND THE CITY OF GOLD

TARZAN AND THE LION MAN

TARZAN AND THE LEOPARD MEN

TARZAN AND THE IMMORTAL MEN          )     TARZAN'S QUEST

THE RED STAR OF TARZAN               )     TARZAN AND THE FORBIDDEN CITY

TARZAN AND THE MAGIC MEN             )     TARZAN THE MAGNIFICENT
TARZAN AND THE ELEPHANT MEN          )

3

35493

Exhibit-11

WB136847
CONFIDENTIAL

EXHIBIT "B"

## DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT MOVING BASIS

### COMPUTATION AND PAYMENT

1.    Definition of Parties:  "Warner" means Warner Bros., a division of Time Warner Entertainment Company, L.P., and its subdivisions engaged in the business of distributing motion pictures for exhibition in theaters and for broadcasting over television stations, but shall not include any other persons, firms or corporations licensed by Warner to distribute motion pictures in any part of the world.  Nor shall such term include: any person, firm or corporation distributing the Picture for purposes other than exhibition in theaters or by television stations; exhibitors or others who may actually exhibit the Picture to the public; radio or television broadcasters; cable operators; manufacturers, wholesalers or retailers of video discs, cassettes or similar devices; book or music publishers; phonograph record producers or distributors; manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, goods, services or theme park or other attractions; whether or not any of the foregoing are subdivisions of Warner.

"Participant" means the party under the foregoing agreement who or which is entitled to participate in the Defined Gross of the Picture which exceeds the Contractual Start Point, computed on a moving basis (all as defined below), and the successors and permitted assigns of such party.

2.    Contractual Start Point:  As between Warner and Participant, the Picture shall be deemed to have reached the "Contractual Start Point" at such time as the Defined Gross (as defined in 3 hereof) of the Picture shall equal the following:

(a)  Warner's distribution fees set forth in 4 hereof.

(b)  Warner's expenses in connection with the distribution of the Picture, as set forth in 5 hereof.

(c)  The cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in 9 hereof, and plus such other costs, if any, as may have been incurred in connection with the financing of the cost of production of the Picture.  Said interest and other costs shall be recouped before said cost of production.

The Contractual Start Point shall be computed on a moving basis.  "Moving basis" means that the Contractual Start Point shall be determined as of the close of each accounting period provided for in paragraph 10 hereof.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
1

35493
**Exhibit-11**

WB136048167
CONFIDENTIAL

3.    "Defined Gross" of the Picture means the aggregate of:

(a)    All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors").

(b)    Where Warner grants theatrical distribution rights to a subdistributor on a basis requiring it to account to Warner with respect to film rentals, either: (i) the film rentals received by such subdistributor from exhibitors which Warner accepts for the purpose of its accountings with such subdistributor; or (ii) Warner's share (actually received) of film rentals received by such subdistributor; whichever Warner elects from time to time as to each subdistributor.

(c)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of (i) the gross wholesale rental income therefrom and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns.

(d)    All amounts actually received by Warner from the following:  (i) trailers (other than trailers advertising television exhibitions of the Picture); (ii) licenses of theatrical distribution rights for a flat sum; (iii) licenses of exhibition or distribution rights other than those referred to in (a), (b), (c) and (d) (ii) of this 3, specifically including licenses to cable operators; (iv) the lease of positive prints (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets; and (v) recoveries by Warner for infringement of copyrights of the Picture.

(e)    All monies actually received by Warner on account of direct subsidies, aide or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any.  If local laws require use of such monies as a condition to the grant of such subsidy or aide, such monies shall not be included in Defined Gross until actually used.

(f)    The sums to be included in Defined Gross under Exhibits "1," "2" and "3" attached hereto.

All costs incurred in connection with any of the foregoing shall be deemed and treated as recoupable distribution expenses.  In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.

4.    Distribution Fees:  Warner's distribution fees shall be as follows:

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
2

35493
Exhibit-11
WB136049
CONFIDENTIAL

(a)    30% of the Defined Gross of the Picture derived by Warner from all sources in the United States and Canada.

(b)    35% of the Defined Gross of the Picture derived by Warner from all sources in the United Kingdom.

(c)    40% of the Defined Gross of the Picture derived by Warner from all sources other than those referred to in (a) and (b) above.

(d)    Notwithstanding the foregoing; (i) with respect to sums included in the Defined Gross pursuant to 3(b)(ii) and 3(d)(ii) hereof, Warner's distribution fee shall be 15% of such sums; (ii) if Warner shall license the exhibition of the Picture on free television, the aforesaid percentages as to amounts received and collected by Warner from sources in the United States, shall be 30% if collected from a network for national network telecasts in prime time; and 35% in all other instances; and, as to amounts received and collected by Warner from sources outside the United States 40%; (iii) no distribution fee shall be charged on Defined Gross referred to in 3(e) hereof.

All distribution fees shall be calculated on the full Defined Gross without any deductions or payments of any kind whatsoever, except as specifically hereinafter provided.

Notwithstanding anything herein contained, it is agreed that for the accounting period in which the Picture shall first reach the Contractual Start Point and each accounting period thereafter, the distribution fees for the purpose of calculating the Contractual Start Point shall be calculated only on that portion of the Defined Gross in respect of such accounting period which is equal to the sum of the following:

(1)    An amount equal to the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period; and

(2)    An amount equal to the distribution fees on Defined Gross necessary to recoup said deductible items plus the distribution fees.

For example:  If for the accounting period in which the Picture first reaches the Contractual Start Point

(i)    the total Defined Gross is $1,000,000; and

(ii)    "X" represents the amount of Defined Gross on which distribution fees are to be charged for the purpose of calculating the Contractual Start Point; and

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
3

35493
Exhibit-11

WB1360569
CONFIDENTIAL

(iii) the average distribution fees for such accounting period are 35%; and

(iv)    the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period are $500,000,

then said $500,000 would be .65X; X would be $769,230.76; the distribution fees for the purpose of calculating the Contractual Start Point would be $269,230.76 (i.e., 35% of $769,230.76) rather than $350,000 (i.e., 35% of $1,000,000); and the Defined Gross in excess of the Contractual Start Point would be $230,769.24 (i.e., $1,000,000 - $769,230.76).

5.    Distribution Expenses:  Warner's deductible distribution expenses in connection with the Picture shall include all costs and expenses incurred in connection with the distribution, advertising, exploitation and turning to account of the Picture of whatever kind or nature, or which are customarily treated as distribution expenses under customary accounting procedures in the motion picture industry.  If Warner reasonably anticipates that additional distribution expenses will be incurred in the future, Warner may, for a reasonable time, set up appropriate reserves therefor. Without limiting the generality of the foregoing, the following particular items shall be included in distribution expenses hereunder:

(a)    The cost and expense of all duped and dubbed negatives, sound tracks, prints, release prints, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connected therewith and inspecting and checking exhibitors' projection and sound equipment and facilities.  Warner may manufacture or cause to be manufactured as many or as few duped negatives, positive prints and other material for use in connection with the Picture as it, in its sole discretion, may consider advisable or desirable.

(b)    All direct costs and charges for advertisements, press books, artwork, advertising accessories and trailers (other than (i) prints of trailers advertising free television exhibition of the Picture, and (ii) the trailer production costs which are included in the cost of production of the Picture), advertising, publicizing and exploiting the Picture by such means and to such extent as Warner may, in its uncontrolled discretion, deem desirable, including, without limitation, pre-release advertising and publicity, so-called cooperative and/or theater advertising, and/or other advertising engaged in with or for exhibitors, to the extent Warner pays, shares in, or is charged with all or a portion of such costs and all other exploitation costs relating to such theater exhibition.  Any re-use fees and costs of recording and manufacturing masters for phonograph records, which Warner shall advance in order to assist in the advertising and

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
4

35493
**Exhibit-11**

WB1360570
CONFIDENTIAL

exploitation of the Picture, shall be treated as costs hereunder to the extent unrecouped by the record company. Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs hereunder. Any costs and charges referred to in this (b) (and not included in the cost of production of the Picture), expended or incurred prior to delivery of the Picture, shall be included in direct costs under this (b). There shall also be included as an item of cost a sum equal to 10% of all direct costs referred to in this (b) to cover the indirect cost of Warner's advertising and publicity departments, both domestic and foreign.

(c) All costs of preparing and delivering the Picture for distribution (regardless of whether such costs are the salaries and expenses of Warner's own employees or employees or parties not regularly employed by Warner), including, without limitation, all costs incurred in connection with the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise, as well as any and all costs and expenses in connection with changing the title of the Picture, recutting, re-editing or shortening or lengthening the Picture for release in any territory or for exhibition on television or other media, or in order to conform to the requirements of censorship authorities, or in order to conform to the peculiar national or political prejudices likely to be encountered in any territory, or for any other purpose or reason. The costs referred to in this (c) shall include all studio charges for facilities, labor and material, whether or not incurred at a studio owned or controlled by Warner.

(d)    All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing, (i) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (ii) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the

FIB02
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
5

35493
**Exhibit-11**

WB136062
CONFIDENTIAL

retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(e)    Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(f)    All costs and expenses, including reasonable attorneys' fees, loss, damage or liability suffered or incurred by Warner in connection with: any action taken by Warner (whether by litigation or otherwise) in copyrighting, protecting and enforcing the copyright of, and other rights and sources of revenue to be derived from, the Picture; reducing or minimizing the matters referred to in (d) and (e) above, the collection of film rentals, and other sums due Warner from exhibitors, subdistributors and others in respect of the Picture or to recover monies due pursuant to any agreement relating to the distribution or the exhibition of the Picture; checking attendance and exhibitors' receipts; preventing and/or recovering damages for unauthorized exhibition or distribution of the Picture, or any impairment of, encumbrance on or infringement upon, the rights of Warner in and to the Picture; prosecuting and defending actions under the antitrust laws, communications laws, and federal, state and local laws, ordinances and regulations (including censorship) affecting the exhibition and/or distribution of the Picture and/or the ability of Warner to derive revenue from the Picture and its component parts and by-products; and auditing of books and records of any exhibitor, subdistributor or licensee.

(g)    Royalties payable to manufacturers of sound recording and reproducing equipment and dues and assessments of, and contributions by Warner to, AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection and/or promotion of motion pictures.

(h)    In the event any person shall make a claim relating to the Picture against Warner or any of its licensees, which claim, in Warner's judgment, is of sufficient merit to constitute a reasonable probability of ultimate loss, cost, damage or expense, Warner may deduct under this (h) such amount as Warner may deem necessary to cover any loss, cost, damage or expense which may be suffered as a result thereof.  Warner shall have the right to settle and pay any such claim.  After the settlement of any such claim, or after the final judicial determination thereof, the amount previously deducted hereunder shall be adjusted accordingly with the next accounting statement rendered hereunder. Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or a waiver of any right or remedy at law or otherwise which may exist in favor of Warner, including, but not limited to, the

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
6

35493
**Exhibit-11**

WB136051872
CONFIDENTIAL

right to require Participant to reimburse Warner on demand for any liability, cost, damage or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses.

(i)    All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement, the amount payable on account thereof shall be treated as an advance against Participant's participation hereunder.

(j)    The cost of all insurance (to the extent that the same is not included in the cost of production of the Picture) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and all insurance on negatives, positive prints, sound materials or other physical property, it being understood, however, that Warner shall not be obligated to take out or maintain any such insurance.

(k)    If Warner shall proceed under 3(b)(i) hereof, all items deducted by the subdistributor as distribution expenses, and which Warner accepts for the purpose of its accountings with such subdistributor, shall be treated as Warner's expenditures under the corresponding subdivision of this paragraph 5.

6.    Film Rentals: "Film Rentals" shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation by boards of censorship, settlement of disputes or otherwise. Until earned, forfeited or applied to the Picture, neither advance payments nor security deposits shall be included in film rentals. No cost (regardless of how incurred, paid or allowed) of Warner's share of cooperative and/or theater advertising shall be deducted in determining film rentals. Where allowances are granted and paid on account of Warner's share of cooperative theater or joint advertising, such payments shall not be deducted in determining film rental, and where Warner's share of cooperative theater or joint advertising is deducted by the exhibitor Warner's share of cooperative theater or

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
7

35493
**Exhibit-11**

WB136054
CONFIDENTIAL 173

joint advertising shall be added back into the film rental received from such exhibitor, and all such costs, payments, discounts and allowances shall be treated as distribution expenses. Wherever Warner exhibits the Picture in a theater or over a television station owned or controlled by Warner, or licenses the Picture or rights connected therewith to theaters, television stations or other agencies in which Warner has an interest, directly or indirectly, or to which Warner is obligated to pay a fixed sum for exhibiting the Picture or for the use of its premises or facilities, Warner shall include in the film rentals of the Picture such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.

7.    Allocations:  Wherever Warner (i) receives from any license either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures (including the Picture) under any agreement (whether or not the same shall provide for the exhibition, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied), or (ii) receives foreign currency under 8 hereof relating to a group of motion pictures (including the Picture), then in any and all such situations Warner shall include in, or deduct from, the Defined Gross, as the case may be, such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters. All costs described in 5 hereof shall be fairly apportioned to the Picture if incurred or expended on an industry basis, or in conjunction with other motion picture producers and/or distributors, or with respect to the Picture and other motion pictures distributed by Warner.

8.    Foreign Receipts:    No sums received by Warner relating to the Picture shall be included in Defined Gross hereunder unless and until such sums have been (i) received by Warner in U.S. dollars in the United States; or (ii) used by Warner for the production or acquisition of motion pictures or television films which can be lawfully removed from the country or territory involved, in which event they shall be included in Defined Gross for the accounting period during which an amount (computed at the official or unofficial rate of exchange, as Warner may elect) equal to the amount expended for such production or acquisition, plus interest thereon, as herein provided, has been recouped by Warner (in excess of normal distribution fees and distribution expenses) from distribution thereof outside the country or territory involved; or (iii) used by Warner for acquisition of tangible personal property which can be and is lawfully exported from the country or territory involved, in which event the U.S. dollar equivalent of the currency utilized to acquire such property shall be included in Defined Gross hereunder for the accounting period during which such property was so exported, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect, in effect on the date of export. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually) advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
8

35493
Exhibit-11
WB136055
CONFIDENTIAL

other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder.  Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor.  Warner makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country.  In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country.

9.    Cost of Production; Interest:

(a)  The "cost of production" of the Picture means the total direct cost of production of the Picture, including the cost of all items listed on Warner's standard Delivery Schedule, computed and determined in all respects in the same manner as Warner then customarily determines the direct cost of other motion pictures distributed and/or financed by it, plus Warner's overhead charge. The determination of what items constitute direct charges and what items are within said overhead charge shall be made in all respects in the same manner as Warner customarily determines such matters.  The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved.  Deferments and participations in Defined Gross of the Picture consented to by Warner (however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Defined Gross, and whether the same are fixed obligations or are contingent upon receipts of the Picture; provided, however, contingent participations based on a percentage of Defined Gross as defined in the applicable agreement shall not be included in the direct cost of production beyond recoupment under 2(c) hereof.

(b)    Warner's overhead charge shall be in an amount equal to 15% of the direct cost of production of the Picture, with the understanding that any production facilities, equipment or personnel supplied by Warner or by a studio owned or controlled by Warner, or in which Warner has a substantial financial interest (and which are not furnished within the overhead charge), shall be supplied at Warner's usual rental rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said 15% overhead charge.  Warner's overhead charge shall accrue and be included in the cost of production of the Picture concurrently with the incurring of the respective items of direct cost to which it applies.

(c)    The amount equal to interest provided for in 2(c) hereof shall be calculated at a rate per annum equal to 125% of the rate announced from time to time by the Bank of America as its prime rate on unsecured loans to its preferred

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
9

35493
**Exhibit-11**

WB1360655
CONFIDENTIAL

customers. Said amount shall be calculated from the respective dates that each item is charged to the Picture until the close of the accounting period during which the cost of production is recouped under 2(c) hereof, except that interest on deferred amounts shall be calculated from the date of payment.

    (d)    Concurrently with delivery to Participant of the first earnings statement hereunder, Warner will (subject to revisions and correction) deliver to Participant an itemized summary of the cost of production of the Picture. Participant shall have the right to audit such statement in accordance with 11 hereof.

    10.    <u>Earnings Statements</u>:  Warner shall render to Participant periodic statements showing, in summary form, the appropriate calculations under this Agreement. Statements shall be issued for each calendar quarter until the Picture has been in release for four (4) years from and including the quarter in which the Picture was first released, and thereafter annually. Each such quarterly or annual period, as the case may be, is herein referred to as an "accounting period". No statements need be rendered for any accounting period during which no receipts are received. Statements rendered by Warner may be changed from time to time to give effect to year-end adjustments made by Warner's Accounting Department or Public Accountants, or to items overlooked, to correct errors and for similar purposes. If Warner shall extend credit to any licensee with respect to the Picture and if such credit has been included in the Defined Gross, and if, in the opinion of Warner, any such indebtedness shall be uncollectible, the uncollected amount may be deducted in any subsequent earning statement. Should Warner make any overpayment to Participant hereunder for any reason, Warner shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Warner to Participant or for Participant's account, or may demand repayment from Participant, in which event Participant shall repay the same when such demand is made. Any U.S. dollars due and payable to Participant by Warner pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring deductions or withholdings for income or other taxes payable by or assessable against Participant. Warner shall have the right to make such deductions and withholdings and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations, and shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises. The right of Participant to receive, and the obligation of Warner to account for, any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statement issued thereafter shows a deficit under 2 hereof such that at least $500,000 of Defined

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
10

35493
**Exhibit-11**

WB136057  **176**
CONFIDENTIAL

Gross would be required before Participant would be entitled to receive any participation hereunder. In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $500,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point and if, as a result of such audit, it is determined by mutual agreement, or in the event of dispute appropriate legal proceedings, that the Picture has earned, or is likely to earn, Defined Gross in excess of the Contractual Start Point as herein defined, accountings hereunder and payments, if required, shall be reinstated.

11.   <u>Accounting Records re Distribution; Audit Rights</u>:  Warner shall keep books of account relating to the distribution of the Picture, together with vouchers, exhibition contracts and similar records supporting the same (all of which are hereinafter referred to as "records"), which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Warner. Participant may, at its own expense, audit the applicable records at the place where Warner maintains the same in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant during reasonable business hours in such manner as not to interfere with Warner's normal business activities. In no event shall an audit with respect to any earnings statement commence later than twenty-four (24) months from the rendition of the earnings statement involved; nor shall any audit continue for longer than thirty (30) consecutive business days; nor shall audits be made hereunder more frequently than once annually; nor shall the records supporting any earnings statement be audited more than once. All earnings statements rendered hereunder shall be binding upon Participant and not subject to objection for any reason unless such objection is made in writing, stating the basis thereof and delivered to Warner within twenty-four (24) months from rendition of the earnings statement, or if an audit is commenced prior thereto, within thirty (30) days from the completion of the relative audit. If Warner, as a courtesy to Participant, shall include cumulative figures in any earnings or other statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Participant's right to examine Warner's records is limited to the Picture, and Participant shall have no right to examine records relating to Warner's business generally or with respect to any other motion Picture for purposes of comparison or otherwise; provided, however, that where any original income or expense document with third parties relates to the Picture and to other motion pictures, Participant shall have the right to examine the entire document without deletions therefrom.

12.   <u>Ownership</u>:  Participant expressly acknowledges that Participant has and will have no right, title or interest of any kind or character whatsoever in or to the Picture, and no lien thereon or other rights in or to the Defined Gross of the Picture; and that the same shall be and remain Warner's sole and exclusive property, and Warner shall not be obligated to segregate the same from its other funds, it being the intent and

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
11

35493
**Exhibit-11**

177
WB136058
CONFIDENTIAL

purpose hereof that the Defined Gross of the Picture, including the Defined Gross in excess of Contractual Start Point, is referred to herein merely as a measure in determining the time and manner of payment to Participant; and that Warner shall not be deemed a trustee, pledgeholder or fiduciary. Participant shall have no right, title or interest of any kind or character whatsoever in or to the literary, dramatic or musical material upon which the Picture is based, or from which it may be adapted; and Warner shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in such material upon such terms and conditions as it may deem advisable, all without consulting or advising Participant and without accounting to Participant in any manner with respect thereto.

13.    Distribution:  As between Participant and Warner, Warner shall have complete authority to distribute the Picture and to license the exhibition thereof throughout the world in accordance with such sales methods, policies and terms as it may, in its uncontrolled discretion, determine. Warner shall have the broadest possible latitude in the distribution of the Picture, and the exercise of its judgment in good faith in all matters pertaining thereto shall be final. Warner has not made any express or implied representation, warranty, guarantee or agreement as to the amount of proceeds which will be derived from the distribution of the Picture, nor has Warner made any express or implied representation, warranty, guarantee or agreement that there will be any sums payable to Participant hereunder, or that the Picture will be favorably received by exhibitors or by the public, or will be distributed continuously. In no event shall Warner incur any liability based upon any claim that Warner has failed to realize receipts or revenue which should or could have been realized. Warner may distribute the Picture either itself or through such distributors, subdistributors and other parties as Warner may, in its uncontrolled discretion, determine, and Warner may refrain from releasing and/or distributing the Picture in any territory for any reason whatsoever. Warner may license the Picture or rights connected therewith to any and all theaters or other agencies in which Warner may have an interest directly or indirectly upon such terms and rentals as Warner may deem fair and proper under the circumstances. Nothing herein contained shall be construed as a representation or warranty by Warner that it now has or will hereafter have or control any theaters or agencies in the United States or elsewhere.

14.    Sale of Picture:  Warner shall have the right at any time after completion of the Picture to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof. Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and stead of Warner, Warner shall be released and discharged of and from any further liability or obligation hereunder. No part of any sale price or other consideration received by, or payable to, Warner shall be included in the Defined Gross hereunder and participant shall have no rights in respect of any thereof.

15.    Assignments, etc.:  Participant shall have the right to sell, assign, transfer or hypothecate (all herein called "assign") all or any part of Participant's right to receive

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement                    Exhibit "B"
Edgar Rice Burroughs, Inc.                                      12

35493
**Exhibit-11**

WB1360538
CONFIDENTIAL

the moneys payable to Participant hereunder.  Any such assignment shall be subject to all pertinent laws and governmental regulations and to the rights of Warner hereunder. In the event of any such assignment by Participant, a Notice of Irrevocable Authority and Distributor's Acceptance in Warner's usual form shall be executed by Participant and by the transferee and delivered to Warner.  If at any time more than three parties shall be entitled to receive payments, which under the terms hereof are to be paid to or for the account of Participant, Warner may, at its option, require that all such parties execute and deliver an agreement in Warner's usual form appointing a disbursing agent for all such parties.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
13

35493
**Exhibit-11**
WB1360079
CONFIDENTIAL

## MUSIC PUBLISHING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in publishing revenues, there shall also be included in Defined Gross of the Picture:

A sum equal to 75% of the "publisher's share" of mechanical reproduction and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided such publisher is vested with all rights therein and all of the "publisher's share" of the receipts therefrom, and provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The "publisher's share" of mechanical reproduction fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof. Mechanical reproduction fees do not include synchronization fees.

The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing rights society in respect of the music and lyrics involved; or, if Warner or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected by Warner or the publisher, less the composer's share of such fees and all reasonable costs and expenses in administering the collection of such fees.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021028MMS/blb  12-13-02
Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "1"

35493
**Exhibit-11**

WB136080
CONFIDENTIAL

# SOUND TRACK RECORD INCOME

In the event the party entitled to share in the Defined Gross of the Picture under the foregoing agreement is not entitled to receive any artists' royalties in respect of phonograph records derived from the sound track of the Picture, then Warner agrees to include in the Defined Gross of the Picture royalties on sound track records, as herein defined, computed at the applicable royalty rate.

As used herein:

The term "sound track records" means and refers to phonograph records, tapes, or other sound recordings which contain either (i) portions of the sound track transferred directly to phonograph record masters from sound records which form a part of the sound track of the Picture; or (ii) sound recordings recorded separately but utilizing substantially the same musical score, parts and instrumentation, and essentially the same artists, music and/or dialogue and/or sound effects as is contained in the sound track of the Picture; or (iii) a combination of (i) and (ii). Sound track records do not, however, include any recordings produced solely for the purpose of advertising and exploiting the Picture and copies of which are not distributed to the public.

The term "applicable royalty rate" means and refers to the following percentages of the prevailing retail price but in no event more than the net royalty actually received and retainable by Warner for its own account with respect to the sale of any particular copies:

5% of 90% in respect of sound track records sold in the United States

2½% of 90% in respect of sound track records sold outside the United States

except that as to sound track records sold pursuant to mail order or "club" plans, the royalty rate shall be one-half of the rate otherwise applicable.

If any sound track records contain selections from other sources, the applicable royalty rate hereunder shall be prorated on the basis of the total number of minutes of selections from the sound track compared to the total number of minutes on such records.

In determining the net royalty retainable by Warner, all royalties payable to artists, conductors and other third parties in respect to such sound track records shall be deducted from the aggregate royalty payable to Warner under the applicable distribution agreement.

The term "prevailing retail price" means and refers to the price generally prevailing in the country of manufacture or sale (as determined by the Record Company), less all taxes, duties and charges for containers.

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
1

35493
**Exhibit-11**

WB136062
CONFIDENTIAL 181

There shall be deducted from amounts included in Defined Gross hereunder a pro rata share of re-use fees and costs of recording and manufacturing masters advanced by Warner or the Record Company. Sales shall be determined on the basis of the number of records sold and for which the Record Company has been paid in U.S. currency, after allowing for all returns, cancellations, exchanges, applicable discounts, etc. and reasonable reserves which may be established therefor. No sums shall be included in Defined Gross with respect to records given away or sold at less than the Record Company's cost or for promotional purposes, or as sales inducements or otherwise.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
2

35493
**Exhibit-11**

**WB1360682**
**CONFIDENTIAL**

MERCHANDISING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in merchandising revenue, there shall be included in Defined Gross of the Picture:

(a)  A sum equal to 50% of all license fees (in excess of all royalties and participations) received by Warner directly as a result of the exercise by Warner itself of merchandising license rights.  If, however, Warner shall sublicense or sub-contract any of such merchandising license rights, Warner shall include in the Defined Gross hereunder, at its election, either a sum equal to (i) 85% of the net sums (in excess of all royalties and participations) received from such sub-licensee; or (ii) 50% of such sub-licensee's license fees from the exercise of such licensing rights (from which there shall be deducted all royalties and participations), and out of the remaining 50% thereof Warner shall pay and discharge the fees of its sub-licensee.

(b)  If the publication rights to the underlying literary material were owned or controlled by the party entitled to share in Defined Gross of the Picture under the foregoing agreement (herein called "participant") prior to the execution of this agreement, and were acquired by Warner pursuant to or in connection with this agreement, then (i) all net sums received by Warner from nonaffiliated or nonsubsidiary publishers from the publication of such underlying literary material and  of novelizations of the screenplay of the Picture, and (ii) a sum equal to 5% of the net receipts of Warner's subsidiary or affiliated publishers from the publication of such material and novelizations, less, in either case, royalties paid out of (i) or (ii) to the writers of such material and novelizations.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021026MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "3"

35493
**Exhibit-11**

WB1360843
**CONFIDENTIAL**

# RIDER TO EXHIBIT "B"

## DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT MOVING BASIS

### COMPUTATION AND PAYMENT

All paragraph references herein refer to paragraph numbers in the Exhibit to which this rider is attached. The provisions herein shall control to the extent they conflict with the provisions in the Exhibit to which this rider is attached.

Paragraph 2: The first sentence in paragraph 2(c) shall end after the words "in 9 hereof".

Paragraph 3: Warner shall elect paragraph 3(b)(i) during the initial theatrical release of the Picture in the following territories: United Kingdom, Canada, France, Germany, Italy, Australia, New Zealand, Benelux, Scandinavia, South Africa, South Korea, Spain, Switzerland, Taiwan and Japan.

Defined Gross shall include all sums actually received by Warner from recoveries of infringement, unfair competition, trademark and piracy actions with respect to the Picture. Recoveries by Warner from infringement, unfair competition, trademark and piracy actions with respect to the Picture representing penalties rather than actual or statutory damages shall be included in Defined Gross of the Picture without any distribution fee. Defined Gross shall also include all sums derived by Warner from distribution of the Picture on a four-wall basis as such term is commonly understood in the motion picture industry.

In subparagraph (d), the parenthetical in the second and third lines is deleted. Licenses to cable operators referred to in paragraph 3(d)(iii) specifically include all forms of pay, subscription, and other types of non-free television.

Paragraph 4: The distribution fee on Defined Gross of the Picture derived by Warner from prime time United States telecast of the Picture on free television on ABC, NBC or CBS or another national network (if any) shall be 25%. For a network other than ABC, NBC or CBS to be considered a national network, it must (i) own or be affiliated with over 200 television stations or a sufficient number to give national coverage comparable to ABC, NBC or CBS; (ii) offer Warner centralized purchasing of motion pictures for distribution to the owned or affiliated stations; (iii) offer a centralized clearing for distribution of the Picture over said television stations (i.e., the network clears telecast of the Picture over its stations -- not the distributor); (iv) handle itself or through affiliated stations the sale of advertising; and (v) pay a single pre-agreed sum for telecast of the Picture over all of its owned and affiliated stations.

<u>Paragraph 5</u>:  If Warner sets up reserves, such reserves must be reasonable and appropriate, and shall be liquidated in no more than eighteen (18) months, except for reserves for taxes, which Warner may withhold longer.  If Warner sets up a reserve for taxes which Warner later discovers are not payable, Warner shall credit such reserve back into Defined Gross.  In addition, Warner shall reduce the interest on unrecouped production cost by an amount equal to the interest which accrued on an amount of production cost equal to the reserves so withheld.  In  paragraph 5(a), the cost of tapes and cassettes referred to therein shall not include any manufacturing costs of home video exhibition or distribution.

In 5(a) and 5(b), if Warner receives any discounts, rebates or credits (not including any cash discounts for accelerated payment), such discounts, rebates or credits shall be credited to the costs referred to in subdivision (a) and (b).

In 5(b), reuse fees and costs of recording and manufacturing masters for soundtrack phonograph records will only be charged as distribution expenses to the extent the record company does not pay same.

In 5(b), subdivision (i) is deleted.

In 5(b) and 5(c), the salaries and expenses of Warner's own employees will be charged to a Picture only if such employees substantially work on that Picture directly.  Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, then the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs under paragraph 5.

In 5(d), line 2, the word "gross" shall be inserted before the word "income".  Change the words "Subject to" on line 17 to "Notwithstanding". The following shall be added at the end of subparagraph (d) : "If Warner receives a refund from the taxing authority which previously assessed any taxes previously deducted hereunder, the amount of such refund together with any interest received thereon shall be credited against sums deductible under this paragraph 5."

In 5(f), deductible costs and expenses will not include the salaries of Warner's regularly employed in-house legal or accounting staff.  The allocable portion of checking and collection costs referred to therein shall be limited to 1% of the Defined Gross of the Picture.

In 5(g), the dues and assessments referred to therein shall be limited to 1% of the Defined Gross of the Picture.

Rider to Exhibit "B"
2

35493
**Exhibit-11**
WB136066
CONFIDENTIAL 185

In 5(h), the word "reasonably" shall be inserted in between the words "may deem" and "necessary" on line 5. The last sentence of subparagraph (h) shall be revised to read the following: "Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or waiver of any right or remedy at law or otherwise which may exist in favor of Warner against Participant, which rights may include the following: the right to require Participant to reimburse Warner on demand for any liability, cost, damage, or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses."

In 5(i) after "participations in the Picture" on line 10 add the following: "but excluding from this subdivision (i) any such participations in the Picture themselves." Delete the phrase in lines 14-15: "or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement."

In 5(j), there shall be added at the end thereof the following: "Insurance recoveries relating to cost of production of the picture shall be credited first to recoupment of cost of production of the picture and then to recoupment of distribution expenses. All other insurance recoveries relating to distribution expenses as described in this paragraph 5 shall be credited against distribution expenses. Distribution expenses which are reimbursed by a third party and distribution expenses incurred but not ultimately paid by Warner shall be credited to distribution expenses under paragraph 5 (unless such reimbursements and/or payments of expenses are made by parties to financing arrangements with Warner)."

Paragraph 6:  The words "all such costs" in line 12 mean allowances paid and granted on account of cooperative theater or joint advertising. At the end of paragraph 6 there shall be added the following: "provided, however, that the terms and conditions of the agreement between Warner and theaters, television stations or other facilities owned or controlled by Warner relating to film rentals shall be consistent with similar terms and conditions between such theaters and another studio relating to a comparable non-Warner picture. Nonrefundable advances received by Warner shall be included as Defined Gross hereunder when received, if such advances relate to licenses of the Picture as a single motion picture for national network or pay television."

Paragraph 7:  In line 12, the words "and reasonably" shall be inserted before "apportioned", and the words "in good faith" shall be inserted after the word "apportioned".

Paragraph 8:  Paragraph 8 shall be deleted in its entirety and the following shall be substituted: "Sums received by Warner which relate to the Picture shall not be included in Defined Gross hereunder unless and until such sums (i) have been received by

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
3

35493
Exhibit-11

WB1360486
CONFIDENTIAL

Warner in U.S. dollars in the United States; or (ii) are freely remittable to the United States; or (iii) are used by Warner for any purpose in the territory involved. In this event, the U.S. dollar equivalent of the currency utilized in a territory shall be included in Defined Gross hereunder for the accounting period during which such Defined Gross were so utilized, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect. As for expenses incurred in foreign territories, Warner will compute the U.S. dollar equivalent of the currency utilized in the Territory, such U.S. dollar equivalent to be computed on the same basis as used for Defined Gross for the accounting period involved. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually), advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, only such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. At Participant's written request, Warner will use its best efforts to convert such deposits or payments into U.S. dollars to the same extent and in the same proportion that Warner is able to convert its own blocked currencies in the country or countries involved. Warner makes no representations or warranties that any part of any such foreign currencies may be converted in U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country."

Paragraph 9: In 9(a) the cost of all items listed on Warner's standard delivery schedule shall be included in cost of production only for such items which are prepared for the Picture. The cost of Warner facilities shall be included in the cost of production only if actually used.

In 9(b) interest on the cost of production shall not be deemed part of the direct cost of production subject to said overhead charge.

Paragraph 10: In line 2, the words "in summary form" shall be substituted by "in reasonable detail".

The second and third sentences shall be deleted and the following substituted: "Statements shall be issued for each calendar quarter until the Picture has been in release for four years from and including the quarter in which the Picture was first released, semiannually for an additional period of two years, and thereafter annually. If the Picture is reissued theatrically in the U.S., quarterly statements shall be resumed until substantially all of the revenues contemplated from such reissue have been

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
4

35493
**Exhibit-11**

WB136068187
CONFIDENTIAL

reported; and if the Picture is released to prime time U.S. network television and/or to a U.S. pay or cable network, statements shall be issued for quarterly accounting periods during which revenues from such sources are included in Defined Gross. Each such quarterly, semiannual or annual period, as the case may be, is herein referred to as an 'accounting period'."

The second to the last sentence of paragraph 10 shall be deleted and the following sentence shall be substituted: "The obligation of Warner to account for but not Participant's right to receive any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statements issued thereafter shows a deficit under 2 hereof such that at least $1,000,000 of Defined Gross would be required before Participant would be entitled to receive any Defined Gross in excess of Contractual Start Point hereunder. Notwithstanding the foregoing, thereafter Employee may request a statement by written notice to Warner (but not more frequently than annually)."

The last sentence is deleted and the following substituted: "In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $1,000,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of Contractual Start Point, and thereafter Participant may request statements by written notice to Warner (but not more frequently than annually)."

Paragraph 11: The applicable records subject to audit shall include the records pertaining to the cost of production of the Picture. Change 24 to 36 in lines 11 and 18. Audits shall not continue for longer than sixty (60) consecutive business days. The words "or if an audit is commenced prior thereto, within thirty (30) days from the completion of the relative audit" in lines 18-20 are deleted and the following substituted: "provided however, that if an audit is completed at least one hundred twenty (120) days prior to the expiration of said thirty-six (36) month period, Warner may give written notice to Participant at any time after ninety (90) days from the completion of such audit requiring Participant to advise Warner in writing of any objections to the earnings statement involved, specifying the particulars of such objection, and if Participant does not make such written objections specifying the particulars thereof within sixty (60) days from receipt of such notice from Warner or, whether or not Warner gives such written notice to Participant, upon the expiration of said thirty-six (36) month period, whichever is earlier, Participant shall thereafter be barred from making any such objection or filing any suit, action or proceeding against Warner with respect to the earnings statement involved." Warner preapproves Sills & Adelmann; Gelfand, Rennert & Feldman; Breslauer, Jacobson, Rutman & Sherman; Nigro, Karlin & Segal; Phil Hacker & Company; and any of the so-called "big six" national accounting firms to conduct audits.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement         Rider to Exhibit "B"
Edgar Rice Burroughs, Inc.                              5

35493.
Exhibit-11

188
WB136069
CONFIDENTIAL

In line 15, after the words "more than once," add "except Purchaser shall not be precluded from again examining such records if the earnings statement is later altered or amended by Warner."

Paragraph 13:  The following shall be added at the end thereof:  "If Warner licenses the exhibition of the Picture to any theater or television station or other facility owned or controlled by Warner or in which Warner has an interest directly or indirectly, Warner shall do so on an arms-length basis, consistent with the manner in which Warner licenses the exhibition of the Picture to facilities in which it does not have an interest."

Paragraph 14  The second sentence of paragraph 14 is deleted and the following substituted in its place:  "Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming in writing the performance of this agreement instead of Warner, if the purchaser, transferee or assignee is at the time a parent, subsidiary or affiliated corporation of Warner, or a corporation with or into which Warner may merge or consolidate, or a person, firm or corporation succeeding to all or a substantial portion of Warner's assets, or another major motion picture distributor as such term is understood in the motion picture industry, Warner shall be released and discharged of and from any further liability or obligation hereunder."

The following shall be added at the end thereof:  "Upon request, Participant may obtain from Warner a copy of the written assumption of the obligations to Participant by such purchaser, transferor or assignee."

Music Publishing Income Exhibit:  The second paragraph is deleted and the following substituted:  "A sum equal to 75% of the 'publisher's share' of mechanical reproduction, synchronization license and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics.  The 'publisher's share' of mechanical reproduction and synchronization license fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof."

At the end of the third paragraph, the following is added:  "If Warner's subsidiary or affiliated publisher is not entitled to 100% of the publisher's share of mechanical reproduction, synchronization license, and performing fees by reason of "split" publishing agreement with the composer or lyricist of the music and lyrics involved, or any corporation furnishing the services of such composer or lyricist, then only the pro rata share of Warner's subsidiary or affiliated publisher shall be included for the purpose of the foregoing computations."

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    Rider to Exhibit "B"
                                                       6

35493
**Exhibit-11**

WB1360700189
CONFIDENTIAL

<u>Soundtrack Record Income Exhibit</u>:  The following is added at the end thereof: "Notwithstanding anything herein contained, the royalty payable hereunder shall be the net royalty actually received and retainable by Warner for its own account from the Record Company, as such royalty may be reduced, calculated, computed and paid in the same manner as the soundtrack record royalty paid to Warner under the applicable agreement with the Record Company is reduced, calculated, accounted for and paid."

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "B"
7

35493
**Exhibit-11**

WB136071190
CONFIDENTIAL

<u>EXHIBIT "C"</u>

## DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT INITIAL BASIS

### COMPUTATION AND PAYMENT

1.    <u>Definition of Parties</u>:  "Warner" means Warner Bros., a division of Time Warner Entertainment Company, L.P., and its subdivisions, subsidiaries and affiliates engaged in the business of distributing motion pictures for exhibition in theaters and for broadcasting over television stations, but shall not include any other persons, firms or corporations licensed by Warner to distribute motion pictures in any part of the world. Nor shall such term include: any person, firm or corporation distributing the Picture for purposes other than exhibition in theaters or by television stations; exhibitors or others who may actually exhibit the Picture to the public; radio or television broadcasters or programming services; cable systems or operators; manufacturers, wholesalers or retailers of video discs, cassettes or similar devices; book or music publishers; sound recording producers or distributors; manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, goods, services or theme park or other attractions; whether or not any of the foregoing excluded parties are subdivisions, subsidiaries or affiliates of Warner.

"Participant" means the party under the foregoing agreement who or which is entitled to participate in the Defined Gross of the Picture in excess of the Contractual Start Point, computed on an initial basis (all as defined below), and the successors and permitted assigns of such party.

2.    <u>Contractual Start Point</u>:  As between Warner and Participant, the Picture shall be deemed to have reached the Contractual Start Point at such time as the Defined Gross (as defined in 3 hereof) of the Picture shall equal the following:

(a)    Warner's distribution fees set forth in 4 hereof.

(b)    Warner's expenses in connection with the distribution of the Picture, as set forth in 5 hereof.

(c)    The cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in 9 hereof, and plus such other costs, if any, as may have been incurred in connection with the financing of the cost of production of the Picture.  Said interest and other costs shall be recouped before said cost of production.

3.    <u>Defined Gross</u>:  As used herein, the term "Defined Gross" means the aggregate of:

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
1

35493

**Exhibit-11**

WB138972
CONFIDENTIAL

(a)    All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors").

(b)    Where Warner grants theatrical distribution rights to a subdistributor on a basis requiring it to account to Warner with respect to film rentals, either: (i) the film rentals received by such subdistributor from exhibitors which Warner accepts for the purpose of its accountings with such subdistributor; or (ii) Warner's share (actually received) of film rentals received by such subdistributor; whichever Warner elects from time to time as to each subdistributor.

(c)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of: (i) the gross wholesale rental income therefrom; and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns.

(d)    All amounts actually received by Warner from the following: (i) trailers (other than trailers advertising television exhibitions of the Picture); (ii) licenses of theatrical distribution rights for a flat sum; (iii) licenses of exhibition or distribution rights other than those referred to in (a), (b), (c) and (d)(ii) of this 3, specifically including licenses to cable operators; (iv) the lease of positive prints (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets; and (v) recoveries by Warner for infringement of copyrights of the Picture.

(e)    All monies actually received by Warner on account of direct subsidies, aide or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any. If local laws require use of such monies as a condition to the grant of such subsidy or aide, such monies shall not be included in Defined Gross until actually used.

(f)    All amounts required to be included under Exhibits "1," "2" and "3" hereof.

All costs incurred in connection with any of the foregoing shall be deemed and treated as recoupable distribution expenses. In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.

Notwithstanding anything herein contained, after the Picture shall be deemed to have reached the Contractual Start Point as defined in 2 above, Defined Gross shall be as defined and this Exhibit shall otherwise be modified as set forth in Schedule 1 attached hereto and incorporated herein by this reference.

4.    <u>Distribution Fees</u>: Warner's distribution fees shall be as follows:

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
2

35493

Exhibit-11

WB136073
CONFIDENTIAL

      (a)    30% of the Defined Gross of the Picture derived by Warner from all sources in the United States and Canada.

      (b)    35% of the Defined Gross of the Picture derived by Warner from all sources in the United Kingdom.

      (c)    40% of the Defined Gross of the Picture derived by Warner from all sources other than those referred to in (a) and (b) above.

      (d)    Notwithstanding the foregoing:  (i) with respect to sums included in the Defined Gross pursuant to 3(b)(ii) and 3(d)(ii) hereof, Warner's distribution fee shall be 15% of such sums; (ii) if Warner shall license the exhibition of the Picture on free television, the aforesaid percentages as to amounts received and collected by Warner from sources in the United States, shall be 30% if collected from a network for national network telecasts in prime time; and 35% in all other instances; and, as to amounts received and collected by Warner from sources outside the United States 40%; and (iii) no distribution fee shall be charged on Defined Gross referred to in 3(e) hereof.

All distribution fees shall be calculated on the full Defined Gross without any deductions or payments of any kind whatsoever, except as specifically hereinafter provided.

Notwithstanding anything herein contained, it is agreed that for the accounting period in which the Picture shall first reach the Contractual Start Point, the distribution fees for the purpose of calculating the Contractual Start Point shall be calculated only on that portion of the Defined Gross in respect of such accounting period which is equal to the sum of the following:

      (a)    An amount equal to the sums specified in subparagraphs (b) and (c) of Paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period; and

      (b)    An amount equal to the distribution fees on Defined Gross equal to the sum of said deductible items, plus the distribution fees on Defined Gross equal to such distribution fee.

    5.    <u>Distribution Expenses</u>:  Warner's deductible distribution expenses in connection with the Picture shall include all costs and expenses incurred in connection with the distribution, advertising, exploitation and turning to account of the Picture of whatever kind or nature, or which are customarily treated as distribution expenses under customary accounting procedures in the motion picture industry.  If Warner reasonably anticipates that additional distribution expenses will be incurred in the future, Warner may, for a reasonable time, set up appropriate reserves therefor.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
3

35493

Exhibit-11

WB136094
CONFIDENTIAL

Without limiting the generality of the foregoing, the following particular items shall be included in distribution expenses hereunder:

(a)    The cost and expense of all duped and dubbed negatives, sound tracks, prints, release prints, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connected therewith and inspecting and checking exhibitors' projection and sound equipment and facilities.  Warner may manufacture or cause to be manufactured as many or as few duped negatives, positive prints and other material for use in connection with the Picture as it, in its sole discretion, may consider advisable or desirable.

(b)    All direct costs and charges for advertisements, press books, artwork, advertising accessories and trailers (other than:  (i) prints of trailers advertising free television exhibition of the Picture, and (ii) the trailer production costs which are included in the cost of production of the Picture), advertising, publicizing and exploiting the Picture by such means and to such extent as Warner may, in its uncontrolled discretion, deem desirable, including, without limitation, pre-release advertising and publicity, so-called cooperative and/or theater advertising, and/or other advertising engaged in with or for exhibitors, to the extent Warner pays, shares in, or is charged with all or a portion of such costs and all other exploitation costs relating to such theater exhibition.  Any re-use fees and costs of recording and manufacturing masters for phonograph records, which Warner shall advance in order to assist in the advertising and exploitation of the Picture, shall be treated as costs hereunder to the extent unrecouped by the record company.  Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs hereunder.  Any costs and charges referred to in this (b) (and not included in the cost of production of the Picture), expended or incurred prior to delivery of the Picture, shall be included in direct costs under this (b).  There shall also be included as an item of cost a sum equal to 10% of all direct costs referred to in this (b) to cover the indirect cost of Warner's advertising and publicity departments, both domestic and foreign.

(c)    All costs of preparing and delivering the Picture for distribution (regardless of whether such costs are the salaries and expenses of Warner's own employees or employees or parties not regularly employed by Warner), including, without limitation, all costs incurred in connection with the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise, as well as any and all costs and expenses in connection with chang-ing the title of the Picture, recutting, re-editing or shortening or lengthening the Picture for release in any territory or for exhibition on television or other media, or in order to conform to the requirements of censorship authorities, or in order to

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement          Exhibit "C"                    Exhibit-11
Edgar Rice Burroughs, Inc.                            4
                                                                                       35493
                                                                                       194
                                                                                       WB136075

conform to the peculiar national or political prejudices likely to be encountered in any territory, or for any other purpose or reason. The costs referred to in this (c) shall include all studio charges for facilities, labor and material, whether or not incurred at a studio owned or controlled by Warner.

(d)    All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing:  (i) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (ii) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(e)    Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(f)    All costs and expenses, including reasonable attorneys' fees, loss, damage or liability suffered or incurred by Warner in connection with: any action taken by Warner (whether by litigation or otherwise) in copyrighting, protecting and enforcing the copyright of, and other rights and sources of revenue to be derived from, the Picture; reducing or minimizing the matters referred to in (d) and (e) above, the collection of film rentals, and other sums due Warner from exhibitors, subdistributors and others in respect of the Picture or to recover monies due pursuant to any agreement relating to the distribution or the exhibition of the Picture; checking attendance and exhibitors' receipts; preventing and/or recovering damages for unauthorized exhibition or distribution of the Picture, or any impairment of, encumbrance on or infringement upon, the rights of Warner in and to the Picture; prosecuting and defending actions under the antitrust laws, communications laws, and federal, state and local laws,

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
5

35493

**Exhibit-11**

ordinances and regulations (including censorship) affecting the exhibition and/or distribution of the Picture and/or the ability of Warner to derive revenue from the Picture and its component parts and by-products; and auditing of books and records of any exhibitor, subdistributor or licensee.

(g)    Royalties payable to manufacturers of sound recording and reproducing equipment and dues and assessments of, and contributions by Warner to, AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection and/or promotion of motion pictures.

(h)    In the event any person shall make a claim relating to the Picture against Warner or any of its licensees, which claim, in Warner's judgment, is of sufficient merit to constitute a reasonable probability of ultimate loss, cost, damage or expense, Warner may deduct under this (h) such amount as Warner may deem necessary to cover any loss, cost, damage or expense which may be suffered as a result thereof. Warner shall have the right to settle and pay any such claim. After the settlement of any such claim, or after the final judicial determination thereof, the amount previously deducted hereunder shall be adjusted accordingly with the next accounting statement rendered hereunder. Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or a waiver of any right or remedy at law or otherwise which may exist in favor of Warner, including, but not limited to, the right to require Participant to reimburse Warner on demand for any liability, cost, damage or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses.

(i)    All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement, the

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
6

35493

Exhibit-11

WB136090
CONFIDENTIAL

amount payable on account thereof shall be treated as an advance against Participant's participation hereunder.

(j)    The cost of all insurance (to the extent that the same is not included in the cost of production of the Picture) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and all insurance on negatives, positive prints, sound materials or other physical property, it being understood, however, that Warner shall not be obligated to take out or maintain any such insurance.

(k)    If Warner shall proceed under 3(b)(i) hereof, all items deducted by the subdistributor as distribution expenses, and which Warner accepts for the purpose of its accountings with such subdistributor, shall be treated as Warner's expenditures under the corresponding subdivision of this 5.

6.    <u>Film Rentals</u>:  "Film Rentals" shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation by boards of censorship, settlement of disputes or otherwise.  Until earned, forfeited or applied to the Picture, neither advance payments nor security deposits shall be included in film rentals.  No cost (regardless of how incurred, paid or allowed) of Warner's share of cooperative and/or theater advertising shall be deducted in determining film rentals.  Where allowances are granted and paid on account of Warner's share of cooperative theater or joint advertising, such payments shall not be deducted in determining film rental, and where Warner's share of cooperative theater or joint advertising is deducted by the exhibitor Warner's share of cooperative theater or joint advertising shall be added back into the film rental received from such exhibitor, and all such costs, payments, discounts and allowances shall be treated as distribution expenses.  Wherever Warner exhibits the Picture in a theater or over a television station owned or controlled by Warner, or licenses the Picture or rights connected therewith to theaters, television stations or other agencies in which Warner has an interest, directly or indirectly, or to which Warner is obligated to pay a fixed sum for exhibiting the Picture or for the use of its premises or facilities, Warner shall include in the film rentals of the Picture such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.

7.    <u>Allocations</u>:  Wherever Warner:  (i) receives from any license either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures (including the Picture) under any agreement (whether or not the same shall provide for the exhibition, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied); or (ii) receives foreign currency under 8 hereof relating to a group of motion pictures (including the Picture), then in any and all such situations Warner shall include in, or deduct from, the Defined Gross, as the case may be, such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.  All costs described in 5 hereof (and, after the Contractual Start Point, all

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement            Exhibit "C"            Exhibit-11
Edgar Rice Burroughs, Inc.                              7

35493

WB136078
CONFIDENTIAL

197

deductible items set forth in Schedule 1 hereto) shall be fairly apportioned to the Picture if incurred or expended on an industry basis, or in conjunction with other motion picture producers and/or distributors, or with respect to the Picture and other motion pictures distributed by Warner.

8.    Foreign Receipts:    No sums received by Warner relating to the Picture shall be included in Defined Gross hereunder unless and until such sums have been: (i) received by Warner in U.S. dollars in the United States; or (ii) used by Warner for the production or acquisition of motion pictures or television films which can be lawfully removed from the country or territory involved, in which event they shall be included in Defined Gross for the accounting period during which an amount (computed at the official or unofficial rate of exchange, as Warner may elect) equal to the amount expended for such production or acquisition, plus interest thereon, as herein provided, has been recouped by Warner (in excess of normal distribution fees and distribution expenses) from distribution thereof outside the country or territory involved; or (iii) used by Warner for acquisition of tangible personal property which can be and is lawfully exported from the country or territory involved, in which event the U.S. dollar equivalent of the currency utilized to acquire such property shall be included in Defined Gross hereunder for the accounting period during which such property was so exported, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect, in effect on the date of export. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually) advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. Warner makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture (or, after the Contractual Start Point, of any deductible items set forth in Schedule 1 hereto) in any other country.

9.    Cost of Production; Interest:

(a)    The "cost of production" of the Picture means the total direct cost of production of the Picture, including the cost of all items listed on Warner's standard Delivery Schedule, computed and determined in all respects in the same manner as Warner then customarily determines the direct cost of other motion pictures distributed and/or financed by it, plus Warner's overhead charge. The determination of what items constitute direct charges and what items are within said overhead charge shall be made in all respects in the same manner as

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    Exhibit "C"
                                                              8

35493

Exhibit-11

198

Warner customarily determines such matters.  The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved.  Deferments and participations in Defined Gross of the Picture consented to by Warner (however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Defined Gross, and whether the same are fixed obligations or are contingent upon receipts of the Picture; provided, however, contingent participations based on a percentage of Defined Gross as defined in the applicable agreement shall not be included in the direct cost of production beyond recoupment under 2(c) hereof.

(b)    Warner's overhead charge shall be in an amount equal to 15% of the direct cost of production of the Picture, with the understanding that any production facilities, equipment or personnel supplied by Warner or by a studio owned or controlled by Warner, or in which Warner has a substantial financial interest (and which are not furnished within the overhead charge), shall be supplied at Warner's usual rental rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said 15% overhead charge.  Warner's overhead charge shall accrue and be included in the cost of production of the Picture concurrently with the incurring of the respective items of direct cost to which it applies.

(c)    The amount equal to interest provided for in 2(c) hereof shall be calculated at a rate per annum equal to 125% of the rate announced from time to time by the Bank of America as its prime rate on unsecured loans to its preferred customers.  Said amount shall be calculated from the respective dates that each item is charged to the Picture until the close of the accounting period during which the cost of production is recouped under 2(c) hereof, except that interest on deferred amounts shall be calculated from the date of payment.

(d)    Concurrently with delivery to Participant of the first earnings statement hereunder, Warner will (subject to revisions and correction) deliver to Participant an itemized summary of the cost of production of the Picture.  Participant shall have the right to audit such statement in accordance with 11 hereof.

10.    Earnings Statements:  Warner shall render to Participant periodic statements showing, in summary form, the appropriate calculations under this Agreement.  Statements shall be issued for each calendar quarter until the Picture has been in release for four years from and including the quarter in which the Picture was first released, and thereafter annually.  Each such quarterly or annual period, as the case may be, is herein referred to as an "accounting period".  No statements need be rendered for any accounting period during which no receipts are received.  Statements

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                     Exhibit "C"                Exhibit-11
                                                        9

35493

199
WB136079
CONFIDENTIAL

rendered by Warner may be changed from time to time to give effect to year-end adjustments made by Warner's Accounting Department or Public Accountants, or to items overlooked, to correct errors and for similar purposes. If Warner shall extend credit to any licensee with respect to the Picture and if such credit has been included in the Defined Gross, and if, in the opinion of Warner, any such indebtedness shall be uncollectible, the uncollected amount may be deducted in any subsequent earning statement. Should Warner make any overpayment to Participant hereunder for any reason, Warner shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Warner to Participant or for Participant's account, or may demand repayment from Participant, in which event Participant shall repay the same when such demand is made. Any U.S. dollars due and payable to Participant by Warner pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring deductions or withholdings for income or other taxes payable by or assessable against Participant. Warner shall have the right to make such deductions and withholdings and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations, and shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises. The right of Participant to receive, and the obligation of Warner to account for, any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statement issued thereafter shows a deficit under 2 hereof such that at least $500,000 of Defined Gross would be required before Participant would be entitled to receive any participation hereunder. In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $500,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point, and if, as a result of such audit, it is determined by mutual agreement, or in the event of dispute appropriate legal proceedings, that the Picture has earned, or is likely to earn, Defined Gross in excess of the Contractual Start Point as herein defined, accountings hereunder and payments, if required, shall be reinstated.

    11.    Accounting Records re Distribution; Audit Rights:  Warner shall keep books of account relating to the distribution of the Picture, together with vouchers, exhibition contracts and similar records supporting the same (all of which are hereinafter referred to as "records"), which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Warner. Participant may, at its own expense, audit the applicable records at the place where Warner maintains the same in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
10

35493

Exhibit-11

200
WB136080
CONFIDENTIAL

during reasonable business hours in such manner as not to interfere with Warner's normal business activities. In no event shall an audit with respect to any earnings statement commence later than 24 months from the rendition of the earnings statement involved; nor shall any audit continue for longer than 30 consecutive business days; nor shall audits be made hereunder more frequently than once annually; nor shall the records supporting any earnings statement be audited more than once. All earnings statements rendered hereunder shall be binding upon Participant and not subject to objection for any reason unless such objection is made in writing, stating the basis thereof and delivered to Warner within 24 months from rendition of the earnings statement, or if an audit is commenced prior thereto, within 30 days from the completion of the relative audit. If Warner, as a courtesy to Participant, shall include cumulative figures in any earnings or other statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Participant's right to examine Warner's records is limited to the Picture, and Participant shall have no right to examine records relating to Warner's business generally or with respect to any other motion Picture for purposes of comparison or otherwise; provided, however, that where any original income or expense document with third parties relates to the Picture and to other motion pictures, Participant shall have the right to examine the entire document without deletions therefrom.

12.    Ownership: Participant expressly acknowledges that Participant has and will have no right, title or interest of any kind or character whatsoever in or to the Picture, and no lien thereon or other rights in or to the Defined Gross of the Picture; and that the same shall be and remain Warner's sole and exclusive property, and Warner shall not be obligated to segregate the same from its other funds, it being the intent and purpose hereof that the Defined Gross of the Picture, including the Defined Gross in excess of the Contractual Start Point, is referred to herein merely as a measure in determining the time and manner of payment to Participant; and that Warner shall not be deemed a trustee, pledgeholder or fiduciary. Participant shall have no right, title or interest of any kind or character whatsoever in or to the literary, dramatic or musical material upon which the Picture is based, or from which it may be adapted; and Warner shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in such material upon such terms and conditions as it may deem advisable, all without consulting or advising Participant and without accounting to Participant in any manner with respect thereto.

13.    Distribution: As between Participant and Warner, Warner shall have complete authority to distribute the Picture and to license the exhibition thereof throughout the world in accordance with such sales methods, policies and terms as it may, in its uncontrolled discretion, determine. Warner shall have the broadest possible latitude in the distribution of the Picture, and the exercise of its judgment in good faith in all matters pertaining thereto shall be final. Warner has not made any express or implied representation, warranty, guarantee or agreement as to the amount of proceeds which will be derived from the distribution of the Picture, nor has Warner made any express or implied representation, warranty, guarantee or agreement that there will be

FI803
021026MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
11

35493

Exhibit-11

WB1360801
CONFIDENTIAL

any sums payable to Participant hereunder, or that the Picture will be favorably received by exhibitors or by the public, or will be distributed continuously.  In no event shall Warner incur any liability based upon any claim that Warner has failed to realize receipts or revenue which should or could have been realized.  Warner may distribute the Picture either itself or through such distributors, subdistributors and other parties as Warner may, in its uncontrolled discretion, determine, and Warner may refrain from releasing and/or distributing the Picture in any territory for any reason whatsoever. Warner may license the Picture or rights connected therewith to any and all theaters or other agencies in which Warner may have an interest directly or indirectly upon such terms and rentals as Warner may deem fair and proper under the circumstances. Nothing herein contained shall be construed as a representation or warranty by Warner that it now has or will hereafter have or control any theaters or agencies in the United States or elsewhere.

14.    <u>Sale of Picture</u>:  Warner shall have the right at any time after completion of the Picture to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof.  Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and stead of Warner, Warner shall be released and discharged of and from any further liability or obligation hereunder.  No part of any sale price or other consideration received by, or payable to, Warner shall be included in the Defined Gross hereunder and Participant shall have no rights in respect of any thereof.

15.    <u>Assignments, etc.</u>:  Participant shall have the right to sell, assign, transfer or hypothecate (all herein called "assign") all or any part of Participant's right to receive the moneys payable to Participant hereunder.  Any such assignment shall be subject to all pertinent laws and governmental regulations and to the rights of Warner hereunder. In the event of any such assignment by Participant, a Notice of Irrevocable Authority and Distributor's Acceptance in Warner's usual form shall be executed by Participant and by the transferee and delivered to Warner.  If at any time more than three parties shall be entitled to receive payments, which under the terms hereof are to be paid to or for the account of Participant, Warner may, at its option, require that all such parties execute and deliver an agreement in Warner's usual form appointing a disbursing agent for all such parties.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "C"
12

35493
Exhibit-11

202
WB136082
CONFIDENTIAL

## SCHEDULE "1"

1.    <u>Defined Gross</u>:  As used herein, the term "Defined Gross" means the aggregate of:

(a)    All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors");

(b)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of:  (i) the gross wholesale rental income therefrom; and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns;

(c)    All sums actually received by Warner from grants or licenses of distribution rights in and to the Picture (in any and all gauges of film, tape and other material) from sources other than those referred to in (a) and (b) above;

(d)    All net earnings of Warner from trailers of the Picture (other than trailers advertising the television exhibition of the Picture); and the lease of positive prints, tapes and other material (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets;

(e)    All net sums derived by Warner from distribution of the Picture on a "road show", "reissue" and "four wall" basis, as such terms are commonly understood in the motion picture industry, whether on fixed or percentage engagements.  The term "net sums" means Warner's receipts less all advertising, publicity and other distribution costs incurred directly in connection therewith;

(f)    All amounts required to be included under Exhibits "1", "2" and "3" hereof.

less the aggregate of:

(i)    All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in

35493

Exhibit-11

WB136083
CONFIDENTIAL

any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing: (A) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (B) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(ii)    Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(iii)    The cost of reducing or minimizing the matters referred to in (i) or (ii) above, which costs shall be fairly apportioned to the Picture if done on an industry basis or with respect to motion pictures distributed by Warner generally.

(iv)    All costs of cooperative or other advertising or promotion (excluding trade and institutional advertising or promotion) incurred in connection with exhibitions of the Picture in theaters (or other places where an admission is charged) where Warner pays, shares in or is charged with all or a portion of the promotional or advertising costs relating to any such exhibitions.

(v)    All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulations or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Schedule "1"
2

35493

Exhibit-11

WB136084
2018
CONFIDENTIAL

rendered beyond any guaranteed period referred to in the foregoing agreement, the amount payable on account thereof shall be treated as an advance against Participant's share of the Defined Gross hereunder, and conversely, any Defined Gross paid to Participant hereunder shall (to the extent permissible under applicable collective bargaining agreements) constitute an advance against such residuals payable to or for the benefit of Participant or any principal stockholder of Participant, or any such heirs, executors, administrators, successors or assigns.

(vi)    Dues and assessments of and contributions by Warner to AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences, and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection, including actions under the antitrust laws, and/or promotion of motion pictures.

In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.  If Warner reasonably anticipates taxes, residuals, uncollectible accounts, or any matters relating to the Picture, which, if and when determined, will be deductible hereunder, Warner may, for a reasonable time, set up appropriate reserves therefor.

2.    Film Rentals:  In Paragraph 6 of the foregoing Exhibit for purposes of computing Defined Gross under this Schedule 1, the third and fourth sentences are deleted, and the following substituted:  Where the film rental is computed on the basis of box-office receipts of the Picture, any expenses incurred in checking attendance and/or receipts of such engagements shall be deducted in determining film rentals hereunder.  There shall be deducted from film rentals expenses incurred in the collection thereof.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Schedule "1"
3

35493
**Exhibit-11**

205
WB136085
CONFIDENTIAL

## MUSIC PUBLISHING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in publishing revenues, there shall also be included in Defined Gross of the Picture:

A sum equal to 75% of the "publisher's share" of mechanical reproduction and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided such publisher is vested with all rights therein and all of the "publisher's share" of the receipts therefrom, and provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The "publisher's share" of mechanical reproduction fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof. Mechanical reproduction fees do not include synchronization fees.

The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing rights society in respect of the music and lyrics involved; or, if Warner or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected by Warner or the publisher, less the composer's share of such fees and all reasonable costs and expenses in administering the collection of such fees.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement            Exhibit "1"
Edgar Rice Burroughs, Inc.

35493

**Exhibit-11**

**206**
WB136086
CONFIDENTIAL

## SOUNDTRACK RECORD INCOME

In the event the party entitled to share in the Defined Gross of the Picture under the foregoing agreement is not entitled to receive any artists' royalties in respect of sound recordings derived from the soundtrack of the Picture, then Warner agrees to include in the Defined Gross of the Picture royalties on soundtrack records, as herein defined, computed at the applicable royalty rate.

As used herein:

The term "soundtrack records" means and refers to phonograph records, tapes, or other sound recordings which contain either: (i) portions of the soundtrack transferred directly to masters from sound records which form a part of the soundtrack of the Picture; or (ii) sound recordings recorded separately but utilizing substantially the same musical score, parts and instrumentation, and essentially the same artists, music and/or dialogue and/or sound effects as is contained in the soundtrack of the Picture; or (iii) a combination of (i) and (ii). Soundtrack records do not, however, include any recordings produced solely for the purpose of advertising and exploiting the Picture and copies of which are not distributed to the public.

The term "applicable royalty rate" means and refers to the following percentages of the prevailing retail price but in no event more than the net royalty actually received and retainable by Warner for its own account with respect to the sale of any particular copies:

    5% of 90% in respect of soundtrack records sold in the United States

    2 1/2% of 90% in respect of soundtrack records sold outside the United States

except that as to soundtrack records sold pursuant to mail order or "club" plans, the royalty rate shall be one-half of the rate otherwise applicable.

If any soundtrack records contain selections from other sources, the applicable royalty rate hereunder shall be prorated on the basis of the total number of minutes of selections from the soundtrack compared to the total number of minutes on such records.

In determining the net royalty retainable by Warner, all royalties payable to artists, conductors and other third parties in respect to such soundtrack records shall be deducted from the aggregate royalty payable to Warner under the applicable distribution agreement.

The term "prevailing retail price" means and refers to the price generally prevailing in the country of manufacture or sale (as determined by the Record Company), less all taxes, duties and charges for containers.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
1

35493

**Exhibit-11**

WB1360207
CONFIDENTIAL

There shall be deducted from amounts included in Defined Gross hereunder a pro- rata share of re-use fees and costs of recording and manufacturing masters advanced by Warner or the Record Company. Sales shall be determined on the basis of the number of records sold and for which the Record Company has been paid in U.S. currency, after allowing for all returns, cancellations, exchanges, applicable discounts, etc. and reasonable reserves which may be established therefor. No sums shall be included in Defined Gross with respect to records given away or sold at less than the Record Company's cost or for promotional purposes, or as sales inducements or otherwise.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
2

35493
**Exhibit-11**

208
WB136088
CONFIDENTIAL

## MERCHANDISING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in merchandising revenue, there shall be included in Defined Gross of the Picture:

(a)  A sum equal to 50% of all license fees (in excess of all royalties and participations) received by Warner directly as a result of the exercise by Warner itself of merchandising license rights.  If, however, Warner shall sublicense or sub-contract any of such merchandising license rights, Warner shall include in the Defined Gross hereunder, at its election, either a sum equal:  to (i) 85% of the net sums (in excess of all royalties and participations) received from such sub-licensee; or (ii) 50% of such sub-licensee's license fees from the exercise of such licensing rights (from which there shall be deducted all royalties and participations), and out of the remaining 50% thereof Warner shall pay and discharge the fees of its sub-licensee.

(b)  If the publication rights to the underlying literary material were owned or controlled by the party entitled to share in Defined Gross of the Picture under the foregoing agreement (herein called "participant") prior to the execution of this agreement, and were acquired by Warner pursuant to or in connection with this agreement, then:  (i) all net sums received by Warner from nonaffiliated or nonsubsidiary publishers from the publication of such underlying literary material and  of novelizations of the screenplay of the Picture; and (ii) a sum equal to 5% of the net receipts of Warner's subsidiary or affiliated publishers from the publication of such material and novelizations, less, in either case, royalties paid out of (i) or (ii) to the writers of such material and novelizations.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "3"

35493

**Exhibit-11**

209
WB136009
CONFIDENTIAL

RIDER TO EXHIBIT "C"

DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT
INITIAL BASIS

COMPUTATION AND PAYMENT

All paragraph references herein refer to paragraph numbers in the Exhibit to which this
Rider is attached. The provisions herein shall control to the extent they conflict with the
provisions in the Exhibit to which this Rider is attached.

Paragraph 2: The first sentence in Paragraph 2(c) shall end after the words "in 9
hereof".

Paragraph 3: Warner shall elect Paragraph 3(b)(i) during the initial theatrical release of
the Picture in the following territories: United Kingdom, Canada, France, Germany,
Italy, Australia, New Zealand, Benelux, Scandinavia, South Africa, South Korea, Spain,
Switzerland, Taiwan and Japan.

Defined Gross shall include all sums actually received by Warner from recoveries of
infringements, unfair competition, trademark and piracy actions with respect to the
Picture. Recoveries by Warner from infringement, unfair competition, trademark and
piracy actions with respect to the Picture representing penalties rather than actual or
statutory damages shall be included in Defined Gross of the Picture without any
distribution fee. Defined Gross shall also include all sums derived by Warner from
distribution of the Picture on a four-wall basis as such term is commonly understood in
the motion picture industry.

In Paragraph 3(d), the parenthetical in the second line is deleted. Licenses to cable
operators referred to in Paragraph 3(d)(iii) specifically include all forms of pay,
subscription and other types of non-free television.

Paragraph 4: The distribution fee on Defined Gross of the Picture derived by Warner
from prime time United States telecast of the Picture on free television on ABC, NBC or
CBS or another national network (if any) shall be 25%. For a network other than ABC,
NBC or CBS to be considered a national network, it must: (i) own or be affiliated with
over 200 television stations or a sufficient number to give national coverage comparable
to ABC, NBC or CBS; (ii) offer Warner centralized purchasing of motion pictures for
distribution to the owned or affiliated stations; (iii) offer a centralized clearing for
distribution of the Picture over said television stations (i.e., the network clears telecast
of the Picture over its stations -- not the distributor); (iv) handle itself or through affiliated
stations the sale of advertising; and (v) pay a single preagreed sum for telecast of the
Picture over all of its owned and affiliated stations.

35493

Exhibit-11

WB136090
CONFIDENTIAL

<u>Paragraph 5</u>: If Warner sets up reserves, such reserves must be reasonable and appropriate, and shall be liquidated in no more than 18 months, except for reserves for taxes, which Warner may withhold longer. If Warner sets up a reserve for taxes which Warner later discovers are not payable, Warner shall credit such reserve back into Defined Gross. In addition, Warner shall reduce the interest on unrecouped production cost by an amount equal to the interest which accrued on an amount of production cost equal to the reserves so withheld.

In 5(a), the cost of tapes and cassettes referred to therein shall not include any manufacturing costs of home video exhibition or distribution.

In 5(a) and 5(b), if Warner receives any discounts, rebates or credits (not including any cash discounts for accelerated payment), such discounts, rebates or credits shall be credited to the costs referred to in subdivision (a) and (b).

In 5(b), reuse fees and costs of recording and manufacturing masters for soundtrack phonograph records will only be charged as distribution expenses to the extent the record company does not pay same.

In 5(b), subdivision (i) is deleted.

In 5(b) and 5(c), the salaries and expenses of Warner's own employees will be charged to a Picture only if such employees substantially work on that Picture directly. Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, then the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs under Paragraph 5.

In 5(d), line 2, the word "gross" shall be inserted before the word "income". Change the words "Subject to" on line 17 to "Notwithstanding". The following shall be added at the end of subparagraph (d) : "If Warner receives a refund from the taxing authority which previously assessed any taxes previously deducted hereunder, the amount of such refund together with any interest received thereon shall be credited against sums deductible under this Paragraph 5."

In 5(f), deductible costs and expenses will not include the salaries of Warner's regularly employed in-house legal or accounting staff. The allocable portion of checking and collection costs referred to therein shall be limited to 1% of the Defined Gross of the Picture.

In 5(g), the dues and assessments referred to therein shall be limited to 1% of the Defined Gross of the Picture.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
2

35493

**Exhibit-11**

WB136011
CONFIDENTIAL

In 5(h), the word "reasonably" shall be inserted in between the words "may deem" and "necessary" on line 5. The last sentence of subparagraph (h) shall be revised to read the following: "Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or waiver of any right or remedy at law or otherwise which may exist in favor of Warner against Participant, which rights may include the following: the right to require Participant to reimburse Warner on demand for any liability, cost, damage, or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses."

In 5(i) after "participations in the Picture" on line 10 add the following: "but excluding from this subdivision (i) any such participations in the Picture themselves." Delete the phrase in lines 14-15 "or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement."

In 5(j), there shall be added at the end thereof the following: "Insurance recoveries relating to cost of production of the picture shall be credited first to recoupment of cost of production of the picture and then to recoupment of distribution expenses. All other insurance recoveries relating to distribution expenses as described in this Paragraph 5 shall be credited against distribution expenses. Distribution expenses which are reimbursed by a third party and distribution expenses incurred but not ultimately paid by Warner shall be credited to distribution expenses under Paragraph 5 (unless such reimbursements and/or payments of expenses are made by parties to financing arrangements with Warner)."

Paragraph 6: The words "all such costs" in line 12 mean allowances paid and granted on account of cooperative theater or joint advertising. At the end of Paragraph 6 there shall be added the following: "provided, however, that the terms and conditions of the agreement between Warner and theaters, television stations or other facilities owned or controlled by Warner relating to film rentals shall be consistent with similar terms and conditions between such theaters and another studio relating to a comparable non-Warner picture. Nonrefundable advances received by Warner shall be included as Defined Gross hereunder when received, if such advances relate to licenses of the Picture as a single motion picture for national network or pay television."

Paragraph 7: In line 13, the words "and reasonably" shall be inserted before "apportioned", and the words "in good faith" shall be inserted after the word "apportioned".

Paragraph 8: Paragraph 8 shall be deleted in its entirety and the following shall be substituted: "Sums received by Warner which relate to the Picture shall not be included in Defined Gross hereunder unless and until such sums (i) have been received by

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
3

35493
**Exhibit-11**

WB136092
CONFIDENTIAL

Warner in U.S. dollars in the United States; or (ii) are freely remittable to the United States; or (iii) are used by Warner for any purpose in the territory involved. In this event, the U.S. dollar equivalent of the currency utilized in a territory shall be included in Defined Gross hereunder for the accounting period during which such Defined Gross were so utilized, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect. As for expenses incurred in foreign territories, Warner will compute the U.S. dollar equivalent of the currency utilized in the Territory, such U.S. dollar equivalent to be computed on the same basis as used for Defined Gross for the accounting period involved. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually), advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any other party designated by Participant in such country, only such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. At Participant's written request, Warner will use its best efforts to convert such deposits or payments into U.S. dollars to the same extent and in the same proportion that Warner is able to convert its own blocked currencies in the country or countries involved. Warner makes no representations or warranties that any part of any such foreign currencies may be converted in U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country."

Paragraph 9: In 9(a), the cost of all items listed on Warner's standard delivery schedule shall be included in cost of production only for such items which are prepared for the Picture. The cost of Warner facilities shall be included in the cost of production only if actually used.

In 9(b), interest on the cost of production shall not be deemed part of the direct cost of production subject to said overhead charge.

Paragraph 10: In line 2, the words "in summary form" shall be substituted by "in reasonable detail".

The second and third sentences shall be deleted and the following substituted: "Statements shall be issued for each calendar quarter until the Picture has been in release for four years from and including the quarter in which the Picture was first released, semiannually for an additional period of two years, and thereafter annually. If the Picture is reissued theatrically in the U.S., quarterly statements shall be resumed until substantially all of the revenues contemplated from such reissue have been

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    Rider to Exhibit "C"
                                                        4

                                                                        35493

                                                                Exhibit-11

                                                        WB136083
                                                        CONFIDENTIAL

reported; and if the Picture is released to prime time U.S. network television and/or to a U.S. pay or cable network, statements shall be issued for quarterly accounting periods during which revenues from such sources are included in Defined Gross. Each such quarterly, semiannual or annual period, as the case may be, is herein referred to as an 'accounting period'."

The second to the last sentence of Paragraph 10 shall be deleted and the following sentence shall be substituted:  "The obligation of Warner to account for but not Participant's right to receive any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statements issued thereafter shows a deficit under 2 hereof such that at least $1,000,000 of Defined Gross would be required before Participant would be entitled to receive any Defined Gross in excess of the Contractual Start Point hereunder.  Notwithstanding the foregoing, thereafter Employee may request a statement by written notice to Warner (but not more frequently than annually)."

The last sentence is deleted and the following substituted:  "In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $1,000,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point, and thereafter Participant may request statements by written notice to Warner (but not more frequently than annually)."

Paragraph 11:  The applicable records subject to audit shall include the records pertaining to the cost of production of the Picture.  Change 24 to 36 in lines 11 and 18. Audits shall not continue for longer than 60 consecutive business days.  The words "or if an audit is commenced prior thereto, within 30 days from the completion of the relative audit" in lines 18-19 are deleted and the following substituted:  "provided however, that if an audit is completed at least 120 days prior to the expiration of said 36-month period, Warner may give written notice to Participant at any time after 90 days from the completion of such audit requiring Participant to advise Warner in writing of any objections to the earnings statement involved, specifying the particulars of such objection, and if Participant does not make such written objections specifying the particulars thereof within 60 days from receipt of such notice from Warner or, whether or not Warner gives such written notice to Participant, upon the expiration of said 36-month period, whichever is earlier, Participant shall thereafter be barred from making any such objection or filing any suit, action or proceeding against Warner with respect to the earnings statement involved."  Warner preapproves Sills & Adelmann; Gelfand, Rennert & Feldman; Breslauer, Jacobson, Rutman & Sherman; Nigro, Karlin & Segal; Phil Hacker & Company; and any of the so-called "big six" national accounting firms to conduct audits.  In line 15 after the words "more than once," add "except Purchaser

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
5

35493

Exhibit-11

WB 26094
CONFIDENTIAL

shall not be precluded from again examining such records if the earnings statement is later altered or amended by Warner."

Paragraph 13:  The following shall be added at the end thereof:  "If Warner licenses the exhibition of the Picture to any theater or television station or other facility owned or controlled by Warner or in which Warner has an interest directly or indirectly, Warner shall do so on an arms-length basis, consistent with the manner in which Warner licenses the exhibition of the Picture to facilities in which it does not have an interest."

Paragraph 14:  The second sentence of Paragraph 14 is deleted and the following substituted in its place:  "Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming in writing the performance of this agreement instead of Warner, if the purchaser, transferee or assignee is at the time a parent, subsidiary or affiliated corporation of Warner, or a corporation with or into which Warner may merge or consolidate, or a person, firm or corporation succeeding to all or a substantial portion of Warner's assets, or another major motion picture distributor as such term is understood in the motion picture industry, Warner shall be released and discharged of and from any further liability or obligation hereunder."

The following shall be added at the end thereof:  "Upon request, Participant may obtain from Warner a copy of the written assumption of the obligations to Participant by such purchaser, transferor or assignee."

Paragraph 1 of Schedule 1:

Defined Gross shall include all film rentals actually received by Warner's subdistributors, if any, in the following territories:  U.K., Canada, France, Germany, Italy, Australia, New Zealand, Benelux, Scandinavia, South Africa, South Korea, Spain, Switzerland, Taiwan and Japan; provided, however, that Warner shall not use a subdistributor for the initial theatrical release of the English language version of the Picture in the United States or Canada.

Defined Gross shall include all sums actually received by Warner from recoveries of infringement, unfair competition, trademark and piracy actions with respect to the Picture.  Defined Gross shall also include all net sums derived by Warner from distribution of the Picture on a four-wall basis as such term is commonly understood in the motion picture industry.

Defined Gross further includes all net sums actually received by Warner on account of direct subsidies, aid or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any.  If local laws require use of such monies as a condition to the grant of such subsidy or aid, such monies shall not be included in Defined Gross until actually used.

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
6

35493

Exhibit-11

WB136098215
CONFIDENTIAL

In 1(d), the parenthetical in the first and second lines is deleted. Licenses of distribution rights referred to in 1(c) specifically include all licenses to cable operators, including pay, subscription, and other types of non-free television.

In 1(f)(i), line 2, the word "gross" shall be inserted before the word "income". Change the words "Subject to" on line 17 to "Notwithstanding". A subparagraph shall be added at the end of subparagraph (i) with the following: "If Warner receives a refund from the taxing authority which previously assessed any taxes previously deducted hereunder, the amount of such refund together with any interest previously received thereon shall be credited against sums deductible under this subparagraph (i)."

1(f) is deleted.

In 1(f), after "participations in the Picture" on lines 10-11, add the following: "but excluding from this subdivision (v) any participations in the Picture themselves." Delete the phrase in lines 15-16: "or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement."

In 1(f), the dues and assessments referred to therein shall be limited to 1% of the Defined Gross of the Picture.

Paragraph 2 of Schedule 1:

The third and fourth sentences of Paragraph 6 of the Exhibit, which are deleted in Schedule 1, shall be deemed reinserted.

Music Publishing Income Exhibit: The second paragraph is deleted and the following substituted: "A sum equal to 75% of the 'publisher's share' of mechanical reproduction, synchronization license and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The 'publisher's share' of mechanical reproduction and synchronization license fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof."

At the end of the third paragraph, the following is added: "If Warner's subsidiary or affiliated publisher is not entitled to 100% of the publisher's share of mechanical reproduction, synchronization license, and performing fees by reason of a "split" publishing agreement with the composer or lyricist of the music and lyrics involved, or any corporation furnishing the services of such composer or lyricist, then only the pro

FI803
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    Rider to Exhibit "C"
7

35493

Exhibit-11

WB136099616
CONFIDENTIAL

rata share of Warner's subsidiary or affiliated publisher shall be included for the purpose of the foregoing computations."

<u>Soundtrack Record Income Exhibit</u>:  The following is added at the end thereof: "Notwithstanding anything herein contained, the royalty payable hereunder shall be the net royalty actually received and retainable by Warner for its own account from the Record Company, as such royalty may be reduced, calculated, computed and paid in the same manner as the soundtrack record royalty paid to Warner under the applicable agreement with the Record Company is reduced, calculated, accounted for and paid."

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
8

35493
**Exhibit-11**

WB136097
217
CONFIDENTIAL

<u>EXHIBIT D</u>

**I.**   <u>FEATURE MOTION PICTURES</u>

1.   TARZAN OF THE APES
2.   THE ROMANCE OF TARZAN
3.   THE RETURN OF TARZAN (THE REVENGE OF TARZAN)
4.   THE ADVENTURES OF TARZAN
5.   THE SON OF TARZAN
6.   TARZAN AND THE GOLDEN LION
7.   TARZAN THE MIGHTY
8.   TARZAN THE TIGER
9.   TARZAN THE APE-MAN
10.   TARZAN THE FEARLESS
11.   TARZAN AND HIS MATE
12.   THE NEW ADVENTURES OF TARZAN
13.   TARZAN AND THE GREEN GODDESS
14.   TARZAN ESCAPES
15.   TARZAN'S REVENGE
16.   TARZAN FINDS A SON
17.   TARZAN'S SECRET TREASURE
18.   TARZAN'S NEW YORK ADVENTURE
19.   TARZAN TRIUMPHS
20.   TARZAN'S DESERT MYSTERY
21.   TARZAN AND THE AMAZONS
22.   TARZAN AND THE LEOPARD WOMAN
23.   TARZAN AND THE HUNTRESS
24.   TARZAN AND THE MERMAIDS
25.   TARZAN'S MAGIC FOUNTAIN
26.   TARZAN AND THE SLAVE GIRL
27.   TARZAN'S PERIL
28.   TARZAN'S SAVAGE FURY
29.   TARZAN AND THE SHE DEVIL
30.   TARZAN'S HIDDEN JUNGLE
31.   TARZAN AND THE LOST SAFARI
32.   TARZAN'S FIGHT FOR LIFE
33.   TARZAN AND THE TRAPPERS
34.   TARZAN'S GREATEST ADVENTURE
35.   TARZAN THE APE-MAN
36.   TARZAN THE MAGNIFICENT
37.   TARZAN GOES TO INDIA
38.   TARZAN'S THREE CHALLENGES
39.   TARZAN AND THE VALLEY OF GOLD
40.   TARZAN'S DEADLY SILENCE
41.   TARZAN AND THE GREAT RIVER
42.   THE PERILS OF CHARITY JONES
43.   TARZAN'S JUNGLE REBELLION
44.   TARZAN AND THE JUNGLE BOY
45.   TARZAN THE APE-MAN
46.   GREYSTOKE, THE LEGEND OF TARZAN LORD OF THE APES

47.   TARZAN (Disney feature-length animated theatrical)

48.   TARZAN AND JANE (Disney feature-length animated direct-to-video)

Exhibit "D"
1

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
1

35493

**Exhibit-11**

218

WB136098
CONFIDENTIAL

II.  **LIVE ACTION TELEVISION MOTION PICTURES**

1.   ALEX THE GREAT
2.   ALGIE B FOR BRAVE
3.   BASIL OF THE BULGE
4.   BLUE STONE OF HEAVEN, THE - PART I
5.   BLUE STONE OF HEAVEN, THE - PART II
6.   CAP'N JAI
7.   CIRCUS, THE
8.   CONVERT, THE
9.   CREEPING GIANTS, THE
10.  DAY OF THE GOLDEN LION, THE
11.  DAY THE EARTH TREMBLED, THE
12.  DEADLY SILENCE - PART I
13.  DEADLY SILENCE - PART II
14.  END OF A CHALLENGE
15.  END OF THE RIVER
16.  EYES OF THE LION
17.  FACES OF DEATH, THE
18.  FANATICS, THE
19.  FIGUREHEAD, THE
20.  FIRE PEOPLE, THE
21.  FOUR O'CLOCK ARMY, THE - PART I
22.  FOUR O'CLOCK ARMY, THE - PART II
23.  GOLDEN RUNAWAY, THE
24.  GUN FOR JAI, A
25.  HOTEL HURRICANE
26.  JAI'S AMNESIA
27.  JUNGLE DRAGNET
28.  JUNGLE RANSOM
29.  KING OF THE DWASARI
30.  LAST OF THE SUPERMEN, THE
31.  LEOPARD ON THE LOOSE
32.  LIFE FOR A LIFE, A
33.  MAN KILLER
34.  MASK OF BONA, THE
35.  MOUNTAINS OF THE MOON - PART I
36.  MOUNTAINS OF THE MOON - PART II
37.  MUGUMA CURSE
38.  PEARLS OF TANGA, THE
39.  PERILS OF CHARITY JONES, THE - PART I
40.  PERILS OF CHARITY JONES, THE - PART II
41.  PRIDE OF A LIONESS, THE
42.  PRIDE OF ASSASSINS
43.  PRISONER, THE
44.  PRODIGAL PUMA, THE
45.  PROFESSIONAL, THE
46.  RENDEVOUS FOR REVENGE
47.  THIEF CATCHER
48.  TIGER, TIGER

Exhibit "D"

2

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
2

35493

**Exhibit-11**

219
WB136099

II.  <u>LIVE ACTION TELEVISION MOTION PICTURES</u> (Continued)

      49.  TO STEAL THE RISING SUN
      50.  TRACK OF THE DINOSAUR
      51.  TREK TO TERROR
      52.  TRINA
      53.  ULTIMATE DUEL, THE
      54.  ULTIMATE WEAPON, THE
      55.  ULTIMATUM, THE
      56.  VILLAGE OF FIRE
      57.  VOICE OF THE ELEPHANT, THE
      58.  TARZAN IN MANHATTAN
      59.  TARZAN AND THE CAVES OF DARKNESS
      60.  TARZAN'S JOURNEY TO DANGER
      61.  TARZAN AND THE PICTURE OF DEATH
      62.  TARZAN AND THE PIRATE TREASURE
      63.  TARZAN IN THE LOST CITY
      64.  TARZAN AND THE KILLER LION
      65.  TARZAN THE HUNTED
      66.  TARZAN'S ELEVENTH HOUR
      67.  TARZAN AND THE SAVAGE STORM
      68.  TARZAN AND THE MYSTIC CAVERN
      69.  TARZAN AND THE SILENT CHILD
      70.  TARZAN AND THE GOLDEN EGG
      71.  TARZAN AND THE POISONED WATERS
      72.  TARZAN'S CHRISTMAS
      73.  TARZAN AND THE UNWELCOME GUEST
      74.  TARZAN AND THE RIVER OF DOOM
      75.  TARZAN AND THE EXTRA-TERRESTRIALS
      76.  TARZAN AND THE ORPHAN
      77.  TARZAN AND THE DEADLY GIFT
      78.  TARZAN AND THE TEST OF FRIENDSHIP
      79.  TARZAN TAMES THE BRONX
      80.  TARZAN AND THE WOMAN OF STEEL
      81.  TARZAN AND THE ENEMY WITHIN
      82.  TARZAN AND THE SONG OF THE JUNGLE
      83.  TARZAN IN THE EYE OF THE HURRICANE
      84.  TARZAN AND THE MISSILE OF DOOM
      85.  TARZAN AND THE FORBIDDEN JEWELS
      86.  TARZAN AND THE BROKEN PROMISE
      87.  TARZAN AND THE AMAZON WOMEN
      88.  TARZAN AND THE KARATE WARRIORS
      89.  TARZAN AND THE LION GIRL
      90.  TARZAN AND THE DEADLY DELUSIONS
      91.  TARZAN AND THE FATAL EPIDEMIC
      92.  TARZAN AND THE MYSTERIOUS SHEIK

                        Exhibit "D"
                            3

35493

Exhibit-11
WB136100
CONFIDENTIAL

## II. LIVE ACTION TELEVISION MOTION PICTURES (Continued)

93.  TARZAN AND THE RUNAWAYS
94.  TARZAN MEETS JANE
95.  TARZAN AND THE WAYWARD BALLOON
96.  TARZAN AND THE FUGITIVE'S REVENGE
97.  TARZAN AND THE MUTANT CREATURE
98.  TARZAN RESCUES THE SONGBIRD
99.  TARZAN AND THE FIRE FIELD
100. TARZAN AND THE MOVIE STAR
101. TARZAN AND THE FOUNTAIN OF YOUTH
102. TARZAN AND THE LAW OF THE JUNGLE
103. TARZAN AND THE SHAFT OF DEATH
104. TARZAN AND THE POLLUTED RIVER
105. TARZAN'S DANGEROUS JOURNEY
106. TARZAN AND THE TOXIC TERROR
107. TARZAN AND THE SHOWDOWN
108. TARZAN AND THE KILLER FOG
109. TARZAN'S HOLLYWOOD ADVENTURE
110. TARZAN AND THE WITNESS FOR THE PROSECUTION
111. TARZAN AND THE ROCK STAR
112. TARZAN AND THE ODD COUPLE
113. TARZAN AND THE RETURN OF THE BRONX
114. TARZAN AND THE NEW COMMISSIONER
115. TARZAN AND THE STONEMAN
116. TARZAN AND THE DEADLY CARGO
117. TARZAN AND THE SAPPHIRE ELEPHANT
118. TARZAN AND THE FEAR OF BLINDNESS
119. TARZAN AND THE MATING SEASON
120. TARZAN AND THE GIFT OF LIVE
121. TARZAN AND THE DEATH SPIDERS
122. TARZAN AND THE RUSSIAN INVASION
123. TARZAN AND THE FIERY END
124. TARZAN AND THE CURSE OF DEATH
125. TARZAN AND THE KING OF THE APES
126. TARZAN AND THE EVIL TWIN
127. TARZAN AND THE DANGEROUS COMPETITION
128. TARZAN AND THE PIRATES REVENGE
129. TARZAN AND CHEETAH'S DESPERATE ADVENTURE
130. TARZAN AND THE SIXTH SENSE
131. TARZAN AND THE KING OF ROMANCE
132. TARZAN AND THE NIGHT HORRORS
133. TARZAN AND THE JEWELS OF JUSTICE

Exhibit "D"
4

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement          Rider to Exhibit "C"
Edgar Rice Burroughs, Inc.                          4

35493

Exhibit-11

WB136101
CONFIDENTIAL

## III. ANIMATED THIRTY MINUTE TELEVISION EPISODES

1. TARZAN AND THE CITY OF GOLD
2. TARZAN AND THE VIKINGS
3. TARZAN AND THE GOLDEN LION
4. TARZAN AND THE FORBIDDEN CITY
5. TARZAN AND THE GRAVEYARD OF THE ELEPHANTS
6. TARZAN'S RETURN TO THE CITY OF GOLD
7. TARZAN AND THE STRANGE VISITORS
8. TARZAN AND THE LAND OF THE GIANTS
9. TARZAN AND THE KNIGHTS OF NIMMR
10. TARZAN'S RIVAL
11. TARZAN IN THE CITY OF SORCERY
12. TARZAN AT THE EARTH'S CORE
13. TARZAN AND THE ICE MONSTER
14. TARZAN AND THE OLYMPIADS
15. TARZAN'S TRIAL
16. TARZAN THE HATED
17. TARZAN AND THE BIRD PEOPLE
18. TARZAN AND THE SUNKEN CITY OF ATLANTIS
19. TARZAN AND THE COLOSSUS OF ZOME
20. TARZAN AND THE BEAST IN THE IRON MASK
21. TARZAN AND THE AMAZON PRINCESS
22. TARZAN AND THE CONQUISTADORS
23. TARZAN AND THE SPIDER PEOPLE
24. TARZAN AND THE SPACE GOD
25. TARZAN AND THE LOST WORLD
26. TARZAN AND THE MONKEY GOD
27. TARZAN AND THE HAUNTED FOREST
28. TARZAN AND THE ISLAND OF DOCTOR MORPHOS
29. TARZAN AND THE SIFU
30. TARZAN AND JANE
31. LAND BENEATH THE EARTH
32. THE DROUGHT
33. THE SOUL STEALER
34. TARZAN AND THE FUTURE KING
35. TARZAN AND THE HUNTRESS
36. TARZAN AND THE WHITE ELEPHANT

Exhibit "D"

5

FI803
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Rider to Exhibit "C"
5

35493

Exhibit-11
WB136102
CONFIDENTIAL

222

PUBLISHER'S RELEASE

The undersigned publisher hereby acknowledges and agrees for the express benefit of WARNER BROS., a division of Time Warner Entertainment Company, L.P., 4000 Warner Boulevard, Burbank, CA 91522, and its successors and assigns forever ("Warner"), that except for the Publishing Rights defined below, the undersigned has no right, title or interest whatsoever in that certain series of novels written by Edgar Rice Burroughs, published by the undersigned, titled TARZAN (the "Property"). Notwithstanding and without limiting the foregoing, if and to the extent that the undersigned owns any right, title or interest in the Property other than Publishing Rights, the undersigned hereby quitclaims such right, title and interest other than Publishing Rights to Warner. The undersigned understands that Warner will be relying upon the foregoing acknowledgement and quitclaim in connection with the purchase of rights in the Property and the possible development, production and distribution of works based on the Property. As used herein, Publishing Rights means (i) the right to publish print editions of the Property in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise, it being acknowledged that unless the Property has heretofore been published in comic book or comic strip form, the right to publish comic books and/or comic strips shall be deemed included within the merchandising rights granted to Warner by said author; (ii) the right to publish recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of published print editions of the Property in the form of CD-ROM, videocassette tape or similar electronically read devices individually purchased by the end-user.  Such electronically read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property but may not contain audio tracks of any kind.

Insofar as it is concerned, the undersigned hereby consents to the publication by the above-named author and/or by Warner, and/or their heirs, representatives, licensees and assigns, in any and all countries of the world, in the above-mentioned publishing media encompassed by the Publishing Rights, of the following: (a) excerpts from and summaries of the Property, or any motion picture or other versions thereof, for the purpose of advertising and/or publicizing any work produced pursuant to the rights owned by or licensed to Warner in the Property; and (b) souvenir booklets and "making-of-the-movie" and "coffee-table" type books relating to the Picture. No such publication shall contain excerpts or summaries taken from the Property in excess of 7,500 words in the aggregate.

35493

Exhibit-11
WB136103
CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned has executed this instrument as of December 2, 2002.

By: _____

Its: _____    ("Publisher")

Address:

_____

_____

_____

35493

Exhibit-11
WB136104
CONFIDENTIAL
224

"TARZAN (2003)"
ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned,
EDGAR RICE BURROUGHS, whose address is c/o Ziffren, Brittenham, Branca,
Fischer et al, 1801 Century Park West, Los Angeles, California 90067, Attention: David
Nochimson, hereby sells, grants and assigns to WARNER BROS., a division of Time
Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner
Boulevard, Burbank, California 91522, in perpetuity and throughout the universe,
among other things, the exclusive right to produce and distribute for and in all media
now known or hereafter devised theatrical and made-for-homevideo live action motion
pictures and allied rights therein (including by way of illustration all soundtrack and
music publishing rights) based on that certain series of novels described as follows:

    Titles: "TARZAN" (and related titles)
    Written By: Edgar Rice Burroughs
    Publisher: _____
    Date and Place of Initial Publication: _____
    Copyright Registration No.: _____

including the title, themes, stories and all other contents thereof, and the characters
therein and all translations, adaptations, sequels and other versions thereof, whether
now or hereafter acquired, and in and to the copyright thereof and all renewals and
extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement
dated December 2, 2002 relating to the transfer and assignment of the foregoing rights
in and to said work, which rights are more fully described in said agreement, and this
assignment is expressly made subject to all of the terms, conditions and provisions
contained in said agreement.  The option described in said agreement has been
exercised by Purchaser.

The undersigned has executed this assignment as of _____, effective on
_____, the date of exercise of the option.

                                EDGAR RICE BURROUGHS, INC.


                                /s/ Illegible
                                Its: President


FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Exhibit 11
WB136105
CONFIDENTIAL

## "TARZAN (2003)"
## OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, EDGAR RICE BURROUGHS, INC., whose address is c/o Ziffren, Brittenham, Branca, Fischer et al, 1801 Century Park West, Los Angeles, California 90067, Attention: David Nochimson, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 2, 2002 and continuing for a period of at least 24 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised theatrical and made-for-homevideo live action motion pictures and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain series of novels described as follows:

    Titles:  "TARZAN" (and related titles)
    Written By:  Edgar Rice Burroughs
    Publisher: _____
    Date and Place of Initial Publication: _____
    Copyright Registration No.: _____

including the title, themes, stories and all other contents thereof, and the characters therein and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated December 2, 2002 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Execution Date of the Option Purchase Agreement: *as of March 1, 2003.*

                          EDGAR RICE BURROUGHS, INC.


                          */s/ Illegible*
                          Its: President

35493

**Exhibit-11**
**WB136106**
**CONFIDENTIAL** 226

or Purchaser's address as designated in this Agreement. Any such delivery or mail service shall have the same effect as personal service within the State of California.

 (d) <u>Relationship of the Parties</u>:  This Agreement is not a partnership between or joint venture of the parties hereto and neither party is the agent of the other.  This Agreement is not for the benefit of any third party, whether or not referred to herein.  Captions and organization are for convenience only and shall not be used to construe meaning.  A waiver of any breach shall not waive a prior or subsequent breach.  All remedies shall be cumulative and pursuit of any one shall not waive any other.  This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

WARNER BROS., a division of Time Warner Entertainment Company, L.P.

by WARNER BROS. PICTURES INC. (its successor-in-interest)

("Purchaser")

By: _____

Its: Vice President

Date signed by Warner Bros. Pictures Inc:

7-17-03

EDGAR RICE BURROUGHS, INC.

_____

("Owner")

Execution Date:  <u>as of March 1, 2003</u>

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

27

35493

Exhibit-11

WB136107
CONFIDENTIAL    227

"TARZAN (2003)"
OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, EDGAR RICE BURROUGHS, INC., whose address is c/o Ziffren, Brittenham, Branca, Fischer et al, 1801 Century Park West, Los Angeles, California 90067, Attention: David Nochimson, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 2, 2002 and continuing for a period of at least 24 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised theatrical and made-for-homevideo live action motion pictures and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain series of novels described as follows:

      Titles: "TARZAN" (and related titles)
      Written By: Edgar Rice Burroughs
      Publisher: _____
      Date and Place of Initial Publication: _____
      Copyright Registration No.: _____

including the title, themes, stories and all other contents thereof, and the characters therein and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated December 2, 2002 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Execution Date of the Option Purchase Agreement: *As of March 1, 2003.*

                    EDGAR RICE BURROUGHS, INC.

                    *[signature]*
              Its: *President*

FL206
021028MMS/blb  Rev. 4-1-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

                                35493

35493

Exhibit 11
WB136108
CONFIDENTIAL
278

SENT BY MESSENGER

June 11, 2003

P. J. Shapiro Esq.
c/o Ziffren, Brittenham, Branca & Fischer
1801 Century Park West
Los Angeles, California 90067

Re: "TARZAN" – Edgar Rice Burroughs, Inc. – Option Purchase Agreement

Dear P. J.:

I enclose herewith five (5) copies of the above captioned agreement, which you have now confirmed is ready for signature.

Please arrange to have all of the copies signed on behalf of Edgar Rice Burroughs, Inc. and return them to me. I will then have two (2) copies countersigned and sent to you for your files.

Note that this agreement will be countersigned on behalf of Warner Bros., a division of Time Warner Entertainment Company, L.P., by its successor-in-interest Warner Bros. Pictures Inc.

Yours truly,

/s/ MARSHALL M. SILVERMAN
Marshall M. Silverman

MMS/blb

enclosures

cc: David Nochimson Esq.
    Dan Furie
    Virginia Tweedy w/enc.
    Mike Edwards w/enc.
    Norma Fuss w/enc.

**Exhibit-11**
WB136109
CONFIDENTIAL
229

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

---

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

   We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

   1.  Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

   2.  In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

   3.  PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: _MP_, _JMKP_

Exhibit-12

PP 230 0001

# PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4.    The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5.    Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6.    All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7.    The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: _____, _____

Exhibit-12
PPC 00002
231

# PACIFIC PICTURES CORPORATION

Page 3
Estate of Joseph Shuster
October 27, 2003

    8.    To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

    9.    All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

    10.    This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

    11.    This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

    If the terms and conditions of this agreement are acceptable to you, please

/ / /
/ / /
/ / /
/ / /

Initials: _MT_, _McN_

Exhibit-12
PPC 00003
232

# PACIFIC PICTURES CORPORATION

Page 4
Estate of Joseph Shuster
October 27, 2003

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

## Approval of Engagement of Pacific Pictures Corp.

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

Date: 10-30-03

By: Mark Warren Peary, Executor
(f/k/a Mark Warren Peavy)

I have read the foregoing agreement and agree to its terms to the extent any of my
interests are concerned.

Date: 10-30-03

Jean A. Peavy

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

September 10, 2004

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor, Estate of Joseph Shuster
Jean Peavy
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren and Jean:

This is to confirm that (1) the joint venture agreement dated as of November 23, 2001 between you and Pacific Pictures Corp. and (2) the engagement agreement dated October 27, 2003 between the Estate of Joseph Shuster and Pacific Pictures Corp. have been cancelled.

Sincerely yours,

Marc Toberoff

AGREED:

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor

Mark Warren Peary

Jean A. Peavy

Exhibit-13

PP 00009
234

1  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
2  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
3  New York, New York  10017
   Telephone:  212-813-5900
4  Fax:          212-813-5901

5  WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP
6  Michael Bergman (SBN 37797)
   David L. Burg (SBN 130403)
7  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
8  Beverly Hills, California  90212
   Telephone:  310-858-7888
9  Fax:          310-550-7191

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, New York  10516
12  Telephone:  845-265-2820
    Fax:          845-265-2819

13

14  Attorneys for Defendants and Counterclaimants

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17

18  JOANNE SIEGEL, an individual; and      )  Case No. 04-8400 RSWL (RZx)
    LAURA SIEGEL LARSON, an               )  Honorable Ronald S.W. Lew
19  individual,                            )
                                           )  Related To 04-08776 RSWL (RZx)
20            Plaintiffs,                  )
                                           )  **FIRST AMENDED**
21        vs.                              )  **COUNTERCLAIMS**
                                           )
22  WARNER BROS. ENTERTAINMENT            )
    INC., a corporation; TIME WARNER      )
23  INC., a corporation; DC COMICS, a     )
    general partnership; and DOES 1-10,   )
24                                         )
            Defendants.                    )
25  _____  )
                                           )
26  AND RELATED COUNTERCLAIMS.            )
                                           )
27

28
                                              **Exhibit-14**

1        Defendant/Counterclaimant DC Comics, for its First Amended

2   Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura

3   Siegel Larson, alleges:

4

5                          **PARTIES**

6        1.       Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a

7   New York General Partnership engaged in the business of, *inter alia*, creating,

8   exploiting, and licensing comic book stories and characters.  DC is the successor in

9   interest to all rights under copyright and other rights, including trademark rights

10   and the good will in and to the first Superman story and all other works and

11   products relating to the Superman character.

12        2.       Upon information and belief, Plaintiff/Counterclaim Defendant

13   Joanne Siegel is an individual and citizen of the State of California, in the County

14   of Los Angeles.  Upon further information and belief, Joanne Siegel is the widow

15   of Jerome Siegel, the individual credited as a co-creator of the first Superman

16   stories.

17        3.       Upon information and belief, Plaintiff/Counterclaim Defendant Laura

18   Siegel Larson is an individual and citizen of the State of California, in the County

19   of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a

20   daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and

21   Laura Siegel Larson are referred to herein as "the Siegels."

22              **JURISDICTION AND VENUE**

23        4.       This Court has jurisdiction of the subject matter hereof under the

24   provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright

25   ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also

26   known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections

27   1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332,

28

**Exhibit-14**

2

**236**

1    1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18

2    U.S.C. § 1367.

3         5.     Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information

4    and belief, a substantial part of the events giving rise to DC's claims occurred or a

5    substantial part of the properties that are the subject of these counterclaims are

6    situated in this District and/or the Plaintiffs/Counterclaim Defendants may be

7    found in this District.

8    **FACTS COMMON TO ALL COUNTERCLAIMS**

9    **Background And History**

10         6.     Upon information and belief, in or about 1933, Jerome Siegel

11    ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated

12    on creating a number of stories, including a story entitled "The Reign of the

13    Superman," which was published in a magazine put out by Siegel and Shuster

14    themselves entitled "Science Fiction." Upon further information and belief, other

15    than the same name, the "Superman" character in this story shared very little, if

16    any, similarity with the character that would later become known as Superman.

17         7.     Upon information and belief, in early 1933, Siegel and Shuster began

18    collaborating on "comic strips," initially for syndication and eventually for

19    publication in "comic books," a new and growing medium. Among their work

20    together were a number of comic strips featuring a character they named

21    Superman. This Superman character bore virtually no resemblance to the character

22    of the same name that had previously appeared in the "Science Fiction" magazine.

23    Upon further information and belief, those works, which were never published,

24    included: (a) twenty four (24) days of Superman comic strips intended for

25    newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of

26    such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page

27    synopsis covering an additional two months of daily comic strips; and (e) fifteen

28    daily comic strips (collectively the "Unpublished Superman Works").

**Exhibit-14**

3

**237**

8.      Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9.      Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10.      On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years. Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11.      Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics." In that connection, upon information and belief, DCI was provided with the twenty four (24) days of Superman comic strips from the Unpublished Superman Works for review. At the instance and expense of DCI and subject to its right to control, Siegel and Shuster cut and pasted the comic strips, and added certain additional material, to create a thirteen page comic book story which was accepted for publication by DCI.

12.      In an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein."

**Exhibit-14**

4

**238**

1   13.   DCI advertised the publication of the new comic story Superman and
2   the new title "Action Comics No. 1" in others of its publications, including but not
3   limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New
4   Adventure Comics No. 26," all of which are cover dated May 1938 and, upon
5   information and belief, were distributed in copies to the public on or before April
6   1, 1938.  These advertisements (the "Superman Ads"), which depict the Superman
7   character in his costume, exhibiting super-strength, show almost the entirety of
8   what would become the cover of "Action Comics No. 1."
9   14.   Upon information and belief, sometime prior to April 16, 1938, but
10  after the Superman Ads, DCI published the thirteen page Superman comic book
11  comprising the first Superman story in "Action Comics No. 1," bearing the "cover"
12  date June 1938 (hereinafter "Action Comics No. 1").  However, Action Comics
13  No. 1 was not comprised entirely of the pre-existing Unpublished Superman
14  Works.  Rather, upon information and belief, in response to DCI's instruction that
15  the Unpublished Superman Works be presented as a thirteen page comic book and
16  subject to DCI's right to control, Siegel and Shuster created additional materials to
17  complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").
18  15.   After the publication of Action Comics No. 1, upon information and
19  belief, Siegel and Shuster supplied further original Superman stories at DCI's
20  instance and expense and subject to its right to control.  On September 22, 1938,
21  Siegel and Shuster entered into another employment agreement (the "DCI
22  September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been
23  doing the art work and continuity for said comics [including Superman comics] for
24  us.  We wish you to continue to do said work and hereby employ and retain you for
25  said purposes . . . ."  The DCI September 22, 1938 Agreement also contained an
26  acknowledgement that DCI was the "exclusive" owner of Superman.
27  16.   Also on September 22, 1938, Siegel and Shuster entered into an
28  agreement with DCI and with the McClure Newspaper Syndicate (the "McClure

**Exhibit-14**

5

**239**

1   September 22, 1938 Agreement") concerning the use of Superman in newspaper
2   strips.

3      17.   All of Siegel and Shuster's contributions to Superman comic books
4   and comic strips published subsequent to Action Comics No. 1 as well as the
5   Additional Action Comics No. 1 Materials, were made either under the DCI March
6   1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure
7   September 22, 1938 Agreement, or contemporaneous oral agreements confirmed
8   by one or more of these Agreements, or certain subsequent agreements affirming
9   those agreements, as employees of DCI or its successors or at DCI's instance and
10  expense and subject to DCI's right of control, with the result that the copyrights to
11  all Superman materials created by them after preparation of materials included in
12  Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are
13  owned exclusively by DC Comics as works made for hire under the then applicable
14  1909 Copyright Act.

15     18.   On November 30, 1938, Siegel wrote to DCI (the "November 1938
16  Letter") suggesting that it do a comic book named Superboy, "which would relate
17  to the adventures of Superman as a youth." The November 30, 1938 Letter does
18  not contain any discussion of plot, dialogue, appearance, or any other
19  copyrightable material relating to Superboy. DCI decided not to publish a
20  "Superboy" comic at that time.

21     19.   In 1939, among the Superman comics prepared by Siegel and Shuster
22  at the instance and expense of DCI and subject to its right of control, was
23  Superman No. 1, with a cover date of Summer 1939. In Superman No. 1, Clark
24  Kent was depicted as a youth with super powers.

25     20.   On December 19, 1939, Siegel and Shuster entered into a new
26  agreement with DCI (the "December 19, 1939 Agreement"), which agreement
27  modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel
28  and Shuster's compensation for Superman comic books and newspaper strips. In

**Exhibit-14**

6

**240**

1  addition, the December 19, 1939 Agreement provided for payment for Siegel and

2  Shuster for uses of Superman beyond comic books and newspaper strips, such as

3  radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel

4  and Shuster again acknowledged DCI's sole ownership of Superman.

5      21.    Upon information and belief, in approximately December 1940,

6  Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page

7  script of continuity for Superboy (the "Unpublished 1940 Superboy Script"),

8  renewing his suggestion to DCI that it publish a comic book about Superman as a

9  youth.  The December 1940 Superboy Script, which sets forth a credit line of "By

10 Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of

11 today's leading adventure comic strip, SUPERMAN, wrote in demanding the

12 adventures of Clark Kent as a youth . . .And so here he is at last...the answer to

13 your requests...America's outstanding boy hero: SUPERBOY!"  The Unpublished

14 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was

15 to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided

16 not to publish a "Superboy" comic at that time.

17     22.    Upon information and belief, on a date prior to November 18, 1944,

18 DCI published its first comic book containing the adventures of Superboy, who

19 was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of

20 January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon

21 information and belief, DCI employed Shuster or an artist from Shuster's art studio

22 (with Shuster's knowledge and under his supervision) to create the artwork and

23 writer Don Cameron to write the Superboy story contained in "More Fun Comics

24 No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any

25 resemblance to anything contained in the Unpublished 1940 Superboy Script, and

26 such similarities as may exist are common to earlier Superman related material

27 owned by DCI.

28

**Exhibit-14**

23.    In 1947, Siegel and Shuster brought suit against, *inter alia,* DCI's successor in interest, National Comics Publications, Inc. ("National") in the New York Supreme Court in Westchester County (the "Westchester Action"). The Westchester Action was, in part, the culmination of a dispute between Siegel and Shuster and National over what Siegel and Shuster claimed was DCI's unauthorized publication of Superboy. In the Westchester Action, in addition to seeking redress in connection with Superboy, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938 Agreement was obtained by duress, and sought to recapture all rights in Superman.

24.    On November 21, 1947, the Court in the Westchester Action issued an opinion (the "Westchester Opinion") after trial in which it found that the March 1, 1938 Agreement transferred to DCI all rights in Superman and that the DCI September 22, 1938 Agreement was valid and not obtained under duress. The Court also held that in publishing Superboy, DCI had acted "illegally."

25.    At the Court's request, the parties to the Westchester Action submitted proposed fact findings and conclusions of law. On April 12, 1948, the Court adopted fact findings and conclusions of law and issued an interlocutory judgment (collectively the "Westchester Action Interlocutory Judgment"). The defendants in the Westchester Action filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

26.    Shortly thereafter, the parties to the Westchester Action entered into two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement"). Under both documents, *inter alia,* Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; (c) acknowledged National was sole and

**Exhibit-14**

8

**242**

exclusive owner of Superman, the conception, idea, continuity, pictorial

representation and formula thereof in all media; (d) agreed that they were enjoined

from creating, publishing or distributing any Superman work or any imitation

thereof, and from using the title Superman or title that contained the word "Super";

(e) acknowledged that National was the sole owner of and owned exclusive rights

in Superboy; (f) agreed that they were enjoined from creating, publishing or

distributing Superboy or any imitation thereof; (g) agreed they were prohibited

from representing their past connection with Superman and Superboy in such a

way to confuse the public that such connection still existed; and (h) agreed they

were prohibited from using any coloring, lettering or printing in referring to

Superman or Superboy that was imitative of that used by National.

27.    In the 1960s, Siegel and Shuster again brought suit against National,

this time in the United States District Court for the Southern District of New York

for a declaration that they (and not National) owned the copyright in the renewal

copyright term for Action Comics No. 1.  In a decision published in *Siegel v.

National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the

district court held, *inter alia*, that the agreements between Siegel and Shuster on

the one hand and DCI (and later National) on the other, intended to assign all rights

in Superman to DCI and National, including renewal copyright rights.

28.    In a decision published in *Siegel v. National Periodical Publications,

Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the

lower court's ruling relating to National's ownership of all rights in Superman.

Siegel and Shuster did not further appeal the ruling.

29.    On December 23, 1975, Siegel and Shuster entered into an agreement

with Warner Communications, Inc., then National's parent company (the

"December 23, 1975 Agreement").  Under this agreement, Siegel and Shuster

again acknowledged that Warner Communications, Inc. was the sole and exclusive

owner of "all right, title and interest in and to the 'Superman' concept, idea,

**Exhibit-14**

9                                          **243**

continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised . . . ."

30. Under the December 23, 1975 Agreement, Siegel and Shuster each were to and did receive throughout their lives annual payments as well as medical insurance coverage. Upon Siegel's death, annual payments were to be made to Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life. The amount of the annual payment pursuant to the December 23, 1975 Agreement was increased over the years. Since Siegel's passing in 1996, Joanne Siegel has continuously received and accepted annual payments and health insurance under that agreement.

## DC Comics' Development And Licensing
## Of Superman Works And Products

31. The initial graphic representations of the Superman character in 1938, now stylistically dated, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. From the portrayal of the Superman character in "Action Comics No. 1," we only know that he is an upright hero who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. Superman is also depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap $1/8^{th}$ of a mile, hurdle a twenty-story building and run faster than an express train. In his ordinary life, the character is depicted as mild-mannered newspaper reporter for The Daily Star known as Clark Kent, and in his alter ego, Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime.

**Exhibit-14**

10

**244**

32.     Since the publication of "Action Comics No. 1," DC Comics has authored, published and distributed several thousand other comic books containing the adventures of Superman throughout the United States and abroad in many millions of copies, adding more than 60 years worth of material to further define, update and improve upon the Superman character and presenting an ongoing new flow of Superman exploits and characters resulting in the creation of an entire fictional Superman "universe."

33.     In addition to the publication of new comic books containing the Superman comic strip character, DC Comics has over the last 66 years participated in the creation, development and licensing of numerous Superman live action and animated feature length motion pictures, motion picture serials, radio and television serials and live theatrical presentations.  These works have also significantly contributed to the modernizing and evolution of the Superman character from his 1938 appearance.

34.     Over the years since Action Comics No. 1, the presentations of Superman provided first by DCI and then DC Comics did not present a static depiction but an ever-evolving portrayal of Superman continuously, featuring new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Most notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No. 1 but only appeared in later publications. These include: his ability to fly; his super-vision which enables him to see through walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his invulnerability to injury which is most often shown as bullets bouncing off his chest and/or arms.

35.     One notable part of the evolution of the appearance of the Superman character undertaken by DC Comics and its predecessors, has been the

**Exhibit-14**

11

**245**

1   transformation of the emblem on the chest of Superman's costume.  In Action

2   Comics No. 1, the emblem was comprised of a small yellow inverted triangle

3   bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics

4   No. 1 Crest").  Thereafter, in changing the appearance of Superman and his

5   costume, DC Comics and/or its predecessors significantly changed the Action

6   Comics No. 1 Crest.  Bearing little if any resemblance to the original, it is now a

7   large yellow five-sided shield, outlined in the color red, and bearing the letter "S"

8   in the middle, also in the color red (the "S in Shield Device").  The S in Shield

9   Device, as transformed by DC Comics and its predecessors, has become a strong

10  symbol, standing alone, of all goods and services relating to Superman and his sole

11  source, DC Comics and its predecessors.

12      36.    At all relevant times, DC Comics, its predecessors in interest and

13  licensees have duly complied with the provisions of the 1976 Copyright Act and its

14  1909 predecessor statute with respect to securing copyright protection for the

15  numerous works in which the Superman character has appeared and establishing

16  DC Comics' copyright ownership thereof, including the original and all works

17  based upon and derived therefrom, and have received from the Register of

18  Copyrights, valid and subsisting certificates of copyright registration and renewal

19  with respect thereto.

20      37.    DC Comics and its predecessors have, since 1938, continuously held

21  themselves out as the exclusive owners of all rights under copyright in Superman.

22      38.    DC Comics has over many decades adopted and made long,

23  continuous and exclusive use of (a) the name and mark Superman and (b) certain

24  key symbols and indicia of origin in connection with and to identify all authorized

25  uses of the Superman character in print and all other media (sometimes hereinafter

26  the "Superman symbols and indicia of origin").  The Superman name and mark

27  and Superman symbols and indicia of origin include, *inter alia*, Superman's

28  characteristic outfit, comprised of a full length blue leotard with red cape, a yellow

**Exhibit-14**

12

**246**

1    belt, the S in Shield Device, as well as certain key identifying phrases.  Most

2    notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a

3    plane!...It's Superman!" first used in the introduction to the 1940 radio program

4    The Adventures of Superman, and thereafter continuously repeated in Superman

5    television programming and various Superman publications.  All of these

6    Superman symbols and indicia of origin have been used on and in connection with

7    a wide variety of publications and licensed goods and services, as they have been

8    added to the Superman character and mythology under DC Comics' and/or its

9    predecessors' supervision and direction, but, in any event, for the earliest symbols,

10   since as early as 1938.

11        39.    As a result of the above-described continuous and exclusive use by

12   DC Comics of the Superman name and mark, as well as the Superman symbols and

13   indicia of origin for over sixty years, the names, marks and symbols and the

14   appearance of the Superman character have become famous and the public has

15   come to recognize that all publications, entertainment and products featuring

16   Superman or bearing such marks all come from the same source, namely, DC

17   Comics, and that DC Comics is the exclusive source of the Superman character

18   and all uses of the character on and in connection with any goods and services.

19        40.    DC Comics owns dozens of federal trademark registrations for

20   Superman related indicia across a broad array of goods and services.  Those

21   registrations include, but are not limited to the following for the following marks:

22   (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177,

23   1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803,

24   1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b)

25   SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026,

26   1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

27   1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the

28   "S in Shield" Device (either alone or as part of a rendering of Superman)

**Exhibit-14**

13

**247**

1  2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233,

2  1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630,

3  1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150,

4  1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No.

5  2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY

6  Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g)

7  SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623,

8  1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i)

9  SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881;

10  (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306;

11  (l) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304;

12  (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No.

13  1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No.

14  1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION

15  COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and

16  indicia of origin, the "Superman Marks").

17      41.    These registrations alone suffice to show the unusual breadth and

18  scope of the use of such marks related to Superman by DC Comics or its licensees

19  on or in connection with a broad range of goods and services, all of which have

20  come to be seen over six decades by countless consumers as indicating an

21  exclusive authorization or sponsorship thereof by plaintiff DC Comics, the

22  publisher and source of all Superman comic books and other Superman

23  productions and products.

24              **The Superman Notices Of Termination**

25      42.    On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim

26  Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel,

27  Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled

28  Notice of Termination of Transfer Covering Extended Renewal. Those documents

**Exhibit-14**

14

**248**

1  purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the

2  Siegels' share in the following grants of copyright: (a) the December 4, 1937

3  Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938

4  Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19,

5  1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975

6  Agreement (collectively the "Superman Notices"). However, the Siegels served no

7  notice terminating their share of the copyright grant in the May 21, 1948 Consent

8  Agreement.

9      43.    The Superman Notices purport to terminate the Siegels' share of the

10  above grants listed therein in the Unpublished Superman Works, Action Comics

11  No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1

12  Works"). However, in none of the seven Superman Notices, or anywhere else, do

13  the Siegels purport to terminate their share of any copyright grant in the Superman

14  Ads.

15      44.    In the Superman Notices, the Siegels expressly recognize and

16  acknowledge that the character Superboy is a derivative work based on Superman.

17  The Superman Notices expressly identify Superboy as part of the Superman

18  "family" of characters in which the Siegels are purporting to terminate their grants.

19  Indeed, the more than 15,000 works listed in the Superman Notices include

20  hundreds of publications and other works that feature *only* Superboy (as opposed

21  to Superman), and also Superman No. 1 with a cover date of Summer 1939, in

22  which Superman is depicted as a youth.

23      45.    In late November, 1998, DC Comics received from Plaintiffs/

24  Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their

25  then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents

26  entitled Notice of Termination of Transfer Covering Extended Renewal. Those

27  documents purport to terminate, effective November 27, 2000, the Siegels' share in

28  the following grants of copyright relating to the character known as "The Spectre":

**Exhibit-14**

15

**249**

1    (a) the December 4, 1937 Agreement; (b) a September 22, 1938 Agreement; (c)

2    and October 10, 1939 Agreement and (d) a second October 10, 1939 Agreement

3    (collectively the "Spectre Notices").

4         46.    The Spectre Notices purport to terminate the Siegels' share of the

5    above grants in: (a) the Spectre character appearing in costume in an ad in issue

6    No. 51 of "More Fun Comics" with a cover date of January 1940; (b) the first

7    Spectre comic book story published in issue No. 52 of "More Fun Comics" with a

8    cover date of February 1940; (c) part 2 of the first Spectre comic book story

9    published in issue No. 53 of "More Fun Comics" with a cover date of March 1940,

10   and hundreds of additional works listed the Spectre Notices (collectively the

11   "Spectre Works").

**The Parties' Negotiations**

**And The Agreement Reached**

14        47.    On April 17, 1997, less than ten days after DC Comics received the

15   Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation.

16   The Siegels requested that DC Comics make an initial settlement proposal. But

17   prior to making such proposal, DC Comics requested that the parties enter into a

18   confidentiality agreement. Frustrated by the Siegels' delay in responding to its

19   proposed form confidentiality agreement, on November 5, 1997, DC Comics'

20   counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you

21   in the past, our client has elected, for settlement purposes only, not to respond to

22   the [Superman Notices] served upon them by challenging their validity or scope *at*

23   *this time*." (Emphasis added.)

24        48.    On December 17, 1997, DC Comics and the Siegels finally entered

25   into a confidentiality agreement. On December 18, 1997, DC Comics forwarded

26   its first substantive proposal with respect to the copyrights at issue, and in

27   connection therewith also raised certain defects in the termination notice, stating

28   "that there is a substantial legal issue as to the effectiveness of your clients'

**Exhibit-14**

16

**250**

1    termination of DC's interest in the Superman Comic." For more than six months,

2    despite repeated requests for feedback, DC Comics heard no response to its

3    December 18, 1997 proposal. Finally, on June 19, 1998, the Siegels' counsel sent

4    a letter to DC Comics' counsel that did not respond to the proposal but only

5    requested more information.

6        49.    On July 23, 1998, DC Comics provided the Siegels with the answers

7    to the questions posed in their counsel's letter of June 19, 1998. Despite requests

8    for feedback for another several months, DC Comics again received no response to

9    its proposal.

10       50.    Having heard no response from the Siegels, on April 15, 1999, one

11   day before the purported "Effective Date" set forth in the Superman Notices, DC

12   Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim

13   Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things,

14   the reasons it considered the Superman Notices to be invalid.

15       51.    On April 30, 1999, DC Comics received a letter from the firm of

16   Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented

17   the Siegels in negotiations with DC Comics. Thereafter, the parties engaged in

18   extensive negotiations with their respective lawyers attending meetings in

19   California and New York, and exchanging proposals. During that time period, at

20   the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance

21   Payment") to the Siegels which payment was agreed to be an advance against any

22   future sums provided under an agreement to be entered into between the parties.

23       52.    On October 16, 2001, a legal representative for DC Comics made an

24   offer to the Siegels through Gang, Tyre by telephone. On October 19, 2001, Kevin

25   Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001

26   offer. That day, Mr. Marks wrote a letter confirming that the Siegels had

27   "accepted D.C. Comics offer of October 16, 2001" and outlined all of the material

28   terms in detail. Those terms included, *inter alia,* that the Siegels transferred or

**Exhibit-14**

17

**251**

FIRST AMENDED COUNTERCLAIMS

1    would transfer all of their rights in the Superman property (which was defined in

2    the letter as Superman, Superboy and related properties including but not limited to

3    Supergirl, Steel, Lois & Clark, and Smallville) and in "The Spectre." In exchange,

4    the Siegels were to receive: (a) a sizeable non-returnable advance; (b) a sizeable

5    non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the

6    Advance Payment; (d) significant guaranteed minimum payments as advances

7    against royalties; and (e) percentage royalties from DC Comics' exploitations of

8    Superman across all media, worldwide.

9       53.    By return letter of October 26, 2001, DC Comics' representative

10   wrote back providing a "more fulsome outline" of the agreed upon points. Neither

11   the Siegels nor any of their representatives in any way disputed the October 26,

12   2001 confirmatory outline from DC Comics. On February 1, 2002, DC Comics

13   forwarded a draft of a more formal written agreement memorializing the terms

14   agreed to in the October 19 and 26, 2001 correspondence.

15      54.    After the October 2001 agreement, DC Comics entered into a written

16   Option Purchase Agreement with Warner Bros., A Division of Time Warner

17   Entertainment Company, L.P. (now known as defendant Warner Bros.

18   Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics

19   granted to Warner Bros. the option to license certain exclusive rights in Superman,

20   and Warner Bros. has commenced photography of a feature-length motion picture

21   based on the property.

22      55.    On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel

23   wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company

24   acknowledging that the Siegels had accepted DC Comics' proposal of October 16,

25   2002, but purporting to object to unspecified provisions of the formal written draft

26   and repudiating the agreement reached by the parties in October 2001. To this day,

27   the Siegels have not identified a single provision of the February 1, 2002 formal

28

**Exhibit-14**

18

**252**

314290v1 02231.0811        FIRST AMENDED COUNTERCLAIMS

1    draft that was inconsistent with the provisions in the Siegels' October 19, 2001

2    acceptance of DC Comics' proposal.

3        56.    On September 30, 2002, however, DC Comics received a letter from

4    the Siegels stating they were breaking off all discussions with DC Comics and

5    again repudiating the agreement reached by the parties in October 2001.

6                        **The Superboy Termination Notices**

7        57.    Notwithstanding the fact that the Siegels had already purported to

8    terminate grants with respect to the Superboy character effective April 16, 1999,

9    on November 8, 2002, the Siegels mailed to DC Comics another Notice of

10   Termination of Transfer purporting to relate solely to Superboy (the "Superboy

11   Notice"). The Superboy Notice purports to terminate, effective November 17,

12   2004, only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the

13   December 23, 1975 Agreement, and identifies many of the same works identified

14   in the Superman Notices. As was the case with the Superman Notices, the Siegels

15   served no notice terminating the copyright grant in the May 21, 1948 Consent

16   Agreement.

17       58.    The Superboy Notice purports to terminate the above grants

18   regarding the following works: (a) the unpublished November 30, 1938 Letter; (b)

19   the unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d)

20   approximately 1,600 additional titles. However, the Superboy Notice lists and

21   purports to terminate grants of rights under copyright relating to hundreds of the

22   same works already purportedly terminated by the earlier Superman Notices. The

23   Superboy Notice does not purport to terminate the 1939 depiction of Superman as

24   a youth in Superman No. 1.

25       59.    In the Superboy Notice, the Siegels make the claim that Superboy is a

26   "separate and distinct copyrighted work and character from the copyrighted work

27   and character Superman." This contention is erroneous.

28

**Exhibit-14**

19

**253**

1    60.    In the Superboy Notices, the Siegels also claim that Jerome Siegel

2  was the sole author of Superboy.  This contention is also erroneous.

3    61.    Among the works listed in the Superboy Notice that the Siegels claim

4  are terminated by such notice of termination (as well as by the Superman Notices),

5  is the WB television series entitled "Smallville." "Smallville" is a modern, teen-

6  oriented drama about the life and relationships of Clark Kent and his circle of

7  friends during Clark's high school years; it features numerous characters not

8  created or developed by Siegel and story lines wholly original to the series.

9    62.    On June 17, 2004, talent agent Ari Emanuel, representing the Siegels,

10  sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating,

11  *inter alia,* that as of the effective date of the Superboy Notice, November 17, 2004,

12  DC Comics and its licensees would be cut off from making any further episodes of

13  "Smallville"

14    63.    On August 4, 2004, the Siegels' new counsel and attorney of record

15  in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels'

16  position that, as of November 17, 2004, DC Comics and its licensees would be cut

17  off from making any further episodes of "Smallville."

18    64.    On August 27, 2004, DC Comics' counsel herein, Fross Zelnick

19  Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the

20  interpretation of the effect of the Superboy Notice and unequivocally informing the

21  Siegels that DC Comics and its licensees would proceed with their planned

22  production, copying, distribution, and exploitation of new episodes of "Smallville."

23              **The Siegels' Filing Of Two Related Cases**

24    65.    On October 8, 2004, 14 days prior to filing the instant action, the

25  Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to

26  Judge Pregerson in this Court.

27

28

                                                              **Exhibit-14**
                                         20                   **254**

1  **FIRST COUNTERCLAIM FOR DECLARATION**

2  **THAT THE SUPERMAN NOTICES AND THE**

3  **SUPERBOY NOTICE ARE INEFFECTIVE**

4   66. DC Comics repeats and realleges paragraphs 1 - 65 above as if fully

5 set forth herein.

6   67. DC Comics contends that the Superman Notices and/or the Superboy

7 Notice are ineffective, *inter alia*, for any or all of the following five independent

8 reasons:

9  **#1  The May 21, 1948 Consent Agreement Has Not Been Terminated**

10   68. The May 21, 1948 Consent Agreement is a written agreement entered

11 into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest

12 and includes a grant of all rights in Superman and Superboy by Siegel and Shuster

13 to DC Comics' predecessor in interest, including all rights under copyright therein.

14   69. As a result of the Siegels' failure to send a Notice of Termination

15 with respect to  the May 21, 1948 Consent Agreement, the grant contained therein

16 to all copyrights related to Superman remains in full force and effect.  Thus, DC

17 Comics is and continues to be the sole owner of all rights of any kind, including

18 rights under copyright, in Superman (including its derivative work Superboy)

19 pursuant to the May 21, 1948 Consent Agreement.

20   **#2 The December 23, 1975 Agreement**

21   70. Through both the Superman Notices and the Superboy Notice, the

22 Siegels purport to terminate their share of the grant of copyright in Superman and

23 Superboy contained in the December 23, 1975 Agreement.

24   71. By letter dated April 15, 1999, the day before the Superman Notice

25 purported to become effective, DC Comics rejected the scope and validity of the

26 Superman Notices, including but not limited to, that Superman Notice purporting

27 to terminate the grant in the December 23, 1975 Agreement.

28

**Exhibit-14**

**255**

314270v1 02231.0811

FIRST AMENDED COUNTERCLAIMS

1    72.    By letter dated August 29, 2004, DC Comics rejected the scope and

2    validity of the Superboy Notice, including but not limited to the Siegels' claim that

3    such notice terminated the December 23, 1975 Agreement.

4    73.    Notwithstanding the Siegels having, by virtue of the Superman

5    Notices, purportedly terminated the grant of copyright contained in the December

6    23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the

7    Superman Notice, after April 16, 1999, the purported effective date of such notices

8    of termination, DC Comics continued to perform under the December 23, 1975

9    Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to

10   accept the benefits under that agreement.  DC Comics has relied upon Joanne

11   Siegel's continued acceptance of benefits under the December 23, 1975 Agreement

12   and has continued to perform under that Agreement without accounting to the

13   Siegels and without making any other change in the manner in which it has

14   exploited Superman.

15   74.    Notwithstanding the Siegels having, by virtue of the Superboy

16   Notice, purportedly terminated the grant of copyright contained in the December

17   23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004

18   rejection of the notice of termination, DC Comics has continued to perform under

19   the December 23, 1975 Agreement.  DC Comics has relied upon Joanne Siegel's

20   continued acceptance of benefits under the December 23, 1975 Agreement and has

21   continued to perform under that Agreement without accounting to the Siegels and

22   without making any other change in the manner in which it has exploited

23   Superboy.

24   75.    Because of DC Comics' continued performance under the December

25   23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's

26   continued acceptance of the benefits of such agreement after she purportedly

27   terminated it in both the Superman Notices and the Superboy Notice, the

28

**Exhibit-14**

22

**256**

1  December 23, 1975 Agreement, and the grant of copyright therein, remains in full

2  force and effect.

3      76.     Thus, DC Comics is and continues to be the sole owner of all rights

4  of any kind, including rights under copyright, in Superman (and its derivative work

5  Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

6                     **#3 The Unpublished Superboy Works**

7      77.     In the Superboy Notice, the Siegels purport to terminate copyright

8  grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy

9  Script and approximately 1,600 additional published titles purportedly relating to

10 Superboy (the "Published Superboy Works").

11     78.     Upon information and belief, as of January 1, 1978, both the

12 November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel

13 Superboy Proposals") remained unpublished and thus were neither in their first nor

14 their second term of copyright as of that date.

15     79.     Copyright in the Published Superboy Works is owned exclusively by

16 DC Comics by virtue of their having been prepared as works made for hire for DC

17 Comics' and/or its predecessors, or by virtue of other copyright grants that remain

18 in full force and effect.

19     80.     Pursuant to the requirements set forth by section 304 (c) of the 1976

20 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in

21 their first or second term of copyright as of January 1, 1978, could be terminated

22 under that provision. As a result, the Superboy Notice is ineffective as to the

23 Siegel Superboy Proposals or any portion of any derivative works containing any

24 copyrightable material therefrom and DC Comics remains the sole owner thereof.

25 Therefore, the Superboy Notice is ineffective.

26

27

28
                                                          **Exhibit-14**
                                        23
                                                          **257**

## #4  Siegel Owned No Copyright In Superboy

81.     The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

82.     Upon information and belief, Siegel, in collaboration with Shuster, prepared the Siegel Superboy Proposals without the prior knowledge or consent of DC Comics' predecessors.

83.     Upon further information and belief, Siegel developed the contents of the Siegel Superboy Proposals within the scope of his employment contracts with DC Comics' predecessors and/or at their instance and expense and subject to their right to control.

84.     As a result of the foregoing, the Siegel Superboy Proposals were derivative works based upon Superman, prepared without the authorization of the copyright owner, and/or were works made for hire, owned *ab initio* by the copyright owner in Superman.

85.     Whether the Siegel Superboy Proposals were derivative works prepared without the prior authorization of the copyright owner, or were works made for hire, Siegel could not and did not own any copyright interest therein that would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c).  Thus, the Superboy Notice is ineffective.

## #5  The Superman Notices Were Not Timely Served

86.     Upon information and belief, DC Comics' predecessor in interest first secured copyright in Action Comics No. 1 by publication with copyright notice prior to April 16, 1938.

87.     All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels are ineffective for failure to comply with the legal requirements therefore

**Exhibit-14**

24

**258**

1  prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304

2  (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999,

3  was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3)

4  and such notices of termination were served less than two years before the

5  allowable effective date in violation of 17 U.S.C. § 304 (c) (4) (A).

6      88.    On information and belief, plaintiffs deny DC Comics' contentions

7  and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above.

8  Accordingly, an actual controversy has arisen and now exists between

9  Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

10     89.    A justiciable controversy exists concerning the above issues and a

11  judicial declaration is necessary and appropriate to determine the parties'

12  respective rights with regard thereto.

13              **SECOND ALTERNATIVE COUNTERCLAIM FOR**

14          **DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR**

15       **CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE**

16        **SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS**

17     90.    DC Comics repeats and realleges paragraphs 1 - 89 above as if fully

18  set forth herein.

19     91.    Since as early as 1998, Plaintiffs/Counterclaim Defendants were on

20  notice of DC Comics' position that the Superman Notices contained legal defects.

21  Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim

22  Defendants were on notice that DC Comics rejected the Superman Notices and

23  asserted exclusive ownership of all copyright in Superman.

24     92.    Since April 16, 1999, the purported effective date of the Superman

25  Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of

26  their purported co-ownership of copyright in Action Comics No. 1.

27     93.    In response to DC Comics' above actions and assertion and such

28  deprivation to the Siegels of the benefits of their alleged copyright co-ownership,

**Exhibit-14**

25

**259**

1  Plaintiffs/Counterclaim Defendants took no action until filing the instant action on

2  October 8, 2004, more than six years after DC Comics advised

3  Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

4  and more than five years after being placed on notice by DC Comics of its claim of

5  exclusive ownership of copyright in Superman and that it rejected and repudiated

6  the Superman Notices and during which time period the Siegels were deprived of

7  benefits to which they claim they are entitled.

8      94.    Because Plaintiffs/Counterclaim Defendants' claim of partial

9  ownership of copyright accrued more than three years prior to

10  Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into

11  consideration any purported agreements to toll the statute of limitations, any claim

12  of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is

13  barred by the three-year statute of limitations of the Copyright Act.

14     95.    On information and belief, plaintiffs deny DC Comics' contentions

15  and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above.

16  Accordingly, an actual controversy has arisen and now exists between

17  Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

18     96.    A justiciable controversy exists concerning the above issues and a

19  judicial declaration is necessary and appropriate to determine the parties'

20  respective rights with regard thereto.

21              **THIRD ALTERNATIVE COUNTERCLAIM**

22                 **FOR BREACH OF CONTRACT**

23     97.    DC Comics repeats and realleges paragraphs 1 - 96 above as if fully

24  set forth herein.

25     98.    In or about October 2001, Plaintiffs/Counterclaim Defendants entered

26  into a written agreement with DC Comics memorialized by the authorized agent of

27  Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of

28  DC Comics, John Schulman, which subsequently was confirmed and ratified in

**Exhibit-14**

26                                                          **260**

1  writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"),

2  pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1)

3  transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

4  transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and

5  interest, including all United States copyrights, which they may have in any and all

6  past, present, and future Superman and Superboy-related properties, works,

7  characters, names, and trademarks (collectively, the "Superman Works"), (2)

8  agreed to accept certain compensation from DC Comics in consideration of any

9  and all rights, title, and interest which they may have in the Superman Works (the

10  "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim

11  related to the Superman Works other than for breach of the Agreement (the

12  "Covenant Not To Sue").

13      99.    DC Comics has performed all of its obligations under the Agreement,

14  except to the extent such performance has been prevented or excused by the acts or

15  omissions of Plaintiffs/Counterclaim Defendants.  Specifically, and without

16  limiting the foregoing, DC Comics established a reserve account of the moneys

17  due to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which

18  DC Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the

19  Agreement but for their repudiation and breach of the Agreement as herein alleged.

20  DC Comics always has been and remains ready, willing, and able to perform all of

21  its obligations under the Agreement, and will resume doing so upon either a

22  withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the

23  Agreement or a final adjudication that the Agreement is enforceable and binding

24  on the parties.

25      100.   Plaintiffs/Counterclaim Defendants have repudiated and otherwise

26  breached the Agreement by, among other things:

27          a.    Claiming, including in this action, that they have not transferred

28  and are not contractually obligated to transfer to DC Comics, worldwide and in

**Exhibit-14**

27

**261**

1   perpetuity, all of their rights, title, and interest, including all United States

2   copyrights, which they may have in the Superman Works, and refusing to execute

3   a formal written transfer thereof to DC Comics;

4       b.      Repudiating the Financial Terms and claiming, including in this

5   action, that they are entitled to additional compensation for the Superman Works;

6   and

7       c.      Initiating this action in violation of the Covenant Not To Sue.

8       101.    As a direct and foreseeable result of the contractual breaches on the

9   part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been

10  damaged in an amount to be proven at trial.

11  **FOURTH ALTERNATIVE COUNTERCLAIM FOR**

12  **DECLARATORY RELIEF REGARDING THE AGREEMENT**

13      102.    DC Comics repeats and realleges paragraphs 1 - 101 above as if fully

14  set forth herein.

15      103.    An actual controversy now exists between DC Comics and

16  Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is

17  binding and enforceable and, therefore, that:

18      a.      Plaintiffs/Counterclaim Defendants either have transferred or

19  are contractually obligated to transfer to DC Comics, worldwide and in perpetuity,

20  any and all rights, title, and interest, including all United States copyrights, which

21  they may have in the Superman Works;

22      b.      If for any reason Plaintiffs/Counterclaim Defendants are

23  adjudged not to have transferred or not to be contractually obligated to transfer to

24  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

25  United States copyrights, which they may have in the Superman Works, then the

26  remaining terms of the Agreement are valid and enforceable and

27  Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any

28

**Exhibit-14**

**262**

314270v1 02231.0811          FIRST AMENDED COUNTERCLAIMS

1    past, present, or future exploitation of the Superman Works by or upon license from

2    DC Comics other than pursuant to the Financial Terms; and

3              c.    If for any reason Plaintiffs/Counterclaim Defendants are

4    adjudged not to have transferred or not to be contractually obligated to transfer to

5    DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

6    United States copyrights, which they may have in the Superman Works, then

7    Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or

8    otherwise exploit the Superman Works in any manner.

9         104.    DC Comics is informed and believes, and on that basis alleges, that

10   Plaintiffs/Counterclaim Defendants dispute these contentions.

11        105.    DC Comics seeks a judicial determination of the parties' respective

12   rights and obligations, which is necessary and appropriate to allow them to

13   properly govern their future conduct.

## FIFTH ALTERNATIVE COUNTERCLAIM FOR
## DECLARATION OF LIMITATIONS ON THE SCOPE OF THE
## SUPERMAN NOTICES AND THE SUPERBOY NOTICE

17        106.    DC Comics repeats and realleges paragraphs 1 - 65 above as if fully

18   set forth herein.

19        107.    In the event the Superman Notices and/or the Superboy Notice are

20   deemed effective and the settlement agreement between the parties is not enforced,

21   DC Comics asserts the following alternative counterclaim for a declaration limiting

22   the scope and reach of the Superman Notices and the Superboy Notice in six

23   separate and independent ways.

24        108.    DC Comics contends that:

### #1  The Superman Ads

26        109.    The regulations governing the contents of notices of termination

27   promulgated by the U.S. Copyright Office under authority of the 1976 Copyright

28   Act require, in relevant part, that a notice of termination served pursuant to section

**Exhibit-14**

29

**263**

1  304 (c) of the 1976 Copyright Act name "each work to which the notice of

2  termination applies."

3       110.    Upon information and belief, all of the Superman Ads first secured

4  copyright protection by publication with copyright notice prior to April 16, 1938

5  and prior to publication of Action Comics No. 1.

6       111.    The Superman Ads contain and show the appearance of Superman,

7  his costume, and his super-strength.

8       112.    The grants made by Siegel and Shuster as to the appearance of

9  Superman, his costume, and his super-strength, are still in effect, and all rights

10  under copyright granted therein are still owned exclusively by DC Comics,

11  because the Superman Notices served by the Siegels do not list the works in which

12  the Superman Ads were first published.

13       113.    Thus, DC Comics is the exclusive owner of all copyright in and to the

14  Superman Ads and thereby retains exclusive ownership of copyright in the

15  appearance of Superman therein, including but not limited to, the appearance of the

16  Superman costume.

17            **#2  Use Of Superman And Superboy Derivative Works**

18            **Prepared Prior To The Purported Effective Dates Of The**

19            **Superman Notices And The Superboy Notice**

20       114.    The Superman Notices purport to terminate the Siegels' share in the

21  copyright grant of Jerome Siegel in all Superman-related works thereafter derived

22  from Action Comics No. 1, including but not limited to the more than 15,000

23  Superman related works (in addition to Action Comics No. 1) listed in the

24  Superman Notices (the "Superman Derivative Works").  Included among the

25  Superman Derivative Works is the image of the "S in Shield Device" that has

26  become a strong trademark of Superman and his single source, DC Comics.

27

28
                                                      **Exhibit-14**

115.    The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

116.    The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117.    Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3 DC Comics Owns All Superman Derivative Works

118.    All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics.  DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119.    The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements").  These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman.  Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No. 1 but only appeared later in the Post Action Comics No. 1 Works.

120.    Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post

**Exhibit-14**

31

**265**

1    Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.

2    Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

3             **#4 Superboy Is A Derivative Work Based On Superman**

4         121.   In the November 1938, Letter suggesting the idea for a Superboy

5    comic strip, Siegel stated such comic "would relate to the adventures of Superman

6    as a youth." In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many

7    faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in

8    demanding the adventures of Clark Kent as a youth . . .And so here he is at

9    last...the answer to your requests...America's outstanding boy hero:

10    SUPERBOY!"

11         122.   As demonstrated by the foregoing, the Siegel Superboy Proposals

12    were based upon the pre-existing Superman character and stories and are thus

13    derivative works based thereon, and were not made at the instigation of Siegel.

14         123.   Thus, even if the Superboy Notice were effective, any recapture of

15    copyright rights would be limited to any new copyrightable subject matter added

16    by Siegel and Shuster to the pre-existing Superman character and stories

17    exclusively owned by DC Comics and its predecessors.

18         124.   The new copyrightable subject matter contained in the Siegel

19    Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture

20    U.S. Copyrights therein, such recapture could not affect DC Comics' continuing

21    right to create and exploit new derivative works that do not include such new

22    copyrightable subject matter, including but not limited to, the television series

23    "Smallville."

24          **#5 The Derivative Work Superboy Is A Joint Work Of Authorship**

25         125.   Upon information and belief, the Siegel Superboy Proposals were

26    joint works of authorship as they were prepared jointly with Shuster and because it

27    was intended that their contents would be merged with artwork to create a comic

28    book or comic strip.

**Exhibit-14**

32

**266**

1    126.   As eventually published, the works containing the Superboy character

2    included both artwork and storyline.

3    127.   The joint author's share in the Siegel Superboy Proposals is owned

4    by DC Comics and cannot be terminated either by the Superman Notices or the

5    Superboy Notice.

6    128.   As a result of the foregoing, DC Comics right to continue to exploit

7    the Siegel Superboy Proposals and any derivative works based thereon cannot be

8    affected by either the Superman Notices or the Superboy Notice.

9    **#6  "Smallville" Is Not Derived From Superboy**

10    129.   Among the derivative works based upon Superman and authorized by

11    DC Comics is the weekly television series, "Smallville."

12    130.   Regardless of whether the Superboy Notice is effective and further

13    regardless of whether Superboy is a derivative work based upon Superman,

14    "Smallville" was derived from and based upon Superman and is not a derivative

15    work based upon the Siegel Superboy Proposals or any succeeding Superboy

16    comic or Superboy work exploited by DC Comics and/or its predecessors prior to

17    May 21, 1948.  Beyond sharing the idea of depicting Superman as a youth,

18    Smallville is not substantially similar to the Siegel Superboy Works.

19    131.   Thus, irrespective of any accounting issues relating to the Siegels'

20    purported right to receive compensation with respect to new episodes of

21    "Smallville," DC Comics' right to continue to authorize production, distribution,

22    and airing of "Smallville" television episodes remains unaffected by the Superman

23    Notices and the Superboy Notice.

24    **#7  The Additional Action Comics No. 1 Materials**

25    132.   The Additional Action Comics No. 1 Materials created in 1938 were

26    prepared at the instance and expense of DCI and subject to its right to control.

27    Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1

28

**Exhibit-14**

FIRST AMENDED COUNTERCLAIMS

1   Materials were "works made for hire" and copyright therein was owned by DCI *ab*

2   *initio.*

3       133.   Because the Additional Action Comics No. 1 Materials were works

4   made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to

5   17 U.S.C. § 304 (c). As a result, DC Comics remains the sole owner of the

6   Additional Action Comics No. 1 Materials.

7       134.   On information and belief, plaintiffs deny DC Comics' contentions

8   and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above.

9   Accordingly, an actual controversy has arisen and now exists between

10   Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

11       135.   A justiciable controversy exists concerning the above issues and a

12   judicial declaration is necessary and appropriate to determine the parties'

13   respective rights with regard thereto.

## SIXTH ALTERNATIVE COUNTERCLAIM FOR
## DECLARATION REGARDING THE PRINCIPLES
## TO BE APPLIED IN AN ACCOUNTING

17       136.   DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135

18   above as if fully set forth herein.

19       137.   DC Comics contends that in the event the Superman Notices and/or

20   the Superboy Notice were deemed valid and effective, any accounting to which the

21   Siegels would be entitled relating to Superman (including its derivative work

22   Superboy, collectively for this Counterclaim "Superman") would be subject to the

23   following limitations and reductions:

24         a.   The Siegels would not be entitled to any revenues derived from

25            exploitation of Superman outside of the United States because

26            termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of

27            non-United States copyrights.  17 U.S.C. § 304 (c) (6) (E).

28

**Exhibit-14**

b. The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works.  17 U.S.C. § 304 (c) (6) (A).

c. Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d. Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present in the Superman works subject to accounting.

e. Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f. The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights.  As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

g. Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect

**Exhibit-14**

35

**269**

FIRST AMENDED COUNTERCLAIMS

1    expenses, taxes, and DC Comics' independent role as a publisher of

2    Superman.

3        h.  Subject to all reductions aforesaid and otherwise determined by the

4            Court to be applicable, the Siegels would be entitled to an accounting

5            of only one-half of the copyright co-owner's profits.

6        138.   On information and belief, plaintiffs deny DC Comics' contentions

7    and/or the legal effect ascribed thereto as set forth above.  Accordingly, an actual

8    controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants

9    and DC Comics as to the above issues.

10        139.   A justiciable controversy exists concerning the above issues and a

11    judicial declaration is necessary and appropriate to determine the parties'

12    respective rights with regard thereto.

13        WHEREFORE, DC Comics demands judgment as follows:

14        1.    Declaring that the Superman Notices and the Superboy Notice are

15    ineffective for one or more of the reasons set forth in DC Comics' First

16    Counterclaim;

17        2.    In the event that the Superman Notices and/or the Superboy Notice

18    are deemed effective, for damages according to proof at trial on DC Comics' Third

19    Alternative Counterclaim;

20        3.    In the event that the Superman Notices and/or the Superboy Notice

21    are deemed effective, declaring on DC Comics' Fourth Alternative Counterclaim

22    that, pursuant to the Agreement:

23            a.    Plaintiffs/Counterclaim Defendants have transferred or are

24    contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any

25    and all rights, title, and interest, including all United States copyrights, which they

26    may have in the Superman Works;

27            b.    In the event that Plaintiffs/Counterclaim Defendants are

28    adjudged not to have transferred or not to be contractually obligated to transfer to

**Exhibit-14**

36

**270**

1 | DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

2 | United States copyrights, which they may have in the Superman Works, then the

3 | remaining terms of the Agreement are valid and enforceable and

4 | Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any

5 | past, present, or future exploitation of the Superman Works by or upon license from

6 | DC Comics other than pursuant to the Financial Terms; and

7 |             c.     In the event that Plaintiffs/Counterclaim Defendants are

8 | adjudged not to have transferred or not to be contractually obligated to transfer to

9 | DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

10 | United States copyrights, which they may have in the Superman Works, then

11 | Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or

12 | otherwise exploit the Superman Works in any manner;

13 |       4.     In the event that the Superman Notices and/or the Superboy Notice

14 | are deemed effective, and DC Comics is not granted the relief sought on its Fourth

15 | Alternative Counterclaim, declaring that the scope and effect of the Superman

16 | Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth

17 | Alternative Counterclaim;

18 |       5.     In the event that the Superman Notices and/or the Superboy Notice

19 | are deemed effective, and DC Comics is not granted the relief sought on its Fourth

20 | Alternative Counterclaim, declaring that any accounting to which

21 | Plaintiffs/Counterclaim Defendants may be entitled will be limited by all

22 | applicable principles, including but not limited to, those set forth in DC Comics'

23 | Sixth Alternative Counterclaim;

24 |       6.     Awarding DC Comics its costs and reasonably attorneys' fees

25 | incurred in connection with DC Comics' defenses and claims herein seeking

26 | declarations with respect to copyright ownership; and

27 |

28 |

**Exhibit-14**

37

**271**

1  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

2  United States copyrights, which they may have in the Superman Works, then the

3  remaining terms of the Agreement are valid and enforceable and

4  Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any

5  past, present, or future exploitation of the Superman Works by or upon license from

6  DC Comics other than pursuant to the Financial Terms; and

7           c.    In the event that Plaintiffs/Counterclaim Defendants are

8  adjudged not to have transferred or not to be contractually obligated to transfer to

9  DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all

10  United States copyrights, which they may have in the Superman Works, then

11  Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or

12  otherwise exploit the Superman Works in any manner;

13           4.    In the event that the Superman Notices and/or the Superboy Notice

14  are deemed effective, and DC Comics is not granted the relief sought on its Fourth

15  Alternative Counterclaim, declaring that the scope and effect of the Superman

16  Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth

17  Alternative Counterclaim;

18           5.    In the event that the Superman Notices and/or the Superboy Notice

19  are deemed effective, and DC Comics is not granted the relief sought on its Fourth

20  Alternative Counterclaim, declaring that any accounting to which

21  Plaintiffs/Counterclaim Defendants may be entitled will be limited by all

22  applicable principles, including but not limited to, those set forth in DC Comics'

23  Sixth Alternative Counterclaim;

24           6.    Awarding DC Comics its costs and reasonably attorneys' fees

25  incurred in connection with DC Comics' defenses and claims herein seeking

26  declarations with respect to copyright ownership; and

27

28

**Exhibit-14**

37

**272**

1         7.    Awarding DC Comics such other and further relief as may be just.

2

3    DATED:    October 14, 2005

4                        FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                         Roger L. Zissu

5                        James D. Weinberger

6                                  -and-

7                        WEISSMANN WOLFF BERGMAN
                         COLEMAN GRODIN & EVALL LLC

8                        Michael Bergman
                         David L. Burg

9                        Adam Hagen

10                                 -and-

11                       PERKINS LAW OFFICE, P.C.
                         Patrick T. Perkins

12

13                       By:_____

14                         David L. Burg

15                       Attorneys for Defendants Warner Bros.
                         Entertainment Inc. and Time Warner Inc., and

16                       Defendant and Counterclaimant DC Comics

17

18

19

20

21

22

23

24

25

26

27

28
                                                **Exhibit-14**

                                                **273**

314270v1  02231.0811          FIRST AMENDED COUNTERCLAIMS

PROOF OF SERVICE
1013A(3) C.C.P. Revised 5/1/88

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF LOS ANGELES    )

I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9665 Wilshire Blvd, Suite 900, Beverly Hills, CA 90212. On the date shown below, I served the foregoing document described as **FIRST AMENDED COUNTERCLAIMS** on the interested parties in said action9, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Marc Toberoff
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067

__XX__   **(BY MAIL)**   I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___   **(FACSIMILE SERVICE)** I caused such document to be transmitted via facsimile to the offices of the addressees at the numbers listed above.

___   **(BY FEDERAL EXPRESS)** I caused a copy of such document(s) to be delivered to the offices of the addressee(s) via Federal Express, next business day delivery service.

Executed on **October 17, 2005**, at Beverly Hills, California.

___   **STATE**      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

__XX__   **FEDERAL**      I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
Adrienne Crayton-Sarpy

**Exhibit-14**

**274**

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF·
NICHOLAS C. WILLIAMSON

· ALSO ADMITTED IN NEW YORK

1999 AVENUE OF THE STARS, SUITE 1540
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

CONFIDENTIAL COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY

May 12, 2005

Via Facsimile and US Mail

Patrick T. Perkins
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, NY 10017

**Re: Superman / Estate of Joseph Shuster / Mark Warren Peary**

Dear Patrick:

On behalf of our clients, Warren Peary, the personal representative of the Estate of Joseph Shuster ("Estate") and Jean Adele Peavy, this is to respond to the buy-out proposal dated April 28, 2005 which DC Comics ("DC") sent directly to them.

While our clients certainly do appreciate DC's efforts, they are passing on DC's offer. It is believed that the offer is extremely low and bears no relation to the net present value of the Estate's 50% interest in *Superman* profits for the duration of copyright, commencing 2013. Nor does DC's offer reflect the considerable strategic value of the Estate's 50% copyright interest in tandem with the Siegel's 50% copyright interest in *Superman.*

One need only to look at DC/Warner Bros.' full-blown plans to reinvigorate *Superman* as a billion dollar film, television and merchandising franchise and to Marvel's $2.2 billion market capitalization to understand how DC's $2 million proposal bears little or no relation to the marketplace and the economic realities of this world famous property.

Given your firm's prior letter on DC's behalf denying our clients' termination interests without legal grounds, my clients have requested that any further communications to them be made through our law firm and not to them directly.

The foregoing is without prejudice to any of our clients' rights, remedies, claims or positions at law or in equity, all of which are hereby expressly reserved.

Very truly yours,

Marc Toberoff

cc: Warren Peary and Jean Peavy

**Exhibit-15** CC00057438

275

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA
SIEGEL LARSON,

     Plaintiffs,

   vs.             No. 04-8400 (RSWL)(RZx)
                         -and-
WARNER BROS. ENTERTAINMENT  No. 04-8776 (RSWL)(RZx)
INC., et al.,

     Defendants.

AND RELATED COUNTERCLAIMS.

# ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934



www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

Exhibit 16
276

```
 1            Beverly Hills, California, Tuesday, August 1, 2006

 2                      10:05 AM - 8:50 PM

 3

 4                    LAURA SIEGEL LARSON,

 5     having been administered an oath, was examined and

 6     testified as follows:

 7

 8                         EXAMINATION

 9     BY MR. ZISSU:

10         Q    Could you tell us your name?

11         A    Laura Siegel Larson.

12         Q    And where do you live?

13         A    6400 Pacific Avenue, No. 106, in Playa Del Rey,

14     California 90293.

15              MR. ZISSU:  Now, we will have certain

16     stipulations, which I think are normal.  Objections

17     except as to form are reserved.

18              Okay?

19              MR. TOBEROFF:  That's fine.

20     BY MR. ZISSU:

21         Q    Should I call you Miss Larson or Miss Siegel

22     or...

23         A    Miss Siegel.

24         Q    What do you prefer?

25         A    Miss Siegel would be fine, thank you.
```

                                                                9

1                  (Defendants' Exhibit 7 marked.)

2    BY MR. ZISSU:

3        Q    My first question is have you seen a copy of

4    that letter before?

5        A    No.

6        Q    Have you seen it, ever?

7        A    No.

8        Q    Did you ever hear from either of the Peavys that

9    they received an offer --

10       A    No.

11       Q    -- from DC Comics?

12       A    No.

13            MR. TOBEROFF:  While the next question is

14   pending, before you answer, please give me time.  Count

15   to 5.

16   BY MR. ZISSU:

17       Q    When did your own involvement with the copyright

18   termination rights pertaining to your father's works

19   begin?

20            MR. TOBEROFF:  Objection.  Vague and ambiguous.

21   Lacks foundation.  Calls for a narrative.

22            THE WITNESS:  When my father died.

23   BY MR. ZISSU:

24       Q    Had you any involvement with these kinds of

25   rights before he died?

62

1      A    He talked to me about what he was doing.

2      Q    And what's your recollection of what he told

3  you?

4      A    He was going to pursue his termination rights

5  that were given to him under the copyright law.

6      Q    Did he ever say why he had not already pursued

7  them?

8      A    No.

9      Q    Did you ever discuss with him why he didn't

10 serve a termination notice while he was alive?

11     A    No.

12     Q    Do you know whether your mother discussed that

13 with him?

14     A    I don't know.

15     Q    Did he ever discuss with you what he thought his

16 termination rights were worth?

17     A    No.

18     Q    Did you ever hear that he had ever done any

19 evaluation or assessment of the value of those rights?

20     A    No.

21     Q    To your knowledge is there any evaluation that

22 was done for him of those rights?

23     A    No.

24     Q    Have you ever had a deposition taken of you

25 before?

1

2

3

4

5

6

7

8          I, LAURA SIEGEL LARSON, do hereby declare under

9     penalty of perjury that I have read the foregoing

10    transcript; that I have made any corrections as appear

11    noted, in ink, initialed by me, or attached hereto; that

12    my testimony as contained herein, as corrected, is true

13    and correct.

14          EXECUTED this _17th_ day of _September_,

15    20 _06_, at _Playa Del Rey,_, _California_.
                        (City)                    (State)

16

17

18

19    _Laura Siegel Larson_
      LAURA SIEGEL LARSON

20

21

22

23

24

25

278

1

1      UNITED STATES DISTRICT COURT

2    FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   JOANNE SIEGEL,              )
    LAURA SIEGEL LARSON         )
5                               )
                 Plaintiffs,    )
6                               )
        v.                      )  CASE NO. CV 04-8400
7                               )            CV 04-8776
    WARNER BROS, et al.         )
8                               )
                 Defendants.    )
9

10

11

12

13        DEPOSITION OF MARK WARREN PEARY
             November 11, 2006
14               8:30 a.m.
            317 Paseo de Peralta
15          Santa Fe, New Mexico

16

17        PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:

18  TAKEN BY:  MR. PATRICK PERKINS
               Attorney for the Defendants
19

20

21

22  REPORTED BY:  MABEL JIN CHIN, NM CCR #81
                  Bean & Associates, Inc.
23                Professional Court Reporting Service
                  500 Marquette, Northwest, Suite 280
24                Albuquerque, New Mexico 87102

25  (3519B) MC



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

3

8.   March 12, 2004 Register of Copyrights documents 57

9.   September 10, 2004 cancellation letter        59

10.  April 26, 2005 letter, Levitz to Peavy, Peary  64

11.  May 12, 2005 letter, Toberoff to Perkins       71

                    *     *     *

                 MARK WARREN PEARY,

   after having been first duly sworn under

   oath, was questioned and testified as follows:

        MR. TOBEROFF:  Before we start, I would just

like to note at the outset of the deposition that we

have discussed timing, and that we have to leave at

4 o'clock sharp so that I can make a flight.

        I would also just like to object that

plaintiffs were not -- I was not given notice as

attorney for Warren Peavy, the witness, that this

deposition was going to be videotaped as I believe is

required by the rules.

        Oh, excuse me.  The Notice.  I'm seeing it's

not in the subpoena.  It may be required in the

subpoena, it's not in the subpoena but it is in the

Notice to me.

                    EXAMINATION

BY MR. PERKINS:

   Q.   Good morning, Mr. Peary.  My name is Patrick

Perkins.  I represent the defendants, DC Comics, and



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit 17

1        Q.    Mr. Peary, what is Pacific Pictures
2   Corporation?
3        A.    It's -- it's one of Marc Toberoff's
4   businesses.
5        Q.    When did you first make the acquaintance of
6   Marc Toberoff?
7        A.    It would have been 2001, I believe.
8        Q.    Do you remember when in 2001?
9        A.    Not exactly.  I was doing research on
10  copyrights and I contacted him as a result.  So exact
11  month, I don't remember.
12       Q.    What exactly were you researching with
13  respect to copyright?
14       A.    Copyright law and rights.
15       Q.    And why did you contact Mr. Toberoff?
16       A.    I thought we might have some rights.
17       Q.    What was the basis for your belief that you
18  thought you might have some rights?
19       A.    What I read about copyright law.
20       Q.    And where did you -- where did you read
21  about copyright law?
22       A.    Various places -- the Internet, articles in
23  magazines.
24       Q.    And what rights did you believe that you
25  had?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
280-669-9492
e-mail: info@litsupport.com

Exhibit 17

21

1   A.   Rights connected to Superman.

2   Q.   What rights connected to Superman did you

3   believe you had?

4   A.   That's my understanding of it, that the law

5   grants certain rights, ownership rights.  That's my

6   understanding.

7   Q.   And that's why you contacted Mr. Toberoff?

8   A.   Yes.

9   Q.   Did you contact anyone else concerning those

10  rights?

11  A.   Yes, I have.  I have had done so in the

12  past, earlier.  I -- I talked to other people.

13  Q.   Whom did you speak to?

14  A.   I talked to an attorney in Albuquerque once.

15  Q.   Do you recall when that was?

16  A.   1990s sometime.  I don't know the exact

17  year.

18  Q.   Was your uncle still alive at the time?

19  A.   I don't think so.

20  Q.   Did you ever discuss the issue of copyright

21  rights in Superman with your uncle?

22  A.   No.  No.

23  Q.   Did he ever talk to you about any

24  unhappiness with respect to the arrangements that had

25  been made with respect to Superman, speak to you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
2-800-669-9492
e-mail: info@litsupport.com

Exhibit 17

22

1   personally?

2           MR. TOBEROFF:   Vague and ambiguous.

3       A.   He didn't say much.  I don't think he wanted

4   to talk too much about it.  He really didn't say that

5   much.

6       Q.   So, going back to your testimony, you

7   contacted Mr. Toberoff sometime in 2001; correct?

8       A.   Yes.

9       Q.   And as you sit here today, you can't

10  remember when in 2001?

11      A.   Not the exact month, no.

12      Q.   Do you remember the season?

13      A.   It seems like it was mid year sometime.

14      Q.   Now, when you contacted Mr. Toberoff, had

15  you made any attempt to evaluate what, if anything,

16  the copyright rights in Superman were worth that you

17  were contacting Mr. Toberoff about?

18          MR. TOBEROFF:   Objection, vague and

19  ambiguous.

20      A.   I don't think I -- no, I don't think I went

21  that far.  I didn't.

22      Q.   Since then have you done anything to try to

23  evaluate the value of copyright rights in Superman?

24          MR. TOBEROFF:   Him personally?

25      Q.   (By Mr. Perkins)  You personally?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
(800) 669-9492
e-mail: info@litsupport.com

Exhibit 17

286

23

1    A.    Me personally?  Not really on my own, just

2    whatever has been discussed with my attorney.

3    Q.    Were there discussions with your attorney

4    concerning the value of Superman?  That's a yes or no

5    question.

6         MR. TOBEROFF:  Objection, calls for

7    attorney-client privileged information.  The substance

8    of his conversations are privileged, and you just

9    outlined the substance.  Instruct him not to answer.

10   Q.    Are you going to follow Mr. Toberoff's

11   instruction not to answer the question?

12        MR. TOBEROFF:  Of course he is going to

13   follow my instruction.

14   A.    Yes.  That's a privileged question.

15   Q.    So you are going to follow his instruction

16   not to answer?

17   A.    Yes.

18   Q.    Thank you.  At what point did Mr. Toberoff

19   become your attorney?

20   A.    It was fairly soon after I contacted him.

21   Q.    Well, you have another relationship with

22   Mr. Toberoff also, or did, other than as an attorney,

23   didn't you?

24        MR. TOBEROFF:  Vague and ambiguous.

25   A.    Well, the -- the first relationship was as



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
(505) 669-9492
e-mail: info@litsupport.com

Exhibit 15
286

24

1    counsel, and then we had discussed possible uses of

2    rights, but we really -- I employed him as counsel

3    very soon after I contacted him.

4         MR. PERKINS:  Would you mark that, please?

5         (Exhibit 3 marked.)

6    Q.   (By Mr. Perkins)  I have asked the court

7    reporter to mark as Exhibit 3 a document that's

8    entitled Joint Venture Agreement.  Could you turn to

9    the last page of this document, please?

10        MR. TOBEROFF:  Before you ask him questions

11   about an isolated portion of the document, I think you

12   should look it over because the rest of the agreement

13   may provide context for whatever question Mr. Perkins

14   is asking.

15        MR. PERKINS:  Well, I didn't ask any

16   questions yet, but I was just --

17        MR. TOBEROFF:  I presume you were about to?

18        MR. PERKINS:  I was just going to ask him if

19   it was his signature on the last page, because if it's

20   not, then it's going to be a very different

21   examination.

22   Q.   (By Mr. Perkins)  Is this your signature on

23   the last page?

24   A.   Yes.

25   Q.   Okay.  Have you seen this agreement before

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
280-669-9492
e-mail: info@litsupport.com

Exhibit 17

24

1   counsel, and then we had discussed possible uses of

2   rights, but we really -- I employed him as counsel

3   very soon after I contacted him.

4           MR. PERKINS:  Would you mark that, please?

5           (Exhibit 3 marked.)

6    Q.    (By Mr. Perkins)  I have asked the court

7   reporter to mark as Exhibit 3 a document that's

8   entitled Joint Venture Agreement.  Could you turn to

9   the last page of this document, please?

10          MR. TOBEROFF:  Before you ask him questions

11  about an isolated portion of the document, I think you

12  should look it over because the rest of the agreement

13  may provide context for whatever question Mr. Perkins

14  is asking.

15          MR. PERKINS:  Well, I didn't ask any

16  questions yet, but I was just --

17          MR. TOBEROFF:  I presume you were about to?

18          MR. PERKINS:  I was just going to ask him if

19  it was his signature on the last page, because if it's

20  not, then it's going to be a very different

21  examination.

22   Q.    (By Mr. Perkins)  Is this your signature on

23  the last page?

24   A.    Yes.

25   Q.    Okay.  Have you seen this agreement before



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
286-669-9492
e-mail: info@litsupport.com

Exhibit 17

25

1    today?

2        A.    Yes.

3        Q.    Did you read it before you signed it?

4        A.    Yes.

5        Q.    Okay.  Why don't you go ahead and go through

6    the agreement, because I am going to ask you some

7    questions about it now.

8              Have you had occasion to read through the

9    document?

10       A.    Yes.

11       Q.    Now, this agreement is a Joint Venture

12   Agreement; correct?

13             MR. TOBEROFF:  Objection, calls for a legal

14   conclusion.  You can answer.

15       A.    Well, that's what it says here.

16       Q.    What did you understand you were doing when

17   you signed this agreement?

18       A.    We were employing Marc Toberoff, Esquire, as

19   our attorney to exploit any rights we may have in

20   connection with Superman.

21       Q.    And so what was Pacific Pictures

22   Corporation's role in this whole agreement, then, your

23   understanding?

24             MR. TOBEROFF:  Calls for speculation.

25       A.    Um -- I don't know how to characterize



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
280-669-9492
e-mail: info@litsupport.com

Exhibit 17

26

1  exactly what Pacific Pictures' role is my.

2  Understanding is that this is when we employed Marc

3  Toberoff as our attorney, and this was a business name

4  he was using.  That's my understanding.

5       Q.   Did you -- did you get legal counsel to

6  advise you on this agreement before entering into it?

7       A.   No.

8       Q.   Now, in the first paragraph -- in the

9  paragraph that's named -- that listed number 1, do you

10 see that?

11      A.   Yes.

12      Q.   It lists a number of characters.  Do you see

13 that?

14      A.   Yes.

15      Q.   Now, I promised the court reporter that I

16 wouldn't reference one particular character because of

17 the difficulty in spelling it, so we won't go through

18 all of them.  But I want to draw your attention to two

19 specific characters.  Before I do, who decided which

20 names and characters would be included in paragraph

21 1?

22           MR. TOBEROFF:  Objection, attorney-client

23 privileged information.  Instruct you not to answer.

24           Also attorney work-product.

25      Q.   Are you going to follow your counsel's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
280-669-9492
e-mail: info@litsupport.com

Exhibit C

27

1    instructions not to answer.

2              THE WITNESS:  Yes.

3              MR. TOBEROFF:  Mr. Perkins, for the

4    remainder of this deposition please assume that he is

5    going to follow his counsel and do not ask him after

6    each question whether he is going to follow the

7    instruction.  I find that improper.

8              MR. PERKINS:  It's actually not,

9    Mr. Toberoff.  I have to ask the question because if I

10   just leave it with your instruction and don't ask, I

11   open myself up to the possibility that at trial he

12   could answer the question saying I was never asked

13   whether I would follow the instruction.

14             MR. TOBEROFF:  Okay.  So let's say for the

15   remainder of the deposition when I instruct you not to

16   answer are you going to follow my instructions?

17             THE WITNESS:  Yes.

18             MR. PERKINS:  That's fine.  Thank you.

19             MR. TOBEROFF:  Okay.  Then you don't need to

20   keep asking him.

21             MR. PERKINS:  Thank you.

22        Q.   (By Mr. Perkins)  Do you have any

23   understanding as to why the character Superboy is

24   listed in paragraph one of this agreement?

25        A.   No.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit 17

28

1    Q.   In the research that you did concerning

2  copyright law relating to Superman, was it your belief

3  that some of the rights that you may have held were

4  rights relating to Superboy?

5    A.   No.

6    Q.   And I also note that paragraph one mentions

7  Smallville.  Do you see that?

8    A.   Yes.

9    Q.   Do you have any understanding as to why that

10 was included in this paragraph?

11   A.   No, I don't.

12   Q.   Do you know what Smallville is?  What that's

13 referring to there?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's -- it was a name that was created by --

17 in connection with the story in connection with

18 Superboy.

19   Q.   And based on the --

20   A.   Or actually, let me finish, because --

21        MR. TOBEROFF:  Wait.

22   A.   It was actually -- I'm recalling, it was

23 part of the whole story from the very beginning, if

24 I'm recalling the whole story, the whole Superman

25 story.  From the very beginning it was used in there,



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                            500 Marquette NW, Suite 280
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                            FAX (505) 843-9492

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

Exhibit
292
(505) 843-9494
FAX (505) 843-9492
292-669-9492
e-mail: info@ltsupport.com

29

```
 1  so that's all I know about it.
 2      Q.   And based on the research that you did, was
 3  it your belief that the copyright rights that you may
 4  have had rights to would include rights in Smallville?
 5      A.   When you say Smallville, are you talking
 6  about, like, the TV show that's on or --
 7      Q.   That -- I'm sorry -- yes.
 8      A.   Oh.
 9           MR. TOBEROFF:  Calls for a legal conclusion
10  as to rights he would have.
11      A.   That's -- that's not really my understanding
12  that that's part of our rights.
13      Q.   You testified earlier, if I'm not mistaken
14  and if I get it wrong please tell me, and I'm sure
15  Mr. Toberoff will jump in and say that I
16  mischaracterized it.  The joint -- the purpose of this
17  document was to hire Mr. Toberoff as your attorney.
18  Is that an accurate characterization of your belief.
19           MR. TOBEROFF:  Asked and answered.  Oh,
20  mischarac- -- okay.  Strike that.
21      A.   Yes.  My understanding was that, that this
22  is the document that we used to hire Mr. Toberoff as
23  our attorney.
24      Q.   If you could turn to the second page in
25  paragraph 5, do you see that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
299-669-9492
e-mail: info@ltsupport.com

Exhibit C

30

1     A.   Yes.

2     Q.   That paragraph provides for a division of

3   proceeds of 50 percent to you and your mother and 50

4   percent to Pacific Pictures, do you see that?

5     A.   Let's see.  Who are the claimants again?

6   Let's see.  Let's see.

7     Q.   In the top paragraph of the first page, it

8   identifies Jean A. Peavy and her son Mark Warren

9   Peary --

10    A.   Oh.

11    Q.   -- individually and collectively as

12  claimants.  Do you see that?

13    A.   Yes.

14    Q.   So, turning back to paragraph 5?

15    A.   Uh-huh.

16    Q.   There is a division of 50 percent to you and

17  your mother and 50 percent to Pacific Pictures.  Do

18  you see that?

19    A.   Yes.

20    Q.   And, do you recall how the parties to this

21  agreement came up with that division?

22         MR. TOBEROFF:  Vague and ambiguous.

23    A.   It's discussions, just discussions between

24  us and Mr. Toberoff.

25    Q.   And what was the basis for choosing that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit
294

1  particular division of proceeds?

2        MR. TOBEROFF:  Vague and ambiguous, asked

3  and answered.

4     A.   Yes, it was pretty much what I said before,

5  it was just based on just discussions over time.

6     Q.   Well, were there certain considerations that

7  went into determining this percentage?

8     A.   Perhaps the amount of work involved, the

9  amount of time, the commitment, like, it was the idea

10  it was not an immediate thing, it might take many

11  years.

12        Level of -- just, you know, that's it.

13     Q.   In entering into this Joint Venture

14  Agreement, what there any discussion as to how much

15  revenue was anticipated would come in, in exploiting

16  the rights here?

17     A.   Oh, I -- I don't recall discussing exact

18  figures, no.

19     Q.   Discuss -- do you recall general amounts?

20     A.   You know, that's -- that's not something we

21  really talked too much about.  It was more having to

22  do with what the exact copyright law states what our

23  rights might be.  We really didn't discuss figures

24  much.

25     Q.   Did you enter into a separate written



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
205-669-9492
e-mail: info@litsupport.com

Exhibit 1

32

1    agreement with Mr. Toberoff concerning his

2    representation of you as a lawyer?

3         A.    This is all I recall, right here.

4              MR. TOBEROFF:  I want to interject.  The

5    question was vague and ambiguous at the time.

6         Q.    If I could ask you to turn to page 3 of the

7    document and take a look at paragraph 8, which is the

8    first paragraph on the page?  Could you please read

9    that paragraph to yourself, and then I'm going to ask

10   you some questions about it.

11        A.    Oh, okay.

12              Okay.

13        Q.    The second sentence of this agreement

14   states, and I quote, "Upon the expiration of the term

15   and the winding up of the venture, or in the event of

16   termination of the venture for any reason, all rights,

17   property or assets of the venture will be held 50

18   percent by the claimants and 50 percent by PPC as

19   tenants in common, and claimants and PPC will each be

20   entitled to receive and continue to receive 50 percent

21   of all proceeds derived from the rights after

22   termination of the venture."

23              My question is, Mr. Peary, what was your

24   understanding as to what, if any relationship, would

25   continue to exist between you and Pacific Pictures in



MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
Exhibite 17
286-669-9492
e-mail: info@litsupport.com

33

1   the event that this agreement was terminated?

2          MR. TOBEROFF:  Calls for a legal conclusion,

3   the document speaks for itself.

4       A.   My understanding of what that meant?

5   Probably death, if he died.

6       Q.   What -- what was your understanding of what

7   would happen to the rights that are at issue in this

8   agreement in the event that this agreement was

9   terminated?

10          MR. TOBEROFF:  Same objections, calls for a

11  legal conclusion.  The document speaks for itself.

12      A.   What would happen to the rights?

13      Q.   Well, who would own them?

14          MR. TOBEROFF:  Are you asking him to read

15  the document and tell you what it means?

16      Q.   I'm asking you, Mr. Peary, what your

17  understanding was of what would happen to the rights

18  if the agreement was terminated at the time that you

19  signed the agreement?

20      A.   Well, it was terminated at some later date.

21      Q.   Yes.

22      A.   The rights would be split 50 percent.

23      Q.   If I could have you go back to page -- to

24  the first page of Exhibit 3, in paragraph 3 there is

25  reference to PPC paying costs and expenses of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit N

34

1  venture.  Do you see that?

2      A.   Yes.

3      Q.   And it refers to -- it lists a number of

4  costs and fees.  My question, Mr. Peary, is, were you

5  ever made aware as to whether any costs or fees were

6  incurred by the venture?

7          MR. TOBEROFF:  Vague and ambiguous.

8      A.   There were -- there was some fees associated

9  with the establishment of the Joe Shuster estate.

10  That's pretty much all I know.

11     Q.   Were you aware of any other attorneys' fees

12  that were incurred in connection with this venture?

13         MR. TOBEROFF:  Objection, vague and

14  ambiguous.

15     A.   The only fees I am aware of is fees

16  associated with the establishment of the Shuster

17  estate.

18     Q.   Now, you mentioned that under this agreement

19  you believe that you were hiring Mr. Toberoff as your

20  attorney.  What is your understanding of the fee

21  arrangement with Mr. Toberoff for his legal services?

22         MR. TOBEROFF:  Asked and answered.

23     A.   Yes.  My understanding is what it says in

24  paragraph 5 that we discussed.

25     Q.   All right.  Hold on to that document, and



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
288-669-9492
e-mail: info@litsupport.com

Exhibit M

35

1   I'm going to mark something else and we're going to go
2   back to it.
3           MR. TOBEROFF:  I'm getting a glass of
4   water.
5           THE VIDEOGRAPHER:  Your mike.
6           MR. TOBEROFF:  Oh, sorry.
7           (A discussion was held off the record.)
8       Q.   (By Mr. Perkins)  Before you look at Exhibit
9   4, I would like you to go back to Exhibit 3 for a
10  moment, Mr. Peary.  Is this document, this agreement
11  the first agreement between you and Mr. Toberoff that
12  you believe established him as your attorney?
13      A.   Yes.
14      Q.   And the date on the back page of this, it's
15  signed November 28, 2001; correct?
16      A.   Yes.
17      Q.   Did you have any discussions with
18  Mr. Toberoff prior to November 28, 2001?
19          MR. TOBEROFF:  Just a second.  I need to put
20  on my mike.
21          Objection, asked and answered.
22      A.   Yes.  I would refer you back to the prior
23  answer about when I first talked to him.
24      Q.   He wasn't your lawyer when you first talked
25  to him; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
(505) 669-9492
e-mail: info@litsupport.com

Exhibit 1
299

40

1    Q.    Who initially came up with the name Michael

2    Catron as the administrator?

3         MR. TOBEROFF:  Came up with it?  Vague and

4    ambiguous.

5    A.    I'm not sure who first came up with it.  He

6    is a long-time friend.  That's all I can say.

7         MR. PERKINS:  Would you mark this for me?

8         (Exhibit 5 marked.)

9    Q.    (By Mr. Perkins)  I have asked the court

10   reporter to mark as Exhibit 5 a document that is dated

11   October 27, 2003.  It is addressed to Mark Warren

12   Peary, and it is from Pacific Pictures Corporation.

13   If I could invite your attention to the last page,

14   please?

15        Is that your signature?

16   A.    Yes.

17   Q.    And did you read this document before you

18   signed it?

19   A.    Yes.

20   Q.    Mr. Peary, what was the purpose of entering

21   into this agreement?

22   A.    As far as I understand, the purpose of this

23   was after I was appointed executor of the Shuster

24   estate.

25   Q.    And why did you need to enter this



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit 19

86

```
1                   UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    JOANNE SIEGEL,              )
     LAURA SIEGEL LARSON         )
5                                )
                     Plaintiffs, )
6                                )
           v.                    ) CASE NO. CV 04-8400
7                                )          CV 04-8776
     WARNER BROS, et al.         )
8                                )
                     Defendants. )
9

10        CERTIFICATE OF COMPLETION OF DEPOSITION

11      I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY
     CERTIFY that on November 11, 2006, the deposition of
12   MARK WARREN PEARY was taken before me at the request
     of, and sealed original thereof retained by:
13

14             Attorney for the Defendants
               PERKINS LAW OFFICE, P.C.
15             1711 Route 9D
               Cold Spring, New York 10516
16             BY: MR. PATRICK PERKINS

17      I FURTHER CERTIFY that copies of this certificate
     have been mailed or delivered on _____, with
18   changes, if any, by the witness appended, to the
     following counsel of record and parties not
19   represented by counsel:

20             Attorney for the Plaintiffs
               MR. MARC TOBEROFF
21             2049 Century Park East, #2720
               Los Angeles, California 90067

22      I FURTHER CERTIFY that examination of this
     transcript and signature of the witness were requested
23   by the witness and all parties present.

24      On November 21, 2006, a letter was mailed or
     delivered to Mr. Toberoff regarding obtaining
25   signature of the witness.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@nmsupport.com

Exhibit 10
1600

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

Via Facsimile

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re:   *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
      USDC Central District of CA, Case No. 04-08400 SGL (RZx)
      *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
      USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-
00016. In addition, enclosed please find Pacific Pictures Corporation's production of
documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc:   Patrick T. Perkins, Esq.
      James D. Weinberger, Esq.

**Exhibit-18**

**302**