ORIGINAL SHIPPED    DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA        )
SIEGEL LARSON,                 )
                               )
          Plaintiffs,          )
                               )
     vs.                       )    No. 04-8400 (RSWL)(RZx)
                               )
WARNER BROS. ENTERTAINMENT )        -and-
INC., et al.,                  )
                               )    No. 04-8776 (RSWL)(RZx)
          Defendants.          )
_____)
AND RELATED COUNTERCLAIMS.

**CERTIFIED ORIGINAL**

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

**U.S. LEGAL**
*Support*

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA  91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

**Exhibit-19**

303

```
 1        Beverly Hills, California, Friday, November 17, 2006

 2                          1:46 PM

 3

 4                     MARC TOBEROFF,

 5          having been first administered an oath,

 6          was examined and testified as follows:

 7

 8                      EXAMINATION

 9   BY MR. BERGMAN:

01:46 10        Q    State your full name for the record, please.

01:46 11        A    Marc Toberoff.

01:46 12        Q    Have you had your deposition taken before,

01:46 13   Mr. Toberoff?

01:46 14        A    Once.

01:46 15        Q    And when was that?

01:47 16        A    I think about nine years ago.

01:47 17        Q    Here in California?

01:47 18        A    Yes.

01:47 19        Q    In what type of a case?

01:47 20        A    It was a commercial litigation.

01:47 21        MR. BERGMAN:  Mr. Williamson, is Mr. Toberoff

01:47 22   appearing for Pacific and IPW, LLC as well as his own

01:47 23   subpoena?

01:47 24        MR. WILLIAMSON:  Yes.

01:47 25        MR. BERGMAN:  Okay.
```

                                                            6

Exhibit-19

304

A    The assertion of the attorney-client privilege goes to matters where you start to ask questions that go to the giving of legal advice or legal strategies, mental impressions, things protected by the work product doctrine.

Q    The record will speak for itself on that.

In paragraph 11 there is the sentence about four lines up from the bottom of the page that begins, "The parties have mutually participated in the negotiation and drafting of this Agreement..."

Did either Peary or Peavy engage in the drafting of this agreement?

A    Only to the extent -- remember I told you earlier that I believe it went through a few drafts in response to requests, revisions, comments by Warren?  So to that extent, yes.

MR. BERGMAN:  Would you mark as Exhibit 14, please, a document on Pacific Pictures Corporation letterhead dated October 27, 2003?

(Deposition Exhibit 14 marked.)

BY MR. BERGMAN:

Q    My first question is going to be whether that is your signature on the last page of Exhibit 14, Mr. Toberoff.

A    Yes, it is.

68

Exhibit-19

305

03:47 1          Actually, looking at the date of this document,

03:47 2    I can narrow the other question you asked:  When we

03:47 3    entered into a legal or retainer agreement.  Still I

03:47 4    think it might be between the date of this and the date

03:47 5    of the cancellation of these two agreements.

03:47 6          Q    Okay.

03:47 7          A    I'm not positive, but that's...

03:48 8          Q    Am I correct that you drafted Exhibit 14?

03:48 9          MR. WILLIAMSON:  Objection.  Vague and

03:4810    ambiguous.

03:4811          THE WITNESS:  Yes, I did.

03:4812    BY MR. BERGMAN:

03:4813          Q    Were --

03:4814          A    With input from Warren.

03:4815          Q    What input did you receive from Mr. Peary?

03:4816          A    I don't recall specific items, but we discussed

03:4817    it.

03:4818          Q    Okay.  So am I correct you formed the -- you

03:4819    probated the estate of Joseph Shuster and then entered

03:4820    into this agreement with the executor of his estate?

03:4821          MR. WILLIAMSON:  Objection.  Assumes facts not

03:4822    in evidence.  It's vague and ambiguous.

03:4923          THE WITNESS:  What's the question?

03:4924    BY MR. BERGMAN:

03:4925          Q    The question is, were you involved in the

69

U.S. LEGAL SUPPORT

**Exhibit-19**

**306**

probate of Joseph Shuster's estate?

      MR. WILLIAMSON:  Objection.  Vague and ambiguous.

      THE WITNESS:  Yes.

BY MR. BERGMAN:

    Q    What was your involvement?

    A    I arranged for a -- since trusts and estates is a specialty of the law, I arranged for an attorney who's a -- who does nothing but trusts and estates work to handle the probating of the estate.

    Q    And what was the purpose in entering into this October 27, 2003 agreement, Exhibit 14?

    A    I think this agreement -- I'd have to compare it line by line to Exhibit 13, but I think this agreement is very similar if not the same to Exhibit 13, but the purpose was to, since -- was to include the executor in the agreement.

    Q    Has Pacific Pictures Corporation advanced or loaned any money to either Peary or Peavy?

    A    You mean like a personal loan?  I don't recall it loaning money to the Shusters.

    Q    Or advancing any money to the Shusters?

    A    I don't recall that, no.

    Q    To the best of your recollection, did you personally advance or loan any money to the Shuster

70

Exhibit-19

307

heirs?

        MR. WILLIAMSON:  Objection.  Asked and answered.

        THE WITNESS:  I don't think so, no.

BY MR. BERGMAN:

    Q  Did any other entity of which you are a member or shareholder advance or loan any money to Peary or Peavy?

    A  I don't believe so.

    Q  Paragraph 3 reads in part that "PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate," close quote.

        In addition to paying the legal fees and costs of setting up the Shuster estate, did PPC pay any other costs or expenses in connection with its agreement with Peary and Peavy?

    A  They may have paid filing fees with the U.S. Copyright Office, things of that nature, document retrieval fees from the U.S. Copyright Office, things of that nature.

    Q  Did you negotiate Exhibit 14 with any attorney representing either the executor of the estate or Miss Peavy?

        MR. WILLIAMSON:  Objection.  Vague and

71

ambiguous.

THE WITNESS:  No, I did not.

BY MR. BERGMAN:

Q    When you discussed either the original Joint

Venture Agreement or this Exhibit 14 with Peavy and

Peary, was there any discussion regarding the ownership

of the character Superboy?

MR. WILLIAMSON:  Objection.  Misstates prior

testimony.  Vague and ambiguous.

THE WITNESS:  I don't know.  I don't recall a

discussion of that.

BY MR. BERGMAN:

Q    Have you ever discussed ownership of the

character Superboy with either Peary or Peavy?

A    That would be privileged.

(Unanswered question.)

Q    Prior to the time that you entered into the

retainer agreement that you have testified to, did you

have any discussion with either Peary or Peavy concerning

the ownership of the character Superboy?

MR. WILLIAMSON:  Objection.  Attorney-client.

THE WITNESS:  That would also be privileged.

(Unanswered question.)

BY MR. BERGMAN:

Q    So is it your position --

72

Exhibit-19
309

A    I can just tell you, as I sit here today, I don't recall, but to the extent I had discussed it, it would be privileged.

Q    And is it your position, Mr. Toberoff, that the attorney-client relationship between you and Peary and Peavy resulted from the Joint Venture Agreement, Exhibit 13?

A    Absolutely not.

Q    Did it result -- that relationship result from Exhibit 14?

A    No.  It didn't result from a document.  It resulted from them seeking legal advice from the very first call and my providing it, which established a confidential relationship.

Q    With the exception of exhibits 13 and 14, have you ever entered into a joint venture agreement with a client?

A    I think that's --

MR. WILLIAMSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I think you already asked that. What do you mean by that?

BY MR. BERGMAN:

Q    I think it speaks for itself.

A    I don't understand.  Not to me.  Clarify that.

73

Exhibit-19
310

Q    Exhibit 13 is a joint venture agreement which in essence provides for a 50-50 split of proceeds between your company, Pacific Pictures Corporation, and the Shuster heirs.  Have you ever entered into a similar joint venture agreement with any legal client?

MR. WILLIAMSON:  Objection.  The document speaks for itself.  Vague and ambiguous.

THE WITNESS:  I don't know.  As I mentioned to you before, there have been situations where I'm involved with -- I'm trying to explain it to you.  If somebody is -- normally, if someone is -- options a book and simply -- and then seeks to set up a film or to monetize that book by licensing film rights or producing a film, it's a very simple, straightforward type of situation, and when we spoke about BLUE MOVIE, for instance, you asked me about that, and I said I had optioned that book.

But in some cases when you're dealing in rights and copyrights, due to the intricasies of copyright law and what's involved, there can be a business side, but everything having to do with the rights and chain of title and issues regarding the rights that may arise are of a very legal nature, so it's very possible to have a business agreement but to in fact be dealing with a lot of legal issues and providing legal advice, and I believe that -- I shouldn't say I believe -- I know that's the

74

Exhibit-19
311

"not particularly" is because the word "active" is

another one of these -- you know, it's a subjective, so I

say not particularly depending on how one defines

"active."

    Q    Okay.  When to the best of your knowledge was

the Smashbox Entertainment, LLC formed?

    A    I don't remember when it was formed.  I believe

it was about three years ago.

    Q    And what activities, if any, has Smashbox

Entertainment engaged in since its formation?

    A    I believe it was going to be the production

entity for a film project; I don't remember what it was,

and for purposes of the -- I believe one of the guilds --

I think the Writers Guild needed a signatory company.

And it may or may not have been a signatory to the

Writers Guild, but it was ultimately not used as the

production entity.

    Q    Okay.

        Would you mark as Exhibit 13 a document entitled

"Joint Venture Agreement" made as of November 23, 2001.

        (Deposition Exhibit 13 marked.)

        THE WITNESS:  If we are going to go into a more

detailed session, could I just use the restroom before we

do that?

        MR. BERGMAN:  Of course.  Why don't we take a

49

03:09 1    five-minute break.

03:09 2        (Recess.)

03:15 3    BY MR. BERGMAN:

03:15 4        Q    Referring to the last page of Exhibit 13,

03:15 5    Mr. Toberoff, I note that this copy does not bear your

03:15 6    signature.  It bears the Peary and Peavy signatures.

03:15 7        To your recollection did you ever sign a copy of

03:16 8    Exhibit 13?

03:16 9        A    I recall a joint venture agreement that was

03:16 10   signed, I believe -- I recall because I believe that

03:16 11   document was produced, but I don't know -- I would have

03:16 12   to compare this to that document to know whether there

03:16 13   were any changes between the two.

03:16 14       Q    I know that the parties to this agreement are

03:16 15   Ms. Peavy and Mr. Peary on the one hand and Pacific

03:16 16   Pictures Corporation on the other.

03:16 17       Am I correct that you've identified Pacific

03:16 18   Pictures Corporation as a loan-out company?

03:16 19       A    I said I believe as it was initially conceived

03:16 20   in whenever it was in the '80s, that's how I conceived

03:16 21   it:  As a loan-out company.

03:16 22       Q    Well, did the nature of Pacific Pictures'

03:17 23   business ever change from being a loan-out company to

03:17 24   being something else?

03:17 25       A    To determine that, I'd have to know what the

50

U.S. LEGAL SUPPORT

**Exhibit-19**

**313**

1    legal definitions of a loan-out company. When I use the

2    term loan-out company," in the entertainment business

3    when you do -- for example, if you're serving as a

4    producer on a film or a writer, for instance, or a

5    director, most people have a company that they -- which

6    is a sole proprietorship that loans out their services,

7    and I believe that people who do that originally for tax

8    purposes. I'm not sure what the reasons are for that.

9    So I believe when it was initially incorporated, that was

10   the purpose, but then afterwards I would just use Pacific

11   Pictures a lot for anything.

12       Q    Anything that you personally were involved in?

13       A    I would -- yeah, I would tend to use it for most

14   things that I was involved in.

15       Q    Okay.

16       A    So I don't know if at that point it's a loan-out

17   company or just a company.

18       Q    And the address given here for Pacific Pictures

19   Corporation, 23852 Pacific Coast Highway, does that

20   continue to be the address of Pacific Pictures

21   Corporation?

22       A    You mean as registered with the California

23   Secretary of State?

24       Q    Well, as operating in actuality, does Pacific

25   Pictures maintain offices?

51

Exhibit-19

314

A    It's not active since -- I think -- didn't you ask me earlier about Pacific, and I said at the end of 2000 -- -- towards the end of 2003 I stopped using it? So it doesn't -- you know, I guess there is a distinction between a technical office for purposes of registration with the Secretary of State and active offices.  I used to work out of my home in Malibu, and this was the mailing address used for myself and Pacific Pictures.

Q    When was your first communication with either Miss Peavy or Mr. Peary concerning the Joe Shuster interest, if any, in Superman?

MR. WILLIAMSON:  Objection.  Assumes facts not in evidence.  Vague and ambiguous.

THE WITNESS:  Sometime around mid 2001.

BY MR. BERGMAN:

Q    And how did that initial communication come about?

A    Warren Peary -- the last name is P E A R Y -- called me up and -- he called me up.

Q    And what did he say?

A    He said he wanted -- was interested in -- I think he said that he got my name off of some article he had read on the Internet and that he wanted a lawyer to help him to figure out what rights the Joe Shuster estate would have in Superman.

52

Q    And what did you reply?

MR. WILLIAMSON:  Objection.  Attorney-client privilege.  Instruct you not to answer.

(Instruction not to answer.)

MR. BERGMAN:  The Joint Venture Agreement between Pacific Pictures, which Mr. Toberoff has testified is owned wholly by him and is basically a loan-out company, and the Peavy and Peary individuals is a business arrangement.  It is not a legal representation document.  It is on its face a joint venture agreement. There is no privilege applicable to that.  Mr. Toberoff was not retained as an attorney.  He was -- he entered into a joint venture for the purpose of retrieving and enforcing and exploiting all of Joe Shuster's and his estate's rights, claims and copyrights.  Certainly at this point in time that I'm asking Mr. Toberoff about, he was an entrepreneur, not an attorney.

MR. WILLIAMSON:  Objection.  Mr. Bergman, you are completely misstating his testimony, the documents and the record before us.  Whether or not there was a retainer agreement between Mr. Toberoff and Mr. Peary and Miss Shuster is, frankly, irrelevant.  I instruct him not to answer.

BY MR. BERGMAN:

Q    Mr. Toberoff, I'll assume that when

53

**Exhibit-19**

**316**

03:22 1    Mr. Williamson instructs you not to answer, you will

03:22 2    refuse to answer on that basis?

03:22 3         A    Generally, yes.  I -- without waiver -- again,

03:22 4    let me say in any of these areas where we may have a

03:23 5    difference of opinion as attorney-client -- obviously

03:23 6    when you are taking a deposition of an attorney, you can

03:23 7    surmise that there will be a lot of things that are

03:23 8    protected by the attorney-client privilege and by work

03:23 9    product.  To the extent -- I'd like it to be understood

03:2310    that to the extent I am able to give you a general answer

03:2311    to certain questions without revealing the substance of

03:2312    attorney-client communications or work product, I don't

03:2313    want that to be misconstrued or claimed to be a waiver at

03:2314    any point in this deposition of attorney-client privilege

03:2315    or work product doctrine.

03:2316         MR. BERGMAN:  I will not assert such a waiver.

03:2317         THE WITNESS:  So I would just answer generally

03:2318    that Mr. Peary called me with respect to Superman rights,

03:2319    as I already mentioned, and my response was, because it

03:2420    was Superman, was that yes, I would be interested in

03:2421    representing him with respect to that.

03:2422    BY MR. BERGMAN:

03:2423         Q    Did you tell him that you'd be interested in

03:2424    entering into a joint venture with Peary and Peavy in

03:2425    order to exploit their interest?

                                                              54

Exhibit-19

317

MR. WILLIAMSON:  Objection.  Attorney-client privilege --

THE WITNESS:  No, I did not, but other than giving you the basic subject matter, which I've already given you, and why he was calling me, the rest of our communications would be privileged, and they're privileged on the basis that he was obviously seeking legal advice, and I was dispensing legal advice.

BY MR. BERGMAN:

Q    And at what point in time did your activities change from that of rendering legal advice to entering into a joint venture with the Peary and Peavy --

MR. WILLIAMSON:  Objection.  Assumes facts not in evidence.

BY MR. BERGMAN:

Q    -- individuals?

A    It didn't change.

Q    You did enter into a joint venture with them, did you not?

A    I entered into a joint venture agreement with them, yes.

Q    How many communications did you have with either Peary or Peavy from the time of that first conversation until November 23, 2001, the as of date of this joint venture agreement?

55

Exhibit-19

318

03:25 1    A    I don't recall.

03:25 2    Q    What is your best estimate?

03:26 3    A    I don't -- we had at least one, we probably had

03:26 4  more than one, but other than that I don't have a basis

03:26 5  for estimating.

03:26 6    Q    Did you have any face-to-face meetings with

03:26 7  either Peavy or Peary prior to November 23, 2001?

03:26 8    A    No.

03:26 9    Q    Prior to this joint venture agreement, had you

03:26 10 ever entered into a joint venture agreement with a

03:26 11 client?

03:26 12       MR. WILLIAMSON:  Objection.  Vague and

03:26 13 ambiguous.

03:26 14       THE WITNESS:  I don't know what you mean by

03:26 15 that.

03:26 16 BY MR. BERGMAN:

03:26 17   Q    Well, you've testified that you were contacted

03:26 18 and served as a lawyer, and yet, as Exhibit 13

03:26 19 demonstrates, you entered into a joint venture agreement

03:26 20 with them under which you received 50 percent of whatever

03:26 21 their recovery might have been.

03:26 22   A    That misstates the document.

03:26 23   Q    No, it doesn't misstate the document.

03:27 24       Am I correct that paragraph 5 of the agreement

03:27 25 states that any moneys received from enforcement,

                                                      56

Exhibit-19
319

settlement or exploitation of any of the rights -- I'll skip something -- will be shared, divided and payable 50 percent to claimants and 50 percent to PPC?

A    You've -- the words you've read appear there. The document speaks for itself.  I'm playing both the role now of the witness and to a certain extent making objections to your question, but you would have to take -- read the whole paragraph in context to give a fair meaning as to what it says.

Q    Who drafted this agreement?

A    I drafted it.

Q    Okay.  Were the -- was Peary or Peavy represented by an attorney in connection with the negotiation of this agreement?

A    I don't -- I didn't deal with an attorney, but I don't know whether or not they were represented by an attorney, whether they sought outside legal advice regarding the agreement.

Q    Did you suggest to them that they do obtain independent legal advice before entering into the agreement?

        MR. WILLIAMSON:  Objection.  Attorney-client.

        THE WITNESS:  Yes, I did.

BY MR. BERGMAN:

Q    Had there been any prior drafts of this

57

Exhibit-19

320

Word Index

Exhibits

agreement?

    A   I believe so, yes.

    Q   And had Peavy or Peary requested any changes in the prior draft?

    A   I believe so, yes.

    Q   What changes had they requested?

    A   I don't recall the specific changes, but I believe there was more than one draft, and I believe the reason for that is because of comments or revisions by Warren.

    Q   And are you still in possession of those prior drafts?

    A   No.

    Q   What happened to them?

    A   I don't know.  I'm not in possession of them. Otherwise, we would have produced them.

    Q   Have you searched for them?

    A   I searched the files.  I searched Pacific Pictures's files for any documents regarding the Shusters, yes.

    Q   Have you asked the Peary --

    A   I did that in response --

    Q   -- Peary or Peavy individuals whether they had any prior drafts?

    A   Yes.

58

Exhibit-19

321

Q    And am I correct that they did not and that they did not produce any?

A    Yes.  They actually did not even have a copy of the fully signed agreement.  What you're looking at -- I believe they didn't.  To my recollection, I believe this was the only copy that they had still retained, what is Exhibit 13.  This didn't come from my files.  This came from Peavy's and Peary's production in response to the subpoena you served on them.

Q    I note that in paragraph 1 of the Joint Venture Agreement, there is a reference to Superboy.

Did you -- have you at any point in time discussed with the Shuster heirs the conflict between the Siegel position and the Shuster heirs' position regarding Superboy?

MR. WILLIAMSON:  Objection.  Assumes facts not in evidence.  Attorney-client.  Instruct you not to answer.

(Instruction not to answer.)

BY MR. BERGMAN:

Q    Did PPC in fact pay, as provided in paragraph 3, the legal fees and costs of setting up Joe Shuster's estate?

A    I believe so, yes.

Q    Did the Shuster heirs request that PPC receive a

59

STATE OF CALIFORNIA      )
                         ) ss
COUNTY OF LOS ANGELES    )


        I, DAVID S. COLEMAN, a Certified Shorthand

Reporter, do hereby certify:

        That prior to being examined, the witness in the

foregoing proceedings was by me duly sworn to

testify to the truth, the whole truth, and nothing

but the truth;

That said proceedings were taken before me at

the time and place therein set forth and were taken

down by me in shorthand and thereafter transcribed

into typewriting under my direction and supervision;

I further certify that I am neither counsel

for, nor related to, any party to said proceedings,

nor in anywise interested in the outcome thereof.

        In witness whereof, I have hereunto subscribed

my name.


Dated: ___**NOV 3 0 2006**___



_____
DAVID S. COLEMAN
CSR No. 4613

<table>
<tr><td>1</td><td>WEISSMANN WOLFF BERGMAN<br>   COLEMAN GRODIN & EVALL LLP</td></tr>
</table>

1  WEISSMANN WOLFF BERGMAN
      COLEMAN GRODIN & EVALL LLP
2  Michael Bergman (SBN 37797)
   Anjani Mandavia (SBN 94092)
3  Adam Hagen (SBN 218021)
   9665 Wilshire Boulevard, Ninth Floor
4  Beverly Hills, California 90212
   Telephone: (310) 858-7888
5  Fax: (310) 550-7191

6  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
7  James D. Weinberger (Admitted *pro hac vice*)
   866 United Nations Plaza
8  New York, New York 10017
   Telephone: (212) 813-5900
9  Fax: (212) 813-5901

10  PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
11  1711 Route 9D
    Cold Spring, New York 10516
12  Telephone: (845) 265-2820
    Fax: (845) 265-2819

13

14  Attorneys for Defendants and Counterclaimant

15                **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17  JOANNE SIEGEL and LAURA        Case Nos. [Consolidated for Discovery]:
    SIEGEL LARSON,                        CV 04-8400 SGL (RZx)
18                                        CV 04-8776 SGL (RZx)
            Plaintiffs,
19                                 Hon. Steven G. Larson, U.S.D.J.
        vs.                        Hon. Ralph Zarefsky, U.S.M.J.
20  WARNER BROS. ENTERTAINMENT
    INC.; TIME WARNER INC.; DC     **DECLARATION OF WAYNE M.**
21  COMICS; and DOES 1-10,         **SMITH IN SUPPORT OF**
            Defendants.            **DEFENDANTS'**
22  JOANNE SIEGEL and LAURA        **MOTION TO COMPEL**
    SIEGEL LARSON,                 **PRODUCTION OF WHISTLE-**
23                                 **BLOWER DOCUMENTS**
            Plaintiffs,
24        vs.                      **DISCOVERY MATTER**
    TIME WARNER INC.; WARNER       **LOCAL RULE 37**
25  COMMUNICATIONS INC.; WARNER
    BROS. ENTERTAINMENT INC.;      Time: 10:00 a.m.
26  WARNER BROS. TELEVISION        Date: April 16, 2007
    PRODUCTION INC.; DC COMICS;    Courtroom: 540
27  and DOES 1-10,                 Mag. Judge Ralph Zarefsky
            Defendants.            Discovery Cutoff: Nov. 17, 2006
28  AND RELATED COUNTERCLAIMS

I, Wayne M. Smith, declare and state as follows:

1.    I am an attorney, admitted to practice before the Supreme Court of the State of California and before this Court, and am employed by defendant Warner Bros. Entertainment Inc. ("Warner Bros.") as Vice President, Senior Litigation and Chief Patent Counsel. I submit this declaration in support of Defendants' Motion to Compel Production of Whistle-blower Documents. I have personal knowledge of the facts contained within this declaration, and, if called upon as a witness, I could and would testify competently thereto.

2.    During the afternoon of June 28, 2006, I received a telephone call from John A. Schulman, General Counsel of Warner Bros., who asked that I come to his office. Upon arriving at his office, Mr. Schulman advised me that a set of documents (the "Superman Documents") addressed to him and apparently relating to the Siegel litigation had arrived from an anonymous source at his office that day. Mr. Schulman informed me that the cover letter contained with the documents indicated that other executives at Warner Bros. may have received the same set of documents, and that he had called the offices of those executives to see if they had received anything. He further advised me that he had asked those executives to send the documents to his office without reviewing them, and that one set of documents had already been delivered to him. Mr. Schulman handed me the stack (approximately an inch high) of Superman Documents that he had received and asked me to wait outside his office while he completed a meeting, after which we would discuss them. The stack did not include any envelope or packaging in which the documents may have arrived. This was not unusual as it has been my experience that the practice of Mr. Schulman's office staff is to dispose of envelopes and packaging upon opening mail.

3.    While I was waiting, I looked at what might be characterized as the "cover letter" that came with the Superman Documents. The cover letter, which

 1  was not signed, alleged various types of ethical misconduct on the part of the
 2  Plaintiffs' counsel in connection with the Siegel litigations. The cover letter also
 3  asserted ethical misconduct – violating the terms of a confidentiality agreement by
 4  leaking settlement information to the press – in connection with another litigated
 5  matter where Plaintiffs' counsel had also represented a party adverse to Warner
 6  Bros. The letter appeared designed to right wrongs caused by Plaintiffs' counsel's
 7  misconduct. The letter also referenced the documents enclosed, providing an
 8  overview of their contents and their connection to Plaintiffs' counsel's alleged
 9  wrongdoing. I also thumbed through the Superman Documents contained with the
10  letter, but did not read any of them in detail. Meanwhile, an assistant for another
11  Warner Bros. executive delivered what appeared to be another set of Superman
12  Documents to Mr. Schulman's office. I did not observe that any of the three sets of
13  Superman Documents – (i) the set Mr. Schulman handed to me; (ii) the other set in
14  his office; or (iii) the set that was delivered while I was waiting outside his office –
15  was contained in an envelope or other packaging.

16         4.     I then met with Mr. Schulman. I told Mr. Schulman that based on the
17  contents of the cover letter and my brief thumbing through the documents, it
18  appeared that certain of the documents in the package were privileged. I said that
19  before I looked at the documents I wanted to review the case law in the area to
20  determine what level of review, if any, of the Superman Documents was
21  appropriate. Mr. Schulman agreed with this approach, gave me one set of the
22  documents, retained the other two sets that he had received, and advised me that he
23  had only looked at the cover letter that came with the documents and would not
24  review the documents at all.

25         5.     I returned to my office with the set of documents. I initially went on
26  the internet and performed a Google search relating to the issue of what obligations,
27  if any, governed the handling of the Superman Documents we had received. My
28  initial search located an article from the June 2006 Los Angeles Lawyer magazine

1   entitled "On the Receiving End," by Kurt L. Schmalz (a true and correct copy of

2   which is attached as Exhibit "A" hereto) which was posted on the Los Angeles

3   County Bar Association web site.  The article concerns the obligations of lawyers

4   who unwittingly receive privileged documents from opposing counsel's files and

5   discusses various California cases that have dealt with the issue, including the *Rico*

6   *v. Mitsubishi Motors Corporation* case pending before the California Supreme

7   Court.

8        6.    I read the Schmalz article and then downloaded and studied the three

9   principal California cases it identifies: *Aerojet-General Corporation v. Transport*

10  *Indemnity Insurance*, 18 Cal.App.4th 996 (1993), *State Compensation Insurance*

11  *Fund v. WPS, Inc. (State Fund)*, 70 Cal.App.4th 644 (1999) and the Court of Appeal

12  decision in the case under review, *Rico v. Mitsubishi Motors Corporation*, 116

13  Cal.App.4th 51 (2004) (*review granted* June 9, 2004).  Based on my review of the

14  relevant California authorities, it appeared that a conservative approach to handling

15  the Superman Documents was to follow the procedure laid out by the Court in *State*

16  *Fund*, specifically:  (i) to review each document but to cease the review once it

17  became apparent that the document was privileged; (ii) to contact opposing counsel

18  and advise that the documents have been received; and (iii) to refrain from using any

19  information in the documents until there was either an agreement with opposing

20  counsel, or the court had determined the documents' disposition.

21       7.    Following my review of the law, I called Mr. Schulman and advised

22  him of the results of my research.  I said that I intended to review the Superman

23  Documents in accordance with *State Fund*.  At Mr. Schulman's request I also sent

24  copies of the three key cases and the article to Mr. Schulman's office.

25       8.    That evening, I took the Superman Documents home with me and spent

26  approximately a half hour reviewing them.  Certain of the documents – such as

27  executed agreements relating to Superman and correspondence between the

28  Plaintiffs and non-lawyer third parties – did not appear subject to any applicable

**Exhibit-20**

**327**

1  privilege. As I was going through the documents I placed them into three piles: (i)

2  "non-privileged," (ii) "privileged," and (iii) "?" (where either I could not tell

3  whether it was privileged or I believed the document covered subject matter where

4  privilege may have been waived in the case, as explained below). In reviewing each

5  document, where it first appeared to me that it was entirely privileged, I ceased

6  reading it, placed the document in the "privileged" pile and did not look at it further.

7  After going through the documents, I placed a post-it note on the top of each pile

8  (indicating "privileged," "non-privileged," or "?"), and fastened each pile together.

9  I did not look at the documents further. Because I did not conduct a detailed review

10  of the Superman Documents, and because of the passage of time, I do not recall

11  their specific contents. I do, however, recall generally the subject matter of certain

12  of the documents.

13      9.    The non-privileged pile was the second largest of the three. It

14  contained what appeared to be agreements between, *inter alia*, the Siegels and/or

15  Shusters and various entities, as well as correspondence concerning the interest in

16  Superman that might be owned by Plaintiff Laura Siegel's estranged step-brother,

17  Michael Siegel. To my knowledge, this last category of documents has never been

18  produced in the litigation.

19      10.   The "?" pile was the smallest. I believe that one or two of the

20  documents in this category potentially fall within the scope of a privilege waiver

21  based Plaintiffs' reliance on an affirmative defense that their predecessor counsel

22  did not have authority to accept a settlement proposal made by Defendants.

23  Defendants position on this privilege waiver is the subject of a separate Motion to

24  Compel filed concurrently herewith.

25      11.   The pile of documents I labeled "privileged" was the largest.

26      12.   Even from the brief review made, it appeared to me that, with the

27  exception of the cover letter (which also addressed the other litigation involving

28  Plaintiffs' counsel), all of the Superman Documents related to the subject matter of

1 | the instant litigation and were responsive to document requests the Defendants had
2 | previously served on Plaintiffs. However, it did not appear to me at the time that
3 | any of the "non-privileged" documents had been produced in the litigation.
4 | Moreover, at least some (and perhaps virtually all) of the privileged documents, as
5 | well as those in the "?" pile, were, to the best of my knowledge, never identified in
6 | any privilege log served by the Plaintiffs.

7 |      13.    The next morning, June 29, 2006, I returned with the Superman
8 | Documents to see Mr. Schulman in his office. Mr. Schulman and I discussed having
9 | a neutral third party hold the documents pending either the parties' agreement as to
10 | their disposition or order of the Court. We decided to ask John Quinn, then with
11 | Arnold & Porter, and former president of the Los Angeles County Bar Association,
12 | to act as the neutral based on his reputation and legal ethics experience. He agreed
13 | and the following morning, June 30, 2006, the three sets of the Superman
14 | Documents, including the set that I had categorized, were handed over to Mr. Quinn.
15 | Out of an abundance of caution we handed over *all* the documents to Mr. Quinn, not
16 | just those that were clearly or potentially privileged. Further, we have not shared
17 | the contents of the Superman Documents with any of the outside counsel
18 | representing the Defendants in this action, nor have we used the contents of the
19 | documents in the litigation.

20 |      I declare under penalty of perjury of the laws of the United States of America
21 | that the foregoing is true and correct.

22 |      Dated this 26th day of March 2007 at Burbank, California.

23
24
25 | Wayne M. Smith
26
27
28

{F0210-072.4}

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 12, 2010.

---

Selected Entity Name: PACIFIC PICTURES CORPORATION
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | PACIFIC PICTURES CORPORATION |
| **Initial DOS Filing Date:** | AUGUST 26, 1988 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Jan 28, 2009) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.state.ny.us keyword TR-194.1 or by writing to NYS Department of Taxation and Finance, Reinstatement Unit/Bldg-8, Rm #958, W.A. Harriman Campus, Albany, NY 12227 or by telephone at 1-800-972-1233

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

% MAX TOBEROFF
330 EAST 57TH STREET
APT 34A
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate

**Exhibit-21**

of incorporation, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

**# of Shares Type of Stock $ Value per Share**
200            No Par Value

*Stock information is applicable to domestic business corporations.

**Name History**

**Filing Date   Name Type         Entity Name**
AUG 26, 1988  Actual      PACIFIC PICTURES CORPORATION

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New
York State. The entity must use the fictitious name when conducting its activities or business in New
York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                 New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS
Homepage   |   Contact Us   |   Web Feedback

**Exhibit-21**

DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:   (310) 553-6700
Facsimile:   (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
  pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone:  (845) 265-2820
Facsimile:   (845) 265-2819

Attorneys for Plaintiff DC Comics

(continued on next page)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DC COMICS,<br><br>                    Plaintiff,<br><br>          v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**DISCOVERY MATTER**<br><br>**JOINT STIPULATION REGARDING DC COMICS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS AND AMENDED PRIVILEGE LOGS**<br><br>NOTICE OF MOTION AND MOTION, DECLARATIONS OF MATTHEW T. KLINE AND MARC TOBEROFF, AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH<br><br>**Judge**:        Hon. Otis D. Wright II<br>**Magistrate**:  Hon. Ralph Zarefsky<br><br>**Hearing Date**:   February 28, 2011<br>**Hearing Time**:   10:00 a.m. |

and risking inconsistent rulings, this Court can defer its ruling until Judge Wright

determines whether the Third and Sixth Claims and DC's allegations as to "consent

agreements" should be struck.  If the claims are dismissed and/or struck, the

Consent Agreements would not be relevant to DC's other claims, and would not

need to be produced.

### *f.*     **The Consent Agreement Is Proper**

Lastly, DC argues that the Consent Agreement is improper.  It is not, as it is

nothing more than the Heirs' agreement to collectively bargain settlement with DC.

The Consent Agreement in no way "violates" the Copyright Act as asserted

by DC.  *See* Docket No. 147-1 at 9-10.  The section under which DC erroneously

claims "rights," 17 U.S.C. § 304(c)(6)(D), simply provides that a "further grant, or

agreement to make a further grant, of any right covered by a terminated grant is

valid only if it is made after the effective date of the termination," but that an

"agreement for such a further grant may be made between the author or [his heirs]

and the original grantee or such grantee's successor in title, after the notice of

termination has been served."  *See Bourne Co. v. MPL Commc'ns, Inc.*, 675 F.

Supp. 859, 864-65 (S.D.N.Y. 1987) (holding that "[§ 304(c)(6)(D)] does give the

terminated grantee a preferred competitive position" but that "[t]he statute neither

compels the terminating party to negotiate with the terminated grantee, nor forbids

him from negotiating with anyone else" and does not create a "right of first refusal"

or other right); 3 M. Nimmer & D. Nimmer, Nimmer § 11.08[A], n.6 (2010)

(stating that "it is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an

exclusive period of negotiation'").  As noted by another leading copyright

authority, a terminated grantee has "no rights under [§ 304(c)(6)(D)], cannot sue for

failure to comply, and the provision [] does not provide a basis for standing."  3 W.

Patry, *Patry on Copyright,* § 21:18.

By the Consent Agreement, the Heirs did not grant or agree to grant any right

**Exhibit 22**

**333**

covered by a terminated grant.  DC itself alleges that the Consent Agreement

simply "prohibit[s] either family from entering into agreements conveying rights …

without the express approval of all stakeholders in the heirs' rights" (FAC, ¶ 170),

demonstrating that the Consent Agreement is not covered or prohibited by the plain

wording of § 304(c)(6)(D), as a matter of law.

DC's claim that the Consent Agreement is against public policy "even if it is

only the Siegels who can bind the Shusters and vice versa" (*supra* at 23) is

nonsensical.  The Heirs are free to conduct settlement negotiations with DC as they

see fit, and to avoid DC's divisive bargaining tactics by collectively negotiating

with DC.   DC's cited authorities merely recite the well-worn principles that all

clients must give informed consent to a settlement, and the policy that an attorney

cannot settle a case without his clients' consent.  *See Tax Authority, Inc. v. Jackson*

*Hewitt, Inc.*, 187 N.J. 4, 21 (N.J. 2006) (holding that a "majority rules" provision

when multiple clients are represented is invalid); Cal. Rules of Prof'l Conduct 3-

310(D) (2010) (requiring the "informed written consent of each client" for an

"aggregate settlement of claims").  The Consent Agreement requires precisely that

– the consent of the Siegels and Shuster Estate, ***not*** their attorney Mr. Toberoff, to a

settlement of their termination rights with DC.[23]

DC also falsely asserts that the Consent Agreement "show[s] how defendants

illegally parked the Shusters' interest in Superboy with the Siegels."  *Supra* at 6.

DC cites no evidence for its accusations, and its underlying assumption is

erroneous.  Due to a binding 1947 judicial determination that Siegel was the sole

creator of Superboy, the Shuster estate did not serve a statutory termination notice

with respect to Superboy.  *See* Docket No. 148-1 at 17-18.

---

[23] As such, DC's citations to cases such as *Calvert v. Stoner*, 33 Cal. 2d 97, 103
(1948), which stand for little more than the proposition that a "contract providing
that the client may not compromise the suit without the consent of his attorney is
against public policy and void" are misplaced.  The Consent Agreement provides
no such thing.

1      Lastly, DC falsely suggests throughout that Mr. Toberoff hypnotized the

2    Siegels and Shusters into various agreements, including the Consent Agreement.

3    *See, e.g., supra* at 11, 24 ("Toberoff induced the Shuster Heirs," "Toberoff forced

4    the Siegels," "points to conflicts of interests and impermissible constraints on a

5    client's freedom of choice").  The notion that Mr. Toberoff somehow forced his

6    clients into such agreements is rebutted by his ongoing representation of them, after

7    DC maliciously sued and maligned Mr. Toberoff in this lawsuit.  DC's tactics are

8    transparent:  interfere with Mr. Toberoff's representation of the Heirs, and "divide

9    and conquer" the Defendants, to leverage a below-market repurchase of the Heirs'

10    Superman interests.

11             **2.    The Retainer Agreements Are Privileged**

12      In their efforts to intrude upon Mr. Toberoff's longstanding attorney–client

13    relationship with the Heirs, DC insists on his firm's retainer agreements.  The Ninth

14    Circuit has held that, aside from an attorney's fee, which is not privileged, retainer

15    agreements which "reveal the motive of the client in seeking representation,

16    litigation strategy, or the specific nature of the services provided," are protected by

17    the attorney-client privilege.  *Clarke v. American Commerce Nat'l Bank*, 974 F.2d

18    127, 129 (9th Cir. 1992).  The Ninth Circuit clearly distinguishes between routine

19    "fee" information and more substantive information in retainer agreements that

20    constitute privileged attorney-client communications:

21        "The subpoenas quoted above demanded more than the amount of attorney
22        fees and manner of payment. The government sought attorney time records
           describing the services performed by the attorneys, ***retainer agreements***,
23        contracts, ***letters of agreement***, and related correspondence. ***We believe this
           type of demand to be an unjustified intrusion into the attorney-client
24        relationship***.
          ....
25        Accordingly, correspondence between attorney and client which reveals the
           client's motivation for creation of the relationship or possible litigation
26        strategy ought to be protected. Similarly, bills, ledgers, statements, time
           records and the like which also reveal the nature of the services provided,
27        such as researching particular areas of law, also should fall within the
           privilege. On the other hand, ***a simple invoice requesting payment for
28        unspecified services rendered reveals nothing more than the amount of the
           fee and would not normally be privileged***...."

**Exhibit 22**

**335**

Dated:      February 7, 2011              Respectfully Submitted,

                                          O'MELVENY & MYERS LLP


                                          By: /s/ Daniel M. Petrocelli
                                              Daniel M. Petrocelli
                                              Attorneys for Plaintiff DC Comics

Dated:      February 7, 2011              Respectfully Submitted,

                                          TOBEROFF & ASSOCIATES, P.C.


                                          By: /s/ Marc Toberoff
                                              Marc Toberoff
                                              Attorneys for Defendants Mark
                                              Warren Peary, Jean Peavy, Joanne
                                              Siegel, and Laura Siegel Larson

CC1:843915

JOINT STIPULATION RE:
DC COMICS' MOTION TO COMPEL

Exhibit 22
336

**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>                Plaintiff,<br><br>     vs.<br><br>PACIFIC PICTURES CORPORATION,<br>ET AL.<br><br>              Defendants. | CASE NO. CV 10-03633 ODW (RZx)<br><br>ORDER ON PLAINTIFF'S MOTION<br>TO COMPEL (DOCKET NO. 159) |

This matter came before the Court on February 28, 2011, on the motion of Plaintiff to compel production of documents. Plaintiff appeared through its counsel Daniel M. Petrocelli, Matthew T. Kline and Jason H. Tokoro. Defendants appeared through their counsel Marc Toberoff and Keith G. Adams. The Court heard argument of counsel and took the matter under submission. Subsequently, the Court asked for and received supplemental briefing. The Court apologizes to the parties for not being able to adjudicate the matter earlier.

Plaintiff presents a number of issues for decision.

The "consent agreement". The first issue, and the most significant, concerns what Plaintiff labels "consent agreements." By this term Plaintiff means agreements whereby the heirs of Jerome Siegel and Joseph Shuster have promised not to make

**Exhibit-23**

**337**

copyright agreements with Plaintiff, following the sending of notice to terminate the copyrights, without the consent of both groups. Plaintiff demands production of these agreements. The Court accepts Defendants' representation that there is only one document in dispute, other matters having been produced.

This is not the first time that this matter has been brought to court for decision. In the forerunner to this lawsuit, *Siegel v. Warner Bros. Entertainment, Inc.*, CV 04-8400-ODW (RZx), Plaintiff DC Comics also moved to compel production of this document, and the same arguments were made there as are made here. The Siegel defendants, who were the Plaintiffs in *Siegel*, did not produce the consent agreement, arguing that the consent agreement was entitled to protection under a negotiated confidentiality agreement and the settlement process in general, and that the consent agreement was protected by the attorney-client privilege. After Mr. Toberoff described the ways in which he thought the attorney-client privilege protected the document, Judge Larson accepted Mr. Toberoff's representation, made as an officer of the Court, that the consent agreement was protected by the attorney-client privilege. Judge Larson also ruled, moreover, that the consent agreement was protected as part of the settlement process. In these rulings he could not have been clearer:

[DC Comics'] motion is denied.

I will accept Mr. Toberoff's clarification of the [consent agreement] or characterization of the [consent agreement]. I understand without having seen it that defense [sic] received a partial rendering of that [consent agreement] that led them to believe that it was not privileged. I can understand why they brought this motion and I certainly do not fault them for doing that.

However, I will accept Mr. Toberoff's characterization of it as a privileged document, as an officer of the court. I have

**Exhibit-23**

**338**

1  every reason to believe that he is the only person who has access

2  to the underlying privileged document; is fairly and accurately

3  representing that to the Court; and I will rely on that

4  representation.

5  Part of this is motivated simply by the Court's

6  commitment to maintaining the settlement privilege. It was the

7  Court that encouraged you to engage in that settlement effort,

8  and I want to maintain the confidences that were agreed to

9  during that period. So that motion is denied.

10

11 Kline Decl., 724 [Ex. SS, p. 12]:2-19.

12 This Court starts with this point therefore — that the matter has been

13 considered once, and ruled upon. The question is why to rule differently now.

14 Defendants argue that the law of the case protects against disclosure of the

15 consent agreement now. Like most doctrines of preclusion, the law of the case doctrine

16 rests on the desire for finality: one bite at the proverbial apple usually is good enough.

17 *Gonzalez v. Arizona*, 624 F.3d 1162, 1186-87 (9th Cir. 2010). The law of the case doctrine

18 applies when an appellate court makes a ruling that then establishes the law to be followed

19 in the trial court, or on subsequent appeals in the appellate court *U.S. v. Alexander*, 106

20 F.3d 874, 876 (9th Cir. 1997); but the doctrine also has been used as a short-hand

21 description of a trial court's desire to adhere to a ruling previously made, recognizing, of

22 course, a trial court's ability to reconsider a ruling under appropriate circumstances. 18B

23 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.1 at 693-94

24 (2002).

25 Plaintiff asserts, however, that this dispute cannot be shoehorned into the law-

26 of-the-case paradigm, because this is not the same case as *Siegel*. In the usual situation,

27 the law of the case doctrine does apply only within the same case; this is not absolute,

28 however, and the doctrine in fact has been applied in closely-related cases. *Disimone v.*

**Exhibit-23**

**339**

*Browner*, 121 F.3d 1262, 1266-67 (9th Cir. 1997).  From a realistic standpoint, the present case is so closely related as to be considered properly part of the same case as *Siegel* for purposes of application of the law of the case principles.  This case has a different docket number attached to it, and it is true that DC Comics has added the Shuster defendants and Mr. Toberoff himself as a defendant, and created some new theories.  But the issue has never been one of *relevance*, for DC Comics asserted in *Siegel* that the document was relevant to the claims there, and the *additional* parties here are not seeking to uncover something they did not have the opportunity to see in *Siegel*.  Thus, the new claims and new parties are not a basis for saying that automatically DC Comics is entitled to the document now when it was not entitled to it then.  The central issue surrounding the controversy is who controls the copyrights connected with the Superman creations and their iterations, and the various claims and counterclaims all derive from and relate to that issue.  The cases are all before the same judge.  The claims in the present case probably could have been filed as counterclaims and cross-claims, perhaps in supplemental pleadings, in the original case.  The jockeying that led to the filing of this present separate lawsuit should not obscure the reality of these facts.  It is appropriate, under the peculiar facts of these two cases, that applicable rulings made in the original case should govern the outcome here, unless there is some very good reason to change those rulings.

Under such circumstances, the law governing motions for reconsideration is what guides this court.  Under both FED. R. CIV. P. 60 and L.R. 7-18, the Court has the authority to reconsider matters, but generally declines to do so unless there has been a significant error in its prior ruling or the law has changed in the meantime.  The Court perceives neither in this case.

The consent agreement came to light, indeed appears to have been made, in connection with the settlement discussions following the first phase of the trial in *Siegel*, discussions that, as Judge Larson indicated, the Court strongly promoted.  The parties negotiated a confidentiality agreement concerning disclosures made in connection with the settlement discussions.  Via a letter that was headlined "Confidential--For Settlement

**Exhibit-23**

**340**

Purposes Only," Defendant Toberoff, who was and is counsel for the Siegels and Shusters, told Plaintiff that an agreement existed among the Siegels and Shusters not to alienate their rights in "Superman" without the consent of the other, and that those parties had agreed in advance to a formula for sharing the proceeds from any transaction that they did enter into. This letter was sent in the context of the settlement discussions that Judge Larson had encouraged, and that were about to take place.

The confidentiality agreement specifically stated that

> Without limitation, any document that is marked 'Confidential–For Settlement Purposes Only' and is disclosed or produced at or in connection with a Settlement Conference shall be treated as Confidential Settlement Information. Confidential Settlement Information shall not be disclosed to anyone other than the parties, their counsel or the mediator or used in any way, shape or form for any purpose, including impeachment, in any pending or future proceeding in any court, in whole or in part, directly or indirectly, orally or in writing, except as set forth in paragraph 6 below.

Kline Decl. 113-14 [Exhibit K 1-2]. The letter mentioning the consent agreement was marked "Confidential–For Settlement Purposes Only," and the parties agreed that it would not be used for any purpose in any future litigation. (Nevertheless, it appears to be the information upon which Plaintiff alleges its belief in the Complaint that Defendants have entered into a consent agreement.) The present motion addresses the underlying document referred to in the letter; that document was not produced in the prior settlement negotiations. Still, however, it is clear that Judge Larson accepted it as an integral part of the settlement discussions, and Mr. Toberoff states that it was entered into for the very

Exhibit-23

341

Case 2:10-cv-03633-ODW-RZ   Document 209-4   Filed 04/17/12   Page 8 of 74   Page ID #:13662

purpose of negotiating during settlement efforts, a sort of Drysdale-Koufax collective approach to negotiation.

Plaintiff argues that the agreement constitutes an independent wrong because it violates the Copyright Act and, as an independent wrong, cannot be insulated from discovery under the rubric of settlement negotiations.  At oral argument, Plaintiff emphasized a case mentioned in the Joint Stipulation, *Carney v. American University*, 151 F.3d 1090 (D.C. Cir. 1998), cited for this proposition.[1]  In *Carney*, a settlement letter containing evidence of retaliation was held admissible, notwithstanding FED. R. EVID. 408, because retaliation was a wrong independent of the underlying charge of racial discrimination.  A similar if not exactly the same argument about the inability of the settlement process to insulate a non-privileged relevant communication also was made to Judge Larson, *see* Kline Decl. 723 [Exhibit SS 11]:18-22, who nevertheless ruled against production of the agreement.  Moreover, while FED. R. EVID. 408 does not protect the underlying facts of an independent wrong, the argument ultimately is a circular one. Plaintiff *assumes* the consent agreement constitutes an independent wrong and, acting on that assumption, takes the position contrary to the impact of Judge Larson's ruling, that the consent agreement is not protected within the settlement rubric that Judge Larson mentioned.

The Court, however, does not assume that this consent agreement constitutes an independent wrong, or is unlawful.  The statute Plaintiff references, 17 U.S.C. § 304(c)(6)(D), says:

> A further grant, or agreement to make a further grant, of any
> right covered by a terminated grant is valid only if it is made

---

[1]    Plaintiff has misdescribed the facts of *Carney*.  Joint Stipulation 15:12-14; R.T. (February 28, 2011) 47:12-19.  *Carney* did not involve an alleged retaliatory threat to fire the employee, but an alleged retaliatory withholding of additional severance pay to which the employee might have been entitled.  151 F.3d at 1095.

**Exhibit-23**

**342**

after the effective date of the termination.  As an exception, however, an agreement for such a further grant may be made between the author . . . and the original grantee or such grantee's successor in title, after the notice of termination has been served . . . .

There is only one Ninth Circuit case construing this provision, *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005), and the Court does not know that it has the elastic interpretation Plaintiff ascribes to it, or is applicable to the factual situation here.  Insofar as pertinent here, *Milne* held that the original copyright holder, who served the termination notice, did not need to wait for the effective date of the termination before entering into a new agreement with the existing grantee of copyright rights.  The *Milne* Court explained that this portion of the statute thus gave the original grantee a favored position, because third parties could not traffic in future interests, but the original grantee could.  430 F.3d at 1047.  *Milne* does not address the situation where the original creators (or their heirs) agree to negotiate together, and do not grant future interests to anyone.  Indeed, *Milne* may well foreshadow the opposite:

Even assuming that Congress intended such a "moment of freedom" between a contractual revocation and re-grant of rights, we note that Christopher's ability to exercise his perceived termination right gave him all the freedom he needed to refrain from entering into a new grant of copyright rights to SSI.

430 F.3d at 1048.  It may be that, if one party can refrain from negotiating with the current grantee, two creators can also agree to refrain from negotiating with the current grantee, except on terms acceptable to both.

Exhibit-23

343

One cannot know with certainty what the consent agreement means without seeing the agreement, and even then it may well be open to differing interpretations. The Court does not accept the argument, however, that simply because Plaintiff *avers* that Defendants have entered into an illegal agreement, that the agreement is, in fact, illegal. Simply calling it illegal does not make it so. Discoverability, on the theory that the existence of the agreement makes Rule 408 inapplicable, cannot turn on whether Plaintiff ultimately proves to be right in its characterization.

In short, Plaintiff called the agreement unlawful in *Siegel*, but did not persuade Judge Larson of that fact. The Court will not re-visit that issue just for the purpose of having that issue re-visited.

Nor will the Court re-visit Judge Larson's ruling that the attorney-client and related privileges protect the consent agreement. It is true that Judge Larson accepted Mr. Toberoff's representation on this point, but Judge Larson did not rule on the basis of simply having heard the incantation "attorney-client privilege." Rather, Judge Larson ruled after Mr. Toberoff described in some detail some facts about the consent agreement, indicating why he claimed the consent agreement was privileged:

> Your Honor, this is absolutely a privileged communication, attorney-client privilege, joint interest privilege, as a communication between parties with an interest in litigation and attorney-work product. The document was signed by me summarizing discussions between my clients. There's no way this document would not be protected by the attorney-client privilege.
>
> The document was written a week before the settlement mediation solely for the purposes of advancing settlement. It reflects discussions between myself and my clients regarding settlement and settlement strategy.

**Exhibit-23**

**344**

* * *

    . . . I wrote a letter, 'settlement, for confidential purposes only,' and in there I talked about this communication because it bore on — it was a discussion between my clients regarding settlement, and I gave some of the results of that. Based on that, they are demanding the underlying communication.

    * * *

    I'll say this: The letter that I sent [that is, the letter that mentions the consent agreement] does not describe every aspect of this communication [the consent agreement], nor does it attach the communication. It describes some of the results of the communication as it bears on settlement.

    The communication is signed by me. It is signed by me, and it refers to discussions that I had with my clients regarding settlement. How that cannot be privileged, I do not know. Even if it had not been signed by me but merely reflected a communication between two parties with an interest in litigation regarding settlement or regarding settlement strategy, that would be protected by the joint interest privilege.

Kline Decl. 718 [Exhibit SS 6]:22-719 [Exhibit SS 7]:7; 720 [Exhibit SS 8]:6-11; 722 [Exhibit SS 10]:14-25. Again, there is no basis to revisit that ruling, unless something has transpired since to cause a change.

    Plaintiff asserts that Defendants have waived the privilege, but the Court does not agree. Plaintiff first says that, by describing the agreement, Defendants have waived any attorney-client privilege, but that argument necessarily was implicitly rejected by Judge Larson. This Court agrees with that rejection. After all, a party is required to disclose something of the substance of an agreement even just to list it in a privilege log.

**Exhibit-23**

**345**

(Indeed, as to other matters at issue on this motion, Plaintiff asserts that materials withheld under a claim of privilege should be described more fulsomely.)  It is not the mere existence of the agreement, or the portions of it that have been referred to, that constitutes a waiver; waiver is a matter of intent, and the Court will not infer intent simply by the description of the agreement here.

Plaintiff also argues that by referring to the consent agreement in this litigation, Defendants have waived the attorney-client privilege.  Again, the Court does not agree.  Plaintiff first raised the agreement in its pleading by innuendo and, as indicated, its knowledge appears to derive from a letter that was protected during the settlement negotiations.  Defendants have thereafter referred to the agreement in this lawsuit.  In the Court's view, Defendants do not waive the privilege by defending themselves.

Plaintiff argues that discovery had closed in the prior lawsuit when it learned of the consent agreement, and that this too is a difference between the two cases, so that this Court should rule differently.  In the *Siegel* litigation, however, Plaintiff asserted that the Siegel defendants were obligated to produce the consent agreement pursuant to two Requests to Produce, Nos. 59 and 63, Kline Declaration 708 [Exhibit QQ]; 721 [Exhibit SS]:7-10.  The continuing obligation to supplement responses existed, notwithstanding the close of discovery.  Again, moreover, this is a difference only because Plaintiff makes it one.  Judge Larson knew the state of discovery and that Plaintiff had just learned of the existence of the agreement.  With that knowledge, he did not extend discovery and, in fact, he ruled that the matter was protected under the rubric of the settlement discussions and the attorney-client and related privileges.

Therefore, Judge Larson having previously decided that the "consent agreement" in issue was protected and need not be disclosed, and the Court finding no error of law or misunderstanding on the Court's part and therefore no reason to reconsider the prior ruling, the Court rules that the consent agreement need not be disclosed here.  The motion to compel is denied as to this document.

**Exhibit-23**

**346**

1           <u>The Retainer Agreements and Related Documents</u>.  The retainer agreements

2   are not privileged unless, in fact, they contain privileged information.  Plaintiff says that

3   it needs to see the agreements to ascertain the date on which Mr. Toberoff began to

4   represent the clients.  The date of the retainer agreement itself is not privileged, nor is the

5   date on which Mr. Toberoff performed services.  But, insofar as the description of the

6   services to be provided reflect advice given, the descriptions are privileged.  Accordingly,

7   the motion to compel is granted as to this request, but Mr. Toberoff may submit redacted

8   copies of his retainer agreements, redacting privileged information.

9

10          <u>Michael Siegel documents</u>.

11          a.     July 11, 2003 letter.  Although Defendants are somewhat cryptic about

12  this letter, nevertheless the record establishes that they asserted privilege as to the letter

13  during the prior litigation, a designation that was upheld by this Court.  Plaintiff points to

14  nothing to demonstrate that the prior ruling was incorrect; Plaintiff simply wants to see the

15  document still.  The Court sees no basis for re-visiting the prior decision.

16

17          b.     Other Michael Siegel documents.  Plaintiff seeks production of 11

18  documents between counsel for Michael Siegel and Mr. Toberoff, who was counsel for

19  Joanne Siegel and Laura Siegel Larson.  Mr. Toberoff states in his portion of the Joint

20  Stipulation that five of those documents do not exist, and the Court accepts that

21  representation.  Mr. Toberoff's claim that the joint defense privilege applies to the balance

22  of the documents, because they were created at a time after Michael Siegel had died and

23  when, by operation of law, Laura Siegel Larson was his sole heir, cannot be evaluated in

24  a vacuum.  Regrettably, the Court orders Mr. Toberoff to deliver the remaining six

25  documents for *in camera* inspection, within seven days.  Within that same seven day

26  period, either side may submit a further memorandum, not to exceed 10 pages in length,

27  assessing the argument that the joint defense privilege applies as a result of Michael

28  Siegel's death.

**Exhibit-23**

**347**

c.   The remaining Michael Siegel documents.  Plaintiff requests that the Court order Defendants to expand on their privilege log as to the other Michael Siegel documents.  The form of the privilege log, however, has been found satisfactory by the Court of Appeals, *see In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992); *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989), and the Court does not see any basis here for any further elaboration.

Documents Referred to in the so-called Toberoff Timeline.  Plaintiff refers to two documents that were identified in the so-called Toberoff Timeline, and that have not been produced or logged, a May 13, 2003 letter from Michael Siegel to Ms. Larson, and a July 5, 2003 letter from Ms. Larson to Michael Siegel.  Joint Stipulation at 37.  As to the latter, Defendants respond that the document does not exist.  Joint Stipulation at 71 n.26.[2] The Court finds no response as to the May 13, 2003 letter.  Accordingly, as to this letter, within seven days Defendants shall either (a) produce it to Plaintiff; or (b) submit a verified further response to Plaintiff indicating that it does not exist or, if it already has been produced, identifying it by Bates number or other identifying mark.

The Dennis Larson documents.  There is no real dispute as to these documents; Defendants do not object to turning them over but, since they involve matters

---

[2]   At oral argument, Plaintiff stated as to this footnote:  "That's not what the footnote says.  And, you know, I was troubled when he said that because I didn't want to have misrepresented anything to the court.  But the footnote says that he was unable to match up the July 13, 2000--excuse me, the July 5, 2003 letter.  It does not say it does not exist.  Now, if it doesn't exist, it doesn't exist."  R.T. (February 28, 2011) 45:4-9.  In the Joint Stipulation, Defendant says:  "The Timeline refers to numerous documents that do not exist, and were thus not included in the stolen documents enclosed with the Timeline."  Joint Stipulation at 71:25-26.  The accompanying footnote lists as the third document the July 5, 2003 letter.  The footnote goes on to say that Defendants were unable to identify a document that matched the description of a July 5, 2003 letter from Laura Siegel to Michael Siegel.  When Defendants say that a document that Plaintiff thinks exists does not exist because Defendants were unable to match up any document with the description that Plaintiff gave them, the Court accepts that representation as a representation that the document does not in fact exist so far as Defendants know.

**Exhibit-23**

**348**

concerning one of the defendants' divorce, they want them protected. The Court does not understand why this portion of the dispute could not have been resolved out of court. The documents shall be produced but shall not be used outside of this litigation and, if filed in connection with any pretrial matter save a dispositive motion, shall be filed under seal, absent agreement of the parties. Any protection that is sought for these documents in connection with a dispositive motion or at trial must be sought separately from the judicial officer who will preside at those proceedings.

Format of Privilege Logs. The privilege log format approved in *Dole v. Milonas, supra,* and *In re Grand Jury Investigation, supra*, often can be acceptable; indeed, it was acceptable in *Siegel* and the Court believes it is acceptable with respect to the Michael Siegel documents, as indicated above. It is not the only acceptable format, however, and the parties, in their pre-hearing negotiations, appeared to reach agreement on this part of the issue, although circumstance prevented their reaching full agreement. While the descriptions in the log could be more fulsome, the Court is not persuaded that they must be so, and the Court sees no strong reason for requiring Defendants to recharacterize over 2,000 documents. The main argument circles back to whether the consent agreement, and related documents, which comprise some of the documents listed on the log, are discoverable. The Court has held that they are not required to be disclosed, which moots the argument to a certain extent. The Court also is wary of requiring characterizations of the documents; either the characterizations must be so generic as to not be much different from what is listed — "litigation update" or "litigation strategy" or "discussing case" do not tell much — or, by being more specific, they may well in fact disclose protected material. The Court will not foreclose the parties from reaching agreement among themselves, as they appeared near to doing, on a protocol that both sides will follow. Absent such agreement, however, the Court is satisfied that the log complies with Ninth Circuit law and need not be expanded.

**Exhibit-23**
**349**

Plaintiff's motion is granted in part and denied in part, as set forth in the foregoing discussion.  Defendants' request for sanctions is denied.

The matters placed under seal will remain under seal.

The Court sustains Plaintiff's objection to matters in the ordered Supplemental Brief that exceeded the scope of the Court's order.  The Court did not consider such matters.

IT IS SO ORDERED.

DATED:  April 11, 2011

_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE

- 14 -

Exhibit-23
350

1  Marc Toberoff (State Bar No. 188547)
     *mtoberoff@ipwla.com*
2  Keith G. Adams (State Bar No. 240497)
     *kgadams@ipwla.com*
3  TOBEROFF & ASSOCIATES, P.C.
   2049 Century Park East, Suite 3630
4  Los Angeles, California, 90067
   Telephone:  (310) 246-3333
5  Fax:         (310) 246-3101

6  Attorneys for Defendants Mark Warren
   Peary, as personal representative of the
7  Estate of Joseph Shuster, Jean Adele Peavy
   and Laura Siegel Larson

8

9              **UNITED STATES DISTRICT COURT**

10     **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

11  DC COMICS,                          | Case No: CV 10-03633 ODW (RZx)
                                         |
12              Plaintiff,              | Hon. Otis D. Wright II, U.S.D.J.
                                         | Hon. Ralph Zarefsky, U.S.M.J.
13     vs.                               |
                                         | **DEFENDANTS' OPPOSITION**
14  PACIFIC PICTURES CORPORATION;        | **TO DC COMICS' MOTION FOR**
    IP WORLDWIDE, LLC; IPW, LLC;         | **REVIEW OF MAGISTRATE**
15  MARC TOBEROFF, an individual;        | **ZAREFSKY'S APRIL 11, 2011**
                                         | **ORDER ON PLAINTIFF'S**
16  MARK WARREN PEARY, as personal       | **MOTION TO COMPEL**
    representative of the ESTATE OF      | **PURSUANT TO FED. R. CIV. P.**
17  JOSEPH SHUSTER; JEAN ADELE           | **72(A) AND L.R. 72-2.1**
    PEAVY, an individual; JOANNE         |
18  SIEGEL, an individual; LAURA         | *Declaration of Keith G. Adams and*
    SIEGEL LARSON, an individual,        | *[Proposed] Order filed concurrently*
19  and DOES 1-10, inclusive,            |
                                         | Complaint filed:  May 14, 2010
20              Defendants.              | Trial Date:        None Set
                                         |
21                                       | Hearing Date:  May 23, 2011
                                         | Hearing Time:  1:30 p.m.
22                                       | Courtroom:      11

23

24

25

26

27

28

**Exhibit-24**

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW  **351**

Here, DC begins by disparaging the 2001 and 2003 Pacific Pictures Agreements and the 2002 IP Worldwide Agreement.  Mot. at 2-3.  DC omits that these benign agreements were voluntarily produced in *Siegel* by the Heirs and expired in 2004 and 2005.  *See* Declaration of Matthew Kline (Docket Nos. 161-163; "Kline Decl."), Exs. LL-OO; Docket No. 146-1 at 18-22.  Pacific Pictures Corp. no longer even exists, and IP Worldwide, LLC has been inactive for years.  *See* Docket No. 146-2, ¶ 7; No. 145-2, Ex. B at 45:6-15; No. 145-6, Ex. CC at 6.

As DC is well aware, for nearly seven years since filing *Siegel* in 2004, Mr. Toberoff has been litigating these cases on behalf of the Heirs pursuant to ordinary legal retainer agreements that also have been produced to DC.  *See* Order at 11:1-8.[1]

Defendants have explained on no fewer than *five* occasions that the Pacific Pictures Agreements did not transfer the Shuster Heirs' termination interest.  *See* Docket No. 33 at 13:20-14:9 ("Thus, as a matter of law, neither the PPC agreements nor the Shuster Executor could transfer his termination interest prior to the October 26, 2013 termination date."), No. 80 at 13:22-14:11 (same), No. 148-1 at 13:22-14:11 (same), No. 103 at 8:8-22 ("[T]he Pacific Picture Agreements could not and did not transfer the Shuster Executor's termination rights or prospective termination interests."), No. 191 at 8:8-22 (same).  DC nonetheless still erroneously contends that the Pacific Pictures Agreements "effectively transferr[ed] 50% ownership in the Shusters' rights to Pacific Pictures" (Mot. at 2), and distorts Defendants' explanation of the relevant law as an "admission" that "these consent agreements violated federal law" or were somehow "illegal."  Mot. at 2, 7.

### 2.     The "Consent Agreement" and Its Improper Disclosure by DC in Willful Breach of a Confidentiality Agreement

#### a.     *The Consent Agreement Is Proper*

DC then claims that Defendants "also entered into at least one more consent agreement in 2008."  Mot. at 3.  As DC is well aware, there is only one such "consent

---

[1] Defendants offered to produce these retainer agreements voluntarily, provided that DC agrees to do likewise at the appropriate juncture.  Kline Decl., Ex. Z.  DC refused.

agreement": a 2008 "collective bargaining agreement" between the Siegel and the Shuster Heirs as to their settlement strategy (the "Consent Agreement").

Magistrate Zarefsky specifically rejected DC's argument that the Consent Agreement was "illegal" and therefore discoverable, as "the argument is ultimately a circular one" and "[s]imply calling it illegal does not make it so." Order at 6, 8. The Consent Agreement was specifically and properly entered into by the Heirs in anticipation of a Court-ordered mediation to articulate, as Magistrate Zaresky aptly put it, a "Drysdale-Koufax collective approach to negotiation." *Id.* at 6. There is nothing improper about this. As Magistrate Zarefsky stated, "if one party can refrain from negotiating with the current grantee [DC], two creators can also agree to refrain from negotiating with the current grantee, except on terms acceptable to both." *Id.* at 7. *See Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 581 (9th Cir. 1987) (approving settlement agreement providing for third-party consent); *see also* Docket No. 196-2/3, Ex. D at Exs. H (at 9225), J (at 6918), K (at 10018) (Warner Bros.' agreements providing that licensee may not settle claims against it without Warner's consent).

Nor does the Consent Agreement "violate" the Copyright Act, as repeatedly asserted by DC without any basis. The statute under which DC erroneously claims "rights," 17 U.S.C. § 304(c)(6)(D) (*see, e.g.,* Mot. at 9), provides no rights or standing to DC. It simply states that a "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination," and that an "agreement for such a further grant may be made between the author or [his heirs] and the original grantee or such grantee's successor in title, after the notice of termination has been served." This, at best, provides DC with a competitive advantage, not a "right of first refusal," "[n]or does the statute provide for an exclusive period of negotiation." *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 864-65 (S.D.N.Y. 1987) (rejecting arguments that § 304(c)(6)(D) provided an "exclusive period of negotiation" or "right of first refusal" and holding that "[t]he statute neither compels the terminating party to

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

**Exhibit-24**

**353**

Case 2:10-cv-03633-ODW-RZ   Document 493-4   Filed 07/30/12   Page 52 of 76   Page
ID #:30684
Case 2:10-cv-09633-ODW-RZ   Document 291-3   Filed 05/02/12   Page 2 of 76   Page ID
#:16184

negotiate with the terminated grantee, nor forbids him from negotiating with anyone
else"); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.08[A], n.6 (2010)
(stating that "it is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an
exclusive period of negotiation'"). Had Congress intended to create the federal right
invented by DC it would have had to do so expressly. *See Gonzaga Univ. v. Doe*,
536 U.S. 273, 290 (2002) ("If Congress wishes to create new rights … it must do so
in clear and unambiguous terms.").[2]

In the Consent Agreement, the Heirs did <u>not</u> "grant, or agree[] to make a
further grant, of any right covered by a terminated grant" in violation of §
304(c)(6)(D). DC itself alleges that the Consent Agreement simply "prohibit[s]
either family from entering into agreements conveying rights … without the express
approval of all stakeholders in the heirs' rights" (FAC, ¶ 170), and such an agreement
is clearly not covered or prohibited by the plain wording of § 304(c)(6)(D).

DC falsely claims that *Milne v. Stephen Slesinger, Inc.,* 430 F.3d 1036 (9th Cir.
2005) held that "§ 304(c)(6)(D) gives DC a right 'in the nature of a right of 'first
refusal.'" Mot. at 9. As Magistrate Zarefsky correctly found, *Milne* establishes no
such "right," and "may well foreshadow the opposite." Order at 7, quoting *Milne*,
430 F.3d at 1048 ( "[W]e note that [the terminating heir's] ability to exercise his
perceived termination right gave him all the freedom he needed to refrain from
entering into a new grant of copyright rights to the [terminated original grantee].").
*Milne* merely states that "section 304(c)(6)(D) … give[s] the original grantee a
competitive advantage over third parties…." *Id.* at 1047-48. As Magistrate Zarefsky
noted, "*Milne* does not address the situation where the original creators (or their
heirs) agree to negotiate together" (Order at 7), as here.

Section 304(c)(6)(D) does not mandate that the Heirs negotiate first with DC,

---

[2] *See Chappell v. Robbins*, 73 F.3d 918, 923 (9th Cir. 1996) (a "clear statement" by
Congress is required); *Milne*, 430 F.3d at 1048 ("[I]f Congress intended to require a
'moment of freedom,' it would have clearly said so."); *Bourne*, 675 F. Supp. at 865 n.11
(noting that Congress did not mandate in "the statute or the legislative history" that "a grant
is valid only if *negotiated* after the termination date").

**Exhibit-24**

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

or permit DC to match their offers from third parties, which is what a "right of first refusal" entails.  DC's entire Third and Sixth Claims for relief in its complaint are erroneously premised on the false construct that § 304(c)(6)(D) provides DC with a "substantive right," which it does not.  *See Bourne*, 675 F. Supp. at 864-65.  As DC has no substantive right under § 304(c)(6)(D), there is no basis for its Third and Sixth Claims premised thereon.  *See* 3 W. Patry, *Patry on Copyright,* § 21:18 (a terminated grantee has "no rights under [§ 304(c)(6)(D)], cannot sue for failure to comply, and the provision [] does not provide a basis for standing").

Lastly, while DC argues that the Consent Agreement "violate[s] law and public policy" (Mot. at 8-9), the authorities it cited merely restate the well-worn principle that an attorney cannot settle a case without his clients' informed consent.  *See Tax Authority, Inc. v. Jackson Hewitt, Inc.*, 187 N.J. 4, 21 (2006) (holding that a "majority rules" provision when multiple clients are represented is invalid); Cal. Rules of Prof'l Conduct 3-310(D) (2010) (requiring the "informed written consent of each client" for an "aggregate settlement of claims"); *Calvert v. Stoner*, 33 Cal. 2d 97, 103 (1948) (requiring attorney's consent for settlement invalid as against public policy).  In accordance with the law the Consent Agreement does not require consent of the Heirs' attorney to any settlement with DC.  While DC tries to salvage its Third and Sixth Claims, there is nothing "unlawful" about the Consent Agreement, and no basis for its frivolous claims, or for further discovery thereof.

b.    *DC's Disclosure of the Consent Agreement in Willful Breach of a Negotiated JAMS Confidentiality Agreement*

Before the Court ruled on summary judgment in *Siegel,* the parties discussed mediating settlement before a JAMS mediator.  *See* Declaration of Marc Toberoff (Docket No. 164; "Toberoff Decl."), Ex. E.  After Judge Larson issued his order upholding the Siegel Heirs' termination, he ordered the parties to participate in settlement discussions.  *Siegel,* 542 F. Supp. 2d at 1145; Toberoff Decl., Ex. F.  In advance of the court-ordered mediation, the parties and their counsel carefully

**Exhibit-24**

**355**

DEFENDANTS' OPPOSITION TO F.R.C.P. 72 MOTION FOR REVIEW

Dated:  May 2, 2011

RESPECTFULLY SUBMITTED,

_____
Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants-Petitioners,
Mark Warren Peary, as personal
representative of the Estate of Joseph
Shuster, Jean Adele Peavy, and Laura
Siegel Larson

**Exhibit-24**

**356**

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:    (310) 246-6779

7   PATRICK T. PERKINS (admitted *pro hac vice*)
      pperkins@ptplaw.com
8   PERKINS LAW OFFICE, P.C.
    1711 Route 9D
9   Cold Spring, NY 10516
    Telephone:  (845) 265-2820
10  Facsimile:    (845) 265-2819

11  Attorneys for Plaintiff DC Comics

12
13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15  DC COMICS,                          Case No. CV 10-03633 ODW (RZx)

16              Plaintiff,              **[PROPOSED] ORDER GRANTING
                                        DC COMICS' MOTION FOR
16                                      REVIEW OF MAGISTRATE'S
17          v.                          ORDER ON PLAINTIFF'S
                                        MOTION TO COMPEL
18  PACIFIC PICTURES                    PURSUANT TO FED. R. CIV. P.
    CORPORATION, IP WORLDWIDE,          72(A) AND L.R. 72-2.1**
19  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          Hon. Otis D. Wright II
20  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,
21  JEAN ADELE PEAVY, an individual,
    JOANNE SIEGEL, an individual,
22  LAURA SIEGEL LARSON, an
    individual, and DOES 1-10, inclusive,
23
            Defendants.                 **DENIED**
24
25
26
27
28
                                        [PROPOSED] ORDER GRANTING DC
                                        COMICS' MOT. FOR REVIEW OF
                                        MAGISTRATE'S ORDER

Denied by
Order of
The Court

**Exhibit 25**
357

1    Good cause appearing, IT IS HEREBY ORDERED that plaintiff DC

2    Comics' Motion For Review Of Magistrate's Order On Plaintiff's Motion To

3    Compel Pursuant To Fed. R. Civ. P. 72(a) And L.R. 72-2.1 is GRANTED; and that

4    defendants are hereby ordered:

5         1. To produce to DC all consent agreements and related documents

6    (including drafts of the agreements and communications regarding their contents),

7    including the document or documents identified in entries 2157 and 2165 of

8    defendants' privilege log.

9         2. To produce to DC the letter from Laura Siegel Larson to Michael Siegel

10   identified in the Toberoff Timeline dated on or around July 11, 2003, and the

11   documents identified in entries 715 and 716 of defendants' privilege log.

12        3. To review all files in defendants' possession, custody, or control

13   (including any files obtained from Michael Siegel and/or Don Bulson) for any

14   unproduced documents from June or July 2003 involving Michael Siegel, Don

15   Bulson, Laura Siegel Larson, and/or Joanne Siegel, and to either submit a sworn

16   verification that no such documents exist, or if such documents do exist, to produce

17   them to DC.

18        4. To amend the "Document Description" category in defendants' privilege

19   logs to provide descriptions of the actual content of the withheld documents,

20   including, but not limited to, identifying all communications involving consent

21   agreements, retainer agreements, and offers to acquire the Siegel and/or Shuster

22   heirs' rights.

23        5. To amend the "Identity of Recipient(s)" category in defendants' privilege

24   logs to identify who is a "to," "cc," or "bcc" to the withheld communications, or if

25   the recipient received the communication by other means.

26        6. To amend their privilege logs to identify all attachments and/or separate

27   communications in a chain of communications as separate entries.

28

[PROPOSED] ORDER GRANTING DC
COMICS' MOT. FOR REVIEW OF
MAGISTRATE'S ORDER

**Exhibit 25**

**358**

1    Defendants are ordered to produce all such documents by no later than May

2    27, 2011.

3

4    IT IS SO ORDERED.

**DENIED** BY ORDER
OF The Court

5

6    Dated:   5/23/11

7    _____
     Honorable Otis D. Wright II
     Judge, United States District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING DC
COMICS' MOT. FOR REVIEW OF
MAGISTRATE'S ORDER

**Exhibit 25**

**359**

ORIGINAL

# In The Matter Of:

## *DC COMICS*
### *v.*
## *PACIFIC PICTURES CORPORATION*

---

## *PEARY, MARK WARREN - Vol. 1*

### *June 29, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**Exhibit-26**

```
 1                Videotaped deposition of MARK WARREN PEARY,

 2     taken on behalf of the Plaintiff, at 1999 Avenue of

 3     the Stars, Los Angeles, California, commencing at

 4     10:28 a.m., WEDNESDAY, JUNE 29, 2011, before SHANDA

 5     GABRIEL, CSR No. 10094.

 6

 7     APPEARANCES:

 8     FOR THE PLAINTIFF:

 9             O'MELVENY & MYERS LLP

10             BY:  DANIEL M. PETROCELLI, ESQ.

11                  MATTHEW T. KLINE, ESQ.

12                  JASON TOKORO, ESQ.

13             1999 Avenue of the Stars

14             7th Floor

15             Los Angeles, California  90067-6035

16             (310) 553-6700

17

       FOR THE DEFENDANTS:
18
               TOBEROFF & ASSOCIATES
19
               BY:  MARC TOBEROFF, ESQ.
20
               2049 Century Park East
21
               Suite 3630
22
               Los Angeles, California  90067
23
               (310) 246-3333
24

25     ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER
```

**Exhibit-26**

**361**

| | | |
|---|---|---|
| 1 | MR. TOKORO: Jason Tokoro for plaintiff DC | 10:29:57 |
| 2 | Comics. | 10:29:59 |
| 3 | MR. TOBEROFF: Marc Toberoff for defendants | 10:30:00 |
| 4 | Laura Siegel Larson and Mark Warren Peary. | 10:30:03 |
| 5 | THE VIDEOGRAPHER: Our court reporter today | 10:30:06 |
| 6 | is Shanda Gabriel of Merrill. Would the reporter | 10:30:09 |
| 7 | please swear in the witness. | 10:30:11 |
| 8 | | 10:30:12 |
| 9 | MARK WARREN PEARY, | 10:30:12 |
| 10 | having been first duly sworn, was | 10:30:12 |
| 11 | examined and testified as follows: | 10:30:12 |
| 12 | | 10:30:19 |
| 13 | THE VIDEOGRAPHER: Please begin. | 10:30:19 |
| 14 | | 10:30:19 |
| 15 | EXAMINATION | 10:30:19 |
| 16 | BY MR. PETROCELLI: | 10:30:19 |
| 17 | Q. Good morning, Mr. Peary. | 10:30:21 |
| 18 | A. Good morning. | 10:30:24 |
| 19 | Q. We're starting at 10:30 rather than the | 10:30:25 |
| 20 | noticed time of 9:30 because Mr. Toberoff informed | 10:30:27 |
| 21 | me this morning of car problems. So we'll probably | 10:30:33 |
| 22 | have to go later than anticipated but hopefully | 10:30:38 |
| 23 | we'll get through this today. | 10:30:42 |
| 24 | Marc, all the defendants' counsel were | 10:30:43 |
| 25 | noticed for the deposition. The other counsel is | 10:30:50 |

Page 16

1      Q.  Oh, the university?                          10:37:20

2      A.  It's a branch of the university.            10:37:21

3      Q.  Okay.  Now, what about your employment?     10:37:23

4   Can you briefly trace it for me?                   10:37:26

5      A.  I've been doing investment work.            10:37:28

6      Q.  I saw from your prior -- your deposition in 10:37:31

7   the Siegel case that you have a two-year degree from 10:37:35

8   I think it's Texas El Paso.                         10:37:39

9          Is that right?                              10:37:39

10     A.  Yes.                                         10:37:39

11     Q.  And you went there right out of high        10:37:42

12  school?                                            10:37:44

13     A.  Yes.                                         10:37:45

14     Q.  And so what have you been doing             10:37:46

15  occupationally from the time you left college, Texas 10:37:49

16  El Paso, to the present?                            10:37:53

17     A.  You want everything I've done or just --    10:37:55

18     Q.  If you can summarize it that would be       10:37:58

19  helpful.                                           10:38:00

20     A.  Summarize it.                               10:38:00

21         I've done a lot of different things.  I     10:38:03

22  built --                                           10:38:05

23     Q.  Can you do it in chronological order for    10:38:05

24  me?                                               10:38:08

25     A.  I can try.                                   10:38:08

Merrill   Corporation   -   Los Angeles
800-826-0277                          www.merrillcorp.com/law

**Exhibit-26**

**363**

Page 17

| | | |
|---|---|---|
| 1 | Q.  Sure. | 10:38:09 |
| 2 | A.  I built homes for a time and sold real | 10:38:11 |
| 3 | estate for a time. | 10:38:14 |
| 4 | Q.  While living in -- | 10:38:18 |
| 5 | A.  In El Paso. | 10:38:18 |
| 6 | Q.  -- in El Paso? | 10:38:20 |
| 7 | A.  Yes.  And -- and then I -- I -- I had a | 10:38:27 |
| 8 | stint selling insurance as well and then I -- I got | 10:38:33 |
| 9 | involved in trading and investing at a later time. | 10:38:40 |
| 10 | Q.  Trading and investing in what? | 10:38:47 |
| 11 | A.  Yes.  I started off in trading futures. | 10:38:48 |
| 12 | Q.  Commodities? | 10:38:55 |
| 13 | A.  Yes.  And then later on branched out more | 10:38:56 |
| 14 | into equity investments and that type of thing and | 10:39:04 |
| 15 | that's been my primary activity for quite a few | 10:39:08 |
| 16 | years. | 10:39:11 |
| 17 | Q.  To the present? | 10:39:11 |
| 18 | A.  Yes. | 10:39:12 |
| 19 | Q.  And you've also written some books from | 10:39:14 |
| 20 | time to time? | 10:39:17 |
| 21 | A.  Yes. | 10:39:17 |
| 22 | Q.  How many books have you authored? | 10:39:18 |
| 23 | A.  Two. | 10:39:19 |
| 24 | Q.  And did you co-author a book with your | 10:39:21 |
| 25 | father? | 10:39:25 |

**Exhibit-26**

**364**

| | | |
|---|---|---|
| 1 | A. I did. | 10:39:25 |
| 2 | Q. Is that in addition to the two books or one | 10:39:25 |
| 3 | of the two? | 10:39:28 |
| 4 | A. No, that's one of the two. | 10:39:28 |
| 5 | Q. And what was that book? | 10:39:30 |
| 6 | A. What was the title of it? | 10:39:31 |
| 7 | Q. Yeah, the one you did with your dad. | 10:39:33 |
| 8 | A. It was called Super Nutrition Gardening. | 10:39:34 |
| 9 | Q. The one you did on your own? | 10:39:37 |
| 10 | A. It was called The Greatest Health Secrets. | 10:39:38 |
| 11 | Q. Okay. You mentioned at the deposition in | 10:39:41 |
| 12 | November of 2006 that you were working on a | 10:39:44 |
| 13 | screenplay of Joe Shuster's life? | 10:39:48 |
| 14 | A. Yes. | 10:39:52 |
| 15 | Q. Do you recall that? | 10:39:52 |
| 16 | A. Yes. | 10:39:52 |
| 17 | Q. Have you continued to work on that? | 10:39:54 |
| 18 | A. No. | 10:39:55 |
| 19 | Q. Have you written any other material | 10:39:58 |
| 20 | regarding either Joe Shuster -- about either Joe | 10:40:05 |
| 21 | Shuster or Jerry Siegel? | 10:40:10 |
| 22 | A. No. | 10:40:12 |
| 23 | Q. Have you been on any -- have you | 10:40:13 |
| 24 | participated in any presentations or pitches to | 10:40:19 |
| 25 | third parties about acquiring options for any work | 10:40:22 |

| | |
|---|---|
| 1 | case against us" or anything like that? | 11:02:50 |
| 2 | A. That would be the only extent of it. I | 11:02:52 |
| 3 | would have mentioned something. That's it. | 11:02:56 |
| 4 | Q. Do you recall what, if anything, she said | 11:03:00 |
| 5 | to you? | 11:03:02 |
| 6 | A. Her -- her faculties are such that I don't | 11:03:06 |
| 7 | think she completely understands what's going on | 11:03:09 |
| 8 | with this. | 11:03:11 |
| 9 | Q. "With this" meaning -- | 11:03:13 |
| 10 | A. This. | 11:03:14 |
| 11 | Q. -- all the legal issues? | 11:03:14 |
| 12 | A. This legal -- yes. | 11:03:16 |
| 13 | Q. Did you discuss it with your sister, Jean, | 11:03:18 |
| 14 | with whom you were living at the time? | 11:03:26 |
| 15 | A. You mean -- | 11:03:27 |
| 16 | Q. Your sister, Dawn, excuse me. | 11:03:28 |
| 17 | A. -- Dawn? | 11:03:29 |
| 18 | Q. What -- what is Dawn's last name? Does she | 11:03:30 |
| 19 | go by Peary? | 11:03:35 |
| 20 | A. She uses Peavy right now. | 11:03:37 |
| 21 | Q. Peavy. Excuse me. Okay. And what is your | 11:03:38 |
| 22 | address? | 11:03:46 |
| 23 | A. 51 Camino Cabo, Santa Fe, New Mexico, | 11:03:46 |
| 24 | 87508. | 11:03:58 |
| 25 | Q. Who owns the house? | 11:04:00 |

| | |
|---|---|
| 1 | A. I do with -- with my mother. | 11:04:01 |
| 2 | Q. Did you discuss the lawsuit with -- with | 11:04:10 |
| 3 | Dawn? | 11:04:12 |
| 4 | A. No. | 11:04:13 |
| 5 | Q. Never? | 11:04:16 |
| 6 | A. No. She hasn't -- she hasn't been involved | 11:04:16 |
| 7 | in any of the legal issues. She just has a general | 11:04:23 |
| 8 | awareness of it. | 11:04:25 |
| 9 | MR. TOBEROFF: If I might, just focus -- | 11:04:27 |
| 10 | just answer his question and focus on the question. | 11:04:28 |
| 11 | BY MR. PETROCELLI: | 11:04:28 |
| 12 | Q. Did you tell her that you were coming here | 11:04:31 |
| 13 | for a deposition? | 11:04:32 |
| 14 | A. She's aware of that. | 11:04:33 |
| 15 | Q. Based on your interactions with her, do you | 11:04:38 |
| 16 | believe she's aware that a lawsuit has been filed by | 11:04:39 |
| 17 | DC Comics against you and others with respect to the | 11:04:42 |
| 18 | Joe Shuster termination interest? | 11:04:46 |
| 19 | A. I don't know if I've discussed that with | 11:04:48 |
| 20 | her. | 11:04:51 |
| 21 | Q. Have you discussed this case with anyone | 11:04:53 |
| 22 | else other than Marc Toberoff? | 11:04:55 |
| 23 | A. No. | 11:04:57 |
| 24 | Q. Have you discussed it with any other | 11:05:02 |
| 25 | lawyers besides Mr. Toberoff? | 11:05:06 |

**Exhibit-26**

**367**

1      A.  That's -- that's pretty much it.                    11:25:55

2      Q.  Where did you get the consent agreement to          11:26:02

3  review, from the lock box?                                 11:26:04

4      A.  I -- I -- I -- yes or -- or it could have           11:26:10

5  been a copy.                                               11:26:15

6      Q.  Where -- where was the copy?                        11:26:16

7      A.  The copy is -- it could be in a separate            11:26:18

8  folder.                                                    11:26:22

9      Q.  What -- what's the name of the folder?              11:26:24

10     A.  The folder is "Legal."                              11:26:26

11     Q.  Where is the folder maintained?                     11:26:29

12     A.  The folder, there could be a copy in there,         11:26:30

13  in the -- in the filing cabinet.                          11:26:35

14     Q.  Is the 2008 consent agreement the last             11:26:40

15  agreement of any kind that you have signed in             11:26:44

16  connection with either this case or anything having       11:26:49

17  to do with the Joe Shuster termination issue?             11:26:52

18     A.  Yes.                                                11:26:55

19     Q.  Okay.  Who else signed the 2008 consent            11:26:57

20  agreement?                                                11:27:07

21     A.  Would have been the -- Laura, Joanne               11:27:07

22  Siegel.                                                   11:27:17

23     Q.  Laura Siegel and Joanne Siegel?                    11:27:17

24     A.  Yes.                                                11:27:20

25     Q.  Anyone else?                                       11:27:20

| | |
|---|---|
| 1 | A. I think there was -- and -- and my attorney | 11:27:21 |
| 2 | signed it. | 11:27:28 |
| 3 | Q. You mean Mr. Toberoff? | 11:27:28 |
| 4 | A. Yes. | 11:27:29 |
| 5 | Q. And did your mother, Jean Peavy, sign it? | 11:27:30 |
| 6 | A. I don't recall if she did. I just -- I | 11:27:33 |
| 7 | didn't read it. I just scanned the -- the pages. I | 11:27:44 |
| 8 | didn't -- I don't recall the signature page. She | 11:27:48 |
| 9 | might have. | 11:27:51 |
| 10 | Q. Do you know where you were when you signed | 11:27:53 |
| 11 | the document in -- in 2008? | 11:27:55 |
| 12 | A. Yeah. When -- when I signed it, I -- I was | 11:27:57 |
| 13 | at home. | 11:28:01 |
| 14 | Q. And what did you do after you signed it? | 11:28:05 |
| 15 | What did you do with it? | 11:28:08 |
| 16 | A. Well, an original was FedExed to | 11:28:09 |
| 17 | Mr. Toberoff and I kept another original. | 11:28:14 |
| 18 | Q. You signed two copies? | 11:28:18 |
| 19 | A. Yes. | 11:28:20 |
| 20 | Q. And you put the other original in your lock | 11:28:21 |
| 21 | box? | 11:28:25 |
| 22 | A. Yes. | 11:28:25 |
| 23 | Q. Did you ever get back from Mr. Toberoff a | 11:28:26 |
| 24 | version that had more signatures on it? | 11:28:29 |
| 25 | A. Well, yes, the version in the lock box | 11:28:30 |

1   would have all the original signatures.

2        Q.  Why did you review -- why did you pick the

3   2008 consent agreement to review?

4        A.  Well, before I came I -- I brought out my

5   folder and it says "Legal, Shuster case" and I

6   flipped through documents, just looked at them and

7   said what do I want to bring, what don't I want to

8   bring and -- and that's all.  It was just a cursory

9   review of what I had in there.  And I left most of

10  it at home, so it was just a cursory review of what

11  I had.

12       Q.  What did you bring with you?

13       A.  I brought a copy of the legal retainer as

14  of 2001 and I brought a -- a copy of the first page

15  of the consent agreement and a -- with a cover

16  letter that was a communication between Mr. Toberoff

17  and another attorney, so it was just like the first

18  page of it, just to jog my memory.  And --

19       Q.  Who was the other attorney?

20       A.  It was -- can I say that?  Just -- it was a

21  communication.  I don't know if that's privileged.

22            MR. TOBEROFF:  Well --

23            THE WITNESS:  Just --

24            MR. TOBEROFF:  I -- I think you can -- I

25  think you can give the name of the attorney.

11:28:35
11:28:48
11:28:51
11:28:53
11:28:59
11:29:06
11:29:08
11:29:10
11:29:15
11:29:18
11:29:21
11:29:23
11:29:25
11:29:28
11:29:41
11:29:43
11:29:48
11:29:53
11:29:56
11:29:57
11:30:04
11:30:07
11:30:07
11:30:08
11:30:12

| | | |
|---|---|---|
| 1 | you described, it went back from '04 to '01? | 12:24:33 |
| 2 | A. I don't know. | 12:24:40 |
| 3 | Q. Did you -- were you advised to seek | 12:24:41 |
| 4 | independent counsel before signing or even in | 12:24:49 |
| 5 | considering whether to sign the conflict of waiver? | 12:24:54 |
| 6 | A. Yes. | 12:24:56 |
| 7 | Q. Who told you that? | 12:24:58 |
| 8 | A. Mr. Toberoff. | 12:25:00 |
| 9 | Q. What did he tell you? | 12:25:01 |
| 10 | A. He said that I could seek separate counsel. | 12:25:03 |
| 11 | Ask -- ask someone else. | 12:25:10 |
| 12 | Q. Did he suggest any lawyers to you? | 12:25:11 |
| 13 | A. No. | 12:25:14 |
| 14 | Q. Okay. Did he tell you this in a verbal | 12:25:18 |
| 15 | conversation or in a letter? | 12:25:20 |
| 16 | A. Probably verbal. | 12:25:22 |
| 17 | Q. Did you seek separate counsel? | 12:25:30 |
| 18 | A. No. | 12:25:31 |
| 19 | Q. Did you make any inquiries at all? | 12:25:34 |
| 20 | MR. TOBEROFF: As to separate counsel? | 12:25:38 |
| 21 | MR. PETROCELLI: Correct. | 12:25:40 |
| 22 | THE WITNESS: No. | 12:25:41 |
| 23 | BY MR. PETROCELLI: | 12:25:41 |
| 24 | Q. Did you even consider it? | 12:25:42 |
| 25 | A. I may have considered it. | 12:25:47 |

MARK WARREN PEARY - 6/29/2011

Page 103

1           Is that right?

13:24:55

2       A.  Yes.

13:24:56

3       Q.  In your Siegel deposition you said that you

13:24:56

4   were looking into the issue of copyright matters and

13:25:03

5   you came across Mr. Toberoff?

13:25:09

6       A.  Yes.

13:25:10

7       Q.  I think you said it might have been six

13:25:15

8   months or so or a few months prior to the time that

13:25:17

9   you signed your first agreement in November 2001.

13:25:20

10          Does that sound right?

13:25:22

11      A.  Between the time I first contacted him and

13:25:23

12  then we signed an agreement?

13:25:26

13      Q.  Yeah, what was that time span?

13:25:27

14      A.  I remember I first contacted him in 2001.

13:25:30

15  That's all I can recall.

13:25:35

16      Q.  Okay.  And to provide a bit more detail,

13:25:36

17  did someone give you his number?

13:25:38

18      A.  I found it through research on my own.

13:25:42

19      Q.  When you say research on your own, you were

13:25:44

20  on your computer on the Internet?

13:25:46

21      A.  Yes, yes.

13:25:47

22      Q.  And how did you come across it?  What did

13:25:48

23  you search that yielded his name?

13:25:50

24      A.  I was doing research on copyright law and

13:25:53

25  changes to the copyright law and various searches

13:25:56

Exhibit-26
372

MARK WARREN PEARY - 6/29/2011

Page 104

| | | |
|---|---|---|
| 1 | having to do with copyright and attorneys involved | 13:26:06 |
| 2 | in entertainment. | 13:26:08 |
| 3 | Q.  And how -- how many names were -- were | 13:26:09 |
| 4 | netted as a result of your searches? | 13:26:13 |
| 5 | A.  Oh, boy, I can't -- I can't recall that. | 13:26:21 |
| 6 | I -- I was impressed with -- when I came across | 13:26:22 |
| 7 | information regarding Mr. Toberoff's dealings. | 13:26:26 |
| 8 | Q.  On the Web site? | 13:26:31 |
| 9 | A.  Yes.  I was impressed. | 13:26:32 |
| 10 | Q.  What impressed you about what you saw on | 13:26:33 |
| 11 | the Web site? | 13:26:35 |
| 12 | A.  I was impressed with what I had read.  Gave | 13:26:36 |
| 13 | me the impression he had a great deal of knowledge | 13:26:39 |
| 14 | and talent in copyright law with property and | 13:26:41 |
| 15 | rights. | 13:26:46 |
| 16 | Q.  Had you -- did you visit his Web site? | 13:26:47 |
| 17 | A.  I don't recall his Web site in particular. | 13:26:53 |
| 18 | Q.  Was it an article you -- you recall having | 13:26:56 |
| 19 | read about him? | 13:26:59 |
| 20 | A.  Excuse me? | 13:27:00 |
| 21 | Q.  An article about him?  I mean, what is it | 13:27:00 |
| 22 | that you read that impressed you? | 13:27:03 |
| 23 | A.  Jeez, it's so far back.  Various searches, | 13:27:04 |
| 24 | his mentions of lawyers and articles.  That's all I | 13:27:10 |
| 25 | can recall. | 13:27:15 |

**Exhibit-26**

373

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 2, 2011

Via E-Mail

Mark Warren Peary
Jean Adele Peavy
51 Camino Cabo
Santa Fe, New Mexico 87508

Re:    Pacific Pictures Agreements

Mark:

This is to confirm your and our understanding that the retainer agreement between Mark Warren
Peary, Jean Adele Peavy and the Law Offices of Marc Toberoff (now Toberoff & Associates,
P.C.), dated as of November 23, 2001 (the "Retainer Agreement"), completely replaced and
superseded the November 23, 2001 agreement between Pacific Pictures Corporation, Jean Adele
Peavy and Mark Warren Peary, as well as the October 27, 2003 agreement between Pacific
Pictures Corporation and Mark Warren Peary (the "PPC Agreement(s)"), and that no provisions
of the PPC Agreements, including paragraph 8 of the 2001 PPC Agreement and paragraph 7 of
the 2003 PPC Agreement, survived or had any continuing force or effect after the Retainer
Agreement was executed.

This also serves to confirm your and our understanding that the September 10, 2004 letter
between Pacific Pictures Corporation, Mark Warren Peary and Jean Adele Peavy totally
cancelled the PPC Agreements, and that no term of the PPC Agreements, including paragraph 8
of the 2001 PPC Agreement and paragraph 7 of the 2003 PPC Agreement, was intended to
survive such cancellation.

Pacific Pictures Corporation has been dissolved, and Marc Toberoff is its successor in interest.
For the avoidance of doubt, in the unlikely event that any right, title or interest of Pacific Pictures
Corporation under either of the PPC Agreements is deemed to have nonetheless survived your
and our mutual cancellation and replacement of the PPC Agreements, Mr. Toberoff hereby
quitclaims any such right, title or interest of Pacific Pictures Corporation to the Estate of Joseph
Shuster.

This letter, including the above quitclaim, shall have no affect on the parties' rights and
obligations under the Retainer Agreement, all of which are expressly preserved.

**Exhibit-27**

**EXHIBIT D**
**118**

**374**

**TOBEROFF & ASSOCIATES, P.C.**

August 2, 2011
Re:    Pacific Pictures Agreements
Page:  2 of 2


Very truly yours,

Marc Toberoff


AGREED:


The Estate of Joseph Shuster


Mark Warren Peary,
as Personal Representative


Mark Warren Peary


Jean Adele Peavy


Marc Toberoff,
as successor to Pacific Pictures Corporation

**Exhibit-27**
375

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

### Circuit Mediation Office
Phone (415) 355-7900 Fax (415) 355-8566
http://www.ca9.uscourts.gov/mediation

# MEDIATION QUESTIONNAIRE

The purpose of this questionnaire is to help the court's mediators provide the best possible mediation service in this case; it serves no other function. Responses to this questionnaire are **not** confidential. Appellants/Petitioners must electronically file this document within 7 days of the docketing of the case. 9th Cir. R. 3-4 and 15-2. Appellees/Respondents may file the questionnaire, but are not required to do so.

9th Circuit Case Number(s): 11-56934

District Court/Agency Case Number(s): CV-10-3633

District Court/Agency Location: Central District of California, Western Division

Case Name: DC Comics v. Pacific Pictures Corporation, et al.

If District Court, docket entry number(s) of order(s) appealed from: 337

Name of party/parties submitting this form: Defendants, Pacific Pictures Corp. et al.

## Please briefly describe the dispute that gave rise to this lawsuit.

Attorney Marc Toberoff represents the heirs of Superman's co-creators, Siegel and Shuster, in long-standing copyright litigation with DC Comics ("DC") and its parent, Warner Bros. Entertainment Inc. ("Warner"), which commenced in 2004. After years of litigation, Mr. Toberoff won key victories on behalf of his clients in Siegel v. Warner Bros. Entertainment Inc., C.D. Cal. Case No. 04-CV-08400, 542 F. Supp. 2d 1098 (C.D. Cal. 2008) (the "Siegel Case"), vindicating the heirs' right pursuant to 17 U.S.C. § 304(c) to terminate Siegel and Shuster's old Superman copyright grants to DC. DC retaliated by filing baseless state-law claims for tortious interference against Mr. Toberoff and entities with which he has been affiliated to obtain economic leverage over Mr. Toberoff and his long-time clients. Mr. Toberoff contends that the claims arise from protected activity, including his efforts to assist the heirs in vindicating their rights under federal copyright law.

## Briefly describe the result below and the main issues on appeal.

On August 13, 2010, defendants moved to strike DC's Fourth, Fifth, and Sixth Claims pursuant to California's Anti-SLAPP statute; that motion was vacated on September 7, 2010, when DC filed an amended complaint. On September 20, 2010, defendants filed a new Anti-SLAPP motion as to DC's amended complaint; that motion was vacated on October 14, 2010 after full briefing. On January 14, 2011, defendants refiled their Anti-SLAPP motion, and the parties then re-submitted their briefing in January 2011. On March 9, 2011, the District Court ordered the parties to once again re-submit their briefing, which the parties did in March 2011. On June 1, 2011, at DC's request, the District Court ordered the parties to file new opposition and reply briefs, which the parties did in August 2011. On October 25, 2011, the District Court denied the Anti-SLAPP motion on the grounds that DC's Fourth, Fifth and Sixth Claims were not subject to the Anti-SLAPP statute. That order is immediately appealable pursuant to Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003).

**Exhibit-28**

**376**

Case 2:10-cv-03633-ODW-RZ Document 468-4 Filed 07/30/12 Page 75 of 76 Page
Case: 11-55863 1/09/2012 7981209 DktEntry: 13-1 Page: 2 of 2 Page (2 of 3)
ID #:28697

Describe any proceedings remaining below or any related proceedings in other tribunals.

The statutory termination rights of Siegel's heirs regarding Superman were litigated in the closely related Siegel Case. The District Court held that the Siegels' termination was valid as to the first Superman story published in Action Comics, No. 1 and other original Superman works. The case was then transferred to Judge Otis Wright on November 20, 2009. Thereafter, a F.R.C.P. 54(b) judgment was entered, and the remainder of the case was stayed pending an appeal by both sides of the Rule 54(b) judgment, currently before the Ninth Circuit, Case No. 11-55863.

In this action, C.D. Cal. Case No. 10-CV-3633, the District Court found that defendants had waived privilege on numerous attorney-client communications that had been stolen from Mr. Toberoff's law firm and delivered to Warner because Mr. Toberoff had produced the documents to the U.S. Attorney's Office, pursuant to a grand jury subpoena and confidentiality agreement, as a condition of their investigation/prosecution of this crime. That order is currently before this Circuit on a writ proceeding, Case No. 11-71844.

DC has taken the position that while this appeal is pending, it is entitled to pursue discovery on claims at issue in this appeal, as well as interrelated federal claims asserted in its complaint.

Provide any other thoughts you would like to bring to the attention of the mediator.

The parties engaged in formal mediation sessions before the Hon. Daniel Weinstein (Ret.) in May-June 2008, September 2009 and April 2010. The parties' efforts were unsuccessful. DC thereafter filed this action in May 2010. The parties have scheduled a further mediation for December 1, 2011.

Any party may provide additional information *in confidence* directly to the Circuit Mediation Office at ca09_mediation@ca9.uscourts.gov. Please provide the case name and Ninth Circuit case number in your message. Additional information might include interest in including this case in the mediation program, the case's settlement history, issues beyond the litigation that the parties might address in a settlement context, or future events that might affect the parties' willingness or ability to mediate the case.

## CERTIFICATION OF COUNSEL

I certify that:

☒ a current service list with telephone and fax numbers and email addresses is attached (see 9th Circuit Rule 3-2).

☒ I understand that failure to provide the Court with a completed form and service list may result in sanctions, including dismissal of the appeal.

Signature | /s/ Marc Toberoff

("s/" plus attorney name may be used in lieu of a manual signature on electronically-filed documents.)

Counsel for | Laura Siegel Larson, Jean Adele Peavy and Mark Warren Peary

**Note:** Use of the Appellate ECF system is mandatory for all attorneys filing in this Court, unless they are granted an exemption from using the system. **To file this form electronically** in Appellate ECF, complete the form, and then print the filled-in form to PDF (File > Print > PDF Printer/Creator). Then log into Appellate ECF and choose Forms/Notices/Disclosure > File a Mediation Questionnaire.

**Exhibit-28**

**377**

## SERVICE LIST

O'MELVENY & MYERS LLP
Daniel M. Petrocelli
 dpetrocelli@omm.com
Matthew T. Kline
 mkline@omm.com
Cassandra L. Seto
 cseto@omm.com
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Plaintiff-Appellee,
DC Comics

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins
 pperkins@ptplaw.com
1711 Route 9D
Cold Spring, NY 10516
Telephone: (845) 265-2820
Facsimile: (845) 265-2819

Attorneys for Plaintiff-Appellee,
DC Comics

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 mtoberoff@ipwla.com
Keith G. Adams
 kgadams@ipwla.com
2049 Century Park East, Suite 3630
Los Angeles, California 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal
representative of the Estate of Joseph
Shuster, Jean Adele Peavy, and Laura
Siegel Larson, individually and as
personal representative of the Estate of
Joanne Siegel

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (State Bar No. 90072)
 rkendall@kbkfirm.com
Laura W. Brill (State Bar No. 195889)
 lbrill@kbkfirm.com
Nicholas F. Daum (State Bar No. 236155)
 ndaum@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 556-2700
Facsimile: (310)556-2705

Attorneys for Defendants-Appellants,
Marc Toberoff, Pacific Pictures
Corporation, IP Worldwide, LLC, and
IPW, LLC

**Exhibit-28**

**378**