1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:   (310) 553-6700
6   Facsimile:    (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8

# UNITED STATES DISTRICT COURT

9

# CENTRAL DISTRICT OF CALIFORNIA

10

11

12   DC COMICS,

                    Plaintiff,

13          v.

14   PACIFIC PICTURES
     CORPORATION, IP WORLDWIDE,
15   LLC, IPW, LLC, MARC TOBEROFF,
     an individual, MARK WARREN
16   PEARY, as personal representative of
     the ESTATE OF JOSEPH SHUSTER,
17   JEAN ADELE PEAVY, an individual,
     LAURA SIEGEL LARSON, an
18   individual and as personal
     representative of the ESTATE OF
19   JOANNE SIEGEL, and DOES 1-10,
     inclusive,
20

21                  Defendants.

Case No. CV 10-3633 ODW (RZx)

**PLAINTIFF DC COMICS'
RESPONSE TO DEFENDANTS'
STATEMENT OF GENUINE
ISSUES  IN OPPOSITION TO DC
COMICS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT ON ITS FIRST AND
THIRD CLAIMS FOR RELIEF**

Hon. Otis D. Wright II

**Hearing Date**:     Aug. 20, 2012
**Hearing Time**:     1:30 p.m.
**Courtroom**:        11

22

23

24

25

26

27

28

1
2
3
4
5

DC Comics ("DC") submits this Response To Defendants' Statement of Genuine Issues In Opposition To DC Comics' Motion For Partial Summary Judgment On Its First And Third Claims For Relief.  Part I addresses defendants' responses to DC's Statement of Uncontroverted Facts.  Part II addresses defendants' purported Statement of Additional Undisputed Facts.

6
7
8
9
10
11
12
13

Defendants identify no actual or material facts in dispute on DC's summary judgment motion, but instead try to create the false impression of such disputes through improper legal argument and a persistent effort to discuss other facts that defendants think advance their position.  Such improper argument has no place in pleadings of this sort, Docket No. 18 at 6-7, and only overburdens the Court and DC with make-work.  DC regrets the length of this submission, but defendants' voluminous submission, laced with false factual assertions and improper legal arguments—all in violation of this Court's rules, *id.*—necessitates it.

14
15
16
17
18
19

Defendants' evidentiary objections to DC's evidence are equally without merit, as shown in DC's concurrently-filed Response To Defendants' Objections To Evidence In Plaintiff's Statement Of Undisputed Facts, Declarations, And Exhibits.  DC objects to certain aspects of defendants' new evidence in its concurrently-filed Objections To Evidence In Defendants' Statement Of Additional Undisputed Facts, Declaration, And Exhibits.

20
21

## I.    REPLY TO DEFENDANTS' RESPONSES TO STATEMENT OF UNCONTROVERTED FACTS

22

| DC'S STATEMENT OF UNCONTROVERTED FACT ("SUF") | |
|---|---|
| 2.    In 1938, DC—which had employed Siegel and Shuster to do other work—elected to include Superman in a new comic book titled *Action Comics*. [Declaration of Daniel. M. Petrocelli ("PD") Exs. 1, 8, 10 at 80 (Finding of Fact ("FOF")) 21, 13 at 133, 14 at 141, 40 at ¶ 5, 41 at 343-45 & 408-21.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed.**  Siegel and Shuster were not employees of DC in | Defendants' response is improper because it does not identify which facts it admits.  Docket No. 18 |

| | |
|---|---|
| 1938, or before. They worked as independent contractors and DC purchased certain material from them. | at 6-7.  The facts it disputes are immaterial to DC's motion. |
| | And as to the one fact it appears to dispute— whether Siegel and Shuster were "employed" or were "independent contractors"—DC's cited evidence shows that on December 4, 1937, Siegel and Shuster entered into a contract with DC titled "AGREEMENT OF <u>EMPLOYMENT</u>," in which DC agreed to "*employ* the *Employees* [Siegel and Shuster] as Artists, for a period of two years, commencing with December 4, 1937 and terminating December 3, 1939…."  Decl. of Daniel Petrocelli ("PD") Ex. 1 at 8 (emphasis added). |
| <u>DC's Evidence</u>: Declaration of Daniel Petrocelli ("PD") Exs. 1, 8, 10 at 80 (FOF 21), 13 at 133, 14 at 141, 40 at ¶ 5, 41 at 343-45 & 408-21. | |
| <u>Defendants' Evidence</u>:  PD Exs. 2, 3; *Siegel v. Warner Bros Entertainment, Inc.*, 658 F. Supp. 2d 1036, 1070 (C.D. Cal. 2009). | |
| | Even if defendants were not wrong on the facts, their objection is legally irrelevant.  The law is clear that both employees and independent contractors are "employed," exactly as DC's SUF 2 asserts.  *E.g.*, *Chaffin v. U.S.*, 176 F.3d 1208, 1212 (9th Cir. 1999). |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

3.     On March 1, 1938, Siegel and Shuster granted to DC the "exclusive right to the use of the [Superman] characters and story."  [PD Ex. 2.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent DC purchased the rights to Superman in the March 1, 1938 Agreement for $130 (the "1938 Grant").<br><br><u>DC's Evidence</u>:  PD Ex. 2.<br><br><u>Defendants' Evidence</u>:  Same. *Siegel v. Warner Bros. Ent. Inc.* ("Siegel I"), 542 F. Supp. 2d 1098, 1107-10 (C.D. Cal. 2008). | Again, defendants' response is improper because it does not identify which facts it admits. Instead, it "disputes" this undisputed fact to make improper arguments, Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present.  The facts defendants dispute are immaterial to DC's pending motion. And DC's cited evidence fully supports SUF 3, and defendants cannot and do not dispute this. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 4.    *Action Comics #1* ("*AC#1*"), published on April 18, 1938, with a cover date of June, 1938, featured an adapted version of Siegel and Shuster's Superman story along with other stories.  [PD Exs. 8, 41 at 408-21.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent that AC #1 did not feature an "adapted version of Siegel and Shuster's Superman story."  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format.<br><br>DC's Evidence:  PD Exs. 8, 41 at 408-21.<br><br>Defendant's Evidence:  PD Ex. 10 at 80, ¶21-22; *Siegel v. Nat'l Periodical Publications, Inc.*, 508 F.2d 909, 911 (2d Cir. 1974). | Again, defendants' response is improper because it does not identify which facts it admits.  Instead, it "disputes" this undisputed fact to make improper arguments, Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present.<br><br>In any event, defendants do not explain the legal or factual difference between "adapted" and "reformatted" or how this is possibly material.  DC's evidence shows that Siegel and Shuster "*revised and expanded* the said SUPERMAN material in compliance with the said request of [DC]," PD Ex. 10 at 80 (FOF 22); *Siegel v. Nat'l Periodical Pubs., Inc.*, 508 F.2d 909, 911 (2d Cir. 1974) ("[DC] asked [Siegel and Shuster] to *revise and expand* the materials into a full-length production suitable for magazine publication, and this was done.") (emphasis added).  "Adapt" is defined as "to fit, change, or modify to suit a new or different purpose," which is fully consistent with DC's SUF 4.  http://dictionary.reference.com/browse/adapt?s=t. |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 5.    After *AC#1* was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success.  [PD Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed.**  Siegel and Shuster did not work pursuant to "work- | Again, defendants' response "disputes" this undisputed fact to make improper arguments, |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

for-hire" agreements and were not compensated in royalties and bonuses for Superman comics. The comic book material produced in their Cleveland shop that DC chose to accept was purchased by DC by the page pursuant to page-rate. The term "work-for-hire" did not appear anywhere in the relevant contracts, as it was inapplicable to independent contractors, like Siegel and Shuster, until the mid-1960s.

<u>DC's Evidence</u>:  PD Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).

<u>Objections to DC's Evidence</u>: Relevancy, prejudicial. FED R. EVID. 401, 402, 403.

<u>Defendants' Evidence</u>:  PD Ex. 10 at 74, ¶14; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 886 (9th Cir. 2005); *Siegel*, 542 F. Supp. 2d at 1111-14.

Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present. The facts it disputes are immaterial to DC's pending motion.

DC's cited evidence fully supports SUF 5, and this Court in *Siegel* ruled that the large majority of works Siegel and Shuster created for DC, even in the early years, were "works for hire." *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1064-80 (C.D. Cal. 2009).

As to the form of Siegel's and Shuster's pay, DC's cited evidence shows Siegel and Shuster were compensated in royalties and bonuses, and how this pay increased, *e.g.*:

- Siegel and Shuster were initially paid a generous per-page rate for their work on Superman—substantially "more than anyone else [was] getting for any feature in any of" DC's other books, PD Ex. 5 at 17—which DC increased with the success of Superman. *Id.* Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).

- Siegel and Shuster also received substantial royalties for many exploitations of Superman, including between "32½%" and "40% of the 'net proceeds'" received from newspaper syndication and "5% of all net proceeds which may be derived of commercial exploitation of SUPERMAN." *Id.* Ex. 3 at 12; Ex. 6 at 20.

- DC also paid Siegel and Shuster generous lump sums and "bonus[es]" throughout the years. *Id.* Ex. 10 at 88-91 (FOF 68 (paid $500 bonus for 1941); 69 (paid $7,000 bonus for 1942); 70 (paid $2,000 to

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | account for royalties for 1942); 71 (paid $6,000 bonus for 1943); 72 (paid $1,500 to account for royalties for 1943); 73 (paid $6,000 bonus for 1944); 74 (paid $1,500 to account for royalties for 1944); 75 (paid $10,000 bonus for 1945)). |

### DC'S STATEMENT OF UNCONTROVERTED FACT

6.    By 1941, the *Saturday Evening Post* reported that Siegel and Shuster stood to make over $2 million (in today's terms) in the next year alone.[2] [PD Ex. 7 at 27.] FN 2: All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** The cited article states that Siegel and Shuster, combined, were purportedly being paid $35 a page plus $600 a week. This statement erroneously implies that Siegel and/or Shuster made "over $2 million (in today's terms)" in 1942, while DC fails to specify its financial assumptions and calculations.<br><br>DC's Evidence:  PD Ex. 7 at 27.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403.  Lack of foundation.  FED R. EVID. 602.<br><br>Defendants' Evidence:  PD Ex. 7. | As set forth in SUF 6, it is undisputed that by 1941, the *Saturday Evening Post* reported that Siegel and Shuster "stood to make"—not "made"—"$2 million (in today's terms)" in 1942.  PD Ex. 7 at 27.  Defendants attack a straw man, saying DC "implied" other facts.<br><br>DC did not "fail[] to identify its financial assumptions and calculations."  In footnote 2— *which defendants tellingly deleted from their response*—DC identified the exact method it used:  a well-known and -respected Bureau of Labor Statistics methodology.  Defendants cannot and do not challenge the adequacy of that methodology or DC's use of it.  Courts regularly use statistics, including the consumer price index, as provided by the Bureau of Labor Statistics. *See Sorenson v. Mink*, 239 F.3d 1140, 1148 (9th Cir. 2001). |

### DC'S STATEMENT OF UNCONTROVERTED FACT

7.    In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment.  The court concluded that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

under which Siegel and Shuster acknowledged the 1938 assignment granted to DC all rights in Superman.  [PD Exs. 9, 11-12.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it omits that the court found that DC misappropriated Jerry Siegel's Superboy while Siegel was overseas fighting for his country in World War II. <br><br>DC's Evidence:  PD Exs. 9, 11-12. <br><br>Defendants' Evidence:  PD Ex. 10 at 108-110. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. <br><br>The new facts defendants assert are unsupported and immaterial to DC's motion.  For example, Siegel admitted he did not "fight" for his country in World War II, but rather as he told DC in January 1944, he had been placed on the "Detached Enlisted Men's List," a status reserved for celebrities:  "DEML is known throughout the Army [as] 'Damn Easy Military Life.'"  Decl. of Cassandra Seto ("SD") Ex. 2 at 5-6.  Siegel was assigned to the Library and Publications Branch of the Army Special Services Company in Honolulu, Hawaii, where he spent the war writing for publications like *Midpacifican.  Id.* Exs. 2, 3. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

8.    In a 1975 agreement, DC provided Siegel and Shuster with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. [PD Ex. 15.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent DC's purported in "today's dollars" are misleading, and incapable of verification as DC does not disclose its financial assumptions for its supposed | Again, defendants' response is improper because it does not identify which facts it admits.  Docket No. 18 at 6-7.  Defendants' response  does not dispute that the terms of the 1975 agreement provided Siegel and Shuster with the benefits set forth in SUF 8.  Instead, it "disputes" DC's |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| calculations.  The 1975 agreement called for monthly payments of $20,000, less withholding taxes, and a lump sum payment of $17,500, $7,500 of which was intended to apply to Siegel and Shuster's legal fees.  Frank Shuster (Joe Shuster's brother) was to be paid $5,000 a year. | calculation of the present day value of those benefits.  This dispute is immaterial to DC's pending motion, and DC did not "fail[] to disclose its financial assumptions for its calculations."  In footnote 2—*which defendants tellingly deleted from their response*—DC identified the exact method it used:  a well-known and -respected Bureau of Labor Statistics methodology.  *See supra* DC's Reply to SUF 6. |
| <u>DC's Evidence</u>: PD Ex. 15. | |
| <u>Objections to DC's Evidence</u>: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. Improper lay opinion, lack of sufficient facts and data, lack of foundation.  Fed. R. of Evid. 701, 702. | |
| <u>Defendants' Evidence</u>:  PD Ex. 15 at 143. | |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 9.      Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustments, given special bonuses, and paid to have Siegel, Shuster, and their families travel to Superman-related events.  [*E.g.*, PD Exs. 17-19; Declaration of Paul Levitz ("LD") Exs. 23, 27, 33, 39, 53, 54, 60, 67, 71, 75-78.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent that it implies DC made "cost- of-living" adjustments for Shuster or his family. <br><br> <u>Objections to DC's Evidence</u>: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. <br><br> As to the facts defendants dispute—whether DC made "cost-of-living" adjustments for Shuster or his family—DC's cited evidence shows that DC regularly adjusted Shuster's compensation under |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | the 1975 agreement according to cost of living statistics. PD Ex. 17 ("Retroactive to January 1, 1988, we will be making payments to [Shuster] at the rate of $80,000 per annum, plus an annual cost of living increase of up to 10%, commencing 1989 based upon the U.S. Department of Labor statistics for the cost of living applicable to the Los Angeles Area."); Ex. 18 ("[T]he cost of living for the Los Angeles area for 1989 increased by 5.15% over 1988. Accordingly, I am instructing the payroll department to make the 5.15% increase, to be applied to [Shuster's] compensation retroactive to January 1, 1990."); Ex. 19 (same; cost-of-living adjustment for Los Angeles in 1990 increased 5.45%). |
|---|---|

| DC's STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

10.     All told, the Siegels and Shusters have been paid well over $4 million under the 1975 agreement, not including medical benefits or bonuses.  [LD ¶ 4 & Exs. Exs. 23, 27, 33, 39, 53, 60, 67, 71.]

| DEFENDANTS' RESPONSE | DC's REPLY |
|---|---|
| **Disputed.**  DC does not provide the underlying data, evidence or financial assumptions it used to arrive at this purported figure. DC also appears to conflate the 1975 agreement, amendments thereto, and the 1992 agreement.<br><br>DC's Evidence: LD ¶ 4 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. Improper lay opinion, lack of sufficient facts and data, lack of | Levitz's sworn declaration—which attests to his personal knowledge of such facts, Decl. of Paul Levitz ("LD") ¶ 1—confirms "[a]s of 2011, Warner had paid the Shuster and Siegel families $4.3 million under the 1975 agreement, not including the medical benefits or special bonuses."  *Id.* ¶ 4.  Business executives are fully competent to provide such testimony.  *E.g.*, *Lockheed Martin Corp. v. U.S.*, 70 Fed. Cl. 745, 753-54 (Fed. Cl. 2006); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). Defendants offer no testimony from Laura Siegel Larson, Jean Peavy, or any other defendant to contest these amounts.<br><br>DC did not "conflate" the 1975 agreement, |

DC'S RESP. TO DEFS.' STATEMENT OF
                    GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| foundation.  Fed. R. of Evid. 701, 702.<br><br>Defendants' Evidence:  Same. | amendments thereto, and the 1992 agreement.  Levitz separately identified in his declaration payments made under the 1992 agreement:  "In total, DC has paid Jean at least over $610,000 under the 1992 agreement, and continues to pay her under this agreement to this day, even though she went back on her word."  LD ¶ 9. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 11.    Neither Siegel nor Shuster ever attempted to exercise any purported termination right, although the windows for both to do so opened in 1984, while both were alive.  [*E.g.*, PD Exs. 25-31, 37.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it implies that Siegel or Shuster did not wish to exercise their termination rights.  Both were elderly, infirm and insolvent by the time a notice of termination right could be served, and the earliest effective date of a Superman termination notice was April, 18, 1994.  Shuster died on July 30, 1992, and Siegel died on January 28, 1996.  It was Siegel's wish that his widow and daughter exercise the termination right and finally restore his copyrights to his family.<br><br>DC's Evidence:  *E.g.*, PD Exs. 25-31, 37.<br><br>Objections to DC's Evidence: Speculative, lack of personal knowledge and foundation. FED R. EVID. 602.  Relevancy | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>The new facts defendants assert are unsupported and immaterial.  Siegel and Shuster lived for many years after their termination window opened (close to a decade and over a decade, respectively), and they were far from insolvent.  DC paid the men (and then their families) millions of dollars under their 1975 agreement with DC.  LD ¶ 4; PD Exs. 17-19.<br><br>Defendants cite no evidence that Joe Shuster "wish[ed]" for Jean to pursue his termination rights.  Defendants' only evidence that Jerry Siegel wanted his wife and daughter to do so is nothing more than an inadmissible, after-the-fact, hearsay account made by his daughter in the context of this litigation.  AD Ex. 18 at 279:2-5. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| and prejudicial.  FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence:<br>Declaration of Keith Adams ("AD") Ex. 18 at 279:2-5 | |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 13.     Shuster had no wife, child, or grandchild, and his will named his sister, Jean Peavy, as sole beneficiary and "executrix" of his estate.  [PD Exs. 33 at 275-76, 46 at 443:10-444:9.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it omits that Shuster's will named Mark Warren Peary as beneficiary in the event Jean Peavy predeceased him and omits that the will states: "In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor."<br><br>DC's Evidence:  PD Exs. 33 at 275-76, 46 at 443:10-444:9.<br><br>Defendants' Evidence:  PD Ex. 34 at 285-286. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the "facts" defendants dispute, in 1992, Jean Peavy told both the California courts (in a sworn affidavit) and DC (in letter that soon followed) that she was Joe Shuster's sole heir. She made no mention of Mark Warren Peary's alleged rights, and based on her representations to the courts and DC, she had all of Joe Shuster's assets "paid, delivered or transferred to her" in 1992, and then made her 1992 Agreement with DC.  PD Ex. 21, 33 at 275-77; LD Exs. 3, 8. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 14.     On August 17, 1992, Jean filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her."  [PD Ex. 21.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it omits that Jean's affidavit stated that the only property to be transferred and delivered to her | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous facts defendants wish to argue—all in contravention of this |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| was "758 shares of Time Warner Common Stock." | Court's rules.  Docket No. 18 at 6-7. |
| <u>DC's Evidence</u>:  PD Ex. 21. | As to the "facts" defendants dispute, Jean represented to DC in 1992 that she was Joe Shuster's sole heir, LD Ex. 3, and she and her brother Frank asserted that Jean had rights to Joe's copyrights.  *Id.* Exs. 3, 6, 8, 9. |
| <u>Objections to DC's Evidence</u>: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. | |
| <u>Defendants' Evidence</u>:  Same. PD Ex. 21 at 182. | Moreover, Jean's affidavit requested the transfer to her of "768 [not 758] shares of Time Warner Common Stock," pursuant to a § 13101 affidavit by Jean Adele Peavy."  PD Ex. 21, 33 ¶ 5.  Those 768 shares, which were trading at just over $100 a share, SD Ex. 6, and were worth over $76,800, PD Ex. 21 at 182, mean Jean made false representations in her affidavit, when she asserted Shuster's assets do "not exceed Sixty Thousand Dollars," PD Ex. 21. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 15.    Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joe Shuster's] Will" and asking DC to pay Shuster's "final debts and expenses."  [LD Ex. 3.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent Jean stated that "Any help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. |
| <u>DC's Evidence</u>:  LD Ex. 3. | |
| <u>Objections to DC's Evidence</u>: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. | |
| <u>Defendants' Evidence</u>:  LD Ex. 3 at 10. | |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 16.    DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year.  [LD Ex. 5; PD Ex. 23.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it implies that DC initiated an offer.  DC's proposal came in response to Jean's letter.<br><br>DC's Evidence: LD Ex. 5; PD Ex. 23.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence:  LD Ex. 3 at 9-11. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted,* and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the "fact" defendants dispute—whether DC "initiated" an offer to Jean—the evidence shows that the 1992 agreement, and the compensation Jean and Frank received, was subject to the parties' discussions and negotiations.  *E.g.*, LD Exs. 3-6, 8, 10, 16, 17. |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 17.    On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments, and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]."  Frank asked if he and Jean could meet with Levitz in New York to discuss the issue.  [LD Ex. 6.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it is misleading by omission of subsequent correspondence from Frank, which indicated displeasure with amount and form of pension payments, and insofar as DC purports to characterize Frank's state of mind.<br><br>DC's Evidence:  LD Ex. 6<br><br>Objections to DC's Evidence: | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted,* and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>The new facts defendants assert are unsupported.  There is no evidence—and defendants cite to none—of correspondence from Frank after October 1992.  LD Exs. 6, 9.  And DC does not purport to "characterize Frank's state of mind"; it quotes Frank, who said he was "extremely |

| Relevancy and prejudicial. FED R. EVID. 401, 402, 403. Inadmissible hearsay. FED R. EVID. 801, 802. Lack of personal knowledge and speculation. FED R. EVID. 602.

Defendants' Evidence: LD Exs. 20 at 43 ("[W]e are merely asking for a fair share."), 25. | pleased." |
|---|---|

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 18.    Levitz dealt with scores of authors and heirs during his decades running DC. When DC agreed to grant an author or heir's request for additional money, Levitz would give them the same admonition:  this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC.  Levitz reiterated this condition to Frank and Jean in 1992, who confirmed they understood and agreed.  [LD ¶ 8.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** as to "scores of authors and heirs."  Levitz states only that he dealt with former writers and artists "from time to time."

DC's Evidence:  LD at ¶ 8

Objections to DC's Evidence: Insufficient to establish "habit" evidence. FED R. EVID. 406. Relevancy. FED R. EVID. 401, 402.

Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.

As to the "fact" defendants dispute—whether Levitz dealt with "*scores* of authors and heirs"— DC's cited evidence shows Levitz worked for DC for over 38 years and was responsible for "maintain[ing] relationships with writers and authors who had worked for DC in the past, as well as their families."  LD ¶¶ 1, 3.  When Levitz stated authors and heirs, "from time to time," "asked DC for money" he did not say scores.  *Id.* ¶ 8.  Defendants attack a straw man. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 19.    The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life.  In | |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

exchange, Jean and Frank re-granted all of Joe Shuster's rights (including any Superman copyrights) to DC and vowed never to assert a claim to such rights.

     The 1992 agreement stated, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

[LD Ex. 8.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** The 1992 Agreement did not "re-grant" "all of Joseph Shuster's rights (including any Superman copyrights) to DC." The 1992 Agreement is silent on Joe Shuster's rights; its short quitclaim concerned only the rights, if any, held by Frank and Jean. Since Joe Shuster's Superman copyrights were long ago assigned to DC in the 1938 Grant and subsequent Siegel and Shuster copyright grants, Frank and Jean could not in 1992 assign to DC Superman copyrights that were already long-owned by DC. The 1992 Agreement does not even mention Superman. Accordingly, Paul Levitz (DC's former President) nowhere | Again, defendants' response is improper because it does not identify which facts it admits. Instead, it "disputes" this undisputed fact to make improper arguments, Docket No. 18 at 6-7, about other immaterial facts and evidence that defendants wish to present. Moreover, defendants' objection is improper legal argument that needed to be made in their 25-page opposition brief—not in this extra pleading. Docket No. 328 (admonishing defendants for "slithering" around Court's rules on page limits). As to defendants' legal and factual arguments, DC's cited evidence shows that in the 1992 agreement, Jean and Frank "*grant[ed] to [DC]* any … copyrights, trademarks, or other property right in any and all work created in whole or in part by [Joe Shuster]…." LD Ex. 8 (emphasis added). Jean and Frank further agreed that the 1992 agreement "fully settles all claims to any payments or other rights or remedies … *whether now or hereafter existing* regarding any copyrights, trademarks, or other property right in |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

states in his declaration on that the 1992 Agreement involved a "re-grant" of Joe Shuster's Superman copyrights.

DC's Evidence: LD Ex. 8.

Objections to DC's Evidence: Speculative, improper argument, improper lay opinion, improper conclusions of law. FED R. EVID. 602, 701, 702. Relevancy. FED R. EVID. 401, 402.

Defendants' Evidence: Same.

any and all work [he] created…." *Id.* (emphasis added). Thus, the 1992 agreement operated to revoke and re-grant all prior grants of Shuster's rights. *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042-45 (9th Cir. 2005); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200-04 (2d Cir. 2008); *Siegel*, 364 F. Supp. at 1037. The 1992 agreement reflects the parties' intent to supersede the prior grants by Shuster. *E.g., Blair & Co. v. Otto*, 5 A.D.2d 276, 279-82 (N.Y. App. Div. 1958); RESTATEMENT (SECOND) OF CONTRACTS § 279 (1988). The 1992 agreement covers the same subject matter as Shuster's prior copyright grants—*i.e.*, assignment of "copyrights … *in any and all work* created in whole or in part by … Joseph Shuster." LD Ex. 8. The 1992 agreement represents the Shuster heirs' sole and final agreement with DC, replacing all remedies they may otherwise claim. It states: "[This] *fully settles **all claims** to any payments or other rights or remedies* which you may have under *any other agreement or otherwise, whether now or hereafter existing* regarding" any and all copyrights in Joe Shuster's works. *Id.* (emphasis added). Levitz testified in his sworn declaration that he told Jean and Frank during their in-person meeting that the 1992 agreement "would represent their last and final deal with DC, and would resolve any past, present, or future claims against DC." LD ¶ 8; *see also* Pl. DC Comics' Mot. For Partial S. J. On Its First And Third Claims For Relief ("DC's MSJ") at 11-12; Pl. DC Comics' Reply ISO Mot. For Partial S. J. On Its First And Third Claims For Relief ("DC's MSJ Reply") at 2-5.

Jean—Shuster's sole heir, PD Ex. 33 at 275-76—

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

had complete authority to assign any copyright interest in his works to DC in the 1992 agreement. *In re Kalt's Estate*, 16 Cal. 2d 807, 811 (1940); *Estate of Molino*, 165 Cal. App. 4th 913, 921 (2008). Jean was a party to the 1992 agreement and bound all other heirs. *Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1040.

The 1992 agreement states that it applies to "*any and all work created in whole or in part by ... Joseph Shuster.*" LD Ex. 8. Shuster's best-known work was Superman, and defendants themselves say he created the character. *See infra* SUF 46. Finally, the 1992 agreement is not a "quitclaim," as DC's legal briefing explains. DC's MSJ Reply at 5.

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

20.    Over the next decade, DC maintained good relations with the Shusters, and Jean and Levitz corresponded regularly. In the close to 60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992 agreement, and requested bonus payments in excess of those required. [LD ¶ 9 & Exs. 3, 10, 11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 77-78.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** In many of the letters DC points to (Exs. 10, 17, 20, 25, 26, 29, 32), Jean expresses displeasure at the amount and form of her pension payments and requests changes. In others letters DC points to (Ex. 23, 27), DC refuses to grant these requests, stating that DC is under no legal obligation on to do so. Jean had tremendous difficulty living on a pension of $25,000 (split two | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. As to those facts defendants dispute, DC's cited evidence shows that in her letters to DC, Jean expressed gratitude—not displeasure—for DC's generosity. *E.g.*, LD Exs. 17 ("let me express again Frank's and my gratitude for having picked up Joe's debts .... We also appreciate the fact that you offered $25,000 per year over the original agreement"); 25 at 51 ("Frank and I want you to |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

ways after withheld taxes) and was forced to beg DC for periodic Christmas bonuses.

DC's Evidence:  LD ¶ 9 & Exs. 3, 10, 11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 77-78.

Objections to DC's Evidence: Relevancy and prejudicial.  Fed R. Evid. 401, 402, 403.

Defendants' Evidence:  LD Exs. 10, 17, 20, 23, 25, 26, 27, 29, 32, 74.

know that we appreciate very much your past generosity."); 26 ("Thank you, Paul, for your kindness and understanding in the care of Joe Shuster's family."); 45 ("Joe would have been pleased that you still continue to honor him through his family."); 54 ("Thank you so much for the $10,000 bonus.  It is highly appreciated.").

Frank and Jean requested extra bonus payments, and DC granted those requests.  LD Exs. 52-53, 59-60, 66-67, 70-71.

Defendants cite no evidence that Jean had difficulty surviving on DC's payments under the 1992 agreement, including the bonuses. Moreover, there is no truth to defendants' claim that Jean had to "beg" DC for bonuses.  DC paid bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001:

- LD Ex. 23 ($25,000 in 1993);
- *Id.* Ex. 27 ($10,000 in 1994);
- *Id.* Ex. 33 ($10,000 in 1995);
- *Id.* Ex. 39 ($10,000 in 1996);
- *Id.* Ex. 53($10,000 in 1998);
- *Id.* Ex. 60 ($10,000 in 1999);
- *Id.* Ex. 67 ($10,000 in 2000); and
- *Id.* Ex. 71 ($25,000 in 2001).

Several of these bonus payments were initiated by DC, and not the result of any request by Jean or Frank.  *Id.* Exs. 23, 27, 33, 39.  To the extent Jean requested bonus payments, DC granted the requests.  LD Exs. 52-53, 59-60, 66-67, 70-71.

### DC'S STATEMENT OF UNCONTROVERTED FACT

21.    In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the SUPERMAN copyright," but asked for an increase in

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

payments "plus a yearly increment to account for inflation."  [LD Ex. 20.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.**  DC misleadingly combines Jean's statements in her letter.  Jean stated that at the present time "Frank and I are not planning to reclaim the SUPERMAN copyright."  Jean further stated: " We believe we have a right to expect that you will be fair with us as well and will grant our request for increased payment.  We will stick to our bargain...."  Moreover, as DC knew, neither Frank nor Jean had any "right to reclaim the SUPERMAN copyright," as siblings have never held a termination right under the Copyright Act, 17 U.S.C. 304(c)(2). <br><br> DC's Evidence: LD Ex. 20. <br><br> Objections to DC's Evidence: Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. <br><br> Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. <br><br> As to those facts defendants dispute—that DC "misleadingly" quotes from Jean's 1993 letter—DC's cited evidence shows Jean confirmed in a 1993 letter to DC that she and Frank "are not planning to reclaim the SUPERMAN copyright."  PD Ex. 20 at 43.  At the same time, Jean requested an increase in payments:  "What Joe's income would have been today plus a yearly increment to account for inflation, is, we believe, a reasonable request .…  We do believe that such an *increase* in payments would be appropriate."  *Id.* (emphasis added).  Jean concludes, "We will stick to our bargain which we signed, dated as of August 1, 1992."  *Id.* at 44.  Defendants attack a straw man, saying DC "misleadingly combines" Jean's statements.  There is nothing misleading about this SUF, which accurately quotes from Jean's 1992 letter. <br><br> Finally, defendants improperly make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 11-12; DC's MSJ Reply at 5-6. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

22.    In 1999—after Congress amended the copyright statute to grant additional statutory heirs termination rights, 17 U.S.C. § 304(d), and after learning that Jerry Siegel's heirs had served Superman copyright termination notices on DC—Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for SUPERMAN.  I want you to know that I intend to continue to honor our pension agreement.  I would, however, appreciate a generous bonus for this year as you had done many times in the past.

[LD Ex. 59.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent it falsely implies that Jean was ever a statutory heir (she was not) or ever held termination rights (she did not).  17 U.S.C. § 304(c)(2)(D) extends termination rights to the executor, personal representative or administrator of an author's estate in the event an author (like Joe Shuster) is not survived by a spouse, child or grandchild.  Joe Shuster's siblings, Frank and Jean have never held termination rights under the Copyright Act, 17 U.S.C. § 304(c)(2), and the 1992 Agreement cannot waive, release or encumber the inalienable termination right of the executor of Joe Shuster's estate. 17 U.S.C. § 304(c)(5).<br><br>DC's Evidence:  LD Ex. 59.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.  Defendants improperly use their response to make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 11-12; DC's MSJ Reply at 5-6. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 23.    In 1993, 1994, 1995, 1996, 1998, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000.  [LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent it is misleading as to amounts of bonuses.  In all but two years (1993 and 2001), the bonus was $10,000.<br><br>DC's Evidence:  LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.<br><br>Objections to DC's Evidence:  Relevancy and prejudicial. FED R. EVID. 401, 402, 403.<br><br>Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted,* and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>Nothing about SUF 23 is "misleading."  DC's cited evidence shows DC paid Jean bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001—and that they "ranged" from $10,000 to $25,000, exactly as SUF 23 states:<br><br>• LD Ex. 23 ($25,000 in 1993);<br>• *Id.* Ex. 27 ($10,000 in 1994);<br>• *Id.* Ex. 33 ($10,000 in 1995);<br>• *Id.* Ex. 39 ($10,000 in 1996);<br>• *Id.* Ex. 53 ($10,000 in 1998);<br>• *Id.* Ex. 60 ($10,000 in 1999);<br>• *Id.* Ex. 67 ($10,000 in 2000); and<br>• *Id.* Ex. 71 ($25,000 in 2001). |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 24.    In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal rights to make such requests, but would pay her a bonus anyway, which she thanked DC for doing.  [LD Ex. 23.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Undisputed,** but irrelevant.<br><br>Objections to DC's Evidence:  Relevancy and prejudicial.  FED R. EVID. 401, 402, 403. | Such relevance objections are improper as set forth in DC's Responses to Defendants' Objections. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 25.     DC has paid the Shusters over $610,000 under the 1992 agreement and as special bonuses, and DC continues to make payments to Jean to this day.  [LD ¶ 9 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.] | |
| DEFENDANTS' RESPONSE | DC'S REPLY |
| **Disputed,** to the extent that there is no evidence that the Shusters were paid "over $610,000" in 1992-2012 under the 1992 Agreement and as bonuses.<br><br>DC's Evidence:  LD ¶ 9 & Exs. 23, 27, 33, 39, 53, 60, 67, 71.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Exhibits: Same. | Levitz's sworn declaration (which defendants do literally nothing to refute) establishes that:  "In total, DC has paid Jean at least … $610,000 under the 1992 agreement, and continues to pay her under the agreement to this day."  LD ¶ 9.  Business executives can provide such testimony, *e.g.*, *Lockheed Martin*, 70 Fed. Cl. at 753-54; *Barthelemy*, 897 F.2d at 1018, and Levitz not only establishes these facts through his unrebutted testimony, DC provided documentary evidence to support it, *e.g.*, LD Exs. 23, 27, 33, 39, 53, 60, 67, 71.  Nor do defendants offer any testimony from Jean Peavy or any other defendant to contest these amounts. |
| DC'S STATEMENT OF UNCONTROVERTED FACT | |
| 26.     Jean's 50-year-old son, Mark Peary (born Peavy), who lives with his mother and does not have a job, testified that Jean was of sound mind when she sent these letters to DC.  [PD Ex. 46 at 443:19-444:22.] | |
| DEFENDANTS' RESPONSE | DC'S REPLY |
| **Disputed,** to the extent that Mark Peary shares a house with his mother and his sister, Dawn Peavy, and is self-employed as an investor and published author.<br><br>DC's Evidence:  PD Ex. 46 at 443:19-444:22.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to those facts defendants dispute, Peary's sister moved into his mom's house with him years later, Docket No. 360-2 at 81:9-14; he published two books in 20 years, WARREN PEARY, THE 10 BIGGEST DIET MYTHS AND GREATEST HEALTH SECRETS REVEALED (2003) |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| Defendants' Evidence: PD Ex. 46 at 444:9-444:22; AD Ex. 17 at 363:14-365. | (self-published by Peavy's mother); WILLIAM S. PEAVY & WARREN PEARY, SUPER NUTRITION GARDENING (1992); and defendants do not explain how investing one's own money is a "job." |
|---|---|

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 27.    Mark Peary, Jean's doctor, and Jean's daughter testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying."  [PD Exs. 44, 46 at 447:18-448:3, 455:10-21, 48 at 517:17-22, 520:2-4, 523:4-13.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Undisputed**, but irrelevant. <u>Objections to DC's Evidence</u>: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403. | Such relevance objections are improper as set forth in DC's Responses to Defendants' Objections. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 28.    In 1996, Peary sent Levitz a screenplay about "the life story of Joe Shuster and Jerry Siegel" called "Dreamers," and asked Levitz to share it with Warner Bros. Peary's screenplay detailed how Shuster became estranged from DC, but toward the end of his life, he and DC made amends.  [LD ¶ 10 & Ex. 44.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** The screenplay "Dreamers" was a fictionalized account of Shuster's life and did not purport to portray his actual relationship with DC.<br><br><u>DC's Evidence</u>:  LD ¶ 10 & Ex. 44.<br><br><u>Objections to DC's Evidence</u>: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403. Inadmissible hearsay.  Fed. R. Evid. 801, 802.  Lack of foundation and personal | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the one point defendants contest, DC's cited evidence shows that Peary described "Dreamers" to Levitz as the "inspiring life story of Joe Shuster and Jerry Siegel," LD Ex. 44 at 82; *id.* ¶ 10.  The screenplay—at pages 126-30 of LD Ex. 44—discusses how Joe Shuster made amends with DC late in his life, just as Levitz testified, LD ¶ 10. |

DC'S RESP. TO DEFS.' STATEMENT OF
                                          GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| knowledge.  Fed. R. Evid. 602.<br><br>Defendant's Evidence:  LD Ex. 44; PD Ex. 46, 450:12-452:3. | |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

29.    Warner Bros. declined to develop "Dreamers," and in 1999, Peary submitted a revised script and asked Levitz if the Siegel family's copyright termination effort would "interfere with [him] selling [his] screenplay."  [LD ¶ 10 & Ex. 46, 62.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Undisputed,** but irrelevant.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403. | Such relevance objections are improper as set forth in DC's Responses to Defendants' Objections. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

30.    Before Peary met Marc Toberoff, he never told DC the Shusters had a right to terminate or challenged the 1992 Agreement.  Instead, from 1992 to 2001, he and Jean affirmed the Agreement and accepted payments under it.  [*E.g.*, LD ¶ 10 & Exs. 20, 23, 24, 26, 27, 28, 33, 34, 39, 43, 53, 54, 59, 60, 61, 67, 68, 71, 72.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.**  Peary never affirmed or even mentioned the 1992 Agreement in the letters DC cites.  Peary was not a party to the 1992 Agreement and did not receive any payments under it.  Jean raised concerns about the terms of the 1992 Agreement less than two months after signing it and thereafter repeatedly asked DC to increase her pension, which DC denied.<br><br>Furthermore, this Court has clearly held that the acceptance of benefits under a pension | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the facts defendants disputes, the evidence shows:<br>• Peary was involved in negotiation of the 1992 Agreement—"Jean asked [him] to forward all of the final debts and expenses for Joe Shuster on to [DC]" for payment, which he did, LD Ex. 7;<br>• Though he and his mother regularly corresponded with Levitz between 1992 and 2001, "Mark Peary never told [Levitz] that he thought he or his family had any remaining |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| agreement is not a bar to termination, in a ruling incorporated into a judgment that DC did not challenge on appeal. *Siegel I*, 542 F. Supp. 2d at 1132-34. | termination claims to assert," LD ¶ 10, Exs. 3, 7, 10, 11, 16-20, 22-35, 37, 39, 41-44, 45-74, 77, 78; |
|---|---|
| <u>DC's Evidence</u>: *E.g.*, LD ¶ 10 & Exs. 20, 23, 24, 26, 27, 28, 33, 34, 39, 43, 53, 54, 59, 60, 61, 67, 68, 71, 72. | • Jean sent DC letters requesting more money to help support Peary, LD Ex. 25; and Peary's sister testified that he "handle[s Jean's] financial issues," Docket No. 305-53 at 2019:2-5, 2056:13-21; |
| <u>Objections to DC's Evidence</u>: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403. | • Jean repeatedly affirmed the 1992 agreement, stating that she would "stick to our bargain," LD Ex. 20 at 43-44, and "continue to honor" the agreement, *id.* Ex. 59; |
| <u>Defendants' Evidence</u>: Same; LD Exs. 10, 17, 45, 52, 66, 70. | • DC granted *every one* of Jean's requests for a bonus—and in many instances, gave her a bonus even when she did not request one. LD Exs. 23, 27, 33, 39, 52-53, 59-60, 66-67, 70-71; |
| | • And Peary submits no testimony—declaration or otherwise—contesting these facts. |
| | Contrary to defendants' straw-man arguments, SUF 30 does not assert, *e.g.*, that "Peary was … a party to the 1992 Agreement." |

| **DC'S STATEMENT OF UNCONTROVERTED FACT** |
|---|

31.    In a November 2001 "Joint Venture Agreement," Peary and Jean formed a joint venture with Toberoff's company Pacific Pictures Corporation "for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations."  Jean and Peary "transfer[ed] and assign[ed]" the following "Rights" to the Joint Venture:

> The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books….

The agreement provided that "in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by [the Shusters] and fifty percent (50%) by [Pacific Pictures]."  [PD Ex. 32; *see*

| | |
|---|---|
| *also* Docket No. 305-37.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent that the 2001 agreement could not have transferred or assigned to the joint venture either the termination rights or the future copyright interests recovered as a result of exercising such termination, as a matter of copyright law. 17 U.S.C. §§ 304(c)(5)-(6)(B), 203(a)(1)—(5). The only person eligible for the termination right under the Copyright Act, 17 U.S.C. § 304(c)(2), is the executor, personal representative or administrator of the estate of Joseph Shuster, and the estate was not probated and Mr. Peary was not appointed as its executor until 2003.<br><br>In 2003, after the Shuster Estate was probated, a new agreement was made between PPC and the Shuster Executor (the "2003 PPC Agreement").<br> As such, the 2001 PPC Agreement is legally inapplicable. Furthermore, in 2004, both PPC Agreements were revoked in 2004 and replaced by a legal retainer agreement.<br><br><u>DC's Evidence</u>: PD Ex. 32. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>Moreover, defendants' objection is improper legal argument that needed to be made in their 25-page opposition brief—not in this extra pleading. Docket No. 328 (admonishing defendants for "slithering" around Court's rules on page limits). Defendants' improper and baseless legal arguments are addressed in DC's legal briefs. DC's MSJ at 11-12; DC's MSJ Reply at 5-6, 8. They are also refuted by the 2001 Pacific Pictures agreement, PD Ex. 37, which Peary admitted under oath—and without objection—operated to assign to Pacific Pictures "all of the Joe Shuster rights, termination rights, to the extent they existed …. [Those rights] were being transferred and assigned to the venture just as [the 2001 contract] says." PD Ex. 46 at 482:8-23. In the 2003 Pacific Pictures agreement, Peary "confirm[ed]" the 2001 agreement on behalf of the Shuster estate. *Id.* Ex. 36.<br><br>Finally, defendants' unsupported factual and legal assertion that their 2004 "legal retainer agreement" revoked and replaced the PPC Agreements is untrue and immaterial, in any event, as shown in DC's briefing. DC's MSJ Reply at 12. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| Defendants' Evidence: Same. AD Exs. 13, 27. | |
|---|---|

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

32.    Toberoff, Jean, Peary, and the Shuster Estate reaffirmed the terms of the Pacific Pictures Joint Venture in a 2003 amendment "confirm[ing]" that the joint venture held the Estate's "copyright termination interest in 'SUPERMAN' pursuant to Section 304(d) of the U.S. Copyright Law." [PD Ex. 36.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** Jean was not a party to the 2003 PPC Agreement, and had no rights or obligations under it. The only parties to the 2003 PPC Agreement were PPC and the Executor of the Estate of Joseph Shuster. The Shuster Executor, appointed in October of 2003, was party only to the 2003 PPC Agreement which did not purport to transfer any termination rights to PPC, but rather provided PPC with a contingent share of proceeds, if any, from recaptured copyright interests.<br><br>The 2003 agreement could not have transferred or assigned to the joint venture the termination right or the future copyrights to be recovered by termination as a matter of copyright law, 17 U.S.C. §304(c)(5)-(6)(B), §203(a)(1)—(5), nor did it even purport to assign either. The 2003 agreement provided that future proceeds, if any, from | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>Moreover, defendants' objection is improper legal argument that needed to be made in their 25-page opposition brief—not in this extra pleading.<br><br>Defendants' improper and baseless legal arguments are addressed in DC's legal briefs. DC's MSJ at 11-12; DC's MSJ Reply at 5-6, 8. They are also refuted by the 2003 Pacific Pictures agreement, PD Ex. 36, which "confirm[ed]" on behalf of the Shuster estate the 2001 agreement "transfer[ring] and assign[ing] to the Venture" the Shuster heirs' termination interest. *Id.* Ex. 32; *see also id.* Ex. 46 at 482:8-23 (Peary admitting under oath—and without objection—that this 2001 agreement operated to assign to Pacific Pictures "all of the Joe Shuster rights, termination rights, to the extent they existed"). |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| recovered copyrights would be shared. | |
|---|---|
| DC's Evidence:  PD Ex. 36. | |
| Defendants' Evidence:  Same at ¶1, 10. | |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

33.    Peary admits that, in 2003, he understood "that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as [the contract] says."  [PD Ex. 46 at 482:8-23.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** to the extent that Peary did not say the quoted language.  Also disputed to the extent that it omits that Peary later learned in discussions with Toberoff that the contract was invalid.<br><br>DC's Evidence:  PD Ex. 46 482:8-23.<br><br>Objections to DC's Evidence:  Improper lay opinion and legal conclusions.  Fed. R. of Evid. 701, 702.  Relevancy.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>And as to the fact it does dispute—that "Peary did not say the quoted language"—the evidence DC cited shows that Peary testified as follows:<br><br>Q:  Okay.  [The 2001 PPC Agreement] says: "In considerations for PPC's contributions to the Venture in the mutual covenants contained herein, claimants hereby transfer and assign to the Venture their rights, titles and – title and interests in the rights."  Do you see that?<br>A:  Yes.<br>*Q:  So you understood when you signed this that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says, correct?*<br>A: *Yes.*<br>PD Ex. 46 at 482:8-23 (emphasis added).  In the 2003 Pacific Pictures agreement, Peary "confirmed the [2001] agreement" on behalf of |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

the Shuster estate—effectively retransferring the same rights on behalf of the estate. *Id.* Ex. 36. Peary is bound by his admissions above, which he made under oath and without any objection from counsel. Deponents who make such direct admissions, by answering an unqualified "Yes" to such questions, cannot "dispute" such testimony, by having their lawyer say the fact is "disputed" in opposing summary judgment. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 252, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|

34.    Peary concedes, as did Toberoff, that these Pacific Pictures agreements are "not lawful," because, *inter alia*, the Shusters could only make such a rights deal with DC. Peary testified he was unaware that the agreements were unlawful when he signed them and filed the Notice. [PD Ex. 46 at 485:16-488:21; Docket No. 191 at 8.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** Peary did not testify that the PPC agreements are "not lawful" because the Shusters could only make such a rights deal with DC.<br><br>DC's Evidence: PD Ex. 46 at 485:16-488:21; Docket No. 191 | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7.<br><br>As to the fact defendants dispute, in moving to dismiss DC's First and Second Claims, Toberoff and Peary asserted that the Pacific Pictures |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| at 8.<br><br><u>Defendants' Evidence:</u>  Same. | agreements were "void *ab initio*" because § 304(c)(6)(D) of the Copyright Act prevents the Shusters from entering into a rights deal with anyone but DC until "after the effective date of the termination."  Docket No. 191 at 8.<br><br>At his deposition, Peary admitted he was "[n]ot [aware] at the time" he signed the Pacific Pictures agreements that they were "not lawful," but became aware of that fact "[s]ometime [in] 2003" when Toberoff told him they were illegal. PD Ex. 46 at 485:16-488:21.  That testimony is reproduced below:<br><br>Q:  Did you think -- did you think that it was proper for lawyer to impose that -- to have such a -- an agreement with a client that the client can't settle without the lawyer's consent no matter how much the client wants to settle?<br>A:  At the time I didn't consider it.<br>Q:  Did you think it was appropriate?  Did you have any knowledge on that subject whether the lawyers are even permitted under the law to have such arrangements?<br>A:  No, I -- I was not aware.<br>Q:  Did you do any research on that subject?<br>A:  Not specifically this, no.<br>Q:  Were you aware that it's not lawful for a lawyer to have such a -- an agreement with a client?<br>A:  Not at the time.<br>Q:  Have you since become aware of that?<br>A:  Yes.<br>Q:  When?<br>A:  Sometime 2003.<br>Q:  How?<br>A:  Discussions with Marc Toberoff. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | PD Ex. 46 at 485:16-488:21. |
|---|---|
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 35.    Peary negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel.  [PD Ex. 39 at 319:9-320:14.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed,** to the extent that it omits that Toberoff advised Peary to seek outside counsel.<br><br>DC's Evidence:  PD Ex. 39 at 319:9-320:14.<br><br>Objections to DC's Evidence: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  AD Ex. 19 at 320:19-23. | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the fact defendants assert—that Toberoff advised Peary to seek outside counsel—there is *no evidence* Toberoff disclosed in writing the conflict of interest arising from his business partnership with Peary or obtained a conflict waiver from the Shuster heirs, as the rules require.  CAL. R. OF PROF'L CONDUCT 3-300, 3-310.  Indeed, recently emerged evidence from the Toberoff Timeline files shows that another law firm openly questioned the legality and ethics of Toberoff's conduct, Docket No. 427-3 at 335-49—for the same reason the Ninth Circuit recently questioned Toberoff's "ethical and professional" conduct vis-à-vis the Shusters.  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012). |
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 36.    Peary only told his mother about the Pacific Pictures agreements "just before [they] were ready to sign."  [PD Ex. 46 at 492:20-493:11.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed**, as the quoted language was used by DC's counsel, and not used or adopted by Peary.<br><br>DC's Evidence:  PD Ex. 46 at | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| 492:20-493:11.<br><br>Objections to DC's Evidence:<br>Relevancy and prejudicial. Fed.<br>R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  PD Ex.<br>46 at 492:5-493:14. | As to the fact defendants do dispute—that Peary did not "use" or "adopt" the quoted language—defendants misstate and mischaracterize Peary's admissions, which are reproduced below:<br><br>Q:  At what point did you disclose to [Jean] what you were doing?<br>A:  Probably when I decided to work, retain Mr. Toberoff, it's probably when I really discussed it. …<br>*Q:  [W]hy did you decide not to share with your mother … your activities until just before you were ready to sign the document?*<br>*A:  I was doing research on my own and she … had no interest or knowledge of any … of the rights or anything.  <u>It was something I did completely on my own because I wanted to be thorough, so that's the reason.</u>*<br>Q:  And did you come to a point when you thought, like, you had sufficient, thorough information that you could then talk with her?<br>A:  Yes.<br>*Q:  [W]hen did you talk with her, was it in that conversation that you first identified to her that you had contacted Mr. Toberoff and you were recommending him?*<br>*A:  I believe so.*<br>PD Ex. 46 at 492:8-493:11 (emphasis added). Peary is bound by such admissions, which he made under oath and without any objection from counsel.  *See Kennedy*, 952 F.2d at 266; *supra* DC's Reply ISO SUF 33. |
| **DC's Statement of Uncontroverted Fact** | |
| 37.    When asked years ago about the Pacific Pictures agreements, Jean testified her "son handles everything legal" and she did not "know what's going on."  [PD Ex. 38 at 310:14-312:13.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.**  Jean was not asked about the PPC agreements.  She was asked about the 1992 Agreement and whether she knew if her brother's estate had made any claims to the Superman copyright.<br><br>DC omits parts of Jean's testimony; her answer was limited to the specific issue of whether the Estate had made claims, and she stated: "I don't know what's going on there."<br><br>DC's Evidence:  PD Ex. 38 at 310:14-312:13.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  PD Ex. 38 at 312:1-312:13. | Defendants' response is well taken in part, but immaterial, and misleading in another part.  When Jean was asked at deposition about her awareness of the Shuster estate filing a copyright termination claim related to Superman, she responded that her "son handles everything legal" and she did not "know what's going on there."  Of course, the termination notice was filed only after Toberoff, Peary, and Jean formed the Pacific Pictures Joint Venture.  PD Exs. 32, 36, 37.  As shown in SUF 36, Peary only showed his mother the original Pacific Pictures agreement just before it was ready to sign.  PD Ex. 46 at 492:8-493:11.  And while Peavy has signed later Pacific Pictures agreements, including one in 2011, her competency to do so is expressly in doubt, given the stroke she suffered in May 2009.  Docket No. 64-4 at 1. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

38.    In 2003, Peary initiated proceedings to probate Joe Shuster's estate—even though, in 1992, his mother had already filed an affidavit in California probate court to obtain all of Shuster's assets.  Peary asked the court to appoint him executor in place of his mother.  [PD Exs. 21, 33-34.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that it was the elderly Jean (86) not Mr. Peary, who asked that he be appointed in Jean's place.  Disputed in that it misleads by omission of the following:  In 2003 Joseph Shuster's estate was expressly | Again, defendants' response is improper because it *implicitly admits the only facts DC asserted,* and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.  Defendants improperly use their response to make merits-based arguments, but such |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

probated in California Superior Court for the express purpose of availing itself of the termination right that for the first time had been extended to the executor of an author's estate by the 1998 Copyright Termination Extension Act ("CTEA"). The Court found this to be reasonable and acceptable and duly appointed Mark Warren Peary as the personal representative of Joseph Shuster's estate, including for the express special purpose of exercising and enforcing the termination right under 17 U.S.C. § 304(c)(2)(d). When Joseph Shuster died, no one held his termination rights, and because he died with minimal assets consisting of some shares of stock, his estate was not probated by Jean in 1992. Instead, per Cal. Prob. Code § 13101, Jean filed an affidavit requesting that such stock be transferred to her.

DC's Evidence: PD Exs. 21, 33-34.

Evidentiary Objections: Relevancy and prejudicial. Fed. R. Evid. 401, 402, 403.

Defendants' Evidence: Same; PD Ex. 21 at 182.

arguments needed to be made in their 25-page opposition brief, and are baseless in any event. DC's MSJ at 15; DC's MSJ Reply at 5-6.

As to the "new" facts defendants assert, all are disputed, and the evidence shows that though defendants claim "it was the elderly Jean (86) not Mr. Peary, who asked that he be appointed in Jean's place," Jean was 82 in 2003, PD Ex. 46 at 447:21-22, and it was *Peary*, not Jean, who petitioned the probate court to be appointed executor of the Shuster estate—even though Shuster's will named Jean the "executrix" and sole beneficiary of his estate, and in 1992, Jean had already filed an affidavit in California probate court to obtain all of Shuster's assets, PD Exs. 21, 33-34; LD 3 at 9.

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 39.    Peary has kept this probate matter open for nine years—despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible." [PD Ex. 35.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that DC erroneously implies that Mr. Peary has not fulfilled his responsibilities as executor of Joseph Shuster's estate.  The estate was specifically probated to avail itself of the termination right under the 1998 CTEA, 17 U.S.C. § 304(d).<br><br>Because a notice of termination as to the early Superman copyrights (e.g., AC#1) would not be effective until 2013 (i.e., 1938 + 75 years) at the earliest under 17 U.S.C. § 304(d)(2), and because the copyright interests cannot be transferred prior to the effective date of termination per 17 U.S.C. § 304(c)(5), the estate has properly been kept open until at least the termination takes effect in 2013.<br><br>DC's Evidence:  PD Ex. 35.<br><br>Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.<br><br>Defendants' Evidence:  PD Exs. 33-34. | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the fact defendants dispute—that "Peary has not fulfilled his responsibilities as executor"—the evidence cited by DC shows that Peary initiated proceedings to probate Shuster's estate in 2003, PD Exs. 33, 34, and signed a form committing to "complet[e] the estate administration as promptly as possible," PD Ex. 35; but the probate remains open to this day. Cal. Super. Ct., Case No. BP 080635.  As for defendants' improper legal arguments, California case law shows that Peary should have closed the Estate years ago, but has kept it open so defendants can make their improper, wrong-party shell-game arguments.  *In re Kalt's Estate*, 16 Cal. 2d at 811; *Estate of Molino*, 165 Cal. App. 4th at 921; Docket Nos. 186 at 12-13; 334 at 9-10; *see also* DC's MSJ at 11-12, 15-17; DC's MSJ Reply at 8. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT |
| --- |

40.     Several weeks after initiating the probate matter and signing the 2003 Pacific Pictures Joint Venture contract, Peary, on behalf of the newly formed Shuster Estate, served a copyright termination notice on DC purporting to take effect on October 26, 2013 (the "Notice").  The Notice nowhere mentions the Joint Venture with Pacific Pictures, or the fact that the Shusters had transferred all their putative termination interests to the Venture.  [PD Ex. 37.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
| --- | --- |
| **Disputed,** in that the Shuster Termination was served many months after the probate case was initiated and after Peary had been appointed as the Shuster Executor.  Disputed in that neither Jean nor Peary, individually or as the executor of the Shuster estate, could have transferred or assigned to the joint venture the termination right or the future copyright interests to be recovered pursuant to statutory termination, as a matter of copyright law. 17 U.S.C. §§ 304(c)(5)-(6)(B).<br><br>DC's Evidence:  PD Ex. 37.<br><br>Defendants' Evidence:  Same. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7.<br><br>As to the fact defendants do dispute—"many months" versus "several weeks"—the undisputed evidence shows that the termination notice was served 13 weeks after the probate case was filed. PD Ex. 33 at 270, Ex. 37 at 303.<br><br>Defendants also improperly make merits-based arguments, but such arguments needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 11-12, 18-20; DC's MSJ Reply at 8. |

| DC'S STATEMENT OF UNCONTROVERTED FACT |
| --- |

41.     Attached to the Notice were sworn certifications by Toberoff and Peary that all information contained in the Notice was "true and correct" and "signed by all persons whose signature is necessary to terminate" Shuster's copyright grants. Toberoff also certified in the Notice that "that before serving the foregoing document …, I caused a reasonable investigation to be made as to the current ownership of the rights being terminated."  [PD Ex. 37 at 303-304.]

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed.** As required by 37 C.F.R. §201.10 (d), Mr. Toberoff duly certified that he "caused a reasonable investigation to be made as to the current ownership of the rights being terminated, including a search of the records in the U.S. Copyright Office." Mr. Peary duly certified, but was not required to swear, that "[to the best [of his] knowledge and belief, this notice has been signed by all persons who signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code." <br><br> DC's Evidence: PD Ex. 37 at 303-304. <br><br> Defendants' Evidence: PD Ex. 37 at 303. | The language used by DC in SUF 41 could have been more precise, so to be clear: Peary certified that all information contained in the termination notice was "true and correct" and "signed by all persons whose signature is necessary to terminate" Shuster's copyright grants. PD Ex. 37 at 303. Defendants do not dispute this. Moreover, Toberoff provided a sworn certification in the Notice "that before serving the foregoing document …, I caused a reasonable investigation to be made as to the current ownership of the rights being terminated." *Id*. at 304. Defendants do not dispute this. |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|
| 42.    In 2008, Peary and Jean signed a "consent agreement" with the Siegels that bars the families from entering into an agreement with DC without the consent of the other. [PD Exs. 46 at 458:21-459:25, 461:19-462:9, 465:25-469:1, 472:8-473:11, 47 at 500:10-501:24, 504:20-506:13, 509:15-511:8.] | |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that it implies that the agreement was titled or characterized itself as a "consent agreement," which DC's evidence does not | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules. Docket No. 18 at 6-7. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| support.<br><br>DC's Evidence:  PD Exs. 46 at 458:21-459:25, 461:19-462:9, 465:25-469:1, 472:8-473:11, 47 at 500:10-501:24, 504:20-506:13, 509:15-511:8. | As to the fact defendants dispute—that the agreement was not "titled or characterized … as a 'consent agreement'"—Peary testified as follows:<br><br>Q:  Have you signed any other agreements at any time since 2004 relating to legal representation to this case in any way?<br>A:  Yes.<br>Q:  What have you signed?<br>A:  … *[I]t's called a consent agreement*. …<br>Q:  You now recall that *you signed something called a consent agreement* and that's also in your lock box?<br>A:  *Yes.*<br>Q:  Okay.  When was that signed?<br>A:  That as 2008, I believe. …<br>Q:  Is the 2008 *consent agreement* the last agreement of any kind that you have signed in connection with either this case or anything having to do with the Joe Shuster termination issue?<br>A:  Yes.<br>Q:  Okay.  Who else signed the 2008 *consent agreement*?<br>A:  Would have been the -- Laura, Joanne Siegel. …<br>Q:  Anyone else?<br>A:  I think there was -- and -- and my attorney [Toberoff] signed it.<br>Q:  And did your mother, Jean Peavy, sign it?<br>A:  I don't recall if she did.  I just -- I didn't read it.  I just scanned the -- the pages.  I didn't -- I don't recall the signature page.  She might have.<br>PD Ex. 46 at 458:21-462:9 (emphasis added). |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| DC'S STATEMENT OF UNCONTROVERTED FACT |
|---|
| 43.    Peary conceded the "consent agreement" was signed by himself, "Laura [Larson], Joanne Siegel," and "Toberoff" in 2008; that it provides that "any agreement with DC or settlement with DC requires the consent of the Siegels"; and that it is "still in effect" today.  [PD Exs. 46 at 458:21-459:25, 461:19-462:9, 469:5-7, 47 at 509:15-511:8; *see also* Docket No. 160 at 63, 231 at 6.] |

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that it misleadingly implies that Mr. Toberoff signed the 2008 agreement as a party to the agreement.  Mr. Toberoff was not a party to the 2008 agreement, and expressly signed it as the Siegels' and Shuster estate's attorney, to approve the form of the agreement only.  Disputed in that DC cites to irrelevant testimony of Ms. Larson concerning Mr. Toberoff's contingency fee in an attempt to elicit bias (PD Ex. 47 at 509:15-511:8).  Disputed in that DC falsely attributes the testimony of Ms. Larson to Mr. Peary, who nowhere states that "any agreement with DC or settlement with DC requires the consent of the Siegels." <br><br> DC's Evidence:  PD Exs. 46 at 458:21-459:25, 461:19-462:9, 469:5-7, 47 at 509:15-511:8; *see also* Docket No. 160 at 63, 231 at 6. <br><br> Defendants' Evidence:  AD Ex. | Again, defendants' response is improper because it *implicitly admits most of the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. <br><br> As to the fact defendants dispute—whether Toberoff signed the consent agreement as a party—Peary testified as follows: <br><br> Q:  Okay.  *Who else signed the 2008 consent agreement*? <br> A:  Would have been the -- Laura, Joanne Siegel. … <br> Q:  Anyone else? <br> A:  I think there was -- and -- and *my attorney [Toberoff] signed it*. … <br> PD Ex. 46 at 461:19-462:2 (emphasis added). <br><br> Defendants have refused to produce the 2008 consent agreement, and cannot make self-serving assertions about its contents or who is bound by it.  *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").In any event, if this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| 26 at 369:1-4. | Defendants' claim that "DC falsely attributes the testimony of Ms. Larson to Mr. Peary, who nowhere states" the language quoted by DC, is demonstrably false, as Peary testified—without objection—as follows: |
|---|---|
| | Q: Did you tell your mother in your conversations over the years and in particular about the consent agreement that *any agreement with DC or settlement with DC requires the consent of the Siegels*? |
| | A: *Yes.* |
| | PD Ex. 46 at 473:1-8 (emphasis added). |

| DC'S STATEMENT OF UNCONTROVERTED FACT | |
|---|---|

44.    After this Court held in the related *Siegel* case that "promotional announcements" featuring the first appearance of Superman fell outside the termination window of § 304(c) of the Copyright Act, both the Siegel and Shuster heirs served new termination notices in 2012 purporting to terminate the announcements.  [PD Exs. 41 at 369-70, 49-50.]

| DEFENDANTS' RESPONSE | DC'S REPLY |
|---|---|
| **Disputed,** in that the Court was referring to certain identified "promotional announcements," not such announcements in general, and disputed as to the term "purporting." | Again, defendants' response is improper because it *implicitly admits the facts DC asserted*, and "disputes" other extraneous, immaterial facts defendants wish to argue—all in contravention of this Court's rules.  Docket No. 18 at 6-7. |
| DC's Evidence:  PD Exs. 41 at 369-70, 49-50. | Defendants' immaterial quibbles are hard to follow, but they cannot dispute that the *Siegel* court held that the "promotional announcements" featuring the first appearance of Superman fell "outside the effective reach of the [Siegel] termination notices."  PD Ex. 41 at 369-70.  Or that after this ruling, the Siegel and Shuster heirs served new termination notices in 2012 purporting to the terminate the announcements. PD Exs. 49-50.  DC says "purport" because the law is clear—copyright termination notices are |
| Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403. | |
| Defendants' Evidence:  PD Ex. 49, 50. | |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

|  | not self-executing and are not valid or enforceable just because they were served. *E.g.*, 37 C.F.R. § 201.10(f)(6) ("Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction."); *Burroughs v. Metro-Goldwyn Mayer, Inc.*, 491 F. Supp. 1320, 1323 n.3 (S.D.N.Y. 1980). Defendants cite no law to the contrary. |
|---|---|
| **DC'S STATEMENT OF UNCONTROVERTED FACT** | |
| 45.    Joe Shuster's original wish, as embodied in the 1975 agreement, was to take care of Frank Shuster because of the assistance Frank had rendered on the early Superman strips as a letterer, and because Frank had taken Joe in during the 1960s; he had never known or understood Joe to want to provide for Jean.  [LD ¶ 7.] | |
| **DEFENDANTS' RESPONSE** | **DC'S REPLY** |
| **Disputed.** DC's Evidence:  LD ¶ 7. Objections to DC's Evidence: Relevancy and prejudicial.  Fed. R. Evid. 401, 402, 403.  Lack of foundation and personal knowledge.  Fed. R. Evid. 602. Improper opinion testimony. Fed. R. Evid. 701. | Defendants fail to identify what fact, if any, they dispute.  Levitz testified—and defendants do not refute—that he "understood Joe's original wish, as embodied in the 1975 agreement, to be to take care of Frank because of the assistance Frank had rendered on the early strips as a letterer, and because Frank had taken Joe in during the 1960s," and "had never known or understood Joe to want to provide for Jean."  LD ¶ 7.  This testimony is uncontradicted and not impeached. The 1975 agreement also very clearly only provides for any benefits for Frank, not Jean.  LD Ex. 15 at 144. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

## II.  DC'S RESPONSES TO DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

| DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS | DC'S RESPONSE |
|---|---|
| 46.  Author Jerome Siegel and illustrator Joseph Shuster co-created Superman in high school in 1933-34.<br><br>Defendants' Evidence:  PD Ex. 10 at 77, ¶ 8. | **Undisputed** that Siegel and Shuster co-created a character called Superman in 1933-34, even though defendants offer no competent evidence to support this claim.  The evidence they cite—a 1947 finding of fact issued by the New York Supreme Court in Westchester County (the "Westchester Action")—states only that Siegel and Shuster "first created cartoon material in which [Superman] first appeared in 1934." |
| 47.  Siegel and Shuster's highly original character became a cultural icon, spawned a multi-billion dollar franchise and brought fortune to many, but not to them.<br><br>Defendants' Evidence:  AD Ex. 1-3, 5, 6. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>As expert witnesses showed in the related *Siegel* case, Shuster and Siegel's limited, original contributions to Superman were not "highly original" and did not "spawn" the Superman franchise—the work of scores of DC artists and editors (including, from time to time, Siegel and Shuster) did.  *E.g.*, SD Exs. 8 ¶ 5; 9 at 5-6.<br><br>DC does not dispute for purposes of this motion that Superman became a "cultural icon" or "spawned a multi-billion dollar franchise," but does dispute that Siegel and Shuster were solely responsible for its success.  Scores of DC artists, editors, and others (including Siegel and Shuster) were responsible.  *Id.*<br><br>DC disputes that Superman "brought fortune to many, but not to [Siegel and Shuster]."  Along with their families, Siegel and Shuster received millions of dollars in compensation for their contributions to Superman.  PD Exs. 7 at 27; 15; 17-19; 23; LD ¶¶ |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

4, 9 & Exs. 3, 5, 8, 10-11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 75-78.  In any event, defendants offer no competent evidence to support this claim, as the hearsay newspaper articles they cite—three articles from the 1970s and obituaries for Siegel and Shuster—merely purport to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives after two failed lawsuits against DC and do not address the millions of dollars the men and their families were paid by DC both before and after these hardships.  *See id.*

Objections to Defendants' Evidence:  AD Exs. 1-3, 5, and 6 are inadmissible hearsay.  FED. R. EVID. 801, 802; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 n.3 (9th Cir. 2005).  Defendants offer these newspaper articles solely for the truth of the matters contained therein to support their erroneous argument that Siegel and Shuster did not benefit from the exploitation of Superman.  Defendants cannot and do not identify any hearsay exception or other basis that would justify the exhibits' admission.  *E.g.*, *Twardowski v. Am. Airlines*, 535 F.3d 952, 961 (9th Cir. 2008); *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001); *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991).

FED. R. CIV. P. 56(c)(1)-(2) requires that only admissible evidence be considered for purposes of summary judgment, thus AD Exs. 1-3, 5, and 6 must be disregarded, *In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008).

Lack of foundation.  Lack of personal knowledge.  FED. R. EVID. 602.

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| 48.    On March 1, 1938, Siegel and Shuster, without counsel, signed an agreement furnished by DC under which they were paid $130 ("1938 Grant") for the rights to their Superman story.<br><br>Defendants' Evidence:  PD Ex. 10 at 81, ¶ 24. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that on March 1, 1938, Siegel and Shuster signed an agreement drafted by DC based on the parties' discussions and negotiations providing, in relevant part:  "In consideration of $130.00 agreed to be paid me by you, I hereby sell and transfer [the Superman] work and strip, all goodwill attached thereto and exclusive right to the use of the characters and story, continuity and title of strip contained therein, to you and your assigns to have and hold forever…."  PD Ex. 2 at 10.<br><br>DC disputes that Siegel and Shuster entered into the March 1, 1938, agreement "without counsel." Defendants offer no competent evidence to support this claim, as the evidence they do cite—a finding of fact from the Westchester Action—merely states that DC sent Siegel and Shuster a check for "$412, which included $130 in payment of the first thirteen page SUPERMAN release at the agreed rate of $10 per page, and a written instrument for [their] signatures." |
| 49.    The 1938 exchange of the rights to Superman for $130 is often cited as the prime example of the type of unremunerative grant the termination right was enacted to remedy.<br><br>Defendants' Evidence: Edward E. Weiman, Andrew W. DeFrancis, Kenneth D. Kronstadt, "Copyright Termination for | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Two cites to recent law review articles do not establish this "fact," which is really only an improper legal argument masquerading as fact. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| Noncopyright Majors: An Overview of Termination Rights and Procedures", 24 INTELL. PROP. & TECH. L.J. 3, 4 (2012) ("First, Congress sought to protect ...first-time authors who, when faced with no alternative, might assign their copyrights for little compensation. For example, when Jerry Siegel and Joe Shuster sold the rights to the Superman character to DC Comics for $130."); Timothy K. Armstrong, "Shrinking the Commons: Termination of Copyright Licenses and Transfers for the Benefit of the Public," 47 HARV. J. ON LEGIS. 359, 399-400 (2010) ("Siegel and Shuster's situation exemplified a pattern that, the legislative history suggests, occurred all too frequently..."). | |
| 50.    Although Superman soon became a phenomenal financial success, DC kept its creators at a basic "page rate," and denied their requests for a simple royalty. <u>Defendants' Evidence</u>:  AD Exs. 1, 3. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Superman was a "financial success."<br><br>DC disputes that it "kept [Siegel and Shuster] at a basic 'page rate,' and denied their requests for a simple royalty."  Siegel and Shuster were initially paid a generous per-page rate for their work on Superman—substantially "more than anyone else [was] getting for any feature in any of" DC's other |

books—which DC increased with the success of Superman.  PD Exs. 3 at 12, 5 at 17, 6 at 20, 7 at 27, 10 at 88-89.  Siegel and Shuster also received substantial royalties for many exploitations of Superman, including between "32½%" and "40% of the 'net proceeds'" received from newspaper syndication and "5% of all net proceeds which may be derived of commercial exploitation of SUPERMAN."  PD Exs. 3, 4, 6, 10 at 85-87 (FOF 45-49, 52).  DC also paid Siegel and Shuster generous lump sums and "bonus[es]" throughout the years.  PD Exs. 3-6, 10 at 88-91 (FOF 55-59, 64-77).

In any event, defendants offer no competent evidence to support this claim, as the two hearsay newspaper articles they cite from 1975 and 1979 merely purport to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives and do not address the specific payment terms of DC's agreements with Siegel and Shuster, *cf. id.*, or the millions of dollars the men and their families were paid by DC.  PD Exs. 7 at 27; 15; 17-19; 23; LD ¶¶ 4, 9 & Exs. 3, 5, 8, 10-11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 75-78.  Moreover, one of these articles refutes defendants' assertion that Siegel and Shuster were not paid royalties, noting: "A revised contract during the '40s also gave [Siegel and Shuster] a small percentage from merchandising."  AD Ex. 3 at 8.

Objections to Defendants' Evidence:  AD Exs. 1 and 3 are inadmissible hearsay.  FED. R. EVID. 801, 802; *supra* at DC's Response to Defendants' Statement of Additional Undisputed Fact ("DSAUF") 47.

Lack of foundation.  Lack of personal knowledge.

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | FED. R. EVID. 602. |
|---|---|
| 51.    In 1947, Siegel and Shuster filed suit against DC in Westchester N.Y. (the "1947 Action").<br><br>Defendants' Evidence: *Siegel v. National Periodical Publications*, 508 F.2d 909, 912 (2d Cir. 1974). | **Undisputed.** |
| 52.    The court in the 1947 Action ultimately held (a) that DC owned Superman pursuant to the 1938 Grant but (b) that DC had stolen Superboy from Siegel, while he was overseas fighting for his country in WWII. The parties thereafter settled the case.<br><br>Defendants' Evidence:  PD Ex. 10 at 108-110, 12 at 120. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Defendants mischaracterize the Westchester Action and its outcome.  Siegel and Shuster sought to recapture rights in Superman by challenging their 1938 agreements with DC, and also challenged DC's 1944 publication of a series of comic-book stories entitled "Superboy," which featured the adventures of Superman as a youth.  In 1947, a referee issued an opinion holding that the parties' 1938 agreements were valid and that Siegel and Shuster assigned "all" of their Superman rights to DC.  The referee found that DC improperly published Superboy—not "that DC had stolen Superboy from Siegel."  DC filed a notice of appeal, but the parties ultimately entered into a stipulation and consent judgment in 1948 in which Siegel and Shuster (1) acknowledged that they transferred to DC all rights in Superman and (2) agreed that DC was the sole and exclusive owner of all rights in Superman and Superboy.  In exchange, Siegel and Shuster were paid nearly $900,000 in today's dollars.  PD Ex. 10 at 108-110; *see Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1112 (C.D. Cal. 2008); CPI Inflation Calculator, Bureau of Labor Statistics |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | (http://www.bls.gov/data/inflation_calculator.htm/).<br><br>DC also disputes that Siegel was "overseas fighting for his country in WWII" when DC published Superboy.  *See supra* SUF 7. |
| 53.    In retaliation for the 1947 Action, DC cut Siegel and Shuster off, and from 1949-1975, deleted their credit byline and any references to them from its publications and corporate histories.<br><br>Defendants' Evidence:  AD Ex. 3 at 8. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC did not "retaliate" against Siegel and Shuster following the Westchester Action—as discussed *supra* at SUF 52, after DC prevailed in large part, the parties entered into a stipulation and consent judgment whereby Siegel and Shuster were paid nearly $900,000 in today's dollars.<br><br>Siegel and Shuster left DC in 1947, so there was no work to "cut off" and no "credit byline" to be deleted.  Moreover, Siegel *objected* to having his name associated with stories he had not written; in the Westchester Action, Siegel's complaint asserted that DC acted improperly by "affix[ing] to the individual releases of said comic strip the name of plaintiff, SIEGEL, as author of the said releases ... whereas in truth and in fact the plaintiff Siegel, was not the author of the individual releases."  PD Ex. 9 at 42.  In any event, DC *did* continue to credit Siegel and Shuster on certain works, *see* SD Exs. 4, 5, and as a gesture of goodwill, in the 1975 agreement DC agreed to give "created by" credit to Siegel and Shuster on Superman works—this was not a "credit byline."  PD Ex. 15.  DC is not aware of any deletion of references to Siegel and Shuster from its "corporate histories."<br><br>Defendants omit that DC re-hired Siegel in the 1950s at Joanne Siegel's request—until, in late 1965, Siegel and Shuster filed false renewal registrations with the Copyright Office and filed a lawsuit seeking a declaration that they owned those |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | renewal rights. SD Ex. 7 at 18:16-19:23; *Siegel v. National Periodical Pubs., Inc.*, 508 F.2d 909, 914 (2d Cir. 1974). |
| | In any event, defendants offer no competent evidence to support this claim, as the one hearsay newspaper article they cite from 1979 merely purports to describe the unfortunate financial hardship Siegel and Shuster faced later in their lives and notes—incorrectly—that Siegel and Shuster's "by-lines as creators of Superman had been removed after the 1947-48 litigation, restored after the 1975 case." |
| | Objections to Defendants' Evidence: AD Ex. 3 is inadmissible hearsay. FED. R. EVID. 801, 802; *supra* DC's Response to DSAUF 47. |
| | Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. |
| 54.    Siegel's last job was as a mail clerk, and Shuster worked intermittently as a messenger boy.<br><br>Defendants' Evidence: AD Ex. 2. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Defendants offer no competent evidence to support this claim, as the one hearsay newspaper article they cite from 1975 merely states that Siegel worked "as a mail clerk in Los Angeles" and Shuster lived "with his younger brother, Frank, who supports him."<br><br>Objections to Defendants' Evidence: AD Ex. 2 is inadmissible hearsay. FED. R. EVID. 801, 802; *supra* DC's Response to DSAUF 47.<br><br>Lack of foundation. Lack of personal knowledge. FED. R. EVID. 602. |
| 55.    In 1969, Siegel and Shuster commenced a federal action seeking declaratory relief as to ownership of the | **Undisputed**. |

| | |
|---|---|
| Superman renewal copyrights.<br><br>Defendants' Evidence:<br>*Siegel*, 508 F.2d at 912-13. | |
| 56.    The 1969 lawsuit resulted in Second Circuit's decision in Siegel, 508 F.2d at 912-13, that DC owned the renewal copyright to Superman pursuant to the 1938 Grant.<br><br>Defendants' Evidence:<br>*Siegel*, 508 F.2d at 912-13. | **Undisputed.** |
| 57.    In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign against DC and its parent, Warner Communications, to protest DC's shabby treatment of Siegel and Shuster.<br><br>Defendants' Evidence:  AD Ex. 2. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that in 1975, certain individuals who were also members of the National Cartoonists Society and Cartoonists Guild supported Siegel and Shuster in their effort to obtain financial assistance from DC and Warner Communications Inc.<br><br>DC disputes the suggestion that it engaged in "shabby treatment" of Siegel and Shuster.  Siegel and Shuster, and their heirs, after suing DC twice and losing, nonetheless were given millions of dollars in recognition of Siegel's and Shuster's contributions to Superman and as a gesture of goodwill.  PD Exs. 7 at 27; 15; 17-19; 23; LD ¶¶ 4, 9 & Exs. 3, 5, 8, 10-11, 16-20, 22-35, 37, 39, 41-43, 45-61, 63-74, 75-78. |
| 58.    In 1975, Warner finally agreed to pay Siegel and Shuster an annual pension of $20,000, and restored their creator credits after 26 years | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that in 1975, Warner Communications Inc. entered into an agreement with Siegel and Shuster |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

(the "1975 Agreement").  The agreement did not transfer the Superman copyrights and expressly acknowledged that such rights were already owned by DC.

Defendants' Evidence:  PD Ex. 15.

providing the pair with, in today's dollars, lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  SUF 8, PD Ex. 15.  Siegel and Shuster acknowledged that DC owned all Superman-related copyrights.  *Id.*

DC disputes the implication that DC delayed in entering into the 1975 agreement with Siegel and Shuster.  The pair left DC in 1947, and engaged in litigation with DC for several years thereafter.  *Nat'l Periodical Pubs.*, 508 F.2d 909.  After the *National* litigation, in which the Second Circuit affirmed that DC owned all rights in Superman, *id.* at 914, Siegel and Shuster encountered financial hardship and approached DC for help, and DC provided Siegel, Shuster, and their families with the generous benefits described above.  DC also disputes that it "restored … creator credits" to Siegel and Shuster in the 1975 agreement.  After Siegel and Shuster left DC in 1947, there was no need to give "credits" to the pair for the work of other DC artists and writers.  In fact, Siegel *objected* to having his name associated with stories he had not written; in the Westchester Action, Siegel's complaint asserted that DC acted improperly by "affix[ing] to the individual releases of said comic strip the name of plaintiff, SIEGEL, as author of the said releases ... whereas in truth and in fact the plaintiff Siegel, was not the author of the individual releases."  PD Ex. 9 at 42.  As a gesture of goodwill, in the 1975 agreement DC agreed to give "created by" credit to Siegel and Shuster on Superman works.  PD Ex. 15 at 146-47.  Finally, the parties have litigated whether the 1975 agreement "transfer[red] the Superman

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | copyrights." |
| 59.    The 1975 Agreement also provided that, after Shuster's death, Warner would pay his brother Frank an annual pension of $5,000.<br><br>Defendants' Evidence:  PD Ex. 15 at 144. | **Undisputed.** |
| 60.    Joseph Shuster died on July 30, 1992 without widow or child, but was survived by his siblings Frank Shuster and Jean Peavy.<br><br>Defendants' Evidence:  PD Ex. 20. | **Undisputed.** |
| 61.    As Shuster had minimal assets, comprised only of a few shares of stock, his estate was not probated. Per Cal. Prob. Code § 13101, Jean Peavy filed an affidavit requesting that the stock be transferred to her.<br><br>Defendants' Evidence:  PD Ex. 21. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Jean Peavy filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." SUF 14, PD Ex. 21.<br><br>DC disputes that "Shuster had minimal assets, comprised only of a few shares of stock."  Shuster had 768 shares of Time Warner stock worth approximately $80,000; moreover, Jean contradicted this account, telling DC in 1992 that she was Joe Shuster's sole heir and had rights in his copyrights.  *See supra* SUF 14. |
| 62.    Upon Joe Shuster's death in 1992, no person or entity had a right to terminate his copyright grants to DC | **Disputed**.<br><br>This is pure legal argument, as evidenced by the only "Evidence" defendants cite—two federal statutes. |

| | |
|---|---|
| until the CTEA became effective in 1998 and extended the termination right to the executor of an author's estate.<br><br>Defendants' Evidence:  17 U.S.C § 304(c)(2) (1978); 17 U.S.C. §304(d). | |
| 63.    Shuster's will nominated Jean as executrix of his estate and stated that, in the event Jean declined to serve, Mr. Peary should be appointed as executor.<br><br>Defendants' Evidence:  PD Ex. 33 at 275. | **Disputed**, but, in any event, the point of dispute is not material to DC's motion.<br><br>Shuster's will uses the words "unable" or "unwilling," not "declined."  It states:  "I give, devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate …. In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, Mark Warren Peary.  I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will and Testament, to act without bond.  In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor, also without bond."  PD Ex. 33 at 275. |
| 64.    On July 15, 2003, Joseph Shuster's nephew Mark Warren Peary petitioned the Superior Court of the State of California to probate Shuster's estate.  As Jean was 86, she declined to serve as executrix, and | **Disputed**.<br><br>DC does not dispute for purposes of this motion that in 2003, Shuster's nephew Mark Warren Peary initiated proceedings in Los Angeles Superior Court to probate Shuster's estate—even though in 1992, his mother Jean Peavy had already filed an affidavit in California probate court to obtain all of Shuster's assets.  SUF 38, PD Exs. 21, 33-34. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| nominated Mr. Peary in her place.<br><br>Defendants' Evidence:  PD Ex. 33 at 270, 280-281. | DC disputes that "[a]s Jean was 86, she declined to serve as executrix, and nominated Mr. Peary in her place."  Jean was 82 in 2003.  PD Ex. 46 at 447:21-22.  Peary asked the probate court to appoint him executor in place of his mother, SUF 38, PD Exs. 21, 33-34—and has kept this probate matter open for nine years, despite his sworn responsibility as executor to "complet[e] the estate administration as promptly as possible."  SUF 39; Docket No. 186 at 12-13. |
| 65.    On October 7, 2003, the Court duly appointed Peary as Executor of Shuster's estate in accordance with his will and granted him the "special power ... to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C. §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings ... in connection with this action."<br><br>Defendants' Evidence:  PD Ex. 34. | **Disputed**.<br><br>DC does not dispute for purposes of this motion that in 2003, a Los Angeles Superior Court appointed Peary to serve as executor of Shuster's estate.<br><br>DC disputes the claim that the Los Angeles Superior Court "granted [Peary] the 'special power … to terminate" under the Copyright Act.  The probate court merely granted Peary's request to be appointed executor so he could serve copyright termination notices on behalf of the Shuster estate.  The state court did not resolve the threshold copyright issues at the center of DC's First Claim.  *Cf. Orr v. Orr*, 440 U.S. 268, 277 n.7 (1979) ("a state court cannot confer standing before this Court on a party who would otherwise lack it"); *see also Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) (state court action "cannot retroactively confer standing in federal court").  As explained in DC's motion, Peary has no "power" to terminate.  DC's MSJ at 21-23, DC's MSJ Reply at 9-10. |
| 66.    On August 1, 1992, DC entered into a short agreement with Frank Shuster and Jean Peavy to raise their pension to | **Disputed**.<br><br>DC does not dispute for purposes of this motion that DC entered into an agreement with Frank |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

$25,000. The full text of this agreement was as follows:

> This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing August 1, 1992, for as long as either one of you is alive. Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practice and shall be subject to all applicable withholding taxes. If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.
>
> We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in

Shuster and Jean Peavy dated August 1, 1992, that contains the language quoted by defendants.

DC disputes that the 1992 agreement was "to raise [Jean and Frank's] pension to $25,000." Under the 1975 agreement, Frank was entitled to $5,000 a year in survivor payments, and Jean was entitled to nothing. LD ¶ 5-7; Exs. 3-6, 15. Jean and Frank bargained for and received a five-fold increase in annual payments, which would be paid to Jean rather than Frank—and they have received, to date, more than $600,000. SUF 25, LD Exs. 23, 27, 33, 39, 53, 60, 67, 71. As Paul Levitz testified—and defendants do not dispute—by agreeing to the payment terms Jean and Frank demanded, DC was "far exceeding [its] promise to Joe and committing to a much larger sum" than was due Frank. SUF 45; LD ¶ 7, Ex. 23.

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

If, despite the terms of this agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement. We also reserve all of our other rights, remedies and defenses in such an event. If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated.

<u>Defendants' Evidence:</u>  PD

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| Ex. 24. | |
|---|---|
| 67.    The 1992 Agreement contains only three obligations of Frank and Jean: they settled with DC any claim to payment that they had; and they quitclaimed to DC and covenanted not to assert any rights that they held relating to Joseph Shuster's works.<br><br>Defendants' Evidence:  PD Ex. 24. | **Disputed**.<br><br>The word "quitclaim" never appears in the 1992 agreement, and this is pure legal argument.  Such legal arguments needed to be made in defendants' 25-page opposition brief, and are baseless in any event. DC's MSJ at 10-18; DC's MSJ Reply at 5. |
| 68.    The 1992 Agreement: does not mention termination rights, or purport to limit or waive the termination right; does not mention Superman or Joseph Shuster's key 1938 grant of copyright or subsequent Superman grants; and does not include the terms revoke, rescind, supersede, replace, extinguish, or any other synonyms. Nor was the Shuster Executor a party to the agreement.<br><br>Defendants' Evidence:  PD Ex. 24. | **Disputed**.<br><br>Again, this is pure legal argument.  Such legal arguments needed to be made in defendants' 25-page opposition brief, and are baseless in any event. DC's MSJ at 10-18; DC's MSJ Reply at 2-5.<br><br>Moreover, by its plain terms, the 1992 agreement "*fully settles all claims* to *any payments or other rights or remedies* which you may have *under any other agreement or otherwise*, whether *now or hereafter existing* regarding *any copyrights, trademarks, or other property right* in *any and all work created in whole or in part by … Joseph Shuster*."  SUF 19, PD Ex. 24 (emphasis added). This clearly encompasses all of Joe Shuster's works, including Superman; all agreements, including the 1938 grant; and all rights, including termination.  *See* DC's MSJ Reply at 4-5. |
| 69.    The 1992 Agreement was not negotiated by statutory heirs within an open termination window during | **Disputed**.<br><br>Again, this is pure legal argument, as best evidenced by defendants' first citation to "Evidence"—*i.e.*, a federal statute.  Such legal |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| which they could meaningfully leverage their termination rights. Furthermore, Jean and Frank negotiated the agreement without the assistance of counsel and there was no meaningful back and forth over its terms.<br><br>Defendants' Evidence:  17 U.S.C 304(c)(2); LD Ex. 3-8. | arguments needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 10-18; DC's MSJ Reply at 5-7.<br><br>Moreover, DC disputes that "there was no meaningful back and forth over" the 1992 agreement—this assertion is belied by the record of several counter-offers back and forth and the meeting the parties had.  LD ¶ 5-7; Exs. 3-7.<br><br>Finally, defendants offer no proof that they were not advised by counsel—just inadmissible assertions by their current counsel. |
| 70.     On the same date as the 1992 Agreement, October 2, 1992, Frank signed a letter addressed to Paul Levitz, then-President of DC, stating that in consideration for the 1992 Agreement Frank was waiving his rights under the 1975 Agreement (to a $5,000 pension). The full text of the letter is as follows:<br><br>In consideration of the agreement dated as of August 1, 1992 between DC Comics, myself and Jean Shuster Peavy, I hereby waive any rights or remedies that I may have under the agreement dated December 23, 1975 between Warner Communications Inc., Jerome Siegel and Joseph Shuster. | **Undisputed**.<br><br>To be clear, DC's briefs address at length the significant other consideration the parties received as part of the 1992 Agreement.  DC's MSJ at 5-6, 16-17; DC's MSJ Reply at 7. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| <u>Defendants' Evidence</u>: LD Ex. 9. | |
| 71.    Neither Paul Levitz's Declaration nor his contemporaneous correspondence with Jean Peavy/Frank Shuster ever describes the 1992 Agreement as a revocation of Joseph Shuster's Superman copyright grants nor as a re-grant of his Superman copyrights, nor suggests that this was the parties' intent. <u>Defendants' Evidence</u>: LD Ex. 5, 8, 9. | **Disputed.** DC does not dispute that Levitz's declaration and correspondence do not use the words "revocation" or "re-grant."  Levitz's declaration and the parties' contemporaneous conduct and correspondence makes clear, however, the "parties' intent" was for the 1992 Agreement to "represent [the Shuster heirs'] last and final deal with DC, and would resolve any past, present, or future claims against DC," LD ¶ 8. Defendants again improperly use their SUF to make merits-based arguments, which needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 13-15; DC's MSJ Reply at 2-4. |
| 72.    Paul Levitz, then-President of DC, characterized the 1992 Agreement as a small act of charity in the "spirit" of the 1975 agreement. <u>Defendants' Evidence</u>: LD at 2; LD Ex. 5 at 27. | **Disputed**, but, in any event, this fact is not material to DC's motion. Levitz was not "President of DC" in 1992.  As the paragraph of his declaration cited by defendants makes clear, Levitz served as "President and Publisher" of DC between 2002 and 2010.  LD ¶ 2. The September 8, 1992, letter from Levitz to Frank Shuster cited by defendants does not "characterize[] the 1992 Agreement as a small act of charity in the 'spirit' of the 1975 agreement." That letter provides "that Time Warner has chosen to look to the spirit of Joe's wish to go on assisting you after his passing, and let that be your guide.  In that spirit, the company will begin making payments to you at an annual rate of $25,000…." LD Ex. 5 at 27.  This letter was sent *before* Frank sent a letter to DC on September 10, 1992, offering that if DC increased the payments due to Frank |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | under the 1975 agreement and made those payments to Jean instead of Frank, she as Shuster's sole heir "would not pursue the termination of the Superman copyright as provided for to creators' heirs in the 1976 U.S. Copyright Act."  LD Ex. 6 at 28.  DC also disputes that its payments under the 1975 and 1992 agreements were a "small act of charity"—DC has paid the Siegel and Shuster heirs well over $4 million under the 1975 agreement, and separately paid the Shuster heirs more than $610,000 under the 1992 agreement.  LD ¶¶ 4, 9 & Exs. 23; 27; 33; 39; 53; 60; 67; 71. |
| 73.    On September 7, 1993, Levitz wrote to Jean: "As I hope you recall from our meetings in New York, we've done extensive research into the copyright act [sic] and any potential rights that you and Frank may have as Joe's siblings and survivors. It is our firm conviction based on that research and expert counsel, that you don't have any legal rights or claims whatsoever." Levitz then went on to say: "After his [Joe Shuster's] death, we [DC] raised $5,000 to $25,000 a year without any legal obligation to do so in deference to Joe's memory and your role in his life."<br><br>Defendants' Evidence:  LD Ex. 23 at 47. | **Undisputed**. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| 74.    Prior to filing this lawsuit in 2010, DC never asserted that the 1992 Agreement was the basis for its chain- of-title to Superman; nor did it ever suggest that the 1992 Agreement prevented termination as a "revocation and re-grant" or otherwise.<br><br>Defendants' Evidence:  LD Ex. 74. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>In any event, defendants offer no competent evidence to support this claim, as the sole document they cite is an inadmissible 2005 settlement communication sent by Levitz to the Shuster heirs—in an effort to avoid litigation—which does not address "chain-of-title to Superman" or the legal significance of the 1992 agreement.<br><br>Objections to Defendants' Evidence:  LD Ex. 74 does not prove this asserted fact, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *U.S. v. Whitney*, 180 Fed. Appx. 670, 673 (9th Cir. 2006); *Hudspeth v. C.I.R.*, 914 F.2d 1207, 1213-14 (9th Cir. 1990); Reply at 7 n.3. |
| 75.    DC admitted, and the Court agreed, that it co-owns the original Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement). *Siegel*, 542 F. Supp. 2d at 1142.<br><br>Defendants' Evidence:  LD Ex. 74 at 256-257; AD Ex. 14 at ¶¶ 12, 17, 26, 37, 137(g). | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Defendants offer no competent evidence to support this claim, as the documents they cite do not contain any "admi[ssion]" that "DC co-owns the original Superman copyrights based on Shuster's 1938 Grant (not the 1992 Agreement)." Defendants cite an inadmissible 2005 settlement communication sent by Levitz to the Shuster heirs—in an effort to avoid litigation—which does not address the legal significance of the 1992 Agreement.  Defendants also cite DC's First Amended Counterclaims in the *Siegel* action, which provide historical background relevant to the claims in that action, and an order from the *Siegel* court concerning the *Siegel heirs*' ability to terminate Siegel and Shuster's 1938 copyright |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | grant to DC.  The *Siegel* case has *nothing* to do with the legal significance of the 1992 agreement or the Shuster heirs' ability to terminate.  Indeed, the *Siegel* court made clear the *Siegel* case did not involve the Shusters' claims, and "[i]t is by no means a foregone conclusion that the Shuster estate will be successful in terminating."  Case No. CV 04-8400, Docket No. 554 at 23.  *See* DC's MSJ Reply at 10 n.4. |
| | <u>Objections to Defendants' Evidence</u>:  LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; FED. R. CIV. P. 56(c)(2); *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n.3; *supra* DC's Response to DSAUF 74. |
| 76.    Elaborate rights agreements (including short form assignments for filing with the Copyright Office) customarily are used by Warner/DC to create valid chains-of-title to copyrights.<br><br><u>Defendants' Evidence</u>:  AD Exs. 8, 9, 11. | **Disputed**.<br><br>Defendants' legal arguments—improperly masquerading as factual ones—run directly contrary to well-established copyright law.  "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.  It doesn't have to be the Magna Charta; *a one-line pro forma statement will do*."  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (emphasis added).  Moreover, defendants omit that DC has not registered many of its other copyright grants with the Copyright Office, as registration is not required.  Pub. L. No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v. Joan Cook Inc.*, 1992 WL 88171, at *4 (S.D.N.Y. Apr. 14, 1992).<br><br><u>Objections to Defendants' Evidence</u>: |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | Defendants offer no competent evidence to support this claim, as shown in DC's concurrently filed Objections To Evidence In Defendants' Statement Of Additional Undisputed Facts, Declaration, and Exhibits at pages 5-8. The third-party contracts defendants cite should be stricken for lack of foundation, FED. R. EVID. 602, and disregarded on relevance grounds, FED. R. EVID. 401, and because they constitute improper habit evidence under FED. R. EVID. character evidence under FED. R. EVID. 404(b). |
| 77.    In the years following the 1992 Agreement, Frank Shuster and Jean Peavy struggled to get by. Requests for increases in their pension were denied, although periodic bonuses were granted.<br><br>Defendants' Evidence:  LD Exs. 10, 17, 20, 25, 26, 29, 32. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC disputes that the Shuster heirs' requests for additional compensation were "denied." As Levitz's declaration and the parties' correspondence make clear, Jean periodically requested bonuses in addition to her payments under the 1992 agreement, and DC paid her bonuses in 1993, 1994, 1995, 1996, 1998, 1999, 2000 and 2001. LD ¶ 9 & Exs. 23; 27; 33; 39; 52-53; 59-60; 66-67; 70-71. In total, DC has paid Jean over $610,000 under the 1992 agreement. LD ¶ 9. |
| 78.    In 2001, spurred by the well- publicized Siegel termination, Mr. Peary, sought the advice of an attorney, and contacted Mr. Toberoff.<br><br>Defendants' Evidence:  AD Ex. 26 at 372:3-373:25. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Peary testified:  "I remember I first contacted him [*i.e.*, Toberoff] in 2001." Peary did not, however, testify that he was "spurred by the well-publicized Siegel termination." Moreover, Peary's deposition testimony has proven to be false in several key respects. *E.g.*, Docket Nos. 305-37 at 1178:7-22; 360-2 at 235-36. Moreover, Peary's mother—Jean Peavy—despite knowing full well about the Siegel termination—affirmed her |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | commitment to honor the 1992 Agreement. *Supra* SUF 20. |
| 79.    In November 2001, Jean and Mr. Peary entered into an agreement with Pacific Pictures Corp. ("PPC"). Both signed the agreement in their individual capacities. Shuster's Estate had not yet been probated and there was no Executor. The Shuster Executor was thus not a party to the Agreement.<br><br>Defendants' Evidence:  PD Ex. 32 at 266. AD Ex. 19 at 313:17-314:11. | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that Jean and Peary entered into an agreement with Pacific Pictures signed by Jean, Peary, and Toberoff in November 2001.<br><br>DC disputes, however, that "Shuster's Estate had not yet been probated and there was no Executor. The Shuster Executor was thus not a party to the Agreement."  Jean, who was a party to the 2001 agreement, was the "executrix" and sole beneficiary of Shuster's estate.  On August 17, 1992, Jean filed a sworn affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that his property "be paid, delivered or transferred to her." PD Ex. 21. |
| 80.    Peary did not mislead Jean about the PPC Agreements, as misrepresented by DC without any support for this.<br><br>Defendants' Evidence:  PD Ex. 38 at 312:1-312:13; Docket 305-37 (Peary's full testimony). | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>DC's briefing did not say Peary misled his mother about the PPC Agreements.  It said Peary testified that he negotiated the Pacific Pictures agreements directly with Toberoff, and without receiving any outside advice from counsel.  SUF 35, 39 at 319:9-320:14.  Peary further testified he only told his mother about the agreements just before they were ready to sign.  SUF 36; PD Ex. 46 at 492:20-493:2. Peary did "mislead" his sister about the contents of his mother's will. *See infra.* |
| 81.    Peary did not rewrite Jean's will to name himself her sole heir, as misleadingly stated by DC without any | **Disputed**, but, in any event, this fact is not material to DC's motion.<br><br>Both of Jean's children, Mark Warren Peary and Dawn Peavy, testified that Jean told them she |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| evidence of this.<br><br>Defendants' Evidence:<br>Docket 360-2 at 235-36. | wanted to provide for them equally under her will. Docket Nos. 305-37 at 1178:10-1179:4; 360-2 at 99:2-11, 103:3-7, 105:10-106:14.  Jean testified in *Siegel* that "[m]y son handles everything legal," PD Ex. 38 at 310:14-312:13; Dawn reiterated that Peary "handle[s Jean's] financial issues," Docket No. 360-2 at 69:2-5, 106:20-22; and Peary admitted he talked with his mother about her alleged desire to modify the will with a trust, Docket No. 305-37 at 1178:7-11:79:22.  Jean's will provides that "Mark Warren Peary … shall be sole beneficiary of my [Jean Peavy's] estate."  Docket No. 360-2 at 235-36.  These facts speak for themselves, and defendants offer no competent evidence to support their factual claims.  The sole document they cite is Jean's will—without any testimony about how that will was created, and why, or how Peary lied to his sister about its contents.  Docket Nos. 360 at 6-9; 377. |
| 82.     As trusts and estates attorney probated the estate of Joseph Shuster, and Mr. Peary was appointed as its executor.<br><br>Defendants' Evidence:  PD Exs. 33, 35, 39 at 318:8-13. | **Undisputed**. |
| 83.     In October 2003, the Executor of the Shuster Estate (the "Shuster Executor") and PPC entered into the 2003 PPC Agreement. This agreement did not purport to transfer the termination interest to PPC, but provided PPC with a contingent share | **Disputed**.<br><br>In the 2001 Pacific Pictures agreement, Jean and Peary "transfer[red] and assign[ed] to the Venture" "all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations," PD Ex. 32, and Peary admitted under oath that he understood when he signed this agreement "that all of the Joe Shuster rights, termination rights, to the extent they existed, |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| of proceeds, if any, from any recovered copyright interests.<br><br>Defendants' Evidence: PD Ex. 36. | were being transferred and assigned to the venture just as it says," *id.* Ex. 46 at 482:8-23.  By its plain terms, the 2003 Pacific Pictures agreement was "intended to supplement" the 2001 agreement and "to confirm the agreement" on behalf of the Shuster estate, *id.* Ex. 36—effectively re-transferring the same rights on behalf of the estate.<br><br>Peary testified:<br><br>Q:  Okay.  [The 2001 PPC Agreement] says: "In considerations for PPC's contributions to the Venture in the mutual covenants contained herein, claimants hereby transfer and assign to the Venture their rights, titles and – title and interests in the rights."  Do you see that?<br><br>A:  Yes.<br><br>*Q:  So you understood when you signed this that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says, correct?*<br><br>A: *Yes.*<br><br>PD Ex. 46 at 482:8-23 (emphasis added).  Peary is bound by such admissions.  *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 252, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."); *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| 84.    In November-December 2003, the Shuster Executor filed in the U.S. Copyright Office and served on DC a formal notice of termination under 17 U.S.C. § 304(d), terminating Joseph Shuster's 1938 Grant and subsequent Superman copyright grants, with an effective termination date of October 26, 2013 (the "Shuster Termination"). The Shuster Termination was signed by Mark Warren Peary as executor of the Shuster Estate. The notice properly stated that it "has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code." <br><br>Defendants' Evidence:  PD Ex. 37. | **Disputed**. <br><br>The Shuster Executor made these filings, but whether the notice was "proper[]" is hotly disputed legal question, at the center of DC's motion.  DC's MSJ at 10-25; DC's MSJ Reply at 8-10.  It is improper for defendants to treat such legal questions—whether Peary acted "properly" as undisputed facts. |
| 85.    In 2004, the parties cancelled and revoked the PPC Agreements, replacing them with a legal retainer agreement, retroactive to 2001. <br><br>Defendants' Evidence:  AD Exs. 13, 27. | **Disputed**. <br><br>DC has briefed at length in its Rule 12 papers, Docket No. 185 at 5-6, this summary judgment briefing, DC's MSJ Reply at 12, and other briefs, *e.g.*, Docket No. 360 at 3-4, whether the Pacific Pictures agreements were ever properly terminated, and whether the Shusters' putative rights were ever assigned back to them, or are still held by Toberoff's companies.  The evidence supporting DC's position includes the plain terms of the 2001, 2003, 2004, and 2011 Pacific Pictures agreements, |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | which do not support defendants' position.  PD Exs. 32; 36; AD Ex. 13. |
| 86.     On April 28, 2005, DC sent a letter to the Shuster Executor that offered to settle with the Shusters at the expense of the Siegels. The Shuster Executor declined this offer.<br><br>Defendants' Evidence:  LD Ex. 74; AD Ex. 15. | **Disputed**, but, in any event, this fact is not material to DC's motion—and the evidence defendants cite violates FED. R. EVID. 408.<br><br>DC does not dispute for purposes of this motion that Levitz sent a settlement communication to the Shuster heirs on April 28, 2005, in an effort to avoid litigation.<br><br>DC disputes that this settlement offer was made "at the expense of the Siegels."  DC also disputes that "The Shuster Executor declined this offer"; Toberoff responded to Levitz—not any of the Shuster heirs—and declined the offer.  AD Ex. 15.<br><br>Objections to Defendants' Evidence:  LD Ex. 74 is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n.3; *supra* DC's Response to DSAUF 74. |
| 87.     PPC was dissolved in 2009.<br><br>Defendants' Evidence:  AD Ex. 21. | **Disputed**, and this fact is not material to DC's motion.<br><br>DC does not dispute for purposes of this motion that the New York Department of State Website states that Pacific Pictures is currently "inactive" and was "dissolved by proclamation" in 2009.<br><br>DC disputes, however, that PPC is in fact "inactive"—defendants do not explain, for example, why a dissolved corporation would continue entering into agreements as recently as 2011.  AD Ex. 27 (noting that PPC is "dissolved" but entering into agreement as of August 2, 2011) |
| 88.     On August 2, 2011, Toberoff, Jean and Peary confirmed their intent that | **Disputed**.<br><br>Defendants offer no competent evidence to support |

| | |
|---|---|
| PPC would have no continuing interest whatsoever when they revoked the PPC Agreements in 2004.<br><br>Defendants' Evidence:  AD Ex. 28. | this claim.  The sole "evidence" defendants cite is a mediation questionnaire they filed in the Ninth Circuit containing Toberoff's own legal argument about this action.<br><br>Moreover, DC has disputed Jean's competency to enter into this 2011 agreement, as well as whether defendants' revoked the 2004 agreement, as well as the legal effect of that asserted revocation.  Docket No. 322 at 1-2; *supra* SUF 85.<br><br>Objections to Defendants' Evidence:  AD Ex. 28 is not evidence.  It is a mediation questionnaire that defendants filed in the Ninth Circuit containing Toberoff's legal argument about this case.  It should be stricken as:  hearsay, FED. R. EVID. 801-02, for lack of foundation and personal knowledge, FED. R. EVID. 602, and as improper opinion evidence.  FED. R. EVID. 701-02. |
| 89.    On April 28, 2005, DC sent a letter to the Shuster Executor that alluded to DC's arguments against the terminations in the Siegel litigation, and offered to settle with the Shusters at the expense of the Siegels. The letter stated, "DC will only pay a premium to one termination party." It also noted, "[I]f we are able to resolve matters with the Siegel heirs ... before we reach an agreement with you. . . there will not be any pressing need to reach an agreement with you." The letter offered the Shuster | **Disputed,** but, in any event, this fact is not material to DC's motion—and the evidence defendants cite violates FED. R. EVID. 408..<br><br>DC does not dispute for purposes of this motion that Levitz sent a settlement communication to the Shuster heirs on April 28, 2005, in an effort to avoid litigation or that the letter included the quoted text.<br><br>DC disputes that this settlement offer was made "at the expense of the Siegels."<br><br>Objections to Defendants' Evidence:  LD Ex. 74 does not prove these asserted facts, and, in any event, it is a settlement offer, which is inadmissible for the use defendants seek to make of it.  FED. R. EVID. 408; *e.g.*, *Whitney*, 180 Fed. Appx. at 673; *Hudspeth*, 914 F.2d at 1213-14; DC's MSJ Reply at 7 n.3; *supra* DC's Response to DSAUF 74. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| Executor a cash advance of two million dollars and royalties. <br><br> <u>Defendants' Evidence</u>:  LD Ex. 74. | |
| 90.    The 2008 Consent Agreement was entered into by the Siegel heirs, the Shuster Executor and Jean. Mr. Toberoff was not a party to the 2008 Consent Agreement. <br><br> <u>Defendants' Evidence</u>:  AD Exs. 22 at 333-335, 25 at 352-53. | **Disputed**. <br><br> DC does not dispute the 2008 Consent Agreement was entered into by the Siegel heirs, the Shuster Executor and Jean.  Defendants have refused to produce the 2008 consent agreement, and cannot make self-serving assertions about whether Toberoff is a party to it.  *Bilzerian*, 926 F.2d 1292 ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").  Indeed, their choice affirmatively to discuss the contents of the document and use facts about it as a sword constitutes a waiver.  *Id.* at 1291-94.  In any event, defendants have admitted that Mr. Toberoff signed the 2008 consent agreement.  PD Ex. 46 at 461:19-462:2.  If this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. |
| 91.    The 2008 Consent Agreement simply requires the consent of the parties thereto to any settlement of their recaptured copyrights with DC. <br><br> <u>Defendants' Evidence</u>:  AD Exs. 22 at 333-335, 25 at 352-53. | **Disputed**. <br><br> Defendants have refused to produce the 2008 consent agreement, and cannot make self-serving assertions about its contents.  *Bilzerian*, 926 F.2d at 1292 ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").  Indeed, their choice affirmatively to discuss the contents of the document and use facts about it as a sword constitutes a waiver.  *Id.* at 1291-94.  In any event, defendants' admissions |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| | about its contents prove its illegality, as shown in DC's briefs.  DC's MSJ at 23-25; DC's MSJ Reply at 10-12.  If this Court has any questions about that document, it can and should review the consent agreement *in camera* or order it produced to DC. |
| 92.     The Shuster Estate remains unable to grant its recaptured copyrights to anyone but DC until the effective date of its termination in October 2013 pursuant to 17 U.S.C. 304(d)(2).<br><br>Defendants' Evidence:  17 U.S.C. § 304(d)(2). | **Disputed**.<br><br>This is pure legal argument, as best evidenced by defendants' first citation to "Evidence"—*i.e.*, a federal statute.  Such legal arguments needed to be made in their 25-page opposition brief, and are baseless in any event.  DC's MSJ at 18; DC's MSJ Reply at 8. |
| 93.     Magistrate Judge Zarefsky rejected DC's arguments that the Consent Agreement constitutes "an independent wrong [that] violates the Copyright Act," and found, instead, that it is a legitimate "Drysdale-Koufax collective approach to negotiation." This Court duly upheld that ruling.<br><br>Defendants' Evidence:  AD Exs. 22, 23, 26. | **Disputed**.<br><br>This is pure legal argument about a court ruling.  It is also erroneously described the court's rulings, as DC shows in its brief.  DC's MSJ Reply at 10 n.4. |
| 94.     The 2001 and 2003 PPC Agreements were voluntarily produced to DC in the Siegel litigation by November 2006.<br><br>Defendants' Evidence:  AD Ex. 18. | **Disputed**.<br><br>Defendants offer no competent evidence to support this claim, as the sole document they cite is a November 15, 2006, cover letter sent by former Toberoff associate Alexander Merino in the *Siegel* case purporting to enclose productions from IPW, LLC and Pacific Pictures Corporation. |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

| 95.    DC also took deposition testimony regarding the PPC Agreements in 2006.<br><br>Defendants' Evidence:  PD Exs. 46 at 458:21-459:25, 461:19-462:9, 469:5-7; AD Exs 17 at 289:11-290:4, 19 at 305:17-306:5. | **Undisputed**. |
|---|---|
| 96.    DC's in-house counsel admitted to reading the anonymous "Timeline" in 2006.<br><br>Defendants' Evidence:  AD Ex. 20 at 325-26 ¶3. | **Disputed**.<br><br>DC had no access to the Timeline.  Wayne Smith worked for Warner Bros.  AD 20 ¶ 2.  He also said, after conducting a cursory review of the Timeline, he concluded that certain parts involved privileged communications, so he immediately turned over the Timeline and attachments to a neutral escrow agent to hold while DC "sought to obtain them through ordinary discovery."  Docket No. 163-12; 163-13 at 759:16-760:7; *In re Pacific Pictures*, 679 F.3d at 1125.  Despite Toberoff's resistance, the district court ordered him to produce the Timeline, Docket No. 163-13 at 760:8-761:5, which he finally did in December 2008.  163-15.  Until then, neither Mr. Smith, nor anyone at DC, nor DC's counsel was able to "read" the Timeline. |
| 97.    In 1997, Jerry Siegel's widow and daughter served notices of termination, entitling them to a share of Superman profits from 1999. DC refused to pay, and four years of grinding negotiations did not result in a settlement.<br><br>Defendants' Evidence: *Siegel I*, 542 F. Supp. 2d at 1114-16. | **Disputed**.<br><br>DC admits that Siegel's widow and daughter filed termination notices in 1997.  Whether those notices were valid, and whether DC and the Siegels reached a settlement agreement in 2001, are issues presently being litigated before the Ninth Circuit in the *Siegel* case.  Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49.  These are not remotely undisputed facts. |

DC'S RESP. TO DEFS.' STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

| | |
|---|---|
| 98.    In 2004, the Siegels filed suit, represented by Mr. Toberoff, to vindicate their recaptured copyrights. In 2008-2009, Warner/DC suffered serious setbacks, as the Court held that the Siegels had successfully recaptured their original Superman copyrights by valid statutory termination.<br><br>Defendants' Evidence: *Siegel*, 542 F. Supp. 2d 1098, 658 F. Supp. 2d 1036 (C.D. Cal. 2009). | **Disputed**, and these "facts" are not remotely material to DC's motion.<br><br>DC agrees that in 2004, Joanne Siegel and Laura Siegel Larson filed a lawsuit concerning copyright termination notices they filed, Case No. CV-04-8400, Docket No. 1, and that Toberoff was their of record.<br><br>DC disputes that "In 2008-2009, Warner/DC suffered serious setbacks…." Such lawyer argument has no place in pleadings of this sort, and the argument is mistaken. In any event, the Siegels lost on the large majority of works they sought to recapture, *Siegel*, 658 F. Supp. 2d at 1064-80, and the narrow issues on which they prevailed are now pending before the Ninth Circuit, Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1, 49. |
| 99.    In 2010, DC fired its general counsel and outside counsel, and, after settlement talks with the Siegels were unsuccessful, sued Mr. Peary and Mr. Toberoff.<br><br>Defendants' Evidence:  AD Ex. 28. | **Disputed**, and these "facts" are not remotely material to DC's motion.<br><br>DC does not dispute that it filed a complaint on May 14, 2010, naming Mark Warren Peary, Jean Peavy, Laura Siegel Larson, Joanne Siegel, Marc Toberoff, and Toberoff's companies Pacific Pictures Corporation; IP Worldwide, LLC; and IPW, LLC as defendants.  Docket Nos. 1, 49.<br><br>DC does dispute defendants' suggestion that the impetus for that complaint was that "settlement talks with the Siegels were unsuccessful."  The allegations in DC's complaint speak for themselves, defendants abandoned all Rule 12 motions challenging DC's complaint, Docket No. 343, and this Court rejected defendants' SLAPP motion and their erroneous assertions that this lawsuit was retaliatory,  Docket No. 337 (rejecting "Defendants' attempt to cloak Toberoff's alleged interference with protected, litigation and |

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT

settlement related conduct").

DC also disputes that "In 2010, DC fired its general and outside counsel." DC does not have a "general counsel." Amy Genkins, DC's current Senior Vice President, Business and Legal Affairs, joined DC in 2008. John Rogovin became General Counsel of Warner Bros. Entertainment Inc. on January 1, 2009. Neither Ms. Genkins nor Mr. Rogovin was "fired" in 2010 or since.

<u>Objections to Defendants' Evidence</u>: The sole "evidence" defendants cite for this claim is AD Ex. 28. AD Ex. 28 is not evidence. It is a mediation questionnaire defendants filed in the Ninth Circuit containing Toberoff's legal argument about this case. It should be stricken as: hearsay, FED. R. EVID. 801-02, for lack of foundation and personal knowledge, FED. R. EVID. 602, and as improper opinion evidence. FED. R. EVID. 701-02. *See supra* DC's Response to DSAUF 88.

Dated: August 6, 2012

Respectfully submitted,

By: /s/ Daniel M. Petrocelli
          Daniel M. Petrocelli
Attorneys for Plaintiff DC Comics

OMM_US:70811187

DC'S RESP. TO DEFS.' STATEMENT OF
GENUINE ISSUES OF MATERIAL FACT