Marc Toberoff (State Bar No. 188547)
  mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
  kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
  parredondo@ipwla.com
David Harris (State Bar No. 255557)
  dharris@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Facsimile:   (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>              Plaintiff,<br><br>     vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>              Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND AND THIRD CLAIMS FOR RELIEF**<br><br>*Statement of Uncontroverted Facts and Conclusions of Law; Declaration of Keith G. Adams; and [Proposed] Order filed concurrently herewith*<br><br>Complaint filed:  May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:          None Set<br><br>Date:    October 15, 2012<br>Time:    1:30 p.m.<br>Place:   Courtroom 11 |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 15, 2012, at 1:30 p.m., or as soon thereafter as counsel may be heard, in Courtroom 11 of the above-captioned Court, located at 312 N. Spring Street, Los Angeles, California, 90012, defendants Mark Warren Peary, as personal representative of the estate of Superman's co-creator Joseph Shuster (the "Shuster Executor"), Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, will and hereby do move for partial summary judgment as to the First, Second and Third Claims for Relief in plaintiff DC Comics' ("DC") first amended complaint (Docket No. 49; "FAC") pursuant to F.R.C.P. 56(a).

DC's First Claim (FAC ¶¶105-34) fails as a matter of law because the Shuster Executor duly served and filed notices of termination in accordance with section 304(d) of the Copyright Act (the "Termination"), and the regulations promulgated thereunder, 37 C.F.R. § 201.10. The First Claim seeks to invalidate this straightforward statutory Termination based on five clearly erroneous theories:

- Part (1) (FAC ¶¶107-11) relies on wordplay to argue that Joe Shuster's termination rights under section 304(c) ceased to exist but did not "expire," contradicting the plain language and structure of the statute. The Shuster Executor owns the "entire termination interest" under a plain reading of 17 U.S.C. § 304(c)(2)(D) because Joseph Shuster left no widow, child or grandchild, and his termination rights under section 304(c) had not been exercised and expired before October 27, 1998, the effective date of the Copyright Term Extension Act. Pub. L. 105-298; 17 U.S.C. § 304(d); 67 Fed. Reg. 69134, 69135; *Stewart v. Abend*, 495 U.S. 207, 212 (1990).

- Part (2) frivolously argues that a perfunctory 1992 pension agreement between DC and Joe Shuster's siblings (the "1992 Agreement") bars the Termination as a supposed "revocation and re-grant" of Joe Shuster's Superman copyright grants/copyrights, contrary to the plain language of the 1992 Agreement,

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

governing case law, and DC's own conduct.  DC owned Shuster's Superman copyrights through a 1938 Grant and subsequent grants that the 1992 Agreement did not even identify or purport to rescind and replace.  *Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974).  The 1992 Agreement does not even mention "Superman."  Moreover, in 1992, no one held Joe Shuster's termination rights under the Copyright Act. 17 U.S.C. § 304(c)(2)(D).  The 1992 Agreement, therefore, does not even come close to qualifying as an express "revocation and re-grant" of Joe Shuster's Superman copyright grants/copyrights, in lieu of statutory termination, under binding Ninth Circuit precedent.  *See Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008).

- Part (3) alleges that the Shuster Executor did not own the termination right, when he plainly did as a matter of federal copyright law.  The Shuster Executor's termination right was not and could not be transferred to third parties.  *See* 17 U.S.C. § 304(c)(2)(A)-(D); 17 U.S.C. §304(c)(6)(D).

- Part (4) alleges that the Termination omitted alleged "grants" of Joe Shuster's Superman copyrights that were not grants at all.  One such purported "grant" was the 1992 Agreement, which did not and could not transfer Superman copyrights long ago assigned by Siegel and Shuster to DC and already in DC's possession.  The other, a May 1948 "consent judgment" has already been litigated and held not be a Superman grant in *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1131-32 (C.D. Cal. 2008), which is binding on DC.

- Part (5) frivolously alleges "unclean hands" because Mr. Peary chose not to serve a "Superboy" termination notice, even though this decision was consistent with the Copyright Act and preclusive factual findings in a 1947 case regarding "Superboy."  *See* 17 U.S.C § 304(d): *Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1310 (D. Del. 1990).

DC's Second Claim (FAC ¶¶135-64) seeks to re-litigate, and overlaps with, issues in *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), currently on appeal.  Much of this claim is barred by the doctrine of issue preclusion/collateral estoppel. *Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.,* 819 F.2d 1519, 1525 (9th Cir. 1987); *Brown v. Dunbar,* 376 Fed. Appx. 786 (9th Cir. 2010).

DC's Third Claim (FAC ¶¶165-73) insists that DC has a non-existent exclusive "right" to negotiate the purchase of the recovered Superman copyrights.  The statute provides no such "right," as case law and treatises confirm.  *See* 17 U.S.C. § 304(c)(6)(D); *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 11.08[A], n.6 (2010). DC lacks standing to bring this claim (6 W. Patry, *Patry on Copyright* § 21:18), which is barred as well by the three-year statute of limitations, as DC was on clear notice of its purported claim in 2006.  17 U.S.C. § 507(b).

Defendants respectfully request a hearing and oral argument on the parties' cross-motions for partial summary judgment to meaningfully assist the Court, given the importance of this case and the unique issues of law raised by these claims.  To conserve judicial resources, Defendants propose that a hearing on the parties' cross-motions be held on October 15, 2012, or another date, as convenient for the Court.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 11, 2012.  This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently-filed declarations, the concurrently-filed Statement of Uncontroverted Facts and Conclusions of law, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

///

///

1    Dated:  August 20, 2012        RESPECTFULLY SUBMITTED,

2                                    /s/ Marc Toberoff
                                     _____
3                                    Marc Toberoff

4                                    TOBEROFF & ASSOCIATES, P.C.
                                     Attorneys for Defendants Mark Warren Peary, as
5                                    personal representative of the Estate of Joseph
                                     Shuster, Jean Adele Peavy, and Laura Siegel
6                                    Larson, individually and as personal representative
                                     of the Estate of Joanne Siegel
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ....................................2

      A.    The Termination Right Under The U.S. Copyright Act ........2

      B.    The Relationship Between Superman's Co-Creators And DC ...................................................................................3

      C.    The 1992 Agreement To A Modest Pension Increase ..........4

      D.    The Executor Of Shuster's Estate Exercises His Termination Right ................................................................5

      E.    Enforcement Of The Siegel Termination, Triggering This Action ..........................................................................6

LEGAL STANDARD ................................................................................6

ARGUMENT ............................................................................................7

    I.    THE TERMINATION MET THE STATUTORY REQUIREMENTS ..............................................................7

    II.    DC'S FIRST CLAIM IS BARRED AS A MATTER OF LAW ................................................................................8

      A.    The Shuster Executor Possessed The § 304(d) Termination Right ................................................................8

          1.    If No Statutory Heirs, Executors Hold Termination Rights .......................................................8

          2.    Shuster's Section 304(c) Termination Rights Expired ................................................................10

      B.    The 1992 Agreement Does Not Affect The Shuster Termination ..........................................................................11

          1.    "Revocation And Re-grant" Exception In *Milne* And *Mewborn* ...................................................12

          2.    The 1992 Agreement Is Not A "Revocation And Re-Grant" ..................................................14

          3.    There Is No Novation Under New York Law ..........15

      C.    The Shuster Executor Properly Signed The Shuster Termination ..........................................................................18

      D.    The Shuster Termination Properly Listed All Copyright Grants ..................................................................18

E.    There Are No "Unclean Hands" That Would Bar
Termination ................................................................19

1.    PPC's Exclusion Is Proper, Not "Unclean
Hands" ..............................................................19

2.    No "Unclean Hands" In Deciding To Not
Terminate Superboy ..........................................20

III.    DC'S SECOND CLAIM IS LARGELY PRECLUDED ..............22

IV.    DC'S THIRD CLAIM FAILS AS A MATTER OF LAW ..........22

A.    Section 304(c)(6)(D) Does Not Provide DC With Any
Rights ........................................................................22

B.    DC Lacks Standing To Bring Its Third Claim ....................24

C.    DC's Third Claim Is Barred By The Statute Of
Limitations ................................................................24

V.    THE COURT MAY ENTER JUDGMENT UNDER F.R.C.P.
54(b) ................................................................................24

CONCLUSION ..................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                           **Pages**

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ............................................................................ 24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................. 6

*Artichoke Joe's Cal. Grand Casino v. Norton*,
  353 F.3d 712 (9th Cir. 2003) ............................................................... 9

*Bourne Co. v. MPL Commc'ns, Inc.*,
  675 F. Supp. 859 (S.D.N.Y. 1987) ...................................................... 23

*Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*,
  41 N.Y.2d 397 (1977) ........................................................................ 15

*Celotex Corporation v. Catrett*,
  477 U.S. 317 (1986) ............................................................................. 6

*Citibank, N.A. v. Benedict*,
  2000 WL 322785 (S.D.N.Y. Mar. 27, 2000) ....................................... 16

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ........................................................ 13-15

*Clinton v. Jones*,
  520 U.S. 681 (1997) ........................................................................... 22

*Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
  819 F.2d 1519 (9th Cir. 1987) ..................................................... 19, 25

*Curtiss-Wright Corp. v. General Electric Co.*,
  446 U.S. 1 (1980) .............................................................................. 25

*Davimos v. Halle*,
  60 A.D.3d 576 (2009) ........................................................................ 17

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  411 F.3d 384 (2d Cir. 2005) .............................................................. 16

*Frank Associates, Inc. v. John J. Ryan & Sons, Inc.*,
  117 N.Y.S.2d 406 (App. Div. 1952) ................................................... 16

*Gausvik v. Perez*,
  392 F.3d 1006 (9th Cir. 2004) ........................................................... 17

*Goldbard v. Empire State Mut. Ins. Co.*,
  5 A.D. 2d 230 (N.Y. App. Div. 1958) ................................................ 15

*Greenberg v. Nat'l Geographic Society*,
  533 F.3d 1244 (11th Cir. 2008) ........................................................... 2

*Groucho Marx Prods. V. Day & Night Co.*,
   689 F.2d 317 (2d Cir. 1982) ....................................................................... 11

*Gucci Am., Inc. v. Guess?, Inc.*,
   2012 WL 2304247 (S.D.N.Y. June 18, 2012) .......................................... 22

*Harris v. Emus Records Corp.*,
   734 F.2d 1329 (9th Cir. 1983) ................................................................. 20

*International Klafter Co., Inc. v. Continental Cas. Co.*,
   869 F.2d 96 (2d Cir. 1989) ....................................................................... 16

*Lennon v. Seaman*,
   84 F.Supp.2d 522 (S.D.N.Y. 2000) .......................................................... 20

*Lucky's Detroit, LLC v. Double L Inc.*,
   2012 WL 219418 (E.D. Mich. Jan. 25, 2012) ......................................... 22

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) ....................................................................... 3

*McKesson HBOC, Inc. ERISA Litig.*,
   391 F. Supp. 2d 812 (N.D. Cal. 2005) ...................................................... 19

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
   362 U.S. 373 (1960) .................................................................................. 10

*Milne v. Slesinger, Inc.*,
   430 F.3d 1036 (9th Cir. 2005) ............................................................ 12-15

*Milton H. Greene Archives v. CMG Worldwide*,
   568 F. Supp. 2d 1152 (C.D. Cal. 2008) ................................................... 11

*Music Sales Corp. v. Morris*,
   73 F. Supp. 2d 364 (S.D.N.Y. 1999) ........................................................ 10

*N.Y. Times v. Tasini*,
   533 U.S. 483 (2001) ................................................................................... 3

*Noel v. Hall*,
   568 F.3d 743 (9th Cir. 2009) .................................................................... 25

*Adidas Am., Inc. v. Payless Shoesource, Inc.*,
   166 Fed. Appx. 268 (9th Cir. 2006) ......................................................... 25

*Pelich v. INS*,
   329 F.3d 1057 (9th Cir. 2003) .................................................................. 19

*Penguin Group (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ............................................................ 11, 13-14

*Rivers v. Walt Disney Co.*,
   980 F. Supp. 1358 (C.D. Cal. 1997) ........................................................ 22

*Rottlund Co.,*
  2004 U.S. Dist. LEXIS 16723 ............................................................... 20

*Sears, Roebuck & Co. v. Sears PLC,*
  744 F. Supp. 1297 (D. Del. 1990)......................................................... 22

*Shady Records, Inc. v. Source Ent., Inc.,*
  2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. January 2, 2005) .................... 20

*Siegel v. Warner Bros. Ent. Inc.,*
  542 F. Supp. 2d 1098 (C.D. Cal. 2009) ........................................ *passim*

*Siegel v. Nat'l Periodical Publications, Inc.,*
  508 F.2d 909 (2d Cir. 1974) ............................................... 4, 11, 17, 21

*Siegel v. Warner Bros. Entertainment Inc.,*
  C.D. Cal. Case No. 04-08400 ODW (RZx) .............................................. 2

*Silvers v. Sony Pictures Ent., Inc.,*
  402 F.3d 881 (9th Cir. 2005) ................................................................ 10

*Stewart v. Abend,*
  495 U.S. 207, 212 (1990)................................................................. 2, 10

*Yahava v. Hua*
  1989 WL 214481 (S.D.N.Y. Nov.28, 1989)........................................... 16

**Statutes/Rules**

17 U.S.C. § 203 ....................................................................................... 2

17 U.S.C. § 304 ............................................................................... *passim*

37 C.F.R. § 201.10 ........................................................................ 7, 8, 19

F.R.C.P. 54(b) ....................................................................................... 25

F.R.C.P. 56............................................................................................. 6

L.R. 7-3 .................................................................................................. 3

**Other Authorities**

2 M. Nimmer & D. Nimmer, *Nimmer On Copyright*
  § 7.20.................................................................................................. 20

3 M. Nimmer & D. Nimmer, *Nimmer On Copyright*
  § 9.02.................................................................................................... 2

  § 11.03.................................................................................................. 9

  § 11.08................................................................................................ 24

3 W. Patry, *Patry on Copyright* (2010)
  § 7:47 ......................................................................................... 23

6 W. Patry, *Patry on Copyright*
  § 21:18 ....................................................................................... 24

67 Fed. Reg. 69134 ...................................................................... 11, 21

67 Fed. Reg. 69135 ...................................................................... 11, 21

H.R. Rep. No. 105-452 (1998),
  105th Congress, 2d Sess. ............................................................. 3, 9

H.R. Rep. No. 94-1476 (1976) ............................................................. 2

# INTRODUCTION

For nearly as long as Superman has fought for justice, Siegel and Shuster struggled to participate in the fruits of their creation, to no avail. Congress enacted the Copyright Act's termination provisions to remedy the harsh publisher/author imbalance, and to enable authors and their families to finally benefit from the increased value of their copyrights. If ever there were a case that fit squarely within Congress' concerted objectives, it is that of Siegel and Shuster. After the Court upheld the Siegels' statutory termination, DC Comics (including its predecessors, "DC") brought this action as to the Shuster estate's mirror image termination in a last-ditch effort to derail its long-awaited statutory recovery, with meritless claims.

Summary judgment in favor of Defendants is amply justified on DC's First, Second and Third Claims, and most of its Second Claim (Dkt. 49, First Amended Complaint ("FAC"), ¶¶105-173).

In 2003, Mark Warren Peary, the executor of Joseph Shuster's estate, duly served and filed notices of termination in accordance with section 304(d) of the Copyright Act (the "Termination"). DC's First Claim (FAC ¶¶105-34) seeks to invalidate this straightforward statutory termination based on five theories, each of which is clearly erroneous as a matter of law. Part (1) relies on wordplay to argue that Joe Shuster's termination rights under section 304(c) ceased to exist but did not "expire," contradicting the plain language and structure of the statute. Part (2) frivolously argues that a short 1992 pension agreement between DC and Shuster's siblings bars the Termination as a supposed "revocation and re-grant" of Shuster's Superman copyright grants, contrary to the language of the 1992 agreement, binding Ninth Circuit precedent, and DC's own actions. Part (3) alleges that the executor did not own the termination right, when he plainly did as a matter of federal copyright law. Part (4) alleges that the Termination omitted alleged "grants" of Joe Shuster's Superman copyrights that were not grants at all. Part (5) frivolously alleges "unclean hands" because Mr. Peary chose not to serve a Superboy termination notice,

consistent with the Copyright Act and preclusive factual findings in a Superboy suit.

DC's Second Claim seeks to re-litigate issues presented in the more-advanced, related case of *Siegel v. Warner Bros. Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx), currently on appeal. Much of this claim is barred by issue preclusion; the remainder should be stayed until resolved in the *Siegel* case.

DC's Third Claim insists that DC has a non-existent exclusive "right" to negotiate the purchase of the recovered Superman copyrights. The statute provides DC no such "right," as both case law and treatises confirm. DC lacks standing under the statute to bring this claim, which is barred as well by the statute of limitations.

DC has proceeded with these meritless claims for well over two years. Despite nearly a decade of discovery between this case and the *Siegel* case, DC cannot present any evidence to support its erroneous legal theories. DC's claims should be rejected, and this Court should confirm, consistent with Congress' clear objectives, that the Shuster Termination is valid and effective, just like the Siegels' termination.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Termination Right Under The U.S. Copyright Act

For over two centuries, the Copyright Act has consistently provided authors and their families with the right to recover previously transferred copyrights to enable their participation in the increased value of such copyrights. *See Stewart v. Abend*, 495 U.S. 207, 219 (1990), 3 M. Nimmer & D. Nimmer, *Nimmer On Copyright* ("*Nimmer*"), § 9.02. These protections culminated in the 1976 Copyright Act's termination provisions. 17 U.S.C. §§ 203(a), 304(c)-(d).

"The 1976 Copyright Act was supposed to reverse two hundred years of publishers' exploitation of authors under the [] Copyright Act." *Greenberg v. Nat'l Geographic Society*, 533 F.3d 1244, 1259 n.1 (11th Cir. 2008). When Congress extended the copyright term, it intended to benefit authors rather than grantees. *See* H.R. Rep. No. 94-1476 (1976) at 140. Congress thus coupled the extension with a new right of authors and "statutory heirs" (*i.e.*, spouse, children and grandchildren) to

terminate transfers of copyright signed before January 1, 1978.  17 U.S.C. § 304(c).

In recognizing the intent of the 1976 Act to "enhance the author's position," the Supreme Court has emphasized this "inalienable" right "to revoke a copyright transfer." *N.Y. Times v. Tasini*, 533 U.S. 483, 496 (2001); *see also Stewart,* 495 U.S. at 230 ("[The 1976 Act] provides an inalienable termination right").

When Congress further extended the copyright term in the 1998 Copyright Term Extension Act (Pub. L. 105-298; "CTEA"), it again coupled this extension with a second termination right in § 304(d), for situations where § 304(c)'s termination right had not been exercised by 1998.  17 U.S.C. §§ 304(b), (d).  *See* H.R. Rep. No. 105-452 (1998) ("H.R. Rep. 105-452") at 8 (intent of CTEA was for "the original authors of works and their beneficiaries to benefit from the extended [renewal] copyright protection").  Congress also, for the first time, provided the termination right to *the executor* of an author's estate, if the author was not survived by a spouse, child or grandchild.  17 U.S.C. § 304(c)(2)(D).

The Copyright Act's termination rights lie in stark contrast to ordinary contract principles, as they empower authors, their statutory heirs and estates to recover copyrights by terminating prior grants *without cause*.  *Id*., § 304(c)(5).  To ensure that termination rights are not contractually waived or circumvented, Congress further abrogated freedom of contract principles to make these rights inalienable. Hence, "[t]ermination … may be effected notwithstanding any agreement to the contrary." *Id*., § 304(c)(5); *see Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (agreement that effectively bars termination by re-characterizing works is void as an "agreement to the contrary").  Moreover, "[a] further grant…of any right covered by a terminated grant is valid only if it is made after the effective date of termination … [or as to] the original grantee or such grantee's successor in title, after the notice of termination has been served…." 17 U.S.C. § 304(c)(6)(D).

### B.   The Relationship Between Superman's Co-Creators And DC

In 1933-34, writer Jerome Siegel and illustrator Joe Shuster, two high school

students, co-created Superman as the "champion of the oppressed" in the midst of the Great Depression.  *See* Statement of Undisputed Facts ("SF") ¶1; *Siegel v. Warner Bros. Ent. Inc.* ("*Siegel I*"), 542 F. Supp. 2d 1098, 1114 n.3 (C.D. Cal. 2008).  Their highly original character would become a cultural icon, spawn a multi-billion dollar franchise and bring fortune to many – but not to them.  SF ¶4.  On March 1, 1938, Siegel and Shuster signed an agreement (the "1938 Grant"), without the aid of counsel, that would later be held to have granted Superman to DC for $130.  SF ¶¶2-3.  Despite Superman's phenomenal success, and DC's promises to "look after" its creators, DC refused to allow them even a simple royalty.  SF ¶17.

In 1947, Siegel and Shuster filed suit against DC in Westchester, N.Y.  SUF ¶5.  The court held that DC owned Superman pursuant to the 1938 Grant, but that DC had stolen Superboy from Siegel (*not* Shuster) while he was overseas fighting for his country in WWII.  SF ¶¶6-10.  Although the case settled, DC retaliated by cutting Siegel and Shuster off, and systematically erased their credit byline and references to them from its publications and histories.  SF ¶¶11, 16.  While Superman was ubiquitous, his creators slipped into obscurity and poverty.  SF ¶17.

In 1969, Siegel and Shuster brought a federal action as to ownership of the Superman renewal copyright, resulting in *Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974), which held that DC owned the Superman renewal copyright pursuant to the 1938 Grant.  SF ¶¶12-14.  In 1975, the National Cartoonists Society and the Cartoonists Guild launched a public-relations campaign protesting DC's shabby treatment of the creators.  SF ¶18.  Worried about negative publicity, DC's parent, Warner, finally agreed to pay Siegel and Shuster a modest pension, and restored their credit after 26 years (the "1975 Agreement").  SF ¶¶19-20.  The 1975 Agreement re-acknowledged that DC already owned all Superman rights (SF ¶38), and provided a $5,000 pension to Shuster's brother Frank.  SF ¶22.

## C.    <u>The 1992 Agreement To A Modest Pension Increase</u>

Shuster died on July 30, 1992 without widow or child, and was survived only

by his siblings, Frank Shuster (died in 1996) and Jean Peavy.  SF ¶¶23-26.  As Shuster's assets were extremely limited, his estate was not originally probated.  SF ¶27.  On October 2, 1992, DC entered into a short agreement with Frank and Jean ("1992 Agreement") to raise their pension to $25,000, which also stated:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which ***you*** [Frank and Jean] may have … regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, ***you*** now grant to us any such rights and release us … and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

SF ¶¶28-29 (emphasis added).  The 1992 Agreement made ***no*** mention of termination rights, Shuster's prior specific Superman grants to DC, or Superman.  *Id*.  DC made clear that Frank and Jean held no rights under the Copyright Act and that it had no obligation to raise the pension.  SF ¶31.  The same day, October 2, 1992, Frank signed a letter to DC stating that, in consideration for the 1992 Agreement, he was waiving his $5,000 pension under the 1975 Agreement.  SF ¶30.  In the years that followed, Frank and Jean struggled to get by.  SF ¶32-33.  Requests for increases in their pension were denied, but periodic bonuses were granted.  *Id*.

### D.    The Executor Of Shuster's Estate Exercises His Termination Right

On July 15, 2003, after the 1998 CTEA gave termination rights to an author's estate, Joe Shuster's nephew, Mark Warren Peary, petitioned the Court to probate his estate.  SF ¶¶43-44.  Shuster's will nominated Jean as executrix and stated that, if she declined, Mr. Peary should be appointed as executor.  SF ¶45.  As Jean was 82, she declined to serve.  SF ¶46.  On October 7, 2003, the Court duly appointed Peary as executor (the "Shuster Executor") with the "power … to terminate prior transfers of the decedent's copyright(s) pursuant to [17 U.S.C.] § 304(d)."  SF ¶¶47-48.

In November 2003, in compliance with the Copyright Act, the Shuster Executor filed in the U.S. Copyright Office and served on DC a notice of termination under 17 U.S.C. § 304(d), terminating Shuster's 1938 Grant and subsequent actual or potential Superman grants – with an effective termination date of October 26, 2013

1  (the "Termination").  SF ¶¶49-60; *Siegel I*, 542 F. Supp. 2d at 1114, n.3.

2      **E.**    **Enforcement Of The Siegel Termination, Triggering This Action**

3      In 1997, Jerry Siegel's widow and daughter served notices of termination as to

4  Siegel's share of the original Superman copyrights.  *Siegel I*, 542 F. Supp. 2d at

5  1114-16; SF ¶61.  In 2004, after four years of grinding negotiations did not result in a

6  settlement, the Siegels, represented by Mr. Toberoff, filed suit to vindicate their

7  copyrights.  SF ¶64.  On April 28, 2005, DC sent a letter to the Shuster Executor,

8  offering to settle with the Shusters at the expense of the Siegels, which was declined.

9  SF ¶42.  In 2008-09, the Court held that the Siegels had successfully recovered their

10  Superman copyrights by valid statutory termination.  SF ¶65; *Siegel I*, 542 F. Supp.

11  2d 1098; 658 F. Supp. 2d 1036 (C.D. Cal. 2009).  In 2010, DC replaced its general

12  and outside counsel, and retaliated by suing herein the Siegels, the Shusters and their

13  long-time counsel, Mr. Toberoff.  SF ¶70.

14      **LEGAL STANDARD**

15      Summary judgment is appropriate where "the pleadings, depositions, answers

16  to interrogatories, and admissions on file, together with the affidavits, if any, show

17  that there is no genuine issue as to any material fact and that the moving party is

18  entitled to judgment as a matter of law."  F.R.C.P. 56(c).  The moving party bears

19  the initial burden of demonstrating the absence of a genuine issue of material fact.

20  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A fact is material

21  only if it affects the outcome.  *Id.* at 248.  The moving party need not disprove the

22  other party's case.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).

23      If the moving party meets its initial burden, the "adverse party may not rest …

24  [on its] pleadings," but instead must demonstrate, by "admissible" evidence, the

25  existence of a genuine issue of material fact for trial.  F.R.C.P. 56(c); *Celotex*, 477

26  U.S. at 323.  "[T]he mere existence of a scintilla of evidence" is insufficient.

27  *Anderson*, 477 U.S. at 252.  "Partial summary judgment" where the court disposes of

28  some but not all claims or issues within a claim, is also permitted.  F.R.C.P. 56(a).

# **ARGUMENT**

## I.    **THE TERMINATION MET THE STATUTORY REQUIREMENTS**

The Shuster Termination fully satisfied the statutory and regulatory requirements for termination under 17 U.S.C. §§ 304(c)-(d) and 37 C.F.R. § 201.10.

Section 304(c)(2)(D) provides that the executor of an author's estate owns the termination right if the author had no widow or children.  As Joe Shuster had no widow or children (SF ¶25), the Shuster Executor held the entire termination right.

Section 304(d) provides a second termination right for copyrights in their renewal term on CTEA's effective date (October 27, 1998), where § 304(c)'s termination right had not been exercised and expired by October 27, 1998.  The Superman copyrights listed in the Termination were secured in 1938, and thus were in their renewal term on October 27, 1998.  SF ¶53.  The termination right can only be exercised in time "windows" defined in § 304(c)(3)-(4).  A § 304(c) termination must be served no later than 59 years after the copyright is secured.  *Id*.  Accordingly, 1997 was the latest a § 304(c) termination could have been served regarding the 1938 Superman works, but none was served.  SF ¶24.  As such, the § 304(c) termination right expired before October 27, 1998 without being exercised.  Section 304(d) therefore provided a termination right to the Shuster Executor.

Termination under §§ 304(c)-(d) applies only to grants "executed before January 1, 1978" by the author or his statutory heirs.  17 U.S.C. § 304(c).  The 1938 Grant and subsequent Shuster agreements listed in the Termination were all executed by Joe Shuster before January 1, 1978.  SF ¶53, 54.

The termination notice must "state the effective date of termination, which shall fall within the five-year period" (17 U.S.C. § 304(c)(4)(A)), and for § 304(d) that period "begin[s] at the end of 75 years from the date copyright was originally secured."  17 U.S.C. § 304(d)(2).  The notice must be served between two and ten years before the effective termination date.  17 U.S.C. § 304(c)(4)(A).  The relevant Superman copyrights were secured on April 18 – October 25, 1938.  SF ¶53.  The

1    Termination noticed an effective date of October 26, 2013, and was served on

2    November 10, 2003, both within the proper time windows.  SF ¶¶49, 55, 59.

3         The termination notice must be "recorded in the Copyright Office before the

4    effective date," 17 U.S.C. § 304(c)(4)(A), and comply "with requirements that the

5    Register of Copyrights shall prescribe by regulation."  17 U.S.C. § 304(c)(4)(B).  The

6    Termination was duly recorded on December 8, 2003 (SF ¶60), well before the

7    effective date, and fully complied with the Copyright Office's regulations. *See* 37

8    C.F.R. § 201.10(a)-(d); SF ¶¶49-59.

9         Because the Termination met all of the statutory and regulatory requirements

10   for termination, it is effective, as of October 26, 2013, to recover Shuster's joint

11   copyright interest in the Superman works listed therein.

## II.    DC'S FIRST CLAIM IS BARRED AS A MATTER OF LAW

13        DC's First Claim contrives five arguments for why the Shuster Termination is

14   supposedly ineffective.  None have any merit.

### A.    The Shuster Executor Possessed The § 304(d) Termination Right

16        Part (1) of DC's First Claim (FAC ¶¶107-11) argues that the Shuster Executor

17   had no Section 304(d) termination right to exercise.  A simple examination of the

18   language, structure and intent of the statute shows otherwise.

#### 1.    If No Statutory Heirs, Executors Hold Termination Rights

20        The Shuster Executor "own[s] the author's entire [§ 304(d)] termination

21   interest" under a plain reading of 17 U.S.C. § 304(c)(2)(D):  "if the author's widow

22   or widower, children, and grandchildren are not living, the author's executor … shall

23   own the author's entire termination interest." *See Siegel I*, 542 F. Supp. 2d at 1114

24   n.3 ("As executor of the Shuster estate, [Mark Warren Peary] is entitled [by the

25   CTEA] … to make the same termination claims for the Superman copyright that

26   Shuster or his heirs would have been entitled to bring.").

27        DC erroneously argues that § 304(d) termination rights only pass to an

28   executor if an author's widow, children and grandchildren are "'not living,' but [] did

1   at some time live." FAC ¶111. This wordplay theory contradicts both the language

2   and intent of the statute and the meaning of "not living" under the Copyright Act.

3        Courts interpret a federal statute by looking at the "the language of the statute,"

4   and "[w]hen the words of a statute are unambiguous, judicial inquiry is complete."

5   *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 (9th Cir. 2003).

6   Congress established in § 304(c)(2) four classes who may exercise termination rights:

7   (1) widow(er), (2) children, (3) grandchildren, and (4) if there is no surviving

8   widow(er), child or grandchild, the executor. The inclusion of estates was deliberate:

9       What … if, upon the death of an author … there is no surviving spouse, and no
    surviving children or grandchildren? ***Under the 1976 Act at its passage, the***
10  ***result was that no one could exercise the right of termination***. That harsh
    result persisted for the current Act's first two decades. Then in the [CTEA],
11  Congress ameliorated that result. Effective from October 27, 1998 onward, ***the***
    ***termination right, instead of lapsing in these circumstances, belongs to "the***
12  ***author's executor, administrator, personal representative, or trustee***."

13  3 *Nimmer* § 11.03[A][2][a]  (quoting 17 U.S.C. § 304(c)(2)(D)) (emphasis added).

14       Section 304(d) was designed to "correct the imbalance arising from the fact

15  that the author (or his heirs) failed to terminate previously, whether through neglect

16  or inability." *Id.*, § 11.05[B][2] at 11-40.12. Such "inability" could arise, as here,

17  "because no one was alive to effectuate termination," and the CTEA "solves that

18  latter situation" through § 304(c)(2)(D). *Id.* at 25.2. The only reasonable

19  interpretation of the statute is that Congress gave § 304(d) termination rights to

20  widows, children and grandchildren if they existed, and otherwise to the author's

21  estate/executor. *See* H.R. Rep. No. 105-452 at 8 (the amendments "allow[] an

22  author's executor to receive his entire termination interest [if] the author's widow,

23  widower, children or grandchildren are not living"). DC has falsely argued that

24  CTEA was not intended "to open the door to an entirely new class of persons." Dkt.

25  458 at 22. The CTEA was intended to do and expressly did exactly that.

26       Furthermore, DC's argument that "not living" under § 304(c)(2)(D) means

27  "once living, now deceased" also contradicts the meaning of "not living" under the

28  Copyright Act. The termination provisions provide a right to recapture the extended

"renewal" copyright.  17 U.S.C. § 304(c), (d).  The related sub-section dealing with the renewal copyright, 17 U.S.C. § 304(a)(1)(C), uses identical language (*i.e.*, "if such author, widow, widower, or children are not living") as that in § 304(c)(2)(D).

Under DC's self-serving interpretation of "not living," a renewal copyright would not vest in the executor of an estate under § 304(a)(1)(C)(iii) unless the author was survived by a spouse or child, who then died.  Yet the courts – including the Supreme Court – have *consistently* held that copyrights are owned by an author's estate, even if the author had no spouse or children.  *See Stewart v. Abend*, 495 U.S. 207, 212 (1990) (renewal copyright vested in executor of an estate where author had no widow or children); *Miller Music Corp. v. Charles N. Daniels, Inc*., 362 U.S. 373, 374–75 (1960) (construing the phrase "not living" to mean "leaving no widow, widower, or children," and granting rights to the author's estate where he had no wife or children); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 373-75 (S.D.N.Y. 1999) (rejecting argument that "not living" means "deceased" and holding "not living" covers situations where the author had no spouse or child).  "Not living" in the related renewal and termination contexts must be interpreted consistently.  *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 900 (9th Cir. 2005) ("[C]ourts will not interpret a statute in a way that results in an absurd or unreasonable result….").

## 2.    Shuster's Section 304(c) Termination Rights Expired

As noted above, Section 304(d) provides a second termination right with respect to any copyright "in its renewal term on the effective date of the [CTEA] [*i.e.*, October 27, 1998] for which the termination right provided in subsection [304](c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right."  Joe Shuster's § 304(c) termination rights were not exercised and had therefore expired by October 27, 1998.  SF ¶24.

DC again engages in wordplay to argue that because Joe Shuster died without a widow or children while he could theoretically have exercised the termination right, his rights did not "expire," but were "extinguished," and that there is supposedly no §

304(d) termination right, contrary to the plain language of the statute.  FAC ¶¶109-111.  This makes no sense.  The Copyright Office itself states, without preconditions or qualification, that under § 304(d) "the termination right will have 'expired,' see 17 U.S.C. § 304(d), 59 years after copyright was secured," regardless of whether the author lived to that exact date.  67 Fed. Reg. 69134, 69135.

Courts also routinely use "expired" to describe rights lost upon death.  *See Groucho Marx Prods. V. Day & Night Co.*, 689 F.2d 317, 320 (2d Cir. 1982) ("[T]he right is not descendible and expires upon the death of the person so protected."); *Milton H. Greene Archives v. CMG Worldwide*, 568 F. Supp. 2d 1152, 1156 (C.D. Cal. 2008) ("[T]hat right expired on an individual's death.").  Indeed, *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008), plainly states that Section 304(d)'s "statutory termination rights expire upon [] death."

## B.    The 1992 Agreement Does Not Affect The Shuster Termination

Sections 304(c)-(d) apply to pre-1978 copyright grants; a post-January 1, 1978 grant by an author's heir is not terminable.  DC thus pretends in part (2) of its First Claim (FAC ¶¶112-17) that the 1992 Agreement, between DC and siblings Frank Shuster and Jean Peavy, regarding a modest pension, is DC's operative grant of Joe Shuster's Superman copyrights.  This makes no sense.  Siegel and Shuster assigned all rights in their original Superman character and story to DC in the 1938 Grant, and thereafter granted additional Superman copyrights to DC.  *Siegel*, 508 F.2d at 911-914.  DC has *for decades* based its chain-of-title to Superman on these pre-1978 grants (SF ¶15) – all of which were duly listed in the Termination.  SF ¶54.

DC frivolously argues that the 1992 Agreement somehow silently "revoked" all of Shuster's prior grants and "re-granted" Shuster's Superman copyrights to DC. FAC ¶¶112-117.  This is preposterous.  The 1992 Agreement, on its face, merely raised Frank and Jean's modest pension and contained a standard quitclaim of *their* rights, if any.  SF ¶29.  The 1992 Agreement contains no language whatsoever of revocation or rescission nor does it purport to replace or even to identify any prior

Superman grants.  *Id.*  It nowhere even mentions Superman, because the Superman copyrights had long ago been assigned by Siegel and Shuster to DC.  SF ¶¶2, 7, 14, 29.  The 1992 Agreement is irrelevant, and cannot bar the Termination as a matter of law.

The 1992 Agreement contains only three obligations of Frank and Jean:  they settled any payment claim, covenanted not to assert and quitclaimed to DC *their* rights, *if any,* in Joe Shuster's works.  SF ¶29.  The 1992 Agreement makes no mention of termination, nor does it purport to limit or waive termination.  *Id.*  This is unsurprising, as siblings like Frank/Jean have no termination rights, and estates did not have termination rights until 1998 under the CTEA.  17 U.S.C. § 304(c)(2).  Nor could the Agreement "settle" the inalienable termination right, which is exercisable "notwithstanding any agreement to the contrary."  17 U.S.C. § 304(c)(5).  Nor could it have pre-assigned terminated copyrights, as "[an] agreement to make a further grant [] of any right covered by a terminated grant is valid only if it is made after the effective date [i.e., October 26, 2013] of the termination."  17 U.S.C. § 304(c)(6)(D).

## 1.   "Revocation And Re-grant" Exception In *Milne* And *Mewborn*

DC unsuccessfully tries to squeeze the 1992 Agreement into a narrow and inapplicable "revocation and re-grant" exception recognized in *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005).  In *Milne*, the author's son, in 1983, during the termination window, expressly agreed to the contractual "revocation of [a pre-1978] agreement[] in favor of the new [1983] agreement, followed by the re-granting (on the same page) of the rights" instead of statutory termination.  *Id.* at 1040-41.  When the author's granddaughter later sought to terminate, *Milne* held there was no pre-1978 grant to terminate, because the 1983 contract had "specifically stated" that it revoked and replaced the pre-1978 copyright grant.  *Id.* at 1040 n.4.  *Milne* emphasized that the author's son "could have served a termination notice," but instead used that "bargaining power" as "leverage to obtain a better deal," with "a net gain of hundreds of millions of dollars."  *Id.* at 1041, 1045.  This was not "an

agreement to the contrary," because the *express* revocation and re-negotiation of a new grant on greatly enhanced terms, under the real threat of termination, achieved "the very result envisioned by Congress [in] the termination provisions." *Id.* at 1047.

*Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008), although not binding here, followed *Milne*. In 1994, an author's widow, during a largely open termination window, *expressly* revoked his 1938 grant and re-granted his copyrights, "leaving in effect no pre-1978 grants" to terminate. *Id.* at 196-200 (contract expressly "stated that '… [it] will cancel and supersede the previous agreements'"). In exchange, the publisher made major financial concessions. *Id.* at 196. Later attempts to terminate were barred, because the widow "wield[ed] the threat of termination" to secure market value for the author's copyrights, and such "renegotiation appears to be exactly what was intended by Congress." *Id.* at 202-04.

In *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978 (9th Cir. 2008), the Ninth Circuit revisited these issues and firmly rejected a publisher's attempt to extend *Milne*'s narrow holding. In 1976, an author's daughter assigned her rights to a publisher. *Id.* at 980. In 1978, she signed a second contract, purporting to assign the already-assigned rights. *Id.* at 981. After she served a termination notice as to the still-operative 1976 grant, the publisher sued, claiming that the 1978 grant "superseded" and "revoked and re-granted" the copyrights. *Id.* at 981-82. The Ninth Circuit upheld the termination, refused to extend *Milne* beyond its "distinct factual scenario," and distinguished *Mewborn* on two principal grounds. *Id.* at 987.

**First**, the Ninth Circuit emphasized that the 1978 agreement, unlike in *Milne*, did not "*expressly* revoke the earlier … assignments." *Id.* at 989 (emphasis added). The 1978 grant was therefore a "nullity" as it purported to grant copyrights already assigned to the publisher and in its possession. *Id.* at 986.

**Second**, the Ninth Circuit noted that, while the *Milne* agreement "expressly stated that it was made in exchange for non-exercise of the immediately investive termination right," Mewborn's agreement "was silent on the issue." *Id.* at 986-89.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    She had no active termination right and " nothing in hand with which to bargain." *Id.*

2        Together, these cases establish the narrow proposition that (1) statutory heirs

3    can leverage their termination right during an open termination window, (2) by

4    expressly revoking a prior copyright grant and re-granting their copyrights (3) on

5    substantially better economic terms, thereby trading on their termination right.  Only

6    then is Congress' concerted objective fulfilled.  *See Mewborn*, 532 F.3d at 987

7    (*Milne*'s express agreement "was tantamount to following the statutory formalities,"

8    and "achieved the exact policy objectives for which 304(c) was enacted").

9        **2.    The 1992 Agreement Is Not A "Revocation And Re-Grant"**

10        The 1992 Agreement does not even remotely qualify under *Milne* and

11    *Mewborn* for this "revocation and re-grant" exception.  It merely "settles all claims to

12    any payments or other rights or remedies which you [*Frank and Jean*] may have

13    under any other agreement or otherwise … in any and all work created … by your

14    brother [Joe Shuster]" and "grant[s] to [DC] any such rights."  SF ¶29.  This

15    boilerplate quitclaim could not possibly transfer Joe Shuster's Superman copyrights,

16    long-owned by DC via Shuster's 1938 Grant and subsequent grants.  SF ¶¶2, 7, 14,

17    29.  Any "grant" was a "nullity" because Frank and Jean "had nothing [] to transfer."

18    *Mewborn*, 532 F.3d at 986.  Nor can DC meet the other requirements of *Milne*.

19        The 1992 Agreement does *not* contain *any* language of revocation (SF ¶29), let

20    alone the required *express* revocation of identified prior copyright grants.  *See Milne*,

21    430 F.3d at 1040-41; *Mewborn*, 532 F.3d at 989.  It include *no* terms like revoke,

22    rescind, supersede, replace, or any other obvious synonyms.  SF ¶29.  The 1992

23    Agreement neither identifies Joe Shuster's key Superman grants nor mentions

24    Superman.  *Compare Milne*, 542 F.3d at 1041 (new agreement contained express

25    "revocation of the [prior] agreements"); *Steinbeck*, 537 F.3d at 197 (contract

26    *expressly* provided it would "cancel and supersede the previous agreements").  The

27    contract also does *not* re-grant Joe Shuster's Superman copyrights.  If the parties had

28    intended a "revocation and re-grant," DC could easily have written this, but did not.

In 1992, neither Frank, Jean, nor anyone else, held a termination right under the Copyright Act.  17 U.S.C. § 304(c)(2) (1978); SF ¶25.  The 1992 Agreement was thus *not* negotiated within or near the termination window such that the termination right could be meaningfully leveraged, and Congress' objective achieved.  *Milne*, 430 F.3d at 1045 ("Although Christopher presumably could have served a termination notice, he elected instead to use his leverage to obtain a better deal….").

### 3.    There Is No Novation Under New York Law

DC blindly argues that, under New York law, the 1992 Agreement supposedly constitutes a "novation" that somehow replaced Shuster's prior agreements.  Dkt. 458 at 13-15, Dkt. 468 at 2-5.  Every step of DC's argument is wrong.

First, DC argues that New York law applies to whether the 1992 Agreement is an "agreement to the contrary" under the Copyright Act.  Dkt. 468 at 2.  The Ninth Circuit in *Milne* and *Mewborn* held that "revocation and re-grant" must be *express* as a matter of federal copyright law, without any reference to state law.

Second, New York law emphasizes the primacy of a contract's language.  *See Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 41 N.Y.2d 397, 399 (1977) (courts look not to "subjective intent," but "to the objective manifestations of the intent of the parties" in their contract); *Croman v. Wacholder*, 769 N.Y.S.2d 219, 223 (2003) ("[N]o basis to accept plaintiff's after-the-fact contention that the written agreement means something other than what it says.").  Try as DC might to distort the language of the 1992 Agreement, its quitclaim concerns Frank and Jean's rights, *if any*, not Joseph Shuster's prior Superman copyright grants.

Third, contrary to New York's emphasis on contractual language, DC has argued that intent to replace a prior contract may be "express or implied," citing *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D. 2d 230, 233 (N.Y. App. Div. 1958).  Dkt. 468 at 2.  But *Goldbard* found a purported settlement agreement did ***not*** extinguish the parties' prior contract, and noted that "courts hasten to find an intention to have a substituted or superseding [settlement] agreement discharging the

old where the settlement has resulted in *formalized papers with <u>unequivocal</u> language* [], or in *formalized or deliberate proceedings in court during the pendency of an action*." *Id.* at 234 (emphasis added).  Nothing remotely like that exists here.

Fourth, DC ignores clear New York decisions that likewise require unequivocal evidence for a novation.  *See Citibank, N.A. v. Benedict*, 2000 WL 322785, at *8 (S.D.N.Y. Mar. 27, 2000) ("[A]ll parties must have 'clearly expressed their intention that a subsequent agreement … [be] substituted for an old agreement'"); *Wang v. Chen*, 1992 WL 7840 at *6 (S.D.N.Y. Jan. 10, 1992) ("[A] novation must never be presumed."); *Frank Associates, Inc. v. John J. Ryan & Sons, Inc.*, 117 N.Y.S.2d 406, 407 (App. Div. 1952) ("It is also well settled that cancellation of a contract must be clearly expressed."); *Yahaya v. Hua*, 1989 WL 214481 at *4 (S.D.N.Y. Nov.28, 1989) (there must be a "clear and definite intention on the part of all concerned that [novation] is the purpose of the agreement").  The 1992 Agreement hardly constitutes this "clear and definite" evidence, as it contains no language whatsoever of revocation and rescission, and does not even specify *any* of the Superman grants it supposedly revokes and replaces.

Fifth, DC miscites extrinsic evidence, notably out-of-context statements from Frank and Jean, to imply that the parties intended the 1992 Agreement to act in place of Frank and Jean's *non-existent* termination right.  This supposed extrinsic evidence is inadmissible, because the 1992 Agreement's language is unambiguous.  *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir 2005) (contractual ambiguity is a "threshold question of law for the court"); *International Klafter Co., Inc. v. Continental Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) (where contractual terms unambiguous, the "intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible").

Sixth, even if such evidence were admissible, the declaration of DC's former President, Paul Levitz, on which DC has relied, nowhere suggests that the 1992 Agreement was intended to be revocation or re-grant.  SF ¶34.  Furthermore, DC's

own actions severely undermine its claims.  The perfunctory 1992 Agreement, which simply increased Frank's modest pension, bears no resemblance to the elaborate rights agreements customarily used by Warner/DC.  SF ¶35.  DC has no evidence that it ever registered the 1992 Agreement with the Copyright Office, as is common place for key copyright assignments.  SF ¶36.  DC has relied for decades on Siegel and Shuster's 1938 Grant *upheld in two Court judgments as granting DC all rights to Superman.  See Siegel,* 508 F.2d at 912-913; SF ¶37.  DC's 2005 letter to the Shuster Executor regarding the Termination thus nowhere even mentions the 1992 Agreement.  SF ¶29.  In 2008, DC admitted, and the *Siegel* Court agreed, that DC co-owns the original Superman copyrights based on Shuster's 1938 Grant, not the 1992 Agreement.  *See Siegel I*, 542 F. Supp. 2d at 1142; *Siegel,* Dkt. 161 at 15.  Finally, even though the Termination was served in 2003, DC did not say one word about the 1992 Agreement until filing this contrived suit in 2010.  SF ¶¶39-42.

Lastly, even if the 1992 Agreement was somehow intended as a "novation," it was not a novation of Joe Shuster's Superman copyright grants.  The 1975 Agreement provided a $5,000 pension to Joe's brother, Frank.  SF ¶22.  On the day Frank signed the 1992 Agreement, he sent a letter to DC waiving his pension under the 1975 Agreement.  SF ¶30.  Under New York law, Frank's letter is incorporated into the 1992 Agreement.  *Davimos v. Halle*, 60 A.D.3d 576, 577 (2009).  To the extent the 1992 Agreement "novated" anything, it was only the 1975 Agreement.

The 1975 Agreement, however, did not transfer any Superman copyrights, which it expressly acknowledged were all already owned by DC.  SF ¶¶21, 38.  This Court held, in an opinion, later incorporated into a Rule 54(b) judgment (SF ¶67), that "the 1975 Agreement was not a 'grant.'  The agreement's execution did not result in the transfer or assignment of the Superman copyright."  *Siegel I*, 542 F. Supp. 2d at 1133.  DC did not bother to appeal that aspect of the judgment, which is binding on DC.  SF ¶68; *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004).

Thus, even if New York law applied, and even if it did not require that a

1    novation be clear and unequivocal, and even if extrinsic evidence were somehow

2    admissible, and even if the 1992 Agreement were a "novation," it novated the 1975

3    Agreement, without any effect on DC's long-held Superman copyrights.

###      C.     The Shuster Executor Properly Signed The Shuster Termination

5        Pursuant to 17 U.S.C. § 304(c)(4), termination notices must be signed "by the

6    number and proportion of the owners of [the author's] termination interest required"

7    to terminate. Part (3) of DC's First Claim (FAC ¶¶118-24) disingenuously alleges

8    that "the Estate did not own the requisite majority interest," and that 50% of the

9    termination right was supposedly owned by defendant Pacific Pictures Corporation

10    ("PPC") pursuant to a 2001 agreement between PPC and Mark Warren Peary/Jean

11    Adele Peavy and a 2003 agreement between PPC and the Shuster Executor.

12        DC's argument fails. Under § 304(c)(2)(D), the Shuster termination right was

13    solely owned by the Shuster Executor, who duly signed his termination notice. SF

14    ¶58. The termination right is not transferrable; it can only be held by statutorily-

15    defined classes (statutory heirs and executors), and PPC was not a member of any

16    such class. 17 U.S.C. § 304(c)(2)(A)-(D). Second, a termination notice must be

17    served before the copyrights to be recovered are transferable to anyone; and even

18    then, prior to the effective termination date (here October 26, 2013), such copyrights

19    can only be anticipatorily assigned to the former grantee or its successor (here, DC).

20    17 U.S.C. § 304(c)(6)(D). Thus, the 2001/2003 PPC agreements, pre-dating both the

21    service *and* effective date of the Termination, could not and did not transfer any

22    termination right or interest to PPC. **DC admits this elsewhere in its complaint**

23    **(FAC ¶¶167-68) and briefs (Dkt. 458 at 8:13-15), citing §304(c)(6)(D), just as**

24    **Defendants do.** The Termination provided all of the required information, and was

25    entirely accurate, as only the Shuster Executor held the termination right.

###      D.     The Shuster Termination Properly Listed All Copyright Grants

27        Termination notices are to contain "[a] brief statement reasonably identifying

28    the grant to which the notice of termination applies." 37 C.F.R. § 201.10(b)(1)(iv).

The Termination listed the 1938 Grant and six other DC agreements, to the extent such are construed as grants. SF ¶54. Part (4) of DC's First Claim (FAC ¶¶ 125-28) erroneously alleges that the Termination is invalid because it failed to list (i) a May 21, 1948 consent judgment ("1948 Judgment") and (ii) the 1992 Agreement.

As shown above, the 1992 Agreement was *not* a Superman copyright "grant," as DC already owned Joe Shuster's Superman copyrights pursuant to the 1938 Grant and subsequent pre-1978 grants (or potential grants) listed in the Termination. DC's equally dubious argument that the 1948 Judgment was a grant was roundly rejected in *Siegel I*, 542 F. Supp. 2d at 1131-32 – an order entered as a Rule 54(b) judgment (SF ¶67) that binds DC as a matter of collateral estoppel. *See Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987). Significantly, DC did not even bother to appeal that ruling. SF ¶69.

### E.    There Are No "Unclean Hands" That Would Bar Termination

Knowing that its legal arguments fail, DC turns in Part (5) of its First Claim (FAC ¶¶129-33), to vague and baseless "unclean hands" arguments. As a preliminary matter "unclean hands is an equitable defense, not a cause of action." *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D. Cal. 2005) (dismissing "unclean hands" claim). "The doctrine of unclean hands does not obviously apply where it is [the plaintiff], not the [defendant], who seeks relief" based on this "defensive doctrine." *Pelich v. INS*, 329 F.3d 1057, 1062 (9th Cir. 2003). Moreover, DC's allegations simply do not hold up.

### 1.    PPC's Exclusion Is Proper, Not "Unclean Hands"

The first part of DC's "unclean hands" claim erroneously alleges that not listing "[PPC's] purported ownership interest in the rights … to be terminated" was a "material misrepresentation intended to mislead the courts, Copyright Office, and DC Comics." FAC ¶¶129-30. This makes no sense. As shown above and admitted by DC (FAC ¶¶167-68), the copyrights to be recovered could not be anticipatorily transferred to PPC per 17 U.S.C. §304(c)(6)(D), as a matter of law. And despite

1    DC's empty rhetoric, the Shusters voluntarily produced the PPC agreements to DC in

2    2006 in *Siegel* (SF ¶77), belying any intent to "mislead" DC or the courts.  *See*

3    *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1983) (rejecting similar

4    argument as party "made no showing that they have been prejudiced in any way").

    The closest analogy to DC's vague "unclean hands" claim is that of a "fraud on

5    the copyright office," where a defendant accused of infringement tries to invalidate a

6    plaintiff's copyright.  However, the "party seeking to establish a fraud on the

7    Copyright Office … bears a heavy burden."  *Lennon v. Seaman*, 84 F.Supp.2d 522,

8    525 (S.D.N.Y. 2000) citing 2 *Nimmer* § 7.20[B].  "The party … must establish that

9    the application … is factually inaccurate, that the inaccuracies were willful or

10   deliberate, and that the Copyright Office relied on those misrepresentations."  *Shady*

11   *Records, Inc. v. Source Ent., Inc.*, 2004 U.S. Dist. LEXIS 26143, at *28 (S.D.N.Y.

12   January 2, 2005).  "Neither innocent misstatements, nor deliberate, but nonmaterial

13   misstatements, will overcome the presumption of validity."  *Id.*

14

15   DC's "unclean hands" claim thus fails as a matter of law.  The PPC agreements

16   ***could not transfer*** the future termination interest.  Thus, neither the Termination nor

17   its filing was "factually inaccurate;" there were no misrepresentations to the

18   Copyright Office, on which it relied or otherwise.  *See Shady Records, Inc.*, 2004

19   U.S. Dist. LEXIS 26143, at *28–*32 (finding "no alleged omissions or misstatements

20   to evaluate for fraudulent intent" because the plaintiff "was indeed an owner of

21   copyright interests in [the song] at the time of the basic registration, by virtue of

22   Michael Ruby's assignment of his interests"); *Rottlund Co.*, 2004 U.S. Dist. LEXIS

23   16723, at *39–*46 (finding no fraud because the plaintiff owned the copyrights by

24   assignment; "[t]hus, the allegedly erroneous work for hire designation is immaterial

25   and caused no prejudice to Defendants").

26          **2.    No "Unclean Hands" In Deciding To Not Terminate Superboy**

27   Part two of DC's purported "unclean hands" claim is based on the proper

28   omission of Superboy from "the Shuster Termination Notice."  FAC ¶¶131-33.  The

1    Shuster Executor's legal decision not to terminate Superboy was correct and, in any

2    event, such a discretionary legal decision could not constitute "unclean hands."

3    <u>Superboy Could Not Have Been Terminated</u>:  DC's claim fails because

4    Superboy could not have been terminated by the § 304(d) Shuster Termination as a

5    matter of law.  Section 304(d) ***only*** applies to "works for which copyright was

6    secured between January 1, 1923, and October 26, 1939."  67 Fed. Reg. 69134,

7    69135 (Nov. 15, 2002), 17 U.S.C.§ 304(d).  Copyright for the first Superboy story

8    was secured in **November 1944** when it was first published in *More Fun Comics*,

9    No. 101.  RJN, Ex. E, FF ¶163; FAC ¶¶41-42, 131.  Superboy was therefore ***not***

10   subject to a § 304(d) termination by the Shuster Executor.

11   <u>Siegel Was Held To Be The Original Superboy Author/Owner</u>:  DC's "unclean

12   hands" theory ignores prior binding decisions as to Superboy.  In 1938-1940, Jerome

13   Siegel, on his own, developed Superboy in a script he submitted to DC, which

14   rejected it.  SF ¶¶6, 8-10.  In 1944, while Siegel was abroad in World War II, DC

15   published Superboy as a new character in *More Fun Comics*, No. 101 and in later

16   comics, based on Siegel's material, but without his consent.  SF ¶10.

17   When Siegel and Shuster jointly sued DC in the 1947 Action, Siegel

18   ***individually*** claimed that Detective had no right to publish Superboy, and that

19   Superboy belonged to him.  SF ¶6.  The court agreed, finding Siegel was the ***sole***

20   creator/owner of Superboy, and enjoined DC from publishing Superboy.  SF ¶¶8-10.

21   The Second Circuit later found such findings preclusive as to DC, Siegel and Shuster.

22   *Siegel*, 508 F.2d at 913-14.  The Shuster Executor thus chose not to include Superboy

23   in his termination, as he was bound (as is DC) by the prior decision that Siegel was

24   the original author/owner of Superboy.

25   <u>Termination Is Discretionary</u>: Termination is not mandatory, it is discretionary.

26   *See* 17 U.S.C. §§ 304(c)-(d).  The Shuster Executor's well-reasoned decision not to

27   file a Superboy termination notice was squarely based on the above, but even if he

28   had refrained for a tactical advantage as alleged by DC (FAC ¶¶10, 89), such cannot

constitute "unclean hands" as a matter of law. *See Gucci Am., Inc. v. Guess?, Inc.*, 2012 WL 2304247 (S.D.N.Y. June 18, 2012) (unclean hands inapplicable to "a tactical choice rather than an 'unconscionable act'"); *Lucky's Detroit, LLC v. Double L Inc.*, 2012 WL 219418, at *15 (E.D. Mich. Jan. 25, 2012) ("litigation tactics" do not constitute "unclean hands"); *Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1310 (D. Del. 1990) (unclean hands "cannot [be] based on … litigation strategy"). Furthermore, despite DC's insinuations (FAC ¶132), the Shusters have no right or interest in Superboy or the Siegels' Superboy termination. SF ¶63.

## III.    DC'S SECOND CLAIM IS LARGELY PRECLUDED

DC's Second Claim (FAC ¶¶135-164) addresses the "scope" of the Shuster Termination. Parts (a) and (c) concern "work for hire" issues *fully* litigated in *Siegel*. *Compare* FAC ¶¶153-54, 158-59 *with Siegel*, 542 F. Supp. 2d at 1126-30; 658 F. Supp. 2d 1036, 1061-68, 1083 (C.D. Cal. 2009) ("work for hire" and unpublished Superman works). Since Siegel and Shuster co-authored the same Superman works and executed the same grants subject to statutory termination, parts (a) and (c) are clearly barred by the judgment in *Siegel* under the issue preclusion doctrine. *See* SF ¶71. The remaining parts ((b), (d) and (e)) should be stayed pending resolution of the more advanced *Siegel* litigation, where such issues first arose. *See* SF ¶72; *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997) (staying action pending related litigation to "serve the interests of judicial economy"); *Clinton v. Jones*, 520 U.S. 681, 706 (1997) (a court "has broad discretion to stay proceedings").

## IV.    DC'S THIRD CLAIM FAILS AS A MATTER OF LAW

### A.    Section 304(c)(6)(D) Does Not Provide DC With Any Rights

DC's Third Claim (FAC ¶¶165-73) fails a matter of law because it is premised on a non-existent "statutory right" under 17 U.S.C. § 304(c)(6)(D) to exclusively negotiate the purchase of the copyrights recovered by the Siegels and the Shuster Executor. DC claims that (1) the long-cancelled and ineffective PPC agreements and (2) the Siegels' and Shusters' 2008 agreement to collectively negotiate with DC (the

"2008 Agreement") somehow interfere with its non-existent "right."

The unambiguous statute provides DC no such "right," and both case law and treatises confirm that none exists. Section 304(c)(6)(D) simply provides that "a further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date," except that an "agreement for such a further grant may be made … [with] the original grantee … after the notice of termination has been served." This merely limits the terminator's ability to make a grant; it does not create an affirmative "right" for the terminatee.

DC's slim theory was expressly rejected in *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987), where a terminated party claimed rights to "an exclusive period of negotiation" and "first refusal" under section 304(c)(6)(D):

> ***Nor does the statute [§ 304(c)(6)(D)] provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else.*** All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights.

*Id.* (citations omitted) (emphasis added). *Bourne* thus rejected the notion of an "exclusive negotiation period," finding nothing in the statute that says "a [third party] grant is valid only if *negotiated* after the termination date." 675 F. Supp. at 861. *Bourne* also rejected the argument that § 304(c)(6)(D) is "'in the nature of a right of first refusal;'" for if Congress intended such a right, "it would have done so in clear language." *Id.* at 865; *see* 3 W. Patry, *Patry on Copyright* ("*Patry*") § 7:47 (2010) ("[§ 304(c)(6)(D) is] sometimes erroneously described as a 'right of first refusal.'").

DC's alleged remedy – to "restore" an "exclusive period of negotiation" – thus makes no sense as "[i]t is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an exclusive period of negotiation.'" 3 *Nimmer* § 11.08[A], n.6 (2010).

Simply put, neither the statute nor the case law supports DC's Third Claim.

Finally, even if DC had such rights, the 2001/ 2003 PPC agreements were cancelled in 2004, *nine years* before the 2013 Termination date. Furthermore, the

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  2008 Agreement does not in any way violate DC's supposed "right." As DC admits,
2  the 2008 Agreement simply "'requires … the consent of the Siegels and the Shuster
3  Estate … to a settlement of their termination rights *with DC*.'" Dkt. 458 at 24.
4  (emphasis added); SF ¶¶80-81.  Indeed, after extensive briefing, Magistrate Zarefsky
5  rejected DC's argument that the 2008 Agreement is "an independent wrong [that]
6  violates the Copyright Act," finding it a legitimate "Drysdale-Koufax collective
7  approach to negotiation." SF ¶82.  This Court upheld that ruling.  SF ¶83.

8  ### B.    DC Lacks Standing To Bring Its Third Claim

9  Because a terminated grantee, like DC, has "no rights under [§ 304(c)(6)(D)],
10  [it] cannot sue for failure to comply, and the provision therefore does not provide a
11  basis for standing." 6 *Patry* § 21:18.  Unless Congress plainly showed "an intent to
12  create not just a private right but also a private remedy," then "a cause of action does
13  not exist and courts may not create one."  *Alexander v. Sandoval*, 532 U.S. 275, 286
14  (2001).  DC points to nothing that gives it such a private remedy.

15  ### C.    DC's Third Claim Is Barred By The Statute Of Limitations

16  DC's Third Claim for declaratory relief under the Copyright Act is subject to
17  17 U.S.C. § 507(b)'s three-year statute of limitations.  DC's Third Claim is expressly
18  based on *the text* of the 2001/2003 PPC Agreements.  Dkt. Nos. 49 ¶169; 458 at 23-
19  25.  DC's claim therefore accrued no later than November 2006, when the PPC
20  Agreements were voluntarily produced to DC, and DC deposed witnesses regarding
21  them in 2006.  SF ¶¶77-78.  DC's Third Claim thus expired in **November 2009**, six
22  months before this suit was filed.  DC's excuse that it was unaware of its claim until
23  it read the anonymous "Timeline" in 2008 does not hold up because DC's claim is
24  based on the PPC Agreements themselves.  Furthermore, because the PPC
25  agreements were cancelled (SF ¶76), the only potential "continuing harm" is from the
26  Consent Agreement, which does not violate any of DC's purported "rights."

27  ## V.    THE COURT MAY ENTER JUDGMENT UNDER F.R.C.P. 54(b)

28  F.R.C.P. 54(b) allows a district court to enter a judgment on orders that resolve

individual claims "[w]hen more than one claim for relief is presented in an action."
To be eligible for entry of judgment under Rule 54(b), an order must constitute "an
ultimate disposition of an individual claim," and there must be "no just reason" to
delay appellate review. *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-
8 (1980). "The Ninth Circuit embraces a 'pragmatic approach [to Rule 54(b)]
focusing on severability [of claims] and efficient judicial administration.'" *Cont'l
Airlines, Inc.*, 819 F.2d at 1525.

    This motion presents an excellent opportunity for this Court to enter a Rule
54(b) judgment, just like it did in *Siegel*. SF ¶67. A Rule 54(b) judgment is
especially appropriate where, as here, it would streamline the issues, conserve
judicial resources and promote settlement. *See Noel v. Hall*, 568 F.3d 743, 747 (9th
Cir. 2009); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 166 Fed. Appx. 268, 270–
71 (9th Cir. 2006). DC's First and Third Claims fail as a matter of law. DC's
Second Claim is largely precluded and the remainder should be stayed pending
resolution of its issues in *Siegel*. DC's Fourth, Fifth and Sixth Claims are stayed and
currently on appeal. SF ¶73. The parties agree that the First Claim (validity of the
Termination) is of paramount importance. Dkt. 458. If a Rule 54(b) judgment is
entered on the First Claim, at a minimum, the remaining claims could be stayed,
while the Ninth Circuit confirms the validity of the Shuster Termination once and for
all.

## **CONCLUSION**

    For the foregoing reasons, summary judgment should be granted to Defendants
as to DC's First Claim, Second Claim (sub-parts (a) and(c)), and Third Claim.

Dated:  August 20, 2012        RESPECTFULLY SUBMITTED,

                     /s/ Marc Toberoff
                     Marc Toberoff

                     TOBEROFF & ASSOCIATES, P.C.
                     Attorneys for Defendants Mark Warren Peary *et al.*