At a Term of the Supreme Court
of the State of New York, held
in and for the County of
Westchester, at the Official
Referee's Chambers, 542 Main
Street, in the City of New
Rochelle and State of New York,
on the 21 day of May, 1948.

*1099 - 1947*

PRESENT:

    HON. J. ADDISON YOUNG,

        Official Referee.

- - - - - - - - - - - - - - - - - - - *203x/305*

JEROME SIEGEL and JOSEPH SHUSTER,  :

          Plaintiffs,  :

    -against-          :    FINAL JUDGMENT

NATIONAL COMICS PUBLICATIONS, INC.,  :
INDEPENDENT NEWS CO., INC., THE MC CLURE
NEWSPAPER SYNDICATE, HARRY DONENFELD,  :
JACOB LIEBOWITZ, PAUL H. SAMPLINER and
WAYNE BORING,  :

          Defendants.  :

- - - - - - - - - - - - - - - - - - -x

        This action having been referred to HON. J.

ADDISON YOUNG, an Official Referee in and for the Ninth

Judicial District, by an order duly made and entered herein

the 19th day of May, 1947, to hear, try and determine the

issues in this matter, with the same force and effect as if

they were tried at a regular term of this Court, and plain-

tiffs having appeared by SLONIM, WEKSTEIN & FRIEDMAN, ESQS.,

their attorneys (MORTON WEKSTEIN, ESQ., of counsel), and

defendants NATIONAL COMICS PUBLICATIONS, INC., INDEPENDENT

NEWS CO., INC., HARRY DONENFELD, JACOB LIEBOWITZ and PAUL

H. SAMPLINER, having appeared by WEIL, GOTSHAL & MANGES,

ESQS., their attorneys (HORACE S. MANGES, ESQ., EDWARD C.

WALLACE, ESQ., and ABRAHAM I. MENIN, ESQ., of counsel),

and defendant THE MC CLURE NEWSPAPER SYNDICATE having

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES

68

appeared by JOHN L. MC CORMICK, ESQ., its attorney (JAMES L. BROWN, ESQ., of counsel), and defendant WAYNE BORING having appeared by SIDNEY H. REICH, ESQ., his attorney, and after trial had, and said Official Referee having on the 12th day of April, 1948 duly made and filed his decision stating his findings of fact herein and conclusions of law thereon, and directing interlocutory judgment, which said interlocutory judgment was duly entered in the office of the Clerk of this Court on the 13th day of April, 1948, and defendants NATIONAL COMICS PUBLICATIONS, INC. and INDEPENDENT NEWS CO., INC. having duly served and filed a notice of appeal dated April 27, 1948 from certain parts of said inter-locutory judgment and plaintiffs having duly served and filed a notice of appeal dated May 10, 1948, from certain parts of said interlocutory judgment, and said notices of appeal having been withdrawn, and the parties hereto and their respective attorneys having duly consented to the vacating of said interlocutory judgment and to the entry of final judgment as hereinafter set forth, it is

ORDERED AND ADJUDGED that the said inter-locutory judgment entered herein on the 13th day of April, 1948, be and the same hereby is in all respects vacated; and it is further

ORDERED AND ADJUDGED that the complaint be and it hereby is dismissed as to each and every cause of action alleged therein as to all defendants; and it is further

DECLARED AND ADJUDGED that the following agreements as originally made and as modified, are valid;

69

     (a)  Agreement dated December 4, 1937
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER.

     (b)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER.

     (c)  Agreement dated September 22, 1938
between DETECTIVE COMICS, INC., JEROME
SIEGEL, JOSEPH SHUSTER and THE MC CLURE
NEWSPAPER SYNDICATE.

     (d)  Agreement dated December 19, 1939
between DETECTIVE COMICS, INC. and JEROME
SIEGEL and JOSEPH SHUSTER;

and it is further

     DECLARED AND ADJUDGED that all of said
agreements as originally made and as modified, be and they
hereby are terminated insofar as plaintiffs may have any
rights under and by virtue of the said agreements, or any of
them; and it is further

     DECLARED AND ADJUDGED that by virtue of
the instrument of March 1, 1938, plaintiffs validly
transferred to DETECTIVE COMICS, INC., one of the constituent
corporations of defendant NATIONAL COMICS PUBLICATIONS, INC.,
all of their rights in and to the comic strip SUPERMAN,
including the title, names, characters, concept and formula,
as same were set forth in the first release of said comic
strip published in the June, 1938 issue of the magazine
"Action Comics" and that by virtue of said instrument, said
DETECTIVE COMICS, INC. became the absolute owner of the
comic strip SUPERMAN, including the title, names, characters,
concept and formula as  the same were set forth in the said
first release; and it is further

     DECLARED AND ADJUDGED that defendant
NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive

owner of and has the sole and exclusive right to the use
of the title SUPERMAN and to the conception, idea, continuity,
pictorial representation and formula of the cartoon feature
SUPERMAN as heretofore portrayed and published, and to
create, publish, sell and distribute and to cause to be
created, published, sold and distributed cartoon or other
comic strip material containing the characters SUPERMAN
(also known as "Clark Kent"), LOIS LANE, PERRY WHITE and
all other characters which have heretofore appeared in said
cartoon or other comic strip material, and that such sole
and exclusive ownership includes, but is not limited to, the
fields of book and magazine publications, newspaper
syndication, radio broadcasts, dramatic presentations,
television, motion picture reproduction and all other forms
of reproduction and presentation, whether now in existence
or that may hereafter be created, together with the
absolute right to license, sell, transfer, or otherwise
dispose of said rights; and it is further

     ORDERED AND ADJUDGED that plaintiffs, their
agents, servants and employees, be and they hereby are
enjoined and restrained from creating, publishing, selling
or distributing or permitting or causing to be created, pub-
lished, sold or distributed any material of the nature
heretofore created, produced or published under the title
SUPERMAN, or any material created, produced or published
in imitation thereof, or from using, permitting or causing
to be used in connection with any comic strip or other
material created by them the title SUPERMAN or any title
imitative of the title SUPERMAN or which shall contain as
part thereof the word "SUPER"; and it is further

**Exhibit E**
**107**

71

DECLARED AND ADJUDGED that defendant
NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive
owner of and has the sole and exclusive right to the use
of the title SUPERBOY and to create, publish, sell and
distribute and to cause to be created, published, sold and
distributed cartoon or other comic strip material containing
the character SUPERBOY and all other characters which have
heretofore appeared in said cartoon or other comic strip
material and that such sole and exclusive ownership includes,
but is not limited to, the fields of book and magazine
publications, newspaper syndication, radio broadcasts,
dramatic presentation, television, motion picture repro-
duction and all other forms of reproduction and presentation
whether now in existence or that may hereafter be created,
together with the absolute right to license, sell, transfer
or otherwise dispose of said rights; and it is further

ORDERED AND ADJUDGED that plaintiffs, their
agents, servants and employees be and they hereby are
enjoined and restrained from creating, publishing, selling
or distributing, or permitting or causing to be created,
published, sold or distributed any material of the nature
heretofore created, produced or published under the title
SUPERBOY or any material created, produced or published in
imitation thereof or from using, permitting or causing to be
used in connection with any comic strip or other material
created by them the title SUPERBOY or any title imitative of
the title SUPERBOY; and it is further

ORDERED AND ADJUDGED that the plaintiffs,
their agents, servants and employees, be and they hereby are
enjoined and restrained from

72

(a)  Representing their past connection
with the comic strips SUPERMAN and/or SUPERBOY
in such manner as may be likely to induce the
belief that such past connection still exists;

(b)  Making any representation as to
such past connection in conjunction with any
material, comic or otherwise, hereafter issued by
plaintiffs or either of them, or with their
consent or on their behalf, more than half as
conspicuous as to size, or more conspicuous as
to color, type of lettering or style of print
than the name or title of any such hereafter
issued material, or in any other manner as may
be likely to induce the belief that defendant
NATIONAL COMICS PUBLICATIONS, INC. is or may be
associated  with such hereafter issued material;
and

(c)  Using any colors, lettering and/or
printing in referring to the words SUPERMAN and/or
SUPERBOY imitative of the colors, lettering and/or
printing now or hereafter used by defendant
NATIONAL COMICS PUBLICATIONS, INC.  in portraying
said words or either of them;

and it is further

ORDERED AND DECLARED that defendant
NATIONAL COMICS PUBLICATIONS, INC. is the sole and exclusive
owner, with all the rights of absolute ownership thereto
appertaining, in and to the comic strips entitled Batman;
Lois Lane, Girl Reporter; Slam Bradley; Johnny Quick; The
Flash; Green Lantern; Aquaman; Air Wave; Hour-Man; Wonder

Woman; Star-Man; Dr. Fate; Hawkman; Crimson Avenger; The

Ultra-Man; TNT and Dan the Dyna-Mite; Manhunter; The Gay

Ghost; Newsboy Legion starring the Guardian; Tarantula;

Mr. Terrific; Sandman; The Atom; The Green Arrow; Dr. Mid-

Nite; Genius Jones; Scribbly and The Red Tornado; Robin,

the Boy Wonder; and Liberty Belle.

ENTER

Official Referee of the Supreme
Court of the State of New York.

STATE OF NEW YORK, COUNTY OF WESTCHESTER SS.,
I, TIMOTHY C. IDONI, COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS,
WESTCHESTER COUNTY DO HEREBY CERTIFY THAT I HAVE COMPARED THIS COPY WITH THE ORIGINAL
THEREOF FILED IN MY OFFICE ON _____ AND THAT THE SAME IS A CORRECT
TRANSCRIPT THEREFROM AND OF THE WHOLE OF SUCH ORIGINAL.
    IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE SUPREME AND COUNTY COURTS, WESTCHESTER COUNTY
FEE PAID

74

Entry of the foregoing judgment is hereby consented to.

*Jerome Siegel*
Jerome Siegel

*Joseph Shuster*
Joseph Shuster

NATIONAL COMICS PUBLICATIONS, INC.

By *[signature]*
Vice-President

INDEPENDENT NEWS CO., INC.

By *Paul H. Sampliner*
President

THE MC CLURE NEWSPAPER SYNDICATE

By *William O'Connell*
TREASURER

*Harry Donenfeld*
Harry Donenfeld

*Jacob Liebowitz*
Jacob Liebowitz

*Paul H. Sampliner*
Paul H. Sampliner

*Wayne Boring*
Wayne Boring

*[signature] Weinstein + Friedman*
Attorneys for Plaintiffs

*Weil, Gotshel & Manges*
Attorneys for Defendants National
Comics Publications, Inc., Inde-
pendent News Co., Inc., Harry
Donenfeld, Jacob Liebowitz and
Paul H. Sampliner

*John L. McCormick*
Attorney for Defendant The McClure
Newspaper Syndicate

75

*Sidney H. Reich*
Attorney for Defendant Wayne Boring

**Exhibit E**
**111**

STATE OF New York }
COUNTY OF New York } SS.:

On the 19 day of May, 1948, before me
personally came JEROME SIEGEL, to me known, and known to
me to be the individual described in, and who executed the
foregoing instrument, and duly acknowledged to me that he
executedthe same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co.Clk's No.429, Reg.No.1110-C-9
Commission Expires March 30, 1949

STATE OF NEW YORK }
COUNTY OF New York } SS.:

On the 19 day of May, 1948, before me
personally came JOSEPH SHUSTER, to me known, and known to
me to be the individual described in, and who executed the
foregoing instrument, and duly acknowledged to me that he
executed the same.

*Anne Crystal*

ANNE CRYSTAL
Notary Public in the State of New York
Qualified in New York County
N.Y.Co.Clk's No.429, Reg.No.1110-C-9
Commission Expires March 30, 1949

76

**Exhibit E**
**112**

STATE OF NEW YORK  )SS.:
COUNTY OF NEW YORK )

On the *o day of May, 1948, before me
came JACOB S. LIEBOWITZ, to me known, who being by me duly
sworn, did depose and say that he resides at Great Neck,
New York; that he is the Vice-President of NATIONAL COMICS
PUBLICATIONS, INC., the corporation described in, and which
executed the foregoing instrument; that he knows the seal of
said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the Board of Directors of said corporation; and that he signed
his name thereto by like order.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 3, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF NEW YORK  )
COUNTY OF NEW YORK )  SS.:

On the *o day of May, 1948, before me came
PAUL H. SAMPLINER, to me known, who being by me duly sworn,
did depose and say that he resides at 944 Fifth Avenue,
New York, N.Y.; that he is the President of INDEPENDENT
NEWS CO., INC., the corporation described in, and which
executed, the foregoing instrument; that he knows the seal
of said corporation; that the seal affixed to said instrument
is such corporate seal; that it was so affixed by order of
the Board of Directors of said corporation; and that he
signed his name thereto by like order.

ALFRED B. YAFFE
Notary Public in the State of New York
Qualified in Kings County
Kings Co. Clk's No. 6, Reg. No. 14-Y-0
N. Y. Co. Clk's No. 6, Reg. No. 13-Y-0
Commission Expires March 30, 1950

STATE OF *New York*  )
COUNTY OF *New York* )  SS.:

William O'Connell  On the 21st day of May, 1948, before me came
_____ , to me known, who being
by me duly sworn, did depose and say that he resides at
*St. Albans, New York*   ; that he is the *Treasurer*
of THE MC CLURE NEWSPAPER SYNDICATE, the corporation
described in, and which executed the foregoing instrument;
that he knows the seal of said corporation; that the seal
affixed to said instrument is such corporate seal; that it
was so affixed by order of the Board of Directors of said
corporation; and that he signed his name thereto by like
order.

GEORGE J. McCARTIN, Jr.
Notary Public, State of New York
Residing in Queens County
Queens Co. Clks. No.3801, Reg.No.121-Mc-0
N.Y. Co. Clks. No. 304, Reg. No. 237-Mc-0
Kings Co. Clks. No. 72, Reg. No. 146-Mc-0
Bronx Co. Clks. No.13, Reg. No. 85-Mc-0
Certificate filed in Westchester Co.

**EXHIBIT E**

77

STATE OF NEW YORK        )
COUNTY OF NEW YORK       ) SS.:

        On the *vo* day of May, 1948, before me personally came HARRY DONENFELD, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

                      ALFRED B. YAFFE
               Notary Public in the State of New York
                   Qualified in Kings County
              Kings Co. Clk's No. 5, Reg. No. 14-Y-0
              N. Y. Co. Clk's No. 6, Reg. No. 15-Y-0
              Commission Expires March 30, 1950

STATE OF NEW YORK        )
COUNTY OF NEW YORK       ) SS.:

        On the *vo* day of May, 1948, before me personally came JACOB LIEBOWITZ, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

                      ALFRED B. YAFFE
               Notary Public in the State of New York
                   Qualified in Kings County
              Kings Co. Clk's No. 5, Reg. No. 14-Y-0
              N. Y. Co. Clk's No. 6, Reg. No. 15-Y-0
              Commission Expires March 30, 1950

STATE OF NEW YORK        )
COUNTY OF NEW YORK       ) SS.:

        On the *vo* day of May, 1948, before me personally came PAUL H. SAMPLINER, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

                      ALFRED B. YAFFE
               Notary Public in the State of New York
                   Qualified in Kings County
              Kings Co. Clk's No. 5, Reg. No. 14-Y-0
              N. Y. Co. Clk's No. 6, Reg. No. 15-Y-0
              Commission Expires March 30, 1950

STATE OF NEW YORK        )
COUNTY OF NEW YORK *Westchester*   ) SS.:

        On the *21* day of May, 1948, before me personally came WAYNE BORING, to me known, and known to me to be the individual described in, and who executed the foregoing instrument, and duly acknowledged to me that he executed the same.

                      ADELE JAMPOL
               Notary Public in the State of New York
                Appointed for Westchester County
              Commission expires March 30, 1949

78

**Exhibit E**
**114**

# Superman's Creators, Nearly Destitute, Invoke His Spirit
By MARY BREASTED
*New York Times (1923-Current file);* Nov 22, 1975;
ProQuest Historical Newspapers: The New York Times (1851-2008)
pg. 62

## Superman's Creators, Nearly Destitute, Invoke His Spirit



Jerry Siegel, left, and Joseph Shuster invented Superman, but are now nearly destitute. Mr. Siegel is a clerk in California. Mr. Shuster, legally blind, lives in Queens.

By MARY BREASTED

Two 61-year-old men, nearly destitute and worried about how they will support themselves in their old age, are invoking the spirit of Superman for help.

Joseph Shuster, who sits amidst his threadbare furniture in Queens, and Jerry Siegel, who waits in his cramped apartment in Los Angeles, share the hope that they each will get pensions from the Man of Steel.

They have survived by odd jobs and sometimes through the sale of valuable old comic books. They have tried to fight for rights to percentages of the Superman products in the courts, but always they have lost.

The last court case took 12 years to complete, and in that entire period Mr. Shuster and Mr. Siegel refused to discuss their problems with the press, on advice of their lawyers.

### Idea Born in 30's

Finally this year they lost in the Second Circuit Federal Court of Appeals here, and their law firm, Coudert Brothers, advised them not to take the case to the Supreme Court. National Periodical Publications, Inc., the company that published Superman Comics, might work out some financial settlement, their lawyer told them, if they dropped the case.

That was in April.

Nothing has happened in the intervening months, and Mr. Shuster and Mr. Siegel have tired of their silent waiting. They have decided to tell the public what happened to them.

In 1933, with the country in the gloom of the Depression, Mr. Siegel decided the public might take to a comic strip about an inspiring fictional character with super powers.

Douglas Fairbanks Sr., the silent film star who never let a stunt man stand in for him in the acrobatically dazzling scenes in which he played Robin Hood and other swashbuckling heroes, was an idol to both Mr. Siegel and Mr. Schuster, who were then high school students in Cleveland.

And one night, the actor's acrobatics gave Mr. Siegel an idea. A creature born on another planet, impervious to the laws of gravity and stronger than an Army tank, would come to earth as a baby, be reared in an orphanage and grow up into a Superman whose consuming passion would be to right the wrongs of the world.

The next day, Mr. Siegel rushed over to see his friend Mr. Shuster, who liked to draw, and together they began to work on a comic strip about the new character.

### Copyright Signed Away

Then, in 1938, Detective Comics, Inc. bought the concept for inclusion in one of its comic strip magazines. The first Superman episode appeared in a new magazine called Action Comics in June 1938. (The first issue of that magazine is now a collector's item worth about $3,000.)

The two young men were paid $10 a page which they split between them, earning about $15 a week each.

They had sold the character of Superman to the company in an act that was, in effect, the signing away of the copyright for their invention.

As the years passed, and Superman comics proved ever more popular, Mr. Siegel and Mr. Schuster decided they should get more of the profits. They sued Detective Comics, Inc., and got some money but not the rights to Superman.

The company dropped them and used other writers and cartoonists to carry on the strip. Mr. Schuster, who was always afflicted with poor eyesight, could get only manual jobs. Now he is unemployed and being supported by his 57-year-old bachelor brother, Frank, who lives with him in Queens.

### The Irony of It

Mr. Siegel, who at one point six years ago was unemployed and so hopelessly in debt that he sold his treasured old comic books to survive, now works for the state of California as a clerk-typist, earning about $7,000 a year. On that salary he supports himself and his wife.

"For years I've been waiting for Superman to crash in and do something about it all," Mr. Siegel said the other day. "Perhaps he would reveal a new superpower. He might have a new ray which is capable of stimulating a corporation's conscience."

Jay Emmett, executive vice-president of Warner Communications, Inc., which now owns National, said recently that he had told the lawyers for Mr. Siegel and Mr. Shuster that the company intended to give them some kind of an annual stipend.

"There is no legal obligation," Mr. Emmett said, "but I sure feel that there is a moral obligation on our part."

Mr. Siegel and Mr. Shuster say they have not yet heard what may be offered by the company.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

THE NEW YORK TIMES, WEDNESDAY, DECEMBER 10, 1975.    L+    81

## Larchmont Board Ends Creche Display

By JAMES FERON
Special to The New York Times

LARCHMONT, N. Y. Dec. 9. — The Christmas crèche will be missing this year from the lawn of the Larchmont Village Hall.

Responding to pleas from state residents who objected to the religious symbol on municipal property, the village Board decided early this week to end the two-decade-old tradition.

The vote informal its decision, although somewhat belatedly, at a turbulent meeting last night. Parker Anderson, a trustee who abstained, said the time, "This mood was in favor of the crèche without it forcing the outcome."

But the board refused remarks by several residents to identify those who had sought removal of the crèche. The residents complained that "because when you say 'they' you are creating a divisiveness that will take generations to heal."

A woman who said she was Jewish asked: "Who is that 'vocal and business world'? The Jews?"

Possibly, she said, although "many fully-minded Christians may link with us in seeing this as a breach of the tradition separating church and state."

Mayor Kenneth H. Wanderer spoke of the rights of minorities and said, "When we do something to minorities, the rights of individuals, we are minimizing ourselves."

A bitter discussion that began in the homes and shops of this old and established community.

---

*(remaining columns of article text)*

## Metropolitan Briefs

### Gas Main Explodes on East Side

### Dutchess Jail Inmates Sue Sheriff

### 13 Children Hurt in School-Bus Crash

### Carey Names an Appellate Justice

### Bearse Reappoints 2 Judges

### From the Police Blotter:

---



Superman, in a drawing by Neal Adams, holds Jerry Siegel, left, and Joseph Shuster, who invented the cartoon character. The two men are at left in the New York Press Club.

## Mild-Mannered Cartoonists Go To Aid of Superman's Creators

By DAVID VIDAL

---

## Theft of $200,000 Is Laid to a Lawyer in Westchester

---

### Police Treasury Fee Will Go Up to $65

### LOTTERY NUMBERS

N. J. Daily—3790
N. J. Pick-It Lottery—711

---

Lie Tests Are Postponed For Head of Slain Family

By JOSEPH F. SULLIVAN
Special to The New York Times

## Lie Tests Are Postponed For Head of Slain Family

By JOSEPH F. SULLIVAN
Special to The New York Times

HACKENSACK, N.J., Dec. 9. — The polygraph tests of Wesley R. Diggs, the 45-year-old man whose wife and three children were found murdered in their Teaneck home last week...

### Rings Worth $175,000 Stolen in Holdup at Bar

### Public Library Begins A Fund-Raising Drive



WHAT WAS THE WEATHER LIKE HERE? Don't ask.

## Nassau County Enters Entente With Soviet

MINEOLA, L. I., Dec. 9 — Nassau County has entered the field of local planning...

---

## 17 Women on Rikers I. Receive Certificates for Secretarial Skills

By EDITH EVANS ASBURY



Graduates of secretarial skills program holding roses at a ceremony yesterday in the Rikers Island detention center

REMEMBER THE NEEDIEST

---

**Exhibit G**

116

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

RECEIVED

FEB 1 5 1978

LAW OFFICES
ALLEN, EASMAN & JANGER

**WARNER COMMUNICATIONS INC.**

December 23, 1975

Mr. Jerome Siegel
Mr. Joseph Shuster
c/o Edmund Preiss, Esq.
Kane, Kessler, Proujansky, Preiss & Permutt
680 Fifth Avenue
New York, New York 10019

Dear Mr. Siegel and Mr. Shuster:

This letter, when countersigned by both of you, constitutes our agreement as follows:

1. You conceived of and created "Superman".

2. You acknowledge that Warner Communications Inc. ("Warner")*, both immediately before and immediately after the signing of this agreement, is the sole and exclusive owner of all right, title and interest in and to the "Superman" concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of any such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence

---

* Such term, as used in this agreement, includes Warner Communications Inc., National Periodical Publications, Inc., Licensing Corporation of America, and all other Warner subsidiaries.

**Exhibit H**

12/18/75

2

or hereafter devised, together with the absolute right to transfer, license, sell or otherwise dispose of said rights.

3.    You brought a proceeding in the United States District Court and in the United States Court of Appeals, asserting certain rights in Superman, and this case was determined against your claims. The Court of Appeals unanimously decided that "all rights in Superman, including the renewal copyright, have passed forever to [National Periodical Publications, Inc., a Warner subsidiary.]" You did not appeal this case to the Supreme Court of the United States. Your determination not to appeal was your own determination. Whatever your subjective reasons may have been, you acknowledge that the determination not to appeal was not made by reason of any promise or inducement by Warner or its representatives.

4.    Warner does not have any legal obligation to pay you any sum of money whatsoever and does not acknowledge that any wrong has been done to you.

5.    Warner has nevertheless determined, in consideration of your past services to Warner and in view of your present circumstances, to make the following voluntary payments:

a.    Warner will make monthly payments to each of you at the annual rate of $20,000 for your respective lifetimes, less any applicable withholding taxes, commencing January 1, 1976.

b.  In addition, if Jerry Siegel dies, on or before December 31, 1985, Warner will pay his wife, Joanne Siegel, if she survives him, monthly payments at the rate of $20,000 a year, commencing on the date of Jerry's death, and ending December 31, 1985, and thereafter monthly payments at the rate of $10,000 a year for the balance of her life.  If Joanne does not live to December 31, 1985, Warner will pay Laura Siegel, Jerry's daughter, if she survives Joanne and Jerry, at the rate of $20,000 a year from the date of Jerry's death or Joanne's death, whichever is later, to December 31, 1985; all payments to Laura will cease on that date.  All payments to be less any applicable withholding taxes.

c.  In addition, Warner will pay Frank Shuster (Joe's brother), if he survives Joe, monthly payments at the rate of $10,000 a year commencing on the date of Joe's death and ending December 31, 1985, and thereafter at the rate of $5,000 a year for the balance of his life.  All payments to be less any applicable withholding taxes.

d.  In addition, Warner will include both of you in the Warner insured medical plan, covering employees generally, or any successor plan thereto.  A copy of such plan as now in effect, together with cover memo dated December 17, 1975, is annexed hereto and incorporated by this reference as Schedule X.

e.  In addition, as requested by you, Warner has paid you, simultaneous with the signing of this agreement, the sum of $7,500 each (not subject to withholding) which you have stated that you intend to apply to legal fees and disbursements incurred by you in connection with the lawsuit described

above.  Any such payment is to be made by you directly to
your counsel in such action, in your discretion, and Warner
does not recognize or have any obligation to such counsel.
Warner does not recognize or have any obligation to your
present counsel.

In addition, Warner has paid you, simul-
taneous with the signing of this agreement, the sum of $10,000
each (not subject to withholding), which you have requested,
to be applied to your debts.

f.  The obligation of Warner to make the periodic
payments provided for above to you, to Jerry's wife (or daughter)
and to Joe's brother, and the credit line obligation set forth
in paragraph 6, will cease forthwith, if you, or either of you,
or anyone acting on your behalf, or claiming through you, com-
mences an action, suit or proceeding against Warner (including
its subsidiaries), or against any licensee of Warner (1) assert-
ing any right, title or interest in the "Superman" concept, idea,
continuity, pictorial representation, formula, characters, car-
toons and comic strips, title, logo, copyrights and trademarks;
or (2) asserting any financial claims against Warner or any
licensee, or claiming any credit line rights, other than as pro-
vided for in this agreement.

6.  The following credit line provisions are agreed
upon:

a.   The following "obligatory credit line"
provisions apply only during the lifetime of the longer-lived
of Jerry Siegel and Joe Shuster.  They apply only to "Superman
Books" whether new or reprints bearing a July 1976 cover date,
or which are on the July 1976 production schedule or are pub-
lished or licensed after such date.  "Superman Books" means
only the following: (i) Superman and Action Comics comic books;
(ii) other comic books, comic strips and books in which both
of the following conditions are met: (A) "Superman" is the sole
title of the strip, alone or with other words, and the name of
another cartoon character is not also used in the title or is
not used instead in the title; and (B)  Superman is the sole cen-
tral character of the strip, the foregoing being intended to
exclude comic books, comic strips and other books combining more
than one central character, or featuring a different central
character.  The foregoing definition explicitly excludes "Justice
League of America", "World's Finest" and "The Superman Family",
but is not limited to such exclusions.  In construing this pro-
vision, it is understood that the reason for such exclusions is
that, while Warner wishes to give you credit for creating Superman,
it cannot do so and does not agree to do so in any situation where
confusion may result as to whether someone else's creation is
yours, or where it would be necessary to use multiple credit lines.

As to "Superman Books" (July 1976 and after),
the following "obligatory credit line" provisions will apply:
The credit line "created by Jerry Siegel and Joe Shuster", or

"by Jerry Siegel and Joe Shuster", or "Superman created by
Jerry Siegel and Joe Shuster", or "Superman by Jerry Siegel
and Joe Shuster", any of such forms being satisfactory, will
be used on the first inside page in conjunction with the title
or logo "Superman". Such credit line will appear approximately
as in Exhibit A, but typeface and size can be changed in
Warner's sole discretion, as long as the credit line remains
legible.

You waive your rights of privacy under the
New York Civil Rights Law and comparable or similar statutory
or case law of other jurisdictions to permit the "obligatory
credit line" uses, and to permit any other uses in any other
publications if Warner or its licensees elect in their sole
discretion to include a credit line in any of them. The agree-
ment to carry such credit line, and the carrying of such credit
line, does not constitute an admission by Warner or any licensee
of any proprietary ownership, right, title or interest of Siegel
and Shuster in Superman or in such comic books, strips or books,
there being none, and you agree that there is no such proprietary
ownership, right, title or interest. The omission of such credit
line shall not give rise to any right or remedy on the part of
Siegel and Shuster, including but not limited to injunctive re-
lief, unless such credit line shall have been omitted from an
issue or edition covered by the "obligatory credit line" use pro-
vision, and unless thereafter you shall give notice (in accord-
ance with the notice provisions hereof) to Warner of such omission

6

and unless such credit line shall be omitted from an additional
issue or edition which goes to press after the receipt date
shown on such registered mail notice, in which case the remedy
shall be limited to an affirmative injunction requiring such
credit line to be carried in issues or editions going to press
after the date of the injunction; it is explicitly understood
and agreed that such injunction will not be an injunction to
restrain distribution of the issues or editions from which
credit has been omitted, and you hereby waive any such remedy.
The reasonable expenses of obtaining such injunction shall be
reimbursed to you by Warner, but you agree that you shall not
be entitled to any damages or other payments whatsoever, which
you hereby waive.

b.   Warner has previously licensed to Film
Export A.G. the right to produce one or more Superman
motion pictures, not yet released, for theatrical, TV, and
other use.  Warner agrees to write a letter request

to the licensee to include a credit line ("Superman created
by Jerry Siegel and Joe Shuster") in the screen credits.
This is not a best efforts undertaking; Warner's sole obligation
will be discharged by sending the letter, which shall quote
this paragraph. Warner does not represent or warrant that the
licensee will honor the request; on the contrary, Warner has
stated that there is no basis for reopening the license agree-
ment. Any use by the movie licensee of the credit line will
explicitly not constitute an acknowledgment of any proprietary
ownership or right, title or interest of Siegel or Shuster in
Superman or in such movies, there being none, as you acknowledge,
nor will any royalties, remuneration or compensation be payable
to you by reason of any such use. You waive your rights of
privacy under the New York Civil Rights Law and similar or com-
parable statutory or case law of other jurisdictions if the movie
licensee elects to carry the credit line. There is no require-
ment as to typeface or size if the licensee elects to carry the
credit line. You acknowledge that the present agreement between
you and Warner is binding whether or not the movie licensee agrees
to carry the credit line.

       c. As to any motion picture or TV license agree-
ments entered after the date hereof, Warner will require the
licensee to carry the credit line ("Superman created by Jerry
Siegel and Joe Shuster") in the screen credits. Any use by any
such future movie or TV licensee of the credit line will ex-
plicitly not constitute an acknowledgment of any proprietary

ownership or right, title or interest of Siegel or Shuster
in Superman or in such movie or TV presentation, there being
none, as you acknowledge, nor will any royalties, remuneration
or compensation be payable to you by reason of any such use.
You waive your rights of privacy under the New York Civil Rights
Law and comparable or similar statutory or case law of other
jurisdictions to permit such credit line.  There is no require-
ment as to typeface or size in movie or TV use.

      d.  No credit line will be carried on any use
licensed by Licensing Corporation of America (a Warner subsidi-
ary) including but not limited to clothing, toys, games, premiums,
or other merchandising rights, and no credit line request will
be made by Licensing Corporation of America to licensees.

      7.  You agree to accept the payments and the credit
line provision set forth above in full accord, satisfaction,
recognition and release of any and all claims by you, whether
legal, moral, equitable or otherwise; you acknowledge that the
agreed payments and the credit line provision are fair, generous,
equitable, satisfactory and sufficient, and that they meet the
objectives of your recent communications to us and to the press,
radio, TV, etc.; you acknowledge that you do not now have, and
will not in the future have, any rights to Superman; and you
agree that any statements you make to the press, radio, TV, etc.
will be consistent with the foregoing.  You authorize Warner to
include the reference to you in the statement annexed hereto
as Exhibit B which Warner intends to release, at the signing of
this agreement.  You intend to release the statement annexed

hereto as Exhibit C, and you authorize Warner to do so on your behalf, at the signing of this agreement. You further acknowledge that you have signed this agreement freely and without compulsion, and that this agreement has been reviewed by your present counsel, Edmund Preiss.

      8.  Any notice to Warner shall be given by registered mail, return receipt requested as follows:

> Warner Communications Inc.
> 75 Rockefeller Plaza
> New York, New York 10019
> Attention:  Jay Emmett
>                Executive Vice President

with copy to:

> Martin D. Payson, Esq.
> Vice President and General Counsel
> Warner Communications Inc.
> 75 Rockefeller Plaza
> New York, New York 10019

with copy to:

> National Periodical Publications, Inc.
> c/o Warner Communications Inc.
> 75 Rockefeller Plaza
> New York, New York 10019
> Attention:  William Sarnoff

      Any notices to Mr. Siegel or Mr. Shuster shall be given by registered mail, return receipt requested as follows:

> Jerome Siegel
> 11711 Mayfield Ave., Apt. 14
> West Los Angeles, California 90049

> Joseph Shuster
> 98-120 Queens Boulevard  Apt 4-K
> Forest Hills, New York 11374

10

with copy to:

>
> Edmund Preiss, Esq.
> Kane, Kessler, Proujansky, Preiss & Permutt
> 680 Fifth Avenue
> New York, New York  10019

Any party may furnish change of address by notice.

9.  This agreement may be signed in counterpart.  The counterparts taken together will constitute the original.

10.  The payment provisions hereof will be binding upon any purchaser of substantially all of the assets of or any successor by merger to Warner Communications Inc. (the parent corporation).  The credit line provisions (limited as set forth in paragraph 6) will be binding upon (a) any purchaser of the National Periodical Publications Inc. business, (b) any purchaser or licensee of the rights to publish the Superman and Action Comics series, or of any other comic book, comic strip or book in the "obligatory credit line use" category, and (c) any licensees of the future motion picture and TV rights to Superman, if any (excluding the existing movie licensee).  Payment provisions and credit line provisions are personal to the named individuals and are not assignable, and do not benefit their heirs, executors or administrators.

11.  This agreement shall be interpreted in accordance with the laws of New York applicable to contracts made and to be performed solely within New York.

Please sign below to signify that this sets forth

the entire understanding between us.

    With our best wishes to you both.

                              WARNER COMMUNICATIONS INC.

                              By
                                   Jay Emmett
                                   Executive Vice President

Accepted and Agreed:

Jerry Siegel

Joseph Shuster

# CALENDAR



*Superman, the character created by Jerry Siegel, left, and Joe Shuster, symbolizes for them a shattered American dream.*

PHOTO BY ULI H. ALBERT

# MAN OF STEEL SPLINTERS AN AMERICAN DREAM

## BY EIRIK KNUTZEN

**S**uperman's continual quest for "truth, justice and the American way" seems something of a cruel joke to the two men who created the Man of Steel.

As 19-year-old Cleveland boys with big dreams in 1934, writer Jerry Siegel and cartoonist Joe Shuster created what was to become the most successful superhero in history. At the time, during the Great Depression, Superman represented their one-way ticket to fame and fortune. Now they're battle-scarred and weary at 64 and their Man of Steel seems to symbolize a shattered American dream.

While remaining in virtual seclusion for 30 years, Siegel and Shuster have kept close tabs on the Man of Steel's incredible financial successes. Now they seem fearful that Warner Communications Inc., parent company of the Superman comic book publishers, may cut off their $20,000-a-year each "pension" for life—gained in late 1975 —if they protest too loudly.

They went to court twice to test legal points with the comic book publishers, seeking to protect what they considered to be their rights as literary creators. They came out on top in the first case in 1947— splitting a $100,000 settlement—but it also was the beginning of financial ruin.

They lost the second in 1975, after a 12-year fight to obtain Superman copyright renewal rights. The court ruled that they had lost all rights to their character after signing the publishers' release form and endorsing a check for $130 in 1938.

The media publicized their dire economic straits, more or less prompting Warner Communications to offer some assistance.

Signing all copyrights over to the comic book publishers, according to Jack C. Harris, an editor and publicist at DC Comics, Inc., "was standard practice back then. It still is. Everyone who does art work for us signs a release saying we own the copyright, though we have a more open contract in that whoever creates a character for us now does get a percentage."

Siegel and Shuster live in quiet middle-class residential sections of Los Angeles'

West Side. Shuster, apparently embarrassed by his small, cluttered one-bedroom apartment, prefers to conduct his infrequent interviews at Siegel's place. A short, pudgy man with thinning gray hair, Shuster wears thick glasses. He is legally blind due to a progressive eye disease since childhood. Married late in life, he is going through divorce and has no children.

Siegel shares his sparsely furnished three-bedroom apartment with Joanne, his wife of 30 years, and his daughter, Laura, a newscaster and director in a local radio.

Plaid blankets cover the sofa and easy chairs as if to hide the wear and tear. Mass-reproduced art lines the walls. The apartment and most of the budget furniture was acquired after the deal with Warner Communications.

Siegel is of slighter build and sports a shock of longish gray hair. Intense blue eyes are set in a craggy, lined face. A recently developed heart condition is a source of chronic anxiety. Like Shuster, Siegel considers himself "semiretired"— meaning he writes comic book scripts and TV treatments while working on an autobiographical book.

**T**hey published one of the original Superman versions in their own mimeographed "fanzine." After nearly four unsuccessful years of trying to sell Superman as a comic strip, they went to work as independent artists in 1937 under a 10-year contract to Detective Comics, the first forerunner of DC Comics. After about a year, the publishers decided to take a chance on their superhero in Action Comics No. 1.

Siegel and Shuster deny that they were aware of selling the Superman character outright for $130 at the time. "We were

paid $10 a page for that 13-page story—a total of $130. Along with the check, we were sent a release form which was releasing all rights to the character. We did not receive any special amount for the character itself," Siegel explained.

When the McClure Syndicate decided to distribute Superman as a newspaper strip in 1939, the creators asked for their rights back. "We were told that we had parted with all our rights, that they owned the character, and if we wanted a syndicated strip, we could be associated with them in a pleasant manner," Siegel recalled.

A revised contract during the '40s also gave them a small percentage from merchandising. "But we were never given an accounting," Shuster said. "At the end of the year they would give us a Christmas bonus and say, 'That's the money due—just forget about everything else.' It was a lump sum to keep us quiet. I think it was something like a few thousand (dollars)."

Besides contractual salaries up to 1948, Siegel estimates that Superman in various forms generated approximately $420,000 for them. "It was mostly from newspapers, not from the comics where millions were made," he smiled. But take the $420,000, split it between us, and spread it over all those years . . . and Joe had to pay about half of that to his staff." After paying his staff, Shuster claims, he never took home more than $150 to $200 per week. And he needed a staff of artists because of the work load and due to his eye condition.

In 1947, toward the end of their 10-year contract period with the comic book publishers, they went to court over a spin-off character, Superboy. The litigation lasted a

**Calendar Movie Section, Page 36**

year, revolving around the fact that the creators of big-money-earner Superman were now ready to go into competition with Detective Comics with their own Superboy magazine. "There was a settlement out of court which is a little complicated, but they regained Superboy in exchange for $100,000. Part of the money was already due us for some work we had done over a period of years," Shuster explained.

"After that first lawsuit, we were completely broke. I went into debt because I didn't have an income (all ties with the publishers were severed once the suit was initiated)—and all the debts had to be repaid. And to pay our attorneys."

**S**evere times followed, especially after their efforts with a strip called "Funnyman" failed to amuse readers. "It got worse and worse for me free-lancing scripts for comic books—soon I found it impossible to make a living as a writer."

With Siegel's mental condition deteriorating, and a child to feed, his wife began to make appeals to the publishers: "We were without funds with only baby food in the house, the diaper service was cut off, along with the milk service, and we got an eviction notice from the landlord for our one-bedroom apartment.

Friends and neighbors in Great Neck, Long Island, extended credit for food and necessities while Mrs. Siegel repeatedly appealed to the president of the comic book publishers and Siegel wrote letters to the media concerning his plight. When he received some publicity in the New York area, he also went on a hunger strike. As a result of that, according to his wife, the publishing company sent one of their attorneys to their house with $50.

Somehow, after years of appeals, Mrs. Siegel persuaded the publisher to hire Siegel back on a free-lance basis and he began writing Superman stories again in 1959— without a by-line. (Their by-lines as creators of Superman had been removed after the 1947-48 litigation, restored after the 1975 case.) Siegel wrote hundreds of stories "developing Superman's emotional life" at $10 per page (he said that before the litigation, he had received $50 a page) until the middle '60s, when again he severed the ties with the publishers and became involved with the 12-year litigation to gain Superman's copyright renewal.

His wife's physical condition dictated a move to the West Coast in 1966, where for the next three years he again had problems finding employment. "Then I got a job for the State of California's Public Utilities Commission as a clerk/typist. My salvation was that as a writer, I knew how to type."

Shuster, meanwhile, moved in with his invalid mother in Forest Hills a few years after the 1947 lawsuit had left him penniless in victory.

Unable to function as an artist, Shuster spent the next 15 years at menial labor as a stockroom clerk, sales clerk: "In 1965, I was the oldest messenger boy in New York City," he laughed. "And one day I had to deliver a message to an office located in the same building as the publisher of DC Comics. Someone from their office saw me in the hall, asked me what I was doing there, then told the publisher about it later. He called me that night—very upset—and asked me to come into his office so he could help me out a little. 'How does it look,' he said, 'for the artist/creator of Superman to be running around delivering messages— you're giving us a bad name!' " □

*Knutzen is a free-lance writer.*

Exhibit I
129
Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Dated:    October 10, 1980

DC Comics, Inc.
75 Rockefeller Plaza
New York, New York 10019

Re:    "SWAMP THING"

Gentlemen:

This is to confirm the terms of the Agreement
between you (hereinafter referred to as the "Owner") and us
(hereinafter referred to as the "Purchaser") regarding that
certain comic book series entitled "SWAMP THING" solely owned
by Owner (said comic book series, together with the title
thereof and all characters, representations, situations,
translations, arrangements, and adaptations thereof, and all
literary, dramatic and photographic material relating to the
foregoing as created for the said comic magazines and the
themes, plots, situations, sequences, pictorial action,
dialogue, drawings and sketches contained in and depicted in
comic magazines published by Owner, and each and every part of
all the aforesaid, whether now or hereafter written, are herein
collectively referred to as the "Work").

1. (a)  Owner hereby grants to Purchaser the sole
and exclusive option (hereinafter called the "Option") to
acquire, exclusively and forever, pursuant to the terms and
conditions hereof, all rights of whatsoever kind and nature,
under copyright and otherwise, throughout the universe in and
to the Work (except for those rights specifically reserved to
Owner pursuant to Paragraph 4 below) including, without
limitation, all motion picture and television and allied rights
(including all silent, sound, dialogue; musical, sequel, and
remake motion picture rights, and all television series,
special, movie-of-the-week rights); all rights pertaining to,
incident to, or deriving from the exercise of the rights
acquired by Purchaser pursuant to this Agreement and/or from
the advertising and/or exploitation and/or turning to account
of any productions, publications, sound recordings or other
products produced in the exercise of such rights and/or from
the exploitation and/or turning to account of any and all other
rights acquired by Purchaser pursuant to this Agreement; all
musical rights (including, without limitation, soundtrack album
and music publishing rights) pertaining to, incident to, or
deriving from the other rights granted to Purchaser pursuant to
this Agreement; the right to publish or cause to be published
books and publications (but not comic books) based upon or
relating to the motion picture based upon the Work (hereinafter

ii

DCC00147516
CONFIDENTIAL

referred to as the "Picture") and/or to the Work; provided, however, subject to Paragraph 3A below, Warner Books (here- inafter referred to as "WB") shall have a right of first refusal with respect to the publishing of said books, as more particularly set forth in said Paragraph 3A below; the right, in connection with or incident to Purchaser's exercise of its other rights under this Agreement, to publish synopses, excerpts and summaries of the Work or the productions based thereon (but no such synopsis, excerpt, or summary shall contain more than 7,500 words from the Work); but, although Owner may be identified as the author of the Work, Owner shall not be identified as the author of any such synopsis, excerpt or summary unless Owner actually has caused the same to be written; the right, for the purpose of advertising and exploiting any motion pictures or other versions of the Work, to broadcast and/or transmit by means of television or radio or any process analogous thereto, whether now known or hereafter invented or devised, excerpts from the Work or any adaptation or versions thereof (such excerpts not to exceed ten [10] minutes in length, nor shall such excerpts be broadcast in serialized form), including any motion picture or other version or versions thereof and announcements of or concerning said motion picture or other version or versions, which broadcasts or transmissions may be accomplished through the use of living actors performing simultaneously with such broadcast or transmission or by any other method or means including the use of motion pictures (including trailers) reproduced on film or by means of magnetic tape or wire or through the use of other recordings or transcriptions, or by video cassettes, video discs, or by any other means, whether now known or hereafter invented or devised, together with all copyrights and exten- sions and renewals of copyrights in and to each and all of the foregoing; the right, insofar as Owner has the right to grant same, to use for all purposes all titles by which the Work, characters depicted therein, or any chapter, or part thereof is now or hereafter known, including but not limited to the right to sell, license and otherwise exploit motion pictures produced hereunder in all forms of paid or cable television in conjunc- tion with the exercise of rights acquired hereunder; the right to distribute, exhibit and otherwise turn to account all motion pictures and other products produced in the exercise of rights acquired hereunder by any means, method, device or format, whether now or hereafter known or invented; as well as all rights now known or hereafter created which may be necessary to effectuate any or all of said rights. The aforesaid rights are hereinafter collectively called the "Optioned Rights". It is hereby agreed that the first motion picture based upon the Work, produced by Purchaser, shall be what is customarily referred to in the motion picture industry generally as a "feature-length theatrical" motion picture.

-2-

DCC00147517
CONFIDENTIAL

(b)   As full consideration for the Option, Purchaser agrees to pay or cause to be paid a sum of not less than Fifteen Thousand Dollars ($15,000.00) (hereinafter referred to as the "Development Sum") to a writer or writers for purposes of developing a treatment for a motion picture screenplay based upon the Work and/or for a motion picture screenplay based upon the Work.  It is agreed that any such treatment shall be written and delivered to Purchaser within four (4) months from the date of this Agreement, and that any such motion picture screenplay shall be written and delivered to Purchaser within six (6) months from the date of this Agreement.  Said six-month period shall hereinafter be referred to as the "Initial Option Period".

(c)   Provided Purchaser has paid or caused to be paid the Development Sum to a writer or writers as set forth in subparagraph (b) above within the Initial Option Period and provided that either a treatment is delivered to Purchaser within four (4) months from the date of this Agreement or a screenplay is delivered to Purchaser within six (6) months from the date of this Agreement, the Initial Option Period shall be deemed automatically extended to the date which is one (1) year from the date of this Agreement.

(d)   In the event Purchaser has not paid or caused to be paid the Development Sum to a writer or writers as set forth in subparagraph (b) above within the Initial Option Period, then provided Purchaser pays the sum of Fifteen Thousand Dollars ($15,000.00) to Owner by the end of the Initial Option Period, the Initial Option Period shall be automatically extended to the date which is one (1) year from the date of the Agreement.

(e)   The extension of the Initial Option Period, pursuant to either subparagraphs (c) or (d) above, shall be hereinafter referred to as the "Extended Option Period".

(f)   The Option may be exercised by Purchaser by written notice to Owner at any time on or before the date of expiration of the Initial Option Period, unless the Initial Option Period has been extended pursuant to either subparagraphs (c) or (d) above.  In such event, the Option may be exercised by Purchaser by written notice to Owner at any time on or before the date of expiration of the Extended Option Period.

(g)   If, prior to the giving to Owner of written notice of exercise of the Option, principal photography of the first motion picture to be produced hereunder in the exercise of the Optioned Rights is commenced, such commencement of principal photography shall constitute exercise of the Option.

-3-

DCC00147518
CONFIDENTIAL

(h)  If Purchaser does not exercise the Option hereunder within the Initial Option Period, or the Extended Option Period, whichever is applicable, any rights granted revert to Owner, and Purchaser hereby agrees to execute such documents as are reasonably necessary to effect such reversion.

2. Purchaser shall have the right to write or cause to be written screen treatments, scenarios and/or screenplay versions of the Work and to do all other things which it maydeem necessary for preparation of the Work as a motion picture.  Neither the writing thereof, nor the engagement of performers or other personnel in connection with the production of a motion picture based on the Work, nor the public announce-ement thereof, shall be deemed to constitute an exercise of the Option, which may be exercised only by written notice to Owner, as hereinabove provided, or by the sooner commencement of principal photography of the first motion picture (if any) produced hereunder in the exercise of the Optioned Rights.

3. (a)  Owner hereby reserves all comic book publication rights in the Work, except only those rights granted to Purchaser pursuant to Paragraph 1(a) above.

(b)  Owner hereby reserves all rights of production and use upon the regular spoken stage with living actors appearing and speaking in person solely in the actual and immediate presence of the audience; provided, however, that Owner shall not have the right to use or license any stage rights in favor of any party other than Purchaser prior to three (3) years after the date of the first general release of the first motion picture produced in the exercise of the Optioned Rights, or five (5) years from the date of the exercise of the Option by Purchaser, whichever first occurs, except that if, prior to the expiration of the said three (3) or five (5) year period, or thereafter but prior to Owner's use or licensing of such rights, Purchaser sells or causes the Picture to be sold to a U.S. television network for prime time exhibition, then at such time the holdback periods set forth herein and in subparagraph (c) below shall be extended to five (5) years after the date of such sale to a U.S. television network, or seven (7) years from the date of the exercise of the Option by Purchaser, whichever first occurs.  Any proposed sale, license, disposition or use by Owner of any such stage rights after such period shall be subject to the provisions of Paragraph 5(e) hereof.

(c)  Owner hereby reserves all radio rights in the Work, except only those rights granted to Purchaser pursuant to Paragraph 1(a) above if the Option is exercised; provided, however, that Owner shall not have the right to use or license any such rights prior to three (3) years after the

iii

-4-

**Exhibit J**

133

DCC00147519
CONFIDENTIAL

date of the first general release of the first motion picture produced in the exercise of the Optioned Rights or five (5) years from the exercise of the Option by Purchaser, whichever first occurs.

(d)   Owner may enter into agreements regarding the rights set forth in subparagraphs (b) and (c) above prior to the expiration of the respective holdback periods; provided, however, that such rights shall not be exercised by any party until the dates of termination of said respective holdback periods.

(e)   Owner hereby reserves all merchandising rights in and to the Work, subject to the following terms and conditions:

(i)   Licensing Corporation of America ("LCA") shall be the licensing agent on behalf of Owner with respect to merchandising;

(ii)   LCA shall be entitled to deduct a fee of thirty-three and one-third percent (33-1/3%) of all gross receipts from United States merchandising licenses, and, with respect to foreign merchandising licenses, a fee of fifteen percent (15%) of "net receipts" (i.e., gross receipts remaining after deduction of foreign agents' commissions, if any, and of taxes deducted by foreign governments), except that if the deduction of LCA's fifteen percent (15%) fee, when combined with the deduction of foreign taxes and foreign agents' commissions, would reduce the remaining receipts below sixty percent (60%) of the original amount prior to any such deductions, then LCA's fee shall be reduced to such lower percentage of net receipts as may be necessary to result in an amount remaining after all such deductions equal to sixty percent (60%) of such original gross receipts; provided, however, that in no event shall LCA's fee on foreign merchandising licenses be reduced below twelve and one-half percent (12-1/2%) of net receipts.

(iii)   All amounts remaining after the deductions permitted pursuant to subparagraph (e)(ii) above, shall be shared fifty percent (50%) thereof to Owner and fifty percent (50%) thereof to Purchaser (hereinafter referred to as "Purchaser's Share").

(iv)   Owner shall provide to Purchaser statements, indicating gross receipts from each territory or country, deduction of LCA's fee, and other information customarily included in same. Such statements shall be sent to Purchaser by Owner not less frequently than quarterly for ⁢ first two (2) years after the first general release of

DCC00147520
CONFIDENTIAL

ii

Picture and any sequel, remake, television series, pilot,
mini-series, or movie-of-the-week, and semiannually thereafter;

(v)  Purchaser shall be paid the Purchaser's
Share derived from all articles, items and commodities licensed
by LCA in connection with the Work and/or the Picture, except,
however, that Purchaser shall not be entitled to the
Purchaser's Share derived from those certain articles, items,
and commodities licensed by LCA pursuant to deals substantially
negotiated by LCA and any licensees after the date which is
eighteen (18) months from the first general release of the
Picture in the United States (hereinafter referred to as the
"Merchandise Date") (said certain articles, items and
commodities hereinafter referred to as "Post Picture
Merchandising").  Notwithstanding anything to the contrary
contained herein, if Purchaser shall at any time (whether prior
to or following the conclusion of such eighteen (18) month
period) grant rights for any remake, sequel, television series,
pilot, or movie-of-the-week, hereunder which is thereafter
actually produced (hereinafter collectively referred to as the
"Subsequent Pictures"), then Purchaser shall be paid the
Purchaser's Share derived from merchandising licenses
substantially negotiated within the period commencing upon the
date of such grant and ending [except as may be extended
pursuant to this subparagraph 3 (e)(v)] upon the date eighteen
(18) months following general release or broadcast in the
United States of any such Subsequent Picture.  With respect to
deals which are substantially negotiated by LCA and any
licensee after the Merchandise Date and prior to any such
grant, all net receipts remaining after the deduction by LCA of
its fee pursuant to subparagraph (e)(ii) above, shall be paid
one hundred percent (100%) to Owner.

The procedure outlined above shall be
repeated with respect to each motion picture or television
program produced and released pursuant to this Agreement.

3A.    Purchaser agrees to first offer to WB any
book proposals based upon or relating to the Picture and/or
the Work (except for a "making of the Picture" type book which
Purchaser may publish or cause to be published without offering
such to WB).  WB shall have ten (10) business days to accept
such proposal(s).  If WB rejects such proposal(s) or is silent,
then all rights in and to such proposal(s) and the books, based
upon such proposal(s), shall be exclusively owned free and
clear by Purchaser, and Purchaser shall be free to offer and
conclude deals for same with any third party for greater
compensation than that offered by WB to Purchaser without any
participation whatsoever by Owner or WB.

DCC00147521
CONFIDENTIAL

4.  (a)  If Purchaser exercises the Option, Purchaser agrees to pay to Owner, concurrently with such exercise, a sum equal to two and one-half percent (2-1/2%) of the cash production budget of the Picture (said sum, as adjusted pursuant to the provisions of Paragraph 4(b) below, shall hereinafter be referred to as the "Cash Purchase Price"), less all sums paid to Owner pursuant to Paragraph 1(d) above.  Upon the exercise of the Option and payment to Owner of the Cash Purchase Price by Purchaser, the Optioned Rights shall automatically vest in Purchaser as Purchaser's sole and absolute property.

(b)  If after the receipt of the negative cost statement by Owner pursuant to Paragraph 4(g) below, it appears that the negative cost exceeds the cash production budget, then in such event, the Purchaser shall promptly pay to Owner two and one-half percent (2-1/2%) of said excess.  If on the other hand, it appears that the cash production budget exceeds the negative cost, the Owner shall promptly repay the Purchaser two and one-half percent (2-1/2%) of such excess.

(c)  In respect to the first feature-length motion picture, if any, based upon the Work and produced in the exercise of the Optioned Rights hereunder, Owner shall be entitled to receive the contingent compensation referred to in Paragraph 4(e)(i) below.

(d)  (i)  In respect of each sequel and/or remake motion picture (as such terms are hereinafter defined), if any, produced in the exercise of the Optioned Rights hereunder, Owner shall be entitled to receive a sum equal to one-half (1/2) the Cash Purchase Price, payable to Owner upon commencement of principal photography of each sequel and/or remake motion picture, plus the contingent compensation referred to in Paragraph 4(e)(ii) below, it being agreed that nothing in this Agreement shall obligate Purchaser ever to produce a sequel or remake motion picture.

(ii)  As used herein, the term "sequel motion picture" means a motion picture other than a television motion picture using one or more of the major characters of the Work participating in different events from those found in the Work, whether such events are prior to, concurrent with or subsequent to the events of any prior motion picture(s) and whose plot is substantially new, it being understood that the first motion picture produced hereunder is not a sequel motion picture. Purchaser's obligation to make the payment provided for in Paragraph 4(d)(i) above shall only be in respect of sequel motion pictures written by Purchaser, its successors, assignees, or licensees, or written by persons engaged or employed by Purchaser, its successors, assignees, or licensees, to write such sequel motion pictures.

iii

-7-

DCC00147522
CONFIDENTIAL

(iii)  As used herein, the term "remake motion picture" means a motion picture other than a television motion picture and other than the first motion picture produced hereunder which is based upon the plot or story of the Work or of a prior motion picture produced hereunder.  The term "remake motion picture" does not include (a) a sequel motion picture, (b) versions (such as foreign language versions or shortened or expanded versions) of the first theatrical motion picture produced by Purchaser based on the Work or any sequel motion picture, or (c) a motion picture based upon some part of the plot or story of the Work which was not used for a prior motion picture.  Purchaser's obligation to make payments provided for in Paragraph 4(d)(i) above shall only be in respect of remake motion pictures written by Purchaser, its successors, assignees or licensees, or written by persons engaged or employed by Purchaser, its successors, assignees, or licensees, to write such remake motion pictures.

(e)  Owner shall be entitled to receive directly from the distributor(s):

(i)  contingent compensation of a sum equal to five percent (5%) of the gross receipts after "artificial breakeven", if any, derived from the first feature length motion picture, if any, produced in the exercise of the Optioned Rights.

For all purposes of this Paragraph 4(e)(i), the term "artificial breakeven" shall mean that point in time when the gross receipts derived by the Picture shall reach a sum equal to two and one-half (2-1/2) times the negative cost of the Picture (hereinafter referred to as the "Multiple"); however, in the event the negative cost of the Picture is Five Million Dollars ($5,000,000) or greater, the Multiple shall be reduced as follows:

| Negative Cost | Multiple |
|---|---|
| $5,000,000 - $6,250,000 | 2.4 times |
| $6,250,000 - $7,500,000 | 2.3 times |
| $7,500,000 - $8,750,000 | 2.2 times |
| $8,750,000 - $10,000,000 | 2.1 times |
| $10,000,000 and over | 2.0 times |

Notwithstanding the foregoing, in the event the distribution rights for the world are granted to two separate distributors (one with respect to the domestic

DCC00147523
CONFIDENTIAL

*for the purpose of the calculation by each such distributor of Owner's*
*participation, if any, in such distributor's gross receipts,*
*WS*

territory and one with respect to the foreign territory) then
~~in connection with the amounts due Owner from each such~~
~~distributor,~~ the term "artificial breakeven" shall mean that *for each such*
point in time when the gross receipts derived by the Picture *distributor*
shall reach a sum equal to the Multiple, as such may be reduced *mll*
as set forth above, times fifty percent (50%) of the negative
cost of the Picture.

The term "negative cost of the
Picture", as used herein, shall be defined as the aggregate
amount referred to in Exhibit "A" of this Agreement, attached
hereto and made a part hereof; and

(ii)  contingent compensation of a sum equal
to two and one-half percent (2-1/2%) of the gross receipts
after "artificial breakeven", if any, derived from each sequel
and each remake motion picture, if any, produced in the
exercise of the Optioned Rights.

(f)  The term "gross receipts" shall be defined
as either the standard definition(s) of the actual distri-
butor(s) of the respective motion picture(s) or, if Purchaser *Purchaser*
obtains another definition which is more advantageous to ~~Owner,~~ *mll bs*
then as such other definition.

(g)  Purchaser shall provide Owner with its
itemized certified negative cost statement for the Picture
within ninety (90) days after Purchaser delivers the Picture to
the distributor(s).  Owner shall have the right to audit Pur-
chaser's certified negative cost statement at Owner's sole
expense.

(h)  With respect to a television program
produced by Purchaser and based upon the Work, Owner shall be
entitled to receive:

(i)  a royalty in the sum of One Thousand
Dollars ($1,000.00) for each program of thirty (30) minutes in
length or less;

(ii)  a royalty in the sum of One Thousand
Two Hundred Fifty Dollars ($1,250.00) for each program of not
more than sixty (60) minutes in length but greater than thirty
(30) minutes in length;

(iii)  a royalty in the sum of One Thousand
Five Hundred Dollars ($1,500.00) for each program of more than
sixty (60) minutes in length; and

(iv)  a rerun royalty equal to twenty percent
(20%) of the applicable royalty set forth in subsections (i),

ii

DCC00147524
CONFIDENTIAL

(ii), and (iii) above, respectively, for the first, second, third, fourth, and fifth reruns, respectively, in the United States or Canada for each such program. For purposes hereof, the term "rerun" shall have the meaning customarily attributed to such term in the television industry in the United States.

The royalty payments, if any, set forth in subparagraphs (h) (i), (ii), and (iii) above, shall be automatically increased by twenty percent (20%) each on the date which is five (5) years from the first telecast of each such television program. Said royalty payments, if any, shall thereafter be increased by twenty percent (20%) every five years hence.

Purchaser agrees to make such royalty payments, if any, to Owner within ten (10) business days of Purchaser's receipt of such television monies.

(i) It is understood that Owner shall be furnished with settlement statements from the distributor(s) at the same time as such are furnished to Purchaser, and Owner shall be furnished with a copy of the audit provisions of Purchaser's agreement(s) with the distributor(s) of the Picture. Furthermore, Owner shall be accorded the right to join with Purchaser in the conduct of any such audit (and if Owner does so join with Purchaser, then the cost of the relative audit shall be shared equally by Purchaser and Owner) or, if Purchaser determines not to exercise its rights of audit in any ~~particular instance~~, to exercise such right of audit in Purchaser's place and stead (and if Owner does exercise such right, then the cost of the relative audit shall be borne by Owner). If as to any period within which an audit may be conducted, Purchaser intends to conduct such audit, then Purchaser shall notify Owner in writing of its intention, such notice to be in sufficient time to enable Owner to exercise its rights under this subparagraph (i). Purchaser agrees to respond promptly to any inquiry by Owner as to Purchaser's intention to conduct any such audit.

(j) With respect to television "movies-of-the-week", television "mini-series", or television pilots of ninety (90) minutes or more in length, as such terms are commonly understood in the motion picture industry generally, Owner shall be entitled to receive:

(i) a royalty in the sum of Twenty Thousand Dollars ($20,000.00) for the first television movie-of-the-week, television mini-series, or television pilot of ninety (90) minutes or more in length, if any, produced in the exercise of the Optioned Rights; or

ii

-10-

**Exhibit J**

139

DCC00147525
CONFIDENTIAL

(ii) a royalty in the sum of Ten Thousand
Dollars ($10,000.00) for each sequel or remake television
movie-of-the-week, television mini-series, or television pilot
of ninety (90) minutes or more in length, if any, produced in
the exercise of the Optioned Rights, and a rerun royalty equal
to twenty percent (20%) of such royalty payment for the first,
second, third, fourth, and fifth reruns, respectively, in the
United States and Canada for each such television program. For
purposes hereof, the term "rerun" shall have the meaning
customarily attributed to such term in the television industry
in the United States. The said royalty payment of Ten Thousand
Dollars ($10,000.00) shall be automatically increased by twenty
percent (20%) on the date which is five (5) years from the
first telecast of each such television program. Said royalty
payment shall thereafter be increased by twenty percent (20%)
every five (5) years hence.

5. (a) Nothing herein contained shall be construed
to obligate Purchaser to exercise the Option or to produce,
release, distribute, exhibit, advertise or exploit any motion
picture or other production or authorize any other person,
firm, or corporation to do so. Purchaser has not made nor is
the distributor(s) of any motion picture produced hereunder
required to make any representation or warranty with respect to
the amount of gross receipts or net profits which will or may
be derived from any motion picture.

(b) It is fully understood that Owner does not
have nor shall Owner have any right, title, or interest of any
kind in or to any gross receipts or net profits derived from
any motion pictures or other productions produced in the
exercise of the rights granted by Owner hereunder, it being
agreed that the share of the gross receipts, if any, payable to
Owner with respect to any motion picture produced hereunder
shall be computed, determined, and paid in the manner herein
provided, but shall not in any way constitute a lien or claim
on or against the said motion picture or its gross receipts or
net profits, or an assignment or transfer thereof or of any
interest therein. It is further fully understood that, insofar
as Owner is concerned, Purchaser and/or the financier and/or
the distributor of any motion picture or other production
produced hereunder shall have the unrestricted right to sell or
assign, and to pledge, mortgage or otherwise hypothecate such
motion pictures and other productions and/or the gross receipts
or net profits thereof, either in whole or in part, without
obtaining Owner's consent. Should Purchaser and/or the
financier and/or the distributor sell or otherwise dispose of
any motion picture produced hereunder or its gross receipts or
net profits (as distinguished from a so-called outright or flat
sale for a particular territory), then such sale or other
disposition shall be made subject to the obligation on the part

DCC00147526
CONFIDENTIAL

of the Purchaser or assignee to pay Owner's share of the gross receipts, if any, hereunder to the same extent and computed in the same manner and subject to the same limitations as though gross receipts and net profits, if any, were continued to be received by Purchaser and/or the financier and/or the distributor. Any assignment, pledge, mortgage, sale, disposition or hypothecation shall be subject to Owner's rights hereunder.

(c)  Nothing herein contained shall be construed to create a partnership or joint venture by or between Owner and Purchaser or make either party the agent of the other. Each of the parties hereto agree not to hold themselves out as the partner or agent of the other or otherwise in any manner contrary to the terms of this Agreement, and neither of the parties hereto shall be or become liable or bound by any representation, act, omission or agreement whatsoever of the other which may be contrary to the provisions of this Agreement.

(d)  Insofar as Owner is concerned, it is expressly agreed that Purchaser and/or the financier and/or the distributor of any motion picture or other production produced in the exercise of the rights granted by Owner hereunder shall have full and exclusive charge and control of the production, distribution, sale, exploitation, marketing, advertising, reissuing, or other distribution or use thereof and that said motion pictures and productions may be distributed, sold outright, exploited, marketed, advertised, or otherwise disposed of by Purchaser and/or the financier and/or the distributor throughout the world and universe in perpetuity, and Purchaser and/or the financier and/or the distributor may, in Purchaser's and/or said financier's and/or said distributor's sole discretion, withhold or withdraw such motion picture or other productions from distribution either entirely or with respect to any country or territory in the world or portion thereof.  It is the intent and purpose hereof that absolute and sole control with reference to all matters involving the production, distribution, sale, exploitation, marketing, advertising, reissuing, or other distribution or use of said motin pictures and other productions shall be exercised by Purchaser and/or the financier and/or the distributor in such manner as Purchaser and/or the financier and/or the distributor in its sole and absolute discretion and judgment may deem proper and that Owner shall not have any voice or control whatsoever in connection therewith.

(e)  If Owner desires to sell, license, or otherwise dispose of any of the rights referred to in Paragraphs 3(b) or 3(c) above, at any time when any such sale, license or disposition would be permitted by such paragraphs, Owner shall first offer such right to Purchaser setting forth the terms and conditions on which the Owner is willing to sell,

ii

-12-

DCC00147527
CONFIDENTIAL

license, or otherwise dispose of such rights, and Purchaser shall have twenty-one (21) days (exclusive of Saturdays, Sundays, and holidays) after receipt of said notice to accept said offer. Such offer shall not contain any non-monetary terms or conditions which by their nature cannot be met as easily by Purchaser as by any other party (e.g., the required employment or use of a certain director, writer, star, etc.). If Purchaser does not accept said offer within said twenty-one (21) day period, then Owner shall have the right to dispose of said rights to any third party; provided, however, that Owner shall not dispose of said rights on terms and conditions set forth in the offer submitted to Purchaser without first notifying Purchaser and giving Purchaser the opportunity within twenty-one (21) days (exclusive of Saturdays, Sundays, and holidays) after receipt to acquire such rights upon such less favorable terms and conditions.

Notwithstanding anything to the contrary contained herein, if prior to the expiration of such holdback period, Purchaser sells or causes the Picture to be sold to a U. S. television network for prime time exhibition, then at such time the holdback periods set forth herein shall be extended to five (5) years after the date of said sale to a U.S. television network, or seven (7) years from the date of the exercise of the Option by Purchaser, whichever first occurs.

(e)  Purchaser agrees to affix or cause to be affixed on each motion picture produced hereunder, and on all advertising, promotional, and other such materials of any kind or nature created by or pursuant to the authority of Purchaser and containing the name or any graphic or pictorial representation of "SWAMP THING", a copyright and trademark notice in a form designated by Owner, designating Owner as the copyright and trademark owner and proprietor of such name and character.

6. The Owner represents and warrants that:

(a). The Owner is the sole author of and has sole, exclusive, unlimited and unencumbered motion picture rights throughout the world in the Work, and the full and sole authority to convey the rights herein granted as well as those rights which Purchaser may hereafter acquire under this Agreement; that each of the foregoing rights are and will be sole and exclusive to the Purchaser, and that no part of the Work is in the public domain, but all is or may be validly copyrighted and registered in the United States and likewise protected elsewhere as far as the laws of the United States and other countries provide for protection.

(b)  The said title may be legally used by Purchaser for motion pictures and television programs based

DCC00147528
CONFIDENTIAL

upon the Work and in the exercise of any other of Purchaser's
rights hereunder; that Owner has not granted nor will Owner
grant to any third party the rights granted to Purchaser
pursuant to this Agreement in respect of the said title; that
Owner has not copied the said title from any other work, and
Owner further agrees not to grant the use of said title for
motion pictures and television programs based on the Work or
for any other purposes for which Purchaser has acquired rights
hereunder.

(c)   All the Work is wholly original with Owner
and its full use, as herein granted, and the full exercise by
Purchaser of all rights it acquires hereunder will not infringe
upon or violate the copyright, right of privacy, right of
publicity, personal, common law, or other rights of others or
constitute a defamation, libel, or slander against any person,
firm, or corporation.

(d)   Owner has not granted nor will Owner grant
to others any rights herein purported to be conveyed, or which
may hereafter be conveyed, and such rights and the full
exercise thereof have not been in any way encumbered, limited,
or diminished by act or omission.

(e)   There are no claims or litigation pending or
threatened concerning or purporting to affect adversely Owner's
rights or title as herein represented or conveyed.

(f)   No motion picture or television program has
ever been authorized by Owner nor to the best of Owner's
knowledge has any motion picture or television program ever
been made nor has any play been produced on the spoken stage
nor has any other work been made based upon any part of the
Work, and no right, license, or privilege to do so has
heretofore been granted by Owner or under Owner's authority.

7. The Owner agrees to defend, indemnify, and hold
the Purchaser and its assignees and licensees, and their
respective officers, agents and associates, harmless from and
against any charges, damages, costs, expenses (including
reasonable counsel fees), judgments, penalties, liabilities, or
losses of any other kind or nature whatsoever which may be
sustained or suffered by or secured against or imposed upon the
Purchaser, or its assignees or licensees, or their respective
officers, agents or associates by reason of the breach or
failure of any of the representations, warranties, covenants or
agreements herein made by Owner.  Purchaser agrees to defend,
indemnify, and hold the Owner harmless from and against any
charges, damages, costs (including reasonable counsel fees),
judgments, penalties, liabilities, or losses of any kind or
nature whatsoever which may be sustained or suffered by or
secured against or imposed upon the Owner arising out of

ii

Exhibit J

143

DCC00147529
CONFIDENTIAL.

material added by the Purchaser which infringes upon or
violates the right of privacy of, or constitutes a libel
against or violates any copyright, common law right or any
other right of any party whatsoever.

8. Owner agrees to prevent the Work and any versions
or part thereof from falling into the public domain anywhere in
the world and will cause to be affixed to each published copy
of the Work, or any version thereof, such notice and will do or
cause to be done such other acts and deeds as may be required
to obtain or maintain copyright in the work and all versions
and parts thereof in each country in the world where such
rights are capable of being obtained or maintained.

9. Owner hereby grants Purchaser the right to use
Owner's name in or in connection with the advertising,
publicity, and/or other turning to account of any of the rights
herein granted or agreed to be granted to Purchaser, it being
agreed that Purchaser shall not, without Owner's consent,
authorize any advertiser to advertise or announce that Owner
corporately endorses any product, commodity, or service.

10. (a)  The Purchaser agrees to accord Owner credit
on screen in the main titles of any theatrical motion picture
or television program made by it and based on the Work, as
follows:

"Based upon characters appearing in magazines published
by DC Comics, Inc."

Said credit, upon the film itself of any
theatrical motion picture or feature length television motion
picture based upon the Property, shall appear on a separate
card.

The said credit shall appear in a size of
type which is not less than the size of type used for the
credit accorded to the screenplay writer(s) for such motion
picture.

(b)  In addition, Owner shall be accorded the
credit, provided for in Paragraph 10(a) above, in paid
advertising issued, ordered, or placed by Purchaser or by the
distributor, with respect to any theatrical motion picture or
feature length television motion picture made by Purchaser
hereunder and based upon the Work, except that Purchaser shall
be under no obligation to accord Owner such credit in:

ii

-15-

**Exhibit J**

144

DCC00147530
CONFIDENTIAL

                 (i)  teaser or special advertising or
publicity;

                 (ii)  advertising or publicity relating to
members of the cast, the director, producers, writers, other
than Owner, and material written by them, or similar matters;

                 (iii)  group, list, or institutional
advertising or publicity;

                 (iv)  any advertising or publicity written in
narrative form, or commercial or merchandising tie-ups,
merchandising by-products, phonograph records, phonograph
record album covers, advertising accessories, or products of
any kind;

                 (v)  advertising of eight (8) column inches
or less;

                 (vi)  trailers or advertising on the screen;

                 (vii)  radio or television advertising or
publicity;

                 (viii)  so-called 24 sheets, 6 sheets,
30 x 40's and 40 x 60's; and

                 (ix)  advertising of such a nature that
consent to the use of Owner's name in connection therewith has
not been granted.

                 (c)  No casual or inadvertent failure to comply
with the provisions of this Paragraph 10 shall constitute a
breach of this Agreement.  In the event of a failure or
omission by Purchaser constituting a breach of Publisher's
obligations under this Paragraph 10, Owner must give Purchaser
written notice thereof and afford Purchaser the opportunity to
remedy such breach within a reasonable time.  It is further
agreed that Owner's rights and remedies in the event of a
failure or omission by Purchaser constituting a breach of
Purchaser's obligations under this Paragraph 10 (which failure
or omission is not remedied within a reasonable time after
Purchaser's receipt of notice from Owner) shall be limited to
Owner's right, if any, to recover damages in an action at law,
and in no event shall Owner be entitled by reason of any such
breach to terminate this Agreement or to enjoin or restrain the
distribution or exhibition of any motion picture produced in
the exercising of rights granted hereunder or the advertising
or publicizing of any such motion picture.

DCC00147531
CONFIDENTIAL

11. (a)  Any and all payments required to be made pursuant hereto shall be made payable to Owner at the address set forth above.

(b)  All notices, which Purchaser is required to or may desire to serve upon Owner in connection with this Agreement, shall be in writing and shall be served by personally delivering same or by addressing same to Owner at the address above, or at such other address as may be designated from time to time by Owner in writing by depositing the same, so addressed, by certified mail or registered mail, or at Purchaser's option, by telegraph, cable, or telex.  If Purchaser elects to send any notice hereunder by telegraph or cable, such notice shall be deemed to have been served upon Owner at the time of delivery thereof to the telegraph or cable office.  If Purchaser elects to mail such notice, such notice shall be deemed to be served upon Owner forty-eight (48) hours after the mailing thereof by Purchaser.  If Purchaser elects to send such notice by telex, such notice shall be deemed to be served upon Owner upon transmission by telex.

(c)  All notices, which Owner is required or may desire to serve upon Purchaser in connection with this Agreement, shall be in writing and shall be served by personally delivering same or by addressing same to Purchaser c/o Benjamin Melniker, Esq., Suite 1104, 1350 Avenue of the Americas, New York, New York 10019, or at such other address as may be designated from time to time by Purchaser in writing, by depositing the same, so addressed, by certified mail or registered mail or, at Owner's option, by telegraph, cable, or telex.  If Owner elects to send any notice hereunder by telegraph or cable, such notice shall be deemed to have been served upon Purchaser at the time of delivery thereof to the telegraph or cable office.  If Owner elects to mail such notice, such notice shall be deemed to be served upon Purchaser forty-eight (48) hours after the mailing thereof by Owner.  If Owner elects to send such notice by telex, such notice shall be deemed to be served upon Purchaser upon transmission by telex.

12.  Owner hereby grants to Purchaser the right, at Purchaser's expense, to institute in the name and on behalf of Purchaser, or Owner and Purchaser jointly, any and all suits and proceedings in law or in equity to enjoin and restrain any infringements of any of the rights herein granted or agreed to be granted to Purchaser, and Owner hereby assigns to Purchaser any and all causes of action resulting from or based upon any such infringement, and the net amount of such damages (i.e., after the recoupment from such damages of Purchaser's and/or Owner's costs and expenses) shall be included in the gross receipts of the Picture.  Owner will not compromise, settle, or in any manner interfere with any such action or litigation, if brought.

DCC00147532
CONFIDENTIAL

If, however, Purchaser fails or refuses to take any such actions described above, then Purchaser hereby appoints Owner or Owner's nominee, irrevocably, as Purchaser's attorney-in-fact with the right, but not the obligation to bring and prosecute suits, actions, and proceedings against third parties with respect to any infringement or alleged infringement by any third party of the copyright in any motion picture or television program produced hereunder, and to take such action as Owner may deem advisable to enforce, protect, and defend any such copyright, if Purchaser fails or refuses to do so. Any such action may be taken by Owner in the name of Purchaser or otherwise. Further, Owner, at its own cost and expense, may join Purchaser as a party plaintiff or defendant in any such suit, action or proceeding. If, as a result of any suit, action, or proceeding taken or instituted by Owner, there is an award of damages to Purchaser and/or to Owner, then the net amount of such damages (i.e., after the recoupment from such damages of Purchaser's and/or Owner's costs and expenses) shall be added to the gross receipts of the Picture.

13. (a)  Concurrently with Owner's execution hereof, Owner shall complete, execute and deliver to Purchaser the short form of option grant, set forth as Exhibit "B" attached hereto and by this reference made a part thereof, and Owner acknowledges that Purchaser shall have the right to detach the said Exhibit "B" and forward it to the United States Copyright Office for recording.

(b)  Concurrently with Owner's execution hereof, Owner shall complete, execute, and deliver to Purchaser the short form of agreement, set forth as Exhibit "C" attached hereto and by this reference made a part hereof, and Owner understands and acknowledges that if Purchaser exercises the Option, Purchaser shall have the right to detach the said Exhibit "C" and forward it to the United States Copyright Office for recording.

(c)  Purchaser shall have the right to fill in, on Exhibits "B" and "C", the date of registration of the Work in the United States Copyright Office, the name of the copyright proprietor, and the Entry Number of such registration.

(d)  Owner agrees, upon Purchaser's request, to procure for Purchaser signed documents and other proof, if such is reasonably required and if such is available to Purchaser, to establish a clear chain of title in Purchaser in and to the rights acquired by Purchaser hereunder.

14. If Owner fails to do or cause to be done any act or thing required to be done or caused to be done by Owner hereunder in order to effectuate the transfer of the rights

ii

DCC00147533
CONFIDENTIAL

herein contemplated within a reasonable time after notice from Purchaser, then, in such event, Owner hereby appoints Purchaser as its irrevocable attorney-in-fact for such limited purposes with the right, but not the obligation so to do in the name of and on Owner's behalf for the benefit of Purchaser, which appointment Owner acknowledges is coupled with an interest.

15. If the Work or any portion thereof shall ever be or become in the public domain, then nothing contained in this Agreement shall be construed to be prejudicial to or operate in derogation of any rights, licenses, privileges or properties which Purchaser may enjoy or be entitled to as a member of the public, and Purchaser may exercise such rights, privileges, or properties as if this Agreement were not in existence. If the Work or any portion thereof shall ever be or become in the public domain not due to any act or failure to act of Owner, its licensees and assigns hereunder, then Owner shall nevertheless be entitled to receive the payments under this Agreement Owner otherwise would be entitled to receive.

16. (a)  No sums, other than those hereinabove specifically provided as being payable to Owner, shall accrue or be payable to Owner in respect of any use or exercise of the Optioned Rights.

(b)  Purchaser intends to produce a motion picture or motion pictures, or television program or television programs, based upon the Work, but is not obligated to do so or to make any other use of the Work.

17.  This Agreement may not be assigned by Purchaser without Owner's prior written consent, except only to: (i) any "major" motion picture company; (ii) any of the following independent production or financing companies: Avco-Embassy Pictures, Filmways, Orion Pictures, Lorimar Productions, The Ladd Company, Polygram Pictures, Melvin Simon Productions, Marble Arch Productions, EMI Films, Time-Life Films, ABC Films, or CBS Films; (iii) any other independent production or financing company having experience, financial responsibility, and a reputation comparable to any of the companies set forth in subparagraph (ii) above; (iv) a bank, or (v) any other person, firm, or corporation, with the prior written approval (such approval not to be unreasonably withheld or delayed) of Owner.  Any assignments inconsistent with this paragraph shall be void.

18.  Owner agrees that solely in connection with the exercise of the Optioned Rights, and any other rights which Purchaser may hereafter acquire hereunder, Purchaser shall have the unlimited right to revise, vary, change, alter, or modify the Work, add to and/or delete from the Work, and to arrange,

ii

-19-

DCC00147534
CONFIDENTIAL

rearrange, and/or transpose the Work, and change the sequence thereof and the characters and descriptions of the characters contained in the Work, and to use a portion or portions of the Work or the characters, plots, or theme thereof in conjunction with any other literary, dramatic, or other material of any kind. Owner hereby waives any so-called "moral" rights of author. It is agreed that the character of "Swamp Thing" shall not be portrayed in the Picture in a manner that will degrade said character in society or bring him into public hatred, contempt, or that will shock, insult, and offend the community, public morals, and decency.

19. No waiver by Purchaser or Owner of any breach by Owner or Purchaser of any of the provisions of this Agreement shall be construed to be a waiver of any preceding or succeeding breach of the same or any other term or provision hereof. Each of the rights and remedies granted to Purchaser or Owner under this Agreement are cumulative, and the exercise of one shall not limit, diminish, or otherwise affect Purchaser's or Owner's right, concurrently or subsequently, to exercise any other rights and remedies as Purchaser or Owner may have, at law or in equity, under this Agreement or otherwise.

20. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, applicable to agreements executed and to be wholly performed therein.

21. This Agreement contains the full and complete understanding between Owner and Purchaser with reference to the within subject matter, supersedes all prior agreements and understandings (if any) between the parties, whether written or oral, with respect to the within subject matter and cannot be modified or amended except by a written instrument executed by Owner and by Purchaser.

Our signature at the foot hereof, together with yours underneath the words "Agreed to and Accepted", shall constitute this a valid, binding, and enforceable agreement between us.

Very truly yours,

SWAMPFILMS, INC.

By: _Michael Uslan_
    Its V-P

Agreed to and Accepted:

DC COMICS, INC.

By: _____
    Its

i

-20-

DCC00147535
CONFIDENTIAL

Exhibit "A"

The term "negative cost of the Picture" shall, for all purposes of this Agreement, be defined as:

The aggregate of all out-of-pocket costs, charges, and expenses paid or incurred in connection with the development, preparation, production, completion and delivery of the Picture, calculated according to the Purchaser's method of accounting, but in accordance with customary motion picture accounting practices, and shall include, but shall not be limited to: (i) all amounts (other than contingent compensation) paid or payable for services of performers, writers, directors, producers and all other "above-the-line" personnel; (ii) all charges and expenses of production facilities, materials, equipment, personnel, insurance, taxes (other than net income taxes), legal and accounting charges and royalties attributable to the Picture, advertising and publicity incurred in connection with the production of the Picture, or any charges or expenses paid or incurred which are customarily included in the negative cost of the Picture; (iii) any fixed items of cost, payment of which may be deferred; (iv) any sums heretofore paid to Owner in connection with the Picture; (v) the overhead charge, if any, to the Picture; and (vi) any interest [at a rate of two percent (2%) over the prime rate, except that if the prime rate is greater than eleven percent (11%), then the interest rate shall be equal to two and one-half percent (2-1/2%) over prime] on any moneys borrowed and used in financing the production thereof. In no event shall the overhead and interest charges set forth in subparagraphs (v) and (vi) above exceed the standard of such charges which iscustomarily included in calculating the negative cost of the Picture.

ii

**Exhibit J**

**150**

DCC00147536
CONFIDENTIAL

Exhibit "B"

## KNOW ALL MEN BY THESE PRESENTS

That for a good and valuable consideration, receipt of which is hereby acknowledged, the undersigned has granted to SWAMPFILMS INC., its successors and assigns, the picture, television, and allied rights in and to that certain work solely owned by the undersigned and entitled "SWAMP THING" and in and to the copyrights thereof throughout the world and all renewals and extensions of such copyrights. The said work was registered on             , 19    in the name of

under Entry No.

The grant hereunder is upon and subject to the terms and provisions of a certain Option Agreement between SWAMP-FILMS, INC. and the undersigned dated October        , 1980.

Dated:

DC COMICS, INC.

By: _____
        Its

STATE OF New York )
                                    ss.:
COUNTY OF New York )

On this 10 day of     October    , 1980, before me came    William Sarnoff
to me known, who, being by me duly sworn, did depose that he did execute the foregoing instrument.

SHELDON J. KORN
Notary Public, State of New York
No. 31-7335380
Qualified in New York County
Commission Expires March 30, 1982

ii

DCC00147537
CONFIDENTIAL

Exhibit "C"


<u>KNOW ALL MEN BY THESE PRESENTS</u>


The undersigned, for One Dollar ($1.00) in hand paid
and for other valuable considerations now received, hereby
sells and assigns unto SWAMPFILMS, INC. (herein termed
"Purchaser"), its successors and assigns forever, all MOTION
PICTURE, TELEVISION AND ALLIED RIGHTS in and to the literary
and/or dramatic work entitled "SWAMP THING" written by the
undersigned and all MOTION PICTURE, TELEVISION AND ALLIED
RIGHTS in all copyrights thereof (and in any renewals or
extensions thereof) including copyrights registered in the
United States on                            , 1980, in the name of

under Entry No.                    , together with the sole and
exclusive right to use, adapt, change, translate, add to and
take from said work and the title in the making of motion
picture photoplays of every kind or character and to lease,
vend, exploit and exhibit the same throughout the world and to
copyright the same in Purchaser's name.

The undersigned agrees to cause renewals of all
copyrights in the work duly to be obtained, and the MOTION
PICTURE, TELEVISION AND ALLIED RIGHTS herein granted are now
assigned to Purchaser for the renewal term and during any
extensions of copyright and, after such renewals or extensions,
a further or like document of confirmation of assignment will
be given to Purchaser if requested. The undersigned hereby
appoints Purchaser its irrevocable attorney-in-fact with the
right, but not the obligation, to execute and file all such
documents and to do all acts necessary for the obtaining of
such extensions or renewals and evidencing the continuation of
the same rights in Purchaser for such renewed or extended terms
as are now vested in Purchaser.

AND the said Purchaser, its successors and assigns,
are hereby empowered to bring, prosecute, defend and appear in
suits, actions and proceedings of any nature under or con-
cerning said copyrights or their renewals, or concerning any
infringement thereof, and particularly infringement of or
interference with any of the MOTION PICTURE, TELEVISION AND
ALLIED RIGHTS now granted under said copyright or renewals in
the name of the copyright proprietor but at the sole cost and
expense of said Purchaser which will indemnify the undersigned
therein. The net amount of damages from infringement or
violation of any copyright or its renewal (i.e., after the
recoupment from such damages of Purchaser's and/or Owner's

DCC00147538
CONFIDENTIAL

costs and expenses) or costs from infringement or violation of any copyright or its renewals, so far as it arises from any violation of MOTION PICTURE, TELEVISION AND ALLIED RIGHTS hereby assigned, is now assigned to and shall be paid to said Purchaser, its successors and assigns.

The terms and conditions of this Assignment are subject to that certain agreement between Purchaser and the undersigned dated as of October    , 1980.

DC COMICS, INC.

By: _____
       Its _____

STATE OF New York )
                              : ss.:
COUNTY OF New York )

On this 10 day of October , 1980, before me came William Sarnoff to me known, who, being by me duly sworn, did depose that he did execute the foregoing instrument.

SHELDON J. KORN
Notary Public, State of New York
No. 31-7980390
Qualified in New York County
Commission Expires March 30, 1982

DCC00147539
CONFIDENTIAL

# Joseph Shuster, Cartoonist, Dies; Co-Creator of 'Superman' Was 78

By BRUCE LAMBERT

Joseph Shuster, a co-creator of Superman who sold the rights to the character for $130, never dreaming it would become a legendary figure in popular culture reaping billions of dollars, died on Thursday at his home in Los Angeles. He was 78 years old.

He died of congestive heart failure, the Los Angeles County coroner's office said.

One night in 1934, Jerry Siegel conceived a superhuman hero, and the next day, he asked his buddy, Mr. Shuster, to draw it. Syndicators repeatedly rejected their comic strip until 1938, when Detective Comics bought the 13-page story for $10 a sheet.

"We were young kids," Mr. Shuster said later. "What did we know?"

Published as a booklet under the name Action Comics, Superman was an instant hit. His popularity helped establish comic books as a format and spawned a genre of bizarrely costumed superheros, from Spiderman to Wonder Woman.

The New York Times

Joseph Shuster with a vintage Superman comic book in 1975.

### Superman: The Industry

Superman reigned as king of the realm and an industry unto himself. Almost faster than a speeding bullet, the Man of Steel appeared in newspaper comics, a radio show, animated cartoons, movie-theater serials, a television series, a Broadway musical, a novel, feature films and a stream of franchised goods, from lunch boxes and toys to bubble gum. In the 1970's alone, Superman sales exceeded $1 billion.

Superman was the baby alien from outer space, reared as a normal American boy and growing up to become Clark Kent, mild-mannered reporter. But when danger loomed, he transformed into the crusader for Truth, Justice and the American Way, ducking into the nearest phone booth, doffing his glasses and stripping to a blue bodysuit. Red cape flowing, he flew off, using X-ray vision and other powers to thwart the latest evil menace or global disaster. He leaped over tall buildings, gallantly kept the admiring and curious Lois Lane at arm's length and feared only kryptonite.

For several years, the Shuster-Siegel team earned a modest living as Superman's cartoonist and writer. But when they pressed for a share of the profits, they were dumped. They tried other story lines, including a character called Funnyman, which flopped.

### Poverty, Then a Pension

Protracted litigation seeking money from Superman's owners also failed. By the 1970's, both men were nearly destitute and even sold their old comic books as collectors' items worth thousands of dollars apiece. Mr. Shuster, partly blind and unemployed, lived in a threadbare Queens apartment.

Finally he and Mr. Siegel appealed to the court of public opinion. In 1975 Warner Communications, which then owned Superman, volunteered to give each a pension of $20,000 a year. In 1981 the figure was raised to $30,000, plus a $15,000 bonus after the first film in the "Superman" series grossed $275 million.

Mr. Shuster was born in Toronto. As a youngster, he moved with his family to Cleveland, where he met Mr. Siegel.

No information on survivors was available.

# Judge Nils Boe, 78; S. Dakota Governor And Aide to Nixon

By BRUCE LAMBERT

Former Gov. Nils A. Boe of South Dakota, whom President Richard M. Nixon appointed as a White House aide and later as chief judge of the United States Customs Court, died Thursday at Sioux Valley Hospital in Sioux Falls, S.D. He was 78 years old and lived in Sioux Falls.

His family said he died of cancer.

While serving on the Customs Court, Judge Boe issued several notable decisions, including a sharply worded rebuke of Mr. Nixon in 1974. The President had ordered a 10 percent surcharge on all import duties to reduce the nation's trade deficit, a move that generated $500 million in four months. But a three-judge panel led by Judge Boe ruled that the power to impose such a surcharge rested with Congress and that Mr. Nixon had overstepped his authority.

"Expedience cannot justify the means by which a deserving and beneficial national result is accomplished," Judge Boe wrote in that case. "To indulge in judicial rationalization in order to sanction the exercise of power where no power in fact exists is to strike the deadliest of blows to our Constitution."

Three years later, he was on a three-judge panel that ordered the Carter Administration to comply with laws imposing duties of 5 percent to 40 percent on an array of popular Japanese electronic products, including televisions, radios, tape recorders and record players. The judges dismissed warnings from the Administration that the duties would upset international relations and trade.

The son of Nils N. Boe, a Lutheran bishop for a synod covering four states, Mr. Boe was born in Baltic, S.D., and grew up in Sioux Falls. After graduating from the University of Wisconsin and its law school, he worked as a private lawyer and as Deputy State Attorney for Minnehaha County. He served as a Navy lieutenant in World War II.

A Republican, he won election to the State House of Representatives for four two-year terms and became Speaker. He was elected Lieutenant Governor in 1962 and Governor in 1964 and was re-elected in 1966.

Nils A. Boe

As Governor, he increased aid to education, advocated property-tax cuts, promoted industrial development and helped start the state's educational television system.

In 1969 President Nixon appointed him director of the new White House Office of Intergovernmental Relations and in 1971 named him to the Customs Court, in Manhattan. He retired from the court in 1984.

Surviving are two sisters, Borghild Boe of Sioux Falls and Lois Hyslop of State College, Pa.

## Frank Yatsu

### Internment Survivor, 108

SEATTLE, Aug. 2 (AP) — Frank Yatsu, one of the oldest survivors of the internment of Japanese-Americans during World War II, died July 24 at a nursing home here, his son Charles said today. He was 108 years old.

Mr. Yatsu was among 120,000 Japanese-Americans who were sent to internment camps in 1942 after the Japanese attack on Pearl Harbor. In 1988 Congress passed a bill apologizing for the internment and authorizing payments of $20,000 to survivors. Mr. Yatsu was one of the first to receive checks and letters of apology.

Mr. Yatsu was born in Japan and immigrated to California in 1906. He spent three years in an Arizona relocation camp with his wife and family. He later moved to Seattle and worked for a window company.

Besides Charles, Mr. Yatsu is survived by two other sons, a daughter and five grandchildren.

# Nicanor Costa Méndez, 69, Aide In Argentina in the Falkland War

BUENOS AIRES, Aug. 2 (AP) — Nicanor Costa Méndez, a former Argentine Foreign Minister and a leading figure in the war for the Falkland Islands in 1982, died today, his family said. He was 69 years old.

He died of lung cancer, his family said.

A lawyer linked to right-wing nationalist groups, Mr. Costa Méndez gained prominence 10 years ago as one of the planners of Argentina's invasion of the Falkland Islands in the South Atlantic, a British colony since 1832 that Argentina calls the Malvinas.

He was then appointed Foreign Minister and the principal civilian counselor to Gen. Leopoldo F. Galtieri, then the President.

The United Nations Security Council urged Argentina to withdraw its forces, but it resisted. British forces sailed to the islands and an 11-week war ensued that ended in Argentina's surrender in June 1982.

The armed forces ousted President Galtieri immediately after the surrender, and Mr. Costa Méndez was dismissed as Foreign Minister.

"Regarding the Malvinas war," Mr. Costa Méndez said in 1985, "all I have to say is that I fought in defense of the Argentine national interest and of my country's sovereignty."

### From a Wealthy Family

A member of a wealthy, patrician Argentine family, Mr. Costa Méndez was born on Oct. 30, 1922, in Buenos Aires. He attended the University of Buenos Aires, graduating with a law degree in 1943. He went on to receive his doctorate in jurisprudence and opened a law practice here.

He served as Foreign Minister from 1966 through 1969 in another military Government, when Gen. Juan Carlos Onganía was President. An avowed anti-Communist, Mr. Costa Méndez favored close ties with the United States.

But when the United States and Western Europe sided with Britain during the Falkland war, he did not hesitate to seek the support of the Communist bloc. He flew to Cuba to attend a meeting of non-aligned nations and was received by President Fidel Castro.

In meetings of the United Nations Security Council and the Organization of American States, Mr. Costa Méndez depicted United States support for Britain in the Falkland war as a "betrayal to the rest of the Americas."

In 1983, an official board of inquiry reported that Mr. Costa Méndez had counseled the junta that the United States would remain neutral in the war, despite an explicit message from the American Secretary of State, Alexander M. Haig Jr., as the ships were moving toward the islands that the United States would support Britain.

Information on survivors was not immediately available.

## Geoffrey W. Lewis, 82, Ambassador in Africa

Geoffrey W. Lewis, a retired career diplomat who served as the United States Ambassador to Mauritania and the Central African Republic, died Saturday at a hospital in Rockland, Me. He was 82 years old and lived in nearby Cushing.

He died of complications from heart and kidney disease, his family said.

Mr. Lewis was appointed to Mauritania in 1965 and the Central African Republic in 1967, where he stayed till his retirement in 1970. His other overseas posts included assignments in Pakistan, Jordan and France and with the North Atlantic Treaty Organization.

Mr. Lewis was born in Brookline, Mass. After graduating from Harvard and studying at Trinity College in England, he became headmaster of the Browne and Nichols School in Cambridge, Mass., in 1937.

In World War II he was a United States Army colonel in London, working on post-war plans. He started at the State Department in 1946 and soon became acting chief of its German affairs bureau, specializing in war reparations, and was also the coordinator for displaced persons.

His survivors include his wife of 55 years, the former Elizabeth Locke; a son, Geoffrey Jr. of Washington; a daughter, Margaret Herbert of Llanarth, Wales; a brother, David, and sister, Edith Richards, both of Dover, Mass.; six grandchildren and one great-grandchild.

# Rae Dalven, 87, Former Professor And a Historian of Jews in Greece

By BRUCE LAMBERT

Rae Dalven, a translator of modern Greek poets and historian of Greek Jews, died on July 27 at Beth Israel Medical Center in Manhattan. She was 87 years old and lived in Manhattan.

Friends said she had been in declining health but they did not know the cause of death.

Dr. Dalven was retired as a professor of English literature and department chairwoman at Ladycliff College in Highland Falls, N.Y.

Born in Preveza, Greece, she immigrated to the United States with her family as a youngster. She graduated from Hunter College and earned a doctorate in English at New York University.

### Translated Greek Poetry

Among her translations was "Modern Greek Poetry" (Gaer, 1949). In a review, W. H. Auden wrote, "we should be very grateful to Miss Dalven for introducing us to a world of poetry which has been closed to us" by the language barrier. Mr. Auden later wrote the introductions to her "The Complete Poems of Cavafy" (Harcourt, Brace, 1961) and "The Fourth Dimension" (Godine, 1977), translating Yannis Ritsos.

Dr. Dalven also wrote two plays, the first of which, "A Season in Hell," about the French poets Rimbaud and Verlaine, was produced Off Broadway in 1950.

Last year she finished "Our Kind of People," an autobiographical play about a family of Greek-Jewish immigrants. It was performed at a synagogue in Manhattan and is scheduled for presentation this fall at a Brooklyn theater and the Greek Orthodox Cathedral in Manhattan.

### Studied Greek Jewish Group

Dr. Dalven's special interest was the history of Jews in Greece, especially the community in Ioannina in northern Greece, most of whose members were driven out during World War II. They were Romaniotes, who traced their ancestry to Palestinians and who migrated as early as 300 B.C. They retained their customs and liturgy, which differed from those of the more numerous Sephardim whose ancestors were expelled from Spain.

Dr. Dalven was the editor of "The Sephardic Scholar," a journal; a board member of the American Friends of the Jewish Museum of Greece and a past president of the American Society of Sephardic Studies and of the Sisterhood of Janina, a Romaniote group.

Her marriage to Jack Negrin ended in divorce. She is survived by several nieces and nephews.

GET THE CROSSWORD ANSWER THAT'LL HELP YOU GET THROUGH TODAY'S PUZZLE.
JUST CALL 1-900-884-CLUB.
Get answers for up to three clues.
Use a touch-tone telephone only.
75¢ for the first minute,
50¢ for each additional minute.
The New York Times

## Deaths

[redacted]

DEUTSCH—James C. Beloved son of Henry and Rose. Dear brother of [redacted]. Adored uncle of Rachel and Ian. Services Monday 12 Noon at "Guttermans" Rockville Center, LI. The courageous way James lived his life is an inspiration to all who knew him.

DOMB—Sarah. The National Council of Young Israel extends its condolences to the Domb family upon the passing of Mrs. Sarah Domb who, together with her husband Mr. Sam Domb, may he live and be well, were active in all Jewish causes. May the family be comforted together with the mourners of Zion and Jerusalem.
Chaim Kaminetzky, National President
Gerald [redacted] Chairman of [redacted]
Rabbi Ephraim [redacted] Executive Vice [redacted]
Rabbi Sholem Rubin, [redacted] Council of Young [redacted]
Mollie [redacted] President, Women's League

GANNON—Jane S. On July 31, 1992, of Forest Hills, NY. Employed by Home [redacted] since 1949. Beloved [redacted] of Sarah and the late [redacted]. Loving sister of Bernice [redacted] dear aunt of Christa [redacted] Karl Himmelmann. [redacted] Fox Funeral Home, [redacted] corner Metropolitan Ave, Forest Hills, Sunday and Monday 3-5, 7-9 PM. Funeral mass at Our Lady of Mercy Church, Tuesday August 4, 9:45 A.M. Interment in St. John's Cemetery.

GOLDBERG—Leonore Mazer. Honorary Life Member of the Anti-[redacted] League National [redacted] Dedicated and devoted [redacted] and Member of the [redacted]

[redacted]

## Deaths

Barrett, Jane
[redacted]
Brachfeld, Stanley
Brody, George
Brody, Sam
Carroll, Gertrude
Connelly, Stephen
Deutsch, James
Domb, Sarah
Gannon, Jane
Goldberg, Leonore
Kopp, Roger
[redacted]
Koppelson, Helene
Kornblith, John
Kramer, William
Lack, Beatrice
Lippner, Grace
Mendelsohn, J.
Moskowitz, Harry
Newman, Shirley
O'Rourke, Charles
Phyfe, Edwin
Resnick, Leonora
Rosenzweig, Simon
Rothstein, Nathan
Strait, Ralph
Tanzer, Beatrice
Teichman, Marsha
Tulip, Hyman
Weinberg, Morris

KOPPELSON—[redacted] 89, of FL. Passed away on [redacted] 1, 1992. Formerly of NY, Mrs. [redacted] was an active member [redacted] for Sight and [redacted] mother of Joyce [redacted] lyn). Adored [redacted] of Susan Zucker [redacted] and Eileen Goodman (Dr. [redacted] Goodman). Cherished great-grandmother of Jared, Matthew, Hayley, Rachael and Katie. Services will be today in [redacted]

MENDELSOHN—Josephine B. (Dolle), 92. Died August 2, 1992 in NYC. Wife of Walter, mother of Paul and Sue Mehling, mother-in-law of Lore Mendelsohn and Robert Mehling. Grandmother of Teri, Eric, Claude and David. No funeral service. Private cremation.

MOSKOWITZ—Harry. We record with sorrow the passing of our friend and [redacted]

[redacted]

## Deaths

PHYFE—Edwin L., of Bethesda Maryland, formerly of Larchmont New York, on July 29, [redacted] Mary Wing Phyfe and [redacted] Herbert L. Phyfe [redacted] Marina Mook. Uncle of one niece and two nephews. Graveside service Tuesday 2:30 PM Kensico Cemetery, Valhalla, New York. [redacted]

[redacted]

## Deaths

TEICHMAN—Marsha (nee Hirsch), 8/1/92. At 41, after a courageous battle with cancer. Loving mother [redacted] 14, and Baruch, 12. [redacted]

[redacted]

## In Memoriam

[redacted]

At home or on the job... start each day with The New York Times.
Call 1-800-631-2500 toll free.

Exhibit K

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# CERTIFICATE OF DEATH
## STATE OF CALIFORNIA
USE BLACK INK ONLY

| STATE FILE NUMBER | | | | | LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER |
|---|---|---|---|---|---|

| | 1A. NAME OF DECEDENT—FIRST (GIVEN) | 1B. MIDDLE | 1C. LAST (FAMILY) | 2A. DATE OF DEATH—MO, DAY, YR | 2B. HOUR | 3. SEX |
|---|---|---|---|---|---|---|
| **DECEDENT PERSONAL DATA** | JOSEPH | — | SHUSTER | Fnd July 30, 1992 | 1106 | MALE |

| 4. RACE | 5. HISPANIC—SPECIFY | 6. DATE OF BIRTH—MO, DAY, YR | 7. AGE IN YEARS | IF UNDER 1 YEAR MONTHS | DAYS | IF UNDER 24 HOURS HOURS | MINUTES |
|---|---|---|---|---|---|---|---|
| CAUCASIAN | Yes ___ [X] No | JULY 10, 1914 | 78 | | | | |

| 8. STATE OF BIRTH | 9. CITIZEN OF WHAT COUNTRY | 10A. FULL NAME OF FATHER | 10B. STATE OF BIRTH | 11A. FULL MAIDEN NAME OF MOTHER | 11B. STATE OF BIRTH |
|---|---|---|---|---|---|
| CANADA | USA | JULIUS SHUSTER | HOLLAND | IDA KAKLARSKY | RUSSIA |

| 12. MILITARY SERVICE? | 13. SOCIAL SECURITY NO. | 14. MARITAL STATUS | 15. NAME OF SURVIVING SPOUSE (IF WIFE, ENTER MAIDEN NAME) |
|---|---|---|---|
| 19 ___ TO 19 ___ [X] NONE | 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 | NEVER MARRIED | NONE |

| 16A. USUAL OCCUPATION | 16B. USUAL KIND OF BUSINESS OR INDUSTRY | 16C. USUAL EMPLOYER | 16D. YEARS IN OCCUPATION | 17. EDUCATION—YEARS COMPLETED |
|---|---|---|---|---|
| ARTIST | COMIC BOOKS | DC COMICS | 60 | 14 |

| | 18A. RESIDENCE—STREET AND NUMBER OR LOCATION | | 18B. CITY | 18C. ZIP CODE |
|---|---|---|---|---|
| **USUAL RESIDENCE** | 11944 MONTANA AVENUE #305 | | W. LOS ANGELES | 90049 |

| 18D. COUNTY | 18E. NUMBER OF YEARS IN THIS COUNTY | 18F. STATE OR FOREIGN COUNTRY | 20. NAME, RELATIONSHIP, MAILING ADDRESS AND ZIP CODE OF INFORMANT |
|---|---|---|---|
| LOS ANGELES | 14 | CALIFORNIA | JEAN PEAVY-SISTER 316 HORTON LANE N.W ALBUQUERQUE, NEW MEXICO 87114 |

| | 19A. PLACE OF DEATH | 19B. IF HOSPITAL, SPECIFY ONE: IP, ER/OP, DOA | 19C. COUNTY |
|---|---|---|---|
| **PLACE OF DEATH** | Residence | | Los Angeles |

| 19D. STREET ADDRESS—STREET AND NUMBER OR LOCATION | 19E. CITY |
|---|---|
| 11944 Montana Avenue #305 | W. Los Angeles |

| | 21. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR A, B, AND C) | | TIME INTERVAL BETWEEN ONSET AND DEATH | 22. WAS DEATH REPORTED TO CORONER? REFERRAL NO. |
|---|---|---|---|---|
| **CAUSE OF DEATH** | IMMEDIATE CAUSE (A) Congestive Heart Failure ▶ | Unk | | [X] Yes 92-06897 ☐ NO |
| | DUE TO (B) Arteriosclerotic Cardiovascular Disease ▶ | Years | | 23. WAS BIOPSY PERFORMED? ☐ YES [X] NO |
| | DUE TO (C) ▶ | | | 24A. WAS AUTOPSY PERFORMED? ☐ YES [X] NO |
| | | | | 24B. WAS IT USED IN DETERMINING CAUSE OF DEATH? ☐ YES [X] NO |

| 25. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN 21 | 26. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 21 OR 25? IF YES, LIST TYPE OF OPERATION AND DATE. |
|---|---|
| Hypertension | No |

| | I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED. | 27B. SIGNATURE AND DEGREE OR TITLE OF CERTIFIER | 27C. CERTIFIER'S LICENSE NUMBER | 27D. DATE SIGNED |
|---|---|---|---|---|
| **PHYSICIAN'S CERTIFICATION** | 27A. DECEDENT ATTENDED SINCE MONTH, DAY, YEAR — DECEDENT LAST SEEN ALIVE MONTH, DAY, YEAR | ▶ | | |
| | | 27E. TYPE ATTENDING PHYSICIAN'S NAME AND ADDRESS | | |

| | I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE AND PLACE STATED FROM THE CAUSES STATED | 28A. SIGNATURE AND TITLE OF CORONER OR DEPUTY CORONER | 28B. DATE SIGNED |
|---|---|---|---|
| **CORONER'S USE ONLY** | | ▶ Deputy Coroner Mary T. Macri | 8-07-92 |

| 29. MANNER OF DEATH—specify one: natural, accident, suicide, homicide, pending investigation or could not be determined | 30A. PLACE OF INJURY | 30B. INJURY AT WORK ☐ YES ☐ NO | 30C. DATE OF INJURY MONTH, DAY, YEAR | 31. HOUR |
|---|---|---|---|---|
| Natural | | | | |

| 32. LOCATION (STREET AND NUMBER OR LOCATION AND CITY) | 33. DESCRIBE HOW INJURY OCCURRED (EVENTS WHICH RESULTED IN INJURY) |
|---|---|

| | 34A. DISPOSITION(S) | 34B. PLACE OF FINAL DISPOSITION—NAME AND ADDRESS | 34C. DATE MO, DAY, YEAR | 35A. SIGNATURE OF EMBALMER | 35B. LICENSE NO. |
|---|---|---|---|---|---|
| **FUNERAL DIRECTOR AND LOCAL REGISTRAR** | CR/RES | RES: 11944 MONTANA AVE.,#305 W. LOS ANGELES, CA 90049 | 8/14/92 | NOT EMBALMED | NONE |
| | 36A. NAME OF FUNERAL DIRECTOR (OR PERSON ACTING AS SUCH) | 36B. LICENSE NO. | 37. SIGNATURE OF LOCAL REGISTRAR | | 38. REGISTRATION DATE |
| | PIERCE BROS WESTWOOD VILLAGE | FD-951 | ▶ Robert C. Katz LR | | AUG 10 1992 |

| | A. | B. | C. | D. | E. | F. | |
|---|---|---|---|---|---|---|---|
| **STATE REGISTRAR** | | | | | | | CENSUS TRACT |

VS-11 (REV. 3-91)                    MAKE NO ERASURES, WHITEOUTS, OR OTHER ALTERATIONS

THIS IS A TRUE CERTIFIED COPY OF THE RECORD FILED IN THE COUNTY OF LOS ANGELES DEPARTMENT OF HEALTH SERVICES IF IT BEARS THIS SEAL IN PURPLE INK.

AUG 11 1992

70                    Director of Health Services and Registrar

Exhibit L
155

119

## AFFIDAVIT OF JEAN PEAVY UNDER
## CALIFORNIA PROBATE CODE SECTION 13101

The undersigned, JEAN PEAVY, hereby affirms the following information as required by California Probate Code Section 13101:

1.    The name of the decedent is JOSEPH SHUSTER (the "decedent").

2.    The decedent died on July 30, 1992 in Los Angeles County, California.

3.    At least 40 days have elapsed since the death of the decedent, as shown in a certified copy of the decedent's death certificate attached to this declaration.

4.    No proceeding is now being or has been conducted in California for administration of the decedent's estate.

5.    The gross value of the decedent's real and personal property in California, excluding the property described in Section 13050 of the California Probate Code, does not exceed Sixty Thousand Dollars ($60,000).

6.    The affiant is the successor of the decedent, as defined in Section 13006 of the California Probate Code.

7.    The property of the decedent to be transferred and delivered to the affiant, as the successor to the decedent, is:

768 shares of Timer Warner Inc. Common Stock

8.    No other person has a right to the interest of the decedent in the described property.

9.    The affiant requests that the described property be paid, delivered or transferred to her.

10.    The affiant declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED:        August 17        , 1992

_Jean Peavy_
JEAN PEAVY

DCC00073013

**STATE OF** NEW MEXICO )

                   ) ss.

**COUNTY OF** BERNALILLO )

      On _____August 17_____, 1992, before me, a notary public for the State of _New Mexico_____, personally appeared JEAN PEAVY (___) known to me or ( X ) proved to me based on satisfactory evidence to be the person whose name is subscribed to the above instrument, and she acknowledged to me that she executed the same.

      **IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal on the day and year first above written.

SEAL:

Barbara Newson

Notary Public for the
State of _New Mexico_____

OFFICIAL SEAL
BARBARA NEWSON
NOTARY PUBLIC
STATE OF NEW MEXICO
Commission Expires 3-13-94

2.

**Exhibit M**
**157**

DCC00073014

Mr. Frank Shuster
98-120 Queens Blvd., Apt. 4K
Rego Park, NY  11374
October 2, 1992

Mr. Paul Levitz
Executive VP & Publisher
DC Comics
1325 Avenue of the Americas
New York, NY  10019

Dear Mr. Levitz:

   In consideration of the agreement dated as of August 1, 1992
between DC Comics, myself and Jean Shuster Peavy, I hereby waive
any rights or remedies that I may have under the agreement dated
December 23, 1975 between Warner Communications Inc., Jerome Siegel
and Joseph Shuster.

                                Very truly yours,

                                *Frank Shuster*

                                Frank Shuster

Confidential

WB007972

**Exhibit N**
**158**

DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz/Executive Vice President & Publisher

Dated as of August 1, 1992

Mr. Frank Shuster
98-120 Queens Blvd., Apt. 4K
Rego Park, NY  11374

Ms. Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque, NM  87114

Dear Mr. Shuster and Ms. Peavy:

This is to confirm our agreement to pay you, collectively, a total of $25,000 a year, payable to Jean Shuster Peavy, commencing as of August 1, 1992, for as long as either one of you is alive.  Such amounts shall be payable in accordance with Warner Communication Inc.'s customary payroll practices and shall be subject to all applicable withholding taxes. If Jean Shuster Peavy shall predecease Frank Shuster, then the foregoing payments shall be made to Frank Shuster for as long as he shall live.

We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

If, despite the terms of this agreement, either of you assert any such claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement.  We also reserve all of our other rights, remedies and defenses in such an event.

If after full consideration of the foregoing, you accept and agree to all of the above, please so indicate by signing below where indicated.

Very truly yours,

DC Comics

By: _____
Paul Levitz

ACCEPTED AND AGREED TO:

_Frank Shuster_
Frank Shuster                          Dated:  10/2/92

_Jean Shuster Peavy_
Jean Shuster Peavy                     Dated:  10/2/92

Exhibit O
159

8



DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401



Paul Levitz/Executive Vice President & Publisher

November 5, 1992

Mrs. Jean S. Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

Thanks for the congratulations. Both Garret and his mom are doing fine, and I'm now back at work.

I appreciate your concerns about the impact of taxes on your income, but I confess the math seems illogical to me. If we were paying the income directly to Frank, who you said pays no income tax now, I believe even in New York's high tax environment on that modest an income he'd pay less than 25% in taxes. I don't know New Mexico's situation, or your finances, but I'd be surprised to find a 45% impact.

In any case, I've discussed your request with Martin Payson, and we feel that with the added $25,000 or more that we're paying out to help with Joe's final bills, and having set the income to you and Frank significantly above the level our settlement with Joe required, we've demonstrated Time Warner's good faith and consideration amply for now. We'd like to suggest that after the final bills are settled, and you have actually gone through a tax filing based on this income (presumably the 1993 tax year filing due in early 1994), we consider the matter again. You can then show us the actual tax impact, and we will then consider making an adjustment if there's an undue burden.

I hope the rest of your tour went well, and that you find all well on your return home.

Sincerely,

Paul Levitz

:lf
cc: Martin Payson



A division of Warner Bros. Inc.—A Time Warner Company

DCC00006439

**Exhibit P**

**160**



DC COMICS
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz, Executive Vice President & Publisher

September 7, 1993

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

I'm sorry to have taken a few weeks to reply to your letter of July 10th, but as you may know, summer is comic convention time as well as vacation time, and our offices are both deserted and chaotic during this season.

As I hope you recall from our meetings in New York, we've done extensive research into the copyright act and any potential rights that you and Frank may have as Joe's siblings and survivors. It is our firm conviction based on that research and expert counsel, that you don't have any legal rights or claims whatsoever.

Nonetheless, we do recognize the fact that Joe would want you to benefit from his great creativity and we have acted accordingly. As you know, Joe's agreement with Warner Communications (and thereby Time Warner and DC) only required us to pay $5,000 a year to Frank after Joe's death. During the 16 years that agreement was controlling, Joe did not ask us to increase that amount. After his death, we raised $5,000 to $25,000 a year without any legal obligation to do so, in deference to Joe's memory and your role in his life.

When you asked us to raise the amount to gross you up for what seemed to be an unlikely effect of taxes, I promised that we would review the effect of the taxes on you after you had experienced the IRS's effect on a year of the income. In the spring, when you and Frank have filed your taxes, I'll be happy to examine your situation in detail and we'll discuss the results of our examination with you.

In the meantime, we are not prepared to consider your request that you receive the same income that Jerry and Joanne Siegel are receiving. Perhaps Joe would have wanted that, but during his long relationship with us he gave no indication of that desire. And even if he had, in fairness, there is a vital difference between being the actual co-creator of Superman and being his surviving family. Jerry and Joe were, in every way, in a class by themselves.

We are, however, pleased that the launch on September 12th of the new Lois & Clark: The New Adventures of Superman television series will give a new generation a new chance to fall in love with Jerry's and Joe's wonderful creation. In celebration of that



Confidential

WB007959

**Exhibit Q**

occasion, we're pleased to enclose a bonus check for $25,000 for you and Frank to enjoy as you watch the premiere.

Best,

Paul Levitz

:lf

cc: Frank Shuster

Confidential

WB007960



DC COMICS
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

July 11, 1994

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Frank Shuster
98-120 Queens Boulevard
Apartment 4K
Rego Park NY 11374

Dear Jean and Frank:

It was nice to have you visit in May, and I'm pleased to see that you're both well. I've finally had an opportunity to discuss your various requests with my colleagues, and would like to share our feelings with you.

While we have a great deal of personal sympathy for your desire to take care of Joe's nephew, niece and her family as you would have hoped (or expected) Joe to respond had he lived, we can't accept that as our corporate responsibility. We have acted in what we believe is a fair and decent, even generous, manner to you beyond our contractual obligations to you both in the spirit of our agreement with Joe. While he may have been willing to go even further, we can't act in his stead. We must, therefore, decline to either raise your annual stipend by the eight or nine thousand dollars you requested or to add an ongoing cost of living formula.

We are willing, however, to share the good fortune that Superman brings us with the family of his creators. We're pleased to acknowledge our pick-up for a second season of LOIS & CLARK: THE NEW ADVENTURES OF SUPERMAN (which happened the day you came in) with the enclosed bonus check for $10,000. On behalf of the DC, Warner Bros. and Time Warner team, we want you to feel Joe's genius is remembered and honored.

I hope that other occasions will arise in future years which we will find suitable for material acknowledgement that can assist your family, but we cannot promise to do more than consider them as they may occur.

Wishing you both continued health and happiness,

Best,

Paul Levitz

:lf

Redacted



A division of Warner Bros.–A Time Warner Entertainment Company

DCC00006420

**Exhibit R**
**163**



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher



June 7, 1995

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque  NM  87114

Dear Jean:

We've recently received official word of the pick up of LOIS & CLARK: THE NEW ADVENTURES OF SUPERMAN for a third season, and wanted to share our success with you and Frank.  Enclosed please find a bonus check for $10,000, continued honor of Joe's wonderful co-creation.

Hope all else is well with you and yours.

Best,

Paul Levitz

:lf

cc: Frank Schuster

A division of Warner Bros.–A Time Warner Entertainment Company

· DCC00006414

**Exhibit S**
**164**