

# Copyright Research Report

:lient Name: George Zadorozny, Esq.

Attention:

Date Received: 2/23/96

Date Mailed: 2/29/96

Property Searched: **SUPERMAN**

For: Comic Magazine

Analyst: Jerry L. Robb

Scope of Search: Full

Service: __X__ Reg. ____ Expedited

Acceptance and reliance upon this report by the client constitutes an acceptance of its terms, conditions and limitations. Any liability arising out of the preparation of this report is limited to a refund of the search fee paid.

We have taken all reasonable steps to ensure the completeness and accuracy of this report; however, due to the highly subjective nature of copyright and title searching we cannot otherwise guarantee these results. This search is valid only for the property or title noted above. If the property or title which was the subject of this search is changed, even slightly, a new search should be conducted. Please note that this report in no way constitutes a legal opinion.

Thomson & Thomson

COPYRIGHT RESEARCH GROUP, 1750 K St., N.W., Suite 200, Washington, DC 20006-2305
Telephone: (202) 835-0240 (800) 356-8630 FAX: (202) 728-0744

Redacted

Thomson & Thomson

February 29, 1996

<u>VIA TELECOPIER</u>
<u>VIA OVERNIGHT DELIVERY</u>

George Zadorozny, Esq.
Business Center
3780 Tampa Road
Oldsmar, Florida 34677

Copyright Report - SUPERMAN

Dear Mr. Zadorozny:

A search of the records of the Copyright Office and the records and files of this office reveals that the character known as **SUPERMAN** created by Jerry Siegel and Joe Shuster, first appeared in <u>Action Comics</u>, No. 1, issue of June 1938, with copyright secured on the blanket copyright on this periodical in the name of Detective Comics, Inc. as of a publication date of April 18, 1938, under entry No. B: 379787. The copyright in the story entitled **SUPERMAN** was separately renewed in the names of Jerome Siegel and Joe Shuster, claiming as authors, April 19, 1965, under entry No. R: 361642. It was also renewed in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire, June 1, 1965, under entry No. R: 362188.

The story as originally published in <u>Action Comics</u> was reportedly incomplete, but was later republished in its entirety in the summer of 1939 as the comic book **SUPERMAN**, Vol. 1, No. 1. Although we find no record of copyright registration or subsequent renewal of a work identified as Vol. 1, No. 1 of this periodical, the records do contain a registration for a work entitled **SUPERMAN (THE COMPLETE STORY OF THE DARING EXPLOITS OF THE ONE AND ONLY SUPERMAN)**, by Jerome Siegel and Joe Shuster, which was **registered for copyright** in the name of Detective Comics Inc., as of a publication date of May 18, 1939, under entry No. AA: 299871. This copyright was renewed in the name of National Periodical Publications, Inc., claiming as proprietor of copyright in a work made for hire, July 1, 1966, under entry No. R: 388937.

1750 K Street NW, Suite 200 Washington, D.C. 20006-2305 Telephone: 800-356-8630, 202-835-0240 Fax: 800-822-8823, 202-728-0744

Washington, D.C. • Boston • New York • Chicago • Los Angeles • Antwerp • London • Paris • Montreal • Toronto

The character **SUPERMAN** made its debut as a daily comic strip on January 16, 1939, and as a Sunday strip on November 5, 1939. It was distributed by and **registered for copyright** in the name of the McClure Newspaper Syndicate, through September 30, 1949. Beginning in October 1949, the strip was drawn by Wayne Boring, and **registered for copyright** in the name of National Comics Publications, Inc. Beginning in 1958, the strip was drawn by Curt Swann, and **registered for copyright** in the name of Superman, Inc. In 1961, the strip was **registered for copyright** in the name of National Periodical Publications Inc. It was discontinued in 1967. These copyrights were renewed in the names of Jerome Siegel and Joe Shuster, claiming as authors. The copyrights in the comic strips originally published through 1943 were renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications Inc., claiming as proprietors of copyright in a work made for hire. Thereafter, renewals were made in the name of National Periodical Publications Inc., and later, beginning with the 1950 releases, in the name of DC Comics Inc.

Redacted

The character **SUPERMAN** continued to be presented in Action Comics, issues of which were **registered for copyright** in the name of Detective Comics, Inc., with the story entitled **SUPERMAN** renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire, through the 1943 issues.

The comic book **SUPERMAN** was published quarterly and **registered for copyright** in the name of Detective Comics Inc. through the issue of Spring 1940. Beginning in the summer of 1940, the comic book was published bimonthly, and **registered for copyright** in the name of Superman Inc. Beginning in February of 1946, the comic book was **registered for copyright** in the name of National Comics Publications Inc. through 1949, when it was again **registered for copyright** in the name of Superman Inc. Beginning in 1950, registrations began in the name of National Periodical Publications Inc.; beginning in 1976, issues were **registered for copyright** in the name of DC Comics Inc. In 1986, the title of the comic book was changed to **THE ADVENTURES OF SUPERMAN.** The copyrights in the issues published through 1943 were renewed both in the names of Jerome Siegel and Joe Shuster, claiming as authors, and in the name of National Periodical Publications, claiming as proprietor of copyright in a work made for hire. Thereafter, renewals were made only in the name of National Periodical Publications Inc., and, beginning with issues published in 1950, in the name of DC Comics Inc, claiming as proprietor of copyright in a work made for hire. Renewal registrations continue to be made in the name of DC Comics, Inc., through the present.

A series of 14 prints by Jerry Siegel and Joe Shuster, with titles such as **SUPERMAN ATTACKING AN AEROPLANE IN MIDAIR**, **SUPERMAN CARRYING A MAN UNDER EACH ARM**, were **registered for copyright** in the name of Superman Inc. as of a publication date of July 26, 1940. We find no record of renewal for these copyright registrations.

A comic book entitled **SUPERMAN-TIM** commenced publication on August 1, 1942, and was **registered for copyright** in the name of Superman Inc. From 1947 through 1950, this periodical was **registered for copyright** in the name of National Comics Publications Inc. These copyrights were renewed in the name of National Periodical Publications Inc., claiming as proprietor of copyright in a work made for hire.

In addition to the above-referenced comic books, several other comic books featuring the character have been published, including **SUPERMAN ANNUAL**, later **SUPERMAN - THE MAN OF STEEL ANNUAL** (1964 - present); **SUPERMAN'S GIRLFRIEND, LOIS LANE** (1958-1974); and **SUPERMAN'S PAL, JIMMY OLSEN** (1954 - 1974), retitled **THE SUPERMAN FAMILY** (1974 - until at least 1984), which were originally **registered for copyright** in the name of National Periodical Publications Inc., and later in the name of DC Comics Inc.. Renewals are being made as they come due in the name of DC Comics Inc. A comic book entitled **SUPERMAN: THE MAN OF STEEL** commenced publication in 1991, with issues **registered for copyright** in the name of DC Comics Inc.

A novel entitled **SUPERMAN**, by George Lowther, based on the cartoon character, and illustrated by Joe Shuster, was **registered for copyright** in the name of Superman, Inc., as of a publication date of November 2, 1942, under entry No. A: 168596. We find no record of renewal for this copyright registration.

An anthology entitled **SUPERMAN - FROM THE THIRTIES TO THE SEVENTIES**, with an introduction by E. Nelson Bridwell, was published by Crown Publishers and **registered for copyright** in the name of National Periodical Publications Inc., as of a publication date of December 14, 1971, under entry No. A: 303583. The application authors are E. Nelson Bridwell and Carmine Infantino. Copyright is claimed on dedication, introduction and compilation.

A book entitled **THE DEATH OF SUPERMAN**, by Dan Jurgens, Jerry Ordway, Louise Simonson, and Roger Stern, was created in 1992, published December 1, 1992, and **registered for copyright** in the name of DC Comics (employer for hire), February 22, 1993, under entry No. TX: 3-496-004. Copyright is claimed on selection and compilation.

A novel entitled **THE DEATH AND LIFE OF SUPERMAN**, by Roger Stern, was created in 1992, published by Bantam Books, August 2, 1993, and **registered for copyright** in the name of DC Comics (employer for hire), September 28, 1993, under entry No. TX: 3-640-100.

A work entitled **SUPERMAN** (spine title: **SUPERMAN STYLE GUIDE**) was created in 1991, published November 11, 1991, and **registered for copyright** in the name of DC Comics, Inc., December 18, 1991, under entry No. TX: 3-221-758. Copyright is claimed on new graphics of old and new characters, new artwork and text.

Another work, entitled **SUPERMAN BETTER THAN EVER** (application title **SUPERMAN, BETTER THAN EVER STYLE GUIDE**), containing text and illustrations, was created in 1993 and **registered for copyright** as an unpublished work in the name of DC Comics, July 16, 1993, under entry No. TXU: 579-563. Copyright is claimed on new graphics of old and new characters, new art and new text.

Numerous other **"Superman"** works, including books, single-issue comic books, coloring books, cut-out books, puzzles, etc., have been published and **registered for copyright** over the years, generally in the name of Superman, Inc., National Comics Publications Inc., National Periodical Publications, Inc., and most recently in the name of DC Comics Inc.

The comic magazine entitled **SUPERMAN** is still being **registered for copyright** in the name of D.C. Comics, Inc.

## Derivative Works

The records disclose a radio program, several motion pictures and several television series featuring the character **SUPERMAN**.

## Recorded Instruments

By instrument dated **September 12, 1946**, recorded February 18, 1948, in Vol. 659, pages 48-77, it is recited that by an agreement dated August 15, 1940, Detective Comics Inc. had granted a license to Fleisher Studios to produce and release one-reel cartoons based on the comic strip **SUPERMAN**, but by a supplemental document, Paramount recites that it failed to exercise the option provided under an agreement dated April 22, 1941, relating to these cartoons and, accordingly, that

Superman, Inc. had the right to produce and release motion pictures of any kind, based on the "Superman" material. Paramount reserved from this declaration such rights as it originally had acquired in the seventeen one-reel cartoons produced under the earlier agreement. The 1946 instrument thereupon recites the terms of the agreement between Detective Comics Inc. and Columbia Pictures Corporation, whereby Columbia was granted the right to produce a serial photoplay of not more than fifteen episodes based on the "Superman" material, both present and future, and the right to produce a feature photoplay therefrom for release in Europe, the United Kingdom and certain other countries abroad with such rights to endure exclusively for a period of two and one-half years after the release of the first episode of the serial and for an additional three years thereafter.

By instrument dated **February 24, 1947**, recorded March 25, 1947, in Vol. 626, pages 5-10, Superman, Inc., Detective Comics Inc. and other publishing companies were merged into National Comics Publications, Inc. and all the copyrights in the cartoon strips published by such earlier companies were assigned to National Comics Publications, Inc.

There is of record a Final Judgment dated **May 21, 1948**, recorded June 1, 1965, in Vol. 1207, pages 1-12, wherein the New York court dismissed the complaint of Jerome Siegel and Joe Shuster, and adjudged that National Comics Publications, Inc. was the sole and exclusive owner of the **SUPERMAN** comic strip material and certain related rights. (See the "Litigation" section of this report for additional information.)

Redacted

By Assignment and Consolidation dated **January 20, 1966**, recorded February 4, 1966, in Vol. 1222, pages 348-369, National Periodical Publications Inc., successor in interest to Detective Comics Inc. and National Comics Publications, Inc., reciting that by an instrument (attached as "Exhibit A") dated July 3, 1944, McClure Newspaper Syndicate assigned to Detective Comics, Inc. all its right, title and interest in all copyrights in **SUPERMAN**, including the copyrights and all renewals and extensions thereof; that by an instrument (attached as "Exhibit B") dated September 30, 1946, Detective Comics, Inc., was consolidated with other corporations into National Comics Publications, Inc.; that by an instrument (attached as "Exhibit C") dated June 29, 1961, National Comics Publications Inc. was consolidated with another corporation into National Periodical Publications, Inc.; that National Periodical Publications, Inc., thereby became vested with all the properties of Detective Comic, Inc., and National Comics Publications, Inc.; thereby stated that it is the owner of and is vested with title to all of the copyrights (and renewals and extensions thereof) in the artistic and literary works

Redacted

consisting of newspaper cartoon strips or continuities entitled **SUPERMAN** which the McClure Newspaper Syndicate had from the first day of publication to July 3, 1944.

By Mortgage and Assignment of Copyright dated **December 21, 1979** and **May 2, 1980**, recorded May 6, 1980, in Vol. 1786, pages 201-214, Film Export A.G. mortgaged and assigned to N.V. Slavenburg's Bank all its right, title and interest in the copyrights and other property listed on an attached Schedule A, and all renewals and extensions of such copyrights, as security for a loan pursuant to the terms of a Loan agreement and Security Assignment dated December 21, 1979 among Film Export AG, International Film Production, Inc., Dovemead Limited, Mr. Alexander Salkind, and N.V. Slavenburg's Bank, to which this instrument is subject. The document further states that the assignor's rights derive from the Agreement between National Periodical Publications, Inc., and Film Export AG dated November 6, 1974, and that, pursuant to an agreement made January 15, 1975, Film Export AG granted to Film Trust S.A. the sole and exclusive right and license to exercise such rights of Film Export AG under the License Agreement to produce two films entitled **SUPERMAN** and **SUPERMAN** II; by an assignment dated January 31, 1977, Film Trust S.A. assigned to International Film Production Inc. all of its right, title, and interest under the Film Trust Agreement; by agreement dated January 31, 1977, as subsequently modified, International Film Production Inc. granted to Film Export AG the exploitation rights in the two films; pursuant to an Agreement dated May 10, 1978 between International Film Production Inc. and Dovemead Limited, International Film Production Inc. engaged Dovemead Ltd. to make the films, and Dovemead granted to International Film Production Inc. the entire copyright and all rights therein. Schedule A enumerates the collateral, including all right, title and interest of Film Export A.B. in and to a license to produce, exhibit and distribute any number of motion picture based on the name, title, characterizations of **SUPERMAN** and other characters as part of the "Superman family", on radio, television and other entertainment media. Attached to the document is a list of Warner distribution agreements relating to **SUPERMAN** I and **SUPERMAN** II.

By Mortgage and Assignment of Copyright dated **December 21, 1979** and **May 2, 1980**, recorded May 6, 1980, in Vol. 1786, pages 215-228, International Film Production, Inc., executed a similar document to N.V. Slavenburg's Bank.

By Mortgage and Assignment of Copyright dated **December 21, 1979**, and **May 1, 1980**, recorded May 6, 1980, in Vol. 1786, pages 229-242, Dovemead, Ltd. executed a similar document to N.V. Slavenburg's Bank.

By Short-Form Collateral Assignment of Rights dated **December 31, 1985**, recorded January 9, 1986, in Vol. 2159, pages 293-295, Cantharus Productions, N.V. assigned to Tri-Star Pictures, Inc., (1) all of its rights in and to that certain Rights Agreement regarding film right to the character **SUPERMAN** and other characters between Tri-Star's predecessor-in-interest, Film Export A.G., and D.C. Comics, Inc. (formerly known as National Periodical Publishing Inc.) dated November 6, 1974, and any motion pictures produced after November 5, 1985 under the authority of and based on the rights granted in that Rights Agreement, but excluding all rights subject to options in favor of Warner Bros, Inc. and any agreements between Warner and Cantharus or its predecessors-in-interest previously entered into and all rights and options in favor of The Cannon Group Inc. or Cannon Productions N.V. under that memorandum agreement dated May 21, 1985 between Alexander Salkind, on behalf of Cantharus, and Yoram Globus and Menahem Golan, on behalf of Cannon, and (2) all of its right, title and interest in or to the Cannon Agreement and all benefits accruing thereunder, all sums or other distributions paid or payable to and rights and options reverting to or held by Cantharus pursuant to the Cannon Agreement, and all motion pictures produced pursuant to the Cannon Agreement to the extent that Cantharus has any interests therein, all as more fully described in that certain Indemnity Agreement dated as of July 1, 1985.

Redacted

There is recorded an undated statement recorded September 20, 1994 in Vol. 3029, page 75, from Warner Brothers, a division of Time Warner Entertainment Company, L.P. (by Nils Victor Montan, assistant secretary) declaring that it is the sole and exclusive owner of all rights in and to the **SUPERMAN** motion pictures, television programs, etc. and owns sole and exclusive rights to any and all future **SUPERMAN** motion pictures, television programs, animated cartoons, etc. whether or not they are deemed sequels to the currently titled **SUPERMAN V** motion picture.

No further document affecting any right, title or interest in the comic magazine or the character entitled **SUPERMAN** is found of record in the Copyright Office. However, the records disclose numerous documents recorded in connection with the various adaptations of the comic magazine.

## Biographical Information

Joseph Schuster died in August 1992 at the age of 78. We have no information with regard to his heirs and the records of the Copyright Office do not disclose an address for them.

Jerome Siegel was born in Cleveland, Ohio on October 17, 1914 and died in Los Angeles, California on January 30, 1996. According to his obituary, he was married and had one son and one daughter. The records of the Copyright Office do not disclose an address for his heirs. In 1986 he was living at 11928 Darlington Avenue, Apartment 102, Los Angeles, CA 90049.

## Notes

If we may be of any further assistance to you, or if you have any questions regarding this report, please do not hesitate to contact me at 1-800-356-8630 (ext. 3312).

Sincerely yours,

Jerry L. Robb

JLR/kah/dms



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

March 25, 1996

Jean Shuster Peavy
316 Horton Lane NW
Albuquerque NM 87114

Dear Jean:

I'm please to inform you that we;ve had an early pick-up for LOIS & CLARK: THE NEW ADVENTURES OF SUPERMAN for the season beginning this fall. The show's done very well in the ratings, and has made it up to the top 20 shows. In continuing recognition of Joe's contribution to our success, we're enclosing a check for $10,000 for you and Frank.

I hope all else is well with you and your family.

Sincerely,

Paul Levitz

:lf

cc: Frank Shuster

A division of Warner Bros.–A Time Warner Entertainment Company

DCC00006375



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

July 9, 1998

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114-1053

Dear Jean:

Thanks for the offer of coming out to the San Diego Con. We're not planning any major events around Superman at the convention, so we'll decline the offer, but I have reopened the question of a raise or bonus with my colleagues, and I'm pleased to enclose a check for $10,000 based on the Superman animated series' success.

If you and Warren decide to come out to San Diego for the fun of it, please let me know and we'll roll out the hospitality wagon.

Best,

Paul Levitz

:lf
enclosure

AGREEMENT

THIS AGREEMENT dated December 18, 1998 between WARNER BROS., a division of Time Warner Entertainment Company, L.P., a Delaware corporation (herein called "Purchaser") and HASBRO, INC., a Rhode Island corporation, and HASBRO INTERNATIONAL, INC., a Massachusetts corporation (herein collectively called "Owner"):

WITNESSETH:

1. Option:

(a) In consideration of the sum of Fifty Thousand Dollars ($50,000) payable to Owner upon execution hereof, Owner hereby grants to Purchaser the sole, irrevocable and exclusive option (the "Option") for the period commencing on the date hereof and continuing until eighteen (18) months after the date of Purchaser's receipt of an executed copy of this Agreement (the "Initial Option Period") to acquire upon and pursuant to the terms and conditions of this Agreement, the rights specified in Paragraph 3 hereof in and to the "Property" (as such term is defined in Paragraph 2 below). For purposes of calculating the Initial Option Period, the date of Purchaser's receipt of the executed copy of the Agreement shall be deemed to be the date which is six (6) weeks prior to the date of Purchaser's actual receipt. The Initial Option Period may be extended by Purchaser for an additional twelve (12) months (the "Extended Option Period") by the payment to Owner of an additional $50,000 at any time prior to expiration of the Initial Option Period. The Initial Option Period and the Extended Option Period (if applicable) shall be referred to herein collectively as the "Option Period." The payment for the Initial Option Period shall be applicable against, and deducted from, the Purchase Price set forth in paragraph 9 below.

(b) Purchaser may exercise the Option at any time during the Option Period by giving Owner written notice accompanied by the payment specified in subparagraph 9(a) hereof. Subject to Owner's consultation and approval rights hereunder, Purchaser shall have the right during the Option Period to cause screenplays, scenarios, treatments, scripts and other material based in whole or in part upon the Property to be written, developed and/or composed by such person or persons as Purchaser may in its sole discretion determine, and to conduct such other preproduction and development activity as Purchaser may desire. If Purchaser does not exercise the Option, Purchaser shall not have the right for any purpose to use or authorize others to use any material so developed by or for Purchaser based in whole or in part upon the Property.

1A. Progress to Production: Purchaser acknowledges that it has entered into that certain Producer Loanout Agreement (the "Producer Agreement") dated March 17, 1999 with Threshold Entertainment, Inc. (f/s/o Larry Kasanoff) ["Employer"]. Purchaser further acknowledges that subparagraph 1(c) of the Producer Agreement contains a progress to production whereby Employer may provide Purchaser with a written notice after any consecutive sixty (60) day period during which Purchaser is not in active development of Picture #1 (as such term is defined in subparagraph 2(b) below). "Active development" is specifically defined in subparagraph 1(c) of the Producer Agreement. If Purchaser fails to resume active development of Picture #1 within thirty (30) days of Employer's written notice, then Picture #1 shall be put into turnaround to Employer and Purchaser shall have no further rights in and to the Property.

2. Definition of Certain Terms:

(a) "Property" as used herein shall mean the following:

(i) The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters comprising the line of toys known as "G.I. JOE" created or manufactured and exploited by Owner, its affiliates, licensees and agents before or during the "Production Period" (as such term is defined in Paragraph 5 below) as set forth in Exhibit "A" attached hereto and incorporated herein by reference. In the event Purchaser wishes to use characters not set forth on Exhibit "A", Owner shall use reasonable good faith efforts to obtain the necessary clearances and other third party consents so that such other characters may be used by Purchaser upon the same terms as provided herein.

(ii) The names, titles, characterizations, literary descriptions, artwork and three dimensional representations of all fictional locations, fictional vehicles and other conveyances and devices depicted, contained and/or relating to the "G.I. JOE" line of toys referred to in (a) above, as set forth in Exhibit "A". In the event Purchaser wishes to use locations, fictional vehicles and other conveyances and devices not set forth on Exhibit "A", Owner shall use reasonable good faith efforts to obtain the necessary clearances and other third party consents so that such other locations, fictional vehicles and other conveyances and devices may be used by Purchaser upon the same terms as provided herein.

(iii) Except for any elements originated in any animated series based on the Property, including, without limitation, the series produced by Gunther-Wahl, Sunbow and DIC, all literary, dramatic, photographic, artwork and physical replications, descriptions and other material relating to the foregoing, and the themes, plots, situations, sequences, pictorial action,

dialogue lines, sketches, figurines, models and replicas contained in such line of toys and related materials and any future versions or adaptations thereof to the extent Owner or an affiliate of Owner owns or controls such future versions or adaptations (Owner being obligated to advise Purchaser of any restrictions).

(b) "Picture" means any live action feature-length theatrical motion picture produced hereunder, whether based on the Property or a prior Picture or any element thereof. The first Picture is referred to as "Picture #1" and subsequent motion pictures are referred to as "Picture #2," "Picture #3," etc.

(c) "New Character" means a character, vehicle or accessory created by or for Purchaser.

(d) "Sequel" means any Picture produced after Picture #1 which contains:

(i) one or more "G.I. JOE" characters, vehicles or accessories; and/or

(ii) A "New Character" which makes use of an identifying characteristic of a "G.I. JOE" character, vehicle or accessory;

whether or not such Picture has a substantially different story than that contained in Picture #1.

3. Rights Granted: Without limiting the generality hereof, Owner hereby grants the following rights to Purchaser, solely and exclusively, but subject to Purchaser's exercise of the Option and Purchaser's payment of the sum due under subparagraph 9(a) and subject further to the other terms, conditions and limitations of this Agreement, including the restrictions on the grant of rights to Purchaser and the exclusions from the grant hereunder and from the Property of those items and properties as set forth in Exhibit "B" attached hereto and incorporated herein by reference:

(a) The right, but only during the Production Period, to produce first class, live action, theatrical motion pictures based upon, incorporating and/or adapted from the Property and recorded originally in the English language. Notwithstanding the foregoing, any Picture produced hereunder may contain animated titles, animated effects and other incidental animation.

(b) The right in perpetuity to distribute and exploit Pictures produced hereunder in any and all media (whether now known or hereafter devised), in any and all languages throughout the universe.

(c)    Solely in connection with motion pictures based upon the Property produced hereunder and the advertising and exploitation thereof, the right to produce sound recordings of or based upon all or any part of the Property, including, without limitation, motion picture soundtrack albums; and the right in its sole discretion to synchronize original music (whether or not based upon the Property) with any Picture produced hereunder and to exploit such original music (whether or not in connection with motion pictures produced hereunder) in all media now known or hereafter devised, including, without limitation, motion picture soundtrack albums. Purchaser hereby grants to Owner at no cost, to the extent of Purchaser's rights in such music (Purchaser making no representation that it will be the exclusive owner thereof), a non-exclusive synchronization and master use license for any original music owned or controlled by Purchaser and used in any Picture (or soundtrack album therefor) to be used by Owner in connection with the advertising and/or promotion of Owner's (as opposed to Owner's licensees') line of products relating to the Property or in connection with Owner's merchandising rights in the Pictures set forth in subparagraph 4(b) below. (The parties acknowledge and agree that Owner does not generally control the right to use music from previous productions based on the Property and the rights to use such music are not included in the grant to Purchaser herein.)

(d)    Solely in connection with Pictures based upon the Property produced hereunder and the advertising, publicity and exploitation thereof, the right to adapt, use, dramatize, arrange, change, vary, modify, alter, transpose and make musical or non-musical versions of the Property and any parts thereof; to add to, interpolate in and subtract or omit from the Property, characters, language, plot, theme, scenes, incidents, situations, action, titles, dialogue, songs, music and lyrics; to translate any of the foregoing into all languages; to include in Pictures, sound records and other items provided for in this Paragraph 3 such language, speech, songs, music, lyrics, dancing, choreography, sound effects, action, situations, scenes, plot, dialogue, incidents, characters, characterizations, and other material (whether or not based upon or taken from the Property) as Purchaser in its uncontrolled discretion may deem advisable, it being the intention hereof that, except as otherwise expressly stated herein, Purchaser shall have the exclusive, absolute and unlimited right to use the Property and each and every part thereof for live action, theatrical motion picture purposes and all other purposes granted hereunder in connection with such Pictures and the advertising and exploitation thereof as Purchaser in its uncontrolled discretion deems advisable, specifically including, without limitation, the right, subject to Paragraph 5 hereof, to produce live action, theatrical motion pictures which are remakes of or sequels to Pictures previously produced hereunder.  Owner waives the benefits of any provision of law known as "droit moral" or any similar laws, and agrees not to institute, support, maintain or authorize any action or lawsuit on the ground that any motion pictures or sound records, or other items produced hereunder in any way constitute any of Owner's droit moral or a defamation or mutilation of any part

thereof, or (subject to Paragraph 8 below) contain unauthorized variations, alterations, modifications, changes or translations. Subject to subparagraphs 3(c), 4(b) and 4(e) hereof (and notwithstanding the expiration of the Production Period) and subject to all of the terms and conditions of this agreement, Owner shall not have any right, title or interest whatsoever in or to any plot, story, character, music, lyrics, dialogue, screenplay, logo or other material of any kind created by or for Purchaser in the exercise of its rights hereunder, or in or to any Picture produced hereunder.

(e) Solely in connection with the advertising, publicity and exploitation of Pictures produced hereunder, the right to broadcast excerpts from the Property and all or any part of any motion picture or sound record produced hereunder by radio and television, or otherwise, whether by living actors, electrical transcription, film, tape or otherwise, in any language.

(f) The right, solely for the purpose of advertising and promoting the Pictures produced hereunder, to produce and publish as serials or otherwise (with or without illustrations) stories, synopses, excerpts, summaries, fictionalizations and novelizations, not to exceed 7,500 words in length, of and from the Property; and, subject to all of the other terms and conditions of this agreement, the right to utilize drawings, pictorial actions or expressions and physical replications of any characters or other elements of the Property in connection with advertising, publicizing and exploiting Pictures produced hereunder.

(g) Subject to Owner's consultation and approval rights hereunder, the right to write and prepare screenplays, teleplays, treatments, storyboards, plans specifications and designs for Pictures and sound records produced hereunder, and to cause musical compositions, including both original music and words and music utilizing or based upon or adapted from all or any part of the Property or any title or titles thereof (subject to subparagraph 3(c) above) to be written and composed and to include such musical compositions solely (except in the case of original music, which may be exploited by Purchaser in all media) in Pictures and sound records produced hereunder.

(h) Subject to the terms and conditions of this agreement, including without limitation subparagraphs 4(b) and 4(e) hereof (and except for "G.I. JOE" characters, devices and accessories and New Characters), the right to copyright Pictures, sound records, musical compositions, screenplays, teleplays, and all other items created by or for Purchaser pursuant to this Paragraph 3, and to secure copyright and/or trademark registration and protection thereof in all countries and territories where such protection is available in Purchaser's own name, or otherwise, together with the right to manufacture copies thereof and to distribute, sell, lease, license, exhibit, transmit, broadcast, project, reproduce, publish, use, perform, advertise, publicize, market, exploit, turn to account and

derive revenue in any form or manner therefrom without any territorial restriction whatsoever by any and all media, methods, systems and processes now or hereafter known, invented, used or contemplated, and the right to import or export such copies into or out of any territory without restrictions. It is further expressly understood and agreed that Pictures, sound records and all other items produced hereunder shall constitute independent derivative works, and Purchaser and its successors, permitted assigns and licensees shall have the perpetual right to exercise the rights granted in this subparagraph (h) with respect to Pictures produced hereunder irrespective of the expiration, termination, transfer or renewal of any copyright owned or controlled by Owner or any assigns of Owner or the reversion of any rights in the Property to Owner hereunder; provided, however, that if the Property reverts to Owner pursuant to Paragraph 5 hereof, Purchaser shall have no right to exploit any material produced or created by it hereunder which is in any manner identifiable with the Property.

(i) The right to use the title, titles, names and/or logo (subject to Paragraph 10 hereof) by which the Property and the elements of the Property are now known or identified or hereafter may be known or identified as the title or titles and/or log of live action, Pictures produced hereunder based upon or adapted from the Property and the right to exploit and exhibit any such motion pictures produced hereunder under any other title or titles and/or log (subject to subparagraph 8(f) and Paragraph 10 hereof) that Purchaser may deem proper in its uncontrolled discretion.

Except as otherwise set forth in this Agreement, including subparagraph (a) above, all rights granted pursuant to this Paragraph 3 are in perpetuity. Subject to the terms and conditions of this Agreement, Purchaser shall have for use in connection with Pictures, all rights herein granted to it in all existing and future characters, devices, versions, translations, dramatizations, arrangements, revisions, continuations, supplements and reissues of the Property designed, manufactured, developed, written or published with the authority of Owner and owned or controlled by Owner or its parents, subsidiaries or affiliates, and their respective successors and assigns, as well as all prior material and other works owned or controlled by Owner upon which the Property is based and from which the Property is adapted. All rights granted Purchaser under this Agreement shall be cumulative, and Purchaser may exercise or refrain from exercising any one or more of said rights separately or simultaneously or in connection with any other rights granted to Purchaser hereby or obtained by Purchaser from other sources, and regardless of whether said rights are granted in the disjunctive or conjunctive. Notwithstanding anything to the contrary herein, Purchaser agrees that the initial exploitation of any Picture produced by it hereunder shall be as a live action, theatrical motion picture.

4. <u>Reservation of Rights</u>: All rights in the Property not specifically granted to Purchaser herein, including, without limitation, the following rights, are reserved to Owner

for Owner's use and disposition, subject, however, to the other provisions of this Agreement:

(a) Subject to the exceptions set forth in Paragraphs 3 and 7 hereof, all rights to publish the Property and any Pictures produced hereunder as follows: (i) the right to publish print editions of the Property and/or the Picture(s) in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise; (ii) the right to publish recorded readings by a single narrator of the text of published print editions of the Property and/or the Picture(s) in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of published print editions of the Property and/or the Picture(s) in the form of CD-Rom, videocassette tape or similar electronically-read devices individually purchased by the end-user. Such electronically-read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property and/or Picture(s) but may not contain audio tracks of any kind.

(b) All merchandising rights. The term "merchandising rights" shall mean the exclusive right to produce, sell and license, or grant others the exclusive right to produce, sell and license, or enter into any agreements with respect to the manufacturing privileges under which a commodity, product or service is manufactured or distributed under the name of or using a representation of "G.I. Joe" or any other character or thing included in the Property or under the name of or using a representation thereof, including but not limited to accessories, mailing pieces, toys, games, figurines, video games or other items or devices. Included in merchandising rights shall be the exclusive right in Owner to use and/or license merchandisers of products and services to reproduce and/or use any New Character. Owner shall consult in good faith with Purchaser regarding any merchandising arrangements relating to New Characters, but Owner's decision shall be final. Owner agrees to advise Purchaser from time to time of the kind and nature of licensed products which have been licensed for production in the exercise by Owner of its merchandising rights hereunder. Further, upon Purchaser's request, Owner agrees to ask that its licensing agent meet with Purchaser to discuss such ideas as Purchaser may have for the exercise of merchandising rights hereunder. Any and all revenues from any such merchandising shall belong solely to Owner; Owner shall be free to exploit such New Characters without any obligation of any kind to Purchaser except with respect to Purchaser's consultation rights as set forth in this subparagraph (b). In addition thereto, any New Character shall be copyrighted in Owner's name. However, Purchaser shall have the right to use New Characters in Pictures produced hereunder. In the event that Owner wishes to produce, or license the right to produce, a video game based upon any Picture hereunder, Purchaser agrees to license to Owner a reasonable amount of footage from the applicable Picture at no charge to Owner.

Notwithstanding the foregoing, Owner's merchandising rights hereunder shall be subject to all applicable third party approvals and all applicable third party royalties which are incorporated in any contracts negotiated by Purchaser in connection with any Picture hereunder; provided, however, that Purchaser shall not provide any third party with a merchandising royalty other than in connection with the use of a performer's likeness in Purchaser's standard 5%-2½% royalty (with Owner entitled to the 50% distribution fee) unless a higher royalty is approved in advance by Owner or if Owner separately negotiates a higher royalty for a third party and then requests that Purchaser include such higher royalty in the applicable contract; and further provided that Owner shall have no obligation to use any performer's likeness.

(c) All animated television rights in and to the Property.

(d) All live action television rights in and to the Property; provided, however, that if Owner desires to produce, or grant to third parties the right to produce, live action television motion pictures or live action episodic television shows based on the Property or based on any Hasbro New Character, Owner shall accord Purchaser a right of First Negotiation/First Refusal upon the same terms and conditions as set forth in Paragraph 6 below.

(e) The right to produce and distribute theatrical feature-length animated motion pictures based upon the Property; provided, however, that subject to Owner's licensee's right to continue to exploit "G.I. Joe - The Movie," an existing animated feature-length motion picture, Owner shall not exercise or authorize any other person to exercise the right of production and distribution of animated feature-length theatrical motion pictures prior to the end of the Production Period.

(f) Subject to all of the rights and licenses granted to Purchaser hereunder, Owner shall retain ownership of and shall be entitled to copyright and trademark in its name or the name of its designee all characters, vehicles, accessories, logos and designs which are presently a part of the Property or are hereafter created by or acquired by Owner in connection with the Property, or are created by Purchaser but are New Characters, and Owner shall be entitled to depict and use all such characters, vehicles, accessories, logos and designs in any of its animated productions based upon the Property and the advertising and exploitation thereof and to use the same for any other purpose not expressly prohibited under this Agreement.

(g) The parties acknowledge and agree that the property entitled "Action Man" is a separate property from the property entitled "G.I. Joe". Owner shall retain sole and exclusive ownership and all right, title and interest in and to the trademark and property "Action Man", and Owner's rights to exploit "Action Man"

shall not be restricted in any way by the terms of this Agreement, and Purchaser acknowledges that no rights in and to the "Action Man" property are being optioned, licensed or otherwise transferred to Purchaser pursuant to this Agreement.

5. Production Period: Purchaser shall not commence principal photography of any Picture hereunder after expiration of the Production Period. The Production Period shall commence on the exercise of Purchaser's Option hereunder and shall continue thereafter until such time as any of the following shall occur:

(a) Commencement of principal photography of Picture #1 has not commenced within three (3) years from execution of this Agreement; provided, however, that if Purchaser has engaged the principal cast member of Picture #1 on a "pay-or-play" basis, said three (3) year period shall be extended for a maximum period of twelve (12) additional months so that Purchaser may set a start date which would permit said principal cast member to render services for Picture #1; or

(b) Four (4) years shall have passed from the date of initial general theatrical release of any Picture in the Domestic Territory and Purchaser shall not have commenced principal photography of the next Picture; provided, however, that if Purchaser has engaged the principal cast member of the next Picture, said four (4) period shall be extended for a maximum period of twelve (12) additional months so that Purchaser may set a start date which would permit said principal cast member to render services for the applicable Picture; or

(c) Purchaser shall not have initially generally theatrically released any Picture in the Domestic Territory within twenty-four (24) months after commencement of principal photography thereof.

"Domestic Territory" as used in this Paragraph 5 and in Paragraph 6 below, shall mean the Continental United States of America.

Purchaser shall advise Owner in writing of the date of commencement of principal photography of any Picture hereunder immediately following such commencement, and shall advise Owner in writing of the date of the initial general domestic theatrical release of each such Picture immediately following such release. However, Purchaser's inadvertent failure to do so shall not be a breach hereof. If the Production Period shall expire, all rights granted Purchaser revert to Owner except that: Purchaser shall continue to have in perpetuity with respect to all existing Pictures all of the exploitation rights set forth in subparagraphs 3(b) through (i); and Purchaser shall retain all rights in New Characters to the extent set forth in this Agreement without any restriction relating to the Production Period.

6. First Negotiation; First Refusal: If the Production Period shall expire but Purchaser shall have completed and generally released Picture #1 for theatrical exhibition in the Domestic Territory, and if Owner shall thereafter desire to produce or grant to third parties the right to produce live action feature-length theatrical motion picture and/or feature-length animated theatrical motion pictures based on the Property or utilizing in any such motion picture any New Character (the "Rights"), Owner shall do so only in accordance with the following procedure:

(a) At such time as Owner elects to exercise or dispose of any of such Rights, Owner shall offer in writing to negotiate in good faith with Purchaser regarding such Rights prior to any exercise of such Rights itself and prior to negotiating with any third party. If Purchaser gives written notice that Purchaser does not wish to negotiate or if such good faith negotiations do not result in a written agreement between Purchaser and Owner within a period of thirty (30) calendar days from Purchaser's receipt of Owner's written offer to negotiate, then Owner may exercise such Rights itself or may negotiate elsewhere for the disposition of such Rights, subject to (b) and (c) below.

(b) If Owner proposes to accept an offer in respect of the Rights which incorporates a material term which is less favorable to Owner (whether or not such offer in its entirety is less favorable to Owner) than Owner's last proposal to Purchaser, then Owner shall give Purchaser written notice of such offer specifying the particulars thereof, including the name of the Offeror, and Purchaser shall have a period of seven (7) business days from receipt of such notice within which to meet said offer; provided, however, that Purchaser shall not be required to meet any terms which cannot be met as easily by one party as another. Purchaser's right to meet said offer shall be exercised by Purchaser, if at all, by giving Owner written notice of Purchaser's election to do so within the aforesaid seven (7) business day period. In the event Purchaser exercises its right to meet such offer, then Purchaser and Owner shall promptly execute an agreement conveying to Purchaser the rights involved upon the terms and conditions of said offer.

(c) In the event Purchaser does not acquire such Rights in accordance with the provisions of (b) above, then Owner shall have the right to sell or otherwise dispose of such Rights but only to the Offeror and upon the terms and conditions specified in such notice; otherwise the provisions of (b) above shall apply again. If Owner enters into a written agreement with a third party whereby such third party acquires the theatrical motion picture rights, either live and/or animated, in and to the Property and/or the right to produce or cause the production of live action theatrical motion pictures and/or feature-length animated theatrical motion pictures based on the Property and/or the right to use a Hasbro New Character in any motion picture, then Purchaser's rights under this Paragraph 6 shall terminate.

7. Product Placement; Tie-ins:

(a) All decisions, arrangements and agreements with respect to so-called "product placement" in connection with Pictures produced hereunder shall be at the sole discretion of Purchaser, subject only to good faith consultation with Owner; provided, however, that Purchaser agrees that no products which are directly competitive with the Property or with any product manufactured, distributed and/or sold by Owner, Milton Bradley, Playskool and/or Playskool Baby subsidiaries shall be placed in the Picture and that no product placement arrangements shall be made with competitors of those persons or entities with which Owner already has ongoing product placement, premium or similar arrangements ("Owner Licensees") unless the Owner Licensees are unwilling or unable to enter into a product placement arrangement with Purchaser on reasonable and customary terms. Any and all revenues derived from any such product placement shall belong solely to Purchaser.

(b) All decisions, arrangements and agreements relating to so-called premiums and commercial tie-ins in connection with any Picture produced hereunder shall be subject to the mutual approval of Owner and Purchaser. Revenues derived from any premium or tie-in arrangement shall be divided 50/50 between Owner and Purchaser without any deductions or offsets from the gross amount of such revenues.

8. Standards; Consultations: The following requirements and procedures apply to Picture #1 and any Sequels:

(a) No Picture, or any advertising or publicity therefor, shall depict the Property in a manner substantially different from the way it is generally depicted by Owner. The various characters, relationships to other characters, their reaction to any given set of circumstances, and their behavior and language shall in general be consistent with that of the Property. Any new or additional character or element introduced in the Pictures which is not contained in the Property will, in general, be consistent with the nature, subject matter, quality and standards of the Property.

(b) No Picture produced and released hereunder shall have a rating issued by the Motion Picture Rating Administration of the Motion Picture Association of America, Inc. which is more restrictive than a "PG-13" rating without the prior written consent of Owner.

(c) All Pictures shall be consistent with the following:

(i) All characters shall be heterosexual;

      (ii) There shall be no war or other conflict utilizing nuclear weapons of any type;

(iii) No war or conflict against a real country will be depicted; provided, however, that Owner agrees that new and imaginary fictional countries and/or villains may be created and depicted, but no such fictional country shall be given characteristics which suggest that a real country is being referred to;

(iv) No "G.I. Joe" characters shall be depicted smoking or drinking alcoholic beverages;

(v) No "G.I. Joe" characters shall be depicted engaging in sexual intercourse;

(vi) At least some of the then existing characters and vehicles from the Property shall be depicted in Picture #1.

(d) Purchaser shall consult in good faith with Owner with respect to the actors to be hired to portray the lead roles in each Picture and with respect to the director for each Picture. Each lead actor for a Picture shall be credible to the public in his or her role. Purchaser acknowledges that it has entered into a Producer Loanout Agreement with Larry Kasanoff in connection the first theatrical motion picture project based upon the Property. Purchaser acknowledges that it has agreed to consult with Larry Kasanoff as to the selection of the writer for such screenplay.

(dd) Purchaser agrees to consult with Owner regarding any names chosen by Purchaser for the characters, vehicles or devices if such name does not appear on Exhibit "A", or is not supplied by Owner pursuant to Paragraph 2(a)(i) or 2(a)(ii) above. If Owner notifies Purchaser that the selection of any such name in Owner's good faith business judgment is likely to violate the trademark rights of a third party with respect to one or more of Owner's product categories, Purchaser agrees to select a substitute name for any such conflicting name and to resubmit such substitute name to Owner for consultation as set forth in this paragraph. Owner agrees that it must notify Purchaser of any such conflict within ten (10) business days (reducible to 5 in the event of production emergencies) from Owner's or Owner's representatives' receipt of Purchaser's request therefor or such name shall be deemed approved.

(e) Purchaser may, but shall not be obligated to, commission a treatment for a particular Picture hereunder prior to commissioning a screenplay. If Purchaser does commission a treatment prior to the writing of a screenplay, Purchaser shall furnish Owner with such treatment and such treatment shall be

subject to Owner's written approval, not to be unreasonably withheld. Disapproval of the treatment on any of the following grounds shall not be deemed unreasonable:

(i) Countries or villains described in the treatment are identifiable as actual existing countries, persons or organizations;

(ii) The number of characters and vehicles taken from the Property (as opposed to newly created characters and vehicles) is insufficient;

(iii) Excessive violence or foul language.

Owner's said approval rights shall be exercised in good faith and shall be deemed given if no written notice of disapproval is received by Purchaser within thirty (30) calendar days of receipt by Owner of said treatment. In the event Owner disapproves the treatment in writing within said thirty (30) calendar-day period, Owner shall in its notice expressing disapproval give specific reasons for such disapproval with Owner's detailed suggested changes, referring to specific scenes, language and characterizations for such treatment to meet Owner's approval.

Purchaser shall then revise the treatment, giving good faith consideration to Owner's requested changes, and shall submit such revised treatment to Owner for its approval, again not to be unreasonably withheld and to be exercised in good faith. The procedure for approval and/or disapproval outlined above shall apply to the revised treatment and shall continue to apply until Owner has approved a revised treatment submitted to it by Purchaser.

The procedure set forth for treatment approval in this subparagraph 8(e) shall apply to any Sequels produced hereunder. The script for the applicable Picture, and the Picture itself, will be consistent in all material respects with the approved treatment therefor.

Whether or not Purchaser has first commissioned a treatment for a particular Picture hereunder, Purchaser shall submit to Owner, prior to commencement of principal photography, the proposed screenplay for such Picture, which screenplay shall be subject to Owner's written approval, not to be unreasonably withheld. The procedure for approval of such screenplay shall be the same as outlined above for treatment approval; provided, however, that if Purchaser complies with the changes in the screenplay requested by Owner and Owner thereafter disapproves such screenplay, Owner's disapproval shall automatically be deemed unreasonable. Each Picture will be photographed and recorded in a manner consistent with the screenplay approved or deemed approved by Owner.

Notwithstanding anything to the contrary contained herein, so long as Purchaser has complied with the provisions of this subparagraph 8(e), Owner may not exercise its approval right over the screenplay of any Picture hereunder in a manner which frustrates the production of such Picture.

(f) The title of all Pictures produced hereunder will contain the phrase "G.I. Joe," either in the main title or as a subtitle (but appearing in the main titles of the picture) in Purchaser's sole discretion. If "G.I. Joe" appears as a subtitle, it shall be no less than 50% of the size of the main title.

(g) The parties acknowledge that vehicles are integral to the "G.I. Joe" property and that it is Purchaser's intent that unique vehicles with unusual characteristics will be featured prominently in the Picture including, without limitation, in action sequences. Purchaser will consult fully and meaningfully with Owner with regard to the design of said vehicles and at Purchaser's request, Owner will provide at least two proposed designs for each vehicle.

9. Consideration: Purchaser agrees to pay, and Owner agrees to accept, as full consideration for all rights granted herein and for Owner's warranties and agreements herein contained, the following:

(a) The sum of Five Hundred Thousand Dollars ($500,000) (the "Purchase Price"), (less the amount paid to Purchaser for the Initial Option Period pursuant to Paragraph 1 hereof), payable upon exercise of the Option.

(b) For each Picture subsequent to Picture #1 including Spinoffs, Purchaser shall pay Owner the sum of Five hundred Thousand Dollars ($500,000) upon the commencement of principal photography of the applicable Picture.

In the event Purchaser shall fail to make payments under subparagraph 9(b) within the time and in the manner hereinabove set forth, Owner acknowledges and agrees that Owner's sole remedy shall be an action at law to recover such payments, and in no event shall any of said rights revert to Owner, nor shall Owner have or be deemed to have any lien, charge or other encumbrance upon said rights to secure payment of said sums; provided, however, that if Purchaser fails to timely make the payment required under subparagraph 9(a) hereof, Owner shall be entitled to seek equitable relief.

10. Credits, Trademark, Title:

(a) Subject to Owner's reasonable prior written approval, Purchaser shall have the right to publish, advertise, announce and use in any manner or medium the name of Owner in connection with any exercise by Purchaser of its rights hereunder; provided, however, that Purchaser may not use Owner's name in commercial tie-ins without Owner's prior written consent which Owner may

withhold in its sole discretion. If Owner does not disapprove any such request within ten (10) business days following submission thereof to Owner by Purchaser, Owner shall be deemed to have approved same. Owner shall (subject to the provisions of the applicable Writers Guild of America Basic Agreement) receive credit on all positive prints and tapes of each Picture, in the end titles on a separate card, in a size of type no less than that accorded other technical credits and in a position no later than the last separate card on which a single credit appears, substantially as follows: "Based in part on Hasbro's characters." In addition, if one or more of Owner's employees or representatives render services as consultants on a Picture, they shall be accorded an appropriate consultation credit in the end titles of said Picture, the size, position and manner of such credit to be in Purchaser's discretion.

(b) Purchaser agrees to affix or cause to be affixed a copyright notice and/or trademark notice, as applicable, in form to be designated by Owner, designating Owner as the copyright and trademark owner and proprietor thereof on any graphic or pictorial representation of any character, device or log contained in the Property or to be contained in the Property, when and if any of the foregoing is depicted by Purchaser in any advertising, promotion and other materials relating to any Picture produced hereunder. With respect to each Picture produced hereunder, Purchaser shall furnish Owner with a copy of the final main and end title screen credits schedule and the final advertising billing schedule prepared by Purchaser when the same are distributed to Purchaser's departmental personnel, but in no event later than five (5) days prior to the delivery of any answer print of any Picture or publication of any advertisement, as the case may be, in order that Owner may insure that Purchaser has complied with the provisions of subparagraphs (a) and (b) hereof. If Owner does not notify Purchaser within three (3) business days after receipt thereof of any errors therein, then Owner shall be deemed to have approved said matters.

(c) No casual or inadvertent failure to comply with credit, copyright or trademark requirements hereunder shall be deemed a breach of this Agreement, and the sole remedy for breach of any of the foregoing provisions of this Paragraph 10 shall be an action at law for damages, it being agreed that in no event shall owner seek or be entitled to injunctive or other equitable relief on account of any breach of any of the billing requirements hereof; provided, however, that Owner shall be entitled to seek equitable relief if there is a material failure by Purchaser to comply with the copyright or trademark requirements hereunder; and provided further that upon any notice by Owner to Purchaser of any inadvertent failure by Purchaser to comply with the provisions of this Paragraph 10, Purchaser shall promptly prospectively cure any such failure.

(d) Purchaser acknowledges that "G.I. Joe" is a registered trademark of Owner in the United States and certain other territories, and that any and all use of

such trademark shall inure solely to the benefit of Owner and shall create no right, title or interest therein or thereto in Purchaser.

(e) (i) Subject to subparagraph 10(e)(ii) below, Purchaser may create and use a new logo in connection with any Picture produced hereunder and all advertising and publicity in connection therewith so long as Purchaser uses such logo in a manner consistent with the protection of Owner's logo under applicable trademark laws. Any such new logo shall be trademarked in Owner's name and may be used by Owner and its licensees at no cost solely in connection with Owner's advertising and exploitation of the Property so long as such use is in a manner consistent with the protection of Owner's logo under applicable trademark laws.

(ii) Any logo created hereunder by Purchaser shall be subject to the approval of Owner, but Owner shall not disapprove any such logo created by Purchaser unless Owner reasonably believes that the use of such logo will impair Owner's trademark rights with respect to any existing logo of Owner. Notwithstanding the foregoing, if any Picture produced hereunder and/or the advertising and publicity therefor has an artwork title which is composed of more than just the phrase "G.I. Joe," but which contains the phrase "G.I. Joe" in a manner and style of print which is the same as the manner and style of print of the rest of such artwork title, then the use of the phrase "G.I. Joe" in such artwork title shall not be considered a logo and shall not be subject to Owner's approval. Any such artwork shall belong to and be copyrighted in the name of Purchaser, but Purchaser acknowledges that Owner remains the sole and exclusive owner and proprietor of the name "G.I. Joe" and all logos, artwork, vehicles and accessories relating thereto.

(f) Notwithstanding anything contained in this Paragraph 10, Owner acknowledges that Purchaser shall have the right to use the name "G.I. Joe" in connection with any Picture and the advertising and publicity therefor, so long as Purchaser shall have the right under this Agreement to produce and/or distribute any such Picture produced hereunder.

11. Owner's Warranties and Indemnities: Owner hereby represents and warrants that:

(a) It is the sole owner of or exclusively controls all rights herein granted; it has full power and authority to enter into and perform this Agreement; the Property does not constitute a libel or defamation of and does not infringe upon the copyright, right of privacy or any other right of any person or entity; the Property is copyrighted in the United States of America and to the best of its knowledge in all countries which are signatories to the Universal Copyright Convention; it knows of

no claims made against it which if true would adversely affect its rights in and to the Property or the rights granted to Purchaser under this Agreement; and the names of the characters, devices and other elements contained in the Property and the title of the Property may be used by Purchaser in the exercise of all or any of its rights hereunder.

(b) Owner has not heretofore assigned or encumbered any of the rights granted hereunder, or if Owner has so assigned or encumbered such rights, such assignment or encumbrance shall be terminated, relinquished or satisfied prior to the execution hereof and shall have no adverse effect on the rights granted hereunder.

(c) Neither the Property nor any element thereof or the exercise by Purchaser pursuant to this Agreement of any of the rights granted to it herein will violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, right of privacy or any other right of any person or constitute a libel or slander of any person.

(d) "G.I. Joe" is a registered trademark of Owner in the United States and certain other territories. Owner shall at its own expense take any and all action reasonably necessary to maintain the continued existence and legal validity of the "G.I. Joe" trademark, including the registrations and pending applications set forth on Exhibit "C", attached hereto and incorporated herein by reference, and any new logo created by Purchaser and trademarked in the name of Owner (the parties acknowledging that Owner's obligation to register such marks is limited to Owner's product categories and Owner is not hereby agreeing to pay for registrations required solely by Purchaser). Owner represents and warrants that to the best of Owner's knowledge (including that which Owner should have known in the exercise of reasonable prudence) there are no adverse claims as of the date hereof that might jeopardize Purchaser's right to use such trademarks as are licensed hereunder. Owner shall notify Purchaser promptly in writing of any adverse claims which arise after the date hereof and agrees that it shall, at its own expense, take all steps necessary in its good faith judgment to enforce its rights in and to the trademarks of the Property and the New Characters and defend and/or prosecute any and all third party claims adverse thereto and conflicting with the rights granted to Purchaser hereunder. Notwithstanding anything contained in this Agreement to the contrary including this Paragraph 11, Owner makes no representations or warranties with respect to New Characters, and any trademarks relating thereto.

Owner will defend, indemnify, make good, save and hold harmless Purchaser, its successors and assigns, from and against any damages, costs, charges, reasonable attorneys' fees, recoveries, judgments, penalties and expense whatsoever which may be obtained against, imposed upon or suffered by Purchaser, its successors and assigns, by

reason of the breach of any warranty, covenant, agreement or representation herein made by Owner.

11A. Purchaser's Warranties: Purchaser has full power and authority to enter into and perform this Agreement and has taken all corporate and other action necessary to do so. Material contained in any Picture which is not in the Property or material which is added to the Property including New Characters does not and will not constitute a libel or defamation of and does not infringe upon the copyright, right or privacy or any other right of any person or entity; the aforementioned material will not violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, musical, artistic, personal, private, civil or property right, or any other right of any person or entity.

12. Purchaser's Indemnities: Purchaser will defend, indemnify, make good, save and hold harmless Owner, its successors and assigns, from and against any damages, costs, charges, reasonable attomeys' fees, recoveries, judgments, penalties and expenses whatsoever which may be obtained against, imposed upon or suffered by Owner, its successors and assigns, by reason of the breach of any warranty, covenant, agreement or representation herein made by Purchaser, or by reason of incorporation of any material including New Characters into any Picture produced hereunder other than material taken from the Property.

13. Copyright: Purchaser shall affix or cause to be affixed an appropriate copyright notice in the name of Purchaser on each of the Pictures produced hereunder in order to afford copyright protection for said Pictures and the Property in the United States of America and in all countries of the world which are member of the Universal Copyright Convention or any other copyright convention. Purchaser shall cause each Picture to be registered for copyright in the U.S. Copyright Office.

Owner will, at the request of Purchaser, execute and deliver, or procure the execution and delivery of, any and all documents consistent herewith which are reasonably necessary or proper to license to Purchaser the rights herein licensed, and Owner agrees to execute and procure any other and further instruments consistent herewith which are necessary to grant, confirm and license the rights in the Property herein licensed to Purchaser in any country throughout the world. If it shall be necessary by the laws of any country that copyright registration for any Picture produced hereunder or any version or adaptation thereof be made in the name of Owner, Purchaser is hereby authorized by Owner to apply for said copyright registration in the name of Owner and in such event, Owner shall and does hereby grant the same to Purchaser. Owner further agrees, upon request, duly to execute, acknowledge, procure and deliver to Purchaser short form instruments consistent herewith for the purpose of recording in the United States and elsewhere. Owner shall execute separate short-form assignments for each Picture. Purchaser shall hold the executed short-form assignments in trust and shall not record such instrument with respect to Picture #1 unless and until Purchaser exercises its Option hereunder, and with respect to subsequent Pictures Purchaser shall record an

assignment only upon commencement of principal photography of the applicable Picture. If the Option lapses, Purchaser shall, upon request, return all signed copies of the assignments.

If the Owner shall undertake legal action to protect the rights, licenses and privileges hereby granted to Purchaser or for the recovery of damages and penalties for any infringement of such rights, licenses and privileges, Purchaser may join in any such action or proceeding at its own cost and expense. If Owner fails to prosecute or defend as aforesaid (Owner having no obligation to do so), Purchaser is hereby authorized to do so, and insofar as may be necessary, shall have the right to use the name of Owner for or in connection with such purpose; and Owner shall, in any such proceedings, afford Purchaser all reasonable assistance in proving and defending the rights, licenses and privileges held by Purchaser under this Agreement. Owner and Purchaser hereby agree to hold each other harmless from and against any costs, expenses or liability (including reasonable outside attorneys' fees and disbursements) incurred by either as a result of any action or proceeding instituted by the other pursuant to this Paragraph, unless and to the extent arising out of a matter which constitutes a breach of the applicable party's representations and warranties.

14. Force Majeure: In the event that the preparation, commencement, production or completion of any of the Pictures hereunder is prevented, delayed, or interrupted by reason of any act or occurrence beyond the control of Purchaser, including without limitation by reason of any fire, flood, earthquake, explosion, epidemic, casualty, accident, war, civil disturbance, statutory enactment or order, local or national government decree, pestilence, national calamity, act of God, lockout, strike, labor disturbance or conditions, inability to obtain essential materials, power or transportation, or delay of a common carrier, or death, illness or incapacity of the director or principal member of the cast of each and any of the Pictures, Purchaser shall, by written notice given to Owner during the continuance of such prevention, delay or interruption, be entitled to suspend the term of this Agreement, including, without limitation, the Option Period (if the force majeure event affects development of Picture #1) and all dates otherwise applicable in the determination of the Production Period, but in any event, with respect to each Picture hereunder, no suspension (except with respect to subparagraph 5(a) as to which there shall be no time limit on the suspension) shall continue for a period of more than three months.

15. Assignment: This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective executors, heirs, administrators, successors and permitted assigns. Without the prior written approval of Purchaser, not to be unreasonably withheld, Owner may not assign its rights hereunder to any party other than a parent or subsidiary or affiliate or any entity into which Owner may merge or which acquires all or substantially all of its assets, which shall not require Purchaser's approval. Owner may also assign all or any part of the consideration it receives hereunder. Purchaser may not assign, transfer, license, delegate and/or grant any or all of its rights,

obligations, privileges and property hereunder to any person or entity other than (i) in connection with any tax or other financing arrangements if Purchaser is still involved as the major distributor of the applicable Picture(s), and/or (ii) to any subsidiary or affiliate or any entity into which Purchaser may merge or which may acquire all or substantially all of its assets, without the prior written approval of Owner not to be unreasonably withheld. Any such assignment, delegation and/or grant by Purchaser shall be subject to all of the terms and conditions of this Agreement and Purchaser shall continue to remain liable for all of its obligations under this Agreement.

16. Miscellaneous: This instrument and instruments executed pursuant hereto includes the entire understanding between the parties and replaces all former agreements and representations with respect to the subject matter hereof. No modification, alteration or amendment of this Agreement shall be valid or binding unless in writing and signed by the party to be charged with such modification, alteration or amendment. No officer, employee or representative of Purchaser or Owner has any authority to make any representation or promise not contained in this Agreement, and Owner and Purchaser acknowledge that neither Owner nor Purchaser has executed this Agreement in reliance on any such promise or representation not expressly set forth in this Agreement.

No waiver by either party of any breach hereof shall be deemed a waiver of any preceding or succeeding breach hereof. Neither Purchaser nor Owner shall be liable for any breach of this Agreement unless it shall have received written notice from the other of such breach and shall not, within a reasonable time after receipt of such notice, have cured such breach.

Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any third party, whether referred to herein or not.

Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order, or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this Agreement shall be affected thereby and such other provisions shall continue in full force and effect.

17. Notices: All notices which either party hereto is required or may desire to give to the other shall be given by addressing the same to the other at the address

hereinafter in this paragraph set forth or at such other address as may be designated in writing by any such party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be sufficiently given when the same shall be received in the U.S. mail, personally delivered, telexed, telecopied and/or when the same shall have been delivered, so addressed, to a telegraph or cable company, toll prepaid. The addresses to which any such notices, accountings or statements shall be given are the following:

To Purchaser: Warner Bros., a division of
Time Warner Entertainment Company, L.P.
4000 Warner Boulevard
Burbank, CA 91522
Attn: Business and Legal Affairs Dept.

To Owner: Hasbro, Inc.
1027 Newport Avenue
Pawtucket, Rhode Island 02862
Attn: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS., a division of Time Warner Entertainment Company, L.P.

By: /S/ Pamela Kirsh
Its: Vice President

HASBRO, INC.

By: /S/ Harold P. Gordon
Its:

HASBRO INTERNATIONAL, INC.

By: /S/ Harold P. Gordon
Its:

"G.I. JOE"

OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 18, 1998 and continuing for a period of 18 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Effective Execution Date of the Option Purchase Agreement: April 8, 1999 (i.e., six weeks prior to Purchaser's actual receipt).

HASBRO, INC.

By: /S/ Harold P. Gordon
Its:

HASBRO INTERNATIONAL, INC.

By: /S/ Harold P. Gordon
Its:

ALL-PURPOSE ACKNOWLEDGMENT

State of ____________________)
)
County of __________________)

On ______________ before me, ________________________________________, personally appeared

__________________________________________________________________________

__________________________________________________________________________,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

__/S/__Sandra Marks________________
Signature of Notary

"G.I. JOE"

ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement. The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of ________________, effective on ________________, the date of exercise of the option.

HASBRO, INC.

By: /S/ Harold P. Gordon
Its:

HASBRO INTERNATIONAL, INC.

By: /S/ Harold P. Gordon
Its:

ALL-PURPOSE ACKNOWLEDGMENT

State of ________________)
)
County of ______________)

On ____________ before me, ____________________________, personally appeared ____________________________________________________________
____________________________________________________________,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

/S/ Sandra Marks
Signature of Notary

EXHIBIT "B"
EXCLUDED RIGHTS

Notwithstanding anything to the contrary in the Agreement to which this Exhibit "B" is attached and incorporated, the following items are excluded from the Property and the rights granted pursuant to the Agreement:

1. TRADEMARKS AND COPYRIGHTS

The Fridge
Fridge Fever
The Refrigerator
William Perry
Slaughter
Sgt. Slaughter
Slaughter's Marauder Vehicle
Slaughter's Marauders

2. EXISTING OR COMMITTED PRODUCTIONS

G.I. Joe – The Movie (animated feature-length movie)
G.I. Joe – A Real American Hero (95 commercial half-hour animated episodes including live-action wraparounds; produced by Sunbow Productions, Inc.)
G.I. Joe – Extreme (13 commercial half-hour episodes (?) produced by Sunbow Productions, Inc.)
G.I. Joe – Extreme (13 commercial half-hour episodes (?) produced by Gunther-Wahl Productions, Inc.)
G.I. Joe – Animated programs (44 commercial half-hour episodes; produced by DIC Animation City, Inc.)
The above may be utilized by Owner, Owner's distributors and Owner and its distributors' licensees anywhere, without restrictions of any kind.

3. LITERARY AND DRAMATIC MATERIAL

The literary or dramatic material or other characters or elements originated in any of the productions referred to in Paragraph 2 above or originated in any other animation television program or animated theatrical motion picture, and also any literary or dramatic material or other characters or elements originated in any comic books or strips (e.g., the Marvel Comics comic book series) or originated in other literary embodiments.

To Owner: Hasbro, Inc.
1027 Newport Avenue
Pawtucket, Rhode Island 02862
Attn: Legal Department

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

WARNER BROS., a division of Time Warner Entertainment Company, L.P.

By: [signature]
Its: VP

HASBRO, INC.

By: [signature]
Its:

HASBRO INTERNATIONAL, INC.

By: [signature]
Its:

981223D4.DOC/EMH; 4/27/99

23

"G.I. JOE"

OPTION AGREEMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, the exclusive option, for an initial option period commencing December 18, 1998 and continuing for a period of 18 months following the Execution Date specified below, which may be extended for an additional period of 12 months and other automatic extensions, to acquire in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE".

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this option agreement is expressly made subject to all of the terms, conditions and provisions contained in said agreement.

Effective Execution Date of the Option Purchase Agreement: April 8, 1999 (i.e., six weeks prior to Purchaser's actual receipt).

HASBRO, INC.

By: [signature]
Its:

HASBRO INTERNATIONAL, INC.

By: [signature]
Its:

981223D4.DOC/EMH; 4/27/99
Short Form Option Agreement

ALL-PURPOSE ACKNOWLEDGMENT

State of Rhode Island

County of Providence

On 5/17/99 before me, Sandra Marks, personally appeared Harold P. Gordon, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Sandra Marks

Signature of Notary Notary Public

981223D4.DOC/EMH; 4/27/99
Short Form Option Agreement

"G.I. JOE"

ASSIGNMENT

For valuable consideration, receipt of which is hereby acknowledged, the undersigned, HASBRO, INC., whose address is 1027 Newport Avenue, Pawtucket, Rhode Island 02862, Attn: Legal Department, hereby sells, grants and assigns to WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser"), whose address is 4000 Warner Boulevard, Burbank, California 91522, in perpetuity and throughout the universe, among other things, the exclusive right to produce and distribute for and in all media now known or hereafter devised motion picture audiovisual works of any kind and allied rights therein (including by way of illustration all soundtrack and music publishing rights) based on that certain property described as follows:

> The name, titles, characterizations, literary descriptions, artwork and three dimensional representations of all of the characters, fictional locations, fictional vehicles and other devices depicted, contained and/or relating to the line of toys known as "G.I. JOE",

including the themes, stories and all other contents thereof, and all translations, adaptations, sequels and other versions thereof, whether now or hereafter acquired, and in and to the copyright thereof and all renewals and extensions of such copyright.

The undersigned and Purchaser have entered into an Option Purchase Agreement dated as of December 18, 1998 relating to the transfer and assignment of the foregoing rights in and to said work, which rights are more fully described in said agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said agreement. The option described in said agreement has been exercised by Purchaser.

The undersigned has executed this assignment as of ______________, effective on ______________, the date of exercise of the option.

HASBRO, INC.

By: [signature]
Its:

HASBRO INTERNATIONAL, INC.

By: [signature]
Its:

981223D4.DOC/EMH; 4/27/99
Short Form Assignment

ALL-PURPOSE ACKNOWLEDGMENT

State of Rhode Island)

County of Providence)

On 5/12/99 before me, Sandra Marks, personally appeared Harold P. Gordon, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Sandra Marks

Signature of Notary Notary Public

981223D4.DOC/EMH; 4/27/99
Short Form Assignment

SEE PC DOC 10483 FOR EXHIBITS.

981223D4.DOC/EMH; 4/27/99

Exhibit W
Exhibit "B"
207

WB136220
CONFIDENTIAL

DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

October 18, 1999

Jean Shuster Peavy
316 Horton Lane, NW
Albuquerque NM 87114-1053

Dear Jean:

Thanks for your note. I've reviewed your request for a bonus for SUPERMAN for 1999 with my colleagues. We're pleased that you continue to honor our agreement and that your health enables you to enjoy some benefit from Joe's wonderful creativity. In that spirit we're pleased to accept your request. Enclosed you'll find a $10,000 check in appreciation of our several successful SUPERMAN programs this year. Please give Warren my best and perhaps we'll meet up at next year's San Diego show.

Best,

Paul Levitz

:lf

Redacted



DC COMICS
1700 Broadway
New York, New York 10019
(212) 636-5555
FAX (212) 636-5485

Paul Levitz/Executive Vice President & Publisher

November 20, 2000

Jean Shuster Peavy
51 Camino Cabo
Santa Fe, NM 87505

Dear Jean,

Thanks for the update and the kind words. Although this has been a fairly quiet year for the Man of Steel (no new television episodes or film for only the second year out of the past twenty-five or so), we're pleased to honor your request for a year 2000 bonus with the enclosed check for $10,000. All of us at DC join in wishing you and Warren a good holiday season, and a happy and healthy new year to come.

Best,

Paul Levitz

# JOINT VENTURE AGREEMENT

AGREEMENT made as of November 23, 2001by and between Pacific Pictures Corporation ("PPC") with offices at 23852 Pacific Coast Highway, Suite 555, Malibu, CA 90265 ; tel. (310) 589-5151; fax: (310) 589-5152 and Jean A. Peavy and her son Mark Warren Peary (f/k/a Mark Warren Peavy) (individually and collectively, "Claimants") located at 51 Camino Cabo, Sante Fe, New Mexico 87508; tel. / fax: (505) 466-4551, regarding the formation of a joint venture for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights").

1. The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, such as, without limitation, "Superman," "Clark Kent," "Lois Lane," "Jimmy Olsen," "Lex Luther," "Lana Lang," "Mr. Mxyztplk," "Superboy," "Supergirl," "The Daily Planet," "Krypton," "Kryptonite," and "Smallville."

2. In consideration of the mutual covenants contained herein and other good and valuable consideration, PPC and Claimants hereby form a joint venture (the "Venture") to investigate, retrieve, enforce and exploit the Rights, including without limitation, via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.) of any and all grant or transfers by Joe Shuster of any copyright interest in his creations. In consideration for PPC'S contributions to the Venture and the mutual covenants contained herein Claimants hereby transfer and assign to the Venture their rights, title and interests in the Rights. The name of the Venture shall be the "Joe Shuster Venture." The Venture's office address shall be the California address set forth above.

3. PPC will pay any and all costs and expenses of the Venture, including the legal fees and costs of setting up Joe Shuster's estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the enforcement and/or defense of the Rights and the Venture. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying,

Initials: ______

postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC'S share of Proceeds set forth in paragraph 5 below.

4. The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Claimants and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5. Any and all moneys and proceeds received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Claimants and fifty percent (50%) to PPC. The parties will use all reasonable efforts to have Joe Shuster's estate/administrator and third party payors, if any, directly pay to the Claimants and PPC their respective fifty percent (50%) share of Proceeds. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Claimants of a reasonable accounting and receipts for said expenses.

6. All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7. The Venture and/or the Estate of Joe Shuster (to be established hereunder) will retain Marc Toberoff, Esq. to render legal services in connection with the Rights and the Venture, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights.

Initials: ____, ____, ____. ____

PPC 00006

8. The term ("Term" ) of the Venture shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term and the winding-up of the Venture or in the event of termination of the Venture for any reason, all Rights, property or assets of the Venture will be held fifty percent (50%) by the Claimants and fifty percent (50%) by PPC as tenants in common, and Claimants and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination of the Venture.

9. To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (c) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Claimants.

10. All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement, including without limitation an irrevocable letter of authority instructing the administrator of Joe Shuster's Estate to divide and disburse all Proceeds from the Rights as set forth in paragraph 5 above. When required hereunder, consent shall not be unreasonably withheld by any party regarding the business of the Venture. The parties hereby approve Michael Catron for appointment as the administrator of Joe Shuster's Estate, once it is established.

11. This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. To the extent any provision of this Agreement is found invalid, said provision shall be stricken

and shall not affect the validity of the remaining provisions hereof. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11. This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

Agreed, understood and accepted:

Pacific Pictures Corporation

By: Marc Toberoff, President — Date: Nov. 28, 2001

Jean A. Peavy — Date: Nov. 28, 2001

Mark Warren Peary
(f/k/a Mark Warren Peavy) — Date: Nov. 28, 2001

DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail:paul.levitz@dccomics.com

Paul Levitz - Executive Vice President & Publisher



December 11, 2001

Jean Shuster Peavy
51 Camino Cabo
Santa Fe NM 87508

Dear jean:

As you surmised, this has been a good year for Superman, with the successful launch of SMALLVILLE and the JUSTICE LEAGUE cartoon series. In the spirit of that success, and of our continuing respect for Joe's great contribution to our culture and our company, enclosed please find a $25,000 bonus check.

Hoping this holiday finds you and Warren well, and that you have a great new year.

Best,

Paul Levitz

:lf



A division of Warner Bros. - An AOL Time Warner Company

DCC00006188