## "TARZAN (2003)"
## OPTION PURCHASE AGREEMENT

DATE:          December 2, 2002

PURCHASER:   Warner Bros., a division of
Time Warner Entertainment Company, L.P.
4000 Warner Boulevard
Burbank, California 9l522

OWNER:       Edgar Rice Burroughs, Inc.
a California corporation  Federal I.D. #95-0586620
c/o Ziffren, Brittenharn, Branca, Fischer et al
1801 Century Park West
Los Angeles, California  90067
Attention:  David Nochimson

This confirms the agreement between WARNER BROS., a division of Time Warner Entertainment Company, L.P. ("Purchaser") and  EDGAR RICE BURROUGHS, INC. ("Owner") with respect to certain rights in the series of published novels and stories ("Stories") written by Edgar Rice Burroughs ("ERB") listed on Exhibit "A" attached hereto featuring the character created by ERB known as "TARZAN".  Those works, and the titles, themes, stories and all other contents thereof, and the characters therein, and all translations, adaptations and other versions thereof now or hereafter owned by Owner, whether now existing or hereafter created, are herein referred to collectively as the "Property".  Purchaser's obligations hereunder are subject to its receipt, in form and pursuant to terms and conditions satisfactory to Purchaser, of copies of all chain-of-title documents with respect to the Property.

    1.  Option:  Owner hereby grants to Purchaser an exclusive and irrevocable option to purchase all rights in the Property as set forth in Paragraph 4 hereof (the "Rights") upon and subject to the following terms and conditions:

       (a)  Option Period:  The initial option period ("Initial Period") shall commence on the date hereof and shall continue for a period of 24 months following the date of receipt by Purchaser of this Agreement signed by Owner ("Execution Date") as indicated below and, if Purchaser has during the Initial Period hired a screenwriter to write a screenplay based on the Property, the Initial Period may be extended by Purchaser for an additional period of 12 months ("Extension Period") consecutive to the Initial Period by written notice and the payment to Owner of the sum provided in subparagraph 1(b)(ii) below at

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

1

**Exhibit BB**
**215**

35493

WB136016
CONFIDENTIAL

any time prior to expiration of the Initial Period.  The Initial Period and Extension Period are hereafter referred to collectively as the "Option Period".

(b) <u>Option Payments</u>:  Purchaser shall pay to Owner the following sums in consideration of the option herein granted:

(i)  For the Initial Period, Two Hundred Fifty Thousand Dollars ($250,000) ("Initial Option Payment"), payable promptly upon delivery of this Agreement to Purchaser executed by Owner.

(ii)  For the Extension Period, if applicable, One Hundred Twenty-Five Thousand Dollars ($125,000) ("Extension Option Payment").

(c) <u>Development Activities</u>:  During the Option Period, Purchaser may engage in customary development and preproduction activities with respect to motion pictures and/or other productions based on the Property.  If in connection with such development or preproduction activities Owner or another party is engaged by or on behalf of Purchaser to write revisions of the Property, all such revisions shall be and remain Purchaser's sole and exclusive property, whether or not Purchaser exercises the option hereunder; provided, however, that if Purchaser does not exercise said option, Purchaser's use (if any) of such revisions shall be subject to Owner's rights in the Property.

(d) <u>Automatic Extensions</u>:  The Initial Period and/or Extension Period, as applicable, shall be extended without notice for periods equal to the length of time necessary to settle or otherwise resolve any third party claims arising during the Option Period which in Purchaser's reasonable good faith judgment would materially and adversely affect Purchaser's acquisition and/or exercise of the Rights and of industry-wide labor disputes and other force majeure events which substantially interfere with Purchaser's development and preproduction of the Property, but no such force majeure extension(s) of the Option Period hereunder shall exceed an aggregate of 6 months, and no such extension(s) of the Option Period due to third party claims shall exceed an aggregate of 6 months unless formal legal action has been initiated and is actively being pursued and/or defended.  Purchaser shall promptly, as soon as practicable under the circumstances, confirm any such extension by written notice to Owner, provided that such notice shall be furnished as a courtesy only and shall not be deemed a condition subsequent to the effectiveness of any such extension.  In the event that the Initial Period or Extension Period would otherwise expire on a Saturday, Sunday or national holiday, said period shall be extended without notice until the end of the next following business day.

2. <u>Purchase Price/Exercise of Option</u>:  If Purchaser exercises its option, the Initial Option Payment will apply toward the purchase price of the Rights which shall be

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

2

**Exhibit BB**
**216**

WB136017
CONFIDENTIAL

a total of One Million Five Hundred Thousand Dollars ($1,500,000) (the "Purchase Price"). The balance of the Purchase Price shall be paid upon exercise of the option. The option, if exercised, shall be exercised by written notice or by commencement of principal photography of the first live action feature-length theatrical motion picture based on the Property produced pursuant to the Rights (the "Picture"). The first project produced hereunder shall be the Picture.

2A. Reversion:

(a) Reversion of Picture Rights: Notwithstanding the foregoing, the Rights granted hereunder shall automatically revert to Owner if Purchaser does not commence principal photography of the Picture within a period of four years following the date of exercise of the option; provided that, Purchaser may elect to extend such four year period for one additional year (to a total of five years) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said four year period, and if Purchaser does extend such four year period then Purchaser may subsequently elect to extend such five year period for one additional year (to a total of six years) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said five year period. In the event of such reversion, Owner shall have no obligation to repay to Purchaser any sums paid to Owner hereunder.

(b) Reversion of Live Action Remake and Sequel Rights: If Purchaser produces the Picture, the rights granted hereunder to produce remakes and sequels shall revert to Owner if Purchaser does not theatrically release the Picture in the United States within four years after commencement of principal photography of the Picture. In connection with each remake or sequel Purchaser produces, the rights granted hereunder to produce additional remakes and sequels shall revert to Owner if Purchaser does not commence principal photography of the next remake or sequel prior to the date which is the earlier of either: (i) the last day of a period of four years after initial theatrical release of the immediately preceding remake or sequel; or (ii) the last day of a period of five years following delivery of the answer print of the immediately preceding sequel or remake. In the case of each such four or five year period (as the case may be), Purchaser shall have the right, at Purchaser's election, to extend such period for one additional year (to a total of five or six years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of the applicable four year period, and if Purchaser does extend such four year period then Purchaser may subsequently elect to extend such five year period for one additional year (to a total of six or seven years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000) no later than the end of said five year period, and if Purchaser does extend such five year period then Purchaser

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

3

35493

Exhibit BB
217

WB136018
CONFIDENTIAL

may subsequently elect to extend such six year period for one additional year (to a total of seven or eight years, as applicable) by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars (250,000) no later than the end of said six year period. It is acknowledged that, thereafter, if Purchaser does not commence principal photography of the next remake or sequel before the end of such seven or eight years (as applicable), the rights granted hereunder to produce additional remakes and sequels shall revert to Owner, and Purchaser shall have no further right to extend the period.

3. <u>Additional Payments/Participation</u>: Owner shall be paid the following additional amounts subject to the conditions specified:

(a) <u>Defined Gross Participation</u>: If the Picture is produced and released, the following amounts (less an amount equal to the Purchase Price):

(i) an amount equal to 2½% of 100% of the Defined Gross of the Picture, defined, accounted for and paid in accordance with the definition contained in Schedule 1 of Exhibit "C" attached hereto, as modified by the Rider thereto. Said participation shall be payable only until such time (if any) as the aggregate amount paid under this subparagraph 3(a)(i) equals Two Million Dollars ($2,000,000).

(ii) thereafter, an amount equal to 2½% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on a moving basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "B" as modified by the Rider thereto but computed with a 12½% distribution fee on Defined Gross from all sources. Said participation shall be payable only until such time as the participation under subparagraph 3(a)(iii) below becomes payable.

(iii) thereafter, an amount equal to 5% of 100% of the Defined Gross of the Picture in excess of the Contractual Start Point on an initial basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "C" as modified by the Rider thereto, but computed with a 17½% distribution fee on Defined Gross from all sources.

(a)(a) <u>Box Office Advances</u>: As used in this Agreement the term "DBO" shall mean domestic (United States and Canada) box office receipts as reported from time-to-time in the motion picture industry trade newspaper known as "Daily Variety" (or, if "Daily Variety" ceases publication of such reports, then as reported from time-to-time by E.D.I.), and the term "WWBO" shall mean world-wide box office receipts as reported from time-to-time in "Daily Variety" (or E.D.I., as the case may be). If the Picture is produced and released, Purchaser shall pay

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

4

35493

**Exhibit BB**
**218**

WB136019
CONFIDENTIAL

Owner the following non-refundable advances against amounts otherwise becoming payable pursuant to subparagraphs 3(a)(ii) and 3(a)(iii) above:

      (i)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the Picture reaches One Hundred Fifty Million Dollars ($150,000,000) or if WWBO of the Picture reaches Three Hundred Million Dollars ($300,000,000); and

      (ii)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the Picture reaches One Hundred Seventy-Five Million Dollars ($175,000,000) or if WWBO of the Picture reaches Three Hundred Fifty Million Dollars ($350,000,000).

      (b)  <u>Theatrical Sequels and Remakes</u>:  As to each live action feature-length theatrical sequel or remake motion picture based on the Property produced pursuant to the Rights, a non-refundable sum equal to the Purchase Price, payable within 10 days following the commencement of principal photography of each such sequel or remake; plus the following sums (less an amount equal to the Purchase Price):

      (i)  an amount equal to 2½% of 100% of the Defined Gross of the applicable sequel or remake, defined, accounted for and paid in accordance with the definition contained in Schedule 1 of Exhibit "C" attached hereto, as modified by the Rider thereto.  Said participation shall be payable only until such time (if any) as the aggregate amount paid under this subparagraph 3(b)(i) equals Two Million Dollars ($2,000,000).

      (ii)  thereafter, an amount equal to 2½% of 100% of the Defined Gross of the applicable sequel or remake in excess of the Contractual Start Point on a moving basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "B" as modified by the Rider thereto but computed with a 12½% distribution fee on Defined Gross from all sources.  Said participation shall be payable only until such time as the participation under subparagraph 3(b)(iii) below becomes payable.

      (iii)  thereafter, an amount equal to 5% of 100% of the Defined Gross of the applicable sequel or remake in excess of the Contractual Start Point on an initial basis, as defined, accounted for and paid in accordance with the definition attached hereto as Exhibit "C" as modified by the Rider thereto, but computed with a 17½% distribution fee on Defined Gross from all sources.

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

5

35493

**Exhibit BB**
**219**

WB136020
CONFIDENTIAL

(b)(b)  Box Office Advances:  If the applicable sequel or remake is produced and released, Purchaser shall pay Owner the following non-refundable advances against amounts otherwise becoming payable pursuant to subparagraphs 3(b)(ii) and 3(b)(iii) above:

(i)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the applicable sequel or remake reaches One Hundred Fifty Million Dollars ($150,000,000) or if WWBO of the applicable sequel or remake reaches Three Hundred Million Dollars ($300,000,000); and

(ii)  Two Hundred Fifty Thousand Dollars ($250,000) if DBO of the applicable sequel or remake reaches One Hundred Seventy-Five Million Dollars ($175,000,000) or if WWBO of the applicable sequel or remake reaches Three Hundred Fifty Million Dollars ($350,000,000).

4.  Grant of Rights:  If the option is exercised, Purchaser shall own, and subject only to such exercise Owner assigns and sells to Purchaser, exclusively, in perpetuity (subject only to the reversion provisions in Paragraph 2A above) and throughout the universe, all live action theatrical motion picture rights and (subject to subparagraph 4A(c)(c)(c)(c) below) live action television series rights in the Property.  All rights not specifically granted hereunder, including without limitation Reserved Rights, Trademark Rights and Copyrights specified below, are reserved to Owner.  Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

(a)  Live Action Theatrical Motion Pictures and Allied Rights:  The right to produce all types of live action theatrical motion pictures and (subject only to the reversion provisions in Paragraph 2A above) sequels thereto and remakes thereof (except made for television programs and television motion pictures), intended for initial exploitation in motion picture theatres and secondary exploitation in any medium now or hereafter devised (including by way of illustration only, any form of theatrical, television, non-theatrical or homevideo exploitation) and all music and music publishing rights, soundtrack album and other soundtrack exploitation rights, and promotional and advertising rights.  Said rights shall be exclusive, subject to the right previously granted to the Walt Disney Company ("Disney") to produce one theatrical musical motion picture as set forth in paragraph 6 of Schedule 1 attached hereto.  Notwithstanding the foregoing grant of soundtrack exploitation rights, it is agreed that Purchaser shall not use more than 10 minutes of the talking (non-singing) soundtrack of the Picture (or any production produced pursuant to the Rights granted hereunder) on any soundtrack album derived therefrom; provided, however, there is no such length limit on Purchaser's use of any songs contained in the Picture (or any other production produced pursuant to the rights granted hereunder) even if the lyrics of such song(s) are taken in whole or in part from the text of the Property.

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

6

35493

Exhibit BB
220

WB136021
CONFIDENTIAL

(b)  Copyrights/Exploitation Rights:  With respect to works produced pursuant to the rights granted in subparagraph 4(a) above, all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in such works (subject to Paragraph 7 below) now or hereafter recognized in any and all territories and jurisdictions (including by way of illustration only, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public) and the right to exploit such works in all media, markets and languages and in any manner now known or hereafter devised subject to Owner's Reserved Rights.

(c)  Alteration Rights:  The right to change, add to, delete or take from, translate, or otherwise modify the Property in any manner Purchaser may in its discretion determine in connection with the Picture and other works that will embody all or part of the Property, but subject in each case to the Character Standards provisions below.  To the fullest extent allowable under any applicable law, Owner hereby irrevocably waives or assigns to Purchaser its so-called "moral rights" or "droit moral".  Owner expressly acknowledges that many parties will contribute to the Picture and other works that will embody all or part of the Property.  Accordingly, if under any applicable law the above waiver or assignment by Owner of "moral rights" or "droit moral" is not effective, then Owner agrees to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(d)  Name, Likeness and Biography:  The right to use, in a reasonable and customary manner, ERB's name, approved likeness and approved biography in and in connection with the Picture and any other works that will embody all or part of the Property; provided, however, that ERB's name, likeness and/or biography shall not be used to endorse any entity, product or service.  Owner shall exercise its approval right over likenesses and biographies reasonably and within 5 days after receipt of written request by Purchaser, or such approvals shall be deemed given.

(e)  Rental Right:  Purchaser and Owner acknowledge and agree that the following sums are in consideration of, and constitute equitable remuneration for, the rental right granted to Purchaser in subparagraph 4(b) hereof: an agreed allocation to the rental right of 3.8% of the Purchase Price and, if applicable, 3.8% of any contingent compensation provided for in this Agreement.  If under the applicable law of any territory or jurisdiction, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Purchaser of the rental right shall nevertheless be fully effective, and Purchaser shall pay Owner such compensation or, if necessary, the parties shall in good faith negotiate the amount and nature

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

7

35493

**Exhibit BB**
**221**

WB136022
CONFIDENTIAL

thereof in accordance with applicable law. Since Purchaser has already paid or agreed to pay Owner equitable remuneration for the rental right, Owner hereby assigns to Purchaser all compensation for the rental right payable or which may become payable to Owner on account or in the nature of a tax or levy, through a collecting society or otherwise. Owner shall cooperate fully with Purchaser in the collection and payment to Purchaser of such compensation. Further, since under this Agreement Purchaser has already paid or agreed to pay Owner full consideration for all rights granted by Owner hereunder, Owner hereby assigns to Purchaser all other compensation payable or which may become payable to Owner on account or in the nature of a tax or levy, through a collecting society or otherwise, under the applicable law of any territory or jurisdiction, including by way of illustration only, so-called blank tape and similar levies. Owner shall cooperate fully with Purchaser in connection with the collection and payment to Purchaser of all such compensation.

(f) <u>Intentionally Omitted</u>.

(g) <u>No Obligation To Proceed</u>: Nothing contained in this Agreement shall be construed as requiring Purchaser to exercise or exploit, or continue to exercise or exploit, any of the rights herein granted.

4A. <u>Reserved Rights</u>: Owner reserves all rights not expressly granted hereunder, including without limitation the following rights (the "Reserved Rights") in the Property, subject to the terms and conditions set forth below, it being expressly acknowledged and agreed that Owner shall have no right to utilize any elements from any work produced by Purchaser pursuant to the Rights or any new or changed material created by or for Purchaser in the exercise of the Reserved Rights or otherwise, provided that if Purchaser does not exercise the option hereunder, Purchaser's use (if any) of such new or changed material shall be subject to Owner's rights in the Property. In connection with the exercise by Owner of any of the Reserved Rights hereunder, Owner shall have the right (notwithstanding anything to the contrary contained in Paragraph 4 above) to advertise and publicize same in all media, including without limitation radio and television.

(a) <u>Publishing Rights</u>: All publishing rights in the Property, including but not limited to the publishing rights set forth in subdivisions 4A(a)(i), 4A(a)(ii) and 4A(a)(iii) below, except that Purchaser shall have the right to publish excerpts from and summaries of the Property, or any motion picture or other versions thereof based upon the Property, for advertising and/or publicizing purposes only (not for sale or resale) of any work produced pursuant to the Rights and the right to publish souvenir booklets (for release only at those theaters exhibiting the Picture or other productions produced pursuant to the Rights granted hereunder) and "making-of-the-movie" type books relating to the Picture (provided such souvenir booklets and "making of the movie" type books are for publicizing

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    8

35493

Exhibit BB
222

WB136023
CONFIDENTIAL

purposes, and not for sale or resale), provided that no such publication shall contain excerpts or summaries in excess of 7,500 words in the aggregate (not to be serialized) taken from the Property. The foregoing limitation on serializing is not intended to and shall not preclude Purchaser's publication of advertising and/or publicity materials in installments. With respect to any "making-of-the-movie" type books, such book(s) shall be titled differently than the Property (but such title may contain the title of the Property such as "The Making of the Film TARZAN"), and Owner's name will not appear on the cover, the title page or the spine thereof other than as part of the billing block or credit list, if any, for the underlying picture.

(i) Print Editions: The right to publish print editions of the Property in book form (including, without limitation, in comic book form), whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise.

(ii) Recorded Readings: The right to publish recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user.

(iii) Electronically Read Editions: The right to publish the text of published print editions of the Property in the form of CD-ROM, videocassette tape or similar electronically read devices individually purchased by the end-user. Such electronically read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property but may not contain audio tracks of any kind.

As further set forth below, Purchaser shall take all steps necessary to protect the copyright in the Property as it may be contained in any publication by Purchaser. With respect to excerpts from the Property (if any) used by Purchaser as aforesaid, Purchaser shall identify ERB as the author of the Property from which the excerpts were taken, but any summaries of the Property (as distinguished from actual excerpts) shall not be attributable to ERB. Purchaser acknowledges that, due to the reservation of publishing rights hereunder, Purchaser shall have no right to, and shall not, publish any publications not specifically enumerated in this subparagraph (specifically but without limitation Purchaser shall not publish the screenplay of, or a novelization of, the Picture or any production produced pursuant to the Rights granted hereunder).

(b) Stage Rights: The right to perform the Property or adaptations thereof on the live stage with actors appearing in person in the immediate presence of the audience (including the right to record a cast album) provided no broadcast,

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

9

**Exhibit BB**
223

WB136024
CONFIDENTIAL

telecast, photography or reproduction of such performance is made, except for archival purposes and for the use of customary minor excerpts in award programs and for advertising and publicity purposes solely in connection with the exploitation of such stage rights. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted stage rights to Disney, the details of such grant of stage rights are listed on Schedule 1 and, in the event of conflict with this subparagraph 4A(b), the details listed on Schedule 1 will control.

(c) <u>Theme Parks</u>: Theme park rights in the Property including, without limitation, the sole right to license 'TARZAN' trademarks and copyrights to theme parks.

(c)(c) <u>Merchandising</u>: The right to license, manufacture and/or sell merchandise and consumer products based on the 'TARZAN' character. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted certain merchandising rights to Disney, the details of which are listed on Schedule 1 attached hereto and, in the event of conflict with this subparagraph 4A(b), the details listed on Schedule 1 will control. In the event that Disney's merchandising rights lapse, and provided Purchaser exercised the Option, Owner shall appoint Purchaser as Owner's merchandising agent on terms to be negotiated in good faith in connection with merchandising rights related to the theatrical motion pictures or direct to video motion pictures produced by Purchaser (but in no event shall such terms be less favorable to Purchaser than the terms of Disney's agreement with Owner for merchandising rights are to Disney). Purchaser shall not have the right to exploit generic merchandising rights.

(c)(c)(c) <u>Animation Rights</u>: All rights to produce animated motion pictures and series for movies and television. Notwithstanding the foregoing, Purchaser acknowledges that Owner previously granted theatrical and television animation rights to Disney.

(c)(c)(c)(c) <u>Television Rights</u>: The right to produce and telecast made-for-television motion pictures and television series. Notwithstanding the foregoing, Purchaser acknowledges that Owner has previously granted to Warner Bros. Television an exclusive option to acquire live action television series rights. Provided none of the Rights granted hereunder have reverted to Owner pursuant to the terms hereof, Purchaser shall have the right of first negotiation with respect to live action long-form television rights pursuant to subparagraph 4A(e), except that if no agreement is reached within the time set forth therein and Owner subsequently is prepared to enter into an agreement for live action long-form television rights with a third party on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall be required to offer the proposed terms to Purchaser, and Purchaser shall then have 10

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

10

35493

**Exhibit BB**

**224**

**WB136025
CONFIDENTIAL**

business days in which to elect to acquire the rights involved on the terms contained in the notice but shall not be required to offer to Purchaser any modification of such terms offered to such third party.  In connection with the foregoing, if and when Warner Bros. Television's rights terminate, Owner agrees not to option or otherwise grant said rights until Purchaser's rights under this Agreement terminate or revert.  If Purchaser produces the Picture, Purchaser shall have the right to produce a live action television series based thereon (the "Series"), subject to the following terms:

(i)  To keep the Series rights alive, Purchaser must start principal photography on the first episode of the Series by the date which is the earlier of either: (A) 4 years after release of the Picture, or (B) 5 years after delivery of the answer print of the Picture; provided, however, that Purchaser has the right to extend such reversion date by an additional year by paying Owner the non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

(ii)  Purchaser may thereafter extend the reversion date set forth in subdivision 4A(c)(c)(c)(c)(i) above by one additional year by paying to Owner the additional non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

(iii)  Purchaser may thereafter extend the reversion date set forth in subdivision 4A(c)(c)(c)(c)(ii) above by one additional year by paying to Owner the additional non-refundable amount of Two Hundred Fifty Thousand Dollars ($250,000).

Notwithstanding the foregoing, in order to avoid a reversion at the reversion date described above, Purchaser must (prior to such reversion date) either: (i) receive a firm order of 13 episodes of the Series from a network, or (ii) commit to the production of 13 episodes of the Series, and must timely produce and continue to produce the Series.  In connection with the Series, Owner will receive Thirty-Five Thousand Dollars ($35,000) per episode (with 5% cumulative annual increases), plus 7.5% of 100% of the modified adjusted gross computed according to the same definition of modified adjusted gross as set forth in Owner's agreement with Warner Bros. Television for said option of live action television series rights.

(c)(c)(c)(c)  Touring Rights:  Touring rights in the Property for the purpose of putting on live action arena shows based on the Property.

(d)  Live Action Made-For-Homevideo Rights:  The right to produce and distribute live action motion pictures for direct-to-video distribution. Notwithstanding the foregoing, provided none of the Rights granted hereunder

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

11

**Exhibit BB**

**225**

WB136026
CONFIDENTIAL

have reverted to Owner pursuant to the terms hereof, Purchaser shall have the right of first negotiation with respect to live action made-for-homevideo rights pursuant to subparagraph 4A(f) without regard to subparagraph 4A(e), except that if no agreement is reached within the time set forth therein and Owner subsequently is prepared to enter into an agreement with a third party on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall be required to offer the proposed terms to Purchaser, and Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice but shall not be required to offer to Purchaser any modification of such terms offered to such third party.

(e) <u>First Negotiation</u>:  If Owner at any time proposes to negotiate with any party for the license, exercise or other disposition of any or all of the live action DTV and/or live action long-form television rights, Owner shall give Purchaser notice thereof and an opportunity to so negotiate prior to Owner so negotiating with any third party.  If Purchaser elects to so negotiate, Owner and Purchaser shall negotiate in good faith for a period of not less than 30 days from the commencement of such negotiations, and if Purchaser elects not to negotiate, Owner may enter into an agreement for the license, exercise or other disposition of such Reserved Rights with any third party with no further obligation to Purchaser with respect thereto.  If Purchaser elects to negotiate and if an agreement does not result therefrom Owner may thereafter negotiate with any third party.  If Owner is at any time prepared to enter into an agreement with a third party for the license, exercise or other disposition of any or all of the live action DTV and/or live action long-form television rights, on terms which are less favorable to Owner than the terms last proposed to Purchaser, Owner shall, before entering into such agreement, give Purchaser notice of the proposed terms thereof (and all modifications of such terms) and the party involved.  In each instance, Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice.  If such notice sets forth a reason for a quicker response (e.g., imminent withdrawal of the offer by such third party upon which such third party agreement is to be based), Purchaser shall use best efforts to make such election within 5 business days.

5.  <u>Representations and Warranties</u>:  Owner hereby represents and warrants:

(a)  That Owner has the right to enter into this Agreement and grant the Rights granted hereunder and that Owner has not heretofore assigned or encumbered any of the rights granted hereunder, except as otherwise set forth in this Agreement.

(b)  That the Stories are original with ERB; that neither the Stories nor any part thereof are taken from or based upon any other material or any motion picture; that to the best of Owner's knowledge (including that which Owner in

FL206
021028MMS/blb  Rev(3) 5-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

12

35493

**Exhibit BB**
**226**

WB136027
CONFIDENTIAL

exercise of reasonable prudence should have known) neither the Stories nor any part thereof, or the exercise by Purchaser of any of the rights herein granted, will violate or infringe upon the trademark, tradename, copyright or patent right of any person; and that to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) neither the Stories nor any part thereof, or the exercise by Purchaser of any of the rights herein granted, will violate or infringe upon any other literary, dramatic, musical or artistic right, or to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) any personal, private, civil or property right, right of privacy or any other right of any person or to the best of Owner's knowledge (including that which Owner in exercise of reasonable prudence should have known) constitute a libel or slander of any person.  Owner makes no warranty hereunder, however, with respect to any material added to any motion picture.

(c)  That, except as otherwise set forth in this Agreement, Owner is the sole owner of all Rights herein granted and has full power and authority to grant said Rights to Purchaser, as more particularly set forth in Paragraph 4 hereof; that except as set forth in this Agreement, none of said rights have been granted, encumbered, or otherwise disposed of in any manner to any person; that no motion picture based in whole or in part on the Property has been produced or authorized by or with the knowledge or consent of Owner, except as set forth in subparagraph 5(f) below; that except as set forth in subparagraph 5(f) below, neither the Property nor any version thereof nor any play or dramatic adaptation based thereon in whole or in part have been published or presented or authorized on the spoken stage by or with the knowledge or consent of Owner, except pursuant to an agreement, dated April 18, 1920, between Owner and Arthur Gibbons (dealing with stage rights) and an agreement, dated 1973, between Owner and Michael White Limited (dealing with stage rights); that Owner has not by license, grant or otherwise done and will not by license, grant, or otherwise do any act or thing which will impair or encumber any of the Rights herein granted or materially interfere with the full enjoyment of said Rights; and that, so far as Owner is aware, there are no claims or litigation pending or threatened which will adversely affect any of the Rights herein granted to Purchaser.

(d)  That the Stories set forth on page 1 of Exhibit "A" attached hereto enjoy copyright protection in the United States; and that the Stories set forth on pages 2 and 3 of Exhibit "A" attached hereto enjoy copyright protection in all countries outside of the United States which adhere to the Berne Copyright Convention (applying a copyright term of "life plus seventy [70] years").

(e)  That ERB died on March 29, 1950, and accordingly, for purposes of the Berne Copyright Convention (as such Convention applies to countries

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

13

35493

**Exhibit BB**

**227**

WB136028
CONFIDENTIAL

outside of the United States which adhere to such Convention), the "life of said author (ERB) plus seventy (70) years" extends to December 31, 2020.

(f)  That motion pictures and television programs set forth in Exhibit "D" attached hereto, all based in whole or in part on the Property, have been heretofore produced, in which productions Purchaser acknowledges there exists a continuing right to exploit, but aside from the productions specified in Exhibit "D", no other theatrical or television motion pictures or television programs have been produced or authorized by or with the knowledge or consent of Owner.

(g)  That TARZAN is a registered trademark of Owner in the United States and certain other territories.

(h)  That the Property is not based in whole or in part on the life of any real person except as approved in writing by Purchaser.

(i)  That, without limiting Purchaser's rights to do so in the event Owner fails to do so, Owner will maintain copyright protection in the Reserved Rights.

(j)  That, except as set forth in Exhibit "A", and except as set forth in subparagraph 5(k) below, to the best of Owner' knowledge, there are no other stories authorized by Owner or its predecessors in interest in which the TARZAN character appears.  If there are any other Stories in which Owner has an interest, such stories shall be deemed Stories hereunder to the extent of Owner' rights therein, if any.

(k)  That none of the publishers listed on Exhibit "A" has any present, continuing, or vested theatrical or homevideo live-action motion picture rights in the character of TARZAN or in any of the Stories.

(l)  Owner has, over the years, licensed various comic book publishers to prepare, create and publish comic books based upon the Property.  The current licensee with respect to comic book rights is Dark Horse.  All of such licensees (including Dark Horse) have been authorized by Owner to prepare stories for use in connection with the exploitation of the licensed comic book rights.  None of the comic book licensees, including Dark Horse, have the motion picture or television rights in the stories created for the comic books.

(m)  If Owner authorizes the writing and publication of any new Stories based upon the Property, then so long as Purchaser has any production rights hereunder, Owner shall not authorize the exploitation of the motion picture and television rights therein and the Property shall be deemed to include any such new Stories.

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

14

**Exhibit BB**

228

**WB136029
CONFIDENTIAL**

The term "person" as used in this Agreement shall mean any person, firm, corporation or other entity.

   5A.  Indemnification:  Owner shall indemnify Purchaser against any liability, damages, costs and expenses (including outside reasonable attorneys' fees) incurred by reason of any claim arising in connection with any breach of Owner's representations, warranties or agreements herein.  Purchaser will indemnify Owner against any liability, loss, damage, cost or expenses (including reasonable attorneys' fees) Owner may incur as a result of any claim or action respecting material incorporated into or added to the Property by Purchaser in the exercise of any of Purchaser's rights hereunder or otherwise in connection with Purchaser's exercise of any of the Rights granted hereunder (provided such claim or action does not arise on account of any breach of warranty or agreement made by Owner hereunder or any wrongful or negligent act of Owner).  The parties hereto, upon presentation of any such claim to either of the parties, or the institution of any such action naming either or both of the parties as defendants, shall promptly notify the other of the presentation of such claim or the institution of any such action giving such other party full details thereof.  In any such claim or action, Owner may have independent counsel, at Owner's sole cost and expense, and said counsel may participate on Owner's behalf, provided that Purchaser shall be entitled to maintain control of the conduct of the defense of any such claim or action.  Purchaser shall have the right to adjust or settle any such claim or action as it may determine in its sole discretion in good faith without affecting the foregoing indemnity; provided, however, that if Owner makes bonding arrangements reasonably satisfactory to Purchaser assuring Purchaser of reimbursements of all payments and expenses in connection with any such claim or action, Purchaser will not settle such claim or action without Owner's prior written consent (so long as Owner does not withhold its consent in bad faith); provided, further, that the preceding proviso shall not apply and Purchaser's right to settle any claim or action and Owner's indemnity obligation shall remain where Purchaser deems advisable a settlement of a lawsuit in which a claim or action for an injunction is made against the production, distribution and/or exploitation of the Picture or any other motion picture or television production which may be produced pursuant to the Rights granted hereunder.  To the extent any such settlement would affect Owner's Reserved Rights, same shall be made only with Owner's prior written consent (so long as Owner does not withhold its consent in bad faith).

   5B.  E&O Insurance:  If Purchaser exercises its option hereunder, then commencing from the time Purchaser's errors and omissions insurance policy applicable to the Picture becomes effective, Purchaser agrees to cover Owner as an additional insured under such errors and omissions policy applicable to the Picture and any other production produced by Purchaser pursuant to the rights granted hereunder, but only with respect to claims or liabilities arising out of Purchaser's production, distribution or exploitation of the Picture (and not from a breach by Owner of any representation, warranty or agreement hereunder), subject to applicable deductibles

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                    15

**Exhibit BB**
**229**

35493

WB136030
CONFIDENTIAL

and exclusions. Purchaser shall not be obligated to maintain errors and omissions insurance for any particular period of time, it being expressly agreed that coverage of Owner hereunder shall continue only during the period of time provided herein and only during such time as Purchaser elects to carry such insurance.

6. <u>Additional Documents</u>: At Purchaser's request, Owner will execute, acknowledge and deliver to Purchaser any and all additional documents consistent herewith which Purchaser may reasonably deem necessary to evidence and effectuate the purposes of this Agreement including, without limitation short-form options and assignments in the form attached hereto. Owner hereby irrevocably appoints Purchaser as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office and elsewhere any and all such documents which Owner fails to execute within 10 business days after Owner's receipt of Purchaser's written request therefor (unless a shorter period of time is reasonably required by Purchaser, but in any event at least 5 business days). Upon Owner's request, Purchaser shall furnish to Owner copies of all such documents which Purchaser so executes on behalf of Owner. The appointment shall be a power coupled with an interest. Concurrently with or promptly after execution by Owner of this Agreement, and as a condition to payment by Purchaser hereunder, Owner will deliver to Purchaser a Publisher's Release in the form attached hereto (or such other form as Purchaser has approved in writing), executed by an authorized signatory of each party to whom Owner has granted publishing rights in the Property.

6A. <u>Character Standards</u>: The following shall apply with respect to motion pictures produced under this Agreement:

(a) Purchaser agrees that it shall exercise a high degree of care so as to insure that the selection of themes and content for such motion pictures, the treatments, screenplays and presentations of such motion pictures, and the advertising and publicity thereof are made in good faith for the entertainment value thereof (taking into account their suitability for children as well as adults) rather than solely for the purposes of sensationalism or to appeal to prurient interests. In this connection, in the portrayal of the TARZAN and JANE characters in such motion pictures and advertising and publicity, Purchaser shall: (1) not portray the TARZAN and JANE characters as not being fundamentally good; (2) not be inconsistent with TARZAN'S and JANE'S basic characters and basic characteristics set forth in the Stories; (3) not depict TARZAN and JANE as unconcerned for the sanctity and well being of human and animal life; and (4) not depict TARZAN or JANE as being contemptuous of race, color, religion, creed or national origin.

Without limiting the generality of the foregoing, Purchaser agrees that in no event shall TARZAN or JANE be portrayed in such motion pictures or advertising and publicity as:

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                16

35493

**Exhibit BB**
**230**

WB136031
CONFIDENTIAL

(i)  losing life or limb or suffering any permanent physical or mental disability of any kind;

(ii)  advocating or participating in any wanton killing of any human or animal other than for purposes of obtaining food, self-protection or the protection of other humans or animals, and in order to obtain knowledge;

(iii)  advocating the use of, or intentionally and knowingly using for himself (except for medicinal or anthropologically accurate ceremonial purposes), alcohol, tobacco products or drugs; and

(iv)  advocating or engaging in illicit sexual activity.

(b)  No later than thirty (30) days prior to the scheduled commencement of principal photography of any motion picture, Purchaser shall furnish to Owner the screenplay therefor in order to ensure observance of the provisions of this Paragraph 6A, and if Owner has any comments thereon, they must be furnished to Purchaser in writing within five (5) business days after the screenplay is received by Owner, and if Owner fails to furnish its comments within such period, Owner shall be deemed to have accepted such screenplay and waived its right to claim that such screenplay failed to comply with the provisions of subparagraphs 6A(a) above and 6A(d) below; provided that the applicable motion picture is consistent with said screenplay.

(c)  Purchaser shall not change the name of the characters TARZAN and JANE, but if Purchaser elects to change the name of any other character(s) in the Stories, it shall first consult with Owner (with Purchaser having the final say) and the fact that Purchaser changes the name of any character(s) shall not in any way alter or affect the status of such character(s) as still being part of the Property and not owned by Purchaser (other than with respect to Purchaser's rights to use the character in and in connection with the Picture and sequels to and remakes of the Picture), and Purchaser's right to exploit such character(s) shall be governed by the terms of this Agreement.

(d)  Purchaser may not change the basic nature of any character in the Stories, it being understood that for purposes of this subparagraph 6A(d), the basic nature is deemed to mean whether a character is fundamentally "good" or "evil," and Purchaser shall not change a character in the Stories who is fundamentally "good" to fundamentally "evil" or vice-versa.  Nothing herein shall limit Purchaser's ability to create and introduce new characters into motion pictures produced hereunder (i.e. characters which do not appear in the Stories).

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

17

**Exhibit BB**

**231**

WB136032
CONFIDENTIAL

(e) Without limiting the provisions of subparagraphs 6A(a), 6A(b), 6A(c) and 6A(d) above, Purchaser shall obtain an MPAA rating for each motion picture produced hereunder no more restrictive than "PG-13".

6B.  Credit, Trademark, Title:

(a)  Credit:  Purchaser shall accord credit to ERB on the positive prints of all motion pictures produced hereunder, on a separate card, in the main titles (meaning the credits, whether before or after the body of the Picture, where the "directed by" credit appears), in a size of type not less than fifty percent (50%) of the size of type used to display the title of the applicable motion picture and, subject to Purchaser's customary exclusions (set forth below), in all paid advertisements issued by or under Purchaser's control, in a size of type not less than that used to accord credit to the screenplay writer(s); provided that notwithstanding said exclusions, ERB will be accorded such credit in all paid advertisements issued by or under Purchaser's control (other than award, nomination, congratulatory advertisements and advertisements announcing personal appearances) in which the screenplay writer(s) for the applicable motion picture is accorded credit, in the following form, all subject to Purchaser's agreement with the Writer's Guild of America (the "WGA") and any other union requirements which may apply:

(i)  "Based on the Story '[name of Story or Stories]' by Edgar Rice Burroughs", if the motion picture is based upon a Story or Stories; or

(ii)  "Based on the 'TARZAN' stories created by Edgar Rice Burroughs", if the motion picture is not based upon a Story or Stories but is based upon the character TARZAN, subject to Purchaser not being precluded from according such credit by the WGA; and if the WGA so precludes said credit, then in the form "Based on the TARZAN character created by Edgar Rice Burroughs".

With respect to each motion picture produced hereunder, Purchaser shall furnish Owner with a copy of the final main and end title screen credits schedule and the final advertising billing schedule prepared by Purchaser when the same are distributed to Purchaser's departmental personnel, but in no event later than five (5) days prior to the delivery of any answer print of any motion picture or publication of any advertisement, as the case may be, in order that Owner may insure that Purchaser has complied with the provisions of subparagraphs 6B(a) and 6B(b) hereof.  If Owner does not notify Purchaser within seventy-two (72) hours (exclusive of Saturdays, Sundays and holidays) after receipt thereof of any errors therein, then Owner shall be deemed to have approved said matters. Tentative credits may be substituted for final credits if the credit accorded ERB is not changed after Owner's approval thereof, or if changed, subject to furnishing

**Exhibit BB**
**232**

WB136033
CONFIDENTIAL

Owner such changed credit in the form of another tentative or final credit in accordance with the foregoing procedure.  In paid advertising, the following shall apply:  any reference to the size of the title shall refer to the regular as opposed to the artwork title; the foregoing credit provisions shall apply only to the billing portion (excluding artwork and advertising copy) of advertisements issued by Purchaser or under Purchaser's direct control relating to the Picture, and shall not apply at any time to teasers, trailers, billboards and other outdoor advertising, radio and television advertising, group, list or special advertisements, commercial tie-ins or by-products, any advertisements of 8 column inches or less, or any advertisements which would be excepted advertisements under the Directors Guild of America Basic Agreement.  No casual or inadvertent failure to comply with credit requirements hereunder shall be deemed a breach of this Agreement, and the sole remedy for breach of any of the foregoing provisions shall be an action at law for damages, it being agreed that in no event shall Owner be entitled to injunctive or other equitable relief on account of any breach of any of the provisions of this subparagraph 6B(a); provided, however, that upon any notice by Owner to Purchaser of any inadvertent failure by Purchaser to comply with the provisions of this subparagraph 6B(a), Purchaser shall prospectively cure any such failure, but Purchaser shall not be required to recall prints or re-do advertisements which have been prepared and run.  Purchaser shall require in Purchaser's contracts with the subdistributors of the Picture that ERB shall receive the credits required hereunder; provided, however, that any failure by a subdistributor to comply therewith shall not be a breach of this Agreement.

(b)  Trademark:

(i)  Purchaser shall insert the Trademark (of which Owner notifies Purchaser in writing of Owner' ownership thereof) together with the following legend, on the prints of each motion picture produced hereunder, in paid advertising relating to each motion picture produced hereunder, and (1) on the jacket or cover (or other wrapping) or label of any soundtrack recording relating to any motion picture produced hereunder, and (2) on any musical compositions relating to any motion picture produced hereunder:


TARZAN ®

"Trademark TARZAN owned by
Edgar Rice Burroughs, Inc. and used by Permission."

Such trademark symbol and legend shall be in legible size.

FL206
02102BMMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

WB136034
CONFIDENTIAL

(ii)  Purchaser acknowledges that Owner has advised Purchaser that TARZAN is a registered trademark of Owner in the United States and certain other territories, that any and all use of the Trademark shall inure solely to the benefit of Owner and shall create no right, title or interest therein or thereto in Purchaser.

(iii)  Purchaser warrants and confirms that it will not obtain in its name or in the name of any agent or representative, any ownership interest in and to the Trademark and that it will not obtain any registration pertaining to such trademark nor will it file any application pertaining thereto.

(iv)  Purchaser agrees that it shall not attack the validity of the Trademark whether prior to or after any reversion to Owner of Purchaser's right to produce any motion pictures hereunder.

(v)  Subject to the other requirements of this subparagraph 6B(b), Purchaser shall be obligated to incorporate the Trademark as part of the title of any motion picture produced hereunder.

(vi)  Purchaser shall not utilize any other trademark, trade name or service mark in connection with the Trademark (it being understood that Purchaser may use its own corporate logo and/or trademark or any of its other applicable corporate logos and/or trademarks or the logos and/or trademarks of any third party manufacturer of soundtrack recordings or music publisher or contributor of production services or equipment) in connection with any motion picture, soundtrack recording or musical composition produced hereunder provided such use,  if it is on the same item as the Trademark, is distinct and separate from the Trademark and shall not vary, modify or change in any manner the Trademark whether by way of translation or otherwise, it being understood that Purchaser may translate the Trademark legends referred to in this Paragraph 6B into foreign languages in connection with the foreign exhibition of any motion picture produced hereunder as well as the foreign distribution or publication, as the case may be, of any soundtrack recording or musical composition produced hereunder.  Purchaser shall, upon Owner' request, execute and deliver any and all documents furnished to Purchaser by Owner which Owner may reasonably require to facilitate Owner' registration, renewal and protection of the Trademark, including, but not limited to recordation of Purchaser as a user of the Trademark. Purchaser furthermore undertakes upon the termination (if any) of Purchaser's right to use the Trademark hereunder, to execute all reasonable and necessary documents furnished to Purchaser by Owner for the purpose of effecting cancellation of the registered user entry or

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

20

**Exhibit BB**

**234**

WB136035
CONFIDENTIAL

other recordation. In connection with the foregoing, when Owner notifies Purchaser in which territories the Trademark is registered and requests Purchaser to advise Owner whether the Trademark is then being used in any territory, Purchaser shall comply with such request, and upon requests by Owner, Purchaser shall furnish Owner with an affidavit (in the form to be furnished to Purchaser by Owner) that it is using the Trademark in motion pictures in any specific territory.

(vii)  Anything to the contrary notwithstanding, Owner acknowledges that Purchaser shall have the right to use the name TARZAN in conjunction with motion pictures based on the TARZAN character and in connection with the exercise of any other rights granted hereunder so long as Purchaser shall have the right under this Agreement to produce and/or distribute such motion pictures.

(viii)  Purchaser hereby agrees to indemnify and hold Owner, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable attorneys' fees) arising out of any unauthorized use by Purchaser of the Trademark. Notwithstanding the foregoing, Owner shall have the right, but not the obligation, to assume the defense of any claim or action arising hereunder, subject to the provisions of subparagraph 7(d) below.

(c)  Owner hereby grants Purchaser the exclusive right to use the word TARZAN and/or the title of any Story as the title of and in connection with any motion picture produced, and, subject to the following sentence, the nonexclusive right to use such words and/or title(s) in the exercise of any other right hereunder. Purchaser may use the title of the Story or the Stories solely for the following purposes:  (i) as the title of such motion picture produced hereunder as may be based on such Story or the Stories; (ii) in the advertising and publicity relating to any motion picture produced hereunder, and (iii) as the title of any soundtrack recording and/or musical composition relating to any motion picture produced hereunder.

7.  Copyright:

(a)  As a condition of the grant of rights by Owner hereunder, Purchaser shall incorporate (and shall cause the respective record company and music publishing company to incorporate) the following form of copyright notice, which shall be in legible size, in the joint names of Owner and Purchaser (or its designee), among the credits on the negative and prints (and tapes if applicable) of motion pictures produced hereunder and on copies of all treatments, screenplays and all advertising or promotional materials issued by Purchaser or under its control in connection with any motion picture produced hereunder, as

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

21

35493

Exhibit BB

235

WB136036
CONFIDENTIAL

well as on the jacket or cover (or other packaging) or label of any soundtrack recording and on any treatment, screenplay and musical composition relating to any motion picture produced hereunder:

> COPYRIGHT © [Year of first publication] Edgar Rice Burroughs, Inc. and [Purchaser or Purchaser's designee]. All Rights Reserved.

In addition, the following form of copyright notice shall appear on the jacket or cover (or other packaging) or label of any soundtrack recording in legible size:

> P [Year of first publication] Edgar Rice Burroughs, Inc. and [Purchaser or Purchaser's designee].

The form of copyright notice shall be submitted to Owner no later than five (5) days prior to the preparation of the credits for the answer print of any motion picture produced hereunder (as well as prior to the manufacture of any soundtrack recording and publication of any musical composition produced hereunder) in order that Owner may insure that Purchaser has complied with the provisions of this Paragraph 7. If Owner does not notify Purchaser within seventy-two (72) hours (exclusive of Saturdays, Sundays and holidays) after receipt of such form of copyright notice, then Owner shall be deemed to have approved said form of copyright notice.

Notwithstanding anything to the contrary contained in this subparagraph 7(a), in the event Purchaser inadvertently omits to incorporate the requisite copyright notice as provided for herein, Purchaser shall not be deemed to be in breach of this subparagraph 7(a) if Purchaser complies with the provisions of Section 405(a)(2) of the United States Copyright Act.

(b) Purchaser shall apply, on behalf of Owner and Purchaser, for Registration of Claim of Copyright in the name of Owner and Purchaser for any motion picture produced hereunder, as well as any screenplay, teleplay, soundtrack recording and musical composition, within ninety (90) days after the date of initial release, exhibition, or publication, as the case may be, and shall concurrently therewith furnish Owner with a copy of the applicable Application to Register Claim of Copyright, and shall instruct the United States Copyright Office to mail a certificate of Registration of Claim of Copyright in respect of said Application to Owner. The Application for Registration of Claim of Copyright shall bear the inscription: "By Agreement Between Warner Bros., a division of Time Warner Entertainment Company, L.P. and Edgar Rice Burroughs, Inc." Purchaser further agrees that the release, exhibition or publication, as the case may be, of any motion picture produced hereunder, as well as any soundtrack recording and musical composition, shall be with such notice of copyright and in such a manner as shall afford to said motion picture copyright protection in the

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

22

35493

**Exhibit BB**
**236**

WB136037
CONFIDENTIAL

United States of America and all countries adhering to the Berne Convention and the Universal Copyright Convention.  References to motion pictures hereunder shall include, but not be limited to, the soundtrack thereof and any dubbed versions, subtitled versions, and any other version thereof.

(c)  Purchaser shall have the right, but not the obligation, at Purchaser's expense, to bring, prosecute, defend and appear in suits, actions and proceedings concerning all copyrights in and to any motion pictures produced hereunder, or concerning any infringement of any such copyright, or any interference with any of the rights herein granted to Purchaser, and to take such action as Purchaser may deem advisable to enforce, protect and/or defend any of the rights, privileges and property herein granted to Purchaser under any and all such copyrights; and to litigate, collect and receive all damages arising from any infringement of any such rights.  Any such action may be taken by Purchaser and Purchaser may, if required by law, join Owner as a party plaintiff or defendant in any such suit, action or proceeding, in which event, Purchaser agrees to indemnify and hold Owner, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable attorneys' fees) resulting from Purchaser joining Owner as a party plaintiff or defendant in any such suit, action or proceeding, except to the extent attributable to the fault of Owner or predecessor or successor in interest of Owner.  If required by Purchaser, Owner shall execute a power of attorney in favor of Purchaser within five (5) business days of the request therefor by Purchaser, so as to enable Purchaser to proceed with any such suits, actions and proceedings. Notwithstanding anything to the contrary set forth in this subparagraph 7(c), if Owner shall notify Purchaser in writing of an infringement with respect to a soundtrack recording and request Purchaser to take action with respect to such infringement, and if Purchaser does not proceed in accordance with such request within five (5) business days of such notice, Owner shall have the right to proceed against the infringement involved at its own expense and shall indemnify and hold harmless Purchaser, its successors and assigns, from and against any loss, liability, damage or expense (including reasonable outside attorneys' fees) resulting from so proceeding.

(d)  Nothing herein shall affect Owner's right to assert or otherwise use its copyright interest in any motion picture produced hereunder, in connection with any suit, action or proceeding of any nature in respect of any matters other than the enforcement, protection and/or defense of the copyright in any motion picture produced hereunder, or other product resulting from Purchaser's exercise of its rights hereunder, it being understood and agreed that no such assertion or use by Owner of its copyright interest shall in any way limit, impair, derogate from, or otherwise restrict Purchaser's sole and exclusive distribution rights in and to any motion picture produced hereunder.  Owner may, if required by law, join Purchaser as a party plaintiff or defendant in any such suit, action or proceeding,

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

23

Exhibit BB
237

WB136038
CONFIDENTIAL

in which event Owner agrees to indemnify and hold Purchaser, its successors and assigns, harmless from and against any loss, liability, damage or expense (including reasonable outside attorneys' fees) resulting from Owner's joining Purchaser as a party plaintiff or defendant in any such suit, action or proceeding.

(e) Owner, as a condition of any grant of print publication rights to any third party, agrees to cause to be affixed to each copy of the Stories or any part thereof hereafter published or offered for sale by or with the authority of Owner notice of copyright in the same form as has been previously affixed to each copy of the Stories or any part thereof, and not to cause any publication of the Stories or any arrangement, revision or reissue thereof in any form without duly copyrighting the same in every country where such publication occurs.

(f) Wherever Purchaser is referred to in the last grammatical paragraph of subparagraph (a) of this subparagraph 7 or subparagraph (b) through (d) of this Paragraph 7, it shall be deemed to mean Purchaser, or, in the event Purchaser's designee is the co-copyright proprietor of the applicable motion picture, then it shall be deemed to mean Purchaser's designee.

8. Irrevocability and No Equitable Relief: Subject to any reversion rights and/or sequel reversion rights set forth herein, all rights granted and agreed to be granted to Purchaser under this Agreement shall be irrevocably vested in Purchaser in perpetuity, including without limitation, for the full term of copyright protection everywhere in the world and any and all renewals, extensions and revivals thereof. No breach by Purchaser of this Agreement shall entitle Owner to equitable relief, whether injunctive or otherwise, against or with respect to the Picture or any other works produced pursuant to the Rights granted hereunder or their exploitation, it being acknowledged and agreed that Owner's remedy of money damages in accordance with the dispute resolution provisions set forth below is adequate. If the rights granted to Purchaser hereunder should revert to Owner pursuant to the provisions of any copyright law or similar law, and if Owner is at any time thereafter prepared to enter into an agreement with a third party for the license, exercise or other disposition of all or any of such rights, Owner shall, before entering into such agreement, give Purchaser notice of the proposed terms thereof (and all modifications of such terms) and the party involved. In each instance, Purchaser shall then have 10 business days in which to elect to acquire the rights involved on the terms contained in the notice.

9. Assignment: Purchaser shall have the right to assign any or all of its rights under this Agreement to any person, and upon such assignment Purchaser shall have no further obligations to Owner hereunder; provided, however, that unless such assignment is to a so-called major or so-called mini-major motion picture company or a United States television network (as those terms are commonly understood in the motion picture or television industries at the time) which assumes such obligations in

FL206
021028MMS/blb Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

24

Exhibit BB
238

WB136039
CONFIDENTIAL

writing, or unless Owner approves of such assignment, such assignment shall not relieve Purchaser of its payment obligations to Owner under this Agreement.

9A. <u>Videocassette/Videodisc Copy</u>:  At such time, if at all, as videocassette and videodisc copies of the Picture and/or any sequel or remakes thereto produced by Purchaser shall be manufactured for distribution in the homevideo market, Purchaser shall furnish Owner, upon request, with 5 such videocassette copies and 5 such videodisc copies at no cost to Owner.  Owner shall use said videocassette and videodisc copies solely for personal, library and reference purposes, and in no event shall said videocassette and videodisc  copies be duplicated or used for any commercial purpose or for profit, including but not limited to the making of public exhibitions of the Picture or such sequel or remake (as applicable).

9B. <u>One-Sheets</u>:  At such time as one-sheets advertising the Picture (and/or each sequel to or remake of the Picture) become available, Purchaser shall furnish Owner, upon Owner's timely request, with 5 copies of each such one-sheet at no cost to Owner.  Owner shall use such copies solely for personal, library and reference purposes, and in no event shall said copies be duplicated or used for any commercial purpose or for profit.

10. <u>Miscellaneous</u>:

(a) <u>Entire Agreement</u>:  Except as herein expressly provided, this Agreement cancels and supersedes all prior negotiations and undertakings relating to the Property and contains all terms and conditions, pertaining to the subject hereof.  If there is any conflict between any provision of this Agreement and any present or future statute, law, ordinance, regulation or collective bargaining agreement the latter shall prevail; provided, that the provision hereof so affected shall be limited only to the extent necessary and no other provision shall be affected.

(b) <u>Notices</u>:  All written notices which either party hereto is required or may desire to give to the other shall be given by delivering or mailing the same to the other at the address shown on the face hereof, or at such other address as may be designated in writing in a notice to the other given as aforesaid.  Notices to Purchaser shall be addressed to the specific attention of Purchaser's Legal Department.  Notices shall be sufficiently given when hand-delivered or when the same shall be deposited so addressed, postage prepaid, in the United States mail and/or when the same shall have been transmitted by facsimile or similar means and the date of said delivery, mailing or transmission shall be the date of the giving of such notice.

(c) <u>Governing Law/Dispute Resolution</u>:  This Agreement shall be governed and construed in accordance with the laws of the State of California

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                          25

35493

**Exhibit BB**
**239**

WB136040
CONFIDENTIAL

applicable to contracts entered into and fully performed therein.  Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of this agreement to arbitrate ("Dispute"), except as otherwise set forth below, shall be resolved according to the following procedures which shall constitute the sole dispute resolution mechanism hereunder:  In the event that the parties are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules").  The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules.  The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute.  The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages.

The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct  or vacate the award.  Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry.  If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County.  The party seeking enforcement of any arbitration award shall be entitled to an award of all costs, fees and expenses, including reasonable outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.

Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Agreement) in the state and federal courts of Los Angeles County.  Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a California court (state or federal) of competent jurisdiction in Los Angeles County.  Any process in such proceeding may be served by, among other methods, delivering it or mailing it, by registered or certified mail, directed to, as applicable, Owner's

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.                                        26

**Exhibit BB**
**240**

35493

WB136041
CONFIDENTIAL

or Purchaser's address as designated in this Agreement.  Any such delivery or mail service shall have the same effect as personal service within the State of California.

(d)  Relationship of the Parties:  This Agreement is not a partnership between or joint venture of the parties hereto and neither party is the agent of the other.  This Agreement is not for the benefit of any third party, whether or not referred to herein.  Captions and organization are for convenience only and shall not be used to construe meaning.  A waiver of any breach shall not waive a prior or subsequent breach.  All remedies shall be cumulative and pursuit of any one shall not waive any other.  This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

WARNER BROS., a division of Time Warner Entertainment Company, L.P.

by WARNER BROS. PICTURES INC. (its successor-in-interest)

("Purchaser")

By: */s/ MARSHALL M. SILVERMAN*
Its: Vice President

Date signed by Warner Bros. Pictures Inc: *7-17-03*

EDGAR RICE BURROUGHS, INC.

*/s/ Illegible*

("Owner")

Execution Date:  as of March 1, 2003

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

**Exhibit BB**
**241**

WB136042
CONFIDENTIAL

## SCHEDULE 1

### "TARZAN" – Merchandising/Television/Stage Rights

1.  <u>General:</u>

    (a)    Disney merchandising rights are limited to the merchandising rights in the Disney pictures utilizing Disney-created materials. Disney does not have the right to exploit generic non-Disney picture related merchandising rights.

    (b)    For purposes of the following, a "picture" includes a theatrical motion picture or direct to video motion picture.

2.  Basic Structure:

    (a)    Disney controls merchandising rights starting eighteen (18) months prior to release of a picture and ending two (2) years after the release date (but in the case of a television series, the term expires one (1) year after the date upon which the last original episode is broadcast), provided, however, that with respect to any category of merchandising goods (such category being defined in the applicable trademark regulations) in which Disney is actively exploiting merchandising rights at the end of such two (2) or one (1) year period, the term with respect to such category of goods shall be extended by one (1) additional year.

    (b)    If a Disney television series is a spin-off series and the term would have otherwise expired but for the production of such spin-off series, then Disney's merchandising rights for such spin-off series shall be on a non-exclusive basis.

    (c)    If Disney theatrically re-releases a picture after the term, then the merchandising license to Disney shall be reactivated for an additional term of three (3) years from the date of such theatrical re-release, provided that with respect to the second and third years of such three (3) year term, Disney's merchandising rights shall be on a non-exclusive basis.

3.  Extension Right:

    (a)    Disney has the right (which it exercised with respect to the first picture) to extend the merchandising term until six (6) years after the release of the first picture (which, in the case of the first picture, would be June, 2005) with the sixth year being non-exclusive. If a television series is produced within such term, the term shall be extended until one (1) year after the date upon which the last original episode of the television series is first broadcast.

842.0
October 21, 2002

DM/sam
187000 3

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

1

**Exhibit BB**
**242**

WB136043
CONFIDENTIAL

(b)     After the end of the extended term, Disney, on a non-exclusive basis, can exercise merchandising rights at Disney theme parks and Disney retail stores (and through Disney catalogue sales).

(c)     The extension right can be exercised (within six (6) months after release) for any additional picture produced after the term.

(d)     If any picture is theatrically re-released, then the term of Disney's merchandising rights shall be reactivated for a period of three (3) years after said re-release (with the last two (2) years being on a non-exclusive basis).

4.      Restrictions on Edgar Rice Burroughs' Exploitation of Generic Merchandising Rights:  During the period that Disney has exclusive rights, Burroughs cannot exploit generic merchandising rights, and during the period that it can exploit generic merchandising rights, it must limit the terms of its licenses (and any renewals thereof) to one (1) year.

5.      Warner Television Series Option:  Warner has an option to acquire the live-action television series rights in the "TARZAN" property, and if it does so, merchandising rights are reserved by Burroughs, provided, however, that upon expiration of the merchandising exclusivity held by Disney regarding the merchandising rights, Warner has a right of first negotiation to acquire the merchandising rights in its television series, provided that if Burroughs and Warner are unable to reach an agreement after good faith negotiations, Warner shall have no merchandising rights in the series.

6.      Stage Rights:  The stage rights in "TARZAN" are under option to Disney.  If the stage play is produced and runs for at least four (4) consecutive months, then Disney can produce one (1) live-action musical theatrical production and one (1) live-action musical television production based on the musical play.  In this connection, Disney has agreed not to release its film during the period commencing one (1) year before and ending one (1) year after the release of a third party (e.g., Warner) film, provided Burroughs gives Disney notice of the commencement of production, intended release date and actual release date of the third party film (updated as required).

FL206
02102BMMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

2

**Exhibit BB**

**243**

WB136044
CONFIDENTIAL

## EXHIBIT A

AN EYE FOR AN EYE           )
WHEN THE LION FED           )
THE GOLDEN LOCKET           )      TARZAN THE UNTAMED
THE DEBT                    )
WHEN BLOOD TOLD             )
THE BLACK FLYER             )

TARZAN, LORD OF THE JUNGLE

TARZAN AND THE LOST EMPIRE

TARZAN AND THE IMMORTAL MEN      )    TARZAN'S QUEST

THE RED STAR OF TARZAN           )    TARZAN AND THE FORBIDDEN CITY

TARZAN AND THE MAGIC MEN         )    TARZAN THE MAGNIFICENT
TARZAN AND THE ELEPHANT MEN      )

TARZAN AND THE FOREIGN LEGION

TARZAN AND THE MADMAN

THE QUEST OF TARZAN              )
TARZAN AND THE CHAMPION         )    TARZAN AND THE CASTAWAYS
TARZAN AND THE JUNGLE MURDER    )

TARZAN AND THE TARZAN TWINS WITH JAD-BAL-JA, THE GOLDEN LION

1

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

1

Exhibit BB
244

WB136045
CONFIDENTIAL

TARZAN OF THE APES

THE RETURN OF TARZAN

THE BEASTS OF TARZAN

THE SON OF TARZAN

TARZAN AND THE JEWELS OF OPAR

| | |
|---|---|
| TARZAN'S FIRST LOVE ) | |
| THE CAPTURE OF TARZAN ) | |
| THE FIGHT FOR THE BALU ) | |
| THE GOD OF TARZAN ) | |
| TARZAN AND THE BLACK BOY ) | |
| THE WITCH DOCTOR SEEKS VENGEANCE ) | JUNGLE TALES OF TARZAN |
| THE END OF BUKAWAI ) | |
| THE LION ) | |
| THE NIGHTMARE ) | |
| THE BATTLE FOR TEEKA ) | |
| A JUNGLE JOKE ) | |
| TARZAN RESCUES THE MOON ) | |

| | |
|---|---|
| AN EYE FOR AN EYE ) | |
| WHEN THE LION FED ) | |
| THE GOLDEN LOCKET ) | TARZAN THE UNTAMED |
| THE DEBT ) | |
| WHEN BLOOD TOLD ) | |
| THE BLACK FLYER ) | |

TARZAN THE TERRIBLE

TARZAN AND THE GOLDEN LION

TARZAN AND THE ANT MEN

TARZAN, LORD OF THE JUNGLE

TARZAN AND THE LOST EMPIRE

TARZAN AT THE EARTH'S CORE

TARZAN THE INVINCIBLE

TARZAN TRIUMPHANT

2

FL206
02102BMMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

2

**Exhibit BB**

**245**

WB136046
CONFIDENTIAL

TARZAN AND THE CITY OF GOLD

TARZAN AND THE LION MAN

TARZAN AND THE LEOPARD MEN

TARZAN AND THE IMMORTAL MEN        )        TARZAN'S QUEST

THE RED STAR OF TARZAN             )        TARZAN AND THE FORBIDDEN CITY

TARZAN AND THE MAGIC MEN           )        TARZAN THE MAGNIFICENT
TARZAN AND THE ELEPHANT MEN        )

3

FL206
021028MMS/blb  Rev(3) 6-5-03
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

35493

Exhibit BB
246

3

WB136047
CONFIDENTIAL

EXHIBIT "B"

## DEFINED GROSS IN EXCESS OF CONTRACTUAL START POINT MOVING BASIS

### COMPUTATION AND PAYMENT

1.      Definition of Parties:  "Warner" means Warner Bros., a division of Time Warner Entertainment Company, L.P., and its subdivisions engaged in the business of distributing motion pictures for exhibition in theaters and for broadcasting over television stations, but shall not include any other persons, firms or corporations licensed by Warner to distribute motion pictures in any part of the world.  Nor shall such term include: any person, firm or corporation distributing the Picture for purposes other than exhibition in theaters or by television stations; exhibitors or others who may actually exhibit the Picture to the public; radio or television broadcasters; cable operators; manufacturers, wholesalers or retailers of video discs, cassettes or similar devices; book or music publishers; phonograph record producers or distributors; manufacturers, distributors, wholesalers, retailers or operators of any types of merchandise, goods, services or theme park or other attractions; whether or not any of the foregoing are subdivisions of Warner.

"Participant" means the party under the foregoing agreement who or which is entitled to participate in the Defined Gross of the Picture which exceeds the Contractual Start Point, computed on a moving basis (all as defined below), and the successors and permitted assigns of such party.

2.      Contractual Start Point:  As between Warner and Participant, the Picture shall be deemed to have reached the "Contractual Start Point" at such time as the Defined Gross (as defined in 3 hereof) of the Picture shall equal the following:

(a)  Warner's distribution fees set forth in 4 hereof.

(b)  Warner's expenses in connection with the distribution of the Picture, as set forth in 5 hereof.

(c)  The cost of production of the Picture, plus an amount equal to interest thereon, all as provided for in 9 hereof, and plus such other costs, if any, as may have been incurred in connection with the financing of the cost of production of the Picture.  Said interest and other costs shall be recouped before said cost of production.

The Contractual Start Point shall be computed on a moving basis.  "Moving basis" means that the Contractual Start Point shall be determined as of the close of each accounting period provided for in paragraph 10 hereof.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
1
**Exhibit BB**
247

35493

**WB136048
CONFIDENTIAL**

3.    "Defined Gross" of the Picture means the aggregate of:

(a)    All film rentals actually received by Warner from parties exhibiting the Picture in theaters and on television where Warner distributes directly to such parties (hereinafter referred to as "exhibitors").

(b)    Where Warner grants theatrical distribution rights to a subdistributor on a basis requiring it to account to Warner with respect to film rentals, either: (i) the film rentals received by such subdistributor from exhibitors which Warner accepts for the purpose of its accountings with such subdistributor; or (ii) Warner's share (actually received) of film rentals received by such subdistributor; whichever Warner elects from time to time as to each subdistributor.

(c)    In respect of licenses of exhibition or distribution rights by means of video discs, cassettes or similar devices, an amount equal to 20% of (i) the gross wholesale rental income therefrom and (ii) the gross wholesale sales income therefrom less a reasonable allowance for returns.

(d)    All amounts actually received by Warner from the following: (i) trailers (other than trailers advertising television exhibitions of the Picture); (ii) licenses of theatrical distribution rights for a flat sum; (iii) licenses of exhibition or distribution rights other than those referred to in (a), (b), (c) and (d) (ii) of this 3, specifically including licenses to cable operators; (iv) the lease of positive prints (as distinguished from the licensing thereof for a film rental); and from the sale or licensing of advertising accessories, souvenir programs and booklets; and (v) recoveries by Warner for infringement of copyrights of the Picture.

(e)    All monies actually received by Warner on account of direct subsidies, aide or prizes relating specifically to the Picture, net of an amount equal to income taxes based thereon imposed by the country involved, if any. If local laws require use of such monies as a condition to the grant of such subsidy or aide, such monies shall not be included in Defined Gross until actually used.

(f)    The sums to be included in Defined Gross under Exhibits "1," "2" and "3" attached hereto.

All costs incurred in connection with any of the foregoing shall be deemed and treated as recoupable distribution expenses. In no event shall rentals from the exhibition of the Picture which are contributed to charitable organizations be included in Defined Gross.

4.    Distribution Fees: Warner's distribution fees shall be as follows:

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
2

35493

Exhibit BB
248

WB136049
CONFIDENTIAL

    (a)    30% of the Defined Gross of the Picture derived by Warner from all sources in the United States and Canada.

    (b)    35% of the Defined Gross of the Picture derived by Warner from all sources in the United Kingdom.

    (c)    40% of the Defined Gross of the Picture derived by Warner from all sources other than those referred to in (a) and (b) above.

    (d)    Notwithstanding the foregoing; (i) with respect to sums included in the Defined Gross pursuant to 3(b)(ii) and 3(d)(ii) hereof, Warner's distribution fee shall be 15% of such sums; (ii) if Warner shall license the exhibition of the Picture on free television, the aforesaid percentages as to amounts received and collected by Warner from sources in the United States, shall be 30% if collected from a network for national network telecasts in prime time; and 35% in all other instances; and, as to amounts received and collected by Warner from sources outside the United States 40%; (iii) no distribution fee shall be charged on Defined Gross referred to in 3(e) hereof.

All distribution fees shall be calculated on the full Defined Gross without any deductions or payments of any kind whatsoever, except as specifically hereinafter provided.

Notwithstanding anything herein contained, it is agreed that for the accounting period in which the Picture shall first reach the Contractual Start Point and each accounting period thereafter, the distribution fees for the purpose of calculating the Contractual Start Point shall be calculated only on that portion of the Defined Gross in respect of such accounting period which is equal to the sum of the following:

    (1)    An amount equal to the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period; and

    (2)    An amount equal to the distribution fees on Defined Gross necessary to recoup said deductible items plus the distribution fees.

For example:  If for the accounting period in which the Picture first reaches the Contractual Start Point

    (i)    the total Defined Gross is $1,000,000; and

    (ii)    "X" represents the amount of Defined Gross on which distribution fees are to be charged for the purpose of calculating the Contractual Start Point; and

FI802
02102BMMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
**249**

35493

**WB136050
CONFIDENTIAL**

(iii) the average distribution fees for such accounting period are 35%; and

(iv)   the sums specified in subparagraphs (b) and (c) of paragraph 2 of this Exhibit which are recouped or paid in respect of such accounting period are $500,000,

then said $500,000 would be .65X; X would be $769,230.76; the distribution fees for the purpose of calculating the Contractual Start Point would be $269,230.76 (i.e., 35% of $769,230.76) rather than $350,000 (i.e., 35% of $1,000,000); and the Defined Gross in excess of the Contractual Start Point would be $230,769.24 (i.e., $1,000,000 - $769,230.76).

5.   Distribution Expenses: Warner's deductible distribution expenses in connection with the Picture shall include all costs and expenses incurred in connection with the distribution, advertising, exploitation and turning to account of the Picture of whatever kind or nature, or which are customarily treated as distribution expenses under customary accounting procedures in the motion picture industry. If Warner reasonably anticipates that additional distribution expenses will be incurred in the future, Warner may, for a reasonable time, set up appropriate reserves therefor. Without limiting the generality of the foregoing, the following particular items shall be included in distribution expenses hereunder:

(a)   The cost and expense of all duped and dubbed negatives, sound tracks, prints, release prints, tapes, cassettes, duplicating material and facilities and all other material manufactured for use in connection with the Picture, including the cost of inspecting, repairing, checking and renovating film, reels, containers, cassettes, packing, storing and shipping and all other expenses connected therewith and inspecting and checking exhibitors' projection and sound equipment and facilities. Warner may manufacture or cause to be manufactured as many or as few duped negatives, positive prints and other material for use in connection with the Picture as it, in its sole discretion, may consider advisable or desirable.

(b)   All direct costs and charges for advertisements, press books, artwork, advertising accessories and trailers (other than (i) prints of trailers advertising free television exhibition of the Picture, and (ii) the trailer production costs which are included in the cost of production of the Picture), advertising, publicizing and exploiting the Picture by such means and to such extent as Warner may, in its uncontrolled discretion, deem desirable, including, without limitation, pre-release advertising and publicity, so-called cooperative and/or theater advertising, and/or other advertising engaged in with or for exhibitors, to the extent Warner pays, shares in, or is charged with all or a portion of such costs and all other exploitation costs relating to such theater exhibition. Any re-use fees and costs of recording and manufacturing masters for phonograph records, which Warner shall advance in order to assist in the advertising and

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
4
**Exhibit BB**
**250**

35493

WB136051
CONFIDENTIAL

exploitation of the Picture, shall be treated as costs hereunder to the extent unrecouped by the record company. Where any Warner advertising or publicity employee (other than an executive supervisory employee) or facility is used for the Picture, the salary of such employee and the cost of such facility (while so used for the Picture) shall be direct costs hereunder. Any costs and charges referred to in this (b) (and not included in the cost of production of the Picture), expended or incurred prior to delivery of the Picture, shall be included in direct costs under this (b). There shall also be included as an item of cost a sum equal to 10% of all direct costs referred to in this (b) to cover the indirect cost of Warner's advertising and publicity departments, both domestic and foreign.

(c) All costs of preparing and delivering the Picture for distribution (regardless of whether such costs are the salaries and expenses of Warner's own employees or employees or parties not regularly employed by Warner), including, without limitation, all costs incurred in connection with the production of foreign language versions of the Picture, whether dubbed, superimposed or otherwise, as well as any and all costs and expenses in connection with changing the title of the Picture, recutting, re-editing or shortening or lengthening the Picture for release in any territory or for exhibition on television or other media, or in order to conform to the requirements of censorship authorities, or in order to conform to the peculiar national or political prejudices likely to be encountered in any territory, or for any other purpose or reason. The costs referred to in this (c) shall include all studio charges for facilities, labor and material, whether or not incurred at a studio owned or controlled by Warner.

(d)     All sums paid or accrued on account of sales, use, receipts, income, excise, remittance and other taxes (however denominated) to any governmental authority assessed upon the negatives, duplicate negatives, prints or sound records of the Picture, or upon the use or distribution of the Picture, or upon the revenues derived therefrom, or any part thereof, or upon the remittance of such revenues, or any part thereof; any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents", and any similar authority to secure the entry, licensing, exhibition, performance, use or televising of the Picture in any country or part thereof, regardless of whether such payments or accruals are assessed against the Picture or the proceeds thereof or against a group of motion pictures in which the Picture may be included or the proceeds thereof. In no event shall the deductible amount of any such tax (however denominated) imposed upon Warner, be decreased (nor the Defined Gross increased) because of the manner in which such taxes are elected to be treated by Warner in filing net income, corporate franchise, excess profits or similar tax returns. Subject to the foregoing, (i) Warner's own United States federal and state income taxes and franchise taxes based on Warner's net income; and (ii) income taxes payable to any country or territory by Warner based on the net earnings of Warner in such country or territory and which is computed and assessed solely by reason of the

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
Exhibit BB
251

35493

WB136052
CONFIDENTIAL

retention in such country or territory by Warner of any portion of the Defined Gross shall not be deductible hereunder.

(e)    Expenses of transmitting to the United States any funds accruing to Warner from the Picture in foreign countries, such as cable expenses, and any discounts from such funds taken to convert such funds directly or indirectly into U.S. dollars.

(f)    All costs and expenses, including reasonable attorneys' fees, loss, damage or liability suffered or incurred by Warner in connection with: any action taken by Warner (whether by litigation or otherwise) in copyrighting, protecting and enforcing the copyright of, and other rights and sources of revenue to be derived from, the Picture; reducing or minimizing the matters referred to in (d) and (e) above, the collection of film rentals, and other sums due Warner from exhibitors, subdistributors and others in respect of the Picture or to recover monies due pursuant to any agreement relating to the distribution or the exhibition of the Picture; checking attendance and exhibitors' receipts; preventing and/or recovering damages for unauthorized exhibition or distribution of the Picture, or any impairment of, encumbrance on or infringement upon, the rights of Warner in and to the Picture; prosecuting and defending actions under the antitrust laws, communications laws, and federal, state and local laws, ordinances and regulations (including censorship) affecting the exhibition and/or distribution of the Picture and/or the ability of Warner to derive revenue from the Picture and its component parts and by-products; and auditing of books and records of any exhibitor, subdistributor or licensee.

(g)    Royalties payable to manufacturers of sound recording and reproducing equipment and dues and assessments of, and contributions by Warner to, AMPTP, MPAA, MPEA, the Academy of Motion Picture Arts and Sciences and other trade associations or industry groups comprised of a substantial number of motion picture producers and/or distributors, but only for purposes relating to the production, distribution, export, import, advertising, exploitation and general protection and/or promotion of motion pictures.

(h)    In the event any person shall make a claim relating to the Picture against Warner or any of its licensees, which claim, in Warner's judgment, is of sufficient merit to constitute a reasonable probability of ultimate loss, cost, damage or expense, Warner may deduct under this (h) such amount as Warner may deem necessary to cover any loss, cost, damage or expense which may be suffered as a result thereof.  Warner shall have the right to settle and pay any such claim.  After the settlement of any such claim, or after the final judicial determination thereof, the amount previously deducted hereunder shall be adjusted accordingly with the next accounting statement rendered hereunder. Nothing herein contained shall be construed as a waiver of any of Participant's warranties contained in this Agreement, or a waiver of any right or remedy at law or otherwise which may exist in favor of Warner, including, but not limited to, the

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
**252**

35493

WB136053
CONFIDENTIAL

right to require Participant to reimburse Warner on demand for any liability, cost, damage or expense arising out of, or resulting from, any breach by Participant of any warranty, undertaking or obligation by Participant, or any right on the part of Warner to recoup or recover any such cost or expense out of Participant's share of any monies payable hereunder, rather than treating such costs or expenses as distribution expenses.

(i)    All amounts paid or payable to or for the benefit of actors, writers, composers, directors and others, pursuant to applicable collective bargaining agreements and/or any law or governmental regulation or decree now or hereafter in force by reason of, and/or as a condition or consideration for, any exhibition, use, re-use, rerun, performance, sale, license and/or distribution of the Picture and/or copies of all or any part thereof, on television, supplemental markets, or otherwise (all herein called "residuals"), together with all taxes, pension fund contributions and other costs paid or payable in respect of such residuals, and in respect of percentage participations in the Picture; provided, however, that if Participant or any principal stockholder of Participant, or any heirs, executors, administrators, successors or assigns of Participant, or any such stockholder, are entitled, either directly or by way of participation in any pension fund, to any such residuals, or to compensation for services rendered beyond any guaranteed period referred to in the foregoing agreement, the amount payable on account thereof shall be treated as an advance against Participant's participation hereunder.

(j)    The cost of all insurance (to the extent that the same is not included in the cost of production of the Picture) covering or relating to the Picture, including, but not limited to, errors and omissions insurance and all insurance on negatives, positive prints, sound materials or other physical property, it being understood, however, that Warner shall not be obligated to take out or maintain any such insurance.

(k)    If Warner shall proceed under 3(b)(i) hereof, all items deducted by the subdistributor as distribution expenses, and which Warner accepts for the purpose of its accountings with such subdistributor, shall be treated as Warner's expenditures under the corresponding subdivision of this paragraph 5.

6.    Film Rentals: "Film Rentals" shall be determined after all refunds, credits, discounts, allowances and adjustments granted to exhibitors, whether occasioned by condemnation by boards of censorship, settlement of disputes or otherwise. Until earned, forfeited or applied to the Picture, neither advance payments nor security deposits shall be included in film rentals. No cost (regardless of how incurred, paid or allowed) of Warner's share of cooperative and/or theater advertising shall be deducted in determining film rentals. Where allowances are granted and paid on account of Warner's share of cooperative theater or joint advertising, such payments shall not be deducted in determining film rental, and where Warner's share of cooperative theater or joint advertising is deducted by the exhibitor Warner's share of cooperative theater or

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
7

35493

Exhibit BB
253

WB136054
CONFIDENTIAL

joint advertising shall be added back into the film rental received from such exhibitor, and all such costs, payments, discounts and allowances shall be treated as distribution expenses. Wherever Warner exhibits the Picture in a theater or over a television station owned or controlled by Warner, or licenses the Picture or rights connected therewith to theaters, television stations or other agencies in which Warner has an interest, directly or indirectly, or to which Warner is obligated to pay a fixed sum for exhibiting the Picture or for the use of its premises or facilities, Warner shall include in the film rentals of the Picture such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters.

     7.    <u>Allocations</u>: Wherever Warner (i) receives from any license either a flat sum or a percentage of the receipts, or both, for any right to a group of motion pictures (including the Picture) under any agreement (whether or not the same shall provide for the exhibition, lease or delivery of positive prints of any of said motion pictures) which does not specify what portion of the license payments apply to the respective motion pictures in the group (or to such prints or other material, if any, as may be supplied), or (ii) receives foreign currency under 8 hereof relating to a group of motion pictures (including the Picture), then in any and all such situations Warner shall include in, or deduct from, the Defined Gross, as the case may be, such sums, determined in good faith, as may be reasonable and consistent with Warner's usual practice in such matters. All costs described in 5 hereof shall be fairly apportioned to the Picture if incurred or expended on an industry basis, or in conjunction with other motion picture producers and/or distributors, or with respect to the Picture and other motion pictures distributed by Warner.

     8.    <u>Foreign Receipts</u>:   No sums received by Warner relating to the Picture shall be included in Defined Gross hereunder unless and until such sums have been (i) received by Warner in U.S. dollars in the United States; or (ii) used by Warner for the production or acquisition of motion pictures or television films which can be lawfully removed from the country or territory involved, in which event they shall be included in Defined Gross for the accounting period during which an amount (computed at the official or unofficial rate of exchange, as Warner may elect) equal to the amount expended for such production or acquisition, plus interest thereon, as herein provided, has been recouped by Warner (in excess of normal distribution fees and distribution expenses) from distribution thereof outside the country or territory involved; or (iii) used by Warner for acquisition of tangible personal property which can be and is lawfully exported from the country or territory involved, in which event the U.S. dollar equivalent of the currency utilized to acquire such property shall be included in Defined Gross hereunder for the accounting period during which such property was so exported, such U.S. dollar equivalent to be computed at the official or unofficial rate of exchange, as Warner may elect, in effect on the date of export. Warner will, promptly after receipt of a written request from Participant (but not more frequently than annually) advise Participant in writing as to foreign revenues not included in Defined Gross as aforesaid, and Warner shall, at the written request and expense of Participant (subject to any and all limitations, restrictions, laws, rules and regulations affecting such transactions), deposit into a bank designated by Participant in the country involved, or pay to any

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
8

**Exhibit BB**
254

35493

**WB136055
CONFIDENTIAL**

other party designated by Participant in such country, such part thereof as would have been payable to Participant hereunder. Such deposits or payments to or for Participant shall constitute due remittance to Participant, and Warner shall have no further interest therein or responsibility therefor. Warner makes no warranties or representations that any part of any such foreign currencies may be converted into U.S. dollars or transferred to the account of Participant in any foreign country. In no event shall Warner be obligated to apply Defined Gross of any country not actually received by Warner in U.S. dollars in the United States to the recoupment of any costs or expenses incurred with respect to the Picture in any other country.

9.     Cost of Production; Interest:

(a)  The "cost of production" of the Picture means the total direct cost of production of the Picture, including the cost of all items listed on Warner's standard Delivery Schedule, computed and determined in all respects in the same manner as Warner then customarily determines the direct cost of other motion pictures distributed and/or financed by it, plus Warner's overhead charge. The determination of what items constitute direct charges and what items are within said overhead charge shall be made in all respects in the same manner as Warner customarily determines such matters. The full amount of all direct costs of production of the Picture (whether payable in cash, deferred or accrued) shall be included in the direct cost of the Picture at the time liability therefor is incurred or contracted, regardless of whether the same has actually been paid to the party or parties entitled thereto at the time involved. Deferments and participations in Defined Gross of the Picture consented to by Warner (however defined) shall be treated as direct costs of production, whether the same shall be in a definite amount or based on a percentage of the Defined Gross, and whether the same are fixed obligations or are contingent upon receipts of the Picture; provided, however, contingent participations based on a percentage of Defined Gross as defined in the applicable agreement shall not be included in the direct cost of production beyond recoupment under 2(c) hereof.

(b)     Warner's overhead charge shall be in an amount equal to 15% of the direct cost of production of the Picture, with the understanding that any production facilities, equipment or personnel supplied by Warner or by a studio owned or controlled by Warner, or in which Warner has a substantial financial interest (and which are not furnished within the overhead charge), shall be supplied at Warner's usual rental rates charged for such items, and such charges shall be treated as direct costs of production of the Picture and shall bear said 15% overhead charge. Warner's overhead charge shall accrue and be included in the cost of production of the Picture concurrently with the incurring of the respective items of direct cost to which it applies.

(c)     The amount equal to interest provided for in 2(c) hereof shall be calculated at a rate per annum equal to 125% of the rate announced from time to time by the Bank of America as its prime rate on unsecured loans to its preferred

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
**255**

35493

**WB136056**
**CONFIDENTIAL**

customers. Said amount shall be calculated from the respective dates that each item is charged to the Picture until the close of the accounting period during which the cost of production is recouped under 2(c) hereof, except that interest on deferred amounts shall be calculated from the date of payment.

(d)    Concurrently with delivery to Participant of the first earnings statement hereunder, Warner will (subject to revisions and correction) deliver to Participant an itemized summary of the cost of production of the Picture. Participant shall have the right to audit such statement in accordance with 11 hereof.

10.    Earnings Statements: Warner shall render to Participant periodic statements showing, in summary form, the appropriate calculations under this Agreement. Statements shall be issued for each calendar quarter until the Picture has been in release for four (4) years from and including the quarter in which the Picture was first released, and thereafter annually. Each such quarterly or annual period, as the case may be, is herein referred to as an "accounting period". No statements need be rendered for any accounting period during which no receipts are received. Statements rendered by Warner may be changed from time to time to give effect to year-end adjustments made by Warner's Accounting Department or Public Accountants, or to items overlooked, to correct errors and for similar purposes. If Warner shall extend credit to any licensee with respect to the Picture and if such credit has been included in the Defined Gross, and if, in the opinion of Warner, any such indebtedness shall be uncollectible, the uncollected amount may be deducted in any subsequent earning statement. Should Warner make any overpayment to Participant hereunder for any reason, Warner shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by Warner to Participant or for Participant's account, or may demand repayment from Participant, in which event Participant shall repay the same when such demand is made. Any U.S. dollars due and payable to Participant by Warner pursuant to any such statement shall be paid to Participant simultaneously with the rendering of such statement; provided, however, that all amounts payable to Participant hereunder shall be subject to all laws and regulations now or hereafter in existence requiring deductions or withholdings for income or other taxes payable by or assessable against Participant. Warner shall have the right to make such deductions and withholdings and the payment thereof to the governmental agency concerned in accordance with its interpretation in good faith of such laws and regulations, and shall not be liable to Participant for the making of such deductions or withholdings or the payment thereof to the governmental agency concerned. In any such event Participant shall make and prosecute any and all claims which it may have with respect to the same directly with the governmental agency having jurisdiction in the premises. The right of Participant to receive, and the obligation of Warner to account for, any share of the Defined Gross of the Picture shall terminate if the Picture has been made available for exhibition on syndicated television in the U.S.A., and if the first earnings statement issued thereafter shows a deficit under 2 hereof such that at least $500,000 of Defined

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
10
**Exhibit BB**
**256**

35493

WB136057
CONFIDENTIAL

Gross would be required before Participant would be entitled to receive any participation hereunder. In the event a new medium of exhibition shall thereafter be developed and there shall be substantial exhibition and distribution of the Picture by such new medium which is likely to generate Defined Gross of $500,000 or the amount of the deficit, whichever is larger, Participant may audit Warner's records for the purpose of determining whether the Picture has earned, or is likely to earn, any Defined Gross in excess of the Contractual Start Point and if, as a result of such audit, it is determined by mutual agreement, or in the event of dispute appropriate legal proceedings, that the Picture has earned, or is likely to earn, Defined Gross in excess of the Contractual Start Point as herein defined, accountings hereunder and payments, if required, shall be reinstated.

     11.   <u>Accounting Records re Distribution; Audit Rights</u>: Warner shall keep books of account relating to the distribution of the Picture, together with vouchers, exhibition contracts and similar records supporting the same (all of which are hereinafter referred to as "records"), which shall be kept on the same basis and in the same manner and for the same periods as such records are customarily kept by Warner. Participant may, at its own expense, audit the applicable records at the place where Warner maintains the same in order to verify earnings statements rendered hereunder. Any such audit shall be conducted only by a reputable public accountant during reasonable business hours in such manner as not to interfere with Warner's normal business activities. In no event shall an audit with respect to any earnings statement commence later than twenty-four (24) months from the rendition of the earnings statement involved; nor shall any audit continue for longer than thirty (30) consecutive business days; nor shall audits be made hereunder more frequently than once annually; nor shall the records supporting any earnings statement be audited more than once. All earnings statements rendered hereunder shall be binding upon Participant and not subject to objection for any reason unless such objection is made in writing, stating the basis thereof and delivered to Warner within twenty-four (24) months from rendition of the earnings statement, or if an audit is commenced prior thereto, within thirty (30) days from the completion of the relative audit. If Warner, as a courtesy to Participant, shall include cumulative figures in any earnings or other statement, the time within which Participant may commence any audit or make any objection in respect of any statement shall not be enlarged or extended thereby. Participant's right to examine Warner's records is limited to the Picture, and Participant shall have no right to examine records relating to Warner's business generally or with respect to any other motion Picture for purposes of comparison or otherwise; provided, however, that where any original income or expense document with third parties relates to the Picture and to other motion pictures, Participant shall have the right to examine the entire document without deletions therefrom.

     12.   <u>Ownership</u>: Participant expressly acknowledges that Participant has and will have no right, title or interest of any kind or character whatsoever in or to the Picture, and no lien thereon or other rights in or to the Defined Gross of the Picture; and that the same shall be and remain Warner's sole and exclusive property, and Warner shall not be obligated to segregate the same from its other funds, it being the intent and

FI802
021028MMS/blb 12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
**Exhibit BB**
**257**

35493

WB136058
CONFIDENTIAL

purpose hereof that the Defined Gross of the Picture, including the Defined Gross in excess of Contractual Start Point, is referred to herein merely as a measure in determining the time and manner of payment to Participant; and that Warner shall not be deemed a trustee, pledgeholder or fiduciary. Participant shall have no right, title or interest of any kind or character whatsoever in or to the literary, dramatic or musical material upon which the Picture is based, or from which it may be adapted; and Warner shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in such material upon such terms and conditions as it may deem advisable, all without consulting or advising Participant and without accounting to Participant in any manner with respect thereto.

13.    Distribution:  As between Participant and Warner, Warner shall have complete authority to distribute the Picture and to license the exhibition thereof throughout the world in accordance with such sales methods, policies and terms as it may, in its uncontrolled discretion, determine.  Warner shall have the broadest possible latitude in the distribution of the Picture, and the exercise of its judgment in good faith in all matters pertaining thereto shall be final.  Warner has not made any express or implied representation, warranty, guarantee or agreement as to the amount of proceeds which will be derived from the distribution of the Picture, nor has Warner made any express or implied representation, warranty, guarantee or agreement that there will be any sums payable to Participant hereunder, or that the Picture will be favorably received by exhibitors or by the public, or will be distributed continuously.  In no event shall Warner incur any liability based upon any claim that Warner has failed to realize receipts or revenue which should or could have been realized.  Warner may distribute the Picture either itself or through such distributors, subdistributors and other parties as Warner may, in its uncontrolled discretion, determine, and Warner may refrain from releasing and/or distributing the Picture in any territory for any reason whatsoever. Warner may license the Picture or rights connected therewith to any and all theaters or other agencies in which Warner may have an interest directly or indirectly upon such terms and rentals as Warner may deem fair and proper under the circumstances. Nothing herein contained shall be construed as a representation or warranty by Warner that it now has or will hereafter have or control any theaters or agencies in the United States or elsewhere.

14.    Sale of Picture:  Warner shall have the right at any time after completion of the Picture to sell, transfer or assign all or any of its rights in and to the Picture and the negative and copyright thereof.  Any such sale, transfer or assignment shall be subject to Participant's rights hereunder, and upon the purchaser, transferee or assignee assuming performance of this agreement in place and stead of Warner, Warner shall be released and discharged of and from any further liability or obligation hereunder.  No part of any sale price or other consideration received by, or payable to, Warner shall be included in the Defined Gross hereunder and participant shall have no rights in respect of any thereof.

15.    Assignments, etc.:  Participant shall have the right to sell, assign, transfer or hypothecate (all herein called "assign") all or any part of Participant's right to receive

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
Exhibit BB
258

35493

WB136059
CONFIDENTIAL

the moneys payable to Participant hereunder.  Any such assignment shall be subject to all pertinent laws and governmental regulations and to the rights of Warner hereunder. In the event of any such assignment by Participant, a Notice of Irrevocable Authority and Distributor's Acceptance in Warner's usual form shall be executed by Participant and by the transferee and delivered to Warner.  If at any time more than three parties shall be entitled to receive payments, which under the terms hereof are to be paid to or for the account of Participant, Warner may, at its option, require that all such parties execute and deliver an agreement in Warner's usual form appointing a disbursing agent for all such parties.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "B"
13.
**Exhibit BB**
**259**

35493

WB136060
CONFIDENTIAL

## MUSIC PUBLISHING INCOME

In the event the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to share directly in publishing revenues, there shall also be included in Defined Gross of the Picture:

A sum equal to 75% of the "publisher's share" of mechanical reproduction and performing fees received in U.S. currency by Warner's subsidiary or affiliated publisher with respect to music and lyrics written specifically for and synchronized in the Picture as released, provided such publisher is vested with all rights therein and all of the "publisher's share" of the receipts therefrom, and provided the party entitled to share in Defined Gross of the Picture under the foregoing agreement is not entitled to receive composers' or lyricists' royalties in respect of such music or lyrics. The "publisher's share" of mechanical reproduction fees shall be the full amount paid by the licensee, less composers' share of such fees and less the charges of the publisher or any agent, trustee or administrator acting for the publisher for the collection of such fees, not to exceed 5% thereof. Mechanical reproduction fees do not include synchronization fees.

The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing rights society in respect of the music and lyrics involved; or, if Warner or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected by Warner or the publisher, less the composer's share of such fees and all reasonable costs and expenses in administering the collection of such fees.

If the agreement or Exhibit to which this Exhibit is attached provides for distribution fees, no distribution fees shall be charged on amounts included in Defined Gross pursuant to this Exhibit.

FI802
021028MMS/blb  12-13-02
Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "1"

**Exhibit BB**

**260**

35493

**WB136061
CONFIDENTIAL**

# SOUND TRACK RECORD INCOME

In the event the party entitled to share in the Defined Gross of the Picture under the foregoing agreement is not entitled to receive any artists' royalties in respect of phonograph records derived from the sound track of the Picture, then Warner agrees to include in the Defined Gross of the Picture royalties on sound track records, as herein defined, computed at the applicable royalty rate.

As used herein:

The term "sound track records" means and refers to phonograph records, tapes, or other sound recordings which contain either (i) portions of the sound track transferred directly to phonograph record masters from sound records which form a part of the sound track of the Picture; or (ii) sound recordings recorded separately but utilizing substantially the same musical score, parts and instrumentation, and essentially the same artists, music and/or dialogue and/or sound effects as is contained in the sound track of the Picture; or (iii) a combination of (i) and (ii). Sound track records do not, however, include any recordings produced solely for the purpose of advertising and exploiting the Picture and copies of which are not distributed to the public.

The term "applicable royalty rate" means and refers to the following percentages of the prevailing retail price but in no event more than the net royalty actually received and retainable by Warner for its own account with respect to the sale of any particular copies:

5% of 90% in respect of sound track records sold in the United States

2½% of 90% in respect of sound track records sold outside the United States

except that as to sound track records sold pursuant to mail order or "club" plans, the royalty rate shall be one-half of the rate otherwise applicable.

If any sound track records contain selections from other sources, the applicable royalty rate hereunder shall be prorated on the basis of the total number of minutes of selections from the sound track compared to the total number of minutes on such records.

In determining the net royalty retainable by Warner, all royalties payable to artists, conductors and other third parties in respect to such sound track records shall be deducted from the aggregate royalty payable to Warner under the applicable distribution agreement.

The term "prevailing retail price" means and refers to the price generally prevailing in the country of manufacture or sale (as determined by the Record Company), less all taxes, duties and charges for containers.

FI802
021028MMS/blb  12-13-02
TARZAN 2003/Option Purchase Agreement
Edgar Rice Burroughs, Inc.

Exhibit "2"
1

**Exhibit BB**
**261**

35493

**WB136062**
**CONFIDENTIAL**