DE-111

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): TELEPHONE AND FAX NOS.: (213) 895-4900 (213) 895-4921

JOHN D. PETTKER, Esq. (SBN 42346)
RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A Law Corporation
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901

ATTORNEY FOR (Name): MARK WARREN PEARY

FOR COURT USE ONLY

FILED
LOS ANGELES SUPERIOR COURT
JUL 23 2003
JOHN A. CLARKE, CLERK
BY E. ALVAREZ, DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

ESTATE OF (Name): **JOSEPH SHUSTER, also known as JOE SHUSTER** /lost

DECEDENT

CASE NUMBER: BP080635

HEARING DATE: 8/25/03

DEPT: 5 TIME: 9:15

**PETITION FOR**

- [X] **Probate of Will and for Letters Testamentary**
- [ ] **Probate of Will and for Letters of Administration with Will Annexed**
- [ ] **Letters of Administration**
- [ ] **Letters of Special Administration**
- [X] **Authorization to Administer Under the Independent Administration of Estates Act** [X] **with limited authority**

1. Publication will be in *(specify name of newspaper)*: DAILY JOURNAL
   a. [X] Publication requested. b. [ ] Publication to be arranged.
2. Petitioner *(name of each)*: MARK WARREN PEARY **requests**
   a. [X] decedent's will and codicils, if any, be admitted to probate.
   b. [X] *(name)*: MARK WARREN PEARY
   be appointed (1) [X] executor (3) [ ] administrator
   (2) [ ] administrator with will annexed (4) [ ] special administrator
   and Letters issue upon qualification.
   c. [X] that [ ] full [X] limited authority be granted to administer under the Independent Administration of Estates Act.
   d. (1) [X] bond not be required for the reasons stated in item 3d.
   (2) [ ] $ bond be fixed. It will be furnished by an admitted surety insurer or as otherwise provided by law. *(Specify reasons in Attachment 2 if the amount is different from the maximum required by Probate Code section 8482.)*
   (3) [ ] $ in deposits in a blocked account be allowed. Receipts will be filed. *(Specify institution and location)*:
3. a. Decedent died on *(date)*: July 30, 1992 at *(place)*: West Los Angeles, California
   (1) [X] a resident of the county named above.
   (2) [ ] a nonresident of California and left an estate in the county named above located at *(specify location permitting publication in the newspaper named in item 1)*:
   b. Street address, city, and county of decedent's residence at time of death *(specify)*: 11944 Montana Avenue #305, West Los Angeles, County of Los Angeles, California 90049
   c. Character and estimated value of the property of the estate:
   (1) Personal property: $ None
   (2) Annual gross income from
   (a) real property: $ None
   (b) personal property: $ None
   Total: $ None
   (3) Real property: $ None *(If full authority under the Independent Administration of Estates Act is requested, state the fair market value of the real property less encumbrances.)*
   d. (1) [X] Will waives bond. [ ] Special administrator is the named executor and the will waives bond.
   (2) [X] All beneficiaries are adults and have waived bond, and the will does not require a bond. *(Affix waiver as Attachment 3d(2).)*
   (3) [X] All heirs at law are adults and have waived bond. *(Affix waiver as Attachment 3d(3).)*
   (4) [ ] Sole personal representative is a corporate fiduciary or an exempt government agency.
   e. (1) [ ] Decedent died intestate.
   (2) [X] Copy of decedent's will dated: 6/28/1988 [ ] codicils dated: are affixed as Attachment 3e(2).
   [X] The will and all codicils are self-proving (Prob. Code, § 8220).

CII/CASE BP080635 LEA/DEF#:
RECEIPT #: CCH151024
DATE PAID: 07/23/03 03:18:19 PM
PAYMENT: $224.50
RECEIVED: 224.50

(Continued on reverse)

Form Approved by the Judicial Council of California DE-111 [Rev. January 1, 1998] Mandatory Use (1/1/2000)

**PETITION FOR PROBATE**

Legal Solutions Plus

Probate Code, §§ 8002, 10450

**Exhibit CC**

270

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

**ATTACHMENT 2c**
**Requested Additional Power**

Requested Additional Power

Petitioner requests that the court grant him the following power in addition to the general powers conferred upon him by law and under the Independent Administration of Estates Act: *the power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings necessary or appropriate in connection with this action.*

261503_1.doc

Exhibit CC

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

**ATTACHMENT 2d(1), 3(c) and 3(d)(1), (2) and (3)**

No bond should be required of petitioner to act as Executor, or if a bond is required by the Court, it should be for a nominal amount, for the following reasons:

1. The first named Executor, Jean Adele Peavy, has signed and filed a Declination to Act as Personal Representative and Waiver of Bond of Mark Warren Peary as Personal Representative. Jean Adele Peavy, who is the sister of the decedent, is also the sole beneficiary under the decedent's Will and the sole heir at law of the decedent's estate under the laws of intestacy.

2. Petitioner is the alternate named Executor under the decedent's Will, and the decedent's Will waives bond.

3. Petitioner, who is the son of Jean Adele Peavy, is the nephew of the decedent.

4. A probate proceeding with respect to the decedent's estate would be unnecessary but for the fact that a personal representative of his estate needs to be appointed for the purpose of *terminating prior transfers of the decedent's copyright(s) pursuant to Section §304(c) of the United States Copyright Act, 17 U.S.C. §304(c)(2)(D)*. This right of the personal representative of the decedent's estate to terminate prior transfers of the decedent's copyright(s) was enacted into federal law as part of the Sonny Bono Copyright Act effective October 27, 1998. The purpose of such new law, enacted over six years after the decedent's death, is to give authors and their estates the power to recover previously assigned copyrights within time limits delineated in the statute.

5. All assets of the decedent, with the exception of the decedent's interest in and to *the copyrights*, which currently have an undetermined value, were of minimal value and transferred through a §13101 affidavit by Jean Adele Peavy shortly after the decedent's death on July 30, 1992.

Dated: July 15, 2003

Mark Warren Peary
MARK WARREN PEARY

261503_1.doc

Exhibit CC

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

**ATTACHMENT 3e(2)**
***(Lost)* Last Will and Testament**

Grounds for Admission of *Lost* Will

The decedent died more than 10 years ago on July 30, 1992. Petitioner and other family members have made a diligent and extensive search for the original Will executed by the decedent on June 28, 1988, but have been unable to find it. Petitioner has only found a copy of such Will, which he is submitting for probate as the decedent's lost Will. Petitioner believes that the original of such Will has been lost or inadvertently destroyed. There would be no reason for the decedent to have revoked such Will by destroying it, because the terms of the Will replicate the result if the decedent died intestate. Under both the Will and the laws on intestacy, petitioner's mother, Jean Adele Peavy, who is the decedent's sister and sole surviving heir at law, would be the sole beneficiary of the decedent's estate and, but for her declination to act, would be entitled to be appointed personal representative. Further, under both the decedent's Will and the laws of intestacy, by reason of the declinations to act that have been filed concurrently with this petition, petitioner is entitled to be appointed personal representative.

The decedent never married and never had any issue.

261503_1.doc



THE

Last Will and Testament of

Joseph Shuster

Dated June 28 1938

Exhibit CC

# Last Will and Testament of

KNOW ALL PERSONS BY THESE PRESENTS:

That, I JOSEPH SHUSTER

of W. Los Angeles, California

being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

I.

I hereby declare that I am the brother of JEAN ADELE PEAVY

at the time of the execution of this Will.

II.

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their N/A (mother, or father) will provide for them.

III.

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

IV.

I give, devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, MARK WARREN PEARY.

V.

I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will and Testament, to act without bond. In the event that my sister, is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor, also without bond.

Exhibit CC

VI.

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my executrix settle my estate in such a manner as shall seem best and most conveniently to her, and I hereby empower my executrix to mortgage, lease sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

VII.

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this 28 day of June, 1988.

Joseph Shuster
Testator

STATE OF CALIFORNIA }
County of Los Angeles } ss.

Each of the undersigned, being first duly sworn on oath, states that on this 28 day of June, 1988:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of JOSEPH SHUSTER (the Testator);

(2) The Testator, in my presence and in the presence of the other Witnesses whose signatures appear below:

(a) Declared the foregoing instrument consisting of one pages, of which this is the last to be his Will;

(b) Requested me and the other Witnesses to act as Witnesses to his Will and to make this affidavit; and

(c) Signed such instrument;

(3) I believe the Testator to be of sound mind, and that in so declaring and signing, he was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testator and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

| | |
|---|---|
| Tom Fenaughty | Robert E Williams |
| Witness | Witness |
| 3374 Overland Ave #1 | 3545 Mentone Ave #3 |
| Address | Address |
| L.A. Ca 90064 | Los Angeles California 90034 |

Witness

Address

SUBSCRIBED & SWORN to before me this 28 day of June, 1988.

F. Patrick Hagerty
Notary Public in and for the State of California, residing at SANTA MONICA, CALIF.

OFFICIAL SEAL
F. PATRICK HAGERTY
NOTARY PUBLIC-CALIFORNIA
PRINICIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires April 23, 1991

Exhibit CC

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

**ATTACHMENT 3g**
**Nonresident of California and Permanent Address**

I, Mark Warren Peary, the proposed personal representative, am a non-resident of California. I reside in the State of New Mexico at the following residence address:

51 Camino Cabo
Santa Fe, NM 87508

I hereby consent to act as the personal representative of the estate of my uncle, Joseph Shuster.

Dated: July 15, 2003

Mark Warren Peary
MARK WARREN PEARY

261503_1.doc

**In the Matter of the Estate of JOSEPH SHUSTER, Decedent**
**Los Angeles County, California, Superior Court – Central District**

**ATTACHMENT 8**

The following is a list of the names, relationships, ages, and addresses, so far as known to or reasonably ascertainable by petitioner, of (1) all persons named in decedent's will and codicils, whether living or deceased, (2) all persons named or checked in items 2, 5, 6, and 7, and (3) all beneficiaries of a devisee trust in which the trustee and personal representative are the same person:

| Name and Address | Relationship | Age |
|---|---|---|
| Mark Warren Peary<br>51 Camino Cabo<br>Santa Fe, NM 87508 | Petitioner/Nephew | Adult |
| Jean Adele Peavy<br>51 Camino Cabo<br>Santa Fe, NM 87508 | Sister | Adult |
| Dawn L. Peavy<br>11405 Lake Nemi<br>El Paso, Texas 79936 | Niece | Adult |

261503_1.doc

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
Telephone: (213) 895-4900
Facsimile: (213) 895-4921

Attorneys for MARK WARREN PEARY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL

In re the Matter of the Estate of

JOSEPH SHUSTER, also known as JOE SHUSTER

Decedent.

CASE NO. BP080635

DECLINATION TO ACT AS PERSONAL REPRESENTATIVE AND WAIVER OF BOND OF MARK WARREN PEARY AS PERSONAL REPRESENTATIVE

I, JEAN ADELE PEAVY, state as follows:

1. I am the only sibling of the decedent, JOSEPH SHUSTER. The decedent's and my parents are both deceased, having predeceased the decedent. I have two children, both of whom survived the decedent. They are Mark Warren Peary and Dawn L. Peavy.

2. I am the sole beneficiary under the decedent's Will dated June 28, 1988, and am nominated to act as Executor under such Will.

3. I hereby decline to serve as personal representative of the decedent's estate, whether as Executor of the decedent's Will or Administrator of his estate.

4. I hereby waive the requirement of a bond by Mark Warren Peary, whether acting as



Executor of the decedent's Will or Administrator of his estate.

Dated: July 15, 2003

Jean Adele Peavy
JEAN ADELE PEAVY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

261504_1.doc

2
DECLINATION TO ACT AS PERSONAL REPRESENTATIVE AND WAIVER OF BOND OF MARK WARREN PEARY AS PERSONAL REPRESENTATIVE

Exhibit CC
321

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, California 90071-2901
Telephone: (213) 895-4900
Facsimile: (213) 895-4921

Attorneys for MARK WARREN PEARY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, CENTRAL

| | |
|---|---|
| In re the Matter of the Estate of<br><br>JOSEPH SHUSTER, also known as JOE SHUSTER<br><br>Decedent. | CASE NO.<br><br>NOMINATION OF PERSONAL REPRESENTATIVE, DECLINATION TO ACT, AND WAIVER OF BOND OF MARK WARREN PEARY |

I, DAWN L. PEAVY, state and declare as follows:

1. I am the niece of JOSEPH SHUSTER (the "decedent"), the decedent named herein, being the daughter of the decedent's sister, Jean Adele Peavy. My brother is Mark Warren Peary.

2. If the decedent's Will is not admitted to probate and an Executor thereof is not appointed and if my mother, Jean Adele Peavy, declines to act as personal representative of the decedent's estate, I am a person entitled to equal priority for appointment as the personal representative of the decedent's estate with my brother, MARK WARREN PEARY.

3. If for any reason MARK WARREN PEARY is not appointed by the Court as Executor of the decedent's Will, I hereby nominate MARK WARREN PEARY of Albuquerque, New Mexico, to serve as the personal representative of the decedent's estate without the

requirement of any bond, pursuant to the authority provided to me under Sections 8461 and 8465 of the California Probate Code, and I decline to act as such personal representative.

4. My intent in making this nomination is to ensure the appointment of a person that I trust to serve as the personal representative of my uncle's estate.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed on July 15, 2003, in El Paso, Texas.

Dawn L. Peavy
DAWN L. PEAVY

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

ORIGINAL

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL, A Law Corporation
JOHN D. PETTKER (SBN 42346)
444 South Flower Street, Suite 1700
Los Angeles, CA 90071-2901
Telephone: 213-895-4900
Facsimile: 213-895-4750

Attorneys for MARK WARREN PEARY, Petitioner

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In the Matter of the Estate of<br><br>JOSEPH SHUSTER, also known as JOE SHUSTER,<br><br>Deceased. | **NO. BP-080635**<br><br>**ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING INDEPENDENT ADMINISTRATION OF ESTATE WITH LIMITED AUTHORITY**<br><br>**Hearing Date: 8-25-03**<br>**Dept. 5 at 9:15 a.m.** |

Petitioner, MARK WARREN PEARY, filed his petition for probate of will and for letters testamentary and for authorization to administer estate under the Independent Administration of Estates Act with limited authority of the estate of Joseph Shuster, also known as Joe Shuster, deceased (the "decedent"), and such petition came on regularly for hearing and approval by the Court at 9:15 a.m. on August 25, 2003, in Department 5 of the above-entitled Court, the Honorable H. RONALD HAUPTMAN, Judge Pro Tem presiding. JOHN D. PETTKER of Rodi, Pollock, Pettker, Galbraith & Cahill, A Law Corporation, appeared as the attorney for petitioner, and no one appeared in opposition.

On evidence given to the satisfaction of the Court, THE COURT FINDS THAT:

1. All notices required by law have been given.

/ / /

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

2. The decedent died on July 30, 1992, a resident of the County of Los Angeles, State of California.

3. The decedent died testate, leaving a will dated June 28, 1988. This will has never been revoked but was lost or inadvertently destroyed. Such will is admitted to probate by Minute Order on August 25, 2003, as the decedent's last Will, and its provisions are as follows:

LAST WILL AND TESTAMENT OF

KNOW ALL PERSONS BY THESE PRESENTS:

I

That, I JOSEPH SHUSTER, of W. Los Angeles, California, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or the undue influence of any person whomsoever, do make, publish and declare this my Last Will and Testament.

I hereby declare that I am the brother of JEAN ADELE PEAVY at the time of the execution of this Will.

II

I make no bequest, gift or devise to my children named in Paragraph I, or to any other child or children hereafter born to or adopted by me, except as hereinafter stated, knowing their ___N/A___ will provide for them.

III

I hereby direct and order that all just debts for which proper claims are filed against my estate, and the expenses of my last illness and funeral, be paid by my executrix as soon after my death as is practicable; provided, however, that this direction shall not authorize any creditor to require payment of any debt or obligation prior to its normal maturity in due course.

IV

I give devise and bequeath unto JEAN ADELE PEAVY all of the rest, residue and remainder of my estate, whether real or personal, and wheresoever situated. In the event that Jean Adele Peavy shall predecease me, or in the event that both Jean Adele Peavy and I shall die as a

/ / /

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

result of a common accident, illness or disaster, then I give, devise and bequeath the residue and remainder of my estate to my nephew, MARK WARREN PEARY.

V

I hereby nominate and appoint my sister, Jean Adele Peavy, executrix of this my Last Will and Testament, to act without bond. In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor, also without bond.

VI

I further direct that my estate be settled without the intervention of any court, except to the extent required by law, and that my executrix settle my estate in such a manner as shall seem best and most conveniently to her, and I hereby empower my executrix to mortgage, lease, sell, exchange and convey the personal and real property of my estate without an order of court for that purpose and without notice, approval or confirmation and in all other respects to administer and settle my estate without the intervention of court.

VII

I hereby revoke any and all former Wills and Codicils thereto made by me and declare this my Last Will and Testament.

In Witness Whereof I have hereunto set my hand this 28th day of June, 1988.

JOSEPH SHUSTER
Testator

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

Each of the undersigned, being first duly sworn on oath, states that on this 28th day of June, 1988:

(1) I am over the age of eighteen (18) years and competent to be a Witness to the Will of JOSEPH SHUSTER (the Testator);

(2) The Testator, in my presence and in the presence of the other Witnesses whose signatures appear below:

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE: (213) 895-4900

(a) Declared the foregoing instrument consisting of one pages, of which this is the last to be his Will;

(b) Requested me and the other Witnesses to act as Witnesses to his Will and to make this affidavit; and

(c) Signed such instrument;

(3) I believe the Testator to be of sound mind, and that in so declaring and signing, he was not acting under any duress, menace, fraud, or undue influence;

(4) The other witnesses and I, in the presence of the Testator and of each other now affix our signatures as Witnesses to the Will and make this affidavit.

Tom Fenaughty
3374 Overland Ave., #1
Los Angeles, CA 90064

Robert Williams
3545 Mentone Ave. #3
Los Angeles, California 90034

SUBSCRIBED & SWORN to before me this 28th day of June, 1988.

[NOTARIAL SEAL]

F. PATRICK HAGERTY
Notary Public in and for the State of California,
residing at Santa Monica, Calif.

**THE COURT ORDERS:**

1. MARK WARREN PEARY is appointed Executor of the decedent's Will recited above, and letters testamentary shall issue on qualification.

2. The Executor is granted limited authority to administer the estate under the Independent Administration of Estates Act (there is no authority, without court supervision, to (1) sell or exchange real property or (2) grant an option to purchase real property or (3) borrow money with the loan secured by an encumbrance upon real property).

3. The Executor is also granted the following special power in addition to the general powers conferred upon him by law and under the Independent Administration of Estates Act: The power to terminate prior transfers of the decedent's copyright(s) pursuant to Section §304(d) of the United States Copyright Act, 17 U.S.C. §304(d), incorporating without limitation 17 U.S.C. §304(c)(2)(D), and to maintain and defend on behalf of the decedent and the estate all proceedings necessary or appropriate in connection with this action.

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900



4. Bond is fixed at $6,000.00.

Dated: ______________________

OCT 0 7 2008

______________________________
Judge Pro Tem of the Superior Court

H. RONALD HAUPTMAN,
JUDGE PRO TEM

204438_1.doc

RODI, POLLOCK, PETTKER, GALBRAITH & CAHILL
A LAW CORPORATION
444 SOUTH FLOWER STREET, SUITE 1700
LOS ANGELES, CALIFORNIA 90071-2901
TELEPHONE (213) 895-4900

5

ORDER ADMITTING WILL TO PROBATE, APPOINTING EXECUTOR AND AUTHORIZING IAEA WITH LIMITED AUTHORITY

Exhibit DD
328

**PACIFIC PICTURES CORPORATION**

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

October 27, 2003

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor
Estate of Joseph Shuster
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren:

We are pleased to welcome you ("Client") as a client of Pacific Pictures Corp. ("PPC"). This letter is intended to supplement the joint venture agreement dated as of November 23, 2001 between PPC and you and your mother, Jean Peavy, and to confirm the agreement regarding your engagement of our company as the Executor of the recently probated Estate of Joseph Shuster.

1. Client hereby engages PPC as its exclusive advisor for the purpose of retrieving, enforcing and exploiting all of Joe Shuster's, and his estate's rights, claims, copyrights, property, title and interests in and to Joe Shuster's creations (hereinafter, such rights, property and claims, are individually and collectively referred to as the "Rights"). The Rights shall include without limitation, all current and future rights, claims, title, copyrights and interests of Client in and to each character, story element, and indicia associated with, and all rights to proceeds from "SUPERMAN," or the "SUPERMAN" stories and comic books, including, without limitation, Client's copyright termination interest in "SUPERMAN" pursuant to Section 304(d) of the U.S. Copyright Law.

2. In furtherance of this exclusive agreement, PPC (which is not a law firm) shall engage the services of attorney Marc Toberoff ("Toberoff") to furnish directly to Client all legal services required by Client in connection with the Rights, including in connection with all legal disputes, litigation, arbitration and/or mediation regarding the Rights; to implement, enforce and prosecute the Rights; and to handle the negotiation of any contracts regarding exploitation of the Rights. PPC may engage additional outside counsel to assist Client, but only at PPC's sole expense.

3. PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate, U.S. copyright office costs such as document retrieval costs and filing fees, research costs, and any and all attorneys' fees, costs and disbursements in connection with any legal actions or disputes concerning the

Initials: MT, MWP

PACIFIC PICTURES CORPORATION

Page 2
Estate of Joseph Shuster
October 27, 2003

enforcement and/or defense of the Rights and the Estate of Joseph Shuster. In addition to attorneys' fees, PPC will be responsible for the payment of any legal filing fees, expert witness fees, subpoena and service of process fees, jury fees, deposition transcript costs, photocopying, postage, long distance telephone and fax charges, computerized legal research, reporter's fees, costs for preparation of exhibits and demonstrative evidence, travel costs outside of the Los Angeles area if required, and messenger fees. Any and all attorneys' fees payable on a contingency basis will be paid solely out of PPC's share of Proceeds set forth in paragraph 5 below.

4. The terms of any and all agreements regarding any of the Rights, in any respect, shall be subject to the express written approval of Client and PPC. The parties each warrant and represent that after signing this Agreement they will not without the express written consent of all the parties transfer, limit or encumber the Rights in any respect.

5. Any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement or exploitation of any of the Rights, including without limitation, fixed and contingent compensation, settlement or judgment amounts, purchase prices, option or quitclaim fees, and/or royalties (" Proceeds"), will be shared, divided and payable: fifty percent (50%) to Client and fifty percent (50%) to PPC. Prior to the above distribution of Proceeds, PPC will be entitled to recoup all of its out-of-pocket expenses under this Agreement subject to the presentation to Client of a reasonable accounting and receipts for said expenses. The parties hereby acknowledge and agree that the due payment to and receipt by Client of Proceeds hereunder shall constitute the due receipt of Proceeds by Jean Peavy and Warren Peavy, respectively, pursuant to paragraph 5 of the Joint Venture Agreement, in full satisfaction of PPC's obligations under said paragraph.

6. All notices, correspondence and payments to each party under this Agreement shall be sent to the respective addresses set forth on page 1 of this Agreement unless either party notifies the other of an address change in writing.

7. The term ("Term") of this agreement shall extend for the full duration of the Rights and any exploitation of the Rights. Upon the expiration of the Term or in the event of termination by Client of this agreement for any reason, all Rights will be held fifty percent (50%) by the Client and fifty percent (50%) by PPC as tenants in common, and Client and PPC will each be entitled to receive and continue to receive fifty percent (50%) of all Proceeds derived from the Rights after termination, if any.

Initials: ___, ___

8. To cover the unlikely event that Marc Toberoff dies or is disabled; PPC will prior to service of any notice of termination regarding the Rights (pursuant to Section 304 (d) of the U.S. Copyright Law) either (a) arrange for a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis; or (b) if no such replacement attorney is arranged to obtain "key man" insurance for Mr. Toberoff in the amount of $150,000 payable solely to Client.

9. All parties agree to execute such further documents and to perform such further acts as may be reasonably necessary or desirable to carry out the purposes and effect of this Agreement. When required hereunder, consent shall not be unreasonably withheld by any party regarding actions conducted under this agreement.

10. This Agreement contains the full understanding of the parties and supersedes all prior or contemporaneous understandings whether written or oral with respect to the subject matter hereof and may not be modified except in writing signed by the party to be bound. By countersigning this Agreement the parties each acknowledge that they clearly understand the terms and conditions of this Agreement; and have agreed to these terms and conditions after detailed and mature deliberation. The parties further acknowledge that they have not signed this Agreement in reliance on any promise or representation not expressly set forth in this Agreement. The parties have mutually participated in the negotiation and drafting of this Agreement and agree that the terms of this Agreement shall not be construed more favorably to one party than the other. If any provision of this Agreement is found to be unenforceable for any reason, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties expressed herein. This Agreement shall bind and inure to the benefit of the parties, their respective heirs, successors and assigns. Executed facsimile copies of this Agreement shall be valid acceptable substitutes for executed originals.

11. This Agreement shall be governed by the laws of California applicable to agreements made and to be performed therein.

If the terms and conditions of this agreement are acceptable to you, please

///
///
///
///

Initials: [illegible], [illegible]

PACIFIC PICTURES CORPORATION

acknowledge your acceptance by signing below.

Very truly yours,

Marc Toberoff
President

**Approval of Engagement of Pacific Pictures Corp.**

I have read the foregoing agreement and I agree to its terms.

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor
(f/k/a Mark Warren Peavy)

Date: 10-30-03

I have read the foregoing agreement and agree to its terms to the extent any of my interests are concerned.

Jean A. Peavy

Date: 10-30-03



# *Certificate of Recordation*

This is to certify that the attached document was recorded in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

| DATE OF RECORDATION | |
|---|---|
| 8Dec03 | |
| **VOLUME** | **DOC. NO.** |
| 3505 | 773 |
| **VOLUME** | **DOC. NO.** |

Marybeth Peters

Register of Copyrights and
Associate Librarian for Copyright Services

JANUARY 2004 — 4,000



**RECORDED DOCUMENTS** **FL-10A**

**DATE:** March 12, 2004

IP Worldwide
9595 Wilshire Blvd. Suite 811
Beverly Hills, CA 90212

ATTN: MARC TOBEROFF

We have recorded the enclosed document(s) in the official records of the Copyright Office:

| | |
|---|---|
| VOLUME | 3505 |
| DOC. NO. | 773-774 |

The recording fee has been handled as follows:

| | |
|---|---|
| RECEIVED | $ |
| APPLIED | $ |
| REFUNDED (under separate cover) | $ |
| **CHARGED TO YOUR DEPOSIT ACCOUNT** | $ |

Sincerely yours,

Register of Copyrights

ENCL(S):
DOC(S): 2

Library of Congress
U.S. Copyright Office
101 Independence Ave, SE
Washington, DC 20559-6000
www.copyright.gov

FL-10A 01/2004: 12,000

Copyright Office fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

# DOCUMENT COVER SHEET

**For Recordation of Documents**
UNITED STATES COPYRIGHT OFFICE

DATE OF RECORDATION (Assigned by Copyright Office) DEC 0 8 2003
Month Day Year

Volume 3505 Page 773

Volume ______ Page ______

FUNDS RECEIVED ______

FOR OFFICE USE ONLY

Do not write above this line.

## To the Register of Copyrights:

*Please record the accompanying original document or copy thereof.*

**1 Name of the party or parties to the document spelled as they appear in the document** (List up to the first three)

Time Warner Inc.
Time Warner
Warner Bros. Entertainment Inc.

**2 Date of execution and/or effective date of the accompanying document** Dec. 1, 2003 (month) (day) (year)

**3 Completeness of document**
☒ Document is complete by its own terms.
☐ Document is not complete. Record "as is."

**4 Description of document**
☐ Transfer of Copyright
☐ Security Interest
☐ Change of Name of Owner
☒ Termination of Transfer(s) [Section 304]
☐ Shareware
☐ Life, Identity, Death Statement [Section 302]
☐ Transfer of Mask Works
☐ Other ______

**5 Title of first work as given in the document**
"Superman"

**6 Total number of titles in document** ~~8~~ 11

**7 Amount of fee calculated** $ 100

**8 Fee enclosed**
☒ Check
☐ Money Order

☐ **Fee authorized to be charged to: Copyright Office Deposit Account number** ______

**Account name** ______

**9 Affirmation***: I hereby affirm to the Copyright Office that the information given on this form is a true and correct representation of the accompanying document. This affirmation will not suffice as a certification of a photocopy signature on the document. **(Affirmation *must* be signed even if you are also signing Space 10.)**

[signature]
Signature

12/1/03
Date

(310) 246-3100 — Phone Number
(310) 246-3101 — Fax Number

**10 Certification***: Complete this certification in addition to the Affirmation if a photocopy of the original signed document is substituted for a document bearing the actual signature.
NOTE: This space *may not* be used for an official certification.

I certify under penalty of perjury under the laws of the United States of America that the accompanying document is a true copy of the original document.

[signature]
Signature

IP Worldwide/Estate of Joseph Shuste
Duly Authorized Agent of:

12/1/03
Date

Recordation will be mailed in window envelope to this address:

Name▼
IP Worldwide/Marc Toberoff, Esq.

Number/Street/Apt▼
9595 Wilshire Blvd., Suite 811

City/State/ZIP▼
Beverly Hills, CA 90212

**YOU MUST:**
- Complete all necessary spaces
- Sign your Cover Sheet in Space 9

**SEND ALL 3 ELEMENTS TOGETHER:**
1. Two copies of the Document Cover Sheet
2. Check/money order payable to *Register of Copyrights*
3. Document

**MAIL TO:**
Library of Congress, Copyright Office
Documents Recordation Section, LM-462
101 Independence Avenue S.E.
Washington, D.C. 20559-6

Fees are subject to change. For current fees, check the Copyright Office website at www.copyright.gov, write the Copyright Office, or call (202) 707-3000.

65

*Knowingly and willfully falsifying material facts on this form may result in criminal liability. 18 U.S.C. §1001.

Exhibit FF

Rev: June 2002—20,000 Web Rev: June 2002 Printed on recycled paper

U.S. Government Printing Office: 2000-461-113/20,021

V3505 D773

# NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED COPYRIGHT RENEWAL TERM OF "SUPERMAN"

To: Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappuccio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O.

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen, President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz, E.V.P. & Publisher

V3505 D773 Page 1

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson
President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co.

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr. Chairman

Marvel Entertainment Group, Inc.
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O.

Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for
Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group, (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO

V3J05 D773 Page 2

PLEASE TAKE NOTICE that pursuant to Section 304(d) of the United States Copyright Act (17 U.S.C. §304(d)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. §201.10, the undersigned Mark Warren Peary, being the person entitled to terminate transfers pursuant to said statutory provisions, hereby terminates the grant of the transfer of renewal copyright(s) (to the extent of author Joseph Shuster's ownership share of the renewal copyright(s)) in and to the copyrighted work(s) entitled "SUPERMAN" made in those certain agreements all as identified below, and the undersigned sets forth in connection therewith the following:

1. The names and addresses of the grantees and/or successors in title whose rights are being terminated are as follows: Time Warner Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Richard D. Parsons, Chief Executive Officer; Time Warner Entertainment Company, L.P., 75 Rockefeller Plaza, New York, NY 10019, Attn: Barry M. Meyer, Chairman & C.E.O.; Warner Bros. Entertainment Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Bros. Inc., 4000 Warner Boulevard, Burbank, CA 91522, Attn: John A. Schulman, V.P. & General Counsel; Warner Communications Inc., c/o Time Warner, Inc., 75 Rockefeller Plaza, New York, NY 10019, Attn: Paul T. Cappucio, E.V.P. & General Counsel; Warner Bros. Television, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Peter Roth, President; Warner Music Group, 75 Rockefeller Plaza, New York, NY 10019, Attn: Roger Ames, Chairman & C.E.O.; Warner Bros. Worldwide Consumer Products, 4000 Warner Boulevard, Burbank, CA 91522, Attn: Dan Romanelli, President; Warner Publisher Services, 135 W. 50th Street, 7th Floor, New York, N.Y. 10020, Attn: Rich Jacobsen, President; Time Warner Book Group, Inc., 1271 Avenue of

V3..5 D773 Page 3

the Americas, New York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; Warner

Books, Inc., 1271 Avenue of the Americas, New York, NY 10020, Attn: Laurence J.

Kirshbaum, C.E.O.; Little, Brown, and Company, 1271 Avenue of the Americas, New

York, NY 10020, Attn: Laurence J. Kirshbaum, C.E.O.; DC Comics Inc., 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levitz, Executive V.P. &

Publisher; DC Comics, A General Partnership, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, Executive V.P. & Publisher; DC Direct, c/o DC Comics, 1700

Broadway, 7th Floor, New York, NY 10019, Attn: Paul Levtiz, E.V.P. & Publisher; Milton

Bradley Co., Division of Hasbro, Inc., 433 Shaker Road, East Longmeadow, MA 01028,

Attn: David E. Wilson, President; Hasbro, Inc., 1027 Newport Ave., Pawtucket, RI

02861, Attn: Alan Hassenfeld, Chief Executive Officer; Wildstorm Productions, 888

Prospect Street, Suite 240, La Jolla, CA 92037, Attn: Jim Lee, Editor & Director;

Wildstorm Productions, c/o DC Comics, 1700 Broadway, 7th Floor, New York, NY

10019, Attn: Paul Levitz, President & Publisher; Dark Horse Publications, 10956 S.E.

Main St., Milwaukie, OR 97222, Attn: Michael Richardson, President; Cantharus

Productions, N.V., 8965 Bay Cove Ct., Orlando, FL 32819, Attn: Ilya Salkind; Ilya

Salkind and Pierre Spengler, 12 Chiswick Lane, London W4 2JE, England, Attn: Albion

Gee, Esq., Albion Gee & Co.; Hallmark Entertainment, Inc., 1325 Avenue of the

Americas, 21st Floor, New York, NY 10019, Attn: Robert Halmi, Jr., Chairman; Marvel

Entertainment Group, Inc., 10 East 40th Street, 9th Floor, New York, NY 10016, Attn: F.

Peter Cuneo, President & C.E.O.; Golden Books Publishing, 1540 Broadway, New

York, NY 10036, Attn: Amy Jarashow, Associate Publisher; Random House Golden

Books for Young Readers, 1540 Broadway, New York, NY 10036, Attn: Kate Kilmo,

Vice President & Publisher; Random House, Inc., 1745 Broadway, New York, NY

V3505 D773 Page 4

10019, Attn: Katherine J. Trager, Senior V.P. & General Counsel; Inkworks, 4320 Delta Lake Drive, Raleigh, NC 27612, Attn: Allan Caplan, President & C.E.O.; Penguin Group (USA) Inc., 375 Hudson Street, New York, NY 10014, Attn: David Shanks, C.E.O.; DK Publishing, Inc., 375 Hudson Street, New York, NY 10014, Attn: Christopher Davis, Publisher; Scholastic, Inc., 557 Broadway, New York, NY 10012, Attn: Richard Robinson, Chairman & C.E.O. Pursuant to 37 C.F.R. Section 201.10(d), service of this notice is being made by first class mail, and additionally service of this notice is being made by certified mail, return receipt requested, to the above grantees or successors at the addresses shown.

2. The works (individually, "Work;" collectively, the "Works") to which this Notice of Termination applies are as follows[1]: The title of the original copyrighted Work to which this Notice of Termination applies is SUPERMAN, an illustrated comic book story constituting a front cover and pages 1-13, inclusive, in the body of Action Comics, Vol. 1, No. 1, June, 1938 issue, which was published on April 18, 1938. This Work was registered for copyright under registration No. B379787 and copyright was originally

V3505 D773 Page 5

---

[1] This Notice of Termination applies as well to each and every element of each Work, including without limitation, the story or stories, character or characters, the interplay of such characters, theme or themes, settings or locales, and includes, but is not limited to, Superman, his origins and escape as an infant to Earth in a rocket ship, his super strength, his invulnerability (bullets bounce off his chest and he's impervious to fire), his super speed, his ability to leap great distances in a single bound, his telescopic vision, his super hearing and sense of smell, his sense of humor, his clean-cut good looks, his high morals, ethics and compassion, his mission as a crime fighter and as a champion of the underdog, his stylized costume and cape, the diamond shaped "S" insignia on his chest, his secret identity / alter ego as the mild mannered bespectacled newspaper reporter, Clark Kent, the feisty and attractive female reporter love interest, Lois Lane, the love triangle between Superman, Lois Lane and Clark Kent, Clark Kent's boss / newspaper Editor (a.k.a. Perry White), the Daily Planet newspaper (f.k.a. the Daily Star) where Clark Kent, Lois Lane and the Editor work, the great skyscraper metropolis where these characters live (a.k.a. Metropolis), Superman's scientist father (a.k.a. Jor L) and Superman's birthplace --a highly advanced but doomed distant planet (a.k.a. Krypton).

secured in this Work as of its April 18, 1938 publication date. This Work was written by Jerome Siegel and illustrated by Joseph Shuster. Renewal of the copyright in and to this Work was made on June 1, 1965, in the name of National Periodical Publications, Inc. claiming as proprietor of copyright, under renewal registration No. R362188. This Work was based upon, incorporated, and constituted a slightly revised version of, the following Works to which this Notice of Termination also applies: twenty-four days (i.e., four six day weeks) of previously unpublished SUPERMAN newspaper comic strips, created c. 1934, written by Jerome Siegel and illustrated by Joseph Shuster.[2] The remaining Works to which this Notice of Termination applies are:

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| SUPERMAN story in comic book form | Jerome Siegel Joseph Shuster | Work created c.1933 | N/A[3] |

V3505 D773 Page 6

[2] In Siegel and Shuster v. National Comics Pub., Inc. et al., the court found that Jerome Siegel and Joseph Shuster were "the originators and authors of the cartoon character Superman and of the title Superman and first created cartoon material in which said character and title first appeared in 1934...," and further found that this material as incorporated in Action Comics No. 1 constituted: "the formula for the continuing SUPERMAN series to come. It depicted and narrated the origin of the character SUPERMAN, and contained a complete delineation of the pictorial representation of SUPERMAN, of his habits and character, of the superhuman powers and attributes with which SUPERMAN was endowed and of the sphere of public good which SUPERMAN exploits were to enhance." Findings of Fact and Conclusions of Law by Referee J. Addison Young, ¶¶ 8, 22 (November 1, 1947); *See also* Siegel and Shuster v. National Comics Pub., Inc. et al., Opinion of Referee J. Addison Young, page 9 ("[the aforementioned material] certainly contained the full delineation of the character Superman and though the story or continuity might vary in the future from time to time, it did, I believe constitute a formula for the continuing series to come..."). In Siegel v. National Periodical Publications, Inc, the Second Circuit Court of Appeals reversed the District Court's determination that Action Comics No. 1 was a work-for-hire and held: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted. The record indicates that the revisions directed by the defendants were simply to accomodate Superman to a magazine format." 508 F.2d 909, 914 (2nd Circuit 1974).

[3] The second and third Works listed in this table as well as the above-referenced 24 days of previously unpublished SUPERMAN newspaper comic strips were first published in a somewhat revised form on April 18, 1938 as Action Comics, Vol. 1, No. 1, June, 1938, which was registered for copyright under registration No. B379787 and renewed under registration No. R362188.

| Title | Name of Author | Date Copyright Secured | Copyright Reg. No. |
|---|---|---|---|
| 15 SUPERMAN daily comic strips (12 strips and 3 scripts) | Jerome Siegel Joseph Shuster | Work created c.1934 | N/A |
| Action Comics #2 [4] | Jerome Siegel Joseph Shuster | May 25, 1938 | B379788 |
| Action Comics #3 | Jerome Siegel Joseph Shuster | June 25, 1938 | B385466 |
| Action Comics #4 | Jerome Siegel Joseph Shuster | July 25, 1938 | B387907 |
| Action Comics #5 | Jerome Siegel Joseph Shuster | August 25, 1938 | B394784 |
| Action Comics # 6 | Jerome Siegel Joseph Shuster | September 26, 1938 | B394866 |
| Action Comics # 7 | Jerome Siegel Joseph Shuster | October 25, 1938 | B399214 |

V3505 D773 Page 7

3. This Notice of Termination applies to the following grants, assignments, transfers and/or agreements to the extent each grants, transfers or assigns the renewal copyright (or any interest in or to the renewal copyright) to any Work identified hereinabove:

(a) A one page agreement between Detective Comics, Inc., on the one hand and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about March 1, 1938;

[4] Action Comics Nos. 2-6 were reprinted in Superman Nos. 1 and 3 (Copyright Reg. Nos. AA299871 and B443035, respectively) to which this Notice of Termination, therefore, also applies.

(b) A two page agreement of purported employment between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joe Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 4, 1937;

(c) A three page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(d) A three page letter agreement between Detective Comics, Inc. and The McClure Newspaper Syndicate, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about September 22, 1938;

(e) A two page letter agreement between Detective Comics, Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 19, 1939;

(f) A seven page agreement or stipulation between National Comics Publications, Inc., Independent News Co., Inc., The McClure Newspaper Syndicate, Harry Donenfeld, Jacob S. Liebowitz, Paul H. Sampliner and Wayne Boring, on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about May 19, 1948;

(g) A twelve page letter agreement (with additional pages for exhibits) between Warner Communications Inc., on the one hand, and Jerome Siegel and Joseph Shuster, co-authors of the comic book/strip SUPERMAN, on the other, executed on or about December 23, 1975.

V3505 D773 Page 8

4. The effective date of termination shall be October 26, 2013.

5. No prior termination of the grants of rights in the copyright of the aforementioned Works for their renewal copyright term has been exercised by the author, Joseph Shuster, or his statutory heirs or representatives pursuant to Section 304 (c) of the United States Copyright Act (17 U.S.C. §304(c)).

6. Joseph Shuster died on July 30, 1992. There is no living widow, child or grandchild of Mr. Shuster. The undersigned, Mark Warren Peary is the Executor of the Estate of Joseph Shuster; and, as such, is the person entitled to exercise Joseph Shuster's termination interest pursuant to 17 U.S.C. § 304 (d), incorporating without limitation 17 U.S.C. § 304 (c)(2)(D), as to the grants of the transfers described herein. To the best knowledge and belief of the undersigned, this notice has been signed by all persons whose signature is necessary to terminate said grants under Section 304(d) of Title 17, United States Code.

Dated: November 7, 2003

Mark Warren Peary
Executor of the Estate of Joseph Shuster
c/o Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

V3505 D773 Page 9

**CERTIFICATE OF INVESTIGATION**

I hereby certify that before serving the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM OF "SUPERMAN", and pursuant to 37 C.F.R. Section 201.10(d), I caused a reasonable investigation to be made as to the current ownership of the rights being terminated, including a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of November, 2003, at Los Angeles, California.

Marc Toberoff, Esq.
9595 Wilshire Boulevard, Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505 D773 Page 10

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true copy of the foregoing document described as NOTICE OF TERMINATION OF TRANSFER COVERING EXTENDED RENEWAL TERM OF "SUPERMAN" to be served this 10th day of November, 2003, by First Class Mail, postage prepaid, upon the following:

To: Time Warner Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Richard D. Parsons
Chief Executive Officer

Time Warner
Entertainment Company, L.P.
75 Rockefeller Plaza
New York, NY 10019
Attn: Barry M. Meyer
Chairman & C.E.O.

Warner Bros. Entertainment Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Bros. Inc.
4000 Warner Boulevard
Burbank, CA 91522
Attn: John A. Schulman
V.P. & General Counsel

Warner Communications Inc.
c/o Time Warner, Inc.
75 Rockefeller Plaza
New York, NY 10019
Attn: Paul T. Cappucio
E.V.P. & General Counsel

Warner Bros. Television
4000 Warner Boulevard
Burbank, CA 91522
Attn: Peter Roth, President

Warner Music Group.
75 Rockefeller Plaza
New York, NY 10019
Attn: Roger Ames
Chairman & C.E.O

Warner Bros. Worldwide
Consumer Products
4000 Warner Boulevard
Burbank, CA 91522
Attn: Dan Romanelli, President

Warner Publisher Services, Inc.
135 W. 50th Street, 7th Floor
New York, NY 10020
Attn: Rich Jacobsen
President

Time Warner Book Group, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Warner Books, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

Little, Brown and Company, Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Laurence J. Kirshbaum, CEO

DC Comics, Inc.
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

V3505 D773 Page 11

DC Comics, a General Partnership
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
Executive V.P. & Publisher

DC Direct
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
E.V.P. & Publisher

Milton Bradley Co.
Division of Hasbro Inc.
433 Shaker Road
East Longmeadow, MA 01028
Attn: David E. Wilson, President

Hasbro, Inc.
1027 Newport Avenue
Pawtucket, RI 02861
Attn: Alan Hassenfeld
Chief Executive Officer

Wildstorm Productions
888 Prospect Street, Suite 240
La Jolla, CA 92037
Attn: Jim Lee
Editor & Director

Wildstorm Productions
c/o DC Comics
1700 Broadway, 7th Floor
New York, NY 10019
Attn: Paul Levitz
President & Publisher

Dark Horse Publications
10956 S.E. Main St.
Milwaukie, OR 97222
Attn: Michael Richardson, President

Cantharus Productions, N.V.
8965 Bay Cove Ct.
Orlando, FL 32819
Attn: Ilya Salkind

Ilya Salkind and Pierre Spengler.
12 Chiswick Lane
London W4 2JE, England
Attn: Albion Gee, Esq.
Albion Gee & Co

Hallmark Entertainment, Inc.
1325 Avenue of the Americas
21st Floor
New York, NY 10019
Attn: Robert Halmi, Jr.
Chairman

Marvel Entertainment Group, Inc..
10 East 40th Street, 9th Floor
New York, NY 10016
Attn: F. Peter Cuneo
President & C.E.O

Golden Books Publishing
1540 Broadway
New York, NY 10036
Attn: Amy Jarashow
Associate Publisher

Random House Golden Books for Young Readers
1540 Broadway
New York, NY 10036
Attn: Kate Klimo
Vice President & Publisher

Random House, Inc.
1745 Broadway
New York, NY 10019
Attn: Katherine J. Trager
Senior V.P. & General Counsel

Inkworks
4320 Delta Lake Dr.
Raleigh, NC 27612
Attn: Allan Caplan
President & CEO

Penguin Group (USA) Inc.
375 Hudson Street
New York, NY 10014
Attn: David Shanks, C.E.O.

V3505 D773 Page 12

DK Publishing, Inc.
375 Hudson Street
New York, NY 10014
Attn: Christopher Davis, Publisher

Scholastic, Inc.
557 Broadway
New York, NY 10012
Attn: Richard Robinson
Chairman & CEO

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of November, 2003, at Los Angeles, California.

Marc Toberoff, Esq.
9595 Wilshire Blvd., Suite 811
Beverly Hills, CA 90212

Counsel for the Estate of Joseph Shuster

V3505 D773 Page 13

# PACIFIC PICTURES CORPORATION

23852 Pacific Coast Highway, Suite 555
Malibu, CA 90265
Tel: (310) 589-5151
Fax: (310) 589-5152

September 10, 2004

Mark Warren Peary (f/k/a Mark Warren Peavy)
Executor, Estate of Joseph Shuster
Jean Peavy
51 Camino Cabo,
Sante Fe, New Mexico 87508

Dear Warren and Jean:

This is to confirm that (1) the joint venture agreement dated as of November 23, 2001 between you and Pacific Pictures Corp. and (2) the engagement agreement dated October 27, 2003 between the Estate of Joseph Shuster and Pacific Pictures Corp. have been cancelled.

Sincerely yours,

Marc Toberoff

AGREED:

The Estate of Joseph Shuster

By: Mark Warren Peary, Executor

Mark Warren Peary

Jean A. Peavy

DC COMICS
1700 Broadway
New York, NY 10019
(212) 636-5555
FAX (212) 636-5485
e-mail: paul.levitz@dccomics.com

Paul Levitz - President & Publisher

By Federal Express

April 28, 2005

Jean Adele Peavy
(as sole heir to Joseph Shuster)
Mark Warren Peary
(as personal representative of the Estate of Joseph Shuster)
51 Camino Cabo
Santa Fe, NM 87505-2277

Dear Jean and Warren:

I write to you today to offer to license from you the interest in Superman which is the subject of your recent notice of termination. Without in any way conceding that the notice of termination is valid, and though the interest you claim in Superman cannot, under any circumstances, become yours until April 2013 – over eight years from now – DC Comics is proposing to enter into an arrangement with you and begin paying you substantial payments starting *now*. For the period covered by your termination notice, DC will only pay a premium to *one* terminating party. Therefore, before proposing the terms of our offer I believe it would be helpful to lay out some of the background and history that brings us to where we are today.

As an initial matter, I want to reiterate to you the great respect that DC Comics and I personally have for Joe Shuster's work, and for Superman's value and contribution to American culture and to DC Comics. As you may know, I have been working in the comic book field for over thirty years, and like Joe, while still in high school started out as a freelancer for DC. It was my pleasure to know Joe for almost the last two decades of his life. As a result of my long association with DC, I can personally attest to DC's heavy investment in and nurturing of the Superman property, which I believe has played a substantial part in creating the lasting value and continued popular interest the character that Joe and Jerry created has enjoyed. DC's efforts have included the distribution of television programming and motion pictures featuring Superman, merchandising of the Superman character, and continually creating new and interesting story lines that have kept Superman alive in the public's imagination. I hope you agree that DC has done its job well in its management and development of Superman.

DCC00057431

Given DC's long history of stewardship, commitment and dedication of resources to Superman, I believe that there is no company better positioned than DC to continue Superman's success.

As you are no doubt aware, aside from you and DC Comics, the heirs of Jerry Siegel also claim to have an interest in the Superman character, and as you probably know, in October 2004 those heirs commenced two lawsuits in federal court in Los Angeles against DC Comics and certain of its affiliated companies. In the first lawsuit they seek an accounting for profits derived from DC's exploitation of the Superman character following the Siegel heirs' purported termination of Jerry Siegel's original 1938 grant to DC. They claim the termination was effective April 16, 1999. In the second lawsuit the Siegel heirs assert that Jerry Siegel – without any contribution from Joe Shuster – was the sole creator and owner of the character Superboy, that the Siegel heirs purported to terminate DC's interest in the Superboy character effective November 18, 2004, and that neither DC, you nor anyone other than the Siegel heirs is entitled to exploit the Superboy property.

The Siegel lawsuits are pending and in their early stages. Although it is too early to tell how these lawsuits will turn out (and we believe that DC has substantial defenses to the Siegel heirs' claims) I am advised that the Siegel heirs' counsel has communicated to our lawyers that it is their ultimate goal to settle all claims with DC relating to Superman. This would presumably include all claims relating to any interest in the copyright extension period that begins in 2013 – the same period in which you claim rights. Most lawsuits do, in fact, settle, and it continues to be our hope as well to reach some sort of amicable resolution with the Siegel heirs. In fact, one of the principal defenses we have raised in the Siegel heirs litigations is that DC did, in fact, reach a comprehensive settlement with the Siegel heirs in 2001, which covered all copyright extension periods, and which was confirmed by the Siegel heirs' lawyers in writing. The Siegel heirs now deny that there was such an agreement. This is one of the issues that the court will ultimately decide.

I want to be frank in telling you that if we are able to resolve matters with the Siegel heirs (whether by settlement or judgment) *before* we reach an agreement with you, so that we acquire or are adjudged to own rights to the Superman character during the copyright extension term that begins in 2013, there will not be any pressing need to reach an agreement with you in advance of that date. The reason that we are contacting you at this time is that we are interested in removing now any possible issues as to whether DC Comics has sufficient rights to continue to fully exploit the Superman character in new works during the extension term beginning in 2013. Once we have certainty that we

DCC00057432

have those rights from one of the joint holders, we are then assured of our right to continue to exploit those rights to create new works, and the other joint holder at best is entitled to a participation or has a claim for an accounting. Therefore, if you are interested in receiving something *now* in exchange for rights that cannot ripen until 2013, you should be aware that we are more motivated to make such a deal now. The deal that we envision makes a payment to you as soon as it is signed, but the opportunity to enter into such a deal exists only in the absence of a similar arrangement with the Siegel heirs, or a judgment by the court that the Siegel heirs have already settled the matter – as we contend they have.

In considering our proposal – which you should discuss with any advisors to you – please keep in mind that even after 2013, if your termination notice is valid, your interest will be limited to U.S. rights since the termination notice you gave applies to rights under U.S. law only. In addition, you will still have to share the copyright with either or both the Siegel heirs or DC, so at best you will only have non-exclusive rights. Further, your interest will be limited to the 1930s version of the Superman character and the triangular (as opposed to the current 5-sided) "S" shield which have extremely limited marketability by themselves. These limitations are substantial and could make it virtually impossible for you to enter into any sort of significant license deal with another company. So a deal between you and DC really makes by far the most sense; it gives both parties significant benefits.

So, with that background, I would like generally to outline for you our offer in exchange for your exclusive license to DC of all rights arising out of Joe's authorship or contributions to DC Comics, including any Shuster post-April 2013 rights in Superman and all related properties, including Superboy (the "Superman Property"). Although there may be fine points to this offer that our representatives will want to work out, the following is our basic proposal:

1. **Non-Refundable Cash Advance**

Upon signing, you shall be paid:

- A non-refundable advance against royalties (as described below) of two million dollars ($2,000,000.00) (This means that no matter what, you get to keep the money; it is applied against money DC may owe you commencing in 2013; it is not repayable by you)

DCC00057433

2. **Royalty Payments**

Beyond the initial advance, you shall share in the success of the Superman Property in connection with new works created after April 18, 2013. Commencing with revenues received on account of such works after April 18, 2013, DC shall pay you royalties, subject to recoupment of the advance described above, but in no event less than $100,000.00 per year, as follows:

- On merchandising and media licenses:
  - 6% of DC's receipts from all media and merchandising licenses for the domestic (U.S.) territory for use of the Superman Property where the property is not commingled with any other superhero or equivalent property
  - 3% of DC's receipts from all media and merchandising licenses for the domestic territory for use of the Superman Property where the property is commingled with one other superhero or equivalent property (*e.g.*, Batman, Flash)
  - An allocable share of DC's receipts from all media and merchandising licenses for the domestic territory where the Superman Property is commingled with multiple other properties, provided that the 6% royalty shall not be reduced to less than 1%
  - 1% of DC's receipts from all media and merchandising licenses for the domestic territory for use of the Superman Property where the property is used in an extraordinarily mixed license with multiple other properties (*e.g.* Six Flags license with DC and Looney Tunes characters), except to the extent that receipts can be specifically attributed to the Superman property in which case the 6% royalty would apply to such receipts.

- On merchandise sold directly by DC
  - 6% of an allocable portion of domestically derived revenue from the Superman Property consistent with revenue reporting by third-party licensees, reducible by commingling or bundling as per the media and merchandising licenses above
- On publications sold directly by DC
  - 1% of the cover price of copies sold in the domestic territory of DC's own editions of publications ("Publications") based on the Superman Property where the Superman Property comprises the title of the publication (*e.g.* "Superman") or where the Superman Property comprises the entire subject matter of the publication (*e.g.* "Action Comics")
  - 1/2% of the cover price of Publications which are based on multiple properties which include the Superman Property
  - there shall be no royalties payable hereunder where the Superman Property appears in publications or stories based on other properties where neither the publication or story title contains the Superman Property

The royalties will be paid to you on a calendar year basis beginning in 2014 (for the April – December, 2013 period) and thereafter through 2033. During this period, you will receive a minimum royalty of $100,000.00 per year regardless of whether DC has recouped its advance. To the extent that the minimum royalty exceeds the royalties earned under the above definitions, such excess shall be treated as an advance against royalties to be earned. Aside from the $100,000.00 minimum, all royalties earned shall first be applied to any unrecouped advances. All sums advanced shall bear interest at the prime interest rate – whatever it may be – to the extent unrecouped.

3. **Credit**

DC Comics shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" on comic books, television programs (main titles), motion pictures (main titles on screen), all publications and other works where credit to creators is customary. Credit must be consistent with guild and other obligations.

4. **Miscellaneous Terms**

You will make appropriate warranties and representations that you have not transferred or licensed any of the Superman rights and that DC may exploit the Superman Property without interference. You and DC will also mutually release each other and provide certain covenants and indemnities as to future claims. Finally, you will acknowledge DC's right to use and publish Joe's biographical facts, materials and photographs in connection with the Superman Property, including in connection with publicity and exploitation of Superman, which is something we want to do.

As mentioned above, there may be other details that would need to be ironed out before an agreement is signed, but we've tried to set forth herein the essential terms of the deal we are proposing.

We hope you feel there are compelling reasons for you to seriously consider our offer. First, it gives you money now, eight years before you could be entitled to it otherwise. Second, it provides you with an annual advance for each year from 2014 through 2033 – as long as the term of copyright in Action Comics no. 1. Third, it allows you to capitalize on the synergies created by the combination of your rights – which, by themselves are at best extremely narrow and likely unmarketable – with those of DC. This is a situation where the whole is clearly greater than the sum of the parts and both you and DC can benefit from their combination.

Finally, to be fully open and candid, there is an additional point which I feel compelled to mention. I understand that you are represented by counsel in this matter – Marc Toberoff – and so I will ask DC's representatives to send him a copy of this letter. I assume that you know that Mr. Toberoff is also representing the Siegel heirs in their lawsuits against DC. I feel compelled to mention the dual role Mr. Toberoff is playing because the offer in this letter is

made only to you, on a confidential basis, in the hopes of making a deal that is mutually beneficial to your family and to DC. I hope that you will consider your own best interests and instruct your counsel accordingly; keeping in mind that what is best for you may well conflict with the interests of Mr. Toberoff's other client.

I am hopeful that you will find our proposal beneficial and fair. I very much look forward to your response and would welcome the opportunity to discuss any question you may have. Please call or write to me at your convenience, but I urge you to do so soon as given the current situation we can only keep this offer open for a short time. Thank you.

Sincerely,

Paul Levitz

DCC00057437

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA SIEGEL LARSON,

Plaintiffs,

vs.

No. 04-8400 (RSWL)(RZx)
-and-
No. 04-8776 (RSWL)(RZx)

WARNER BROS. ENTERTAINMENT INC., et al.,

Defendants.

AND RELATED COUNTERCLAIMS.

ORIGINAL

DEPOSITION OF LAURA SIEGEL LARSON

Beverly Hills, California

Tuesday, August 1, 2006

Reported by:
DAVID S. COLEMAN
CSR No. 4613

Job No. 1-50934

www.sarnoffcourtreporters.com

Irvine • Los Angeles • San Francisco

phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

Beverly Hills, California, Tuesday, August 1, 2006

10:05 AM - 8:50 PM

LAURA SIEGEL LARSON,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. ZISSU:

Q Could you tell us your name?

A Laura Siegel Larson.

Q And where do you live?

A 6400 Pacific Avenue, No. 106, in Playa Del Rey, California 90293.

MR. ZISSU: Now, we will have certain stipulations, which I think are normal. Objections except as to form are reserved.

Okay?

MR. TOBEROFF: That's fine.

BY MR. ZISSU:

Q Should I call you Miss Larson or Miss Siegel or...

A Miss Siegel.

Q What do you prefer?

A Miss Siegel would be fine, thank you.

(Defendants' Exhibit 7 marked.)

BY MR. ZISSU:

Q My first question is have you seen a copy of that letter before?

A No.

Q Have you seen it, ever?

A No.

Q Did you ever hear from either of the Peavys that they received an offer --

A No.

Q -- from DC Comics?

A No.

MR. TOBEROFF: While the next question is pending, before you answer, please give me time. Count to 5.

BY MR. ZISSU:

Q When did your own involvement with the copyright termination rights pertaining to your father's works begin?

MR. TOBEROFF: Objection. Vague and ambiguous. Lacks foundation. Calls for a narrative.

THE WITNESS: When my father died.

BY MR. ZISSU:

Q Had you any involvement with these kinds of rights before he died?

A He talked to me about what he was doing.

Q And what's your recollection of what he told you?

A He was going to pursue his termination rights that were given to him under the copyright law.

Q Did he ever say why he had not already pursued them?

A No.

Q Did you ever discuss with him why he didn't serve a termination notice while he was alive?

A No.

Q Do you know whether your mother discussed that with him?

A I don't know.

Q Did he ever discuss with you what he thought his termination rights were worth?

A No.

Q Did you ever hear that he had ever done any evaluation or assessment of the value of those rights?

A No.

Q To your knowledge is there any evaluation that was done for him of those rights?

A No.

Q Have you ever had a deposition taken of you before?

I, LAURA SIEGEL LARSON, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this 17th day of September, 2006, at Playa Del Rey, (City), California (State).

Laura Siegel Larson

LAURA SIEGEL LARSON

1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

JOANNE SIEGEL,
LAURA SIEGEL LARSON )
Plaintiffs, )
v. ) CASE NO. CV 04-8400
CV 04-8776
WARNER BROS, et al. )
Defendants. )

DEPOSITION OF MARK WARREN PEARY
November 11, 2006
8:30 a.m.
317 Paseo de Peralta
Santa Fe, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: MR. PATRICK PERKINS
Attorney for the Defendants

REPORTED BY: MABEL JIN CHIN, NM CCR #81
Bean & Associates, Inc.
Professional Court Reporting Service
500 Marquette, Northwest, Suite 280
Albuquerque, New Mexico 87102

(3519B) MC

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit JJ
362

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

3

8. March 12, 2004 Register of Copyrights documents 57
9. September 10, 2004 cancellation letter 59
10. April 26, 2005 letter, Levitz to Peavy, Peary 64
11. May 12, 2005 letter, Toberoff to Perkins 71

* * *

MARK WARREN PEARY,

after having been first duly sworn under oath, was questioned and testified as follows:

MR. TOBEROFF: Before we start, I would just like to note at the outset of the deposition that we have discussed timing, and that we have to leave at 4 o'clock sharp so that I can make a flight.

I would also just like to object that plaintiffs were not -- I was not given notice as attorney for Warren Peavy, the witness, that this deposition was going to be videotaped as I believe is required by the rules.

Oh, excuse me. The Notice. I'm seeing it's not in the subpoena. It may be required in the subpoena, it's not in the subpoena but it is in the Notice to me.

EXAMINATION

BY MR. PERKINS:

Q. Good morning, Mr. Peary. My name is Patrick Perkins. I represent the defendants, DC Comics, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit JJ
363

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

20

Q. Mr. Peary, what is Pacific Pictures Corporation?

A. It's -- it's one of Marc Toberoff's businesses.

Q. When did you first make the acquaintance of Marc Toberoff?

A. It would have been 2001, I believe.

Q. Do you remember when in 2001?

A. Not exactly. I was doing research on copyrights and I contacted him as a result. So exact month, I don't remember.

Q. What exactly were you researching with respect to copyright?

A. Copyright law and rights.

Q. And why did you contact Mr. Toberoff?

A. I thought we might have some rights.

Q. What was the basis for your belief that you thought you might have some rights?

A. What I read about copyright law.

Q. And where did you -- where did you read about copyright law?

A. Various places -- the Internet, articles in magazines.

Q. And what rights did you believe that you had?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit JJ
364

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

21

A. Rights connected to Superman.

Q. What rights connected to Superman did you believe you had?

A. That's my understanding of it, that the law grants certain rights, ownership rights. That's my understanding.

Q. And that's why you contacted Mr. Toberoff?

A. Yes.

Q. Did you contact anyone else concerning those rights?

A. Yes, I have. I have had done so in the past, earlier. I -- I talked to other people.

Q. Whom did you speak to?

A. I talked to an attorney in Albuquerque once.

Q. Do you recall when that was?

A. 1990s sometime. I don't know the exact year.

Q. Was your uncle still alive at the time?

A. I don't think so.

Q. Did you ever discuss the issue of copyright rights in Superman with your uncle?

A. No. No.

Q. Did he ever talk to you about any unhappiness with respect to the arrangements that had been made with respect to Superman, speak to you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit JJ
365

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

22

personally?

MR. TOBEROFF: Vague and ambiguous.

A. He didn't say much. I don't think he wanted to talk too much about it. He really didn't say that much.

Q. So, going back to your testimony, you contacted Mr. Toberoff sometime in 2001; correct?

A. Yes.

Q. And as you sit here today, you can't remember when in 2001?

A. Not the exact month, no.

Q. Do you remember the season?

A. It seems like it was mid year sometime.

Q. Now, when you contacted Mr. Toberoff, had you made any attempt to evaluate what, if anything, the copyright rights in Superman were worth that you were contacting Mr. Toberoff about?

MR. TOBEROFF: Objection, vague and ambiguous.

A. I don't think I -- no, I don't think I went that far. I didn't.

Q. Since then have you done anything to try to evaluate the value of copyright rights in Superman?

MR. TOBEROFF: Him personally?

Q. (By Mr. Perkins) You personally?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
366

23

A. Me personally? Not really on my own, just whatever has been discussed with my attorney.

Q. Were there discussions with your attorney concerning the value of Superman? That's a yes or no question.

MR. TOBEROFF: Objection, calls for attorney-client privileged information. The substance of his conversations are privileged, and you just outlined the substance. Instruct him not to answer.

Q. Are you going to follow Mr. Toberoff's instruction not to answer the question?

MR. TOBEROFF: Of course he is going to follow my instruction.

A. Yes. That's a privileged question.

Q. So you are going to follow his instruction not to answer?

A. Yes.

Q. Thank you. At what point did Mr. Toberoff become your attorney?

A. It was fairly soon after I contacted him.

Q. Well, you have another relationship with Mr. Toberoff also, or did, other than as an attorney, didn't you?

MR. TOBEROFF: Vague and ambiguous.

A. Well, the -- the first relationship was as

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
367

24

counsel, and then we had discussed possible uses of rights, but we really -- I employed him as counsel very soon after I contacted him.

MR. PERKINS: Would you mark that, please?

(Exhibit 3 marked.)

Q. (By Mr. Perkins) I have asked the court reporter to mark as Exhibit 3 a document that's entitled Joint Venture Agreement. Could you turn to the last page of this document, please?

MR. TOBEROFF: Before you ask him questions about an isolated portion of the document, I think you should look it over because the rest of the agreement may provide context for whatever question Mr. Perkins is asking.

MR. PERKINS: Well, I didn't ask any questions yet, but I was just --

MR. TOBEROFF: I presume you were about to?

MR. PERKINS: I was just going to ask him if it was his signature on the last page, because if it's not, then it's going to be a very different examination.

Q. (By Mr. Perkins) Is this your signature on the last page?

A. Yes.

Q. Okay. Have you seen this agreement before

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
368

24

counsel, and then we had discussed possible uses of rights, but we really -- I employed him as counsel very soon after I contacted him.

MR. PERKINS: Would you mark that, please?

(Exhibit 3 marked.)

Q. (By Mr. Perkins) I have asked the court reporter to mark as Exhibit 3 a document that's entitled Joint Venture Agreement. Could you turn to the last page of this document, please?

MR. TOBEROFF: Before you ask him questions about an isolated portion of the document, I think you should look it over because the rest of the agreement may provide context for whatever question Mr. Perkins is asking.

MR. PERKINS: Well, I didn't ask any questions yet, but I was just --

MR. TOBEROFF: I presume you were about to?

MR. PERKINS: I was just going to ask him if it was his signature on the last page, because if it's not, then it's going to be a very different examination.

Q. (By Mr. Perkins) Is this your signature on the last page?

A. Yes.

Q. Okay. Have you seen this agreement before

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
369

25

today?

A. Yes.

Q. Did you read it before you signed it?

A. Yes.

Q. Okay. Why don't you go ahead and go through the agreement, because I am going to ask you some questions about it now.

Have you had occasion to read through the document?

A. Yes.

Q. Now, this agreement is a Joint Venture Agreement; correct?

MR. TOBEROFF: Objection, calls for a legal conclusion. You can answer.

A. Well, that's what it says here.

Q. What did you understand you were doing when you signed this agreement?

A. We were employing Marc Toberoff, Esquire, as our attorney to exploit any rights we may have in connection with Superman.

Q. And so what was Pacific Pictures Corporation's role in this whole agreement, then, your understanding?

MR. TOBEROFF: Calls for speculation.

A. Um -- I don't know how to characterize

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
370

26

exactly what Pacific Pictures' role is my. Understanding is that this is when we employed Marc Toberoff as our attorney, and this was a business name he was using. That's my understanding.

Q. Did you -- did you get legal counsel to advise you on this agreement before entering into it?

A. No.

Q. Now, in the first paragraph -- in the paragraph that's named -- that listed number 1, do you see that?

A. Yes.

Q. It lists a number of characters. Do you see that?

A. Yes.

Q. Now, I promised the court reporter that I wouldn't reference one particular character because of the difficulty in spelling it, so we won't go through all of them. But I want to draw your attention to two specific characters. Before I do, who decided which names and characters would be included in paragraph 1?

MR. TOBEROFF: Objection, attorney-client privileged information. Instruct you not to answer. Also attorney work-product.

Q. Are you going to follow your counsel's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit 33
371

27

instructions not to answer.

THE WITNESS: Yes.

MR. TOBEROFF: Mr. Perkins, for the remainder of this deposition please assume that he is going to follow his counsel and do not ask him after each question whether he is going to follow the instruction. I find that improper.

MR. PERKINS: It's actually not, Mr. Toberoff. I have to ask the question because if I just leave it with your instruction and don't ask, I open myself up to the possibility that at trial he could answer the question saying I was never asked whether I would follow the instruction.

MR. TOBEROFF: Okay. So let's say for the remainder of the deposition when I instruct you not to answer are you going to follow my instructions?

THE WITNESS: Yes.

MR. PERKINS: That's fine. Thank you.

MR. TOBEROFF: Okay. Then you don't need to keep asking him.

MR. PERKINS: Thank you.

Q. (By Mr. Perkins) Do you have any understanding as to why the character Superboy is listed in paragraph one of this agreement?

A. No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
372

28

Q. In the research that you did concerning copyright law relating to Superman, was it your belief that some of the rights that you may have held were rights relating to Superboy?

A. No.

Q. And I also note that paragraph one mentions Smallville. Do you see that?

A. Yes.

Q. Do you have any understanding as to why that was included in this paragraph?

A. No, I don't.

Q. Do you know what Smallville is? What that's referring to there?

A. Yes.

Q. What is it?

A. It's -- it was a name that was created by -- in connection with the story in connection with Superboy.

Q. And based on the --

A. Or actually, let me finish, because --

MR. TOBEROFF: Wait.

A. It was actually -- I'm recalling, it was part of the whole story from the very beginning, if I'm recalling the whole story, the whole Superman story. From the very beginning it was used in there,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
373

29

so that's all I know about it.

Q. And based on the research that you did, was it your belief that the copyright rights that you may have had rights to would include rights in Smallville?

A. When you say Smallville, are you talking about, like, the TV show that's on or --

Q. That -- I'm sorry -- yes.

A. Oh.

MR. TOBEROFF: Calls for a legal conclusion as to rights he would have.

A. That's -- that's not really my understanding that that's part of our rights.

Q. You testified earlier, if I'm not mistaken and if I get it wrong please tell me, and I'm sure Mr. Toberoff will jump in and say that I mischaracterized it. The joint -- the purpose of this document was to hire Mr. Toberoff as your attorney. Is that an accurate characterization of your belief.

MR. TOBEROFF: Asked and answered. Oh, mischarac- -- okay. Strike that.

A. Yes. My understanding was that, that this is the document that we used to hire Mr. Toberoff as our attorney.

Q. If you could turn to the second page in paragraph 5, do you see that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
374

30

A. Yes.

Q. That paragraph provides for a division of proceeds of 50 percent to you and your mother and 50 percent to Pacific Pictures, do you see that?

A. Let's see. Who are the claimants again? Let's see. Let's see.

Q. In the top paragraph of the first page, it identifies Jean A. Peavy and her son Mark Warren Peary --

A. Oh.

Q. -- individually and collectively as claimants. Do you see that?

A. Yes.

Q. So, turning back to paragraph 5?

A. Uh-huh.

Q. There is a division of 50 percent to you and your mother and 50 percent to Pacific Pictures. Do you see that?

A. Yes.

Q. And, do you recall how the parties to this agreement came up with that division?

MR. TOBEROFF: Vague and ambiguous.

A. It's discussions, just discussions between us and Mr. Toberoff.

Q. And what was the basis for choosing that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
375

31

particular division of proceeds?

MR. TOBEROFF: Vague and ambiguous, asked and answered.

A. Yes, it was pretty much what I said before, it was just based on just discussions over time.

Q. Well, were there certain considerations that went into determining this percentage?

A. Perhaps the amount of work involved, the amount of time, the commitment, like, it was the idea it was not an immediate thing, it might take many years.

Level of -- just, you know, that's it.

Q. In entering into this Joint Venture Agreement, what there any discussion as to how much revenue was anticipated would come in, in exploiting the rights here?

A. Oh, I -- I don't recall discussing exact figures, no.

Q. Discuss -- do you recall general amounts?

A. You know, that's -- that's not something we really talked too much about. It was more having to do with what the exact copyright law states what our rights might be. We really didn't discuss figures much.

Q. Did you enter into a separate written

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit 33
376

agreement with Mr. Toberoff concerning his representation of you as a lawyer?

A. This is all I recall, right here.

MR. TOBEROFF: I want to interject. The question was vague and ambiguous at the time.

Q. If I could ask you to turn to page 3 of the document and take a look at paragraph 8, which is the first paragraph on the page? Could you please read that paragraph to yourself, and then I'm going to ask you some questions about it.

A. Oh, okay.

Okay.

Q. The second sentence of this agreement states, and I quote, "Upon the expiration of the term and the winding up of the venture, or in the event of termination of the venture for any reason, all rights, property or assets of the venture will be held 50 percent by the claimants and 50 percent by PPC as tenants in common, and claimants and PPC will each be entitled to receive and continue to receive 50 percent of all proceeds derived from the rights after termination of the venture."

My question is, Mr. Peary, what was your understanding as to what, if any relationship, would continue to exist between you and Pacific Pictures in

33

the event that this agreement was terminated?

MR. TOBEROFF: Calls for a legal conclusion, the document speaks for itself.

A. My understanding of what that meant? Probably death, if he died.

Q. What -- what was your understanding of what would happen to the rights that are at issue in this agreement in the event that this agreement was terminated?

MR. TOBEROFF: Same objections, calls for a legal conclusion. The document speaks for itself.

A. What would happen to the rights?

Q. Well, who would own them?

MR. TOBEROFF: Are you asking him to read the document and tell you what it means?

Q. I'm asking you, Mr. Peary, what your understanding was of what would happen to the rights if the agreement was terminated at the time that you signed the agreement?

A. Well, it was terminated at some later date.

Q. Yes.

A. The rights would be split 50 percent.

Q. If I could have you go back to page -- to the first page of Exhibit 3, in paragraph 3 there is reference to PPC paying costs and expenses of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

Exhibit JJ
378

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

34

venture. Do you see that?

A. Yes.

Q. And it refers to -- it lists a number of costs and fees. My question, Mr. Peary, is, were you ever made aware as to whether any costs or fees were incurred by the venture?

MR. TOBEROFF: Vague and ambiguous.

A. There were -- there was some fees associated with the establishment of the Joe Shuster estate. That's pretty much all I know.

Q. Were you aware of any other attorneys' fees that were incurred in connection with this venture?

MR. TOBEROFF: Objection, vague and ambiguous.

A. The only fees I am aware of is fees associated with the establishment of the Shuster estate.

Q. Now, you mentioned that under this agreement you believe that you were hiring Mr. Toberoff as your attorney. What is your understanding of the fee arrangement with Mr. Toberoff for his legal services?

MR. TOBEROFF: Asked and answered.

A. Yes. My understanding is what it says in paragraph 5 that we discussed.

Q. All right. Hold on to that document, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit 39
379

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

35

I'm going to mark something else and we're going to go back to it.

MR. TOBEROFF: I'm getting a glass of water.

THE VIDEOGRAPHER: Your mike.

MR. TOBEROFF: Oh, sorry.

(A discussion was held off the record.)

Q. (By Mr. Perkins) Before you look at Exhibit 4, I would like you to go back to Exhibit 3 for a moment, Mr. Peary. Is this document, this agreement the first agreement between you and Mr. Toberoff that you believe established him as your attorney?

A. Yes.

Q. And the date on the back page of this, it's signed November 28, 2001; correct?

A. Yes.

Q. Did you have any discussions with Mr. Toberoff prior to November 28, 2001?

MR. TOBEROFF: Just a second. I need to put on my mike.

Objection, asked and answered.

A. Yes. I would refer you back to the prior answer about when I first talked to him.

Q. He wasn't your lawyer when you first talked to him; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit JJ
380

40

Q. Who initially came up with the name Michael Catron as the administrator?

MR. TOBEROFF: Came up with it? Vague and ambiguous.

A. I'm not sure who first came up with it. He is a long-time friend. That's all I can say.

MR. PERKINS: Would you mark this for me?

(Exhibit 5 marked.)

Q. (By Mr. Perkins) I have asked the court reporter to mark as Exhibit 5 a document that is dated October 27, 2003. It is addressed to Mark Warren Peary, and it is from Pacific Pictures Corporation. If I could invite your attention to the last page, please?

Is that your signature?

A. Yes.

Q. And did you read this document before you signed it?

A. Yes.

Q. Mr. Peary, what was the purpose of entering into this agreement?

A. As far as I understand, the purpose of this was after I was appointed executor of the Shuster estate.

Q. And why did you need to enter this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Exhibit 33
381

86

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL, )
LAURA SIEGEL LARSON )
)
Plaintiffs, )
)
v. ) CASE NO. CV 04-8400
) CV 04-8776
WARNER BROS, et al. )
)
Defendants. )

CERTIFICATE OF COMPLETION OF DEPOSITION

I, MABEL JIN CHIN, New Mexico CCR #81, DO HEREBY CERTIFY that on November 11, 2006, the deposition of MARK WARREN PEARY was taken before me at the request of, and sealed original thereof retained by:

Attorney for the Defendants
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
BY: MR. PATRICK PERKINS

I FURTHER CERTIFY that copies of this certificate have been mailed or delivered on ______________, with changes, if any, by the witness appended, to the following counsel of record and parties not represented by counsel:

Attorney for the Plaintiffs
MR. MARC TOBEROFF
2049 Century Park East, #2720
Los Angeles, California 90067

I FURTHER CERTIFY that examination of this transcript and signature of the witness were requested by the witness and all parties present.

On November 21, 2006, a letter was mailed or delivered to Mr. Toberoff regarding obtaining signature of the witness.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit JJ

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

87

I FURTHER CERTIFY that the recoverable cost of the original and one copy of the deposition, including exhibits to Mr. Perkins is $ 508.68 .

I FURTHER CERTIFY that I did administer the oath to the witness herein prior to the taking of this deposition; that I did thereafter report in stenographic shorthand the questions and answers set forth herein, and the foregoing is a true and correct transcript of the proceeding had upon the taking of this deposition to the best of my ability.

I FURTHER CERTIFY that I am neither employed by nor related to nor contracted with (unless excepted by the rules) any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

MABEL JIN CHIN
Certified Court Reporter #81
License expires: 12/31/2006

(3519B) MC
Date taken: November 11, 2006
Proofread by: LR

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

Exhibit JJ

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



**LAW OFFICES OF MARC TOBEROFF**

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
ALEXANDER M. MERINO

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

November 15, 2006

Via Facsimile

Adam Hagen, Esq.
Weissman Wolff Bergman Coleman Grodin & Evall LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

Re: *Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
USDC Central District of CA, Case No. 04-08400 SGL (RZx)
*Joanne Siegel & Laura Siegel Larson v. Time Warner, Inc. et al.*
USDC Central District of CA, Case No. 04-08776 SGL (RZx)

Dear Adam:

Enclosed please find IPW, LLC's production of documents, numbered IPW 00001-00016. In addition, enclosed please find Pacific Pictures Corporation's production of documents, numbered PPC 00001-00009.

Very truly yours,

Alexander M. Merino

cc: Patrick T. Perkins, Esq.
James D. Weinberger, Esq.

Exhibit KK

ORIGINAL SHIPPED DEC 0 1 2006

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CERTIFIED ORIGINAL

JOANNE SIEGEL and LAURA SIEGEL LARSON,

Plaintiffs,

vs.

WARNER BROS. ENTERTAINMENT INC., et al.,

Defendants.

AND RELATED COUNTERCLAIMS.

No. 04-8400 (RSWL)(RZx)

-and-

No. 04-8776 (RSWL)(RZx)

DEPOSITION OF MARC TOBEROFF

Beverly Hills, California

Friday, November 17, 2006

Reported by:

DAVID S. COLEMAN

CSR No. 4613

U.S. LEGAL Support

Certified Shorthand Reporters

15250 Ventura Boulevard, Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Exhibit LL

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

Beverly Hills, California, Friday, November 17, 2006

1:46 PM

MARC TOBEROFF,

having been first administered an oath,

was examined and testified as follows:

EXAMINATION

BY MR. BERGMAN:

01:46 Q State your full name for the record, please.

01:46 A Marc Toberoff.

01:46 Q Have you had your deposition taken before,

01:46 Mr. Toberoff?

01:46 A Once.

01:46 Q And when was that?

01:47 A I think about nine years ago.

01:47 Q Here in California?

01:47 A Yes.

01:47 Q In what type of a case?

01:47 A It was a commercial litigation.

01:47 MR. BERGMAN: Mr. Williamson, is Mr. Toberoff

01:47 appearing for Pacific and IPW, LLC as well as his own

01:47 subpoena?

01:47 MR. WILLIAMSON: Yes.

01:47 MR. BERGMAN: Okay.

A The assertion of the attorney-client privilege goes to matters where you start to ask questions that go to the giving of legal advice or legal strategies, mental impressions, things protected by the work product doctrine.

Q The record will speak for itself on that.

In paragraph 11 there is the sentence about four lines up from the bottom of the page that begins, "The parties have mutually participated in the negotiation and drafting of this Agreement..."

Did either Peary or Peavy engage in the drafting of this agreement?

A Only to the extent -- remember I told you earlier that I believe it went through a few drafts in response to requests, revisions, comments by Warren? So to that extent, yes.

MR. BERGMAN: Would you mark as Exhibit 14, please, a document on Pacific Pictures Corporation letterhead dated October 27, 2003?

(Deposition Exhibit 14 marked.)

BY MR. BERGMAN:

Q My first question is going to be whether that is your signature on the last page of Exhibit 14, Mr. Toberoff.

A Yes, it is.

Actually, looking at the date of this document, I can narrow the other question you asked: When we entered into a legal or retainer agreement. Still I think it might be between the date of this and the date of the cancellation of these two agreements.

Q Okay.

A I'm not positive, but that's...

Q Am I correct that you drafted Exhibit 14?

MR. WILLIAMSON: Objection. Vague and ambiguous.

THE WITNESS: Yes, I did.

BY MR. BERGMAN:

Q Were --

A With input from Warren.

Q What input did you receive from Mr. Peary?

A I don't recall specific items, but we discussed it.

Q Okay. So am I correct you formed the -- you probated the estate of Joseph Shuster and then entered into this agreement with the executor of his estate?

MR. WILLIAMSON: Objection. Assumes facts not in evidence. It's vague and ambiguous.

THE WITNESS: What's the question?

BY MR. BERGMAN:

Q The question is, were you involved in the

probate of Joseph Shuster's estate?

MR. WILLIAMSON: Objection. Vague and ambiguous.

THE WITNESS: Yes.

BY MR. BERGMAN:

Q What was your involvement?

A I arranged for a -- since trusts and estates is a specialty of the law, I arranged for an attorney who's a -- who does nothing but trusts and estates work to handle the probating of the estate.

Q And what was the purpose in entering into this October 27, 2003 agreement, Exhibit 14?

A I think this agreement -- I'd have to compare it line by line to Exhibit 13, but I think this agreement is very similar if not the same to Exhibit 13, but the purpose was to, since -- was to include the executor in the agreement.

Q Has Pacific Pictures Corporation advanced or loaned any money to either Peary or Peavy?

A You mean like a personal loan? I don't recall it loaning money to the Shusters.

Q Or advancing any money to the Shusters?

A I don't recall that, no.

Q To the best of your recollection, did you personally advance or loan any money to the Shuster

heirs?

MR. WILLIAMSON: Objection. Asked and answered.

THE WITNESS: I don't think so, no.

BY MR. BERGMAN:

Q Did any other entity of which you are a member or shareholder advance or loan any money to Peary or Peavy?

A I don't believe so.

Q Paragraph 3 reads in part that "PPC has paid and will continue to pay any and all costs and expenses incurred by it in connection with this agreement, including the legal fees and costs of setting up Joseph Shuster's Estate," close quote.

In addition to paying the legal fees and costs of setting up the Shuster estate, did PPC pay any other costs or expenses in connection with its agreement with Peary and Peavy?

A They may have paid filing fees with the U.S. Copyright Office, things of that nature, document retrieval fees from the U.S. Copyright Office, things of that nature.

Q Did you negotiate Exhibit 14 with any attorney representing either the executor of the estate or Miss Peavy?

MR. WILLIAMSON: Objection. Vague and

ambiguous.

THE WITNESS: No, I did not.

BY MR. BERGMAN:

Q When you discussed either the original Joint Venture Agreement or this Exhibit 14 with Peavy and Peary, was there any discussion regarding the ownership of the character Superboy?

MR. WILLIAMSON: Objection. Misstates prior testimony. Vague and ambiguous.

THE WITNESS: I don't know. I don't recall a discussion of that.

BY MR. BERGMAN:

Q Have you ever discussed ownership of the character Superboy with either Peary or Peavy?

A That would be privileged.

(Unanswered question.)

Q Prior to the time that you entered into the retainer agreement that you have testified to, did you have any discussion with either Peary or Peavy concerning the ownership of the character Superboy?

MR. WILLIAMSON: Objection. Attorney-client.

THE WITNESS: That would also be privileged.

(Unanswered question.)

BY MR. BERGMAN:

Q So is it your position --

A I can just tell you, as I sit here today, I don't recall, but to the extent I had discussed it, it would be privileged.

Q And is it your position, Mr. Toberoff, that the attorney-client relationship between you and Peary and Peavy resulted from the Joint Venture Agreement, Exhibit 13?

A Absolutely not.

Q Did it result -- that relationship result from Exhibit 14?

A No. It didn't result from a document. It resulted from them seeking legal advice from the very first call and my providing it, which established a confidential relationship.

Q With the exception of exhibits 13 and 14, have you ever entered into a joint venture agreement with a client?

A I think that's --

MR. WILLIAMSON: Objection. Vague and ambiguous.

THE WITNESS: I think you already asked that. What do you mean by that?

BY MR. BERGMAN:

Q I think it speaks for itself.

A I don't understand. Not to me. Clarify that.

Q Exhibit 13 is a joint venture agreement which in essence provides for a 50-50 split of proceeds between your company, Pacific Pictures Corporation, and the Shuster heirs. Have you ever entered into a similar joint venture agreement with any legal client?

MR. WILLIAMSON: Objection. The document speaks for itself. Vague and ambiguous.

THE WITNESS: I don't know. As I mentioned to you before, there have been situations where I'm involved with -- I'm trying to explain it to you. If somebody is -- normally, if someone is -- options a book and simply -- and then seeks to set up a film or to monetize that book by licensing film rights or producing a film, it's a very simple, straightforward type of situation, and when we spoke about BLUE MOVIE, for instance, you asked me about that, and I said I had optioned that book.

But in some cases when you're dealing in rights and copyrights, due to the intricacies of copyright law and what's involved, there can be a business side, but everything having to do with the rights and chain of title and issues regarding the rights that may arise are of a very legal nature, so it's very possible to have a business agreement but to in fact be dealing with a lot of legal issues and providing legal advice, and I believe that -- I shouldn't say I believe -- I know that's the

"not particularly" is because the word "active" is another one of these -- you know, it's a subjective, so I say not particularly depending on how one defines "active."

Q Okay. When to the best of your knowledge was the Smashbox Entertainment, LLC formed?

A I don't remember when it was formed. I believe it was about three years ago.

Q And what activities, if any, has Smashbox Entertainment engaged in since its formation?

A I believe it was going to be the production entity for a film project; I don't remember what it was, and for purposes of the -- I believe one of the guilds -- I think the Writers Guild needed a signatory company. And it may or may not have been a signatory to the Writers Guild, but it was ultimately not used as the production entity.

Q Okay.

Would you mark as Exhibit 13 a document entitled "Joint Venture Agreement" made as of November 23, 2001.

(Deposition Exhibit 13 marked.)

THE WITNESS: If we are going to go into a more detailed session, could I just use the restroom before we do that?

MR. BERGMAN: Of course. Why don't we take a

five-minute break.

(Recess.)

BY MR. BERGMAN:

Q Referring to the last page of Exhibit 13, Mr. Toberoff, I note that this copy does not bear your signature. It bears the Peary and Peavy signatures.

To your recollection did you ever sign a copy of Exhibit 13?

A I recall a joint venture agreement that was signed, I believe -- I recall because I believe that document was produced, but I don't know -- I would have to compare this to that document to know whether there were any changes between the two.

Q I know that the parties to this agreement are Ms. Peavy and Mr. Peary on the one hand and Pacific Pictures Corporation on the other.

Am I correct that you've identified Pacific Pictures Corporation as a loan-out company?

A I said I believe as it was initially conceived in whenever it was in the '80s, that's how I conceived it: As a loan-out company.

Q Well, did the nature of Pacific Pictures' business ever change from being a loan-out company to being something else?

A To determine that, I'd have to know what the

legal definitions of a loan-out company. When I use the term loan-out company," in the entertainment business when you do -- for example, if you're serving as a producer on a film or a writer, for instance, or a director, most people have a company that they -- which is a sole proprietorship that loans out their services, and I believe that people who do that originally for tax purposes. I'm not sure what the reasons are for that. So I believe when it was initially incorporated, that was the purpose, but then afterwards I would just use Pacific Pictures a lot for anything.

Q Anything that you personally were involved in?

A I would -- yeah, I would tend to use it for most things that I was involved in.

Q Okay.

A So I don't know if at that point it's a loan-out company or just a company.

Q And the address given here for Pacific Pictures Corporation, 23852 Pacific Coast Highway, does that continue to be the address of Pacific Pictures Corporation?

A You mean as registered with the California Secretary of State?

Q Well, as operating in actuality, does Pacific Pictures maintain offices?

A It's not active since -- I think -- didn't you ask me earlier about Pacific, and I said at the end of 2000 -- -- towards the end of 2003 I stopped using it? So it doesn't -- you know, I guess there is a distinction between a technical office for purposes of registration with the Secretary of State and active offices. I used to work out of my home in Malibu, and this was the mailing address used for myself and Pacific Pictures.

Q When was your first communication with either Miss Peavy or Mr. Peary concerning the Joe Shuster interest, if any, in Superman?

MR. WILLIAMSON: Objection. Assumes facts not in evidence. Vague and ambiguous.

THE WITNESS: Sometime around mid 2001.

BY MR. BERGMAN:

Q And how did that initial communication come about?

A Warren Peary -- the last name is P E A R Y -- called me up and -- he called me up.

Q And what did he say?

A He said he wanted -- was interested in -- I think he said that he got my name off of some article he had read on the Internet and that he wanted a lawyer to help him to figure out what rights the Joe Shuster estate would have in Superman.

Q And what did you reply?

MR. WILLIAMSON: Objection. Attorney-client privilege. Instruct you not to answer.

(Instruction not to answer.)

MR. BERGMAN: The Joint Venture Agreement between Pacific Pictures, which Mr. Toberoff has testified is owned wholly by him and is basically a loan-out company, and the Peavy and Peary individuals is a business arrangement. It is not a legal representation document. It is on its face a joint venture agreement. There is no privilege applicable to that. Mr. Toberoff was not retained as an attorney. He was -- he entered into a joint venture for the purpose of retrieving and enforcing and exploiting all of Joe Shuster's and his estate's rights, claims and copyrights. Certainly at this point in time that I'm asking Mr. Toberoff about, he was an entrepreneur, not an attorney.

MR. WILLIAMSON: Objection. Mr. Bergman, you are completely misstating his testimony, the documents and the record before us. Whether or not there was a retainer agreement between Mr. Toberoff and Mr. Peary and Miss Shuster is, frankly, irrelevant. I instruct him not to answer.

BY MR. BERGMAN:

Q Mr. Toberoff, I'll assume that when

Mr. Williamson instructs you not to answer, you will refuse to answer on that basis?

A Generally, yes. I -- without waiver -- again, let me say in any of these areas where we may have a difference of opinion as attorney-client -- obviously when you are taking a deposition of an attorney, you can surmise that there will be a lot of things that are protected by the attorney-client privilege and by work product. To the extent -- I'd like it to be understood that to the extent I am able to give you a general answer to certain questions without revealing the substance of attorney-client communications or work product, I don't want that to be misconstrued or claimed to be a waiver at any point in this deposition of attorney-client privilege or work product doctrine.

MR. BERGMAN: I will not assert such a waiver.

THE WITNESS: So I would just answer generally that Mr. Peary called me with respect to Superman rights, as I already mentioned, and my response was, because it was Superman, was that yes, I would be interested in representing him with respect to that.

BY MR. BERGMAN:

Q Did you tell him that you'd be interested in entering into a joint venture with Peary and Peavy in order to exploit their interest?

MR. WILLIAMSON: Objection. Attorney-client privilege --

THE WITNESS: No, I did not, but other than giving you the basic subject matter, which I've already given you, and why he was calling me, the rest of our communications would be privileged, and they're privileged on the basis that he was obviously seeking legal advice, and I was dispensing legal advice.

BY MR. BERGMAN:

Q And at what point in time did your activities change from that of rendering legal advice to entering into a joint venture with the Peary and Peavy --

MR. WILLIAMSON: Objection. Assumes facts not in evidence.

BY MR. BERGMAN:

Q -- individuals?

A It didn't change.

Q You did enter into a joint venture with them, did you not?

A I entered into a joint venture agreement with them, yes.

Q How many communications did you have with either Peary or Peavy from the time of that first conversation until November 23, 2001, the as of date of this joint venture agreement?

A I don't recall.

Q What is your best estimate?

A I don't -- we had at least one, we probably had more than one, but other than that I don't have a basis for estimating.

Q Did you have any face-to-face meetings with either Peavy or Peary prior to November 23, 2001?

A No.

Q Prior to this joint venture agreement, had you ever entered into a joint venture agreement with a client?

MR. WILLIAMSON: Objection. Vague and ambiguous.

THE WITNESS: I don't know what you mean by that.

BY MR. BERGMAN:

Q Well, you've testified that you were contacted and served as a lawyer, and yet, as Exhibit 13 demonstrates, you entered into a joint venture agreement with them under which you received 50 percent of whatever their recovery might have been.

A That misstates the document.

Q No, it doesn't misstate the document.

Am I correct that paragraph 5 of the agreement states that any moneys received from enforcement,

settlement or exploitation of any of the rights -- I'll skip something -- will be shared, divided and payable 50 percent to claimants and 50 percent to PPC?

A You've -- the words you've read appear there. The document speaks for itself. I'm playing both the role now of the witness and to a certain extent making objections to your question, but you would have to take -- read the whole paragraph in context to give a fair meaning as to what it says.

Q Who drafted this agreement?

A I drafted it.

Q Okay. Were the -- was Peary or Peavy represented by an attorney in connection with the negotiation of this agreement?

A I don't -- I didn't deal with an attorney, but I don't know whether or not they were represented by an attorney, whether they sought outside legal advice regarding the agreement.

Q Did you suggest to them that they do obtain independent legal advice before entering into the agreement?

MR. WILLIAMSON: Objection. Attorney-client.

THE WITNESS: Yes, I did.

BY MR. BERGMAN:

Q Had there been any prior drafts of this

agreement?

A I believe so, yes.

Q And had Peavy or Peary requested any changes in the prior draft?

A I believe so, yes.

Q What changes had they requested?

A I don't recall the specific changes, but I believe there was more than one draft, and I believe the reason for that is because of comments or revisions by Warren.

Q And are you still in possession of those prior drafts?

A No.

Q What happened to them?

A I don't know. I'm not in possession of them. Otherwise, we would have produced them.

Q Have you searched for them?

A I searched the files. I searched Pacific Pictures's files for any documents regarding the Shusters, yes.

Q Have you asked the Peary --

A I did that in response --

Q -- Peary or Peavy individuals whether they had any prior drafts?

A Yes.

Q And am I correct that they did not and that they did not produce any?

A Yes. They actually did not even have a copy of the fully signed agreement. What you're looking at -- I believe they didn't. To my recollection, I believe this was the only copy that they had still retained, what is Exhibit 13. This didn't come from my files. This came from Peavy's and Peary's production in response to the subpoena you served on them.

Q I note that in paragraph 1 of the Joint Venture Agreement, there is a reference to Superboy.

Did you -- have you at any point in time discussed with the Shuster heirs the conflict between the Siegel position and the Shuster heirs' position regarding Superboy?

MR. WILLIAMSON: Objection. Assumes facts not in evidence. Attorney-client. Instruct you not to answer.

(Instruction not to answer.)

BY MR. BERGMAN:

Q Did PPC in fact pay, as provided in paragraph 3, the legal fees and costs of setting up Joe Shuster's estate?

A I believe so, yes.

Q Did the Shuster heirs request that PPC receive a

STATE OF CALIFORNIA )
) ss
COUNTY OF LOS ANGELES )

I, DAVID S. COLEMAN, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: NOV 30 2006

[signature]

DAVID S. COLEMAN
CSR No. 4613

Word Index

Exhibits

WEISSMANN WOLFF BERGMAN
COLEMAN GRODIN & EVALL LLP
Michael Bergman (SBN 37797)
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212
Telephone: 310-858-7888
Fax: 310-550-7191

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: 212-813-5900
Fax: 212-813-5901

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
1711 Route 9D
Cold Spring, NY 10516
Telephone: 845-265-2820
Fax: 845-265-2819

Attorneys for Defendants and Counterclaimant

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

JOANNE SIEGEL and LAURA SIEGEL LARSON,

Plaintiffs,

vs.

TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1-10,

Defendants.

AND RELATED COUNTERCLAIMS

Case Nos. CV 04-8400 SGL (RZx)
CV 04-8776 SGL (RZx)
Hon. Stephen G. Larson, U.S.D.J.

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES AND SCHEDULES A & B IN SUPPORT THEREOF**

[Defendants' Local Rule 56.1 Statement; Declarations of Michael Bergman (2), Janice Cannon, Melinda Hage, Paul Levitz, Mark Rose, Jeff Rovin, Julie Spencer and Exhibits Thereto; Notice of Lodging of Non-Paper Exhibits; and [Proposed] Orders Filed Con-currently Herewith]

Time: 10:00 a.m.
Date: July 16, 2007
Courtroom 1

## PLAINTIFFS' NOTICES OF TERMINATION AND FILING OF THESE ACTIONS

### A.    Superman

On April 3, 1997, Plaintiffs served seven separate notices of termination under Section 304(c), purporting to terminate Siegel's copyright grants to DC's predecessors in the Superman character and comic book stories dating back to 1938 (the "Superman Notices"), all effective as of April 16, 1999. (Bergman Decl. Exhs. Z-DD, ¶ 4.)  By letter dated April 15, 1999, DC rejected the Superman Notices as untimely and legally invalid. (Bergman Decl. Exh. EE, ¶ 49.)[12]

The Superman Notices purport to terminate Siegel's – but not Shuster's – participation in the copyright grants to Detective and its successors. (Bergman Decl. Exhs. Z-DD, ¶ 2.)  Therefore, even if the Superman Notices are effective, DC remains (through Shuster's unterminated interests) a co-owner of the copyrights which are the subject of the Notices, and retains all the rights of a co-owner to exploit those copyrights without being subject to a claim for infringement.  Accordingly, in the Superman Action, filed on October 8, 2004, Plaintiffs essentially seek an accounting and a one-half share in the profits from the exploitation of Superman after the effective date of their Notices. (FASMC, ¶¶ 54(c), 57-59, 66-73, 105(d), 106, 108-110.)

Plaintiffs' operative complaint casts a wide – and inappropriately excessive – net with respect to the profits they seek to share:  Thus, Plaintiffs allege that they are entitled not only to a share of the profits arising from the domestic exploitation of Superman copyrights, but also to a share of the profits arising from any *foreign* exploitation of the character. (FASMC, ¶ 58(a).)  Plaintiffs further allege that they are entitled to a share of the profits arising from the exploitation the Superman trademarks, including the related characters and symbols associated with the

---

[12] Plaintiffs' First Amended Complaint in the Superman Action (Bergman Decl. Exh. EE) is hereinafter referenced as the "FASMC."

2. That DC and its licensees are entitled to continue using all of the copyrightable elements contained in the Announcements without the need to account to or share with Plaintiffs any of the profits generated from such use, and that DC and its licensees are entitled to use all of the story elements contained in the Non-Terminated Superboy Works without infringing on any of the copyright rights Plaintiffs claim to have recaptured by virtue of the Superboy Notice.

In the Superboy Action

3. That the post-termination episodes of *Smallville* do not infringe upon Plaintiffs' recaptured copyrights in the Submissions, and dismissing Plaintiffs' First Claim for Relief for copyright infringement and Fifth Claim for Relief for injunction in the Superboy Action, insofar as those claims relate to *Smallville*.

In the Superman Action

4. That Plaintiffs cannot establish that TWI and WBEI are the alter egos of DC, and dismissing the First through Fifth Claims for Relief in the First Amended Complaint as against defendants TWI and WBEI.

DATED: April 30, 2007

Respectfully submitted,

WEISSMANN WOLFF BERGMAN COLEMAN GRODIN & EVALL, LLP

-and-

FROSS ZELNICK LEHRMAN ZISSU, PC

-and-

PERKINS LAW OFFICE, PLC

By [signature]
Michael Bergman
Attorneys for Defendants

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 1 of 21 Page ID #:14161

Marc Toberoff (CA State Bar No. 188547)
*mtoberoff@ipwla.com*
Nicholas C. Williamson (CA State Bar No. 231124)
*nwilliamson@ipwla.com*
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiffs and Counterclaim Defendants
JOANNE SIEGEL and LAURA SIEGEL LARSON

FILED
2011 FEB -3 AM 11:55
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ______

COPY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,

Plaintiffs,

vs.

WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,

Defendants.

Case No. CV 04-08400 ODW (RZx)

**THIRD AMENDED COMPLAINT FOR:**
[1] DECLARATORY RELIEF RE: TERMINATION, 17 U.S.C. §304(c);
[2] DECLARATORY RELIEF RE: PROFITS;
[3] DECLARATORY RELIEF RE: USE OF "S" CREST; and
[4] ACCOUNTING FOR PROFITS.

DEMAND FOR JURY TRIAL

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 2 of 21 Page ID #:14182

| DC COMICS,<br><br>Counterclaimant,<br><br>vs.<br><br>JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,<br><br>Counterclaim Defendants. |
|---|

Plaintiffs JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter the "Plaintiffs"), by and through their attorneys of record, hereby allege as follows:

**JURISDICTION AND VENUE**

1. This is a civil action seeking declaratory relief, and an accounting for profits and related claims arising out of Plaintiffs' termination of prior grants of copyright in and to the original character and work known as "Superman" and subsequent "Superman" works pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c), and defendants' willful misconduct with respect thereto.

2. This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to the United States Copyright Act (hereinafter, the "Copyright Act"), 17 U.S.C. § 101 *et al.* and 28 U.S.C. §§ 1331, 1332, 1338(a) and (b).

3. This Court has supplemental jurisdiction over the related state claims herein under 18 U.S.C. § 1367 in that these claims form part of the same case and controversy as the federal claims herein.

4. This Court has personal jurisdiction over the defendants in that defendants are regularly doing business in the State of California and in this

District, and because a substantial part of the relevant acts complained of herein occurred in the State of California and this District.

5. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a) because a substantial part of the wrongful acts that give rise to the claims herein below occurred in this district and because WARNER BROS. ENTERTAINMENT INC. has its principal place of business in this district.

**PARTIES**

6. Plaintiff JOANNE SIEGEL (hereinafter "Joanne Siegel") is an individual and citizen of and resides in the State of California, in the County of Los Angeles, and is and at all times has been a citizen of the United States. Joanne Siegel is the widow of famed comic book creator Jerome (a.k.a. "Jerry") Siegel.

7. Plaintiff LAURA SIEGEL LARSON (hereinafter "Laura Siegel") is an individual and a citizen of and resides in the State of California, in the County of Los Angeles, and is and at all times has been a citizen of the United States. Laura Siegel is the daughter of Jerome Siegel.

8. Plaintiffs are informed and believe and based thereon allege that defendant WARNER BROS. ENTERTAINMENT INC. (hereinafter "Warner Bros.") is a corporation organized and existing under the laws of the State of Delaware, which has its principal place of business in Los Angeles County, California. Warner Bros. is a wholly owned subsidiary of Time Warner Inc.

9. Plaintiffs are informed and believe and based thereon allege that Defendant DC COMICS (hereinafter "DC") is a general partnership organized and existing under the laws of the State of New York, which has its principal place of business in the State of New York; and that DC regularly conducts significant business in the State of California and in the County of Los Angeles. DC is also a wholly owned subsidiary of defendant Warner Bros. (Warner Bros.

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 4 of 21 Page ID #:14164

and DC are sometimes collectively referred to hereinafter as the "Defendants"; and each reference to Defendants shall also refer to each Defendant).

10. Plaintiffs are informed and believe and based thereon allege that on or about September 30, 1946, the New York corporations, Detective Comics, Inc., Superman, Inc., All American Comics, Inc., Jolaine Publications, Inc., Wonderwoman Publishing, Inc., Hop Harrigan Enterprise, Inc., Gainlee Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best Comics, Inc. and Trafalgar Printing Co., Inc. were consolidated into the New York corporation National Comics Publications, Inc., the name of which was later changed to National Periodical Publications, Inc., and eventually to DC Comics, Inc.; and further that DC, and Warner Bros., and/or each of them, are the alleged successor(s)-in-interest to National Periodical Publications, Inc.

11. Plaintiffs are informed and believe and based thereon allege that Time Warner Inc. (hereinafter "Time Warner") is a corporation organized and existing under the laws of the State of Delaware, which has its corporate headquarters in the State of New York, and that Time Warner regularly conducts significant ongoing business in the State of California and in the County of Los Angeles. Time Warner is the parent company of both Warner Bros. and DC.[1]

12. Plaintiffs are informed and believe and based thereon allege that Defendant DC never, or rarely, exploits "Superman," independently of its controlling parent company, Warner Bros.; that even relatively linear functions such as "Superman" licensing are not handled directly by DC, but are exploited exclusively through Warner Bros.; that the agreements and other arrangements between Defendants Warner Bros. and DC regarding "Superman" are not "arms length" agreements, serve primarily Warner Bros.' interests, and thus, do not

[1] Plaintiffs have omitted Time Warner Inc. as a party pursuant to the Court's May 19, 2009 and July 8, 2009 orders. Plaintiffs respectfully reserve all rights to appeal such rulings and to reinstate Time Warner in the event the orders are reversed.

reflect the appropriate market values of the copyrights to "Superman," at issue herein.

13. Plaintiffs are informed and believe and based thereon allege that Defendants Warner Bros. and DC are, and at all times material hereto were, the alter-egos of each other and there exists and has existed at all times material hereto a unity of interest and ownership among such Defendants such that any separateness has ceased to exist in that Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and caused valuable assets, property, rights and/or interests to be transferred to each other without adequate consideration.

14. Plaintiffs are informed and believe and based thereon allege that the fictitiously named Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiffs, and Plaintiffs will amend this Complaint to assert the true names and capacities of such fictitiously named Defendants when the same have been ascertained. For convenience, each reference herein to a named Defendant shall also refer to the Doe Defendants and each of them.

15. Plaintiffs are informed and believe and based thereon allege that each of the Defendants was the agent, partner, servant, employee, or employer of each of the other Defendants herein, and that at all times herein mentioned, each of the Defendants was acting within the course and scope of such employment, partnership and/or agency and that each of the Defendants is jointly and severally responsible for the damages hereinafter alleged.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

16. In 1933 Jerome Siegel conceived the original idea of a cartoon strip

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 6 of 21 Page ID #:14188

featuring a unique man of superhuman strength and powers who would perform feats of great importance for the public good. Siegel conceived, in essence, the first "superhero" -- an original concept which embodied our nation's ideals at the World's darkest hour, became a cultural icon and spawned, what is today, a booming industry. Jerry Siegel entitled his character -- "Superman."

17. In or about 1934, Jerome Siegel authored twenty-four days (four weeks) of "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine page synopsis covering approximately two months of daily "Superman" newspaper comic strips (at six days per week). Plaintiffs are informed and believe and based thereon allege that these works, though originally unpublished, were thereafter included or incorporated in the early "Superman" comic strips thereafter published from on or about April 18, 1938 to April 13, 1943 (collectively, referred to hereinafter as the "Initially Unpublished Works").

18. In or about 1934, Jerome Siegel and the artist, Joe Shuster (hereinafter collectively, "Siegel and Shuster") co-authored *fifteen* daily "Superman" comic strips, consisting of one week (six days) of completely inked daily "Superman" comic strips and three additional six day weeks of "Superman" comic strips in penciled form (the "1934 Superman Comic Strip"). "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years.

19. Although "Superman" was not picked up for publication for some time, Siegel and Shuster did get other features they created into print with the Nicholson Publishing Company including "Henri Duval" and "Dr. Occult." In a letter dated October 4, 1935, the company's owner Malcolm Wheeler-Nicholson, wrote to Mr. Siegel expressing an interest in publishing "Superman" in comic book form but Siegel and Shuster rejected his offer. Nicholson

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 7 of 27 Page ID #:14187

became involved with a new comic magazine company, Detective Comics, Inc. (hereinafter, "Detective Comics") and two Siegel and Shuster features, "Slam Bradley" and "Spy," which appeared in "Detective Comics No. 1."

20. On or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with Detective Comics (the "1937 Agreement") to continue to produce the comic magazine features, "Slam Bradley" and "The Spy," which agreement provided, in part, that any new and additional features which Siegel and Shuster produced for use in a comic magazine were to be first submitted to Detective Comics which reserved the right to accept or reject same within sixty days.

21. One of the early entities to which Siegel had submitted "Superman" was The McClure Newspaper Syndicate. In or about early 1938, the head of the syndicate sought Siegel's permission to forward Siegel and Shuster's 1934 Superman Comic Strip material to Detective Comics for potential publication in its contemplated new magazine, "Action Comics." By this time, "Superman" and his miraculous powers had already been completely developed by Siegel and Shuster.

22. In or about January–February 1938, when Detective Comics expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster cut and pasted their aforementioned 1934 Superman Comic Strip into more than ninety separate panels ("Revised 1934 Superman Comic Strip"), so as to render their newspaper strip more suitable for a magazine layout.

23. The "Superman" material described hereinabove, which was the independent, original creation of Siegel and Shuster, contained virtually all of the signature elements and characters of the "Superman" mythology and constituted the formula for the continuing "Superman" series to come. It depicted and narrated the origin of the "Superman" character, and contained a

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/09/11 Page 9 of 21 Page ID #:14416

complete delineation of the literary and pictorial representation of "Superman," including without limitation, his habits, character, superhuman powers, appearance, costume, secret identity and attributes, and the sphere of public good "Superman" was to enhance.

24. By an instrument dated March 1, 1938 (hereinafter, the "1938 Grant"), which had been prepared by Detective Comics, Siegel and Shuster agreed to the publication of their Revised 1934 Superman Comic Strip by Detective Comics in consideration for the sum of $10 per page for this thirteen page installment equal to a total of $130.

25. Thereafter, Detective Comics published Siegel and Shuster's "Revised 1934 Superman Comic Strip" in the "June, 1938" issue of "Action Comics No. 1," which was issued for sale on April 18, 1938.

26. Action Comics No. 1 and the predecessor materials created solely by Siegel and Shuster contained the essential elements of "Superman" which continue to this day, including without limitation, Superman's origin from the distant planet, his "back-story" (sent to Earth as an infant in a spaceship by his scientist father), his core physical and mental traits, his mission as a champion of the oppressed to use his great powers to benefit humankind, his secret identity as newspaper reporter, "Clark Kent," his relationship with other key characters such as the newspaper editor from whom he takes his assignments and his romantic interest in Lois, who rebuffs Clark as a coward, while romantically inclined towards "Superman."

27. Action Comics No. 1 was followed by further issues published at regular intervals, with each subsequent issue containing additional "Superman" material created by Siegel and Shuster.

28. Between on or about March, 1938 and on or about September, 1938, Siegel and Shuster continued to create "Superman" strips, stories and continuities.

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 9 of 21 Page ID #:14189

29. On or about September 22, 1938, Detective Comics, Siegel and Shuster entered into an agreement with The McClure Newspaper Syndicate (hereinafter, the "1938 McClure Agreement") regarding the newspaper syndication of a "Superman" comic strip.

30. On or about September 22, 1938, Detective Comics and Siegel and Shuster therefore entered into an agreement (hereinafter, the "1938 Agreement") which for the first time provided that Detective Comics would thereby "employ and retain" Siegel and Shuster to do the "artwork and continuity" for five comic strips, including "Superman."

31. Prior to September 22, 1938, Siegel and Shuster solely created six comic book issues of "Superman," published as Action Comics Nos. 1 through 6. Of these, Action Comics Nos. 1 through 5 had been published prior to September 22, 1938; and Action Comics No. 6 was published four days later on September 26, 1938.

32. Action Comics No. 1 is not a "work made for hire." Action Comics Nos. 2-6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938 Agreement, are also not "works made for hire."

33. On or about December 19, 1939, Detective Comics and Siegel and Shuster entered into a supplemental agreement (hereinafter, the "1939 Agreement") which raised Siegel and Shuster's per page compensation rate for the increasingly popular "Superman" comic strip.

34. Plaintiffs are informed and believe and thereon allege that the "Superman" works created by Siegel and Shuster after they entered into the 1938 Agreement with Detective Comics were also not "works made for hire." The 1938 Agreement for the first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent work on "Superman," yet Siegel and Shuster were never employees of Detective Comics. Siegel and Shuster operated their own independent comic book production business. Without

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 10 of 26 Page ID #:14175

limitation, Siegel and Shuster were not paid a salary, but were consistently paid on a "per page" basis, and only for materials actually delivered by them to Detective Comics and published by Detective Comics. Plaintiffs are further informed and believe and thereon allege that in compensating Siegel and Shuster, Detective Comics did not withhold or deduct payroll, social security and other taxes normally deducted from employee salaries; Detective Comics did not provide employee benefits to Siegel and Shuster; Siegel and Shuster worked from their own premises (not Detective Comic's premises); determined their own hours and days of work; supplied, used and paid for their own instrumentalities, tools and materials; and hired and paid for their own employees who worked at Siegel and Shuster's instance and expense, under Siegel and Shuster's direction and full control.

35. In or about 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester against National Comics Publications, Inc. (hereinafter, the "1947 Action" ) to determine the validity of the contracts between National Comics Publications, Inc.'s predecessors –in–interest and Siegel and Shuster with respect to "Superman." Pursuant to a stipulation of the parties the action was referred for decision to an Official Referee of the New York Supreme Court. After trial of the action the Official Referee rendered an opinion dated November 1, 1947. On April 12, 1948, the Official Referee signed detailed findings of fact and conclusions of law and entered an interlocutory judgment upholding the contracts in some respects, to which notices of appeal were filed by all said parties. Settlement negotiations ensued, resulting in a stipulation of settlement between said parties executed on or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948.

36. In or about the early 1970's, a dispute arose between Siegel and Shuster and National Periodical Publications, Inc. regarding the renewal

copyright to "Superman," resulting in Siegel and Shuster's filing of an action against National Periodical Publications, Inc. in the United States District Court for the Southern District of New York for a declaration that Siegel and Shuster were entitled to the renewal copyright to "Superman." The District Court held in Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et al., 364 F. Supp. 1032 (1973) that the initial "Superman" comic strip, published in Action Comics No. 1, is a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. § 26, and that, in any event, the various agreements between the parties, prior to the action, transferred the renewal copyright in this material to Detective Comics.

37. On appeal, the United States Court of Appeals for the Second Circuit held in Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et al., 509 F.2d 909 (2nd Cir. 1974), that the District Court erred in finding that Superman was a "work for hire" under the Copyright Act, 17 U.S.C. § 26, and that "Superman" and his miraculous powers were created by Siegel and Shuster long before any employment relationship with Detective Comics. The Second Circuit nonetheless held that the Official Referee's determination in the 1947 Action that Siegel and Shuster had transferred all rights in "Superman" to Detective Comics implicitly included a determination that Siegel and Shuster had transferred the renewal copyright in "Superman" to Detective Comics; and that this determination was binding under the doctrine of *res judicata*.

38. On or about December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications Inc. (hereinafter the "1975 Agreement") the alleged parent company of National Periodical Publications, Inc., which provided for (i) annual payment of $20,000 to Siegel and Shuster each for their respective lifetimes, plus medical benefits to Siegel and Shuster each; and (ii) that Siegel and Shuster would be given credit on certain

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 12 of 21 Page ID #:14172

"Superman" publications and derivative works as the "creators" of Superman, in exchange for Siegel and Shuster's acknowledgement that Warner Communications, Inc. was the exclusive owner of all right, title and interest in and to "Superman." (The 1937 Agreement, the 1938 Grant, the 1938 McClure Agreement, the 1938 Agreement, the 1939 Agreement, the 1948 Stipulation and the 1975 Agreement described hereinabove are hereinafter sometimes referred to collectively as the "Alleged Grants.")

39. On April 3, 1997, Plaintiffs, Joanne Siegel and Laura Siegel, served by first class mail, postage prepaid, notices of termination, as permitted by the Copyright Act, 17 U.S.C. § 304(c) (hereinafter, the "Termination Notices") on each of the Defendants and a number of their subsidiaries, licensees and affiliates, terminating the Alleged Grants of the renewal copyright to (i) the copyrightable "Superman" character, (ii) the 1934 Superman Comic Strip and the Revised 1934 Superman Comic Strip, both published as/in Action Comics No. 1, (iii) the material published as/in Action Comics Nos. 1-6 (statutory copyright to Action Comics No. 6 was secured on September 26, 1938), (iv) the material published as/in Action Comics Nos. 7- 61 (statutory copyright to Action Comics No. 61 was secured on April 13, 1943), and/or (v) subsequent works involving "Superman," all as set forth in the Notices of Termination (hereinafter sometimes referred to collectively as the "Works").

40. Plaintiffs are informed and believe and based thereon allege the Initially Unpublished Works set forth in the Termination Notices were incorporated or included in Works published thereafter, to which the Termination applies.

41. Plaintiffs are further informed and believe and based thereon allege that the copyrights to all the Works were duly renewed.

42. The Notices of Termination were drafted, served on Defendants and filed with the United States Copyright Office, all in full compliance with

the Copyright Act, 17 U.S.C. § 304(c), and the regulations promulgated thereunder by the Register of Copyrights, 37 C.F.R. § 201.10 (2003). (Plaintiffs' aforesaid exercise of their termination rights under 17 U.S.C. § 304(c) regarding "Superman" is sometimes hereinafter referred to as the "Termination").

43. As the original co-author of each Work Jerome Siegel owned an undivided fifty percent (50%) of the copyright of each Work prior to any alleged transfer or assignment of any such Work pursuant to any Alleged Grant.

44. The Notices of Termination terminated on April 16, 1999 (hereinafter, the "Termination Date") all prior grants or purported grants of the renewal copyrights in and to each and/or all the Works for their extended renewal terms (hereinafter, sometimes referred to individually and collectively as the "Recaptured Copyrights"), including, but not limited to, the Alleged Grants.

45. On April 16, 1999, the Termination Date, Plaintiffs re-gained ownership to Jerome Siegel's undivided fifty percent (50%) copyright interest in and to each and/or all the Works for their extended renewal terms. In accordance with 17 U.S.C. § 304(c), and as set forth in the Notices of Termination, Jerome Siegel's surviving son, Michael Siegel, is also entitled to share in the proceeds from this recaptured interest.

46. Defendants have acknowledged that the Notices of Termination are effective. Defendants have further admitted that Plaintiffs thereby co-own the copyright(s) to at least the original "Superman" elements authored by Siegel and Shuster; and that Defendants have a duty to account to Plaintiffs for Defendants' exploitation of such copyright(s).

47. On April 16, 1997, in response to the service of the Notices of Termination, John A. Schulman, Executive Vice President and General Counsel of Defendant Warner Bros., wrote a letter to Joanne Siegel, stating in relevant part:

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 14 of 2 Page ID #:14174

"As to the Notices of Termination, I wasn't surprised at their arrival…After the effective date of the termination, there will still remain 14 years of copyright protection left to the joint copyright holders of the original Superman elements. Those are what we should share."

48. Similarly, on October 10, 1997, Paul Levitz, President and Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in relevant part:

"The [Superman] rights involved are non-exclusive; they are shared with DC. Since both you and DC would have these rights, we would each have the obligation to pay the other for using those rights if you did not re-grant them to DC."

49. Yet, on April 15, 1999, one day before the Termination Date, Defendant DC, by its attorneys (Fross Zelnick, *et al*) sent a letter to the Plaintiffs' attorney, Arthur J. Levine, frivolously denying the validity of the termination with respect to *any* "Superman" copyrights, stating in relevant part:

"[Y]ou are hereby put on notice that DC Comics rejects both the validity and scope of the notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed, any rights at all, in Superman."

50. Defendant DC's April 15, 1999 letter constituted a thinly veiled threat that if Plaintiffs ever attempted to exploit *any* of their recaptured copyright interests in "Superman," Defendants would engage in a campaign of intimidation, including, but not limited to, instituting frivolous litigation against Plaintiffs and using Defendants' enormous market power to restrict Plaintiffs'

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 1 of 2 Page ID #:14417

ability to exploit their Recaptured Copyright interests. Given that Time Warner is one of the largest media companies in the world with over $38 billion in annual revenues, Defendants' threats had a devastating and chilling effect on Plaintiffs' freedom to exploit the copyright interests they had properly regained under the Copyright Act, 17 U.S.C. § 304(c), thereby damaging Plaintiffs and causing them great emotional distress.

51. In the nearly 9 ½ years since the Termination Date, none of the Defendants has ever accounted to the Plaintiffs for any proceeds or profits whatsoever from their ongoing exploitation of "Superman" and the jointly owned Recaptured Copyrights.

**FIRST CLAIM FOR RELIEF**

(Declaratory Relief Re: Termination, 17 U.S.C. § 304(c) - Against All Defendants)

52. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53. By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants under Federal copyright law, 17 U.S.C. §§ 101 *et seq.*, concerning their respective rights and interests in and to the copyright to various "Superman" works, for which Plaintiffs desire a declaration of rights.

54. Plaintiffs contend and Defendants deny that:

a. The Notices of Termination terminated on April 16, 1999 all prior grants, assignments or transfers of copyrights for the extended renewal term in and to each and/or all of the Works (as defined in paragraph 39 hereinabove) to any of the Defendants and other parties duly served with the Notices of Termination, including their predecessors-in-interest; and

b. As of the effective Termination Date, April 16, 1999, Plaintiffs owned and continue to own an undivided fifty percent (50%) of the

Recaptured Copyrights to each and/or all the Works for their renewal terms.

55. A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their respective rights and obligations with respect to the Termination and the copyright interests thereby recaptured by Plaintiffs.

**SECOND CLAIM FOR RELIEF**

(Declaratory Relief Re: Profits from Recaptured Copyrights - Against All Defendants)

56. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 55 inclusive, as though fully set forth herein.

57. By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning how Profits from Recaptured Copyrights should be defined for purposes of Defendants and Plaintiffs accounting to one another as joint owners of the Recaptured Copyrights.

58. Plaintiffs contend and Defendants deny that:

a. Profits include Defendants' revenues from the post - April 16, 1999 exploitation of the Recaptured Copyrights in foreign territories, when such exploitation results from the predicate exercise *in the United States* of any right(s) under the Recaptured Copyrights by any Defendant, their licensees or assigns;

b. There should be no *apportionment* of Profits since Plaintiffs are entitled to fifty percent (50%) of such Profits as *joint owners* of the Recaptured Copyrights;

c. Alternatively, *apportionment*, if any, should apply only to profits from the exploitation of the Recaptured Copyrights in *derivative works created by a Defendant*, but not to profits from mere *licensing* of the Recaptured Copyrights. Any such apportionment should weigh heavily in Plaintiffs' favor,

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 17 of 24 Page ID #:14177

since the value of the "Superman" franchise exploited by the Defendants ("Superman Franchise") is largely attributable to the unique "Superman" mythology protected by the Recaptured Copyrights. The Superman Franchise capitalizes on the success of, and is hardly distinguishable from, the underlying Recaptured Copyrights co-owned by Plaintiffs;

d. Profits include profits from any merchandise or other derivative works created, produced or manufactured on or after the Termination Date, April 16, 1999, notwithstanding that the underlying licensing agreement for such exploitations may have been executed prior thereto;

e. Profits are not limited to the Profits of Defendant DC, Warner Bros.' wholly owned subsidiary, but include the Profits of Defendant Warner Bros., as well; and

f. In determining Profits, deductible costs should include only reasonable costs directly attributable to the exploitation of the Recaptured Copyrights, of the type customarily deducted in arms' length agreements to exploit copyrights of comparable value, all in compliance with Generally Accepted Accounting Principles ("GAAP").

59. A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* so that the parties may know their respective rights and obligations with respect to Profits from the exploitation of the Recaptured Copyrights after the Termination Date.

**THIRD CLAIM FOR RELIEF**

(Declaratory Relief Re: Use of the "Superman" Crest - Against All Defendants)

60. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 59 inclusive, as though fully set forth herein.

61. By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants concerning whether Plaintiffs are entitled, after the Termination Date, to

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 1 of 2 Page ID #:14417

commercially exploit the "Superman" crest comprised of a large red "S" centered on a broad triangular yellow field, first appearing (as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest) in the 1934 Superman Comic Strip and the 1934 Revised Superman Comic Strip created by Siegel and Shuster and published as Action Comics No. 1, and in only slightly revised form in subsequent Works (hereinafter the "Superman Crest"); and whether Defendants' duty to account, as non-exclusive joint owners of such Recaptured Copyrights, includes Profits from the licensing of this crest.

62. Defendants allege a trademark interest in a "Superman" shield (hereinafter the "Superman Shield" and/or "Superman Trademark") which is also comprised of a large red "S" on a broad triangular yellow field, first appearing in later Works, as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest, with the upper corners of the triangular crest slightly cropped.

63. Plaintiffs contend and Defendants deny that:

a. The Recaptured Copyrights include the copyright to the "Superman" crest comprised of a large red "S" centered on a broad triangular yellow field, first appearing as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest, in the 1934 Superman Comic Strip and the Revised 1934 Superman Comic Strip published as Action Comics No. 1, and appeared in subsequently published Works in only slightly revised form (hereinafter the "Superman Crest").

b. Defendants' alleged Superman Trademark design arose directly from, and is substantially identical to, Siegel and Shuster's copyrighted Superman Crest;

c. Defendants receive significant proceeds and value from the utilization and copying of the Superman Crest and/or substantially identical

Superman Shield for which Defendants must account to Plaintiffs;

d. In turn, Plaintiffs should likewise be allowed to exercise their rights under copyright with respect to the Superman Crest, including without limitation the right to commercially exploit the Superman Shield in merchandise;

e. Defendants, in any event, cannot use the alleged Superman Trademark or any other purported trademark interest regarding "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of their rights under the Copyright Act in any of the jointly owned Recaptured Copyrights.

64. A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*., so that the parties may know their respective rights and obligations with respect to the Superman Crest and the Superman Shield.

**FOURTH CLAIM FOR RELIEF**

(Accounting for Profits - Against All Defendants)

65. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66. On or after the Termination Date, April 16, 1999, Defendants and/or each of them have licensed and/or commercially exploited and will continue to license or exploit the Recaptured Copyrights, including without limitation, *via* merchandising, publishing, and derivative motion picture and television programming.

67. As result of such licensing and/or commercial exploitation of the Recaptured Copyrights on or after April 16, 1999, Defendants and/or each of them have received and will continue to receive substantial Profits, fifty percent (50%) of which is payable to Plaintiffs as the joint owner of the Recaptured Copyrights.

68. Defendant Warner Bros. has acted and continues to act in most

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 20 of 2 Page ID #:14141

instances as the effective joint-owner and licensor (as opposed to licensee) of the Recaptured Copyrights; and, as such, Warner Bros., along with the other Defendants, owes a duty to account to Plaintiffs.

69. To date, the Profits received by Defendants and/or each of them from such licensing and/or commercial exploitation on or after April 16, 1999 is estimated to be in excess of $50 million, however the exact sums actually received and to be received by Defendants and/or each of them, are unknown to Plaintiffs at this time, for these amounts can be properly determined only by an accounting.

70. Plaintiffs have demanded an accounting by Defendants on a continuing basis of all amounts received by them and/or payable to them from such licensing and other commercial exploitation on or after April 16, 1999, and that Defendants pay Plaintiffs their fifty percent (50%) share of all such Profits.

71. In nearly 9 ½ years since the Termination Date, Defendants have, nonetheless, never accounted to or paid any Profits whatsoever to Plaintiffs.

72. Plaintiffs at no time waived their rights to receive their share of such Profits, nor have Plaintiffs at any time consented to the use and exploitation of the Recaptured Copyrights in the United States or any foreign territories.

73. Plaintiffs are entitled to an ongoing accounting from Defendants regarding all amounts received, realized by or payable to Defendants on or after April 16, 1999 from the licensing and any other commercial exploitation of the Recaptured Copyrights and "Superman Franchise," and to the payment by Defendants to Plaintiffs of fifty percent (50%) of all such Profits.

WHEREFORE, Plaintiffs pray for relief as follows:

**PRAYER FOR RELIEF**

ON THE FIRST CLAIM FOR RELIEF

74. For a declaration as follows:

a. That pursuant to the Copyright Act, 17 U.S.C.§ 304(c), Plaintiffs validly terminated on April 16, 1999 all prior grants, assignments or transfers to any of the Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each and/or all of the Works; and

b. That, as of the Termination Date, Plaintiffs owned and continue to own fifty percent (50%) of the aforesaid Recaptured Copyrights.

ON THE SECOND CLAIM FOR RELIEF

75. For a declaration as follows:

a. That as joint owners of the Recaptured Copyrights, Plaintiffs are entitled to an accounting for Profits received or payable to the Defendants;

b. That Profits include Defendants' revenues from the post - April 16, 1999 exploitation of the Recaptured Copyrights in territories outside of the United States whenever such exploitation is based on the predicate exercise *in the United States* of any right(s) in and to the Recaptured Copyrights by any Defendant, their licensees or assigns;

c. That there should be no *apportionment* of Profits since Plaintiffs are entitled to fifty percent (50%) of such Profits as joint owners of the Recaptured Copyrights;

d. Alternatively, that apportionment should apply only to profits from the exploitation of the Recaptured Copyrights in *derivative works created by a Defendant*, but not to profits from *licensing* of the Recaptured Copyrights;

e. That apportionment, if any, should weigh strongly in Plaintiffs' favor, since the value of the Superman Franchise is largely attributable to the unique "Superman" character and other elements created by Siegel and Shuster and protected by the Recaptured Copyrights, in a percentage that the court may deem just and proper;

f. That Profits include profits from any merchandise or other derivative works created, produced or manufactured on or after the Termination

Date, April 16, 1999, notwithstanding that underlying licensing for such exploitation may have occurred prior thereto;

g. That Profits include the Profits of Defendants DC, Warner Bros. and Time Warner, their subsidiaries and divisions; and

h. That in determining Profits, only reasonable costs directly attributable to the exploitation of the Recaptured Copyrights, of the type customarily deducted in arms' length agreements to exploit copyrights of comparable value to the Recaptured Copyrights, should be deducted from gross revenues, all in compliance with GAAP.

ON THE THIRD CLAIM FOR RELIEF

76. For a declaration as follows:

a. That by the Termination, Plaintiffs recaptured a fifty percent (50%) interest in the copyright to the Superman Crest created by Siegel and Shuster;

b. That Defendants' Superman Shield design arose directly from, and is substantially identical to, the copyrighted Superman Crest created by Siegel and Shuster;

c. That Defendants must account to Plaintiffs for fifty percent (50%) of the proceeds they receive from the licensing or other exploitation of the Superman Crest and/or Superman Shield;

d. That Plaintiffs, as co-owners of the copyright in and to the Superman Crest, likewise are permitted to license or otherwise exploit the Superman Crest, subject to a duty to account to Defendants for any such exploitation; and

e. That Defendants cannot use their alleged trademark in the Superman Shield or any other alleged trademark interest with respect to "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of Plaintiffs' rights under the Copyright Act in the jointly owned

Recaptured Copyrights.

ON THE FOURTH CLAIM FOR RELIEF

77. For an accounting by the Defendants, jointly and severally, of any and all proceeds from the licensing and any other exploitation of the Recaptured Copyrights or Superman Franchise on or after the Termination Date, April 16, 1999;

78. For 50% of any and all proceeds from the licensing and any other exploitation of the Recaptured Copyrights or "Superman Franchise" on or after April 16, 1999 pursuant to such accounting; and

79. For the imposition of a constructive trust for the benefit of Plaintiffs on all sums received and to be received by the Defendants, jointly or severally, derived from the licensing and any other exploitation of the Recaptured Copyrights or "Superman Franchise" on or after April 16, 1999.

ON ALL CLAIMS FOR RELIEF

80. For Plaintiffs' costs of suit;

81. For interest at the highest lawful rate on all sums awarded Plaintiffs other than punitive damages;

82. For reasonable attorneys' fees; and

83. For such other and further relief as the Court may deem just and proper.

Dated: January 31, 2011

TOBEROFF & ASSOCIATES, P.C.

Marc Toberoff
Attorneys for Plaintiffs,
JOANNE SIEGEL and LAURA SIEGEL LARSON

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 24 of 24 Page ID #:14144

**JURY TRIAL DEMANDED**

Plaintiffs hereby request a trial by jury on each claim for relief alleged in the Complaint for which trial by jury is allowable.

Dated: January 31, 2011

TOBEROFF & ASSOCIATES, P.C.

Marc Toberoff
Attorneys for Plaintiffs,
JOANNE SIEGEL and LAURA SIEGEL LARSON

Case 2:04-cv-08400-ODW-RZ Document 644 Filed 02/03/11 Page 2 of 2 Page ID #:141

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On February 3, 2011, I served the attached documents described as

**THIRD AMENDED COMPLAINT**

as follows:

[ ] :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. I placed ____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

[X] :BY HAND:

As follows: I delivered to the address listed below by hand the documents listed herein.

Daniel M. Petrocelli, Esq.
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

[X] :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February 3, 2011, in Los Angeles, California.

Nicholas C. Williamson

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 1 of 13 Page ID #:1418

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone: (845) 265-2820
Facsimile: (845) 265-2819

Attorneys for Defendants and Counterclaimant

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOANNE SIEGEL and LAURA SIEGEL LARSON,

Plaintiffs and Counterdefendants,

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,

Defendants and Counterclaimant.

Case No. CV-04-8400 ODW (RZx)

**ANSWER TO THIRD AMENDED COMPLAINT**

The Hon. Otis D. Wright II

On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16. Docket Nos. 637, 643. For purposes of completeness, defendants hereby reassert the responses and defenses contained in the Answer to Second Amended Complaint, Docket No. 385, with changes to reflect only the current date, the updated pleading title, plaintiffs' dismissal of their Fifth Claim for Relief, and the Court's dismissal of Time Warner Inc. as a party to this action. Defendants reserve all rights, including to amend this pleading as and when appropriate.

Defendants Warner Bros. Entertainment Inc. ("Warner Bros.") and DC Comics ("DC" or "DC Comics") (collectively, "defendants"), by their attorneys, answer the Third Amended Complaint filed by plaintiffs on January 31, 2011:

1. Defendants admit only that plaintiffs have brought this civil action for the alleged causes of action set forth in the Complaint, but otherwise deny the allegations in paragraph 1.

2. Defendants admit only that plaintiffs purport to assert that this Court has subject matter jurisdiction as alleged in paragraph 2 but otherwise deny the allegations contained in the Complaint.

3. Defendants admit only that plaintiffs purport to assert that this Court has supplemental jurisdiction as alleged in paragraph 3 but otherwise deny the allegations contained in the Complaint.

4. Defendants admit only that they regularly do business in the State of California and in this District but otherwise deny the allegations in paragraph 4.

5. Admitted.

6. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 and on that basis deny the same.

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 3 of 13 Page ID #:1141

7. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and on that basis deny the same.

8. Defendants admit that Warner Bros. Entertainment Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles County, and that it is an indirect wholly owned subsidiary of Time Warner Inc., but otherwise deny the allegations in paragraph 8 that DC Comics is a New York General partnership comprised of Warner Communications, Inc. and E.C. Publications, Inc.

9. Defendants deny the allegations contained in paragraph 9 except admit that DC Comics is a New York General Partnership comprised of Warner Communications, Inc. and E.C. Publications, Inc.

10. Defendants deny the allegations in paragraph 10 except admit that DC Comics is the successor-in-interest to, *inter alia*, Detective Comics, Inc. and National Periodical Publications, Inc. and except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

11. Defendants deny the allegations contained in paragraph 11 except admit that Time Warner Inc. is a Delaware corporation with its corporate headquarters in the State of New York and that certain of its wholly owned subsidiaries regularly conduct business in the State of California and in the County of Los Angeles. Defendants further admit that defendant Warner Bros. is affiliated with defendant Time Warner Inc. and that DC Comics is a New York general partnership whose general partners are entities affiliated with defendant Time Warner Inc.

12. Denied.

13. Denied.

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 4 of 13 Page ID #:1419

14. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 and on that basis deny the same.

15. Denied.

16. Defendants admit only that in 1933 Siegel and Shuster co-created a character entitled Superman, which character was thereafter substantially changed prior to its first publication in 1938 but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 16 and on that basis deny the same.

17. Defendants admit only that during the 1930s Siegel and Shuster created twenty-four days of comic strips featuring a character entitled Superman and a paragraph previewing future Superman exploits, but lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 and on that basis deny the same.

18. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 and on that basis deny the same.

19. Defendants admit only that Siegel and Shuster's work on features entitled "Henri Duval" and "Dr. Occult" was published by the Nicholson Publishing Company during the 1930s, that Malcolm Wheeler-Nicholson was involved with Detective Comics, Inc. and that work that Siegel and Shuster did on features entitled "Slam Bradley" and "Spy" was published in a comic magazine entitled "Detective Comics No. 1," but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 19 and on that basis deny the same.

20. Defendants admit only that on or about December 4, 1937, Jerry Siegel and Joe Shuster entered into an agreement with Detective Comics, Inc. but deny the remaining allegations in paragraph 20 except to the extent the allegations accurately

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 6 of 13 Page ID #:1413

reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

21. Defendants deny that Superman and his "miraculous powers" had all been completely developed by early 1938 and otherwise Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 and on that basis deny the same.

22. Defendants admit only that in early 1938 defendants' predecessor, Detective Comics, Inc., requested that Siegel and Shuster turn certain Superman comic strips they had co-created, along with additional material that Siegel and Shuster would newly create, into a 13-page comic book story suitable for publication in a comic magazine format, and that Siegel and Shuster thereafter delivered such a comic book story to Detective Comics, Inc. and that such story contained approximately 90 separate panels, but defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 22 and on that basis deny the same.

23. Defendants deny the allegations contained in paragraph 23 except admit that certain elements and characters of the Superman mythology such as his origins from a distant planet, some of his physical traits, and his secret identity as Clark Kent were contained in Action Comics No. 1 and except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

24. Defendants admit only that Siegel and Shuster entered into an agreement with Detective Comics, Inc. dated March 1, 1938, whereby Siegel and Shuster transferred to Detective Comics, Inc. "the strip entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein," but otherwise deny the allegations contained in paragraph 24 except to the extent the allegations accurately

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 6 of 13 Page ID #:14131

reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

25. Defendants admit that Detective Comics, Inc. published a Superman comic story in Action Comics No. 1 with a cover date of June 1938, lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 relating to the "Revised 1934 Superman Comic Strip" and on that basis deny the same, and deny the remaining allegations in paragraph 25, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

26. Defendants deny the allegations in paragraph 26 except admit that Action Comics No. 1 contains Superman's origin from a distant, unnamed planet, some of his physical traits, his secret identity as Clark Kent, a co-worker named "Lois," and deny the remaining allegations in paragraph 26 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

27. Defendants admit only that following Action Comics No. 1, at the instance and expense of Detective Comics, Inc., and subject to its right of control, Siegel and Shuster jointly created some additional Superman episodes that appeared in subsequent issues of Action Comics but deny the remaining allegations in paragraph 27, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

28. Defendants admit only that between March 1938 and September 1938, Siegel and Shuster jointly created Superman strips, stories and continuities at the instance and expense of Detective Comics, Inc. and subject to its right of control, but deny the remaining allegations in paragraph 28, except to the extent the

allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

29. Defendants admit only that on September 22, 1938 Detective Comics, Inc., Siegel, Shuster, and The McClure Newspaper Syndicate entered into an agreement but deny the remaining allegations in paragraph 29, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

30. Defendants admit only that on September 22, 1938 Detective Comics, Inc., Siegel, and Shuster entered into an agreement but otherwise deny the allegations in paragraph 30 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

31. Defendants admit only that between March 1938 and September 1938, Siegel and Shuster provided certain of the contents for Action Comics Nos. 1-6 and that Action Comics Nos. 2-6 were created at the instance and expense of Detective Comics, Inc. and subject to its right of control, and that Action Comics Nos. 1-5 were published prior to September 22, 1938; lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 relating to the publication date of Action Comics No. 6 and on that basis deny the same; and deny the remaining allegations in paragraph 31, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

32. Denied.

33. Defendants only admit that Siegel and Shuster entered into an agreement with Detective Comics, Inc. on December 19, 1939 but otherwise deny the allegations in paragraph 33, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

34.     Defendants deny the allegations contained in the first three sentences of paragraph 34, except that with respect to the allegations in the third sentence of paragraph 34, to the extent they accurately reflect the contents of documents, respectfully refer the Court to such documents for evidence of the contents thereof. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 and on that basis deny the same.

35.     Defendants admit the allegations of paragraph 35 except that defendants deny that the Official Referee's opinion in the 1947 Action was dated November 1, 1947, deny that the Official Referee only "up[held] the contracts in some respects," and lack knowledge or information sufficient to form a belief as to whether the Official Referee "signed" detailed findings of fact on April 12, 1948, and on that basis deny the same.

36.     Defendants admit the allegations contained in the first sentence of paragraph 36 except as to the date on which the dispute arose, but otherwise deny the allegations in paragraph 36 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

37.     Defendants deny the allegations in paragraph 37 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

38.     Defendants admit only that on December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications, Inc., but deny the remaining allegations in paragraph 38 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

39.     Defendants admit only that plaintiffs purport to have mailed notices of termination dated April 3, 1997, to defendants and various other entities, but deny

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 9 of 13 Page ID #:1434

the remaining allegations in paragraph 39 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

40. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 and on that basis deny the same.

41. Admitted.

42. Denied.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Defendants deny the allegations in paragraph 47 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and all other documents related thereto for evidence of the contents thereof.

48. Defendants deny the allegations in paragraph 48 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and all other documents related thereto for evidence of the contents thereof.

49. Defendants admit only that on April 15, 1999, plaintiffs received a letter from DC Comics' attorneys that, *inter alia*, rejected the termination notices and the validity thereof, and stated that DC Comics continued to claim sole copyright ownership in Superman as of that date. Defendants deny the remaining allegations in paragraph 49 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and any documents related thereto for evidence of the contents thereof.

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 10 of 13 Page ID #:1413

50. Defendants deny the allegations in paragraph 50 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

51. Defendants deny that plaintiffs own any copyright rights to Superman, that any such rights have been "recaptured" and that they have never accounted to the plaintiffs for any proceeds or profits from their exploitation of Superman, but otherwise admit the allegations in paragraph 51.

**FIRST CLAIM FOR RELIEF**

52. Defendants re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53. Defendants deny the allegations contained in paragraph 53 except admit that an actual and justiciable controversy has arisen and now exists between the parties.

54. Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 54, including but not limited to, subparagraphs (a) – (d).

55. Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

**SECOND CLAIM FOR RELIEF**

56. Defendants re-allege and incorporate by reference paragraphs 1 through 55 inclusive, as though fully set forth herein.

57. Defendants deny the allegations in paragraph 57 except admit only that an actual and justiciable controversy has arisen and now exists between plaintiffs and defendants.

58. Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 58, including but not limited to, subparagraphs (a) – (f) and aver that the Court has already ruled in Defendants' favor with respect to subparagraph (a).

59. Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

**THIRD CLAIM FOR RELIEF**

60. Defendants re-allege and incorporate by reference paragraphs 1 through 59 inclusive, as though fully set forth herein.

61. Defendants deny that plaintiffs are entitled to exploit the Superman crest and that plaintiffs are entitled to any accounting of any profits from any exploitation thereof and otherwise deny the allegations of paragraph 61.

62. Defendants admit that they own and possess the exclusive right to use a trademark interest in the Superman “S in Shield” device, but otherwise deny the allegations in paragraph 62 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

63. Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 63, including but not limited to, subparagraphs (a) – (e).

64. Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

**FOURTH CLAIM FOR RELIEF**

65. Defendants re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66. Defendants admit that defendant DC Comics has continuously licensed and commercially exploited and intends to continue to license and exploit its copyright rights in Superman. Defendants further admit that defendant Warner Bros. Entertainment Inc. has made use of the Superman copyrights under license from defendant DC Comics. Defendants deny the remaining allegations in paragraph 66.

Case 2:04-cv-08400-ODW-RZ Document 64 Filed 02/17/11 Page 12 of 13 Page ID #:14137

67. Defendants admit that defendant DC Comics has earned profits from its exploitation of the Superman copyrights, and that defendant Warner Bros. Entertainment Inc. has earned profits from its licensed use of the Superman copyrights, but deny the remaining allegations in paragraph 67.

68. Denied.

69. Denied.

70. Defendants admit that plaintiffs have demanded an accounting but otherwise deny the allegations in paragraph 70.

71. Denied.

72. Denied.

73. Denied.

**FIRST AFFIRMATIVE DEFNSE**

74. Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

75. Plaintiffs' claims are barred by the doctrines of laches, waiver, acquiescence, and/or estoppel.

**THIRD AFFIRMATIVE DEFENSE**

76. Plaintiffs' claims are barred because plaintiffs have not sent a Notice of Termination with respect to a separate and complete grant of rights in Superman by Siegel and Shuster.

**FOURTH AFFIRMATIVE DEFENSE**

77. Plaintiffs' claims are barred because plaintiffs have continued to accept the benefits of one of the grants of rights in Superman they allege to have terminated, even after the purported effective date of such termination.

**FIFTH AFFIRMATIVE DEFENSE**

78. The "Unpublished Superman" works are not eligible for termination under the Copyright Act or, if they are, any such termination is premature.

**SIXTH AFFIRMATIVE DEFENSE**

79. Plaintiffs' claims are barred by the statute of limitations, including but not limited to, 17 U.S.C. § 507(b).

**SEVENTH AFFIRMATIVE DEFENSE**

80. Plaintiffs' claims are barred because the notices of termination sent by plaintiffs were not timely served.

**EIGHTH AFFIRMATIVE DEFENSE**

81. Plaintiffs' claims are barred on the basis of settlement.

**NINTH AFFIRMATIVE DEFENSE**

82. Defendants incorporate herein by reference their Third and Fourth Alternative Counterclaims. Plaintiffs' claims are barred on the basis of the Agreement.

**TENTH AFFIRMATIVE DEFENSE,**

83. Because the various paragraphs of plaintiffs' Complaint do not comply with Fed. R. Civ. P. 8(a) and (e), defendants are not required to separately admit or deny each averment contained therein.

**ELEVENTH AFFIRMATIVE DEFENSE**

84. Plaintiffs' claims are barred to the extent that the Court has already ruled adversely to plaintiffs with respect to any of them.

FOR THESE REASONS, defendants pray that the Court dismiss all of plaintiffs' claims and find for defendants on all counts, that defendants be awarded costs, including reasonable attorneys' fees, and pray for such other and further relief as this Court deems just and proper.

Dated: February 17, 2011

Respectfully Submitted,

O'MELVENY & MYERS LLP

By: ______________________
Daniel M. Petrocelli
Attorneys for Defendants and Counterclaimant

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 1 of 3 Page ID #:14139

COPY

2011 FEB 17 PM 3:38
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

FILED

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone: (845) 265-2820
Facsimile: (845) 265-2819

Attorneys for Defendants and Counterclaimant

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOANNE SIEGEL and LAURA SIEGEL LARSON,

Plaintiffs

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,

Defendants

WARNER BROS ENTERTAINMENT INC, DC COMICS, and DOES 1-10

COUNTERCLAIMANT

V.

JOANNE SIEGEL and LAURA SIEGEL LARSON

COUNTERDEFENDANTS

Case No. CV-04-8400 ODW (RZx)

**SECOND AMENDED COUNTERCLAIMS**

The Hon. Otis D. Wright II

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 2 of 3 Page ID #:14260

On January 31, 2011, the Court granted, with changes, plaintiffs' Motion for Leave to File Third Amended Complaint Pursuant to Fed. R. Civ. P. 15 and 16. Docket Nos. 637, 643. For purposes of completeness, defendants hereby reassert the counterclaims contained in the First Amended Counterclaims, Docket No. 42, with changes to reflect only the current date, the updated pleading title, and the Court's dismissal of Time Warner Inc. as a party to this action. Defendants reserve all rights, including to amend these counterclaims as and when appropriate.

Defendant/Counterclaimant DC Comics, for its Second Amended Counterclaims against Plaintiff/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, alleges:

**PARTIES**

1. Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a New York General Partnership engaged in the business of, *inter alia*, creating, exploiting, and licensing comic book stories and characters. DC is the successor in interest to all rights under copyright and other rights, including trademark rights and the good will in and to the first Superman story and all other works and products relating to the Superman character.

2. Upon information and belief, Plaintiff/Counterclaim Defendant Joanne Siegel is an individual and citizen of the State of California, in the County of Los Angeles. Upon further information and belief, Joanne Siegel is the widow of Jerome Siegel, the individual credited as a co-creator of the first Superman stories.

3. Upon information and belief, Plaintiff/Counterclaim Defendant Laura Siegel Larson is an individual and citizen of the State of California, in the County of Los Angeles. Upon further information and belief, Laura Siegel Larson is a daughter of Jerome Siegel. Plaintiff/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson are referred to herein as "the Siegels."

## JURISDICTION AND VENUE

4. This Court has jurisdiction of the subject matter hereof under the provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections 1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332, 1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18 U.S.C. § 1367.

5. Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information and belief, a substantial part of the events giving rise to DC's claims occurred or a substantial part of the properties that are the subject of these counterclaims are situated in this District and/or the Plaintiffs/Counterclaim Defendants may be found in this District.

## FACTS COMMON TO ALL COUNTERCLAIMS

### Background And History

6. Upon information and belief, in or about 1933, Jerome Siegel ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated on creating a number of stories, including a story entitled "The Reign of the Superman," which was published in a magazine put out by Siegel and Shuster themselves entitled "Science Fiction." Upon further information and belief, other than the same name, the "Superman" character in this story shared very little, if any, similarity with the character that would later become known as Superman.

7. Upon information and belief, in early 1933, Siegel and Shuster began collaborating on "comic strips," initially for syndication and eventually for publication in "comic books," a new and growing medium. Among their work together were a number of comic strips featuring a character they named Superman. This Superman character bore virtually no resemblance to the character of the same name that had previously appeared in the "Science Fiction" magazine. Upon

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 4 of 3 Page ID #:14262

further information and belief, those works, which were never published, included: (a) twenty four (24) days of Superman comic strips intended for newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page synopsis covering an additional two months of daily comic strips; and (e) fifteen daily comic strips (collectively the "Unpublished Superman Works").

8. Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9. Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10. On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC. Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years. Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11. Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics." In that connection, upon information and belief, DCI was provided with the twenty four (24) days of Superman comic strips from the Unpublished Superman Works for review. At the instance and expense of DCI and subject to its right to control, Siegel and Shuster cut and pasted the comic strips, and added certain additional material, to create a thirteen page comic book story which was accepted for publication by DCI.

12. In an agreement with DCI dated March 1, 1938 (the "March 1, 1938 Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip

entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein."

13. DCI advertised the publication of the new comic story Superman and the new title "Action Comics No. 1" in others of its publications, including but not limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New Adventure Comics No. 26," all of which are cover dated May 1938 and, upon information and belief, were distributed in copies to the public on or before April 1, 1938. These advertisements (the "Superman Ads"), which depict the Superman character in his costume, exhibiting super-strength, show almost the entirety of what would become the cover of "Action Comics No. 1."

14. Upon information and belief, sometime prior to April 16, 1938, but after the Superman Ads, DCI published the thirteen page Superman comic book comprising the first Superman story in "Action Comics No. 1," bearing the "cover" date June 1938 (hereinafter "Action Comics No. 1"). However, Action Comics No. 1 was not comprised entirely of the pre-existing Unpublished Superman Works. Rather, upon information and belief, in response to DCI's instruction that the Unpublished Superman Works be presented as a thirteen page comic book and subject to DCI's right to control, Siegel and Shuster created additional materials to complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

15. After the publication of Action Comics No. 1, upon information and belief, Siegel and Shuster supplied further original Superman stories at DCI's instance and expense and subject to its right to control. On September 22, 1938, Siegel and Shuster entered into another employment agreement (the "DCI September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us. We wish you to continue to do said work and hereby employ and retain you for

said purposes . . . ." The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

16. Also on September 22, 1938, Siegel and Shuster entered into an agreement with DCI and with the McClure Newspaper Syndicate (the "McClure September 22, 1938 Agreement") concerning the use of Superman in newspaper strips.

17. All of Siegel and Shuster's contributions to Superman comic books and comic strips published subsequent to Action Comics No. 1 as well as the Additional Action Comics No. 1 Materials, were made either under the DCI March 1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, or contemporaneous oral agreements confirmed by one or more of these Agreements, or certain subsequent agreements affirming those agreements, as employees of DCI or its successors or at DCI's instance and expense and subject to DCI's right of control, with the result that the copyrights to all Superman materials created by them after preparation of materials included in Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are owned exclusively by DC Comics as works made for hire under the then applicable 1909 Copyright Act.

18. On November 30, 1938, Siegel wrote to DCI (the "November 1938 Letter") suggesting that it do a comic book named Superboy, "which would relate to the adventures of Superman as a youth." The November 30, 1938 Letter does not contain any discussion of plot, dialogue, appearance, or any other copyrightable material relating to Superboy. DCI decided not to publish a "Superboy" comic at that time.

19. In 1939, among the Superman comics prepared by Siegel and Shuster at the instance and expense of DCI and subject to its right of control, was Superman No. 1, with a cover date of Summer 1939. In Superman No. 1, Clark Kent was depicted as a youth with super powers.

Case 2:04-cv-0 400-ODW-RZ Document 646 Filed 02/17/11 Page 7 of 3 Page ID #:14126

20. On December 19, 1939, Siegel and Shuster entered into a new agreement with DCI (the "December 19, 1939 Agreement"), which agreement modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips. In addition, the December 19, 1939 Agreement provided for payment for Siegel and Shuster for uses of Superman beyond comic books and newspaper strips, such as radio, motion pictures, and toys. Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

21. Upon information and belief, in approximately December 1940, Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script"), renewing his suggestion to DCI that it publish a comic book about Superman as a youth. The December 1940 Superboy Script, which sets forth a credit line of "By Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests... America's outstanding boy hero: SUPERBOY!" The Unpublished 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was to become the might [sic] figure known as SUPERMAN!" Again, DCI decided not to publish a "Superboy" comic at that time.

22. Upon information and belief, on a date prior to November 18, 1944, DCI published its first comic book containing the adventures of Superboy, who was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of January-February 1945 (hereinafter "More Fun Comics No. 101"). Upon information and belief, DCI employed Shuster or an artist from Shuster's art studio (with Shuster's knowledge and under his supervision) to create the artwork and writer Don Cameron to write the Superboy story contained in "More Fun Comics No. 101." The Superboy story in "More Fun Comics No. 101" bears little if any

resemblance to anything contained in the Unpublished 1940 Superboy Script, and such similarities as may exist are common to earlier Superman related material owned by DCI.

23. In 1947, Siegel and Shuster brought suit against, *inter alia*, DCI's successor in interest, National Comics Publications, Inc. ("National") in the New York Supreme Court in Westchester County (the "Westchester Action"). The Westchester Action was, in part, the culmination of a dispute between Siegel and Shuster and National over what Siegel and Shuster claimed was DCI's unauthorized publication of Superboy. In the Westchester Action, in addition to seeking redress in connection with Superboy, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938 Agreement was obtained by duress, and sought to recapture all rights in Superman.

24. On November 21, 1947, the Court in the Westchester Action issued an opinion (the "Westchester Opinion") after trial in which it found that the March 1, 1938 Agreement transferred to DCI all rights in Superman and that the DCI September 22, 1938 Agreement was valid and not obtained under duress. The Court also held that in publishing Superboy, DCI had acted "illegally."

25. At the Court's request, the parties to the Westchester Action submitted proposed fact findings and conclusions of law. On April 12, 1948, the Court adopted fact findings and conclusions of law and issued an interlocutory judgment (collectively the "Westchester Action Interlocutory Judgment"). The defendants in the Westchester Action filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

26. Shortly thereafter, the parties to the Westchester Action entered into two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement"). Under both documents, *inter alia*, Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledge

that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No. 1; (c) acknowledged National was sole and exclusive owner of Superman, the conception, idea, continuity, pictorial representation and formula thereof in all media; (d) agreed that they were enjoined from creating, publishing or distributing any Superman work or any imitation thereof, and from using the title Superman or title that contained the word "Super"; (e) acknowledged that National was the sole owner of and owned exclusive rights in Superboy; (f) agreed that they were enjoined from creating, publishing or distributing Superboy or any imitation thereof; (g) agreed they were prohibited from representing their past connection with Superman and Superboy in such a way to confuse the public that such connection still existed; and (h) agreed they were prohibited from using any coloring, lettering or printing in referring to Superman or Superboy that was imitative of that used by National.

27. In the 1960s, Siegel and Shuster again brought suit against National, this time in the United States District Court for the Southern District of New York for a declaration that they (and not National) owned the copyright in the renewal copyright term for Action Comics No. 1. In a decision published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the district court held, *inter alia*, that the agreements between Siegel and Shuster on the one hand and DCI (and later National) on the other, intended to assign all rights in Superman to DCI and National, including renewal copyright rights.

28. In a decision published in *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the lower court's ruling relating to National's ownership of all rights in Superman. Siegel and Shuster did not further appeal the ruling.

29. On December 23, 1975, Siegel and Shuster entered into an agreement with Warner Communications, Inc., then National's parent company (the

"December 23, 1975 Agreement"). Under this agreement, Siegel and Shuster again acknowledged that Warner Communications, Inc. was the sole and exclusive owner of "all right, title and interest in and to the 'Superman' concept, idea, continuity, pictorial representation, formula, characters, cartoons and comic strips, title, logo, copyrights and trademarks, including any and all renewals and extensions of such rights, in the United States and throughout the world, in any and all forms of publication, reproduction and presentation, whether now in existence or hereafter devised . . . ."

30. Under the December 23, 1975 Agreement, Siegel and Shuster each were to and did receive throughout their lives annual payments as well as medical insurance coverage. Upon Siegel's death, annual payments were to be made to Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life. The amount of the annual payment pursuant to the December 23, 1975 Agreement was increased over the years. Since Siegel's passing in 1996, Joanne Siegel has continuously received and accepted annual payments and health insurance under that agreement.

**DC Comics' Development And Licensing**
**Of Superman Works And Products**

31. The initial graphic representations of the Superman character in 1938, now stylistically dated, presented his adventures with a limited number of characters in settings that had the look and feel of that particular period. From the portrayal of the Superman character in "Action Comics No. 1," we only know that he is an upright hero who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. Superman is also depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap 1/8th of a mile, hurdle a twenty-story building and run faster than an express train. In his ordinary life, the character is depicted as a mild-mannered newspaper reporter for The Daily Star known as Clark Kent, and in his alter ego,

Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime.

32. Since the publication of "Action Comics No. 1," DC Comics has authored, published and distributed several thousand other comic books containing the adventures of Superman throughout the United States and abroad in many millions of copies, adding more than 60 years worth of material to further define, update and improve upon the Superman character and presenting an ongoing new flow of Superman exploits and characters resulting in the creation of an entire fictional Superman "universe."

33. In addition to the publication of new comic books containing the Superman comic strip character, DC Comics has over the last 66 years participated in the creation, development and licensing of numerous Superman live action and animated feature length motion pictures, motion picture serials, radio and television serials and live theatrical presentations. These works have also significantly contributed to the modernizing and evolution of the Superman character from his 1938 appearance.

34. Over the years since Action Comics No. 1, the presentations of Superman provided first by DCI and then DC Comics did not present a static depiction but an ever-evolving portrayal of Superman continuously, featuring new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Most notably, many of Superman's powers that are among his most famous today did not appear in Action Comics No. 1 but only appeared in later publications. These include: his ability to fly; his super-vision which enables him to see through walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-hearing which enables him to hear conversations at great distances; his invulnerability to injury which is most often shown as bullets bouncing off his chest and/or arms.

35. One notable part of the evolution of the appearance of the Superman character undertaken by DC Comics and its predecessors, has been the transformation of the emblem on the chest of Superman's costume. In Action Comics No. 1, the emblem was comprised of a small yellow inverted triangle bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics No. 1 Crest"). Thereafter, in changing the appearance of Superman and his costume, DC Comics and/or its predecessors significantly changed the Action Comics No. 1 Crest. Bearing little if any resemblance to the original, it is now a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red (the "S in Shield Device"). The S in Shield Device, as transformed by DC Comics and its predecessors, has become a strong symbol, standing alone, of all goods and services relating to Superman and his sole source, DC Comics and its predecessors.

36. At all relevant times, DC Comics, its predecessors in interest and licensees have duly complied with the provisions of the 1976 Copyright Act and its 1909 predecessor statute with respect to securing copyright protection for the numerous works in which the Superman character has appeared and establishing DC Comics' copyright ownership thereof, including the original and all works based upon and derived therefrom, and have received from the Register of Copyrights, valid and subsisting certificates of copyright registration and renewal with respect thereto.

37. DC Comics and its predecessors have, since 1938, continuously held themselves out as the exclusive owners of all rights under copyright in Superman.

38. DC Comics has over many decades adopted and made long, continuous and exclusive use of (a) the name and mark Superman and (b) certain key symbols and indicia of origin in connection with and to identify all authorized uses of the Superman character in print and all other media (sometimes hereinafter the "Superman symbols and indicia of origin"). The Superman name and mark and

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 13 of 3 Page ID #:14211

Superman symbols and indicia of origin include, *inter alia,* Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases. Most notable among the latter is "Look!...Up in the sky!...It's a bird!...It's a plane!...It's Superman!" first used in the introduction to the 1940 radio program The Adventures of Superman, and thereafter continuously repeated in Superman television programming and various Superman publications. All of these Superman symbols and indicia of origin have been used on and in connection with a wide variety of publications and licensed goods and services, as they have been added to the Superman character and mythology under DC Comics' and/or its predecessors' supervision and direction, but, in any event, for the earliest symbols, since as early as 1938.

39. As a result of the above-described continuous and exclusive use by DC Comics of the Superman name and mark, as well as the Superman symbols and indicia of origin for over sixty years, the names, marks and symbols and the appearance of the Superman character have become famous and the public has come to recognize that all publications, entertainment and products featuring Superman or bearing such marks all come from the same source, namely, DC Comics, and that DC Comics is the exclusive source of the Superman character and all uses of the character on and in connection with any goods and services.

40. DC Comics owns dozens of federal trademark registrations for Superman related indicia across a broad array of goods and services. Those registrations include, but are not limited to the following for the following marks: (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177, 1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803, 1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b) SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026, 1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 14 of 3 Page ID #:14212

1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the "S in Shield" Device (either alone or as part of a rendering of Superman) 2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233, 1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630, 1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150, 1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No. 2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g) SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623, 1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i) SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881; (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306; (1) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304; (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No. 1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No. 1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and indicia of origin, the "Superman Marks").

41. These registrations alone suffice to show the unusual breadth and scope of the use of such marks related to Superman by DC Comics or its licensees on or in connection with a broad range of goods and services, all of which have come to be seen over six decades by countless consumers as indicating an exclusive authorization or sponsorship thereof by plaintiff DC Comics, the publisher and source of all Superman comic books and other Superman productions and products.

**The Superman Notices Of Termination**

42. On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled Notice

of Termination of Transfer Covering Extended Renewal. Those documents purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the Siegels' share in the following grants of copyright: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19 1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975 Agreement (collectively the "Superman Notices"). However, the Siegels served no notice terminating their share of the copyright grant in the May 21, 1948 Consent Agreement.

43. The Superman Notices purport to terminate the Siegels' share of the above grants listed therein in the Unpublished Superman Works, Action Comics No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1 Works"). However, in none of the seven Superman Notices, or anywhere else, do the Siegels purport to terminate their share of any copyright grant in the Superman Ads.

44. In the Superman Notices, the Siegels expressly recognize and acknowledge that the character Superboy is a derivative work based on Superman. The Superman Notices expressly identify Superboy as part of the Superman "family" of characters in which the Siegels are purporting to terminate their grants. Indeed, the more than 15,000 works listed in the Superman Notices include hundreds of publications and other works that feature *only* Superboy (as opposed to Superman), and also Superman No. 1 with a cover date of Summer 1939, in which Superman is depicted as a youth.

45. In late November, 1998, DC Comics received from Plaintiffs/Counterclaim Defendants. Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents entitled Notice of Termination of Transfer Covering Extended Renewal. Those documents purport to terminate, effective November 27, 2000, the Siegels'

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 16 of 3 Page ID #:14214

share it the following grants of copyright relating to the character known as "The Spectre": (a) the December 4, 1937 Agreement; (b) a September 22, 1938 Agreement; (c) and October 10, 1939 Agreement and (d) a second October 10, 1939 Agreement (collectively the "Spectre Notices").

46. The Spectre Notices purport to terminate the Siegels' share of the above grants in: (a) the Spectre character appearing in costume in an ad in issue No. 51 of "More Fun Comics" with a cover date of January 1940; (b) the first Spectre comic book story published in issue No. 52 of "More Fun Comics" with a cover date of February 1940; (c) part 2 of the first Spectre comic book story published in issue No. 53 of "More Fun Comics" with a cover date of March 1940, and hundreds of additional works listed the Spectre Notices (collectively the "Spectre Works").

**The Parties' Negotiations**

**And The Agreement Reached**

47. On April 17, 1997, less than ten days after DC Comics received the Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation. The Siegels requested that DC Comics make an initial settlement proposal. But prior to making such proposal, DC Comics requested that the parties enter into a confidentiality agreement. Frustrated by the Siegels' delay in responding to its proposed form confidentiality agreement, on November 5, 1997, DC Comics' counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you in the past, our client has elected, for settlement purposes only, not to respond to the [Superman Notices] served upon them by challenging their validity or scope *at this time*." (Emphasis added.)

48. On December 17, 1997, DC Comics and the Siegels finally entered into a confidentiality agreement. On December 18, 1997, DC Comics forwarded its first substantive proposal with respect to the copyrights at issue, and in connection therewith also raised certain defects in the termination notice, stating "that there is a substantial legal issue as to the effectiveness of your clients' termination of DC's

interest in the Superman Comic." For more than six months despite repeated requests for feedback, DC Comics heard no response to its December 18, 1997 proposal. Finally, on June 19, 1998, the Siegels' counsel sent a letter to DC Comics' counsel that did not respond to the proposal but only requested more information.

49. On July 23, 1998, DC Comics provided the Siegels with the answers to the questions posed in their counsel's letter of June 19, 1998. Despite requests for feedback for another several months, DC Comics again received no response to its proposal.

50. Having heard no response from the Siegels, on April 15, 1999, one day before the purported "Effective Date" set forth in the Superman-Notices, DC Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things, the reasons it considered the Superman Notices to be invalid.

51. On April 30, 1999, DC Comics received a letter from the firm of Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented the Siegels in negotiations with DC Comics. Thereafter, the parties engaged in extensive negotiations with their respective lawyers attending meetings in California and New York, and exchanging proposals. During that time period, at the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance Payment") to the Siegels which payment was agreed to be an advance against any future sums provided under an agreement to be entered into between the parties.

52. On October 16, 2001, a legal representative for DC Comics made an offer to the Siegels through Gang, Tyre by telephone. On October 19, 2001, Kevin Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001 offer. That day, Mr. Marks wrote a letter confirming that the Siegels had "accepted D.C. Comics offer of October 16, 2001" and outlined all of the material terms in detail. Those terms included, *inter alia*, that the Siegels transferred or would transfer all of

their rights in the Superman property (which was defined in the letter as Superman, Superboy and related properties including but not limited to Supergirl, Steel, Lois & Clark, and Smallville) and in "The Spectre." In exchange, the Siegels were to receive: (a) a sizeable non-returnable advance; (b) a sizeable non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d) significant guaranteed minimum payments as advances against royalties; and (e) percentage royalties from DC Comics' exploitations of Superman across all media, worldwide.

53. By return letter of October 26, 2001, DC Comics' representative wrote back providing a "more fulsome outline" of the agreed upon points. Neither the Siegels nor any of their representatives in any way disputed the October 26, 2001 confirmatory outline from DC Comics. On February 1, 2002, DC Comics forwarded a draft of a more formal written agreement memorializing the terms agreed to in the October 19 and 26, 2001 correspondence.

54. After the October 2001 agreement, DC Comics entered into a written Option Purchase Agreement with Warner Bros., A Division of Time Warner Entertainment Company, L.P. (now known as defendant Warner Bros. Entertainment Inc.) dated as of November 6, 1999, pursuant to which DC Comics granted to Warner Bros. the option to license certain exclusive rights in Superman, and Warner Bros. has commenced photography of a feature-length motion picture based on the property.

55. On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company acknowledging that the Siegels had accepted DC Comics' proposal of October 16, 2002, but purporting to object to unspecified provisions of the formal written draft and repudiating the agreement reached by the parties in October 2001. To this day, the Siegels have not identified a single provision of the February 1, 2002 formal

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 19 of 3 Page ID #:14217

draft that was inconsistent with the provisions in the Siegels' October 19, 2001 acceptance of DC Comics' proposal.

56. On September 30, 2002, however, DC Comics received a letter from the Siegels stating they were breaking off all discussions with DC Comics and again repudiating the agreement reached by the parties in October 2001.

**The Superboy Termination Notices**

57. Notwithstanding the fact that the Siegels had already purported to terminate grants with respect to the Superboy character effective April 16, 1999, on November 8, 2002, the Siegels mailed to DC Comics another Notice of Termination of Transfer purporting to relate solely to Superboy (the "Superboy Notice"). The Superboy Notice purports to terminate, effective November 17, 2004, only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the December 23, 1975 Agreement, and identifies many of the same works identified in the Superman Notices. As was the case with the Superman Notices, the Siegels served no notice terminating the copyright grant in the May 21, 1948 Consent Agreement.

58. The Superboy Notice purports to terminate the above grants regarding the following works: (a) the unpublished November 30, 1938 Letter; (b) the unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d) approximately 1,600 additional titles. However, the Superboy Notice lists and purports to terminate grants of rights under copyright relating to hundreds of the same works already purportedly terminated by the earlier Superman Notices. The Superboy Notice does not purport to terminate the 1939 depiction of Superman as a youth in Superman No. 1.

59. In the Superboy Notice, the Siegels make the claim that Superboy is a "separate and distinct copyrighted work and character from the copyrighted work and character Superman." This contention is erroneous.

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 20 of 3 Page ID #:14421

60. In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy. This contention is also erroneous.

61. Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville." "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

62. On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia*, that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

63. On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

64. On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

**The Siegels' Filing Of Two Related Cases**

65. On October 8, 2004, 14 days prior to filing the instant action, the Siegels filed a related action, Civil Case No. 04-8400, which case was assigned to Judge Pregerson in this Court.

**FIRST COUNTERCLAIM FOR DECLARATION THAT THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE ARE INEFFECTIVE**

66. DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

67. DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

**#1 The May 21, 1948 Consent Agreement Has Not Been Terminated**

68. The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

69. As a result of the Siegels' failure to send a Notice of Termination with respect to the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect. Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

**#2 The December 23, 1975 Agreement**

70. Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

71. By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

72. By letter dated August 29, 2004, DC Comics rejected the scope and validity of the Superboy Notice, including but not limited to the Siegels' claim that such notice terminated the December 23, 1975 Agreement.

73. Notwithstanding the Siegels having, by virtue of the Superman Notices, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the Superman Notice, after April 16, 1999, the purported effective date of such notices of termination, DC Comics continued to perform under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept the benefits under that agreement. DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superman.

74. Notwithstanding the Siegels having, by virtue of the Superboy Notice, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of the notice of termination, DC Comics has continued to perform under the December 23, 1975 Agreement. DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superboy.

75. Because of DC Comics' continued performance under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's continued acceptance of the benefits of such agreement after she purportedly terminated it in both the Superman Notices and the Superboy Notice, the December 23, 1975 Agreement, and the grant of copyright therein, remains in full force and effect.

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 23 of 3 Page ID #:14221

76. Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (and its derivative work Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

**#3 The Unpublished Superboy Works**

77. In the Superboy Notice, the Siegels purport to terminate copyright grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy Script and approximately 1,600 additional published titles purportedly relating to Superboy (the "Published Superboy Works").

78. Upon information and belief, as of January 1, 1978, both the November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel Superboy Proposals") remained unpublished and thus were neither in their first nor their second term of copyright as of that date.

79. Copyright in the Published Superboy Works is owned exclusively by DC Comics by virtue of their having been prepared as works made for hire for DC Comics' and/or its predecessors, or by virtue of other copyright grants that remain in full force and effect.

80. Pursuant to the requirements set forth by section 304 (c) of the 1976 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in their first or second term of copyright as of January 1, 1978, could be terminated under that provision. As a result, the Superboy Notice is ineffective as to the Siegel Superboy Proposals or any portion of any derivative works containing any copyrightable material therefrom and DC Comics remains the sole owner thereof. Therefore, the Superboy Notice is ineffective.

**#4 Siegel Owned No Copyright In Superboy**

81. The Siegel Superboy Proposals are derivative works based upon the pre-existing copyrighted Superman character and stories owned by DC Comics' predecessors.

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 24 of 3 Page ID #:14222

82. Upon information and belief, Siegel, in collaboration with Shuster, prepared the Siegel Superboy Proposals without the prior knowledge or consent of DC Comics' predecessors.

83. Upon further information and belief, Siegel developed the contents of the Siegel Superboy Proposals within the scope of his employment contracts with DC Comics' predecessors and/or at their instance and expense and subject to their right to control.

84. As a result of the foregoing, the Siegel Superboy Proposals were derivative works based upon Superman, prepared without the authorization of the copyright owner, and/or were works made for hire, owned ab initio by the copyright owner in Superman.

85. Whether the Siegel Superboy Proposals were derivative works prepared without the prior authorization of the copyright owner, or were works made for hire, Siegel could not and did not own any copyright interest therein that would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c). Thus, the Superboy Notice is ineffective.

**#5 The Superman Notices Were Not Timely Served**

86. Upon information and belief, DC Comics' predecessor in interest first secured copyright in Action Comics No. 1 by publication with copyright notice prior to April 16, 1938.

87. All grants made by Siegel and Shuster or rights in Action Comics No. 1 are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels are ineffective for failure to comply with the legal requirements therefore prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304 (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999, was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3) and such notices

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 2 of 3 Page ID #:14223

of termination were served less than two years before the allowable effective date in violation of 17 U.S.C. § 304 (c) (4) (A).

88. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 66 – 87 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

89. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

**SECOND ALTERNATIVE COUNTERCLAIM FOR DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS**

90. DC Comics repeats and realleges paragraphs 1 - 89 above as if fully set forth herein.

91. Since as early as 1998, Plaintiffs/Counterclaim Defendants were on notice of DC Comics' position that the Superman Notices contained legal defects. Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim Defendants were on notice that DC Comics rejected the Superman Notices and asserted exclusive ownership of all copyright in Superman.

92. Since April 16, 1999, the purported effective date of the Superman Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of their purported co-ownership of copyright in Action Comics No. 1.

93. In response to DC Comics' above actions and assertion and such deprivation to the Siegels of the benefits of their alleged copyright co-ownership, Plaintiffs/Counterclaim Defendants took no action until filing the instant action on October 8, 2004, more than six years after DC Comics advised Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 26 of 3 Page ID #:14224

and more than five years after being placed on notice by DC Comics of its claim of exclusive ownership of copyright in Superman and that it rejected and repudiated the Superman Notices and during which time period the Siegels were deprived of benefits to which they claim they are entitled.

94. Because Plaintiffs/Counterclaim Defendants' claim of partial ownership of copyright accrued more than three years prior to Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into consideration any purported agreements to toll the statute of limitations, any claim of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is barred by the three-year statute of limitations of the Copyright Act.

95. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 90 – 94 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

96. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

**THIRD ALTERNATIVE COUNTERCLAIM**

**FOR BREACH OF CONTRACT**

97. DC Comics repeats and realleges paragraphs 1 - 96 above as if fully set forth herein.

98. In or about October 2001, Plaintiffs/Counterclaim Defendants entered into a written agreement with DC Comics memorialized by the authorized agent of Plaintiffs/Counterclaim Defendants, Kevin Marks, and by the authorized agent of DC Comics, John Schulman, which subsequently was confirmed and ratified in writing by Plaintiff/Counterclaim Defendant Joanne Siegel (the "Agreement"), pursuant to which, among other things, Plaintiffs/Counterclaim Defendants (1) transferred to DC Comics, worldwide and in perpetuity, or, alternatively, agreed to

transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in any and all past, present, and future Superman and Superboy-related properties, works, characters, names, and trademarks (collectively, the "Superman Works"), (2) agreed to accept certain compensation from DC Comics in consideration of any and all rights, title, and interest which they may have in the Superman Works (the "Financial Terms"), and (3) covenanted never to sue DC Comics for any claim related to the Superman Works other than for breach of the Agreement (the "Covenant Not To Sue").

99. DC Comics has performed all of its obligations under the Agreement, except to the extent such performance has been prevented or excused by the acts or omissions of Plaintiffs/Counterclaim Defendants. Specifically, and without limiting the foregoing, DC Comics established a reserve account of the moneys due to Plaintiffs/Counterclaim Defendants based upon the Financial Terms, which DC Comics would have paid to Plaintiffs/Counterclaim Defendants pursuant to the Agreement but for their repudiation and breach of the Agreement as herein alleged. DC Comics always has been and remains ready, willing, and able to perform all of its obligations under the Agreement, and will resume doing so upon either a withdrawal by Plaintiffs/Counterclaim Defendants of their repudiation of the Agreement or a final adjudication that the Agreement is enforceable and binding on the parties.

100. Plaintiffs/Counterclaim Defendants have repudiated and otherwise breached the Agreement by, among other things:

a. Claiming, including in this action, that they have not transferred and are not contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all of their rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, and refusing to execute a formal written transfer thereof to DC Comics;

b. Repudiating the Financial Terms and claiming, including in this action, that they are entitled to additional compensation for the Superman Works; and

c. Initiating this action in violation of the Covenant Not To Sue.

101. As a direct and foreseeable result of the contractual breaches on the part of Plaintiffs/Counterclaim Defendants herein alleged, DC Comics has been damaged in an amount to be proven at trial.

**FOURTH ALTERNATIVE COUNTERCLAIM FOR DECLARATORY RELIEF REGARDING THE AGREEMENT**

102. DC Comics repeats and realleges paragraphs 1 - 101 above as if fully set forth herein.

103. An actual controversy now exists between DC Comics and Plaintiffs/Counterclaim Defendants, in that DC Comics contends the Agreement is binding and enforceable and, therefore, that:

a. Plaintiffs/Counterclaim Defendants either have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

b. If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c. If for any reason Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 29 of 3 Page ID #:14227

DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner.

104. DC Comics is informed and believes, and on that basis alleges, that Plaintiffs/Counterclaim Defendants dispute these contentions.

105. DC Comics seeks a judicial determination of the parties' respective rights and obligations, which is necessary and appropriate to allow them to properly govern their future conduct.

**FIFTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION OF LIMITATIONS ON THE SCOPE OF THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE**

106. DC Comics repeats and realleges paragraphs 1 - 65 above as if fully set forth herein.

107. In the event the Superman Notices and/or the Superboy Notice are deemed effective and the settlement agreement between the parties is not enforced, DC Comics asserts the following alternative counterclaim for a declaration limiting the scope and reach of the Superman Notices and the Superboy Notice in six separate and independent ways.

108. DC Comics contends that:

**#1 The Superman Ads**

109. The regulations governing the contents of notices of termination promulgated by the U.S. Copyright Office under authority of the 1976 Copyright Act require, in relevant part, that a notice of termination served pursuant to section 304 (c) of the 1976 Copyright Act name "each work to which the notice of termination applies."

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 30 of 3 Page ID #:14422

110. Upon information and belief, all of the Superman Ads first secured copyright protection by publication with copyright notice prior to April 16, 1938 and prior to publication of Action Comics No. 1.

111. The Superman Ads contain and show the appearance of Superman, his costume, and his super-strength.

112. The grants made by Siegel and Shuster as to the appearance of Superman, his costume, and his super-strength, are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels do not list the works in which the Superman Ads were first published.

113. Thus, DC Comics is the exclusive owner of all copyright in and to the Superman Ads and thereby retains exclusive ownership of copyright in the appearance of Superman therein, including but not limited to, the appearance of the Superman costume.

**#2 Use Of Superman And Superboy Derivative Works Prepared Prior To The Purported Effective Dates Of The Superman Notices And The Superboy Notice**

114. The Superman Notices purport to terminate the Siegels' share in the Copyright grant of Jerome Siegel in all Superman-related works thereafter derived from Action Comics No. 1, including but not limited to the more than 15,000 Superman related works (in addition to Action Comics No. 1) listed in the Superman Notices (the "Superman Derivative Works"). Included among the Superman Derivative Works is the image of the "S in Shield Device" that has become a strong trademark of Superman and his single source, DC Comics.

115. The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

Case 2:04-cv-08400-ODW-RZ Document 648 Filed 02/17/11 Page 31 of 3 Page ID #:14229

116. The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

117. Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

**#3 DC Comics Owns All Superman Derivative Works**

118. All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics. DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

119. The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements"). These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman. Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No 1 but only appeared later in the Post Action Comics No. 1 Works.

120. Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements. Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 32 of 3 Page ID #:14230

**#4 Superboy Is A Derivative Work Based On Superman**

121. In the November 1938, Letter suggesting the idea for a Superboy comic strip, Siegel stated such comic "would relate to the adventures of Superman as a youth." In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last...the answer to your requests...America's outstanding boy hero: SUPERBOY!"

122. As demonstrated by the foregoing, the Siegel Superboy Proposals were based upon the pre-existing Superman character and stories and are thus derivative works based thereon, and were not made at the instigation of Siegel.

123. Thus, even if the Superboy Notice were effective, any recapture of copyright rights would be limited to any new copyrightable subject matter added by Siegel and Shuster to the pre-existing Superman character and stories exclusively owned by DC Comics and its predecessors.

124. The new copyrightable subject matter contained in the Siegel Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture U.S. Copyrights therein, such recapture could not affect DC Comics' continuing right to create and exploit new derivative works that do not include such new copyrightable subject matter, including but not limited to, the television series "Smallville."

**#5 The Derivative Work Superboy Is A Joint Work Of Authorship**

125. Upon information and belief, the Siegel Superboy Proposals were joint works of authorship as they were prepared jointly with Shuster and because it was intended that their contents would be merged with artwork to create a comic book or comic strip.

126. As eventually published, the works containing the Superboy character included both artwork and storyline.

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 33 of 3 Page ID #:14231

127. The joint author's share in the Siegel Superboy Proposals is owned by DC Comics and cannot be terminated either by the Superman Notices or the Superboy Notice.

128. As a result of the foregoing, DC Comics right to continue to exploit the Siegel Superboy Proposals and any derivative works based thereon cannot be affected by either the Superman Notices or the Superboy Notice.

**#6 "Smallville" Is Not Derived From Superboy**

129. Among the derivative works based upon Superman and authorized b DC Comics is the weekly television series, "Smallville."

130. Regardless of whether the Superboy Notice is effective and further regardless of whether Superboy is a derivative work based upon Superman, "Smallville" was derived from and based upon Superman and is not a derivative work based upon the Siegel Superboy Proposals or any succeeding Superboy comic or Superboy work exploited by DC Comics and/or its predecessors prior to May 21, 1948. Beyond sharing the idea of depicting Superman as a youth, Smallville is not substantially similar to the Siegel Superboy Works.

131. Thus, irrespective of any accounting issues relating to the Siegels' purported right to receive compensation with respect to new episodes of "Smallville," DC Comics' right to continue to authorize production, distribution, and airing of "Smallville" television episodes remains unaffected by the Superman Notices and the Superboy Notice.

**#7 The Additional Action Comics No. 1 Materials**

132. The Additional Action Comics No. 1 Materials created in 1938 were prepared at the instance and expense of DCI and subject to its right to control. Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1 Materials were "works made for hire" and copyright therein was owned by DCI *ab initio*.

133. Because the Additional Action Comics No. 1 Materials were works made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to

17 U.S.C. § 304 (c). As a result, DC Comics remains the sole owner of the Additional Action Comics No. 1 Materials.

134. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 106 - 133 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

135. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

**SIXTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION REGARDING THE PRINCIPLES TO BE APPLIED IN AN ACCOUNTING**

136. DC Comics repeats and realleges paragraphs 1 - 65 and 106 - 135 above as if fully set forth herein.

137. DC Comics contends that in the event the Superman Notices and/or the Superboy Notice were deemed valid and effective, any accounting to which the Siegels would be entitled relating to Superman (including its derivative work Superboy, collectively for this Counterclaim "Superman") would be subject to the following limitations and reductions:

a. The Siegels would not be entitled to any revenues derived from exploitation of Superman outside of the United States because termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of non-United States copyrights. 17 U.S.C. § 304 (c) (6) (E).

b. The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works. 17 U.S.C. § 304 (c) (6) (A).

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 3 of 3 Page ID #:14233

c. Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d. Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present it the Superman works subject to accounting.

e. Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f. The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights. As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 36 of 3 Page ID #:14234

g. Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect expenses, taxes, and DC Comics' independent role as a publisher of Superman.

h. Subject to all reductions aforesaid and otherwise determined by the Court to be applicable, the Siegels would be entitled to an accounting of only one-half of the copyright co-owner's profits.

138. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics as to the above issues.

139. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

WHEREFORE, DC Comics demands judgment as follows:

1. Declaring that the Superman Notices and the Superboy Notice are ineffective for one or more of the reasons set forth in DC Comics' First Counterclaim;

2. In the event that the Superman Notices and/or the Superboy Notice are deemed effective, for damages according to proof at trial on DC Comics' Third Alternative Counterclaim;

3. In the event that the Superman Notices and/or the Superboy Notice are deemed effective, declaring on DC Comics' 'Fourth Alternative Counterclaim that, pursuant to the Agreement:

a. Plaintiffs/Counterclaim Defendants have transferred or are contractually obligated to transfer to DC Comics, worldwide and in perpetuity, any and all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works;

b. In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then the remaining terms of the Agreement are valid and enforceable and Plaintiffs/Counterclaim Defendants are not entitled to any compensation for any past, present, or future exploitation of the Superman Works by or upon license from DC Comics other than pursuant to the Financial Terms; and

c. In the event that Plaintiffs/Counterclaim Defendants are adjudged not to have transferred or not to be contractually obligated to transfer to DC Comics, worldwide and in perpetuity, all rights, title, and interest, including all United States copyrights, which they may have in the Superman Works, then Plaintiffs/Counterclaim Defendants nevertheless are not entitled to license or otherwise exploit the Superman Works in any manner;

4. In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that the scope and effect of the Superman Notices and the Superboy Notice are limited as set forth in DC Comics' Fifth Alternative Counterclaim;

5. In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and DC Comics is not granted the relief sought on its Fourth Alternative Counterclaim, declaring that any accounting to which Plaintiffs/Counterclaim Defendants may be entitled will be limited by all applicable principles, including but not limited to, those set forth in DC Comics' Sixth Alternative Counterclaim;

6. Awarding DC Comics its costs and reasonably attorneys' fees incurred in connection with DC Comics' defenses and claims herein seeking declarations with respect to copyright ownership; and

Case 2:04-cv-08400-ODW-RZ Document 646 Filed 02/17/11 Page 3 of 3 Page ID #:14238

7. Awarding DC Comics such other and further relief as may be just.

Dated: February 17, 2011

Respectfully Submitted,

O'MELVENY & MYERS LLP

By: ______________________
Daniel M. Petrocelli
Attorneys for Defendants and Counterclaimant

CC1:844136

Case 2:04-cv-08400-ODW-RZ Document 667 Filed 07/11/11 Page 1 of 2 Page ID #:1037

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,

Plaintiffs,

vs.

WARNER BROS. ENTERTAINMENT INC., a corporation; DC COMICS, a general partnership; and DOES 1-10,

Defendants.

DC COMICS,

Counterclaimant,

vs.

JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual,

Counterclaim Defendants.

Case No: CV 04-8400 ODW (RZx)

Hon. Otis D. Wright II, U.S.D.J.

**ORDER GRANTING RENEWED MOTION FOR ENTRY OF A PARTIAL JUDGMENT UNDER FED. R. CIV. P. 54(B) AND FOR STAY OF REMAINING CLAIMS PENDING APPEAL PURSUANT TO THE COURT'S MAY 5, 2011 ORDER**

Complaint filed: October 8, 2004
Trial Date: None Set

# ORDER

As established by the Court's decisions of March 26, 2008 (Docket No. 293), August 12, 2009 (Docket No. 560), October 30, 2009 (Docket No. 595), March 15, 2011 (Docket No. 659) and May 5, 2011 (Docket No. 664), the First Claim of Plaintiffs' Third Amended Complaint and the First, Second, Third and Fourth Counterclaims of Defendant DC Comics' Second Amended Counterclaims have been fully resolved. As set forth in the Court's March 15, 2011 order, there is no just reason for delay entering judgment in this case. Accordingly, for the reasons set forth in the above-referenced orders, as well as plaintiff's motion papers and all of the pleadings and records on file in this action, plaintiff's Renewed Motion for Entry of a Partial Judgment Under Fed. R. Civ. P. 54(b) is hereby GRANTED.

IT IS HEREBY ORDERED that:

1. Plaintiff's Renewed Motion for Entry of a Partial Judgment Under Fed. R. Civ. P. 54(b) and For Stay of Remaining Claims Pending Appeal Pursuant to the Court's May 5, 2011 order is GRANTED.
2. Judgment in this action shall be entered on the First Claim of the Third Amended Complaint, and the First, Second, Third and Fourth Counterclaims of the Second Amended Counterclaims (as stricken in part by the Court's May 5, 2011 order), and the Court's March 26, 2008 order (Docket No. 293), August 12, 2009 order (Docket No. 560), and October 30, 2009 order (Docket No. 595) are hereby CERTIFIED AS FINAL PURSUANT TO FED. R. CIV. P. 54(b).
3. Further proceedings in this case are hereby stayed pending appeal.
4. Instead of the status reports referred to in the Court's March 15, 2011 order, plaintiffs are ordered to file a status report on or before **Wednesday, June 8, 2011,** and every 60 days thereafter, until further order of the Court.

IT IS SO ORDERED. May 17, 2011 U.S. District Judge

Case 2:04-cv-08400-ODW-RZ Document 674 Filed 08/17/11 Page 1 of 2 Page ID #:1 0

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

PATRICK T. PERKINS (admitted *pro hac vice*)
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone: (845) 265-2820
Facsimile: (845) 265-2819

Attorneys for Defendants and Counterclaimant

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

JOANNE SIEGEL and LAURA SIEGEL LARSON,

Plaintiffs and Counterdefendants,

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1-10,

Defendants and Counterclaimant.

Case No. CV-04-8400 ODW (RZx)

**DEFENDANTS' NOTICE OF CROSS-APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

The Hon. Otis D. Wright II

Case 2:04-cv-08400-ODW-RZ Document 674 Filed 06/15/11 Page 2 of 2 Page ID #:15639

PLEASE TAKE NOTICE that defendants Warner Bros. Entertainment Inc. and DC Comics hereby cross appeal to the United States Court of Appeals for the Ninth Circuit from the Judgment Pursuant To Fed. R. Civ. P. 54(b) dated May 17, 2011 (Docket No. 669) ("Judgment"), which purported to certify as final the Court's orders dated March 26, 2008 (Docket No. 293), August 12, 2009 (Docket No. 560), and October 30, 2009 (Docket No. 595) (collectively, "Interlocutory Orders"), and enter judgment on plaintiff's First Claim for Relief and defendants' First, Second, Third, and Fourth Counterclaims. Plaintiff's notice of appeal was filed on May 27, 2011 (Docket No. 671), and this notice of cross appeal is timely pursuant to Federal Rule of Appellate Procedure 4(a)(3).

To be clear, defendants dispute the finality of the Judgment on the ground that, *inter alia*, the Interlocutory Orders do not fully and finally dispose of any claim as required for partial final judgment under Federal Rule of Civil Procedure 54(b). *See* Docket Nos. 624, 624-1-624-4; 655, 655-1-655-7; 661, 661-1-661-9; 663. Defendants will therefore move to dismiss plaintiff's appeal for lack of jurisdiction.

Defendants file this cross-appeal to preserve their rights to appeal all adverse rulings in the Interlocutory Orders, in the event the Ninth Circuit does not dismiss plaintiff's appeal for lack of jurisdiction. Defendants will voluntarily dismiss this cross-appeal if their motion to dismiss plaintiff's appeal is granted.

Dated: June 15, 2011

Respectfully Submitted,

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
Daniel M. Petrocelli
Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

DC COMICS,

Plaintiff,

vs.

PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, Laura Siegel Larson, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,

Defendants.

No. CV-10-3633 ODW (RZx)

VIDEOTAPED DEPOSITION OF MARK WARREN PEARY

TAKEN ON

WEDNESDAY, JUNE 29, 2011

Reported by: SHANDA GABRIEL

CSR No. 10094

MR. TOKORO: Jason Tokoro for plaintiff DC Comics. 10:29:57 10:29:59

MR. TOBEROFF: Marc Toberoff for defendants Laura Siegel Larson and Mark Warren Peary. 10:30:00 10:30:02

THE VIDEOGRAPHER: Our court reporter today is Shanda Gabriel of Merrill. Would the reporter please swear in the witness. 10:30:06 10:30:09 10:30:11

10:30:12

MARK WARREN PEARY,

having been first duly sworn, was

examined and testified as follows: 10:30:12 10:30:12 10:30:12

10:30:19

THE VIDEOGRAPHER: Please begin. 10:30:19

10:30:19

EXAMINATION 10:30:19

BY MR. PETROCELLI: 10:30:19

Q. Good morning, Mr. Peary. 10:30:21

A. Good morning. 10:30:24

Q. We're starting at 10:30 rather than the noticed time of 9:30 because Mr. Toberoff informed me this morning of car problems. So we'll probably have to go later than anticipated but hopefully we'll get through this today. 10:30:25 10:30:27 10:30:33 10:30:38 10:30:42

Marc, all the defendants' counsel were noticed for the deposition. The other counsel is 10:30:43 10:30:50

Q. And you had known him since you were a small boy? 10:46:18 10:46:21

A. Yes. Not real closely, but I did know him. 10:46:21

Q. He had no children, right? 10:46:28

A. Correct. 10:46:28

Q. But he had been married once? 10:46:30

A. Briefly. 10:46:31

Q. What years was he married? 10:46:36

A. 1979, I believe. 10:46:37

Q. Did you attend his wedding? 10:46:43

A. No. 10:46:45

Q. Did he and his wife elope? 10:46:46

A. Excuse me? 10:46:49

Q. Did they elope, they went off on their own and got married without a cere- -- you know, a ceremony for the family? 10:46:50 10:46:53 10:46:56

A. I'm not aware of the circumstances of their marriage. 10:46:57 10:47:01

Q. What was his wife's name? 10:47:01

A. I'm not sure I can recall. I never met her. 10:47:02 10:47:11

Q. Never spoke with her? 10:47:11

A. No. 10:47:12

Q. Ever communicate at all with her in writing? 10:47:13 10:47:16

A. There is -- there's only one. 11:21:57
Q. Which one is that? 11:22:02
A. That's the legal retainer. 11:22:03
Q. What's the date of it? 11:22:07
A. It is -- it is active as of 2001. 11:22:08
Q. But created after the fact? 11:22:19
A. Yes. 11:22:20
Q. When was it created? 11:22:23
A. 2004, I believe. 11:22:24
Q. And is that the last document you have signed with Mr. Toberoff or any of his entities? 11:22:32 11:22:39
A. With Mr. Toberoff. 11:22:44
MR. TOBEROFF: You mean last agreement or any document? 11:22:45 11:22:47
BY MR. PETROCELLI: 11:22:47
Q. Is that the last agreement, contract, that you have signed with Mr. Toberoff or any of his entities, the one in 2004 that you said goes back to 2001? 11:22:49 11:22:54 11:22:56 11:23:03
A. Yes. 11:23:05
Q. Have you signed any other agreements at any time since 2004 relating to legal representation relating to this case in any way? 11:23:07 11:23:13 11:23:20
A. Yes. 11:23:22
Q. What have you signed? 11:23:24

A. It's a --

MR. TOBEROFF: Don't go into -- just -- just give a very -- the title or -- don't go into details of the document.

THE WITNESS: It's -- it's called a consent agreement.

BY MR. PETROCELLI:

Q. Is that in your lock box?

A. Yes.

Q. Why didn't you mention it earlier when I asked you about the agreements in your lock box?

MR. TOBEROFF: Argumentative.

THE WITNESS: I -- I mentioned what I had recalled.

BY MR. PETROCELLI:

Q. So you're now recalling additional documents that you signed?

A. I -- I recall -- I stated what -- the documents I recalled.

Q. You now recall that you signed something called a consent agreement and that's also in your lock box?

A. Yes.

Q. Okay. When was that signed?

A. That was 2008, I believe.

11:23:25 11:23:28 11:23:36 11:23:40 11:23:40 11:23:42 11:23:42 11:23:45 11:23:46 11:23:50 11:23:52 11:23:55 11:24:01 11:24:07 11:24:07 11:24:10 11:24:12 11:24:12 11:24:18 11:24:20 11:24:22 11:24:24 11:24:25 11:24:26 11:24:30

Q. When is the last time you saw it, or a copy of it? 11:24:38 11:24:42

A. Fairly recently I reviewed it last, I don't know, maybe in the last month or so I might have reviewed it. 11:24:46 11:24:51 11:24:53

Q. Why? 11:24:54

A. Because I was thinking about this case because of this. 11:24:54 11:25:00

Q. This deposition? 11:25:02

A. Yes. 11:25:03

Q. Besides the 2008 consent agreement, what else did you review in connection with this deposition? 11:25:06 11:25:09 11:25:13

A. I reviewed my prior deposition for the Siegel case and exhibits. That's -- that's what I've reviewed. 11:25:13 11:25:19 11:25:30

Q. Did you have a copy of your prior deposition? 11:25:32 11:25:34

A. Yes. 11:25:36

Q. And the exhibits? 11:25:37

A. Yes. 11:25:38

Q. Besides the 2008 consent agreement and your deposition in the Siegel case together with the exhibits of that deposition, what else did you review in connection with this deposition? 11:25:42 11:25:45 11:25:48 11:25:51

A. That's -- that's pretty much it. 11:25:55

Q. Where did you get the consent agreement to review, from the lock box? 11:26:02 11:26:04

A. I -- I -- I -- yes or -- or it could have been a copy. 11:26:10 11:26:15

Q. Where -- where was the copy? 11:26:16

A. The copy is -- it could be in a separate folder. 11:26:18 11:26:22

Q. What -- what's the name of the folder? 11:26:24

A. The folder is "Legal." 11:26:26

Q. Where is the folder maintained? 11:26:29

A. The folder, there could be a copy in there, in the -- in the filing cabinet. 11:26:30 11:26:35

Q. Is the 2008 consent agreement the last agreement of any kind that you have signed in connection with either this case or anything having to do with the Joe Shuster termination issue? 11:26:40 11:26:44 11:26:49 11:26:52

A. Yes. 11:26:55

Q. Okay. Who else signed the 2008 consent agreement? 11:26:57 11:27:07

A. Would have been the -- Laura, Joanne Siegel. 11:27:07 11:27:17

Q. Laura Siegel and Joanne Siegel? 11:27:17

A. Yes. 11:27:20

Q. Anyone else? 11:27:20

A. I think there was -- and -- and my attorney signed it. 11:27:21

Q. You mean Mr. Toberoff? 11:27:28

A. Yes. 11:27:29

Q. And did your mother, Jean Peavy, sign it? 11:27:30

A. I don't recall if she did. I just -- I didn't read it. I just scanned the -- the pages. I didn't -- I don't recall the signature page. She might have. 11:27:33

Q. Do you know where you were when you signed the document in -- in 2008? 11:27:53

A. Yeah. When -- when I signed it, I -- I was at home. 11:27:57

Q. And what did you do after you signed it? What did you do with it? 11:28:05

A. Well, an original was FedExed to Mr. Toberoff and I kept another original. 11:28:09

Q. You signed two copies? 11:28:18

A. Yes. 11:28:20

Q. And you put the other original in your lock box? 11:28:21

A. Yes. 11:28:25

Q. Did you ever get back from Mr. Toberoff a version that had more signatures on it? 11:28:26

A. Well, yes, the version in the lock box 11:28:30

would have all the original signatures. 11:28:35

Q. Why did you review -- why did you pick the 2008 consent agreement to review? 11:28:48 11:28:51

A. Well, before I came I -- I brought out my folder and it says "Legal, Shuster case" and I flipped through documents, just looked at them and said what do I want to bring, what don't I want to bring and -- and that's all. It was just a cursory review of what I had in there. And I left most of it at home, so it was just a cursory review of what I had. 11:28:53 11:28:59 11:29:06 11:29:08 11:29:10 11:29:15 11:29:18 11:29:21

Q. What did you bring with you? 11:29:23

A. I brought a copy of the legal retainer as of 2001 and I brought a -- a copy of the first page of the consent agreement and a -- with a cover letter that was a communication between Mr. Toberoff and another attorney, so it was just like the first page of it, just to jog my memory. And -- 11:29:25 11:29:28 11:29:41 11:29:43 11:29:48 11:29:53

Q. Who was the other attorney? 11:29:56

A. It was -- can I say that? Just -- it was a communication. I don't know if that's privileged. 11:29:57 11:30:04

MR. TOBEROFF: Well -- 11:30:07

THE WITNESS: Just -- 11:30:07

MR. TOBEROFF: I -- I think you can -- I think you can give the name of the attorney. 11:30:08 11:30:12

Q. Was that mediation session in April 2010 the last time you saw her? 11:47:54 11:47:56

A. In person, yes. 11:48:00

Q. You said you spoke with her daughter, Laura? 11:48:02 11:48:04

A. Yes. 11:48:05

Q. When was that? 11:48:07

A. After she died. 11:48:09

Q. What was the purpose of that? Phone call? 11:48:11

A. Yes. 11:48:14

Q. To give your condolences? 11:48:16

A. Yes. 11:48:17

Q. And have you spoken to Laura since then? 11:48:18

A. No. 11:48:25

Q. You identified the document that the Siegels and you signed as a consent agreement. 11:48:28 11:48:30

Is the word -- is that the title of the document? 11:48:34 11:48:37

A. I believe the title, if I'm allowed to say that -- 11:48:43 11:48:45

MR. TOBEROFF: Objection. Actually, you can -- you can testify as to the title, but that's it. Not to any contents of the document. 11:48:46 11:48:50 11:48:53

THE WITNESS: I recall the title says "Superman Agreement." 11:48:57 11:48:59

"QUESTION: Did you tell your mother in your conversations over the years and in particular about the consent agreement that any agreement with DC or settlement with DC requires the consent of the Siegels?") 12:08:40 12:08:41 12:08:44 12:08:46 12:08:51 12:08:54 12:08:56

THE WITNESS: Yes. 12:09:52

BY MR. PETROCELLI: 12:09:52

Q. What did you say in that regard? 12:09:54

A. Pretty much what -- what you said there. 12:09:59

Q. Did you discuss with her what would happen if, for example, you wanted to do a settlement or an agreement with DC but the Siegels did not, how you would deal with that circumstance? 12:10:04 12:10:12 12:10:16 12:10:19

A. I don't recall going into that detail of what-ifs. 12:10:27 12:10:30

Q. Did your mom ask you, "Well, what if we can't agree with the Siegels? I mean, what happens then?" Did she put that -- 12:10:32 12:10:35 12:10:37

A. No. 12:10:40

Q. -- question to you in so many words? 12:10:41

A. No. 12:10:42

Q. Do you -- did -- if she had put that question to you, could you have answered it? 12:10:46 12:10:48

MR. TOBEROFF: Again, don't testify based on knowledge and communications you received -- don't testify based on knowledge you received through your communications with your attorney.

THE WITNESS: I -- all I can --

MR. TOBEROFF: And I also, when he asks you about conversations, if you understand the substance of the conversation you can give him that substance. If you understand the exact words you used, you can give him the exact words. But if you don't remember the exact words you used, don't make up the words to fill in the blanks. That would be speculating.

THE WITNESS: Uh-huh. The question again being?

BY MR. PETROCELLI:

Q. Did you have an understanding in discussions with your mom about the consent agreement what would happen if the Siegels and you could not agree?

MR. TOBEROFF: Asked and answered.

THE WITNESS: I didn't discuss that with her.

BY MR. PETROCELLI:

Q. Did you have an awareness in your own mind of what would happen?

12:10:53 12:10:56 12:11:00 12:11:02 12:11:07 12:11:08 12:11:11 12:11:14 12:11:17 12:11:19 12:11:21 12:11:25 12:11:27 12:11:33 12:11:33 12:11:33 12:11:38 12:11:40 12:11:43 12:11:45 12:11:49 12:11:51 12:11:51 12:11:52 12:11:57

A. I'm aware -- 12:11:59

Q. Had she asked you the question, could you have answered it? 12:11:59 12:12:01

A. Oh. 12:12:02

MR. TOBEROFF: You can only answer the next question to the extent you have an understanding that's separate and apart from your communications with me. 12:12:02 12:12:04 12:12:06 12:12:09

THE WITNESS: Just -- okay. 12:12:10

It's just we -- I thought the agreement was good. It was mutually beneficial. That's -- that's all I can say. 12:12:14 12:12:17 12:12:24

BY MR. PETROCELLI: 12:12:24

Q. Why did you think it was good and mutually beneficial? 12:12:25 12:12:28

MR. TOBEROFF: I instruct you not to answer. 12:12:28 12:12:29

(Unanswered question.) 12:12:30

THE WITNESS: I follow -- 12:12:32

MR. TOBEROFF: I instruct you not to answer. 12:12:34 12:12:35

THE WITNESS: I follow my attorney's advice. 12:12:35 12:12:36

BY MR. PETROCELLI: 12:12:36

Q. Can I get an answer to my prior question, 12:12:47

(The reporter read the record as follows:

"QUESTION: Do you have any current arrangement for the consent agreement or otherwise whereby the Shuster interest's share in any proceeds or recovery attributable to Superboy?")

MR. TOBEROFF: That was really fast.

THE REPORTER: I'm sorry.

(The reporter read the record as follows:

"QUESTION: Do you have any current arrangement for the consent agreement or otherwise whereby the Shuster interests share in any proceeds or recovery attributable to Superboy.")

THE WITNESS: No.

BY MR. PETROCELLI:

Q. Does the consent agreement -- under the consent agreement as you understand it, would the Shuster interest's share in any proceeds or recovery attributable to Superboy?

MR. TOBEROFF: This is the same question.

12:16:23 12:16:23 12:14:58 12:15:00 12:15:06 12:15:10 12:15:15 12:15:17 12:15:17 12:15:17 12:15:17 12:15:17 12:14:58 12:15:00 12:15:06 12:15:10 12:15:15 12:15:17 12:16:24 12:16:24 12:16:31 12:16:33 12:16:39 12:16:44 12:16:47

Do we have the same agreement? 12:16:49

MR. PETROCELLI: We do. It's not the same question because I limited it to the consent agreement. 12:16:50 12:16:54 12:16:54

MR. TOBEROFF: Do we have the same agreement that I will allow him to answer but that will not be deemed -- 12:16:54 12:16:58 12:16:58

MR. PETROCELLI: Yes. 12:16:58

MR. TOBEROFF: -- a waiver of the privilege as to any other questions or the document? 12:17:00 12:17:00

MR. PETROCELLI: Yes. 12:17:02

MR. TOBEROFF: You can answer. 12:17:03

THE WITNESS: Okay. No. 12:17:03

BY MR. PETROCELLI: 12:17:03

Q. Have the Shusters, by "the Shusters" I mean you, your mom, the estate of Joe Shuster, the Shuster interest, have the Shusters ever had any agreement with the Siegels regarding Superboy? 12:17:07 12:17:13 12:17:17 12:17:21

A. No. 12:17:28

Q. Is it your understanding that if the Siegels were to be paid or recover money associated with Superboy, that it would belong solely to them and not to the Shuster side? 12:17:34 12:17:42 12:17:47 12:17:50

Is that your understanding? 12:17:55

A. Yes. 12:17:56

Q. Have you ever had any discussions with any member of the Siegel family about Superboy and sharing or not sharing in recoveries associated with Superboy? 12:18:02 12:18:08 12:18:16 12:18:21
A. No. 12:18:21
Q. Have you ever had a discussion with your mother about whether the Shusters had an interest in Superboy? 12:18:24 12:18:24 12:18:33
A. No. 12:18:37
Q. You never once raised that subject with her? 12:18:37 12:18:39
A. No. 12:18:41
Q. Has she ever discussed it with you? 12:18:42
A. No. 12:18:45
Q. At any time, even going back to the time when Joe Shuster was alive? 12:18:46 12:18:49
A. We never discussed that. 12:18:51
Q. Did you ever discuss it with Joe Shuster? 12:18:53
A. No. 12:18:55
MR. PETROCELLI: Okay. Okay. Would you agree that I don't need to ask any more questions about his knowledge about the consent agreement because you're -- you're going to assert the same objections? 12:19:07 12:19:14 12:19:17 12:19:21 12:19:23
MR. TOBEROFF: If you're asking as to the 12:19:24

Superboy. 17:47:48

Q. But you -- it was included in the first agreement that you signed in November, Exhibit 10 -- 17:47:48 17:47:51

MR. TOBEROFF: Here is the exhibit. 17:47:54

BY MR. PETROCELLI: 17:47:54

Q. -- paragraph 1. 17:47:56

A. Yes. 17:47:56

MR. TOBEROFF: He's referring -- again, when he refers to Exhibit 10, paragraph 1 and the inclusion of Superboy, I'd like you to read paragraph 1 to see the way Superboy is included. 17:47:57 17:47:58 17:48:02 17:48:04

MR. PETROCELLI: You know, please don't. 17:48:07

MR. TOBEROFF: No. 17:48:07

MR. PETROCELLI: It's not appropriate. 17:48:09

MR. TOBEROFF: It's only fair that when you talk about something, he looks at it. 17:48:10 17:48:11

MR. PETROCELLI: He doesn't need you to tell him how to read it, okay? 17:48:13 17:48:14

MR. TOBEROFF: I'm not telling him -- 17:48:16

MR. PETROCELLI: That's just inappropriate. 17:48:16

MR. TOBEROFF: I'm telling him to read it. 17:48:17

MR. PETROCELLI: No, you're telling him more than that. Let's not get -- go down this path. 17:48:19 17:48:20

Q. What did you as the executor on behalf of the estate get as consideration for giving up any 17:48:22 17:48:26

claim to Superboy? 17:48:30

MR. TOBEROFF: Assumes facts. Lacks foundation. 17:48:32 17:48:33

THE WITNESS: My understanding is the Shuster estate -- 17:48:36 17:48:40

BY MR. PETROCELLI: 17:48:41

Q. Did you understand my question? Let me ask it again. 17:48:41 17:48:44

A. Repeat it. 17:48:48

Q. Yes. 17:48:48

As the executor of the Shuster estate, in executing Exhibit 13, the October 27, 2003 amendment to your joint venture agreement, what did the estate get in return for giving up any and all claim to Superboy? 17:48:48 17:48:57 17:48:57 17:49:02 17:49:07

MR. TOBEROFF: Assumes facts and lacks foundation. 17:49:07 17:49:13

THE WITNESS: I think the question mischaracterizes the situation. 17:49:13 17:49:14

BY MR. PETROCELLI: 17:49:14

Q. Can you answer the question? 17:49:18

MR. TOBEROFF: He's trying and you're interrupting his answer. 17:49:19 17:49:20

MR. PETROCELLI: No. He's -- 17:49:21

MR. TOBEROFF: Excuse me. 17:49:22

MR. PETROCELLI: -- he's arguing and he's not answering my question. 17:49:22 17:49:23

MR. TOBEROFF: No, he's -- he's -- 17:49:25

BY MR. PETROCELLI: 17:49:26

Q. Do you understand the question, sir? 17:49:26

A. I -- I think it mischaracterizes the situation. 17:49:27 17:49:28

Q. It's not up to you to make that decision. That's for a judge to make. 17:49:29 17:49:31

MR. TOBEROFF: He can answer. 17:49:33

BY MR. PETROCELLI: 17:49:33

Q. Do you understand the question? 17:49:34

A. I don't know how to answer it because it assumes certain things that are -- that I don't believe are true. 17:49:35 17:49:37 17:49:40

Q. What, if anything, did the estate get for removing the words "Superboy" and "Smallville" from your joint venture agreement from the way they appeared in Exhibit 10? 17:49:42 17:49:44 17:49:49 17:49:52

MR. TOBEROFF: Again, he's referring to Exhibit 10. Please look at Exhibit 10 and the way they appeared in Exhibit 10. Those are your words, Mr. Petrocelli. So please look at the way Superboy appeared in Exhibit 10. 17:49:55 17:49:57 17:49:59 17:50:02 17:50:06

MR. PETROCELLI: Marc, you don't need to 17:50:07

Exhibit SS

repeat my question to him. Now, really, you're -- you're starting to get out -- out of hand here. 17:50:08 17:50:10

MR. TOBEROFF: I've been pretty good. I've been a good boy. 17:50:12 17:50:14

MR. PETROCELLI: Let's -- let's keep it that way. Okay? 17:50:15 17:50:16

MR. TOBEROFF: Please look at Exhibit 10 which he's referred to before you answer the question. 17:50:18 17:50:20 17:50:21

BY MR. PETROCELLI: 17:50:21

Q. So what did -- what's the answer? 17:50:27

A. What did we get? 17:50:29

Q. Yes. What did you get in return for your agreement to delete the references to Superboy and Smallville? 17:50:31 17:50:33 17:50:45

A. All I can say is I don't think we have rights to it. 17:50:45 17:50:48

Q. I didn't ask you whether you thought you had rights. I asked you what -- what, if anything, did you get for agreeing to do this supplement? 17:50:48 17:50:50 17:50:53

A. There was -- okay. There was no remuneration or compensation or anything. 17:50:56 17:50:58

Q. None, right? 17:51:01

A. Okay. 17:51:02

Q. Is that correct? 17:51:02

MR. TOBEROFF: He just answered you. 17:51:05

THE WITNESS: That's what I said. 17:51:06

BY MR. PETROCELLI: 17:51:06

Q. Okay. And the estate of which you were in charge of administering did not seek a second opinion from another lawyer on that subject. 17:51:07 17:51:12 17:51:15

Is that right? 17:51:15

A. That's correct. 17:51:20

Q. The sole advice that you accepted was the lawyer who represented the Siegels who were asserting 100 percent ownership. 17:51:20 17:51:24 17:51:28

Is that correct? 17:51:28

A. Yes. 17:51:28

Q. Did you disclose to the probate court that you had executed this amendment deleting any reference to Superboy and Smallville for no remuneration or compensation based on the advice of the lawyer for the Siegels who were claiming 100 percent rights to Superboy? Did you make that disclosure to the probate court? 17:51:41 17:51:45 17:51:48 17:51:53 17:51:56 17:52:01 17:52:03

A. I don't believe so. 17:52:06

Q. When you -- in connection with your decision to accept the -- the advice of Mr. Toberoff, were you made aware of any copyright -- before I get there, turn to Exhibit 14. 17:52:13 17:52:17 17:52:26 17:52:39

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, Shanda Gabriel, Certified Shorthand Reporter, Certificate No. 10094, for the State of California, hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined the witness was by me first duly sworn;

The foregoing transcript is a true record of the testimony given.

Dated July 14, 2011.

[signature]

Shanda Gabriel
CSR 10094

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

DC COMICS,

Plaintiff,

vs.

PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, JOANNE SIEGEL, an individual, LAURA SIEGEL LARSON, an individual, and DOES 1-10, inclusive,

Defendants.

Case No. CV-10-3633 ODW (RZx)

DEPOSITION OF:

LAURA SIEGEL LARSON

FRIDAY, JULY 22, 2011

9:45 A.M.

Reported by:

Kathleen E. McCarthy

CSR No. 4483

and Matt Kline of O'Melveny here as well. 09:46:36

THE WITNESS: Excuse me. Which is Matt and which is -- 09:46:41 09:46:42

MR. PETROCELLI: Jason -- 09:46:43

THE WITNESS: Jason, and Matt -- 09:46:44

MR. PETROCELLI: -- is to my right -- 09:46:45

THE WITNESS: Okay. 09:46:45

MR. PETROCELLI: -- and then Matt is down at the end there. 09:46:45 09:46:48

THE WITNESS: All right. Thank you. 09:46:48

THE VIDEOGRAPHER: The court reporter today is Kathy McCarthy of Merrill. 09:46:48 09:46:50

Would the reporter please swear in the witness. 09:46:50 09:46:52

09:46:52

LAURA SIEGEL LARSON,

having been first duly sworn, was

examined and testified as follows:

09:47:02

THE VIDEOGRAPHER: You may begin. 09:47:02

EXAMINATION 09:47:03

BY MR. PETROCELLI:

Q. Could you please state your full name. 09:47:04

A. Laura Siegel Larson. 09:47:07

MR. PETROCELLI: Okay. There you go. 10:02:22
THE WITNESS: Okay. 10:02:24
BY MR. PETROCELLI:
Q. So after the litigation document that you and your family entered into with Mr. Toberoff in 2004, were there any other documents, to your knowledge, that were sent to Mr. Zadrozny for his review related to Superman? 10:02:25 10:02:27 10:02:31 10:02:34 10:02:40
A. I don't recall. 10:02:41
Q. You signed a document sometime in or about 2008 that the Shusters also signed, some agreement; correct? 10:02:44 10:02:49 10:02:52
A. Yes. 10:02:53
Q. And Mr. Toberoff also signed that; correct? 10:02:54
A. Yes. 10:02:57
Q. Did Mr. Zadrozny, to your knowledge, review that document? 10:02:59 10:03:05
A. Yes. 10:03:05
Q. Did he review that document prior to the time you signed it? 10:03:07 10:03:10
A. Yes. 10:03:11
Q. How do you know he reviewed it? 10:03:14
A. Because he and I spoke about it. 10:03:20
Q. How long before you signed it -- withdrawn. 10:03:27
Did you send him a copy of it before signing 10:03:33

Exhibit TT

it?

A. Yes. 10:03:36

Q. Was he here in town with you or -- 10:03:37

A. No. 10:03:40

Q. He was living in Florida? 10:03:40

A. Yes. 10:03:42

Q. Has he lived in Florida the whole time you've been dealing with him? 10:03:42

A. Yes. 10:03:45

Q. Okay. Did any other attorney besides Mr. Zadrozny review that document, to your knowledge, before you or your mother signed it? 10:03:51

A. Which document are you speaking of? 10:03:58

Q. This 2008 -- we've been calling it a consent agreement. 10:04:00

A. Oh. The -- no. 10:04:05

Q. How many documents have you or your mother signed that the Shusters also signed, one or more Shuster people? 10:04:11

A. Only one. 10:04:20

Q. Was the 2008 consent agreement the last document you asked or your mother asked, to your knowledge, Mr. Zadrozny to review related to Superman? 10:04:32

A. I believe so. 10:04:49

Q. Have you signed any other documents related 10:04:52

any interest in Superboy.

A. I don't know anything about his arrangements with the Shusters.

Q. Have you ever inquired of anybody why the Shusters would give up their entire interest in Superboy that they were asserting at one point in time?

MR. TOBEROFF: Assumes facts. Lacks foundation.

THE WITNESS: I think they -- they found out by reading more carefully the 1947 ruling.

BY MR. PETROCELLI:

Q. Well, that's an interesting point. It's not what I asked you. That's your speculation; right?

A. That's my speculation.

Q. And you know there's a lot of documents after 1947 that they could have read that would have informed them that Joe Shuster was a co-creator of Superboy; correct?

A. I don't know that.

Q. I know that you picked the 1947 ruling because that's the one Mr. Toberoff likes to talk about; right?

A. No. That's the one that my father told me about my entire life.

16:12:55 16:12:57 16:12:58 16:13:00 16:13:04 16:13:07 16:13:10 16:13:10 16:13:12 16:13:12 16:13:16 16:13:21 16:13:23 16:13:28 16:13:30 16:13:32 16:13:36 16:13:41 16:13:41 16:13:42 16:13:44 16:13:46 16:13:48 16:13:51

Q. But that's not the last word on the subject; right? 16:13:52 16:13:54

A. I don't know that that's the last word on the subject. 16:13:54 16:13:56

Q. And you're aware that there are documents that both Joe Shuster and your dad caused to be filed in which they claimed co-credit for Superboy; correct? 16:13:57 16:13:58 16:14:03

A. I do not know that. 16:14:06

Q. And you have seen those copyright certifications. 16:14:07 16:14:10

A. I don't recall anything like that. 16:14:10

Q. Copyright registration documents; correct? 16:14:11

MR. TOBEROFF: Just slow it down. Let him finish the question. What's your answer? 16:14:15 16:14:18

THE WITNESS: My answer is I have not seen those. I have not seen what you're referring to. 16:14:20 16:14:21

BY MR. PETROCELLI:

Q. But I had asked you not to surmise that the Shusters must have read some opinion back in 1947. I had asked you if you had ever discussed with anyone why they would disavow on the interest in Superboy that they previously had -- 16:14:24 16:14:29 16:14:32 16:14:36 16:14:42

A. Okay. 16:14:43

Q. -- claimed. 16:14:44

A. I didn't understand that that was your 16:14:45

question. The answer to that is no. 16:14:46
Q. Okay. Do you have a copy of our Complaint there just while we're on this subject? 16:15:06 16:15:14
A. No, I don't. 16:15:18
Q. You are aware that in Action Comics No. 1, Mr. Shuster did the illustrations or worked on the illustrations; correct? 16:15:34 16:15:39 16:15:43
A. Yes. 16:15:44
Q. And there's some depiction of Superman as a youth with super powers; correct -- not in Action Comics No. 1. Excuse me. In Superman No. 1. 16:15:44 16:15:51 16:15:54
A. I haven't seen it for a long time. 16:15:58
Q. Okay. Well, rather than put you through a memory test, can you take a look at our Complaint which has been marked as Exhibit 59. Turn to page 29, paragraph 88. 16:16:01 16:16:03 16:16:07 16:16:12
(Whereupon, Plaintiff's Exhibit 59 was marked for identification.) 16:16:16
THE WITNESS: 29, paragraph 88, yes. 16:16:17
MR. PETROCELLI: Yes. 16:16:18
Q. When you read paragraph 88 and you saw the first bullet under paragraph 88 which states that, in part, "Toberoff had entered into the 2001 joint-venture agreement with the Shuster Heirs, specifying that the Shuster Heirs owned an interest in 16:16:21 16:16:26 16:16:33 16:16:37 16:16:40

17:44:39 A. No, I really don't.

17:44:42 Q. Do you know whether you were bumping up

17:44:44 against a deadline to send out the Superboy notice?

17:44:48 A. I think we were getting close to a deadline,

17:44:50 I think more in terms of end date than beginning date.

17:44:55 Q. Did you have any discussions with any member

17:45:03 of the Shuster family that you were going to be

17:45:06 sending out the Superboy notice --

17:45:09 A. No.

17:45:10 Q. -- claiming a hundred percent termination

17:45:12 interest?

17:45:12 A. No, we did not.

17:45:14 Q. Did you and your mother discuss whether you

17:45:16 should do so beforehand?

17:45:18 A. Whether we should what?

17:45:19 Q. Contact them beforehand and let them know.

17:45:26 A. No.

17:45:27 Q. Did you have any idea what their view was

17:45:33 about Mr. Shuster's termination interest with respect

17:45:37 to Superboy?

17:45:39 A. We didn't talk to them about Superboy.

17:45:43 Q. Well, were you not concerned that they might

17:45:48 protest or contest the assertion by the Siegel family

17:45:53 that Jerome Siegel was the sole creator and the sole

17:45:57 person entitled to claim a termination interest?

17:45:59 A. No.
17:46:02 Q. Why not?
17:46:05 A. Because we were, you know, relying on the Westchester decision.
17:46:08
17:46:10 Q. In 1947?
17:46:11 A. Yes, correct.
17:46:12 Q. But --
17:46:13 A. '47, '48, whenever it was.
17:46:15 Q. How did you know they were aware of it?
17:46:17 A. We weren't trying to get inside their minds. We were doing what we thought, you know, we had rights to.
17:46:20
17:46:25
17:46:26 Q. But what if -- but did you discuss with your mother the possibility that you may now be entering into an area in which they might contest your position? Did that thought ever occur to you?
17:46:30
17:46:33
17:46:43
17:46:45 A. We felt perfectly confident that we were within our rights.
17:46:47
17:46:48 Q. I understand that you made a judgment that you were within your rights, but did you give some consideration to the idea that the family of Joe Shuster might have a different view and might dispute this in some way?
17:46:49
17:46:52
17:46:58
17:47:01
17:47:05 A. I don't recall that being a concern.
17:47:07 Q. Never even occurred to you?

A. Of course.

Q. And you knew your father felt that way also; right?

A. Yes.

Q. And your mother felt that way; correct?

A. We all did.

Q. And do you think that -- did it occur to you that Jean Peavy might have some feelings about her brother's getting credit for Superboy when you now were claiming sole credit?

A. To the best of my recollection, it wasn't -- it wasn't anything that we were concerned about or worried about. We thought that they shared the same view that we had.

Q. You had no basis to think that. What was your basis?

A. I'm --

Q. Some opinion in 1947 that you don't even know that they were aware of?

A. Just discussions that I had had with my father during his lifetime.

Q. Did you ever at any time have a discussion with someone in the Shuster family about whether they agreed with that position?

A. I did not.

17:51:23 17:51:25 17:51:28 17:51:28 17:51:29 17:51:31 17:51:32 17:51:35 17:51:40 17:51:45 17:51:46 17:51:51 17:51:54 17:51:58 17:51:59 17:52:02 17:52:03 17:52:04 17:52:07 17:52:08 17:52:10 17:52:14 17:52:17 17:52:21 17:52:22

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, Kathleen E. McCarthy, Certified Shorthand Reporter No. 4483 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

Before completion of the deposition, review of the transcript [ ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 3rd day of August, 2011.

[signature]

Kathleen E. McCarthy, CSR No. 4483

**TOBEROFF & ASSOCIATES, P.C.**

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 2, 2011

Via E-Mail

Mark Warren Peary
Jean Adele Peavy
51 Camino Cabo
Santa Fe, New Mexico 87508

Re: Pacific Pictures Agreements

Mark:

This is to confirm your and our understanding that the retainer agreement between Mark Warren Peary, Jean Adele Peavy and the Law Offices of Marc Toberoff (now Toberoff & Associates, P.C.), dated as of November 23, 2001 (the "Retainer Agreement"), completely replaced and superseded the November 23, 2001 agreement between Pacific Pictures Corporation, Jean Adele Peavy and Mark Warren Peary, as well as the October 27, 2003 agreement between Pacific Pictures Corporation and Mark Warren Peary (the "PPC Agreement(s)"), and that no provisions of the PPC Agreements, including paragraph 8 of the 2001 PPC Agreement and paragraph 7 of the 2003 PPC Agreement, survived or had any continuing force or effect after the Retainer Agreement was executed.

This also serves to confirm your and our understanding that the September 10, 2004 letter between Pacific Pictures Corporation, Mark Warren Peary and Jean Adele Peavy totally cancelled the PPC Agreements, and that no term of the PPC Agreements, including paragraph 8 of the 2001 PPC Agreement and paragraph 7 of the 2003 PPC Agreement, was intended to survive such cancellation.

Pacific Pictures Corporation has been dissolved, and Marc Toberoff is its successor in interest. For the avoidance of doubt, in the unlikely event that any right, title or interest of Pacific Pictures Corporation under either of the PPC Agreements is deemed to have nonetheless survived your and our mutual cancellation and replacement of the PPC Agreements, Mr. Toberoff hereby quitclaims any such right, title or interest of Pacific Pictures Corporation to the Estate of Joseph Shuster.

This letter, including the above quitclaim, shall have no affect on the parties' rights and obligations under the Retainer Agreement, all of which are expressly preserved.

Exhibit UU

**TOBEROFF & ASSOCIATES, P.C.**

August 2, 2011
Re: Pacific Pictures Agreements
Page: 2 of 2

Very truly yours,

Marc Toberoff

AGREED:

The Estate of Joseph Shuster

Mark Warren Peary,
as Personal Representative

Mark Warren Peary

Jean Adele Peavy

Marc Toberoff,
as successor to Pacific Pictures Corporation

Exhibit UU

521

Case 2:10-cv-0 3 ODW-RZ Document 9 Filed 11/02/11 Page 1 of 12 Page ID #:221 0

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (State Bar No. 90072)
*rkendall@kbkfirm.com*
Laura W. Brill (State Bar No. 195889)
*lbrill@kbkfirm.com*
Nicholas F. Daum (State Bar No. 236155)
*ndaum@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 556-2700
Facsimile: (310)556-2705

Attorneys for Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

DC COMICS,

Plaintiff,

vs.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,

Defendants.

Case No: CV 10-03633 ODW (RZx)

Hon. Otis D. Wright II, U.S.D.J.
Hon. Ralph Zarefsky, U.S.M.J.

**DEFENDANTS' NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

Complaint filed: May 14, 2010
Discovery Cutoff: None Set
Trial Date: None Set

Case 2:10-cv-0 8 ODW-RZ Document 9 Filed 11/02/11 Page 2 of 12 Page ID #:221 1

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff (State Bar No. 188547)
*mtoberoff@ipwla.com*
Keith G. Adams (State Bar No. 240497)
*kgadams@ipwla.com*
2049 Century Park East, Suite 3630
Los Angeles, California, 90067
Telephone: (310) 246-3333
Fax: (310) 246-3101

Attorneys for Defendants Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel

DEFENDANTS' NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
Exhibit VV
523

Case 2:10-cv-0 3 -ODW-RZ Document 9 Filed 11/02/11 Page of 12 Page ID #:221 2

Notice is hereby given that Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, Mark Warren Peary, as personal representative of the Estate of Joseph Shuster, Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel, the Defendants in the above named case, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Order Denying Defendants' Motion to Strike Pursuant to Anti-SLAPP Statute, entered in this action by the Honorable Otis D. Wright II in the United States District Court for the Central District of California, on October 25, 2011 at Docket No. 337, and attached hereto as **Exhibit A**.

This October 25, 2011 order denied Defendants' anti-SLAPP motion to strike pursuant to California's anti-SLAPP statute, Cal. Code of Civil Procedure § 421.16, and constitutes an immediately appealable collateral order under well-established Ninth Circuit authority. *See Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003); Cal. Code. Civ. Proc. § 421.16(f)-(g).

Dated: November 2, 2011

RESPECTFULLY SUBMITTED,

/s/ Richard Kendall

Richard Kendall

KENDALL BRILL & KLIEGER LLP
Attorneys for Defendants Marc Toberoff *et al.*

/s/ Marc Toberoff

Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

# EXHIBIT A

Exhibit VV
525

Case 2:10-cv-0 6 -ODW -RZ Document 9 Filed 11/02/11 Page 5 of 12 Page ID #:221 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

| Present: | The Honorable Otis D. Wright II, United States District Judge |
|---|---|

| Sheila English | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):** **Order Denying Defendants' Motion to Strike Pursuant to Anti-SLAPP Statute [145]**

Defendants move to strike the Fourth, Fifth and Sixth Claims from Plaintiffs' First Amended Complaint ("FAC") pursuant to California's Anti-SLAPP statute, Code Civ. P. § 425.16(e)(2). [145] Defendants argue these claims "concern conduct protected by the Anti-SLAPP law because they concern statements made in connection with litigation and filings in the U.S. Copyright Office." (Mot. at 13.) Plaintiffs disagree.

Having considered the papers filed in support of and in opposition to the instant motion, the Court deems this matter suitable for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. As discussed below, Defendants' motion is **DENIED**.

**DISCUSSION**

The anti-SLAPP statute establishes a procedure to expose and dismiss meritless and harassing claims that seek to chill the exercise of a person's Constitutional rights of petition or free speech in connection with a public issue. *Kearny v. Foley & Lardner, LLP*, 590 F.3d 638, 648 (9th Cir. 2009). Analysis of an anti-SLAPP motion to strike involves a two-step process. First, the defendant must show that the claim arises from an "act . . . in furtherance of the person's right of petition or free speech under the United States or California Constitution ..." *Id.* (quoting Cal. Code Civ. P. § 425.16(b)(1)).

"If the court determines that the defendant has met this burden, it must then determine

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

whether the plaintiff has demonstrated a probability of prevailing on the merits." *Id.* To establish a probability of prevailing, the plaintiff must show that "the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Id.* (footnote and citations omitted).

***Fourth Claim***: Interference With 1992 Shuster Agreement

Defendants argue "[b]ecause DC's Fourth Claim is clearly based upon filing with the U.S. Copyright Office [ ] of statutory termination notices, under clear Ninth Circuit precedent it is subject to the protections of the Anti-SLAPP law." (Mot at 14-15.) Plaintiffs counter that "DC's Fourth Claim would be viable if all it alleged was that defendants wrongfully induced the Shusters to sign the Pacific Pictures agreements." (Opp'n at 18) ("Even if the subsequent acts singled out in defendants' motion (filing notices, assisting in a probate case, or even encouraging litigiousness) might help evidence the overall scheme, they are not the root of DC's claims and do not trigger SLAPP.").

It is "the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies [citation], and when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." *Freeman v. Schack*, 154 Cal. App. 4th 719, 727 ( 2007) (quoting *Martinez v. Metabolife Internat., Inc.*, 113 Cal. App. 4th 181, 188 (2003)).

Here, Plaintiffs allege they had an agreement with the Shusters to settle the parties' rights with respect to the subject copyrights ("1992 Agreement"). (FAC ¶ 175.) Marc Toberoff ("Toberoff") then allegedly interfered with this agreement by reaching out to, and forming a joint venture between the Shusters and Pacific Pictures Corporation (helmed by Toberoff) to exploit the Shusters' copyrights. (Id. ¶ 177) ("Toberoff's ultimate purpose in approaching the Shuster Heirs was to induce them to repudiate the 1992 Agreement and grant him the rights they had already granted to DC Comics."). This is the gravamen of Plaintiffs' claim, a business tort.

Defendants attempt to invoke the Anti-SLAPP statute by bootstrapping protected

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

activity to this claim. (*See* Reply at 4) (mining the operative complaint for arguably protected activity). Defendants also take issue with Plaintiffs' statement that the Fourth Claim "would be viable if all it alleged was that defendants wrongfully induced the Shusters to sign the [Pacific Pictures Agreements]." ("This makes no sense, as all of DC's alleged damages stem from the Shuster estate's exercise of its statutory termination [of DC's] rights by filing a notice with the U.S. Copyright Office, triggering litigation with DC.").

Unlike Defendants, the Court finds logic in Plaintiffs' argument. By inducing the Shusters to sign the Pacific Pictures Agreements, which purport to assign Toberoff the same rights they already assured DC by the 1992 Agreement, Plaintiffs argue that Toberoff interfered with DC's rights under the 1992 Agreement. This makes sense, as the Pacific Pictures Agreements essentially gut the 1992 Agreement, purporting to assign to Toberoff those rights which were already assigned to DC Comics.

As for the protected activity advanced by Defendants, such activity is not *itself* the act of interference. The interference was Toberoff's inducement of the Shusters to repudiate the 1992 Agreement and otherwise encumber the subject copyrights, all in derogation of DC's own interests in those very copyrights. The protected activities advanced by Defendants, while relevant to be sure, are not the material facts underlying the alleged interference. *See, e.g.*, *Gerbosi v. Gaims, Weil, West & Epstein, LLP*, 193 Cal. App. 4th 435, 443 (2011) ("A cause of action 'arising from protected activity' means that the defendant's acts underpinning the plaintiff's cause of action involved an exercise of the right of petition or free speech. [Citation.] ... The defendant must establish that the plaintiff's cause of action is actually *based on* conduct in the exercise of those rights. [Citation.]") (emphasis in original). And, while such protected activity may *evidence* the alleged interference, it does not shield it. *See, e.g.*, *Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal. App. 4th 1388, 1399 (2002) ("This contention confuses State Farm's allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct.") (emphasis in original).

In short, the Court finds that Defendants have not met their initial burden of demonstrating that Plaintiffs' Fourth Claim arises from protected activity. Accordingly, Plaintiffs need not demonstrate a probability of prevailing on the merits of this claim.

***Fifth Claim***: Interference with Prospective Economic Advantage re: Siegel-DC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

Comics Agreement (Against Toberoff)

Plaintiffs Fifth Claim is for "Interference with Prospective Economic Advantage re: Siegel-DC Comics Agreement." (*See* FAC.) Specifically, Plaintiffs allege "Toberoff was well aware of the [settlement] agreement between [DC] and the Siegel Heirs…. when he approached the Siegel Heirs and their representatives in late 2001and 2002 to express interest in purchasing their Superman rights…." (FAC ¶¶ 184-85) ("Toberoff intentionally engaged in independently wrongful conduct to carry out his interference by … falsely misrepresenting to the Siegel Heirs that he had a billionaire investor ready to purchase their Superman rights if they repudiated their settlement agreement with [DC]; falsely representing to the Siegels that he would help them produce a competing Superman motion picture; and wrongly inducing the Siegels to repudiate their agreement and business relationship with [DC].").

Defendants argue "it is [ ] clear that Toberoff's communications with the Siegels occurred in connection with settlement negotiations and anticipated litigation." (Mot. at 17.) The Court does not share Defendants' clarity. Plaintiffs allege "[a]t the time Toberoff approached the Siegel Heir in 2001, DC Comics and the Siegel Heirs had finally reached an agreement resolving their claims to the Superman . . . rights." (Compl. ¶ 182.) Plaintiffs acknowledge that this Court previously found this agreement deficient, but contend new evidence (including, but not limited to the contested Toberoff Timeline) warrants further review. (Compl. at 57 n.6.)

As the Toberoff Timeline is currently the subject of a discovery dispute, and Plaintiffs sought but Defendants opposed staying this motion pending resolution of discovery, the Court is inclined to construe the uncertainty against the moving parties, Defendants. In any event, Plaintiffs have established a long-lasting economic relationship with the Siegels, and allege that Toberoff's nonprotected conduct interfered with this relationship. (Compl. ¶¶ 180-86.) Under the facts before the Court, Defendants have simply not met their burden of demonstrating that this claim arises from protected activity.

The Court finds particularly illustrative Judge Larson's prior observations of the negotiations between DC Comics and the Siegels, around the time of the alleged

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

interference, and without knowledge of the present claim:

> From the Court's reading of the parties' [October 19, 2001 and October 26, 2001] correspondence, it is clear that the parties went well beyond reaching a settlement in principle regarding their respective positions to the Superman property. Rather, . . . the parties' correspondence, and the actions taken in response thereto, illustrates that they found themselves in the all-too-familiar situation in which verbal settlement negotiations result in what the parties believe to be an agreement on all the major points of dispute, but which, upon further discussion, falls short of the agreement needed to resolve their dispute. The devil, as it often is, was in the details.

*Siegel v. Warner Bros. Entertainment Inc.*, 542 F.Supp.2d 1098, 1137 (C.D. Cal. 2008). The devil, Plaintiffs argue, was Toberoff's interference and, suffice it to say, Defendants have not established-through the haze of details-that Toberoff's alleged misconduct is protected.

***Sixth Claim***: Declaratory Relief re: Invalidity of Copyright Assignment and Consent Agreements

Here, Plaintiffs seek a declaration invalidating Toberoff's various agreements with the Siegels and Shusters. Defendants contend "DC's challenge to these alleged agreements under the unfair competition laws [ ] invokes the litigation-protection provisions of the Anti-SLAPP law." (Mot. at 20.) Like above, however, Defendants' attempt to harness these claims to protected activities falters.

Defendants contend the "agreements at issue [were] expressly entered into with respect to Toberoff's legal services regarding the Siegel Termination and Shuster Termination, respectively." (Mot. at 20) ("For instance, [ ] both the 2001 and 2003 [Pacific Pictures] Agreements specifically refer to employing Toberoff's legal services (Ex. C ¶ 7, Ex. D ¶ 2), and this was clearly understood by Toberoff's clients."). Not quite.

To begin, said agreements engage Pacific Pictures "as [the Shusters'] exclusive advisor for the purpose of retrieving, enforcing and exploiting . . . Joe Shuster's creations."

Case 2:10-cv-0 6 -ODW -RZ Document 9 Filed 11/02/11 Page 10 of 12 Page ID #:221 9

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

(Def. Exh. D ¶ 1.) And, "in furtherance of this exclusive agreement, [Pacific Pictures] (which is not a law firm) shall engage the services of attorney Mark Toberoff [the President of Pacific Pictures]...." (Id. ¶ 2.) Plainly, this was not an agreement for the provision of legal services, but one concerning the exploitation of Joe Shuster's creations. Merely referencing an intent to engage a particular attorney in the future does not transform this into an agreement for legal services.

As Plaintiffs offer, moreover, other agreements specifically disclaim any suggestion that they encompass legal services. (*See*, *e.g.*, Opp'n at 13) ("[T]his Agreement does not include legal services and/or expenses in connection with litigation or formal legal arbitration, if any. The provision of such services…, if requested and desired by [the Siegels], will be rendered and provided by Marc Toberoff, Esq., subject to good faith negotiation of a mutually acceptable agreement executed by Mr. Toberoff and [the Siegels].") (citation omitted).

Finally, the earliest agreement referenced by Defendants is a November 28, 2001 Joint Venture Agreement with the Shusters, a month or so *after* DC Comics and the Shusters had reached "a.settlement in principle," as noted by Judge Larson. (*See* Def. Exh. B.) Such a timeline-coupled with Plaintiffs' arguments and Defendants' inability to demonstrate that Toberoff's conduct was protected-counsels against striking these claims. More pointedly, it gives the Court great pause that a business relationship lasting over 60 years (between DC Comics and the Shusters) came undone at around the time of the alleged interference, after those parties had apparently reached a settlement in principle.[1]

Again, Defendants fail to establish that this claim is subject to the Anti-SLAPP statute, and Plaintiffs need not demonstrate a probability of prevailing on the merits.

**CONCLUSION**

---

[1] Defendants' attempt to cloak Toberoff's alleged interference with protected, litigation and settlement related conduct lacks the specificity required to meet their burden. Such failure affects the Court's disposition of every claim attacked by Defendants' motion.

Case 2:10-cv-0 6 -ODW -RZ Document 9 Filed 11/02/11 Page 11 of 12 Page ID #:22140

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3633 ODW (RZx) | Date | October 25, 2011 |
|---|---|---|---|
| Title | *DC Comics v. Pacific Pictures Corp., et al.* | | |

Because Defendants have not met their burden of showing that the claims arise from Toberoff's protected activity, Defendants' special motion to strike is **DENIED**.

**SO ORDERED**

---- : 00

Initials of Preparer SE

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am over the age of eighteen years and not a party to the within action; my business address is: 2049 Century Park East, Suite 3630, Los Angeles, California 90067. On November 2, 2011, I served the foregoing documents, described as **(1) Notice of Appeal and (2) Representation Statement**, on the interested parties in this action as follows:

DANIEL M. PETROCELLI (S.B. #097802)
dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

PATRICK T. PERKINS
pperkins@ptplaw.com
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Telephone: (845) 265-2820
Facsimile: (845) 265-2819

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I certify that the foregoing documents are being filed electronically by using the CM/ECF system. As such, the documents will be served electronically on all interested parties whose attorneys are registered CM/ECF users and have consented to electronic service.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 2, 2011, at Los Angeles, California.

Keith G. Adams