Appeal Nos. 11-55863, 11-56034

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LAURA SIEGEL LARSON,
*Plaintiff, Counterclaim-Defendant, Appellant, and Cross-Appellee,*

*v.*

WARNER BROS. ENTERTAINMENT INC. AND DC COMICS,
*Defendants, Counterclaimants, Appellees, and Cross-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NO. CV-04-8400 ODW (RZx)

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANTS AND APPELLEES WARNER BROS. ENTERTAINMENT INC. AND DC COMICS

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, cross-appellants and appellees Warner Bros. Entertainment Inc. and DC Comics, by and through their counsel of record, hereby disclose:

1. Warner Bros. Entertainment Inc. is a corporation that is an indirect, wholly-owned subsidiary of Time Warner Inc.

2. DC Comics is a New York general partnership comprised of Warner Communications Inc. and E.C. Publications, Inc., which are wholly-owned subsidiaries of Time Warner Inc., a Delaware corporation. Time Warner Inc. is a publicly-held corporation that indirectly owns more than 10% of DC Comics.

Dated: March 23, 2012        O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
      Daniel M. Petrocelli
      Attorneys for Warner Bros.
      Entertainment Inc. and DC Comics

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.................................................................1

INTRODUCTION ...........................................................................................1

STATEMENT OF ISSUES PRESENTED........................................................5

STATEMENT OF THE CASE..........................................................................6

STATEMENT OF FACTS .................................................................................9

    A.    Statutory Background ...............................................................9

    B.    Factual Background ................................................................10

            1.    Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s............................................................................10

            2.    Litigation Over Superman During The 1940s, 1960s, And 1970s ...........................................................14

            3.    Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement.............15

            4.    Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement........................................................................18

    C.    Proceedings Below....................................................................19

STANDARD OF REVIEW ...............................................................................22

SUMMARY OF ARGUMENT ..........................................................................23

ARGUMENT .....................................................................................................25

DC's Cross-Appeal On Its Second Through Fourth Counterclaims

I.    THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE ...................25

A.  Under California Law, A Contract Is Enforceable So
    Long As Parties Agree On Its Essential Terms, Even
    Absent Formalized Documentation .........................................25

B.  The October 19, 2001, Writing Constitutes An
    Enforceable Agreement As A Matter Of Law .........................28

C.  At A Minimum, DC Is Entitled To Factfinding As To
    Whether The Parties Intended To Be Bound By The
    Essential Terms Identified In The October 19, 2001,
    Letter .......................................................................................34

II.  THE DISTRICT COURT ERRED IN GRANTING
     SUMMARY JUDGMENT TO LARSON ON DC'S
     LIMITATIONS COUNTERCLAIM .................................................37

     Larson's Appeal Of Her First Claim And
     DC's Cross-Appeal On Both Parties' First Claims

I.   LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE
     HER CLAIM HAS NOT BEEN FULLY AND FINALLY
     ADJUDICATED ...............................................................................40

II.  THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-
     FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT
     FROM TERMINATION.....................................................................41

     A.  A Work Is Made-For-Hire Under The 1909 Copyright
         Act When It Is Created At The "Instance And Expense"
         Of The Commissioning Party .................................................42

     B.  The District Court Correctly Held That *Action Comics
         #2-3, #5-61, Superman #1 (Pages 1-2)-23*, And The Post-
         McClure Strips Were Works-For-Hire .....................................45

         1.  *Action Comics #2-3, #5-6* ..............................................48

         2.  *Action Comics #7-61* And *Superman #1-23* .................51

         3.  Post-McClure Newspaper Strips .....................................55

C.  The District Court Erred In Granting Summary Judgment
    Against DC On The Work-For-Hire Status Of *Action
    Comics #1* And *#4, Superman #1* (Pages 3-6), And Pre-
    McClure Strips ......................................................................... 61

    1.  *Action Comics #1* ........................................................... 61

        a.  Key Elements Of *Action Comics #1* Were Made-
            For-Hire ................................................................. 61

        b.  *National* Is Not Preclusive As To The Work-For-
            Hire Status Of *Action Comics #1* ........................ 68

    2.  Pre-McClure Strips .......................................................... 71

        a.  The Pre-McClure Strips Were Made At DC's
            Instance And Expense ............................................. 71

        b.  Larson's Failure To List The Pre-McClure Strips
            In Her Termination Notice Also Precludes
            Termination ............................................................. 72

    3.  Pages 3-6 Of *Superman #1* ............................................ 77

    4.  Artwork In *Action Comics #4* ........................................ 79

    5.  Promotional Announcements ........................................... 80

CONCLUSION ......................................................................................... 87

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM

**Exhibit WW**

# TABLE OF AUTHORITIES

## CASES

*Almond v. ABB Indus. Sys., Inc.,*
2001 WL 242548 (S.D. Ohio Mar. 6, 2001)........................................................78

*Ariz. State Carpenters Pension Trust Fund v. Miller,*
938 F.2d 1038 (9th Cir. 1991) ...........................................................................40

*Atla-Medine v. Crompton Corp.,*
2001 WL 1382592 (S.D.N.Y. Nov. 7, 2001).......................................................36

*Banner Entm't, Inc. v. Super. Ct.,*
62 Cal.App.4th 348 (1998) ........................................................................... 29, 35

*Beck v. Am. Health Grp. Int'l, Inc.,*
211 Cal.App.3d 1555 (1989).................................................................................29

*Boisson v. Banian, Ltd.,*
273 F.3d 262 (2d Cir. 2001)..................................................................................62

*Burroughs v. M-G-M, Inc.,*
683 F.2d 610 (2d Cir. 1982)..................................................................... 74, 75, 76

*Bustamante v. Intuit, Inc.,*
141 Cal.App.4th 199 (2006) .......................................................................... 29, 35

*Callie v. Near,*
829 F.2d 888 (9th Cir. 1987).................................................................................35

*CCNV v. Reid,*
490 U.S. 730 (1989)..............................................................................................43

*Chaffin v. U.S.,*
176 F.3d 1208 (9th Cir. 1999) ..............................................................................44

*Clackamas Gastroenterology Assocs., P.C. v. Wells,*
538 U.S. 440 (2003)..............................................................................................43

*Clarke v. Fiedler,*
44 Cal.App.2d 838 (1941)............................................................................... 26, 27

*Comm'r v. Sunnen,*
  333 U.S. 591 (1948)...........................................................................................68

*Cool Fuel, Inc. v. Connett,*
  685 F.2d 309 (9th Cir. 1982).............................................................................82

*Cuellar de Osorio v. Mayorkas,*
  656 F.3d 954 (9th Cir. 2011)..............................................................................22

*Dolman v. Agee,*
  157 F.3d 708 (9th Cir. 1998)..................................................................... 42, 43, 44

*Easter Seal Soc'y v. Playboy Enters.,*
  815 F.2d 323 (5th Cir. 1987)..............................................................................42

*Eden Toys, Inc. v. Florelee Undergarment Co.,*
  697 F.2d 27 (2d Cir. 1982)............................................................................ 63, 64

*Elite Show Servs., Inc. v. Staffpro, Inc.,*
  119 Cal.App.4th 263 (2004) ...............................................................................26

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,*
  122 F.3d 1211 (9th Cir. 1997) ............................................................................63

*EPIC, Inc. v. Pac. Lumber Co.,*
  257 F.3d 1071 (9th Cir. 2001) ............................................................................71

*Ersa Grae Corp. v. Fluor Corp.,*
  1 Cal.App.4th 613 (1991) ...................................................................................26

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
  2002 WL 398696 (S.D.N.Y. Mar. 15, 2002).......................................................53

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
  342 F.3d 149 (2d Cir. 2003)...................................................................... 42, 47, 59

*Estate of Thottam,*
  165 Cal.App.4th 1331 (2008) .............................................................................26

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991)................................................................................... 63, 80

*Fireman's Fund Ins. Co. v. Int'l Mkt. Place,*
773 F.2d 1068 (9th Cir. 1985) ..............................................................71

*Gaiman v. McFarlane,*
360 F.3d 644 (7th Cir. 2004)................................................................80

*Gausvik v. Perez,*
392 F.3d 1006 (9th Cir. 2004) ................................................ 22, 51, 81

*Granite Rock Co. v. Teamsters,*
649 F.3d 1067 (9th Cir. 2011) ....................................................... 68, 70

*Harper & Row, Publishers v. Nation Enters.,*
471 U.S. 539 (1985)..............................................................................51

*Harris v. Rudin, Richman & Appel,*
74 Cal.App.4th 299 (1999) ....................................................... 26, 27, 29

*In re Smith,*
964 F.2d 636 (7th Cir. 1992)................................................................58

*Inamed Corp. v. Kuzmak,*
275 F.Supp.2d 1100 (C.D. Cal. 2002) ..................................................34

*Jachetta v. U.S.,*
653 F.3d 898 (9th Cir. 2011)................................................................51

*Jada Toys, Inc. v. Mattel, Inc.,*
518 F.3d 628 (9th Cir. 2008)................................................................62

*Jim Henson Prods. v. John T. Brady & Assocs.,*
16 F.Supp.2d 259 (S.D.N.Y. 1997)......................................................60

*Lamle v. Mattel, Inc.,*
394 F.3d 1355 (Fed. Cir. 2005).............................................................29

*Levin v. Knight,*
780 F.2d 786 (9th Cir. 1986).................................................................29

*Lin-Brook Builders Hardware v. Gertler,*
352 F.2d 298 (9th Cir. 1965)...................................................... 42, 43, 59

*Lozano v. Ashcroft,*
258 F.3d 1160 (10th Cir. 2001) ................................................................83

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch.
of Contemporary Dance, Inc.,*
380 F.3d 624 (2d Cir. 2004)......................................................................55

*Marvel Characters, Inc. v. Simon,*
310 F.3d 280 (2d Cir. 2002)............................................................... 45, 70

*Marvel Worldwide, Inc. v. Kirby,*
777 F.Supp.2d 720 (S.D.N.Y. 2011)................................................ 44, 49, 53, 78

*Mattel, Inc. v. MGA Entm't, Inc.,*
2011 WL 3420603 (C.D. Cal. Aug. 4, 2011)..........................................35

*Mattel, Inc. v. MGA Entm't, Inc.,*
616 F.3d 904 (9th Cir. 2010)............................................................ 24, 35, 39

*May v. Morganelli-Heumann & Assocs.,*
618 F.2d 1363 (9th Cir. 1980) .......................................................... 42, 43, 45

*Medina v. Ramsey Steel Co.,*
238 F.3d 674 (5th Cir. 2001)....................................................................36

*Meyer v. Holley,*
537 U.S. 280 (2003) ..................................................................................44

*Murray v. Gelderman,*
566 F.2d 1307 (5th Cir. 1978) ........................................................... 43, 49

*Music Sales Corp. v. Morris,*
73 F.Supp.2d 364 (S.D.N.Y. 1999)..........................................................75

*Narayan v. EGL, Inc.,*
616 F.3d 895 (9th Cir. 2010).....................................................................23

*Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.,*
191 F.2d 594 (2d Cir. 1951).............................................................. 58, 69

*New Hampshire v. Maine,*
532 U.S. 742 (2001)...................................................................................39

*Nike, Inc. v. Just Did It Enters.,*
6 F.3d 1225 (7th Cir. 1993)..............................................................................36

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,*
558 F.2d 1090 (2d Cir. 1977)............................................................................62

*Pantone, Inc. v. A. I. Friedman, Inc.,*
294 F.Supp. 545 (S.D.N.Y. 1968).....................................................................62

*Partmar Corp. v. Paramount Pictures Theatres Corp.,*
347 U.S. 89 (1954)............................................................................................51

*Patel v. Liebermensch,*
45 Cal.4th 344 (2008) .......................................................................................27

*Picture Music, Inc. v. Bourne, Inc.,*
457 F.2d 1213 (2d Cir. 1972)....................................................................*passim*

*Playboy Enters., Inc. v. Dumas,*
53 F.3d 549 (2d Cir. 1995)................................................................... 43, 49, 53

*Recycling Solutions Tech., LLC v. Rosenberg,*
2011 WL 1696826 (E.D. Ky. May 4, 2011) ......................................................36

*Rennick v. O.P.T.I.O.N. Care, Inc.,*
77 F.3d 309 (9th Cir. 1996)..............................................................................29

*S. Cal. Painters v. Best Interiors, Inc.,*
359 F.3d 1127 (9th Cir. 2004) ..........................................................................35

*Samuels v. Holland Am. Line-USA Inc.,*
656 F.3d 948 (9th Cir. 2011)............................................................................22

*Sargent v. Am. Greetings Corp.,*
588 F.Supp. 912 (N.D. Ohio 1984)...................................................................62

*Scherr v. Universal Match Corp.,*
297 F.Supp. 107 (S.D.N.Y. 1967).....................................................................44

*Scherr v. Universal Match Corp.,*
417 F.2d 497 (2d Cir. 1969)..............................................................................79

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ............................................................. 40

*Seiler v. Lucasfilm, Ltd.*,
808 F.2d 1316 (9th Cir. 1986) ............................................................. 82

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
206 F.3d 1322 (9th Cir. 2000) .................................................. 42, 43, 44

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*,
161 F.2d 406 (2d Cir. 1946).................................................................. 80

*Shaw v. Hahn*,
56 F.3d 1128 (9th Cir. 1995)................................................................. 70

*Siegel v. Nat'l Periodical Publ'ns*,
364 F.Supp. 1032 (S.D.N.Y. 1973)............................................. 15, 68, 69

*Siegel v. Nat'l Periodical Publ'ns*,
508 F.2d 909 (2d Cir. 1974).................................................... 11, 15, 68

*St. Paul Water Co. v. Ware*,
83 U.S. 566 (1872)................................................................................ 44

*Tex Print Indus., Inc. v. Zayre Corp.*,
1977 WL 22752 (D. Mass. Feb. 10, 1977) ........................................... 83

*The Facebook, Inc. v. Pac. Nw. Software, Inc.*,
640 F.3d 1034 (9th Cir. 2011) ....................................................... passim

*Thomas v. Ponder*,
611 F.3d 1144 (9th Cir. 2010) ............................................................. 23

*Toledano v. O'Connor*,
501 F.Supp.2d 127 (D.D.C. 2007)........................................................ 29

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869
(9th Cir. 2005)............................................................................... passim

*U.S. v. Alexander*,
326 F.2d 736 (4th Cir. 1964)................................................................ 83

ix
Exhibit WW

*U.S. v. Diaz-Lopez,*
  625 F.3d 1198 (9th Cir. 2010) .............................................................82

*U.S. v. Resnick,*
  594 F.3d 562 (7th Cir. 2010).............................................................78

*Vass v. Compaq Computer Corp.,*
  953 F.Supp. 114 (D. Md. 1997) .........................................................36

*Wallace v. City of San Diego,*
  479 F.3d 616 (9th Cir. 2007)..............................................................23

*Warren v. Fox Family Worldwide, Inc.,*
  328 F.3d 1136 (9th Cir. 2003) ...........................................................49

*Webster Indus., Inc. v. Northwood Doors, Inc.,*
  320 F.Supp.2d 821 (N.D. Iowa 2004)..................................................36

*Weddington Prods., Inc. v. Flick,*
  60 Cal.App.4th 793 (1998) ................................................................31

## STATUTES

17 U.S.C. §4 (1909) (repealed 1976)........................................................9

17 U.S.C. §7 (1909) (repealed 1976)......................................................47

17 U.S.C. §24 (1909) (repealed 1976)................................................ *passim*

17 U.S.C. §26 (1909) (repealed 1976)................................................ 9, 41

17 U.S.C. §203 ........................................................................... 10, 41

17 U.S.C. §203 ..................................................................................74

17 U.S.C. §304 ............................................................................ *passim*

17 U.S.C. §507 ..................................................................................37

17 U.S.C. §702 ..................................................................................73

28 U.S.C. §1291 ..................................................................................1

28 U.S.C. §1331 ..................................................................................1

28 U.S.C. §1338 ..................................................................................................... 1

28 U.S.C. §1367 ..................................................................................................... 1

CAL. CIV. CODE §1550 ........................................................................................... 25

**RULES**

FED. R. CIV. P. 54(b) ..................................................................................... *passim*

FED. R. CIV. P. 56(a) ........................................................................................... 22

FED. R. EVID. 1002 ............................................................................................... 82

FED. R. EVID. 801(d)(2)(A) ................................................................................. 78

**REGULATION**

37 C.F.R. §201.10 ......................................................................................... *passim*

**OTHER AUTHORITIES**

42 F.R. 45916-21 ........................................................................................... 74, 77

52 F.R. 23443-46 (1987) ....................................................................................... 62

76 F.R. 32320 (June 6, 2011) ............................................................................... 75

1 WILLIAM F. PATRY, PATRY ON COPYRIGHT (1st ed. 2007) ................................... 76

41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005) ........................... 44

6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3] (2011) ......................................... 82

Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301 (2003) ............................................................................. 34

Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry*, 1 VA. SPORTS & ENT. L.J. 101 (2001) ..................................................... 28

Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film Agreements*, L.A. LAW. 18 (Apr. 1999) ................................................................. 28

Jay M. Spillane,
*Lawsuits over "Handshake Deals" Are As Old As the*
*Entertainment Industry (and Can Be Easily Avoided)*, 11 ENT. &
SPORTS LAW. 15 (1993) ..........................................................................29

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
(2011) ................................................................................................ 62, 76

RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-429 (1965)................................44

SECOND SUPP. REG.'S REP. ON GEN. REV'N OF U.S. COPYRIGHT
LAW, 94TH CONG. 304 (1975)...........................................................................16

Exhibit WW
547

## STATEMENT OF JURISDICTION

This appeal arises from a partial judgment under FED. R. CIV. P. 54(b) on appellant Laura Siegel Larson's First Claim for Relief and cross-appellants Warner Bros. Entertainment Inc. and DC Comics' (together "DC's") First through Fourth Counterclaims. Larson's First Claim asserts that copyright termination notices she served make her joint owner of several early Superman works. DC's Counterclaims assert that the notices are invalid (First Counterclaim); Larson's lawsuit is time-barred (Second Counterclaim); and Larson's claims are barred by an October 2001 settlement agreement (Third and Fourth Counterclaims).

The district court had jurisdiction over these claims. 28 U.S.C. §§1331, 1338, 1367. This Court has jurisdiction over DC's Second, Third, and Fourth Counterclaims, because they were fully and finally adjudicated below. 28 U.S.C. §1291. This Court lacks jurisdiction over Larson's First Claim and DC's First Counterclaim, which were not fully and finally adjudicated. *Infra* at 40-41.

## INTRODUCTION

This case is about the ownership of copyright in the earliest comics that introduced elements of the iconic Superman character and story, including aspects of his appearance, powers, and background. As it comes before this Court—an appeal and cross-appeal addressing multiple rulings below—the case presents an

**Exhibit WW**

unusually broad array of doctrinal, factual, and procedural issues. But much of the case reduces to a familiar proposition: a deal is a deal.

The doctrinal issues focus on an intersection between the 1909 Copyright Act and the 1976 amendments to that Act. The 1976 Act extended existing copyrights under the 1909 Act—including copyrights that had been assigned— while giving the original authors and certain of their heirs the right to terminate previous assignments of their copyrights and to negotiate new assignments with existing rights holders or other parties.

By design, the 1976 Act struck a careful balance. On the one hand, it gave authors (and certain heirs) a fresh start on their original rights and new leverage to renegotiate old assignments. On the other hand, it gave rights owners who had acquired and then developed the assigned works—sometimes into exceedingly valuable commercial properties—continuing rights to exploit derivative works created under the assignments, as well as an exclusive, first opportunity to negotiate new deals to reclaim any terminated rights.

At first, the negotiation process contemplated by the 1976 Act worked here just as intended. The heirs to Superman's original story writer served notices of termination as to certain early Superman works. While DC contested the notices on various grounds—including that the works at issue were made-for-hire and hence not subject to termination—that dispute was shelved for four years while the

2

parties worked to negotiate a resolution that would both secure DC's rights, and ensure the family reaped financial benefits from DC's continued exploitation of Superman. The family, represented by a prominent entertainment law firm, ultimately struck a deal with DC—one that included every essential term for a re-grant of rights, provided for various other non-essential terms, and guaranteed the family many millions of dollars in cash, royalties, and other compensation.

But after agreeing to this deal in writing, the family was approached by a self-styled "intellectual property entrepreneur" who dangled the prospect of even more money. In short order the family reneged on its deal with DC, refused to complete discussions over a "long form" contract formalizing the agreement, and fired their lawyers. The family asserted there was no deal without a long form, and the district court agreed, casting aside established California contract law principles—principles essential to the entertainment industry, where many business deals are never formalized. The rule there is simple, however: a deal is a deal, long form or not.

That principle also lies at the core of the underlying copyright dispute here. Superman's creators conceived the Superman character, but no one would publish it. It was only DC, years later, that recognized Superman's commercial potential. DC employed the creators as artists, purchased the entirety of their rights in Superman, and promoted and published the first Superman story. DC developed

Superman not just commercially, but creatively as well, employing many artists—including but not limited to the original creators—to develop many of the now-widely-recognized elements of the Superman mythos.

For their valuable contributions to DC's efforts, DC paid the original creators millions of dollars in today's terms, pursuant to agreements that could not have been clearer: DC paid them to create new Superman material for DC, the exclusive owner of all rights in the character and story. Over the years, the creators tried to undo their original Superman agreements, but the courts repeatedly rejected their efforts. And now it is Larson who contends that her father's 1930s deals with DC, like her own 2001 deal, were not deals at all—she says her father was not creating Superman for DC, as his agreements plainly said, but for himself, and that she should now own rights that her father never did.

The 1976 Act does not sanction her claims. It was intended to allow authors and heirs to "recapture" copyrights they initially owned and then assigned—not copyrights they never owned in the first place.

This long-running dispute should be brought to an end. Enforcing Larson's deal will afford her tens of millions of dollars for which she bargained in 2001, while protecting the deal her own father struck in the 1930s, when DC employed him to create new Superman material on DC's behalf.

**Exhibit WW**
551

## STATEMENT OF ISSUES PRESENTED

### *DC's Cross-Appeal On Its Second Through Fourth Counterclaims*

1. a. Whether DC is entitled to entry of judgment on all claims on the basis of an October 2001 settlement agreement, confirmed by a letter from Larson that explicitly "accepted D.C. Comics' offer" and described in detail all essential "terms" of the parties' "monumental accord."

b. Whether DC is at least entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in Larson's October 2001 letter.

2. Whether Larson's claims are barred by the Copyright Act's three-year limitations period.

### *Larson's Appeal On Her First Claim And*
### *DC's Cross-Appeal On Both Parties' First Claims*

1. Whether this Court lacks jurisdiction over the appeal of the parties' respective First Claims because the district court did not fully and finally adjudicate the scope of rights to early Superman works at issue in those claims.

2. Assuming the Court has jurisdiction to hear these claims:

a. Whether the district court properly ruled that Superman works created by Larson's father Jerome Siegel and his collaborator Joseph Shuster at DC's instance and expense—after Siegel and Shuster assigned all of their Superman rights to DC and entered into various employment agreements with DC—were works-for-hire.

b. Whether the district court erred in ruling that Larson was entitled to recapture a handful of early Superman works that were made at DC's instance and expense and/or were not listed in Larson's copyright termination notices.

c. Whether the district court erred in ruling *sua sponte* on the copyrightable elements in certain promotional announcements owned by DC, without giving DC notice or an opportunity to be heard on the issue, and without examining the actual announcements or a legible copy of them.

## STATEMENT OF THE CASE

Superman was co-created by Siegel and Shuster in the 1930s, and introduced to the world by DC in *Action Comics #1*, published in 1938. ER-1019; SER-9-10. This copyright dispute arises more than a half-century later because of a 1976 amendment to the Copyright Act, which allows "authors"—within the meaning of that term under the 1909 version of the Act—of copyrighted works (and certain of their heirs) to terminate earlier assignments of their copyrights and reclaim those copyrights for themselves. Nobody denies that Siegel and Shuster were the authors of certain foundational elements of Superman, but neither does anyone deny that most other elements appeared for the first time in derivative works—comic books, newspaper strips, and other media—created *after* Siegel and Shuster assigned to DC all rights to Superman, and were hired by DC along with many other artists to create new Superman works. The dispute here centers on whether certain of the

earliest derivative works were "made for hire" on DC's behalf, making DC the "author" of the works under the 1909 Act and precluding termination by Siegel's heirs.

During their lifetimes, neither Siegel nor Shuster—despite a long history of litigation against DC—sought to exercise any termination rights in Superman. Within a year of Siegel's death in 1996, however, his widow Joanne (now deceased) and daughter Larson served termination notices seeking to recapture a broad range of Superman works. ER-1024-92. DC disputed most aspects of the termination notices, but sought to resolve the controversy through negotiation with Larson and her lawyer Kevin Marks. ER-16; SER-393, 100-01. The parties reached a settlement agreement on October 19, 2001, in which DC agreed to pay Larson $3 million in up-front cash, annual guarantees worth $5 million, and tens of millions more in future profit sharing, in exchange for which DC would receive all of the putative Superman rights Larson claimed to own. SER-132, 147-48, 434-35, 456-61. A little more than six months later, however, Larson repudiated the agreement, fired Marks, and began working with Marc Toberoff (a Hollywood producer/lawyer) and Ari Emanuel (an agent) to sell her putative Superman rights. SER-133-34, 182-83, 404, 417-20, 422-25, 819-20, 835-37. No buyer emerged; and in 2004, Larson (now using Toberoff as her lawyer) filed this lawsuit, seeking a declaration that her termination notices were valid and entitled her to an

**Exhibit WW**
554

accounting of Superman-related profits. ER-325. DC counterclaimed asserting, *inter alia*, that the notices were invalid and Larson's claims were barred by the parties' October 2001 agreement and the statute-of-limitations. ER-273-310.

In 2008, the district court granted partial summary judgment against DC on its Second through Fourth Counterclaims, holding Larson's claims were neither time-barred nor precluded by the October 2001 agreement. SER-61-62, 66.

The court also issued a series of partial rulings on Larson's First Claim and DC's First Counterclaim. The court ruled the vast majority of works listed in Larson's termination notices were works-for-hire as a matter of law and thus could not be terminated. ER-43-140. But it held that certain other works were *not* made-for-hire and thus could be terminated. ER-81, 114, 189. The court did not, however, resolve the scope of the rights at issue. *Infra* at 20-21.

Larson now appeals some (not all) of the adverse rulings on her First Claim, asserting that the court erred in finding that the following works were made-for-hire: *Action Comics #2-3, #5-61*; pages 1-2 of *Superman #1, Superman #2-23*; and newspaper strips created after the parties entered into a syndication agreement with McClure in 1938. ER-81, 114, 189.

DC cross-appeals the rejection of its threshold limitations and settlement counterclaims. DC also contends that Larson's appeal on her First Claim is unripe because the court did not declare the scope of rights at issue in that claim and thus

did not fully adjudicate it (or DC's First Counterclaim). But assuming this Court

has jurisdiction to address the parties' First Claims, DC cross-appeals, asserting

that while the court's work-for-hire rulings were correct as to the works contested

by Larson, the court erred in rejecting work-for-hire as to the following works (or

certain key elements therein): *Action Comics #1* and *#4*; pages 3-6 of *Superman*

*#1*, and two weeks of newspaper strips created before the McClure agreement. DC

also cross-appeals the court's ruling that pre-*Action Comics #1* promotional

announcements, while owned by DC, do not fully depict certain key Superman

elements.

## STATEMENT OF FACTS

### A. Statutory Background

The 1909 Copyright Act governs the copyright in all works—including

those at issue here—published before January 1, 1978, the effective date of the

1976 Copyright Act. Under the 1909 Act, copyright could be secured for "all the

writings of an author." 17 U.S.C. §4 (1909) (repealed 1976). Under the 1909 Act,

an "author" was entitled to a copyright for an initial 28-year period and an

additional 28-year "renewal" period. *Id.* §24.

The 1909 Act defined the statutory term "author" to "include an employer in

the case of works made for hire." 17 U.S.C. §26 (1909). It also provided that "in

the case of … any work copyrighted by … an employer for whom such work is

Exhibit WW
556

made for hire," the author/employer was entitled to renewal rights. *Id.* §24. These two sections thus made clear that an "employer" in the case of a "work for hire" was a statutory "author" with full rights in both the original copyright and the renewal term. For this reason, the 1976 Act's provisions addressing "termination" of the extended renewal term—the provisions at issue here—have no application to works that were made-for-hire under the 1909 Act, 17 U.S.C. §§203(a), 304(c)-(d), as Larson concedes, LB-21.

A person or entity who commissions a work is the statutory "author" of that work under the work-for-hire provision of the 1909 Act whenever the work was created at the "instance and expense" of the commissioning party, unless the parties expressly agreed that "the employee or independent contractor retained the copyright in his work." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 881 (9th Cir. 2005); *see infra* at 42-43.

**B. Factual Background**

1. *Siegel And Shuster's Work-For-Hire Arrangements With DC During The 1930s And 1940s*

Siegel, a young writer in Cleveland, and his high-school friend Shuster, an illustrator, worked together to conceive many fictional characters—including a crime-fighting hero named "Superman." SER-6-7. Between 1933 and 1937, Siegel and Shuster submitted draft Superman comic strips to several publishers, without success. ER-584; SER-12, 678.

In 1937, DC[1] hired Siegel and Shuster to do comic-book work. On December 4, 1937, Siegel and Shuster entered into an employment agreement providing that DC would "employ [Siegel and Shuster] as Artists for a period of two years," pay them $10 per page of material, and, in return, Siegel and Shuster would "give their exclusive services" in producing certain comic features and submit all material for any new features to DC. ER-602-03. This "1937 Employment Agreement" also provided that if Siegel or Shuster left DC's employ, they were prohibited from using or copying "any of the products or work or creations or characters or plots used, made or created by [them] while in the employ of [DC]." ER-602.

Siegel and Shuster submitted various comic strips to DC under this agreement, including their existing black-and-white Superman drafts. SER-12-13, 678. DC chose to include the Superman story in its new *Action Comics* comic book, to be published April 18, 1938, with a June 1938 cover date. DC editor Vin Sullivan directed Siegel and Shuster to "revise[] and expand[]" the unfinished Superman drafts into a "full-length 13-panel production suitable for magazine publication." ER-957; *see Siegel v. Nat'l Periodical Publ'ns*, 508 F.2d 909, 911 (2d Cir. 1974). At Sullivan's direction, Siegel and Shuster revised the material and

---

[1] "DC" refers to DC Comics as well as its predecessors and successors (including Detective Comics and National Comics Publications).

added "several additional pictures to illustrate the story continuity"—including a new picture showing Superman with a distinct "S" on his chest, which DC's own artists colored red. ER-654; SER-385-86. DC's artists colorized the strips, choosing and adding the iconic blue-and-red color scheme to Siegel's and Shuster's black-and-white drafts. SER-441-43. DC's artists also created a cover for *Action Comics #1* based on a panel that featured Superman in his DC-colorized costume—red cape and boots, blue leotard, and heraldic red "S" crest—and exhibiting super-strength by lifting a car. SER-14, 234-35, 728.

DC artists also created "Promotional Announcements"—a black-and-white version of its artists' cover art—to promote *Action Comics #1*. SER-15, 678, 730. These Promotional Announcements were published beginning on April 5, 1938, before *Action Comics #1* was published on April 18, 1938. ER-1019; SER-572, 579-580. DC has filed a motion to lodge an original version of one comic book containing a Promotional Announcement (*Detective Comics #15*, published on April 10, 1938) with the Court for its review. *See also* SER-729-96.

On March 1, 1938, before the publication of *Action Comics #1*, Siegel and Shuster assigned to DC in writing all of their rights in Superman and agreed "not to employ said characters or said story ... without obtaining [DC's] written consent" ("1938 Assignment"). ER-917. Superman was a success, and after *Action Comics #1* was published, Siegel and Shuster continued to supply DC with draft Superman

12
**Exhibit WW**
559

material, for which they were paid $10 per page. ER-83, 960.

The parties memorialized their arrangement in a September 22, 1938, agreement ("1938 Employment Agreement"), which provided that Siegel and Shuster "have been doing the art work and continuity for [Superman and other comics] for us. We wish you to continue to do said work and hereby employ and retain you for said purposes." ER-605. DC maintained the "right to reasonably supervise the editorial matter of all features," and agreed to continue paying Siegel and Shuster $10 per page. ER-606-07. The agreement also gave DC the right to terminate Siegel and Shuster and retain other artists to produce new Superman works. ER-606. The same day, DC entered into an agreement with the McClure Syndicate ("Syndication Agreement") giving McClure permission to publish Superman strips in newspapers in exchange for royalties. ER-609-11.

DC exercised "constant editorial supervision" over Siegel and Shuster's creation of new material, requiring them to send all drafts to DC's editors for review, giving detailed instructions on story elements and illustrations, and even suggesting that the pair move "to New York where we can be at a moment's touch with everything that you do." SER-219-49, 264-66. This relationship continued throughout most of the 1940s, during which time Superman's popularity grew and expanded into other media. ER-858-86. Broad newspaper syndication, successful merchandising, and effective exploitation of Superman in movie serials, animated

cartoons, and merchandising resulted in royalty payments, bonuses, and other

compensation for Siegel and Shuster amounting to $5.4 million (in today's terms)

from 1938 to 1946 alone. ER-466, 585-86, 945.

2.   *Litigation Over Superman During The 1940s, 1960s, And 1970s*

DC's relationship with Siegel and Shuster became contentious. Other artists

and editors brought Superman to new media, including radio and film, and created

many of the now-familiar story-lines and catch phrases—*e.g.*, "Up, up, and away,"

or "It's a bird, it's a plane, it's Superman." SER-680-81. Siegel also left to serve

in World War II; and while gone, DC, working with Shuster, published

"Superboy" stories that Siegel argued DC had no permission to publish. SER-590-

95, 603-07, 680.

In 1947, Siegel and Shuster filed an action against DC in New York state

court seeking to invalidate the 1938 Assignment ("Westchester Action"). SER-20,

597. The Westchester court issued an interlocutory ruling concluding, *inter alia*,

that the 1938 Assignment granted "all" Superman rights to DC, but that publishing

the Superboy stories was improper. ER-939-93. In May 1948, DC, Shuster, and

Siegel entered into a stipulation and consent judgment under which Siegel and

Shuster acknowledged that the 1938 Assignment transferred to DC all rights in

Superman, including "the title, names, characters, concept and formula" as set

forth in *Action Comics #1*. ER-995-1017.

By the late 1950s, Siegel, Shuster, and DC had reconciled their differences. Siegel again wrote Superman stories for DC, and Shuster received a stipend. SER-294-96. But in 1965, Siegel and Shuster challenged DC's copyright renewal rights in Superman, and in 1969 they filed a lawsuit seeking a declaration that they owned the Superman renewal copyrights. The court held that Siegel and Shuster assigned to DC *all* rights in Superman, including renewal rights. *Siegel v. Nat'l Periodical Publ'ns*, 364 F.Supp. 1032 (S.D.N.Y. 1973), *aff'd*, 508 F.2d at 913-14.

After this loss, Siegel and Shuster approached DC for financial help. In 1975, DC agreed to provide them a lump sum of $17,500 each, annual payments of $20,000 each, lifetime medical benefits, and benefits and payments to their heirs. SER-641-75. In return, Siegel and Shuster acknowledged DC was the exclusive owner of "all right, title and interest" in Superman. SER-641. DC increased its annual payments to more than $125,000 annually, paid special bonuses, and provided other benefits to Siegel, Shuster, and their families. *See* SER-390, 427-31, 448, 641-75, 680.

3.    *Larson's Termination Notices Under The 1976 Act And The Parties' 2001 Settlement Agreement*

Congress amended the Copyright Act in 1976 to extend the copyright term and give authors and certain heirs limited rights to terminate prior copyright grants for works subject to the extension term. The Act struck a careful "compromise" between the interests of authors and grantees, the latter of whom often invested

decades of effort to develop copyrighted works into successful properties. SECOND
SUPP. REG. REP. ON GEN. REV'N OF U.S. COPYRIGHT LAW, 94TH CONG. 304 (1975).

In 1997, after Siegel's death, his widow and daughter served notices
purporting to terminate, as of 1999, various of Siegel's Superman copyright grants
to DC ("Notices"). ER-1018-83. DC disputed the Notices' validity; but rather
than litigate, the parties spent the next four years trying to reach a business deal.
Larson was represented by Kevin Marks of the leading entertainment law firm
Gang Tyre, which represents the likes of Clint Eastwood and Steven Spielberg.
SER-98-99, 433-34. DC's lead negotiator was then-General Counsel of Warner
Bros., John Schulman. SER-433-34.

Negotiations progressed, and when expectations grew that a deal would be
reached, DC paid Larson a non-refundable advance of $250,000. SER-416. On
October 16, 2001, DC made a settlement offer to Larson. SER-105, 434. On
October 19, Marks called Schulman to accept the offer and report "we are closed."
SER-107-08. Later that day, he sent Schulman a letter (1) confirming that Larson
had "accepted D.C. Comics' offer"; (2) documenting the deal's material terms in
six, single-spaced pages; and (3) thanking Schulman for his "help and patience in
reaching this monumental accord." SER-25, 61-62, 456-61, 111-12.

Under the parties' October 19 agreement, Larson was to assign to DC all of
her rights "in the 'Superman' and 'Spectre' properties (including 'Superboy')," in

16
**Exhibit WW**
563

exchange for, *inter alia*, \$3 million, an annual guarantee of \$500,000 per year for 10 years, and 6% of gross revenues from all media and merchandising revenues (*e.g.*, television, movies, and toys). SER-456-61. Almost all the money would be Larson's alone—Gang Tyre's fee was 5%. SER-798-99.

On October 26, 2001, Schulman wrote back, confirmed the parties' agreement, set forth "a more fulsome outline of what we believe the deal we've agreed to is," and indicated DC would begin drafting a long-form document so "we will have this super-matter transaction in document form." SER-118-19, 397-98, 463-70. Neither Marks nor Larson objected to Schulman's letter. ER-435. DC began performing its obligations under the October 19 agreement, including establishing a significant reserve for monies owed, which quickly grew to \$20 million. SER-397, 399.

DC's outside counsel worked on the separate long-form document for three months and sent Marks a draft on February 1, 2002. SER-125, 435, 472-528. Neither Marks nor Larson raised any objection until May 9, 2002, when Larson's mother sent DC a letter acknowledging that Larson had "accepted" DC's October 16, 2001, offer, but objecting to unspecified portions of the long-form document and concluding that "we have no deal[,] and this [long-form] contract makes an agreement impossible." SER-412-14. Marks told DC the long-form was "aggressive," but "not contrary to what had been agreed to," and the parties would

**Exhibit WW**
**564**

"deal with it." SER-126-27, 130, 436, 439. For the next two months, Marks reworked the draft, which he sent to Larson on July 15, 2002. SER-131-32.

4. *Larson Allies With A New Business Partner Who Induces Her To Repudiate The 2001 Settlement Agreement*

Starting in 2001, Toberoff, the self-described "rights-hunter," "movie producer," and "intellectual property entrepreneur," began pursuing Siegel's and Shuster's heirs. SER-115-16, 182-84, 404, 817-23, 835-36, 859-63. In November 2001, he induced the Shusters to become his business partners and to repudiate their existing contractual arrangements with DC. SER-183, 858-61.[2] Thereafter, the Shusters served a termination notice purporting to recapture certain Superman rights as of October 26, 2013. SER-844-56.

Toberoff targeted the Siegels as well. SER-115-16, 182-83. He wrote Larson's brother and called Marks seeking to secure the Siegels' Superman rights for himself. SER-814. Marks rebuffed Toberoff, telling him in February, July, and August 2002 that Larson had made a deal with DC. SER-115-16, 119-24, 182-83, 811. Toberoff insisted in August 2002 that Marks communicate to Larson that he and agent Emanuel had an unnamed "investor" willing to purchase her rights for $15 million cash and generous "back-end" compensation. SER-122-24, 811, 875-76. Marks conveyed this offer to Larson, but admonished her that she had a "deal"

[2] Toberoff's business misconduct is the subject of another lawsuit and two appellate matters before this Court. Appeal Nos. 11-56934, 11-71844 ("*Shuster*").

with DC, and if she repudiated it, Marks would have to "testify against [her] in court." SER-183, 811.

On September 21, 2002, Larson fired Marks, and sent a letter to DC stating she was "ending negotiations." SER-418-20. A month later, Larson signed an agreement with Toberoff's production company, IP Worldwide, to act as her agent to exploit her putative Superman rights. SER-184, 422-25. But the promised $15 million investor never materialized, and Toberoff never produced any other buyers. SER-122-23, 184-87, 811-13, 875-76. Instead, more than seven years of litigation ensued, and Toberoff—who became Larson's lawyer—stands to receive 40% of any recovery. SER-187, 839-44, 860-63.[3]

## C. Proceedings Below

Larson filed suit on October 8, 2004. Her First Claim sought a declaration that her termination notices were valid and effective as of 1999, entitling her to an accounting of Superman-related profits from 1999 forward. ER-338. DC's First Counterclaim sought a declaration that the Notices were invalid; its Second Counterclaim alleged Larson's claims were time-barred; and its Third and Fourth Counterclaims asserted that Larson's claims were barred by the parties' 2001 settlement agreement. ER-293-301.

---

[3] Toberoff's entertainment company also secured a 50% ownership interest in the Shusters' putative rights—later trading that 50% ownership interest for a 50% contingency fee. SER-186, 860-63.

In March 2008, the district court issued a partial summary judgment order. SER-5-90. It held that Larson recaptured certain unspecified rights in *Action Comics #1*, but did not recapture the Promotional Announcements containing the first appearance of Superman. SER-43-44. The order rejected DC's settlement counterclaims, holding that while the parties had formed "an agreement on all major points of dispute," the terms in Marks' October 19, 2001, letter "differ in substance from those set forth in [DC's] later letter of October 26, 2001 ... such that there was no unequivocal acceptance of an offer and, thus, no agreement." SER-63. The court rejected DC's limitations counterclaim as well, accepting Larson's representations that she did not terminate settlement negotiations until September 21, 2002, making her claims timely by four days. ER-198.

The parties submitted briefing to resolve remaining work-for-hire issues. In August 2009, the court ruled that the vast majority of works at issue—including *Action Comics #2-3, #5-61*; pages 1-2 of new material in *Superman #1* (which reprinted the stories in *Action Comics #1-4*, with some changes to the *Action Comics #1* story); *Superman #2-23*; and the newspaper strips created after the Syndication Agreement—were works-for-hire and thus exempt from termination. ER-43-140. But the court also ruled that *Action Comics #4, Superman #1* (pages 3-6), and two weeks of strips created before Syndication Agreement were *not* works-for-hire and thus were recaptured. ER-80-81, 140.

The district court expressly reserved ruling on key issues concerning the scope of rights Larson recaptured. It did not determine the extent to which Larson's recaptured rights were diminished by DC's rights in the Promotional Announcements. SER-298-305, 310-13, 321-24, 2-3. It left open whether its enumeration of the limited Superman elements in *Action Comics #1*—as compared to the universe of elements DC owns outright—was intended to be "dicta," as Larson had argued. SER-305-08, 313-19, 325-26, 2-3. And it deferred ruling on these and other open issues "until shortly before the time of" a later accounting trial. SER-198.

That accounting trial never occurred, and the open questions flagged by the court were never answered. In 2009, the judge presiding over the Superman cases resigned, and the cases were reassigned. The parties submitted a joint status report agreeing that the "promotional announcement" and "dicta" questions had to be answered before Larson's First Claim could be fully resolved. SER-146-70.

DC filed *Shuster*, and Larson and Toberoff responded by moving to stay that case, and seeking an interlocutory appeal here. SER-143-45. The district court denied Larson's Rule 54 and stay motions, listing seven open issues—including the "promotional announcement" and "dicta" issues—that "foreclosed a finding that [Larson's First Claim] … is final." SER-141. Larson amended her complaint to remove the request for an accounting of profits from the First Claim, but she did

not eliminate the request for a scope of rights declaration. Dkt. No. 5-1 at 12-14.

She moved again for entry of Rule 54(b) judgment, and on May 17, 2011, the court

entered partial final judgment on Larson's First Claim and DC's First through

Fourth Counterclaims. ER-235-41.

Larson appealed and DC cross-appealed. ER-228, 230.[4] DC moved to

dismiss Larson's appeal, and the Appellate Commissioner denied the motion

without prejudice to its reargument in merits briefing. Dkt. Nos. 5-1, 9.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's grant of summary

judgment." *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 959 (9th Cir. 2011).

Summary judgment is appropriate if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). "In considering a motion for summary judgment, [the court] must draw all

reasonable inferences in favor of the nonmoving party." *Samuels v. Holland Am.*

*Line-USA Inc.*, 656 F.3d 948, 952 (9th Cir. 2011). The "non-moving party's

evidence is to be believed, and all justifiable inferences are to be drawn in [its]

---

[4] Larson's brief does not challenge (and thus waives the right to challenge, *Gausvik v. Perez*, 392 F.3d 1006, 1008 n.1 (9th Cir. 2004)), several adverse rulings on her First Claim, including that she did not recapture the Promotional Announcements, that certain pre-1938 material created by Siegel was *not* copyrightable, and that she was not entitled to profits from foreign exploitation of Superman. ER-76-77, 180-81, 207.

favor," such that its "version of any disputed issue of fact is … presumed correct."
*Thomas v. Ponder*, 611 F.3d 1144, 1149 (9th Cir. 2010). The court must make
"[c]redibility determinations" and "weigh[] … the evidence" in favor of the non-
moving party, *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010), and "must
disregard all evidence favorable to the moving party that the jury is not required to
believe," *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

### DC's Cross Appeal On Its Second Through Fourth Counterclaims

DC's Second, Third, and Fourth Counterclaims allege that Larson's claims
below are barred by the parties' 2001 settlement agreement and the Copyright
Act's three-year limitations period. These threshold claims were fully adjudicated
by the district court's Rule 54(b) judgment and are ripe for appeal.

I. Marks' October 19, 2001, letter reflects a legally enforceable agreement
to resolve all claims at issue here, because it details all the essential terms of an
agreement: the scope of rights at issue, a significant cash payment, and generous
royalty terms, amounting to tens of millions of dollars for Larson. The letter
expressly stated that Larson "accepted" DC's offer and referred to the parties'
"monumental accord." Both parties' representatives testified that they understood
an agreement had been reached. Given the parties' agreement on the essential
terms detailed in the October 19, 2001, letter, it is irrelevant that the parties

subsequently failed to conclude a formalized deal document. *E.g., The Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1038 (9th Cir. 2011). At a minimum, DC is entitled to factfinding on the question whether the parties intended to be bound by the essential terms identified in the October 19 letter. *E.g., Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 910-13 (9th Cir. 2010).

II. DC was entitled to factfinding on its limitations counterclaim. Under the parties' tolling agreement, the limitations period restarted ten days after either party "terminat[ed]" negotiations in writing. Larson herself has taken conflicting positions as to when negotiations were terminated. Under the theory she asserted below—which the district court accepted on summary judgment—her claims were timely. But in *Shuster*, to avoid a tortious interference claim, she asserted a theory of termination that would make her claims here time-barred. Her conflicting positions confirm the existence of a factual dispute only a jury can resolve.

## Larson's And DC's Appeals On Their Respective First Claims

I. The district court entered Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, but the judgment did not fully and fairly adjudicate those claims, because the court never conclusively determined all "rights and obligations" in the Superman works at issue.

II. Assuming the judgment on the parties' First Claims is ripe for appeal, the judgment should be affirmed in part and reversed in part. The court held that the

vast majority of works at issue were created as works-for-hire, including *Action Comics #2-3, #5-61*, pages 1-2 of new material in *Superman #1*, *Superman #2-23*, and all strips created after the Syndication Agreement with McClure. Those rulings all involve Superman works created entirely after Siegel and Shuster assigned all Superman rights to DC and entered into employment agreements with DC to produce new Superman work under DC's direction. Those works are obviously and unambiguously works-for-hire. But the court also held that *Action Comics #1* and *#4, Superman #1* (pages 3-6), and the two weeks of Strips created before the Syndication Agreement were not works-for-hire and thus could be recaptured. Those rulings were incorrect. The district court also erred in ruling on rights contained within certain Promotional Announcements without examining the best visual evidence of their contents.

## ARGUMENT

### DC'S CROSS-APPEAL ON ITS
### SECOND THROUGH FOURTH COUNTERCLAIMS

**I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON THE THRESHOLD SETTLEMENT AGREEMENT ISSUE**

**A. Under California Law, A Contract Is Enforceable So Long As Parties Agree On Its Essential Terms, Even Absent Formalized Documentation**

Under California law, an enforceable agreement is formed where one party accepts another party's offer in exchange for consideration. CAL. CIV. CODE

§1550. And once a party accepts an offer, an enforceable agreement may arise even if subsequent documentation is contemplated, or additional terms and conditions are subsequently raised. *See Facebook*, 640 F.3d at 1037-38; *Estate of Thottam*, 165 Cal.App.4th 1331, 1340-41 (2008); *Elite Show Servs., Inc. v. Staffpro, Inc.*, 119 Cal.App.4th 263, 268-69 (2004); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 307 (1999); *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 624 & n.3 (1991).

The question is simply whether the agreed-upon terms are "sufficiently definite that a court can ascertain the parties' obligations thereunder and determine whether those obligations have been performed or breached." *Elite*, 119 Cal.App.4th at 268. So long as "the parties have agreed to its existing terms," and those terms are definite, the "fact that an agreement contemplates subsequent documentation does not invalidate the agreement." *Ersa*, 1 Cal.App.4th at 624 n.3; *see Facebook*, 640 F.3d at 1037-38; *Thottam*, 165 Cal.App.4th at 1340-41.

"Any other rule" would allow a party to repudiate a contract "whenever the understanding was that it should be reduced to another written form, by simply suggesting other and additional terms and conditions." *Clarke v. Fiedler*, 44 Cal.App.2d 838, 847 (1941). "If this were the rule, the contract would never be completed in cases where, by changes in the market, or other events … it became the interest of either party to adopt that course in order to escape or evade

obligations incurred in the ordinary course of commercial business." *Id.* Put simply, "few contracts would be enforceable if … subsequent disputes were taken as evidence that an agreement was never reached." *Patel v. Liebermensch*, 45 Cal.4th 344, 352 (2008). Accordingly, "[w]here the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one,'" the parties' "failure to follow it with a more formal writing does not negate the existence of the prior contract." *Harris*, 74 Cal.App.4th at 307.

*Facebook* illustrates this rule. After one day of settlement negotiations, the parties signed a handwritten, one-and-a-third page term sheet reflecting basic terms of a corporate acquisition, including cash and stock consideration and mutual releases. 640 F.3d at 1037. The settlement subsequently foundered during negotiation over documents that Facebook said were "required to finalize" the agreement, including a stock agreement and release form. *Id.*

This Court held that the parties had formed an enforceable agreement, because the existing writing showed that the parties "meant to bind themselves and each other, even though everyone understood that some material aspects of the deal would be papered later." *Id.* at 1038. An informal agreement is not enforceable, the Court explained, if it lacks "necessary term[s]," but it will be enforced "so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred" and fashion an appropriate remedy. *Id.* at 1037-38.

**Exhibit WW**

The test for enforceability, this Court remarked, is not "very demanding," and was "easily" passed by the term sheet: "The parties agreed that Facebook would swallow up ConnectU, the Winklevosses would get cash and a small piece of Facebook, and both sides would stop fighting and get on with their lives." *Id.*

Much the same is true here, as the following sections show.

## B. The October 19, 2001, Writing Constitutes An Enforceable Agreement As A Matter Of Law

The uncontradicted, documentary evidence establishes that Larson accepted DC's offer on October 19, 2001, in a written letter that identifies all the essential terms of the settlement.

1. The October 19 letter explicitly stated: "The Siegel Family … has accepted D.C. Comics' offer of October 16, 2001." SER-456. The letter congratulated DC on "this monumental accord." SER-461. And it detailed "[t]he terms" of the agreement in six, single-spaced, typewritten pages, *id.*—a much more thorough and detailed writing than the one-and-a-third page handwritten sheet enforced in *Facebook.* SER-456-61.

In the entertainment industry, it is standard for parties to recognize and perform contractual obligations in the absence of a formalized, long-form contract (or, sometimes, any written contract). *See* Gary M. McLaughlin, Note, *Oral Contracts in the Entertainment Industry,* 1 VA. SPORTS & ENT. L.J. 101, 117-20 (2001); Harrison J. Dossick, *Resolving Disputes over Oral and Unsigned Film*

*Agreements*, L.A. LAW. 18, 19 (Apr. 1999); Jay M. Spillane, *Lawsuits over*

*"Handshake Deals" Are As Old As the Entertainment Industry (and Can Be Easily*

*Avoided)*, 11 ENT. & SPORTS LAW. 15, 15 (1993). The question, as in *Facebook*, is

simply whether the essential terms of the agreement can be identified. Here the

October 19 letter specified every term "deemed essential as a matter of law" in a

copyright assignment, *i.e.*, "the subject matter, the price, and the party against

whom enforcement is sought." *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir. 1986);

*see Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361-62 (Fed. Cir. 2005); *Toledano v.*

*O'Connor*, 501 F.Supp.2d 127, 142 (D.D.C. 2007). The letter identified:

> • the full scope of rights assigned: "all of [their] rights in the 'Superman'
> and 'Spectre' properties (including 'Superboy'), resulting in 100%
> ownership to D.C. Comics"
>
> • the precise cash terms: an "advance of $2,000,000" and a "signing bonus
> of $1,000,000"
>
> • the specific royalty terms: "6% of Superman/Spectre Gross Revenues"
> from "all media" other than publications and "1% of the cover price of DC
> Comics' publications." SER-456-58.

Nowhere did the letter contain any suggestion that Larson's acceptance was

tentative or contingent on formal documentation.[5] The extrinsic record confirms

---

[5] Under California law, an initial writing is not enforceable if it *clearly*
demonstrates that the parties did *not* intend to be bound until other documents were
executed. *See Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 208-11 (2006);
*Harris*, 74 Cal.App.4th at 307; *Banner Entm't, Inc. v. Super. Ct.*, 62 Cal.App.4th
348, 358 (1998); *Beck v. Am. Health Grp. Int'l, Inc.*, 211 Cal.App.3d 1555, 1562-
63 (1989); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 316 (9th Cir. 1996).

the opposite. Marks testified he worked through "the last open point" of the agreement with Schulman on October 16, which "closed the deal," and he "believed that an accord had been reached on the terms exactly set forth in this letter." SER-105-06, 111-12. Schulman testified the October 19 letter "accurately set forth all material terms of our agreement." SER-435. DC manifested its understanding that an agreement was reached by beginning performance, setting aside a reserve account for the Siegels and including in its license agreement with Warner Bros. a requirement that the Siegel family be given screen credit in an upcoming Superman movie—both terms required by the October 19 writing. SER-397, 399, 435-36, 459.

2. The district court nevertheless held that no agreement was formed on October 19, finding that the terms of Marks' October 19 acceptance letter were "materially different" from DC's five-page letter of October 26, 2001, and "vastly different" from the 56-page "long form" draft of February 1, 2002. SER-64. These differences, the court found, showed that the parties "had not passed the threshold where they had finalized and assented to all material terms," because "as they attempted to sketch in the finer details of a settlement from the broad outlines contained in the October 19 letter, more and more issues arose upon which they could not reach agreement, resulting in the negotiations falling apart." SER-63-64.

That analysis misses the point. Marks' October 19 acceptance of DC's offer
settled the matter, and none of the subsequent discussions undid that contract. The
fact that the parties did not reach agreement on issues that "arose" as they
attempted to formalize the deal has no bearing on whether the parties had
previously agreed on the *essential* terms of the deal, while understanding "that
some material aspects of the deal would be papered later." *Facebook*, 640 F.3d at
1038. And the court nowhere identified in the October 26 letter any disagreement
over any *essential* term specified in the October 19 letter—*i.e.*, the scope of rights
transferred or key financial terms.[6]

Rather than revealing a disagreement over essential terms, DC's October 26
letter expressly confirms its understanding that a binding agreement had been
reached. The letter states that Schulman was merely providing a "more fulsome
outline of what we believe the deal *we've agreed to* is," and that DC would begin
"working on the draft agreement" to put "this super-matter transaction *in document
form*." SER-463 (emphasis added). The October 26 letter itself was thus neither

---

[6] The court wrongly suggested that this case is like *Weddington Prods., Inc. v.
Flick*, 60 Cal.App.4th 793 (1998), because in both cases "the parties had agreed to
a rough outline of an agreement, but were thereafter unable to reach agreement on
the finer details and the negotiations fell apart." SER-62. In fact, *Weddington* held
the settlement agreement at issue unenforceable only because the parties had failed
to agree on *the most essential matter in dispute between them*—the terms of a
license for a "sound library," which "was a material issue to both sides" and thus
not "a minor, immaterial or separable issue." 60 Cal.App.4th at 815.

an "acceptance" nor a "rejection" of an "offer" by the Siegels—it was instead a confirmation of terms *already agreed to*, as set forth in the October 19 letter, with further recognition that the deal would be "papered." *Facebook*, 640 F.3d at 1038.

The district court's focus on the "vastly different" February 2002 long-form agreement was even more misplaced. It was, of course, vastly different in the sense that it was a 56-page, detailed, formal draft contract, rather than a listing of terms—just the kind of formal documentation that was attempted without success in *Facebook*. But, again, nowhere did the court identify any essential term in the long-form agreement that differed from the essential terms in the October 19 letter. Marks himself did not express any reservations about the February 2002 long-form until three months later, after he learned that Larson had complained about it. SER-436. Even then, Marks told Schulman the draft was "not contrary to what [had been] agreed to" and the parties could "deal with it." SER-126-27, 130, 436.

In any event, even if the February 2002 draft included different terms, it is the *new* terms that would be unenforceable, not the October 19 terms. As this Court explained in holding that Facebook's duty to draft deal documents did not render the preexisting term sheet unenforceable: "[I]f Facebook should draft terms that are unfair or oppressive, or that deprive the Winklevosses of the benefit of their bargain, the district court could reject them as a breach of the implied covenant of good faith and fair dealing …. The district court got it exactly right

32
**Exhibit WW**
579

when it found the Settlement Agreement enforceable but refused to add the stack of documents drafted by Facebook's deal lawyers." 640 F.3d at 1038. The same analysis applies here. The 56 pages drafted by DC's lawyers were just that—pages drafted by DC's lawyers. A binding contract already existed, in the essential terms the Siegels accepted on October 19.

3. Although the district court itself identified no disagreements over essential terms reflected in the correspondence and drafts following the October 19 letter, Larson offered up some 10 pages of differences. But none were raised at the time (*i.e.*, six years earlier, in 2001), nor did they reflect material differences over an essential term. For example, Larson contended the October 19 and October 26 letters described the rights transfer differently, but both merely used different lawyerly phrases to say that DC would receive 100% of the rights in all Superman properties. *Compare* SER-458, *with* SER-464. Larson also asserted that the letters state different terms for royalty reductions in "extraordinary cases" involving the use of Superman rights with other properties, but the only difference is that while the October 19 letter gives one *example* of such a use, the October 26 letter provides additional examples; the basic contractual term is identical. *Compare* SER-457-58, *with* SER-467-68. Larson also pointed to language about Superman "cameo" appearances in other characters' stories, SER-553-54, but both letters provide that royalties for "cameos" will be zero, *compare* SER458, *with* SER-467,

33
**Exhibit WW**
580

consistent with industry standards, SER-172-75; Benjamin A. Goldberger, *How the "Summer of the Spinoff" Came to Be: The Branding of Characters in American Mass Media*, 23 LOY. L.A. ENT. L. REV. 301, 320, 371 (2003).[7]

Other purported differences Larson identified—*e.g.*, representations and warranties, an obligation to provide certain historical documents, a right of first refusal on biographical works, publicity obligations, advertising credits, dispute-resolution procedures, and indemnities—likewise do not represent material differences concerning essential terms. *See Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1120-22 (C.D. Cal. 2002) (terms concerning license termination, indemnification, sublicenses, transfer of rights, confidentiality, and dispute resolution not essential). The differences in language thus do not undermine the basic agreement that is reflected in the plain terms of the October 19 letter and confirmed by the parties' contemporaneous conduct and subsequent testimony.

## C. At A Minimum, DC Is Entitled To Factfinding As To Whether The Parties Intended To Be Bound By The Essential Terms Identified In The October 19, 2001, Letter

At minimum, if there were any genuine dispute as to whether the parties intended to be bound by the essential terms identified in the October 19 letter, that

---

[7] As Schulman explained, the different language in his letter concerned the precise definition of "cameo," SER-437, which would have been worked out in the long form. Marks did not object to Schulman's description of "cameos" at the time, and when asked at his deposition to identify all differences between his letter and Schulman's, he did not mention "cameos." SER-118-19, 435, 533-44.

dispute should have been resolved by a jury. The question whether parties

intended to be bound by terms expressed in an informal agreement is one of fact,

*see Bustamante*, 141 Cal.App.4th at 208; *Banner*, 62 Cal.App.4th at 358, and thus

"summary judgment is inappropriate" where that question is materially contested,

*S. Cal. Painters v. Best Interiors, Inc.*, 359 F.3d 1127, 1130 (9th Cir. 2004); *see*

*Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987) ("summary enforcement

inappropriate" where there is "conflicting evidence" as to whether parties agreed

on "material terms" of settlement agreement).[8]

The record described above, especially when viewed favorably to DC,

plainly precludes summary judgment against DC on this question. In *Mattel*, this

Court reversed the same district court for making improper determinations

concerning contractual intent on summary judgment, where they "turn[ed] in part

on the credibility of conflicting extrinsic evidence." 616 F.3d at 910; *see Mattel,*

*Inc. v. MGA Entm't, Inc.*, 2011 WL 3420603, \*2 (C.D. Cal. Aug. 4, 2011) (jury

finding on remand opposite of what court held on summary judgment).

The district court made the same mistake here. Rather than accepting all

inferences and making all credibility determinations in DC's favor, it engaged in

its own factfinding as to the parties' intent, and rejected inferences favoring DC.

---

[8] The district court said *Callie* found "no enforceable agreement" because of disagreements over its "finer details," SER-64, but *Callie* actually found disputed factual issues concerning agreement on *essential* terms, *see* 829 F.2d at 890-91.

For example, the court speculated that DC's post-agreement conduct "could as much be seen as goodwill gestures on defendants' part while the negotiations continued as [they] could reflect an indication on [DC's] part that they thought they were contractually bound to do the same." SER-65. But on summary judgment, the court was required to adopt the inference favorable to DC.

Similarly, in analyzing the differences among the letters and February draft agreement, the court observed that "materiality is in the eye of the beholder," and then held that the differences were material enough to establish that there was no agreement on October 19, 2001. SER-63. But any question whose answer depends on "the eye of the beholder" is a classic jury question. *Atla-Medine v. Crompton Corp.*, 2001 WL 1382592, *6 (S.D.N.Y. Nov. 7, 2001) (where issues are "in the eyes of the beholder," "[r]are is the case where summary judgment would be appropriate").[9] The district court also appeared to credit Marks' subsequent

---

[9] *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681-82 (5th Cir. 2001) ("what constitutes 'substantial sales experience' is in the eye of the beholder" and thus "the trier-of-fact's duty to determine"); *Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment ruling on parody defense because "[h]umor … is in the eyes of the beholder"); *Recycling Solutions Tech., LLC v. Rosenberg*, 2011 WL 1696826, *1 (E.D. Ky. May 4, 2011) ("Beauty may be in the eye of the beholder, but summary judgment requires something a bit more concrete."); *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F.Supp.2d 821, 824-25 (N.D. Iowa 2004) (though "fraud, like beauty, is in the eye of the beholder … this court's task on motions for partial summary judgment [is to] determine only whether the resisting parties have generated genuine issues of material fact"); *Vass v. Compaq Computer Corp.*, 953 F.Supp. 114, 119 (D. Md. 1997) ("judgment made through the eyes of the beholder" is "not to be summarily determined").

testimony about the relevant events over testimony from DC witnesses, including testimony concerning the "goodwill gesture" point, which DC witness Paul Levitz disputed, and the materiality of differences between the October 19 and 26 letters, which Schulman addressed. SER-67, 397-99, 435-37.

Beyond the record evidence already discussed, new evidence has come to light further indicating that Larson knew she was bound by the October 19 terms. In *Shuster*, the district court compelled Larson to produce a July 2003 letter she wrote to her brother, in which she repeatedly states that Marks insisted, in August 2002, that Larson had a "deal with Time Warner/DC." SER-810-14, 824-25. The letter states that Marks would "testify against [her] in court" if she repudiated the deal and accepted Toberoff's offer. SER-811. The letter confirms that Marks told Toberoff that Larson had a "deal" with DC. SER-811. Given this letter, there is *at least* a jury question as to whether Larson understood she was bound to the October 19 terms.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LARSON ON DC'S LIMITATIONS COUNTERCLAIM

The district court's order granting summary judgment against DC on its limitations counterclaim also erroneously resolves factual disputes against DC.

Copyright claims must be filed "within three years after the claim accrued," or 1,095 days. 17 U.S.C. §507(b). Larson's claims accrued on April 16, 1999—

the day her Notices purport to take effect. SER-62. Accordingly, Larson was required to file her claim by April 16, 2002. The parties, however, entered into a tolling agreement on April 6, 2000—356 days into the 1,095-day limitations period, with 739 days left to run—providing that it would expire, as relevant here, "10 business days after ... either party terminat[es] negotiations, in writing, relating to the Notices." SER-348-51.

There are two possible termination "triggers" for this provision. One occurred on May 9, 2002, when Larson's mother sent DC a letter stating that the February 2002 draft long-form contract "makes an agreement impossible." SER-234. If that letter terminated negotiations, then the limitations period restarted on May 20, 2002, and ended May 28, 2004—five months before Larson filed suit.

The other possible event occurred on September 21, 2002, when the Siegels sent a letter to DC stating that "we are totally stopping and ending negotiations." SER-420. If that letter terminated negotiations for purposes of the tolling agreement, then the limitations period restarted 10 days later, on October 4, 2002, and closed on October 11, 2004—four days after Larson filed suit.

Larson herself has taken conflicting positions as between these two possibilities. In the district court below, she contended that negotiations were not terminated until the later date of September 21, 2002. The court agreed, holding her claims to be timely. SER-60-61.

Since that ruling, however, Larson has argued the opposite in *Shuster*. In *Shuster*, DC alleges that Toberoff interfered with DC's business relationship with Larson by wrongfully inducing her to repudiate the 2001 settlement and cut ties with DC. SER-816-19. Toberoff and Larson filed an unsuccessful motion to strike this claim, arguing he "had [nothing] to do with the May 9[, 2002] letter that ended DC's purported 'prospective economic advantage'" and made settlement discussions "moribund." SER-825, 868, 878-79; *see* Appeal Nos. 11-55863, 11-71844 .

Larson cannot have it both ways. Either the parties' settlement negotiations "ended" on May 9, 2002—in which case Larson's claims here are time-barred—or on September 21, 2002—in which case Larson has essentially conceded Toberoff's liability for DC's interference claim in *Shuster*. Settled principles of estoppel prevent Larson (and Toberoff) from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). At the very least, her shifting positions demonstrate that a jury, too, could go either way. *See Mattel*, 616 F.3d at 910.

Exhibit WW
586

## LARSON'S APPEAL OF HER FIRST CLAIM AND
## DC'S CROSS-APPEAL ON BOTH PARTIES' FIRST CLAIMS

### I.   LARSON'S ENTIRE APPEAL IS PREMATURE BECAUSE HER CLAIM HAS NOT BEEN FULLY AND FINALLY ADJUDICATED

Before this Court can exercise jurisdiction over an interlocutory appeal, it must determine *de novo* whether the claim on appeal has been fully adjudicated. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1084 (9th Cir. 2010). Rule 54(b) requires final judgment on an *entire* claim. *Ariz. State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991).

The Rule 54(b) judgment on DC's Second through Fourth Counterclaims was proper, as those claims were fully adjudicated. The Rule 54(b) judgment on Larson's First Claim and DC's First Counterclaim, however, was invalid and thus not appealable. *See* Dkt. No. 5-1.

Larson's First Claim seeks a declaration regarding the parties' "respective *rights and obligations* with respect to the Termination and the *copyright interests thereby recaptured*." ER-338-39 ¶¶53-55 (emphasis added). The district court's judgment did not fully determine the parties' "rights and obligations" or the scope of the "copyright interests" assertedly recaptured by Larson. For example, the judgment does not establish the extent to which Larson's recaptured rights—if any—are diminished by the Promotional Announcements owned by DC, which feature key story elements from *Action Comics #1*. Dkt. No. 5-1, at 11-17. The

court also left open whether its description of the limited elements in *Action Comics #1* was intended to be "dicta," as Larson argued below. SER-305-08, 313-19, 325-26, 2-3.

As discussed *supra* at 20-22, both Larson and the district court acknowledged that the court's summary judgment rulings left open key legal and factual questions concerning the "scope of [Larson's] recaptured copyrights." SER-198, 298-305, 310-13, 321-24, 2-3. Larson sought finality on the First Claim by amending it to remove a request for an accounting, but the accounting request was only *one* of the unresolved matters. The First Claim will be finally adjudicated only when the parties' "rights and obligations" and "copyright interests" are fully determined.

## II. THE SUPERMAN ELEMENTS AT ISSUE WERE MADE-FOR-HIRE ON BEHALF OF DC AND ARE THUS EXEMPT FROM TERMINATION

Assuming the Court has jurisdiction to consider the remainder of this appeal, the questions largely concern whether certain early Superman works qualify as "works for hire" under the 1909 Copyright Act, 17 U.S.C. §§24, 26 (1909) (repealed 1976). As Larson acknowledges, LB-21, a work made-for-hire under the 1909 Act is not subject to the termination provisions created by the 1976 Act, 17 U.S.C. §§203(a), 304(c)-(d). The district court held that the vast majority of works

at issue were created as works-for-hire, but it held a few works were not, and thus could be recaptured. The first category of rulings was correct, the second was not.

## A. A Work Is Made-For-Hire Under The 1909 Copyright Act When It Is Created At The "Instance And Expense" Of The Commissioning Party

1. It has been "the well-established law of this circuit"—and others—for decades that a work qualifies as made-for-hire under the 1909 Act whenever it was created at the "instance and expense" of another party. *Fox*, 429 F.3d at 879-81.[10] The instance-and-expense test embodies a presumption "when one person engages another ... to produce a work of an artistic nature ... the title to the copyright shall be in" the employer. *Lin-Brook*, 352 F.3d at 300.

The "instance" requirement is met where the hiring party was the "motivating factor in producing the work." *Fox*, 429 F.3d at 879. What matters is "the degree to which the 'hiring party had the right to control or supervise the artist's work,'" irrespective of whether it was actually exercised. *Id.* The "expense" requirement can be satisfied in different ways: (1) the hiring party may assume "the financial risk of the [work's] success," *id.* at 881, or (2) "simply

---

[10] *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000); *Dolman v. Agee*, 157 F.3d 708, 711-12 (9th Cir. 1998); *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368-69 (9th Cir. 1980); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158-63 (2d Cir. 2003); *Easter Seal Soc'y v. Playboy Enters.*, 815 F.2d 323, 325-27 (5th Cir. 1987).

**Exhibit WW**

pay[]" a sum for its creation, *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 555 (2d Cir. 1995), or (3) the hired party may "expect[] to be compensated" for his work, *Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978).

If the "instance and expense" test is satisfied, the court must presume the parties agreed the copyright "lies *ab initio* with the commissioning party." *Fox*, 429 F.3d at 881; *see Self-Realization*, 206 F.3d at 1326; *Dolman*, 157 F.3d at 711-12. That presumption is rebutted *only* if the party seeking to defeat work-for-hire status adduces evidence proving that the parties expressly agreed the commissioning party would *not* own the copyright. *Fox*, 429 F.3d at 881; *Dolman*, 157 F.3d at 712-13; *May*, 618 F.2d at 1368-69; *Lin-Brook*, 352 F.2d at 300.

2. In a tacit concession that she cannot prevail under the settled instance-and-expense test, Larson labors to escape it. She first complains the test has been "criticized," but concedes it has been this Circuit's controlling law for decades. LB-23.[11]

---

[11] Although the criticism is therefore irrelevant, it is also wrong. The commentators Larson cites would limit work-for-hire to traditional "employees"— excluding works made by independent contractors at the "instance and expense" of another—on the theory that the 1909 Act refers to the "employer" in the case of a work-for-hire. LB-26-27. But the word "employer" plainly does *not* limit work-for-hire to the "more conventional master-servant relationship." LB-26; *see* LB-57-58. The cases Larson cites refer only to use of the word "employee," which *does* generally refer to common-law master-servant relationships. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 n.5 (2003); *CCNV v. Reid*, 490 U.S. 730, 738-40 (1989). The term "employer" has no such connotation, because it is perfectly conventional to refer to the "employer of an independent

Larson also suggests that the instance-and-expense test should be applied differently in the context of termination rights under the 1976 Act (LB-27-28), but she cites nothing in the Act's text or history supporting such a rule,[12] and it makes no sense. A work is either made-for-hire or it is not—it cannot be a work-for-hire for all purposes *except* termination rights. In the termination context as in any other, if the work was made at the instance and expense of the employer—whether by a traditional employee or an independent contractor—then the employer was the statutory "author" *ab initio*, leaving no authorship rights for anyone else to recapture. *E.g.*, *Marvel Worldwide, Inc. v. Kirby*, 777 F.Supp.2d 720, 741-42 (S.D.N.Y. 2011) (applying instance-and-expense test in termination context to find work-for-hire).[13]

---

contractor." *See Meyer v. Holley*, 537 U.S. 280, 290 (2003); *St. Paul Water Co. v. Ware*, 83 U.S. 566, 576-77 (1872); *Chaffin v. U.S.*, 176 F.3d 1208, 1212 (9th Cir. 1999); RESTATEMENT (SECOND) OF TORTS ch. 15, §§409-29 (1965); 41 AM. JUR. 2D *Independent Contractors* §§8, 14, 19, 47 (2005).

[12] Indeed, leading cases like *Picture Music* and *Lin-Brook* had already applied work-for-hire beyond traditional employer-employee relationships by 1976, and Congress did nothing to alter the doctrine as it applied to works governed by the 1909 Act. What is more, this Court's precedents largely solidified the instance-and-expense test *after* 1976—starting with *May* in 1980, *supra* n.10—refuting any suggestion that the 1976 Act somehow undermined the test.

[13] Larson also errs in asserting that the instance-and-expense test is "ill-suited for summary adjudication due to its inherently fact-intensive nature." LB-57. Courts frequently apply the test on summary judgment where, as here, there are no disputes of historical fact. *E.g.*, *Self-Realization*, 206 F.3d at 1324, 1330; *Dolman*, 157 F.3d at 711; *Kirby*, 777 F.Supp.2d at 738, 743; *Scherr v. Universal Match Corp.*, 297 F.Supp. 107, 113 (S.D.N.Y. 1967), *aff'd*, 417 F.2d 497 (2d Cir. 1969).

**B.**     **The District Court Correctly Held That** *Action Comics #2-3, #5-61, Superman #1 (Pages 1-2)-23,* **And The Post-McClure Strips Were Works-For-Hire**

In the time period at issue here, DC published and distributed Superman

stories in various formats, including: as part of *Action Comics,* as the standalone

comic *Superman,* and in "strips" syndicated in daily newspapers. The district court

held that the following works were made-for-hire: the Superman works in *Action*

*Comics #2-3* and *#5-61,* pages 1-2 of *Superman #1* and *Superman #2-23,* and

newspapers strips created after DC entered into the Syndication Agreement with

McClure ("Strips").

All of the foregoing works were both created and published after Siegel and

Shuster entered into two relevant agreements with DC: the 1937 Employment

Agreement of December 7, 1937, and the 1938 Assignment, pursuant to which

Siegel and Shuster assigned all rights in all aspects of Superman. *Supra* at 11-12.

Under those agreements, DC possessed complete control over creation of

new Superman stories and elements. Nothing could be done without DC's

consent. DC warned Siegel and Shuster that DC would "not tolerate or accept

slipshod work," and that if their new Superman stories and artwork did not "show a

marked improvement," DC would "make other arrangements to have it done."

In the cases cited by Larson, summary judgment was precluded by credible, admissible, direct evidence that the parties did not intend the commissioning work to be made-for-hire. *See Fox,* 429 F.3d at 875; *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 292 (2d Cir. 2002); *May,* 618 F.2d at 1368.

SER-223, 249. Given the 1938 Assignment, DC had the right to employ other artists to create new Superman works if Siegel and Shuster could not meet DC's quality and timing demands. The parties' correspondence further shows that DC:

- advised Siegel and Shuster that they "need[ed] constant editorial supervision and an alter-ego who can criticize and point out small details ... which may make or break the strip," SER-220;
- required them to submit their draft material far enough "in advance" that DC could go over it "with a fine tooth comb," SER-220, 224, 228-35;
- made substantive revisions to the draft material, SER 223-24, 231, 242;
- demanded that Siegel "re-write" scripts and sent him synopses to "elaborate in detail," SER 223-24, 231, 237-38;
- provided detailed instructions for the illustrations, SER-234-35, 242, 244-45;
- directed Siegel as to story elements and themes, SER-223-24, 234-38; and
- insisted that Siegel and Shuster submit sketches of cover art for DC to "okay," SER-224, 234-35, 242.

The record also established without ambiguity that DC incurred significant expense to create new Superman works after retaining Siegel and Shuster and requiring their assignment of all rights in the character and story. DC made a major financial investment in commissioning Siegel and Shuster to create new Superman material—DC compensated them significantly for that material, and bore all the costs of printing, distributing, and promoting the Superman works, which itself suffices to satisfy the expense requirement. ER-425-27, 960; SER-223-24, 678-79; *Fox*, 429 F.3d at 881.

After Siegel and Shuster spent years unsuccessfully trying to sell their nascent character and story, DC was the one party willing to take the "tremendous gamble" of purchasing the rights to Superman, hiring Siegel and Shuster to create new Superman works, and developing those works into a successful property. ER-425-27. Further, DC assumed a significant financial risk in relying entirely on Siegel and Shuster, rather than hiring additional artists to meet the demands of producing daily copy for syndicated newspaper comic pages. If Siegel and Shuster did not satisfy their obligations to provide quality work on a timely basis, the result would be empty pages in *Action Comics*, blank space in daily newspaper funny pages, and financial loss to DC's brand and bottom line.

Finally, it bears emphasis that after the 1938 Assignment, DC owned the Superman character and story outright. ER-917. When the commissioning party owns the copyright in the underlying work, that party necessarily has full authority to control and develop the work, thus making any derivative work a work-for-hire. *See Hogarth*, 342 F.3d at 163; *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972); 17 U.S.C. §7 (1909) (derivative works "produced with the consent of the proprietor of copyright … shall be regarded as new works").[14]

---

[14] It is true that an artist *can* own the copyright in his contributions to a derivative work (LB-31), but *not* if the derivative work is made-for-hire.

Nothing in the foregoing factual record is disputed, and it plainly establishes

that all new Superman stories and elements published after the 1937 Employment

Agreement and 1938 Assignment were created because DC employed and paid

Siegel and Shuster to create them. If DC at any point became dissatisfied with

their work, DC could have terminated the relationship and paid someone else to

develop DC's exclusive rights in Superman. ER-427, 917. The undisputed record

shows, in short, that the new, derivative Superman works created after March 1938

were created at DC's instance and expense, and thus it is presumed that the parties

agreed that DC would own the copyright in those works *ab initio*, unless Larson

can establish an express agreement to the contrary. *Supra* at 43.

Larson does not even *attempt* to identify any such agreement, because none

exists. That should end the matter. Larson instead proffers a litany of arguments

with respect to each category of works, in an effort to show that the works were not

created at DC's instance, or expense, or both. Those efforts are futile.

1.    *Action Comics #2-3, #5-6*

a. The district court correctly held that *Action Comics #2-3, #5-6*, which

were published between May and September 1938, were "done at the instance of"

DC. ER-83. Before *Action Comics #1* was published, DC made clear that

Superman would be a "new feature" requiring Siegel and Shuster regularly to

supply DC with new material. ER-423. Consistent with their agreement, DC set

aside space for the Superman feature in its comic books, including "every succeeding monthly issue of Action Comics for the period in question," ER-83, which was "published at regular intervals." ER-960. For each installment, Siegel and Shuster submitted Superman strips to DC and were paid $10 per page. *Id.*

b. Larson's arguments that *Action Comics #2-3, #5-6* were not created at DC's instance and expense are meritless. Larson first contends the works cannot be works-for-hire because DC did not commit to accepting new material, and thus there was no "guaranteed compensation" and the expense factor is not satisfied. LB-29. That argument has been "roundly rejected." *Kirby*, 777 F.Supp.2d at 742. No court has ever held that the "expense" factor requires guaranteed compensation. *See Murray*, 566 F.2d at 1311 n.7 ("neither the form of compensation, nor the amount, is determinative"); *Picture Music*, 457 F.2d at 1216 (lack of fixed payment "is never conclusive"). To the contrary, courts have found work-for-hire where there was *no* obligation to pay an artist for unpublished works. *E.g.*, *Playboy*, 53 F.3d at 555; *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003); *Picture Music*, 457 F.2d at 1216. In fact, the lack of a long-term guarantee "is not something which is atypical" in a work-for-hire situation. ER-86. The expense requirement is satisfied, for example, where an artist is paid only in royalties, which may amount to nothing if the work does not succeed. *Warren*, 328 F.3d at 1142.

Larson next argues that the 1938 Employment Agreement undermines the work-for-hire status of *Action Comics #2-3, #5-6* because it states that DC "*hereby employ[s] and retain[s] you.*" LB-30 (emphasis added). But that language simply signifies that Siegel and Shuster were now subject to the particular terms of the 1938 Employment Agreement—it does nothing to establish that Siegel and Shuster were not already producing Superman work at DC's instance and expense. The 1938 Employment Agreement, in fact, expressly states that Siegel and Shuster "*have been* doing the art work and continuity *for us*" and that DC wanted the pair "to *continue* to do said work." ER-605 (emphasis added). The new written agreement thus simply "formalized what had informally been ongoing beforehand." ER-85.

Finally, Larson contends that "Siegel had already written" the Superman stories in *Action Comics #2-3, #5-6,* before 1938. LB-32. Larson's first theory is that because the district court held that certain elements of *Action Comics #4* and *Superman #1* were created before 1938—which is erroneous in any event, *infra* at 61-68—it must be true that the other *Action Comics* contained preexisting elements. LB-32. But Larson has pointed to absolutely no *evidence* that *Action Comics #2-3, #5-6* were based on preexisting materials. Absent such evidence,

there is no basis for any inference that they were.[15] Larson's second theory is that the new works were based on a paragraph written by Siegel in 1934 that "previewed" Superman's future exploits (LB-32), but the district court rejected that argument, holding that the so-called "preview" paragraph "constitutes mere *ideas* for future works rather than *expressions* of those ideas, and thus contains no copyrightable material." ER-75; *see Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("no author may copyright facts or ideas"). Larson did not appeal that ruling, thereby waiving this contention. *See Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89, 99 (1954); *Gausvik*, 392 F.3d at 1008 n.1.

2. *Action Comics #7-61* And *Superman #1-23*

a. *Action Comics #7-61* and *Superman #1-23* were produced by Siegel and Shuster not only after the 1938 Assignment gave DC exclusive rights in Superman, but after the 1938 Employment Agreement formalized the artists' working relationship. ER-87. The 1938 Employment Agreement confirmed that the works were created at DC's instance:

- Siegel and Shuster "will supply us each and every month …, in sufficient time for publication …, sufficient copy and art";
- "The standard of said comics shall be equal to the present standards";

---

[15] As for *Action Comics #6*, Larson never argued below that this work was based on pre-existing material, so the argument is waived. *See Jachetta v. U.S.*, 653 F.3d 898, 906 (9th Cir. 2011).

- "[I]f at any time the art and continuity of any feature shall not be up to the standard ..., [DC] may terminate this agreement and substitute other artists";
- DC "shall have the right to reasonably supervise the editorial matter of all features." ER-605-07.

These works were also created at DC's expense. All three means of satisfying the expense requirement, *supra* at 42-43, were present here: DC assumed the financial risk of Superman's success and bore responsibility for printing, distributing, and promoting these works; DC paid Siegel and Shuster for these works; and Siegel and Shuster expected to be compensated pursuant to the 1938 Agreement, which provided that DC would "pay you on publication, for any and all of said comics," according to a fixed pay scale. ER-606.

Because *Action Comics #7-61* and *Superman #1-23* were plainly created at DC's instance and expense, they are works-for-hire as a matter of law.

b. None of Larson's barrage of contrary arguments has merit. Larson first contends that these works were not created at DC's "expense" because DC was obligated to pay only for works DC decided to publish. LB-49. But Larson did not below and does not now seek to recapture any unpublished, unpaid-for, non-copyrighted work (nor could she)—making this issue irrelevant. And she was paid for the works that were published, and no work-for-hire precedent requires *fixed compensation* for every possible submission to satisfy the "expense" test. *Supra* at

49. The *Kirby* court correctly described Larson's argument to the contrary (advanced by her same counsel here) as "roundly rejected." 777 F.Supp.2d at 742.

It is beside the point that Siegel and Shuster *also* incurred costs to create these new Superman works. LB-48. It is undisputed that they were more than compensated for those costs under the payment schedule established by the 1938 Agreement—they both became wealthy as a result of those payments. ER-466, 585-86, 605-07; *see Playboy*, 53 F.3d at 555 (fact that artist provided own tools and studio, hired assistants, paid taxes and benefits, and set his own work schedule had "no bearing on whether the work was made at the hiring party's expense"); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 WL 398696, *20 (S.D.N.Y. Mar. 15, 2002) (artist cannot "unilaterally … disrupt a work for hire arrangement by paying certain costs of the project that he was not contractually bound to pay").

Larson says DC's payments under the 1938 Employment Agreement were "by law" not payments for work produced at DC's instance, but "a discretionary *purchase* of completed material." LB-49. Larson cites no "law" so holding, and the facts preclude that conclusion. DC *already owned all rights to Superman*, so there was nothing for DC to "purchase." *Supra* at 47.[16] Under the 1938

---

[16] Larson says that testimony of DC expert Mark Waid proves DC did not own the rights in not-yet-published Superman material, because Waid sought the "blessing" of the Siegels to publish a newly discovered, unpublished Superman work. LB-52-53. There is no evidence that Waid did so because he thought it was legally required—indeed, a "blessing" is obviously not equivalent to a "license."

Employment Agreement, DC paid the artists for work they were obligated to create on a specified timely basis, under quality standards enforced by DC.[17] ER-605-07.

Larson next contends that *Action Comics #7-61* and *Superman #1-23* were not made at DC's instance because DC did not exercise complete control over Siegel's and Shuster's creative processes. LB-55. "All [DC] really had," Larson says, "was the purchasing power of any buyer." *Id.* No. DC had much more— most significantly, it had the power to terminate Siegel and Shuster outright if they did not produce publishable-quality work, to retain other artists to create Superman works and, as the sole owner of Superman, to bar Siegel and Shuster from ever creating any more Superman works of any kind. *Supra* at 12-13. DC also had the right to supervise their work to determine whether it satisfied "present standards" of publication. *See Fox*, 429 F.3d at 880 ("complete control over the author's work is not necessary"). The law does not require the employer to insert itself directly

---

And whatever Waid personally thought does not bind DC as a corporation, nor could his personal state of mind create or eliminate rights that existed as a matter of law in 1938 based on contractual agreements. Finally, rights in unpublished works are not at issue here. *Supra* at 52.

[17] The district court concluded that Larson "failed to present evidence that Siegel and Shuster were not, in any given instance, paid for their work." ER-89. Rather, the court held, a 1939 agreement between the parties suggested that the "pattern and practice" was for DC to pay Siegel and Shuster even for Superman material they had *not* created. ER-90; *see* ER-965. Larson addresses the court's inference at great length (LB-51-54), but her entire discussion misses the point: even if Siegel and Shuster were *not* paid for unpublished work, the works that *were* published plainly were created at DC's instance and expense.

into the artist's creative process—after all, the whole point of commissioning an artist is to engage the artist's creative talents. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Sch. of Contemporary Dance, Inc.*, 380 F.3d 624, 635 (2d Cir. 2004). The employer need not dictate or shape how works are made: "talented people ... are expected by their employers to produce the sort of work for which they were hired," *id.* at 640-41—exactly as Siegel and Shuster did here.[18]

3. *Post-McClure Newspaper Strips*

a. Siegel and Shuster created many Strips after executing the 1938 Employment and Syndication Agreements. It is plain they were created at DC's instance—Siegel and Shuster were engaged by DC for the express purpose of creating them, as the district court held. ER-103. The Syndication Agreement provided: "Detective agrees to permit [Siegel and Shuster] to supply 'Superman' strip exclusively to us for syndication...." ER-609. The Syndication Agreement also reaffirmed DC's exclusive ownership of Superman: "[T]he title 'Superman' shall always remain the property of [DC]." ER-610. And the 1938 Employment Agreement reinforced that Siegel and Shuster would timely "furnish ... all of the

---

[18] Larson asserts in passing that the parties "could not have intended" these works to be made-for-hire because courts in this time period applied the work-for-hire doctrine only to "traditional employees." LB-56. This Court rejected the identical argument in *Fox*, holding that General Eisenhower's war memoir, written during the same time period at issue here, was a work-for-hire even though he was not a traditional employee. *Compare* 429 F.3d at 877, *with id.* at 881 (Nelson, D.W., J., dissenting).

art and continuity for the newspaper strip entitled 'Superman'" to McClure. ER-605. That Agreement also gave DC the express "right to reasonably supervise the editorial matter of all features." ER-607. And again, the 1938 Employment Agreement authorized DC to terminate Siegel and Shuster and retain other artists to produce the Strips. *Supra* at 12-13.

As the parties' correspondence establishes, DC gave Siegel and Shuster "constant editorial supervision," insisting that the pair "send all the [newspaper] material here before it goes to the syndicate for release" so its editors could review the draft strips, make substantive revisions to the script and artwork, correct "any mistakes," and "okay" the final strip before sending it to McClure. ER-431-40, 445-56, 453, 460. In a January 23, 1940, letter, an editor reminded Siegel: "[P]lease do not forget that all copy must clear though our office ... You've got to give us plenty of time for okaying, so get busy." ER-435. DC made clear that if the newspaper strips did not meet its editorial standards, "we shall have to consider it 'unacceptable', and make other arrangements to have it done." ER-460.

As the court below observed, the facts of this case are "eerily similar" to those in *Picture Music*, 457 F.2d at 1214, and compel the same work-for-hire conclusion. ER-104. As in *Picture Music*, the artists (Siegel and Shuster) worked with another party (McClure) to create derivative works owned by a third party (DC). As in *Picture Music*, the employer here (DC) owned the original work, per

the 1938 Assignment. As in *Picture Music*, the artists here exercised substantial creative license in creating the work, but as in *Picture Music*, the employer here had a right to accept, reject, or modify the pair's work. *Id.* at 1217. As in *Picture Music*, it is irrelevant whether they operated as independent contractors.

The Strips also were created at DC's expense. Siegel and Shuster were handsomely compensated for their work pursuant to the 1938 Employment Agreement. As explained, it is irrelevant that they were not paid a guaranteed amount. *Supra* at 49. Further, DC assumed the financial risk of Superman's newspaper syndication; while DC did not expect syndication to be tremendously profitable, it owned all of the underlying rights, and stood to lose the value of those rights if the syndication failed. *See Fox*, 429 F.3d at 881. The Post-McClure Strips were clearly works-for-hire.

b. Larson contends otherwise, but her arguments are meritless. *First*, she says that Siegel's involvement in soliciting newspaper syndication proves the Strips were made at his own "instance." LB-37. But there can be no dispute that the Strips were created pursuant to Siegel's and Shuster's *contractual obligation to create them for DC. Supra* at 55-56. And DC itself also actively sought newspaper syndication. *E.g.*, SER-290.

*Second*, Larson tries to distinguish *Picture Music*, saying the employer-artist relationship there was a traditional employer-employee arrangement, while the

relationship between Siegel, Shuster, and DC was more akin to a joint venture. LB-34, 40. But again, it is settled that the work-for-hire doctrine applies equally to independent contractors and traditional employees. *Supra* at 42-43 & n.11.[19]

*Third*, Larson argues that a finding in *Fawcett* that McClure owned the "proprietor" copyright in the Strips precludes a finding that the Strips were made-for-hire pursuant to an obligation to DC. But the work-for-hire status of the Strips was *never* before the *Fawcett* court, which considered the limited question whether Superman rights had fallen into the public domain due to McClure's failure to properly affix copyright notices to certain newspaper strips, and if so, whether those errors were chargeable to DC. 191 F.2d at 599. As the district court concluded, "to imply Judge Hand [the judge in *Fawcett*] sought to extend the reach of his ruling to questions beyond the narrow confines of the case before him to those now before this Court fifty years later is simply misdirected." ER-40.

*Fourth*, Larson says McClure and DC owned the Strips not as works-for-hire but by an "implied assignment of Siegel and Shuster's common law copyrights in

---

[19] In any event, as the district court explained, the right of control held by both DC and McClure was "reflective of a more traditional employment engagement." ER-104. Larson notes that the district court in *Nat'l Comics Pubs., Inc. v. Fawcett Pubs., Inc.*—a lawsuit DC filed in the 1940s alleging that the Captain Marvel comic books infringed its rights in Superman—likened the parties' syndication arrangement to a joint venture, but on appeal the Second Circuit did *not* accept that formulation, 191 F.2d 594, 599 (2d Cir. 1951), so it carries no weight. *In re Smith*, 964 F.2d 636, 638 (7th Cir. 1992).

Exhibit WW

the strips." LB-43. But even if Larson were correct that there was an assignment
(she is not), this Court has held that an assignment of rights is not "inimical with
the work-for-hire doctrine." *Fox*, 429 F.3d at 881. Once the instance-and-expense
test has been satisfied, the work-for-hire "presumption may be rebutted only by
evidence that the parties did not intend to create a work-for-hire"—an assignment
"is insufficient to rebut the presumption." *Id.*; *Lin-Brook*, 352 F.2d at 300.

*Fifth*, Larson says a work-for-hire conclusion is contrary to McClure's
copyright registrations for the Strips, which identify Siegel and Shuster as the
"author" and McClure as the "owner." LB-43. But the sole case she cites *rejects*
her position, holding that a publisher's reference to the hired party as an "author"
did *not* change the work-for-hire status of its book, because "author" "was being
used, not as a 'legal conclusion,' but 'colloquially.'" *Hogarth*, 342 F.3d at 166-67
& n.24; *see Picture Music*, 457 F.2d at 1214 & n.1. There is no evidence McClure
intended to use "author" in anything other than its colloquial sense. ER-610.

*Sixth*, Larson notes that in 1944, McClure assigned to DC "all its right, title
and interest in all copyrights in Superman," which she says was unnecessary if DC
owned the copyright in the Strips. LB-45. But DC only allowed McClure to
register copyrights in its name for practical purposes—the Syndication Agreement

made clear that DC retained beneficial ownership of all Superman rights and the copyrights in the Strips would "revert" back to DC. ER-610.[20]

*Finally*, Larson argues that DC's ownership of rights is inconsistent with the Syndication Agreement's allowing DC to use the Strips in its comic books "six months after newspaper release." LB-46. But DC could grant McClure a six-month exclusive license in the Strips—in exchange for 40-50% of the net proceeds from the Strips—precisely *because* DC owned their rights. ER-609-10.[21]

The conclusion that the Strips were created at DC's instance-and-expense, pursuant to the 1938 Employment and Syndication Agreements, is unassailable.

---

[20] Larson similarly argues that if DC owned the Strips as works-for-hire, then Siegel and Shuster would not have needed to execute the Syndication Agreement. LB-46. But that agreement imposed obligations on Siegel and Shuster, so their execution was necessary. Notably, the agreement took care to reaffirm that the pair had *no* rights in the Strips, were employees of DC, and could be replaced at any time. *E.g.*, ER-610.

[21] Nothing about the "indivisibility" doctrine would have precluded DC from granting such a license, as the very case cited by Larson shows. LB-47 (citing *Jim Henson Prods. v. John T. Brady & Assocs.*, 16 F.Supp.2d 259, 288 (S.D.N.Y. 1997) ("indivisible" right means "the transfer of anything less than all rights was deemed a license rather than an assignment")). Nor does the holding in *Fawcett* (LB-47) preclude that result. *Supra* at 58.

Exhibit WW
607

### C. The District Court Erred In Granting Summary Judgment Against DC On The Work-For-Hire Status Of *Action Comics #1* And *#4, Superman #1* (Pages 3-6), And Pre-McClure Strips

The district court incorrectly held that *Action Comics #1* and *#4, Superman #1* (pages 3-6), and the two weeks of strips created before the Syndication Agreement ("Pre-McClure Strips") were not works-for-hire.

#### 1. Action Comics #1

##### a. *Key Elements Of* Action Comics #1 *Were Made-For-Hire*

The undisputed record shows that key graphic and story elements from the Superman story in *Action Comics #1* were made-for-hire for DC. Indeed, some elements were not even created by Siegel and Shuster, but by other DC artists.

DC's Colorization. DC colorist Jack Adler testified that, in keeping with industry custom, Siegel and Shuster submitted black-and-white panels to DC for use in *Action Comics #1*. SER-442. DC's other artists decided what colors to use and applied those colors to the story, including Superman's iconic blue leotard, red cape, and red S-crest. *Id.* The unique combination of these colors with the story elements in *Action Comics #1* will always be DC's property—meaning that DC has an irrevocable joint-ownership stake in *Action Comics #1* even if Larson is able to recapture certain story elements.

The district court erroneously assumed that DC's use of color in *Action Comics #1* was *not* independently copyrightable. SER-49-51. In fact, "adding

colors to a previously black and white picture may constitute an original copyrightable contribution." MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §2.14 (2011); *see Boisson v. Banian, Ltd.*, 273 F.3d 262, 271 (2d Cir. 2001); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 n.6 (2d Cir. 1977); 52 F.R. 23443-46 (1987) (colorization of black-and-white motion pictures is copyrightable and may be registered). While color alone may not be copyrightable, the selection and use of color in combination with other protectable elements can be sufficiently creative to warrant copyright protection. *See Boisson*, 273 F.3d at 271; *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 n.6 (9th Cir. 2008); *Sargent v. Am. Greetings Corp.*, 588 F.Supp. 912, 919 (N.D. Ohio 1984); *Pantone, Inc. v. A. I. Friedman, Inc.*, 294 F.Supp. 545, 547 (S.D.N.Y. 1968).

DC's unique selection and application of colors to the *Action Comics #1* story far exceeds the minimal standard for copyrightability. Larson's own expert acknowledged that "Superman's distinctive iconic costume is very much about its colors," SER-370, and the story was promoted as being in "*Color!*," *infra* at 84.

DC's Cover Art. DC's artists also created the cover of *Action Comics #1*, which introduces the Superman story that immediately follows. ER-388; SER-728. A February 22, 1938, letter from DC editor Vin Sullivan to Siegel provided: "I'm enclosing a silverprint of the cover of Action Comics. You'll note that we already used one of those panel drawings of SUPERMAN, as you suggested in

your recent letter." SER-388. In other words, per Siegel's suggestion, DC used one of the panel drawings from the Superman story as a template to create the cover art. Siegel confirmed these events in his memoir. SER-803-04. The court below suggested, however, that Sullivan's letter *could* be read to imply that Siegel created the cover art and enclosed it with his "letter" to Sullivan. SER-51. That reading is at odds with the plain language of the letter and Siegel's own account.

Larson argued below that DC's cover was not independently copyrightable because it was derivative of Siegel and Shuster's preexisting creation. A derivative work is independently copyrightable if it contains "non-trivial" variations from the original work, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1220 (9th Cir. 1997)—*i.e.*, it possesses "more than a de minimis degree of creativity," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 363 (1991).

In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34-35 (2d Cir. 1982), the court considered these two illustrations:

 

*Original Illustration*    *Derivative Illustration*

Exhibit WW
610

While the individual distinctions are minimal, the court found that "the numerous changes made by [the second artist]—the changed proportions of the hat, the elimination of individualized fingers and toes, the overall smoothing of lines— combine to give the [second] drawing a different, cleaner 'look'" than the original sketch. *Id.* The second illustration was thus independently copyrightable. *Id.*

Here, there are numerous non-trivial distinctions between the cover of *Action Comics #1* and the panel that inspired it:

- On the cover, Superman has distinguishable facial features and musculature, bears a visible S-crest on his chest, and wears the now-iconic red boots. In the panel, Superman's face, musculature, and S-crest are obscured, and he wears socks.
- The cover depicts a man under the car who was shaken out of the car by Superman—the panel does not.
- The man featured on the bottom left foreground of the cover has different hair, facial features, and clothing than the man in the panel. He is touching his temples in disbelief and his tie is blowing in the wind. In the panel, the man is covering his ears and his tie is stationary.
- The man featured in the left background of the cover has different hair and clothes than the version in the panel, and has discernible facial features.
- In the cover, Superman appears larger than the closest figure(s). In the panel, he appears to be the same size.
- The car featured on the cover is fully visible and contains different rear wheel wells, headlights, and other details than the car in the panel. On the

**Exhibit WW**

cover, the tire that flew off the car is angled differently than the panel, emphasizing the force with which Superman smashed the car into the rocks.

- The scale, layout, and background landscape of the two images are different.
- Even the rocks in the background of the two images are different; they are less detailed and prominent in the cover art.



*Panel in* Action Comics #1

**Exhibit WW**



*Cover of* Action Comics #1

66

These differences warrant independent copyright protection for the cover.

Siegel and Shuster's 1938 Material. Siegel and Shuster created certain elements of the Superman story in *Action Comics #1* ("Preexisting Material") before entering into employment with DC. That Preexisting Material is not at issue here. Siegel and Shuster testified, however, that in early 1938, they made key additions to the Preexisting Material, including: (1) "several additional pictures to illustrate the story continuity," which appear on the first page of *Action Comics #1*, ER-654; SER-386; (2) the last panel, which features Superman in his cape, leotard, and S-crest breaking through a chain with his chest, ER-654; SER-386; and (3) "the scientific explanation on page 1 … and the last panel," ER-654.

These additions were made at DC's instance and expense, further making *Action Comics #1* and the Superman story therein a joint work that will always be co-owned by DC. Siegel's sworn affidavit avers that he and Shuster created this material *only after* DC told the pair they "could proceed" and agreed to publish their work. ER-654. DC also had the "right to control or supervise" Siegel and Shuster's work, and in fact exercised that right. *See Fox*, 429 F.3d at 879. DC sent Siegel and Shuster a letter on February 1, 1938, directing them to "[s]tart immediately on the thirteen (13) page feature of SUPERMAN for the new Action Comics Magazine." SER-379. DC instructed the pair to adapt the Preexisting Material "into a full length … strip suitable for magazine production," demanding

that their work be "the very best" and "without imperfections." ER-957; SER-381. Siegel and Shuster "compli[ed] with the said request of DC" and submitted the revised and expanded material on February 22, 1938. ER-957. DC later chastised the pair for failing to comply with the formatting requirements, saying that if DC were not so pressed for time, it "would have rejected" their submission. SER-383.

Siegel and Shuster's additions were also created at DC's expense—Siegel and Shuster were paid for their *Action Comics #1* contributions, and DC assumed the financial risk and burden of publishing, distributing, and marketing *Action Comics #1*. ER-75, 425-27, 917, 958, 960; SER-383, 804.

    b.    National *Is Not Preclusive As To The Work-For-Hire Status Of* Action Comics #1

The court below erroneously held that the "thrust" of DC's argument that key elements of *Action Comics #1* were made-for-hire "was made and rejected" in *National* "and is thus precluded as a matter of collateral estoppel." SER-46. Collateral estoppel applies only where "the matter raised in the second suit is identical in all respects with that decided in the first proceeding." *Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948); *see Granite Rock Co. v. Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011). That threshold requirement is not satisfied here.

The issue in *National* was whether Siegel and Shuster owned the renewal copyright in the Superman story in *Action Comics #1*. 364 F.Supp. at 1033. That publication, which contained multiple comic features, was considered a periodical

magazine under the 1909 Act. 17 U.S.C. §24 (1909). That Act provided that the owner of a copyright in a periodical magazine (*i.e.*, DC) could obtain a renewal copyright for the entirety of the magazine, and the author of a discrete portion of that magazine could obtain a renewal copyright for its discrete contribution— unless it was a work-for-hire. *Id.* DC's predecessor, National, renewed the copyright in the entirety of *Action Comics #1* in 1965 "as a proprietor of a work for hire." ER-1018. In 1969, Siegel and Shuster sued National for a declaration that they owned the renewal copyright for the Superman story in *Action Comics #1*.

The district court in *National* found against Siegel and Shuster on two separate, independent grounds. First, the parties' prior agreements assigned all of their rights in Superman to DC, including any copyright renewal rights. *Nat'l*, 364 F.Supp. at 1037-38. Second, the Westchester Court's prior findings concerning the creation of *Action Comics #1* were binding and compelled the conclusion that Siegel and Shuster's contribution was a work-for-hire. *Id.* at 1035-37.

The Second Circuit affirmed on the sole basis that Siegel and Shuster had assigned their renewal rights to DC. *Nat'l*, 508 F.2d at 914. As such, the Second Circuit did not need to reach the second basis for the district court's ruling. In dicta, however, the Second Circuit disagreed with that ruling, stating that "there was no conclusion of law in the [Westchester Action] that the comic strip was a work for hire so as to create the presumption that the employer was the author."

*Id.* The Second Circuit also commented that the evidence was not otherwise "sufficient to create the presumption that the strip was a work for hire" as to Siegel and Shuster's contribution to *Action Comics #1. Id.* But neither the district court nor the Second Circuit reached the opposite conclusion, much less considered whether Superman elements in *Action Comics #1* that were created by DC other artists or added by Siegel and Shuster at DC's instance and expense were works-for-hire—the questions now before this Court. This alone forecloses application of collateral estoppel. *Granite Rock,* 649 F.3d at 1070.

It is irrelevant that, as the court below found, "much of the evidence" cited in DC's motion to prove that the Additional Material was made-for-hire "could have been admitted [in *National*]," but was not. SER-46-48. Collateral estoppel applies only where the identical issue was "actually litigated" and "necessarily decided." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288-89 (2d Cir. 2002); *Shaw v. Hahn,* 56 F.3d 1128, 1131 (9th Cir. 1995).

Nor was the Second Circuit's limited discussion of the work-for-hire issue "necessary to support a valid and final judgment on the merits," as is also required. *Simon,* 310 F.3d at 288-89; *see Shaw,* 56 F.3d at 1132 n.5. The Second Circuit's ruling was based on its finding that Siegel and Shuster assigned all of their rights to DC. Its rejection of the district court's alternative work-for-hire ruling clearly was not "necessary" to its judgment *in DC's favor* affirming that Siegel and Shuster did

not own any renewal copyright in *Action Comics #1*. Such dicta has "no preclusive effect," *EPIC, Inc. v. Pac. Lumber Co.*, 257 F.3d 1071,1077 (9th Cir. 2001), just as "determination[s] adverse to the winning party do not have preclusive effect," *Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069 (9th Cir. 1985).

The district court's ruling should be reversed, and this Court should rule as a matter of law that DC owns the color elements and cover art in *Action Comics #1*, as well as the material added by Siegel and Shuster in 1938.

2. *Pre-McClure Strips*

a. *The Pre-McClure Strips Were Made At DC's Instance And Expense*

After entering into the 1937 Employment Agreement and assigning all of their Superman rights to DC in the 1938 Assignment, but before the parties' business relationship with McClure was formalized in the Syndication Agreement, Siegel and Shuster drafted two weeks of newspaper strips on behalf of DC. ER-615; SER-582-89. The court below wrongly concluded that these Pre-McClure Strips were not made-for-hire because they were created before the Syndication Agreement. ER-109-14.

The Syndication Agreement was not necessary to establishing that the Pre-McClure Strips were made at DC's instance and expense. The Pre-McClure Strips were created during the term of the 1937 Employment Agreement and, even more significantly, after DC became 100% owner of all rights in Superman pursuant to

the 1938 Assignment. *Supra* at 11-12. Given that assignment, DC had full authority to control the development of Superman by artists of its choosing, making any resulting derivative work a work-for-hire. *Supra* at 47.

The district court erroneously assumed that "Siegel created the script and Shuster created the artwork for the [Pre-McClure Strips] without any indication that they received permission to do so beforehand from Detective Comics." ER-111. As Siegel's own account makes clear, these strips were only completed *after* DC gave its consent. ER-615-17, 620. Siegel created a "script"—which did not include any artwork—and sent it to McClure. ER-615. He then approached DC to request permission to proceed. ER-616. DC responded that Siegel needed a "definite offer" from a syndicate. *Id.* It was only then that Shuster "illustrat[ed] Siegel's] script" and Siegel sent the completed strips to McClure. *Id.*

DC also incurred the expense of compensating Siegel and Shuster for their work on the Strips, and (along with McClure) bore the financial risk of the Strips' success. ER-609-11, 466. The Pre-McClure Strips were, in short, made at DC's instance and expense, just like other derivative Superman works produced under similar conditions during the same time period.

b.    *Larson's Failure To List The Pre-McClure Strips In Her Termination Notice Also Precludes Termination*

Wholly apart from their status as works-for-hire, there is a separate reason Larson cannot terminate DC's rights in the Pre-McClure Strips: Larson did not

identify them in her termination notice, as the Copyright Act requires. ER-1023-92.

The Act requires that a termination notice "comply, in form, content, and manner of service, with requirements" that the Copyright Office prescribes. 17 U.S.C. §304(c)(4)(B); *see id.* §702. The Copyright Office's regulations provide that such a notice must "include a clear identification" of "[t]he title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number." 37 C.F.R. §201.10(b)(1)(ii). It is undisputed that Larson's Notices provide *none* of this information for the Pre-McClure Strips—no title, author, copyright date, or registration number.

The court below nevertheless held that this violation of §201.10(b)(1)(ii) was "harmless error," because the Notices include a "catch-all" footnote:

> This Notice of Termination applies to each and every work (in any medium whatsoever, whenever created) that includes or embodies any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stories .... Every reasonable effort has been made to find and list herein every such SUPERMAN-related work ever created. Nonetheless, if any such work has been omitted, such omission is unintentional and involuntary, and this Notice also applies to each and every such omitted work.

ER-132-33; SER-1026. Under 37 C.F.R. §201.10(e)(1), however, an error in a termination notice is harmless only when it "do[e]s not materially affect the

adequacy of the information required to serve the purposes of [17 U.S.C. §304(c)]." Section 201.10(e)(2) identifies the types of immaterial mistakes covered by this rule: good-faith errors made in (1) "giving the date or registration number," (2) identifying the "effective date of termination," (3) "or in describing the precise relationships" between deceased authors and their statutory heirs. The C.F.R. comments confirm that the harmless error rule applies only to mistakes concerning those "specific items" of information. 42 F.R. 45917-19.

None of that applies to the error here, which involves the *complete omission* of *all* information required by §201.10(b)(1)(ii) concerning the Pre-McClure Strips. Larson's Notice deprived DC of any "reasonable opportunity to identify the affected grant and work from the information given in the notice," 42 F.R. 45916-21, 45918, and denied the public its right under the Act to "constructive notice of the facts stated in the recorded document," which is supposed to "specifically identif[y] the work to which it pertains," 17 U.S.C. §§304(c)(4), 205.

The only case to consider this issue confirmed that the complete omission of a work from a termination notice bars recapture of that work. In *Burroughs v. M-G-M, Inc.*, 683 F.2d 610, 622 (2d Cir. 1982), the heirs of Tarzan's creator served a termination notice listing 35 Tarzan stories, including the first, but omitting five later Tarzan works. The Second Circuit affirmed the district court's conclusion that the notice was invalid as to the unlisted works, even though their omission was

"undoubtedly inadvertent," and even though the works contained elements in common with other Tarzan works that were listed and could be recaptured. *Id.* Although *Burroughs* did not use the words "harmless error." ER-36-37, the necessary implication was that the heirs' "inadvertent" omission was not harmless.

Rather than follow *Burroughs*, the district court relied on *Music Sales Corp. v. Morris*, 73 F.Supp.2d 364 (S.D.N.Y. 1999), but that case actually supports DC's position. *Morris* considered whether a termination notice's vague description of the grant to be terminated was sufficient to satisfy §201.10(b)(1)(iv)'s notice requirement. *Morris* did not hold that the failure to identify a *work* was harmless. To the contrary, it acknowledged that a notice "must list all the works in which the grantee's rights are to be terminated," and twice emphasized that "only the works specified in a termination notice are terminated." *Id.* at 378, 380 & 380 n.29.[22]

The district court cited four additional reasons that Larson's omission of the Pre-McClure Strips from her termination notice was harmless. None is persuasive.

_____

[22] As for the vague grant definition *Morris* addressed, the court held it adequate because "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights" for recordation. *Id.* at 378. The court read that statement to demonstrate "how little concrete information need be conveyed and yet still be considered adequate." ER-18. But 37 C.F.R. §201.10(f)(6) (formerly (f)(5)) provided at the time that mere recordation of a termination notice by the Copyright Office "does not mean that it is otherwise sufficient under the law," and that recordation "is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met." The Copyright Office has recently reaffirmed that "recordation of a notice does not mean that the notice meets the requirements of the law." 76 F.R. 32320 (June 6, 2011).

*First*, it found that the Pre-McClure Strips were inextricable from the works listed in the Notices because "the Superman character exists as a conglomerate." ER-28, 31. Larson, however, is only entitled to recapture rights in certain *works*, not an entire character. *See Burroughs*, 683 F.2d at 622-23; 1 WILLIAM F. PATRY, PATRY ON COPYRIGHT §3:164 (1st ed. 2007).

*Second*, the district court found that the catch-all footnote's reference to "Krypton" pointed to the Pre-McClure Strips, which contained the first use of "Krypton." ER-16, 17. But the footnote listed *dozens* of common Superman elements, the vast majority of which were undeniably created by DC and thus not subject to termination—including, *e.g.*, "Smallville," the town where Superman grew up; "Kryptonite," fragments of Krypton that have the power to harm Superman; Clark Kent's co-workers "Jimmy Olsen" and "Perry White"; villain "Lex Luthor"; Superman's adoptive parents, the Kents; love interest "Lana Lang"; and allies like "Supergirl." ER-1026, 2036. The unsurprising fact that the long list of elements in the Notices included *one* element that appeared in the Pre-McClure Strips hardly suffices to give notice that Larson sought to terminate those strips.

*Third*, the district court cited the relatively low number of works omitted from the voluminous Notices. ER-28-29, 132. This makes no sense. Of the more than 15,000 works listed in the Notices, only 15 were deemed subject to termination by the court below: *Action Comics #1*, *Action Comics #4*, portions of

*Superman #1*, and the 12 Pre-McClure Strips. ER-80, 189. The remaining 15,000-plus works reflect obvious overreaching. The 12 Pre-McClure Strips, which represent 80% of the works held to be terminated, were completely omitted from the Notices. The district court's rule would create a perverse incentive to waste hundreds of pages listing non-terminable works to preserve the argument that the notice was intended to encompass all potentially terminable works.

*Fourth*, the court said the "amount of effort" Larson took to prepare the Notices weighed in favor of harmless error. ER-4. But weighing the terminating party's effort in the harmlessness analysis would override the essential balance struck by §201.10(b)(1)(ii). In crafting the provision, the Copyright Office adopted authors' requests to delete certain requirements as unduly burdensome, while accepting movie studios' request to ensure that notices contain "information necessary to give notice" to grantees. 42 F.R. 45917-18. The "amount of effort" required to file a proper notice, in other words, is reflected in the notice requirements themselves—it cannot excuse the failure to meet those requirements.

### 3. *Pages 3-6 Of* Superman #1

*Superman #1* contains the Superman stories published in *Action Comics #1-#4*, plus some new material. As for the story based on *Action Comics #1*, DC revised the first two pages (which the district court held were made-for-hire, ER-81), and added four new pages. ER-761. The court below erroneously concluded

that these four new pages—which became pages 3-6 of *Superman #1*—were not made-for-hire based on hearsay speculation by commentator James Steranko in a foreword to DC's 1989 reprinting of *Superman #1*. ER-81.

Steranko opined that, "according to legend," these pages were part of the original Superman story created by Siegel and Shuster in 1935—before their employment by DC—but were cut from *Action Comics #1*. SER-272. Siegel himself debunked this theory in his memoir, explaining: "[Commentators] state Superman magazine No. 1 contains pages omitted from the Action Comics No. 1 origin story. *The truth is that the additional pages were specifically created for use in Superman Magazine No. 1*." SER-803 (emphasis added). Siegel also recounted in *The Story Behind Superman No. 1* that a DC editor sent him a letter on March 27, 1939 specifying in detail the contents of "the first six pages," including specific panels and headings. ER-761. That is, pages 3-6 were created along with the rest of *Superman #1* in 1939—*after* Siegel was employed by DC— and were thus made as a work-for-hire.[23]

___

[23] Even beyond Siegel's direct repudiation of the "legend," the law requires evidence, not folklore. *See Fox*, 429 F.3d at 880 n.3 (rejecting hearsay statements in magazine that Eisenhower wrote portions of manuscript before being retained by Doubleday); *accord U.S. v. Resnick*, 594 F.3d 562, 570 n.4 (7th Cir. 2010); *Kirby*, 777 F.Supp.2d at 729; *Almond v. ABB Indus. Sys., Inc.*, 2001 WL 242548, *7-8 (S.D. Ohio Mar. 6, 2001). The district court appeared to assume that the party-admission rule would apply because DC published the reprint of *Superman #1* containing Steranko's foreword. ER-81. But there is no evidence that Steranko was speaking on DC's behalf, *cf.* FED. R. EVID. 801(d)(2)(A) (party-admission rule

## 4. *Artwork In* Action Comics #4

The district court held that Siegel wrote a script in 1934 "telling the story of

Superman interceding in a college football game and using his superpowers on the

field," which was incorporated into *Action Comics #4.* ER-51-52, 77-80. It is

undisputed that Siegel did not create *any* artwork to accompany his 1934 script.

Even so, the district court held that Larson could recapture the artwork created for

*Action Comics #4.* ER-77-90.

That conclusion was wrong for two reasons. First, DC created the artwork

and thus owns it as a work-for-hire. *See Scherr v. Universal Match Corp.*, 417

F.2d 497 (2d Cir. 1969). In *Scherr*, a soldier created a "small clay table model" of

an infantryman, and an officer asked him to create a large statue based on the

model. 417 F.2d at 499. The court held that the large statue was made-for-hire,

because "[w]hile the idea for the statue originated from the smaller clay model, the

statue differs from the model." *Id.* Here, the distinction between Siegel's 1934

script and *Action Comics #4* is equally or more substantial—unlike the script,

*Action Comics #4* contains 99 panels of detailed artwork illustrating the story. ER-

551-58. That artwork did not exist at all prior to Siegel's employment by DC.

Because the artwork possesses "more than a *de minimis* quantum of creativity," it

---

applies to statements made "in an individual or representative capacity"), and even
if he were, the foreword obviously contains multiple levels of hearsay.

is independently copyrightable, *Feist*, 499 U.S. at 363, and because it was created at DC's instance and expense, it is owned by DC.

Second, DC is at least joint owner of the overall Superman story in *Action Comics #4*, including its artwork. *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("The contents of a comic book are typically the joint work of four artists—the writer, the penciler[,] the inker[,] ... and the colorist who colors it."). Under the 1909 Act, a joint work was created where multiple authors made contributions to be integrated into a single work. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 410 (2d Cir. 1946). Siegel obviously intended the football-story script to be combined with illustrations to form a comic strip, and DC of course intended its artwork to be combined with Siegel's story. Accordingly, DC is at least a joint owner of the entire *Action Comics #4* story.

## 5. *Promotional Announcements*

While the district court correctly held that Promotional Announcements published prior to *Action Comics #1* were not recaptured, SER-43-44, it erred in describing the copyrightable elements encompassed therein, SER-44-45.

The court's ruling arose from partial summary judgment motions that were never intended to address the *scope* of rights at issue in the Announcements, but only threshold questions concerning the validity of Larson's Notices as to those works. DC argued—and the district court agreed—that Larson failed to recapture

the Announcements published before *Action Comics #1* because they fell outside
the Notice's statutory time limit. SER-43-44; 699-712. Larson has not appealed
that holding, waiving any right to challenge it. *See Gausvik*, 392 F.3d at 1008 n.1.

The court's order, however, made gratuitous and inaccurate comments
concerning the copyrightable elements in the Announcements, based on the court's
review of a poor, multiple-generation photocopy. SER-44-45. DC filed a motion
for clarification asserting that these statements could not be binding because
neither party moved for summary judgment as to the scope of the Announcements.
SER-328-343. The district court found otherwise, on the ground that Larson's
opposition to DC's motion raised "questions concerning the scope of the
copyrightable material contained in those announcements." SER-1. Larson's
opposition, however, contended only that DC's motion raised "classic issues of
fact" concerning the scope of rights in the Announcements, "precluding summary
judgment" on the very scope question the court then decided. SER-356-57.
Indeed, an entire section of Larson's brief was titled "The Question Of What
Literary Elements Are Actually Contained In The Ad [Is] A Genuine Issue Of
Material Fact." SER-356. On reply, DC fully agreed that this issue should be
reserved for trial and was *not* an issue for summary judgment. ER-353.

Before a court can grant summary judgment *sua sponte*, the moving party
must have "reasonable notice" and "a full and fair opportunity to ventilate the

issues." *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982). DC had neither. The only issue on summary judgment was whether the Announcements were covered by Larson's Notices. While the scope question came up in briefing, both parties agreed it was a disputed issue for trial.

The court below also denied DC an opportunity to be heard. Because the only issue properly before the court was when the Announcements were first published—and not their copyrightable content—DC did not present original versions of them. Instead, DC appended a multiple-generation photocopy from *More Fun Comics #31* and a photocopied printout of a photo of *Detective Comics #15*. *See* SER-329-43. After reviewing these poor copies, the district court stated at oral argument: "[Y]ou can hardly make out whether it's an 'S' or a '5' or what it is on his chest." SER-339-340 . Rather than reserving the issue for trial or reviewing an original version, the court's summary judgment order concluded that "the 'S' crest" is not "recognizable." SER-44.

That ruling was incorrect. Where, as here, the content of a work is at issue, "[a]n original writing … is required in order to prove its content." FED. R. EVID. 1002; *see Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986). Given "the hazards of inaccurate or incomplete duplication," *id.*; *see U.S. v. Diaz-Lopez*, 625 F.3d 1198, 1201 (9th Cir. 2010), a copy of lesser quality than the original is not an adequate substitute, *see* 6 WEINSTEIN'S FEDERAL EVIDENCE §1003.02[3]

(2011); *Lozano v. Ashcroft*, 258 F.3d 1160, 1166 (10th Cir. 2001); *U.S. v. Alexander*, 326 F.2d 736, 742-43 (4th Cir. 1964); *Tex Print Indus., Inc. v. Zayre Corp.*, 1977 WL 22752, *1 n.1 (D. Mass. Feb. 10, 1977).

The court's failure to review an original version of the Announcements resulted in multiple errors. As is clear from the copy of *Detective Comics #15* DC seeks to lodge and from the true-to-scale image on the next page below, the Announcements, in fact, clearly do depict Superman's S-shield, super-strength, costume, and facial features. Indeed, the S-shield is as recognizable in the Announcements as in the original *Action Comics #1* cover[24]:

---

[24] The cover reproduced in the summary judgment order was not the version that appeared in 1938—it is from the DC Comics Archive Edition published in 1997. This special edition completely reconstructed the original, which had low color registration making the "S" difficult to discern.

# BRAND NEW!

## AND JUST WHAT YOU'VE BEEN WAITING FOR - -



Look for this dandy new magazine filled with original adventure features and pictures in

### Color!

Written and drawn especially for you by your favorite artists!

You'll miss the treat of a lifetime if you fail to buy a copy!

**10c at all Newsstands**

## SPECIAL PRIZES AND AWARDS!

---

## MORE FUN COMICS

*The National Comics Magazine*

### VINCENT A. SULLIVAN

*Editor*

MORE FUN COMICS, published monthly by Detective Comics, Inc., 480 Lexington Ave., New York, N. Y. Entered as second class matter at Post Office, New York, N. Y. under the Act of March 3, 1879. Subscription rates: 12 issues by mail in the United States, its possessions, and Mexico, South America and Spain, $1.50; elsewhere $2.60. The Publisher accepts no responsibility for unsolicited material. Entire contents copyright 1938 by Detective Comics, Inc. For advertising rates address

GILMAN, NICOLL & RUTHMAN, 19 West 44th St., N. Y.
Branches—Boston, Philadelphia, Chicago, Detroit, San Francisco, Seattle



*Version Electronically Filed By DC Below*



*Version Delivered to Chambers By DC Below*

This Court should reverse the district court's ruling and remand so the

copyrightable elements in the Announcements can be determined at trial.

## CONCLUSION

This Court should grant judgment as a matter of law on DC's settlement and

statute-of-limitations counterclaims and dismiss the remainder of this appeal on

that basis. Alternatively, this Court should remand so the district court can hold a

trial on these counterclaims and fully adjudicate Larson's First Claim and DC's

First Counterclaim as well. If this Court decides to reach the merits of the parties'

First Claims now, it should affirm in part and reverse in part, as described above.

Respectfully submitted,

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

PATRICK T. PERKINS
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, New York 10516

DANIEL M. PETROCELLI
MATTHEW T. KLINE
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

*Attorneys for Warner Bros. Entertainment Inc. and DC Comics*

Dated: March 23, 2003

Exhibit WW
634

## CERTIFICATE OF COMPLIANCE

I certify that this brief is accompanied by an unopposed motion for leave to

file an oversize brief pursuant to Fed. R. App. P. 27, 28.1, and 32 and Circuit Rules

27-1 and 32-2 and is 19,862 words, excluding the portions exempted by Fed. R.

App. P. 32(a)(7)(B)(iii). This brief's type size and type face comply with Fed. R.

App. P. 32(a)(5) and (6).

Dated: March 23, 2012          O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
      Daniel M. Petrocelli
      Attorneys for Warner Bros.
      Entertainment Inc. and DC Comics

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, DC identifies the following related

cases currently pending before this Court:

1. *Pacific Pictures Corp. v. U.S. Dist. Ct.*, Appeal No. 11-71844 (9th Cir.)

(filed June 30, 2011) (argued Feb. 7, 2012) (Kozinski, C.J.; O'Scannlain, J.; Smith,

J.); and

2. *Pacific Pictures Corp. v. DC Comics*, Appeal No. 11-56934 (9th Cir.)

(filed Nov. 2, 2011).

DC has filed concurrently herewith a motion requesting assignment of these

appeals to the same panel that is presiding over Appeal No. 11-71844.

Dated: March 23, 2012                    O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli
Attorneys for Warner Bros.
Entertainment Inc. and DC Comics

## **ADDENDUM**

Except for the following, all applicable statutes, rules, and regulations, are

contained in the Statutory Addendum of Appellant Laura Siegel Larson's First

Brief On Cross-Appeal.

### **17 U.S.C. § 4 (1909) (repealed 1976)**

§ 4. ALL WRITINGS OF AUTHOR INCLUDED.—The works for which

copyright may be secured under this title shall include all the writings of an author.

### **17 U.S.C. § 7 (1909) (repealed 1976)**

§ 7. COPYRIGHT ON COMPILATIONS OF WORKS IN PUBLIC DOMAIN OR

OF COPYRIGHTED WORKS; SUBSISTING COPYRIGHTS NOT

AFFECTED.— Compilations or abridgments, adaptations, arrangements,

dramatizations, translations, or other versions of works in the public domain or of

copyrighted works when produced with, the consent of the proprietor of the

copyright in such works, or works republished with new matter, shall be regarded

as new works subject to copyright under the provisions of this title; but the

publication of any such new works shall not affect the force or validity of any

subsisting copyright upon the matter employed or any part thereof, or be construed

to imply an exclusive right to such use of the original works, or to secure or extend

copyright in such original works.

A-1

**Exhibit WW**
**637**

No copyright shall subsist in the original text of any work which is in the public domain, or in any work which was published in this country or any foreign country prior to July 1, 1909, and has not been already copyrighted in the United States, or in any publication of the United States Government, or any reprint in whole or in p art, thereof, except that the Postmaster General may secure copyright on behalf of the United States in the whole or any part of the publications authorized by section 2506 of title 39.

The publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgment or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor.

## 37 C.F.R. § 201.10

This section covers notices of termination of transfers and licenses under sections 203, 304(c) and 304(d) of title 17, of the United States Code. A termination under section 304(d) is possible only if no termination was made under section 304(c), and federal copyright was originally secured on or between January 1, 1923, and October 26, 1939.

(a) Form. The Copyright Office does not provide printed forms for the use of persons serving notices of termination.

A-2

(b) Contents.

(1) A notice of termination covering the extended renewal term under

sections 304(c) and 304(d) of title 17, U.S.C., must include a clear

identification of each of the following:

(i) Whether the termination is made under section 304(c) or under

section 304(d);

(ii) The name of each grantee whose rights are being terminated, or

the grantee's successor in title, and each address at which service of

the notice is being made;

(iii) The title and the name of at least one author of, and the date

copyright was originally secured in, each work to which the notice of

termination applies; and, if possible and practicable, the original

copyright registration number;

(iv) A brief statement reasonably identifying the grant to which the

notice of termination applies;

(v) The effective date of termination;

(vi) If termination is made under section 304(d), a statement that

termination of renewal term rights under section 304(c) has not been

previously exercised; and

A-3

**Exhibit WW**
**639**

(vii) In the case of a termination of a grant executed by a person or

persons other than the author, a listing of the surviving person or

persons who executed the grant. In the case of a termination of a grant

executed by one or more of the authors of the work where the

termination is exercised by the successors of a deceased author, a

listing of the names and relationships to that deceased author of all of

the following, together with specific indication of the person or

persons executing the notice who constitute more than one-half of that

author's termination interest: That author's surviving widow or

widower; and all of that author's surviving children; and, where any of

that author's children are dead, all of the surviving children of any

such deceased child of that author; however, instead of the

information required by this paragraph (vii), the notice may contain

both of the following:

> (A) A statement of as much of such information as is currently
>
> available to the person or persons signing the notice, with a
>
> brief explanation of the reasons why full information is or may
>
> be lacking; together with
>
> (B) A statement that, to the best knowledge and belief of the
>
> person or persons signing the notice, the notice has been signed

A-4

by all persons whose signature is necessary to terminate the

grant under section 304 of title 17, U.S.C., or by their duly

authorized agents.

(2) A notice of termination of an exclusive or nonexclusive grant of a

transfer or license of copyright or of any right under a copyright, executed

by the author on or after January 1, 1978, under section 203 of title 17,

U.S.C., must include a clear identification of each of the following:

    (i) A statement that the termination is made under section 203;

    (ii) The name of each grantee whose rights are being terminated, or

    the grantee's successor in title, and each address at which service of

    the notice is being made;

    (iii) The date of execution of the grant being terminated and, if the

    grant covered the right of publication of a work, the date of

    publication of the work under the grant;

    (iv) For each work to which the notice of termination applies, the title

    of the work and the name of the author or, in the case of a joint work,

    the authors who executed the grant being terminated; and, if possible

    and practicable, the original copyright registration number;

    (v) A brief statement reasonably identifying the grant to which the

    notice of termination applies;

A-5

**Exhibit WW**
**641**

(vi) The effective date of termination; and

(vii) In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author of all of the following, together with specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest: That author's surviving widow or widower; and all of that author's surviving children; and, where any of that author's children are dead, all of the surviving children of any such deceased child of that author; however, instead of the information required by this paragraph (b)(2)(vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently available to the person or persons signing the notice, with a brief explanation of the reasons why full information is or may be lacking; together with

(B) A statement that, to the best knowledge and belief of the person or persons signing the notice, the notice has been signed by all persons whose signature is necessary to terminate the

A-6

grant under section 203 of title 17, U.S.C., or by their duly
authorized agents.

(3) Clear identification of the information specified by paragraphs (b)(1) and
(b)(2) of this section requires a complete and unambiguous statement of
facts in the notice itself, without incorporation by reference of information in
other documents or records.

(c) Signature.

(1) In the case of a termination of a grant under section 304(c) or section
304(d) executed by a person or persons other than the author, the notice shall
be signed by all of the surviving person or persons who executed the grant,
or by their duly authorized agents.

(2) In the case of a termination of a grant under section 304(c) or section
304(d) executed by one or more of the authors of the work, the notice as to
any one author's share shall be signed by that author or by his or her duly
authorized agent. If that author is dead, the notice shall be signed by the
number and proportion of the owners of that author's termination interest
required under section 304(c) or section 304(d), whichever applies, of title
17, U.S.C., or by their duly authorized agents, and shall contain a brief
statement of their relationship or relationships to that author.

A-7

(3) In the case of a termination of a grant under section 203 executed by one or more of the authors of the work, the notice shall be signed by each author who is terminating the grant or by his or her duly authorized agent. If that author is dead, the notice shall be signed by the number and proportion of the owners of that author's termination interest required under section 203 of title 17, U.S.C., or by their duly authorized agents, and shall contain a brief statement of their relationship or relationships to that author.

(4) Where a signature is by a duly authorized agent, it shall clearly identify the person or persons on whose behalf the agent is acting.

(5) The handwritten signature of each person effecting the termination shall either be accompanied by a statement of the full name and address of that person, typewritten or printed legibly by hand, or shall clearly correspond to such a statement elswhere in the notice.

(d) Service.

(1) The notice of termination shall be served upon each grantee whose rights are being terminated, or the grantee's successor in title, by personal service, or by first-class mail sent to an address which, after a reasonable investigation, is found to be the last known address of the grantee or successor in title.

A-8

Exhibit WW
644

(2) The service provision of section 203, section 304(c) or section 304(d) of title 17, U.S.C., whichever applies, will be satisfied if, before the notice of termination is served, a reasonable investigation is made by the person or persons executing the notice as to the current ownership of the rights being terminated, and based on such investigation:

(i) If there is no reason to believe that such rights have been transferred by the grantee to a successor in title, the notice is served on the grantee; or

(ii) If there is reason to believe that such rights have been transferred by the grantee to a particular successor in title, the notice is served on such successor in title.

(3) For purposes of paragraph (d)(2) of this section, a reasonable investigation includes, but is not limited to, a search of the records in the Copyright Office; in the case of a musical composition with respect to which performing rights are licensed by a performing rights society, a "reasonable investigation" also includes a report from that performing rights society identifying the person or persons claiming current ownership of the rights being terminated.

(4) Compliance with the provisions of paragraphs (d)(2) and (d)(3) of this section will satisfy the service requirements of section 203, section 304(c),

A-9

or section 304(d) of title 17, U.S.C., whichever applies. However, as long as

the statutory requirements have been met, the failure to comply with the

regulatory provisions of paragraph (d)(2) or (d)(3) of this section will not

affect the validity of the service.

(e) Harmless errors.

(1) Harmless errors in a notice that do not materially affect the adequacy of

the information required to serve the purposes of section 203, section 304(c),

or section 304(d) of title 17, U.S.C., whichever applies, shall not render the

notice invalid.

(2) Without prejudice to the general rule provided by paragraph (e)(1) of this

section, errors made in giving the date or registration number referred to in

paragraph (b)(1)(iii), (b)(2)(iii), or (b)(2)(iv) of this section, or in complying

with the provisions of paragraph (b)(1)(vii) or (b)(2)(vii) of this section, or

in describing the precise relationships under paragraph (c)(2) or (c)(3) of this

section, shall not affect the validity of the notice if the errors were made in

good faith and without any intention to deceive, mislead, or conceal relevant

information.

(f) Recordation.

A-10

**Exhibit WW**
**646**

(1) A copy of the notice of termination will be recorded in the Copyright Office upon payment of the fee prescribed by paragraph (2) of this paragraph (f) and upon compliance with the following provisions:

(i) The copy submitted for recordation shall be a complete and exact duplicate of the notice of termination as served and shall include the actual signature or signatures, or a reproduction of the actual signature or signatures, appearing on the notice; where separate copies of the same notice were served on more than one grantee or successor in title, only one copy need be submitted for recordation; and

(ii) The copy submitted for recordation shall be accompanied by a statement setting forth the date on which the notice was served and the manner of service, unless such information is contained in the notice. In instances where service is made by first-class mail, the date of service shall be the day the notice of termination was deposited with the United States Postal Service.

(iii) The copy submitted for recordation must be legible per the requirements of §201.4(c)(3).

(2) The fee for recordation of a document is prescribed in §201.3(c).

(3) The date of recordation is the date when all of the elements required for recordation, including the prescribed fee and, if required, the statement

A-11

referred to in paragraph (f)(1)(ii) of this section, have been received in the
Copyright Office. After recordation, the document, including any
accompanying statement, is returned to the sender with a certificate of
record.

(4) Notwithstanding anything to the contrary in this section, the Copyright
Office reserves the right to refuse recordation of a notice of termination as
such if, in the judgment of the Copyright Office, such notice of termination
is untimely. Conditions under which a notice of termination will be
considered untimely include: the effective date of termination does not fall
within the five-year period described in section 203(a)(3) or section
304(c)(3), as applicable, of title 17, United States Code; or the documents
submitted indicate that the notice of termination was served less than two or
more than ten years before the effective date of termination. If a notice of
termination is untimely or if a document is submitted for recordation as a
notice of termination on or after the effective date of termination, the Office
will offer to record the document as a "document pertaining to copyright"
pursuant to §201.4(c)(3), but the Office will not index the document as a
notice of termination.

(5) In any case where an author agreed, prior to January 1, 1978, to a grant
of a transfer or license of rights in a work that was not created until on or

A-12

**Exhibit WW**
**648**

after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created.

(6) A copy of the notice of termination shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect. However, the fact that the Office has recorded the notice does not mean that it is otherwise sufficient under the law. Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction.

(7) Notices of termination should be submitted to the address specified in §201.1(b)(2).

A-13

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2012, I caused to be electronically filed the Principal And Response Brief Of Cross-Appellants And Appellees Warner Bros. Entertainment Inc. And DC Comics with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all interested parties in this case are registered CM/ECF users.

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on March 23, 2012, at Los Angeles, California.

/s/ Cassandra Seto
Cassandra Seto

OMM_US:70649074

APPELLATE CASE NO. 11-56934

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DC COMICS,

*Plaintiff – Appellee,*

v.

PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF; MARK WARREN PEARY, as personal representative of the Estate of Joseph Shuster; LAURA SIEGEL LARSON, individually and as personal representative of the Estate of Joanne Siegel; JEAN ADELE PEAVY,

*Defendants – Appellants.*

### APPELLANTS' OPENING BRIEF

Appeal From The United States District Court for the Central District of California,
Case No. CV-10-03633 ODW (RZx), Hon. Otis D. Wright II

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff  (188547)
 *mtoberoff@ipwla.com*
Keith G. Adams (240497)
 *kgadams@ipwla.com*
Pablo D. Arredondo (241142)
 *parredondo@ipwla.com*
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101

*Attorneys for Defendants-Appellants, Mark Warren Peary, as personal representative of the Estate of Joseph Shuster Shuster, and Jean Adele Peavy, and Laura Siegel Larson, individually and as personal representative of the Estate of Joanne Siegel*

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
 *rkendall@kbkfirm.com*
Laura W. Brill (195889)
 *lbrill@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California  90067
Telephone:   (310) 556-2700

*Attorneys for Defendants-Appellants, Pacific Pictures Corporation, IP Worldwide, LLC, IPW, LLC, and Marc Toberoff*

**Exhibit XX**
**651**

## **F.R.A.P. 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners make the following disclosure statements:

Defendant-Petitioner IPW, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IPW, LLC.

Defendant-Petitioner IP Worldwide, LLC does not have a parent corporation, nor does any publicly held corporation own 10% or more of IP Worldwide, LLC.

Defendant-Petitioner Pacific Pictures Corporation does not have a parent corporation, nor does any publicly held corporation own 10% or more of Pacific Pictures Corporation.

Dated:  April 24, 2012          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster, and Jean Adele Peavy, and
Laura Siegel Larson, individually and as personal
representative of the Estate of Joanne Siegel

/s/ Laura W. Brill
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC,
IPW, LLC and Marc Toberoff

**Exhibit XX**
**652**

# <u>TABLE OF CONTENTS</u>

STATEMENT OF JURISDICTION..............................................................1

ISSUES PRESENTED.................................................................................1

STATEMENT OF THE CASE.....................................................................2

INTRODUCTION. .......................................................................................2

STATEMENT OF FACTS ...........................................................................6

      A.     The Termination Right .........................................................6

      B.     Joseph Shuster's Death And The 1992 Agreement .............7

      C.     Marc Toberoff's Representation Of The Shusters .............7

      D.     The Siegels' Terminations And Settlement Negotiations....9

      E.     The Siegels Grow Dissatisfied ..........................................11

      F.     The Ari Emanuel Offer ......................................................11

      G.     The Siegels Regroup .........................................................12

      H.     The Siegel Litigations .......................................................13

      I.     The Instant Action .............................................................14

STANDARD OF REVIEW ..........................................................................15

SUMMARY OF ARGUMENT ....................................................................15

ARGUMENT ...............................................................................................19

I.     CALIFORNIA'S ANTI-SLAPP STATUTE PROTECTS
     CITIZENS' RIGHT TO PETITION .............................................19

II.    DC'S CLAIMS FALL UNDER THE ANTI-SLAPP STATUTE ...............20

A.  Claims That Entail Any Non-Incidental Protected Activity
    Are Subject To The Anti-SLAPP Law..................................................20

B.  Filings To Establish A Statutory Property Right, Legal
    Proceedings, Settlement And Other Litigation-Related
    Activities Are All Protected By The Anti-SLAPP Statute .................22

    1.  DC's Fourth Claim Implicates Protected Activity...................24

        a.  The Fourth Claim Arises From Mr. Toberoff's
            Assistance Of The Shuster Executor To Exercise
            His Right To Petition........................................25

        b.  The Fourth Claim Also Concerns Protected
            Conduct In Anticipation of Litigation ......................28

    2.  DC's Fifth Claim Implicates Protected Activity .....................30

        a.  The Fifth Claim Concerns Statutory Termination
            Implicating The Anti-SLAPP Law ................................31

        b.  The Fifth Claim Concerns Settlement,
            Anticipated And Actual Litigation Implicating
            The Anti-SLAPP Law ........................................32

    3.  The Initial Lack Of A Formal Legal Retainer
        Agreement Between The Heirs and Toberoff Does Not
        Change The Analysis ...............................................34

C.  The Sixth Claim Falls Within § 425.16(e).........................................35

D.  The District Court Ignored The Realities Of DC's Claims ...............36

III.  DC'S SLAPP CLAIMS HAVE NO REASONABLE
      PROBABILITY OF SUCCESS ..................................................40

    A.  DC's Fourth Claim Has No Probability Of Success...........................40

**Exhibit XX**

1.    The Fourth Claim Is Barred By The Statute Of
Limitations .................................................................40

2.    The Fourth Claim Is Also Barred By The Litigation
Privilege ....................................................................42

3.    DC's Fourth Claim Fails Because The 1992
Agreement Has No Effect On Termination Rights..................43

a.    The 1992 Agreement Did Not Assign Superman
Rights.................................................................44

b.    No Breach Of The 1992 Agreement................................44

c.    The 1992 Agreement Could Not Waive
Termination As A Matter Of Law .................................45

d.    No "Revocation And Regrant".......................................46

B.    DC's Fifth Claim Has No Probability Of Success............................47

1.    The Fifth Claim Is Barred By the Statute of
Limitations .................................................................47

2.    The Fifth Claim Is Barred By the Litigation Privilege.............49

3.    There Is No Evidence That Mr. Toberoff Interfered
With DC's Purported Prospective Economic
Advantage ..................................................................51

4.    DC Has Shown No "Wrongful Act"........................................53

C.    DC's Sixth Claim Has No Probability of Success .............................54

1.    The Sixth Claim Is Barred By the Statute of
Limitations .................................................................54

2.    DC's Sixth Claim Is Premised On A Non-Existent
"Right" To Negotiate ....................................................55

       3.     The Sixth Claim Is Barred By the Litigation Privilege ............57

       4.     DC's Sixth Claim Is Preempted By the Copyright Act ............58

       5.     DC's Sixth Claim Fails To Plead Conduct That
              Violates the UCL ........................................................................60

CONCLUSION ................................................................................................61

STATEMENT OF RELATED CASES ...................................................................63

CERTIFICATE OF COMPLIANCE ......................................................................64

STATUTORY ADDENDUM ...............................................................................65

CERTIFICATE OF SERVICE .............................................................................75

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Abogados v. AT&T, Inc.*,
223 F.3d 932 (9th Cir. 2000) ................................................................15

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................................................57

*Altera Corp. v. Clear Logic, Inc.*,
424 F.3d 1079 (9th Cir. 2005) .............................................................59

*Aronson v. Kinsella*,
58 Cal. App. 4th 254 (1997) ................................................................58

*Asia Inv. Co. v. Borowski*,
133 Cal. App. 3d 832 (1982) ..........................................................51, 58

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .............................................1, 2, 20, 40

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture
Partners*,
52 Cal. App. 4th 867 (1997) ................................................................45

*Bourne Co. v. MPL Commc'ns, Inc.*,
675 F. Supp. 859 (S.D.N.Y. 1987) .......................................................56

*Brandlin v. Belcher*,
67 Cal. App. 3d 997 (1977) .................................................................34

*Briggs v. Eden Council for Hope & Opportunity*,
19 Cal. 4th 1106 (1999) ............................................................ 23, *passim*

*Cabral v. Martins*,
177 Cal. App. 4th 471 (2009) .............................................................43

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal. 4th 163 (1999) ...................................................................60, 61

*Chang v. Lederman*,
172 Cal. App. 4th 67 (2009) ....................................................................43

*Classic Media, Inc. v. Mewborn* ("*Mewborn*"),
532 F.3d 978 (9th Cir. 2008) ............................................................. 46-47

*Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*,
819 F.2d 1519 (9th Cir. 1987) ................................................................38

*Crowley v. Katleman*,
8 Cal. 4th 666 (1994) ..............................................................................50

*Del Madera Properties v. Rhodes & Gardner, Inc.*,
820 F.2d 973 (9th Cir. 1987) ..................................................................60

*Drum v. Bleau, Fox & Associates*,
107 Cal. App. 4th 1009 (2003) ...............................................................43

*E.E.O.C. v. Waffle House, Inc.*,
534 U.S. 279 (2002) ................................................................................45

*Flatley v. Mauro*,
39 Cal.4th 299 (2006) .............................................................................39

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ............................................................................49

*Fox Searchlight Pictures, Inc. v. Paladino* ("*Fox*"),
89 Cal. App. 4th 294 (2001) ........................................................ 21, 36-37

*GeneThera, Inc. v. Troy & Gould Prof. Corp.*,
171 Cal. App. 4th 901 (2009) .................................................................23

*Hilton v. Hallmark Cards*,
580 F.3d 874 (9th Cir. 2009) ...................................................... 20-21, 23, 27

*Jespersen v. Zubiate-Beauchamp*,
114 Cal. App. 4th 624 (2003) ..........................................................21, 34

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) ................................................................41, 49

*Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*,
285 F.3d 848 (9th Cir. 2002) ....................................................54

*Kashian v. Harriman*,
98 Cal. App. 4th 892 (2002) ........................................23, 39, 50

*Kodadek v. MTV Networks*,
152 F.3d 1209 (9th Cir. 1998) ..................................................59

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ............................................................53

*Ludwig v. Superior Court*,
37 Cal. App. 4th 8 (1995) ...................................................23, 34

*Marvel Characters v. Simon*,
310 F.3d 280 (2d Cir. 2002)......................................................46

*Mindys Cosmetics, Inc. v. Dakar* ("*Mindys*"),
611 F.3d 590 (9th Cir. 2010) ...............................19, *passim*

*Moonrunners L.P. v. Time Warner*,
2005 U.S. Dist. LEXIS 41244 (C.D. Cal. June 17, 2005) .......................3

*Motown Record Corp. v. George A. Hormel & Co.*,
657 F. Supp. 1236 (C.D. Cal. 1987) ........................................59

*Nasr v. Geary*,
2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003) ......................58

*Navellier v. Sletten*,
29 Cal. 4th 82 (2002) ...........................................................20, 23

*Norgart v. Upjohn Co.*,
21 Cal. 4th 383 (1999) ..............................................................49

**Exhibit XX**
**659**

*Olszewski v. Scripps Health*,
30 Cal. 4th 798 (2003) ........................................................................60

*Pacific Gas & Electric Co. v. Bear Stearns & Co.* ("*PG&E*"),
50 Cal. 3d 1118 (1990) ..............................................................27, 43, 51

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985)...........................................................................57

*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*,
20 Cal. 4th 1135 (1999) .....................................................................34

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*,
133 Cal. App. 4th 658 (2005) ............................................................35

*Ritchie v. Williams*,
395 F.3d 283 (6th Cir. 2005) .............................................................58

*Rothman v. Jackson*,
49 Cal. App. 4th 1134 (1996) ............................................................58

*Rubin v. Green*,
4 Cal. 4th 1187 (1993) ............................................................ 24, *passim*

*Rusheen v. Cohen*,
37 Cal. 4th 1048 (2006) .....................................................................42

*Salma v. Capon*,
161 Cal. App. 4th 1275 (2008) ..........................................................21

*Samuels v. Forest*,
2007 WL 3149285 (Cal. App. Oct. 30, 2007) ....................................41

*Seltzer v. Barnes*,
182 Cal. App. 4th 953 (2010) ................................................ 21, *passim*

*Shroyer v. New Cingular Wireless Servs.*,
606 F.3d 658 (9th Cir. 2010) .............................................................61

*Siegel v. National Periodical Publications,*
508 F.2d 909 (2d Cir. 1974)......................................................44

*Siegel v. Warner Bros. Entertainment Inc.* ("*Siegel I*"),
542 F. Supp. 2d 1098 (C.D. Cal. 2008) ...................................... 3, *passim*

*Siegel v. Warner Bros. Entertainment Inc.,*
658 F. Supp. 2d 1036 (C.D. Cal. 2009) .............................................3, 14

*Silberg v. Anderson,*
50 Cal. 3d 205 (1990) ............................................................42

*Slater v. Blackwood,*
15 Cal. 3d 791 (1975) ............................................................22

*Sole Energy Co. v. Petrominerals Corp.,*
128 Cal. App. 4th 212 (2005) ...................................................52

*South Sutter, LLC v. LJ Sutter Partners, L.P.,*
193 Cal. App. 4th 634 (2011) ...............................................22, 27

*Stewart v. Abend,*
495 U.S. 207 (1990)..............................................................46

*Streamcast Networks, Inc. v. Skype Techs., S.A.,*
2006 WL 5441237 (C.D. Cal. Sept. 14, 2006) ...............................41

*Stutz Motor Car of Am. v. Reebok Int'l,*
909 F. Supp. 1353 (C.D. Cal. 1995) .........................................54

*United States v. Lockheed Missiles & Space Co.,*
190 F.3d 963 (9th Cir. 1999) ...................................................19

*Taheri Law Group v. Evans,*
160 Cal. App. 4th 482 (2008) ................................................ 24, *passim*

*Trembath v. Digardi,*
43 Cal. App. 3d 834 (2000) ...................................................40

*Varian Med. Sys., Inc. v. Delfino*,
35 Cal.4th 180 (2005) ..................................................................20

*Wilcox v. Superior Court*,
27 Cal. App. 4th 809 (1994) ...........................................................4

*Wilton v. Mountain Wood Homeowners Assn.*,
18 Cal.App.4th 565 (1993) ...........................................................43

*Youst v. Longo*,
43 Cal. 3d 64 (1987) ............................................................... 51-52

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) ........................................................15

## **Statutes**

17 U.S.C. § 301(a) ......................................................................58

17 U.S.C. § 304(c)(2) ...............................................................7, 45

17 U.S.C. § 304(c)(2)(D) ..........................................................7, 45

17 U.S.C. § 304(c)(5) ..................................................................45

17 U.S.C. § 304(c)(6)(D) ................................................... 18, *passim*

17 U.S.C. § 304(d) .......................................................................9

17 U.S.C. § 304(d)(1) ..................................................................26

28 U.S.C. § 1331 ..........................................................................1

28 U.S.C. § 1338 ..........................................................................1

28 U.S.C. § 1367 ..........................................................................1

Cal. Bus. & Prof. Code § 17208 ....................................................54

Cal. Civil Code § 47(b) ............................................................ 17, *passim*

California Code of Civil Procedure ("CCP"),
CCP § 339(1) ................................................................................40, 47

CCP § 425.16(a) ................................................................................19

CCP § 425.16(b) ............................................................ 20, 22-23

CCP § 425.16(e)(1) ................................................................22, 25

CCP § 425.16(e)(4) ............................................................ 21-22

CCP § 425.16(f) ................................................................................1, 15

CCP § 425.16(g) ................................................................................1

F.R.C.P. 9(b) ................................................................................61

## Other Authorities

61 Cal. Jur. 3d Unfair Competition § 3 (2008) ....................................60

H.R. Rep. No. 94-1476 (1976) ................................................................6

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2010) ("*Nimmer*"),
3 *Nimmer* § 11.01 ................................................................................6

3 *Nimmer* § 11.08[A], n.6 ................................................................56

W. Patry, *Patry on Copyright* (2010)
3 *Patry on Copyright* § 7:47 ................................................................56

3 *Patry on Copyright* § 21:18 ................................................................57

**Exhibit XX**
**663**

## STATEMENT OF JURISDICTION

Plaintiff-Appellee DC Comics ("DC") brought suit for declaratory relief under the Copyright Act and state-law claims against defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC (the "Toberoff Defendants"), defendants Joanne Siegel and Laura Siegel Larson (heirs of Jerome Siegel; the "Siegels") and defendants Mark Warren Peary and Jean Peavy (relatives of Joseph Shuster; the "Shusters") (collectively, "Defendants"). The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338 and 1367.

This Court has jurisdiction pursuant to the collateral order doctrine. *See Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003); California Code of Civil Procedure ("CCP") § 425.16(f)-(g).

## ISSUES PRESENTED

1.    Did the district court err in finding that DC's Fourth, Fifth and Sixth Claims did not fall within California's Anti-SLAPP statute, where such claims were based on the Siegels' and Shusters' exercise of their right to petition via the filing and enforcement of Notices of Termination under the Copyright Act, settlement negotiations, the filing of probate proceedings, and their choice of defendant Mr. Marc Toberoff as counsel?

2.    Did the district court err in failing to find that DC's Fourth, Fifth and

1

**Exhibit XX**
**664**

Sixth Claims did not have a "reasonable probability" of success on the merits,

where such claims are all barred by the statutes of limitations and litigation

privilege, and are substantively meritless as a matter of law?

## STATEMENT OF THE CASE

This is an appeal, authorized by *Batzel*, 333 F.3d at 1025, from the district

court's collateral order, dated October 25, 2011 (ER 1-7), denying Defendants'

motion to strike DC's state-law claims pursuant to California's Anti-SLAPP

statute, CCP § 425.16.  It was timely filed on November 2, 2011.  ER 13-26.

## INTRODUCTION

High school students Jerry Siegel and Joe Shuster created Superman in the

throes of the Great Depression.  In 1938, as a condition to publication, they were

required to sign a "release," and were later held in a 1947 lawsuit to have assigned

away their copyright to DC.  In 1997, Siegel's elderly widow, Joanne Siegel, and

daughter, Laura Siegel Larson, exercised their inalienable rights under section

304(c) of the Copyright Act to restore Siegel's copyrights to his family by

terminating such grants.  In 2003, the Shuster estate followed suit, filing

comparable statutory "notices of termination."

Congress established the "termination right" due to significant concerns that

an author's unequal bargaining power often resulted in the loss of their copyrights

to publishers, without ever realizing their value.  In practice, this imbalance

continues, and this legislative objective is thwarted unless it is enforced; a process

that, as here, can involve years of litigation.  Without effective legal advocacy,

Congress' complicated termination scheme is illusory.

This case centers on the efforts of DC and its parent Warner Bros.

Entertainment Inc. ("Warner") to thwart the Copyright Act's termination right by

attacking the attorneys who vindicate it.  Mr. Toberoff has long represented the

Shusters and the Siegels (the "Heirs") in drafting and filing their statutory notices

of termination with the Copyright Office and in their litigation and settlement

negotiations with Warner/DC.

Mr. Toberoff, representing the Siegels, filed suit against Warner/DC in 2004

to vindicate their termination notices and copyrights.  *Siegel v. Warner Bros.*

*Entertainment Inc.*, C.D. Cal. Case No. 04-08400 ODW (RZx).  In 2008-09,

Warner/DC suffered significant setbacks, as Toberoff secured partial summary

judgment that the Siegels had successfully recaptured their original Superman

copyrights, in what is perhaps the highest-profile case on statutory termination.

*Siegel v. Warner Bros. Entertainment Inc.,* 542 F. Supp. 2d 1098, 1116, 1145 (C.D.

Cal. 2008) ("*Siegel I*"), 658 F. Supp. 2d 1036 (C.D. Cal. 2009) ("*Siegel II*").

Nor was this the first time that Toberoff, a well-known artists' rights

attorney, had prevailed against Warner regarding copyrights.  *See Moonrunners*

*L.P. v. Time Warner,* 2005 U.S. Dist. LEXIS 41244 (C.D. Cal. June 17, 2005).

In 2010, Warner fired their outside counsel, and through DC embarked on a campaign to attack the Heirs by attacking their counsel.  DC filed meritless state-law claims against Mr. Toberoff, recasting protected activity as purported tortious interference and unfair competition.  Yet the alleged "interference" arises fundamentally from the Heirs' exercise and Toberoff's vindication of their federal termination right.

California's Anti-SLAPP law was designed to protect citizens from such claims – "meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816 (1994).  The Anti-SLAPP law allows courts swiftly to dispose of state-law claims implicating such rights, unless the plaintiff demonstrates a "reasonable probability" that it will prevail.  As DC could not meet this burden, its retaliatory claims should have been struck by the district court.

DC's state-law claims, while masked with rhetoric, are directed at activity protected under California's Anti-SLAPP law.

DC's Fourth Claim, for tortious interference with contract, is built on a theory that Mr. Peary's retention of Mr. Toberoff, to help probate Joe Shuster's estate and to file termination notices amounts, to "interference" with a 1992 Agreement between DC and Shuster's siblings.  Claims like this, arising from the

filing of probate proceedings and statutory notices, unequivocally fall within the Anti-SLAPP law.

DC's Fifth Claim, for interference with prospective economic advantage, centers on the Siegels temporarily ending settlement negotiations regarding their termination notices and retention of Mr. Toberoff to file a Superboy termination notice, resume settlement negotiations, and enforce their rights in court. As with the Fourth Claim, such claims of "interference" that arise from settlement negotiations, the filing of statutory notices and the enforcement of legal rights are clearly subject to the Anti-SLAPP law.

DC's Sixth Claim alleges that a *litigation* agreement between the Heirs to collectively negotiate settlement somehow violated California's unfair competition laws. Such litigation and settlement-related activity plainly falls under the Anti-SLAPP law.

The district court failed to appreciate that these are protected petition activities, and that DC's state-law claims fall squarely within the Anti-SLAPP law. Having made this fundamental error, the district court never addressed DC's total inability to establish a *prima facie* case as to any of its retaliatory claims. All of DC's state-law claims are barred by the statutes of limitations and the litigation privilege, and are otherwise meritless, as demonstrated below.

Due to these errors, and Warner's tactics, the Heirs and their counsel have

**Exhibit XX**

suffered and continue to suffer precisely the harms that the Anti-SLAPP law was designed to prevent. Sadly, Joanne Siegel, who fought for more than a decade to see her late husband's rights restored to his family, has recently passed away,[1] her efforts at a fair resolution thwarted by Warner/DC's resource-rich retaliation.

This Court, the California Legislature and state courts throughout California have deemed similar tactics to be against public policy, swiftly striking such claims, as is necessary and appropriate here.

## STATEMENT OF FACTS

### A.  The Termination Right

In 1976, Congress amended the Copyright Act to extend the copyright renewal term. To compensate for authors' unequal bargaining position, it gave authors and their surviving spouses, children, and grandchildren, the right to terminate prior grants of copyright, without cause, so as to benefit from this extension and remedy the author/publisher imbalance. ER 1003 ¶49; 17 U.S.C. § 304 (c)(5); H.R. Rep. No. 94-1476 at 140 (1976); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 11.01.

To safeguard this important "termination right," Congress ensured that it could not be waived or circumvented:  "[t]ermination of the grant may be effected

---

[1] Ms. Larson was substituted as personal representative of Joanne Siegel's estate. Excerpts of Record ("ER"), 750-51, 793-94.

notwithstanding any agreement to the contrary" and "[a] further grant … is valid

only if it is made after the effective date of termination … [or as to] the original

grantee … after the notice of termination has been served…."  17 U.S.C. §§ 304(c)

(5), (c)(6)(D).

### B.    Joseph Shuster's Death And The 1992 Agreement

Joe Shuster died on July 30, 1992, and had no widow or child.  ER 1004

¶51.  Although he was survived by his siblings (*id.*), Frank Shuster (died in 1996)

and Jean Peavy ("Peavy"), siblings hold no termination rights.  17 U.S.C.

§ 304(c)(2).  On October 2, 1992, DC, entered into a one-page agreement with

Frank and Jean ("1992 Agreement") (ER 1005 ¶55), which raised their pension to

$25,000, and stated:

> [T]his agreement fully settles all claims to any payments or other rights or remedies which ***you*** [Frank Shuster and Jean Peavy] may have … regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon.  In any event, ***you*** now grant to us any such rights and release us… and covenant not to assert any claim of right….

ER 671 (emphasis added).

### C.    Marc Toberoff's Representation Of The Shusters

In 1998, Congress amended the 1976 Copyright Act, extending termination

rights to an author's estate.  17 U.S.C. § 304(c)(2)(D).  In mid-to-late 2001, Joe

Shuster's nephew, Mark Warren Peary ("Peary"), spurred by the well-publicized

Siegel termination, sought the advice of an attorney, and contacted Marc Toberoff.

ER 682:7-21, 819:9-25, 852:5-22.  In November 2001, Peary and his mother, Peavy, chose Mr. Toberoff as their counsel and since then he has continuously provided legal advice to them.  ER 821:1-822:22, 853:18-854:3.

Peavy and Peary entered into a November 23, 2001 agreement with Mr. Toberoff's "loan-out" company Pacific Pictures ("2001 PPC Agreement") "to investigate, retrieve, enforce and exploit the Rights ['Joe Shuster and his estate's rights, claims, copyrights']…via the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304(c) of the U.S. Copyright Law (Title 17, U.S.C. )...."  ER 725.  The agreement provided for "Marc Toberoff, Esq. to render legal services … to implement, enforce and prosecute" the above (ER 726 ¶7) and for "a suitable replacement attorney experienced in copyright litigation and willing to enforce the Rights on solely a contingent fee basis" "in the event that Marc Toberoff dies or is disabled."  ER 727 ¶9.

As contemplated, Mr. Toberoff arranged for an estates attorney to probate the estate of Joseph Shuster ("Shuster Estate"), and Mr. Peary was appointed as its personal representative ("Shuster Executor").  ER 771-91.  In October 2003, the 2001 PPC Agreement was modified ("2003 PPC Agreement") (ER 730-33), and confirmed Mr. Toberoff's continued engagement as counsel "to furnish all legal services directly to Client [Shuster Executor] as shall be required."  ER 730 ¶2.

In November 2003, Mr. Toberoff, on behalf of the Shuster Executor, served

and filed with the U.S. Copyright Office a 17 U.S.C. § 304(d) notice of termination of Joe Shuster's Superman copyright grants ("Shuster Termination").  ER 865-81. Toberoff prepared and signed the notice as "counsel for the Estate of Joseph Shuster."  ER 878, 881.

In September 2004, Toberoff, Peary and Peavy cancelled and revoked the 2001/2003 PPC Agreements, replacing them with a legal retainer agreement to clarify Mr. Toberoff's engagement, and their long-standing attorney-client relationship.  ER 695-98, 820:9-14, 825:19-826:23, 849.  To ensure that this retainer agreement, rather than the PPC Agreements, would govern the entire term of their relationship, they made it effective as of November 23, 2001, and it remains in effect today.  ER 695-98.

On April 28, 2005, DC sent the Shuster Executor a low-ball settlement offer to settle all legal claims and buy out his termination interest, referencing DC's purported defenses and lengthy *Siegel* litigations, which he rejected.  ER 766, 861:18-20, 883-89.

## D.    The Siegels' Terminations And Settlement Negotiations

Jerry Siegel died in 1996, survived by his widow, Joanne Siegel, their daughter, Laura Siegel Larson, and his son from a prior marriage, Michael Siegel (died in 2006).  *Siegel I*, 542 F. Supp. 2d at 1113-1114; ER 493 ¶111, 1008-09 ¶67. On April 3, 1997, Joanne and Laura, represented by attorney Arthur Levine,

exercised their rights under 17 U.S.C.§ 304(c) by serving and filing with the

Copyright Office notices of termination (the "Siegel Termination") of Jerry

Siegel's Superman grants.  ER 1008-09 ¶67.

The parties engaged in settlement negotiations.  *Siegel I,* 542 F. Supp. 2d at

1115.  On April 15, 1999, the day before the Siegel Termination was to take effect,

DC contested its "validity and scope."  *Id.*; ER 808-10.  Thereafter, the Siegels

retained attorney Kevin Marks, signed a "tolling agreement" regarding

contemplated litigation, and continued negotiations in 2000-2001.  *Siegel I*, 542 F.

Supp. 2d at 1115; ER 1009 ¶68.

On October 19, 2001, Marks sent DC a "letter outlining the substance of a

settlement offer."  *Siegel I*, 542 F. Supp. 2d at 1136.  DC did not agree to that

proposal.  *Id.*  Instead, on October 26, 2001, DC responded with a materially

different outline and counter-offer.  *Id.*  Months later, on February 1, 2002, DC

sent the Siegels' a 56-page settlement proposal, loaded with "trap doors" and many

new and changed material terms not in Marks' October 19 offer or DC's October

26 counter-offer.  *Id.* at 1115, 1137-40; ER 319:21-330:1, 535-51, 581-638.

As Mr. Toberoff was advising the Shusters, he naturally wanted to know the

status of the Siegel Termination.  ER 827:1-828:4.  He left a phone message for

Marks on November 29, 2001, which Marks did not return.  ER 317:4-11.  On

February 6, 2002, Mr. Toberoff tried again, and the two had a brief conversation

wherein Marks stated that the Siegels were negotiating with DC.  ER 317:18-319:20, 559, 829:16-830:25.

### E.    The Siegels Grow Dissatisfied

Angered by DC's aggressive February 1, 2002 proposal, and dissatisfied with Marks' representation, the Siegels began looking for new counsel, contacting noted trial lawyer Gary Spence in March 2002 for representation.  ER 38-67.

On May 9, 2002, Joanne Siegel, with no involvement by Mr. Toberoff or any other counsel (ER 895:17-896:1), sent a letter to DC's parent company, stating "we were stabbed in the back …. [y]our company's unconscionable contract dated February [1], 2002 contained new, outrageous demands that were not in the proposal….   After four years we have no deal and this contract makes an agreement impossible."  ER 640-42.

Aware of the Siegels' extreme dissatisfaction, Marks drafted a new proposal, which he never sent to DC.  ER 343:18-349:4, 1011-12 ¶¶77-81.  Nor did DC ever attempt to modify or retract its two counter-proposals.  ER 1009-12 ¶¶69-81.

### F.    The Ari Emanuel Offer

In early August 2002, months *after* Joanne Siegel had declared an agreement with DC "impossible," Mr. Toberoff, who had not been in contact with Marks since February 6, and had had no contact with the Siegels, spoke with Marks regarding the Siegel Termination.  ER 831:10-834:24, 897:1-3, 904:6-13.

11
**Exhibit XX**
**674**

As Marks was now open to discussion, Toberoff inquired whether the Siegels were interested in licensing their rights.  ER 332:10-333:6; 834:14-836:1.

In August 2002, Marks, Toberoff and Ari Emanuel, head of William Morris Endeavor, held a conference call during which Emanuel offered to purchase the Siegels' rights for $15 million on terms to be negotiated.  ER 334:1-336:8; 835:5-836:1.  Marks conveyed Emanuel's August 2002 offer to the Siegels, but neither they nor Marks responded to it.  ER 335:23-340:21; 837:24-838:23.

### G.    The Siegels Regroup

On September 21, 2002, the Siegels sent a letter to Marks, with a copy to DC, terminating Marks and providing "notification that we are totally stopping and ending all negotiations with DC."  ER 908:17-909:7; 929; *see Siegel I*, 542 F. Supp. 2d at 1136.  After years of grinding negotiations, the Siegels had had enough.

Seeking new counsel, Joanne Siegel was referred by her friend Peavy to Mr. Toberoff, whom she initially contacted in late September 2002 for legal representation (ER 838:1-839:24; 904:6-13), and Mr. Toberoff soon began providing legal advice to the Siegels.  ER 840:14-841:9, 897:1-3, 904:6-13.

Earlier in 2002, Toberoff and Emanuel had formed a joint venture, IP Worldwide, LLC, to focus on intellectual property.  ER 816:4-16.  The Siegels entered into an agreement with IP Worldwide  ("IPWW Agreement"), dated as of

October 3, 2002, which provides for "the legal services of Marc Toberoff, Esq. and the business services of Ariel Emanuel to market and negotiate the sale, license [or] settlement … of the [Siegel Termination] Rights" for 10% of any proceeds. ER 735-36 ¶¶1, 6.

In November 2002, Mr. Toberoff prepared and filed for the Siegels a statutory notice of termination regarding Superboy. ER 914-27, 1013-16 ¶¶86, 89.

In 2003-2004 Mr. Toberoff held settlement negotiations with DC/Warner regarding Superman/Superboy, but again the parties were unable to reach an agreement. ER 719-21.

On January 21, 2003, the Siegels agreed that Emanuel could attempt to buy-out Michael Siegel's 25% termination interest, but this was unsuccessful. ER 969.

The IPWW Agreement was briefly extended in 2004, and expired on April 23, 2005. ER 736 ¶5, 969.

## H.    The *Siegel* Litigations

After Mr. Toberoff's negotiations with DC/Warner did not result in settlement, the Siegels signed a litigation retainer agreement with him dated October 3, 2004. ER 664, 844:15-18. In October 2004, Toberoff filed two legal actions against Warner/DC to validate the contested Siegel terminations and enforce their copyrights. C.D. Cal. Case No. 04-CV-08400 ODW RZx (Superman), No. 04-CV-08776 (Superboy) ("*Siegel* litigations"); ER 1017 ¶91.

On March 26, 2008, after extensive discovery, the district court granted the

Siegels' motion for summary judgment in dominant part, holding that "all the

Superman material contained in Action Comics, Vol. 1 [first published Superman

comic-book] is not a work-made-for-hire and is therefore subject to termination."

*Siegel I*, 542 F. Supp. 2d at 1130.  The court rejected DC's defenses – most

notably, DC's dubious assertion that the parties had a binding settlement

agreement.  *Id.* at 1139.  The court later held that the Siegels had recaptured other

key *Superman* works.  *Siegel II*, 658 F. Supp. 2d at 1063-83.

The *Siegel* litigations were thereafter transferred to a new district judge,

who, in May 2011, entered a Rule 54(b) judgment that is currently under appeal.

Case Nos. 11-55863, 11-56034.

## I.    The Instant Action

In early 2010, Warner/DC fired their outside counsel, hired new counsel and

embarked on a belligerent new strategy.  After the Heirs did not accept Warner's

offer in a settlement mediation (Document 3-1 at 2), DC filed the instant action, on

May 14, 2010, against its long-time opposing counsel Mr. Toberoff and his clients,

containing state-law claims for purported tortious interference with prospective

economic advantage (Fourth Claim), tortious interference with contract (Fifth

Claim) and unfair competition (Sixth Claim).  ER 1057.

On September 20, 2010, defendants filed an Anti-SLAPP motion and

motions to dismiss DC's state-law claims.  ER 1142-43.  Under CCP § 425.16(f), an Anti-SLAPP motion is to be heard within 30 days as part of the statute's protections.  However, the motions were repeatedly vacated/postponed *sua sponte*, delaying their resolution.  ER 29, 741, 746, 792, 795, 977, 982.  On October 25, 2011, the district court denied the Anti-SLAPP motion on the grounds that DC's claims were purportedly not subject to the Anti-SLAPP statute.  ER 1-7 ("Order").  This appeal followed, rendering it unnecessary for the district court to resolve the motions to dismiss.  ER 13-26.[2]

## STANDARD OF REVIEW

A district court's grant or denial of a motion to strike under California's Anti-SLAPP statute is reviewed *de novo*.  *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007).

## SUMMARY OF ARGUMENT

It is well-established that a defendant targeted for protected speech or petition activity does not lose the protections of the Anti-SLAPP statute due to clever pleading.  No matter how a plaintiff recasts its allegations to mask attacks on protected activity, the Anti-SLAPP statute applies.  Case law dismisses such

---

[2] On April 17, 2012, a panel denied a writ petition regarding a discovery order. In *dicta* the panel commented on facts not before the Court, contradicting prior judgments in other cases. *See Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000).  Appellants will petition to correct these misstatements.

routine maneuvers, and dictates that where, as here, protected conduct is "more than merely incidental" to claims, the Anti-SLAPP statute applies and the plaintiff must show by admissible evidence that its claims have a "reasonable probability of success," or they will be stricken.

DC's state-law claims unmistakably target Mr. Toberoff's support and enforcement of the Heirs' termination rights under the Copyright Act, which is far from "incidental," and DC has failed to show by admissible evidence any probability of success.

Fourth Claim:  This claim is saturated with protected activity.  It alleges Mr. Toberoff induced Jean Peavy and Mark Warren Peary to enter into 2001/2003 PPC Agreements, expressly to probate Joseph Shuster's estate and file the Shuster Termination.  ER 1040-41 ¶¶177-78.  DC alleges that the pursuit of these legal proceedings breached the 1992 Agreement between DC and Jean Peavy, and that Mr. Toberoff tortiously interfered by encouraging the Shusters to pursue this petition activity.  *Id*.

The probate proceeding squarely constitutes protected activity.  The Shuster Termination – an attempt to establish a property right under a comprehensive statutory scheme – is also protected activity.  The PPC Agreements are likewise protected as entered into in furtherance of such activity, and in anticipation of litigation, given DC's challenges to the Siegel Termination.  This claim also

attacks the Shusters' protected choice of counsel.

Fifth Claim:  This claim alleges that, after the Siegels served their

termination notices and engaged in settlement discussions, Mr. Toberoff solicited

them as clients and induced them to end those discussions, to file additional

termination notices, and to enforce their terminations in litigation.  This claim

unambiguously falls within the Anti-SLAPP statute as it is based on terminations,

settlement negotiations, alleged solicitation, and anticipated and actual litigation.

Sixth Claim:  This claim is based on allegations that the Heirs have agreed to

collectively negotiate any settlement with DC, and that this purportedly impedes

DC's alleged right "to negotiate settlement."  Defendants' tactical choices as to the

settlement are unequivocally protected activity under the Anti-SLAPP law.

DC also cannot show any probability of success on its state-law claims:

Fourth Claim:  This claim is barred by the applicable two-year statute of

limitations, which ran from the date DC had inquiry notice.  DC knew in 2003 of

the alleged breach of its 1992 Agreement, when it was served with the Shuster

Termination, and in 2006 DC received the PPC Agreements that form the basis of

its claim.

It is barred by the litigation privilege (Cal. Civil Code § 47(b)) as it based on

Mr. Toberoff's supposed inducement of the Shusters to probate the Shuster estate

and file the Shuster Termination.

The claim is also meritless because (a) the perfunctory 1992 Agreement with Joe Shuster's siblings did not transfer Superman rights *long ago assigned* by Siegel and Shuster to DC, and (b) the Shuster Termination could have not breached the 1992 Agreement because termination rights cannot be waived or encumbered.

Fifth Claim:  This claim is similarly barred by the applicable two-year statute of limitations.  DC knew in 2006 from discovery in *Siegel* the details of the August 2002 offer to the Siegels' attorney that allegedly "interfered;" and received in 2006 a copy of the IPWW Agreement it relies upon.  DC's in-house counsel also read the anonymous "Toberoff Timeline" in 2006.

The Fifth Claim is also barred by the litigation privilege as DC's core allegations concern the rejection of settlement offers and alleged "solicitation" of clients.

Furthermore, this interference claim requires a "wrongful act" and a "reasonable probability" of economic advantage.  DC had no probability of "prospective economic advantage" from negotiations after Joanne Siegel unequivocally rejected DC's proposals in May 2002, well before Mr. Toberoff's alleged "interference" in August 2002.  And after two years of discovery, DC has no admissible evidence of the "wrongful acts" it alleged.

Sixth Claim:  This claim is meritless as it is premised on a fictitious "right" to negotiate with the Heirs under 17 U.S.C. § 304(c)(6)(D) that appears nowhere in

the statute, and it fails to plead any "unlawful, unfair or fraudulent" act under the

UCL.  DC's claim is also preempted, barred by the statute of limitations, and

barred by the litigation privilege because it targets litigation-related activity.

## ARGUMENT

## I.    CALIFORNIA'S ANTI-SLAPP STATUTE PROTECTS CITIZENS' RIGHT TO PETITION

California's Anti-SLAPP law, CCP § 425.16, provides substantive immunity

against claims that interfere with the rights of free speech and petition.  It was

enacted "in response to the legislature's concern about civil actions aimed at

private citizens for exercising their political or legal rights."  *United States v.*

*Lockheed Missiles & Space Co.*, 190 F.3d 963, 970 (9th Cir. 1999); *see* CCP §

425.16(a) ("[T]here has been a disturbing increase in lawsuits brought primarily to

chill the valid exercise of the constitutional rights of freedom of speech and

petition ….").

"The hallmark of a [SLAPP claim] is that it lacks merit and is brought with

the goals of obtaining an economic advantage over a citizen party by increasing the

cost of litigation … and of deterring future litigation." *Id.* at 970-71.  "The statute

was designed to allow courts 'to promptly expose and dismiss meritless and

harassing claims seeking to chill protected expression.'"  *Mindys Cosmetics, Inc. v.*

*Dakar* ("*Mindys*"), 611 F.3d 590, 595 (9th Cir. 2010) (quotation omitted).  *See*

*Varian Med. Sys., Inc. v. Delfino*, 35 Cal.4th 180, 193 (2005) ("The point of the anti-SLAPP statute is that you have a right *not* to be dragged through the courts because you exercised your constitutional rights.").

The Anti-SLAPP law is to be "construed broadly." *Hilton v. Hallmark Cards*, 580 F.3d 874, 882-83 (9th Cir. 2009). "Nothing in the statute itself categorically excludes any particular type of action from its operation." *Navellier v. Sletten*, 29 Cal. 4th 82, 92 (2002). The Anti-SLAPP law applies to state-law claims brought in federal court, and a ruling on an Anti-SLAPP motion is subject to immediate appeal. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003).

To prevail on an Anti-SLAPP motion, a defendant makes a *prima facie* showing that the claims arise from activity protected under the Anti-SLAPP law. *Neville*, 160 Cal. App. 4th at 1261-62. "The burden then shifts to the plaintiff to establish a reasonable probability that the plaintiff will prevail on [the] claim." *Batzel*, 333 F.3d at 1024.

## II.   DC'S CLAIMS FALL UNDER THE ANTI-SLAPP STATUTE

### A.   <u>Claims That Entail Any Non-Incidental Protected Activity Are Subject To The Anti-SLAPP Law</u>

The Anti-SLAPP statute applies to any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech." CCP §§ 425.16(b). Thus, the Anti-SLAPP law "includes not merely

actual exercises of" such rights "but also conduct that furthers such rights." *Hilton,* 599 F.3d at 903; *see id.* at 888 (that this is a "dispute over who can profit from ['a commercial product'] does not defeat" the Anti-SLAPP law); CCP § 425.16(e)(4) (protecting conduct "in connection with a public issue").

In determining whether a cause of action entails protected activity, courts attempt to obtain a complete picture of the claims. *See Jespersen v. Zubiate-Beauchamp*, 114 Cal. App. 4th 624, 630 (2003) (court refused to "wear the blinders that appellants have fashioned" by insisting it look only at the complaint).

A defendant need not show that the entirety of a state-law cause of action is premised on protected activity, as a "a plaintiff cannot frustrate the purpose of the SLAPP statute through a pleading tactic of combining allegations of protected and non-protected activity under the label of one 'cause of action.'" *Fox Searchlight Pictures, Inc. v. Paladino* ("*Fox*"), 89 Cal. App. 4th 294, 308 (2001). Consequently, "a mixed cause of action [with protected and unprotected activity] is subject to section 425.16 if at least one of the underlying acts is protected, unless the allegations of protected conduct are merely incidental to the unprotected activity." *Salma v. Capon*, 161 Cal. App. 4th 1275, 1288 (2008); *see Seltzer v. Barnes*, 182 Cal. App. 4th 953, 962-963 (2010) (same).

For example, protected activity is not "incidental" where it is central to the injury or harm a plaintiff alleges. *See South Sutter, LLC v. LJ Sutter Partners,*

*L.P.*, 193 Cal. App. 4th 634, 660 (2011) (holding that for purposes of the Anti-SLAPP law a "cause of action" is defined by the "injury suffered" by plaintiff); *Slater v. Blackwood*, 15 Cal. 3d 791, 795 (1975) ("[T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted ….").

### B. Filings To Establish A Statutory Property Right, Legal Proceedings, Settlement And Other Litigation-Related Activities Are All Protected By The Anti-SLAPP Statute

The right to petition protected by the Anti-SLAPP statute includes "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law."  CCP § 425.16(e)(1).  This Circuit has held that the Anti-SLAPP law thus clearly applies to filings with government agencies such as the Patent and Trademark Office or the Copyright Office.  *See Mindys,* 611 F.3d at 597.

This Circuit has also found that matters "in the public eye" fall under section 425.16(e)(4)'s protections "in connection with a public issue." *Hilton,* 580 F.3d at 886 (9th Cir. 2009); FAC ¶¶ 34-37 ("Superman has remained constantly in the public's eye").

Furthermore, "[t]he constitutional right of petition encompasses the basic act of filing litigation," *Navellier*, 29 Cal. 4th at 90, and because section 425.16(b)

applies to "any act … in furtherance of the [] right of petition," it applies to any "litigation-related activities." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 908 (2002). Courts adopt an "expansive view of what constitutes litigation-related activities" (*id.*), as the Anti-SLAPP law is to be "construed broadly." *Hilton*, 580 F.3d at 882-83, 903.

If a communication "concern[s] the subject of the dispute" and is made "in anticipation of litigation," it falls within section 426.16(e). *Neville*, 160 Cal. App. 4th at 1268. Therefore, communications regarding the settlement of anticipated litigation are protected. *See id.*; *GeneThera, Inc. v. Troy & Gould Prof. Corp.,* 171 Cal. App. 4th 901, 907-908 (2009) (interference claim regarding settlement negotiations barred by Anti-SLAPP law); *Seltzer*, 182 Cal. App. 4th at 963 (tort claims based on settlement arose from protected activity under §425.16(e)(2)).

Even where a *non-attorney* supports litigation-related activity, Courts will strike the claims. *See Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 12-13 (1995) (Anti-SLAPP law applies to both those who "formally fil[e] a lawsuit" and those "who support[ed] and encourag[ed] the filing of a lawsuit"); *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1110, 1115 (1999) (non-attorney's assistance "in prosecuting a … court action" protected by §425.16(e)).

A citizen's choice of counsel "in furtherance of [her] right of petition," is equally protected. CCP §§ 425.16(b). The Anti-SLAPP law thus applies to

allegedly improper solicitation by an attorney. *See Taheri Law Group v. Evans*, 160 Cal. App. 4th 482, 489 (2008) (holding "it is difficult to conjure a clearer scenario than the case before us of a lawsuit arising from [Anti-SLAPP] protected activity" than an action involving "improper solicitation" by an opposing attorney). "Any other conclusion … would conflict with the client's fundamental right to access the courts, which necessarily includes the right to be represented by the attorney of his or her choice." *Id.* at 490. *See also Rubin v. Green*, 4 Cal. 4th 1187, 1196-98 (1993).

### 1.   DC's Fourth Claim Implicates Protected Activity

The thrust of DC's Fourth Claim is that Mr. Toberoff supposedly "interfered" with DC's 1992 Agreement by causing the Shuster estate to be probated and by thereafter drafting, serving, and filing the estate's statutory termination notices with the U.S. Copyright Office:

- Toberoff "induced the Shuster heirs to serve a notice of termination ...." ER 987-88 ¶6.
- "Toberoff then filed a termination notice on behalf of the Shusters …." ER 989-90 ¶10.
- "The 2001 [PPC] Agreement provided that this purpose would be realized in part 'via the establishment of Joe Shuster's estate … and the estate's termination ….'" ER 1006-07 ¶60.
- "After entering into the 2001 [PPC] Agreement, the Shuster Heirs filed a probate action … to establish the Shuster Estate." ER 1008 ¶65.
- "On November 10, 2003, one week after the 2003 [PPC] Agreement was signed, defendant Mark Peary [Shuster Executor] served on DC Comics a 'Notice of Termination ….'" ER 1017

¶92.

- "[The 1992 Agreement] allowed DC Comics to continue freely… *without the risk of termination of the alleged Shuster rights* or expensive and protracted legal disputes …." ER 1040 ¶176 (emphases added).

- "Toberoff knew that his actions in having his company enter into a joint venture with the Shusters *for the purpose of terminating DC Comics' rights* were substantially certain to interfere with DC Comics' 1992 Agreement with the Shusters…." ER 1040-41 ¶177 (emphases added).

- "As the direct result of Toberoff's and Pacific Pictures' actions, the Shuster Heirs have breached the 1992 Agreement, causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees …." ER 1041 ¶179.

      a.    <u>The Fourth Claim Arises From Mr. Toberoff's</u>

             <u>Assistance Of The Shuster Executor To Exercise His</u>

             <u>Right To Petition</u>

As alleged by DC, the purported "breach" of the 1992 Agreement "induced" by Mr. Toberoff was the Shuster Termination. ER 1040-41 ¶¶176-179. The 2001 PPC Agreement was expressly entered into so as to probate the Shuster estate and execute that termination. ER 1040 ¶177.

In *Mindys,* this Circuit recently held that the Anti-SLAPP law is clearly implicated where, as with the Shuster Termination, an individual "attempt[s] to establish a property right under a comprehensive federal statutory scheme," as such is part of a protected legal proceeding. 611 F.3d at 597 (filing an application with trademark office is protected); *see* CCP § 425.16(e)(1) (right to petition includes "any written or oral statement or writing made before a legislative, executive, or

judicial proceeding, or any other official proceeding authorized by law"); *Plumley v. Mockett*, 164 Cal. App. 4th 1031 (2008) (granting Anti-SLAPP motion to strike claims against attorney for filing with patent office); *Briggs*, 19 Cal. 4th at 1109-10 (granting Anti-SLAPP motion based on filing with government agency and assisting in litigation).

The express purpose of the 2001 PPC Agreement was "the establishment of Joe Shuster's estate and the estate's termination pursuant to Section 304 (c) of the U.S. Copyright Law (Title 17, U.S.C.)." ER 725 ¶1; *see* ER 726 ¶7 ("the Estate of Joseph Shuster (to be established hereunder)."). Under the 2001 PPC Agreement, PPC/Mr. Toberoff paid the "legal fees and costs of setting up Joe Shuster's estate" (ER 725-26 ¶3), so the estate could exercise its termination right. ER 1006-07 ¶60.

The PPC Agreement also expressly designated "Marc Toberoff, Esq., to render legal services" and required him "to implement" the Shuster estate's termination. ER 726 ¶7. Pursuant thereto, he prepared and served a formal "Notice of Termination" signed by "Marc Toberoff, Esq., Counsel for the Estate of Joseph Shuster." ER 878. It was a legally operative document, complete with case citations, proofs of service and other indicia of a lawyer's draftsmanship. ER 869-81. As required by the agreement and statute, the Notice was filed and recorded by Mr. Toberoff with the U.S. Copyright Office. ER 866-68; 17 U.S.C. §§ 304(c)(4), 304(d)(1).

Thus, even if one views the alleged "interference" as relating only to the 2001 PPC Agreement, like the district court (ER 3), the claim still falls within the Anti-SLAPP statute, which "includes not merely actual exercises of" the right of petition "but also conduct that furthers such rights." *Hilton*, 599 F.3d at 903.

The damages alleged in the Fourth Claim all arise from the Shuster Executor's exercise of his right to petition by the Shuster Termination.  DC falsely alleges that the 1992 Agreement enabled it to exploit Superman "without the risk of termination of the alleged Shuster rights" (ER 1040 ¶176), and that this was breached by the Shuster Termination, "causing DC Comics to lose the value of the Agreement and forcing DC Comics to incur substantial attorneys' fees …."  ER 1041 ¶179.  But for the Shuster Termination, DC would have no "resulting damages," a requisite element of any tortious interference claim.  *Pacific Gas & Electric Co. v. Bear Stearns & Co.* ("*PG&E*"), 50 Cal. 3d 1118, 1126 (1990).  *See South Sutter, LLC*, 193 Cal. App. 4th at 660 (for Anti-SLAPP purposes, a cause of action is defined by the "injury suffered").

The Fourth Claim, viewed from every angle – DC's allegations, the 2001 PPC Agreement and/or DC's alleged damages – arises from protected activity.

b.    The Fourth Claim Also Concerns Protected Conduct In

Anticipation of Litigation

The Fourth Claim also implicates litigation-related activity.  The Shuster

Termination was conducted in anticipation of litigation or settlement.  Before Mark

Warren Peary reached out to Mr. Toberoff for legal assistance, the Shusters knew

the Siegels were involved in a legal dispute with DC.  ER 684:2-691:17, 950

(March 2001 letter from Jean Peavy to Joanne Siegel:  "There was so much

injustice done that I am hoping that the wrongs will be righted and that your

attorney [Marks] will get a fair deal for you.").  Aware of the Siegel Termination,

Peary researched copyright attorneys on the internet, and contacted Mr. Toberoff in

2001 for legal advice.  ER 852:5-23.

The 2001/2003 PPC Agreements expressly contemplate litigation:  both state

that PPC will pay "any and all attorneys' fees, costs and disbursements in

connection with any legal actions or disputes concerning the enforcement and/or

defense of the [Termination] Rights" and that Mr. Toberoff would be retained "to

render legal services … in connection with all legal disputes, litigation, arbitration

and/or mediation …."  ER 725-26 ¶¶3, 7; 730-31 ¶¶3, 7.

The probate action filed with Mr. Toberoff's assistance and the Shuster

Termination it enabled (ER 1008 ¶65; 1017 ¶93; 1040-41 ¶177) were both

protected petition activity and a prelude to this litigation, as is apparent from the

*Siegel* litigations. *Briggs*, 19 Cal. 4th at 1115 (§ 425.16 includes "communications preparatory to or in anticipation of the bringing of an action or other official proceeding").

In response to the Shuster Termination, DC sent a letter to the Shuster Executor that referenced its protracted litigation with the Siegels and DC's purported defenses, and made a "settlement" offer that was rejected, leading to this lawsuit.  ER 766, 883-889.

DC also attacks Mr. Toberoff for the alleged litigation strategy of choosing not to pursue Superboy on behalf of the Shuster estate so that the Siegels could sue for copyright infringement (ER 1016 ¶89, 1041 ¶178) – clearly protected litigation-related activity under section 425.16.

The Shusters entered into an attorney-client relationship with Mr. Toberoff in 2001, and subsequently into a formal retainer agreement dated as of 2001, and he has consistently provided legal advice and services to them.  ER 695-98, 726 ¶7, 849, 853:18-855:20.  DC's Fourth Claim accuses Mr. Toberoff of soliciting the Shusters and challenges their choice of Mr. Toberoff as their counsel to assist in probating the Shuster estate, the estate's Shuster Termination, and anticipated litigation, all subject to the Anti-SLAPP law.  ER 725-26 ¶¶2-3, 7; 730 ¶¶2-3; 866-81; 987-90 ¶6, 10; *see Taheri Law Group*, 160 Cal. App. 4th at 489.

## 2.    DC's Fifth Claim Implicates Protected Activity

DC's Fifth Claim is also premised on protected activity:  Mr. Toberoff's

purported improper solicitation of the Siegels allegedly caused them to end

settlement negotiations with DC (ER 1012 ¶80; 1043-44 ¶186) that DC contends

would have "resolv[ed] their claims to the Superman and Superboy rights" (ER

1042-43 ¶182); enter into the IPWW Agreement with Mr. Toberoff (ER 1012 ¶81);

file a Superboy termination notice (ER 1013 ¶86); enter into a litigation retainer

agreement with Mr. Toberoff (ER 664); and file suit against DC (ER 1017 ¶91),

with Toberoff as their counsel, to vindicate their Superman and Superboy rights

ER 1043-44 ¶¶184, 186.  DC alleges:

- "***When a dispute arose in 1997 over the Siegel Heirs' attempt to
  terminate prior grants of Siegel's share of Superman rights, DC
  Comics and Siegel [sic] commenced negotiations***…resolving their
  claims to the Superman and Superboy rights."  ER 1042 ¶182
  (emphasis added).
- "The economic relationship that the Siegel Heirs and DC Comics
  had contemplated and agreed to …. avoid[ed] the possibility of an
  expensive and protracted lawsuit regarding ownership of those
  [Superman and Superboy] rights."  ER 1043 ¶183.
- "In or around August 2002 … Toberoff contacted Marks again
  regarding the Siegel-DC Comics [Settlement] Agreement."  ER
  1011 ¶77.
- "On or around September 21, 2002, based on Toberoff's
  inducements and other acts of interference described above, the
  Siegel Heirs sent a letter to DC Comics repudiating the Siegel-DC
  Comics Agreement."  ER 1012 ¶80 (incorporated by reference).
- "On October 23, 2002, the Siegel Heirs formalized an agreement
  with defendant IP Worldwide for the purpose of 'arrang[ing] and
  negotiat[ing] the sale, lease, license and all other dispositions or

exploitations' of the Siegel Heirs' Superman rights." ER 1012
¶81.

- "After Toberoff induced the Siegel Heirs to repudiate the Siegel-
DC Comics Agreement, on November 8, 2002, the Siegel Heirs
served a second copyright termination notice on DC Comics
directed at the character Superboy." ER 1013 ¶86 (incorporated by
reference).

- "As a direct result of Toberoff's misdeeds, the Siegel Heirs…
ended all further discussions, causing DC Comics … ***to incur
millions of dollars in subsequent legal fees in disputes [the
lawsuit]with the Siegel heirs***." ER 1043-44 ¶ 186.

a.    <u>The Fifth Claim Concerns Statutory Termination</u>

<u>Implicating The Anti-SLAPP Law</u>

DC emphasizes that the basis of its Fifth Claim is supposed interference with

a purported agreement "resolving [the Siegels'] claims to Superman and Superboy

rights." ER 1042-43  ¶¶182-83.[3]  DC alleges that Mr. Toberoff induced "the Siegel

Heirs [to] serve[] a second copyright termination notice on DC Comics directed at

the character Superboy" (ER 1013-16 ¶¶86, 89), and that DC "incurred millions of

dollars in subsequent legal fees" in the Siegels' suits to enforce their Superman and

Superboy terminations, in which Mr. Toberoff served as their counsel.  ER 1043-

44 ¶186.

Both the Siegels' filing of their Superboy termination notices and

---

[3] DC's central allegations flatly contradict the district court's detailed ruling and
subsequent Rule 54(b) judgment in the *Siegel* litigations that no such agreement
existed.  *Siegel I*, 542 F. Supp. 2d at 1136-40.

enforcement of the Superboy and Superman terminations are clearly protected

activity and hardly "incidental" to DC's Fifth Claim.  *See Mindys,* 611 F.3d at 597;

*Plumley,* 164 Cal. App. 4th 1031; *Briggs,* 19 Cal. 4th at 1109-10.

> b.    The Fifth Claim Concerns Settlement, Anticipated And
>
>        Actual Litigation Implicating The Anti-SLAPP Law

Litigation between DC and the Siegels was contemplated as early as 1997,

after the Siegel Termination was served.  ER 1008-09 ¶67.  In April 1999, DC told

the Siegels that it would litigate if the parties failed to settle.  ER 808-10.  The

Siegels and DC thereafter entered into a tolling agreement, and agreed not to

"assert any statute of limitations … defense" for the period up to the formal end of

settlement negotiations, and agreed to treat their settlement communications as

confidential.  *See Siegel I*, 548 F. Supp. 2d at 1136; ER 211:17-212:6 (referring to

litigation "looming over" such negotiations), 811-13.  Extremely disappointed by

DC's February 2002 settlement proposal, the Siegels began searching for new

counsel in March 2002.  ER 38-67.

All of DC's alleged damages arise out of the Siegels' decision to temporarily

cease settlement negotiations with DC, retain Mr. Toberoff, and to ultimately file

suit to enforce their rights.  ER 1012 ¶¶80-81; 1042-44 ¶¶182-185, 186 ("the

[Siegels]… ended all further discussions, causing DC Comics … to incur millions

of dollars in subsequent legal fees in disputes with the Siegel[s].").

In Fall 2002, after Joanne Siegel was referred to Mr. Toberoff by her friend Peavy, she contacted him seeking legal representation. ER 838:1-839:24; 904:6-13. The Siegels and Mr. Toberoff formed an attorney-client relationship and he has represented them ever since, including in over seven years of litigation with DC. ER 840:14-841:9, 897:1-3, 904:6-13. The Siegels' IPWW Agreement with Mr. Toberoff, attacked by DC (ER 1011-14 ¶¶78, 81-84; 1043 ¶185), explicitly provided for "the legal services of Marc Toberoff, Esq.," entailed his legal services regarding "settlement," and contemplated his retention in litigation. ER 735-37 ¶¶2, 10. Mr. Toberoff resumed settlement talks with Warner/DC in 2003-04, and when such failed, he and the Siegels signed a standard litigation retainer agreement, pursuant to which he enforced the Siegel Termination in years of hard-fought litigation. ER 664-69, 719-21, 737 ¶7, 844:15-18, 969.

As DC's Fifth Claim is inextricably based on the Siegels' decision to temporarily end settlement negotiations, and on anticipated and actual litigation, it unambiguously falls within section 425.16(e). DC's Fifth Claim is also subject to the Anti-SLAPP law because it is premised on Mr. Toberoff's alleged wrongful solicitation of the Siegels and on their choice of him as counsel. ER 1043-44 ¶¶ 185-86; *Taheri*, 160 Cal. App. 4th at 489.

To allow DC's complaint to obscure this reality is to fall prey to the very "blinders" courts have cautioned against in applying the Anti-SLAPP law.

33

**Exhibit XX**

**696**

*Jespersen*, 114 Cal. App. 4th at 630.

### 3.    The Initial Lack Of A Formal Legal Retainer Agreement Between The Heirs and Toberoff Does Not Change The Analysis

DC's allegation (ER 1007-13 ¶¶64, 83), adopted by the district court (ER 6),

that the Heirs choice of Mr. Toberoff and the legal advice/services he rendered

were not protected because he did not at first have a formal "legal retainer

agreement" is erroneous.  The Heirs clearly testified that Toberoff acted at all

times as their lawyer (ER 838:1-839:7, 840:14-841:9, 846:1-6, 853:18-854:3,

891:1-3, 904:6-13), as confirmed by the record evidence.  ER 726 ¶7, 731 ¶7, 735

¶2.  Moreover, "neither a retainer nor formal agreement is required to establish the

attorney-client relationship."  *Brandlin v. Belcher*, 67 Cal. App. 3d 997, 1001

(1977).  *See People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems,

Inc.*, 20 Cal. 4th 1135, 1147 (1999) ("'When a party seeking legal advice consults

an attorney at law and secures that advice, the relation of attorney and client is

established *prima facie*.'") (citation omitted).  Moreover, even conduct by

nonlawyers that facilitates petition activity is protected by the Anti-SLAPP Law.

Whether he acted as an attorney or merely "support[ed] and encourag[ed]"

litigation, Mr. Toberoff's assistance in the Heirs' assertion of statutory termination

rights is protected.  *Ludwig*, 37 Cal. App. 4th at 12-13; *see Briggs,* 19 Cal. 4th at

1110, 1115.

## C.    The Sixth Claim Falls Within § 425.16(e)

DC's Sixth Claim also concerns activity protected by the Anti-SLAPP law,

as it alleges that agreements between the Defendants violate California's unfair

competition laws by impeding DC's *settlement* negotiations with the Siegels and

Shusters.  ER 1044 ¶¶187-188.

It is clear that DC's Sixth Claim, like its closely-related Third Claim,

focuses, as DC later clarified, on an alleged "[consent] agreement [the Heirs] made

in 2008, in advance of a [settlement] mediation with DC in the *Siegel* litigation" to

collectively negotiate settlement.  ER 367.  On its face, the Sixth Claim challenges

protected settlement activity during litigation.  *See Seltzer*, 182 Cal. App. 4th at

962; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133

Cal. App. 4th 658, 672 (2005) (Anti-SLAPP statute applies to "litigation tactics"

supporting a "position in an ongoing lawsuit").

As set forth above, the PPC and IPWW Agreements, which the Sixth Claim

references, are also protected because such expressly provided for Mr. Toberoff's

legal services regarding the Heirs' statutory terminations, he in fact rendered such

services, and the Heirs both sought and relied upon his legal advice in anticipation

of litigation, actual litigation and settlement negotiations with DC.  ER 664-69,

695-698, 725-26 ¶¶2-3, 7; 730 ¶¶2-3; 735 ¶2.

D.     **The District Court Ignored The Realities Of DC's Claims**

The district court erred in accepting DC's mischaracterization of its complaint and by failing to apply well-established caselaw that the Anti-SLAPP statute applies where protected activity is more than incidental to a claim.

Fourth Claim:  The district court found, contrary to both DC's complaint and a complete picture of the record, that the "protected activity advanced by Defendants, while relevant to be sure, are not the material facts underlying the alleged interference." ER 3.  It held that the purported "interference was Mr. Toberoff's inducement of the Shusters to repudiate the 1992 Agreement" and that "while such protected activity [the Shuster Termination] may *evidence* the alleged interference, it does not shield it." *Id.* (emphasis in original).

As interpreted by the court, the alleged "interference" was the 2001 PPC Agreement that purportedly induced the Shuster Termination. *Id.*; ER 1040-41¶177.  As shown above, the objective of the 2001 PPC Agreement was classic protected petition activity, namely probate proceedings and the filing of statutory termination notices.  ER 725-26 ¶¶1, 3, 7; 1006-08 ¶¶60, 65.

The district court ignored that supposedly "unprotected" activity was inextricably linked *in both DC's FAC and reality* to clearly protected activity, despite DC's "pleading tactic of combining allegations of protected and nonprotected activity" under one cause of action.  *Fox,* 89 Cal.App.4th at 308.

The court's Order was further premised on the critical misconception that "the Pacific Pictures Agreements essentially gut the 1992 Agreement, purporting to assign to Toberoff those rights which were already assigned to DC Comics."  ER 3.  As shown below, the PPC Agreements could do no such thing as a matter of law (17 U.S.C. § 304(c)(6)(D)), and therefore had no effect on the 1992 Agreement.

In any event, the district court erred by assuming interference and that, because DC pled a "business tort," it fell outside the Anti-SLAPP statute.  ER 2. This circularity begs and "confuses the threshold question of whether the SLAPP statute applies with the question of whether [the plaintiff] has established a probability of success on the merits."  *Fox,* 89 Cal.App.4th at 305.  It also defeats the underlying purpose of the Anti-SLAPP statute, as "[t]he favored causes of action in SLAPP suits are … business torts such as interference with prospective economic advantage."  *Briggs,* 19 Cal. 4th at 1125.  Ironically, by conflating and assuming the merits to deny application of the Anti-SLAPP law, the district court never reached the merits, or Defendants' demonstration that DC's claims are barred and frivolous as a matter of law.  ER 3, 6.

<u>Fifth Claim:</u>  The district court held that the Fifth Claim was not subject to the Anti-SLAPP statute because it was unclear whether "'Toberoff's communications with the Siegels occurred in connection with settlement

negotiations and anticipated litigation.'" ER 4.  This lack of clarity arose from

DC's allegations that "'at the time Toberoff approached the Siegel Heir[s] in 2001

[*sic*], DC Comics and the Siegel Heirs had finally reached an agreement'" (ER 4),

contrary to all the record evidence and the detailed ruling in *Siegel*, 542 F. Supp.

2d at 1136-40, that no agreement was consummated.

The Order's flawed reasoning appeared to be: (1) if there was no agreement

between DC and the Siegels, Toberoff's communications would have been

protected as "'occurr[ing] in connection with settlement negotiations and

anticipated litigation;'" but (2) as it could not be determined whether there was an

agreement, (3) Toberoff's communications fell outside the Anti-SLAPP statute.

*See Seltzer*, 182 Cal. App. 4th at 965 ("The burden is on the party opposing a

section 425.16 motion to strike to show that no factual dispute exists.").

Critically, the Order contradicted the district court's own judgment in *Siegel*,

which incorporated the ruling that no settlement agreement had been reached,

binding DC and the district court.  *See Continental Airlines, Inc. v. Goodyear Tire

& Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987).

The Order also contained numerous misstatements of basic facts.  For

example, it gave great weight to the proximity of Mr. Toberoff's "November 28,

2001" agreement with the Shusters "a month or so *after* DC Comics and the

Shusters had reached a 'settlement in principle'" as "counsel[ing] against striking

[DC's] claims," when DC's alleged 2001 settlement in principle was with the Siegels, not the Shusters – who had not even engaged in settlement negotiations. ER 6 (emphasis in original).

Again, the district court found that the claim fell outside the Anti-SLAPP statute by improperly conflating the merits and assuming interference.  ER 4-5; *see Flatley v. Mauro*, 39 Cal.4th 299, 316 (2006) ("If, however, a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits"); *Kashian*, 98 Cal. App. 4th at 910–911 ("[C]onduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage … simply because it is alleged to have been unlawful or unethical.").

Sixth Claim:  The Order ignored the protected 2008 Consent Agreement regarding litigation settlement at the heart of DC's Sixth Claim.  It also ignored that both the PPC and IPWW agreements *expressly* provided for Mr. Toberoff's legal services; that the Heirs both sought and relied upon his legal advice; and that Mr. Toberoff has consistently provided legal advice/services to the Heirs.  Instead, the district court found that the Sixth Claim fell outside the Anti-SLAPP law because (i) the 2003 PPC Agreement stated PPC "is not a law firm," and (ii) the IPWW Agreement, though expressly providing for "the legal services of Marc

Toberoff, Esq." in connection with the "settlement … of the [Siegels' Termination]

Rights" (ER 730 ¶2), stated that it "did not include legal services in connection

with litigation…. [to be rendered] subject to good faith negotiation of a mutually

acceptable agreement" (ER 6, 732 ¶10), which was thereafter done.  ER 664-69.

## III.  DC'S SLAPP CLAIMS HAVE NO REASONABLE PROBABILITY OF SUCCESS

As DC's state-law claims fall within the Anti-SLAPP statute, it has the

"burden … to establish a reasonable probability that [it] will prevail."  *Batzel*, 333

F.3d at 1024.  DC can make no such showing.

### A.  DC's Fourth Claim Has No Probability Of Success

#### 1.  The Fourth Claim Is Barred By The Statute Of Limitations

DC's initial complaint was filed on May 14, 2010.  ER 1057.  As claims for

tortious interference with a contract accrue upon the alleged breach of contract,

DC's Fourth Claim is barred by the two-year statute of limitations.  *See* CCP §

339(1); *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (2000) ("[T]he accrual date

could not be later than the actual breach of the contract by the party who was

wrongfully induced to breach").

Both DC and the district court argued that the 2001/2003 PPC Agreements

constitute the alleged tortious interference and breach.  ER 2, 365.  DC knew about

the 2001 and 2003 PPC Agreements by no later than November 15, **2006,** when

unredacted copies of *both* agreements were produced in the *Siegel* action, and DC

used such agreements in depositions.  ER 724-33, 959.  *See Samuels v. Forest*,

2007 WL 3149285, at *8 (Cal. App. Oct. 30, 2007) (plaintiff on notice of

interference claim once he saw allegedly interfering agreement).

DC's Fourth Claim also relies on allegations that the November 10, **2003**

service on DC and filing of the Shuster Termination, signed by Mr. Toberoff, itself

*breached* the 1992 Agreement, triggering the statute.  *See* FAC 1006-1018, ¶¶ 58,

60-65, 90, 92, 99, 1040-41 ¶177 ("terminating DC Comics rights w[as]

substantially certain to interfere with DC Comics' 1992 Agreement"), 1041 ¶178;

*Streamcast Networks, Inc. v. Skype Techs., S.A.*, 2006 WL 5441237, at *10 (C.D.

Cal. Sept. 14, 2006) (interference claim accrued once plaintiff knew that

counterparty sought to "terminate the [contract]").

DC's Fifth Claim is unequivocally barred by the two-year statute of

limitations because DC was on "notice" of its purported claim in 2003, *seven years*

earlier, or, at the very latest, by 2006, *three years* before DC filed its complaint.

California's "discovery rule" cannot save DC's Fourth Claim because "the

limitations period begins once the plaintiff 'has notice or information of

circumstances to put a reasonable person on inquiry.'  A plaintiff need not be

aware of the specific 'facts' necessary to establish the claim …."  *Jolly v. Eli Lilly

& Co.*, 44 Cal. 3d 1103, 1110-11 (1988) (citation omitted).  Given DC's receipt of

41

**Exhibit XX**

**704**

the Shuster Termination in 2003 and receipt of the 2001 and 2003 PPC

Agreements in 2006, DC cannot invoke the discovery rule.

### 2.   The Fourth Claim Is Also Barred By The Litigation Privilege

California Civil Code § 47(b) provides absolute immunity against tort claims

based on any communication in any "judicial proceeding" or "any other official

proceeding authorized by law" (*Silberg v. Anderson*, 50 Cal. 3d 205, 211-12

(1990)), and all "noncommunicative actions which are necessarily related to that

communicative act."  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1052 (2006) ("[The

litigation privilege] is not limited to statements made during … proceedings, but

may extend to steps taken prior thereto, or afterwards.").

The analysis is comparable to that for determining whether the Anti-SLAPP

law applies.  *See Briggs*, 19 Cal.4th at 1115 (noting overlap between the litigation

privilege and Anti-SLAPP law).

DC's Fourth Claim is barred by the litigation privilege on three grounds:

*First*, the Fourth Claim alleges conduct protected by the litigation privilege

as it is based on allegations that Mr. Toberoff "induce[d] the Shuster Heirs" to

become his clients.  ER 726 ¶ 7 (Mr. Toberoff is "to render legal services …

including in connection with all legal disputes…."), 1040-41 ¶¶178-79; *Rubin*, 4

Cal. 4th at 1196-98.

*Second*, as admitted by DC, the clear and express purpose of the PPC

Agreements was "'the establishment of Joe Shuster's estate … and the estate's

termination pursuant to Section 304(c) of the U.S. Copyright [Act].'"  ER 1006-07

¶60.  *See* ER 1039-41 ¶¶175-179.  Acts supporting probate proceedings "are all

absolutely protected by the litigation privilege."  *Cabral v. Martins*, 177 Cal. App.

4th 471, 485 (2009); *see Chang v. Lederman*, 172 Cal. App. 4th 67, 87 (2009)

(letter "sent to further the objectives of the probate proceedings" privileged).

*Third*, Mr. Toberoff's drafting, service and filing of the Shuster Termination,

central to the PPC Agreements and DC's "interference" allegations (ER 1040-41 ¶

177), is protected.  *See Drum v. Bleau, Fox & Associates*, 107 Cal. App. 4th 1009,

1028 (2003) (filing with a government agency of "a notice … of a potential interest

in property" is protected); *Wilton v. Mountain Wood Homeowners Assn.*, 18

Cal.App.4th 565, 569-70 (1993) (filing of lien protected).

### 3.    DC's Fourth Claim Fails Because The 1992 Agreement Has No Effect On Termination Rights

Tortious interference with contract requires "a valid contract" and an "actual

breach or disruption of the contractual relationship."  *PG&E*, 50 Cal. 3d at 1126.

DC alleges, and the district court accepted (ER 3), that the 1992 Agreement was

interfered with because "terminating DC Comics' rights was substantially certain

to interfere with DC Comics' 1992 Agreement."  ER 1040-41 ¶177.  However, the

perfunctory 1992 Agreement was **irrelevant** to both the Shuster Termination and

DC's long extant ownership of Superman.

> a.    The 1992 Agreement Did Not Assign Superman Rights

DC's "interference" claim is based on a totally erroneous premise, namely

that the 1992 Agreement granted Superman rights to DC. On its face, it did no

such thing. The one-page 1992 Agreement does not purport to revoke or replace

Siegel and Shuster's longstanding Superman copyright grants to DC, under which

DC has owned and exploited Superman for decades. ER 671, 996-1002 ¶¶32, 37,

44, 46-47; *Siegel v. National Periodical Publications,* 508 F.2d 909 (2d Cir. 1974).

The 1992 Agreement does not even mention Superman. ER 671. DC simply

added a form quitclaim of Frank Shuster and Jean Peavy's rights, *if any*, in raising

their annual pension by a few thousand dollars. *Id.*

> b.    No Breach Of The 1992 Agreement

DC makes no cognizable allegation of any breach of any term of the 1992

Agreement. The parties to the agreement are DC, and Joe Shuster's siblings, Frank

Shuster (who died in 1996) and Jean Peavy. ER 1005-06 ¶¶55, 57. It contains

only three obligations of Frank and Jean: they settled any claim to payment,

quitclaimed to DC and covenanted not to assert any rights that they held relating to

Joe Shuster's works. ER 671. The 1992 Agreement does not pertain to any right,

remedy or claim of anyone other than Frank or Jean.

A deceased author's siblings, like Frank and Jean, have *never* held

termination rights under the Copyright Act.  17 U.S.C. § 304(c)(2).  In 1992, no

one held Joe Shuster's termination rights as he left no widow or child.  ER 1004

¶51.  It was not until 1998, when Congress extended termination rights to "the

author's executor [or] personal representative," 17 U.S.C. § 304(c)(2)(D), that it

became possible to exercise such rights by probating Joe Shuster's estate, which

was not done until 2003.  ER 1008 ¶65.

The sole party with the power to exercise the termination right is the Shuster

Executor.  As neither the Shuster Executor nor the estate were parties to the 1992

Agreement, it has no bearing on them.  *See E.E.O.C. v. Waffle House, Inc.*, 534

U.S. 279, 294 (2002) ("[A] contract cannot bind a nonparty.").

c.    The 1992 Agreement Could Not Waive Termination As
      A Matter Of Law

In order for a claim for interference with a contract to stand, the underlying

contract must be enforceable.  *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla

Village Square Venture Partners*, 52 Cal. App. 4th 867, 877-80 (1997).  If the 1992

Agreement were construed to waive, prohibit or encumber the Shuster

Termination, it would be void under the Copyright Act, which gives the right to

terminate "notwithstanding any agreement to the contrary."  17 U.S.C. § 304(c)(5).

To further protect the termination right, Congress specified that "an agreement to

grant rights covered by a terminated grant is not valid if entered before notice of termination," 17 U.S.C. § 304(c)(6)(D), which was not done here until 2003. *See Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("[1976 Act] provides an inalienable termination right"); *Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.").

Accordingly, even if the 1992 Agreement were somehow construed as transferring or impeding the Shuster Executor's termination right, it would be unenforceable.

### d.    No "Revocation And Regrant"

*Milne v. Stephen Slesinger, Inc.,* 430 F.3d 1036, 1040 n.5, 1042-45 (9th Cir. 2005), recognized a narrow exception to the above rule of inalienability where there is no longer an operative pre-1978 copyright grant to terminate because a party, with the leverage of a then-current termination right, expressly *revoked* a pre-1978 copyright grant, and replaced it with a non-terminable post-1978 copyright *re-grant*. The Ninth Circuit limited *Milne* in *Classic Media, Inc. v. Mewborn* ("*Mewborn*"), 532 F.3d 978, 986-89 (9th Cir. 2008), where the plaintiff publisher tried to evade termination by mischaracterizing a redundant post-January 1, 1978 grant as a "revocation and regrant" to artificially invoke *Milne's* narrow exception. This Circuit held that the post-January 1, 1978 grant was a "nullity,"

because it purported to grant copyright interests that had already been granted to the publisher, and did not expressly revoke that operative pre-1978 grant. *Id.*

DC's Fourth Claim and the 1992 Agreement clearly fall within *Mewborn*. As in *Mewborn*, the purported grantee, DC, already long owned Joe Shuster's Superman rights at the time of the 1992 Agreement, which itself contained no language of revocation and did not mention statutory termination as the purported grantors (Jean and Frank) were not eligible. ER 671. If anything, DC's claim is even weaker than that rejected in *Mewborn*, where the grantor had a future termination right.

In sum, DC's 1992 Agreement with Jean Peavy and Frank Shuster was completely irrelevant to the Shuster Termination as a matter of law. Therefore, the 1992 Agreement could not have been breached by the PPC Agreements/Shuster Termination, as assumed by the district court.

### B.    DC's Fifth Claim Has No Probability Of Success

#### 1.    The Fifth Claim Is Barred By the Statute of Limitations

Like DC's Fourth Claim, DC's Fifth Claim for interference with prospective economic advantage is barred by the applicable two-year statute of limitations. CCP § 339(1). The alleged interference by Mr. Toberoff occurred in **2002**, when the Siegels fired their then-attorney Marks and ended his settlement negotiations on their behalf with DC. ER 1011-12 ¶¶78-80; 1041-44 ¶¶180-86.

47
**Exhibit XX**
**710**

DC cannot possibly meet its burden of showing facts sufficient to invoke the "discovery rule," because DC had more than ample facts to have put it on inquiry notice regarding its claim by 2006, at the latest.  DC alleges that a September 21, 2002 letter from the Siegels ended DC's negotiations and its prospective economic advantage.  ER 1012 ¶80.  On October 7, 2006, DC deposed the Siegels' former attorney Kevin Marks, who testified that in August 2002, Mr. Emanuel offered to purchase the Siegels' Superman rights.  ER 335:1-5.  On November 17, 2006, a copy of the IPWW Agreement dated as of October 3, 2002 was produced to DC in *Siegel*, which provided for Toberoff and Emanuel to "arrange and negotiate the sale, lease, license, and all other dispositions" of the Siegels' Superman rights.  ER 737 ¶7, 959.

Thus, by 2006, DC indisputably knew that its supposed economic relationship had allegedly been disrupted (ER 1012 ¶80); and that shortly thereafter Toberoff and Emanuel entered into the IPWW agreement with the Siegels (ER 1012-13 ¶¶81-84) to represent the Superman rights DC had been negotiating to buy.  ER 1008-12 ¶¶67-69, 81; 1042-43 ¶¶182-85.

All that information was more than sufficient to have raised a reasonable suspicion as to the allegations of DC's Fifth Claim.  ER 1039 ¶¶ 171-72.  The law is crystal-clear that claims accrue when the plaintiff "at least 'suspects … that someone has done something wrong' to him," and that the plaintiff "need not know

the 'specific facts'" involved in the allegations.  *Norgart v. Upjohn Co.*, 21 Cal. 4th

383, 397-398 (1999) (citations omitted).  *See Fox v. Ethicon Endo-Surgery, Inc.*,

35 Cal. 4th 797, 807-08 (2005) (same); *Jolly*, 44 Cal. 3d at 1110-11 (plaintiff has

enough information "to put a reasonable person on inquiry").

DC has argued that it only became aware of the alleged "wrongful acts"

through the anonymous "Toberoff Timeline."  DC's in-house legal team at its

parent company, Warner Bros., admitted that they read and knew the contents of

the Timeline in mid-2006.  ER 760-61 ¶3 ("I [Wayne Smith, Warner's in-house

counsel] looked at what might be characterized as the 'cover letter' [Timeline] that

came with the Superman Documents," and Smith summarizes its contents), ¶4

("Mr. Schulman [Warner's General Counsel] … advised me that he had only

looked at the cover letter [Timeline] ….").

The two-year limitations period was indisputably triggered in 2006, nearly

*four years* before DC filed its complaint.

### 2.    The Fifth Claim Is Barred By the Litigation Privilege

The thrust of DC's Fifth Claim is that it was negotiating a settlement "to

avoid the possibility of an expensive and protracted lawsuit regarding ownership of

[Superman] rights" (ER 1043 ¶183) and that supposedly Mr. Toberoff wrongfully

solicited the Siegels, caused them to reject DC's settlement proposal, and DC "to

incur millions of dollars in subsequent legal fees in disputes with the Siegel[s];"

namely, the *Siegel* litigations in which Mr. Toberoff is DC's long-time opposing

counsel. ER 1009-13, ¶¶70-84; 1043-44 ¶¶184-86.

This claim is barred by Civil Code § 47(b)'s litigation privilege for three

independent reasons.

*First*, § 47(b) has long provided immunity against third-party actions for

wrongful solicitation of opposing parties:

> Plaintiff's claims, however styled, are founded essentially upon
> alleged misrepresentations made by the law firm … [about the]
> possibility of being retained to prosecute … Whether these acts
> amounted to wrongful attorney solicitation or not, they were
> communicative in their essential nature and therefore within the
> privilege of section 47(b)….

*Rubin*, 4 Cal. 4th at 1196.  Such claims cannot serve as the basis for a lawsuit by

anyone other than the attorney's client.  *Id.* at 1196-98.  *See Crowley v. Katleman*,

8 Cal. 4th 666, 681 n.9 (1994) (a party "cannot maintain a retaliatory action

charging the attorneys for the opposing party with 'soliciting' the suit"); *Taheri*

*Law Group,* 160 Cal. App. 4th at 490 (same).

*Second*, the Fifth Claim's core allegation that Mr. Toberoff purportedly

caused the Siegels to reject an alleged "[settlement] agreement resolving their

claims" (ER 1042-43 ¶182) and to "end[] all further [settlement] discussions" (ER

1043-44 ¶186) is barred by the litigation privilege.  *See Rosenthal*, 135 Cal. App.

3d at 126 (applying litigation privilege to bar alleged tortious interference with

settlement negotiations); *Kashian*, 98 Cal. App. 4th at 920 (pre-suit

communications by an attorney protected even if "they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal," so long as they are "'logically related'" to the ensuing action) (citations omitted).

Where, as here, alleged conduct regards "settlement … [the] Civil Code section 47 litigation privilege applies as a matter of law." *Seltzer*, 182 Cal. App. 4th at 972. *See Asia Inv. Co. v. Borowski*, 133 Cal. App. 3d 832, 842 (1982) (holding that an alleged "threat to coerce" via legal action, during settlement negotiations, was privileged under § 47(b)).

*Third*, even if Mr. Toberoff was not acting as an attorney – and he expressly was – there can be <u>no</u> liability for tortious interference based on a non-attorney's inducement of a party to file suit. *PG&E*, 50 Cal. 3d at 11273-24, 1136 (litigation privilege applies where a non-attorney convinced a party to seek declaratory relief to terminate a contract, paid costs, and retained and paid for outside counsel).

### 3.    There Is No Evidence That Mr. Toberoff Interfered With DC's Purported Prospective Economic Advantage

To prevail on a claim for tortious interference with economic advantage, DC must show that it is "reasonably probable that [its] prospective economic advantage would have been realized but for the defendant's interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987). The record establishes that Mr. Toberoff did not cause the Siegels to reject DC's proposal.

DC alleges that Mr. Toberoff's purported "wrongful acts" occurred "[i]n or around August, 2002," and it is clear from the record evidence that the first substantive contact between Toberoff and the Siegels' attorney, Marks, was in early August 2002.  ER 1011 ¶77.  August 2002 was three months <u>after</u> Joanne Siegel had sent her May 9, 2002 letter to DC's parent company, stating: "[a]fter four years we have no deal and this [February 1, 2002 draft] contract makes an agreement impossible."  ER 642.  *Siegel I*, 542 F. Supp. 2d at 1139, held that by this letter the Siegels had "clearly and unequivocally" rejected DC's proposals.

The record also demonstrates that after receiving DC's egregious February 1, 2002 proposal, the Siegels began looking for new counsel in March 2002 to replace Marks, well before any contact with Toberoff.  ER 38-67, 656:20-657:17.

Moreover, in the subsequent *seven* months, the Siegels did not bother to make a counter-proposal.  ER 1009-12 ¶¶69, 75-80.  Nor did DC take any action to rectify this dire situation, such as modifying or withdrawing its egregious proposal. Under these circumstances, neither side had any reason to believe an agreement was "probable."  *See Youst,* 43 Cal.3d at 71 ("reasonable probability" of prospective economic advantage required); *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243 (2005) (no "probability of future economic benefit" because the parties were merely engaged in negotiations with the possibility of an agreement).

It is clear from this record that DC "disrupted" its own negotiations by continuing to grind the Siegels, and that by August 2002, it had no reasonable probability of "prospective economic advantage."

### 4. DC Has Shown No "Wrongful Act"

Claims for "interference with a prospective economic advantage," also require a "wrongful act." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003). The sole such allegation in the Fifth Claim is that purportedly in August 2002, "Toberoff falsely misrepresent[ed] to the Siegel heirs that he had a billionaire investor ready to purchase their Superman rights" for $15 million and "falsely represent[ed] to the Siegels he would help them produce a competing Superman motion picture." ER 1043 ¶185.

This squarely contradicts the record evidence, and after two years of discovery DC has no evidence to support such allegations, or that Mr. Toberoff had anything to do with the failure of DC's protracted negotiations.

As DC is aware, Emanuel, who made the $15 million offer, was the wealthy "investor." ER 332:6-335:25. DC offered no evidence that the highly successful Emanuel (who DC has not bothered to depose herein) was not sincere in offering $15 million for the Siegels' valuable Superman copyrights. As Marks testified, there was no mention of a "billionaire investor" or of producing a Superman movie. ER 164-65 ¶¶2-5. Nor can DC show that the Siegels relied on Emanuel's

offer, or that it caused them to end their already moribund negotiations with DC.

Simply put, there is no "wrongful act" to support DC's interference claim.

## C.    DC's Sixth Claim Has No Probability of Success

DC's Sixth Claim for declaratory relief under California's UCL focuses on a 2008 agreement between the Heirs to collectively negotiate with DC prior to a settlement mediation in *Siegel* ("Consent Agreement").  ER 1038-39 ¶170.  DC erroneously claims that such agreement(s) "interfered" with a non-existent "right" of DC to negotiate with the Heirs regarding their terminations.

### 1.    The Sixth Claim Is Barred By the Statute of Limitations

"Any action to enforce any cause of [UCL] action shall be commenced within four years after the cause of action accrued."  Cal. Bus. & Prof. Code § 17208.  The Sixth Claim is expressly based on the **2001/2003** PPC Agreements and **2002** IPWW Agreement.  ER 1044 ¶188.  In *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002), this Circuit clearly held that under Cal. Bus. & Prof. Code § 17208, UCL claims "are subject to a four-year statute of limitations [] which [begins] to run on the date the cause of action accrued [*i.e.,* the conduct occurred], not on the date of discovery."  *See Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1363 (C.D. Cal. 1995) (claims accrue at moment of alleged injury "irrespective of whether plaintiff knew of its accrual").

Therefore, to the extent DC's Sixth Claim is based on the 2001/2003 PPC

Agreements and/or 2002 IPWW Agreement, it expired in **2007**.  Nor is the Sixth

Claim saved by its inclusion of the 2008 Consent Agreement, because it provides

DC with no basis for relief as shown below.

### 2.    DC's Sixth Claim Is Premised On A Non-Existent "Right" To Negotiate

DC's Sixth Claim is premised on the erroneous legal position that DC has a

"right" under 17 U.S.C. § 304(c)(6)(D) to negotiate the purchase of the Heirs'

recaptured copyrights.  ER 1037-44 ¶¶168-170, 188.  The statute provides no such

right, and the cases and authorities confirm that none exists.

17 U.S.C. § 304(c)(6)(D) simply provides:

> A further grant, or agreement to make a further grant, of any
> right covered by a terminated grant is valid only if it is made
> after the effective date of the termination. As an exception,
> however, an agreement for such a further grant may be made
> between the [author/heirs] … and the original grantee or such
> grantee's successor in title, after the notice of termination has
> been served ….

DC alleges that § 304(c)(6)(D) gives it an exclusive "right" to negotiate the

purchase of the Heirs' copyrights, when the statute says no such thing.  ER 1037-

44 ¶¶168-71, 187-88.  The statute does not provide any "right" of negotiation to a

terminated grantee, nor mandate any action by the terminating party; it simply

invalidates certain agreements prior to the termination date.

The theory DC advances was expressly addressed and rejected in *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987):

> Nor does the statute [17 U.S.C. § 304(c)(6)(D)] provide for an exclusive period of negotiation. The statute neither compels the terminating party to negotiate with the terminated grantee, nor forbids him from negotiating with anyone else. All it requires is that prior to the effective date of termination, the terminated grantee is the only person with whom the author or his successor can make an enforceable and effective agreement to transfer those rights.

*Bourne* further noted that "[i]ndeed, the statute merely provides that a grant to someone other than the original grantee is valid 'only if it is made after the effective date of termination,' not that such a grant is valid only if *negotiated* after the termination date." *Id.* at n.11 (emphasis in original). *See* 3 *Nimmer* § 11.08[A], n.6 (2010) ("It is inaccurate to refer to this [§ 304(c)(6)(D)] advantage as 'an exclusive period of negotiation.'").

If Congress had intended to give a terminated party a "right" of negotiation or first refusal, rather than a mere competitive advantage, it would have done so in the statute. *See Milne,* 430 F.3d at 1048 (holding, with respect to termination rights, "if Congress intended [a requirement] it would have clearly said so"); *Bourne*, 675 F. Supp. at 866 ("If Congress had intended to create a right of first refusal, it would have done so..."); 3 W. Patry, *Patry on Copyright* § 7:47 (2010) ("[Section 304(c)(6)(D)], sometimes erroneously described as a 'right of first refusal,' does not give the original grantee [this] right…").

The Siegels and the Shuster Executor were not compelled to negotiate with DC before or after they served their termination notices.  DC's Sixth Claims fails because it contravenes the statute's unambiguous language.  *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).

DC has no basis nor standing to sue for an alleged "violat[ion] of section 304(c)(6)(D)" because it has no "rights" thereunder.  ER 1038-44 ¶¶170, 188.  *See* 3 *Patry on Copyright* § 21:18 (terminated grantee has "no rights under [§ 304(c)(6)(D)], cannot sue for failure to comply, and the provision therefore does not provide a basis for standing."); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (no claim unless Congress showed "an intent to create not just a private right but also a private remedy").

Furthermore, as pled, the Consent Agreement, requiring both the Siegels' and Shusters' "approval" to enter into further agreements (ER 1038-39 ¶170), is not "a further grant, or agreement to make a further grant" and therefore would not violate section 304(c)(6)(D) in any event.

### 3.    The Sixth Claim Is Barred By the Litigation Privilege

The Consent Agreement was entered into *during* the *Siegel* litigations in connection with settlement negotiations.  ER 367.  Both the PPC Agreements and the IPWW Agreement likewise reference litigation regarding the Siegel and Shuster Terminations, which was in the air due to the Siegels' protracted

settlement negotiations.  ER 1006-17 ¶¶60-65, 90.  Such "'communications which

have some relation to an anticipated lawsuit'" are protected by the litigation

privilege.  *Nasr v. Geary*, 2003 U.S. Dist. LEXIS 13887 (C.D. Cal. June 9, 2003)

(quoting *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 262 (1997)); *Rubin*, 4 Cal. 4th

at 1194 (same); *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1145 (1996) (same).

　　　DC itself alleges that all these agreements relate to ***settlement*** of litigation.

*See* ER 1038-39 ¶170 (such "agreements … impede [DC's] ability to settle"); 1044

¶188 (such agreements purportedly "strip the Siegels and Shusters of their right

freely to settle their claims").  Such conduct is unequivocally protected by Civil

Code § 47.  *Seltzer*, 182 Cal. App. 4th at 972; *Asia Inv. Co.*, 133 Cal. App. 3d at

842.  The California Supreme Court has clearly held that unfair competition

allegations may not be used as an end-run around the litigation privilege.  *Rubin*, 4

Cal. 4th at 1203 ("[P]lacing in the hands of a litigation adversary a weapon with

the tactical potential of a statutory unfair competition claim [] would promote all of

the evils we have described above as accompanying retaliatory suits ….").  DC's

claim is thus barred by the litigation privilege.

### 4.    DC's Sixth Claim Is Preempted By the Copyright Act

　　　The Copyright Act "broadly preempts state law claims" like DC's Sixth

Claim.  *Ritchie v. Williams*, 395 F.3d 283, 285 (6th Cir. 2005); 17 U.S.C. § 301(a).

If a "state law unfair competition claim is based solely on rights equivalent to those

protected by the federal copyright laws," it is preempted.  *Kodadek v. MTV Networks*, 152 F.3d 1209, 1213 (9th Cir. 1998).  *See Trenton v. Infinity Broadcast'g Corp.*, 865 F. Supp. 1416, 1428 (C.D. Cal. 1994) ("'The fact that the state-created right is either broader or narrower than its federal counterpart will not save it from preemption.'") (citation omitted).

To avoid preemption, the plaintiff must demonstrate that its "state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act."  *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90 (9th Cir. 2005).

 Here, DC's state-law claim merely reformulates DC's Third Claim under the Copyright Act.  *Compare* ER 1039 ¶172 (Third Claim: "to establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material") *with* 1044 ¶189 (Sixth Claim: to "establish the parties' respective rights and obligations with respect to the copyright interest in the Superman material").  DC's Sixth Claim simply incorporates by reference allegations of a supposed violation of the Copyright Act and makes no additional allegations.  ER 1044 ¶¶187-88.  *See Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1239 (C.D. Cal. 1987) (dismissing UCL claim that incorporated by reference copyright allegations).

As DC's UCL claim is inextricably intertwined with its Copyright Act

**Exhibit XX**

claim, it is preempted.  *See Del Madera Properties v. Rhodes & Gardner, Inc.*, 820

F.2d 973, 977 (9th Cir. 1987) (UCL claim preempted where "constructed upon the

premise" of a Copyright Act violation").

### 5.    DC's Sixth Claim Fails To Plead Conduct That Violates the UCL

DC's Sixth Claim fails as a matter of law as it does not plead any "unlawful,

unfair, or fraudulent business practice" under the UCL.  *Olszewski v. Scripps*

*Health*, 30 Cal. 4th 798, 827 (2003).

Unlawful:  "A business practice is unlawful [under the UCL] 'if it is

forbidden by any law….'"  *Id.* at 827.  Conduct "neither required nor proscribed by

law does not constitute an 'unlawful' business activity."  61 Cal. Jur. 3d Unfair

Competition § 3 (2008).  As section 304(c)(6)(D) does not "require" or "proscribe"

any conduct, but merely states when a transfer of the termination interest is valid, it

cannot support a claim of "unlawful" business activity.

Unfair:  If a "practice" is not "unlawful," it is only considered to be "unfair"

if it "threatens an incipient violation of an antitrust law … or otherwise

significantly threatens or harms competition."  *Cel-Tech Commc'ns, Inc. v. Los*

*Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999).  DC alleges that

"consent agreements" somehow "strip the Siegels and Shusters of their right freely

to settle their claims and violate [DC's] concomitant right freely to negotiate

settlement of such claims."  ER 1044 ¶188.  This is not "conduct that threatens an

incipient violation of an antitrust law" and will not sustain an unfair competition

claim.  *Cel-Tech*, 20 Cal. 4th at 187.

    <u>Fraud:</u>  A claim of fraudulent practices must be pled with specificity.  *See*

F.R.C.P. 9(b) ("[A] party must state with particularity the circumstances

constituting fraud or mistake."); *Shroyer v. New Cingular Wireless Servs.*, 606

F.3d 658, 665-67 (9th Cir. 2010) (applying Rule 9(b) to dismiss UCL "fraud"

claim as "conclusory allegations do not suffice").  DC's Sixth Claim does not even

allege fraud.

## <u>CONCLUSION</u>

    This case is against public policy and has inflicted real and abiding harm on

the Heirs by interfering with their relationship with counsel in the exercise and

enforcement of their statutory termination right.  Congress specifically sought to

benefit authors and their statutory heirs through the termination right.  Superman is

a national icon, and the Siegels and Shusters are exemplars of those meant to

benefit from such right, and they should not be subject to attack, directly or

through their counsel, for reclaiming what is theirs.  A core policy of the State of

California is to protect the right of petition and the attorney-client relationship

essential to that right against baseless suits such as this.  If opposing counsel can be

freely attacked with meritless tort claims for supporting the termination right, then

the policies of the Copyright Act and of California's Anti-SLAPP law will be

severely compromised.

The district court's Order denying the Anti-SLAPP motion should be

reversed, and this case should be remanded with instructions to enter an order

granting Defendants' Anti-SLAPP motion, and for further proceedings consistent

with this Court's ruling.

Dated:  April 24, 2012          TOBEROFF & ASSOCIATES, P.C.

                                /s/ Marc Toberoff
                                _____
                                Marc Toberoff

                                Attorneys for Defendants-Appellants,
                                Mark Warren Peary, as personal representative of the
                                Estate of Joseph Shuster Shuster, and Jean Adele
                                Peavy, and Laura Siegel Larson, individually and as
                                personal representative of the Estate of Joanne Siegel

                                /s/ Laura W. Brill
                                _____
                                Laura W. Brill

                                Attorneys for Defendants-Appellants,
                                Pacific Pictures Corporation, IP Worldwide, LLC,
                                IPW, LLC and Marc Toberoff

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants identify the writ

proceeding *In re Pacific Pictures Corp.*, 9th Circuit Case No. 11-71844 as related

to this case as it arises out of the same district court case as the instant appeal.

Defendants further identify the appeal and cross-appeal in *Larson v. Warner Bros.*

*Entertainment Inc., et al.*, 9th Circuit Case Nos. 11-55863, 11-56034, are related to

this case as they arise out of the related district court case, *Larson v. Warner Bros.*

*Entertainment Inc., et al.*, Case No. 04-CV-08400 ODW (RZx).

Dated:  April 24, 2012        TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

/s/ Laura W. Brill
_____
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC,
IPW, LLC and Marc Toberoff

**Exhibit XX**
**726**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 27(d) and 32(a), I certify

that the appellant Laura Siegel Larson's attached opening brief is proportionately

spaced, has a typeface of 14 points or more, and does not exceed 14,000 words.

Dated:  April 24, 2012          TOBEROFF & ASSOCIATES, P.C.

/s/ Marc Toberoff
_____
Marc Toberoff

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

/s/ Laura W. Brill
_____
Laura W. Brill

Attorneys for Defendants-Appellants,
Pacific Pictures Corporation, IP Worldwide, LLC,
IPW, LLC and Marc Toberoff

## STATUTORY ADDENDUM

### 17 U.S.C. § 304

(c) Termination of Transfers and Licenses Covering Extended Renewal Term. – In
the case of any copyright subsisting in either its first or renewal term on January 1,
1978, other than a copyright in a work made for hire, the exclusive or nonexclusive
grant of a transfer or license of the renewal copyright or any right under it,
executed before January 1, 1978, by any of the persons designated by subsection
(a)(1)(C) of this section, otherwise than by will, is subject to termination under the
following conditions:

(1) In the case of a grant executed by a person or persons other than the author,
termination of the grant may be effected by the surviving person or persons who
executed it. In the case of a grant executed by one or more of the authors of the
work, termination of the grant may be effected, to the extent of a particular
author's share in the ownership of the renewal copyright, by the author who
executed it or, if such author is dead, by the person or persons who, under clause
(2) of this subsection, own and are entitled to exercise a total of more than one-half
of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be
exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless

there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly

authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were

**Exhibit XX**

covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2)

of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) Termination Rights Provided in Subsection (c) Which Have Expired on or before the Effective Date of the Sonny Bono Copyright Term Extension Act. — In

the case of any copyright other than a work made for hire, subsisting in its renewal

term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for

which the termination right provided in subsection (c) has expired by such date,

where the author or owner of the termination right has not previously exercised

such termination right, the exclusive or nonexclusive grant of a transfer or license

of the renewal copyright or any right under it, executed before January 1, 1978, by

any of the persons designated in subsection (a)(1)(C) of this section, other than by

will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this

section apply to terminations of the last 20 years of copyright term as provided by

the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years

beginning at the end of 75 years from the date copyright was originally secured.

### California Code of Civil Procedure – Section 425.16.

(a) The Legislature finds and declares that there has been a disturbing increase in

lawsuits brought primarily to chill the valid exercise of the constitutional rights of

freedom of speech and petition for the redress of grievances. The Legislature finds

and declares that it is in the public interest to encourage continued participation in

matters of public significance, and that this participation should not be chilled

through abuse of the judicial process. To this end, this section shall be construed

broadly.

(b) (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. (3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding.

(c) (1) Except as provided in paragraph (2), in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5. (2) A defendant who prevails on a special motion to

strike in an action subject to paragraph (1) shall not be entitled to attorney's fees

and costs if that cause of action is brought pursuant to Section 6259, 11130,

11130.3, 54960, or 54960.1 of the Government Code. Nothing in this paragraph

shall be construed to prevent a prevailing defendant from recovering attorney's

fees and costs pursuant to subdivision (d) of Section 6259, 11130.5, or 54690.5.

(d) This section shall not apply to any enforcement action brought in the name of

the people of the State of California by the Attorney General, district attorney, or

city attorney, acting as a public prosecutor.

(e) As used in this section, "act in furtherance of a person's right of petition or free

speech under the United States or California Constitution in connection with a

public issue" includes: (1) any written or oral statement or writing made before a

legislative, executive, or judicial proceeding, or any other official proceeding

authorized by law, (2) any written or oral statement or writing made in connection

with an issue under consideration or review by a legislative, executive, or judicial

body, or any other official proceeding authorized by law, (3) any written or oral

statement or writing made in a place open to the public or a public forum in

connection with an issue of public interest, or (4) any other conduct in furtherance

of the exercise of the constitutional right of petition or the constitutional right of

free speech in connection with a public issue or an issue of public interest.

(f) The special motion may be filed within 60 days of the service of the complaint

or, in the court's discretion, at any later time upon terms it deems proper. The motion shall be scheduled by the clerk of the court for a hearing not more than 30 days after the service of the motion unless the docket conditions of the court require a later hearing.

(g) All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.

(h) For purposes of this section, "complaint" includes "cross-complaint" and "petition," "plaintiff" includes "cross-complainant" and "petitioner," and "defendant" includes "cross-defendant" and "respondent."

(i) An order granting or denying a special motion to strike shall be appealable under Section 904.1.

(j) (1) Any party who files a special motion to strike pursuant to this section, and any party who files an opposition to a special motion to strike, shall, promptly upon so filing, transmit to the Judicial Council, by e-mail or facsimile, a copy of the endorsed, filed caption page of the motion or opposition, a copy of any related notice of appeal or petition for a writ, and a conformed copy of any order issued pursuant to this section, including any order granting or denying a special motion

73
**Exhibit XX**
**736**

to strike, discovery, or fees. (2) The Judicial Council shall maintain a public record of information transmitted pursuant to this subdivision for at least three years, and may store the information on microfilm or other appropriate electronic media.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically

by the Court's ECF system and by first class mail on those parties not registered

for ECF pursuant to the rules of this court.  Pursuant to Circuit Rule 31-1,

submission of one original and seven copies of the brief was deferred.  Pursuant to

Circuit Rule 30-1.3, four copies of the excerpts of the record have been mailed to

the Court, and one copy of the excerpts of the record have been mailed to opposing

counsel on the date this brief was electronically filed.

Dated:  April 24, 2012          TOBEROFF & ASSOCIATES, P.C.

/s/ Pablo Arredondo

Pablo Arredondo

Attorneys for Defendants-Appellants,
Mark Warren Peary, as personal representative of the
Estate of Joseph Shuster Shuster, and Jean Adele
Peavy, and Laura Siegel Larson, individually and as
personal representative of the Estate of Joanne Siegel

1　DANIEL M. PETROCELLI (S.B. #097802)
　　dpetrocelli@omm.com
2　MATTHEW T. KLINE (S.B. #211640)
　　mkline@omm.com
3　CASSANDRA L. SETO (S.B. #246608)
　　cseto@omm.com
4　O'MELVENY & MYERS LLP
　　1999 Avenue of the Stars, 7th Floor
5　Los Angeles, CA 90067-6035
　　Telephone: (310) 553-6700
6　Facsimile: (310) 246-6779

7　Attorneys for Plaintiff DC Comics

8　　　　　**UNITED STATES DISTRICT COURT**

9　　　　　**CENTRAL DISTRICT OF CALIFORNIA**

10　DC COMICS,　　　　　　　　　Case No. CV 10-3633 ODW (RZx)

11　　　　　　Plaintiff,　　　　　　**DECLARATION OF PAUL**
　　　　　　　　　　　　　　　　　**LEVITZ IN SUPPORT OF DC**
12　　　　v.　　　　　　　　　　　**COMICS' MOTION FOR**
　　　　　　　　　　　　　　　　　**PARTIAL SUMMARY**
13　PACIFIC PICTURES　　　　　　**JUDGMENT ON ITS FIRST AND**
　　CORPORATION, IP WORLDWIDE,　**THIRD CLAIMS FOR RELIEF**
14　LLC, IPW, LLC, MARC TOBEROFF,
　　an individual, MARK WARREN
15　PEARY, as personal representative of　Hon. Otis D. Wright II
　　the ESTATE OF JOSEPH SHUSTER,
16　JEAN ADELE PEAVY, an individual,　**Hearing Date:**　Aug. 20, 2012
　　LAURA SIEGEL LARSON, an　　　**Hearing Time:**　1:30 p.m.
17　individual and as personal　　　　　**Courtroom:**　　11
　　representative of the ESTATE OF
18　JOANNE SIEGEL, and DOES 1-10,
　　inclusive,
19
　　　　　　Defendants.
20

21

22

23

24

25

26

27

28
　　　　　　　　　　　　　　　　LEVITZ DECL. RE: DC'S
　　　　　　　　　　　　　　　　MOT. FOR PARTIAL SUMM. J.

**DECLARATION OF PAUL LEVITZ**

1.     I worked at DC Comics ("DC") for 38 years, and continue to serve as Senior Advisor, Consulting Editor, and as a writer for DC. I have personal knowledge of the matters set forth in this declaration or conducted due diligence to gather them, and if called to testify to the facts stated herein, I could and would do so competently.

2.     In 1972, I began working as a freelance writer for DC. In 1973, I became an assistant editor. Throughout the 1970s, I became progressively more involved in management of DC's general business activities, and in 1980, I was promoted to Manager of Business Affairs. By 1985, I had become predominantly responsible for DC's business operations, and I was promoted to Executive Vice President. In 1989, I became Executive Vice President and Publisher. From 2002 to 2010, I served as DC's President and Publisher. Since then, I have served as Senior Advisor, Consulting Editor, and as a writer for DC.

3.     During my many years as a business executive at DC, part of my role was to maintain relationships with writers and artists who had worked for DC in the past, as well as their families. I had many interactions with Joseph Shuster, his brother Frank Shuster, his sister Jean Peavy, and his nephew Mark Warren Peary. Attached hereto as Exhibits 1-78 are true and correct copies of my correspondence with the Shuster family that DC and I could locate.

4.     In a 1975 agreement, DC affiliate Warner Communications Inc. agreed to provide Joe Shuster and Jerome Siegel with lump sum payments, lifetime annual payments, survivor payments to their heirs, insurance coverage, and other benefits. As of 2011, Warner had paid the Shuster and Siegel families $4.3 million under the 1975 agreement, not including medical benefits or special bonuses.

5.     After Joe Shuster passed away in 1992, Frank and Jean wrote letters to me and Martin Payson at Time Warner asking for financial assistance. (Exhibits 3, 6 and 7.) Jean told us she was Joe's sole heir. (Exhibit 3.) I took the lead in

- 1 -

**Exhibit YY**
**740**

1  negotiations with Frank and Jean. On September 8, 1992, I sent Frank a letter
2  offering that DC would increase the survivor payments due to Frank under the 1975
3  agreement from $5,000 to $25,000 per year. (Exhibit 5.)

4      6.    On September 10, 1992, Frank sent me a letter stating that he was
5  "extremely pleased" with DC's offer, and saying that, after "discuss[ing] this good
6  news with [his] sister Jean," she and Frank wished that payments be made directly
7  to Jean, who would "send [Frank] whatever money [he] wanted as a gift which
8  would not be taxable to [him]." (Exhibit 6.)

9      7.    Frank (who lived in New York) said that Jean would be visiting New
10  York soon, and asked if he and Jean could meet with me in New York to discuss
11  these issues further. (Exhibit 6.) I agreed, and we met in my office at DC in late
12  September or early October 1992. Jean basically spoke for the two of them, as
13  Frank was frail and considerably older. It was clear that by changing the agreement
14  to pay the annual stipend for Jean's lifetime rather than Frank's, DC would both be
15  far exceeding our promise to Joe and committing to a much larger sum. I
16  understood Joe's original wish, as embodied in the 1975 agreement, to be to take
17  care of Frank because of the assistance Frank had rendered on the early Superman
18  strips as a letterer, and because Frank had taken Joe in during the 1960s; I had never
19  known or understood Joe to want to provide for Jean. Nonetheless, on DC's behalf,
20  I conditionally agreed to Jean and Frank's request.

21      8.    Given DC's financial success, former writers and artists, or their
22  families, would from time to time, ask DC for money, much as Frank and Jean had
23  done. Every time DC agreed to grant such a request, I would make clear to the
24  writer, artist, or family member that the payment would represent their last and final
25  deal with DC, and would resolve any past, present, or future claims against DC. I
26  recall having this same discussion with Frank and Jean during our in-person
27  meeting in 1992. Frank and Jean both confirmed that they understood. Following
28  this discussion, DC (through me) and Frank and Jean signed an agreement on

- 2 -

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

1  October 2, 1992, dated as of August 1, 1992. A true and correct copy of that

2  agreement is attached hereto as Exhibit 8. In key part, and consistent with the

3  above, it states:

> We ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. In any event, you now grant to us any such rights and release us, our licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

9      9.    DC maintained a good relationship with the Shuster family until 2001.

10  In particular, Jean and I exchanged many letters, notes, and holiday cards. In many

11  of Jean's letters, she would request special bonuses in excess of the payments due

12  under the 1992 agreement based on some particular new success DC had achieved,

13  like a television series. When Jean made such a request—including in 1999—DC

14  agreed to honor Joe's memory and provide an additional bonus ranging from

15  $10,000 to $25,000. DC paid Jean bonuses in 1993, 1994, 1995, 1996, 1998, 1999,

16  2000 and 2001. (Exhibits 23, 27, 33, 39, 53, 60, 67, 71.) In total, DC has paid Jean

17  at least over $610,000 under the 1992 agreement, and continues to pay her under

18  the agreement to this day, even though she went back on her word.

19      10.   I also exchanged correspondence over the years with Jean's son, Mark

20  Warren Peary. On May 29, 1996, Mark sent me a screenplay called

21  "DREAMERS," which he described as "an inspiring life story of Joe Shuster and

22  Jerry Siegel." (Exhibit 44.) The screenplay discusses how Joe Shuster made

23  amends with DC late in his life. Mark asked me to pass along the screenplay to

24  Warner Bros., which I did. On November 6, 1999, Mark asked whether I would be

25  willing to submit a revised screenplay to Warner Bros. (which I later did) and asked

26  whether Joanne Siegel's termination claim concerning her husband's rights would

27  "interfere with us selling our screenplay." (Exhibit 62.) Mark Peary never told me

28  that he thought he or his family had any remaining termination claims to assert. To

- 3 -

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

**Exhibit YY**
**742**

1   the contrary, in 1999, Jean told me she planned to honor our 1992 agreement and

2   would assert no termination claim. (Exhibit 59.) I was disappointed when I learned

3   that the Shuster family filed their termination claim.

4       I declare under penalty of perjury under the laws of the United States that the

5   foregoing is true and correct and that this declaration is executed this 16th day of

6   July 2012 in New York, New York.

7

8                                 Paul Levitz

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEVITZ DECL. RE: DC'S
MOT. FOR PARTIAL SUMM. J.

1   DANIEL M. PETROCELLI (S.B. #097802)
      dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
      mkline@omm.com
3   CASSANDRA L. SETO (S.B. #246608)
      cseto@omm.com
4   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, 7th Floor
5   Los Angeles, CA  90067-6035
    Telephone:  (310) 553-6700
6   Facsimile:   (310) 246-6779

7   Attorneys for Plaintiff DC Comics

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10  DC COMICS,                          Case No. CV 10-3633 ODW (RZx)

11            Plaintiff,                **PLAINTIFF DC COMICS'
                                        AMENDED OBJECTIONS AND
12       v.                             RESPONSES TO DEFENDANT
                                        MARK WARREN PEARY'S
13  PACIFIC PICTURES                    FIRST SET OF
    CORPORATION, IP WORLDWIDE,          INTERROGATORIES**
14  LLC, IPW, LLC, MARC TOBEROFF,
    an individual, MARK WARREN          Hon. Otis D. Wright II
15  PEARY, as personal representative of
    the ESTATE OF JOSEPH SHUSTER,       **Complaint Filed:** May 14, 2010
16  JEAN ADELE PEAVY, an individual,    **Trial Date:**       None Set
    LAURA SIEGEL LARSON, an
17  individual and as personal
    representative of the ESTATE OF
18  JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19
              Defendants.
20

21
    PROPOUNDING PARTY:      Mark Warren Peary
22
    RESPONDING PARTY:       DC Comics
23
    SET NUMBER:             One (Nos. 1-15)
24

25

26

27

28

                                        DC'S AMENDED OBJ. & RESP. TO
                                        PEARY INTERROGATORY NOS. 1-15

1      Pursuant to Federal Rule of Civil Procedure 33, plaintiff DC Comics ("DC")

2  hereby objects and responds to defendant Mark Warren Peary's ("Peary") First Set

3  of Interrogatories (the "Interrogatories").

4      **PRELIMINARY STATEMENT**

5      DC's Amended Objections and Responses to Defendant Mark Warren

6  Peary's First Set of Interrogatories ("Responses") are based on the information

7  currently known to DC.  These Interrogatories, along with Mr. Peary's

8  contemporaneously served Requests for Production, represent the first discovery

9  served by defendants in this action, and defendants have only recently served their

10  Answer in this case.  DC has attempted to investigate diligently and respond as best

11  it can to these Interrogatories.  Many of the interrogatories are addressed by

12  reference to DC's complaint and attached exhibit (Docket No. 49, Docket No. 49

13  Ex. A), all briefing in this action—including, but not limited to, the briefing and

14  exhibits filed in connection with defendants' Rule 12 and SLAPP motions (Docket

15  Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2, 35, 36,

16  75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4, 81, 89,

17  90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100, 100-1 to

18  100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147, 147-1 to

19  147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to 182-40,

20  183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193, 193-1 to

21  193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to 305-59,

22  306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333, 333-1 to

23  333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and exhibits filed in

24  connection with Plaintiff DC Comic's Motion for Partial Summary Judgment On

25  Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6, 460, 460-1 to

26  460-3 )—and all discovery in this action and the *Siegel* action—including, but not

27  limited to, all deposition testimony (*e.g.*, DCC00000001-154435 and WB000001-

28  149488), and Plaintiff DC Comics' Objections and Responses to Defendant Mark

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1  Warren Peary's First Set of Requests for Production (*e.g.*, Responses 1-3, 5, 43, 45,

2  46, 48, 53-55).  Given that discovery is ongoing, expert discovery has not yet

3  begun, and defendants continue their efforts to stymie DC's discovery in this case,

4  DC anticipates that it may be necessary to supplement these Responses as more

5  information becomes available.

6  By these Responses, DC does not intend to waive, and does not waive, any

7  objection at trial to the admission into evidence of these Responses, in whole or in

8  part, or the information produced in connection with it.  Rather, DC intends to

9  preserve, and does preserve, all objections to the admission into evidence of these

10  Responses, in whole or in part, and the information produced in connection with

11  them, including, without limitation, objections based on relevance, foundation,

12  authenticity, or privilege, as well as any and all objections based on the Federal

13  Rules of Evidence or otherwise.

14  ### SPECIFIC OBJECTIONS AND RESPONSES

15  **Interrogatory No. 1**

16  IDENTIFY all COMMUNICATIONS between YOU AND Mark Warren

17  Peary.

18  **Response to Interrogatory No. 1**

19  DC objects to this Interrogatory on the grounds that it is indefinite as to time

20  and not reasonably limited in scope and would include, for example, discussions

21  with Mr. Peary at mediation sessions.  DC objects to the extent the Interrogatory

22  calls for irrelevant information and calls for a search for documents that is unduly

23  expensive, overbroad, unduly burdensome, and oppressive.  DC further objects to

24  the extent the Interrogatory seeks communications that defendants have refused to

25  produce in response to discovery served by DC, including but not limited to

26  screenplays Mr. Peary sent to DC in 1997 and 2006.

27  DC objects to the definition of "YOU" as vague and overbroad and will

28  respond to this term as limited to the relevant representatives at DC and Warner

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   Bros. Entertainment Inc.  DC objects to the definition of "COMMUNICATION" as

2   overbroad to the extent it encompasses the transmission of information orally, by

3   telephone, or through gesture.  DC also objects to the definition of

4   "COMMUNICATION" as overbroad to the extent it includes documents filed in

5   connection with prior or ongoing litigation.  DC objects to the extent the Request

6   "all COMMUNICATIONS" on the ground that such request is overly broad,

7   unduly burdensome, oppressive, and not reasonably calculated to lead to the

8   discovery of admissible evidence.  As used in these Responses, the phrase "all

9   COMMUNICATIONS," or phrases of similar import, should be understood to

10  mean those communications DC and its counsel were able to locate using

11  reasonable diligence and reasonable judgment concerning the whereabouts of such

12  communications.  DC does not object to or withhold any information based on the

13  definition of "IDENTIFY," as this definition mirrors in large part language that DC

14  employed in its own discovery requests.  Defendants previously objected to this

15  same language in DC's requests as impermissibly overbroad.  Based on defendants'

16  tacit acknowledgement that DC's use of this term is proper, DC will answer this

17  discovery and has confirmed with defendants that they will do the same.

18       Subject to and without waiving the foregoing objections, DC has exercised

19  reasonable diligence in identifying responsive information and documents, and

20  hereby responds as follows:

21       DC00145-151, DCC00004186-87, DCC00004191, DCC00006855,

22  DCC00006872-6879, DCC00057431-57447, DCC00089366-89372, WB008506-

23  8507.  Representatives from Warner Bros. Entertainment Inc. and DC, including

24  Paul Levitz, had non-written communications with Mr. Peary over the years as

25  well.

26

27

28

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   **Interrogatory No. 2**

2          IDENTIFY all COMMUNICATIONS between YOU AND Jean Adele

3   Peavy.

4   **Response to Interrogatory No. 2**

5          DC objects to this Interrogatory on the grounds that it is indefinite as to time

6   and not reasonably limited in scope, and to the extent that it seeks the production of

7   any item, or portion thereof, which is not reasonably calculated to lead to the

8   discovery of relevant and admissible evidence.

9          DC objects to the definition of "YOU" as vague and overbroad and will

10  respond to this term as limited to the relevant representatives of DC and Warner

11  Bros. Entertainment Inc.  DC objects to the definition of "COMMUNICATION" as

12  overbroad to the extent it encompasses the transmission of information orally, by

13  telephone, or through gesture.  DC also objects to the definition of

14  "COMMUNICATION" as overbroad to the extent it includes documents filed in

15  connection with prior or ongoing litigation.  DC objects to the extent the Request

16  "all COMMUNICATIONS" on the ground that such request is overly broad,

17  unduly burdensome, oppressive, and not reasonably calculated to lead to the

18  discovery of admissible evidence.  As used in these Responses, the phrase "all

19  COMMUNICATIONS," or phrases of similar import, should be understood to

20  mean those communications DC and its counsel were able to locate using

21  reasonable diligence and reasonable judgment concerning the whereabouts of such

22  communications.  DC does not object to or withhold any information based on the

23  definition of "IDENTIFY," as this definition mirrors in large part language that DC

24  employed in its own discovery requests.  Defendants previously objected to this

25  same language in DC's requests as impermissibly overbroad.  Based on defendants'

26  tacit acknowledgement that DC's use of this term is proper, DC will answer this

27  discovery and has confirmed with defendants that they will do the same.

28

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    Subject to and without waiving the foregoing objections, DC responds as

2    follows:

3    DC00014-15, DC00156-157 DCC00004186-4187, DCC00004191,

4    DCC00006182-6184, DCC00006188-6190, DCC00006192-6194, DCC00006198,

5    DCC00006203-6207, DCC00006214-15, DCC00006372-6373, DCC00006375-

6    6376, DCC00006399, DCC00006413-6439, DCC00006441, DCC00006477-6492,

7    DCC00006498, DCC00006607-6618, DCC00006620, DCC00006629-6630,

8    DCC00006778, DCC00006869, DCC00008506-8507, DCC00057431-57447,

9    DCC00057854, DCC00073008, DCC00073010, WB007959-7961, WB0010161-

10    10162, WB010169-10170.  Representatives from Warner Bros. Entertainment Inc.

11    and DC, including Paul Levitz, had non-written communications with Ms. Peavy

12    over the years as well.

13    **Interrogatory No. 3**

14    IDENTIFY all COMMUNICATIONS between YOU AND Frank Shuster.

15    **Response to Interrogatory No. 3**

16    DC objects to this Interrogatory on the grounds that it is indefinite as to time

17    and not reasonably limited in scope.

18    DC objects to the definition of "YOU" as vague and overbroad and will

19    respond to this term as limited to the relevant representatives of DC and Warner

20    Bros. Entertainment Inc.  DC objects to the definition of "COMMUNICATION" as

21    overbroad to the extent it encompasses the transmission of information orally, by

22    telephone, or through gesture.  DC also objects to the definition of

23    "COMMUNICATION" as overbroad to the extent it includes documents filed in

24    connection with prior or ongoing litigation.  DC objects to the extent the Request

25    "all COMMUNICATIONS" on the ground that such request is overly broad,

26    unduly burdensome, oppressive, and not reasonably calculated to lead to the

27    discovery of admissible evidence.  As used in these Responses, the phrase "all

28    COMMUNICATIONS," or phrases of similar import, should be understood to

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   mean those communications DC and its counsel were able to locate using

2   reasonable diligence and reasonable judgment concerning the whereabouts of such

3   communications.  DC does not object to or withhold any information based on the

4   definition of "IDENTIFY," as this definition mirrors in large part language that DC

5   employed in its own discovery requests.  Defendants previously objected to this

6   same language in DC's requests as impermissibly overbroad.  Based on defendants'

7   tacit acknowledgement that DC's use of this term is proper, DC will answer this

8   discovery and has confirmed with defendants that they will do the same.

9          Subject to and without waiving the foregoing objections, DC responds as

10  follows:

11         DC00006-7, DC00014-15, DCC00005142-44, DCC00005673,

12  DCC00006206-6207, DCC00006375-76, DCC00006399, DCC00006413-6415,

13  DCC00006417, DCC00006420-6422, DCC00006431-6436, DCC00006440-6441,

14  DCC00006448, DCC00006462, DCC00006474, DCC00006495, DCC00006775-

15  6777, DCC00006856, DCC00006867, DCC00057854, DCC00073008,

16  DCC00073010, DCC00073012, DCC00073016-73017, WB005603, WB007972,

17  WB010161-10162, WB010169-10170.  Representatives from DC, including Paul

18  Levitz, had non-written communications with Frank Shuster over the years as well.

19

20  **Interrogatory No. 4**

21         IDENTIFY all COMMUNICATIONS between YOU AND Joseph Shuster

22  REGARDING YOUR rights in AND to Superman.

23  **Response to Interrogatory No. 4**

24         DC objects to this Interrogatory on the grounds that it is indefinite as to time

25  and not reasonably limited in scope.

26         DC further objects to the use of the term "all" in connection with the

27  requested communications on the ground that such interrogatory is overly broad,

28  unduly burdensome, oppressive, and not reasonably calculated to lead to the

- 6 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   discovery of admissible evidence.  DC will not search and review every record or

2   source of information within its possession, custody, or control in an effort to locate

3   "all" communications.  Subject to these objections, DC will use reasonable

4   diligence to locate responsive information and documents in its own files, based on

5   inquiry of those persons who may reasonably be expected to possess responsive

6   information, and examination of those files reasonably expected to yield responsive

7   information.

8          DC objects to the definition of "YOU" as vague and overbroad and will

9   respond to this term as limited to the relevant representatives of DC and Warner

10   Bros. Entertainment Inc.  DC objects to the definition of "COMMUNICATION" as

11   overbroad to the extent it encompasses the transmission of information orally, by

12   telephone, or through gesture.  DC also objects to the definition of

13   "COMMUNICATION" as overbroad to the extent it includes documents filed in

14   connection with prior or ongoing litigation.  DC objects to the extent the Request

15   "all COMMUNICATIONS" on the ground that such request is overly broad,

16   unduly burdensome, oppressive, and not reasonably calculated to lead to the

17   discovery of admissible evidence.  As used in these Responses, the phrase "all

18   COMMUNICATIONS," or phrases of similar import, should be understood to

19   mean those communications DC and its counsel were able to locate using

20   reasonable diligence and reasonable judgment concerning the whereabouts of such

21   communications.  DC does not object to or withhold any information based on the

22   definition of "IDENTIFY," as this definition mirrors in large part language that DC

23   employed in its own discovery requests.  Defendants previously objected to this

24   same language in DC's requests as impermissibly overbroad.  Based on defendants'

25   tacit acknowledgement that DC's use of this term is proper, DC will answer this

26   discovery and has confirmed with defendants that they will do the same.

27          Subject to and without waiving the foregoing objections, DC responds as

28   follows:

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    DCC00004132, DCC00004153, DCC00004186-4187, DCC00004191,

2    DCC00004499-4505, DCC00004507-4508, DCC00004521- DCC00004579,

3    DCC00004908, DCC00005126, DCC00005658, DCC00005662, DCC00005663-

4    5666, DCC00005668, DCC00005669, DCC00005671, DCC00005672,

5    DCC00006190, DCC00007178-7182, DCC00007199-7201, DCC00007206-7208,

6    DCC00007954-7965, DCC00007990-8024, DCC00045543-45544, DCC00057253-

7    57256, DCC00057358-57361, WB005603, WB005623-5624, WB005627-5638,

8    WB005663-5664, WB005794-5800, WB006603-6607, WB007942-7943,

9    WB007959-7961, WB008305-8316, WB008556-8557, WB008559-8561,

10   WB008563.  Representatives from DC, including Paul Levitz, had non-written

11   communications with Joseph Shuster over the years as well.**Interrogatory No. 5**

12          IDENTIFY all COMMUNICATIONS between YOU AND any third-party

13   that REFERRED TO the 1992 AGREEMENT.

14   **Response to Interrogatory No. 5**

15          DC objects to this Interrogatory on the grounds that it is indefinite as to time

16   and not reasonably limited in scope, and to the extent that it seeks the production of

17   any item, or portion thereof, which is not reasonably calculated to lead to the

18   discovery of relevant and admissible evidence.  DC further objects to the extent that

19   it seeks information protected by the attorney-client privilege, the attorney work

20   product doctrine, or any other applicable privilege or immunity.

21          DC objects to the phrase "COMMUNICATIONS between YOU AND any

22   third-party" as overbroad, as it would include, for example, all statements made to

23   the court, mediators, and to the press concerning the 1992 agreement and DC's

24   claims in this case concerning that agreement.  DC objects to the definition of

25   "COMMUNICATION" as vague and overbroad and will respond to this term as

26   excluding any documents filed in connection with prior or ongoing litigation.  DC

27   objects to the extent the Request "all COMMUNICATIONS" on the ground that

28   such request is overly broad, unduly burdensome, oppressive, and not reasonably

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    calculated to lead to the discovery of admissible evidence.  As used in these

2    Responses, the phrase "all COMMUNICATIONS," or phrases of similar import,

3    should be understood to mean those communications DC and its counsel were able

4    to locate using reasonable diligence and reasonable judgment concerning the

5    whereabouts of such communications.  DC objects to the definition of "YOU" as

6    vague and overbroad and will respond to this term as limited to the relevant

7    representatives of DC and Warner Bros. Entertainment Inc.  DC does not object to

8    or withhold any information based on the definition of "IDENTIFY," as this

9    definition mirrors in large part language that DC employed in its own discovery

10   requests.  Defendants previously objected to this same language in DC's requests as

11   impermissibly overbroad.  Based on defendants' tacit acknowledgement that DC's

12   use of this term is proper, DC will answer this discovery and has confirmed with

13   defendants that they will do the same.

14        Subject to and without waiving all foregoing objections, DC refers

15   defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

16   No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

17   and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

18   (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

19   35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

20   81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

21   100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

22   147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

23   182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

24   193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

25   305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

26   333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

27   exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

28   Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1  460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

2  DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

3  deposition testimony in those cases and here.  All of these sources are incorporated

4  by reference herein.

5  　　　　Subject to and without waiving the foregoing objections, DC is willing to

6  meet and confer with defendants to reasonably tailor this request.

7  **Interrogatory No. 6**

8  　　　　IDENTIFY all persons who participated in the negotiation of the 1992

9  AGREEMENT.

10  **Response to Interrogatory No. 6**

11  　　　　DC objects to the Interrogatory to the extent it calls for irrelevant information

12  and calls for a search for documents that is unduly expensive, overbroad, unduly

13  burdensome, and oppressive.  The phrase "participated in the negotiation" is

14  ambiguous, and lacks sufficient precision to allow DC to formulate an appropriate

15  response.  DC further objects to this Interrogatory to the extent that it seeks

16  information protected by the attorney-client privilege, the attorney work product

17  doctrine, or any other applicable privilege or immunity.

18  　　　　DC objects to the extent the Request seeks identification of "all persons" on

19  the ground that such request is overly broad, unduly burdensome, oppressive, and

20  not reasonably calculated to lead to the discovery of admissible evidence.  As used

21  in these Responses, the phrase "all persons," or phrases of similar import, should be

22  understood to mean those persons DC and its counsel were able to identify using

23  reasonable diligence and reasonable judgment.  DC does not object to or withhold

24  any information based on the definition of "IDENTIFY," as this definition mirrors

25  in large part language that DC employed in its own discovery requests.  Defendants

26  previously objected to this same language in DC's requests as impermissibly

27  overbroad.  Based on defendants' tacit acknowledgement that DC's use of this term

28

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1  is proper, DC will answer this discovery and has confirmed with defendants that

2  they will do the same.

3         Subject to and without waiving the foregoing objections, DC responds as

4  follows:  Jean Peavy, Frank Shuster, Paul Levitz, Lillian Laserson, and Carol

5  Simkin.

6  **Interrogatory No. 7**

7         IDENTIFY all persons who participated in the drafting of the 1992

8  AGREEMENT.

9  **Response to Interrogatory No. 7**

10        DC objects to the Interrogatory to the extent it calls for irrelevant information

11  and calls for a search for documents that is unduly expensive, overbroad, unduly

12  burdensome, and oppressive.  DC objects to this Interrogatory to the extent that it

13  seeks information protected by the attorney-client privilege, the attorney work

14  product doctrine, or any other applicable privilege or immunity.

15        DC objects to this Interrogatory on the grounds that the phrase "persons who

16  participated in the drafting" is vague and ambiguous, and lacks sufficient precision

17  to allow it formulate an appropriate response.  DC objects to the extent the Request

18  seeks identification of "all persons" on the ground that such request is overly broad,

19  unduly burdensome, oppressive, and not reasonably calculated to lead to the

20  discovery of admissible evidence.  As used in these Responses, the phrase "all

21  persons," or phrases of similar import, should be understood to mean those persons

22  DC and its counsel were able to identify using reasonable diligence and reasonable

23  judgment.  DC does not object to or withhold any information based on the

24  definition of "IDENTIFY," as this definition mirrors in large part language that DC

25  employed in its own discovery requests.  Defendants previously objected to this

26  same language in DC's requests as impermissibly overbroad.  Based on defendants'

27  tacit acknowledgement that DC's use of this term is proper, DC will answer this

28  discovery and has confirmed with defendants that they will do the same.

- 11 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

**Exhibit ZZ**

1    Subject to and without waiving all foregoing objections, DC responds as

2    follows:  Jean Peavy, Frank Shuster, Paul Levitz, Carol Simkin, Lillian Laserson,

3    and John Schulman.

4    **Interrogatory No. 8**

5    IDENTIFY all witnesses REGARDING the 1992 AGREEMENT.

6    **Response to Interrogatory No. 8**

7    DC objects to the Interrogatory to the extent it calls for irrelevant information

8    and calls for a search for documents that is unduly expensive, overbroad, unduly

9    burdensome, and oppressive.

10    DC further objects to this Interrogatory on the grounds that the phrase "all

11    witnesses" is vague and ambiguous, and lacks sufficient precision to allow it

12    formulate an appropriate response.  DC will interpret this phrase as encompassing

13    those persons who participated in the negotiating or drafting of the 1992 agreement.

14    DC does not object to or withhold any information based on the definition of

15    "IDENTIFY," as this definition mirrors in large part language that DC employed in

16    its own discovery requests.  Defendants previously objected to this same language

17    in DC's requests as impermissibly overbroad.  Based on defendants' tacit

18    acknowledgement that DC's use of this term is proper, DC will answer this

19    discovery and has confirmed with defendants that they will do the same.

20    Subject to and without waiving all foregoing objections, DC responds as

21    follows:  Jean Peavy, Frank Shuster, Paul Levitz, Lillian Laserson, Jenette Kahn,

22    Carolyn McCandless, Pat Caldon, Carol Simkin, John Schulman, Marty Payson,

23    Chris Caramalis, Mark Warren Peary, Dawn Peavy.  DC submits that Marc

24    Toberoff, Pacific Pictures Corporation, IP Worldwide LLC, IPW LLC, and Ari

25    Emanuel also are material witnesses to the 1992 agreement, although none of these

26    parties participated in negotiating or drafting that agreement.

27

28

- 12 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

**Exhibit ZZ**

**756**

1    **Interrogatory No. 9**

2        IDENTIFY any evidence that supports YOUR contention that "[t]he Shuster

3    Termination Notice is invalid, and thus ineffective," found in paragraph 106 of

4    YOUR COMPLAINT.

5    **Response to Interrogatory No. 9**

6        DC objects to the Interrogatory to the extent it requires DC to prove through

7    the discovery process its ultimate legal arguments related to the ramifications of

8    defendants' agreements and communications.  DC objects to the Interrogatory on

9    the ground that it is compound and includes numerous discrete subparts that should

10   each be counted as a separate interrogatory for the purposes of calculating the

11   number of interrogatories that Peary has propounded on DC.  DC articulated five

12   separate bases for the invalidity of the Shuster Termination Notice in its complaint

13   (Docket No. 49 ¶¶ 105-134), and discovery must accordingly be addressed to each

14   basis individually.  DC objects to the Interrogatory to the extent it seeks

15   information protected by the attorney-client privilege, the attorney work product

16   doctrine, or any other applicable privilege or immunity.  DC further objects to the

17   extent this Interrogatory seeks documents that defendants have refused to produce

18   in response to discovery served by DC, including but not limited to the 2008

19   "consent agreement" defendants continue to refuse to disclose.

20       DC objects to the definition of "YOUR" and will respond to that term as

21   limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

22   objects to the use of the term "any" evidence on the ground that such request is

23   vague, overly broad, unduly burdensome, oppressive, and not reasonably calculated

24   to lead to the discovery of admissible evidence.  DC does not object to or withhold

25   any information based on the definition of "IDENTIFY," as this definition mirrors

26   in large part language that DC employed in its own discovery requests.  Defendants

27   previously objected to this same language in DC's requests as impermissibly

28   overbroad.  Based on defendants' tacit acknowledgement that DC's use of this term

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    is proper, DC will answer this discovery and has confirmed with defendants that

2    they will do the same.

3          Subject to and without waiving the foregoing objections, DC responds as

4    follows:

5          DC00001-7, DC00008-12, DC00014-15, DC00156-157, DCC00000557-

6    3336, DCC00004510-4520, DCC00006188-6190, DCC00006192-6194,

7    DCC00006198, DCC00006203-6205, DCC00006206-6207, DCC00006214-6215,

8    DCC00006372-6373, DCC00006375-6376, DCC00006399, DCC00006413-6441,

9    DCC00006448, DCC00006462, DCC00006474, DCC00006477-6492,

10   DCC00006495-6496, DCC00006498, DCC00006607-6618, DCC00006629-6630,

11   DCC00006775-6778, DCC00006855-6856, DCC00006867, DCC00006869,

12   DCC00006872-6879, DCC00007102-7159, DCC00007183-7198, DCC00007826-

13   7837, DCC00007954- DCC00007965, DCC00007990-8024, DCC00008506-8507,

14   DCC00045603-45626, DCC00056945-56950, DCC00057538-57550,

15   DCC00057854, DCC00073008, DCC00073010, DCC00073012-73017,

16   DCC00089361-89365, DCC00141525, WB000670-3453, WB005709-5766,

17   WB006588-6602, WB007959-7961, WB007972, WB008050-8053, WB008305-

18   8316, WB009991-10003, WB010169-10170, WB010161-10162, PPC00001-09,

19   IPW00001-16, Q0001-07, LSL00211-212, LSL00482-486.

20         Subject to and without waiving all foregoing objections, DC refers

21   defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

22   No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

23   and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

24   (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

25   35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

26   81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

27   100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

28   147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

- 14 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

2   193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

3   305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

4   333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

5   exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

6   Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

7   460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

8   DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

9   deposition testimony in those cases and here.  All of these sources are incorporated

10  by reference herein.

11      Given that discovery is ongoing in this case, and expert discovery has not yet

12  begun, DC expressly reserves its right to supplement these Responses as more

13  information becomes available, and to use in discovery and at trial any information

14  omitted from these Responses as a result of mistake, inadvertence, or oversight.

15

16  **Interrogatory No. 10**

17      IDENTIFY any evidence that supports YOUR contention that "[t]he 1992

18  Agreement that Frank Shuster and Jean Peavy entered into with DC Comics bars

19  the Shuster Estate from pursuing termination because, *inter alia*, in exchange for

20  valuable consideration, the 1992 Agreement effected a rescission, revocation, and

21  re-grant of all prior copyright grants, which eliminated any pre-1978 grant that

22  could be subject to termination under section 304 of the Copyright Act," found in

23  paragraph 112 of YOUR COMPLAINT.

24  **Response to Interrogatory No. 10**

25      DC objects to the Interrogatory to the extent that it requires DC to prove

26  through the discovery process its ultimate legal arguments related to the

27  ramifications of defendants' agreements and communications.  DC further objects

28  to this Interrogatory to the extent that it seeks information protected by the attorney-

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   client privilege, the attorney work product doctrine, or any other applicable

2   privilege or immunity.

3       DC objects to the definition of "YOUR" and will respond to that term as

4   limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

5   objects to the use of the term "any" evidence on the ground that such request is

6   vague, overly broad, unduly burdensome, oppressive, and not reasonably calculated

7   to lead to the discovery of admissible evidence.  DC does not object to or withhold

8   any information based on the definition of "IDENTIFY," as this definition mirrors

9   in large part language that DC employed in its own discovery requests.  Defendants

10  previously objected to this same language in DC's requests as impermissibly

11  overbroad.  Based on defendants' tacit acknowledgement that DC's use of this term

12  is proper, DC will answer this discovery and has confirmed with defendants that

13  they will do the same.

14      Subject to and without waiving the foregoing objections, DC responds as

15  follows:

16      DCC00006-7, DC00014-15, DC00156-157,  DCC00000557-3336,

17  DCC00006184, DCC00006188-6190, DCC00006192-6194, DCC00006198,

18  DCC00006203-6205, DCC00006206-6207, DCC00006214-6215, DCC00006372-

19  6373, DCC00006375-6376, DCC00006399, DCC00006413-6441, DCC00006448,

20  DCC00006462, DCC00006474, DCC00006477-6492, DCC00006495-6496,

21  DCC00006498, DCC00006607-6618, DCC00006620, DCC00006629-6630,

22  DCC00006775-6778, DCC00006855-6856, DCC00006867, DCC00006869,

23  DCC00006872-6879, DCC00007102-7159, DCC00007183-7198, DCC00007826-

24  7837, DCC00007990-8024, DCC00008506-8507, DCC00045603-45626,

25  DCC00056945-56950, DCC00057538-57550, DCC00057854, DCC00073008,

26  DCC00073010, DCC00073012-73017, DCC00089361-89365, DCC00141525,

27  WB000670-3453, WB005603, WB005709-5766, WB006588-6602, WB007959-

28  7961, WB007972, WB008050-8053, WB009991-10003, WB010169-10170,

- 16 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    WB010161-10162, PPC00001-09, IPW00001-16, Q0001-07, LSL00211-212,

2    LSL00482-486.

3         Subject to and without waiving all foregoing objections, DC refers

4    defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

5    No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

6    and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

7    (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

8    35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

9    81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

10   100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

11   147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

12   182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

13   193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

14   305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

15   333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

16   exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

17   Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

18   460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

19   DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

20   deposition testimony in those cases and here.  All of these sources are incorporated

21   by reference herein.

22        Given that discovery is ongoing in this case, and expert discovery has not yet

23   begun, DC expressly reserves its right to supplement these Responses as more

24   information becomes available, and to use in discovery and at trial any information

25   omitted from these Responses as a result of mistake, inadvertence, or oversight.

26   **Interrogatory No. 11**

27        IDENTIFY any evidence that supports YOUR contention that "Shuster's

28   heirs approached DC Comics in 1992 seeking increased annual payments, certain

- 17 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    tax benefits, and payment of Shuster's debts and expenses," and that "[a]t the time,

2    Shuster's heirs recognized the value of Superman as a property," found in

3    paragraph 115 of YOUR COMPLAINT.

4    **Response to Interrogatory No. 11**

5         DC objects to the Interrogatory to the extent that it requires DC to prove

6    through the discovery process its ultimate legal arguments related to the

7    ramifications of defendants' agreements and communications.  DC further objects

8    to the Interrogatory on the ground that it is compound and includes numerous

9    discrete subparts addressed to separate contentions.  Each subpart should be

10   counted a separate interrogatory for the purposes of calculating the number of

11   interrogatories that Peary has propounded on DC.  DC objects to this Interrogatory

12   to the extent that it seeks information protected by the attorney-client privilege, the

13   attorney work product doctrine, or any other applicable privilege or immunity.

14        DC objects to the definition of "YOUR" and will respond to that term as

15   limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

16   further objects to the use of the term "any" evidence on the ground that such request

17   is vague, overly broad, unduly burdensome, oppressive, and not reasonably

18   calculated to lead to the discovery of admissible evidence.  DC does not object to or

19   withhold any information based on the definition of "IDENTIFY," as this definition

20   mirrors in large part language that DC employed in its own discovery requests.

21   Defendants previously objected to this same language in DC's requests as

22   impermissibly overbroad.  Based on defendants' tacit acknowledgement that DC's

23   use of this term is proper, DC will answer this discovery and has confirmed with

24   defendants that they will do the same.

25        Subject to and without waiving the foregoing objections, DC responds as

26   follows:

27        DC00008-12, DC00014-15, DC00156-157, DC00094-144, DCC00006184,

28   DCC00006188-6190, DCC00006192-94, DCC00006198, DCC00006203-05,

- 18 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1 DCC00006206-07, DCC00006214-15, DCC00006372-73, DCC00006375-76,

2 DCC00006399, DCC00006413-41, DCC00006448, DCC00006462,

3 DCC00006474, DCC00006477-92, DCC00006495-96, DCC00006498,

4 DCC00006775-78, DCC00006855-56, DCC00006867, DCC00006869,

5 DCC00006872-79, DCC00008506-07, DCC00057854, DCC00057855,

6 DCC00073008, DCC00073010, DCC00073012-17, WB005603, WB007959-61,

7 WB007972, WB010169-70, WB010161-10162, Q0001-07, LSL00211-12,

8 LSL00482-86.

9  Subject to and without waiving all foregoing objections, DC refers

10 defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

11 No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

12 and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

13 (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

14 35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

15 81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

16 100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

17 147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

18 182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

19 193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

20 305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

21 333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

22 exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

23 Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

24 460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

25 DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

26 deposition testimony in those cases and here.  All of these sources are incorporated

27 by reference herein.

28

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   Given that discovery is ongoing in this case, and expert discovery has not yet

2   begun, DC expressly reserves its right to supplement these Responses as more

3   information becomes available, and to use in discovery and at trial any information

4   omitted from these Responses as a result of mistake, inadvertence, or oversight.

5   **Interrogatory No. 12**

6   IDENTIFY any evidence that supports YOUR contention that "the Shusters

7   are estopped from disputing that the 1992 Agreement remains in full force and

8   effect, which operates to preclude the assertion of any termination right," found in

9   paragraph 117 of YOUR COMPLAINT.

10  **Response to Interrogatory No. 12**

11  DC objects to the Interrogatory to the extent that it requires DC to prove

12  through the discovery process its ultimate legal arguments related to the

13  ramifications of defendants' agreements and communications.  DC further objects

14  to this Interrogatory to the extent that it seeks information protected by the attorney-

15  client privilege, the attorney work product doctrine, or any other applicable

16  privilege or immunity.

17  DC objects to the definition of "YOUR" and will respond to that term as

18  limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

19  objects to the use of the term "any" evidence on the ground that such request is

20  vague, overly broad, unduly burdensome, oppressive, and not reasonably calculated

21  to lead to the discovery of admissible evidence.  DC does not object to or withhold

22  any information based on the definition of "IDENTIFY," as this definition mirrors

23  in large part language that DC employed in its own discovery requests.  Defendants

24  previously objected to this same language in DC's requests as impermissibly

25  overbroad.  Based on defendants' tacit acknowledgement that DC's use of this term

26  is proper, DC will answer this discovery and has confirmed with defendants that

27  they will do the same.

28

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    Subject to and without waiving the foregoing objections, DC responds as

2    follows:

3    DC00008-12, DC00014-15, DC00156-157, DC00094-144, DCC00000557-

4    3336, DCC00006188-6190, DCC00006192-6194, DCC00006198, DCC00006203-

5    6205, DCC00006206-6207, DCC00006214-6215, DCC00006372-6373,

6    DCC00006375-6376, DCC00006399, DCC00006413-6441, DCC00006448,

7    DCC00006462, DCC00006474, DCC00006477-6492, DCC00006495-6496,

8    DCC00006498, DCC00006607-6618, DCC00006629-6630, DCC00006775-6778,

9    DCC00006855-6856, DCC00006867, DCC00006869, DCC00006872-6879,

10   DCC00007102-7159, DCC00007183-7198, DCC00007826-7837, DCC00007990-

11   8024, DCC00045603-45626, DCC00056945-56950, DCC00057538-57550,

12   DCC00057854, DCC00073008, DCC00073010, DCC00073012-73017,

13   DCC00089361-89365, DCC00141525, WB000670-3453, WB005603, WB005709-

14   5766, WB006588-6602, WB007959-7961, WB007972, WB008050-8053,

15   WB009991-10003, WB010169-10170, WB010161-10162, PPC00001-09,

16   IPW00001-16, Q0001-07, LSL00211-212, LSL00482-486.

17   Subject to and without waiving all foregoing objections, DC refers

18   defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

19   No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

20   and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

21   (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

22   35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

23   81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

24   100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

25   147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

26   182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

27   193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

28   305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

2   exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

3   Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

4   460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

5   DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

6   deposition testimony in those cases and here.  All of these sources are incorporated

7   by reference herein.

8          Given that discovery is ongoing in this case, and expert discovery has not yet

9   begun, DC expressly reserves its right to supplement these Responses as more

10  information becomes available, and to use in discovery and at trial any information

11  omitted from these Responses as a result of mistake, inadvertence, or oversight.

12  **Interrogatory No. 13**

13         IDENTIFY any evidence that supports YOUR contention that purported

14  "omissions [in the Shuster Termination Notice] were not inadvertent, but were

15  intended to conceal material information from DC Comics, including: (a) the

16  various conflicts of interest arising from Toberoff's and his companies' significant

17  ownership interest in the Shuster Estate's and the Siegel Heirs' purported rights;

18  and (b) consent agreements that Toberoff procured limiting the Shuster and Siegel

19  Heirs' freedom to enter into agreements with DC Comics regarding those rights,"

20  found in paragraph 123 of YOUR COMPLAINT.

21  **Response to Interrogatory No. 13**

22         DC objects to the Interrogatory to the extent that it requires DC to prove

23  through the discovery process its ultimate legal arguments related to the

24  ramifications of defendants' agreements and communications.  DC further objects

25  to this Interrogatory to the extent that it seeks information protected by the attorney-

26  client privilege, the attorney work product doctrine, or any other applicable

27  privilege or immunity.  DC also objects to the extent the Interrogatory calls for

28  information which is not available to DC.  DC further objects to the extent this

- 22 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1   Interrogatory seeks documents that defendants have refused to produce in response

2   to discovery served by DC, including but not limited to the 2008 "consent

3   agreement" defendants continue to refuse to disclose.

4        DC objects to the definition of "YOUR" and will respond to that term as

5   limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

6   further objects to the use of the term "any" evidence on the ground that such request

7   is vague, overly broad, unduly burdensome, oppressive, and not reasonably

8   calculated to lead to the discovery of admissible evidence.  DC does not object to or

9   withhold any information based on the definition of "IDENTIFY," as this definition

10  mirrors in large part language that DC employed in its own discovery requests.

11  Defendants previously objected to this same language in DC's requests as

12  impermissibly overbroad.  Based on defendants' tacit acknowledgement that DC's

13  use of this term is proper, DC will answer this discovery and has confirmed with

14  defendants that they will do the same.

15       Subject to and without waiving the foregoing objections, DC responds as

16  follows:

17       DC00001-7, DC00014-15, DC00156-1576, DCC00000557-3336,

18  DCC00007102-7159, DCC00007183-7198, DCC00007826-7837, DCC00056945-

19  56950, DCC00057538-57550, DCC00089361-89365, DCC000141525, IPW00001-

20  00016, PPC00001-00009, WB000670-3453, WB005709-5766, WB006588-6602,

21  WB008050-8053, WB009991-10003, PPC00001-09, IPW00001-16, Q0001-07,

22  LSL00211-212, LSL00482-486.

23       Subject to and without waiving all foregoing objections, DC refers

24  defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

25  No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

26  and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

27  (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

28  35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100, 100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147, 147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to 182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193, 193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to 305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333, 333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6, 460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*, DCC00000001-154435 and WB000001-149488)—including, but not limited to, all deposition testimony in those cases and here.  All of these sources are incorporated by reference herein.

Given that discovery is ongoing in this case, and expert discovery has not yet begun, DC expressly reserves its right to supplement these Responses as more information becomes available, and to use in discovery and at trial any information omitted from these Responses as a result of mistake, inadvertence, or oversight.

**Interrogatory No. 14**

IDENTIFY any evidence that supports YOUR contention that "the Shuster Termination Notice … contains material misrepresentations intended to mislead the courts, Copyright Office, and DC Comics—all to the detriment of DC Comics," found in paragraph 129 of YOUR COMPLAINT.

**Response to Interrogatory No. 14**

DC objects to the Interrogatory to the extent that it requires DC to prove through the discovery process its ultimate legal arguments related to the ramifications of defendants' agreements and communications.  DC further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

**Exhibit ZZ**

**768**

1  privilege or immunity.  DC also objects to the extent the Interrogatory calls for

2  information which is not available to DC.  DC further objects to the extent this

3  Interrogatory seeks documents that defendants have refused to produce in response

4  to discovery served by DC, including but not limited to the 2008 "consent

5  agreement" defendants continue to refuse to disclose.

6      DC objects to the definition of "YOUR" and will respond to that term as

7  limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

8  further objects to the use of the term "any" evidence on the ground that such request

9  is vague, overly broad, unduly burdensome, oppressive, and not reasonably

10  calculated to lead to the discovery of admissible evidence.  DC does not object to or

11  withhold any information based on the definition of "IDENTIFY," as this definition

12  mirrors in large part language that DC employed in its own discovery requests.

13  Defendants previously objected to this same language in DC's requests as

14  impermissibly overbroad.  Based on defendants' tacit acknowledgement that DC's

15  use of this term is proper, DC will answer this discovery and has confirmed with

16  defendants that they will do the same.

17      Subject to and without waiving the foregoing objections, DC responds as

18  follows:

19      DC00001-7, DC00008-12, DCC00000557-3336, DCC00004510-4520,

20  DCC00007102-7159, DCC00007147-7159, SM No. 1, DCC00007183-7198,

21  DCC00007826-7837, DCC00045557-45591, DCC00045603-45613,

22  DCC00056945-56950, DCC00057538-57550, DCC0006849-6854, DCC00089361-

23  89365, DCC000141525, DCC00141359-141364, DCC00141525, DCC00141565-

24  141572, DCC00142156-142342, IPW00001-00016, PPC00001-00009, WB000670-

25  3453, WB005709-5766, WB006588-6602, WB008050-8059, WB008305-8316,

26  WB009991-10003, PPC00001-09, IPW00001-16, Q0001-07, LSL00211-212,

27  LSL00482-486.

28

- 25 -

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1       Subject to and without waiving all foregoing objections, DC refers

2  defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

3  No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

4  and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

5  (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

6  35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

7  81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

8  100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

9  147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

10  182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

11  193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

12  305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

13  333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

14  exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

15  Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

16  460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

17  DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

18  deposition testimony in those cases and here.  All of these sources are incorporated

19  by reference herein.

20       Given that discovery is ongoing in this case, and expert discovery has not yet

21  begun, DC expressly reserves its right to supplement these Responses as more

22  information becomes available, and to use in discovery and at trial any information

23  omitted from these Responses as a result of mistake, inadvertence, or oversight.

24  **Interrogatory No. 15**

25       IDENTIFY any evidence that supports YOUR contention that "[i]nduced by

26  Toberoff, the Shuster Heirs also falsely disclaimed any interest in the Superboy

27  rights in the Shuster Termination Notice," found in paragraph 131 of YOUR

28  COMPLAINT.

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1    **Response to Interrogatory No. 15**

2    DC objects to the Interrogatory to the extent that it requires DC to prove

3    through the discovery process its ultimate legal arguments related to the

4    ramifications of defendants' agreements and communications.  DC objects to this

5    Interrogatory to the extent that it seeks information protected by the attorney-client

6    privilege, the attorney work product doctrine, or any other applicable privilege or

7    immunity.  DC further objects to the extent this Interrogatory seeks documents that

8    defendants have refused to produce in response to discovery served by DC,

9    including but not limited to the 2008 "consent agreement" defendants continue to

10   refuse to disclose.

11   DC objects to the definition of "YOUR" and will respond to that term as

12   limited to relevant representatives of DC and Warner Bros. Entertainment Inc.  DC

13   objects to the use of the term "any" evidence on the ground that such request is

14   vague, overly broad, unduly burdensome, oppressive, and not reasonably calculated

15   to lead to the discovery of admissible evidence.  DC does not object to or withhold

16   any information based on the definition of "IDENTIFY," as this definition mirrors

17   in large part language that DC employed in its own discovery requests.  Defendants

18   previously objected to this same language in DC's requests as impermissibly

19   overbroad.  Based on defendants' tacit acknowledgement that DC's use of this term

20   is proper, DC will answer this discovery and has confirmed with defendants that

21   they will do the same.

22   Subject to and without waiving the foregoing objections, DC responds as

23   follows:

24   DC00001-5, DC00008-12, DCC00000557-3336, DCC00004510-20,

25   DCC00007102-7159, DCC00007147-7159, DCC00007183-7198, DCC00007826-

26   7837, DCC00045557-45591, DCC00045603-45613, DCC00056945-56950,

27   DCC00057538-57550, DCC00089361-89365, DCC000141525, DCC00142156-

28   142342, WB000670-3453, WB005709-5766, WB006588-6602, WB008050-8053,

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1  WB008305-8316, WB009991-10003, PPC00001-09, IPW00001-16**,** Q0001-07,

2  LSL00211-212, LSL00482-486, SGL000003529-3237.

3       Subject to and without waiving all foregoing objections, DC refers

4  defendants' attention to its complaint and attached exhibit (Docket No. 49, Docket

5  No. 49 Ex. A), all briefing in this action—including, but not limited to, the briefing

6  and exhibits filed in connection with defendants' Rule 12 and SLAPP motions

7  (Docket Nos. 30, 30-1 to 30-5, 31, 31-1, 31-2, 32, 33, 33-1 to 33-4, 34, 34-1, 34-2,

8  35, 36, 75, 75-1 to 75-5, 76, 77, 77-1 to 77-3, 78, 78-1 to 78-2, 79, 80, 80-1 to 80-4,

9  81, 89, 90, 91, 92, 93, 94, 94-1 to 94-40, 98, 98-1 to 98-4, 99, 99-1 to 99-2, 100,

10  100-1 to 100-3, 102, 102-1, 103, 103-1, 106, 107, 108, 146, 146-1 to 146-4, 147,

11  147-1 to 147-3, 148, 148-1 to 148-5, 149, 150, 151, 154, 156, 181, 182, 182-1 to

12  182-40, 183, 183-1 to 183-4, 184, 185, 186, 191, 191-1, 192, 192-1 to 192-3, 193,

13  193-1 to 193-2, 194, 195, 195-1, 196, 196-1 to 196-4, 201, 202, 203, 304, 305-1 to

14  305-59, 306 (errata), 307, 308, 312, 312-1 to 312-2, 313, 314, 314-1 to 314-3, 333,

15  333-1 to 333-3, 334, 334-1 to 334-13, 335, 338, 338-1), and the briefing and

16  exhibits filed in connection with Plaintiff DC Comic's Motion for Partial Summary

17  Judgment On Its First and Third Claims (Docket Nos. 458, 459, 459-1 to 459-6,

18  460, 460-1 to 460-3 )—and all discovery in this action and the *Siegel* action (*e.g.*,

19  DCC00000001-154435 and WB000001-149488)—including, but not limited to, all

20  deposition testimony in those cases and here.  All of these sources are incorporated

21  by reference herein.

22       Given that discovery is ongoing in this case, and expert discovery has not yet

23  begun, DC expressly reserves its right to supplement these Responses as more

24  information becomes available, and to use in discovery and at trial any information

25  omitted from these Responses as a result of mistake, inadvertence, or oversight.

26

27

28

DC'S AMENDED OBJ. & RESP. TO
PEARY INTERROGATORY NOS. 1-15

1

2    Dated:  July 20, 2012                    Respectfully submitted,

3                                             By:  /s/ Daniel M. Petrocelli

4                                                  Daniel M. Petrocelli

5                                             Attorneys for Plaintiff DC Comics

6    OMM_US:70779360

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DC'S AMENDED OBJ. & RESP. TO
**Exhibit ZZ**                         PEARY INTERROGATORY NOS. 1-15

**773**