DANIEL M. PETROCELLI (S.B. #097802)
  dpetrocelli@omm.com
MATTHEW T. KLINE (S.B. #211640)
  mkline@omm.com
CASSANDRA L. SETO (S.B. #246608)
  cseto@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035
Telephone:  (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Plaintiff DC Comics

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC COMICS,<br><br>        Plaintiff,<br><br>        v.<br><br>PACIFIC PICTURES CORPORATION, IP WORLDWIDE, LLC, IPW, LLC, MARC TOBEROFF, an individual, MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER, JEAN ADELE PEAVY, an individual, LAURA SIEGEL LARSON, an individual and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. CV 10-3633 ODW (RZx)<br><br>**PLAINTIFF DC COMICS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND AND THIRD CLAIMS FOR RELIEF**<br><br>STATEMENT OF GENUINE ISSUES; DECLARATION AND FED. R. CIV. P. 56(D) AFFIDAVIT OF DANIEL M. PETROCELLI; DECLARATION OF DAMON BONESTEEL; OBJECTIONS; AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH<br><br>Hon. Otis D. Wright II<br><br>**Hearing Date**:   Oct. 15, 2012<br>**Hearing Time**:   1:30 p.m.<br>**Courtroom**:     11 |

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION .................................................................................. 1

II.   SUMMARY JUDGMENT SHOULD BE GRANTED IN DC'S FAVOR ON ITS FIRST CLAIM, BASED ON THE 1992 AGREEMENT. ................................................................................... 2

III.  THE SHUSTERS' UNCLEAN HANDS ALSO BAR TERMINATION. ............................................................................. 17

IV.   CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Am. Meat Inst. v. Leeman*,
    180 Cal. App. 4th 728 (2009) .................................................................. 18

*Barry v. Donnelly*,
    781 F.2d 1040 (4th Cir. 1986) .............................................................. 18

*Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*,
    No. SACV 05-1083 (Oct. 13, 2006) ...................................................... 25

*Classic Media, Inc. v. Mewborn*,
    532 F.3d 978 (9th Cir. 2008) ...........................................................*passim*

*Connell v. City of N.Y.*,
    230 F. Supp. 2d 432 (S.D.N.Y. 2002) .................................................. 24

*Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*,
    543 F. Supp. 522 (D. Del. 1982) .......................................................... 18

*Eazypower v. Alden Corp.*,
    2003 WL 22859492 (N.D. Ill. Dec. 2, 2003) ...................................... 19

*Effects Assocs., Inc. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990) ................................................................ 10

*Estate of Molino*,
    165 Cal. App. 4th 913 (2008) ................................................................ 6

*Gucci Am, Inc. v. Guess?, Inc.*,
    2012 WL 2304247 (S.D.N.Y. June 18, 2012) .................................... 24

*Huthwaite, Inc. v Randstad Gen. Partner*,
    2006 WL 3065470 (N.D. Ill. Oct. 24, 2006) .............................. 18, 22

*In re Kalt's Estate*,
    16 Cal. 2d 807 (1940) ............................................................................ 6

*In re McKesson HBOC, Inc. ERISA Litig.*,
    391 F. Supp. 2d 812 (N.D. Cal. 2005)................................................ 18

*Linzer Prods. Corp. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) ................................................ 18

*Lucky's Detroit, LLC v. Double L Inc.*,
    2012 WL 219418 (E.D. Mich. Jan. 25, 2012) .................................... 24

*Makaeff v. Trump Univ., LLC*,
    2011 WL 613571 (S.D. Cal. Feb. 11, 2011) ...................................... 25

# TABLE OF AUTHORITIES

*Marvel Characters, Inc. v. Simon,*
  310 F.3d 280 (2d Cir. 2002) ................................................................. 4, 5, 16

*McCormick v. Cohn,*
  1992 WL 687291 (S.D. Cal. July 31, 1992) ........................................... 18

*Metabolife Int'l, Inc. v. Wornick,*
  264 F.3d 832 (9th Cir. 2001) ............................................................... 2, 19

*Milne v. Stephen Slesinger, Inc.,*
  430 F.3d 1036 (9th Cir. 2005) ........................................................ *passim*

*Mitchell Bros. Film Group v. Cinema Adult Theater,*
  604 F.2d 852 (5th Cir. 1979) ................................................................... 17

*New York Times Co., Inc. v. Tasini,*
  533 U.S. 483 (2001) ................................................................................... 3

*Pelich v. I.N.S.,*
  329 F.3d 1057 (9th Cir. 2003) ................................................................. 18

*Penguin Grp. (USA) Inc. v. Steinbeck,*
  537 F.3d 193 (2d Cir. 2008) .......................................................... *passim*

*Perform. Unlimited, Inc., v. Questar Publishers, Inc.,*
  52 F.3d 1373 (6th Cir. 1995) ............................................................. 22, 23

*R&R Recreation Prods., Inc. v. Joan Cook Inc.,*
  1992 WL 88171 (S.D.N.Y. Apr. 14, 1992) ............................................. 11

*Rupert v. Jones,*
  2011 WL 855849 (N.D. Cal. Mar. 9, 2011) .............................................. 1

*Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.,*
  482 F. Supp. 980 (S.D.N.Y. 1980) .......................................... 17, 22, 25

*Shloss v. Sweeney,*
  515 F. Supp. 2d 1068 (N.D. Cal. 2007) ................................................. 18

*Stewart v. Abend,*
  495 U.S. 207 (1990) .............................................................................. 3, 5

*Texas Partners v. Conrock Co.,*
  685 F.2d 1116 (9th Cir. 1982) ................................................................. 19

*U.S. v. Hardesty,*
  977 F.2d 1347 (9th Cir. 1992) ............................................................ 5, 12

iii

# TABLE OF AUTHORITIES

*Vogue Ring Creations, Inc. v. Hardman*,
    410 F. Supp. 609 (D.C.R.I. 1976) ...................................................... 18

*Walczyk v. Rio*,
    496 F.3d 139 (2d Cir. 2007) ............................................................ 24

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ................................................................... 18-19

## STATUTES

17 U.S.C. § 304(c) ............................................................................ 4, 23

17 U.S.C. § 304(c)(5) ........................................................................ 3, 4

17 U.S.C. § 304(c)(6)(D) ...................................................................... 24

17 U.S.C. § 304(d)(1) ...................................................................... 24, 25

28 U.S.C. § 2201(a) ............................................................................. 18

## RULES AND REGULATIONS

37 C.F.R. 201.10(b)(1)(vii) ............................................................... 24, 25

FED. R. CIV. P. 54(b) ........................................................................... 25

FED. R. CIV. P. 56(d) ....................................................................... 2, 19

## OTHER AUTHORITIES

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102
    Stat. 2853 (1988) ........................................................................ 11

3 NIMMER ON COPYRIGHT § 7.20[B] (2012) ........................................... 18

4 NIMMER ON COPYRIGHT § 13.09[B] (2012) .......................................... 18

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

## I.   INTRODUCTION

Defendants' cross-motion for summary judgment should be denied as procedurally improper and substantively without basis.  It is procedurally defective because it rehashes the same arguments the parties addressed on DC's pending summary judgment motion, Petrocelli Decl. ("PD") Ex. 4, and seeks to resolve issues—including DC's unclean-hands claim—that are not ripe for review.

As to DC's Third Claim, the Court ruled in DC's favor on the claim in its recent tentative, *id*. Ex. 1 ("Tentative") at 17-18, and defendants raised *no* argument concerning that ruling in their hour-long challenge to the Court's opinion, *id*. Ex. 2 ("Hr'g Tr.").  Summary judgment should enter in DC's favor on its Third Claim, and there is no need to re-brief that issue yet again.

DC's Second Claim, pled in the alternative to DC's First Claim, is not ripe for summary adjudication.  It alleges that, even if the Shusters' termination notice is valid (a premise that the First Claim contests), the Shusters may recapture only a limited sliver of rights (if any) because, *e.g.*, the works listed in their notice are non-terminable unpublished works, works-made-for-hire, and derivative works.  Docket No. 49 ¶¶ 152-64.  If the Court rules in DC's favor on DC's First Claim, there is no need to reach this Second Claim now.  *E.g.*, *Rupert v. Jones*, 2011 WL 855849, at *3 n.6 (N.D. Cal. Mar. 9, 2011).  Moreover, the Second Claim presents several issues currently before the Ninth Circuit in the *Siegel* case set to be heard November 5, 2012, Appeal Nos. 11-55863, 11-56034, Docket Nos. 31-1 at 41-87; 49 at 17-28; 65-1—only further reason not to address this Second Claim now.

That leaves DC's First Claim, large parts of which defendants improperly reargue in their cross-motion.  DC asserted five bases for this First Claim, two of which it will address in detail below.  The other three bases require no further briefing presently.  The first basis—DC's "expired" argument, Docket No. 49 ¶¶ 107-11—was fully briefed by the parties months ago, Docket Nos. 458 at 21-23; 468 at 9-10; Docket No. 186 at 14-17, and there is no reason to re-brief it yet again,

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1   especially given that defendants spent no time addressing the issue on September 5.

2   The second basis—DC's "majority interest" argument, Docket No. 49 ¶¶ 118-24—

3   was fully briefed, Docket Nos. 458 at 18-20; 468 at 8; Docket No. 186 at 20-21,

4   and the Court tentatively ruled against DC on it, Tentative at 15-17, although DC

5   respectfully disagrees with that conclusion.  The third basis—the Shusters' failure

6   to terminate 1992 and 1948 grants, Docket No. 49 ¶¶ 112-17—can and will be

7   mooted if the Court rules in DC's favor on its 1992 Agreement claim.

8       The two remaining bases for DC's First Claim—the 1992 Agreement, and

9   unclean-hands—merit discussion.  The Court tentatively ruled in DC's favor on the

10   1992 Agreement, and that tentative should stand.  Defendants materially misstated

11   the facts and law about the 1992 Agreement in their cross-motion and at the

12   September 5 hearing, and DC now corrects those misstatements.

13       Defendants also direct their motion at DC's unclean-hands claim, another

14   independent basis for its First Claim.  Defendants' motion fails to cite the case law

15   demonstrating that DC's unclean-hands claim, brought as a declaratory relief

16   action, is a fully proper way to challenge the Shuster termination notice.  Their

17   motion also ignores that discovery into this claim is ongoing, will take months to

18   complete (particularly given delays defendants have caused), and bars their motion.

19   *See* FED. R. CIV. P. 56(d); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th

20   Cir. 2001); PD ¶¶ 5-22 (detailing ongoing, needed discovery).

21       In short, no part of defendants' motion is well taken; it should be denied.

22   **II.   SUMMARY JUDGMENT SHOULD BE GRANTED IN DC'S FAVOR**

23         **ON ITS FIRST CLAIM, BASED ON THE 1992 AGREEMENT.**

24       As shown by its tentative opinion and the oral argument it held on September

25   5, the Court is well aware of DC's First Claim concerning the 1992 Agreement.

26   DC will not repeat its prior briefing or argument, but instead responds to significant

27   misrepresentations about the 1992 Agreement and its legal effect, made both in

28   defendants' cross-motion and argument at the September 5 hearing.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1        *1. The Lead Premise of Defendants' Argument:  That The Termination Right*

2    *Is "Inalienable" And Congress "Abrogated" Contract Law.*  Defendants say Jean

3    Peavy is not bound by the $600,000-and-counting, lifetime contract she signed with

4    DC in 1992 because the "termination right is inalienable" and, in enacting the

5    termination and agreement-to-the-contrary laws in the Copyright Act, Congress

6    rewrote "everything that we are taught in law school" about contracts, including a

7    "deal is a deal."  Hr'g Tr. at 31:12-32:5; *id.* at 8:19-9:2; Cross-Mot. at 3, 12.

8        The Ninth Circuit rejected this position seven years ago in *Milne v. Stephen*

9    *Slesinger, Inc.*, 430 F.3d 1036, 1047 (9th Cir. 2005).  Below are the *Milne* court's

10   own words, refuting defendants' "inalienability" argument—which Clare Milne,

11   like defendants here, based on dicta in the *Stewart* case, *see* Hr'g Tr. at 32:6:

12         To support her theory that the 1983 agreement falls under the
     category of "an agreement to the contrary," Clare reads the Supreme
13   Court's decision in *Stewart v. Abend*, 495 U.S. 207, 110 S. Ct. 1750,
     109 L. Ed. 2d 184 (1990), <u>as holding that Congress intended to make</u>
14   <u>the termination right inalienable for authors and their families.</u>
     *Stewart*, however, <u>did not</u> interpret the "agreement to the contrary"
15   language of section 304(c)(5) or its counterpart under section
     203(a)(5).  In fact, the only discussion in *Stewart* pertaining to
16   inalienability is the Court's relatively brief portrayal of the evolution
     of copyright law, beginning with the Copyright Act of 1790 and
17   ending with the 1976 Copyright Act.  Accordingly, *Stewart* <u>does not</u>
     support the broad "plain meaning" that Clare attributes to section
18   304(c)(5) [the agreement-to-the-contrary provision in the Act].
19
20   *Milne*, 430 F.3d at 1043 (footnote and cites omitted; underlining added).[1]

21       *Milne* also rejected the argument made by defendants here—again, notably

22   unsupported by any case law, *see* Cross-Mot. at 3:15-26—that the Copyright Act

23   rewrote the copyright law to forbid all contracts that bar later termination claims:

24         Relying on legislative history, the district court [in *Milne* correctly]
     read the House Report for the 1976 Copyright Act as confirming the
25   rule that "[n]othing in the Copyright Acts has altered the power of

26   _____
     [1] Defendants' cite to a *parenthetical* in a *footnote* in *New York Times Co., Inc. v.*
27   *Tasini*, 533 U.S. 483, 496 n.3 (2001), Cross-Mot. at 3:4, is equally unavailing—and
     no more a "holding" on this issue, *cf.* Hr'g Tr. at 32:8, than the dicta in *Stewart* that
28   *Milne* openly discounted.

1  private parties to contract." H.R. REP. NO. 94-1476, 94th Cong., 2d
2  Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5743.

3      Clare [Milne] criticizes the district court's approach to statutory
   construction, arguing that section 304(c)'s meaning is clear on its face
4  and that there was no need for the district court to consider legislative
   history. She maintains that the district court used legislative history to
   override the statute itself.

5      We disagree. Section 304(c)(5) states that "[t]ermination … may be
6  effected notwithstanding any agreement to the contrary, including an
   agreement to make a will or to make any future grant." 17 U.S.C. §
7  304(c)(5). As we have noted, the phrase "agreement to the contrary" is
   unclear…..

8      [A review of the legislative history shows] Congress specifically
9  stated that it did not intend for the statute to "prevent the parties to a
   transfer or license from voluntarily agreeing at any time to terminate
10 an existing grant and negotiating a new one[.]" H.R. REP. NO. 94-1476
   at 127. Congress further stated that "nothing in this section or
11 legislation is intended to change the existing state of the law of
   contracts concerning the circumstances in which an author may
12 terminate a license, transfer or assignment." H.R. REP. NO. 94-1476 at
   142. Congress therefore anticipated that parties may contract, as an
13 alternative to statutory termination, to revoke a prior grant by replacing
   it with a new one. Indeed, Congress explicitly endorsed the continued
14 right of "parties to a transfer or license" to "voluntarily agree[] at any
   time to terminate an existing grant and negotiate[e] a new one." H.R.
15 REP. NO. 94-1476 at 127.

16 *Milne*, 430 F.3d at 1045-46 (footnote and cites omitted; underlining added).[2]

17     In *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 203 (2d Cir. 2008),
18 the Second Circuit, relying on *Milne*, held the same as *Milne*—again rejecting
19 defendants' arguments that Congress intended to "abrogate" contract law:

20     There is also no indication in the statutory text or the legislative
21 history of the Copyright Act that elimination of a termination right
   through termination of a pre-1978 contractual grant was precluded or
22

23 _____
   [2] Defendants cite *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002)
24 to argue the termination right cannot be "contractually waived or circumvented,"
   and that Congress "abrogated freedom of contract principles…." Cross-Mot. at
25 3:15-23. This ignores *Milne*, and disregards *Marvel*'s holding that the parties there
   could have settled their dispute and barred any termination claim had they just filed
26 a proper "statement of settlement" that complied with the collateral-estoppel rules.
   310 F.3d at 291-92. It also ignores that *Marvel* had *nothing* to do with a post-1978
27 copyright grant replacing all pre-1978 grants—as was the case in *Milne*, *Steinbeck*,
   and here. Rather, *Marvel* involved a *1969* settlement agreement, made years before
28 the termination right was created in the late 1970s. 310 F.3d at 283-84, 287.

4

undesirable.  The House Report for the 1976 amendments noted, for example, that <u>"nothing in [the Copyright Act] is intended to change the existing state of the law of contracts concerning the circumstances in which an author may cancel or terminate a license, transfer, or assignment."</u>  H.R. Rep. No. 94-1476, at 128 (1976)…. So, provided that a post-1978 agreement effectively terminates a pre-1978 grant, <u>Congress did not manifest any intent for the earlier agreement to survive simply for purposes of exercising a termination right in the future.</u>  *See Milne…*, 430 F.3d [at] 1046 … (post-1978 agreement superseding pre-1978 agreement was of "the type expressly contemplated and endorsed by Congress" because it enabled an author's statutory heirs to renegotiate the terms of an original grant with full knowledge of the market value of the works at issue).  (Underlining added.)

Despite these holdings, defendants told the Court at the September 5 hearing that, if Jean Peavy held the right of termination in 1992 and agreed with DC not to pursue the right for $25,000 per year going forward, her 1992 contract with DC would be "totally void," because that right is "inalienable," and Congress barred all such agreements to the contrary.  Hr'g Tr. at 31:14-32:5.  *Milne* and *Steinbeck* expressly reject defendants' erroneous assertions.[3]

   *2. Jean's Ability To Dispose Of Joe Shuster's Rights And What Those Rights Were In October 1992.*  Defendants sowed confusion—both in their cross-motion, and at the September 5 hearing, Docket No. 478 at 12, 15; Hr'g Tr. at 37:18-

---

[3] Defendants also rely on dicta in *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 985-86 (9th Cir. 2008), to make their "inalienability" arguments.  But the earlier-decided Ninth Circuit opinion—*i.e.*, *Milne*—"controls," *U.S. v. Hardesty*, 977 F.2d 1347, 1347 (9th Cir. 1992), and the Second Circuit in *Steinbeck* overturned the district court opinion on which *Mewborn* mistakenly relied.  *Compare Mewborn*, 532 F.3d at 986, *with Steinbeck*, 537 F.3d at 199-200, 202-04.

   At all events, the "alienability" issue that motivated Congress—that authors in *their first contracts with publishers* would assign their termination rights in works when they had no idea what the works would be worth decades later, *see Stewart*, 495 U.S. at 225-30; *Marvel*, 310 F.3d at 290-91; *Steinbeck*, 527 F.3d at 197-98; *Mewborn*, 532 F.3d at 983-84—is not present here.  Jean Peavy knew full well what Superman was worth in 1992; her son and co-defendant, Mark Peary, admits this.  *Infra* at 14.  And as in *Milne*, when Jean made her deal in 1992, she was not making a forbidden "'agreement to make a future will'" or "'future grant'" not knowing what Superman was worth.  *Milne*, 430 F.3d at 1043.  Instead, knowing Superman's full value in 1992, she freely granted to DC all copyrights, claims, or other rights in any and all of Joe's creations.  *Infra* at 13-14; Tentative at 3-4, 8-10.

1   43:25—about whether Jean Peavy (or Joe Shuster) had any Superman rights to

2   grant to DC when Jean made the 1992 Agreement.  The Court asked several

3   questions on this issue as well.  Hr'g Tr. at 51:7-54:19.   The case law and

4   undisputed facts confirm the Court's tentative opinion was fully correct.

5       a.  As Joe Shuster's designated executrix and sole heir, Docket No. 459-3 at

6   182, 275-76, Jean had full right in 1992 to contract on behalf of Joe's estate and

7   dispose of any copyrights or contracts he held, even if his will was not probated.  *In*

8   *re Kalt's Estate*, 16 Cal. 2d 807, 811 (1940); *Estate of Molino*, 165 Cal. App. 4th

9   913, 921 (2008).  California law is clear on this point, and defendants have never

10  disputed it.  Docket Nos. 186 at 12-13; 334 at 9-10; 458 at 15; 468 at 7-8.  Indeed,

11  it was only *Joe's rights* that Jean could have granted DC in 1992, because, unlike

12  her brother Frank, Jean had no rights or contracts with DC to settle, other than those

13  she received from Joe.  Docket No. 458 at 5-6; 468 at 7; *cf.* Hr'g Tr. at 19, 40:6-24.

14      In making the 1992 Agreement, Jean stood in the same shoes as did

15  Christopher Milne and as Elaine Steinbeck—as an author's authorized successor

16  making an agreement that would affect the rights of any heirs and statutory rights

17  holders who followed.  *Steinbeck*, 537 F.3d at 200-01; *Milne*, 430 F.3d at 1044-46.

18      b.  As in *Steinbeck* and *Milne*, before DC made its agreement with Jean, DC

19  owned all of the underlying copyrights in Superman—based on then-existing

20  copyright grants from Joe Shuster to DC.  Docket Nos. 458 at 3-5; Tentative at 2-3.

21  The same was true in *Steinbeck*:  Before Elaine made her 1994 Agreement with

22  Penguin, Penguin held copyrights grants from the 1930s in John Steinbeck's books,

23  537 F.3d at 196, and when Elaine made the 1994 Agreement, she had no present

24  right to terminate those grants, *id.* at 202-03 & n.5; *infra* at 14-15.  In *Milne*,

25  Christopher *potentially* could have filed a notice of copyright termination in 1983 in

26  several of his father's Winnie the Pooh books, but he had *not* done so, and so when

27  he made his 1983 Agreement with the Slesinger company, neither he nor his father

28  owned the relevant Winnie the Pooh copyrights.  430 F.3d at 1040; *infra* n.10.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

c.  In their respective 1992, 1994, and 1983 agreements, the parties here and in *Steinbeck* and *Milne* each engaged in a simultaneous, two-part transaction—*the first part of which gave back to the heirs the rights their relatives once held.*  In the first part of the 1992 Agreement, DC "fully settled" all of its agreements with Joe—thereby superseding its agreements with Shuster under New York contract law, Docket No. 458 at 6 ("this agreement <u>fully settles</u> all claims to any payments or *other rights or remedies which you may have under <u>any other agreement</u> or otherwise*, whether now or hereafter existing regarding any *<u>copyrights</u>*, trademarks, or other property right *in any and all work* created in whole or in part by [Joe Shuster]"); *id*. at 13-14; Docket No. 468 at 2-4.  Likewise, Penguin "cancel[led] and supersede[d]" its agreements with John Steinbeck, as the first step of its 1994 contract, *Steinbeck*, 537 F.3d at 196, and Slesinger "revoked" A.A. Milne's grants to it, as the first step in its 1983 agreement with Christopher.  430 F.3d at 1044.[4]

---

[4] Defendants argued repeatedly there was "no language" in the 1992 Agreement or any extrinsic evidence that supported DC's position that the 1992 Agreement expressly and impliedly superseded all of Joe Shuster's pre-1978 grants.  Hr'g Tr. at 14:24-25, 19:22-21:20, 22:6-22, 40:6-24, 47:18-48:5; Cross-Mot. at 11-12, 16; Docket No. 462 at 15-16.  But, as the Court's tentative ruling correctly held:

> The broad and all-encompassing language of the 1992 Agreement <u>unmistakably operates to supersede all prior grants</u>.  (See Petrocelli Decl. Exh. 24.)  Unlike *Mewborn*, where the post 1978 agreement transferred rights "in addition to" those transferred in pre 1978 grants, <u>the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements, settling and  displacing "all claims … under any agreement" related to "any and all" works "created in whole or in part by … Joseph Shuster."</u>  (UF 19.)….

> Defendants insist "the [1992] agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.)  Surely Defendants recognize that "any and all work created in whole or in part by … Joseph Shuster" necessarily includes his most famous creation, Superman.  <u>And, just as clear, when … a party seeks to supersede all prior agreements, that party need not specifically list every superseded agreement, lest that party forget one such agreement and thus leave open the door for subsequent disputes.</u>  Indeed, Defendants' own expansive language that the 1992 Agreement does not mention "Joseph Shuster's key 1938 Grant and subsequent Superman grants" lends credence to the need for all-encompassing language.

d.  In the second part of each of the 1992, 1983, and 1994 contracts—and for new and valuable consideration given to the heirs—Jean, Christopher, and Elaine each then granted their relatives' copyrights back to the publisher in question:

- Jean Peavy expressly "grant[ed]" to DC "any copyrights" in "any and all work created in whole or in part by [her] brother, Joseph Shuster…." Adams Decl. Ex. O; Tentative at 9; Docket No. 468 at 4-5.  In consideration, while DC had owed Jean *nothing* before the 1992 Agreement, it agreed to pay her $25,000 a year for the rest of her life.  *Id.* This new and valuable consideration—which Jean obtained only after expressly threatening to assert a termination claim, Docket No. 460-1 at 28; Tentative at 10—netted Jean and her family over $600,000, and that sum is still growing today, Docket No. 468 at 6-7; Tentative at 4-5, 14.

- Christopher Milne likewise re-granted all of his father's copyrights to Slesinger in the second part of his contract.  *Milne*, 430 F.3d at 1040.  The Pooh Properties Trust was already entitled to tens of millions of dollars in royalties before Christopher made the 1983 agreement, but under the new contract—made after Christopher threatened termination—Christopher "doubled" the Trust's royalty share.  *Id.* at 1046.

---

Tentative at 9-10 (underlining added).

Not only did the 1992 Agreement *expressly* "fully settle" "any other agreement" Joe had with DC—embracing any and all grants he gave DC in the 1930s or after, *id.* at 9—Paul Levitz told Jean and Frank that the 1992 Agreement would create final and total peace between the parties, exactly what the New York law on superseding prior contracts contemplates.  Docket No. 468 at 7.

Defendants do not and cannot dispute this testimony.  Instead, they argue the 1992 Agreement (and Levitz) needed to use magic words like "revoke" or "cancel." Cross-Mot. at 14; Hr'g Tr. at 14:24-25, 19:22-21:20, 22:6-22, 40:6-24, 47:18-48:5. But *none* of the cases defendants cite say these words are required, Docket No. 468 at 2-4; the cases they cite using these words post-date the 1992 Agreement by a decade, *id.*; and the words "fully settle" "all other agreements" are the sort of words DC needed to supersede its prior contracts under New York law.  Tentative at 9; Docket No. 468 at 4-5.  New York law is the *very law defendants argued must apply* until confronted with DC's summary judgment motion and the Court's tentative.  *Compare* Tentative at 7; Docket No. 468 at 2, *with* Hr'g Tr. at 46:2-12.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

- In *Steinbeck*, Elaine was already receiving significant royalties from Penguin for her husband's books, but in exchange for replacing her husband's old agreements with Penguin, and making new post-1978 grants, she received "larger guaranteed advance payments" and royalties calculated based on retail, not wholesale prices.  537 F.3d at 200.

e.  What these cases recognize—and as the 1992 Agreement provides—is that there is significant value to a publisher like DC, Penguin, or Slesinger in getting an heir to enter into a post-1978 transaction that both (a) returns the creator's copyrights to the family and (b) re-grants those copyrights to the publisher.  The value exists because the post-1978 agreement that replaces the earlier ones—and fully settles all the parties' claims—is *not* subject to termination under § 304, and is *not* a forbidden agreement to the contrary.  *See Steinbeck*, 537 F.3d at 201-03; *Milne*, 430 F.3d at 1043-46.  As *Steinbeck* explained it:

> Contrary to the district court's observation that "[a]t no point did Penguin lose or gain any rights other than those originally granted to it under the 1938 Agreement," *Steinbeck*, 433 F. Supp. 2d at 401-02, the 1994 Agreement obligated Penguin to pay larger guaranteed advance payments and royalties….

537 F.3d at 200.  And as *Steinbeck* made clear, post-1978 agreements may not be terminated under § 304—period—even if the party making the post-1978 agreement tried to preserve its termination claims for a later day.  *Id*. at 199-204.[5]

_____

[5] *Id*. at 201 ("It is of … little relevance that the 1994 Agreement might have intended that earlier created termination rights survive it, for our central inquiry is not the parties' intent to preserve these rights—which are granted by statute, not contract—but rather their intent to terminate the 1938 Agreement.  The availability of termination rights under the Copyright Act is not dependent on the intent of the parties but on, among other things, the date that a grant of rights was executed and the relationship to the author of those seeking to exercise the termination right.  So, even if we accept that the 1994 Agreement 'explicitly carries forward possible future termination,' *Steinbeck*, 433 F. Supp. 2d at 401, it does not matter inasmuch as the pre-1978 grant of rights no longer existed.  To the extent that the 1994 Agreement might also have contemplated the potential preservation of termination rights, it does not abrogate the 1994 Agreement's clear expression of intent to terminate all prior grants of a transfer or license in the subject copyrights.").

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1   Here, and as in *Milne*, the facts are even stronger for DC than in *Steinbeck*.

2   In inducing DC to sign the 1992 Agreement, Frank and Jean expressly told DC that

3   if Jean received the $25,000 per year for the rest of her life, Jean would not pursue a

4   termination claim, Docket No. 460-1 at 28, just as Christopher had done, *Milne*,

5   430 F.3d at 1046; Tentative at 9-10.  She reaffirmed this promise after the 1992

6   Agreement was made, including in 1999.  Docket No. 460-2 at 236; Tentative at 4-

7   5.  In fact, *Jean has never disavowed making any of these promises*, nor have

8   defendants submitted a shred of testimony from her.  Instead, they rely on lawyer

9   arguments masquerading as witness testimony.  *E.g.*, *supra* n.4; *infra* nn.5-6.

10  f.  Finally, defendants' claim that Jean never possessed Joe's copyright

11  interests, Hr'g Tr. at 41:4-9, 17:22-24, 19:6-11, is not only contrary to law, but

12  refuted by defendants' own conduct.  In 2001, on behalf of his company defendant

13  Pacific Pictures, Toberoff signed an agreement with Jean and Peary expressly

14  obtaining an assignment to Joe's copyrights in Superman.  Docket No. 468 at 8;

15  Adams Decl. Ex. Z; Tentative at 15-16; PD Ex. 3.  Toberoff's argument that Jean

16  never had any of Joe's rights to assign—meant only to stave off this Court's

17  tentative ruling—is precisely the opposite of what he said and did in his own

18  private, business contract with Jean in 2001.  *Id.*

19  *3.  Whether The 1992 Agreement Was A "Grant" And Whether DC Relied*

20  *On That Grant Before.*  Likewise without merit are defendants' attacks on the 1992

21  Agreement as too "short" and "flimsy" to constitute a valid copyright grant.  Cross-

22  Mot. at 1:21; Hr'g Tr. at 45:9-11.  In 1990, before the 1992 Agreement was made,

23  the Ninth Circuit held that a copyright agreement needed only to be *one-line long*:

24  [The] writing requirement [in section 204 of the Copyright Act] is not
    unduly burdensome; it necessitates neither protracted negotiations nor
25  substantial expense.  The rule is really quite simple:  If the copyright
    holder agrees to transfer ownership to another party, that party must
26  get the copyright holder to sign a piece of paper saying so.  It doesn't
    have to be the Magna Charta; <u>a one-line pro forma statement will do</u>.
27

28  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (Kozinski, J.).

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1     The 1992 Agreement fully satisfies this test, and while defense counsel

2   attempted at the September 5 hearing to testify as a fact witness about what DC's

3   copyright contracts usually say, how long they are, and where it files them,[6] there is

4   no competent record evidence to support those assertions.  Defendants cite no

5   testimony from any DC witness; no opinion testimony from an expert; no testimony

6   from Jean; and no competent evidence to establish DC's protocols.  Docket No. 473

7   at 5-7 (DC's objections to alleged evidence of its practices).  And since 1989 the

8   law has been clear that DC need not publicly file its copyright agreements.  Pub. L.

9   No. 100-568, 102 Stat. 2853, 2857, 2861 (1988); *R&R Recreation Prods., Inc. v.*

10  *Joan Cook Inc.*, 1992 WL 88171, at \*4 (S.D.N.Y. Apr. 14, 1992).

11     Defendants also falsely argue that DC "contrived" its arguments concerning

12  the 1992 Agreement when it hired Daniel Petrocelli in 2010.[7]  Defendants provide

13  no evidence of this—for good reason.  Long before hiring Petrocelli, the 1992

14  Agreement was the subject of discovery and communications among the parties in

15  *Siegel*.  *E.g.*, PD Exs. 35-39; Docket No. 334-10 at 43-44.  And *years before* DC

16  hired Petrocelli, Warner Bros. relied upon the 1992 Agreement to establish its

17  ownership of Joe Shuster's Superman copyrights.  Bonesteel Decl. ¶¶ 2-3.[8]

18

19    [6] Hr'g Tr. at 47:5-48:5 ("I know Warner Brother … and DC agreements"; the

20 1992 Agreement is "flimsy"; DC and Warner Bros. "filed [the contracts] with the copyright office to give the wor[l]d constructive notice of their copyrights").

21    [7] *See* Hr'g Tr. at 24:15-24 ("You know what the first time is [DC] mentioned the 1992 agreement? After they replaced their lawyers and they hired new counsel, and

22 new counsel came up with this theory.  But, that is what I meant, your Honor, when I was talking about fancy.  I wasn't referring to your tentative.  I was referring to a

23 new argument that is being contrived by lawyers…."); *id.* at 34:15-22 ("DC has never acted as if this 1992 agreement is the basis of its chain of title"); *id.* at 39:18-

24 40:4 ("They came up with that argument when they hired Mr. Petrocelli in 2010.").

25    [8] Defendants' claim that the "billion" dollar Superman franchise hangs on this one agreement, and hence it should be longer, is also false.  *Cf.* Hr'g Tr. at 20:1-17;

26 34.  The 1938 grant is a few lines long, *id.* at 55; the *Cohen* case makes clear this is proper; and Joe's Superman contributions he seeks to terminate—*i.e.*, a few early

27 comic strips—represent a tiny fraction of the 70 years of Superman content that DC owns free and clear of any claims by Shuster.  *E.g.*, Docket Nos. 49 ¶¶ 34-39; Case

28 No. CV-04-8400, Docket Nos. 336 at 24-25; 623 at 4-6.

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

      *4.  DC Also Prevails Under Any "Waiver," "Fairness," Or Other Test Defendants Assert.*  Defendants plainly lose under *Milne* and *Steinbeck*, which bar termination where a post-1978 agreement—like the 1992 Agreement—replaces all pre-1978 copyright grants that might otherwise be terminable.  *Supra* at 5-11.

      a.  Defendants propose jettisoning the test established by *Milne* and *Steinbeck* in favor of a multifactor test, asserting that, among other factors, an author or heir can relinquish a termination right only by knowingly using the threat of termination "as leverage to bargain a new deal" that "realize[s] the increased market value" of the author's work.  Hr'g Tr. at 13:14-14:2; Docket Nos. 478 at 13-14, 462 at 11.

      In the first place, no court has ever adopted defendants' test.  During oral argument, defendants argued that *Mewborn* modified the test announced in *Milne*, and they represented that in *Mewborn* (a) Classic Media called its 1978 agreement with Winifred Mewborn "a revocation and a regrant," (b) "the district court <u>bought that argument</u> and said [Winifred] had no termination right," and (c) the Ninth Circuit reversed on the ground that there was no "express revocation" and, thus, "<u>limit[ed]</u>" *Milne* and adopted defendants' test.  Hr'g Tr. at 14:9-24, 15:4-14.

      Each of these contentions is demonstrably false.  First, *Mewborn* could not "limit" *Milne*, as Ninth Circuit rules hold.  *Hardesty*, 977 F.2d at 1347.  Second, as shown by his own brief in *Mewborn*, Toberoff's characterization of the facts of *Mewborn* to this Court were untrue.  Contrary to Toberoff's claims here about what arguments the district court in *Mewborn* "bought," Hr'g Tr. at 14:18-20, he told the Ninth Circuit in *Mewborn* "[t]he district court … found that the 1978 Assignment *did <u>not</u> revoke and replace the 1976 Assignment*," and, instead, only granted rights "in addition to the rights granted" in 1976.  PD Ex. 16 at 536 (emphases added). The Ninth Circuit in *Mewborn*, 532 F.3d at 982, noted exactly the same.

      Thus, the focus of *Mewborn* was *not* whether the 1978 agreement superseded and replaced all pre-1978 copyright grants—which is the issue here, and was the issue in *Milne* and *Steinbeck*—but, rather, in the context of a non-superseded *pre-*

1   *1978 grant*, whether in making an "additional" *post-1978* grant, Winifred

2   "intend[ed] to relinquish a known termination right." *Mewborn*, 532 F.3d at 989.

3   Because Winifred, unlike Jean—was totally unaware of the termination provisions,

4   did not know what rights she was supposedly relinquishing, "had nothing in hand

5   with which to bargain," and was paid a mere $3,000, *Mewborn* held that her 1978

6   deal with Classics did not meet the objectives of the termination laws and could not

7   be enforced. *Id*. at 979-81, 989.  The undisputed facts here are the opposite:  Jean

8   threatened a claimed right of termination—and used it to obtain lifetime, annual

9   payments, which she has never renounced and receives to this day, 20 years later.

10          b.  To the extent such an "intent to relinquish" test exists separate and apart

11  from the supersede-and-replace formulation in *Milne* and *Steinbeck*, DC meets it.

12  As *Steinbeck* and *Milne* both observed, "post-1978 agreement[s] superseding pre-

13  1978 agreement[s]"—like the 1992 Agreement—were "'expressly contemplated

14  and endorsed by Congress'" because they "enabled an author's statutory heirs to

15  renegotiate the terms of an original grant with full knowledge of the market value

16  of the works at issue." *Steinbeck*, 537 F.3d at 203 (quoting *Milne*, 430 F.3d at

17  1046).  And as this Court held in its tentative, "[u]nlike the heirs in *Mewborn*":

18          Jean and Frank were aware of the Copyright Act's termination rights
19          when they bargained for and entered into the 1992 Agreement.  (*See* UF
            17, 21, 22.)  As DC points out, "the fact that Jean and Frank were able to
20          obtain hundreds of thousands of dollars in benefits … shows that
            Mewborn's concerns about [the heirs'] ignorance are inapt here."  (Mot.
21          at 17.)….  And, unlike in *Mewborn*, the record here is rife with "evidence
            … to support a finding that [Jean Peavy], when entering the [1992]
22          Agreement, considered … termination rights … [and] that [Jean]
            intended to waive or relinquish them."  *Mewborn*, 532 F.3d at 989.[9]

23          As defendants concede, and cases like *Milne* hold, the goal of the termination
24
25  law was to allow authors or heirs to make a new deal with publishers decades after

26          [9] Tentative at 9-10; *see also* Hr'g Tr. at 30:9-15 ("THE COURT:  … Now, with
27  respect to the Shusters, they kept saying over and over again that they would not
    seek to reclaim any rights in the future.  They said that over and over again.  They
28  made their intent clear; right?  And I guess in exchange for that, DC continued to
    give them checks.  MR. TOBEROFF:  Correct, Your Honor.").

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1    their initial grants, when the authors or heirs "knew what the value of these

2    creations were," and when they had new leverage—a threatened termination

3    claim—to secure a new and better financial deal.  Hr'g Tr. at 9:10-18, 13:14-19;

4    *Milne*, 430 F.3d at 1044-45 & n.8, 1046-47; *Steinbeck*, 537 F.3d at 197-98.

5            That purpose was realized here when Jean, in 1992—after invoking the

6    termination provisions and expressly offering "not [to] pursue the termination of

7    the Superman copyright," Docket No. 460-1 at 28; Tentative at 10—made a deal

8    with DC for all of Joe's Superman rights.  To date, the deal has netted Jean over

9    half a million dollars, and lifetime security—neither of which DC ever owed her

10   before.  Jean (and all the world) knew Superman's value in 1992.  Peary testified he

11   and Jean believed, *in 1992*, Superman had generated "billions of dollars," they had

12   not received their full share, and—knowing this and being of "sound mind"—Jean

13   still signed the 1992 deal.  Docket No. 305-37 at 1253:23-1257:22.  That Peary

14   (and Toberoff) now wish that Jean had held out for more money does not undo the

15   1992 Agreement.  An heir's "current dissatisfaction" with a predecessor heir's post-

16   1978 agreement in no way "discredit[s] the validity of [that] agreement and the

17   rights conferred thereby."  *Milne*, 430 F.3d at 1045; *Steinbeck*, 537 F.3d at 204.

18           c.  Contrary to defendants' suggestions at oral argument, Hr'g Tr. at 15:25-

19   16:6, 25:4-15, 34:9-35:23, it is immaterial whether Jean had a then-existing

20   termination right when she entered into the 1992 Agreement—the salient point is

21   that she "wield[ed] the threat of termination," even if she had no present right, to

22   extract benefits from DC.  *Steinbeck*, 537 F.3d at 202.  Defendants run from

23   *Steinbeck*, asserting that Elaine's 1994 Agreement with Penguin was enforceable

24   only because she was "in the termination window" when she executed it.  Hr'g Tr.

25   at 35:9-14.  This is wrong.  As *Steinbeck*, 537 F.3d at 202, 203 n.5, stated:

26           It is undisputed that the Steinbeck Descendants could not have
         exercised their termination rights in 1994 because they lacked more
27       than one-half of the author's termination interest.…  [And t]here is
         some question as to why Penguin agreed to terminate and renegotiate

28

                                        14                          DC'S OPP. TO DEFS.'
                                                               MOT. FOR PARTIAL SUMM. J.

the 1938 Agreement, for without a majority termination interest, <u>it
appears that Elaine Steinbeck would have been *unable* to terminate the
1938 Agreement on her own</u>….  (Emphases added.)

The court nonetheless held that Elaine's 1994 contract with Penguin—which had

the legal effect of barring future termination claims her stepsons would assert—was

enforceable.  *Id*. at 203-04.  And this was so even though her 1994 contract with

Penguin actually tried to preserve such future termination rights.  *Supra* at 9.

*Steinbeck* said it was "immaterial" whether Elaine had a present right of

termination in 1994, 537 F.3d at 203 n.5, and instead held that what mattered was

that she "did renegotiate and cancel the 1938 Agreement while wielding the threat

of termination.  Indeed, this kind of renegotiation appears to be exactly what was

intended by Congress."  *Id*. at 202.  *Steinbeck* also "reject[ed] the suggestion that,

notwithstanding the plain language of the 1994 Agreement, there was no effective

termination of the 1938 Agreement because the 1994 Agreement provided no

opportunity—no 'moment of freedom'—for those holding the termination right to

renegotiate the terms of the grant," once the termination occurred.  *Id*. at 201.

The court summed up its reasoning, *id*. at 204, which equally applies here:

> It should be noted that under our view, authors or their statutory
> heirs holding termination rights are still left with an opportunity to
> threaten (or to make good on a threat) to exercise termination rights
> and extract more favorable terms from early grants of an author's
> copyright.  But nothing in the statute suggests that an author or an
> author's statutory heirs are entitled to more than one opportunity,
> between them, to use termination rights to enhance their bargaining
> power or to exercise them….  In this case, Elaine Steinbeck had the
> opportunity in 1994 to renegotiate the terms of the 1938 Agreement to
> her benefit, for at least some of the works covered by the agreement
> were eligible, or about to be eligible, for termination.  By taking
> advantage of this opportunity, she exhausted the single opportunity
> provided by statute to Steinbeck's statutory heirs to revisit the terms of
> her late husband's original grants of licenses to his copyrights.  It is no
> violation of the Copyright Act to execute a renegotiated contract where
> the Act gives the original copyright owner's statutory heirs the
> opportunity and incentive to do so.  *See Milne*, 430 F.3d at 1046; *cf.
> Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 989 (9th Cir. 2008)
> (termination right preserved, notwithstanding a March 1978—i.e. post-
> 1978—grant of rights, where termination right could not have been

15

exercised until 1984 at the earliest, and where "[n]either party intended to revoke and replace (or even modify)" a 1976 grant of rights).

Other cases recognize that contracts may serve as alternatives to termination, regardless of whether the requirements to terminate (*e.g.*, a present termination right, filing a termination notice, etc.) are met.[10]  As in *Milne* and *Steinbeck*, Jean took her family's one opportunity decades after Joe created Superman to cash in on any asserted termination claims.  The deal she bargained for must be enforced.

5.  *Defendants' Misstatements About Jean's Authority And Role.*  Defendants deflect from the facts that (a) Jean is the beneficiary of the purported termination right they claim Joe's Estate holds, and (b) that Joe's will named Jean not only as his sole heir, but as executor of his Estate to enforce such rights.  Docket No. 459-3 at 275-76; Hr'g Tr. at 41:20-21, 25:19-27:4.  To do so, Toberoff and Peary induced Jean to be replaced by Peary as executor of Shuster's Estate in 2003, Adams Decl. Ex. CC, in an effort to avoid the dispositive effect of the 1992 Agreement, which Jean knowingly signed in 1992, just weeks after Jean told the California courts and DC she was Joe's sole heir and executor of his estate.  Docket Nos. 186 at 12-13; 334 at 9-10; 458 at 15; 468 at 7-8; 460-1 at 9; Adams Decl. Ex. M at 156, 182.  Peary and Toberoff also refuse to close the 2003 probate case or to distribute the Estate's assets to Jean—as Joe's will and California law require—because Peary and Toberoff wish to persist in their arguments that Jean never obtained the

---

[10] Defendants conceded at oral argument that *Milne* enforced Christopher's 1983 agreement "although [he] didn't follow the statutory formalities of termination" and "contractually terminated instead."  Hr'g Tr. at 13:20-21, 34:1-3; *see Milne*, 430 F.3d at 1045 ("[a]lthough Christopher <u>presumably</u> could have served a termination notice, he elected instead to use his leverage to obtain a better deal"); *id.* at 1040 ("faced with the <u>possibility</u> that Christopher <u>might</u> seek to terminate … Disney proposed that the parties renegotiate") (emphases added).  In *Marvel*, the court recognized that parties could have barred a termination claim by drafting—*even before 1978*—a "stipulation of settlement, complete with sufficient factual findings on authorship," defining a work as a non-terminable work-for-hire.  310 F.3d at 291.  And, again, in *Steinbeck*, 537 F.3d at 200-03, the Second Circuit rejected the district court's conclusion that "'[a]ny interpretation of the 1994 Agreement having the effect of disinheriting the statutory heirs to the termination interest … must be set aside as contrary to the very purpose of the termination statute.'"

DC'S OPP. TO DEFS.' MOT. FOR PARTIAL SUMM. J.

1  termination rights, and thus she is not bound by her 1992 Agreement.  *E.g.*, Docket

2  Nos. 186 at 13; 334 at 9-13; 458 at 8, 15; 468 at 7-8.

3      The Court pressed defendants on these issues at the September 5 hearing, and

4  once again Toberoff was not candid about the true facts.  *E.g.*, Hr'g Tr. at 41:20-21,

5  25:19-27:4.  He claimed Jean "declined to act [as executor in 2003] because she

6  was 82."  *Id*. at 42:19.  But Peary testified Jean was "competent" and "had the

7  ability to serve as an executor" in 2003, and that Jean *never* said she was "unable or

8  unwilling to serve."  Docket No. 305-37 at 1286:1-3, 1374:17-1375:4.  Peary also

9  admitted:  "I'm the one that has initiated the whole -- the whole project.  I've been

10  involved in it with Toberoff from the beginning and I'm active and knowledgeable

11  on it."  *Id*. at 1374:20-25.  Peary did this without "any discussion" with Jean, and

12  Jean confirmed in 2006:  "I don't know what's going on" with Shuster's "estate."

13  Docket No. 305-59 at 2107:10-13.  Defendants cannot and should not be rewarded

14  for such duplicitous efforts to manipulate the termination process or this Court.

15  **III.    THE SHUSTERS' UNCLEAN HANDS ALSO BAR TERMINATION.**

16      The Shusters Notice contains at least two material misrepresentations, either

17  of which suffices to invalidate it.  First, it conceals defendants' fraudulent scheme

18  to manipulate the Siegel and Shuster heirs' Superboy rights.  Second, it attests that

19  the Shuster Estate holds Shuster's putative termination interest, but omits that 10

20  days before the notice was served, the Estate purported to assign all of its

21  "termination interest" to the Pacific Pictures Joint Venture—a deception this Court

22  rightly found to be "problematic."  Tentative at 16.  Unclean hands bars copyright

23  enforcement where a putative owner engages in "wrongful acts … affecting the

24  equitable relations between the parties."  *Mitchell Bros. Film Group v. Cinema*

25  *Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).  The doctrine applies when, as

26  here, a party "fails to advise the Copyright Office of facts," *Russ Berrie & Co., Inc.*

27  *v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980), or "misrepresents

28  the scope of his copyright to the court or opposing party," *Huthwaite, Inc. v*

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1    *Randstad Gen. Partner*, 2006 WL 3065470, at *9 (N.D. Ill. Oct. 24, 2006)."[11]

2         A.  The Law.  Citing two cases that do not involve an unclean-hands claim

3    asserted as a declaratory-relief claim, defendants argue that because unclean hands

4    is an equitable defense, it cannot be asserted as an affirmative claim.  Mot. 19

5    (citing *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 842 (N.D.

6    Cal. 2005) (request for remediation); *Pelich v. I.N.S.*, 329 F.3d 1057, 1062 (9th Cir.

7    2003) (habeas petition)).  Neither case so holds, *id.*, and defendants identify *no* case

8    precluding an unclean-hands claim brought as a declaratory-relief action.

9         None exists, and as DC showed at the Rule 12 stage, courts allow declaratory

10   relief claims based on anticipated defenses like unclean hands.[12]  If the rule were

11   otherwise, parties would be confronted with "the rock-and-a-hard-place choice to

12   cease [their activity] or fac[e] an infringement suit" and only then assert unclean

13   hands as a defense.  *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 557 n.96

14   (S.D.N.Y. 2007).  "The Declaratory Judgment Act was designed to prevent such

15   situations," *id.*, empowering courts to "declare the rights and other legal relations of

16   any interested party … whether or not further relief is or could be sought," 28

17   U.S.C. § 2201(a).  The Declaratory Judgment Act gives "federal courts unique and

18   substantial discretion in deciding whether to declare the rights of litigants," *Wilton*

19

20        [11] *See Vogue Ring Creations, Inc. v. Hardman*, 410 F. Supp. 609, 616 (D.C.R.I.
21   1976); *McCormick v. Cohn*, 1992 WL 687291, at *4 (S.D. Cal. July 31, 1992).
     Defendants attack a straw man, saying DC's unclean-hands claim fails because it
22   does not meet the test for a claim of "fraud on the Copyright Office."  Mot. 20.
     Unclean hands has long been recognized as a separate and distinct doctrine,
23   *compare* 4 NIMMER ON COPYRIGHT § 13.09[B] (unclean hands), *with* 3 *id.* § 7.20[B]
     (fraud on the Copyright Office)—the two standards cannot be conflated.

24        [12] *E.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1081-82 (N.D. Cal. 2007)
25   (unclean-hands claim was "properly before the Court" because "if Defendants had
     sued Plaintiff for copyright liability, she could have raised an unclean hands
26   defense"); *Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*, 543 F. Supp. 522, 548,
     554 (D. Del. 1982) (granting "unenforceability" claim, which is "rooted in the
27   equitable concept of 'unclean hands'"); *Barry v. Donnelly*, 781 F.2d 1040, 1043 n.8
     (4th Cir. 1986) (affirmative claim based on statute-of-limitations defense); *Am.
28   Meat Inst. v. Leeman*, 180 Cal. App. 4th 728, 744 (2009) (same; preemption).

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1    *v. Seven Falls Co.*, 515 U.S. 277, 286 (1995), which is essential here.  If DC were

2    forced to wait until the Shusters brought a lawsuit after the 2013 termination date to

3    assert unclean hands, it would be unfairly impeded in conducting and planning its

4    business.  Such economic harm is grounds for an unclean-hands claim to proceed.

5    *Eazypower v. Alden Corp.*, 2003 WL 22859492, at *2-3 (N.D. Ill. Dec. 2, 2003).

6        <u>B.  The Merits.</u>  Defendants' challenges to the merits of DC's unclean-hands

7    claim turn on contested factual issues that are the subject of ongoing discovery, PD

8    ¶¶ 12-18—which is itself grounds to deny defendants' motion.  FED. R. CIV. P.

9    56(d); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982);

10   *Metabolife*, 264 F.3d at 846.  Defendants' merits arguments fail in any event.

11       *1.  Superboy Fraud.*  From 1940 to 2002, Siegel, Shuster, and their families

12   asserted that Superboy was a joint creation of Siegel and Shuster.  For example:

13   - A 1940 script that Toberoff says features the first appearance of Superboy

14     contains the joint byline:  "By Jerry Siegel and Joe Shuster."  Statement of

15     Genuine Issues ("SGI") 1.

16   - Before the 1940 script, Shuster illustrated works for DC featuring Superman

17     as a boy with super-powers.  In *Action Comics #1*, Shuster drew Superman

18     as a very young boy displaying astounding "feats of strength":



27   *Action Comics #1* (1938), SGI 2

28   Shuster also showed Superman as a boy with super-powers in *Superman #1*:

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.



*Superman #1* (1939), SGI 3

- In a 1942 Sunday comic strip, Shuster depicted Superman as a "youth" who could "outrun the express" train and had other "amazing powers":

Superman Sunday Strip (1942), SGI 4

- In 1948, a New York court found that Shuster provided the artwork for the first stand-alone Superboy story, printed in *More Fun Comics #101*.  SGI 5.

- In 1972 and 1973, Jerry Siegel and Joe Shuster filed copyright renewal notices identifying Superboy as their *joint creation*.   SGI 6.

- In 1982, Siegel's widow Joanne sent a letter to DC stating:  "It's no mystery who the creators were in Jerry and Joe's case.  Not only of Superman, *but Superboy and other comics*."  SGI 7 (emphasis added).

- In 2001, Jean and Peary signed the Pacific Pictures Agreement, defining "Superboy" as among "Joe Shuster's creations."  SGI 9.

1       This all changed in 2002, when Toberoff orchestrated an illicit scheme to

2   position Jerry Siegel as the sole creator of Superboy so the Siegels could assert a

3   baseless Superboy-related copyright infringement claim against DC in one of the

4   two *Siegel* cases.  In 1997, years before Toberoff interfered, Siegel's heirs filed a

5   termination notice seeking to terminate Siegel's prior Superman grants.  SGI 8.

6   The notice expressly included *Superboy* works and elements among the "character,

7   story element, or indicia reasonably associated with SUPERMAN," in recognition

8   of the fact that Superboy is a complete derivative of Superman.  *Id.*

9       In November 2001—right when he entered into the 2001 Pacific Pictures

10  Agreement with the Shusters—Toberoff set out to acquire the Siegels' interests,

11  hoping to obtain their putative Superman rights and secure for himself a majority

12  interest in the Siegel and Shuster heirs' collective rights.  SGI 10.  He succeeded.

13  In October 2002, the Siegels signed an agreement with Toberoff's company IP

14  Worldwide to exploit their putative Superman rights.  SGI 11.  The next month, the

15  Siegels filed another termination notice directed at Superboy, which listed the same

16  Superboy works and elements identified in the 1997 notice (along with a handful of

17  additional Superboy titles that had fallen into the termination window).  SGI 12.

18      The Siegels' 2002 notice contained two crucial falsehoods:  (1) it erroneously

19  stated that Superboy was a copyrightable work "separate and distinct" from

20  Superman—though their 1997 notice acknowledged that Superboy was purely a

21  derivative of Superman, SGI 13; and (2) it falsely recited that Superboy was "solely

22  written and created" by Siegel and sought to recapture 100% of Superboy rights—

23  enabling the Siegels to bring an infringement claim against DC in *Siegel*.  *Id.*

24      While the Shusters believed that Joe Shuster had co-authored Superboy, to

25  induce them to join his fraudulent scheme, Toberoff colluded with Peary to agree

26  that Superboy was created by Siegel alone.  Without receiving any independent

27  legal advice, without conducting any factual investigation, and without consulting

28  with Jean, Peary agreed to disclaim any interest in Superboy, and defendants

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

1  amended the 2001 Pacific Pictures Agreement to delete all reference to "Superboy"

2  and redefine the Shusters' putative rights as including only "Superman."  SGI 14.

3  Peary then filed the termination notice, which deceived the Copyright Office,

4  courts, and DC by misrepresenting Shuster's copyright interests, omitting all

5  references to Superboy-specific works and elements, and concealing defendants'

6  plan to falsely position Siegel as the sole creator of Superboy.  SGI 15; *Russ Berrie*,

7  482 F. Supp. at 988 ("failure to advise the Copyright Office of facts" unclean

8  hands); *Huthwaite*, 2006 WL 3065470, at *9 ("misrepresenting the scope of [one's]

9  copyright" unclean hands); *Perform. Unlimited, Inc., v. Questar Publishers, Inc.*, 52

10  F.3d 1373, 1383 (6th Cir. 1995) ("conduct involving fraud, deceit" unclean hands).

11  To complete this fraudulent scheme, in 2004, the Siegels filed a copyright

12  claim against DC in *Siegel* and sought to enjoin the successful *Smallville* television

13  show.  The *Siegel* court rightly rejected this claim, holding that to the extent there

14  was "any original copyrightable material in Siegel's Superboy submissions," such

15  material was part of "a joint work with Shuster's illustrations."  Case No. CV-04-

16  8776 ODW, Docket No. 151 at 62 (underlining added).

17  Toberoff and defendants have blocked full inquiry into their financial deals,

18  including the *quid pro quo* the Shusters received for falsely forfeiting their interest

19  in Superboy.  PD ¶¶ 12-18.  What we do know at present is that defendants' 2008

20  consent agreement, which remains in effect, binds the Siegels and Shusters together

21  by barring either family from making an agreement with DC without the other's

22  consent.  SGI 16.  It is also clear from defendants' selective disclosures about the

23  agreement that it requires the Siegels to pay a portion of their recovery from *Siegel*

24  to the Shusters.  SGI 17.  Defendants' motion carefully asserts the Shusters have no

25  claim to "the Siegels' Superboy termination," Cross-Mot. 22, but *does not deny* the

26  consent agreement entitles them to share in the Siegels' *Superman* recovery.

27  Defendants' efforts to excuse their Superboy frauds all fail:

28  a.  Defendants say the Shusters were barred from claiming an interest in

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.

Superboy by a 1948 ruling by a Westchester County court.  *Id.* at 21.  Not so.  Judge Larson held in *Siegel* the Westchester ruling did *not* establish that Superboy was a sole creation of Siegel.  Case No. CV-04-8776 ODW, Docket No. 151 at 5-38.  To the contrary, he held that to the extent Superboy was separately copyrightable from Superman—and he left that question open—it was a "joint work" by Siegel and Shuster.  *Id.* at 62.  Siegel and Shuster told the Copyright Office the same thing in 1972 and 1973—some 25 years *after* the Westchester case, and 30 years before Toberoff and Peary engaged in unclean hands by rewriting history.  *Supra* at 20.

b.  Defendants also say the timing limitations of the termination laws barred the Shusters from seeking to recapture Superboy.  Again, untrue.  Under 17 U.S.C. § 304(c), the Shusters could have served a termination notice seeking to recapture the rights in *More Fun Comics #101*, which was published on November 18, 1944, at any point between November 18, 1990 and November 18, 2003—just as the Siegels did.  17 U.S.C. § 304(c) (allowing termination 56-61 years after work's publication provided notice is served 2-10 years in advance).  The Shusters served their notice under § 304(d) on November 10, 2003, eight days before the cut-off.

The Shusters also could have attempted to recapture rights in Superboy by claiming the character was purely derivative of Superman—the same approach the Siegels took in their 1997 notice by listing dozens of Superboy-specific works and including a broad "catch-all" footnote identifying "Superboy" as among the universe of Superman elements.  SGI 8.  The Shusters' notice does not list *any* Superboy-specific works, and its catch-all footnote—which mirrors the Siegels' in many other respects—deliberately omits all reference to Superboy.  SGI 15.

c.  Defendants' attempt to cast their illegal dealings as a legitimate effort to gain a "tactical advantage," which they argue "cannot constitute 'unclean hands,'" Mot. 21-22, is both false and illogical.  Why would any party engage in "conduct involving fraud, deceit,… or bad faith," *Questar*, 52 F.3d at 1383, except to gain some perceived advantage?  Indeed, courts frequently apply the doctrine of unclean

1   hands based on a party's "strategic choice."  *E.g.*, *Walczyk v. Rio*, 496 F.3d 139,

2   146 (2d Cir. 2007) (plaintiff "made the strategic choice" to "initiate[] and direct[]"

3   fraudulent lawsuit); *Connell v. City of N.Y.*, 230 F. Supp. 2d 432, 439 (S.D.N.Y.

4   2002) ("unclean hands comes to mind" where party acted for "strategic reason").[13]

5           2.  *Concealment of Pacific Pictures.*  A termination notice can only be filed

6   "by the person or persons who … own and are entitled to exercise a total of more

7   than one-half of [an] author's termination interest," 17 U.S.C. § 304(d)(1), and

8   "must include a clear identification of … the person or persons executing the notice

9   who constitute more than one-half of that author's termination interest."  37 C.F.R.

10  201.10(b)(1)(vii).  Ten days before Peary filed the termination notice, the Shuster

11  Estate purported to transfer *100%* of Shuster's termination interest to the Pacific

12  Pictures Joint Venture.  Defendants withheld this key fact from the Copyright

13  Office and DC.  Docket Nos. 458 at 7-9, 18-20; 468 at 8; Tentative at 16.

14          Defendants concede that the Pacific Pictures agreements are "not lawful" and

15  were "void *ab initio*" under § 304(c)(6)(D) of the Copyright Act, *e.g.*, Docket No.

16  191 at 8, and, on that basis, assert "there were no misrepresentations to the

17  Copyright Office."  Cross-Mot. 20.  But as Peary admitted at his depositions, he did

18  not know these agreements were illegal, until *after* he filed his termination notice in

19  2003.  Docket No. 305-37 at 1326:16-1336:11; *see* PD Ex. 3 at 356:2-357:7

20  (Toberoff says not sure when he knew).  In its Tentative, the Court rightly observed

21  that, whether the Pacific Pictures agreements could legally transfer the Shusters'

22

23      [13] Defendants' cases are inapposite and merely conclude that the specific facts in
24  those cases did not constitute unclean hands.  *Gucci Am, Inc. v. Guess?, Inc.*, 2012
    WL 2304247, at *34 (S.D.N.Y. June 18, 2012) (decision to delay filing suit was
25  motivated by legitimate budgeting decisions rather than bad faith); *Lucky's Detroit,
    LLC v. Double L Inc.*, 2012 WL 219418, at *15 (E.D. Mich. Jan. 25, 2012)
26  (privilege objection was insufficient to "arise to unclean hands in this case").
    Defendants erroneously describe *Sears* as holding that "unclean hands 'cannot [be]
27  based on ... litigation strategy,'" Mot. 22, when the court denied the unclean-hands
    claim because plaintiff's misconduct was unrelated to its infringement claim—not
28  because it was motivated by strategy, 744 F. Supp. 1297, 1310 (D. Del. 1990).

termination interest, "the Court finds problematic Defendants' conduct—especially their failure to inform the copyright office of agreements which they themselves believed would affect ownership of the subject copyrights…." Tentative at 16.

Such intentional deception constitutes unclean hands and bars enforcement. In *Russ Berrie*, 482 F. Supp. at 988, a designer copyrighted a toy design, but did not "disclose to the Copyright Office … pre-existing works on which his designs" were based. The court refused to enforce the copyright, finding the "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application" was reason to deny "enforcement on the ground of unclean hands." *Id.* Likewise, Peary knew full well when he filed the Notice that, *one week earlier*, he had purported to transfer 100% of the Shusters' "termination interest" to the Joint Venture, and if he disclosed this key fact to the Copyright Office, the Notice could be challenged and rejected. 17 U.S.C. § 304(d)(1), 37 C.F.R. 201.10(b)(1)(vii).[14]

## IV.   CONCLUSION

This Court should deny defendants' motion, and enter judgment in favor of DC on its First and Third Claims as set forth in the Court's tentative order.[15]

Dated:  September 21, 2012

Respectfully submitted,

By:   /s/  Daniel M. Petrocelli
Daniel M. Petrocelli

---

[14] That defendants "produced the PPC agreements" years later, Cross-Mot. 20—rather than suppressing them, as they have many other harmful documents, Docket No. 477-2 at 119-45—does not absolve defendants of liability. Defendants never withdrew the false statements in their Notice or filed a corrected one.

[15] Defendants' request for judgment under FED. R. CIV. P. 54(b), Cross-Mot. 25, is premature. It will be ripe once these motions are resolved. DC disputes the claim that its Fourth through Sixth Claims are "stayed" pending defendants' SLAPP appeal. *Id.* A central question presented in the appeal is whether the Ninth Circuit has jurisdiction to hear it. Appeal No. 11-56934, Docket No. 37-1 at 26-27; *and compare Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, No. SACV 05-1083, Docket No. 54 (Oct. 13, 2006) (no stay), *with Makaeff v. Trump Univ., LLC*, 2011 WL 613571, at *2 (S.D. Cal. Feb. 11, 2011) (stay).

DC'S OPP. TO DEFS.'
MOT. FOR PARTIAL SUMM. J.