# EXHIBIT 1

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

TENTATIVE

DC COMICS,

                    Plaintiff,

vs.

PACIFIC PICTURES CORP., *et al.*,

                    Defendants.

ORDER

CASE NO. CV 10-3633 ODW (RZx)

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [458]

## I.    INTRODUCTION

DC Comics ("DC" or "Plaintiff") filed this action in May 2010 to secure its claimed interest in the Superman copyrights, after certain heirs of Joseph Shuster, the first illustrator of Superman, served DC with a copyright termination notice purporting to recapture certain early Superman works as of October 26, 2013.

DC now moves for partial summary judgment as to the First and Third Claims. DC's First Claim contests the validity of the termination notice at issue here, and its Third

**EXHIBIT 1**

**12**

Claim, pled in the alternative, challenges the web of agreements that Marc Toberoff and his entertainment companies and business partners engineered in alleged violation of DC's rights under the Copyright Act. (Mot. at 1 ("There is a pressing need to resolve these claims now, given the imminence of the 2013 termination date.")).

## II.    FACTS

Semantic quibbles aside, the following facts are undisputed.  On March 1, 1938, Jerome Siegel and Joseph Shuster granted DC the "exclusive right to the use of the [Superman] characters and story." (UF 3.)   "Action Comics #1 ("AC#1"), published on April 18, 1938, with a cover date of June 1938 featured an adapted version of Siegel and Shuster's Superman story." (UF 4.)   Defendants purport, but do not actually dispute this fact by arguing "AC #1 did not feature an 'adapted version of Siegel and Shuster's Superman story.'  Siegel and Shuster reformatted their prior Superman story from a newspaper format to a magazine format." (Id.)   All the same, after AC#1 was published, Siegel and Shuster continued to supply DC with draft Superman material pursuant to work-for-hire agreements.  Siegel and Shuster were compensated for their work in royalties and bonuses, both of which increased with Superman's success. (UF 5.)

By 1941, the Saturday Evening Post reported that Siegel and Shuster stood to make over $2 million (in today's dollars) in the next year alone. (UF 6 ("All present day dollar amounts were calculated using the Bureau of Labor Statistics' online inflation calculator, available at: http://www.bls.gov/data/inflation_calculator.htm/.")).   In 1947, Siegel and Shuster sued DC in New York seeking to invalidate the 1938 assignment.  The court concluded that the 1938 assignment granted all Superman rights to DC.  In 1948, the parties entered into a stipulated judgment pursuant to which Siegel and Shuster

**EXHIBIT 1**
**13**

acknowledged that the 1938 assignment granted DC all rights in Superman. (UF 7.)

In a 1975 agreement, DC provided Siegel and Shuster with (in today's dollars) lump sums of $75,000 each, lifetime annual payments of $80,000 each per year, survivor payments to their heirs, and insurance coverage, as well as "credits" on new Superman works.  Siegel and Shuster acknowledged that DC owned all Superman-related copyrights. (UF 8.)   Defendants argue DC does not disclose its financial assumptions for its supposed calculation (though provided earlier), contending instead that the 1975 agreement called for "monthly payments of $20,000 . . . and a lump sum payment of $17,500 . . . ." (Id.)

Since 1975, DC has voluntarily increased the annual payments, made periodic cost-of-living adjustment, given special bonuses, and paid to have Siegel, Shuster, and their families have to Superman-related events. (UF 9.)   All told, the Siegels and Shusters have been paid over $4 million under the 1975 agreement, not including medical benefits or bonuses. (UF 10.)   Shuster passed away on July 30, 1992. (UF 12.)

Shuster had no wife or child, and his will named his sister, Jean Peavy, as sole beneficiary and executrix of his estate. (UF 13.)   Defendants dispute this, arguing the statement "omits that Shuster's will named Mark Warren Peary, Jean's son, as beneficiary in the event Jean predeceased him and omits that the will states: 'In the event that my sister is for any reason unable or unwilling to act as executrix hereof, I nominate and appoint Mark Warren Peary to act as executor.'" (Opp'n UF.)   On August 17, 1992, Jean filed an affidavit in California state court identifying herself as Shuster's "successor" and sole heir and requesting that certain property "be paid, delivered or transferred to her." (UF 14.)

Four days after filing her affidavit in the California probate court, Jean wrote to DC, identifying herself as "heir to [Joeseph Shuster's] Will" and asking DC to pay

Shuster's "final debts and expenses." (UF 15.)   Defendants attempt, but again fail to dispute this fact by pointing out that Jean actually stated " [a]ny help that Time Warner could give to the family of Joe Shuster to pay his final debts and expenses would be warmly appreciated." (Opp'n UF.)   In response, DC offered to cover Joe's debts and increase survivor payments to his brother Frank from $5,000 to $25,000 per year. (UF 16; Petrocelli Decl. Exh. 24.)     On September 10, 1992, Frank sent a letter to DC's then-Executive Vice President, Paul Levitz, stating he was "extremely pleased" with the increased payments and asking, after "discuss[ing] this good news with [Jean]," that payments be made directly to Jean, who would "send [Frank] whatever money [he] wanted as a gift which would not be taxable to [him]."   Frank asked if he and Jean could meet with Levitz in New York to discuss the issue. (UF 17.)   Defendants' sole objection to this fact is that it misleadingly fails to include subsequent correspondence. (Opp'n UF.)

TENTATIVE

Paul Levitz dealt with many authors and heirs during his decades at DC.   When DC agreed to grant an author or heir's request for additional money, Levitz would give them this admonition: "this agreement would represent the author/heir's last and final deal with DC, and would fully resolve any past, present, or future claims against DC." Levitz reiterated this admonition to Frank and Jean in 1992, who confirmed they understood and agreed. (UF 18.)   The parties executed an agreement on October 2, 1992, confirming that DC would cover Shuster's debts and pay Jean $25,000 a year for the rest of her life.   In exchange, Jean and Frank re-granted all of Shuster's rights to DC and vowed never to assert a claim to such rights. (UF 19.)

ORDER

Over the next decade, DC maintained good relations with the Shusters, and Jean and Paul Levitz corresponded regularly.   In the close-to-60 letters back and forth between Paul and Jean, Jean thanked DC for its generosity, reaffirmed the 1992

**EXHIBIT 1**
**15**

agreement, and requested bonus payments in excess of those required. (UF 20.) Defendants contend that, over this decade, Jean expressed displeasure at the amount and form of her pension payments and requested changes. (Opp'n UF.)   In a 1993 letter, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman copyright," but asked for an increase in payments "plus a yearly increment to account for inflation." (UF 21.)   Defendants contend "Jean stated that at the present time 'Frank and I are not planning to reclaim the Superman copyright.' [And]: 'We believe we have a right to expect that you will be fair with us as well and will grant our request for increased payment.   We will stick to our bargain [which we signed, dated as of August 1, 1992]'" (Opp'n UF.)

In 1999 – after Congress amended the copyright statute to grant additional statutory heirs termination rights under 17 U.S.C. § 304(d) – and after learning that Jerry Siegel's heirs had served Superman copyright termination notices on DC–Jean reiterated her commitment "to honor" the 1992 Agreement, and again asked for a bonus:

> I have learned from the Internet that Joanne Siegel has filed a copyright claim for Superman. I want you to know that I intend to continue to honor our pension agreement. I would, however, appreciate a generous bonus for this year as you had done many times in the past.

(UF 22.)

In 1993, 1994, 1995, 1996, 1997, 1999, 2000, and 2001, DC provided additional bonuses to Jean, ranging from $10,000 to $25,000. (UF 23.)   In one instance when Jean asked for a bonus, DC made clear its position that Jean had no legal right to make such requests, but would pay her a bonus anyway, which she thanked DC for doing. (UF 24.) Jean's 50-year-old son, Mark Warren Peary (born Peavy) testified that Jean was of sound mind when she sent these letters to DC. (UF 26.)   Mark Peary, Jean's doctor, and Jean's daughter all testified that, after "suffer[ing] a debilitating stroke in May of 2009," Jean has aphasia, and has difficulty communicating and "understand[ing] what people are saying." (UF 27.)   On November 7, 2003, Mark Warren Peary (as substitute executor of

5

EXHIBIT 1
16

the Shuster estate) served on DC a notice of termination of the prior grants of Shuster's Superman copyrights. (*See* Petrocelli Decl. Exh. 37.)   Other facts shall be discussed as necessary.

## III.   DISCUSSION

As to its First Claim, DC seeks a declaration that the "Shuster Termination Notice [is] invalid." Docket No. 49 ¶¶ 106-34.   DC argues it is entitled to summary judgment on three grounds: (1) "The 1992 Agreement Bars the Shusters from Pursuing Termination[;]" (2) "The Shusters Lack the Majority Interest Necessary to Terminate" because they assigned 50% of their putative rights to Pacific Pictures; and (3) "There Is No Statutory Basis for the Shusters to Terminate, given that Joe Shuster had no statutory heir under the Copyright Act when he died." (Mot. at 9.)   "DC's Third Claim, which is pled in the alternative to its First Claim, alleges that the Pacific Pictures Agreements and 2008 consent agreement improperly restrict the Shuster heirs' ability to enter into agreements with DC, in violation of § 304(c)(6)(D) of the Copyright Act." (Id.).

### *1992 Agreement*

The Copyright Act provides a termination right for the grant of a copyright transfer or license made by parties other than the author only if the grant was made prior to January 1, 1978. 17 U.S.C. § 304(c).   Our inquiry begins, then, with whether the 1992 Agreement superseded "Joseph Shuster's key 1938 Grant and subsequent Superman grants[,]" as Defendants put it. (Opp'n at 12.)

DC argues the 1992 agreement between DC and Jean Shuster Peavy and Frank Shuster – Joseph's siblings – bars the Shusters from exercising their statutory termination rights. (Mot. at 10.)   That agreement provides, in pertinent part:

> We [DC] ask you to confirm by your signatures below that this agreement fully settles all claims to any payments or other rights or remedies which you may have under any other agreement or otherwise, whether now or hereafter existing regarding any copyrights, trademarks, or other property right in any and all work created in whole or in part by your brother, Joseph Shuster, or any works based thereon. *In any event*, you now grant to us any such rights and release us, our

licensees and all others acting with our permission, and covenant not to assert any claim of right, by suit or otherwise, with respect to the above, now and forever.

(Mot. at 6) (quoting SUF 19; Petrocelli Decl. Exh. 24) (emphasis added).

Defendants contend "DC attempts to circumvent termination by trying to jam the 1992 Agreement into a narrow and inapplicable 'revocation and re-grant' exception recognized in *Milne v. Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005)" ("*Milne*"). (Opp'n at 9) (arguing DC ignores "the plain language of the 1992 Agreement").

As Defendants acknowledged earlier in this litigation, it is New York law, which governs the 1992 Agreement. (Docket No. 191 at 4, n.6; Docket No. 333 at 21; *see also* Reply at 2 ("'whether [an] Agreement terminated and superseded [an earlier agreement],' is determined by governing state law – in this case, as in *Steinbeck*, 'New York law'") (quoting *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2nd Cir. 2008) ("*Steinbeck*") citing *Milne* with approval).

Under New York law, "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." *Steinbeck*, 537 F.3d at 200 (quoting *Jones v. Trice*, 608 N.Y.S.2d 688, 688 (2d Dep't 1994); *see also Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (2d Dep't 1984) ("[W]here the parties have clearly expressed . . . their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement.").

The question is thus "whether the subsequent agreement, . . . in whatever form it may be, is a matter of intention, *expressed or implied*, a superseder of, or substitution for, the old agreement." *Goldbard v. Empire State Mut. Ins. Co.*, 5 A.D.2d 230, 233 (N.Y. App. Div. 1958) (emphasis added). With a broad release and all-encompassing language, it would here appear that the 1992 Agreement aims to supersede any and all

7

**EXHIBIT 1**

**18**

prior agreements between the parties. (*See* SUF 19 ("this agreement *fully settles all claims* to *any payments or other rights or remedies* which you *may have* under *any other agreement or otherwise, whether now or hereafter existing* regarding *any copyrights . . . in any and all work created in whole or in part by your brother, Joseph Shuster*")) (emphasis added).

Pointing to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) ("*Mewborn*"), Defendants argue the "Ninth Circuit emphasized that Mewborn's 1978 agreement, unlike [that] in *Milne*, did not '*expressly* revoke the earlier … assignments.'" (Opp'n at 11) (quoting *Id.* at 989) (emphasis added by Defendants).  In *Mewborn*, the Ninth Circuit upheld a termination notice regarding the novel "Lassie Come Home," finding *Milne* inapplicable.  In 1976, the author's daughter, Mewborn, assigned her share of Lassie film and television rights to the publisher. *Id.* at 980.  In 1978, she signed a second contract which purported to assign additional copyrights to the publisher for $3,000. *Id.* at 981.  In 1996, Mewborn served a termination notice as to her 1976 grant.  The publisher sued Mewborn, claiming that the non-terminable 1978 grant "superseded" and implicitly "revoked and re-granted" her Lassie rights. *Id.* at 981-82.  The Ninth Circuit disagreed, upheld the termination and rejected the publisher's attempt to re-characterize the 1978 grant as a "revocation and re-grant." *Id.* at 989.

Contrary to Defendants' assertion, however, the Ninth Circuit did not rest its decision on the lack of an express revocation of earlier agreements. *See id.* at 989 ("Because we conclude that the 1978 Assignment did not expressly *or impliedly* transfer Mewborn's termination right as to the 1976 Assignment, and that the circumstances here are not even close to those in *Milne*, the district court improperly concluded that the 1978 Assignment included a grant of Mewborn's termination right.") (emphasis added).

Rather than revoke and supersede the prior agreement, the Ninth Circuit found that the "1978 Assignment simply assigned to Classic's predecessor-in-interest the additional

8
**EXHIBIT 1**
**19**

enumerated rights that Mewborn had not assigned in 1976." *Id.* (observing "[n]or is there any evidence in the record to support a finding that Mewborn or LTI, when entering into the 1978 Agreement, considered Mewborn's termination rights under § 304(c), or that Mewborn intended to waive or relinquish them. Rather, the evidence suggests that Mewborn did not intend to waive her termination rights. ").

Such is not the case here. The broad and all-encompassing language of the 1992 Agreement unmistakably operates to supersede all prior grants. (*See* Petrocelli Decl. Exh. 24.) Unlike *Mewborn*, where the post-1978 agreement transferred rights "in addition to" those transferred in pre-1978 grants, the 1992 Agreement deals squarely with the same subject matter as the parties' earlier agreements, settling and displacing "all claims . . .. under any agreement" related to "any and all" works "created in whole or in part by . . . Joseph Shuster." (UF 19.) Unlike the heirs in *Mewborn*, moreover, Jean and Frank were aware of the Copyright Act's termination rights when they bargained for and entered into the 1992 Agreement. (*See* UF 17, 21, 22.) As DC points out, "the fact that Jean and Frank were able to obtain hundreds of thousands of dollars in benefits . . . shows that *Mewborn*'s concerns about [the heirs'] ignorance are inapt here." (Mot. at 17.)

Defendants insist that 1992 Agreement does not even mention Superman or Joseph Shuster's key 1938 Grant and subsequent Superman grants." (Opp'n at 12.) Surely Defendants recognize that "any and all work created in whole or in part by . . . Joseph Shuster" necessarily includes his most famous creation, Superman. And, just as clear, when once a party seeks to supersede all prior agreements, that party need not specifically list every superseded agreement, lest that party forget one such agreement and thus leave open the door for subsequent disputes. Indeed, Defendants' own expansive language that the 1992 Agreement does not mention "Joseph Shuster's key 1938 Grant *and subsequent Superman grants*" lends credence to the need for all-encompassing language.

And, unlike in *Mewborn*, the record here is rife with "evidence . . . to support a finding that [Jean Peavy], when entering into the [1992] Agreement, considered . . . termination rights . . . [and] that [Jean] intended to waive or relinquish them." *Mewborn*, 532 F.3d at 989; *see also Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (N.Y. 1977) (considering extrinsic evidence).

In a 1993 letter, for example, Jean confirmed she would "stick to our bargain" and not attempt "to reclaim the Superman copyright." (UF 21.)   And, in 1999–after Congress amended the Copyright Act to grant additional statutory heirs termination rights, and after learning that Jerome Siegel's heirs had served Superman copyright termination notices on DC–Jean again reiterated her commitment "to honor" the 1992 Agreement. (UF 22.)   Such evidence is uncontroverted by Defendants, who merely allege in conclusory fashion that, by entering into the 1992 Agreement, they did not intend to discharge and supersede all prior grants of the Superman copyrights.   Such a showing (or lack thereof) is decidedly insufficient at this stage in the litigation.

As one New York court put it, "while the question of whether a substituted agreement effects a discharge of a prior agreement constitutes a triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact does not arise when the opponent offers no evidence as to the parties' intent in making the agreement." *Callanan Industries, Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712 (N.Y.A.D. 3 Dept.,1986) (citations omitted).   As in *Callanan*, although Defendants have alleged in conclusory terms that they did not intend for the 1992 Agreement to discharge and supersede all prior copyright grants, they have offered absolutely no evidence in support of that conclusion.   Nor, indeed, have Defendants even earnestly controverted the facts alleged in Plaintiff's moving papers with anything other than general denials, which is "patently insufficient." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986) (explicating the parties' relative burdens on summary judgment).

To the extent Defendants argue "the 1992 Agreement by Frank and Jean cannot bar the Shuster Executor's exercise of his termination rights" (Opp'n at 8), they are wrong. As noted in *Steinbeck*, "nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them." 537 F.3d at 204.

Jean Peavy, Joseph Shuster's sister and sole heir, entered into the 1992 Agreement (along with Frank) which renegotiated the terms of the parties' prior agreements to her and Frank's benefit. By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to the Shuster heirs to revisit the terms of Schuster's original grants of licenses to his copyrights. As in *Milne*, Defendants "present[] no authority suggesting that Congress designed the statutory termination provisions to prevent parties from agreeing to a simultaneous revocation and new grant of rights." *Milne*, 430 F.3d at 1046-47 (certainly, with regard to [*Milne*], [the heir's] concerns are unfounded. The 1983 agreement came about some seven years after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act, and after he was able to assess the works' value over the course of more than five decades.").

Similarly here, the 1992 Agreement came about some sixteen (16) years "after the copyright owner felt empowered to exercise his right of termination under the 1976 Copyright Act . . . ." *Id.* Joseph Shuster, who himself passed away in 1992, never did terminate his prior grants of the Superman copyrights to DC and, by entering into the 1992 Agreement – which increased Frank and Jean's payments – the heirs essentially

11
**EXHIBIT 1**
**22**

struck a deal that binds all other heirs. *See Steinbeck*, 537 F.3d at 202 (" Once the termination right is extinguished, it is extinguished with respect to all parties holding a termination interest, whether or not they agreed to its exercise.").[1]

# TENTATIVE

# ORDER

---

[1] To the extent Defendants believe Jean and Frank struck a bad deal, "merely increas[ing] their pension from $5,000 to $25,000," it is not this Court's place to renegotiate the parties' contracts, notwithstanding Defendants' objection that "this small sum bears no relation to the value of Superman." (Opp'n at 17.)

**EXHIBIT 1**

Defendants next argue that an author or his estate may exercise termination rights "notwithstanding any agreement to the contrary, including an agreement to make a will or to make a future grant. 17 U.S.C. § 304(c)(5)" (Opp'n at 8 ("Thus, any agreement that purports to waive, settle or limit the termination right is unenforceable."). Such an argument has been previously considered and rejected.

> As the *Steinbeck* court noted:
> We do not read the phrase 'agreement to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right. To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights. . . . Moreover, the 1994 Agreement did not divest the Steinbeck Descendants of any termination right under section 304(d) when the parties entered into that agreement. In 1994 [as in 1992], only 17 U.S.C. § 304(c) provided a termination right; section 304(d) would not become effective for another four years. It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest. As of 1994, then, the agreement entered into by Elaine Steinbeck did not deprive the Steinbeck Descendants of any right they could have realized at that time. None of the parties could have contemplated that Congress would create a second termination right four years later. Had Elaine Steinbeck not entered into the 1994 Agreement, the section 304(c) termination right would have expired, and Penguin would have been bound only by the 1938 Agreement for the duration of the copyright terms absent (as ultimately happened) Congressional action. *We cannot see how the 1994 Agreement could be an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist.*

Steinbeck, 537 F.3d at 202-03 (emphasis added).

13

EXHIBIT 1
24

The same holds true here.   In 1992, when Joseph Shuster passed away and his heirs entered into the 1992 Agreement, "neither the parties to the 1992 Agreement, nor anybody else, held a termination right . . . ." (Opp'n at 16.)   As of 1992, then, "the agreement entered into by [Jean and Frank] did not deprive the [Shuster heirs] of any rights they could have realized at that time." *Steinbeck*, 537 F.3d at 203.   Nor, of course, could the parties have contemplated that Congress would create a second termination right six years later.   In short, this Court agrees with *Steinbeck*'s reasoning that the 1992 Agreement is not "an 'agreement to the contrary' solely because it had the effect of eliminating termination rights that did not yet exist." *Id.*

Defendants contend "DC's motion is defective as it fails to address most of defendants' affirmative defenses to DC's claims, preventing summary judgment in DC's favor, while permitting summary judgment against DC on its erroneous legal theories." (Opp'n at 2.)   The Court disagrees.   It is not Plaintiff's duty to disprove Defendants' affirmative defenses, but rather it is Defendants who bear the burden of proving the applicability of their affirmative defenses. *See*, *e.g.*, *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir.2006) (noting that a defendant bears the burden of proof at summary judgment with respect to affirmative defenses); c.f. *Digital Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F.Supp.2d 1019, 1023 -24 (W.D.Wash.,2003) ("Since the affirmative defense of obviousness is Defendant's burden, by failing to challenge the issue on summary judgment, Defendant fails to raise a genuine issue of material fact.").

Finally, the 1992 Agreement explains that "[i]f, despite the terms of this agreement, either of you [Jean or Frank] assert any [ ] claim of right, for any reason, you agree to refund to us, upon the making of any such assertion, all amounts previously paid to you hereunder, and we will have no obligation to make any further payments under this agreement." (Petrocelli Decl. Exh. 24 ("We also reserve all of our other rights, remedies

and defenses in such an event.")).   Suffice it to say, it does not appear from the record before this Court that the heirs refunded any such monies.

In sum, the Court finds that the 1992 Agreement, which represented the Shuster heirs' opportunity to renegotiate their prior grants of copyrights, impliedly superseded all prior grants of the Superman copyrights.   The 1992 Agreement thus represents the parties' operative agreement and, as a post-1978 agreement, it is not subject to termination pursuant to 17 U.S.C. § 304(d).

///

///

///

# TENTATIVE

***Majority Interest***

Section 304(d) of the Copyright Act provides that a termination notice must be served "by the person or persons who . . . own and are entitled to exercise a total of more than one-half of [an] author's termination interest" and "shall be signed by the [requisite] number and proportion of the owners" (Mot. at 18) (quoting 17 U.S.C. §§ 304(d)(1), (c)(1)-(4)); *see also Steinbeck*, 537 F.3d at 202 (recognizing that author's heirs "could not have exercised their termination rights" if "they lacked more than one-half of the author's termination interest" at the time their notice was served).

# ORDER

"According to the Shuster heirs' written contracts and deposition admissions, the Estate owned 0% of Shuster's putative termination interest when the Estate served the [Termination] Notice." (Mot. at 18)   In 2001, the Shusters "transfer[red] and assign[ed] . . . all current and future rights, claims, title, copyrights and interests" in "Joe Shuster's creations" to the Pacific Pictures Joint Venture with Marc Toberoff. (UF 31.)   In 2003, the Estate "confirm[ed]" these rights included any "copyright termination interest in

'Superman' pursuant to Section 304(d) of the U.S. Copyright Law." (UF 32.)  Mark Warren Peary even admitted under oath that he understood when he signed the Pacific Pictures agreement, "that all of the Joe Shuster rights, termination rights, to the extent they existed, were being transferred and assigned to the venture just as it says." (UF 33.)

Defendants argue "the copyrights recaptured pursuant to a termination notice cannot be anticipatorily transferred to anyone prior to the service of a termination notice, and can be transferred only to the grantee [i.e., DC] or its successor before 'the effective date of the termination' – here, October 26, 2013. (Opp'n at 18) (quoting 17 U.S.C. §304(c)(6)(D)).  Thus, argue Defendants, "as a pure matter of law, the 2001/2003 [Pacific Pictures Corporation] PPC Agreements –pre-dating both the effective date and the service of the Shuster Executor's termination notice – could not and did not transfer the prospective copyrights to be recovered by the Shuster termination." (Opp'n at 18.)

# TENTATIVE

DC argues Defendants must be held accountable for entering into these agreements, notwithstanding their illegality. (Reply at 8) ("This illegality defense fails for two reasons.").  First, although defendants say the Pacific Pictures contracts "did not transfer the prospective copyrights to be recovered by the Shuster Termination," Peary testified under oath, and without any objection, that the 2001 contract "transferr[ed] and assign[ed] to the venture" "all of the Joe Shuster rights, termination rights, to the extent they existed," (Reply at 8) (citations omitted).  "The 2003 agreement reaffirmed the 2001 Agreement [and] [t]hese admissions and facts are fatal to defendants' defense." *Id.*

# ORDER

While the Court finds problematic Defendants' conduct – especially their failure to inform the copyright office of agreements which they themselves believed would affect ownership of the subject copyrights – these agreements do not alter the fact that "the inalienable right to serve the Shuster Termination could not have been transferred to

PPC." (Opp'n at 18) ("No contract with PPC could create a new statutory class eligible or required to sign a termination notice. Only the signature of Mr. Peary, the Shuster Executor, was required and allowed by statute. 17 U.S.C. § 304(c)(4)).   Thus, although the Defendants believed their contracts transferred the Shuster heirs' termination rights, those agreements did not and, indeed, could not have done so.

Second, DC argues Defendants fail "to address the public-policy rule that they may not assert the illegality of their own contracts as a defense." Mot. 19-20 (citing cases)." (Reply at 8) ("Like a swindler who induces a minor to sign a contract, [D]efendants cannot claim their contracts are illegal to avoid liabilities they create.").   While that may be so, the Court does not believe that estoppel is applicable here.   In fact, were the Court to hold Defendants to their contracts (and find they lacked the majority interest to terminate), it would essentially rewrite copyright law, allowing parties to traffic in future rights. *See Milne*, 430 F.3d at 1047 (clarifying that Congress intended to protect original grantees like DC by "prohibit[ing] a new grant of rights terminated by statute until after the effective date of termination—to avoid trafficking in future interests" by third parties).

### *Third Claim* ORDER

DC argues it is "entitled to summary judgment on its Third Claim, which is pled in the alternative. (Mot. at 23.)   The gist of this claim is that "Defendants' consent agreements violate section 304(c)(6)(D) of the Copyright Act by (I) purporting to assign the Shusters' copyright interests to Pacific Pictures before the effective termination date in 2013, and (ii) barring the Shusters from making any deal with DC without Toberoff's and the Siegels' consent." (Reply at 10.)

Section 304(c)(6)(D) provides:
A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further

grant may be made between the author or [his heirs] and the original grantee or [its successor], after the notice of termination has been served....

17 U.S.C. § 304(c)(6)(D).

As DC points out, "Congress described this right in the original grantee's favor as 'in the nature of a right of 'first refusal,'" (Mot at 23) (quoting H.R. REP. NO. 94-1476 at 127). In *Milne*, the Ninth Circuit cited the statutory text and legislative history, and confirmed that § 304(c)(6)(D) "give[s] the original grantee a competitive advantage over third parties" akin to a "right of 'first refusal.'" 430 F.3d at 1047.

As discussed above, Defendants do not dispute that they entered into multiple agreements purporting to grant rights covered by a (to be) terminated grant. Defendants merely argue, as they do above, that those agreements are void. (*See* Opp'n at 18.) Given that DC brings this claim in the alternative to its first claim, on which it prevailed, it suffices to note that DC prevails on this claim as well. (*See* Mot at 23-25; Reply at 10-12.)[2]

# ORDER

---

[2] The Court finds curious Defendants' argument that section 304(c)(6)(D) "does not state that 'a [third party] grant is valid only if negotiated after the termination date.'" (Opp'n at 22) (citation omitted). For one, DC does not base its Third Claim on Defendants' negotiations, but rather on Defendants' finalized agreements. That section, moreover, *does* in fact state that a third party grant agreement "is valid only if it is *made* after the effective date of termination." 304(c)(6)(D) (emphasis added). And, finally, it is beyond dispute that the subject agreements at issue here were made well *before* the termination date.

IV.    **CONCLUSION**

As explained above, DC's motion for summary judgment is **GRANTED.**


**SO ORDERED**

August 30, 2012

_____
OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE


# TENTATIVE

# ORDER

# EXHIBIT 2

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE OTIS D. WRIGHT

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
DC Comics,                      )
7                  PLAINTIFF,    )
                                )
8  VS.                           )   NO. CV 10-3633 ODW ODW
                                )
9  Pacific Pictures Corporation, et  )
   al.,                          )
10                 DEFENDANT,    )
   _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           LOS ANGELES, CALIFORNIA

16         WEDNESDAY, SEPTEMBER 5, 2012

17

18

19      _____

20         KATIE E. THIBODEAUX, CSR 9858
           U.S. Official Court Reporter
21         312 North Spring Street, #436
           Los Angeles, California 90012
22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**31**

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFF:

 4          O'MELVENY AND MYERS LLP
            BY:  DANIEL M. PETROCELLI
 5          -and- DIMITRI D. PORTNOI
            -and- MATTHEW T. KLINE
 6          -and- JASON TOKOROFF
            400 South Hope Street
 7          Eighteenth Floor
            Los Angeles, CA  90067
 8

 9

10    FOR DEFENDANT:

11          TOBEROFF AND ASSOCIATES PC
            BY:  MARC TOBEROFF
12          -and- KEITH ADAMS
            -and- PABLO ARREDONDO
13          22337 Pacific Coast Highway
            Suite 348
14          Malibu, CA  90265

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**32**

```
1      LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 5, 2012

2                          1:30 P.M.

3                        - - - - -

4

5

6      THE CLERK:  Calling Item 2, CV 10-3633, DC Comics

7   versus Pacific Pictures Corporation, et al.

8           Counsel, may I have your appearances please.

9      MR. PETROCELLI:  Thank you.  Good afternoon, your

10  Honor.  Daniel Petrocelli with Matthew Kline, Dmitri

11  Portnoi and Jason Tokoro for plaintiff DC Comics.

12      MR. TOBEROFF:  Good afternoon, your Honor.  Mark

13  Toberoff for the defendants.  I am here with my

14  associates Keith Adams and Pablo Arredondo.

15      THE COURT:  Gentlemen, good afternoon.

16          All right.  We are here on plaintiff's motion

17  for partial summary judgment on the first and third

18  claims, and I believe everyone has gotten our tentative;

19  correct?

20      MR. PETROCELLI:  Yes, your Honor.

21      THE COURT:  All right.

22      MR. TOBEROFF:  Yes, your Honor.

23      THE COURT:  Beginning with the moving party.

24      MR. PETROCELLI:  Yes.  Do you prefer that we --

25      THE COURT:  Make yourself comfortable.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**33**

1      MR. PETROCELLI:  I am actually more comfortable

2  standing if that is okay with you.

3          Your Honor, the central dispositive issue with

4  respect to our first claim the termination notice of the

5  Schuster heirs is ineffective is that the 1992 agreement

6  replaced all prior agreements and grants and regranted

7  new grants in 1992, and that would govern the parties

8  fully and finally going forward.

9          The copyright termination statute in all the

10  cases, all of them, including Milne and Mewborn and

11  Steinbeck all agree, and I believe even the defendants

12  agree that if we are dealing with grants that were made

13  after January 1, 1978, then there is no right of

14  termination.

15          If we are dealing with grants that still are

16  in existence as of the time this notice of termination

17  was filed in 2003, that were made prior to January 1,

18  1978, then there may be a right of termination.  We have

19  to then go to our other arguments that we presented in

20  our brief.

21          I am going to focus mainly on what I think is

22  the lynchpin argument which is the 1992 agreement, and

23  the first case to really address the issue of what would

24  happen if the parties entered into a new agreement after

25  January 1, 1978 superseding and replacing the old

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**34**

1    agreements, whether that would extinguish any right to

2    terminate was addressed in the Milne case by the first

3    the District Court, the late Florence Marie-Cooper and

4    then the Ninth Circuit.

5             In that case, the Milne case, I submit,

6    directly deals with the issue at hand, namely that if the

7    parties do enter into a new post 1978 agreement replacing

8    the old agreement, there is no right to terminate.  The

9    copyright statute itself says that because it only

10   applies, it only provides the right to terminate to the

11   pre 1978 agreements and grants.

12            So Milne went on to address another argument

13   made by Ms. Milne in that claim, Clair Milne, contesting

14   the termination -- or advancing the termination right.

15   Forgive me.  And Clair Milne argued in that case, well,

16   wait a second, there is another part of the copyright

17   statute in the termination sections that says you can't

18   have an agreement to the contrary.

19            So even though the parties enter into this new

20   agreement replacing the old with a new set of grants,

21   that is still an agreement to the contrary and that is

22   still forbidden and you can't wipe out a termination

23   right in that manner.

24            That issue was discussed at length in Milne,

25   and the Milne court concluded that if the parties in fact

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

**35**

1  have superseded their old agreement with a new agreement

2  and it is after 1978, that is the beginning and the end

3  of the analysis.  It is straightforward because the

4  copyright statute on its face only allows termination for

5  pre 1978 grants.  And all of the discussion on that case

6  is really focused on this threshold issue which was the

7  case of first impression there, of whether the other

8  section dealing with a forbidden agreement to the

9  contrary encompassed this type of agreement.

10         And the court, after a lengthy analysis of the

11  legislative history and the cases, concluded that you can

12  supersede, revoke and replace, and that wipes out any

13  right of termination.  And there is nothing wrong with

14  that.  In fact, the court goes on to cite very important

15  language in the congressional history whereby Congress

16  made clear that nothing in this section or legislation is

17  intended to change the existing state of the law of

18  contracts concerning the circumstances in which an author

19  may terminate a license, transfer or assignment.

20         Indeed, Congress explicitly endorsed the

21  continued right of parties to a transfer or license, to

22  voluntarily agree at any time to terminate an existing

23  grant and negotiate a new one.  And that is at Pages 1045

24  and 1046 of the opinion which is 430 F.3d.  And then the

25  court winds through additional points and concludes that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

**36**

1   superseding agreements are not subject to termination.

2        THE COURT:  Is this a long way of saying you agree

3   with the tentative?

4        MR. PETROCELLI:  Yes.  And I didn't want to be

5   presumptuous, but that would pretty much sum it up,

6   Judge.

7        THE COURT:  Thank you, Mr. Petrocelli.

8        MR. PETROCELLI:  So, unless the court has any

9   questions, I would be prepared to defer.  And, by the

10  way, I am going to submit on the tentative even with

11  respect to the majority interest issue which the court

12  tentatively ruled against us unless you have questions or

13  if I need to respond.

14       THE COURT:  No.  We will deal with that later.

15       MR. PETROCELLI:  Thank you.

16       THE COURT:  All right.  Mr. Toberoff.

17       MR. TOBEROFF:  Your Honor, since -- your Honor,

18  since this is all about a half page agreement called the

19  1992 agreement, and a lot of fancy arguments are being

20  made about that page, I would like to set up that

21  document for you.

22       THE COURT:  I am not certain that there are any

23  fancy arguments.  We have an agreement supported by quite

24  a bit of consideration, and isn't that kind of the end of

25  it?  Promises made that we will never again pursue any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**37**

1  future interests in Superman, promises repeated over and

2  over again.  Where is the fancy part?

3      MR. TOBEROFF:  I intend to explain all of that to

4  you.  First, I would just like permission to set that up.

5      THE COURT:  Go ahead.

6      (Pause in proceedings.)

7      THE COURT:  We spent a good deal of tax payer

8  money to upgrade this courtroom, and we are still using

9  those things?

10     MR. TOBEROFF:  Well, I am using it so that we can

11 really focus on this 1992 agreement.

12         That is the agreement in question, your Honor.

13 First of all, I would like to tell you how much I

14 appreciate the fact that the order you sent out was

15 labeled a tentative order, and I am here to attempt to

16 change your opinion about this matter by focusing on both

17 the facts and the law.

18     THE COURT:  Okay.

19     MR. TOBEROFF:  The termination provisions were

20 entered into, were enacted by Congress.  They are very;

21 unusual provisions because they cut through everything we

22 are taught in law school that a deal is a deal, that you

23 make a contract, if there is consideration for a

24 contract, it is enforceable whether it is for $10 or

25 $10 million.  You stick by those contracts.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**38**

```
1              And Congress said with respect to authors and

2    the Copyright Act, no.  There is a tremendous imbalance

3    of power between publishers and authors, and that means

4    that when authors want to have their works published,

5    they are going to have no leverage and those works may go

6    on to become very, very valuable.  And they will not have

7    had the opportunity to have bargained for profits or for

8    sufficient remuneration because they had no bargaining

9    leverage.

10             So what we are going to do is give you authors

11   the ability after a very long waiting period, in the case

12   of the terminations, 56 years, in the case of the

13   Schusters under 304(d), 75 years, we are going to give

14   them an attempt to realize some of the increased market

15   value of their works because when they first made the

16   deal with the publisher, not only didn't they have any

17   leverage but no one really knew what the value of these

18   creations were.

19             And, understand, large companies use

20   copyrights for exclusivity and to profit, but the reason

21   for copyright law to begin with is to provide financial

22   incentives for people to create because by providing

23   authors financial incentives, it is thought to be good

24   for commerce and good for a culture.

25             Siegel and Schuster who created Superman
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**39**

1    before there were any superheros and signed a document

2    with a small publisher, a release to have that publisher

3    publish Superman and got paid $130 were later held in

4    1947 and again in '74 to have sold all their rights for

5    $130, the poster boys for the termination provisions.

6           When people talk about the legislative intent

7    to correct the imbalance of power between authors and

8    publishers, they often refer to Siegel and Schuster

9    selling Superman for $130.

10        THE COURT:  Is that your position is that they

11   sold Superman, and all they were compensated was $130?

12   Is that your argument?

13        MR. TOBEROFF:  That is what they were originally

14   compensated.

15        THE COURT:  No.  No. is that what you are trying

16   to tell me?

17        MR. TOBEROFF:  No.  That is the beginning of the

18   story.  That is the beginning of the story.

19        THE COURT:  Okay.  Pretend that we don't have a

20   jury here and be factually accurate.  All right.

21        MR. TOBEROFF:  All right.  Your Honor, the -- so

22   the purpose of the termination, so concerted was the

23   legislative intent to give you authors and their families

24   a termination right, that they put into the termination

25   provisions, a provision that said termination can be

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**40**

1    affected notwithstanding any agreement to the contrary.

2         This is a statutory prohibition because they

3    realized that as soon as they give this termination right

4    to authors that publishers would use their bargaining

5    leverage when they make deals with authors to assent away

6    their termination rights, to circumvent termination

7    rights, to encumber termination rights.

8         And so in the first case that dealt with this

9    language which is Marvel versus Simon which dealt with

10   Captain America, another superhero.  Simon had signed a

11   settlement agreement in a case where they were arguing

12   over who had the rights to Captain America, and they

13   resolved that case with a settlement agreement.  And that

14   settlement agreement said everything you did for us, we

15   own all rights to Captain America.  And everything you

16   did for us was work for hire.

17        Later on, Simon sought to exercise his

18   termination rights under the Copyright Act and the

19   District Court in New York, Southern District, said you

20   can't, you don't have any termination rights because you

21   signed something saying it is work for hire.  And if it

22   is work for hire, you don't have any termination rights.

23   And Simon argued that this is an agreement to the

24   contrary, reading it this way is an agreement to the

25   contrary, and the District Court said I don't think so.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**41**

1  You are bound by your settlement agreement.  You are

2  done.

3          They went to the Second Circuit, and the

4  second circuit reversed saying to the extent you can't

5  after the fact nullify the termination right by calling

6  works works for hire.  That is an agreement to the

7  contrary because the way Marvel was reading the agreement

8  has the effect of extinguishing the termination right.

9  And that is prohibited by the Copyright Act.  It is void

10  to the extent it nullifies the termination right.  That

11  was the first major case dealing with this provision

12  notwithstanding any agreement to the contrary.

13          Now, we get to the Milne decision in the Ninth

14  Circuit which is a different situation.  In Milne, the

15  son, Christopher Milne, was in the termination window.

16  He had a termination right.  He was going to terminate,

17  and he went to the original grantee which was

18  Schlesinger, Inc., SSI, and said I am going to terminate

19  that 1930 grant and then I will get the rights back and I

20  might renegotiate a new deal with you or I might sell

21  them to somebody else.  And like Superman, the

22  Winnie-the-Pooh rights, it was a billion dollar

23  enterprise.

24          And SSI said, wait a minute, don't do that,

25  why don't we negotiate a new deal now.  So wielding the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**42**

1    threat of termination, they said rather than statutorily

2    terminate the 1930 grant and then enter into a new

3    agreement, let's do it contractually.

4         And so they entered into an agreement, a

5    multi-page agreement that did a number of things.  One,

6    it expressly revoked the old 1930 grant.  Two, it

7    expressly said that we are doing this because of your

8    termination right and we are doing it in lieu of

9    termination.  Three, it expressly regranted the exact

10   same copyrights granted in the 1930 grant because the

11   whole purpose was to replace that grant.  All of it was

12   express.  And, as a result, Christopher Milne ended up

13   with an additional $300 million.

14        Now, the court said since the purpose of

15   termination is to allow authors and their families to

16   realize the increased market value of their works years

17   later, and that is exactly what Christopher Milne was

18   doing.  He was using the leverage of termination to do

19   that.

20        The court reasoned that, although they didn't

21   follow the statutory formalities of termination, we

22   achieved a congressional objective.  He used the

23   termination as leverage to bargain a new deal, and that

24   new deal corresponded to the value of the Winnie-the-Pooh

25   franchise in question.  And, then, thereby created a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**43**

1    narrow exception to what, to the prohibition of you can

2    terminate notwithstanding any agreement to the contrary.

3            So you could be sure after the Milne case that

4    every time you exercise, an author or family exercised a

5    termination right with respect to something of value,

6    what is the publisher going to say?  Revocation and

7    regrant.  They are going to find a post '78 agreement and

8    call it a revocation and regrant.

9            And that is exactly what happened in the

10   Mewborn case that I litigated.  They found a '78

11   agreement that assigned the exact same thing as a '76

12   agreement, motion picture television and allied rights,

13   they both had the exact same, very similar language, and

14   they said the '78 agreement, by dealing with the same

15   subject matter, effectively supersedes the '76 agreement,

16   and therefore you have no agreement that you can

17   terminate.

18           And they read into the agreement a revocation

19   and a regrant, and the district court bought that

20   argument and said you have no termination right.  All you

21   have is this 1980 agreement because the 1975 agreement by

22   dealing with the same subject effectively superseded even

23   though, and we argue, there is no language of revocation

24   and regrant.  In Milne, it was express.  Here, there is

25   no language.  You can't reform an agreement for the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 2
44

1    parties.

2            It went up to the Ninth Circuit and in

3    Mewborn, and the Ninth Circuit agreed.  The Ninth Circuit

4    said we are going to limit our ruling in Milne to the

5    factual circumstances of Milne which is someone with a

6    current termination right uses that termination right as

7    leverage to bargain for a new deal for value relative to

8    the market value of the copyrights they are dealing with.

9            And the important point is the use of the

10   termination right by leverage because the court concluded

11   in Milne that is how you realize the congressional

12   objective, and as long as that is being realized in a

13   real way, we are okay with that.  But that is not what

14   happened in Mewborn.

15           The court said there is no express revocation.

16   Mewborn, she had termination rights, but they wouldn't

17   come up for another 16 years.  So it wasn't relevant to

18   the negotiation.  The amount of money involved was a few

19   thousand dollars, didn't reflect the value of Lassie.

20   And it said, therefore, because the factors in Milne were

21   not present here, we are not going to read a revocation

22   into that.  We are not going to take this termination

23   right away from this person given this concerted

24   legislative objective behind the right.

25           Steinbeck which is relied on heavily in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**45**

1    tentative is not binding, but Steinbeck is not against

2    our position.  Steinbeck supports Milne.  In Steinbeck,

3    the court noted that Elaine Steinbeck wielded the

4    termination right to bargain for a substantially enhanced

5    deal.  And that substantially enhanced deal was major

6    advances, major royalties.

7            So Steinbeck does not contradict.  But I would

8    submit, your Honor, that the two Ninth Circuit cases in

9    Mewborn and Milne are what is most relevant and binding

10   here although Steinbeck can also be instructive.

11           So, now, let's go to, if I may, your Honor, to

12   the 1992 agreement, and I would like to talk about what

13   it is and it isn't.  And a bit of history about Siegel

14   and Schuster.  In 1938, there was -- the core grant of

15   Siegel and Schuster's Superman copyright which is really

16   their, the Superman character and the initial Superman

17   story from which everything else is derived, that was

18   granted in the 1938 grant.  That was -- it was then

19   litigated in 1947 where Siegel and Schuster litigated

20   whether they had rights to Superman from the 1938 grant,

21   and the court said they do, they have all rights under

22   the 1938 grant and they entered into a stipulated

23   judgment.

24           Then, in 1974, Siegel and Schuster were in

25   court again, and the court focused again on the 1938

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**46**

1   grant, your Honor, and they said based on the 1947 case,

2   DC owns all rights to Superman based on the 1938 grant.

3   So you have two court decisions upholding this 1938

4   grant, and then, after that, there are various other

5   assignments from Siegel and Schuster that DC has relied

6   on for years for its chain of title to Superman.

7        In 1975, due to negative publicity regarding

8   DC's and Warner Brothers' treatment of Siegel and

9   Schuster, the cartoonist's guild and various other

10  parties objected.  Warner Brothers were coming out with a

11  big Christopher Reeve movie, they engineered the 1975

12  agreement.

13       The 1975 agreement restored their credit which

14  had been taken away for years because they had sued DC,

15  and it provided them a pension of $20,000 each which

16  they, after that, they raised that pension.  And it said

17  when Joe Schuster dies, we are going to give his brother

18  Frank Schuster a $5,000 survivor pension.  And it also

19  acknowledged that, as of 1975, Siegel and Schuster had

20  just lost the 1974 case, acknowledged that DC owns all

21  right, title and interest to Superman.

22       So, in 1992, when this document was entered

23  into, Jean Peavy and Frank Schuster didn't own any rights

24  to the Superman to grant.  Like Mewborn, in the Lassie

25  case, the court said a 1978 agreement assigning motion

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**47**

1   picture and television rights to Lassie is a nullity

2   because you already signed it in 1976.

3           So, here, just to set the stage, Jean -- the

4   siblings of Joe Schuster, Frank Schuster and Jean Peavy

5   who signed this 1992 document, their rights -- they

6   didn't have any rights to Superman.  What they had was

7   the right to a $5,000 pension.

8           And that is what this document is about, your

9   Honor, and I can show you based on other evidence that

10  that is what this document is about.  So if you turn to

11  the first paragraph of this document, it is basically a

12  three paragraph agreement, it provides them with a

13  $25,000 pension.

14          There is another document that was signed on

15  the same date by Frank Schuster which I can put on on

16  this machine for you, but that document, I can read it to

17  you, it is Exhibit 9 to the Petrocelli declaration.  It

18  says, in consideration of the agreement dated as of

19  August 1, 1992, with DC Comics between DC Comics and

20  myself, I hereby waive any rights and remedies they may

21  have under the agreement dated December 23, 1975.  That

22  is the 1975 agreement that gave them a $5,000 pension.

23          In giving them a pension, they threw in a

24  quitclaim.  Now, and that is the language that the court

25  in its tentative focused on and found to be broad or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**48**

1   construed as superseding, but what is noteworthy and why

2   I call it a tentative is the transfer language says and

3   this is the key, this is the yellow highlighted portion

4   on the board that I put in front of you.  It says,

5   that -- excuse me, your Honor.  Just need a sip of water.

6          It says we ask you to confirm by your

7   signature below that this agreement fully settles all

8   claims to any payment or other rights or remedies which

9   you may have, meaning Frank Schuster and Jean Peavy.

10  They didn't have any rights at that time, but it said any

11  rights you have under any agreement.  And then it says

12  down below, whether now or hereafter existing, and then

13  it says down below, and they grant those rights which you

14  may have.  And it says it assigns such rights.

15         Do you see that, your Honor?  The focus is on

16  the rights that Frank Schuster and Jean Peavy had, not on

17  the original Superman copyrights of Siegel and Schuster

18  that were granted in 1938 and acknowledged in 1975.

19         And there is no basis, I respectfully submit,

20  your Honor, for -- to read into this document as a

21  revocation or regrant.

22         And I put to the court, why would DC who has a

23  1938 grant upheld in two court judgments to give them all

24  rights to Superman and in an acknowledgment by 1975 by

25  Siegel and Schuster that they already own all rights to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**49**

1    Superman, why would DC feel the need to revoke all of

2    that chain of title that it has relied on for years and

3    replace it with an ambiguous document like this?  If they

4    were really revoking these pre '78 copyright grants.

5            They have a multibillion dollar Superman

6    franchise.  It just, it defies credibility to suggest

7    that Warner Brothers and DC are going to be launching

8    movies that cost, those Superman movies cost about $250

9    million a pop with another 150 million in print and

10   advertising and marketing cost.  That is $400 million a

11   motion picture.  They have investment partners.  They

12   have insurance.

13           It defies credibility to suggest that they are

14   going to throw away the chain of title that they have

15   relied on for years that has been upheld by two court

16   judgments and replace it with this half-page ambiguous

17   scenario here.

18           And if DC which is an intellectual property

19   company with inside counsel and outside counsel and

20   Warner, in particular, if they intended to revoke those

21   prior agreements, it would have been easy enough to say

22   it in plain English, or as my father says in plain

23   Brooklyn English.  If that was their intention, they

24   would have put it in the contract.

25           They know how to say we hereby cancel the 1938

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**50**

1    grant or refer generally we hereby cancel all pre '78

2    grants.  They didn't do so.  Not only does it suggest

3    that wasn't DC's intent or the parties' intent, but if

4    they wanted a revocation, it was incumbent upon them to

5    say so because courts whether it is New York or

6    California, all courts say you are bound by the objective

7    manifestation of your intent.  I am not interested in

8    after the fact rationalizations and self-serving

9    declarations years later.  I am going to look at the

10   document that you signed.  So none of this is in there.

11          There is no language of rescission, there is

12   no language of revocation, and the -- the sweeping

13   language, your Honor, is language about their rights.

14   Jean Peavy, it says rights that, quote, you may have, and

15   the only rights that Jean, that Frank Schuster had was

16   rights to a $5,000 pension.  That is why the first

17   paragraph talks about the pension, and that is why a

18   letter he signed on the same date talks about he is

19   waiving his rights to that pension under the 1975

20   agreement.

21          Now, the court mentioned in its tentative that

22   we didn't come up with any evidence.  Well, first and

23   foremost, the evidence of no revocation, your Honor, is

24   the 1992 agreement itself.  Secondly, and that is why

25   this should end, but if we go outside that and start

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**51**

1    looking at extrinsic evidence, the evidence is abundant.

2    And it all points to the fact that this agreement had

3    nothing do with termination and nothing to do with the

4    revocation and regrant.  And I would like to briefly take

5    you through that, your Honor.

6              Number one, Paul Levitz was the president,

7    long time president of DC.  Paul Levitz's name is on the

8    document, and Paul Levitz managed the relationship with

9    the Schuster heirs, the Schuster siblings, Jean Peavy and

10   Frank Schuster.  He submits a four or five page

11   declaration.  He talks about the generosity of DC.  He

12   talks about how they met in New York prior to signing

13   this agreement.  He talks about how the -- it was

14   expressed at their meeting that they were going to

15   increase the $5,000 pension and make it $25,000.

16             The silence is deafening.  He doesn't say a

17   word about revocation and regrant.  Now, he is the

18   president of DC.  He is not going to lie in a sworn

19   declaration.  That is why he says nothing about

20   revocation or regrant even though he is submitting the

21   declaration in support of their motion and not a word

22   about revocation or regrant.

23             When the Schusters served the termination in

24   2003, did DC or Warner Brothers hop up and say you can't

25   do that, you have no termination rights.  You have a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**52**

1    revocation and regrant, this 1992 agreement.  Not a word

2    about the 1992 agreement, your Honor.

3              In 2005, they send a multi-page letter to the

4    Schusters trying to get them to settle.  And in that

5    agreement, they take on the Schuster termination.  They

6    don't mention the 1992 agreement in 2005 either.

7              It bears mentioning, your Honor, when we are

8    talking about settlement and we are talking about

9    leverage and the termination right in that agreement

10   which they have made, in that letter which they have they

11   have made public, just for starters, they offered the

12   Schusters $2 million, a percentage of the profits which

13   starts to reflect the leverage of termination because

14   then they really exercised their termination and it was

15   exercised by the party with the termination rights which

16   was the Schuster executive.

17        THE COURT:  Couple of things.  I need you to slow

18   down a little bit.

19        MR. TOBEROFF:  I am sorry.

20        THE COURT:  And are you talking about negotiations

21   that were taking place between the parties in connection

22   with settlement?

23        MR. TOBEROFF:  Yes, your Honor.  But it is in a

24   letter that they put into evidence in this case.

25   Otherwise, I wouldn't be talking about it.  It is a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**53**

1    document that they have relied on, your Honor.  That is

2    why I am talking about it.

3            So in 19 -- 2008, in the Siegel case where the

4    Siegel termination was upheld, it was argued that even

5    though the Siegel termination was upheld, Warner can

6    continue as they could to exploit Superman because they

7    were successors to Joe Schuster's half of the copyright.

8    And they were successors to Joe Schuster's half of the

9    copyright that was granted in the 1938 grant which is the

10   key grant upheld in two court judgments.

11           So in 2008, after the termination was served

12   in 2003, they didn't say to the court that our chain of

13   title to Joe Schuster has been replaced by a 1992

14   agreement.  Again, they made no mention of the 1992

15   agreement.  You know what the first time is that they

16   mentioned the 1992 agreement?  After they replaced their

17   lawyers and they hired new counsel, and new counsel came

18   up with this theory.

19           But, that is what I meant, your Honor, when I

20   was talking about fancy.  I wasn't referring to your

21   tentative.  I was referring to a new argument that is

22   being contrived by lawyers that bears no relation to the

23   actual document that was signed by the parties.  That is

24   what I meant by that comment.

25           There is other evidence, your Honor, even the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**54**

1    evidence that they point to, that actually runs in our

2    favor, and I have to dial it back just a little bit, and

3    I will try and slow down.  I'm sorry.

4            The key factor in the Milne case was that the

5    holder of a current termination right within the

6    termination window is going to use the termination to

7    bargain for a much better deal that bears some

8    resemblance to the market, increased market value of what

9    they are bargaining for.

10            Here, this never took place.  Frank Schuster

11    didn't have a termination right.  He is the brother of

12    Joe.  Jean Peavy didn't have a termination right despite

13    their mentioning things in letters about termination.

14    They are not lawyers.  They don't know what they are

15    talking about.  They don't have a termination right.

16            THE COURT:  Why not?  Jean?

17            MR. TOBEROFF:  Because siblings don't have

18    termination rights.

19            THE COURT:  What about as the executor?

20            MR. TOBEROFF:  She wasn't the executor.  The

21    estate was never probated.

22            THE COURT:  She was named as executrix in the

23    will; right?

24            MR. TOBEROFF:  That's right, but the estate was

25    never probated.  What happened was she was a beneficiary.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

1    The estate was in probate because they didn't have any

2    money.  She sent -- when you have a pauper's estate, you

3    don't have a probate estate.  He had a few shares of

4    stock, and she sent in -- there is a regulatory

5    declaration you can send in saying these are his assets.

6    His assets are some shares, ironically, of Time Warner

7    stock and can you send me the stock.  And they did that.

8    It was never probated.

9         Then what happened was in 1992, nobody had --

10   even if she was an executrix in 1992, she didn't have a

11   termination right because executors of estates didn't get

12   termination rights until 1998 under the Copyright Term

13   Extension Act.  So in 1992 -- first of all, so Jean

14   Schuster, Jean and Frank had never had any termination

15   rights, ever.  In 1992, no one had termination rights

16   despite mentions in letters to termination rights.

17        So, interestingly, they point, they say, well,

18   termination was mentioned in letters from Jean Peavy,

19   and, therefore, she used it as leverage to bargain for a

20   new deal.  And what I submit, your Honor, is let's say

21   Jean thought she had termination rights, DC knows she

22   doesn't have termination rights.  Their lawyers know who

23   had termination rights and who don't.  And even if Jean

24   and Frank thought they were using termination rights,

25   they didn't have termination rights.  And if they don't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 2

56

1  have them, how can it be used as leverage to negotiate a

2  better deal thereby fulfilling the congressional intent

3  of the termination provision?  It couldn't.  It never

4  happened.

5          And I submit that DC is reinventing history.

6  It is not in the agreement, and it is not in their

7  letters.  And I will give you another example.  Exhibit

8  43 is a letter dated July 10, 1993 from Jean Peavy to

9  Paul Levitz.  Because it is in 1993, it took place after

10 1992.  They claim that the intent of the parties in 1992

11 was to relinquish their termination rights.  The intent

12 of both DC and Jean Peavy was to relinquish their

13 termination rights.

14          So if she relinquishes the termination rights,

15 how come in 1993 she refers to termination rights in

16 trying to ask them for even another increase in their

17 pension?  She says, during the past year, Frank and I

18 have been able to review our rights as Joe's only

19 surviving next of kin.  We are aware of the fact that in

20 1994 after 56 years, Superman could revert to us.

21          She is talking about that in 1993 after she

22 signed that.  The 56 years is the window for the first

23 termination right.  She is talking about termination.

24 She doesn't know what she is talking about because Frank

25 and her don't have any termination rights, but it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**57**

1    certainly suggests that she didn't relinquish them in

2    1992 if she is talking about it in 1993.

3            Then, in response, and I can put this on the

4    elmo.  I don't know.  Would you like to look at it, your

5    Honor?

6        THE COURT:  Do you want me to look at it?

7        MR. TOBEROFF:  Well, I will show you another

8    document.  I'm sorry.  It is exhibit -- it is Exhibit 20

9    to Petrocelli's declaration, a letter dated July 10,

10   1993.  So then, in response, Paul Levitz, the same Paul

11   Levitz who sent in a declaration never mentioning

12   revocation or regrant, he writes a letter back.

13           And he says, as I hope you recall from our

14   meetings in New York, we have done extensive research

15   into the Copyright Act and any potential rights that you

16   and Frank may have as Joe's siblings and survivors.  It

17   is our firm conviction based on that research and expert

18   counsel that you don't have any legal rights or claims

19   whatsoever.

20           Now, he is telling them what we know, that

21   they didn't have any rights.  All they have for rights

22   was a $5,000 pension.  So he says -- but he starts out

23   the paragraph, I hope you recall from our meetings in New

24   York that we have done extensive research and that you

25   don't have any rights.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**58**

```
 1              Well, in his declaration, the meetings in New
 2    York he is talking about are meetings that took place he
 3    says in late September before they signed this in
 4    October.  So what he is saying is before we signed this
 5    thing, the reason we are only giving you $25,000 a year
 6    split two ways and we are going to deduct taxes from that
 7    as well is because you don't have any rights.  This is an
 8    act of charity.  And that is why they did it.
 9              Now, a key point -- so the things they point
10    to as being evidence -- and in the tentative, it says we
11    don't present any evidence -- all of this, the 1992
12    agreement, these letters are all evidence that it wasn't
13    the intent of the parties.
14         THE COURT:  That is not a complete sentence.
15         MR. TOBEROFF:  Sorry.  Did I miss something
16    grammatically?
17         THE COURT:  No I just missed something.  You said
18    it wasn't the intent of the parties.
19         MR. TOBEROFF:  Oh.  Excuse me.  That it wasn't the
20    intent of the parties to relinquish termination rights
21    which they didn't have, that it wasn't -- there was no
22    use of the termination right to achieve a congressional
23    purpose of being able to bargain a new deal that is
24    relative to the increased market value of the copyrights
25    in question.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**59**

1    THE COURT:  Now, we understand that each party has

2    different interests here with respect to termination

3    rights.

4         DC is not anxious for any of the heirs or

5    putative heirs to terminate anything and reclaim any of

6    their rights, is it?

7    MR. TOBEROFF:  Correct.

8    THE COURT:  All right.  They are sitting on the

9    golden goose.  Now, with respect to the Schusters, they

10   kept saying over and over again that they would not seek

11   to reclaim any rights in the future.  They said that over

12   and over again.  They made their intent clear; right?

13   And I guess in exchange for that, DC continued to give

14   them checks.

15   MR. TOBEROFF:  Correct, your Honor.

16   THE COURT:  Okay.  Now, granted, DC acknowledges

17   and I think we all acknowledge DC was not under any legal

18   obligation to do so, was it?

19   MR. TOBEROFF:  Not at all.  It was charitable.

20   THE COURT:  It was, and it also was designed to

21   keep them happy and not make them start looking for

22   perhaps other rights, get them a nice deal, a sweet deal,

23   that goes on into perpetuity, and I don't know the extent

24   to which it took care of their needs.  But it seemingly

25   made them happy year in and year out, all through the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**60**

1    '90's.  They kept getting checks, and I guess they were

2    happy with that.  And I guess that means they didn't go

3    out and find a lawyer to research their rights under the

4    Copyright Act; right?

5         MR. TOBEROFF:  No, your Honor.  They were very

6    unhappy with that, and the letters that are all attached

7    to the declaration, every year, essentially when it comes

8    Christmas time, they are begging for money.

9         THE COURT:  They may have been begging for money,

10   but then they would get money and then they would express

11   their gratitude.

12        MR. TOBEROFF:  That's correct, your Honor.  But I

13   am glad you are bringing that up because I think that

14   goes to the core of this.  This is a very unusual right.

15   It goes against everything that we are taught in law

16   school, like I said, at the beginning of this, that a

17   deal is a deal, that you have a contract.

18            Let's just say for hypothetical purposes that

19   Jean Schuster was the executrix and there was an estate

20   and she did have the power of termination and she signed

21   a document that said I hereby state that I will never,

22   ever in consideration for $25,000 a year exercise my

23   termination right.  That wouldn't -- that would be void.

24   That would be totally void.

25            Why?  Because of the provision in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**61**

1    termination that says the termination right is

2    inalienable.  You can't waive it, you can't encumber it,

3    you can't circumvent it.  Why did the Congress make the

4    termination inalienable?  And, by the way, your Honor, it

5    was held in two supreme court cases to be inalienable.

6              In Stewart v. Abend which is the famous

7    copyright case dealing with Rear Window and a case called

8    New York Times versus Tasini, they held the termination

9    right to be inalienable.  Now, the question is why would

10   they take these rash measures which hamper freedom of

11   contract principles that we all learn in law school

12   govern parties' transactions.  Why would they do that?

13             The reason is because they knew that the first

14   thing publishers would do is go to authors or the heirs

15   that don't have any money -- to many people $25,000 a

16   year is a tremendous amount of money -- and they would go

17   to them and say we are going to give you $25,000 not to

18   exercise your termination rights and you have to promise

19   never to exercise your termination rights and you have to

20   waive your termination rights.  You have to agree never

21   to exercise those rights, or if you do exercise those

22   rights, we are going to penalize you and you have to pay

23   back all that money.

24             They knew that publishers would do that.  They

25   didn't want publishers to do that because that would

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**62**

1  defeat the purposes of the termination, and that is why

2  they had the provision notwithstanding any agreement to

3  the contrary.  That is why they had the provision.

4          So there is a -- forgive me, your Honor, there

5  is a disconnect here, and that disconnect is totally

6  understandable.  And that is the same disconnect that we

7  experienced in the district court in the Lassie case and

8  that was experienced at the district court level in the

9  Captain America case.

10          And that is people look at this through the

11  glass of contract law not through the glass and

12  objectives of the Copyright Act.  This is a new area of

13  law because these cases are now coming into existence

14  because of the long waiting period, 56 years and 75

15  years.

16          And you have these leading cases, but, believe

17  me, the Ninth Circuit as it expressed in Mewborn and the

18  Supreme Court takes this termination right very

19  seriously, and the prohibition of notwithstanding any

20  agreement to the contrary is very serious.  They don't

21  want people waiving their termination rights.  And they

22  said, Milne said under these specific factors, since the

23  purpose of the termination right was really realized

24  here -- really realized, excuse me -- the objective was

25  realized, because the purpose was realized to the tune of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**63**

1   a $300 million increase, even though they didn't follow

2   the formalities, they contractually terminated instead of

3   statutorily terminated, we are going to let this go.  But

4   then in Mewborn, they are going to say we don't want

5   publishers to go crazy with this revocation or regrant

6   exception.  If you don't have a factual scenario that is

7   similar to Mewborn, it doesn't work and they struck it

8   down.

9          And in Steinbeck which is relied on in the

10   tentative, your Honor, the Steinbeck court says that

11   Elaine Steinbeck wielded the termination right to bargain

12   for a better deal.  Here, Jane Peavy and Frank Schuster

13   didn't wield anything.  What they wielded was a $5,000

14   pension, and DC wielded a little money.

15          And there was -- DC has never acted as if this

16   1992 agreement is the basis of its chain of title, and

17   the reason, your Honor, why I wanted to put that

18   agreement in front of you is because it really is not

19   credible that Warner Brothers and DC is relying for

20   $400 million movies in a billion dollar business on this

21   half page resolution in an agreement with Jean Peavy and

22   Frank Schuster.

23          And there is discussion about understanding

24   law in reviewing these contracts in the tentative, and I

25   just want to point out that these cases of Milne and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**64**

1    Mewborn which are Ninth Circuit cases are construing the

2    prohibition of notwithstanding any agreement to the

3    contrary in the Copyright Act.  And in construing

4    notwithstanding any agreement to the contrary, they are

5    saying that a revocation and regrant must be express, and

6    you must use the termination right which you must have as

7    leverage to bargain a better deal.

8            And you must be within the termination window

9    or near the termination window.  In Steinbeck, they argue

10   that they are not in the termination window.  That is

11   incorrect.  We checked it out.  Grapes of Wrath and other

12   leading Steinbeck works were in the termination window,

13   and there were a few Steinbeck works that were outside

14   but close to the termination window.  Therefore, they use

15   the termination in Steinbeck as leverage to achieve a

16   better deal thereby fulfilling the congressional

17   directive of the termination right.

18           Nothing even remotely like that happened here,

19   your Honor, because, number one, Jean Peavy and Frank

20   Schuster had no termination rights and never had any

21   termination rights.  Number two, your Honor, nobody had a

22   termination right in 1992.  So they couldn't have used it

23   as leverage.

24           And DC knew no one had any rights and they

25   said in their letter referring to 1992 meetings before

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**65**

1    they signed this document that we analyzed this, and you

2    don't have any rights.  So no one could have used the

3    termination right as leverage to bargain for a better

4    deal, termination had nothing to do with this agreement.

5    It was about a 1992 pension increase of the only right

6    that Frank Schuster had which was a right to $5,000 on a

7    1975 agreement.

8              And the 1975 agreement acknowledged that DC

9    already owned all rights to Superman, and this came

10   through in a quitclaim.  And it therefore says you hereby

11   grant to us, you settle any claims or rights and you

12   grant to us all rights that you, meaning Frank Schuster

13   and Jean Peavy had, not you grant us, regrant to us Joe

14   Schuster's copyright grants and we revoke his prior

15   grants.

16         THE COURT:  Wait a minute.

17              There is really no dispute here then; right?

18         MR. TOBEROFF:  Excuse me, your Honor?

19         THE COURT:  What is the dispute?  DC says it owns

20   the rights.  You agree.  Why are we here?

21         MR. TOBEROFF:  The dispute, your Honor, is that DC

22   owns the rights by virtue of a 1938 grant and some other

23   grants.

24         THE COURT:  Okay.

25         MR. TOBEROFF:  The Copyright Act is, on an

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**66**

1    author's estate, the executor of an author's estate, the

2    right to recover their copyrights after a very long

3    waiting period by terminating all grants.  They have to

4    follow certain formalities.

5         THE COURT:  Don't go through all that again.

6    There are no heirs, there is no spouse, there is no

7    issue.  There is no executrix.  You just said that the

8    Schusters had no rights.  Why are we here?

9         MR. TOBEROFF:  Your Honor, the Schusters --

10        THE COURT:  They have no rights to reclaim.

11        MR. TOBEROFF:  We are here because the chain of

12   title to the Schuster copyrights is based on pre '78

13   grants.

14        THE COURT:  The chain of title.  What chain of

15   title?  There was a works for hire back in 1938.  Nothing

16   has changed.

17        MR. TOBEROFF:  The original Superman story was not

18   a work for hire, and it was held in the Siegel case which

19   this court granted a judgment on which said that it is

20   not work for hire.

21        THE COURT:  Okay.  How did title to Superman,

22   then, change from DC?  And when?

23        MR. TOBEROFF:  It changed -- it hasn't changed

24   yet.

25        THE COURT:  Okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

1      MR. TOBEROFF:  This is declaratory relief, to

2  declare that a termination notice that was filed in 2003

3  that becomes effective in 2013 is void, is ineffective.

4  So DC has Superman.  They continue to exploit Superman,

5  but in 2013, they will have certain Superman copyrights

6  but will not have the original Superman story that was

7  created by Siegel and Schuster independently and was not

8  work for hire.

9      THE COURT:  Who will have that?

10     MR. TOBEROFF:  That will be owned by the estate of

11  Joe Schuster, and by the Siegels and most probably they

12  will enter into a new agreement with the natural buyer

13  for those rights since the rights are split.  Other

14  people may be reluctant to buy those rights, but they can

15  sell them to somebody else.  But, probably, they will

16  enter into a negotiation with Warner Brothers to make a

17  new deal with Warner Brothers.  But it won't be a deal

18  for $25,000 annual pension split two ways with taxes

19  deducted first.  It will be a real deal that is relative

20  to the market value of Superman which is exactly what

21  Congress wanted.

22          And, your Honor, the Siegel termination has

23  been upheld.  There is no reason why the Schuster

24  termination shouldn't be upheld.  It is the mirror image.

25  You are dealing with works that were co-created by Siegel

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**68**

1    and Schuster, and there is no reason why the Schuster

2    termination shouldn't be upheld as the Siegel termination

3    was upheld.

4            And you can't take away this important right

5    that Congress has given these people based on, you know,

6    after the fact rationalizations when DC is bound by their

7    own document.  They drafted that document.  If they

8    wanted to revoke pre '78 grants, the 1938 grant upheld in

9    two court judgments, why didn't they we hereby revoke

10   those grants?  Or why didn't they say we hereby revoke

11   all prior grants and replace it with this grant?

12           THE COURT:  That is not a grant of anything, is

13   it?

14           MR. TOBEROFF:  What?

15           THE COURT:  This August 1, 1992 letter isn't a

16   grant of anything.

17           MR. TOBEROFF:  I agree.  I agree, your Honor.

18   That is what we are saying.  They are saying that this

19   August, 1992 letter did the following:  Revoked Siegel

20   and Schuster's prior copyright grants which DC has always

21   relied and regranted Siegel and Schuster's copyrights to

22   DC.  And because it took place in 1992 and was signed by

23   Schuster heirs, it can't be terminated and now we are

24   bulletproof.  And they never came up with that argument

25   ever before.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 2

69

```
1          They came up with that argument when they
2   hired Mr. Petrocelli in 2010.  That is when they first
3   presented that argument even though the termination
4   notices were served in 2003.
5          THE COURT:  Okay.
6          MR. TOBEROFF:  And looking -- the reason why I
7   wanted to, you know, I know it is a little antiquated,
8   your Honor, to do a big blowup like that on an easel.
9   But the reason why I wanted to do that is because I
10  wanted to put in front of you that half page agreement
11  which all the fuss is about because it did not say any of
12  the things that DC says it says.  And with due respect, I
13  think the court was to some extent led astray by some of
14  these arguments which I call fancy arguments.
15          And the reason I call them fancy arguments is
16  there is no indication in that document of revocation or
17  regrant.  They say impliedly revoked by talking about the
18  same subject matter, your Honor, but it doesn't talk
19  about the same subject matter.  It doesn't talk about Joe
20  Schuster's original Superman copyrights.  It says
21  whatever rights you, Frank and Jean, have, and they
22  didn't have any rights.  And DC says in its letters you
23  didn't have any right and the 1975 agreement says we
24  already own all rights.
25          THE COURT:  All right.  Tell me specifically what
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**70**

1    you mean when you say they don't have any rights,

2    specifically, what are you saying?  They also don't have

3    any future rights?

4         MR. TOBEROFF:  Jean Peavy and Frank Schuster had

5    no rights to Joe Schuster's copyrights because they were

6    long ago -- in 1992 because they were long ago assigned

7    to DC by Siegel and Schuster.  So in 1992, they didn't

8    have any rights to give to DC.  They also didn't have

9    termination rights.  That's what I mean.

10        THE COURT:  Are you saying they also had never

11   acquired termination rights?

12        MR. TOBEROFF:  No.  Siblings aren't entitled to

13   termination rights.  So what happened is the Siegels had

14   termination rights because before 1998 --

15        THE COURT:  No.  Stay with the Schusters.

16        MR. TOBEROFF:  Okay.

17        THE COURT:  All right.  And the Schuster estate

18   will never acquire any termination rights, or will the

19   executor be able to exercise those termination rights?

20        MR. TOBEROFF:  The executor has termination

21   rights.  In 1998, the law changed.  And, previously, only

22   authors and statutory heirs were charged.  By statutory,

23   I mean spouse, children or grandchildren.  That is it.

24   Not siblings.  Then in 1998, they said that is not really

25   fair.  What if you were never married or didn't have any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**71**

1   children.  We are going to give termination rights to the

2   executor administrator of estates if there is no spouse

3   or children.

4           And after 1998, that is the first time there

5   was any possibility of a Schuster termination.  Unlike

6   the Siegels who terminated long before that because they

7   had a spouse and a child that could terminate.  So what

8   do you do, then, when you terminate?  You go to a court

9   which they did, and you said he died, we didn't have

10  enough money to bury him when he died therefore we didn't

11  probate the will.

12          But, now, there is this new right.  So we want

13  to probate the estate for purposes of exercising this new

14  right in the Superior Court of California.  This was duly

15  processed, petition for probate.  They probated, and the

16  will said I nominate, if the estate is probated, I

17  nominate Jean Peavy as the executrix, but if she declines

18  to act, I nominate Warren Peary, my nephew, as executor.

19  And she declined to act because she was 82 at the time,

20  and Warren Peary was nominated the executor.  That is the

21  first time anybody has the rights.  And who has the

22  rights?  Warren Peary, the executor.  He then files

23  termination notices in 2003.

24      THE COURT:  Wait a minute.  Back up.  You see that

25  is the first time when Warren Peary was named the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

1    alternative executor, that is the first time anyone had

2    any rights.

3        MR. TOBEROFF:  Termination rights.  Yes.  Or any

4    rights outside of a $5,000 pension of Frank Schuster.

5        THE COURT:  Well, didn't Jean have those rights

6    before when she was the primary executrix?

7        MR. TOBEROFF:  No, because you become -- you don't

8    become executor or executrix unless there is an estate

9    that is probated.  And I am not a trust and estates

10   lawyer, but my understanding is that when someone says in

11   a will that you will be the executrix, it means if the

12   estate is probated that you will be the executrix.  I

13   don't think she has legal power to sign things as the

14   executrix if there is no estate over which to be an

15   executrix.  It is hard to pronounce that word.

16       THE COURT:  Okay.  I understand.

17       MR. TOBEROFF:  So she didn't -- I don't believe in

18   1998, that is why before termination notice could be

19   served for the Schusters, they would have to probate the

20   will.  And they went to court and said we didn't probate

21   the will before because there were no assets to be really

22   concerned about that don't rise to the level of probating

23   and under a special section for pauper's will, you can

24   just distribute the few assets by sending in a piece of

25   paper in the probate court or Superior Court.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 2
73

1          So once they had this right, they then

2     probated the estate.  We served termination notices in

3     2003.  And from all this time from 2003 to 2010, no

4     one said peep about you can't do this, the 1992

5     agreement.  If DC really believed that this was a bar to

6     termination, wouldn't that be the first thing out of

7     their mouths on getting this termination notice?

8          And when they send a letter to the Schusters

9     trying to settle and telling them if we settle with the

10    Siegels before you, we are not going to settle with you.

11    And we don't agree that this termination is valid.

12    Wouldn't they say remember the 1992 agreement you signed,

13    that bars termination.  They don't say anything about it.

14         This is cooked up now, and I'm sorry to say it

15    is a side show.  Because if you really look at that

16    agreement, your Honor, if a jury looked at that agreement

17    or, I mean, let me put it this way, we are all lawyers

18    here.

19         If you were a lawyer for DC and your intention

20    was to revoke all prior grants from Siegel and Schuster

21    or from Schuster to DC of an important billing or a

22    copyright like Superman, wouldn't you put in the

23    agreement I hereby revoke all prior grants from Joe

24    Schuster to Superman?  Wouldn't you say I cancel those

25    agreements?  Wouldn't you say I rescind those agreements?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**74**

1          You would make it abundantly clear.  You would

2     say we hereby revoke and rescind all prior grants by Joe

3     Schuster of Superman copyrights and including without

4     limitation, the 1938 grants.  And we are hereby

5     regranting those rights.  And you would do it -- that is

6     why they do it.  Not only didn't they do it which casts a

7     great inference that that wasn't the intention of DC, but

8     it was incumbent upon them to do that.

9          And they are bound by the objective

10    manifestations that are intent in this flimsy one page

11    letter.  And I don't believe this is a sound basis to

12    deprive the second half of the copyright of their rights

13    under the copyright act.  And, your Honor, this is a --

14    many think about this case as the seminal case dealing in

15    this area.  First of all, it is dealing with Superman so

16    there is a tremendous amount of interest in the case.

17         And, secondly, it is dealing with a lot of the

18    nuances of a fairly complicated area of law.  There have

19    been law review articles about the Superman case.

20         THE COURT:  Hang on a second.

21         That doesn't matter.  None of that matters.

22    Let's stick with the issues of this tiny little case.

23    That is all I care about.  I don't care what it will do

24    to history.

25         All right.  Have you made your arguments?  You

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**75**

1    have been talking for an hour.

2         MR. TOBEROFF:  And I greatly appreciate you

3    letting me heard, your Honor.  One last argument is that

4    there is talk about New York law, and like I said before,

5    the -- the Ninth Circuit cases that are binding, the

6    Milne case and the Mewborn case, are dealing with

7    copyright act and provision in the copyright act

8    notwithstanding any agreement to the contrary.

9         They don't make, in construing that language,

10   and in construing the narrow exception to that language

11   in the copyright act, they don't make reference to state

12   law.  But even if you do look at New York law, New York

13   law is not different than California law.  In fact, New

14   York law puts more emphasis on the objective

15   manifestation of the parties' intent and doesn't look at

16   extrinsic evidence and after-the-fact rationalizations.

17   They look at the document.  They say if it is not in the

18   document, it is not there.

19        Number two, to find any kind of rescission,

20   revocation or novation under New York law, the parties'

21   intent to cancel and replace a prior agreement has to be

22   unequivocal.  Has to be crystal clear.  Novation will

23   never be presumed, the cases say.

24        Now, there is one case, I believe, cited by DC

25   where they say novation can be express or implied, but in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**76**

1    those cases where they are implied, it is crystal clear

2    from all of the circumstances surrounding the agreement,

3    that the intention was to revoke and replace an old

4    agreement from all of the circumstances.

5            Here, it is the opposite.  It is not

6    unequivocal in this flimsy 1992 agreement, and all of the

7    surrounding circumstances don't show any intent to

8    revoke.  And Levitz's declaration on the subject never

9    mentions that the intent was to revoke, and he signed the

10   agreement.  And the letters show that there was no intent

11   to relinquish termination rights so it is the opposite.

12           One can't find under New York law, an

13   unequivalent intent of both parties to revoke these

14   copyright grants on which DC has long relied.  I submit,

15   your Honor, it is impossible for this document to be the

16   basis of Warner Brothers and DC's chain of title to a

17   billion dollar franchise.  Nobody would let that happen.

18           I know Warner Brother agreements and DC

19   agreements.  When they have somebody assign them

20   copyrights, they have an agreement this thick.  And they

21   attach to it a short form assignment, and that short form

22   assignment is filed with the copyright office to give the

23   word constructive notice of their copyrights.

24           If this revoked all prior Superman grants and

25   replaced it with this, that means this is the basis of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**77**

1    their Superman franchise.  And I submit that that is

2    impossible that companies of this magnitude would have

3    their lawyers draft something like this that their

4    intention was to revoke all prior grants and regrant them

5    the Superman copyrights.  It is an impossibility.

6          THE COURT:  What you suggest is lunacy.  So, okay,

7    I am sure that is not their intent.

8          MR. TOBEROFF:  Then if it is not their intention,

9    they still have the termination right.  I agree with you,

10   your Honor.  It is not their intention.

11          Thank you.

12          THE COURT:  Wrap up?

13          MR. PETROCELLI:  Because of time constraints, your

14   Honor, I am not going to try to respond to a lot of what

15   Mr. Toberoff said.  What I would like to do is just

16   recenter the issue.  When the Schusters served the notice

17   of termination in 2003 for the very first time as

18   Mr. Toberoff described, the Schusters relied solely on

19   Section 304(d) of the copyright statute claiming that

20   that section gave them the right to terminate

21   notwithstanding all the prior history.

22          That section, your Honor, 304(d) specifically

23   states that the right to terminate a copyright interest

24   is only available for copyright grants or agreements

25   before January 1, 1978.  There is no right to terminate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**78**

```
 1    any grants after January 1, 1978.  Nobody disagrees with

 2    that.  Not certainly in the statute, and all the cases

 3    uniformly agree with it.

 4            So, the issue in this case and that is the

 5    subject of the briefing in the court's tentative is

 6    whether in 2003, when the notice of termination was

 7    served, there existed any agreements or grants prior to

 8    January, 1978, or whether the only thing that existed was

 9    after January 1, 1978.

10            So that takes us to 1992.  Because what

11    happened in 1992 is that the parties entered into an

12    agreement, the one you have in front of you which is

13    indisputably governed by New York law where it was made.

14    The defendants acknowledge that New York law applies in

15    prior briefing, and the cases apply state law to

16    interpreting a contract.

17            The issue in this case is not whether that

18    1992 agreement waives a termination right.  The issue is

19    whether that 1992 agreement was intended to and did

20    supersede and replace all prior agreements by the parties

21    and insert in place of those prior agreements a new

22    agreement going forward which we contend it plainly does.

23        THE COURT:  Wait a minute.  Do you say that this

24    1992 letter is in effect a grant of a intellectual

25    property interest?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**79**

1          MR. PETROCELLI:  Correct.  Correct.  And I will

2     walk you through that.  Okay.  And that has been the

3     position that we briefed, that this document does

4     two things.  Okay.  It, number one, replaces and

5     supersedes and gets rid of all the other prior agreements

6     so there can be no further claims whatsoever brought

7     under any prior agreements at all.  And, number two, it

8     establishes new grants going forward.

9          The sole subject matter of the operative

10    paragraph which is the second paragraph is the copyrights

11    of Joe Schuster.  That is the sole subject matter.  The

12    first -- and, again, this is subject to New York law, and

13    New York law says when you enter into an agreement -- and

14    your Honor cites it in the tentative, I won't repeat

15    it -- which supersedes prior agreements, those agreements

16    are gone.  And the second part of this is that there is a

17    new grant going forward which is specific in the second

18    sentence of that first paragraph.

19          That grant of these rights is not subject to

20    termination because it is after January 1, 1978.  And

21    this isn't the first case where this has come up, your

22    Honor.  Take the Steinbeck case.  Elaine Steinbeck

23    entered into a new agreement just like the Schusters in

24    1994 instead of 1992.  She, just like the Schusters, at

25    the time had no termination right.  She did not have any.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**80**

```
 1              The reason she did not have any even though

 2   she was the surviving spouse is because there were adult

 3   children, and the law says you have to have more than

 4   50 percent.  And her children did not want to join with

 5   her.  She only had exactly 50 percent.  And the case

 6   makes clear that she had no right to terminate.

 7       THE COURT:  Well, what rights did Jean Schuster

 8   have to convey to DC?

 9       MR. PETROCELLI:  That is precisely the correct

10   question, your Honor.  And the rights that Jean Schuster

11   had was she stood as the executrix and the sole heir

12   under the will which, prior to this agreement, she had

13   filed papers with the California court.  And we have

14   attached them to -- it is Exhibit 33 to my declaration, a

15   will made out in 1988, June 28, six years, four years

16   earlier where she was named the sole beneficiary and she

17   was also the executrix.

18              And we also cited the law, and defendants

19   don't challenge it, that on the death of the decedent, in

20   this case, Joseph Schuster who died July 30, 1992, even

21   without probate, the rights vest immediately to the sole

22   beneficiary, in this case, Jean.

23       THE COURT:  What rights in Superman does Joe

24   Schuster have in his name?

25       MR. PETROCELLI:  Joe Schuster was a party to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**81**

1    numerous contracts.  Joe Schuster, whatever Joe Schuster

2    had the power to do the day before he died, let's say,

3    now Jean Schuster had the power to do it.

4         The reason why we have an agreement with Jean

5    Schuster is because she, as she had previously told DC in

6    correspondence that is before the court, she said she is

7    the heir.  That is why they are dealing with her.  The

8    only reason they are dealing with her is because she is

9    now Joe's representative.  She is not a party to any

10   pension agreements or any personal agreements.  There was

11   no financial obligation to her whatsoever.

12       THE COURT:  When Joe Schuster died, what rights

13   did he have to Superman?

14       MR. PETROCELLI:  Joe Schuster had copyrights that

15   he had granted, and he had the right to receive money

16   over the years.  And he received that money.  By the time

17   he died, his last contract he made said he wanted his

18   brother, Frank, to get money.

19       Okay.  That is this last agreement that he

20   signed that was in 1975, and that provided for $5,000 a

21   year to brother Frank and zero to anybody else.

22       THE COURT:  But you know my question was, what

23   rights did he have in Superman?

24       MR. PETROCELLI:  He had the right to enter into a

25   new agreement.  He could have entered into a new

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**82**

1  agreement.  And so what this document is is his

2  representative standing in his shoes, made a new

3  agreement.  So if Joe had made this agreement the day

4  before, it would be -- we would be making the identical

5  argument that we are making now which is that his

6  representatives made this agreement.

7          This is not a personal agreement about

8  personal pension claims of Jean Schuster.  She had no

9  personal pension claims.  She had nothing.  This is an

10  agreement that purports to get rid of all prior

11  agreements that Joe Schuster had with DC from the very

12  beginning through the very end and say all that is being

13  superseded now by this.

14          Secondly, it said you now grant to us any such

15  rights.

16      THE COURT:  Okay.  As we have discussed, those

17  rights were the right to receive a few bucks in the

18  pension payment.

19      MR. PETROCELLI:  No.  Here, the rights that are

20  referred to are the rights -- because it says any such

21  rights.  So you have to look to the prior sentence to see

22  what any such rights means.  And the prior sentence, I

23  believe, I don't know exactly what he put in front of

24  you, but I presume it is the copy of this agreement.

25          And the rights are, your Honor, claims to any

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**83**

1    payments or other rights or remedies which you may have

2    under any agreement or otherwise whether now or hereafter

3    existing regarding any copyrights, trademarks or other

4    property right in any or all work created in whole or in

5    part by your brother, Joseph Schuster, or any works based

6    thereon.  So, in any event, you now grant to us any such

7    rights.  In other words --

8         THE COURT:  Okay.  That is why I asked you.  When

9    he died, what rights did Joseph Schuster have in

10   Superman?

11        MR. PETROCELLI:  He had the right, as I

12   indicated -- at the moment of his death?  Or prior to his

13   death?

14        THE COURT:  I want to know what rights passed to

15   Jean as a result of Joe Schuster's death.

16        MR. PETROCELLI:  All of Joe Schuster's powers and

17   rights and ability including to make a new agreement on

18   his behalf.

19        THE COURT:  Okay.

20        MR. PETROCELLI:  And that is what this document

21   is.  In other words, it is not our position, your Honor,

22   that this is a document whereby we were asking Jean to

23   convey her personal rights because she had no personal

24   rights.

25             This is a document that was entered into with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**84**

1  her to convey the rights of Joe Schuster in the

2  copyrights including the right to make a new grant of

3  those copyrights especially given, especially given, that

4  there had been the specific issue raised before this by

5  her and her brother that they might have the ability to

6  reclaim copyrights and terminate interest in the future.

7      THE COURT:  Okay.  Well, I can see why DC would

8  basically want to tear up a clear, unequivocal grant of

9  intellectual property in Superman from 1938.  I can

10  understand why they would tear that up for this ephemeral

11  thing.  That makes a lot of sense to me.

12      MR. PETROCELLI:  By the way, the 1938 agreement

13  itself that this replaces is a 1-page agreement.  It is a

14  simple 1-page grant.  I mean I think that is in the

15  record also.

16      THE COURT:  That is when lawyers could get to the

17  point.  Those were the days.

18      MR. PETROCELLI:  And, remember, they are not

19  dealing with lawyers here, your Honor.

20      THE COURT:  I know.

21      MR. PETROCELLI:  They are dealing with

22  individuals, and they are trying to obviously keep this

23  simplistic.  And the Steinbeck case, the Milne case, they

24  all say when you enter into an agreement -- let me ask

25  the same thing, your Honor, that you just asked me

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**85**

1    applied to in the John Steinbeck case.  Elaine Steinbeck

2    was his representative under his will, and she canceled

3    prior grants and made new grants.  In that case, the

4    language was more specific than it is in this case.

5           And that takes us now to the New York cases on

6    whether or not when the parties make a contract to

7    replace and supersede all prior agreements and replace

8    them with something new, how specific must that be in

9    order for that to be upheld.

10          And we set out those various cases from New

11   York which described that the ultimate test is not

12   whether it is specific or explicit but what the intention

13   of the parties is.  The language, of course, is the most

14   helpful guide to that, but the intention can be implied.

15          The intent we were talking about is the intent

16   to supersede prior agreements and replace them with a new

17   grant.  We are not talking about an intent to waive or

18   relinquish termination.  That is not the operative intent

19   here.  The operative intent which would make this

20   contract a new 1992 agreement going forward is when this

21   contract is over, what do the parties think they have?

22          What the parties think they have is no more

23   prior agreements that Joe entered into, Jean never

24   entered into any agreements with DC.  This wasn't

25   canceling any of Jean's agreements.  Frank never entered

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT 2
86

1   into any agreements with DC. All of this was about, and

2   if you look at the wording, in simple terms, without a

3   lot of legal verbosity, it is extremely all-encompassing

4   and broad. Any and all rights. Any and all claims.

5   Whether now or hereafter existing regarding any

6   copyrights, trademarks or other property right in any and

7   all work. You now grant that to us. You being the only

8   person who has the legal power to grant that to us.

9          So now we have an explicit grant that is after

10  1978, and when Congress came along in 1998 and passed

11  this amendment to the termination law, they did not

12  change this part. They kept the part intact that says

13  your right to terminate only applies to grants and

14  agreements prior to January 1, 1978.

15         So Milne and Steinbeck, both specifically deal

16  with the question, and Steinbeck is most applicable here

17  because Elaine Steinbeck like the Schusters in 1994 had

18  no termination right. But she nonetheless entered into a

19  new grant of rights on behalf of her deceased husband.

20         Milne, we have a new grant of rights in 1983.

21  And so those two are the lead cases, one from the Second

22  Circuit, one from the Ninth Circuit. And they both dealt

23  with specifically the argument that Mr. Toberoff has been

24  advancing whether or not you can make new grants that get

25  rid of old agreements after 1978 and whether that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

1    extinguishes any new termination rights that might come

2    along.  And the court said, yes, it does because Congress

3    could have said something different in the statute if

4    they wanted.  They could have said the right of

5    termination applies to post-1978 grants in these

6    circumstances.  They did not.

7         And, bear in mind here, your Honor, that this

8    says, fully settles all claims and agreements in the past

9    which would include all of his copyright grants that he

10   made in the past.  So it is very clear that the intention

11   here, it is straightforward in the sense that, look, you

12   are coming back to us.  We are going to take care of this

13   once and for all, and, essentially, that is what Paul

14   Levitz testified in that affidavit which is not refuted.

15   Here is the deal, nothing more in the past, and here is

16   where it is going forward.

17        And I want to explain something, your Honor,

18   because it may not have been clear from our papers.

19   Mr. Toberoff says that this is only about the 1975

20   pension agreement.  That was the last document that Joe

21   Schuster signed.  That document said Joe is supposed to

22   get $20,000 a year for the rest of his life.  It turns

23   out they gave him a lot more than that, but on his death

24   it is supposed to go to his brother Frank for Frank's

25   life.  $5,000.  That is addressed in the first paragraph

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**88**

1    here where they decided to increase Frank's lifetime

2    pension to give him more financial security from 5 to 25.

3           And they entered into a separate agreement

4    with Frank on the same day making clear, and that is

5    Exhibit 9 to my -- to Mr. Levitz's declaration making

6    clear that this waives any rights or remedies that he has

7    under the agreement dated December 23, '75 between

8    Warners and Mr. Schuster, Joseph Schuster.

9           So the purpose of Exhibit 9 was to directly

10   get rid of the '75 agreement because that was in an

11   agreement where Frank was named specifically as a third

12   party beneficiary and he could enforce.  So that is the

13   Frank Schuster agreement, Exhibit 9.

14          When you go to the 1992 agreement which is

15   Exhibit 8, this is not about a pension agreement for

16   Frank's benefit.  This is not about any other agreement

17   for Jean's benefit.  This is about Joe Schuster's

18   copyrights.  That is the sole subject matter of the

19   operative paragraph here.  And the reason --

20          THE COURT:  Okay.  Mr. Petrocelli.  All right.  I

21   understand.

22          MR. PETROCELLI:  You got it.

23          THE COURT:  You have made that.

24          All right.  The matter stands submitted.

25   Thank you, counsel.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**

1          MR. PETROCELLI:  Thank you.

2          MR. TOBEROFF:  Thank you.

3       (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**90**

```
 1                          CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  September 10, 2012

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT 2**
**91**

# EXHIBIT 3

# In The Matter Of:

*DC COMICS*

*v.*

*PACIFIC PICTURES CORPORATION*

_____

*TOBEROFF, MARC  - Vol. 1*

*September 18, 2012*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT 3**
**92**

MARC  TOBEROFF – 9/18/2012

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DC COMICS,                      )
                                )
            Plaintiff,          )No.
                                )CV-10-3633 ODW (RZx)
        VS.                     )
                                )
PACIFIC PICTURES CORPORATION,)
IP WORLDWIDE, LLC, IPW, LLC, )
MARC TOBEROFF, an individual,)
Laura Siegel Larson, as         )
personal representative of   )
the ESTATE OF JOSEPH SHUSTER,)
JEAN ADELE PEAVY, an            )
individual, JOANNE SIEGEL,   )
an individual, LAURA SIEGEL   )
LARSON, an individual, and   )
DOES 1-10, inclusive,           )
                                )
            Defendants.         )
                                )
            _____)




VIDEOTAPED DEPOSITION OF MARC TOBEROFF

TAKEN ON

TUESDAY, SEPTEMBER 18, 2012




Reported by:  SHANDA GABRIEL

CSR No. 10094


Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

**EXHIBIT 3**
**93**

MARC   TOBEROFF - 9/18/2012

Page 2

```
 1            Videotaped deposition of MARC TOBEROFF,

 2    taken on behalf of the Plaintiff, at 1999 Avenue of

 3    the Stars, Los Angeles, California, commencing at

 4    9:25 a.m., TUESDAY, SEPTEMBER 18, 2012, before

 5    SHANDA GABRIEL, CSR No. 10094.

 6

 7    APPEARANCES:

 8    FOR THE PLAINTIFF:

 9            O'MELVENY & MYERS LLP

10            BY:  DANIEL M. PETROCELLI, ESQ.

11                 JASON TOKORO, ESQ.

12            1999 Avenue of the Stars

13            7th Floor

14            Los Angeles, California  90067-6035

15            (310) 553-6700

16                                                   09:25:49
      FOR THE TOBEROFF ENTITY DEFENDANTS and MARC
17    TOBEROFF:                                      09:25:49

18
              KENDALL BRILL & KLIEGER LLP
19
              BY:  RICHARD B. KENDALL, ESQ.
20
              10100 Santa Monica Boulevard
21
              Suite 1725
22
              Los Angeles, California 90067
23
              (310) 556-2700
24

25    ALSO PRESENT:  FRITZ SPERBERG, VIDEOGRAPHER
```

**EXHIBIT 3**
**94**

MARC  TOBEROFF - 9/18/2012

Page 3

```
 1
                          I N D E X
 2
 3   WITNESS              EXAMINATION              PAGE
 4   MARC TOBEROFF       (BY MR. PETROCELLI)         6
 5
 6
 7                      E X H I B I T S
 8   NO.            PAGE      DESCRIPTION
 9   Exhibit 100     120      Incoming/Outgoing Call
                              Register
10
     Exhibit 101     127      E-mail dated November 17,
11                            2001 to Michael from Marc
                              Toberoff
12
     Exhibit 102     152      Renner, Otto Pre-bill
13                            worksheet
14   Exhibit 103     266      October 3, 2004 letter to
                              Joanne and Laura Siegel
15                            re: Engagement for
                              Professional Services
16
     Exhibit 104     287      Incoming/Outgoing Call
17                            Register
18   Exhibit 105     303      July 11, 2003 letter to
                              Michael from Laura
19
     Exhibit 106     304      July 5, 2003 Fax
20                            Transmittal to Marc
                              Toberoff from Laura Siegel
21                            Larson
22   Exhibit 107     304      July 8, 2003 Fax
                              Transmittal to Marc
23                            Toberoff from Laura Siegel
                              Larson
24
25
```

**EXHIBIT 3**

**95**

MARC  TOBEROFF - 9/18/2012

Page 4

```
 1                    I N D E X (CONTINUED)

 2

 3              PREVIOUSLY MARKED EXHIBITS

 4              EXHIBIT NUMBER    PAGE
                       9          99
 5                    10          97
                      11         246
 6                    13         225
                      20         262
 7                    21         262
                      60         281
 8                    61         285
                      75         209
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MARC TOBEROFF - 9/18/2012

Page 5

```
 1                  LOS ANGELES, CALIFORNIA;

 2                TUESDAY, SEPTEMBER 18, 2012

 3                       9:25 A.M.

 4

 5           THE REPORTER:  I am making the following

 6    statements pursuant to Rule 30(b)(5) of the Federal

 7    Rules of Civil Procedure:

 8           My name is Shanda Gabriel, C.S.R. 10094,

 9    the videographer is Fritz Sperberg, both contracted

10    by Merrill Corporation, 20750 Ventura Boulevard,

11    Suite 205, Woodland Hills, California.

12           Today's date is September 18, 2012, the

13    time is 9:25 a.m. and this deposition is being held

14    at 1999 Avenue of the Stars, Los Angeles,

15    California.

16           Would counsel please state your appearances

17    and whom you represent:                              09:25:39

18           MR. PETROCELLI:  Daniel Petrocelli for       09:25:39

19    plaintiff, DC Comics.                                09:25:40

20           MR. TOKORO:  Jason Tokoro for plaintiff, DC  09:25:42

21    Comics.                                              09:25:44

22           MR. KENDALL:  Richard Kendall on behalf of   09:25:44

23    the Toberoff entity defendants and Marc Toberoff.    09:25:47

24           THE REPORTER:  The witness is Marc

25    Toberoff.
```

**EXHIBIT 3**

**97**

MARC  TOBEROFF - 9/18/2012

Page 6

```
 1              Would you please raise your right hand to
 2      be sworn in.
 3                        MARC TOBEROFF,
 4              having been first duly sworn, was
 5              examined and testified as follows:
 6
 7                        EXAMINATION
 8      BY MR. PETROCELLI:
 9         Q.  I will address you as Mr. Toberoff for the        09:26:02
10      purpose of the deposition, if that's all right with     09:26:06
11      you.                                                     09:26:08
12         A.  I won't be offended.                             09:26:08
13         Q.  Can you tell us what your educational            09:26:11
14      background is?                                           09:26:15
15         A.  I went to -- starting with what, college?        09:26:16
16         Q.  Yeah.                                             09:26:16
17         A.  I went to McGill University, and then in my      09:26:22
18      third year I transferred to Princeton, and then I       09:26:28
19      didn't -- I missed my girlfriend, essentially, and      09:26:37
20      transferred -- decided to go back to McGill and         09:26:41
21      graduated from McGill after being at Princeton, I       09:26:45
22      think, for -- between a half a year and a year.  I'm    09:26:47
23      not sure.                                               09:26:51
24         Q.  What year did you graduate?                      09:26:51
25         A.  In 1977.                                         09:26:53
```

MARC  TOBEROFF - 9/18/2012

Page 7

```
 1          Q.   And --                                    09:26:57
 2          A.   And then I went to Columbia University    09:26:57
 3    School of Law.                                       09:27:00
 4          Q.   Immediately thereafter?                   09:27:01
 5          A.   Yeah.                                      09:27:02
 6          Q.   And when did you graduate?                09:27:03
 7          A.   In 1980.                                  09:27:05
 8          Q.   '80?  And then what did you do after you  09:27:07
 9    graduated from Columbia Law School?                  09:27:11
10          A.   I worked at a big law firm, Kelley Drye & 09:27:13
11    Warren.                                              09:27:19
12          Q.   Where?                                    09:27:20
13          A.   In New York, Park Avenue.                 09:27:22
14          Q.   From when to when?                        09:27:23
15          A.   I think it was approximately a year.  I   09:27:26
16    don't -- I don't recall the time span.               09:27:28
17          Q.   And what did you do there?                09:27:33
18          A.   General litigation.                       09:27:35
19          Q.   Thereafter?                               09:27:37
20          A.   Thereafter, I believe I worked at a firm  09:27:40
21    called Beldock Levine & Hoffman, an entertainment    09:27:48
22    firm that did mostly music.                          09:27:53
23          Q.   What's the second name?                   09:27:55
24          A.   Levine.                                   09:27:56
25          Q.   Levine?  Where was that located?          09:27:57
```

MARC  TOBEROFF - 9/18/2012

Page 8

| | | |
|---|---|---|
| 1 | A.  In Manhattan. | 09:27:58 |
| 2 | Q.  Okay. | 09:28:01 |
| 3 | A.  On -- in the 40s or 50s somewhere off -- | 09:28:01 |
| 4 | between Madison and Park, I believe. | 09:28:06 |
| 5 | Q.  Were you a litigator there? | 09:28:09 |
| 6 | A.  No.  That was more of a transactional | 09:28:11 |
| 7 | entertainment firm, although they handled some | 09:28:13 |
| 8 | litigation and I participated in some. | 09:28:17 |
| 9 | Q.  How long were you there? | 09:28:22 |
| 10 | A.  I -- I don't -- couldn't tell you. | 09:28:26 |
| 11 | Q.  Approximately when did you leave? | 09:28:29 |
| 12 | A.  I think it was approximately a year. | 09:28:29 |
| 13 | Q.  One year? | 09:28:32 |
| 14 | A.  Could -- could be -- could be less.  Could | 09:28:34 |
| 15 | be a little more, could be a little less. | 09:28:37 |
| 16 | Q.  And thereafter? | 09:28:39 |
| 17 | A.  And then I worked at another entertainment | 09:28:41 |
| 18 | firm called Levine & Thall. | 09:28:45 |
| 19 | Q.  How do you spell the second name? | 09:28:48 |
| 20 | A.  T-h-a-l-l. | 09:28:50 |
| 21 | Q.  In Manhattan? | 09:28:54 |
| 22 | A.  Yes, that was on Madison Avenue, I believe. | 09:28:56 |
| 23 | Q.  What did you do there? | 09:28:58 |
| 24 | A.  That -- they had a transactional practice, | 09:29:00 |
| 25 | no litigation.  It was more entertainment contracts | 09:29:03 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 3
100

MARC  TOBEROFF - 9/18/2012

```
 1   with an emphasis on music.                         09:29:07

 2        Q.   How long were you there?                 09:29:10

 3        A.   Again, I don't -- the time span,         09:29:11

 4   approximately a year.  Could be less.              09:29:16

 5        Q.   What did you do next?                     09:29:21

 6        A.   Then I worked for a director named Robert 09:29:23

 7   Altman, film director.                             09:29:30

 8        Q.   Where?                                    09:29:34

 9        A.   In New York.                              09:29:36

10        Q.   What did you do for Mr. Altman?           09:29:38

11        A.   I was a glorified gopher.                 09:29:44

12        Q.   You were not practicing law during that  09:29:47

13   time period?                                       09:29:49

14        A.   No, I was just handling just sort of all 09:29:49

15   sorts of business, quasi, legal, just like I said, 09:29:53

16   glorified gopher.                                  09:30:01

17        Q.   How long were you doing that?            09:30:02

18        A.   I think I had a title but --             09:30:04

19        Q.   What was it?                             09:30:06

20        A.   -- I viewed myself --                    09:30:06

21        Q.   You don't remember?                      09:30:07

22        A.   I viewed myself as a glorified gopher.   09:30:08

23        Q.   Okay.  How long did you work for         09:30:11

24   Mr. Altman?                                        09:30:12

25        A.   That wasn't -- it was about six months, I 09:30:13
```

MARC   TOBEROFF - 9/18/2012

| | | |
|---|---|---|
| 1 | think. | 09:30:17 |
| 2 | Q.  And then what? | 09:30:18 |
| 3 | A.  And then I -- and I'm not sure whether the | 09:30:21 |
| 4 | Altman was in between one of the legal jobs that I | 09:30:24 |
| 5 | mentioned or after. | 09:30:29 |
| 6 | And then I worked for a film producer by | 09:30:34 |
| 7 | the name of Elliott Kastner, who -- I started an | 09:30:39 |
| 8 | office for him in New York. | 09:30:43 |
| 9 | Q.  What did you do for Elliott Kastner? | 09:30:45 |
| 10 | A.  That was -- you know, I call that a | 09:30:51 |
| 11 | glorified gopher position also, but I think I was -- | 09:30:53 |
| 12 | had more responsibilities there.  It was more | 09:30:57 |
| 13 | defined.  A New York office.  Advised him on | 09:31:01 |
| 14 | business and legal issues and worked on development | 09:31:07 |
| 15 | of new film products.  He was a real producer.  He | 09:31:15 |
| 16 | had produced about 60 movies with all the big stars. | 09:31:19 |
| 17 | Q.  How long did you work for Mr. Kastner? | 09:31:24 |
| 18 | A.  My recollection is hazy, but it was four | 09:31:27 |
| 19 | years, four, five years, four years, something in | 09:31:32 |
| 20 | that area.  I don't think as much as five, maybe | 09:31:34 |
| 21 | four is a good number. | 09:31:37 |
| 22 | Q.  Was that the last job you had in New York | 09:31:38 |
| 23 | before moving to California? | 09:31:41 |
| 24 | A.  Yes. | 09:31:42 |
| 25 | Q.  What films did you work on while you were | 09:31:44 |

MARC  TOBEROFF - 9/18/2012

Page 11

| | | |
|---|---|---|
| 1 | with Mr. Kastner during the four years? | 09:31:46 |
| 2 | MR. KENDALL:  Overbroad.  Vague and | 09:31:51 |
| 3 | ambiguous. | 09:31:53 |
| 4 | THE WITNESS:  We were shooting -- I think | 09:31:53 |
| 5 | the first film that was in production was a film | 09:31:58 |
| 6 | with Sidney Lumet directing called Garbo Talks, and | 09:32:00 |
| 7 | then after that, we did a film in New York called -- | 09:32:04 |
| 8 | it was either called Falling Angel or the basis for | 09:32:15 |
| 9 | it was Falling Angel, Alan Parker directing, Robert | 09:32:18 |
| 10 | De Niro and Lisa Bonet. | 09:32:24 |
| 11 | And then in the interim there was a film | 09:32:27 |
| 12 | that we did as more of an independent film called | 09:32:31 |
| 13 | Oxford Blues, and we did a little film called Class | 09:32:36 |
| 14 | of Zombie High.  Probably a couple others.  I can't | 09:32:42 |
| 15 | recall. | 09:32:49 |
| 16 | Q.  After working with Mr. Kastner, what did | 09:32:51 |
| 17 | you do? | 09:32:55 |
| 18 | A.  I -- I moved out to California. | 09:32:57 |
| 19 | Q.  And did you begin employment? | 09:33:02 |
| 20 | A.  No. | 09:33:04 |
| 21 | Q.  How long were you in California? | 09:33:06 |
| 22 | A.  I was self-  -- I was self-employed. | 09:33:08 |
| 23 | Q.  Self-employed?  As what? | 09:33:09 |
| 24 | A.  As a -- I was interested in breaking into | 09:33:11 |
| 25 | the film business and producing films.  And -- | 09:33:15 |

EXHIBIT 3
103

MARC  TOBEROFF - 9/18/2012

Page 12

| | | |
|---|---|---|
| 1 | Q.  What years are we talking about?  Sorry. | 09:33:18 |
| 2 | A.  And -- and if -- if I wasn't able to | 09:33:20 |
| 3 | generate an income in a certain period of time, I | 09:33:29 |
| 4 | would have to get a job. | 09:33:31 |
| 5 | Q.  What years are we talking about now? | 09:33:34 |
| 6 | A.  Probably -- | 09:33:37 |
| 7 | Q.  Late '80s? | 09:33:38 |
| 8 | A.  No, no, I moved out -- I think I've been in | 09:33:39 |
| 9 | California some -- between around 16 years, 15, 16 | 09:33:41 |
| 10 | years. | 09:33:48 |
| 11 | Q.  So -- so we're talking early '90s? | 09:33:51 |
| 12 | A.  I think mid-'90s. | 09:33:54 |
| 13 | Q.  Mid-'90s?  Okay. | 09:33:57 |
| 14 | A.  But I'm not sure. | 09:33:59 |
| 15 | Q.  Were you self-employed as a lawyer or were | 09:34:02 |
| 16 | you self-employed as a person trying to make it in | 09:34:09 |
| 17 | the entertainment industry outside of the practice | 09:34:14 |
| 18 | of law? | 09:34:15 |
| 19 | A.  I believe I was self- -- my focus, | 09:34:16 |
| 20 | initially my focus was on trying to produce films. | 09:34:23 |
| 21 | Q.  And -- | 09:34:28 |
| 22 | A.  And I had some projects, some scripts that | 09:34:29 |
| 23 | I was developing and pitching around town as an | 09:34:33 |
| 24 | independent producer. | 09:34:38 |
| 25 | Q.  Where were you officed? | 09:34:39 |

**EXHIBIT 3**
**104**

MARC   TOBEROFF - 9/18/2012

Page 13

```
 1        A.   In the -- at home.                            09:34:40

 2        Q.   Some -- somewhere in West L.A.?               09:34:44

 3        A.   Well, I rented a house in Bel Air in lower    09:34:46

 4   Beverly Glen.                                           09:34:53

 5        Q.   Okay.                                         09:34:54

 6        A.   And the house had a separate sort of guest    09:34:55

 7   house or a pool house, which I converted into an        09:35:00

 8   office, and so that's how I went to work.  I went --    09:35:02

 9   went downstairs into the garden and that was my         09:35:04

10   office.                                                 09:35:07

11        Q.   So for how long --                            09:35:08

12        A.   And I kept regular business hours, you        09:35:09

13   know, like somebody going to a regular office.          09:35:11

14        Q.   How long did you carry out that activity      09:35:14

15   where you were focusing on being a film producer?       09:35:18

16             MR. KENDALL:  I'm going to object to that     09:35:26

17   as vague and ambiguous.                                 09:35:28

18             THE WITNESS:  Couple years.  Year --          09:35:32

19   coup- -- couple years, year and a half.  I'd say a      09:35:38

20   couple years.                                           09:35:42

21   BY MR. PETROCELLI:                                      09:35:42

22        Q.   Then -- did you then undertake to do          09:35:45

23   something different?                                    09:35:49

24        A.   I had a -- I don't know if I would use the    09:35:57

25   word "undertake."  In other words, one's career         09:36:04
```

MARC  TOBEROFF - 9/18/2012

Page 14

```
 1    evolves or morphs, due to things you choose to do,        09:36:09
 2    due to opportunities that present themselves, so I        09:36:14
 3    don't know if there was like a plan where I'm             09:36:16
 4    saying, "Now I'm going to stop doing this and start       09:36:18
 5    doing this," but there was a -- I got involved with       09:36:21
 6    an intellectual property matter that was -- quickly       09:36:25
 7    became a legal matter and -- in which I was able to       09:36:31
 8    achieve a settlement.                                     09:36:37
 9         Q.  Is that a matter in which you had a client       09:36:41
10    or a matter in which you were the principal or both?      09:36:44
11         A.  I believe he was a client.                       09:36:51
12         Q.  Was that -- what was the nature of that          09:36:55
13    matter?                                                   09:36:57
14         MR. KENDALL:  I'll caution you to keep your          09:36:58
15    answer very, very general so as not to reveal any         09:37:00
16    confidential attorney-client information.                 09:37:04
17         THE WITNESS:  The nature of the matter was           09:37:07
18    a gentleman who is the son of a famous writer who         09:37:11
19    had -- had done all sorts of interesting things,          09:37:21
20    like wrote movies for the Marx Brothers, and what I       09:37:28
21    focused on were his rights in a TV series called          09:37:33
22    Combat!, which is an old World War II series              09:37:36
23    starting Vic Morrow.                                      09:37:42
24    BY MR. PETROCELLI:                                        09:37:43
25         Q.  Starting with that matter -- well, what did      09:37:43
```

**EXHIBIT 3**

**106**

MARC   TOBEROFF - 9/18/2012

Page 15

```
 1    you do after that matter was concluded?          09:37:48

 2         A.  I didn't have to get a job.              09:37:52

 3         Q.  Because?                                 09:37:55

 4         A.  Because we settled the case.  We         09:37:55

 5    achieved -- we achieved a settlement, which in those   09:38:01

 6    days from me was an enormous amount of money and I     09:38:05

 7    didn't have to get a job, and so --                    09:38:09

 8         Q.  Did that -- I'm sorry.                    09:38:11

 9         A.  And that kind of galvanized a focus on    09:38:13

10    intellectual property.                            09:38:17

11         Q.  Did that matter involve copyright        09:38:20

12    termination issues?                               09:38:23

13         A.  No.                                      09:38:24

14         Q.  Okay.  Did -- so when you began to work  09:38:25

15    again, was it with the focus on intellectual      09:38:30

16    property?                                         09:38:34

17         A.  I -- I -- to me that galvanized my interest   09:38:34

18    in intellectual property as a valuable component of    09:38:42

19    the entertainment industry.                       09:38:54

20         Q.  At some point in time did you go back to  09:38:55

21    work again for yourself or for --                 09:38:58

22         A.  I was always working.  It was for myself.  09:39:01

23         Q.  Well, I thought I heard you say you didn't  09:39:03

24    have to get a job.                                09:39:05

25         A.  That's right.  I --                      09:39:07
```

EXHIBIT 3
107

MARC   TOBEROFF - 9/18/2012

Page 16

```
 1        Q.  You meant for another person?              09:39:09

 2        A.  I could afford to continue to work for     09:39:10

 3   myself, to be self-employed.                        09:39:12

 4        Q.  Okay.  So --                               09:39:13

 5        A.  I've always worked.  I'm a workaholic.     09:39:15

 6   When I say "get a job," I don't mean, you know, go  09:39:18

 7   surfing.                                            09:39:21

 8        Q.  Right.                                     09:39:21

 9        A.  I mean not to have to work for a boss but I 09:39:22

10   could be my own boss.                               09:39:24

11        Q.  So can you generally then describe the     09:39:26

12   nature of your self-employment from that point      09:39:31

13   forward?                                            09:39:35

14        A.  After that case which resulted in a, you   09:39:35

15   know, legal settlement agreement, I began focusing  09:39:39

16   more on intellectual property, and starting with    09:39:46

17   what was the relevant legal aspect of that case,    09:39:50

18   which was separated rights under the Writers Guild  09:39:56

19   collectively bargaining agreement.                  09:40:02

20        Q.  That was the issue in the Combat! case?    09:40:04

21        A.  That was the issue in the Combat! case     09:40:06

22   where, although he had a contract which purported to 09:40:08

23   waive his separated rights and that was the position 09:40:14

24   ABC Cap Cities took.  You had a contract that       09:40:16

25   purported to waive those rights, you couldn't waive 09:40:21
```

**EXHIBIT 3**
**108**

MARC   TOBEROFF - 9/18/2012

Page 17

| | | |
|---|---|---|
| 1 | those rights.  And, in fact, the Writers Guild | 09:40:24 |
| 2 | collective bargaining agreement acted as an | 09:40:26 |
| 3 | invisible agreement that superseded terms of the | 09:40:30 |
| 4 | writers' employment agreement to the extent they | 09:40:34 |
| 5 | were less favorable than the terms of the Writers | 09:40:35 |
| 6 | Guild agreement. | 09:40:40 |
| 7 | And -- and that to me was a very | 09:40:40 |
| 8 | interesting dynamic, because every -- I believe | 09:40:42 |
| 9 | everybody was referring to their employment | 09:40:47 |
| 10 | agreement to understand their rights, and there was | 09:40:53 |
| 11 | this collective bargaining agreement out there that | 09:40:55 |
| 12 | really superseded it. | 09:40:58 |
| 13 | And so after that, I started working a | 09:41:00 |
| 14 | great deal in the area of Writers Guild, rights | 09:41:04 |
| 15 | under the Writers Guild agreement, separated rights, | 09:41:08 |
| 16 | collectively bargaining, that type of thing. | 09:41:12 |
| 17 | Q.   During this time -- first of all, in the | 09:41:13 |
| 18 | meantime had you become licensed as a lawyer in the | 09:41:18 |
| 19 | state of California? | 09:41:20 |
| 20 | A.   I -- when I moved out here, I took the bar | 09:41:20 |
| 21 | pretty quickly.  I remember studying for the bar.  I | 09:41:28 |
| 22 | don't remember the year.  I should have checked that | 09:41:33 |
| 23 | before the deposition but I didn't. | 09:41:35 |
| 24 | Q.   When you began this work -- | 09:41:42 |
| 25 | A.   I know -- I know I took the bar when I was | 09:41:46 |

MARC  TOBEROFF - 9/18/2012

Page 18

```
 1    in that particular house in Beverly Glen.              09:41:50

 2         Q.  You did?                                      09:41:52

 3         A.  Yeah.                                         09:41:53

 4         Q.  Okay.                                         09:41:53

 5         A.  Because I remember studying it -- for it in   09:41:53

 6    that house.                                            09:41:57

 7         Q.  Okay.                                         09:41:57

 8         A.  I have a funny story to tell but I won't --   09:41:58

 9         Q.  Maybe at a break.                             09:42:00

10         A.  -- use up your time.                          09:42:01

11              MR. KENDALL:  I'm just going to caution you  09:42:03

12    to answer the questions.  Save the comments for        09:42:05

13    another time.                                          09:42:08

14              THE WITNESS:  Okay.                          09:42:08

15    BY MR. PETROCELLI:                                     09:42:08

16         Q.  The -- around this time period when you       09:42:09

17    began to work for yourself with the focus on IP,       09:42:15

18    starting with this matter involving the Combat! show   09:42:22

19    and then continuing thereafter, did you form any       09:42:25

20    entities through which you functioned?                 09:42:30

21              MR. KENDALL:  Vague and ambiguous.           09:42:35

22              THE WITNESS:  I'm not sure if the question   09:42:37

23    is did I form entities -- no.  I don't believe --      09:42:42

24    BY MR. PETROCELLI:                                     09:42:47

25         Q.  In other words, you were working without a    09:42:47
```

EXHIBIT 3
110

MARC  TOBEROFF - 9/18/2012

Page 19

| | |
|---|---|
| 1  loan-out company or some other company that -- with | 09:42:54 |
| 2  which you were affiliated? | 09:42:56 |
| 3       MR. KENDALL:  Vague and ambiguous. | 09:42:58 |
| 4       THE WITNESS:  I wasn't -- I had a company | 09:42:59 |
| 5  which I had incorporated in the mid to late '80s | 09:43:09 |
| 6  when I was in New York. | 09:43:15 |
| 7  BY MR. PETROCELLI: | 09:43:15 |
| 8       Q.  Which company was that? | 09:43:17 |
| 9       A.  Pacific Pictures Corporation or Pacific | 09:43:17 |
| 10  Pictures Corp., period, I think is the proper name. | 09:43:21 |
| 11  I'm not sure. | 09:43:23 |
| 12       Q.  And is that the same Pacific Pictures Corp. | 09:43:23 |
| 13  that was a named party in this case? | 09:43:25 |
| 14       A.  Yes. | 09:43:28 |
| 15       Q.  Okay.  And that company no longer exists, | 09:43:29 |
| 16  was dissolved at some point? | 09:43:33 |
| 17       A.  Correct. | 09:43:34 |
| 18       Q.  And you're the legal successor to it? | 09:43:35 |
| 19       A.  Yes. | 09:43:38 |
| 20       Q.  When -- when did it dissolve? | 09:43:39 |
| 21       A.  I believe that it was dissolved, initially | 09:43:45 |
| 22  dissolved by the Secretary of State. | 09:43:53 |
| 23       Q.  For California or New York? | 09:43:57 |
| 24       A.  I think when -- I wasn't using it, and my | 09:43:59 |
| 25  memory is hazy about this so I'll do the best I can. | 09:44:08 |

MARC  TOBEROFF - 9/18/2012

Page 20

```
 1              I think I wasn't using it, and my          09:44:12

 2    accountant said that you don't need to pay, you      09:44:13

 3    know, New York -- you know, if you're using it you   09:44:17

 4    have to pay New York taxes and California taxes, so  09:44:19

 5    I wasn't using it for that reason, and the New York  09:44:26

 6    State just dissolved it.                             09:44:27

 7              And then I believe that I revived the      09:44:35

 8    company, I revived the company, and then after, I    09:44:36

 9    dissolved the company after reviving it.             09:44:21

10        Q.  Do you know when you revived it?             09:44:24

11        A.  It's hazy.  I may -- I may have revived      09:44:26

12    it -- I think I revived it prior to entering into    09:44:32

13    forming another company called IPW.                  09:44:37

14        Q.  Had you revived it prior to the time of      09:44:40

15    entering into the November 2001 agreement with the   09:44:43

16    Shusters?                                            09:44:51

17        A.  I -- I don't know if it had to be revived,   09:44:51

18    then.  I'm not sure.                                 09:45:01

19        Q.  What was the name of your accountant at the  09:45:02

20    time?                                                09:45:05

21        A.  I don't know.                                09:45:05

22        Q.  You don't remember?                          09:45:06

23        A.  Not at all.                                  09:45:07

24        Q.  Is it the same accountant you have today?    09:45:09

25        A.  No.                                          09:45:10
```

MARC   TOBEROFF - 9/18/2012

Page 21

```
 1        Q.  Other than Pacific Pictures Corp., did you        09:45:15

 2   form any other entities through which you did any          09:45:19

 3   kind of business?                                          09:45:22

 4        A.  No, that was --                                   09:45:24

 5            MR. KENDALL:  Wait, wait.  Just a minute.         09:45:24

 6   Lacks foundation as to time.                               09:45:26

 7            THE WITNESS:  That was it.                         09:45:28

 8   BY MR. PETROCELLI:                                         09:45:28

 9        Q.  Okay.  Are you still involved in the same         09:45:30

10   type of self-employment that you were going back to       09:45:40

11   your time on the Combat! matter and the focus on IP?      09:45:44

12   Is that fair to say you've been doing the same kind       09:45:49

13   of thing ever since to the present?                        09:45:52

14            MR. KENDALL:  Vague and ambiguous.               09:45:53

15   Overbroad --                                               09:45:53

16            THE WITNESS:  I wouldn't say that.                09:45:54

17            MR. KENDALL:  Now, you need to wait a beat        09:45:55

18   so that I can make objections.                             09:45:56

19            THE WITNESS:  Sorry.                              09:45:58

20   BY MR. PETROCELLI:                                         09:45:58

21        Q.  You may answer.                                   09:46:03

22        A.  I wouldn't say that, no.                          09:46:04

23        Q.  Did there come a time when the nature of         09:46:07

24   your work changed?                                         09:46:10

25        A.  Yes.                                              09:46:10
```

```
 1        Q.   When was that?                              09:46:11

 2        A.   It was -- started to change when I had the  09:46:14

 3   Dukes of Hazard case.                                 09:46:20

 4        Q.   Do you know what year that was?             09:46:21

 5        A.   2005, 2004.  I should say it started to     09:46:22

 6   change when we filed the Superman action on behalf    09:46:29

 7   of the Siegels, it was November of 2004, and then in  09:46:33

 8   2005 we had the Dukes of Hazard case and then after   09:46:36

 9   that, my business became primarily litigation.  You   09:46:41

10   know, I would say -- yeah, primarily litigation.      09:46:52

11        Q.   Is that true today?                         09:46:57

12        A.   Yes.                                         09:46:58

13        Q.   And you still are engaged in some part of   09:46:59

14   business that consists of entrepreneurial activity    09:47:03

15   in the entertainment business?                        09:47:07

16            MR. KENDALL:  Vague and ambiguous.           09:47:08

17            THE WITNESS:  I would say so, yes.            09:47:09

18   BY MR. PETROCELLI:                                    09:47:09

19        Q.   Do you currently conduct that part of your  09:47:13

20   business through some entity?                         09:47:17

21        A.   It depends on the circumstance.             09:47:26

22        Q.   What companies or entities, whether they be 09:47:30

23   corporations, partnerships, limited liability        09:47:35

24   companies, have you utilized over the years other     09:47:37

25   than Pacific Pictures Corp. about which you've        09:47:45
```

MARC   TOBEROFF - 9/18/2012

Page 23

```
 1    already testified?                              09:47:47
 2         A.  I have --                              09:47:48
 3              MR. KENDALL:  Wait just a minute.     09:47:48
 4              Vague and ambiguous.  Overbroad.      09:47:49
 5              THE WITNESS:  I have a company called IPW,  09:47:52
 6    LLC.  That's the name of the company.  It's not --  09:48:01
 7    BY MR. PETROCELLI:                              09:48:04
 8         Q.  Still have it?                         09:48:05
 9         A.  I -- yes.                              09:48:05
10         Q.  Okay.                                  09:48:07
11         A.  And I have another company called IP  09:48:11
12    Management.                                     09:48:14
13         Q.  And you also have an entity through which  09:48:20
14    you practice law?                               09:48:25
15         A.  Yes, Toberoff & Associates.           09:48:26
16         Q.  Is that a --                           09:48:30
17         A.  PC.                                    09:48:31
18         Q.  An LLC?                                09:48:31
19         A.  No, it's a professional corporation.  09:48:32
20         Q.  Professional corporation.  Okay.      09:48:34
21              Are those the only three entities through  09:48:37
22    which you currently do business?               09:48:38
23         A.  I would say so, yes.                   09:48:49
24         Q.  And are you the sole --               09:48:51
25         A.  And I don't know if I currently do business  09:48:52
```

MARC  TOBEROFF - 9/18/2012

Page 24

```
 1    through those entities.  I do business through        09:48:55
 2    Toberoff & Associates.  I don't know if you would     09:49:02
 3    say I'm doing business through IPW.  And IP           09:49:04
 4    Management is -- is -- is rare.                       09:49:08
 5         Q.   What is IP Management?                      09:49:13
 6         A.   It's a company that I had, I don't remember 09:49:14
 7    what the original reason was for incorporating it,    09:49:20
 8    but I just kept it.  And IP Management is a -- is      09:49:23
 9    a -- is a -- not a very active company.               09:49:26
10         Q.   It's a California corporation?              09:49:32
11         A.   Yeah.                                       09:49:33
12         Q.   Are you the sole shareholder?              09:49:34
13         A.   Yes.  Yeah, I believe so.                   09:49:36
14         Q.   And IPW, what is it?                        09:49:38
15         A.   It's an LLC.                                09:49:41
16         Q.   Are you the sole member?                    09:49:45
17         A.   No, there are two members.                  09:49:45
18         Q.   The other one -- are you one of them?       09:49:47
19         A.   Yes.                                        09:49:49
20         Q.   And the other is whom?                      09:49:49
21         A.   Bruce Karsh.                                09:49:50
22         Q.   K-a-r-s-h?                                  09:49:52
23         A.   K-a-r-s-h, correct.                         09:49:54
24         Q.   And you're the sole member of Toberoff &    09:49:56
25    Associates?                                           09:50:04
```

MARC  TOBEROFF - 9/18/2012

Page 25

```
 1        A.   It's not -- it's -- I'm the sole          09:50:04

 2   shareholder.                                        09:50:08

 3        Q.   Sole shareholder.  Okay.                  09:50:08

 4             Other than IPW, IP Management, Toberoff & 09:50:11

 5   Associates and Pacific Pictures, are there any      09:50:16

 6   entities, other entities with which you have been   09:50:18

 7   affiliated in any of your business activities since 09:50:22

 8   the time you came to California?                    09:50:25

 9             MR. KENDALL:  Vague and ambiguous.        09:50:26

10             THE WITNESS:  What do you mean            09:50:28

11   "affiliated"?                                       09:50:30

12   BY MR. PETROCELLI:                                  09:50:30

13        Q.   You know, a partner of, an owner of, a    09:50:31

14   member of?                                          09:50:33

15             MR. KENDALL:  Vague and ambiguous.        09:50:38

16             THE WITNESS:  IP Worldwide, LLC.          09:50:38

17   BY MR. PETROCELLI:                                  09:50:38

18        Q.   Any others?                               09:50:44

19             MR. KENDALL:  Vague and ambiguous.        09:50:49

20             THE WITNESS:  I -- not that I -- there -- 09:50:50

21   I've been in situations where you need to           09:51:00

22   incorporate a company to do -- to make a movie      09:51:03

23   for -- I'm not sure what the reasons are.  It could 09:51:13

24   be a Guild reason, for one of the guilds, and they  09:51:15

25   don't accept this kind of company but they will     09:51:19
```

MARC  TOBEROFF - 9/18/2012

Page 26

```
 1    accept a corporation.  There are various Guild          09:51:21
 2    rules, and companies were incorporated to make a        09:51:26
 3    specific movie.  And those companies may still          09:51:29
 4    exist -- my name could be affiliated with one of        09:51:36
 5    those companies and it could still exist or not         09:51:39
 6    exist.                                                   09:51:43
 7    BY MR. PETROCELLI:                                       09:51:43
 8        Q.  Can you estimate the number of such             09:51:43
 9    companies?                                               09:51:45
10        A.  No.                                              09:51:45
11        Q.  Were you -- when they were established,          09:51:49
12    were --                                                  09:51:51
13        A.  For instance, there was -- there was a           09:51:53
14    company, I -- I get -- there was a company to do a       09:51:55
15    movie about -- I just forgot the title of the movie.     09:52:02
16    It was a movie about wine.  It may come to me later      09:52:05
17    on.  And I believe there was a special purpose, they     09:52:13
18    call it a special purpose vehicle that was               09:52:15
19    established for purposes of that movie.                  09:52:19
20        Q.  When such entities have been established,        09:52:21
21    were you a shareholder of them or a member of them?      09:52:24
22        A.  I'm not sure.                                    09:52:26
23        Q.  Were you involved in setting them up?            09:52:26
24        A.  No.                                              09:52:28
25        Q.  Who would have knowledge about the status        09:52:31
```

**EXHIBIT 3**
**118**

MARC  TOBEROFF - 9/18/2012

Page 27

```
 1   of these entities?                                    09:52:34

 2        A.  I think basically whoever was the line       09:52:36

 3   producer or primary producer of the picture.          09:52:38

 4        Q.  And these are projects in which you had       09:52:43

 5   some kind of participation?                            09:52:44

 6             MR. KENDALL:  Vague and ambiguou- --         09:52:44

 7             THE WITNESS:  Yes.                            09:52:44

 8             MR. KENDALL:  Vague and ambiguous.           09:52:47

 9   BY MR. PETROCELLI:                                     09:52:48

10        Q.  IP Worldwide, that was a limited liability    09:52:54

11   company?                                               09:52:58

12        A.  Yes.                                          09:52:58

13        Q.  And who were its members?                     09:53:00

14        A.  Myself and Ari Emanuel.                       09:53:01

15        Q.  And was Endeavor at the time also a member?   09:53:08

16        A.  I believe Endeavor -- I believe Endeavor      09:53:11

17   may have had some equity in it.  I believe 10          09:53:16

18   percent.                                               09:53:18

19        Q.  Did --                                        09:53:19

20        A.  I'm not sure whether they were a member or    09:53:20

21   whether they simply were entitled to a percentage of   09:53:22

22   proceeds.                                              09:53:25

23        Q.  A 10 percent contractual interest?           09:53:26

24        A.  Right.                                        09:53:28

25        Q.  Okay.  Did IP Worldwide get replaced         09:53:30
```

MARC  TOBEROFF - 9/18/2012

Page 28

```
 1   effectively by IPW?                              09:53:35

 2          MR. KENDALL:  Vague and ambiguous.        09:53:39

 3          THE WITNESS:  I -- I don't know "replaced," 09:53:40

 4   I would say they're a successor to the company, not 09:53:42

 5   in a formal sense, but by virtue of the assets of IP 09:53:50

 6   Worldwide being transferred to IPW.              09:53:56

 7   BY MR. PETROCELLI:                               09:53:56

 8      Q.  When that occurred, that is when IPW was  09:53:59

 9   created and succeeded to the assets of IP Worldwide, 09:54:04

10   you were the sole member of IPW, not Ari Emanuel, 09:54:09

11   correct?                                         09:54:15

12      A.  When the assets were being transferred?   09:54:15

13      Q.  When you created IPW in, I think you      09:54:18

14   said --                                          09:54:21

15      A.  I wasn't the sole member.  I think I said 09:54:21

16   Bruce Karsh was --                               09:54:24

17      Q.  Oh, that's correct.  But Emanuel was not a 09:54:25

18   member?                                          09:54:27

19      A.  No, he is not a member.                   09:54:27

20      Q.  Nor was Endeavor?                          09:54:28

21      A.  No.                                        09:54:31

22      Q.  But Karsh came in as a member at that time? 09:54:32

23      A.  Yes.                                       09:54:34

24      Q.  And remains to this day?                   09:54:34

25      A.  Yes.                                       09:54:37
```

MARC  TOBEROFF - 9/18/2012

Page 29

```
 1        Q.  And what's the percentage interest between    09:54:37

 2   you and Mr. Karsh and IPW?                              09:54:40

 3        A.  I have 90 percent and Mr. Karsh has 10         09:54:43

 4   percent.                                                09:54:45

 5        Q.  Okay.  And in IP Management, you are the       09:54:46

 6   sole owner?                                             09:54:48

 7        A.  I believe so, yes.                             09:54:50

 8        Q.  Okay.  What is -- what year was IP             09:54:51

 9   Management created?                                     09:54:58

10        A.  I don't know.                                  09:54:58

11        Q.  For what purpose?                              09:54:59

12        A.  I don't remember.  I think there was -- I      09:55:00

13   have a vague recollection of having a company that      09:55:05

14   was set up for another purpose, and that purpose        09:55:07

15   never came about, and I was going to dissolve the       09:55:11

16   company, and instead, I kept it and the name was        09:55:16

17   changed to IP Management, but it's a very -- it's an    09:55:19

18   inactive company.                                       09:55:25

19        Q.  Do you have any contractual --                 09:55:28

20        A.  It's not completely inactive, but it's not     09:55:29

21   an active company.                                      09:55:33

22        Q.  Is your only business relationship with        09:55:34

23   Mr. Karsh through his co-membership in IPW?             09:55:39

24        THE WITNESS:  Yes.                                 09:55:46

25        MR. KENDALL:  Vague and ambiguous.                 09:55:47
```

MARC   TOBEROFF - 9/18/2012

Page 30

```
 1   BY MR. PETROCELLI:                                  09:55:47
 2       Q.  You don't have any other contractual        09:55:48
 3   arrangements with him?                              09:55:49
 4       A.  It relates only to IPW.                     09:55:52
 5       Q.  Does Mr. Karsh have a financial interest of 09:55:55
 6   any kind of any proceeds or recoveries that might   09:56:03
 7   come out of the Siegel or Shuster termination       09:56:05
 8   interests?                                          09:56:10
 9           MR. KENDALL:  Calls for a legal conclusion. 09:56:11
10           THE WITNESS:  No.                           09:56:12
11   BY MR. PETROCELLI:                                  09:56:12
12       Q.  In other words, were the Siegels and/or the 09:56:14
13   Shusters to enter into a settlement with DC,        09:56:19
14   Mr. Karsh would not participate in any of the       09:56:27
15   proceeds?                                           09:56:29
16       A.  No.                                         09:56:29
17           MR. KENDALL:  Calls for a legal conclusion. 09:56:30
18           Marc, I know you're a lawyer and I know you 09:56:30
19   think you know the right way to answer the question,09:56:39
20   but I have to have a moment to interpose an         09:56:41
21   objection if I think it appropriate to do so.  So   09:56:43
22   please do give me that opportunity.                 09:56:47
23           THE WITNESS:  Okay.                         09:56:48
24   BY MR. PETROCELLI:                                  09:56:48
25       Q.  Are the -- does IPW, the successor to IP    09:56:49
```

MARC  TOBEROFF - 9/18/2012

Page 31

```
 1    Worldwide, have any financial interest in the        09:56:56

 2    Shuster or Siegel termination interests, whether it   09:57:03

 3    be Superman or Superboy?                              09:57:06

 4         MR. KENDALL:  Calls for a legal conclusion.      09:57:12

 5         THE WITNESS:  No.                                09:57:12

 6    BY MR. PETROCELLI:                                    09:57:12

 7    Q.  Okay.  At the time of the succession of           09:57:13

 8    assets from IP Worldwide to IPW, did IP Worldwide     09:57:19

 9    have any financial interest in the Siegel or Shuster  09:57:23

10    termination interests?                                09:57:28

11    A.  I don't believe so.                               09:57:29

12    Q.  They were excluded?                               09:57:30

13    A.  What do you mean "they were excluded"?            09:57:33

14    Q.  At the time that you did -- IP Worldwide          09:57:36

15    was created in or about 2002 with you and Ari         09:57:39

16    Emanuel, correct?                                     09:57:47

17    A.  Correct.                                          09:57:48

18    Q.  And at that time, you had already, for            09:57:49

19    example, through PPC, Pacific Pictures, entered into  09:57:54

20    the November 2001 agreement with the Shusters,        09:57:58

21    correct?                                              09:57:58

22    A.  Correct.                                          09:58:03

23    Q.  Was that agreement and any interests that         09:58:04

24    PPC or you might have in that agreement part of your  09:58:07

25    arrangement with Mr. Emanuel through IP Worldwide?    09:58:10
```

MARC  TOBEROFF - 9/18/2012

Page 32

```
 1              MR. KENDALL:  Vague and ambiguous.        09:58:14

 2              THE WITNESS:  No.                         09:58:15

 3    BY MR. PETROCELLI:                                  09:58:15

 4         Q.  Was it specifically excluded?             09:58:16

 5         A.  Yes.                                       09:58:18

 6         Q.  Okay.  And thereafter, IP Worldwide entered  09:58:19

 7    into an agreement sometime in October 2002 with    09:58:31

 8    Laura and Joanne Siegel, right?                    09:58:36

 9         A.  Yes.                                       09:58:36

10         Q.  An exclusive representation agreement?    09:58:40

11         A.  Yes.                                       09:58:42

12         Q.  And given that Mr. -- under that agreement,  09:58:43

13    I'm just sort of paraphrasing, IP Worldwide was    09:58:52

14    entitled to 10 percent of any recoveries or proceeds  09:58:58

15    made by the Siegels during the tenure of IP        09:59:03

16    Worldwide's exclusive representation, correct?     09:59:09

17              MR. KENDALL:  Just a moment, please.     09:59:11

18              Thank you.                                09:59:19

19              THE WITNESS:  I think proceeds would be the  09:59:20

20    right answer.                                       09:59:21

21    BY MR. PETROCELLI:                                  09:59:21

22         Q.  At the time that the assets of IP         09:59:23

23    Worldwide -- and I'm using this in the lay sense,  09:59:31

24    were folded into IPW, did -- did that include IP   09:59:34

25    Worldwide's contractual agreements with the Siegels?  09:59:41
```

MARC  TOBEROFF - 9/18/2012

Page 33

```
 1              MR. KENDALL:  Vague and ambiguous.  Calls      09:59:47

 2   for a legal conclusion.                                   09:59:48

 3              THE WITNESS:  No.                               09:59:49

 4   BY MR. PETROCELLI:                                        09:59:49

 5      Q.   What -- what happened to IP Worldwide's           09:59:52

 6   agreement with the Siegels such that it was not          09:59:56

 7   transferred to IPW?                                       09:59:58

 8      A.   There's not a -- let me just try and answer      10:00:00

 9   it this way:  The IP Worldwide agreement was             10:00:09

10   governed by a term.  I don't know what the                10:00:14

11   initial --                                                10:00:17

12      Q.   Eighteen months.                                  10:00:18

13      A.   -- term --                                        10:00:18

14              Okay.  So you had an 18-month term and then    10:00:19

15   there was an extension of that term and I don't know     10:00:22

16   what --                                                   10:00:24

17      Q.   Three months.                                     10:00:25

18      A.   --  the exact date -- the exact time frame       10:00:25

19   of that extension.  I don't know if it was three         10:00:31

20   months, I thought it was a little bit longer.             10:00:32

21              There was -- IP -- the -- the -- the IP        10:00:36

22   Worldwide agreement expired on its own.  It wasn't       10:00:40

23   part of any assets that were transferred to IPW.          10:00:47

24      Q.   Okay.                                             10:00:57

25      A.   And I -- I'm not sure, but I believe it          10:00:58
```

MARC  TOBEROFF - 9/18/2012

Page 34

```
 1    had -- had expired before that or was about to        10:01:00

 2    expire.  And was either -- moot, essentially moot.     10:01:04

 3         Q.  In 2004, you entered into what has been        10:01:16

 4    referred to as a legal retainer agreement with the     10:01:24

 5    Siegels, correct?                                       10:01:26

 6         A.  Correct.                                       10:01:28

 7         Q.  Was that done through IPW?                     10:01:28

 8         A.  No.                                            10:01:32

 9         Q.  That was done through your law offices?        10:01:38

10         A.  Correct, a litigation retainer agreement.      10:01:39

11         Q.  And neither Mr. Karsh nor IPW had any          10:01:43

12    interest in any proceeds under that legal retainer     10:01:46

13    agreement, right?                                       10:01:49

14         A.  Correct.                                       10:01:50

15         Q.  And that legal retainer agreement remains      10:01:51

16    extant to this day.                                     10:01:54

17             Is that right?                                 10:01:54

18         A.  Correct.                                       10:01:56

19         Q.  All right.  Is it correct, then, that in       10:01:56

20    the event of any proceeds or recovery by way of        10:02:07

21    litigation outcome or transaction or settlement,       10:02:10

22    that Ari Emanuel would not be entitled to any          10:02:13

23    contractual payments?                                   10:02:18

24         A.  Correct.                                       10:02:20

25             MR. KENDALL:  Calls for a legal conclusion.    10:02:20
```

MARC  TOBEROFF - 9/18/2012

Page 35

```
 1   BY MR. PETROCELLI:                                      10:02:20

 2       Q.  Nor would any --                                10:02:22

 3       A.  Sorry.                                          10:02:25

 4       Q.  -- any of his talent agencies, such as          10:02:25

 5   Endeavor, William Morris Endeavor, correct?             10:02:28

 6       A.  Correct.                                        10:02:28

 7           MR. KENDALL:  Calls for a legal conclusion.     10:02:31

 8   BY MR. PETROCELLI:                                      10:02:31

 9       Q.  So he has no further interest in any of         10:02:31

10   this, correct?                                          10:02:33

11           MR. KENDALL:  Calls for a legal conclusion.     10:02:34

12           THE WITNESS:  Correct.                          10:02:34

13   BY MR. PETROCELLI:                                      10:02:34

14       Q.  Did he or Endeavor receive any                 10:02:37

15   consideration at the time that IP Worldwide was         10:02:40

16   folded into IPW?                                        10:02:50

17       A.  Why don't we use the term "wound down."        10:02:53

18       Q.  Wound down.  Fair enough.                       10:02:55

19       A.  Did they receive -- are you talking about       10:02:57

20   consideration -- when you say "consideration," are      10:02:59

21   you talking about in the legal sense or are you         10:03:02

22   talking about it in money?                              10:03:05

23       Q.  Well, start with money.                         10:03:08

24       A.  I mean, I -- there's probably -- let me put     10:03:10

25   it this way:  A lawyer would look at a document and     10:03:15
```

MARC  TOBEROFF - 9/18/2012

Page 36

```
 1    could find consideration for the agreement, but they      10:03:17
 2    didn't receive money --                                   10:03:20
 3         Q.  Can you --                                       10:03:22
 4         A.  -- or -- or some other asset when it was         10:03:23
 5    wound down.                                               10:03:30
 6         Q.  Now, as part of the consider- -- as part of      10:03:38
 7    the consideration that -- first of all, who received     10:03:40
 8    the consideration?  Was it Ari or was it Endeavor?       10:03:43
 9              MR. KENDALL:  Lacks foundation.                 10:03:46
10    BY MR. PETROCELLI:                                        10:03:46
11         Q.  To your knowledge.                               10:03:48
12         A.  It was -- the -- the -- let me just --           10:03:48
13         Q.  What was the nature of the consideration?       10:03:51
14              MR. KENDALL:  Lacks foundation.                 10:03:52
15              THE WITNESS:  The nature of the                 10:03:53
16    consideration was that these assets, which consisted     10:03:55
17    of various interests and various intellectual            10:03:59
18    properties that the company had accumulated, would      10:04:04
19    be transferred to IPW, and -- but in the event that     10:04:09
20    there were proceeds from those assets, that Ari had     10:04:13
21    a carried interest in those proceeds.                    10:04:24
22    BY MR. PETROCELLI:                                        10:04:26
23         Q.  But that carried interest did not apply to      10:04:26
24    the new agreement made with the Siegels.  That          10:04:30
25    replaced the IP Worldwide agreement, correct?           10:04:32
```

MARC   TOBEROFF - 9/18/2012

Page 37

| | | |
|---|---|---|
| 1 | A.   I don't know if it's correct to say | 10:04:40 |
| 2 | "replaced."  They were different agreements. | 10:04:41 |
| 3 | Q.  Okay. | 10:04:41 |
| 4 | A.  They -- one -- one came after the other.  I | 10:04:44 |
| 5 | don't know if it's correct to say "replaced." | 10:04:47 |
| 6 | Q.  Did Mr. Emanuel negotiate with you for some | 10:04:50 |
| 7 | consideration in respect of the Siegel agreement | 10:04:58 |
| 8 | that IP Worldwide had entered into during the time | 10:05:04 |
| 9 | that you and he were members of IP Worldwide? | 10:05:07 |
| 10 | MR. KENDALL:  Vague and ambiguous. | 10:05:10 |
| 11 | THE WITNESS:  Did he negotiate with me? | 10:05:14 |
| 12 | BY MR. PETROCELLI: | 10:05:15 |
| 13 | Q.  Correct. | 10:05:15 |
| 14 | A.  No. | 10:05:16 |
| 15 | Q.  In other words, did he attempt to obtain | 10:05:16 |
| 16 | any consideration as a result of what would be your | 10:05:19 |
| 17 | ongoing efforts on behalf of the Siegels after the | 10:05:21 |
| 18 | winding down of IP Worldwide? | 10:05:24 |
| 19 | MR. KENDALL:  Vague and ambiguous. | 10:05:25 |
| 20 | THE WITNESS:  No.  I think he asked me | 10:05:30 |
| 21 | about it. | 10:05:33 |
| 22 | BY MR. PETROCELLI: | 10:05:33 |
| 23 | Q.  And you declined to offer him any | 10:05:35 |
| 24 | participation or any piece of the -- of the -- of | 10:05:38 |
| 25 | the proceeds. | 10:05:43 |

EXHIBIT 3
129

MARC  TOBEROFF - 9/18/2012

Page 38

```
 1              Is that correct?                        10:05:43

 2     A.   Correct.                                     10:05:44

 3     Q.   And he accepted that?                        10:05:45

 4     A.   As far as I know.                            10:05:46

 5     Q.   Okay.  Do you have any documentation with    10:05:53

 6  Mr. Emanuel that reflects the nature of your winding 10:05:55

 7  down of this company, IP Worldwide?                  10:06:00

 8              MR. KENDALL:  Vague and ambiguous.        10:06:04

 9              THE WITNESS:  We have a winding down      10:06:04

10  agreement.                                           10:06:07

11  BY MR. PETROCELLI:                                   10:06:07

12     Q.   Is that the only document of which you are   10:06:08

13  aware?                                               10:06:10

14     A.   I believe so.  It was a winding down         10:06:12

15  agreement.  It had exhibits to it.                   10:06:15

16     Q.   Since --                                     10:06:18

17     A.   I believe it was one comprehensive           10:06:21

18  document.                                            10:06:24

19     Q.   Right.  Since the winding down of IP         10:06:24

20  Worldwide and the exit of Mr. Emanuel, has he        10:06:33

21  approached you regarding any financial interest in   10:06:39

22  the Shuster or Siegel cases or recoveries of         10:06:44

23  proceeds of any monies that might be forthcoming?    10:06:51

24              MR. KENDALL:  Now, in responding to that 10:06:54

25  question, I just want to caution you that to the     10:06:56
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 3
130

MARC  TOBEROFF - 9/18/2012

1    extent you had discussions with Mr. Emanuel that you        10:06:58

2    believe fall within the attorney-client privilege,          10:07:03

3    either communications or work product, depending on         10:07:09

4    whether this is in furtherance of the representation        10:07:12

5    of the clients, either try to make a judgment about         10:07:15

6    that or confer with me about it before you respond,         10:07:19

7    because I don't want you to waive the                       10:07:23

8    attorney-client privilege with respect to any such         10:07:25

9    privileged communications.                                  10:07:28

10         THE WITNESS:  Could you repeat the                    10:07:32

11   question.                                                   10:07:33

12   BY MR. PETROCELLI:                                          10:07:33

13       Q.  Right.  And to be clear, we can't have a            10:07:33

14   record where you are carving out information on the         10:07:36

15   basis of the privilege without letting me know.            10:07:42

16         So if you're going to assert the privilege           10:07:47

17   with respect to certain communications, I -- I need,       10:07:50

18   at minimum, to know some basic foundational                 10:07:53

19   information so I can make my own judgments.  Okay?         10:07:56

20       A.  Okay.  Could you repeat the question?             10:07:59

21       Q.  Yeah.                                               10:07:59

22         I was asking whether you and Ari have had            10:08:05

23   any discussions since he exited IP Worldwide about         10:08:08

24   his or any of his agencies' participation in any           10:08:12

25   Siegel or Shuster monies, settlements, proceeds,           10:08:17

MARC  TOBEROFF - 9/18/2012

Page 40

```
 1    recoveries, deals.                                    10:08:20
 2              MR. KENDALL:  Hold on for one moment.        10:08:21
 3              I think you can answer that question "yes"   10:08:28
 4    or "no" without any privilege concerns.               10:08:30
 5              THE WITNESS:  I would just need to clarify.  10:08:32
 6              Are you referring to discussions where Ari  10:08:33
 7    or Endeavor is asking for a percentage of any         10:08:40
 8    recovery from the Siegel and Shuster matters?         10:08:45
 9    BY MR. PETROCELLI:                                    10:08:45
10        Q.  Or other type of consideration.  You said    10:08:52
11    "percentage," but you know, some --                   10:08:54
12        A.  Right.                                        10:08:56
13        Q.  -- some piece of the -- the action.          10:08:56
14        A.  No.                                           10:08:58
15        Q.  Okay.  Have you had any communications on     10:08:59
16    that subject with Mr. Emanuel, since 2004?            10:09:03
17        A.  Let me just go back.                          10:09:05
18        Q.  Or any of his representatives?                10:09:08
19        A.  Let me just go back.                          10:09:10
20              The second question that you -- the         10:09:11
21    question that you asked when I answered "no,"         10:09:12
22    overlaps with the question you answered [sic]         10:09:15
23    previously where I answered, "yes."                   10:09:18
24              We discussed it and I said no.              10:09:19
25        Q.  I understood from your testimony that that   10:09:25
```

MARC   TOBEROFF - 9/18/2012

Page 41

```
 1    discussion occurred at the time of the winding down          10:09:27
 2    as part of the negotiation of your wind-down                 10:09:30
 3    agreement.                                                   10:09:35
 4          Is that correct?                                       10:09:36
 5      A.  I'm not sure if it occurred at the time of             10:09:37
 6    the winding down.  The -- the -- the winding down            10:09:38
 7    was handled by -- between the general counsel at             10:09:43
 8    Endeavor, and myself and Tom McGuire.  Ari delegated         10:09:48
 9    to him and Ari wasn't really involved in discussions         10:09:53
10    about it.                                                    10:09:59
11          And the -- after -- I believe after that, I            10:10:00
12    recall a discussion with Ari about, you know,                10:10:06
13    whether he would have a piece of proceeds from the           10:10:12
14    Siegel litigation and I said no.                             10:10:16
15      Q.  That was the only such discussion?                     10:10:19
16      A.  Yeah.  It could have been, you know, a                 10:10:20
17    phone discussion, followed by a discussion in                10:10:24
18    person.  I don't know if it was -- it was -- it              10:10:27
19    could have been spread out over two or three                 10:10:30
20    conversations or it could have been one                      10:10:35
21    conversation.                                                10:10:37
22      Q.  And what did Ari say to you about that?                10:10:37
23      A.  He said something to the effect that --                10:10:41
24    that he should be entitled to, you know, a piece of          10:10:46
25    that.                                                        10:10:50
```

**EXHIBIT 3**
**133**

MARC  TOBEROFF - 9/18/2012

Page 42

```
 1              And -- and -- and I said, "First of all, I        10:10:50
 2    can't share legal fees, I can't share legal fees            10:10:58
 3    with you, and all I have are legal fees from that           10:11:00
 4    case."                                                      10:11:03
 5              And I -- we may have joked or I may have           10:11:04
 6    joked and said, "You didn't do anything."                   10:11:10
 7              And he may have said something to the              10:11:11
 8    effect, "Since when do I have to do something to get        10:11:13
 9    paid?  Since when do I have to do something to make         10:11:16
10    money?"                                                     10:11:18
11              Which is --                                       10:11:19
12              MR. KENDALL:  Again, don't -- don't               10:11:22
13    comment.                                                    10:11:23
14              THE WITNESS:  Okay.                               10:11:24
15              MR. KENDALL:  State the facts.                    10:11:25
16              THE WITNESS:  Something to that effect.           10:11:26
17              MR. PETROCELLI:  I believe he's stating           10:11:27
18    what transpired in the conversation, which was             10:11:28
19    responsive to my question.                                 10:11:31
20              THE WITNESS:  No, I was about to give a           10:11:33
21    little flourish, so I appreciate the objection.            10:11:34
22    BY MR. PETROCELLI:                                         10:11:34
23       Q.  Have you recounted the conversation as best         10:11:44
24    you can recall it?                                          10:11:46
25       A.  Yes.                                                 10:11:46
```

MARC  TOBEROFF - 9/18/2012

Page 43

```
 1        Q.  Okay.  When did that happen?              10:11:47

 2        A.  I would say within -- I don't know, within 10:11:48

 3    a year of the company being wound down.  Could be  10:11:59

 4    within six months.  But I can't really put a time on 10:12:04

 5    it.                                                10:12:07

 6        Q.  Since the winding down of IP Worldwide,    10:12:07

 7    have you had any other business agreements with    10:12:11

 8    Mr. Emanuel or his agencies?                       10:12:13

 9            MR. KENDALL:  Vague and ambiguous.         10:12:17

10    Overbroad.                                         10:12:22

11            THE WITNESS:  Not that I could think of    10:12:23

12    right now.                                         10:12:29

13    BY MR. PETROCELLI:                                 10:12:29

14        Q.  From e-mails that have been produced in    10:12:34

15    this case, is it correct that Mr. Emanuel reached  10:12:35

16    out to the U.S. Attorney's office regarding the    10:12:40

17    effort to identify and investigate the person who  10:12:45

18    wrote the timeline documents and took documents from 10:12:53

19    your office?                                       10:12:56

20        A.  I don't know what you mean by "reached     10:12:56

21    out."  My understanding was that he made a call.   10:13:02

22        Q.  What are the circumstances, to your        10:13:06

23    knowledge, under which he made that call?          10:13:09

24        A.  My wanting to have the matter investigated. 10:13:10

25            MR. KENDALL:  Okay.  I want to caution you 10:13:22
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277        www.merrillcorp.com/law

**EXHIBIT 3**

**135**

```
 1    now that we're in an area that involves privilege,          10:13:26

 2    so keep your answer general and I'm sure there will         10:13:30

 3    be follow-up questions and we can clarify where the         10:13:34

 4    privilege line should be drawn so that                      10:13:37

 5    Mr. Petrocelli has a record.                                10:13:39

 6          THE WITNESS:  The circumstances are that I            10:13:43

 7    wanted to have the matter investigated and had never        10:13:45

 8    had any experience like that before and wasn't              10:13:54

 9    getting any traction.                                       10:14:01

10    BY MR. PETROCELLI:                                          10:14:01

11       Q.  Did you speak to Mr. Emanuel about this             10:14:07

12    subject?                                                    10:14:10

13       A.  Yes, I did.                                          10:14:12

14       Q.  Did you initiate that contact?                      10:14:16

15       A.  Yes.                                                 10:14:18

16       Q.  Why did you initiate it with Mr. Emanuel?           10:14:20

17          MR. KENDALL:  Okay.  So now I need to                10:14:26

18    caution you, if -- if this is something that you            10:14:27

19    consider to be work product arising from your               10:14:31

20    representation of your clients, then I think you            10:14:36

21    should, in that circumstance, so indicate and               10:14:41

22    decline to answer the question.                             10:14:46

23          If, on the other hand, you don't, then so            10:14:48

24    indicate and answer it.                                     10:14:52

25          THE WITNESS:  I think it is work product.            10:14:53
```

MARC  TOBEROFF - 9/18/2012

Page 45

```
 1    BY MR. PETROCELLI:                              10:14:57

 2        Q.  So on that question, you won't answer?  10:14:58

 3        A.  Correct.                                10:15:00

 4        Q.  Okay.  And we'll have a stipulation that 10:15:00

 5    whenever you tell me that something is privileged or 10:15:05

 6    it's work product, it means you're not going to   10:15:07

 7    answer?                                          10:15:09

 8        A.  Correct.                                10:15:10

 9        Q.  Okay.  When you spoke with Mr. Emanuel on 10:15:14

10    this topic -- when was that, by the way?        10:15:17

11        A.  It would have been around the time of any 10:15:23

12    e-mails that were produced.                     10:15:26

13        Q.  Okay.  Did you discuss --               10:15:32

14        A.  Would have been -- would have been sometime 10:15:33

15    before that or shortly before that.             10:15:36

16        Q.  Was that the first communication you had 10:15:37

17    with Mr. Emanuel on the subject -- on any subject 10:15:40

18    related to the Siegel or Shuster issues since the 10:15:43

19    conversation where he asked for some consideration 10:15:49

20    and you declined to offer it to him?            10:15:53

21        A.  No.                                     10:15:57

22        Q.  You had had intervening communications? 10:15:57

23        A.  Casual conversations.  He knows that's what 10:16:01

24    I've been working on almost exclusively for a very 10:16:03

25    long period of time.                            10:16:06
```

**EXHIBIT 3**

**137**

MARC  TOBEROFF - 9/18/2012

Page 46

```
 1        Q.  And he checks in on it every now and then?      10:16:08

 2        A.  He doesn't check in.  We will be talking        10:16:11

 3    about something else and, "How is Superman going?"      10:16:15

 4    We have casual, friendly conversations.                 10:16:17

 5        Q.  Have you worked with Mr. Emanuel in             10:16:20

 6    connection with, for example, exploring potential       10:16:24

 7    purchasers of the Siegel or Shuster interests?          10:16:26

 8            MR. KENDALL:  Now I'm going to have to give      10:16:33

 9    you that same admonition as to the context in which     10:16:35

10    this occurs and whether you believe that it falls       10:16:38

11    within your work product privilege.                     10:16:40

12            THE WITNESS:  I think that is work product      10:16:46

13    as well.                                                10:16:48

14    BY MR. PETROCELLI:                                      10:16:48

15        Q.  Have such -- have you had conversations         10:16:50

16    with Mr. Emanuel on the subject of his assisting        10:16:55

17    with respect to potential purchasers of the Siegel      10:17:02

18    or Shuster interests?  You can answer that "yes"        10:17:05

19    or "no."                                                10:17:25

20            MR. KENDALL:  I think you can answer that       10:17:25

21    "yes" or "no" without waiving your privilege.           10:17:27

22            THE WITNESS:  Yes.  Without waiver of any       10:17:28

23    privilege.                                              10:17:30

24    BY MR. PETROCELLI:                                      10:17:30

25        Q.  Have you had any discussions with anybody       10:17:31
```

```
 1    other than Mr. Emanuel on that subject?          10:17:33

 2             MR. KENDALL:  So now with that --       10:17:38

 3    BY MR. PETROCELLI:                               10:17:38

 4        Q.  Let me exclude for the purpose of this   10:17:41

 5    question, Joanne Siegel, Laura Siegel, Mr. Peary, 10:17:43

 6    Ms. Peavy and Dawn Peavy.                        10:17:55

 7             MR. KENDALL:  And his -- and Mr. Toberoff's 10:17:59

 8    counsel?                                         10:18:01

 9             MR. PETROCELLI:  Yes.  He meaning you, your 10:18:03

10    firm?                                            10:18:03

11             MR. KENDALL:  Well, and members of his  10:18:04

12    firm, too.                                       10:18:05

13             MR. PETROCELLI:  Yes.                    10:18:06

14             MR. KENDALL:  I'm sorry, I shouldn't have 10:18:06

15    said "members."  Associates.                     10:18:08

16             MR. PETROCELLI:  Yes.  In other words, I'm 10:18:09

17    not interested in -- yes, Mr. Kendall's firm,    10:18:10

18    members of your firm, he and the Siegels and the 10:18:12

19    Shusters.                                        10:18:15

20        Q.  Other than those folks with whom you may 10:18:15

21    have discussed this topic, I'm not, at least not 10:18:17

22    right now inquiring about that, I'm asking about 10:18:22

23    people other than those individuals.             10:18:24

24             MR. KENDALL:  Could I just ask, would you 10:18:25

25    also include --                                  10:18:27
```

MARC  TOBEROFF - 9/18/2012

Page 48

```
 1           MR. PETROCELLI:  Sure.                       10:18:27

 2           MR. KENDALL:  -- persons retained by         10:18:28

 3   counsel for purposes of assisting with the           10:18:33

 4   prosecution of cases on behalf of his clients or in  10:18:44

 5   the defense of Mr. Toberoff?                          10:18:50

 6           MR. PETROCELLI:  Can you help me out?  Who    10:18:52

 7   do you have in mind?  Are you talking about lawyers?  10:18:54

 8           MR. KENDALL:  There could be litigation       10:18:58

 9   support personnel, could be experts, you know.       10:19:03

10           MR. PETROCELLI:  Okay.  I'm not -- I'm not    10:19:05

11   talking about people who would be expert -- whose    10:19:11

12   business it is to render testimony in cases like,    10:19:18

13   you know, DecisionQuest.                             10:19:22

14       Q.  I'm trying to focus on outside parties.  So  10:19:27

15   we started with Mr. Emanuel and now I'm asking you   10:19:32

16   whether there's anybody other than Mr. Emanuel who's 10:19:35

17   not part of your legal team.                         10:19:37

18       A.  Whether I've had discussions?                10:19:40

19           MR. KENDALL:  Just a moment.                 10:19:41

20           MR. PETROCELLI:  Yes.                        10:19:42

21           MR. KENDALL:  Now, could you just phrase     10:19:42

22   what the question is so we have --                   10:19:44

23   BY MR. PETROCELLI:                                   10:19:44

24       Q.  The question is whether you've had           10:19:47

25   communications on the subject of identifying or      10:19:48
```

**EXHIBIT 3**
**140**

MARC  TOBEROFF - 9/18/2012

Page 49

```
 1    assisting in identifying or dealing with potential        10:19:52

 2    purchasers of the Siegel or Shuster termination           10:19:56

 3    interests?                                                10:19:59

 4         A.  I'll answer yes.                                 10:20:00

 5         Q.  With whom?                                       10:20:06

 6         A.  Since we're getting into a tricky area of        10:20:07

 7    work product or privilege, I want to confer with          10:20:13

 8    Mr. Kendall --                                            10:20:16

 9              MR. PETROCELLI:  Sure.                          10:20:17

10              THE WITNESS:  -- about this.                    10:20:18

11              MR. PETROCELLI:  Off the record?                10:20:18

12              THE WITNESS:  Yes.                              10:20:19

13              MR. PETROCELLI:  Okay.                          10:20:20

14              THE VIDEOGRAPHER:  Off the record.  The         10:20:21

15    time is 10:20.                                            10:20:22

16              (Brief recess.)                                 10:20:23

17              THE VIDEOGRAPHER:  Back on the record at        10:34:24

18    10:34.                                                    10:34:25

19    BY MR. PETROCELLI:                                        10:34:25

20         Q.  We've had a brief break, you've had a            10:34:27

21    chance to chat with Mr. Kendall, and I guess we have      10:34:30

22    a pending question?                                       10:34:33

23              MR. KENDALL:  Well, if you're going to make     10:34:34

24    a record of what happened, I think you probably also      10:34:36

25    want to include that you took what you described as       10:34:37
```

MARC  TOBEROFF - 9/18/2012

Page 50

```
1    an urgent matter from another client during that       10:34:39
2    same interval, which extended the break.  Is that      10:34:44
3    correct?                                                10:34:46
4           MR. PETROCELLI:  Probably by three minutes       10:34:46
5    to four minutes, but that's correct.                    10:34:47
6           THE WITNESS:  So, do you want to read back       10:34:54
7    the question?                                           10:34:56
8               (The reporter read the record                10:35:17
9               as follows:                                  10:35:17
10               "QUESTION:  The question is                 10:19:47
11               whether you've had communications           10:19:47
12               on the subject of identifying or            10:19:48
13               assisting in identifying or dealing         10:19:52
14               with potential purchasers of the            10:19:55
15               Siegel or Shuster termination               10:19:58
16               interests?                                  10:19:59
17               "ANSWER:  I'll answer yes.                  10:20:00
18               "QUESTION:  With whom?")                    10:20:06
19           THE WITNESS:  Sony, Paramount, and Fox --       10:35:19
20    BY MR. PETROCELLI:                                     10:35:19
21       Q.  Can you identify --                             10:35:26
22       A.  -- Studios.                                     10:35:26
23       Q.  Yes.  Can you identify the people at those      10:35:27
24    studios?                                               10:35:29
25       A.  At Sony, I forget the name of the               10:35:29
```

**EXHIBIT 3**
**142**

MARC  TOBEROFF - 9/18/2012

Page 51

```
 1   gentleman.                                          10:35:36

 2        Q.  The person you met with?                   10:35:38

 3        A.  Yeah.  He was -- he was quite high up in   10:35:39

 4   the company, but I forget -- well, I remember now,  10:35:43

 5   it's Peter Schlessel.  It's pronounced "Schlessel"  10:35:47

 6   or "Schlessel."  I believe that's the name.         10:35:52

 7        Q.  Just the two of you?                        10:35:54

 8        A.  Me, him, and a gentleman that introduced me 10:35:56

 9   to him named Julio Caro, who is just a friend of    10:36:06

10   mine who is buddies with him.                       10:36:09

11        Q.  This was a in-person meeting?               10:36:11

12        A.  Yes.                                        10:36:13

13        Q.  And when did it happen?                     10:36:13

14        A.  I'm not sure.  I believe approximately four 10:36:14

15   years ago.                                          10:36:30

16        Q.  Before or after this lawsuit was filed?    10:36:31

17   This lawsuit was filed on May 14, 2010.             10:36:33

18        A.  After?                                      10:36:36

19        Q.  Afterwards?  Okay.                          10:36:36

20            And the --                                  10:36:38

21        A.  Oh, this lawsuit?                           10:36:39

22        Q.  This lawsuit.                               10:36:41

23        A.  No, it was -- it was before this lawsuit   10:36:42

24   was filed.                                          10:36:43

25        Q.  Okay.                                       10:36:43
```

MARC   TOBEROFF - 9/18/2012

Page 52

```
 1        A.  I believe it was approximately four years       10:36:46

 2   ago.                                                      10:36:49

 3        Q.  Okay.  And you said that was Fox, right?         10:36:49

 4        A.  No.  Sony.                                       10:36:51

 5        Q.  That was Sony?                                   10:36:53

 6        A.  Correct.                                         10:36:53

 7        Q.  I'm sorry.  Fox?  Who were the                   10:36:54

 8   participants?                                             10:36:58

 9        A.  Myself, Tom Rothman, a co-head of the            10:36:59

10   studio, Tom Rothman is the co-head of the studio and     10:37:06

11   people from his legal or business affairs department     10:37:11

12   whose names I don't recall.                              10:37:13

13        Q.  Anybody other than you attend on your side?     10:37:19

14        A.  No.                                             10:37:21

15        Q.  And when did that meeting occur?                10:37:22

16        A.  I -- I don't recall.  The best way to date      10:37:23

17   it is that I produced a studio pass that had the         10:37:28

18   date on it --                                            10:37:33

19        Q.  Okay.                                           10:37:33

20        A.  -- of that meeting.                             10:37:34

21        Q.  And then the third discussion?                  10:37:36

22        A.  Third -- you mean the third entity?             10:37:41

23        Q.  Yes.                                            10:37:44

24        A.  Paramount?                                      10:37:44

25            What's the question?                            10:37:44
```

MARC   TOBEROFF - 9/18/2012

Page 53

```
 1          Q.  What were the participants?              10:37:50

 2          A.  Participant was the head of Paramount film 10:37:53

 3    division, whose name I don't remember.  I'm very bad 10:38:04

 4    at names.  I don't remember his name at the moment. 10:38:08

 5    And somebody from legal affairs and another person  10:38:11

 6    from legal or business affairs.                     10:38:19

 7          Q.  Don't remember the names?                 10:38:23

 8          A.  I don't remember the names.  I believe    10:38:23

 9    there were three people at the meeting.             10:38:26

10          Q.  And just you on your side?                10:38:27

11          A.  Yes.                                      10:38:29

12          Q.  And when did that occur?                  10:38:32

13          A.  Approximately two years ago.  A year -- a 10:38:33

14    year -- year and a half to two years ago.           10:38:43

15          Q.  Can you give me the sequence of the three 10:38:46

16    meetings?                                           10:38:51

17          A.  Sony was the first.  I'm not sure whether 10:38:53

18    Paramount was the second or the third.              10:39:01

19          Q.  Has -- have you had discussions with      10:39:05

20    Mr. Emanuel in respect of any of those three        10:39:08

21    meetings or those three contacts?                   10:39:11

22              MR. KENDALL:  Vague and ambiguous.        10:39:14

23              THE WITNESS:  I believe only with respect 10:39:14

24    to Paramount.                                       10:39:24

25    BY MR. PETROCELLI:                                  10:39:24
```

MARC   TOBEROFF - 9/18/2012

Page 54

```
 1      Q.  What -- can you describe the nature of your      10:39:29

 2   interactions with Mr. Emanuel on this subject, the     10:39:31

 3   subject being potential purchasers of the rights?      10:39:34

 4      MR. KENDALL:  I'll caution you in answering         10:39:37

 5   that question to keep it general so that it does not   10:39:39

 6   implicate your work product or communications in       10:39:42

 7   furtherance of your representation of your clients.    10:39:47

 8   BY MR. PETROCELLI:                                     10:39:47

 9      Q.  If you're excluding anything in your            10:39:55

10   discussions with Mr. Emanuel, I need to know that.     10:39:57

11      MR. KENDALL:  Dan, I think the appropriate          10:39:59

12   way to go about it so that you have your record is     10:40:01

13   that the witness should -- should answer in a way      10:40:03

14   that does not create a privilege issue, and then you   10:40:06

15   should follow up if you choose to, and then the        10:40:10

16   witness can, depending on the question that you ask,   10:40:13

17   make a determination as to whether it calls for        10:40:17

18   privileged material.                                   10:40:21

19      But I'm hoping that the witness can at              10:40:22

20   least give you the general nature without -- in the    10:40:23

21   same way, for example, that it might be described in   10:40:27

22   a privilege log, without creating a risk of waiver.    10:40:29

23      THE WITNESS:  I think that's a logical way          10:40:34

24   to proceed.                                            10:40:35

25   BY MR. PETROCELLI:                                     10:40:35
```

MARC  TOBEROFF - 9/18/2012

Page 55

```
 1        Q.  Well, I need to understand that if and when    10:40:37
 2   you're giving me a general description, you're doing    10:40:39
 3   so for that purpose rather than just categorically      10:40:42
 4   giving me a general description of conversations        10:40:48
 5   because you're excluding privileged information         10:40:49
 6   without my knowledge.  That's my only concern.  I       10:40:52
 7   need to know we're in that area.                        10:40:54
 8        MR. KENDALL:  And I think -- I think when I        10:40:55
 9   make that objection, it's clear that we're in that      10:40:57
10   area.  And then you should -- you should follow up      10:41:00
11   as you think is appropriate.                            10:41:02
12   BY MR. PETROCELLI:                                      10:41:02
13        Q.  Start with whatever you can tell me.           10:41:04
14        A.  So what's the question?                        10:41:08
15        Q.  To describe your interactions with             10:41:10
16   Mr. Emanuel on the subject of potential purchasers      10:41:12
17   of the rights.                                          10:41:15
18        MR. KENDALL:  Same caution.                        10:41:16
19        THE WITNESS:  Are you referring to those           10:41:17
20   three studios that I just mentioned or just             10:41:19
21   anything?                                               10:41:21
22   BY MR. PETROCELLI:                                      10:41:21
23        Q.  Anything.  In other words, I'm making the      10:41:22
24   question as broad as possible.                          10:41:24
25        MR. KENDALL:  Overbroad.                           10:41:27
```

MARC  TOBEROFF - 9/18/2012

Page 56

```
 1              THE WITNESS:  All right.                    10:41:28

 2              MR. KENDALL:  And same objections --        10:41:30

 3              THE WITNESS:  So I can ans- --              10:41:30

 4              MR. KENDALL:  -- and cautions.              10:41:32

 5              THE WITNESS:  -- I can answer that I've had 10:41:34

 6     conversations with him on the subject of -- of      10:41:41

 7     resolving the rights or monetizing the rights aside 10:41:50

 8     from simply through settlement with Warner Bros. and 10:41:58

 9     DC.                                                  10:42:04

10     BY MR. PETROCELLI:                                   10:42:04

11        Q.  Did you say "aside from"?                     10:42:05

12        A.  Yes.                                          10:42:06

13        Q.  You mean potential deals with people or       10:42:09

14     companies other than Warner Bros. and DC?            10:42:12

15        A.  Yes.                                          10:42:14

16        Q.  Okay.  And have you had these discussions     10:42:16

17     with Mr. Emanuel with an expectation that he might   10:42:21

18     play a role for which he might be compensated?       10:42:26

19              MR. KENDALL:  Just a moment, please.        10:42:30

20              I think you can answer that question.       10:42:40

21              THE WITNESS:  I don't recall conversations  10:42:42

22     that focus to any -- to any extent on his            10:42:44

23     compensation.                                        10:42:50

24     BY MR. PETROCELLI:                                   10:42:50

25        Q.  What was your purpose in having these         10:42:52
```

EXHIBIT 3
148

MARC   TOBEROFF - 9/18/2012

Page 57

| | |
|---|---|
| 1    discussions with Mr. Emanuel? | 10:42:54 |
| 2         MR. KENDALL:  Again, I think you can answer | 10:42:57 |
| 3    that question at a general level and then -- but do | 10:42:58 |
| 4    not get into work product in describing it. | 10:43:02 |
| 5         THE WITNESS:  I'm not going to disclose my | 10:43:05 |
| 6    thought processes, which the purpose would entail, | 10:43:07 |
| 7    but the subject was, as I said, to explore | 10:43:11 |
| 8    opportunities for monetizing my clients' rights. | 10:43:16 |
| 9    BY MR. PETROCELLI: | 10:43:16 |
| 10       Q.  Can you disclose to me the specifics of | 10:43:23 |
| 11   your conversations with Mr. Emanuel on that subject? | 10:43:25 |
| 12        MR. KENDALL:  Same caution. | 10:43:36 |
| 13   BY MR. PETROCELLI: | 10:43:41 |
| 14       Q.  So to be clear, what I'm asking you to | 10:43:42 |
| 15   elicit is everything you can remember about the | 10:43:45 |
| 16   conversations without withholding any part of the | 10:43:50 |
| 17   conversations.  I'm not asking for your thought | 10:43:52 |
| 18   process for this question, I'm just asking you what | 10:43:54 |
| 19   you and he discussed. | 10:43:57 |
| 20        MR. KENDALL:  And overbroad.  Vague and | 10:43:58 |
| 21   ambiguous. | 10:43:58 |
| 22        Same caution. | 10:44:02 |
| 23        THE WITNESS:  So, let me tell you what I am | 10:44:03 |
| 24   not discussing on the basis of work product; that is | 10:44:08 |
| 25   the -- my strategy with respect to monetizing those | 10:44:14 |

EXHIBIT 3
149

MARC  TOBEROFF - 9/18/2012

Page 58

| | | |
|---|---|---|
| 1 | rights, which in turn impinges on settlement with | 10:44:19 |
| 2 | Warner Bros. and DC and the value of those rights. | 10:44:24 |
| 3 | That I'm not -- any conversations that impinge upon | 10:44:33 |
| 4 | that.  But I can tell you that my conversations with | 10:44:36 |
| 5 | Ari are usually general and casual. | 10:44:40 |
| 6 | BY MR. PETROCELLI: | 10:44:40 |
| 7 | Q.  On what basis are you declining to tell me | 10:44:57 |
| 8 | everything you and Mr. Emanuel discussed? | 10:45:04 |
| 9 | A.  On the basis that certain things coming | 10:45:06 |
| 10 | from me are revealing my work product on behalf of | 10:45:08 |
| 11 | the Siegels and the Shusters. | 10:45:13 |
| 12 | Q.  What relationship, if any, does Mr. Emanuel | 10:45:15 |
| 13 | have with the Siegels or the Shusters? | 10:45:19 |
| 14 | MR. KENDALL:  I'm going to call -- I'm | 10:45:21 |
| 15 | sorry.  I'm going to object as that calls for a | 10:45:23 |
| 16 | legal conclusion and it's vague and ambiguous. | 10:45:28 |
| 17 | THE WITNESS:  He doesn't, to my knowledge, | 10:45:36 |
| 18 | have any direct relationship with the Siegels or the | 10:45:37 |
| 19 | Shusters. | 10:45:40 |
| 20 | BY MR. PETROCELLI: | 10:45:40 |
| 21 | Q.  And do you -- | 10:45:40 |
| 22 | A.  His relationship is through me. | 10:45:41 |
| 23 | Q.  Do you have any agreement of any kind with | 10:45:43 |
| 24 | him in connection with your work on this case, on | 10:45:49 |
| 25 | the Siegel and Shuster litigation? | 10:45:53 |

MARC  TOBEROFF - 9/18/2012

Page 59

```
 1            MR. KENDALL:  Vague and ambiguous.           10:45:57

 2            THE WITNESS:  I wouldn't call it an          10:46:03

 3    agreement.                                           10:46:04

 4    BY MR. PETROCELLI:                                   10:46:04

 5        Q.  What is it about your relationship with      10:46:13

 6    Mr. Emanuel that you believe justifies not           10:46:16

 7    disclosing your conversations with him?              10:46:24

 8            MR. KENDALL:  Just a moment, please.         10:46:31

 9            Lacks foundation.  Vague and ambiguous.      10:46:36

10            And I'll caution you in answering that       10:46:38

11    question not to reveal either work product or        10:46:40

12    communications that you had with Mr. Emanuel in      10:46:46

13    furtherance of your representation of your clients   10:46:49

14    to the extent that those communications were         10:46:55

15    intended by you to be maintained as confidential.    10:46:57

16            MR. PETROCELLI:  I think we're just going    10:47:05

17    around in circles.                                   10:47:07

18            I'm trying to understand why his             10:47:08

19    conversations with Ari would be work product as      10:47:11

20    opposed to his conversations with the man on the     10:47:14

21    street or the folks at Fox, Paramount or Sony.       10:47:17

22    What's different about the Ari communications such   10:47:22

23    that they --                                         10:47:25

24            MR. KENDALL:  Just a minute.                 10:47:26

25            MR. PETROCELLI:  -- are subject to some      10:47:26
```

**EXHIBIT 3**
**151**

MARC  TOBEROFF - 9/18/2012

Page 60

```
 1    claim of privilege?  I'm only asking so that I can          10:47:28
 2    understand the position in the event we decide to           10:47:31
 3    litigate it.                                                 10:47:33
 4         MR. KENDALL:  So, I think that your view is            10:47:34
 5    a bit narrow in that there are two privileges that          10:47:41
 6    may be implicated and that's why I gave the caution.        10:47:45
 7         So one privilege is the work product                   10:47:49
 8    privilege.  And when you ask the witness about his          10:47:50
 9    thought processes or certain steps he took in               10:47:54
10    representation of his clients, then the work product        10:47:57
11    privilege is implicated.                                    10:48:00
12         But there's another privilege when you --             10:48:01
13    that's implicated when you ask about a conversation,        10:48:04
14    depending on the circumstances and you're free to          10:48:10
15    make -- you know, ask whatever you want to ask as          10:48:12
16    far as foundation, but that privilege is the               10:48:15
17    attorney-client privilege that adheres, if you are         10:48:17
18    contacting a third person in furtherance of your           10:48:22
19    attorney-client relationship and the communications        10:48:25
20    are intended to be confidential.                           10:48:29
21         So I want to caution the witness, and                 10:48:32
22    that's why I've done that, not to reveal either            10:48:35
23    category of privilege.  And I think there are ways         10:48:40
24    for you to make a record of whatever foundation --         10:48:42
25    foundational facts you want to in order to pursue          10:48:47
```

MARC  TOBEROFF - 9/18/2012

Page 61

```
 1    the matter if you choose to.  I recognize you may        10:48:52

 2    have a disagreement, but that's --                       10:48:53

 3           MR. PETROCELLI:  Yeah, we do and I -- it's        10:48:56

 4    usually my practice not to argue on the record about     10:48:58

 5    these things.  I'm just trying to get whatever           10:49:01

 6    information I can.                                        10:49:03

 7           MR. KENDALL:  Right, and it's my practice,        10:49:05

 8    too, but since you -- you asked me --                     10:49:06

 9           MR. PETROCELLI:  I was hoping.                    10:49:08

10           MR. KENDALL:  -- what the basis was, I           10:49:09

11    thought I should respond.                                 10:49:10

12    BY MR. PETROCELLI:                                        10:49:10

13        Q.  Do you have any kind of written agreement        10:49:14

14    with Mr. Emanuel that your discussions with him are      10:49:18

15    intended to be confidential and he's not permitted       10:49:22

16    to disclose them to anybody?                             10:49:24

17        A.  No.                                              10:49:27

18        Q.  Okay.  Do you have a verbal agreement with       10:49:28

19    him to that effect?                                       10:49:30

20           MR. KENDALL:  Vague and ambiguous.               10:49:32

21           THE WITNESS:  I would say yes, we have an        10:49:34

22    understanding of that when we're talking about           10:49:38

23    confidential matters.                                     10:49:43

24    BY MR. PETROCELLI:                                        10:49:43

25        Q.  Well, have you told him that he's not           10:49:44
```

**EXHIBIT 3**
**153**

MARC  TOBEROFF - 9/18/2012

Page 62

```
 1    allowed to disclose those matters to anybody?          10:49:46

 2       A.  Yes.                                            10:49:48

 3       Q.  And has he agreed to that?                      10:49:49

 4       A.  Yes.                                            10:49:49

 5       Q.  And how has he agreed to it?                    10:49:50

 6       A.  Verbally.                                       10:49:51

 7       Q.  Okay.  When did you first reach that            10:49:57

 8    agreement with him, that verbal agreement?            10:49:59

 9       A.  When we first started discussing matters of     10:50:01

10    that nature.                                           10:50:09

11       Q.  When did that happen?                           10:50:10

12       A.  It would be sometime after the commencement     10:50:11

13    of the Siegel lawsuit in late 2004.                    10:50:15

14       Q.  And what does Mr. Emanuel get in return for     10:50:22

15    having this verbal agreement with you and sharing      10:50:27

16    information with you and having discussions with       10:50:31

17    you?  Is he being compensated?  Is there anything      10:50:32

18    he's receiving for this role he's playing?             10:50:35

19          MR. KENDALL:  Vague and ambiguous.  Lacks        10:50:38

20    foundation.                                            10:50:42

21          THE WITNESS:  No.                                10:50:42

22    BY MR. PETROCELLI:                                     10:50:42

23       Q.  Just out of friendship?                         10:50:44

24          MR. KENDALL:  Vague and ambiguous.               10:50:46

25          THE WITNESS:  I can't --                         10:50:47
```

**EXHIBIT 3**

**154**

MARC  TOBEROFF - 9/18/2012

Page 63

```
 1            MR. KENDALL:  Just a minute.  Just a        10:50:47

 2    minute.                                             10:50:48

 3            THE WITNESS:  Sorry.                         10:50:48

 4            MR. KENDALL:  Calls for speculation.        10:50:50

 5            THE WITNESS:  I can't answer as to what his 10:50:53

 6    motivations are.                                     10:50:56

 7    BY MR. PETROCELLI:                                   10:50:56

 8        Q.  What are yours?                              10:50:57

 9        A.  In furtherance of my clients.               10:51:00

10        Q.  Have you withheld in this litigation e-mail 10:51:06

11    communications with Mr. Emanuel on the basis of this 10:51:09

12    verbal agreement -- this verbal confidentiality     10:51:12

13    agreement?                                           10:51:16

14            MR. KENDALL:  I'm going to object to that   10:51:17

15    question on the ground that I don't think it's      10:51:19

16    proper for you to ask questions in this deposition  10:51:23

17    about Mr. Toberoff's actions or decisions in his    10:51:25

18    capacity as counsel for his clients or as -- in his 10:51:36

19    capacity as counsel for and his firm's counsel for  10:51:45

20    himself and the Toberoff entities.                  10:51:52

21            So I think you're free to ask questions     10:51:54

22    that you would normally ask of a lay witness but not 10:51:56

23    about the discovery process.                        10:52:00

24    BY MR. PETROCELLI:                                   10:52:00

25        Q.  Have you --                                  10:52:01
```

MARC  TOBEROFF - 9/18/2012

Page 64

```
 1           I'm not going to respond other than to have        10:52:04
 2     you understand that when I don't respond, it doesn't     10:52:10
 3     mean I agree.                                            10:52:12
 4           MR. KENDALL:  We can say that that's a             10:52:14
 5     reciprocal understanding.                                10:52:16
 6           MR. PETROCELLI:  Yes.  It will save a lot          10:52:17
 7     of chatter.                                              10:52:19
 8        Q.  The -- have you had written communications        10:52:21
 9     with Mr. Emanuel since 2004 to the present?              10:52:25
10        A.  Casual, casual e-mails.                           10:52:29
11        Q.  Related --                                        10:52:37
12        A.  Not a lot.  I don't -- I don't -- I              10:52:37
13     generally communicate with him by phone.                 10:52:40
14        Q.  Have you had --                                   10:52:42
15        A.  He's not very responsive to e-mails and          10:52:43
16     things.                                                  10:52:46
17        Q.  Have you had written communications with          10:52:46
18     him since 2004 related to the Siegel or Shuster          10:52:48
19     interests?                                               10:52:53
20        A.  I'm sure I have.                                  10:52:53
21        Q.  Okay.                                             10:52:53
22           MR. KENDALL:  Mr. Petrocelli, could I just        10:52:58
23     ask that you try to hold your questions until he's       10:53:00
24     finished answering.  I think when you look at the        10:53:03
25     record eventually, you will see many interruptions       10:53:05
```

**EXHIBIT 3**

**156**

MARC   TOBEROFF - 9/18/2012

Page 65

```
 1   where the answer continues, despite interjections by        10:53:10

 2   you, and so I think it would be much easier for the         10:53:13

 3   reporter if you wait until the witness has stopped          10:53:16

 4   talking before you start talking again.                     10:53:19

 5        MR. PETROCELLI:  I think the witness and I             10:53:22

 6   are communicating easily and clearly and oftentimes,        10:53:23

 7   as virtually all witnesses do, they pause between           10:53:29

 8   words and don't complete their sentences all at once        10:53:32

 9   so it's hard for me to know when the witness is             10:53:35

10   ending, but I'll make an effort to do better.               10:53:37

11        Q.  The -- other than talking with you, are you        10:53:44

12   aware of any other activity that Mr. Emanuel has            10:53:50

13   undertaken or performed in connection with the              10:53:56

14   Siegel or Shuster interest since 2004 and the wind          10:53:59

15   down of IP Worldwide, other than conversations with         10:54:02

16   you?                                                        10:54:08

17        MR. KENDALL:  That would call for a "yes"              10:54:13

18   or "no."                                                    10:54:14

19        THE WITNESS:  Can you repeat the question?            10:54:18

20        MR. PETROCELLI:  Yes.                                 10:54:36

21           (The reporter read the record                      10:54:36

22        as follows:                                            10:54:36

23           "QUESTION:  Other than talking                     10:53:47

24        with you, are you aware of any                        10:53:48

25           other activity that Mr. Emanuel has               10:53:52
```

**EXHIBIT 3**
**157**

MARC TOBEROFF - 9/18/2012

Page 66

```
 1              undertaken or performed in          10:53:56
 2              connection with the Siegel or       10:53:58
 3              Shuster interest since 2004 and the  10:54:00
 4              wind down of IP Worldwide, other     10:54:02
 5              than conversations with you?")       10:54:08
 6         THE WITNESS:  Not that I can recall.      10:54:37
 7    BY MR. PETROCELLI:                             10:54:37
 8         Q.  Are you aware, for example, of whether or  10:54:48
 9    not he has had discussions with third parties  10:54:51
10    regarding the Siegel or Shuster interests?     10:54:55
11         MR. KENDALL:  Vague and ambiguous.        10:54:58
12         THE WITNESS:  I'm not aware of a specific 10:55:14
13    instance.                                      10:55:16
14    BY MR. PETROCELLI:                             10:55:16
15         Q.  Have you made contact with any potential 10:55:23
16    purchaser -- withdrawn.                        10:55:26
17         Have you made contact with any person or  10:55:30
18    entity regarding potential interests in the Siegel 10:55:32
19    or Shuster interests, other than the three studios 10:55:36
20    you mentioned, Fox, Paramount and Sony?        10:55:39
21         MR. KENDALL:  Just a moment.              10:55:52
22         I think that question is vague, ambiguous 10:55:55
23    and overbroad.  And I just want to give a caution to 10:55:57
24    the witness, you have in the litigation disclosed 10:56:03
25    information concerning the contacts with the   10:56:12
```

**EXHIBIT 3**

**158**

MARC   TOBEROFF - 9/18/2012

Page 67

```
 1    studios.                                              10:56:14
 2           This question could call for -- potentially    10:56:15
 3    for either work product or attorney-client           10:56:20
 4    furtherance communications.  I don't know.  But       10:56:27
 5    either -- I think answer the question if you can      10:56:31
 6    without waiving privilege, and give Mr. Petrocelli a  10:56:34
 7    chance to follow up, or I suggest you confer with me  10:56:38
 8    so as not to waive any privileges.                    10:56:41
 9           THE WITNESS:  Without -- without waiver of     10:56:47
10    privilege, I cannot recall specific parties, but I'm  10:56:49
11    sure in the course of, you know, the eight years of   10:57:02
12    litigating the Siegel case, that there have been      10:57:07
13    additional conversations between me and third         10:57:10
14    parties of a very general nature.                     10:57:15
15    BY MR. PETROCELLI:                                    10:57:15
16       Q.  And you can't identify any of them?           10:57:22
17       A.  I -- I -- I can't -- I can -- I can give       10:57:24
18    you one example of what makes me answer that way.     10:57:37
19           I had a conversation with a gentleman who      10:57:42
20    is part of a company set up by Haim Saban, which was  10:57:57
21    a new entity focused on intellectual property         10:58:08
22    rights.  And we had a lunch.  And I don't have a      10:58:14
23    specific recollection.  We talked about a lot of      10:58:20
24    different things at the lunch.  And we may have -- I  10:58:26
25    may have mentioned Superman in a general way, what    10:58:30
```

MARC   TOBEROFF - 9/18/2012

Page 68

```
 1   the status of the case was in a general way in terms      10:58:33

 2   of rulings that we have had that are favorable to          10:58:37

 3   us.                                                        10:58:42

 4        Q.  Do you know the name of the person?              10:58:44

 5        A.  I don't remember his name.                       10:58:46

 6        Q.  Do you know when that happened?                  10:58:47

 7        A.  I do not.                                        10:58:53

 8        Q.  Can you recall -- have you had any contact       10:58:54

 9   with any private investment --                            10:58:56

10        A.  I remember it was a fish restaurant in the       10:58:58

11   Century City mall.                                        10:59:00

12        Q.  Can you --                                       10:59:02

13        A.  I don't remember his name.                       10:59:03

14        Q.  Can you recall the name, have you had any        10:59:03

15   contact with any private investment firms,                10:59:06

16   investment banks, private equity funds, potential         10:59:09

17   investors regarding potential interest in the             10:59:12

18   rights?                                                   10:59:17

19        A.  That triggered a recollection, and there's      10:59:17

20   a -- a gentleman I met, I also don't recall his           10:59:29

21   name, who was an investment banker who I have -- who      10:59:32

22   worked for a fund that's split off from Goldman           10:59:47

23   Sachs.  It's a very aggressive high-powered fund and      10:59:53

24   he was aware of the Superman case and he was              11:00:02

25   interested in Superman.                                   11:00:06
```

EXHIBIT 3
160

MARC   TOBEROFF - 9/18/2012

Page 69

| | | |
|---|---|---|
| 1 | Q.  And you met with him? | 11:00:10 |
| 2 | A.  We had -- we had only general | 11:00:11 |
| 3 | conversations. | 11:00:14 |
| 4 | Q.  When was that? | 11:00:14 |
| 5 | A.  Over a period of time.  He had -- | 11:00:15 |
| 6 | Q.  What years? | 11:00:19 |
| 7 | A.  Trying to remember his -- his -- I would | 11:00:19 |
| 8 | say between two and four years.  There were -- he | 11:00:23 |
| 9 | was sort of a acquaintance who I would run into in | 11:00:32 |
| 10 | Century City and I believe he had offices at some | 11:00:37 |
| 11 | point in Century City. | 11:00:41 |
| 12 | Q.  You don't know the name of that person? | 11:00:42 |
| 13 | A.  I don't remember his name. | 11:00:44 |
| 14 | Q.  Do you -- | 11:00:45 |
| 15 | A.  He was always asking about Superman. | 11:00:46 |
| 16 | Q.  Do you have any documents that would | 11:00:48 |
| 17 | identify the name of either of these people that | 11:00:51 |
| 18 | you've just mentioned, the person associated with | 11:00:54 |
| 19 | Haim Saban and this other person in this fund? | 11:00:58 |
| 20 | A.  I don't think so. | 11:01:01 |
| 21 | Q.  And was that in the last two to four years | 11:01:02 |
| 22 | that you had those discussions with this fellow? | 11:01:05 |
| 23 | A.  I would say two to four years is a -- I | 11:01:07 |
| 24 | think I've known him for about five years. | 11:01:13 |
| 25 | Q.  And you don't know his name? | 11:01:16 |

MARC  TOBEROFF - 9/18/2012

Page 70

```
 1        A.  His name might come to me in the course of      11:01:17

 2    this conversation.  But it wasn't a serious -- these    11:01:21

 3    are just general, "What's happening with Superman,"     11:01:23

 4    you know.  A lot of people know that I'm involved       11:01:26

 5    with the Superman case.  And they ask me in a social    11:01:28

 6    way about it and I will comment on it, and if they      11:01:33

 7    have some -- you know, people might have a casual        11:01:36

 8    conversation.                                           11:01:43

 9        So in this particular instance, I remember          11:01:46

10    a casual conversation saying, "Are you interested in    11:01:47

11    somebody coming in and funding the litigation, and      11:01:53

12    described to me that this fund isn't afraid of          11:01:55

13    litigation," and they do that.                          11:01:58

14        Q.  Is anybody --                                   11:02:00

15            MR. KENDALL:  Just one minute.                  11:02:00

16            Mr. Toberoff, I'm going to ask you to focus     11:02:02

17    on the question and answer the question posed.          11:02:05

18            THE WITNESS:  Okay.                             11:02:06

19    BY MR. PETROCELLI:                                      11:02:06

20        Q.  Is there anybody who is funding this            11:02:07

21    litigation other than you?                              11:02:10

22        A.  No.                                             11:02:11

23        Q.  Has -- have you had any -- have you or          11:02:13

24    anybody else, to your knowledge, had any               11:02:18

25    negotiations, actual contractual negotiations, with    11:02:22
```

MARC TOBEROFF - 9/18/2012

Page 71

```
 1    a third party to do some kind of deal with respect        11:02:26
 2    to the termination rights of the Siegels or              11:02:31
 3    Shusters?                                                 11:02:35
 4          MR. KENDALL:  Vague and ambiguous.                 11:02:36
 5    BY MR. PETROCELLI:                                        11:02:36
 6       Q.  Other than DC Comics, of course, and Warner       11:02:37
 7    Bros.?                                                    11:02:40
 8          MR. KENDALL:  Vague and ambiguous.                 11:02:40
 9          THE WITNESS:  Are you asking me whether any        11:02:49
10    of these things that I've described have progressed      11:02:50
11    to the level of having an actual negotiation?            11:02:53
12    BY MR. PETROCELLI:                                        11:02:53
13       Q.  Yes.  Plus to the extent there were any           11:02:58
14    negotiations with anybody else that we haven't           11:03:01
15    covered, that's what I'm asking.                         11:03:02
16       A.  No.                                                11:03:06
17       Q.  Okay.  And have -- have there been any deal       11:03:06
18    terms exchanged with anyone regarding acquisition of     11:03:11
19    the rights?                                               11:03:14
20       A.  No.                                                11:03:14
21       Q.  To your knowledge, have any third parties         11:03:19
22    conducted any due diligence with respect to a            11:03:21
23    potential deal for acquisition of the rights?            11:03:24
24          MR. KENDALL:  Lacks foundation.  Calls for         11:03:27
25    speculation.  Vague and ambiguous.                       11:03:29
```

MARC   TOBEROFF - 9/18/2012

Page 72

```
 1            THE WITNESS:  I don't know.  I would be      11:03:30
 2    guessing.                                            11:03:31
 3    BY MR. PETROCELLI:                                   11:03:31
 4       Q.   That's why I said "to your knowledge."  In   11:03:32
 5    other words, has anybody ever --                     11:03:34
 6       A.   I don't have knowledge.                      11:03:35
 7       Q.   -- asked you for materials to review?        11:03:36
 8       A.   I don't believe so.                          11:03:55
 9       Q.   Have you written any assessment or --        11:03:56
10       A.   I believe the closest thing to that would    11:03:59
11    be a reference to, you know, there's a published     11:04:01
12    decision that you can get.                           11:04:05
13       Q.   Have you prepared and sent any analyses to   11:04:07
14    any third parties regarding the -- the rights or     11:04:11
15    risks associated with obtaining the rights?          11:04:16
16            MR. KENDALL:  Vague and ambiguous.           11:04:18
17            THE WITNESS:  Not that I can recall, no.      11:04:19
18    BY MR. PETROCELLI:                                   11:04:19
19       Q.   In the discussions that you had with the     11:04:29
20    studios and these other individuals whose names you  11:04:32
21    cannot recall, can you generally describe the        11:04:36
22    content of those discussions?                        11:04:38
23            MR. KENDALL:  Same cautions as before        11:04:41
24    concerning the attorney-client communications and    11:04:43
25    work product privileges.                             11:04:45
```

EXHIBIT 3
164

MARC  TOBEROFF - 9/18/2012

Page 73

```
 1   BY MR. PETROCELLI:                                    11:04:45
 2       Q.  You need to let me know whether you are       11:04:51
 3   excluding things discussed in those conversations.    11:04:54
 4       A.  I understand.  I'm thinking about them.        11:04:57
 5       Q.  If you need to go through them one by one,     11:05:01
 6   that's fine.  I'll give you the option of either       11:05:02
 7   giving me the substance of them generally or          11:05:08
 8   collectively or you can go one by one.                11:05:10
 9           MR. KENDALL:  I think right now the pending    11:05:13
10   question is can you recall them, so I was -- I think   11:05:15
11   you can answer that question.  I just was cautioning   11:05:17
12   you not to go further.  And then Mr. Petrocelli is     11:05:19
13   free to follow up as he deems appropriate.  So that   11:05:23
14   really should be "yes" or "no" as to what you can      11:05:26
15   recall.                                                11:05:29
16           MR. PETROCELLI:  Apparently that wasn't my     11:05:30
17   question.  Someone's looking at Livenote.  But I       11:05:32
18   don't use Livenote.  But in any event, we can start    11:05:34
19   with that question.                                    11:05:37
20           THE WITNESS:  What is the question?            11:05:37
21   BY MR. PETROCELLI:                                     11:05:38
22       Q.  Are you able to recount the conversations      11:05:39
23   with the three studios and these other individuals     11:05:40
24   about the -- about any potential interest in           11:05:42
25   acquiring the rights?                                  11:05:45
```

**EXHIBIT 3**

**165**

MARC   TOBEROFF - 9/18/2012

Page 74

```
 1        A.  Are you asking me whether I am able to        11:05:46
 2    recall them?                                          11:05:49
 3        Q.  Yes.                                          11:05:49
 4        A.  I have a general recollection of the          11:06:07
 5    conversations, yes.                                   11:06:09
 6        Q.  Can you recount them to me?                   11:06:10
 7            MR. KENDALL:  That calls for a "yes" or       11:06:14
 8    "no."                                                 11:06:20
 9            THE WITNESS:  I believe that a lot of work    11:06:20
10    product is intricately bound up in those              11:06:22
11    conversations.                                        11:06:25
12    BY MR. PETROCELLI:                                    11:06:25
13        Q.  In each of them?                              11:06:26
14        A.  Because those conversations naturally         11:06:27
15    entail discussions of the risks of litigation.        11:06:35
16        Q.  And therefore on that basis you will          11:06:44
17    decline to provide the details of the                 11:06:47
18    conversations --                                      11:06:49
19            MR. KENDALL:  Mr. Toberoff --                 11:06:50
20    BY MR. PETROCELLI:                                    11:06:50
21        Q.  -- and I need not ask any more questions?     11:06:52
22    Trying to make my record so that I am not met with    11:06:55
23    an objection later on that I didn't ask the right     11:07:00
24    question.                                             11:07:04
25            MR. KENDALL:  So Mr. Toberoff, I think        11:07:04
```

MARC  TOBEROFF - 9/18/2012

Page 75

```
 1    perhaps we should confer on the matter of privilege      11:07:08

 2    before you answer that question.                         11:07:11

 3            THE WITNESS:  I was going to say subject to       11:07:12

 4    conferring with my counsel, but if it's okay -- I        11:07:14

 5    don't want to interrupt your deposition.  If it's        11:07:17

 6    okay with you, we can take a short break to confer.      11:07:18

 7            MR. PETROCELLI:  Well, when you need to           11:07:21

 8    confer, you need to confer.                              11:07:24

 9            THE WITNESS:  Okay.                               11:07:26

10            THE VIDEOGRAPHER:  Off the record.  The          11:07:27

11    time is 11:07.                                           11:07:29

12            (Brief recess.)                                  11:08:44

13            THE VIDEOGRAPHER:  Back on the record at         11:11:46

14    11:11.                                                   11:11:50

15            THE WITNESS:  So, I can describe my              11:11:52

16    conversations with Sony, Paramount and Fox to the       11:11:53

17    best of my recollection.                                 11:12:00

18    BY MR. PETROCELLI:                                       11:12:00

19        Q.  Without excluding anything?                      11:12:02

20        A.  Not excluding.                                   11:12:04

21        Q.  Excuse me?                                       11:12:05

22        A.  I'm not excluding anything that was said.        11:12:06

23        Q.  Okay.  And what about with respect to the       11:12:08

24    other two individuals?                                   11:12:09

25        A.  I'm not excluding.                               11:12:13
```

MARC   TOBEROFF - 9/18/2012

Page 76

```
 1         Q.   Okay.  So please do.                        11:12:15

 2         A.   So where do you want me to start?          11:12:17

 3         Q.   Whatever way makes sense, chronological    11:12:20

 4    order.                                               11:12:23

 5         A.   The -- I have just a general recollection  11:12:25

 6    of the meetings with I believe it's Peter Schlessel 11:12:29

 7    or "Schlessel" at Sony, and -- where I discussed the 11:12:32

 8    state of the case in general, what rulings we've     11:12:44

 9    had.  I believe by that time, I believe it was after 11:12:51

10    the ruling in 2008, summary judgment ruling, and my  11:12:55

11    understanding of what joint owners of a copyright     11:13:02

12    interest are allowed to do.                           11:13:14

13         Essentially each has the non-exclusive          11:13:17

14    right to exploit whatever copyrights they own         11:13:19

15    subject to a duty to account to the other party.      11:13:22

16         And I recall him saying that -- that Sony        11:13:26

17    was -- had a very good relationship with Warner       11:13:37

18    Bros.  And I recall general -- I don't recall the     11:13:41

19    specific words used, but I -- I recall a general      11:13:48

20    understanding that if there was a -- any -- any deal  11:13:52

21    made between Sony and my clients, that Sony would     11:14:01

22    then want to make a deal with Warner Bros., and how   11:14:10

23    that would work, sort of general conversations of     11:14:21

24    would that be before a deal is made with my clients   11:14:24

25    or after a deal, just general -- these were the       11:14:27
```

MARC  TOBEROFF - 9/18/2012

Page 77

```
 1    topics of conversation that I recall.  I don't        11:14:31

 2    recall how those topics were resolved.                11:14:36

 3         Q.  Did you also discuss potential acquisition   11:14:39

 4    of the Shuster interest?                              11:14:42

 5         A.  I -- no, I don't think so.  I think that     11:14:52

 6    was -- I think the focus was on the Siegel interest   11:14:57

 7    in the Sony conversation.                             11:15:05

 8         Q.  Did Sony express any interest in pursuing    11:15:07

 9    this?                                                 11:15:10

10         A.  They were interested.  They were            11:15:14

11    interested, but -- they expressed interest, Yes.      11:15:16

12         Q.  Did you discuss with them that if -- if and  11:15:25

13    when the Shuster termination became effective, that   11:15:31

14    there would effectively be a blocking right to        11:15:37

15    preclude Warner Bros. from proceeding with            11:15:40

16    exploitation of Superman?                             11:15:41

17              MR. KENDALL:  Just a moment, please.        11:15:43

18              Thank you.                                  11:16:01

19              THE WITNESS:  I don't recall that.          11:16:04

20    BY MR. PETROCELLI:                                    11:16:04

21         Q.  Was there any discussion whatsoever          11:16:09

22    regarding circumstances under which Warner Bros.      11:16:11

23    might not be able to proceed to exploit Superman      11:16:13

24    without the involvement of the Shuster and/or Siegel  11:16:20

25    interests?                                            11:16:25
```

MARC  TOBEROFF - 9/18/2012

Page 78

```
 1        A.  I don't have any specific recollection of    11:16:25

 2   that.                                                 11:16:30

 3        Q.  Okay.  And nothing came of that              11:16:36

 4   conversation as a result of it, right?  Afterwards,   11:16:37

 5   I mean.                                               11:16:41

 6        A.  I don't know what you mean by "nothing came  11:16:45

 7   of it."                                               11:16:49

 8        Q.  There has been no further contact?           11:16:50

 9        A.  I decided not to pursue it afterwards.       11:16:51

10        Q.  With Sony?                                   11:16:56

11        A.  Yes.                                         11:16:57

12        Q.  Why?                                         11:16:57

13        A.  That, I'm going to assert work product.      11:16:57

14        Q.  Did you discuss your reasons with him?       11:16:59

15        A.  No.                                          11:17:01

16        Q.  Okay.  What was the next?                    11:17:03

17        A.  The next -- the next, I believe, was         11:17:09

18   Paramount.  I believe it was -- I'm not sure, but     11:17:13

19   I'm pretty sure it was Paramount was the next before  11:17:23

20   Fox.  And at that meeting I recall them wanting me    11:17:26

21   to sort of run through the background of the case,    11:17:35

22   what is the case about, what rulings have we had in   11:17:40

23   the case, and I was essentially doing it for their    11:17:44

24   lawyers who were in the room.  And I don't recall --  11:17:52

25   I recall the topic.  I recall the conversation.       11:17:56
```

**EXHIBIT 3**
**170**

MARC  TOBEROFF - 9/18/2012

Page 79

```
 1              And they expressed interest in -- I would          11:18:08
 2    say keen interest in being in the Superman business.         11:18:15
 3       Q.  Was there any discussion of acquisition of            11:18:22
 4    the Shuster interest at some point in the future?            11:18:24
 5       A.  I don't recall discussions about the                  11:18:26
 6    Shuster interests.  I recall going over sort of the          11:18:34
 7    general landscape of the litigation.  And I                  11:18:41
 8    believe -- I believe this was before the 2010                11:18:52
 9    lawsuit.  I -- I believe it was.                             11:18:56
10       Q.  In the Sony meeting, did you disclose that            11:18:59
11    the Shusters had filed a notice of termination that          11:19:01
12    would become effective in 2013?                              11:19:03
13       A.  I don't specifically recall.                          11:19:05
14       Q.  And in the Fox meeting, did that come up?             11:19:11
15       A.  I don't specifically recall discussions of           11:19:14
16    the Shuster termination.                                     11:19:17
17       Q.  Were you discussing that -- either in the            11:19:18
18    Fox or Sony meetings that the studios would buy the          11:19:21
19    Siegel interest and receive an accounting from              11:19:27
20    Warner Bros. or they, themselves, would also be             11:19:30
21    involved in exploiting the property as a                     11:19:32
22    co-copyright owner?                                          11:19:37
23              MR. KENDALL:  Objection.  Compound.  Vague         11:19:37
24    and ambiguous.                                               11:19:45
25              THE WITNESS:  I'm -- I'm simply going to           11:19:45
```

**EXHIBIT 3**
**171**

MARC  TOBEROFF - 9/18/2012

Page 80

```
 1    testify as to what was said at those meetings, not      11:19:47

 2    to what my assumptions were or impressions were.        11:19:50

 3    BY MR. PETROCELLI:                                       11:19:50

 4        Q.  That was my question.                           11:19:55

 5        A.  I'm trying not to -- to fill in the blanks.     11:19:56

 6        Q.  Right.  Were the -- was that topic              11:19:58

 7    discussed, whether they would exploit themselves or     11:20:00

 8    whether they would just simply receive money from       11:20:03

 9    Warner Bros.?                                            11:20:06

10        A.  I don't believe it was specifically             11:20:07

11    addressed.                                               11:20:09

12            Let me see.  I don't believe it was -- I        11:20:11

13    don't recall a conversation about -- in the Sony        11:20:23

14    meeting.  I recall conversations with Paramount         11:20:28

15    about --                                                11:20:33

16            MR. KENDALL:  He was asking about Fox in        11:20:35

17    his question.                                            11:20:36

18            THE WITNESS:  Oh.                                11:20:36

19    BY MR. PETROCELLI:                                       11:20:36

20        Q.  Actually, I was asking about both, Sony and    11:20:37

21    Fox.                                                     11:20:40

22        A.  I recall in Paramount --                        11:20:40

23            MR. KENDALL:  I'm sorry.  He's asking about     11:20:43

24    Sony and Fox.                                            11:20:44

25            THE WITNESS:  Okay.  I don't recall a           11:20:45
```

MARC   TOBEROFF - 9/18/2012

Page 81

```
 1     conversation at Fox about that.  And I don't recall          11:20:47

 2     a conversation at Sony.                                       11:20:53

 3     BY MR. PETROCELLI:                                            11:20:53

 4         Q.  Was I confused?  Was the second                       11:20:56

 5     conversation that you were describing to me the Fox           11:20:59

 6     conversation?                                                 11:21:02

 7         A.  No, it was Paramount.                                 11:21:03

 8         Q.  Then I was confused.  So would your answer            11:21:03

 9     be the same for Paramount?                                    11:21:10

10         A.  Paramount, I have a vague recollection of,            11:21:11

11     you know, Paramount being interested in doing a              11:21:16

12     Superman movie.                                               11:21:23

13         Q.  Did you discuss any figures in -- in either          11:21:28

14     of these meetings or any of these three meetings             11:21:30

15     regarding the value of the Siegel rights that you            11:21:32

16     were there to talk about?                                     11:21:36

17         A.  No.                                                   11:21:37

18         Q.  Were any figures discussed at all?                    11:21:37

19         A.  No.                                                   11:21:39

20         Q.  What about thereafter?                                11:21:41

21         A.  No.                                                   11:21:41

22         Q.  And on the Paramount meeting there were no           11:21:45

23     subsequent discussions?                                       11:21:48

24         A.  With?                                                 11:21:48

25         Q.  With them?                                            11:22:04
```

MARC   TOBEROFF - 9/18/2012

Page 82

| | | |
|---|---|---|
| 1 | A.  No. | 11:22:06 |
| 2 | Q.  Did you make a decision as you did similar | 11:22:10 |
| 3 | to Sony not to pursue subsequent discussions with | 11:22:12 |
| 4 | them? | 11:22:15 |
| 5 | A.  No. | 11:22:15 |
| 6 | Q.  But nothing happened relative to Paramount | 11:22:33 |
| 7 | after the Paramount meeting? | 11:22:35 |
| 8 | MR. KENDALL:  Overbroad.  Vague and | 11:22:38 |
| 9 | ambiguous. | 11:22:46 |
| 10 | THE WITNESS:  After the Paramount meeting, | 11:22:46 |
| 11 | I checked with the agent at Endeavor who -- and I | 11:22:49 |
| 12 | forget, I'm terrible with names and I forget his | 11:22:56 |
| 13 | name as well.  There was an agent, it may come -- it | 11:22:59 |
| 14 | just came to me.  John Fogelman.  He -- I checked | 11:23:02 |
| 15 | with him. | 11:23:08 |
| 16 | Q.  Did he help arrange the meeting? | 11:23:16 |
| 17 | A.  Yeah, he helped set up the meeting.  He set | 11:23:17 |
| 18 | up the meeting for me. | 11:23:19 |
| 19 | Q.  Did anybody help set up the -- the Sony | 11:23:20 |
| 20 | meeting? | 11:23:24 |
| 21 | A.  My friend Julio Caro, who I mentioned. | 11:23:27 |
| 22 | Q.  What about the Fox meeting? | 11:23:30 |
| 23 | A.  No, I set that up myself.  Tom -- | 11:23:31 |
| 24 | Q.  So Fogelman followed up at your request? | 11:23:32 |
| 25 | A.  Tom Rothman went to law school with me at | 11:23:35 |

**EXHIBIT 3**
**174**

MARC  TOBEROFF - 9/18/2012

Page 83

```
 1   Columbia.                                         11:23:38

 2        Q.  Okay.  You were talking about Fogelman.  11:23:39

 3   I'm sorry.                                        11:23:41

 4        A.  So I followed up with Fogelman, and I -- I  11:23:42

 5   didn't -- I don't -- there was no definitive answer  11:23:51

 6   as to what's happening or what's the next step or I  11:23:55

 7   don't recall any definitive answer.              11:23:59

 8        Q.  And what about Fox -- and nothing further  11:24:04

 9   happened after the Fogelman followup?            11:24:08

10        MR. KENDALL:  Overbroad.  Vague and          11:24:10

11   ambiguous.                                        11:24:12

12        THE WITNESS:  Not -- no.                     11:24:12

13   BY MR. PETROCELLI:                                11:24:12

14        Q.  Did the Sony meeting occur before or after  11:24:23

15   the filing of this lawsuit?                       11:24:26

16        A.  Sony meeting occur -- when you say "this  11:24:34

17   lawsuit," I tend to think about the Siegel and the  11:24:37

18   Shuster together.                                 11:24:41

19        Q.  Forgive me.  The case that you filed.    11:24:41

20        A.  The Shuster case?                        11:24:42

21        Q.  Yes.                                     11:24:43

22        A.  Why don't we call this the Shuster case and  11:24:43

23   the other the Siegel case.                        11:24:46

24        Q.  Fair enough.                             11:24:46

25        A.  So Sony was before that --              11:24:47
```

**EXHIBIT 3**
**175**

MARC  TOBEROFF - 9/18/2012

Page 84

```
 1        Q.  And Paramount --                        11:24:47
 2        A.  -- long before that.                    11:24:49
 3        Q.  Before or after the Shuster case?       11:24:50
 4        A.  Long before.                            11:24:52
 5        Q.  And Fox, before or after?               11:24:53
 6        A.  I believe before.                       11:24:55
 7        Q.  Okay.                                   11:24:59
 8        A.  Paramount was before as well.           11:24:59
 9        Q.  All three of the studio meetings were   11:25:00
10    before?                                         11:25:02
11        A.  I believe so.                           11:25:02
12        Q.  And since the Shuster case was filed, the 11:25:03
13    only discussions that you have had with potential 11:25:05
14    third parties, or third parties, I should say, are 11:25:08
15    these two people who you can't recall from these 11:25:10
16    investor funds?                                 11:25:13
17        A.  That was before the Shuster case was filed. 11:25:13
18        Q.  All before?                             11:25:15
19        A.  Yes.                                    11:25:16
20        Q.  So no -- no meetings, no communications 11:25:16
21    with third parties on this topic after the Shuster 11:25:21
22    case?                                           11:25:23
23            MR. KENDALL:  Vague and ambiguous.      11:25:23
24            THE WITNESS:  Not that I recall.        11:25:28
25    BY MR. PETROCELLI:                              11:25:28
```

MARC  TOBEROFF - 9/18/2012

Page 85

```
 1        Q.  Okay.  And on the Fox meeting, can you give      11:25:29

 2   me your account of that meeting?  I think that was        11:25:34

 3   the third one in line.                                    11:25:40

 4        A.  Tom Rothman was personally interested, I         11:25:52

 5   recall in his words, I said, "Are you interested in       11:25:54

 6   Superman?"                                                11:25:59

 7            And he said, "Who isn't?"                        11:25:59

 8            And I described basically the rulings that       11:26:04

 9   we had gotten so far and that these rulings are           11:26:11

10   publically -- the lawyers acknowledged that they          11:26:25

11   already had, in doing their due diligence -- they         11:26:26

12   had already done due diligence and knew -- the            11:26:29

13   lawyers had read the decisions and knew what the          11:26:33

14   state of the litigation was.                              11:26:34

15            I recall a -- I recall something to the          11:26:49

16   effect that Tom Rothman said he was going to have         11:27:12

17   his legal people evaluate, evaluate it.                   11:27:15

18        Q.  Did anything occur after the meeting,            11:27:22

19   follow up on the meeting?                                 11:27:28

20        A.  No.                                              11:27:29

21        Q.  In any of these three meetings, was there        11:27:30

22   any discussion of the need for the Shusters to agree      11:27:35

23   to any deal respecting the Siegel interests?             11:27:43

24        MR. KENDALL:  Vague and ambiguous.                   11:27:47

25   Argumentative.                                            11:27:48
```

**EXHIBIT 3**

**177**

MARC   TOBEROFF - 9/18/2012

Page 86

```
 1              THE WITNESS:  No.  I don't recall -- I      11:27:49
 2    recall the focus being on the Siegels and the        11:27:56
 3    rulings that we had to date regarding the Siegels,    11:28:00
 4    and what those rulings said the Siegels have and      11:28:02
 5    don't have.                                           11:28:05
 6              And -- and now that I phrase it that way, I  11:28:07
 7    recall that in the Paramount meeting and in the Fox   11:28:15
 8    meeting, but not in the Sony meeting, an attempt by   11:28:19
 9    me to delineate what those works were to which the    11:28:25
10    Siegels had recovered their copyright pursuant to     11:28:33
11    Judge Larson's two partial summary judgment rulings,  11:28:35
12    and how there was an issue as to what the             11:28:41
13    elements -- still pending issues as to what the       11:28:47
14    elements are which are contained in those works, and  11:28:49
15    my, you know, trying to ballpark with them those      11:28:58
16    elements.                                             11:29:04
17         Q.  Did the -- did these meetings occur after    11:29:04
18    the Siegels and Shusters and you had signed the       11:29:08
19    document that's been referred to in this case as the  11:29:12
20    consent agreement?                                    11:29:16
21         A.  Sony, no.  I don't -- I think they occurred  11:29:19
22    before.                                               11:29:27
23         Q.  The consent agreement was signed in 2008?    11:29:30
24         A.  Yeah, may have -- Fox may have taken place   11:29:35
25    after that.  I don't know.  But it could just as      11:29:38
```

MARC   TOBEROFF - 9/18/2012

Page 87

```
 1    easily have taken place before.                      11:29:42

 2         Q.   Were your discussions --                   11:29:43

 3         A.   It's easy enough to figure that out from -- 11:29:45

 4    by that parking pass, or studio admittance pass,     11:29:46

 5    whatever that says.                                  11:29:50

 6         Q.   Were your discussions with the two investor 11:29:51

 7    individuals generally along the same lines of the    11:29:54

 8    studio discussions?                                  11:29:57

 9         A.   Not at all.                                11:30:00

10         Q.   How did they differ?                       11:30:01

11         A.   One was a meet and greet with Haim Saban's 11:30:03

12    company where we're just talking about an overall    11:30:06

13    relationship, and they were, you know, interested    11:30:08

14    in -- in intellectual properties as a base.  He had  11:30:14

15    made his fortune based on Power Rangers and, you     11:30:18

16    know, and they were interested in exploring other    11:30:22

17    branded properties, and we were just talking and I   11:30:24

18    don't have a specific recollection about -- you      11:30:30

19    know, I -- I have a general recollection, and part   11:30:32

20    of me is assuming that I mentioned Superman to them, 11:30:37

21    but I don't have a specific recollection of that.    11:30:41

22         Q.   And nothing further happened after that    11:30:42

23    meet and greet?                                      11:30:44

24         A.   No.                                        11:30:45

25         Q.   Okay.                                      11:30:47
```

MARC  TOBEROFF - 9/18/2012

Page 88

```
 1         A.  We were -- we were -- you know, not -- not      11:30:48
 2    for lack of mutual interest, just for lack of time.      11:30:53
 3         Q.  Do you know -- do you remember the name of      11:30:56
 4    the company, the new company that was being formed?      11:30:57
 5         A.  No.                                             11:30:59
 6         Q.  Okay.  And finally with this last investor      11:31:00
 7    individual?                                              11:31:03
 8         A.  Very casual conversations with him sort of,     11:31:03
 9    you know, kind of pitching me.  But I didn't have        11:31:10
10    any, you know --                                         11:31:19
11         Q.  Have you --                                     11:31:32
12         A.  I'm just trying to think.                       11:31:32
13         My recollection is bumping into him in the          11:31:36
14    Century City mall between the -- you know, 2049           11:31:39
15    and --                                                   11:31:43
16         Q.  Okay.                                           11:31:43
17         A.  -- building, and him kind of pitching me        11:31:43
18    and saying, "What's happening with Superman?"  And      11:31:46
19    wanting to see if he could get in on it somehow.         11:31:49
20         Q.  And nothing happened beyond that encounter      11:31:52
21    with this individual?                                    11:31:54
22         A.  No.                                             11:31:55
23         MR. PETROCELLI:  Okay.  You can change the          11:31:56
24    tape.                                                    11:31:57
25         THE VIDEOGRAPHER:  This will mark the end           11:31:58
```

MARC  TOBEROFF - 9/18/2012

Page 89

```
 1    of Volume I, Tape Number 1 in the deposition of Marc       11:31:59

 2    Toberoff.  Changing tapes at 11:32.                        11:32:02

 3           (Brief recess.)                                     11:32:07

 4           THE VIDEOGRAPHER:  We're back on the                11:33:40

 5    record.                                                    11:33:41

 6           This marks the beginning of Volume I, Tape          11:33:41

 7    Number 2 in the deposition of Marc Toberoff.  The          11:33:43

 8    time is 11:33.                                             11:33:45

 9    BY MR. PETROCELLI:                                         11:33:45

10       Q.  When you spoke to Ari Emanuel about                 11:33:48

11    contacting the U.S. Attorney's office, did you             11:33:55

12    discuss with him why you were asking him to assist         11:33:57

13    in that?                                                   11:34:03

14       A.  Why I was asking him?  I don't know --             11:34:16

15    that's a little vague to me.                               11:34:18

16       Q.  Well, recount your conversation with him on         11:34:21

17    that subject.                                              11:34:23

18       A.  It was, you know, a conversation to the            11:34:24

19    extent that, I don't know how this works, I've never       11:34:28

20    really been in this -- that kind of situation, but         11:34:36

21    that there was a surprising lack of attention,            11:34:39

22    something along the lines of, you know, "Everyone's        11:34:46

23    very busy with, you know, major crimes and I get the       11:34:48

24    feeling it's hard to get anybody's attention," and         11:34:56

25    whether he knew anyone, can call anyone to give this       11:34:58
```

MARC  TOBEROFF - 9/18/2012

Page 90

| | | |
|---|---|---|
| 1 | some attention, just to review it. | 11:35:05 |
| 2 | Q.  What did he say? | 11:35:06 |
| 3 | A.  To review this matter.  And just because I | 11:35:07 |
| 4 | know he knows a lot of people. | 11:35:17 |
| 5 | Q.  What did he say? | 11:35:19 |
| 6 | A.  And he said, "I'll call.  Who are you -- | 11:35:22 |
| 7 | I'll -- I'll call them up.  Who are you -- who | 11:35:25 |
| 8 | should I call?" | 11:35:30 |
| 9 | And I gave him the name of who I had | 11:35:32 |
| 10 | figured out was -- at the USAO who was in charge of | 11:35:36 |
| 11 | what I believed would be the appropriate division, | 11:35:40 |
| 12 | in that sort of white collar crime division. | 11:35:44 |
| 13 | Q.  Did he, to your knowledge, contact that | 11:35:48 |
| 14 | person? | 11:35:49 |
| 15 | A.  He said he did.  I don't know whether or | 11:35:55 |
| 16 | not he in fact did.  I believe he did, yes. | 11:35:56 |
| 17 | Q.  Other than contact that person, did he do | 11:36:00 |
| 18 | anything else in regard to that matter? | 11:36:01 |
| 19 | MR. KENDALL:  Calls for speculation. | 11:36:05 |
| 20 | BY MR. PETROCELLI: | 11:36:05 |
| 21 | Q.  To your knowledge? | 11:36:07 |
| 22 | A.  Not to my knowledge. | 11:36:09 |
| 23 | Q.  Let me take you back to 2001.  We started | 11:36:18 |
| 24 | out the deposition by walking through your | 11:36:24 |
| 25 | employment history. | 11:36:29 |

MARC   TOBEROFF - 9/18/2012

Page 91

```
 1              Do you remember the year when you first      11:36:35
 2    learned of either the Siegel or Shuster termination    11:36:38
 3    issue?                                                 11:36:44
 4              MR. KENDALL:  So I'll just interpose an       11:36:51
 5    objection of asked and answered in the first session   11:36:53
 6    of -- or in the last round of deposition.  I guess     11:36:57
 7    it was in the Siegel litigation.  And I assume just    11:37:03
 8    as you said during Laura Siegel's deposition, that     11:37:11
 9    you don't intend to ask the same questions that have   11:37:17
10    been asked previously.                                 11:37:21
11              Is that correct?                             11:37:22
12              MR. PETROCELLI:  That's not correct.         11:37:23
13              THE WITNESS:  Which, that you didn't say it  11:37:26
14    in the Siegel or that you're not going to do that      11:37:28
15    here?                                                  11:37:30
16              MR. PETROCELLI:  You know, it's -- it's      11:37:31
17    sort of unnecessary chatter, which I don't think is    11:37:32
18    productive.  I've read your deposition in the Siegel   11:37:38
19    case, I'm familiar with it.  I may or may not ask      11:37:40
20    some of the same questions from time to time.          11:37:44
21    Whatever information is in there, I'm aware of.         11:37:49
22    It's not my intention to re- -- replay that            11:37:51
23    examination.  Obviously that examination occurred      11:37:56
24    many years ago without the benefit of a lot of         11:38:01
25    information that's now available, so we will be         11:38:03
```

**EXHIBIT 3**
**183**

MARC  TOBEROFF - 9/18/2012

Page 92

```
 1    going over the same timeline of events.  I think      11:38:07

 2    that's obvious.                                        11:38:12

 3           So with that, can you repeat the question,      11:38:15

 4    please.                                                11:38:18

 5           THE WITNESS:  I just want to note that          11:38:18

 6    what's salient of that, and I think what prompted      11:38:23

 7    you to say at the Siegel deposition that you're not    11:38:24

 8    going to repeat the questions is because in allowing   11:38:27

 9    you to take depositions of the same parties whose      11:38:30

10    depositions you had taken on the same subjects in      11:38:35

11    the Siegel case, the Magistrate Zarefsky cautioned     11:38:38

12    that he expects that DC's counsel would not be just    11:38:42

13    asking the same questions.                             11:38:50

14           MR. PETROCELLI:  And I'm mindful of the         11:38:51

15    Court's rulings and where we are right now in the      11:38:58

16    case.                                                  11:39:00

17           THE WITNESS:  Okay.                             11:39:01

18           MR. PETROCELLI:  And I'm the last person in     11:39:02

19    this room who wants to waste time so --                11:39:03

20           THE WITNESS:  Right.                            11:39:06

21           MR. PETROCELLI:  -- we'll do our best.          11:39:07

22              (The reporter read the record               11:39:17

23           as follows:                                     11:39:17

24              "QUESTION:  Let me take you                  11:36:18

25           back to 2001.  We started out the               11:36:19
```

**EXHIBIT 3**

**184**

MARC  TOBEROFF – 9/18/2012

Page 93

```
 1              deposition by walking through your          11:36:25
 2              employment history.  Do you                 11:36:29
 3              remember the year when you first            11:36:35
 4              learned of either the Siegel or             11:36:38
 5              Shuster termination issue?")                11:36:43
 6              THE WITNESS:  I don't know what you mean     11:39:19
 7      by "Shuster termination issue."  But to try and cut 11:39:40
 8      through it, I -- I had read on the Internet, I      11:39:43
 9      believe it was on the Internet, about the Shusters  11:39:52
10      having exercised -- Siegels having exercised their  11:39:56
11      termination rights and I believe that was sometime  11:40:01
12      in 2001.                                            11:40:03
13      BY MR. PETROCELLI:                                  11:40:03
14          Q.  Do you have any documents that would date   11:40:05
15      when that occurred?                                 11:40:09
16          A.  No.                                         11:40:10
17          Q.  Okay.                                       11:40:13
18          A.  I -- I remember that it was all over the    11:40:14
19      Internet.                                           11:40:19
20          Q.  Okay.                                       11:40:19
21          A.  That there were copies of the termination   11:40:21
22      notice that were posted on the Internet.  And just  11:40:24
23      like they talked about these litigations on the     11:40:30
24      Internet, there was a tremendous amount of talk and 11:40:32
25      speculation as to what is happening with the        11:40:35
```

EXHIBIT 3
185

MARC   TOBEROFF - 9/18/2012

Page 94

```
 1    Siegels, the Superman termination.                        11:40:39
 2           MR. KENDALL:  I'm going to caution you to          11:40:43
 3    listen to the questions and ask the question             11:40:45
 4    that's -- answer the question that is posed and wait      11:40:47
 5    for the next question which might ask you for other       11:40:50
 6    information instead of anticipating it.  Okay?            11:40:53
 7           THE WITNESS:  Okay.                                11:40:58
 8    BY MR. PETROCELLI:                                        11:40:58
 9        Q.  When you saw this Internet report or              11:40:58
10    whatever it was, is it just something you happened        11:41:02
11    to see fortuitously or were you endeavoring to            11:41:08
12    research and investigate ownership of rights              11:41:12
13    associated with Superman?                                 11:41:15
14        A.  I don't have a recollection of the latter.        11:41:22
15    I believe so it was the former.                           11:41:26
16        Q.  Once you saw a reference to the Shusters          11:41:29
17    having filed --                                           11:41:33
18        A.  Siegel.                                           11:41:33
19        Q.  Excuse me.  Once you saw a reference to the       11:41:33
20    Siegels having filed some documents that terminate        11:41:36
21    copyright interests, did that then spawn an interest      11:41:43
22    on your part in investigating further?                    11:41:48
23        A.  I'm trying to think back to 2001.  I do           11:42:01
24    have a recollection of Superman being all over the        11:42:09
25    Internet.  I don't know in thinking about it right        11:42:12
```

MARC   TOBEROFF - 9/18/2012

Page 95

```
 1    now whether I -- actually, a question triggered this        11:42:16
 2    thought.                                                    11:42:29
 3           I don't know whether I was looking into             11:42:29
 4    Superman after I was contacted by Warren Peary or           11:42:32
 5    was aware of the Siegel termination before I was            11:42:41
 6    contacted by Warren Peary.  I don't know.                   11:42:44
 7           So when I say it was all over the Internet,          11:42:48
 8    that I do recall.  But I don't recall whether I saw         11:42:51
 9    it all over the Internet or I did a -- I typed in --        11:42:54
10    Googled "Superman" after I got a call from Warren           11:42:58
11    Peary.  It may very well have been the latter.  I           11:43:01
12    don't recall.                                               11:43:03
13        Q.  Do you have any documents that would                11:43:04
14    identify when Mr. Peary called you?                         11:43:09
15        A.  You mean like a phone log or something?             11:43:18
16        Q.  Any -- any document or any -- any piece of          11:43:20
17    evidence that would establish when he contacted you?        11:43:24
18        A.  Not that I can think of.  Except the 2001.          11:43:29
19        Q.  Sometime prior to 2000- --                          11:43:37
20        A.  No, I'm saying the 2001 PPC agreement --            11:43:40
21        Q.  Correct.                                            11:43:43
22        A.  -- means that he contacted me before that,         11:43:44
23    so that would be a document.                                11:43:45
24        Q.  Right.  I meant affix the actual date              11:43:46
25    within a couple of days?                                    11:43:49
```

MARC  TOBEROFF - 9/18/2012

Page 96

```
 1        A.  No.                                        11:43:50

 2        Q.  Okay.  And do you know whether -- when     11:43:55

 3   Mr. Peary contacted you, you were already familiar 11:43:58

 4   to some degree with the Superman termination issue 11:44:03

 5   because you read on the Internet something about it? 11:44:06

 6        A.  That's the part I -- I couldn't say.       11:44:09

 7        Q.  Okay.                                      11:44:10

 8        A.  I may have -- I may have -- I may have been 11:44:12

 9   aware of it or I may have looked into it after he   11:44:14

10   called me.                                          11:44:19

11        Q.  Whenever --                                11:44:20

12        A.  I wouldn't be surprised if I -- if either  11:44:21

13   was the case.                                       11:44:23

14        Q.  When you did look into it, did you look    11:44:24

15   into it by yourself or did someone assist you?      11:44:28

16        A.  By myself.                                 11:44:32

17        Q.  Okay.  As of this point in time in 2001,   11:44:37

18   whether it's when you saw Superman all over the     11:44:39

19   Internet or when Mr. Peary called you, and I        11:44:42

20   appreciate you can't remember which happened first, 11:44:45

21   had you had any prior --                            11:44:49

22        A.  May I ask --                               11:44:51

23            MR. KENDALL:  Just a minute.  Let him      11:44:52

24   finish his question.                                11:44:53

25            THE WITNESS:  Okay.                        11:44:55
```

**EXHIBIT 3**

**188**

MARC  TOBEROFF - 9/18/2012

Page 97

```
 1   BY MR. PETROCELLI:                                    11:44:55

 2       Q.  You may -- you were about to say something?   11:44:55

 3       A.  I'm just trying to figure out, and it would   11:44:59

 4   be helpful if you gave me the date of the first       11:45:02

 5   agreement with Warren Peary.                          11:45:07

 6       Q.  Sure.                                         11:45:11

 7       A.  If you gave me that date, it might help me    11:45:11

 8   to sort this out.                                     11:45:13

 9       Q.  November 23, 2001 is the -- the date which    11:45:14

10   is recited in the first sentence.  It says,           11:45:22

11   "Agreement made as of November 23, 2001."  That's     11:45:25

12   been previously marked in this case as Exhibit 10,    11:45:32

13   signed by you, Warren Peary and Jean Peavy on         11:45:35

14   November 28, if that's helpful to you.  A copy of     11:45:41

15   Exhibit 10 is in front of you.                        11:45:44

16            (The document referred to was                11:45:44

17            previously marked for                        11:45:44

18            identification as Exhibit 10 and is          11:45:44

19            attached to this deposition.)                11:45:46

20            THE WITNESS:  Right.  So I don't -- again,   11:45:46

21   I don't know -- that doesn't -- I don't know whether  11:45:51

22   I was aware of the Siegels' termination before I got  11:45:55

23   that call or I started looking into Superman after I  11:45:58

24   got that call.                                        11:46:04

25   BY MR. PETROCELLI:                                    11:46:07
```

**EXHIBIT 3**
**189**

MARC  TOBEROFF - 9/18/2012

Page 98

```
 1        Q.  I think I asked you -- well, you answered    11:46:08

 2   it.  You did all the research yourself.              11:46:13

 3           Is that right?                               11:46:13

 4        A.  I believe so.                               11:46:15

 5        Q.  Okay.  Was anybody working with you at the  11:46:17

 6   time, 2001?                                          11:46:19

 7           MR. KENDALL:  Vague and ambiguous.           11:46:22

 8           THE WITNESS:  2001, no, I think I was just   11:46:26

 9   working on my own.                                   11:46:33

10   BY MR. PETROCELLI:                                   11:46:33

11        Q.  You testified in --                         11:46:39

12        A.  I first -- I believe in 2001 I was working  11:46:41

13   on my own.  I didn't have an employee.               11:46:49

14        Q.  In the Siegel deposition, you testified     11:46:51

15   that upon seeing the reference to the Siegel         11:46:54

16   termination on the Internet, you found some document 11:46:57

17   that referenced Arthur Levine, a lawyer for the      11:47:05

18   Siegels, and called him.  Do you recall that         11:47:11

19   happening?  Not the testimony, but that that, in     11:47:14

20   fact, happened?                                      11:47:16

21        A.  Yes, I recall -- it wasn't some document,   11:47:16

22   it was -- the termination notice itself was posted   11:47:19

23   on the Internet.  And at the end of the termination  11:47:21

24   notice it was signed, I believe, by Arthur Levine,   11:47:25

25   had his firm name and address, may have had his      11:47:28
```

MARC   TOBEROFF - 9/18/2012

Page 99

```
 1    telephone number, I don't know.                        11:47:31

 2         Q.  Okay.                                          11:47:32

 3         A.  But it's easy to look up.                      11:47:34

 4              MR. PETROCELLI:  Do you want to put           11:47:35

 5    Exhibit 9 in front of Mr. Toberoff, please.  That's    11:47:36

 6    the Siegel termination notice.                         11:47:37

 7                  (The document referred to was            11:47:39

 8                  previously marked for                     11:47:39

 9                  identification as Exhibit 9 and is       11:47:39

10                  attached to this deposition.)            11:47:48

11    BY MR. PETROCELLI:                                     11:47:48

12         Q.  And when you saw the reference, you'll see    11:47:48

13    on page bearing Bates number 1877, the name of         11:47:53

14    Arthur J. Levine at a law firm in Washington, D.C.     11:48:02

15    and that's -- this is the --                           11:48:06

16         A.  Are you looking at -- oh, okay.  I didn't     11:48:08

17    realize it's at the very back here.                    11:48:13

18         Q.  In any event, you saw this termination       11:48:24

19    notice on the Internet and did you -- did you print    11:48:27

20    it, by the way?                                        11:48:31

21         A.  I don't recall printing it.                   11:48:34

22         Q.  Okay.  And you then called Mr. Levine?        11:48:36

23         A.  And also --                                   11:48:40

24         Q.  You're not sure if it was this big, thick    11:48:40

25    document, right?                                       11:48:45
```

MARC  TOBEROFF - 9/18/2012

Page 100

```
 1          A.  Yeah, I don't know.                        11:48:45

 2          Q.  Right.  What was your purpose in calling   11:48:46

 3   Mr. Levine?                                           11:48:51

 4          A.  To find out the -- by that point, I believe 11:49:06

 5   I was representing the Shusters and Superman was      11:49:10

 6   created by Siegel and Shuster, and they each had --   11:49:15

 7   were co-authors of a joint work, and I wanted to      11:49:22

 8   find out what was the status of that termination.     11:49:27

 9          Q.  Are you confident that you called         11:49:29

10   Mr. Levine after Mr. Peary had contacted you?        11:49:36

11          A.  I believe so, yes.                         11:49:48

12          Q.  Do you have any documents including phone  11:49:49

13   records that would evidence when you called          11:49:52

14   Mr. Levine?                                           11:49:55

15          A.  No, I don't.                               11:49:56

16          Q.  And Mr. Levine advised you that the Siegels 11:50:04

17   were then represented by a different attorney, Kevin  11:50:09

18   Marks or Bruce Ramer?                                 11:50:13

19          MR. KENDALL:  Asked and answered in the       11:50:16

20   first deposition.                                     11:50:17

21          THE WITNESS:  I believe he advised me that    11:50:19

22   he did the termination, but after doing the          11:50:23

23   termination itself there were other lawyers in       11:50:27

24   Los Angeles that were -- transactional lawyers that  11:50:33

25   were representing the Siegels and he wasn't          11:50:39
```

**EXHIBIT 3**
**192**

MARC   TOBEROFF - 9/18/2012

Page 101

```
 1    really -- he wasn't -- he still represents them but        11:50:41
 2    he was not particularly active in that                     11:50:47
 3    representation.  And he gave me the name of Kevin          11:50:50
 4    Marks and the Gang, Tyre firm and may have given me        11:50:57
 5    their phone number.                                        11:51:01
 6    BY MR. PETROCELLI:                                         11:51:02
 7        Q.  What was your purpose in wanting to call           11:51:02
 8    Mr. Marks or pursue anybody associated with the            11:51:03
 9    Siegel interests?                                          11:51:07
10            MR. KENDALL:  Now --                               11:51:09
11            THE WITNESS:  I don't want to reveal my            11:51:11
12    purposes or strategy, except generally to say that I       11:51:13
13    wanted to know what the status was.                        11:51:16
14    BY MR. PETROCELLI:                                         11:51:16
15        Q.  Status of what?                                   11:51:18
16        A.  Of the other half of the copyright.               11:51:19
17        Q.  In other words, whether the rights had been       11:51:22
18    conveyed to a third party or back to --                    11:51:24
19        A.  Whether --                                        11:51:28
20        Q.  -- DC?                                            11:51:28
21            MR. KENDALL:  Just a minute.  Just a              11:51:29
22    minute.  Finish your question.                             11:51:29
23            MR. PETROCELLI:  I did.                           11:51:31
24            THE WITNESS:  The status --                       11:51:35
25            MR. KENDALL:  Just a minute.  Hold on.            11:51:36
```

MARC  TOBEROFF - 9/18/2012

Page 102

```
 1              So I'm going to object as compound.  There      11:51:48
 2    were really two questions in what you asked.  One         11:51:52
 3    was what was your purpose.  And as to that, I             11:51:56
 4    believe the witness began to discuss work product        11:52:00
 5    issues.  Then you asked a somewhat different             11:52:04
 6    question and the witness began to answer about what      11:52:07
 7    Mr. Marks said.  So that raises other privileged         11:52:15
 8    considerations with respect to Mr. Marks'                11:52:22
 9    communications with you, whether those were             11:52:25
10    privileged, whether the privilege has been waived as    11:52:31
11    to those, and so I just caution you to -- since you     11:52:35
12    have more knowledge about that than -- than I do, to    11:52:42
13    try to sort that through.  And if you can answer the    11:52:45
14    question without revealing privileged information,      11:52:51
15    please do so.  And then if there are areas where you    11:52:55
16    can't answer, I think if you just so indicate in a      11:52:58
17    general way and then Mr. Petrocelli can follow up to    11:53:01
18    make his record.                                        11:53:03
19              THE WITNESS:  So I'm -- I'm not --             11:53:04
20              MR. PETROCELLI:  Let me just repeat the        11:53:09
21    question.                                                11:53:10
22              THE WITNESS:  Okay.                            11:53:11
23    BY MR. PETROCELLI:                                       11:53:11
24         Q.  What was your purpose in contacting            11:53:12
25    Mr. Marks?                                               11:53:17
```

**EXHIBIT 3**
**194**

MARC   TOBEROFF - 9/18/2012

Page 103

```
 1        A.  I'll only speak in a general way, I'm --        11:53:18
 2   not specifically because that will reveal work          11:53:21
 3   product, and I'll do so if you agree that that's not    11:53:23
 4   going to waive privilege here.                          11:53:26
 5        Q.  We don't believe there is any privilege        11:53:31
 6   attached to any of these conversations.                 11:53:33
 7        A.  There's work product.                          11:53:34
 8        Q.  Or -- or work product, for a variety of        11:53:35
 9   reasons, including some mentioned by -- by              11:53:39
10   Mr. Kendall.                                            11:53:44
11            MR. KENDALL:  So can I make the suggestion,    11:53:45
12   and each side has its positions with respect to        11:53:47
13   whether there is work product or whether               11:53:55
14   conversations that Mr. Marks is having might be in     11:53:58
15   furtherance of his -- his representation of his        11:54:02
16   clients, the Siegels at the time, or whether what      11:54:05
17   Mr. Toberoff is doing in a conversation with          11:54:09
18   Mr. Marks is within the furtherance of his             11:54:14
19   relationship -- of his attorney-client relationship   11:54:17
20   the Shusters at the time.                              11:54:20
21            If we could just say that the general         11:54:23
22   answer that Mr. Toberoff has offered to give is        11:54:26
23   without prejudice to either side's positions and      11:54:30
24   will not constitute an additional basis for claiming  11:54:33
25   that there is a waiver of any such privileges.  I      11:54:37
```

MARC  TOBEROFF - 9/18/2012

Page 104

```
 1    recognize you have a overarching provision        11:54:41

 2    that there is -- position that there is no         11:54:45

 3    privilege.                                         11:54:47

 4         MR. PETROCELLI:  The difficulty with that     11:54:53

 5    is while in concept that's generally agreeable,    11:54:54

 6    answers may provide other bases to argue that      11:54:59

 7    there's been a waiver.  He may, for example, say, "I  11:55:04

 8    spoke to X, Y and Z" about a subject.  So --       11:55:07

 9         MR. KENDALL:  I'm not --                       11:55:13

10         MR. PETROCELLI:  The giving of the answer      11:55:14

11    isn't a waiver, but there may be information in the 11:55:17

12    answer that may furnish other grounds.             11:55:19

13         MR. KENDALL:  That's -- I think that's an      11:55:21

14    appropriate distinction to make.  The mere giving of 11:55:24

15    the answer will not.  If -- and we can take them    11:55:27

16    question by question.                              11:55:37

17         MR. PETROCELLI:  And again, to be clear,       11:55:38

18    it's without prejudice to anybody's positions coming 11:55:39

19    into this deposition because, as you know,         11:55:42

20    Mr. Kendall, we have a series of objections to the 11:55:45

21    assertion of any kind of privilege to bar any of   11:55:51

22    these questions, and I appreciate that there's a   11:55:53

23    disagreement on that and we'll have to get it worked 11:55:58

24    out.                                               11:56:00

25         THE WITNESS:  Okay.  So I'll answer           11:56:01
```

**EXHIBIT 3**
**196**

MARC  TOBEROFF - 9/18/2012

Page 105

```
 1    generally without waiver of privilege or work          11:56:04

 2    product.  When I say "privilege," I'm referring to     11:56:08

 3    work product as well.                                  11:56:10

 4           That the purpose was to check the status of     11:56:14

 5    the -- the Siegel termination.  "What do you mean      11:56:22

 6    status?"  You know, had a complaint been filed?  Had   11:56:25

 7    the matter been settled?  What -- what's the status?   11:56:32

 8    BY MR. PETROCELLI:                                     11:56:37

 9       Q.  You saw from the -- by the way, for all         11:56:38

10    these privilege and work product assertions, in the   11:56:48

11    year 2001, there's only one -- who is the client?     11:56:54

12       A.  Who is the client?                             11:57:02

13       Q.  Yes.                                           11:57:02

14       A.  At the point when I was inquiring into the     11:57:05

15    status of the Siegel termination, the Shusters were   11:57:09

16    the clients.                                          11:57:14

17       Q.  And who was the client or who were the         11:57:14

18    clients in 2002, through September 30, 2002?          11:57:17

19       A.  To September 30, 2000- to -- 2002?  The        11:57:31

20    Shusters were the client.                             11:57:36

21       Q.  No other client?                               11:57:38

22           MR. KENDALL:  I'm going to object as           11:57:42

23    overbroad.  Vague and ambiguous.                      11:57:43

24    BY MR. PETROCELLI:                                     11:57:43

25       Q.  You can answer.                                11:57:54
```

MARC   TOBEROFF - 9/18/2012

Page 106

```
 1          MR. KENDALL:  And I'm going to have an        11:58:10

 2    additional objection to it.  Lacks foundation.      11:58:12

 3          THE WITNESS:  To the extent I was             11:58:17

 4    communicating on behalf of IP Worldwide, or Ari     11:58:31

 5    Emanuel, I would say there was a attorney-client    11:58:38

 6    relationship there.  I handled all legal matters for 11:58:42

 7    IP Worldwide.                                       11:58:49

 8          MR. KENDALL:  I think we need to go off the   11:58:51

 9    record for a minute, because there's a privilege    11:58:53

10    matter I need to discuss with the witness.          11:58:55

11    Shouldn't take long.                                11:58:59

12          MR. PETROCELLI:  Okay.                        11:59:00

13          THE VIDEOGRAPHER:  Off the record.  The       11:59:01

14    time is 11:59.                                      11:59:02

15          (Brief recess.)                               12:04:19

16          THE VIDEOGRAPHER:  We're back on the record   12:04:38

17    at 12:04.                                           12:04:39

18    BY MR. PETROCELLI:                                  12:04:39

19      Q.  I think there was a pending question about    12:04:43

20    prior to September 30, 2002, who your clients were  12:04:47

21    regarding Superman, and you indicated that in all of 12:04:59

22    2001 it was Shuster, Joe Shuster.                   12:05:03

23          Is that correct?                              12:05:09

24      A.  No, I said Shuster and then I included IP     12:05:09

25    Worldwide.                                          12:05:18
```

MARC  TOBEROFF - 9/18/2012

Page 107

```
 1        Q.  IP Worldwide comes about in 2002, right?      12:05:18

 2        A.  Yes, and you said September --                12:05:22

 3        Q.  Let's break this down.                        12:05:28

 4        A.  Didn't you say September 30, 2002?            12:05:29

 5        Q.  For the purpose of this last question, I     12:05:32

 6   focused just on 2001.                                 12:05:33

 7        A.  Oh, okay.                                     12:05:36

 8        Q.  So for 2001, the only client would have      12:05:37

 9   been the Shusters, correct?                           12:05:45

10        A.  Correct.                                      12:05:50

11        Q.  Okay.  In 2002, focusing on January 1 until  12:05:53

12   September 30, 2002, the Shusters remained the         12:05:58

13   client, correct?                                      12:06:02

14        A.  Correct.                                      12:06:03

15        Q.  Did you have any other clients during that   12:06:04

16   period of time with respect to Superman?              12:06:07

17        A.  IP Worldwide.                                 12:06:08

18        Q.  And --                                        12:06:11

19            MR. KENDALL:  Just give me a moment.          12:06:12

20            I'll object to that as calling for a legal    12:06:14

21   conclusion.                                            12:06:16

22   BY MR. PETROCELLI:                                     12:06:16

23        Q.  And what Superman legal work were you doing  12:06:17

24   for IPW?                                               12:06:23

25            MR. KENDALL:  Objection to the extent that   12:06:26
```

EXHIBIT 3
199

MARC   TOBEROFF - 9/18/2012

Page 108

1    it calls for work product or attorney-client          12:06:27

2    communications.                                        12:06:30

3          THE WITNESS:  I'll just answer generally         12:06:33

4    that I acted as general counsel for the joint          12:06:36

5    venture IP Worldwide, because I was a lawyer.  And     12:06:44

6    communications between Ari Emanuel, who was a          12:06:53

7    general partner or a member of IP Worldwide with me    12:06:57

8    regarding matters of a legal nature I believe are      12:07:02

9    privileged, we've asserted privilege and I'll assert   12:07:08

10   a privilege as to that.                                12:07:11

11   BY MR. PETROCELLI:                                     12:07:12

12       Q.  And I'm only asking about matters related      12:07:12

13   to Superman.                                           12:07:14

14          Are you saying you had privileged               12:07:14

15   discussions with Ari Emanuel in 2002 related to        12:07:17

16   Superman where you were the lawyer and he was the      12:07:20

17   client?                                                12:07:24

18          MR. KENDALL:  Vague and ambiguous.              12:07:26

19   Misstates the witness' answer and therefore lacks      12:07:28

20   foundation and is argumentative.                       12:07:30

21          THE WITNESS:  When you say "you were the        12:07:35

22   lawyer and he was the client," that -- that            12:07:38

23   doesn't -- I don't know if that's the proper way to    12:07:44

24   describe a relationship within a company or a joint    12:07:46

25   venture between a member of that company and general   12:07:52

EXHIBIT 3
200

MARC  TOBEROFF - 9/18/2012

Page 109

1    counsel for that company.                          12:07:57

2    BY MR. PETROCELLI:                                 12:07:57

3         Q.  Well, you were the only lawyer involved for   12:08:00

4    IPW during this period of time?                    12:08:04

5         A.  It's not IPW, it's IP Worldwide.          12:08:06

6         Q.  You're right, IP Worldwide.  Correct?     12:08:09

7         A.  Yes, yes.                                 12:08:12

8         Q.  And the only other person who was         12:08:12

9    affiliated with IP Worldwide other than you is Ari   12:08:14

10   Emanuel, correct?                                  12:08:17

11        A.  Correct.                                  12:08:19

12        Q.  So are you saying you had conversations   12:08:19

13   between you and Ari Emanuel where, by virtue of your   12:08:23

14   status as a lawyer for IPW and -- Worldwide and his   12:08:26

15   status as a member of IP Worldwide, you're saying   12:08:32

16   they were privileged?                              12:08:36

17        A.  Yes.                                      12:08:37

18        Q.  And they related to Superman?             12:08:37

19        A.  Yes.                                      12:08:38

20        Q.  Did they relate to the Shuster interest in   12:08:40

21   Superman?                                          12:08:44

22           MR. KENDALL:  Vague and ambiguous.         12:08:45

23   Overbroad.                                         12:08:45

24           THE WITNESS:  I don't recall.              12:08:47

25   BY MR. PETROCELLI:                                 12:08:47

EXHIBIT 3
201

MARC   TOBEROFF - 9/18/2012

Page 110

| | | |
|---|---|---|
| 1 | Q.  You earlier testified that the Shuster | 12:08:50 |
| 2 | interest was excluded from IP Worldwide, correct? | 12:08:52 |
| 3 | A.  That's correct. | 12:08:55 |
| 4 | Q.  Okay.  Did you -- | 12:08:55 |
| 5 | A.  You said "relate."  That's a broad word. | 12:08:57 |
| 6 | Q.  Correct. | 12:09:00 |
| 7 | Did you have discussions with Mr. Emanuel | 12:09:03 |
| 8 | on which you're asserting privilege involving the | 12:09:07 |
| 9 | Shuster termination interest? | 12:09:13 |
| 10 | MR. KENDALL:  Just a moment. | 12:09:14 |
| 11 | Vague and ambiguous.  Overbroad.  I think | 12:09:28 |
| 12 | you can answer that question with a "yes" or a "no" | 12:09:32 |
| 13 | or whether you recall, but do not get into | 12:09:35 |
| 14 | discussions of that, if you can -- if it's your view | 12:09:38 |
| 15 | that those would be privileged. | 12:09:42 |
| 16 | THE WITNESS:  I don't -- it's moot, because | 12:09:46 |
| 17 | I don't recall specific conversations. | 12:09:48 |
| 18 | BY MR. PETROCELLI: | 12:09:48 |
| 19 | Q.  With Mr. Emanuel about the Shuster side of | 12:09:51 |
| 20 | the -- of Superman? | 12:09:55 |
| 21 | A.  I don't recall a specific conversation. | 12:09:56 |
| 22 | Q.  Okay. | 12:09:59 |
| 23 | A.  But you may ask me a question that will | 12:10:00 |
| 24 | refresh my recollection. | 12:10:03 |
| 25 | This conversation started with you asking | 12:10:05 |

MARC   TOBEROFF - 9/18/2012

Page 111

```
 1    whether there was any other client or -- who had an        12:10:13
 2    interest, and so I described that relationship for        12:10:18
 3    that purpose.                                              12:10:22
 4        Q.  You had conversations with Mr. Emanuel           12:10:25
 5    prior to September 30, 2002 regarding the Siegel          12:10:29
 6    side of the Superman interest?                             12:10:33
 7        A.  The Siegel?                                       12:10:34
 8        Q.  Yes.                                              12:10:34
 9        A.  No.                                               12:10:34
10        Q.  What was the subject of your --                  12:10:39
11        A.  Not -- I should say not that I recall.           12:10:44
12        Q.  Okay.  Do you recall any conversations with     12:10:47
13    Mr. Emanuel prior to September 30, 19- --                  12:10:50
14    September 30, 2002 regarding Superman that you            12:10:55
15    believe are privileged?                                   12:10:58
16        A.  It's too open-ended to -- to -- I'm sure         12:11:01
17    there were, but I can't just think of it in that         12:11:08
18    global sense.                                             12:11:11
19            MR. KENDALL:  I think at this point we need      12:11:14
20    to confer on a matter of privilege.                       12:11:15
21            THE WITNESS:  Okay.                              12:11:20
22            THE VIDEOGRAPHER:  Off the record.  The          12:11:21
23    time is 12:11.                                            12:11:24
24            (Brief recess.)                                  12:11:25
25            THE VIDEOGRAPHER:  Back on the record at         12:13:42
```

MARC  TOBEROFF - 9/18/2012

Page 112

```
 1    12:13.                                              12:13:53

 2            THE WITNESS:  Okay.  So I'm going to amend   12:14:14

 3    my answer.                                          12:14:16

 4            Yes, I do recall conversations with Ari     12:14:20

 5    Emanuel.  I'm getting confused on the dates.        12:14:24

 6    September 30, 2002, I do recall conversations with  12:14:27

 7    Ari Emanuel.                                        12:14:30

 8    BY MR. PETROCELLI:                                  12:14:30

 9        Q.  When did they occur?                        12:14:31

10        A.  They occurred in -- leading up to, in       12:14:32

11    August 2002, a telephone conversation with Marks in 12:14:45

12    which I was on the phone with Ari Emanuel.  So they 12:14:52

13    occurred sometime before that.                      12:14:55

14        Q.  When is the first one you recall?           12:15:01

15        A.  I don't recall specific -- I don't recall   12:15:02

16    specific conversations at specific times.           12:15:11

17        Q.  Do you believe that the August 2002         12:15:19

18    conversation with Mr. Emanuel was the first such    12:15:22

19    privileged conversation you had with him in regard  12:15:27

20    to Superman?                                        12:15:30

21            MR. KENDALL:  Objection.  Overbroad.  Just  12:15:32

22    a minute.                                           12:15:36

23            And I believe there's been prior testimony  12:15:40

24    about earlier communications with Mr. Emanuel in    12:15:44

25    regard to Superman being privileged.                12:15:50
```

**EXHIBIT 3**
**204**

MARC   TOBEROFF - 9/18/2012

Page 113

```
 1            THE WITNESS:  I don't believe that -- I        12:15:53

 2    can't put dates on the conversations, but I do not     12:15:57

 3    believe that the first conversation I had with Ari     12:16:02

 4    Emanuel was in August, or even in July.                12:16:04

 5    BY MR. PETROCELLI:                                     12:16:04

 6       Q.  To be clear, I'm asking you about               12:16:14

 7    conversations with Ari Emanuel related to Superman     12:16:18

 8    that you believe are privileged and hence won't        12:16:22

 9    disclose to me.                                        12:16:28

10       A.  I can't think of it that way in a general       12:16:29

11    sense and give you any kind of answer that's           12:16:31

12    complete.  You would have to ask me a question and     12:16:33

13    then I would have to think about conversations         12:16:39

14    relating to that question and then make a decision     12:16:40

15    whether or not to assert privilege regarding that      12:16:44

16    conversation.                                          12:16:46

17       Q.  When is the first time you ever had a           12:16:46

18    conversation with Mr. Emanuel regarding Superman       12:16:48

19    ever?                                                  12:16:51

20            MR. KENDALL:  Asked and answered.              12:16:52

21            THE WITNESS:  Yeah, I -- I -- I don't have     12:16:53

22    a specific recollection where I can answer, give you   12:17:01

23    a date, or -- or approximate date.                     12:17:03

24    BY MR. PETROCELLI:                                     12:17:03

25       Q.  Was it at or about the time that IP             12:17:10
```

EXHIBIT 3
205

MARC  TOBEROFF - 9/18/2012

Page 114

```
 1    Worldwide was formed between Mr. Emanuel and you?        12:17:13

 2         A.  I don't recall the specific conversation.      12:17:16

 3         Q.  When you formed --                             12:17:37

 4         A.  I believe there -- there were conversations    12:17:38

 5    but I don't have a recollection of a specific           12:17:40

 6    conversation.                                           12:17:42

 7         Q.  Did you have a specific conversation with      12:17:45

 8    Mr. Emanuel when forming IP Worldwide that the          12:17:49

 9    Shuster side of the Superman interests was being        12:17:56

10    specifically excluded?                                  12:18:02

11         A.  I believe I had a conversation but I don't     12:18:06

12    have a specific recollection of that conversation.      12:18:11

13         Q.  And you are aware of a document that has       12:18:14

14    the initials J.S. in a --                               12:18:17

15         A.  Yes, that's why I didn't believe --            12:18:20

16         Q.  An attachment that refers to excluded          12:18:24

17    endeavors?                                              12:18:26

18         A.  I don't know if I'd use the word               12:18:28

19    "endeavors."                                            12:18:30

20         Q.  Yes, no pun intended.                          12:18:31

21         A.  Not to confuse it with the agency.             12:18:33

22         Q.  Exactly.                                       12:18:36

23         A.  That's why I believe there were                12:18:36

24    conversations, but I don't have a specific              12:18:37

25    recollection of a conversation.                         12:18:39
```

**EXHIBIT 3**
**206**

MARC  TOBEROFF - 9/18/2012

Page 115

```
 1        Q.  Other than Shusters and IP Worldwide, you      12:18:48

 2   had no other clients with respect to Superman prior      12:18:55

 3   to September 30, 2002, correct?                          12:18:58

 4            MR. KENDALL:  Objection.  Calls for a legal     12:19:02

 5   conclusion.  Lacks foundation.                           12:19:07

 6            THE WITNESS:  No.  There was -- there           12:19:25

 7   was -- not clients, no.                                  12:19:27

 8   BY MR. PETROCELLI:                                       12:19:27

 9        Q.  Are you unsure?                                 12:19:30

10        A.  No, I'm just thinking of the November 2001      12:19:31

11   e-mail to Michael Siegel where he could be a             12:19:35

12   prospective client and we've asserted privilege with     12:19:41

13   respect to that e-mail and that initial                  12:19:48

14   correspondence.  But aside from that, no.                12:19:51

15        Q.  You did not form an attorney-client             12:19:54

16   relationship with Michael Siegel in 2001.                12:19:56

17            Is that correct?                                12:19:59

18        A.  He did not become a client.                     12:19:59

19        Q.  Of yours, correct?                              12:20:01

20        A.  No, he did not --                               12:20:03

21        Q.  Or --                                           12:20:04

22        A.  -- become a client.                             12:20:05

23        Q.  Ever?                                           12:20:06

24        A.  No.  He never did.                              12:20:08

25        Q.  Okay.  So going back, then, to your --          12:20:19
```

MARC  TOBEROFF - 9/18/2012

Page 116

```
 1    let's first back up to your call with Mr. Levine.          12:20:24

 2          Did you ask him to send you any documents?          12:20:29

 3      A.  Not that I recall.                                  12:20:34

 4      Q.  Did he?                                             12:20:35

 5      A.  Not that I recall.                                  12:20:35

 6      Q.  Did you ask him if there were any                   12:20:36

 7    settlements of the Shuster interest -- of the Siegel      12:20:39

 8    interest?  Excuse me.                                     12:20:43

 9      A.  Not that I recall.                                  12:20:43

10      Q.  You knew from the termination notice that           12:20:48

11    the effective date was 1999 and you were calling          12:20:50

12    roughly two years after that, right?                      12:20:55

13          MR. KENDALL:  Objection.  Calls for the             12:20:57

14    witness' thinking and work product.                       12:21:00

15          THE WITNESS:  I don't -- I don't recall             12:21:10

16    specifics of a conversation with Levine, other than       12:21:12

17    the gist of the conversation, I was inquiring as to       12:21:17

18    the status and him referring me to Kevin Marks and        12:21:21

19    the Gang, Tyre firm.                                      12:21:25

20    BY MR. PETROCELLI:                                        12:21:25

21      Q.  When you had that --                                12:21:27

22      A.  And I believe it was a pretty short                 12:21:28

23    conversation.                                             12:21:30

24      Q.  When you had that call, you were aware that         12:21:31

25    the effective date of the Siegel termination was          12:21:33
```

MARC  TOBEROFF - 9/18/2012

Page 117

```
 1    1999, correct?                              12:21:37
 2         A.  I -- I don't know what my awareness was or   12:21:42
 3    whether it registered in glancing over the   12:21:46
 4    termination notice or not.                   12:21:49
 5         Q.  You said "glance" --               12:21:50
 6         A.  I may have been aware, I may not have been   12:21:52
 7    aware, or I may have been aware and not focused on   12:21:54
 8    it.  I don't recall.                         12:21:58
 9         Q.  Did you discuss with him whether there had   12:21:59
10    been a disposition or resolution of the rights?   12:22:00
11         A.  I don't recall having a conversation of   12:22:04
12    that nature with him.                        12:22:06
13         Q.  If you didn't have a conversation of that   12:22:09
14    nature with him, what were you talking about?   12:22:11
15         A.  I don't recall, other than that I called to   12:22:14
16    inquire about the status.  I said, "What's the   12:22:19
17    status of that termination?  Are you handling that?"   12:22:21
18    I don't know.  In other words, I would be filling in   12:22:27
19    the blanks for you because I don't recall what was   12:22:31
20    actually said in the conversation.           12:22:33
21         Q.  But when you asked what the status was, you   12:22:34
22    were aware at the time that one such possibility   12:22:36
23    might be that the Siegels had transferred their   12:22:40
24    rights to a third party?                     12:22:43
25              MR. KENDALL:  Objection.          12:22:44
```

EXHIBIT 3
209

MARC   TOBEROFF - 9/18/2012

Page 118

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 12:22:44 |
| 2 | Q.  Correct? | 12:22:45 |
| 3 | MR. KENDALL:  Just a minute. | 12:22:46 |
| 4 | THE WITNESS:  Go ahead. | 12:22:47 |
| 5 | MR. KENDALL:  Argumentative.  Vague and | 12:22:49 |
| 6 | ambiguous.  Calls for a legal conclusion. | 12:22:54 |
| 7 | THE WITNESS:  So I -- I'm just going to | 12:23:03 |
| 8 | tell you the following:  I don't have a specific | 12:23:09 |
| 9 | recollection of the conversation.  I have a general | 12:23:11 |
| 10 | recollection of the purpose why I was calling, and | 12:23:14 |
| 11 | I'm willing to share that purpose with you.  But I'm | 12:23:18 |
| 12 | not willing to share with you my state of mind when | 12:23:22 |
| 13 | I'm calling in furtherance of the Shusters' interest | 12:23:29 |
| 14 | to find out the status of the other half of the | 12:23:33 |
| 15 | copyrights in which they would have a prospective | 12:23:36 |
| 16 | interest. | 12:23:38 |
| 17 | And aside from that, it's moot because I | 12:23:41 |
| 18 | don't recall what my -- I can tell you that it's | 12:23:43 |
| 19 | moot because I don't recall my specific -- whether I | 12:23:46 |
| 20 | knew or did not know or focused or didn't -- hadn't | 12:23:52 |
| 21 | focused. | 12:23:55 |
| 22 | BY MR. PETROCELLI: | 12:23:55 |
| 23 | Q.  When -- he gave you the name of Kevin | 12:23:59 |
| 24 | Marks? | 12:24:01 |
| 25 | A.  He did. | 12:24:02 |

MARC   TOBEROFF - 9/18/2012

Page 119

```
 1        Q.  By the way, when -- so the record is clear,       12:24:03

 2   whenever you tell me that you're not going to tell         12:24:05

 3   me something, I'm obviously -- I'll obviously have         12:24:08

 4   to accept that and I will reserve the right to            12:24:14

 5   decide whether it's important enough for me to go in       12:24:18

 6   and get a ruling on, but I don't want to have to          12:24:22

 7   keep making a record and repeating myself.                12:24:24

 8        MR. KENDALL:  That's something that I think          12:24:26

 9   in the context of that -- of this deposition should        12:24:27

10   be addressed to me.  And I will say yes, we               12:24:30

11   understand that that is what you're doing.                12:24:33

12        MR. PETROCELLI:  Okay.                               12:24:35

13        Q.  When -- so he gave you the name of Kevin         12:24:36

14   and you called Kevin up, right?                           12:24:41

15        A.  (Witness nods.)                                  12:24:43

16        Q.  And we've seen records that indicate from        12:24:44

17   Marks' logs that it was around November 29.               12:24:46

18        Does that sound right?                               12:24:51

19        A.  It only sounds right as to approximate           12:24:53

20   recollection of what Marks' testimony was or -- or        12:24:57

21   the records that were exhibits.                           12:24:59

22        Q.  Okay.  That --                                   12:25:04

23        Jason, can you show Mr. Toberoff --                  12:25:07

24   what's -- we need to make an exhibit number.  Is          12:25:14

25   that right?                                               12:25:16
```

MARC  TOBEROFF - 9/18/2012

Page 120

```
 1            MR. TOKORO:  Yeah, it's going to be 100.      12:25:17
 2            MR. PETROCELLI:  Exhibit 100.               12:25:31
 3            (The document referred to was             12:25:33
 4            marked for identification by the          12:25:33
 5            C.S.R. as Exhibit 100 and attached        12:25:33
 6            to this deposition.)                      12:25:39
 7   BY MR. PETROCELLI:                                 12:25:39
 8       Q.  Do you see the reference to your name on   12:25:39
 9   the incoming calls of what I'll represent to you is 12:25:44
10   Mr. Marks' telephone log back on November 29, 2001? 12:25:47
11       A.  Yes, yes.                                  12:25:51
12       Q.  Okay.  And you called and left a message   12:25:52
13   but did not speak with him, correct?               12:25:55
14       A.  Yes.  He misspelled my name, with a "K."   12:25:59
15       Q.  The number 589-5151, that was your number  12:26:05
16   at the time?                                       12:26:09
17       A.  Yes.                                       12:26:10
18       Q.  Your phone number?                         12:26:10
19            Now, we know from your testimony in the   12:26:19
20   Siegel case that you did finally speak with        12:26:21
21   Mr. Marks sometime in February 2002.  You recall   12:26:24
22   that, speaking to him then?                        12:26:28
23       A.  I don't -- I know that was the testimony.  12:26:32
24   I don't have a specific recollection --            12:26:35
25       Q.  Okay.                                      12:26:36
```

**EXHIBIT 3**
**212**

MARC  TOBEROFF - 9/18/2012

Page 121

```
 1       A.  -- sitting here now of a specific time          12:26:37

 2  speaking to him in February.                             12:26:41

 3       Q.  Okay.  After not receiving a telephone          12:26:42

 4  return call from Mr. Marks, what, if anything, did       12:26:49

 5  you do to inquire about or investigate the status of     12:26:55

 6  the Siegel rights?                                       12:27:01

 7            MR. KENDALL:  Overbroad.  Calls for a          12:27:01

 8  narrative.  And I'll object to the extent that it        12:27:05

 9  calls for work product or communications that were       12:27:09

10  intended to remain confidential in furtherance of        12:27:15

11  your representation of your clients.                     12:27:18

12            THE WITNESS:  I think it's moot because I      12:27:22

13  don't recall -- I don't recall doing anything.  Are      12:27:32

14  you asking between November and the alleged              12:27:37

15  February date?                                           12:27:41

16  BY MR. PETROCELLI:                                       12:27:41

17       Q.  I am.                                           12:27:43

18       A.  I don't recall doing anything.                  12:27:44

19       Q.  Did you reach out to anybody else to            12:27:47

20  inquire about the status of the Siegel rights?           12:27:49

21       A.  I don't recall doing that.                      12:27:51

22            MR. KENDALL:  Why don't we take our break      12:28:01

23  now.  You've got a 12:30 time right upon you.            12:28:03

24            MR. PETROCELLI:  Okay.  Roughly --             12:28:05

25            THE VIDEOGRAPHER:  Off the record.  The        12:28:07
```

**EXHIBIT 3**
**213**

MARC   TOBEROFF - 9/18/2012

Page 122

```
 1    time is 12:28.                                           12:28:11

 2              (At 12:28 p.m., the deposition                 12:28:12

 3         of MARC TOBEROFF was adjourned for

 4         noon recess.)

 5    ///

 6    ///

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 3**

**214**

MARC   TOBEROFF - 9/18/2012

Page 123

```
 1              (At 1:14 p.m., the deposition

 2         of MARC TOBEROFF was reconvened.)

 3                                                    13:13:59

 4         THE VIDEOGRAPHER:  Back on the record at   13:13:59

 5    1:14.                                           13:14:05

 6                                                    13:14:05

 7              EXAMINATION (CONTINUED)               13:14:05

 8    BY MR. PETROCELLI:                              13:14:05

 9       Q.  Are you ready?                           13:14:12

10       A.  Yes.                                     13:14:12

11       Q.  Mr. Toberoff, prior to the February 2002 13:14:19

12    telephone call with Kevin Marks, is it fair to say 13:14:28

13    that you had some knowledge that the Siegels were in 13:14:33

14    talks with Warner Bros. or DC or some Warner Bros. 13:14:42

15    affiliate for the disposition of the rights?    13:14:46

16              MR. KENDALL:  Lacks foundation.       13:14:53

17              THE WITNESS:  I believe that on the   13:14:59

18    Internet there was speculation as to whether the 13:15:04

19    long-running Siegel/DC dispute had been settled. 13:15:14

20    I'm just paraphrasing.  And -- and that was the 13:15:24

21    extent of -- of -- I believe that was my general 13:15:33

22    knowledge on the subject.  I didn't have knowledge 13:15:40

23    and that was part of the reason why I was calling 13:15:43

24    for, to find out what was, in fact, the status.  13:15:45

25    BY MR. PETROCELLI:                              13:15:45
```

**EXHIBIT 3**

**215**

MARC  TOBEROFF - 9/18/2012

Page 124

```
 1        Q.  Did you ask Ari Emanuel, given his vast        13:15:50

 2   connections and relationships in the entertainment      13:15:56

 3   community, to make some inquiries to find out what      13:15:59

 4   the status of the rights --                             13:16:04

 5        A.  I don't recall --                              13:16:06

 6        Q.  -- was?                                        13:16:06

 7           MR. KENDALL:  Just a minute.  Just a            13:16:07

 8   minute.                                                 13:16:08

 9           Argumentative.  Lacks foundation.               13:16:09

10           THE WITNESS:  I don't recall asking him         13:16:10

11   that.                                                   13:16:11

12   BY MR. PETROCELLI:                                      13:16:11

13        Q.  Do you know if you did so?                     13:16:12

14        A.  I may have, but I don't recall it.             13:16:15

15        Q.  Do you know if he did make any inquiries       13:16:16

16   about that?                                             13:16:18

17        A.  I don't recall anything of that nature.        13:16:18

18        Q.  Do you know -- do you recall having any        13:16:20

19   discussions with Mr. Emanuel about what the status      13:16:22

20   of rights might be with Warner Bros.?                   13:16:27

21        A.  I don't recall.                                13:16:33

22           MR. KENDALL:  Let me caution you with           13:16:34

23   respect to attorney-client communications and work      13:16:37

24   product privileges.                                     13:16:38

25           THE WITNESS:  You know, without waiver of       13:16:42
```

MARC  TOBEROFF - 9/18/2012

Page 125

```
 1    any privilege, I don't recall a conversation of that        13:16:43
 2    nature.                                                      13:16:46
 3    BY MR. PETROCELLI:                                           13:16:46
 4         Q.  Did you attempt to locate the Siegels in           13:16:47
 5    Los Angeles, Joanne Siegel and Laura Siegel?                 13:16:51
 6              MR. KENDALL:  Lacks foundation as to time.         13:16:57
 7              MR. PETROCELLI:  I'm talking about the time        13:16:59
 8    frame 2001 and, you know, early part of 2002.  Let's        13:17:00
 9    take it up to the February call with Kevin Marks.           13:17:06
10    February of '02.                                            13:17:11
11              THE WITNESS:  I don't have a recollection         13:17:12
12    of attempting to locate Joanne or Laura Siegel in          13:17:13
13    Los Angeles.                                                13:17:19
14    BY MR. PETROCELLI:                                          13:17:19
15         Q.  Did you make a -- a judgment not to attempt       13:17:20
16    to locate them and communicate with them?                  13:17:23
17              MR. KENDALL:  Objection to the extent that       13:17:28
18    it calls for work product.                                 13:17:29
19              THE WITNESS:  I -- I -- my recollection is       13:17:32
20    that I had a initial conversation with Arthur             13:17:38
21    Levine, and that Arthur Levine directed me to Kevin       13:17:41
22    Marks of Gang, Tyre and I felt that was the               13:17:52
23    appropriate person to make inquiries to.  And I           13:17:54
24    don't recall any efforts to locate the Siegels,           13:17:59
25    contact the Siegels or to find out contact              13:18:01
```

**EXHIBIT 3**
**217**

MARC  TOBEROFF - 9/18/2012

Page 126

1    information directly for the Siegels in Los Angeles.          13:18:06

2    BY MR. PETROCELLI:                                            13:18:06

3        Q.  Did you feel it was not appropriate for you          13:18:10

4    to try to contact the Siegels directly because you           13:18:14

5    had been told Kevin Marks was their lawyer?                   13:18:18

6        A.  I don't recall a thought process.  I don't           13:18:24

7    recall a specific thought process.  I believe I had          13:18:29

8    all of the contact information I needed since I had           13:18:32

9    their lawyer.                                                 13:18:34

10       Q.  But when you didn't hear back from their             13:18:34

11   lawyer for weeks, if not a couple of months, did you         13:18:38

12   give any thought to trying to reach out to them              13:18:43

13   directly, "them" being Joanne and Laura Siegel?              13:18:46

14       A.  I don't recall thinking that, no.                    13:18:49

15       Q.  Was it a factor in your thought process at           13:18:50

16   the time that you were told they had a lawyer, were          13:18:53

17   represented by a lawyer?                                      13:18:59

18       A.  I would assume so, but I don't recall a              13:19:02

19   specific thought process about that.                         13:19:03

20       Q.  You did reach out to Michael Siegel,                 13:19:07

21   though, right?                                                13:19:09

22       A.  In November of '01.                                  13:19:09

23       Q.  Right.  And you went to some considerable            13:19:13

24   effort to track him down, right?                             13:19:16

25           MR. KENDALL:  Objection.  Vague and                  13:19:18

EXHIBIT 3
218

MARC  TOBEROFF - 9/18/2012

Page 127

```
 1   ambiguous.  Lacks foundation.                      13:19:19
 2         THE WITNESS:  Sitting here, I don't recall   13:19:24
 3   what efforts I made to.  I do recall that there was 13:19:32
 4   some deposition testimony on the subject.          13:19:35
 5   BY MR. PETROCELLI:                                 13:19:35
 6     Q.  You mean your prior deposition?              13:19:40
 7     A.  Yeah, I recall there may have been some      13:19:42
 8   deposition testimony on the subject, but I don't   13:19:44
 9   recall how considerable my efforts were or not     13:19:49
10   considerable.                                      13:19:52
11     Q.  Well, you wrote to him saying that there     13:19:57
12   were thousands of Michael Siegels or thousands of  13:19:58
13   Siegels or words to that effect?                   13:20:01
14     A.  So then that's what I'm recalling.           13:20:02
15     Q.  Right?                                       13:20:02
16     A.  That's what I'm recalling.                   13:20:05
17     Q.  I'll show you that letter.  It's actually    13:20:09
18   an e-mail dated November 17, 2001.  And I'm told   13:20:14
19   that's Exhibit 101.                                13:20:24
20         (The document referred to was               13:20:33
21          marked for identification by the           13:20:33
22          C.S.R. as Exhibit 101 and attached         13:20:33
23          to this deposition.)                       13:20:41
24   BY MR. PETROCELLI:                                 13:20:41
25     Q.  You understand this is an e-mail that was    13:20:42
```

**EXHIBIT 3**
**219**

MARC  TOBEROFF - 9/18/2012

Page 128

1    recently in this case ordered to be produced and has          13:20:44

2    been produced by --                                           13:20:47

3        A.  I understand.                                         13:20:49

4        Q.  -- by you?                                            13:20:50

5        A.  It's our position in any -- any questions I           13:20:50

6    answer without waiver of that position, that this is          13:20:54

7    a privileged document and we're preserving that               13:20:57

8    objection.                                                    13:21:05

9        Q.  The -- you state in the e-mail -- well,               13:21:06

10   first of all, how did you get Mr. Siegel's e-mail             13:21:14

11   address?  I'm now talking about Michael Siegel, of            13:21:17

12   course, the person to whom you directed this e-mail.          13:21:21

13       A.  I don't recall.                                       13:21:25

14       Q.  And then you said:                                    13:21:30

15              "It wasn't an easy task since                      13:21:31

16           there are about 2,000 Michael                         13:21:33

17           Siegels in the U.S."                                  13:21:35

18           Do you see that?                                      13:21:38

19       A.  Yes.                                                  13:21:38

20       Q.  Were you the one who ferreted through all             13:21:39

21   the Michel Siegels or did somebody assist you?                13:21:45

22       A.  I don't think anybody assisted me in                  13:21:51

23   November of 2001.                                             13:21:53

24       Q.  How did you find him?                                 13:21:54

25       A.  I don't have a specific recollection of how           13:21:56

**EXHIBIT 3**
**220**

MARC   TOBEROFF - 9/18/2012

Page 129

```
 1    I found him, and I -- reading this now, I don't        13:22:01
 2    believe the 2,000 is literal, I believe it's a --      13:22:06
 3    just a light way to introduce myself saying, "You      13:22:10
 4    are difficult to find.  There are 2,000 Michael        13:22:18
 5    Siegels."                                               13:22:19
 6         Q.  Can you tell me as best as you can recall     13:22:19
 7    how it was that you were able to locate him?            13:22:24
 8         A.  I would be speculating based on, you know,     13:22:41
 9    knowledge of how you could locate somebody.             13:22:46
10         Q.  You have no actual recollection?               13:22:48
11         A.  I don't have a specific recollection of the   13:22:51
12    steps I took to locate Michael Siegel.                 13:22:52
13         Q.  Do you have a recollection of any of the       13:22:56
14    steps you took?                                         13:22:58
15         A.  Not really.                                    13:22:58
16         Q.  Did you get any information about him from     13:23:00
17    Arthur Levine?                                          13:23:07
18         A.  I don't believe so.                            13:23:08
19         Q.  Did Arthur Levine identify anyone else to     13:23:14
20    you, other than Kevin Marks?                            13:23:19
21         A.  I don't believe so.                            13:23:21
22         Q.  Why on November 17 are you reaching out to    13:23:30
23    Michael Siegel rather than Joanne or Laura Siegel      13:23:33
24    who happened to reside in L.A.?                         13:23:37
25         A.  Because Joanne and -- I believe in            13:23:49
```

EXHIBIT 3
221

MARC  TOBEROFF - 9/18/2012

Page 130

```
 1    November 2001, that -- I'm ballparking here, I'm        13:23:51
 2    giving you -- I'm trying to approximate, I believe      13:24:03
 3    in November of 2001 I was under the impression that     13:24:07
 4    the Siegels were already represented by counsel.        13:24:15
 5    And that -- that's it, that they were already           13:24:19
 6    represented by counsel.                                 13:24:24
 7            MR. KENDALL:  Which Siegels?                     13:24:25
 8            THE WITNESS:  That -- that Laura and Joanne      13:24:26
 9    Siegel were represented by counsel with respect to      13:24:28
10    their termination interest.                             13:24:30
11    BY MR. PETROCELLI:                                      13:24:30
12        Q.  What was the basis of that knowledge?           13:24:33
13        A.  I believe reading things on the Internet.       13:24:34
14        Q.  By the time you wrote this e-mail on            13:24:41
15    November 17, 2001, had you spoken to --                 13:24:42
16        A.  Excuse me, let me take that back.               13:24:45
17        Q.  -- Arthur Levine?                               13:24:46
18        A.  Let me take that back a step.                   13:24:47
19            It may be something, in fact, because the       13:24:49
20    termination notice was posted and there was a large     13:24:52
21    law firm and a lawyer signing the termination notice    13:24:56
22    that they were represented with respect to their        13:24:58
23    termination interests by counsel.                       13:25:01
24        Q.  Although that notice was filed in 1997 and      13:25:03
25    it's now four years later, right?                       13:25:05
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277        www.merrillcorp.com/law

**EXHIBIT 3**
**222**

MARC  TOBEROFF - 9/18/2012

Page 131

```
 1      A.  Right.                                    13:25:07

 2      Q.  You believe at the time that you reached  13:25:08

 3   out to Michael Siegel and wrote this e-mail, that 13:25:10

 4   you had spoken to Mr. Levine and gotten the name of 13:25:13

 5   Kevin Marks and were told that he was counsel for  13:25:20

 6   Laura and Joanne?                                 13:25:22

 7      A.  I couldn't date it that precisely.  I     13:25:23

 8   well -- I may well have, but regardless of whether I 13:25:28

 9   did or not, you can come to that conclusion based on 13:25:31

10   the termination notice.                           13:25:33

11         First of all, it's a very -- it's sort of a 13:25:37

12   heavy duty legal document and it's signed by Arthur 13:25:40

13   Levine with a lot of information about a large    13:25:43

14   Washington, D.C. law firm at the end of it.       13:25:45

15      Q.  How did you come to learn that there was a 13:25:51

16   Michael Siegel?                                   13:25:53

17      A.  Reading something about Superman, I think 13:25:55

18   it was on the Internet, reading about Superman or 13:26:08

19   that Superman -- something about Jerry Siegel.    13:26:10

20      Q.  Did you make copies of the materials that 13:26:14

21   you read --                                       13:26:16

22      A.  No.                                        13:26:16

23      Q.  -- that provided some of the source       13:26:17

24   information for you?                              13:26:18

25      A.  No.  But I believe there were histories.  I 13:26:21
```

MARC   TOBEROFF - 9/18/2012

Page 132

```
 1    don't know if Wikipedia existed then.  I don't think    13:26:24

 2    it did.  But there were similar things available on     13:26:27

 3    the Internet, the type of thing you'd find where if     13:26:30

 4    you go on Wikipedia and you type in "Jerry Siegel"      13:26:33

 5    that talk about, you know, Jerry Siegel, his life,      13:26:36

 6    et cetera, et cetera.                                   13:26:39

 7         Q.  Well, do you recall having done that and       13:26:39

 8    gotten the name of Michael Siegel that way?             13:26:41

 9         A.  I believe so, yes.  Reading something that     13:26:43

10    Jerry Siegel was -- was married to Bella Siegel and     13:26:46

11    had one son and then got divorced and remarried, I      13:26:53

12    believe that information was available on the           13:26:58

13    Internet.                                               13:26:59

14         Q.  Did you --                                     13:27:01

15         A.  Readily available.                             13:27:02

16         Q.  Did you ask Arthur Levine about Michael        13:27:03

17    Siegel and whether he -- what his status was,           13:27:12

18    whether he had a lawyer, things like that?             13:27:15

19         A.  I don't recall a conversation with Arthur      13:27:19

20    Levine regarding Michael Siegel.                        13:27:21

21         Q.  Do you believe you did not have such a         13:27:22

22    conversation or you just can't remember one way or      13:27:27

23    the other?                                              13:27:28

24         A.  I believe I did not.                           13:27:29

25         Q.  Did you have a view that Michael Siegel was    13:27:33
```

MARC   TOBEROFF - 9/18/2012

Page 133

```
 1    not represented by a lawyer when you wrote this        13:27:37

 2    e-mail?                                                13:27:40

 3        A.  Yes.                                           13:27:40

 4        Q.  What informed that view?                       13:27:41

 5        A.  Simply that I didn't -- that I didn't know     13:27:43

 6    that he had a lawyer.                                  13:27:52

 7        Q.  You had an understanding --                    13:27:55

 8        A.  I -- let me -- two things would have           13:27:57

 9    informed that.                                         13:28:00

10        MR. KENDALL:  Can I just -- before you say         13:28:01

11    two things would have --                               13:28:02

12        THE WITNESS:  Right.                               13:28:04

13        MR. KENDALL:  -- now you should be                 13:28:05

14    testifying to facts, not to, you know, hypotheticals   13:28:06

15    that you're now thinking of as a lawyer.               13:28:10

16        So keep your -- keep your testimony -- if          13:28:12

17    you're actually remembering something that occurred,   13:28:14

18    then that's one thing and you should of course         13:28:18

19    reveal that.                                           13:28:20

20        THE WITNESS:  So -- so I appreciate that.          13:28:21

21        I'm not -- I'm deducing.  I'm not -- I'm           13:28:23

22    filling in the blanks.                                 13:28:26

23    BY MR. PETROCELLI:                                     13:28:26

24        Q.  Witnesses do that all the time if it's        13:28:29

25    based on --                                            13:28:31
```

MARC  TOBEROFF - 9/18/2012

Page 134

```
 1         A.   And I tell them not to.                      13:28:32

 2         Q.   If it's based on their best estimate and     13:28:33

 3    recollection of what occurred, so just do your best.   13:28:36

 4         A.   Okay.  So the answer to that is I don't      13:28:40

 5    have -- I don't have a recollection of why I didn't    13:28:42

 6    think Michael Siegel was represented.                  13:28:48

 7         Q.   Do you recall trying to find out if he had   13:28:51

 8    a lawyer?                                              13:28:53

 9         A.   I wouldn't know how to do that.  No, I       13:28:54

10    don't recall doing that.                               13:29:04

11         Q.   You could have asked Mr. Levine, right?      13:29:04

12         A.   I didn't draw any connection between         13:29:06

13    Mr. Levine and Michael Siegel.                         13:29:07

14         Q.   Did you --                                   13:29:09

15         A.   And that wasn't a topic of conversation.     13:29:11

16         Q.   Did you have a view when you spoke to        13:29:13

17    Mr. Levine that Michael Siegel was somehow not part    13:29:16

18    of the notice of termination or the -- the group       13:29:19

19    that was terminating the copyright interest?           13:29:23

20         A.   I don't -- well, let me say this:  I don't   13:29:25

21    know whether I spoke to Arthur Levine before I wrote   13:29:31

22    this e-mail or after I wrote this e-mail.  If          13:29:39

23    there's a date that -- there's something that has      13:29:41

24    come up where we've been able to narrow the date       13:29:44

25    with Arthur Levine, that might be helpful but I        13:29:47
```

MARC  TOBEROFF - 9/18/2012

Page 135

```
 1    don't recall any -- Michael Siegel coming up at all       13:29:51
 2    in the conversation with Arthur Levine or my              13:29:54
 3    thinking about Michael Siegel while I'm speaking to       13:29:59
 4    Arthur Levine.                                            13:30:02
 5         Q.  Is it fair to say that when you did speak        13:30:03
 6    to Arthur Levine after seeing whatever you saw on         13:30:07
 7    the Internet, that you understood Michael Siegel was      13:30:14
 8    not part of the group or the parties who were             13:30:22
 9    terminating the Siegel copyright interest?               13:30:27
10         A.  Yes, I understood that.                          13:30:29
11         Q.  Okay.  What was your interest in reaching        13:30:35
12    out to Michael Siegel, given that he wasn't part of       13:30:38
13    the terminating group, if I could use that                13:30:42
14    expression?                                               13:30:45
15         A.  It would be representing him, because I          13:30:46
16    believe that he had an interest, because he was --        13:30:50
17    you know, the -- the spouses and children and             13:30:58
18    grandchildren have an interest, and he was a child.       13:31:01
19         Q.  But you understood at the time that if           13:31:05
20    others who had the ability and standing to terminate      13:31:07
21    the copyright interests were in the process of doing      13:31:10
22    so or had already done so, that Michael would be          13:31:13
23    entitled to money, right?                                 13:31:17
24         MR. KENDALL:  Just a minute.                         13:31:18
25         Objection.  Argumentative.  Lacks                    13:31:21
```

**EXHIBIT 3**
**227**

MARC  TOBEROFF - 9/18/2012

Page 136

```
 1    foundation.  And I'm going to express the caution          13:31:27
 2    that this may be getting into a work product area,         13:31:29
 3    so bear that in mind in answering the question.            13:31:34
 4          THE WITNESS:  I'm, first of all, sort of             13:31:38
 5    overarching thing, in 2000- -- I don't want to             13:31:46
 6    impute my knowledge today to my knowledge in 2001,         13:31:49
 7    so I believe my knowledge in 2001 regarding                13:31:57
 8    termination was pretty limited.  And I -- I believe        13:32:02
 9    that I knew that Michael had a 25 percent interest         13:32:11
10    of something.                                              13:32:20
11    BY MR. PETROCELLI:                                         13:32:20
12       Q.  That he had a -- some kind of financial            13:32:24
13    interest in that he could receive money as a result        13:32:29
14    of the termination of the rights?                          13:32:34
15          MR. KENDALL:  Same objections and caution.          13:32:38
16          THE WITNESS:  Yes, I believe that at that           13:32:43
17    time in 2001 I knew that much.                             13:32:45
18    BY MR. PETROCELLI:                                         13:32:45
19       Q.  Why did you think he needed a lawyer?              13:32:48
20       A.  To represent him with respect to his              13:32:53
21    interest --                                                13:32:54
22       Q.  Did you have --                                    13:32:57
23       A.  Sort of self-evident.                             13:32:55
24       Q.  Forgive me.                                        13:32:57
25          Did you have a belief that the Siegels who         13:32:58
```

**EXHIBIT 3**
**228**

MARC  TOBEROFF - 9/18/2012

Page 137

```
 1    did terminate were not in contact with him and were        13:33:00
 2    not working in collaborating with him?                     13:33:03
 3              MR. KENDALL:  Again, caution with respect        13:33:08
 4    to work product and lacks foundation.                      13:33:09
 5    Argumentative.  And compound.                              13:33:13
 6              THE WITNESS:  I hadn't formed a belief one       13:33:19
 7    way or another.                                            13:33:24
 8    BY MR. PETROCELLI:                                         13:33:24
 9         Q.  You later came to learn that Joanne and          13:33:25
10    Laura were in touch with Michael Siegel and his           13:33:27
11    lawyer, Don Bulson, right, in connection with the         13:33:30
12    termination?                                              13:33:34
13              MR. KENDALL:  Same objections and caution,      13:33:34
14    and add that to the extent you learned that from the      13:33:36
15    Siegels, that would seem to call for attorney-client      13:33:40
16    communications.  By "the Siegels" I mean Laura and        13:33:42
17    Joanne.                                                   13:33:50
18              THE WITNESS:  Without waiver of any             13:33:51
19    privilege or work product, yes, I became aware of         13:33:55
20    that.                                                     13:33:57
21              MR. KENDALL:  Just one second.  You don't       13:33:59
22    have to go off the record.  I'm just going to grab        13:34:01
23    coffee and I'm going to be away from the microphone.      13:34:03
24              MR. PETROCELLI:  Are you asking me to wait?     13:34:05
25              MR. KENDALL:  Just a moment while I'm away      13:34:07
```

**EXHIBIT 3**
**229**

MARC   TOBEROFF - 9/18/2012

Page 138

| | | |
|---|---|---|
| 1 | from the microphone. | 13:34:10 |
| 2 |         MR. PETROCELLI:  Okay. | 13:34:11 |
| 3 |         (Pause in proceedings.) | 13:34:11 |
| 4 | BY MR. PETROCELLI: | 13:34:11 |
| 5 |     Q.  You said that as of 2001 you had limited | 13:34:31 |
| 6 | knowledge of copyright termination issues. | 13:34:38 |
| 7 |         Is that a fair statement? | 13:34:44 |
| 8 |     A.  Yes. | 13:34:46 |
| 9 |     Q.  Okay.  Prior to your dealings on this | 13:34:47 |
| 10 | matter starting in 2001 with the Shusters and | 13:34:56 |
| 11 | Michael Siegel and, et cetera, had you had any prior | 13:34:59 |
| 12 | experience with termination of copyright interests? | 13:35:04 |
| 13 |     A.  I was actually thinking about that question | 13:35:09 |
| 14 | before the deposition and I couldn't think of an | 13:35:11 |
| 15 | example. | 13:35:18 |
| 16 |     Q.  Were you generally familiar with the | 13:35:18 |
| 17 | concept? | 13:35:20 |
| 18 |         MR. KENDALL:  Vague and ambiguous. | 13:35:22 |
| 19 |         THE WITNESS:  I -- I believe my knowledge | 13:35:24 |
| 20 | was limited and it could well be that my initial | 13:35:28 |
| 21 | knowledge was with respect to Superman and the | 13:35:32 |
| 22 | publicity surrounding the Superman termination. | 13:35:39 |
| 23 | BY MR. PETROCELLI: | 13:35:39 |
| 24 |     Q.  By the time that you received the phone | 13:35:44 |
| 25 | call from Mr. Peary, did you believe that you were | 13:35:45 |

EXHIBIT 3
230

MARC   TOBEROFF - 9/18/2012

Page 139

```
 1    fully qualified in the area of copyright termination    13:35:47

 2    to collaborate with him?                                13:35:52

 3            MR. KENDALL:  Just a moment.                     13:35:57

 4            Lacks foundation.  Argumentative.                13:35:58

 5    Ambiguous.  Vague.                                       13:36:05

 6            THE WITNESS:  I believe I was qualified.         13:36:10

 7    BY MR. PETROCELLI:                                       13:36:10

 8        Q.  I said "fully qualified," you said              13:36:14

 9    "qualified."                                             13:36:16

10            You thought you were competent and              13:36:16

11    qualified to handle the matter?                          13:36:18

12        A.  I felt, yes, and that I would do legal          13:36:20

13    research and go over the statute and these were          13:36:22

14    statutory rights and I would take it from there.         13:36:25

15        Q.  Okay.  In this e-mail to Michael Siegel,        13:36:30

16    Exhibit 101, it states in the third paragraph:           13:36:40

17            "Based upon my research, I am                    13:36:45

18            absolutely convinced that you                    13:36:48

19            retain important rights with                     13:36:50

20            respect to your father Jerome                    13:36:52

21            Siegel's work, including Superman."              13:36:56

22            What research had you done?                      13:37:00

23        A.  Looking at the termination provision.           13:37:05

24    That's what this paragraph refers to.                    13:37:09

25        Q.  You're talking about section 304C?              13:37:12
```

**EXHIBIT 3**
**231**

MARC   TOBEROFF - 9/18/2012

Page 140

```
 1        A.  The fact -- yeah, the termination section      13:37:14

 2   304, there's different components, there's C,          13:37:18

 3   there's D.  But looking there, it's readily apparent   13:37:21

 4   that termination rights go to a spouse, children or    13:37:28

 5   grandchildren and he was a child.                      13:37:32

 6        Q.  Were you absolutely convinced that the        13:37:43

 7   Siegels had not entered into any kind of agreements    13:37:46

 8   by the time that this e-mail was sent which might      13:37:49

 9   have abridged Mr. Michael Siegel's rights?             13:37:58

10        MR. KENDALL:  Objection.  Calls for a legal       13:38:04

11   conclusion.  Vague, ambiguous and caution you with     13:38:05

12   respect to work product and attorney-client            13:38:08

13   communications with the Shusters as of this point in   13:38:10

14   time.                                                  13:38:13

15        THE WITNESS:  So first of all, when you           13:38:16

16   say "the Siegels," you're referring to Joanne and      13:38:18

17   Laura Siegel?                                          13:38:20

18   BY MR. PETROCELLI:                                     13:38:20

19        Q.  Correct.                                      13:38:21

20        A.  Not -- if we're saying "Siegels," I just      13:38:22

21   want it understood, whenever I say "Siegels," I mean   13:38:24

22   Laura and Joanne and that's true throughout the        13:38:27

23   case.  I've never once talked generically about the    13:38:31

24   Siegels and meant it to refer to Michael Siegel.       13:38:33

25        So when -- I'll take the questions as             13:38:37
```

MARC   TOBEROFF - 9/18/2012

Page 141

```
 1    referring to Laura and Joanne, and that when either      13:38:41
 2    of us are speaking about Michael Siegel, we're going     13:38:43
 3    to say "Michael" or we're going to say "Michael          13:38:47
 4    Siegel," because there's been a lot of willful           13:38:49
 5    confusion in this case on that point.                    13:38:51
 6            So in this instance, I -- I don't have a         13:38:52
 7    specific recollection of my specific state of mind       13:39:08
 8    at that particular period of time.  I'm filling in       13:39:11
 9    the blanks, so I can't answer that question.  But I      13:39:15
10    believe that my knowledge about termination was          13:39:21
11    somewhat limited at that time and growing.  I was        13:39:31
12    learning about it and I knew enough to know that as      13:39:33
13    a child, he had an interest in Superman.                 13:39:37
14       Q.  You had no knowledge at the time you wrote        13:39:43
15    this e-mail whether or not Joanne and Laura Siegel       13:39:48
16    had already executed a -- a new grant or some other      13:39:51
17    disposition with Warner Bros. or DC Comics following     13:39:59
18    their termination, right?                                13:40:01
19            MR. KENDALL:  Argumentative.                     13:40:03
20            THE WITNESS:  I -- I -- I didn't know            13:40:04
21    either way.                                              13:40:06
22    BY MR. PETROCELLI:                                       13:40:06
23       Q.  In addition to reading the copyright             13:40:16
24    statute, did you do any other research, any factual      13:40:18
25    research?                                                13:40:22
```

**EXHIBIT 3**
**233**

MARC  TOBEROFF - 9/18/2012

Page 142

```
 1              MR. KENDALL:  Objection.  Calls for work    13:40:25

 2    product.                                              13:40:28

 3              THE WITNESS:  I don't recall -- when you're 13:40:31

 4    talking about this period of time when I wrote this   13:40:33

 5    letter?                                               13:40:36

 6    BY MR. PETROCELLI:                                    13:40:36

 7        Q.  Correct.                                      13:40:37

 8        A.  I don't recall what my level of research      13:40:37

 9    was.  I presume I read about Superman and the         13:40:39

10    creation of Superman and I don't recall specifically  13:40:45

11    what my level of research was.                        13:40:50

12        Q.  Had you investigated the chain of title of    13:40:52

13    the various grants?                                   13:41:00

14              MR. KENDALL:  Objection.                    13:41:02

15              THE WITNESS:  I don't believe so.           13:41:02

16              MR. KENDALL:  Calls for work product.       13:41:03

17    BY MR. PETROCELLI:                                    13:41:03

18        Q.  Had you searched for any published cases      13:41:05

19    involving the Shusters or the Siegels?                13:41:09

20              MR. KENDALL:  Same objection.               13:41:11

21              THE WITNESS:  So, wait a minute.  We're     13:41:12

22    talking about November 17, 2001, and what's the date  13:41:14

23    of the Shuster agreement, October?                    13:41:19

24    BY MR. PETROCELLI:                                    13:41:22

25        Q.  23 -- oh, Shuster agreement, November 23,     13:41:23
```

**EXHIBIT 3**

**234**

MARC  TOBEROFF - 9/18/2012

Page 143

```
 1    2001.  That's in front of you, I think.              13:41:25

 2         A.  Yeah.  I -- I don't know how far along I     13:41:34

 3    was in terms of research.                            13:41:37

 4         Q.  Had you started any research?               13:41:40

 5         A.  I don't know.                                13:41:41

 6         Q.  In the next paragraph you asked Mr. Michael  13:41:45

 7    Siegel whether he had signed anything regarding the  13:41:48

 8    rights, and you indicated that the documents may not  13:41:51

 9    necessarily prevent or preclude his future rights.    13:41:55

10         Do you see that?                                 13:42:03

11    A.  Yes.                                              13:42:03

12         Q.  Why did you ask him that?                    13:42:04

13         MR. KENDALL:  Objection.  Calls for work         13:42:08

14    product.                                              13:42:09

15         THE WITNESS:  Yeah, I believe that is -- I       13:42:11

16    believe that is work product.                        13:42:14

17    BY MR. PETROCELLI:                                    13:42:14

18         Q.  Had you --                                   13:42:22

19         A.  I think the answer is fairly apparent, but   13:42:22

20    it is work product.                                  13:42:24

21         Q.  Were you aware as of the time you wrote      13:42:27

22    this e-mail of the provision in section 304 dealing  13:42:30

23    with agreements to the contrary?                     13:42:35

24         MR. KENDALL:  Objection.  Calls for work         13:42:38

25    product.                                             13:42:39
```

MARC  TOBEROFF - 9/18/2012

Page 144

```
 1           THE WITNESS:  I think that's work product      13:42:43
 2    as well.                                              13:42:45
 3    BY MR. PETROCELLI:                                    13:42:45
 4        Q.  Your knowledge of that?                       13:42:46
 5        A.  My knowledge of the statute, what parts I     13:42:47
 6    was aware of, how I believe they applied to the       13:42:52
 7    situation or didn't apply.                            13:42:54
 8        Q.  Is it fair to say that you at least read      13:42:55
 9    section 304 prior to the time you wrote this e-mail?  13:42:57
10           MR. KENDALL:  Same objection.                 13:43:01
11    Argumentative.                                        13:43:04
12           THE WITNESS:  I -- is it fair to say that I    13:43:05
13    read 304?                                             13:43:07
14    BY MR. PETROCELLI:                                    13:43:07
15        Q.  Yes, the copyright statute on termination.    13:43:09
16        A.  I think I looked at it, yes.                  13:43:12
17        Q.  Okay.                                         13:43:13
18        A.  But I can also answer generally, without     13:43:13
19    waiver of work product, that my -- remember I told    13:43:17
20    you how my first -- actually, I don't know if it was  13:43:21
21    the first or not, but I told you about the separated  13:43:25
22    rights case, about the Combat! case?                  13:43:28
23        Q.  Yes.                                          13:43:32
24        A.  Well, what was glaring in that case and the   13:43:32
25    other side felt was their winning -- was their        13:43:36
```

**EXHIBIT 3**
**236**

MARC   TOBEROFF - 9/18/2012

Page 145

```
 1   winning fact was that the contract contained a       13:43:40
 2   waiver of separated rights, and I actually proved to 13:43:43
 3   them that that was actually a fact quite contrary to 13:43:48
 4   their interests, that they attempted to circumvent   13:43:51
 5   the Writers Guild agreement.                          13:43:54
 6         So I was very familiar that there could        13:43:55
 7   be -- people felt that their attempts by users of    13:43:59
 8   intellectual property to waive rights that are       13:44:08
 9   unwaivable, from -- from that experience.            13:44:13
10         Now, whether -- what was going through my      13:44:18
11   head at that particular time is work product, but I  13:44:20
12   don't recall.                                        13:44:23
13     Q.  Are you saying that that paragraph about       13:44:25
14   the effect of "any agreements you may have signed"   13:44:30
15   was prompted by your work on the separated rights    13:44:32
16   issue?                                               13:44:36
17     A.  I'm not saying it's prompted by that, but I    13:44:37
18   had an orientation towards intellectual property     13:44:40
19   rights that there could be all sorts of contractual  13:44:41
20   provisions where people try to dissuade people from  13:44:45
21   exercising their rights by purporting to have them   13:44:51
22   waive rights, and which are unenforceable in many    13:44:53
23   instances.                                           13:44:59
24     Q.  But you had a general awareness that based     13:44:59
25   upon looking at section 304, that there was a        13:45:03
```

MARC  TOBEROFF - 9/18/2012

Page 146

```
 1   specific provision dealing with agreements to the      13:45:07

 2   contrary.                                              13:45:10

 3         MR. KENDALL:  Objection.  Calls for work         13:45:10

 4   product.  Argumentative.                               13:45:12

 5         THE WITNESS:  That -- that's -- that is           13:45:13

 6   work product.  But it's moot because I don't have a    13:45:15

 7   specific recollection.  When I wrote this, I was       13:45:18

 8   keying into the notwithstanding any agreement to the   13:45:21

 9   contrary language, in section 304 or not.              13:45:23

10   BY MR. PETROCELLI:                                     13:45:23

11      Q.  By the time you wrote this e-mail to            13:45:42

12   Michael Siegel, had you already been in contact with   13:45:43

13   the Shusters?                                          13:45:48

14      A.  I can't answer that question definitively,      13:45:49

15   but I suspect that the -- I -- I -- I don't know        13:46:00

16   definitively, but I suspect that the contact from      13:46:07

17   the Shusters regarding Superman triggered this and I   13:46:12

18   know it triggered my call to Arthur Levine.            13:46:18

19      Q.  You can definitively date the Peary call to     13:46:26

20   you before your call to Arthur Levine?                 13:46:32

21      A.  I can't date it, but I -- but if somebody       13:46:38

22   asked me, "What do you believe from what you do        13:46:44

23   know, what do you believe or what's your best          13:46:47

24   estimate?" that would be my estimate.                  13:46:50

25      Q.  When Mark Peary called you, by that point       13:46:53
```

MARC  TOBEROFF - 9/18/2012

Page 147

```
1    in time you had already seen the references that    13:46:57
2    were all over the Internet about Superman, right?    13:47:02
3    Before the termination of the -- of the copyright    13:47:06
4    interests, correct?  You're shaking your head.    13:47:08
5         A.  I'm -- I'm actually --    13:47:13
6         Q.  Okay.    13:47:14
7         A.  I'm actually just focused on the last    13:47:14
8    question.  I'm trying --    13:47:16
9         Q.  Okay.    13:47:18
10        A.  -- I'm really trying to focus and recall    13:47:18
11   the ordering of these things, because they're --    13:47:21
12   there's a flurry of activity all happening around    13:47:24
13   the same time, and I -- and I don't know when the    13:47:32
14   Arthur Levine call was.  I have no idea when the    13:47:34
15   Arthur Levine call was.  So if there's anything that    13:47:39
16   could refresh my recollection on that, that would be    13:47:45
17   helpful.    13:47:47
18          But I don't recall when -- of whether the    13:47:49
19   Arthur -- I'm trying -- I don't have a month.  All I    13:47:50
20   know is it must have been before February.  If    13:47:55
21   February was the -- what we have -- it must have    13:47:58
22   been before this date here that we have in the    13:48:02
23   11-20 --    13:48:10
24        Q.  You're referring to Kevin Marks' call log    13:48:11
25   for November 29, 2001?    13:48:15
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277         www.merrillcorp.com/law

**EXHIBIT 3**
**239**

MARC  TOBEROFF - 9/18/2012

Page 148

```
 1        A.  Yes.                                          13:48:17
 2        Q.  What's the exhibit number there just for      13:48:18
 3   the record?                                            13:48:22
 4            MR. TOKORO:  100.                             13:48:22
 5            THE WITNESS:  Exhibit 100, so if I got        13:48:23
 6   Kevin Marks' name from Arthur Levine, which I did,     13:48:26
 7   and I called him on 11-29, I must have spoken to       13:48:31
 8   Arthur Levine before 11-29.                            13:48:34
 9            And this is dated November 17, 12 days        13:48:37
10   earlier.  So I don't know if I spoke to Arthur         13:48:40
11   Levine before I wrote this or soon after, but I am     13:48:45
12   seeing a flurry of activity in a very short time       13:48:50
13   period.                                                13:48:55
14            MR. KENDALL:  I'd like to just have a         13:48:57
15   moment to confer with my client given that he's        13:48:59
16   talking about conversations that have privilege        13:49:02
17   issues associated with them.  Just take a minute.      13:49:06
18            THE VIDEOGRAPHER:  Off the record.  The       13:49:11
19   time is 1:49.                                          13:49:12
20            (Brief recess.)                               13:54:02
21            THE VIDEOGRAPHER:  Back on the record at      13:54:02
22   1:54.                                                  13:54:09
23   BY MR. PETROCELLI:                                     13:54:09
24        Q.  Yes, I asked you just a few moments ago       13:54:12
25   whether or not you were aware about the Superman       13:54:18
```

MARC  TOBEROFF - 9/18/2012

Page 149

```
 1   termination by the Siegels, Joanne and Laura, that        13:54:22

 2   had been referenced on the Internet as of the time        13:54:29

 3   you first received the phone call from Mark Peary.        13:54:34

 4        A.  I believe I was aware of it.  But I -- I --       13:54:44

 5            MR. KENDALL:  Mr. Toberoff, I think you           13:54:52

 6   answered the question so you're free to go on but         13:54:53

 7   please focus on the question and answer the              13:54:56

 8   question.                                                13:54:58

 9   BY MR. PETROCELLI:                                       13:54:58

10        Q.  Are you done with your answer?                  13:55:07

11        A.  Yes.                                             13:55:10

12        Q.  Okay.  In response to the e-mail to Michael     13:55:14

13   Siegel, Exhibit 101, did you come to learn whether       13:55:28

14   or not Michael had signed any agreements?                13:55:33

15        A.  Can you repeat that, please?                    13:55:37

16        Q.  Yes.                                            13:55:39

17            Did you ever come to learn that Michael had     13:55:39

18   signed any agreements related to Superman in             13:55:45

19   response to the issue raised in the November 17          13:55:48

20   e-mail?                                                  13:55:53

21        A.  At any time?                                    13:56:02

22            MR. KENDALL:  He's asking in your               13:56:06

23   conversations with Michael Siegel.                       13:56:07

24            THE WITNESS:  I didn't have conversations.      13:56:10

25            MR. PETROCELLI:  I didn't ask him about his     13:56:11
```

MARC  TOBEROFF - 9/18/2012

Page 150

```
 1   conversations with Michael.                      13:56:13

 2        Q.  After sending this e-mail, November 17, did   13:56:14

 3   there come a time when you learned whether or not    13:56:21

 4   Michael had signed anything related to Superman?     13:56:23

 5        A.  Only in the course of this litigation I      13:56:28

 6   learned that he had a retainer agreement with Don    13:56:30

 7   Bulson or Renner, Otto, but I don't think that's     13:56:38

 8   what you're referring to.                            13:56:39

 9        Q.  No, I'm not.  No.  Some kind of property     13:56:39

10   rights agreement or settlement agreement or anything 13:56:42

11   like that?                                           13:56:44

12        A.  No.                                          13:56:45

13        Q.  Okay.  And you spoke to Mr. Bulson at some   13:56:45

14   point in either 2001 or 2002.                        13:56:51

15            Is that right?                               13:56:51

16        A.  Yes.                                         13:56:51

17        Q.  He called you after you sent this e-mail?    13:56:57

18        A.  I don't remember what the circumstances      13:57:00

19   were of conversations with Bulson, but I -- I        13:57:02

20   believe I spoke to him.  I believe I spoke to him    13:57:15

21   not -- not in 2001 but in 2002.                      13:57:24

22        Q.  About what?                                 13:57:29

23        A.  I don't recall the conversation.  I'm -- I   13:57:34

24   would be filling in the blanks.                      13:57:38

25        Q.  Did he call you or did you call him?         13:57:41
```

**EXHIBIT 3**
**242**

MARC  TOBEROFF - 9/18/2012

Page 151

```
 1        A.  I believe that there was this e-mail, then       13:57:45
 2    I believe there was a conversation with Bulson or        13:57:51
 3    one or two conversations with Bulson, and then I         13:57:54
 4    believe there was the next time I spoke to Bulson it     13:57:59
 5    was about interest in buying Michael Siegel's            13:58:05
 6    interest, which was after.                               13:58:11
 7        Q.  After what?                                      13:58:15
 8        A.  The offer, the documented, you know,             13:58:16
 9    whenever we entered into the conflict waiver with        13:58:20
10    the Siegels and there was a --                           13:58:23
11        Q.  That was January 2003.                           13:58:25
12        A.  Right.  So that's the next -- those are          13:58:26
13    the --                                                   13:58:28
14        Q.  Okay.  And when do you believe you spoke to      13:58:29
15    Don Bulson after sending your e-mail to Michael          13:58:35
16    Siegel?                                                  13:58:37
17        A.  I believe it was in 2002 but I don't know        13:58:37
18    when it was.                                             13:58:39
19        Q.  Did he call you or did you call him?             13:58:40
20        A.  I believe he called me.                          13:58:46
21        Q.  Did you get any documents from him?              13:58:47
22        A.  I don't think so.                                13:58:51
23        Q.  Did you ask him about any agreements along       13:58:52
24    the lines you had asked of Mr. Michael Siegel?           13:58:54
25        A.  I don't recall.                                  13:58:58
```

MARC   TOBEROFF - 9/18/2012

Page 152

```
 1           MR. PETROCELLI:  Do you have a -- the          13:59:02

 2   Bulson time records?  Is that the same exhibit        13:59:04

 3   throughout, 102?  Okay.                               13:59:21

 4           (The document referred to was

 5           marked for identification by the

 6           C.S.R. as Exhibit 102 and attached

 7           to this deposition.)

 8   BY MR. PETROCELLI:

 9      Q.  Let me show you certain time records -- you    13:59:31

10   now have in front of you certain time records that    13:59:33

11   have been produced in this case by Don Bulson, and    13:59:35

12   they've been marked as Exhibit 102, and you'll see    13:59:41

13   on the first -- I don't know if it's the first page,  13:59:50

14   it's the page with control number EOMS 00183 on the   13:59:51

15   bottom right-hand corner.  These have obviously been  13:59:57

16   redacted prior to their production to us.             14:00:01

17           In any event you'll see what appears to be    14:00:11

18   an entry on November 27, 2001 where:                  14:00:13

19           "Review e-mail from Mike                      14:00:17

20           Siegel, telephone conference with            14:00:18

21           Mike Siegel, telephone conference            14:00:19

22           with Mark Toberoff" -- Mark spelled          14:00:21

23           with a "K" not a "C."                        14:00:23

24           And I know you said you thought the call      14:00:29

25   occurred in 2002, but looking at this now, it might   14:00:30
```

MARC  TOBEROFF - 9/18/2012

Page 153

| | |
|---|---|
| 1   have occurred in November of 2001, right? | 14:00:34 |
| 2       A.  I don't have any reason to believe this is | 14:00:36 |
| 3   incorrect. | 14:00:38 |
| 4       Q.  Okay.  Which would have been, you know, ten | 14:00:38 |
| 5   days or so after your e-mail to Michael Siegel. | 14:00:44 |
| 6           In that call, did you discuss -- what did | 14:00:49 |
| 7   you discuss with Mr. Bulson? | 14:00:54 |
| 8       A.  I don't even recall the conversation. | 14:00:58 |
| 9       Q.  Did you inquire about the status of the | 14:00:59 |
| 10  rights as you had endeavored to do with Kevin Marks | 14:01:04 |
| 11  on November 29? | 14:01:10 |
| 12      A.  Again, drawing a blank with respect to -- I | 14:01:15 |
| 13  know that when I spoke to Kevin -- Don Bulson in | 14:01:20 |
| 14  2003 regarding a buyout on Michael Siegel's | 14:01:29 |
| 15  interest, that -- on behalf of Ari Emanuel, that | 14:01:34 |
| 16  I -- that was not the first time that I had spoken | 14:01:43 |
| 17  to him.  I knew who he was, I was familiar with him, | 14:01:45 |
| 18  I knew he represented Michael Siegel.  And from that | 14:01:49 |
| 19  I surmised that I must have spoken to him in 2002, | 14:01:54 |
| 20  but I don't remember my conversations with Bulson. | 14:01:57 |
| 21      Q.  Well -- | 14:01:57 |
| 22      A.  Which leads me to believe they were pretty | 14:02:01 |
| 23  uneventful. | 14:02:04 |
| 24      Q.  That billing record -- the billing records, | 14:02:05 |
| 25  Exhibit 102, will -- | 14:02:06 |

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

**EXHIBIT 3**

MARC   TOBEROFF - 9/18/2012

Page 154

```
 1         A.  I'll see if it refreshes --            14:02:07

 2         Q.  -- do contain references to telephone calls   14:02:10

 3    with you in 2002.                                14:02:12

 4         A.  No, no, I understand.                   14:02:15

 5         Q.  Let me get back to my question.         14:02:19

 6             Do you recall discussing the status of  14:02:21

 7    the -- of the Siegel rights, the rights terminated  14:02:26

 8    by Michael -- by Laura and Joanne Siegel?        14:02:31

 9         A.  I don't.                                14:02:34

10         Q.  You came to learn, commencing with your  14:02:35

11    discussions with Don Bulson that Joanne and Laura  14:02:40

12    were in contact with Don Bulson and Michael Siegel  14:02:46

13    regarding their dealings with DC and Warner Bros.,  14:02:51

14    correct?                                         14:02:55

15         A.  I don't know -- I would be -- you know, I'm  14:02:59

16    not saying I didn't.  I just can't -- since I have  14:03:02

17    no recollection of these conversations, in fact, I  14:03:04

18    hadn't even recalled that we spoke in 2001, I      14:03:08

19    thought it must have been sometime in 2002, I      14:03:10

20    don't -- can't say one way or another based on the  14:03:14

21    recollection of the conversation.                14:03:17

22         Q.  Do you have any reason to believe you would  14:03:18

23    not have asked Mr. Bulson about the status of the  14:03:20

24    rights?                                          14:03:23

25             MR. KENDALL:  Argumentative.  Lacks     14:03:23
```

**EXHIBIT 3**
**246**

MARC  TOBEROFF - 9/18/2012

Page 155

```
 1   foundation.  Calls for speculation.              14:03:25

 2         THE WITNESS:  Not as I sit here now.  I    14:03:25

 3   don't have a reason to believe that I did not.   14:03:28

 4   BY MR. PETROCELLI:                               14:03:28

 5     Q.  Did you discuss the status of the          14:03:34

 6   relationship between Joanne and Laura and Michael? 14:03:36

 7         MR. KENDALL:  Same objections.             14:03:39

 8         THE WITNESS:  I have no recollection of the 14:03:39

 9   contents of our conversation.                    14:03:43

10   BY MR. PETROCELLI:                               14:03:43

11     Q.  Did you discuss with Mr. Bulson when you   14:03:46

12   and he first spoke that you were working with the 14:03:50

13   Shusters?                                        14:03:54

14         MR. KENDALL:  Same objections.             14:03:56

15         THE WITNESS:  I don't -- I don't recall    14:03:56

16   whether I did or not.                            14:04:04

17   BY MR. PETROCELLI:                               14:04:04

18     Q.  Is it fair to say that you were exploring  14:04:07

19   whether or not the Siegels had yet to make a new 14:04:11

20   arrangement with Warner Bros., understanding that if 14:04:16

21   they had not, the Shusters and Siegels could join 14:04:21

22   forces and would have, combined, better bargaining 14:04:24

23   power?                                           14:04:28

24         MR. KENDALL:  Objection.  Lacks foundation. 14:04:28

25   Argumentative.  Calls for speculation.           14:04:30
```

**EXHIBIT 3**
**247**

MARC TOBEROFF - 9/18/2012

Page 156

```
 1              THE WITNESS:  I think that would be work      14:04:33

 2      product.  But I don't -- again, I don't have a        14:04:35

 3      specific recollection of that conversation.  Because  14:04:40

 4      I don't have a recollection of the conversation, I    14:04:44

 5      don't have a recollection of any purpose or strategy  14:04:46

 6      behind my discussions in those phone conversations.   14:04:52

 7      BY MR. PETROCELLI:                                     14:04:52

 8          Q.  When you began working with the Shusters,     14:04:57

 9      you did have a sufficient understanding of the way    14:05:02

10      the copyright laws worked such that you appreciated   14:05:05

11      that they would be in a much stronger position if     14:05:13

12      the Siegels had not yet made a new agreement with DC  14:05:16

13      or Warner Bros., correct?                             14:05:21

14              MR. KENDALL:  Argumentative.  Lacks           14:05:22

15      foundation.                                           14:05:26

16              THE WITNESS:  I believe that's work           14:05:26

17      product.                                              14:05:27

18      BY MR. PETROCELLI:                                    14:05:27

19          Q.  You understood that if the Shuster            14:05:28

20      termination notice would one day become effective,   14:05:30

21      combined with the Siegels, the two forces could join  14:05:38

22      hands and be in a much stronger position than each    14:05:43

23      of them individually might be, correct?               14:05:46

24              MR. KENDALL:  Lacks foundation.               14:05:48

25              THE WITNESS:  Without disclosing what my      14:05:48
```

Page 157

```
 1    thought processes were with respect to in           14:05:55

 2    furtherance of the Shusters, which the question      14:05:57

 3    calls for, would be work product.                    14:06:00

 4    BY MR. PETROCELLI:                                   14:06:03

 5        Q.  But you -- I want to be clear about this.    14:06:03

 6    My question is directed to your having that          14:06:05

 7    understanding as of -- as early as 2001 when you     14:06:08

 8    started to work with the Shusters.                   14:06:13

 9           Is that correct?                              14:06:16

10           MR. KENDALL:  Objection.  Calls for work      14:06:17

11    product.  Vague and ambiguous.                       14:06:19

12           THE WITNESS:  Work product.                   14:06:21

13    BY MR. PETROCELLI:                                   14:06:21

14        Q.  When did you first find out that there was   14:06:32

15    no agreement between the Siegels and Warner Bros. or 14:06:39

16    DC following the Siegels termination?                14:06:43

17        A.  I believe that would be in -- I recall in    14:06:45

18    February.                                            14:07:01

19        Q.  February 2002?                               14:07:03

20        A.  Yes.                                         14:07:06

21        Q.  With Kevin Marks?                            14:07:08

22        A.  Yes.                                         14:07:09

23        Q.  And he definitively told you that the --     14:07:12

24    there was no agreement between the parties?          14:07:14

25           MR. KENDALL:  Argumentative.  Vague and       14:07:17
```

MARC  TOBEROFF - 9/18/2012

Page 158

```
 1   ambiguous.                                          14:07:19
 2         THE WITNESS:  No, I -- it was implicit in     14:07:19
 3   that conversation that -- first of all, in that     14:07:28
 4   conversation he blew me off, as I testified         14:07:34
 5   previously.  That's the best way to summarize it.   14:07:37
 6   BY MR. PETROCELLI:                                  14:07:37
 7      Q.  And have you read that deposition recently?  14:07:40
 8      A.  I did go over it.                             14:07:42
 9         But it was implicit in so doing that there    14:07:46
10   was not an agreement.  And because if -- in the way 14:07:52
11   he blew me off, he would have just said, "We have an 14:08:00
12   agreement."                                         14:08:02
13      Q.  You're deducing that, right, to use your     14:08:04
14   word?                                               14:08:07
15      A.  It's not just deducing.  It's -- it's body   14:08:07
16   language.  I'm not just deducing it.  It's -- it's  14:08:10
17   the takeaway from the conversation.                 14:08:13
18      Q.  To be clear, though, he did not say to you,  14:08:15
19   "There is no agreement," correct?                   14:08:18
20      A.  It was clear to me in that conversation      14:08:22
21   that there was no agreement.                        14:08:24
22      Q.  Did he say that to you?                       14:08:25
23      A.  I don't recall him saying those words,       14:08:28
24   "There is no agreement."                            14:08:30
25      Q.  What words did he say that made that clear   14:08:31
```

MARC   TOBEROFF - 9/18/2012

Page 159

1    to you?                                                    14:08:33

2         A.   Words to the effect that, "We're in             14:08:33

3    negotiations with DC, I'm not at liberty to discuss       14:08:42

4    anything," and just feeling uncomfortable talking         14:08:45

5    about anything having to do with it whatsoever.           14:08:52

6         Q.   And from -- from that, you deduced that         14:08:55

7    there was no definitive agreement in place?               14:08:59

8         A.   That there was no agreement.                    14:09:04

9         Q.   No agreement?                                   14:09:05

10         Was that information valuable to you at the        14:09:07

11    time?                                                     14:09:14

12         A.   I don't know --                                14:09:16

13         MR. KENDALL:  Vague and ambiguous.                 14:09:17

14         THE WITNESS:  I don't know what you mean           14:09:18

15    by "valuable."                                            14:09:19

16    BY MR. PETROCELLI:                                        14:09:19

17         Q.   Well, what did you do --                       14:09:20

18         A.   Was it relevant?                               14:09:22

19         Q.   Yes, was it relevant to what you were          14:09:22

20    doing?                                                    14:09:24

21         A.   Yes.                                           14:09:24

22         Q.   Did it cause you to believe that you,          14:09:28

23    either through IP Worldwide or through some other        14:09:38

24    entity or with some other person might be able to        14:09:41

25    pursue those rights that the Siegels had?                14:09:45

MARC  TOBEROFF - 9/18/2012

Page 160

```
 1        A.   That's work product.  My thought process        14:09:52
 2   with respect to that information is work product.         14:09:55
 3        Q.   Work product in pursuit of which client's       14:09:59
 4   work?                                                     14:10:02
 5        A.   Shusters'.                                       14:10:02
 6        Q.   Okay.  Okay.  I'm going to come back to the     14:10:03
 7   Kevin Marks conversation.  It's a little bit out of      14:10:10
 8   sequence.                                                 14:10:14
 9            Let me go to the Shusters.  Make sure I've       14:10:14
10   covered this, though.                                     14:10:29
11            It's your testimony you have no                  14:10:30
12   recollection whatsoever what you discussed with Don      14:10:31
13   Bulson on or about November 27, 2001?                     14:10:34
14        A.   I have no recollection.  I don't even           14:10:39
15   remember --                                               14:10:42
16        Q.   Did you --                                       14:10:43
17        A.   -- we had spoken at that time.                   14:10:42
18        Q.   -- receive any documents from him?              14:10:43
19        A.   I don't believe so, no.                          14:10:44
20        Q.   Did you ask for any?                             14:10:46
21        A.   I don't believe so, no.                          14:10:48
22        Q.   Okay.  I'm going to go to this next exhibit     14:10:55
23   here that you have in front of you.  Exhibit 10, the     14:11:00
24   joint venture agreement made as of November 23, 2001    14:11:03
25   between PPC, Pacific Pictures and Jean Peavy and         14:11:11
```

EXHIBIT 3
252

MARC  TOBEROFF - 9/18/2012

Page 161

```
 1    Mark Warren Peary.                              14:11:17

 2          Do you have that?                         14:11:19

 3    A.  Yes.                                        14:11:20

 4    Q.  You read in your testimony in the Siegel   14:11:21

 5  case that you recently reviewed that this joint  14:11:36

 6  venture agreement, just like the supplemental one in 14:11:42

 7  2003, was not a legal retainer agreement.  True? 14:11:45

 8          MR. KENDALL:  Calls for a legal conclusion. 14:11:54

 9          THE WITNESS:  I don't -- you're referring 14:11:58

10  to my recollection of my prior testimony?        14:12:00

11  BY MR. PETROCELLI:                               14:12:00

12    Q.  You just read that in your prior           14:12:02

13  deposition?                                      14:12:04

14    A.  I don't -- I don't recall reading that in  14:12:05

15  my prior deposition.                             14:12:07

16    Q.  Okay.  It's correct that this document,    14:12:07

17  Exhibit 10 --                                    14:12:13

18    A.  I read my testimony last week.             14:12:14

19    Q.  Okay.                                      14:12:16

20    A.  Midweek.                                   14:12:16

21    Q.  It's correct that this document, Exhibit   14:12:17

22  10, was not a legal retainer agreement, correct? 14:12:19

23          MR. KENDALL:  Objection.  Vague and      14:12:22

24  ambiguous.  Calls for a legal conclusion.        14:12:24

25          THE WITNESS:  I don't -- again, it's a   14:12:49
```

MARC   TOBEROFF - 9/18/2012

Page 162

```
 1   legal conclusion.  I can't -- I can't -- I'm putting      14:12:51
 2   my hat on as a fact witness, not as a lawyer.  So         14:12:55
 3   I'm not going to give you my legal conclusion about       14:12:59
 4   this.                                                     14:13:01
 5   BY MR. PETROCELLI:                                        14:13:01
 6       Q.  At the time you entered into this                 14:13:02
 7   agreement, you understood that it was not a legal         14:13:05
 8   retainer agreement, correct?                              14:13:08
 9           MR. KENDALL:  Objection.  Calls for a legal       14:13:11
10   conclusion.  Lacks foundation.                            14:13:13
11           THE WITNESS:  This agreement calls for the        14:13:15
12   provision and -- and/or notes the provision of legal      14:14:01
13   services, but I don't know if you could style it as       14:14:06
14   a legal retainer agreement.                               14:14:13
15   BY MR. PETROCELLI:                                        14:14:13
16       Q.  Well, when you entered into this agreement,       14:14:14
17   when you signed it, did you understand that it was a      14:14:17
18   legal retainer agreement?                                 14:14:22
19           MR. KENDALL:  Calls for a legal conclusion.       14:14:25
20   Lacks foundation.                                         14:14:26
21           THE WITNESS:  I understood that I would be        14:14:27
22   providing legal services to the venture and that I        14:14:31
23   would be providing legal services to the Shusters         14:14:38
24   who were, you know, partners in the joint venture --      14:14:42
25   joint venture.                                            14:14:47
```

**EXHIBIT 3**
**254**

MARC   TOBEROFF - 9/18/2012

Page 163

| | | |
|---|---|---|
| 1 | BY MR. PETROCELLI: | 14:14:47 |
| 2 | Q.  So is it your testimony then that you | 14:14:48 |
| 3 | understood that once this document had been signed, | 14:14:50 |
| 4 | this document caused you to be retained as the -- as | 14:14:54 |
| 5 | a lawyer for the Shusters? | 14:14:58 |
| 6 | A.  I believe that -- that this document | 14:14:59 |
| 7 | contemplates -- I believe that I was already | 14:15:12 |
| 8 | providing legal services and advice to the Shusters | 14:15:14 |
| 9 | prior to this document actually being signed on | 14:15:17 |
| 10 | November 28, and that the document provides for my | 14:15:23 |
| 11 | continuing provision -- there's a lot of "provide" | 14:15:32 |
| 12 | words in there -- but that the document contemplates | 14:15:37 |
| 13 | my continued provision of legal services of the | 14:15:39 |
| 14 | venture and to the Shusters. | 14:15:43 |
| 15 | Q.  So I didn't ask you whether you had been | 14:15:45 |
| 16 | rendering legal services beforehand.  I asked you | 14:15:48 |
| 17 | whether in signing this document did you believe | 14:15:53 |
| 18 | that it caused you to be retained as counsel to the | 14:15:55 |
| 19 | Shusters.  That was the effect of that document as | 14:16:00 |
| 20 | you understood it when it was signed? | 14:16:03 |
| 21 | A.  I don't -- | 14:16:05 |
| 22 | MR. KENDALL:  Just a moment.  I'm going to | 14:16:05 |
| 23 | object as asked and answered and argumentative. | 14:16:21 |
| 24 | BY MR. PETROCELLI: | 14:16:21 |
| 25 | Q.  You can answer. | 14:16:28 |

**EXHIBIT 3**
**255**

MARC  TOBEROFF - 9/18/2012

Page 164

```
 1        A.  I don't know what you mean by caused me to    14:16:32

 2    be retained?                                          14:16:34

 3        Q.  Upon signing this document, did you believe   14:16:37

 4    that when the document -- because the document was    14:16:38

 5    executed, you had thereby been retained as counsel    14:16:43

 6    or -- is that what you believe the effect of this     14:16:46

 7    document was, was to retain you as the lawyer to the  14:16:49

 8    Shusters?                                             14:16:52

 9        A.  No.                                           14:16:52

10        MR. KENDALL:  Calls for -- vague and              14:16:54

11    ambiguous.  Calls for a legal conclusion.  Lacks      14:16:55

12    foundation.                                           14:16:57

13    BY MR. PETROCELLI:                                    14:16:57

14        Q.  Had you been retained as a lawyer for the     14:16:59

15    Shusters before signing this document?                14:17:02

16        A.  Not formally retained as in a signed          14:17:07

17    retainer agreement.                                   14:17:11

18        Q.  When is the first signed retainer agreement   14:17:16

19    you had with the Shusters for the rendition of your   14:17:18

20    legal services?                                       14:17:21

21        MR. KENDALL:  Calls for a legal conclusion.       14:17:21

22        THE WITNESS:  The first -- let me state it        14:17:23

23    this way:  This document, this document acknowledges  14:17:37

24    that I'm providing legal services and will continue   14:17:42

25    to provide legal services to the venture and to the   14:17:45
```

MARC   TOBEROFF - 9/18/2012

Page 165

```
 1   Shusters in connection with their termination rights      14:17:47

 2   and the probating of the Shusters estate.                 14:17:50

 3        There was no formal written retainer for my          14:17:55

 4   legal services with the Shusters or to the joint          14:18:01

 5   venture until an agreement in 2004, which actually        14:18:04

 6   replaced this agreement.                                  14:18:11

 7   BY MR. PETROCELLI:                                        14:18:11

 8        Q.  So there's no agreement that was signed by       14:18:12

 9   you as Marc Toberoff, the lawyer, with the Shusters       14:18:15

10   to render legal services until 2004.                      14:18:18

11        Is that right?                                       14:18:22

12        MR. KENDALL:  Objection.  Argumentative.             14:18:23

13   Vague and ambiguous.  Calls for a legal conclusion.       14:18:28

14   Lacks foundation.                                         14:18:36

15        THE WITNESS:  I believe -- I -- I -- I               14:18:42

16   believe that it was contemplated that there would be      14:18:49

17   such an agreement but we never got around to it.          14:18:51

18   BY MR. PETROCELLI:                                        14:18:51

19        Q.  Until 2004?                                      14:18:54

20        A.  Until 2004.                                      14:18:55

21        Q.  The parties to this agreement are Pacific        14:18:56

22   Pictures Corporation on the one hand and Jean Peavy       14:18:59

23   and Mark Warren Peary on the other hand, correct?         14:19:02

24        A.  Correct.                                         14:19:06

25        MR. PETROCELLI:  We have to change the tape          14:19:07
```

**EXHIBIT 3**
**257**

MARC   TOBEROFF - 9/18/2012

Page 166

```
 1    right now.                                          14:19:08

 2             MR. KENDALL:  Can we just take a           14:19:10

 3    couple-minute break to stretch?                     14:19:10

 4             THE VIDEOGRAPHER:  This will mark the end  14:19:12

 5    of Volume I, Tape Number 2 in the deposition of Marc 14:19:13

 6    Toberoff.  Going off the record.  The time is 2:19.  14:19:16

 7             (Brief recess.)                            14:19:35

 8             THE VIDEOGRAPHER:  We're back on the       14:28:11

 9    record.                                             14:28:12

10             This marks the beginning of Volume I, Tape 14:28:12

11    Number 3 in the deposition of Marc Toberoff.  The   14:28:14

12    time is 2:28.                                       14:28:16

13    BY MR. PETROCELLI:                                  14:28:16

14       Q.  You have Exhibit 10 in front of you,         14:28:21

15    Mr. Toberoff.  Paragraph 7 states:                  14:28:24

16             "The venture and/or the                    14:28:28

17             estate of Joe Shuster to be                14:28:29

18             established hereunder will retain          14:28:33

19             Marc Toberoff to render legal              14:28:35

20             services in connection with the           14:28:36

21             rights in the venture."                    14:28:39

22             And it goes on.                            14:28:40

23             No agreement was entered into retaining you 14:28:45

24    for legal services until 2004.                      14:28:49

25             Is that correct?                           14:28:49
```

**EXHIBIT 3**

**258**

MARC  TOBEROFF - 9/18/2012

Page 167

```
 1          A.  No written agreement.              14:28:58

 2          Q.  No written agreement.  Okay.       14:28:59

 3              Now, at the time you prepared this joint   14:29:04

 4    venture agreement in your capacity as president of   14:29:09

 5    Pacific Pictures Corporation, you had the option of   14:29:16

 6    also preparing a written legal retainer agreement at   14:29:24

 7    the same time, correct?                      14:29:30

 8              MR. KENDALL:  Argumentative.       14:29:32

 9              THE WITNESS:  What's the question?  14:29:36

10    BY MR. PETROCELLI:                           14:29:36

11          Q.  Is that correct?                  14:29:36

12          A.  Could I have just had a legal retainer   14:29:38

13    agreement?                                   14:29:40

14          Q.  Sure, yeah.  It's a different question but   14:29:44

15    that's fine.                                 14:29:45

16          A.  I think I could have proposed that.   14:29:47

17          Q.  And what was the reason that you elected to   14:29:49

18    use a joint venture agreement in lieu of a written   14:29:53

19    retainer agreement, a more conventional written   14:29:57

20    retainer agreement of the sort that, let's say, you   14:30:01

21    used in 2004?                                14:30:03

22              MR. KENDALL:  Assumes facts.  Lacks   14:30:04

23    foundation.  Argumentative.                  14:30:06

24              THE WITNESS:  I believe in 2000- -- around   14:30:16

25    this time period, 2001, 2000- -- remember I told you   14:30:18
```

**EXHIBIT 3**
**259**

MARC  TOBEROFF - 9/18/2012

Page 168

```
 1    I had moved to Los Angeles and I was focusing on          14:30:21
 2    some entertainment business-type of ventures and          14:30:34
 3    also doing legal work, and I mentioned the Writers         14:30:36
 4    Guild case that I was involved in.                         14:30:45
 5              So when it came to people who had                 14:30:50
 6    intellectual property rights -- I'm sorry, this is a       14:30:58
 7    longer explanation.  Do you want the long                  14:31:04
 8    explanation?                                                14:31:06
 9        Q.  If that's what it takes, sure.                      14:31:07
10        A.  Okay.  So when it came to people with               14:31:09
11    rights, like someone had written a novel which would       14:31:15
12    make a good movie, what many independent people did        14:31:17
13    is they would enter into a free option regarding           14:31:25
14    those rights, and the free option would be for a           14:31:28
15    term, and at the end of the term you could exer- --        14:31:36
16    during the term you could exercise the option by           14:31:39
17    paying a fixed price for those rights and I had            14:31:43
18    developed this form of agreement originally as an          14:31:48
19    alternative to that and the reason --                      14:31:53
20        Q.  "That" being what?                                 14:31:56
21        A.  An option.  An option purchase agreement.          14:31:57
22    And in an option purchase agreement, the person           14:32:02
23    doing the optioning, it's in their interest to make        14:32:05
24    the purchase price as low as possible so that they         14:32:07
25    could then use that as a building block to                 14:32:13
```

**EXHIBIT 3**
**260**

MARC  TOBEROFF - 9/18/2012

Page 169

1    facilitate, let's say, making a movie, setting up a          14:32:15

2    movie, producing a movie.                                     14:32:21

3          And I didn't like that form of agreement.               14:32:24

4    I preferred a form of agreement where the ultimate           14:32:26

5    monetization was left open and that the rights               14:32:31

6    hold- -- both I and the rights holder could                  14:32:36

7    participate in that in the way where our interests           14:32:39

8    were aligned rather than our interests being                 14:32:41

9    misaligned because I'm trying to peg them at a low           14:32:43

10   purchase price even though they're giving me                 14:32:47

11   something akin to a free option.                             14:32:54

12        Q.  In the option paradigm, you would have a            14:32:55

13   period of time in which to exercise the option and           14:32:59

14   if you chose to exercise it, you would then pay a            14:33:02

15   pre specified amount of consideration?                       14:33:05

16        A.  Right.  You have an option for a 24-month           14:33:08

17   term, the purchase price is 100,000, and you can             14:33:11

18   exercise that -- that option any time within that 24         14:33:14

19   months.                                                       14:33:17

20        And so you then would control these rights              14:33:19

21   and you use that as a building block to produce a            14:33:21

22   movie or set up a movie at a studio, the lower the           14:33:23

23   price the easier it is for you to set up the movie           14:33:27

24   and, therefore, to leverage off of that, because             14:33:30

25   it's inexpensive, so that someone else could -- like         14:33:35

MARC   TOBEROFF - 9/18/2012

Page 170

```
 1    if you were a producer, you could charge a much        14:33:37
 2    bigger producer fee, and thereby the rights holder     14:33:40
 3    would get shortchanged.                                14:33:43
 4           And so I viewed that as being -- not            14:33:44
 5    having -- being aligned in interest.  So I developed   14:33:49
 6    this form of agreement for better or for worse,        14:33:52
 7    which is this joint venture agreement form.            14:33:55
 8           So when that's -- the way this came about       14:33:59
 9    is, I basically looked for a form of agreement with    14:34:02
10    a rights holder and used this form and then modified   14:34:11
11    it to -- in the descriptive paragraphs to mention      14:34:17
12    Superman and the particular rights at issue.           14:34:21
13       Q.  Was it a prior joint venture agreement that     14:34:23
14    you had used or that you found elsewhere?              14:34:26
15       A.  I believe this was based on a prior            14:34:30
16    agreement that I had used for somebody else, for       14:34:35
17    some other matter.  But I couldn't tell you what       14:34:38
18    prior agreement.                                       14:34:41
19       Q.  Can you turn back for a moment to Exhibit       14:34:45
20    101, the Michael Siegel e-mail, and at the very end    14:34:50
21    you list five references.                              14:34:57
22       A.  Yes.                                            14:34:57
23       Q.  One of them, number 4, has reference to the     14:35:09
24    Combat! separated rights issue you previously          14:35:12
25    described, right?                                      14:35:15
```

MARC  TOBEROFF - 9/18/2012

Page 171

```
 1        A.   Exactly.                                    14:35:16

 2        Q.   The others, numbers 1, 2, 3 and 5, do they  14:35:17

 3   involve copyright termination issues?                 14:35:21

 4        A.   No.                                          14:35:24

 5        Q.   Did you have business arrangements, and by  14:35:25

 6   that I mean other than legal retainer agreements,     14:35:34

 7   with the references identified in 1 through 5?        14:35:37

 8        MR. KENDALL:  Vague and ambiguous.  Calls        14:35:44

 9   for a legal conclusion.                               14:35:46

10        THE WITNESS:  I -- I -- I don't believe I        14:35:46

11   had legal retainer agreements.  The Ralston matter    14:35:56

12   was a litigation matter from the get-go.  Gilligan's  14:36:01

13   Island was a Writers Guild arbitration from the       14:36:11

14   get-go.  Roy Huggins, I don't know whether we         14:36:14

15   actually had an agreement or not.  We had an ongoing  14:36:25

16   relationship where I was looking at his rights        14:36:28

17   because he had created so many famous                 14:36:35

18   things, but I don't know --                           14:36:37

19   BY MR. PETROCELLI:                                    14:36:45

20        Q.   And number 2?                               14:36:45

21        A.   -- whether we had an agreement.             14:36:46

22             Swerling, I believe it was a legal retainer 14:36:49

23   with -- I believe it was a legal retainer.            14:36:55

24        Q.   Given your explanation for why you elected  14:37:06

25   to use a joint venture agreement, is there a reason   14:37:08
```

MARC  TOBEROFF - 9/18/2012

Page 172

```
 1    why you also did not contemporaneously prepare a        14:37:11

 2    legal retainer agreement?                               14:37:16

 3              MR. KENDALL:  Argumentative.  Calls for a     14:37:18

 4    legal conclusion.                                       14:37:21

 5              THE WITNESS:  I can't point -- you know,      14:37:25

 6    other than laziness or something of that nature, I      14:37:27

 7    can't point to a specific -- you know, a specific       14:37:34

 8    reason or thinking that I don't want to do this.  I     14:37:36

 9    can't point to anything specific on that.               14:37:44

10    BY MR. PETROCELLI:                                      14:37:44

11        Q.  At the time you entered into this              14:37:46

12    agreement, as it states you were the president of       14:37:48

13    PPC, right?                                             14:37:51

14        A.  Yes.                                            14:37:51

15        Q.  And the only representative of PPC,            14:37:53

16    correct?                                                14:37:53

17        A.  The -- I was the only shareholder and          14:37:57

18    officer.                                                14:38:01

19        Q.  Okay.  And only employee, right?              14:38:04

20        A.  I believe so in 2001, yeah.                    14:38:05

21        Q.  Paragraph 4 states:                            14:38:11

22              "The terms of any and all                     14:38:11

23          agreements regarding any of the                  14:38:13

24          rights in any respect shall be                   14:38:14

25          subject to the expressed written                 14:38:16
```

MARC  TOBEROFF - 9/18/2012

Page 173

```
 1            approval of claimants and PPC.  The      14:38:18
 2            parties each warrant and represent       14:38:23
 3            that after signing this agreement,       14:38:24
 4            they will not, without the              14:38:25
 5            expressed written consent of all        14:38:27
 6            the parties transfer, limit or          14:38:28
 7            encumber the rights in any              14:38:31
 8            respect."                               14:38:34
 9            The claimants were Jean and Mark and PPC   14:38:34
10   was your company, correct?                       14:38:39
11       A.  Correct.                                 14:38:41
12       Q.  So when you executed this, you understood  14:38:42
13   that neither the Shusters nor PPC could make a deal   14:38:45
14   with respect to the rights without the written    14:38:51
15   consent of all three of you, correct?  Namely Jean   14:38:55
16   Peavy, Mark Peary and PPC?                        14:39:00
17       A.  Yes, that's correct.                     14:39:03
18       Q.  And as far as PPC is concerned, the only   14:39:06
19   person acting for PPC was you, correct?           14:39:11
20            MR. KENDALL:  Asked and answered.        14:39:13
21   Argumentative.                                    14:39:13
22            THE WITNESS:  Yes.                       14:39:16
23   BY MR. PETROCELLI:                                14:39:16
24       Q.  Is it fair to say that -- and by the way,   14:39:23
25   that provision remained in effect until when?     14:39:29
```

MARC  TOBEROFF - 9/18/2012

Page 174

```
 1        A.  I'd have to look at whether the 2003 PPC     14:39:42

 2   agreement, what effect that had on this agreement.    14:39:47

 3   But if that didn't have -- if that didn't effect      14:39:53

 4   this provision, then it would be until we replaced    14:39:55

 5   this agreement with a legal retainer dated as of      14:40:02

 6   November 23rd, 2001.                                  14:40:05

 7        Q.  But signed when?                             14:40:06

 8        A.  Signed in -- I think it was 2004.            14:40:09

 9        Q.  Okay.  We'll get to that one.                14:40:11

10        Is it fair to say in 2001 when PPC entered       14:40:22

11   into this joint venture agreement with Jean Peavy     14:40:26

12   and Mark Peary, you understood that in a legal        14:40:28

13   retainer agreement, you as a lawyer would not be      14:40:38

14   permitted to include a provision that said that the   14:40:41

15   client requires your consent to settle, correct?      14:40:44

16        MR. KENDALL:  Objection.  Calls for a legal      14:40:50

17   conclusion.  Incomplete hypothetical.                 14:40:50

18        THE WITNESS:  I know that's the case             14:41:00

19   sitting here today.  I can't -- I can't -- I don't    14:41:01

20   have a -- I don't have a specific knowledge of        14:41:04

21   whether I knew that in 2001.                          14:41:08

22   BY MR. PETROCELLI:                                    14:41:08

23        Q.  Do you have any reason to believe you        14:41:10

24   didn't know that in 2001?                             14:41:11

25        A.  I don't have a reason to believe either      14:41:17
```

EXHIBIT 3
266

MARC  TOBEROFF - 9/18/2012

Page 175

```
 1    way.                                                    14:41:19

 2             THE VIDEOGRAPHER:  I'm getting some            14:41:20

 3    transmissions from some sort of electronic device.     14:41:22

 4             MR. KENDALL:  It's probably because I put      14:41:29

 5    my iPad on my lap.  Sorry.                              14:41:30

 6             THE VIDEOGRAPHER:  Thank you.  Appreciate      14:41:32

 7    it.  We're fine now.                                    14:41:34

 8             MR. PETROCELLI:  Are we on the record?         14:41:37

 9        Q.  One -- one reason to believe you did know       14:41:39

10    at the time that a lawyer cannot have an agreement      14:41:41

11    with a client that requires the lawyer's consent for   14:41:47

12    a client to settle --                                  14:41:50

13        A.  Uh-huh.                                         14:41:50

14        Q.  -- is that you were a lawyer in good           14:41:52

15    standing in California who would be chargeable with    14:41:54

16    that knowledge, correct?                               14:41:59

17        A.  Are you asking me whether I should know --     14:42:01

18    you're asking -- you're asking me different things.    14:42:03

19    The first question is, do I know here sitting today    14:42:05

20    that I specifically knew that at that time, and I --   14:42:08

21    and I don't know the answer to that one way or the     14:42:15

22    other.                                                 14:42:16

23        Q.  Then I asked you do you have any reason to     14:42:20

24    believe that you wouldn't have been aware of that      14:42:22

25    general principal, and you said, "I have no reason     14:42:24
```

**EXHIBIT 3**
**267**

MARC  TOBEROFF - 9/18/2012

Page 176

```
 1    to believe either way."                        14:42:31

 2          Do you recall that?                      14:42:31

 3     A.   I have no reason to believe that I was not    14:42:32

 4    aware of that, but you can ask your next question.  14:42:34

 5     Q.   Okay.  I will.                            14:42:42

 6          You do agree with me that if you had used a  14:42:50

 7    legal retainer agreement in lieu of a joint venture  14:42:55

 8    agreement from inception, from November 23, 2001,   14:42:59

 9    you could not have included a provision that    14:43:08

10    required your consent or PPP's [sic] consent in   14:43:11

11    order for the Shusters to make a settlement,    14:43:14

12    correct?                                        14:43:14

13     A.   Are you asking for my legal conclusion?   14:43:18

14     Q.   I'm asking whether you had that knowledge  14:43:22

15    in 2001.                                        14:43:25

16          MR. KENDALL:  It calls for a legal        14:43:27

17    conclusion.  Incomplete hypothetical.           14:43:28

18          THE WITNESS:  Just a second.              14:43:43

19          Do you want me to wait while you --       14:43:44

20    BY MR. PETROCELLI:                              14:43:46

21     Q.   I don't think there's an instruction     14:43:47

22    pending.                                        14:43:48

23          MR. KENDALL:  Yeah, there's no instruction.  14:43:48

24    I'm listening.                                  14:43:50

25          THE WITNESS:  Okay.                       14:43:51
```

**EXHIBIT 3**
**268**

MARC   TOBEROFF - 9/18/2012

Page 177

```
 1    BY MR. PETROCELLI:                                  14:43:51

 2        Q.  Do you need the question back?             14:43:54

 3        A.  So -- no, I think I know the question.     14:43:55

 4            If you're asking for my legal conclusion   14:44:03

 5    sitting here today, I believe that's correct, yes. 14:44:05

 6        Q.  I'm asking whether you knew in 2001 --     14:44:12

 7    well, let me ask a different question.  Okay?      14:44:21

 8    You've already answered that one.                  14:44:23

 9            Did you prepare any drafts of a legal      14:44:24

10    retainer agreement prior to executing Exhibit 10,  14:44:45

11    this joint venture agreement?                      14:44:54

12        A.  I don't recall doing that.                 14:44:55

13        Q.  How many times prior to Exhibit 10 had you 14:45:04

14    entered into a joint venture agreement with a party 14:45:07

15    whom you also acted as a lawyer?                    14:45:17

16        A.  That's a difficult question because the    14:45:23

17    focus of these agreements or intellectual property 14:45:36

18    rights, because those were the focus of the        14:45:41

19    agreements, there -- there is a degree of legal    14:45:43

20    knowledge that's brought to bear on the subject    14:45:50

21    matter of the agreement.                           14:45:52

22            So if, for instance, it was a larger       14:45:55

23    company and the company was in the intellectual    14:45:59

24    property business, they would have a general counsel 14:46:04

25    or a business affairs person, a lawyer, at that    14:46:07
```

MARC  TOBEROFF - 9/18/2012

Page 178

```
 1   company who would be evaluating the intellectual        14:46:10
 2   property rights they were -- they were using as the     14:46:13
 3   basis for conducting business.                          14:46:20
 4          I was doing that all -- all in the same, so      14:46:23
 5   it involved some of these things, not originally but    14:46:27
 6   may evolve to involve intellectual -- legal analysis    14:46:36
 7   of things, and some wouldn't.  Some would be more       14:46:43
 8   clear-cut.                                              14:46:48
 9          And so I can't -- it's hard to specifically      14:46:52
10   answer that question because you'd have to take each    14:46:56
11   situation and look at each situation and see            14:47:00
12   whether -- how much from the get-go legal aspects       14:47:02
13   were envisaged.                                         14:47:10
14       Q.  Had you signed, prior to Exhibit 10,            14:47:13
15   partnership agreements or joint venture agreements      14:47:20
16   with people whom you regarded to be clients of your     14:47:21
17   law practice?                                           14:47:26
18          MR. KENDALL:  Vague and ambiguous.               14:47:27
19          THE WITNESS:  I don't know the answer to         14:47:33
20   that.                                                   14:47:33
21   BY MR. PETROCELLI:                                      14:47:34
22       Q.  Had you signed any joint venture agreements     14:47:34
23   prior to Exhibit 10?                                    14:47:38
24       A.  I believe so, yes, because I believe this       14:47:38
25   was patterned --                                        14:47:44
```

**EXHIBIT 3**

**270**

1          Q.   That's what you said.                          14:47:45

2          A.   -- under an agreement.                         14:47:46

3               And the provision you pointed to about         14:47:48

4     consenting to -- consenting to any agreements            14:47:58

5     regarding the rights is -- is to simulate the            14:48:01

6     exclusivity of an option.                                14:48:07

7               If you have an option during the option        14:48:08

8     period, there can be no agreements regarding those       14:48:10

9     rights.  So it was to simulate that while giving the     14:48:15

10    rights holder the upside, rather than paying them at     14:48:21

11    a fixed low purchase price.                              14:48:23

12              So that's the derivation of that, and this     14:48:26

13    is with sufficient detail that I believe it must         14:48:29

14    have been patterned under some other agreement.          14:48:33

15         Q.   Did you have any discussions -- with whom      14:48:38

16    did you negotiate this, Mark Peary?                      14:48:42

17         A.   Yes.                                           14:48:44

18         Q.   Okay.  And I think as you previously           14:48:45

19    testified, you have no knowledge that Peary was          14:48:50

20    represented by a lawyer in those negotiations with       14:48:54

21    you, correct?                                            14:48:58

22         A.   I didn't deal with a lawyer but he may have    14:48:59

23    consulted a lawyer.                                      14:49:03

24         Q.   And you said he may have.  You have no         14:49:04

25    knowledge that he did, right?                            14:49:07

EXHIBIT 3
271

MARC  TOBEROFF - 9/18/2012

Page 180

```
 1        A.  I have no knowledge either way.          14:49:07

 2        Q.  Okay.  No one to this day has ever        14:49:11

 3   identified to you that he consulted with a lawyer,  14:49:13

 4   correct?                                           14:49:13

 5        MR. KENDALL:  Well, I caution you that to     14:49:17

 6   the extent you've discussed that issue with any of  14:49:21

 7   your clients, you would not be able to disclose that  14:49:23

 8   information in responding to this question.        14:49:29

 9        THE WITNESS:  I have no knowledge of that     14:49:36

10   either way.                                        14:49:37

11   BY MR. PETROCELLI:                                 14:49:37

12        Q.  You can't identify a lawyer by name who   14:49:38

13   Mr. Peary worked with in negotiating this joint    14:49:40

14   venture agreement with you, correct?              14:49:45

15        A.  Correct.                                  14:49:46

16        Q.  And there are no drafts of this agreement  14:49:48

17   in existence.                                      14:49:51

18        Is that correct?                              14:49:52

19        A.  I don't think we had any drafts in our    14:49:53

20   file.  Anything that we had would have been        14:49:56

21   produced.  So if we didn't produce any drafts, we   14:49:58

22   didn't have any drafts.                            14:50:00

23        Q.  And in -- you were the sole drafter,      14:50:01

24   correct?                                           14:50:05

25        MR. KENDALL:  Objection.  Vague and           14:50:08
```

**EXHIBIT 3**
**272**

MARC TOBEROFF - 9/18/2012

Page 181

```
 1    ambiguous.                                          14:50:09

 2         THE WITNESS:  I drafted -- I believe this      14:50:09

 3    went through a couple of iterations where I         14:50:11

 4    responded to comments by Warren Peary, but other    14:50:15

 5    than that, I drafted it.                            14:50:21

 6    BY MR. PETROCELLI:                                  14:50:21

 7         Q.  So are you saying you sent him a draft, he  14:50:24

 8    made comments, you sent him a revised draft, he made 14:50:27

 9    comments, you went through that process?            14:50:30

10         A.  Yes, I believe so.                         14:50:34

11         Q.  And you don't have copies of the prior     14:50:35

12    drafts?                                             14:50:37

13         A.  No.                                        14:50:37

14         Q.  How did you transmit it to him?            14:50:38

15         A.  Unless -- if we didn't produce any -- I    14:50:40

16    don't have a -- if we didn't produce any, we didn't 14:50:42

17    have copies, otherwise we would have produced them. 14:50:46

18         Q.  And how did you transmit the drafts to him? 14:50:50

19         A.  I believe by -- I don't -- I don't have a  14:50:58

20    specific recollection.  But I'm -- this was -- seems 14:51:02

21    to have been faxed and I don't believe in those days 14:51:07

22    you were PDFing --                                  14:51:12

23         Q.  Where do you see a fax?  The fax reference 14:51:15

24    I see has a 2006 Patrick Perkins law office.        14:51:17

25         A.  Oh, okay, I'm reading -- either -- it was  14:51:20
```

MARC  TOBEROFF - 9/18/2012

Page 182

```
 1    either -- it was probably transmitted by mail.      14:51:23

 2         Q.  You don't remember?                         14:51:25

 3         A.  I don't remember.                           14:51:26

 4         Q.  Okay.                                        14:51:27

 5         A.  But I -- I think it would have been by       14:51:28

 6    mail.                                                 14:51:34

 7         Q.  You did not actually meet either Jean --    14:51:34

 8         A.  We didn't.                                   14:51:40

 9         Q.  -- Peavy or Mark Peary before signing this, 14:51:40

10    correct?                                              14:51:44

11         A.  Not in person.                               14:51:44

12         Q.  And did you have any conversations with      14:51:45

13    Jean prior to signing Exhibit 10?                     14:51:47

14         A.  Yes, I spoke to her.  I met her over the    14:51:48

15    phone.                                                14:51:55

16         Q.  You spoke with her on the phone?             14:51:56

17         A.  Yes, I believe so.                           14:51:59

18         Q.  Okay.                                        14:51:59

19         A.  But I believe it was more of a sort of       14:52:03

20    general greeting-type conversation.                   14:52:06

21         Q.  Was there any discussion with Mr. Peary as   14:52:11

22    to why this was being structured as a joint venture   14:52:13

23    agreement and not an option agreement or -- or not    14:52:17

24    even a legal retainer agreement?                      14:52:20

25              MR. KENDALL:  I'm going to caution you now  14:52:22
```

**EXHIBIT 3**
**274**

MARC  TOBEROFF - 9/18/2012

Page 183

| | | |
|---|---|---|
| 1 | that he's asking about communications that you had | 14:52:24 |
| 2 | with a person who became a client, so just think | 14:52:27 |
| 3 | about when the client relationship -- when the | 14:52:34 |
| 4 | confidential relationship towards the client | 14:52:37 |
| 5 | relationship began and do not reveal any | 14:52:39 |
| 6 | attorney-client communications. | 14:52:43 |
| 7 | THE WITNESS:  Without -- just to -- to -- | 14:52:47 |
| 8 | you know, we have so many differences of opinion in | 14:52:50 |
| 9 | discovery, apparently, that it's silly to fight a | 14:52:53 |
| 10 | battle that's moot because I don't have a | 14:52:56 |
| 11 | recollection, so I don't -- without waiver of the | 14:52:59 |
| 12 | privilege, I don't have a recollection of a | 14:53:01 |
| 13 | conversation one way or another. | 14:53:02 |
| 14 | BY MR. PETROCELLI: | 14:53:07 |
| 15 | Q.  Do you have a recollection of any | 14:53:07 |
| 16 | discussions with Jean or Mark, by Mark I mean Mark | 14:53:09 |
| 17 | Peary, regarding paragraph 4 which prevented them | 14:53:15 |
| 18 | from entering into an agreements without PPC's | 14:53:17 |
| 19 | consent? | 14:53:20 |
| 20 | MR. KENDALL:  Same caution and then just | 14:53:20 |
| 21 | one observation I think you're referring to | 14:53:24 |
| 22 | Mr. Peary as Mark Peary, and the witness is | 14:53:26 |
| 23 | referring to him by his middle name, Warren Peary, | 14:53:29 |
| 24 | and you just may want to clarify that. | 14:53:32 |
| 25 | THE WITNESS:  I know him as Warren so I | 14:53:35 |

EXHIBIT 3
275

MARC  TOBEROFF - 9/18/2012

Page 184

```
 1    refer to him as Warren.                              14:53:38

 2    BY MR. PETROCELLI:                                   14:53:38

 3        Q.  Warren is fine.                              14:53:39

 4            Did you have discussions with Warren or      14:53:41

 5    with Jean regarding the restrictions in paragraph 4? 14:53:43

 6        A.  I don't recall one way or another, again,    14:53:48

 7    without waiver of the privilege.                     14:53:52

 8        Q.  Had you received any documents from Jean or  14:53:54

 9    Warren in connection with the Shuster interests      14:54:01

10    prior to executing Exhibit 10?                       14:54:07

11        A.  I don't recall one way or another whether I  14:54:10

12    did or not.  At that -- before entering into this, I 14:54:15

13    don't recall.                                        14:54:19

14        Q.  You asked them about agreements, correct?    14:54:19

15        A.  I don't recall.                              14:54:21

16        Q.  You asked Michael Siegel about agreements    14:54:22

17    that could have an effect, pointing out that even if 14:54:24

18    he signed agreements they might not have any legal   14:54:27

19    effect.  Do you recall we saw that in an e-mail?     14:54:31

20            MR. KENDALL:  Just a moment, please.         14:54:33

21            THE WITNESS:  No.                            14:54:36

22            MR. KENDALL:  Just a moment, please.         14:54:36

23            THE WITNESS:  Sure.                          14:54:38

24            MR. KENDALL:  Argumentative.  Lacks          14:54:53

25    foundation.                                          14:54:53
```

MARC   TOBEROFF - 9/18/2012

Page 185

```
 1    BY MR. PETROCELLI:                                14:54:53
 2        Q.  Do you have Exhibit --                    14:54:56
 3        A.  Yeah, I have it.  That's not -- I don't   14:54:57
 4    believe that's what the exhibit says.             14:55:00
 5        Q.  You see Exhibit 101, right?               14:55:02
 6        A.  Right.                                    14:55:04
 7        Q.  And you -- you see the reference to       14:55:04
 8    paragraph 4 about "agreements you may have signed"? 14:55:06
 9        A.  Yes.                                      14:55:09
10        Q.  That may not necessarily prevent or       14:55:09
11    preclude his future rights and it's worthwhile to 14:55:11
12    examine the issue more closely.                   14:55:14
13            Do you see all of that in that paragraph? 14:55:15
14    I'm directing your attention to it, okay?  I've   14:55:19
15    asked you about that paragraph in the context of  14:55:21
16    your e-mail to Michael Siegel.                    14:55:23
17            In your discussions with Warren or Jean   14:55:27
18    leading up to the execution of Exhibit 10, did you 14:55:28
19    likewise ask them about the existence of any      14:55:31
20    agreements that might effect the Joe Shuster      14:55:37
21    interests?                                        14:55:44
22        A.  Well, the question assumes facts that I   14:55:45
23    asked Michael Siegel, and the e-mail, the paragraph 14:55:48
24    that you're pointing to is not asking Michael Siegel 14:55:51
25    whether he's done that, so --                     14:55:53
```

**EXHIBIT 3**
**277**

MARC  TOBEROFF - 9/18/2012

Page 186

```
 1        Q.  Well, I didn't mean to have you parse my      14:55:55
 2    words so precisely.  I'm merely trying to find out    14:56:00
 3    whether you raised the issue with the Shusters prior  14:56:04
 4    to all of you signing Exhibit 10, whether there       14:56:08
 5    existed any agreements that you should review that    14:56:12
 6    bore on the issue of the Shuster termination          14:56:15
 7    interest or Shuster interests, Shuster copyright      14:56:19
 8    interests.                                            14:56:22
 9        A.  I don't --                                    14:56:24
10        MR. KENDALL:  Just a minute.                      14:56:24
11        I'm going to caution you that depending on        14:56:28
12    when the communications occurred and whether they     14:56:31
13    were in the course of discussing possible legal       14:56:37
14    representation, these conversations may -- if they    14:56:43
15    did occur, may have been privileged.                  14:56:46
16        THE WITNESS:  So because the question             14:56:50
17    reveals the substance of any communication, even      14:56:55
18    though it's targeted at the time frame of the         14:56:58
19    communication, I'm -- it would be privileged but I    14:57:01
20    don't -- just to moot this issue, I don't remember    14:57:05
21    whether I had a discussion like that before signing   14:57:10
22    this agreement or after signing this agreement.       14:57:12
23    BY MR. PETROCELLI:                                    14:57:12
24        Q.  What due diligence --                         14:57:16
25        A.  But if I did have a discussion like that, I   14:57:17
```

MARC  TOBEROFF - 9/18/2012

Page 187

1    would assert privilege regarding that discussion.                    14:57:19

2        Q.  Did you have a copy of the 1999 agreement                    14:57:21

3    as of the time that you signed Exhibit 10?                           14:57:25

4        A.  I don't recall having a copy of the 1992                     14:57:29

5    agreement.                                                           14:57:33

6        Q.  When did you first get a copy of it?                         14:57:33

7        A.  I don't know.                                                14:57:36

8        Q.  Was it in the year 2001?                                     14:57:39

9        A.  I don't know.  I know at some point I got a                  14:57:42

10   copy of it.                                                          14:57:47

11       Q.  How did you get it?                                          14:57:48

12       A.  I don't know.  When I say "I don't know," I                  14:57:49

13   mean I don't recall.                                                 14:57:53

14       Q.  You don't --                                                 14:57:56

15       A.  I don't recall whether I got a copy of that                  14:57:57

16   before we signed this or after we signed this.  But                  14:57:59

17   I know we had a copy of it, so at some point I got a                 14:58:12

18   copy of it.                                                          14:58:15

19       Q.  So you can't tell me when you got it or                      14:58:16

20   from whom you got it?                                                14:58:19

21       A.  I don't recall sitting here in the                          14:58:20

22   deposition, and I didn't research that before coming                14:58:23

23   here.                                                                14:58:26

24       Q.  You're certain you didn't have it as of the                 14:58:27

25   time you signed Exhibit 10?                                          14:58:29

EXHIBIT 3
279

MARC  TOBEROFF - 9/18/2012

Page 188

```
 1        A.  I don't recall one way or another.        14:58:30

 2        Q.  What about the 1975 agreement?            14:58:35

 3        A.  I would be surprised if I did, but I don't  14:58:38

 4   know one way or another.                           14:58:41

 5        Q.  What about the '75 agreement?  Did you have  14:58:42

 6   that prior to signing Exhibit 10?                  14:58:43

 7        A.  I don't believe I did.                    14:58:48

 8        Q.  Did you have copies of any agreements     14:58:52

 9   involving any Shusters prior to your signing Exhibit  14:58:53

10   10?                                                14:58:57

11        A.  I don't know.  I don't know what the extent  14:58:57

12   was of my research regarding Superman as of        14:59:24

13   November 23rd and November 28th, 2001.             14:59:30

14        Q.  Do you recall inquiring of the Shusters   14:59:36

15   whether there were any agreements involving Joe    14:59:38

16   Shuster or involving any heirs of Joe Shuster?     14:59:42

17        MR. KENDALL:  I'm going to caution you that   14:59:49

18   that would appear to call for privileged information  14:59:50

19   depending on when that inquiry was made and the    14:59:52

20   context in which it was made.                      14:59:55

21        THE WITNESS:  I -- I would assert privilege   14:59:58

22   over that if I recalled, but I don't recall one way  15:00:02

23   or the other.                                      15:00:05

24   BY MR. PETROCELLI:                                 15:00:05

25        Q.  Prior to entering Exhibit 10, did you do  15:00:18
```

MARC  TOBEROFF - 9/18/2012

Page 189

```
 1   any due diligence?                                    15:00:20

 2           MR. KENDALL:  Vague and ambiguous.            15:00:26

 3           THE WITNESS:  I --                            15:00:27

 4           MR. KENDALL:  And calls for -- potentially    15:00:29

 5   calls for work product depending on the timing and   15:00:33

 6   context.                                             15:00:38

 7           THE WITNESS:  I don't know whether due        15:00:38

 8   diligence is the correct way to describe it if       15:00:40

 9   you're asking me whether I did research on Superman.  15:00:42

10   BY MR. PETROCELLI:                                   15:00:42

11      Q.  On doing a deal with the Shusters.            15:00:45

12      A.  I don't know what that means, due diligence   15:00:47

13   in that context.  What does that -- usually due      15:00:49

14   diligence means --                                   15:00:53

15      Q.  Ask about agreements, ask if they have any    15:00:53

16   papers that might be important.  Have them send you  15:00:56

17   copies.  Did you do any of that?                     15:01:01

18      A.  I don't know --                               15:01:05

19           MR. KENDALL:  Just a minute.  You have to    15:01:06

20   give me an opportunity --                            15:01:08

21           THE WITNESS:  Sorry.                         15:01:09

22           MR. KENDALL:  -- when he's asking about      15:01:11

23   client communications, to interpose --               15:01:13

24           MR. PETROCELLI:  You keep saying that.  I'm  15:01:14

25   not.  I'm not going to argue with you.               15:01:16
```

MARC  TOBEROFF - 9/18/2012

Page 190

```
 1            MR. KENDALL:  I didn't say you're not.        15:01:18
 2            MR. PETROCELLI:  He says you're -- I'm         15:01:20
 3     asking him about client communications.              15:01:21
 4            MR. KENDALL:  Oh, I think that was.            15:01:21
 5            MR. PETROCELLI:  Okay, well, but you're        15:01:23
 6     suggesting that I'm acknowledging that.  You're      15:01:24
 7     having negotiations, as far as I see, entering into  15:01:28
 8     a joint venture agreement, and I don't think the     15:01:30
 9     attorney-client privilege attaches to any of this.   15:01:33
10     I'm not going to argue that with you, but I'm not    15:01:35
11     asking you in my question for attorney-client        15:01:38
12     communications.                                      15:01:41
13            MR. KENDALL:  I don't want to engage in       15:01:41
14     extended colloquy, but I'm sure you're aware that    15:01:42
15     under the laws of most states, the communications    15:01:45
16     with a potential client are, depending on the        15:01:50
17     context and the timing in relation to the retention, 15:01:56
18     privileged, and the client has a privilege to        15:02:01
19     assert.                                              15:02:03
20            So I think we might have a disagreement on     15:02:03
21     the law but it may be moot.  But I need, in any      15:02:07
22     event, to give my client a caution so that he        15:02:11
23     doesn't inadvertently waive a privilege belonging to 15:02:14
24     the Shusters.                                        15:02:20
25            THE WITNESS:  So --                           15:02:22
```

**EXHIBIT 3**

**282**

MARC  TOBEROFF - 9/18/2012

Page 191

```
 1          MR. PETROCELLI:  With all due respect, I     15:02:23
 2   think your client is the last person who needs the  15:02:25
 3   caution, but in any event, starting to chew up a lot 15:02:27
 4   of time with these long statements but proceed,      15:02:32
 5   Mr. Toberoff.                                         15:02:36
 6          THE WITNESS:  That's why I'm trying to cut     15:02:36
 7   through it by telling you, signaling to you when      15:02:38
 8   something is moot while preserving the privilege.     15:02:40
 9   BY MR. PETROCELLI:                                    15:02:40
10     Q.  You're not signaling it, you're just saying    15:02:44
11   it.  And I'm accepting your answers and moving on.    15:02:46
12     A.  When -- the reason --                           15:02:48
13          MR. KENDALL:  I think we need to take a        15:02:52
14   little break because you're starting now to get a     15:02:53
15   little sloppy in your conversation when there's no    15:02:57
16   question pending.                                     15:03:01
17          THE WITNESS:  Okay.                            15:03:02
18          MR. KENDALL:  And -- and you're doing so in    15:03:02
19   a context which is fraught with mines, seeing as how  15:03:06
20   you were --                                           15:03:10
21          MR. PETROCELLI:  Can you have this             15:03:11
22   discussion off the record, please.  We're going off   15:03:12
23   the record now, okay?  If you want to take a break,   15:03:13
24   just say, "Take a break."                             15:03:17
25          THE VIDEOGRAPHER:  The time is 3:03.           15:03:18
```

**EXHIBIT 3**
**283**

MARC  TOBEROFF - 9/18/2012

Page 192

```
 1              (Brief recess.)                          15:03:20
 2              THE VIDEOGRAPHER:  Back on the record at  15:18:06
 3     3:18.                                             15:18:08
 4     BY MR. PETROCELLI:                                15:18:08
 5         Q.  We have confirmed over the break that no  15:18:09
 6     drafts of the joint venture agreement have been   15:18:11
 7     produced.                                         15:18:15
 8              Are you confident there were drafts?     15:18:15
 9         A.  I'm confident that this went through more 15:18:18
10     than one iteration.                              15:18:23
11         Q.  With Mr. Peary receiving an iteration,   15:18:27
12     commenting and your changing it?                 15:18:29
13         A.  Yes.                                     15:18:31
14         Q.  And you didn't save it?                  15:18:34
15         A.  I couldn't find any other drafts.        15:18:35
16         Q.  And Mr. Peary doesn't, to your knowledge, 15:18:37
17     have copies, either?                             15:18:39
18         A.  No, we couldn't -- we couldn't find other 15:18:41
19     drafts.                                          15:18:44
20         Q.  You did anticipate at the time that there 15:18:46
21     might be legal proceedings as evidenced by the   15:18:48
22     document itself, correct?                        15:18:55
23         A.  In general, yes.  But I certainly didn't -- 15:18:58
24              MR. KENDALL:  I think that was the      15:19:07
25     question.                                        15:19:08
```

MARC   TOBEROFF - 9/18/2012

Page 193

```
 1              THE WITNESS:  Okay.                    15:19:12

 2    BY MR. PETROCELLI:                               15:19:12

 3       Q.  So we were talking about -- I was asking  15:19:18

 4    you about agreements, whether you had requested  15:19:24

 5    and/or reviewed any agreements beforehand.       15:19:29

 6              And is it your best recollection that prior  15:19:35

 7    to signing Exhibit 10, you had not reviewed any  15:19:37

 8    prior agreements or correspondence involving the  15:19:43

 9    Shusters?                                        15:19:49

10              MR. KENDALL:  Asked and answered.      15:19:50

11              THE WITNESS:  I don't have a recollection  15:19:51

12    of reviewing documents prior to entering into this  15:19:53

13    agreement.                                       15:20:01

14    BY MR. PETROCELLI:                               15:20:01

15       Q.  Did you review a copy of Joe Shuster's will  15:20:05

16    prior to entering into Exhibit 10?               15:20:11

17       A.  No, I don't believe so.                   15:20:14

18       Q.  Did you know there was a will?            15:20:16

19              MR. KENDALL:  I'm going to just caution you  15:20:21

20    given the time period to -- in the event that you  15:20:25

21    had conversations about a will, depending on the  15:20:30

22    context, they might be privileged.               15:20:35

23              THE WITNESS:  I don't have an independent  15:20:37

24    recollection of knowing whether or not there was a  15:20:46

25    will.  I could -- you know, there might be something  15:20:48
```

MARC  TOBEROFF - 9/18/2012

Page 194

```
 1    in this joint venture agreement.                    15:20:52

 2    BY MR. PETROCELLI:                                  15:20:52

 3        Q.  You knew that an estate had not been        15:20:55

 4    probated, correct?                                  15:20:58

 5        A.  I am surmising that from the paragraph that 15:21:04

 6    talks about probating the estate, but I don't have  15:21:07

 7    an independent recollection of knowing that.        15:21:12

 8        Q.  All your information about the status of     15:21:19

 9    the estate, identity of the executors, for example, 15:21:23

10    or anything else related to Joe Shuster's estate    15:21:29

11    came from talking to Warren?                        15:21:35

12        A.  Talking to Jean and Warren.                 15:21:38

13        Q.  Jean, you said, was more of a               15:21:41

14    pleasantry-type conversation, introductory          15:21:43

15    conversation, right?                                15:21:45

16        A.  Right, but Warren may have asked Jean for   15:21:46

17    something, I may have asked Warren to ask Jean or -- 15:21:48

18    but I was primarily dealing with Warren.  Jean was  15:21:52

19    in the picture, but I was primarily dealing with    15:21:56

20    Warren.                                             15:22:00

21        Q.  Any reason why you didn't ask to see a copy 15:22:00

22    of the will?                                        15:22:02

23        A.  I don't know at what stage -- obviously in  15:22:03

24    the process of probating the will I would have      15:22:12

25    received a copy of the will, but I don't -- you're  15:22:15
```

EXHIBIT 3
286

MARC  TOBEROFF - 9/18/2012

Page 195

```
 1   asking me about before entering into this agreement,    15:22:17
 2   and I don't have an independent recollection of          15:22:20
 3   that.                                                     15:22:24
 4        Q.  You knew when you entered into this             15:22:28
 5   agreement that Jean had another child named Dawn,        15:22:30
 6   right?                                                    15:22:30
 7        A.  I'm -- I don't know if that's correct.  I       15:22:35
 8   can't say definitively before entering into this         15:22:40
 9   whether I knew about Dawn or not.                         15:22:43
10        Q.  Prior to the 2003 agreement you knew about      15:22:45
11   Dawn, right?                                              15:22:48
12        MR. KENDALL:  I'm going to just caution you         15:22:53
13   again not to reveal any attorney-client                  15:22:54
14   communications.  So if that's something you learned      15:22:57
15   about on your own, that's one thing.  If you learned     15:22:59
16   about it from a client, you shouldn't be answering a     15:23:01
17   question like that.                                       15:23:04
18        MR. PETROCELLI:  I think that's absurd on           15:23:04
19   its face that his knowledge of the existence of Dawn     15:23:07
20   Peavy is possibly privileged no matter who it came       15:23:10
21   from.                                                     15:23:14
22        Q.  In any event, go ahead, you can answer.         15:23:17
23        MR. KENDALL:  Just a moment.                         15:23:19
24        MR. PETROCELLI:  And if you're going to             15:23:20
25   withhold your answer on the ground of the objection,     15:23:21
```

MARC  TOBEROFF - 9/18/2012

Page 196

```
 1    just please let me know.                              15:23:24
 2             MR. KENDALL:  Just a moment.  Let me make    15:23:25
 3    sure I didn't misunderstand your question.            15:23:26
 4             So I think the question was prior to the     15:23:34
 5    2003 agreement you knew about Dawn, so to the extent  15:23:36
 6    that that's something that you learned from your      15:23:43
 7    clients as opposed to simply learning it some other   15:23:46
 8    way or a meeting with Dawn, I think you need to be    15:23:51
 9    cautious about the privilege.  But I leave it to you  15:23:56
10    since you're the one who knows how you acquired the   15:24:04
11    information.                                           15:24:06
12             THE WITNESS:  I don't have a specific        15:24:08
13    recollection of when I first heard about Dawn or met  15:24:11
14    Dawn, when Dawn came into the picture.                15:24:18
15    BY MR. PETROCELLI:                                     15:24:18
16        Q.  When --                                        15:24:22
17        A.  I was dealing with Warren primarily and       15:24:22
18    then next, Jean.  I wasn't dealing with Dawn.         15:24:26
19        Q.  When did you first meet Dawn in person?       15:24:30
20        A.  I believe it was in connection with this      15:24:52
21    case.                                                  15:24:53
22        Q.  Was it in preparation for her deposition in   15:24:53
23    this case or attendance at the deposition?            15:24:59
24        A.  I definitely met her then.  I'm thinking if   15:25:00
25    I met her before that.  Oh, I know when I met her.    15:25:04
```

MARC  TOBEROFF - 9/18/2012

Page 197

```
 1    First time I met Dawn was the Superman Returns      15:25:09

 2    premier.  That was definitely the first time I met  15:25:15

 3    her and may have been the first time I became aware 15:25:18

 4    of her.                                             15:25:22

 5         Q.  What year was that?                        15:25:23

 6         A.  Whenever Superman Returns was released.    15:25:24

 7    There was a premier in which everybody was invited. 15:25:31

 8         Q.  Here in L.A.?                              15:25:36

 9         A.  In L.A., so I think that was 2006.  And    15:25:36

10    that's when I mentioned -- that's when I met Dawn.  15:25:41

11         Q.  Is --                                      15:25:45

12         A.  And that may have been the first time I had 15:25:46

13    heard about her.                                    15:25:48

14         Q.  Had you known about Dawn in 2001, would you 15:25:49

15    have included her in this agreement?                15:25:52

16         MR. KENDALL:  Objection.  Incomplete           15:25:56

17    hypothetical.  Calls for speculation.               15:25:59

18         THE WITNESS:  I don't know.  I -- I don't      15:26:14

19    know.  I'd have to think about it.  I don't --      15:26:19

20    BY MR. PETROCELLI:                                  15:26:19

21         Q.  Is there any reason why this agreement is  15:26:24

22    limited to Warren and Jean rather than Warren, Jean 15:26:26

23    and Dawn?                                           15:26:31

24         A.  I don't know what -- the answer to -- to   15:26:32

25    that.  I could try and deduce the answer.           15:27:09
```

MARC   TOBEROFF - 9/18/2012

Page 198

 1        Q.  Did Warren not tell you about his sister,            15:27:12

 2    Dawn?                                                        15:27:14

 3        A.  I don't know.                                        15:27:15

 4           MR. KENDALL:  Just a minute.  Now we're              15:27:17

 5    getting into a privileged area, so you know, the            15:27:19

 6    period leading up to the execution of this document,        15:27:26

 7    but at some point I would expect that there were            15:27:30

 8    conversations in contemplation of your engagement           15:27:34

 9    that would be privileged.  You'll have to do your           15:27:37

10    best to -- to draw that line in a way that you think        15:27:40

11    is -- is consistent with the privilege laws.                15:27:45

12           THE WITNESS:  I don't know what the answer           15:27:54

13    to that question is.  I -- I -- as we're going down         15:27:55

14    this road and asking questions, I could deduce that         15:28:01

15    I may have had a copy of the will and, therefore, I         15:28:03

16    was going off the will which mentions Warren and            15:28:06

17    mentions Jean.  And that those would be the relevant        15:28:10

18    people regarding the subject matter of the                  15:28:17

19    agreement.  But I don't have a specific recollection        15:28:24

20    of that.  But it's -- that seems like a decent              15:28:25

21    deduction.                                                  15:28:30

22    BY MR. PETROCELLI:                                          15:28:31

23        Q.  Did Jean tell you that she had a daughter           15:28:31

24    named Dawn prior to your signing Exhibit 10?                15:28:33

25           MR. KENDALL:  Same caution with respect to          15:28:39

**EXHIBIT 3**
**290**

MARC  TOBEROFF - 9/18/2012

Page 199

```
 1   attorney-client communications.                        15:28:40

 2           THE WITNESS:  She may have.                     15:28:42

 3   BY MR. PETROCELLI:                                      15:28:42

 4      Q.  According to this agreement, various rights      15:28:45

 5   into Joe Shuster's creations are being transferred      15:28:53

 6   by the claimants to the venture.  You can see that      15:28:58

 7   in the first three paragraphs.                          15:29:02

 8           What rights of the claimants did you            15:29:08

 9   believe they had at the time you signed this?           15:29:11

10           MR. KENDALL:  Caution you with respect to       15:29:20

11   your work product.                                      15:29:21

12           THE WITNESS:  The only rights that I was        15:29:34

13   aware of that they would have would be termination      15:29:44

14   rights, and that's only upon probating the estate.      15:29:49

15   This was, like I said, a general form of agreement      15:29:53

16   and that's how this general form read.  It had sort     15:29:55

17   of a broad preamble paragraph about your rights and     15:29:58

18   claims and not knowing whether it was a specific        15:30:02

19   right or whether it was a claim to a specific right     15:30:06

20   and what form that would take.                          15:30:08

21   BY MR. PETROCELLI:                                      15:30:08

22      Q.  Why did you believe that -- withdrawn.           15:30:14

23           If you didn't have the will you would not       15:30:22

24   have known for whose benefit such rights, such          15:30:25

25   termination rights may have existed, correct?           15:30:29
```

MARC  TOBEROFF - 9/18/2012

Page 200

```
  1        A.   Incorrect.                              15:30:32

  2        Q.   How would you have known without the will?  15:30:32

  3        A.   Because it's -- the termination rights are  15:30:35

  4   not based on a will.                              15:30:37

  5        Q.   Well --                                 15:30:40

  6        A.   They're based on whether somebody is a --  15:30:40

  7        Q.   But -- I'm sorry, complete your answer.  15:30:43

  8        A.   -- a spouse, child or a grandchild, and if  15:30:44

  9   there's no spouse, child or grandchild, then the --  15:30:46

 10   the holder of the rights would be the executor,   15:30:49

 11   administrator of the estate.                      15:30:53

 12        Q.   When you signed Exhibit 10, did you have an  15:30:54

 13   understanding that the only holder of any         15:30:58

 14   termination rights would be the executor of the   15:31:00

 15   estate?                                           15:31:04

 16        A.   Yes.                                    15:31:05

 17        Q.   So you knew there was an appointed executor  15:31:06

 18   and a will?                                       15:31:10

 19        A.   I knew there was an appointed executor?  15:31:10

 20        Q.   Yeah, did you?                          15:31:14

 21        A.   As we're going down this line of        15:31:20

 22   questioning and you're asking me about Dawn and   15:31:21

 23   you're saying why is Jean and Warren, I'm now     15:31:23

 24   thinking that I may have had a copy of the will and  15:31:26

 25   that was determining, but I don't know that for   15:31:31
```

**EXHIBIT 3**
**292**

MARC   TOBEROFF - 9/18/2012

Page 201

1    sure.  It may have been those are just the people I                    15:31:33

2    was dealing with.  And I wasn't aware -- I wasn't                      15:31:37

3    aware of Dawn.                                                         15:31:40

4         Q.  Did you obtain a copy of the will?  Do you                    15:31:43

5    recall obtaining a copy of the will from Jean or                       15:31:46

6    Warren prior to signing Exhibit 10?                                    15:31:50

7         A.  No, I don't.                                                  15:31:53

8         Q.  There's no references in your privilege log                   15:31:55

9    to any communications with them during this period                     15:31:57

10   of time.                                                               15:32:00

11        A.  I don't -- yeah, I don't --                                   15:32:00

12        Q.  Are you aware of that?                                        15:32:02

13        A.  No.  I don't recall one way or another, and                   15:32:03

14   my initial reaction was I was leaning towards that I                   15:32:10

15   hadn't, and then in talking about Dawn I'm thinking,                   15:32:14

16   well, maybe I did.  But I think that I -- I think --                   15:32:18

17   I'm, you know, speculating.  I think that I was                        15:32:22

18   essentially dealing with Warren and Jean and                           15:32:26

19   believing that those were Joe Shuster's heirs and                      15:32:33

20   that was -- turns out was correct.                                     15:32:38

21        Q.  You understood, though, that even if an                       15:32:41

22   executor had the standing to serve a notice of                         15:32:45

23   termination, the proceeds that may result from any                     15:32:51

24   effective termination or any agreement that's                          15:32:58

25   entered into go to the designated beneficiaries, not                   15:33:00

**EXHIBIT 3**
**293**

```
 1    to the executor, correct?                              15:33:08
 2           MR. KENDALL:  I'm going to object.              15:33:09
 3    Incomplete hypothetical.  Lacks foundation.  Calls     15:33:10
 4    for speculation.  Calls for a legal conclusion.        15:33:12
 5           THE WITNESS:  I understand that sitting          15:33:19
 6    here today.                                            15:33:21
 7    BY MR. PETROCELLI:                                     15:33:21
 8       Q.  You understood that at the time you entered     15:33:22
 9    into Exhibit 10, right?                                15:33:23
10       A.  I don't have a --                               15:33:25
11           MR. KENDALL:  Just a second.  I couldn't         15:33:26
12    quite -- so what I'm reading is the question is --     15:33:27
13    and I don't think that's what you said is -- "you      15:33:35
14    understood that at the time you understood into        15:33:37
15    Exhibit 10" --                                         15:33:39
16           MR. PETROCELLI:  "As of."  But let me            15:33:43
17    rephrase the question.                                 15:33:44
18       Q.  As of the time you entered into Exhibit 10,     15:33:45
19    you understood that the beneficiaries of Joe           15:33:48
20    Shuster's estate on whose behalf the executor must     15:33:54
21    act and serve, were whom?  Did you know who they       15:33:59
22    were?                                                  15:34:04
23       A.  I believe it was Jean Peavy.                    15:34:09
24       Q.  Did you know that for a fact at the time        15:34:10
25    you entered into Exhibit 10?                           15:34:12
```

MARC  TOBEROFF - 9/18/2012

Page 203

```
 1        A.   It's very hard for me to distinguish what I      15:34:13

 2   know now and what I absolutely knew for a fact at          15:34:16

 3   the time I entered into this agreement.                    15:34:19

 4        Q.   Did you get any legal advice from anybody        15:34:26

 5   before entering into this agreement?                       15:34:29

 6        A.   No.                                              15:34:31

 7        Q.   Is there any reason why you didn't enter         15:34:47

 8   into this agreement in Mark Peary's capacity as an         15:34:49

 9   executor, as opposed to individually?                      15:34:58

10        MR. KENDALL:  Objection.  Argumentative.             15:35:05

11   Incomplete -- no, just argumentative.                      15:35:10

12        THE WITNESS:  I don't understand that                 15:35:11

13   question because Mark Peary was -- there was no            15:35:12

14   estate -- there was no executor of an estate.  The        15:35:15

15   will had not been probated in 2001.                        15:35:20

16   BY MR. PETROCELLI:                                         15:35:20

17        Q.   You indicated in here that another               15:35:24

18   gentleman was going to act as the administrator of        15:35:27

19   the estate.  A guy named Michael Catron in paragraph      15:35:29

20   10, correct?                                               15:35:35

21        A.   Right.                                           15:35:36

22        Q.   And the fact that it says, "The                  15:35:37

23   administrator of Joe Shuster's estate," did that          15:35:39

24   suggest to you that you believed there was no will        15:35:42

25   and he died intestate?                                     15:35:44
```

**EXHIBIT 3**
**295**

MARC   TOBEROFF - 9/18/2012

Page 204

```
 1        A.   "Administrator" is a word that's used in --      15:35:46

 2   interchangeably with "executor."  "Personal             15:35:49

 3   representative," "administrator" and "executor" are     15:35:52

 4   very often used interchangeably.                        15:35:55

 5        Q.   Is that how you intended to use it in         15:35:56

 6   paragraph 10?                                           15:35:58

 7        A.   Yes.                                          15:35:59

 8        Q.   So you are certain that you knew there was    15:36:00

 9   a will, you are certain that you knew it named Jean     15:36:01

10   Peary as the executrix, but yet Michael Catron is       15:36:04

11   being indicated for appointment as administrator?       15:36:10

12        MR. KENDALL:  Objection.  Argumentative.           15:36:13

13   Lacks foundation.  Assumes facts.                       15:36:14

14        THE WITNESS:  And misstates my testimony.          15:36:23

15        I did not say I was certain.  Originally I         15:36:24

16   thought that I wasn't aware of the will.  I didn't      15:36:29

17   know one way or another whether I had gotten the        15:36:31

18   will before signing this.  And then when you're         15:36:34

19   asking questions about Dawn, I think perhaps that's     15:36:36

20   why I was focusing on Jean and Mark.  But I don't       15:36:38

21   know --                                                 15:36:41

22        Q.   You mean Jean and Warren?                     15:36:41

23        A.   Jean and Warren, correct.  But I don't know   15:36:43

24   one way or another.  So if the question is premised     15:36:47

25   on knowledge of a will before entering into it, I       15:36:51
```

MARC  TOBEROFF - 9/18/2012

Page 205

```
 1   can't answer that question because I'm not accepting      15:36:54
 2   that premise.  I don't know either way.  Could be         15:36:55
 3   yes, could be no.                                         15:36:57
 4       Q.  Does the reference to Michael Catron jog          15:36:58
 5   your recollection that you were unaware of a will         15:37:01
 6   and that it named Jean as executrix?                      15:37:06
 7           MR. KENDALL:  Argumentative.  Lacks               15:37:11
 8   foundation.                                               15:37:12
 9           THE WITNESS:  It -- it doesn't -- it              15:37:12
10   doesn't jog a memory, but I can deduce from that,         15:37:17
11   that that wouldn't be in there.                           15:37:23
12   BY MR. PETROCELLI:                                        15:37:26
13       Q.  That what?                                        15:37:26
14       A.  If I had seen the will, I wouldn't have put       15:37:27
15   that in there, but it doesn't jog a specific              15:37:29
16   recollection.                                             15:37:31
17       Q.  Do you recall any discussions with Jean           15:37:32
18   Peavy at or before entering into Exhibit 10 that          15:37:34
19   Michael Catron would replace her as a personal            15:37:41
20   representative of Joe Shuster's estate?                    15:37:47
21           MR. KENDALL:  I'm going to object to that         15:37:49
22   question as potentially calling for attorney-client       15:37:50
23   communications and caution the witness with respect       15:37:56
24   to that.                                                  15:38:01
25   BY MR. PETROCELLI:                                        15:38:01
```

MARC   TOBEROFF - 9/18/2012

Page 206

```
 1        Q.  Do you recall any such discussions with      15:38:05

 2   her?                                                   15:38:06

 3        A.  It -- it -- I -- what's the question again    15:38:06

 4   specifically?  Can you repeat the question?           15:38:11

 5        Q.  The question was whether or not you had       15:38:13

 6   discussed with her that Michael Catron would serve    15:38:17

 7   as personal representative of Joe's estate in lieu    15:38:20

 8   of her?                                               15:38:23

 9        MR. KENDALL:  Again, caution you, since          15:38:27

10   that's calling for a communication with someone who   15:38:28

11   became your client and at some point in the meet-up   15:38:30

12   presumably you were having confidential               15:38:34

13   communications with her.                              15:38:36

14        THE WITNESS:  I'm trying to think whether        15:38:41

15   this is moot or not before I'll object on the basis   15:38:57

16   of privilege to questions about how to set up the     15:39:00

17   estate of Joe Shuster and discussions as to who       15:39:04

18   should be administrator and why.                      15:39:09

19   BY MR. PETROCELLI:                                    15:39:09

20        Q.  And my questions are focused as of the       15:39:15

21   signing of Exhibit 10, right?  You understood that,   15:39:18

22   right?                                                15:39:21

23        A.  Well, whatever the focus is, you're asking   15:39:23

24   questions about the probating of the Shuster estate.  15:39:25

25   So those conversations are privileged.  But I don't   15:39:28
```

**EXHIBIT 3**
**298**

MARC   TOBEROFF - 9/18/2012

Page 207

```
1    have a specific recollection of the specific        15:39:35

2    conversation.                                        15:39:38

3        Q.  Did you know who Michael Catron was when     15:39:39

4    you signed Exhibit 10?                               15:39:41

5        A.  I -- I knew how he related to the Shusters.  15:39:42

6        Q.  From Warren?                                 15:39:54

7        A.  From Warren or Jean.                         15:39:57

8        Q.  Did you speak to Michael Catron?             15:39:58

9        A.  I recall speaking to him at some point.      15:40:00

10       Q.  Prior to signing Exhibit 10?                 15:40:12

11       A.  I don't know if it was prior or after, but   15:40:13

12   I recall speaking to him and I recall some business  15:40:18

13   about him wanting to go to the premier.              15:40:22

14       Q.  How did you understand he related to the     15:40:28

15   Shusters at the time you signed Exhibit 10?          15:40:30

16       A.  Friend.  Long-time friend.                   15:40:32

17       Q.  Did you have any written communication with  15:40:36

18   Mr. Catron whereby he agreed to serve as personal    15:40:38

19   representative of the estate?                         15:40:41

20       A.  No.                                          15:40:44

21       Q.  Have you had any oral conversation with him  15:40:46

22   to that effect prior to signing Exhibit 10?          15:40:47

23       A.  I don't recall.                              15:40:55

24       Q.  In paragraph 5 of Exhibit 10, it indicates   15:40:59

25   that 50 percent of the proceeds go to claimants, 50  15:41:06
```

**EXHIBIT 3**
**299**

MARC   TOBEROFF - 9/18/2012

Page 208

```
 1   percent to PPC.  Claimants being defined previously      15:41:13

 2   as Jean and Warren.                                      15:41:16

 3          Why was the money split between Jean and          15:41:23

 4   Warren if Jean were the sole beneficiary under Joe's     15:41:27

 5   estate?                                                  15:41:31

 6          MR. KENDALL:  Caution you with respect to         15:41:34

 7   attorney-client communications if that was told to       15:41:35

 8   you in confidence.                                       15:41:40

 9          THE WITNESS:  I don't think it says here          15:41:42

10   it's being -- I think that's misreading this             15:41:43

11   document.  It just says 50 percent is going to the       15:41:46

12   claimants and 50 percent to PPC.                         15:41:50

13   BY MR. PETROCELLI:                                       15:41:50

14      Q.  Well, did you have an understanding about         15:41:52

15   the sharing arrangement between Warren and Jean as       15:41:54

16   of the time you signed Exhibit 10 with respect to        15:41:59

17   their 50 percent of the proceeds?                        15:42:01

18      A.  I don't believe so.                               15:42:02

19      Q.  Okay.  And do you -- did you have any             15:42:06

20   understanding why Warren would be getting anything       15:42:08

21   if Jean were the sole beneficiary?                       15:42:15

22      A.  I -- I don't have an understanding.  I            15:42:19

23   think I viewed that as their business, what they         15:42:23

24   want to do amongst themselves with the proceeds is       15:42:26

25   their business.                                          15:42:30
```

**EXHIBIT 3**
**300**

MARC   TOBEROFF - 9/18/2012

Page 209

```
 1         Q.  Did you obtain a copy of Jean's will prior       15:42:35
 2    to signing Exhibit 10?                                    15:42:41
 3         A.  I don't believe so.                              15:42:45
 4         Q.  When is the first time you have seen Jean's      15:42:47
 5    will?                                                     15:42:49
 6         A.  I think it was fairly recently in this           15:42:50
 7    case.  I think it was when you specifically               15:42:52
 8    requested it.                                             15:42:57
 9         Q.  Here's Exhibit 75, Mr. Toberoff, which is        15:42:59
10    Joe Shuster's will.  And -- excuse me, excuse me,         15:43:06
11    that's Jean Peavy's will.                                 15:43:16
12              (The document referred to was
13              previously marked for
14              identification as Exhibit 75 and is
15              attached to this deposition.)
16    BY MR. PETROCELLI:
17         Q.  Looking at that, do you see that's              15:43:20
18    consistent with your recollection that you first saw     15:43:24
19    it in connection with its production in this case as     15:43:26
20    opposed to at the time back in 2001?                     15:43:29
21         A.  It's not inconsistent with it but I don't       15:43:35
22    see a date here.                                         15:43:38
23         Q.  The date of the last will and testament is      15:43:42
24    August 24, 2001.  That is the last will and              15:43:45
25    testament of -- of Jean Peavy.                           15:43:50
```

MARC  TOBEROFF - 9/18/2012

Page 210

```
 1          Did you have an understanding as of the      15:43:58
 2  date of Exhibit 10 that she had a will that she had  15:43:59
 3  just made that made Warren her sole beneficiary to   15:44:04
 4  the exclusion of Dawn?                               15:44:14
 5      A.  No.                                          15:44:17
 6      Q.  You have in this case asserted that Exhibit  15:44:26
 7  10 is void ab initio, correct?                       15:44:31
 8          MR. KENDALL:  Are you asking that in his     15:44:37
 9  capacity as a party or in his capacity as a lawyer?  15:44:41
10          MR. PETROCELLI:  Any capacity.  It's a       15:44:46
11  foundational question.  I can point you -- point to  15:44:49
12  a reference to that effect in the brief.             15:44:55
13          MR. KENDALL:  I think if you're asking       15:44:59
14  about briefs, so you're asking about argument        15:45:03
15  advanced by lawyers in briefs, that's not a proper   15:45:09
16  subject of this.  If you're asking about             15:45:16
17  declarations, then I think it is.  If it's a simple  15:45:18
18  foundation to ask whether he's aware --              15:45:20
19          MR. PETROCELLI:  It is a simple              15:45:24
20  foundational question.  It doesn't warrant a lot of  15:45:25
21  discussion.                                          15:45:29
22          MR. KENDALL:  If it's simply foundational    15:45:29
23  and you don't intend to follow up on the drafting of 15:45:31
24  the brief, then I -- I think that's fine.            15:45:34
25          MR. PETROCELLI:  That's correct.  I don't.   15:45:36
```

MARC  TOBEROFF - 9/18/2012

Page 211

```
 1              THE WITNESS:  Okay.  So I think you're      15:45:38

 2    misstating the assertion.  I think the assertion is   15:45:40

 3    that the transfer, the purported transfer of -- I     15:45:46

 4    have to find the specific provision in the            15:45:55

 5    agreement.                                            15:46:00

 6    BY MR. PETROCELLI:                                    15:46:00

 7        Q.  Yeah.  Can you show me the -- where in here   15:46:09

 8    you have the -- this statement for the motion to      15:46:11

 9    dismiss.  Here it is right here.  Okay.               15:46:14

10              Let me -- let me just read this from the    15:46:20

11    Shuster motion to dismiss filed on September 20,      15:46:23

12    2010.  Again, it's foundational to my getting back    15:46:26

13    to 2001:                                              15:46:29

14              "In its third and sixth                     15:46:30

15              claims, DC alleges that the 2001            15:46:35

16              and 2003 Pacific Pictures                   15:46:37

17              agreements violated its purported           15:46:40

18              right of exclusivity.  However, if          15:46:41

19              and to the extent the 2001 and 2003         15:46:45

20              Pacific Pictures agreements had             15:46:49

21              granted any Shuster termination             15:46:51

22              interest prior to October 26, 2013,         15:46:55

23              the effective date of the Shuster           15:46:58

24              termination, such transfers were            15:47:00

25              void ab initio under section                15:47:06
```

MARC  TOBEROFF - 9/18/2012

Page 212

```
 1              304(C)6(D) and had no legal force     15:47:07

 2         or effect."                                15:47:13

 3              I'll represent to you that's a statement  15:47:14

 4    that I --                                       15:47:16

 5         A.  Okay.                                  15:47:17

 6         Q.  -- quoted verbatim out of the Shuster 15:47:17

 7    motion to dismiss, paragraph 99, filed September 20,  15:47:20

 8    2002.                                           15:47:28

 9              Did you have that understanding when you  15:47:31

10    signed Exhibit 10?                              15:47:36

11         A.  I don't believe I did.  Otherwise -- well,  15:47:41

12    there are two --                                15:47:45

13         Q.  What is it you're looking at?  I'm just  15:47:47

14    curious.                                        15:47:49

15         A.  I'm looking at Exhibit 10.             15:47:50

16         Q.  Okay.                                  15:47:50

17         A.  I'm looking at the -- the way Exhibit 10  15:47:53

18    works is that it has a broad definition of rights  15:47:54

19    where it says that the joint ventures, for purpose  15:47:59

20    of investigating, retrieving, enforcing and      15:48:04

21    exploiting their rights -- I'm looking for the    15:48:06

22    definition of rights.  Okay.  So the definition of  15:48:10

23    rights is on top.  It's:                        15:48:12

24              "Regarding a formation of a           15:48:13

25         joint venture for purposes of              15:48:14
```

**EXHIBIT 3**
**304**

MARC   TOBEROFF - 9/18/2012

Page 213

```
 1              retrieving, enforcing, exploiting        15:48:16
 2              all of Joe Shuster's rights,             15:48:18
 3              claims" --                               15:48:18
 4              (Reporter interruption.)                 15:48:18
 5              THE WITNESS:  -- "and his                15:48:22
 6              estates, rights, claims, copyrights,     15:48:22
 7              property, title, interest, in any of     15:48:24
 8              Joe Shuster's creations."                15:48:26
 9         And that's defined as the rights with a       15:48:27
10    capital R.  And it's a very broad provision to     15:48:30
11    define rights.                                     15:48:33
12         And then the next provision says that:        15:48:34
13              "Hereby form a joint venture             15:48:40
14              to investigate, retrieve and             15:48:41
15              enforce and exploit the rights"          15:48:42
16              with a capital R, "including" dot,       15:48:44
17              dot, dot "the estate's termination       15:48:51
18              pursuant to section 304C."               15:48:54
19         And then -- so that would -- that would       15:48:58
20    seem -- could be argued was enlarging, even further, 15:49:01
21    this broad definition of rights.                   15:49:05
22         And then down below it says that:              15:49:09
23              "Claimants hereby transfer,              15:49:15
24              assign to the venture their right,       15:49:17
25              title and interest in the rights."       15:49:18
```

MARC  TOBEROFF - 9/18/2012

Page 214

1              So, I don't -- I don't believe as I sit          15:49:21

2    here today that -- I think that this agreement is          15:49:29

3    poorly drafted, but it may also be that at that            15:49:36

4    stage in 2001 I was not aware of that provision in         15:49:43

5    the copyright that states that you can't assign the        15:49:47

6    termination as, one, until after it's been                 15:49:53

7    exercised, and, two, until -- to a third party until       15:49:56

8    the effective date of termination.                         15:50:00

9       Q.  Are you certain you did not appreciate that         15:50:07

10   at the time you signed Exhibit 10?                          15:50:09

11      A.  I'm not certain, but there's only two               15:50:11

12   possibilities.  One, that crept in here due to the         15:50:14

13   broad way that this is draft -- all encompassing way       15:50:21

14   this is drafted where first you say -- you               15:50:26

15   define the rights as everything, even though they          15:50:27

16   have no rights, which is a vestige from that type of       15:50:29

17   agreement I was using.                                     15:50:32

18              And then there's an attempt to focus in on      15:50:34

19   the particular situation here by talking what the          15:50:36

20   venture will do, in which case which mention              15:50:41

21   termination, the actual purpose of the venture, and       15:50:42

22   then there's an assignment using the capital R for        15:50:46

23   the rights to the venture, which would, by virtue of      15:50:48

24   the other paragraph, probably sweep in the                 15:50:52

25   termination interest.                                      15:50:54

MARC   TOBEROFF - 9/18/2012

Page 215

```
 1        Q.  Well, what other rights, besides the       15:50:54
 2   estate's termination rights, were you seeking to    15:50:57
 3   have transferred to the venture?                     15:51:00
 4        A.  The way I had this form of agreement, it    15:51:01
 5   was -- it was -- a lot of times I would enter into   15:51:08
 6   agreements where we -- the form of agreement I had   15:51:11
 7   where I would enter into an agreement with someone   15:51:15
 8   not knowing what rights they had, and they didn't    15:51:17
 9   know what rights they had, and the purpose of the    15:51:19
10   joint venture was to investigate what rights they -- 15:51:21
11   they had and to monetize those rights.               15:51:24
12        Q.  And whatever rights they did have by virtue 15:51:27
13   of this joint venture agreement were being hereby    15:51:30
14   transferred and assigned to the venture?             15:51:32
15        A.  That's what it says.                        15:51:35
16        Q.  And the only rights of which you were       15:51:37
17   actually aware existed was the future termination    15:51:39
18   right of the estate, correct?                        15:51:44
19        A.  Correct.                                    15:51:45
20        MR. KENDALL:  Wait.  Just a minute.             15:51:45
21   Objection.  Calls for a legal conclusion.  And --    15:51:47
22   BY MR. PETROCELLI:                                   15:51:57
23        Q.  Are you saying the thought never occurred   15:51:58
24   to you that in going through the various iterations  15:51:59
25   of this agreement and believing you were fully       15:52:03
```

**EXHIBIT 3**
**307**

MARC  TOBEROFF - 9/18/2012

Page 216

```
 1    competent and qualified to render legal services as      15:52:09

 2    well in the area of copyright termination in            15:52:15

 3    particular, that this document was making a transfer    15:52:19

 4    and assignment that could be void ab initio?            15:52:27

 5         MR. KENDALL:  Argumentative.                        15:52:31

 6         THE WITNESS:  I don't believe -- I don't           15:52:31

 7    believe I knew -- at this stage, I did not -- I do      15:52:33

 8    not believe I had experience with termination          15:52:38

 9    rights.  I was reading up on it based, I believe, on    15:52:40

10    the Siegel termination.  And I don't believe that I     15:52:45

11    knew all the ins and outs, and I don't believe -- if    15:52:56

12    I was aware of that provision, I would never have       15:52:59

13    had this assignment, because you're right that the      15:53:01

14    focus is termination rights, obviously, and that I      15:53:03

15    know enough to know that the only rights they could     15:53:06

16    have would be termination rights, despite the broad     15:53:08

17    drafting of this and that, therefore, if it's           15:53:12

18    assigning the rights, it would be assigning             15:53:14

19    termination rights.                                     15:53:15

20         No, I don't believe that I would have a            15:53:16

21    provision like that.  There would be no sense to        15:53:18

22    have a provision like that that would be void ab        15:53:21

23    initio.                                                 15:53:25

24    BY MR. PETROCELLI:                                      15:53:25

25      Q.  Did you -- by the way, how did you satisfy        15:53:39
```

MARC  TOBEROFF - 9/18/2012

Page 217

```
 1    yourself prior to entering into Exhibit 10 that the        15:53:43

 2    estate did have a termination right?                       15:53:48

 3              MR. KENDALL:  Lacks foundation.                  15:53:54

 4              THE WITNESS:  I don't know what you mean         15:53:59

 5    by how did I satisfy myself.  It's -- it's --              15:54:00

 6    BY MR. PETROCELLI:                                         15:54:00

 7         Q.  Well, how did you know, for example, Joe          15:54:03

 8    Shuster did not leave a wife, spouse?                      15:54:04

 9         A.  It's easily discernible that Joe Shuster          15:54:09

10    wasn't --                                                  15:54:09

11         Q.  How did you discern that prior to executing      15:54:14

12    Exhibit 10?                                                15:54:17

13         A.  Basic background, Internet research on Joe        15:54:17

14    Shuster.                                                   15:54:21

15         Q.  You did that?                                     15:54:21

16         A.  Yes.                                              15:54:22

17         Q.  Prior to Exhibit 10?                              15:54:23

18         A.  Yes.                                              15:54:24

19         Q.  What did you discover?                            15:54:27

20         A.  That Superman was created by Joe Shuster          15:54:28

21    and Jerry Siegel, and that Joe Shuster, I -- I --         15:54:31

22    what I would usually do is look for an obituary or        15:54:41

23    something of that nature, and I don't recall              15:54:43

24    specifically, but I believe at the time I entered        15:54:49

25    into this, I knew that Joe Shuster didn't have a          15:54:51
```

MARC  TOBEROFF - 9/18/2012

Page 218

```
 1    widow and didn't have any children or grandchildren.        15:54:57

 2         Q.  And how did you know that?                          15:54:59

 3         A.  Based on basic research.                            15:55:00

 4         Q.  What research --                                    15:55:03

 5         A.  And --                                              15:55:05

 6         Q.  -- did you do that told you whether or not          15:55:06

 7    he had ever married?                                         15:55:08

 8         A.  Looking at obituaries.                              15:55:09

 9         Q.  In the probate --                                   15:55:15

10         A.  Usually an obituary, it says "Joe Shuster           15:55:16

11    is survived by."                                             15:55:19

12         Q.  Okay.  Did you know as of the time you              15:55:22

13    signed Exhibit 10 that he had been married?                 15:55:24

14         A.  Did I know that?                                    15:55:32

15         Q.  Yes.                                                15:55:32

16         A.  No.                                                 15:55:32

17         Q.  When probate papers were filed in 2003, you        15:55:37

18    were aware that there was a representation made to          15:55:41

19    the Court in one of the papers that he had never           15:55:45

20    been married?                                               15:55:47

21         MR. KENDALL:  Objection.  Lacks foundation            15:55:48

22    as to time.                                                 15:55:49

23    BY MR. PETROCELLI:                                          15:55:49

24         Q.  You're aware of that now, correct?                 15:55:51

25         A.  Yeah.  What's the question?                        15:55:56
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

**EXHIBIT 3**
**310**

MARC  TOBEROFF - 9/18/2012

Page 219

```
 1         Q.  You're aware of that now, correct?          15:55:57

 2         A.  That the probate paper said he had never    15:55:59

 3    been married?                                         15:56:02

 4         Q.  Correct.                                     15:56:03

 5         A.  Vaguely.                                     15:56:03

 6         Q.  When did you first find out that he had     15:56:04

 7    been married?                                         15:56:06

 8         A.  After that.                                  15:56:07

 9         Q.  After the filing of the probate papers?     15:56:09

10         A.  If the probate paper said he was never      15:56:11

11    married, it means that I found out after that he was 15:56:13

12    married, very short-lived marriage or "short-lived"  15:56:17

13    if you're British, and that they got divorced.       15:56:21

14         Q.  And what have you done to confirm that they 15:56:25

15    actually got divorced?                               15:56:28

16              MR. KENDALL:  I'm going to just caution you 15:56:32

17    with respect to that that it may call for work       15:56:34

18    product.  So give that some consideration before you 15:56:37

19    respond and don't waive your work product.           15:56:40

20              THE WITNESS:  I -- I -- I'm not going to go 15:56:41

21    into particulars of what I actually did to confirm   15:56:47

22    it, but it was -- I treated that with considerable   15:56:50

23    attention and confirmed that they got divorced.      15:56:55

24    BY MR. PETROCELLI:                                    15:56:55

25         Q.  And you have records of --                  15:57:01
```

**EXHIBIT 3**
**311**

MARC   TOBEROFF - 9/18/2012

Page 220

```
 1         A.  Because it was a big surprise to me.              15:57:02

 2         Q.  Do you have records that show the -- the --       15:57:04

 3    the divorce, the legal divorce?                            15:57:10

 4         MR. KENDALL:  I think now you're asking a             15:57:16

 5    question about Mr. Toberoff's representation of his        15:57:17

 6    clients, which I think calls for work product.  I'll       15:57:24

 7    caution you, Mr. Toberoff.                                 15:57:29

 8         THE WITNESS:  Without waiving my work                 15:57:31

 9    product, I -- I would have to check my files what I        15:57:32

10    still have or don't still have.  I --                      15:57:36

11    BY MR. PETROCELLI:                                         15:57:38

12         Q.  Do you know --                                    15:57:39

13         A.  I recall being very focused on that and           15:57:39

14    confirming that, because it came to me as a big            15:57:42

15    surprise.                                                  15:57:44

16         Q.  Did you also confirm whether the spouse or        15:57:44

17    former spouse was deceased?                                15:57:50

18         MR. KENDALL:  Same caution.                           15:57:56

19         THE WITNESS:  Sounds familiar.  Without               15:57:59

20    waiving of any work product, it sounds familiar.           15:58:03

21    BY MR. PETROCELLI:                                         15:58:03

22         Q.  You just -- you don't have a clear                15:58:06

23    recollection of that?                                      15:58:07

24         A.  I don't have a clear recollection.  I have        15:58:08

25    a clear recollection -- recollection of determining        15:58:10
```

**EXHIBIT 3**
**312**

MARC   TOBEROFF - 9/18/2012

Page 221

```
 1    that they got divorced and, in fact, legally        15:58:14
 2    divorced.                                             15:58:16
 3         Q.  I was asking about whether she -- when she  15:58:18
 4    died, if she died?                                    15:58:21
 5         A.  Yeah, I have a vague recollection that she  15:58:23
 6    did die, but -- but --                                15:58:25
 7         Q.  So, circling back to a question I asked you 15:58:30
 8    a while ago, I don't think it was answered and if it 15:58:35
 9    was, I apologize for asking it again, but given your 15:58:38
10    knowledge that only the estate would have a          15:58:41
11    termination right and that was the only right of     15:58:43
12    which you were aware the Shusters had, why wasn't    15:58:47
13    this agreement prepared so that it was between PPC   15:58:53
14    and the estate of Joe Shuster by its personal        15:58:58
15    representative?                                       15:59:02
16         A.  Because there was no --                      15:59:04
17              MR. KENDALL:  Argumentative.                15:59:06
18              THE WITNESS:  -- there was no estate.       15:59:06
19    BY MR. PETROCELLI:                                    15:59:06
20         Q.  Why wasn't it prepared such that it was     15:59:09
21    only between Jean, as executor, named under the will 15:59:10
22    of Joe Shuster and PPC?                               15:59:16
23              MR. KENDALL:  Argumentative.                15:59:19
24              THE WITNESS:  Because she was elderly.      15:59:20
25    BY MR. PETROCELLI:                                    15:59:20
```

**EXHIBIT 3**
**313**

MARC  TOBEROFF - 9/18/2012

Page 222

```
 1        Q.  Meaning what?                              15:59:29

 2        A.  She was elderly and she declined to act as  15:59:29

 3    an executor of an estate.                           15:59:33

 4        Q.  She didn't decline to act as of the signing 15:59:35

 5    of Exhibit 10, though, correct?                     15:59:37

 6        A.  Yes, she didn't -- anyway, this is          15:59:40

 7    revealing privileged information now.               15:59:45

 8        Q.  She told you prior to the signing of        15:59:47

 9    Exhibit 10 that she would not serve as executrix?   15:59:49

10        MR. KENDALL:  Just a minute.  I'm going to       15:59:52

11    object in light of the witness' last answer that it 15:59:53

12    appears to call for privileged information.         15:59:56

13        THE WITNESS:  Privileged.  I believe those      15:59:59

14    conversations are privileged as to the setting up of 16:00:02

15    the estate, other than what's as part of the estate 16:00:04

16    record.                                             16:00:08

17    BY MR. PETROCELLI:                                  16:00:08

18        Q.  So to be clear on this so there's no waste  16:00:09

19    of time here, you do recall discussions with Jean   16:00:12

20    and/or Warren on this subject and decline to answer? 16:00:17

21        MR. KENDALL:  Which subject?                    16:00:26

22        MR. PETROCELLI:  The subject of -- of           16:00:27

23    Jean's willingness or unwillingness to serve as an  16:00:29

24    executrix for the purpose of serving a notice of    16:00:33

25    termination.                                        16:00:36
```

MARC   TOBEROFF - 9/18/2012

Page 223

```
 1            THE WITNESS:  I don't recall specific        16:00:37

 2    conversations.  I recall the result of             16:00:38

 3    conversations.                                      16:00:44

 4    BY MR. PETROCELLI:                                  16:00:44

 5         Q.  The result being what?  Her unwillingness  16:00:47

 6    to serve?                                           16:00:53

 7         A.  Exactly.                                   16:00:53

 8         Q.  That's all you recall, none of the         16:00:54

 9    thinking, none of the reasons, no particulars, just 16:00:56

10    that?                                               16:00:58

11         A.  Yes.                                       16:00:58

12         Q.  Okay.  When did you come to appreciate that 16:01:01

13    the transfers were void under 304(C)60?            16:01:15

14            MR. KENDALL:  Calls for the witness' work   16:01:21

15    product.                                            16:01:23

16            THE WITNESS:  I can't put a date on it.     16:01:27

17    BY MR. PETROCELLI:                                  16:01:27

18         Q.  Was it before the Shuster lawsuit in May   16:01:29

19    2010?                                               16:01:32

20         A.  Yes.                                       16:01:33

21         Q.  Was it before the attempt to cancel the PPC 16:01:36

22    agreements and substitute a legal retainer agreement 16:01:48

23    in 2004?                                            16:01:51

24            MR. KENDALL:  I'm going to object as        16:01:52

25    apparently calling for work product.               16:01:54
```

MARC  TOBEROFF - 9/18/2012

Page 224

```
 1              THE WITNESS:  I can't -- I can't put a date        16:01:58
 2    on it, but -- I can't put a date on it.                     16:02:00
 3    BY MR. PETROCELLI:                                          16:02:00
 4        Q.  Can you tell me whether it was before or           16:02:04
 5    after the events I just described that took place in        16:02:06
 6    2004?                                                       16:02:08
 7        A.  I would say certainly by 2004 I was                 16:02:09
 8    thinking of the next question, whether it was               16:02:15
 9    before, you know, the 2003 agreement or not.                16:02:18
10    Because the 2003 agreement doesn't -- and it's              16:02:22
11    been -- it's been kind of swept into the 2001               16:02:26
12    agreement, and the briefing, and we pointed out             16:02:30
13    recently that the 2003 agreement doesn't, in fact,          16:02:33
14    assign termination rights to any joint venture.             16:02:40
15    They stay with the executor under the 2003                  16:02:43
16    agreement.                                                  16:02:44
17        Q.  Was that deliberate or are you just saying          16:02:45
18    that's just the way you now read the words?                 16:02:48
19              MR. KENDALL:  Objection.                          16:02:51
20              THE WITNESS:  No, no, that's --                   16:02:51
21              MR. KENDALL:  Appearing to call for your          16:02:53
22    work product.                                               16:02:54
23              THE WITNESS:  Yeah, that's -- that's what         16:02:55
24    it says.                                                    16:02:56
25    BY MR. PETROCELLI:                                          16:02:56
```

**EXHIBIT 3**
**316**

MARC  TOBEROFF - 9/18/2012

Page 225

```
 1        Q.  Let's take a quick look at that.              16:03:01

 2        A.  I assume if it says that, it's deliberate.    16:03:02

 3            MR. PETROCELLI:  I'm going to do something     16:03:06

 4    bold and go out of chronological order for a moment.  16:03:08

 5            Can you give Mr. Toberoff a copy of the        16:03:23

 6    2003 --                                               16:03:25

 7            MR. TOKORO:  2003?                             16:03:25

 8            MR. PETROCELLI:  Yeah.                         16:03:33

 9            MR. TOKORO:  13.                               16:03:33

10            (The document referred to was                 16:03:36

11            previously marked for                         16:03:36

12            identification as Exhibit 13 and is           16:03:36

13            attached to this deposition.)                 16:03:48

14    BY MR. PETROCELLI:                                    16:03:48

15        Q.  You now have Exhibit 13, which is the         16:03:49

16    document with Mark Warren Peary as executor of the    16:03:52

17    estate of Joe Shuster dated as of -- dated            16:03:57

18    October 27, 2003, signed on October 30, 2003 by you   16:04:05

19    as president of PPC, by Mr. Peary as executor and     16:04:08

20    also by Ms. Peavy.                                    16:04:17

21            Do you see that?                              16:04:17

22        A.  Yes, except to note that the agreement's      16:04:34

23    with the executor of the estate of Joe Shuster, not   16:04:37

24    with Jean Peavy.  She's just signing it to say that   16:04:40

25    she's read it and familiar with it.                   16:04:44
```

**EXHIBIT 3**

**317**

MARC  TOBEROFF - 9/18/2012

Page 226

```
 1        Q.  Well, she says:                      16:04:50

 2              "I have read the foregoing          16:04:51

 3        agreement and agree to its terms to      16:04:52

 4        the extent any of my interests are       16:04:53

 5        concerned."                              16:04:55

 6        Right?                                    16:04:55

 7     A.  Yes.                                     16:04:55

 8        Q.  Okay.  Now, looking at this document, 16:04:57

 9  Exhibit 13, does it refresh your recollection as to 16:05:01

10  whether you came to appreciate that the transfer in 16:05:05

11  the November 2001 document, Exhibit 10, was void ab 16:05:16

12  initio?                                        16:05:23

13     A.  It doesn't specifically refresh my     16:05:23

14  recollection.                                  16:05:25

15        Q.  Okay.  Now, your point earlier that led us 16:05:31

16  to this document was that there's no additional 16:05:33

17  grant of rights here to the venture.  Is that what 16:05:35

18  you were pointing out to me?                   16:05:40

19     A.  I believe that the -- this agreement calls 16:05:43

20  for a division of proceeds.  I believe it's as 16:05:51

21  follows.  The only person with a termination  16:05:56

22  interest who can expedite termination interest is 16:05:59

23  the executor of the estate of Joe Shuster.     16:06:02

24        Joe Shuster has this agreement, joint     16:06:04

25  venture agreement with PPC, which agrees to share 16:06:06
```

MARC  TOBEROFF - 9/18/2012

Page 227

```
 1    proceeds from that termination interest, but is not       16:06:08

 2    assigning the termination right to the joint             16:06:12

 3    venture.                                                 16:06:17

 4         Q.  Well, the termination rights had already        16:06:20

 5    been assigned to the joint venture in the prior          16:06:21

 6    document, Exhibit 10, correct?                           16:06:26

 7         A.  Of course not.                                  16:06:29

 8         Q.  Why do you say, "Of course not"?                16:06:30

 9         A.  Hence this line of questioning.                 16:06:32

10         Q.  Well, you say that because at some point        16:06:35

11    you realized that any such transfer would be void or     16:06:36

12    you're saying it was never intended to do so?            16:06:39

13         MR. KENDALL:  Just a minute.                        16:06:42

14    BY MR. PETROCELLI:                                       16:06:42

15         Q.  Let me -- let me withdraw that.                 16:06:44

16         When you signed Exhibit 10, were -- you             16:06:45

17    were intending to have transferred to PPC any future     16:06:49

18    termination rights that the Shusters might have,         16:06:54

19    knowing full well that the only way such rights          16:06:58

20    could be secured is by notice of termination served      16:07:01

21    by the estate, correct?                                  16:07:05

22         A.  Incorrect.                                      16:07:07

23         Q.  What's incorrect about that?                    16:07:08

24         A.  The last part.                                  16:07:09

25         Q.  What's the last part?                           16:07:12
```

MARC   TOBEROFF - 9/18/2012

Page 228

```
 1        A.  The "knowing full well."  After "knowing      16:07:13

 2     full well."                                           16:07:18

 3        Q.  I believe you previously testified that you    16:07:19

 4     knew that in order for the Shuster termination        16:07:21

 5     interest to be enforced, the estate had to serve a    16:07:24

 6     notice of termination, correct?                       16:07:31

 7            MR. KENDALL:  Argumentative.                   16:07:33

 8     BY MR. PETROCELLI:                                    16:07:33

 9        Q.  You knew that?                                 16:07:35

10            MR. KENDALL:  Lacks foundation.                16:07:36

11            THE WITNESS:  Let me -- let me state it        16:07:37

12     simply.                                               16:07:39

13            I don't believe that when I entered into       16:07:39

14     the 2001 agreement I was aware that you can't         16:07:44

15     transfer a termination expectancy prior to serving a  16:07:46

16     termination notice and with respect to a third        16:07:53

17     party, which PPC was, or the joint venture was, I     16:07:55

18     should say, prior to the effective date of the        16:07:58

19     termination.                                          16:08:01

20     BY MR. PETROCELLI:                                    16:08:01

21        Q.  Right.  But you --                             16:08:01

22        A.  In addition to that, in addition to that,      16:08:02

23     that there -- there -- neither Warren or Jean         16:08:05

24     individually in 2001 had a termination interest.      16:08:18

25        Q.  Yet you had them transfer whatever interest    16:08:27
```

**EXHIBIT 3**
**320**

MARC   TOBEROFF - 9/18/2012

Page 229

```
 1    they did have to PPC, correct?                    16:08:29

 2         A.  No.  They didn't have a termination      16:08:31

 3    interest because individually a nephew or a sibling  16:08:33

 4    does not have termination rights.                 16:08:39

 5         Q.  That speaks to Warren.                   16:08:42

 6         A.  Speaks to her, too.  She didn't have     16:08:44

 7    termination rights.                               16:08:46

 8         Q.  Oh, the sibling.  But nonetheless, you   16:08:47

 9    included language whereby they were granting rights,  16:08:50

10    they, individually, were granting rights to PPC?  16:08:52

11         A.  Right.                                   16:08:55

12             MR. KENDALL:  Just a moment.  Give me a --  16:08:56

13    you guys --                                       16:09:00

14             MR. PETROCELLI:  We've covered this      16:09:01

15    already.  I don't need to go over it again.  I'm  16:09:02

16    going to go back to Exhibit 13 now.               16:09:05

17             MR. KENDALL:  So do you want to withdraw  16:09:09

18    that question so that I don't need to --          16:09:10

19             MR. PETROCELLI:  No.                     16:09:10

20             MR. KENDALL:  -- focus on whether I need to  16:09:11

21    object?                                           16:09:12

22             MR. PETROCELLI:  The question was answered  16:09:12

23    and if -- I'm ready to proceed to a different     16:09:14

24    question.                                         16:09:17

25             THE WITNESS:  Well, then you should object.  16:09:19
```

MARC  TOBEROFF - 9/18/2012

Page 230

```
 1            MR. KENDALL:  If I have an objection I          16:09:21
 2    should make it so you can correct it, but I got        16:09:22
 3    distracted by the fact that the witness answered the   16:09:26
 4    question before giving me a chance to object.          16:09:28
 5            I'm going to object as unintelligible and       16:09:39
 6    lacks foundation.  Assumes facts.  And                 16:09:44
 7    argumentative.                                         16:09:47
 8    BY MR. PETROCELLI:                                     16:09:47
 9        Q.  Was -- was it your understanding that with     16:09:50
10    signing Exhibit 13 you were intending to revoke the    16:09:55
11    grants that were made in Exhibit 10?                   16:10:07
12        A.  I don't recall having that understanding.      16:10:11
13        Q.  Okay.                                          16:10:22
14        A.  I note that the agreement says                 16:10:22
15    "supplement."  It doesn't say "revoke."                16:10:23
16        Q.  The purpose of this agreement is, among        16:10:30
17    other things, for Warren, as executor, to engage PPC   16:10:33
18    as its, meaning Warren's, exclusive advisor for the    16:10:41
19    purpose of proceeding with the termination rights of   16:10:47
20    the estate?                                            16:10:49
21        A.  That's what it says.                           16:10:49
22        Q.  And in paragraph 4, it states similar to       16:10:57
23    paragraph 4 of Exhibit 10, that:                       16:11:05
24            "Client" -- who is defined as                   16:11:09
25            Warren, the executor -- "cannot                 16:11:11
```

EXHIBIT 3
322

MARC  TOBEROFF - 9/18/2012

Page 231

```
 1              enter into any agreement without          16:11:13
 2              the expressed written approval of         16:11:15
 3              PPC."                                      16:11:17
 4              Correct.                                   16:11:17
 5      A.  It's what it says.                             16:11:19
 6      Q.  Did you receive any legal advice on the       16:11:21
 7  propriety of an executor entering into such an        16:11:24
 8  arrangement prior to your signing Exhibit 13?         16:11:27
 9      A.  I received legal advice as to the form        16:11:32
10  of -- I believe I received legal advice as to the     16:11:45
11  form of Exhibit 13.                                   16:11:49
12      Q.  What do you mean by "form"?                   16:11:52
13      A.  But not specifically on the point of an       16:11:53
14  executor.  I don't recall receiving legal advice     16:11:57
15  specifically on an executor entering into this type   16:12:03
16  of agreement.                                          16:12:22
17      Q.  Did you receive any -- any legal advice on    16:12:31
18  whether an executor could contractually agree to      16:12:35
19  require the consent of a third party in executing     16:12:41
20  contracts in the course of the executor's duties?     16:12:49
21      A.  I -- I don't believe so.  But I -- I          16:12:52
22  recall -- first of all, when I'm discussing           16:13:01
23  receiving legal advice, it's without waiver.  I'm --  16:13:03
24  there's -- there have been certain privileged         16:13:09
25  communications that were held no longer privileged    16:13:11
```

EXHIBIT 3
323

MARC  TOBEROFF - 9/18/2012

Page 232

```
 1    due to the sharing of the documents with the USAO,        16:13:15
 2    the writ and the writ appeal, and one of those was a     16:13:20
 3    memo which was an ethics memo, and reviewing, I          16:13:23
 4    believe, the 2001 agreement, either the 2001            16:13:33
 5    agreement or the form of the 2001 agreement, and --     16:13:40
 6    which I, you know, wanted to be reviewed.               16:13:47
 7          And as a result of that memo, I had asked         16:13:51
 8    for, okay, well, if that form of agreement is          16:13:59
 9    problematic, what form of agreement would you          16:14:02
10    suggest for agreements of this nature?                 16:14:04
11          And this was the suggested form of               16:14:11
12    agreement which I modified, but I don't know if I      16:14:14
13    covered the executor.                                  16:14:18
14       Q.  The point I was asking about, the executor?    16:14:19
15       A.  Yeah, I don't know if it covered that         16:14:21
16    specific point.                                        16:14:24
17       Q.  The -- the advice you just described having    16:14:24
18    received was from Armstrong Hirsch?                    16:14:28
19       A.  Yes.                                            16:14:30
20       Q.  And did Armstrong -- was that Jim Jackoway?    16:14:31
21       A.  It was his firm.                                16:14:36
22       Q.  His firm?                                       16:14:37
23       A.  And then he had somebody else who he          16:14:37
24    referred to as his ethics, you know, person, or      16:14:40
25    maven to do the review.                               16:14:45
```

EXHIBIT 3
324

MARC   TOBEROFF - 9/18/2012

Page 233

```
 1          Q.  Did they, to your knowledge, review and       16:14:47

 2     approve the form of Exhibit 13?                          16:14:50

 3          A.  They didn't -- well, when you say "review       16:14:53

 4     and" -- they didn't review and approve this             16:14:56

 5     agreement.  This agreement was based on --               16:14:58

 6          Q.  "This" being Exhibit 13?                        16:15:00

 7          A.  This agreement was based on a suggested         16:15:03

 8     form of agreement for moving forward with               16:15:06

 9     intellectual property matters, not -- not specific       16:15:14

10     to the Shusters but more of a general template to be     16:15:24

11     used for IP Worldwide.                                   16:15:28

12          Q.  And what was it about this -- what was the     16:15:31

13     issue that they believed as described to you by them     16:15:33

14     that this form attempted to solve?                       16:15:38

15              MR. KENDALL:  I'm going to object to that       16:15:41

16     question.  There's been a limited waiver as a result     16:15:42

17     of the writ proceedings with respect to that            16:15:49

18     document, but there hasn't been a waiver with           16:15:51

19     respect to further communications besides that          16:15:56

20     document.                                                16:15:57

21              MR. PETROCELLI:  There have been no such       16:15:59

22     limited waiver.                                          16:16:01

23              THE WITNESS:  Excuse me?                        16:16:03

24              MR. PETROCELLI:  There's been no ruling of      16:16:03

25     which I am aware that says the waiver is limited.  I     16:16:06
```

EXHIBIT 3
325

MARC  TOBEROFF - 9/18/2012

Page 234

```
 1    think that's your gloss on it.                    16:16:08

 2          MR. KENDALL:  I think it -- there's been,   16:16:10

 3    as I understand it, communications between the    16:16:12

 4    parties to the effect that your client, through you,  16:16:16

 5    has asserted that there is a broad subject matter  16:16:22

 6    waiver, and the position that's been advanced by   16:16:24

 7    your opponents is that there is not.               16:16:31

 8          MR. PETROCELLI:  That, I understand.  But    16:16:33

 9    you were making the objection as though the limited  16:16:34

10    waiver was part of some court ruling or court order  16:16:38

11    in those terms.  And I don't believe that's correct.  16:16:41

12          MR. KENDALL:  Just a moment.  Let me         16:16:44

13    consult the record.  I don't think I meant to say  16:16:45

14    that and I'm not sure I did say that.              16:16:47

15    BY MR. PETROCELLI:                                 16:16:58

16       Q.  Can you answer the question?               16:16:58

17          MR. KENDALL:  Well, no, because I'm looking  16:17:00

18    at the record right now.                          16:17:01

19          Yeah, I didn't say what you claim I said.   16:17:04

20          THE WITNESS:  What's the question?          16:17:08

21    BY MR. PETROCELLI:                                 16:17:08

22       Q.  Let me re-put the question to you.         16:17:09

23          What was the issue that the Jackoway firm   16:17:10

24    described to you or the concern that the Jackoway  16:17:16

25    firm described to you, that the form or format they  16:17:19
```

MARC  TOBEROFF - 9/18/2012

Page 235

| | | |
|---|---|---|
| 1 | suggested to you was intended to solve? | 16:17:23 |
| 2 | MR. KENDALL:  I'm going to caution you that | 16:17:25 |
| 3 | it's one thing to discuss that document but it's | 16:17:29 |
| 4 | another thing to discuss advice that's not contained | 16:17:33 |
| 5 | in that document.  And I will caution you that to do | 16:17:37 |
| 6 | so might waive privileges that you may currently | 16:17:41 |
| 7 | enjoy, recognizing that the parties have a | 16:17:45 |
| 8 | disagreement about that. | 16:17:48 |
| 9 | THE WITNESS:  So I'm not going to testify | 16:17:49 |
| 10 | beyond the contours of that ethics memo that was | 16:17:53 |
| 11 | written up. | 16:17:59 |
| 12 | BY MR. PETROCELLI: | 16:17:59 |
| 13 | Q.  Is it your recollection that the ethics | 16:18:02 |
| 14 | memo references this issue? | 16:18:04 |
| 15 | A.  What issue? | 16:18:07 |
| 16 | Q.  The issue that you just described, that the | 16:18:08 |
| 17 | form of Exhibit 13 was intended to address? | 16:18:10 |
| 18 | MR. KENDALL:  Vague and ambiguous. | 16:18:17 |
| 19 | THE WITNESS:  I -- I don't know if it does. | 16:18:17 |
| 20 | It really references on problematic or potentially | 16:18:19 |
| 21 | problematic areas that touch upon -- it reviewed the | 16:18:29 |
| 22 | 2001 PPC agreement.  And like I said, the 2001 PPC | 16:18:35 |
| 23 | agreement was emblematic of a kind of a form and -- | 16:18:44 |
| 24 | BY MR. PETROCELLI: | 16:18:49 |
| 25 | Q.  You don't have to repeat that. | 16:18:49 |

MARC  TOBEROFF - 9/18/2012

Page 236

```
 1        A.   Okay.  And without, you know, waiver of any    16:18:50

 2   privilege, I wanted to have that reviewed for IP         16:18:53

 3   Worldwide, going forward for IP Worldwide, and the       16:19:00

 4   Jackoway firm was interested in -- we had a mutual       16:19:04

 5   interest in Jackoway representing IP Worldwide, and      16:19:08

 6   so they did that review for me, and what came out of     16:19:12

 7   that review was a form of agreement which I -- was       16:19:18

 8   the basis for the 2003 agreement.                        16:19:29

 9        Q.   And are you refusing to answer my question?    16:19:33

10        A.   I -- I --                                      16:19:37

11             MR. KENDALL:  Just a minute.  Just a           16:19:38

12   minute.                                                  16:19:39

13             So now what is the question that you're        16:19:40

14   asking if he's refusing to answer?                       16:19:41

15   BY MR. PETROCELLI:                                       16:19:41

16        Q.   What did the Jackoway firm explain to you      16:19:45

17   was the issue or concern that the form of Exhibit 13     16:19:47

18   was intended to address and resolve?                     16:19:52

19             MR. KENDALL:  Okay.  So I think in light of    16:19:54

20   the witness' testimony he just gave, I need to           16:19:56

21   confer with him for a moment.                            16:19:58

22             MR. PETROCELLI:  Okay.  Let's go off the       16:20:00

23   record.                                                  16:20:02

24             THE WITNESS:  I'm going to limit it to the     16:20:02

25   memo.                                                    16:20:03
```

MARC  TOBEROFF - 9/18/2012

Page 237

| | | |
|---|---|---|
| 1 | MR. KENDALL:  You're going to talk to me | 16:20:04 |
| 2 | first. | 16:20:05 |
| 3 | THE WITNESS:  Thanks. | 16:20:06 |
| 4 | THE VIDEOGRAPHER:  Off the record.  The | 16:20:07 |
| 5 | time is 4:20. | 16:20:08 |
| 6 | This will mark the end of Volume I, Tape | 16:20:13 |
| 7 | Number 3 in the deposition of Marc Toberoff. | 16:20:16 |
| 8 | Changing tapes at 4:20. | 16:20:18 |
| 9 | (Brief recess.) | 16:20:28 |
| 10 | THE VIDEOGRAPHER:  We're back on the | 16:25:15 |
| 11 | record. | 16:25:17 |
| 12 | This marks the beginning of Volume I, Tape | 16:25:17 |
| 13 | Number 4 in the deposition of Marc Toberoff.  The | 16:25:19 |
| 14 | time is 4:25. | 16:25:22 |
| 15 | BY MR. PETROCELLI: | 16:25:22 |
| 16 | Q.  I think I had a pending question, | 16:25:26 |
| 17 | Mr. Toberoff. | 16:25:28 |
| 18 | (The reporter read the record | 16:25:41 |
| 19 | as follows: | 16:25:41 |
| 20 | "QUESTION:  What did the | 16:19:45 |
| 21 | Jackoway firm explain to you was | 16:19:45 |
| 22 | the issue or concern that the form | 16:19:47 |
| 23 | of Exhibit 13 was intended to | 16:19:52 |
| 24 | address and resolve?") | 16:19:53 |
| 25 | THE WITNESS:  I'll answer that, provided | 16:25:44 |

MARC  TOBEROFF - 9/18/2012

Page 238

```
 1    you agree that I'm not waiving privilege as to my          16:25:54

 2    communications with the Jackoway firm, other               16:26:00

 3    communications.                                            16:26:02

 4    BY MR. PETROCELLI:                                         16:26:02

 5         Q.  I think we have that agreement.                    16:26:04

 6         A.  Okay.  Those issues would be as outlined in        16:26:05

 7    that ethics memo.                                          16:26:14

 8         Q.  Okay.  I'm not going to take you through           16:26:21

 9    that right this moment.                                    16:26:24

10         You did, as part of your inquiries with the           16:26:25

11    Jackoway firm, discuss whether they would be               16:26:33

12    directly involved in rendering advice, not just            16:26:36

13    generally on the form of your agreements but               16:26:39

14    specifically with respect to Superman, right?             16:26:41

15    Including perhaps doing the estate work?                   16:26:47

16         MR. KENDALL:  I'm going to caution you,               16:26:49

17    you're more aware than I am of -- of what's in the         16:26:51

18    document that was disclosed, but if that's in the          16:26:55

19    document that's disclosed, then I think it's fair          16:27:02

20    game.  If it's not, then we have to confront the           16:27:06

21    privilege issues that might be involved in                 16:27:09

22    responding to that question.                               16:27:12

23         THE WITNESS:  So what I'd like to do is be            16:27:14

24    able to answer your questions, as well as -- as            16:27:24

25    specifically as possible without waiving -- and to         16:27:26
```

**EXHIBIT 3**
**330**

MARC  TOBEROFF - 9/18/2012

Page 239

```
 1    the extent of things already disclosed in those writ        16:27:32
 2    documents that pertain to this issue, without              16:27:35
 3    waiving privilege.                                         16:27:38
 4    BY MR. PETROCELLI:                                         16:27:38
 5        Q.  We have the agreement that by your                 16:27:40
 6    answering the question, it's not going to be argued        16:27:42
 7    as an additional basis for waiver.                         16:27:45
 8        A.  Okay.  So with respect to -- as part of the        16:27:47
 9    writ documents, I'm aware of the -- what I'll call         16:27:59
10    the ethics memo.  Was there another document that          16:28:03
11    pertained to ethics regarding an estate?                   16:28:07
12        Q.  Well, look, I only asked you the question          16:28:15
13    because that's how I read one of the documents, and        16:28:17
14    without taking you through --                              16:28:20
15        A.  Okay.  Let me ask it this way.                     16:28:22
16        Q.  -- the documents --                                16:28:23
17        A.  Well, let me ask it this way, how -- if I          16:28:25
18    may, because it will make it a lot easier --               16:28:27
19        Q.  Two.                                               16:28:28
20        A.  There are two --                                   16:28:28
21        Q.  That's what I recall.                              16:28:30
22        A.  There are two separate memos that were             16:28:31
23    produced as part of the writ documents?                    16:28:35
24        Q.  Yes.                                               16:28:37
25        A.  Okay.  So since that first -- first memo --        16:28:37
```

MARC  TOBEROFF - 9/18/2012

Page 240

```
 1        Q.  I'm only asking you whether you contacted      16:28:41
 2   that firm for the purpose, among others, of working     16:28:45
 3   with you to handle matters specific to the Superman     16:28:51
 4   work you were doing.                                    16:28:55
 5            MR. KENDALL:  I'd like to caution you that      16:28:56
 6   since the premise of your discussing this is that       16:28:58
 7   you believe it's in a memo that's been disclosed,       16:29:05
 8   that the prudent thing for you to do would be to ask    16:29:10
 9   to see the memo.                                        16:29:13
10            MR. PETROCELLI:  I'm not going to do that,     16:29:14
11   Dick, and you're wasting my time now.                   16:29:16
12        Q.  Can you answer the question, yes or no?        16:29:18
13        A.  Repeat the question.                           16:29:22
14            MR. PETROCELLI:  Yes.                          16:29:22
15               (The reporter read the record               16:29:22
16            as follows:                                    16:29:22
17               "QUESTION:  I'm only asking                 16:28:43
18            you whether you contacted that firm            16:28:44
19            for the purpose, among others, of              16:28:50
20            working with you to handle matters             16:28:51
21            specific to the Superman work you              16:28:52
22            were doing.")                                  16:28:55
23            MR. KENDALL:  I'm going to give you a          16:29:37
24   caution that I think you may be disclosing              16:29:39
25   attorney-client communications by this.  Now, you've   16:29:41
```

MARC  TOBEROFF - 9/18/2012

Page 241

```
 1    got an agreement that it won't be a waiver, but you        16:29:44
 2    have to make the judgment as to whether you want to        16:29:48
 3    be doing that.                                             16:29:50
 4          THE WITNESS:  Right.  Again, without               16:29:51
 5    waiver, I don't know if I specifically anticipated         16:29:57
 6    that they would work on Superman.  I think it was we       16:30:17
 7    were -- we had a relationship where we were mutually       16:30:22
 8    interested in each other, and they had a facility          16:30:27
 9    and were willing to give me some advice.                   16:30:34
10    BY MR. PETROCELLI:                                         16:30:34
11       Q.  In connection with the execution of Exhibit       16:30:39
12    13, did you have any discussions with Mr. Peary or         16:30:42
13    Jean Peavy that any part of Exhibit 10 might be            16:30:48
14    unlawful or void or otherwise legally problematic?         16:30:57
15       A.  Did I have any discussion, ever?                   16:31:08
16       Q.  As of the time you signed Exhibit 13              16:31:09
17    with -- with Mr. Peary, with Warren.                       16:31:13
18          MR. KENDALL:  So --                                16:31:18
19          THE WITNESS:  That's privileged.                   16:31:19
20          MR. KENDALL:  -- I'm going to instruct            16:31:20
21    you -- right.                                              16:31:21
22    BY MR. PETROCELLI:                                         16:31:21
23       Q.  Did you -- was it your intention in signing      16:31:24
24    Exhibit 13 to rectify any problems with the document       16:31:32
25    that had been executed as Exhibit 10?                      16:31:37
```

**EXHIBIT 3**
**333**

MARC  TOBEROFF - 9/18/2012

Page 242

```
 1          MR. KENDALL:  Vague and ambiguous.        16:31:42
 2   Overbroad.                                       16:31:44
 3          THE WITNESS:  I can't recall specifically, 16:32:08
 4   but -- but one of the -- I don't know if "rectify" 16:32:10
 5   is the right word, but one of the issues is that 16:32:15
 6   leaving aside the non-transferability of termination 16:32:19
 7   interest, one of the issues is that how can you  16:32:23
 8   transfer issue -- how could you even transfer -- how 16:32:30
 9   could you have any agreement regarding termination 16:32:36
10   that doesn't -- before the estate is actually     16:32:44
11   probated?                                        16:32:48
12   BY MR. PETROCELLI:                               16:32:48
13      Q.  Did you have that issue in mind when you  16:32:50
14   signed Exhibit 13?                               16:32:53
15      A.  Yes.                                      16:32:54
16      Q.  And you started out that answer by saying, 16:32:59
17   "Apart from the transferability issue"?          16:33:02
18      A.  Right.                                    16:33:03
19      Q.  Did you have that issue in mind when you  16:33:04
20   signed Exhibit 13?                               16:33:06
21      A.  I can't recall whether I had that in mind. 16:33:07
22      Q.  When you entered into Exhibit 10, you were 16:33:20
23   aware that the window for serving the notice of   16:33:30
24   termination would not open until 2003?           16:33:33
25      A.  I was aware of the termination windows, how 16:33:41
```

MARC  TOBEROFF - 9/18/2012

Page 243

```
1    they worked.                                      16:33:43
2       Q.  Were you aware that the earliest year in  16:33:45
3    which the termination notice could be served was in 16:33:48
4    2003?                                             16:33:51
5       A.  I don't have a specific recollection, but I 16:33:53
6    believe that I was aware of that.  When I signed  16:33:56
7    Exhibit 10?                                       16:34:00
8       Q.  Correct.                                   16:34:01
9       A.  It's easier if you say 2001 agreement.     16:34:01
10      Q.  Okay.  When you signed the 2001 agreement, 16:34:07
11   which is Exhibit 10, you were generally aware that 16:34:11
12   the termination window for the Shusters opened up in 16:34:14
13   2003?                                             16:34:17
14      A.  I believe I was aware of that.             16:34:17
15      Q.  I want to ask you about Superboy as it     16:34:35
16   relates to these agreements so we can focus your  16:34:38
17   attention on that, okay?                          16:34:44
18          In the 2001 agreement, Exhibit 10, as      16:34:49
19   you'll see in the second paragraph, there's a     16:34:52
20   reference to Superboy in broadly describing what the 16:34:53
21   rights shall include.                             16:35:02
22          Do you see that?                           16:35:08
23      A.  Yes.                                       16:35:08
24      Q.  And then in the 2003 agreement, that's     16:35:09
25   Exhibit 13, there's no reference to Superboy,      16:35:22
```

MARC  TOBEROFF - 9/18/2012

```
 1    correct?                                             16:35:25

 2         A.   Nor any of those other things, correct.   16:35:30

 3         Q.   Right.                                     16:35:32

 4              Was -- was it your intention as of the time 16:35:33

 5    you executed Exhibit 13 that it not encompass        16:35:38

 6    Superboy as a separate copyrightable property.       16:35:48

 7              MR. KENDALL:  I'm just going to caution you 16:35:52

 8    as to your work product and -- at that time.         16:35:56

 9              If you consider that to be work product, we 16:36:02

10    may want to have a discussion outside -- off the     16:36:04

11    record about that.  But if you're comfortable        16:36:08

12    asking -- answering that question, feel free.        16:36:11

13              THE WITNESS:  I don't believe this --      16:36:15

14    that -- that implicates work product because I don't 16:36:17

15    believe that the conclusion you've drawn is correct. 16:36:25

16              In one you have a -- and I would need to    16:36:27

17    explain this.                                        16:36:33

18              In Exhibit 10, 2001 PPC agreement, you have 16:36:34

19    a -- an attempt to list, without limitation, some of 16:36:38

20    the elements of Superman.  In looking at that now,   16:36:42

21    particularly Mr. Mxyztplk, however you pronounce     16:36:46

22    that name, I don't even know that character, I       16:36:50

23    believe these characters came off of language in the 16:36:53

24    Siegel termination that -- that was available on the 16:36:58

25    Internet.  And that I -- in an effort to be          16:37:00
```

MARC  TOBEROFF - 9/18/2012

Page 245

```
 1    complete, that was thrown into the Exhibit 10 2001      16:37:07

 2    agreement.                                              16:37:13

 3           In the 2003 agreement, I don't believe          16:37:15

 4    there was an intent to exclude or include Superman.     16:37:19

 5    I just believe --                                       16:37:29

 6    BY MR. PETROCELLI:                                      16:37:30

 7       Q.  You meant Superboy?                             16:37:30

 8       A.  Superboy.  I just believe there wasn't an       16:37:31

 9    intent to list the elements that were listed in the     16:37:34

10    2001 agreement.                                         16:37:37

11       Q.  In 2000- --                                     16:37:40

12       A.  I believe too much is being read into that.     16:37:42

13       Q.  In 2003, did you, in entering into Exhibit      16:37:44

14    13, have the view that the Shusters had a right to      16:37:50

15    terminate with respect to Superboy, as well as         16:37:54

16    Superman?                                               16:37:57

17           MR. KENDALL:  Calls for work product.           16:38:00

18           THE WITNESS:  That would be work product        16:38:08

19    but it's -- it's moot because I can't pin down --       16:38:09

20    well, maybe I could pin it down.                        16:38:27

21           MR. KENDALL:  I think you have to be            16:38:36

22    careful not to think aloud when you're talking about    16:38:38

23    privileged material.                                    16:38:40

24           THE WITNESS:  Okay.  Okay.  It's true.  So      16:38:41

25    what was the question?                                  16:39:04
```

MARC  TOBEROFF - 9/18/2012

Page 246

```
 1   BY MR. PETROCELLI:                                16:39:04

 2        Q.  The question was whether you had a view at    16:39:06

 3   the time you executed Exhibit 13, the 2003 agreement   16:39:11

 4   with Warren, whether or not the Shusters had an        16:39:16

 5   interest in Superboy, termination interest in          16:39:22

 6   Superboy?                                              16:39:26

 7        A.  I believe I concluded that they didn't.       16:39:27

 8        Q.  When did you reach that conclusion?           16:39:29

 9        A.  The only reason I'm saying that is because    16:39:30

10   we filed a Superboy termination before entering into   16:39:33

11   that.                                                  16:39:35

12        Q.  In 2002?                                      16:39:35

13        A.  Right.  But I don't have -- otherwise I       16:39:36

14   didn't have a specific recollection, do I recall the   16:39:38

15   Superboy termination date.                             16:39:44

16        MR. PETROCELLI:  Could you show                   16:39:45

17   Mr. Toberoff Exhibit 11, please.                       16:39:47

18             (The document referred to was               16:39:49

19             previously marked for                       16:39:49

20             identification as Exhibit 11 and is         16:39:49

21             attached to this deposition.)               16:39:51

22        MR. PETROCELLI:  Which is the Superboy            16:39:51

23   notice of termination.                                 16:39:52

24             That notice of termination is dated         16:40:06

25   November 8, 2002.                                      16:40:10
```

MARC  TOBEROFF - 9/18/2012

Page 247

```
 1        Q.  Now, you prepared Exhibit 11, right?        16:40:28

 2        A.  Yes, I did.                                  16:40:32

 3        Q.  Okay.  And it's a notice of termination      16:40:36

 4   served on behalf of Joanne Siegel and Laura Siegel    16:40:40

 5   Larson, right?                                        16:40:45

 6        A.  Correct.                                     16:40:46

 7        Q.  Is it fair to say that as of November 8,     16:40:46

 8   2002, you had formed the view that the Shusters had   16:40:49

 9   no termination interests in Superboy?                16:40:53

10        A.  Yes.                                         16:40:56

11        Q.  Okay.  Did you have that view when you       16:41:00

12   entered into the 2001 agreement, Exhibit 10?         16:41:03

13        A.  I don't believe I was focused on it one way  16:41:07

14   or another.                                           16:41:19

15        Q.  Do you recall --                             16:41:20

16        A.  I don't believe the listing of Superboy is   16:41:20

17   indicative -- was indicative of a determination of    16:41:22

18   any kind.  I think it was just an attempt to list     16:41:26

19   related elements of Superboy -- Superman, excuse me.  16:41:29

20        Q.  I understand your answer that folks on our   16:41:31

21   side are reading too much into this, but --           16:41:36

22        A.  No, that's -- that's not just -- that's not  16:41:38

23   just that.                                            16:41:40

24        MR. KENDALL:  Don't argue with him.  Just        16:41:41

25   answer the questions.                                 16:41:42
```

**EXHIBIT 3**
**339**

MARC   TOBEROFF - 9/18/2012

Page 248

```
 1              THE WITNESS:  Okay.                        16:41:43

 2    BY MR. PETROCELLI:                                   16:41:43

 3         Q.  I'm trying to establish what you knew when  16:41:44

 4    or what you -- what views you formed when.           16:41:48

 5              When you signed Exhibit 10, the 2001       16:41:55

 6    agreement with the Shusters, did you have a view     16:41:58

 7    about whether or not their future termination        16:42:03

 8    interest would extend to Superboy?                   16:42:05

 9         A.  I don't believe I did.                      16:42:10

10         Q.  Okay.  So sometime between -- so there      16:42:12

11    wasn't any attempt in Exhibit 10 to exclude          16:42:14

12    Superboy, correct?                                   16:42:18

13         A.  No.                                         16:42:19

14         Q.  Okay.  Sometime before November 8, 2002,    16:42:33

15    you formed the view that the Shusters had no         16:42:35

16    termination rights with respect to Superboy,         16:42:39

17    correct?                                             16:42:41

18         A.  Correct.                                    16:42:42

19         Q.  When did you form that view?                16:42:42

20         A.  I can't put a date or even a month on it.   16:42:44

21         Q.  When you formed that view, did you discuss  16:42:52

22    it with either Jean Peavy or Warren Peary?           16:42:55

23              MR. KENDALL:  That would appear to call for 16:43:00

24    privileged communications.                           16:43:02

25              THE WITNESS:  Without waiving the substance 16:43:09
```

MARC  TOBEROFF - 9/18/2012

Page 249

```
 1    of the communications, I can -- will you allow me to      16:43:10

 2    answer whether I discussed the subject?                    16:43:15

 3    BY MR. PETROCELLI:                                         16:43:15

 4        Q.  Yeah.  Did you discuss the subject?                16:43:18

 5            MR. KENDALL:  And you're agreeing that it          16:43:19

 6    won't be a waiver?                                         16:43:22

 7            MR. PETROCELLI:  Yes.                              16:43:23

 8        Q.  I am going to ask you additional questions         16:43:23

 9    about it but we'll take it one by one.                     16:43:25

10        A.  Right, but you're not agreeing [sic] by            16:43:27

11    answering that question I'm waiving?                       16:43:30

12        Q.  Correct.                                           16:43:31

13        A.  Yes.                                               16:43:34

14        Q.  Did you have any communications with him on        16:43:34

15    that subject in writing?                                   16:43:37

16        A.  I believe it was --                                16:43:43

17            MR. KENDALL:  Just a minute.  So -- so I           16:43:44

18    think this is calling for a privileged                     16:43:45

19    communication.                                            16:43:50

20            Can we just streamline this, are you               16:43:51

21    willing to agree that all questions up to a point          16:43:54

22    where you say "the agreement is off," are --               16:43:58

23            MR. PETROCELLI:  Yes.                              16:44:03

24            MR. KENDALL:  -- answerable without                16:44:04

25    constituting a waiver?                                     16:44:08
```

MARC  TOBEROFF - 9/18/2012

Page 250

```
 1            MR. PETROCELLI:  Yes, as we discussed at          16:44:09
 2    the outset, because I pointed out to you that there       16:44:10
 3    may be information in the answer that might provide       16:44:13
 4    additional bases for arguments, but not the giving        16:44:17
 5    of the answer is not going to be used against you as      16:44:20
 6    a ground for waiver.                                      16:44:23
 7            THE WITNESS:  I don't understand that             16:44:27
 8    distinction.                                              16:44:27
 9    BY MR. PETROCELLI:                                        16:44:28
10       Q.  If you said to me, "I discussed it with           16:44:28
11    your partner, Matt Kline, you know, ten years            16:44:30
12    ago" --                                                   16:44:32
13       A.  I did.  He's actually on all of this.             16:44:32
14            MR. PETROCELLI:  So can we go back to the        16:44:39
15    examination?                                              16:44:41
16            MR. KENDALL:  I think that works.  But I         16:44:42
17    just want to be clear that what you're agreeing is       16:44:45
18    that until you say otherwise, these questions will       16:44:48
19    not constitute a waiver.                                  16:44:55
20            MR. PETROCELLI:  His giving of the answers,      16:44:56
21    yes, that's correct.                                      16:44:58
22       Q.  In any event, let's go back to where we          16:45:00
23    were.  I asked you if you had discussed this subject    16:45:02
24    of the Shusters having no termination interest with     16:45:06
25    Peary, you said yes, and now I'm asking you whether     16:45:10
```

MARC   TOBEROFF - 9/18/2012

Page 251

1    you had any written communications with him on that        16:45:13

2    subject?                                                    16:45:14

3        A.   I don't believe it was in writing.                16:45:15

4        Q.   And the verbal communications that you had        16:45:15

5    with him, did you have such communications with him        16:45:18

6    prior to your serving Exhibit 11, the November 8,          16:45:24

7    2002 Superboy notice of termination?                       16:45:31

8        A.   I believe so, yes.                                 16:45:35

9        Q.   Can you date those communications?                16:45:37

10        A.   No.                                               16:45:38

11        Q.   They were telephonic?                            16:45:41

12        A.   Yes.                                              16:45:42

13        Q.   And you reviewed various materials on which      16:45:45

14    you formed the -- the basis for your conclusion?          16:45:50

15        A.   Yes.                                              16:45:53

16        Q.   Okay.  What materials inform that view that      16:45:55

17    you reviewed?                                              16:46:01

18        A.   Well, I can --                                   16:46:03

19            MR. KENDALL:  That would seem to call for         16:46:05

20    work product.                                             16:46:06

21            THE WITNESS:  But we have -- I think we've        16:46:07

22    already stated in our briefs what that's based on.        16:46:12

23            MR. KENDALL:  Okay.                               16:46:17

24            THE WITNESS:  So without any additional           16:46:18

25    waiver to anything you can claim --                       16:46:19

MARC  TOBEROFF - 9/18/2012

Page 252

```
 1            MR. KENDALL:  We have that understanding.     16:46:21
 2   I just --                                              16:46:22
 3            THE WITNESS:  Okay.  So -- so the materials    16:46:23
 4   were the 1947 findings of facts and conclusions of     16:46:26
 5   law regarding Superboy, and the 1974 Second Circuit    16:46:32
 6   opinion holding that those findings in the 1947        16:46:41
 7   Westchester actions were preclusive and binding on     16:46:48
 8   the parties and their successors.                      16:46:51
 9   BY MR. PETROCELLI:                                     16:46:53
10       Q.  Did you -- do you know whether Mr. Peary       16:46:53
11   received any independent legal advice on that          16:46:59
12   subject that is independent of you?                    16:47:02
13       A.  I have no idea.                                16:47:06
14       Q.  Do you know of anybody who actually gave       16:47:07
15   him any independent advice on that subject?            16:47:10
16       A.  I don't know.                                  16:47:14
17       Q.  When you -- did you form -- you cannot give    16:47:23
18   me even a month when you formed this view about        16:47:31
19   Superboy?                                              16:47:34
20       A.  I really -- I can't.  I have specific          16:47:36
21   recollections of a conversation, but I don't have a    16:47:42
22   specific recollection tying -- tying it to a month     16:47:46
23   or a time.                                             16:47:55
24       Q.  What did -- what did Mr. Peary say to you      16:47:56
25   when you had this discussion with him?                 16:47:58
```

EXHIBIT 3
344

MARC  TOBEROFF - 9/18/2012

Page 253

```
 1        A.  That's privileged.                          16:48:02

 2        Q.  Did -- did you discuss this subject with    16:48:04

 3   the Siegels that --                                   16:48:14

 4        A.  Yes.                                         16:48:17

 5        Q.  Did you obtain a written conflict of        16:48:17

 6   interest waiver of any kind from the Shusters with   16:48:22

 7   regard to this subject?                              16:48:30

 8        A.  Yes.  I believe I did.                       16:48:32

 9        Q.  When was that?                              16:48:34

10        A.  I believe it was in -- later in -- on in    16:48:37

11   2008.                                                16:48:47

12        Q.  Did you get a conflict of interest waiver   16:48:51

13   on this subject from the Siegels?                    16:48:53

14        A.  I believe so.  I'd have to check.  I know I 16:48:56

15   had a conflict of interest with the Siegels when we  16:49:03

16   entered into the IP.                                 16:49:05

17        MR. KENDALL:  I think you may have              16:49:07

18   misspoken.  You said you know you have a conflict of 16:49:09

19   interest.  Did you mean waiver?                      16:49:12

20        THE WITNESS:  Conflict of interest waiver.      16:49:13

21   I know I have a conflict of interest waiver, a       16:49:15

22   conflict waiver, I'll call it, with the Siegels when 16:49:17

23   we entered into the IP Worldwide agreement, and then 16:49:21

24   again when we filed the Siegel action in 2004.  And  16:49:28

25   I would have to check, but I wouldn't be surprised    16:49:36
```

**EXHIBIT 3**
**345**

MARC   TOBEROFF - 9/18/2012

Page 254

```
 1    if they encompassed Superboy.                        16:49:42

 2    BY MR. PETROCELLI:                                    16:49:42

 3       Q.  They're not specific to Superboy, you're      16:49:51

 4    saying?                                               16:49:53

 5       A.  No.  Not just about Superboy.                  16:49:55

 6       Q.  The 2008 --                                    16:49:56

 7       A.  When you say "not specific to Superboy,"       16:49:58

 8    you mean to the exclusion of other things?            16:49:59

 9       Q.  Correct.                                       16:50:02

10       A.  No.                                            16:50:02

11       Q.  Do they call out Superboy specifically?       16:50:03

12       A.  That's what I -- I -- I would say I would      16:50:05

13    not be surprised if they do, or -- but I don't        16:50:08

14    know -- I can't answer you specifically whether they  16:50:13

15    do or not.                                            16:50:15

16       Q.  The --                                         16:50:15

17          MR. KENDALL:  You shouldn't be speculating      16:50:16

18    without -- without knowledge as to what's actually    16:50:19

19    in the document.                                      16:50:21

20          THE WITNESS:  That's true.                      16:50:22

21          MR. KENDALL:  Just for -- one moment.           16:50:22

22          Fritz, could you just tell us where we are      16:50:24

23    on time?                                              16:50:26

24          THE VIDEOGRAPHER:  Yes.  5:39 has been the      16:50:27

25    time on the record to this point.                     16:50:36
```

MARC  TOBEROFF - 9/18/2012

Page 255

```
 1            MR. KENDALL:  Thank you.              16:50:38

 2            MR. PETROCELLI:  We will go to seven hours   16:50:38

 3    today, but it will come as no surprise to you that I  16:50:40

 4    will be seeking more time to complete the           16:50:42

 5    examination, and we can talk about that some other  16:50:44

 6    point not on the record.                            16:50:47

 7            THE WITNESS:  And it actually does come as   16:50:48

 8    a surprise to me.                                   16:50:50

 9    BY MR. PETROCELLI:                                  16:50:50

10        Q.  Okay.                                       16:50:51

11        A.  Even for you.                               16:50:54

12        Q.  So let's go back to where we were.          16:50:56

13            The 2008 conflict waiver, was that specific  16:50:57

14    to Superboy?                                        16:51:01

15        A.  No.                                         16:51:02

16        Q.  Is that the same document as the consent    16:51:10

17    agreement?                                          16:51:13

18        A.  No.                                         16:51:13

19        Q.  So in 2008, you have a conflict waiver with  16:51:14

20    the Shusters, correct?                              16:51:20

21        A.  Yes.                                        16:51:20

22        Q.  And do you have a separate conflict waiver  16:51:26

23    in 2008 with the Siegels?                           16:51:29

24        A.  Yes.                                        16:51:31

25        Q.  That you executed at around the same time   16:51:33
```

MARC  TOBEROFF - 9/18/2012

Page 256

```
 1   as the Shusters?                                     16:51:36

 2       A.  Yes.                                          16:51:37

 3       Q.  Is that the same document?                    16:51:37

 4       A.  I don't know.                                 16:51:38

 5       Q.  In other words, did both sides or both        16:51:39

 6   families sign the same conflict waiver?               16:51:41

 7       A.  I don't know.  I believe they were            16:51:46

 8   separate.                                             16:51:48

 9           MR. PETROCELLI:  Do you have it?  Okay.       16:51:54

10       Q.  When the -- how many agreements are you       16:52:04

11   aware of that both the Siegels and the Shusters       16:52:18

12   together have signed, either in counterpart or on     16:52:22

13   the same piece of paper, but were the parties to the  16:52:29

14   same agreement?                                       16:52:31

15       A.  One.                                          16:52:32

16       Q.  That's the 2008 consent agreement?            16:52:33

17       A.  Yes.                                          16:52:35

18       Q.  Okay.  Other than they may have signed a      16:52:36

19   conflict waiver as well, but you're not sure about    16:52:43

20   that, right?                                          16:52:46

21       A.  You mean if they signed together?             16:52:49

22       Q.  Right.                                        16:52:51

23       A.  I don't -- I don't believe they signed        16:52:51

24   together, but I would have to check that.             16:52:54

25       Q.  Did Mr. Peary tell you when you informed      16:53:02
```

MARC  TOBEROFF - 9/18/2012

Page 257

```
 1    him of your view regarding the fact that the           16:53:05

 2    Shusters had no termination rights or interest in      16:53:12

 3    Superboy, that he needed time to think about that      16:53:14

 4    and do some independent research or talk to            16:53:17

 5    somebody, or did he tell you that was not an issue     16:53:19

 6    or -- of concern to him right when you told him?       16:53:25

 7              MR. KENDALL:  Objection.                      16:53:28

 8              THE WITNESS:  Privileged.                     16:53:28

 9              MR. KENDALL:  Privileged.  And compound.      16:53:29

10    And argumentative.                                      16:53:31

11    BY MR. PETROCELLI:                                      16:53:31

12         Q.  At the time that you told him this, the PPC   16:53:39

13    agreements were in effect, correct?                    16:53:43

14              MR. KENDALL:  Just a moment.                  16:53:44

15    BY MR. PETROCELLI:                                      16:53:44

16         Q.  The first PPC agreement was in effect          16:53:46

17    because you said you told him prior to 2001, right?    16:53:48

18    Prior to serving the termination notice in             16:53:51

19    November 2002, correct?                                 16:53:53

20         A.  It was after the first PPC agreement.          16:53:55

21         Q.  When -- in 2003 -- well, you served a          16:54:02

22    termination notice for the Shusters in 2003 after      16:54:08

23    the estate was set up, correct?                        16:54:12

24         A.  Yes.                                           16:54:12

25         Q.  And the executor was appointed and -- and     16:54:17
```

**EXHIBIT 3**
**349**

MARC   TOBEROFF - 9/18/2012

Page 258

```
 1    all that, right?                                    16:54:21
 2        A.  Yes.                                        16:54:22
 3        Q.  And that notice of termination did not      16:54:22
 4    extend to Superboy, correct?                        16:54:27
 5        A.  No.                                          16:54:27
 6        Q.  That's incorrect?                            16:54:35
 7        A.  When you say "extend to Superboy," I -- I    16:54:36
 8    would answer as follows:  In a notice of             16:54:45
 9    termination, you list the grant that's being         16:54:48
10    terminated and you list the works to which the       16:54:49
11    copy -- you list the works transferred by those      16:55:00
12    grants or the copyrights, the copyrights that were   16:55:03
13    transferred to -- I'm not stating this properly.     16:55:07
14        Q.  No.                                          16:55:10
15        A.  You list -- you list the -- not just -- I    16:55:11
16    don't want to use it too broadly.                    16:55:13
17            You don't list the affected works.  The      16:55:15
18    central focus is you terminate -- you don't          16:55:19
19    terminate works, you terminate a grant.  The grant   16:55:22
20    granted what?  The grant granted copyrights in       16:55:24
21    works.                                               16:55:27
22            So you list -- would list those works.  So   16:55:27
23    to that extent, no, the termination would have no    16:55:31
24    effect.  The termination did not list Superboy.      16:55:35
25        Q.  Okay.                                        16:55:40
```

MARC   TOBEROFF - 9/18/2012

Page 259

```
 1          A.  But there's a longer legal answer to that.    16:55:40
 2          Q.  You were -- in serving that notice of         16:55:46
 3    termination, you had already concluded that the         16:55:49
 4    Shusters had no termination interest in Superboy,        16:55:52
 5    correct?                                                 16:55:52
 6              MR. KENDALL:  Asked and answered.              16:55:56
 7              THE WITNESS:  In serving the Superboy          16:55:57
 8    termination?                                             16:56:01
 9    BY MR. PETROCELLI:                                       16:56:01
10          Q.  No, in serving the Shuster termination        16:56:02
11    notice in 2003, by then you had already concluded       16:56:05
12    that the Shusters had no termination interests to       16:56:08
13    Superboy?                                                16:56:11
14              MR. KENDALL:  Asked and answered.              16:56:11
15              THE WITNESS:  Not -- not specifically, no.     16:56:12
16    BY MR. PETROCELLI:                                       16:56:12
17          Q.  I'm correct.  Is that right?  You already     16:56:15
18    reached that view as early as November of 2002,         16:56:19
19    right?                                                   16:56:22
20          A.  Yes.                                           16:56:22
21          Q.  Okay.  Did you document in any --             16:56:23
22          A.  I need to --                                   16:56:31
23              MR. KENDALL:  I think the record is a          16:56:31
24    little garbled.                                          16:56:33
25              Could I ask the reporter to read back the     16:56:34
```

**EXHIBIT 3**
**351**

MARC  TOBEROFF - 9/18/2012

Page 260

```
 1    last three questions and answers.                          16:56:37

 2                 (The reporter read the record                 16:56:37

 3           as follows:                                         16:56:37

 4                 "QUESTION:  You were -- in                     16:55:46

 5           serving that notice of termination,                 16:55:48

 6           you had already concluded that the                  16:55:50

 7           Shusters had no termination                         16:55:52

 8           interest in Superboy, correct?                      16:55:55

 9                 "MR. KENDALL:  Asked and answered.            16:55:56

10                 "THE WITNESS:  In serving the Superboy        16:55:57

11           termination?                                        16:56:01

12                 "QUESTION:  No, in serving the                16:56:02

13           Shuster termination notice in 2003, by             16:56:04

14           then you had already concluded that                16:56:06

15           the Shusters had no termination interests          16:56:08

16           to Superboy?                                        16:56:11

17                 "MR. KENDALL:  Asked and answered.            16:56:11

18                 "THE WITNESS:  Not -- not                      16:56:12

19           specifically, no.                                   16:56:13

20                 "QUESTION:  I'm correct.                       16:56:15

21           is that right?  You already reached                 16:56:16

22           that view as early as November of                   16:56:19

23           2002, right?                                        16:56:21

24                 "ANSWER:  Yes.")                               16:56:22

25                 THE WITNESS:  Okay.  I think just hearing      16:57:25
```

MARC  TOBEROFF - 9/18/2012

Page 261

```
 1    that, I couldn't -- I couldn't follow it.  I think      16:57:26
 2    there's maybe confusion between the Shuster Superman     16:57:28
 3    termination notice and the Siegel Superboy              16:57:33
 4    termination notice.                                     16:57:36
 5    BY MR. PETROCELLI:                                      16:57:36
 6        Q.  I wasn't -- I thought that they were very       16:57:39
 7    clear to me, so I have no reason to follow up on        16:57:42
 8    them.                                                   16:57:44
 9            THE WITNESS:  Okay.  Well, can you read          16:57:45
10    me -- read them back again so to the extent I mixed     16:57:47
11    the two up, I'm answering correctly?                    16:57:50
12                (The reporter read the record               16:57:50
13            as follows:                                     16:57:50
14                "QUESTION:  You were -- in                   16:55:46
15            serving that notice of termination,             16:55:48
16            you had already concluded that the             16:55:50
17            Shusters had no termination                     16:55:52
18            interest in Superboy, correct?")                16:55:55
19            THE WITNESS:  And what's the question            16:55:55
20    before that?                                            16:55:55
21            MR. KENDALL:  You can look at it on here,        16:55:55
22    maybe that will be easier.                              16:59:24
23            MR. PETROCELLI:  Have you concluded looking      16:59:24
24    at that on the Livenote so I can resume questioning     16:59:25
25    you?                                                    16:59:28
```

MARC  TOBEROFF - 9/18/2012

Page 262

```
 1            THE WITNESS:  I'm just studying it.  Okay.     16:59:30

 2   BY MR. PETROCELLI:                                      16:59:30

 3      Q.  Okay?  Let me direct your attention to           16:59:50

 4   Exhibit 20.  This is a -- an agreement --               16:59:53

 5      A.  I need -- are you referring to --                17:00:07

 6      Q.  New exhibit.  I'm going to hand it to you.       17:00:10

 7   This is --                                              17:00:12

 8      A.  Excuse me.  I need to get some water.  I'm       17:00:13

 9   feeling kind of tired.                                  17:00:16

10            MR. PETROCELLI:  Let's take a short break,     17:00:20

11   please.                                                 17:00:23

12            THE VIDEOGRAPHER:  Off the record.  The        17:00:23

13   time is 5:00 o'clock.                                   17:00:24

14            (Brief recess.)                                17:00:28

15            THE VIDEOGRAPHER:  Back on the record at       17:05:59

16   5:06.                                                   17:06:10

17              (The documents referred to

18              were previously marked for

19              identification as Exhibit 20 and 21

20              and is attached to this

21              deposition.)

22   BY MR. PETROCELLI:

23      Q.  Mr. Toberoff, you have Exhibit 20 in front      17:06:11

24   of you, which is a -- a letter agreement with Warren    17:06:15

25   and Jean to the effect that the joint venture           17:06:24
```

MARC  TOBEROFF - 9/18/2012

Page 263

```
 1    agreement of November 2001 and the engagement          17:06:33

 2    agreement of October 2003 are being canceled.          17:06:38

 3              Do you see that?                              17:06:38

 4         A.  Yes.                                           17:06:38

 5         Q.  And then Exhibit 21 is a redacted letter      17:06:52

 6    agreement regarding engagement for professional        17:06:55

 7    services that is dated as of November 23, 2001.        17:06:57

 8              Do you see that?                              17:07:02

 9         A.  Yes.                                           17:07:05

10         Q.  And do you know when that was actually        17:07:07

11    created and signed?                                    17:07:12

12         A.  Sometime in 2004.                             17:07:18

13         Q.  Was it at or about the time of the            17:07:24

14    September 10, 2004 cancellation agreement, Exhibit     17:07:28

15    20?                                                    17:07:32

16         A.  Yes.                                          17:07:32

17         Q.  Okay.  Were these essentially prepared in     17:07:33

18    tandem, Exhibit 20 and 21?                             17:07:37

19         A.  I believe, yes.                               17:07:39

20         Q.  Okay.  By the time you --                     17:07:42

21         A.  Let me see if there's a date on this         17:07:49

22    retainer.                                              17:07:51

23              MR. PETROCELLI:  Is there a date on this?    17:07:52

24    No?                                                    17:07:55

25              THE WITNESS:  When they signed it.           17:07:55
```

MARC  TOBEROFF - 9/18/2012

Page 264

```
 1          MR. PETROCELLI:  We don't see a date on it.     17:08:08

 2      Q.  By the time that you executed Exhibit 20,        17:08:11

 3  the September 10, 2004 agreement, had you come to        17:08:18

 4  the view that the transfers set forth in the 2001        17:08:30

 5  agreement were void ab initio?                           17:08:35

 6      A.  I believe by 2- -- I believe by                  17:08:40

 7  September of 2004, I would have known that.              17:08:49

 8      Q.  Is that one of the reasons why the               17:08:54

 9  agreement was canceled?                                  17:08:58

10      A.  I don't -- I think there was -- it could         17:09:07

11  have been.  I don't want to speculate, but I don't       17:09:11

12  have a specific recollection of focusing on that.        17:09:15

13  My specific recollection is that I wasn't                17:09:23

14  comfortable with the form of the agreement to begin      17:09:29

15  with.  That's why I had it reviewed.  And even after     17:09:32

16  I had the new form of agreement, I -- even though        17:09:37

17  that -- and again, without waiver of the                 17:09:43

18  attorney-client relationship with the Jackoway firm,     17:09:46

19  I wasn't really comf- -- entirely comfortable with       17:09:50

20  that, either, and then just replaced it by a             17:09:55

21  retainer agreement, which coincided with the fact        17:10:00

22  that learning more about the termination rights,         17:10:05

23  feeling that everything surrounding Superman was in      17:10:11

24  anticipation of litigation, and -- and that it was       17:10:20

25  just a bad fit between how I used to do business         17:10:26
```

**EXHIBIT 3**
**356**

MARC  TOBEROFF - 9/18/2012

Page 265

```
 1    starting with that 2001 form of agreement and even        17:10:29

 2    under the 2003 agreement it was just simpler to have      17:10:33

 3    a simple retainer.                                        17:10:39

 4          And the idea was to replace -- to cancel           17:10:40

 5    and replace that agreement with this retainer             17:10:42

 6    agreement.  That's why it was both dated as of the        17:10:44

 7    exact same date.                                          17:10:47

 8       Q.  Was it prepared, that is Exhibit 20 and           17:10:49

 9    Exhibit 21, at or about the time of commencement of       17:10:56

10    litigation in the Siegel case?                            17:10:58

11       A.  I think it was prepared before that.              17:11:04

12       Q.  The Siegel litigation was in October 2004?        17:11:05

13       A.  When we filed the Siegel lawsuit?                 17:11:07

14       Q.  Yes.                                               17:11:13

15       A.  It was either October or November.  I -- I        17:11:13

16    would -- it would be helpful to know the date when I      17:11:16

17    entered into the Siegel litigation retainer               17:11:20

18    agreement.  I didn't know whether that was -- if          17:11:22

19    that was around September 10, 2004.                       17:11:29

20       Q.  Take a look at that document which has also       17:11:37

21    been produced to us in redacted form.  It's dated         17:11:40

22    October 3, 2004.                                          17:11:43

23          THE WITNESS:  October 3, 2004?                     17:11:48

24          MR. PETROCELLI:  Yeah.  That will be marked        17:11:50

25    as Exhibit 103.                                           17:11:51
```

**EXHIBIT 3**
**357**

MARC  TOBEROFF - 9/18/2012

Page 266

```
  1            (The document referred to was       17:11:52

  2            marked for identification by the     17:11:52

  3            C.S.R. as Exhibit 103 and attached   17:11:52

  4            to this deposition.)                 17:11:58

  5       MR. PETROCELLI:  We'll hand you that as   17:11:58

  6  well.                                          17:12:00

  7       Q.  What was the reason --                17:12:13

  8       A.  So -- so --                           17:12:14

  9       Q.  I'm sorry, go ahead.                  17:12:16

 10       A.  What was -- wasn't there a question pending  17:12:17

 11  where we were trying to date something?       17:12:19

 12       Q.  Whether you entered into the -- these  17:12:20

 13  agreements, Exhibit 20 and 21 with the Shusters at  17:12:24

 14  or about the time you commenced litigation on behalf  17:12:28

 15  of the Siegels.                               17:12:31

 16            You said you wanted to see the engagement  17:12:33

 17  letter with the Siegels.                      17:12:36

 18       A.  It was -- it was before.  So the Siegel  17:12:37

 19  agreement is -- it's dated October 3, 2004, and it  17:12:39

 20  was signed on October 3, 2004, which means it would  17:12:45

 21  have been negotiated beforehand.              17:12:54

 22            And the -- this was probably signed on  17:12:56

 23  September 10, 2004, the same time this agreement --  17:13:01

 24  cancellation, so there was no doubling up of fees,  17:13:06

 25  and -- so I believe the anticipation of litigation  17:13:09
```

**EXHIBIT 3**
**358**

MARC  TOBEROFF - 9/18/2012

Page 267

```
 1    in the Siegel matter -- I think the litigation        17:13:24
 2    surrounding the Siegel matter always impacted the     17:13:32
 3    Shuster matter.                                        17:13:34
 4        Q.  Is there any -- was there any part of your    17:13:39
 5    new arrangement with the Shusters starting in or      17:13:49
 6    about September 10, 2004, that prevented -- that      17:13:52
 7    required them to get the consent of you, the Siegels  17:14:00
 8    or anybody else to consummate a settlement?           17:14:05
 9        A.  No.  That aspect of the 2001, 2003 PPC        17:14:09
10    agreements does not exist in the retainer agreement.  17:14:19
11        Q.  Okay.  And to be clear about that, if you     17:14:25
12    take a look at Exhibit 21 you'll see that there are   17:14:26
13    some redactions, including paragraphs 7 and 8 in      17:14:31
14    their entirety.                                        17:14:37
15        A.  Right.                                         17:14:42
16        Q.  Are you certain that there is no provision    17:14:42
17    in the unredacted agreement that pertain to the       17:14:45
18    Shusters' need for consent of someone else in order   17:14:51
19    to make a settlement?                                  17:14:55
20        A.  To be 100 percent certain, I would have to    17:14:57
21    look at the unredacted agreement, but I don't         17:15:02
22    believe that would be in here.                         17:15:05
23        Q.  And the same question for Exhibit 103, the    17:15:08
24    Siegel retainer agreement, are you certain it         17:15:13
25    contained no provisions requiring the consent of      17:15:19
```

MARC  TOBEROFF - 9/18/2012

Page 268

```
 1   others to consummate a settlement?                     17:15:24

 2       A.  I don't believe that had any requirement of    17:15:26

 3   any other consent than Joanna and Laura to a           17:15:37

 4   settlement.                                             17:15:44

 5       Q.  Any such requirement --                         17:15:44

 6       A.  I don't believe the Shuster retainer            17:15:46

 7   agreement has that also.  But in your -- your -- I      17:15:48

 8   don't have the unredacted agreement in front of me     17:15:56

 9   to verify that.                                         17:15:59

10       Q.  And that requirement after 2004, the first     17:16:00

11   time that requirement came into existence was in       17:16:06

12   2008 when the parties signed the consent agreement?    17:16:08

13           MR. KENDALL:  What requirement?                17:16:14

14           MR. PETROCELLI:  The requirement for the       17:16:15

15   consent of another to consummate a settlement.         17:16:16

16           THE WITNESS:  Well, again, we're getting       17:16:23

17   into an area of where we assert a privilege, and       17:16:25

18   privilege has been upheld, so my answer is without     17:16:27

19   waiver of privilege, same agreement, correct?          17:16:30

20   BY MR. PETROCELLI:                                     17:16:30

21       Q.  Yes.                                            17:16:33

22       A.  Okay.  And I'm also discussing what has        17:16:33

23   already been disclosed, which is essentially -- and    17:16:37

24   now I've forgotten the question.  So I prepared -- I   17:16:41

25   prepared the record to answer the question.            17:16:45
```

**EXHIBIT 3**
**360**

MARC  TOBEROFF - 9/18/2012

Page 269

```
 1          Q.  My question was the first time that a        17:16:46
 2    requirement for the consent of another to consummate  17:16:48
 3    a settlement was 2008, after the 2004 agreements?     17:16:51
 4          A.  With respect to the Siegels and Shusters?    17:16:57
 5          Q.  Yes.  Correct.                               17:16:57
 6          A.  Yes.                                         17:16:57
 7          Q.  Is the consent --                            17:17:01
 8          A.  But I would answer that more specifically,   17:17:10
 9    it's not the consent of another.  You're technically  17:17:13
10    correct, but it's basically mutual consent of the     17:17:15
11    Siegels and Shusters to a settlement of their         17:17:19
12    termination interests.                                17:17:21
13          Q.  Did they receive --                          17:17:22
14          A.  Not my consent.                             17:17:25
15          Q.  Your consent is not required at all?        17:17:28
16          A.  Absolutely not.                             17:17:30
17          Q.  And not any entity associated with you?     17:17:31
18          A.  Correct.                                     17:17:34
19          Q.  Okay.  And no third party, it's just the    17:17:34
20    Siegels and the Shusters?                              17:17:39
21          A.  Correct.                                     17:17:39
22          Q.  Okay.  Is -- is it both Mark --             17:17:40
23          A.  And -- and --                                17:17:51
24          Q.  -- Warren Peary and Jean?                   17:17:53
25          A.  I was just about to say that the -- the     17:17:54
```

MARC  TOBEROFF - 9/18/2012

Page 270

```
 1    consent, I believe, is the executor.            17:17:58

 2        Q.  On the Shuster side?                     17:18:04

 3        A.  I believe so.                            17:18:05

 4        Q.  And on the Siegel side?                  17:18:08

 5        A.  I'm not 100 percent certain.             17:18:09

 6            On the Siegel side it was Laura and Joanne.  17:18:11

 7        Q.  Now it's just Laura?                     17:18:14

 8        A.  Correct.                                 17:18:15

 9        Q.  Did -- you said that there was a conflict  17:18:19

10    waiver signed by Peary in or about 2008, I believe?  17:18:24

11        A.  Yes.                                     17:18:34

12        Q.  What prompted that?                      17:18:35

13        A.  The consent agreement.                   17:18:35

14            MR. KENDALL:  Just a minute.  I think we're  17:18:37

15    getting into a slightly different area.          17:18:38

16            So, again, I just want to caution you on  17:18:40

17    privilege.  And I assume we have the same        17:18:43

18    understanding, that it will not be a waiver, so  17:18:47

19    you'll just have to make a determination whether  17:18:49

20    you -- you want to provide this information since it  17:18:51

21    may be privileged.                               17:18:55

22            MR. PETROCELLI:  I believe he answered the  17:18:56

23    question.  He said "the consent agreement."      17:18:58

24            MR. KENDALL:  So he did, but that's because  17:19:06

25    he didn't give me an opportunity to object first and  17:19:07
```

**EXHIBIT 3**
**362**

MARC  TOBEROFF - 9/18/2012

Page 271

```
 1    give him a caution first.                      17:19:10
 2    BY MR. PETROCELLI:                             17:19:10
 3        Q.  Do you know whether the Shusters received   17:19:12
 4    independent legal advice regarding the conflict    17:19:16
 5    waiver or the consent agreement?               17:19:22
 6        A.  I don't know whether they did or did not.   17:19:23
 7        Q.  And do you know whether the Siegels did?    17:19:27
 8        A.  I believe the Siegels did.              17:19:32
 9        Q.  Do you know the name of the attorney?   17:19:34
10        A.  George Zadorozny.                       17:19:35
11        Q.  George Zadorozny?                       17:19:40
12        A.  And I don't -- they may have -- I know that   17:19:42
13    whenever it came to something like that, they would   17:19:46
14    run it by George Zadorozny and/or George Zadorozny   17:19:48
15    and Arthur Levine or just George Zadorozny.    17:19:54
16        Q.  Did you send copies of the consent     17:19:58
17    agreement to George or Arthur?                 17:20:00
18        A.  No, that wasn't the practice.          17:20:06
19        MR. KENDALL:  Marc, take your hand away    17:20:08
20    from your face because it interferes with the   17:20:09
21    projection of your voice.                      17:20:12
22        THE WITNESS:  Okay.                        17:20:13
23    BY MR. PETROCELLI:                             17:20:13
24        Q.  It also detracts from your -- your     17:20:16
25    appearance.                                    17:20:18
```

**EXHIBIT 3**
**363**

MARC  TOBEROFF - 9/18/2012

Page 272

```
 1        A.  Sophisticated demeanor.                    17:20:18

 2        Q.  I know you said that Zadorozny would be     17:20:23

 3   involved in certain matters.                         17:20:28

 4        A.  "Zadorozny."                                17:20:30

 5        Q.  "Zadorozny."                                17:20:31

 6        A.  Yeah.                                        17:20:31

 7        Q.  Do you know for certain if he was involved  17:20:34

 8   in the -- for the Siegels with respect to the 2008   17:20:37

 9   consent agreement?                                   17:20:45

10        A.  Not 100 percent certain, but that's my      17:20:46

11   belief.                                              17:20:50

12        Q.  Did the Siegels --                          17:20:53

13        A.  Put it another way, I would be very         17:20:53

14   surprised if he was not.                             17:20:55

15        Q.  Did the Siegels also sign a conflict waiver 17:20:56

16   in 2008?                                             17:20:59

17        A.  Yes.                                        17:21:00

18        Q.  Do you know if he was involved in that      17:21:00

19   document?                                            17:21:01

20        A.  I thought you just asked me that.           17:21:05

21        Q.  I asked you about the consent agreement.    17:21:07

22        A.  Oh, okay.                                   17:21:09

23        Q.  Did you --                                  17:21:10

24        A.  Two separate documents, yeah.               17:21:11

25            So consent agreement, it would be the same  17:21:12
```

MARC  TOBEROFF - 9/18/2012

Page 273

```
 1    answer for both.                                          17:21:14

 2         Q.  There are two documents that the Siegels        17:21:16

 3    signed in 2008?                                          17:21:18

 4         A.  Yes.                                            17:21:19

 5         Q.  Okay.                                           17:21:19

 6         A.  And -- and now that you ask it that way, I      17:21:19

 7    have even -- I -- I think it's even -- it's even         17:21:23

 8    more likely that Zadorozny was involved with the --     17:21:29

 9    with respect to the consent agreement, yes, and         17:21:35

10    since there were two agreements, including a            17:21:39

11    conflict waiver -- a conflict waiver and a consent      17:21:43

12    agreement, I believe he was involved in reviewing       17:21:46

13    those.                                                  17:21:47

14         Q.  And Zadorozny was involved in reviewing the    17:21:48

15    2004 retainer agreement with Joanne and Laura?          17:21:51

16         A.  Yes.                                            17:21:55

17         Q.  Why did you date the engagement for            17:22:00

18    professional services that you signed with Warren in    17:22:05

19    2004 as of November 23, 2001?                           17:22:08

20         A.  Two reasons.  One, I wanted to make it         17:22:13

21    clear that this agreement was replacing the PPC         17:22:15

22    agreements and two, I wanted -- it was -- it was        17:22:19

23    like an assertion of privilege over our                 17:22:27

24    relationship, attorney-client relationship             17:22:33

25    commencing at the latest on November 23rd, 2001 when    17:22:37
```

1    we signed the PPC agreement.                                    17:22:42

2         Q.  When you signed the -- excuse me.  Are you             17:22:45

3    a signatory to the consent agreement?                          17:22:50

4         A.  Only as to approval as to form.                       17:22:52

5         Q.  Okay.  Did you receive independent legal              17:22:59

6    advice?  Did you receive legal advice regarding that           17:23:03

7    subject whether the Siegels and Shusters could sign            17:23:06

8    a consent agreement without violating some law,                17:23:14

9    including the copyright statute?                               17:23:19

10        MR. KENDALL:  So that may call for                        17:23:21

11   privileged information given the specificity of the            17:23:23

12   question.  I just caution you not to reveal any                17:23:26

13   attorney-client communications you may have had with           17:23:31

14   anyone who was acting as your counsel or providing             17:23:34

15   legal advice.                                                  17:23:37

16        THE WITNESS:  But I can answer outside                    17:23:46

17   of -- I can answer whether or not -- revealing                 17:23:53

18   whether or not I did is not --                                 17:23:56

19        MR. KENDALL:  If the answer is no, then                   17:23:57

20   you're not revealing any attorney-client                      17:23:59

21   communication.  If the answer is yes, then you might           17:24:01

22   be, and so then you have to make a judgment as to              17:24:06

23   whether you wish to reveal that.                               17:24:08

24        THE WITNESS:  Not -- not any -- not outside               17:24:12

25   of my firm.                                                    17:24:15

MARC  TOBEROFF - 9/18/2012

Page 275

```
 1   BY MR. PETROCELLI:                                    17:24:15

 2       Q.  Okay.  Okay.  Let's -- let's go back now to    17:24:17

 3   2002.                                                  17:24:30

 4           You earlier in the deposition indicated        17:24:56

 5   that you spoke to Kevin Marks in February '02, and     17:25:00

 6   you thought it was clear from the conversation, even   17:25:11

 7   though the words were not used, that there was no      17:25:14

 8   agreement that the Siegels had entered into post       17:25:20

 9   termination, correct?                                  17:25:22

10           MR. KENDALL:  I'm sorry.                       17:25:24

11           MR. PETROCELLI:  Is that a short summary of    17:25:25

12   what we previously discussed?                          17:25:27

13           MR. KENDALL:  One moment for a second.         17:25:29

14   BY MR. PETROCELLI:                                     17:25:29

15       Q.  Just a foundational question to get you       17:25:34

16   back there.                                            17:25:35

17           MR. KENDALL:  Just give me a second.           17:25:36

18           I think it's argumentative and does not       17:25:42

19   accurately state the witness' testimony.  But on      17:25:52

20   your representation that it's just foundational, I     17:25:54

21   think you can answer the question.                     17:25:58

22           THE WITNESS:  So --                            17:26:04

23   BY MR. PETROCELLI:                                     17:26:04

24       Q.  I'm drawing your attention back to that       17:26:05

25   conversation, okay?                                    17:26:08
```

**EXHIBIT 3**
**367**

MARC  TOBEROFF - 9/18/2012

Page 276

```
 1        A.   I -- I recall giving testimony as to that      17:26:09

 2   conversation.                                            17:26:12

 3        Q.   Okay.                                          17:26:12

 4        A.   Whatever it was, it's in the record.           17:26:12

 5        Q.   In -- did you specifically ask Mr. Marks       17:26:15

 6   whether there was any documentation that had been        17:26:31

 7   prepared in connection with a settlement or an           17:26:35

 8   agreement with Warner Bros. or DC?                       17:26:41

 9        A.   I don't recall asking him that.                17:26:43

10        Q.   Did you explain to him why you were            17:26:47

11   speaking to him on the subject?                          17:26:54

12        A.   I believe -- I believe I did.                  17:26:56

13        Q.   What did you say to him?                       17:26:59

14        A.   Let me say it this way.  I don't have a        17:27:04

15   specific -- my specific recollection of the              17:27:07

16   conversation was it was a very short conversation        17:27:09

17   and that he blew me off, and that the gist of the        17:27:12

18   conversation was that he was in negotiations, not        17:27:19

19   that he had reached an agreement.                        17:27:22

20        Q.   Did you call him back again, even though he    17:27:28

21   hadn't returned your phone call?                         17:27:31

22        A.   In February?                                   17:27:37

23        Q.   Yes.                                           17:27:38

24        A.   Yes, I called to check in on him.  I called    17:27:38

25   a second time.                                           17:27:41
```

MARC  TOBEROFF - 9/18/2012

Page 277

```
 1        Q.  And by this time, having had some time        17:27:42

 2   since you entered into the agreement with -- with      17:27:46

 3   Shuster, did you express to him a potential interest   17:27:48

 4   on your part to explore buying out the Siegel          17:27:52

 5   interests?                                             17:27:57

 6            MR. KENDALL:  Just a moment.  Okay.           17:27:58

 7            THE WITNESS:  I don't believe that in         17:28:02

 8   February the conversation even got that far.           17:28:10

 9   BY MR. PETROCELLI:                                     17:28:10

10        Q.  Is this -- can you --                         17:28:17

11            MR. TOKORO:  Exhibit 100.                     17:28:21

12   BY MR. PETROCELLI:                                     17:28:21

13        Q.  You have Exhibit 100, which is Mr. Marks'     17:28:22

14   call log?                                              17:28:24

15        A.  Yes.                                          17:28:25

16        Q.  Which -- for February 6, 2002, which says:    17:28:26

17            "Potential buyout (end of                     17:28:31

18            November.)"                                   17:28:37

19        Do you see that?                                  17:28:41

20            MR. KENDALL:  It's page GTRB 0604.            17:28:41

21            MR. PETROCELLI:  Yes, that's correct.         17:28:44

22            THE WITNESS:  What's the page?                17:28:46

23   BY MR. PETROCELLI:                                     17:28:46

24        Q.  Bates number 604.                             17:28:49

25        A.  Okay.                                         17:28:52
```

MARC  TOBEROFF - 9/18/2012

Page 278

| | | |
|---|---|---|
| 1 | Q.  Does looking at that jog your memory that | 17:29:23 |
| 2 | you discussed the potential buyout with him? | 17:29:26 |
| 3 | A.  It doesn't jog a memory, but it -- it | 17:29:28 |
| 4 | suggests that I may have. | 17:29:35 |
| 5 | Q.  At that time -- | 17:29:35 |
| 6 | A.  It says end of November.  That can only | 17:29:39 |
| 7 | refer to the fact he called end of November. | 17:29:41 |
| 8 | Because otherwise reading it literally it's talking | 17:29:46 |
| 9 | about a special buyout in November. | 17:29:48 |
| 10 | Q.  As of February 2002, did you have an | 17:29:51 |
| 11 | interest of exploring a buyout of the Siegel | 17:30:00 |
| 12 | interests? | 17:30:02 |
| 13 | A.  As of what date? | 17:30:02 |
| 14 | Q.  As of early part of 2002. | 17:30:05 |
| 15 | A.  I don't -- I don't -- according to this, I | 17:30:18 |
| 16 | did.  But I don't have a specific recollection of | 17:30:23 |
| 17 | that.  I have a recollection of that -- I have a | 17:30:25 |
| 18 | recollection of him basically blowing me off, no | 17:30:28 |
| 19 | traction to the conversation whatsoever and, you | 17:30:35 |
| 20 | know, him making me feel uncomfortable just staying | 17:30:39 |
| 21 | on the phone.  And that -- that the next time we | 17:30:42 |
| 22 | spoke, you know, closer to early August was when | 17:30:49 |
| 23 | that -- when that topic was broached. | 17:30:55 |
| 24 | Q.  You said earlier today that you got very | 17:30:59 |
| 25 | clearly the impression that there was no deal in | 17:31:05 |

EXHIBIT 3
370

MARC  TOBEROFF - 9/18/2012

Page 279

```
 1   place, correct?                                    17:31:08

 2       A.  Yes.                                        17:31:08

 3       Q.  Did he tell you that negotiations were      17:31:10

 4   ongoing?                                            17:31:12

 5       A.  I -- my impression was that they were in    17:31:19

 6   negotiations.  I don't recall him saying,           17:31:22

 7   "Negotiations are ongoing."                         17:31:25

 8       Q.  When did you first form the view that you   17:31:29

 9   wanted to acquire the rights, the Siegel rights?    17:31:36

10       A.  Sometime in 2002.                           17:31:38

11       Q.  Why did you want to do so?                  17:31:40

12       A.  And it wasn't -- you say -- I would love    17:31:42

13   to -- you say form -- repeat what you just said     17:31:49

14   because I wasn't --                                 17:31:53

15       Q.  When did you decide you wanted to acquire   17:31:54

16   the Siegel rights?                                  17:31:59

17           MR. KENDALL:  Lacks foundation and          17:32:00

18   argumentative.  Assumes facts.                      17:32:01

19           THE WITNESS:  I don't believe I ever made a 17:32:03

20   decision that I personally would like to acquire the 17:32:06

21   Siegel rights.  I didn't have personally the money  17:32:13

22   to acquire the Siegel rights.  I wanted to be       17:32:19

23   associated with the Siegel rights.                  17:32:22

24   BY MR. PETROCELLI:                                  17:32:29

25       Q.  In what capacity?                           17:32:29
```

**EXHIBIT 3**
**371**

MARC  TOBEROFF - 9/18/2012

Page 280

```
 1        A.   In any capacity.  Because I -- I --        17:32:30

 2        Q.   Did you pitch this idea to Ari Emanuel     17:32:33

 3   about an interest in acquiring the Siegel rights?    17:32:39

 4        MR. KENDALL:  I'll just caution you that        17:32:43

 5   when you had communications with Mr. Emanuel at this 17:32:47

 6   time in 2002, you need to consider whether those     17:32:51

 7   were in furtherance of your representation of the    17:32:57

 8   Shusters and consider whether that's privileged.     17:33:07

 9        THE WITNESS:  What was the question?            17:33:28

10   BY MR. PETROCELLI:                                   17:33:28

11        Q.   When did you first broach the idea with Ari 17:33:29

12   Emanuel that he, in concert with you in some         17:33:32

13   capacity, might want to pursue the Siegel interests? 17:33:41

14        MR. KENDALL:  That has the same issue but       17:33:50

15   it also lacks foundation.                            17:33:52

16        THE WITNESS:  Without waiving -- again,         17:33:53

17   without waiving any privilege.                       17:33:56

18        MR. KENDALL:  Let's just make sure              17:33:58

19   Mr. Petrocelli nodded in affirmative that it will    17:34:00

20   not waive.  Correct?                                 17:34:03

21        MR. PETROCELLI:  Yes.                           17:34:03

22        THE WITNESS:  Okay.  First of all, I don't      17:34:04

23   think "pitching" him is the right word from your     17:34:09

24   last question, but made him aware of that there was  17:34:12

25   an opportunity regarding Superman, the Siegel        17:34:17
```

**EXHIBIT 3**
**372**

MARC  TOBEROFF - 9/18/2012

Page 281

```
 1    Superman -- recaptured Siegel Superman copyrights        17:34:22

 2    sometime in 2002.                                        17:34:30

 3          And I would probably -- I don't know the           17:34:33

 4    exact time, sometime between February and when we        17:34:36

 5    spoke in August, and I would -- I believe it's           17:34:39

 6    closer to August than to February.                       17:34:47

 7      Q.  Take a look at Exhibit 60 for a moment.            17:34:49

 8          (The document referred to was                      17:34:55

 9          previously marked for                              17:34:55

10          identification as Exhibit 60 and is                17:34:55

11          attached to this deposition.)                      17:35:01

12    BY MR. PETROCELLI:                                       17:35:01

13      Q.  This is a copy of the memorandum of               17:35:02

14    agreement that you signed with Mr. Emanuel on            17:35:04

15    February 12, 2002.  Exhibit 60, you have that in         17:35:11

16    front of you?                                            17:35:21

17      A.  Yes.                                               17:35:22

18      Q.  And did you --                                    17:35:23

19      A.  Let me just look.  I want to look at what         17:35:24

20    the dates are here.                                      17:35:26

21      Q.  Sure.                                             17:35:28

22          Did you discuss with Mr. Emanuel the              17:35:43

23    potential acquisition of the Siegel rights as of the    17:35:47

24    time that you signed Exhibit 60?                         17:35:52

25      A.  I don't have a recollection of that.             17:35:59
```

**EXHIBIT 3**
**373**

MARC  TOBEROFF - 9/18/2012

Page 282

1        Q.  One way or the other or you don't believe          17:36:02

2   you did?                                                     17:36:04

3        A.  I don't believe I did.                              17:36:04

4        Q.  If you look at page 6 of Exhibit 60, which          17:36:13

5   bears control number EN 00007, do you have that in          17:36:17

6   front of you?                                                17:36:28

7        A.  Yes.                                                17:36:29

8        Q.  It says, "Legal claims" -- under "Appendix          17:36:29

9   1":                                                          17:36:32

10              "Legal Claims/Litigation                         17:36:33

11           (initialed due to confidentiality)                  17:36:35

12           JS claims."                                         17:36:38

13           Do you see that?                                    17:36:40

14        A.  Yes.                                               17:36:40

15        Q.  What does that refer to?                           17:36:42

16        A.  Joseph Shuster claims.                             17:36:44

17        Q.  There was no --                                    17:36:48

18        A.  And more specifically, my pre-existing             17:36:48

19   agreement, 2001 PPC agreement.                              17:36:52

20        Q.  There was no legal claims or litigation at         17:36:57

21   that time, correct?                                         17:37:04

22        A.  It was just a generic way of referring to          17:37:05

23   those agreements as -- you know, as rights of               17:37:09

24   claims.                                                     17:37:13

25        Q.  Now, is there -- you did not --                    17:37:14

MARC  TOBEROFF - 9/18/2012

Page 283

| | | |
|---|---|---|
| 1 | A.  Let me just see the -- if we have the part | 17:37:17 |
| 2 | that refers to Appendix 1. | 17:37:20 |
| 3 | Q.  If you look at the first page of the | 17:37:28 |
| 4 | agreement under B, from "PPC," (a)? | 17:37:30 |
| 5 | A.  Right. | 17:37:38 |
| 6 | Q.  "PPC's current IP business | 17:37:39 |
| 7 | subject to pre-existing | 17:37:42 |
| 8 | commitments and exclusions | 17:37:43 |
| 9 | per Appendix 1"? | 17:37:44 |
| 10 | A.  So PPC had a 2001 agreement with the | 17:37:45 |
| 11 | Shusters.  That's what "JS claims" refers to and -- | 17:37:48 |
| 12 | Q.  Was there any intention to exclude any | 17:37:55 |
| 13 | potential dealings for the acquisition of the Siegel | 17:37:56 |
| 14 | interests at the time that you executed Exhibit 60? | 17:38:06 |
| 15 | A.  I don't believe so. | 17:38:08 |
| 16 | Q.  Okay. | 17:38:10 |
| 17 | A.  But I believe that -- I don't -- in answer | 17:38:10 |
| 18 | to your first question, the reason why I believe | 17:38:15 |
| 19 | that we -- we weren't discussing on this, is because | 17:38:17 |
| 20 | I -- I -- there was obviously an effort to exclude | 17:38:35 |
| 21 | the Shuster claims and I -- I -- I wouldn't want to | 17:38:39 |
| 22 | paint too much of an emphasis on that because it | 17:38:48 |
| 23 | would be in Emanuel's interest to include as much as | 17:38:50 |
| 24 | possible in the agreement. | 17:38:55 |
| 25 | Q.  You would not want to place too much of an | 17:38:58 |

MARC  TOBEROFF - 9/18/2012

Page 284

```
 1   emphasis on it to whom, to Emanuel, you mean, at the      17:39:02
 2   time?                                                     17:39:05
 3       A.  Yes, because -- because -- because I didn't       17:39:05
 4   want to -- I didn't want that to get shoehorned into      17:39:07
 5   this agreement.  I wanted to keep it separate.            17:39:11
 6       Q.  You're saying you wouldn't have been              17:39:13
 7   talking about Superman?                                   17:39:15
 8       A.  I wouldn't have been emphasizing Superman         17:39:15
 9   because that would then -- could possibly lead to         17:39:19
10   insistence that I include the Joe Shuster rights and      17:39:22
11   claims in the deal.                                       17:39:28
12       Q.  When you did start to talk to Mr. Emanuel         17:39:28
13   about Superman, did you tell him that you did have        17:39:31
14   the Shuster side, a deal with the Shusters?               17:39:37
15       A.  Yes.                                              17:39:41
16       Q.  Okay.                                             17:39:44
17       A.  I'm not sure if -- I believe that that           17:39:44
18   was -- that was disclosed when we entered into this      17:39:55
19   agreement.  In other words, they knew what "JS           17:39:57
20   claims" meant.                                            17:40:05
21       Q.  "They" being Emanuel?                             17:40:05
22       A.  Emanuel and Tom McGuire.                          17:40:06
23       Q.  And Tom McGuire?                                  17:40:09
24       A.  Yeah.                                             17:40:11
25       Q.  Okay.  Go to Exhibit 61.  That's a letter        17:40:11
```

MARC  TOBEROFF - 9/18/2012

Page 285

```
 1    by Joanne Siegel dated May 9, 2002 to Richard        17:40:16

 2    Parsons.                                             17:40:20

 3              (The document referred to was              17:40:21

 4         previously marked for                           17:40:21

 5         identification as Exhibit 61 and is             17:40:21

 6         attached to this deposition.)                   17:40:32

 7    BY MR. PETROCELLI:                                   17:40:32

 8         Q.  When is the first time you saw this letter? 17:40:44

 9         A.  I can't put a date on it.  I believe it     17:40:46

10    would be sometime after the IP Worldwide agreement   17:41:06

11    was entered into.                                    17:41:10

12         Q.  In October 2002?                            17:41:11

13         A.  Whatever the day of the IP Worldwide        17:41:14

14    agreement is, yeah.                                  17:41:17

15         Q.  Following your phone call with Kevin Marks  17:41:19

16    in February of 2002, did you make any efforts to     17:41:21

17    contact Joanne or Laura Siegel?                      17:41:28

18         A.  Repeat that, please.  I was reading this.   17:41:38

19         Q.  Following your phone call with Kevin Marks  17:41:39

20    in 2002, did you make any effort to contact the      17:41:41

21    Siegels, Joanne or Laura?                            17:41:44

22         A.  Joanne or Laura, no.                        17:41:46

23         Q.  Do you know whether Mr. Emanuel did at any  17:41:47

24    time?                                                17:41:49

25         A.  I don't believe he did.                     17:41:49
```

MARC   TOBEROFF - 9/18/2012

Page 286

```
 1        Q.  What, if anything, did you do following      17:41:56

 2    that February 2002 phone call to Kevin Marks to       17:41:58

 3    learn more about the status of the negotiations       17:42:05

 4    between the Siegels and Warner Bros. or DC?           17:42:11

 5        MR. KENDALL:  Objection.  Argumentative.          17:42:15

 6    Lacks foundation.                                     17:42:18

 7        THE WITNESS:  I don't know if I did               17:42:19

 8    anything more.  I may or may not have.  Remember we   17:42:27

 9    spoke earlier about a conversation with Don Bulson    17:42:31

10    and I said that between the initial -- we can look    17:42:34

11    back at the Don Bulson telephone log.  There may      17:42:43

12    have been another conversation with Don Bulson in     17:42:48

13    which I asked him, "What's happening with the         17:42:51

14    Siegels?"                                             17:42:52

15    BY MR. PETROCELLI:                                    17:42:53

16        Q.  Your -- turn to the Kevin Marks call log      17:42:58

17    again, Exhibit 100.  Page 615.  Bates number 615.     17:43:02

18    This is his call log for July 30, 2002.              17:43:07

19        MR. KENDALL:  Just a moment.  I don't think       17:43:17

20    that Exhibit 100 includes that.                       17:43:25

21        THE WITNESS:  Exhibit 102.                        17:43:27

22        MR. PETROCELLI:  We have to go to a new           17:43:28

23    exhibit.  Call that Exhibit 104.                      17:43:30

24        THE WITNESS:  We have Exhibit --                  17:43:33

25        MR. KENDALL:  That's Bulson.                      17:43:34
```

MARC  TOBEROFF - 9/18/2012

Page 287

```
 1                THE WITNESS:  Okay.                        17:43:35
 2                MR. KENDALL:  He asked for Kevin Marks.    17:43:36
 3                THE WITNESS:  Okay.  I'm getting a little  17:43:38
 4    tired.                                                 17:43:39
 5                MR. PETROCELLI:  Do you want to give       17:43:40
 6    Mr. Toberoff Exhibit 104.                              17:43:41
 7                THE WITNESS:  Thank you.                   17:43:51
 8                (The document referred to was             17:43:51
 9                marked for identification by the          17:43:51
10                C.S.R. as Exhibit 104 and attached        17:43:51
11                to this deposition.)                      17:43:52
12                MR. KENDALL:  Mr. Toberoff, you said you  17:43:52
13    were getting a little tired.  Do you need a short     17:43:53
14    break just to, you know, focus or are you okay to go  17:43:55
15    on?                                                   17:44:01
16                THE WITNESS:  Just maybe get a cold glass  17:44:02
17    of water.                                             17:44:04
18                MR. PETROCELLI:  Let's take a short break. 17:44:06
19                THE VIDEOGRAPHER:  Off the record.  The   17:44:08
20    time is 5:44.                                         17:44:09
21                (Brief recess.)                           17:47:50
22                THE VIDEOGRAPHER:  We are back on the     17:47:54
23    record at 5:48.                                       17:48:07
24    BY MR. PETROCELLI:                                    17:48:07
25        Q.  So you have Exhibit 104 in front of you,      17:48:10
```

**EXHIBIT 3**
**379**

MARC   TOBEROFF - 9/18/2012

Page 288

```
 1   the Kevin Marks call log, and you'll see an entry          17:48:12
 2   for July 30, 2002 on page bearing Bates number 0615.       17:48:16
 3       A.  Yes.                                                17:48:40
 4       Q.  Okay.  In that call, by the time you made          17:48:41
 5   that call, had you already reached an understanding        17:48:53
 6   with Ari Emanuel that an attempt would be made to          17:49:01
 7   engage Mr. Marks in a discussion about a potential         17:49:11
 8   offer?                                                     17:49:14
 9           MR. KENDALL:  I'm going to object.  Were           17:49:15
10   you meaning to represent that the outgoing call from       17:49:19
11   Mr. Marks on page 615 was a call placed by Marc            17:49:21
12   Toberoff?                                                  17:49:29
13           MR. PETROCELLI:  I don't know who placed           17:49:30
14   the call so I'm not making that reference.                 17:49:31
15       Q.  Did you make a call to him on July 30?             17:49:33
16       A.  I don't think so.  There's -- there's a --         17:49:43
17   and I think there was some testimony interpreting          17:49:49
18   this call sheet by -- by Kevin Marks.  I don't             17:49:54
19   recall what it was.  But I see there's -- on the           17:50:00
20   out- call -- -going call sheet on Bates stamp 0614,        17:50:05
21   there's a call from a Marc Toberoff on 7-24-02 and         17:50:08
22   then there's a call --                                     17:50:16
23           MR. KENDALL:  I think you just misspoke.           17:50:17
24           THE WITNESS:  Oh, outgoing.                        17:50:21
25   BY MR. PETROCELLI:                                         17:50:21
```

**EXHIBIT 3**
**380**

MARC   TOBEROFF - 9/18/2012

Page 289

```
 1        Q.  Did you speak to Mr. Marks in or about        17:50:23

 2   July, before the call that you had with him on which   17:50:27

 3   Ari Emanuel also participated?                         17:50:32

 4        A.  There was some conversation between the       17:50:36

 5   call where Ari was on the call.  I believe that two    17:50:44

 6   things happened.  One was that there was calls and     17:50:49

 7   messages left and that I eventually spoke to him.      17:50:55

 8        Q.  "Him" being Kevin?                            17:50:59

 9        A.  Kevin.  And then we had one conversation.     17:51:00

10   And then there were attempts to set up a conference    17:51:03

11   call with Ari, myself and Kevin Marks.                 17:51:10

12        Q.  Now, before the conference call with you,     17:51:16

13   Marks and Emanuel, you mentioned a prior call that     17:51:20

14   you had with Marks that took place in or about July?   17:51:26

15        A.  I think late July would be a good estimate.   17:51:42

16        Q.  Now, in that call, did you ask Mr. Marks      17:51:47

17   whether the negotiations were still ongoing, what      17:51:52

18   the status of the talks with Warner Bros. or DC was?   17:51:57

19        A.  I don't recall the specific words             17:52:01

20   exchanged, but I recall the gist of the                17:52:04

21   conversation, and the gist of the conversation was     17:52:07

22   what is the status of the Siegel rights, has an        17:52:10

23   agreement been concluded with Warner Bros., and his    17:52:17

24   tone was different.                                    17:52:25

25        While he didn't want to go into detail, he        17:52:30
```

MARC  TOBEROFF - 9/18/2012

Page 290

```
 1   said in -- in pretty clear terms, something to the     17:52:32
 2   effect, "But if you want to make an offer, I will      17:52:36
 3   convey it to my clients."                              17:52:40
 4        Q.  Do you have a -- did you make any memo of      17:52:41
 5   your conversation with Kevin Marks on this occasion?   17:52:44
 6        A.  No.                                            17:52:47
 7        Q.  Any writing that refers to it that you --      17:52:50
 8        A.  Nothing --                                     17:52:52
 9        Q.  What about your prior calls with him?          17:52:53
10        A.  Nothing that I could locate, no.               17:52:56
11        Q.  Is it true that Mr. Marks told you in this     17:53:01
12   call or in any of the prior calls that the Siegel       17:53:05
13   family had reached an agreement with DC Comics          17:53:09
14   subject to documentation?                               17:53:12
15             MR. KENDALL:  Argumentative.                  17:53:15
16             THE WITNESS:  I -- I don't recall that at      17:53:16
17   all him saying we had reached an agreement subject      17:53:20
18   to documentation.                                       17:53:23
19             What I recall was going back, the initial     17:53:26
20   conversation, I think we're dating it in                17:53:32
21   February based on this call log, in which he            17:53:36
22   basically didn't want to talk about the subject but     17:53:38
23   indicated to me that he was in negotiations.            17:53:45
24   Then -- it was a very short conversation and he blew    17:53:53
25   me off.                                                 17:53:55
```

MARC   TOBEROFF - 9/18/2012

Page 291

```
 1            And then when we had a conversation which      17:53:56

 2    we're now dating towards the end of July, it was a     17:53:59

 3    different conversation.  He made it clear that the     17:54:05

 4    rights were available but he didn't want to give me    17:54:07

 5    any indication of how much the Siegels wanted for      17:54:12

 6    those rights.                                          17:54:17

 7    BY MR. PETROCELLI:                                     17:54:17

 8        Q.  I want to be very clear on this:  Did he or    17:54:18

 9    did he not tell you that the Siegel family had         17:54:20

10    reached an agreement with DC Comics subject to         17:54:24

11    documentation?                                         17:54:26

12        A.  I don't -- I don't recall him using those      17:54:27

13    words, "reached an agreement subject to" --            17:54:32

14        Q.  Did he lead you to believe with body           17:54:35

15    language, as you put it, or any other words that he    17:54:38

16    used, that DC -- that the Siegel family had reached    17:54:41

17    an agreement with DC Comics subject to                 17:54:43

18    documentation?                                         17:54:45

19        A.  No, because he essentially invited an          17:54:46

20    offer.  He invited an offer, and when I use -- let     17:54:52

21    me describe -- when I use the word "body language"     17:54:59

22    obviously he's not in front of me so body language     17:55:02

23    is just a metaphor.  What I'm saying is, it was        17:55:04

24    clear from the gist of the conversation what was       17:55:06

25    happening.                                             17:55:10
```

MARC  TOBEROFF - 9/18/2012

Page 292

```
 1        Q.  Did he tell you that he did not feel it was        17:55:13
 2   appropriate for you to be making offers while he was        17:55:17
 3   in the process of documenting an existing deal?             17:55:20
 4        MR. KENDALL:  Argumentative.                           17:55:24
 5        THE WITNESS:  No, I think it's to the                  17:55:24
 6   contrary.  It was, "If you want to make an offer" --        17:55:26
 7        MR. KENDALL:  Don't interrupt him.                     17:55:32
 8        MR. PETROCELLI:  Yeah, I'm trying to get               17:55:32
 9   through this briskly.                                       17:55:33
10        THE WITNESS:  It was -- well, pretty                   17:55:34
11   important to your claims.                                   17:55:36
12        So he did not put it that way to me because            17:55:41
13   that would be contrary to inviting an offer.  He            17:55:50
14   said, "I'm not going to discuss with you money, but         17:55:55
15   if you want to make an offer, I will convey it to my        17:56:00
16   client."                                                    17:56:03
17   BY MR. PETROCELLI:                                          17:56:03
18        Q.  Did he --                                          17:56:03
19        A.  And I followed that up by setting up a             17:56:04
20   meeting, a conference to do just that, in which he          17:56:07
21   willingly participated.                                     17:56:11
22        Q.  You've seen Mr. Marks' August 9, 2002              17:56:14
23   memo to the file or memo to Joanne Siegel, Laura            17:56:17
24   Siegel --                                                   17:56:24
25        A.  Yes.                                               17:56:24
```

MARC  TOBEROFF - 9/18/2012

Page 293

```
 1        Q.  -- and Don Bulson?                            17:56:24

 2        A.  Yes.                                          17:56:25

 3        Q.  And you see where he states that he had       17:56:25

 4   told you he reached an agreement with DC Comics        17:56:30

 5   subject to documentation?                              17:56:33

 6           MR. KENDALL:  I don't think it's in front      17:56:34

 7   of the witness, right?                                 17:56:36

 8           MR. PETROCELLI:  It's not in front of the      17:56:36

 9   witness.                                               17:56:38

10        Q.  Do you recall --                              17:56:38

11           MR. KENDALL:  But you said, "And you see       17:56:40

12   where he states" so shouldn't he see where that is     17:56:41

13   stated before answering the question?                  17:56:44

14   BY MR. PETROCELLI:                                     17:56:44

15        Q.  Do you recall having seen that in the memo?   17:56:45

16        A.  I recall the words "subject to                17:56:47

17   documentation," yes.                                   17:56:48

18        Q.  When you saw whatever he wrote there, when    17:56:49

19   you first saw that memo, did you believe that any of   17:56:53

20   the statements in it were inaccurate?                  17:56:56

21           MR. KENDALL:  Com- -- compound.  Vague and     17:56:59

22   ambiguous.  And I'm going to request that you place    17:57:01

23   the document before the witness so that he can         17:57:05

24   review the statements thereto, unless he has a clear   17:57:07

25   recollection of all the statements that were there.    17:57:12
```

EXHIBIT 3
385

MARC  TOBEROFF - 9/18/2012

Page 294

```
 1              THE WITNESS:  Yeah, since your question      17:57:15
 2    wasn't just focused on that particular aspect, which   17:57:17
 3    I think I already answered, then I would have to see   17:57:19
 4    the documents to look at other aspects of the memo.    17:57:22
 5    BY MR. PETROCELLI:                                     17:57:22
 6        Q.  With respect to the aspects that I did ask     17:57:25
 7    you about, when you saw his August 9, 2002 memo, did   17:57:27
 8    you believe that it was inaccurate in how it           17:57:33
 9    referred to or reflected those aspects of your         17:57:37
10    conversations?                                         17:57:39
11              MR. KENDALL:  Vague and ambiguous and --     17:57:42
12              THE WITNESS:  I -- I --                       17:57:42
13              MR. KENDALL:  -- overbroad.                   17:57:42
14              THE WITNESS:  -- have to look at the memo    17:57:43
15    to -- I want to see what he says in the memo.  If he   17:57:44
16    said in the memo, "I told Mr. Toberoff that we had a   17:57:51
17    deal subject to documentation," that would be -- I    17:57:56
18    believe is inaccurate.                                 17:58:02
19    BY MR. PETROCELLI:                                     17:58:02
20        Q.  Have you had any discussions with him about   17:58:05
21    his having written something inaccurate in his memo?  17:58:07
22        A.  Did I have discussions with him?              17:58:11
23        Q.  Yeah, after you saw the memo, did you ever    17:58:13
24    have any conversations with Mr. Marks on that          17:58:15
25    subject?                                               17:58:17
```

MARC  TOBEROFF - 9/18/2012

Page 295

| | | |
|---|---|---|
| 1 | MR. KENDALL:  So I'm just going to caution | 17:58:17 |
| 2 | you with respect to your conversations with | 17:58:19 |
| 3 | Mr. Marks, who had a client relationship with the | 17:58:22 |
| 4 | Siegels before you did, and still has | 17:58:29 |
| 5 | confidentiality obligations arising from that | 17:58:33 |
| 6 | period, and of course you have confidentiality | 17:58:35 |
| 7 | obligations, to be cautious in what you disclose so | 17:58:38 |
| 8 | as not to waive any privileges. | 17:58:42 |
| 9 | BY MR. PETROCELLI: | 17:58:42 |
| 10 | Q.  Did you have any such discussions with him | 17:58:47 |
| 11 | on that subject after having seen his memo? | 17:58:49 |
| 12 | A.  I'm -- it's our position that the writ | 17:58:53 |
| 13 | documents do not entail subject matter waiver, so | 17:59:02 |
| 14 | any -- those discussions with Marks would be | 17:59:05 |
| 15 | privileged, about the subject matter of his | 17:59:07 |
| 16 | representation or my representation. | 17:59:10 |
| 17 | Q.  Did you have conversations with him on the | 17:59:13 |
| 18 | subject of his August 9, 2002 memo? | 17:59:15 |
| 19 | A.  I don't recall a specific subject [sic] | 17:59:17 |
| 20 | about the August 9 memo.  I may have. | 17:59:20 |
| 21 | MR. KENDALL:  I think you might have just | 17:59:24 |
| 22 | misspoken. | 17:59:34 |
| 23 | Could you read back his answer. | 17:59:36 |
| 24 | (The reporter read the record | 17:59:36 |
| 25 | as follows: | 17:59:36 |

MARC  TOBEROFF - 9/18/2012

Page 296

```
 1              "QUESTION:  I don't recall a          17:59:18

 2          specific subject [sic] about the         17:59:19

 3          August 9 memo.  I may have.")            17:59:20

 4          MR. KENDALL:  I think you meant to say   17:59:38

 5     "conversation" not "subject."                 17:59:40

 6          THE WITNESS:  I don't recall a -- did I say  17:59:41

 7     I don't recall a specific subject?            17:59:42

 8     BY MR. PETROCELLI:                            17:59:43

 9          Q.  I understood what you meant.         17:59:43

10          A.  I meant conversation.                17:59:44

11          MR. KENDALL:  But the record needs to be 17:59:45

12     clear, Mr. Petrocelli.                        17:59:46

13          THE WITNESS:  I meant "conversation."    17:59:49

14     BY MR. PETROCELLI:                            17:59:49

15          Q.  Did -- you testified in the Siegel   17:59:57

16     deposition to a subsequent conference call where  17:59:59

17     Mr. Emanuel made an offer of $15 million plus a   18:00:01

18     reference to some back-end participation.     18:00:08

19          You recall that offer on the conference  18:00:12

20     call?                                         18:00:13

21          A.  When you say "subsequent," you mean  18:00:14

22     subsequent to what?                           18:00:16

23          Q.  Subsequent to this -- what we've been 18:00:18

24     calling this late July phone call to --       18:00:20

25          A.  Where I said he invited an offer?    18:00:20
```

**EXHIBIT 3**
**388**

MARC  TOBEROFF - 9/18/2012

Page 297

```
 1        Q.  -- Kevin Marks.                              18:00:23

 2             Yes, subsequent to your -- the call that    18:00:26

 3   you've just been talking about.                       18:00:28

 4        A.  Okay.  Yes.  All right.                       18:00:29

 5        Q.  Now, with respect to that conference call,    18:00:33

 6   before the call had you had discussions with          18:00:37

 7   Mr. Emanuel about what was to be conveyed to          18:00:45

 8   Mr. Marks?                                            18:00:51

 9        A.  Yes.                                          18:00:51

10        Q.  Okay.  With respect to the $15 million,       18:00:55

11   where was that money coming from?                     18:01:00

12             THE WITNESS:  Do we -- I don't want to       18:01:06

13   waive any privileges by answering that question.      18:01:09

14             MR. KENDALL:  So --                          18:01:12

15             MR. PETROCELLI:  We disagree that there are  18:01:13

16   any privileges but we've had this understanding that  18:01:14

17   your giving of an answer isn't going to trigger a     18:01:17

18   waiver.                                               18:01:19

19             THE WITNESS:  Okay.                          18:01:20

20             My understanding that the 15 million was    18:01:23

21   coming from Ari Emanuel, and that understanding       18:01:26

22   encompassed an understanding that Ari Emanuel was --  18:01:33

23   would, like anybody else making an acquisition, like  18:01:37

24   buying a house or buying a company, would finance     18:01:41

25   that acquisition as he saw fit.  Either with debt     18:01:43
```

EXHIBIT 3
389

| | |
|---|---|
| 1 | financing or from -- from -- from a bank or bringing | 18:01:48 |
| 2 | in equity partners. | 18:01:55 |
| 3 | BY MR. PETROCELLI: | 18:02:00 |
| 4 |     Q.  Did you -- do you know whether, at the time | 18:02:00 |
| 5 | the $15 million conversation occurred, this | 18:02:03 |
| 6 | conference call with Kevin Marks, that the $15 | 18:02:08 |
| 7 | million had been funded already? | 18:02:14 |
| 8 |     A.  I -- I -- I think that's the wrong way to | 18:02:18 |
| 9 | look at it. | 18:02:23 |
| 10 |     Q.  I'm just asking whether the money had been | 18:02:24 |
| 11 | collected and gathered and was available? | 18:02:26 |
| 12 |     A.  The money -- I believe the money was | 18:02:29 |
| 13 | available because I believe that Ari Emanuel had | 18:02:34 |
| 14 | much more than $15 million in August of -- of -- of | 18:02:38 |
| 15 | 2002. | 18:02:44 |
| 16 |     Q.  Did you ask Mr. Emanuel whether absent some | 18:02:45 |
| 17 | ability to obtain alternate financing, he was | 18:02:49 |
| 18 | prepared to put up the $15 million himself? | 18:02:51 |
| 19 |     A.  It was understood that he was prepared -- | 18:02:55 |
| 20 | when you say "alternate form of financing" it's | 18:02:57 |
| 21 | understood that he was financing the offer. | 18:03:02 |
| 22 |     Q.  He, personally? | 18:03:03 |
| 23 |     A.  Yes, he personally, whether it's by -- and | 18:03:04 |
| 24 | assumed that he -- that -- and it was -- and I | 18:03:09 |
| 25 | assumed, like in any financial transaction, there | 18:03:12 |

**EXHIBIT 3**
**390**

MARC  TOBEROFF - 9/18/2012

Page 299

```
 1    would be a cash component, a debt component, and      18:03:15

 2    possibly bringing in other equity investors.          18:03:18

 3        Q.  So the $15 million that would go to the       18:03:21

 4    Siegels that was offered on the conference call, was  18:03:23

 5    that a cash payment of $15 million or was that part   18:03:26

 6    cash and the rest to be paid over time?  How was      18:03:31

 7    that structured in your call?                         18:03:34

 8        MR. KENDALL:  Just a minute.  Now, you've         18:03:36

 9    moved to what was said.                               18:03:38

10        MR. PETROCELLI:  You don't have to dissect        18:03:40

11    my questions in the interest of time.  I'll rephrase  18:03:41

12    the question, okay?                                   18:03:44

13        Q.  When you made the offer on the conference     18:03:45

14    call, was the $15 million a cash payment to the       18:03:46

15    Siegels?                                              18:03:51

16        A.  So I would answer the question this way.      18:03:55

17    Usually in a rights transaction or a rights           18:04:00

18    acquisition --                                        18:04:02

19        Q.  Can you just stick with me?                   18:04:02

20        A.  No, because I don't want my answer to be      18:04:03

21    misunderstood when you say "cash payment," it was a   18:04:06

22    fixed payment as opposed to a contingent payment.     18:04:09

23        Q.  I understand it was fixed, but if it had      18:04:11

24    been accepted, was the money to be paid all at once,  18:04:14

25    the 15 million, as opposed to over time?              18:04:16
```

EXHIBIT 3
391

```
 1          A.  I don't think the negotiations had gotten       18:04:18

 2     that far.                                                 18:04:20

 3          Q.  Okay.  But you understood that Mr. Emanuel       18:04:20

 4     had the ability himself, personally, to come up with     18:04:24

 5     the 15 million all at once if required?                  18:04:29

 6               MR. KENDALL:  Objection.  Asked and            18:04:31

 7     answered.                                                 18:04:32

 8               THE WITNESS:  I wouldn't view it as come up     18:04:33

 9     with the $15 million.  I would view it as the            18:04:34

10     capability of financing that transaction.                18:04:37

11     BY MR. PETROCELLI:                                        18:04:37

12          Q.  Were you going to put up any part of the 15     18:04:40

13     million?                                                  18:04:42

14          A.  No.                                              18:04:42

15          Q.  Okay.                                            18:04:42

16          A.  And when I say "you" --                          18:04:45

17          Q.  You, Marc Toberoff?                             18:04:46

18          A.  Neither me nor IPW.                             18:04:47

19          Q.  Okay.  Who would then under --                  18:04:51

20          A.  IP Worldwide.  Now, I'm calling it IPW.         18:04:52

21          Q.  IP Worldwide.                                    18:04:55

22               Who was to be the purchaser of the rights?     18:04:56

23          A.  I envisaged that it would be Ari Emanuel.       18:05:03

24          Q.  What role, if any, would IP Worldwide --        18:05:07

25          A.  Or some designee of Ari Emanuel.                18:05:10
```

MARC  TOBEROFF - 9/18/2012

Page 301

```
 1          Q.  What role, if any, did you envision IP        18:05:13
 2    Worldwide playing?                                      18:05:17
 3          A.  That IP Worldwide would have a carried        18:05:18
 4    interest for bringing this opportunity in.              18:05:23
 5          Q.  Did you discuss with Mr. Emanuel, at the      18:05:25
 6    time of this conference call, what that carried         18:05:28
 7    interest would be?                                      18:05:30
 8          A.  No.                                           18:05:35
 9          Q.  Were you aware of any other investors or      18:05:39
10    people who were planning to provide any part of the     18:05:42
11    $15 million?                                            18:05:49
12          A.  Not specific to that offer.                   18:05:50
13          Q.  Did --                                        18:05:56
14          A.  I was aware that Mr. Emanuel made             18:05:56
15    investments in all sorts of things, and in those        18:05:59
16    investments he would invest with people.  I had a       18:06:03
17    general awareness of that.                              18:06:06
18          Q.  Okay.  Was there any other investor besides   18:06:09
19    Ari Emanuel who, to your knowledge, was interested      18:06:17
20    in acquiring the Siegel rights but who walked away      18:06:25
21    from it?                                                18:06:28
22          A.  Any other investor interested in              18:06:29
23    acquiring --                                            18:06:38
24          Q.  Besides Ari Emanuel, who you said was --      18:06:39
25          A.  It's kind of vague, that question.            18:06:42
```

**EXHIBIT 3**
**393**

MARC  TOBEROFF - 9/18/2012

Page 302

```
 1        Q.  Besides Ari Emanuel, who you said was the      18:06:43
 2   person who was going to come up with the $15 million    18:06:45
 3   to fund the offer?                                      18:06:48
 4        A.  I wouldn't use that term.                      18:06:49
 5        Q.  Finance the $15 million, however you want      18:06:52
 6   to put it, were you aware of any other person who       18:06:54
 7   expressed an interest in investing in the Siegel        18:06:59
 8   rights?                                                 18:07:02
 9             MR. KENDALL:  Lacks foundation as to time.    18:07:04
10             THE WITNESS:  In connection with this $15     18:07:06
11   million?                                                18:07:08
12   BY MR. PETROCELLI:                                      18:07:08
13        Q.  I'll -- I'll let you answer that question      18:07:15
14   then I'm going to follow up.                            18:07:16
15        A.  No.                                            18:07:18
16        Q.  Okay.  In connection with any other offer,     18:07:19
17   not the $15 million offer to acquire the Siegel         18:07:20
18   rights?                                                 18:07:23
19             MR. KENDALL:  Vague and ambiguous.            18:07:24
20             THE WITNESS:  Well, that would relate to      18:07:27
21   these other conversations we had about talking to       18:07:28
22   three different studios.                                18:07:31
23   BY MR. PETROCELLI:                                      18:07:31
24        Q.  Yeah, forget all of that.                      18:07:33
25             I'm talking about in the 2002 or '3 time      18:07:34
```

**EXHIBIT 3**
**394**

MARC  TOBEROFF - 9/18/2012

Page 303

```
 1   frame, was there any other person who came forward        18:07:37

 2   or expressed an interest in acquiring the rights          18:07:41

 3   besides Ari Emanuel?                                       18:07:44

 4       A.  There may have but I don't recall a               18:07:45

 5   specific person.                                          18:07:51

 6       Q.  Let me show you a document.                       18:08:06

 7           MR. KENDALL:  While Mr. Petrocelli is doing       18:08:27

 8   that, could you just give me a time check.                18:08:29

 9           THE VIDEOGRAPHER:  13 minutes remain in the       18:08:33

10   seven hours.                                              18:08:35

11           MR. KENDALL:  Thank you.                          18:08:36

12   BY MR. PETROCELLI:                                        18:08:36

13       Q.  Can you -- can you show Mr. Toberoff Laura        18:08:37

14   Siegel's July 11, 2003 letter.  Is there an exhibit       18:08:52

15   number for this?                                          18:09:01

16           THE REPORTER:  105.

17              (The document referred to was

18              marked for identification by the

19              C.S.R. as Exhibit 105 and attached

20              to this deposition.)

21   BY MR. PETROCELLI:

22       Q.  Do you recall providing some comments and        18:09:24

23   revisions to this letter before Laura sent it out to      18:09:29

24   Michael?                                                  18:09:32

25       A.  I think this is the letter where there were      18:09:32
```

EXHIBIT 3
395

MARC  TOBEROFF - 9/18/2012

Page 304

```
 1   comments to it.                                      18:09:38

 2             MR. PETROCELLI:  Can you show Mr. Toberoff  18:09:39

 3   the two prior drafts, just to confirm that it's his  18:09:40

 4   handwriting.                                         18:09:45

 5             Mark that document dated July 5, 2003,     18:10:08

 6   which has Bates number 138 on the bottom right-hand  18:10:10

 7   corner as the next exhibit.  What is it?             18:10:13

 8             THE REPORTER:  106.                         18:10:13

 9             MR. PETROCELLI:  106.  And then this        18:10:21

10   document which -- July 8 with Bates number 146 at    18:10:21

11   the bottom as Exhibit 107.                           18:10:30

12             (The documents referred to were            18:10:32

13             marked for identification by the           18:10:32

14             C.S.R. as Exhibits 106 and 107 and         18:10:32

15             attached to this deposition.)              18:10:32

16   BY MR. PETROCELLI:                                   18:10:32

17      Q.  Mr. Toberoff, looking at Exhibits 106 and     18:10:42

18   107, the two drafts that I just showed you, does     18:10:45

19   your handwriting appear on them as offering          18:10:51

20   revisions and/or comments?                           18:10:55

21      A.  Okay.  So let me be specific.  On 106, on     18:10:57

22   Bates number 1 -- SD 139, there's underlining, I     18:11:13

23   can't identify that as my underlying.                18:11:18

24      Q.  Can you go to page 141?                        18:11:23

25      A.  Wait, wait, wait, let me finish.              18:11:24
```

MARC  TOBEROFF - 9/18/2012

Page 305

```
 1            That little -- up above the underlining in        18:11:26

 2    the first -- second paragraph, there's like a little       18:11:29

 3    star thingamajiggy that -- I don't do those little         18:11:31

 4    stars like that.  So that's not -- I didn't do that.       18:11:35

 5            Okay, next, 140, I don't know whether              18:11:39

 6    that's my underlining.                                     18:11:42

 7        Q.  141?                                               18:11:47

 8        A.  The word "draft, that's not my handwriting.        18:11:48

 9        Q.  "Opinion, re:"?                                    18:11:51

10        A.  That's my handwriting.                             18:11:53

11        Q.  And the next page, is any of that                  18:11:57

12    handwriting --                                             18:11:59

13        A.  My wife says my handwriting looks like lice        18:12:00

14    so anything that looks like lice is my handwriting.        18:12:02

15        Q.  Pages 142, -43, and -44 where there are            18:12:04

16    significant handwritten notations, is that your            18:12:08

17    handwriting?                                               18:12:12

18        A.  Okay.  So the word "draft" on the top of           18:12:19

19    all of these pages, that's not my handwriting.  The        18:12:21

20    other writing is my handwriting.  The crossed out          18:12:24

21    parts, I -- I -- I'm not sure who did that.  Could         18:12:37

22    very well be me.                                           18:12:42

23        Q.  Just focusing on the -- page 144 again,            18:12:44

24    there -- the handwritten words --                          18:12:48

25        A.  I haven't focused on it at all.                    18:12:52
```

**EXHIBIT 3**
**397**

MARC  TOBEROFF - 9/18/2012

Page 306

```
 1        Q.  No, just is that -- any of your handwriting      18:12:53
 2   on page 144 appear?                                        18:12:56
 3        A.  The word "draft," no.  The other writing,         18:12:58
 4   yes.  Crossed out stuff, presumably, but I don't           18:13:04
 5   know.                                                      18:13:08
 6        Q.  Okay.  And in the interest of time, just          18:13:12
 7   take a very quick look at 107.  And I don't need you       18:13:20
 8   to go through all the pages but just, for example,         18:13:24
 9   page 148 of Exhibit 107, the Bates number at the           18:13:26
10   bottom 148, does your handwriting appear on that           18:13:34
11   page?                                                      18:13:38
12        A.  148, yes.                                         18:13:41
13        Q.  Okay.  Now, going to the final version of         18:13:50
14   the letter, which is Exhibit 105 signed by Laura.          18:13:53
15        A.  I just want to see -- okay.                       18:13:56
16        Q.  Where there's a reference down at the             18:14:13
17   bottom of page 2 Bates stamped 134 [sic], "Why the         18:14:16
18   original investor left," when you were reviewing and       18:14:20
19   revising the letter, who did you understand the            18:14:28
20   original investor who left to be?                          18:14:34
21        A.  I -- I don't know if I was focusing on            18:14:38
22   that.  I was looking at the letter, but if I focused       18:14:47
23   on that I would understand the original investor           18:14:51
24   would be Ari Emanuel since he was the original             18:14:52
25   investor.                                                  18:14:55
```

MARC  TOBEROFF - 9/18/2012

Page 307

```
 1        Q.  Now, where it says:                         18:14:55

 2              "Marc told the above to the               18:14:57

 3          investor who found another place to           18:14:58

 4          invest his money" --                          18:15:00

 5        A.  Yes.                                         18:15:01

 6        Q.  -- that's Ari Emanuel?                       18:15:06

 7        A.  I -- I -- I don't know where that's coming   18:15:07

 8    from.                                                18:15:09

 9        Q.  Well, when you reviewed this letter --       18:15:13

10        A.  I have -- that's what I was just checking.   18:15:15

11        Q.  Did you tell Ari Emanuel that Kevin Marks    18:15:18

12    had told you that there was a deal with Time Warner  18:15:23

13    and DC, which caused Ari Emanuel to go find another  18:15:26

14    place to invest his money?                           18:15:30

15              MR. KENDALL:  Just a moment, please.       18:15:32

16              THE WITNESS:  Well, I'm -- in answer to    18:15:33

17    your first question, I was checking these drafts to  18:15:35

18    see if this language was in the draft and I --       18:15:40

19    I either modified it, didn't touch it, or it was     18:15:43

20    never in them.                                       18:15:46

21    BY MR. PETROCELLI:                                   18:15:46

22        Q.  Well, let's focus on the final draft for a   18:15:47

23    moment.                                              18:15:49

24        A.  Okay.                                        18:15:55

25        Q.  Under the heading "Why the original          18:15:59
```

Merrill  Corporation  -  Los Angeles
Los Angeles - 800-826-0277          www.merrillcorp.com/law

EXHIBIT 3
399

MARC   TOBEROFF - 9/18/2012

Page 308

```
 1    investor left"  --                              18:16:01

 2         A.  Okay.                                  18:16:01

 3         Q.  -- did Kevin Marks ever tell you that the   18:16:03

 4    Siegels had a deal with Time Warner and DC?     18:16:10

 5         A.  No.                                    18:16:12

 6         Q.  Did you ever tell Ari Emanuel that Kevin   18:16:18

 7    Marks told you the Siegels had a deal with Time   18:16:21

 8    Warner and DC?                                  18:16:24

 9         A.  What was the question again?           18:16:31

10         Q.  Did you ever tell Ari Emanuel that Kevin   18:16:32

11    Marks had told you the Siegels had a deal with Time   18:16:35

12    Warner or DC?                                   18:16:38

13         A.  Did I ever tell Ari Emanuel that Kevin   18:16:41

14    Marks had told me that the Siegels had a, quote,   18:16:44

15    deal, end quote, with Time Warner and DC?       18:16:47

16              No, I don't recall telling Ari Emanuel   18:16:51

17    that.                                           18:16:53

18         Q.  Do you recall telling Ari Emanuel anything   18:16:53

19    that after which he then went and found another   18:16:56

20    place to invest his money?                      18:17:02

21              MR. KENDALL:  Assumes fact not in evidence.   18:17:07

22              THE WITNESS:  I don't know what this refers   18:17:08

23    to, "Investor found another place to invest his   18:17:10

24    money."                                         18:17:14

25    BY MR. PETROCELLI:                              18:17:14
```

**EXHIBIT 3**
**400**

MARC  TOBEROFF - 9/18/2012

Page 309

```
 1        Q.  When you received drafts of this document    18:17:15

 2   or even the final version of it, did you believe      18:17:19

 3   that these statements were inaccurate?                18:17:22

 4        A.  I don't know if I received the final         18:17:25

 5   version before it was sent, and I would have to       18:17:27

 6   see -- I may have.  I'm not saying I didn't, but I    18:17:31

 7   don't know if I did, and I would have to see the      18:17:34

 8   prior draft to see what they have under this          18:17:36

 9   heading, "Why the original investor left."            18:17:38

10        Q.  Do you believe it is inaccurate?             18:17:45

11        A.  Which?  Do I believe --                      18:17:47

12        Q.  Turn to page --                              18:17:47

13        A.  -- what's inaccurate?                        18:17:49

14        Q.  That statement is inaccurate?                18:17:49

15            MR. KENDALL:  Which statement?               18:17:49

16            THE WITNESS:  Which one?                     18:17:52

17   BY MR. PETROCELLI:                                    18:17:52

18        Q.  That Marc told the above to the investor     18:17:52

19   who found another place to invest his money?          18:17:54

20            MR. KENDALL:  Compound.                      18:17:56

21            THE WITNESS:  Yes.                           18:17:58

22   BY MR. PETROCELLI:                                    18:17:59

23        Q.  Now go to Exhibit 10- -- I believe it's      18:17:59

24   107.  The prior draft.  107, Marc, Mr. Toberoff.      18:18:03

25            And under -- where it says Bates numbers     18:18:14
```

MARC  TOBEROFF - 9/18/2012

Page 310

```
 1    148, you see the statement, "Marc told this to        18:18:18

 2    the" -- first of all, it says:                        18:18:25

 3              "Kevin Marks told Marc we had              18:18:27

 4         a deal with DC."                                 18:18:29

 5         Next statement:                                 18:18:32

 6              "Marc told this" --                        18:18:33

 7    A.   Wait, wait, which -- which -- 106?              18:18:33

 8    Q.   Correct.  Bates number -- Exhibit 107,         18:18:37

 9    Mr. Toberoff.  Not 106.                              18:18:42

10    A.   Okay.                                           18:18:44

11    Q.   And it's Bates number 148.  Under the          18:18:45

12    heading "Why the original investor left."            18:18:52

13         Do you see that?  Do you see your              18:19:01

14    handwriting?  Can you read that to me?               18:19:02

15    A.   I -- I can't.  If I had a magnifying glass      18:19:07

16    I could.                                             18:19:15

17    Q.   Are you able to read any of that to me?        18:19:15

18    A.   It's hard for me to read.  "Marc also" -- I    18:19:18

19    just see words.  "Get back investor with anything   18:19:35

20    concrete regarding your interest because apparently 18:19:43

21    neither you nor Don Bulson" something "responded to 18:19:48

22    his interest for a long time."  Something to that   18:19:59

23    effect.                                              18:20:04

24    Q.   Were you aware of any investor, and I want     18:20:06

25    to put aside Ari Emanuel, anyone other than Ari     18:20:13
```

MARC   TOBEROFF - 9/18/2012

Page 311

| | | |
|---|---|---|
| 1 | Emanuel, okay, who you had conversations or | 18:20:16 |
| 2 | discussions with about acquiring the Siegel rights | 18:20:23 |
| 3 | but who then went elsewhere with his money, and this | 18:20:28 |
| 4 | again is in the 2002 or 2003 time frame? | 18:20:33 |
| 5 | A.  We already answered that. | 18:20:36 |
| 6 | Q.  And the answer is you're not aware of any? | 18:20:37 |
| 7 | A.  Not that I'm not aware.  There was no -- | 18:20:39 |
| 8 | the investor was Ari Emanuel on the $15 million with | 18:20:41 |
| 9 | the only footnote that -- that Ari -- I did not know | 18:20:46 |
| 10 | whether Ari anticipated bringing in other people he | 18:20:52 |
| 11 | did deals with to participate in equity or to | 18:20:56 |
| 12 | finance it himself. | 18:20:59 |
| 13 | MR. KENDALL:  Okay.  Before you ask your | 18:21:00 |
| 14 | next question, could we have a time, Fritz? | 18:21:02 |
| 15 | THE VIDEOGRAPHER:  Seven hours. | 18:21:08 |
| 16 | MR. KENDALL:  Thank you. | 18:21:10 |
| 17 | MR. PETROCELLI:  So since we're at the | 18:21:11 |
| 18 | seven-hour limit, we'll stop now.  I'm not done with | 18:21:14 |
| 19 | my examination.  I will discuss with you or | 18:21:19 |
| 20 | Mr. Kendall soon whether and to what extent you'll | 18:21:25 |
| 21 | agree to give more time.  If I'm not able to reach | 18:21:31 |
| 22 | an agreement, then we'll have to deal with the issue | 18:21:34 |
| 23 | in other ways, okay?  But in the meantime, I want to | 18:21:39 |
| 24 | thank you for your time. | 18:21:44 |
| 25 | THE WITNESS:  Thank you. | 18:21:46 |

MARC   TOBEROFF - 9/18/2012

Page 312

```
 1            MR. KENDALL:  In the meantime, do you want      18:21:46

 2    to reach a stipulation with respect to this            18:21:48

 3    transcript that the original will be --                18:21:50

 4            THE WITNESS:  Before we do that, I'd like       18:21:55

 5    to just go off the record for one second and just      18:21:57

 6    mention something to you.                              18:21:59

 7            THE VIDEOGRAPHER:  Off the record.  The         18:22:02

 8    time is 6:22.                                          18:22:03

 9            (Brief recess.)                                 18:22:04

10            MR. KENDALL:  Stipulation is that the          18:23:07

11    original be sent to Mr. Toberoff with a copy to me.    18:23:08

12    And that Mr. Toberoff will have 30 days within which   18:23:14

13    to make any changes that he deems necessary.  If no    18:23:18

14    changes are made and provided to you within 30 days,   18:23:22

15    then the transcript will be deemed to be usable in     18:23:31

16    lieu of the original -- that a copy of the             18:23:40

17    transcript will be deemed to be useable in lieu of     18:23:44

18    the original, and if changes are made we'll be         18:23:46

19    notified.  And the court reporter can be relieved of   18:23:49

20    her duties under the Code and the transcript can be    18:23:53

21    signed under penalty of perjury.                       18:23:56

22            MR. PETROCELLI:  Yes.                           18:23:58

23            THE REPORTER:  Off the record?                  18:24:00

24            MR. PETROCELLI:  Yes.                           18:24:40

25            THE VIDEOGRAPHER:  This will mark the end       18:24:40
```

```
 1    of Volume I, Tape Number 4 in the deposition of Marc      18:25:01

 2    Toberoff.                                                  18:25:03

 3           All original videotapes will be retained at        18:25:03

 4    Merrill Legal Solutions at 20750 Ventura Boulevard,       18:25:05

 5    Woodland Hills, California.  Going off the record.        18:25:09

 6    The time is 6:25.                                          18:25:11

 7           (Deposition adjourned at 6:25 p.m.)

 8                          -oOo-

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       DECLARATION

 2

 3

 4

 5

 6          I hereby declare I am the deponent in the

 7    within matter; that I have read the foregoing

 8    deposition and know the contents thereof, and I

 9    declare that the same is true of my knowledge except

10    as to the matters which are therein stated upon my

11    information or belief, and as to those matters, I

12    believe it to be true.

13          I declare under the penalties of perjury of

14    the State of California that the foregoing is true

15    and correct.

16          Executed on the _____ day of

17    _____ 2012, at

18    _____,

19    California.

20

21

22

23

24          _____

25                       MARC TOBEROFF
```

EXHIBIT 3
406

MARC  TOBEROFF - 9/18/2012

Page 315

```
 1   STATE OF CALIFORNIA    )
                            )  ss.
 2   COUNTY OF LOS ANGELES  )

 3

 4          I, Shanda Gabriel, Certified Shorthand

 5   Reporter, Certificate No. 10094, for the State of

 6   California, hereby certify:

 7          I am the deposition officer that

 8   stenographically recorded the testimony in the

 9   foregoing deposition;

10          Prior to being examined the witness was by

11   me first duly sworn;

12          The foregoing transcript is a true record

13   of the testimony given.

14          Before completion of the deposition, review

15   of the transcript [X] was [] was not requested.  If

16   requested, any changes made by the deponent (and

17   provided to the reporter) during the period allowed

18   are appended hereto.

19

20   Dated _____.

21

22                    _____
                                Shanda Gabriel
23                              CSR 10094

24

25
```

**EXHIBIT 3**
**407**

# EXHIBIT 4

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 21, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6850

Marc Toberoff
Toberoff & Associates, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write concerning defendants' August 20, 2012, filing, styled as a "Motion For Partial Summary Judgment On First, Second and Third Claims For Relief." Docket No. 478. Defendants' motion is procedurally improper to the extent it repeats the same legal arguments and factual assertions, presents the same evidence, and requests the same relief as the 93 pages of papers defendants already filed in opposition to DC's Motion For Partial Summary Judgment On Its First And Third Claims For Relief, Docket Nos. 462-465, which has been fully briefed and was taken under submission by the Court on August 13, 2012. Docket No. 476.

DC's summary judgment motion addresses three of the five grounds supporting DC's First Claim—(1) the Shusters are barred from terminating by their 1992 agreement with DC, (2) the Shusters lacked the majority interest necessary to terminate, and (3) the Shusters do not have a statutory basis to terminate—and the entirety of DC's Third Claim. Docket Nos. 458, 468. Defendants' opposition brief affirmatively requests that "summary adjudication [be] granted *in defendants' favor* as to sub-parts (1), (2) and (3) of DC's First Claim …, and as to DC's Third Claim." Docket No. 462 at 25 (emphasis added). Defendants also submitted a proposed order asking for judgment in defendants' favor on "DC's First and Third Claims," Docket No. 465-1, and proposed Conclusions of Law providing that "summary judgment should be granted in defendants' favor on Section (1)," "Section (2)," and "Section (3) of DC's First Claim" and "on DC's Third Claim." Docket No. 465 at 48-50.

**EXHIBIT 4**
**408**

O'MELVENY & MYERS LLP

Page 2

Defendants have now filed 55 additional pages (plus almost 800 pages of exhibits) asking the Court for the exact same relief—entry of judgment in defendants' favor on DC's First and Third Claims—duplicating the same legal arguments, facts, and evidence contained in defendants' prior briefing. *Compare* Docket No. 462 at 1-25 *with* Docket No. 478 at 2-6, 7-8, 10-18, 22-24. Defendants have no right to rebrief these issues—especially in light of the Court's August 13, 2012, order taking DC's motion under submission and making clear that no further argument was necessary, Docket No. 476—and the Court should not be burdened with considering the same arguments twice. We made this clear during our extensive meet-and-confer exchanges on DC's motion and defendants' contemplated cross-motion.

Defendants' cross-motion is a "procedurally improper" successive motion that "seek[s] precisely the same relief as before" without presenting new facts, evidence, or legal argument. *Siemens Westinghouse Power Corp. v. Dick Corp.*, 219 F.R.D. 552, 554 (S.D.N.Y. 2004); *see also Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (while successive summary judgment motions may be allowed, courts should guard against "the potential for abuse ... and retain discretion to weed out frivolous or simply repetitive motions"); *Eaton v. Siemens*, 2012 U.S. Dist. LEXIS 24358, at *11-14 (E.D. Cal. Feb. 27, 2012) (denying leave to file successive summary judgment motion that was "a recapitulation of Defendants' previous argument").

Defendants' motion is also procedurally improper in that defendants *never* indicated they would seek summary judgment on DC's Second Claim—much less met-and-conferred on these issues during our many discussions about defendants' cross-motion—in plain violation of Local Rule 7-3 and Judge Wright's requirement that counsel must "engage in a pre-filing conference 'to discuss thoroughly … the substance of the contemplated motion and any potential resolution.'" Docket No. 18 at 4. Defendants' failure to meet and confer is particularly inexcusable in light of Judge Zarefsky's recent admonition that defendants violated the Local Rules by failing to properly meet-and-confer on their motion to compel. Docket 467 at 1-2.

Please confirm by 12.00 p.m. on Wednesday, August 22 that you will file a new cross-motion that eliminates all duplicative legal arguments, facts, and evidence and the argument concerning DC's Second Claim. If you refuse to amend your cross-motion, we will so advise the Court and seek all appropriate relief.

DC reserves all rights.

Very truly yours,

/s/ Daniel M. Petrocelli

Daniel M. Petrocelli
of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline

**EXHIBIT 4**
**409**

# EXHIBIT 5



**DETECTIVE COMICS**

Publishers of
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW YORK COMICS

January 25, 1940

480 LEXINGTON AVE.
NEW YORK, N. Y.

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

In looking over the daily releases by Boring, I must say that there is a decided improvement. If the quality is kept up, I'm inclined to believe that we will not have to worry about the art. Working together with Joe, I think, will produce the necessary quality.

Received the Sunday release and noticed one material mistake in the continuity. I note that you say that a hemophiliac is a person with lack of blood. If you will consult the dictionary, you will note the definition that "hemophilia is a tendency to profuse bleeding even from slight wounds". We have notified McClure to make the change.

I wish you would let me know how long the present continuity for the Sunday release will run. From what I've seen of this release it's not so hot. Has the next Sunday continuity been written? If so, please send me a copy immediately, so that we may be in a position to edit same.

I am enclosing a copy of a letter from the St. Louis Dispatch, which is self-explanatory. I must inform you that at the present time there seems to be a concerted drive against movies and comic books which parent-teachers groups and womens clubs claim are harmful for children. I know that there is definite objection to the Dick Tracy serial in the movies. We must point our editorial policy with a view of obtaining the approval of parents, while still not sacrificing the adventure and the thrill Superman has always brought to children.

I am also enclosing a synopsis which we think is suitable for a Superman release. After reading it I am sure that you can elaborate in detail action where necessary. As soon as you have completed playing out or writing the detailed panel script for this story, we would like to have it before it goes into work. Let me know what you think of this synopsis.

I have just received the first Superman release which will be inserted in Action, May issue. I've got to get at least one more before the month is over, which is just two more days. From your promised five releases a month I'm down to one. For anyone to have fallen down that badly, you are certainly a Superman in reverse. Now get behind these magazine releases and by the end of next month I've got to have five in order not to be delayed on the Superman quarterly.

I'm returning the letter from Cassidy. Let me know as soon as he gets

000002143

LSL ER 448

- 20 -

**EXHIBIT 5**
**410**

Mr. Jerome Siegel                    -2-                    January 29, 1943

This last Saturday we signed with Kesler Products for a radio program. The first broadcast will be February 12th from 5:15 to 5:30. The New York station is WOR and WEM in Buffalo. These stations are the nearest to Cleveland. This is only a 10 station hookup covering the New England stations, and as I've written you before, the cost of producing the program and the amount we get from them show us a net loss of about $700.00 a week without overhead. However, if the program is good, we may be able to sell other stations and sponsors.

We have shown you that we're a live organization and we will get you some place, providing you cooperate by getting your stuff in on time and putting the best possible quality in the releases.

Best regards to Joe and have him drop me a line.

                                        Very sincerely yours,

                                        J. S. LIEBOWITZ

JSL:GF

000002144

LSL ER 449

-21-

**EXHIBIT 5**
**411**

# EXHIBIT 6



**DETECTIVE COMICS**
INCORPORATED

Published by
DETECTIVE COMICS
MORE FUN COMICS
New ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

January Twenty Second
1 9 4 0

Dear Jerry:

Returned herewith are Joe's sketches for the next
action. Jack has stated today will be okay, except that we suggest
the thug be grabbing a strand of gems from the rail's back instead
of pulling it, on have attive trying to get away a little from
the excessive use of pistols and knives on the covers, at least.
The other two sketches are too much of the same old routine, and
also they take SUPERMAN away from the camera instead of toward
it.

We've been having considerable talk about the daily
released of SUPERMAN, and I believe that in fairness to you we
have you hand all this material here before it goes to the syndicate
for release. You'll note that a number of queries have been
noted on the enclosed proof sheet for the latest set of released.
In my opinion, and in the opinion of the others most vitally
interested, the drawing is not nearly as good as it must be if
SUPERMAN is going to continue to be a success. In the first place
most of the figures are too small, giving the impression of small
men rather than of large men — and that includes Kent and his alter
ego SUPERMAN. And in the picture in the second strip in which
Kent takes the other guy to the top of the flagpole, the other guy
is a dead ringer for Charlie McCarthy. In the third strip, the two
running guards look more like western union boys who have just got
their wedding papers, and in the third picture of that same strip,
Kent's figure leaves a great deal to be desired artistically.

Now for the fourth strip. In the first panel, SUPERMAN'S
physique is a bit on the lah-de-dah side. I like particularly his
nice fat bottom. His pose in the second picture is reminiscent of
certain FLIT ads done by a cartoonist who signs himself    "Dr. Seuss."

There is nothing quite so explicit to criticize in the
last two strips, so I'll have to speak more generally and simply
say that the art work is not up to standard.

000002259

-18-

Now, Jerry, I don't write you a piece like this so
you can show it to the artist who is working on the stuff to
prove to him that he's no good. I do write it to you to impress
you with the fact that you must exercise close supervision over
the stuff so that what comes out in the papers will be as good
as anybody else's stuff.   You know, we build a feature with
these drawings, and then try to hoodwink publishers with the
idea that what we now give him is just as good——which isn't it right.

Between you, you and Joe ought to be able to tell
what's good and what isn't; and you ought to insist that you
get nothing but good stuff.   If one particular man can't
deliver, then it's a case of trying to find one who can.   Your
present and future, as you probably realize, are closely aligned
with the success of SUPERMAN.   If you treat your feature well, he'll
probably take care of you for a long time; on the other hand,
kick him around and he'll let you down——and you'll find that
you're up against a mighty tough proposition trying to sell some-
body on another idea.   You'd find it tougher, I daresay, to sell
another idea under these conditions than if you'd never sold
another idea.

Believe me, Jerry, it's absolutely imperative that you
tighten up on the stuff from all angles.   Watch it very closely,
and let's see a decided improvement on the next batch.   The
improvement will have to be quick, for this is no time to experiment
when you've got a feature that's going good.

Best regards,

000002260

—19—

LSL ER 446

**EXHIBIT 6**
**413**

# EXHIBIT 7

PLAZA 3-0741



**DETECTIVE COMICS**

Publishers of
DETECTIVE COMICS
MORE FUN COMICS
NEW ADVENTURE COMICS
ACTION COMICS
NEW BOOK COMICS

January 25, 1940

480 LEXINGTON AVE.
NEW YORK, N. Y.

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

I received your last letter in which you enclosed the clipping from the Plain Dealer. I can imagine how proud you and Joe must have been to see yourself in print in your home town.

In this interview there seems to have been a lot of misstatements. One in particular relating to the manufacture of Superman sweaters and emblems. Also, a remark regarding movie and radio. On the radio proposition, we expect to sign any day with Booker Flour Co. - we to pay the cost of producing the program and they pay so much per station. The net result of this transaction will show us a loss of $600, every week, so at the present time this is nothing to gloat over. Our job, in order to get out of this hole, will be to sell other radio stations from record transcriptions which we make from the original broadcast. This will not come for a long time, depending of course whether the present program is successful.

We also plan to go after various licenses. In connection with this we have set up a publicity department which is to issue all information regarding Superman. It is therefore important that you give no further interviews. You might have mentioned in your interview that the first ones who saw something in the Superman strip was Detective Comics, Inc., who bought all rights to it. You might have also said that you have a very satisfactory arrangement with Detective Comics, Inc. as compensation for the transfer of all your rights, so hereafter we forbid you to grant any interviews relating to Superman and its development. Please refer all inquiries to our office. You can readily see the harm that will be done if things are not handled from a central source and if statements are issued which are in conflict with one another.

I notice that you are quite enthusiastic about Mr. Boring's work. When we received the proofs of the daily that he did, we certainly were shocked at the many shortcomings. These criticisms have already been conveyed to you by Whit. I cannot reiterate too strongly the need for painstaking work which is necessary on the Superman daily, Sunday and magazine pages. You can see from our manner of going about things now, such as criticizing and approving the scripts, that we will not tolerate or accept slipshod work. I know that you can do and that you can influence Joe to do a very good job on this strip.

Whit sent you an okayed cover design. This must be in by the end of this week. Tell Joe that when he sketches covers to bear in mind that Superman must always appear the largest figure and a front view.

It is now the 23rd of the month and I have yet to receive any releases on Superman which

000002141

- 11 -

LSL ER 434

**EXHIBIT 7**
414

Mr. Jerome Siegel                                        January 25, 1940

is needed for the May issue of Action. Let me know by return air mail just when this
is coming in. The Syndicate has also called saying that they are right up to dead-
line. Haven't you turned out any Sunday or daily strips since you left here? Please
do not forget that all copy must clear through our office. How long does the present
continuity on the dailies continue and are you working on any new scripts? You've got
to give us plenty of time for okaying so get busy.

I have not received a copy of the detailed Superman continuity which has been recently
okayed by us. We are going over this script with a fine tooth comb. Please type your
synopsis double spaced and on one side of the paper. Get behind your work with zest
and ambition to improve and forget about book rights, movie rights and all other dreams.
I will let you know as soon as things happen. After all, you must realize that we have
a bigger stake in it than you have and we will take care of things in the proper manner.

                                        Very sincerely yours,

                                        J. S. LIEBOWITZ

JSL:MN

P.S. We're sending you a couple of Superman #4 preview copies. Also enclosing a
check for $104.00.

We notice in the last daily release that Clark Kent is flying in the air not
dressed in Superman costume. We think it's an unwise policy to show him without the
Superman costume when performing any of his feats.

000002142

LSL ER 435

-12-

EXHIBIT 7
415

# EXHIBIT 8

# DETECTIVE COMICS
### INCORPORATED

**February 8, 1940**

450 LEXINGTON AVE.
NEW YORK, N. Y.

Publishers of
S U P E R M A N
ACTION COMICS
DETECTIVE COMICS
ADVENTURE COMICS
MORE FUN COMICS

Mr. Jerome Siegel,
10622 Kimberley Avenue,
Cleveland, Ohio.

Dear Jerry:

I hope that everything is now on an even keel with Cassidy and Boring at work. Also, that you have forgotten about our unpleasant episode of last week. From now on, I hope we will only have nice things to write to each other.

I am enclosing a copy of a letter which was received by McClure from the New York Post, which is self-explanatory. Many other people have had the same criticism lately. Just this morning Mr. Waldo called me about the same matter. It is very important that Joe do the entire Superman figure as there seems to be no one who is able to copy his style and the facial expression of Superman. I hope that you will see to it that this is done and that the quality of the rest of the strip will continually improve.

I like the present arrangement on the editing of the strip and I think you do too, as it gives us an opportunity to catch any mistakes. Whit knows his business and is very anxious to cooperate with you. We are, however, encountering trouble and delay on your other continuities. For example, the man who draws the Spy strip has now been delayed an entire week. He is unusually slow as it is, to delay him another week holds up the production of our magazine. You should try and get ahead.

I have also received a letter from the syndicate in which they insist that you catch up with the daily and the Sunday strips, as it is causing them a lot of needless expense and delay. I think, however, from now on these conditions will be remedied.

With kindest regards to all, I am

Sincerely yours,
J. S. Liebowitz

JSL:MN

P.S.- The syndicate has just called up stating that they received a contract from a California paper. They want to start some time in May and the syndicate is therefore anxious to know how long the present daily continuity will run -- also the Sunday. I have asked you once before to give me this information -- Will you please be good enough by return mail to let me know the

000002261

- 13 -

LSL ER 437

**EXHIBIT 8**
**416**

# EXHIBIT 9

PLAZA 3-0741

# DETECTIVE COMICS

Publishers of
S U P E R M A N
ACTION COMICS
DETECTIVE COMICS
ADVENTURE COMICS
MORE FUN COMICS

480 LEXINGTON AVE.
NEW YORK, N. Y.

May 2, 1940

Mr. J. Siegel,
Box 1808,
University Center Station,
Cleveland, Ohio.

Dear Jerry:

I am enclosing a check for $520.00 for the two Superman releases lately received and a check to yourself for the Spectre release.

By this time you no doubt have received the Syndicate check. This is quite a substantial sum and I have every hope that these will continue to grow, provided however, you pay strict attention to the plotting and the art work on the Superman. Incidently, I must say that the last two releases were not at all to our liking. This may be altogether due to your method of working, which is on a piece work basis in factory style. We've got to have tailor made releases. The fact that you pay Cassidy on a piece work basis certainly does not allow the man to take the pains necessary to plan and draw. Naturally, if he is to earn a good living, he has to bat the stuff out no matter what results. I think your income at present is large enough to warrant your taking a little additional expense which will prove to be a very wise investment, if we are to perpetuate the Superman strip. Pay the man a little more so that he will be able to allow himself a little more time and give it better quality.

The new artist is still in the process of working on his first release. We have seen some of the work and feel assured that it will definitely be an improvement over what we have been getting. I cannot at the present time figure out the cost, but as soon as the releases are finished I will write you.

As to your continuities, there is no need to go into it in detail again after our long telephone conversation. While in your last letter you seem to be imbued with a new spirit to raise the standard of the material, I am afraid that you will in a few weeks lapse into your old way of doing things. I hope that you will see to it that this does not happen.

Incidently, the Syndicate thinks that the current daily releases are absolutely the worse that they have ever read. They criticize our editorial supervision and you know that we are not at fault in this respect. So put on your thinking cap and get us some real good stuff.

While we are in the process of negotiations with several

-14-

LSL ER 439

**EXHIBIT 9**
417

Mr. J. Siegel                    1.-                    May 2, 1940

licensees, none of them have materialized as yet.  I believe I told
you that the picture rights have been sold to Republic for release
as a 15 part serial.  The price we got was $8,000. and while this sum
may seem insignificant we have gone ahead feeling assured that all the
publicity we will receive as a result of this venture would aid us
materially in building up the radio end and promoting the sale of
licensed merchandise.

Incidently, Macy's is building for their Thanksgiving
Day Parade a figure of Superman 4-1/2 stories high and it will cost
approximately $15,000.  I think that this will induce you to come into
town for the parade.

This morning we received the decision from the Court
of Appeals on the case which Fox took to a higher court.  The verdict
was altogether in our favor and the decision in the lower court was sus-
tained.  We are now in the process of examining competitive magazines
for any infringements of Superman, whether in costume or in deeds.

We have received no synopsis from you lately.  Better
hurry up so that we will have sufficient time for comment.  Please let me
hear from you as to what you plan to do to improve the art work.

Regards from everyone here to yourself, Joe and Mrs.
Siegel.

                                        Sincerely,

                                        J. S. LIEBOWITZ

JSL:MN

P.S.The St. Louis Post Dispatch would like you to do a scene such as is
described on the attached sheet.  They plan to use this as part of a
promotion.  When you have this ready send it on to me so that I can forward
it to them.

- 15 -

LSL ER 440

**EXHIBIT 9**
**418**

# EXHIBIT 10

From:
Jerry Siegel,                                                           Page One
10402 Glendon Road,
University Heights, Ohio.

SUPERBOY
I.

1.  (Panel occupies full page.  Contains the title, SUPERBOY, the by-line, By Jerry

    Siegel and Joe Shuster, a script box, and an illustration showing SUPERBOY leap-

    ing high over the city at great speed alongside SUPERMAN)

    Script Box:    It has to happen!   So many faithful followers of today's leading

                   adventure comic strip, SUPERMAN, wrote in demanding the adventures

                   of Clark Kent as a youth that the creation of this newest and

                   most promising magazine comic strip character was inevitable! And

                   so here he is at last...the answer to your requests...America's

                   outstanding boy hero:   SUPERBOY!!
                       •••••••••••••••••••••••••••••••••••••••
                                    II.
1.  Caption:    You will recall that as the distant planet, Krypton, burst into frag-

                ments, superscientist Jor-L and his wife Lora, launched their infant

                son toward the planet Earth in a trial space-ship...!

    (SCENE:    Shows the space-ship hurtling up from the surface of Krypton into

               space as the planet blows to bits)

2.  Caption:    As the solitary vessel hurtled thru interplanetary space, it nar-

                rowly dodged oblivion in the form of comets, meteors, and other

                stellar obstacles....

    (SCENE:  illustrates)

3.  Caption:    Alighting upon Earth, it burst into flames.  Its tiny passenger

                was saved from a fiery death by a passing motorist....

    Man(lifting child from flaming vessel in horror):   Why — it's a BABY!

4.  Caption:    He immediately turned it over to the officials of the Crestwood

                Orphanage....

    Man:        You'll see that it's — er — well taken care of?

    Stout Woman Attendant in Charge:    As well as can be expected!

EXHIBIT 10
419

000000478

SUPERBOY (Release No. One)                                             Page Two

5.  Caption:   But the motorist — Charles Kent — finds he can't forget the infant....

    Charles(at home,in armchair,to wife):   I can't get that little rascal out of

                                    my mind, Mary!

    Mary Kent(his wife):   Then why not adopt him, Charles?  You know we've always

                                    wanted a son of our own!

6.  Caption:   Meanwhile — at the Crestwood Orphanage.....

    Woman Attendant(running from room into hall,screaming):   EEEEeeee!

    Doctor:   Tell me, Nurse!  What is it?

7.  Woman Attendant(pointing in terror at room):   In the nursery, Doctor! IN THERE!

    Doctor:   What can be ailing you?

8.  Doctor(entering, pince-nez glasses falling from nose in amazement as sights

            baby lifting armchair overhead in one hand):   ULP!!

    Woman Attendant(triumphantly):   NOW what do you say!
                    ................................................
                                    III.

1.  Doctor(advancing toward child):   This is amazing — incredible!  A child —

            possessed of such strength!  I still can't believe it!

    Nurse:   Don't go near him, Doctor!

2.  Doctor(as baby drops armchair on his foot):   OUCH!  My foot!

    Nurse:   See!  I warned you!

3.  Caption:   Puzzled at his surroundings, the infant lifts empty metal cribs,

            smashes them together in thoughtful contemplation.....

    Doctor:   He's wrecked the equipment!

    Nurse:   This is TOO MUCH!  I'm going to the Director of the Orphanage!

4.  Director(suspiciously):   A child — smashing up the contents of the nursery?

                    Nurse Jacobs — are you sure you — er — haven't

                    imbibed?

    Nurse(indignantly):   Come see for yourself!

5.  Sound from nursery):   CRASH!

    Director(as he and nurse hurry toward it):   What's THAT?

    Nurse(grimly):   You'll see!

EXHIBIT 10
420

000000479

6.   Director(amased to see doctor up on chandalier):  Doctor Calvin!  What are you doing
        up there on that chandalier?  Come down here at once!

     Doctor(up on chandalier,gasping):  At once — right away — but keep that little
        savage away from me!

7.   Director(as Doctor stands besides him):  And now — your explanation, please!

     Doctor(pointing to baby playing on floor):  That infant threw me up there!

8.   Director(heatedly):  Pardon my saying so, my dear Doctor Calvin, but I think you're a
        cockeyed liar!  Surely, you don't expect me to BELIEVE that!

     Nurse(shouting):  LOOK OUT!

     (SCENE:  Baby is waddling toward the director)

                    • • • • • • • • • • • • • • • • • • • • • • • • • •
                              IV.

1.   Director(as seized, lifted by baby):  Hey!  Wha ——— ?

     Baby:  Da!

2.   (SCENE:  Shows the Director being hurled up toward the chandalier)

3.   Director(hanging from chandalier):  HELP!  Get me down from here!

     Doctor(triumphantly):  Still think it's impossible?

4.   Director(on floor again, gazing at baby astonished as it whirls crib
        overhead):  Amazing — beyond all belief!  This infant actually possesses
        the strength of many men!

     Nurse:  But you've got to get rid of the little monster at once!  He'll wreck
        the establishment!  There'll be nothing left of the Orphanage, then
        where'll WE be!

     Doctor:  There's a lot in what the nurse says!

5.   Another nurse(coming into room):  A Mr. and Mrs. Charles Kent to see you, Director.

     Director:  Kent...Kent.  Say, that's the fellow who wished this miniature
        hurricane on us!  I'll see him at once.

     Doctor:  Do you think he's come to....

     Nurse:  If only he HAS!

EXHIBIT 10
421

000000480

Page Four

6.  Director(rubbing hands delightedly):  And what can I do for you, please?

    Charles:  Err — we've come about the youngster I brought here.

    Mary:  You see — we'd like to....

7.  Director(holding out pen and form-sheet):  ...adopt the infant?  Why, nothing
        could be simpler!  Just sign this paper, and he's yours!

    Charles(reaching for pen, jubilantly):  You hear that, Mary?

    Mary:  Oh! – Oh! – OH-HH!!!!

8.  Caption:  Several minutes later, the Kents depart with the newly acquired
        member of their family.....

    Mary(holding child, as they walk toward their car):  Doesn't it seem strange
        that we secured custody of the child so quickly?  I always thought
        there was a lot of red tape attached to adopting a child.

    Charles:  So did I.  But let's not look a gift horse in the mouth!
        ..............................................
                                    ▼.

1.  Mary(as they drive along, baby asleep in her arms):  Fast asleep!  Isn't he
        adorable?  I still can't believe our wonderful luck!  He's all ours!

    Charles:  The car...we're not moving!

2.  Charles(out of car,looking at it in dismay,wheel is stuck in muddy ditch):  Talk
        about your bad luck!  Here we are stuck in a ditch, and miles from a
        service station, or a telephone!

    Mary(out of car,baby left in car):  Here comes an auto. Maybe they'll help!

3.  Charles(as car speeds swiftly by):  They wouldn't stop!

    Mary:  Let's try to push it!

4.  Caption:  Together, husband and wife shove, and pant, and strain — but without
        any luck!

    Charles:  (Puff!)  Can't budge it!

    Mary:  I'm exhausted!

5.  Caption:  Within the car...the tiny passenger awakens in the midst of a yawn...

    (SCENE:  Shows the baby awakening, sleepily)

EXHIBIT 10
422

000000481

SUPERBOY   (Release No. One)                                    Page Five

6.   Caption:    ...then...clambers out and thoughtfully observes his foster-parents'
                 labor....

     (SCENE: illustrates, baby is unnoticed)

7.   Caption:    The infant acts.  Stepping in, it calmly lifts the auto out of the
                 ditch and sets it back on the road....

     Charles(not noting child):  It's moving!

     Mary(ditto):   We've done it!!

8.   Charles(abruptly noting child holding rear end of car off
                 of road):  Mary -- L-LOOK!

     Mary:   I am! -- And I still don't believe my eyes!
                 ...................................
                                VI.
1.   Charles(closeup of the two,gasping):   The baby -- lifted the car off the road --
                 with one hand....IMPOSSIBLE!

     Mary:  But -- we can't be dreaming -- because -- we BOTH SAW IT!!

2.   Charles:   Careful, Mary!   Keep away from it!

     Mary(avoiding his restraining hands,approaching child):    Put it down!
     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3.   Caption:    In response to Mary's command, the child obediently lowers the car,
                 then toddles toward her....
     Mary:   You see, it did as I said!
     Charles:   The strength of a dozen elephants -- and yet, it still possesses
                 the instincts of a normal child!

4.   Caption:   Shortly after....as they proceed on their way....
     Mary(holding sleeping baby):   See...he's fallen asleep again.
     Charles:   Mary!  I'm just beginning to realise!  We've a problem child on
                 our hands!  And in more ways than one!

5.   Mary:   I see what you mean.  Our boy's extraordinary strength may make him the
                 object of everyone's envy and fear....cause him to become an outcast.
                 We mustn't let THAT happen!
     Charles:   Only one way to safeguard against it.  No one must learn of his
                 super-strength!

EXHIBIT 10
423

000000482

Page Six

6. Mary: But how came we train an infant, who doesn't understand a word of English, what to do and what not to do?

Charles: That's up to us to figure out! And somehow, I've a feeling that we'll succeed!

7. Caption: That evening....

Mary(in home,before fireplace,watching infant playing on floor): I wonder what his history is, Charles? Where he came from? Where he gets his tremendous strength?

Charles: We may never know, Mary. But one thing we DO know. He's our son, now and forever!

8. Mary: Our son — and we haven't even named him!

Charles: You know what name we'd always planned to give our boy — if we ever had one! — Clark!

9. Mary: Then —— "Clark" it is!

Charles(lifting infant): You hear that, Clark? Clark Kent! How do you like the sound of your new name?

Clark: Da! Da!

.............................................

VII.

1. Caption: The task of teaching the infant Clark to conceal his tremendous strength proceeds....

Mary(working in kitchen,to Clark, as he tries to lift refrigerator): No, Clark! You mustn't do that! — Or we won't have any nice ice cream for desert!

(SCENE: Shows question marks over Clark's head)

2. Charles(to Mary): Well, how are the lessons in will-power coming along?

Mary(discouraged): I'm very discouraged, Charles. It's hard — but — I think I'm making slight progress. — Answer the doorbell.

(SCENE: Clark is playing on floor with electric train)

000000483

EXHIBIT 10
424

SUPERBOY     (Release No. One)                              Page Seven

3.   Mrs. Doyle(entering with Mickey, her brattish eight year old son):  I've heard
              so much about your adopted child, I just HAD to come and see him. And I've
              brought Mickey along to play with him!

     Mickey:   Aw, who wants to play with a baby?

     Mary:     Mrs. Doyle!  I haven't seen you in AGES!

4.   Mrs. Doyle(pinching Clark's cheek):   Cute little fellow!  My, how hard his cheeks
              are!

     Charles(whispering to Mary):   Ps-st!  Get her away from Clark before she dis-
                          covers something!

     Mary(to Mrs. Doyle):   Would you care to come upstairs and see my new sewing-machine?

5.   Mrs. Doyle(as climbs upstairs, shouting back to Mickey as Charles and Mary
              accompany her):  Play with Clark, Mickey dear!

     Mickey:   Me play with that infant?  Not on your life!

6.   Mickey(when they are alone):  Toy trains!  Phooey!  I outgrew that long ago!
     (SCENE:   Mickey is kicking the train off the track.  Clark grimaces in displeasure)

7.   Mickey(leaning down to Clark, smirking):  Well, diaper-pants!  Wottaya say to THAT?
     (SCENE:   Clark's wrath is rising)

8.   (SCENE:  Shows Clark striking up at Mickey with terrific right that knocks him
              off his feet.)
                    ..............................
                              VIII.
1.   Shout:   MA-AAAaaaa!
     Mrs. Doyle(turning, startled, as hears shout):   That's Mickey!

     Mary:   What can be the matter?

2.   Mrs. Doyle(taking Mickey's arm, shaking him):  What happened?

     Mickey(bawling, pointing at black eye):  All I did was kick his train — an' —
              an' he HIT ME!

000000484

EXHIBIT 10
425

Page Eight

3. Mrs. Doyle(dragging Mickey out thru front door by ear): Telling me such a
ridiculous story! When we get home, your dad will warm the seat of
your trousers!

Mickey: But he DID hit me!!

Mary(shouting anxiously after them): Don't be too harsh on him, Mrs. Doyle!

4. Mary(lifting Clark): Shame on you, Clark! Picking on a boy four years older
than yourself!

Charles(chuckling,Clark is grinning): Sorry, Mary — but I can't help being
proud of MY SON! He sure gave that brat what he deserved!

5. Caption: One day — the inevitable occurs....

Mary: Charles, I've been dreading this for a long time, but...I believe the
time has come when we're obliged to place Clark in school!

Charles: We've tried to teach him to control his strength, but what happens
from here on is in the hands of fate alone!

6. Mary(to teacher,as takes Clark to kindergarten): You'll take good care of him,
won't you, Miss Lemon?

Miss Lemon(sourpuss kindergarten teacher): Have no fear, Mrs. Kent. Clark's
personality will be developed in this class. You'll be surprised how
it blooms!

Charles: (*—You may be in for some surprised yourself, Old Gal—*)

7. Caption: No sooner does Clark seat himself in the kindergarten class, then....

Brat(aiming spitball in rubber band at Clark from rear,to little girl seated
beside him): WATCH THIS!

Girl beside him: Tee Hee!

8. Caption: The serenity of Clark's features changes not one whit as the
spitball bounces, unnoticed, off the rear of his neck....

(SCENE illustrates)

Girl: Tee Hee! He didn't even feel it!

Brat: Yeah? Well, he'll feel this TACK!

(NOTE: Brat raises tack meaningly)

000000485

EXHIBIT 10
426

IX.                                     Page Nine

1. Caption: Surreptitiously, the class brat slips the tack beneath Clark....

   Brat(to himself,as does so): ("—Ho! Ho! — When he moves back in the chair, this
                                will be FUNNY!—")

2. Caption: But again, Clark's expression is maddeningly impassive!

   Girl: Tee Hee! It doesn't even bother him!

   Brat(face darkening): It don't, eh? Well, I'll fix him during recess!

3. Caption: Recess time...

   Brat(stopping Clark): Wait a minute, you! I don't like your face!

   Clark: Aw! — Let him alone!

4. Brat(socking Clark): I'll show you!

5. Brat(dancing with pain,holding fist): Ouch! My fist! My fist!

   Girl: Let that be a lesson to you!

6. Caption: After that, Clark is left alone. But when he reaches the fifth grade...
            the members of the Thick-and-Thin Club hold a conference in which he
            is vitally concerned....

   Tom: This kid Clark Kent always keeps off by himself. Let's pretend we want him
        to join the club an' give him th' works. It oughta be a lot of fun.

   Bob: Sounds like a good idea!

   Dick: All in favor, says aye!

   Others(meeting in garage): Aye!

7. Tom(to Clark,in school): Want to join the Thick-and-Thin Club?

   Clark(pleased): Oh, yes!

   Dick: Good! Then come to the meeting tonight in Tom's father's garage!

8. Mary(as Clark leaves house): Where are you going, Clark?

   Clark: Just out to see some fellows.

   Charles(reading newspaper): Be back early, son.
                     ...........................................

X.

1. Tom(to the others): Here's the set-up! We get Clark to enter the old haunted
                       house. Then we scare the dickens out of him. Good idea?

   Bob: Swell!

   Dick: This ought to be a riot!

EXHIBIT 10
427

000000486

2. Tom(to Clark, as he enters):   So you want to be a member of the <u>Thick-and-Thin</u> <u>Club</u>,
eh?  You realise that you can't join our club unless
you've got the courage of a lion and always help
your friends?

Clark:  I realise that!

Bob:   Then you're going to have a chance to prove if you qualify!

3. Tom:  You're to beter the old haunted house on <u>Hudson</u> <u>Street</u> and stay there for
a full hour.

Clark:  Is that all?  It'll be a cinch!

Bob:  ("—HE thinks!  But he doesn't know what we got planned for him!—")

4. Caption:  Racing swiftly, the members of the club reach the house before Clark...
Tom(as they enter thru rear door; they're carrying sheets, etc.):  Got everything?

Bob:  Yeah.  Hurry.  He'll be here any minute!

5. Caption:   The boys hide, chuckling in anticipation of the fun that lies ahead...
Tom(on floor):   Sh-hh!  Lay low!

Bob:  I hear someone coming!

Dick:   Boy!  Wait'll I put on my spook outfit!

6. Caption:  The front door opens and closes with a slam.  But instead of Clark,
several hard-faced individuals enter....

Croy(thug in lead):   Remember where you hid the stolen jewelry?

Jim:   Naturally.  In the cupboard.  Think I'd be dumb enough to forget where
I salted away fifty grand!

7. Tom(gasping, looking thru slightly ajar door):  Gee!  It ain't Clark!

Bob:  It's some men!

Dick:  And they look like DESPERATE CROOKS!!

8. Jim(opening cupboard, taking out bag):  Here they are!

Croy(whirling, snatching out gun):  A noise —> from the next room!

·······················································

II.

1. Croy(throwing open door, sighting cowering boys):  It's some kids!

Jim:  They heard everything!  Cover 'em!

Tom(quaking):  D-don't sh-shoot us!
Bob:  W-we won't squeal on you!

000000487

EXHIBIT 10
428

SUPERBOY  (Release No. One)

Page Eleven

2.  Jim(as Croy ties them up):  Too bad for you kids, but you know what we look like
and we can't risk a rap right now!

Croy:  If we was turned in, it would mean life for us. — There!  That fixes 'em!
Shall I take them out to the car?

3.  Caption:  In the darkness outside the house, Clark pauses alert as his keen
eyes penetrate the blackness to reveal his bound friends being placed
in the rear....

Clark:  The boys...in trouble...

4.  Caption:  As the car drives off, Clark takes a flying leap after it...

Clark:  Maybe I can help them!

5.  Caption:  ...that lands him noiselessly atop the rear-tire!

Clark: Made it!

6.  Caption:  The thieves stop the car at the top of a steep incline. Clark leaps
to hiding behind a nearby rock....

Croy(standing beside):  But the kids will be killed!

Jim(shoving at rear of car):  It's either them or us!

7.  Caption:  Propelled by the criminals, the auto commences to speed down the
mountainside with its helpless captives....

(SCENE: illustrates car speeding down mountain road haphazardly at terrific speed)

8.  Clark(springing to top of rock):  Got to act — now!

Croy(looking up, amazed):  Hey!  Lookit the kid!

Jim(firing at Clark):  Get him!

..........................................

XII.

1.  Caption:  Down springs Clark in the very face of the firing weapons. The
bullets careen harmlessly off his super-tough skin, but due to
the darkness the crooks believe they have missed....

Clark(cracking their heads together as he streaks down):  Let's see how thick-
skulled you are!

000000488

EXHIBIT 10
429

Page Twelve

2. Caption:  Leaving the unconscious thugs behind him, Clark races down the incline
   after the rocketing car....

   Clark(running at terrific speed):  Another few seconds, and they're done for!

3. Caption:  ...overtaking it in a few moments!  He leaps to the running board!

   Clark:  Now to get in!

4. Caption:  Climbing in, Clark desperately applies the brakes....

   Tom(shouting):  It's Clark!

   Clark:  Pray, boys — pray!!

5. Caption:  ....so that the auto skids to a stop x bare inches from a cliff's brink!

   (SCENE: illustrates)

6. Caption:  Clark unties his friends....

   Tom(emerging from car):  Whew!  That was a close call!

   Bob(to Clark):  How did you happen to show up in time?

   Clark:  I saw those crooks take you fellows into the car and hid on the running
   board!  But let's drive back up the incline and tie up those crooks before
   they come to.  I saw them lying unconscious!

7. Newspaper Headline:  BOYS CAPTURE CRIMINALS!!

   (SCENE:  Pictures of boys on front page)

8. Caption:  Clark is made a permanent member of the Thick-and-Thin Club....

   Tom(at meeting):  The crooks claimed a young kid jumped at them out of the
   darkness. But it was too dark to see who he was.

   Bob:  Probably a made-up story.

   Dick:  Wouldn't it be strange if there was young kid like us playing at being
   Robin Hood and helping people in trouble?

   Clark:  ("—That's an IDEA!—")

   .............................

   IIII.

1. Mary(to Clark):  You're quite a hero, Clark, aren't you, since that writeup in
   the paper?

   Clark:  I didn't do much.

   Charles:  ("—I WONDER!—")

000000489

EXHIBIT 10
430

Page Thirteen

2. Caption:   That evening...

Clark(on his bed in bedroom):  A young kid — venturing out to help people in need ——gee...that sounds like a grand idea...I could put my hidden strength to work for a good purpose!

3. Clark:  But I'd have to hide my true identity from everybody while I was out playing at being Robin Hood. — I get it!  A masquerade costume!

4. Caption:  Surreptitiously, the lad designs a strange costume of his own cretin...
(SCENE: Shows Clark making costume)

5. Caption:  As he tries it on for the first time, he feels a strange premonition come over him....

Clark(wearing costume):  Strange — but I feel almost as tho I were MADE to wear this costume — always....!

6. Caption:  That night he springs out into the darkness in search of adventure, and someone to help...
(SCENE:  Shows SUPERBOY streaking over city at night)

7. Caption:  And so was launched the career of SUPERBOY, youthful Champion of Righteousness!  In later years he was to become the might figure known as SUPERMAN!  But the story of SUPERBOY's amazing and often humorous adventures is a series of astonishing narratives in itself...!  Don't miss a single adventure of the comic page's newest sensation: SUPERBOY!!

(SCENE: Shows portrait of SUPERBOY)

Small script box in lower right hand corner of panel:  The End.
.............................

From:
Jerry Siegel,
2402 Glendon Road,
University Heights, Ohio.

000000490

**EXHIBIT 10**
**431**