Marc Toberoff (State Bar No. 188547)
 mtoberoff@ipwla.com
Keith G. Adams (State Bar No. 240497)
 kgadams@ipwla.com
Pablo D. Arredondo (State Bar No. 241142)
 parredondo@ipwla.com
David Harris (State Bar No. 255557)
 dharris@ipwla.com
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Telephone:  (310) 246-3333
Fax:         (310) 246-3101

Attorneys for Defendants Mark Warren
Peary, as personal representative of the
Estate of Joseph Shuster, Jean Adele Peavy,
and Laura Siegel Larson, individually and
as personal representative of the Estate of
Joanne Siegel

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DC COMICS,<br><br>              Plaintiff,<br><br>   vs.<br><br>PACIFIC PICTURES CORPORATION; IP WORLDWIDE, LLC; IPW, LLC; MARC TOBEROFF, an individual; MARK WARREN PEARY, as personal representative of the ESTATE OF JOSEPH SHUSTER; JEAN ADELE PEAVY, an individual; LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL, and DOES 1-10, inclusive,<br><br>              Defendants. | Case No: CV 10-03633 ODW (RZx)<br><br>Hon. Otis D. Wright II, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND AND THIRD CLAIMS FOR RELIEF**<br><br>*Reply to Statement of Genuine Issues; Evidentiary Objections; Responses to Evidentiary Objections; Objection to Rule 56(d) Declaration; and Reply Declaration of Keith G. Adams filed concurrently herewith*<br><br>Complaint filed:   May 14, 2010<br>Discovery Cutoff:  None Set<br>Trial Date:          None Set<br><br>Date:   October 15, 2012<br>Time:   1:30 p.m.<br>Place:  Courtroom 11 |

1

# **TABLE OF CONTENTS**

2    I.       INTRODUCTION ............................................................................1

3    II.     THE 1992 AGREEMENT DOES NOT SUPPORT DC'S
4            ARGUMENTS ..............................................................................2

5    III.    DC'S "UNCLEAN HANDS" CLAIM LACKS MERIT ..................9

6    IV.    DC OFFERS NO REBUTTAL AS TO OTHER CLAIMS AND
            ISSUES ......................................................................................11

7    V.     CONCLUSION ...........................................................................12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLES OF CONTENTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Cases**                                                                          **Pages**

*Bourne Co. v. MPL Commc'ns, Inc.*,
  675 F. Supp. 859 (S.D.N.Y. 1987) ....................................................................... 12

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ..................................................................... *passim*

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992) ................................................................................ 5

*Estate of Molino*,
  165 Cal. App. 4th 913 (2008) ............................................................................. 7

*FTC v. Publ'g Clearing House, Inc.*,
  104 F.3d 1168 (9th Cir.1997) ............................................................................. 8

*Gucci Am., Inc. v. Guess?, Inc.*,
  2012 WL 2304247 (S.D.N.Y. June 18, 2012) .................................................. 10

*In re Estate of McGee*,
  2008 WL 3856834 (Cal. Ct. App. Aug. 20, 2008) ........................................ 6, 7

*In re Kalt's Estate*,
  16 Cal.2d 807 (1940) .......................................................................................... 7

*Jones v. Trice*,
  202 A.D.2d 394 (N.Y. App. 1994) ..................................................................... 5

*Lamkin v. Vierra*,
  198 Cal. App. 2d 123 (1961) .............................................................................. 6

*Marvel v. Simon*,
  310 F.3d 280 (2d Cir. 2002) ............................................................................... 3

*Mellen & Jayne, Inc. v. AIM Promotions, Inc.*,
33 A.D.3d 676 (N.Y. App. 2006) ......................................................................... 5

*MGM Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ........................................................... 10

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) ................................................................... *passim*

*Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*,
  100 A.D.2d 865 (N.Y. App. 1984) ..................................................................... 5

ii
TABLES OF CONTENTS AND AUTHORITIES

*Penguin Group (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008) ............................................................ *passim*

*Russ Berrie & Co. v. Jerry Elener Co., Inc.*,
  482 F. Supp. 980 (S.D.N.Y. 1980) ........................................................ 11

*Shady Records, Inc. v. Source Ent., Inc.*,
  2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. January 2, 2005) ................... 11

*Siegel v. Nat'l Periodical Publications, Inc.*,
  508 F.2d 909 (2d Cir. 1974) ............................................................ 1, 9, 10

*Siegel v. Time Warner Inc.*,
  496 F. Supp. 2d 1111 (C.D. Cal. 2007) .................................................. 9

*United States v. U.S. Currency, $30,060.00*
  39 F.3d 1039 (9th Cir. 1994) ................................................................ 4

**<u>Statutes</u>**

17 U.S.C. § 304(c). ...................................................................... 3, 10

17 U.S.C. § 304(c)(5) ..................................................................... 2, 3

17 U.S.C. § 304(c)(6) ......................................................................... 3

17 U.S.C. § 304(c)(6)(D) ............................................................ *passim*

17 U.S.C. § 304(d) ...................................................................... 10, 11

Pub. L. 105-298 (1998) ..................................................................... 1, 7

37 C.F.R. § 201.10 ............................................................................. 11

**<u>Other Authorities</u>**

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2010)
  § 11.07[E][2][b][i] .......................................................................... 3
  § 11.08[A] .................................................................................. 12

3 W. Patry, *Patry on Copyright* (2010)
  §7:47 ......................................................................................... 12

6 W. Patry, *Patry on Copyright* (2010)
  § 21:18 ....................................................................................... 12

# I.    INTRODUCTION

In 1992, DC already owned all of Joe Shuster's rights to Superman free and clear.  Its pre-1978 copyright grants had been repeatedly upheld in court, and nobody – not Shuster's sister Jean, his brother Frank, or his estate – had any right to terminate those grants.  *See Siegel v. Nat'l Periodical Publications, Inc.,* 508 F.2d 909, 912-913 (2d Cir. 1974); Pub. L. 105-298 (1998).



DC's First Claim nonetheless asks this Court to believe that in 1992, for unknown reasons, DC decided, in raising a small pension, to tear up its venerated pre-1978 Superman grants and replace them with an "ephemeral" one-paragraph quitclaim.  It further asks this Court to believe that this boilerplate silently worked to (i) revoke all of Shuster's copyright grants, (ii) give those copyrights to his siblings, and (iii) regrant those copyrights back to DC.

As this Court correctly observed, this argument is "lunacy."  It defies all legal and common sense.  Not a single word in the 1992 Agreement, drafted by DC's own counsel, attempts to do *any* of these things.  Why would they?  Even Paul Levitz, DC's President, who handled and signed the 1992 Agreement, could not bring himself to say in his declaration (Docket 460) that DC intended what it now argues.

At the hearing on this matter, this Court rejected DC's frivolous argument:

> <u>Defendants' Counsel</u>: And I submit that that is impossible that companies of this magnitude would have their lawyers draft something like this [if] their intention was to revoke all prior grants and regrant them the Superman copyrights. It is an impossibility.
>
> <u>The Court</u>:  What you suggest is lunacy.  So, okay, I am sure that is not their intent.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    *See* Declaration of Daniel Petrocelli (Docket 493-1; "PD"), Ex. 2 (9/5/2012 Tr.) at

2    78:2-7.  The Court was incredulous at DC's ludicrous, self-serving argument:

3        <u>The Court</u>:  Well, I can see why DC would basically want to tear up a
         clear, unequivocal grant of intellectual property in Superman from 1938.
4        I can understand why they would tear that up for this ephemeral thing.
         That makes a lot of sense to me.  *Id.* at 85:7-11.
5

6        DC's "unclean hands" argument is equally specious.  It frivolously accuses the

7    Shuster Estate of a conspiracy for (i) opting not to bring a Superboy claim *against*

8    *DC* (due to 1947 court findings that Siegel created Superboy) and (ii) not listing

9    irrelevant (and ineffective) transactions with the Copyright Office.

10       DC fails to address, and thereby implicitly concedes, numerous other issues as

11   to its First, Second and Third Claims.  DC has had ample discovery – *eight years*

12   between this and the closely-related *Siegel* cases (two years in this case alone) – and

13   no amount of additional discovery will salvage DC's meritless claims.  Nor do DC's

14   attacks on opposing counsel, empty speculation and prejudicial rhetoric about

15   "fraudulent schemes" rescue its deficient legal claims. The time has come to end this.

16   **II.    THE 1992 AGREEMENT DOES NOT SUPPORT DC'S ARGUMENTS**

17       DC's convoluted arguments do nothing to salvage its First Claim.

18       **Inalienability**:  As shown in Defendants' opening brief (Docket 478 ("Mot.")

19   2-3), the termination right is inalienable and unwaivable, may be effected

20   "notwithstanding any agreement to the contrary," and transfers of terminated rights

21   are valid only if signed after a termination notice is served.  17 U.S.C. §§ 304(c)(5),

22   304(c)(6)(D); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008)

23   (noting "the inalienability of termination rights provision in § 304(c)(5)").

24       **Promises Not to Exercise Termination Rights**:  DC's argument that "if Jean

25   Peavy held the right of termination in 1992" (which she did not) "and agreed with

26   DC not to pursue the right for $25,000 per year going forward," the contract would

27   be enforceable is 100% wrong.  Docket 491 ("Opp.") 5, 10 (referring to supposed

28   "promises" in Jean's informal letters).  This is *exactly* the sort of "agreement to the

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  contrary" barred by § 304(c)(5).  *See Marvel v. Simon*, 310 F.3d 280, 290 (2d Cir.

2  2002) (agreement reclassifying works as non-terminable "works-for-hire" was void

3  "agreement to the contrary"; "clear Congressional purpose behind § 304(c) was to

4  prevent authors from waiving their termination right by contract"); 3 *Nimmer* §

5  11.07[E][2][b][i] (agreements that "expressly abandon[] the termination right" or

6  promise "not to terminate at any point in the future" are void "agreement[s] to the

7  contrary").  If the 1992 Agreement was construed to anticipatorily transfer terminated

8  copyrights, it would also be void as a "[f]urther grant … of any right covered by a

9  terminated grant" prior to service of a termination notice. 17 U.S.C. § 304(c)(6).

10  **<u>Mewborn</u>, <u>Milne</u> and <u>Steinbeck</u>**:  Defendants did <u>not</u> argue, as DC suggests

11  (Opp. 3, 9), that the Copyright Act forbids the type of "revocation and regrant"

12  upheld in *Milne*.  Defendants explained this limited exception to the "inalienability"

13  rule, which applies only where someone with current termination rights enters into a

14  post-1978 grant that expressly "revokes and replaces" all pre-1978 grants.  Mot. 12-

15  14; *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005); *Mewborn*, 532

16  F.3d 978; *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008).

17  In *Milne*, the author's son, who had an immediate termination right, *expressly*

18  used that leverage to *expressly* revoke a pre-1978 copyright grant and replace it with

19  a post-1978 grant, gaining "hundreds of millions of dollars."  That agreement was

20  held not to be an "agreement to the contrary" because it "fulfilled the very purposes

21  for which Congress enacted the termination right."  430 F.3d at 1040-41, 1045-47.

22  In *Steinbeck*, which neither binds this Court nor supports DC's arguments, the

23  widow (1) had a present termination right, and (2) "wield[ed] the threat of

24  termination" to enter into a new contract with major financial concessions, which (3)

25  *expressly* stated that it "'cancel[led] and supersede[d] the previous [pre-1978]

26  agreements.'"  537 F.3d at 196-200, 202-04.  Unlike the 1992 Agreement here, there

27  was a "clear expression of intent to terminate all prior grants."  *Id.* at 201.

28  In *Mewborn,* the publisher argued, just like DC, that a post-1978 grant that did

3

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1    <u>not</u> expressly revoke a pre-1978 grant, and purported to grant already-assigned rights,

2    barred termination as a "revocation and regrant" under *Milne*.  Like DC, the publisher

3    argued that even though the new grant had no language of revocation, it "effectively

4    superseded" the pre-1978 grant by dealing with the same subject matter.  Like this

5    Court at the hearing, the Ninth Circuit rejected this claim and emphasized that the

6    new grant (1) was a "nullity" because it purported to grant rights *already owned* by

7    the publisher, (2) did not "expressly revoke[]" the prior grant, unlike the "express[]"

8    revocation in *Milne*, and (3) unlike in *Milne*, financially did not reflect termination

9    leverage, since termination could not be done for years.  532 F.3d at 980-82, 986-89.

10    DC grossly mischaracterizes *Mewborn*, and *pretends* that Defendants argue it

11    "jettisoned" *Milne*.  Opp. 12-13.  *Mewborn* applied and explained *Milne*, but properly

12    refused to expand *Milne* beyond "its distinct factual scenario."  532 F.3d at 986.[1]

13    The common holding of these cases is clear:  when a party uses their ***current***

14    ***termination right as leverage*** to negotiate a much better post-1978 copyright grant

15    that ***expressly revokes and replaces*** pre-1978 copyright grants, it will be upheld.

16    This is not "defendants' test" (Opp. 12); it is specifically stated in the case law.

17    <u>**The 1992 Agreement Is Not a "Revocation and Regrant"**</u>:  DC argues that

18    the 1992 Agreement's phrase "fully settles all claims to any payments or other rights

19    or remedies ***you*** [*i.e.*, Frank and Jean] ***may have***" (*id.* at 7-8, emph. added) somehow

20    silently (i) revoked Joe's long-standing Superman grants to DC, (ii) granted those

21    copyrights back to Frank and Jean, and (iii) immediately re-granted them back to DC.

22    As this Court noted at the hearing, that is "lunacy."  The 1992 Agreement does not

23    meet *any* of the Ninth Circuit's requirements from *Milne* and *Mewborn*.

24    <u>*First*, the 1992 Agreement nowhere purports to revoke Joe Shuster's key</u>

25    <u>Superman grants, on which DC long relied</u>.  DC weakly argues that the 1992

26    Agreement "gave back to the heirs the rights their relatives [*i.e.*, Joe] held."  Opp. 7.

27    The 1992 Agreement says nothing of the sort.  DC's efforts to analogize this case to

28    _____

[1] DC cites *United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992), which held that an earlier circuit case controls if there is an "irreconcilable conflict," not present here.

1  *Milne* and *Steinbeck* (Opp. 7), where the post-1978 contracts ***expressly*** revoked the

2  pre-1978 contracts, lack merit from the outset.

3      DC's prior motion strained to evade this fatal flaw by arguing that the 1992

4  Agreement was somehow a "novation" under New York law.  Docket 458 at 13-15.

5  Defendants demonstrated that New York law[2] ***requires*** that the intent to replace a

6  prior contract be "clearly expressed" (Mot. 16; *Citibank, N.A. v. Benedict*, 2000 WL

7  322785, at *8 (S.D.N.Y. Mar. 27, 2000)),  and that, at best, the 1992 Agreement

8  amended Frank's $5,000 pension in a 1975 agreement that did not grant DC any

9  copyrights.  Mot. 15-18.  DC does not even attempt to defend its erroneous argument,

10 or to refute that the 1992 Agreement solely amended the 1975 agreement, and instead

11 makes only false conclusory references to New York law.  Opp. 7, 8 n.4.

12     The parties need not "list every superseded agreement" or say "magic words."

13 Opp. 7-8 n.4.  But if parties want to revoke binding contracts, then federal copyright

14 law, New York law and common sense require "unequivocal" language stating this.

15 Mot. 12-18.  If DC had wanted the 1992 Agreement to revoke and supersede Joe

16 Shuster' prior grants, it would have simply said so.  DC cannot now ask "[t]he court

17 … under the guise of interpretation, to write a new contract … or supply the missing

18 terms."  *Mellen & Jayne, Inc. v. AIM Promotions, Inc.*, 33 A.D.3d 676, 678 (N.Y.

19 App. 2006).  A court "may … no[t] redraft a contract" for the parties.  *Cruden v.

20 Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992).

21     <u>*Second*,</u> Jean and Frank had nothing to grant.  DC claims that Jean "possessed

22 Joe's copyright interests."  Opp. 10.  However Joe, at his death, had no Superman

23 rights to leave Jean because, as DC was forced to concede, "DC owned all of the

24 underlying copyrights in Superman – based on then-existing copyright grants from

---

[2] *Steinbeck*, 537 F.3d at 200, notes that under New York law a novation is *express* (citing *Jones v. Trice*, 202 A.D.2d 394, 395 (1994) (contract "expressly stated that '[a]ll… agreements…[are] superseded by this contract'"); *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867 (1984) (agreement "clearly and unequivocally provided that [it] was … 'in lieu of' and would 'supersede' any other agreements" and parties stated "[w]e agree no other contract[s] … are in effect")).

5

Joe Shuster." Opp. 6.  Jean could not "grant" Joe's Superman copyrights, because DC
owned them and, absent a clear revocation of Joe's old grants that did not happen,
any purported regrant would be a "nullity," just as in *Mewborn*, 532 F.3d at 987.

At the hearing, the Court asked DC's counsel ***five times*** the simple threshold
question of what rights Frank/Jean had to convey (PD Ex. B at 51:7-8 ("[W]hat rights
did Jean Shuster have to convey to DC?"); 52:12-13 ("When Joe Shuster died, what
rights did he have to Superman?"); 52:22-23 ("But you know my question was, what
rights did he have in Superman?"); 54:8-10 ("When he died, what rights did Joe
Shuster have in Superman?"); 54:14-15 ("I want to know what rights passed to Jean
as a result of Joe's death.")) and *five times* DC could not give a straight answer.

With the plain language of the 1992 Agreement before the Court on an easel,
DC's counsel could not say with a straight face that this simple one-page pension
agreement revoked Joe Shuster's venerable Superman copyright grants to DC
(upheld in two court decisions) and returned these valuable Superman copyrights to
Frank and Jean, nor provide *any* reason why DC would have done this.

DC engages in double-talk, arguing that if Jean had no rights, she must have
granted Joe's.  Opp. 6.  The 1992 Agreement "settles all claims to ***any*** payments or
other rights or remedies that ***you*** [Jean/Frank] ***may*** have."  Reply Undisputed Facts
("RUF") ¶29.  It was a boilerplate quitclaim that nowhere states or implies that Jean
owned Joe's rights.  In fact, before signing the 1992 Agreement, DC told Jean that it
was DC's "firm conviction based on [] research and expert counsel, that you don't
have any legal rights or claims whatsoever."  Docket 479 ("AD"), Ex. Q at 161.[3]

DC's suggestion that "Jean had full right [*sic*] in 1992 to contract on behalf of
Joe's estate and dispose of any contracts he held, even if his will is not
probated" (Opp. 6) is also erroneous.  *See Lamkin v. Vierra*, 198 Cal. App. 2d 123,
125 (1961) (executrix cannot contract for estate prior to appointment); *In re Estate of*

---

[3] DC claims the 2001 Agreement shows Jean had Joe's rights (Opp. 10), but it calls
for "establishment of Joe[]'s estate and the estate's termination." AD Ex. Z, 210 ¶2.

1   *McGee*, 2008 WL 3856834 *17 (Cal. Ct. App. Aug. 20, 2008) (daughter's actions

2   "not on behalf of the estate" where prior to probate).[4]  And the cases DC cites (Opp.

3   6)[5] do not support its argument that Jean could somehow "dispose" of, or modify, Joe

4   Shuster's key contracts, which had been fully performed decades prior.

5          <u>*Third*, Frank and Jean had no termination rights to leverage, as DC well knew</u>.

6   In 1992 ***no one*** held Joe Shuster's termination rights, which extended only to

7   widows, children and grandchildren, not to siblings like Frank and Jean, and not to

8   executors until 1998.  Pub. L. 105-298 (1998).  DC tries to evade this with false

9   argument that in *Steinbeck*, "when Elaine made the 1994 Agreement, she had no

10  present right to terminate those grants."  Opp. 6; 14.  *Steinbeck* stressed that it

11  concerned "authors or their statutory heirs [widow, children] holding termination

12  rights."  537 F.3d at 204.  *Steinbeck* also stressed that the widow "wield[ed] the threat

13  of termination" to secure market value, during an open window for key works (*e.g.*,

14  "Of Mice and Men" (1938) and "The Grapes of Wrath" (1939)).  *Id.* at 202, 204.

15  While the widow in *Steinbeck* could not terminate "on her own," there was a

16  plausible "threat" of termination because if no agreement was reached with the

17  widow, she and the children could terminate the publisher's rights.  The widow had

18  already joined with the children on a new contract.  *Id.* at 196 n.1.  DC's misleading

19  references to Jean's supposed "threats" of termination (Opp. 8, 13) ignore that in

20  1992 neither Jean, nor anyone else, had termination rights, as DC told her.  RUF ¶31.

21         DC tries to buttress its position that Jean had "leverage" by analogizing the

22  1992 Agreement's increased compensation to that in *Milne*.  Opp. 8-9.  In *Milne*, 430

---

[4] DC tries to sow confusion about the Shuster Estate.  The Estate is "open" because
its only asset is the Termination, and the Estate cannot "distribute" the recovered
copyrights before the Termination is effective in 2013.  17 U.S.C. § 304(c)(6)(D);
RUF ¶47.  Jean never told the "courts" that she was the "executor of [Joe's] estate" in
1992.  Opp. 16.  DC irresponsibly accuses Peary of some sinister plot for serving as
executor (Opp. 16-17), when Shuster's will names Peary as an alternate.  Jean (82)
left the legal details of the Estate/Termination to her son.  Docket 305-59 at 27-28.

[5] *In re Kalt's Estate*, 16 Cal.2d 807, 811 (1940) ("[A]ssignment by a legatee of his
legacy under a will during probate is a fraudulent conveyance…."); *In re Estate of
Molino*, 165 Cal. App. 4th 913, 921 (2008) (addressing "heir-hunting" agreements).

1   F.3d at 1040-41, the renegotiation was worth "hundreds of millions" – a far cry from

2   the $25,000/year pension (split two ways) in the 1992 Agreement.  DC's math,

3   claiming $600,000, is extremely misleading.  RUF ¶32.  In the "revocation and

4   regrant" context, courts consider whether the amount payable to an heir reflects the

5   leverage of termination and the market value of the copyrights subject to termination.

6   *Mewborn*, 532 F.3d at 987; *Milne*, 430 F.3d at 1040-46; *Steinbeck*, 537 F.3d at 196.

7   **<u>1992 Agreement As DC's Chain-of-Title</u>**:  DC attacks another straw man –

8   arguing that the 1992 Agreement is not "too 'short'" to transfer copyrights.  Opp. 10-

9   11.  DC ignores, as it cannot rebut, Defendants' real argument that the 1992

10  Agreement, containing no language revoking and replacing Joe Shuster's critical

11  Superman copyrights grants, is far too "ephemeral" to have been intended by DC as

12  the basis for its chain-of-title to Superman, as confirmed by DC's own conduct.

13      *First*, before 2010, DC *never* argued that the 1992 Agreement prevented the

14  Shuster Termination, served in 2003.  RUF ¶¶ 39-42.

15      *Second*, DC *never* claimed that its Superman chain-of-title rested on the flimsy

16  1992 Agreement, and instead consistently relied on the 1938 Grant and other pre-

17  1978 agreements DC now argues were supposedly "revoked."  RUF ¶¶37-38.  DC's

18  newfound "evidence" on this point (Opp. 11) is wholly "insufficient" as it consists of

19  in-house counsel's vague, conclusory affidavit as to unspecified "dealings" with a

20  "foreign government," which attaches no proof.  *FTC v. Publ'g Clearing House, Inc.,*

21  104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking

22  detailed facts and any supporting evidence, is insufficient to create a genuine issue of

23  material fact.").  Even if this were credited, it is a single reference in two decades to

24  the 1992 Agreement, which according to DC's "revocation and regrant" argument is

25  the rights foundation of its billion-dollar Superman franchise.  None of this adds up.

26      *Third*, when *real* copyright assignments are involved, the industry employs

27  explicit language in long-form agreements plus short-form assignments (for filing

28  with the Copyright Office), and this is true even for far less valuable characters (*e.g.,*

1  AD Ex. J (DC/"Swamp Thing")).  This is not counsel's "testimony" (Opp. 11), but a

2  viable inference from the record evidence.  RUF ¶35.  In opposition, DC presents no

3  evidence that its other chain-of-title agreements rely on the type of vague language

4  found in the 1992 Agreement or the convoluted legal theories DC now advances.

5  **III.    DC'S "UNCLEAN HANDS" CLAIM LACKS MERIT**[6]

6      DC cannot present any theories or evidence to save its stale "unclean hands"

7  claim, based on documents DC has had since 2003 and 2006.  RUF ¶77.

8      **Superboy**: The first part of DC's "unclean hands" claim is based on the fiction

9  that the Shuster Executor could have terminated "Superboy," but conspired to

10  "falsely position[]" Siegel as Superboy's "sole creator."  Opp. 21.  DC presents no

11  evidence for its speculation and conspiracy theory, while ignoring the key facts.

12      *First*, in a 1947 action filed by Siegel and Shuster ("1947 Action"), the Court

13  held that Siegel was "the originator and sole owner of the comic strip feature

14  SUPERBOY."  AD Ex. C at 91, ¶25.  The Second Circuit held in *Siegel,* 508 F.2d at

15  913-14, that these findings were "binding."[7]  Thus, the Shuster Executor reasonably

16  chose not to attempt to separately terminate Superboy.  DC nevertheless argues that

17  Siegel and Shuster "co-created" Superboy, citing random instances where a "boy

18  Superman" appeared in early Superman works.  Opp. 19-20.  However, the 1947

19  Action specifically found that such Superman material "did not contain the plan,

20  scheme, idea or conception of the comic strip SUPERBOY as it was later submitted

21  by … SIEGEL to [DC]."  AD, Ex. C at 83 ¶¶164-66.  Moreover, to the extent

22  "Superman as a youth" was depicted in these early Superman works, such depictions

23  were duly terminated by the Shuster Executor.  AD Ex. FF.

24      Unlike the 1947 Action, the Superman/Superboy renewal notices DC cites

25  _____

26  [6] DC has had **years** of discovery, distinguishing this case from *Texas Partners v.
   Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982) (Opp. 19), where the opposing
27  party had no "opportunity to proceed with discovery."

28  [7] DC wrongly argues that Judge Larson did not consider the 1947 ruling binding
   (Opp. 23) is wrong; like the Second Circuit, he held the findings had "preclusive
   effect."  *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1121 (C.D. Cal. 2007).

1    (Opp. 20) were held invalid, and thus are not binding.  *Siegel,* 508 F.2d at 912-13.

2        *Second*, Superboy was "not subject to a § 304(d) termination."  Mot. 21.  DC

3    does not dispute this and argues only that it was terminable under § 304(c).  Opp. 23.

4    But the Shuster Executor had no powers under § 304(c).  AD Ex. DD at 327-28.

5        *Third*, even if the Shuster Executor had tried to terminate Superboy, that would

6    not prevent the Siegels from asserting that Siegel alone created Superboy in their

7    termination and infringement claim.  In short, DC wants to invalidate the Shuster

8    Termination because *the Siegels* filed a legal claim DC disagrees with, and the

9    Shuster Executor chose not to pursue a tenuous opposing claim, given the 1947

10   Action.  Such legal or tactical choices do not constitute "unclean hands."  *See MGM*

11   *Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1240 (C.D. Cal. 2007) ("[A]

12   legal position … cannot be the basis of [] unclean hands …."); *Gucci Am., Inc. v.*

13   *Guess?, Inc.*, 2012 WL 2304247 (S.D.N.Y. June 18, 2012) ("unclean hands" is

14   inapplicable to a legitimate "tactical choice" regarding the pursuit of claims).

15       *Fourth*, DC's allegation of a "quid pro quo" (Opp. 22) for the Shuster Estate's

16   non-pursuit of Superboy is nothing but wild speculation, supported by _no evidence_

17   beyond DC's own pleadings.  DC conspicuously omits that Ms. Larson and Mr.

18   Peary *both* testified that the Shusters have no interest whatsoever in the Siegels'

19   Superboy termination or Superboy litigation.  RUF ¶63.

20       Ultimately, termination is discretionary, and the Shuster Executor's informed

21   legal decision not to terminate Superboy does not constitute "unclean hands."

22   **Pacific Pictures Agreements**: DC willfully distorts the record as to the second

23   part of its "unclean hands" claim.  The only party with a termination interest was the

24   Shuster Estate (established in 2003), and the only agreement with that party – the

25   2003 PPC Agreement – did <u>not</u> transfer any rights,[8] and only engaged PPC as an

26   "exclusive advisor."  AD Ex. EE at 329 ¶1.  The 2001 PPC Agreement could not, and

27   _____

28   [8] DC knowingly misrepresents that "[t]en days before Peary filed the [2003]
     termination notice, the Shuster Estate purported to transfer 100% of Shuster's
     termination interest" to PPC.  Opp. 24.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  did not attempt to, transfer the non-extant right to serve a termination notice and, as

2  DC itself asserted (Docket 49 ¶170) it could not anticipatorily assign copyrights to be

3  terminated.  17 U.S.C. § 304(c)(6)(D).  There was no deception of either the

4  Copyright Office or DC – the basis of DC's "unclean hands" claim – because the

5  ownership of the "termination interest" always remained with the Estate.  Docket 49,

6  ¶¶129-30.  Defendants' voluntary production of the PPC Agreements in 2006, years

7  before the 2013 termination date, further undercuts its "deception" theory.  RUF ¶77.

8      DC cannot cite any law that the listing of the PPC Agreements might have

9  caused "a rejection of the application."  Opp. 25.  First, there was no "application":

10  terminations are filed at the Copyright Office with a form Cover Sheet that requires

11  limited information (AD Ex. FF); and neither 17 U.S.C. § 304(d) nor the Copyright

12  Office regulations, 37 C.F.R. § 201.10, require the disclosure of any information as to

13  third-party agreements.  Second, because the 2001 PPC agreement could not transfer

14  termination rights or terminable copyrights, it could not be grounds for rejecting the

15  termination.  *Shady Records, Inc. v. Source Ent., Inc.*, 2004 U.S. Dist. LEXIS 26143,

16  at *28 (S.D.N.Y. January 2, 2005) (even "deliberate, but nonmaterial" misstatements

17  insufficient).  DC's only case, *Russ Berrie & Co. v. Jerry Elener Co., Inc.*, 482 F.

18  Supp. 980, 988 (S.D.N.Y. 1980) is inapposite; there a party tried to copyright a

19  public-domain work, and even then the Court did not invalidate the registration.

20  **IV.  DC OFFERS NO REBUTTAL AS TO OTHER CLAIMS AND ISSUES**

21      **Statutory/Regulatory Requirements**:  The Shuster Termination met all the

22  applicable legal requirements.  Mot. 7-8.  DC does not refute and concedes this issue.

23      **First Claim, Sub-Part (1)** (Executor Rights):  DC offers no new arguments, as

24  the Shuster Executor plainly holds § 304(d) termination rights.

25      **First Claim, Sub-Part (3)** (Majority Interest):  DC conceded this issue at the

26  hearing (PD Ex. 2 at 38:10-12), and offers no new argument.

27      **First Claim, Sub-Part (4)** (1948 Judgment):  DC offered no arguments in its

28  own motion or in opposition to Defendants' motion (at 18-19), conceding this issue.

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**Second Claim**:  As shown (Mot. 22), this claim entirely overlaps with, and is largely precluded by, the judgment in *Siegel*.  DC concedes this.  Opp. 1 ("[T]he Second Claim presents several issues currently before the Ninth Circuit in the *Siegel* case….").  Defendants asked that this claim be decided consistently with *Siegel* and otherwise stayed (Mot. 22), and DC offers no reason why this Court should not do so.

**Third Claim**:  DC's Third Claim is premised on the fiction that DC has a "right" to a period of exclusive negotiations with the Shusters under § 304(c)(6)(D). This unambiguous statute provides ***no such "right"*** to DC, and both case law and the leading treatises confirm that none exists.  *See* Mot. 22-24; 17 U.S.C. § 304(c)(6)(D) (only states when rights *can* be transferred); *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 865 (S.D.N.Y. 1987) (rejecting theory that § 304(c)(6)(D) provides an "exclusive negotiation period"); 3 *Nimmer* § 11.08[A], n.6 (2010) ("It is inaccurate to refer to this…as 'an exclusive period of negotiation.'"); 3 *Patry* §7:47 (2010) (same). Defendants did not violate DC's "rights" under § 304(c)(6)(D), because it has no such rights, and DC has "no basis for standing" on its Third Claim.  6 *Patry* § 21:18.

**Procedure**:  DC contends that Defendants' cross-motion for summary judgment is somehow improper because it covers some of the same issues as DC's cross-motion.  Opp. 1-2.  Such cross-motions are routine, and DC offers no legal support for its baseless contention.  Reply Decl. of Keith Adams, Ex. C.

**Judgment**:  DC suggests that Defendants' request (Mot. 24-25) that the Court enter a Rule 54(b) judgment is "premature," but offers no other argument and concedes that a judgment can be entered "once these motions are resolved."  Opp. 25.

## V.    CONCLUSION

The Court should grant Defendants' motion and enter a Rule 54(b) judgment.

Dated:  October 1, 2012        RESPECTFULLY SUBMITTED,

/s/ Marc Toberoff
Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
Attorneys for Defendants Mark Warren Peary *et al.*

12