1  DANIEL M. PETROCELLI (S.B. #097802)
     dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3  CASSANDRA L. SETO (S.B. #246608)
     cseto@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
5  Los Angeles, CA  90067-6035
   Telephone:  (310) 553-6700
6  Facsimile:   (310) 246-6779

7  Attorneys for Plaintiff DC Comics

8

9

                    UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

10

11  DC COMICS,                              Case No. CV 10-03633 ODW (RZx)

                   Plaintiff,              **DC COMICS' NOTICE OF**
12                                          **MOTION AND MOTION FOR AN**
              v.                            **EVIDENTIARY HEARING AND**
13                                          **SANCTIONS, INCLUDING**
    PACIFIC PICTURES CORPORATION,           **TERMINATING SANCTIONS,**
14  IP WORLDWIDE, LLC, IPW, LLC,            **APPOINTMENT OF SPECIAL**
    MARC TOBEROFF, an individual,           **MASTER, AND OTHER RELIEF**
15  MARK WARREN PEARY, as personal
    representative of the ESTATE OF
16  JOSEPH SHUSTER, JEAN ADELE             DECLARATION OF DANIEL M.
    PEAVY, an individual, LAURA            PETROCELLI AND [PROPOSED]
17  SIEGEL LARSON, an individual and as    ORDER SUBMITTED
    personal representative of the ESTATE  CONCURRENTLY HEREWITH
18  OF JOANNE SIEGEL, and DOES 1-10,
    inclusive,
19                                          Hon. Otis D. Wright II
                   Defendants.
20
                                           **Hearing Date**:  Nov. 12, 2012
21                                          **Hearing Time**:  1:30 p.m.
                                            **Courtroom**:      11
22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on November 12, 2012, at 1:30 p.m., or as soon thereafter as the matter may be heard by the above-entitled Court, located at 312 North Spring Street, Los Angeles, California in Courtroom 11, plaintiff DC Comics will and hereby does move this Court for an evidentiary hearing to address defendants' discovery misconduct.

This Motion is made pursuant to the Court's inherent authority to prevent abuses of the litigation process, Federal Rules of Civil Procedure 1, 26(b)(b), 37(b), and 53(a)(1)(C), Local Rules 11-9 and 83-7, and this Court's admonition, in its standing order, that "the responsibility for the progress of litigation falls not only upon the attorneys in this action, but upon the Court as well."  DN 18.[1]  As set forth in the accompanying Motion, defendants—through defendant Marc Toberoff as defendant, counsel of record to other defendants, and counsel to material third-party witnesses and custodians—have systematically suppressed relevant evidence. Defendants refused to disclose the existence or nature of key evidence; submitted false and misleading privilege logs to mask or conceal non-privileged documents; and made affirmative misrepresentations—including under oath—about the existence, location, and provenance of evidence.  Defendants' misconduct "clearly impair[s] [DC]'s ability to go to trial and *threaten[s]* to interfere with the rightful decision of the case." *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 353 (1995) (emphasis in original).[2]

In light of this misconduct, DC requests that this Court schedule and conduct an evidentiary hearing for the purpose of presenting live testimony and argument on these issues.  *Wyle v. R.J. Reynolds*, 709 F.2d 585, 592 (9th Cir. 1983) (evidentiary hearing "*best determines* the appropriate sanctions"); *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1114 (9th Cir. 2004) (affirming terminating sanctions

---

[1] All cites to "DN" are to the Docket in this case.

[2] All emphases are added unless otherwise noted.

DC'S MOT. FOR EVIDENTIARY HR'G RE DISCOVERY SANCTIONS

imposed after "three-day hearing"); *Valley Engr's, Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1054 (9th Cir. 1998) (same; "two days of hearings"); *Anheuser-Busch*, 69 F.3d at 343 (same; "extensive evidentiary hearing"); *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1449 (9th Cir. 1986) (same; "several" hearings). Following that hearing, or based solely on the record of discovery misconduct detailed in DC's Motion, this Court should impose appropriate sanctions against defendants, including terminating sanctions, *e.g.*, *Valley Eng'rs*, 158 F.3d 1051; the appointment of a special master under FED. R. CIV. P. 53(a)(1)(C); a finding of a waiver of privilege over all withheld documents, *e.g.*, *Teleglobe USA Inc. v. BCE Inc.*, 493 F.3d 345, 386 (3d Cir. 2007); *Get-A-Grip, II, Inc. v. Hornell Brewing Co.*, 2000 WL 1201385, at *3 (E.D. Pa. Aug. 8, 2000); and evidentiary and monetary sanctions, *e.g.*, FED. R. CIV. P. 37(b)(2)(A), (C); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).

This Motion is made following several conferences of counsel, including an in-person meeting on July 17, 2012 (with defendant Marc Toberoff participating via telephone), concerning defendants' discovery misconduct and DC's request for relief. Decl. of Daniel M. Petrocelli ("PD") Part I; Exs. 1-11. The motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the concurrently filed Declaration of Daniel M. Petrocelli and exhibits in support thereof; any additional briefing that may be filed pursuant to the Rules; all exhibits, files, and records on file in this action; matters of which judicial notice may be taken; and such additional submissions and argument as may be presented at or before the hearing on this motion.

Dated:          October 10, 2012

Respectfully Submitted,
O'MELVENY & MYERS LLP

By:   /s/  Daniel M. Petrocelli
        Daniel M. Petrocelli
        Attorneys for Plaintiff DC Comics

DC'S MOT. FOR EVIDENTIARY HR'G RE DISCOVERY SANCTIONS

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................... 1

II.   TOBEROFF'S SEVEN-YEAR COURSE OF MISCONDUCT ................... 4

    A.    Relevant Background Regarding The Superman Litigation ................ 4

    B.    2005 to 2009: Toberoff Hides Critical Evidence In *Siegel* ................... 6

        1.   Toberoff Conceals The Michael-Laura Letters ......................... 6

        2.   Toberoff Violates The Court's Privilege Log Order ................. 7

        3.   A Third Party Exposes Toberoff's Concealment Of Documents ......................................................................... 8

        4.   Toberoff Conceals His Violation Of The April 30 Order ........ 11

        5.   Toberoff Seizes Control Of Third-Party Witness Files ............ 11

        6.   Toberoff Obtains Partial Summary Judgment On A False Record ............................................................................ 12

        7.   Toberoff Misleads DC And The Court To Avoid Reopening Discovery ...................................................... 13

    C.    2010 to 2012: Toberoff's Misconduct Continues In This Case ......... 14

        1.   Toberoff Violates The December 7, 2010, Order.................... 15

        2.   Toberoff Conceals The May 2003 Letter ............................... 15

        3.   Toberoff Conceals The July 2003 Letter................................ 17

        4.   Toberoff Conceals The July 5 Drafts .................................... 18

        5.   Toberoff Conceals The November 2002 Letter........................ 19

        6.   Toberoff Conceals The November 2001 Email........................ 20

        7.   Toberoff's Misconduct Permeates Every Aspect Of These Cases ............................................................................. 21

III.  TOBEROFF'S MISCONDUCT SHOULD BE INVESTIGATED AND REMEDIED THROUGH AN EVIDENTIARY HEARING............. 21

IV.   CONCLUSION ...................................................................... 25

DC'S MOT. FOR EVIDENTIARY HR'G RE DISCOVERY SANCTIONS

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

4

*Adriana Int'l Corp. v. Thoeren*,
   913 F.2d 1406 (9th Cir. 1990) ........................................................................ 4

5

6

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*,
   69 F.3d 337 (1995) ............................................................................... *passim*

7

8

*Atl. Fed. Sav. & Loan Ass'n of Ft. Lauderdale v. Blythe Eastman Paine
   Webber, Inc.*,
   890 F.2d 371 (11th Cir. 1989) ...................................................................... 24

9

10

*Bankatlantic v. Blyth Eastman Paine Webber, Inc.*,
   127 F.R.D. (S.D. Fla. 1989) .......................................................................... 24

11

*C.T. v. Liberal Sch. Dist.*,
   2008 WL 217203 (D. Kan. Jan. 25, 2008) .................................................... 25

12

13

*Cline Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*,
   602 F.2d 1062 (2d Cir. 1979) ....................................................................... 25

14

*Computer Task Grp., Inc. v. Brotby*,
   364 F.3d 1112 (9th Cir. 2004) ........................................................ i, 34, 21, 23

15

16

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
   482 F.3d 1091 (9th Cir. 2007) ........................................................................ 4

17

18

*Doctor's Assocs., Inc. v. QIP Holders LLC*,
   2009 WL 1668573 (D. Conn. June 15, 2009) ............................................... 24

19

20

*E. & J. Gallo Winery v. Gibson, Dunn & Crutcher LLP*,
   432 Fed. Appx. 657 (9th Cir. 2011) .............................................................. 22

21

*G-K Props. v. Redevelopment Agency of the City of San Jose*,
   577 F.2d 645 (9th Cir. 1978) ................................................................... 22, 23

22

23

*Get-A-Grip, II, Inc. v. Hornell Brewing Co.*,
   2000 WL 1201385 (E.D. Pa. Aug. 8, 2000) ............................................. ii, 24

24

*Harmston v. City & Cnty. of San Francisco*,
   2007 U.S. Dist. LEXIS 87144 (N.D. Cal. Nov. 6, 2007) .............................. 24

25

26

*Hester v. Vision Airlines, Inc.*,
   687 F.3d 1162 (9th Cir. 2012) ...................................................................... 23

27

28

*In re Application of Chevron Corp.*,
   736 F. Supp. 2d 773 (S.D.N.Y. 2010) .......................................................... 24

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

*In re Pacific Pictures Corp.*,
    679 F.3d 1121 (9th Cir. 2012) ................................................................*passim*

*In re Phenylpropanolamine Prods. ("PPA") Liab. Litig.*,
    460 F.3d 1217 (9th Cir. 2006) ...................................................... 22, 23

*In re Walnut Assocs., L.P.*,
    475 B.R. 217 (E.D. Pa. 2012) ............................................................ 24

*Jadwin v. Abraham*,
    2008 WL 4057921 (E.D. Cal. Aug. 22, 2008) .................................. 24

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006) ......................................................... ii, 22

*Moreland v. State Farm Mut. Auto. Ins. Co.*,
    2007 WL 1033453 (D. Colo. Apr. 3, 2007) ...................................... 24

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
    115 F.R.D. 543 (N.D. Cal. 1987) ..................................................... 24

*N. Am. Watch Corp. v. Princess Ermine Jewels*,
    786 F.2d 1447 (9th Cir. 1986) ..................................................... ii, 23

*O'Connor v. Boeing N. Am., Inc.*,
    185 F.R.D. 272 (C.D. Cal. 1999) ...................................................... 25

*Ritacca v. Abbott Labs.*,
    203 F.R.D. 332 (N.D. Ill. 2001) ................................................ 24, 25

*Teleglobe Comm'cs Corp. v. BCE, Inc.*,
    493 F.3d 345 (3d Cir. 2007) ........................................................ ii, 25

*Trusz v. UBS Realty Investors LLC*,
    2010 WL 3583064 (D. Conn. Sept. 7, 2010) .................................... 24

*U.S. v. Conn.*,
    931 F. Supp. 974 (D. Conn. 1996) .................................................... 25

*Valley Engr's, Inc. v. Electric Eng'g Co.*,
    158 F.3d 1051 (9th Cir. 1998) ............................................*passim*

*Valvanis v. Milgroom*,
    2008 U.S. Dist. LEXIS 104809 (D. Haw. Dec. 30, 2008) ................. 4

*Wachtel v. Health Net, Inc.*,
    239 F.R.D. 81 (D.N.J. 2006) ............................................................. 24

*Wyle v. R.J. Reynolds*,
    709 F.2d 585 (9th Cir. 1983) ...............................................i, 3, 21

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

**RULES**

FED. R. CIV. P. 1 ...................................................................................i

FED. R. CIV. P. 26 .............................................................................i, 26

FED. R. CIV. P. 37 .......................................................................i, ii, 22

FED. R. CIV. P. 53(A)(1)(C) .........................................................i, 24

FED. R. CIV. P. 60 ...............................................................................13

FED. R. CIV. P. 26 Advisory Committee Notes ................................25

C.D. L.R. 11-9 .......................................................................................i

C.D. L.R. 37 ...........................................................................................i

C.D. L.R. 83-7 .....................................................................................24

**OTHER AUTHORITIES**

3 WRIGHT ET AL., FED. PRAC. & PROC. § 2602.1 (2012) ........................24

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

## I.     INTRODUCTION

Plaintiff DC Comics brings this motion for an evidentiary hearing and other relief to redress defendants' willful concealment of evidence in this case by defendant Marc Toberoff.  Notwithstanding Toberoff's calculated scheme to conceal evidence—necessitating years of untold time, money, and valuable court resources—DC has uncovered key letters establishing that Toberoff fraudulently induced the Siegel defendants to break their 2001 agreement with DC and enter into a new agreement with Toberoff and his business partners instead.  The nature and even existence of these documents were covered up by Toberoff through a systematic course of deceptive conduct dating back to the *Siegel* lawsuit filed against DC by Toberoff on behalf of the Siegels, and continuing throughout this case.  Toberoff withheld documents in violation of court orders, submitted fraudulent privilege logs to conceal non-privileged documents, falsely denied the existence and defendants' possession of documents and, when questioned about this by DC and the Court, responded with false and misleading explanations.

The evidence that has now come to light is particularly probative of DC's Fifth Claim.  This asserts that DC made a binding settlement deal with the Siegels (through their lawyer Kevin Marks) in October 2001, and that Toberoff tortiously interfered with that deal by falsely promising that a "billionaire investor" would pay the Siegels $15 million in cash, plus other consideration, if the Siegels repudiated their agreement with DC and made a new deal with Toberoff and his business partners.  At the outset of this case in 2010, DC served document requests directed to this claim and secured a stipulated court order requiring immediate production.  In response, defendants represented to DC and the Court that "to the extent that relevant documents exist, they have either been produced or designated as privileged."  This was false.  Toberoff withheld at least five critical documents responsive to the 2010 Court order.  *None* of these documents was previously produced or privileged—*all* were suppressed in violation of the Court's order.

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

But Toberoff's misrepresentations went far beyond that.  To prove that the requested documents did not exist, Toberoff called DC's "billionaire investor" claim a "mockery," and explicitly represented to DC and the Court that "[t]here are no documents related to an offer by a 'billionaire investor' to purchase the Siegels' Superman rights, because no such offer was ever conveyed, and the sworn testimony of the relevant witnesses is consistent on this point."  These representations were knowingly false:  the recently disclosed letters between Laura Siegel and her half-brother Michael Siegel specifically discuss that Toberoff made false promises of a "billionaire investor" and his alleged $15-million-plus offer.

Chief among these long-concealed, responsive letters are the following:

- A November 2002 letter from Laura to Michael recounting how after the Siegels cut their ties with DC "the billionaire investor who was offering $15 million" disappeared.

- A May 2003 letter from Michael to Laura explaining how, in the fall of 2001, "Marc [Toberoff] had a mysterious billionaire who wanted to invest in the Superman copyright" and how this offer was bogus.

- And a July 2003 letter, in which Laura makes the admission—devastating to defendants' position in the *Siegel* case and this case—that Marks told her in 2002 she "had a deal with TimeWarner/DC" and that she could not rightly accept Toberoff's competing business offer.  DN 455 at 3, 9.

Toberoff concealed these letters and other evidence in several ways.[3]  He represented to DC and the Court that he did not possess the November 2002 letter, but Michael's former lawyers exposed this falsehood.  They kept an electronic copy of Michael's files—a paper copy of which they gave his estate and Toberoff in 2006.  This electronic file and other evidence established that Toberoff was sent a

---

[3] Toberoff's counsel of record in this case disclaims responsibility for Toberoff's discovery conduct, advising they "divided" labor and Toberoff *alone* "handle[d] document production [and] the preparation of privilege logs."  PD ¶¶ 7-8; Exs. 7, 9.

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

1    copy of the November 2002 letter in *2006*, yet did not log it or produce it to DC.

2    Likewise, when DC moved to compel production of the May 2003 letter, Toberoff

3    refused to acknowledge if he had a copy of the letter or if it existed.  Only after

4    another Court order did Toberoff produce the letter—which he possessed for years.

5          Toberoff's conduct regarding the July 2003 letter from Laura to Michael

6    exposes a clear-cut fraud on DC and the Court—he repeatedly concealed it behind

7    privilege log entries that make no mention of any such letter:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Autho(s)r | Document Type | Privilege Claim | Present Location |
|-------|------------------|--------------------------|----------------------|---------------|-----------------|------------------|
| 79    | 7/5/2003         | Atty Marc Toberoff       | Laura Siegel         | Facsimile     | Atty/Client     | Plaintiffs' Counsel |
| 82    | 7/11/2003        | Atty Marc Toberoff       | Laura Siegel         | Facsimile     | Atty/Client     | Plaintiffs' Counsel |

10   These bogus privilege log entries directly defied the Court's instructions and orders.

11   In preparing this log—which Toberoff submitted in the *Siegel* case and again in this

12   case—the Court directed Toberoff to review his privilege claims and "to the extent

13   that there are any documents where you have not identified all the people who

14   received it, you will supplement that and indicate it, correct?"  *Id.* Ex. 40 at 644:9-

15   13.  Toberoff responded, "Absolutely, Your Honor."  *Id.*  Toberoff defied this

16   order, never listed Michael as a recipient, and when DC pressed Toberoff to

17   produce all correspondence between Laura and Michael, including the July letter,

18   he continued to deliberately mislead DC and the Court about these documents.  And

19   this is not all; still other Michael-Laura correspondence exists, including an October

20   2002 letter mentioned in the November letter, which Toberoff has yet to produce.

21         Toberoff's demonstrable misconduct "clearly impair[s] [DC]s ability to go to

22   trial and threaten[s] to interfere with the rightful decision in the case."  *Anheuser-*

23   *Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 353 (9th Cir. 1995).

24   The evidentiary hearing DC seeks in this motion is required to expose the full range

25   of Toberoff's misconduct and to bring it to a halt.  *E.g.*, *id.* at 343; *Wyle v. R.J.*

26   *Reynolds*, 709 F.2d 585, 592 (9th Cir. 1983) (hearing "best" method to "determine

27   appropriate sanctions" for discovery misconduct).[4]  After years of obstruction and

28   ────────────
     [4] *Accord Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1114 (9th Cir.

                                    DC'S MOT. FOR EVIDENTIARY HR'G RE
                                    DISCOVERY SANCTIONS

delay, DC should not be forced to endure further barriers to obtaining important evidence. Time has run out in this case; immediate relief is required.

## II. TOBEROFF'S SEVEN-YEAR COURSE OF MISCONDUCT

"In evaluating the propriety of sanctions," courts "look at all incidents of a party's [discovery] misconduct," *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990), including in related cases, *e.g.*, *Valvanis v. Milgroom*, 2008 U.S. Dist. LEXIS 104809, at *19, 22-23 n.12 (D. Haw. Dec. 30, 2008) ("conduct in [prior] Bankruptcy Action is relevant in determining [party's] intent"); *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007) (describing how party was sanctioned in previous case and remarking that "this appeal is a continuation of that pattern"). Toberoff's years of discovery misconduct in *Siegel* and this case—cases he just last week called one and the same, DN 495-4 at 2—all justify the evidentiary hearing and other relief that DC seeks.[5]

### A. Relevant Background Regarding The Superman Litigation

Jerry Siegel and Joe Shuster co-created Superman in 1938 and assigned all copyrights in it to DC. Neither man, despite a long history of litigation against DC, ever sought to terminate DC's copyrights. DN 184 at 308; 458 at 3-5. Joe's sister and sole heir, Jean, settled any such claim through a 1992 Agreement with DC. DN 458, 491. After Jerry died in 1996, his daughter Laura sought to terminate DC's copyrights in a handful of early Superman works. DN 184 at 3-8; 458 at 3-5. DC

2004) (affirming terminating sanctions imposed after "three-day hearing"); *accord Valley Engr's, Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1054-55 (9th Cir. 1998).

[5] Throughout this case, defendants have insisted that discovery proceedings and rulings from *Siegel*, Case No. CV-04-8400, apply here because they are "so closely related as to be considered properly part of the same case." DN 495-4 at 2. As explained in this Motion, the evidence that has come to light demonstrates that Toberoff and the Siegels concealed evidence and violated court orders in *Siegel* as well. In doing so, they not only covered up evidence that undercut their claims and would have exposed Toberoff's business frauds, they misled the Court in obtaining critical substantive and discovery rulings that they have successfully invoked as "law of the case" in this action. *E.g.*, DN 209. As shown below and DC's Consent Agreement motion (filed today), they have misled the Court in this case as well.

DC'S MOT. FOR EVIDENTIARY HR'G RE DISCOVERY SANCTIONS

contested the Siegels' termination, and the parties spent years negotiating business terms to resolve the dispute.  In October 2001, through their lead negotiator Kevin Marks, the Siegels and DC reached what Marks called a "monumental accord," in which DC retained all rights in Superman and agreed to pay the Siegels $3 million in up-front and other monies.  PD Exs. 23, 24, 64 at 1284-86, 68 at 1450-54.

Around this same time, Toberoff "set his sights on Superman."  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012); PD Ex. 64 at 1287-88.  In November 2001, he induced Joe Shuster's nephew Mark Warren Peary and sister Jean to enter into a joint venture agreement with Toberoff's company Pacific Pictures and to assign to the Venture all of the Shusters' putative Superman rights.[6]  Also in November 2001, Toberoff directly contacted Marks and Michael Siegel, trying to secure the Siegels' rights, DN 493-7 at 787-88, even though he had heard reports the Siegels had made a deal with DC.  PD Ex. 87 at 2626:21-2629:12.  In a February 2002 call with Toberoff, Marks confirmed the reports, and told Toberoff the Siegels had a deal with DC.  PD Ex. 84 at 2565:18-2567:20, 2571:13-22.

Undeterred, Toberoff kept after Marks.  In July 2002, Toberoff represented to Marks—*falsely*—that he had a wealthy investor willing to buy the Siegels' putative Superman rights for $15 million and "back-end" monies.  PD Exs. 27 at 338; 84 at 2572:7-2574:25.  Marks reiterated to Toberoff that the Siegels had a deal with DC, the deal was being documented, and the Siegels could not entertain Toberoff's offer.  PD Exs. 27 at 338-39; 32 at 418.  Marks also told the Siegels that DC would likely sue them and Toberoff if they accepted Toberoff's offer.  *Id*.  But seduced by Toberoff's false promises, the Siegels repudiated the deal with DC and signed a new one with Toberoff, his company IP Worldwide, and his then business partner,

---

[6] The Ninth Circuit noted Toberoff's dealings with the heirs raised "ethical" concerns, *Pacific Pictures*, 679 F.3d at 1124, as did a law firm that advised him, PD Exs. 29, 30 (unconscionable fees; conflicts of interest).  Toberoff admits the Pacific Pictures contracts are "not lawful," DN 147-1 at 2, 8; 305-37 at 1327:5-13, and this Court rightly noted the deals "gut" Jean's 1992 Agreement with DC, DN 337 at 3.

Ari Emanuel.  PD Ex. 64 at 1287-88.  As subsequent events revealed, Toberoff's unnamed, "billionaire" investor did not exist, no $15 million payment was made, there was no back-end deal, and the rights were never marketed.  PD Ex. 57; DN 394 at 14-17; 427 at 5-7; 439 at 1-2; 451 at 1-2.

Instead, having cornered the Siegel and Shuster interests, Toberoff sat and waited.  Then, two years later he sued DC on behalf of the Siegels to enforce their termination.  PD Ex. 33.  DC countersued, asserting the Siegels were bound by their 2001 deal with DC.  PD Ex. 34 at 509-10.  The Siegels claimed there was no binding deal and moved for summary judgment.  PD Ex. 47 at 792-808.  Without access to the evidence Toberoff was concealing—which undermined the Siegels' essential claim—the district court ruled in the Siegels' favor on DC's settlement defense.  That ruling is now before the Ninth Circuit.  PD Exs. 50, 64, 6.

Nine months after the district court ruled in *Siegel*, the Toberoff Timeline was ordered produced.  PD Ex. 53.  It disclosed that Marks told the Siegels and Toberoff in late 2002 that the Siegels had a "deal" with DC and were *not* free to make a new deal with Toberoff.  PD Ex. 22 at 311.  Toberoff claimed the Timeline was a "hit piece," and refused to produce the underlying documents it disclosed, asserting they *did not exist* or were *privileged*.  DN 225 at 13-14.

In May 2010, DC filed this case.  Only in the past two years, after countless, costly discovery disputes, has it finally come to light how Toberoff suppressed damning evidence in violation of Court orders, his legal duties, and DC's rights.

**B.    2005 to 2009:  Toberoff Hides Critical Evidence In *Siegel***

*1. Toberoff Conceals The Michael-Laura Letters*

DC's first requests for documents in *Siegel* served in 2005 specifically called for all communications between Michael Siegel and Laura and/or Joanne Siegel relating to Superman.  PD Ex. 35 at 534.  Toberoff (on behalf of the Siegels) agreed to produce "all non-privileged documents" in response to DC's discovery requests, including requests that called for communications with Michael.  PD Ex. 36 at 566.

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

1  DC served similar requests on Toberoff, Michael's Estate and lawyers, but Toberoff
2  intervened, took control of all the productions, and made all discovery responses
3  himself.  PD Exs. 42-45; DN 455 at 4-5; 477 at 1-7.

4       Though plainly responsive, Toberoff produced *no* Michael-Laura letters in
5  response to these discovery demands.  For a year he produced no privilege log
6  either.  PD Ex. 39 at 615.  DC moved to compel, and while Toberoff promised in
7  response to produce a "detailed privilege log," PD Ex. 37 at 603-04, the logs he
8  prepared and submitted—for the Siegels, for himself, and for Michael's Estate and
9  lawyers—listed no communications between Michael and Laura.  DN 332 ¶ 2.  DC
10  asked that Toberoff be ordered to correct his logs to include basic bibliographic
11  information, such as all recipients of documents.  PD Ex. 39 at 616.  The Court
12  agreed and ordered Toberoff to do so on August 18, 2006.  *Id.* Ex. 41 at 66.

13      *2.  Toberoff Violates The Court's Privilege Log Order*

14       Toberoff produced revised logs that identified no letters between Michael
15  and Laura.  DN 317-2.  As subsequent events reveal, Toberoff engineered the logs
16  to conceal these damaging letters and other non-privileged evidence, in violation of
17  the Court's order.  *First*, the logs contained false descriptions.  Toberoff logged
18  multiple documents under one entry number, typically a fax cover sheet.  Because
19  the fax itself was ostensibly an attorney-client communication, the entry appeared
20  to reflect a protected communication.  In reality—and as we only learned last
21  year—these entries concealed attachments, which were never logged and were *not*
22  privileged in any event.  Thus, far from identifying all the "recipients" for each
23  document as the Court's order required, the log failed even to list each document
24  withheld.  In this way, Toberoff concealed Laura's July 2003 letter to Michael.
25  *Supra* at 2; DN 160 at 30-38; 171 at 3-4; 209 at 11-12; 225 at 13-17; 243 at 10-12;
26  252; 253 at 1-9; 274 at 1-8; 285; 316 at 1-20; 317 at 1-5; 323; 329 at 1-5; 332 at 1-
27  9; 336.  Below is the log entry that Toberoff used to cover up the July 2003 letter,
28  DN 317-3 at 8—it makes no mention of a letter to Michael from Laura, *id.*:

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

| Log # | Date of Document | Identity of Recipient(s) | Identity of Autho(s)r | Document Type | Privilege Claim | Present Location |
|-------|------------------|--------------------------|------------------------|---------------|------------------|-------------------|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

*Second*, in instances where his fax-cover-sheet artifice was not available, Toberoff concealed documents by choosing not to produce or log them at all. The November 2002 letter from Laura to Michael falls in this category. *Supra* at 2; DN 394, 427, 439, 451, 455, 457, 477, 488. Indeed, in obtaining the November letter a few months ago, DC learned that Toberoff failed, *for some five years*, to log *over 224 documents* he received from Michael's files, including the November 2002 letter and a key November 2001 email that Toberoff authored. *Id.*; *infra* at 19-21.

### 3. A Third Party Exposes Toberoff's Concealment Of Documents

In June 2006, Warner Bros. received a memo titled "Superman - Marc Toberoff Timeline," along with supporting exhibits. DN 49, Ex. A. The memo summarizes the supporting documents and describes Toberoff's "potentially questionable conduct." DN 42-14 at 213. The Court concluded Warner Bros. acted "responsibly" in handling the materials by giving them to an escrow—even though the cursory review allowed by law revealed that many of the enclosures were responsive, non-privileged documents Toberoff had failed to produce, including Michael-Laura correspondence. *Id.*; DN 163-12 at 736-40; 163-13 at 760:3-7.

a. In response to DC's request, Toberoff refused to produce the non-privileged documents that accompanied the Timeline or provide a privilege log for any that were privileged. In March 2007, DC moved for this relief and a ruling that Toberoff waived any privilege over documents he previously failed to log pursuant to the Court's August 18 order. DN 163-12, Ex. TT ¶ 9; 164-1, Ex. B ¶ 3. In opposition, Toberoff submitted a March 2007 declaration stating: "*I have reviewed the [Timeline] documents and compared them to my firm's legal files. I found that all but two non-privileged documents in Plaintiffs' legal files had long ago been produced or listed by Plaintiffs in a privilege log.*" DN 477-2 at 90 ¶ 22. In other words, Toberoff told the Court that every responsive, non-privileged document had been produced, and every privileged document had been logged except for two.

1    This declaration was materially false, as recent events have now shown.  No

2    fewer than *four copies* of the May 2003 letter from Michael to Laura, *supra* at 2—

3    over which defendants admittedly *never* claimed privilege, DN 288 at 18:4-16—

4    were among the Timeline documents, and Toberoff failed to identify, produce, or

5    log any of them.  DN 253 at 1-5; 477-2 at 119-45.  Moreover, *five copies* of the July

6    2003 letter were among the Timeline documents, and Toberoff never identified,

7    produced, or logged any copy of either.  DN 329, 332, 366.  *Infra* at 15-18.

8    b.  Toberoff compounded this deception.  At an April 30, 2007 hearing, he

9    told the Court "*I went through every single one* of [the Timeline documents] … and

10   found [only] two documents that were non-privileged that hadn't been produced

11   that consisted of letters from plaintiffs to DC Comics, which I produced."  DN 317-

12   4 at 65:25-66:5.  The Court pressed Toberoff:  "you went through these

13   whistleblower documents, and … you verified that each of the whistleblower

14   documents either had been produced or had been listed on the privilege log."  *Id.* at

15   66:17-19.  Toberoff's responded unequivocally:  "*That is the case*, your Honor, and

16   that was certainly my intention to say that [in my declaration], and *I'm saying that*

17   *now*."  *Id.* at 66:21-23.  This was false: *nine* copies of the May/July letters were

18   among the Timeline documents Toberoff possessed; he produced or logged *none*.

19   c.  Despite Toberoff's assurances, the Court still found that his declaration

20   left some "wiggle room" and, wanting no room for doubt, ordered Toberoff to:

21   submit a declaration that does identify by the Bates numbers of the
     [Timeline] documents and the corresponding Bates numbers of
22   documents already produced, those among the [Timeline] documents
     which are unprivileged and have already been produced.  *Id.* at 74:12-
23   75:5.

24   Toberoff protested, arguing the order required him to "prove that I'm not lying," *id*.

25   at 75:12-13—precisely what he was doing, as events later confirmed.

26   Toberoff then submitted a second declaration.  In this May 2007 filing,

27   Toberoff swore "*I have accounted for each* [Timeline] Document[] as bate[s]

28   stamped by [escrow] John Quinn, Esq. (designated by 'Q') and identified by bates

numbers the Documents produced to [DC] by [the Siegels] or third party witnesses, as applicable, or listed in a privilege log furnished to [DC] by [the Siegels] and/or such third parties…." DN 42-14 at 195 ¶ 2. This declaration was also materially false. Putting aside that he asserted new privilege claims over seven additional documents (belying his March 23 declaration that *only* "two documents" were neither produced nor logged), *compare id.* at 195-204, *with* DN 42-14 at 218-21, Toberoff perpetuated his concealment of the Michael-Laura letters. As an example, if Toberoff had complied with the April 30 Court order, he would have identified the *four* copies of the May 2003 letter included among the Timeline documents—as well as each of its recipients—but Toberoff identified *none*. Now that the May 2003 letter has been disclosed, we know that the first copy of it was Bates stamped "Q32-33." PD Ex. 28. But Toberoff's declaration described pages Q32-33, and the five preceding pages, as Siegel privilege log entry #82, DN 42-14 at 196:

**Q 0027-33          Plaintiffs' supplemental privilege log # 82**

Privilege log entry #82, however, does *not identify* a May 2003 letter from Michael to Laura, but rather, a July 11, 2003, fax from Laura to Toberoff, DN 317-2 at 8:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Autho(s)r | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

Toberoff buried another copy of the May 2003 (Q139-40) letter in this same way:

**Q 0138-45          Plaintiffs' supplemental privilege log # 79**

DN 42-14 at 197. Entry #79, however, once again identifies not a May 2003 letter from Michael, but a different July 2003 fax from Laura to Toberoff, DN 317-2 at 8:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Autho(s)r | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 79 | 7/5/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

Toberoff used the same deception to conceal the July 2003 letter. There were *five* copies of this letter from Laura to Michael among the Timeline documents, PD Ex. 32, yet *not one copy* appears in Toberoff's May 2007 declaration or any of the logs Toberoff prepared. One of the copies is "Q483-88." *Id.* Toberoff hid this copy of the July letter behind log entries 82 and 83, DN 42-14 at 200:

**Q 0483-88          Plaintiffs' supplemental privilege log # 82, 83**

Again, entries 82 and 83 identify two July 11, 2003, faxes from Laura to Toberoff, with no mention of the July 11, 2003, letter from *Laura to Michael*, DN 317-2 at 8:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Autho(s)r | Document Type | Privilege Claim | Present Location |
|-------|------------------|--------------------------|-----------------------|---------------|-----------------|------------------|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |
| 83 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

Toberoff employed this same fraudulent device to conceal the *six* other versions of the May and July 2003 letters, as well as *nine* copies of July 5 drafts of the July 2003 letter. DN at 477-2 at 102-13, 119-35; *infra* at 15-19. In all, *18 pieces* of actual or draft correspondence between Michael and Laura were included in the Timeline documents and *not one* was identified; *Toberoff hid them all.*

### 4. Toberoff Conceals His Violation Of The April 30 Order

The Court's April 2007 order required the escrow agent "to return to the [Siegels] any documents which are identified in [Toberoff's] declaration as being privileged and having been identified on the privilege logs." DN 317-4 at 74:23-75:1. In late 2008, the escrow asked whether he could "compare the description of each document in the privilege log to the corresponding [Timeline] document" to ensure documents were, in fact, logged as Toberoff had sworn. DN 42-14 at 219.

Realizing such review would expose his concealment of other documents, Toberoff objected. PD Exs. 51, 52. Unaware of Toberoff's false representation as an officer of the court that he had complied with its April 30 order, the Court sustained Toberoff's objection. DN 42-14 at 221. Through his deception, Toberoff succeeded in misleading the Court and forestalling disclosure of the May and July 2003 letters—and other damning evidence—for several years.

### 5. Toberoff Seizes Control Of Third-Party Witness Files

Toberoff also thwarted DC's discovery of documents held by Michael, his Estate, and their attorneys. Following Michael's death in 2006, and because Laura was Michael's sole heir, Toberoff asserted that he—and not the Ohio law firm of Renner Otto (Michael's lawyers) or Michael's Estate—must respond to DC's subpoenas on Renner and the Estate. PD Exs. 42-43, 48-49. Toberoff refused to

1  produce scores of documents in their possession, and made overreaching claims of

2  privilege.  Just like the logs he prepared for himself and the Siegels, Toberoff

3  prepared logs for Renner and the Estate that identified *no* communications between

4  Michael and Laura, including their May and July 2003 correspondence.  PD Ex. 46.

5  As to the documents Toberoff did log, DC contested whether 15 letters and emails

6  Toberoff exchanged with Don Bulson (a Renner lawyer) were privileged.  Toberoff

7  told the Ohio federal court the documents were "clearly" and "classic" privileged

8  materials under "bedrock principles" of law.  DN 161-4 at 26, 27.  The Ohio court

9  reviewed the documents and ordered Toberoff "immediately" to produce them,

10  finding that Toberoff's *business* negotiations with Bulson were *not* privileged.[7]

11       This ruling did not curtail Toberoff's misconduct.  As the Ninth Circuit noted

12  in 2012, "most of [the Timeline] documents [Toberoff refused to produce] are not

13  covered by attorney-client privilege because they do not represent communications

14  between a lawyer and his client for the purpose of obtaining legal advice," but were

15  business-related communications.  *Pacific Pictures*, 679 F.3d at 1125, 1129.

16  Moreover, despite the Ohio court's rejection of Toberoff's assertion of privilege

17  between Michael and Laura during this time (2003) and concerning the same issues

18  (Toberoff's effort to buy Michael's rights), Toberoff continued to suppress Michael

19  and Laura's May and July 2003 letters, which fit these very same parameters.

20       *6.  Toberoff Obtains Partial Summary Judgment On A False Record*

21       Having concealed evidence that Marks told the Siegels and Toberoff that the

22  Siegels had a "deal" with DC, Toberoff secured summary judgment for the Siegels

23  on DC's settlement defense in March 2008.  DC's appeal of this decision—based

---

24       [7] DN 161-5 at 30-31 (documents "relate to the offers back and forth between

25  Toberoff, on behalf of an investor who wishes to purchase Michael Siegel's interest

26  and Bulson on behalf of Michael Siegel").  The Court denied DC other documents

27  on the ground of relevance to the accounting issues in *Siegel*.  DN 161-7.  Bulson

28  later testified Toberoff misled him in these business discussions, DN 305-52 at

1863-1867:2, 1874:25-1881:7, 1925:5-19, consistent with Toberoff's lack of candor

with DC, the Courts, *see supra* & *infra*, and the Copyright Office, DN 491 at 19-25.

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

1   on a still incomplete record facilitated by Toberoff's suppression of evidence, PD

2   Ex. 66-72, 75—is set for oral argument next month.[8]

3          7. *Toberoff Misleads DC And The Court To Avoid Reopening Discovery*

4          Although the Timeline should have been produced in April 2007, Toberoff

5   withheld it from DC until it was ordered produced in December 2008.  DN 42-14 at

6   218-21.  By then, summary judgment had been granted against DC on its pivotal

7   settlement defense.  The Timeline revealed that Marks had told the Siegels (in his

8   "Marks Memo") that they had a "deal" with DC, and that they could not abandon

9   that deal in favor of Toberoff's business offer.  DN 49, Ex. A at 63; PD Ex. 27.

10         Based on the emergence of the Timeline (but still without having obtained

11  the underlying documents), DC moved to reopen discovery and retake Marks'

12  deposition.  DN 368-2 at 37-38, 42-61.  In successfully opposing DC's motion,

13  Toberoff called the Timeline a pack of lies. *Id.* at 37-38.  And he filed a sworn

14  declaration, dated March 2, 2009, attesting that he reviewed Marks' deposition and

15  the Marks Memo, and the Memo "reveals *no inconsistency* with Marks' testimony

16  regarding the alleged settlement agreement."  PD Ex. 54 at 971 ¶ 32.

17         This was false, as now confirmed by the recent production of the Marks

18  Memo following the Ninth Circuit's ruling in *Pacific Pictures* in 2012.  The Memo,

19  written in August 2002, told the Siegels "an agreement was reached last October

20  with D.C. Comics, albeit subject to documentation."  DN 427-3 at 253.  Marks

21  warned the Siegels if they struck a new deal with Toberoff "there would be a

22  genuine risk of litigation against the Siegel family (and Toberoff/ Emanuel) by

23  D.C.," and Marks would have to testify "that an agreement was reached." *Id.* at

24  253-54.  Marks told the Siegels to "stay the course" with DC and continue

25  ───────────────

26       [8] Because the prejudice to DC (including its litigation fees and costs) cannot be
     fully cured even if the Ninth Circuit rules in its favor on appeal, DC anticipates it
27   will need to revisit sanctions and evidentiary issues in *Siegel* on remand, no matter
     the result on appeal, including under the Court's discovery sanction rules and its
28   power to correct judgments—partial or otherwise—under, *e.g.*, FED. R. CIV. P. 60.

1   documenting their "deal"—"the right thing to do…." *Id.* at 254.  At his 2006

2   deposition, Marks suggested the October 2001 deal with DC ceased to bind the

3   Siegels when DC sent them a February 2002 draft long-form.  PD Ex. 84 at

4   2568:12-14 ("if the question is did I think at this point [February 2002] there was a

5   final, binding, enforceable agreement, the answer would be no but I did believe that

6   we had come to an agreement back on October 19th, 2001…").  Marks' testimony

7   conflicts with his Memo, *written six months __after__ February 2002*, in which he told

8   the Siegels they had a "deal" with DC and *never* said they could renounce the 2001

9   deal because of the February 2002 draft or otherwise.  DN 427-3 at 253-54.  The

10  emergence of the Marks Memo is clear proof Toberoff materially misled the Court

11  *under oath*, to avoid discovery into both his misconduct and the Siegels' claims.

12      **C.      2010 to 2012: Toberoff's Misconduct Continues In This Case**

13       DC did not learn until the Timeline was ordered produced in December 2008

14  and discovery in this case of the fraudulent steps Toberoff took to break up DC's

15  2001 deal with the Siegels.  As alleged in DC's Fifth Claim, Toberoff used the false

16  promise of an offer from an unnamed (and non-existent) investor to get the Siegels

17  to break their deal with DC.  Toberoff responded to this claim with feigned outrage:

18      • He told this Court (in SLAPP briefs and motions to stay discovery) and the

19  Ninth Circuit (in four failed appeals) that DC's "billionaire investor" claim is a

20  "mockery," "contrary to all evidence," based on the "untrustworthy and

21  inadmissible Timeline," and no "further discovery" would prove DC's claim.

22  DN 196 at 1-5, 10; 312 at 3; 477-2 at 103-09, 121-27, 131-33.

23      • He said the only offer conveyed to the Siegels came from his then partner,

24  Emanuel, and that "[t]here are *no documents* related to an offer by a 'billionaire

25  investor' to purchase the Siegels' Superman rights."  DN 162-12 at 589.

26      • And he said he had "*no contact* with *any* member of the Siegel family" until

27  late summer "2002" and could not have interfered in 2001.  DN 145-1 at 23-24.

28  When Toberoff made these claims, he was knowingly suppressing non-privileged

1   evidence refuting each assertion.  Michael and Laura's May and July 2003 letters

2   discuss the "billionaire investor," *supra* at 2, and a November 17, 2001, email from

3   Toberoff to Michael shows that Toberoff made direct contact with Michael in *2001*.

4   PD Ex. 25.  Toberoff hid all of this evidence and more in this case.

5       ### 1.  *Toberoff Violates The December 7, 2010, Order*

6       When DC filed its complaint in this case in May 2010, Toberoff resisted

7   discovery by moving to stay all discovery, including related to the Timeline.  DN

8   42 at 4-7, 40-61; 44-1 at 2-4, 8-11; 61 at 5-7, 32-55.  This Court and the Ninth

9   Circuit rejected these requests.  DN 74 at 1-2; 163-2.  After serving its very first

10  document demands, DC was forced to move to compel when Toberoff refused to

11  comply.  DN 125.  Unable to credibly oppose, Toberoff stipulated to a Court order

12  waiving *all* objections to DC's requests other than privilege, as long as he could

13  produce documents, in part, by designating those the parties had already produced

14  in *Siegel*.  DN 132, 133.[9]  On December 7, 2010, the Court entered an order

15  requiring Toberoff to produce all documents responsive to "each and every one" of

16  DC's requests on the Siegels and Shusters, except privileged documents, which he

17  was ordered to log.  DN 133.  Toberoff's ensuing production violated this order

18  when he failed to produce or log the key letters between Michael and Laura.

19      ### 2.  *Toberoff Conceals The May 2003 Letter*

20      DC's long road to obtaining the May 2003 letter—a document Toberoff now

21  concedes is not privileged, DN 288 at 18:4-16—started with the Timeline.  It

22  described a May 13, 2003, letter from Michael to Laura concerning Toberoff's

23  misconduct and the "billionaire investor."  In December 2010 and January 2011,

24  DC asked Toberoff (both as counsel for the Siegels and Shusters and as a defendant

25  in this case) to review the Timeline documents and to produce the May 2003 letter

26  if it was among them.  DN 161 ¶ 26; 162-9 at 576-77; 162-11 at 583-84.

27      ---
        [9] Toberoff insisted on tying discovery in this case to *Siegel* and argued discovery

28  orders he obtained in *Siegel* should dictate here.  *E.g.*, DN 160 at 56-57, 66-78.

1    a. Toberoff refused to answer DC's questions, and instead misled DC and the

2    Court into believing the May 2003 document did not exist.  He argued "the *ranting*

3    anonymous 'Timeline' [is] *inaccurate*," DN 162-10 at 581; and when DC pressed

4    for the May 2003 letter, he said: "[as] to your claims that we have not produced

5    certain documents alluded to in the *ranting*, anonymous Timeline, we have

6    repeatedly stated that the inadmissible Timeline is *extremely untrustworthy*," *id.* at

7    589.  Toberoff said: "*to the extent that relevant documents exist*, they have either

8    been *produced* or *designated as privileged*….  There are *no documents related* to an

9    offer by a 'billionaire investor' to purchase the Siegel's Superman rights ….  DC's

10   overzealous quest to find *non-existent documents* based on *frivolous allegations in*

11   *an anonymous incoherent* '*hit piece*' is *unworthy of DC and its counsel*."  *Id.*

12   DC moved to compel in February 2010, DN 160 at 37-38, and Toberoff

13   opposed, reiterating the Timeline was "untrustworthy" and "inaccurate."  *Id.* at 5,

14   71.  Toberoff represented to the Court all relevant documents had "either been

15   produced or designated as privileged," and chastised DC for "mov[ing] to compel

16   *non-existent* documents based on the so-called 'Toberoff Timeline.'"  *Id.*  In April

17   2011, the Court ordered Toberoff to either "(a) produce [the May 2003 letter to DC]

18   or (b) submit a verified further response to [DC] indicating that it does not exist or,

19   if it already has been produced, identifying" where.  DN 209 at 12.

20   b. Left with no other option, Toberoff produced a single *redacted* copy of the

21   May 2003 letter—a production plainly made to cover up his long suppression of the

22   letter.  *First*, while Toberoff told the Court the "'redactions' were of an <u>attorney's</u>

23   <u>very limited marginalia</u> and underlines on the <u>sole copy</u> of the May 13 letter that

24   Defendants' counsel located in its legal files," DN 267-1 at 26, in truth, Toberoff

25   made further redactions, as DC learned when it obtained the Timeline documents in

26   2012.  Toberoff redacted a fax header from the May 2003 letter, DN 288 at 17:20-

27   22, which showed a date of July 6, 2003—a date on which no faxes appear on any

28   of the Toberoff or Siegel privilege logs.  DN 162-6 at 427; 163-17 at 892.

*Second*, Toberoff's claim that he had produced his "sole copy," DN 267-1 at 26, of the May 2003 letter was false.  When the Timeline documents were produced recently, four different "Q" Bates stamped copies of the letter were found among the Timeline documents in Toberoff's files.  Toberoff knew the copies were there. DC had asked him to search the Timeline documents for the May letter, DN 161 ¶ 26; 162-9 at 576-77; 162-11 at 583-84, and he had recently given copies of these Q-Bates-stamped documents to the U.S. Attorney, DN 205 at 4-12; 212 at 10.

The Q-Bates-stamped copies of the May 2003 letter revealed the extent of Toberoff's deception in his declarations and representations to the Court, as the Q-stamped copies uncracked the code of where and how Toberoff hid documents in his privilege logs.  *Supra* at 9-11.  DC had asked for any Q-stamped versions of the May 2003 letter to unlock the code.  DN 296, 296-8.  Knowing it would expose his privilege-log deceptions, Toberoff resisted, falsely claiming defendants "did not assert privilege" over the May 2003 letter and thus DC did not need "copies of copies" of the letter "'to understand defendants' privilege logs.'"  DN 296-1 at 4-6.

### 3.  *Toberoff Conceals The July 2003 Letter*

As with Michael's May 2003 letter to Laura, the Timeline disclosed Laura's July 2003 response, in which Toberoff's misconduct is discussed.  DN at 49, Ex. A at 65-66; 362-2 at 287.  Defying the Court's orders, including its December 7 order, Toberoff failed to produce or log the letter.  DN 160 at 30-33, 37-38.  DC raised the issue with Toberoff immediately.  DN 162-9.  Because entries #715 and #716 of the Siegels' logs purported to be faxes from Laura to Toberoff dated July 11, 2003, DC asked Toberoff whether the July 2003 letter was an unidentified enclosure to these faxes.  *Id.* at 576; 162-11 at 584.  DC also asked him to agree to a court order "that parties may not withhold non-privileged communications in this case on the grounds they were later sent to a lawyer."  DN 162-9 at 576.

Toberoff refused these requests.  DN 162-10 at 581; 162-12 at 588.  It was not until after DC filed *four* motions seeking the July 2003 letter, and after Laura

DC'S MOT. FOR EVIDENTIARY HR'G RE DISCOVERY SANCTIONS

Siegel gave damaging testimony revealing the existence and non-privileged nature of the letter, that Toberoff finally admitted he had logged it as part of log entry #82. DN 160 at 30-33, 37-38; 225 at 13-17;  253 at 6-9; 316 at 6-20.  Entry #82 makes no mention of Laura's July 2003 letter to Michael, nor does it assert the "joint defense privilege" Toberoff would later (frivolously) claim justified his withholding the letter.  DN 329 at 1-3; 362 at 5.  Instead, the log entry states, DN 317-2 at 8:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Autho(s)r | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

After Toberoff admitted how he had "logged" the July letter, DC filed a *fifth* motion, and this Court, in October 2011, ordered him to produce it.  DN 329 at 1-5; 336.  Like the May 2003 letter, Toberoff knew exactly where the July 2003 letter was all along.  Laura testified Toberoff helped her draft the letter and gave him a copy of it.  PD Ex. 86 at 2591:12-15, 2593:11-12; 2596:11-14, 2598:22-2601:3.

### 4.  Toberoff Conceals The July 5 Drafts

The Timeline also described a July 5, 2003, letter from Laura to Michael, DN 49, Ex. A at 65, which Toberoff neither produced nor logged as the Court's orders required.  DC complained, and as before, Toberoff refused to confirm whether the letter existed, condemned DC for relying on the "untrustworthy" Timeline, and assured DC that all documents had been produced or logged.  DN 162-12 at 589.

DC moved to compel, and Toberoff opposed, arguing "[t]he Timeline refers to numerous documents that *do not exist*."  DN 160 at 71-72 & n.2.  Toberoff said he was "unable to identify a document that matched the Timeline's description of the July 5 document" and the "letter *does not exist*."  *Id.*; DN 231 at 20; *see* DN 177 at 51:14-15 ("[W]e specifically pointed out that this letter *does not exist*.").

These representations were false, but they succeeded in misleading the Court to accept Toberoff's claim "that the document does not in fact exist so far as Defendants know."  DN 209 at 12 n.2.  DC moved for reconsideration, noting the July 5 letter could be "a draft letter" or differ in some trivial way from the Timeline's description.  DN 253 at 9.  Toberoff stood his ground:  "As previously

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

1    stated, this purported July 5 letter from Laura Siegel to Michael Siegel *does not*

2    *exist* as described." DN 269 at 13. Judge Zarefsky refused reconsideration. But

3    when DC received the Timeline documents in May 2012, Toberoff's deception was

4    plainly exposed. It contained *nine* copies of the July 5 letter. PD Ex. 31. Precisely

5    as DC had expected and noted in urging reconsideration, the July 5 letter was an

6    earlier version of the July 11 letter that Toberoff and Laura had drafted.

7              *5. Toberoff Conceals The November 2002 Letter*

8              The May 2003 letter disclosed another concealed document; in his opening

9    line, Michael thanked Laura for her "letter of November 2 of last year." DN 225-4

10   at 3. Toberoff never produced or logged the November letter, and refused to turn it

11   over even though the May 2003 letter disclosed it. When DC moved to compel,

12   Toberoff assured the Court: "I caused my office to re-check our relevant case files.

13   There's no November 2nd letter appearing in our files." DN 267-16, ¶ 4; DN 288

14   at 38:23-25 ("[W]e did perform a diligent search of our records, all of our records,

15   and there's no November 2nd letter as described."). Judge Zarefsky denied DC's

16   motion because Toberoff represented he "conducted a diligent and reasonable

17   search, and … [it] disclosed no November 2nd, 2002, letter." DN 288 at 43-44:2.

18             DC also sought to obtain the November 2002 letter from Bulson and Renner.

19   In *Siegel*, Toberoff produced logs for Bulson in 2006, but they made no mention of

20   the November letter. DN 332-1. However, DC learned in 2011 that Renner kept an

21   electronic archive of all of Michael's files—paper copies of which had been sent to

22   lawyers for the Estate and Toberoff in 2006. PD Ex. 56 at 985. Renner agreed, if

23   DC would pay the cost, to log all documents in its archive, so DC could compare

24   Renner's log to Toberoff's logs and productions. *Id.* Exs. 20, 58, 62.

25             Toberoff immediately intervened, insisting that only he could prepare a log.

26   PD Exs. 21, 61, 63. But for months, he refused to do so, *id.*, and only when DC

27   threatened to move to compel, *id.*, did he finally relent and provide a new Bulson

28   log, DN 362-2 at 295-318. The log contained *224+ entries* that had never been

DC'S MOT. FOR EVIDENTIARY HR'G RE DISCOVERY SANCTIONS

produced or logged before—*and all of which pre-date 2006*.  DN 362-2 at 319-21.

One new entry—# 399—was the November 2002 letter.  DN 362-2 at 311.

Even though he had failed to log the letter for more than five years, Toberoff still refused to produce it, claiming it was not among the hard copy documents he possessed in 2006.  DN 412 at 7-11.  Both Renner, and sworn declarations Toberoff and his associate filed in Ohio in 2006, all confirmed he received the full Bulson Michael Siegel file in 2006.  DN 362-2 at 319; 427-2 at 4; 477 at 1-7; 477-2 at 48-53.  Beyond that falsehood, Toberoff also claimed it was privileged, but as we now know, the letter is not remotely privileged.  DN 451 at 6.  Toberoff withheld it because it exposed his business frauds.  In the letter, Laura writes to Michael:

> My mother and I have had extensive meetings *with Toberoff and Emanuel* in the past few weeks.  *We learned … the billionaire investor* who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere.

DN 455-2 at 4.  Laura's letter both confirms that Toberoff made promises about the non-existent billionaire investor, and disproves Toberoff's recently invented claim that Emanuel was the "*investor*."  DN 145-1 at 8; 231 at 17.  Laura's letter plainly distinguishes between Emanuel and the "investor"—they are not one and the same.

### 6.  Toberoff Conceals The November 2001 Email

Also among the 224+ newly logged documents on the new Bulson log was a November 17, 2001, email from Toberoff to Michael.  DN 362-2 at 309 (#339).  In his SLAPP motion, Toberoff had told the Court that he had "*no contact* with *any* member of the Siegel family" until late summer "2002."  DN 145-1 at 23-24.  The logging of the November 2001 email proved this was untrue.

DC moved to obtain the email, arguing any asserted claim of privilege was waived by Toberoff's failure to log it for five years.  DN 394 at 3-9; 455.  In July 2012, the Court granted DC's motion.  DN 457.  In a failed motion for reconsideration, Toberoff swore he "first received the November 2001 Email *in 2011* as part of Renner Otto's electronic database of Michael's client files," and

1   argued he did not receive the email from Renner or the Estate in 2006.  DN 466-1 ¶

2   17; 475 at 3-4.  Three independent sources disproved this claim: Renner;

3   declarations Toberoff and his associate filed in 2006; and a recent document

4   production by the Estate, which includes the very November 2002 letter and

5   November 2001 email Toberoff falsely said the Estate did not have.  DN 362-2 at

6   319; 427-2 at 4; 477 at 1-7; 477-2 at 48-53; PD Exs. 76 at 1634, 39.

7          *7.  Toberoff's Misconduct Permeates Every Aspect Of These Cases*

8          Toberoff's suppressions are not limited to the documents that have been

9   disclosed to date.  There is correspondence between Michael and Laura (including

10  an October 2, 2002, letter from Michael to Laura cited in her November 2002

11  letter), which Toberoff refuses to produce.  Toberoff also refuses to produce the

12  224+ documents listed five years too late on the new Bulson log, as well as the

13  Emanuel documents the Timeline discloses.  Toberoff also deceived the Courts and

14  DC regarding Emanuel's involvement in the USAO investigation, and he continues

15  to assert overreaching privilege claims to block discovery of business agreements

16  like the Consent Agreement, as well as damaging testimony in depositions,

17  including his own.  PD ¶¶ 11-20; Exs. 2, 5, 8, 14, 16, 18, 19.

18  **III.   TOBEROFF'S MISCONDUCT SHOULD BE INVESTIGATED AND**

19  **        REMEDIED THROUGH AN EVIDENTIARY HEARING**

20         Toberoff has systematically concealed evidence, exploiting his status as a

21  litigator and officer of the court.  While certain third parties, such as the Timeline

22  author and the files of the Renner Otto firm, have enabled DC to uncover pieces of

23  Toberoff's deception, this Court should hold an evidentiary hearing to ascertain the

24  full range of Toberoff's misconduct.  The Ninth Circuit has noted that evidentiary

25  hearings are the "best" method to "determine[] appropriate sanctions" for discovery

26  misconduct, *Wyle*, 709 F.2d at 592, and during this hearing, Toberoff and other

27  witnesses should be examined, *Brotby*, 364 F.3d at 1114; *supra* n.4.  This process

28  would enable the Court to confirm what sanctions are warranted, and such a hearing

is especially important given that Toberoff and his counsel refuse to let him testify on discovery issues.  PD Ex. 87 at 2623:10-2624:7.

This Court has broad power to impose sanctions under its inherent authority or Rule 37.  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).  By evading his discovery obligations and court orders—and lying about it—Toberoff has "ma[de] it impossible for [the] court to be confident [DC] will ever have access to the true facts," *Valley Eng'rs*, 158 F.3d at 1058.  Toberoff's misconduct warrants terminating sanctions on DC's Fifth Claim and perhaps others.  Alternative relief— such as findings of privilege waiver, evidentiary sanctions, or awarding DC its fees—are appropriate.  Given the dispositive nature of this motion and the pressing need for relief, DC files this motion with this Court, and seeks an immediate hearing.  The Court could employ a special master to help investigate these issues.

**A. Terminating Sanctions.**  "It is well settled that dismissal is warranted where, as here, a party has engaged in deliberatively deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch*, 69 F.3d at 348. In such cases, dismissal is "encourage[d]." *G-K Props. v. Redevelopment Agency of the City of San Jose*, 577 F.2d 645, 647 (9th Cir. 1978).  Courts impose terminating sanctions where "counsel or [a] party has acted willfully or in bad faith in failing to comply with rules of discovery or with court orders." *Id.*  "Bad faith is exhibited … [by] delaying or disrupting litigation," *E. & J. Gallo Winery v. Gibson, Dunn & Crutcher LLP*, 432 Fed. Appx. 657, 659 (9th Cir. 2011), or "[d]isobedient conduct," *In re Phenylpropanolamine Prods. ("PPA") Liab. Litig.*, 460 F.3d 1217, 1233 (9th Cir. 2006).

Under the Ninth Circuit's "five-part" test,[10] courts grant terminating sanctions for conduct much like defendants' here.  *Valley Eng'rs*, 158 F.3d at 1057.

---

[10] *Anheuser-Busch*, 69 F.3d at 348: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

1    In *Valley Engineers*, for example, plaintiffs learned of the existence of *one*

2    smoking-gun memo in defendants' files by being "sharp enough to spot what was

3    not there." *Id*.  Defendants "continued to refuse to produce the memorandum …

4    even after it was plain that [plaintiffs] had figured out it must exist." *Id*. at 1058.  In

5    affirming terminating sanctions, the Ninth Circuit held:  "Considering how

6    [defendants] acted regarding the [] memorandum, it was a reasonable inference that

7    if there was other discoverable material harmful to its case that its adversaries did

8    not know about, it would be hidden forever." *Id*.  Terminating sanctions were

9    appropriate because the defendants had "so damage[d] the integrity of the discovery

10   process that there can never be assurance of proceeding on the true facts…." *Id*.;

11   *accord North Am. Watch*, 786 F.2d at 1449; *Hester v. Vision Airlines, Inc.*, 687

12   F.3d 1162, 1169-71 (9th Cir. 2012).

13          Here, Toberoff has violated three court orders, submitted four false and

14   misleading declarations, made misrepresentations to the Court, bogged down the

15   Court for years in his efforts to hid the ball, and otherwise subverted DC's right to a

16   fair search for the truth in both this case and the *Siegel* case.  Such conduct warrants

17   terminating sanctions, on at least DC's claims against Toberoff, and neither his

18   "late tender of evidence," nor self-serving explanations why the concealed Michael-

19   Laura letters somehow help his defense are valid bases to avoid this result.  *Id*.;

20   *Brotby*, 364 F.3d at 1115; *PPA*, 460 F.3d at 1227-28; *Anheuser-Busch*, 69 F.3d at

21   353-54; *G-K Props.*, 577 F.2d at 648; PD Exs. 5 at 62-87; 7 at 92-100; 8 at 101-03.

22   The Court's orders gave Toberoff multiple opportunities to comply.  Rather than do

23   so, his conduct shows he does "not take [his] oath to tell the truth seriously and …

24   will say anything at any time in order to prevail." *Anheuser-Busch*, 69 F.3d at 352.

25   Because there is no guarantee Toberoff will cease his misconduct if the Court were

26   to impose lesser sanctions, terminating sanctions are justified.  *Id*.

27          **B. Appointing A Special Master.**  The Court has inherent authority, and

28   authority under Rule 53, to appoint a special master to help it address Toberoff's

misconduct.  FED. R. CIV. P. 53(a)(1)(C); *U.S. v. Conn.*, 931 F. Supp. 974, 984 (D.

Conn. 1996).  The sheer number of discovery disputes here—and the time it takes

to resolve them under Local Rule 37 (a lag-time Toberoff exploits)—justifies

appointing a special master to handle document discovery issues in an expedited

manner, and to attend and supervise depositions.[11]  A special master could also be

appointed to police Toberoff's compliance with discovery—both under the Court's

past orders, and in conjunction with relief it orders on this motion.  *E.g.*, *Nat'l Ass'n*

*of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 560 (N.D. Cal. 1987)

("incorrect or false responses to discovery requests, and a failure to divulge

information and produce documents" justified appointment); 3 WRIGHT ET AL., FED.

PRAC. & PROC. § 2602.1 (2012) (same); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81,

111-13 (D.N.J. 2006).  The special master could also assess Toberoff's claims of

privilege.[12]  DC is willing to advance the cost of any special master in the first

instance, provided he has authority to impose those costs on Toberoff, as warranted.

*See also* PD ¶¶ 9-10 (discussing defendants' response to special master proposal).

   **C. Waiver of Privilege.**  Toberoff's misconduct justifies a waiver of

privilege over all documents withheld.[13]  "[P]reventing a party from asserting the

---

[11] *E.g., Trusz v. UBS Realty Investors LLC*, 2010 WL 3583064, at *5 (D. Conn.
Sept. 7, 2010) (special master "particularly appropriate" where counsel repeatedly
"have imposed upon th[e] Magistrate Judge"); *Jadwin v. Abraham*, 2008 WL
4057921, at *7 (E.D. Cal. Aug. 22, 2008); *Moreland v. State Farm Mut. Auto. Ins.
Co.*, 2007 WL 1033453, at*4-5 (D. Colo. Apr. 3, 2007); *In re Application of
Chevron Corp.*, 736 F. Supp. 2d 773, 784-85 (S.D.N.Y. 2010) (depositions);
*Harmston v. City & Cnty. of San Francisco,* 2007 U.S. Dist. LEXIS 87144, at *28-
29 (N.D. Cal. Nov. 6, 2007) (same).

[12] *E.g., Atl. Fed. Sav. & Loan Ass'n of Ft. Lauderdale v. Blythe Eastman Paine
Webber, Inc.*, 890 F.2d 371, 375 (11th Cir. 1989); *Doctor's Assocs., Inc. v. QIP
Holders LLC*, 2009 WL 1668573, at *1 (D. Conn. June 15, 2009).

[13] *Cf. Walnut*, 475 B.R. at 233 (waiver where party "inexcusably obstructed the
prosecution of this adversary proceeding" and court's "ability to efficiently and
justly rule on the issues"); *accord Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335
(N.D. Ill. 2001); *Get-A-Grip, II, Inc. v. Hornell Brewing Co.*, 2000 WL 1201385, at
*3-4 (E.D. Pa. Aug. 8, 2000); *Bankatlantic v. Blyth Eastman Paine Webber, Inc.*,

DC'S MOT. FOR EVIDENTIARY HR'G RE
DISCOVERY SANCTIONS

1   attorney-client privilege is a legitimate sanction for abusing the discovery process"

2   when a court "finds bad faith, willfulness, or fault."  *Teleglobe Comm'cs Corp. v.*

3   *BCE, Inc.*, 493 F.3d 345, 386 (3d Cir. 2007); *see* FED. R. CIV. P. 26 Advisory

4   Committee Notes (failure to comply with Rule 26(b)(5) "may be viewed as a

5   waiver of the privilege or protection").  Courts find bad faith "where counsel has

6   'disregarded' its professional responsibilities in the discovery process or to the

7   court."  *Bankatlantic*, 127 F.R.D. at 231; *see Cline Forty-Second Street Theatre*

8   *Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1067 (2d Cir. 1979); *Ritacca*,

9   203 F.R.D. at 335 ("cavalier attitude towards following court orders and the

10  discovery rules supports finding waiver").  At a minimum, the Court can and

11  should order Toberoff to produce all documents, including attachments to fax cover

12  sheets and the like that Toberoff never separately logged,[14] as well as the 224+ new

13  documents on the Bulson log, *supra* at 19-21, and all documents from 2000 to 2004

14  when Toberoff acted predominantly as a businessman and entrepreneur, while

15  invoking his status as a lawyer purposefully to shield relevant evidence, *id*. at 12.

16  **IV.    CONCLUSION**

17          DC's motion should be granted.

18  Dated:    October 10, 2012            Respectfully submitted,
                                          O'MELVENY & MYERS LLP
19

20                                        By:  /s/ Daniel M. Petrocelli
                                               Daniel M. Petrocelli
21

22

23

---

24  127 F.R.D. at 233, 234-36 (S.D. Fla. 1989).

25      [14] *E.g., O'Connor v. Boeing N. Am., Inc.*, 185 F.R.D. 272, 280 (C.D. Cal. 1999)
    ("To claim the attorney-client privilege or work product doctrine for an attachment
26  to, or enclosure with, another privileged document, the attachment or enclosure
    must be listed as a separate document on the privilege log; otherwise, such
27  attachment or enclosure must be disclosed."); *C.T. v. Liberal Sch. Dist.*, 2008 WL
    217203, at *9 (D. Kan. Jan. 25, 2008) (privilege waived where attachments were
28  not "separately listed" on plaintiff's initial or amended logs).