# EXHIBIT 1

| | |
|---|---|
| **From:** | Tokoro, Jason |
| **Sent:** | Monday, June 18, 2012 7:23 PM |
| **To:** | Richard Kendall |
| **Cc:** | Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo; Pearson, Ashley; Laura Brill |
| **Subject:** | RE: DC Comics v. Pacific Pictures - Erratum |

Counsel,

Please see the below correspondence sent on behalf of Matthew T. Kline.

\*          \*          \*

Dick,

We have received no response to our email below from you or Marc.

1. We need the supplemental interrogatory responses concerning your communications with the U.S. Attorney's Office.  It has been nearly two weeks since we requested that you report the contents of those communications in supplemental interrogatory responses.  Yet, neither you nor your client, Mr. Toberoff, has provided us with a date certain for when DC can expect to receive that information.

2. You have further refused to provide any answers concerning the document issues we identified below.  Please immediately respond to our inquiries.

Your continued refusal to meaningfully participate in this case, including with respect to discovery, is not proper for the reasons set forth in my email below.  You have yet to provide any authority for your position that your firm and Mr. Toberoff can agree to a purported division of labor that delegates all discovery responsibilities to him, your client, especially in light of the discovery misconduct and delay by your client here.

We request a Rule 37 conference this week or next.

DC reserves all rights and remedies.

Best and thanks,

Matt


**From:** Tokoro, Jason
**Sent:** Wednesday, June 13, 2012 6:21 PM
**To:** 'Richard Kendall'
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo; Pearson, Ashley; Laura Brill
**Subject:** RE: DC Comics v. Pacific Pictures - Erratum

Counsel,

Please see below correspondence sent on behalf of Matthew T. Kline.

**EXHIBIT 1**
**25**

\*          \*          \*

Dick,

1. Your response remains no response at all.  Neither you nor your client, Mr. Toberoff, has provided us with a date certain for when DC will discover your oral communications with the government, which you only recently disclosed.  Again, saying Mr. Toberoff will address this issue at some point in time is not a response.

You continue to refer to Mr. Toberoff as your "co-counsel," and insist that you may assign your discovery duties to him and take no part in ensuring the accuracy and completeness of his work—even though he is doing work for clients you represent.  Despite several requests orally and in writing, you have provided us with no authority—and we know of none—that permits you, your colleagues, and your law firm to assign their duties in this way.  Moreover, Mr. Toberoff is not your "co-counsel"; you and he represent no clients in common.  Whereas Mr. Toberoff represents defendants Laura Siegel Larson, Mark Warren Peary, and Jean Peavy, your firm's notice of appearance in this case states:

> PLEASE TAKE NOTICE that Richard B. Kendall, Laura W. Brill, Nicholas F. Daum and Nathalie E. Cohen of the law firm Kendall, Brill, & Klieger, LLP hereby enter their appearance on behalf of Defendants Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC, and IPW, LLC in the above- captioned matter.  Docket No. 21 at 1.

Mr. Toberoff has never appeared *pro per* or on behalf of any of the corporate defendants.  In addition, the caption page and signature blocks for pleadings in this case have identified your firm as representing the Toberoff Defendants and Mr. Toberoff as representing the Siegel and Shuster heirs:

MARC TOBEROFF (S.B. # 188547)
NICHOLAS C. WILLIAMSON (S.B. # 231124)
KEITH G. ADAMS (S.B. # 240497)
TOBEROFF & ASSOCIATES, P.C.
2049 Century Park East, Suite 2720
Los Angeles, California 90067
Telephone: (310) 246-3333
Facsimile: (310) 246-3101
*Attorneys for Defendants Mark Warren Peary*
*as personal representative of the Estate of Joseph*
*Shuster, Joanne Siegel, and Laura Siegel Larson*

RICHARD B. KENDALL (S.B. # 90072)
rkendall@kbkfirm.com
LAURA W. BRILL (S.B. # 195889)
lbrill@kbkfirm.com
NICHOLAS F. DAUM (S.B. # 236155)
ndaum@kbkfirm.com
NATHALIE E. COHEN (S.B. # 258222)
ncohen@kbkfirm.com
KENDALL BRILL & KLIEGER LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: (310) 556-2700
Facsimile: (310) 556-2705
*Attorneys for Defendants Marc Toberoff,*
*Pacific Pictures Corporation, IP*
*Worldwide, LLC, and IPW, LLC*

2

**EXHIBIT 1**
**26**

Dated:   August 30, 2010          Respectfully Submitted,

                                   TOBEROFF & ASSOCIATES, P.C.

                                   By:   /s/ Marc Toberoff
                                         Marc Toberoff
                                         Attorneys for Defendants Mark
                                         Warren Peary as personal
                                         representative of the Estate of Joseph
                                         Shuster, Joanne Siegel, and Laura
                                         Siegel Larson

Dated:   August 30, 2010          Respectfully Submitted,

                                   KENDALL BRILL & KLIEGER LLP

                                   By:   /s/ Richard B. Kendall
                                         Richard B. Kendall
                                         Attorneys for Defendants Marc
                                         Toberoff, Pacific Pictures
                                         Corporation, IP Worldwide, LLC,
                                         and IPW, LLC

*E.g.,* Docket Nos. 42, 44-1, 75.

The law is clear.   You cannot avoid your duty meaningfully to participate in this case, nor can you avoid liability for the discovery misconduct of Mr. Toberoff, through a purported division of labor that delegates all discovery responsibilities to him, your client.  Recent California Court of Appeal authority confirms this.  In *Cole v. Patricia A. Meyer & Assocs., APC*, 2012 WL 2106364, at *14 (Cal. Ct. App. June 12, 2012), for example, the court held that though California law generally allows co-counsel to divide the duties of conducting a case, an attorney cannot avoid liability for misconduct by intentionally failing to learn about the case based on a purported division of labor.  The court reasoned that as "counsel of record"—which you and your firm are here—attorneys owe a "duty of care to their clients that encompasse[s] 'both a knowledge of the law and obligation of diligent research and informed judgment.'"  *Id.* at *13.  The court found that defendants "cannot avoid liability for malicious prosecution by claiming  to have been ignorant of" key facts in the case—even facts another attorney allegedly assumed responsibility  for. *Id.* at *14; *see also In re Girardi*, 611 F.3d 1027, 1061-62 ("willful ignorance" of the plaintiffs' co-counsel of record in the underlying case not a defense); *In re Mitchell*, 901 F.2d 1179, 1188 (3d Cir. 1990) (division of labor among counsel does not diminish attorney's personal responsibility for complying with court rules); *Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225, 234 (2d Cir. 1977) ("The principle that a lawyer cannot delegate his fiduciary duties to another in an effort to avoid its strictures or to avoid responsibility for the manner in which they are taken is settled law."); *J.M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338 (D. Conn. 1981) (finding attorney liable for failure of co-counsel to comply with discovery requests; "[t]he fact that an attorney may have engaged co-counsel to assist him in the conduct of a case does not relieve that counsel of record of his duty to supervise all aspects of the litigation").

2.  As for the open document issues, you still have not told us why the October 21, 2010, email was not produced to DC prior to our pressing for the document.  Nor have you given assurance that other documents have not been produced for the same reason.  You claim the failure to produce the October 21 email was a "harmless error," but how are you defining "harmless"?  Are there any other documents that your office did not produce because you felt it was "harmless" if you withheld them?  You also have not explained your statement that other omissions in production were caused by a "non-repeated human error."  Again, what was the "non-repeated human error" and why you are sure it was "non-repeated."  How can DC rely on the completeness of your firm's search for documents when these "errors" have been exposed?

We still need and are entitled to precision here, especially given the original and inadequate production that you let your client provide.

Thanks,

3

**EXHIBIT 1**
**27**

Matt

**From:** Richard Kendall [mailto:rkendall@kbkfirm.com]
**Sent:** Wednesday, June 13, 2012 11:13 AM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo; Pearson, Ashley; Laura Brill
**Subject:** RE: DC Comics v. Pacific Pictures - Erratum

Matt:  Please see below a corrected version of my 9:45 email to you of this morning.  The last word in the first paragraph was meant to be "co-counsel" and has been corrected in the version set out below.

## Kendall Brill Klieger

**Richard B. Kendall**
Kendall Brill & Klieger LLP
Direct:  (310) 272-7900

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside information.  Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.  Thank you.

**From:** Richard Kendall
**Sent:** Wednesday, June 13, 2012 9:45 AM
**To:** 'Kline, Matthew'
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo; Pearson, Ashley; Laura Brill
**Subject:** RE: DC Comics v. Pacific Pictures

Matt:

As we have told you, Mr. Toberoff, who is our co-counsel in the above-referenced action, is preparing supplemental responses to your interrogatories concerning communications with the United States Attorney's Office.  To the extent that those supplemental responses seek information describing those communications that, in the wake of the Ninth Circuit's ruling on the writ petition, are now required to be disclosed, such information will be provided to you.  Our law firm has also responded to your separate document subpoena.  We are unaware of any obligation whatsoever to informally provide interrogatory responses to you when our co-counsel is in the midst of preparing the same.  We are also unaware of any legal basis (and you have supplied none), for your insistence that our firm is required to duplicate the work of our co-counsel.

The reason why the "earliest email" in the email chain you reference (that is, an October 21, 2010 email from me) was not produced to you as a stand-alone document that the email was already produced as a stand-alone email by Mr. Toberoff, at SD 00916.  That is in addition, of course, to being produced to you twice in the email chains to which I referred you earlier.  Thus, the entire content of this email has been produced three different times.  The failure to produce a fourth copy was a harmless error.  I am attaching to this email yet a fourth copy, which Mr. Daum has printed out from our "sent" file.  If, for some reason, you have any need for a different version of this document as a stand-alone document (in addition to the three other ways in which this identical email has been produced to you) please let me know and we will be happy to bates-label it.

Kind regards,

Dick

4

**EXHIBIT 1**
**28**

**Kendall Brill Klieger**

**Richard B. Kendall**
Kendall Brill & Klieger LLP
Direct: (310) 272-7900

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

**From:** Kline, Matthew [mailto:MKline@OMM.com]
**Sent:** Monday, June 11, 2012 5:19 PM
**To:** Richard Kendall
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo; Pearson, Ashley; Laura Brill
**Subject:** RE: DC Comics v. Pacific Pictures

Dick,

The issues are joined now, and you are not providing us with answers.

1. You've not addressed how we will discover your oral communications with the government other than to say Marc Toberoff will be addressing that issue at some unnamed point in time. Marc Toberoff, your client, has not done so, and saying he will do so at some point in time is not a response. We need to know from you what you and the USAO said to one another, and you can certainly provide that detail in amended interrogatory responses, especially given the work you and your firm did on the original responses—both signing them and meeting and conferring on their substance. Moreover, despite our conversation last week, you have provided us with no authority justifying your relegating your discovery duties to your client in this way, and we are aware of none, especially in light of the discovery misconduct by your client here. Please provide us with any authority on which you are relying to assign your duties in this way.

2. The claims of sloppiness are not well taken. SD 924 and 925 contain a series of emails in a chain, but not the earliest email standing alone. The earlier email has not been produced. Why is that? Are you saying it has been? Are you saying it no longer exists as a stand-alone email? Or are you saying you eliminated copies of earlier emails in chains? Last week, you said you did no de-duplication—now are you saying you did? Also, what was the "non-repeated human error" and why are you sure it was "non-repeated"?

As discussed last week, we need and are entitled to precision here, especially given the original and inadequate production that you let your client provide.

Thanks,

Matt

**From:** Richard Kendall [mailto:rkendall@kbkfirm.com]
**Sent:** Monday, June 11, 2012 4:38 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Tokoro, Jason; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo; Pearson, Ashley; Laura Brill
**Subject:** RE: DC Comics v. Pacific Pictures

Matt:

Your reply to my email is not constructive, and this correspondence is becoming a waste of time.

5

**EXHIBIT 1**
**29**

First, you have not disputed that my notes are protectable work product. The question of whether you are entitled to obtain the contents of my communications with the USAO through means other than disclosure my work product-privileged notes is of course a different one, as I pointed out in my below email. As discussed during our "meet and confer," I disagree with the other comments in your first paragraph.

Second, you are being sloppy and are absolutely wrong in persisting with your accusation that the copy of the "October 21, 2010, email from you to Mr. Klein, copying Mr. Toberoff, [misdated] September 13, 2010" that resided in KBK's files was not produced to you. Again, please see SD 924 and 925, referenced in my prior email. The September 14 email that resided in our "sent" file was not produced because of a non-repeated human error.

As to the remainder of your rhetoric, I will simply disagree and let it go at that for now.

Kind regards,

Dick


**Kendall Brill Klieger**

**Richard B. Kendall**
Kendall Brill & Klieger LLP
Direct: (310) 272-7900

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

---

**From:** Pearson, Ashley [mailto:APearson@OMM.com]
**Sent:** Monday, June 11, 2012 3:35 PM
**To:** Richard Kendall; Laura Brill
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Tokoro, Jason; 'mtoberoff@ipwla.com'; Nicholas Daum; kgadams@ipwla.com; Pablo Arredondo
**Subject:** FW: DC Comics v. Pacific Pictures

Counsel,

Please see the email below sent on behalf of Matt Kline.

*       *       *

Dick:

I have been out of the office, and I write in response to your email below.

1. Whether your notes contain verbatim, or near verbatim, recitations of your conversations with Mr. Kim or Mr. Klein does not absolve you of the obligation to disclose to DC the substance of those communications, including what you told the USAO or what the USAO told you. Such information is not privileged or shielded by work-product protections, as the courts have held. As we made clear in our prior email, DC does not seek your work-product notes about your strategy calls, and defendants may redact and log that information, but DC is entitled to know what communications you exchanged in those non-privileged discussions. In addition, it is plain that Mr. Toberoff's interrogatory responses require updating based not only upon the courts' decisions, but also these recently disclosed conversations between you and the USAO, which have never before been disclosed or logged. Neither you nor your firm can avoid its obligations to meaningfully participate in this case and ensure that your clients' discovery responses are accurate and complete by claiming you have an "agreement" with Mr. Toberoff regarding a division of labor that allows him to control all aspects

6

**EXHIBIT 1**
**30**

of the discovery process—especially here, where it has been proven time and time again that Mr. Toberoff's discovery responses have been incomplete, and he has made untrue claims concerning the contents and substance of documents.

2. Jason did inadvertently describe the October 21, 2010, email from you to Mr. Klein, copying Mr. Toberoff, as being dated September 13, 2010, but that is beside the point. The point is that your firm never produced this document to DC, and you still have provided no explanation for why that is the case, given the allegedly exhaustive nature of your document searches. Nor did your firm produce a redacted or unredacted copy of the September 14, 2010, email from you to Mr. Toberoff, which Mr. Toberoff produced from his personal Gmail account. You state that Mr. Toberoff's office will produce redacted versions of this document from Mr. Toberoff's email account and the Kendall Brill firm's "sent" file, but that response avoids the broader issue at hand—why neither you nor your firm produced these documents? Did your search not capture them? Do they not exist in your firm's files? It can't be the latter as to the September 14 email, because you seem to be saying that you will now produce a copy your firm's "sent" file. In sum, we need to know why these documents were not picked up by your search, and whether other similar documents exist. Too much time and effort has been expended, as it is, trying to get defendants and their counsel to comply with the courts' recent orders.

Best and thanks,

Matt

**From:** Richard Kendall [mailto:rkendall@kbkfirm.com]
**Sent:** Thursday, June 07, 2012 1:33 PM
**To:** Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Laura Brill; Nicholas Daum; Keith Adams; Pablo Arredondo; Marc Toberoff; Tokoro, Jason
**Subject:** RE: DC Comics v. Pacific Pictures

Matt:

1. I do not believe you are entitled to know the contents of my work product, except to know that it does not contain either a verbatim, or near verbatim, of my conversations with either Mr. Kim or Mr. Klein. Your contention that Mr. Toberoff's interrogatory responses require updating based on the Ninth Circuit's decision that the attorney-client privilege was waived as to the stolen documents provided to the USAO presents different issues, and Mr. Toberoff is reviewing those.

2. The copy of the "September 13, 2010" email in the KBK files to which you refer (you have misread the date: it is actually an October 21, 2010 email whose subject is "Grand Jury subpoena dated September 13, 2010") has already been produced to you twice by Mr. Toberoff's office. See SD 924 and 925. The September 14, 2010 email residing in Mr. Toberoff's gmail account was inadvertently produced by Mr. Toberoff without redacting the portion of the document reflecting my attorney-client communication to Mr. Toberoff. Mr. Toberoff's office will be producing a redacted version of this email, from both his gmail account and duplicate thereof that resides in the KBK "sent" file, and will be supplementing the privilege log to assert the attorney-client privilege in the redacted portion of this document. In the meantime, please return the inadvertently produced document and destroy all copies of same, and make no further use of the document in any correspondence, motion practice, pleadings, briefs, or otherwise. The attachment (the September 10, 2010 email from Mr. Klein to me, denominated as such in the September 14 email) was produced to you long ago, and is already part of the record in the litigation over the stolen documents in the District Court and the Ninth Circuit.

All rights are reserved.

Kind regards,

Dick

7

**EXHIBIT 1**
**31**

**K** Kendall Brill Klieger

**Richard B. Kendall**
Kendall Brill & Klieger LLP
Direct: (310) 272-7900

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

---

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Wednesday, June 06, 2012 9:26 PM
**To:** Richard Kendall
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Laura Brill; Nicholas Daum; Keith Adams; Pablo Arredondo; Marc Toberoff
**Subject:** RE: DC Comics v. Pacific Pictures

Counsel,

Please see the below correspondence sent on behalf of Matthew T. Kline.

\*          \*          \*

Dick,

1. Thank you for your letter and checking your computer for notes. Some follow-up questions: Do any of the notes record what you told the USAO or what the office told you? If so, the substance of those communications must be disclosed, as they are not privileged. If there are work-product notes about your strategy calls, we do not want to see those. But we are entitled to know is what communications you exchanged in those non-privileged discussions. If the notes need to be redacted, that is fine. You should also report on the contents of the communications in amended Interrogatory Responses to DC's Requests Nos. 9-19 served on December 10, 2011, on defendant Marc Toberoff. *E.g.,* Interrogatory No. 9 ("DESCRIBE in detail any and all COMMUNICATIONS between YOU and any law enforcement official, including anyone employed by the United States Attorney's Office for the Central District of California and/or the Federal Bureau of Investigation, regarding the TOBEROFF TIMELINE AUTHOR and/or the TOBEROFF TIMELINE."). We expect to get those communications this week or early next. If you want to discuss the matter further in a Rule 37 call, let's have it this Friday.

2. During our meet-and-confer on Monday, we discussed the fact that defendants have not produced documents in the possession, custody or control of the Kendall Brill firm responsive to the Court's orders. Specifically, your firm has not produced its copies of correspondence with the U.S. Attorney's Office—on which you are an author or recipient— that have been produced by Mr. Toberoff from his personal Gmail account. We have attached two examples that Jason identified—a September 13, 2010, email from you to Mr. Klein and copying Mr. Toberoff, and a September 14, 2010, email from you to Mr. Toberoff forwarding an email to you from Mr. Klein. Please confirm why you did not produce these documents; do they not exist among your files? Did your search not capture them? Either way, please check again to see that your firm's production was fully complete. We want to follow up on these issues and the others raised in our call.

Thanks,

Matt

**EXHIBIT 1**
**32**

**From:** Dawn Mancil [mailto:dmancil@kbkfirm.com]
**Sent:** Tuesday, June 05, 2012 11:44 AM
**To:** Kline, Matthew
**Cc:** mtoberoff@jpwla.com; Richard Kendall
**Subject:** DC Comics v. Pacific Pictures


**Dawn F. Mancil**
**Assistant to Richard B. Kendall, Esq.**
Kendall Brill & Klieger LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Tel: (310) 556-2700
Fax: (310) 556-2705
E-mail: dmancil@kbkfirm.com
Web: www.kbkfirm.com

PLEASE NOTE:  This message, including any attachments, may include privileged, confidential and/or inside information.  Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.  Thank you.

# EXHIBIT 2

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

July 2, 2012

OUR FILE NUMBER
905,900-321

WRITER'S DIRECT DIAL
(310) 246-6850

WRITER'S E-MAIL ADDRESS
dpetrocelli@omm.com

**VIA E-MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    _DC Comics v. Pacific Pictures Corp. et al._, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We are in receipt of defendants' production of documents pursuant to Judge Zarefsky's June 21, 2012, order, as well as your correspondence of the last two weeks in which you both claimed that defendants and their counsel are meeting their respective discovery obligations. Defendants' recent production, like their discovery conduct of the past two years, proves this is not the case. DC requests a Rule 37 conference to discuss the issues below, and to discuss using a special master to manage discovery and the role of defense counsel going forward:

1. October 2, 2002, Letter. After conducting an _in camera_ review and rejecting defendants' claims of privilege, Judge Zarefsky ordered defendants to produce a November 2, 2002, letter from Laura Siegel Larson to Michael Siegel. Docket No. 451 at 6. The first paragraph of the November 2002 letter references a "letter of October 2nd." The October 2 letter has never been logged or produced by defendants, and there is no basis for withholding it. Defendants' claims of privilege over this chain of communication repeatedly have been rejected. Moreover, any privilege that may have otherwise applied—and none did —was waived by defendants' failure to timely log this document. DC demands that the referenced October 2, 2002, letter be produced no later than July 6, 2012.[1]

---

[1] In her November 2002 letter, Laura also writes: "Enclosed you will find a copy of a letter my mother and I have sent to Lillian Laserson…." No enclosure is included in defendants'

**EXHIBIT 2**
**34**

O'MELVENY & MYERS LLP
July 2, 2012 - Page 2

    2.  <u>Obligations Of The Kendall Brill Firm</u>.  We have discussed Kendall Brill's obligation
meaningfully to participate in this case repeatedly, and have provided you with the relevant
authority that requires the Kendall Brill firm to ensure the Toberoff defendants' compliance with
discovery.  What is most odd about Dick's recent response to these issues, *see* June 25, 2012
Email, is that, while the Kendall Brill firm now purports to defend Mr. Toberoff's discovery
conduct, the Kendall Brill firm has repeatedly professed in recent weeks to be ignorant of any
discovery responses he has prepared other than those DC directed at the Kendall Brill firm.

    a.  On the discovery issues in which the Kendall Brill firm has been directly involved, it
knows from its own experiences and court rulings that Mr. Toberoff cannot be trusted to manage
discovery.  Take the USAO and Timeline documents as an example.  Mr. Toberoff's initial
production of these documents, as the Kendall Brill firm well knows, was deficient, and only
when the Kendall Brill firm became involved did new documents that Mr. Toberoff previously
withheld emerge.  As it stands, the Kendall Brill firm still refuses to answer the basic question
DC has asked about the reasons for the omissions in defendants' productions, but without the
Kendall Brill firm's involvement, important relevant documents would not have been produced.

    b.  The Ninth Circuit also has put the Kendall Brill firm on clear notice about its need to
play a more direct role.  Not only did the court rightly and openly question Mr. Toberoff's ethics
and professionalism, *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012), it called
him out for failing to produce non-privileged business documents that he falsely claimed were
protected by privilege, *id.* at 1129 ("most of these [Timeline] documents are not covered by the
attorney-client privilege because they do not represent communications between a lawyer and his
client for the purpose of obtaining legal advice"); 1127 n.4.

    c.  This repeatedly has proven to be the case, and the Kendall Brill firm along with Mr.
Toberoff have made one irresponsible argument after another to the courts in these cases that are
belied by non-privileged documents that the Kendall Brill firm has allowed Mr. Toberoff to
suppress.  Take the November 2, 2002, letter as an example.  Mr. Toberoff initially represented it
did not exist; then falsely claimed it was privileged.  Docket Nos. 267-1 at 2; 267-2 ¶¶ 4-5; 267-9
at 187; 267-7 at 18; 362-2 at 311 (Entry 399); 395-1 at 97.  All the while the Kendall Brill firm
and Mr. Toberoff made factual assertions in briefs that the November 2, 2002, letter directly
contradicted.  In urging the courts to dismiss DC's claims, defendants' claimed that DC's
"billionaire investor" claim was a "mockery," "contrary to all the evidence," "based entirely on
the untrustworthy, inadmissible [Toberoff] Timeline," and that no "further discovery" would
help establish this claim.[2]

---

production.  Defendants are not permitted to strip out enclosures from documents they produce.
This enclosure (as it exists in the form Laura sent it) must be produced by July 6, as well.
  [2] Docket No. 196 at 1-5, 10:
     • "DC contends that Mr. Toberoff defrauded the Siegels in 2002 by stating that he had a
     'billionaire' investor and would help the Siegels produce a competing Superman film …."

O'MELVENY & MYERS LLP
July 2, 2012 - Page 3

Yet in the long-suppressed November 2, 2002, letter, Laura herself writes: "My mother and I have had extensive meetings with Toberoff and Emmanuel in the past few weeks. We learned that due to the delays and the misinformation Kevin [Marks] has given them that there was a deal with DC, *the billionaire investor who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere.*" (Emphases added.)  These are Laura Siegel Larson's words—"billionaire investor"—that she used in a letter distinguishing among Mr. Toberoff, Mr. Emanuel, and the billionaire investor as a third person. She says it was the "billionaire investor" who made the $15 million offer, not Mr. Emanuel— even though Mr. Toberoff and the Kendall Brill firm now falsely claim that Mr. Emanuel was the unnamed "investor."  *See infra.*  Clearly, the "further discovery" the Kendall Brill firm and Mr. Toberoff sought to  deny DC through incendiary rhetoric and false claims about DC's complaint, *supra* n.2, was needed.  This further discovery has not only verified DC's claims, but has shown how both the Kendall Brill firm and Mr. Toberoff have falsely misrepresented key facts to the courts and engaged in rampant discovery abuse in aid of this improper scheme.

Defense counsel have violated their duty of candor repeatedly, and their misrepresentations of fact have been repeated *over and over* in briefing, correspondence, and even defendants' depositions.  Included among the many examples:

October 4, 2010, SLAPP Reply

2. **"Billionaire Investor" and Fraud**. DC relies on the Timeline, an obviously inadmissible screed penned by a thief who violated fundamental duties of professional ethics and had absolutely no percipient knowledge of the events he purports to describe. DC's allegation that Toberoff misled the Siegels by representing that he had a "billionaire" investor or that he would help produce a Superman film, the sole allegations of "wrongfulness" required for DC's Fifth Claim, is based entirely on this untrustworthy, inadmissible Timeline, and is contradicted by the sworn testimony of all percipient

---

Each of these allegations has been conclusively disproven by documents and sworn depositions provided in 2006, and none can be cured by further discovery."
• "DC's allegation that Toberoff misled the Siegels by representing that he had a 'billionaire' investor or that he would help produce a Superman film, the sole allegations of 'wrongfulness' required for DC's Fifth Claim, is based entirely on this untrustworthy, inadmissible Timeline, and is contradicted by the sworn testimony of all percipient witnesses …. DC knows all this, yet conceals it from the Court."
• "DC's assertion of the requisite 'wrongful act' reduce to its allegations … that Toberoff misled the Siegels by stating (1) that a 'billionaire' investor was interested in acquiring their rights; and (2) that he was interested in making a movie based on Superman. FAC ¶ 78, 185.  First, the Timeline does not even state that Toberoff spoke with the Siegels about a billionaire. The Timeline says he discussed the billionaire with their then-attorney, Kevin Marks, on August 8, 2002. FAC Ex. A 63.  But Kevin Marks testified about this conversation four years ago, and his testimony shows what a mockery DC's accusations of fraud really are…."

3
**EXHIBIT 2**
**36**

O'MELVENY & MYERS LLP

July 2, 2012 - Page 4

witnesses. First, even the Timeline does not assert that Toberoff ever told the Siegels that he had a "billionaire" investor. Its anonymous author claims, without percipient knowledge, that Toberoff told this to Kevin Marks on August 8, 2002. FAC, Ex. A 63. Second, each participant in this conversation has been examined in deposition. Indeed, Marks, who has no interest in this dispute, described this entire conversation at length in his 2006 deposition. Ex. H (KM Depo 166:6-170:24); *see also* Ex. E (MT Depo 98:25-104:14). There was absolutely no mention of a "billionaire" investor or that Toberoff would help produce a Superman film. *Id.* DC knows all this, yet conceals it from the Court.

Docket No. 98 at 2-3.

October 4, 2010, SLAPP Evidentiary Objections

Remarkably, the Declaration includes not a single piece of admissible evidence to support the key factual allegations of the complaint against the Siegels' and Shusters' long-time counsel, Marc Toberoff, i.e., that he misrepresented that there was a "billionaire" investor for the Siegels or that he offered to produce a competing Superman movie based on the Siegels' recaptured copyrights. As Declarant well knows, the sworn testimony of percipient witnesses in the six-year old Siegel litigation is entirely to the contrary. *See* Reply in Support of Anti-SLAPP motion, at 5-6. Yet the Declarant, without any evidence, has repeatedly accused Mr. Toberoff of fraud and larded the Declaration and DC's oppositions with unseemly ad hominem attacks on Mr. Toberoff based on irrelevant hearsay. This tactical character assassination of Mr. Toberoff repeated throughout the Declaration and opposition papers should be given no credence whatsoever. It is not proper to bring a lawsuit for the purpose of destroying the reputation of a lawyer due to his effective advocacy.  That virtually everything in the Declaration is objectionable and inadmissible and/or attacks Mr. Toberoff based on total irrelevancies is noteworthy for one purpose only: it shows that this vicious suit is a pure act of retaliation covered by California's Anti-SLAPP statute, as its purpose is to attack Mr. Toberoff in connection with his successful representation of the Siegels and Shusters.

Docket No. 99 at 2-3.

October 7, 2010, Letter from Laura Brill

The lack of civility you have shown, not just to Mr. Toberoff, but also to attorneys at this firm, has occurred again and again. The chart below illustrates just some of the many instances of unprofessional conduct that defendants have endured since the outset of this case. …

Falsely alleging, without adequate inquiry or particularity, that Mr. Toberoff "falsely represented to the Siegels that if they repudiated their agreement with DC Comics and entered into an agreement with him instead, a 'billionaire investor' 'was prepared

O'MELVENY & MYERS LLP

July 2, 2012 - Page 5

immediately to pay the Siegels $15 million for their Superman rights, plus a generous back-end profit participation in any future exploitations of the Superman Property.'"

<u>October 14, 2010, Defendants' Objection to Sur-Reply</u>

The Kevin Marks Declaration: Kevin Marks' very brief declaration was also permissible rebuttal evidence. DC based the "bad act" required for its Fifth Claim solely on the demonstrably false fraud allegation that Mr. Toberoff misled the Siegels by supposedly representing that he had a "billionaire investor" and would produce a competing Superman movie.

Docket No. 108 at 2-3.

<u>May 2, 2011, Defendants' Opposition to Motion for Review</u>

Second, there was no mention of a "billionaire investor" in Mr. Toberoff's August 2002 Conversation with Mr. Marks, in which the talent agent, Ari Emanuel [not a mysterious "billionaire"] offered to purchase the Siegel Heirs' rights (Docket No. 196-2, Ex. H at 166:6-170:24 (testimony of Kevin Marks), Ex. E at 98:25-104:14 (testimony of Marc Toberoff); Docket No. 196-3 (further testimony of Kevin Marks)).

Docket No. 231 at 17.

<u>May 31, 2011, Defendants' Opposition to Motion for Reconsideration</u>

There was no mention of a "billionaire investor" in Mr. Toberoff's August 2002 conversation with Mr. Marks, in which the talent agent, Ari Emanuel offered to purchase the Siegel Heirs' rights for $15 million plus a participation. *See* Docket No. 196-2, Ex. H at 166:6-170:24 (testimony of Kevin Marks), Ex. E at 98:25-104:14 (testimony of Marc Toberoff); Docket No. 196-3 (further testimony of Kevin Marks). …

Defendants addressed DC's trumped-up mysterious "billionaire" claim in opposition to DC's original motion to compel, and noted that DC itself had long ago identified the "investor" as Mr. Emanuel. Docket No. 160 at 70:2-71:3. Defendants likewise pointed out in their anti-SLAPP motion that the August 2002 offer was made by Mr. Emanuel, not a mysterious "billionaire," as consistently testified to by Mssrs. Marks and Toberoff in 2006. See Docket No. 145 at 8:12-28; No. 196-2, Ex. E at 103:8-9, Docket No. 145-6, Ex. R at 168:2-169:5. …

Certain words that appear in the May 13 Letter unsurprisingly appear in DC's complaint (e.g., "billionaire," FAC ¶ 7-8, 66-85) because the complaint is based on the inadmissible rant in the anonymous Timeline, which, in turn, clearly riffed off Michael Siegel's speculations in his inadmissible May 13 Letter. DC cherry-picks these repeated words to somehow validate its baseless complaint and to falsely accuse Defendants of

O'MELVENY & MYERS LLP

July 2, 2012 - Page 6

misrepresenting to the Court.  DC specious arguments ignore the innocuous actual content of the May 13 Letter.

Docket No. 269 at 8, 9, 10-11.

Deposition of Laura Siegel Larson 7/23/11

Q.  -- it starts out "I really wish to discuss Marc Toberoff."  And it says in the third sentence:  "I told you when he first contacted me, he wanted to buy my share of the copyright.  Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation.  When you signed with Marc the billionaire invested elsewhere."  Do you know where he got that information?
A.  I have no idea.
Q.  You don't think he made it up, do you?
A.  You know, Michael was a very confused guy, on a lot of medication, and when he would write things to me, such as asking me did I know that Marc was the attorney for the Shusters, well, of course I did, and, you know --
Q.  He's telling you that Marc Toberoff contacted him and said he had a mysterious billionaire.
A.  Yeah.  Well, I don't know where that came from.
Q.  Did you think your brother – your stepbrother was lying?
A.  I don't -- I don't know that he came up with the wording himself.  You know, I mean it -- I had never heard this referred to in any way other than in this letter, "mysterious billionaire."  I don't know what that means.
Q.  Put $15 million up front, plus participation, that happened to be exactly the same number that Mr. Emanuel had offered you; correct?
A.  That was interesting, and that caught my eye.
Q.  Mr. Toberoff had told you that he knew billionaire investors; correct?
A.  No, he never used that term. …
Q.  By the way, when you wrote your stepbrother back, did you straighten him out on things that you think he had wrong in his letter to you of May 13?
A.  I did my best to.
Q.  Can you explain to me as best as you can, for example, what you said about the billionaire, the mysterious billionaire?
A.  You know, I don't remember how I put it to him, but I, you know, I tried to in as simple a manner as possible explain what he had wrong in this letter.  Regarding specifically the billionaire, I really don't recall what I said.
Q.  Did you type the letter yourself?
A.  Yes, I did.

Docket No. 305-24 at 1018:18-1020:4, 1024:24-1025:12.

August 29, 2011, SLAPP Reply

6

**EXHIBIT 2**

**39**

O'MELVENY & MYERS LLP

July 2, 2012 - Page 7

After extensive discovery, DC unsurprisingly has no admissible evidence to support the frivolous allegations in its Fifth Claim that, in August 2002, "Toberoff and his partner [Ari Emanuel, now head of the William Morris Endeavor Agency] [mis]represented to Marks that they had a wealthy or 'billionaire' investor who would pay the Siegels $15 million cash for their Superman rights … [and would produce] a new Superman movie." Opp. at 10; *see also* FAC ¶¶ 77-78. DC has long been aware that Mr. Emanuel was the investor. *See, e.g.*, Docket No. 196-2, Ex. H at 166:6-170:24 (testimony of Kevin Marks), Ex. E at 98:25-104:14 (testimony of Marc Toberoff). As Mr. Marks also clearly testified, there was no mention of a "billionaire investor" or producing a Superman movie. *See* Declaration of Kevin Marks, ¶¶ 2-5.

Docket No. 312 at 3.

April 24, 2012 SLAPP Appeal

**4. DC Has Shown No "Wrongful Act"**

Claims for "interference with a prospective economic advantage," also require a "wrongful act." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003). The sole such allegation in the Fifth Claim is that purportedly in August 2002, "Toberoff falsely misrepresent[ed] to the Siegel heirs that he had a billionaire investor ready to purchase their Superman rights" for $15 million and "falsely represent[ed] to the Siegels he would help them produce a competing Superman motion picture." ER 1043 ¶185.

This squarely contradicts the record evidence, and after two years of discovery DC has no evidence to support such allegations, or that Mr. Toberoff had anything to do with the failure of DC's protracted negotiations.

As DC is aware, Emanuel, who made the $15 million offer, was the wealthy "investor." ER 332:6-335:25. DC offered no evidence that the highly successful Emanuel (who DC has not bothered to depose herein) was not sincere in offering $15 million for the Siegels' valuable Superman copyrights. As Marks testified, there was no mention of a "billionaire investor" or of producing a Superman movie. ER 164-65 ¶¶2-5. Nor can DC show that the Siegels relied on Emanuel's offer, or that it caused them to end their already moribund negotiations with DC. Simply put, there is no "wrongful act" to support DC's interference claim.

Appeal No. 11-56934, Docket No. 8 at 53-54.

Defendants and their counsel have no excuse for failing to produce the November 2, 2002 letter months—if not years—ago. Their withholding of the letter and related correspondence is gravely prejudicial to DC, given its importance to refuting key assertions defendants have made to the district court and the Ninth Circuit—and continue to make and press despite their duty of

O'MELVENY & MYERS LLP

July 2, 2012 - Page 8

candor to the courts.  It also once again proves that, Mr. Toberoff's protestations notwithstanding, he is not complying with his discovery duties and obligations, and by either knowingly endorsing this misconduct or turning a blind eye to it, the Kendall Brill firm is engaging in the same misconduct as well.

     d.  And to be clear, the November 2, 2002, letter is just latest example of this pattern of discovery misconduct—all of which is chronicled by the courts' orders and is apparent when one compares the documents that have been obtained in litigation the false and misleading privilege logs and related declarations that Mr. Toberoff has served on the Kendall Brill firm's watch.  Among the many examples:

- DC requested that defendants produce Laura Siegel Larson's May 13, 2003, letter to Michael, which is identified in the Toberoff Timeline, but had never been produced or logged by defendants.  Docket No. 160 at 37-38.  Defendants refused for weeks and months to produce the document or even disclose whether it existed.  *Id.*  It was not until the Court ordered defendants to (a) produce it to DC; or (b) submit a verified further response to DC indicating that it does not exist, Docket No. 209 at 12, that defendants finally produced the letter.  Defendants, by their own admission, Docket No. 412 at 10, never claimed any privilege over the letter, and it was clearly responsive to numerous of DC's requests.  Docket Nos. 49, Ex. A at 65-66; 160 at 37-38; 162-9 at 577 ¶ 10; 162-10 at 581-82 ¶ 10; 162-11 at 584 ¶ 10; 162-12 at 588-89 ¶ 10; 225 at 13-17.  Exactly like the November 2, 2002, letter, the May 13 letter exposed direct misrepresentations made by defendants to the courts in their SLAPP and other briefing, including that Toberoff used false promises of a "mysterious billionaire" "investor" to induce the Siegels to end their business relationship with DC and transfer to Toberoff and his companies their putative Superman copyrights.  Docket No. 225-4 at 3; *see also* Docket Nos. 181 at 23-24; 201 at 3-7; 205 at 17-20; 215 at 8-10.

- DC similarly requested that defendants produce Michael's July 2003 response to Laura, also identified in the Timeline and never produced or listed in defendants' privilege logs.  Docket No. 160 at 30-33.  Defendants first misleadingly suggested that no such letter existed, and that the Timeline was an inaccurate "hit piece."  Docket Nos. 160 at 70-71; 162-9 at 577-78; 162-10 at 580-82; 162-11 at 584; 162-12 at 588-89.  Defendants then claimed the letter was privileged, but refused to identify the privilege log entry where it was listed.  Docket No. 231 at 19-20.  Defendants finally conceded in September 2011, in response to DC's motion to compel, the July 2003 letter appears at Privilege Log Entry No. 82 in the *Siegel* case.  Docket Nos. 316 at 21-24; 317 at 1-5.  Entry No. 82, however, does not identify the letter.  Entry No. 82 logs a "Facsimile" from "Laura Siegel" to "Marc Toberoff."  Docket No. 317-2 at 8.  Defendants then claimed for the first time that the document was subject to a common-interest privilege.  Docket No. 316 at 24-26.  Judge Wright rejected that argument and ordered defendants to produce the July 2003 letter, Docket No. 336, and its production fully revealed, once again,

O'MELVENY & MYERS LLP
July 2, 2012 - Page 9

that defendants had lied to the courts about its contents.  Among many other non-privileged portions of the document, it confirms:  (1) Kevin Marks, the Siegels' prior attorney who negotiated the October 2001 settlement between DC and the heirs, believed the Siegels "had a deal with DC" and stated he would "testify" to that effect; (2) Mr. Marks told Mr. Toberoff the Siegels "had a deal with Time Warner/DC"; (3) Mr. Toberoff did not plan to produce a Superman movie to exploit the Siegels' putative copyrights; and (4) Laura was seeking to convince her brother Michael to sell his 25% interest in the Siegels' putative Superman rights to another of Mr. Toberoff's "investors," while concealing that the investor was, in fact, Mr. Emanuel—Mr. Toberoff's and Laura's business partner.  Docket No. 362-2 at 286-90.

- Defendants have also failed to list on their privilege logs the names of all recipients of withheld correspondence, thus concealing potential privilege waivers and preventing discovery of essential evidence by DC.  To avoid discovery of their concealment, defendants have intervened where third parties have been subpoenaed and prepared privilege logs on their behalves—controlling how withheld documents are identified in the logs.  By way of example, defendants listed the Marks Memo in the Siegels' July 19, 2006, Privilege Log in *Siegel* as an August 9, 2002, letter from Marks to Joanne and Laura—listing no other recipients—withheld on "Atty/Client" grounds.  (Entry 325.)  In 2006, DC issued a subpoena to Mr. Bulson for the production of documents in *Siegel*.  Mr. Toberoff refused to allow Bulson to produce documents or prepare a privilege log in response to DC's subpoena.  Instead, Mr. Toberoff provided a privilege log to DC that, among other things, did not list the Marks Memo.  *See* Docket No. 317-3 at 41.  Defendants finally produced the Marks Memo to DC, as part of the Timeline documents provided to the USAO, and it is, in fact, an August 9, 2002, letter from Mr. Marks to Joanne, Laura, *and* Mr. Bulson, with a copy to Bruce Ramer.  Docket No. 427-3 at 333-34.  By omitting Mr. Bulson—Michael's attorney, neither of whom had an attorney-client relationship with Mr. Marks—defendants prevented DC from challenging their assertion of "Atty/Client" privilege over the Marks Memo.  Like Michael's May 2003 letter and Laura's July 2003 letter, the Marks Memo exposes direct misrepresentations made by defendants to the courts in its SLAPP and other briefing.  It confirms that Mr. Marks told Mr. Toberoff in August 2002 that the Siegels had an existing agreement with DC; that Mr. Toberoff and Mr. Emanuel made a competing offer, nonetheless; that if the Siegels accepted the offer, they and Mr. Toberoff would likely be sued, and Mr. Marks would have to testify against them; and that the "right thing to do" was to finalize documenting the agreement with DC in "good faith."  *Id.*  Discovery in this case has shown the promises Mr. Toberoff and Mr. Emanuel made were empty ones.  On the other hand, third parties who have not been co-opted by Mr. Toberoff have provided to DC complete and accurate logs that contradict defendants' logs.  Gang Tyre—who did not allow Mr. Toberoff to impede their discovery obligations—provided to DC a privilege log on September

9

**EXHIBIT 2**

**42**

O'MELVENY & MYERS LLP

July 2, 2012 - Page 10

21, 2006, in *Siegel* that accurately listed the Marks Memo as an August 9, 2002 "Memorandum" from "Atty Kevin Marks" to "Joanne Siegel; Laura Siegel Larson; Atty Don Bulson; Atty Bruce Ramer," withheld on grounds of "ac; ac-common interest; wp." (Entry 713.) The Kendall Brill firm should have performed an independent review of the documents withheld and/or redacted by Mr. Toberoff.

- The Timeline and USAO documents show that Mr. Toberoff continues to omit from defendants' privilege logs the names of all recipients of correspondence to conceal privilege waivers. For example, Entries 3158 and 3159 in Toberoff's privilege log in this case list an August 16, 2010, email from Toberoff to the USAO and an email response from the USAO that same day, respectively. Docket No. 163-17 at 1038. Both entries assert a "Joint Interest Privilege" as the basis for withholding. *Id.* When the communications were finally produced by defendants to DC, the documents showed that Mr. Emanuel was copied on both emails. Docket No. 427-11 at 1139-41. There is no basis for asserting Mr. Emanuel had a "joint" interest with the USAO; defendants have never made that claim; and, therefore the communications never should have been withheld.

- The USAO documents also confirm that defendants made misrepresentations to Judge Zarefsky and the Ninth Circuit concerning the contents of the withheld documents. Counsel represented to the Ninth Circuit there was *no evidence* the Siegels consented to Mr. Toberoff's disclosure of the Timeline documents to the USAO. Docket No. 387-2 at 6:22-8:3 ("There is no evidence that the client waived … Your Honor, I think it is pointed out that the client has never waived …."). The USAO documents directly refute this assertion. Counsel wrote to the USAO: "You have requested that I confirm that Mr. Toberoff's clients have authorized Mr. Toberoff's disclosure to the [USAO] of the documents enclosed with my letter to you dated September 27, 2010, pursuant to the Grand Jury Subpoena dated September 13, 2010 and the terms of my September 27, 2010 letter. *I so confirm.*" Docket No. 427-11 at 1149 (emphasis added). Mr. Toberoff similarly represented to Judge Zarefsky in moving for a protective order that the USAO communications included his "frank assessment of potential *suspects*" for who authored the Toberoff Timeline. Docket No. 420 at 11 (emphasis added). The USAO documents establish David Michaels was the only suspect Mr. Toberoff identified and Mr. Toberoff's accusations were unqualified. Docket No. 427-11 at 1075 ("The Firm has proof positive as to the identity of the perpetrator….").

- Along the same lines, the Timeline documents include evidence that directly refutes claims made by defendants in their SLAPP briefing. Defendants have claimed that Mr. Toberoff represented the Siegels as a lawyer—and not as a business advisor—since the inception of their relationship. *E.g.*, Docket No. 145-1. The Timeline documents show that as late as October 2004, the Siegels were

O'MELVENY & MYERS LLP
July 2, 2012 - Page 11

involved in contentious negotiations with Toberoff regarding his legal representation of the heirs.  *See* SD00172-75 (Oct. 2, 2004, Laura Email to Toberoff).  In her October 2 email, Laura makes clear to Mr. Toberoff that the Siegels object to many of the legal representation terms proposed by Mr. Toberoff; that the heirs are familiar with legal retainer agreements and how they are entered into; and that the legal retainer agreements needs to be finalized for Mr. Toberoff to move forward.  *Id.*  Also included in the Timeline documents is a draft retainer agreement from October 2004, confirming that the terms of Mr. Toberoff representing the Siegels as a lawyer were unsettled well into 2004.  *See* SD00166-71.

    e.  As Dick recently said, courts follow the general principle that litigants may divide among co-counsel the "duties of conducting" a case.  *Cole v. Patricia A. Meyer & Assocs., APC*, 2012 WL 2106364, at \*14 (Cal. Ct. App. June 8, 2012).  "This does not mean, however, that an associated attorney whose name appears on all filings in a case and who is served with all documents filed by the other side need not know anything about the case with which he or she is associated."  *Id.*  The "general rule" does not allow the Kendall Brill firm to escape responsibility and liability for its clients and co-counsel's discovery misconduct.  It is the Kendall Brill firm's duty and obligation as the only attorneys of record for the Toberoff defendants to ensure that their responses and disclosures are complete and accurate—which is something the Kendall Brill firm now expressly says it declines to do.  *See Hawkins v. Fulton Cnty.*, 96 F.R.D. 416, 420-21 (N.D. Ga. 1982) ("[E]ven if another attorney is now responsible for all discovery matters, [the defense attorney] is still attorney of record for the Defendant and is responsible as such . . . for any failure to provide discovery.").

    Whether Mr. Toberoff has acted like he was representing himself and his business entities is beside the point.  Mr. Toberoff has never appeared *pro per* in this case, and while we believed your firm was monitoring his discovery responses and conduct, you disclosed to us, for the first time, a few weeks ago, when pressed, that your firm was not doing so, despite being the only counsel of record for the Toberoff defendants.

    f.  In light of this disclosure and the discovery misconduct only briefly addressed above, it is clear that several forms of relief are  required.  First, a special master should review defendants' files and privilege logs to identify additional documents improperly withheld on grounds of privilege, responsiveness, or otherwise.  Second, the Kendall Brill firm must ensure and verify the accuracy and completeness of all of the Toberoff defendants' discovery responses pursuant to their professional obligations and the Federal Rules, including going through their clients' files and the privilege logs to ensure all required documents have been produced.  Mr. Toberoff and the Kendall Brill firm may also need to be sanctioned for all the cost and deception their misconduct has caused.  Indeed, as the Kendall Brill firm has known from the outset of this case, and from the first major motion that your firm helped Mr. Toberoff prepare, he cannot be trusted to represent facts accurately, fully, or completely.  And as his document productions have shown, he is sitting on responsive, non-privileged documents that only get produced when the courts or your firm intervenes.  This must be brought to an end.

O'MELVENY & MYERS LLP
July 2, 2012 - Page 12

     3. <u>Missing Pages of Renner Otto Bills</u>.  Page 723 of the Renner Otto bills, which should appear between EOMS 00185 and EOMS 00186, is missing from the documents defendants produced to DC.  The missing page appears to reflect billing entries for the time period between July 30, 2002, and September 24, 2002—a critical time period at issue in this case during which Mr. Bulson received a copy of the August 9, 2002, Marks Memo discussing Mr. Toberoff's offer to acquire the Siegels' putative Superman interests, including Michael's interest.  DC demands that page 723 of the Renner Otto bills (redacted, if need be) also be produced no later than July 6, 2012.

*     *     *

     Please let us know when you are available to meet and confer on these issues, pursuant to Rule 37.  We propose the afternoons of July 6 or 9.

     All of DC's rights and remedies are reserved.

                Very truly yours,

                /s/ Daniel M. Petrocelli

                Daniel M. Petrocelli
                of O'MELVENY & MYERS LLP

cc:    Matthew T. Kline, Esq.
       Defense Counsel

OMM_US:70757040

# EXHIBIT 3



writer's direct:
310.272.7922
lbrill@kbkfirm.com

July 11, 2012

Daniel Petrocelli
Partner
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    _DC Comics v. Pacific Pictures Corporation, et al._  Case No. CV 10-3633 ODW(RZx)

Dear Dan:

I write in response to your July 2, 2012 letter.  Let us be clear about your letter and its place in the lawsuit you filed on behalf of DC Comics.  Superman's co-creators and their heirs have been in litigation with DC over the original Superman copyrights, off and on, for more than half a century, and now the heirs are finally at the precipice of recapturing those rights under the Copyright Act's termination provisions.  DC is at a loss to find any legitimate legal or factual argument that would save it from losing these valuable rights.  Unable to win on the merits, DC has authorized its counsel to engage in a relentless smear campaign against the heirs and their counsel, Mr. Toberoff.  This campaign began with the filing of this frivolous lawsuit and has since found its way into nearly every motion, brief, letter, email and conference among counsel.  In pursuing this campaign, DC and its counsel have unashamedly twisted and distorted the well-established factual record in an effort to: (i) interfere with the attorney-client relationship between the heirs and their counsel; (ii) elicit bias against the heirs and their counsel; (iii) artificially drive up litigation costs to force the heirs to settle; and (iv) obfuscate the straightforward merits of the heirs' termination notices.

Despite DC's campaign, the heirs remain entirely satisfied with Mr. Toberoff's longstanding representation of them.  Moreover, as a result of DC's appalling tactics, the heirs have become even more steadfast in their desire to enforce their rights under the Copyright Act.  Nothing in DC's smear campaign can or will change the facts or the heirs' confidence that they will ultimately prevail on the merits of their copyright dispute with DC.  Neither DC's unfounded attacks nor the unjustified costs such tactics impose will dissuade them from seeking a just resolution in the Courts.

Perhaps realizing that DC's strategy is failing, your letter now seeks to expand DC's smear campaign to falsely smear Mr. Toberoff's counsel, Kendall, Brill & Klieger ("KBK").  In keeping with DC's repeated practices in this case, your letter is filled with mischaracterizations and outright misrepresentations of the record.  For fourteen pages, it distorts the few discovery disputes in which DC has prevailed, while ignoring that DC has brought motions on approximately 37 purported discovery issues, each accompanied by the same type of accusations as made in your letter, and DC has _lost_ on approximately 29 of those issues.  Your letter

**EXHIBIT 3**
**46**

Kendall Brill & Klieger LLP

July 11, 2012
Page 2

conflates and confuses issues, distorts rulings in this case and the *Siegel* case beyond recognition
and ignores the real issues in this case and the facts which demonstrate that DC's allegations are
meritless. Your letter departs from standards of professionalism, while wrongly questioning the
professionalism of not one, but two separate law firms and their respective attorneys.

Ironically, while we were drafting this response to your fictional account of our supposed
discovery misconduct, your partner, Matt Kline, suddenly turned over two responsive documents
that DC had never produced in nearly eight years of litigation. Although Mr. Kline had
personally dedicated substantial time to harassing Mr. Kendall about this firm having initially
missed turning over an e-mail that had *already* been produced to DC by Mr. Toberoff, Mr. Kline
casually sent over these two new documents without explanation, and subsequently stated only
that "The two documents in question were found as we finalized the motion for summary
judgment DC will file Monday." Of course, that is no explanation at all. It seems obvious that
the only reason these long overdue documents are finally coming to light is because your firm
intends to use them in DC's upcoming motion for partial summary judgment, which you have
said you will file in less than one week. This sort of selective withholding of discoverable
material until it is deemed useful to one's side raises serious questions as to what other
responsive materials are being withheld by DC and your firm.

The withholding and calculated last-minute production of these new documents is only the latest
example of DC eschewing its own discovery obligations while attaching the basest of motives to
its opposing counsels' efforts to comply with their obligations. In over two years of litigation in
this case, DC and its counsel have still not provided a single privilege log, while vehemently
attacking inconsequential details about Defendants' logs. Similarly, DC has refused to
meaningfully respond to defendants' targeted requests for production and interrogatories
regarding specific passages from DC's complaints. Instead, DC points to nearly the *entire*
production and record in both this action and in *Siegel,* rendering their answers meaningless and
making it impossible for defendants' to know the evidence that DC relies upon. DC's counsel
have also asserted that the three witnesses Paul Levitz, Lillian Laserson and Martin Payson, upon
whom it intends to rely in its upcoming motion for partial summary judgment, are conveniently
unavailable for deposition until just *after* defendants' opposition to DC's motion would be due.

The Court and Magistrate Judge Zarefsky have already commented on numerous occasions about
the improper discovery conduct of DC's counsel, expressing bewilderment at your unwillingness
to pursue this case in a more professional manner or to cooperate with opposing counsel on
easily resolvable issues. You have been reminded that the "parties have a responsibility to make
sure that discovery is …proportional to the issues in the lawsuit and does not create undue
burden or *harassment*." Docket No. 439 (emphasis added). You have been called out for
mischaracterizing court opinions and casting those mischaracterizations as fact. *See, e.g.*,
Docket No. 378 at 4 ("Plaintiff also asserts, as if it were fact, that in July 2003 Ms. Siegel and
Mr. Larson had no community interest. The Ohio Court that Plaintiff references as support for
this proposition did not rule so broadly.") You have been questioned for your practice of quoting
our communications with you "out of context" in your declarations. *See, e.g.*, Docket No 323 at

**EXHIBIT 3**
**47**

Kendall Brill & Klieger LLP

July 11, 2012
Page 3

2 (denying DC's motion to reconsider and noting that defendants' "caution is not misplaced"). You have been chastised for your unwillingness to agree to even the most reasonable accommodations. *See, e.g.*, Docket Nos. 209 at 13 (ruling in defendants favor and noting "[t]he Court does not understand why this portion of the dispute could not have been resolved out of court."); 323 at 2. And you have been told that your motions are "head[ing] in the wrong direction," resulting in increasing conflict instead of resolving issues. Docket No. 323 at 2 (noting "the direction of the lawsuit needs to be forward, not backward").

We will be bringing your continued unprofessionalism, ongoing harassment, relentless refusal to cooperate, lack of candor in Court filings, and discovery misconduct to the Court's attention and reserve the right to seek sanctions for your contemplated motion and other improper conduct.

In the meantime, here are our point-by-point responses to your latest communication:

       1.   <u>Alleged October 2, 2002 Letter from Michael Siegel to Laura Siegel</u>

Defendants are not in possession of this letter. Ms. Larson did not keep a copy of the letter, and was under no obligation to do so at the time. She did not provide it to her former counsel at the Gang, Tyre firm. This letter was also not included in the Renner Otto electronic archive discussed in more detail below. Accordingly, defendants, after an exhaustive search, have not found this letter.

       2.   <u>Obligations of the Kendall Brill Firm</u>

          a.      Defendants will not permit DC to interfere with the attorney-client relationship between Mr. Toberoff and his counsel, or allow the incendiary and improper remarks made by DC to pass without comment. KBK rejects the suggestion that Mr. Toberoff "cannot be trusted." To the contrary, it is DC's and its counsel's assertions that cannot be trusted due to their misrepresentations of the record in their Court filings and correspondence.

One such assertion is the false claim that "important relevant documents" were supposedly missing from Mr. Toberoff's production of documents provided by Toberoff to the USAO. While KBK did promptly provide a supplemental production, no document produced was by any stretch "important" and, indeed, the overwhelming majority of documents produced to DC after the initial production were copies of documents <u>already in DC's possession</u>, including various email attachments of <u>court filings originally served directly on DC in this action</u>. Aside from email attachments consisting of copies of pleadings and other documents already in DC's possession, the other documents produced included such obviously inconsequential items as a cover sheet to a facsimile already in DC's possession, and copies of a transmittal email for a document already in DC's possession. Nothing in this discovery process was prejudicial to DC, or otherwise a cause for DC's baseless accusations.

111868.2

**EXHIBIT 3**
**48**

July 11, 2012
Page 4

      b.    Your mischaracterization of the Ninth Circuit's writ decision is unfaithful to the opinion you purport to describe.  The Ninth Circuit did not "put the Kendall Brill firm on clear notice" regarding its representation of Mr. Toberoff.  The writ of mandamus before the Ninth Circuit concerned a discovery order, which was stayed, and a privilege waiver issue, no more, no less.  As you know, the issue was whether defendants' disclosure to the USAO of their stolen privileged documents, pursuant to a grand jury subpoena and common interest/confidentiality agreement, to aid in the investigation and potential prosecution of the theft, waived privilege.  That was the only issue before the Court in the writ petition; and that is all that the appellate court ruled on.  Defendants' position before the Ninth Circuit, was entirely reasonable, was consistent with the holdings of other Circuits, and nothing in the Ninth Circuit's decision or in any of the Magistrate Judge's or District Court's rulings leading up to the writ decision suggests otherwise.

As to Mr. Toberoff's "ethics and professionalism," the Ninth Circuit made it abundantly clear that the purported "concerns" DC sought to raise and that defendants vigorously disputed were "not before this court."  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124 (9th Cir. 2012).  Nor did the Ninth Circuit "call out" Mr. Toberoff for failing to produce non-privileged documents.  Rather, the Ninth Circuit noted the undisputed fact that the thief stole non-privileged documents, along with other documents as to which the courts had repeatedly upheld defendants' claims of privilege.  679 F.3d at 1129.  Earlier in its decision the Court had expressly noted that DC was not disputing the privileged nature of documents at issue in the writ petition and that the court was assuming the documents at issue were in fact privileged.  *Id.* at 1127 n.4 ("Because no one challenges whether these communications would have been privileged absent waiver, we do not address that issue.  For example, we assume but do not decide that these communications were all made for the purpose of obtaining legal as opposed to business advice.") (emphasis added).  None of this remotely suggests that the Ninth Circuit ruled that the documents were not privileged –indeed, the Ninth Circuit clearly stated that it assumed that the documents *were privileged* and emphasized that "we do not address that issue" – and nothing remotely suggests that the court "called out" Mr. Toberoff as to this issue.

      c.    It is important to examine in detail the facts of the November 2, 2002 letter, as it serves as the cornerstone of your false and irresponsible accusations.

First, there was no effort to "suppress" the November 2, 2002 letter.  After DC inquired about the letter in April–May, 2011, Mr. Toberoff and his associates checked and re-checked their relevant case files and could not find a November 2, 2002 letter.  Docket Nos. 267-16 at 1-2; 395-1 at 96-97.  Mr. Toberoff also asked his client Laura Siegel Larson to look for a copy of the November 2, 2002 letter, and she too was unable to find such letter.  Docket No. 395-1 at 97.   That Mr. Toberoff did not have and could not find the letter was duly communicated to DC.  Docket Nos. 267-2 at 2; 267-7 at 18; 267-16 at 1-2.  Mr. Toberoff did not obtain a copy of the November 2, 2002 letter until Mr. Toberoff became aware of, and the Renner Otto firm furnished – for the first time in the litigation – an electronic archive of Michael Siegel's legal file.  There is no basis to believe that Mr. Toberoff is in any way responsible for the Renner Otto firm not disclosing or

**EXHIBIT 3**
**49**

Kendall Brill & Klieger LLP

July 11, 2012
Page 5

producing its electronic archive earlier. Upon its discovery in the electronic archive, Mr.
Toberoff listed the November 2, 2002 letter on a privilege log pertaining to the archive, which
was promptly provided to DC in November 2011. Docket No. 412 at 10. There was nothing
improper about this conduct, and Mr. Toberoff did exactly what any responsible lawyer would
do in a similar situation: Upon learning of the existence of a responsive document that had not
previously been logged and as to which there is a reasonable claim of privilege, he logged it.

Even more importantly, once the privilege issue was resolved in DC's favor, the document was
promptly produced. Moreover, while your letter spends six pages castigating KBK and Mr.
Toberoff based on two words, "billionaire investor" in the November 2, 2002 letter for which
DC fails to provide the relevant context, the letter as a whole does not remotely support DC's
claims in this litigation or in your letter. To the contrary, it highlights why they are so baseless.

As just one example, you have completely ignored that in this November 2, 2002 letter, eight
years before you brought your tortious interference claim, Ms. Larson stated in no uncertain
terms that it was DC's "revolting" conduct that sunk DC's relationship with her. EOMS 00215.
This is fully consistent with the other evidence in the case, notably Joanne Siegel's May 9, 2002
letter to Time-Warner, which was sent well before the August, 2002 Ari Emanuel offer that DC
falsely claims interfered with its relationship. Ms. Larson also describes her and her mother's
growing dissatisfaction with their prior counsel, also well before the August 2002 offer, and
makes clear that this dissatisfaction had nothing whatsoever to do with Mr. Toberoff ("Toward
the end of 2001, there was a shift. They [Gang, Tyre] started pressuring us to lower our
expectations and to take an offer we did not want. They increasingly seemed to be siding with
DC against our interests…Between February and May of this year [2002] we became so
dissatisfied with their representation and the revolting offer from DC that we asked for a meeting
with Kevin [Marks] on May 22nd planning to fire them then and there."). EOMS 00215. Ms.
Larson also makes plain that later in October 2002 she retained "Toberoff, the attorney, [who]
has a successful track record of representing creator-writers and their heirs who have been
screwed by the studios" (), and that she did not become aware of Marc Toberoff "until August
2002." EOMS 00216.

The July 2003 letter from Ms. Larson to Michael Siegel further supports defendants, as long
before DC brought its baseless claims, Ms. Larson describes:

- Warner/DC's "hardball tactics" and the "bad and unreasonable deal" she and her
  mother rejected due to DC's "bogus [February, 2002] offer filled with
  unacceptable land mines." LSL00482
- That Warner/DC's lawyers are "particularly heartless and that it is their common
  practice to use every ounce of their leverage to grind people in negotiations."
  LSL00483
- That Warner/DC "want[s] to make an example of [the Siegels] so that other
  creators and their heirs won't go after their rights by Termination or otherwise."
  *Id*.

**EXHIBIT 3**
**50**

July 11, 2012
Page 6

- That "Marc Toberoff has no plans to produce a Superman movie."  *Id.*

Despite all this, you harp on the words "billionaire investor" in the November 2002 letter as evidence of some "independent wrongful act" by Mr. Toberoff.  Yet, as you yourself already know and quote on page 6 of your diatribe, Ms. Larson has already unequivocally testified that Mr. Toberoff never used the term "billionaire investor" and that she heard that term not from Mr. Toberoff, but from Michael Siegel.

> Q. Mr. Toberoff had told you that he knew billionaire investors; correct?
>
> A. No, he never used that term.
> Q. Well, he used terms similar, like he knew very wealthy investors and people in the entertainment industry who had money and would buy properties; correct?
> A. No….

Deposition of Laura Siegel Larson, July 23, 2011, Docket No. 305-24 at 1020:2-9.

This testimony is consistent with the sworn testimony of every other percipient witness in this matter, including the disinterested third party, attorney Kevin Marks.  Mr. Toberoff never told Mr. Marks, Joanne Siegel or Laura Siegel Larson that he had a "billionaire" investor to purchase the Siegel's Superman interests.  Rather, all relevant witnesses have repeatedly confirmed under oath that in August 2002 Ari Emanuel made an offer to purchase the Siegel's interests for $15 million plus a "back end" to be negotiated.  That offer – which was made months after Joanne Siegel and Laura Siegel Larson had unequivocally rejected DC's February 1, 2002 proposal, and began seeking new counsel – was passed along by Marks in mid-August 2002 to Joanne Siegel and Laura Siegel Larson, but they ultimately rejected it.  No "billionaire" made an offer for Superman rights, and no mention was made, by Mr. Toberoff, Mr. Emanuel or Mr. Marks to Ms. Larson or Joanne Siegel of a "billionaire" investor.

The fact that Michael Siegel, who was "very confused," used the term "billionaire investor" to Ms. Larson and that she used the same term in response to placate him, simply is not persuasive evidence – in the face of universal sworn denials – that the term came from Mr. Toberoff.  Nor of course does it justify the unprofessional personal attacks on Mr. Toberoff or his counsel that DC hurls while completely ignoring the context in which the November 2, 2002 letter was written.

Accordingly, let us repeat once again: *Mr. Toberoff never made any representations about a "billionaire" investor*.  Defendants have been absolutely clear about this all along, and have accurately portrayed the facts.  Their counsel's representations to the Court are entirely consistent with this reality and the record.  By contrast, DC's false invective, skewed with scurrilous attacks and bogus character assassination calls into question the ethical and professional standards of you and your firm.

**EXHIBIT 3**
**51**

July 11, 2012
Page 7

        d.      Your other examples of purported "discovery misconduct" are equally false distortions of the record.

- DC has previously complained about the supposed withholding of Michael Siegel's May 13, 2003 and used it as a basis to argue that onerous discovery obligations should be placed on Mr. Toberoff. Docket 231 at 19; Docket No. 225 at 17:5-10. Judge Wright has already rejected this effort. Docket No. 248. Moreover, DC's claims of improper conduct are simply wrong. Defendants made no inaccurate representations about the letter. Magistrate Judge Zarefsky ordered defendants to either produce the letter or verify to DC that it did not exist. Docket No. 209 at 12. Defendants did not claim the letter did not exist, and timely produced it in accordance with the order. Docket 231 at 19.

- With regard to Laura Siegel Larson's "July 2003" letter, you misstate an extensive record in an effort to sow confusion about issues that have long since been resolved. There are at least three potential "July 2003" letters at issue, which you deliberately confuse. First, there is a July 11, 2003 letter from Laura Siegel Larson to Michael Siegel, that was expressly found in the *Siegel* litigation to have been duly logged as privileged, and protected from disclosure by both Magistrate Judge Zarefsky and by Judge Larson in the underlying *Siegel* litigation. Docket No. 225 at 15-16. That letter was later disclosed to the USAO in connection with its investigation of the theft of Mr. Toberoff's legal files, and, eventually, as a result of the Ninth Circuit's writ decision, timely produced to you.

  Second, there is a purported July 5, 2003 letter from Michael Siegel to Laura Siegel Larson that is mentioned in the anonymous "Timeline." That letter, as defendants have repeatedly informed you, does not exist and, as far as defendants can tell from a search of the relevant records, has never existed. Although there is a reference to a "July 5" letter in the Timeline, no such letter has ever been identified in the files.

  Third, there were drafts of the July 11, 2003, letter exchanged between Mr. Toberoff and Ms. Larson on or around July 5, 2003 – all of which were, until the Ninth Circuit's writ decision, clearly privileged attorney-client communications, and all of which have now been produced to you as a result of the Ninth Circuit's decision. Defendants' representations concerning these letters have been entirely consistent, as reflected in nearly five years of pleadings on this issue. Your false and irresponsible accusation that "defendants . . . lied to the courts about [the] contents" of the July 11, 2003 letter is, unsurprisingly, not accompanied by any citation to the record or a single example of an inaccurate representation. The only party/counsel that has attempted to mislead the Court here is DC and your firm with its manipulative efforts to confuse and conflate the different letters at issue. Docket No. 15-16.

**EXHIBIT 3**
**52**

**Kendall Brill & Klieger LLP**

July 11, 2012
Page 8

Moreover, the July 11, 2003 letter fatally undermines the allegations of DC's 2010 Complaint and the fabricated claims about Mr. Toberoff's purported interference that your firm contains to press. For example, the July 11, 2003 letter unambiguously confirms that Warner/DC disrupted their own negotiations by their egregious February 2002 proposal – "It was a bogus offer filled with unacceptable land mines…As a result of Time Warner's hardball tactics, we feared that we would have trouble collecting any future money from them…You and Don Bulson stated that you couldn't believe how bad the document was that they had written…We believe their lawyers are particularly heartless and that it is their common practice to use every ounce of their leverage to grind people in negotiations" – just like Joanne Siegel's May 9, 2002 letter –that was in your possession long before filing DC's frivolous complaint.  LSL 00482-483.  Ms. Larson also confirms "We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad [DC Comics] deal" and that Mr. Emanuel's offer to purchase the Siegel interest was not the cause of the failed settlement between the Siegel heirs and Warner/DC.  LSL 00483.  Ms. Larson further confirms that "We went to Marc to talk about him representing the Siegels. Marc did not pursue us." "Marc did not call my mom nor me.  My mom called the Shuster family to see what the Shusters were doing.  The family gave Marc's number to my mom and she called him…We felt that Marc grasped our situation very well and was sympathetic to author's rights."  *Id.*

- Similarly without merit is your contention that Defendants' privilege log was designed to "conceal[] privilege waivers and prevent[] discovery of essential evidence."  The Court has, despite constant motion practice, repeatedly rejected DC's challenge to defendants' privilege logs and upheld them as consistent with Ninth Circuit standards.  Your specific reference to the August 9, 2002 letter from Kevin Marks, and your claim that "defendants prevented DC from challenging their assertion of 'Atty/Client' privilege over the Marks memo" based upon it being cc'ed to Michael Siegel's attorney, Don Bulson, is incorrect, as the August 9, 2002 memo was properly logged, showing Don Bulson as a recipient of the memo, in the privilege log produced in this case in 2010.  Docket 162-6 at 422, no. 623.  DC had more than ample opportunity to challenge the privilege over this document based upon its provision to Mr. Bulson.

  As to the two log entries you point to regarding USAO communications (nos. 3158 and 3159), these two documents were one sentence emails scheduling a meeting between Mr. Toberoff and the USAO, and DC was long ago informed that Mr. Toberoff had briefly met with the USAO to discuss the theft of legal files from is firm..  As you know, these scheduling emails contain absolutely nothing of any substance.  Accusing defendants of attempting to conceal these utterly

**EXHIBIT 3**
**53**

Kendall Brill & Klieger LLP

July 11, 2012
Page 9

insignificant documents is an example of your tactic of making overblown claims of misconduct in response to any discrepancy, no matter how inconsequential. Given the thousands of entries in defendants' privilege logs, it is inevitable that there will be inadvertent errors. This is a far cry from your irresponsible allegations of a "pattern of discovery misconduct" and "deception," and in no way supports the extraordinary appointment of a special master.

- DC's repeated assertion that the USAO documents somehow conflict with representations made to the Ninth Circuit are just as false as they were when DC first raised them in its improper Rule 28(j) letter to the Court. Docket No. 42-1. As we pointed out then, the USAO documents merely confirm that Mr. Toberoff's clients authorized the limited disclosure of the stolen privileged documents to the USAO pursuant to the secrecy surrounding a grand jury subpoena and an express confidentiality/common interest agreement specifically intended to preserve their privilege. *See* Docket No. 43. Far from voluntarily waiving privilege, the documents demonstrate that both Mr. Toberoff and his clients took affirmative steps to protect the attorney-client privilege and that there was no intent to waive privilege. At oral argument, Judge Kozinski (accurately) pointed out that there was nothing in the record concerning the consent of Mr. Toberoff's clients to disclosure to the USAO. Mr. Toberoff's counsel, Richard Kendall accurately stated that there was no evidence of such consent in the record, but that the issue of consent was irrelevant to the Ninth Circuit's determination. This accurate representation to the Ninth Circuit of both the facts and the law is the opposite of a "misrepresentation." Once again, it is DC, not defendants, that is falsely portraying the facts and the record.

- Your contention that the stolen documents disprove and/or contradict the fact that Mr. Toberoff represented the Siegels as a lawyer from the outset of their relationship is a red herring, and a tired one at that. This issue has been repeatedly addressed and refuted in defendants' prior filings. First, in 2006, the Siegels and Mr. Toberoff voluntarily produced the 2002 IP Worldwide Agreement between them in the *Siegel* case and in this case, Mr. Toberoff's 2004 *litigation* retainer agreement was produced. The IP Worldwide Agreement expressly notes Mr. Toberoff's legal services with respect to transactional matters, while also noting that legal services with respect to contemplated *litigation* would be rendered pursuant to a negotiated litigation retainer. IPWW 00003-00005. There is therefore nothing revelatory about the fact that the stolen documents reflect the negotiation of this retainer agreement in 2004, as the *actual* 2004 retainer agreement was long ago produced to DC. Moreover, as repeatedly explained to you, neither a retainer nor formal agreement is required to establish the attorney-client relationship. *Brandlin v. Belcher*, 67 Cal. App. 3d 997, 1001(1977); *see also People ex rel. Dept. of Corporations v. SpeeDee Oil Change*

111868.2

**EXHIBIT 3**
**54**

July 11, 2012
Page 10

*Systems, Inc.*, 20 Cal. 4th 1135, 1147 (1999) ("'When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established prima facie.'") (citation omitted). Whether Mr. Toberoff and the Siegels had a formal retainer regarding litigation or whether its terms were highly negotiated by the Siegels at a later date is irrelevant to the issue of Mr. Toberoff's attorney-client relationship with them as of October, 2002.

　　　　e.　　　　　　We reject, once again, your baseless attempts to interfere with the attorney-client relationship between KBK and its client, Mr. Toberoff, or to impose an allocation of work as between KBK and Mr. Toberoff's law firm. As we have frequently explained, and as you and the Court have been well aware since at least 2010, Mr. Toberoff's law firm is conducting a substantial portion of his defense in this matter, as is his right. Mr. Toberoff and/or other attorneys at his firm have appeared on multiple occasions in connection with discovery matters before the Court, and have met and conferred with your firm concerning discovery matters in this litigation on dozens of occasions, without any objection by DC. You have cited to no legal authority whatsoever suggesting that this division of labor between our two law firms is inappropriate or improper. Both law firms are well aware of their respective obligations. If you have a motion you intend to bring on some issue concerning the division of labor between the two firms, please identify it and the legal basis for such a motion.

　　　　f.　　　　　　Your repeated statements about moving for a special master are also not well taken. Under Fed. R. Civ. P. 53(a)(1)(B)(i), the appointment of a special master is not appropriate absent "some exceptional condition." Here, no such condition exists. As detailed throughout this letter, your charges of discovery misconduct are made up of nothing but factual misrepresentations, distortions, and hyperbole. Both the Court and Magistrate have routinely ruled as such, consistently denying the bulk (80%) of your discovery motions. *See, e.g.*, Docket Nos. 439; 309; 262; 252; 248; 239; 209. That DC has adopted a strategy of radically multiplying the proceedings with repeated duplicative motions is not a basis to now allow it to engage in judge-shopping in an effort to find a new decision-maker, less diligent than Magistrate Judge Zarefsky and without the nearly eight years of background that Magistrate Judge Zarefsky has in handling both this case and the related *Siegel* litigations since 2004.. The Court's exasperated and somewhat sarcastic reaction to the plaintiff in *Goins v. Hitchcock I.S.D.*, 191 F. Supp. 2d 860, 867 (S.D. Tex. 2002) is just as appropriate to DC in this case:

　　　　"[Plaintiff seeks] copious amount of information from defendants, some of which appears privileged or otherwise non-discoverable. Moreover, at least one [of] the requested documents does not even exist. Nevertheless, Plaintiff seeks the appointment of a Special Master because Defendants have supposedly failed to cooperate!"

**EXHIBIT 3**
**55**

Kendall Brill & Klieger LLP

July 11, 2012
Page 11

As in *Goins,* it is not the defendants who have failed to cooperate in this case; rather, it is DC and its counsel, both of whom continue to foster an unprofessional, uncooperative, and ultimately counter-productive discovery process.  If a special master were appointed in this case, under these circumstances, there would be no limit to the cases in which one could be appointed.  *Id.* (noting "if this Court appointed a Special Master each and every time that a party objected to the manner in which another party was responding to its discovery requests, Special Masters would become the rule – not the exception").  We will therefore oppose any effort to appoint a special master.

You state further:  "Mr. Toberoff and the Kendall Brill firm may also need to be sanctioned. . . ." In light of the above refutation of your outrageous letter, the only sanctions that may be appropriate are those we will seek on behalf of our clients against DC Comics and your firm in the event you move forward with the motion described in your letter.

        d.       <u>Page 723 of Renner Otto Bills</u>

Page 723 was not produced because it was not responsive to DC's request, as narrowed by DC, in the meet and confer process, to billing entries which show contacts between Mr. Toberoff and Mr. Bulson.  Defendants do not object to producing page 723, redacted along the lines of the redactions ordered by Magistrate Judge Zarefsky's on June 21, 2012.

Sincerely,

*[signature: Laura W Brill]*

Laura W. Brill

LWB:np

cc:    Richard Kendall
       Marc Toberoff

**EXHIBIT 3**
**56**

# EXHIBIT 4

**K** Kendall Brill Klieger

writer's direct:
310.272.7900 telephone
310.272.7936 facsimile
rkendall@kbkfirm.com

July 20, 2012

**VIA EMAIL AND U.S. MAIL**

Matthew T. Kline, Esq.
O'Melveny and Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035
*mkline@omm.com*

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, No. CV-10-3633 (ODW) (RZx)

Dear Matt:

This letter follows up on our meet and confer session held at your office on Tuesday, July 17.

During that session, among other issues, you stated that the primary discovery concern of plaintiff DC Comics (DC) is with two "buckets" of information—(a) the validity of Defendants' privilege logs that have been submitted in this matter, and (b) documents (notably, an October 2, 2002 letter) which are referenced in other documents, but which Defendants have not found in their files after searching for them.  By this letter, we offer a proposal for resolving DC's concerns.

Defendants disagree strongly with DC's contention that there has been any material error (other than a very small number of inadvertent errors of no consequence that are common in complex litigation) concerning Defendants' privilege logs.  In fact, both the form and content of the logs have been repeatedly upheld both in this action and in the *Siegel* case, over the course of active litigation spanning nearly eight years.  We also believe, as stated in prior correspondence to you, that your other accusations of discovery misconduct in this litigation by Toberoff & Associates are without basis, and nothing in this offer of compromise should be deemed to suggest otherwise.

Nonetheless, Defendants hope to resolve your concerns, put this matter behind us definitively, and to move on to litigating the merits of the underlying dispute.  Accordingly, Defendants offer the following proposal.

*First,* counsel from Kendall Brill & Klieger LLP ("KBK") will independently review each document created prior to October 8, 2004 (the date the *Siegel* litigation commenced) that is listed on the privilege logs submitted in this action.  If, in the independent judgment of KBK, privilege does not apply to any logged document, that document will be produced promptly to you.

**Kendall Brill & Klieger LLP**

10100 Santa Monica Blvd.   Suite 1725   Los Angeles, CA 90067   telephone 310.556.2700   facsimile 310.556.2705   www.kbkfirm.com

**EXHIBIT 4**
**57**

Matthew T. Kline, Esq.
July 20, 2012
Page 2

*Second*, KBK will prepare amended privilege logs.  If DC Comics agrees to provide subject-matter descriptions in the privilege logs it is to submit in this action, Defendants will also provide subject-matter descriptions on their privilege logs, even though the Court ruled that it need not do so.  See Docket No. 209 at 13.  Regardless of whether or not the subject matter descriptions are included, if any logged entry fails to list any recipient of a privileged document, the logs will be appropriately amended.

*Third*, KBK will conduct a reasonable, independent search concerning documents in the second "bucket": that is, documents identified by DC that are referred to in other communications but which have not been located and produced, such as the October 2, 2002 letter,[1]  and KBK will confirm to DC the records searched and the results of this search.  If any such documents are found following this search, they will promptly be produced or, if privileged, appropriately logged.  To date, the October 2, 2002 letter is the only such document identified by DC.  However, if there are other such documents sought by DC, please let us know at once, and we will look for them as well.

Finally, if, in conducting this independent review, KBK discovers information suggesting that any other responsive documents exist that have not been produced or logged, such documents will be promptly produced to you.

We anticipate that we could complete the foregoing within 30 days from the date you agree to it.  Given this proposal, there should be no reason at this time for motion practice relating to the appointment of a special master concerning Defendants' logs, particularly given that the Court has already rejected DC's call for a special master, and such appointment is certainly not appropriate before KBK has completed its independent review.  See Fed. R. Civ. P. 53(a) (authorizing appointment of master only in "exceptional" circumstances); *La Buy v. Howes Leather Co.,* 352 U.S. 249, 258 (1957); *Upjohn Co. v. Hygieia Biological Laboratories,* 151 F.R.D. 355, 360 (E.D. Cal. 1993).   If after our extensive review of the documents you still desire a special master, we can discuss the issue at that time and, if we cannot resolve our differences, both sides will have the options of engaging in motion practice.

---

[1] To be clear, the Toberoff firm has already conducted such a search for the October 2, 2002 letter, and has not identified a copy of that letter, but KBK will independently search for this document as well.

**EXHIBIT 4**
**58**

Matthew T. Kline, Esq.
July 20, 2012
Page 3


The foregoing is not a complete statement of Defendants' position, and all rights and remedies are expressly reserved.

Very truly yours,

Richard B. Kendall

RBK:dfm

cc:    Marc Toberoff

**EXHIBIT 4**
**59**

**K** Kendall Brill Klieger



Matthew T. Kline, Esq.
O'Melveny and Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067-6035

90067603599

**EXHIBIT 4**
**60**

WILLIAMS LEA | SYMPHONY
CENTURY CITY

# CALENDAR REQUEST

| | |
|---|---|
| Job Number | 0000061240 - 000 |
| Requested Date | 07/23/2012 10:04 AM |
| Due Date | 07/23/2012 01:00 PM |
| Case Number | CV-10-3633 |
| Client Number | 0905900 |
| Matter Number | 00321 |

| | |
|---|---|
| Requested By | CALENDAR,LITIGATION |
| User ID | 1000000000 |
| Phone | |
| Office Floor | |
| Room Number | |
| Number of Documents | 1.000 |

| | |
|---|---|
| Client Name | WARNER BROTHERS |
| Matter Name | DC Comics v Pacific Pictures Corp. - CV-10-3633 |
| Email Legal Team 1 | |
| Email Legal Team 2 | |
| Number of Pages including coversheet | 5 |

[X] Document sent to Calendar

| | |
|---|---|
| Document Type | FOLLOW UP LETTER |

**Method of Service**

- [ ] USPS Mail
- [ ] Overnight Courier
- [ ] Personally Served
- Other

| | |
|---|---|
| Postmark date-Date sent | 07-20-12 |
| Deliver Original To | MATTHEW KLINE |
| Time Received to Mailroom | 07/23/2012 09:35 AM |

Special Instructions

**EXHIBIT 4**
**61**

http://lasymphony1/symphony/Applications/JT_Print.aspx?SITE=OME-04026&JOBTYP...      7/23/2012

# EXHIBIT 5

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 7, 2012

OUR FILE NUMBER
905900-321

**VIA EMAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:     *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Dick:

We write in response to your July 20 letter and your firm's offer to review a limited number of your clients' files and re-log and produce documents, if DC promises not to file its special-master motion with the District Court.  While we appreciate that your firm has taken a small step in the right direction, there are several shortcomings in the proposal, chief among them:  (1) your firm's and your clients' failure to acknowledge the seriousness of the discovery problems at issue (or the significant cost and delay caused by defendants' actions); (2) your firm's and your clients' failure meaningfully to address many of the issues we raised during our lengthy in-person meet-and-confer on these issues; and (3) your firm's and your clients' assertion that appointment of a special master is unnecessary.  Also unacceptable is your firm's offer to do work required of it by law as a quid pro quo to avoid DC's motion.  In short, based on the present record, DC is not prepared to accept your offer, and will file its motion shortly, unless there is a significant change in defendants' position.

## I.     TOBEROFF'S DISCOVERY MISCONDUCT MUST BE ACKNOWLEDGED.

Your July 20 letter begins by staking out the following factual and legal position:

> Defendants disagree strongly with DC's contention that there has been any material error (other than a very small number of inadvertent errors of no consequence that are common in complex litigation) concerning Defendants' privilege logs.  In fact, both the form and content of the logs have been repeatedly upheld both in this action and in the *Siegel* case, over the course of active litigation spanning nearly eight years.  We also believe, as stated in prior correspondence to you, that your other accusations of discovery misconduct in this litigation by Toberoff & Associates are

**EXHIBIT 5**
**62**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 2

without basis, and nothing in this offer of compromise should be deemed to
suggest otherwise.

Each claim you make above is in error, improperly minimizes fundamental discovery
misconduct that cannot be swept away, *cf. Hester v. Vision Airlines, Inc.*, 2012 WL 2914108, at
*5-7 (9th Cir. July 18, 2012), and pays no heed either to the significant prejudice DC has
suffered or the needless costs defendants have imposed on the courts. We discussed many
examples of your clients' discovery misconduct at our recent in-person meeting, and while you
claimed to be unaware of many of the issues we discussed, your letter does nothing to address
the points we raised or the further diligence you said your firm would conduct in response.

    A.  <u>Toberoff's Conduct Was Intentional And The Heaviest Sanctions Are Warranted</u>.
Toberoff's pattern of obstructing the discovery process has prejudiced DC's ability to litigate its
claims in this case.[1] Just last month, the Ninth Circuit issued an opinion re-affirming the
propriety of the most grave sanctions (default) where a party withholds relevant evidence,
redacts information that is not legitimately privileged, and obfuscates efforts to uncover it.
*Hester*, 2012 WL 2914108, at *5-7. In *Hester*, plaintiffs alleged that their employer was
wrongfully retaining hazard pay, and issued interrogatories and requests for production asking
for "all communications and documents that relate to hazard pay." *Id.* at *2. Defendant refused
to cooperate with plaintiff's requests by first asserting the documents did not exist, and later
making an incomplete production that only included select pages of some documents, and
heavily redacted copies of others. *Id.* at *2-3. The district court found that defendant
"intentionally delayed production of documents, misrepresented its current and past
production … and otherwise engaged in bad faith conduct." *Id.* at *5. As a sanction, the court
struck defendant's answer. *Id.* The Ninth Circuit affirmed and recommended other possible
sanctions. *Id.* at *9; *accord, e.g.*, *Connecticut Gen.*, 482 F.3d at 1097 (defendant's "pattern of
deception and discovery abuse …. so damage[d] the integrity of the discovery process that there
[could] never be assurance of proceeding on the true facts"); *Valley Eng'rs*, 158 F.3d at 1054-58
(terminating sanctions warranted where party suppressed smoking-gun document by denying it
existed and through false privilege claims; plaintiffs "probably would never have seen [it], had
[their] lawyer not been sharp enough to spot what was not there"; defendant's "discovery
violations ma[de] it impossible for [the] court to be confident that the parties [would] ever have
access to the true facts").

---

[1] *See* FED. R. CIV. P. 37; *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d
1091, 1097 (9th Cir. 2007); *In re Phenylpropanolamine Prods. Liab. Litig.*, 460 F.3d 1217,
1236-1237 (9th Cir. 2006); *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112 (9th Cir. 2004);
*Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1057-1058 (9th Cir. 1998); *Anheuser-Busch,
Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 349 (9th Cir. 1995); *Adriana Intl. Corp. v. Lewis
& Co.*, 913 F.2d 1406, 1412 (9th Cir. 1990); *N. Am. Watch Corp. v. Princess Ermine Jewels*, 786
F.2d 1447, 1450-1451 (9th Cir. 1986); *G-K Props. v. Redevelopment Agency of San Jose*, 577
F.2d 645, 647 (9th Cir. 1978); *Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 2012 WL 3036481,
at *4 (Jul. 26, 2012).

**EXHIBIT 5**
**63**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 3

Toberoff's pattern of withholding non-privileged documents, redacting non-privileged information, falsely claiming that requested documents do not exist, and knowingly manipulating his privilege logs is equally improper.  So, too, is his and his counsel's refusal fully and finally to remedy the situation.  As we will show the Court, Toberoff's "willful halting [of] the discovery process" has prejudiced DC's ability to litigate its claims, *Barbieri v. Rio Suites Hotel & Casino*, 45 Fed. Appx. 652, 653 (9th Cir. 2002); wasted the courts' limited resources, *G-K Props.*, 577 F.2d at 647; and "damage[d] the integrity of the discovery process," *Conn. Gen. Life Ins.*, 482 F.3d at 1097.  Many documents central to DC's case have been produced only after DC has "spot[ted] what was not there," *Valley Engr's*, 158 F.3d at 1058—and then had to fight through false denials that such documents did not exist, purposefully opaque privilege logs, and costly motion practice.  The Ninth Circuit not only permits sanctions in such circumstances, it "encourage[s]" them, *G-K Props.*, 577 F.2d at 647, and both sanctions and a special master are needed to get to the full depths of Toberoff's misconduct.

Discussed below are a few examples (not exhaustive) showing that Toberoff's actions have been "deliberate," "material," and prejudicial, despite your claims in your July 20 letter to the contrary, and Toberoff's recent denials, *see* Docket No. 466, which your firm notably did not sign off on our join.

*1. The May 13, 2003, Letter.*  The Toberoff Timeline identifies a May 13, 2003, letter from Michael Siegel to Laura Siegel Larson that had never been produced or logged in this case or in *Siegel*—despite its being directly responsive to document requests in both cases.  The Timeline describes the May 2003 letter as documenting Michael's many concerns about Toberoff's misconduct, including his efforts to secure the Superman copyrights for himself.

After defendants failed to produce the document by the court-ordered date for defendants to make their document production in December 2010, DC requested during a meet-and-confer that month that Toberoff confirm whether the May 2003 letter existed and, if so, to produce it.  Toberoff refused to confirm the letter's existence, instead stating only that DC should not rely on the Timeline.  Given Toberoff's non-answer, DC sent a follow-up letter on December 29 concerning documents identified in the Timeline that defendants had never produced or logged, including (1) the May 2003 letter; (2) a December 16, 2002, letter from Toberoff to the Siegel heirs; (3) a July 5, 2003, letter from Michael to Laura; and (4) a September-October 2003 letter regarding Ari Emanuel's fee for representing the Siegel heirs.  Toberoff responded in a letter a few days later that "the ranting anonymous 'Timeline' [is] inaccurate and untrustworthy," he claimed that the December 2002 and September-October 2003 letters did not exist, and he evaded DC's questions as to the May 2003 and July 5 letters.  Docket Nos. 162-9, 162-10.

DC pressed Toberoff again, requesting on January 5 that defendants produce several documents, *including specifically the May 2003 letter from Michael to Laura*.  Docket No. 162-11.  Your claims that Toberoff did not intentionally obstruct discovery (stated in your July 20 letter and elsewhere) are belied by Toberoff's letter of January 8, 2011, in which he stated:

*As to your claims that we have not produce documents alluded to in the ranting, anonymous Timeline, we have repeatedly stated that the inadmissible Timeline is*

**EXHIBIT 5**

**64**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 4

> *extremely untrustworthy.* **To the extent that relevant documents exist, they have either been produced or designated as privileged**.

Nonetheless, in the interest of clarity: …

> - *There are no documents related to an offer by a "billionaire investor" to purchase the Siegels' Superman rights, because no such offer was ever conveyed*, and the sworn testimony of the relevant witnesses is consistent on this point. The Timeline itself, states that this supposed offer was made at the August 2002 meeting between Kevin Marks, Ari Emanuel, and [Mr. Toberoff]. Docket No. 98 at 4:21-6:3. As Kevin Marks testified, "[a]t no time during that conversation did either Mr. Toberoff or Mr. Emanuel say anything about a 'billionaire investor.' The world 'billionaire' was never used in the conversation by any of its participants." Docket No. 98-3 at 1:16-2:7.

> *DC's overzealous quest to find non-existent documents based on frivolous allegations in an anonymous incoherent "hit piece" is unworthy of DC and its counsel.*

Docket No. 162-12 at 589 (emphases added).

   a. While you, Mr. Daum, and Toberoff (in our in-person meeting) and Ms. Brill (in her letter that preceded it) all tried to downplay Toberoff's failure to produce the May 2003 letter in late 2010 or early 2011, every one of the defenses offered is without merit. During our meeting, Toberoff argued that DC's discovery requests were blunderbuss and he innocently did not locate the May 2003 letter during his searches. But as you and he know, DC's December 2010 and January 2011 letters—which we discussed during our meeting—asked Toberoff to confirm the existence of the May 2003 letter based on a search of the documents in defendants' possession, which would include the Timeline documents. Docket No. 162-9 at 574-78; 162-11 at 583-86. The letters confirm we also specifically raised the letter during our lengthy meet-and-confer call.

   Mr. Daum argued that any failure to find the document was inadvertent, but when we pressed him on the any factual basis he had to make this claim, he conceded that he and your firm played *no role* in trying to discern why Toberoff had not produced the document in 2010 or 2011, much less any role in searching for the document in 2010. In any event, Mr. Daum's suggestion that Toberoff innocently could not locate the May 2003 letter cannot be taken seriously: the May 2003 letter appears no fewer than *four* times among the Toberoff Timeline documents at Q0032-33, Q0139-40, Q0317-18, Q0590-91. Both Toberoff and your firm had to have reviewed this document on numerous occasions in making the representations you did in numerous briefs to the Court in 2010 about the accuracy of the Timeline and DC's reliance on the allegations contained therein.

   We pressed Toberoff in December 2010 and January 2011 to look among the Timeline documents for the May 2003 letter, and his response was: the Timeline is "untrustworthy" and

**EXHIBIT 5**

**65**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 5

"to the extent relevant documents exist, they have either been produced or designated as privileged." Docket No. 162-12 at 589. These were direct, knowing misrepresentations and not inadvertent errors, as you now describe them. Nowhere among any of defendants' logs in *Siegel* or this case was or is the May 2003 letter from Michael to Laura ever listed. And as of January 2011, never had it been produced.

Your letter notably makes no mention of any of these facts or any follow-up investigation your firm has done into why Toberoff did not produce the May 2003 letter in 2010 or early 2011. Nor does your letter grapple with the fact that Toberoff made numerous affirmative misstatements to DC and the Court about the Timeline, the May 2003 letter, and otherwise, including the following, false statement in Toberoff's January 8, 2011, letter that: "There are *no documents* related to an offer by a 'billionaire investor' to purchase the Siegels' Superman rights, because no such offer was ever conveyed…." Docket No. 162-12 at 589.

As both Toberoff and your firm well knew in 2010 and 2011, the May 2003 letter existed among the Toberoff Timeline documents, it had never been produced or logged, and that letter expressly mentioned the "billionaire" investor. *See* Docket No. 225-4 at 3 ("Marc [Toberoff] had a mysterious *billionaire* who wanted to invest in the Superman copyright. When you signed with Marc the *billionaire* invested elsewhere."). As Toberoff and your firm also knew, defendants were under a court order, issued in December 2010, to produce all responsive, non-privileged documents—having waived all other objections to DC's document requests—and yet they failed to do either with respect to the May 2003 letter. Docket No. 133. Nor did your firm ever produce or log the document among the productions made for the Toberoff defendants, and even though Toberoff and your firm have possessed the May 2003 letter since at least mid-2010, in possessing the Toberoff Timeline documents.

At our recent in-person meeting, you said that said Toberoff's January 8 letter—and the representations he made therein—were a revelation to you, and you wanted to look into them. Yet, your July 20 letter only makes further blanket denials of misconduct and does nothing to grapple with Toberoff's January 8 statements, or your firm's or defendants' failure to produce this non-privileged, obviously responsive, relevant document, which directly belied statements your firm was making in court filings.

b.  Your July 20 letter argues no harm, no foul—going so far as to say Toberoff's suppression of this evidence was "of no consequence." But as we explained at our in-person meeting, defendants' and their counsels' efforts to minimize the impropriety, cost, and impact of the discovery misconduct at issue here is not well-taken. Defendants and their counsel have knowingly caused DC to spend hundreds of thousands of dollars and to waste months of precious time to obtain documents like the May 2003 letter, which defendants were under court order to produce in December 2010. And as we will discuss below, Toberoff's misconduct—which your firm has permitted—has allowed defendants to present a skewed evidentiary record to the courts, including in the SLAPP appeal papers your firm recently filed and has done nothing to correct. These record issues, akin to those raised in Rule 28(j) letter after the oral argument in the *Pacific Pictures* case are troubling, to say the least.

**EXHIBIT 5**
**66**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 6

And the prejudice DC has suffered under cannot be undersold.  Toberoff did not turn over the May 2003 letter in December 2010, as he was required.  Rather, he rather represented to DC in January 2011, when DC pressed on why the May 2003 document had not been produced: "DC's overzealous quest to find non-existent documents based on frivolous allegations in an anonymous incoherent 'hit piece' is unworthy of DC and its counsel."  Docket No. 162-12 at 589.  In his court filings (with which your firm was served), he did not disclose that the May 2003 letter was among the Timeline documents.  Instead, he chastised DC for relying on the Timeline as proof that the letter existed, insisting the Timeline was "unreliable" and "grossly inaccurate."  Docket No. 160 at 5, 71-72.  Nowhere did Toberoff disclose that the May 2003 letter was among the Timeline documents, or that he had never specifically logged the letter.  Worse, he took deliberate steps to hid the letter's existence.  And, in fact, by their own later admission, defendants conceded they had *never* claimed *any* privilege over the May 2003 letter, but only other communications that DC sought.  Docket No. 412 at 10.

Toberoff's deceptions were not "inadvertent errors … common in complex litigation," as your July 20 letter asserts.  They were sanctionable acts of deliberately misleading DC and the courts.  *E.g.*, *Hester*, 2012 WL 2914108, at *5-7.  Fortunately, DC spotted the gap in defendants' production, pressed the issue despite Toberoff's bellicose claims that DC's suspicions were "unworthy" of counsel, and Judge Zarefsky ultimately granted DC's motion and ordered defendants to either (a) produce the May 2003 letter, or (b) provide a verified response that it did not exist.  Docket No. 209 at 12.  Only then did Toberoff produce the May 2003 letter.

Mr. Daum's recent suggestion—based on no evidence submitted by Toberoff in 2011 or now—that Toberoff only found the May 2003 letter after Judge Zarefsky issued his order is incredible.  It also directly belied by the fact that the document appears no fewer than *four times* among the Toberoff Timeline documents that DC asked Toberoff to search in December 2010 and January 2011, and with which your firm has long been intimately familiar.  It is also belied by the fact that Toberoff had to review all of the Timeline documents in preparing his court-ordered declaration in May 2007—and yet he not only failed to produce this document then, he later denied its existence.  And it is belied by the fact that both your firm and Toberoff must have reviewed the Timeline documents before producing them to the U.S. Attorney's Office in September 2010—and yet neither he nor your firm volunteered to produce the document when DC served its motion on all parties and counsel seeking it.  Toberoff (and your firm) also had to review the logs (and logged documents) in producing privilege logs for all defendants in late December 2010 and early 2011.  If you have any basis to support Mr. Daum's claim of an innocent discovery of this document after Judge Zarefsky's order—based on an actual investigation into actual facts—please provide it without delay.  Otherwise, we can only assume you have no facts to support your claim that the failure to produce this document was an "inadvertent error."  That Mr. Daum made this statement—with no basis to support it, and when the plain evidence so clearly contradicts it—causes us even deeper concern.

Still another reason we know no inadvertent error occurred are the steps Toberoff took after producing the document to cover his tracks.  Not only did he refuse to produce the document in December 2010, as required by court order, he also refused to produce all Q-Bates

**EXHIBIT 5**

**67**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 7

stamped versions of the May 2003 letter when DC requested it.  Docket Nos. 160 at 71-72; 296-1 at 4-6; 296-8 at 76; 296-9 at 77-79.  Producing the Q-Bates stamped versions of the documents would have shown (a) that non-privileged, non-produced documents existed among the Timeline documents, and (b) that Toberoff's privilege logs, as discussed further below, were a sham.  Yet he successfully refused to produce the Q-Bates stamp version, calling DC's claimed need to obtain the documents baseless.  He also objected successfully to orders that would have compelled him to produce all Michael-Laura Siegel-related correspondence, and that would have compelled him to update and re-scrub his privilege logs.  Docket Nos. 160 at 68-71; 209 at 11-12.  As we would learn, and is discussed below, the May 2003 letter was not the only document Toberoff suppressed.  Many more existed, and many more were buried among the Timeline documents and false privilege entries that neither Toberoff nor your firm did anything to correct.

c.  The production of May 2003 letter—and the recent production of the Toberoff Timeline documents—also show what a sham defendants' privilege logs have been, and why the modest corrective action you propose falls well short.  Defendants' production of the Timeline documents in May 2012 show that *four versions* of the May 2003 letter existed among the Timeline documents, and that Toberoff repeatedly misled DC and the courts with false, overbroad privilege log entries that claim no privilege over letters like the May 2003 letter, but instead lump and hide them behind other specific logged documents.  This is not an isolated mistake; this intentionally deceptive and sanctionable practice repeats itself time and again.  To take one example (among many), a copy of the May 2003 letter included among the Timeline documents bears Bates stamps Q0139-40.  In his court-ordered May 2007 declaration in *Siegel*, Toberoff said that these pages corresponded with Siegel Supplemental Privilege Log Entry 79:

Q 0138-45       Plaintiffs' supplemental privilege log # 79

As shown below, Entry No. 79 only identifies a July 5, 2003, transmittal from Laura to Toberoff—and makes utterly no mention of a May 2003 letter from Michael to Laura.  Indeed, the log entry makes no mention of a *May* 2003 communication.  It makes no mention of *Michael Siegel*.  And it makes no mention of a *letter*—just a July "Facsimile" from Laura to Toberoff.

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s)r | Document Type | Privilege Claim | Present Location |
|-------|------------------|--------------------------|------------------------|---------------|-----------------|------------------|
| 79 | 7/5/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

You cannot claim this a simple mistake, or that Toberoff's failure to address and correct this issue in late 2010 or early 2011 was an innocent error.  DC pressed Toberoff repeatedly to identify and produce the May 2003 letter.  DC also pressed Toberoff to look at and for July 2003 correspondence involving Laura Siegel—including on July 5, 2003, specifically.  Docket No. 162-9 at 577 ("We raised that there are certain communications listed on the Toberoff Timeline documents that neither appear on defendants' logs nor have been produced.  We provided the following document as an example, a May 13, 2003 letter from Michael Siegel to Laura Siegel Larson discussed in the last paragraph of page 3 on the Timeline, … [and a] July 5, 2003 letter from Laura Siegel Larson to Michael Siegel discussed on page 4…  You said that DC should not rely on the accuracy of the Timeline, but took under advisement our request that you verify

**EXHIBIT 5**
**68**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 8

whether such documents exist—and, if so, to either produce them, or list them on defendants' privilege logs."). So not only did Toberoff have the Timeline documents to go through and find the May 2003 letter among them—and to produce all versions of it—he had DC asking him to look at documents from July 2003 for Michael-Laura Siegel correspondence. This included the July 5 letter at log entry No. 79. Again, rather than producing the May 2003 letter—which Toberoff *never* asserted was privileged, Docket No. 412 at 10—he lied and dissembled. He and your firm said the Timeline was a ranting "hit piece" that could not be believed. He said DC had all the documents to which it was entitled and that his logs needed no correcting and did nothing to obscure the existence of relevant, responsive, or non-privileged documents. And he and your firm said that DC's "billionaire investor" claim was a "mockery."[2]

Not only did Toberoff repeatedly and deliberately lie in his logs, he did not correct his misstatements (a) when Judge Zarefsky ordered him in 2007 to go through all the Timeline documents once again; or (b) when DC repeatedly challenged the logs in this case. While Toberoff claimed in our meeting the other day that a paralegal went through the underlying documents to create his 2007 declaration, that is not what his declaration states, and it is not what Judge Zarefsky ordered him to do. *Cf.* May 21, 2007, Toberoff Decl. at 1 (Toberoff declaring: "Pursuant to the Order, *I have accounted for each of the Documents*….") (emphasis added). Worse still, DC raised repeated complaints with Toberoff's logs and filed motions seeking to require defendants to update them to ensure that non-privileged documents were not being hidden behind opaque, incomplete, and false log entries. Docket Nos. 160 at 40-44; 162-8 at 571-73; 162-9 at 574-78; 162-11 at 583-86; 205 at 3, 18-19; 207-10 at 472-75; 207-12 at 488; 225 at 13-20; 243 at 10-12; 253 at 6-10; 274 at 7-8. Time and again, Toberoff rejected DC's claims of impropriety, arguing that his logs were fully proper and that he was hiding nothing. Docket Nos. 160 at 66-68, 74-78; 162-10 at 579-82; 162-12 at 587-90; 207-11 at 481-82; 207-13 at 494; 210 at 12-13, 15-16; 231 at 16-22; 269 at 11-15. The production of the May 2003 letter and the recent production of the Toberoff Timeline documents—with full Q-Bates stamping finally exposed—show just how badly Toberoff misled DC and the courts in claiming his logs were proper and did not need to be updated in any way.

Toberoff's knowing, deliberate, and repeated suppression of the May 2003 letter is reason alone to justify terminating sanctions in this case. *See Valley Eng'rs*, 158 F.3d at 1054-58; *supra* at 2-3. But there are many other acts in which defendants have engaged to justify this relief and that show that Toberoff's failure to produce the May 2003 letter was far from an innocent error. As shown below, Toberoff played the same games in hiding Laura's July 2003 response to Michael—first suggesting it did not exist, and then being caught hiding the document behind yet another fax-cover-sheet privilege log entry, listing only Laura and himself as recipients.

---

[2] How your firm could make such representations about the accuracy of the Timeline and DC's allegations when you possessed and had reviewed the Timeline documents is an issue that must be fully explored. So, too, is your firm's failure to fulfill its duty of candor when Toberoff falsely told DC and the courts the documents it sought did not exist.

**EXHIBIT 5**
**69**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 9

d.  Finally, as for your repeated claims that Toberoff's failure to produce this and other smoking-gun documents were not "material," your own briefs and letters in this case, as do Toberoff's, refute this.  As you know, before defendants produced the May 2003 letter, they and your firm argued repeatedly and vociferously that DC's and the Timeline's "mysterious billionaire" investor claim, Docket Nos. 181 at 23-24; 201 at 3-7; 205 at 17-20; 215 at 8-10; 225-4 at 3,  was a "mockery," "contrary to all the evidence," and "based entirely on the untrustworthy, inadmissible Timeline," *e.g.,* Docket No. 196 at 1-5, 10.  Yet Michael's May 2003 letter supports this claim and corroborates the Timeline:

> Marc had a *mysterious billionaire* who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation.  When you signed with Marc the *billionaire* invested elsewhere.  Marc has his own production company, he was going to team with Emanuel and make a [Superman] movie. This has not happened.  Docket No. 225-4 at 3 (emphases added).

The May 2003 letter also contradicts Toberoff's representation in his January 8 letter to DC that "[t]here are no documents related to an offer by a 'billionaire investor' to purchase the Siegels' Superman rights."  Docket No. 162-12 at 589.  As shown below, DC has obtained—at great expense, and only after overcoming significant deception and stonewalling—still other documents that corroborate its "billionaire investor" claim, including from Larson herself.  While Toberoff, Larson, and you may all now try to explain key evidence like the May 2003 letter away, those explanations are for the jury—and not for defendants and their counsel to use as a basis improperly to withhold discovery.  Such skewing of the facts, especially when defendants and their counsel were taking such strident positions in their briefs about such issues, require the stiffest and fullest sanctions.

*2. July 2003 Letter And Drafts.*  As noted above, Toberoff's pattern of burying smoking-gun documents behind fax cover sheets to him was repeated when it came to Laura's July 2003 response to Michael's May 2003 letter.  Like the May 2003 letter, the Timeline identifies a July 5, 2003, letter from Laura to Michael that had never been produced or logged in this case or in *Siegel*.  DC requested that defendants (1) confirm whether the July 5 letter existed and, if so, to produce it; and (2) to review Entry Nos. 715 and/or 716 to the Siegel Privilege Log in this case— both listed as facsimiles from Laura to Marc—and confirm whether the logged documents included a July 11, 2003, letter from Laura to Michael, which DC believed could be the non-privileged July 2003 letter referenced in the Timeline.  Docket Nos. 162-9 at 576-577; 162-11 at 583-84.  In any event, Toberoff was under court order, as of December 2010, to produce or log responsive documents—and he did neither for the July 2003 letter that would only finally emerge in late 2011, and pursuant to court order issued by Judge Wright.

a.  Ms. Brill's claim in her recent letter that three potential "July 2003" letters are at issue and that Toberoff made no misrepresentations as to any one is false.  She ignores Toberoff's and your firm's obligation to produce or log the document in late 2010 and/or early 2011—neither of which ever occurred.

**EXHIBIT 5**
**70**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 10

As for Ms. Brill's three asserted categories, the first is the July 11 letter. Despite DC's simple and straightforward requests, and the court's December 2010 order mandating the production or logging of responsive documents, Toberoff refused to review Log Entry Nos. 715 and 716 or to confirm DC's understanding that the July 11 letter from Laura to Michael was included as an attachment to the fax cover sheet but not separately logged. Docket Nos. 162-10 at 580-82; 162-12 at 588-89. Toberoff asserted that privilege as to the documents identified at Entry Nos. 715 and 716 had been repeatedly upheld by the courts in this case and in *Siegel*, but would not state whether the July 11 letter existed, or whether his logs accurately depicted what documents were hidden behind them. Docket Nos. 160 at 66-68; 231 at 19-20. Based on Toberoff's representations that DC was not entitled to the documents, Judge Zarefsky and the District Court rejected DC's motions to obtain the July 11 correspondence from Laura to Michael, though Judge Zarefsky did note that Toberoff's responses about the document were "cryptic." Docket Nos. 209, 248.

During Larson's July 22, 2011, deposition, she testified that she responded to Michael's May 2003 letter, that Toberoff made factual edits to the letter (via faxes to her), that she believed she sent the response in July 2003, and that she gave Toberoff a copy of the final letter. Docket No. 316-5 at 314:12-15, 316:11-12, 323:11-14, 325:22-327:22, 328:3-330:3. Despite these clear admissions, Toberoff again refused to produce a copy of the letter; confirm whether defendants' possessed a copy; address whether it was defendants' position that the letter was privileged, and, if so, why; or confirm whether the letter appears on defendants' logs, and, if so, at what entry number. Docket No. 361-2 at 216-18.

It was not until DC filed its second motion to compel production of the July 11 letter in September 2011, that Toberoff finally conceded defendants did not separately log the July 11 letter, as the law requires them to do. Toberoff conceded the July 11 letter appeared at *Siegel* Privilege Log Entry No. 82 in the *Siegel* case. Docket Nos. 316 at 21-24; 317 at 1-5. Again, Log Entry No. 82 does not identify Laura's July 11 letter; nor does any other entry. Entry No. 82 logs a "Facsimile" from "Laura Siegel" to "Marc Toberoff." It says nothing about a letter from Laura to Michael, and does not specify the alleged "common interest" privilege claim that defendants now newly asserted:

| Log# | Date | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|------|------|--------------------------|-----------------------|----------------------|-----------------|------------------|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiff's Counsel |

Docket No. 317-2 at 8.

Clearly, none of the rulings in *Siegel*—which Toberoff argued precluded DC from obtaining the July 11 letter—conceivably could have dealt with the discoverability of the July 11 letter, since its existence was only confirmed by Toberoff in September 2011. Toberoff's suppression of Laura's letter behind a false privilege entry was not an "inadvertent" mistake as

**EXHIBIT 5**
**71**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 11

you claim.  Toberoff used this same calculated, illegal devise to hide evidence in burying the May 2003 letter.  Both your firm and Toberoff knew this critically important letter existed in the Timeline documents, was directly responsive to DC's requests, related closely to DC's claims in this case (and arguments defendants were making to the contrary, including whether DC had a "deal" with the Siegel family in 2001, with which Toberoff interfered).  DC asked Toberoff to review the Timeline documents for this July 2003 letter.  And Toberoff—despite knowing the exact location of the July 11 letter, knowing he had never separately logged it, and knowing it was responsive to DC's requests—dissembled to both DC and the courts about its existence, all while your firm looked on in silence.  As for the privilege claim that was asserted in Log Entry No. 82, it did not reach or even embrace the Michael to Laura letter—only attorney-client privilege was asserted, and yet where common-interest privilege had been claimed over Michael-Laura communications, that specific claim, not an attorney-client privilege claim, had been made.  *E.g.,* Docket No. 162-6 at 416-17 (Entry Nos. 495, 507-09, 512, 516-19).  Toberoff's representations to the courts that his privilege claims to this document had been upheld was, thus, false—and, at best—horribly misleading.  Courts in the Ninth Circuit do not permit such games.  *Supra* at 2-3.

        b.  The second "July 2003" letter at issue, according to Ms. Brill's letter, is the July 5 letter identified in the Timeline that defendants had never produced or logged.  Toberoff refused to confirm whether the July 5 letter existed and instead, like the May 2003 letter, chastised DC for relying on the "inadmissible" and "untrustworthy" Timeline and represented that "[t]o the extent that relevant documents exist, they have either been produced or designated as privileged."  Docket No. 162-12 at 589.  When DC moved to compel, Toberoff for the first time claimed that defendants were "unable to identify a document that *matched*" the description of the July 5 letter—a representation Judge Zarefsky found meant "the document does not in fact exist so far as Defendants know."  Docket Nos. 160 at 71-72 & n.2; 209 at 11-12 & n.2.  DC requested that defendants conduct a diligent review of all files in their possession, custody, or control (including any files obtained from Michael or Don Bulson, Michael's attorney) for any unproduced documents from June or July 2003, since the July 5 letter could be misdated in the Timeline or be found in a different form, such as a draft letter.  Docket Nos. 253 at 9; 253-17.  Toberoff continued to claim the July 5 letter, in whatever form, did not exist.  Docket No. 269 at 12-13.

        Defendants' recent production of the Timeline documents refutes Marc's claims that he could not "match" any documents in defendants' possession, custody, or control to the July 5 letter:  the July 5 letter appears no fewer than *nine* times among the Timeline documents at Q0141-45, Q0147-51, Q0153-57, Q0319-23, Q0389-93, Q0478-82, Q0592-96, Q0661-65, and Q0750-54.  As DC suggested to defendants, the July 5 letter appears to be a draft of Laura's July 11 letter.  Toberoff's clear misrepresentation is recklessly repeated in Ms. Brill's recent letter and reinforces why DC is saying you cannot rely on his representations or the review he has purportedly conducted of defendants' documents.

        c.  The third category of "July 2003" letters identified by Ms. Brill are the drafts that DC learned about during Laura's July 2011 deposition, which defendants had never

**EXHIBIT 5**
**72**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 12

logged or produced in this case or in *Siegel*. Docket No. 316-5 at 314:12-15, 316:11-12, 323:11-14, 325:22-327:22, 328:3-330:3. Ms. Brill claims without citation to anything that defendants representations about these drafts have been "entirely consistent, as reflected in nearly five years of pleadings on this issue." This means nothing, other than that Toberoff consistently has made entirely false misrepresentations about this evidence. When DC requested that defendants produce all drafts of the July 11 letter, Toberoff represented that the drafts had been logged and upheld as privileged in this case and in *Siegel*. Like the May 2003 and July 11 letters, however, defendants never separately logged the drafts, as they were obligated to do. And as discussed below, defendants' recent production of the Timeline documents (yet again) shows that the drafts were hidden behind fax cover sheets, instead of being separately logged. No court could have ruled on the discoverability of the July 11 drafts since their existence was not confirmed until May 2012. Toberoff knew this, but he continued to make contrary representations to DC and the courts, with no acts of intervention by your firm.

d. Defendants' production of the July 11, 2003, letter fully revealed that defendants had lied to the courts about its contents—and the veracity of the Timeline. Among many other important revelations, the document confirms that Kevin Marks, the Siegels' prior attorney, who negotiated the October 2001 settlement between DC and the heirs, told Toberoff and the Siegels that the Siegels "had a deal with DC"—which directly refuted arguments Toberoff and defendants and their counsel had made in this case. Docket No. 362-2 at 286-90.

Again, failing to produce this document or to log it properly, so that any privilege claim over it could have been litigated years ago, was not an "inadvertent error[] of no consequence," as your July 20 letter asserts. Laura's admissions in the letter to her brother go to core issues in the *Siegel* case—and the letter should have been produced years ago, when she, Michael, and Marks could have been deposed using the document. But now Michael is dead, summary judgment was entered in *Siegel* without access to this evidence, and a Rule 54 motion was granted in *Siegel* (again without access to this evidence)—all to DC's great prejudice. Equally harmful, Toberoff and his counsel have had the audacity in this case to make arguments directly contrary to the letter, knowing the letter was suppressed and being kept from DC. And only further adding to the harm defendants suppressed the letter long enough to keep DC from using it in its briefs on defendants' SLAPP motion (both in the district court and before the Ninth Circuit), and in Larson's deposition.

Indeed, only after a year of delay and Judge Wright's rejection of Toberoff's belated and baseless claim of privilege in the July 11 letter did defendants finally produce it in November 2011. While Ms. Brill and Toberoff now argues (wrongly) that the letter somehow actually supports defendants' defenses in this case, such self-serving claims have never been a basis to suppress evidence, nor are they an after-the-fact excuse for having done so. *Supra* at 2-3 (collecting cases).

EXHIBIT 5
73

O'MELVENY & MYERS LLP

August 7, 2012 - Page 13

e. The production of the Timeline documents, including the Q-Bates versions of the July 11, July 5, and July 11 draft letters, confirm how deliberately misleading defendants' privilege logs have been. A copy of the July 11 letter included in the Timeline documents bears Bates stamps Q0484-88. In his court-ordered May 21, 2007, declaration in *Siegel*, Toberoff said that these pages corresponded with Siegel Supplemental Privilege Log Entry Nos. 82 and 83:

Q 0483-88        Plaintiffs' supplemental privilege log # 82, 83

Entry Nos. 82 and 83 identify two July 11, 2003, transmittals from Laura to Toberoff—and makes no mention of a July 11 letter from Laura to Michael:

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s)r | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 82 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |
| 83 | 7/11/2003 | Atty Marc Toberoff | Laura Siegel | Facsimile | Atty/Client | Plaintiffs' Counsel |

Listing the document in this manner allowed Toberoff to suppress the July 11 letter for years by hiding it behind an allegedly privileged facsimile from Laura.

f. DC spent tens of thousands of dollars—sending numerous letters, participating in several meet-and-confers, filing five sets of briefs, and appearing at oral arguments on the issue of the July 2003 letter—over a period of ten months. Your blithe assurances that DC has not been harmed by defendants' and their counsels' actions are not well taken. This is especially true give defendants' and their counsels' recent efforts to keep record evidence from the Ninth Circuit that directly refutes key factual positions they are taking before that Court.

*3. November 2, 2002, Letter.* When DC received the May 2003 letter, it disclosed yet another communication between Michael and Laura that defendants had never produced, logged, or disclosed in this case or the *Siegel* case—a November 2, 2002, letter from Laura to Michael. DC requested that defendants produce the November 2 letter immediately after learning of its existence in April 2011. Docket No. 267-3 at 8. Toberoff represented that defendants could not "locate" the November 2 letter. Docket Nos. 267-2 ¶¶ 4-5; 267-7 at 18. DC pressed defendants to conduct a diligent search of all files in their possession, including Michael's files, which were in Toberoff's possession since 2006 when he handled the production of documents and preparation of privilege logs for *both* Bulson and Melvin Banchek, Michael's estate administrator. Docket No. 267-1 at 9. Toberoff again said the letter could not be found, and Judge Zarefsky denied DC's motion to compel it based on Toberoff's representation that he "perform[ed] a diligent search of [defendants'] record, all of [defendants'] records." Docket No. 288 at 38:23-39:1; *see also* Docket No. 267-16 ¶ 4 ("After DC asked for a November 2, 2002 letter from Laura Siegel to Michael Siegel, I caused my office to re-check our relevant case files.").

a. While you and Toberoff (in our in-person meeting) and Ms. Brill (in her recent letter) suggested that Toberoff did not obtain a copy of the November 2 letter until 2011, the facts show

**EXHIBIT 5**

**74**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 14

otherwise. As you know, in late 2011—after all SLAPP briefing had been closed, and after DC had to send four letters and hold multiple meet-and-confers on the subject—defendants finally produced a privilege log for the electronic archive of Michael's files that we only months earlier learned that the Renner Otto firm possessed. Among the new entries on the Bulson Archive Log that appear nowhere in the Michael Siegel-related logs in *Siegel*—which Toberoff prepared— was the November 2, 2002, letter from Laura to Michael. Docket No. 362-2 at 313 (Entry 399).

Toberoff refused to produce the November 2 letter to DC, claiming he had not logged the document six years earlier because it was not part of Michael's files he received in 2006, and claiming that the document was subject to attorney-client and common-interest privilege. Docket No. 412 at 7-11. Both these claims were specious. Judge Zarefsky rejected Toberoff's privilege claims after an *in camera* review, Docket No. 451 at 5, and Renner Otto confirmed:

> I appreciate you making us aware of Mr. Toberoff's 5/7/12 filing. I've spoken to Don Bulson and consulted the "Renner Otto [electronic] archive" referenced in [Toberoff's] brief. To the best of my knowledge*, the "Renner Otto archive" was the product of scanning Mr. Siegel's paper files* before they were forwarded to the attorneys for Mr. Siegel's estate, *and the documents in the "Renner Otto archive" and the paper file should be the same.*

Docket No. 427-2 at 4 (Renner Otto partner J. Ryland) (emphasis added); *see also* Docket No. 362-2 at 319 (Renner Otto told DC that the electronic archive is an exact replica of the documents returned to defendants).

At our recent meeting, and in the days after, you, Toberoff, and one of his associates have speculated—based on no hard evidence or facts—that somehow the November 2 letter, which is devastating for defendants, did not make it into the hard copy file that Toberoff received in 2006. Your July 20 letter says and does nothing to justify this speculation. As the facts all show, and as Judge Wright recently ruled in ordering Toberoff to produce another document from the Bulson log based on DC's arguments of waiver, Docket No. 457, Toberoff possessed the November 2002 letter in 2006, and he chose first neither to produce it or log it in *Siegel*, next neither to produce it or log it in this case, and finally to lie about whether he possessed the document in briefing and oral argument before the Court. Toberoff's recent motion for reconsideration on this issue, Docket No. 466, may assert that he engaged in no misconduct, but his words and actions in the *Siegel* case, including handling the document production for Mr. Banchek, all refute his current arguments. Again, notably, your firm did not join that recent brief that Toberoff filed.

b. Defendants' suggestion that the November 2 letter somehow supports defendants' positions in this case, and thus DC was not harmed by its suppression, are equally without merit. The November 2 letter not only directly contradicts factual assertions made by defendants in their briefing in this case, it directly supports DC's claim that Toberoff used false promises of a "mysterious billionaire" investor to induce the Siegels to end their business relationship with DC and to do business with him instead. Docket No. 225-4 at 3; *see also* Docket Nos. 181 at 23-24; 201 at 3-7; 205 at 17-20; 215 at 8-10. In the long-suppressed November 2, 2002, letter, Laura

**EXHIBIT 5**
**75**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 15

herself writes: "My mother and I have had extensive meetings with Toberoff and Emanuel in the past few weeks. We learned that due to the delays and the misinformation Kevin had given them that *there was a deal with DC, the <u>billionaire investor</u> who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere*." (Emphases added.) This (empty) $15 million offer by an alleged billionaire investor (who Toberoff's discovery responses in this case show never existed) matches exactly the $15 million offer Kevin Marks said that Toberoff and Emanuel made to the Siegels in 2002. Docket No. 427-3 at 333-34. While Kevin Marks, in a narrowly crafted declaration, denied that Toberoff invoked the "billionaire investor" with him, this November 2002 letter from Larson is stunning, contemporaneous proof that Toberoff invoked this fake investor with her and her family. Laura's recent denial that Toberoff invoked the "billionaire investor" with her, Docket No. 466, is directly belied by her own words in 2002, and casts her credibility, in general, in even greater doubt.

Despite the November 2002 letter, which Toberoff has had in his possession since 2006 (and Laura herself knows she wrote), defendants filed one brief after another in this case saying there was no proof—none—of DC's billionaire-investor claims. You said this in your SLAPP briefs. Ms. Brill said this to us. And Toberoff said on January 8, 2011: "There are no documents related to an offer by a "billionaire investor" to purchase the Siegels' Superman rights, because no such offer was ever conveyed…. DC's overzealous quest to find non-existent documents based on frivolous allegations in an anonymous incoherent 'hit piece' is unworthy of DC and its counsel." Docket No. 162-12 at 589. The prejudice here is palpable—your SLAPP brief on file with the Ninth Circuit right now disputes DC's billionaire investor claim. Appeal No. 11-56934, Docket No. 8 at 53-54. And you have resisted any efforts to get evidence like the November 2002 letter before the Court. *Id.*, Docket Nos. 25, 26. Defendants' discovery misconduct has not only deprived the courts of key evidence, but it flouts Toberoff's and his counsels' duty of candor to the courts to make such arguments when you know such evidence was withheld. Indeed, Toberoff was well aware of this document well before the district court denied defendants' SLAPP motion, and well before defendants' filed their SLAPP appeal. Even under his false submission, Docket Ni. 466, he received the electronic archive from Bulson *last year*—and *before* Judge Wright ruled on the SLAPP motion, and before you and he filed your SLAPP briefs in the Ninth Circuit.

c. Again, Ms. Brill's and Toberoff's efforts to argue how the document should be interpreted—and to (preview the false testimony Laura will proffer (were Toberoff not refusing to allow her to be deposed again)—do nothing to justify defendants' discovery misconduct. Your claim now that Laura was using the term "billionaire investor" to "placate" Michael, who was "very confused," is not only implausible on its face, but should have been the subjects of Laura's depositions in *Siegel* and this case—which defendants prevented by not producing these documents, and now are seeking to prevent further by not allowing her to be examined about this document or her recent declaration.

*4. November 17, 2001, Email and the Renner Otto Bills.* Toberoff's production in late 2011 of the Bulson Privilege Log listed for the first time another critical document: a November

**EXHIBIT 5**

**76**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 16

17, 2001, email from Toberoff to Michael. That email showed that Toberoff had contacted the Siegel family well before he claimed to have done so in SLAPP briefs you filed. Docket No. 145-1 at 23-24. Like the November 2, 2002, letter, Toberoff claimed the November 17, 2001, email had not previously been logged because it was not a part of Michael's hard copy file returned to Toberoff in 2006. Docket No. 412. DC showed in its motion before the District Court that this claim was false, Docket No. 455, and Judge Wright ordered defendants to produce the November 17 email. Docket No. 457.

Toberoff also forced us to incur needless costs to obtain Renner Otto's bills—which also show that he contacted Michael Siegel well before he claimed. A Renner Otto billing entry from November 17, 2001—which took us months of effort and yet another motion, Docket No. 394 at 10-13—confirm that Toberoff spoke to Bulson in November *2001*.



Docket No. 455-2 at 5. And as before, defendants' recent efforts to explain away these harmful documents miss the point. Such explanations are no excuse for failing to produce responsive evidence.

   *5. Other Defects In Toberoff's and Defendants' Privilege Logs.* DC has successfully shown, again and again, that defendants' privilege logs have been used to hide key, non-privileged documents by excluding important identifying information. And as the Ninth Circuit noted, Toberoff has also abused his position as a lawyer to assert privilege over business communications. *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1124, 1129, 1127 n.4 (9th Cir. 2012).

   Yet another stark example of Toberoff manipulating the contents of his privilege logs to hide key facts—and to harm DC—is his failure to list Ari Emanuel as a recipient of communications with the U.S. Attorney's Office. You claim that the failure to list Emanuel was inadvertent—and, in any event, inconsequential because these were "scheduling emails" that contain "absolutely nothing of any substance."

   To begin, as Mr. Daum acknowledged during our meet-and-confer, this was not a one-time oversight or mistake. Both times Emanuel's name should have appeared—on two separate entries, Docket Nos. 163-17 at 1038 (Entry Nos. 3158, 3159); 427-11 at 1137-41—Toberoff omitted Emanuel's name. This is exactly the same pattern and practice of omitting damaging details that one sees when you look at Toberoff's log entries for the May and July 2003 letters discussed above (buried and never listed), the November 2002 letter and November 2001 email (never listed), and other documents.

**EXHIBIT 5**
**77**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 17

As for the notion that Emanuel's inclusion in these discussions was unimportant, that is a farce.  You represented to the Ninth Circuit that defendants and the USAO formed a common-interest agreement, documented by a letter you sent the USAO.  Appeal No. 11-71844, Docket No. 1-1 at 9-11, 26-29.  That letter never mentioned Emanuel, Docket No. 212 at 12-13, and had we obtained real privilege logs from defendants that showed that Toberoff had included Emanuel (not his or your client, and not part of your defense team) as part of the discussions with the USAO, we could have shown only how much more baseless defendants' common-interest claims were.

*6.  Toberoff's Privilege Claims Made In Bad Faith*.  In *Siegel*, DC sought to discover communications between Michael, Bulson, Toberoff, and Laura relating to Toberoff's efforts to secure Michael's rights for the mysterious "investor" he claimed to represent.  Toberoff asserted a common interest privilege over all communications with Michael—whether they resided in the files of the Siegels, their agents, or with Bulson.  DC challenged this broad assertion of privilege.  The district court in Ohio conducted an *in camera* review of 15 communications and ordered defendants to produce all 15 after rejecting Toberoff's position that these documents were "clearly protected under the doctrine of the 'common interest'" and were "<u>classic</u> *privileged* subject matter."  Docket No. 161-4 at 26, 27.  The district court found:

> After reviewing all of the 15 documents, and the claimed joint interest privilege which has been asserted, the court finds that none of the 15 documents are subject to the attorney/client privilege based on the joint interest exception.  First, the court finds that none of the 15 communications … are for the purpose of giving legal advice.  Second, the court finds [that 13] communications … are not made in regard to the joint and common legal or defense strategy relative to ongoing or upcoming litigation. Finally, *the court finds that the interest of Michael Siegel, as reflected in the 13 communications, is separate and apart from those of Joanne and Laura Siegel*.  These documents relate to the offers back and forth between Mike [*sic*] Toberoff, on behalf of an investor who wishes to purchase Michael Siegel's interest and Bulson on behalf of Michael Siegel.  Docket No. 161-5 at 30-31 (emphasis added).

Toberoff had no basis to assert privilege over these 15 documents, much less to claim that they were "clearly" protected and "classic" privileged material.  We urge you, read each of these documents and please tell us if you can truly claim that Toberoff's privilege claims are within bounds of reason.  Each discusses a business deal over which attorney-client privilege does not remotely extend.  For example, Bulson wrote to Toberoff in a June 18, 2003, letter:  "I have discussed with Michael the offer you passed on from a potential investor who is interest in purchasing Michael's interest in the Superman copyright.  The amount offered is not acceptable to Michael."  Docket No. 161-8 at 57.  Toberoff responded on August 6 stating he had a "high-end accountant get quotes for an annuity paying out the sums as set forth in Michael Siegels' long-awaited June 18, 2003, counter-offer regarding buy-out."  Toberoff went on to write that Michael's counter-offer was "well over twice (230%) of the last Warner Bros. offer and nearly five times the investor's original offer which I believe was based in large part on the last WB

**EXHIBIT 5**
**78**

offer, rejected by the Siege's [*sic*]." *Id.* at 61.  Toberoff then walked through all the reasons why Michael should accept his unnamed investor's offer, and why Michael's claims to the contrary were without merit.  *Id.* at 61-62.

Is it really your position that the objection to producing such documents was made in good faith?  Or that the common-interest privilege claims Toberoff belatedly made over the November 2002 or July 2003 letters were made in good faith—and not intended to delay and deny DC discovery?[3]  As we will discuss below, your present positions on these questions (*i.e.*, that Toberoff did nothing wrong) make your compromise offer (*i.e.*, let your firm, rather than a special master, make similar privilege calls in its sole discretion), an illusory one.

## II.    YOUR FIRM'S "COMPROMISE" PROPOSAL FALLS WELL SHORT.

Your compromise proposal includes three parts—each of which is somewhat hard to follow, and none of which meets or satisfies DC's concerns.

A.  Part 1.  Your July 20 letter begins:

*First*, counsel from [KBK] will independently review each document created prior to October 8, 2004 (the date the *Siegel* litigation commenced) that *is listed* on the privilege logs submitted in this action.  If, *in the independent judgment of KBK*, privilege does not apply to any logged document, that document will be produced promptly to DC.  (Emphases added.)

There are three significant problems with this proposal.

*First*, it confines itself to documents "*listed* on the privilege logs submitted in this action."  As shown above, none of the May 2003, July 2003, November 2002, or November 2001 correspondence was ever "listed" on logs.  The May and July 2003 documents were hidden behind other entries.  The November 2002 and November 2001 documents appeared nowhere— they were not even buried behind other entries—until after (a) we uncovered that the Renner Otto firm kept an electronic copy of the Michael Siegel documents; and (b) Renner Otto itself agreed to create new logs (at DC's expense) that listed each and every document in its possession.  You have given us no express assurances that your review would include documents like the May and July 2003 letters (which were buried, but not "listed" on logs) and you have come up with no protocol to make sure documents like the November 2001 and November 2002 correspondence do not exist.  Again, it is your duty as counsel in this case to make sure that your

---

[3] For example, Toberoff asserted the November 2 letter from Laura to Michael was protected by a common-interest privilege, Docket No. 412 at 7-11, chastised DC for engaging in "self-serving speculation" about its contents, and asserted that the letter concerned "legal and settlement strategies vis-à-vis DC/Warner that is squarely within the common interest privilege," *id.* at 10.  Judge Zarefsky rejected those claims, and for good reason:  the November 2 letter is yet again Laura trying to get Michael to do business with Toberoff—the very same non-privileged subject matter rejected by the Ohio court.

EXHIBIT 5
79

O'MELVENY & MYERS LLP
August 7, 2012 - Page 19

clients are fulfilling their discovery obligations. (Our previous letters on these issues make that plain.) We will not make trades that alleviate your firm of this duty—which is only heightened in this case, given the extensive misconduct in which your clients have engaged.

*Second*, the October 2004 cut-off you propose is unworkable. Toberoff has shown a propensity to bury privileged documents in time-periods other than those listed on the face of his logs, *supra*, and the October 2004 cut-off excludes several critical categories of documents— among them, communications involving David Michaels starting in 2006; with Michael before his death in 2006; regarding the 2008 Consent Agreement and related conflict disclosures and waivers; and regarding the USAO-related issues from 2010.

*Third*, with all respect, we cannot rely on KBK's "independent judgment" about what is privileged or not, given the positions you have taken so far in this case—and particularly in defending (often blindly, and based on no hard facts) Toberoff's conduct. *See supra* Part I.

B. Part 2. The next part of your proposal is:

*Second*, KBK will prepare amended privilege logs. If DC Comics agrees to provide subject-matter descriptions in the privilege logs it is to submit in this action, Defendants will also provide subject-matter descriptions on their privilege logs, even though the Court ruled that it need not do so. *See* Docket No. 209 at 13. Regardless of whether or not the subject matter descriptions are included, if any *logged entry* fails to list any recipient of a privileged document, the logs will be appropriately amended. (Emphasis added.)

There are four significant problems with this proposal.

*First*, you again focus on amending "logged entries"—not amending the logs to include any and all documents whether previously logged or not, and providing full and complete bibliographic information for each. This may be a drafting issue with your recent letter, but given the way defendants have improperly parsed words to deny DC documents in the past, we can permit no ambiguity.

*Second*, DC's discovery responses are not remotely an issue here—and as was revealed by your comments at our recent meeting, and by your letter, you are not even aware of the substance of DC's discovery responses. Each already provides a "subject matter" line-item entry; defendants provide *none*, and never have.

We understand from our meeting that Marc seeks further log entries from DC flagging any communications regarding the Toberoff Timeline. Defendants already possess Wayne Smith's declaration in *Siegel* setting forth the precise circumstances of DC's receipt and handling of the Timeline documents, and Judge Zarefsky's ruling finding that Mr. Smith acted appropriately and professionally. Case No. CV 04-8400, Docket Nos. 108; 177 at 19:3-7. Moreover, to put this issue to rest, there are no documents or communications that relate to the Timeline that predate June 28, 2006.

**EXHIBIT 5**
**80**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 20

If defendants want to finalize the privilege logging stipulation that we completed only in part in 2010, we are happy to do so. To be clear, however, defendants cannot use that stipulation as a chit to avoid the full relief DC now seeks from defendants, in the form of a full document production, fully redone privilege logs, and special master both to police that process and to make recommendations about the appropriate sanctions to impose on defendants given the grave prejudice they have cause.

*Third*, defendants and their counsel are already under a legal obligation to amend their logs, and every day they fail to do so, the need for and propriety of the fullest sanctions becomes all the more appropriate. That the court in *Siegel*—without any close examination of the logs, the documents contained therein, or the many examples of discovery abuse exposed in this case— held that defendants' privilege logs were consistent with the Ninth Circuit default standards is irrelevant. As you know, the *Siegel* court issued its rulings before the Ninth Circuit called Toberoff out for failing to produce non-privileged business documents that he falsely claimed were privileged. *Pacific Pictures*, 679 F.3d at 1129, 1127 n.4. Moreover, the Rutter section on which defendants and the *Siegel* court relied says that more details are needed, including that "[a]ny attachment to an allegedly privileged document should be listed separately from the document to which it is attached." W. SCHWARZER, ET AL., RUTTER GROUP PRACTICE GUIDE: FED. CIV. PROC. BEFORE TRIAL § 11:1921 (2012) ("*Rutter*"). Finally, the record plainly shows that Toberoff has violated this rule (and other rules) time and again—the May and July 2003 letters, and July 5, 2003, draft letters are all examples of this, as are the Emanuel log entries.

*Fourth*, "if any logged entry fails to list any recipient of a privileged document, the logs will be *appropriately amended*." It is unclear what you mean by "appropriately amended." And Toberoff's misconduct in preparing defendants' privilege logs is, as you know, not limited to his failure to list all recipients. He has also failed to log certain documents *at all*, and has improperly grouped multiple documents together and listed them as one. At a bare minimum, any log would need to comport with the Rutter Guide format set forth at, *e.g.*, *Rutter* §§ 11:1914-21 (*e.g.*, "Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds."; "Any attachment to an allegedly privileged document should be listed separately from the document to which it is attached.").

C. Part 3. You lastly say:

*Third*, KBK will conduct a reasonable, independent search concerning documents in the second "bucket": that is, documents identified by DC that are referred to in other communications but which have not been located and produced, such as the October 2, 2002 letter, and KBK will confirm to DC the records searched and the results of this search. If any such documents are found following this search, they will promptly be produced or, if privileged, appropriately logged. To date, the October 2, 2002 letter is the only such document identified by DC. However, if there are other such documents sought by DC, please let us know at once, and we will look for them as well.

There are a number of problems with this proposal as well.

**EXHIBIT 5**
**81**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 21

*First*, it ignores the "third bucket" of documents that we discussed at our meeting, as does the thrust of your letter.  This third bucket is defendants' Superman-related files in general.  It is comprised of documents over which defendants or their agents have possession, custody, or control, and have not produced or logged, no matter the reason—be it claims the documents are not responsive to DC's requests in this case and/or in *Siegel*, Toberoff wanted to suppress them, etc.  Your firm has never conducted a review of these materials, yet, as you know, Toberoff has withheld documents in the past on a number of improper grounds.  This includes the Don Bulson-related materials.  It also includes his withholding clearly relevant documents as non-responsive, based on intentionally narrow interpretations of DC's requests.  One example of this—and one that caused us to have to re-open the deposition of a witness—was Jean Peavy's will.  Docket Nos. 360, 377.

While you say that KBK will conduct a search for further responsive documents, you qualify this by saying it will do *only if* KBK finds in its review "information suggesting that any other responsive documents exist."  Both your firm's normal legal obligations that apply in any case, as well as all of the misconduct that has occurred here, is more than enough to "suggest[] that any other responsive documents exist."  KBK must review all documents in defendants' possession, custody, and control in conducting this review, to ensure documents are not omitted—including files held by Toberoff, his entertainment companies, and the documents Toberoff has obtained from third parties.  This includes, among other sources, the boxes of documents Laura found after Joanne's death and gave to Toberoff; the file cabinet or safe where Mark Peary keeps "important documents, including the 2008 Consent Agreement"; and the "boxes of divorce, copyright and financial paperwork" referenced in Laura's November 2 letter.  This must be a comprehensive review and cannot in any way rely on Toberoff's representations regarding his purported prior searches for documents.

*Second*, there are a number of documents that your firm can and should be looking for and producing.  This includes the:

- October 2, 2002, Michael letter to Laura:  The November 2, 2002, letter disclosed yet another document defendants had never produced or log in this case or in *Siegel*—an October 2, 2002, letter from Michael to Laura.  Toberoff claims defendants do not possess the October 2 letter, but similar claims have consistently proven to be false.  KBK must conduct an independent search for this document and cannot rely on Toberoff's representations.  As you start your search, we note from Don Bulson's billing entries (only recently produced) that on September 4, 2002, Bulson was working on a "draft letter."  See below:

**EXHIBIT 5**
**82**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 22



Toberoff redacted the subject matter of the letter on which Bulson was working and all work that Bulson did that followed on September 20, 2002.  This very well could be a draft of the October 2, 2002, letter, and if Bulson helped work on it, it very well exists in his files—either in draft or final form.  We assume defendants have no objection to the Renner Otto firm searching for and producing this October 2002 letter if they can find it, or even drafts if the final does not exist.  Please let us know immediately.  We also note that the Bulson privilege log finally produced in 2011 mentions communications between Michael and Bulson during this September-October 2002 time period, including two communications on October 1.

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 636 | 9/2/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 637 | 9/2/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 638 | 9/3/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 641 | 9/4/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 642 | 9/19/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 643 | 9/19/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 645 | 9/22/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 646 | 9/23/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 647 | 9/23/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 649 | 9/24/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 650 | 9/24/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 651 | 9/24/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 653 | 9/28/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 654 | 9/28/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |
| 655 | 10/1/2002 | Atty Don Bulson | Michael Siegel | E-mail | Atty/Client | Defendants' Counsel |
| 656 | 10/1/2002 | Michael Siegel | Atty Don Bulson | E-mail | Atty/Client | Defendants' Counsel |

So, too, do later billing entries, which mention Bulson reviewing a "Letter from Laura" on September 29, 2002, and doing fully redacted work on October 1, 2002, the day before the October 2 letter was sent.  Bulson also had a long meeting with Michael on October 5.

**EXHIBIT 5**

**83**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 23



| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 9/24/2002 59787 | DWB Service Email to Marks re status, review email from Mike Siegel | 290.00 | 0.40 | 116.00 | Billable |
| 9/26/2002 59800 | DWB Service Tel. conf. with Kevin Marks, tel. conf. with Mike Siegel | 290.00 | 1.10 | 319.00 | Billable |
| 9/27/2002 59808 | DWB Service Review letters from Joanne Siegel, tel. conf. with Mike Siegel | 290.00 | 1.30 | 377.00 | Billable |
| 9/29/2002 59831 | DWB Service Review letter from Laura Siegel | 290.00 | 0.35 | 101.50 | Billable |
| Total: September 2002 | | | 6.05 | | $1,754.50 |
| Date: October 2002 10/1/2002 62797 | | | | | |
| 10/5/2002 62831 | DWB Service Meeting with Mike Siegel | 290.00 | 2.25 | 652.50 | Billable |

- **2008 Consent Agreement and Drafts**:  KBK can and must review the 2008 consent agreement and any drafts.  The only basis for defendants not producing the 2008 consent agreement was Toberoff's self-serving and unsubstantiated claim to Judge Larson that the entire document was privileged (which must be contrasted with Toberoff's recent claims that he was not a party to the agreement at all).  Judge Larson accepted this representation at face value, neither he nor Judge Zarefsky ever review the document in camera, and Judge Zarefsky held he was bound by Judge Larson's ruling absent new facts.  Those new facts have emerged.  Larson and Peary have openly discussed certain contents of the consent agreement in depositions since Judge Zarefsky's ruling, and their testimony confirms that the consent agreement—at least in part—documents business agreements about when and how the Siegel and Shuster family can deal with DC.  Docket Nos. 163-11 at 722:2-10; 160 at 25-26, 50-52; 147-1 at 2.  Since Judge Zarefsky's ruling, Toberoff's claims of privilege have also proven to be highly unreliable at best, *supra* Part I, and the Ninth Circuit specifically recognized that he was suppressing non-privileged business documents claiming they were privileged, *Pacific Pictures*, 679 F.3d at 1129.  The emergence of documents like the May and July 2003 letters, and November 2002 letter all confirm this is the case—as do the Ohio court's rulings.

KBK must review the consent agreement and either produce the document (redacted if necessary) or represent to DC or a special master that in its view as well the document is privileged in its entirety—meaning, that no part of the 2008 consent agreement contains business terms or agreements between the Siegels, Shusters, and/or Toberoff or his entertainment companies.

**EXHIBIT 5**

**84**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 24

- <u>Documents identified in Timeline that Have Never Been Produced or Logged</u>:  DC requested in December 2010 that defendants produce two additional documents identified in the Timeline:  (1) a December 16, 2002, letter from Marc and Mr. Emanuel to Joanne and Laura; and (2) a September-October 2003 letter with Mr. Emanuel.  Docket No. 162-9 at 577 n.1.  Marc claimed defendants were unable to identify a document that "matched" either of these descriptions.  Docket No. 162-10 at 581-82.  It has been shown over and over that the Timeline accurately describes documents.  While Toberoff has played games about what documents "match" or not, we need a reasonable and diligent search for all documents described in the Timeline.  This means looking both at the date of the documents, as well as their contents to see if they fairly match.

- <u>Conflict Disclosures, Waivers, and Similar Documents Addressing the Conflict of interest between Toberoff and the Siegel and/or Shuster heirs</u>:  Defendants have represented that Toberoff disclosed potential and actual conflicts of interest to the Siegels and the Shusters at various times in their relationships and the heirs executed conflict waivers.  This includes at the time of entering into the Pacific Pictures agreements, the IP Worldwide agreements, and the 2008 consent agreement.  Defendants have never produced these documents and refuse to identify where they are listed (if at all) on their logs.  This is a whole category of documents that needs carefully to be reviewed to ensure Toberoff is not hiding business communications among them.  And as you know, the terms of retention are not privileged and must be produced—even if documents need to be redacted to do that.

- <u>Drafts of the Pacific Pictures Agreements with the Shusters (2001 & 2003)</u>:  No drafts have ever been produced to DC nor has Toberoff identified where such drafts appear on defendants' privilege logs, if at all.

- <u>Drafts of the IP Worldwide agreements with the Siegels</u>:  No drafts have ever been produced to DC nor has Toberoff identified where such drafts appear on defendants' privilege logs, if at all.

- <u>Siegel Retainer Agreement</u>:  Defendants produced to DC a heavily redacted copy of the Siegels' October 2004 retainer agreement with Marc (LSL00213-20).  Toberoff claims the redactions relate to the provision of legal advice.  Yet, Laura testified at her deposition that the initial retainer agreement was amended shortly after it was executed to reflect that Mr. Emanuel's role had come to an end with the filing of the *Siegel* litigation.  Docket No. 305-24 at 807:16-814:7.  There is no basis to redact this purely business-related information.

In addition, the Siegel agreement is similar to the boilerplate form in *Rutter*.  *See* PAUL W. VAPNEK ET AL., CALIFORNIA PRACTICE GUIDE:  PROFESSIONAL RESPONSIBILITY FORM 5:C (2010).  Assuming that the redacted portions generally correspondence to the boilerplate *Rutter* form, the redactions would appear to be

**EXHIBIT 5**
**85**

O'MELVENY & MYERS LLP

August 7, 2012 - Page 25

overbroad.  To the extent the redacted material includes provisions between the Siegels and Shusters, as well as their counsel, setting forth arrangements or agreements regarding settlement, such material should not have been redacted—such contractual arrangements are not privileged and are directly relevant to DC's claims in this case.  *See* Docket No. 160 at 11:27-12:18; *Calvert v. Stoner*, 33 Cal.2d 97, 103 (1948) (agreement preventing settlement without attorney consent void); *Nehad v. Mukasey*, 535 F.3d 962, 970 (9th Cir. 2008) ("Only the client … may decide whether to make or accept an offer of settlement.").

It is incumbent upon KBK to review the Siegel agreement and verify the propriety of Toberoff's privilege claims.  If the redacted contents do not reflect legal "advice given," but rather contractual arrangements, limitations on settlement, or other non-privileged material, such material must be produced to DC.

- <u>Shuster Retainer Agreement</u>:  Defendants similarly produced a heavily redacted copy of the Shusters' 2004 retainer agreement with Marc (dated "As of November 23, 2001) (MWP00054-57).  For the same reasons, it is incumbent upon KBK to review the Shuster agreement and verify the propriety of Toberoff's privilege claims.

- <u>Communications with David Michaels</u>:  Toberoff identified for the first time in interrogatory responses and privilege logs provided to DC in January 2011, that Mr. Michaels communicated with the Siegels in late 2005 in an attempt to "steal" them as clients from Toberoff.  Toberoff refused to produce the documents, claiming the communications were privileged despite that Mr. Michaels was no longer employed by Toberoff & Associates when the communications were sent and defendants accused Mr. Michaels of "disparaging" Marc in his communications.  Toberoff represented that the communications were made in connection with Mr. Michaels' potential representation of the Siegels, and discussed their case.  Judge Zarefsky denied DC's motion to compel the Michaels-Siegel communications based on Toberoff's representations concerning the privileged nature of the documents.  Docket No. 262 at 4.  As we have seen, Toberoff's representations cannot be trusted and you and/or the special master should review them, like the documents above and below.

- <u>May 13, 2003, letter</u>:  When Toberoff produced the May 13 letter to DC, he redacted unidentified portions of it without explaining what had been redacted or why.  The Court's order did not invite defendants to redact the May 13 letter and defendants waived any privilege that might otherwise have existed by not listing the document (in whole or as redacted) on a privilege log.  *E.g.*, *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149-50 (9th Cir. 2005); *Vieste, LLC v. Hill Redwood Dev.*, 2010 WL 4807058, at *9 (N.D. Cal. Nov. 18, 2010).

When DC asked Toberoff to clarify the scope and basis for defendants' redactions, he would say only that the redacted material consisted or marginalia and underlining by

**EXHIBIT 5**

**86**

an unnamed attorney.  This does not meet defendants' burden of proving the elements of a privilege claim, given, as they claim , they do not know who made the redacted notations, or when, or why.  *See U.S. v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) ("The party asserting the privilege bears the burden of proving each essential element."); *Martin*, 278 F.3d at 999-1000 (laying out elements); *Williams v. Adams*, 2009 WL 1220311, at *7 (E.D. Cal. May 4, 2009).

KBK must review the unredacted copy of the May 13 letter and verify the redactions made by Marc are appropriate.

- <u>Agreements with Mr. Emanuel</u>:  Defendants keep stating that Mr. Emanuel has no continuing financial interest in any recovery by the Siegel and/or Shuster heirs pursuant to their Superman and/or Superboy termination notices.  What defendants refuse to answer is whether Mr. Emanuel retains an interest in monies received by Toberoff or his entertainment companies from this case, representation of the Siegel and/or Shuster heirs, or any contingent interest Toberoff has in Superman and/or Superboy rights.

  Defendants' recent disclosure that Mr. Emanuel was involved in the grand jury investigation of the Timeline author suggests he continues to retain an interest in Superman and/or this litigation.  DC is entitled to discover what that financial interest is and the business arrangement between Mr. Emanuel and Toberoff.

*        *        *

Given the severity of defendants' discovery misconduct—and your refusal to directly acknowledge or remedy it—DC will have to ask the Court for significant relief.  This includes appointing a special master to make sure all responsive documents are produced without delay, defendants' privilege logs are full and complete, legitimate privilege claims can be fully and fairly ventilated, and that the Court can remedy the significant prejudice defendants have caused.

Your claim that the Court has rejected DC's call for a special master is erroneous—DC has never moved to appoint a special master, and in any event, defendants' discovery misconduct plainly satisfies the "exceptional circumstances" required to appoint one.  FED. R. CIV. P. 53(a).

As we have noted, and you have yet to agree to, the Renner Otto firm should also be asked to prepare a complete log of the electronic archive of Michael Siegel's file that lists all bibliographic information for each document in the file.  DC has agreed to pay the reasonable costs for this work, and we can only hope you agree Renner Otto can proceed, since you made no objection in your July 20 letter.

Finally, if your firm makes a significant move in its position shortly, we will consider not filing the motion.  Your July 20 letter and proposal is unacceptable, however, mainly because of its first premise—that no material, intentional, or prejudicial misconduct has occurred here.  That position is neither sustainable under the facts of this case, nor the relevant case law.

**EXHIBIT 5**

**87**

O'MELVENY & MYERS LLP
August 7, 2012 - Page 27

Very truly yours,

/s/  Matthew T. Kline

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.
       Marc Toberoff, Esq.
       Defense Counsel

OMM_US:70812504.1

**EXHIBIT 5**
**88**

# EXHIBIT 6

**From:** Nicholas Daum [mailto:ndaum@kbkfirm.com]
**Sent:** Friday, August 10, 2012 1:25 PM
**To:** Tokoro, Jason; Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; Laura Brill; David Harris; Keith Adams; Pablo Arredondo; Richard Kendall; Marc Toberoff
**Subject:** RE: DC v. PPC

Matt and Jason:
We are preparing a response to your 27-page August 7, 2012 letter, which in turn responded to Dick Kendall's letter of July 20. Dick is on vacation through the end of next week. We have been working on a detailed response, which we will have for DC as soon as Dick returns, in the week of August 20.
Best,
**Nicholas F. Daum**
Kendall Brill & Klieger LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Tel: (310) 556-7200
Fax: (310) 556-7205
E-mail: ndaum@kbkfirm.com
Web: www.kbkfirm.com

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Tuesday, August 07, 2012 12:30 PM
**To:** Richard Kendall; Marc Toberoff
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Laura Brill; Nicholas Daum; David Harris; Keith Adams; Pablo Arredondo
**Subject:** DC v. PPC

Counsel,

Please see attached correspondence sent on behalf of Matthew T. Kline.

Very truly yours,

**EXHIBIT 6**
**89**

**Jason H. Tokoro**
**O'Melveny & Myers LLP - Century City**
1999 Avenue of the Stars, Suite 700
Los Angeles, California  90067
Direct Dial:  (310) 246-6707
Fax:  (310) 246-6779
Email: jtokoro@omm.com

*This message and any attached documents contain information from the law firm*
*of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are*
*not the intended recipient, you may not read, copy, distribute, or use this*
*information. If you have received this transmission in error, please notify the*
*sender immediately by reply e-mail and then delete this message.*

 please consider the environment - do you really need to print this email?

**EXHIBIT 6**
**90**

# EXHIBIT 7

# Kendall Brill Klieger

writer's direct:
310.272.7900 telephone
310.272.7936 facsimile
rkendall@kbkfirm.com

August 24, 2012

<u>Via E-Mail</u>

Matthew Kline, Esq.
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your August 7, 2012 letter regarding DC's contemplated motion to appoint a special master to review defendants' privilege logs and underlying documents, and our firm's offer to review the same.

First, let me be clear about the role of Kendall Brill & Klieger ("KBK") to date in this litigation. As you know, KBK does not represent the Siegel or Shuster heirs, who are clients of Mr. Toberoff. KBK represents Mr. Toberoff and his entities with respect to the claims DC has brought against them in this action. In that regard, and as we have repeatedly discussed, defendants have divided the responsibilities of co-counsel in this matter. While KBK has been involved in briefing key substantive motions and appellate issues, KBK did not handle document production or the preparation of privilege logs. While we note your recent position that Mr. Toberoff is not entitled to engage KBK as his counsel to perform specific tasks while retaining responsibility for discovery, we have advised you in previous correspondence that we do not agree with your analysis of the law.

Second, as we have also discussed, Mr. Toberoff has agreed, on a going-forward basis, if it will help to resolve or at least narrow the discovery disputes between the parties, to broaden the scope of KBK's role in the case. Mr. Toberoff has agreed to engage KBK to review, for the first time, all of defendants' assertions of privilege in this matter, and to prepare revised and updated privilege logs concerning the same to the extent, in our independent judgment, such revisions are appropriate. However, defendants are not willing to undertake the expense of paying for KBK's time in reviewing the discovery produced to date in this litigation, and KBK is not willing to undertake this responsibility, if DC is determined to demand the appointment of a special master regardless of the substantial efforts to be made by defendants in general, and KBK in particular, to address and alleviate DC's purported concerns and to resolve any remaining discovery issues.

**Kendall Brill & Klieger LLP**
10100 Santa Monica Blvd.   Suite 1725   Los Angeles, CA 90067   telephone 310.556.2700   facsimile 310.556.2705   www.kbkfirm.com

**EXHIBIT 7**
**91**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
August 24, 2012
Page:   2 of 10

Third, your letter consists of more than 20 pages of repeated incendiary accusations against Mr. Toberoff, all of which you have made before.  Each of these accusations has been ventilated at length in correspondence between the parties, and the majority of these accusations have been the subject of extensive motion practice before the Court and multiple Court rulings, many of which, I note, were decided in defendants' favor.  There is no need in this letter to rehash these accusations, Mr. Toberoff's responses, your (and your predecessor counsel's) extensive correspondence with Mr. Toberoff concerning discovery issues since 2006, or the many prior court orders upholding Mr. Toberoff's positions and, occasionally, DC's positions.

Rather, the purpose of this letter is to address the concerns you raised regarding my detailed July 20 proposal to resolve any remaining disputes.   Each of your concerns can be readily and entirely addressed, as shown below.  In short, Mr. Toberoff will authorize KBK to perform a complete review designed to give you and the Court full confidence that all responsive non-privileged documents have been produced, and that defendants in this case have prepared and produced accurate and complete privilege logs.[1]

At the completion of KBK's review, defendants are willing to agree to a streamlined and expedited review of any remaining issues concerning defendants' assertions of privilege.  Such an expedited review could be made by Magistrate Judge Zarefsky, who has years of experience with discovery in this matter or, if necessary and appropriate once the issues are clear, a special master.   The goal of involving KBK in this process would be to once and for all provide the basis for fully resolving any remaining issues concerning discovery and privilege logs in this matter.

I.      **THE KBK REVIEW PROPOSAL AND DC'S RESPONSE**

A.      **Part I**

Part I of our proposal offered the following:

> First, counsel from Kendall, Brill & Klieger LLP ("KBK") will independently review each document created prior to October 8, 2004 (the date the Siegel litigation commenced) that is listed on the privilege logs submitted in this action.  If, in the independent judgment of KBK, privilege does not apply to any logged document, that document will be produced promptly to DC.

DC raised two concerns about this proposal.

1.      DC complained that the proposal was limited to documents "listed on the privilege logs submitted in this action" (8/7 Letter at 18).  However, this was not the intent of

---

[1] References to the term "privilege" or "privileged" in this letter refers to attorney-client privilege, work product protection, common interest privilege and other discovery protections or immunities.

115147

**EXHIBIT 7**
**92**

Matthew Kline, Esq.
August 24, 2012
Page:  3 of 10

KBK's proposal.  Rather, KBK is offering to review *all* documents (whether or not specifically identified on a privilege log) that defendants have withheld on the basis of privilege in this case during the relevant time period.  This would include both defendants' privilege logs as well as the Renner Otto logs.

As part of this review, KBK will review for privilege all attachments (if any) to all documents listed as entries on the logs.  To the extent such attachments have not been separately listed on any privilege log, KBK will separately log any such attachment, or if non-privileged, KBK will produce such attachment.

This directly addresses DC's stated concern – if any document dated during the relevant time period has been withheld from production on privilege grounds, whether as an original document or as an attachment, KBK will duly review it for privilege, and either produce such a document, or (if necessary) update the privilege logs concerning it.

Furthermore, if such review reveals any evidence suggesting that *any* additional responsive documents exist that have not been produced, KBK will conduct a diligent search to identify such responsive documents, and will endeavor to produce them promptly.

    2.    DC's second stated concern is that the "October 2004 cut-off excludes" (1) communications with David Michaels, (2) certain communications with Michael Siegel, (3) communications regarding the 2008 "consent agreement," and (4) communications with the USAO from 2010.  8/7 Letter at 19.  KBK will agree to review all logs, and correspondence files related thereto, insofar as they concern any such communications.  That should entirely resolve DC's stated concern.

    **B.**    **Part 2**

Part 2 of our compromise proposal offered the following:

> Second, KBK will prepare amended privilege logs. If DC Comics agrees to provide subject-matter descriptions in the privilege logs it is to submit in this action, Defendants will also provide subject-matter descriptions on their privilege logs, even though the Court ruled that it need not do so. See Docket No. 209 at 13. Regardless of whether or not the subject matter descriptions are included, if any logged entry fails to list any recipient of a privileged document, the logs will be appropriately amended.

DC raised three concerns about this proposal.

    1.    DC again raised the issue of documents not listed on privilege logs.  That has been addressed above in Section I.A.1.  Again, all documents as described above and held on the basis of privilege will be reviewed, and will be separately logged; if any non-privileged responsive documents are found that have not been produced, such documents would, of course, be produced.

115147

**EXHIBIT 7**
**93**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
August 24, 2012
Page: 4 of 10

    2.    DC asserts that the "substance of DC's discovery responses … already provides a 'subject matter' line-item entry" (8/7 Letter at 19). We understand, however, that DC has failed to provide any privilege logs in this case. Regardless, defendants will agree to provide subject-matter descriptions on their privilege logs consistent with the subject matter descriptions on the logs provided by DC in *Siegel*. Accordingly, the amended logs will provide subject-matter descriptions consistent with DC's own practices. This should entirely resolve this issue.

    3.    DC argued that (a) each part of a "chain" of e-mail communications should be listed separately and (b) attachments to communications should be listed separately. This issue has been the subject of extensive motion practice in the matter. *See, e.g.*, Docket Nos. 209, 252. Nonetheless, KBK will agree to provide amended logs in a format consistent with the *Rutter* guide, §§ 11:1914-21, cited by DC. To be clear, defendants will log each part of a "chain" of email communications separately, and will separately log any attachment to a document, such as an attachment to a fax.

**C.**    <u>**Part 3**</u>

Part 3 of our proposal offered the following:

> Third, KBK will conduct a reasonable, independent search concerning documents in the second "bucket": that is, documents identified by DC that are referred to in other communications but which have not been located and produced, such as the October 2, 2002 letter, and KBK will confirm to DC the records searched and the results of this search. If any such documents are found following this search, they will promptly be produced or, if privileged, appropriately logged. To date, the October 2, 2002 letter is the only such document identified by DC. However, if there are other such documents sought by DC, please let us know at once, and we will look for them as well.

DC raised two basic concerns about this proposal.

    1.    DC demanded that KBK conduct a review not only of documents that have been specifically put at issue, but also review "defendants' Superman-related files in general." 8/7 Letter at 21. Defendants' "Superman-related files in general" consists of millions of pages of documents, the overwhelming majority of which are litigation documents, drafted, served or filed directly in connection with this litigation or the *Siegel* litigation. There is no basis for reviewing all such documents; nor is it appropriate to re-create defendants' entire document production from scratch, spanning nearly eight years of litigation. As set forth above, if there is any evidence whatsoever that any responsive, non-privileged documents exist that have not been duly produced, KBK will conduct a diligent search for such documents, and if located will produce or duly log them, and will describe its search to DC.

    2.    DC raised concerns about assorted documents, most of which were already addressed and resolved by motion practice in this litigation. Nonetheless, KBK, without assenting to a re-opening of Judge Larson's, Judge Zarefsky's, or Judge Wright's discovery

**EXHIBIT 7**
**94**

**Kendall Brill & Klieger LLP**

Matthew Kline, Esq.
August 24, 2012
Page:  5 of 10

rulings, or conceding any of DC's arguments on these subjects, will agree to search for these
documents, as set forth below.

<u>October 2, 2002 Letter from Michael Siegel to Laura Siegel Larson:</u>  KBK will search for the
October 2 letter, including in Renner Otto's electronic archive of Michael Siegel's files, based on
DC's representations in its current letter.  If any such letter is found, and it is not privileged, it
will produced.

<u>Renner Otto Billing Entries:</u>  DC seems to object to redactions to billing entries (8/7 Letter at
16), but given that those were set by the Court after *in camera* review (Docket No. 451), and that
DC did not seek review of that order, there is no basis for DC's objection.  Nonetheless, KBK
will independently review these redactions.

<u>2008 Consent Agreement and Drafts:</u>  DC's motion to compel on this issue was denied, as was
DC's motion for review.  Docket Nos. 209, 252.  KBK is nonetheless willing to independently
review the 2008 Consent Agreement and drafts thereof that were communicated to the parties
thereto (if any) for privilege.

<u>Documents Identified in the "Timeline":</u>  KBK will conduct a diligent search for the purported
December 16, 2002 letter and the purported September-October 2003 letter, and, if such
documents are identified and are non-privileged, they will be produced.

<u>Conflict Waivers:</u>  DC's motion to compel on this issue was again, denied.  See Docket No. 209,
252.  Nonetheless, KBK is willing to search for and independently review for privilege conflict
disclosures, waivers, and other documents addressing potential conflicts between Mr. Toberoff
and the Siegel and Shuster heirs.

<u>Siegel and Shuster Retainers:</u>  DC's motion to compel on this issue was also denied.  See Docket
Nos. 267, 285.  Nonetheless, KBK is willing to independently review the redactions made to the
Siegels' and the Shusters' retainer agreements with Mr. Toberoff.

<u>Communications with David Michaels:</u>  DC's motion to compel on this issue was likewise
denied.  See Docket Nos. 205, 262.  Nonetheless, KBK is willing to search for and independently
review for privilege the communications between David Michaels and the Siegels.

<u>Redactions to the May 13, 2003 letter:</u>  DC's motion to compel on this issue was also denied.
See Docket No. 267, 285.  KBK is nonetheless willing to review for privilege the redactions
made to the May 13 letter when it was produced to DC.

<u>Agreements with Mr. Emanuel:</u>  KBK is willing to search for and review for privilege
agreements between Mr. Emanuel and Mr. Toberoff, his "entertainment companies," the Siegels
and the Shusters, which relate to the Siegels, the Shusters, Superman and/or Superboy, if any
exist that have not been produced.

115147

**EXHIBIT 7**
**95**

Matthew Kline, Esq.
August 24, 2012
Page:   6 of 10

To be clear, if it is necessary to amend the privilege logs to reflect claims of privilege based on the above-mentioned review, the logs will be amended.  If responsive, non-privileged documents are identified, they will be produced promptly.  The above, in addition to the proposal in my July 20, 2012 letter, directly addresses and remedies each and every one of DC's specific concerns as stated in your letter of August 7, 2012.  If, following KBK's review, DC does not agree with any remaining assertion of privilege, defendants will agree to an expedited procedure for resolving any such issues.  Accordingly, KBK's proposal, if accepted, offers a way to expeditiously and finally resolve DC's remaining discovery concerns.

### D.      Purported Concerns With KBK's Review

Beyond the specific concerns DC has raised, DC states that it "cannot rely on KBK's 'independent judgment'" about privilege determinations.  That statement is utterly without basis.[2]  DC has no grounds whatsoever for drawing conclusions as to KBK's "independent judgment" concerning matters of privilege.  As we have advised you on multiple occasions, KBK has made no independent determination of privilege in this matter, and has performed no work whatsoever to date related to Defendants' privilege logs.

You suggest that there is something improper in two of the arguments that our firm has made: first, that the Timeline is unreliable and second, that there is no basis in the evidence for DC's claim (in its Complaint) that Mr. Toberoff purportedly conveyed a fraudulent offer from an unknown "billionaire" investor to Laura Siegel Larson and her mother concerning Superman rights, and no evidence that any such offer could have caused Laura and her mother to cease its negotiations with DC in 2002.   However, both of these statements are not only accurate, but have been conclusively demonstrated by the evidence.  The Timeline is clearly unreliable—it describes events that did not occur, misinterprets events that did happen, and is based on hearsay, innuendo and outright fabrications.  The Timeline also refers to documents that apparently (a) do not exist (*e.g.*, supposed communications or agreements with Ari Emanuel) or (b) do not exist as described (*e.g.*, there is no "July 5 letter" from Laura to Michael, although there is a July 5 draft of a letter sent at a later date that was logged).

---

[2] It is ironic that your firm, of all firms, would claim (with no facts to support the accusation) that our firm cannot be trusted to discharge its discovery obligations to the court and opposing counsel.  As you noted during our recent meet and confer, my partner, Robert Klieger, was forced to seek extraordinary discovery sanctions against your firm and its client based on egregious discovery misconduct committed by a team of partners and associates in your own Entertainment and Media Litigation practice group.  As you recall, the Court determined in that matter that your practice group's representations to the Court about discovery matters were "seriously misleading and obfuscatory."  *See Wingnut Films v. Katja Motion Pictures Group,* CV 05-1516-RSWL SHX, 2007 WL 2758571, at 10, 11 and *passim* (C.D. Cal. 2007).  I have enclosed a highlighted copy of that decision for your reference.

**EXHIBIT 7**
**96**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
August 24, 2012
Page:   7 of 10

As to the references to the "billionaire" investor, the claim that Toberoff made a fraudulent offer
to Laura and her mother from a purported "billionaire" investor (as opposed to the genuine $15
million offer from Ari Emanuel, about which DC has known for years), and that this offer caused
Laura and Joanne Siegel to break off negotiations with DC in 2002, is simply not supported by
the evidence.  Indeed, the November 2, 2002 and July 11, 2003 letters, which you quote out of
context, make it abundantly clear that (a) Toberoff had nothing whatsoever to do with the
decision of Laura and Joanne Siegel to reject DC's settlement, and (b) there was no offer aside
from the $15 million offer which DC has long known about and which all the relevant witnesses
have testified to.  To be clear, what Laura Siegel wrote was the following:

> We were shocked by the change of attitude we saw in Bruce Ramer and Kevin
> Marks from the time we retained them to recent months. In the beginning they
> appeared to be very much on our side, determined to get justice for us and they
> vowed to work hard for us in negotiations versus DC and AOL Time Warner.
> Toward the end of 2001, there was a shift.
>
> They started pressuring us to lower our expectations and to take an offer we did
> not want. They increasingly seemed to be siding with DC against our interests.
> We never made any outright acceptance of the DC deal. Kevin tried to scare us by
> saying if we didn't take DC's "final offer" they'd probably sue us.
>
> Between February and May of this year we became so dissatisfied with their
> representation and the revolting offer from DC that we asked for a meeting with
> Kevin on May 22 planning to fire them then and there.  In the meeting, we
> decided to give Kevin one last chance.  He wanted to redraft DC's February 1
> proposal along the lines of the last discussion he had had with John Schulman.
> We gave Kevin conditional permission to do just that but it was not to be sent out
> if we did not approve of it. As you know it was unacceptable and we fired Gang,
> Tyre, Ramer & Brown and notified DC, etc. that negotiations were over.
>
> That terrible letter from Kevin in which he threatened to testify against us if called
> into court was the last straw.  We are glad to be rid of them.
>
> It came as quite a surprise to my mother and me that everyone but us--Arthur
> Levine, Kevin Marks, you, and Don Bulson--knew about the interest of Marc
> Toberoff and Ari Emmanuel in the properties as far back as 2001 and no one ever
> mentioned it to us until Kevin's letter of August, 2002.  It was very interesting to
> hear from you that you and Don Bulson were contacted in Nov., 2001.  It's a
> shame that Kevin kept them from contacting us and that he did not inform us of
> them or their offer until August 2002.
>
> My mother and I have had extensive meetings with Toberoff and Emmanuel in
> the past few weeks.  We learned that due to the delays and the misinformation
> Kevin had given them that there was a deal with DC, the billionaire investor who
> was offering $15 million up front plus participation thought it was a hopeless

115147

**EXHIBIT 7**
**97**

**Kendall Brill & Klieger LLP**

Matthew Kline, Esq.
August 24, 2012
Page:  8 of 10

situation and invested his money elsewhere.  We were very impressed with Toberoff and Emmanuel, however, and have signed them as our new representatives.

November 2, 2002 letter at 1-2.

We went to Marc to talk about him representing the Siegels.  Marc did not pursue us:

- We fired Kevin Marks and Bruce Ramer because they were insisting we take a bad TW/DC deal.  You'll remember that you, Don Bulson, and we were shocked when Kevin Marks said that if asked to, he would testify against us in court.

- Neither Kevin Marks or Don Bulson informed us that Marc Toberoff had contacted Marks and you about the Superman rights until months after it had taken place.

- Kevin Marks had turned away Marc saying we had a deal with DC when we did not.

- Marc did not call my mom nor me.

- My mom called the Shuster family to see what the Shusters were doing.

- The [Shuster] family gave Marc's number to my mom and she called him after we had fired Ramer and Marks.

July 11, 2003 letter at 1-2.

I quote these letters at length to be clear: the very correspondence you point to in your letter as somehow having been secreted reveals precisely that DC's claims are without merit.  While DC is of course entitled to responsive discovery, including discovery adverse to its claims, it is surprising that you have accused KBK (on the basis of these letters) of misrepresenting evidence in Court filings when, in fact, the letters conclusively demonstrate the truth of defendants' substantive arguments.

Second, it appears you misunderstood, or are deliberately mischaracterizing, statements made during our most recent meet and confer.  Your reference at page 6 to "Mr. Daum's recent suggestion … that Toberoff only found the May 2003 letter after Judge Zarefsky issued his [April 11, 2011] order" is not based on any statement by Mr. Daum, and was certainly not a representation by Mr. Daum or anyone else that Mr. Toberoff in fact found the May letter after Judge Zarefsky issued his order.  Rather, Mr. Daum accurately informed you that neither Mr. Daum nor KBK had any involvement with the production of the May 2003 letter.

115147

**EXHIBIT 7**
**98**

Matthew Kline, Esq.
August 24, 2012
Page:  9 of 10

Accordingly, KBK has offered to conduct a review that meets each and every one of DC's
substantive concerns.  DC's proffered reasons for distrusting KBK's ability to conduct this
review are without basis.  DC should permit KBK to conduct this review, and agree to
expeditiously resolve any remaining issues as to privilege thereafter.

## II.    DC'S ARGUMENTS AS TO MISCONDUCT AND PREJUDICE HAVE PREVIOUSLY BEEN ADDRESSED AND CERTAINLY DO NOT WARRANT SANCTIONS

As noted above, the issues raised in your letter have been addressed exhaustively both in the
parties' correspondence, in briefing before the Court and in numerous Court rulings, in which
KBK has had minimal or no involvement.  KBK's offer to review all of defendants' privilege
includes an offer to review independently the issues raised in your letter and to ensure the
expeditious resolution of any issues that remain open following KBK's independent review.
This proposal provides in essence all you have asked for, causes no prejudice to DC, and
addresses the claims of prejudice you have made.

Significantly, none of the cases cited by DC comes close to justifying sanctions in this case,
much less the "terminating sanctions" that you claim are justified by the late production of a
single May 2003 letter.  8/7 Letter at 8.  Each case cited by DC involved, unlike here, the willful
and direct violation of multiple court orders on specific subjects.  *See, e.g., Hester v. Vision
Airlines, Inc.*, 2012 U.S. App. LEXIS 14683, *5-6 (9th Cir. July 18, 2012) (party willfully
violated several court orders to produce specific documents, and "the day after the trial was
initially scheduled to begin, [] still had not complied with the order to produce the documents");
*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1095-1096 (9th Cir.
2007) (discovery misconduct continued despite multiple court orders, and for over a year-and-a-
half after the Court had given an express warning that it would entertain terminating sanctions);
*Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1053-1054 (9th Cir. 1998) (multiple years of
disobedience to court orders).  Nothing comparable has occurred in this case.

Indeed, the core element of case-dispositive sanctions is prejudice to the substantive resolution of
a matter.  The Ninth Circuit has emphasized (in a case cited in your letter) that "[w]hat is most
critical for case-dispositive sanctions ... is whether the discovery violations 'threaten to interfere
with the rightful decision of the case.'"  *Connecticut Gen. Life Ins. Co. v. New Images of Beverly
Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007).  Here, it appears that the document production issues
raised in your letter have not affected the rightful disposition of the substantive issues in the case.

As one example, the May 13 letter upon which you base much of your letter was long ago
produced to DC, was plainly irrelevant to the *Siegel* matter, and was before the Court in this
matter when it made its ruling on defendants' anti-SLAPP motion.  Notably, DC did not seek to
reopen judgment in the *Siegel* matter pursuant to Fed. R. Civ. P. 60 based on these documents or
any other purported discovery violation.

In fact, DC made similar arguments as part of its summary judgment motion in *Siegel*, in
claiming that the Siegels had purportedly reached an agreement with DC in 2001, including that

**EXHIBIT 7**
**99**

**Kendall Brill & Klieger LLP**

Matthew Kline, Esq.
August 24, 2012
Page:  10 of 10

Marks had confirmed a "deal" with DC, and that Mr. Toberoff had allegedly made a competing offer. *See* Defendant DC Comics and Warner Bros.' May 29, 2007 Opposition to Motion for Partial Summary Judgment at 22 (referencing the PPC Agreement and Mr. Toberoff's contacts with Marks in late 2001), 24-25 (discussing the $15 million offer to purchase the Siegels' "Superman" interest, and the Siegels subsequent agreement with IP Worldwide), 68-69 (positing theory that the Siegels rejected DC/Warner's 2001-02 offers due to "a seemingly more lucrative offer by their current counsel [Mr. Toberoff]"), 69-74 (concerning Mr. Marks' testimony and DC's alleged "deal").

 In response, the Siegels focused on the diverging terms of the 2001-02 counteroffers exchanged by the parties, and noted that DC's accusations against Mr. Toberoff were irrelevant. *See* Plaintiff Laura Siegel Larson and Joanne Siegel's June 25, 2007 Reply in Support of Motion for Partial Summary Judgment at 59 n.31, 60-61.  The *Siegel* court agreed, took note of DC's allegations, including Marks' testimony that he thought there was a "deal," but found that no agreement had been reached by the parties. *Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1136-39 (C.D. Cal. 2008).

The review that KBK proposes to conduct (followed, if necessary, by an expeditious review of any remaining discovery issues) would likely put to rest any remaining disputes between the parties as to the propriety of defendants' claims of privilege in this matter.

If DC is truly interested in advancing the substantive merits of this dispute for resolution, it should accept defendants' generous offer, and allow KBK to conduct a review that will resolve DC's concerns and help the parties move closer to litigating the substantive merits of this case, as opposed to unnecessarily contentious discovery battles.

Defendants reserve all rights.

Very truly yours,

Richard Kendall

RK:dfm

**EXHIBIT 7**
**100**

# EXHIBIT 8

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 30, 2012

OUR FILE NUMBER
905900-321

**VIA EMAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:  *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Dick:

We write in response to your August 24 letter.  All of your points are disputed, but to address the three most salient ones:

1.  We note you do not and cannot defend Marc Toberoff's and defendants' years-long pattern of discovery misconduct, which is telling.  Their intentional obstruction of discovery has prejudiced DC's ability to litigate its claims in this case and the *Siegel* case by denying DC access to key evidence at critical junctures.  Defendants' misconduct justifies the heaviest sanctions in this case and ultimately, if need be, in *Siegel*.  This includes terminating sanctions, monetary sanctions, and a finding of complete privilege waiver.  *E.g.*, *Valley Eng'rs v. Electric Eng'g Co.*, 158 F.3d 1051, 1057-1058 (9th Cir. 1998); *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374-74 (11th Cir. 1999); *Prescott v. Cnty of Stanislaus*, 2012 WL 383387, at *10-11 (E.D. Cal. Feb. 6, 2012); *In re 400 Walnut Assocs., L.P.*, 2012 WL 2839633, at *14-15 (Bkrtcy. E.D. Pa. July 11, 2012); *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335 (N.D. Ill. 2001); *Get-A-Grip, II, Inc. v. Hornell Brewing Co., Inc.*, 2000 WL 1201385, at *1 (E.D. Pa. Aug. 8, 2000); *Bankatlantic v. Blyth Eastman Paine Webber, Inc.*, 127 F.R.D. 224, 235-36 (S.D. Fla. 1989).

While you say your firm played no role in defendants' discovery misconduct, our letters pointed out examples of the ways in which it did so.  This includes sitting silently by as Toberoff falsely denied in court whether documents existed and falsely claimed privilege.  Your firm was in possession of those very same documents and reviewed them in making the repeated claims it did about the Toberoff Timeline memo and its enclosures.  *Cf. infra* at 2-3 (collecting cases).

As for your claims regarding Mr. Daum's statements, he made two important claims at our in-person meeting:  (1) that Toberoff did not find the May 2003 document *until after Magistrate Judge Zarefsky issued his April 2012 order* (hence Toberoff had no bad intent); and

**EXHIBIT 8**

**101**

O'MELVENY & MYERS LLP

August 30, 2012 - Page 2

(2) when I pressed Mr. Daum on how he knew these asserted facts, he conceded that your firm had done no independent investigation to confirm the facts he and your colleagues asserted.

Mr. Daum's and Toberoff's claims that Toberoff did not have access to the May 2003 letter in 2010 and 2011—when Toberoff made his bellicose denials about the existence of the letter—were patently false, as defendants and their counsel well knew, given their access to the Toberoff Timeline documents. Indeed, as we just learned a few months ago, several copies of the May 2003 letter existed among the Timeline documents that both Toberoff and your firm possessed and reviewed. And, as you know, it was your firm that personally delivered those documents to the USAO in September 2010, and it was your firm that, in disputes with DC, claimed the Timeline documents were privileged and need not be produced.

You fail to address these and other key points, but as you know, Toberoff was under court order to produce the May 2003 document in December 2010; neither you nor he can or do deny it was responsive; and defendants admitted in later court filings that defendants never claimed the May 2003 letter was privileged. Nonetheless, defendants refused to produce the May 2003 letter in 2010 or early 2011, violating that 2010 court order. Instead, defendants insisted to DC that the May 2003 letter did not exist and, in fact, chastised DC for demanding its production. Defendants said all this with your firm's full complicity. Indeed, your firm sat idly by while Toberoff made these false claims—knowing full well that several copies of the May 2003 letter existed among the Timeline documents that your firm possessed, had reviewed, and had delivered to USAO. Worse still, you knew that Toberoff himself had failed to produce this document to DC when he made his own initial document production in January 2011. DC raised numerous concerns about this production with your firm at the time, and your firm defended the production.

2. Your firm's proposal that DC "permit" it to address DC's concerns by conducting a review of a limited universe of documents—rather than all documents in your clients' possession, custody or control—is incomplete, potentially illusory (if you stick to your overly aggressive stances on privilege and responsiveness), comes months too late, and most importantly, falls well short of your basic legal duties as counsel in this case. *E.g.*, DC's June 13, 2012 Email; DC's July 2, 2012 Letter; DC's Aug. 7, 2012 Letter; *In re Girardi*, 611 F.3d 1027, 1061-62 (9th Cir. 2010) ("willful ignorance" of the plaintiffs' co-counsel of record in the underlying case not a defense); *In re Mitchell*, 901 F.2d 1179, 1188 (3d Cir. 1990) (division of labor among counsel does not diminish attorney's personal responsibility for complying with court rules); *Fund of Funds, Ltd. v. Arthur Anderson & Co.*, 567 F.2d 225, 234 (2d Cir. 1977) ("The principle that a lawyer cannot delegate his fiduciary duties to another in an effort to avoid its strictures or to avoid responsibility for the manner in which they are taken is settled law."); *Hawkins v. Fulton Cnty.*, 96 F.R.D. 416, 420-21 (N.D. Ga. 1982) ("[E]ven if another attorney is now responsible for all discovery matters, [the defense attorney] is still attorney of record for the Defendant and is responsible as such . . . for any failure to provide discovery."); *Cole v. Patricia A. Meyer & Assocs., APC*, 2012 WL 2106364, at *14 (Cal. Ct. App. June 12, 2012) (while California law generally allows co-counsel to divide the duties of conducting a case, an attorney cannot avoid liability for misconduct based on a purported division of labor); *J.M. Cleminshaw*

**EXHIBIT 8**
**102**

O'MELVENY & MYERS LLP
August 30, 2012 - Page 3

*Co. v. City of Norwich*, 93 F.R.D. 338 (D. Conn. 1981) (finding attorney liable for failure of co-counsel to comply with discovery requests; "[t]he fact that an attorney may have engaged co-counsel to assist him in the conduct of a case does not relieve that counsel of record of his duty to supervise all aspects of the litigation").

The law requires your firm to conduct the review DC has demanded and that your recent letter outlines (in part); DC need not "permit" it. DC will not forfeit its legal rights and claims—as you demand that it do—in exchange for a promise to fulfill only a small part of your existing legal obligations. It certainly will not do so when your compromise proposal does nothing to address or remedy the significant prejudice caused DC over the past several years, including legal fees DC expended on improper and needless discovery battles Toberoff invited and caused.

Your no-harm-no-foul arguments also ignore the obvious prejudice DC has suffered and the direct and deliberate lies Toberoff told the courts and DC. It also ignores that his deceptions violated court orders, and that the violation of a court order, in any event, is not a prerequisite for the most serious sanctions, including terminating sanctions.

3. As we have addressed in other correspondence, defendants persist in making baseless claims that DC has provided no privilege logs in this case, when DC has in fact done so, and has offered defendants numerous times to meet and confer on (a) what additional information they reasonably require; and/or (b) to complete the stipulation defendants once said they wished to negotiate on these issues. DC's offers to meet and confer (made, *inter alia*, in letters and emails dated June 12 and August 7) have been ignored by defendants. Defendants' failure to meet and confer on such issues is full grounds to moot any concerns they raise. *E.g.*, Docket No. 467.

*        *        *

In short, your proposal is unworkable and comes nowhere close to addressing DC's concerns. DC will file its motion shortly. As for the *quid pro quo* you demand, your firm should conduct the review and production it has offered—without any of the limitations you suggest on your search and production, and without any impingement on DC's rights. It has long been your firm's duty to conduct this review. You cannot blame your failure to do so on sets of conditions you wish to impose on DC—the party aggrieved by defendants' rampant discovery misconduct.

Again, the remainder of your letter is disputed, and DC reserves all rights.

Very truly yours,

/s/ Matthew T. Kline

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.
       Defense Counsel

OMM_US:70828350

**EXHIBIT 8**
**103**

# EXHIBIT 9

**◀◀ Kendall Brill Klieger**

writer's direct:
310.272.7900 telephone
310.272.7936 facsimile
rkendall@kbkfirm.com

September 4, 2012

<u>Via E-Mail</u>

Matthew Kline, Esq.
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

This letter responds to your letter of August 30, which in turn responded to my letter of August 24.

First, I note that your letter changes the subject. You no longer raise any substantive objection whatsoever to the proposal made by this law firm, Kendall Brill & Klieger ("KBK"), to review the privilege logs and document productions that Toberoff & Associates have previously prepared in this matter, and you have dropped the special master issue. Although that should end the matter, DC now apparently intends to make a baseless motion for sanctions regardless of our efforts to resolve any discovery issues efficiently. That is improper.

Avoiding a reasonable attempt to "confer in a good faith effort to eliminate the necessity for hearing the motion or to eliminate as many of the disputes as possible," as required by Local Rule 37-1, your letter is framed as a baseless attack on KBK. Apparently, your firm and your client have decided upon this tactic in the hope that a barrage of inaccurate threats and disparagement of opposing counsel will help DC obtain tactical advantage in this litigation, or create a conflict between KBK and its client, Mr. Toberoff. Unfortunately, this is not the first time that your law firm and your client have pursued such tactics in this litigation, even though such conduct directly violates the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(g)(1)(B)(ii)(discovery must "not [be] interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.")

This letter addresses your baseless arguments in support of your threats to bring a sanctions motion against KBK.[1] Should DC, on these facts, pursue a groundless and harassing motion for

---

[1] A separate letter addressing your August 30 letter with respect to your assertions as to Mr. Toberoff and the Toberoff entities, as well as your arguments with respect to terminating sanctions, will be forthcoming once we have an opportunity to confer with Mr. Toberoff, who, as

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.  Suite 1725  Los Angeles, CA 90067  telephone 310.556.2700  facsimile 310.556.2705  www.kbkfirm.com

**EXHIBIT 9**
**104**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
September 4, 2012
Page: 2 of 10

sanctions, KBK and its clients will inform the Court of DC's practices in this matter, seek discovery of your firm's and client's improper discovery practices in this and other cases, and seek to sanction DC and your firm for its improper motion practice and pattern and practice of discovery abuse.

## I.    DC's Claims of Discovery Abuses By KBK Are Without Basis and Untimely

### A.    DC Has Not Been Prejudiced Due to the Production of the May and July 2003 Letters

Almost the entirety of your allegations against KBK in your August 7 and August 30 letters derive from what you claim was the late production of a May 13, 2003 letter and a July 11, 2003 letter. Both of these letters were correspondence between Michael Siegel and Laura Siegel Larson. Although DC is complaining about these letters now, they were long ago produced to DC—the May 2003 letter was produced in April 2011, and the July 2003 letter was produced in October 2011.

Any claim of prejudice to DC from the date of production of these letters is specious. In the instant *Shuster* matter, no trial date has been set. DC has had both documents for almost a full year, with more than sufficient opportunity to take discovery concerning them. As for the *Siegel* matter, if the late production of these documents were in fact in any way significant, DC could have made a motion pursuant to Federal Rule of Civil Procedure 60(b) to reopen the judgment in that matter. Judgment in *Siegel* was entered on May 20, 2011, and DC was in possession of *all* of the relevant documents (that is, both the May 13 and July 11 letters) by no later than October 2011. DC did not make such a motion, despite having more than ample time to do so. DC's failure to make such a motion demonstrates precisely that these documents were not significant to *Siegel*.

To the contrary, as I noted in my most recent letter to you, both documents at issue strongly support the position of Defendants in this matter. They make clear that DC's substantive allegations in this case and in *Siegel* about the involvement of Mr. Toberoff and/or a purported "deal" with DC are false.

As to KBK's clients, it is worth noting that DC served its request for production of documents in December 2010, with responses due by January 24, 2011. DC obtained production of the May 2003 letter less than three months later, on April 11, 2011, and received production of the July letter by October 2011 (while, in the interim, Judge Zarefsky had considered, and rejected, each of the arguments as to discovery misconduct and improper logging of that document made by

---

you know, has just returned from vacation and is preparing today for tomorrow's hearing on the Court's tentative summary judgment opinion. As with our prior letters, the lack of a full response to DC's barrage of false accusations is not any sort of concession or admission, and should not be willfully misinterpreted by DC as one.

**EXHIBIT 9**
**105**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
September 4, 2012
Page:  3 of 10

DC in its most recent letter).  Given the state of the litigation, there is no conceivable prejudice from a delay of three months in obtaining the May 2003 letter.

Even more tellingly, DC, again despite having the May 2003 letter for more than a year, and the July letter for almost a year, has *never* to date sought sanctions related to the production of these documents, whether from KBK or from Mr. Toberoff.  That alone is a decisive indication that DC was not in fact harmed by the timing of the production of these letters, and means that DC cannot obtain sanctions in connection with their production..  *See, e.g.*, *Franklin v. Krueger Int'l, Inc.*, 1997 WL 691424 (S.D.N.Y.  Nov. 5, 1997 ) (8 month delay in bringing motion for sanctions barred bringing sanctions motion); *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 757 (7th Cir. 1994) (two year delay in bringing Rule 37 sanctions motion meant that no sanctions could be obtained, regardless of merit)   That DC has waited so long to raise the issue undermines any claim that sanctions are appropriate or DC's claims of prejudice genuine.  Instead, the delay reflects DC's improper proposes:  to harass, to increase the costs of defense, and to distract attention from the lack of merit of DC's claims.

### B.    DC's Claims About KBK's Involvement in the Production of the May and July 2003 Letters Are Without Basis

As a preliminary matter, the impropriety of your demand for sanctions as to persons other than KBK will be addressed in more detail in separate correspondence.  As to this firm, as we have repeatedly informed you, KBK has not handled document production or the preparation of privilege logs in this matter.  KBK does not represent the Siegel or Shuster heirs, who are clients of Mr. Toberoff.  KBK does represent Mr. Toberoff and his entities with respect to the claims DC has brought against them in this action.  However, based on a division of labor between counsel, which reflects Mr. Toberoff's long involvement in the *Siegel* case, in which many discovery disputes were litigated between the parties and addressed by the Court, Mr. Toberoff and his firm have taken responsibility for producing documents and privilege logs in response to discovery directed towards Mr. Toberoff and those business entities, as well as the document and deposition discovery for the clients that Mr. Toberoff represents exclusively.

This is not new information for you.  The chronology of discovery concerning the May and July 2003 letters (that is, the documents put at issue in your August 7 and August 30, 2012 letters) shows the baselessness of your allegations against KBK.

Prior to late 2010 and early 2011, the production of the May and July 2003 letters had not been the subject of discussion between the parties in this litigation.[2]  Their production was apparently raised in a meet and confer session between your firm and Mr. Toberoff's firm in December 2010, followed by a motion to compel served by DC on January 28, 2011.  KBK did not participate in that meet and confer, as your own declaration confirms.  *See* Docket No. 161 at ¶

---

[2] The July 11, 2003 letter had been the subject of extensive litigation in *Siegel*, long before KBK's involvement in this matter..

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
September 4, 2012
Page:   4 of 10

26 (identifying participants in meet and confer, making clear that no KBK attorneys were involved).

Nor were the May or July 2003 letters required to be produced by KBK's *clients* at the time of that meet and confer process.  In document discovery requests served directly on KBK's client, Mr. Toberoff, DC sought documents related to Michael Siegel and Laura Siegel Larson.  On January 24, 2011, KBK served its objections and responses to those requests, but did *not* agree to produce these documents.  1/24/11 Discovery Responses at 39.[3]

On January 28, 2011, or a mere four days after KBK served objections on behalf of Mr. Toberoff, and without ever conferring with KBK, DC served its portion of a discovery joint stipulation relating to its motion to compel production from the heirs.  DC then filed that motion on February 7, 2011 (Docket No. 160).

The joint stipulation made absolutely clear that the relevant motion to compel did not concern KBK or its clients:

> DC's motion is solely directed at discovery served on the Heirs, responding defendants Laura Siegel Larson, Joanne Siegel, Mark Warren Peary, and Jean Adele Peavy. It does not relate to any discovery served on Marc Toberoff, Pacific Pictures Corporation, IP Worldwide, LLC or IPW, LLC. As such, the "Toberoff" defendants are not parties to this joint stipulation.

Docket No. 160 at 3 n.1.  The joint stipulation did not concern KBK's clients, KBK did not have responsibility for the joint stipulation, and no attorney for KBK signed the joint stipulation.

---

[3] DC's document request no. 48 to Mr. Toberoff sought "All DOCUMENTS RELATING to any COMMUNICATION between or among Laura Siegel Larson and Michael Siegel."  Toberoff responded and objected to that request as follows: "Toberoff objects to this request on the grounds that it is compound, duplicative, overbroad, burdensome and oppressive, as it could be reasonably construed to request all documents relating to Superman and/or Superboy.  Toberoff objects to this request on the grounds that it is compound, overbroad, burdensome and oppressive. Toberoff objects to this request on the grounds that the term "RELATING" is vague and ambiguous, and lacks sufficient precision to allow him to formulate an appropriate response. Toberoff further objects to this request on the grounds that it is indefinite as to time, not reasonably limited in scope, and to the extent that it seeks the production of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence.  Toberoff further objects to this request to the extent that it seeks communications or items protected by the attorney-client privilege, the joint interest privilege, the attorney work product doctrine and any other privilege or immunity available under law or arising from contractual obligation. Subject to and without waiving the foregoing general and specific objections, Toberoff is willing to meet and confer with Plaintiff regarding the tailoring of this request."  1/24/11 Response at 39.

**EXHIBIT 9**
**107**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
September 4, 2012
Page:   5 of 10

Subsequently, DC sought a further meet and confer concerning KBK's clients' discovery
responses, and sent a letter—addressed to Mr. Toberoff's firm, not KBK—that did not
specifically reference the May 13, 2003 letter.  In the subsequent meet and confer, in which KBK
participated, the parties agreed that they would not re-brief or re-argue any of the issues raised in
DC's February 2011 motion.  Given that agreement, KBK did not re-parse the details of the
February 7 motion, including the May 13 letter or issues related to privilege logs.  DC then failed
to take further action on the issue as to KBK's clients until late March 2011, when it served and
then filed a new motion to compel against the Toberoff defendants that summarily re-
incorporated the arguments in its February 7, 2011 motion.  The response to DC's new motion,
served on behalf of this firm's clients, duly noted this.  Docket No. 210 at 1 n.1.  On April 11,
2011, the same day that the Toberoff defendants' response to DC's new motion was due, the
Court ordered production of the May 13, 2003 letter, and that letter was promptly produced by
Toberoff & Associates on behalf of its own clients.  Nothing in this chronology remotely
supports sanctions with respect to the May 13 letter.

In its April 11, 2011 Order, the Court also rejected DC's contentions with respect to the
production of the July 11, 2003 letter and thus did not order its production.  Following the
production of the May 13 letter, DC sought reconsideration of the Court's April 11, 2011 order
and asked for production of the July 11, 2003 letter both before Judge Zarefsky and Judge
Wright.  Those motions for reconsideration/review, like the initial motion, were directed
exclusively at the Siegel and Shuster heirs, whom KBK does not represent.  Neither KBK nor its
clients joined in the briefing on the motions, and no KBK attorney appeared at the only Court
hearing concerning these motions, which were denied.  Docket No. 252, 285.  In those motions,
DC raised precisely the same issues that you now raise again in your most recent correspondence
concerning the May 13 letter, and Mr. Toberoff, on behalf of his clients, explained in detail the
history of the logging of the July 2003 letter on privilege logs served long ago.  Judge Zarefsky,
with full knowledge of the issues raised by DC here and elsewhere concerning the May and July
letters, again declined to order production of the July letter.  Docket No. 285.  Subsequently,
Judge Zarefsky, again with full knowledge of the facts concerning the May 13 letter, denied a
related motion brought by DC against the Siegel and Shuster heirs for all production copies of
the May 13 letter.  Docket No. 309.  On October 24, 2011, Judge Wright, without providing an
opinion, ordered production of the July 11, 2003 letter.  Docket No. 336.  Mr. Toberoff's firm
then promptly complied with the production order.  In light of Judge Zarefsky's repeated and
thoughtful denials of DC's demands for the July 11 letter, there is no reason whatsoever that this
firm ought to have produced that document in advance of the production by co-defendants in
response to a motion directed at them.

From that history, it is simply not possible to concoct some sort of free-form obligation of KBK
to have independently produced the May or July 2003 letters in early 2011 (as opposed to later in
2011, when they were in fact produced).

In fact, (a) while DC's February 2011 motion was pending, DC agreed not to repeat its
arguments concerning the May and July letters in a separate motion directed at the Toberoff
defendants, and the Toberoff defendants agreed to be bound by the outcome of the February 7,

115722.2

**EXHIBIT 9**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
September 4, 2012
Page:   6 of 10

2011 motion; (b) DC simultaneously contended that "other independent" disputes concerning discovery directed to Mr. Toberoff should move forward; (c) in light of the parties' agreement, KBK did not involve itself in the issues raised by that February 2011 motion; (d) DC knew that the February 2011 motion papers were not prepared by or signed by KBK; (e) the issues involved the privilege logs and document production of the Siegel and Shuster heirs, and other issues not involving KBK's clients and that had been the subject of extensive litigation before KBK had any involvement, and (f) at least until October 2011, the Courts had consistently rejected DC's position, with full knowledge of the facts you have set forth in your letters of August 7 and August 30.

The indiscriminate use of the term "defendants" in your August 30 letter, without attention to the clients KBK actually represents or its position in the litigation, and your incendiary claim that KBK somehow ignored its own discovery obligations, is blind to the reality of the discovery process in this case, and DC's own discovery motions and DC's agreement that duplication of effort with respect to these issues was unnecessary.

Moreover, as noted above, as to KBK's clients there was at most less than a three-month period between when DC claims it was entitled to receive the May 13 letter on January 24, 2011, and when it in fact received a copy on or about April 11, 2011.  A claim that KBK was, despite the facts noted above, required to investigate the circumstances of the May 13 letter or its production, when those issues were being litigated by other, separately-represented parties, is simply without basis.

As to the July 11, 2003, letter, it was upheld as privileged by Judge Zarefsky *despite* DC having the May 13, 2003, letter, and *despite* DC providing the Court with the information it now urges again in its most recent correspondence about allegedly improper logging.  Obviously, KBK was under no obligation to produce this document after Judge Zarefsky had upheld it as privileged (and, indeed, would have violated its professional responsibility to its client in doing so) before Judge Wright ordered it produced in October 2011.

Your statement of the law, which implies that KBK is somehow responsible for DC's disputes with parties that it does not represent, is false.  There is no requirement that an attorney police the discovery responses of a joint defendant that attorney does not represent.  *E.g. Indep. Fire Ins. Co. v. Lea*, 979 F.2d 377, 379 (5th Cir. 1992) ("we do not think that the basic policies of "deterrence and education" behind Rule 11 require an interpretation of the Rule which creates such forms of vicarious liability.").  Moreover, nothing prohibits co-counsel from dividing responsibilities among themselves.  *E.g., Abrams v. Se. Mun. Bonds Inc.*, 138 F. App'x 88, 91 (10th Cir. 2005) (describing co-counsel agreement establishing "the division of responsibilities" between firms); *Cole v. Patricia A. Meyer & Associates, APC,* No. B227712, 2012 WL 2106364, at *14 (Cal. Ct. App. June 8, 2012) ("California law generally allows an attorney of record to associate another attorney and to divide the duties of conducting the case.").

The cases you cite deal almost entirely with situations that are dramatically distinguishable from the one present here.   Several of the cited cases involve co-counsel associating with or actually signing frivolous or abusive filings. *E.g., Cole v. Patricia A. Meyer & Associates*, APC, No.

115722.2

**EXHIBIT 9**

Matthew Kline, Esq.
September 4, 2012
Page:   7 of 10

B227712, 2012 WL 2106364, at *14 (Cal. Ct. App. June 8, 2012); *In re Girardi*, 611 F.3d 1027, 1062 (9th Cir. 2010). Another involves counsel-of-record's total abdication of responsibility, leaving only a suspended attorney with full responsibility for the case. *In re Mitchell*, 901 F.2d 1179, 1188 (3d Cir. 1990). *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 226, 234 (2d Cir. 1977), involved the "unusual facts" in which a firm unable to bring a lawsuit due to conflict of interest assisted another firm in bringing the suit. Still others involve a situation in which an attorney of record delegates entire responsibility to a co-counsel, not where (as here) the relevant motions were directed to a party unrepresented by co-counsel and co-counsel have agreed on a division of responsibility. *J. M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338, 348 (D. Conn. 1981). These cases are far afield from shared responsibility for discovery tasks routinely divided among counsel or handled by the client, much less a situation where (as here) different attorneys represent different clients with separate discovery obligations.

Finally, your August 30 letter makes affirmatively false statements about what transpired during our in-person meet and confer on this issue. My colleague Mr. Daum did not tell you (and could not have told you) that Mr. Toberoff did not "find" the May 13, 2003 letter until after it was ordered produced. Mr. Daum, as he advised you, had no knowledge of when Mr. Toberoff "found" the May 13 letter, as KBK did not handle the production or involve itself in that issue for the reasons described above. Rather, Mr. Daum informed you, accurately, that KBK did not know the details of its production, but that KBK suspected (but did not know) that the letter had likely, prior to its production, been kept with documents for which a claim of privilege had been asserted. I note for the record that your own conduct at this meeting makes you a highly unreliable witness, as your intemperate yelling, interrupting, storming out of the meeting, and otherwise behaving in a highly unprofessional manner makes you unlikely to be aware of what any attorney said. Sadly, the false accusations in your August 30 letter are consistent with the unprofessional and accusatory conduct you demonstrated during our meeting.

## II.    DC and O'Melveny and Myers Have Demonstrated a Pattern and Practice of Unprofessional Conduct In This Matter

The rejection of KBK's substantive proposal to advance the merits of the dispute, while continuing in unfounded accusations, is consistent with what is now (unfortunately) clearly a pattern and practice of unprofessional conduct by DC and your firm in its conduct of this matter.

As you are aware, Judge Zarefsky has repeatedly commented on numerous occasions about the improper conduct and lack of professionalism of DC's counsel. *See, e.g.,* Docket No. 209 at 13 (ruling for Defendants and noting "[t]he Court does not understand why this portion of the dispute could not have been resolved out of court."); No. 323 at 2 (noting that DC's constant motions are "head[ing] in the wrong direction" and that "the direction of the lawsuit needs to be forward, not backward"); No. 439 (reminding DC of its "responsibility to make sure that discovery is … proportional to the issues in the lawsuit and does not create undue burden or harassment"). Your current threats against this firm fly in the face of these warnings.

**EXHIBIT 9**
**110**

Kendall Brill & Klieger LLP

Matthew Kline, Esq.
September 4, 2012
Page:   8 of 10

You and your law firm's inappropriate and harassing conduct to date, launched while failing to observe your own most basic discovery obligations, includes at least the following:

- Filing of discovery motions even when the issues raised in such motions had long ago been resolved. *See, e.g.* Docket No. 44 (motion to "initiate discovery" filed after parties had already held Fed. R. Civ. P. 26(f) conference).
- Knowingly false representations to the Court concerning the facts of the case. *See, e.g.*, Docket No. 455 (false statement that a letter was "provided" to Mr. Toberoff in 2006).
- Failing to produce critical documents for years, and failing to produce revised and complete privilege logs in this action. *E.g.*, production in July, 2012 of two critical letters from Jean Peavy that should have been produced in 2006.
- Filing obviously improper documents with the Court of Appeals, including a "supplemental excerpts of record" that consisted largely of obviously inadmissible documents that had never been put before any lower court.
- Highly unprofessional conduct during meet and confer sessions, including but not limited to yelling, threats, storming out of meetings, and the like.
- Offensive and harassing correspondence with counsel, even as concerns mundane scheduling matters. *E.g.*, emails of August 30, 2010, rejecting extension of a deadline for KBK attorneys to observe Jewish high holidays, where scheduling conflict for KBK arose from its efforts to accommodate OMM attorney's request for an extension: Kline – "It is offensive that . . . you would try to recast for 'religious' reasons your unprofessional and irresponsible demand for a quid pro quo," and Petrocelli – "None of this is about anyone's religious observances, and you know it."

At this point, it is clear that we are not dealing with isolated incidents of unprofessional conduct, which might be excusable as merely unfortunate episodes. Rather, we are dealing with tactics that are part and parcel of DC Comics', and your firm's, overall litigation strategy in this matter.[4]

But engaging in unprofessional conduct, unwarranted attacks on opposing counsel, and frivolous discovery practice in order to raise the expense of Mr. Toberoff's defense is unacceptable. It is a violation of the Local Rules of this Court and of the standards governing the profession. *See* Central District of California, Civility Guidelines, at 8 ("Before filing a motion with the court, we will engage in more than a mere pro forma discussion of its purpose in an effort to resolve the issue with opposing counsel"); ("Unless directly and necessarily in issue, we will not disparage the intelligence, morals, integrity, or personal behavior of our adversaries before the court, either in written submissions or oral presentations"); ("We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety"); L.R. 83-8.1 ("It is the policy of the Court to discourage

---

[4] Notably, this is not the first time DC's counsel has been reprimanded for similar practices. *See, e.g.*, *Slesinger v. Walt Disney Co.*, 2002 WL 31590870 (Cal. App. Nov. 20, 2002) (noting court finding that "a jury could conclude that [a client's] destruction of . . . files was done willfully or that [the client] willfully suppressed evidence.").

Matthew Kline, Esq.
September 4, 2012
Page: 9 of 10

vexatious litigation and to provide persons who are subjected to vexatious litigation with security against the costs of defending against such litigation and appropriate orders to control such litigation"); *ABA Model Rules of Professional Conduct, Preamble § 5* ("A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials"); § 9 (requiring a "professional, courteous, and civil" approach to litigation); *United States v. Young*, 470 U.S. 1, 9 (1985) (opposing counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate. The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel.").

The pattern and practice of improper, harassing, and uncivil behavior must stop. If DC and its counsel continue to approach this litigation primarily as a vehicle for imposing costs on its adversaries and attacking its opposing counsel, they do so at their peril.[5] I note that any motion for discovery sanctions must in the first instance be put to Magistrate Judge Zarefsky, who is intimately familiar with discovery in this matter and DC's related misconduct. *See Grimes v. City & County of San Francisco*, 951 F.2d 236, 240 (9th Cir. 1991).

Finally, I note that, in the context of this litigation, DC's motion practice concerning KBK seems designed to generate a potential conflict between KBK and its client, Mr. Toberoff, and is improper for that reason alone. If you are determined to move forward with a motion against KBK, please contact us immediately to discuss timing so that we can responsibly address and resolve potential conflict issues that may result.

Defendants and this firm reserve all rights.

Very truly yours,

Richard Kendall / enc

Richard Kendall

RK:dfm

cc: Marc Toberoff

---

[5] The lawyers at Warner Bros. and DC Comics who are responsible for the conduct of this litigation, including without limitation John Rogovin, Clara Pope, and Wayne Smith, are subject to the ethical rules and Civility Guidelines that govern the conduct of lawyers practicing in Central District of California. We request that you provide a copy of this correspondence to each of them.

115722.2

**EXHIBIT 9**
**112**

# EXHIBIT 10

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 14, 2012

OUR FILE NUMBER
905900-321

**VIA EMAIL**

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Dick:

　　　We are in receipt of your letter of September 4, 2012.  We disagree with every aspect of it and object to your false and improper assertions.  DC will file its motion.

　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　 /s/ Matthew T. Kline

　　　　　　　　　　　　Matthew T. Kline
　　　　　　　　　　　　of O'MELVENY & MYERS LLP

cc:    Daniel M. Petrocelli, Esq.
　　　　Defense Counsel

**EXHIBIT 10**
**113**

# EXHIBIT 11

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

October 3, 2012

Via E-Mail

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your August 30, 2012 letter, which rejected the more than reasonable proposal sent by Mr. Kendall in a letter dated August 24, 2012.

As an initial matter, your letter falsely states that Mr. Kendall "do[es] not and cannot defend" against the baseless accusations in DC's August 7, 2012 letter that defendants have engaged in a "years-long pattern of discovery misconduct." Mr. Kendall's August 24 letter makes quite clear that "each of [DC's] accusations has been ventilated at length in correspondence between the parties, and the majority of these accusations have been the subject of extensive motion practice before the Court and multiple Court rulings, many of which … were decided in defendants' favor."

After eight years of litigation between this case and *Siegel,* and over two years of discovery in this case alone, DC is at a loss to support its frivolous tort claims against its opposing counsel, so it now attempts to shift the focus of this case from the meritless claims in its complaint to false claims of discovery "misconduct." Your refusal to accept Mr. Kendall's reasonable proposal, which directly and fully addressed each and every purported concern you raised, demonstrates that DC and you have never had a sincere interest in resolving real issues, if any, but have trumped up and/or exaggerated purported discovery issues as an excuse to file an accusatory motion. DC's transparent motive – exemplified by your massive repetitive letters containing page after page of recycled false accusations and irrelevancies, and DC's drive for a "special master" to review every document and privilege log entry in eight years of litigation – is to exert leverage by improperly driving up defendants' litigation costs.

This is plain as day.

**EXHIBIT 11**
**114**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 8

Notably, all of the supposed "misconduct" charged by DC focuses on irrelevant offers to and correspondence with Michael Siegel, who did not file a termination notice and did not participate in Laura and Joanne Siegel's settlement negotiations with Warner/DC at issue, and therefore is not once mentioned in DC's 61-page complaint or amended complaint. Due to this underlying lack of relevance and the fact that the minimal number of documents at issue were produced to DC well prior to DC's filing deadlines, DC's hyperbolic claims of prejudice, sanctimonious rhetoric and cries for sanctions ring hollow.

We refute below (yet again) the baseless accusations DC has recycled throughout this case.

> **A.**     **The May 13, 2003 Letter**

As DC is aware from the stolen documents it received, the May 2003 letter was inadvertently mis-logged in the *Siegel v. Warner Bros. Entertainment Inc.* litigation as part of a fax transmission from Ms. Larson to Mr. Toberoff. *Cf.* 8/7 Letter at 7-8 (speculating, with no evidence that this not a "mistake").

Motion Practice: DC focuses on meet-and-confer sessions in December 2010-January 2011, but those concerned a number of purported issues, including the May 2003 letter. DC indicated in the meet and confer process (as it usually does) that it was moving ahead with a motion to compel, and offered no basis for compromise. As DC obviously intended to file its motion, regardless of the May 2003 letter, defendants properly decided to leave this issue, along with several others, for Magistrate Zarefsky to decide.

Notably, when DC made its motion covering numerous issues, defendants did not oppose production of the May 2003 letter on privilege grounds, as the letter had not been logged; nor did defendants deny the letter's existence. Magistrate Zarefsky denied in large part DC's motion (Docket No. 209), but as defendants did not oppose as to the May 2003 letter, he ordered that defendants either produce the letter or verify that it did not exist. Defendants promptly produced the May 2003 letter.

Thus, DC's claims that defendants in January-February 2011 "obstruct[ed] discovery" (8/7 Letter at 3-5) or made "numerous affirmative misstatements to DC and the Court" (8/7 Letter at 5) regarding the May 2003 letter are demonstrably false.

As pointed out by Mr. Kendall in his August 24 letter, DC mischaracterizes numerous straightforward statements at the parties' July 17, 2012 in-person meeting regarding DC's false charges. *See, e.g.,* DC's 8/7 letter at 4-5 (mischaracterizing Mr. Daum and Mr. Toberoff's comments regarding the May 13 letter), 6 (incorrectly referring to "Mr. Daum's recent suggestion … that Toberoff only found the May 2003 letter after Judge Zarefsky issued his [April 11, 2011] order"), 8 (pretending that statements in the January 8, 2011 letter "were a revelation"), 8 ( pretending "Mr. Toberoff claimed in our meeting the other day that a paralegal went through the underlying documents.").

**EXHIBIT 11**
**115**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 8

"Timeline" Allegations:  Contrary to DC's suggestions, Defendants' statements as to the inaccuracy and inadmissibility of the anonymous Timeline, written by a thief, are more than warranted.  First and foremost, the Timeline makes one false accusation after another against Mr. Toberoff based on hearsay, innuendo and outright fabrications, and after years of discovery by DC, there is no admissible evidence to support its self-serving conclusions, which contradict the great weight of admissible evidence.  Tellingly, even though DC has long been aware of the author of the Timeline, which it attached to its complaint, it has studiously avoided taking his deposition, preferring instead to rely on the Timeline's anonymous prejudicial rhetoric.

Second, even if the Timeline's false facts were true, the rambling Timeline does not and cannot "connect the dots" in support of its anonymous legal conclusions.

Third, the Timeline also purports to describe numerous documents that either (a) do not exist (*e.g.*, supposed communications or agreements with Ari Emanuel) or (b) do not exist as described (*e.g.*, there is no "July 5 letter" from Laura to Michael, although there is a July 5 draft of a letter sent at a later date that was logged).  DC's repeated accusations regarding this document have never held up.  *See* 8/7 Letter at 6 ("he took deliberate steps to hid [*sic*] the letter's existence"), 8 n.2 (DC's accusations against KBK based on this non-issue).

Alleged Prejudice:  DC certainly cannot claim prejudice in this case based on – at most – a few months of delay (from December 2010 to April 2011) in receiving the May 2003 letter, especially since no substantive rulings on the merits were made during that period.  The only pending non-discovery motions during this period were defendants' motion to dismiss and anti-SLAPP motion.  The May 2003 letter is irrelevant to the motions to dismiss, which necessarily addressed DC's pleadings (which, again, nowhere even mention Michael Siegel), and DC was allowed by the Court to file an "updated" anti-SLAPP opposition that featured thousands of pages of exhibits, *including the May 13 letter*, before the Court decided that motion.

Nor can DC claim prejudice because defendants "successfully" opposed DC's motions to compel (a) unredacted versions of the May 13 letter (when the redactions were of very minor marginalia), and (b) "all Michael-Laura Siegel-related correspondence."  8/7 Letter at 7.  Despite DC's repeated hyperbole on these issues, DC points to nothing in defendants' oppositions that was inaccurate.

Nor was the May 13, 2003 letter remotely relevant to the *Siegel* litigation.  The May 13 letter concerned an offer on behalf of Ari Emanuel to buy Michael Siegel's limited Superman interest. Numerous admissible documents were produced by the Siegels detailing this very negotiation. Yet, in the hundreds of pages of briefing DC filed with the parties' cross-motions for summary judgment in *Siegel*, DC/Warner never once mentioned this offer to Michael Siegel, or even Michael Siegel.

**EXHIBIT 11**
**116**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   4 of 8

DC's only theory of prejudice seems to be that, if it had the letter, it could have made the same baseless tortious interference claim based on its "billionaire" theory in the *Siegel* litigation. However, DC brought comparable interference arguments as part of its summary judgment motion in *Siegel*, and was entirely unsuccessful as the Court barely even acknowledged DC's irrelevant theories. *See Siegel v. Warner Bros. Entertainment Inc.*, 542 F. Supp. 2d 1098, 1136-39 (C.D. Cal. 2008).

At the absolute most, DC's "prejudice" consists of having to meet and confer and devote two pages of its largely unsuccessful 78-page discovery motion to the May 13, 2003 letter. Considering that litigation almost always involves discovery disputes, and the large numbers of unsuccessful discovery motions brought by DC in this litigation – many on utterly irrelevant topics (*e.g.*, Laura Siegel Larson's divorce proceedings) – that is no prejudice at all.

Finally, DC's repeated mischaracterization of the parties' general December 2010 discovery stipulation, signed by Magistrate Zarefsky, as "having waived all other objections to DC's document requests," does not transform routine discovery disputes in this case into a violation of this court order, as DC erroneously contends. 8/7 Letter at 5. *See, e.g., id.* at 5, 9. DC pressed the very same argument numerous times with Magistrate Judge Zarefksy, to no avail. *See, e.g.,* Docket No. 177 at 44; Docket No. 309.

### B.    The July 11, 2003 Letter

The July 11, 2003 letter was properly protected by the common-interest privilege between Laura Siegel and Michael Siegel, as it describes privileged matters of common legal interest between them (the statutory termination interest) and an attorney's advice related to such interest.

DC's entire three-page argument about the July 11, 2003 letter (8/7 Letter at 9-11) boils down to the following: Ms. Larson sent a copy of her July 11 letter, via facsimile, to her counsel, Mr. Toberoff. That facsimile was logged. DC repeatedly brought up the letter in this litigation and *Siegel*, and its arguments were consistently rejected by the courts, including Judge Wright, until Judge Wright, on October 24, 2011, reversed his prior order and Magistrate Judge Zarefsky, and ordered the release of the document, without opinion. Docket No. 336.

DC's complaint, in essence, is that: (1) the underlying July 11 letter was not separately logged; (2) defendants did not separately list the common-interest privilege on their initial logs, even though the common-interest privilege is an extension of the attorney-client privilege, and (3) when the issue was properly teed up for the Court, defendants openly directed the Court to that very log entry when discussing the July 11 letter and discussed why the common-interest privilege applied. None of this is improper, much less "horribly misleading" (8/7 Letter at 11) as you claim.

As to a "July 5 letter," DC's arguments about the "July 5, 2003" letter amount to claims that dated *drafts* of a letter sent by Laura Siegel Larson to her attorney are the equivalent of a "return

**EXHIBIT 11**
**117**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  5 of 8

letter to Michael" dated July 5 by her.  8/7 Letter at 11.  They are not.  DC then cites its arguments that a "July 5 letter could be misdated in the Timeline, or be found in a different form, such as a draft letter," but that "Toberoff continued to claim the July 5 letter, in whatever form, did not exist."  8/7 Letter at 11.  This is knowingly false.  What defendants stated was as follows:

> "July 5, 2003 Letter:  DC repeats its original arguments to this Court and its arguments in its motion for review rejected by Judge Wright.  As previously stated, **this purported July 5 letter from Laura Siegel to Michael Siegel does not exist <u>as described</u>**.  DC claims this letter exists based solely on a reference in the anonymous Timeline.  As Defendants previously pointed out, the Timeline describes numerous documents that do not exist:
>
> > *E.g.*, a purported (1) September-October 2003 letter with Ari Emanuel; (2) December 16, 2002 letter from Marc Toberoff and Ari Emanuel to Joanne Siegel and Laura Siegel Larson; and (3) July 5, 2003 letter from Laura Siegel to Michael Siegel.  As Defendants informed DC, they were unable to identify a document that matched either (1), (2) (although there was a December 16, 2002 letter from Marc Toberoff to Ari Emanuel, Joanne Siegel, and Laura Siegel Larson that was long ago produced to DC) or (3).
>
> Docket No. 160 at 71-72, n.26.  DC previously misrepresented this statement to the Court, and was called on it.  Now, it oddly dismisses this as a "footnote" and "indirect" (Mot. at 8), when Defendants' statement is perfectly clear.  **DC's motion now advocates that the Court order a vague search and production that goes far beyond the purported July 5 letter and <u>implicates privileged communications</u>.  For instance, "communications from June or July 2003 involving Michael Siegel, Don Bulson [Michael Siegel's attorney]," etc., or <u>a "draft" of [a] contemplated communication</u>.**  Mot. at 8-9.  DC thus argues that the alleged July 5 Letter may be completely different from what is described in the Timeline, the sole basis for DC's original motion.  There are many duly logged communications from this period.  See Docket Nos. 162-7, 162-8, Ex. W.  DC's motion for reconsideration on this point is both nonsensical and moot."

Docket No. 269 at 11-12 (emphases added).  Defendants thus accurately stated that the July 5 letter did not exist as described, and expressly referred to privileged communications (*e.g.*, "a draft") that were different from the letter as described in the Timeline.  DC misrepresents the record.  There was no "misrepresentation" (8/7 Letter at 11) by defendants at any point.

Lastly, DC's vague arguments about "drafts" of the July 11, 2003 letter (8/7 Letter at 11-13) are unsupported by any references to the record.  The only purported error DC can point to is that such drafts, which, like the July 11, 2003 letter itself, were faxed from Laura Siegel Larson to Marc Toberoff, were logged as part of such faxes, but not separately logged as "attachments."  8/7 Letter at 11-12, 13.  Yet, despite DC's repeated claims, in both this case and *Siegel*, that defendants' logs were insufficient for not separately listing "attachments," the Courts repeatedly

**EXHIBIT 11**
**118**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   6 of 8

upheld defendants' logs.  *See, e.g.,* Docket No. 209.  DC's real complaint seems to be that it lost numerous discovery motions.

Nor does the July 11, 2003 letter contain any "revelations" (8/7 Letter at 12) as DC pretends. DC avers that "the document confirms that Kevin Marks … told Toberoff and the Siegels that the Siegels 'had a deal with DC.'"  *Id.*  Kevin Marks testified to the same thing in the *Siegel* case and, on summary judgment in *Siegel*, DC presented Marks' testimony to the Court, which properly dismissed it as irrelevant.  DC's rhetoric that defendants have "ma[d]e arguments directly contrary to the letter" or that the letter "directly refutes key factual positions" (*id.* at 12, 13) is unsupported by any evidence.

C.    <u>**November 2, 2002 Letter/November 17, 2001 E-mail**</u>

The issues surrounding the November 2, 2002 letter from Michael Siegel to Laura Siegel and the November 17, 2001 e-mail from Mr. Toberoff to Michael Siegel were extensively examined in defendants' recent motion for reconsideration.  Docket No. 457.  In DC's motion for review it argued that privilege had been waived as to the November 2001 email based on the repeated, knowingly false assertion that "Michael's lawyers confirmed that they gave Toberoff a copy of the email six years ago."  Docket No. 455 at 1.  Defendants exposed this lie in their motion for reconsideration proving that (1) Renner Otto never said any such thing and (2) Renner Otto had sent Michael's paper files to Melvin Banchek, administrator of Michael's estate.  DC unwittingly demonstrated in its opposition that *it had known all along* from the testimony of Michael's lawyer, Don Bulson, and other evidence that Renner Otto had ***not*** sent Michael's paper files to Mr. Toberoff, as DC and its counsel had willfully misrepresented to Judge Wright.

This firm received paper files from Michael's estate in 2006 that were responsive to DC's particular subpoena requests to Renner Otto in the *Siegel* case.  The November 2001 email, however, was not present in such paper files, as consistently represented and testified to.  Despite DC's misrepresentations, the chain of custody over Renner Otto's paper files was twice broken before any such files were received by this firm.  DC has presented no competent evidence whatsoever that the paper files sent by Renner Otto to Mr. Banchek even contained the November 2001 email.  The only thing DC has ever pointed to is a casual 2012 e-mail sent by Josh Ryland (a litigator who neither represented Michael nor participated in the creation of Renner Otto's electronic archive ***six years ago***) suggesting that the paper files "should be the same" as their electronic archive.  Moreover, there is no evidence that even if the paper files sent to Mr. Banchek had been "the same" – which we do not know – all such paper files were sent to Mr. Toberoff's firm in connection with DC's subpoena requests in *Siegel*.  DC cannot point to the Court's July 16, 2012 order, without opinion (Docket No. 457), that DC solicited by outright misrepresentations, nor the Court's more-recent order denying defendants' motion for reconsideration without opinion (Docket No. 488) as a finding of any misconduct by defendants.

DC's hyperbole that the November 17, 2001 e-mail is "critical" (8/7 Letter at 16) is also absurd. DC's false assertion that the November 17, 2001 e-mail "showed that Toberoff had contacted the

**EXHIBIT 11**
**119**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  7 of 8

Siegel family well before he claimed to have done so in SLAPP briefs you filed" (8/7 Letter at 16) is based on a willful misreading of those briefs, which clearly used the term "Siegel family" to describe Mr. Toberoff's clients Laura and Joanne Siegel, not the third party Michael, who was a bystander. DC has repeatedly engaged in such misleading word games, even where the term "Siegels" has been *expressly* defined by defendants as solely referring to Laura and Joanne Siegel. *E.g.,* Docket No. 455 at 2. This sort of intentionally misleading gamesmanship has become emblematic of DC's and its counsel's appalling litigation tactics in this case.

As DC well knows, Laura and Joanne Siegel served and filed Superman notices of termination, not Michael. And Laura and Joanne, not Michael, conducted the settlement negotiations with DC that it claims Mr. Toberoff interfered with. Michael is immaterial to DC's tortious interference, and for this reason, Michael Siegel, despite his last name, nowhere appears in DC's lengthy complaint. No amount of rhetoric or wordplay changes this reality. DC's newfound arguments regarding Michael Siegel are, for the most part, an irrelevant sideshow designed to mask DC's inability to support its frivolous claims.

Moreover, the November 17, 2001 email, as held by Magistrate Zarefsky, after reviewing it *in camera,* is a clearly privileged communication regarding potential legal representation and advice as to Michael's rights (Docket No. 451), undermining DC's specious tactical theme that Mr. Toberoff, its opposing litigation counsel for eight years, was acting as a "Hollywood businessman," not as an attorney.

  **D.**  <u>Other Issues</u>

*Billionaire Investor*: Despite DC's unrelenting discovery in this case, DC still has nothing to substantiate its false allegation that Mr. Emanuel made a fraudulent offer to the Siegels, which, like DC's "billionaire investor" sideshow, is contrary to the testimony of every relevant witness. The very documents DC points to as support for its "billionaire" allegations, such as the November 2, 2002 letter from Laura Siegel Larson to Michael Siegel squarely contradict DC's ultimate claim of tortious interference, and demonstrate that DC derailed its own settlement negotiations with the Siegels long before Mr. Emanuel's $15 million offer in August 2002, rendering DC's "billionaire" allegations immaterial. Notwithstanding this, as Laura set forth in her recent declaration, Mr. Toberoff made no representations or promises about a "billionaire investor." Docket No. 466-2. This is consistent with the sworn testimony of Kevin Marks, the Siegels' former counsel to whom the August 2002 offer was conveyed. Docket No. 312-2.

*Renner Otto Bills*: DC's claim that it was "forced" to "incur needless costs to obtain Renner Otto's bills" is also meritless, as Magistrate Zarefsky, in spite of DC's erroneous arguments and after *in camera* review, upheld many/most of the privilege claims as to Renner Otto's bills and specifically approved multiple redactions of such bills so as to preserve privilege. Docket No. 451. As to DC's claim that such entries "confirm that Toberoff spoke to Bulson in November *2001*" (8/17 Letter at 16), that is hardly a "revelation" given that defendants disclosed Mr.

**EXHIBIT 11**
**120**

**TOBEROFF & ASSOCIATES, P.C.**

October 3, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   8 of 8

Toberoff's communications with Michael Siegel *during that same time period* in their log of the Bulson electronic archive.

*Failure to List Ari Emanuel*:  DC also complains about the inadvertent failure to list Mr. Emanuel as "cc'd" on two short **scheduling e-mails** with the U.S. Attorney's Office that are of no moment.  This supposedly "stark example" is *de minimis*.  DC's contention that it "could have shown only how much more baseless defendants' common-interest claims were" is nonsensical given the inconsequential content of these two e-mails.  8/7 Letter at 16-17.

*Other Privilege Claims*:  DC complains that Mr. Toberoff, in 2006, in the *Siegel* litigation, asserted the common interest privilege on behalf of Laura Siegel Larson, regarding certain communications with Michael Siegel's attorney, Don Bulson, and that an Ohio Court ultimately rejected the privilege.  DC then rhetorically asked whether privilege was asserted in "good faith." 8/7 Letter at 17-18.  DC points to ***nothing*** to show that the privilege assertion was not made in good faith, or that the documents were inaccurately described to the Ohio Court.  DC misleadingly neglects to mention that the same Ohio Court denied DC's motion to compel and *upheld* Mr. Toberoff's assertion of the common interest privilege as to the vast majority of the communications between Laura and Michael.  *See* Docket No. 163, Ex. C.

DC's August 7, 2012 letter contains numerous further misstatements, *non sequiturs*, and erroneous contentions.  For example, DC repeatedly complains that KBK did not "join" briefs (*see, e.g.*, 8/7 Letter at 3, 14) that were directed at defendants that KBK does not represent.

While we have endeavored to correct many of DC's misstatements, mischaracterizations of the record and misleading omissions in its overblown 27-page letter, such are too numerous and convoluted to address all of them.  Accordingly, any failure to address any such misstatement or mischaracterization should not be construed as defendants' assent.

DC's pattern and practice of manufacturing overblown discovery disputes is nothing more than a transparent attempt to drive up litigation costs and shift the focus away from DC's meritless, dying claims.  DC's and its counsel's willfully misleading litigation tactics are highly improper, and will be brought to the Court's attention.  All of defendants' rights and remedies are reserved.

Very truly yours,

Keith Adams

**EXHIBIT 11**
**121**

# EXHIBIT 12

**From:** Richard Kendall [mailto:rkendall@kbkfirm.com]
**Sent:** Monday, June 25, 2012 2:53 PM
**To:** Tokoro, Jason; Kline, Matthew
**Cc:** Petrocelli, Daniel; Seto, Cassandra; 'David Harris'; 'Marc Toberoff'; 'Mark T. Drooks'; Laura Brill; Nicholas Daum; Pablo Arredondo
**Subject:** RE: DC Comics v. Pacific Pictures Corp.

Jason:

First, as you request, Mr. Toberoff will provide you with supplemental interrogatory responses by June 27.

Second, Mr. Kline's interpretation of the rights and responsibilities of co-counsel (see the attached June 18, 2012 email you sent on Mr. Kline's behalf) is mistaken. As emphasized by the very case on which Mr. Kline relies, "California law generally allows an attorney of record to associate another attorney and to divide the duties of conducting the case." *Cole v. Patricia A. Meyer & Associates, APC*, No. B227712, 2012 WL 2106364, at *14 (Cal. Ct. App. June 8, 2012); *see also Abrams v. Se. Mun. Bonds Inc.*, 138 F. App'x 88, 91 (10th Cir. 2005) (describing co-counsel agreement establishing "the division of responsibilities" between firms). Mr. Kline, as our opposing counsel, has no right whatsoever to interfere with defendants' apportionment of the labor of their attorneys in defending this matter. None of the authority he cites—all of which involves patently distinguishable situations—even suggests such a right. Both Mr. Toberoff's firm and our law firm are well aware of our obligations and responsibilities as co-counsel.

As you and Mr. Kline have long been aware, Mr. Toberoff has taken the lead in responding to discovery directed at him or his affiliated companies, has argued on his own behalf and on behalf of those companies before the Court, and has conferred with you many times on their behalf concerning discovery issues. He is clearly entitled to take such steps, as both the party who has been sued and an attorney in this matter, and you waived any argument to the contrary (if such an argument ever existed) many months ago. It was, of course, the decision of your client to take the unusual step of suing its opposing counsel during ongoing litigation. Mr. Toberoff is entitled to take all appropriate steps—including in the allocation of work between his firm and Kendall Brill & Klieger—to reduce the financial burdens that your tactics have forced him to endure.

If there is a motion that your client wishes to make with respect to the allocation of responsibilities between Mr. Toberoff's firm and Kendall Brill & Klieger, please advise defendants what that motion is, the grounds for the motion, what relief your client would be

**EXHIBIT 12**
**122**

seeking from the Court, and any statutes, rules, and/or case authorities that support said motion that you wish to bring to our attention. Until you specify the motion you intend to make, we do not believe that you are entitled to force Mr. Toberoff to incur the expense of a meet and confer session on this issue. In any event, I have appointments and conference calls scheduled for this afternoon at 4 p.m., and so I would be unavailable in any event.

Third, as we have repeatedly represented to you, this law firm has thoroughly checked our files in response to the Court's direction to produce copies of communications with the United States Attorney's Office related to the Timeline, and all such communications have been produced.

Finally, we reject your characterization of Mr. Toberoff's conduct. All rights and remedies are expressly reserved.

Kind regards,

Richard B. Kendall

**⟨⟨ Kendall Brill Klieger**

**Richard B. Kendall**
Kendall Brill & Klieger LLP
Direct: (310) 272-7900

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

---

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Monday, June 25, 2012 1:29 PM
**To:** Pablo Arredondo
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; 'David Harris'; 'Marc Toberoff'; 'Mark T. Drooks'; Richard Kendall; Laura Brill; Nicholas Daum
**Subject:** RE: DC Comics v. Pacific Pictures Corp.

Pablo,

You once again removed Mr. Kendall from the email exchange. We have copied him here since Mr. Kendall must meaningfully participate in this case and can't not to come to these meetings.

We still need supplemental interrogatory responses concerning Mr. Kendall's communications with the U.S. Attorneys' office, which we requested over two weeks ago and were due long before. Please confirm defendants will provide the supplemental responses by Wednesday, June 27.

Also, neither you nor Mr. Kendall has provided us with a response to our June 13 and June 18 emails concerning Mr. Kendall's legal obligations in this case. We will need to meet and confer on

**EXHIBIT 12**
**123**

the issues identified in our June 13 and June 18 emails today, after we are finished meeting and conferring with Mr. Drooks.

We can and should also confer on the partial summary judgment motion that DC intends to file, which we notified defendants of last week.

Best and thanks,

Jason

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Monday, June 25, 2012 11:42 AM
**To:** Tokoro, Jason
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; 'David Harris'; 'Marc Toberoff'; 'Mark T. Drooks'
**Subject:** RE: DC Comics v. Pacific Pictures Corp.

Counsel for defendants will attend the meeting.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
{t} 310.246.3333
{f} 310.246.3101

This message and any attached documents may contain information from Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** Mark T. Drooks [mailto:mtd@birdmarella.com]
**Sent:** Monday, June 25, 2012 9:16 AM
**To:** Tokoro, Jason
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Keith Adams; Pablo Arredondo; David Harris; Richard Kendall; Laura Brill; Nicholas Daum; Marc Toberoff
**Subject:** RE: DC Comics v. Pacific Pictures Corp.

That's fine; please let me know if that time is inconvenient for the defendants.

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Friday, June 22, 2012 5:57 PM
**To:** Mark T. Drooks
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Keith Adams; Pablo Arredondo; David Harris; Richard Kendall; Laura Brill; Nicholas Daum; Marc Toberoff

**EXHIBIT 12**
**124**

**Subject:** RE: DC Comics v. Pacific Pictures Corp.

Mark,

We propose meeting at our offices on Monday, June 25, at 4:00 p.m.  Our offices are located at 1999 Avenue of the Stars, Suite 700, Los Angeles, California 90067.  As we stated previously, defendants and their counsel—against whom we will direct any motion as well—are obviously invited to participate in-person or by phone.

Best,

Jason

**From:** Mark T. Drooks [mailto:mtd@birdmarella.com]
**Sent:** Friday, June 22, 2012 3:18 PM
**To:** Tokoro, Jason
**Subject:** RE: DC Comics v. Pacific Pictures Corp.

Do you have a time when you want to meet on Monday afternoon?

**From:** Tokoro, Jason [mailto:jtokoro@OMM.com]
**Sent:** Thursday, June 21, 2012 5:34 PM
**To:** Mark T. Drooks
**Cc:** Petrocelli, Daniel; Kline, Matthew; Seto, Cassandra; Keith Adams; Pablo Arredondo; David Harris (dharris@ipwla.com); Richard Kendall; Laura Brill; Nicholas Daum; Marc Toberoff
**Subject:** RE: DC Comics v. Pacific Pictures Corp.

Counsel,

Please see the attached correspondence sent on behalf of Matthew T. Kline.

Very truly yours,
**Jason H. Tokoro**
**O'Melveny & Myers LLP - Century City**
1999 Avenue of the Stars, Suite 700
Los Angeles, California  90067
Direct Dial:  (310) 246-6707
Fax:  (310) 246-6779
Email: jtokoro@omm.com
*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

 please consider the environment - do you really need to print this email?

**EXHIBIT 12**
**125**

**From:** Lisa Lambrix [mailto:lak@birdmarella.com] **On Behalf Of** Mark T. Drooks
**Sent:** Thursday, June 21, 2012 3:02 PM
**To:** Tokoro, Jason
**Subject:** DC Comics v. Pacific Pictures Corp.

I attach my letter of today's date.

**Mark T. Drooks**
O: 310.201.2100  |  F:  310.201.2110  |  E: mtd@birdmarella.com

**Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
www.birdmarella.com

**EXHIBIT 12**
**126**

# EXHIBIT 13

**Attachments:**     DC v PPC Production 6.28.2012 EOMS 183-216.pdf

**From:** Pablo Arredondo [mailto:parredondo@ipwla.com]
**Sent:** Thursday, June 28, 2012 5:34 PM
**To:** Seto, Cassandra
**Cc:** Tokoro, Jason; 'Marc Toberoff'; 'David Harris'
**Subject:** DC v. PPC

Counsel:

Please find attached documents Bates-stamped EOMS 183-216, comprised of the redacted
Bulson privilege log entries and the November 2, 2002 Laura Siegel letter, per the Court's
June 21, 2012 Order.

Pablo

Pablo D. Arredondo
Toberoff & Associates, P.C.
22337 Pacific Coast Highway, #348
Malibu, California 90256
(t) 310.246.3333
(f) 310.246.3101

This message and any attached documents may contain information from
Toberoff & Associates, P.C. that is confidential and/or privileged. If you are not the intended recipient,
you may not read, copy, distribute or use this information. If you have received this transmission in
error, please notify the sender immediately by reply e-mail and then delete this message.

**EXHIBIT 13**
**127**

Received    May-01-12  04:35pm    From-    To-    Page 021

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                    Pre-bill Worksheet                                    Page   720

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 10/24/2001 20643 | DWB Service _____ letter to Mike Siegel | 275.00 | 3.50 | 962.50 | Billable |
| 10/25/2001 20697 | DWB Service Tel. conf. with Mr. Siegel, | 275.00 | 1.25 | 343.75 | Billable |
| 10/29/2001 20720 | DWB Service Confer with John Del Col | 275.00 | 0.75 | 206.25 | Billable |
| 10/30/2001 20724 | DWB Service Meeting with Mike Siegel | 275.00 | 1.00 | 275.00 | Billable |

Total: October 2001                                                9.10            $2,502.50

Date: November 2001
11/21/2001
24441

| 11/27/2001 24457 | DWB Service Review email from Mike Siegel, tel. conf. with Mike Siegel, tel. conf. with Mark Toberoff | 275.00 | 1.20 | 330.00 | Billable |

1/29/2001
24467

Total: November 2001                                               2.50             $770.00

Date: December 2001
| 12/5/2001 27632 | DWB Service Place call to Kevin Marks | 275.00 | 0.10 | 27.50 | Billable |

Total: December 2001                                               0.10              $27.50

Date: January 2002
1/23/2002
30796

**EXHIBIT 13**
**128**

EOMS 00183
Apr.29.2012  04:06 PM

Received    May-01-12 04:35pm    From-    To-    Page 022

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                    Pre-bill Worksheet                                      Page    721

SIEG.2G0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| Total: January 2002 | | | 0.35 | | $96.25 |
| Date: February 2002 | | | | | |
| 2/11/2002 DWB 35125 | Service Tel. conf. with Marc Toberoff, ▮▮▮ | 275.00 | 1.45 | 398.75 | Billable |
| 2/12/2002 DWB 35128 | Service Tel. conf. with Mr. Siegel | 275.00 | 0.70 | 192.50 | Billable |
| 2/23/2002 35200 | ▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | |
| 2/25/2002 DWB 35213 | Service Tel. conf. with Steve Webster, prepare for meeting, meeting with Mike Siegel | 275.00 | 6.75 | 1,856.25 | Billable |
| Total: February 2002 | | | 15.90 | | $4,372.50 |
| Date: March 2002 | | | | | |
| 3/8/2002 DWB 37015 | Service Tel. conf. with Kevin Marks | 275.00 | 1.50 | 412.50 | Billable |
| 3/12/2002 37049 | ▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | |
| 3/14/2002 DWB 37158 | Service Tel. conf. with Mr. Siegel, ▮▮▮ | 275.00 | 0.45 | 123.75 | Billable |
| 3/16/2002 DWB 37181 | Service Tel. conf. with Ms Siegel | 275.00 | 0.35 | 96.25 | Billable |
| 3/22/2002 DWB 37342 | Service Tel. conf. with Marc Toberoff | 275.00 | 0.70 | 192.50 | Billable |
| Total: March 2002 | | | 3.40 | | $935.00 |

**EXHIBIT 13**
**129**

Apr. 29 2012 04:06 PM    EOMS 00184

Received May-01-12 04:36pm    From-    -To-    Page 023

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    722

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date<br>ID<br>Task | Lawyer | Rate<br>Markup % | Hours<br>DNB Time | Amount<br>DNB Amt | Total |
|---|---|---|---|---|---|

**Date: May 2002**

| | | | | | |
|---|---|---|---|---|---|
| 5/8/2002 DWB<br>44646 Service<br>Prepare letter to Marks, email to Mike Siegel | | 290.00 | 0.80 | 232.00 | Billable |
| 5/9/2002 DWB<br>44654 Service<br>Prepare report | | 290.00 | 0.75 | 217.50 | Billable |
| 5/10/2002 DWB<br>44660 Service<br>Revise and sent letter to Marks, reply to correspondence from Mr. Siegel | | 290.00 | 1.20 | 348.00 | Billable |
| 5/20/2002 DWB<br>44954 Service<br>Review and reply to email from Mike Siegel | | 290.00 | 0.40 | 116.00 | Billable |
| 5/21/2002 DWB<br>44866 Service<br>Email report to Mike Siegel | | 290.00 | 0.20 | 58.00 | Billable |
| 5/22/2002 DWB<br>44874 Service<br>Letter to attorney for DC Comics re medical insurance | | 290.00 | 0.30 | 87.00 | Billable |
| 5/23/2002 DWB<br>44891 Service<br>Tel. conf. with Kevin Marks | | 290.00 | 0.40 | 116.00 | Billable |

Total  May 2002

4.05                    $1,174.50

**Date: July 2002**

| | | | | | |
|---|---|---|---|---|---|
| 7/8/2002 DWB<br>51678 Service<br>Tel. conf. with Mike Siegel | | 290.00 | 0.30 | 87.00 | Billable |
| 7/15/2002<br>51740 | | | | | |
| 7/19/2002 DWB<br>51767 Service    tel. conf. with Mike Siegel | | 290.00 | 3.00 | 870.00 | Billable |
| 7/30/2002 DWB<br>51850 Service<br>Tel. conf. with Mark Tobaroff, tel. conf. with Kevin Marks | | 290.00 | 0.90 | 261.00 | Billable |

**EXHIBIT 13**
**130**

EOMS 00185
Apr.29.2012 04:06 PM

Received  May-01-12  04:35pm    From-    -To-    Page 025

11/22/2007                                Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                          Pre-bill Worksheet                                          Page   724

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| 9/24/2002 DWB<br>59787 Service<br>Email to Marks re status, review email from Mike Siegel | | 290.00 | 0.40 | 116.00 | Billable |
| 9/26/2002 DWB<br>59800 Service<br>Tel. conf. with Kevin Marks, tel. conf. with Mike Siegel | | 290.00 | 1.10 | 319.00 | Billable |
| 9/27/2002 DWB<br>59808 Service<br>Review letters from Joanne Siegel, tel. conf. with Mike Siegel | | 290.00 | 1.30 | 377.00 | Billable |
| 9/29/2002 DWB<br>59831 Service<br>Review letter from Laura Siegel | | 290.00 | 0.35 | 101.50 | Billable |

Total: September 2002                                                        6.05                    $1,754.50

Date: October 2002
10/1/2002
62797                                        ████████████████████████████████████████

| 10/5/2002 DWB<br>62831 Service<br>Meeting with Mike Siegel | | 290.00 | 2.25 | 652.50 | Billable |
| 10/7/2002 DWB<br>62840 Service<br>Mike Siegel | | 290.00 | 1.40 | 406.00 | Billable |
| 10/29/2002 DWB<br>63032 Service<br>Meeting with Mike Siegel | | 290.00 | 1.00 | 290.00 | Billable |

Total: October 2002                                                         6.65                    $1,928.50

Date: November 2002
| 11/11/2002 DWB<br>65290 Service   ████████ place call to Toberoff | | 290.00 | 0.40 | 116.00 | Billable |
| 11/19/2002 DWB<br>65347 Service<br>Tel. conf. with Mark Toberoff | | 290.00 | 1.00 | 290.00 | Billable |

EXHIBIT 13
131

PAGE   25/34    Apr-29 2012 04:07 PM    EOMS 00186

Page 026          -oT-          -morᖷ          Mq8E:ÞO  ℨ⊥−⊥O−ɣɐM  bɘvɩɘɔɘᴚ

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                    Pre-bill Worksheet                                    Page    725

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| · 1/25/2002 65409 | ██████████████████████████████ | | | | |
| Total· November 2002 | | | 1.70 | | $493.00 |
| **Date: January 2003** | | | | | |
| 1/15/2003 DWB 71840 Service | Review file, correspondence with Mr. Siegel | 290.00 | 0.40 | 116.00 | Billable |
| 1/16/2003 DWB 71853 Service | Email to Toberoff, review and reply to email from Mike Siegel | 290.00 | 0:35 | 101.50 | Billable |
| 1/22/2003 71912 | ██████████████████████████████ | | | | |
| 1/23/2003 DWB 71923 Service | Tel. conf. with Marc Toberoff | 290.00 | 0.60 | 174.00 | Billable |
| 1/24/2003 DWB 71947 Service | Tel. conf. with Marc Toberoff | 290.00 | 0.50 | 145.00 | Billable |
| 1/28/2003 DWB 71978 Service | Legal research, report to Mike Siegel | 290.00 | 1.00 | 290.00 | Billable |
| 1/29/2003 DWB 71991 Service | Tel. conf. with Mike Siegel | 290.00 | 0.60 | 174.00 | Billable |
| Total· January 2003 | | | 9.45 | | $2,740.50 |
| **Date: March 2003** | | | | | |
| 3/4/2003 DWB 78629 Service | Tel. conf. with Marc Toberoff | 290.00 | 0.45 | 130.50 | Billable |

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:4* AM                                   Pre-bill Worksheet                          Page   726

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| Total: March 2003 | | | 0.45 | | $130.50 |
| **Date: April 2003** | | | | | |
| 4/4/2003 81944 | DWB Service Tel. conf. with Marc Toberoff | 305.00 | 0.35 | 106.75 | Billable |
| 4/14/2003 81994 | | | | | |



| 4/15/2003 82001 | DWB Service Reply to email from Mike Siegel | 305.00 | 0.25 | 76.25 | Billable |
| Total: April 2003 | | | 2.30 | | $701.50 |
| **Date: May 2003** | | | | | |
| 5/2/2003 84972 | DWB Service Tel. conf. with Marc Toberoff | 305.00 | 0.30 | 91.50 | Billable |
| 5/7/2003 85003 | | | | | |
| 5/8/2003 85007 | DWB Service Tel. conf. with Steve Webster, report to Mr. Siegel | 305.00 | 0.40 | 122.00 | Billable |
| 5/12/2003 85044 | | | | | |
| Total: May 2003 | | | 1.90 | | $579.50 |
| **Date: June 2003** | | | | | |
| 6/3/2003 88053 | DWB Service Tel. conf. with Toberoff re offer for rights | 305.00 | 0.40 | 122.00 | Billable |



11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    727

SIEG ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 6/10/2003 88115 | DWB | | | | |
| 6/17/2003 88176 | | | | | |
| 6/18/2003 88185 | | | | | |
| 6/19/2003 88194 | | | | | |
| 6/23/2003 88203 | DWB Service Report to Mr. Siegel | 305.00 | 0.30 | 91.50 | Billable |
| Total: June 2003 | | | 2.90 | | $884.50 |
| Date: July 2003 | | | | | |
| 7/14/2003 92810 | | | | | |
| 7/21/2003 92834 | DWB Service Tel. conf. with Marc Toberoff | 305.00 | 0.40 | 122.00 | Billable |
| Total: July 2003 | | | 1.80 | | $549.00 |
| Date: August 2003 | | | | | |
| 8/11/2003 94820 | | | | | |
| Total: August 2003 | | | 0.60 | | $163.00 |

EXHIBIT 13
134

EOMS 00189

Received    May-01-12   04:36pm    From-    -To-    Page 030



*LEGAL RESEARCH*

11/22/2007
3:41 AM

Renner, Otto, Boisselie, & Sklar, LLP
Pre-bill Worksheet

Page   729

SIEG ZG0101: Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| 4/6/2004 119416 | | | | | |
| 4/12/2004 119417 | | | | | |
| 4/15/2004 119418 | | | | | |
| 4/16/2004 119419 | | | | | |
| 4/19/2004 119421 | | | | | |
| 4/20/2004 119422 | | | | | |
| Total  April 2004 | | | 18.70 | | $1,840.50 |

**Date: May 2004**

| 5/10/2004 123457 | DWB Service | 315.00 | 0.30 | 94.50 | Billable |
|---|---|---|---|---|---|
| | Tel. conf. with Mike Siegel | | | | |
| Total  May 2004 | | | 0.30 | | $94.50 |

**Date: June 2004**

| 6/3/2004 127249 | DWB Service | 315.00 | 0.60 | 189.00 | Billable |
|---|---|---|---|---|---|
| | Tel. conf. with Marc Toberoff | | | | |
| 6/8/2004 127267 | DWB Service | 316.00 | 0.60 | 189.00 | Billable |
| | Review and reply to emails from Mr. Siegel and voice mail message from Mr. Toberoff | | | | |
| 6/21/2004 127366 | DWB Service | 315.00 | 3.40 | 1,071.00 | Billable |
| | Review and reply to email, prepare for meeting , meeting with Mr. Siegel | | | | |

**EXHIBIT 13**
135

EOMS 00190
Apr. 29 2012 04:08 PM

Received    May-01-12  04:36pm    From-    -To-    Page 031

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                    Pre-bill Worksheet                              Page   730

SIEG ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Total: June 2004 | | | 4.60 | | $1,449.00 |
| Date: July 2004 | | | | | |
| 7/6/2004 DWB | | 315.00 | 0.10 | 31.50 | Billable |
| 130901 Service | Place call to Toberoff | | | | |
| Total: July 2004 | | | 0.10 | | $31.50 |
| Date: August 2004 | | | | | |
| 8/2/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 134042 Service | Forward estate papers to Steve Webster | | | | |
| Total: August 2004 | | | 0.30 | | $94.50 |
| Date: September 2004 | | | | | |
| 9/30/2004 DWB | | 315.00 | 0.60 | 189.00 | Billable |
| 138716 Service | Tel. conf. with Marc Toberoff re purchase offer | | | | |
| Total: September 2004 | | | 0.60 | | $189.00 |
| Date: October 2004 | | | | | |
| 10/5/2004 DWB | | 315.00 | 0.90 | 283.50 | Billable |
| 141956 Service | Review file, prepare report, email to Mike Siegel | | | | |
| 10/11/2004 DWB | | 315.00 | 0.40 | 126.00 | Billable |
| 141993 Service | Tel. conf. with Marc Toberoff re offer | | | | |
| 10/13/2004 DWB | | 315.00 | 0.80 | 252.00 | Billable |
| 142008 Service | ████████ tel. confs. with Marc Toberoff | | | | |
| 10/27/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 142106 Service | Tel. conf. with Marc Toberoff | | | | |
| 10/28/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 142122 Service | Tel. conf. with Mike Siegel | | | | |

**EXHIBIT 13**

**136**

EOMS 00191

Received   May-01-12  04:36pm       From-        -To-              Page 032

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                    Pre-bill Worksheet                                    Page   731

SIEG.ZG0101:Mr. Mike Siegel (continued)

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---------|-------------|---------------|----------------|----------------|-------|
| Total: October 2004 | | | 2.70 | | $850.50 |

Date: November 2004
  11/4/2004
    145809

  11/12/2004
    145666

| | | | | | |
|---------|-------------|---------------|----------------|----------------|-------|
| Total: November 2004 | | | 2.40 | | $756.00 |
| Date: December 2004 | | | | | |
| 12/6/2004 DWB | | 315.00 | 0.30 | 94.50 | Billable |
| 147974 Service | Review and reply to email from Mike Siegel | | | | |
| Total December 2004 | | | 0.30 | | $94.50 |
| Date: February 2005 | | | | | |
| 2/17/2005 DWB | | 315.00 | 0.50 | 157.50 | Billable |
| 155843 Service | Tel. conf. with Marc Toberoff | | | | |
| Total: February 2005 | | | 0.50 | | $157.50 |
| Date: May 2005 | | | | | |
| 5/8/2005 DWB | | 330.00 | 0.30 | 99.00 | Billable |
| 165782 Service | Review and reply to email from Mike Siegel | | | | |
| Total: May 2005 | | | 0.30 | | $99.00 |
| Date: July 2005 | | | | | |
| 7/25/2005 DWB | | 330.00 | (0.50) | 165.00 | Billable |
| 173249 Service | Review pleadings schedule and request copies | | | | |
| Total: July 2005 | | | 0.50 | | $165.00 |

Received May-01-12 04:36pm   From-   To-   Page 033

11/22/2007
3:41 AM

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page   732

SIEG ZG0101:Mr. Mike Siegel (continued)          *Resonum*

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| **Date: August 2005** | | | | | |
| 8/2/2005 176556 | | | | | |
| 8/3/2005 176573 | | | | | |
| Total August 2005 | | | 14.00 | | $1,400.00 |
| **Date: September 2005** | | | | | |
| 9/30/2005 180768 | KMG Service | 100.00 | 0.80 | 80.00 | Billable |
| | Created Motion to Intervene. | | | | |
| Total September 2005 | | | 0.80 | | $80.00 |
| **Date: October 2005** | | | | | |
| 10/3/2005 184450 | KMG Service | 100.00 | 1.00 | 100.00 | Billable |
| | Created Motion to Intervene. | | | | |
| 10/4/2005 184489 | KMG Service | 100.00 | 1.00 | 100.00 | Billable |
| | Created Motion to Intervene. | | | | |
| 10/12/2005 184524 | KMG Service | 100.00 | 1.00 | 100.00 | Billable |
| | Created Motion to Intervene. | | | | |
| 10/31/2005 184158 | DWB Service | 330.00 | 1.90 | 627.00 | Billable |
| | Tel conf. with Marc Toberoff, meeting with Mike Siegel | | | | |
| Total October 2005 | | | 4.90 | | $927.00 |
| **Date: November 2005** | | | | | |
| 11/2/2005 185612 | KMG Service | 100.00 | 1.80 | 180.00 | Billable |
| | Created Motion to Intervene. | | | | |

**EXHIBIT 13**

138

EQMS 00193

**Renner, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3805 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  November 30, 2001

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| | | | $275.00/hr | |
| 11/27/2001 | DWB | Review email from Mike Siegel, tel. conf. with Mike Siegel, tel. conf. with Mark Toberoff | 1.20 | 330.00 |
| 11/29/2001 | | | $275.00/hr | |
| | | | $275.00/hr | |
| | For professional services rendered | | **2.80** | **$770.00** |

**EXHIBIT 13**

**139**



## Reiner, Otto, Boisselle, & Sklar, LLP

The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending July 31, 2002

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|          |     |                                                                        | Hrs/Rate              | Amount      |
|----------|-----|------------------------------------------------------------------------|-----------------------|-------------|
| 7/8/2002 | DWB | Tel. conf. with Mike Siegel                                            | 0.30<br>$290.00/hr    | 87.00       |
| 7/15/2002 |     |                                                                       |                       |             |
| 7/19/2002 |     |                                                                       | $290.00/hr            |             |
| 7/30/2002 | DWB | Tel. conf. with Mark Toberoff, tel. conf. with Kevin Marks            | 0.90<br>$290.00/hr    | 261.00      |
| 7/31/2002 | DWB | Review statements and outstanding charges, confer with Accountant     | 0.75<br>$290.00/hr    | 217.50      |
|          |     | For professional services rendered                                     | 5.45                  | $1,580.50   |

**EXHIBIT 13**
**140**
**EOMS 00195**

 

# Rer____r, Otto, Boisselle, & Sklar, LLP

The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44105

## For Period Ending November 30, 2002

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  | Hrs/Rate | Amount |
|---|---|---|
| 11/11/2002  DWB  Review Siegel letter, place call to Toberoff | 0.40<br>$290.00/hr | 116.00 |
| 11/19/2002  DWB  Tel. conf. with Mark Toberoff | 1.00<br>$290.00/hr | 290.00 |
| 11/26/2002 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 0.30<br>$290.00/hr | 87.00 |
| For professional services rendered | 1.70 | $493.00 |

**EXHIBIT 13**

**141**

**EOMS 00196**



### Re̶er, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

#### For Period Ending  January 31, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 1/15/2003 DWB | Review file, correspondence with Mr. Siegel | | 0.40 $290.00/hr | 116.00 |
| 1/16/2003 DWB | Email to Toberoff, review and reply to email from Mike Siegel | | 0.35 $290.00/hr | 101.50 |
| 1/22/2003 | ███████████████████████████████ | | | |
| 1/23/2003 DWB | Tel. conf. with Marc Toberoff | | 0.60 $290.00/hr | 174.00 |
| 1/24/2003 DWB | Tel. conf. with Marc Toberoff | | 0.50 $290.00/hr | 145.00 |
| 1/28/2003 DWB | Legal research, report to Mike Siegel | | 1.00 $290.00/hr | 290.00 |
| 1/29/2003 DWB | Tel. conf. with Mike Siegel | | 0.60 $290.00/hr | 174.00 |
| | For professional services rendered | | 9.45 | $2,740.50 |

**EXHIBIT 13**
**142**

EOMS 00197

Reir, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

## For Period Ending March 31, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  | Hrs/Rate | Amount |
|---|---|---|
| 3/4/2003 DWB  Tel. conf. with Marc Toberoff | 0.45<br>$290.00/hr | 130.50 |
| For professional services rendered | 0.45 | $130.50 |

**EXHIBIT 13**

143

EOMS 00198



### Ren...r, Otto, Boisselle, & Sklar, LLP

The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending April 30, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 4/4/2003 DWB | Tel. conf. with Marc Toberoff | 0.35<br>$305.00/hr | 108.75 |
| 4/14/2003 | | | |
| 4/15/2003 DWB | Reply to email from Mike Siegel | 0.25<br>$305.00/hr | 76.25 |
| | For professional services rendered | 2.30 | $701.50 |

**EXHIBIT 13**
**144**

EOMS 00199



### Re___r, Otto, Boisselle, & Sklar, LLP
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

#### For Period Ending May 31, 2003

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| ❧ | 5/2/2003 | DWB  Tel. conf. with Marc Toberoff | 0.30<br>$305.00/hr | 91.50 |
| ❧ | 5/7/2003 |  |  |  |
|  | 5/8/2003 | DWB  Tel. conf. with Steve Webster, report to Mr. Siegel | 0.40 | 122.00 |
| ❧ | 5/12/2003 |  |  |  |
|  |  | For professional services rendered | 1.90 | $579.50 |

**EXHIBIT 13**
**145**

EOMS 00200

### Renr, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44105

### For Period Ending  June 30, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 6/3/2003 | DWB | Tel. conf. with Toberoff re offer for rights | 0.40 $305.00/hr | 122.00 |
| 6/10/2003 |  |  |  |  |
| 6/17/2003 |  |  |  |  |
| 6/18/2003 |  |  |  |  |
| 6/19/2003 | DWB | Tel. conf. with Marc Toberoff regarding proposal | 0.40 $305.00/hr | 122.00 |
| 6/23/2003 | DWB | Report to Mr. Siegel | 0.30 $305.00/hr | 91.50 |
|  |  | For professional services rendered | 2.90 | $884.50 |



## Re___er, Otto, Boisselle, & Sklar, LLP

The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

Invoice submitted to:
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106

For Period Ending July 31, 2003

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 7/14/2003 DWB | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 1.40 $305.00/hr | 427.00 |
| 7/21/2003 DWB | Tel. conf. with Marc Toberoff | 0.40 $305.00/hr | 122.00 |
| | For professional services rendered . | 1.80 | $549.00 |

**EXHIBIT 13**
147

**EOMS 00202**

## Rer, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending February 28, 2002

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 2/11/2002 | DWB | Tel. conf. with Marc Toberoff, ▌▌▌▌▌▌ | 1.45<br>$275.00/hr | 398.75 |
| 2/12/2002 | DWB | Tel. conf. with Mr. Siegel | 0.70<br>$275.00/hr | 192.50 |
| 2/23/2002 | | ▌▌▌▌▌▌▌▌▌▌ | $275.00/hr | |
| 2/25/2002 | DWB | Tel. conf. with Steve Webster, prepare for meeting, meeting with Mike Siegel | 6.75<br>$275.00/hr | 1,856.25 |
| | | For professional services rendered | 15.90 | $4,372.50 |

**EXHIBIT 13**
148
**EOMS 00203**

# Reer, Otto, Boisselle, & Sklar, LLP

The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending June 30, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 6/3/2004 | DWB | Tel. conf. with Marc Toberoff | 0.60 $315.00/hr | 189.00 |
| 6/8/2004 | DWB | Review and reply to emails from Mr. Siegel and voice mail message from Mr. Toberoff | 0.60 $315.00/hr | 189.00 |
| 6/21/2004 | DWB | Review and reply to email, prepare for meeting , meeting with Mr. Siegel | 3.40 $315.00/hr | 1,071.00 |
|  |  | For professional services rendered | 4.60 | $1,449.00 |

EOMS 00204

**EXHIBIT 13**

**149**



**Re????r, Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106

#### For Period Ending July 31, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  | Hrs/Rate | Amount |
|---|---|---|
| 7/6/2004 DWB  Place call to Toberoff | 0.10<br>$315.00/hr | 31.50 |
| For professional services rendered | 0.10 | $31.50 |

## Re[  ]r, Otto, Boiselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3606 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending September 30, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 9/30/2004 DWB Tel. conf. with Marc Toberoff re purchase offer |  | 0.60 $315.00/hr | 189.00 |
| For professional services rendered |  | 0.60 | $189.00 |

**EXHIBIT 13**
**151**
**EOMS 00206**

## Re**\_\_\_\_**r, Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bandemeer Rd
Cleveland Heights OH 44106

For Period Ending October 31, 2004

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

|  |  | Hrs/Rate | Amount |
|---|---|---|---|
| 10/5/2004 DWB  Review file, prepare report, email to Mike Siegel | | 0.90<br>$315.00/hr | 283.50 |
| 10/11/2004 DWB  Tel. conf. with Marc Toberoff re offer | | 0.40<br>$315.00/hr | 126.00 |
| 10/13/2004 DWB  ███████████  tel. confs. with Marc Toberoff | | 0.80<br>$315.00/hr | 252.00 |
| 10/27/2004 DWB  Tel. conf. with Marc Toberoff | | 0.30<br>$315.00/hr | 94.50 |
| 10/28/2004 DWB  Tel. conf. with Mike Siegel | | 0.30<br>$315.00/hr | 94.50 |
| For professional services rendered | | 2.70 | $850.50 |

**EXHIBIT 13**

**152**

Ren y. Otto, Boisselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

November 14, 2007          Invoice #    90477

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  November 30, 2004

G0101; Notices of Termination of Copyright Transfer In SUPERMAN

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 11/4/2004 | | |
| 11/12/2004 | | |
| For professional services rendered | 2.40 | $756.00 |

EOMS 00208
**EXHIBIT 13**
**153**

  Re**, Otto, Boiselle, & Sklar, LLP 
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3505 Bendemeer Rd
Cleveland Heights OH 44106

For Period Ending  March 31, 2002

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 3/8/2002 DWB  Tel. conf. with Kevin Marks | | 1.50 $275.00/hr | 412.50 |
| 3/12/2002 | | ██████ $275.00/hr | |
| 3/14/2002 | | ██████ | |
| 3/15/2002 DWB  Tel. conf. with Ms Siegel | | 0.35 $275.00/hr | 96.25 |
| 3/22/2002 DWB  Tel. conf. with Marc Toberoff | | 0.70 $275.00/hr | 192.50 |
| For professional services rendered | | 3.40 | $935.00 |

EXHIBIT 13
154
EOMS 00209

Received    May-01-12  06:38pm    From-    To-    Page 007

**Renn  Otto, Boisselle, & Sklar, LLP**
The Keith Building
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3605 Bendemeer Rd
Cleveland Heights OH 44106

### For Period Ending  February 28, 2005

G0101: Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | Hrs/Rate | Amount |
|---|---|---|
| 2/17/2005 DWB  Tel. conf. with Marc Toberoff | 0.50 $315.00/hr | 157.50 |
| For professional services rendered | 0.50 | $157.50 |

**EXHIBIT 13**
**155**

EOMS 00210
Apr. 29 2012 06:06 PM

Received  May-01-12  06:38pm    From-    To-    Page 012

# Renner, Otto, Boisselle, & Sklar, LLP 

**The Keith Building**
1621 Euclid Avenue
Cleveland, OH 44115
(216) 621-1113

*Invoice submitted to:*
Mr. Mike Siegel
3665 Bandemeer Rd
Cleveland Heights OH 44106

### For Period Ending  October 31, 2005

G0101; Notices of Termination of Copyright Transfer in SUPERMAN

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 10/3/2005 | KMG | Created Motion to Intervene. | 1.00 $100.00/hr | 100.00 |
| 10/4/2005 | KMG | Created Motion to Intervene. | 1.00 $100.00/hr | 100.00 |
| 10/12/2005 | KMG | Created Motion to Intervene. | 1.00 $100.00/hr | 100.00 |
| 10/31/2005 | DWB | Tel. conf. with Marc Toberoff, meeting with Mike Siegel | 1.90 $330.00/hr | 627.00 |
| | | **For professional services rendered** | **4.90** | **$927.00** |

**EXHIBIT 13**

156

Apr. 29 2012  06:06 PM    EOMS 00211

Received   May-01-12  05:38pm    From-                   To-              Page 014

2/21/2008
5:32 AM

4/26/11  4/08
3:46pm

Renner, Otto, Boisselle, & Sklar, LLP
Pre-bill Worksheet

Page    701

Nickname       SIEG.L0102 | 38877
Full Name      Mr. Mike Siegel
Address        3605 Bendemeer Rd
               Cleveland Heights OH 44106
Phone 1                        Phone 2
Phone 3                        Phone 4
In Ref To      L0102; RENNER, OTTO, BOISSELLE & SKLAR vs. ESTATE OF MICHEAL SIEGEL - CASE NO.
               CV-07-620856

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Date: May 2006 | | | | | |
| 5/31/2006 208070 | DWB Service | 345.00 | 0.20 | 69.00 | Billable Hold |
| | Review and sign engagement letter, email to counsel | | | | |
| Total May 2006 | Hold | | 0.00 0.20 | $69.00 | $0.00 |
| Date: November 2007 | | | | | |
| 11/7/2007 276613 | DWB Service | 360.00 | 1.50 | 540.00 | Billable Hold |
| | Assemble documentation | | | | |
| Total: November 2007 | Hold | | 0.00 1.50 | $540.00 | $0.00 |
| Date: January 2008 | | | | | |
| 1/11/2008 282904 | DWB Service | 360.00 | 3.00 | 1,080.00 | Billable |
| | Work on declaration | | | | |
| 1/14/2008 282284 | EAB Service | 120.00 | 0.20 | 24.00 | Billable |
| | Attention to case law research. | | | | |
| 1/17/2008 282931 | DWB Service | 360.00 | 2.00 | 720.00 | Billable |
| | Prepare expert report | | | 1.25 | |
| 1/29/2008 283035 | JMR Service | 285.00 | 0.75  1.25  213.75 | | Billable |
| | Attention to hearing issues; call with court re scheduling; call to Siegel counsel   attention to LCF notice | | | | |
| 1/31/2008 283041 | JMR Service | 285.00 | 1.00  1.75  285.00 | | Billable |
| | Call with Toberoff firm re hearing on 2/1; review reply and opposition brief re same. | | | | |

PAGE. 14/ 37

**EXHIBIT 13**
157

Apr.29 2012  01:07 PM    **EOMS 00212**

Received  May-01-12  05:38pm     From-     -To-     Page 022

11/22/2007                        Renner, Otto, Boisselle, & Sklar, LLP
3:41 AM                                  Pre-bill Worksheet                                    Page    716

Nickname          SIEG.ZG0100 | 13840
Full Name         Mr. Mike Siegel
Address           3605 Bendemeer Rd
                  Cleveland Heights OH 44105
Phone 1                              Phone 2
Phone 3                              Phone 4
In Ref To         G0100; General Matters

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| Date: November 2006 | | | | | |
| 11/2/2006 | DWB | 346.00 | 0.30 | 103.50 | Billable |
| 229529 | Service | | | | |
| | Tel. conf. with Marc Toberoff | | | | |
| Total: November 2006 | | | 0.30 | | $103.50 |
| TOTAL | Billable Fees | | 0.30 | | $103.50 |

| Date ID | Lawyer Expense | Price Markup % | Quantity | Amount | Total |
|---|---|---|---|---|---|
| Date: July 2002 | | | | | |
| 7/22/2002 | EXPENSE | 60.99 | 1.000 | 60.99 | Billable |
| 54322 | Misc. | | | | |
| | Flowers for Ms. Bella Siegel. [71332] | | | | |
| Total  July 2002 | | | | | $60.99 |
| TOTAL | Billable Costs | | | | $60.99 |

|  | | | | Amount | Total |
|---|---|---|---|---|---|
| Total of Fees (Time Charges) | | | | | $103.50 |
| Total of Costs (Expense Charges) | | | | | $60.99 |
| Total new charges | | | | | $164.49 |
| Total New Balance | | | | | $164.49 |

EXHIBIT 13
158

PAGE  22/ 37                                         EOMS 00213
Apr.29 2012  06:08 PM

Received    May-01-12  06:38pm    -From-    -To-    Page 023

11/22/2007                          Renner, Otto, Boisselle, & Sklar, LLP
3:42 AM                                  Pre-bill Worksheet                                    Page    734

Nickname        SIEG.ZG0108 | 33237
Full Name       Mr. Melvin H. Banchek
Address         55 Public Square, Suite 918
                Cleveland OH 44113

Phone                                  Phone 2
Phone 3                                Phone 4
In Ref To       G0108; Michael Siegel's Death and Estate

| Date ID | Lawyer Task | Rate Markup % | Hours DNB Time | Amount DNB Amt | Total |
|---|---|---|---|---|---|
| **Date: May 2006** | | | | | |
| 5/31/2006 | DWB | 345.00 | 0.20 | 69.00 | Billable |
| 208070 | Service | | | | |
| | Review and sign engagement letter, email to counsel | | | | |
| Total: May 2006 | | | 0.20 | | $69.00 |
| **Date August 2006** | | | | | |
| 8/21/2006 | DWB | 345.00 | 0.50 | 172.50 | Billable |
| 219738 | Service | | | | |
| | Tel. conf. with Steve Ott, tel. conf. with Toberoff's office | | | | |
| 8/23/2006 | DWB | 345.00 | 0.80 | 276.00 | Billable |
| 219748 | Service | | | | |
| | Tel. conf. with Mel Banchek, email to Toberoff's office, tel. conf. with Toberoff's office, office conference re representation | | | | |
| Total: August 2006 | | | 1.30 | | $448.50 |
| TOTAL | Billable Fees | | 1.50 | | $517.50 |

| Date ID | Lawyer Expense | Price Markup % | Quantity | Amount | Total |
|---|---|---|---|---|---|
| **Date: July 2006** | | | | | |
| 7/31/2006 | EXPENSE | 230.04 | 1.000 | 230.04 | Billable |
| 216351 | O/S Prof. Serv | | | | |
| | Outside Professional Services rendered by Ott & Associates. [2000666] | | | | |
| Total July 2006 | | | | | $230.04 |
| TOTAL | Billable Costs | | | | $230.04 |
| | | | | Amount | Total |
| Total of Fees (Time Charges) | | | | | $517.60 |

*Duplicate of P.703 + 715*

EXHIBIT 13
159

PAGE 23/ 37                                    EQMS 00214
Apr. 29 2012  06:09 PM

**Laura Siegel Larson**
**6400 Pacific Avenue #106**
**Playa Del Rey, CA 90293**

November 2, 2002

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

Dear Michael,

Thank you for your very nice letter of October 2nd. I truly appreciate your understanding of the difficulty of my divorce. You did not mention how your mother is doing. I hope that means she has improved and is home with you again.

This has been a very busy month involving various aspects of the Superman and Superboy rights. Enclosed you will find a copy of a letter my mother and I have sent to Lillian Laserson, the General Counsel of DC Comics and Roger Zissu and Carol Simkin of DC's outside law firm, Fross Zelnick Lerhman & Zissu, P.C. Under the terms of the Tolling Agreement, these letters had to be sent at the conclusion of negotiations with DC so that the Tolling Agreement is terminated as well.

We were shocked by the change of attitude we saw in Bruce Ramer and Kevin Marks from the time we retained them to recent months. In the beginning they appeared to be very much on our side, determined to get justice for us and they vowed to work hard for us in negotiations versus DC and AOL Time Warner. Toward the end of 2001, there was a shift. They started pressuring us to lower our expectations and to take an offer we did not want. They increasingly seemed to be siding with DC against our interests. We never made any outright acceptance of the DC deal. Kevin tried to scare us by saying if we didn't take DC's "final offer" they'd probably sue us.

Between February and May of this year we became so dissatisfied with their representation and the revolting offer from DC that we asked for a meeting with Kevin on May 22nd planning to fire them then and there. In the meeting, we decided to give Kevin one last chance. He wanted to redraft DC 's February 1st proposal along the lines of the last discussion he had had with John Schulman. We gave Kevin conditional permission to do just that but it was not to be sent out if we did not approve of it. As you know it was unacceptable and we fired Gang, Tyre, Ramer & Brown and notified DC, etc. that negotiations were over.

That terrible letter from Kevin in which he threatened to testify against us if called into court was the last straw. We are glad to be rid of them.

It came as quite a surprise to my mother and me that everyone but us--Arthur Levine, Kevin Marks, you, and Don Bulson--knew about the interest of Marc Toberoff and Ari Emmanuel in the properties as far back as 2001 and no one ever mentioned it to us until Kevin's letter of August, 2002. It was very interesting to hear from you that you and Don Bulson were contacted in Nov., 2001. It's a shame that Kevin kept them from contacting us and that he did

**EXHIBIT 13**
**160**

EOMS 00215

Page 2
Nov. 2, 2002

not inform us of them or their offer until August 2002.

My mother and I have had extensive meetings with Toberoff and Emmanuel in the past few weeks. We learned that due to the delays and the misinformation Kevin had given them that there was a deal with DC, the billionaire investor who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere. We were very impressed with Toberoff and Emmanuel, however, and have signed them as our new representatives. Not only do they have a first hand knowledge of the real value of properties that are adapted to TV and film, it is possible that the top talent that Emmanuel's Endeavor Agency represents (top stars, directors, producer-writers) could be successfully packaged with Siegel properties. They have other ideas as well. In addition, Toberoff, the attorney, has a successful track record of representing creator-writers and their heirs who have been screwed by the studios. This makes them a good fit with Superman and other Siegel creations. They consider DC's last offer to us ridiculous. They are currently putting together a strategy that will be much more aggressive than anything that Marks or Ramer ever did. We are hopeful that they will bring matters to a satisfying conclusion.

I now have two new divorce lawyers and my ex is continuing to represent himself. He doesn't care how much this costs me or that it's taking money away from the children. The latest on that front is that he didn't like a ruling the judge made in my favor by extending the restraining order against him. So he's taking it to the Court of Appeals and trying to get it dismissed on a technicality. This is, of course, time consuming, upsetting and very expensive.

I have boxes and boxes of divorce, copyright and financial paperwork everywhere in my small place--even all over my bed--including the records of Superman expenses I xeroxed for you a long time ago. When my ceilings had to be ripped out and replaced, and I had to pack things up and move out for awhile, things got even harder to locate. As soon as I find the papers that pertain to you, I'll put them in the mail along with my mother's.

I hope you will stay well as the weather changes and that the increasing cold doesn't make your arthritis act up. We're all sick here. I've had a throat and sinus infection for three weeks now. The antibiotics I've taken haven't worked and I have a lot of pounding headaches. I'm also having a flare-up of my Multiple Sclerosis with increased numbness and tingling. I fell down three times in the last few days, once onto a pile of carton boxes. I also suffer from chronic fatigue and need rest badly. My mom has bronchitis, Michael's asthma has been bothering him and James fractured his wrist playing flag football. His cast just came off this week. Here's hoping it won't be a bad winter and we'll all be better soon.

Best wishes for the holidays,

*Laura*

Laura

**EXHIBIT 13**    EOMS 00216

**161**

# EXHIBIT 14

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
905900-321

August 16, 2012

WRITER'S DIRECT DIAL
(310) 246-6840

**VIA E-MAIL**

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    _DC Comics v. Pacific Pictures Corp. et al._, CV-10-3633 (ODW) (RZx)

Dear Counsel:

The "Privilege Log of Bulson Archive" that defendants produced in this case on November 29, 2011, claims privilege over 224 documents defendants failed to claim privilege over in October 2006, when defendants submitted their first privilege log for Don Bulson.  The new privilege log entries on the 2011 "Privilege Log of Bulson Archive" are:  Entry Nos. 1-4, 7, 10, 12, 14, 16, 17, 19, 21, 22, 24-26, 28, 30, 32, 33, 35, 37, 39, 40, 42-44, 48, 49, 51, 52, 54, 55, 57, 58, 60, 61, 63, 66-73, 76, 77, 79-82, 85-94, 96, 99, 104, 106, 107, 110, 112-115, 117, 122, 123, 130, 134, 135, 137, 143, 147, 150, 152, 153, 157, 158, 160, 161, 176, 178, 186, 188, 191, 194, 200, 202, 204, 224, 231, 235, 237, 238, 240, 248, 249, 252, 253, 265, 267, 284-286, 289-292, 295, 299, 303, 305, 308, 314, 318, 321, 324, 325, 329, 332, 336, 340, 347-349, 352, 355, 361, 364-368, 370-372, 375, 376, 385-387, 396-398, 403, 405-406, 413, 428, 439, 442, 447, 458, 459, 471, 474, 484, 485, 499, 509, 512, 517, 520-537, 539, 541, 543, 545, 547, 548, 550-561, 563-566, 568, 570, 573-584.

Defendants' failure to log these 224 documents for five years—from 2006 to 2011—constitutes a waiver of privilege, and all of these documents must be produced.  _See_ Docket No. 457; _Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct._, 408 F.3d 1142, 1149-50 (9th Cir. 2005); _Vieste, LLC v. Hill Redwood Dev._, 2010 U.S. Dist. LEXIS 126607, at *27-29 (N.D. Cal. Nov. 18, 2010); _Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC_, 2010 U.S. Dist. LEXIS 57880, at *8-11 (S.D. Cal. June 11, 2010).  Your claim that defendants did not previously

**EXHIBIT 14**
**162**

O'MELVENY & MYERS LLP
August 16, 2012 - Page 2

possess the documents above until 2011 has been rejected, Docket No. 457, and is demonstrably untrue, Docket No. 477.

Defendants also assert that certain of the new entries in the Bulson Archive Log (1) were logged multiple times to "track" their repeated appearances in the electronic archive, or (2) were not responsive to DC's prior requests in the *Siegel* case.  Docket No. 362-2 at 323.  Please immediately and specifically identify which of the 224 documents above defendants claim fall into category (1), and please immediately and specifically identify which of the 224 documents above defendants claim fall into category (2).  DC reserves all rights to challenge such claims.

If defendants refuse to produce the requested documents and information to DC, DC requests a Rule 37 meet-and-confer to discuss the issues.  Please let us know when you are available.

Very truly yours,

/s/ Matthew T. Kline

Matthew T. Kline
of O'MELVENY & MYERS LLP

cc:    Daniel M Petrocelli, Esq.
       Defense Counsel

**EXHIBIT 14**
**163**

# EXHIBIT 15

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22337 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

August 27, 2012

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:     <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Dear Matt:

I write in response to your August 16, 2012 letter, asserting that defendants have somehow waived privilege over 224 documents listed in defendants' November 29, 2011 privilege log corresponding to Renner Otto's electronic archive received by this firm in summer 2011 on the purported ground that such documents were supposedly in defendants' possession through the 2006 Bulson paper file and not logged in the 2006 Bulson privilege log, or otherwise.

1.     As a preliminary matter, it is obvious that many of the purported "224 documents" were listed on defendants' prior logs, as a cursory examination of those logs reveals.

For example, Entry No. 7 on the 2011 Bulson log describes a July 18, 1997 letter from Himanshu Amin to Michael Siegel, which corresponds exactly to (a) Entry No. 1 on the 2006 privilege log, furnished in connection with a subpoena to Don Bulson, and (b) Entry No. 43 on the Siegels' December 15, 2010 privilege logs.

It is clear that DC, before sending its August 16 letter, did not even bother to examine or "match up" the 2011 Bulson logs to prior logs.  As such, DC's letter fails to identify the documents actually at issue and does not comply with Local Rule 37-1.

2.     Given that DC did not bother to adequately identify the documents at issue, defendants are not obliged to do DC's work for it and "match up" the documents listed in the 2011 Bulson privilege log into the categories DC suggests, nor has DC offered a reason why such an exercise would be useful.

Moreover, it appears from DC's demand that defendants identify documents "logged" multiple times that DC conflates the 2011 Bulson privilege log (which attempted to list documents only

**EXHIBIT 15**
**164**

**TOBEROFF & ASSOCIATES, P.C.**

August 27, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 2

once) with the "Master List" (which simply listed every document, both privileged and non-privileged, in the "electronic archive" in the order in which they appeared, including duplicates).

In any event, our November 29, 2011 and December 14, 2011 letters both included detailed descriptions of actual or potential discrepancies between the 2011 logs and prior logs, including certain of the entries at issue.

3.      Furthermore, the proper time to have raised this issue was during the recent motion practice concerning the November 17, 2001 email, which concerned similar issues as those now argued by DC regarding the 224 documents.  DC omitted the larger issue of these 224 documents (most of which are irrelevant) from its initial motion and motion for review regarding the November 2001 email because:  (a) to do so would have undermined DC's arguments that the November 2001 email was supposedly secreted due its contents, rather than because defendants did not have it in their possession; and (b) so that DC could later leverage a limited decision as to one document (the November 2001 e-mail) into a decision that covers hundreds of documents. Such tactics are obviously improper.

4.      Regardless, contrary to your letter, no Court has "rejected" the claim that defendants did not possess these documents until 2011.  As you are aware, Magistrate Zarefsky accepted defendants' claims as to when they came into possession of the November 2001 email and denied DC's motion on July 16, 2012.  Docket No. 452.  While Judge Wright overturned Magistrate Zarefsky's order without opinion (Docket No. 457), he did so based on DC's repeated knowing misrepresentation that Renner Otto had sent all of Michael Siegel's paper files to Mr. Toberoff.  The July 16 order, which is currently the subject of defendants' motion for reconsideration, did not make **any** factual findings and certainly did not find that defendants possessed either the November 2001 e-mail or the 224 documents in 2006, as DC claims.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

**EXHIBIT 15**
**165**

# EXHIBIT 16

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 28, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write in response to your August 27, 2012, letter concerning the over 224 documents defendants failed to claim privilege over in October 2006, when defendants submitted their first privilege log for Don Bulson.

1.  Monday, August 27 was the last day by rule for defendants to meet and confer with DC regarding the issues addressed in our August 16 letter.  C.D. L.R. 37-1 ("Unless relieved by written order of the Court upon good cause shown, counsel for the opposing party *shall* confer with counsel for the moving party within ten (10) days after the moving party serves a letter requesting such conference.").  DC will advise the court of defendants' failure to do so.

Your claim that our August 16 letter "does not comply with Local Rule 37-1" because it does not "identify the documents actually at issue" is not well-taken and again shows defendants' carelessness for the facts.  You state that it is "*obvious*" that "*many*" of the over 224 documents were listed on defendants' prior logs.  The sole "example" defendants identify is Entry No. 7 on the 2011 Bulson log, which lists a July 18, 1997, letter from "Atty Himanshu Amin" to "Michael Siegel," withheld on the grounds of "Attorney/Client, Common Interest Privilege":

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 7 | 7/18/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client, Common Interest Privilege | Renner Otto |

**EXHIBIT 16**
**166**

O'MELVENY & MYERS LLP
August 28, 2012 - Page 2

You claim that Entry No. 7 "*corresponds exactly*" with Entry No. 1 on the 2006 Bulson log. Not true. Entry No. 1 on the 2006 Bulson log lists a July 18, 1997, letter from "Atty Himanshu Amin" to "Michael Siegel," withheld on the ground of "Atty/Client"—no assertion of a "Common Interest Privilege":

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 1 | 7/18/1997 | Michael Siegel | Atty Himanshu Amin | Letter | Atty/Client | Plaintiffs' Counsel |

Indeed, it is obvious from a cursory examination of the two logs that Entry No. 1 on the 2006 Bulson log "*corresponds exactly*" with Entry No. 6 on the 2011 Bulson log, which DC did not identify as being one of the over 224 documents defendants did not log in 2006. Entry No. 6 lists a July 18, 1997, letter form "Atty Himanshu Amin" to "Michael Siegel," withheld on the ground of "Attorney/Client":

| Log # | Date | Identity of Author(s) | Identity of Recipient(s) | Type | Privilege | Location |
|---|---|---|---|---|---|---|
| 6 | 7/18/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Attorney/Client | Renner Otto |

Defendants also claim that Entry No. 7 on the 2011 Bulson log corresponds with Entry No. 43 on the Siegel's *December 2010* logs. Not only is this irrelevant—since DC challenges defendants' failure to list the over 224 documents in *2006*—it is false. Entry No. 43 on the 2010 Siegel log lists a July 18, 1997, letter from "Atty Himanshu Amin" to "Michael Siegel" withheld on the ground of "Atty/Client"—again, no assertion of a "Common Interest Privilege" as in Entry No. 7 on the 2011 Bulson log[1]:

| Log # | Date of Document | Identity of Author(s) | Identity of Recipient(s) | Document Type | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 43 | 7/18/1997 | Atty Himanshu Amin | Michael Siegel | Letter | Atty/Client | Defendants' Counsel |

What is clear is that before sending defendants' August 27 letter, defendants did not bother to examine or "match up" the 2011 Bulson log to prior logs.

2. DC requested that defendants specifically identify which of the 224 documents fall into the two categories listed in DC's August 16 letter in order to assess defendants' claims of why certain documents weren't logged in 2006. Defendants' refusal to provide this information does not comply with their meet-and-confer obligations. As to your claim that DC conflates the 2011 Bulson Log with the "Master List," your December 14, 2011, letter disproves this. Defendants wrote on December 14, "[A]s also set forth in my November 29, 2011 letter, many of

---

[1] DC notes that Entry No. 43 on the 2010 Siegel log does not have a corresponding entry on the Siegels' logs in the *Siegel* action—meaning the document was not logged by the Siegels in 2006 either. That the Siegels logged Entry No. 43 in 2010, prior to receiving the Renner Otto electronic archive in Fall 2011, again shows that defendants have been in possession of the document for years and their failure to list it on their privilege log in 2006 constitutes a waiver of privilege. *See, e.g., Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.,* 408 F.3d 1142, 1149-50 (9th Cir. 2005).

**EXHIBIT 16**
**167**

O'MELVENY & MYERS LLP

August 28, 2012 - Page 3

the documents [on the December 7, 2011 privilege log] *were logged multiple times to 'track' their repeated appearances in the electronic archive*."  DC again asks defendants specifically to identify which documents defendants claim, if any, (1) were logged multiple times to "track" their repeated appearances in the electronic archive, or (2) were not responsive to DC's prior requests in the *Siegel* case.

3.  Defendants' accusations that DC sought to obtain an improper advantage by not addressing these 224 documents in its prior motion is without basis and wrong.   Defendants cannot dictate the timing or substance of DC's motions.

4.  DC addressed defendants' meritless arguments concerning their failure to log documents in 2006 in opposing defendants motion for reconsideration of Judge wright's July 16, 2012, order.  *See* Docket No. 477.

Absent a change in position by defendants, DC will file its motion.  All of DC's rights are reserved.

Very truly yours,

/s/ Jason H. Tokoro

Jason H. Tokoro
for O'MELVENY & MYERS LLP

cc:    Daniel M Petrocelli, Esq.
Matthew T. Kline, Esq.
Defense Counsel

**EXHIBIT 16**
**168**

# EXHIBIT 17

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

22631 PACIFIC COAST HIGHWAY #348

MALIBU, CALIFORNIA 90265

MARC TOBEROFF*
KEITH G. ADAMS
PABLO D. ARREDONDO*
DAVID HARRIS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

kgadams@ipwla.com

September 7, 2012

<u>Via E-Mail</u>

Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*</u>, Case No. 10-CV-03633 ODW (RZx)

Dear Jason:

I write in response to your August 28, 2012 letter, and to follow-up on Mr. Kline's August 16, 2012 letter and my August 27, 2012 letter.  DC appears to stand by its erroneous position that defendants have waived privilege over "224 documents" listed in the 2011 privilege log corresponding to documents in the Renner Otto electronic archive.

Those "224 documents" fall into two basic categories.

The first category is documents that were in the Renner Otto electronic archive, sent to defendants in 2011, that were not in the paper files sent to this firm from the Estate of Michael Siegel in 2006 and were not otherwise in defendants' possession until receipt of the electronic archive in 2011.  These documents were indeed "new," and therefore logged for the first time in the 2011 privilege log.

The second category is documents that were previously logged, but which DC pretends are "new"/first logged in 2011, based on some erroneous interpretation of defendants' prior logs.  As I stated in my August 27 letter, it is obvious that DC did not bother to properly examine or "match up" the 2011 electronic archive logs to prior logs, *e.g.*, the 2010 log and subsequent logs provided by Laura Siegel Larson in this litigation, or the 2006 logs provided by Ms. Larson and third parties in the related *Siegel* litigation.

There are numerous entries that DC claimed did not "match up" that are identical in every respect, making it obvious that DC did not appropriately cross-check its erroneous list of purportedly "new" documents.  For example:

**EXHIBIT 17**
**169**

**TOBEROFF & ASSOCIATES, P.C.**

September 7, 2012
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:    2 of 2

| 2011 Bulson Log Entry No. | 2010 Siegel Log Entry No. | 2006 Bulson Log Entry No. | Description |
|---|---|---|---|
| 106 | 139 | 40 | 9/9/1999 Letter from Arthur Levine to Don Bulson (A/C, CIP) |
| 265 | 341 | 167 | 7/26/2000 E-mail from Don Bulson to Michael Siegel (A/C) |
| 321 | 510 | 218 | 7/31/2001 Letter from Michael Siegel to Don Bulson (A/C) |
| 352 | 574 | 245 | 2/7/2002 E-mail from Don Bulson to Michael Siegel (A/C) |

These examples are just that – examples.  Defendants are under no obligation to go through and unravel every entry erroneously listed by DC, as you demand.

It seems likely that whoever reviewed the entries and generated the list of "224" documents did not realize that: (a) in the 2006 logs, the recipients of documents were listed first, while the authors of documents were listed second; and (b) in the 2010 logs and subsequent logs, the authors of documents were listed first, and the recipients were listed second.

Also within this second category are 2011 log entries that DC complains are "new," but which correspond to documents that were, in fact, previously logged with trivial, non-substantial differences, as set forth in great detail in our November 29, 2011 and December 14, 2011 letters. For example, DC cites defendants' listing of "common interest privilege" in addition to "attorney/client privilege," although this is consistent with Ninth Circuit law and Magistrate Judge Zarefsky's rulings in this case.  *See* Docket No. 378 at 2 ("[T]he circuit 'has long recognized that the joint defense privilege is 'an extension of the attorney-client privilege.''").

As set forth in our prior letters on this subject, DC's "waiver" claim is without merit.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith Adams

**EXHIBIT 17**
**170**

# EXHIBIT 18

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

September 10, 2012

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6707

Marc Toberoff
Toberoff & Associates, P.C.
22631 Pacific Coast Highway #348
Malibu, CA 90265

WRITER'S E-MAIL ADDRESS
jtokoro@omm.com

Richard Kendall
Kendall Brill & Klieger LLP
10110 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)</u>

Dear Counsel:

We are in receipt of your letter of September 7, 2012, concerning the over 224 documents defendants failed to claim privilege over in October 2006, when defendants submitted their first privilege log for Don Bulson.  We disagree with every aspect of it, including your refusal to meet and confer with DC.  Absent a change in position by defendants, DC will file its motion and inform the Court of your choice not to comply with Rule 37.

All of DC's rights are reserved.

Very truly yours,

/s/ Jason H. Tokoro

Jason H. Tokoro
for O'MELVENY & MYERS LLP

cc:    Daniel M Petrocelli, Esq.
Matthew T. Kline, Esq.
Defense Counsel

**EXHIBIT 18**
**171**