# EXHIBIT 19

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Marc Toberoff Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTOBEROFF_ASST> |
| **Sent:** | Friday, May 21, 2004 9:15 AM |
| **To:** | Ariel Emanuel Scheduler |
| **Subject:** | RE: Favor |

Dear autumn:
Are the Siegels(superman) meting AE and MT in AE's office or have you reserved a conference room? Please let me know...

Nicholas
IP Worldwide

> -----Original Message-----
> **From:** Ariel Emanuel Scheduler
> **Sent:** Thursday, May 20, 2004 3:41 PM
> **To:** Marc Toberoff Assistant
> **Subject:** RE: Favor
>
> Thank you so much. I'm sorry to bother you so much.
>
> > -----Original Message-----
> > **From:** Marc Toberoff Assistant
> > **Sent:** Thursday, May 20, 2004 3:40 PM
> > **To:** Ariel Emanuel Scheduler
> > **Cc:** IPWW
> > **Subject:** RE: Favor
> >
> > Dear Autumn,
> > The meeting is now rescheduled for 11:30.
> > The meeting is with the siegels (the superman heirs).
> > It is a very important client.
> > Please confirm receipt of this email
> > Thanks.
> > Nicholas
> > IP Worldwide
> >
> > > -----Original Message-----
> > > **From:** Ariel Emanuel Scheduler
> > > **Sent:** Thursday, May 20, 2004 3:34 PM
> > > **To:** Marc Toberoff Assistant
> > > **Subject:** Favor
> > >
> > > AE will be able to do the meeting tomorrow. He was wondering, could you push it to 11:30?
> > >
> > > Also, I deleted the old email. Who is the meeting with again?
> > >
> > > Thanks,
> > >
> > > Autumn

1

**EXHIBIT 19**

**172**

WME 00051

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Marc Toberoff Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTOBEROFF_ASST> |
| **Sent:** | Tuesday, May 11, 2004 12:36 PM |
| **To:** | Ariel Emanuel Scheduler |
| **Cc:** | IPWW |
| **Subject:** | RE: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive) |

We need to schedule an office meeting between Marc Toberoff, Ari Emanuel, and Laura Siegel Larson(superman). Times during which the Larsons are available include: Thursday the 13th from 12.30 – 5:00, Friday the 14th from 12.30- 5.00, and finally Tuesday the 18th from12.00 – 5.00. Please let me know at your earliest convenience and I'll coordinate with the Larsons. Thanks….

Nicholas C. Williamson
IP Worldwide

# REDACTED

1

**EXHIBIT 19**
**173**

WME 00052

REDACTED

2

**EXHIBIT 19**
**174**

WME 00053

REDACTED

WME 00054

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Marc Toberoff Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTOBEROFF_ASST> |
| **Sent:** | Thursday, October 30, 2003 4:03 PM |
| **To:** | Ariel Emanuel Scheduler |
| **Subject:** | RE: AE/MT/Siegels mtg (re Superman/Superboy) |

Not good. Here are the times they provided for me:

11/4 – 11, 12, or 1p

11/5 – 11, 12 or 1p

11/6 – 1 or 2p

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Thursday, October 30, 2003 12:54 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

11/4 at 5PM?

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Thursday, October 30, 2003 12:53 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

Of course, 11/5 @ 4p does not work for the Siegels. They are available on 11/4, or morning of 11/5, or afternoon of 11/6.

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, October 29, 2003 6:17 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

Who are the siegels? Can I have first names?

1

**EXHIBIT 19**
**176**

WME 00055

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, October 29, 2003 6:15 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

That's fine.

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, October 29, 2003 6:10 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

4PM, works on 11/5

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, October 29, 2003 6:07 PM
**To:** Ariel Emanuel Scheduler
**Subject:** AE/MT/Siegels mtg (re Superman/Superboy)

Is AE available anytime on 11/4 or 11/5 for a mtg with the Siegels? We need to schedule this ASAP due to the importance of this property. Let me know. Thanks.

2

**EXHIBIT 19**

177

WME 00056

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Marc Toberoff Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTOBEROFF_ASST> |
| **Sent:** | Thursday, October 30, 2003 12:55 PM |
| **To:** | Ariel Emanuel Scheduler |
| **Subject:** | RE: AE/MT/Siegels mtg (re Superman/Superboy) |

I'll run it by them. Will let you know.

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Thursday, October 30, 2003 12:54 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

11/4 at 5PM?

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Thursday, October 30, 2003 12:53 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

Of course, 11/5 @ 4p does not work for the Siegels. They are available on 11/4, or morning of 11/5, or afternoon of 11/6.

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, October 29, 2003 6:17 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

Who are the siegels? Can I have first names?

1

**EXHIBIT 19**
**178**

WME 00057

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, October 29, 2003 6:15 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)


That's fine.


-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, October 29, 2003 6:10 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)


4PM, works on 11/5


-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, October 29, 2003 6:07 PM
**To:** Ariel Emanuel Scheduler
**Subject:** AE/MT/Siegels mtg (re Superman/Superboy)


Is AE available anytime on 11/4 or 11/5 for a mtg with the Siegels? We need to schedule this ASAP due to the importance of this property. Let me know. Thanks.


2

**EXHIBIT 19**
**179**

WME 00058

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Marc Toberoff Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTOBEROFF_ASST> |
| **Sent:** | Wednesday, October 29, 2003 6:22 PM |
| **To:** | Ariel Emanuel Scheduler |
| **Subject:** | RE: AE/MT/Siegels mtg (re Superman/Superboy) |

Laura and Joanne Siegel. Daughter and widow of Jerry Siegel, co-creator of Superman/Superboy. AE/MT represent their rights in the property.

FYI, I still need to confirm the date/time of mtg w/the Siegels. But I don't anticipate any problems.

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, October 29, 2003 6:17 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

Who are the siegels? Can I have first names?

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, October 29, 2003 6:15 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

That's fine.

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, October 29, 2003 6:10 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg (re Superman/Superboy)

4PM, works on 11/5

1

**EXHIBIT 19**
**180**

WME  00059

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, October 29, 2003 6:07 PM
**To:** Ariel Emanuel Scheduler
**Subject:** AE/MT/Siegels mtg (re Superman/Superboy)


Is AE available anytime on 11/4 or 11/5 for a mtg with the Siegels? We need to schedule this ASAP due to the importance of this property. Let me know. Thanks.

**EXHIBIT 19**
**181**

WME 00060

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Ariel Emanuel Scheduler </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_SCHED> |
| **Sent:** | Thursday, May 20, 2004 8:21 AM |
| **To:** | Marc Toberoff Assistant |
| **Subject:** | AE, MT, Laura and Joanne Siegel (Superman) |

Can we reschedule this for next week?  AE will not be able to attend tomorrow.

Thanks,

Autumn

1

**EXHIBIT 19**

**182**

WME .00061

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Ariel Emanuel Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_ASST> |
| **Sent:** | Thursday, May 20, 2004 8:16 AM |
| **To:** | Ariel Emanuel Scheduler |

Resked dr. brodney

Change the siegel superman meeting but just check with him first

# REDACTED

1

**EXHIBIT 19**
**183**

WME 00062

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Marc Toberoff Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MTOBEROFF_ASST> |
| **Sent:** | Tuesday, May 11, 2004 12:36 PM |
| **To:** | Ariel Emanuel Scheduler |
| **Cc:** | IPWW |
| **Subject:** | RE: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive) |

We need to schedule an office meeting between Marc Toberoff, Ari Emanuel, and Laura Siegel Larson(superman). Times during which the Larsons are available include: Thursday the 13th from 12.30 – 5:00, Friday the 14th from 12.30- 5.00, and finally Tuesday the 18th from12.00 – 5.00. Please let me know at your earliest convenience and I'll coordinate with the Larsons. Thanks....

Nicholas C. Williamson
IP Worldwide

# REDACTED

1

**EXHIBIT 19**
**184**

WME 00063

REDACTED

WME 00064

REDACTED

WME 00065

**Tom McGuire Assistant**

| | |
|---|---|
| From: | Ariel Emanuel Scheduler </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_SCHED> |
| Sent: | Tuesday, November 04, 2003 11:12 AM |
| To: | Marc Toberoff Assistant |
| Subject: | RE: AE/MT/Siegels mtg |

Thanks.

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Tuesday, November 04, 2003 11:11 AM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg

Laura and Joanne Siegel

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Tuesday, November 04, 2003 11:09 AM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg

Forgot. What are their names?

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Tuesday, November 04, 2003 11:09 AM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg

Ok. Confirmed.

**EXHIBIT 19**
**187**

WME 00066

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Tuesday, November 04, 2003 11:06 AM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg


AE can do 11/13 at 3PM/


-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Tuesday, November 04, 2003 11:04 AM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg


Ok. 11/13 AM does not work for them...here's what they proposed:

11/12 AM (10 – 1), 11/13 afternoon up to 4p or 11/14 AM (10 – 1)

Let me know.


-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Monday, November 03, 2003 3:42 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg


Ok thanks.


-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Monday, November 03, 2003 3:42 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg


I'll have to let you know tomorrow after I hear back from the Siegels.

2

**EXHIBIT 19**
**188**

WME 00067

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Monday, November 03, 2003 3:26 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg


930, 1030 works he has an 1145


-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Monday, November 03, 2003 3:23 PM
**To:** Ariel Emanuel Scheduler
**Subject:** RE: AE/MT/Siegels mtg


Flexible w/the hour? Anytime before 1p right?


-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Monday, November 03, 2003 3:20 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: AE/MT/Siegels mtg


AM on 11/13 works best. -


-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Monday, November 03, 2003 3:18 PM
**To:** Ariel Emanuel Scheduler
**Subject:** AE/MT/Siegels mtg


Is AE available next week around the same time? Either morning of 11/11, 11/12 or 11/13? I need some times to get back to the Siegels when I call to reschedule. Thanks.


3

**EXHIBIT 19**
**189**

WME  00068

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Ariel Emanuel Scheduler </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_SCHED> |
| **Sent:** | Monday, May 17, 2004 12:45 PM |
| **To:** | Ariel Emanuel Assistant |
| **Subject:** | FW: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive) |

# REDACTED

-----Original Message-----
**From:** Ariel Emanuel Scheduler
**Sent:** Wednesday, May 12, 2004 2:57 PM
**To:** Marc Toberoff Assistant
**Subject:** RE: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive)

The 21st works. Can we do it AT 11am? That would be great. (is this the Superman mtg?) Let me know. Thanks for being patient.

Autumn

    -----Original Message-----
    **From:** Marc Toberoff Assistant
    **Sent:** Wednesday, May 12, 2004 1:01 PM
    **To:** Ariel Emanuel Scheduler
    **Cc:** IPWW
    **Subject:** RE: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive)

We need to set an in person meeting at endeavour (AE's office or reserve a conference room) for AE, Marc Toberoff(ceo of IP worldwide we are down the street with accounting) and the Siegels. You need to find out from AE if he can meet either anytime after 11 am Tuesday may 18th or anytime after 11am Friday May 21. You will then let me know. I will then call the siegels and let them know the final time. I need this set up today if at all possible. Thanks

IP Worldwide

    -----Original Message-----
    **From:** Ariel Emanuel Scheduler
    **Sent:** Wednesday, May 12, 2004 12:47 PM
    **To:** Marc Toberoff Assistant
    **Subject:** RE: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive)

1

**EXHIBIT 19**
**190**

WME 00069

I'm sorry Nicholas —I'm new...What is this that I'm setting?  Thanks

-----Original Message-----
**From:** Marc Toberoff Assistant
**Sent:** Wednesday, May 12, 2004 12:20 PM
**To:** Ariel Emanuel Scheduler
**Cc:** IPWW
**Subject:** RE: CC//AE, Marc Toberoff, Larry Cohen (re: It's Alive)


The siegels are available the following for an office meeting with AE and MT:
After 1 pm 5/13
After 1 pm 5/18
After 1 pm 5/21
please let me know so I can coordinate with this very important client.

Nicholas

IP Worldwide

# REDACTED

**EXHIBIT 19**

WME  00070

REDACTED

WME 00071

REDACTED

4
**EXHIBIT 19**
**193**

WME 00072

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | mtoberoff@ipwla.com |
| **Sent:** | Monday, October 25, 2004 2:17 PM |
| **To:** | Ariel Emanuel |
| **Cc:** | Ariel Emanuel Assistant |
| **Subject:** | SBOY |

Ari:

Just filed the SBOY complaint last Friday will send you a copy (I'm keeping that guy we met very busy). It's liberating not to dick around and it all has that DFWM ring to it, dontcha think.

# REDACTED

Thanks

Marc Toberoff
IPW
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067
(310) 246-3100
Fax:(310) 246-3101
MToberoff@ipwla.com

**EXHIBIT 19**
**194**

WME 00073

**Tom McGuire Assistant**

| | |
|---|---|
| From: | marc.toberoff@gmail.com on behalf of Marc Toberoff <mtoberoff@ipwla.com> |
| Sent: | Monday, December 01, 2008 11:49 AM |
| To: | Ariel Emanuel |
| Subject: | Hit list |

Ari:

Need to pull a Rabbit out of the Hat and get these contracts or proof of the deal ASAP.  The **confidentiality** of any docs will be strictly protected by a Protective Order in the case.

Since the harsh treatment of Siegel and Shuster over Superman is a *cause celebre* for writers/artists, and this case sets precedents in advancing artists rights, you would think that writers (and their reps) would get behind it and give permission to release big old deals.

AE: **Shane Black**, *Long Kiss Goodnight* ($4.5M); *Last Boy Scout* ($1.75M); PLEASE get permission to release contract

Lynn Nesbit (**Janklow** partner): **Michael Crichton** (died 11/4/08),  *Jurassic Park* ($5M plus gross); *Timeline* (15% gross to Crichton and Dick Donner)

Janklow: **Thomas Harris**, *Hannibal* (huge deal)

Robert Gottlieb (212-333-1500), then AMG: **Tom Clancy**, *Patriot Games, Sum of All Fears, Clear and Present Danger*

David Gernett (212-838-7777): **Jon Grisham**, *The Firm, The Chamber, A Time To Kill, The Client*

Need to come in TODAY to speak to you about something else.


Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

1
**EXHIBIT 19**
**195**

WME 00074

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | mtoberoff@ipwla.com |
| **Sent:** | Friday, April 18, 2008 1:14 PM |
| **To:** | Ariel Emanuel |
| **Cc:** | Ariel Emanuel Assistant |
| **Subject:** | Fwd: SMan Philadelphia Inquirer Article 4/8/08 |
| **Attachments:** | SMan Philadelphia Inquirer 4.8.08.pdf |

*Bernard Levin <blevin@ipwla.com>* wrote:
Date: Fri, 18 Apr 2008 12:11:12 -0700 (PDT)
From: Bernard Levin <blevin@ipwla.com>
Subject: SMan Philadelphia Inquirer Article 4/8/08
To: mtoberoff@ipwla.com

**Marc Toberoff**
Toberoff & Associates
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

**EXHIBIT 19**
**196**

WME 00075



SERVICE.
COVERAGE.
PRICE.

Mel Nace Insurance Agcy Inc
Mel Nace, Agent
Sellersville, PA 18960-2601

Click here for
more information

# The Philadelphia Inquirer

Home   Inquirer   Daily News   News   Business   Sports   Entertainment   Living   Restaurants & Food   Travel

News   Front Page   Sports   Business   Obituaries   Arts & Entertainment   Food, Home & Life   Health & Science   Education   Opinion   BI

Subscriber Services / Get a Subscription   |   Join Our Team          Web Search powered by YAHOO! SEARCH

## JONATHAN LAST      MY YAHOO!

Welcome (

📧 email this   🖨 print this          TEXT SIZE: A A **A** A

Posted on Tue, Apr. 8, 2008

## One Last Thing: Truth, justice and a copyright whodunnit

By Jonathan Last
Inquirer Editorial Board

You may not know Jerome Siegel, but you know his work. In 1933, Siegel and his high school buddy Joseph Shuster created Superman. In his first incarnation, Superman was a bald-headed, Depression-era villain bent on world domination. But Siegel and Shuster tinkered with the character until Supes became the hero we know and love: He came from an alien planet, had great strength and speed, was impervious to bullets, could leap a building in a single bound, and was known to the outside world as mild-mannered reporter Clark Kent.

Siegel and Shuster shopped their Superman comics to a number of publishers until Detective Comics purchased the strip, and the future rights to Superman ("to have and hold forever"), in March 1938 for $130. On April 18, 1938, Detective Comics published Action Comics No. 1 - which pictured Superman on the cover, hoisting a car above his head - and changed the comic-book industry forever.

The publisher and its succeeding corporate parents (it's now owned by Time Warner) have made a vast fortune from Superman, with only small, grudging payments to the character's creators over the years. It's a classic case of big business bullying individual creators.

But on March 26, a California district court awarded a share of Superman's intellectual property rights back to Siegel's heirs, ruling the estate could claim a share in the profit. The story of how the heirs triumphed is a tribute to truth, justice and the American way.



SPENCER WEINER / Los Angeles Times

Action Comics No. 1 - featuring Superman - was published April 18, 1938 (June cover date). It changed the comic-book industry forever.

### SAVE AND SHARE

      

Yahoo! Buzz

The 1909 Copyright Act granted a copyright lasting 28 years from the date of first publication, with the option for renewal, also lasting 28 years. The idea behind the two tiers was that the value of intellectual property is not always immediately apparent. The renewal period was intended to let creators reap a truer value of their work after 28 years: If they sold the first rights to their work to another party, but the work increased in value, after 28 years the creators could receive a second copyright, which they could sell at a truer price. It's what lawyers call a second bite at the apple.

It was a good system, but the Supreme Court stepped in and changed it. In the 1943 case *Fred Fisher Music Co. v. M.*

Smokin' the c
for more than

P060096 1/06

Today's

- ABC
- VOTI
- Phil S
- Philli
- Susa
  Alyci

» More

- VOTI
- A wi
  repel
- ABC
- Two
- Barn
  Kens

» More

**EXHIBIT 19
197**

WME_00076
4/18/2008 12:08 PM

*Witmark & Sons*, the Supreme Court decided that creators could sell *both* the initial rights and the renewal rights from the outset. As a result of that ruling, corporations demanded both sets of copyrights from creators. That negated the whole purpose of renewal as an instrument of fairness.

So in 1976, Congress tried to clean up the mess by passing a new Copyright Act. The 1976 version increased the length of both the initial and renewal copyrights by 19 years. Most important, it created a mechanism that would allow - after a passage of time - creators to terminate a grant of rights they had previously made.

This is what Jerome Siegel's heirs had been trying to do: terminate the exclusive rights he had given Detective Comics back in 1938, allowing them to share Superman's copyright with Time Warner - thus entitling them to a share of the profit Supes has made since 1999 and going forward. (Why 1999? Read the decision, linked below.)

Termination is a complicated process. It begins with the creators' filing a "notice of termination," where they pick the date in the past that they designate as the moment of creation. Siegel's heirs chose April 16, 1938, two days before Action Comics No. 1 was published. Their case looked solid, except for one gigantic problem.

Time Warner dug up two ads for Action Comics No. 1, which had run in other comic books before April 16, 1938. The ads featured a miniature black-and-white version of the famous Action Comics cover with Superman and the car. They were published on April 5 and April 10, 1938. Time Warner argued that the appearance of Superman in the ads before the date given on the termination notice meant that the rights the company held superseded the rights created on the date specified by Siegel's family. It's a hypertechnical mistake, but one Time Warner insisted was "fatal" to the termination claim.

Judge Stephen Larson of the Central District of California wrote a decision that reads like an episode from *The Perils of Pauline*. Page after page, he explains that Time Warner is *correct!* The two earlier ads *could* give it protection from the Siegel heirs' attempt at termination! The court was prepared to grant Time Warner sole copyright to everything in those ads.

But then Larson pulls off an amazing twist!

"The court begins by observing what is *not*
depicted in the announcements," Larson wrote (emphasis in the original). No mention of the character's name or origins! No description of any of Superman's powers (except for his strength, which is obvious because he's holding a car above his head)! This leaves Time Warner with only what is pictured in the ads.

And that picture was in black and white and quite tiny. Superman's distinctive blue-and-red costume? Nowhere. He's so minuscule, you can't even make out the *S* on his chest.

Larson's exciting conclusion? Time Warner "may continue to exploit the image of a person with extraordinary strength who wears a black-and-white leotard and cape."

But as for Superman - or at least the Superman we know from Action Comics No. 1 - Time Warner now has to share him with Jerome Siegel's heirs.

As in many suspense stories, there are lots of loose ends. The decision may be appealed. How much Siegel's family is owed will be subject to litigation. And co-creator Joseph Shuster's estate *won't* have the chance to try to get his rights back until 2013.

But for now, Judge Larson's decision is enough. It makes you believe a man can fly.

(Postscript for lawyers: I've elided certain other points of contention in the case - notably, the fights over collateral estoppel and the nature of "work for hire" - for brevity's sake. Apologies; I throw myself on the mercy of the court.)

**How a creator's heirs prevailed**

■ Read the Superman decision at http://go.philly.com/superman

Contact Jonathan V. Last at jlast@phillynews.com.

**Sponsored Links**

**Action Comics**
Heritage buys, sells and auctions for great prices.
www.HA.com/Comics

**Action Comics**
Browse a huge selection now. Find exactly what you want today.
www.ebay.com

**dc comic action figure**
dc comic action figure & More. 100,000 Stores. Deals. Reviews.
shopping.yahoo.com

MOST

■ One l
■ One l
   whod
■ One l
■ One l
   of pro

LATE!

■ One l
   04/13/
   By Jon
■ One l
   good
   By Jon
■ One l
   comn
   By Jon
■ One l
   hacki
   By Jon
■ One l
   03/09/
   By Jon

Top Jobs







$304,0
246 N

FOR

Ford E

**EXHIBIT 19**
**198**

**Tom McGuire Assistant**

| From: | Ariel Emanuel Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_ASST> |
|---|---|
| Sent: | Tuesday, April 01, 2008 5:47 PM |
| To: | ariannahuf@aol.com |
| Subject: | Marc Toberoff |

Hi Arianna – Ari asked me to send you the news articles from the New York Times, Los Angeles Times, and Variety; all regarding the victory in the Superman copyright case against Warner Bros Studios.

# Time Warner ordered to share Superman rights

From Bloomberg News

March 29, 2008

Time Warner Inc., the world's largest media company, must share control of the Superman copyright with the heirs of the comic hero's creator, Jerome Siegel, a federal judge has ruled.

Siegel's widow, Joanne, and their daughter, Laura Larson, won back his half of the copyright to Superman material, under the order this week by U.S. District Judge Stephen Larson in Riverside.

Jerome Siegel and his creative partner, Joseph Shuster, granted the rights to DC Comics in 1938, a contract that expired in 1999, the judge found.

"After 70 years, Jerome Siegel's heirs regain what he granted so long ago -- the copyright in the Superman material that was published in Action Comics," Larson wrote in his order Wednesday. The victory was "no small feat indeed," he said.

Joanne Siegel's and Laura Larson's share of the profit must still be determined at trial, according to the order.

Marc Toberoff, the Siegels' lawyer, said Jerome Siegel fought for decades, without success, to share in the profit from the rights to his Superman character, which he sold with Shuster for $130. Jerome Siegel died in 1996.

"Joanne Siegel has courageously carried the torch in this matter for decades, and this is probably the first good news she has received regarding Superman in 70 years," Toberoff said.

Time Warner spokesmen Edward Adler and Keith Cocozza didn't immediately return phone calls and e-mails seeking comment.

# Warner vexed by legal Man of Steel

*Lawyer Toberoff dings Superman*

WME 00078

## By DIANE GARRETT

He's a superhero to rights holders -- but Kryptonite to studios.

Last week, attorney Marc Toberoff won a potentially costly "Superman" victory against Warner Bros. for co-creator Jerome Siegel's heirs. The federal ruling, which gives the heirs a stake in rights sold 71 years ago, could put a serious crimp on future plans for one of the studio's most enduring -- and lucrative -- franchises, especially if co-creator Joe Shuster's heirs follow suit in five years, when they are eligible to do so.

As it is, the studio has at least two Superman projects in development -- a follow-up to Bryan Singer's "Superman Returns" and "Justice League" -- and it may end up paying tens of millions from the domestic haul of "Superman Returns" to Siegel's heirs under the ruling, which applies to domestic monies for Superman projects since 1999.

The case is Toberoff's latest -- and potentially most damaging -- claim against the studio. The dedicated copyright crusader has pursued claims involving "Wild Wild West," "Dukes of Hazzard," "Smallville" and the upcoming "Get Smart."

He has gone after other studios, including Sony, but his most high-profile cases -- and victories -- have involved Warners. The studio paid "Moonrunners" producer Robert B. Clark a $17.5 million settlement in a case about similarities between that 1974 movie and the bigscreen "The Dukes of Hazzard." And a federal judge ruled earlier in the Siegels' favor over "Smallville," although that was challenged and the case still being resolved.

The studio declined to comment on the latest ruling in favor of their legal nemesis, issuing only a statement noting that, "substantial issues relating to the accounting of profits were ruled in our favor."

Among these issues: international profits, trademark-related revs and profits stemming from Superman fare produced before 1999, when Siegel's heirs terminated the earlier copyright arrangement under a 1976 law.

To the Siegels, Toberoff's legal maneuvers are nothing short of heroic. The family had been destitute for years after Siegel sold rights to his Man of Steel to Detective Comics for $130. DC Comics had started to pony up more monies after Warners made successful movies based on the character, but Siegel had long wished to redress the fact he had gotten so little from his creation; he died in 1996.

Toberoff has set up a production company, Intellectual Properties Worldwide, to develop films around these and other titles. And he has built up a sideline business producing bigscreen adaptations of the projects whose copyright claims he pursues. He has a producing credit on "Fantasy Island," a Sony project for Eddie Murphy, as well as "Sanford and Son."

March 29, 2008

# Ruling Gives Heirs a Share of Superman Copyright

By MICHAEL CIEPLY

LOS ANGELES — Time Warner is no longer the sole proprietor of Superman.

A federal judge here on Wednesday ruled that the heirs of Jerome Siegel — who 70 years ago sold the rights to the action hero he created with Joseph Shuster to Detective Comics for $130 — were entitled to claim a share of the United States copyright to the character.

2

**EXHIBIT 19**

**200**

WME 00079

The ruling left intact Time Warner's international rights to the character, which it has long owned through its DC Comics unit.

And it reserved for trial questions over how much the company may owe the Siegel heirs for use of the character since 1999, when their ownership is deemed to have been restored. Also to be resolved is whether the heirs are entitled to payments directly from Time Warner's film unit, Warner Brothers, which took in $200 million at the domestic box office with "Superman Returns" in 2006, or only from the DC unit's Superman profits.

Still, the ruling threatened to complicate Warner's plans to make more films featuring Superman, including another sequel and a planned movie based on the DC Comics' "Justice League of America," in which he joins Batman, Wonder Woman and other superheroes to battle evildoers.

If the ruling survives a Time Warner legal challenge, it may also open the door to a similar reversion of rights to the estate of Mr. Shuster in 2013. That would give heirs of the two creators control over use of their lucrative character until at least 2033 — and perhaps longer, if Congress once again extends copyright terms — according to Marc Toberoff, a lawyer who represents the Siegels and the Shuster estate.

"It would be very powerful," said Mr. Toberoff, speaking by telephone on Friday. "After 2013, Time Warner couldn't exploit any new Superman-derived works without a license from the Siegels and Shusters."

Time Warner lawyers declined to discuss the decision, a spokesman said. A similar ruling in 2006 allowed the Siegels to recapture their rights in the Superboy character, without determining whether Superboy was, in fact, the basis for Warner Brothers's "Smallville" television series. The decision was later challenged in a case that has yet to be resolved, said Mr. Toberoff, who represented the family in that action.

This week's decision by Stephen G. Larson, a judge in the Federal District Court for the Central District of California, provided long-sought vindication to the wife and daughter of Mr. Siegel, who had bemoaned until his death in 1996 having parted so cheaply with rights to the lucrative hero.

"We were just stubborn," Joanne Siegel, Mr. Siegel's widow, said in a joint interview with her daughter, Laura Siegel Larson. "It was a dream of Jerry's, and we just took up the task."

The ruling specifically upheld the Siegels' copyright in the Superman material published in Detective Comics' Action Comics Vol. 1. The extent to which later iterations of the character are derived from that original was not determined by the judge.

In an unusually detailed narrative, the judge's 72-page order described how Mr. Siegel and Mr. Shuster, as teenagers at Glenville High School in Cleveland, became friends and collaborators on their school newspaper in 1932. They worked together on a short story,

WME 00080

"The Reign of the Superman," in which their famous character first appeared not as hero,
but villain.

By 1937, the pair were offering publishers comic strips in which the classic Superman
elements — cape, logo and Clark Kent alter-ego — were already set. When Detective
Comics bought 13 pages of work for its new Action Comics series the next year, the
company sent Mr. Siegel a check for $130, and received in return a release from both
creators granting the company rights to Superman "to have and hold forever," the order
noted.

In the late 1940s, a referee in a New York court upheld Detective Comics' copyright,
prompting Mr. Siegel and Mr. Shuster to drop their claim in exchange for $94,000. More
than 30 years later, DC Comics (the successor to Detective Comics) gave the creators each
a $20,000-per-year annuity that was later increased to $30,000. In 1997, however, Mrs.
Siegel and her daughter served copyright termination notices under provisions of a 1976
law that permits heirs, under certain circumstances, to recover rights to creations.

Mr. Toberoff, their lawyer, has been something of a gadfly to Warner in the past. In the
late 1990s, for example, he represented Gilbert Ralston, a television writer, in a legal battle
over his rights in the CBS television series "The Wild Wild West," which was the basis for a
1999 Warner Brothers film that starred Will Smith. The case, said Mr. Toberoff, was
settled.

Compensation to the Siegels would be limited to any work created after their 1999
termination date. Income from the 1978 "Superman" film, or the three sequels that
followed in the 1980s, are not at issue. But a "Superman Returns" sequel being planned
with the filmmaker Bryan Singer (who has also directed "The Usual Suspects" and "X-
Men") might require payments to the Siegels, should they prevail in a demand that the
studio's income, not just that of the comics unit, be subject to a court-ordered accounting.

Mrs. Siegel and Ms. Larson said it was too soon to make future plans for the Superman
character. But they were inclined to relish this moment.

"I have lived in the shadow of this my whole life," Ms. Larson said. "I am so happy now, I
just can't explain it."

Mark Tseng // Endeavor

4
**EXHIBIT 19**
**202**

WME 00081

**Tom McGuire Assistant**

| | |
|---|---|
| From: | Ariel Emanuel Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_ASST> |
| Sent: | Friday, March 28, 2008 3:58 PM |
| To: | nikkifinke@aol.com |
| Subject: | Superman/Court opinion |
| Attachments: | Superman SJ Decision.3.26.08.pdf |

Attached please find the Court's decision and opinion of the Superman case.

Mark Tseng // Endeavor

<<...>>

**EXHIBIT 19**
203

WME 00082

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA

10   JOANNE SIEGEL and LAURA SIEGEL      )
     LARSON,                             )   CASE NO. CV-04-8400-SGL (RZx)
11                                       )
                                         )   [Consolidated for pre-trial and discovery
12                Plaintiffs,            )   purposes with CV-04-8776-SGL (RZx)]
                                         )
13   v.                                  )   ORDER GRANTING IN PART AND
                                         )   DENYING IN PART PLAINTIFFS'
14   WARNER BROS. ENTERTAINMENT          )   MOTION FOR PARTIAL SUMMARY
     INC.; TIME WARNER INC.; and DC      )   JUDGMENT; ORDER GRANTING IN
15   COMICS,                             )   PART AND DENYING IN PART
                                         )   DEFENDANTS' MOTION FOR PARTIAL
16                Defendants.            )   SUMMARY JUDGMENT
     _____)
17

18        The termination provisions contained in the Copyright Act of 1976 have aptly

19   been characterized as formalistic and complex, such that authors, or their heirs,

20   successfully terminating the grant to the copyright in their original work of authorship

21   is a feat accomplished "against all odds." 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT

22   § 7:52 (2007).

23        In the present case, Joanne Siegel and Laura Siegel Larson, the widow and

24   the daughter of Jerome Siegel, seek a declaration from the Court that they have

25   overcome these odds and have successfully terminated the 1938 grant by Jerome

26   Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of

27   the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's

28   half of the copyright in the same.  No small feat indeed.  It requires traversing the

**EXHIBIT 19**
204

WME 00083

1    many impediments — many requiring a detailed historical understanding both

2    factually and legally of the events that occurred between the parties over the past

3    seventy years — to achieving that goal and, just as importantly, reckoning with the

4    limits of what can be gained through the termination of that grant.

5    Any discussion about the termination of the initial grant to the copyright in a

6    work begins, as the Court does here, with the story of the creation of the work itself.

7    In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High

8    School in Cleveland, Ohio. Siegel was an aspiring writer and Shuster an aspiring

9    artist; what Siegel later did with his typewriter and Shuster with his pen would

10    transform the comic book industry. The two met while working on their high

11    school's newspaper where they discovered their shared passion for science fiction

12    and comics, the beginning of a remarkable and fruitful relationship.

13    One of their first collaborations was publishing a mail-order fanzine titled

14    "Science Fiction: The Advance Guard of Future Civilization."[1] In the January, 1933,

15    issue, Siegel and Shuster's first superman character appeared in the short story

16    "The Reign of the Superman," but in the form of a villain not a hero. The story told

17    of a "mad scientist's experiment with a deprived man from the breadlines" that

18    transformed "the man into a mental giant who then uses his new powers — the

19    ability to read and control minds — to steal a fortune and attempt to dominate the

20    world." (Decl. Michael Bergman, Ex. HH at 1126). This initial superman character

21    in villain trappings was drawn by Shuster as a bald-headed mad man.

22    A couple of months later it occurred to Siegel that re-writing the character as

23    a hero, bearing little resemblance to his villainous namesake, "might make a great

24    comic strip character." (Decl. Michael Bergman, Ex. HH at 1126). Much of Siegel's

25    desire to shift the role of his protagonist from villain to hero arose from Siegel's

26    exposure to despair and hope: Despair created by the dark days of the Depression

27

28    _____

[1] A fanzine is a publication, usually distributed at no or nominal cost, produced by fans of a particular topic (such as comic books, opera, murder mystery stories, etc.) for others who share their interest.

2

**EXHIBIT 19**
**205**

WME  00084

1   and hope through exposure to the "gallant, crusading heros" in popular literature

2   and the movies.  (Decl. Michael Bergman, Ex. HH at 1126).  The theme of hope

3   amidst despair struck the young Siegel as an apt subject for his comic strip:

4   "Superman was the answer — Superman aiding the downtrodden and oppressed."

5   (Decl. Michael Bergman, Ex. HH at 1126).

6          Thereafter, Siegel sat down to create a comic book version of his new

7   character.  While he labored over the script, Shuster began the task of drawing the

8   panels visualizing that script.  Titling it "The Superman," "[t]heir first rendition of the

9   man of steel was a hulking strongman who wore a T-shirt and pants rather than a

10   cape and tights."  (Decl. Michael Bergman, Ex. HH at 1129).  And he was not yet

11   able to hurdle skyscrapers, nor was he from a far away planet; instead, he was

12   simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or

13   Tarzan, who combated crime.  Siegel and Shuster sent their material to a publisher

14   of comic books — Detective Dan — and were informed that it had been accepted

15   for publication.  Their success, however, was short-lived; the publisher later

16   rescinded its offer to publish their submission.  Crestfallen, Shuster threw into the

17   fireplace all the art for the story except the cover (reproduced below), which Siegel

18   rescued from the flames.

19

20

21

22

23

24

25

26

27

28

3

**EXHIBIT 19**
**206**

WME  00085

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 37 of 157    Page
ID #:31749
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008 ·  Page 4 of 72



EXHIBIT HII

Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip.  The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by <u>Detective Dan</u> in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips — not comic books — were the most popular medium for comics.  As one observer of the period has commented:

> It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day.  The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format.  When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips.  The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

4

EXHIBIT 19
207

WME  00086

1   (Decl. Mark Evanier, Ex. A at 5-6).

2         On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming

3   over plot ideas for this new feature when an idea struck him: "I was up late counting

4   sheep and more and more ideas kept coming to me, and I wrote out several weeks

5   of syndicate script for the proposed newspaper strip.  When morning came, I

6   dashed over to Joe [Shuster]'s place and showed it to him."  (Decl. Michael

7   Bergman, Ex. HH at 1129).  Siegel re-envisioned his character in more of the mythic

8   hero tradition of Hercules, righting wrongs in present-day society.  His inspiration

9   was to couple an exaggeration of the daring on-screen acrobatics performed by

10  such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make

11  such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John

12  Carter of Mars stories, and placing all of this within a storyline that was the reverse

13  of the formula used in the Flash Gordon serials.  The end product was of a

14  character who is sent as an infant to Earth aboard a space ship from an unnamed

15  distant planet (that had been destroyed by old age) who, upon becoming an adult,

16  uses his superhuman powers (gained from the fact that his alien heritage made him

17  millions of years more evolved than ordinary humans) to perform daring feats for the

18  public good.

19        Siegel named his character "Superman."  Unlike his previous incarnation,

20  Siegel's new Superman character's powers and abilities were much more

21  extraordinary and fantastic:  Superhuman strength; the ability to leap 1/8th of a mile,

22  hurdle a twenty-story building, and run faster than an express train; and nothing less

23  than a bursting shell could penetrate his skin.  Siegel placed his character in a very

24  cosmopolitan environment that had the look and feel of mid-thirties America.  He

25  also humanized his character by giving his superhero an "ordinary person" alter

26  ego:  Mild-mannered, big-city newspaper reporter Clark Kent.   Siegel developed

27  this concept of Superman's secret identity both as a means for his superhero to

28  maintain an inconspicuous position in everyday society and as a literary device to

**EXHIBIT 19**
**208**

WME  00087

1  introduce a conflict — and the potential for story lines centered around that conflict

2  — between the character's dual identities, a conflict played out no more

3  dramatically than in the love "triangle" between the character's dual identities and

4  another newspaper reporter, Lois Lane.

5      Shuster immediately turned his attention to giving life and color to Siegel's

6  idea by drawing illustrations for the story.  Shuster conceived of the costume for

7  Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S"

8  emblazoned on an inverted triangular crest on his chest, and boots as footwear.  In

9  contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed

10  glasses, combed black hair, and sporting a fedora.  He drew Superman and his

11  alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive

12  curl over his forehead, and endowed him with a lean, muscular physique.  Clark

13  Kent hid most of these physical attributes behind his wardrobe, which he could

14  quickly doff revealing his Superman costume underneath when he was called to

15  action by someone in need of his superpowers.  One of the earliest of Shuster's

16  sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted

17  below:

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 19**
**209**

WME  00088

1
2
3
4
5
6
7
8
9
10
11
12
13



CLARK KENT          SUPERMAN

ONE AND SAME!

14   The two then set about combining Siegel's literary material with Shuster's

15   graphical representations.  Together they crafted a comic strip consisting of several

16   weeks' worth of material suitable for newspaper syndication.  Siegel typed the

17   dialogue and Shuster penciled in artwork, resulting in four weeks of Superman

18   comic strips intended for newspapers.  (Decl. Michael Bergman, Ex. H at 1).  The

19   art work for the first week's worth "of daily [comic] strips was completely inked" and

20   thus ready for publication.  (Decl. Michael Bergman, Ex. H at 1).  The "three

21   additional weeks of 'Superman' newspaper comic strip material" differed from the

22   first week's material "only in that the art work, dialogue and the balloons in which

23   the dialogue appeared had not been inked," instead consisting of no more than

24   black-and-white pencil drawings.  (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

25   Siegel also wrote material to which Shuster provided no illustrations:  A

26   paragraph previewing future Superman exploits, and a nine-page synopsis of the

27   storyline appearing in the three weeks of penciled daily Superman newspaper

28   comic strips.  (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

**EXHIBIT 19**
**210**

WME  00089

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 41 of 157    Page
ID #:31743
Case 2:04-cv-08776-SGL-RZ    Document 147    Filed 03/26/2008    Page 8 of 72

2).

     The two shopped the character for a number of years to numerous publishers but were unsuccessful.  As Siegel later recalled:  One publisher "expressed interest in Superman," but preferred that it be "published in comic book form where it would be seen in color" rather than "a black-and-white daily strip," a suggestion to which he and Shuster balked given their earlier experience with the comic book publisher of <u>Detective Dan</u>.  (Decl. Michael Bergman, Ex. H at 2).

     In the meantime, Siegel and Shuster penned other comic strips, most notably "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company.  When Nicholson folded shop in 1937, Detective Comics acquired some of its comic strip properties, including "Slam Bradley" and "The Spy."

     On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics whereby they agreed to furnish some of these existing comic strips for the next two years, and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics,] and [that Detective Comics] shall be deemed the sole creator thereof . . . ."  (Decl. Michael Bergman, Ex. A).  The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given a sixty-day option to publish the material.

     Soon thereafter Detective Comics decided to issue a new comic book magazine titled <u>Action Comics</u> and began seeking new material.  Inquiry was made of many newspaper comic strip publishers, including McClure Newspaper Syndicate.  Amongst the material submitted by McClure to Detective Comics was the previously rejected Siegel and Shuster Superman comic strip.  Detective Comics soon became interested in publishing Siegel and Shuster's now well-traveled Superman material, but in an expanded thirteen-page comic book format, for release in its first volume of <u>Action Comics</u>.

8

**EXHIBIT 19**
**211**

WME 00090

1    On February 1, 1938, Detective Comics returned the existing Superman

2 newspaper comic strip material to Siegel and Shuster for revision and expansion

3 into a full-length, thirteen-page comic book production.  Detective Comics' desire to

4 place Superman in a comic book required that Siegel and Shuster reformat their

5 existing Superman newspaper material by re-cutting the strip into separate panels

6 and then re-pasting it into a comic book format.

7    An issue emerged due to Detective Comics' additional requirement that there

8 be eight panels per page in the comic book.  Siegel and Shuster's existing

9 Superman newspaper material did not have enough drawings to meet this format.

10 In response, portions of the thirteen-page comic went forward with fewer than eight

11 panels per page, and in the remaining pages Shuster either trimmed or split existing

12 panels to stay within the page size, or drew additional panels from the existing

13 dialogue to meet the eight-panel requirement.  As Shuster later recounted:

14    The only thing I had to do to prepare Superman for
    comic book publication was to ink the last three weeks of
15    daily strips which I had previously completely penciled in
    detail.  In addition, I inked the lettering and the dialogue
16    and story continuity and inked in the balloons containing
    the dialogue.  Certain panels I trimmed to conform to
17    Detective's page size.  I drew several additional pictures
    to illustrate the story continuity and these appear on
18    page 1 of the first Superman release.  This was done so
    that we would be certain of having a sufficient number of
19    panels to make a thirteen page release.  Finally, I drew
    the last panel appearing on the thirteenth page.
20    Detective's only concern was that there would be panels
    sufficient for thirteen complete pages.  Jerry told me that
21    Detective preferred having eight panels per page but in
    our judgment this would hurt the property.  I specifically
22    refer to the very large panel appearing on what would be
    page 9 of the thirteen page release.  We did not want to
23    alter this because of its dramatic effect.  Accordingly, on
    this page but six panels appeared.
24
(Decl. Michael Bergman, Ex. G at 2).  Siegel similarly recollected:
25
    Upon receiving word from Detective that we could
26    proceed, Joe Shuster, under my supervision, inked the
    illustrations, lettering and dialogue balloons in the three
27    weeks of daily strips that had been previously penciled.
    In addition, he trimmed certain pictures to meet
28    Detective's panel specifications and extended others.
    To assure ourselves of having the proper number of

9

**EXHIBIT 19**
212

WME  00091

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 43 of 157    Page
ID #:31745
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 10 of 72

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

panels we added several pictures to illustrate the story
continuity, I had already written.  Added as well for this
reason was the scientific explanation on page 1 of the
release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted

Superman material to Detective Comics.  Soon thereafter Detective Comics

informed Siegel that, as he had earlier suggested to them, one of the panels from

their Superman comic would be used as the template (albeit slightly altered from the

original) for the cover of the inaugural issue of Action Comics.  (Decl. Michael

Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of Action Comics,

Detective Comics wrote to Siegel, enclosing a check in the sum of $130,

representing the per-page rate for the thirteen-page Superman comic book release

and enclosing with it a written agreement for Siegel and Shuster's signatures.  The

agreement assigned to Detective Comics "all [the] good will attached . . . and

exclusive right[s]" to Superman "to have and hold forever."  (Decl. Michael

Bergman, Ex. F).  Siegel and Shuster executed and returned the written assignment

to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September

22, 1938, employment agreement in which Siegel and Shuster acknowledged that

Detective Comics was "the exclusive owner[]" of not only the other comic strips they

had penned for Nicholson (and continued to pen for Detective Comics), but

Superman as well; that they would continue to supply the artwork and storyline (or

in the parlance of the trade, the "continuity") for these comics at varying per-page

rates depending upon the comic in question for the next five years; that Detective

Comics had the "right to reasonably supervise the editorial matter" of those existing

comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing

the . . . characters or continuity thereof or in any wise similar" to these comics to a

third party; and that Detective Comics would have the right of first refusal (to be

**EXHIBIT 19**
213

WME  00092

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 44 of 157    Page
ID #:31756
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 11 of 72

1    exercised within a six-week period after the comic's submission) with respect to any

2    future comic creations by Siegel or Shuster.

3        Detective Comics announced the debut of its Action Comics series with full

4    page announcements in the issues of some of its existing publications.  Specifically,

5    in More Fun Comics, Vol. 31, with a cover date of May, 1938, Detective Comics

6    placed the following black-and-white promotional advertisement on the comic's

7    inside cover, which reproduced the cover of the soon-to-be published first issue of

8    Action Comics, albeit in a greatly reduced size:

9

10

11



12

13

14

15

16

17

18

19

20

21

22

23

24

25        Similarly, Detective Comics, Vol. 15, with a cover date of May, 1938, had a

26    full-page black-and-white promotional advertisement on the comic's inside cover

27    which contained within it a reproduction of the cover (again in a reduced scale) of

28    the soon-to-be published first issue of Action Comics:

11

**EXHIBIT 19**
**214**

WME 00093

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 45 of 157    Page
ID #:31757
Case 2:04-cv-08776-SGL-RZ    Document 172    Filed 03/26/2008    Page 12 of 72

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16    To provide some context and contrast, the cover of the first issue of <u>Action Comics</u>
17    is notable for its difference from the promotional advertisements both in its scale
18    and its colorized format.
19
20
21
22
23
24
25
26
27
28

**EXHIBIT 19**
**215**

WME  00094

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   Superman itself was published by Detective Comics on April 18, 1938, in

18   Action Comics, Vol. 1, which had a cover date of June, 1938.  A full reproduction of

19   the original Superman comic contained in Action Comics, Vol. 1, is attached as an

20   addendum to this Order.  See Attachment A to this Order.  The Superman comic

21   became an instant success, and Superman's popularity continues to endure to this

22   day as his depiction has been transferred to varying media formats.

23   The Superman character has evolved in subsequent works since his initial

24   depiction in Action Comics, Vol. 1.  These additional works have added decades of

25   new material to further define, update, and develop the character (such as his

26   origins, his relationships, and his powers and weaknesses) in an ongoing flow of

27   new exploits and supporting characters, resulting in the creation of an entire fictional

28   Superman "universe."  For instance, absent from Action Comics, Vol. 1, was any

13

**EXHIBIT 19**
**216**

WME  00095

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 47 of 157    Page
ID #:31759
Case 2:04-cv-08776-SGL-RZ    Document 175    Filed 03/26/2008    Page 14 of 72

1    reference to some of the more famous story elements now associated with
2    Superman, such as the name of Superman's home planet "Krypton."  Many of
3    Superman's powers that are among his most famous today did not appear in <u>Action</u>
4    <u>Comics</u>, Vol. 1, including his ability to fly (even through the vacuum of space); his
5    super-vision, which enables him to see through walls ("x-ray" vision) and across
6    great distances ("telescopic" vision); his super-hearing, which enables him to hear
7    conversations at great distances; and his "heat vision," the ability to aim rays of
8    extreme heat with his eyes.  The "scientific" explanation for these powers was also
9    altered in ensuing comics, initially as owing to differences in gravity between Earth
10   and Superman's home planet (the latter being much larger in size than the former),
11   and later because Krypton orbited a red sun, and his exposure to the yellow rays of
12   Earth's sun somehow made his powers possible.  In a similar Earth-Krypton
13   connection, it was later revealed that Superman's powers could be nullified by his
14   exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

15        Aside from the further delineation of Superman's powers and weaknesses,
16   many other elements from the Superman story were developed in subsequent
17   publications.  Some of the most famous supporting characters associated with
18   Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and
19   Brainiac, were created long after <u>Action Comics</u>, Vol. 1, was published.  Moreover,
20   certain elements contained in <u>Action Comics</u>, Vol. 1, were altered, even if slightly, in
21   later publications, most notably Superman's crest.  In <u>Action Comics</u>, Vol. 1, the
22   crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the
23   middle, shown throughout the comic as solid yellow in most instances and as a red
24   "S" in two instances.  Thereafter, the emblem changed, and today is a large yellow
25   five-sided shield, outlined in the color red, and bearing the letter "S" in the middle,
26   also in the color red.

27        The acclaim to which the release of <u>Action Comics</u>, Vo. 1, was greeted by
28   the viewing public quickly made Superman not only the iconic face for the comic

14

**EXHIBIT 19**
**217**

WME  00096

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 48 of 157    Page
ID #:31700
Case 2:04-cv-08776-SGL-RZ    Document 170    Filed 03/26/2008    Page 15 of 72

1    book industry but also a powerful super-salesman for his publisher.  Detective

2    Comics oversaw the creation, development, and licensing of the Superman

3    character in a variety of media, including but not limited to radio, novels, live action

4    and animated motion pictures, television, live theatrical productions, merchandise

5    and theme parks.  From such promotional activity, Detective Comics came to "own[]

6    dozens of federal trademark registrations for Superman related indicia, such as

7    certain key symbols across a broad array of goods and services."  (Decl. Paul Levitz

8    ¶ 10).  The most notable of these marks that are placed on various items of

9    merchandise are "Superman's characteristic outfit, comprised of a full length blue

10   leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key

11   identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a

12   plane! . . . It's Superman!'"  (Decl. Paul Levitz ¶ 10).

13        Meanwhile, Siegel continued to submit other comic book characters to

14   Detective Comics that were also published.  Sometimes these submissions were

15   without Shuster serving as an illustrator and sometimes, such as in the case of

16   Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.

17   Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.

18   Among these subsequent creations was "The Spectre," a comic written by Siegel

19   and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'

20   More Fun Comics, Vol. 52.  The comic told the story about a superhero with a

21   supernatural bent — the character being the spirit of a police officer killed in the line

22   of duty while investigating a gangland overlord and who, after meeting a higher

23   force in the hereafter, is sent back to Earth with nearly limitless abilities but offered

24   eternal rest only when he has wiped out all crime.

25        With Superman's growing popularity, a growing rift developed between the

26   parties.  Siegel and Shuster believed that Detective Comics' poached the artists

27   apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-

28   house to its New York offices, and further believed that Detective Comics had not

**EXHIBIT 19**
**218**

WME  00097

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 49 of 157    Page
ID #:31761
Case 2:04-cv-08776-SGL-RZ    Document 171    Filed 03/26/2008    Page 16 of 72

1   paid them their fair share of profits generated from the exploitation of their

2   Superman creation and from the profits generated from copycat characters that

3   they believed had their roots in the original Superman character.  As a result, in

4   1947, Siegel and Shuster brought an action against Detective Comics' successor in

5   interest in New York Supreme Court, Westchester County, seeking, among other

6   things, to annul and rescind their previous agreements with Detective Comics

7   assigning their ownership rights in Superman as void for lack of mutuality and

8   consideration.

9        After a trial, official referee J. Addison Young issued detailed findings of fact

10   and conclusions of law wherein he found that the March 1, 1938, assignment of  the

11   Superman copyright to Detective Comics was valid and supported by valuable

12   consideration and that, therefore, Detective Comics was the exclusive owner of "all"

13   the rights to Superman.  The parties eventually settled the Westchester action and

14   signed a stipulation on May 19, 1948, whereby in exchange for the payment of over

15   $94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding

16   that Detective Comics owned all rights to Superman.  Two days later, the official

17   referee entered a final consent judgment vacating his earlier findings of fact and

18   conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

19        The feud between the parties did not end after the Westchester action.  In

20   the mid-1960s, the simmering dispute boiled anew when the expiration of the initial

21   copyright term for Superman led to another round of litigation over ownership to the

22   copyright's renewal term.[2]  In 1969, Siegel and Shuster filed suit in federal district

23   court in New York seeking a declaration that they, not Detective Comics' successor

24

_____

25        [2]  Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at

26   the time of Siegel and Shuster's creation of Superman and later assignment of
     rights in the same to Detective Comics, an author was entitled to a copyright in his

27   work for twenty-eight years from the date of its publication.  See 17 U.S.C. § 24,
     repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq.  Upon the expiration of

28   this initial twenty-eight year term, the author could renew the copyright for a
     second twenty-eight year period (the "renewal term").

**EXHIBIT 19**
**219**

WME  00098

1  (National Periodical Publications, Inc.), were the owners of the renewal rights to the

2  Superman copyright. See Siegel v. National Periodical Publications, Inc., 364

3  F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974).  The end

4  result of the litigation was that, in conformity with United States Supreme Court

5  precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S.

6  643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1,

7  1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation),

8  Siegel and Shuster had assigned not only Superman's initial copyright term but the

9  renewal term as well, even though those renewal rights had yet to vest when the

10  grant (and later the stipulation) was made.

11      After the conclusion of the 1970s Superman litigation, the New York Times

12  "ran a story about how the two creators of Superman were living in near destitute

13  conditions":

14      Two 61-year-old men, nearly destitute and worried about
        how they will support themselves in their old age, are
15      invoking the spirit of Superman for help. Joseph Shuster,
        who sits amidst his threadbare furniture in Queens, and
16      Jerry Siegel, who waits in his cramped apartment in Los
        Angeles, share the hope that they each will get pensions
17      from the Man of Steel.

18  Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y.

19  TIMES, Nov. 22, 1975, at 62.

20      Apparently in response to the bad publicity associated with this and similar

21  articles, the parties thereafter entered into a further agreement, dated December

22  23, 1975.  See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-

23  president of Warner Communications, Inc.,] said, 'but I sure feel that there is a

24  moral obligation on our part'").  In the agreement, Siegel and Shuster re-

25  acknowledged the Second Circuit's decision that "all right, title and interest in"

26  Superman ("including any and all renewals and extensions of . . . such rights")

27  resided exclusively with DC Comics and its corporate affiliates and, in return, DC

28  Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

17

**EXHIBIT 19**
**220**

WME 00099

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 51 of 157    Page
ID #:31763
Case 2:04-cv-08776-SGL-RZ    Document 1763    Filed 03/26/2008    Page 18 of 72

1   Siegel and Shuster with modest annual payments for the remainder of their lives;
2   provided them medical insurance under the plan for its employees; and credited
3   them as the "creators of Superman." In tendering this payment, Warner
4   Communications, Inc. specifically stated that it had no legal obligation to do so, but
5   that it did so solely "in consideration" of the pair's "past services . . . and in view of
6   [their] present circumstances," emphasizing that the payments were "voluntary."
7   The 1975 agreement also made certain provisions for Siegel's spouse Joanne,
8   providing her with certain monthly payments "for the balance of her life if Siegel"
9   died before December 31, 1985. Finally, Warner Communications, Inc. noted that
10  its obligation to make such voluntary payments would cease if either Siegel or
11  Shuster (or their representatives) sued "asserting any right, title or interest in the
12  'Superman' . . . copyright." As the years went by Warner Communications, Inc.
13  increased the amount of the annual payments, and on at least two occasions paid
14  the pair special bonuses.

15      As the time grew nearer to the December 31, 1985, cutoff date for surviving
16  spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her
17  "terrible worry" over the company's refusal to provide Jerome Siegel life insurance
18  in the 1975 agreement. (Decl. Michael Bergman, Ex. NN). She voiced her concern
19  that, should anything happen to her husband after the cutoff date, she and their
20  daughter "would be left without any measure of [financial] security." (Decl. Michael
21  Bergman, Ex. NN). The parties thereafter agreed by letter dated March 15, 1982,
22  that Warner would pay Joanne Siegel the same benefits it had been paying her
23  husband if he predeceased her, regardless of the time of his death. (Decl. Michael
24  Bergman, Ex. OO). Jerome Siegel died on January 28, 1996, and Joanne Siegel
25  has been receiving these voluntary survival spouse benefits since that time.

26      In the meantime, changes in the law resurrected legal questions as to the
27  ownership rights the parties had to the Superman copyright. With the passage of
28  the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

18

**EXHIBIT 19**
**221**

WME  00100

1  concerning artists' transfers of the copyrights in their creations.  First, the 1976 Act

2  expanded by nineteen years the duration of the renewal period for works, like the

3  initial release of Superman in Action Comics, Vol. 1, that were already in their

4  renewal term at the time of the Act's passage.  See 17 U.S.C. § 304(b).

5      Second, and importantly for this case, the 1976 Act gave artists and their

6  heirs the ability to terminate any prior grants of the rights to their creations that were

7  executed before January 1, 1978, regardless of the terms contained in such

8  assignments, e.g., a contractual provision that all the rights (the initial and renewal)

9  belonged exclusively to the publisher.  Specifically, section 304(c) to the 1976 Act

10  provides that, "[i]n the case of any copyright subsisting in either its first or renewal

11  term on January 1, 1978, other than a copyright in a work made for hire, the

12  exclusive or nonexclusive grant of a transfer or license of the renewal copyright or

13  any right under it, executed before January 1, 1978, . . . is subject to termination . . .

14  notwithstanding any agreement to the contrary . . . ."

15      It is this right of termination that Joanne Siegel and Laura Siegel Larson now

16  seek to vindicate in this case.[3]  In pursuing such a claim, the two heirs, initially

17  sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

18  _____

19      [3]  Although the present case only concerns the Siegel heirs' efforts to
    terminate the 1938 grant, it has come to the Court's attention that the estate of

20  Superman co-creator Joseph Shuster has recently filed termination notices to
    reclaim the rights to the Superman copyright.  According to documents filed with

21  the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister
    and the court-appointed representative of the Shuster estate, has given notice of

22  the estate's intent to terminate the 1938 grant of the Superman copyright to
    Detective Comics and its successors effective 2013.  As executor of the Shuster

23  estate, Peary is entitled, under changes made to the 1976 termination provisions
    by the 1998 Sonny Bono Copyright Term Extension Act, to make the same

24  termination claims for the Superman copyright that Shuster or his heirs would have
    been entitled to bring beforehand.  See 17 U.S.C. § 304(c)(2); 3 NIMMER ON

25  COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was
    originally passed if an author died without leaving heirs before exercising the right

26  to termination "the result was that no one could exercise [that] right," but this
    "harsh result" was "ameliorated" through the passage of the 1998 Act by providing

27  that, "instead of lapsing," the termination right could be exercised by "the author's
    executor, administrator, personal representative, or trustee").

28

19

**EXHIBIT 19**
**222**

WME 00101

Case 2:10-cv-03633-ODW-RZ   Document 500-4   Filed 10/10/12   Page 53 of 157   Page
ID #:31705
Case 2:04-cv-08776-SGL-RZ   Document 175   Filed 03/26/2008   Page 20 of 72

1   Levine, in compiling the information necessary to draft the termination notice itself.[4]

2   On April 3, 1997, the two heirs served seven separate notices of termination

3   under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's

4   potential grant(s) in the Superman copyright to defendants, including the March 1,

5   1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975,

6   agreement.  The termination notices also specified that they covered hundreds of

7   works, with the added proviso that the intent was for the termination notice to apply

8   "to each and every work . . . that includes or embodies" Superman, and the failure

9   to list any such work in the notice was "unintentional and involuntary."  Each of the

10  termination notices had an effective date of April 16, 1999.  A flurry of settlement

11  discussions between the parties quickly ensued, but just as quickly fizzled out.

12  Nearly two years then passed without much discussion between the parties.

13  The day before the purported termination was to take effect, defendants sent

14  a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the

15  termination notices.  (Decl. Marc Toberoff, Ex. Q at 171).  The same day DC

16  Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel

17  that his company would "continue to provide the income and insurance benefits you

18  . . . have been receiving under the 1975 agreement, without prejudice to [the

19  company's] rights under that agreement, as long as we all continue to pursue the

20  goal of working together."  (Decl. Michael Bergman, Ex. P).

21  Not long after the termination notices' effective date passed, the Siegel heirs

22  retained new counsel and the parties re-entered into settlement discussions to

23  resolve their respective claims to the Superman copyright.  Towards that end, DC

24  Comics (and its "successors, past and present subsidiaries or affiliates") and the

25  Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed

26  that neither would "assert any statute of limitations . . . defense[] relating to . . . the

27  ────────────────────

28  [4]  Before going into private practice, Mr. Levine served as General Counsel
for the United States Copyright Office and also as Executive Director for the
National Commission on New Technological Uses of Copyrighted Works.

20

**EXHIBIT 19**
**223**

WME  00102

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 54 of 157    Page
ID #:31766
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 21 of 72

1    [Termination] Notices" based on "the passage of time during the period from the

2    date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7

3    hereof (the 'Tolling Period')" while the parties attempted "to find an amicable

4    resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex.

5    A at 1). The agreement further provided that the tolling period would remain in

6    effect "until 10 business days after the earlier of: (a) one of the parties terminating

7    negotiations, in writing, relating to the [Termination] Notices, or (b) the parties

8    reaching an amicable resolution of the disputes between them relating to the

9    Notices." (Reply Decl. Marc Toberoff, Ex. A at 2).

10    At some point the broad outline of a global settlement concerning the

11    copyright to the Superman material, as well as to other works Siegel either authored

12    or contributed material to Detective Comics (notably, Superboy and The Spectre

13    properties), was reached. Specifically, on October 19, 2001, counsel for Joanne

14    Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General

15    Counsel confirming and summarizing the substance of the settlement. The letter

16    concluded that "if there is any aspect of the above that is somehow misstated,

17    please let me know by [October 22, 2001] at 2:00, as I will be out of the office —

18    and likely difficult to reach — for the following four weeks." (Decl. Marc Toberoff,

19    Ex. BB).

20    A week later, on October 26, 2001, Warner Bros' General Counsel John

21    Shulman responded with a letter, stating that he had "reviewed" the summary set

22    forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of

23    what we believe the deal we've agreed to is"; the outline was five pages long.

24    (Decl. Marc Toberoff, Ex. CC). The letter concluded that Warner Bros. was

25    "working on the draft agreement" so as to "have this super-matter transaction in

26    document form." (Decl. Marc Toberoff, Ex. CC).

27    A few months later, on February 1, 2002, outside counsel for Warner Bros.

28    provided a copy of the promised draft agreement (spanning fifty-six pages), with the

**EXHIBIT 19**
**224**

WME 00103

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 55 of 157    Page
ID #:31707
Case 2:04-cv-08776-SGL-RZ    Document 147    Filed 03/26/2008    Page 22 of 72

1   proviso that, "[a]s our clients have not seen this latest version of the agreement, I

2   must reserve their right to comment."  (Decl. Marc Toberoff, Ex. DD).  Mention was

3   also made in the draft agreement for the need of certain "Stand Alone Assignments"

4   that had as yet not been finalized, something which Warner's outside counsel

5   promised would be forthcoming.  (Decl. Marc Toberoff, Ex. DD).

6        Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time

7   Warner's Chief Operating Officer Richard Parsons, recounting that she and her

8   daughter had "made painful concessions and reluctantly accepted John Shulman's

9   last [settlement] proposal [in October, 2001]," but upon reading the proposed draft

10  agreement learned that they had been "stabbed in the back," as it "contained new,

11  outrageous demands that were not in the [October, 2001] proposal," such as

12  "condition[ing] recei[pt of] financial compensation for our rights on demands which

13  were not in the proposal we accepted."  (Decl. Michael Bergman, Ex. Z).  The letter

14  concluded that "[a]fter four years we have no deal and this contract makes an

15  agreement impossible."  (Decl. Michael Bergman, Ex. Z).

16       Time Warner's CEO quickly responded with a letter of his own on May 21,

17  2002, expressing shock and dismay as "each of the major points covered in the

18  draft agreement . . . accurately represented the agreement previously reached" by

19  the parties.  (Decl. Michael Bergman, Ex. AA).  The letter continued by

20  acknowledging that, as with all lengthy negotiations, Time Warner "expected" that

21  the submission of the draft agreement would result in further "comments and

22  questions on the draft" by Siegel family's representatives that "would need to [be]

23  resolve[d]."  (Decl. Michael Bergman, Ex. AA).  The letter concluded by reaffirming

24  Time Warner's continued interest "that this agreement can be closed based upon

25  the earlier discussions with [the Siegel family's] lawyers."  (Decl. Michael Bergman,

26  Ex. AA).

27       Not long thereafter, the Siegel heirs' lawyers submitted for the family's review

28  and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

**EXHIBIT 19
225**

WME 00104

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 56 of 157    Page
ID #:31768
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 23 of 72

1    (Decl. Marc Toberoff, Ex. AA).  The Siegel heirs, on September 21, 2002, rejected

2    the redraft and fired their attorneys.  (Decl. Marc Toberoff, Ex. AA).  That same day

3    Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General

4    Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing]

5    negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of

6    its representatives and associates concerning" their rights to, among other things,

7    Superman.  (Decl. Michael Bergman, Ex. DD).

8        Joanne Siegel and Laura Siegel Larson thereafter filed the present action,

9    with the assistance of new counsel, Marc Toberoff, on October 8, 2004.  Both sides

10   have since filed cross-motions for partial summary judgment.

11       Reduced to their essentials, the legal questions at stake in the parties' cross-

12   motions are two-fold:

13       (1) The validity and enforceability of the termination notices in light of

14   (a) whether any copyrightable Superman material contained in the promotional

15   advertisements for Action Comics, Vol. 1, lies outside the reach of the termination

16   notice (and hence, the termination notice is not enforceable against it);  (b) whether

17   certain portions of the Superman comic in Action Comics, Vol. 1, are in the nature of

18   a work for hire (and hence, not subject to termination); (c) whether the failure to list

19   the 1948 consent judgment in the notices as one of the grants sought to be

20   terminated materially affects the notices of termination; (d) whether the post-

21   termination receipt of benefits under the 1975 agreement acts as a novation to re-

22   grant the Superman copyright; (e) whether the statute of limitations ran out before

23   the instant action was instituted thereby forestalling this lawsuit; and (f) whether the

24   settlement negotiations that took place between the parties resulted in an

25   enforceable agreement disposing of the claims asserted in the present action; and,

26       (2) The parameters of what was recaptured (and the rights flowing therefrom)

27   through the termination notices, namely, (a) whether plaintiffs have a right to

28   defendants' post-termination foreign profits from the exploitation of the Superman

**EXHIBIT 19**
**226**

WME  00105

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 57 of 157    Page
Case 2:04-cv-08776-SGL-RZ    Document 417-9    Filed 03/26/2008    Page 24 of 72
ID #:31769

1  copyright; (b) whether plaintiffs are entitled to profits from any of the various

2  trademarks that defendants have procured since the grant in marketing Superman;

3  (c) whether plaintiffs are entitled to profits from the derivative works of the

4  Superman material published by Detective Comics and its successors in interest

5  prior to the termination notice's effective date; and (d) whether any recovery of

6  profits extends beyond those made through DC Comics' exploitation of the

7  Superman copyright to that of its corporate siblings and parent who are licensees to

8  that copyright's movie and television rights, be it based on an alter-ego theory or

9  other notion of equity.

10      I.      Validity and Enforceability of Termination Notices

11          The 1976 Act created a new right allowing authors and their heirs the ability

12  to terminate a prior grant to the copyright in their creations.  See 17 U.S.C.

13  § 304(c).  The 1976 Act also set forth specific steps concerning the timing and

14  contents of the notices that had to be served to effectuate the termination of a prior

15  grant.  One of the most important steps was placing a limit on the temporal reach

16  such a notice could have on what was subject to being recaptured.  Specifically, the

17  "[t]ermination of the grant may be effected at any time during a period of five years

18  beginning at the end of fifty-six years from the date copyright was originally

19  secured."  17 U.S.C. § 304(c)(3) (emphasis added).  Moreover, the notice is

20  required to be "served not less than two or more than ten years before" its effective

21  date.

22          Taken together, someone seeking to exercise the termination right must

23  specify the effective date of the termination, and that effective date must fall within a

24  set five-year window which is at least fifty-six years, but no more than sixty-one

25  years, from the date the copyright sought to be recaptured was originally secured,

26  and such termination notice must be served two to ten years before its effective

27  date.  The purpose of this time window for terminating pre-1978 grants was so that

28  the only rights to the copyright affected thereby were those to the 19-year extension

24

**EXHIBIT 19**
**227**

WME  00106

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 58 of 157    Page
ID #:31740
Case 2:04-cv-08776-SGL-RZ    Document 177    Filed 03/26/2008    Page 25 of 72

1    in the renewal term created by the 1976 Act, leaving undisturbed the grantee's

2    vested interest to the original 28-year renewal term as set forth in the 1909 Act, the

3    governing statute at the time the grant itself was made.

4        Additional procedures required to be followed to make the termination notice

5    effective were specified as well:  The author or his or her heirs had to serve "an

6    advance notice in writing upon the grantee or the grantee's successor in title"; the

7    notice had to be signed by the author or his or her heirs; the notice was required to

8    "state the effective date of the termination"; and the notice must be "recorded in the

9    Copyright Office before the effective date of termination."  17 U.S.C. § 304(c)(4).

10       Beyond these statutory requirements, the notice was also required to

11   "comply, in form, content, and manner of service, with [the] requirements that the

12   Register of Copyrights . . . prescribe[s] by regulation."  17 U.S.C. § 304(c)(4)(B).

13   Toward that end, the Register promulgated regulations implementing this statutory

14   proviso.  See 37 C.F.R. § 201.10.  Among those regulations was one requiring the

15   terminating party to identify in the notice "each work as to which the notice of

16   termination applies."  37 C.F.R. § 201.10(b)(1)(ii).

17       As one noted author has commented, "[i]t is difficult to overstate the

18   intricacies of these [termination] provisions, the result of which is that they are

19   barely used, no doubt the result desired by lobbyists for assignees."  William Patry,

20   Choice of Law and International Copyright, 48 Am. J. Comp. L. 383, 447 (2000);

21   see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir.

22   1982) (commenting that the steps necessary to make a termination effective

23   oftentimes create "difficult, technical questions").  Those intricate provisions

24   oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating

25   party to reclaim the full measure of the copyright in a work of authorship.  This case

26   is no different.

27

28

**EXHIBIT 19**
**228**

WME  00107

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 59 of 157    Page
ID #:31771
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 26 of 72

1.    <u>Promotional Announcements</u>

Plaintiffs gave notice that the effective date of the termination notices was April 16, 1999, meaning that, backdating from that date sixty-one years, the termination notices would leave unaffected (or better said, beyond their reach) any statutory copyright that had been secured in the Superman material before April 16, 1938.  Defendants contend that the promotional announcements for <u>Action Comics</u>, Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the five-year effective window of plaintiffs' termination notices; therefore, they argue, any copyright material contained in those promotional announcements, notably the illustration of Superman on the cover of <u>Action Comics</u>, Vol. 1, is unaffected by the termination notices and remains theirs to exploit exclusively.  As defendants frame it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of limitations[;] . . . if any work falls outside the five-year window established by the [termination] effective date, it <u>cannot</u> be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability." (Defs' Mot. Partial Summ. J. at 29).  Thus, any work that was published with notice prior to April 16, 1938, <u>i.e.</u>, sixty-one years before the stated effective date, remains untouched by the termination notice.[5]

Plaintiffs do not dispute the legal consequence section 304(c)'s five-year window has in this case on the effective reach of their termination notices.  As drafters of the notice, Siegel's heirs were given <u>carte</u> <u>blanche</u> in identifying the termination notices' effective date.  Once they chose a date, certain consequences flowed therefrom, the most important of which is to cabin the five-year window

_____

[5]  Defendants also contend that the promotional advertisements are not effected by the termination notices because plaintiffs failed to list those works in their notices.  As the Court finds that the promotional advertisements fall outside the five-year window during which those notices could effectively terminate the grant in the copyright contained in them, the Court will not pass on the consequences, if any, stemming from plaintiffs' additional failure to list those promotional announcements in their notices.

26

**EXHIBIT 19**
**229**

WME  00108

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 60 of 157    Page
ID #:31742
Case 2:04-cv-08776-SGL-RZ    Document 417-1    Filed 03/26/2008    Page 27 of 72

within which the notice can recapture any copyright secured in the material to which

the grant was directed.  A copyright in a work statutorily secured even just days

outside this five year window is beyond the effective reach of the termination notice,

in much the same way a tardily-filed renewal registration has been held to be

ineffective.  Cf. 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even

several days is fatal and that the purported renewal is void to rescue the subject

work from the public domain, whether filed after expiration of the one year or prior to

its initiation").  A leading treatise supports such a calculation and the consequences

flowing from it:

> The appropriate dates for termination notices are measured from "the date copyright was originally secured, or beginning on January 1, 1978, whichever is later."  In the case of pre-January 1, 1978 works, "secured" means the work the actual date the work was first published with notice (or in the case of unpublished works, the date of registration), e.g., April 15, 1970, not December 31, 1970.  Failure to pay attention to the differences between the date the copyright was originally secured for purposes of section 304(c) termination of transfer and section 305 expiration of term may lead to an untimely notice of termination.

2 PATRY ON COPYRIGHT § 7:43; see also 3 NIMMER ON COPYRIGHT § 11.05[B][1] at

11-40.11 ("Suppose that statutory copyright for a song were first secured on May

21, 1925.  Based on the statutory provision that termination may be effected

'beginning at the end of fifty-six years from the date copyright was originally

secured,' the first effective date for termination should be May 21, 1981"); 3 JAY

DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL

CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a

work was so published predates the current year by more than sixty-one years, then

the termination right [to that work] under section 304(c) has expired.  The statute

apparently requires calculation of all these termination periods from the exact date

of publication, rather than from the end of the publication year, as is appropriate for

determining copyright terms under the 1976 Act").

**EXHIBIT 19**
**230**

WME 00109

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 61 of 157    Page
ID #:31743
Case 2:04-cv-08776-SGL-RZ    Document 1743    Filed 03/26/2008    Page 28 of 72

1    It is in this sense that one can say whether a termination notice is timely or

2    not, a question that does not go to the notice's validity (the notice remains valid with

3    respect to a copyright in works that was secured during the five year window) but as

4    to its enforceability against a copyright in a particular work pre- or post-dating that

5    window. Thus, the key in deciding this timeliness question begins with a

6    determination of when the copyright in the work in question was secured, and not

7    when the work itself was created.

8    The determination of when the copyright in a work is secured is when the

9    material was protected by statute, meaning when the copyright in such a work

10    secured protection under this country's copyright laws.  Under the 1909 Act, "works

11    could have obtained statutory copyright . . . , without the necessity of registration,

12    simply by the act of publishing copies of the work bearing a proper copyright notice.

13    As to such works, registration did not create the copyright, but merely recorded it."

14    2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17

15    U.S.C. § 10 (repealed).  Thus, the initial question is whether the comic books

16    containing the promotional announcements bore such a copyright notice upon

17    them.

18    Section 19 of the 1909 Act delineated what constituted proper notice: "The

19    notice of copyright required by section 10 of this title shall consist either of the word

20    'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of

21    the copyright proprietor, and if the work be a printed literary, musical, or dramatic

22    work, the notice shall include also the year in which the copyright was secured by

23    publication."  If the comic books in question contained such a notice, then the date

24    of publication is also the date the copyright in the material contained therein was

25    secured.  If not, then any of the copyrightable material in the works (including the

26    promotional announcements) was never secured (absent evidence that the material

27    had been registered beforehand with the Copyright Office when it was in an

28    unpublished state) but instead was injected into the public domain.

**EXHIBIT 19**
**231**

WME  00110

1      Here, the material submitted by defendants (the cover page for the magazine

2   and the page on which the promotional announcements is displayed) does contain

3   such a notice.  At the bottom of the promotional announcement itself is the

4   following:  "Entire contents copyright 1938 by Detective Comics, Inc." (Decl.

5   Michael Bergman, Ex. C at 10 & Ex. D at 14).  Thus, the copyright for any of the

6   works contained in the comic books in question was secured on the date they were

7   published.

8      This leads to the next question:  What are the publication dates for the two

9   comic books that contained the promotional announcements for <u>Action Comics</u>,

10   Vol. 1, featuring an illustration of Superman?  Defendants have submitted the initial

11   copyright registrations for these comics, which indicate that <u>More Fun Comics</u>,

12   Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13   plaintiffs' termination notices, and that <u>Detective Comics</u>, Vol. 15, was published on

14   April 10, 1938, six days outside the temporal reach of the termination notices.

15   Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16   constituted <u>prima facie</u> evidence of the publication date for a work.[6]  <u>See</u> 17 U.S.C.

17

18      [6]  Defendants' suggestion that the addition of section 304(a)(4)(B) by the

19   Copyright Amendments Act of 1992 somehow altered this rule by extending the
<u>prima facie</u> imprimatur to renewals like those in this case is simply mistaken.

20   (Defs' Reply at 40 & n.16).  That section provides that, so long as the renewal
occurred "within 1 year before [the] expiration" of the initial term, then "the

21   certificate of such registration shall constitute prima facie evidence as to the . . .
the facts stated in the certificate."  However, the 1992 Act's provisions placed one

22   very important proviso on its applicability — its provisions applied only where a

23   party was filing a renewal registration to the "extended term of copyright in a work."
Thus, the amendments' provisions were limited to renewal claims to works <u>that</u>

24   <u>were still in their initial term when the 1976 Act became effective</u>, January 1, 1978,
meaning for copyrights whose first term of copyright was secured on or after

25   January 1, 1950.  That is to say, section 304(a)(4)(B)'s provisions only applies to
works that had yet reached the time for renewal <u>before</u> the 1976 Act extended the

26   term of the renewal period (unlike Superman in <u>Action Comics</u>, Vol. 1, or the

27   comics containing the promotional announcements).  For those works, the 1992
amendments allowed such renewal to be made at anytime, but provided incentives

28   for prompt renewal, the most notable being the extension of the <u>prima facie</u> rule to
such promptly filed renewal claims.  <u>See</u> 2 PATRY ON COPYRIGHT § 7:50 ("Effective

29

**EXHIBIT 19**
**232**

WME  00111

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 63 of 157    Page
ID #:31745
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 30 of 72

1    § 209 (repealed) (providing that a "certificate of registration" issued by the Register

2    of Copyrights "shall be admitted in any court as prima facie evidence of the facts

3    stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d

4    737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the

5    reason that renewal certificates issued during the 1909 Act were not accorded

6    prima facie status was because of the "minimal attention" the Register of Copyrights

7    paid to the information contained therein; "[a]s long as original registration for a

8    work has been made, the Copyright Office accept[ed] it at face value").

9        Plaintiffs attempt to refute this prima facie evidence through expert testimony

10   and by legal argument.

11       As to the latter, plaintiffs seek to discredit the value of the initial copyright

12   registration for More Fun Comics, Vol. 31, because Detective Comics' successor

13   did not obtain that registration until nearly 28 years after its publication, on the eve

14   of the expiration of the initial copyright term.  The 1909 Act required that, once

15   copyright had been secured by publication with notice, "there shall be promptly

16   deposited" the required copies of the published work and the registration claim

17   itself.  17 U.S.C. § 13 (repealed).  Plaintiffs suggest that such a "late" initial

18   registration raises questions as to the trustworthiness of any of the information

19   contained in that registration.  (Pls' Opp. at 48-49).  Plaintiffs correctly point out that

20   Professor Nimmer in his treatise has commented that, "where there was a failure to

_____

22   June 26, 1992, Congress abolished the requirements that works in their first term
     of copyright published or registered between 1964 and 1977 must be timely

23   renewed in order to enjoy the (now) 67-year renewal term.  Instead, these works
     are now automatically renewed for the full term of 75 years.  Copyrights whose

24   first term of copyright was secured between January 1, 1950, and December 31,
     1963, still are to have been renewed according to the requirements of the 1909

25   Act.  Failure to do so resulted in the work falling into the public domain. . . .
     Renewal claims may still be filed at any time during the renewal period, and a

26   number of incentives have been added to encourage filing.  [One such] incentive[]
     for renewing provided in the Copyright Act of 1992 are the prima facie status that

27   is accorded to the validity of the work").  Given that none of the comics in question
     fall within the class affected by section 304(a)(4)(B), that section's expansion of

28   the prima facie status to renewal claims does not apply here.

30

**EXHIBIT 19**
**233**

WME   00112

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 64 of 157    Page
ID #:31776
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 31 of 72

1    promptly register and deposit, under the 1909 Act, some questions as to the viability

2    of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150.

3    But Professor Nimmer's comments as to the collateral consequences flowing from

4    such a delay were not geared toward the validity of the copyright itself, but to the

5    existence of an impediment to bringing an action for infringement.  See id. at 7-149

6    (noting that Supreme Court's Washingtonian decision effectively read the "words

7    'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not

8    satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . .

9    requirement was (as it still is) clearly a condition precedent to the right to bring an

10    infringement action").

11         Although the general line of reasoning plaintiffs seek to draw from such a

12    "late-in-time" registration makes sense from a policy perspective, plaintiffs have

13    cited no authority that such long delays in registration vitiates or otherwise

14    diminishes the statutorily conferred prima facie presumption to which such

15    registration claims (and the information contained therein) are entitled, especially

16    once a registration has (as here) been tendered.  Moreover, even were the Court to

17    entertain plaintiffs' invitation, there remains the initial registration for the other comic

18    book in question — Detective Comics, Vol. 15 — which was obtained shortly after

19    that comic book's publication and, hence, the problem pressed by defendants with

20    the promotional announcement contained therein falling outside the effective reach

21    of the termination notice remains.

22         Plaintiffs next contend that the copies of the registration certificates

23    submitted by defendants have not been authenticated by the declarant to whose

24    declaration they are affixed, and hence, are not admissible as proof of the comic

25    books' publication date.  (Pls' Opp. at 48-49 ("the certificate is not properly

26    authenticated, but is merely attached to the declaration of defendants' attorney, who

27    appears to have no personal knowledge of it").  Such extrinsic evidence of

28    authenticity by the declarant is unnecessary for these copyright registration

**EXHIBIT 19**
**234**

WME  00113

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 65 of 157    Page
ID #:31747
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 32 of 72

certificates.  Under Federal Rule of Evidence 902(1), a "document bearing a seal

purporting to be that of the United States . . . or of a . . . department, officer, or

agency thereof," with "a signature purporting to be an attestation or execution," is

considered self-authenticated.  Close inspection of the copyright registration

certificates submitted by defendants clearly reveals the seal issued by the United

States Copyright Office, signed by the Register of Copyrights, and bearing the

following legend: "[A]ttached are additional certificates for the [comics in question]

which were registered in accordance with provisions of the United States Copyright

Law."  (Decl. James Weinberger, Ex. B & C).  The requirements of Rule 902(1)

have been met, rendering the copies of the copyright registration certificates as self-

authenticated and, thus, admissible.

The obscure nature of these promotional announcements does not alter this

analysis.  It is undoubtedly true that the existence of these announcements was not

widely recognized even by comic book aficionados.  That, however, does not

change the effect their existence has vis-à-vis the termination notices' effective

reach.  Once a termination effective date is chosen and listed in the notice, the five-

year time window is an unbendable rule with an inescapable effect, not subject to

harmless error analysis.  See 37 C.F.R. § 201.10(e) (limiting application to

"[h]armless errors in a notice" that does not "materially affect the adequacy of the

information") (emphasis added).  That good cause may have existed for failing to

structure the termination notices so as to sweep the announcements within its reach

does not obviate application of the rule itself.

The importance such promotional announcements may have on the reach of

a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr.

Levine, who drafted the termination notices in this case.  He also drafted plaintiffs'

termination notice with respect to The Spectre copyright, and structured it in such a

way so as to include among the works affected by the notice's five-year window a

promotional announcement for The Spectre contained in a comic published a month

**EXHIBIT 19**
**235**

WME  00114

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 66 of 157    Page
ID #:31748
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 33 of 72

1    before the one containing the first comic book story of the character. (Decl. Michael

2    Bergman, Exs. WW-YY (termination notice describing among the works affected by

3    the notice the promotional announcement as "Spectre character appearing in

4    costume in an ad in issue No. 51 of More Fun Comics, copyrighted November 28,

5    1939, as Copyright Registration No. B437786, publication date January 1940") &

6    Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

7         Having provided prima facie evidence of the comic books' publication dates,

8    the burden shifts to the plaintiffs to produce some evidence calling into question

9    those dates. The burden of production is not a heavy one (in large measure owing

10   to the fact that so little is proffered by the applicant or scrutinized by the Copyright

11   Office in the application process to procure the registration in the first instance), but

12   it is one that must be met nonetheless. See 3 PATRY ON COPYRIGHT § 9:14 ("the

13   Copyright Office has no ability to verify facts stated in the certificate, and not

14   surprisingly makes no effort to do so. . . . At the most, the Office can take notice of

15   any inconsistent facts that appear on the deposit copy and request clarification from

16   the claimant . . . . In any event, [the opposing party] should be required to present

17   only a small degree of evidence calling into question the fact at issue in order to

18   rebut the certificate's presumption").

19        On that point all that plaintiffs have submitted is the opinion of a comic book

20   historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among

21   other things, assist it "in attempting to determine approximate dates of past

22   publication" of its comics. (Decl. Mark Evaier ¶ 12). From this particular

23   experience, as well as his long history in the comic book industry, Mr. Evanier seeks

24   to cast doubt on the veracity of the asserted publication dates for the comics

25   containing the promotional announcements. The general thrust of his expert

26   opinion is that, outside the first printing of certain famous comic superheros such as

27   Superman in Action Comics, Vol. 1, a particular "run of the mill" comic book's exact

28   date of publication during the 1930s and 1940s is difficult to determine, rendering

33

EXHIBIT 19
236

WME 00115

1    the dates listed on the certificates as nothing more than "mere guesstimates" by the

2    publisher.  (Decl. Mark Evanier ¶ 10).  Furthermore, Mr. Evanier downplays the

3    significance of the fact that the comic books in question contained promotional

4    announcements for Action Comics, Vol. 1, as necessarily meaning that their

5    publication must have preceded Action Comics publication.  As Mr. Evanier

6    explains, the dates provided by publishers were often the dates initially scheduled

7    or intended for publication, but the actual dates often varied with printing, delivery,

8    and other delays.  (Decl. Mark Evanier ¶ 11).

9           Mr. Evanier's expert opinion is chalk full of information on the publication of

10   comic books in general during this time period, but is void of any specific evidence

11   or opinion as to the publication of the particular comic books in question in this

12   case.  He offers no evidence of any specific printing, delivery, or other problems that

13   may have affected the publication of More Fun Comics, Vol. 31, or Detective

14   Comics, Vol. 15.  His general opinion thus does not sufficiently refute the prima

15   facie evidence set forth in the initial copyright registration certificates for these

16   particular comic books.  At most, his opinion raises some doubts as to the precision

17   of the dates contained in initial copyright registrations for comic books in general

18   from this period.  However, those copyright notices were completed at a time which,

19   by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate

20   as possible in listing those dates and long before any incentive to provide

21   inaccurate dates by virtue of contemplating this present litigation or the termination

22   provisions of the 1976 Act existed.  Plaintiffs evidence does no more than inform the

23   Court that, despite efforts to be precise about publication dates for comic books

24   during this particular period, mistakes could be made; it is not at all probative on the

25   issue of whether mistakes were in fact made with respect to the information

26   contained in the particular registration certificates at issue in this case.  The Court

27   therefore finds that the promotional announcements containing an illustration of

28   Superman from the cover of Action Comics, Vol. 1, are outside the effective reach

**EXHIBIT 19**
**237**

WME  00116

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 68 of 157    Page
ID #:31780
Case 2:04-cv-08776-SGL-RZ    Document 178    Filed 03/26/2008    Page 35 of 72

1    of the termination notices.

2           Perhaps anticipating this finding, plaintiffs next seek to downplay the

3    significance of the promotional announcements themselves by arguing that, legally

4    and factually, little, if any, copyrightable Superman material is contained in those

5    announcements.  Specifically, plaintiffs submit that Siegel and Shuster's material

6    was an indivisible joint work, and that the advertisements were a derivative work of

7    the authors' material.  Thus, they claim that none of the Superman material

8    contained in the promotional announcements (namely, the cover artwork from

9    Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue

10   to exploit the same, regardless of the termination notice.  As framed by plaintiffs:

11   "Defendants' entire argument is falsely premised on the erroneous assumption that

12   they can take the cover of Action Comics, No. 1, one of many illustrated panels in

13   Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted

14   joint work, and own a separate copyright in the illustration in the form of a mere 'in

15   house announcement' depicting a reduced image of the illustration.  [Moreover,]

16   Detective's 'in-house announcements,' at best, are derivative works based on the

17   pre-existing cover and interior panel of Siegel and Shuster's pre-existing

18   'Superman' story."  (Pls' Opp. at 44, 46).

19          This emphasis on the joint nature of Siegel and Shuster's Superman material

20   is rendered nugatory by the fact that Siegel and Shuster granted the copyright in

21   their material to Detective Comics on March 1, 1938, well before the promotional

22   advertisements were published by Detective Comics in April of that year.  Thus, by

23   the time the promotional announcements were published, Siegel and Shuster's

24   Superman material was owned solely by Detective Comics to do with it as it saw fit,

25   whether it be as a full-length comic or as artwork in its advertising.  That Siegel and

26   Shuster intended their work to be combined together and depicted as a unitary

27   whole is a separate and distinct question from whether, in later using some of

28   Shuster's artwork from that combined material it had acquired, Detective Comics

**EXHIBIT 19**
**238**

WME 00117

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 69 of 157   Page
ID #:31781
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 36 of 72

1    somehow unraveled the copyrightability in that portion of the work.  The manner of a

2    work's authorship is entirely separate from the way in which an assignee may

3    exploit that material once it has acquired exclusive ownership of the same and,

4    correspondingly, whether there were anything copyrightable in the work the

5    assignee subsequently published using only parts of that material.

6        In this respect it is important to remember that a joint work can consist of

7    either inseparable or interdependent parts, the latter example of which include "the

8    collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result

9    of the interdependent contributions of the collaborators, i.e., one person wrote the

10    lyrics and the other the music, either of which could on its own [stand] as an

11    independent work, but which, when combined, form a single[, separate]

12    'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6.  The original Superman

13    material was the product of the story and dialogue written by Siegel and the art work

14    drawn by Shuster; each on its own could have been a work in its own right subject

15    to copyright protection, but when merged together they formed a single new and

16    unified interdependent work.  See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111,

17    1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright

18    to [the same] (if a joint work) would be considered comprised of interdependent

19    parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and

20    color to those words").

21        At most, Detective Comics took a part of Shuster's independently

22    copyrightable art work out of the joint work and utilized it, in conjunction with other

23    material (namely, the advertising slogan), in a promotional announcement.  There is

24    no rule preventing a publisher or others from publishing portions or excerpts of

25    works, joint or otherwise, that it solely owns, and then seeking a separate copyright

26    in the same.  Indeed, the opposite is true — the holder of a copyright is expressly

27    entitled to prepare derivative works based upon a copyrighted work it owns or to

28    utilize portions of that work in other materials.  See 17 U.S.C. § 106(2); see

36

**EXHIBIT 19**
**239**

WME  00118

1 generally 17 U.S.C. § 1 (repealed).  Detective Comics could just as well have

2 decided to split up the Superman material for publication into two or three

3 installments as it could (and did) decide to publish a portion of that material in an

4 advertisement to promote the comic.

5   This leads to plaintiffs' contention that the "derivative nature" of the

6 promotional advertisement itself works to exclude any of the copyright in the pre-

7 existing Superman material (notably, the art work for the Action Comics, Vol. 1

8 cover) contained therein from enuring to the benefit of the defendants to continue to

9 exploit.  Generally, if an author contributes additional original material to a pre-

10 existing work so as to recast, transform, or adapt that work, then the copyright

11 protection afforded to the author of that derivative work extends only to that

12 additional material and in no way extends to the underlying, pre-existing material.

13 See 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not

14 extend to any part of that work using "preexisting material in which copyright

15 subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10.  Thus, it is asserted that the

16 author of the pre-existing material work (here Siegel and Shuster) would continue to

17 retain ownership in the same despite its use in the derivative work (the promotional

18 announcement).

19   Even assuming that the changes made to the cover page for Action Comics,

20 Vol. 1, in the promotional announcements is not merely a reproduction, but

21 sufficiently "recast, transform, or adapts" the pre-existing material so as to be

22 considered a derivative work thereof (e.g, the cover is shown in black and white

23 instead of color, the scale of the artwork itself is diminished, and text is placed

24 alongside the artwork), there remains a complicating wrinkle.  At the time the

25 promotional announcements were placed in Detective Comics' existing comic book

26 publications, the underlying pre-existing Superman material from which a portion of

27 the announcements were derived (again the artwork for the cover) had yet to be

28 published, and, hence, copyright in the same was protected at the time under state

**EXHIBIT 19**
**240**

WME  00119

1   common law.  See 17 U.S.C. § 2 (repealed).

2    Given that the portion of the pre-existing material at issue had yet to achieve

3   statutory copyright protection when it was first published in More Fun Comics, Vol.

4   31, and Detective Comics, Vol. 15, it was injected into the public domain upon the

5   publication of the promotional announcements themselves, absent investiture of

6   statutory copyright protection through its publication.  See 17 U.S.C. § 10

7   (repealed).  That is to say, the copyright in the cover of Action Comics, Vol. 1, itself

8   first achieved statutory protection, if at all, upon its publication in the

9   announcements, not its later publication in Action Comics, Vol. 1.  See 2 PATRY ON

10  COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work

11  copyright covers the unpublished material").

12   This fact has repercussions on plaintiffs' derivative works argument, as it

13  alters the general rule described above.   Once Detective Comics published a

14  portion of the previously unpublished pre-existing material — as was its right as

15  owner of the material at that time — its continued protection resided exclusively

16  under statutory copyright in the derivative work itself lest that portion of the pre-

17  existing material (the art work for the cover) be injected into the public domain.  See

18  Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th

19  Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished

20  material is included in an authorized published derivative work, the derivative work

21  publishes the previously unpublished material").  As Professor Nimmer explains:

22    Because a derivative work by definition to some extent
    incorporates a copy of the pre-existing work, publication
23  of the former necessarily constitutes publication of the
    copied portion of the latter.  Of course, an article that
24  merely describes a pre-existing work but does not
    incorporate any substantial portion of it is not a
25  derivative work and hence, does not publish the pre-
    existing work.  Unless the basic work is reproduced in
26  the published work, it is not published.  If only the broad
    outlines or other fragmentary portion of the pre-existing
27  work are copied and published in the derivative work,
    then only to that extent is the pre-existing work
28  published.

**EXHIBIT 19**
**241**

WME   00120

Case 2:10-cv-03633-ODW-RZ   Document 500-4   Filed 10/10/12   Page 72 of 157   Page
ID #:31784
Case 2:04-cv-08776-SGL-RZ   Document 174   Filed 03/26/2008   Page 39 of 72

1 NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

("any work published prior to January 1, 1978, was not only thereby divested of

common law copyright; it was also injected into the public domain, unless at the

moment of publication copies of the work bore a proper copyright notice").

Thus, included in defendants' right to continue to exploit the copyright in the

derivative work (the promotional announcements) is the right to the copyright in that

part of the pre-existing work (the illustration from the cover) that was published for

the first time in that derivative work.

The cases cited by plaintiffs as standing for the contrary are all

distinguishable, as either the act of publication in question fell within the "limited"

publication exception because the material was distributed for promotional purposes

to members in the trade and not, as here, the general public itself, see Rushton v.

Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

derivative work was itself in the public domain (unlike here where the underlying

material was in an unpublished state protected by common law copyright), thereby

mooting any question about divestiture of the underlying work through publication.

See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

Here, the promotional announcements represent the first time Superman

appeared to the public, and consequently, the first time any of Siegel and Shuster's

Superman material was protected by statutory copyright, albeit in conjunction with

the other material contained in the advertisement itself.  Thus, all of the material in

the promotional announcement (which included the graphic depiction of Superman

later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

protection before the earliest possible date covered by the plaintiffs' termination

notices.  The Court therefore finds that the publication date for at least one of the

comics containing the promotional announcements falls outside the reach of the

termination notice and, therefore, any copyrightable material contained therein

**EXHIBIT 19**
**242**

WME 00121

1  (including that found in the cover to <u>Action Comics</u>, Vol. 1, <u>as</u> <u>depicted</u> in those

2  announcements) remains for defendants to exploit.

3       This leads to the question of the <u>scope</u> of the copyrighted material remaining

4  in defendants' possession by way of the promotional announcements, a question

5  that defendants themselves acknowledge "is most obviously answered by [looking

6  at] the ads which speak for themselves" and that does not require some "special

7  'lens'" to resolve.  (Defs' Reply at 44).

8       The Court begins by observing what is <u>not</u> depicted in the announcements.

9  Obviously, nothing concerning the Superman storyline (that is, the literary elements

10  contained in <u>Action Comics</u>, Vol. 1) is on display in the ads; thus, Superman's

11  name, his alter ego, his compatriots, his origins, his mission to serve as a champion

12  of the oppressed, or his heroic abilities in general, do not remain within defendants

13  sole possession to exploit.  Instead the only copyrightable elements left arise from

14  the pictorial illustration in the announcements, which is fairly limited.

15       The person in question has great strength (he is after all holding aloft a car).

16  The person is wearing some type of costume, but significantly the colors, if any, for

17  the same are not represented, as the advertisement appears only in black and

18  white.  The argument that the "S" crest is recognizable in the promotional

19  advertisement is not persuasive.  What is depicted on  the chest of the costume is

20  so small and blurred as to not be readily recognizable, at best all that can be seen is

21  some vague marking or symbol its precise contours hard to decipher.  The Court

22  thus concludes that defendants may continue to exploit the image of a person with

23  extraordinary strength who wears a black and white leotard and cape.  What

24  remains of the Siegel and Shuster's Superman copyright that is still subject to

25  termination (and, of course, what defendants truly seek) is the entire storyline from

26  <u>Action Comics</u>, Vol. 1, Superman's distinctive blue leotard (complete with its

27  inverted triangular crest across the chest with a red "S" on a yellow background), a

28  red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

**EXHIBIT 19**
**243**

WME  00122

1    and run faster than a locomotive, none of which is apparent from the

2    announcement.

3        2.    Work Made for Hire Aspect of Portions of Action Comics, Vol. 1

4        Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5    prior grant in the copyright to a creation does not apply to a "work made for hire,"

6    because the copyright in such a creation was never the artist's to grant, belonging

7    instead to the one who employed the artist to create the work.  See 17 U.S.C.

8    § 304(c); Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)

9    ("Once it is established that a work is made for hire, the hiring party is presumed to

10   be the author of the work").  The manner in which Siegel and Shuster's Superman

11   material was submitted, then re-submitted in a reformatted version, and finally

12   accepted for publication by Detective Comics raises questions about the work for

13   hire status of the re-formatted material (but not the initial material submitted to the

14   publisher) later published in Action Comics, Vol. 1.

15       Defendants argue that portions of the copyrightable material contained in

16   Action Comics, Vol. 1, are unaffected by the termination notice because those

17   portions belong exclusively to them as "works for hire," arguing that certain material

18   found in the comic book was created by Detective Comics' in-house employees, or

19   that the material was added to the underlying Superman material by Siegel and

20   Shuster at the publisher's direction.  (Defs' Opp. at 27).  Specifically, the alleged

21   "additional" material provided by Detective Comics' in-house employees is the color

22   choices made throughout the comic, notably, the red color of the letter "S" on

23   Superman's crest and the art work for the cover to the magazine itself (albeit

24   modeled after a interior panel in the Superman comic illustrated by Shuster).

25   Similarly, the additional material supplied in response to the publisher's February 1,

26   1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27   "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28   the first Superman release" and "the last panel appearing on the thirteenth page."

41

**EXHIBIT 19**
**244**

WME  00123

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 75 of 157    Page
ID #:31787
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 42 of 72

1    (Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

2         The thrust of defendants' argument was made and rejected by the Second

3    Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as

4    a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-

5    interest presented much of the same evidence now submitted in this case to argue

6    that this additional material transformed the entirety of Siegel and Shuster's

7    pre-existing Superman material published in Action Comics, Vol. 1, into a work

8    made for hire.  The Second Circuit rejected this argument, elaborating: "In the case

9    before us, Superman and his miraculous powers were completely developed long

10    before the employment relationship was instituted.  The record indicates that the

11    revisions directed by the defendants were simply to accommodate Superman to a

12    magazine format.  We do not consider this sufficient to create the presumption that

13    the [comic book] strip was a work for hire." Siegel, 508 F.2d at 914.  This

14    conclusion forecloses any further litigation on the point of whether Shuster's

15    additional drawings when reformatting the underlying Superman material into a

16    comic book format or other facts related to such a theory such as the colorization

17    process for Action Comics, Vol. 1, or the party responsible for the illustration of the

18    cover to the magazine, rendered all or portions of the resulting comic book a work

19    made for hire.

20         Defendants seek to avoid the collateral estoppel effect of the Second

21    Circuit's decision by arguing that the only issue concerning the work for hire status

22    of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions,"

23    and not what was "added to the first Superman story by Detective's employees,"

24    amongst whom defendants count Siegel and Shuster after they executed the

25    December, 1937, contract.  (Defs' Opp. at 36).  Such a reading conflicts with the

26    record.  The evidence that was proffered during the 1970s litigation in the trial court

27    on the work for hire question included declarations from Siegel and Shuster

28    discussing what took place during the reformatting process.  This is the same

42

EXHIBIT 19
245

WME 00124

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 76 of 157    Page
ID #:31788
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 43 of 72

1    evidence that defendants now seek to use in this case to argue that the reformatted

2    material was a work made for hire.

3         Moreover, the circumstances surrounding the reformatting of the underlying

4    Superman material was not only mentioned by the Second Circuit, but discounted

5    by that court in passing on the work for hire nature of <u>Action Comics</u>, Vol. 1, itself,

6    not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.

7    It would be incongruous for the Court, in respecting as it must the Second Circuit's

8    judgment, to now hold that, while that reformatted material did not transform the

9    entirety of the material in <u>Action Comics</u>, Vol. 1, into a work made for hire, some

10   subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)

11   was somehow excised out and should be accorded work made for hire status.  The

12   litigation of the larger question sweeps within it defendants' opportunity to litigate a

13   subpart thereof.

14        A contrary holding would transgress certain core principles of collateral

15   estoppel:  "A new contention is not necessarily a new issue.  If a new legal theory or

16   factual assertion raised in the second action is relevant to the issues that were

17   litigated and adjudicated previously, the prior determination of the issue is

18   conclusive on the issue despite the fact that new evidence or argument relevant to

19   the issue was not in fact expressly pleaded, introduced into evidence, or otherwise

20   urged." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25

21   (3rd ed. 2007).  Significantly, much of the evidence underlying defendants'

22   arguments was presented in the Second Circuit litigation (notably Siegel and

23   Shusters' declarations submitted in that litigation) or, if not, was certainly available

24   to be used in that case (the colorization process for the initial printing of

25   <u>Action Comics</u>, Vol. 1, or that in-house employees supposedly drew the cover to the

26   magazine).  "A party may be precluded from re-litigating an issue if evidence

27   supporting the party's position on the issue could have been submitted in previous

28   litigation but, for whatever reason, was not properly raised.  Evidence that is not the

43

**EXHIBIT 19**
**246**

WME 00125

1   result of a different factual situation or changed circumstances, but is instead

2   historical in nature and could have been admitted at the first trial if properly

3   submitted, cannot be introduced in subsequent litigation of the same issue." Id. §

4   132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d

5   245, 257 (D.C. Cir. 1992)).

6          Nowhere have defendants explained why they did not bring up the question

7   of the colorization process for Action Comics, Vol. 1, or the cover art work for the

8   magazine, before the courts handling the 1970s Superman litigation. The question

9   about the legal effect the reformatting of the underlying Superman material had on

10  the work for hire question was litigated by the parties and resolved by the courts

11  during the 1970s Superman matter. Similarly, the question about the colorization

12  and cover art work (and who was responsible for the same) could have been raised

13  in conjunction with the work for hire question, but defendants failed or decided not

14  to do so. Having litigated the question and having the opportunity to present all the

15  evidence that pressed on the issue, defendants are now barred from seeking to

16  relitigate it anew even under the purported limited guise that it is now being offered.

17         Some noted treatise writers have commented that the Second Circuit's

18  analysis focusing on the work for hire nature of the additional reformatted material

19  should have been analyzed as a derivative work, that is, that the additional material

20  was derivative of the underlying Superman material. See 1 NIMMER ON COPYRIGHT

21  § 5.03[B] [1][b][I] at 5-33 n.92. ("The Siegel decision . . . may be understood as

22  holding that the first expression of the Superman character was the underlying

23  work, and the later development of the character was a derivative work. Because

24  only the derivative work was produced in a for-hire relationship, the underlying work

25  remains the property of the creators"). However, this analysis does not benefit

26  defendants.

27         First, no additional literary material was supplied in re-formatting the

28  underlying Superman material into a comic book format.   All the dialogue and

44

**EXHIBIT 19**
247

WME  00126

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 78 of 157    Page
ID #:31790
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 45 of 72

1    storyline contained in <u>Action Comics</u>, Vol. 1, was present before Detective Comics

2    requested the pair to provide a reformatted version of the material, and that literary

3    material remained unchanged through the reformatting process.  All that is left was

4    supplying some additional illustrations by Shuster, the precise ones specified in his

5    declaration.  From the Court's review of these additional illustrations, it appears that

6    the material is completely derivative of other panels in the <u>Action Comics</u>, Vol. 1,

7    comic, with its origins in the underlying Superman material.  Thus, for instance,

8    while the final panel on page 13 shows Superman's crest with a red "S" on a yellow

9    background, so, too, does another panel containing the underlying, pre-existing

10   material.  Similarly, while the panels on the first page to the comic show Superman

11   leaping skyscapers, running at high rates of speed, and demonstrating feats of

12   great strength, so, too, do other panels containing the pre-existing material.  Indeed,

13   the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical

14   depiction of Superman was well on its way to being completely developed before

15   the re-formatted material in question was created some three years later.  Thus,

16   even if the additional material in question was tendered as a derivative work that

17   was made for hire by Shuster, all the potentially copyrightable material contained

18   therein is completely derivative of the pre-existing material and, hence, is not

19   subject to independent copyright protection in the first instance.  This, then, lends

20   strong support to the Second Circuit's observation: "Superman and his miraculous

21   powers were completely developed long before the employment relationship was

22   instituted."  <u>Siegel</u>, 508 F.2d at 914.

23          Defendants also argue that the coloring for <u>Action Comics</u>, Vol. 1, was not

24   created or chosen by Siegel or Shuster, but was instead the product of some of

25   Detective Comics' in-house employees working in the printing department.  Even if

26   this argument was not otherwise precluded by collateral estoppel, the evidence

27   produced in support is less than persuasive.  According to "eye-witness" Jack Adler,

28   the material contained in comic books "at the time" was provided by artists to the

**EXHIBIT 19**
**248**

WME 00127

1    Detective Comics' production staff in black and white.  (Decl. Jack Adler ¶ 3).

2    "Typically," members of the staff then decided upon the color that would be applied

3    throughout the magazine, something that defendants argue is an additional element

4    added to the underlying Superman material that is itself subject to copyright

5    protection.  (Decl. Jack Adler ¶ 3).  Defendants' argument depends entirely upon

6    Mr. Adler's declaration, which is not as clear as they suggest.

7         Mr. Adler does not state that he worked on the colorizing of Action Comics,

8    Vol. 1, itself.  Instead he states that he "worked for the engraving company that

9    made the metal plates for printing of, among other things, comic books for Detective

10   Comics."  (Decl. Jack Adler ¶ 3).  He then states that, "[a]t the time, comic book

11   artists . . . submitted drawn and inked comic book work in black and white."  (Id.).

12   Mr. Adler further states that the black-and-white pages "were then photographed by

13   the engraver and a photo print was hand[-]colored by staff at Detective and by the

14   engravers."  (Id.).  Of course, nothing in this statement precludes the possibility that,

15   even if the Superman material was so submitted, Siegel and Shuster may have also

16   placed certain color directions with their material to be utilized in the engraving

17   process.  In fact, that the earlier incarnation of Superman as hulking strongman in

18   the tradition of Tarzan was created by the pair as a comic book with color

19   illustrations lends to the possibility that they already had pre-conceived color

20   choices in mind for the later comic if it were later reformatted into a comic book,

21   rather than a newspaper comic strip.

22        Moreover, viewed in context, Mr. Adler's declaration appears to describe

23   procedures generally employed in the printing process, not as evidence of what

24   actually occurred with respect to the printing of Action Comics, Vol. 1, itself.  His

25   statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value

26   in light of his candid admission that he has "no knowledge of Siegel and Shuster

27   selecting any of the color in Action Comics, No.1." (Id. ¶ 4).  Mr. Adler attempts to

28   temper his admission of lack of knowledge by stating, without any basis, that he is

**EXHIBIT 19**
**249**

WME 00128

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 80 of 157    Page
ID #:31792
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 47 of 72

1  "aware that Detective staff member, Ed Eisenberg, selected the color for

2  Superman's 'S' in Shield on his costume." (Id.)  Of course, Mr. Adler's statement on

3  this point is inadmissible as it is based on hearsay.  Without any direct link between

4  Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists

5  an insufficient evidentiary foundation for his conclusions concerning the manner in

6  which the Superman material was supplied to the printer and the colorization of the

7  same was handled.

8         Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn

9  by Detective Comics' in-house artists.  However, the scant evidentiary basis

10  provided in support of this argument is ambiguous.  In a letter sent to Jerome Siegel

11  dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a

12  silverprint of the cover of Action Comics," with the observation that Detective

13  Comics "used one of those panel drawings of SUPERMAN, as you suggested in

14  your recent letter." (Decl. Michael Bergman, Ex. I).  The inference sought to be

15  drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an

16  interior illustration from the Superman comic for the cover artwork he was stating

17  that one of the publisher's in-house artists saw the interior panel in question and

18  then drew the cover using the interior panel as inspiration.  Of course, given the

19  limited nature of the information contained in the passage it could also be argued

20  that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion

21  for the comic book's cover and Detective Comics decided to "use" this suggestion.

22  This alternative reading is not implausible.  As demonstrated by the pair's attempt to

23  have their earlier incarnation of Superman published by Detective Dan, Shuster had

24  in the past drawn exemplars for the cover illustration for his comics well before they

25  were ever accepted for publication.

26         In conclusion, the Court finds that the question of the work-for-hire nature of

27  certain portions of the Superman material published in Action Comics, Vol. 1, is

28  precluded from further litigation by operation of the 1974 Second Circuit decision.

**EXHIBIT 19**
**250**

WME  00129

Case 2:10-cv-03633-ODW-RZ   Document 500-4   Filed 10/10/12   Page 81 of 157   Page
ID #:31793
Case 2:04-cv-08776-SGL-RZ   Document 174   Filed 03/26/2008   Page 48 of 72

1    Accordingly, the binding nature of that court's decision leads to the conclusion that

2    all the Superman material contained in Action Comics, Vol. 1, is not a work-made-

3    for-hire and therefore is subject to termination.

4         3.    Failure to Include 1948 Consent Judgment

5         Among the regulatory requirements promulgated by the Register of

6    Copyrights concerning the termination notice's "form, content, and manner of

7    service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must

8    "reasonably" identify "the grant" to which it applies.  37 C.F.R. § 201.10(b)(1)(iv).

9    Thus, if the author entered into five separate grants of rights for the same work, and

10   a notice of termination identifies only four of those grants, the fifth grant remains

11   "intact," and the grantee's rights thereunder remain unaffected.  See 3 NIMMER ON

12   COPYRIGHT § 11.06[B] at 11-40.22(1) n.63 ("if a grant was not effectively terminated,

13   then the rights licensed under such grant remain").

14        Here, defendants argue that plaintiffs' failure to identify the 1948 consent

15   judgment from the Westchester action is fatal to their attempts to terminate their

16   grant to the copyright in Superman, as that consent judgment was among the

17   grants leading to the transfer of ownership from the artists to Detective Comics.

18   Such argumentation is predicated upon the notion that, notwithstanding the

19   plaintiffs' act of identifying the stipulation between the parties from the Westchester

20   litigation that resulted in the consent judgment, identification of the consent

21   judgment from the Westchester action itself as (or part of) a "grant" was necessary

22   because it constituted the final step in "effectuat[ing] the transfer to [Detective

23   Comics] of the sole and exclusive ownership of all rights relating to 'Superman'";

24   "without it the rights identified in the Stipulation would not have been transferred."

25   (Defs' Opp. at 39).  The Court disagrees.

26        Although the 1976 Act nowhere defines the term "grant," the central question

27   raised is plainly one of transfer:  Did Siegel and Shuster transfer any rights to

28   Superman through or in conjunction with the 1948 consent judgment?   If so, then it

**EXHIBIT 19**
**251**

WME  00130

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 82 of 157    Page
ID #:31794
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 49 of 72

1    operated as a grant by the artists in the same.

2        On that point, the 1976 Act is helpful as it defines a "transfer of copyright

3    ownership" as "an assignment, mortgage, exclusive license, or any other

4    conveyance, alienation, or hypothecation of a copyright."  17 U.S.C. § 101; see

5    Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125

6    U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to

7    any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right

8    comprised in a copyright. [Thus, a]  'transfer' includes not only assignments (as

9    understood under the [1909] Act), but also exclusive licenses and any other

10   conveyance of copyright or of any exclusive right comprised in a copyright").

11       The consent judgment at issue did not effectuate any transfer of rights from

12   Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of

13   the Westchester action, such a transfer was effectuated by the execution of the

14   earlier stipulated agreement of the parties, not a document created two days later

15   which simply memorialized the transfer that the stipulation itself had accomplished.

16   The binding nature of the transfer contained in the stipulation was completed the

17   moment that agreement was executed.  The consent judgment was a mere

18   formality whose execution (or lack thereof) did not detract from the otherwise

19   binding nature of the parties' earlier agreement.  It merely parroted what was

20   already agreed to by the parties in the stipulation itself.

21       Finally, even if the 1948 consent judgment is a "grant" separate and apart

22   from (or part and parcel with) the 1948 stipulation, the regulations recognize that not

23   all errors in compliance with its terms impact the validity of the termination notice:

24   "Harmless errors in a notice that do not materially affect the adequacy of the

25   information required to serve the purposes of . . . section 304(c) . . . shall not render

26   the notice invalid." 37 C.F.R. § 201.10(e)(1).  Here, viewing the issue in the light

27   most favorable to the defendants, the 1948 consent judgment simply served to

28   culminate or otherwise finalize the transfer of the Superman copyright achieved

**EXHIBIT 19**
**252**

WME  00131

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 83 of 157    Page
ID #:31795
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 50 of 72

1    through the stipulation the parties reached two days earlier. That plaintiffs only

2    identified the latter rather than the former does not materially affect defendants'

3    understanding of the "grant" sought to be affected by the notice. Indeed, courts

4    have required much less in meeting the regulation's requirement of providing "a

5    brief statement reasonably identifying the grant being terminated." See Music Sales

6    Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of

7    the grant in the termination notice as the "grant or transfer of copyright and the

8    rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on

9    termination notices customarily accepted by the Register of Copyrights"); see also 2

10    PATRY ON COPYRIGHT § 7:45 (approving Music Sales). Nowhere do defendants

11    argue why the harmless error rule should not apply in a situation such as this where

12    one document that is a part in the process leading to the "transfer" of rights is

13    identified, but its necessary corollary was not.

14         Accordingly, the Court concludes that, even if the consent judgment is

15    viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant

16    subject to the termination notice was a harmless error that did not diminish the

17    notice defendants received regarding the nature of the grant (and resulting transfer

18    of rights) that plaintiffs intended to terminate.

19         4.   Continued Acceptance of Benefits Under 1975 Agreement

20         Defendants argue that Joanne Siegel's continued acceptance of benefits

21    under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto

22    post-termination grant of rights in the Superman copyright to defendants under the

23    terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-

24    accepted the terms of the grant"). (Defs' Opp. at 41). The legal premise of their

25    argument is that the 1976 Act recognizes that, once a termination notice has been

26    served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is

27    free to make "a further grant . . . of any right covered by a terminated grant" to the

28    original grantee or its successor in title. 17 U.S.C. § 304(c)(6)(D). The Court

**EXHIBIT 19**
**253**

WME 00132

1    ultimately rejects this argument as unpersuasive because it mistakenly assumes the

2    1975 agreement was a "grant" to the Superman copyright.

3          A look at the context leading up the execution of the 1975 agreement

4    illuminates in what way the parties believed (and just as importantly did not intend)

5    for that agreement to bind them.  The 1975 agreement appears to have been

6    drafted in response to bad publicity (apparently due to the juxtaposition of the

7    creators' misfortune and the Superman character's commercial success), and not

8    as a means to transfer or convey the party's rights to the Superman copyright.  The

9    agreement observed that nothing therein should be construed as undermining the

10   rights defendants had been conferred by virtue of the March 1, 1938, assignment,

11   rights which were later vindicated in the Westchester action and the 1970s Second

12   Circuit litigation.  Indeed, the agreement reaffirmed defendants' <u>existing</u> rights to

13   Superman and provided plaintiffs with annual payments, medical insurance, and

14   screen credits.  Such conferral of benefits was identified in the agreement as a

15   "voluntary" act by defendants in recognition of Siegel and Shuster's "past services."

16   The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's

17   widow on the timing of her husband's death.

18         This context and the language in the agreement itself demonstrate that the

19   1975 agreement was not a "grant."  The agreement's execution did not result in the

20   transfer or assignment of the Superman copyright.  Indeed, the agreement itself

21   expressly disavows such an interpretation by including language that the conferring

22   of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in

23   recognition of the pair's "past services," and that nothing therein should be

24   construed as undermining the rights defendants had been conferred in the March 1,

25   1938, assignment as vindicated in the Westchester action and the 1970s Second

26   Circuit litigation.  Thus, by its own terms, no rights were transferred through the

27   execution of that agreement.  A reaffirmation of existing rights without more is no

28   more "an assignment" or "conveyance" of rights to a copyright than it would if

51

**EXHIBIT 19**
254

WME 00133

1    Detective Comics had instead issued a press release declaring that previous court

2    rulings had recognized its existing ownership rights to that copyright.

3         Similarly, the 1982 codicil under which Joanne Siegel continued to receive

4    annual payments and benefits did not transfer any rights.  The codicil consists of

5    five paragraphs.  The first merely notes that the letter is in response to a letter

6    written by Joanne Siegel to the company's executive officer regarding her concern

7    over how she would provide for herself after her husband's death.  The second

8    referenced the 1975 agreement, noted the increase in the amount of the annual

9    payments from $20,000 to $50,000 thereunder, and the payment of an additional

10   bonus.  The third clarified a royalty policy that applied to creators other than Siegel

11   and Shuster.  The fourth set forth the agreement to continue to pay benefits to

12   Joanne Siegel for the balance of her life in the event her husband predeceased her

13   before 1985.  The fifth and final paragraph merely wishes Joanne Siegel and her

14   family well.  Nowhere in these five humble paragraphs is a transfer of rights to be

15   inferred, much less explicitly found.

16        Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain

17   contained in the 1975 agreement post-termination somehow operated as a de facto

18   re-acceptance of the agreement itself (and the obligations flowing thereunder),

19   nowhere among those re-accepted "obligations" or "commitments" in that

20   agreement was there a grant to the Superman copyright.  Defendants protest the

21   Court drawing this conclusion, arguing that plaintiffs have admitted in their

22   pleadings (their complaint, and by filing a termination notice directed at the 1975

23   agreement) that the 1975 agreement contained a grant to the Superman copyright.

24   It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are

25   considered judicial admissions" that bind the party who made them.  American Title

26   Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).  That being said,

27   "courts still have discretion not to apply the doctrine in particular cases."  18 JAMES

28   WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

**EXHIBIT 19**
**255**

WME 00134

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 86 of 157    Page
ID #:31798
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 53 of 72

1   (citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because the rule is

2   intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an

3   equitable doctrine invoked by a court at its discretion'")).

4        As noted at the outset, the termination provisions contained in the 1976 Act

5   are among the most complex and technical ones in the statute.  Given this

6   complexity, it is not surprising that a party seeking to harness its machinery may,

7   out of an abundance of caution, be more "over-inclusive" in terms of listing the

8   possible "grants" it seeks to terminate.  To penalize a party for being over-inclusive

9   rather than under-inclusive is all the more inequitable given the high hurdles the

10  termination provisions put in place.  Here, plaintiffs were represented by highly

11  experienced counsel who decided to list the 1975 agreement as a "grant" so as to

12  leave no stone unturned; an approach all the more justified given the extremely

13  technical and arcane arguments that have been advanced in this litigation

14  concerning the efficacy and enforceability of the termination notices themselves.

15  The Court therefore concludes that in these circumstances discretion counsels

16  against applying the judicial estoppel doctrine in the manner advocated by

17  defendants.

18       Accordingly, the Court concludes that Joanne Siegel's continued receipt of

19  payments and benefits under the 1975 agreement and 1982 codicil thereto does not

20  constitute a "further grant" or "an agreement to make a further grant" pursuant to 17

21  U.S.C. § 304(c)(6)(D).

22       5.    Statute of Limitations

23       Defendants contend that the present action was filed untimely.  The statute

24  of limitations itself is clear enough.  The Copyright Act of 1976 provides that "[n]o

25  civil action shall be maintained under the provisions of this title unless it is

26  commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The

27  issue raised by defendants implicates the latter clause and requires the Court to

28  determine when plaintiffs' claims accrued.

53

**EXHIBIT 19**
**256**

WME 00135

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 87 of 157    Page
ID #:31799
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 54 of 72

1    At the outset, a clarification of terms is in order. The instant matter, although

2   couched in terms of terminating the 1938 grant, is in effect one for co-ownership of

3   the copyright in the Superman material contained in Action Comics, Vol. 1,

4   because, if successful, plaintiffs would gain only a joint ownership interest in that

5   material with DC Comics, owing to the fact that Shuster left no heirs who could

6   simultaneously seek to terminate his half of the grant in the material. Claims of co-

7   ownership accrue when there is a "plain and express repudiation of co-ownership

8   . . . communicated to the claimant." Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir.

9   1996).

10    Here, defendants assert that such a repudiation was expressed by a letter

11   submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of

12   negotiations that took place between the parties shortly after the submission of the

13   termination notices. The Court finds to the contrary. As explained more fully below,

14   although the letter stated a position that the termination notices were "defective," the

15   letter addressed only the scope of the rights that could be recaptured by the

16   termination notices and left unchallenged the notices' validity and enforceability,

17   thus falling short of the required repudiation.[7]

18   ————————————————

19    [7] One could quibble with whether any date other than the termination
   effective date itself can serve as the accrual date in a case involving the right to
20   termination of a grant. Much like having to await a judicial determination whether
   one is a heir (as opposed to instances when an ownership claim is based on
21   whether or not someone is a creator) has been held to be the earliest instant for
   an accrual date, see Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992) (Hank
22   Williams' putative daughter's claim to be an owner had to await judicial
   determination that she was in fact his daughter and heir, thus accrual date was not
23   triggered when Hank Williams' first contested her putative status but instead when
   state court made determination that she was his heir), so too a claim of ownership
24   by way of termination of a grant cannot be realized unless and until after the
   termination's effective date. Stated another way, a party's status as a creator is a
25   factual question subject to being challenged by the other putative co-owner at any
   time, and hence, the accrual date for the same would begin at that instant. The
26   same, however, is not true of a putative co-owner by way of termination. Their
   status as co-owner is not predicated upon a pre-existing factual scenario, like
27   whether they were involved in jointly creating the material per se. Instead, their
   status as a co-owner is predicated upon a legal mechanism — the exercise of a
28

54

**EXHIBIT 19**
**257**

WME 00136

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 88 of 157    Page
ID #:31800
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 55 of 72

1      Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2    Mr. Levine, that they considered "the Superman Notices to be defective in several

3    respects." (Defs' Opp. at 50). What is telling is that the areas of defect elaborated

4    upon in the letter did not relate to the validity or enforceability of the termination

5    notices themselves, but pointed to areas curtailing the scope of what could be

6    recaptured even assuming the notice to be properly presented. These defects thus

7    did not call into question plaintiffs asserted right to termination contained in the

8    notices. For example, the letter remarks that defendants would still retain its rights

9    in trademarks that it had secured over the years to certain Superman-related

10    material, and that the termination would not give plaintiffs access to an accounting

11    of the foreign profits defendants gained from exploiting the copyright. Far from

12    repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13    validity of that ownership interest. Thus, the letter remarked that, "if the Siegels do

14    not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15    joint owners of the United States copyright in the 'Superman' comic published in

16    Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17      Even more telling was DC Comics' subsequent conduct. The parties'

18    negotiations quickly broke down and not much of substance was communicated

19    between the parties thereafter. Then, the day before the termination effective date,

20    DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22    _____

new statutory right revoking an earlier transfer in the copyright in question, be it
23    one they solely or jointly created — that takes place at a certain defined point in
time. Unless and until that legal triggering point is passed, there is nothing for the
24    other co-owner to reject or challenge. This is particularly the case given that
termination notices can be served up to ten years before the effective termination
25    date. Defendants' position would, as a matter of logic, countenance scenarios
where due to an early "rejection" of the termination notice, the passage of the
26    limitations period would occur well before the termination effective date even
arrived (and with it the putative co-owner's rights even vested). Nonetheless, the
27    Court need not resolve this question as the letter in question does not constitute a
plain and express repudiation of plaintiffs' termination notice (and, hence, its right
28    to co-ownership to the copyright in the Siegel and Shuster Superman material).

**EXHIBIT 19**
**258**

WME  00137

Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 56 of 72

1    notice, proclaiming:

2         The absence of any steps towards negotiation for two
         years, particularly on the 'eve' of the April 16, 1999
3         purported 'effective' date of the termination, leaves us
         concerned.  Thus our client has no alternative but to
4         move to the stage of putting your clients on clear notice,
         as set forth below, of DC Comics' rights and of its
5         determination, if it becomes necessary, to take all
         appropriate and necessary steps to protect those rights.
6         First, your clients are hereby put on notice that DC
         Comics rejects both the validity and scope of the Notices
7         . . . .

8    (Decl. Marc Toberoff, Ex. Q (emphasis added)).

9         If, as defendants contend, such notice of intent had been so clearly and

10   unmistakably communicated over a year and half earlier, it is odd for them to have

11   to repeat it and then state that they were "putting" plaintiffs "on notice" about it.

12   Accordingly, the Court finds that the present action seeking declaratory relief

13   regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the

14   effective date of that termination.  DC Comics' submission of the letter the day

15   before that date denying the validity of the termination notice gave a plain and

16   express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity

17   of their termination notice was now ripe.  See 28 U.S.C. § 2201 ("In a case of actual

18   controversy within its jurisdiction, . . . any court of the United States, upon the filing

19   of an appropriate pleading, may declare the rights and other legal relations of any

20   interested party seeking such declaration, whether or not further relief is or could be

21   sought.")

22        Applying both the date of the accrual of the claim, the parties' tolling

23   agreement to the three-year statute of limitations, and the filing date of this action,

24   the Court concludes that it is timely.  The effective date of the termination notice,

25   and therefore the date of accrual, is April 16, 1999.  The parties entered into a

26   tolling agreement on April 6, 2000, which amounts to nine days less than one year

27

28

**EXHIBIT 19**
**259**

WME  00138

1   that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until

2   ten business days after plaintiffs' September 21, 2002, letter providing written notice

3   that they were ending settlement negotiations, that is, October 4, 2002, at which

4   time the limitations clock started ticking once more.[9]  The present action was filed

5   two years and four days later, on October 8, 2004.  Adding the periods of time the

6   limitations period was running together, it is clear that they add up to a period of

7   time just short of the three-year period set forth in § 507(b).

8          Accordingly, the Court concludes that the present action is timely.

9          6.      The 2001-2002 Settlement Negotiations

10         Defendants contend that plaintiffs' termination notice is no longer effective as

11   the parties' settlement negotiations led to them entering into a binding post-

12   termination agreement that resolved the issues presently before the Court.  A brief

13   review of the time line regarding those negotiations is helpful to the Court's analysis

14   of the present issue:

15         October 19, 2001    Pursuant to the parties' negotiations, plaintiffs' counsel
                               sent to defendants' counsel a six-page letter outlining
16                             the substance of a settlement offer from defendants that

---

18         [8]  Defendants' argument that the tolling agreement does not apply to
     plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc.,
19   because neither was a "party to" or bound by that agreement is disingenuous.
     (Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound
20   not only DC Comics but also its "past and present subsidiaries or affiliates."  (Decl.
     Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate
21   sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly
     qualifies as a corporate affiliate to the same; a point defendants later admit when
22   speaking to the alter ego question presented in the pleadings.  (Defs' Mot. Summ.
     J. at 79 ("the following is a chart of the current corporate structure and affiliations
23   between DC, WBEI and TWI")).  Moreover, representatives for both companies
     were actively involved in the settlement negotiations themselves, further
24   undermining any suggestion that they were bystanders to the process.

26         [9]  Defendants argue that the tolling period concluded much earlier based on
     the parties earlier having reached "an amicable resolution of the dispute."  (Defs'
27   Opp. at 51 (emphasis in original)).  Given that the Court finds that no such
     "resolution," as opposed to a naggingly close potential for the same, occurred
28   through the parties settlement discussion post-termination, see infra A.6, their
     argument is without merit.

57

**EXHIBIT 19**
**260**

WME  00139

1    was "accepted" by the plaintiffs.

2    October 26, 2001    Defendants responded, noting they were working on a
                         draft agreement and enclosing "a more fulsome outline"
3                        of "what" they "believe the deal" they have "agreed" to is.

4    February 1, 2002    Defendants' counsel provided a fifty-six page draft
                         agreement that reserved the right to have their clients
5                        comment upon it and noted that certain, related "stand
                         alone" assignments were in the process of being
6                        finalized.

7    May 5, 2002         Plaintiffs responded to defendants' draft by stating that
                         the proposed agreement contained new, unacceptable
8                        terms to which they had not agreed.

9    May 21, 2002        Defendants sent a letter to plaintiffs stating that they
                         believed that each of the major points in the settlement
10                       had already been agreed upon.

11   Sept 21, 2002       Plaintiffs rejected their counsel's proposed draft
                         agreement and advised defendants in writing that they
12                       were ending negotiations.

13          The parties are in agreement that California law should be applied in

14   deciding this question, but disagree as to its application.  "California law is clear that

15   there is no contract until there has been a meeting of the minds on all material

16   points."  Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998).

17   The failure to reach a meeting of the minds on all material points prevents the

18   formation of a contract even if the parties have orally agreed upon some of the

19   terms, or have taken some action related to the contract.  Grove v. Grove Valve &

20   Reg. Co., 4 Cal.App.3d 299, 311-12 (1970).  Similarly, the terms proposed in an

21   offer must be met exactly, precisely, and unequivocally for its acceptance to result

22   in the formation of a binding contract.  See Panagotacos v. Bank of America, 60

23   Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719,

24   726 (1959).  A qualified acceptance constitutes a rejection terminating the original

25   offer and the making of a counteroffer to the original offeror, which must also be

26   unequivocally accepted by the former offeror for a binding contract to form.  See

27   Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159

28   Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

58

**EXHIBIT 19**
**261**

WME  00140

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 92 of 157    Page
ID #:31804
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 59 of 72

1   acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance

2   amounts to a new proposal or counteroffer putting an end to the original offer'"); In

3   re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE

4   § 1585 ("A qualified acceptance is a new proposal.").

5          The parties disagree over whether the terms contained in plaintiffs' October

6   19, 2001, letter differ in substance from those set forth in defendants' later letter of

7   October 26, 2001 (and accompanying outline), such that there was no unequivocal

8   acceptance of an offer and, thus, no agreement.  As with much in both life and law,

9   materiality is in the eye of the beholder.  From the Court's reading of the parties'

10  correspondence, it is clear that the parties went well beyond reaching a settlement

11  in principle regarding their respective positions to the Superman property.  Rather,

12  as suggested by the time line above, the parties' correspondence, and the actions

13  taken in response thereto, illustrates that they found themselves in the all-too-

14  familiar situation in which verbal settlement negotiations result in what the parties

15  believe to be an agreement on all the major points of dispute, but which, upon

16  further discussion, falls short of the agreement needed to resolve their dispute.  The

17  devil, as it often is, was in the details.

18         That material details remained is evidenced by defendants' response to

19  plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the

20  deal" they had "agreed to."   Moreover, defendants' February, 2002, draft

21  agreement was not even considered final by its authors, who reserved the right for

22  their clients to "comment" on it, and would also require the further submission of a

23  number of "stand alone" agreements yet to be finalized.  Indeed, Time Warner's

24  CEO later commented that submission of the draft agreement was "expected" to

25  result in further "comments and questions" from the Siegel heirs that "would need to

26  be resolved."

27         This give and take reveals that the parties, while close to agreeing to a

28  complete and comprehensive settlement of their dispute, had not passed the

59

**EXHIBIT 19**
**262**

WME  00141

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 93 of 157    Page
ID #:31805
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 60 of 72

1    threshold where they had finalized and assented to all material terms of such a

2    settlement.  Rather, as they attempted to sketch in the finer details of a settlement

3    from the broad outlines contained in the October 19 letter, more and more issues

4    arose upon which they could not reach agreement, resulting in the negotiations

5    falling apart.  In this respect, the present case is not unlike Callie v. Near, 829 F.2d

6    888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

7    which the courts held that no enforceable agreement was reached when the parties

8    had agreed to a rough outline of an agreement, but were thereafter unable to reach

9    agreement on the finer details and the negotiations fell apart.

10          Defendants' argument to the contrary is premised on the notion that they can

11   limit the scope of the legal analysis to the October 19, 2001, letter and call it a

12   contract, regardless of their materially different October 26, 2001, letter in reply ("I

13   enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

14   vastly different February 1, 2002, draft, which were both part and parcel of the same

15   settlement negotiation.  Ignoring these contemporaneous communications is at

16   odds with the requirement in contract formation that courts must consider "all the

17   surrounding circumstances."  Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

18   These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

19   agreement provides context and meaning as to the understanding the parties had

20   about the effect of the October 19 letter itself.

21          Defendants further seek to create issues of fact through post hoc testimony

22   and rationalizations.  None of this subjective belief is sufficient to defeat the

23   objective manifestation of the parties' intent relayed in the documents referenced

24   above that aptly demonstrate that there was no "meeting of the minds" on all

25   material terms.  See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

26   existence of mutual consent is determined by objective rather than subjective

27   criteria, the test being what the outward manifestations of consent would lead a

28   reasonable person to believe.  Accordingly, the primary focus in determining the

**EXHIBIT 19**
**263**

WME  00142

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 94 of 157    Page
ID #:31806
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 61 of 72

1   existence of mutual consent is upon the acts of the parties involved"); Stewart v.

2   Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a

3   contract is based upon objective and outward manifestations of the parties"); CAL.

4   CIV. CODE § 1639.

5          One need only review the language of the parties' correspondence, their

6   conduct in reaction thereto, and the numerous material differences between the

7   terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002,

8   draft to reach the conclusion that the parties failed to come to an agreement on all

9   material terms. See Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12

10  (1970) (failure to reach meeting of the minds on all material points prevents contract

11  formation even though parties orally agreed on many terms, or have taken action

12  relating to the contract). Far from signifying that the parties' "negotiations . . .

13  result[ed] in a binding contract" leaving nothing more than the drafting of more

14  formal documentation memorializing that agreement, see Louis Lesser Enterprises,

15  Ltd. v. Roeder, 209 Cal.App.2d 401, 404 (1962), these submissions between the

16  parties went far beyond that by adding in or further refining areas from what was

17  contained in the October 19 letter. That after the submission of the October 19

18  letter defendants began the process of creating a settlement trust account and the

19  parties negotiated about providing Siegel and Shuster screen credits in the then

20  upcoming movie Superman Returns could as much be seen as goodwill gestures

21  on defendants' part while the negotiations continued as it could reflect an indication

22  on their part that they thought they were contractually bound to do the same.

23         From all of this there is no document or set of documents reflecting

24  agreement by the parties to singular, agreed terms. Defendants cannot explain to

25  the Court what from the parties' differing exchange constitutes this purported

26  contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance"

27  reflected in the October 19 letter and either festoon upon it all the terms contained

28  in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

**EXHIBIT 19**

WME 00143

1   clearly and unequivocally rejected that latter draft agreement), or have the Court

2   perform that task.  The Court's responsibility is not to create a patch-quilt agreement

3   by stringing together certain expressions of assent made at one point (October 19),

4   and attaching to it material terms spelled out later in time (and to which the

5   supposedly assenting party promptly rejected).  See Industrial Indemnity v. Superior

6   Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7        Accordingly, the Court concludes that the parties' settlement negotiations did

8   not result in an enforceable agreement resolving the issues presently before the

9   Court.

10   B.    Limitations on Scope of Recaptured Rights

11        The principal purpose behind the creation of the termination right was to give

12   authors (and their heirs) a chance to retain the extended renewal term in their work

13   and then re-bargain for it when its value in the marketplace was known.  See H.R.

14   REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the

15   termination right "safeguarding authors against unremunerative transfers . . .

16   because of the unequal bargaining position of authors, resulting in part from the

17   impossibility of determining a work's prior value until it has been exploited").

18        The need for such a second bite at the apple flowed from the fact that the

19   1909 Act created a dual term in the copyright to a work, one realized upon the

20   work's publication and the second occurring twenty-eight years later with the

21   copyright's renewal.  Justification for this splitting of terms was based, in part, on the

22   understanding that an author's ability to realize the true value of his or her's work

23   was often not apparent at its creation, but required the passage of time (and the

24   marketing efforts by a publisher) to materialize.  The renewal term in the copyright

25   to the work thus served as a mid-course re-valuation tool allowing the author, by

26   giving him or her the right of renewal in the work, leverage in re-negotiating a better

27   deal with the original grantee or any other suitor who desired to continue to market

28   the copyright.  See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

**EXHIBIT 19**
**265**

WME  00144

1    theory behind a dual system of term was that it gave the author or the author's heirs

2    a 'second bite at the apple;' when the renewal term came around, the value of the

3    copyright would be better known than at the time of initial publication.  With this

4    information, a new bargain could be struck that would more accurately reflect the

5    market rate").  This re-valuation mechanism provided by the renewal term under the

6    1909 Act was largely frustrated by the Supreme Court's decision in <u>Fred Fisher</u>

7    <u>Music</u>, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their

8    rights to both the initial and the renewal term.

9         Although the termination right contained in the 1976 Act sought to correct the

10   damage done by <u>Fred Fisher</u> to an author's ability to renegotiate through the

11   reversion of rights, it did not revert to the author the full panoply of rights he or she

12   would have enjoyed upon renewal under the 1909 Act.  Owing in large measure to

13   objections by publishers seeking to minimize the disruption to "existing contracts

14   and authorized derivative works already in distribution" that such a recapture right

15   would engender, <u>see</u> 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain

16   limitations on what authors (or their heirs) gained from exercising the termination

17   right.  It is to these limits on the termination right that the Court now turns.

18        1.    <u>Foreign Profits</u>

19        Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant

20   under this subsection affects only those rights covered by the grant that arise under

21   this title[, Title 17 of the United States Code, governing copyrights], and in no way

22   affects rights arising under any other Federal, State, or foreign laws."  Defendants

23   read from this a statutory limitation on the scope of any accounting arising from the

24   termination notices in this case to those profits realized by the domestic exploitation

25   of the Superman copyright contained in <u>Action Comics</u>, Vol. 1, excluding those

26   realized from foreign sources.  The Court finds this argument persuasive.

27        Although the Court can locate no case that has specifically addressed the

28   issue of accounting profits from the foreign exploitation of a copyright that is subject

**EXHIBIT 19**
**266**

WME  00145

1    to a valid termination notice, the statutory text could not be any clearer on this

2    subject.  Through this section, Congress expressly limited the reach of what was

3    <u>gained</u> by the terminating party through exercise of the termination right;

4    specifically, the terminating party only recaptured the <u>domestic</u> rights (that is, the

5    rights arising under title 17 to the United States Code) of the grant to the copyright

6    in question.  Left expressly intact and undisturbed were any of the rights the original

7    grantee or its successors in interest had gained over the years from the copyright

8    through other sources of law, notably the right to exploit the work abroad that would

9    be governed by the copyright laws of foreign nations.  Thus, the statute explains

10   that termination "in no way affects rights" the grantee or its successors gained

11   "under foreign laws."

12        Such a reading is supported by leading commentators, who are in agreement

13   as to the effect of § 304(c)(6)(E) has in a case such as this.

14        Professor Nimmer states:

15           A grant of copyright "throughout the world" is
16     terminable only with respect to uses within the
       geographic limits of the United States.  Because
17     copyright has no extraterritorial operation, arguably
       American law is precluded from causing the termination
18     of rights based upon foreign copyright laws.  A response
       to this argument is that the nonextraterritoriality of
19     copyright is irrelevant because the question here is one
       of contract law, not copyright law, in that it concerns the
20     effect of a contract granting certain rights.  The contract
       law of one nation may be applicable in another nation
21     under the latter's conflict-of-laws rule.  The conclusive
       answer to this problem lies in the text of the termination
22     provisions of the Copyright Act, which expressly provide
       that statutory termination "in no way affects rights arising
23     under . . . foreign laws" — that is, under foreign copyright
       (not contract) laws.  Thus, even if the conflicts rule of a
24     foreign nation were to call for application of the American
       termination rule as a rule of contract law, that rule by its
25     own terms excepts from termination the grant of those
       rights arising under foreign copyright laws.

26   3 Nimmer on Copyright § 11.02[B][2] at 11-19.

27        Professor Patry agrees:  "Accordingly, where a U.S. author conveys

28   worldwide rights and terminates under either section, grants in all other countries

**EXHIBIT 19**
**267**

WME  00146

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 98 of 157    Page
ID #:31810
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 65 of 72

1    remain valid according to their terms or provisions in other countries' laws." 7

2    PATRY ON COPYRIGHT § 25:74.

3        Plaintiffs argue, however, that the section also allows for the possibility that

4    the terminating party gains not only the domestic rights to the copyright in question

5    (the "rights covered by the grant that arise under this title"), but also retains

6    whatever other rights it may have under "Federal, State, or foreign laws." From this

7    premise, plaintiffs argue that, because an accounting between co-owners in a

8    copyright is governed by state law, and California state law allows for the sharing of

9    foreign profits between tenants in common, so, too, should defendants be forced to

10    account for their foreign profits. This argument misses the fact that all plaintiffs

11    have gained from the termination right is a recapturing of the <u>domestic</u> copyright in

12    the Superman material published in <u>Action Comics</u>, Vol. 1. Defendants continue to

13    hold, unaffected, separate rights to that copyright arising under <u>foreign</u> copyright

14    laws. This distinction is important for two reasons.

15        First, such an open effort to extend the reach of U.S. copyright law overseas,

16    as plaintiffs' reading of the statute avows, would be in direct contradiction to not only

17    the plain terms of the statute (stating that termination does <u>not</u> affect another

18    parties' rights arising under the copyright laws of "foreign" nations), but stands in

19    stark juxtaposition to the longstanding rule "that the copyright laws [of this country]

20    have no application beyond the U.S. border." <u>Los Angeles News Serv. v. Reuters</u>

21    <u>TV Intern.</u>, 340 F.3d 926, 931 (9th Cir. 2003). If Congress contemplated the ability

22    to attach or otherwise force the accounting of foreign profits to which the original

23    grantee or its successors are legally entitled under the copyright laws of other

24    nations through the backdoor of applying state law tenant in common principles,

25    one would have expected such an intention to have been made expressly, and

26    certainly with some explanation given the incongruity that arises from the statutory

27    language's notation that termination did <u>not</u> affect another's rights under "foreign

28    laws."

**EXHIBIT 19**
**268**

WME  00147

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 99 of 157    Page
ID #:31891
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 66 of 72

1    Second, the cases cited by plaintiffs requiring one co-owner to account to the

2    other for both domestic and foreign profits involved parties who were co-owners to

3    the "world-wide" copyright in the work and, not as with the termination right, to only

4    the domestic copyright.  See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996)

5    (noting that declaratory action was filed after other co-owner obtained a "renewal of

6    the copyright" listing himself as the sole author in the song "Let the Good Times

7    Roll").  Plaintiffs have directed the Court to no case wherein a co-owner of the

8    domestic copyright in a work was allowed an accounting of a co-owner's foreign

9    profits.  See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as

10   were originally the subject of a grant will revert upon the termination of that grant.

11   [T]o the extent that a grant includes rights based upon federal law other than the

12   Copyright Act, state law, or foreign law, such rights are not subject to termination").

13   Accordingly, the Court holds that the termination notice affects only the

14   domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to

15   Detective Comics of the copyright in the Superman material contained in Action

16   Comics, Vol. 1.  The termination notice is not effective as to the remainder of the

17   grant, that is, defendants exploitation of the work abroad under the aegis of foreign

18   copyright laws.  Thus, although defendants retain the unfettered right to exploit the

19   works (and retain the profits derived therefrom) in foreign nations, they may do so

20   domestically only as a co-owner (through Shuster's share) of the works.  See Oddo

21   v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an

22   independent right to use or license the use of the copyright. . . . . A co-owner of a

23   copyright must account to other co-owners for any profits he earns from licensing or

24   use of the copyright . . . .").  As such, defendants must account to plaintiffs only for

25   the profits from such domestic exploitation of the Superman copyright.

26   2.    Trademark Rights and Ownership of Pre-Termination Derivative

27         Works

28   As noted in the previous section, the right to termination leaves undisturbed

66

EXHIBIT 19
269

WME  00148

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 100 of 157
Page ID #:31812
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 67 of 72

1   the original grantee or its successors in interests rights arising under "federal law."

2   17 U.S.C. § 304(c)(6)(E).  Among the rights based on federal law that defendants

3   secured over the years were several trademarks that utilized or incorporated

4   portions of the copyrighted material found in Action Comics, Vol. 1.  Defendants

5   seek a declaration from the Court that, even if successful in terminating the

6   Superman copyright contained in Action Comics, Vol. 1, plaintiffs cannot share in

7   defendants' profits "purely attributable to [Superman] trademark rights." (Defs'

8   Reply at 11).  Plaintiffs admirably concede the point in their briefs, but argue that

9   they are "entitled to profits from mixed trademark uses to the extent such exploit

10   recaptured copyright elements (e.g., 'Superman costume')." (Pls' Reply at 49 n.28).

11        Similarly, defendants seek a declaration that, to the extent plaintiffs are

12   entitled to an accounting as a result of their successfully terminating the 1938 grant,

13   it should not include any profits attributable to the "post-termination exploitation of

14   derivative works [of Action Comics, Vol. 1,] prepared prior to termination." (Defs'

15   Mot. Summ. J. at 28).  Again, plaintiffs concede, as they should, this point.  (Pls'

16   Reply at 49 n.28).  Section 304(c)(6)(A) provides that derivative works created

17   during the grant (meaning up until the termination effective date) may continue to be

18   exploited after termination.  Again, however, plaintiffs hold out as a separate

19   question the existence of pre-termination derivative works that are "altered so as to

20   become post-termination derivative works." (Pls' Reply at 49 n.28).

21        Given that these contentions by plaintiffs — the recapture or accounting from

22   the mixed use of trademark and copyright and what to do with any alteration in pre-

23   termination derivative works — are not the subject of the present motion, the Court

24   will not address them in this Order.  Even though it is clear that these issues will

25   impact the accounting of profits in some manner, they cannot be fully adjudicated

26   based on the narrow record currently before the Court and absent a full briefing of

27   the particular mixed uses or altered pre-termination derivative works that are

28   specifically at issue.

**EXHIBIT 19**
**270**

WME  00149

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 101 of 157
Page ID #:31813
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 68 of 72

1    Accordingly, the Court holds that the profits defendants garner from the use

2    of Superman trademarks that "are purely attributable to [those] trademark rights,"

3    and from its use of unaltered pre-termination derivative works are not subject to

4    accounting.

5    3.    Accounting for Profits of Warner Bros. Entertainment, Inc., and Time

6    Warner, Inc.

7    The parties are in disagreement over whether plaintiffs may directly share in

8    the profits from the exploitation of the works by DC Comics corporate sibling,

9    Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time

10    Warner, Inc. ("TWI"). The genesis for this claim stems from certain inter-corporate

11    transactions amongst these actors concerning the Superman copyright. In the

12    same year that plaintiffs' termination notices became effective, DC Comics

13    executed an exclusive license in favor of WBEI (and a year later a separate

14    exclusive license with WBEI's television division) to exploit the Superman copyright

15    for the remainder of its extended renewal term in certain media formats, notably

16    movies, television, and home video. (Decl. Marc Toberoff, Exs. E & F). Defendants

17    contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an

18    accounting of the profits made by DC Comics (in the form of the licensing fees it has

19    collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has

20    made pursuant to the license.[10]

21    Defendants' argument is not without support. The Court starts with the

22    general principle that "each co-owner has an independent right to use or license the

23    use of the copyright[, but that a] co-owner of a copyright must account to other

24    co-owners for any profits he earns from licensing or use of the copyright." Oddo,

25    743 F.2d at 633. Licensees, on the other hand, are accountable only to their

26    _____

27    [10] It appears to the Court that because TWI is not a licensee of the works, it
may not have any profits to account for; however, absent evidence of this fact from
28    either side (or the representation that such is not the case), the Court cannot rule
on this issue at this time.

68

EXHIBIT 19
271

WME 00150

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 102 of 157
Page ID #:31814
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 69 of 72

1  licensors, and owe no duty of accounting to the non-licensor co-owner of a

2  copyright the licensee exploits. See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523

3  (9th Cir. 1990).

4      Plaintiffs, however, take a different view of the licenses, arguing that "Warner

5  has stepped exclusively into DC's shoes with respect to such motion picture and

6  television copyrights." (Pls' Opp. at 30). In other words, the exclusive license had

7  the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs

8  (assuming the successful termination of the 1938 grant) insofar as the exploitation

9  of the copyright in the mediums in which those licenses are concerned.

10     This theory, however, requires large legal leaps that are not countenanced

11 by current law. To begin, in order for an exclusive license in the entirety of the

12 interest in a joint work itself (such as Superman) to be effective, the consent of both

13 joint owners in the copyrighted work is required. See 2 PATRY ON COPYRIGHT § 5:7

14 ("A joint author (or co-owner) may not, however, transfer all interest in the work

15 without the other co-owner's express (and written) authorization, since that would

16 result in an involuntary transfer of the other joint owner's undivided interest in the

17 whole"). The same requirement for prior consent holds true even with respect to the

18 wholesale transfer of exclusive licenses in subparts to a copyright, such as a license

19 transferring all the stage rights (not just the joint owner's rights) to a novel but not

20 the movie or literary rights. Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-

21 39.

22     Such consent simply did not occur here. DC Comics unilaterally sought to

23 give an exclusive license to the entirety in the Superman property's movie and

24 television rights to WBEI post-termination. As a result, the attempt to provide an

25 exclusive license was ineffective. At best, all that was conveyed was a non-

26 exclusive license, and, at worst, a license agreement whose terms are null and void

27 absent ratification by plaintiffs. See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

28     Applying these principles in a vacuum, the Court would readily reach the

**EXHIBIT 19**
**272**

WME  00151

1  conclusion championed by defendants: WBEI, as a licensee, is answerable only to

2  DC Comics as its licensor; that DC Comics is the only entity that must account for

3  profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that

4  DC Comics' accounting to plaintiffs is limited to those profits derived from licensing

5  the Superman copyright to WBEI.

6       However, the Court's analysis does not occur in vacuum; rather, it must take

7  into account the relevant facts of this case, particularly given that the accounting

8  sought by plaintiffs in this action is an equitable remedy, and the Court must

9  conduct its inquiry accordingly. See Oddo, 743 F.2d at 633 ("A co-owner of a

10  copyright must account to other co-owners for any profits he earns from licensing or

11  use of the copyright, . . . but the duty to account does not derive from the copyright

12  law's proscription of infringement.   Rather, it comes from equitable doctrines

13  relating to unjust enrichment and general principles of law governing the rights of

14  co-owners.") (internal quotation marks and citations omitted).

15       Here, the relatedness of the transferor and the transferee entities cannot be

16  ignored.  The evidence before the Court reveals that the relevant entities are all

17  closely related entities — parent corporations, wholly and partially-owned

18  subsidiaries, partners, sibling business entities (owned directly or indirectly by the

19  same parent) — although it is not entirely clear to the Court exactly what those

20  relationships have been at all relevant times.  This fact alone raises a specter of a

21  "sweetheart deal" entered into by related entities in order to pay a less than market

22  value fee for licensing valuable copyrights.  If such were the case, the related entity

23  might be able to exploit the copyrights without the responsibility of answering to the

24  co-owner of a joint work, and the licensor co-owner would thereby be relieved of the

25  responsibility of accounting for any profits (other than a greatly reduced licensing

26  fee) to the non-licensor co-owner.  This result would be inequitable.

27       This concern is bolstered by the declaration of Paul Levitz, President and

28  Publisher for DC Comics, which states that under the post-2003 corporate

**EXHIBIT 19**
**273**

WME  00152

Case 2:10-cv-03633-ODW-RZ   Document 500-4   Filed 10/10/12   Page 104 of 157
Page ID #:31816
Case 2:04-cv-08776-SGL-RZ   Document 174   Filed 03/26/2008   Page 71 of 72

1   restructuring of Time Warner's business, "for operating management purposes, DC

2   reports" not to immediate corporate parent WCI, but to its sibling corporation

3   "WBEI," the licensee of the rights at issue in this action.  (Decl. Paul Levitz ¶ 17).

4   As Levitz explains, "I report to and obtain approvals from WBEI's President and

5   Chief Operating Officer before making significant acquisitions or certain financial

6   decisions or investments that are outside the scope of DC's customary acquisitions

7   and investments; before implementing meaningful strategic changes; and before

8   embarking on something substantially outside DC's normal course of business."

9   (Id.).  Although this is not evidence of what occurred at the time of the license, it is

10   still probative evidence of the relatedness of the licensee and licensor that could

11   result in an extremely favorable licensing arrangement that works to the detriment of

12   the non-licensor co-owner.  These open issues also touch upon factors to be

13   considered in analyzing alter ego claims.  See Sonora Diamond Corp. v. Superior

14   Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290

15   (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an

16   opposing party is using the corporate form unjustly, is that justice be done. What the

17   formula comes down to, once shorn of verbiage about control, instrumentality,

18   agency and corporate entity, is that liability is imposed to reach an equitable result").

19        Whether the license fees paid represents the fair market value therefor, or

20   whether the license for the works between the related entities was a "sweetheart

21   deal," are questions of fact that are not answered on summary judgment, certainly

22   not without the benefit of expert testimony which has not been presented by either

23   party on this topic.  The Court therefore concludes that summary judgment on this

24   issue is inappropriate at this time.[11]

25

26   _____

27        [11]  Because the Court concludes that defendants' motion for summary
     adjudication of this issue must be denied for the reasons stated above, the Court
28   does not at this time resolve other arguments raised by plaintiffs regarding this
     issue.

**EXHIBIT 19**
**274**

WME  00153

Case 2:10-cv-03633-ODW-RZ    Document 500-4    Filed 10/10/12    Page 105 of 157
Page ID #:31817
Case 2:04-cv-08776-SGL-RZ    Document 174    Filed 03/26/2008    Page 72 of 72

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long ago — the copyright in the Superman material that was published in <u>Action Comics</u>, Vol. 1.  What remains is an apportionment of profits, guided in some measure by the rulings contained in this Order, and a trial on whether to include the profits generated by DC Comics' corporate sibling's exploitation of the Superman copyright.

DATE:  March 26, 2008

*S. G. Larson*

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

72

**EXHIBIT 19**
275

WME  00154

**Tom McGuire Assistant**

| | |
|---|---|
| From: | Ariel Emanuel Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_ASST> |
| Sent: | Tuesday, April 01, 2008 6:37 PM |
| To: | Ariel Emanuel Assistant; ariannahuf@aol.com |
| Subject: | RE: Marc Toberoff |
| Attachments: | Superman SJ Decision.3.26.08.pdf |

Attached please find the court's opinion.

Mark Tseng  ' Endeavor <<...>>

---

**From:** Ariel Emanuel Assistant
**Sent:** Tuesday, April 01, 2008 5:47 PM
**To:** 'ariannahuf@aol.com'
**Subject:** Marc Toberoff

Hi Arianna — Ari asked me to send you the news articles from the New York Times, Los Angeles, Times, and Variety; all regarding the victory in the Superman copyright case against Warner Bros Studios.

# Time Warner ordered to share Superman rights

From Bloomberg News

March 29, 2008

Time Warner Inc., the world's largest media company, must share control of the Superman copyright with the heirs of the comic hero's creator, Jerome Siegel, a federal judge has ruled.

Siegel's widow, Joanne, and their daughter, Laura Larson, won back his half of the copyright to Superman material, under the order this week by U.S. District Judge Stephen Larson in Riverside.

Jerome Siegel and his creative partner, Joseph Shuster, granted the rights to DC Comics in 1938, a contract that expired in 1999, the judge found.

"After 70 years, Jerome Siegel's heirs regain what he granted so long ago -- the copyright in the Superman material that was published in Action Comics," Larson wrote in his order Wednesday. The victory was "no small feat indeed," he said.

Joanne Siegel's and Laura Larson's share of the profit must still be determined at trial, according to the order.

Marc Toberoff, the Siegels' lawyer, said Jerome Siegel fought for decades, without success, to share in the profit from the rights to his Superman character, which he sold with Shuster for $130. Jerome Siegel died in 1996.

"Joanne Siegel has courageously carried the torch in this matter for decades, and this is probably the first good


CONFIDENTIAL
WME 00155

news she has received regarding Superman in 70 years," Toberoff said.

Time Warner spokesmen Edward Adler and Keith Cocozza didn't immediately return phone calls and e-mails seeking comment.

# Warner vexed by legal Man of Steel

## *Lawyer Toberoff dings Superman*

## By DIANE GARRETT

He's a superhero to rights holders -- but Kryptonite to studios.

Last week, attorney Marc Toberoff won a potentially costly "Superman" victory against Warner Bros. for co-creator Jerome Siegel's heirs. The federal ruling, which gives the heirs a stake in rights sold 71 years ago, could put a serious crimp on future plans for one of the studio's most enduring -- and lucrative -- franchises, especially if co-creator Joe Shuster's heirs follow suit in five years, when they are eligible to do so.

As it is, the studio has at least two Superman projects in development -- a follow-up to Bryan Singer's "Superman Returns" and "Justice League" -- and it may end up paying tens of millions from the domestic haul of "Superman Returns" to Siegel's heirs under the ruling, which applies to domestic monies for Superman projects since 1999.

The case is Toberoff's latest -- and potentially most damaging -- claim against the studio. The dedicated copyright crusader has pursued claims involving "Wild Wild West," "Dukes of Hazzard," "Smallville" and the upcoming "Get Smart."

He has gone after other studios, including Sony, but his most high-profile cases -- and victories -- have involved Warners. The studio paid "Moonrunners" producer Robert B. Clark a $17.5 million settlement in a case about similarities between that 1974 movie and the bigscreen "The Dukes of Hazzard." And a federal judge ruled earlier in the Siegels' favor over "Smallville," although that was challenged and the case still being resolved.

The studio declined to comment on the latest ruling in favor of their legal nemesis, issuing only a statement noting that, "substantial issues relating to the accounting of profits were ruled in our favor."

Among these issues: international profits, trademark-related revs and profits stemming from Superman fare produced before 1999, when Siegel's heirs terminated the earlier copyright arrangement under a 1976 law.

To the Siegels, Toberoff's legal maneuvers are nothing short of heroic. The family had been destitute for years after Siegel sold rights to his Man of Steel to Detective Comics for $130. DC Comics had started to pony up more monies after Warners made successful movies based on the character, but Siegel had long wished to redress the fact he had gotten so little from his creation; he died in 1996.

Toberoff has set up a production company, Intellectual Properties Worldwide, to develop films around these and other titles. And he has built up a sideline business producing bigscreen adaptations of the projects whose copyright claims he pursues. He has a producing credit on "Fantasy Island," a Sony project for Eddie Murphy, as well as "Sanford and Son."

March 29, 2008

CONFIDENTIAL    WME 00156

# Ruling Gives Heirs a Share of Superman Copyright

By MICHAEL CIEPLY

LOS ANGELES — Time Warner is no longer the sole proprietor of Superman.

A federal judge here on Wednesday ruled that the heirs of Jerome Siegel — who 70 years ago sold the rights to the action hero he created with Joseph Shuster to Detective Comics for $130 — were entitled to claim a share of the United States copyright to the character. The ruling left intact Time Warner's international rights to the character, which it has long owned through its DC Comics unit.

And it reserved for trial questions over how much the company may owe the Siegel heirs for use of the character since 1999, when their ownership is deemed to have been restored. Also to be resolved is whether the heirs are entitled to payments directly from Time Warner's film unit, Warner Brothers, which took in $200 million at the domestic box office with "Superman Returns" in 2006, or only from the DC unit's Superman profits.

Still, the ruling threatened to complicate Warner's plans to make more films featuring Superman, including another sequel and a planned movie based on the DC Comics' "Justice League of America," in which he joins Batman, Wonder Woman and other superheroes to battle evildoers.

If the ruling survives a Time Warner legal challenge, it may also open the door to a similar reversion of rights to the estate of Mr. Shuster in 2013. That would give heirs of the two creators control over use of their lucrative character until at least 2033 — and perhaps longer, if Congress once again extends copyright terms — according to Marc Toberoff, a lawyer who represents the Siegels and the Shuster estate.

"It would be very powerful," said Mr. Toberoff, speaking by telephone on Friday. "After 2013, Time Warner couldn't exploit any new Superman-derived works without a license from the Siegels and Shusters."

Time Warner lawyers declined to discuss the decision, a spokesman said. A similar ruling in 2006 allowed the Siegels to recapture their rights in the Superboy character, without determining whether Superboy was, in fact, the basis for Warner Brothers's "Smallville" television series. The decision was later challenged in a case that has yet to be resolved, said Mr. Toberoff, who represented the family in that action.

This week's decision by Stephen G. Larson, a judge in the Federal District Court for the Central District of California, provided long-sought vindication to the wife and daughter of Mr. Siegel, who had bemoaned until his death in 1996 having parted so cheaply with rights to the lucrative hero.

"We were just stubborn," Joanne Siegel, Mr. Siegel's widow, said in a joint interview with her daughter, Laura Siegel Larson. "It was a dream of Jerry's, and we just took up the task."

CONFIDENTIAL    WME 00157

The ruling specifically upheld the Siegels' copyright in the Superman material published in Detective Comics' Action Comics Vol. 1. The extent to which later iterations of the character are derived from that original was not determined by the judge.

In an unusually detailed narrative, the judge's 72-page order described how Mr. Siegel and Mr. Shuster, as teenagers at Glenville High School in Cleveland, became friends and collaborators on their school newspaper in 1932. They worked together on a short story, "The Reign of the Superman," in which their famous character first appeared not as hero, but villain.

By 1937, the pair were offering publishers comic strips in which the classic Superman elements — cape, logo and Clark Kent alter-ego — were already set. When Detective Comics bought 13 pages of work for its new Action Comics series the next year, the company sent Mr. Siegel a check for $130, and received in return a release from both creators granting the company rights to Superman "to have and hold forever," the order noted.

In the late 1940s, a referee in a New York court upheld Detective Comics' copyright, prompting Mr. Siegel and Mr. Shuster to drop their claim in exchange for $94,000. More than 30 years later, DC Comics (the successor to Detective Comics) gave the creators each a $20,000-per-year annuity that was later increased to $30,000. In 1997, however, Mrs. Siegel and her daughter served copyright termination notices under provisions of a 1976 law that permits heirs, under certain circumstances, to recover rights to creations.

Mr. Toberoff, their lawyer, has been something of a gadfly to Warner in the past. In the late 1990s, for example, he represented Gilbert Ralston, a television writer, in a legal battle over his rights in the CBS television series "The Wild Wild West," which was the basis for a 1999 Warner Brothers film that starred Will Smith. The case, said Mr. Toberoff, was settled.

Compensation to the Siegels would be limited to any work created after their 1999 termination date. Income from the 1978 "Superman" film, or the three sequels that followed in the 1980s, are not at issue. But a "Superman Returns" sequel being planned with the filmmaker Bryan Singer (who has also directed "The Usual Suspects" and "X-Men") might require payments to the Siegels, should they prevail in a demand that the studio's income, not just that of the comics unit, be subject to a court-ordered accounting.

Mrs. Siegel and Ms. Larson said it was too soon to make future plans for the Superman character. But they were inclined to relish this moment.

"I have lived in the shadow of this my whole life," Ms. Larson said. "I am so happy now, I just can't explain it."

Mark Tseng // Endeavor

CONFIDENTIAL       WME 00158

Tom McGuire Assistant

| | |
|---|---|
| From: | Ariel Emanuel Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_ASST> |
| Sent: | Monday, March 31, 2008 3:08 PM |
| To: | cr@charlierose.com |
| Subject: | Superman/Marc Toberoff News Articles |

Hi Charlie — Ari asked me to send you the news articles from the New York Times, Los Angeles, Times, and Variety; all regarding the victory in the Superman copyright case against Warner Bros Studios.

Mark Tseng / Endeavor

# Time Warner ordered to share Superman rights

From Bloomberg News

March 29, 2008

Time Warner Inc., the world's largest media company, must share control of the Superman copyright with the heirs of the comic hero's creator, Jerome Siegel, a federal judge has ruled.

Siegel's widow, Joanne, and their daughter, Laura Larson, won back his half of the copyright to Superman material, under the order this week by U.S. District Judge Stephen Larson in Riverside.

Jerome Siegel and his creative partner, Joseph Shuster, granted the rights to DC Comics in 1938, a contract that expired in 1999, the judge found.

"After 70 years, Jerome Siegel's heirs regain what he granted so long ago -- the copyright in the Superman material that was published in Action Comics," Larson wrote in his order Wednesday. The victory was "no small feat indeed," he said.

Joanne Siegel's and Laura Larson's share of the profit must still be determined at trial, according to the order.

Marc Toberoff, the Siegels' lawyer, said Jerome Siegel fought for decades, without success, to share in the profit from the rights to his Superman character, which he sold with Shuster for $130. Jerome Siegel died in 1996.

"Joanne Siegel has courageously carried the torch in this matter for decades, and this is probably the first good news she has received regarding Superman in 70 years," Toberoff said.

Time Warner spokesmen Edward Adler and Keith Cocozza didn't immediately return phone calls and e-mails seeking comment.

# Warner vexed by legal Man of Steel

## *Lawyer Toberoff dings Superman*

## By DIANE GARRETT

He's a superhero to rights holders -- but Kryptonite to studios.

Last week, attorney Marc Toberoff won a potentially costly "Superman" victory against Warner Bros. for co-creator Jerome Siegel's heirs. The federal ruling, which gives the heirs a stake in rights sold 71 years ago, could put a serious crimp on future plans for one of the studio's most enduring -- and lucrative -- franchises, especially if co-creator Joe Shuster's heirs follow suit in five years, when they are eligible to do so.

As it is, the studio has at least two Superman projects in development -- a follow-up to Bryan Singer's "Superman Returns" and "Justice League" -- and it may end up paying tens of millions from the domestic haul of "Superman Returns" to Siegel's heirs under the ruling, which applies to domestic monies for Superman projects since 1999.

The case is Toberoff's latest -- and potentially most damaging -- claim against the studio. The dedicated copyright crusader has pursued claims involving "Wild Wild West," "Dukes of Hazzard," "Smallville" and the upcoming "Get Smart."

He has gone after other studios, including Sony, but his most high-profile cases -- and victories -- have involved Warners. The studio paid "Moonrunners" producer Robert B. Clark a $17.5 million settlement in a case about similarities between that 1974 movie and the bigscreen "The Dukes of Hazzard." And a federal judge ruled earlier in the Siegels' favor over "Smallville," although that was challenged and the case still being resolved.

The studio declined to comment on the latest ruling in favor of their legal nemesis, issuing only a statement noting that, "substantial issues relating to the accounting of profits were ruled in our favor."

Among these issues: international profits, trademark-related revs and profits stemming from Superman fare produced before 1999, when Siegel's heirs terminated the earlier copyright arrangement under a 1976 law.

To the Siegels, Toberoff's legal maneuvers are nothing short of heroic. The family had been destitute for years after Siegel sold rights to his Man of Steel to Detective Comics for $130. DC Comics had started to pony up more monies after Warners made successful movies based on the character, but Siegel had long wished to redress the fact he had gotten so little from his creation; he died in 1996.

Toberoff has set up a production company, Intellectual Properties Worldwide, to develop films around these and other titles. And he has built up a sideline business producing bigscreen adaptations of the projects whose copyright claims he pursues. He has a producing credit on "Fantasy Island," a Sony project for Eddie Murphy, as well as "Sanford and Son."

March 29, 2008

# Ruling Gives Heirs a Share of Superman Copyright

By MICHAEL CIEPLY

LOS ANGELES — Time Warner is no longer the sole proprietor of Superman.

A federal judge here on Wednesday ruled that the heirs of Jerome Siegel — who 70 years ago sold the rights to the action hero he created with Joseph Shuster to Detective Comics for $130 — were entitled to claim a share of the United States copyright to the character.

EXHIBIT 18
281
CONFIDENTIAL    WME 00160

The ruling left intact Time Warner's international rights to the character, which it has long owned through its DC Comics unit.

And it reserved for trial questions over how much the company may owe the Siegel heirs for use of the character since 1999, when their ownership is deemed to have been restored. Also to be resolved is whether the heirs are entitled to payments directly from Time Warner's film unit, Warner Brothers, which took in $200 million at the domestic box office with "Superman Returns" in 2006, or only from the DC unit's Superman profits.

Still, the ruling threatened to complicate Warner's plans to make more films featuring Superman, including another sequel and a planned movie based on the DC Comics' "Justice League of America," in which he joins Batman, Wonder Woman and other superheroes to battle evildoers.

If the ruling survives a Time Warner legal challenge, it may also open the door to a similar reversion of rights to the estate of Mr. Shuster in 2013. That would give heirs of the two creators control over use of their lucrative character until at least 2033 — and perhaps longer, if Congress once again extends copyright terms — according to Marc Toberoff, a lawyer who represents the Siegels and the Shuster estate.

"It would be very powerful," said Mr. Toberoff, speaking by telephone on Friday. "After 2013, Time Warner couldn't exploit any new Superman-derived works without a license from the Siegels and Shusters."

Time Warner lawyers declined to discuss the decision, a spokesman said. A similar ruling in 2006 allowed the Siegels to recapture their rights in the Superboy character, without determining whether Superboy was, in fact, the basis for Warner Brothers's "Smallville" television series. The decision was later challenged in a case that has yet to be resolved, said Mr. Toberoff, who represented the family in that action.

This week's decision by Stephen G. Larson, a judge in the Federal District Court for the Central District of California, provided long-sought vindication to the wife and daughter of Mr. Siegel, who had bemoaned until his death in 1996 having parted so cheaply with rights to the lucrative hero.

"We were just stubborn," Joanne Siegel, Mr. Siegel's widow, said in a joint interview with her daughter, Laura Siegel Larson. "It was a dream of Jerry's, and we just took up the task."

The ruling specifically upheld the Siegels' copyright in the Superman material published in Detective Comics' Action Comics Vol. 1. The extent to which later iterations of the character are derived from that original was not determined by the judge.

In an unusually detailed narrative, the judge's 72-page order described how Mr. Siegel and Mr. Shuster, as teenagers at Glenville High School in Cleveland, became friends and collaborators on their school newspaper in 1932. They worked together on a short story,

EXHIBIT 19 CONFIDENTIAL    WME 00161
282

"The Reign of the Superman," in which their famous character first appeared not as hero, but villain.

By 1937, the pair were offering publishers comic strips in which the classic Superman elements — cape, logo and Clark Kent alter-ego — were already set. When Detective Comics bought 13 pages of work for its new Action Comics series the next year, the company sent Mr. Siegel a check for $130, and received in return a release from both creators granting the company rights to Superman "to have and hold forever," the order noted.

In the late 1940s, a referee in a New York court upheld Detective Comics' copyright, prompting Mr. Siegel and Mr. Shuster to drop their claim in exchange for $94,000. More than 30 years later, DC Comics (the successor to Detective Comics) gave the creators each a $20,000-per-year annuity that was later increased to $30,000. In 1997, however, Mrs. Siegel and her daughter served copyright termination notices under provisions of a 1976 law that permits heirs, under certain circumstances, to recover rights to creations.

Mr. Toberoff, their lawyer, has been something of a gadfly to Warner in the past. In the late 1990s, for example, he represented Gilbert Ralston, a television writer, in a legal battle over his rights in the CBS television series "The Wild Wild West," which was the basis for a 1999 Warner Brothers film that starred Will Smith. The case, said Mr. Toberoff, was settled.

Compensation to the Siegels would be limited to any work created after their 1999 termination date. Income from the 1978 "Superman" film, or the three sequels that followed in the 1980s, are not at issue. But a "Superman Returns" sequel being planned with the filmmaker Bryan Singer (who has also directed "The Usual Suspects" and "X-Men") might require payments to the Siegels, should they prevail in a demand that the studio's income, not just that of the comics unit, be subject to a court-ordered accounting.

Mrs. Siegel and Ms. Larson said it was too soon to make future plans for the Superman character. But they were inclined to relish this moment.

"I have lived in the shadow of this my whole life," Ms. Larson said. "I am so happy now, I just can't explain it."

Mark Tseng // Endeavor

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Ariel Emanuel Scheduler </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_SCHED> |
| **Sent:** | Tuesday, April 01, 2008 7:35 PM |
| **To:** | marja@ariannaonline.com; adriana@huffingtonpost.com |
| **Cc:** | Ariel Emanuel Assistants Group |
| **Subject:** | CC//Ariana Huffington, Marc Toberoff |

Hey Ladies,
Please let me know when Ariana will be available to talk to Marc re: SUPERMAN CASE.
Best,

Katrina Lebedeva
Endeavor

CONFIDENTIAL

WME 00163

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Ariel Emanuel Assistant </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_ASST> |
| **Sent:** | Tuesday, July 20, 2004 8:51 AM |
| **To:** | Ariel Emanuel Scheduler |
| **Subject:** | set |

Marc Toberoff, Siegels, AE

Toberoff wants this re: Superman. Ask AE if this is ok.

CONFIDENTIAL

EXHIBIT 19
285

WME 00164

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Ariel Emanuel Scheduler </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AEMANUEL_SCHED> |
| **Sent:** | Friday, July 16, 2004 9:44 AM |
| **To:** | Ariel Emanuel Assistant |
| **Subject:** | Superboy |

Superman/superboy offer- mtoberoff@ipwla.com – Please email Toberoff the offer (ae spoke to Toberoff about it last week).

IF you cant email it email Toberoff telling him why.

Erin Junkin
Endeavor Agency

CONFIDENTIAL

**EXHIBIT 19**
**286**

WME 00165

## Tom McGuire Assistant

| | |
|---|---|
| **From:** | Chris Jacquemin </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=CJACQUEMIN> |
| **Sent:** | Wednesday, August 27, 2003 5:57 PM |
| **To:** | Ariel Emanuel |
| **Cc:** | Ariel Emanuel Assistant |
| **Subject:** | superman |

Below is a list of all of the Superman properties my office could find. We have denoted the dates that the properties aired or were released. If there was box office data associated with anything, we have listed that as well. Please let me know if you would like anything further about this.

### Superman — Film

Superman (1941)
Animation/Short

Superman (1948)
A compilation of 15 episodes of "The Adventures of Superman."

Superman (1950)
A compilation of 15 episodes of "The Adventures of Superman."

Superman and the Mole Men (1951)

Superman's Peril (1954)
A compilation of 3 episodes of "The Adventures of Superman" TV series: episodes #32, #44 and #47.

Superman in Scotland Yard (1954)
A compilation of 3 episodes of "The Adventures of Superman" TV series: episodes #34, #38 and #49.

Superman in Exile (1954)
A compilation of 3 episodes of "The Adventures of Superman" TV series: no #s given.

Superman Flies Again (1954)
A compilation of 3 episodes of "The Adventures of Superman" TV series: episodes #30, #35 and #42.

Superman and the Jungle Devil (1954)
A compilation of 3 episodes of "The Adventures of Superman" TV series: episodes #31, #39 and #40.

Stamp Day for Superman (1954) — Short Film

Superman (1973)
A compilation of 4 episodes of "The Adventures of Superman" TV series: episodes #80, #82 and #95, #100.

Superman: The Movie (1978)
Warner Bros.
Total Box Office: $134,218,018

Superman II (1980)
Warner Bros.
Total Box Office: $108,185,706

Superman III (1983)
Warner Bros.
Total Box Office: $59,950,623

Supergirl (1984)
Tri-Star

EXHIBIT 20
287
CONFIDENTIAL

WME 00166

Total Box Office: $14,296,438

Superman IV: The Quest for Peace (1987)
Warner Bros.
Total Box Office: $15,681,020

**Superman — Television**

The Adventures of Superman
(Syndication, 1952 – 1957 – 104 episodes)
(ABC, 1957-1958, daytime)
(CBS, 1966)

The New Adventures of Superman
(CBS, 1966-1969, Animated, 68 total Episodes)

The Adventures of Superboy
(CBS, 1966-1969, Animated, 34 6-minute episodes)

The Batman/Superman Hour
(CBS, 1968-1969, Animated)

The Superman-Aquaman Hour
(CBS, 1968-1969, Animated)

SuperFriends
(ABC, Animated, 1973-1985: Super Friends, The All-New SuperFriends Hour, SuperFriends: The Legendary Super Powers Show, The Challenge of the SuperFriends, The World's Greatest SuperFriends, The Super Powers Team: Galactic Guardians)
(Cartoon Network)

The Making of Superman: The Movie (1978)

The Making of Superman II (1980)

Man and Superman (1982)

The Making of Superman III (1983)

Supergirl: The Making of the Movie (1984)

Superman 50th Anniversary (1988)

Superman (1988)
(CBS, Animated)

Superboy
(1988-1991, Syndicated Only, 78 episodes)
*1990-1991 name changed to Adventures of Superboy

Lois and Clark: The New Adventures of Superman
(1993-1997, ABC)

Superman: The Last Son of Krypton (1996)
Animated – 64 minutes

Superman
(1996-2000, Animated, 54 episodes)

Making Superman: Filming the Legend (2001)

The Batman/Superman Movie (1998)
Animated – 64 minutes

Superman: The Animated Series
(WB, 1996-2000)

**EXHIBIT 19** CONFIDENTIAL                    WME 00167
288

(Cartoon Network)

Superboy and Supergirl and 7 Monster (????)

Justice League
(Cartoon Network, M-F 5pm, Sat 12:30pm)

**CJ**

EXHIBIT 19 CONFIDENTIAL
289

WME 00168

**Tom McGuire Assistant**

| | |
|---|---|
| **From:** | Andrew Goodman </O=ENDEAVOR AGENCY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=AGOODMAN> |
| **Sent:** | Thursday, August 29, 2002 12:14 PM |
| **To:** | Ariel Emanuel |
| **Cc:** | Ariel Emanuel Assistant |
| **Subject:** | Superman |

Marc would like to know if Kevin Marks at Gang, Tyre, Ramer, & Brown ever responded to you regarding the Superman offer.

REDACTED

- Andrew

CONFIDENTIAL

EXHIBIT 19
290

WME 00169

# REDACTED

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Tuesday, June 08, 2010 12:27 PM
**To:** Ariel Emanuel
**Cc:** Ariel Emanuel Assistant
**Subject:** URGENT stolen docs

DA's office says I need to file a claim with LAPD so that they commence an investigation. The West LA Division LAPD has jurisdiction; do you or anyone have a contact there so this gets the attention it deserves?

Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

# REDACTED

1

**EXHIBIT 19** CONFIDENTIAL                          WME 00170
291

REDACTED

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Tuesday, June 15, 2010 4:14 PM
**To:** Ariel Emanuel
**Cc:** Ariel Emanuel Assistant
**Subject:** URGENT

Ari:

To better orient this so we can get some results here:

I do not believe that this matter would fall under the Cyber/IP Crimes Section of the US Attorneys' Office. It would probably fall under the Major Frauds section of the US Attorney's Office, Central District of California

The Deputy Chief of the Major Frauds section is AUSA, Mr. **Beong-Soo Kim,** (213) 894-3868. Mr. Kim reports to the Chief of the Criminal Division, Ms. **Christine Ewell** (213) 894-4443., and the Deputy Chief of the Criminal Division, **Daniel Goodman.**

Can you please run this up the flagpole with your contact to get the reference that will help move this along?

THANKS!

Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

REDACTED

CONFIDENTIAL

WME 00171

# REDACTED

**From:** Ariel Emanuel [mailto:aemanuel@wmeentertainment.com]
**Sent:** Tuesday, June 15, 2010 4:16 PM
**To:** 'Marc Toberoff'
**Subject:** RE: URGENT

yes

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Tuesday, June 15, 2010 4:14 PM
**To:** Ariel Emanuel
**Cc:** Ariel Emanuel Assistant
**Subject:** URGENT

Ari:

To better orient this so we can get some results here:

I do not believe that this matter would fall under the Cyber/IP Crimes Section of the US Attorneys' Office.  It would probably fall under the Major Frauds section of the US Attorney's Office, Central District of California

The Deputy Chief of the Major Frauds section is AUSA, Mr. **Beong-Soo Kim,** (213) 894-3868.  Mr. Kim reports to the Chief of the Criminal Division, Ms. **Christine Ewell** (213) 894-4443., and the Deputy Chief of the Criminal Division, **Daniel Goodman.**

Can you please run this up the flagpole with your contact to get the reference that will help move this along?

THANKS!

Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333

1

**EXHIBIT 19**
**293**

CONFIDENTIAL

Fax: (310) 246-3101
MToberoff@ipwla.com

**EXHIBIT 19** CONFIDENTIAL          WME 00173
**294**

# REDACTED

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Monday, August 16, 2010 4:05 PM
**To:** Kim, Beong-Soo (USACAC)
**Cc:** Ariel Emanuel
**Subject:** Re: referral

Mr. Kim:

Are you free to meet tomorrow morning for breakfast or at your office, any time between 8:30 and 10:30 am?

Marc Toberoff

On Fri, Aug 13, 2010 at 4:56 PM, Kim, Beong-Soo (USACAC) <Beong-Soo.Kim@usdoj.gov> wrote:

Yes, I'll be in on Monday.  We could also talk by phone now, if you wanted.  213-894-3868.

---

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Friday, August 13, 2010 4:55 PM

**To:** Kim, Beong-Soo (USACAC)
**Subject:** Re: referral

We missed each other, but I will be in the area again Monday. Is there a time I could swing by and see you?

On Thu, Aug 12, 2010 at 10:20 PM, Kim, Beong-Soo (USACAC) <Beong-Soo.Kim@usdoj.gov> wrote:

I'm upstairs from Judge Wright; you could try me on the 11th Floor after your hearing?

---

**From:** marc.toberoff@gmail.com [mailto:marc.toberoff@gmail.com] **On Behalf Of** Marc Toberoff
**Sent:** Thursday, August 12, 2010 10:20 PM
**To:** Kim, Beong-Soo (USACAC)
**Subject:** Re: referral

1

**EXHIBIT 19** CONFIDENTIAL    WME 00174
295

Mr. Kim:

I would welcome that opportunity. However, I am in Federal Court tomorrow before Judge Otis Wright for a status conference at 2:30 pm, with traffic I may not be back to the office in time. If Friday does not work are you available on Monday?

I would also be happy to go downtown and meet with you in person.

Thank-you.

Marc Toberoff

On Thu, Aug 12, 2010 at 9:20 PM, Kim, Beong-Soo (USACAC) <Beong-Soo.Kim@usdoj.gov> wrote:

Marc: Let's try to talk tomorrow afternoon, if you're around, about your referral to my office. I'll leave it to you whether you'd like Ari Emanuel to be on the call.

# REDACTED

_____

*Beong-Soo Kim*

*Chief, Major Frauds Section*

*Central District of California*

*(213) 894-3868 (phone); (213) 894-6269 (fax)*

--
Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

--
Marc Toberoff

2

EXHIBIT 19
296

CONFIDENTIAL    WME 00175

Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com


--
Marc Toberoff
Toberoff & Associates, PC
2049 Century Park East, Suite 2720
Los Angeles, CA 90067
Tel: (310) 246-3333
Fax: (310) 246-3101
MToberoff@ipwla.com

**EXHIBIT 19** CONFIDENTIAL          WME  00176
**297**

**EXHIBIT 19**
**298**

**EXHIBIT 19**
**299**

**EXHIBIT 19**
**300**

# EXHIBIT 20

# O'MELVENY & MYERS LLP

| BEIJING | 1999 Avenue of the Stars, 7th Floor | SAN FRANCISCO |
|---|---|---|
| BRUSSELS | Los Angeles, California 90067-6035 | SHANGHAI |
| HONG KONG | | SILICON VALLEY |
| LONDON | TELEPHONE (310) 553-6700 | SINGAPORE |
| LOS ANGELES | FACSIMILE (310) 246-6779 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |
| NEW YORK | | |

August 3, 2011

OUR FILE NUMBER
905900-321

**VIA E-MAIL**

WRITER'S DIRECT DIAL
(310) 246-6840

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

WRITER'S E-MAIL ADDRESS
mkline@omm.com

Gerald A. Berk
Steuer Escovar Berk Brown
55 Public Square, Suite 1475
Cleveland, Ohio 44113

Re:     *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

      We write to follow up on several issues raised during Don Bulson's deposition—all of which we hope to resolve before taking the second day of his deposition, per his agreement, this Fall:

      1.  <u>Withdrawn Objections</u>.  At the end of Mr. Bulson's deposition Mr. Berk stated that he would be withdrawing many of the objections and instructions not to answer that he made during the deposition.  Dep. of Don Bulson ("Tr.") at 163:13-21.  As Mr. Berk promised he would do, *see id.* at 163:22-164:4, please review the enclosed transcript and specifically identify each objection that counsel for the defendants and the Estate of Michael Siegel wish to withdraw.  We need to meet and confer this week or next week on any remaining objections that you have, so that we can address them in any necessary motion.

      2.  <u>Objections re: Documents Conveyed to Mr. Bulson by Mr. Siegel</u>.  Throughout the deposition both Mr. Berk and Mr. Toberoff instructed Mr. Bulson not to answer questions regarding non-privileged documents or information conveyed to Mr. Bulson by Mr. Siegel.  *E.g.,* Tr. at 24:22-30:23, 52:1-3; 55:11-20, 60:13-62:1.  We requested that you identify what authority you were relying on to take that position, but you did not have any specific authorities at hand. *See id.* at 27:2-29:10.  The law is clear that non-privileged documents do not become privileged because they are sent to an attorney or reside in his files.  *E.g., U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977); *In re Rupert*, 309 F.2d 97, 99 (6th Cir. 1962); *Suezaki v. Super. Ct.*, 58 Cal.

**EXHIBIT 20**
**301**

O'MELVENY & MYERS LLP
August 3, 2011 - Page 2

2d 166, 176 (1962) (mere transmission to counsel of non-privileged communication "cannot create the privilege if none, in fact, exists"); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638 (1994); *Davies v. Columbia Gas & Elec. Co.*, 68 N.E.2d 571, 579 (Ohio C.P. 1938), *order aff'd*, 68 N.E.2d 231 (Ct. App. 1939) (non-privileged documents received by "attorney for the purposes of consultation … could not be regarded as privileged communications.").[1]  Please provide us with citations to the authorities you are relying on in asserting that non-privileged documents and information become privileged simply because they were conveyed to an attorney.  We need to meet and confer this issue this week or next week, so that we can address any remaining disputes in a motion.

2.  Expert Report.  Mr. Bulson testified that he believes an expert report was submitted in the Renner Otto litigation against the Estate of Michael Siegel containing billing records and/or time entries reflecting when Mr. Bulson spoke with Mr. Toberoff.  Tr. at 20:5-24:3.  Mr. Ryland has indicated that Renner Otto can produce such responsive documents to DC but needs to go through you regarding privilege assertions before doing so.  Please confirm that Mr. Ryland is authorized to produce Renner Otto's expert report.  We hope to avoid having to serve subpoenas on your offices seeking this document, which is readily available to Mr. Ryland.  If you are unwilling to allow these documents to be produced, we need to meet and confer on the issue this week or next week.

3.  Calendar and/or Billing Entries.  In addition to the expert report, DC requests that non-privileged portions or calendars and billing entries maintained by Mr. Bulson and/or Renner Otto regarding the representation of Michael Siegel be produced.  Tr. at 18:12-24:3.  Please confirm that Mr. Ryland is authorized to produce these documents (redacted, as need be).  We are not seeking the disclosure of attorney-client or work product information that may be contained in Mr. Bulson's calendars or billing entries, but we are entitled to discover the dates on which Mr. Bulson spoke or corresponded with Mr. Toberoff.  The timeline of Mr. Bulson and Mr. Toberoff's interactions is directly relevant to our claims in this case.  If you are unwilling to allow these documents to be produced, we need to meet and confer on the issue this week or next week.

4.  Michael Siegel File.  As you are aware, as Mr. Ryland informed us, *see* July 15, 2011, Ryland Letter to Kline, and as Mr. Bulson testified, Tr. at 14:25-18:11, Renner Otto is in

---

[1] *Accord U.S. v. Ruehle*, 583 F.3d 600, 608-09 (9th Cir. 2009) (district court's presumption of privilege over all communications during attorney-client relationship was error); *U.S. v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir.), *cert. denied*, 377 U.S. 976 (1964) (attorney-client relationship does not create an automatic "cloak of protection … draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (statements made in meeting not necessarily privileged simply because legal counsel present); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4 (N.D. Ill. 1980) ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with an attorney.").

EXHIBIT 20
302

O'MELVENY & MYERS LLP
August 3, 2011 - Page 3

possession of a digital copy of Mr. Siegel's files. Renner Otto is lawfully in possession of those documents and is entitled to retain a copy of Mr. Siegel's files as well as review them. *E.g.*, OH Adv. Op. 1992-8 (Ohio Bd. Com. Griev. Disp.); *In re Int'l Corp.*, 2004 WL 5507905, at *1 (S.D. Ohio Oct. 1, 2004); OH. Prof. Cond. R. 1.15(a), 1.16(d); *Disc. Counsel v. Noel*, 894 N.E.2d 31, 34 (Ohio 2008). We understand that Mr. Ryland intends to defer to you regarding claims of attorney-client privilege and work product. However, Renner Otto is obligated to respond to DC's subpoena for production of documents—which requires it to produce responsive, non-privileged documents in these digital files and produce a privilege log. FED. R. CIV. P. 45(d), (e); *e.g., Heilman v. Vojkufka*, 2011 WL 677877, at * 18 (E.D. Cal. Feb. 17, 2011); *U.S. v. Martin*, 278 F.3d 988. 1000 (9th Cir. 2002); *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992); *see also* William W. SCHWARZER ET AL., FEDERAL CIVIL PROCEDURE BEFORE TRIAL ("RUTTER") §§ 11:2220-2318 (2011).

As an interim step to Renner Otto making this full production or making any privilege calls, and so that our disputed document issues may be framed, we propose that the Renner Otto firm (at DC's expense) take the first step of preparing a log of all documents in their Michael Siegel file. This log would identify who authored the document, to whom it was sent (if anyone), the date of the document, when it was received by Renner Otto (if that date is known), and the total number of pages for each individual document. All attachments and enclosures would be listed separately, as would each part of email chains.[2] Such a log is necessary to identify each document in Mr. Siegel's file, since Mr. Toberoff's privilege assertions over the Michael Siegel file and other documents—in this and related cases—have been adjudged to be erroneous and overbroad, and given that he has admitted clipping privileged and non-privileged documents together and listing them as a single privilege log entry. Case No. 1:06 MC 99, Docket No. 15 at 2-3 (April 1, 2008, Order of the U.S. District Court for the Northern District of Ohio) ("[T]he court finds that none of the 15 documents are subject to the attorney/client privilege … [N]one of the 15 communications … are for the purpose of giving legal advice."); June 20, 2011, Hearing Tr. at 16:19-18:15 ("[T]he letter we believe was part of a larger communication from the client wanting to discuss these communications with her brother … It appeared paper clipped with the other documents.").

If you are unwilling to agree to this procedure, we need to meet and confer on the issue this week or next week.

_____

[2] *E.g., Narayan v. EGL, Inc.*, 2006 WL 3050851, at *1 (N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to include separate listing for attachments); *In re Heritage Bond Litig.*, 2004 WL 1970058, at *5 (C.D. Cal. July 23, 2004) (same); *Mold-Masters Ltd. v. Husky Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001) ("Since a document with an attachment constitutes two separate documents, a party objecting to the disclosure of a document with an attachment must prove that both the document and the attachment individually satisfy the requirements of the applicable privilege or doctrine."); RUTTER § 11:1919 ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

**EXHIBIT 20**
**303**

O'MELVENY & MYERS LLP

August 3, 2011 - Page 4

    5.  "Confidentiality" Designations.  During the deposition, you refused to allow us to examine Mr. Bulson regarding two exhibits:  (1) a February 12, 2002, memorandum of agreement between Pacific Pictures Corporation, Ari Emanuel, and Endeavor (Ex. 44 - EN00001-7), Tr. at 88:8-92:14; and (2) a May 12, 2005, letter from Mr. Toberoff to Patrick Perkins responding to DC's April 28, 2005, proposal to the Shusters (Ex. 52 - SHU 109-111), Tr. at 137:12-139:25.  You objected to both exhibits on the grounds that they were marked "confidential" and therefore governed by the protective order in the *Siegel* case, which you argued applied in this case because the parties purportedly always anticipated entering into a protective order.  First, there is no protective order in this case, and defendants produced both exhibits by designation, without reservation of any rights or claims of confidentiality.  *See* Dec. 7, 2010, Toberoff Letter to Petrocelli (attached).  Second, neither of the two exhibits was marked "confidential" when the bates stamps were applied prior to production, as required by the protective order in *Siegel*.  The "confidential" label exists on the underlying document—and the person whom affixed it could not have labeled the document confidential with the parties' protective order in Siegel in mind.  That order did not enter until April 5, 2006.  Please confirm your agreement that DC may proceed to examine Mr. Bulson regarding both exhibits when his deposition is re-commenced.  If you disagree, we need to meet and confer on these issues without delay.

    As for your threats that defendants will disclose DC's confidential documents, *e.g.*, Tr. at 152:2-153:1 ("Warner Brothers and DC have marked thousands of documents confidential with all sorts of financial information.  And if DC is not abiding by when we mark things confidential and abiding by the protective order we're not going to abide by that order either."), these threats are improper and be advised that DC will seek full relief against you and defendants if you act out on them.

    6.  Protective Order re: Deposition.  During the deposition, Mr. Ryland requested that Mr. Bulson's deposition be marked "attorney's eyes only" and be subject to a protective order between the parties, specifically with respect to portions of the deposition that deal with the business practices of Renner Otto Boisselle & Sklar, LLP.  Tr. at 20:14-21:24.  Please confirm your agreement to Mr. Ryland's request and we will prepare a protective order for your review.

**EXHIBIT 20**
**304**

O'MELVENY & MYERS LLP
August 3, 2011 - Page 5

\*       \*       \*

Please provide us with the earliest possible date this or next week that you are available to meet and confer on these issues.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

Enclosure(s)
cc:     Daniel M. Petrocelli, Esq.
        Jason Tokoro, Esq.
        Josh Ryland, Esq.
        Richard Kendall, Esq.

**EXHIBIT 20**
**305**

# EXHIBIT 21

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

\* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

August 11, 2011

<u>Via E-Mail</u>

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Matt:

I write on behalf of defendants and the Estate of Michael Siegel (the "Estate") in response to your August 3, 2011 letter regarding Don Bulson's deposition.

1.    <u>Withdrawn Objections:</u>  Mr. Berk stated at the end of Mr. Bulson's deposition that he would consider withdrawing certain of his objections made early on in the deposition.

The Estate hereby withdraws its objections to DC's questioning on the following topics:  (1) communications between Mr. Bulson and Mr. Toberoff concerning the purchase of the Michael Siegel interest (Rough Transcript ("Trns.") at 31:5-13, 43:12-45:3); (2) whether Mr. Bulson discussed the May 13, 2003 letter from Michael Siegel to Laura Siegel Larson with Marc Toberoff (Trns. at 55:11-56:16); and (3) whether Mr. Bulson would have "wanted to know" the identity of the potential investor in the Michael Siegel interest (Trns. at 85:19-86:15).  However, topic (3) is moot as it was answered later without objection. Trns. at 98:9-16.  The Estate maintains its objections to the extent DC's questioning concerns or implicates the substance of any communications between Mr. Bulson and Michael Siegel.

The Estate also maintains its objections as to communications between Michael Siegel and Don Bulson regarding Mr. Siegel's communications with Laura Siegel Larson.  Trns. at 60:13-66:3, 72:21-75:8, 76:18-80:17.

2.    <u>Documents Conveyed to Mr. Bulson:</u>  Your assertion that we improperly instructed Mr. Bulson not to answer questions concerning certain alleged "non-privileged documents" is a straw man.  The Estate clearly stated that "[Mr. Bulson] can answer concerning whether he sent these documents, but any conversations he had with Michael Siegel concerning these documents are privileged."  Trns. at 51:16-20.  Defendants also never asserted, as you claim, that non-privileged

**EXHIBIT 21**
**306**

**TOBEROFF & ASSOCIATES, P.C.**

August 11, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 4

documents become privileged through their transmission to an attorney, and none of DC's examples involve such assertions:

- Trns. at 24:22-30:23:  The Estate did not assert the May 13, 2003 letter from Michael Siegel to Laura Siegel Larson itself was privileged.  The Estate merely instructed Mr. Bulson not to answer a question about whether he had previously seen the document to the extent that he had seen it during privileged communications with Michael Siegel.  Mr. Bulson clearly testified that he had never seen the May 13 letter "independent of Michael [Siegel] giving [him] this document."  Trns. at 26:21-23.
- Trns. at 52:1-3:  The Estate clearly and properly asserted privilege as to "communications between Mr. Bulson and Michael Siegel."
- Trns. at 55:11-20:  The Estate did not assert privilege as to the May 13 letter.  Nonetheless, the instruction not to answer the question of whether Mr. Bulson ever communicated with Mr. Toberoff about the May 13 letter is withdrawn as stated above.
- Trns. at 60:13-62:1:  The Estate clearly and properly instructed Mr. Bulson not to answer questions regarding his attorney-client communications with Michael Siegel about Marc Toberoff.

3.      Expert Report/Calendar & Billing Entries:  We have asked Renner Otto for a copy of the expert report and its calendar and billing entries so that we can review such documents and determine whether the Estate will assert privilege as to any information contained therein.  The Estate needs to review such documents as they are produced to enable it to assert privilege where appropriate.  DC cannot possibly object to this, as it states that it is "not seeking the disclosure of attorney-client or work product information" contained in such documents, but merely "the dates on which Mr. Bulson spoke or corresponded with Mr. Toberoff."

DC's claim that the "timeline of Mr. Bulson and Mr. Toberoff's interactions is directly relevant to our claims in this case" is incorrect, as the discovery sought by DC is entirely collateral.  DC's complaint makes no allegations whatsoever concerning the purchase of the Michael Siegel interest and does not *once* mention Mr. Siegel.

4.      The Michael Siegel File:  Your demand that Renner Otto prepare what amounts to a privilege log and to include information far beyond that which is required is improper.

The privilege as to these files is for the Estate to assert.  Renner Otto stated "unequivocally [that] we will not make any determinations with respect to privilege on our own judgment, because we do not hold the privilege, nor can we assert it or waive it."  Trns. at 53:5-8.

Moreover, your proposal to "log" "all" documents in Renner Otto's Michael Siegel archive regardless of whether they are even responsive to the subpoena makes no sense whatsoever.  You demand that the log must identify "the date of the document" *and* the date "when it was received by Renner Otto (if that date is known)," as well as "the total number of pages for each individual

**EXHIBIT 21**
**307**

**TOBEROFF & ASSOCIATES, P.C.**

August 11, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 4

document" and that "[a]ll attachments and enclosures would be listed separately, as would each part of email chains."  DC is not entitled to all these details in a standard log unless otherwise ordered by a court.  DC's February 7, 2011 motion to compel such details  (Docket No. 160 at 40-44) was denied on April 11, 2011 (Docket No. 209 at 13); its April 25, 2011 motion for review of that April 11 order on that subject (Docket No. 225 at 17-20) was denied on May 11, 2011 (Docket No. 248); *and* its motion for reconsideration of that April 11 order on that subject (Docket No. 253 at 9-10) was denied on June 20, 2011 (Docket No. 285).  Each time, DC claimed that defendants' privilege logs were "deficient" and that defendants were required to list such details, particularly with respect to "Michael Siegel" documents, and the Courts denied DC's demands and upheld defendants' privilege logs.

Your offer to pay Renner Otto is a transparent and improper attempt to motivate Renner Otto to act contrary to its former client's and now the Estate's interest by divulging information that the Courts have consistently held DC is not entitled to.

5.    Confidentiality Designations:  The entire dispute as to this issue of documents marked "Confidential" from the *Siegel* litigation could be easily avoided if DC would agree to a protective order in this case similar in substance to the one entered into by the parties in *Siegel*, which permitted witnesses to be examined as to documents designated "confidential."  *See Siegel v. Warner Bros. Entertainment, Inc.*, Docket No. 50, ¶¶ 5-8.

DC's claim that "the 'confidential' label exists on the underlying document," and that therefore the *Siegel* protective order does not apply, is disingenuous.  The *Siegel* protective order applies to "any writing produced in any Document Production by any party or non-party witness marked as 'CONFIDENTIAL.'"  *Id.*, ¶ 4.  Nowhere does the protective order require that such a "CONFIDENTIAL" designation be affixed at the time of production.

DC's hypocrisy on this subject is notable; on one hand, it asserts that no protective order was entered into in this case, while threatening, on the other hand, that it will "seek full relief against you and defendants" if defendants disclose confidential documents produced by DC in *Siegel*.

You also falsely contend that I "refused" to allow you to examine Mr. Bulson on a May 12, 2005 letter from me to Patrick Perkins.  You asked several questions about that letter, I did not instruct Mr. Bulson not to answer any questions on the basis of my objections, and you chose not to ask any further questions after I objected. Trns. at 137:2-138:19.

6.    Protective Order re: Depositions:  We will agree in principle to Mr. Ryland's request for a protective order concerning Renner Otto's business practices, subject to approving the particular terms and language of any such order.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

**EXHIBIT 21**
**308**

**TOBEROFF & ASSOCIATES, P.C.**

August 11, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  4 of 4

Very truly yours,

Marc Toberoff

cc:    Josh Ryland

**EXHIBIT 21**
**309**

# EXHIBIT 22

## SUPERMAN – MARC TOBEROFF TIMELINE

*\*Please read closely. We have enclosed several supporting documents in our package to you, and very much hope you will spend some time reviewing them before you come to any potential settlement with Marc Toberoff, who represents the Siegels and the Schuster heirs in the ongoing Superman legal dispute with Time Warner and DC Comics.*

*The below information should save Time Warner potentially millions and millions of dollars, and, if you so choose, - have Marc Toberoff suspended, disgraced, --- if not ultimately disbarred --- from practicing law.*

*Toberoff being labeled as the "relentless crusader for artists' rights" is hardly that: he has devised a strategy whereas he has ultimately claimed much ownership of the Superman copyright personally as he can. And of course, he has done so without the knowledge and full disclosure to the Siegels and Schuster heirs, creators of Superman.*

*As it stands right now, the single person who would stand to gain the MOST in a settlement with Time Warner regarding the ongoing SUPERMAN legal dispute would not be the heirs themselves, but Marc Toberoff.*

*What you do with the below information is up to you. You should most certainly conduct your own investigation. We believe there are details within this timeline that will be of strong interest to you.*

*Consider it an early holiday gift.*

*(Also, please be aware that this timeline is written with the assumptions that the reader(s) are aware of the characters involved within the ongoing Superman legal dispute between Time Warner/DC Comics. The heirs to the SUPERMAN copyright are: the Siegels (Joanne, Laura & Michael), Jerry Siegel's heirs, who collectively have claims to 50% of the copyright to Superman, while the Schuster estate has claims on the other 50%.) Marc Toberoff currently represents both parties in ongoing litigation.*

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

In 2000 MT established a separate corporation entitled "Pacific Pictures Corporation" (PPC), with an address of 23852 Pacific Coast Hwy, Suite 555, Malibu, CA 90265. Tel: (310)-589-5151. You will see below that he established this business to solicit his services as an attorney.

In 2001, Marc Toberoff (MT) began researching Superman, who had rights, etc.

MT initially contacts Kevin Marks at Gang, Tyre, who represented Joanne and Laura Siegel with an offer for the Siegel rights. Marks discourages Toberoff from any advances, and does not tell Siegels initially of the interaction because he believes it is not in their best interest.

1

Q 0001

On Nov. 23, 2001, MT entered into a joint venture agreement between his own outside corporation Pacific Pictures Corp. (NOT a law firm), and Mark Warren Peavy, and his mother Jean Peavy, heirs to the Joe Schuster estate. For the purposes of this document, we do not know the content of that agreement.

MT and Ari Emanuel, partner and agent at Endeavor, contacts Kevin Marks at Gang, Tyrer, Ramer, & Brown again, (who represented Joanne and Laura Siegel), on August 8, 2002. MT approaches the Siegels, *not as an attorney but as a film producer*, stating that he is "allied" with Emanuel, hoping such a claim will legitimize him.

On August 8th 2002, MT tells Marks that he and Emanuel have a billionaire ready to offer $15 million dollars up-front, plus what they promise to be meaningful participation from proceeds for exploitation of the Siegels' rights to SUPERMAN and some continued royalties on an ongoing basis in all media. Kevin Marks says to the Siegels, "Don't do it." Gang, Tyrer tells the Siegels that they believe MT has brokered a confidential agreement with the Joe Schuster estate. Marks also tells the Siegels that the Schuster estate will have termination rights in approximately 2013. Schuster missed termination notices.

Within their offer, MT appeals to the Siegels' sense of ownership and encourages them to take this deal. MT says he can help them make a movie in direct competition to the one being made at Warner Brothers (MT makes this argument to Joanne and Laura, all the while knowing full well that no one would ever go near making such an attempt; no other studio would go for it because of the division of rights, and no one outside of the studio system would attempt such an endeavor for all the enormous costs attributable to the making, marketing and distribution of such a film.) In other words, MT displays "predatory intent" in his initial approach to the Siegels from the very beginning.

In their very first conversation, Kevin Marks tells MT "no go" --- that the Siegels have already reached an agreement with Time Warner and DC Comics.

Marks conveys MT's offer to the Siegels, and Marks does say to the Siegels, it is a better offer than the one you have. However, Marks also tells the Siegels that he would testify in court against the Siegels if they accepted this offer because he believes there has already been an agreement reached.

The Siegels are angry at Kevin Marks that he said he would testify against them if they took MT's offer, and relations break down between the Siegels and Gang, Tyrer. They fire Gang, Tyrer. And, because the Siegels believed that MT was sympathetic to their plight, and because MT appealed to their sense of ownership of SUPERMAN, they decide to enter into an agreement with Intellectual Properties Worldwide, otherwise known as "IPW", Marc Toberoff's film production company, for 10% for any kind of deal he got to make a movie or exploit the rights. (as you know, the Siegels submitted termination notices on the Superman copyright in 1997).

2

Q 0002

EXHIBIT A
63

**EXHIBIT 22**
**311**

The Siegels' agreement with IPW is an agreement that mirrors the earlier Pacific Pictures agreement that MT makes with the heirs to Joe Schuster (*see more information on this below*). In other words, Marc Toberoff is named as their attorney within the agreement (which is masked as a retainer agreement) in the event that they go to litigation over anything (*please see enclosed document*). Upon the Siegels signing the agreement, MT then tells Joanne and Laura that his mysterious billionaire has decided to invest elsewhere. In other words, MT makes himself the Siegels' attorney of record while he solicited them as a film producer, violating the rule that no lawyer may directly solicit business, with the double violation of doing it under the auspices of doing separate business dealings. MT's sole intent was to become the Siegels' attorney, not to help the Siegels (as he had alleged) to make a movie in competition to *Superman Returns*, which was then in development at Warner Brothers. MT also never divulges his previous direct dealings with the Schuster heirs, and his Nov.23, 2001 joint agreement with the Peavys (the Schuster heirs) in which he is named their attorney of record.

In 2002, MT set his sights on acquiring the passive interest to Michael Siegel's rights, who, as you know, is Jerry Siegel's son from his first marriage, and is Laura's half-brother. Michael Siegel has an interest of 12.5% in SUPERMAN and SUPERBOY. The Siegels total have 50% interest (Joanne holds 50%, Laura 25%. Michael 25%). So, in essence, Joanne has 25%, Laura 12.5, Michael 12.5. MT used to his advantage the strained relationship between Joanne and Laura, and Michael; as well as strained communication with the Schusters.

Here comes Ari Emanuel, and he is going to finance the purchase of Michael Siegel's interest. But Michael Siegel turns him down flat. MT discloses the intent to purchase to Joanne and Laura, admitting it is a possible conflict of interest. MT is fully aware of what he is doing is wrong.

On December 16, 2002, there is another letter from MT and Ari Emanuel to Joanne and Laura Siegel, saying they are re-approaching Michael again about purchasing his interest. MT tells Michael Siegel that they have an investor ready to buy out his interest, though the amount is significantly less than what DC showed as his share.

March 3, 2003 – letter from Paul Levitz/DC Comics to the Siegels, and MT is messing up relationships for his own personal benefit. DC is trying to understand why they backed out of the deal. The reason is MT who is interfering in all the relationships up to this point.

May 2003 -- MT is continuing to make business arrangements with the Schuster heirs, unbeknownst to Joanne and Laura Siegel .

May 13, 2003: Michael Siegel sends a very concerned letter to Laura Siegel about Marc Toberoff's actions. *(please see enclosed letter; this letter lays out well MT's scheme).* Among other things, Michael Siegel tells her of how Toberoff is now controlling the whole of the SUPERMAN copyright, how he may have bought a substantial portion of the Schuster interest for himself, and he brings to light MT's utter lack of opening a

3

Case 2:10-cv-03838-ODW-RZ   Document 500-49   Filed 10/10/12   Page 146 of 157   Page ID #:31858
Case 2:10-cv-03838-ODW-RZ   Document 500-49   Filed 10/03/13   Page 149 of 157   Page ID #:73678
Page ID #:31858

dialogue with anyone regarding making another SUPERMAN movie, in partnership with Ari Emanuel.   Also that MT has not even made contact with Time Warner.  Lastly, Michael conveys that MT seems to have an agenda of "someone" buying him out, and that MT is pressing for an answer.

In May-June 2003. **STATUE OF LIMITATIONS is coming close on for filing of the SUPERMAN complaint.  Both Joanne and Laura Siegel are now very ill.**  MT starts saying to the Siegels that the statue of limitations is coming up, and they would have waived their right to sue based on the termination notices. *This is the very seed MT meant to mine all along.* He sends them the research on the statue of limitations, and concerned, the Siegels contact Art Levine in Washington, D.C. to have independent research done on the matter. The research confirms that they should file by September.

In June, Ari Emanuel through IPW is still trying to buy Michael Siegel's interest but can't come to terms on price.

End of June 2003, MT gets a law firm to represent the Schusters to assist with the SUPERMAN copyrights. They determine the value of the estate is $0, and California Probate Code will not be applicable, such that the estate attorney will not be entitled to any future settlement regarding the Superman interest.  Estate attorney is only receiving an hourly rate. MT "graciously" pays all legal fees.

In other words, MT helped probate the estate, but hired an attorney to do the dirty work. Fittingly, the Joe Schuster will was "lost", so the will had no value.  So, the court writes the will for him, and includes the rights to proceed with the termination.  And since the firm receives an hourly rate, and the estate is valued at $0, it does not effect any future settlement. The estate attorney will thereby not be entitled to statutory compensation. Another example of showing that MT is solely motivated *at all times* not by his clients' interests, but manipulating pieces of the puzzle so that he may receive the greatest percentage from a very possible large Time Warner settlement, through part ownership and unconscionable fees (*see below*).

**Absolutely nothing is moving ahead with Siegel/Schuster rights and agreements because MT was never intending to do anything with rights other than litigate.**

July 5, 2003. Laura Siegel reveals her ignorance of Toberoff's dubious actions in her return letter back to Michael --- MT has NOT told them he is about to enter into the PPC agreement, whereby MT *personally* will have a 50% of the Schuster interest in Superman. He will shortly own equal to what Joanne owns (25% of entire copyright), and double what Laura owns, *but MT has failed to disclose this.*  The Schusters – through the Pacific Pictures Corp agreement – gave MT half of what they had.  MT never had the intention to make a movie in competition to the one at Warners – it is tantamount to throwing $$$ away, but it does appeal to the heirs' sense of lost ownership.  MT never did want to make a movie, and exploit the rights. MT knows no one is going to invest in an outside movie project outside of Warner Brothers, though he uses Ari Emanuel, the agent, to legitmize his claims. *(please see enclosed letter)*

4

Also, in the letter back to Michael Siegel, that MT helped Laura Siegel draft --- in response to Michael's accusations of Toberoff, Laura clearly states that MT does *not* have a production company. (This is false – Marc Toberoff's IPW has been in existence, partly funded by Ari Emanuel, since at least 2002). In the draft of the letter, MT crossed out the statement that he does not have a production company, and writes " MT has not plans to produce a SUPERMAN movie, nor is this feasible given the division of ownership of the rights." (please see enclosed letter). **This clearly delineates that Toberoff never had the intention of making a movie, and approached the Siegels and Schusters separately —- not for the exploitation of rights as he initially asserted,** but to gain an unconscionable fee from a very large possible settlement with Time Warner.

August 7, 2003 --- Letter from Rodi-Pollock, who is the attorney in the Schuster estate – who says the Schuster Will would be written by the court August 25, 2003, since the Schuster Will had been "lost".

Sept-Oct 2003 ---- Letter with Ari Emanuel in which he would receive $2.5 million flat fee for "negotiating services"

On October 27, 2003, MT uses PPC to enter into another agreement with the Joe Schuster's heirs: Mark Warren Peavy and Jean Peavy, in which PPC is "engaged as the Executor of the recently probated estate of Joeseph Schuster." The agreement purports that PPC is the Peavys exclusive advisor "for the purpose of retrieving, enforcing, and exploiting all of Joe Schuster's rights ....in all of his creations...". In this agreement, MT also names himself their attorney for any and all litigation or questions that should arise in regards to these Rights. MT also clearly delineates that PPC is NOT a law firm. And, lastly but most significantly, MT defines that any and all moneys and proceeds, in cash or in kind, received from the enforcement, settlement, or exploitation of any of the Rights, ...any monies would be split 50/50. **IN ESSENCE, MARC TOBEROFF NOW HAS A 25% STAKE IN SUPERMAN PERSONALLY BECAUSE OF HIS DEAL WITH THE SCHUSTERS THAT WAS MADE IN 2003. He gets – under the guise of Pacific Pictures Corp – the rights to retrieve and enforce and exploit Joe Schuster's interest in SUPERMAN.** MT's alleged "firewall" between film producing and soliciting business as an attorney comes tumbling down. (*please see enclosed signed agreement, dated October 27, 2003*).

In 2013 MT will own Schuster's side of it; but it does not matter, they will settle before.

MT inquires into the legality of entering into the Pacific Pictures Corporation agreement with the Peavys, heirs to Schuster estate, using law firm Armstrong, Hirsch, Jackoway, Tyerman, & Wertheimer. The inquiry raises strong eyebrows, and questions of legality as to MT's actions in regards to the Schusters, and strongly discourages further involvement with MT and this matter.

5

August 2003 – Michael Siegel wants an annuity of $200,000, which equaled $3.5 million. MT tells him that "no investor is going to go for that." MT says Warners' estimation was $2 million less; such a bad risk for an investor, MT says. MT is tenaciously going after the 12.5%, and of course, the investor MT "has" is himself. He is trying to get Michael to lower the price.

**MT is also trying to convince Michael Siegel not to sell his interest to another outside party. MT is lying to Michael Siegel to make sure he can still draw a fee from Michael's 12.5% interest. If Michael went away, he would only draw from remaining 37.5%, instead of 50%. In the final letter, MT tells Michael Siegel that he cannot sell without our approval because Michael did not take part in the termination, but "we will give you (Michael Siegel) approval, if you sell it to a third party, *monitored by Marc Toberoff*." MT is lying to Michael Siegel about Siegel's ability to sell his interest in the SUPERMAN copyright.**

**Significantly, MT admits to Laura Siegel that there never was a billionaire willing to invest $15 million when he first approached them. But by then the Siegels were concerned about appearing flaky for changing lawyers a few times. They decide to stick it out.**

October 2, 2004 --- MT files the complaint with the court against Time-Warner. There is disgruntlement in the Siegel camp, regarding the contingency fee. MT pushes hard for 33.3% contingency fee to go up to 40% if it falls within 60 days of trial (which, of course, he would make sure that it would…). In the contingency agreement they signed for SUPERMAN, IPW (Marc Toberoff's *film production company*) would have received a 10% negotiating fee (thus most likely bolstering Ari Emanuel's take in the settlement from Time Warner as well). Thus, Toberoff used the "film production arm" of his company to use as a shell to elicit larger contingency fees from his clients despite the fact that Toberoff maintains that there is a "firewall" between his law firm and his production company. (see John Lippman, *Wall Street Journal* article enclosed.)

MT "graciously" agrees to decrease IPW's take by 5%, which will be deducted from the firm's % fee, applicable to the gross proceeds of any settlement or outcome of the litigations.

****In other words, MT decreases his contingency fee by 5% -- instead of getting 50%, he will get 45%. Combined with the Schuster interest, the aggregate of any outcome in SUPERMAN litigation for Marc Toberoff *personally* becomes 47.5% of the entire Superman interest.***** It becomes clear at this juncture that MT thwarted the earlier deal with Time Warner and DC Comics in 2002 for his own personal gain.

And lastly, on the DUKES OF HAZZARD case, MT pocketed $8.5 million personally, more than any single plaintiff involved in the case (each plaintiff pocketed around $1.7 million). According to the settlement amount, he received an unconscionable 50% contingency fee.

6

Q 0006

EXHIBIT A
67

**EXHIBIT 22**
**315**

Very strong likelihood that Marc created an entity for the purposes of the lawsuit (Moonrunners Limited, or Moonrunners LLP), which allegedly held the rights at issue and ultimately led to the injunction. Christensen-Miller, Kevin Leichter, or the like need explore in greater detail the existence of the entity in which the rights were allegedly held. It is strongly believed this entity was created only to bolster the lawsuit – that the rights were never conveyed at all.

**MT had his President of Production of IPW, J. Todd Harris, leak the confidential settlement on the DUKES OF HAZZARD case to Variety ($17.5 million). He then called Larry Greenfield, another attorney in his office at the time who has since left, to cover his tracks, "demanding" to know who leaked the amount, and to act as if he was portraying shock and dismay at the leak. MT did it himself to attract more business in town. At least 7 attorneys have come and gone at the Law Offices of Marc Toberoff, and many have left due to ethical issues.**

And lastly, MT is charging 50% in another Allison Giannini case involving real estate. The reason this fact is included is to show a history of charging unconscionable fees.

It should be noted for those at Time Warner that Marc Toberoff has still managed to set up SKYPORT as a producer at Warners, and he has a tangential hold on GILLIGAN'S ISLAND. Fyi.

*******************

cc:      Alan F. Horn
         Jeff Robinov
         John Schulman
         Patti Connolly

7

Q 0007

EXHIBIT A
68
**EXHIBIT 22**
316

# EXHIBIT 23

PLAINTIFF'S
EXHIBIT
48

# GANG, TYRE, RAMER & BROWN, INC.
**ATTORNEYS AT LAW**

NORMAN R. TYRE
HERMIONE K. BROWN
BRUCE M. RAMER
CHARLES A. SCOTT
DONALD S. PASSMAN
HAROLD A. BROWN
LAWRENCE D. ROSE

JEFFREY M. MANDELL
KEVIN S. MARKS
GREGG HARRISON
NANCY L. BOXWELL
BARBARA SILBERBUSCH
ONDRAUS JENKINS

TOM R. CAMP
J. EUGENE SALOMON, JR.
OF COUNSEL

MARTIN GANG (1901-1998)

132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212-2403
(310) 777-4800
FAX (310) 777-4801

October 19, 2001

**VIA TELECOPIER and U.S. MAIL**

John A. Schulman, Esq.
Executive Vice President/General Counsel
Warner Bros. Pictures
4000 Warner Boulevard
Main Administration, Room 226
Burbank, CA 91522-0022

Re:    Siegel Family – "Superman"

Dear John:

This is to confirm our telephone conversation of October 19, 2001. The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the majority owners of the terminated copyright interests) has accepted D.C. Comics offer of October 16, 2001 in respect of the "Superman" and "Spectre" properties. The terms are as follows:

A.    Definitions.

1.    "The Property" means all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to the Property.

2.    "Superman/Spectre Gross Revenues" means DC Comics' worldwide gross revenues derived from the Property, excluding only revenues derived from D.C. Comic's publications.

B.    Financial Terms.

1.    A non-returnable, but recoupable advance of $2,000,000.

236172.1

**EXHIBIT 23**
317

GTRB 0302

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 2

2. A non-returnable, non-recoupable signing bonus of 1,000,000.

3. D.C. Comics will forgive the $250,000 advance from last year – stated otherwise, that payment will not reduce the advance or bonus, nor shall it be recoupable (contrary to Paragraph 3 of the January 12, 2001 letter agreement).

4. There will be an annual guarantee of $500,000 per year payable for 10 years beginning March 31, 2002. The annual guarantee is recoupable from royalty payments (under 5 and 6 below). The annual guarantee is paid March 31st of each year. If at the end of the annual guarantee period (i.e., 10 years), D.C. is unrecouped, the annual guarantee will be reduced to $100,000 or 25% of the average royalties for the previous three years (recomputed each year), whichever is greater (for so long as D.C. is unrecouped). If D.C. is recouped, then the annual guarantee will be 75% of the average royalties for the previous three years, which is recomputed each year.

5. A royalty of 6% of Superman/Spectre Gross Revenues. This applies (without limitation) to the use of the entire Property, including the so-called Superman library , in any and all media now or hereafter known (excluding DC Comics publications), in or on merchandise and in promotional campaigns. This royalty applies when the Property is used alone or is licensed for motion picture and television projects in accordance with the "safe harbor" motion picture and television deals discussed in Paragraph C(10). This 6% royalty will be adjusted pro-rata when the Property is used in conjunction with other book characters (other than in a "cameo" type of appearance), but in no event less than 3% except that the royalty can be further reduced to (a) 1.5% in the case of Justice League of America, "Superfriends" and "Superheros" merchandise and licensing, and (b) 1% in extraordinary cases such as D.C. Comics/Warner Bros. overall license to Six Flags (which involves numerous characters, including D.C. Comic's characters and Looney Toones characters)[1].

6. A royalty of 1% of the cover price of DC Comics' publications. This

---

[1] This reduction would not apply to a license for a "Superman" specific ride or attraction.

236172.1

EXHIBIT 23
318

GTRB 0303

GANG, TYRE, RAMER & BROWN, INC.

John A. Schulman, Esq.
October 19, 2001
Page 3

royalty applies when the Property is used alone, and will be adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than in a "cameo" type of appearance), but in no event less than 0.5%.

7.    Recoupment begins as of January 1, 2000.

8.    During the first calendar year in which advances/guaranteed payments are made there shall be no interest. Thereafter (that is, beginning January 1 of the following year), there shall be interest at the prime lending rate, and this interest is also recoupable.

9.    Annual guarantees and royalties (if D.C. is fully recouped) are paid for the duration of U.S. copyright of Action Comics No. 1. However, for motion picture and television product released near the end of the term, royalties will continue to be paid as follows: (a) for a motion picture released near the end of the term, royalties shall be paid for five years from the initial theatrical release even if some part of that five year period is after the U.S. copyright expires, (b) for television series, royalties will be paid through the full first run of the series, plus three years thereafter (so as to pick up at least the first syndication sale), even if that period is after the U.S. copyright term expires, and (c) for other substantial projects (akin to motion picture and television projects), royalties shall be paid for five years from the initial theatrical release of such project, even if some part of that five year period is after the U.S. copyright expires.

C.    Other Terms.

1.    The Siegel Family would transfer all of its rights in the "Superman" and "Spectre" properties (including "Superboy"), resulting in 100% ownership to D.C. Comics, as between the Siegel Family and D.C. Comics.

2.    If for any legal reason, there cannot be a transfer of all rights at this time, everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer. This would not result in additional monies upon perfecting the "Spectre" termination. Rather, and by way of example, in the unlikely situation that the law changes, and this transfer is somehow

236172.1

EXHIBIT 23
319

GTRB 0304

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 4

invalidated or limited by operation of law, and there is a future court judgment against D.C. Comics, this deal would apply against the amount of such judgement, except to the extent of $100,000 per year. For the sake of clarity, this provision will not in any circumstance reduce the monies due the Siegel Family under this deal.

3.  Until the expiration of the U.S. copyright for Action Comics No. 1, there will be a credit on "Superman" comics and other publications, movies and television programs that reads: "By Special Arrangement with the Jerry Siegel Family". The size and placement of credit is to be in D.C. Comics' discretion.

4.  D.C. shall accord credit along the lines of "Superman created by Jerry Siegel and Joe Shuster", "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" or "Superboy created by Jerry Siegel" or "The Spectre created by Jerry Siegel and Bernard Bailey" (as applicable) on motion pictures (main titles on screen, paid ads), television programs (main titles), all publications, and on all other works where credit to creators is customary.

5.  The accounting statements will be rendered March 31st, and if royalty payments are due for the previous calendar year, they will be paid at the same time (along with the annual guarantee for the then present year).

6.  In respect of the monies due under this rights deal, D.C. Comics will pay directly 47.5% to Joanne Siegel, 23.75% to Laura Siegel Larson, 23.75 % to Michael Siegel, and 5% to Gang, Tyre, Ramer & Brown, Inc. (counsel to the Siegel Family).

7.  Joanne, Laura and Michael can assign or otherwise dispose of all or part of their monetary contractual entitlements under this deal (other than insurance) up to a maximum of three times each.

8.  D.C. Comics to provide medical and dental insurance for Michael and Laura, and Laura's children for so long as they are minors. Laura is also to be reimbursed for the costs of medical and dental insurance for her and her sons since November 2000.

236172.1

**EXHIBIT 23**
**320**

**GTRB 0305**

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 5

9.   DC Comics to provide the opportunity for the Siegel Family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major changes planned in publications), and the Siegel Family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel Family will be informed of such developments early enough in the development process so that their opportunity to give input is meaningful.

10.   Siegel Family to have full audit rights. Intra-company transactions will be covered by "safe harbors" established at a level consistent with the Salkind Superman theatrical motion picture deal, the "Lois & Clark" television program deal, the WB Television Animation deal, and the existing fee arrangements with Warner Bros. Consumer Products. There will be an expedited dispute resolution procedure for challenging intra-company deals which fall outside the safe harbors. D.C. would also include in the "safe harbors" the Salkind or other deals as they may be reduced, but only (i) where another character of comparable stature to "Superman" (e.g., "Batman") is used in a comparable manner in connection with the same project, (ii) on a prorata basis with the adjustment in the other character's rights deal, and (iii) in all events, the reduction shall be no less than 50% or the original rights deal.

11.   At the end of the U.S. Copyright term, the Siegel Family agrees that it will not exploit the Property, even though it is in the public domain.

12.   The Siegel Family would agree to execute further documents, and D.C. Comics would be appointed as attorney-in-fact to execute such documents if the Siegel Family fails to do so within a reasonable period of time.

13.   Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party. The Siegel Family would agree that there will be no interference with the Superman rights, or disparagement of D.C. Comics. D.C. Comics and AOL Time Warner agree not to disparage the Siegel Family.

14.   Full E&O and general liability coverages, and full indemnities for Joanne Siegel, Laura Siegel Larson, and Michael Siegel against liability for DC or affiliate actions.

236172.1

**EXHIBIT 23**
**321**

GTRB 0306

GANG, TYRE, RAMER & BROWN, INC.
John A. Schulman, Esq.
October 19, 2001
Page 6

It is also agreed that Joanne's widow's benefits (including both payments and insurance), are to continue for her life, and will not be treated as an advance against this deal, and are not recoupable from this deal.

John, if there is any aspect of the above that is somehow misstated, please let me know by Monday at 2:00, as I will be out of the office – and likely difficult to reach – for the following four weeks.

Many thanks for help and patience in reaching this monumental accord.

Sincerely,

GANG, TYRE, RAMER & BROWN, INC.

By

Kevin S. Marks

KSM:ljl

cc:    Joanne Siegel
       Laura Siegel Larson
       Bruce Ramer
       Don Bulson

236172.1

**EXHIBIT 23**
**322**

**GTRB 0307**

GANG, TYRE, RAMER & BROWN, INC.
ATTORNEYS AT LAW
132 SOUTH RODEO DRIVE
BEVERLY HILLS, CALIFORNIA 90212
PHONE      (310) 777-4800
TELECOPIER (310) 777-4801

TELECOPIER TRANSMITTAL SHEET

Date:  October 19, 2001

PLEASE DELIVER THE FOLLOWING MATERIAL AS SOON AS POSSIBLE TO:

Recipient                        Telecopier No.
John Schulman                    (818) 954-4768

From:   Kevin S. Marks

Re:     Siegel Family – "Superman"

Number of pages transmitted (including this page):    6

COMMENTS:

IF DOCUMENT IS NOT RECEIVED PROPERLY,
PLEASE CALL (310) 777-4800 IMMEDIATELY.
THANK YOU.

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR
THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE
OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY
NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

---

## TRANSMISSION REPORT

# THIS DOCUMENT WAS CONFIRMED
# (REDUCED SAMPLE ABOVE – SEE DETAILS BELOW)

** COUNT **
TOTAL PAGES SCANNED    :    7
TOTAL PAGES CONFIRMED   :    7

*** SEND ***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|-----|----------------|------------|----------|--------|------|---------|
| 1 | 818 954 4768 | 10-19- 1  6:43PM | 2'35" | 7/ 7 | EC | COMPLETED 12000 |

NOTE:                                  TOTAL     0:02'35"     7

NOTE:
No. : OPERATION NUMBER      48  : 4800BPS SELECTED   EC  : ERROR CORRECT      G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE       SF  : STORE & FORWARD    RI  : RELAY INITIATE     RS : RELAY STATION
MB : SEND TO MAILBOX        PG  : POLLING A REMOTE   MP  : MULTI-POLLING      RM : RECEIVE TO MEMORY

**EXHIBIT 23**
323

GTRB 0308