# EXHIBIT 24

OCT-26-2001   17:24      JOHN SCHULMAN                      818 954 4768      P.01

**WARNER BROS.**

PLAINTIFF'S
EXHIBIT
49

John A. Schulman
Executive Vice President
and General Counsel

4000 Warner Boulevard
Burbank, California 91522-0022
(818) 954-4223 Fax: (818) 954-4768
E-Mail: john.schulman@warnerbros.com

October 26, 2001

**Via Facsimile (310) 777-4801**
Kevin Marks, Esq.
Gang, Tyre, Ramer & Brown
132 S. Rodeo Drive
Beverly Hills, CA  90212

    Re:    <u>Siegels</u>

Dear Kevin:

    I have received, and have finally had a chance to review, your outline fax of October 19.  I apologize for not responding earlier; I have been on the road.

    I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is.  We're working on the draft agreement so that by the time you have accomplished something of truly momentous import, we will have this super-matter transaction in document form.

    Thank you.

Sincerely,

John A. Schulman

JAS:hjl
cc:  Bruce Ramer, Esq. (w/encl)

A Time Warner Entertainment Company

**GTRB 0145**

**EXHIBIT 24**
**324**

OCT-26-2001  17:24        JOHN SCHULMAN                    818 954 4768    P.02

## October 2001 Outline

**Transfer**

- Regrant, grant, etc.
- 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published), including post term rights as members of public
- 100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re Superman, Superboy, Spectre, and related properties -- even if not created for DC Comics
- All properties, including but not limited to Superman, Superboy, Spectre, and all rights of any kind (i.e., copyrights, trademarks, indicia) therein (the "Properties")
- In perpetuity and worldwide
- Siegels will execute further documents as may be necessary to evidence DC's ownership of rights; designate WB as attorney in fact
- Siegels warrant and represent no termination nor any other rights remaining except for rights under this agreement and the written agreement to include various provisions to ensure same (jointly and severally)
- Siegels warrant and represent no contract of any kind with any other party with respect to or related to the Properties, including but not limited to agreements to exploit or otherwise encumber any of the Properties covered by the agreement. (jointly and severally)
- Siegels agree not to exploit or enter into any agreements or transactions with respect to, or related to the Properties in any way (jointly and severally)
- Give copy of all documents relating to rights/history
- Siegels warrant and represent not to interfere with or diminish DC/WB enjoyment of exclusive ownership, control, and use (jointly and severally)
- Non-disparage AOLTW, its subsidiaries, employees, and/or agents, predecessors, and properties (mutual). Right to use J. Siegel bio and photos in publicity, etc., re property.
- The Siegel family and DC will issue a joint press release announcing the agreement. Thereafter, upon DC's request, the Siegel family will continue to positively publicize the Properties, including: making themselves reasonably available for public appearances (with any travel or related expenses paid by DC and subject to their health and reasonable availability); consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties; and offering to AOLTW companies a first opportunity to negotiate for any biographical works in any media.

**Initial Payment**

- $2 million recoupable (advance)
- $1 million non-recoupable
- Waive right to recoup $250,000 per 2000 letter

GTRB 0146

**EXHIBIT 24**

**325**

OCT-26-2001  17:25        JOHN SCHULMAN                              818 954 4768     P.03

GTRB 0147

**EXHIBIT 24**
**326**

GTRB 0148

EXHIBIT 24
327

UC T-26-2001  17:25       JOHN SCHULMAN                    818 954 4768      P.05

## Annual Payment (Advance)

- $500,000 per year for ten years, commencing 2002, payable 3/31 of year, recoupable from anything due under deal
- Thereafter, if DC fully recouped, 75% of average of last three years Siegel earnings; if DC not fully recouped, greater of $100,000 or 25% of average of last three years Siegel earnings
- Terminate when Action #1 US copyright terminates

## Widows Benefits (not assignable or transferrable)

- $135,000/year
- Payable for Joanne's life, personal,
- Paid as now
- Medical, comparable to past, for life

## Royalty

- Commencing for revenue received on or after 1/1/00
- All advances (Initial and Annual) non-interest bearing for year in which paid; then interest at 100% of prime on unrecouped amounts after 12/31 of year of payment
- 6% of DC's receipts from all Media licenses for use of the Properties, except:

  1) with respect to licenses which commingle the Properties with another DC property similar in stature and used in a like manner (e.g., a Superman and Batman film or video), the 6% shall be reducible to 3%.

  2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%

- 6% of DC's receipts from all merchandising licenses for use of the Properties (including but not limited to product licensing, promotional licensing, and licenses for the sale of entertainment goods and services such as theme parks or publications), except:

  1) with respect to licenses which commingle the Properties with another DC property and the properties are used and/or marketed in a like manner (e.g., a Superman and Batman action figure set), the 6% shall be reducible to 3%.

  2) with respect to licenses which commingle the Properties with multiple other DC properties and where the Properties are neither the predominant creative element nor the sole predominant identity or title of the Media product in question (e.g., Justice League, Superfriends, Super Heroes), the 6% shall be reduced to 1.5%.

  3) with respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties, DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the licensee, but to the extent such information is not available, the 6% shall be reducible to not less than 1%

  4) with respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation.

**EXHIBIT 24**
328

GTRB 0149

- 1% of revenue derived from extraordinary mixed licenses in instances such as DC Comics/Warner Bros.' overall license to Six Flags (which involves numerous characters, including DC Comics and Looney Toons characters); to the extent revenues from such licenses are not specifically attributed to royalties earned by the sale of character merchandise which can be directly allocated either to the Properties or to other properties in which the Siegels do not share, or are not specific fees calculated on a per ride or per show or other similar basis which can also be directly allocated either to the Properties or to other properties in which the Siegels do not share.

- 1% of the cover price of copies sold of DC's own editions of publications based on the Properties. A publication shall be considered based on the Properties when one of the characters that comprise the Properties shall be the title of the publication (e.g., Superman) or shall be the title of all the features within the publication (e.g., Action Comics containing only Superman stories).

  1) with respect to publications which are based on multiple properties as well as the Properties, the 1% shall be reducible to 1/2%

  2) there will be no reduction of the royalties payable hereunder for the appearance of characters from other properties in publications or stories based on the Properties when those other characters do not appear in the title of the publication or feature in question

  3) there will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties characters do not appear in the title of the publication or feature in question.

- [section moved to above] Ceases when US copyright Action #1 ceases, except on motion pictures released in last five years before end of term, which shall earn royalty for five years from release and TV series, which shall earn royalty for three years from last initial TV broadcast of consecutive years of original episodes, even if goes beyond term of copyright of Action #1.

Payment

All monies due the Siegels hereunder, except widow's benefit, shall be paid in following manner:

      47.5% Joanne Siegel
      23.75% Laura Siegel Larson
      23.75% Michael Siegel
      5.00% Gang Tyre Ramer & Brown

Notwithstanding the foregoing, each of the first three listed above may designate one or more persons to receive monies due him or her to up to three such persons. Such designations (who sign) shall not be an assignee/beneficiary of contract rights and shall carry no rights against DC Comics.

Advise (Non-assignable or transferrable; subject to confidentiality)

DC Comics to provide the opportunity for the Siegel family to be informed about major developments (e.g., motion pictures, television programs, theme park attractions, major

EXHIBIT 24
329

GTRB 0150

changes planned in publications), and the Siegel family will have an opportunity to give its input, but this does not rise to the level of a consultation right. The Siegel family will be informed of such developments periodically. To facilitate this, the family will appoint a single representative who will receive occasional written updates from DC and with whom, upon request, a DC representative will meet once a year to provide a broader overview of current developments.

Credit (Non-assignable or transferrable)

Credit on work first created after date hereof (excluding later episodes of ongoing tv series) along the lines of "Superman created by Jerry Siegel and Joe Shuster," "Created by Jerry Siegel and Joe Shuster" or "Based on the characters created by Jerry Siegel and Joe Shuster" (as applicable) on motion pictures (main titles on screen, only), television programs (main titles only), and on all other works where credit to creators is customary. (Credit must be consistent with guild and other obligations.)

Credit on Superman movies and TV shows first created after date hereof (excluding later episodes of ongoing tv series) and initially released during the term of the U.S. copyright of Action #1: credit on audio/visual work itself only "By Special Arrangement with Jerry Siegel Family" (as applicable). Our choice of size and placement. Same credit on all Superman publications (comics and/or books) first created after the date hereof and initially published during term of U.S. copyright of Action #1. (Credit must be consistent with guild and other obligations.)

Accounting

Itemized royalty accounting on an annual basis, with royalty payments (that is, amounts in excess of recoupable Annual and Initial Advances and interest, if applicable) to be paid no later than March 31 following the close of the annual accounting period. Year 2000 statement and payment, if any, to be accounted with year 2001. Standard WB provisions.

Audit (Non-assignable or transferrable; by majority vote; only one audit per any period)

Siegel family to have full audit rights. Standard WB language and time frames. There will be an expedited dispute resolution procedure for challenging intercompany deals which fall outside the safe harbors.

Safe Harbors for Intercompany Deals
- Salkind (Motion Pictures)
- Lois & Clark (TV)
- WB Television Animation Deal
- Merchandising representation practice

OCT-26-2001  17:27     JOHN SCHULMAN     818 954 4768     P.08

<u>Expedited Dispute Resolution</u> (Any claims between the parties)
- Arbitration
- Compensation damages only to Siegels
- No injunction against DC/WB breaches, no termination of rights, no reversion
- DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach

<u>Medical Coverage/Son & Daughter (Grandsons only through minority)</u> (Non-assignable or transferrable)

Medical and dental coverage, or reimbursement for the cost of same at DC Comics' then current cost, for Laura Siegel Larson and Michael Siegel for their lives (in the form of conventional insurance programs consistent with those offered to DC Comics employees, although it is to be clear that neither Laura nor Michael is an employee of DC Comics). Laura to be reimbursed for premiums she has paid for medical and dental coverage for her and her sons since November 20, 2000. Laura's sons covered for the period of their minority. Cooperate with Joanne to get medical ID card.

<u>Release and covenant not to sue by Siegels</u>
- Through date of signing of all claims past, present, and/or future, actual and/or potential (except breach of the agreement itself)
- Approve all deals made before 12/31/00

<u>Miscellaneous</u>
- Mutual intention is that Siegels have no further rights vis a vis DC/WB or the Properties or any right to get further compensation or any other relief except the monies and other obligations due hereunder. If, notwithstanding this mutual intent, the Siegels or any one of them attempt to assert claims, all but $100,000/year creditable to any other obligation WB has or may have to Siegels: if any claim by Siegel or successor and resultant DC expense and/or liability, compensation hereunder over $100,000 annually is to be reduced equivalently; [only total due hereunder is ever due]
- Siegels defend and indemnify re third party claims
- Siegels defend and indemnify re Dennis claim
- Widow and daughter indemnify re Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign
- DC Comics to defend and indemnify Siegels (who sign) against claims brought by third parties for DC/WB acts
- Siegels to refer all inquiries relating in any way to Properties to DC/WB.
- At end of term of copyright of Action #1, Siegels may not exploit Property, even though some of it will be p.d.

TOTAL P.08

GTRB 0152

**EXHIBIT 24**
**331**

# EXHIBIT 25

## Michael Siegel

| | |
|---|---|
| **From:** | <MToberoff@aol.com> |
| **To:** | <msiegel@core.com> |
| **Sent:** | Saturday, November 17, 2001 8:24 |
| **Attach:** | Marc Toberoff references.rtf |
| **Subject:** | Your Rights |

Privileged & Confidential

Michael:

I am very glad to have located you, which wasn't easy since there are about 2,000 Michael Siegels in the US. Please be assured that I am contacting you about a very important and confidential matter.

I am an intellectual property attorney (admitted to both the New York and California Bars) who specializes in upholding the rights of creators and their heirs in entertainment properties. If you provide me with a fax number I can fax (or FedEx if you prefer) some articles on me in the New York Times, Variety and The Hollywood Reporter.

Based upon my research I am absolutely convinced that you retain important rights with respect to your father Jerome Siegel's work, including Superman. This is true, in addition to or notwithstanding whatever will or estate your father may have left.

As a preliminary matter, have you signed (or have you been asked to sign) anything regarding such rights? If so, depending on the circumstances, such documents may not necessarily prevent or preclude your future rights, and it would be worthwhile to examine this issue more closely.

I am willing to work "on spec" on a purely success driven basis to help you to receive the full benefit of your rights. That is, I would charge no hourly legal fees and I would pay all out-of-pocket costs involved. This is how I normally work so my clients have no risk from fully investigating, analyzing and enforcing their rights. I normally achieve very beneficial results this way.

I have attached a list of references of people who I believe were simialrly situated to you whom I represented very successfully. Feel free to contact them.

Even if you believe you own no rights, or even if you think you have signed them away in prior dealings I sincerely hope you look into this a bit further with me. It certainly will do harm to contact me, discuss the matter and get a fresh perspective of your situation (without any cost to you).

I don't mind communicating by e-mail, but initially we should meet and discuss the situation over the phone. It will give you a better sense of who I am and hopefully a better understanding and greater sense of security with respect to this matter.

11/17/2001

CONFIDENTIAL

**EXHIBIT 25**

332

EOMS 00673

I welcome the opportunity to speak with you at your earliest convenience. The best number is (310) 589-5151 or you can always try my mobile phone: (310) 989-0920. My fax is (310) 589-5152.

I will hold all our communications as strictly privileged and confidential and would hope that you would do the same for me.

Marc Toberoff

11/17/2001

CONFIDENTIAL

**EXHIBIT 25**
**333**

EOMS 00018    BONS 00674

**Marc Toberoff references:**

1.    Mike Ralston, son of Gilbert Ralston, (deceased) writer/creator of "*The Wild Wild West*" (re: rights dispute with CBS and Warner Bros.):    (843) 883-3811

2.    Joe Swerling, Jr., son of the famous Joe Swerling (wrote the book for "*Guys & Dolls*," etc.):    (323) 856-7350.

3.    Rocky Kalish, co-writer of "*Gilligan's Island*" pilot (represented in dispute against the other co-writer/co-creator):    (818) 384-2998

4.    Steve Pirosh, son of Robert Pirosh (deceased) prolific writer/creator of TV series "*Combat!*" and Marx Brothers' movies, etc.:    (805) 542-7746

5.    Roy Huggins (creator of *The Fugitive, The Rockford Files, Maverick*, etc.):    (310) 476-7892.

# EXHIBIT 26

**Laura Siegel Larson**
**6400 Pacific Avenue #106**
**Playa Del Rey, CA 90293**

November 2, 2002

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

Dear Michael,

Thank you for your very nice letter of October 2nd. I truly appreciate your understanding of the difficulty of my divorce. You did not mention how your mother is doing. I hope that means she has improved and is home with you again.

This has been a very busy month involving various aspects of the Superman and Superboy rights. Enclosed you will find a copy of a letter my mother and I have sent to Lillian Laserson, the General Counsel of DC Comics and Roger Zissu and Carol Simkin of DC's outside law firm, Fross Zelnick Lerhman & Zissu, P.C. Under the terms of the Tolling Agreement, these letters had to be sent at the conclusion of negotiations with DC so that the Tolling Agreement is terminated as well.

We were shocked by the change of attitude we saw in Bruce Ramer and Kevin Marks from the time we retained them to recent months. In the beginning they appeared to be very much on our side, determined to get justice for us and they vowed to work hard for us in negotiations versus DC and AOL Time Warner. Toward the end of 2001, there was a shift. They started pressuring us to lower our expectations and to take an offer we did not want. They increasingly seemed to be siding with DC against our interests. We never made any outright acceptance of the DC deal. Kevin tried to scare us by saying if we didn't take DC's "final offer" they'd probably sue us.

Between February and May of this year we became so dissatisfied with their representation and the revolting offer from DC that we asked for a meeting with Kevin on May 22nd planning to fire them then and there. In the meeting, we decided to give Kevin one last chance. He wanted to redraft DC 's February 1st proposal along the lines of the last discussion he had had with John Schulman. We gave Kevin conditional permission to do just that but it was not to be sent out if we did not approve of it. As you know it was unacceptable and we fired Gang, Tyre, Ramer & Brown and notified DC, etc. that negotiations were over.

That terrible letter from Kevin in which he threatened to testify against us if called into court was the last straw. We are glad to be rid of them.

It came as quite a surprise to my mother and me that everyone but us--Arthur Levine, Kevin Marks, you, and Don Bulson--knew about the interest of Marc Toberoff and Ari Emmanuel in the properties as far back as 2001 and no one ever mentioned it to us until Kevin's letter of August, 2002. It was very interesting to hear from you that you and Don Bulson were contacted in Nov., 2001. It's a shame that Kevin kept them from contacting us and that he did

**EXHIBIT 26**
**335**

EOMS 00215

Page 2
Nov. 2, 2002

not inform us of them or their offer until August 2002.

My mother and I have had extensive meetings with Toberoff and Emmanuel in the past few weeks. We learned that due to the delays and the misinformation Kevin had given them that there was a deal with DC, the billionaire investor who was offering $15 million up front plus participation thought it was a hopeless situation and invested his money elsewhere. We were very impressed with Toberoff and Emmanuel, however, and have signed them as our new representatives. Not only do they have a first hand knowledge of the real value of properties that are adapted to TV and film, it is possible that the top talent that Emmanuel's Endeavor Agency represents (top stars, directors, producer-writers) could be successfully packaged with Siegel properties. They have other ideas as well. In addition, Toberoff, the attorney, has a successful track record of representing creator-writers and their heirs who have been screwed by the studios. This makes them a good fit with Superman and other Siegel creations. They consider DC's last offer to us ridiculous. They are currently putting together a strategy that will be much more aggressive than anything that Marks or Ramer ever did. We are hopeful that they will bring matters to a satisfying conclusion.

I now have two new divorce lawyers and my ex is continuing to represent himself. He doesn't care how much this costs me or that it's taking money away from the children. The latest on that front is that he didn't like a ruling the judge made in my favor by extending the restraining order against him. So he's taking it to the Court of Appeals and trying to get it dismissed on a technicality. This is, of course, time consuming, upsetting and very expensive.

I have boxes and boxes of divorce, copyright and financial paperwork everywhere in my small place--even all over my bed--including the records of Superman expenses I xeroxed for you a long time ago. When my ceilings had to be ripped out and replaced, and I had to pack things up and move out for awhile, things got even harder to locate. As soon as I find the papers that pertain to you, I'll put them in the mail along with my mother's.

I hope you will stay well as the weather changes and that the increasing cold doesn't make your arthritis act up. We're all sick here. I've had a throat and sinus infection for three weeks now. The antibiotics I've taken haven't worked and I have a lot of pounding headaches. I'm also having a flare-up of my Multiple Sclerosis with increased numbness and tingling. I fell down three times in the last few days, once onto a pile of carton boxes. I also suffer from chronic fatigue and need rest badly. My mom has bronchitis, Michael's asthma has been bothering him and James fractured his wrist playing flag football. His cast just came off this week. Here's hoping it won't be a bad winter and we'll all be better soon.

Best wishes for the holidays,

*Laura*

Laura

**EXHIBIT 26**                    EOMS 00216

**336**

# EXHIBIT 27

**LAURA SIEGEL LARSON**
**6400 PACIFIC AVENUE #106**
**PLAYA DEL REY, CA 90293**
**(310) 827-8136**
**FAX (310) 827-7227**
November 6, 2002

# FAX TRANSMITTAL

**TO:**    Marc Toberoff
**FAX#:**   (310) 246-3101
**FROM:**  Laura Siegel Larson and Joanne Siegel
**PHONE:** (310) 827-8136

### Page 1 of 3

MESSAGE:

Dear Marc,

Attached, for your records, please find the Kevin Marks memo of August 9, 2002. It makes reference to the contact you had with his office. Although your initial contact with him had been in late 2001, this August, 2002 letter was the first time he notified us of your interest in the Siegel rights.

Please note that we had been unhappy with the representation that the Ramer firm had been giving us for some time. We went to a meeting at Kevin's office in May, 2002 prepared to terminate them as our representatives. At that same meeting between my mother, Kevin Marks and myself, Marks told us that if we did not accept the February 1, 2002 DC proposed contract or a redraft that he wanted to write, that he and his firm could no longer represent us. DC's document had been totally unacceptable and while we were ready to terminate Marks and Ramer right then and there, we gave conditional approval to Kevin to make one last attempt at a redraft. When delivered to us in July, we found his draft unacceptable as well and followed through on our earlier desire to terminate Gang, Tyre, Ramer & Brown as our representatives.

Sincerely,

*Laura Siegel Larson*

Laura Siegel Larson

Q 0087

Privileged & Confidential
All Rights Reserved

SD 00087

EXHIBIT 27
337

# GANG, TYRE, RAMER & BROWN, INC.
## MEMORANDUM

From: Kevin S. Marks                    Date: August 9, 2002

To: Joanne Siegel                       Re: "Superman"
    Laura Siegel Larson
    Don Bulson

cc: Bruce Ramer

On August 8, 2002, I received a call from Mark Toberoff and Ari Emanuel. Toberoff is a lawyer; Emanuel is one of the founding partners of the Endeavor Talent Agency.

They have formed a group (with other investors, I am sure) that is interested in acquiring intellectual property rights, exploiting those rights in all media, and attaching Endeavor clients to projects that evolve from those rights. We do not know who the other investors are or what other funding sources are available to this group. They are aware of the Siegel termination rights.

In a previous telephone conversation (initiated by Mr. Toberoff), I told Mr. Toberoff that the Siegel Family had reached an agreement with D.C. Comics (subject to documentation), but that all aspects of the agreement and the negotiations were confidential. Mr. Toberoff asked me if I would make an offer to him and his group that the Siegel Family would consider in lieu of the D.C. Comics deal. I told him that I did not feel that it was appropriate to be making offers while I was in the process of documenting an existing deal.

On August 8, the Toberoff/Emanuel Group took the initiative and made an offer. Their offer is $15 million up-front, plus what they promise to be a meaningful participation from proceeds from the exploitation of "Superman" in all media on an ongoing basis. They said they have already done their "due diligence" and that such an arrangement would not be subject to further legal or other research on their part.

Having received this proposal, I am obliged to pass it on to you.

I must caution that I believe an agreement was reached last October with D.C. Comics, albeit subject to documentation. (If called to testify, I would have to testify as much.) The reason I bring this up is that if the Siegel Family were to proceed in this direction, I believe that there would be a genuine risk of litigation against the Siegel Family (and Toberoff/Emanuel for

245415.1

Q 0088

Privileged & Confidential
All Rights Reserved

SD 00088

EXHIBIT 27
338

NOV-06-2002 03:12 PM

SENT BY:                          8-12- 2 :11:19AM ;                     -310 827 7227      ;# 3/ 3

# GANG, TYRE, RAMER & BROWN, INC.

Joanne Siegel
Laura Siegel Larson
Don Bulson
August 9, 2002
Page 2

that matter) by D.C. Comics. I would also not be surprised if existing benefits (such as insurance reimbursement and widow's benefits) were cut off.

This new offer (which has significant blanks to fill in) looks like it could be better than the D.C. deal. I believe the Toberoff/Emanuel group attaches enhanced value to the property because it has brokered a confidential arrangement with the Shuster estate and is trying to put together the Siegel and Shuster termination pieces. (As we have discussed previously, the Shuster estate will have termination rights in approximately 2013 if the U.S. Supreme Court upholds the recent law extending the copyright term). I, of course, cannot assure you that this is a real deal, and undisclosed investors sometimes disappear just when you think you are close to concluding an arrangement.

My recommendation ultimately is to stay the course with D.C. Comics. I do not say that as a matter of economics; it is candidly what I think to be the right thing to do under the circumstances.

Therefore, I would send D.C. Comics the revised draft that I have prepared (as it may be modified with your input). We should continue to negotiate the documentation in good faith with D.C. Comics, and make every genuine effort to come up a written agreement that is true to the deal that was made. I believe the deal will be finalized with D.C. Comics, even if the process is not entirely smooth. If, despite all those good faith efforts, the parties cannot reach final agreement, then the negotiations would be terminated and then (and only then) would there would be a clear parting of ways which would open up your exploring other possibilities.

I will be out of the office the week of August 12th. If you would like to discuss this matter in my absence, please feel free to call Bruce Ramer.

Best regards.

K.S.M.

245415.1

Q 0089

Privileged & Confidential
All Rights Reserved

SD 00089

EXHIBIT 27
339

# EXHIBIT 28

JUL-06-2003 11:07 PM                          1 710 827 7227               P.0:

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year.  I would have written sooner but I have endured much sadness.  My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff.  I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this?  Now that you have signed with him, he is in control of the whole Superman copyright.  I told you when he first contacted me, he wanted to buy my share of the copyright.  Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation  When you signed with Marc the billionaire invested elsewhere.  Marc has his own production company, he was going to team with Emmanuel and make a movie.  This has not happened.  You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us.  Marc has chosen not to open any dialog with Time Warner or anyone else.  How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright.  In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner.  Has he told you this?  Do you know who owns the Shuster interest in the Superman copyright?  Has Marc bought the Shuster interest himself?  For a long time now, Marks and Rammer said there should be a united Siegel front.  Marc is not negotiating with anyone, but he has found someone willing to buy me out.  How can he find someone to buy me out and not negotiate for the entire Siegel interest?  Has Marc offered to find someone to buy your interest?  If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright.  This would weaken your position?  The amount Marc's investor is offering is less than half of what DC showed as my share, There is a very real possibility I will contact Time Warner and see if they will buy me out.  Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get.  Marc is really pressing for an answer to the offer his investor made.

Am I missing something?  Is it Joanne's and your intention to do nothing?  You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more?  Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc.  If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly.  Last week a package of documents arrived from Marc.  Don and I have not had time to review them yet.

Q 0032

SD 00032

EXHIBIT 28
340

This procedure has taken way to long.  I have been on contract negotiation teams and have never seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Q 0033

SD 00033

EXHIBIT 28
341

JUN 16 2003 11:07 PM                                    1 718 827 7227         P.02

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Q 0139

Privileged & Confidential
All Rights Reserved

SD 00139

EXHIBIT 28
342

JUL.-06-2003 11:08 PM                    1    `10 827 7227              P.03

This procedure has taken way to long.  I have been on contract negotiation teams and have never seen anything like this.  Your attorneys have chosen not to have any dialog with the other side for years at a time.  I want a united Siegel interest, but I might be forced to act on my own.  I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

*Michael*

Q 0140

**Privileged & Confidential**
**All Rights Reserved**

SD 00140

**EXHIBIT 28**
**343**

JUL-06-2003 11:07 PM                                    1 718 827 7227              P.02

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share, There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Q 0317

Privileged & Confidential
All Rights Reserved

SD 00318

EXHIBIT 28
344

This procedure has taken way to long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for years at a time. I want a united Siegel interest, but I might be forced to act on my own. I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Q 0318

Privileged & Confidential
All Rights Reserved

SD 00319

EXHIBIT 28
345

JUL-06-2003 11:07 PM                                          1 710 827 7227          P.02

Michael Siegel
3605 Bendemeer Rd.
Cleveland Heights, Ohio 44118

May 13, 2003

Dear Laura,

Thank you for your letter of November 2 of last year. I would have written sooner but I have endured much sadness. My mother passed away last year and I am particularly saddened by her not having been able to enjoy some of the money due us from DC Comics and Time Warner.

I really wish to discuss Marc Toberoff. I learned from Marks and Rammer that Marc was the attorney on record for the Shuster half of the Superman copyright, has Marc ever informed you of this? Now that you have signed with him, he is in control of the whole Superman copyright. I told you when he first contacted me, he wanted to buy my share of the copyright. Marc had a mysterious billionaire who wanted to invest in the Superman copyright, put 15 million dollars up front plus participation. When you signed with Marc the billionaire invested elsewhere. Marc has his own production company, he was going to team with Emmanuel and make a movie. This has not happened. You mentioned Marc had a number of innovative, proactive ideas that could bring all members of the Siegel interest both justice and many times more than the amount DC's representatives wanted to throw our way to get rid of us. Marc has chosen not to open any dialog with Time Warner or anyone else. How can he negotiate a contact if he is not talking to anyone?

Marc is now the attorney for the entire Superman copyright. In 2013 under the Sunny Bono law Marc will be able to take the Superman copyright from Time Warner. Has he told you this? Do you know who owns the Shuster interest in the Superman copyright? Has Marc bought the Shuster interest himself? For a long time now, Marks and Rammer said there should be a united Siegel front. Marc is not negotiating with anyone, but he has found someone willing to buy me out. How can he find someone to buy me out and not negotiate for the entire Siegel interest? Has Marc offered to find someone to buy your interest? If I would sell my interest it would leave you with less than half of the Superman copyright and not all of the Siegel interest in the Superman copyright. This would weaken your position? The amount Marc's investor is offering is less than half of what DC showed as my share. There is a very real possibility I will contact Time Warner and see if they will buy me out. Marc seems to have an agenda of someone buying me out so I will have to look for the best deal I can get. Marc is really pressing for an answer to the offer his investor made.

Am I missing something? Is it Joanne's and your intention to do nothing? You have filed letters of Termination on Superman and The Spectre, have any other letters of Termination been filed or will there be more? Regarding an old item, I would very much appreciate the release of the funds I understand are being held in escrow for me by Marc. If it turns out that we have no disagreement regarding your expenses and too much money was released, that certainly can be dealt with quickly. Last week a package of documents arrived from Marc. Don and I have not had time to review them yet.

Q 0590

Privileged & Confidential
All Rights Reserved

SD 00591

**EXHIBIT 28**
346

JUL-06-2003 11:08 PM                                    1  10 827 7227          P.03

This procedure has taken way to long. I have been on contract negotiation teams and have never seen anything like this. Your attorneys have chosen not to have any dialog with the other side for years at a time. I want a united Siegel interest, but I might be forced to act on my own. I do have something to sell independently, Marc's actions prove this.

I hope your health is getting better and that your divorce is now over.

Sincerely,

Michael

Q 0591

Privileged & Confidential
All Rights Reserved

SD 00592

**EXHIBIT 28**
**347**

# EXHIBIT 29

RECEIVED

MAY 2 8 2003

Marc Toberoff

## TELECOPIER COVER PAGE

**DATE:**        May 28, 2003

**RECIPIENT:**        Marc Toberoff

**SENDER:**        James R. Jackoway

**FAX NUMBER:**        310-246-3101

**NUMBER OF PAGES:**        6(including cover page)

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0090

**Privileged & Confidential**
**All Rights Reserved**

SD 00090

**EXHIBIT 29**
**348**

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER
## MEMORANDUM

TO:        Jim Jackoway

FROM:      Gerry Hemmerling

DATE:      May 27, 2003

RE:        Marc Toberoff -- Superman rights

CC:        Michele Mulrooney
           Kurt Harrison

---

Michele asked me to give you the citations for the statutes we discussed last week about the Toberoff matter.

The Joint Venture Agreement regarding the Superman rights provides for Toberoff's corporation, PPC, to deal with the Superman rights and to pay all costs and disbursements with respect to the rights. It also provides for PPC to pay all costs and legal fees of "setting up" Joe Shuster's estate. PPC will then recoup its "out of pocket expenses", excluding contingent legal fees, from the proceeds of the Joint Venture prior to distribution. The Agreement also provides for PPC to retain Toberoff to render all legal services regarding the rights and the Joint Venture and to handle the negotiation of contracts regarding the exploitation of the rights. Under the Agreement, the parties are to approve the appointment of Michael Catron as administrator of the estate and to instruct him to disburse the proceeds from the rights in accordance with the Agreement.

-1-

Q 0091

Privileged & Confidential
All Rights Reserved

SD 00091

**EXHIBIT 29**
349

In essence, under the Agreement, PPC and not Shuster's heir, would be controlling the probate of Shuster's estate, and Toberoff personally would be controlling the exploitation of the rights. Pursuant to the Agreement, we would be handling the probate estate for PPC and your role in negotiating contracts for exploitation of the rights would not be independent of Toberoff.

The purpose of the probate laws is generally to protect the estate and the heirs of the decedent. They restrict the amount of fees paid to lawyers and executors for the estate, including fees for negotiating and enforcing contracts dealing with estate interests, and also allow the court to examine contracts dealing with disposition of estate interests.

In addition to ethical problems that Toberoff may have and that we may have indirectly through Toberoff or PPC, there are some specific probate problems under the Agreement. Lawyers for an estate cannot have any conflicts of interest with regard to estate matters or estate heirs. There is a potential conflict of interest that the firm might have if we handled the probate matters, with PPC advancing all probate costs and in effect controlling the probate, and your being involved with the estate in negotiating contracts that would benefit both PPC and the estate.

*what is it ?*

The court can examine the Agreement pursuant to Probate Code Section 11604, a copy of which is attached, and can refuse distribution of the Joint Venture proceeds pursuant to the Agreement or can order distribution in a different manner if the court finds that the arrangement was inequitable. It can also limit

-2-

Q 0092

Privileged & Confidential
All Rights Reserved

EXHIBIT 29
350

SD 00092

the attorneys' fees paid to lawyers for the estate in connection with the rights pursuant to Probate Code Sections 10810 and 10811, copies of which are attached.  In particular, if we represented the estate, the court must determine that any contingent fee arrangements that benefited the firm must be in the best interests of the estate and the heirs.

I am asking Kurt to discuss with you and give you the appropriate sections of the Business and Professions Code and State Bar Rules regarding other ethical problems that are applicable to the matter.

002-mem
attachments

-3-

Q 0093

Privileged & Confidential
All Rights Reserved

SD 00093

EXHIBIT 29
351

§ 11604. Distribution to person other than beneficiary

(a) This section applies where distribution is to be made to any of the following persons:

(1) The transferee of a beneficiary.

(2) Any person other than a beneficiary under an agreement, request, or instructions of a beneficiary or the attorney in fact of a beneficiary.

(b) The court on its own motion, or on motion of the personal representative or other interested person or of the public administrator, may inquire into the circumstances surrounding the execution of, and the consideration for, the transfer, agreement, request, or instructions, and the amount of any fees, charges, or consideration paid or agreed to be paid by the beneficiary.

(c) The court may refuse to order distribution, or may order distribution on any terms that the court deems just and equitable, if the court finds either of the following:

(1) The fees, charges, or consideration paid or agreed to be paid by a beneficiary are grossly unreasonable.

(2) The transfer, agreement, request, or instructions were obtained by duress, fraud, or undue influence.

(d) Notice of the hearing on the motion shall be served on the beneficiary and on the persons described in subdivision (a) at least 15 days before the hearing in the manner provided in Section 415.10 or 415.30 of the Code of Civil Procedure.

Enacted Stats 1990 ch 79 § 14 (AB 759), operative July 1, 1991.

Q 0094

Privileged & Confidential
All Rights Reserved

SD 00094

EXHIBIT 29
352

## § 10810.  Compensation of estate attorney

(a) Subject to the provisions of this part, for ordinary services the attorney for the personal representative shall receive compensation based on the value of the estate accounted for by the personal representative, as follows:

(1) Four percent on the first one hundred thousand dollars ($100,000).

(2) Three percent on the next one hundred thousand dollars ($100,000).

(3) Two percent on the next eight hundred thousand dollars ($800,000).

(4) One percent on the next nine million dollars ($9,000,000).

(5) One-half of 1 percent on the next fifteen million dollars ($15,000,000).

(6) For all amounts above twenty-five million dollars ($25,000,000), a reasonable amount to be determined by the court.

(b) For the purposes of this section, the value of the estate accounted for by the personal representative is the total amount of the appraisal of property in the inventory, plus gains over the appraisal value on sales, plus receipts, less losses from the appraisal value on sales, without reference to encumbrances or other obligations on estate property.

Added Stats 1991 ch 82 § 30(SB 896), effective June 30, 1991 oper.

Q:
if I have someone
to probate will
for 5 K can he
demand to be later me
sell it ?

Q 0095

Privileged & Confidential
All Rights Reserved

SD 00095

EXHIBIT 29
353

# EXHIBIT 30

RECEIVED

MAY 3 0 2003

Marc Toberoff

## TELECOPIER COVER PAGE

| | |
|---|---|
| **DATE:** | **May 30, 2003** |
| **RECIPIENT:** | **Marc Toberoff** |
| **SENDER:** | **James R. Jackoway** |
| **FAX NUMBER:** | **310-246-3101** |
| **NUMBER OF PAGES:** | **25(including cover page)** |

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable Federal or State law. If the reader of the message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via regular U.S. mail.

If all pages are not received, please contact sender at (310) 553-0305. Thank you

Q 0105

**Privileged & Confidential**
**All Rights Reserved**

SD 00105

**EXHIBIT 30**
**354**

# ARMSTRONG HIRSCH JACKOWAY TYERMAN & WERTHEIMER
## MEMORANDUM

TO:        James R. Jackoway, Esq.

FROM:      Kurt L. Harrison

DATE:      May 29, 2003

RE:        Marc Toberoff -- Ethical Issues

cc:        Gerry Hemmerling, Esq.
           Michele M. Mulrooney, Esq.

**********************************************************************

    Gerry Hemmerling informs me that this Firm has been asked to assist Mr. Marc Toberoff and his corporation, Pacific Pictures Corporation ("PPC"), by providing legal services in connection with a joint venture between PPC, on the one hand, and Jean Peavy and her son, Mark Peary, (collectively, the "Peavys") on the other. Ms. Hemmerling requested that I examine some of the ethical issues that might confront Mr. Toberoff and this Firm, if the Firm were to agree to assist Mr. Toberoff and PPC in the joint venture.

    I understand that Mr. Toberoff formed PPC and that PPC entered into a Joint Venture Agreement (the "Agreement") with the Peavys to exploit certain copyrights held, assigned, or transferred by the late Joe Shuster. The Peavys are Shuster's heirs. Among other things, the Agreement requires the parties to

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-1-

Q 0106

Privileged & Confidential
All Rights Reserved

SD 00106

**EXHIBIT 30**
**355**

engage Mr. Toberoff to perform legal services for the Peavys, and entitles Mr. Toberoff, through PPC, to receive 50% of all profits realized from the exploitation of the copyrights. We do not know at present how Mr. Toberoff came in contact with the Peavys.

## RULE 1-200

As you know, Rule 1-200 of the California Rules of Professional Conduct prohibits any member of the California State Bar from knowingly assisting in, soliciting, or inducing any violation of the Rules of Professional Conduct or the State Bar Act (Cal. Bus. & Prof. Code § 6000 et seq.). In essence, this Rule makes any potential ethical problems confronting Mr. Toberoff this Firm's potential problems as well, if the Firm agrees to assist Mr. Toberoff and PPC in the transaction with the Peavys. Hence, this Memorandum examines both potential issues confronting Mr. Toberoff in his relationship with the Peavys and the transaction in question and potential issues that would confront this Firm were it to agree to assist Mr. Toberoff and PPC.

## RULE 1-400

The first potential problem raised by Mr. Toberoff's relationship with the Peavys arises from the prohibition against certain forms of advertising and solicitation by attorneys. Rule 1-400 prohibits certain types of "communications" and "solicitations." With respect to prohibited solicitations, an

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC.                    -2-                    Q 0107

**Privileged & Confidential
All Rights Reserved**

SD 00107

**EXHIBIT 30
356**

Thus, even if Mr. Toberoff contacted the Peavys by mail, rather than in person or by telephone, the communication would presumably violate Rule 1-400, unless Mr. Toberoff had made the required disclosures on the first page and envelope of the letter. Again, without knowing exactly how and why Mr. Toberoff contacted the Peavys, it is difficult to know whether he violated Rule 1-400. However, given the circumstances here, there is reason for concern in connection with any potential involvement of this Firm.

## BUSINESS AND PROFEESIONS CODE §6150 ET SEQ.

Mr. Toberoff's use of a corporate entity to acquire business also raises concerns about "capping." The State Bar Act (the "Act") broadly defines a "capper" or "runner" as any person, firm, association, or corporation acting in any manner or in any capacity as an agent for an attorney in the solicitation or procurement of business for the attorney. <u>Bus</u>. <u>Prof</u>. <u>Code</u> § 6151. The Act makes it unlawful for any person, firm, corporation, partnership, or association to act as runner or capper for any attorney. <u>Bus</u>. & <u>Prof</u>. <u>Code</u> § 6152.

In this case, PPC appears to be soliciting or procuring business for Mr. Toberoff. Indeed, presumably at the suggestion or insistence of PPC, the Agreement requires the Peavys to engage the legal services of Mr. Toberoff, who then gets paid from the proceeds of the copyright exploitation. Of course, "capping" also requires that the corporation soliciting or procuring

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

—4—

Q 0108

Privileged & Confidential
All Rights Reserved

SD 00108

**EXHIBIT 30**
**357**

business for the attorney act for consideration. However, given the broad definition of consideration and the close relationship of Mr. Toberoff and PPC, it would probably not be difficult to find consideration. See Civ. Code § 1605 (broadly defining consideration as any benefit conferred or prejudice suffered by the promisor as inducement for the promise).

Furthermore, if this Firm were to engage in a long-term relationship with Mr. Toberoff by participating in other similar ventures, Mr. Toberoff, PPC, or whatever other entity Mr. Toberoff employs also appears to be soliciting or procuring business for the Firm. Hence, it might appear that the Firm itself were "joining" in the capping activity, which is also a violation of the Act. Bus. & Prof. Code § 6152. Such activity would also independently violate Rule 1-200, which, as mentioned above, prohibits attorneys from inducing, soliciting, or assisting in the violation of the Act.

## RULE 2-200

Aside from the questions raised above, if this Firm agreed to assist Mr. Toberoff in the joint venture with the Peavys, the Firm's involvement would also raise ethical issues regarding the financial relationship between Mr. Toberoff and the Firm. Rule 2-200(A) prohibits attorneys from dividing fees for legal services unless (1) the client consents in writing after full disclosure and (2) the total fee charged by all lawyers is not unconscionable. Even if all other ethical concerns were

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-5-

Q 0109

Privileged & Confidential
All Rights Reserved

SD 00109

EXHIBIT 30
358

satisfied, this Rule would require that a full written disclosure
be made both to the Peavys and to the personal representative of
the Shuster Estate.  Furthermore, as discussed below, it is
questionable whether the second prong of requirement can be met
because of the 50% fee being charged by Mr. Toberoff through PPC.

## RULE 3-300

The Agreement also raises issues concerning Rule 3-300
regarding avoiding interests adverse to a client.  Rule 3-300
prohibits an attorney from entering into a business transaction
or knowingly acquiring an ownership or other pecuniary interest
adverse to a client unless (1) the transaction and its terms are
fair and reasonable to the client; (2) the transaction and its
terms are fully disclosed and transmitted in writing to the
client in a manner which should reasonably have been understood
by the client; (3) the client is advised in writing that the
client may seek the advice of an independent lawyer and is given
a reasonable opportunity to seek that advice; and (4) the client
consents to the transaction in writing.  Furthermore, the written
disclosure requires more than just presenting the client with a
written agreement.  Decisions interpreting this Rule require the
lawyer to fully advise the client in writing of all disadvantages
and legal obligations of the transaction.[1]

In this case, the Agreement itself would unlikely
suffice as the required written disclosure.  Furthermore, there

---

[1] For the sake of brevity, I have not cited these cases here.

G:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-6-

Privileged & Confidential
All Rights Reserved

Q 0110

SD 00110

EXHIBIT 30
359

appears to be no writing advising the Peavys of their right to seek independent legal advice, and we do not know whether the Peavys were given an opportunity to seek such advice.  Finally, as discussed below, there is a significant question as to whether 50% of all net profits is objectively fair and reasonable under the circumstances.

Mr. Toberoff's use of a corporate entity, PPC, as the party to the joint venture with the Peavys would most likely make no difference in the application of Rule 3-300.  As a policy matter, if an attorney could circumvent Rule 3-300 by the simple expedient of forming a corporate entity to engage in the transaction with the client, the Rule would have no vitality.  This suggests that a court would most likely disregard the corporate entity for the purposes of applying Rule 3-300 under the circumstances presented here.

RULE 3-310

Ms. Hemmerling has discussed the potential conflicts that this Firm would have in representing the Shuster Estate, while being paid by a party whose pecuniary interests are adverse to the Estate and its heirs, the Peavys.  The issues discussed by Ms. Hemmerling implicate Rule 3-310, and in particular Subdivisions (B), (C), and (F).  You should note, however, that Rule 3-310 can be satisfied by obtaining the client's written informed consent.  In this case, prudence would suggest that the

S:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-7-

Q 0111

Privileged & Confidential
All Rights Reserved

SD 00111

EXHIBIT 30
360

written informed consent should be obtained from both the Peavys and the personal representative of the Shuster Estate.

## RULE 4-200

Finally, Rule 4-200 prohibits an attorney from entering into agreement for, charging, or collecting an illegal or unconscionable fee. The Rule lists eleven factors that are among the factors to be considered. Without engaging in an extensive analysis of each factor here, it appears far from clear whether the 50% net profit fee charged by Mr. Toberoff through PPC[2] is conscionable. As you know, contingent fees in most cases typically run between 20% and 40% of net recovery. Looking at the factors, it is difficult to see how a fee well in excess of the usual upper limit of contingent fee agreements can be justified in this case. Ultimately, however, there is no bright line standard for determining this issue. Furthermore, this issue is difficult to evaluate without some appreciation for the discounted value of the rights in question. Nonetheless, as noted above, this issue raises concerns both in the near- and far-term as to Rule 4-200 and, as discussed above, as to Rules 2-200 and 3-300.

---

[2] As with the application of Rule 3-300, it is unlikely that Mr. Toberoff's use of PPC would shield him from the requirements of Rule 4-200.

3:\KLH\PPC_TOBEROFF\MEMO.REV1.DOC

-8-

Q 0112

**Privileged & Confidential**
**All Rights Reserved**

SD 00112

**EXHIBIT 30**
**361**

For your review, I have included all of the rules and statutes cited in this Memorandum.  If you wish me to pursue further any of the issues discussed herein, please let me know.


ATTACHMENTS

Q 0113

Privileged & Confidential
All Rights Reserved

SD 00113

**EXHIBIT 30**
**362**



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 1-400. Advertising and Solicitation**

(A) For purposes of this rule, "communication" means any message or offer made by or on behalf of a member concerning the availability for professional employment of a member or a law firm directed to any former, present, or prospective client, including but not limited to the following:

    (1) Any use of firm name, trade name, fictitious name, or other professional designation of such member or law firm; or

    2) Any stationery, letterhead, business card, sign, brochure, or other comparable written material describing such member, law firm, or lawyers; or

    (3) Any advertisement (regardless of medium) of such member or law firm directed to the general public or any substantial portion thereof; or

    (4) Any unsolicited correspondence from a member or law firm directed to any person or entity.

(B) For purposes of this rule, a "solicitation" means any communication:

    (1) Concerning the availability for professional employment of a member or a law firm in which a significant motive is pecuniary gain; and

    (2) Which is; 

        (a) delivered in person or by telephone, or

        (b) directed by any means to a person known to the sender to be represented by counsel in a matter which is a subject of the communication.

(C) A solicitation shall not be made by or on behalf of a member or law firm to a prospective client with whom the member or law firm has no family or prior professional relationship, unless the solicitation is protected from abridgment by the Constitution of the United States or by the Constitution of the State of California. A solicitation to a former or present client in the discharge of a member's or law firm's professional duties is not prohibited.

(D) A communication or a solicitation (as defined herein) shall not:

    (1) Contain any untrue statement; or

    (2) Contain any matter, or present or arrange any matter in a manner or format which is false, deceptive, or which tends to confuse, deceive, or mislead the public; or

    (3) Omit to state any fact necessary to make the statements made, in the light of circumstances under which they are made, not misleading to the public; or

    (4) Fail to indicate clearly, expressly, or by context, that it is a communication or solicitation, as the case may be; or

    (5) Be transmitted in any manner which involves intrusion, coercion, duress, compulsion, intimidation, threats, or vexatious or harassing conduct.

Q 0114

Privileged & Confidential
All Rights Reserved

http://...calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk... 5/27/2003

SD 00114

**EXHIBIT 30**
**363**



(6) State that a member is a "certified specialist" unless the member holds a current certificate as a specialist issued by the Board of Legal Specialization, or any other entity accredited by the State Bar to designate specialists pursuant to standards adopted by the Board of Governors, and states the complete name of the entity which granted certification.

(E) The Board of Governors of the State Bar shall formulate and adopt standards as to communications which will be presumed to violate this rule 1-400. The standards shall only be used as presumptions affecting the burden of proof in disciplinary proceedings involving alleged violations of these rules. "presumption affecting the burden of proof" means that presumption defined in Evidence Code sections 605 and 606. Such standards formulated and adopted by the Board, as from time to time amended, shall be effective and binding on all members.

(F) A member shall retain for two years a true and correct copy or recording of any communication made by written or electronic media. Upon written request, the member shall make any such copy or recording available to the State Bar, and, if requested, shall provide to the State Bar evidence to support any factual or objective claim contained in the communication.

(Former rule 1-400 (D)(6) repealed by order of the Supreme Court effective November 30, 1992. New rule 1-400 (D)(6) added by order of the Supreme Court effective June 1, 1997.)

*Standards:*

Pursuant to rule 1-400(E) the Board of Governors of the State Bar has adopted the following standards, effective May 27, 1989, unless noted otherwise, as forms of "communication" defined in rule 1-400(A) which are presumed to be in violation of rule 1-400:

(1) A "communication" which contains guarantees, warranties, or predictions regarding the result of the representation.

(2) A "communication" which contains testimonials about or endorsements of a member unless such communication also contains an express disclaimer such as "this testimonial or endorsement does not constitute a guarantee, warranty, or prediction regarding the outcome of your legal matter."

(3) A "communication" which is delivered to a potential client whom the member knows or should reasonably know is in such a physical, emotional, or mental state that he or she would not be expected to exercise reasonable judgment as to the retention of counsel.

(4) A "communication" which is transmitted at the scene of an accident or at or en route to a hospital, emergency care center, or other health care facility.

(5) A "communication," except professional announcements, seeking professional employment for pecuniary gain, which is transmitted by mail or equivalent means which does not bear the word "Advertisement," "Newsletter" or words of similar import in 12 point print on the first page. If such communication, including firm brochures, newsletters, recent legal development advisories, and similar materials, is transmitted in an envelope, the envelope shall bear the word "Advertisement," "Newsletter" or words of similar import on the outside thereof.

(6) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies a relationship between any member in private practice and a government agency or instrumentality or a public or non-profit legal services organization.

(7) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation which states or implies that a member has a relationship to any other lawyer or a law firm as a partner or associate, or officer or shareholder pursuant to Business and professions Code sections 6160-6172 unless such relationship in fact exists.

(8) A "communication" which states or implies that a member or law firm is "of counsel" to another lawyer or a law firm unless the former has a relationship with the latter (other than as a partner or associate, or officer or shareholder pursuant to Business and professions Code sections 6160-6172) which is close, personal, continuous, and regular.

(9) A "communication" in the form of a firm name, trade name, fictitious name, or other professional designation used by a member or law firm in private practice which differs materially from any other such designation used by such member or law firm

Q 0115

Privileged & Confidential
All Rights Reserved

The State Bar of California - Rules of Professional Conduct                                  Page 3 of 3

at the same time in the same community.

(10) A "communication" which implies that the member or law firm is participating in a lawyer referral service which has been certified by the State Bar of California or as having satisfied the Minimum Standards for Lawyer Referral Services in California, when that is not the case.

(11) A "communication" which states or implies that a member is a "certified specialist" unless such communication also states the complete name of the entity which granted the certification as a specialist. (Repealed by order of the Supreme Court, effective June 1, 1997. See rule 1-400(D)(6).)

(12) A "communication," except professional announcements, in the form of an advertisement primarily directed to seeking professional employment primarily for pecuniary gain transmitted to the general public or any substantial portion thereof by mail or equivalent means or by means of television, radio, newspaper, magazine or other form of commercial mass media which does not state the name of the member responsible for the communication. When the communication is made on behalf of a law firm, the communication shall state the name of at least one member responsible for it.

(13) A "communication" which contains a dramatization unless such communication contains a disclaimer which states "this is a dramatization" or words of similar import.

(14) A "communication" which states or implies "no fee without recovery" unless such communication also expressly discloses whether or not the client will be liable for costs.

(15) A "communication" which states or implies that a member is able to provide legal services in a language other than English unless the member can actually provide legal services in such language or the communication also states in the language of the communication (a) the employment title of the person who speaks such language and (b) that the person is not a member of the State Bar of California, if that is the case.

(16) An unsolicited "communication" transmitted to the general public or any substantial portion thereof primarily directed to seeking professional employment primarily for pecuniary gain which sets forth a specific fee or range of fees for a particular service where, in fact, the member charges a greater fee than advertised in such communication within a period of 90 days following dissemination of such communication, unless such communication expressly specifies a shorter period of time regarding the advertised fee. Where the communication is published in the classified or "yellow pages" section of telephone, business or legal directories or in other media not published more frequently than once a year, the member shall conform to the advertised fee for a period of one year from initial publication, unless such communication expressly specifies a shorter period of time regarding the advertised fee.

(Amended by order of Supreme Court, operative September 14, 1992. Standard (5) amended by the Board of Governors, effective May 11, 1994. Standards (12) - (16) added by the Board of Governors, effective May 11, 1994.)

© 2003 State Bar of California

Q 0116

**Privileged & Confidential**
http://www.calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk... 5/27/2003
**All Rights Reserved**

SD 00116

EXHIBIT 30
365

The State Bar of California / Rules of Professional Conduct                    Page 1 of 1



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

Rule 2-200. Financial Arrangements Among Lawyers

(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:

    (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and

    (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.

(B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client. A member's offering of or giving a gift or gratuity to any lawyer who has made a recommendation resulting in the employment of the member or the member's law firm shall not of itself violate this rule, provided that the gift or gratuity was not offered in consideration of any promise, agreement, or understanding that such a gift or gratuity would be forthcoming or that referrals would be made or encouraged in the future.

© 2003 State Bar of California



Q 0117

Privileged & Confidential
All Rights Reserved

http://www.calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...  5/27/2003

SD 00117

EXHIBIT 30
366

The State Bar of California - ...ules of Professional Conduct



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

# CURRENT RULES

## Rule 3-300. Avoiding Interests Adverse to a Client

A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:

(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and

(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and

(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

### *Discussion:*

Rule 3-300 is not intended to apply to the agreement by which the member is retained by the client, unless the agreement confers on the member an ownership, possessory, security, or other pecuniary interest adverse to the client. Such an agreement is governed, in part, by rule 4-200.

Rule 3-300 is not intended to apply where the member and client each make an investment on terms offered to the general public or a significant portion thereof. For example, rule 3-300 is not intended to apply where A, a member, invests in a limited partnership syndicated by a third party. B, A's client, makes the same investment. Although A and B are each investing in the same business, A did not enter into the transaction "with" B for the purposes of the rule.

Rule 3-300 is intended to apply where the member wishes to obtain an interest in client's property in order to secure the amount of the member's past due or future fees. (Amended by order of Supreme Court, operative September 14, 1992.)

© 2003 State Bar of California

Q 0118



**Privileged & Confidential
All Rights Reserved**

The State Bar of California    ...ules of Professional Conduct     Page 1 of 3

Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
Location: Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 3-310. Avoiding the Representation of Adverse Interests**

(A) For purposes of this rule:

(1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

(2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

(3) "Written" means any writing as defined in Evidence Code section 250.

(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

(F) A member shall not accept compensation for representing a client from one other than the client unless:

(1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

Q 0119

Privileged & Confidential
All Rights Reserved

SD 00119



**EXHIBIT 30**
**368**

(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

(a) such nondisclosure is otherwise authorized by law; or

(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

*Discussion:*

Rule 3-310 is not intended to prohibit a member from representing parties having antagonistic positions on the same legal question that has arisen in different cases, unless representation of either client would be adversely affected.

Other rules and laws may preclude making adequate disclosure under this rule. If such disclosure is precluded, informed written consent is likewise precluded. (See, e.g., Business and Professions Code section 6068, subdivision (e).)

Paragraph (B) is not intended to apply to the relationship of a member to another party's lawyer. Such relationships are governed by rule 3-320.

Paragraph (B) is not intended to require either the disclosure of the new engagement to a former client or the consent of the former client to the new engagement. However, both disclosure and consent are required if paragraph (E) applies.

While paragraph (B) deals with the issues of adequate disclosure to the present client or clients of the member's present or past relationships to other parties or witnesses or present interest in the subject matter of the representation, paragraph (E) is intended to protect the confidences of another present or former client. These two paragraphs are to apply as complementary provisions.

Paragraph (B) is intended to apply only to a member's own relationships or interests, unless the member knows that a partner or associate in the same firm as the member has or had a relationship with another party or witness or has or had an interest in the subject matter of the representation.

Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the formation of a partnership for several partners or a corporation for several shareholders, the preparation of an ante-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an "uncontested" marital dissolution. In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., Evid. Code, §962) and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2).

Subparagraph (C)(3) is intended to apply to representations of clients in both litigation and transactional matters.

In *State Farm Mutual Automobile Insurance Company v. Federal Insurance Company* (1999) 72 Cal.App. 4th 1422 [86 Cal.Rptr.2d the court held that subparagraph (C)(3) was violated when a member, retained by an insurer to defend one suit, and while that suit was still pending, filed a direct action against the same insurer in an unrelated action without securing the insurer's consent. Notwithstanding State Farm, subparagraph (C)(3) is not intended to apply with respect to the relationship between an insurer and a member when, in each matter, the insurer's interest is only as an indemnity provider and not as a direct party to the action.

There are some matters in which the conflicts are such that written consent may not suffice for non-disciplinary purposes. (See *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 [197 Cal.Rptr. 185]; *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *Ishmael v. Millington* (1966) 241 Cal.App.2d 520 [50 Cal.Rptr. 592].)

Paragraph (D) is not intended to apply to class action settlements subject to court approval.

Q 0120

Privileged & Confidential
All Rights Reserved

http://...ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...  5/27/2003

SD 00120

EXHIBIT 30
369



Paragraph (F) is not intended to abrogate existing relationships between insurers and insureds whereby the insurer has the contractual right to unilaterally select counsel for the insured, where there is no conflict of interest. (See *San Diego Navy Federal Credit Union v. Cumis Insurance Society* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].) (Amended by order of Supreme Court; operative September 14, 1992; operative March 3, 2003.)

© 2003 State Bar of California

Q 0121

Privileged & Confidential
All Rights Reserved

a.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...  5/27/2003

SD 00121

EXHIBIT 30
370



Printed from The State Bar of California website (www.calbar.ca.gov) on Tuesday May 27, 2003
**Location:** Home > Attorney Resources > Rules & Regulations > Rules of Professional Conduct

## CURRENT RULES

**Rule 4-200. Fees for Legal Services**

(A) A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.

(B) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:

   (1) The amount of the fee in proportion to the value of the services performed.

   (2) The relative sophistication of the member and the client.

   (3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.

   (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.

   (5) The amount involved and the results obtained.

   (6) The time limitations imposed by the client or by the circumstances.

   (7) The nature and length of the professional relationship with the client.

   (8) The experience, reputation, and ability of the member or members performing the services.

   (9) Whether the fee is fixed or contingent.

   (10) The time and labor required.

   (11) The informed consent of the client to the fee.

© 2003 State Bar of California



Q 0122

**Privileged & Confidential**
**All Rights Reserved**

http://...calbar.ca.gov/state/calbar/calbar_generic_pr.jsp?BV_EngineID=hadchfkflekfbemgcfk...  5/27/2003

SD 00122

**EXHIBIT 30**
**371**

# BUSINESS AND PROFESSIONS CODE
# SECTION 6150-6156

6150.   This article is a part of Chapter 4 of this division of the
Business and Professions Code, but the phrase "this chapter" as used
in Chapter 4 does not apply to the provisions of this article unless
expressly made applicable.

6151.   As used in this article:
   (a) A runner or capper is any person, firm, association or
corporation acting for consideration in any manner or in any capacity
as an agent for an attorney at law or law firm, whether the attorney
or any member of the law firm is admitted in California or any other
jurisdiction, in the solicitation or procurement of business for the
attorney at law or law firm as provided in this article.
   (b) An agent is one who represents another in dealings with one or
more third persons.

6152.   (a) It is unlawful for:
   (1) Any person, in an individual capacity or in a capacity as a
public or private employee, or for any firm, corporation, partnership
or association to act as a runner or capper for any attorneys or to
solicit any business for any attorneys in and about the state
prisons, county jails, city jails, city prisons, or other places of
detention of persons, city receiving hospitals, city and county
receiving hospitals, county hospitals, superior courts, or in any
public institution or in any public place or upon any public street
or highway or in and about private hospitals, sanitariums or in and
about any private institution or upon private property of any
character whatsoever.
   (2) Any person to solicit another person to commit or join in the
commission of a violation of subdivision (a).
   (b) A general release from a liability claim obtained from any
person during the period of the first physical confinement, whether
as an inpatient or outpatient, in a clinic or health facility, as
defined in Sections 1203 and 1250 of the Health and Safety Code, as a
result of the injury alleged to have given rise to the claim and
primarily for treatment of the injury, is presumed fraudulent if the
release is executed within 15 days after the commencement of
confinement or prior to release from confinement, whichever occurs
first.
   (c) Nothing in this section shall be construed to prevent the
recommendation of professional employment where that recommendation
is not prohibited by the Rules of Professional Conduct of the State
Bar of California.
   (d) Nothing in this section shall be construed to mean that a
public defender or assigned counsel may not make known his or her
services as a criminal defense attorney to persons unable to afford
legal counsel whether those persons are in custody or otherwise.

Q 0123

Privileged & Confidential
All Rights Reserved

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156  5/27/2003

SD 00123

EXHIBIT 30
372

CA Codes (bpc:6150-6156)

Page 2 of 5

6153.  Any person, firm, partnership, association, or corporation violating subdivision (a) of Section 6152 is punishable, upon a first conviction, by imprisonment in a county jail for not more than one year or by a fine not exceeding fifteen thousand dollars ($15,000), or by both that imprisonment and fine.  Upon a second or subsequent conviction, a person, firm, partnership, association, or corporation is punishable by imprisonment in a county jail for not more than one year, or by imprisonment in the state prison for two, three, or four years, or by a fine not exceeding fifteen thousand dollars ($15,000), or by both that imprisonment and fine.

Any person employed either as an officer, director, trustee, clerk, servant or agent of this state or of any county or other municipal corporation or subdivision thereof, who is found guilty of violating any of the provisions of this article, shall forfeit the right to his office and employment in addition to any other penalty provided in this article.

6154.  (a) Any contract for professional services secured by any attorney at law or law firm in this state through the services of a runner or capper is void.  In any action against any attorney or law firm under the Unfair Practices Act, Chapter 4 (commencing with Section 17000) of Division 7, or Chapter 5 (commencing with Section 17200) of Division 7, any judgment shall include an order divesting the attorney or law firm of any fees and other compensation received pursuant to any such void contract.  Those fees and compensation shall be recoverable as additional civil penalties under Chapter 4 (commencing with Section 17000) or Chapter 5 (commencing with Section 17200) of Division 7.

(b) Notwithstanding Section 17206 or any other provision of law, any fees recovered pursuant to subdivision (a) in an action involving professional services related to the provision of workers' compensation shall be allocated as follows:  if the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the State General Fund, and one-half of the penalty collected shall be paid to the Workers' Compensation Fraud Account in the Insurance Fund; if the action is brought by a district attorney, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half of the penalty collected shall be paid to the Workers' Compensation Fraud Account in the Insurance Fund; if the action is brought by a city attorney or city prosecutor, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half of the penalty collected shall be paid to the Workers' Compensation Fraud Account in the Insurance Fund.  Moneys deposited into the Workers' Compensation Fraud Account pursuant to this subdivision shall be used in the investigation and prosecution of workers' compensation fraud, as appropriated by the Legislature.

6155.  (a) An individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients, unless all of the following requirements are met:

(1) The service is registered with the State Bar of  California and (a) on July 1, 1988, is operated in conformity with minimum standards for a lawyer referral service established by the State Bar,

Q 0124

Privileged & Confidential
All Rights Reserved

or (b) upon approval by the Supreme Court of minimum standards for a
lawyer referral service, is operated in conformity with those
standards.

(2) The combined charges to the potential client by the referral
service and the attorney to whom the potential client is referred do
not exceed the total cost that the client would normally pay if no
referral service were involved.

(b) A referral service shall not be owned or operated, in whole or
in part, directly or indirectly, by those lawyers to whom,
individually or collectively, more than 20 percent of referrals are
made. For purposes of this subdivision, a referral service that is
owned or operated by a bar association, as defined in the minimum
standards, shall be deemed to be owned or operated by its governing
committee so long as the governing committee is constituted and
functions in the manner prescribed by the minimum standards.

(c) None of the following is a lawyer referral service:
(1) A plan of legal insurance as defined in Section 119.6 of the
Insurance Code.

(2) A group or prepaid legal plan, whether operated by a union,
trust, mutual benefit or aid association, public or private
corporation, or other entity or person, which meets both of the
following conditions:

(A) It recommends, furnishes, or pays for legal services to its
members or beneficiaries.

(B) It provides telephone advice or personal consultation.

(3) A program having as its purpose the referral of clients to
attorneys for representation on a pro bono basis.

(d) The following are in the public interest and do not constitute
an unlawful restraint of trade or commerce:

(1) An agreement between a referral service and a participating
attorney to eliminate or restrict the attorney's fee for an initial
office consultation for each potential client or to provide free or
reduced fee services.

(2) Requirements by a referral service that attorneys meet
reasonable participation requirements, including experience,
education, and training requirements.

(3) Provisions of the minimum standards as approved by the Supreme
Court.

(4) Requirements that the application and renewal fees for
certification as a lawyer referral service be determined, in whole or
in part, by a consideration of any combination of the following
factors:  a referral service's gross annual revenues, number of
panels, number of panel members, amount of fees charged to panel
members, or for-profit or nonprofit status; provided that the
application and renewal fees do not exceed ten thousand dollars
($10,000) or 1 percent of the gross annual revenues, whichever is
less.

(5) Requirements that, to increase access to the justice system
for all Californians, lawyer referral services establish separate
ongoing activities or arrangements that serve persons of limited
means.

(e) A violation or threatened violation of this section may be
enjoined by any person.

(f) With the approval of the Supreme Court, the State Bar shall
formulate and enforce rules and regulations for carrying out this
section, including rules and regulations which do the following:

(1) Establish minimum standards for lawyer referral services.  The
minimum standards shall include provisions ensuring that panel
membership shall be open to all attorneys practicing in the
geographical area served who are qualified by virtue of suitable

Q 0125

Privileged & Confidential     http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156   5/27/2003
All Rights Reserved

SD 00125

EXHIBIT 30
374

experience, and limiting attorney registration and membership fees to reasonable sums which do not discourage widespread attorney membership.

(2) Require that an entity seeking to qualify as a lawyer referral service register with the State Bar and obtain from the State Bar a certificate of compliance with the minimum standards for lawyer referral services.

(3) Require that the certificate may be obtained, maintained, suspended, or revoked pursuant to procedures set forth in the rules and regulations.

(4) Require the lawyer referral service to pay an application and renewal fee for the certificate in such reasonable amounts as may be determined by the State Bar. The State Bar shall adopt rules authorizing the waiver or reduction of the fees upon a demonstration of financial necessity. The State Bar may require that the application and renewal fees for certification as a lawyer referral service be determined, in whole or in part, by a consideration of any combination of the following factors: a referral service's gross annual revenues, number of panels, number of panel members, amount of fees charged to panel members, or for-profit or nonprofit status; provided that the application and renewal fees do not exceed ten thousand dollars ($10,000) or 1 percent of the gross annual revenues, whichever is less.

(5) Require that, to increase access to the justice system for all Californians, lawyer referral services establish separate ongoing activities or arrangements that serve persons of limited means.

(6) Require each lawyer who is a member of a certified lawyer referral service to comply with all applicable professional standards, rules, and regulations, and to possess a policy of errors and omissions insurance in an amount not less than one hundred thousand dollars ($100,000) for each occurrence and three hundred thousand dollars ($300,000) aggregate, per year. By rule, the State Bar may provide for alternative proof of financial responsibility to meet this requirement.

(g) Provide that cause for denial of certification or recertification or revocation or certification of a lawyer referral service shall include, but not be limited to:

(1) Noncompliance with the statutes or minimum standards governing lawyer referral services as adopted and from time to time amended.

(2) Sharing common or cross ownership, interests, or operations with any entity which engages in referrals to licensed or unlicensed health care providers.

(3) Direct or indirect consideration regarding referrals between an owner, operator, or member of a lawyer referral service and any licensed or unlicensed health care provider.

(4) Advertising on behalf of attorneys in violation of the Rules of Professional Conduct or the Business and Professions Code.

(h) This section shall not be construed to prohibit attorneys from jointly advertising their services.

(1) Permissible joint advertising, among other things, identifies by name the advertising attorneys or law firms whom the consumer of legal services may select and initiate contact with.

(2) Certifiable referral activity involves, among other things, some person or entity other than the consumer and advertising attorney or law firms which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified in the advertising.

(i) A lawyer referral service certified under this section and operating in full compliance with this section, and in full compliance with the minimum standards and the rules and regulations

Q 0126

Privileged & Confidential
All Rights Reserved

CA Codes (bpc:6150-6156)

Page 5 of 5

of the State Bar governing lawyer referral services, shall not be deemed to be in violation of Section 3215 of the Labor Code or Section 750 of the Insurance Code.

(j) The payment by an attorney or law firm member of a certified referral service of the normal fees of that service shall not be deemed to be in violation of Section 3215 of the Labor Code or Section 750 of the Insurance Code, provided that the attorney or law firm member is in full compliance with the minimum standards and the rules and regulations of the State Bar governing lawyer referral services.

(k) Certifications of lawyer referral services issued by the State Bar shall not be transferable.


6156.  (a) Any individual, partnership, association, corporation, or other entity, including, but not limited to, any person or entity having an ownership interest in a lawyer referral service, which engages, has engaged, or proposes to engage in violations of Section 6155, shall be liable for a civil penalty as defined in Sections 17206, 17206.1, and 17536, respectively, which shall be assessed and recovered in a civil action brought:

(1) In the manner specified in subdivision (a) of Section 17206 or Section 17536.

(2) By the State Bar of California.

(b) If the action is brought pursuant to subdivision (a), the court shall determine the reasonable expenses, if any, incurred by the State Bar in its investigation and prosecution of the action.  In these cases, before any penalty collected is paid out pursuant to subdivision (b) of Section 17206 or 17536, the amount of the reasonable expenses incurred by the State Bar shall be paid to the State Bar and shall be deposited and used as provided in subdivision (c).

(c) If the action is brought pursuant to paragraph (2) of subdivision (a), the civil penalty shall be paid to the State Bar and shall be deposited into a special fund to be used first for the investigation and prosection of other such cases by the State Bar, with any excess to be used for the investigation and prosecution of attorney discipline cases.

Q 0127

Privileged & Confidential
All Rights Reserved

http://leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=06001-07000&file=6150-6156  5/27/2003

SD 00127

EXHIBIT 30
376