# EXHIBIT 33

1  Marc Toberoff (CA State Bar No. 188547)
   Rafael Gomez-Cabrera (CA State Bar No. 229744)
2  Jeffrey B. Linden (CA State Bar No. 224761)
   Nicholas C. Williamson (CA State Bar No. 231124)
3  LAW OFFICES OF MARC TOBEROFF, PLC
   1999 Avenue of the Stars, Suite 1540
4  Los Angeles, CA 90067
   Telephone: (310) 246-3333
5  Facsimile: (310) 246-3101

6  Attorneys for Plaintiffs
   Joanne Siegel and Laura Siegel Larson

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10
   JOANNE SIEGEL, an individual; and        Civil Case No. _____
11 LAURA SIEGEL LARSON, an individual,

12              Plaintiffs,                  **COMPLAINT FOR**:
                                             [1] DECLARATORY RELIEF RE:
13      vs.                                      TERMINATION, 17 U.S.C.§304(c);
                                             [2] DECLARATORY RELIEF RE:
14 WARNER BROS. ENTERTAINMENT                    PROFITS;
   INC., a corporation; TIME WARNER INC.,    [3] DECLARATORY RELIEF RE:
15 a corporation; DC COMICS INC., a              USE OF "S" CREST;
   corporation; and DOES 1-10,               [4] ACCOUNTING FOR PROFITS;
16                                            [5] WASTE OF JOINTLY OWNED
              Defendants.                         COPYRIGHTS;
17                                            [6] VIOLATION OF LANHAM ACT
                                                 15 U.S.C. § 1125;
18                                           [7] VIOLATION OF CALIFORNIA
                                                 BUSINESS AND PROFESSIONAL
19                                               CODE §§ 17200 *ET SEQ.*
20
                                             DEMAND FOR JURY TRIAL
21

22

23

24      Plaintiffs JOANNE SIEGEL and LAURA SIEGEL LARSON (hereinafter the

25 "Plaintiffs"), by and through their attorney of record, hereby allege as follows:

26              **JURISDICTION AND VENUE**

27      1.      This is a civil action seeking declaratory relief, accounting for profits, remedies

28 for violations of the Lanham Act and violations of California unfair competition laws and

**EXHIBIT 33**
**442**

1  related claims arising out of Plaintiffs' termination of prior grants of copyright in and to the

2  original character and work known as "Superman" and subsequent "Superman" works

3  pursuant to the United States Copyright Act of 1976, 17 U.S.C. § 304(c), and defendants'

4  willful misconduct with respect thereto.

5       2.      This Court has subject matter jurisdiction over the claims set forth in this

6  Complaint pursuant to the United States Copyright Act (hereinafter, the "Copyright Act"),  17

7  U.S.C. § 101 *et al.* and 28 U.S.C. §§ 1331, 1338(a) and 1332 .

8       3.      This Court has supplemental jurisdiction over the related state claims herein in

9  that these claims form part of the same case and controversy as the federal claims herein.

10      4.      This Court has personal jurisdiction over the defendants in that defendants are

11  regularly doing business in the State of California and in this District, and because a

12  substantial part of the relevant acts complained of herein occurred in the State of California

13  and this District.

14      5.      Venue is proper in the United States District Court for the Central District of

15  California pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a).

16                              **PARTIES**

17      6.      Plaintiff JOANNE SIEGEL (hereinafter "Joanne Siegel") is an individual and

18  citizen of and resides in the State of California, in the County of Los Angeles,  and is and at all

19  times has been a citizen of the United States.  Joanne Siegel is the widow of famed comic

20  book creator Jerome (a.k.a. "Jerry") Siegel.

21      7.      Plaintiff LAURA SIEGEL LARSON (hereinafter "Laura Siegel") is an

22  individual and a citizen of and resides in the State of California, in the County of Los Angeles,

23  and is and at all times has been a citizen of the United States.  Laura Siegel is the daughter of

24  Jerome Siegel.

25      8.      Plaintiffs are informed and believe and based thereon allege that defendant

26  WARNER BROS. ENTERTAINMENT INC. (hereinafter "Warner Bros.") is a corporation

27  organized and existing under the laws of the State of Delaware, which has its principal place

28

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**EXHIBIT 33**
**443**

1  of business in Los Angeles County, California. Warner Bros. is a wholly owned subsidiary of

2  Defendant TIME WARNER INC.

3       9.    Plaintiffs are informed and believe and based thereon allege that Defendant DC

4  COMICS INC. (hereinafter "DC") is a corporation organized and existing under the laws of

5  the State of New York, which has its principal place of business in the State of New York; and

6  that DC regularly conducts significant business in the State of California and in the County of

7  Los Angeles. DC is also a wholly owned subsidiary of defendant Warner Bros.

8       10.    Plaintiffs are informed and believe and based thereon allege that on or about

9  September 30, 1946, the New York corporations, Detective Comics, Inc., Superman, Inc., All

10  American Comics, Inc., Jolaine Publications, Inc., Wonderwoman Publishing, Inc., Hop

11  Harrigan Enterprise, Inc., Gainlee Publishing Co., Inc., J.R. Publishing Co., Inc., Worlds Best

12  Comics, Inc. and Trafalgar Printing Co., Inc. were consolidated into the New York

13  corporation National Comics Publications, Inc., the name of which was later changed to

14  National Periodical Publications, Inc., and eventually to DC Comics, Inc.; and further that DC,

15  Warner Bros. and Time Warner, and/or each of them, are the alleged successor(s)-in-interest

16  to National Periodical Publications, Inc.

17       11.    Plaintiffs are informed and believe and based thereon allege that Defendant

18  TIME WARNER INC. (hereinafter "Time Warner") is a corporation organized and existing

19  under the laws of the State of Delaware, which has its corporate headquarters in the State of

20  New York, and that Time Warner regularly conducts significant ongoing business in the State

21  of California and in the County of Los Angeles. Time Warner is the parent company of both

22  Warner Bros. and DC. (Time Warner, Warner Bros. and DC are sometimes collectively

23  referred to hereinafter as the "Defendants;" and each reference to Defendants shall also refer

24  to each Defendant).

25       12.    Plaintiffs are informed and believe and based thereon allege that Defendant DC

26  never, or rarely, exploits "Superman," independently of its controlling parent company,

27  Warner Bros.; that even relatively linear functions such as "Superman" licensing are not

28  handled directly by DC, but are exploited exclusively through Warner Bros.; that the

3

**EXHIBIT 33**
**444**

1    agreements and other arrangements between Defendants Warner Bros. and DC regarding

2    "Superman" are not "arms length" agreements, serve primarily Warner Bros.' interests, and

3    thus, do not reflect the appropriate market values of the copyrights to "Superman," at issue

4    herein.

5         13.    Plaintiffs are informed and believe and based thereon allege that Defendants

6    Time Warner, Warner Bros. and DC are, and at all times material hereto were, the alter-egos

7    of each other and there exists and has existed at all times material hereto a unity of interest and

8    ownership among such Defendants such that any separateness has ceased to exist in that

9    Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for

10    its and/or their separate, individual purposes, and caused valuable assets, property, rights

11    and/or interests to be transferred to each other without adequate consideration.

12         14.    Plaintiffs are informed and believe and based thereon allege that the fictitiously

13    named Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them,

14    were in some manner responsible or legally liable for the actions, damages, events,

15    transactions and circumstances alleged herein. The true names and capacities of such

16    fictitiously named defendants, whether individual, corporate, associate, or otherwise are

17    presently unknown to Plaintiffs, and Plaintiffs will amend this Complaint to assert the true

18    names and capacities of such fictitiously named Defendants when the same have been

19    ascertained. For convenience, each reference herein to a named Defendant shall also refer to

20    the Doe Defendants and each of them.

21         15.    Plaintiffs are informed and believe and based thereon allege that each of the

22    Defendants was the agent, partner, servant, employee, or employer of each of the other

23    Defendants herein, and that at all times herein mentioned, each of the Defendants was acting

24    within the course and scope of such employment, partnership and/or agency and that each of

25    the Defendants is jointly and severally responsible for the damages hereinafter alleged.

26                  **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

27         16.    In 1933 Jerome Siegel conceived the original idea of a cartoon strip featuring a

28    unique man of superhuman strength and powers who would perform feats of great importance

<div align="center">4</div>

---

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

<div align="center">

**EXHIBIT 33**

**445**

</div>

for the public good.  Siegel conceived, in essence, the first "superhero" -- an original concept which embodied our nation's ideals at the Worlds' darkest hour, became a cultural icon and spawned, what is today, a booming industry.  Jerry Siegel entitled his character -- "Superman."

17.    In or about 1934, Jerome Siegel authored twenty-four days (four weeks) of "Superman" comic strips intended for newspaper publication, a synopsis of comic strips for weeks two, three and four, a paragraph previewing future "Superman" exploits and a nine page synopsis covering approximately two months of daily "Superman" newspaper comic strips (at six days per week).  Plaintiffs are informed and believe and based thereon allege that these works, though originally unpublished were thereafter included or incorporated in the early "Superman" comic strips thereafter published from on or about April 18, 1938 to April 13, 1943 (collectively, referred to hereinafter as the "Initially Unpublished Works").

18.    In or about 1934, Jerome Siegel and the artist, Joe Shuster (hereinafter collectively, "Siegel and Shuster") co-authored *fifteen* daily "Superman" comic strips, consisting of one week (six days) of completely inked daily "Superman" comic strips and three additional six day weeks of "Superman" comic strips in penciled form. (the "1934 Superman Comic Strip").  "Superman" was submitted by Siegel and Shuster to numerous publishers over the next few years.

19.    Although "Superman" was not picked up for publication for some time, Siegel and Shuster did get other features they created into print with the Nicholson Publishing Company including "Henri Duval" and "Dr. Occult."  In a letter dated October 4, 1935, the company's owner Malcolm Wheeler-Nicholson, wrote to Mr. Siegel expressing an interest in publishing "Superman" in comic book form but Siegel and Shuster rejected his offer. Nicholson became involved with a new comic magazine company, Detective Comics, Inc. (hereinafter, "Detective Comics") and two Siegel and Shuster features, "Slam Bradley" and "Spy," appeared in "Detective Comics No. 1."

20.    On or about December 4, 1937, Siegel and Shuster, as independent contractors, entered into an agreement with Detective Comics (the "1937 Agreement") to continue to

5

**EXHIBIT 33**
**446**

1 produce the comic magazine features, "Slam Bradley" and "The Spy," which agreement
2 provided, in part, that any new and additional features which Siegel and Shuster produced for
3 use in a comic magazine were to be first submitted to Detective Comics which reserved the
4 right to accept or reject same within sixty days.

5     21.    One of the early entities to whom Siegel had submitted "Superman" was The
6 McClure Newspaper Syndicate. In or about early 1938, the head of the syndicate sought
7 Siegel's permission to forward Siegel and Shuster's 1934 Superman Comic Strip material to
8 Detective Comics for potential publication in its contemplated new magazine, "Action
9 Comics." By this time, "Superman" and his miraculous powers had already been completely
10 developed by Siegel and Shuster.

11     22.    In or about January–February 1938, when Detective Comics expressed interest
12 to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel
13 and Shuster cut and pasted their aforementioned material into more than ninety separate
14 panels ("Revised 1934 Superman Comic Strip"), so as to render their newspaper strip more
15 suitable for a magazine layout.

16     23.    The "Superman" material described hereinabove, which was the independent,
17 original creation of Siegel and Shuster, contained virtually all of the signature elements and
18 characters of the "Superman" mythology and constituted the formula for the continuing
19 "Superman" series to come. It depicted and narrated the origin of the "Superman" character,
20 and contained a complete delineation of the literary and pictorial representation of
21 "Superman," including without limitation, his habits, character, superhuman powers,
22 appearance, costume, secret identity and attributes, and the sphere of public good "Superman"
23 was to enhance.

24     24.    By an instrument dated March 1, 1938 (hereinafter, the "1938 Grant"), which
25 had been prepared by Detective Comics, Siegel and Shuster agreed to the publication of their
26 Revised 1934 Superman Comic Strip by Detective Comics in consideration for the sum of
27 $130.

28

6

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

EXHIBIT 33
447

1    25.    Thereafter, Detective Comics published Siegel and Shuster's "Revised 1934

2    Superman Comic Strip" in the "June, 1938" issue of "Action Comics No. 1," which was

3    issued for sale on April 18, 1938.

4    26.    Action Comics No. 1 and the predecessor materials created solely by Siegel

5    and Shuster contained the essential elements of "Superman" which continue to this day,

6    including without limitation, Superman's origin from the distant planet, his "back-story" (sent

7    to Earth as an infant in a spaceship by his scientist father), his core physical and mental traits,

8    his mission as a champion of the oppressed to use his great powers to benefit humankind, his

9    secret identity as newspaper reporter, "Clark Kent," his relationship with other key characters

10   such as the newspaper editor from whom he takes his assignments and his romantic interest in

11   Lois, who rebuffs Clark as a coward, while romantically inclined towards "Superman."

12   27.    Action Comics No. 1 was followed by further issues published at regular

13   intervals, with each subsequent issue containing additional "Superman" material created by

14   Siegel and Shuster.

15   28.    Between March, 1938 and on or about September, 1938, Siegel and Shuster

16   continued to create "Superman" strips, stories and continuities.

17   29.    On or about September 22, 1938, Detective Comics, Siegel and Shuster entered

18   into an agreement with The McClure Newspaper Syndicate (hereinafter, the "1938 McClure

19   Agreement) regarding the newspaper syndication of a "Superman" comic strip.

20   30.    On or about September 22, 1938, Detective Comics and Siegel and Shuster

21   therefore entered into an agreement (hereinafter, the "1938 Agreement") which for the first

22   time provided that Detective Comics would thereby "employ and retain" Siegel and Shuster to

23   do the "artwork and continuity" for five comic strips, including "Superman."

24   31.    Prior to September 22, 1938, Siegel and Shuster solely created six comic book

25   issues of "Superman," published as Action Comics Nos. 1 through 6.  Of these, Action

26   Comics Nos. 1 through 5 had been published prior to September 22, 1938; and Action Comics

27   No. 6 was published four days later on September 26, 1938.

28

7

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**EXHIBIT 33**
**448**

1    32.    Action Comics No. 1 was not a "work made for hire." Action Comics Nos. 2-

2  6, which were thereafter created by Siegel and Shuster prior to their entering into the 1938

3  Agreement, were also not "works made for hire."

4    33.    On or about December 19, 1939, Detective Comics and Siegel and Shuster

5  entered into a supplemental agreement (hereinafter, the "1939 Agreement") which raised

6  Siegel and Shuster's per page compensation rate for the increasingly popular "Superman"

7  comic strip.

8    34.    Plaintiffs are informed and believe and thereon allege that the "Superman"

9  works created by Siegel and Shuster after they entered into the September 22, 1938 agreement

10  with Detective Comics were also not "works made for hire." The 1938 Agreement for the

11  first time used the term "employ and retain" with respect to Siegel and Shuster's subsequent

12  work on "Superman," yet Siegel and Shuster were never traditional employees of Detective

13  Comics. Without limitation, Siegel and Shuster were not paid a salary, but were consistently

14  paid on a "per page" basis, and only for materials actually delivered by them and published.

15  Plaintiffs are further informed and believe and thereon allege that in compensating Siegel and

16  Shuster, Detective Comics did not withhold or deduct payroll, social security and other taxes

17  normally deducted from employee salaries; Detective Comics did not provide employee

18  benefits to Siegel and Shuster; Siegel and Shuster worked from their own premises (not

19  Detective Comic's premises); determined their own hours and days of work; supplied, used

20  and paid for their own instrumentalities, tools and materials; and hired and paid for their own

21  assistants.

22    35.    In or about 1947, Siegel and Shuster filed an action in the Supreme Court of

23  the State of New York, County of Westchester against National Comics Publications, Inc.

24  (hereinafter, the "1947 Action" ) to determine the validity of the contracts between National

25  Comics Publications, Inc.'s predecessors–in–interest  and Siegel and Shuster with respect to

26  "Superman." Pursuant to stipulation of the parties the action was referred for decision to an

27  Official Referee of the New York Supreme Court. After trial of the action the Official Referee

28  rendered an opinion dated November 1, 1947. On April 12, 1948, the Official Referee signed

8

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**EXHIBIT 33**
**449**

1 | detailed findings of fact and conclusions of law and entered an interlocutory judgment
2 | upholding the contracts in some respects, to which notices of appeal were filed by all said
3 | parties. Settlement negotiations ensued, resulting in a stipulation of settlement between said
4 | parties executed on or about May 19, 1948 (hereinafter, the "1948 Stipulation"), and the entry
5 | in the New York Supreme Court of a final consent judgment dated May 21, 1948.

6 |     36.    In or about the early 1970's, a dispute arose between Siegel and Shuster and
7 | National Periodical Publications, Inc. regarding the renewal copyright to "Superman,"
8 | resulting in Siegel and Shuster's filing of an action against National Periodical Publications,
9 | Inc. in the United States District Court for the Southern District of New York for a declaration
10 | that Siegel and Shuster were entitled to the renewal copyright to "Superman." The District
11 | Court held in <u>Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et al.</u>,
12 | 364 F. Supp.1032 (1973) that the initial "Superman" comic strip, published in Action Comics
13 | No. 1, is a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. §26, and that,
14 | in any event, the various agreements between the parties, prior to the action, transferred the
15 | renewal copyright in this material to Detective Comics.

16 |     37.    On appeal, the United States Court of Appeals for the Second Circuit held
17 | in <u>Jerome Siegel and Joseph Shuster v. National Periodical Publications, Inc. et al.</u>, 509 F.2d
18 | 909 (2nd Cir., 1974), that the District Court erred in finding that Superman was a "work for
19 | hire" under the Copyright Act, 17 U.S.C. §26, and that "Superman" and his miraculous
20 | powers were created by Siegel and Shuster long before any employment relationship with
21 | Detective Comics. The Second Circuit nonetheless held that the Official Referee's
22 | determination in the 1947 Action that Siegel and Shuster had transferred all rights in
23 | "Superman" to Detective Comics implicitly included a determination that Siegel and Shuster
24 | had transferred the renewal copyright in "Superman" to Detective Comics; and that this
25 | determination was binding under the doctrine of *res judicata*.

26 |     38.    On or about December 23, 1975, Siegel and Shuster entered into an agreement
27 | with Warner Communications Inc. (hereinafter the "1975 Agreement") the alleged parent
28 | company of National Periodical Publications, Inc., which provided for (i) the payment of

<div align="center">9</div>

---

<div align="center">Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition</div>

<div align="center">**EXHIBIT 33**
**450**</div>

1 | $10,000 to Siegel and Shuster, modest annual payments plus medical benefits to Siegel and

2 | Shuster and, upon their deaths, to certain of their respective heirs; and (ii) that Siegel and

3 | Shuster would be given credit on certain "Superman" publications and derivative works as the

4 | "creators" of Superman, in exchange for Siegel and Shuster's acknowledgement that Warner

5 | Communications, Inc. is the exclusive owner of all right, title and interest in and to

6 | "Superman." (The 1937 Agreement, the 1938 Grant, the 1938 McClure Agreement, the 1938

7 | Agreement, the 1939 Agreement, the 1948 Stipulation and the 1975 Agreement described

8 | hereinabove are hereinafter sometimes referred to collectively as the "Alleged Grants".)

9 |        39.      On April 3, 1997, Plaintiffs, Joanne Siegel and Laura Siegel, served by first

10 | class mail, postage prepaid, notices of termination, as permitted by the Copyright Act, 17

11 | U.S.C. § 304 (c) (hereinafter, the "Termination Notices") on each of the Defendants and a

12 | number of their subsidiaries, licensees and affiliates, terminating the Alleged Grants of the

13 | renewal copyright to (i) the copyrightable "Superman" character, (ii) the 1933 Superman

14 | Comic Strip and the Revised 1933 Superman Comic Strip, both published as/in Action

15 | Comics No. 1,  (iii) the material published as/in Action Comics Nos. 1-6 (statutory copyright

16 | to Action Comics No. 6 was secured on September 26, 1938), (iv) the material published as/in

17 | Action Comics Nos. 7- 61 (statutory copyright to Action Comics No. 61 was secured on April

18 | 13, 1943), and/or (v) subsequent works involving "Superman," all as set forth in the Notices

19 | of Termination (hereinafter sometimes referred to collectively as the "Works").

20 |        40.      Plaintiffs are informed and believe and based thereon allege the Initially

21 | Unpublished Works set forth in the Termination Notices were incorporated or included in

22 | Works published thereafter, to which the Termination applies.

23 |        41.      Plaintiffs are further informed and believe and based thereon allege that the

24 | copyrights to all the Works were duly renewed.

25 |        42.      The Notices of Termination were drafted, served on Defendants and filed with

26 | the United States Copyright Office, all in full compliance with the Copyright Act, 17 U.S.C.

27 | 304(c), and the regulations promulgated thereunder by the Register of Copyrights, 37 C.F.R. §

28 |

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**EXHIBIT 33**
**451**

1   201.10 (2003). (Plaintiffs' aforesaid exercise of their termination rights under 17 U.S.C. §

2   304(c) regarding "Superman" is sometimes hereinafter referred to as the "Termination").

3         43.    As the original co-author of each Work Jerome Siegel owned an undivided fifty

4   percent (50%) of the copyright of each Work prior to any alleged transfer or assignment of any

5   such Work pursuant to any Alleged Grant.

6         44.    The Notices of Termination terminated on April 16, 1999 (hereinafter, the

7   "Termination Date") all prior grants or purported grants of the renewal copyrights in and to

8   each and/or all the Works for their extended renewal terms (hereinafter, sometimes referred to

9   individually and collectively as the "Recaptured Copyrights"), including, but not limited to,

10   the Alleged Grants.

11         45.    On April 16, 1999, the Termination Date, Plaintiffs re-gained ownership to

12   Jerome Siegel's undivided fifty percent (50%) copyright interest in and to each and/or all the

13   Works for their extended renewal terms. In accordance with 17 U.S.C. 304(c), and as set forth

14   in the Notices of Termination, Jerome Siegel's surviving son, Michael Siegel, is also entitled

15   to share in the proceeds from this recaptured interest.

16         46.    Defendants have acknowledged that the Notices of Termination are effective.

17   Defendants have further admitted that Plaintiff's thereby co-own the copyright(s) to at least

18   the original "Superman" elements authored by Siegel and Shuster; and that Defendants have a

19   duty to account to Plaintiffs for Defendants' exploitation of such copyright(s).

20         47.    On April 16, 1997, in response to the service of the Notices of Termination,

21   John A. Schulman, Executive Vice President and General Counsel of Defendant Warner Bros.

22   wrote a letter to Joanne Siegel, stating in relevant part:

23            "As to the Notices of Termination, I wasn't surprised at their

24            arrival...After the effective date of the termination, there will

25            still remain 14 years of copyright protection left to the joint

26            copyright holders of the original Superman elements. Those are

27            what we should share."

28

11

**EXHIBIT 33**
**452**

48.     Similarly, on October 10, 1997, Paul Levitz, President and Publisher of Defendant DC Comics, wrote a letter to Plaintiffs, stating in relevant part:

> "The [Superman] rights involved are non-exclusive; they are shared with DC. Since both you and DC would have these rights, we would each have the obligation to pay the other for using those rights if you did not re-grant them to DC."

49.     Yet, on April 15, 1999, one day before the Termination Date, Defendant DC, by its attorneys (Fross Zelnick, *et al*) sent a letter to the Plaintiffs' attorney, Arthur J. Levine, frivolously denying the validity of the termination with respect to *any* "Superman" copyrights, stating in relevant part:

> "[Y]ou are hereby put on notice that DC Comics rejects both the validity and scope of the notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed, any rights at all, in Superman."

50.     Defendant DC's April 15, 1999 letter constituted a thinly veiled threat that if Plaintiffs ever attempted to exploit *any* of their recaptured copyright interests in "Superman," Defendants would engage in a campaign of intimidation, including, but not limited to, instituting frivolous litigation against Plaintiffs and using Defendants' enormous market power to restrict Plaintiffs' ability to exploit their Recaptured Copyright interests. Given that Time Warner is one of the largest media companies in the world with over $38 billion in annual revenues, Defendants' threats had a devastating and chilling effect on Plaintiffs' freedom to exploit the copyright interests they had properly regained under the Copyright Act, 17 U.S.C. § 304 (c), damaging Plaintiffs and causing them great emotional distress.

51.     In the nearly 5 ½ years since the Termination Date, none of the Defendants has ever accounted to the Plaintiffs for any proceeds or profits whatsoever from their ongoing exploitation of "Superman" and the jointly owned Recaptured Copyrights.

////

12

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

EXHIBIT 33
453

## **FIRST CLAIM FOR RELIEF**

(Declaratory Relief Re: Termination, 17 U.S.C. § 304(c) - Against All Defendants)

52.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53.     By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiffs and Defendants under Federal copyright law, 17 U.S.C. §§ 101 *et seq.*, concerning their respective rights and interests in and to the copyright to various "Superman" works, for which Plaintiffs desires a declaration of rights.

54.     Plaintiffs contend and Defendants deny that:

        a.     The Notices of Termination terminated on April 16, 1999 all prior grants, assignments or transfers of copyrights for the extended renewal term in and to each and/or all of the Works (as defined in paragraph 39 hereinabove) to any of the Defendants and other parties duly served with the Notices of Termination, including their predecessors-in-interest;

        b.     As of the effective Termination Date, April 16, 1999, Plaintiffs owned and continue to own an undivided fifty percent (50%) of the Recaptured Copyrights to each and/or all the Works for their renewal terms;

        c.     By reason of the foregoing, Plaintiffs are entitled to fifty percent (50%) of any and all proceeds, compensation, monies, profits, gains and advantages from the exploitation of, or attributable to, in whole or in part, any aspect of the Recaptured Copyrights (hereinafter, sometimes referred to as "Profits"); and

        d.     By reason of the foregoing, Defendants own or control only fifty percent (50%) of the Recaptured Copyrights, and thus, as of the Termination Date, had and have no authority to confer exclusive licenses or grants with respect to any element of the "Superman" mythology protected by the Recaptured Copyrights.

55.     A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their respective rights and

13

**EXHIBIT 33**
**454**

1   obligations with respect to the Termination and the copyright interests thereby recaptured by

2   Plaintiffs.

## SECOND CLAIM FOR RELIEF

4   (Declaratory Relief Re: Profits from Recaptured Copyrights - Against All Defendants)

5        56.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 55

6   inclusive, as though fully set forth herein.

7        57.    By reason of the foregoing facts, an actual and justiciable controversy has

8   arisen and now exists between Plaintiffs and Defendants concerning how Profits from

9   Recaptured Copyrights should be defined for purposes of Defendants and Plaintiffs accounting

10  to one another as joint owners of the Recaptured Copyrights.

11       58.    Plaintiffs contend and Defendants deny that:

12           a.    Profits include Defendants' revenues from the post - April 16, 1999

13  exploitation of the Recaptured Copyrights in foreign territories, when such exploitation results

14  from the predicate exercise *in the United States* of any right(s) under the Recaptured

15  Copyrights by any Defendant, their licensees or assigns,;

16           b.    There should be no *apportionment* of Profits since Plaintiffs are entitled

17  to fifty percent (50%) of such Profits as *joint owners* of the Recaptured Copyrights;

18           c.    Alternatively, *apportionment*, if any, should apply only to profits from

19  the exploitation of the Recaptured Copyrights in *derivative works created by a Defendant*, but

20  not to profits from mere *licensing* of the Recaptured Works. Any such apportionment should

21  weigh heavily in Plaintiff's favor, since the value of the "Superman" franchise exploited by

22  the Defendants ("Superman Franchise") is largely attributable to the unique "Superman"

23  mythology protected by the Recaptured Copyrights. The Superman Franchise capitalizes on

24  the success of, and is hardly distinguishable from, the underlying Recaptured Copyrights co-

25  owned by Plaintiffs;

26           d.    Profits include profits from any merchandise or other derivative works

27  created, produced or manufactured on or after the Termination Date, April 16, 1999,

28

14

**EXHIBIT 33**
**455**

1 | notwithstanding that the underlying licensing agreement for such exploitations may have been

2 | executed prior thereto;

3 |   e.   Profits are not limited to the Profits of Defendant DC, Warner Bros.'

4 | wholly owned subsidiary, but include the Profits of Defendants Warner Bros. and Time

5 | Warner, as well; and

6 |   f.   In determining Profits, deductible costs should include only reasonable

7 | costs directly attributable to the exploitation of the Recaptured Copyrights, of the type

8 | customarily deducted in arms' length agreements to exploit copyrights of comparable value,

9 | all in compliance with Generally Accepted Accounting Principles (GAAP).

10 |   59.   A declaration of the Court is necessary pursuant to the Declaratory Judgment

11 | Act, 28 U.S.C. §§ 2201 *et seq.* so that the parties may know their respective rights and

12 | obligations with respect to Profits from the exploitation of the Recaptured Copyrights after the

13 | Termination Date.

14 | **THIRD CLAIM FOR RELIEF**

15 | (Declaratory Relief Re: Use of the "Superman" Crest - Against All Defendants)

16 |   60.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 59

17 | inclusive, as though fully set forth herein.

18 |   61.   By reason of the foregoing facts, an actual and justiciable controversy has

19 | arisen and now exists between Plaintiffs and Defendants concerning whether Plaintiffs are

20 | entitled, after the Termination Date, to commercially exploit the "Superman" crest comprised

21 | of a large red "S" centered on a broad triangular yellow field, first appearing (as part of

22 | "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest)

23 | in the 1934 Superman Comic Strip and the 1934 Revised Superman Comic Strip created by

24 | Siegel and Shuster and the published as Action Comics No. 1, and in only slightly revised

25 | form in subsequent Works (hereinafter the "Superman Crest"); and whether Defendants' duty

26 | to account, as non-exclusive joint owners of such Recaptured Copyrights, include Profits from

27 | licensing of this crest.

28 |

15

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**EXHIBIT 33**
**456**

62. Defendants allege a trademark interest in a "Superman" shield (hereinafter the "Superman Shield" and/or "Superman Trademark") which is also comprised of a large red "S" on a broad triangular yellow field, first appearing in later Works, as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest, with the upper corners of the triangular crest slightly cropped.

63. Plaintiffs contend and Defendants deny that:

a. The Recaptured Copyrights include the copyright to the "Superman" crest comprised of a large red "S" centered on a broad triangular yellow field, first appearing as part of "Superman's" costume, centered on and highlighting Superman's "V" shaped muscular chest, in the 1934 Superman Comic Strip and the Revised 1934 Superman Comic Strip published as Action Comics No. 1, and appeared in subsequently published Works in only slightly revised form (hereinafter the "Superman Crest").

b. Defendants' alleged Superman Trademark design arose directly from, and is substantially identical to, Siegel and Shuster's copyrighted Superman Crest;

c. Defendants receive significant proceeds and value from the utilization and copying of the Superman Crest and/or substantially identical Superman Shield for which Defendants must account to Plaintiffs;

d. In turn, Plaintiffs should likewise be allowed to exercise their rights under copyright with respect to the Superman Crest, including without limitation the right to commercially exploit the Superman Shield in merchandise;

e. Defendants, in any event, cannot use the alleged Superman Trademark or any other purported trademark interest regarding "Superman" to prevent, hinder or restrain Plaintiffs' use, exercise or exploitation of their rights under the Copyright Act in any of the jointly owned Recaptured Copyrights.

64. A declaration of the Court is necessary pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., so that the parties may know their respective rights and obligations with respect to the Superman Crest and the Superman Shield.

////

16

## **FOURTH CLAIM FOR RELIEF**

(Accounting for Profits - Against All Defendants)

65.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66.     On or after the Termination Date, April 16, 1999, Defendants and/or each of them have licensed and/or commercially exploited and will continue to license or exploit the Recaptured Copyrights, including without limitation, *via* merchandising, publishing, and derivative motion picture and television programming.

67.     As result of such licensing and/or commercial exploitation of the Recaptured Copyrights on or after April 16, 1999, Defendants and/or each of them have received and will continue to receive substantial Profits, fifty percent (50%) of which is payable to Plaintiffs as the joint owner of the Recaptured Copyrights.

68.     Defendant Warner Bros. has acted and continues to act in most instances as the effective joint-owner and licensor (as opposed to licensee) of the Recaptured Copyrights; and, as such, Warner Bros., along with the other Defendants, owes a duty to account to Plaintiffs.

69.     To date, the Profits received by Defendants and/or each of them from such licensing and/or commercial exploitation on or after April 16, 1999 is estimated to be $40 million, however the exact sums actually received and to be received by Defendants and/or each of them, are unknown to Plaintiffs at this time, for these amounts can be properly determined only by an accounting.

70.     Plaintiffs have demanded an accounting by Defendants on a continuing basis of all amounts received by them and/or payable to them from such licensing and other commercial exploitation on or after April 16, 1999, and that Defendants pay Plaintiffs their fifty percent (50%) share of all such Profits.

71.     In nearly 5 ½ years since the Termination Date, Defendants have, nonetheless, never accounted to or paid any Profits whatsoever to Plaintiffs.

/ / / /

/ / / /

17

**EXHIBIT 33**
**458**

72.     Plaintiffs at no time waived their rights to receive their share of such Profits, nor have Plaintiffs at any time consented to the use and exploitation of the Recaptured Copyrights in the United States or any foreign territories.

73.     Plaintiffs are entitled to an ongoing accounting from Defendants regarding all amounts received, realized by or payable to Defendants on or after April 16, 1999 from the licensing and any other commercial exploitation of the Recaptured Copyrights and "Superman Franchise," and to the payment by Defendants to Plaintiffs of fifty percent (50%) of all such Profits.

## FIFTH CLAIM FOR RELIEF

(Waste of Co-Owned Copyright - Against All Defendants)

74.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 73 inclusive, as though fully set forth herein.

75.     On or about April 16, 1999, Plaintiffs became and currently are the co-owners, as tenants in common, with Defendants of an undivided fifty percent (50%) of the Recaptured Copyrights.

76.     The April 15, 1999 letter from Defendant DC's attorneys alleged hereinabove baselessly denied the validity of the Termination with respect to *any* and all "Superman" copyrights and threatened to take action against Plaintiffs if they attempted to exploit *any* of their Recaptured Copyrights.

77.     In so threatening Plaintiffs, DC, and by extension DC's parent companies, Warner Bros. and Time Warner, asserted exclusive ownership and control of "Superman" and effectively controlled the Recaptured Copyrights, notwithstanding the Termination.

78.     Plaintiffs are informed and believe and thereon allege that in light of Defendants' adverse claims, resources, power and ubiquitous presence in the marketplace, virtually no parties would dare to license the Recaptured Copyrights from Plaintiffs.

79.     Plaintiffs are informed and believe and thereon allege that since the Termination Date, Defendants and/or each of them have caused injury to the Recaptured Copyrights by committing waste thereon.  Plaintiffs are informed and believe and thereon

18

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

EXHIBIT 33
459

1  allege that such waste includes, without limitation, Defendants under-utilization of the

2  Recaptured Copyrights, non "arms length" contracts between wholly owned subsidiaries

3  and/or divisions, self-serving accounting practices and the improper allocation of revenues,

4  costs and profits with respect to the Recaptured Copyrights, and the overall weakening of the

5  Superman Franchise due to Defendants relatively marginal exploitation thereof in a period

6  when market opportunities for such a superhero franchise has been and continues to be at an

7  all time high.

8      80.    The ongoing waste by Defendants has caused and continues to cause great

9  irreparable injury to Plaintiffs as co-owners of the Recaptured Copyrights, and such damages

10  are particularly acute given that the Recaptured Copyrights are of limited duration.

11      81.    By reason of the foregoing, Defendants have committed waste on the

12  Recaptured Copyrights, and as a direct and proximate result thereof, have damaged Plaintiffs

13  in an amount not yet ascertained, but which will be assessed at the time of trial.

14      82.    Plaintiffs are informed and believe and thereon allege that Defendants'

15  frivolous denial of the validity of the Termination with respect to any "Superman" copyrights;

16  Defendants' threats to bring suit against Plaintiffs if they attempted to exploit any of their

17  recaptured copyright interest; and Defendants willful failure to account and improper

18  accounting practices, after the Termination Date, were conducted in an intentional, malicious,

19  calculated and oppressive manner in conscious disregard for Plaintiffs' rights, health and

20  feelings, and knowingly and intentionally injured and damaged Plaintiffs, which conduct

21  constituted oppression and malice as defined by California Civil Code § 3294. In accordance

22  with California Civil Code § 3294, Plaintiffs are entitled to punitive damages in an amount

23  sufficient to punish Defendants, to be assessed at trial.

24                          **FIFTH CLAIM FOR RELIEF**

25      (Violation of the Lanham Act § 43(a), 15 U.S.C. § 1125 - Against All Defendants)

26      83.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 82

27  inclusive, as though fully set forth herein.

28  / / / /

19

**EXHIBIT 33**
**460**

84.     Plaintiffs are informed and believe and thereon allege that Defendants have failed and refused to include Plaintiffs names, as co-owners of the Recaptured Copyrights, on any and all copyright notices pertaining to such Recaptured Copyrights, with a willful intention to mislead and misrepresent the nature, qualities, and origins of Defendants' goods, services or commercial activities.

85.     Plaintiffs are informed and believe and thereon allege that Defendants DC, Warner Bros. and Time Warner have falsely represented to third parties that Defendants are the *exclusive* owners of all copyrights to the Recaptured Copyrights and based upon such false claims, representations and omissions have induced others to enter into agreements with them, including but not limited to agreements to *exclusively* license, develop, and create new derivative works from the Recaptured Copyrights.

86.     Plaintiffs are informed and believe and thereon allege that Defendants used such false designations, attributions and omissions regarding the Recaptured Copyrights in interstate commerce in order to induce others to enter into contracts or other forms of business arrangements with Defendants for the exploitation of Recaptured Copyrights.  Such actions constitute the use of false description or representation in interstate commerce, likely to cause confusion, mistake or to deceive and is in opposition to the protection of the public interest.

87.     Defendants have passed off and continue to pass off and misrepresent the Recaptured Copyrights which are co-owned by Plaintiffs as being exclusively owned by Defendants, thus appropriating Plaintiffs' rights in the Recaptured Copyrights and depriving Plaintiffs of their rights to ownership credit in, and use of, the Recaptured Copyrights and of attendant goodwill, resulting in likely confusion of and a fraud on the public.

88.     Plaintiffs are informed and believe and thereon allege that in doing so Defendants were attempting to pass off the Recaptured Copyrights as Defendants sole property in a manner calculated to deceive Plaintiffs' potential licensors and/or customers and members of the public.

89.     Defendants' passing off and false and misleading designation have proximately caused and will continue to cause Plaintiffs substantial injury and damage including, without

<div align="center">20</div>

<div align="center">**EXHIBIT 33**
**461**</div>

1  limitation, loss of customers, dilution of goodwill, injury to their business reputation, and

2  diminution of the value of the Recaptured Copyrights.  The ongoing harm this wrongful

3  conduct will cause to Plaintiffs is both imminent and irreparable, and the amount of damage

4  sustained by Plaintiffs will be difficult to ascertain if such wrongful conduct is allowed to

5  continue unabated.

6         90.     By reason of the foregoing, Defendants have violated and are continuing to

7  violate the Lanham Act, 15 U.S.C. § 1125.

8         91.     Plaintiffs are entitled to an injunction, during the pendency of this action, and

9  permanently, restraining Defendants, their officers, agents and employees, and all persons

10  acting in concert with them, from *exclusively* licensing or granting rights to any element of the

11  Superman Franchise protected by the Recaptured Copyrights

12         92.     Plaintiffs are entitled to injunctive relief during the pendency of this action and

13  permanently, restraining Defendants, their agents, employees, and all persons acting in concert

14  with them, from engaging in any further violations of the Lanham Act, and to require

15  Defendants to include Plaintiffs' names on all copyright notices relating to the Recaptured

16  Copyrights.

17         93.     Plaintiffs have no adequate remedy at law with respect to these ongoing

18  violations.

19         94.     Plaintiffs are further entitled to recover from Defendants the damages,

20  including attorneys' fees and costs, it sustained and will sustain, and any income, gains,

21  profits, and advantages obtained by Defendants as a result of their acts and omissions alleged

22  hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed

23  at the time of trial.

24         95.     Plaintiffs are informed and believe and thereon allege that Defendants'

25  wrongful conduct, acts and omissions were conducted in an intentional, callous, and

26  calculated manner in conscious disregard for Plaintiffs' rights, health and feelings, and

27  knowingly and intentionally injured and damaged Plaintiffs, which conduct constituted

28  oppression and malice as defined by California Civil Code § 3294.  In accordance with

<div align="center">21</div>

<div align="center">**EXHIBIT 33**
**462**</div>

1 | California Civil Code § 3294, Plaintiffs are entitled to punitive damages in an amount

2 | sufficient to punish Defendants DC, Warner Bros. and Time Warner, to be assessed at trial.

3 | <div align="center">**SIXTH CLAIM FOR RELIEF**</div>

4 | <div align="center">(Violation of California Business and Professions Code, §§ 17200 *et seq*.</div>

5 | <div align="center">(Unfair Competition) - Against All Defendants)</div>

6 |      96.    Plaintiffs re-allege and incorporate herein by reference the allegations set forth

7 | in paragraphs 1 through 95, inclusive, as though fully set forth herein.

8 |      97.    In addition to the wrongful acts and omissions alleged hereinabove and

9 | incorporated herein, Plaintiffs are informed and believe that since the Termination Date,

10 | Warner Bros.' and its parent, Time Warner, have intentionally omitted from Time Warner's

11 | Annual Reports on Form 10-K, Quarterly Reports on Form 10 Q, Current Reports on Form 8-

12 | K and other publicly reported documents any and all mention of the Termination, even though

13 | it drastically reduces their ownership interest in "Superman" -- one of their most valuable

14 | intellectual properties. Such systematic public misrepresentations by omission are likely to

15 | deceive, cause confusion and mistake and are an affront to the public interest.

16 |      98.    Defendants' wrongful conduct, acts, and omissions alleged hereinabove

17 | constitute unlawful, unfair business practices and unfair competition under California

18 | Business and Professions Code §§ 17500 *et seq*., and under the common law.

19 |      99.    As a direct and proximate result of Defendants' conduct, acts, and omissions as

20 | alleged hereinabove, Plaintiffs are entitled to recover their share of any income, gains,

21 | compensation, profits and advantages obtained, received or to be received by Defendants, or

22 | any of them, arising from the licensing and any other exploitation of the Recaptured

23 | Copyrights; and are entitled to an order requiring Defendants, jointly and severally, to render

24 | an accounting to ascertain the amount of such proceeds.

25 |      100.    As a direct and proximate result of Defendants' wrongful conduct, acts and

26 | omissions pleaded hereinabove, Plaintiffs have been damaged, and Defendants have been

27 | unjustly enriched, in an amount that shall be assessed at trial for which damages and/or

28 | restitution and disgorgement is appropriate.  Such damages and/or restitution and

<div align="center">22</div>

---

<div align="center">Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition</div>

<div align="center">**EXHIBIT 33**

**463**</div>

1  disgorgement should include a declaration by this Court that Defendants are jointly and

2  severally the constructive trustee for the benefit of Plaintiffs and an order that Defendants

3  convey to Plaintiffs fifty percent (50%) of all proceeds and other compensation received or to

4  be received by Defendants that are attributable the licensing or exploitation on or after the

5  Termination Date of the Recaptured Copyrights.

6        101.    Defendants' wrongful conduct, acts, omissions have proximately caused and

7  will continue to cause Plaintiffs substantial injury and damage including, without limitation,

8  loss of customers, dilution of goodwill, injury to Plaintiffs' reputation, and diminution of the

9  value of Plaintiffs' joint ownership interest in the Recaptured Copyrights.  The harm this

10  wrongful conduct will cause to Plaintiffs is both imminent and irreparable, and the amount of

11  damage sustained by Plaintiffs will be difficult to ascertain if such wrongful conduct is

12  allowed to continue without restraint.

13        102.    Plaintiffs are entitled to an injunction, during the pendency of this action, and

14  permanently, restraining Defendants, their officers, agents and employees, and all persons

15  acting in concert with them, from *exclusively* licensing or granting rights to any element of the

16  Superman Franchise protected by the Recaptured Copyrights

17        103.    Plaintiffs are entitled to an injunction, during the pendency of this action, and

18  permanently, restraining Defendants, their officers, agents and employees, and all persons

19  acting in concert with them, from engaging in any such further unlawful conduct, and

20  requiring Defendants to include Plaintiffs' names on all copyright notices relating to the

21  Recaptured Copyrights.

22        104.    Plaintiffs have no adequate remedy at law with respect to such ongoing

23  unlawful conduct.

24        105.    Plaintiffs are informed and believe and thereon allege that Defendants'

25  wrongful conduct, acts and omissions were conducted in an intentional, malicious, calculated

26  and oppressive manner in conscious disregard for Plaintiffs' rights, health and feelings, and

27  knowingly and intentionally injured and damaged Plaintiffs, which conduct constituted

28  oppression and malice as defined by California Civil Code § 3294.  In accordance with

<div align="center">23</div>

---

<div align="center">Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition</div>

<div align="center">**EXHIBIT 33**
**464**</div>

1  California Civil Code § 3294, Plaintiffs are entitled to punitive damages in an amount

2  sufficient to punish Defendants, to be assessed at trial.

3      WHEREFORE, Plaintiffs pray for relief as follows:

4                          **PRAYER FOR RELIEF**

5                     <u>ON THE FIRST CLAIM FOR RELIEF</u>

6      106.   For a declaration as follows:

7              a.      That pursuant to the Copyright Act, 17 U.S.C.§304(c), Plaintiffs validly

8  terminated on April 16, 1999 all prior grants, assignments or transfers to any of the

9  Defendants and any of their predecessors-in-interest, of the renewal copyrights in and to each

10 and/or all of the Works;

11             b.      That, as of the Termination Date, Plaintiffs owned and continue to own

12 fifty percent (50%) of the aforesaid Recaptured Copyrights;

13             c.      That Defendants control only fifty percent (50%) of the Recaptured

14 Copyrights, and thus, as of the Termination Date, had/have no authority to confer *exclusive*

15 licenses or grants with respect to any element of the "Superman" mythology protected by the

16 Recaptured Copyrights; and

17             d.      That Plaintiffs are entitled to fifty percent (50%) of any and all Profits

18 from the exploitation of, or attributable to, in whole or in part, any aspect of the Recaptured

19 Copyrights.

20                    <u>ON THE SECOND CLAIM FOR RELIEF</u>

21     107.   For a declaration as follows:

22             a.      That as joint owners of the Recaptured Copyrights, Plaintiffs are

23 entitled to an accounting for Profits received or payable to the Defendants;

24             b.      That Profits include Defendants' revenues from the post - April 16,

25 1999 exploitation of the Recaptured Copyrights in territories outside of the United States

26 whenever such exploitation is based on the predicate exercise *in the United States* of any

27 right(s) in and to the Recaptured Copyrights by any Defendant, their licensees or assigns;

28

                                    24

**EXHIBIT 33**
**465**

1    c.  That there should be no *apportionment* of Profits since Plaintiffs are

2 entitled to fifty percent (50%) of such Profits as joint owners of the Recaptured Copyrights;

3    d.  Alternatively, that apportionment should apply only to profits from the

4 exploitation of the Recaptured Works in *derivative works created by a Defendant*, but not to

5 profits from *licensing* of the Recaptured Works;

6    e.  That apportionment, if any, should weigh strongly in Plaintiff's favor,

7 since the value of the Superman Franchise is largely attributable to the unique "Superman"

8 character and other elements created by Siegel and Shuster and protected by the Recaptured

9 Copyrights, in a percentage that the court may deem just and proper;

10    f.  That Profits include profits from any merchandise or other derivative

11 works created, produced or manufactured on or after the Termination Date, April 16, 1999,

12 notwithstanding that underlying licensing for such exploitation may have occurred prior

13 thereto;

14    g.  That Profits include the Profits of Defendants DC, Warner Bros. and

15 Time Warner, their subsidiaries and divisions; and

16    h.  That in determining Profits, only reasonable costs directly attributable

17 to the exploitation of the Recaptured Copyrights, of the type customarily deducted in arms'

18 length agreements to exploit copyrights of comparable value to the Recaptured Copyrights,

19 should be deducted from gross revenues, all in compliance with Generally Accepted

20 Accounting Principles (GAAP).

21     <u>ON THE THIRD CLAIM FOR RELIEF</u>

22  108. For a declaration as follows:

23    a.  That by the Termination, Plaintiffs recaptured a fifty percent (50%)

24 interest in the copyright to the Superman Crest created by Siegel and Shuster;

25    b.  That Defendants' Superman Shield design arose directly from, and is

26 substantially identical to, the copyrighted Superman Crest created by Siegel and Shuster;

27

28

<div align="center">25</div>

---

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

<div align="center">**EXHIBIT 33**
**466**</div>

1            f.      That Defendants must account to Plaintiffs for fifty percent (50%) of

2 the proceeds they receive from the licensing or other exploitation of the Superman Crest

3 and/or Superman Shield;

4            g.     That Plaintiffs, as co-owners of the copyright in and to the Superman

5 Crest, likewise are permitted to license or otherwise exploit the Superman Crest, subject to a

6 duty to account to Defendants for any such exploitation; and

7            h.     That Defendants cannot use their alleged trademark in the Superman

8 Shield or any other alleged trademark interest with respect to "Superman" to prevent, hinder

9 or restrain Plaintiffs' use, exercise or exploitation of Plaintiffs' rights under the Copyright Act

10 in the jointly owned Recaptured Copyrights.

11 <center>ON THE FOURTH CLAIM FOR RELIEF</center>

12     109.   For an accounting by the Defendants, jointly and severally, of any and all

13 proceeds from the licensing and any other exploitation of the Recaptured Copyrights or

14 Superman Franchise on or after the Termination Date, April 16, 1999;

15     110.   For 50% of any and all proceeds from the licensing and any other exploitation

16 of the Recaptured Works or "Superman Franchise" on or after April 16, 1999 pursuant to such

17 accounting; and

18     111.   For the imposition of a constructive trust for the benefit of Plaintiffs on all

19 sums received and to be received by the Defendants, jointly or severally, derived from the

20 licensing and any other exploitation of the Recaptured Works or "Superman Franchise" on or

21 after April 16, 1999.

22 <center>ON THE FIFTH CLAIM FOR RELIEF</center>

23     112.   For compensatory and consequential damages according to proof as shall be

24 determined at trial; and

25     113.   For punitive and exemplary damages as may be awarded at trial.

26 / / / /

27 / / / /

28 / / / /

<center>26</center>

<center>**EXHIBIT 33**
**467**</center>

<div align="center">ON THE SIXTH CLAIM FOR RELIEF</div>

114.    For an order preliminarily and thereafter permanently enjoining Defendants from *exclusively* licensing or granting rights to any element of the Superman Franchise protected by the Recaptured Copyrights;

115.    For an order preliminarily and thereafter permanently requiring Defendants include Plaintiffs' names on any and all copyright notices relating to the Recaptured Copyrights;

116.    For compensatory and consequential damages according to proof as shall be determined at trial;

117.    For such other and further relief and remedies available under the Lanham Act, 15 U.S.C. § 1125, which the Court may deem just and proper; and

118.    For punitive and exemplary damages as may be awarded at trial.

<div align="center">ON THE SEVENTH CLAIM FOR RELIEF</div>

119.    For an accounting of all Profits;

120.    For the imposition of a constructive trust on all Profits received and to be received;

121.    For restitution to Plaintiffs of Defendants' unlawful proceeds;

122.    For an order preliminarily and thereafter permanently enjoining Defendants from *exclusively* licensing or granting rights to any element of the Superman Franchise protected by the Recaptured Copyrights;

123.    For an order preliminarily and thereafter permanently requiring Defendants include Plaintiffs' names on any and all copyright notices relating to the Recaptured Copyrights;

124.    For compensatory and consequential damages according to proof as shall be determined at trial;

125.    For such other and further relief and remedies available under California Business and Professions Code, §§ 17200 *et seq.*, which the Court may deem just and proper; and

<div align="center">27</div>

<div align="center">**EXHIBIT 33**
**468**</div>

1    126.    For punitive and exemplary damages as may be awarded at trial.

2                        ON ALL CLAIMS FOR RELIEF

3    127.    For Plaintiffs' costs of suit;

4    128.    For interest at the highest lawful rate on all sums awarded Plaintiffs other than

5    punitive damages;

6    129.    For reasonable attorneys' fees; and

7    130.    For such other and further relief as the Court may deem just and proper.

8    Dated: October  _8_, 2004              LAW OFFICE OF MARC TOBEROFF

9
                                           By: _____
10                                               Marc Toberoff

11                                         Attorneys for Plaintiffs Joanne Siegel and
                                           Laura Siegel Larson
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                28

EXHIBIT 33
469

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY TRIAL DEMANDED**

Plaintiffs hereby request a trial by jury on each claim for relief alleged in the Complaint.

Dated: October 8, 2004

LAW OFFICE OF MARC TOBEROFF

By: _____
          Marc Toberoff

Attorneys for Plaintiffs Joanne Siegel and Laura Siegel Larson

29

Complaint for Declaratory Relief, Accounting, Lanham Act Violations and Unfair Competition

**EXHIBIT 33**
**470**

# EXHIBIT 34

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
Patrick T. Perkins (Admitted *pro hac vice*)
James D. Weinberger (Admitted *pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: 212.813.5900
Fax: 212.813.5901

LOEB & LOEB LLP
Jonathan Zavin (Admitted *pro hac vice*)
345 Park Avenue
New York, NY 10154
Telephone: 212.407.4000
Fax: 212.407.4990

LOEB & LOEB LLP
David Grossman (State Bar. No. 211326)
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4164
Telephone: 310.282.2000
Fax: 310.282.2200

Attorneys for Defendants Warner Bros.
Entertainment Inc., Time Warner Inc., and
Defendant and Counterclaimant DC Comics

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE SIEGEL, an individual; and LAURA SIEGEL LARSON, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> WARNER BROS. ENTERTAINMENT INC., a corporation; TIME WARNER INC., a corporation; DC COMICS, a general partnership; and DOES 1-10. <br><br> Defendants. | Case No. 04-8400 (DDP) (RZx) <br><br> **ANSWER AND COUNTERCLAIMS** |

**EXHIBIT 34**
**471**

DC COMICS,

        Counterclaimant,

    vs.

JOANNE SIEGEL, an individual; and
LAURA SIEGEL LARSON, an individual,

        Counterclaim Defendants.

      Defendants Warner Bros. Entertainment Inc. ("Warner Bros."), Time Warner Inc. ("Time Warner"), and DC Comics ("DC" or "DC Comics") (collectively "Defendants"), by their attorneys, answer the Complaint, as corrected by plaintiffs' Notice of Errata Re: Plaintiffs' Complaint filed October 28, 2004:

      1.    Defendants admit only that plaintiffs have brought this civil action for the alleged causes of action set forth in the Complaint, but otherwise deny the allegations in paragraph 1.

      2.    Defendants admit only that plaintiffs purport to assert that this Court has subject matter jurisdiction as alleged in paragraph 2 but otherwise deny the allegations contained in the Complaint.

      3.    Defendants admit only that plaintiffs purport to assert that this Court has supplemental jurisdiction as alleged in paragraph 3 but otherwise deny the allegations contained in the Complaint.

      4.    Defendants admit only that they regularly do business in the State of California and in this District but otherwise deny the allegations in paragraph 4.

      5.    Admitted.

      6.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 and on that basis deny the same.

EXHIBIT 34
472

7.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and on that basis deny the same.

8.    Admitted.

9.    Defendants deny the allegations contained in paragraph 9 except admit that DC Comics is a New York General Partnership comprised of Warner Communications, Inc. and E.C. Publications, Inc.

10.    Defendants deny the allegations in paragraph 10 except admit that DC Comics is the successor-in-interest to, *inter alia*, Detective Comics, Inc. and National Periodical Publications, Inc. and except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

11.    Defendants deny the allegations contained in paragraph 11 except admit that Time Warner Inc. is a Delaware corporation with its corporate headquarters in the State of New York and that certain of its wholly owned subsidiaries regularly conduct business in the State of California and in the County of Los Angeles.  Defendants further admit that defendant Warner Bros. is affiliated with defendant Time Warner Inc. and that DC Comics is a New York general partnership whose general partners are entities affiliated with defendant Time Warner Inc.

12.    Denied.

13.    Denied.

14.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 and on that basis deny the same.

15.    Denied.

16.    Defendants admit only that in 1933 Siegel and Shuster co-created a character entitled Superman, which character was thereafter substantially changed

EXHIBIT 34
473

prior to its first publication in 1938 but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 16 and on that basis deny the same.

17.    Defendants admit only that during the 1930s Siegel and Shuster created twenty-four days of comic strips featuring a character entitled Superman and a paragraph previewing future Superman exploits, but lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 and on that basis deny the same.

18.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 and on that basis deny the same.

19.    Defendants admit only that Siegel and Shuster's work on features entitled "Henri Duval" and "Dr. Occult" was published by the Nicholson Publishing Company during the 1930s, that Malcolm Wheeler-Nicholson was involved with Detective Comics, Inc. and that work that Siegel and Shuster did on features entitled "Slam Bradley" and "Spy" was published in a comic magazine entitled "Detective Comics No. 1," but lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 19 and on that basis deny the same.

20.    Defendants admit only that on or about December 4, 1937, Jerry Siegel and Joe Shuster entered into an agreement with Detective Comics, Inc. but deny the remaining allegations in paragraph 20 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

21.    Defendants deny that Superman and his "miraculous powers" had all been completely developed by early 1938 and otherwise Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 and on that basis deny the same.

EXHIBIT 34
474

22.    Defendants admit only that in early 1938 defendants' predecessor, Detective Comics, Inc., requested that Siegel and Shuster turn certain Superman comic strips they had co-created, along with additional material that Siegel and Shuster would newly create, into a 13-page comic book story suitable for publication in a comic magazine format, and that Siegel and Shuster thereafter delivered such a comic book story to Detective Comics, Inc. and that such story contained approximately 90 separate panels, but defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 22 and on that basis deny the same.

23.    Defendants deny the allegations contained in paragraph 23 except admit that certain elements and characters of the Superman mythology such as his origins from a distant planet, some of his physical traits, and his secret identity as Clark Kent were contained in Action Comics No. 1 and except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

24.    Defendants admit only that Siegel and Shuster entered into an agreement with Detective Comics, Inc. dated March 1, 1938 whereby Siegel and Shuster transferred to Detective Comics, Inc. "the strip entitled 'Superman' . . . all good will attached thereto and exclusive right to the use of the characters and story, continuity and title of strip . . ." and agreed not to employ Superman and other characters in the strip "by their names contained therein," but otherwise deny the allegations contained in paragraph 24 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

25.    Defendants admit that Detective Comics, Inc. published a Superman comic story in Action Comics No. 1 with a cover date of June 1938, lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 relating to the "Revised 1934 Superman

**EXHIBIT 34**
**475**

Comic Strip" and on that basis deny the same, and deny the remaining allegations in paragraph 25, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

26.    Defendants deny the allegations in paragraph 26 except admit that Action Comics No. 1 contains Superman's origin from a distant, unnamed planet, some of his physical traits, his secret identity as Clark Kent, a co-worker named "Lois," and deny the remaining allegations in paragraph 26 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

27.    Defendants admit only that following Action Comics No. 1, at the instance and expense of Detective Comics, Inc., and subject to its right of control, Siegel and Shuster jointly created some additional Superman episodes that appeared in subsequent issues of Action Comics but deny the remaining allegations in paragraph 27, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

28.    Defendants admit only that between March 1938 and September 1938, Siegel and Shuster jointly created Superman strips, stories and continuities at the instance and expense of Detective Comics, Inc. and subject to its right of control, but deny the remaining allegations in paragraph 28, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

29.    Defendants admit only that on September 22, 1938 Detective Comics, Inc., Siegel, Shuster, and The McClure Newspaper Syndicate entered into an agreement but deny the remaining allegations in paragraph 29, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

EXHIBIT 34
476

30.    Defendants admit only that on September 22, 1938 Detective Comics, Inc., Siegel, and Shuster entered into an agreement but otherwise deny the allegations in paragraph 30 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

31.    Defendants admit only that between March 1938 and September 1938, Siegel and Shuster provided certain of the contents for Action Comics Nos. 1-6 and that Action Comics Nos. 2-6 were created at the instance and expense of Detective Comics, Inc. and subject to its right of control, and that Action Comics Nos. 1-5 were published prior to September 22, 1938; lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 relating to the publication date of Action Comics No. 6 and on that basis deny the same; and deny the remaining allegations in paragraph 31, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

32.    Denied.

33.    Defendants only admit that Siegel and Shuster entered into an agreement with Detective Comics, Inc. on December 19, 1939 but otherwise deny the allegations in paragraph 33, except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

34.    Defendants deny the allegations contained in the first three sentences of paragraph 34, except that with respect to the allegations in the third sentence of paragraph 34, to the extent they accurately reflect the contents of documents, respectfully refer the Court to such documents for evidence of the contents thereof. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 and on that basis deny the same.

EXHIBIT 34[7]
477

35.    Defendants admit the allegations of paragraph 35 except that defendants deny that the Official Referee's opinion in the 1947 Action was dated November 1, 1947, deny that the Official Referee only "up[held] the contracts in some respects," and lack knowledge or information sufficient to form a belief as to whether the Official Referee "signed" detailed findings of fact on April 12, 1948 and on that basis deny the same.

36.    Defendants admit the allegations contained in the first sentence of paragraph 36 except as to the date on which the dispute arose, but otherwise deny the allegations in paragraph 36 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

37.    Defendants deny the allegations in paragraph 37 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

38.    Defendants admit only that on December 23, 1975 Siegel and Shuster entered into an agreement with Warner Communications, Inc., but deny the remaining allegations in paragraph 38 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

39.    Defendants admit only that plaintiffs purport to have mailed notices of termination dated April 3, 1997 to defendants and various other entities, but deny the remaining allegations in paragraph 39 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

40.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 and on that basis deny the same.

41.    Admitted.

EXHIBIT 34[8]
478

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    Defendants deny the allegations in paragraph 47 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and all other documents related thereto for evidence of the contents thereof.

48.    Defendants deny the allegations in paragraph 48 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and all other documents related thereto for evidence of the contents thereof.

49.    Defendants admit only that on April 15, 1999, plaintiffs received a letter from DC Comics' attorneys that, *inter alia,* rejected the termination notices and the validity thereof, and stated that DC Comics continued to claim sole copyright ownership in Superman as of that date.  Defendants deny the remaining allegations in paragraph 49 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents and any documents related thereto for evidence of the contents thereof.

50.    Defendants deny the allegations in paragraph 50 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

51.    Defendants deny that plaintiffs own any copyright rights to Superman, or that any such rights have been "recaptured," but otherwise admit the allegations in paragraph 51.

EXHIBIT 34
479

**FIRST CLAIM FOR RELIEF**

52.    Defendants re-allege and incorporate by reference paragraphs 1 through 51 inclusive, as though fully set forth herein.

53.    Defendants deny the allegations contained in paragraph 53 except admit that an actual and justiciable controversy has arisen and now exists between the parties.

54.    Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 54, including but not limited to, subparagraphs (a) – (d).

55.    Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

**SECOND CLAIM FOR RELIEF**

56.    Defendants re-allege and incorporate by reference paragraphs 1 through 55 inclusive, as though fully set forth herein.

57.    Defendants deny the allegations in paragraph 57 except admit only that an actual and justiciable controversy has arisen and now exists between plaintiffs and defendants.

58.    Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 58, including but not limited to, subparagraphs (a) – (f).

59.    Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

**THIRD CLAIM FOR RELIEF**

60.    Defendants re-allege and incorporate by reference paragraphs 1 through 59 inclusive, as though fully set forth herein.

61.    Defendants deny that plaintiffs are entitled to exploit the Superman crest and that plaintiffs are entitled to any accounting of any profits from any exploitation thereof and otherwise deny the allegations of paragraph 61.

**EXHIBIT 34**0
**480**

62.    Defendants admit that they own and possess the exclusive right to use a trademark interest in the Superman "S in Shield" device, but otherwise deny the allegations in paragraph 62 except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

63.    Defendants admit that plaintiffs contend and that defendants deny all of the assertions contained in paragraph 63, including but not limited to, subparagraphs (a) – (e).

64.    Defendants deny the allegations contained in paragraph 55 except admit that a declaration of the Court is necessary.

## FOURTH CLAIM FOR RELIEF

65.    Defendants re-allege and incorporate by reference paragraphs 1 through 64 inclusive, as though fully set forth herein.

66.    Defendants admit that defendant DC Comics has, continuously on an exclusive basis licensed and commercially exploited and intends to continue to license and exploit its copyright rights in Superman.  Defendants further admit that defendant Warner Bros. Entertainment Inc. has made use of the Superman copyrights under license from defendant DC Comics.  Defendants deny the remaining allegations in paragraph 66.

67.    Defendants admit that defendant DC Comics has earned profits from its exploitation of the Superman copyrights, and that defendant Warner Bros. Entertainment Inc. has earned profits from its licensed use of the Superman copyrights, but deny the remaining allegations in paragraph 67.

68.    Denied.

69.    Denied.

70.    Defendants admit that plaintiffs have demanded an accounting but otherwise deny the allegations in paragraph 70.

71.    Admitted.

EXHIBIT 34
481

72.    Denied.

73.    Denied.

## FIFTH CLAIM FOR RELIEF

74.    Defendants re-allege and incorporate by reference paragraphs 1 through 73 inclusive, as though fully set forth herein.

75.    Denied.

76.    Denied except to the extent the allegations accurately reflect the contents of documents, and respectfully refer the Court to such documents for evidence of the contents thereof.

77.    Defendants admit that defendant DC Comics has continuously and consistently asserted to plaintiffs exclusive ownership and control of all rights in Superman but deny the remaining allegations in paragraph 77.

78.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 78 and on that basis deny the same.

79.    Denied.

80.    Denied.

81.    Denied.

82.    Denied.

## SIXTH CLAIM FOR RELIEF[1]

83.    Defendants re-allege and incorporate by reference paragraphs 1 through 82 inclusive, as though fully set forth herein.

84.    Defendants admit that they have not listed plaintiffs' names on any copyright notices, but otherwise deny the allegations in paragraph 84.

---

[1] This claim is erroneously referred to as "Fifth Claim For Relief" in plaintiffs' complaint.

EXHIBIT 34
482

85.     Defendants admit that DC Comics has continuously held itself out as the sole owner of copyright and all other rights in Superman but deny the remaining allegations in paragraph 85.

86.     Defendants admit that DC Comics has continuously held itself out as the sole owner of copyright and all other rights in Superman but deny the remaining allegations in paragraph 86.

87.     Defendants admit that DC Comics has continuously held itself out as the sole owner of copyright and all other rights in Superman but deny the remaining allegations in paragraph 87.

88.     Defendants admit that DC Comics has continuously held itself out as the sole owner of copyright and all other rights in Superman but deny the remaining allegations in paragraph 88.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

## SEVENTH CLAIM FOR RELIEF[2]

96.     Defendants re-allege and incorporate by reference paragraphs 1 through 95 inclusive, as though fully set forth herein.

97.     Defendants admit that defendant Time Warner has made no mention of plaintiffs' ineffective termination notices in publicly reported documents, but otherwise deny the allegations in paragraph 97.

98.     Denied.

99.     Denied.

---

[2] This claim is erroneously referred to as "Sixth Claim For Relief" in plaintiffs' complaint.

**EXHIBIT 34**[3]
**483**

1     100.   Denied.

2     101.   Denied.

3     102.   Denied.

4     103.   Denied.

5     104.   Denied.

6     105.   Denied.

**FIRST AFFIRMATIVE DEFNSE**

106.   Plaintiffs' complaint fails to state a claim upon which relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

107.   Plaintiffs' claims are barred by the doctrines of laches, waiver, acquiescence, and/or estoppel.

**THIRD AFFIRMATIVE DEFENSE**

108.   Plaintiffs' claims are barred because plaintiffs have not sent a Notice of Termination with respect to a separate and complete grant of rights in Superman by Siegel and Shuster.

**FOURTH AFFIRMATIVE DEFENSE**

109.   Plaintiffs' claims are barred because plaintiffs have continued to accept the benefits of one of the grants of rights in Superman they allege to have terminated, even after the purported effective date of such termination.

**FIFTH AFFIRMATIVE DEFENSE**

110.   The "Unpublished Superman" works are not eligible for termination under the Copyright Act or, if they are, any such termination is premature.

**SIXTH AFFIRMATIVE DEFENSE**

111.   Plaintiffs' claims are barred by the statute of limitations, including but not limited to, 17 U.S.C. § 507 (b).

**EXHIBIT 34**
14
**484**

## SEVENTH AFFIRMATIVE DEFENSE

112.   Plaintiffs' claims are barred because the notices of termination sent by plaintiffs were not timely served.

## EIGHTH AFFIRMATIVE DEFENSE

113.   Plaintiffs' claims are barred on the basis of settlement.

## NINTH AFFIRMATIVE DEFENSE

114.   Because the various paragraphs of plaintiffs' Complaint do not comply with Fed. R. Civ. P. 8(a) and (e), defendants are not required to separately admit or deny each averment contained therein.

FOR THESE REASONS, defendants pray that the Court dismiss all of plaintiffs' claims and find for defendants on all counts, that defendants be awarded costs, including reasonable attorneys' fees under Section 505 of the United States Copyright Act, and pray for such other and further relief as this Court deems just and proper.

## COUNTERCLAIMS

## PARTIES

1.   Defendant/Counterclaimant DC Comics ("DC" or "DC Comics") is a New York General Partnership engaged in the business of, *inter alia*, creating, exploiting, and licensing comic book stories and characters.  DC is the successor in interest to all rights under copyright and other rights, including trademark rights and the good will in and to the first Superman story and all other works and products relating to the Superman character.

2.   Upon information and belief, Plaintiff/Counterclaim Defendant Joanne Siegel is an individual and citizen of the State of California, in the County of Los Angeles.  Upon further information and belief, Joanne Siegel is the widow of Jerome Siegel, the individual credited as a co-creator of the first Superman stories.

EXHIBIT 34
15
485

3.      Upon information and belief, Plaintiff/Counterclaim Defendant Laura Siegel Larson is an individual and citizen of the State of California, in the County of Los Angeles.  Upon further information and belief, Laura Siegel Larson is a daughter of Jerome Siegel.  Plaintiff/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson are referred to herein as "the Siegels."

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of the subject matter hereof under the provisions of the U.S. Copyright Act, 17 U.S.C. § 101 *et seq.*, relating to copyright ownership, under sections 39 and 43 (a) and (c) of the U.S. Trademark Act, also known as the Lanham Act, 15 U.S.C. §§ 1121 and 1125 (a) and (c), and sections 1331, 1332, 1338 (a) and 1338 (b) of the Judicial Code, 28 U.S.C. §§ 1331, 1332, 1338 (a) and 1338 (b), as well as under principles of supplemental jurisdiction, 18 U.S.C. § 1367.

5.      Venue is proper under 28 U.S.C. § 1391 (b) in that, upon information and belief, a substantial part of the events giving rise to DC's claims occurred or a substantial part of the properties that are the subject of these counterclaims are situated in this District and/or the Plaintiffs/Counterclaim Defendants may be found in this District.

## FACTS COMMON TO ALL COUNTERCLAIMS
### Background And History

6.      Upon information and belief, in or about 1933, Jerome Siegel ("Siegel") and his friend and co-creator, Joseph Shuster ("Shuster") collaborated on creating a number of stories, including a story entitled "The Reign of the Superman," which was published in a magazine put out by Siegel and Shuster themselves entitled "Science Fiction."  Upon further information and belief, other than the same name, the "Superman" character in this story shared very little, if any, similarity with the character that would later become known as Superman.

EXHIBIT 34
486

7.    Upon information and belief, in early 1933, Siegel and Shuster began collaborating on "comic strips," initially for syndication and eventually for publication in "comic books," a new and growing medium.  Among their work together were a number of comic strips featuring a character they named Superman.  This Superman character bore virtually no resemblance to the character of the same name that had previously appeared in the "Science Fiction" magazine. Upon further information and belief, those works, which were never published, included: (a) twenty four (24) days of Superman comic strips intended for newspapers; (b) a seven page synopsis of the last eighteen days (weeks 2-4) of such strips; (c) a paragraph previewing Superman exploits; (d) a nine-page synopsis covering an additional two months of daily comic strips; and (e) fifteen daily comic strips (collectively the "Unpublished Superman Works").

8.    Upon information and belief, between 1933 and 1937 Siegel and Shuster submitted the Unpublished Superman Works to a number of prospective publishers and newspaper syndicates, but the work was rejected by them all.

9.    Meanwhile, between 1935 and 1937, Siegel and Shuster created a number of comics strips that were published, including such titles as "Dr. Occult," "Henri Duval," and "Spy."

10.    On December 4, 1937, Siegel and Shuster entered into an "Agreement of Employment" (the "December 4, 1937 Agreement") with Detective Comics, Inc. ("DCI"), a predecessor in interest to DC.  Under the Agreement, Siegel and Shuster agreed to "give their exclusive services" in producing comic features entitled "Slam Bradley" and "The Spy" for a period of two years.  Under the Agreement, Siegel and Shuster were required to submit any new comics to DCI first, which reserved the right to accept or reject the work for a period of sixty (60) days.

11.    Early in 1938, DCI was looking for materials for a new comic book it was intending to publish under the name "Action Comics."  In that connection,

EXHIBIT 34
17
487

1    upon information and belief, DCI was provided with the twenty four (24) days of
2    Superman comic strips from the Unpublished Superman Works for review.  At the
3    instance and expense of DCI and subject to its right to control, Siegel and Shuster
4    cut and pasted the comic strips, and added certain additional material, to create a
5    thirteen page comic book story which was accepted for publication by DCI.

6        12.    In an agreement with DCI dated March 1, 1938 (the "March 1, 1938
7    Agreement"), Siegel and Shuster, among other things, transferred to DCI "the strip
8    entitled 'Superman' . . . all good will attached thereto and exclusive right to the use
9    of the characters and story, continuity and title of strip . . ." and agreed not to
10   employ Superman and other characters in the strip "by their names contained
11   therein."

12       13.    DCI advertised the publication of the new comic story Superman and
13   the new title "Action Comics No. 1" in others of its publications, including but not
14   limited to, "More Fun Comics No. 31," "Detective Comics No. 15," and "New
15   Adventure Comics No. 26," all of which are cover dated May 1938 and, upon
16   information and belief, were distributed in copies to the public on or before April
17   1, 1938.  These advertisements (the "Superman Ads"), which depict the Superman
18   character in his costume, exhibiting super-strength, show almost the entirety of
19   what would become the cover of "Action Comics No.1."

20       14.    Upon information and belief, sometime prior to April 16, 1938, but
21   after the Superman Ads, DCI published the thirteen page Superman comic book
22   comprising the first Superman story in "Action Comics No. 1," bearing the "cover"
23   date June 1938 (hereinafter "Action Comics No. 1").  However, Action Comics
24   No. 1 was not comprised entirely of the pre-existing Unpublished Superman
25   Works.  Rather, upon information and belief, in response to DCI's instruction that
26   the Unpublished Superman Works be presented as a thirteen page comic book and
27   subject to DCI's right to control, Siegel and Shuster created additional materials to
28   complete Action Comics No. 1 (the "Additional Action Comics No. 1 Materials").

EXHIBIT 34
18
488

15. After the publication of Action Comics No. 1, upon information and belief, Siegel and Shuster supplied further original Superman stories at DCI's instance and expense and subject to its right to control. On September 22, 1938, Siegel and Shuster entered into another employment agreement (the "DCI September 22, 1938 Agreement"), confirming that Siegel and Shuster had "been doing the art work and continuity for said comics [including Superman comics] for us. We wish you to continue to do said work and hereby employ and retain you for said purposes . . . ." The DCI September 22, 1938 Agreement also contained an acknowledgement that DCI was the "exclusive" owner of Superman.

16. Also on September 22, 1938, Siegel and Shuster entered into an agreement with DCI and with the McClure Newspaper Syndicate (the "McClure September 22, 1938 Agreement") concerning the use of Superman in newspaper strips.

17. All of Siegel and Shuster's contributions to Superman comic books and comic strips published subsequent to Action Comics No. 1 as well as the Additional Action Comics No. 1 Materials, were made either under the DCI March 1, 1938 Agreement, the DCI September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, or contemporaneous oral agreements confirmed by one or more of these Agreements, or certain subsequent agreements affirming those agreements, as employees of DCI or its successors or at DCI's instance and expense and subject to DCI's right of control, with the result that the copyrights to all Superman materials created by them after preparation of materials included in Action Comics No. 1 and to the Additional Action Comics No. 1 Materials are owned exclusively by DC Comics as works made for hire under the then applicable 1909 Copyright Act.

18. On November 30, 1938, Siegel wrote to DCI (the "November 1938 Letter") suggesting that it do a comic book named Superboy, "which would relate to the adventures of Superman as a youth." The November 30, 1938 Letter does

EXHIBIT 34[9]
489

not contain any discussion of plot, dialogue, appearance, or any other copyrightable material relating to Superboy.  DCI decided not to publish a "Superboy" comic at that time.

19.    In 1939, among the Superman comics prepared by Siegel and Shuster at the instance and expense of DCI and subject to its right of control, was Superman No. 1, with a cover date of Summer 1939.  In Superman No. 1, Clark Kent was depicted as a youth with super powers.

20.    On December 19, 1939, Siegel and Shuster entered into a new agreement with DCI (the "December 19, 1939 Agreement"), which agreement modified the DCI September 22, 1938 Agreement by, *inter alia*, doubling Siegel and Shuster's compensation for Superman comic books and newspaper strips.  In addition, the December 19, 1939 Agreement provided for payment for Siegel and Shuster for uses of Superman beyond comic books and newspaper strips, such as radio, motion pictures, and toys.  Under the December 19, 1939 Agreement, Siegel and Shuster again acknowledged DCI's sole ownership of Superman.

21.    Upon information and belief, in approximately December 1940, Siegel, on behalf of himself and Joe Shuster, submitted to DCI a thirteen-page script of continuity for Superboy (the "Unpublished 1940 Superboy Script"), renewing his suggestion to DCI that it publish a comic book about Superman as a youth.  The December 1940 Superboy Script, which sets forth a credit line of "By Jerry Siegel and Joe Shuster," states, in part, "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last…the answer to your requests…America's outstanding boy hero: SUPERBOY!"  The Unpublished 1940 Superboy Script goes on to say about Superboy that "[i]n later years he was to become the might [sic] figure known as SUPERMAN!"  Again, DCI decided not to publish a "Superboy" comic at that time.

22.    Upon information and belief, on a date prior to November 18, 1944, DCI published its first comic book containing the adventures of Superboy, who was Superman as a youth, in "More Fun Comics No. 101" with a "cover" date of January-February 1945 (hereinafter "More Fun Comics No. 101").  Upon information and belief, DCI employed Shuster or an artist from Shuster's art studio (with Shuster's knowledge and under his supervision) to create the artwork and writer Don Cameron to write the Superboy story contained in "More Fun Comics No. 101."  The Superboy story in "More Fun Comics No. 101" bears little if any resemblance to anything contained in the Unpublished 1940 Superboy Script, and such similarities as may exist are common to earlier Superman related material owned by DCI.

23.    In 1947, Siegel and Shuster brought suit against, *inter alia,* DCI's successor in interest, National Comics Publications, Inc. ("National") in the New York Supreme Court in Westchester County (the "Westchester Action").  The Westchester Action was, in part, the culmination of a dispute between Siegel and Shuster and National over what Siegel and Shuster claimed was DCI's unauthorized publication of Superboy.  In the Westchester Action, in addition to seeking redress in connection with Superboy, Siegel and Shuster sought to invalidate the March 1, 1938 Agreement, argued that the DCI September 22, 1938 Agreement was obtained by duress, and sought to recapture all rights in Superman.

24.    On November 21, 1947, the Court in the Westchester Action issued an opinion (the "Westchester Opinion") after trial in which it found that the March 1, 1938 Agreement transferred to DCI all rights in Superman and that the DCI September 22, 1938 Agreement was valid and not obtained under duress.  The Court also held that in publishing Superboy, DCI had acted "illegally."

25.    At the Court's request, the parties to the Westchester Action submitted proposed fact findings and conclusions of law.  On April 12, 1948, the Court adopted fact findings and conclusions of law and issued an interlocutory

EXHIBIT 34[1]
491

judgment (collectively the "Westchester Action Interlocutory Judgment"). The defendants in the Westchester Action filed a notice of appeal, and the Westchester Action Interlocutory Judgment was stayed pending appeal.

26. Shortly thereafter, the parties to the Westchester Action entered into two separate agreements: (a) a stipulation dated May 19, 1948 (the "May 19, 1948 Stipulation") and (b) a consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Agreement"). Under both documents, *inter alia,* Siegel and Shuster: (a) agreed to vacate the Westchester Action Interlocutory Judgment; (b) acknowledged that, pursuant to the March 1, 1938 Agreement, they transferred to DCI all rights in and to Superman, including "the title, names, characters, concept and formula" as set forth in Action Comics No.1; (c) acknowledged National was sole and exclusive owner of Superman, the conception, idea, continuity, pictorial representation and formula thereof in all media; (d) agreed that they were enjoined from creating, publishing or distributing any Superman work or any imitation thereof, and from using the title Superman or title that contained the word "Super"; (e) acknowledged that National was the sole owner of and owned exclusive rights in Superboy; (f) agreed that they were enjoined from creating, publishing or distributing Superboy or any imitation thereof; (g) agreed they were prohibited from representing their past connection with Superman and Superboy in such a way to confuse the public that such connection still existed; and (h) agreed they were prohibited from using any coloring, lettering or printing in referring to Superman or Superboy that was imitative of that used by National.

27. In the 1960s, Siegel and Shuster again brought suit against National, this time in the United States District Court for the Southern District of New York for a declaration that they (and not National) owned the copyright in the renewal copyright term for Action Comics No. 1. In a decision published in *Siegel v. National Periodical Publications, Inc.*, 364 F. Supp. 1032 (S.D.N.Y. 1973), the district court held, *inter alia*, that the agreements between Siegel and Shuster on

EXHIBIT 34<sup>22</sup>
492

1 | the one hand and DCI (and later National) on the other, intended to assign all rights

2 | in Superman to DCI and National, including renewal copyright rights.

3 |      28.    In a decision published in *Siegel v. National Periodical Publications,*

4 | *Inc.*, 508 F.2d 909 (2d Cir. 1974), the Court of Appeals affirmed that portion of the

5 | lower court's ruling relating to National's ownership of all rights in Superman.

6 | Siegel and Shuster did not further appeal the ruling.

7 |      29.    On December 23, 1975, Siegel and Shuster entered into an agreement

8 | with Warner Communications, Inc., then National's parent company (the

9 | "December 23, 1975 Agreement"). Under this agreement, Siegel and Shuster

10 | again acknowledged that Warner Communications, Inc. was the sole and exclusive

11 | owner of "all right, title and interest in and to the 'Superman' concept, idea,

12 | continuity, pictorial representation, formula, characters, cartoons and comic strips,

13 | title, logo, copyrights and trademarks, including any and all renewals and

14 | extensions of such rights, in the United States and throughout the world, in any and

15 | all forms of publication, reproduction and presentation, whether now in existence

16 | or hereafter devised . . . ."

17 |      30.    Under the December 23, 1975 Agreement, Siegel and Shuster each

18 | were to and did receive throughout their lives annual payments as well as medical

19 | insurance coverage. Upon Siegel's death, annual payments were to be made to

20 | Plaintiff/Counterclaim Defendant Joanne Siegel for the remainder of her life. The

21 | amount of the annual payment pursuant to the December 23, 1975 Agreement was

22 | increased over the years. Since Siegel's passing in 1996, Joanne Siegel has

23 | continuously received and accepted annual payments and health insurance under

24 | that agreement.

25 |          **DC Comics' Development And Licensing**

26 |          **Of Superman Works And Products**

27 |      31.    The initial graphic representations of the Superman character in 1938,

28 | now stylistically dated, presented his adventures with a limited number of

**EXHIBIT 34**[3]
**493**

characters in settings that had the look and feel of that particular period. From the portrayal of the Superman character in "Action Comics No. 1," we only know that he is an upright hero who was sent as an infant to Earth aboard a space ship from an unnamed distant planet destroyed by old age. Superman is also depicted as secretly possessed of extraordinary physical abilities, including superhuman strength and the ability to leap $1/8^{th}$ of a mile, hurdle a twenty-story building and run faster than an express train. In his ordinary life, the character is depicted as a mild-mannered newspaper reporter for <u>The Daily Star</u> known as Clark Kent, and in his alter ego, Superman is a costumed heroic figure using his extraordinary physical abilities to fight against crime.

32.    Since the publication of "Action Comics No.1," DC Comics has authored, published and distributed several thousand other comic books containing the adventures of Superman throughout the United States and abroad in many millions of copies, adding more than 60 years worth of material to further define, update and improve upon the Superman character and presenting an ongoing new flow of Superman exploits and characters resulting in the creation of an entire fictional Superman "universe."

33.    In addition to the publication of new comic books containing the Superman comic strip character, DC Comics has over the last 66 years participated in the creation, development and licensing of numerous Superman live action and animated feature length motion pictures, motion picture serials, radio and television serials and live theatrical presentations. These works have also significantly contributed to the modernizing and evolution of the Superman character from his 1938 appearance.

34.    Over the years since Action Comics No.1, the presentations of Superman provided first by DCI and then DC Comics did not present a static depiction but an ever-evolving portrayal of Superman continuously, featuring new super powers, new villains, new components to the Superman universe, new

EXHIBIT 34
494

1  elements in the Superman back story, and changes in the appearance of Superman.
2  Most notably, many of Superman's powers that are among his most famous today
3  did not appear in Action Comics No. 1 but only appeared in later publications.
4  These include: his ability to fly; his super-vision which enables him to see through
5  walls ("X-ray" vision) and across great distances ("telescopic" vision); his super-
6  hearing which enables him to hear conversations at great distances; his
7  invulnerability to injury which is most often shown as bullets bouncing off his
8  chest and/or arms.

9       35.     One notable part of the evolution of the appearance of the Superman
10  character undertaken by DC Comics and its predecessors, has been the
11  transformation of the emblem on the chest of Superman's costume.  In Action
12  Comics No. 1, the emblem was comprised of a small yellow inverted triangle
13  bearing the letter "S" shown in yellow and sometimes in red (the "Action Comics
14  No. 1 Crest").  Thereafter, in changing the appearance of Superman and his
15  costume, DC Comics and/or its predecessors significantly changed the Action
16  Comics No. 1 Crest.  Bearing little if any resemblance to the original, it is now a
17  large yellow five-sided shield, outlined in the color red, and bearing the letter "S"
18  in the middle, also in the color red (the "S in Shield Device").  The S in Shield
19  Device, as transformed by DC Comics and its predecessors, has become a strong
20  symbol, standing alone, of all goods and services relating to Superman and his sole
21  source, DC Comics and its predecessors.

22       36.     At all relevant times, DC Comics, its predecessors in interest and
23  licensees have duly complied with the provisions of the 1976 Copyright Act and its
24  1909 predecessor statute with respect to securing copyright protection for the
25  numerous works in which the Superman character has appeared and establishing
26  DC Comics' copyright ownership thereof, including the original and all works
27  based upon and derived therefrom, and have received from the Register of
28

EXHIBIT 34
495

Copyrights, valid and subsisting certificates of copyright registration and renewal with respect thereto.

37.    DC Comics and its predecessors have, since 1938, continuously held themselves out as the exclusive owners of all rights under copyright in Superman.

38.    DC Comics has over many decades adopted and made long, continuous and exclusive use of (a) the name and mark Superman and (b) certain key symbols and indicia of origin in connection with and to identify all authorized uses of the Superman character in print and all other media (sometimes hereinafter the "Superman symbols and indicia of origin").  The Superman name and mark and Superman symbols and indicia of origin include, *inter alia*, Superman's characteristic outfit, comprised of a full length blue leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key identifying phrases.  Most notable among the latter is "Look!…Up in the sky!…It's a bird!…It's a plane!…It's Superman!" first used in the introduction to the 1940 radio program The Adventures of Superman, and thereafter continuously repeated in Superman television programming and various Superman publications.  All of these Superman symbols and indicia of origin have been used on and in connection with a wide variety of publications and licensed goods and services, as they have been added to the Superman character and mythology under DC Comics' and/or its predecessors' supervision and direction, but, in any event, for the earliest symbols, since as early as 1938.

39.    As a result of the above-described continuous and exclusive use by DC Comics of the Superman name and mark, as well as the Superman symbols and indicia of origin for over sixty years, the names, marks and symbols and the appearance of the Superman character have become famous and the public has come to recognize that all publications, entertainment and products featuring Superman or bearing such marks all come from the same source, namely, DC

EXHIBIT 34
26
496

1   Comics, and that DC Comics is the exclusive source of the Superman character

2   and all uses of the character on and in connection with any goods and services.

3       40.    DC Comics owns dozens of federal trademark registrations for

4   Superman related indicia across a broad array of goods and services.  Those

5   registrations include, but are not limited to the following for the following marks:

6   (a) SUPERMAN (in block letters) Reg. Nos. 2,419,510, 2,204,195, 1,278,177,

7   1,221,718, 1,209,668, 1,175,907, 1,183,841, 1,248,822, 1,216,976, 1,186,803,

8   1,189,393, 1,180,068, 1,184,822, 1,181,536, 1,182,947, 1,070,290; (b)

9   SUPERMAN (in the well-known "telescopic" lettering) Reg. Nos. 2,226,026,

10  1,278,175, 1,200,394, 1,185,526, 1,185,853, 1,209,863, 1,220,896, 1,183,809,

11  1,182,226, 1,181,537, 1,189,355, 1,218,552, 1,108,577, 391,821, 371,803; (c) the

12  "S in Shield" Device (either alone or as part of a rendering of Superman)

13  2,211,378, 2,226,415, 1,262,572, 1,179,537, 1,197,814, 1,200,387, 1,200,233,

14  1,209,743, 1,201,167, 1,201,149, 1,229,321, 1,199,690, 1,199,552, 1,199,630,

15  1,184,881, 1,182,172, 1,189,376, 1,180,292, 1,178,048, 1,182,041, 1,173,150,

16  1,140,418, 1,235,769, 411,871; (d) SUPERMAN RIDE OF STEEL Reg. No.

17  2,485,624; (e) MAN OF STEEL Reg. Nos. 2,226,436, 1,433,864; (f) SUPERBOY

18  Reg. Nos. 394,923 (telescopic lettering), 1,221,719 (block letters); (g)

19  SUPERGIRL (stylized and in block letters) Reg. Nos. 987,395, 414,623,

20  1,238,334; (h) SUPERWOMAN (in telescopic lettering) Reg. No. 394,922; (i)

21  SMALLVILLE Reg. Nos. 2,626,700, 2,809,352, 2,768,213, 2,765,711, 2,882,881;

22  (j) KRYPTONITE Reg. Nos. 2,656,1,239,506; (k) KRYPTO Reg. No. 1,168,306;

23  (l) LOOK, UP IN THE SKY, IT'S A BIRD, IT'S A PLANE Reg. No. 1,527,304;

24  (m) LEX LUTHOR Reg. Nos. 2,802,600, 1,634,007; (n) LOIS LANE Reg. No.

25  1,184,702; (o) PERRY WHITE Reg. No. 1,184,703; (p) JIMMY OLSEN Reg. No.

26  1,190,637; (q) LOIS AND CLARK Reg. No. 1,990,231; and (r) ACTION

27  COMICS (stylized) 360,765 (collectively with the SUPERMAN symbols and

28  indicia of origin, the "Superman Marks").

EXHIBIT 34
497

41.    These registrations alone suffice to show the unusual breadth and scope of the use of such marks related to Superman by DC Comics or its licensees on or in connection with a broad range of goods and services, all of which have come to be seen over six decades by countless consumers as indicating an exclusive authorization or sponsorship thereof by plaintiff DC Comics, the publisher and source of all Superman comic books and other Superman productions and products.

## The Superman Notices Of Termination

42.    On April 8, 1997, DC Comics received from Plaintiffs' Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, seven documents entitled Notice of Termination of Transfer Covering Extended Renewal.  Those documents purport, under 17 U.S.C. § 304 (c), to terminate, effective April 16, 1999, the Siegels' share in the following grants of copyright: (a) the December 4, 1937 Agreement; (b) the March 1, 1938 Agreement; (c) the DCI September 22, 1938 Agreement; (d) the McClure September 22, 1938 Agreement; (e) the December 19, 1939 Agreement; (f) the May 19, 1948 Stipulation; (g) the December 23, 1975 Agreement (collectively the "Superman Notices").  However, the Siegels served no notice terminating their share of the copyright grant in the May 21, 1948 Consent Agreement.

43.    The Superman Notices purport to terminate the Siegels' share of the above grants listed therein in the Unpublished Superman Works, Action Comics No. 1, and in excess of 15,000 additional works (the "Post-Action Comics No. 1 Works").  However, in none of the seven Superman Notices, or anywhere else, do the Siegels purport to terminate their share of any copyright grant in the Superman Ads.

44.    In the Superman Notices, the Siegels expressly recognize and acknowledge that the character Superboy is a derivative work based on Superman.

EXHIBIT 34
28
498

1  The Superman Notices expressly identify Superboy as part of the Superman

2  "family" of characters in which the Siegels are purporting to terminate their grants.

3  Indeed, the more than 15,000 works listed in the Superman Notices include

4  hundreds of publications and other works that feature *only* Superboy (as opposed

5  to Superman), and also Superman No. 1 with a cover date of Summer 1939, in

6  which Superman is depicted as a youth.

7      45.    In late November, 1998, DC Comics received from Plaintiffs/

8  Counterclaim Defendants Joanne Siegel and Laura Siegel Larson, through their

9  then-counsel, Finnegan, Henderson, Farabow, Garrett & Dunner, four documents

10 entitled Notice of Termination of Transfer Covering Extended Renewal.  Those

11 documents purport to terminate, effective November 27, 2000, the Siegels' share in

12 the following grants of copyright relating to the character known as "The Spectre":

13 (a) the December 4, 1937 Agreement; (b) a September 22, 1938 Agreement; (c)

14 and October 10, 1939 Agreement and (d) a second October 10, 1939 Agreement

15 (collectively the "Spectre Notices").

16     46.    The Spectre Notices purport to terminate the Siegels' share of the

17 above grants in: (a) the Spectre character appearing in costume in an ad in issue

18 No. 51 of "More Fun Comics" with a cover date of January 1940; (b) the first

19 Spectre comic book story published in issue No. 52 of "More Fun Comics" with a

20 cover date of February 1940; (c) part 2 of the first Spectre comic book story

21 published in issue No. 53 of "More Fun Comics" with a cover date of March 1940,

22 and hundreds of additional works listed the Spectre Notices (collectively the

23 "Spectre Works").

## The Parties' Negotiations
## And The Agreement Reached

26     47.    On April 17, 1997, less than ten days after DC Comics received the

27 Superman Notices, its counsel wrote to the Siegels' counsel inviting negotiation.

28 The Siegels requested that DC Comics make an initial settlement proposal.  But

prior to making such proposal, DC Comics requested that the parties enter into a confidentiality agreement.  Frustrated by the Siegels' delay in responding to its proposed form confidentiality agreement, on November 5, 1997, DC Comics' counsel wrote the Siegels' counsel and stated, *inter alia*, "[a]s we had advised you in the past, our client has elected, for settlement purposes only, not to respond to the [Superman Notices] served upon them by challenging their validity or scope *at this time*."  (Emphasis added.)

48.    On December 17, 1997, DC Comics and the Siegels finally entered into a confidentiality agreement.  On December 18, 1997, DC Comics forwarded its first substantive proposal with respect to the copyrights at issue, and in connection therewith also raised certain defects in the termination notice, stating "that there is a substantial legal issue as to the effectiveness of your clients' termination of DC's interest in the Superman Comic."  For more than six months, despite repeated requests for feedback, DC Comics heard no response to its December 18, 1997 proposal.  Finally, on June 19, 1998, the Siegels' counsel sent a letter to DC Comics' counsel that did not respond to the proposal but only requested more information.

49.    On July 23, 1998, DC Comics provided the Siegels with the answers to the questions posed in their counsel's letter of June 19, 1998.  Despite requests for feedback for another several months, DC Comics again received no response to its proposal.

50.    Having heard no response from the Siegels, on April 15, 1999, one day before the  purported "Effective Date" set forth in the Superman Notices, DC Comics provided a more comprehensive written notice to Plaintiffs/Counterclaim Defendants Joanne Siegel and Laura Siegel Larson detailing, among other things, the reasons it considered the Superman Notices to be invalid.

51.    On April 30, 1999, DC Comics received a letter from the firm of Gang, Tyre, Ramer & Brown, Inc. ("Gang, Tyre") indicating it now represented

EXHIBIT 34
500

1  the Siegels in negotiations with DC Comics.  Thereafter, the parties engaged in

2  extensive negotiations with their respective lawyers attending meetings in

3  California and New York, and exchanging proposals.  During that time period, at

4  the Siegels' request, DC Comics provided a payment of $250,000 (the "Advance

5  Payment") to the Siegels which payment was agreed to be an advance against any

6  future sums provided under an agreement to be entered into between the parties.

7       52.    On October 16, 2001, a legal representative for DC Comics made an

8  offer to the Siegels through Gang, Tyre by telephone.  On October 19, 2001, Kevin

9  Marks of Gang, Tyre, on behalf of the Siegels, accepted the October 16, 2001

10  offer.  That day, Mr. Marks wrote a letter confirming that the Siegels had

11  "accepted D.C. Comics offer of October 16, 2001" and outlined all of the material

12  terms in detail.  Those terms included, *inter alia,* that the Siegels transferred all of

13  their rights in the Superman property (which was defined in the letter as Superman,

14  Superboy and related properties including but not limited to Supergirl, Steel, Lois

15  & Clark, and Smallville) and in "The Spectre."  In exchange, the Siegels were to

16  receive: (a) a sizeable non-returnable advance; (b) a sizeable non-recoupable and

17  non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d)

18  significant guaranteed minimum payments as advances against royalties; and (e)

19  percentage royalties from DC Comics' exploitations of Superman across all media,

20  worldwide.

21       53.    By return letter of October 26, 2001, DC Comics' representative

22  wrote back providing a "more fulsome outline" of the agreed upon points.  Neither

23  the Siegels nor any of their representatives in any way disputed the October 26,

24  2001 confirmatory outline from DC Comics.  On February 1, 2002, DC Comics

25  forwarded a draft of a more formal written agreement memorializing the terms

26  agreed to in the October 19 and 26, 2001 correspondence.

27       54.    On May 9, 2002, Plaintiff/Counterclaim Defendant Joanne Siegel

28  wrote a letter to the Co-Chief Operating Officer of DC Comics' parent company

EXHIBIT 34
501

acknowledging that the Siegels had accepted DC Comics' proposal of October 16, 2002, but purporting to object to unspecified provisions of the formal written agreement.  To this day, the Siegels have not identified a single provision of the February 1, 2002 formal draft that was inconsistent with the provisions in the Siegels' October 19, 2001 acceptance of DC Comics' proposal.

55.    On September 30, 2002, however, DC Comics received a letter from the Siegels stating they were breaking off all discussions with DC Comics and impliedly and purportedly repudiating the agreement already reached by the parties.

**The Superboy Termination Notices**

56.    Notwithstanding the fact that the Siegels had already purported to terminate grants with respect to the Superboy character effective April 16, 1999, on November 8, 2002, the Siegels mailed to DC Comics another Notice of Termination of Transfer purporting to relate solely to Superboy (the "Superboy Notice").  The Superboy Notice purports to terminate, effective November 17, 2004, only two grants of copyright: (a) the May 19, 1948 Stipulation and (b) the December 23, 1975 Agreement, and identifies many of the same works identified in the Superman Notices.  As was the case with the Superman Notices, the Siegels served no notice terminating the copyright grant in the May 21, 1948 Consent Agreement.

57.    The Superboy Notice purports to terminate the above grants regarding the following works: (a) the unpublished November 30, 1938 Letter; (b) the unpublished 1940 Superboy Script; (c) More Fun Comics No. 101; and (d) approximately 1,600 additional titles.  However, the Superboy Notice lists and purports to terminate grants of rights under copyright relating to hundreds of the same works already purportedly terminated by the earlier Superman Notices.  The Superboy Notice does not purport to terminate the 1939 depiction of Superman as a youth in Superman No. 1.

EXHIBIT 34
32
502

58. In the Superboy Notice, the Siegels make the claim that Superboy is a "separate and distinct copyrighted work and character from the copyrighted work and character Superman." This contention is erroneous.

59. In the Superboy Notices, the Siegels also claim that Jerome Siegel was the sole author of Superboy. This contention is also erroneous.

60. Among the works listed in the Superboy Notice that the Siegels claim are terminated by such notice of termination (as well as by the Superman Notices), is the WB television series entitled "Smallville." "Smallville" is a modern, teen-oriented drama about the life and relationships of Clark Kent and his circle of friends during Clark's high school years; it features numerous characters not created or developed by Siegel and story lines wholly original to the series.

61. On June 17, 2004, talent agent Ari Emanuel, representing the Siegels, sent a letter to DC Comics' licensee and affiliated company, Warner Bros., stating, *inter alia,* that as of the effective date of the Superboy Notice, November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville"

62. On August 4, 2004, the Siegels' new counsel and attorney of record in this case, Marc Toberoff, contacted Warner Bros. and reiterated the Siegels' position that, as of November 17, 2004, DC Comics and its licensees would be cut off from making any further episodes of "Smallville."

63. On August 27, 2004, DC Comics' counsel herein, Fross Zelnick Lehrman & Zissu, P.C., sent a letter to the Siegels' counsel rejecting the interpretation of the effect of the Superboy Notice and unequivocally informing the Siegels that DC Comics and its licensees would proceed with their planned production, copying, distribution, and exploitation of new episodes of "Smallville."

EXHIBIT 34
503

**The Siegels' Filing Of Two Related Cases**

64.    On October 8, 2004, the Siegels filed the instant action and on October 22, 2004, they filed a second action, Civil Case No. 04-08776, which case was assigned to Judge Lew in this Court.

## FIRST COUNTERCLAIM FOR DECLARATION THAT THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE ARE INEFFECTIVE

65.    DC Comics repeats and realleges paragraphs 1 - 64 above as if fully set forth herein.

66.    DC Comics contends that the Superman Notices and/or the Superboy Notice are ineffective, *inter alia*, for any or all of the following five independent reasons:

**#1  The May 21, 1948 Consent Agreement Has Not Been Terminated**

67.    The May 21, 1948 Consent Agreement is a written agreement entered into by Jerome Siegel and Joseph Shuster with DC Comics' predecessor in interest and includes a grant of all rights in Superman and Superboy by Siegel and Shuster to DC Comics' predecessor in interest, including all rights under copyright therein.

68.    As a result of the Siegels' failure to send a Notice of Termination with respect to  the May 21, 1948 Consent Agreement, the grant contained therein to all copyrights related to Superman remains in full force and effect.  Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (including its derivative work Superboy) pursuant to the May 21, 1948 Consent Agreement.

**#2 The December 23, 1975 Agreement**

69.    Through both the Superman Notices and the Superboy Notice, the Siegels purport to terminate their share of the grant of copyright in Superman and Superboy contained in the December 23, 1975 Agreement.

**EXHIBIT 34**
**504**

70.    By letter dated April 15, 1999, the day before the Superman Notice purported to become effective, DC Comics rejected the scope and validity of the Superman Notices, including but not limited to, that Superman Notice purporting to terminate the grant in the December 23, 1975 Agreement.

71.    By letter dated August 29, 2004, DC Comics rejected the scope and validity of the Superboy Notice, including but not limited to the Siegels' claim that such notice terminated the December 23, 1975 Agreement.

72.    Notwithstanding the Siegels having, by virtue of the Superman Notices, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' rejection of the Superman Notice, after April 16, 1999, the purported effective date of such notices of termination, DC Comics continued to perform under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel continued to accept the benefits under that agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superman.

73.    Notwithstanding the Siegels having, by virtue of the Superboy Notice, purportedly terminated the grant of copyright contained in the December 23, 1975 Agreement, and with full knowledge of DC Comics' August 29, 2004 rejection of the notice of termination, DC Comics has continued to perform under the December 23, 1975 Agreement.  DC Comics has relied upon Joanne Siegel's continued acceptance of benefits under the December 23, 1975 Agreement and has continued to perform under that Agreement without accounting to the Siegels and without making any other change in the manner in which it has exploited Superboy.

EXHIBIT 34
505

74.    Because of DC Comics' continued performance under the December 23, 1975 Agreement and Plaintiff/Counterclaim Defendant Joanne Siegel's continued acceptance of the benefits of such agreement after she purportedly terminated it in both the Superman Notices and the Superboy Notice, the December 23, 1975 Agreement, and the grant of copyright therein, remains in full force and effect.

75.    Thus, DC Comics is and continues to be the sole owner of all rights of any kind, including rights under copyright, in Superman (and its derivative work Superboy), rendering the Superman Notices and the Superboy Notice ineffective.

### #3  The Unpublished Superboy Works

76.    In the Superboy Notice, the Siegels purport to terminate copyright grants of rights in the November 1938 Letter and the Unpublished 1940 Superboy Script and approximately 1,600 additional published titles purportedly relating to Superboy (the "Published Superboy Works").

77.    Upon information and belief, as of January 1, 1978, both the November 1938 Letter and the Unpublished 1940 Superboy Script (the "Siegel Superboy Proposals") remained unpublished and thus were neither in their first nor their second term of copyright as of that date.

78.    Copyright in the Published Superboy Works is owned exclusively by DC Comics by virtue of their having been prepared as works made for hire for DC Comics' and/or its predecessors, or by virtue of other copyright grants that remain in full force and effect.

79.    Pursuant to the requirements set forth by section 304 (c) of the 1976 Copyright Act, 17 U.S.C. § 304 (c), only copyright grants in works that were in their first or second term of copyright as of January 1, 1978, could be terminated under that provision.  As a result, the Superboy Notice is ineffective as to the Siegel Superboy Proposals or any portion of any derivative works containing any

EXHIBIT 34
506

1    copyrightable material therefrom and DC Comics remains the sole owner thereof.

2    Therefore, the Superboy Notice is ineffective.

### #4  Siegel Owned No Copyright In Superboy

4        80.    The Siegel Superboy Proposals are derivative works based upon the

5    pre-existing copyrighted Superman character and stories owned by DC Comics'

6    predecessors.

7        81.    Upon information and belief, Siegel, in collaboration with Shuster,

8    prepared the Siegel Superboy Proposals without the prior knowledge or consent of

9    DC Comics' predecessors.

10        82.    Upon further information and belief, Siegel developed the contents of

11    the Siegel Superboy Proposals within the scope of his employment contracts with

12    DC Comics' predecessors and/or at their instance and expense and subject to their

13    right to control.

14        83.    As a result of the foregoing, the Siegel Superboy Proposals were

15    derivative works based upon Superman, prepared without the authorization of the

16    copyright owner, and/or were works made for hire, owned *ab initio* by the

17    copyright owner in Superman.

18        84.    Whether the Siegel Superboy Proposals were derivative works

19    prepared without the prior authorization of the copyright owner, or were works

20    made for hire, Siegel could not and did not own any copyright interest therein that

21    would be subject to copyright termination pursuant to 17 U.S.C. § 304 (c).  Thus,

22    the Superboy Notice is ineffective.

### #5  The Superman Notices Were Not Timely Served

24        85.    Upon information and belief, DC Comics' predecessor in interest first

25    secured copyright in Action Comics No. 1 by publication with copyright notice

26    prior to April 16, 1938.

27        86.    All grants made by Siegel and Shuster or rights in Action Comics No.

28    1 are still in effect, and all rights under copyright granted therein are still owned

**EXHIBIT 34**[7]
**507**

1 | exclusively by DC Comics, because the Superman Notices served by the Siegels
2 | are ineffective for failure to comply with the legal requirements therefore
3 | prescribed by section 304 (c) of the U.S. Copyright Act of 1976, 17 U.S.C. § 304
4 | (c), in that: the "Effective date" of the Superman Notices, namely April 16, 1999,
5 | was too late to fall within the required period specified in 17 U.S.C. § 304 (c) (3)
6 | and such notices of termination were served less than two years before the
7 | allowable effective date in violation of 17 U.S.C. § 304 (c) (4) (A).

8 |        87.    On information and belief, plaintiffs deny DC Comics' contentions
9 | and/or the legal effect ascribed thereto as set forth in paragraphs 65 – 86 above.
10 | Accordingly, an actual controversy has arisen and now exists between
11 | Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

12 |        88.    A justiciable controversy exists concerning the above issues and a
13 | judicial declaration is necessary and appropriate to determine the parties'
14 | respective rights with regard thereto.

15 | **SECOND ALTERNATIVE COUNTERCLAIM FOR**
16 | **DECLARATION THAT ANY CLAIM BY THE SIEGELS FOR**
17 | **CO-OWNERSHIP OF SUPERMAN (INCLUDING ITS DERIVATIVE**
18 | **SUPERBOY) IS BARRED BY THE STATUTE OF LIMITATIONS**

19 |        89.    DC Comics repeats and realleges paragraphs 1 - 88 above as if fully
20 | set forth herein.

21 |        90.    Since as early as 1998, Plaintiffs/Counterclaim Defendants were on
22 | notice of DC Comics' position that the Superman Notices contained legal defects.
23 | Moreover, effective at least as early as April 15, 1999, Plaintiffs/Counterclaim
24 | Defendants were on notice that DC Comics rejected the Superman Notices and
25 | asserted exclusive ownership of all copyright in Superman.

26 |        91.    Since April 16, 1999, the purported effective date of the Superman
27 | Notices, Plaintiffs/Counterclaim Defendants have been deprived of the benefits of
28 | their purported co-ownership of copyright in Action Comics No. 1.

EXHIBIT 34[38]

508

92.    In response to DC Comics' above actions and assertion and such deprivation to the Siegels of the benefits of their alleged copyright co-ownership, Plaintiffs/Counterclaim Defendants took no action until filing the instant action on October 8, 2004, more than six years after DC Comics advised Plaintiffs/Counterclaim Defendants in writing of defects in the Superman Notices and more than five years after being placed on notice by DC Comics of its claim of exclusive ownership of copyright in Superman and that it rejected and repudiated the Superman Notices and during which time period the Siegels were deprived of benefits to which they claim they are entitled.

93.    Because Plaintiffs/Counterclaim Defendants' claim of partial ownership of copyright accrued more than three years prior to Plaintiffs/Counterclaim Defendants bringing the instant action, even taking into consideration any purported agreements to toll the statute of limitations, any claim of ownership of copyright in Superman by Plaintiffs/Counterclaim Defendants is barred by the three-year statute of limitations of the Copyright Act.

94.    On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 89 – 94 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

95.    A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

### THIRD ALTERNATIVE COUNTERCLAIM FOR ENFORCEMENT OF SETTLEMENT AGREEMENT BETWEEN THE PARTIES

96.    DC Comics repeats and realleges paragraphs 1 - 95 above as if fully set forth herein.

EXHIBIT 34
509

97.    In the event the Superman Notices and/or the Superboy Notice are deemed effective, DC Comics asserts this alternative counterclaim for enforcement of the settlement agreement between the parties.

98.    On October 16, 2001, DC Comics made an offer to settle the issues between the parties, which the Siegels, through their lawyers and authorized representative, Gang, Tyre, accepted by telephone and again in writing on October 19, 2001.  The terms accepted by the Siegels included all necessary material terms, including, *inter alia,* that the Siegels transferred to DC Comics and/or divested themselves of all of their claimed rights in the Superman property (which was defined in the letter as Superman, Superboy and related properties including but not limited Supergirl, Steel, Lois & Clark, and Smallville) and in a property called "The Spectre."  In exchange, the Siegels were to receive: (a) a non-returnable advance; (b) a non-recoupable and non-returnable signing bonus; (c) "forgiveness" of the Advance Payment; (d) guaranteed minimum payments as advances against royalties; and (e) percentage royalties from DC Comics' exploitations of Superman across all media, worldwide.

99.    Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics' offer and the Siegels' acceptance of such offer on October 19, 2001 letter represent an enforceable agreement, *inter alia,* settling all claims between the parties relating to the Superman Notices and the Superboy Notice.

100.    The Siegels' purported repudiation of the agreement was a material breach of such agreement.

## FOURTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION OF LIMITATIONS ON THE SCOPE OF THE SUPERMAN NOTICES AND THE SUPERBOY NOTICE

101.    DC Comics repeats and realleges paragraphs 1 - 100 above as if fully set forth herein.

EXHIBIT 34
510

102.    In the event the Superman Notices and/or the Superboy Notice are deemed effective and the settlement agreement between the parties is not enforced, DC Comics asserts the following alternative counterclaim for a declaration limiting the scope and reach of the Superman Notices and the Superboy Notice in six separate and independent ways.

103.    DC Comics contends that:

### #1  The Superman Ads

104.    The regulations governing the contents of notices of termination promulgated by the U.S. Copyright Office under authority of the 1976 Copyright Act require, in relevant part, that a notice of termination served pursuant to section 304 (c) of the 1976 Copyright Act name "each work to which the notice of termination applies."

105.    Upon information and belief, all of the Superman Ads first secured copyright protection by publication with copyright notice prior to April 16, 1938 and prior to publication of Action Comics No. 1.

106.    The Superman Ads contain and show the appearance of Superman, his costume, and his super-strength.

107.    The grants made by Siegel and Shuster as to the appearance of Superman, his costume, and his super-strength, are still in effect, and all rights under copyright granted therein are still owned exclusively by DC Comics, because the Superman Notices served by the Siegels do not list the works in which the Superman Ads were first published.

108.    Thus, DC Comics is the exclusive owner of all copyright in and to the Superman Ads and thereby retains exclusive ownership of copyright in the appearance of Superman therein, including but not limited to, the appearance of the Superman costume.

EXHIBIT 34
511

### #2  Use Of Superman And Superboy Derivative Works Prepared Prior To The Purported Effective Dates Of The Superman Notices And The Superboy Notice

109.   The Superman Notices purport to terminate the Siegels' share in the copyright grant of Jerome Siegel in all Superman-related works thereafter derived from Action Comics No. 1, including but not limited to the more than 15,000 Superman related works (in addition to Action Comics No. 1) listed in the Superman Notices (the "Superman Derivative Works").  Included among the Superman Derivative Works is the image of the "S in Shield Device" that has become a strong trademark of Superman and his single source, DC Comics.

110.   The Superboy Notice purports to terminate the Siegels' share in the copyright grant of Jerome Siegel in the approximately 1,600 of the Published Superboy Works.

111.   The Superman Derivative Works and the Published Superboy Works are all based upon pre-existing works and were prepared under the authority of the grants of copyright entered into by Siegel and Shuster to DC Comics and/or its predecessors.

112.   Regardless of whether the Superman Notices and the Superboy Notice are legally effective, under the Copyright Act, 17 U.S.C. § 304 (c)(6)(A), DC Comics retains the right to make use of the Superman Derivative Works and the Superboy Published Works under the terms of the original grants under which they were prepared without any duty to account to the Siegels for any such use.

### #3  DC Comics Owns All Superman Derivative Works

113.   All copyright rights in any of the works listed in the Superman Notices, or any other derivative works based upon and that post-date Action Comics No. 1 (the "Post Action Comics No. 1 Works") are owned exclusively by DC Comics.  DC Comics' ownership of such copyrights is not subject to termination pursuant to the Copyright Act.

EXHIBIT 34
512

114.   The Post Action Comics No. 1 Works contain many copyrightable elements not present in Action Comics No. 1 (the "Post Action Comics No. 1 Elements").  These include, but are not limited to, new super powers, new villains, new components to the Superman universe, new elements in the Superman back story, and changes in the appearance of Superman.  Notably, many of Superman's powers that are among his most famous today did <u>not</u> appear in Action Comics No. 1 but only appeared later in the Post Action Comics No. 1 Works.

115.   Regardless of whether the Superman Notices and the Superboy Notice are valid and effective, DC Comics remains the sole owner of the Post Action Comics No. 1 Works and in the Post Action Comics No. 1 Elements.  Moreover, the Siegels can make no use of the Post Action Comics No. 1 Elements.

### #4  Superboy Is A Derivative Work Based On Superman

116.   In the November 1938, Letter suggesting the idea for a Superboy comic strip, Siegel stated such comic "would relate to the adventures of Superman as a youth."  In the Unpublished 1940 Superboy Script, Siegel wrote "[s]o many faithful followers of today's leading adventure comic strip, SUPERMAN, wrote in demanding the adventures of Clark Kent as a youth . . .And so here he is at last…the answer to your requests…America's outstanding boy hero: SUPERBOY!"

117.   As demonstrated by the foregoing, the Siegel Superboy Proposals were based upon the pre-existing Superman character and stories and are thus derivative works based thereon, and were not made at the instigation of Siegel.

118.   Thus, even if the Superboy Notice were effective, any recapture of copyright rights would be limited to any new copyrightable subject matter added by Siegel and Shuster to the pre-existing Superman character and stories exclusively owned by DC Comics and its predecessors.

119.   The new copyrightable subject matter contained in the Siegel Superboy Proposals is *de minimis* and thus, even if the Siegels could recapture

EXHIBIT 34
513

1    U.S. Copyrights therein, such recapture could not affect DC Comics' continuing
2    right to create and exploit new derivative works that do not include such new
3    copyrightable subject matter, including but not limited to, the television series
4    "Smallville."

**#5  The Derivative Work Superboy Is A Joint Work Of Authorship**

6        120.    Upon information and belief, the Siegel Superboy Proposals were
7    joint works of authorship as they were prepared jointly with Shuster and because it
8    was intended that their contents would be merged with artwork to create a comic
9    book or comic strip.

10        121.    As eventually published, the works containing the Superboy character
11    included both artwork and storyline.

12        122.    The joint author's share in the Siegel Superboy Proposals is owned by
13    DC Comics and cannot be terminated either by the Superman Notices or the
14    Superboy Notice.

15        123.    As a result of the foregoing, DC Comics right to continue to exploit
16    the Siegel Superboy Proposals and any derivative works based thereon cannot be
17    affected by either the Superman Notices or the Superboy Notice.

**#6  "Smallville" Is Not Derived From Superboy**

19        124.    Among the derivative works based upon Superman and authorized by
20    DC Comics is the weekly television series, "Smallville."

21        125.    Regardless of whether the Superboy Notice is effective and further
22    regardless of whether Superboy is a derivative work based upon Superman,
23    "Smallville" was derived from and based upon Superman and is not a derivative
24    work based upon the Siegel Superboy Proposals or any succeeding Superboy
25    comic or Superboy work exploited by DC Comics and/or its predecessors prior to
26    May 21, 1948.  Beyond sharing the idea of depicting Superman as a youth,
27    Smallville is not substantially similar to the Siegel Superboy Works.

28

**EXHIBIT 34**44
**514**

126.  Thus, irrespective of any accounting issues relating to the Siegels' purported right to receive compensation with respect to new episodes of "Smallville," DC Comics' right to continue to authorize production, distribution, and airing of "Smallville" television episodes remains unaffected by the Superman Notices and the Superboy Notice.

### #7  The Additional Action Comics No. 1 Materials

127.  The Additional Action Comics No. 1 Materials created in 1938 were prepared at the instance and expense of DCI and subject to its right to control. Thus, under the 1909 Copyright Act, the Additional Action Comics No. 1 Materials were "works made for hire" and copyright therein was owned by DCI *ab initio*.

128.  Because the Additional Action Comics No. 1 Materials were works made for hire, the grant of U.S. Copyright therein cannot be terminated pursuant to 17 U.S.C. § 304 (c).  As a result, DC Comics remains the sole owner of the Additional Action Comics No. 1 Materials.

129.  On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth in paragraphs 102 - 128 above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics concerning the above issues.

130.  A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

### FIFTH ALTERNATIVE COUNTERCLAIM FOR DECLARATION REGARDING THE PRINCIPLES TO BE APPLIED IN AN ACCOUNTING

131.  DC Comics repeats and realleges paragraphs 1 - 130 above as if fully set forth herein.

132.   DC Comics contends that in the event the Superman Notices and/or the Superboy Notice were deemed valid and effective, any accounting to which the Siegels would be entitled relating to Superman (including its derivative work Superboy, collectively for this Counterclaim "Superman") would be subject to the following limitations and reductions:

a. The Siegels would not be entitled to any revenues derived from exploitation of Superman outside of the United States because termination pursuant to 17 U.S.C. § 304 (c) cannot affect any grant of non-United States copyrights.  17 U.S.C. § 304 (c) (6) (E).

b. The Siegels would not be entitled to any revenues derived from exploitation of the Superman Derivative Works and the Superboy Derivative Works.  17 U.S.C. § 304 (c) (6) (A).

c. Any accounting of profits for exploitation of Superman would be reduced to account for the value of the appearance of Superman based upon the Siegels' failure to terminate the Superman Ads.

d. Any accounting of recoverable profits for exploitation of Superman would be reduced to that portion of such profits that are attributable to the copyrightable elements from Action Comics No. 1 less the Additional Action Comics No. 1 Materials (if any), actually present in the Superman works subject to accounting.

e. Any accounting of recoverable profits would be limited to profits of DC Comics, the sole owner of rights under any purportedly terminated grants and the sole owner of copyright in Action Comics No. 1, and the Siegels would not be entitled to any share of revenues earned by any third party licensees of DC Comics, including but not limited to, any of the other defendants.

f. The Siegels would not be entitled to any accounting for profits attributable to DC Comics' continuing exercise of its rights to use all

EXHIBIT 34[46]
516

other rights other than rights under copyright with respect to Superman and Superboy, including but not limited to, any trademark rights. As a result, any accounting of profits would be further reduced by the value in Superman and the Superman Marks that have been built up by DC Comics and its predecessors over the last six decades by virtue of, *inter alia*, the Post Action Comics No. 1 Works and Elements, and the Superman Marks

g. Any accounting of profits would be further reduced by additional factors, including but not limited to, DC Comics' direct and indirect expenses, taxes, and DC Comics' independent role as a publisher of Superman.

h. Subject to all reductions aforesaid and otherwise determined by the Court to be applicable, the Siegels would be entitled to an accounting of only one-half of the copyright co-owner's profits.

133. On information and belief, plaintiffs deny DC Comics' contentions and/or the legal effect ascribed thereto as set forth above. Accordingly, an actual controversy has arisen and now exists between Plaintiffs/Counterclaim Defendants and DC Comics as to the above issues.

134. A justiciable controversy exists concerning the above issues and a judicial declaration is necessary and appropriate to determine the parties' respective rights with regard thereto.

WHEREFORE, DC Comics demands judgment as follows:

1. Declaring that the Superman Notices and the Superboy Notice are ineffective for one or more of the reasons set forth in DC Comics' First Counterclaim;

2. In the event that the Superman Notices and/or the Superboy Notice are deemed effective, enforcing the settlement agreement of all claims between the parties;

EXHIBIT 34[47]
517

3.    In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and the Court further finds that there is no enforceable settlement agreement between the parties, declaring that the scope and effect of the Superman Notices and the Superboy Notice are limited as set forth in DC Comics' Third Alternative Counterclaim

4.    In the event that the Superman Notices and/or the Superboy Notice are deemed effective, and the Court further finds that there is no enforceable settlement agreement between the parties, declaring that any accounting to which the Siegels may be entitled will be limited by all applicable principles, including but not limited to, those set forth in DC Comics Fourth Alternative Counterclaim.

5.    Awarding DC Comics its costs and reasonably attorneys' fees incurred in connection with DC Comics' defenses and claims herein seeking declarations with respect to copyright ownership; and

6.    Awarding DC Comics such other and further relief as may be just.

DATED:    November 22, 2004

FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu
Patrick T. Perkins
James D. Weinberger

-and-

LOEB & LOEB LLP
Jonathan Zavin
David Grossman

By: _____
Patrick T. Perkins (Admitted *pro hac vice*)

Attorneys for Defendants Warner Bros. Entertainment Inc., Time Warner Inc., and Defendant and Counterclaimant DC Comics

I:\PPERKINS\DCC\Siegel\Pleadings\Superman Answer & CC - Final.doc

EXHIBIT 34
48
518

# EXHIBIT 35

Calendar
2231.811



1  FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   Roger L. Zissu (Admitted *pro hac vice*)
2  Patrick T. Perkins (Admitted *pro hac vice*)
   James D. Weinberger (Admitted *pro hac vice*)
3  866 United Nations Plaza
   New York, New York 10017
4  Telephone: (212) 813-5900
   Fax: (212) 813-5901
5
   WEISSMANN WOLFF BERGMAN
6    COLEMAN GRODIN & EVALL LLP
   Michael Bergman (SBN 37797)
7  David L. Burg (SBN 130403)
   Adam Hagen (SBN 218021)
8  9665 Wilshire Boulevard, Ninth Floor
   Beverly Hills, California 90212
9  Telephone: (310) 858-7888
   Fax: (310) 550-7191
10
11 Attorneys for Defendants/Counterclaimant

| | |
|---|---|
| 12  JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case No. 04-8400 (DDP) (RZx) |
| 13          Plaintiffs, | |
| 14      vs. | |
| 15  WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10. | -and- |
| 16          Defendants. | |
| 17  JOANNE SIEGEL and LAURA SIEGEL LARSON, | Case No. 04-8776 (DDP) (RZx) |
| 18          Plaintiffs, | |
| 19      vs. | **DEFENDANTS'/ COUNTERCLAIMANT'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS** |
| 20  TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10. | |
| 21 | |
| 22 | |
| 23          Defendants. | |
| 24  AND RELATED COUNTERCLAIMS | |

25          Pursuant to Fed. R. Civ. P. 34, Defendants Warner Bros. Entertainment Inc.,

26 Time Warner Inc., Warner Communications Inc., and Warner Bros. Television

27 Production Inc., and Defendant and Counterclaimant DC Comics, request that

28

**EXHIBIT 35**
**519**

1  Plaintiffs Joanne Siegel and Laura Siegel Larson respond hereto in writing and
2  produce and permit inspection and copying of each of the following documents and
3  tangible things in their possession, custody or control. The documents and things
4  identified herein shall be produced no later than 30 days from the date of this request
5  at the offices of Fross Zelnick Lehrman & Zissu, P.C., 866 United Nations Plaza, New
6  York, New York 10017, or as otherwise agreed.

7  **INSTRUCTIONS AND DEFINITIONS**

8      A.    "Plaintiffs" means, collectively and severally, Plaintiffs Joanne Siegel
9  and Laura Siegel Larson and each of their past and present agents and
10 representatives.

11     B.    "Siegel" means Jerome (a.k.a. "Jerry") Siegel and each of his agents
12 and representatives.

13     C.    "Shuster" means Joseph (a.k.a. "Joe") Shuster and each of his agents
14 and representatives.

15     D.    The "Shuster Representatives" means, collectively and severally, Jean
16 Adele Peavy, Mark Warren Peary, all executors, administrators, heirs, and
17 representatives of the estate of Joseph Shuster, and all of their respective agents and
18 representatives.

19     E.    "Defendants" means, collectively and severally, Defendants Warner
20 Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., and
21 Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC
22 Comics, each of their predecessors in interest, and all of their agents, employees,
23 and representatives.

24     F.    "First Complaint" means the complaint and any amendments,
25 supplements, or corrections thereto in action Case No. 04-8400 (DDP) (RZx).

26     G.    "Second Complaint" means the complaint and any amendments,
27 supplements, or corrections thereto in action Case No. 04-08776 (DDP) (RZx).

28

2

**EXHIBIT 35**
**520**

1      H.    "Concerning" means relating to, describing, evidencing, proving,
2 tending to prove, referring to, comprising, constituting, disproving or tending to
3 disprove.

4      I.     Whenever the terms "and" or "or" are used they are to be construed
5 both disjunctively and conjunctively as necessary to bring within the scope of these
6 discovery requests responses that might otherwise be construed to be outside the
7 scope.

8      J.     The use of the singular form of any word includes the plural and vice
9 versa.

10      K.    In the event any document is withheld on a claim of attorney/client
11 privilege or work product immunity, please provide a statement signed by an
12 attorney representing Plaintiffs setting forth as to each such document:

13            (1)    The name of the sender(s) of the document;
14            (2)    The name of the author(s) of the document;
15            (3)    The name(s) of all person(s) to whom copies were sent and/or to
16                    whom the information contained therein was disclosed;
17            (4)    Job title of every person named in (1), (2), and (3) above;
18            (5)    Date of the document;
19            (6)    The date on which the document was received;
20            (7)    A brief description of the nature and subject matter of the
21                    document; and
22            (8)    The statute, rule, or decision which is claimed to give rise to the
23                    privilege.

24      M.    "Writing" means any tangible expression or communication -- printed
25 or electronic -- however created, recorded, embodied, maintained, filed, or stored in
26 any medium, mode, form, or technology, including, without limitation, as defined
27 by Rule 1001 of the Federal Rules of Evidence, and includes every "original" and
28 every "duplicate" of each such Writing as defined, respectively, by Rules 1001(3)

<div align="center">3</div>

**EXHIBIT 35**
**521**

1 │ and (4) of the Federal Rules of Evidence.

2 │      N.    The "1947 Action" means the lawsuit filed by Jerome Siegel and

3 │ Joseph Shuster in or about 1947 in the Supreme Court of the State of New York,

4 │ County of Westchester, against National Comics Publications, Inc.

5 │ <div align="center">**REQUESTS**</div>

6 │ **Request No. 1**

7 │     All Writings upon which Plaintiffs intend to rely in this action.

8 │ **Request No. 2**

9 │     All Writings concerning any communication or agreements among or

10 │ between Siegel and Shuster.

11 │ **Request No. 3**

12 │     All Writings concerning any communication or agreement between Siegel

13 │ and/or Shuster, on the one hand, and Defendants, on the other hand.

14 │ **Request No. 4**

15 │     All Writings concerning or which Plaintiffs contend support any of the

16 │ allegations in paragraph 16 of the First Complaint.

17 │ **Request No. 5**

18 │     All Writings concerning: (a) the twenty-four days of "Superman" comic strips

19 │ intended for newspaper publication; (b) the synopsis of comic strips for weeks two,

20 │ three and four; (c) the paragraph previewing future "Superman" exploits; and (d) the

21 │ nine page synopsis that Plaintiffs allege Siegel created "in or about 1934," in

22 │ paragraph 17 of the First Complaint, including but not limited to correspondence

23 │ relating thereto, as well as any drafts, sketches, drawings, or story boards.

24 │ **Request No. 6**

25 │     All Writings concerning: (a) the fifteen daily "Superman" comic strips and (b)

26 │ the three additional six day weeks of "Superman" comics that Plaintiffs allege

27 │ Siegel and Shuster created "in or about 1934," in paragraph 18 of the First

28 │ Complaint, including but not limited to correspondence relating thereto, as well as

<div align="center">4</div>

**EXHIBIT 35**

**522**

1   any drafts, sketches, drawings, or story boards.

2   **Request No. 7**

3       All Writings concerning the October 4, 1935 letter from Malcolm Wheeler-
4   Nicholson referred to in paragraph 19 of the First Complaint.

5   **Request No. 8**

6       All Writings concerning the December 4, 1937 agreement between Siegel and
7   Shuster and Detective Comics referred to in paragraph 20 of the First Complaint.

8   **Request No. 9**

9       All Writings concerning the request to Siegel and Shuster from McClure
10  Newspaper Syndicate to forward the "1934 Superman Comic Strip material" to
11  Detective Comics that Plaintiffs allege in paragraph 21 of the First Complaint took
12  place in 1938.

13  **Request No. 10**

14      All Writings concerning or which Plaintiffs contend support the allegation in
15  paragraph 21 of the First Complaint that, by early 1938, "'Superman" and his
16  miraculous powers had already been completely developed by Siegel and Shuster."

17  **Request No. 11**

18      All Writings concerning or which Plaintiffs contend support the allegations in
19  paragraph 22 of the First Complaint that in or about January or February 1938, in
20  response to interest by Detective Comics, "Siegel and Shuster cut and pasted"
21  material they had previously created into "more than ninety separate panels."

22  **Request No. 12**

23      All Writings concerning the March 1, 1938 grant from Siegel and Shuster to
24  Detective Comics referred to in paragraph 24 of the First Complaint.

25  **Request No. 13**

26      All Writings concerning any advertisement of Superman and "Action Comics
27  No. 1," including but not limited to those which appeared in "More Fun Comics No.
28  31," "Detective Comics No. 15," and "New Adventure Comics No. 26."

5

**EXHIBIT 35**
**523**

1 | **Request No. 14**

2 |     All Writings concerning Action Comics No. 1, including but not limited to,

3 | any correspondence related thereto, and all drafts, sketches, drawings, or story

4 | boards.

5 | **Request No. 15**

6 |     All Writings concerning the September 22, 1938 agreement among Siegel and

7 | Shuster, Detective Comics and The McClure Newspaper Syndicate referred to in

8 | paragraph 29 of the First Complaint.

9 | **Request No. 16**

10 |     All Writings concerning the September 22, 1938 grant from Siegel and

11 | Shuster to Detective Comics referred to in paragraph 30 of the First Complaint.

12 | **Request No. 17**

13 |     All Writings concerning Action Comics Nos. 1-6, including but not limited to

14 | any correspondence related thereto, and all drafts, sketches, drawings, or story

15 | boards.

16 | **Request No. 18**

17 |     All Writings concerning or which Plaintiffs contend support the allegation in

18 | paragraph 32 of the First Complaint that Action Comics Nos. 2-6 were not "works

19 | made for hire."

20 | **Request No. 19**

21 |     All Writings concerning the December 19, 1939 agreement between Siegel

22 | and Shuster and Detective Comics referred to in paragraph 33 of the First

23 | Complaint.

24 | **Request No. 20**

25 |     All Writings concerning or which Plaintiffs contend support the allegations in

26 | paragraph 34 of the First Complaint that the Superman works created by Siegel and

27 | Shuster after September 28, 1938 were not "works made for hire."

28 |

<br>

6

**EXHIBIT 35**

**524**

**Request No. 21**

All Writings concerning the "character, conception and plan" for "Superboy," and its submission to any other person or entity, including but not limited to Detective Comics, referred to in paragraph 18 of the Second Complaint.

**Request No. 22**

All Writings concerning the letter dated December 2, 1938 referred to in paragraph 19 of the Second Complaint.

**Request No. 23**

All Writings concerning the "Siegel Superboy Material" referred to in paragraph 22 of the Second Complaint, including but not limited, any correspondence related thereto, and all drafts, sketches, drawings, or story boards.

**Request No. 24**

All Writings concerning any submission (or response thereto) of the "Siegel Superboy Material" referred to paragraphs 27-28 of the Second Complaint.

**Request No. 25**

All Writings concerning or which Plaintiffs contend support any of the allegations in paragraph 31 of the Second Complaint.

**Request No. 26**

All Writings concerning the "Superboy Comic Books" referred to in paragraph 37 of the Second Complaint.

**Request No. 27**

All Writings concerning the 1947 Action.

**Request No. 28**

All Writings concerning the trial of the 1947 Action before the Official Referee.

**Request No. 29**

All Writings concerning the May 19, 1948 stipulation of settlement between Siegel and National Comics Publications, Inc. referred to in paragraph 35 of the

7

**EXHIBIT 35**
**525**

1 │ First Complaint.

2 │ **Request No. 30**

3 │     All Writings concerning the Consent Judgment entered into by the parties to

4 │ the 1947 Action.

5 │ **Request No. 31**

6 │     All Writings concerning the action brought in the United States District Court

7 │ for the Southern District of New York entitled *Siegel v. National Periodical Publs.,*

8 │ *Inc.*, Case No. 69 Civ. 1429.

9 │ **Request No. 32**

10 │     All Writings concerning the appeal to the United States Court of Appeals for

11 │ the Second Circuit entitled *Siegel v. National Periodical Publs., Inc.*, Docket No.

12 │ 73-2844.

13 │ **Request No. 33**

14 │     All Writings concerning the December 23, 1975 agreement referred to in

15 │ paragraph 38 of the First Complaint.

16 │ **Request No. 34**

17 │     All Writings concerning any benefits ever received by Siegel, Shuster, or

18 │ Plaintiffs from Defendants, including without limitation pursuant to the December

19 │ 23, 1975 Agreement referred to in paragraph 38 of the First Complaint and

20 │ paragraph 57 of the Second Complaint.

21 │ **Request No. 35**

22 │     All Writings concerning the conception or creation of any element of the

23 │ Superman character or story.

24 │ **Request No. 36**

25 │     All Writings concerning any communication or agreement (a) between or

26 │ among Plaintiffs concerning any of the matters alleged in the First Complaint or the

27 │ Second Complaint, (b) between Plaintiffs, and on the one hand, and any other

28 │ person or entity, on the other hand, concerning any of the matters alleged in the First

8

**EXHIBIT 35**

**526**

1  Complaint or the Second Complaint, or (c) between Plaintiffs and Defendants.

2  **Request No. 37**

3      All Writings concerning any of the following:

4      i.    Letter from Jerry Siegel to Stanley H. Livingston, President,

5  Consolidated Book Publishers, dated June 1, 1933.

6      ii.    Letter from Stanley H. Livingston, President, Consolidated Book

7  Publishers, to Jerry Siegel dated June 8, 1933.

8      iii.    Post card from Jerry Siegel to Stanley H. Livingston, President,

9  Consolidated Book Publishers, dated August 8, 1933.

10      iv.    Letter from Stanley H. Livingston, President, Consolidated Book

11  Publishers, to Jerry Siegel dated August 22, 1933.

12      v.    Letter from Lee O'Mealia to Jerry Siegel dated July 17, 1933.

13      vi.    Letter from Lee O'Mealia to Jerry Siegel dated September 11, 1933.

14      vii.    Letter from Lee O'Mealia to Jerry Siegel dated November 2, 1933.

15      viii.    Letter from Lee O'Mealia to Jerry Siegel dated August 31, 1934.

16      ix.    Letter from Russell Keaton to Jerry Siegel dated June 9, 1934.

17      x.    Script for Superman submitted by Jerry Siegel to Russell Keaton on

18  or about June 11, 1934.

19      xi.    Letter from Russell Keaton to Jerry Siegel dated June 14, 1934.

20      xii.    Letter from Russell Keaton to Jerry Siegel dated June 22, 1934.

21      xiii.    Letter from Russell Keaton to Jerry Siegel dated July 6, 1934.

22      xiv.    Letter from Russell Keaton to Jerry Siegel dated July 11, 1934.

23      xv.    Letter from Russell Keaton to Jerry Siegel dated August 7, 1934.

24      xvi.    Letter from Russell Keaton to Jerry Siegel dated October 17, 1934.

25      xvii.    Letter from Russell Keaton to Jerry Siegel dated November 3, 1934.

26      xviii.    Rejection letters re Superman from the Bell Syndicate, Publishers

27  Syndicate of Chicago, Super Magazines, Dell Publishing Company, Swan-

28

9

**EXHIBIT 35**
**527**

1 │ McDonald Features, Esquire Features, McClure Newspaper Syndicate, United

2 │ Features Syndicate or The Ledger Syndicate.

3 │       xix.      Letter dated November 16, 1974 from the editor of Super Magazines.

4 │       xx.      Letter dated October 29, 1937 from the editor of Super Magazines.

5 │       xxi.      Letter from Joseph B. Agnelli of The Bell Syndicate to Jerry Siegel

6 │ dated February 21, 1935.

7 │       xxii.      Letter from Horace Epps of The Bell Syndicate to Jerry Siegel, dated

8 │ May 27, 1935.

9 │       xxiii.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated June

10 │ 6, 1935.

11 │       xxiv.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated July 3,

12 │ 1935.

13 │       xxv.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

14 │ October 4, 1935.

15 │       xxvi.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated March

16 │ 13, 1936.

17 │       xxvii.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated March

18 │ 20, 1936.

19 │       xxviii.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated March

20 │ 16, 1937.

21 │       xxix.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

22 │ August 3, 1937.

23 │       xxx.      Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

24 │ December 1, 1937.

25 │       xxxi.      Letter from M.C. Gaines of The McClure Newspaper Syndicate to

26 │ Jerry Siegel dated November 30, 1937.

27 │       xxxii.      Letter from M.C. Gaines of The McClure Newspaper Syndicate to

28 │ Jerry Siegel dated February 9, 1938.

10

EXHIBIT 35

528

1      xxxiii.  Letter from The McClure Newspaper Syndicate to Jerry Siegel dated
2 April 8, 1938.

3      xxxiv.  Letter from The McClure Newspaper Syndicate to Jerry Siegel dated
4 April 13, 1938.

5      xxxv.   Letter from The McClure Newspaper Syndicate to Jerry Siegel dated
6 April 21, 1938.

7      xxxvi.  Letter from Jerry Siegel to M.C. Gaines of The McClure Newspaper
8 Syndicate dated December 1, 1937.

9      xxxvii.  Letter from M.C. Gaines of The McClure Newspaper Syndicate to
10 Jerry Siegel dated June 13, 1938.

11      xxxviii. Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry Siegel
12 dated December 1, 1937.

13      xxxix.  Letter from Jerry Siegel to Jack Liebowitz of Detective Comics, Inc.
14 dated December 6, 1937.

15      xl.      Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry Siegel
16 dated December 9, 1937.

17      xli.      Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry Siegel
18 dated January 5, 1938.

19      xlii.     Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry Siegel
20 dated March 1, 1938.

21      xliii.    Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry Siegel
22 dated June 9, 1938.

23      xliv.     Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
24 dated January 10, 1938.

25      xlv.      Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
26 dated January 12, 1938.

27      xlvi.     Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
28 dated January 31, 1938.

11

EXHIBIT 35
529

1       xlvii.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
2   dated February 1, 1938.

3       xlviii.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
4   dated February 4, 1938.

5       xlix.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
6   dated February 9, 1938.

7       l.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
8   dated February 16, 1938.

9       li.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
10  dated February 22, 1938.

11      lii.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel
12  dated March 14, 1938.

13      liii.    Letter from Howard Denby of Esquire Features, Inc. to Jerry Siegel
14  dated September 9, 1936.

15      liv.    Letter from New Fun's Managing Editor to Jerry Siegel dated
16  October 23, 1935.

17      lv.    Letter from Swan-McDonald Features, Inc. to Jerry Siegel dated
18  February 27, 1936.

19      lvi.    Letter from William Laas of United Features Syndicate to Jerry
20  Siegel dated February 13, 1937.

21      lvii.    Letter from The Ledger Syndicate to Jerry Siegel dated March 2,
22  1937.

23      lviii.    Letter from Chas. F. Lounsbury of The Register and Tribune
24  Syndicate dated August 26, 1938.

25      lix.    Letter from Chas. F. Lounsbury of The Register and Tribune
26  Syndicate dated September 7, 1938.

27

28

12

**EXHIBIT 35**
**530**

**Request No. 38**

All Writings concerning the notices of termination under 17 U.S.C. § 304, which Plaintiffs claim they served on or about April 3, 1997.

**Request No. 39**

All Writings concerning or which Plaintiffs contend support their allegation that the notices of termination served by Plaintiffs on or about April 3, 1997 were drafted, served and filed in full compliance with 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10 (2003).

**Request No. 40**

All Writings concerning the notice of termination under 17 U.S.C. § 304, which Plaintiffs claim they served on or about November 8, 2002.

**Request No. 41**

All Writings concerning or which Plaintiffs contend support their allegation that the notice of termination served by Plaintiffs on or about November 8, 2002 was drafted, served and filed in full compliance with 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10 (2003).

**Request No. 42**

All Writings concerning ownership or any claim of ownership by Plaintiffs of any trademarks, trade dress, or related marks or rights in the Superman Crest, as that term is defined in the First and Second Complaints.

**Request No. 43**

All Writings concerning or which Plaintiffs contend support any damage or injury which they claim has resulted from the waste alleged in Count Five of the First Complaint.

**Request No. 44**

All Writings concerning or which Plaintiffs contend support the allegation of "Defendants' under-utilization of the Recaptured copyrights" in paragraph 79 of the First Complaint.

13

**EXHIBIT 35**
**531**

**Request No. 45**

All Writings concerning or which Plaintiffs contend support the allegation of "Defendants' non 'arms length' contracts between wholly owned subsidiaries and divisions" in paragraph 79 of the First Complaint.

**Request No. 46**

All Writings concerning or which Plaintiffs contend support the allegation of "Defendants' self-serving accounting practices" in paragraph 79 of the First Complaint.

**Request No. 47**

All Writings concerning or which Plaintiffs contend support the allegation of "Defendants' improper allocation of revenues, costs and profits" in paragraph 79 of the First Complaint.

**Request No. 48**

All Writings concerning or which Plaintiffs contend support the allegation of "Defendants' relatively marginal exploitation" of the Superman franchise in paragraph 79 of the First Complaint.

**Request No. 49**

All Writings concerning or which Plaintiffs contend support the allegation that "market opportunities for such a superhero franchise has been and continues to be at an all time high" in paragraph 79 of the First Complaint.

**Request No. 50**

All Writings concerning any attempts by Plaintiffs, Siegel, and/or Shuster to sell, license, assign, transfer, market, or otherwise exploit any rights in Superman.

**Request No. 51**

All Writings concerning any payments or other consideration received by Plaintiffs from any Defendants in connection with Superman.

14

**EXHIBIT 35**
**532**

1    **Request No. 52**

2        All Writings concerning the settlement discussions between Plaintiffs and

3    Defendants that took place from approximately April 17, 1997 through September

4    30, 2002.

5    **Request No. 53**

6        All Writings concerning the October 19, 2001 letter from Plaintiffs' then

7    counsel to John Schulman.

8    **Request No. 54**

9        All Writings concerning the October 26, 2001 letter from John Schulman to

10    Plaintiffs' then counsel.

11    **Request No. 55**

12        All Writings concerning the draft agreement transmitted to Plaintiffs on or

13    about February 1, 2002.

14    **Request No. 56**

15        All Writings concerning the May 9, 2002 letter from Joanne Siegel to Richard

16    Parsons.

17    **Request No. 57**

18        All Writings concerning the September 21, 2002 letter from Plaintiffs to Paul

19    Levitz.

20    **Request No. 58**

21        All Writings concerning any communications between Plaintiffs and any

22    attorney, partner, employee, agent, or representative of the law firm Gang Tyre

23    Ramer & Brown after September 21, 2002.

24    **Request No. 59**

25        All Writings concerning any disposition of any rights relating to Superman,

26    including but not limited to any solicitation, offer, option, agreement or license.

27

28

15

**EXHIBIT 35**
**533**

1 **Request No. 60**

2      All Writings concerning the division of any revenues relating to Superman

3 among Plaintiffs and between Plaintiffs and any other person or entity.

4 **Request No. 61**

5      All Writings concerning any communication or agreement between Michael

6 Siegel and Plaintiffs related to Superman.

7 **Request No. 62**

8      All Writings concerning any communication or agreement between Dennis

9 Larson and Plaintiffs related to Superman.

10 **Request No. 63**

11      All Writings concerning the Shuster Representatives, including but not

12 limited to any communication or agreements between Plaintiffs and any of the

13 Shuster Representatives.

14 **Request No. 64**

15      All Writings concerning Marc Toberoff or his law firm which were created or

16 which refer to the period prior to his being retained as counsel for Plaintiffs in these

17 related actions.

18 DATED:      June 21, 2005          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                     Roger L. Zissu
19                                   Patrick T. Perkins
                                     James D. Weinberger
20
                                              -and-
21
22                                   WEISSMANN WOLFF BERGMAN
                                        COLEMAN GRODIN & EVALL LLP
23                                   Michael Bergman
                                     David L. Burg
                                     Adam Hagen
24
25                                   By: _____
                                          Patrick T. Perkins
26                                   Attorneys for Defendants/Counterclaimant
27
28

16

**EXHIBIT 35**
**534**

PROOF OF SERVICE

1013A(3) C.C.P. Revised 5/1/88

STATE OF CALIFORNIA                   )
                                      ) ss.
COUNTY OF LOS ANGELES                 )

I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 1513 Livonia Avenue, Los Angeles, CA 90035. On the date shown below, I served the foregoing document described as **DEFENDANTS'/COUNTERCLAIMANT'S FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENT AND THINGS** on the interested parties in said action, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Marc Toberoff
Rafael Gomez-Cabrera
Nicholas C. Williamson
Law Offices of Marc Toberoff, PLC
1999 Avenue of the Stars, Suite 1540
Los Angeles, CA 90067

\_\_\_     **(BY MAIL)**   I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**XX**     **(PERSONAL SERVICE)** I delivered such document to the offices of the addressee above.

\_\_\_     **(FACSIMILE SERVICE)**  I caused such document to be transmitted via facsimile to the offices of the addressees at the numbers listed above.

\_\_\_     **(BY FEDERAL EXPRESS)** I caused a copy of such document(s) to be delivered to the offices of the addressee(s) via Federal Express, next business day delivery service.

Executed on **June 21, 2005**, at Beverly Hills, California.

\_\_\_     **STATE**        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**XX**     **FEDERAL**     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
MEL STEINER

**EXHIBIT 35**
**535**

# EXHIBIT 36

1   Marc Toberoff (CA State Bar No. 188547)
    Larry S. Greenfield (CA State Bar No. 093917)
2   Nicholas C. Williamson (CA State Bar No. 231124)
    LAW OFFICES OF MARC TOBEROFF, PLC
3   1999 Avenue of the Stars, Suite 1540
    Los Angeles, CA 90067
4   Telephone: (310) 246-3333
    Facsimile: (310) 246-3101
5

6   Attorneys for Plaintiffs and Counterclaim Defendants
    Joanne Siegel and Laura Siegel Larson
7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10  JOANNE SIEGEL, an individual; and   Civil Case No. **04-8400  DDP (RZx)**
11  LAURA SIEGEL LARSON, an                                    **&**
12  individual,                          **04-8776  DDP (AJWx)**

13          Plaintiffs,                  **PLAINTIFFS JOANNE SIEGEL
                                         AND LAURA SIEGEL LARSON'S
14      vs.                              RESPONSE TO DEFENDANTS'/
                                         COUNTERCLAIMANT'S FIRST
15  WARNER BROS.                         SET OF REQUESTS FOR
                                         PRODUCTION OF DOCUMENTS
16  ENTERTAINMENT INC., a                AND THINGS**
    corporation; TIME WARNER INC., a
17  corporation; DC COMICS, a general
18  partnership; and DOES 1-10,

19          Defendants
20
21  DC COMICS,

22          Counterclaimant
23
24      vs.

25  JOANNE SIEGEL, an individual; and
26  LAURA SIEGEL LARSON, an
    individual,
27
28          Counterclaim Defendants.

                                1
**EXHIBIT 36**
**536**

1  PROPOUNDING PARTY:  Defendants WARNER BROS. ENTERTAINMENT

2  INC., TIME WARNER INC., WARNER COMMUNICATIONS INC.,

3  WARNER BROS. TELEVISION PRODUCTION INC., and Defendant/

4  Counterclaimant DC COMICS.

5  RESPONDING PARTY:  Plaintiffs JOANNE SIEGEL and LAURA SIEGEL

6  LARSON.

7  SET NUMBER:  One (Nos. 1-64).

8       Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs

9  Joanne Siegel and Laura Siegel Larson ("Plaintiffs") hereby respond to the first

10  set of Requests for the Production of Documents and Things ("Request for

11  Production") served by Defendants Warner Bros. Entertainment Inc., Time

12  Warner Inc., Warner Communications Inc., Warner Bros. Television Production

13  Inc., and Defendant/Counterclaimant DC Comics ("Defendants").  Discovery is

14  ongoing, and Plaintiffs reserve the right to amend, modify, supplement or alter

15  this response as warranted by subsequently discovered information, and also to

16  rely upon subsequently discovered information or information omitted from this

17  response due to mistake, error, or inadvertence.  By producing any item in

18  response to the Request for Production, Plaintiffs are not waiving any objection

19  on any ground to its use for any purpose in any subsequent proceeding

20  (including as evidence at trial) in this or any other action.  Any statement in this

21  response that Plaintiffs will produce responsive items does not constitute a

22  representation that any such item exists within its possession, custody or

23  control.  Any production in response to the Request for production will be done

24  at a reasonable time and in a reasonable manner to be agreed upon by counsel.

25  //

26  //

27  //

28  //

# I.

## OBJECTIONS TO THE ENTIRE REQUEST FOR PRODUCTION

Plaintiffs object to the entire Request for Production on each of the following grounds and incorporate by reference each of the following objections into their response to each individual request within it:

1.      Plaintiffs object to the entire Request for Production to the extent that it seeks the production or identification of any item, or portion thereof, comprising or reflecting information transmitted and maintained in confidence between Plaintiffs or any person or entity acting on their behalf and their counsel for the purpose of obtaining legal advice or representation, on the ground that such information is protected from disclosure by the attorney-client privilege. Plaintiffs will serve a log identifying each item, or portion thereof, withheld from production in response to the Request for Production under claim of attorney-client privilege which was created before the inception of this action.

2.      Plaintiffs object to the entire Request for Production to the extent that it seeks the production or identification of any item, or portion thereof, comprising or reflecting information with any confidential impression, conclusion, opinion, legal research, or legal theory of counsel for Plaintiffs or any other person or entity, on the ground that such information is protected from disclosure by the attorney work product privilege. Plaintiffs will serve a log identifying each item, or portion thereof, withheld from production in response to the Request for Production under claim of attorney work product privilege which was created before the inception of this action.

3.      Plaintiffs object to the entire Request for Production to the extent that it seeks the production or identification of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and

admissible evidence, on the ground that it exceeds the permissible scope of discovery delimited by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

    4.    Plaintiffs object to the entire Request for Production to the extent that it seeks the production or identification of any item, or portion thereof, comprising or reflecting any trade secret or other confidential or proprietary information of Plaintiffs or any other person or entity.

    5.    Plaintiffs object to the entire Request for Production to the extent that it seeks the production or identification of any item, or portion thereof, which is protected from disclosure by any privacy or similar rights of Plaintiffs or any other person or entity.

    6.    Plaintiffs object to the entire Request for Production to the extent that it seeks the production of original documents, on the ground that such production would be burdensome, oppressive, and unnecessary.  Plaintiffs reserve the right to comply with the Request for Production, subject to this response, by producing a true copy of any item or by permitting inspection of any item.

    7.    Plaintiffs object to the entire Request for Production to the extent that it seeks the production of duplicative identical items, on the ground that such production would be burdensome, oppressive, and unnecessary.

    8.    Plaintiffs object to the entire Request for Production to the extent that it seeks the production of any item which has been served, filed, or transmitted in the course of this action, on the ground that such production would be burdensome oppressive, and unnecessary.

    9.    Plaintiffs object to the entire Request for Production to the extent that it purports to impose any obligation beyond those set forth in Rule 34 of the Federal Rules of Civil Procedure and Local Rules 34-1 through 34-3 of the United States District Court for the Central District of California, including, without limitation, the assertion that the Request for Production is "continuing"

1  and all purported instructions included in it pertaining to the content of

2  Plaintiffs' written response and the manner of Plaintiffs' production of

3  documents and things.

4      10.    Plaintiffs object to the definition of "Plaintiffs" set forth in the

5  Request for Production on the grounds that it is vague, ambiguous, overbroad,

6  burdensome and oppressive.  Plaintiffs will treat the term "Plaintiffs" as used in

7  the Request for Production to mean Plaintiffs Joanne Siegel and Laura Siegel

8  Larson only.

9      11.    Plaintiffs object to the definition of "Siegel" set forth in the

10  Request for Production on the grounds that it is vague, ambiguous, overbroad,

11  burdensome and oppressive.  Plaintiffs will treat the term "Siegel" as used in the

12  Request for Production to mean Jerry Siegel only.

13      12.    Plaintiffs object to the definition of "Shuster" set forth in the

14  Request for Production on the grounds that it is vague, ambiguous, overbroad,

15  burdensome and oppressive.  Plaintiffs will treat the term "Shuster" as used in

16  the Request for Production to mean Joseph Shuster only.

17      13.    Plaintiffs object to the definition of "Shuster Representatives" set

18  forth in the Request for Production on the grounds that it is vague, ambiguous,

19  overbroad, burdensome and oppressive.  Plaintiffs will treat the term "Shuster

20  Representatives" as used in the Request for Production to mean Jean Adele

21  Peavy and Mark Warren Peary only.

22                                **II.**

23              **RESPONSES TO INDIVIDUAL REQUESTS**

24      Subject to and without waiving the foregoing objections, Plaintiffs

25  respond to each individual request within the Request for Production as follows:

26  **Request No. 1**

27      All Writings upon which Plaintiffs intend to rely in this action.

28  **Response to Request No. 1**

1    Plaintiffs further object to this request on the grounds that it is vague,

2    ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

3    this request on the ground that it is premature.  Subject to and without waiving

4    the foregoing objections, Plaintiffs will produce all non-privileged documents

5    they are able to determine are responsive to this request.

6    **Request No. 2**

7    All Writings concerning any communication or agreements among or

8    between Siegel and Shuster.

9    **Response to Request No. 2**

10    Plaintiffs further object to this request on the grounds that it is vague,

11    ambiguous, overbroad, burdensome and oppressive.  Subject to and without

12    waiving the foregoing objections, Plaintiffs will produce all non-privileged

13    documents concerning communications or agreements between Siegel and

14    Shuster relating to Superman or Superboy that they determine are responsive to

15    this request.

16    **Request No. 3**

17    All Writings concerning any communication or agreement between Siegel

18    and/or Shuster, on the one hand, and Defendants, on the other hand.

19    **Response to Request No. 3**

20    Plaintiffs further object to this request on the grounds that it is vague,

21    ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to

22    this request on the grounds that the information sought by this Request for

23    Production is equally if not more readily available to Defendants.  Subject to

24    and without waiving the foregoing objections, Plaintiffs will produce all non-

25    privileged documents they are able to determine are responsive to this request.

26    **Request No. 4**

27    All Writings concerning or which Plaintiffs contend support any of the

28    allegations in paragraph 16 of the First Complaint.

**EXHIBIT 36**
**541**

1  **Response to Request No. 4**

2      Plaintiffs further object to this request on the grounds that it is vague,

3  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

4  waiving the foregoing objections, Plaintiffs will produce all non-privileged

5  documents they are able to determine are responsive to this request.

6  **Request No. 5**

7      All Writings concerning: (a) the twenty-four days of "Superman" comic

8  strips intended for newspaper publication; (b) the synopsis of comic strips for

9  weeks two, three and four; (c) the paragraph previewing future "Superman"

10  exploits; and (d) the nine page synopsis that Plaintiffs allege Siegel created "in

11  or about 1934," in paragraph 17 of the First Complaint, including but not

12  limited to correspondence relating thereto, as well as any drafts, sketches,

13  drawings, or story boards.

14  **Response to Request No. 5**

15      Plaintiffs further object to this request on the grounds that it is vague,

16  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

17  waiving the foregoing objections, Plaintiffs will produce all non-privileged

18  documents they are able to determine are responsive to this request.

19  **Request No. 6**

20      All Writings concerning: (a) the fifteen daily "Superman" comic strips

21  and (b) the three additional six day weeks of "Superman" comics that Plaintiffs

22  allege Siegel and Shuster created "in or about 1934," in paragraph 18 of the

23  First Complaint, including but not limited to correspondence relating thereto, as

24  well as any drafts, sketches, drawings, or story boards.

25  **Response to Request No. 6**

26      Plaintiffs further object to this request on the grounds that it is vague,

27  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

28  waiving the foregoing objections, Plaintiffs will produce all non-privileged

**EXHIBIT 36**

1  documents they are able to determine are responsive to this request.

2  **Request No. 7**

3      All Writings concerning the October 4, 1935 letter from Malcolm

4  Wheeler-Nicholson referred to in paragraph 19 of the First Complaint.

5  **Response to Request No. 7**

6      Plaintiffs further object to this request on the grounds that it is vague,

7  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

8  waiving the foregoing objections, Plaintiffs will produce all non-privileged

9  documents they are able to determine are responsive to this request.

10  **Request No. 8**

11      All Writings concerning the December 4, 1937 agreement between Siegel

12  and Shuster and Detective Comics referred to in paragraph 20 of the First

13  Complaint.

14  **Response to Request No. 8**

15      Plaintiffs further object to this request on the grounds that it is vague,

16  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

17  waiving the foregoing objections, Plaintiffs will produce all non-privileged

18  documents they are able to determine are responsive to this request.

19  **Request No. 9**

20      All Writings concerning the request to Siegel and Shuster from McClure

21  Newspaper Syndicate to forward the "1934 Superman Comic Strip material" to

22  Detective Comics that Plaintiffs allege in paragraph 21 of the First Complaint

23  took place in 1938.

24  **Response to Request No. 9**

25      Plaintiffs further object to this request on the grounds that it is vague,

26  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

27  waiving the foregoing objections, Plaintiffs will produce all non-privileged

28  documents they are able to determine are responsive to this request.

**Request No. 10**

All writings concerning or which Plaintiffs contend support the allegation in paragraph 21 of the First Complaint that, by early 1938, "'Superman' and his miraculous powers had already been completely developed by Siegel and Shuster."

**Response to Request No. 10**

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive. Subject to and without waiving the foregoing objections, Plaintiffs will produce all non-privileged documents they are able to determine are responsive to this request.

**Request No. 11**

All Writings concerning or which Plaintiffs contend support the allegations in paragraph 22 of the First Complaint that in or about January or February 1938, in response to interest by Detective Comics, "Siegel and Shuster cut and pasted" material they had previously created into "more than ninety separate panels."

**Response to Request No. 11**

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive. Subject to and without waiving the foregoing objections, Plaintiffs will produce all non-privileged documents they are able to determine are responsive to this request.

**Request No. 12**

All Writings concerning the March 1, 1938 grant from Siegel and Shuster to Detective Comics referred to in paragraph 24 of the First Complaint.

**Response to Request No. 12**

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive. Subject to and without waiving the foregoing objections, Plaintiffs will produce all non-privileged

9

**EXHIBIT 36**

544

1 | documents they are able to determine are responsive to this request.

2 | **Request No. 13**

3 |     All Writings concerning any advertisement of Superman and "Action

4 | Comics No. 1," including but not limited to those which appeared in "More Fun

5 | Comics No. 31," "Detective Comics No. 15," and "New Adventure Comics No.

6 | 26."

7 | **Response to Request No. 13**

8 |     Plaintiffs further object to this request on the grounds that it is vague,

9 | ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

10 | this request on the grounds that the information sought by this Request for

11 | Production is equally if not more readily available to Defendants.  Subject to

12 | and without waiving the foregoing objections, Plaintiffs will produce all non-

13 | privileged documents they are able to determine are responsive to this request.

14 | **Request No. 14**

15 |     All Writings concerning Action Comics No. 1, including but not limited

16 | to, any correspondence related thereto, and all drafts, sketches, drawings, or

17 | story boards.

18 | **Response to Request No. 14**

19 |     Plaintiffs further object to this request on the grounds that it is vague,

20 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

21 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

22 | documents they are able to determine are responsive to this request.

23 | **Request No. 15**

24 |     All Writings concerning the September 22, 1938 agreement among Siegel

25 | and Shuster, Detective Comics and The McClure Newspaper Syndicate referred

26 | to in paragraph 29 of the First Complaint.

27 | **Response to Request No. 15**

28 |     Plaintiffs further object to this request on the grounds that it is vague,

ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to
this request on the grounds that the information sought by this Request for
Production is equally if not more readily available to Defendants. Subject to
and without waiving the foregoing objections, Plaintiffs will produce all non-
privileged documents they are able to determine are responsive to this request.

**Request No. 16**

All Writings concerning the September 22, 1938 grant from Siegel and
Shuster to Detective Comics referred to in paragraph 30 of the First Complaint.

**Response to Request No. 16**

Plaintiffs further object to this request on the grounds that it is vague,
ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to
this request on the grounds that the information sought by this Request for
Production is equally if not more readily available to Defendants. Subject to
and without waiving the foregoing objections, Plaintiffs will produce all non-
privileged documents they are able to determine are responsive to this request.

**Request No. 17**

All Writings concerning Action Comics Nos. 1-6, including but not
limited to any correspondence related thereto, and all drafts, sketches, drawings
or story boards.

**Response to Request No. 17**

Plaintiffs further object to this request on the grounds that it is vague,
ambiguous, overbroad, burdensome and oppressive. Subject to and without
waiving the foregoing objections, Plaintiffs will produce all non-privileged
documents they are able to determine are responsive to this request.

**Request No. 18**

All Writings concerning or which Plaintiffs contend support the
allegation in paragraph 32 of the First Complaint that Action Comics Nos. 2-6
were not "works made for hire."

1 | <u>Response to Request No. 18</u>

2 |     Plaintiffs further object to this request on the grounds that it is vague,

3 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

4 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

5 | documents they are able to determine are responsive to this request.

6 | <u>Request No. 19</u>

7 |     All Writings concerning the December 19, 1939 agreement between

8 | Siegel and Shuster and Detective Comics referred to in paragraph 33 of the First

9 | Complaint.

10 | <u>Response to Request No. 19</u>

11 |     Plaintiffs further object to this request on the grounds that it is vague,

12 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

13 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

14 | documents they are able to determine are responsive to this request.

15 | <u>Request No. 20</u>

16 |     All Writings concerning or which Plaintiffs contend support the

17 | allegations in paragraph 34 of the First Complaint that the Superman works

18 | created by Siegel and Shuster after September 28, 1938 were not "works made

19 | for hire."

20 | <u>Response to Request No. 20</u>

21 |     Plaintiffs further object to this request on the grounds that it is vague,

22 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

23 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

24 | documents they are able to determine are responsive to this request.

25 | <u>Request No. 21</u>

26 |     All Writings concerning the "character, conception and plan" for

27 | "Superboy," and its submission to any other person or entity, including but not

28 | limited to Detective Comics, referred to in paragraph 18 of the Second

12

**EXHIBIT 36**

547

1 | Complaint.

2 | <u>**Response to Request No. 21**</u>

3 |     Plaintiffs further object to this request on the grounds that it is vague,

4 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

5 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

6 | documents they are able to determine are responsive to this request.

7 | <u>**Request No. 22**</u>

8 |     All Writings concerning the letter dated December 2, 1938 referred to in

9 | paragraph 19 of the Second Complaint.

10 | <u>**Response to Request No. 22**</u>

11 |     Plaintiffs further object to this request on the grounds that it is vague,

12 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

13 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

14 | documents they are able to determine are responsive to this request.

15 | <u>**Request No. 23**</u>

16 |     All Writings concerning the "Siegel Superboy Material" referred to in

17 | paragraph 22 of the Second Complaint, including but not limited to, any

18 | correspondence related thereto, and all drafts, sketches, drawings, or story

19 | boards.

20 | <u>**Response to Request No. 23**</u>

21 |     Plaintiffs further object to this request on the grounds that it is vague,

22 | ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

23 | this request on the grounds that it is duplicative of requests nos. 21 and 22

24 | above.  Subject to and without waiving the foregoing objections, Plaintiffs will

25 | produce all non-privileged documents they are able to determine are responsive

26 | to this request.

27 | <u>**Request No. 24**</u>

28 |     All Writings concerning any submission (or response thereto) of the

13

**EXHIBIT 36**
**548**

1. "Siegel Superboy Material" referred to in paragraphs 27-28 of the Second
2. Complaint.
3. **Response to Request No. 24**
4.     Plaintiffs further object to this request on the grounds that it is vague,
5. ambiguous, overbroad, burdensome and oppressive. Subject to and without
6. waiving the foregoing objections, Plaintiffs will produce all non-privileged
7. documents they are able to determine are responsive to this request.
8. **Request No. 25**
9.     All Writings concerning or which Plaintiffs contend support any of the
10. allegations in paragraph 31 of the Second Complaint.
11. **Response to Request No. 25**
12.     Plaintiffs further object to this request on the grounds that it is vague,
13. ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to
14. this request on the grounds that the information sought by this Request for
15. Production is equally if not more readily available to Defendants. Subject to
16. and without waiving the foregoing objections, Plaintiffs will produce all non-
17. privileged documents they are able to determine are responsive to this request.
18. **Request No. 26**
19.     All Writings concerning the "Superboy Comic Books" referred to in
20. paragraph 37 of the Second Complaint.
21. **Response to Request No. 26**
22.     Plaintiffs further object to this request on the grounds that it is vague,
23. ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to
24. this request on the grounds that the information sought by this Request for
25. Production is equally if not more readily available to Defendants. Subject to
26. and without waiving the foregoing objections, Plaintiffs will produce all non-
27. privileged documents they are able to determine are responsive to this request.
28. **Request No. 27**

1    All Writings concerning the 1947 Action.

2  **Response to Request No. 27**

3    Plaintiffs further object to this request on the grounds that it is vague,

4  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

5  waiving the foregoing objections, Plaintiffs will produce all non-privileged

6  documents they are able to determine are responsive to this request.

7  **Request No. 28**

8    All Writings concerning the trial of the 1947 Action before the Official

9  Referee.

10  **Response to Request No. 28**

11    Plaintiffs further object to this request on the grounds that it is vague,

12  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

13  this request on the grounds that it is duplicative of request no. 27.  Subject to

14  and without waiving the foregoing objections, Plaintiffs will produce all non-

15  privileged documents they are able to determine are responsive to this request.

16  **Request No. 29**

17    All Writings concerning the May 19, 1948 stipulation of settlement

18  between Siegel and National Comics Publications, Inc. referred to in paragraph

19  35 of the First Complaint.

20  **Response to Request No. 29**

21    Plaintiffs further object to this request on the grounds that it is vague,

22  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

23  this request on the grounds that it is duplicative of request no. 27.  Subject to

24  and without waiving the foregoing objections, Plaintiffs will produce all non-

25  privileged documents they are able to determine are responsive to this request.

26  **Request No. 30**

27    All Writings concerning the Consent Judgment entered into by the parties

28  to the 1947 Action.

**EXHIBIT 36**

1 | **Response to Request No. 30**

2 |      Plaintiffs further object to this request on the grounds that it is vague,

3 | ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

4 | this request on the grounds that it is duplicative of request no. 27.  Subject to

5 | and without waiving the foregoing objections, Plaintiffs will produce all non-

6 | privileged documents they are able to determine are responsive to this request.

7 | **Request No. 31**

8 |      All Writings concerning the action brought in the United States District

9 | Court for the Southern District of New York entitled *Siegel v. National*

10 | *Periodical Publs., Inc.*, Case No. 69 Civ. 1429.

11 | **Response to Request No. 31**

12 |      Plaintiffs further object to this request on the grounds that it is vague,

13 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

14 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

15 | documents they are able to determine are responsive to this request.

16 | **Request No. 32**

17 |      All Writings concerning the appeal to the United States Court of Appeals

18 | for the Second Circuit entitled *Siegel v. National Periodical Publs., Inc.*, Docket

19 | No. 73-2844.

20 | **Response to Request No. 32**

21 |      Plaintiffs further object to this request on the grounds that it is vague,

22 | ambiguous, overbroad, burdensome and oppressive.  Subject to and without

23 | waiving the foregoing objections, Plaintiffs will produce all non-privileged

24 | documents they are able to determine are responsive to this request.

25 | **Request No. 33**

26 |      All Writings concerning the December 23, 1975 agreement referred to in

27 | paragraph 38 of the First Complaint.

28 | **Response to Request No. 33**

1        Plaintiffs further object to this request on the grounds that it is vague,

2   ambiguous, overbroad, burdensome and oppressive.  Subject to and without

3   waiving the foregoing objections, Plaintiffs will produce all non-privileged

4   documents they are able to determine are responsive to this request.

5   **Request No. 34**

6        All Writings concerning any benefits ever received by Siegel, Shuster, or

7   Plaintiffs from Defendants, including without limitation pursuant to the

8   December 23, 1975 Agreement referred to in paragraph 38 of the First

9   Complaint and paragraph 57 of the Second Complaint.

10  **Response to Request No. 34**

11       Plaintiffs further object to this request on the grounds that it is vague,

12  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

13  this request on the grounds that the information sought by this Request for

14  Production is equally if not more readily available to Defendants.  Subject to

15  and without waiving the foregoing objections, Plaintiffs will produce all non-

16  privileged documents they are able to determine are responsive to this request.

17  **Request No. 35**

18       All Writings concerning the conception or creation of any element of the

19  Superman character or story.

20  **Response to Request No. 35**

21       Plaintiffs further object to this request on the grounds that it is vague,

22  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

23  waiving the foregoing objections, Plaintiffs will produce all non-privileged

24  documents they are able to determine are responsive to this request.

25  **Request No. 36**

26       All Writings concerning any communication or agreement (a) between or

27  among Plaintiffs concerning any of the matters alleged in the First Complaint or

28  the Second Complaint, (b) between Plaintiffs, and on the one hand, and any

1   other person or entity, on the other hand, concerning any of the matters alleged

2   in the First Complaint or the Second Complaint, or (c) between Plaintiffs and

3   Defendants.

4   **Response to Request No. 36**

5       Plaintiffs further object to this request on the grounds that it is vague,

6   ambiguous, overbroad, burdensome and oppressive.  Subject to and without

7   waiving the foregoing objections, Plaintiffs will produce all non-privileged

8   documents they are able to determine are responsive to this request.

9   **Request No. 37**

10      All Writings concerning any of the following:

11      i.      Letter from Jerry Siegel to Stanley H. Livingston, President,

12  Consolidated Book Publishers, dated June 1, 1933.

13      ii.     Letter from Stanley H. Livingston, President, Consolidated Book

14  Publishers, to Jerry Siegel dated June 8, 1933.

15      iii.    Post card from Jerry Siegel to Stanley H. Livingston, President,

16  Consolidated Book Publishers, dated August 8, 1933.

17      iv.     Letter from Stanley H. Livingston, President, Consolidated Book

18  Publishers, to Jerry Siegel dated August 22, 1933.

19      v.      Letter from Lee O'Mealia to Jerry Siegel dated July 17, 1933.

20      vi.     Letter from Lee O'Mealia to Jerry Siegel dated September 11,

21  1933.

22      vii.    Letter from Lee O'Mealia to Jerry Siegel dated November 2,

23  1933.

24      viii.   Letter from Lee O'Mealia to Jerry Siegel dated August 31, 1934.

25      ix.     Letter from Russell Keaton to Jerry Siegel dated June 9, 1934.

26      x.      Script for Superman submitted by Jerry Siegel to Russell Keaton

27  on or about June 11, 1934.

28      xi.     Letter from Russell Keaton to Jerry Siegel dated June 14, 1934.

1       xii.     Letter from Russell Keaton to Jerry Siegel dated June 22, 1934.

2       xiii.    Letter from Russell Keaton to Jerry Siegel dated July 6, 1934.

3       xiv.    Letter from Russell Keaton to Jerry Siegel dated July 11, 1934.

4       xv.     Letter from Russell Keaton to Jerry Siegel dated August 7, 1934.

5       xvi.    Letter from Russell Keaton to Jerry Siegel dated October 17,

6 1934.

7       xvii.    Letter from Russell Keaton to Jerry Siegel dated November 3,

8 1934.

9       xviii.   Rejection letters re Superman from the Bell Syndicate, Publishers

10 Syndicate of Chicago, Super Magazines, Dell Publishing Company, Swan-

11 McDonald Features, Esquire Features, McClure Newspaper Syndicate, United

12 Features Syndicate or The Ledger Syndicate.

13      xix.    Letter dated November 16, 1974 from the editor of Super

14 Magazines.

15      xx.     Letter dated October 29, 1937 from the editor of Super

16 Magazines.

17      xxi.    Letter from Joseph B Angelli of The Bell Syndicate to Jerry

18 Siegel dated February 21, 1935.

19      xxii.    Letter from Horace Epps of The Bell Syndicate to Jerry Siegel,

20 dated May 27, 1935.

21      xxiii.   Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

22 June 6, 1935.

23      xxiv.   Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

24 July 3, 1935.

25      xxv.    Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

26 October 4, 1935.

27      xxvi.   Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

28 March 13, 1936.

1      xxvii.   Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

2   March 20, 1936.

3      xxviii.  Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

4   March 16, 1937.

5      xxix.    Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

6   August 3, 1937.

7      xxx.     Letter from Malcolm Wheeler-Nicholson to Jerry Siegel dated

8   December 1, 1937.

9      xxxi.    Letter from M.C. Gaines of the McClure Newspaper Syndicate to

10  Jerry Siegel dated November 30, 1937.

11     xxxii.   Letter from M.C. Gaines of The McClure Newspaper Syndicate to

12  Jerry Siegel dated February 9, 1938.

13     xxxiii.  Letter from The McClure Newspaper Syndicate to Jerry Siegel

14  dated April 8, 1938.

15     xxxiv.   Letter from The McClure Newspaper Syndicate to Jerry Siegel

16  dated April 13, 1938.

17     xxxv.    Letter from The McClure Newspaper Syndicate to Jerry Siegel

18  dated April 21, 1938.

19     xxxvi.   Letter from Jerry Siegel to M.C. Gaines of The McClure

20  Newspaper Syndicate dated December 1, 1937.

21     xxxvii.  Letter M.C. Gaines of The McClure Newspaper Syndicate to

22  Jerry Siegel dated June 13, 1938.

23     xxxviii. Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry

24  Siegel dated December 1, 1937.

25     xxxix.   Letter from Jerry Siegel to Jack Liebowitz of Detective Comics,

26  Inc. dated December 6, 1937.

27     xl.      Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry

28  Siegel dated December 9, 1937.

1        xli.    Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry

2    Siegel dated January 5, 1938.

3        xlii.    Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry

4    Siegel dated March 1, 1938.

5        xliii.    Letter from Jack Liebowitz of Detective Comics, Inc. to Jerry

6    Siegel dated June 9, 1938.

7        xliv.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

8    dated January 10, 1938.

9        xlv.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

10   dated January 12, 1938.

11       xlvi.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

12   dated January 31, 1938.

13       xlvii.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

14   dated February 1, 1938.

15       xlviii.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

16   dated February 4, 1938

17       xlix.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

18   dated February 9, 1938.

19       l.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

20   dated February 16, 1938.

21       li.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

22   dated February 22, 1938.

23       lii.    Letter from Vin Sullivan of Detective Comics, Inc. to Jerry Siegel

24   dated March 14, 1938.

25       liii.    Letter from Howard Denby of Esquire Features, Inc. to Jerry

26   Siegel dated September 9, 1936.

27       liv.    Letter from New Fun's Managing Editor to Jerry Siegel dated

28   October 23, 1935.

1        lv.     Letter from Swan-McDonald Features, Inc. to Jerry Siegel dated

2    February 27, 1936.

3        lvi.    Letter from William Laas of United Features Syndicate to Jerry

4    Siegel dated February 13, 1937.

5        lvii.    Letter from The Ledger Syndicate to Jerry Siegel dated March 2,

6    1937.

7        lviii.    Letter from Chas. F. Lounsbury of The Register and Tribune

8    Syndicate dated August 26, 1938.

9        lix.    Letter from Chas. F. Lounsbury of The Register and Tribune

10    Syndicate dated September 7, 1938.

11    **Response to Request No. 37**

12        Plaintiffs further object to this request on the grounds that it is vague,

13    ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to

14    this request on the grounds that the information sought by this Request for

15    Production is equally if not more readily available to Defendants.  Subject to

16    and without waiving the foregoing objections, Plaintiffs will produce all non-

17    privileged documents they are able to determine are responsive to this request.

18    **Request No. 38**

19        All Writings concerning the notices of termination under 17 U.S.C. § 304,

20    which Plaintiffs claim they served on or about April 3, 1997.

21    **Response to Request No. 38**

22        Plaintiffs further object to this request on the grounds that it is vague,

23    ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

24    this request on the grounds that it is duplicative of Defendants' above requests.

25    Subject to and without waiving the foregoing objections, Plaintiffs will produce

26    all non-privileged documents they are able to determine are responsive to this

27    request.

28

1  **Request No. 39**

2      All Writings concerning or which Plaintiffs contend support their

3  allegation that the notices of termination served by Plaintiffs on or about April

4  3, 1997 were drafted, served and filed in full compliance with 17, U.S.C. §

5  304(c) and 37 C.F.R. § 201.10 (2003).

6  **Response to Request No. 39**

7      Plaintiffs further object to this request on the grounds that it is vague,

8  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

9  waiving the foregoing objections, Plaintiffs will produce all non-privileged

10  documents they are able to determine are responsive to this request.

11  **Request No. 40**

12      All Writings concerning the notice of termination under 17 U.S.C. § 304,

13  which Plaintiffs claim they served on or about November 8, 2002.

14  **Response to Request No. 40**

15      Plaintiffs further object to this request on the grounds that it is vague,

16  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

17  waiving the foregoing objections, Plaintiffs will produce all non-privileged

18  documents they are able to determine are responsive to this request.

19  **Request No. 41**

20      All Writings concerning or which Plaintiffs contend support their

21  allegation that the notice of termination served by Plaintiffs on or about

22  November 8, 2002 was drafted, served and filed in full compliance with 17

23  U.S.C. § 304(c) and 37 C.F.R. § 201.10 (2003).

24  **Response to Request No. 41**

25      Plaintiffs further object to this request on the grounds that it is vague,

26  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

27  this request on the grounds that it is duplicative of Defendants' above requests.

28  Subject to and without waiving the foregoing objections, Plaintiffs will produce

1  all non-privileged documents they are able to determine are responsive to this

2  request.

3  **Request No. 42**

4     All Writings concerning ownership or any claim of ownership by

5  Plaintiffs of any trademarks, trade dress, or related marks or rights in the

6  Superman Crest, as that term is defined in the First and Second Complaints.

7  **Response to Request No. 42**

8     Plaintiffs further object to this request on the grounds that it is vague,

9  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

10  waiving the foregoing objections, Plaintiffs will produce all non-privileged

11  documents they are able to determine are responsive to this request.

12  **Request No. 43**

13     All Writings concerning or which Plaintiffs contend support any damage

14  or injury which they can claim has resulted from the waste alleged in Count

15  Five of the First Complaint.

16  **Response to Request No. 43**

17     Plaintiffs further object to this request on the grounds that it is vague,

18  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

19  this Request for Production on the ground that it is premature.  Subject to and

20  without waiving the foregoing objections, Plaintiffs will produce all non-

21  privileged documents they are able to determine are responsive to this request.

22  **Request No. 44**

23     All Writings concerning or which Plaintiffs contend support the

24  allegation of "Defendants' under-utilization of the Recaptured copyrights" in

25  paragraph 79 of the First Complaint.

26  **Response to Request No. 44**

27     Plaintiffs further object to this request on the grounds that it is vague,

28  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

**EXHIBIT 36**

**559**

1  waiving the foregoing objections, Plaintiffs will produce all non-privileged

2  documents they are able to determine are responsive to this request.

3  **Request No. 45**

4    All Writings concerning or which Plaintiffs contend support the

5  allegation of "Defendants' non 'arms length' contracts between wholly owned

6  subsidiaries and divisions" in paragraph 79 of the First Complaint.

7  **Response to Request No. 45**

8    Plaintiffs further object to this request on the grounds that it is vague,

9  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

10  this request on the grounds that the information sought by this Request for

11  Production is equally if not more readily available to Defendants.  Subject to

12  and without waiving the foregoing objections, Plaintiffs will produce all non-

13  privileged documents they are able to determine are responsive to this request.

14  **Request No. 46**

15    All Writings concerning or which Plaintiffs contend support the

16  allegation of "Defendants' self-serving accounting practices" in paragraph 79 of

17  the First Complaint.

18  **Response to Request No. 46**

19    Plaintiffs further object to this request on the grounds that it is vague,

20  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

21  this request on the grounds that the information sought by this Request for

22  Production is equally if not more readily available to Defendants.  Subject to

23  and without waiving the foregoing objections, Plaintiffs will produce all non-

24  privileged documents they are able to determine are responsive to this request.

25  **Request No. 47**

26    All Writings concerning or which Plaintiffs contend support the

27  allegation of "Defendants' improper allocation of revenues, costs and profits" in

28  paragraph 79 of the First Complaint.

1  Response to Request No. 47

2      Plaintiffs further object to this request on the grounds that it is vague,

3  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

4  this request on the grounds that the information sought by this Request for

5  Production is equally if not more readily available to Defendants.  Subject to

6  and without waiving the foregoing objections, Plaintiffs will produce all non-

7  privileged documents they are able to determine are responsive to this request.

8  **Request No. 48**

9      All Writings concerning or which Plaintiffs contend support the

10  allegation of "Defendants' relatively marginal exploitation" of the Superman

11  franchise in paragraph 79 of the First Complaint.

12  Response to Request No. 48

13      Plaintiffs further object to this request on the grounds that it is vague,

14  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

15  this request on the grounds that the information sought by this Request for

16  Production is equally if not more readily available to Defendants.  Subject to

17  and without waiving the foregoing objections, Plaintiffs will produce all non-

18  privileged documents they are able to determine are responsive to this request.

19  **Request No. 49**

20      All Writings concerning or which Plaintiffs contend support the

21  allegation that "market opportunities for such a superhero franchise has been

22  and continues to be at an all time high" in paragraph 79 of the First Complaint.

23  **Response to Request No. 49**

24      Plaintiffs further object to this request on the grounds that it is vague,

25  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

26  waiving the foregoing objections, Plaintiffs will produce all non-privileged

27  documents they are able to determine are responsive to this request.

28

**EXHIBIT 36**

**Request No. 50**

All Writings concerning any attempts by Plaintiffs, Siegel, and/or Shuster to sell, license, assign, transfer, market, or otherwise exploit any rights in Superman.

**Response to Request No. 50**

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive. Subject to and without waiving the foregoing objections, Plaintiffs will produce all non-privileged documents they are able to determine are responsive to this request.

**Request No. 51**

All Writings concerning any payments or other consideration received by Plaintiffs from any Defendants in connection with Superman.

**Response to Request No. 51**

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to this request on the grounds that the information sought by this Request for Production is equally if not more readily available to Defendants. Subject to and without waiving the foregoing objections, Plaintiffs will produce all non-privileged documents they are able to determine are responsive to this request.

**Request No. 52**

All Writings concerning the settlement discussions between Plaintiffs and Defendants that took place from approximately April 17, 1997 through September 30, 2002.

**Response to Request No. 52**

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive. Plaintiffs further object to this Request for Production on the ground that it violates Rule 408 of the Federal Rules of Evidence. Subject to and without waiving the foregoing

27

**EXHIBIT 36**

**562**

1 objections, Plaintiffs will produce all non-privileged documents they are able to

2 determine are responsive to this request.

3 **Request No. 53**

4     All Writings concerning the October 19, 2001 letter from Plaintiffs' then

5 counsel to John Schulman.

6 **Response to Request No. 53**

7     Plaintiffs further object to this request on the grounds that it is vague,

8 ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

9 this Request for Production on the ground that it violates Rule 408 of the

10 Federal Rules of Evidence.  Subject to and without waiving the foregoing

11 objections, Plaintiffs will produce all non-privileged documents they are able to

12 determine are responsive to this request.

13 **Request No. 54**

14     All Writings concerning the October 26, 2001 letter from John Schulman

15 to Plaintiffs' then counsel.

16 **Response to Request No. 54**

17     Plaintiffs further object to this request on the grounds that it is vague,

18 ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

19 this Request for Production to the extent that it violates Rule 408 of the Federal

20 Rules of Evidence. Subject to and without waiving the foregoing objections,

21 Plaintiffs will produce all non-privileged documents they are able to determine

22 are responsive to this request.

23 **Request No. 55**

24     All Writings concerning the draft agreement transmitted to Plaintiffs on

25 or about February 1, 2002.

26 **Response to Request No. 55**

27     Plaintiffs further object to this request on the grounds that it is vague,

28 ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

1  this Request for Production to the extent that it violates Rule 408 of the Federal

2  Rules of Evidence. Subject to and without waiving the foregoing objections,

3  Plaintiffs will produce all non-privileged documents they are able to determine

4  are responsive to this request.

5  **Request No. 56**

6      All Writings concerning the May 9, 2002 letter from Joanne Siegel to

7  Richard Parsons.

8  **Response to Request No. 56**

9      Plaintiffs further object to this request on the grounds that it is vague,

10  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

11  this Request for Production to the extent that it violates Rule 408 of the Federal

12  Rules of Evidence.  Subject to and without waiving the foregoing objections,

13  Plaintiffs will produce all non-privileged documents they are able to determine

14  are responsive to this request.

15  **Request No. 57**

16      All Writings concerning the September 21, 2002 letter from Plaintiffs to

17  Paul Levitz.

18  **Response to Request No. 57**

19      Plaintiffs further object to this request on the grounds that it is vague,

20  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

21  waiving the foregoing objections, Plaintiffs will produce all non-privileged

22  documents they are able to determine are responsive to this request.

23  **Request No. 58**

24      All Writings concerning any communications between Plaintiffs and any

25  attorney, partner, employee, agent, or representative of the law firm Gang Tyre

26  Ramer & Brown after September 21, 2002.

27  **Response to Request No. 58**

28      Plaintiffs further object to this request on the grounds that it is vague,

1  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

2  waiving the foregoing objections, Plaintiffs submit that any and all such

3  documents are private, proprietary and privileged, and Plaintiffs will not

4  produce any such documents.

5  **Request No. 59**

6      All Writings concerning any disposition of any rights relating to

7  Superman, including but not limited to any solicitation, offer, option, agreement

8  or license.

9  **Response to Request No. 59**

10      Plaintiffs further object to this request on the grounds that it is vague,

11  ambiguous, overbroad, burdensome and oppressive.  Plaintiffs further object to

12  this request on the grounds that it is duplicative of the above requests.  Subject

13  to and without waiving the foregoing objections, Plaintiffs will produce all non-

14  privileged documents they are able to determine are responsive to this request.

15  **Request No. 60**

16      All Writings concerning the division of any revenues relating to

17  Superman among Plaintiffs and between Plaintiffs and any other person or

18  entity.

19  **Response to Request No. 60**

20      Plaintiffs further object to this request on the grounds that it is vague,

21  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

22  waiving the foregoing objections, Plaintiffs will produce all non-privileged

23  documents they are able to determine are responsive to this request.

24  **Request No. 61**

25      All Writings concerning any communication or agreement between

26  Michael Siegel and Plaintiffs related to Superman.

27  **Response to Request No. 61**

28      Plaintiffs further object to this request on the grounds that it is vague,

1  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

2  waiving the foregoing objections, Plaintiffs will produce all non-privileged

3  documents they are able to determine are responsive to this request.

4  **Request No. 62**

5      All Writings concerning any communication or agreement between

6  Dennis Larson and Plaintiffs related to Superman.

7  **Response to Request No. 62**

8      Plaintiffs further object to this request on the grounds that it is vague,

9  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

10  waiving the foregoing objections, Plaintiffs respond as follows: any and all such

11  documents are private, proprietary and privileged, and Plaintiffs will not

12  produce any such documents.

13  **Request No. 63**

14      All Writings concerning the Shuster Representatives, including but not

15  limited to any communication or agreements between Plaintiffs and any of the

16  Shuster Representatives.

17  **Response to Request No. 63**

18      Plaintiffs further object to this request on the grounds that it is vague,

19  ambiguous, overbroad, burdensome and oppressive.  Subject to and without

20  waiving the foregoing objections, Plaintiffs will produce all non-privileged

21  documents concerning any communication or agreement between Plaintiffs and

22  any of the Shuster Representatives relating to "Superman" or "Superboy" that

23  they determine are responsive to this request.

24  **Request No. 64**

25      All Writings concerning Marc Toberoff or his law firm which were

26  created or which refer to the period prior to his being retained as counsel for

27  Plaintiffs in these related actions.

28

<u>Response to Request No. 64</u>

Plaintiffs further object to this request on the grounds that it is vague, ambiguous, overbroad, burdensome and oppressive.  Subject to and without waiving the foregoing objections, Plaintiffs respond as follows: any and all such documents are private, proprietary and privileged, and Plaintiffs will not produce any such documents.

Dated: July 21, 2005                    LAW OFFICES OF MARC TOBEROFF

By: _____
                                         Marc Toberoff

Attorneys for Plaintiffs and Counterclaim
Defendants Joanne Siegel and Laura Siegel
Larson

32
**EXHIBIT 36**
**567**

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 1999 Avenue of the Stars, Suite 1540, Los Angeles, California 90067.

On July 21, 2005, I served the attached documents described as **PLAINTIFFS JOANNE SIEGEL AND LAURA SIEGEL LARSON'S RESPONSE TO DEFENDANTS'/ COUNTERCLAIMANT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS** on all interested parties in this action by placing __ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

Roger L. Zissu
Patrick T. Perkins
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, New York 10017
Facsimile: (212) 813-5901

Michael Bergman
David L. Burg
WEISSMANN WOLF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile: (310) 550-7191

[X]  :BY FACSIMILE:

As follows: I caused the transmission of the above named document to the fax number set forth above, or on the attached service list.

[X]  :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on July 21, 2005, in Los Angeles, California.

_____
Nicholas C. Williamson

**EXHIBIT 36**
**568**

# EXHIBIT 37



FROSS ZELNICK LEHRMAN & ZISSU, P.C.
Roger L. Zissu (Admitted *pro hac vice*)
James D. Weinberger (Admitted *pro hac vice*)
866 United Nations Plaza
New York, New York 10017
Telephone: (212) 813-5900
Fax: (212) 813-5901

PERKINS LAW OFFICE, P.C.
Patrick T. Perkins (Admitted *pro hac vice*)
1711 Route 9D
Cold Spring, New York 10516
Telephone: (845) 265-2820
Fax: (845) 265-2819

WEISSMANN WOLFF BERGMAN
  COLEMAN GRODIN & EVALL LLP
Michael Bergman (SBN 37797)
Anjani Mandavia (SBN 94092)
Adam Hagen (SBN 218021)
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212
Telephone: (310) 858-7888
Fax: (310) 550-7191

Attorneys for Defendants and Counterclaimant

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>        Plaintiffs,<br><br>        vs.<br><br>WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,<br>        Defendants. | Case Nos. [Consolidated for Discovery]:<br>        04-8400 RSWL (RZx)<br>        04-8776 RSWL (RZx)<br>Hon. Ronald S.W. Lew, U.S.D.J.<br>Hon. Ralph Zarefsky, U.S.M.J.<br><br>**NOTICE OF MOTION RE: JOINT STIPULATION; JOINT STIPULATION RE: DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS** |
| JOANNE SIEGEL and LAURA SIEGEL LARSON,<br><br>        Plaintiffs,<br><br>        vs.<br><br>TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10,<br>        Defendants. | **DISCOVERY MATTER**<br>**LOCAL RULE 37**<br><br>Time: 10:00 a.m.<br>Date: August 14, 2006<br>Courtroom: 540<br>Mag. Judge Ralph Zarefsky<br>Discovery Cutoff: Nov. 17, 2006 |
| AND RELATED COUNTERCLAIMS | |

CONFORM AND RETURN

**EXHIBIT 37**
**569**

1    TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2            PLEASE TAKE NOTICE THAT on August 14, 2006 or as soon thereafter as

3    the matter may be heard in the above-entitled action before the Honorable Ralph

4    Zarefsky, United States Magistrate Judge, United States District Court for the

5    Central District of California, Western Division, Roybal Federal Building,225 East

6    Temple Street, Los Angeles, California, Courtroom 540, defendants Warner Bros.

7    Entertainment Inc., Time Warner Inc., Warner Communications Inc., Warner Bros.

8    Television Production Inc. and defendant and counterclaimant DC Comics

9    (collectively, "Defendants"), having attempted to meet and confer with Plaintiffs

10   Joanne Siegel and Laura Siegel Larson ("Plaintiffs" or the "Siegels") in writing on

11   June 27 and 30, 2006, in accordance with Local Rule 37-1 of the Local Rules of the

12   United States District Court for the Central District of California ("L.R."), and the

13   parties having been unable to resolve their discovery dispute regarding Plaintiffs'

14   failure to produce certain responsive documents, hereby move the Court to rule on

15   this jointly filed stipulation pursuant to L.R. 37-3.

16           This motion is made pursuant to Rules 26 and 37 of the Federal Rules of Civil

17   Procedure and L.R. 37.  Defendants contend the discovery sought hereby is likely to

18   lead to the discovery of admissible evidence, and good cause therefore exists for it.

19   Defendants have made good faith and reasonable attempts to resolve this matter

20   without Court intervention, pursuant to L.R. 37, and the parties conducted a

21   conference of counsel matter pursuant to L.R. 37-1 on July 10, 2006, without

22   success. *See* Declaration of James D. Weinberger dated July 24, 2006, submitted

23   herewith, ¶ 13-14 & Ex. L.

24           This motion is based on this notice of motion; the Joint Stipulation Re:

25   Defendants' Motion to Compel Production of Documents; the declarations

26   submitted by the parties; any supplemental memoranda that may be filed in

27   connection with the Joint Stipulation; the pleadings and papers on file in this action;

28

1 | and on such oral argument and other matters as the Court may properly consider at

2 | the time of the hearing of this motion.

3 | DATED:    July 24, 2006      FROSS ZELNICK LEHRMAN & ZISSU, P.C.

4 | PERKINS LAW OFFICE, P.C.

5 | -and-

6 | WEISSMANN WOLFF BERGMAN
     COLEMAN GRODIN & EVALL LLP

7 |

8 | By: _Roger L. Zissu_

9 | Roger L. Zissu

10 | Attorneys for Defendants and Counterclaimant

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

3

EXHIBIT 37
571

1

## **TABLE OF CONTENTS**

2    TABLE OF AUTHORITIES ......................................................................... 5

3    I.    DEFENDANTS' INTRODUCTORY STATEMENT ...................................... 9

4    II.    PLAINTIFFS' INTRODUCTORY STATEMENT ....................................... 10

5    III.    DEFENDANTS' CONTENTIONS ............................................................. 12

6          A.    PROCEDURAL HISTORY AND BACKGROUND ........................ 12

7          B.    PLAINTIFFS HAVE WAIVED PRIVILEGE ON ISSUES
                 RELATING TO THE SETTLEMENT OF THIS ACTION AND
8                SHOULD THEREFORE BE REQURIED TO PRODUCE
                 RESPONSIVE DOCUMENTS .......................................................... 16

9                1.    Plaintiffs' Implied Waiver of Privilege Concerning
10                     Counsel's Authority to Accept Settlement Offer .................... 16

11               2.    Plaintiffs' Express Waiver of Privilege Concerning
                       Their Retention and Termination of Counsel ........................... 19

12               3.    Plaintiffs' Failure to Produce a Privilege Log .......................... 22

13   IV.    PLAINTIFFS' CONTENTIONS ................................................................. 23

14         A.    PROCEDURAL BACKGROUND ................................................... 23

15         B.    LEGAL STANDARDS ..................................................................... 24

16               1.    State Law Applies to Privilege Issues Regarding State
17                     Law Component of Federal Claim ............................................ 24

18               2.    The Attorney-Client Privilege ................................................... 25

19         C.    PLAINTIFFS DID NOT WAIVE THEIR PRIVILEGES
                 ON ISSUES RELATING TO DEFENDANTS' ASSERTION
20               OF A PURPORTED SETTLEMENT AGREEMENT ....................... 26

21               1.    Plaintiffs Have Not Impliedly Waived The Attorney-
22                     Client Privilege ......................................................................... 26

23               2.    Plaintiffs Did Not Expressly Waive The Attorney-
                       Client Privilege In The September 21, 2002 Letter ................. 30

24               3.    The Attorney Work Product Doctrine Also Protects
25                     Documents Sought By Defendants ............................................ 33

26               4.    Plaintiffs Have Produced A Detailed Privilege Log ................ 35

27   V.    DEFENDANTS' CONCLUSION ................................................................ 36

28   VI.    PLAINTIFFS' CONCLUSION .................................................................. 37



1

# TABLE OF AUTHORITIES

2 **I.    Defendants' Authorities**

3 <u>Cases</u>

4 *Burlington Northern & Santa Fe Railway Co. v. United States Dist. Ct.*,
   408 F.3d 1142 (9th Cir. 2005).................................................................23

5 *Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*,
6   136 F.R.D. 179 (E.D. Cal. 1991)...........................................................23

7 *Diversified Dev. & Inv., Inc. v. Heil*,
   889 P.2d 1212 (N.Mex. 1995).................................................................18

8 *Grand Lake Drive In, Inc. v. Superior Court*,
9   179 Cal. App. 2d 122 (Cal. Ct. App. 1960) ...........................................18

10 *Griffith v. Davis*,
   161 F.R.D. 687 (C.D.Cal. 1995) .............................................................18

11
*Hartman v. Hook-Superrx Inc.*,
12   42 F. Supp. 2d 854 (S.D. Ind. 1999) ......................................................17

13 *Peters v. Wallach*,
   321 N.E.2d 806 (Mass. 1975) .................................................................18

14
*Price v. Superior Court*,
15   161 Cal. App. 2d 650 (Cal. Ct. App. 1958) ...........................................18

16 *Shapo v. Tires 'N Tracks, Inc.*,
   336 Ill.App.3d 387, 270 Ill.Dec. 254 (Ill. App. Ct. 2002) ....................17

17
*Steinfeld v. Dworkin*,
18   515 A.2d 1051, 1052 (Vt. 1986)  ...........................................................17

19 *Transamerica Title Ins. Co. v. Superior Court*,
   188 Cal.App.3d 1047, 233 Cal.Rptr. 825 (Cal. Ct. App. 1987).......17, 20

20
*United States v. Zolin*,
21   809 F.2d 1411 (9th Cir. 1987), *aff'd in part, vacated in part on other grounds*,
   491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) ........................21

22
*Walsh v. Barcelona Assoc., Inc.*,
23   476 N.E.2d 1090 (Ohio App. 1984)....................................................18-19

24 *Weil v. Investment/Indicators, Research & Mgm't, Inc.*,
   647 F.2d 18 (9th Cir. 1981).................................................................21-22

25
*Willard C. Beach Air Brush Co. v. General Motors Corp.*,
26   118 F. Supp. 242 (D.N.J. 1953) .............................................................18

27 *Wilson v. Superior Court*,
   63 Cal.App.3d 825, 134 Cal.Rptr. 130 (Cal. Ct. App. 1976)..................17

28



**<u>Rules</u>**

Fed. R. Civ. P. 26 ................................................................................. 19, 22

**Treatise**

Paul R. Rice, Attorney-Client Privilege in the United States (2d ed. 2006) ........... 21

**II.    <u>Plaintiff's Authorities</u>**

**Federal Cases**

*Amco Ins. Co. v. Madera Quality Nut LLC,*
        2006 U.S. Dist. LEXIS 21205 (E.D. Cal. 2006) ................................. 24

*Baird v. Koerner,*
        279 F.2d 623 (9th Cir. 1960) ................................................... 25-26

*Burlington Northern & Santa Fe Railway Co. v. United States Dist. Ct.,*
        408 F.3d 1142 (9th Cir. 2005) .................................................. 36

*Durkin v. Shields (In re Imperial Corp. of Am.),*
        167 F.R.D. 447 (S.D. Cal. 1995) ............................................... 35

*E.E.O.C. v. Lutheran Soc. Svcs.,*
        186 F.3d 959 (D.C. Cir. 1999) ................................................. 34

*F.D.I.C. v. Fidelity & Deposit Co. of Maryland,*
        196 F.R.D. 375 (S.D. Cal. 2000) ............................................... 25, 26

*Garcia v. City of El Centro,*
        214 F.R.D. 587 (S.D. Cal. 2003) .............................................. 33

*Handgards, Inc. v. Johnson & Johnson,*
        413 F. Supp. 926 (N.D. Cal. 1976) ............................................ 33-34

*Hardeman v. Amtrak/Caltrain R.R.,*
        2006 U.S. Dist. LEXIS 28861 (N.D. Cal. 2006) ................................ 36

*Hartman v. Hook-Superx Inc.,*
        42 F. Supp. 2d 854 (S.D. Ind. 1999) .......................................... 29

*Hercules, Inc. v. Exxon Corp.,*
        434 F. Supp. 136 (D. Del. 1977) .............................................. 32

*Hickman v. Taylor,*
        329 U.S. 495 (1947) .......................................................... 34

*In re Grand Casinos, Inc.,*
        181 F.R.D. 615 (D. Minn. 1998) ............................................... 34

*In re Horn,*
        976 F.2d 1314 (9th Cir. 1992) ................................................ 30

*In re Osterhoudt,*
        722 F.2d 591 (9th Cir. 1983) ................................................. 30

**EXHIBIT 37**
6
**574**

*Powell v. U.S., Dep't of Justice,*
  584 F. Supp. 1508 (N.D. Cal. 1984)...............................................34

*Star Editorial v. United States Dist. Court,*
  7 F.3d 856 (9th Cir. 1993) .........................................................24

*Starsight Telecast v. Gemstar Development Corp.,*
  158 F.R.D. 650, 654 (N.D. Cal. 1994) ......................................31-32

*United States v. Zolin,*
  809 F.2d 1411 (9th Cir. 1985) ...................................................33

*United States v. Nobles,*
  422 U.S. 225, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975).....................34

*Upjohn Co. v. United States,*
  449 US 383, 101 S Ct 677, 66 L Ed 2d 584 (1981) .........................32

**State Cases**

*2,022 Ranch, L.L.C. v. Superior Ct.,*
  7 Cal. Rptr. 3d 197 (2003)........................................................26

*City & County of S.F. v. Superior Court,*
  37 Cal.2d 227 (1951)...............................................................26

*Estate of Kime,*
  144 Cal.App.3d 246 (1983) .......................................................29

*Jones v. Superior Court,*
  119 Cal.App.3d 534 (1981) ...................................................28, 31

*Lake Drive In., Inc. v. Superior Court,*
  179 Cal. App. 2d 122 (1960) .....................................................30

*Mitchell v. Superior Court,*
  37 Cal. 3d 591 (1984)..................................25, 28-29, 31, 32

*People v. Hayes,*
  21 Cal. 4th 1211 (1999) ...........................................................31

*People v. Kor,*
  129 Cal.App.2d 436 (1954).......................................................25

*Price v. Superior Court,*
  161 Cal. App. 2d 650 (1958) .....................................................30

*Ringler Associates Inc. v. Maryland Casualty Co.,*
  80 Cal.App.4th 1165 (2000) ......................................................26

*Rodriguez v. Superior Court,*
  14 Cal. App. 4th 1260 (1993) ....................................................33

*Schlumberger Limited v. Superior Court,*
  115 Cal.App.3d 386 (1981) .......................................................28

7

**EXHIBIT 37**



*Shapo v. Tires 'N Tracks, Inc.,*
    336 Ill. App. 3d 387 (2002) ...............................................29

*Southern Cal. Gas Co. v. Public Utilities Com.,*
    50 Cal. 3d 31 (1990) .......................................................32

*Steinfeld v. Dworkin,*
    515 A.2d 1051 (Vt. 1986) .................................................29

*Sullivan v. Superior Court,*
    29 Cal.App.3d 64 (1972)...................................................25

*Transamerica Title Ins. Co. v. Superior Court,*
    188 Cal.App.3d 1047 (1987) ........................................28, 33

*Travelers Ins. Companies v. Superior Court,*
    143 Cal.App.3d 436 (1983) .........................................28, 32

*W. Digital Corp. v. Superior Court,*
    60 Cal. App. 4th 1471 (1998) ...........................................30

*Wilson v. Superior Court,*
    63 Cal.App.3d 825 (1976) ................................................28

**Rules**

Fed. R. Civ. P. 26(b)(3) .......................................................34

Fed. R. Evid. 501.............................................................24

**State Statutes**

Cal. Evid. Code § 912.........................................................31

Cal. Evid. Code § 954.........................................................25

I.    **DEFENDANTS' INTRODUCTORY STATEMENT**

These actions, consolidated for purposes of discovery, relate to Plaintiffs'
attempt to recapture under the Copyright Act certain rights in literary works
featuring the characters Superman and Superboy from Defendant and
Counterclaimant DC Comics ("DC"), and its licensees and/or parent company, the
various Warner entities named in the complaints (collectively, "Defendants").  DC
has filed a counterclaim against Plaintiffs seeking to enforce a 2001 settlement
agreement between the parties which resolved as between them all claims relating to
their purported right to recapture such copyright interests, and which Plaintiffs now
refuse to honor.

Defendants have served requests for documents seeking to probe the basis for
Plaintiffs' defenses to their settlement counterclaim.  Those defenses are essentially
twofold:  Plaintiffs claim both that the parties did not reach any valid agreement,
and even if they did, Plaintiffs' counsel was not authorized to do so.  Plaintiffs,
however, have improperly relied on the attorney-client privilege to withhold
documents which, as a result of two discrete waivers, are indisputably discoverable
in this action.  Plaintiffs have made both implied (by asserting that their counsel was
not authorized to accept a settlement offer made by Defendants as set forth in an
October 19, 2001 letter to Defendants' counsel) and express (through copying DC's
president a letter terminating their former counsel and explaining in detail the
reasons for such termination) waivers of the privilege, and they cannot now be
"undone."  Despite the fact that Defendants' document requests seek documents
related to these subjects, Plaintiffs have refused to produce any responsive and
privileged documents.  Moreover, Plaintiffs to date have refused to provide
Defendants with a privilege log, despite the fact that Defendants' document requests
were served *over a year ago*, making it impossible for Defendants to determine
which documents Plaintiffs are withholding.[1]

---

[1] Plaintiffs produced a privilege log at 7pm New York time on Thursday, July 20,



1    Plaintiffs cannot use the privilege as both a shield and a sword, relying on the

2    purported unauthorized actions of their former counsel to defend against DC's

3    counterclaim while at the same time seeking to protect communications with

4    counsel related to that authority.  Moreover, Plaintiffs cannot withhold documents

5    relating to the settlement negotiations where Plaintiffs waived the attorney-client

6    privilege on such subject matter by expressly copying DC's president on a letter to

7    her then counsel.  Accordingly, Defendants respectfully request that their motion to

8    compel be granted in its entirety, and that Plaintiffs be ordered to produce

9    responsive documents and a privilege log immediately.

10   **II.    PLAINTIFFS' INTRODUCTORY STATEMENT**

11       Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow

12   and daughter, respectively, of Jerome Siegel ("Siegel"), the co-author of the world

13   renowned comic book hero, "Superman," and the author of "Superboy."   This case

14   arises out of Plaintiffs' proper exercise of their right under section 304(c) of the

15   1976 United States Copyright Act, 17 U.S.C. § 304(c), to recapture Siegel's original

16   copyrights in "Superman" and "Superboy" by serving statutory notices on the

17   defendants herein ("Defendants") on April 3, 1997 and March 8, 2002, respectively

18   terminating Siegel's prior grant(s) of "Superman" and "Superboy" to Defendants'

19   predecessor(s) (the "Termination(s)").

20       Plaintiffs' Terminations complied with all the requirements of 17 U.S.C. §

21   304(c) and 37 C.F.R. § 201.10, the regulations promulgated thereunder by the

22   Register of Copyrights.  Accordingly, on April 16, 1999, the noticed "Superman"

23   termination date, all rights Siegel conveyed in "Superman" to Defendants'

24   predecessors duly reverted to Plaintiffs.  On November 17, 2004, the noticed

25   "Superboy" Termination date, all rights that Siegel had conveyed in "Superboy" to

26

27   2006.  Defendants do not believe that the production of such log is sufficient to

28   resolve the instant dispute as it does not comply with the requirements of the
     relevant caselaw.

1   Defendants' predecessors duly reverted to Plaintiffs.

2        Shortly after Plaintiffs served their "Superman" Termination notices the

3   general counsel of Defendant Warner Bros. Entertainment Inc. ("WB") and the

4   President of DC Comics ("DC"), a wholly owned WB subsidiary, both

5   acknowledged the validity of the "Superman" Termination and the parties began

6   negotiations for Defendants' purchase and settlement of the Plaintiffs' recaptured

7   copyright interests.  By October 19, 2001, the parties appeared to agree on certain

8   deal points, subject, of course, to their articulation in an acceptable written

9   agreement; however, negotiations broke down and fell apart by early 2002 because

10  Defendants unilaterally modified such terms in a one-sided fashion and added

11  aggressive new terms, both of which were wholly unacceptable to Plaintiffs.[2]

12  Consequently, no agreement was made or executed by the parties.

13       Defendants neither claimed that a supposed settlement agreement had been

14  entered into, nor attempted to perform or tender performance under any such

15  purported agreement.  Instead, Defendants, in a reversal of their prior

16  acknowledgement of the Termination two years earlier, contested the "Superman"

17  Termination in April, 1999, days before its effective date, claiming it was somehow

18  invalid.

19       Defendants thereafter also claimed that the "Superboy" Termination was

20  invalid.  Plaintiffs consequently commenced the within declaratory relief actions

21  regarding the validity and effect of the "Superman" and "Superboy" Terminations

22  on October 8, 2004, and October 22, 2004, respectively.  Defendants in their

23  answers and counterclaims asserted for the very first time that they had purchased

24

---

25  [2] DC's October 26, 2001 reply to Marks' October 19, 2001 letter already contained
    different terms and indicated that the parties were a long way from an agreement.
26  Declaration of Marc Toberoff ("Toberoff Decl."), Ex. A ("I enclose herewith for
    you and Bruce a more fulsome outline of what we believe the deal we've agreed to
27  is.").  Moreover, DC's first draft of a settlement agreement dated February 1, 2002
    contained numerous revisions and new material terms never agreed to by Plaintiffs
28  and rejected by Plaintiffs. (Toberoff Decl., Ex B, Declaration of James Weinberger
    ("Weinberger Decl."), Ex. B.

EXHIBIT 37
579

1 Plaintiffs' recaptured copyright interests pursuant to a purported "settlement
2 agreement" even though it was clear from the record and the parties' actions that no
3 such agreement had ever been consummated.

4      Plaintiffs moved for partial summary adjudication on February 15, 2006 that
5 their statutory "Superboy" Termination is valid and that Plaintiffs thereby
6 recaptured Siegel's "Superboy" copyright. Defendants cross-moved for summary
7 judgment claiming the "Superboy" Termination was invalid based in large part on
8 the same purported claims and defenses asserted with respect to "Superman." On
9 March 23, 2006, the Court granted Plaintiffs' motion in its entirety and denied
10 Defendants' motion in its entirety. Defendants' subsequently moved to have this
11 order certified for appeal, which motion was also denied by the Court.

12      Defendants now seek privileged attorney-client communications in an attempt
13 to prove their dubious "last ditch" claim that if Plaintiffs are found to have
14 recaptured Siegel's "Superman" and "Superboy" copyrights under the Copyright
15 Act, DC somehow purchased such rights pursuant to an alleged settlement
16 agreement which was clearly never consummated. In so doing, Defendants strain to
17 get its "foot in the door" and enter with impunity the protected sanctum of Plaintiffs'
18 protected attorney-client relationships.

19      Defendants' overreaching strategy ignores substantial legal precedent that the
20 mere disclosure of the fact of a communication between a client and attorney does
21 not amount to a disclosure of the specific contents of that communication, nor
22 constitute a waiver of the attorney-client privilege. Defendants similarly ignore
23 prevailing caselaw which holds that, to the limited extent a court may find a waiver
24 of the attorney-client privilege with respect to a disclosed communication, such
25 waiver is construed and applied very narrowly.

26 **III.**   **DEFENDANTS' CONTENTIONS**
27      **A.**     **PROCEDURAL HISTORY AND BACKGROUND**
28      On April 3, 1997, Plaintiffs Joanne Siegel and Laura Siegel Larson



1 ("Plaintiffs" or "the Siegels"), the widow and daughter of Jerome Siegel ("Siegel")

2 mailed several notices of termination under section 304(c) of the 1976 Copyright

3 Act purporting to terminate Siegel's copyright grants to defendant and

4 counterclaimant DC's predecessor, Detective Comics, Inc., (the "Superman

5 Termination Notices"), affecting Siegel's share as a co-author in seven grants of

6 rights under copyright made by Siegel and Joseph Shuster in certain Superman

7 comic book stories dating back to 1937. The Superman Termination Notices relate

8 only to Siegel's – but not Shuster's – participation in these grants.

9     Shortly after receipt of the Superman Termination Notices, the parties began

10 settlement negotiations. Following extensive discussions between the parties over

11 several years, on October 16, 2001, a legal representative for DC, without

12 acknowledging the validity of the Superman Termination Notices or any claims

13 based upon those notices, made a settlement offer to the Siegels by telephone

14 through their prior law firm, Gang Tyre Ramer & Brown ("Gang Tyre").

15     On October 19, 2001, the Siegels, accepted the October 16, 2001 offer,

16 through an executed writing from Gang Tyre confirming that the Siegels had

17 "accepted D.C. Comics' offer of October 16, 2001" and outlining all of the material

18 terms in detail. (*See* Exhibit A to the Declaration of James D. Weinberger in

19 Support of Defendants' Motion to Compel ("Weinberger Decl.").) Those terms

20 included, *inter alia,* that the Siegels transferred any rights they might have in the

21 Superman property (which was defined in the letter as Superman, Superboy and

22 related properties including but not limited to Supergirl, Steel, Lois & Clark, and

23 Smallville). In exchange, the Siegels were to receive: (a) a sizeable non-returnable

24 advance; (b) a sizeable non-recoupable and non-returnable signing bonus; (c)

25 forgiveness of a previously made advance payment; (d) significant guaranteed

26 minimum payments as advances against royalties; and (e) percentage royalties from

27 DC's exploitations of Superman across all media, worldwide. (*Id.*)

28

1       Several months after endeavoring to memorialize the agreement into a long-

2  form contract in February 2002, DC received several letters from the Siegels. First,

3  on September 21, 2002, DC was copied on a letter from the Siegels to the Gang Tyre

4  firm, in which they terminated that firm's representation and explained the basis for

5  such termination. (Weinberger Decl. Ex. B.) Plaintiffs informed Gang Tyre that

6  they rejected Gang Tyre's "redraft of the February 4, 2002 document [the long-form

7  contract noted above] which you sent us on July 15, 2002." On the same day, DC

8  received a second letter from the Siegels stating they were breaking off all

9  discussions with DC and impliedly and purportedly repudiating the agreement

10  already reached by the parties. (*Id.* Ex. C.)

11       On November 8, 2002, Plaintiffs served a "new" notice of termination (the

12  "Superboy Termination Notice"), relating only to literary works featuring Superboy

13  and purporting to terminate grants made only by Siegel in the Superboy works

14  already identified in the Superman Termination Notices.

15       On October 8, 2004, Plaintiffs filed this first action (the "Superman Action")

16  seeking a declaration as to the effectiveness of the Superman Termination Notices

17  and an accounting for Siegel's one-half share in profits from Superman exploitation

18  following the effective date of the termination. On October 22, 2004, Plaintiffs filed

19  their second action (the "Superboy Action"), seeking a declaration that Plaintiffs

20  have recaptured all rights in the Superboy literary works. Plaintiffs allege further

21  that "[d]efendants' ongoing exploitation of the 'Superboy' mythology, including but

22  not limited to the Superboy Comic Books, and other publications, 'Superboy'

23  merchandising, animated and live action television programming (*e.g.*, the

24  *Smallville* Series)" infringes Plaintiffs' copyright rights in the "Siegel Superboy

25  Material," namely, the Submissions.

26       DC filed identical counterclaims in both actions seeking enforcement of the

27  October 19, 2001 settlement agreement agreement; if the claim is successful, all of

28  Plaintiffs' claims in this case are moot. (*See, e.g.*, Weinberger Decl. Ex. D.) On

June 21, 2005, Defendants served document requests in these actions seeking

documents concerning the repudiated settlement agreement, including the following

written requests:

**Request No. 52**

    All Writings concerning the settlement discussions between
Plaintiffs and Defendants that took place from approximately April
17, 1997 through September 30, 2002.

**Request No. 53**

    All Writings concerning the October 19, 2001 letter from
Plaintiffs' then counsel to John Schulman [Defendant Warner Bros.
Entertainment Inc.'s general counsel].

**Request No. 55**

    All Writings concerning the draft agreement transmitted to
Plaintiffs on or about February 1, 2002.

**Request No. 58**

    All Writings concerning any communications between
Plaintiffs and any attorney, partner, employee, agent, or representative
of the law firm Gang Tyre Ramer & Brown after September 21, 2002.

**Request No. 59**

    All Writings concerning any disposition of any rights relating
to Superman, including but not limited to any solicitation, offer,
option, agreement or license.

(Weinberger Decl. Ex. E.)   Plaintiffs served identical responses to each of these

requests as follows:

    Plaintiffs further object to this request on the grounds that it is vague,
ambiguous, overbroad, burdensome and oppressive. Plaintiffs further
object to this Request for Production on the ground that it violates
Rule 408 of the Federal Rules of Evidence. Subject to and without
waiving the foregoing objections, Plaintiffs will produce all non-
privileged documents they are able to determine are responsive to this
request.

(*Id*. Ex. F.)  Plaintiffs produced approximately 1900 pages of documents in

September 2005, none of which contained purportedly privileged communications

between them and Gang Tyre.  (*Id*. ¶ 8.)  Despite several requests, Plaintiffs until

July 20, 2006 had not produced a privilege log, either.  (*Id*. ¶¶ 9, 14 & Exs. G-I, M)

1    On April 17, 2006, Defendants served additional discovery requests,

2  including requests for admission pursuant to Fed. R. Civ. P. 36. (*Id.* Ex. J.) In

3  response to Defendants' Request for Admission No. 69, which asked Plaintiffs to

4  admit that Gang Tyre was authorized to send the October 19, 2001 letter (*id.* Ex. A,

5  accepting DC Comics' offer of settlement), Plaintiffs responded with an unqualified

6  denial of the request. (*Id.* Ex. K.) By this denial, Plaintiffs have placed into issue

7  the defense that Gang Tyre was not authorized to send the October 19, 2001 letter.

8  No documents or privilege log have been produced by Plaintiffs since serving their

9  response to Request for Admission No. 69, until Plaintiffs produced a log on July

10  20, 2006. (*Id.* ¶¶ 9, 14 & Ex. M.)

11    In view of Plaintiffs' continuing failure to produce responsive documents or

12  to identify documents being withheld on the basis of a claimed attorney-client

13  privilege, Defendants' counsel wrote to Plaintiffs' counsel on June 27, 2006

14  requesting a conference to discuss the dispute. (*Id.* ¶ 13 & Ex. L.) On July 10,

15  2006, the parties conducted a meet-and-confer on the issues set forth in this motion

16  and were unable to come to a satisfactory resolution. (*Id.* ¶ 14.)

17  **B.    PLAINTIFFS HAVE WAIVED PRIVILEGE ON ISSUES
       RELATING TO THE SETTLEMENT OF THIS ACTION
18     AND SHOULD THEREFORE BE REQURIED TO
       PRODUCE RESPONSIVE DOCUMENTS**

19
    **1.    Plaintiffs' Implied Waiver of Privilege Concerning
          Counsel's Authority to Accept Settlement Offer**
20

21    Defendants have served document requests seeking documents relating to the

22  settlement negotiations that culminated in Gang Tyre's October 19, 2001 letter in

23  which attorney Kevin Marks of that firm communicated to Defendants the fact that

24  "[t]the Siegel Family . . . has accepted DC Comics' offer of October 16, 2001"

25  (Weinberger Decl. Ex. E), an agreement Plaintiffs now refuse to honor. In response

26  to Defendants' Request for Admission No. 69, Plaintiffs stated that the Siegels *did*

27  *not* give Mr. Marks authority to send the October 19, 2001 letter. (Weinberger Decl.

28  Ex. K.)

1    Because Plaintiffs have put Gang Tyre's authority in issue in connection with

2    their defense to DC's counterclaim to enforce the settlement agreement, Plaintiffs

3    have impliedly waived the attorney-client privilege with respect to the subject

4    matter related to the settlement between the parties and, thus, Defendants are

5    entitled to discovery from Plaintiffs on the issue of that authority. *See Transamerica*

6    *Title Ins. Co. v. Superior Court*, 188 Cal.App.3d 1047, 1052-53, 233 Cal.Rptr. 825,

7    828 (Cal. Ct. App. 1987) ("The privilege may also be impliedly waived where a

8    party to a lawsuit places into issue a matter that is normally privileged.  It is said that

9    in that case the gravamen of the lawsuit is so inconsistent with the continued

10   assertion of the privilege as to compel the conclusion that the privilege has in fact

11   been waived.") (*citing Wilson v. Superior Court*, 63 Cal.App.3d 825, 134 Cal.Rptr.

12   130 (Cal. Ct. App. 1976)).  *See also Shapo v. Tires 'N Tracks, Inc.*, 336 Ill.App.3d

13   387, 394, 270 Ill.Dec. 254, 260-61 (Ill. App. Ct. 2002) ("In this case, the core of the

14   instant litigation is premised upon defendant's complaint that its former attorneys

15   were not authorized to settle the case on its behalf.  Therefore, defendant has placed

16   the conduct of its former counsel at issue, and waiver is applicable to those earlier

17   communications between it and its former counsel involving the settlement

18   agreement, and the trial court did not abuse its discretion by allowing those

19   communications to be disclosed."); *Hartman v. Hook-Superrx Inc.*, 42 F. Supp. 2d

20   854 (S.D. Ind. 1999) ("Because of the unique nature of the attorney-client

21   relationship, and consistent with the public policy favoring settlements, federal law

22   presumes that an attorney-of-record who enters into a settlement agreement,

23   purportedly on behalf of a client, has authority to do so. . . . By refusing to waive the

24   attorney-client privilege regarding those communications and thus not permitting

25   the development of evidence of such communications, we seriously doubt that

26   Plaintiff can rebut the presumption that [his attorney] had authority to bind

27   [Plaintiff] to the May 9 settlement agreement."); *Steinfeld v. Dworkin*, 515 A.2d

28   1051, 1052 (Vt. 1986) ("[A] party attacking his own attorney's authority to settle

17
**EXHIBIT 37**
**585**

1   impliedly waives the privilege as to the very matter he puts in issue . . . It would

2   work an extreme hardship on other litigants and on the court if a party could, at the

3   same moment, assert the lack of authority to settle and yet prevent facts bearing on

4   that authority from coming into evidence."). Accordingly, as Plaintiffs have put

5   Gang Tyre's authority to settle in issue in this action, they have waived the privilege

6   with respect to such authority.

7          Moreover, *regardless* of whether Plaintiffs are claiming that the October 19,

8   2001 letter was authorized, whether a client gives her counsel *affirmative* authority

9   to settle is *never* subject to the privilege because such communications are not

10  intended to be confidential in the first place; without confidentiality, the *sine qua*

11  *non* of any protected communication, no attorney-client privilege exists. *See Grand*

12  *Lake Drive In, Inc. v. Superior Court*, 179 Cal. App. 2d 122, 125 (Cal. Ct. App.

13  1960) ("When the client does not intend his communication to be confidential, it is

14  not privileged."); *Price v. Superior Court*, 161 Cal. App. 2d 650 (Cal. Ct. App.

15  1958) (same); *Griffith v. Davis*, 161 F.R.D. 687, 694 (C.D.Cal. 1995) ("[C]ourts

16  have consistently refused to apply the privilege to information that the client intends

17  or understands may be conveyed to others."). *See also Willard C. Beach Air Brush*

18  *Co. v. General Motors Corp.*, 118 F. Supp. 242, 244 (D.N.J. 1953) (privilege does

19  not extend to "the client's grant of authority to the attorney to settle, since this must

20  be communicated to the other party to the settlement and is thus not confidential");

21  *Peters v. Wallach*, 321 N.E.2d 806, 809 (Mass. 1975) ("The client's grant of

22  authority to settle must be communicated to the other party to the settlement and is

23  thus not confidential."); *Diversified Dev. & Inv., Inc. v. Heil*, 889 P.2d 1212, 1218

24  (N.Mex. 1995) (holding that "the attorney-client privilege does not prohibit

25  [defendant's attorney] from disclosing what [defendant] authorized him to agree

26  upon with or communicate to [plaintiff]"); *Walsh v. Barcelona Assoc., Inc.*, 476

27  N.E.2d 1090, 1093 (Ohio App. 1984) ("By its very nature, a communication from a

28  client to his attorney conveying authority to the attorney to act on his behalf as his

18
**EXHIBIT 37**
**586**

1   agent in entering into an agreement with the opposing party, is a communication
2   which is intended to be communicated to the opposing party. Because such a
3   conversation is not intended to be confidential, it is not privileged.")  This provides
4   an alternative basis for the discovery in question.

5          At the parties' meet and confer on this motion, Plaintiffs claimed that because
6   – in their view – DC's counterclaim to enforce the settlement agreement was
7   "frivolous," Defendants were not permitted to probe the defenses asserted by
8   Plaintiffs in response thereto.  (Weinberger Decl. ¶ 14.)  This argument turns the
9   discovery process on its head, and would allow for any party to refuse to meet its
10  discovery obligations based on a belief that the opposing party's claims were weak.
11  This is clearly not the case.  Indeed, DC's counterclaim has been an integral part of
12  this litigation since it was asserted in December 2004.  (*Id.* Ex. D.)  Plaintiffs did not
13  move to dismiss the claim, nor have they moved for summary judgment.  Under
14  these circumstances, Defendants are entitled to seek discovery from Plaintiffs on
15  their defenses to the claim, so long as the discovery sought is likely to lead to the
16  discovery of admissible evidence.  *See* Fed. R. Civ. P. 26.

17         Defendants therefore request that the Court enter an order requiring the
18  immediate production of all documents relating to Gang Tyre's authority (or the
19  alleged lack thereof), including (i) all correspondence between Gang Tyre and
20  Plaintiffs relating to the October 19, 2001 settlement letter, and (ii) all documents
21  relating to the terms of the retention of Gang Tyre, as requested, *inter alia*, by
22  document requests 52, 53 and 59 as set forth above.

23         **2.    Plaintiffs' Express Waiver of Privilege Concerning
                    Their Retention and Termination of Counsel**
24
25         In addition to their implied subject matter waiver of the attorney-client
26  privilege, Plaintiffs have also expressly waived the attorney-client privilege with
27  respect to the reasons for and fact of termination of the Gang Tyre firm by copying
28  certain individuals, including DC's president Paul Levitz on a September 21, 2002

1  letter to Gang Tyre terminating their services and explaining the basis for such

2  termination. (Weinberger Decl. Ex. B.). *See, e.g., Transamerica*, 188 Cal.App. at

3  1052, 233 Cal.Rptr. at 828 ("The privilege is waived with respect to a protected

4  communication if any holder of the privilege voluntarily discloses a significant part

5  of the communication . . . ."). That letter states as follows:

6      Kevin S. Marks, Esq.
       Bruce M. Ramer, Esq.
7      Gang, Tyre, Ramer & Brown, Inc.
       132 South Rodeo Drive
8      Beverly hills, CA 90212

9                          September 21, 2002

10     Dear Kevin and Bruce,

11         As we previously discussed with you and hereby affirm, we
       rejected DC Comics' offer for the Siegel Family interest in Superman
12     and other characters sent to us by you on February 4, 2002. We
       similarly reject your redraft of the February 4, 2002 document which
13     you sent to us on July 15, 2002. Therefore due to irreconcilable
       differences, after four years of painful and unsatisfying negotiations,
14     this letter serves as formal notification that we are totally stopping
       and ending all negotiations with DC Comics, Inc., its parent company
15     AOL Time Warner and all of its representatives and associates,
       effective immediately.

16
           This letter is also notification that, effective immediately, we
17     are terminating (Gang, Tyre, Ramer & Brown, Inc., and all of your
       firm's partners, associates and employees as representatives of the
18     Siegel Family interest regarding Superman, Superboy, the Spectre
       and all related characters and entities. We instruct you to take no
19     further actions on our behalf.

20         Please return all materials regarding the above including but
       not limited to files, correspondence, notes and documents to us
21     forthwith. These should be sent to Joanne Siegel at the above address.

22         It is a shame that four years were wasted due to DC Comics
       and AOL Time Warner's greed. We have no intention of publicly
23     disparaging DC or any individual in the parent company. However,
       should DC or its parent company, officers, attorneys, representatives
24     or spokespersons disparage us or our rights, we will vigorously
       respond in kind.

25     Sincerely,                          Sincerely,

26     /s/                                 /s/

27     Joanne Siegel                       Laura Siegel Larson

28     cc:   Michael Siegel

EXHIBIT 37    20
588

1  Don Bulson, Esq.
   Paul Levitz
2
3  (Weinberger Decl. Ex. B.).  Plaintiffs have neither produced a copy of the

4  September 21, 2002 letter, the July 15, 2002 "redraft," or any other documents

5  relating to these issues, despite the fact that they were expressly requested in

6  Defendants' document requests.  *See, e.g.*, Doc. Reqs. 52, 55, 58.

7      In response, Plaintiffs claimed at the parties' meet and confer that the Siegels'

8  September 21, 2002 letter to Gang Tyre setting forth a detailed basis for their

9  termination (Weinberger Decl. Ex. B) does not, by virtue of being sent to DC's

10 president, constitute a waiver of the attorney-client privilege.  (Weinberger Decl. ¶

11 14.)  Plaintiffs' counsel argued that the letter was only sent to DC's president to

12 advise him that Gang Tyre was no longer representing the Siegels and thus could not

13 constitute a waiver.  (*Id.* ¶ 14.)  However, DC's president was sent a *separate* letter

14 on the same day advising him of Gang Tyre's termination (*id.* Ex. C), which

15 establishes that this explanation is pure makeweight.

16     Plaintiffs also assert that the Siegels were not represented by counsel when

17 they sent the September 21, 2002 letter to DC's president, and thus could not have

18 intended the communication as a waiver of the privilege.  (*Id.* ¶ 14.)  Intent,

19 however, is not required to find that a waiver has occurred:

20     The recognition of the attorney-client privilege depends on
       confidentiality.  When the client destroys the confidentiality that
21     forms the basis for the privilege, the privilege vanishes, regardless of
       whether the availability of the privilege was "known" to the client or
       the client "intentionally relinquished" it. . . . If an intention to waive
22     were required, waiver would seldom result from clients' disclosures.

23 Paul R. Rice, Attorney-Client Privilege in the United States (2d ed. 2006), § 9:19 at

24 44-47 (citing, *inter alia*, *United States v. Zolin*, 809 F.2d 1411, 1415 (9th Cir. 1987),

25 *aff'd in part, vacated in part on other grounds*, 491 U.S. 554, 109 S.Ct. 2619, 105

26 L.Ed.2d 469 (1989) ("voluntary delivery of a privileged communication . . . to

27 someone not a party" constitutes a waiver); *Weil v. Investment/Indicators, Research*

28

1 & *Mgm't, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (waiver found despite fact that client

2 did not intend to waive privilege)).

3    The burden is on Plaintiffs to prove the existence of the privilege. *See Weil*,

4 647 F.2d at 25 ("As with all evidentiary privileges, the burden of proving that the

5 attorney-client privilege applies rests not with the party contesting the privilege, but

6 with the party asserting it.") (citations omitted). Given the express waiver of the

7 privilege covering all the issues raised in the September 21, 2002 letter from

8 Plaintiffs to their counsel as disclosed to DC's president, Plaintiffs cannot meet such

9 a burden here. Defendants therefore respectfully request that the Court enter an

10 order that documents relating to Plaintiffs' termination of Gang Tyre be produced

11 immediately.

12    **3.    Plaintiffs' Failure to Produce a Privilege Log**

13    Plaintiffs' failure to produce a privilege log compounds the problems with the

14 privilege waivers described above. Because Defendants have neither the responsive

15 documents nor a log specifying exactly which documents Plaintiffs claim are subject

16 to the attorney-client privilege, they are in no position to determine whether

17 Plaintiffs are improperly withholding the relevant documents.

18    It is axiomatic that any claim of privilege extends only to the substance of the

19 allegedly privileged communications. To prevent litigants from misusing or hiding

20 behind the privilege to avoid their discovery obligations, the Federal Rules of Civil

21 Procedure require litigants to produce a log of communications and correspondence

22 that but for the privilege would be responsive and relevant to discovery. *See* Fed. R.

23 Civ. P. 26(b)(5); Fed. R. Civ. P. 26(f), Advisory Committee's Note (1983

24 Amendment). Such logs traditionally include the date of the document, the

25 identities of the persons from and to whom it was sent or who prepared it, the

26 general subject matter, and the nature of the privileged claimed. Fed. R. Civ. P.

27 26(b)(6). This information is meant to allow the opposing party and the Court to

28 make a proper evaluation of the propriety of the claim of privilege. *See* Fed. R. Civ.

1    P. 26(f), Advisory Committee's Note (1983 Amendment) ("The purpose of

2    discovery is to provide a mechanism for making relevant information available to

3    the litigants . . . . Thus, the spirit of the rules is violated when advocates attempt to

4    use discovery tools as tactical weapons rather than expose the facts and illuminate

5    the issues . . . .").

6        As the Ninth Circuit has held, a privilege log is an absolute requirement for

7    the proper assertion of a privilege, including the attorney-client privilege and work

8    product doctrine; mere boilerplate objections or blanket refusals incorporated into

9    discovery responses – such as the objections Plaintiffs have interposed to nearly

10   every discovery request served by Defendants – are insufficient to assert a privilege.

11   *Burlington Northern & Santa Fe Railway Co. v. United States Dist. Ct.*, 408 F.3d

12   1142, 1149 (9th Cir. 2005). *See also Eureka Fin. Corp. v. Hartford Accident &*

13   *Indem. Co.*, 136 F.R.D. 179, 184-85 (E.D. Cal. 1991) (failure "to comply with a well

14   settled requirement of specifically identifying the evidence to which a privilege

15   applies" constitutes a waiver of the attorney-client privilege). Defendants have

16   requested that Plaintiffs produce a log on several occasions. (Weinberger Decl. Exs.

17   G-I.) No response was ever received to any of those inquiries until July 10, 2006,

18   when Plaintiffs represented that such a log was forthcoming. (*Id.* ¶¶ 9, 14.) No log

19   was received by Defendants until July 20, 2006 (*id.* ¶ 14 & Ex. M), and Defendants

20   maintain that such production is not sufficient to meet their burden of establishing

21   any privilege. Therefore, Defendants request that the Court enter an order (a)

22   requiring Plaintiffs to produce a comprehensive privilege log within three (3)

23   business days from the date of entry of the Court's order, and (b) finding that

24   Plaintiffs' failure to comply with such order results in a complete waiver of the

25   attorney-client privilege.

26   **IV.    PLAINTIFFS' CONTENTIONS**

27        **A.    PROCEDURAL BACKGROUND**

28        Plaintiffs served Defendant DC their first set of requests for production of

1   documents on May 13, 2005. (Toberoff Decl. ¶ 5). Plaintiffs also served defendant

2   WB a separate set of requests on May 13, 2005. *Id.,* ¶ 6. Both Defendants filed

3   responses to their respective requests on June 13, 2005. *Id.,* ¶ 7. DC thereafter

4   produced a small portion of their non-privileged documents available for copying on

5   August 9, 2005. *Id.,* ¶ 14, Ex. H. However, DC did not serve a privilege log until

6   almost *eight months* later on April 7, 2006. *Id.,* ¶ 15, Ex. I. Incredibly, despite

7   Plaintiffs' repeated demands, WB failed to produce *any* documents for copying until

8   June 2, 2006, over *a year* after Plaintiffs' requests. *Id.,* ¶ 16, Ex. J. WB

9   subsequently served their privilege log on June 27, 2006, *thirteen months* after

10  Plaintiffs' Requests. *Id.,* ¶ 17, Ex. K.

11         Defendants served their first requests for production on June 21, 2005,

12  (including requests nos. 52, 53, and 55) seeking amongst other documents

13  communications concerning the settlement proposals discussed in October, 2001.

14  *Id.,* ¶ 8. Plaintiffs responded to these requests on July 21, 2005. *Id.* Plaintiffs

15  produced responsive documents shortly thereafter on September 29, 2005. *Id.,* ¶ 18.

16         On April 17, 2006, Defendants served a second set of discovery requests to

17  which Plaintiff responded on June 7, 2006. *Id.,* ¶ 19. Plaintiffs produced a detailed

18  privilege log to Defendants on July 20, 2006. *Id.,* ¶ 20, Ex. L.

19         **B.    LEGAL STANDARDS**

20                **1.    State Law Applies to Privilege Issues Regarding State
                       Law Component of Federal Claim.**
21

22         Rule 501 of the Federal Rules of Evidence provides that when a federal court

23  hears a civil action in which state law provides the rule of decision, privileges shall

24  be determined in accordance with State law." Fed. R. Evid. 501. *See Star Editorial*

25  *v. United States Dist. Court*, 7 F.3d 856, 859 (9th Cir. 1993); *Amco Ins. Co. v.*

26  *Madera Quality Nut LLC*, 2006 U.S. Dist. LEXIS 21205, *12 (E.D. Cal. 2006) ("the

27  discovery in question relates to state law…claims; thus, the existence and extent of

28  any privilege is controlled by California law.").

1    Work product protection is governed by federal law because it is not a

2  privilege, but rather is a procedural immunity, or a qualified protection from

3  discovery. *F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 196 F.R.D. 375, 381

4  (S.D. Cal. 2000).

5    Therefore, whether Plaintiffs have purportedly waived their attorney-client

6  privilege with respect to DC's state claim of a purported settlement agreement is

7  governed by California law, while the applicability of the work product doctrine is

8  governed by federal standards.

9    **2.    The Attorney-Client Privilege**

10    The attorney-client privilege is codified in California Evidence Code § 950, et

11  seq. and in general allows the client "to refuse to disclose, and to prevent another

12  from disclosing, a confidential communication between client and lawyer...." Cal.

13  Evid. Code § 954.   It is a privilege owned by the client, not the attorney.   The

14  attorney-client privilege covers all forms of communication, including transmission

15  of specific documents. *Mitchell v. Superior Court*, 37 Cal. 3d 591, 600 (1984).

16    "The privilege of confidential communication between client and attorney

17  should be regarded as sacred.   It is not to be whittled away by means of specious

18  argument that it has been waived.   Least of all should the courts seize upon slight

19  and equivocal circumstances as a technical reason for destroying the privilege."

20  *People* v. *Kor,* 129 Cal.App.2d 436, 447 (1954); *Sullivan v. Superior Court,* 29

21  Cal.App.3d 64, 71 (1972).

22    "Clearly, the fundamental purpose behind the privilege is to safeguard the

23  confidential relationship between clients and their attorneys so as to promote full

24  and open discussion of the facts and tactics surrounding individual legal matters."

25  *Mitchell*, 37 Cal. 3d at 599.   The public policy fostered by the privilege seeks to

26  insure "the right of every person to freely and fully confer and confide in one having

27  knowledge of the law, and skilled in its practice, in order that the former may have

28  adequate advice and a proper defense." *Baird v. Koerner*, 279 F.2d 623, 629 (9th

25

**EXHIBIT 37**

1    Cir. 1960); *see also 2,022 Ranch, L.L.C. v. Superior Ct.*, 7 Cal. Rptr. 3d 197, 204

2    (2003).

3        "Although exercise of the privilege may occasionally result in the suppression

4    of relevant evidence…these concerns are outweighed by the importance of

5    preserving confidentiality in the attorney-client relationship." *Mitchell,* 37 Cal. 3d

6    at 599-600, *citing City & County of S.F. v. Superior Court,* 37 Cal.2d 227, 235

7    (1951).

8        The burden is on the party claiming waiver of a privilege to prove the

9    existence of an intentional and knowing waiver. *Ringler Associates Inc. v.*

10   *Maryland Casualty Co.*, 80 Cal.App.4th 1165, 1188 (2000); *see also Fidelity &*

11   *Deposit Co. of Maryland,* 196 F.R.D. at 380.

12       **C.    PLAINTIFFS DID NOT WAIVE THEIR PRIVILEGES ON ISSUES RELATING TO DEFENDANTS' ASSERTION OF A**

13       **PURPORTED SETTLEMENT AGREEMENT**

14           **1.    Plaintiffs Have Not Impliedly Waived The Attorney-Client Privilege**

15

16       Defendants improperly seek documents constituting confidential attorney-

17   client communications relating to the negotiation of a proposed, but never

18   consummated, settlement of Plaintiffs' Termination regarding "Superman."

19   (Weinberger Decl., Ex. E). Defendants' argument that Plaintiffs have waived the

20   attorney-client privilege with respect to such negotiations is meritless. Defendants'

21   dubious claim is falsely premised on a straw man argument that Plaintiffs have put

22   the authority of their prior attorney, Kevin Marks ("Marks"), of the firm Gang, Tyre,

23   Ramer & Brown ("Gang Tyre"), in issue. To stretch to this unsupported conclusion,

24   Defendants misleadingly argue that "Plaintiffs *stated* that the Plaintiffs *did not* give

25   Mr. Marks authority to send [a] October 19, 2001 letter [containing certain proposed

26   deal points]."

27       In fact, Plaintiffs have not, do not and would not ridiculously claim that

28   Marks, their own attorney, lacked the authority to conduct such negotiations.



1  Defendants' waiver argument is based on a single answer to their Request for

2  Admission No. 69 which has since been substantially supplemented and clarified by

3  Plaintiffs.  Defendants' Request No. 69 stated: "Admit that Kevin Marks was

4  authorized by Plaintiffs to send the October 19 Letter on Plaintiffs' behalf."

5          Plaintiffs objected to this Request, including insofar as it focused on

6  privileged communications between Plaintiffs and their attorney and ultimately

7  denied the Request, not because Plaintiffs claimed that Marks lacked authority to

8  negotiate on their behalf but because Plaintiffs had not been furnished with Marks'

9  October 19, 2001 letter before it had been sent to DC's counsel.  (Toberoff Decl., ¶

10  2).  In their motion, Defendants mischaracterize the parties' "meet and confer"

11  session and conveniently omits that Plaintiffs' counsel provided this very

12  explanation to DC's counsel and offered to clarify its response by amending it.  *Id.*,

13  ¶ 22.  Plaintiffs thereafter amended their response to Request No. 69 (*see* Toberoff

14  Decl., Ex. M) as follows:

15          "Plaintiffs additionally object to this Request No. 69 on the basis that  it
           inherently requests the disclosure of attorney-client communications between
16          Plaintiffs and their attorney, Kevin Marks ("Marks").  Subject to and without
           waiving the foregoing general and specific objections, Plaintiffs respond as
17          follows: Plaintiffs admit only that Marks acted within the scope of his
           authority in communicating Plaintiffs' conditional interim approval of the
18          basic deal points set forth in the October 19 Letter, however such approval
19          (and authorization) was reasonably conditioned upon (1) such deal points
           being properly reflected in a final written settlement agreement containing no
20          additional new terms or revised terms that were unacceptable to Plaintiffs and
21          (2) Plaintiffs' careful review, approval and execution of a final written
           settlement agreement.  Plaintiffs did not receive a copy of the October 19
22          Letter prior to it being sent by Marks to defendant Warner Bros.
23          Entertainment Inc.'s general counsel, John Schulman, and, as such, did not
           approve the form or wording of the October 19 Letter."
24
25          Plaintiffs have not put into issue Marks' authority as their attorney to act on
26  their behalf in settlement negotiations, nor have Plaintiffs waived their attorney-
27  client privilege with respect to communications with their attorneys regarding these
28

1   negotiations.

2        The attorney-client privilege may be impliedly waived where a party to a

3   lawsuit places into issue a matter that is normally privileged.  It is said in such case

4   that *the gravamen of the lawsuit* is so inconsistent with the continued assertion of

5   the privilege as to compel the conclusion that the privilege has in fact been waived.

6   *Wilson v. Superior Court*, 63 Cal.App.3d 825, 830 (1976).  The scope of such an

7   implied waiver, however, is very narrowly defined and the information required to

8   be disclosed must fit strictly within the confines of the waiver.  *See, e.g., Travelers*

9   *Ins. Companies* v. *Superior Court* 143 Cal.App.3d 436 (1983); *Jones v. Superior*

10  *Court*, 119 Cal.App.3d 534, 547 (1981).

11       Here, Plaintiffs have not placed into issue Marks' authority, nor is Marks'

12  authority by any means the gravamen of this lawsuit.  Privileged communications do

13  not become discoverable simply because they are related to issues raised in the

14  litigation.  *Schlumberger Limited v. Superior Court,* 115 Cal.App.3d 386, 393

15  (1981).

16       The attorney-client privilege is not to be set aside when one party seeks

17  verification of the authenticity of its adversary's position.  *Mitchell*, 37 Cal. 3d at

18  606, illustrates this point.  There, the defendant argued that discovery of privileged

19  information might help it verify the genuineness and reasonableness of the

20  Plaintiffs' claim for emotional distress.  The court reasoned that what was at issue

21  was the Plaintiffs' state of mind as to her emotional distress and not the state of

22  mind of her attorneys.  *Id.*

23       In support of its "placing in issue" implied waiver argument, Defendants cite

24  *Transamerica Title Ins. Co. v. Superior Court*, 188 Cal.App.3d 1047 (1987), where

25  the court *upheld* the attorney-client privilege although its exercise might suppress

26  relevant evidence.  *Id.* at 1052.  In discussing implied waiver, the court made clear

27  that "the privilege is not to be set aside when one party seeks verification of the

28  authenticity of its adversary's position."  *Id.* at 543, *citing Mitchell*, 37 Cal.3d at

1    600.

2        The "in issue" doctrine creates an implied waiver of the privilege *only* when

3    the client tenders an issue involving *the substance or content of* a protected

4    communication, not where the privileged communication simply represents one of

5    several forms of indirect evidence in a particular case. *Mitchell*, 37 Cal.3d at 606.

6    Generally, implied waivers are limited to situations, if any, where *the client* has

7    placed in issue the decisions, conclusions, and mental state of the attorney who will

8    be called as a witness to prove such matters. *Estate of Kime*, 144 Cal.App.3d 246,

9    259 (1983). Plaintiffs have neither placed in issue the substance or content of their

10   protected communications with their attorney nor their attorney's mental state

11   regarding settlement negotiations and proposals.

12       Defendants string cite inapplicable cases from random jurisdictions such as

13   *Hartman v. Hook-Superx Inc.*, 42 F. Supp. 2d 854 (S.D. Ind. 1999), *Shapo v. Tires*

14   *'N Tracks, Inc.*, 336 Ill. App. 3d 387 (2002) and *Steinfeld v. Dworkin*, 515 A.2d

15   1051 (Vt. 1986), where, in each case, a party attempted to extricate itself from a

16   clear unequivocal settlement agreement by frivolously claiming that their attorney

17   lacked the authority to act on their behalf. No such agreement exists in this case.

18       Defendants alternatively argue that whether a client has given her attorney

19   authority to conduct settlement negotiations is not intended to be confidential and is

20   therefore never privileged. From there, Defendants attempt to bootstrap their

21   argument that they are entitled to clearly privileged communications regarding such

22   negotiations. Defendants' argument is largely disingenuous because Defendants do

23   not seek by this motion documents relevant to whether Plaintiffs *authorized* their

24   attorney to conduct settlement negotiations (authorization which is presumed and

25   admitted by Plaintiffs). Rather, Defendants use this *Trojan Horse* excuse to obtain

26   clearly privileged communications relating to the strategies and mental processes of

27   Plaintiffs and their attorneys in such settlement negotiations.

28       None of Defendants' cited authority deals with analogous circumstances or

29

**EXHIBIT 37**

**597**

1  finds that the attorney-client privilege is waived with respect to settlement

2  negotiations as broadly claimed by Defendants. *See e.g., Lake Drive In., Inc. v.*

3  *Superior Court*, 179 Cal. App. 2d 122 (1960) (in slip and fall case at defendant's

4  restaurant, defendant's expert could not avoid answering questions regarding slip

5  location on account of attorney-client privilege); *Price v. Superior Court*, 161 Cal.

6  App. 2d 650 (1958) (witness statement not privileged where agent requesting

7  recorded statement told witness that statement would be available to all parties).

8      Defendants further demand to see Plaintiffs' retainer agreement with Gang

9  Tyre to which they are also not entitled. *See W. Digital Corp. v. Superior Court*, 60

10 Cal. App. 4th 1471, 1482-83 (1998) (retainer agreement not discoverable if it

11 embodies any confidential information or litigation strategy). An attorney may

12 invoke the attorney-client privilege to protect information regarding a client's

13 retainer agreement if disclosure would "convey[] information which ordinarily

14 would be conceded to be part of the usual privileged communication between

15 attorney and client." *In re Horn*, 976 F.2d 1314, 1317 (9th Cir. 1992); *see also In re*

16 *Osterhoudt*, 722 F.2d 591, 593-94 (9th Cir. 1983).

17     In *Horn*, the court noted that letters of consultation and retainer agreements

18 describing the intended scope of the attorney-client relationship could reveal the

19 client's motivation for seeking legal representation and thus, such a demand

20 constituted an "unjustified intrusion into the attorney-client relationship." 976 F.2d

21 at 1318. Plaintiffs' retainer agreement with Gang Tyre indeed reveals confidential

22 information including both Plaintiffs' motivation and the scope of legal services and

23 is therefore privileged. (Toberoff Decl., ¶ 24).

24          **2.    Plaintiffs Did Not Expressly Waive The Attorney-**
           **Client Privilege In The September 21, 2002 Letter**
25

26     Plaintiffs' mistaken provision to Paul Levitz of DC of a copy of its September

27 21, 2002 letter[3] terminating the legal services of Gang Tyre did not function as an

28 
   _____
   [3] At the time the September 21, 2002 letter was sent by Plaintiffs, they were

1   express waiver of the attorney-client privilege regarding *the reasons* Plaintiffs chose

2   to do so.  Nor did the letter waive Plaintiffs' privilege with respect to attorney-client

3   communications and attorney work product referenced therein or privileged

4   communications regarding "all issues" raised by the letter, as Defendants

5   erroneously argue.

6        Plaintiffs' mere reference to attorney-client communications in the September

7   21, 2002 letter, devoid of a discussion of the contents of those communications,

8   does not result in the waiver of the attorney-client privilege.  In order for a

9   communication's privileged status to be waived, the holder of the privilege must

10  disclose "a significant part of the communication" or specifically consent to its

11  disclosure.  Cal. Evid. Code § 912.  What constitutes a significant part of the

12  communication is a matter of judicial interpretation; however, the limited scope of

13  any such waiver should be determined primarily by reference to the protective

14  purposes of the privilege.  *Jones*, 119 Cal.App.3d at 547.

15       "[A] disclosure that a communication did occur that does not disclose the

16  specific content of the communication may not waive the privilege."  *People v.*

17  *Hayes*, 21 Cal. 4th 1211, 1266 (1999); *Mitchell*, 37 Cal. 3d at 601 (1984) (Client's

18  disclosures, "at most, affirmed that she had discussed certain warnings with her

19  attorneys, and in no way revealed a significant part of the substance of those

20  discussions.")

21       Whereas "cc'ing" the September 22, 2002 letter to Paul Levitz may be found

22  to have waived the privilege with respect to this letter, itself, Plaintiffs' reference in

23  the September 22, 2002 letter to DC's February, 2002 counter-offer (*i.e.*, DC's

24  February 1, 2002 agreement draft) and to Marks' re-drafting of a counter-proposed

25  agreement that ultimately was never sent to Defendants, surely does not disclose the

26  specific substance of Marks' proposed re-draft and/or other attorney-client

27

28  effectively without counsel and merely "cc'ed" Paul Levitz, a DC executive with
    whom Plaintiffs had developed a friendship over the years, to avoid any confusion.



1   communications, and, as such, does not waive such communications.

2          Defendants mischaracterize the permissible scope of the waiver they

3   advocate.  The waiver exception has been very narrowly construed, and applied only

4   "if facts relevant to a particular, narrow subject matter have been disclosed in

5   circumstances in which it would be unfair to deny the other party an opportunity to

6   discover other relevant facts with respect to that subject matter." *Hercules, Inc. v.*

7   *Exxon Corp.*, 434 F. Supp. 136, 156 (D. Del. 1977); *Starsight Telecast v. Gemstar*

8   *Development Corp.*, 158 F.R.D. 650, 654 (N.D. Cal. 1994); *Southern Cal. Gas Co.*

9   *v. Public Utilities Com.*, 50 Cal. 3d 31, 40 (1990) (disclosure must be "essential for

10  a fair adjudication of the action").  As in this case, "[i]f a discernible line exists

11  between the information withheld and the information disclosed, the line should be

12  maintained." *Starsight,* 158 F.R.D. at 655.

13         In *Travelers Ins. Companies v. Superior Court*, 143 Cal. App. 3d 436, 444

14  (1983), for instance, the court held that the client's acknowledgment of attorney

15  communications with regard to certain matters in its interrogatory responses had not

16  reached the point of substantial disclosure wherein the privilege ceased to operate.

17  The client's responses were not "wide enough in scope and deep enough in

18  substance to constitute 'a significant part of the communication.'" *Id.*  The same

19  can be said for Plaintiffs' brief reference to previous attorney-client communications

20  in the September 21, 2002 letter. *See Mitchell,* 37 Cal. 3d at 603 (client's

21  "admission did not disclose any of the actual substance or content").

22         Moreover, to the extent, if any, that Plaintiffs discussed in the September 21,

23  2002 letter the facts underlying privileged communications, this also does not waive

24  the privilege. *Upjohn Co. v. United States*, 449 US 383, 395, 101 S Ct 677, 66 L Ed

25  2d 584 (1981).  "The attorney-client privilege seeks to protect the conversations and

26  communications between the attorney and client, not merely the conclusions

27  developed by those conversations or the fact that such conversations occurred."

28  *Southern Cal. Gas Co.*, 50 Cal. 3d at 49.  A finding of waiver in the instant case,

1   where the existence of privileged communications was merely recited in the

2   September 21, 2002 letter, would completely undermine the purpose and protections

3   of the attorney-client privilege.

4        Nor can Defendants claim that Plaintiffs' disclosure of one privileged

5   communication terminating its attorneys necessarily triggers further disclosures.

6   "Waiver of privilege as to one aspect of a protected relationship does not necessarily

7   waive the privilege as to other aspects of the privileged relationship." *Rodriguez v.*

8   *Superior Court,* 14 Cal. App. 4th 1260, 1270 (1993). Nothing in Defendants'

9   authority supports the argument that voluntary disclosure of a privileged

10  communication waives the privilege as to documents merely referenced in the

11  disclosed communication. *See United States v. Zolin,* 809 F.2d 1411, 1416 (9th Cir.

12  1985), *aff'd in part, vacated in part on other grnds*, 491 U.S. 554, 109 S.Ct. 2619,

13  105 L.Ed.2d 469 (1989) (privilege only waived as to tapes actually given to third

14  party).

15       Interestingly, Defendants rely on *Transamerica Title Ins. Co.*, 188 Cal. App.

16  3d 1047, where the attorney client privilege was *upheld* despite voluntary disclosure

17  by the client of a privileged letter. *Id. at* 1053 (noting that "[e]xcept for the June 21

18  letter, no attorney-client communications were revealed to any other party."). The

19  appellee's far-reaching waiver arguments were rejected as such waiver would

20  "surely impinge on [the appellant's] ability to freely and openly communicate to its

21  attorneys." *Id.*

22  **3.    The Attorney Work Product Doctrine Also Protects
            Documents Sought By Defendants**
23

24       Rule 26 of the Federal Rules of Civil Procedure mandates that "the court shall

25  protect against disclosure of the mental impressions, conclusions, opinions, or legal

26  theories of an attorney or other representative of a party." *See Garcia v. City of El*

27  *Centro,* 214 FRD 587, 591 (S.D. Cal. 2003) (work product guards against divulging

28  an attorney's strategies and legal impressions); *Handgards, Inc. v. Johnson &*

1   *Johnson*, 413 F Supp 926, 930 (N.D. Cal. 1976) (doctrine "aimed at protecting the

2   effectiveness of a lawyer's trial preparations by immunizing such materials from

3   discovery"); *Hickman v. Taylor*, 329 U.S. 495, 510-11, 91 L. Ed. 451, 67 S. Ct. 385

4   (1947).

5       According to the plain text of Rule 26 of the Federal Rules of Civil

6   Procedure, the work product doctrine applies not only to documents created by the

7   attorney, but also by the party and its representatives. Further, the doctrine applies

8   not only where litigation is pending, but also where it is anticipated. That is, the

9   party, as here, must hold a reasonably objective belief that litigation is a possibility.

10  See *E.E.O.C. v. Lutheran Soc. Svcs.*, 186 F.3d 959, 968 (D.C. Cir. 1999).

11      Courts even afford work product protection to documents in which an

12  attorney collates or categorizes the facts. Thus, while the facts themselves are not

13  privileged, the compilation is protected as work product. *In re Grand Casinos, Inc.*,

14  181 FRD 615, 622 (D. Minn. 1998). In addition, although the work product

15  privilege is inapplicable to purely factual materials, courts must be particularly

16  sensitive to that possibility that an attorney's discussion of factual matters will

17  reveal tactical or strategic thoughts. *Powell v. United States, Dep't of Justice*, 584 F

18  Supp 1508, 1520 (N.D. Cal. 1984).

19      The work product privilege is intended to prevent a litigant from taking a free

20  ride on the research and thinking of his opponent's lawyer and to avoid the resulting

21  deterrent to a lawyer's committing his thoughts to paper. *See, e.g., United States v.*

22  *Nobles*, 422 U.S. 225, 238, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975).

23      Here, Defendants' requests ignore the attorney work product doctrine. The

24  documents sought by Defendants – documents relating to settlement negotiations,

25  attorney-client communications and particularly, Marks' July 15, 2002 draft

26  settlement agreement that was never sent to Defendants – necessarily embody the

27  mental impressions, opinions, strategies and/or legal theories of Plaintiffs' attorneys

28  and are squarely covered by the work product doctrine. Defendants should not be

1  allowed to gain access to the fruits of Plaintiffs' counsel's legal analysis or

2  strategies. *Durkin v Shields (In re Imperial Corp. of Am.)*, 167 F.R.D. 447, 453

3  (S.D. Cal. 1995).

4         There has been no waiver of work product protection in the instant case; to

5  the contrary, the protection is intended to apply in precisely this type of situation.

6  "The doctrine assures an attorney that his private files shall remain free from

7  intrusions of opposing counsel in the absence of special circumstances."

8  *Handgards*, 413 F Supp at 930.  As Defendants have not demonstrated such

9  circumstances or necessity, Defendants' motion to compel such documents should

10 be denied.

11              **4.    Plaintiffs Have Produced A Detailed Privilege Log**

12        Plaintiffs' timely responses to Defendants' requests for production properly

13 objected to the disclosure of documents protected by the attorney-client privilege

14 and the work product doctrine.  On July 20, 2006, Plaintiffs furnished Defendants

15 with a 25 page privilege log, containing 342 entries, properly setting forth with

16 respect to each communication: the date, sender, recipient, the nature of the

17 privilege claimed, the document type and the present location of the document.

18 (Toberoff Decl., Ex. L).  Defendants conveniently omit that Plaintiffs informed

19 Defendants in June, 2006 that they were in the process of assembling this detailed

20 privilege log.  *Id.*, ¶ 19.

21        Defendants' waiver claim is sharply at odds with their own behavior

22 regarding the disclosure to Plaintiffs of their respective privilege logs: Defendant

23 DC did not serve Plaintiffs with a privilege log until almost *eight months* after

24 Defendants responses to Plaintiffs' discovery requests were due; and its parent,

25 Defendant WB waited *thirteen months* to comply.  Yet now it is Defendants who

26 baldly claim that Plaintiffs have entirely waived their attorney client privilege with

27 respect to all privileged documents based on a comparable delay in presenting their

28 privilege logs.



1   Defendants' argument that failure to submit a privilege log in a timely manner
2   waives the underlying privilege is incorrect.  In *Burlington Northern & Santa Fe*
3   *Railway Co. v. United States Dist. Ct.,* 408 F.3d 1142 (9th Cir. 2005) the court
4   explicitly rejected the contention that the failure to produce a privilege log within
5   the 30 day period prescribed by Rule 34 of the Federal Rules of Civil Procedure
6   constitutes a waiver of privilege.  *Id.* at 1147.  *See also Hardeman v.*
7   *Amtrak/Caltrain R.R.,* 2006 U.S. Dist. LEXIS 28861, *3 (N.D. Cal. 2006).
8   The Court should instead make a case by case determination of factors such
9   as: the timeliness of the objection and accompanying information about the withheld
10  documents; the magnitude of the document production; and other particular
11  circumstances of the litigation that make responding to discovery unusually easy or
12  unusually hard, including the relative sophistication of the party compiling the log.
13  *Burlington,* 408 F.3d at 1149.  Here, considering that the dispute over "Superman"
14  and "Superboy" has been going on for decades, Plaintiffs had a very considerable
15  amount of documents to sift through and analyze.  It took Defendants, sophisticated
16  multinationals with no less than three law firms tending to their discovery
17  compliance, 8-13 months to provide Plaintiffs with their privilege logs; it is little
18  wonder Plaintiffs would need as much time to comply as well.  Therefore, Plaintiffs,
19  having now provided Defendants with a substantial privilege log, have not in any
20  way waived their attorney-client privilege as to these protected communications.
21  **V.   DEFENDANTS' CONCLUSION**
22  Plaintiffs' effort to avoid the consequences of their actions in which they
23  affirmatively waived the attorney-client privilege on two discrete issues relevant to
24  this litigation must be stopped.  Not only have Plaintiffs improperly asserted
25  privilege in the face of their waiver, but they have not event attempted to properly
26  substantiate their position by providing Defendants with a privilege log.
27  Accordingly, Defendants respectfully requests that their motion to compel be
28  granted.

36
**EXHIBIT 37**
**604**

1   VI.   **PLAINTIFF'S CONCLUSION**

2          For the foregoing reasons, Plaintiffs respectfully request that this court deny

3   Defendants' motion to compel in its entirety.

4   Respectfully submitted,

5   DATED: July 24, 2006          FROSS ZELNICK LEHRMAN & ZISSU, P.C.

6                                 PERKINS LAW OFFICE, P.C.

7                                          -and-

8                                 WEISSMANN WOLFF BERGMAN
                                      COLEMAN GRODIN & EVALL LLP
9

10                                By: _____

11                                    Roger L. Zissu

12                                Attorneys for Defendants and Counterclaimant

13  DATED: July 24, 2006          LAW OFFICES OF MARC TOBEROFF, PLC
                                  Marc Toberoff
14                                Nicholas C. Williamson

15

16                                By: _____
                                      Marc Toberoff
17
                                  Attorneys for Plaintiffs/Counterclaim-Defendants
18

19  I:\jweinberger\doc\Siegel Litigation\Pleadings\04cv8400\060724-0425344-Joint Stip on Defs Motion to Compel re Privilege (Final)-jdw.doc

20

21

22

23

24

25

26

27

28

                                       37

**EXHIBIT 37**
**605**

**PROOF OF SERVICE**

STATE OF CALIFORNIA         )
                             ) ss.
COUNTY OF LOS ANGELES   )

      I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 9665 Wilshire Blvd, Ninth Floor, Beverly Hills, California 90212.  On the date shown below, I served the documents described as: **NOTICE OF MOTION RE: JOINT STIPULATION; JOINT STIPULATION RE: DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS** on the interested parties in said action, by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

Marc Toberoff
Law Offices of Marc Toberoff, PLC
~~1999 Avenue of the Stars, Suite 1540~~ 2049 Century Park East, Suite 2720
Los Angeles, CA 90067
**Fax No.: (310) 246-3101**

\_\_\_    **(BY MAIL)**  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Beverly Hills, California.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

\_\_\_    **(FACSIMILE SERVICE)**  I caused such document to be transmitted via facsimile to the offices of the addressees at the numbers listed above.

**XX**    **(PERSONAL SERVICE)**  I caused such envelope to be delivered by hand to the addressees above.

\_\_\_    **(BY FEDERAL EXPRESS)**  I caused a copy of such document(s) to be delivered to the offices of the addressee(s) via Federal Express, next business day delivery service.

Executed on **July 24, 2006**, at Beverly Hills, California.

\_\_\_    **STATE**    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**XX**    **FEDERAL**    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____
Pamela Crawford

**EXHIBIT 37**
**606**

# EXHIBIT 38

2231.811



1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Plaintiffs and Counterclaim Defendants
   JOANNE SIEGEL and LAURA SIEGEL LARSON

6
7                  UNITED STATES DISTRICT COURT

8                  CENTRAL DISTRICT OF CALIFORNIA

9  JOANNE SIEGEL, an individual; and    Case Nos.:
10 LAURA SIEGEL LARSON, an              CV 04-08400 RSWL (RZx)
   individual,                          CV 04-08776 RSWL (RZx)
11
                  Plaintiffs,           [Honorable Ronald S. W. Lew]
12      vs.                             [Honorable Ralph Zaresky]

13 TIME WARNER INC., a corporation;
14 WARNER COMMUNICATIONS            DECLARATION OF MARC
   INC., a corporation; WARNER      TOBEROFF IN OPPOSITION TO
15 BROS. ENTERTAINMENT INC., a      DEFENDANTS' MOTION TO
   corporation; WARNER BROS.        COMPEL PRODUCTION OF
16 TELEVISION PRODUCTION INC.,      DOCUMENTS
17 a corporation; DC COMICS, a general
   partnership; and DOES 1-10,      DISCOVERY MATTER
18                                   LOCAL RULE 37

19                Defendants.        [Complaint filed: October 22, 2004]

20
   DC COMICS,                       Date:  August 14, 2006
21                                   Time:  10:00 a.m.
                  Counterclaimant,   Place: Courtroom 540
22      vs.                          Mag. Judge Ralph Zarefsky

23
24 JOANNE SIEGEL, an individual; and
   LAURA SIEGEL LARSON, an
25 individual,

26
                  Counterclaim Defendants.
27
28

CONFORM AND RETURN

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

**EXHIBIT 38**
**607**

## DECLARATION OF MARC TOBEROFF

I, Marc Toberoff, declare as follows:

1.    I am an attorney at the Law Offices of Marc Toberoff, PLC, counsel of record for plaintiffs Laura Siegel Larson and Joanne Siegel ("Plaintiffs"). I am a member in good standing of the State Bar of California and submit this declaration in opposition to defendants' ("Defendants") Motion to Compel Production of Documents. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.    My review of the legal file of Plaintiffs' prior attorney, Kevin Marks ("Marks") revealed that Plaintiffs had not been furnished Marks' October 19, 2001 letter before it was sent to DC's counsel.

3.    A true and correct copy of a letter dated October 26, 2001 to Marks from John Schulman ("Schulman"), General Counsel of Defendant Warner Bros. Entertainment, Inc. ("WB"), on behalf of Defendant DC Comics ("DC"), is attached hereto as Exhibit "A." At the request of Defendants, financial terms, not relevant to the present motion, have been redacted pursuant to the parties' Protective Order.

4.    A true and correct copy of a letter dated February 1, 2002 from DC's attorney, Patrick Perkins, to Marks, enclosing a February 1, 2002 *draft* agreement is attached hereto as Exhibit "B."

5.    On May 13, 2005, I caused Defendants' attorneys herein to be served with Plaintiffs' first set of requests to DC for production of documents.

6.    On May 13, 2005, I caused Defendants' attorneys to be served with Plaintiffs' first set of requests to WB for production of documents.

7.    On June 13, 2005, Defendants DC and WB served my law offices with responses to Plaintiffs' respective requests for production.

8.    On June 21, 2005, Defendants served my law offices with their first requests for production to Plaintiffs which sought, amongst other documents, communications concerning the parties' settlement proposals in October, 2001. On

1

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

**EXHIBIT 38**
**608**

July 21, 2005, I caused Plaintiffs' responses to these requests to be served on Defendants.

9.    A true and correct copy of a July 15, 2005 letter from Defendants' attorney, James Weinberger ("Weinberger"), to Larry Greenfield ("Greenfield"), previously an attorney in my law offices, is attached hereto as Exhibit "C."

10.    A true and correct copy of a July 18, 2005 letter from Greenfield to Weinberger is attached hereto as Exhibit "D."

11.    A true and correct copy of a July 25, 2005 letter from Weinberger to Greenfield is attached hereto as Exhibit "E."

12.    A true and correct copy of a July 26, 2005 letter from me to Weinberger is attached hereto as Exhibit "F."

13.    A true and correct copy of an August 2, 2005 letter from Weinberger to me is attached hereto as Exhibit "G."

14.    In response to Plaintiffs' first set of requests for production, DC made a portion of their non-privileged documents available for copying on August 9, 2005. A true and correct copy of the letter from Weinberger to me dated August 9, 2005 informing me of this is attached hereto as Exhibit "H."

15.    Defendant DC did not serve a privilege log on my law offices until April 7, 2006. A true and correct copy of the letter from Weinberger to me dated April 7, 2006 enclosing DC's privilege log is attached hereto as Exhibit "I."

16.    In response to Plaintiffs' first set of requests for production served on WB on May 13, 2005, WB first made documents available to Plaintiffs for copying on June 2, 2006. A true and correct copy of the letter dated June 2, 2006 from Defendants' attorneys informing me of this is attached hereto as Exhibit "J."

17.    WB subsequently served their privilege log on my law offices on June 27, 2006. A true and correct copy of the letter dated June 27, 2006 from Defendants' attorneys to me enclosing their privilege log is attached hereto as Exhibit "K."

2

Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel

**EXHIBIT 38**
**609**

1   18. On September 29, 2005, in response to Defendants' first set of requests

2 for production, I caused documents of Plaintiffs to be made available to Defendants

3 for copying.

4   19. On April 17, 2006, Defendants served a second set of discovery requests

5 on my law offices. I caused Plaintiffs' responses to these requests to be served on

6 June 7, 2006, and on or about this time I informed Defendants that Plaintiffs were in

7 the process of assembling a detailed privilege log.

8   20. On July 20, 2006, I caused Plaintiffs' privilege log to be served on

9 Defendants. A true and correct copy of Plaintiffs' privilege log is attached hereto as

10 Exhibit "L."

11   21. In a July 20, 2006 telephone conference, I informed Defendants' counsel

12 that Plaintiffs would shortly furnish Defendants with a supplemental privilege log.

13   22. On July 10, 2006, I met and conferred with Defendants' counsel

14 Weinberger wherein I specifically explained the reasons why Plaintiffs had denied

15 Defendants/Counterclaimants' Request For Admission No. 69 and offered to provide

16 in clarification an amended response by Plaintiffs.

17   23. A true and correct copy of Plaintiffs' Supplemental Response To

18 Defendants/Counterclaimants' Request For Admission No. 69, dated July 21, 2006, is

19 attached hereto as Exhibit "M."

20   24. My review of the Plaintiffs' retainer agreement with Gang Tyre revealed

21 that such agreement contains confidential information, including Plaintiffs'

22 motivation for seeking legal representation and the scope of legal services.

23   I declare under penalty of perjury of the laws of the United States of America

24 that the foregoing is true and correct.

25   Executed on July 24, 2006 in Los Angeles, California.

26

27          _____

28            Marc Toberoff

<div align="center">3</div>

<div align="center">Declaration Of Marc Toberoff In Opposition To Defendants' Motion To Compel</div>

<div align="center">**EXHIBIT 38**</div>
<div align="center">610</div>

# EXHIBIT 39

**CONFORMED COPY**

1   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
    Roger L. Zissu (Admitted *pro hac vice*)
2   James D. Weinberger (Admitted *pro hac vice*)
    866 United Nations Plaza
3   New York, New York 10017
    Telephone: (212) 813-5900
4   Fax: (212) 813-5901

5   PERKINS LAW OFFICE, P.C.
    Patrick T. Perkins (Admitted *pro hac vice*)
6   1711 Route 9D
    Cold Spring, New York 10516
7   Telephone: (845) 265-2820
    Fax: (845) 265-2819

8
    WEISSMANN WOLFF BERGMAN
9      COLEMAN GRODIN & EVALL LLP
    Michael Bergman (SBN 37797)
10  Anjani Mandavia (SBN 94092)
    Adam Hagen (SBN 218021)
11  9665 Wilshire Boulevard, Ninth Floor
    Beverly Hills, California 90212
12  Telephone: (310) 858-7888
    Fax: (310) 550-7191

13
14  Attorneys for Defendants and Counterclaimant

15              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**

16  | JOANNE SIEGEL and LAURA SIEGEL | Case Nos. [Consolidated for Discovery]: |

JOANNE SIEGEL and LAURA SIEGEL LARSON,

            Plaintiffs,

            vs.

WARNER BROS. ENTERTAINMENT INC.; TIME WARNER INC.; DC COMICS; and DOES 1-10,

            Defendants.

JOANNE SIEGEL and LAURA SIEGEL LARSON,

            Plaintiffs,

            vs.

TIME WARNER INC.; WARNER COMMUNICATIONS INC.; WARNER BROS. ENTERTAINMENT INC.; WARNER BROS. TELEVISION PRODUCTION INC.; DC COMICS; and DOES 1-10,

            Defendants.

AND RELATED COUNTERCLAIMS

Case Nos. [Consolidated for Discovery]:
        04-8400 RSWL (RZx)
        04-8776 RSWL (RZx)
Hon. Ronald S.W. Lew, U.S.D.J.
Hon. Ralph Zarefsky, U.S.M.J.

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

**DISCOVERY MATTER**
**LOCAL RULE 37**

Time: 10:00 a.m.
Date: August 14, 2006
Courtroom: 540
Mag. Judge Ralph Zarefsky
Discovery Cutoff: Nov. 17, 2006

**EXHIBIT 39**
**611**

1        This motion to compel was filed in response to Plaintiffs' improper attempt to use

2    the privilege as both shield and sword: to prevent discovery relevant to Defendants'

3    counterclaim to enforce the parties' settlement agreement, and simultaneously to defend

4    against that enforcement.  Plaintiffs' response, rather than justifying their position, is

5    littered with excuses based on bare assertions of counsel, as opposed to competent

6    testimony from Plaintiffs themselves.  Accordingly, Defendants now submit this

7    supplemental memorandum of law in further support of their motion.[1]

8    **I.**    **Plaintiffs' Supplemental Response to RFA 69 Makes Clear that They**
     **Have Put Counsel's Authority to Settle in Issue in this Litigation**
9

10        Defendant DC Comics has counterclaimed to enforce a settlement agreement

11   between the parties contained in and evidenced by an October 19, 2001 letter from

12   Plaintiffs' counsel, Kevin Marks of Gang Tyre, to DC's representative.  (Weinberger Decl.

13   Ex. A.)  In furtherance of this claim, Defendants served a request for admission seeking

14   Plaintiffs' position on whether Mr. Marks "was authorized by Plaintiffs to send the

15   October 19 Letter on Plaintiffs' behalf."  In response, Plaintiffs denied that Mr. Marks was

16   so authorized, without further explanation.  (Weinberger Decl. Ex. K, RFA 69.)  Plaintiffs,

17   therefore, have placed Mr. Marks' authority to send the letter in issue, and as such have

18   waived the attorney-client privilege with respect to that authority.  Thus, Defendants are

19   entitled to discovery of relevant privileged communications relating to Mr. Marks'

20   authority.  *See, e.g., Transamerica Title Ins. Co. v. Superior Court,* 188 Cal.App.3d 1047,

---

21       [1] It is worth noting Plaintiffs' tactic of responding to Defendants' motion to compel by

22   complaining about supposed deficiencies in *Defendants'* document production.  Such
     complaints are irrelevant and unjustified.  Any deficiencies, even if they existed, would be

23   of no relevance here since they are not the subject of this motion.  In any event, Plaintiffs
     have accepted and not sought judicial intervention with respect to any discovery dispute

24   pursuant to Local Rule 37 nor have they been affected by the time it has taken Defendants
     to comply with their massive document requests.  Plaintiffs have made no effort to review

25   or even copy nearly 50,000 pages of responsive DC Comics documents or DC's comic
     book library, and over 10,000 pages of responsive Warner Bros documents, all of which

26   have been available for several months.  Given the volume of documents responsive to,
     *inter alia,* Plaintiffs' broad request for "all documents concerning Superman," it is no

27   wonder that it took DC and Warner Bros. several months to compile privilege logs
     containing thousands of entries.  Indeed, the first time they ever felt the need to complain

28   to this Court about Defendants' actions was in response to this motion.

**EXHIBIT 39**
**612**

1  1052-53, 233 Cal.Rptr. 825, 828 (Cal. Ct. App. 1987).

2      The fact that Plaintiffs' have waived the privilege regarding the authority of their

3  former counsel to accept Defendants' settlement offer was reinforced by a supplemental

4  response Plaintiffs' served on the eve of the deadline to respond to this motion, which

5  provides a lengthy explanation of the conditions upon which Mr. Marks was authorized to

6  send the letter in question, including that: (a) certain "basic deal points" had their

7  "conditional interim approval," (b) a "final written settlement agreement containing no

8  additional new terms or revised terms that were unacceptable to Plaintiffs" had to be

9  reached; and (c) Plaintiffs' review of such final agreement.  (Toberoff Decl. Ex. M.)

10  Plaintiffs' denial of Mr. Marks' authority, and the conditions laid out in the supplemental

11  response, have clearly placed Mr. Marks' authority "in issue," and as Plaintiffs concede,

12  the "'in issue' doctrine creates an implied waiver of privilege . . . when the client tenders

13  an issue involving the substance or content of a protected communication." (Joint Stip. at

14  29 (citing *Mitchell v. Superior Court*, 37 Cal. 3d 591, 606 (1984)).)  Plaintiffs cannot take

15  the issue out of play by relying on privilege to block discovery while at the same time

16  reserving their rights on the authority defense.  Indeed, the revised response is an even

17  broader waiver of the privilege as it divulges specific purported instructions to counsel.

18  Defendants are thus entitled to the requested discovery.

19  **II.    Plaintiffs' Attempts to Avoid the Consequences of Copying DC's
       President on a Communication With Their Counsel Are Unavailing**

20      The second waiver of privilege at issue here occurred when Plaintiffs copied Paul

21  Levitz, president of Defendant DC Comics, on a September 21, 2002 letter (Weinberger

22  Decl. Ex. B) in which they terminated Gang Tyre as counsel and explained in detail the

23  basis for their actions.  *See* Cal. Evid. Code § 912(a).  Plaintiffs do not seriously dispute

24  this, arguing only that the letter was sent to Mr. Levitz both as a mistake and to avoid

25  confusion.  (Joint Stip. at 30 and n.3.)[2]  Next, Plaintiffs argue that even if there were a

26

27      [2] These justifications are without basis, inconsistent and insufficient to overcome the
    fact that a waiver did in fact occur.  Plaintiffs submit no evidence, (*i.e.*, a declaration from

28  the Plaintiffs), supporting their argument that the letter was sent by mistake.  Moreover,
    the inconsistent claim that Plaintiffs copied Mr. Levitz "to avoid any confusion" is false –

2

**EXHIBIT 39**
**613**

1    waiver of privilege, that waiver should be limited to the September 21, 2002 letter itself,

2    meaning that the underlying facts described in the letter, specifically Plaintiffs' rejection of

3    Gang Tyre's redraft agreement, would remain protected.  But the authority cited by

4    Plaintiffs for this proposition relates to a *court-ordered waiver*, not a voluntary one like

5    that at issue here. (Joint Stip. at 33 (citing *Rodriguez v. Superior Court*, 14 Cal. App. 4th

6    1260 (Cal. Ct. App. 1993) (waiver ordered by court was to be narrowly construed)).

7            Plaintiffs ignore the law relating to waiver, namely, that it occurs with respect to the

8    *subject matter of a communication, not merely the communication itself.*  *See* 2 Paul R.

9    Rice, Attorney-Client Privilege in the United States (2d ed. 2006), § 9:32 at 127

10   ("Disclosures made without objection waive the privilege of the communications actually

11   revealed and for *all other communications relating to the same subject matter*") (emph.

12   added).  *See also Kerns Constr. Co. v. Superior Court*, 266 Cal.App.2d 405, 414, 74

13   Cal.Rptr 74, 79 (Cal. Ct. App. 1968) ("[W]hen his (holder of the privilege) conduct

14   touches a certain point of disclosure, fairness requires that his privilege shall cease whether

15   he intended that result or not.  He cannot be allowed, after disclosing as much as he

16   pleased, to withhold the remainder.  He may elect to withhold or to disclose, but after a

17   certain point, his election must remain final.") (citation, internal quotation marks omitted).

18           The communications at issue are directly relevant to DC's counterclaim for breach

19   of the settlement agreement set forth in the October 19, 2001 Marks letter, and Plaintiffs'

20   defenses thereto. (*See* Weinberger Decl. Ex. D.)  One of Plaintiffs' defenses is that when

21   DC later forwarded a draft long-form version of the agreement in February 2002, it

22   supposedly added new terms unacceptable to Plaintiffs, thus scuttling the deal, even

23   though Plaintiffs never articulated what the purportedly objectionable terms were. (*See,*

24   *e.g.*, Toberoff Decl. Ex. M.)  As the letter copied to DC's president indicates, following

25   receipt of DC's February 2002 long-form, Mr. Marks prepared and sent to Plaintiffs a

26   proposed revision for transmittal to DC's counsel.  This version clearly would have

27   _____

28   Mr. Levitz was sent a separate letter on the same day (Weinberger Decl. Ex. C) informing
     him that Plaintiffs were breaking off negotiations at that time.  Plaintiffs' attempts to
     rewrite history cannot undo the waiver that has occurred.

1  addressed any concerns of Plaintiff's counsel regarding the long-form. Plaintiffs,

2  however, simply "rejected" it without articulating any basis for doing so. *These facts are*

3  *disclosed in the letter at issue here*, and further discovery relating to such disclosed facts

4  may well demonstrate that Plaintiffs simply had second thoughts about the agreement they

5  entered into and thus have no defense to the counterclaim.

6        Having voluntarily disclosed this privileged information to DC, Plaintiffs have

7  waived the privilege as to the entire contents of the letter, including the existence of and

8  their reasons for "rejecting" their own counsel's revised draft long-form. While the draft

9  long-form might otherwise qualify as work product, even absent the waiver here "[t]he

10  Ninth Circuit has expressly held that even opinion work-product may be discovered where

11  'mental impression are at issue in a case and [ ] the need for the material is compelling.'"

12  *E.E.O.C. v. Safeway Store, Inc.*, No. C-00-3155 TEH(EMC), 2002 WL 31947153, *7

13  (N.D. Cal. Sept. 16, 2002) (quoting *Holmgren v. State Farm Mutual Auto. Ins. Co.,* 976

14  F.2d 573, 577 (9th Cir. 1992)). Thus, Mr. Marks' redrafted long-form must be disclosed.

15  **III.    Plaintiffs' Privilege Log Is Woefully Inadequate**

16        Plaintiffs claim that their July 20, 2006 (the night before their response to this

17  motion was due) service of a privilege log – a log identifying only documents from 1999 to

18  2003, which contains no identification of the subject matter of any document and omits

19  "cc's" and other identifying information – satisfies their obligations under Rule 26 and

20  *Burlington Northern & Santa Fe Railway Co. v. United States District Court*, 408 F.3d

21  1142 (9th Cir. 2005). *Burlington* provides that courts are to use the 30-day discovery

22  response deadline as a default for privilege logs, and consider further delay in context of a

23  number of factors, *inter alia*, the level of information provided about each document to

24  allow the litigant seeking discovery and the court to evaluate the privilege, and the volume

25  of documents. 408 F.3d at 1149.

26        Plaintiffs have not come close to meeting their burden under *Burlington*, in part

27  because their log is woefully inadequate. It fails to provide essential details "that, without

28  revealing information itself privileged or protected, will enable other parties to assess the

1  applicability of the privilege or protection" claimed. Fed. R. Civ. P. 26(b)(5). *See also In*
2  *re CV Therapeutics, Inc.*, No. C-03-3709, 2006 WL 1699536, *2 (N.D. Cal. June 16, 2006)
3  (privilege log must include subject matter of each document). Plaintiffs' log (Weinberger
4  Decl. Ex. M) does not provide any description of the subject matter of any communication,
5  or an identification of *all* recipients of the communications at issue (*e.g.*, persons who were
6  copied). The log is also devoid of communications outside the February 1999 through
7  January 2003 period despite that negotiations between the parties through counsel began in
8  1997. (Joint Stip. at 13-14.) Thus, even if contrary to fact the log provided sufficient
9  detail under Rule 26, it contains huge gaps where allegedly protected communications
10  undoubtedly took place. Because Plaintiffs have failed to identify these communications in
11  their log, they are no longer subject to the privilege and should be produced. Finally,
12  Plaintiffs' explanation for the delay in producing the log – namely, that the dispute
13  between the parties has been going on for decades – is unsupported by evidence and highly
14  dubious. As noted above, since only documents from 1999 to 2003 are listed on the log,
15  Plaintiffs' excuses do not meet their burden in justifying their delay.

16  <center>**CONCLUSION**</center>

17      Because the attorney-client privilege "impedes full and free discovery of the truth,"
18  the privilege must be strictly construed. *Weil v. Investment/Indicators, Research & Mgm't,*
19  *Inc.* 647 F.2d 18, 24 (9th Cir. 1981). Here, Plaintiffs' defenses to DC's counterclaim are
20  grounded in attorney-client communications which have been disclosed to Defendants.
21  Thus, the privilege cannot attach. Accordingly, Defendants request that their motion to
22  compel be granted as set forth in the previously submitted proposed order.

23  DATED:      July 31, 2006            FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                         PERKINS LAW OFFICE, P.C.
24                                             -and-
                                         WEISSMANN WOLFF BERGMAN
25                                           COLEMAN GRODIN & EVALL LLP

26                                       By:
27                                           Roger L. Zissu

28                                       Attorneys for Defendants and Counterclaimant

<center>5</center>

<center>**EXHIBIT 39**
**616**</center>

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA          )
3
                          ) ss.
COUNTY OF LOS ANGELES    )
4

5         I am employed in the County of Los Angeles, State of California; I am over the age of 18
and not a party to the within action; my business address is 9665 Wilshire Blvd, Ninth Floor,
6 Beverly Hills, California 90212.  On the date shown below, I served the documents described as:
**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO**
7 **COMPEL PRODUCTION OF DOCUMENTS** on the interested parties in said action, by
8 placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

9 Marc Toberoff
Nicholas C. Williamson
10 Law Offices of Marc Toberoff, PLC
2049 Century Park East, Suite 2720
11 Los Angeles, CA 90067
**Fax No.: (310) 246-3101**
12

13   ____   **(BY MAIL)**  I am "readily familiar" with the firm's practice of collection and processing
correspondence for mailing.  Under that practice it would be deposited with the U.S. postal
14 service on that same day with postage thereon fully prepaid at Beverly Hills, California.  I
am aware that on motion of the party served, service is presumed invalid if postal
15 cancellation date or postage meter date is more than one day after date of deposit for
16 mailing in affidavit.

17   ____   **(FACSIMILE SERVICE)**  I caused such document to be transmitted via facsimile to the
offices of the addressees at the numbers listed above.
18

19   <u>XX</u>   **(PERSONAL SERVICE)** I caused such envelope to be delivered by hand to the
addressees above.
20

21   ____   **(BY FEDERAL EXPRESS)** I caused a copy of such document(s) to be delivered to the
offices of the addressee(s) via Federal Express, next business day delivery service.
22

23        Executed on **July 31, 2006**, at Beverly Hills, California.

24   ____   **STATE**     I declare under penalty of perjury under the laws of the State of California
that the foregoing is true and correct.
25

26   <u>XX</u>   **FEDERAL**   I declare that I am employed in the office of a member of the bar of this
court at whose direction the service was made.

27

28                           *Ticci Bennett*
                                Ticci Bennett

**EXHIBIT 39**
**617**

# EXHIBIT 40

1

2

3

4                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
5                          WESTERN DIVISION

6    JOANNE SIEGEL, ET AL.,           )
                                      )
7          PLAINTIFFS,                 )
                                      )
8          VS.                         )    CASE CV 04-8400-RSWL(RZX)
                                      )
9                                      )    LOS ANGELES, CALIFORNIA
     WARNER BROS. ENTERTAINMENT,       )    AUGUST 14, 2006
10   INC., ET AL.,                     )
                                      )
11         DEFENDANTS.                 )
                                      )
12   JOANNE SIEGEL, ET AL.,           )
                                      )
13         PLAINTIFFS,                 )
                                      )
14         VS.                         )    CASE CV 04-8776-RSWL(RZX)
                                      )
15                                     )    LOS ANGELES, CALIFORNIA
     TIME WARNER, INC., ET AL.,        )
16                                     )
           DEFENDANTS.                 )
17   _____)

18                            HEARING
                BEFORE THE HONORABLE RALPH ZAREFSKY
19                UNITED STATES MAGISTRATE JUDGE
     APPEARANCES:
20
     FOR THE PLAINTIFFS:          LAW OFFICES OF MARC TOBEROFF
21                                BY:  MARC TOBEROFF
                                       NICHOLAS WILLIAMSON
22                                ATTORNEYS AT LAW
                                  SUITE 2720
23                                2049 CENTURY PARK EAST
                                  CENTURY CITY, CALIFORNIA  90067
24
     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

**EXHIBIT 40**
**618**

2

```
 1   APPEARANCES:  (CONTINUED)
     FOR DEFENDANTS:          WEISSMANN WOLFF BERGMAN
 2                              COLEMAN GRODIN & EVALL LLP
                             BY:  MICHAEL BERGMAN
 3                                ANJANI MANDAVIA
                                  ATTORNEYS AT LAW
 4                           9665 WILSHIRE BOULEVARD
                             NINTH FLOOR
 5                           BEVERLY HILLS, CALIFORNIA  90212

 6   COURTROOM DEPUTY/        ILENE BERNAL
     RECORDER:
 7
     TRANSCRIBER:             DOROTHY BABYKIN
 8                           COURT HOUSE SERVICES
                             1218 VALEBROOK PLACE
 9                           GLENDORA, CALIFORNIA  91740
                             (626) 963-0566
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 40**
**619**

3

1                          I N D E X

2    CASE NO. CV 04-8400-RSWL(RZX)              AUGUST 14, 2006
            CV 04-8776-RSWL(RZX)
3
     HEARING:   DEFENDANTS' MOTION TO COMPEL PRODUCTION OF
4               DOCUMENTS.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 40**
**620**

4

1              LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 14, 2006

2              THE CLERK:  CASE NUMBER CV 04-8400-RSWL(RZX),

3    JOANNE SIEGEL, ET AL. VERSUS WARNER BROS. ENTERTAINMENT INC.,

4    ET AL.; AND CASE NUMBER CV 04-8776-RSWL(RZX), JOANNE SIEGEL,

5    ET AL. VERSUS TIME WARNER, INC., ET AL.

6              COUNSEL, PLEASE MAKE YOUR APPEARANCES.

7              MR. TOBEROFF:  GOOD MORNING, YOUR HONOR.

8              MARC TOBEROFF FOR PLAINTIFFS JOANNE SIEGEL AND

9    LAURA SIEGEL-LARSON.

10             THE COURT:  GOOD MORNING.

11             MR. WILLIAMSON:  GOOD MORNING, YOUR HONOR.

12             NICHOLAS WILLIAMSON FOR PLAINTIFFS.

13             THE COURT:  GOOD MORNING.

14             MR. BERGMAN:  GOOD MORNING, YOUR HONOR.

15             MICHAEL BERGMAN APPEARING FOR THE DEFENDANTS AND

16   COUNTERCLAIMANT.

17             THE COURT:  GOOD MORNING.

18             MS. MANDAVIA:  GOOD MORNING, YOUR HONOR.

19             ANJANI MANDAVIA, ALSO FOR DEFENDANT AND

20   COUNTERCLAIMANTS.

21             THE COURT:  ALL RIGHT.  GOOD MORNING.

22             ALL RIGHT.  WE'RE HERE ON THE DEFENDANTS' MOTION TO

23   COMPEL.

24             DOES THE MOVING PARTY WISH TO BE HEARD?

25             MR. BERGMAN:  YES, YOUR HONOR.

**EXHIBIT 40**
**621**

5

1              THE COURT:  GO AHEAD.

2              MR. BERGMAN:  YOUR HONOR, ALTHOUGH WE'RE --

3              THE COURT:  LET'S SEE.  JUST A MOMENT.  LET'S FIND

4    OUT WHERE THE BEEPING NOISE IS COMING FROM.

5              THE CLERK:  I THINK IT'S MY COMPUTER.  I'M JUST

6    SHUTTING IT OFF.

7              THE COURT:  ALL RIGHT.  THE TAPE IS OKAY?

8              THE CLERK:  YES.  THE TAPE IS FINE.

9              THE COURT:  ALL RIGHT.  GO AHEAD, MR. BERGMAN.

10             MR. BERGMAN:  THANK YOU, YOUR HONOR.

11             THE COURT:  WE SOLVED THE BEEPING NOISE PROBLEM.

12             MR. BERGMAN:  WE ARE SEEKING SEVERAL FORMS OF

13   DISCOVERY RELIEF IN THIS MOTION, YOUR HONOR.  BUT THE MAIN

14   THRUST DEALS WITH THE AUTHORITY OF THE PLAINTIFFS' PRIOR

15   COUNSEL TO SEND A LETTER DATED OCTOBER 19, 2001, WHICH LETTER

16   IS EXHIBIT A TO THE DECLARATION OF JAMES WEINBERGER.

17             THE COURT:  RIGHT.  BUT YOU ARE ONLY SEEKING RELIEF

18   TO COMPEL PRODUCTION OF DOCUMENTS IN FOUR OR FIVE CATEGORIES,

19   RIGHT?

20             MR. BERGMAN:  THAT IS CORRECT, YOUR HONOR.

21             THE COURT:  OKAY.  AND IT'S ALL BASED ON THIS ONE

22   LETTER.

23             MR. BERGMAN:  PRIMARILY.

24             THE COURT:  OKAY.

25             MR. BERGMAN:  CERTAINLY WITH RESPECT TO THE

EXHIBIT 40
622

6

1    AUTHORITY OF MR. MARKS.

2              YOUR HONOR, THIS DISPUTE HAD BEEN RAGING SINCE THE

3    LATE 90'S.  THE PARTIES SPENT SEVERAL YEARS NEGOTIATING A

4    POSSIBLE AGREEMENT.  THEY WERE REPRESENTED -- THE PLAINTIFFS

5    WERE REPRESENTED BY A VERY PROMINENT FIRM, GANG TYRE RAMER &

6    BROWN, BRUCE RAMER AND KEVIN MARKS.  THE DEFENDANTS WERE

7    REPRESENTED BY WARNER BROS.' GENERAL COUNSEL.

8              THE NEGOTIATIONS BETWEEN THEM WENT ON FOR YEARS.

9    FINALLY, ON OCTOBER 16, 2001, MR. SCHULMAN MADE AN OVERALL

10   OFFER OF SETTLEMENT.

11             THREE DAYS LATER, ON OCTOBER 19, 2001, MR. MARKS

12   SENT A LETTER IN WHICH HE SAYS, QUOTE, THE SIEGEL FAMILY,

13   THAT IS, THE PLAINTIFFS IN THIS ACTION.

14             THE COURT:  I READ THE LETTER, SIR.

15             MR. BERGMAN:  OKAY.

16             WE BELIEVE THAT THAT ACCEPTANCE CREATED A CONTRACT,

17   A SETTLEMENT AGREEMENT, ONE THAT RENDERS THESE COPYRIGHT

18   ACTIONS MOOT BECAUSE THE PARTIES HAVE ALREADY SETTLED THEIR

19   DISPUTE.

20             THE PLAINTIFFS LATER REPUDIATED A LONG FORM

21   AGREEMENT, AS YOUR HONOR HAS SEEN FROM OUR PAPERS, ON THE

22   GROUND THAT IT HAD NEW AND INCONSISTENT TERMS AND THAT

23   SOMEHOW ENTITLED THEM TO REPUDIATE IT.  BUT THAT'S FOR

24   ANOTHER COURT FOR ANOTHER DAY.  TODAY WE ARE SIMPLY TRYING TO

25   ESTABLISH THAT MR. MARKS HAD THE AUTHORITY TO SEND EXHIBIT A.

**EXHIBIT 40**
**623**

7

1           THE COURT:  NOW, LET ME JUST INTERRUPT YOU, SIR.  I
2      WANT TO MAKE SURE I HAVE THE PROCEDURE -- THE PROCEDURAL
3      POSTURE CORRECT.
4           THE PLAINTIFFS SUED SEEKING TO RECOVER THEIR
5      COPYRIGHTS.  YOU ASSERTED A COUNTERCLAIM, CORRECT?
6           MR. BERGMAN:  THAT IS CORRECT, YOUR HONOR.
7           THE COURT:  THE COUNTERCLAIM SEEKS ENFORCEMENT OF
8      WHAT YOU SAY IS A SETTLEMENT AGREEMENT.
9           MR. BERGMAN:  CORRECT, YOUR HONOR.
10          THE COURT:  WHAT DID THE PLAINTIFFS PLEAD IN REPLY
11     TO THE COUNTERCLAIM?
12          MR. BERGMAN:  THEY DENIED THAT SUCH A CONTRACT WAS
13     ENTERED INTO.
14          THE COURT:  A SIMPLE DENIAL?
15          MR. BERGMAN:  YES, YOUR HONOR.
16          THE COURT:  ALL RIGHT.
17          MR. BERGMAN:  OKAY.
18          THE COURT:  GO AHEAD.
19          MR. BERGMAN:  THERE EXISTS IN MY MIND SUBSTANTIAL
20     QUESTION AS TO WHETHER THE DOCUMENT, THE OCTOBER 19 LETTER,
21     IS EVEN PRIVILEGED.  IT WAS -- THE FACT OF AN ATTORNEY'S
22     AUTHORITY IS UNDER THE FEDERAL RULES PRESUMED.
23          THE COURT:  IF IT'S NOT PRIVILEGED, THEN, WHAT
24     ARGUMENT WOULD YOU HAVE FOR COMPELLING MATERIAL THAT IS
25     PRIVILEGED?

**EXHIBIT 40**
**624**

8

1           MR. BERGMAN:  WELL, YOUR HONOR, THE -- HAVING

2   RAISED THE WHOLE ISSUE OF HIS AUTHORITY, AS THE PLAINTIFFS

3   HAVE DONE, THEY HAVE DECLINED TO PRODUCE DOCUMENTS.  THEY

4   HAVE EXPRESSLY DENIED REQUEST FOR ADMISSION NUMBER 69 WHICH

5   SIMPLY ASKS THEM TO ADMIT THAT MR. MARKS WAS AUTHORIZED --

6           THE COURT:  ALL RIGHT.  BUT STICK WITH ME FOR A

7   MOMENT, MR. BERGMAN.

8           I THOUGHT WHAT YOU JUST SAID WAS THAT THIS OCTOBER

9   LETTER YOU BELIEVE MAY WELL NOT BE PRIVILEGED AT ALL.

10          IS THAT RIGHT?

11          MR. BERGMAN:  THAT'S CORRECT, YOUR HONOR.

12          THE COURT:  SO, IF THAT LETTER ITSELF IS NOT

13  PRIVILEGED, THEN, THE COPYING OF THE LETTER TO THE DC COMICS

14   -- IS IT VICE PRESIDENT?  IS THAT WHO --

15          MR. BERGMAN:  I BELIEVE THAT YOUR HONOR IS --

16          THE COURT:  IF THAT'S SO, HOW COULD THAT WAIVE A

17  PRIVILEGE IF IT WERE NOT PRIVILEGED IN THE FIRST PLACE?

18          MR. BERGMAN:  I BELIEVE YOUR HONOR IS CONFUSING

19  EXHIBIT A, THE OCTOBER 19 LETTER, WITH EXHIBIT B, WHICH IS A

20  SEPTEMBER 21, 2002 LETTER, AS TO WHICH WE ARE ALLEGING

21  CERTAIN PRIVILEGES WERE WAIVED.

22          THE COURT:  I SEE.  OKAY.

23          MR. BERGMAN:  BUT WITH RESPECT TO THE --

24          THE COURT:  ALL RIGHT.

25          MR. BERGMAN:  -- AUTHORITY OF MR. MARKS, WE THINK

**EXHIBIT 40**
**625**

9

1  IT VERY CLEAR THAT THE PLAINTIFFS HAVE PLACED THAT ISSUE IN

2  ISSUE; NAMELY, THEY HAVE DENIED THAT HE WAS AUTHORIZED.  AND

3  ON THE EVE OF FILING THE JOINT STATEMENT, THEY PROVIDED YET A

4  SUPPLEMENTAL ANSWER TO THAT DENIAL IN WHICH THEY DISCLOSED

5  PART OF HIS AUTHORITY, BUT NOT ALL OF IT.

6          THE COURT:  OKAY.  WELL, JUST A MOMENT.  I WANT TO

7  MAKE SURE I STICK WITH THE RIGHT TRAIN OF THOUGHT.

8          SO THE DENIAL OF THE AUTHORITY, YOU'RE SAYING, IS

9  THAT WHICH CAME IN RESPONSE TO THE REQUEST FOR ADMISSION.

10          MR. BERGMAN:  THAT IS CORRECT, YOUR HONOR.

11          THE COURT:  IS THERE ANY OTHER PLACE WHERE IT WAS

12  DENIED?

13          MR. BERGMAN:  IT WAS DENIED, WE BELIEVE, INDIRECTLY

14  IN A SUPPLEMENTAL RESPONSE TO INTERROGATORY -- TO REQUEST

15  NUMBER 69.

16          THE COURT:  ALL RIGHT.  BUT OTHER THAN IN RESPONSE

17  TO THE REQUEST, IS THERE ANY OTHER PLACE WHERE THE AUTHORITY

18  OF -- MR. MARKS, WAS IT?

19          MR. BERGMAN:  NO, SIR.  THERE --

20          THE COURT:  MR. RAMER, WHATEVER --

21          MR. BERGMAN:  THOSE WERE THE ONLY TWO INSTANCES.

22          THE COURT:  OKAY.  ALL RIGHT.

23          GO AHEAD.

24          MR. BERGMAN:  AND, OF COURSE, IN THEIR PAPERS FILED

25  IN THE JOINT STATEMENT, THE PLAINTIFFS NEVER EVEN APPROACHED

**EXHIBIT 40**
**626**

10

1    THAT ISSUE.  THEY SAY, OF COURSE, WE AUTHORIZED HIM TO

2    NEGOTIATE.  OF COURSE WE AUTHORIZED HIM TO EXTEND AN INTERIM

3    CONDITIONAL APPROVAL, WHATEVER THAT MIGHT MEAN.  BUT WE

4    BELIEVE THAT THE QUESTION OF HIS AUTHORITY IS VITAL TO THIS

5    CASE.  IF HE WAS AUTHORIZED, WE BELIEVE -- OFFER, OCTOBER

6    16.  ACCEPTANCE, OCTOBER 19.  CONTRACT.  AND THAT CONTRACT

7    PUTS US ON OUR WAY TO ESTABLISHING THE COUNTERCLAIM.

8             THE PLAINTIFFS SIMPLY CAN'T RAISE THE ISSUE DENYING

9    THE AUTHORITY OF THEIR COUNSEL AND THEN SAY TO US YOU CAN'T

10   LOOK BEHIND THAT.  YOU CAN'T ASCERTAIN THE CIRCUMSTANCES

11   CONCERNING HIS LACK OF AUTHORITY.

12            WE BELIEVE THE CASES DICTATE QUITE CLEARLY THAT WE

13   CAN.

14            THE OTHER POINT THAT WE RAISED, YOUR HONOR -- AND,

15   BY THE WAY, THAT -- THERE'S BEEN AN --

16            THE COURT:  LET ME ASSUME YOU ARE CORRECT FOR THE

17   MOMENT.  IF YOU ARE CORRECT, THEN, WOULD YOU BE ENTITLED TO

18   ANYTHING BEYOND DOCUMENTS WHICH DISCUSS WHAT AUTHORITY HE

19   HAD?

20            MR. BERGMAN:  IN THAT RESPECT, I DON'T BELIEVE SO,

21   YOUR HONOR.  ALTHOUGH WE WOULD CERTAINLY BE ENTITLED TO

22   QUESTION MR. MARKS AT DEPOSITION CONCERNING ANY CONVERSATIONS

23   THAT HE MAY HAVE HAD DEALING WITH THE QUESTION OF HIS

24   AUTHORITY.

25            THE COURT:  BUT JUST LIMITED TO THE QUESTION OF HIS

EXHIBIT 40
627

1    AUTHORITY.

2              MR. BERGMAN:  YES, SIR, IN THAT RESPECT.

3              THE COURT:  ALL RIGHT.

4              MR. BERGMAN:  THERE HAS ALSO BEEN A SEPARATE WAIVER

5    REGARDING THE CIRCUMSTANCES UNDER WHICH THE PLAINTIFFS

6    TERMINATED THE GANG TYRE FIRM.  AND THAT ARISES, YOUR HONOR,

7    UNDER THE LETTER DATED EXHIBIT -- MARKED EXHIBIT B, WHICH IS

8    A SEPTEMBER 21, 2002 LETTER.

9              AND JUST BY WAY OF BACKGROUND, YOUR HONOR, WE --

10             THE COURT:  THAT'S THE ONE I WAS REFERRING TO

11   EARLIER.

12             MR. BERGMAN:  YES, IT IS, SIR.

13             WE HAD ENTERED INTO WHAT WE CONTEND WAS A

14   SETTLEMENT AGREEMENT IN OCTOBER OF '01.  IN FEBRUARY OF '02

15   WE TRANSMIT TO THE PLAINTIFFS' COUNSEL A LONG-FORM AGREEMENT

16   MEMORIALIZING THE SETTLEMENT AGREEMENT.  NOTHING IS HEARD FOR

17   SEVERAL MONTHS.  AND THEN WE RECEIVE A LETTER DATED SEPTEMBER

18   21, 2002, EXHIBIT B, WHICH WAS, AS YOUR HONOR HAS NOTED,

19   COPIED TO A GENTLEMAN BY THE NAME OF PAUL LEVITZ, WHO IS THE

20   PRESIDENT OF DEFENDANT DC COMICS.

21             IN THAT LETTER THE PLAINTIFFS DO A NUMBER OF

22   THINGS.  FIRST OF ALL, THEY REFER TO DISCUSSIONS THAT THEY

23   PREVIOUSLY HAD WITH GANG TYRE CONCERNING THEIR REJECTION OF

24   THE LONG-FORM AGREEMENT.

25             IT TALKS ABOUT IRRECONCILABLE DIFFERENCES AND FOUR

EXHIBIT 40
628

12

1    YEARS OF PAINFUL AND UNSATISFYING NEGOTIATIONS.  IT ALSO

2    TERMINATES THE SERVICES OF GANG TYRE & BROWN.  AND IN DOING

3    SO, IT REFERS TO A DOCUMENT THAT WE WERE PREVIOUSLY UNAWARE

4    OF THAT IS A REDRAFT OF THE FEBRUARY 4, 2002 LONG FORM

5    PREPARED BY DEFENDANTS, WHICH REDRAFT WAS PREPARED BY MR.

6    MARKS AND MR. RAMER.

7              THE COURT:  LET ME ASK YOU, SIR, FOR THE

8    IRRECONCILABLE DIFFERENCES, DO YOU READ THAT AS

9    IRRECONCILABLE DIFFERENCES BETWEEN THE PLAINTIFFS AND THEIR

10   COUNSEL OR BETWEEN PLAINTIFFS AND THE DEFENDANTS?

11             MR. BERGMAN:  I CANNOT ANSWER THAT QUESTION, YOUR

12   HONOR.  I DON'T -- I THINK IT CAN BE READ EITHER WAY.

13             THE COURT:  ALL RIGHT.

14             MR. BERGMAN:  WE BELIEVE THAT THIS LETTER REFERRING

15   AS IT DOES TO A JULY 15, 2002 REDRAFT BY GANG TYRE, A REDRAFT

16   THAT WAS OBVIOUSLY INTENDED FOR TRANSMISSION TO THE

17   DEFENDANTS, WE BELIEVE THAT THE REFERENCE TO IT AND THE

18   EXPRESSION THAT IT HAS BEEN REJECTED WAIVES THE PRIVILEGE

19   INSOFAR AS IT RELATES TO THAT LONG-FORM AGREEMENT PREPARED BY

20   GANG TYRE AND THE CIRCUMSTANCES OF THEIR TERMINATION.

21             THE PLAINTIFFS CLEARLY INTENDED THIS LETTER TO GO

22   TO DC COMICS.  ONE CAN SEE THAT CLEARLY FROM THE LAST

23   PARAGRAPH, WHICH IS OBVIOUSLY DIRECTED AT THE DEFENDANTS, AS

24   WELL AS BY THE FACT THAT MR. LEVITZ WAS COPIED.

25             AND WE BELIEVE, YOUR HONOR, THAT THE PLAINTIFFS

**EXHIBIT 40**
**629**

13

1    SHOULDN'T BE PERMITTED TO REVEAL SOME PORTION OF A PRIVILEGED

2    COMMUNICATION AND THEN PRECLUDE DISCOVERY AS TO THAT VERY

3    SAME SUBJECT MATTER OF THE TERMINATION.

4              WE ALSO --

5              THE COURT:  BUT THEY HAVE A SOLUTION FOR YOU ON

6    THAT ONE.  THEY SAY DON'T REVEAL THIS LETTER AT ALL.  THAT

7    WOULD BE THEIR SOLUTION.

8              MR. BERGMAN:  WELL, BUT, OF COURSE, THEY HAVE

9    REVEALED IT.  IT'S --

10             THE COURT:  GO AHEAD.

11             MR. BERGMAN:  IT'S BEEN DONE.

12             WE BELIEVE THAT THE ATTORNEY-CLIENT PRIVILEGE

13   REGARDING THOSE CIRCUMSTANCES HAVE BEEN WAIVED.  AND WE ALSO

14   ASSERT, YOUR HONOR, THAT THERE IS NO WORK PRODUCT PRIVILEGE

15   FOR THAT JUNE -- THAT JULY REDRAFT OF THE AGREEMENT.  A,

16   BECAUSE IT WAS INTENDED FOR TRANSMISSION TO US IN THE FIRST

17   PLACE AND MAY NOT HAVE A PRIVILEGE.  AND, B, FOR THE OBVIOUS

18   REASON THAT THE REDRAFT ITSELF WILL REFLECT THE MENTAL

19   IMPRESSIONS OF MR. MARKS AND MR. RAMER AS TO WHETHER OR NOT,

20   AS PLAINTIFFS CONTEND, THE DEFENDANTS' LONG-FORM AGREEMENT

21   WAS SO FAR OUT OF THE BALLPARK, SO CONTRARY TO THE SETTLEMENT

22   AGREEMENT THAT HAD BEEN REACHED, THAT THEY COULD UNDER SOME

23   LEGAL THEORY REPUDIATE THE UNDERLYING SETTLEMENT AGREEMENT.

24             WE BELIEVE THAT THE MENTAL IMPRESSIONS OF THEIR

25   COUNSEL WILL BE DEMONSTRATIVE CONCERNING THAT ISSUE.  AND

EXHIBIT 40
630

1    THAT FOR THAT REASON UNDER NINTH CIRCUIT LAW BECAUSE THEIR

2    MENTAL IMPRESSIONS ARE INVOLVED, AND BECAUSE WE HAVE A

3    COMPELLING NEED FOR THE PRODUCTION OF THAT DOCUMENT -- WE

4    CAN'T GET IT ANY OTHER WAY, WE BELIEVE THAT THE WORK PRODUCT

5    PRIVILEGE HAS ALSO BEEN WAIVED IN THAT REGARD.

6              AND, FINALLY, YOUR HONOR, WE'RE MOVING FOR A

7    COMPLETE PRIVILEGE LOG.  AS WE POINT OUT IN OUR PAPERS, THIS

8    DISPUTE HAS BEEN RAGING FOREVER.  THE EARLIEST DOCUMENTS THAT

9    WERE REQUESTED WERE IN 1938.  WE'VE RECEIVED AT THE LAST

10   POSSIBLE MOMENT RIGHT BEFORE THE FILING OF THE JOINT

11   STATEMENT A PRIVILEGE LOG THAT IS LIMITED TO THE PERIOD FROM

12   1999 TO 2003.  WE BELIEVE WE ARE ENTITLED TO DOCUMENTS PRIOR

13   TO '99 AND SUBSEQUENT TO '03 AND TO THE FILING OF THE CASE.

14             I WOULD ALSO REFER YOUR HONOR TO THAT PRIVILEGE

15   LOG, WHICH IS ATTACHED TO MR. TOBEROFF'S DECLARATION.  AS YOU

16   CAN SEE, IT IS NOT ONLY INCOMPLETE INSOFAR AS TIME IS

17   CONCERNED, BUT IT FAILS TO DESCRIBE THE SUBJECT MATTER OF THE

18   DOCUMENTS WHICH ARE ASSERTEDLY PRIVILEGED.  AND IT FAILS TO

19   INDICATE WHO OTHER THAN THE ADDRESSEE MAY HAVE RECEIVED

20   COPIES.

21             AND WITHOUT THAT INFORMATION, THERE IS SIMPLY NO

22   WAY FOR THE PLAINTIFFS TO -- FOR THE DEFENDANTS TO ASSESS

23   WHETHER THE ASSERTED PRIVILEGES ARE VALID OR NOT.

24             UNLESS YOUR HONOR HAS FURTHER QUESTIONS, THAT'S ALL

25   I HAD TO SAY.

EXHIBIT 40
631

15

1           THE COURT:  NO.  THANK YOU VERY MUCH.

2           MR. BERGMAN:  THANK YOU, SIR.

3           THE COURT:  MR. TOBEROFF, ARE YOU GOING TO RESPOND?

4           MR. TOBEROFF:  YES, I DO, YOUR HONOR.

5           YOUR HONOR, ALTHOUGH WE'RE NOT HERE TODAY TO ARGUE

6    THE MERITS OF THEIR CLAIM THAT THERE WAS SOME SORT OF

7    SETTLEMENT AGREEMENT, SINCE THEY HAVE MENTIONED IT, I THINK

8    IT'S IMPORTANT TO PUT -- TO MENTION A LITTLE BIT ABOUT THAT

9    TO PUT -- TO PUT THIS DISCOVERY ISSUE IN PERSPECTIVE.

10          ACCORDING TO THE DOCUMENTS, CONVERSATIONS TOOK

11   PLACE BETWEEN THE GENERAL COUNSEL, JOHN SCHULMAN OF WARNER

12   BROS., GENERAL COUNSEL OF WARNER BROS., AND KEVIN MARKS, WHO

13   AT THAT TIME WAS THE ATTORNEY FOR THE PLAINTIFFS.  AND

14   FOLLOWING THAT, A LETTER WAS SENT OVER BY KEVIN MARKS --

15   THAT'S THE OCTOBER 19TH LETTER -- APPROVING CERTAIN KEY

16   MATERIAL DEAL POINTS.

17          OBVIOUSLY, AT THAT STAGE WHEN THEY WERE TRYING TO

18   REACH A SETTLEMENT AGREEMENT, ANY SUCH APPROVAL OF BASIC DEAL

19   POINTS -- YOU NEED TO START SOMEWHERE AND AGREE ON SOME

20   THINGS IN ORDER TO MOVE FORWARD TO A FINAL AGREEMENT.  ANY

21   SORT OF APPROVAL IS OBVIOUSLY CONDITIONAL ON, NUMBER ONE,

22   THAT THOSE DEAL POINTS BE ARTICULATED IN AN ACCEPTABLE

23   LONG-FORM AGREEMENT, WHICH THE PARTIES ARE GOING TO CAREFULLY

24   REVIEW AND EXECUTE.

25          AND, NUMBER TWO, THAT THOSE DEAL POINTS ARE NOT

EXHIBIT 40
632

16

1   CHANGED IN ANY MATERIAL FASHION, AND THAT NEW -- IF ANY NEW

2   DEAL POINTS ARE ADDED, YOUR HONOR, THAT THOSE NEW DEAL POINTS

3   ARE EITHER -- WOULD HAVE TO BE ACCEPTED.  THIS IS IMPLICIT.

4          SO --

5          THE COURT:  SO, ARE YOU SAYING THAT IT'S THE

6   PLAINTIFFS' POSITION THAT THERE WERE MATERIAL POINTS THAT

7   WERE CHANGED?

8          MR. TOBEROFF:  ABSOLUTELY.

9          AND IN ORDER TO ARRIVE AT THAT, YOU DON'T NEED TO

10  ENTER THE SANCTUM OF THE ATTORNEY -- OF ATTORNEY-CLIENT

11  PRIVILEGED COMMUNICATIONS.  ALL YOU HAVE TO DO IS COMPARE THE

12  OCTOBER 19TH LETTER FROM KEVIN MARKS TO A SUBSEQUENT LETTER

13  SENT OVER BY JOHN SCHULMAN DATED OCTOBER 26TH AND THEN

14  FINALLY TO THE FIRST DRAFT OF A PROPOSED SETTLEMENT AGREEMENT

15  THAT WAS SENT OVER FEBRUARY 2ND OF 2002.

16         THE ISSUE --

17         THE COURT:  ARE THOSE IN FRONT OF ME?

18         MR. TOBEROFF:  I BELIEVE SO.  THE OCTOBER 26TH

19  LETTER FROM JOHN SCHULMAN IS EXHIBIT A TO MY DECLARATION.

20  AND I WOULD HAVE TO LOOK FOR THE -- TO LOOK FOR THE FULL

21  AGREEMENT.

22         JUST LOOKING, YOUR HONOR, AT THE OCTOBER 26TH

23  LETTER OF JOHN SCHULMAN, ENCLOSING -- IT'S AN ENCLOSING

24  LETTER, YOU CAN TELL RIGHT AWAY THAT THERE ISN'T AN

25  AGREEMENT.

**EXHIBIT 40**
**633**

17

1           HE SAYS -- HE SAYS, "I ENCLOSE HEREWITH FOR YOU

2           AND BRUCE A MORE FULSOME OUTLINE OF WHAT WE

3           BELIEVE THE DEAL WE'VE AGREED TO IS."

4           SO, THIS IS AFTER KEVIN MARKS HAS SENT OVER A

5    LETTER WITH BASIC DEAL POINTS.  HE'S NOW SENDING OVER ON

6    OCTOBER 26TH -- BY HIS LANGUAGE, IT WOULD APPEAR THAT WHAT HE

7    BELIEVES THE DEAL IS IS SOMETHING DIFFERENT THAN KEVIN MARKS

8    BELIEVES THE DEAL IS.  THEY'RE ESSENTIALLY EXCHANGING OFFERS

9    AND COUNTEROFFERS AT THIS POINT.

10          SO, THIS ISSUE IS GOING TO BE RESOLVED BY BASICALLY

11   NOT BASED ON THE MENTAL IMPRESSIONS OF ATTORNEYS OR

12   ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS, BUT BY COMPARING

13   THESE DOCUMENTS IN WHICH THE COURT WILL MOST PROBABLY FIND

14   OFFER, COUNTEROFFER, COUNTEROFFER, AND THEN A REJECTION.

15          THE COURT:  SO, YOUR ARGUMENT IN THE MAIN SUIT IS

16   GOING TO BE THAT THE OCTOBER 19TH LETTER WAS AN OFFER, AND

17   THE OCTOBER 26TH LETTER WAS A COUNTEROFFER?

18          MR. TOBEROFF:  SOMETHING LIKE THAT.  ESSENTIALLY,

19   IT'S CLEAR FROM THE OCTOBER 26TH LETTER THAT WHAT -- WHAT

20   KEVIN MARKS BELIEVED HE WAS APPROVING AT THAT INITIAL STAGE

21   OF AGREEING ON BASIC DEAL POINTS WAS SOMETHING DIFFERENT.  IN

22   OTHER WORDS, THE OFFER HE BELIEVED HE WAS ACCEPTING IS

23   SOMETHING DIFFERENT.  AND, THEREFORE, WHAT HE PROPOSED IS

24   REALLY A COUNTEROFFER.  AND THEN WITH THE OCTOBER 26TH LETTER

25   IS ANOTHER COUNTEROFFER FOLLOWED BY --

EXHIBIT 40
634

18

1                THE COURT:  LEAD ME THROUGH THAT FOR A MOMENT.

2          SHOW ME WHERE IN THE OCTOBER --

3          (TAPE 1 ENDING.)

4                THE CLERK:  ALL RIGHT.  YOU CAN PROCEED.

5                THE COURT:  ALL RIGHT.  I INTERRUPTED COUNSEL

6    BECAUSE OUR TAPE MACHINE HAD ENDED.  SO, YOU CAN RESUME NOW.

7                MR. TOBEROFF:  I NEEDED A GLASS OF WATER ANYWAY.

8                THE OCTOBER 26TH PROPOSAL HAS A WARRANTY AND

9    INDEMNIFICATION PROVISIONS THAT ARE FAR BROADER IN THE

10   OCTOBER 19TH LETTER.  FOR INSTANCE, KEVIN MARKS HAD MADE A

11   POINT OF SAYING THE PLAINTIFFS WILL ONLY WARRANT AND

12   REPRESENT THAT THEY HAVE NOT SOLD THESE RIGHTS TO ANY THIRD

13   PARTY.

14               AND RIGHT AWAY, ON OCTOBER 26TH, SCHULMAN IS ASKING

15   FOR MUCH HEAVIER-DUTY WARRANTIES, WHICH IS A MATERIAL DEAL

16   POINT BECAUSE OF THE INDEMNIFICATION PROVISIONS THAT ARE

17   CONNECTED TO THOSE WARRANTIES AND REPRESENTATIONS.

18               BUT THAT'S FOR -- THAT IS FOR, I BELIEVE, ANOTHER

19   DAY TO ARGUE THAT POINT.

20               THE COURT:  IT'S NOT FOR ME TO DECIDE, BUT IT IS

21   INTERESTING BACKGROUND.

22               MR. TOBEROFF:  RIGHT.  AND THE REASON I AM GIVING

23   THAT BACKGROUND IS TO SAY THAT WE -- FIRST OF ALL, PLAINTIFFS

24   HAVE -- THERE IS NO SETTLEMENT AGREEMENT.  AND DEFENDANTS

25   HAVE NEVER ACTED AS IF THERE IS A SETTLEMENT AGREEMENT.

EXHIBIT 40
635

19

1    THESE DISCUSSIONS TOOK PLACE IN 19- -- 2001 AND 2002.

2            IN 2002, AFTER PLAINTIFFS REJECTED WARNER BROS.'

3    PROPOSAL, WARNER BROS. DIDN'T WRITE A LETTER SAYING, WE HAVE

4    A BINDING AGREEMENT OR A TENDER PAYMENT UNDER THE AGREEMENT.

5            THEY DID NOTHING UNTIL 2004 WHEN WE FILED FOR

6    DECLARATORY RELIEF TO ESTABLISH THE RIGHTS OF THE PLAINTIFFS.

7    ALL OF A SUDDEN THEY SAY, WELL, WE DON'T BELIEVE YOU HAVE ANY

8    RIGHTS.  BUT TO THE EXTENT YOU DO, WE BOUGHT THEM IN A

9    SETTLEMENT AGREEMENT.

10           IT'S -- IT'S -- IN MY OPINION THAT CLAIM IS NOT

11   GOING TO GO ANYWHERE IN COURT.

12           THE COURT:  WELL, WE'LL SEE.

13           MR. TOBEROFF:  WE'LL SEE.

14           THE COURT:  THE DEFENDANTS HAVE A DIFFERENT

15   OPINION.

16           MR. TOBEROFF:  I --

17           THE COURT:  AND AS I SAID, I'M NOT GOING TO MAKE

18   THE DECISION.  SO, WHY DON'T WE GO TO --

19           MR. TOBEROFF:  I UNDERSTAND.

20           THE COURT:  -- THE MEAT OF THIS MOTION.

21           MR. TOBEROFF:  OKAY.  SO, AGAINST THAT BACKDROP, WE

22   HAVE NOT PUT IT -- WE HAVE NOT -- PLAINTIFFS HAVE NOT SAID

23   THAT KEVIN MARKS WAS NOT AUTHORIZED TO SEND THAT LETTER.  IN

24   MY PAPERS I SAY WE'VE NEVER SAID -- WE DO NOT NOW SAY -- AND

25   IT'S RIDICULOUS TO SAY THAT YOUR OWN ATTORNEY DOES NOT HAVE

EXHIBIT 40
636

1    AUTHORITY TO NEGOTIATE ON YOUR BEHALF.

2            KEVIN MARKS HAD ABSOLUTE AUTHORITY.  AND WE'VE SAID

3    THAT ALL ALONG.  RECENTLY, THE SIEGELS HAD A DEPOSITION

4    TAKEN.  THEY SAID THE EXACT SAME THING.

5            I BELIEVE THIS CLAIM IS MERELY A STRAWMAN IN ORDER

6    TO INVADE THE PRIVILEGE.  KEVIN MARKS HAD AUTHORITY TO ENTER

7    INTO THOSE NEGOTIATIONS.

8            WHEN ASKED ORIGINALLY ABOUT THE LETTER, THEY GOT

9    THE LETTER AT THE SAME TIME WARNER BROS. GOT THE LETTER.  SO,

10   THEY NEVER APPROVED THE ACTUAL WORDING OF THAT LETTER.  AND,

11   SO, ORIGINALLY WHEN THEY DIDN'T GIVE AN UNQUALIFIED ADMISSION

12   TO THE REQUEST FOR ADMISSION THAT THEY APPROVE THE LETTER,

13   THAT'S WHAT THEY WERE REFERRING TO.  AND THEN WHEN -- IN

14   THEIR SUPPLEMENTAL RESPONSE THEY SUPPLEMENTED BY TRYING TO

15   DESCRIBE THAT.

16           THE SUPPLEMENTAL RESPONSE, AGAIN, DOES NOT PUT

17   KEVIN MARKS' AUTHORITY AT ISSUE, YOUR HONOR.  IT SAYS, "WE

18   CONDITIONALLY APPROVED THE TERMS IN THE KEVIN MARKS'

19   LETTER."

20           AND THEN IT RECITES PROBABLY IN TOO -- MAYBE TOO

21   VERBOSE A FASHION, IT RECITES THE CONDITIONS, WHICH ARE THE

22   OBVIOUS CONDITIONS.

23           ONE, THAT THOSE TERMS GET ARTICULATED IN AN

24   ACCEPTABLE LONG-FORM AGREEMENT.

25           TWO, THAT THE TERMS AREN'T CHANGED; AND

**EXHIBIT 40**
**637**

1          THREE, THAT THERE ARE NO NEW TERMS THAT AREN'T

2     ACCEPTABLE TO US.

3          THAT DOES NOT PUT YOUR ATTORNEY'S AUTHORITY AT

4     ISSUE BY SAYING THAT WE CONDITIONALLY APPROVE THE TERMS IN

5     HIS LETTER BASED ON THOSE OBVIOUS OTHER APPROVALS THAT TAKE

6     PLACE IN REACHING A FINAL SETTLEMENT AGREEMENT.

7          SO, THAT ASIDE, SINCE THE AUTHORITY OF KEVIN MARKS

8     IS AT ISSUE, THAT UNDERCUTS THEIR WHOLE THEORY THAT -- BY

9     PUTTING AT ISSUE, WE'VE OPENED UP THE ENTIRE ATTORNEY-CLIENT

10    PRIVILEGE.

11         THE COURT:  LET ME JUST ASK YOU, MR. TOBEROFF.  I

12    BELIEVE I HAD MR. BERGMAN'S UNDERSTANDING OF THIS.  I JUST

13    WANT TO MAKE SURE THAT YOU AGREE WITH HIM.

14         WHEN YOU FILED YOUR PLEADING, YOUR REPLY TO THEIR

15    COUNTERCLAIM -- SOMETIMES IT'S CALLED AN ANSWER; TECHNICALLY

16    IT'S A REPLY -- BUT WHEN YOU FILED THAT, DID YOU ASSERT AS A

17    DEFENSE TO THE COUNTERCLAIM THAT MR. MARKS DID NOT HAVE

18    AUTHORITY TO ACT ON YOUR BEHALF?

19         MR. TOBEROFF:  NO, WE DID NOT, YOUR HONOR.

20         THE COURT:  ALL RIGHT.  THERE'S NO PLEADING WHICH

21    SETS THAT FORTH?

22         MR. TOBEROFF:  THAT'S CORRECT, YOUR HONOR.

23         THE COURT:  ALL RIGHT.  GO AHEAD.

24         MR. TOBEROFF:  SO, THAT TAKES -- I BELIEVE THIS

25    WHOLE AUTHORITY ISSUE IS REALLY A STRAW-MAN ARGUMENT.

EXHIBIT 40
638

22

1    THERE'S NO INTENTION ON OUR PART TO SAY THAT KEVIN MARKS DID

2    NOT HAVE AUTHORITY.

3            THE SECOND PART OF THEIR MOTION DEALS WITH THE

4    SEPTEMBER 21ST, 2002 LETTER.  AND WHAT HAPPENED AT THIS STAGE

5    WAS THAT THE SIEGELS WERE TERMINATING THEIR CURRENT COUNSEL

6    AND THEY WERE IN BETWEEN COUNSEL.  AND THEY HAD A

7    LONG-STANDING RELATIONSHIP OR FRIENDSHIP WITH AN EXECUTIVE --

8    THE PRESIDENT OF DC, WHO WAS PAUL LEVITZ, WHO THEY HAD CC'D

9    THIS LETTER.

10            SO, WHEN THEY SENT OUT A LETTER TERMINATING THEIR

11    COUNSEL, SO THAT THERE WOULD BE NO MISUNDERSTANDING WITH THE

12    OTHER SIDE OR CONFUSION, THEY CC'D PAUL LEVITZ.  THEY

13    SHOULDN'T HAVE DONE SO.  IF THEY HAD BEEN REPRESENTED BY AN

14    ATTORNEY AT THE POINT, THEY WOULDN'T HAVE DONE SO.  BUT THEY

15    DID IT.

16            IN THAT LETTER THEY MENTION A COUPLE OF THINGS.

17    THEY MENTION THAT THEY'RE TERMINATING THEIR ATTORNEY.  BUT

18    THEY DON'T MENTION WHY, AND THEY DON'T MENTION THE SUBSTANCE

19    OF THAT TERMINATION.

20            SO, THE MERE MENTION THAT YOU'RE TERMINATING YOUR

21    ATTORNEYS DOES NOT OPEN UP THE REASONS WHY YOU'RE TERMINATING

22    YOUR ATTORNEYS.

23            WHAT THE CASE LAW SAYS -- AND, BY THE WAY, THEY'VE

24    CITED NO CASE LAW FOR THEIR ARGUMENTS -- THAT THE MERE

25    MENTION OF SOMETHING OPENS UP -- OPENS IT UP.  YOU HAVE TO GO

**EXHIBIT 40**
**639**

23

1    INTO GREAT DETAIL ABOUT THE SUBSTANCE OF IT IN ORDER TO OPEN

2    UP THE ATTORNEY-CLIENT PRIVILEGE.  THAT'S WHAT THE CASES SAY.

3    AND EVEN WHEN YOU DO THAT, THE CASES SAY THAT THE COURT

4    SHOULD DRAW A LINE WHEREVER IT CAN DRAW A LINE RATHER THAN

5    OPEN UP THE ENTIRE PRIVILEGE ON THE SUBJECT MATTER.

6             THE COURT:  DO YOU READ THE IRRECONCILABLE

7    DIFFERENCES AS APPLYING TO THE RELATIONSHIP BETWEEN THE

8    PLAINTIFFS AND THEIR ATTORNEYS OR BETWEEN THE PLAINTIFFS AND

9    THE DEFENDANTS?

10            MR. TOBEROFF:  I READ IT ABSOLUTELY AS APPLYING TO

11   IRRECONCILABLE DIFFERENCES WITH RESPECT TO THE NEGOTIATIONS,

12   EVEN THOUGH THAT'S SORT OF A BUZZ WORD.

13            THE COURT:  I DON'T THINK THAT ANSWERED MY

14   QUESTION.

15            MR. TOBEROFF:  YES, I -- OKAY.  I'M SORRY.

16            THE COURT:  IRRECONCILABLE DIFFERENCES WITH RESPECT

17   TO THE NEGOTIATIONS COULD BE WITH RESPECT TO THE WAY THE

18   ATTORNEYS HAD CONDUCTED THE NEGOTIATIONS ON BEHALF OF THE

19   PLAINTIFFS.

20            SO, I'M ASKING YOU WHETHER YOU READ IT AS

21   IRRECONCILABLE DIFFERENCES BETWEEN THE PLAINTIFFS AND THEIR

22   THEN COUNSEL IN HOW THOSE NEGOTIATIONS HAD BEEN CONDUCTED FOR

23   EXAMPLE, OR BETWEEN THE PLAINTIFFS AND THE DEFENDANTS IN

24   TERMS OF HOW THE NEGOTIATIONS WERE COMING INTO FRUITION?

25            MR. TOBEROFF:  I BELIEVE IT HAS TO DO PURELY WITH

EXHIBIT 40
640

24

1    THE NEGOTIATIONS NOT WITH IRRECONCILABLE DIFFERENCES WITH THE

2    COUNSEL.

3             THE COURT:  ALL RIGHT.

4             MR. TOBEROFF:  BECAUSE IT SAYS WE -- IF IT'S,

5    THEREFORE, DUE TO IRRECONCILABLE DIFFERENCES AFTER FOUR YEARS

6    OF PAINFUL AND UNSATISFYING NEGOTIATIONS, THOSE NEGOTIATIONS

7    WERE NOT WITH -- WITH THEIR ATTORNEYS, THEY WERE WITH WARNER

8    BROS.  SO, THE IRRECONCILABLE DIFFERENCES I THINK REFERS TO

9    THE NEGOTIATIONS WITH WARNER BROS.  AND THEN THEY ASKED TO

10   END THOSE NEGOTIATIONS.

11            ONE OF THE REASONS WHY THEY'RE ASKING TO END

12   NEGOTIATIONS IS BECAUSE THEY HAD VARIOUS AGREEMENTS IN WHICH

13   THEY NEED TO INFORM THE OTHER SIDE WHEN THEY'RE STOPPING

14   NEGOTIATIONS.  THEY HAD A CONFIDENTIALITY AGREEMENT, FOR

15   INSTANCE, AND THEY ALSO HAD A TOLLING AGREEMENT.

16            SO, THE FACT OF MENTIONING THEIR TERMINATION OF

17   ATTORNEYS DOESN'T OPEN UP THE PRIVILEGE AS TO WHY THEY

18   TERMINATED THEIR ATTORNEYS.

19            THE SECOND THING THEY MENTION HERE IS A REDRAFT,

20   WHICH WAS OBVIOUSLY REJECTED BECAUSE IT WAS NEVER SENT.  THAT

21   REDRAFT IS PROTECTED BY -- THE REASONS WHY THEY REJECTED

22   THEIR ATTORNEYS' REDRAFT COULD NOT BE -- YOU KNOW, IT'S A

23   PERFECT EXAMPLE OF A COMMUNICATION THAT SHOULD BE PROTECTED

24   BY THE ATTORNEY-CLIENT PRIVILEGE.  THEIR MENTAL IMPRESSIONS,

25   THEIR REASONS, THEIR COMMUNICATIONS WITH THEIR ATTORNEY AS TO

EXHIBIT 40
641

1   WHETHER OR NOT A REDRAFT WOULD BE ACCEPTABLE TO THEM OR NOT,

2   ALL OF THAT IS PROTECTED.   IT'S ALSO PROTECTED AS ATTORNEY

3   WORK PRODUCT.

4          AND SIMPLY BY MENTIONING THAT THERE WAS A REDRAFT,

5   YOU DON'T OPEN UP THE ATTORNEY-CLIENT PRIVILEGE.   BECAUSE THE

6   SUBSTANCE OF THAT REDRAFT, THE SUBSTANCE OF THEIR REJECTION,

7   THE REASONS WHY THEY REJECTED IT, ALL OF THE PRIVILEGED

8   THINGS ATTENDANT TO THAT REDRAFT NONE OF THOSE ARE MENTIONED

9   IN THIS LETTER.   AND THE CASE LAW SAYS THAT IF YOU JUST -- IF

10  YOU DON'T MENTION THE SUBSTANCE, YOU DON'T WAIVE THE

11  PRIVILEGE AS TO THAT SUBSTANCE.

12         AS FAR AS THE ATTORNEY -- AS FAR AS THE WORK

13  PRODUCT DOCTRINE IS CONCERNED, IT'S INCORRECT TO SAY THE

14  MENTAL IMPRESSIONS OF KEVIN MARKS IS AT ISSUE IN THIS CASE

15  AND THAT WE'VE PLACED THAT AT ISSUE.   IT'S NEITHER AT ISSUE

16  NOR HAVE WE PLACED IT AT ISSUE.   IT'S NOT THE -- IT'S UP TO

17  THE CLIENT TO DECIDE WHETHER TO ACCEPT NEW AND DIFFERENT

18  TERMS IN A SETTLEMENT AGREEMENT.   IT'S NOT UP TO THEIR

19  ATTORNEY.

20         SO, HOW ARE THE MENTAL IMPRESSIONS OF THEIR

21  ATTORNEY AT ISSUE.   LET'S SAY THE ATTORNEY THINKS, WELL, YOU

22  KNOW WHAT, THESE NEW CONDITIONS AREN'T SO BAD.   I THINK WE

23  SHOULD ACCEPT SOME OF THEM AND REJECT OTHERS.

24         DOES THAT MEAN THAT IT BINDS THE CLIENT.   I DON'T

25  THINK SO.

EXHIBIT 40
642

26

1          SO, I CAN'T SEE -- ALTHOUGH A LOT OF THESE PHRASES

2    ARE BEING LOOSELY THROWN AROUND BY THE DEFENDANTS, I REALLY

3    DON'T SEE HOW THE MENTAL IMPRESSIONS OF KEVIN MARKS ARE AT

4    ISSUE HERE.  AND IF THEY ARE, THIS SUBJECT MATTER IS STILL

5    PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.

6          LASTLY, AS FAR AS THE PRIVILEGE LOG ISSUE IS

7    CONCERNED, IT'S INCORRECT THAT THE PRIVILEGE LOG DOES NOT

8    CONNOTE OTHER PARTIES, LIKE CC'D PARTIES.  THEY MADE A COUPLE

9    OF POINTS REGARDING THE PRIVILEGE LOGS, AND I WANT TO ADDRESS

10   SOME OF THEM.

11          THE PRIVILEGE LOG ACTUALLY DOES -- WHEN MORE THAN

12   ONE PARTY RECEIVES A COPY OF THE DOCUMENT, THE PRIVILEGE LOG

13   WILL NOTE THAT.  FOR EXAMPLE, THERE ARE SOME ENTRIES THERE

14   THAT SAY LAURA SIEGEL LARSON, JOANNE SIEGEL AND DON BULSON.

15   AND ALL THREE PARTIES ARE LISTED EVEN THOUGH DON BULSON, FOR

16   INSTANCE, IS ONLY CC'D OR LAURA SIEGEL IS CC'D ON THE COPY.

17   SO, WE DON'T LAY IT OUT --

18          THE COURT:  ARE YOU REPRESENTING TO THE COURT THAT

19   IN EVERY CASE WHERE THERE WERE MULTIPLE ADDRESSEES OR

20   MULTIPLE PERSONS WHO RECEIVED THE DOCUMENT, YOU HAVE

21   IDENTIFIED THOSE?

22          MR. TOBEROFF:  I DON'T WANT TO -- I REPRESENT

23   THAT'S THE INTENT.  I'LL GO BACK AND DOUBLE CHECK

24   EVERYTHING.  TO THE EXTENT THERE IS A DOCUMENT WHERE THE CC'S

25   WERE NOT -- ARE NOT IN THERE, I'LL GLADLY ADD IT TO THE

EXHIBIT 40
643

1    PRIVILEGE LOG.

2              THE COURT:  WELL, THAT'S NOT AN ISSUE BETWEEN THE

3    TWO OF YOU.

4              MR. TOBEROFF:  ABSOLUTELY NOT AN ISSUE.

5              THE COURT:  SO --

6              MR. TOBEROFF:  NOR IS IT AN ISSUE --

7              THE COURT:  SO, LET'S JUST FOCUS ON THIS FOR A

8    MOMENT.

9              SO, YOU'LL REVIEW THE PRIVILEGE LOG.  AND TO THE

10   EXTENT THERE ARE ANY DOCUMENTS WHERE YOU HAVE NOT IDENTIFIED

11   ALL THE PEOPLE WHO RECEIVED IT, YOU WILL SUPPLEMENT THAT AND

12   INDICATE IT, CORRECT?

13             MR. TOBEROFF:  ABSOLUTELY, YOUR HONOR.

14             THE COURT:  ALL RIGHT.  SO, THE OTHER ISSUE WHICH

15   THE DEFENDANTS IDENTIFIED WAS THE TIME PERIOD COVERED BY THE

16   PRIVILEGE LOG.  WHY DON'T YOU ADDRESS THAT.

17             MR. TOBEROFF:  OKAY.  I INFORMED DEFENDANTS'

18   COUNSEL THAT THIS PRIVILEGE LOG COVERS A CERTAIN PERIOD,

19   NAMELY, THE PERIOD OF KEVIN MARKS' REPRESENTATION AND ALL OF

20   THE LETTERS IN THAT FILE.  IT WAS A VERY LARGE FILE.  AND

21   THAT WE WOULD BE SERVING ADDITIONAL PRIVILEGE LOGS BECAUSE

22   THERE ARE A LOT OF DOCUMENTS AND A LOT OF FILES GOING -- IN

23   THIS CASE, INCLUDING, YOU KNOW, TWO LITIGATIONS -- ONE IN

24   1947 AND ONE IN 1974.

25             AND WE'RE IN THE PROCESS --

EXHIBIT 40
644

28

1            THE COURT:  YES, I READ ABOUT THOSE.

2            MR. TOBEROFF:  WE'RE IN PROCESS OF ASSEMBLING

3    THOSE PRIVILEGE LOGS.  AND, OF COURSE, WE'RE GOING TO --

4    WE'RE GOING TO PRODUCE THEM.  SO, THERE'S NO ISSUE --

5            THE COURT:  WHEN?

6            MR. TOBEROFF:  I'D LIKE TO DO IT AFTER -- IN

7    SEPTEMBER, IF I CAN, BECAUSE I'M GOING AWAY IN THE LAST TWO

8    WEEKS IN AUGUST.

9            THE COURT:  THE LAST TWO WEEKS IN AUGUST STARTS

10   ABOUT NOW.

11           MR. TOBEROFF:  NO, THE 18TH.  SO --

12           THE COURT:  THAT'S SATURDAY.

13           MR. TOBEROFF:  -- CAN WE SAY BY THE END OF

14   SEPTEMBER?

15           THE COURT:  DO YOU HAVE ANY OTHER DEADLINES COMING

16   UP THAT THAT WOULD AFFECT?

17           MR. TOBEROFF:  WELL, I'M SUPPOSED TO BE ON TRIAL IN

18   -- WHAT DATE?

19           (COUNSEL CONFERRING.)

20           MR. TOBEROFF:  SEPTEMBER 15TH.  I HAVE A TRIAL

21   SEPTEMBER 15TH.

22           THE COURT:  NO.  NO.  NO.  DEADLINES IN THIS CASE?

23           MR. TOBEROFF:  NO, I DON'T BELIEVE SO.

24           THE COURT:  ALL RIGHT.  SO, YOU'RE PROPOSING BY THE

25   END OF SEPTEMBER TO HAVE ALL PRIVILEGE LOGS TO THE PLAINTIFF

**EXHIBIT 40**
**645**

1    --

2                 MR. TOBEROFF:  YES.

3                 THE COURT:  -- TO THE DEFENDANT?

4                 MR. TOBEROFF:  YES.

5                 THE COURT:  ALL RIGHT.  I'LL SEE WHAT THE

6    DEFENDANTS HAVE TO SAY ABOUT THAT IN A MOMENT.

7                 ALL RIGHT.  GO AHEAD.

8                 MR. TOBEROFF:  AS FAR AS THE SUBJECT MATTER IS

9    CONCERNED, I DON'T BELIEVE THAT ON A PRIVILEGE LOG BY

10   DISCLOSING THE SUBJECT MATTER YOU'RE DISCLOSING SOMETHING

11   THAT'S PRIVILEGED.  AND I DON'T -- AND WE'VE NEVER DONE IT

12   THAT WAY, WHERE WE PUT DOWN DOCUMENTS ARE ATTORNEY-CLIENT

13   PRIVILEGED AND THEN WE DISCLOSE THE PRIVILEGED SUBJECT MATTER

14   OF THE COMMUNICATION.

15                 SO, I WOULD BEG TO DIFFER ON THAT POINT AND SEEK

16   YOUR HONOR'S GUIDANCE ON THAT.

17                 THE COURT:  THE WHOLE PURPOSE OF A LOG IS TO --

18   WITHOUT DISCLOSING PRIVILEGED MATTERS GIVE THE OTHER SIDE

19   AND, IF NECESSARY, THE COURT, SUFFICIENT INFORMATION SO THAT

20   A DETERMINATION CAN BE MADE IF CHALLENGED AS TO WHETHER

21   SOMETHING TRULY IS PRIVILEGED.  SO, THERE HAS -- IT'S KIND

22   LIKE A GOLDILOCKS PRINCIPLE.  IT HAS TO BE JUST ENOUGH.

23                 MR. TOBEROFF:  SO, FOR INSTANCE, HERE THE DOCUMENTS

24   -- FIRST OF ALL, THE DOCUMENTS THAT ARE CLAIMED ARE

25   PRIVILEGED ON A LOG ARE NOT SOME SORT OF STRANGE SPECIES.

**EXHIBIT 40**
**646**

30

1    THEY'RE ESSENTIALLY, YOU KNOW, JOANNE AND LAURA SIEGEL TO

2    KEVIN MARKS, LETTER, ATTORNEY-CLIENT PRIVILEGE, PLAINTIFF'S

3    COUNSEL.  IT'S A LETTER FROM THE CLIENT TO HER ATTORNEY.

4           WOULD YOU SAY IN THAT INSTANCE TO UNDER- -- WE

5    WOULD NEED TO NOTE THE SUBJECT MATTER?  I --

6           THE COURT:  IT'S SORT OF HARD TO TELL IN ANY

7    PARTICULAR ITEM.  I MEAN, I CAN IMAGINE -- I CAN IMAGINE A

8    FEW COMMUNICATIONS BETWEEN ATTORNEY AND CLIENT THAT ARE NOT

9    PRIVILEGED.  BUT I WOULD SAY PRESUMPTIVELY MOST OF THEM ARE.

10          MR. TOBEROFF:  RIGHT.

11          THE COURT:  OKAY.  THE SPECIFICS OF THE LOG ARE NOT

12   BEFORE ME THIS MORNING.

13          MR. TOBEROFF:  OKAY.  SO, WE WOULD CERTAINLY BE

14   PREPARED -- WELL, WE'RE IN THE PROCESS OF PREPARING THOSE

15   OTHER LOGS.  AND I DON'T THINK THE LOGS ARE AN ISSUE.

16          THE COURT:  YOU FOLKS HAVE ENOUGH TO FIGHT OVER

17   WITHOUT FIGHTING OVER THINGS LIKE THAT.

18          MR. TOBEROFF:  I AGREE.

19          THE COURT:  ALL RIGHT.  ANYTHING ELSE, MR.

20   TOBEROFF?

21          MR. TOBEROFF:  NO.  THAT'S IT UNLESS YOU HAVE ANY

22   QUESTIONS FOR ME.

23          THE COURT:  NO, I DON'T HAVE ANYTHING FURTHER.

24          ALL RIGHT.  THANK YOU.

25          MR. TOBEROFF:  THANK YOU.

**EXHIBIT 40**
**647**

31

1            THE COURT:  MR. BERGMAN.

2            MR. BERGMAN:  JUST A FEW POINTS, YOUR HONOR.

3            THE COURT:  WELL, LET'S START WITH THE PRIVILEGE

4    LOG.  IF THEY GET TO YOU PRIVILEGE LOGS COVERING ALL PERIODS,

5    AND GET THOSE TO YOU BY THE END OF SEPTEMBER, IS THAT

6    SUFFICIENT FOR YOU?

7            MR. BERGMAN:  I WOULD, OF COURSE, PREFER THEM --

8            THE COURT:  YOU WANT THEM YESTERDAY, I KNOW.  BUT

9    --

10            MR. BERGMAN:  -- PREFER THEM EARLIER, BUT I DON'T

11    WANT TO INTERFERE IN ANY WAY WITH MR. TOBEROFF'S VACATION.

12    AND WE WILL ACCEPT THAT DATE.

13            THE COURT:  ALL RIGHT.  SO, MR. TOBEROFF, YOU'LL DO

14    THAT.  BY THE END OF SEPTEMBER, ALL PRIVILEGE LOGS DELIVERED

15    TO THE DEFENDANTS, INCLUDING ANY REVISIONS OF THE CURRENT

16    PRIVILEGE LOG WHICH AFTER YOUR REVIEW YOU CONCLUDE ARE

17    APPROPRIATE.  ALL RIGHT.

18            MR. BERGMAN:  AND --

19            THE COURT:  SO, THAT -- AND THE ONLY THING THAT

20    LEAVES ME TO DECIDE ON THE PRIVILEGE LOG ISSUE IS WHETHER THE

21    DESCRIPTION IS SUFFICIENT; IS THAT CORRECT?

22            MR. BERGMAN:  THAT'S CORRECT, YOUR HONOR.  AND IF

23    YOU'LL -- IF YOU'LL NOTICE, IT'S EXHIBIT M TO MR. TOBEROFF'S

24    DECLARATION.

25            THE COURT:  N?

**EXHIBIT 40**
**648**

32

1            MR. BERGMAN:  M, AS IN MICHAEL, YOUR HONOR.

2            THE COURT:  ALL RIGHT.

3            MR. BERGMAN:  AND IF YOU'LL NOTICE, UNDER THE

4    COLUMN "DOCUMENT DESCRIPTION," IT SIMPLY SAYS, "NOTES,

5    LETTER, DRAFT, NOTES, LETTER."  I MEAN, THERE IS NO WAY GIVEN

6    THOSE GENERIC DESCRIPTIONS THAT WE COULD ASSESS WHETHER THE

7    PARTICULAR DOCUMENT IS PRIVILEGED OR NOT.  THERE ARE LETTERS

8    THAT AREN'T PRIVILEGED.  THERE ARE NOTES THAT AREN'T

9    PRIVILEGED.

10           WHAT IF ONE OF THE ATTORNEYS TOOK NOTES OF

11   SOMETHING THAT MR. SCHULMAN SAID TO HIM AND WROTE DOWN

12   VERBATIM WHAT WAS SAID TO HIM.  THOSE NOTES WOULDN'T

13   BE PRIVILEGED.  WE, AT LEAST, HAVE THE --

14           THE COURT:  I'M NOT SO SURE ABOUT THAT.

15           MR. BERGMAN:  WELL, ALL HE WOULD BE DOING IN THAT

16   INSTANCE IS TRANSMITTING SOMETHING THAT HIS OPPONENT HAD TO

17   SAY WITHOUT INDICATING HIS OWN MENTAL IMPRESSIONS OR

18   OPINIONS.

19           BUT IN ANY EVENT, YOUR HONOR --

20           THE COURT:  OH, I THINK, MR. BERGMAN, THAT IF YOU

21   TOOK NOTES OF THE MEETING YOU HAD WITH MR. TOBEROFF, THAT YOU

22   WOULD NOT BE ACTING SIMPLY AS A STENOGRAPHER.

23           MR. BERGMAN:  THAT'S CORRECT, YOUR HONOR.  EXCEPT

24   IF MR. TOBEROFF HAD A PARTICULAR STATEMENT THAT HE WANTED TO

25   CONVEY TO ME, AND I WROTE DOWN THAT STATEMENT VERBATIM, I

EXHIBIT 40
649

1    DON'T THINK THAT WOULD BE PRIVILEGED.  BUT THAT'S -- IT'S A

2    NICE ACADEMIC QUESTION.

3              THE COURT:  THEN YOU BECOME A WITNESS AS TO WHAT

4    MR. TOBEROFF SAID?

5              MR. BERGMAN:  YES.

6              THE COURT:  I'M NOT SO SURE, MR. BERGMAN.

7              MR. BERGMAN:  BUT MY POINT IS, YOUR HONOR, THERE'S

8    JUST NO WAY TO TELL FROM LETTER, NOTES, DRAFT WHAT WE'RE

9    TALKING ABOUT.  SO, I BELIEVE THAT -- THAT IT IS INADEQUATE.

10   AND WITH ALL RESPECT, WE HAVE PLACED THAT ISSUE BEFORE YOUR

11   HONOR.

12             THE COURT:  SO, IF IT SAID NOTES OF CONVERSATIONS

13   WITH CLIENT, YOU THINK THAT WOULD BE SUFFICIENT TO IDENTIFY

14   IT AS WORK PRODUCT?

15             MR. BERGMAN:  I BELIEVE IT WOULD BE, YOUR HONOR.

16             THE COURT:  IF IT SAID NOTES FROM RESEARCH -- OR

17   RESEARCH NOTES?

18             MR. BERGMAN:  I BELIEVE THAT THAT WOULD BE

19   SUFFICIENT.

20             THE COURT:  AND IF IT SAID NOTES RECITING WHAT MR.

21   BERGMAN SAID TO ME?

22             MR. BERGMAN:  THAT WOULD BE SUFFICIENT, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  GO AHEAD.

24             MR. BERGMAN:  AND IF I CAN ADDRESS THE OTHER POINT,

25   YOUR HONOR.

EXHIBIT 40
650

34

1          WITH ALL DUE RESPECT TO MR. TOBEROFF, HE'S BEATING

2    AROUND THE BUSH.  THIS LETTER FROM MR. MARKS DATED SEPTEMBER

3    19 SAYS THAT THE FAMILY, QUOTE, HAS ACCEPTED, CLOSE QUOTE,

4    THE OCTOBER 16 OFFER.

5          THE COURT:  OKAY.  WAIT A SECOND.  YOU SAID,

6    "SEPTEMBER 19TH."  YOU MEAN OCTOBER 19TH.

7          MR. BERGMAN:  I'M SORRY, YOUR HONOR.  I DID MEAN

8    OCTOBER 19TH.

9          THE COURT:  OKAY.

10         MR. BERGMAN:  EXHIBIT A TO THE WEINBERG

11   DECLARATION.

12         THE COURT:  OKAY.

13         MR. BERGMAN:  AND IF YOU'LL NOTICE IT SAYS, "HAS

14   ACCEPTED."

15         THE COURT:  YES, I SEE THAT.

16         MR. BERGMAN:  MR. TOBEROFF'S PAPERS MERELY TALK

17   ABOUT, WELL, OF COURSE, OUR ATTORNEY WAS AUTHORIZED TO

18   NEGOTIATE.  AND, OF COURSE, HE HAD THE POWER TO NEGOTIATE ON

19   OUR BEHALF.  NO WHERE DOES HE SAY THAT HE HAD THE POWER TO

20   ACCEPT THE OFFER ON THEIR BEHALF.  THAT'S THE POINT THAT IS

21   BEING OBFUSCATED BY THIS DENIAL OF DISCOVERY.  WE ARE

22   ENTITLED TO KNOW WHETHER THAT LETTER WAS AUTHORIZED OR NOT.

23         AND, FRANKLY, IN THE SUPPLEMENTAL RESPONSE THAT MR.

24   TOBEROFF MADE TO NUMBER 69, HE JUST RAISES MORE AND MORE

25   QUESTIONS.  HE TALKS ABOUT MR. MARKS HAVING APPROVAL TO

**EXHIBIT 40**
**651**

1    COMMUNICATE PLAINTIFF'S CONDITIONAL INTERIM APPROVAL OF THE

2    BASIC DEAL POINTS.  WELL, THAT'S A LOT DIFFERENT FROM A

3    LETTER THAT'S SAYING THE FAMILY ACCEPTS.

4         AND THEN HE GOES FORWARD TO CITE CERTAIN

5    CONDITIONS, INCLUDING THE CONDITION THAT THERE BE NOTHING IN

6    THE FINAL SETTLEMENT AGREEMENT WHICH IS ADDITIONAL OR REVISED

7    FROM THE BASIC CONTRACT.  THAT'S QUITE A CONDITION.

8         THE COURT:  WELL, WOULDN'T THAT BE -- I MEAN, IF

9    YOU ADD IN THE WORD "MATERIAL," WOULDN'T THAT SIMPLY BE A

10   STATEMENT OF THE LAW, THAT IF THE -- IF THE ULTIMATE DOCUMENT

11   CONTAINS NEW MATERIALLY DIFFERENT TERMS THAT IT IS NOT THE

12   CONTRACT THE PARTIES HAD AGREED TO?

13        MR. BERGMAN:  BUT IT -- BUT I BELIEVE IT WOULD.

14   BUT THAT DOES NOT ENTITLE THE PARTY TO REPUDIATE THE CONTRACT

15   THAT HAD BEEN ENTERED INTO.  WHAT IT ENTITLES A PARTY TO DO

16   IS TO HAVE MR. MARKS AND MR. RAMER DO A REDRAFT, WHICH IS

17   PRECISELY WHAT THEY DID, AND SEND IT TO THE DEFENDANTS.

18        THE COURT:  WELL, NOW YOU'RE INTO AN ISSUE OF

19   CONTRACT LAW.  AND YOU MAY BE RIGHT ON THAT BUT YOU MAY NOT

20   BE.

21        MR. BERGMAN:  WELL, BUT WE -- WE HAVE TO START THE

22   LONGEST JOURNEY WITH A SINGLE STEP, YOUR HONOR.  AND THE

23   SINGLE STEP IN OUR INSTANCE AT THIS POINT IS TO FIND OUT

24   WHETHER IT WAS -- THAT LETTER WAS AUTHORIZED OR NOT.  AND WE

25   HAVE A DENIAL THAT IT WAS AUTHORIZED.

EXHIBIT 40
652

1          AND THERE ARE SEVERAL CASES -- NOT IN CALIFORNIA, I

2    MIGHT NOTE, YOUR HONOR.  BUT THERE ARE SEVERAL CASES THAT WE

3    CITED FROM OTHER JURISDICTIONS, INCLUDING THE NORTHERN

4    DISTRICT OF ILLINOIS, WHERE THE COURTS HAVE CLEARLY HELD THAT

5    THE QUESTION -- THAT WHEN YOU SAY THAT YOUR ATTORNEY WAS NOT

6    AUTHORIZED TO ENTER INTO A SETTLEMENT AGREEMENT, THAT PLACES

7    HIS AUTHORITY IN ISSUE AND YOU CANNOT DECLINE DISCOVERY WHICH

8    IS DESIGNED TO REACH THAT.

9          THE COURT:  OKAY.  NOW, JUST A MOMENT.  LET'S GO

10   BACK TO -- AS I UNDERSTOOD YOUR ORIGINAL ARGUMENT, YOU SAID

11   THAT THEY PLACED THE AUTHORITY IN ISSUE BY VIRTUE OF THEIR

12   RESPONSES TO THE REQUEST TO ADMIT.  THAT WAS ONE WAY.  AND

13   ALSO BY VIRTUE OF DISCLOSING THE SEPTEMBER 21, 2002 LETTER.

14   THAT'S THE OTHER WAY.

15         MR. BERGMAN:  NO, THE OTHER WAY, YOUR HONOR, IS BY

16   VIRTUE OF THEIR SUPPLEMENTAL RESPONSES TO --

17         THE COURT:  TO THE REQUEST TO ADMIT.

18         MR. BERGMAN:  -- TO THE REQUEST TO ADMIT.

19         THE COURT:  RIGHT.  RIGHT.  SO, THAT'S THE ONLY WAY

20   THEY PLACED IT IN ISSUE IS BY THEIR RESPONSES TO THE REQUEST

21   TO ADMIT?

22         MR. BERGMAN:  THEIR INITIAL DENIAL --

23         THE COURT:  RIGHT.

24         MR. BERGMAN:  -- AND THEN THEIR FURTHER RESPONSES

25   WHICH PRECEDED THE SPECIFIED CONDITIONS.

**EXHIBIT 40**
**653**

37

1          THE COURT:  OKAY.  THAT'S THE ONLY WAY THESE

2    PLAINTIFFS, THEMSELVES, PLACED THE ISSUE -- PLACED THE MATTER

3    IN ISSUE.

4          MR. BERGMAN:  THAT IS CORRECT, YOUR HONOR.

5          THE COURT:  OKAY.  ALL RIGHT.

6          NOW, THE OCTOBER 19TH, 2001 LETTER, EXHIBIT A, AND

7    THE SEPTEMBER 21, 2002 LETTER, EXHIBIT B TO MR. WEINBERGER'S

8    DECLARATION, EXHIBIT B, THE SEPTEMBER 21, 2002 LETTER REFERS

9    TO A DOCUMENT SENT ON FEBRUARY 4TH, 2002, RIGHT?

10          MR. BERGMAN:  THAT'S THE DEFENDANTS' LONG-FORM

11    MEMORIAL OF THE SETTLEMENT AGREEMENT, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  IT DOES NOT REFER TO THIS

13    OCTOBER 19TH, 2001 LETTER?

14          MR. BERGMAN:  NO, IT DOES NOT.

15          THE COURT:  ALL RIGHT.  OKAY.  GO AHEAD NOW.

16          SO -- WELL, WAIT.  LET ME JUST PURSUE THAT FOR A

17    MOMENT.

18          IS IT YOUR VIEW THAT THE FEBRUARY 4TH, 2002

19    LONG-FORM LETTER IS IN ALL MATERIAL RESPECTS THE SAME AS THE

20    OCTOBER 19TH, 2001 LETTER?

21          MR. BERGMAN:  YES, THAT IS OUR POSITION, YOUR

22    HONOR.  AND OUR POSITION IS THAT THE OCTOBER 26TH LETTER IS

23    ALSO IN COMPLETE CONFORMITY WITH THE OCTOBER 19 LETTER.

24          THE COURT:  ALL RIGHT.  LET'S ASSUME -- LET'S TAKE

25    THAT AS A STARTING POINT.

**EXHIBIT 40**
**654**

1          IS THAT A -- IS THE LEGAL DETERMINATION ON WHETHER

2    THAT IS SO AN OBJECTIVE ONE OR ONE THAT PERTAINS TO THE

3    SUBJECTIVE VIEWS OF THE PARTIES INVOLVED?

4          MR. BERGMAN:  I BELIEVE IT'S OBJECTIVE, YOUR HONOR.

5    BUT THE POINT IS WE HAVE A DIFFERENT PERCEPTION OF WHAT THE

6    CONTRACTUAL THEORY IS.  MR. TOBEROFF IS TALKING ABOUT THE

7    OCTOBER 19 LETTER AS BEING AN OFFER.  THE OCTOBER 26TH LETTER

8    BEING A COUNTEROFFER.

9          I'M SAYING, THE DEFENDANTS ARE SAYING, THAT THE

10   OCTOBER 19 LETTER IS AN AGREEMENT.  IT IS AN ACCEPTANCE OF A

11   SPECIFIC OFFER.  IT RECITES ALL OF THE TERMS.  AND AT THE

12   CONCLUSION OF IT, MR. MARKS TELLS MR. SCHULMAN MANY THANKS

13   FOR HELP AND PATIENCE IN REACHING THIS MONUMENTAL ACCORD.  I

14   SAY THAT THAT'S A CONTRACT THEN AND THERE.

15         THE COURT:  AND YOU SAY THAT FURTHERMORE THEY WERE

16   SIMPLY DOCUMENTING IT -- DOTTING THE I'S AND CROSSING THE T'S

17   WHEN THEY SENT THE FEBRUARY 4TH REDRAFT, RIGHT?

18         MR. BERGMAN:  PRECISELY.

19         THE COURT:  SO, WHAT DOES THE SUBJECTIVE VIEW OF

20   ANYBODY HAVE TO DO WITH IT AT THAT POINT?  IF THAT'S TRUE,

21   IF, IN FACT, THE FEBRUARY 4TH LONG-FORM LETTER MERELY FILLED

22   OUT THE -- FILLED IT OUT, FLUSHED IT OUT, ISN'T THAT EITHER

23   TRUE OBJECTIVELY OR NOT TRUE OBJECTIVELY?

24         MR. BERGMAN:  WELL, I BELIEVE THAT THAT'S -- THAT'S

25   SO, YOUR HONOR.  BUT YOU HAVE TO BEAR IN MIND THAT WE'VE GOT

**EXHIBIT 40**
**655**

1    TO START FROM A FOUNDATION.  WAS THERE A CONTRACT ON OCTOBER

2    19?

3              THEY'RE ARGUING THAT THIS FEBRUARY 2002 LONG FORM

4    PREPARED BY DEFENDANTS WAS SO BEYOND WHAT HAD BEEN AGREED TO

5    THAT IT ENTITLED THEM UNDER SOME UNKNOWN LEGAL THEORY TO

6    REPUDIATE THE UNDERLYING AGREEMENT.

7              THE COURT:  ALL RIGHT.  THAT'S --

8              MR. BERGMAN:  WHAT WE'RE --

9              THE COURT:  SO, THAT'S -- LET'S ASSUME THAT'S THEIR

10   ARGUMENT.

11             MR. BERGMAN:  OKAY.  WHAT WE'RE TRYING TO --

12             THE COURT:  THERE'S A MATERIAL CHANGE WHICH FREED

13   THEM FROM ANY OBLIGATION THEY HAD THERETOFORE UNDERTAKEN.

14             MR. BERGMAN:  OKAY.  ASSUMING THAT SUCH A THEORY

15   EXISTS, AND I KNOW OF NONE, WE STILL HAVE TO START OFF

16   WITH THE PREMISE, WAS THEIR A CONTRACT ON OCTOBER 19 OR

17   WASN'T THERE.  AND THAT DEPENDS UPON WHETHER MR. MARKS HAD

18   THE AUTHORITY TO WRITE IN HIS OCTOBER 19 LETTER THAT THE

19   FAMILY HAS, PAST TENSE, ACCEPTED DC COMICS' OFFER OF OCTOBER

20   16TH.

21             THE COURT:  ALL RIGHT.  BUT -- AND I UNDERSTAND

22   THAT POINT.

23             AND IF THAT'S THE CASE, THEN THE REFERENCE IN THE

24   SEPTEMBER 21, 2002 LETTER, NOT TO THE OCTOBER 19TH LETTER BUT

25   TO THE FEBRUARY 4TH LONG-FORM LETTER, HOW DOES THAT IN ANY

EXHIBIT 40
656

40

1    WAY WAIVE ANY PRIVILEGE THAT WOULD BE INVOLVED?

2            MR. BERGMAN:  THAT DOESN'T, YOUR HONOR.

3            THE COURT:  ALL RIGHT.

4            MR. BERGMAN:  BUT THE REFERENCE --

5            THE COURT:  -- GET BACK TO THE REQUEST FOR

6    ADMISSIONS.

7            MR. BERGMAN:  THE REFERENCE -- WE'RE TALKING REALLY

8    ABOUT TWO SEPARATE ISSUES.  ON THE ONE HAND, THERE'S THE

9    AUTHORITY OF MR. MARKS.  ON THE OTHER HAND, WE HAVE THE WHOLE

10   QUESTION OF WHETHER THERE'S BEEN A WAIVER AS A RESULT OF THE

11   SEPTEMBER 21 LETTER OF THE CIRCUMSTANCES CONCERNING THE GANG

12   TYRE TERMINATION AND --

13           THE COURT:  OKAY.  ANYTHING REFERRED TO IN THAT

14   LETTER.

15           MR. BERGMAN:  -- AND IN PARTICULAR --

16           THE COURT:  RIGHT.

17           MR. BERGMAN:  -- THAT JUNE -- THAT 2000- -- THAT

18   REDRAFT THAT GANG TYRE DID.

19           AND THE IMPORTANCE OF THAT IS THAT GANG TYRE, THEY

20   WERE THE NEGOTIATORS OF THE AGREEMENT.  THEY KNOW WHAT THEY

21   DISCUSSED, AND WHAT THEY ACCEPTED, AND WHAT THEY AGREED TO ON

22   OCTOBER 19TH.  IT'S THEIR MENTAL IMPRESSIONS, AS REFLECTED IN

23   THEIR REDRAFT OF THE 2002 LONG FORM PREPARED BY DEFENDANTS,

24   THAT HAS CONSIDERABLE BEARING UPON THE PURPORTED ARGUMENT OF

25   THE PLAINTIFFS THAT THAT LONG FORM PREPARED BY DEFENDANTS WAS

**EXHIBIT 40**
**657**

1    SO -- SO BEYOND THE AGREEMENT, THAT THEY HAD A RIGHT TO

2    REPUDIATE.

3              THE COURT:  NOW, YOU OBVIOUSLY HAVE THE LONG-FORM

4    AGREEMENT.  YOU PREPARED IT, RIGHT?

5              MR. BERGMAN:  INDEED, YOUR HONOR.

6              THE COURT:  NOT YOU, YOURSELF, BUT SOMEBODY --

7              MR. BERGMAN:  YES.

8              THE COURT:  -- MR. SCHULMAN, SOMEBODY ON YOUR

9    BEHALF.

10             SO, IF I UNDERSTAND YOUR ARGUMENT, YOU THINK

11   THE LONG-FORM AGREEMENT IS CONSISTENT WITH THE OCTOBER LETTER

12   --

13             MR. BERGMAN:  RIGHT.

14             THE COURT:  -- THE OCTOBER 19TH LETTER.  AND YOU

15   THINK THAT THE GANG TYRE ATTORNEYS MAY HAVE THOUGHT SO AS

16   WELL?

17             MR. BERGMAN:  CORRECT, YOUR HONOR.

18             THE COURT:  HOW WOULD WHAT THEY THOUGHT BE RELEVANT

19   IF THIS IS AN OBJECTIVE DETERMINATION AS TO WHETHER THE

20   FEBRUARY 4TH LETTER ADDED MATERIAL NEW TERMS OR NOT?

21             MR. BERGMAN:  WELL, USING THE TERM "OBJECTIVE

22   DETERMINATION" IS SOMEWHAT MISLEADING, YOUR HONOR.  THERE ARE

23   ALWAYS THE QUESTIONS OF WHAT DID THE PARTIES INTEND BY THE

24   WORDS THAT THEY USED.  AND THAT IF WE HAVE THE GANG TYRE

25   UNDERSTANDING AND WE HAVE THE DEFENDANTS' UNDERSTANDING, THAT

EXHIBIT 40
658

42

1    MAY SHED LIGHT ON THAT SUBJECT.  IT GOES --

2              THE COURT:  ALL RIGHT.

3              MR. BERGMAN:  -- BEYOND A SIMPLE COMPARISON OF THE

4    AGREEMENT AND THEN THE LONG -- THE FIRST LONG FORM AND THE

5    REDRAFT.  BUT CERTAINLY THE IMPRESSION OF THE GANG TYRE

6    ATTORNEYS AS TO HOW FAR AFIELD, IF AT ALL, THE DEFENDANTS'

7    LONG FORM WENT, I BELIEVE IT IS HIGHLY RELEVANT, CERTAINLY

8    DISCOVERABLE, YOUR HONOR.  WHETHER IT'S ADMISSIBLE AT TRIAL

9    OR NOT MAY BE ANOTHER QUESTION.

10             THE COURT:  IT SEEMS LIKE IT WOULD ALMOST MAKE

11   THE ATTORNEYS EXPERT WITNESSES AS TO WHAT A MATERIAL CHANGE

12   WAS.

13             MR. BERGMAN:  WELL, YOUR HONOR, IN MANY OF THESE

14   CASES THE ATTORNEYS ARE CALLED UPON TO TESTIFY AS TO WHAT WAS

15   DISCUSSED AND WHAT WAS THEIR UNDERSTANDING.

16             THE COURT:  ALL RIGHT.

17             MR. BERGMAN:  AND I'VE ALREADY TOUCHED UPON THE

18   PRIVILEGE LOG, YOUR HONOR.  I DO BELIEVE THAT IF WE'RE GOING

19   TO GET TO THE POINT OF BEING ABLE TO TEST ANY OF THESE

20   PRIVILEGES WE NEED MORE INFORMATION.

21             THANK YOU, YOUR HONOR.  YOU'VE BEEN VERY PATIENT.

22             MR. TOBEROFF:  THANK YOU, YOUR HONOR.

23             THE COURT:  OKAY.  THANK YOU VERY MUCH.

24             I'M GOING TO TAKE THIS ONE UNDER SUBMISSION.  I

25   HOPE TO GET A RESPONSE OUT OR A RULING OUT SHORTLY.

**EXHIBIT 40**
**659**

43

1           MR. BERGMAN:  THANK YOU, SIR.

2           THE COURT:  THANK YOU VERY MUCH.

3           (PROCEEDINGS COMPLETED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 40**
**660**

44

1                    C E R T I F I C A T E

2

3          I CERTIFY THAT THE FOREGOING IS A CORRECT

4    TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

5    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6

7

8

9    FEDERALLY CERTIFIED TRANSCRIBER          DATED
     DOROTHY BABYKIN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 40
661

# EXHIBIT 41



Priority
Send  X
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOANNE SIEGEL and LAURA SIEGEL LARSON,

                 Plaintiff,

      vs.

WARNER BROS. ENTERTAINMENT INC., et al.,

                Defendants.

CASE NO. CV 04-8400-RSWL (RZx)

ORDER ON DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

This matter came before the Court on August 14, 2006 on Defendants' Motion to Compel. Defendants appeared through their attorneys, Michael Bergman and Anjani Mandavia. Plaintiffs appeared through their attorneys Marc Toberoff and Nicholas C. Williamson. The Court heard argument of counsel and took the matter under submission.

Defendants seek to compel Plaintiffs to produce documents falling within five categories, identified as Requests 52-59. In general, these categories concern writings involving certain settlement negotiations between the parties in 2001 and 2002. Plaintiffs apparently have produced documents responsive to these requests, but the documents currently sought all involve attorney-client communications, and the Defendants assert that those documents should be produced because Plaintiffs have waived the privilege.

EXHIBIT 41
662

1    Defendants assert that Plaintiffs have waived the privilege by putting in issue

2    the authority of their prior counsel to negotiate a settlement. The privilege may be

3    impliedly waived where a party to a lawsuit places into issue a matter that is normally

4    privileged, if the gravamen of the lawsuit is so inconsistent with the continued assertion

5    of the privilege as to compel the conclusion that the privilege has in fact been waived.

6    *Wilson v. Superior Court,* 63 Cal. App.3d 825,134 Cal. Rptr. 130 (1976). Defendants

7    assert the alleged settlement in a counterclaim, responding to Plaintiffs' claim to recapture

8    their copyright. At oral argument, both sides confirmed that Plaintiffs had not *pleaded* any

9    lack of authority when they filed the reply to the counterclaim called for by FED. R. CIV.

10   P. 7(a). Thus, as a matter of pleading, Plaintiffs have not themselves taken steps to bring

11   into issue a matter that is so inconsistent with maintenance of the attorney-client privilege

12   that it requires disclosure of attorney-client communications.

13   Instead, Defendants argue that Plaintiffs have done so by their response and

14   supplemental response to a request to admit. Defendants requested that Plaintiffs admit

15   that their prior counsel was authorized to send a letter of October 19, 2001, the letter

16   which, at oral argument, Defendants stated constituted the contract of settlement. In

17   response to the request to admit, Plaintiffs asserted various objections, including (by

18   apparent incorporation of introductory objections) the objection of attorney-client

19   privilege, and then denied the request subject to those objections. In a supplemental

20   response, Plaintiffs qualified their denial further.

21   From these responses, Defendants assert that Plaintiffs have denied that their

22   prior counsel had authority to negotiate a settlement, and therefore have placed the matter

23   in issue and necessarily have waived the privilege with respect to that issue. This

24   argument makes the request to admit do too much work. To begin with, the response was

25   not an unqualified denial; it was a denial accompanied by objections. Whatever the

26   meaning of "subject to" in this context, and whatever the validity of incorporating general

27   objections into specific responses — neither matter of which Defendants address — it is

28   hard to read the response as a denial without limitation. And assuming that the objections

2

**EXHIBIT 41**

1 | *are* properly stated, Defendants never moved to determine the sufficiency of the
2 | objections. *See* FED. R. CIV. P. 36(a).
3 |         More importantly, however, Defendants misconstrue the office of a request
4 | to admit. A request to admit is not a discovery device in the customary sense of
5 | "discovery." 8A WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE
6 | §2253 at 524 (1994) Rather, it is a method of short-circuiting proof for trial. Those
7 | matters which are admitted do not have to be proved otherwise. Those which are denied
8 | require proof. FED. R. CIV. P. 36(b). And if a party denies a matter he should have
9 | admitted, the remedy is to require him, upon appropriate motion, to reimburse the party
10 | who propounded the request for the expenses incurred in proving up the matter at trial.
11 | FED. R. CIV. P. 37(c); *see, e.g., Marchand v. Mercy Medical Center*, 22 F.3d 933 (9th Cir.
12 | 1994). In short, responding to a request to admit by denying the request is not the same
13 | as affirmatively placing the matter in issue, and certainly not the same as the situation
14 | where the gravamen of the action necessarily is inconsistent with maintaining the
15 | privilege.
16 |         Defendants also assert that Plaintiffs waived the privilege explicitly, by
17 | sending a copy of a letter, dated September 21, 2002, to a Vice President of DC Comics.
18 | That letter, signed by both Plaintiffs, and addressed to their then counsel, states:
19 |
20 |         As we previously discussed with you and hereby affirm,
21 |         we rejected DC Comics' offer for the Siegel Family interest in
22 |         Superman and other characters sent to us by you on February 4,
23 |         2002. We similarly reject your redraft of the February 4, 2002
24 |         document which you sent to us on July 15, 2002. Therefore due
25 |         to irreconcilable differences, after four years of painful and
26 |         unsatisfying negotiations, this letter serves as formal
27 |         notification that we are totally stopping and ending all
28 |         negotiations with DC Comics, Inc., its parent company AOL

3

**EXHIBIT 41**
**664**

1   Time Warner and all of its representatives and associates,
2   effective immediately.

3        This letter is also notification that, effective immediately,
4   we are terminating Gang, Tyre, Ramer & Brown, Inc., and all of
5   your firm's partners, associates and employees as
6   representatives of the Siegel Family interest regarding
7   Superman, Superboy, the Spectre and all related characters and
8   entities. We instruct you to take no further actions on our
9   behalf.

10       Please return all materials regarding the above including
11  but not limited to files, correspondence, notes and documents to
12  us forthwith. These should be sent to Joanne Siegel at the above
13  address.

14       It is a shame that four years were wasted due to DC
15  Comics and AOL Time Warner's greed. We have no intention
16  of publically disparaging DC or any individual in the parent
17  company. However, should DC or its parent company, officers,
18  attorneys, representatives or spokespersons disparage us or our
19  rights, we will vigorously respond in kind.

20

21  Weinberger Declaration, Ex. B. Disclosure of materials previously held in confidence can
22  waive the attorney-client privilege. Here there is no doubt that the privilege, if any exists,
23  has been waived as to this letter. The Court does not agree that it has been waived any
24  more broadly than that.

25       The first paragraph of this letter appears to refer to irreconcilable differences
26  between Plaintiffs and Defendants, not irreconcilable differences between Plaintiffs and
27  their counsel. The entire subject of the paragraph is the settlement negotiations, and how
28  DC Comics' proposal is not acceptable and the underlying negotiations have not been

1  fruitful. While it is possible to read the reference to "irreconcilable differences" as a

2  reference instead to differences with Plaintiffs' counsel, that reading is not the one

3  supported by the context in which the statement is made.

4       More importantly, the letter does not open the door to an exploration of the

5  reasons that Plaintiffs discharged their counsel, or just what the irreconcilable differences

6  may have been, or what conversations they had with their counsel about settlement. These

7  topics are all mentioned in the briefest of terms, as slight incidents to the overall message

8  of the letter, which is Plaintiffs' disagreement with Defendants and Plaintiffs' decision to

9  end negotiations. Plaintiffs have not revealed a significant portion of the communications,

10  and that is what is required to create a waiver based on sending the communication to

11  someone other than counsel. *See Mitchell v. Superior Court,* 37 Cal.3d 591, 602, 208 Cal.

12  Rptr. 886, 691 P.2d 642 (1984); *Travelers Ins. Companies v. Superior Court,* 143 Cal. App.

13  3d 436, 444, 191 Cal. Rptr. 871 (1983); *People v. Hayes,* 21 Cal.4th 1211, 1266 (2000).

14  Accordingly, the Court finds that Plaintiffs have not waived the privilege, other than with

15  respect to the letter itself.

16       Finally, Defendants assert that the privilege log prepared by Plaintiffs is

17  insufficient. At oral argument, Plaintiffs agreed to review the log, and verify that they had

18  listed all recipients for any memoranda or letters referenced in the log. They also agreed

19  to provide, not later than September 30, 2006, a supplement to the log, covering other

20  periods of time. The only remaining issue is whether the descriptions in the log are

21  sufficient. The Court notes that the log appears to follow the form suggested in a

22  commonly-used treatise, W. SCHWARZER, W. TASHIMA AND J. WAGSTAFFE, FEDERAL

23  CIVIL PROCEDURE BEFORE TRIAL, Form 11:A (Rutter 2006). Moreover, the log appears

24  to have the same information which the Court found sufficient in *Dole v. Milonas,* 889

25  F.2d 885 (9th Cir. 1989); *see in re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.

26  1992 ). Accordingly, this Court too finds that by providing this log, the Plaintiffs have

27  sufficiently asserted the attorney-client privilege and the work product doctrine.

28  ///

5

**EXHIBIT 41**
**666**

1        In accordance with the foregoing, with the exception of the September 21,

2 2002 letter, Defendants' Motion to Compel is denied.

3

4        IT IS SO ORDERED.

5

6        DATED: *August 18*, 2006

7

8

9                             RALPH ZAREFSKY

                UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 42



1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Melvin H. Banchek

6              UNITED STATES DISTRICT COURT

7             CENTRAL DISTRICT OF CALIFORNIA

8

9   JOANNE SIEGEL, an individual; and      Civil Case No. **04-8400  RSWL (RZx)**
    LAURA SIEGEL LARSON, an                              **&**
10  individual,                             **04-8776 RSWL  (RZx)**

11                                          **MELVIN H. BANCHEK'S**
              Plaintiff,                    **OBJECTIONS TO DEFENDANTS'**
12      vs.                                 **SUBPOENA**

13
    WARNER BROS.
14  ENTERTAINMENT INC., a
15  corporation; TIME WARNER INC., a
    corporation; DC COMICS, a general
16  partnership; and DOES 1-10,

17
              Defendants
18

19

20  DC COMICS,

21
              Plaintiff
22

23      vs.

24
    JOANNE SIEGEL, an individual; and
25  LAURA SIEGEL LARSON, an
26  individual,

27
              Counterclaim Defendants
28

                          1

          OBJECTIONS TO DEFENDANTS' SUBPOENA

                  **EXHIBIT 42**
                     **668**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Melvin H. Banchek ("Banchek"), pursuant to the provisions of Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, makes the following objections to the subpoena duces tecum (the "Subpoena") that was served on him on August 10, 2006:

## I.

## OBJECTIONS TO THE ENTIRE SUBPOENA

Banchek objects to the entire Subpoena on each of the following grounds and incorporates by reference each of the following objections into his response to each individual request within it:

1.  Banchek objects to the entire Subpoena to the extent that it seeks the production or identification of any item, or portion thereof, comprising or reflecting information transmitted and maintained in confidence between Banchek and any person or entity on whose behalf he is acting as counsel for the purpose of obtaining legal advice or representation, on the ground that such information is protected from disclosure by the attorney-client privilege and the attorney work product doctrine. Banchek will serve a log identifying each item, or portion thereof, withheld from production in response to the Subpoena under claim of attorney-client privilege which was created before the inception of this action.

2.  Banchek objects to the entire Subpoena to the extent that it seeks the production or identification of any item, or portion thereof, comprising or reflecting information with any confidential impression, conclusion, opinion, legal research, or legal theory of Banchek or any other person or entity working on his behalf, on the ground that such information is protected from disclosure by the attorney work product privilege and the attorney work product doctrine. Banchek will serve a log identifying each item, or portion thereof, withheld

2

OBJECTIONS TO DEFENDANTS' SUBPOENA

**EXHIBIT 42**
**669**

1 | from production in response to the Subpoena under claim of attorney work

2 | product privilege which was created before the inception of this action.

3 |     3.    Banchek objects to the entire Subpoena to the extent that it seeks

4 | the production or identification of any item, or portion thereof, which is not

5 | reasonably calculated to lead to the discovery of relevant and admissible

6 | evidence, on the ground that it exceeds the permissible scope of discovery

7 | delimited by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

8 |     4.    Banchek objects to the entire Subpoena to the extent that it seeks

9 | the production or identification of any item, or portion thereof, comprising or

10 | reflecting any trade secret or other confidential or proprietary information of

11 | Banchek or any other person or entity.

12 |     5.    Banchek objects to the entire Subpoena to the extent that it seeks

13 | the production or identification of any item, or portion thereof, which is

14 | protected from disclosure by any privacy or similar rights of Banchek or any

15 | other person or entity.

16 |     6.    Banchek objects to the entire Subpoena to the extent

17 | that it seeks the production of original documents, on the ground that such

18 | production would be burdensome, oppressive, and unnecessary.  Banchek

19 | reserves the right to comply with the Subpoena, subject to this response, by

20 | producing a true copy of any item or by permitting inspection of any item.

21 |     7.    Banchek objects to the entire Subpoena to the extent that it seeks

22 | the production of duplicative identical items, on the ground that such production

23 | would be burdensome, oppressive, and unnecessary.

24 |     8.    Banchek objects to the entire Subpoena to the extent that it seeks

25 | the production of any item which has been served, filed, or transmitted in the

26 | course of this action, on the ground that such production would be burdensome,

27 | oppressive, and unnecessary.

28 |     9.    Banchek objects to the definition of "Siegel" set forth in the

3

OBJECTIONS TO DEFENDANTS' SUBPOENA

**EXHIBIT 42**
**670**

1  Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome

2  and oppressive.  Banchek will treat the term "Siegel" as used in the Subpoena to

3  mean the individual Jerome Siegel only.

4         10.    Banchek objects to the definition of "Shuster" set forth in the

5  Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome

6  and oppressive.  Banchek will treat the term "Shuster" as used in the Subpoena

7  to mean the individual Joseph Shuster only.

8         11.    Banchek objects to the definition "Shuster Representatives" as set

9  forth in the Subpoena on the grounds that it is vague, ambiguous, overbroad,

10  burdensome and oppressive.  Banchek will treat the term "Shuster

11  Representatives" as used in the Subpoena to mean the individuals Warren Peary

12  and Jean Adele Peavey only.

13         12.    Banchek objects to the definition of "Plaintiffs" set forth in the

14  Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome

15  and oppressive.  Banchek will treat the term "Plaintiffs" as used in the

16  Subpoena to mean the individuals Joanne Siegel and Laura Siegel only.

17         13.    Banchek objects to the definition of "Michael Siegel" set forth in

18  the Subpoena on the grounds that it is vague, ambiguous, overbroad,

19  burdensome and oppressive.  Banchek will treat the term "Michael Siegel" as

20  used in the Subpoena to mean the individual Michael Siegel only.

21                                            **II.**

22                  **RESPONSES TO INDIVIDUAL CATEGORIES**

23        Subject to and without waiving the foregoing objections, Banchek

24  responds to each individual request within the Subpoena as follows:

25  **Document Category No. 1:**

26        All Documents Concerning Superman and/or Superboy.

27  **Response to Document Category No. 1:**

28        Banchek objects to this request on the grounds that it is vague and

<div align="center">4</div>

<div align="center">OBJECTIONS TO DEFENDANTS' SUBPOENA</div>

<div align="center">**EXHIBIT 42**</div>
<div align="center">**671**</div>

1  ambiguous.  Banchek further objects to this request on the grounds that it is

2  overbroad, burdensome and oppressive.  Banchek further objects to this request

3  to the extent it seeks documents or communications protected by the

4  attorney/client privilege and the attorney work product doctrine.  Subject to and

5  without waiving the foregoing objections, Banchek will produce all non-

6  privileged documents he is able to determine are responsive to this request.

7  **Document Category No. 2:**

8      All Documents Concerning any negotiations Concerning Superman

9  and/or Superboy including but not limited to, negotiations by or with

10  Defendants, Plaintiffs, Dennis Larson, Toberoff, and/or the Shuster

11  Represenatives.

12  **Response to Document Category No. 2:**

13      Banchek objects to this request on the grounds that it is vague and

14  ambiguous, including without limitation, the phrase "any negotiations

15  Concerning Superman and/or Superboy."  Banchek further objects to this

16  request on the grounds that it is overbroad, burdensome and oppressive.

17  Banchek further objects to this request to the extent it seeks documents or

18  communications protected by the attorney/client privilege and the attorney work

19  product doctrine.  Subject to and without waiving the foregoing objections,

20  Banchek will produce all non-privileged documents he is able to determine are

21  responsive to this request.

22  **Document Category No. 3:**

23      All Documents Concerning any agreements with Plaintiffs, Michael

24  Siegel, Dennis Larson, Toberoff, and/or the Shuster Representatives Concerning

25  Superman and/or Superboy, including but not limited to, any agreements

26  Concerning any ownership interest in and/or revenue from Superman and/or

27  Superboy.

28

<div align="center">5</div>

---

<div align="center">OBJECTIONS TO DEFENDANTS' SUBPOENA</div>

<div align="center">**EXHIBIT 42**
**672**</div>

**Response to Document Category No. 3:**

Banchek objects to this request on the grounds that it is vague and ambiguous, including without limitation, the phrase "any agreements Concerning any ownership interest in and/or revenue from Superman and/or Superboy." Banchek further objects to this request on the grounds that it is overbroad, burdensome and oppressive. Banchek further objects to this request to the extent it seeks documents or communications protected by the attorney/client privilege and the attorney work product doctrine. Subject to and without waiving the foregoing objections, Banchek will produce all non-privileged documents he is able to determine are responsive to this request.

**Document Category No. 4:**

All Documents Concerning any valuation of any current or potential ownership interest in Superman and/or Superboy.

**Response to Document Category No. 4:**

Banchek objects to this request on the grounds that it is vague and ambiguous, including without limitation, the phrase "any valuation of any current or potential ownership interest." Banchek further objects to this request on the grounds that it is overbroad, burdensome and oppressive. Banchek further objects to this request to the extent it seeks documents or communications protected by the attorney/client privilege and the attorney work product doctrine. Subject to and without waiving the foregoing objections, Banchek will produce all non-privileged documents he is able to determine are responsive to this request.

**Document Category No. 5:**

All Documents evidencing any correspondence with any third person Concerning Superman and/or Superboy, including but not limited to, Plaintiffs, Dennis Larson, Toberoff, and/or the Shuster Representatives.

**EXHIBIT 42**
**673**

**Response to Document Category No. 5:**

Banchek objects to this request on the grounds that it is vague and ambiguous. Banchek further objects to this request on the grounds that it is overbroad, burdensome and oppressive. Banchek further objects to this request to the extent it seeks documents or communications protected by the attorney/client privilege and the attorney work product doctrine. Subject to and without waiving the foregoing objections, Banchek will produce all non-privileged documents he is able to determine are responsive to this request.

**Document Category No. 6:**

All Documents Concerning Michael Siegel's estate, including but not limited to, any wills, draft wills, and any communications expressing Michael Siegel's wishes with respect to any assets.

**Response to Document Category No. 6:**

Banchek objects to this request on the grounds that it is vague and ambiguous as to the phrase "Michael Siegel's wishes." Banchek further objects to this request on the grounds that it is overbroad, burdensome and oppressive. Banchek further objects to this request to the extent it seeks documents or communications protected by the attorney/client privilege and the attorney work product doctrine. Subject to and without waiving the foregoing objections, Banchek will produce all non-privileged documents he is able to determine are responsive to this request.

**Document Category No. 7:**

All Documents Concerning any litigation relating to Michael Siegel's estate.

**Response to Document Category No. 7:**

Banchek objects to this request on the grounds that it is duplicative. Banchek objects to this request on the grounds that it is vague and ambiguous as to the phrase "any litigation relating to Michael Siegel's estate." Banchek

7

**EXHIBIT 42**
**674**

1 | further objects to this request on the grounds that it is overbroad, burdensome
2 | and oppressive. Banchek further objects to this request to the extent it seeks
3 | documents or communications protected by the attorney/client privilege and the
4 | attorney work product doctrine. Subject to and without waiving the foregoing
5 | objections, Banchek will produce all non-privileged documents he is able to
6 | determine are responsive to this request.

8 | Dated: August 23, 2006          LAW OFFICES OF MARC TOBEROFF, PLC

Marc Toberoff
Attorneys for MELVIN H. BANCHEK

8

OBJECTIONS TO DEFENDANTS' SUBPOENA

**EXHIBIT 42**
**675**

 

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720, Los Angeles, California 90067.

On August 23, 2006, I served the attached document described as **MELVIN H. BANCHEK'S OBJECTIONS TO DEFENDANTS' SUBPOENA** on all interested parties in this action by placing _____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza
New York, NY 10017
Facsimile No. 212-813-5901

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.
1711 Route 9D
Cold Spring, NY 10516
Facsimile No. 845-265-2819

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212
Facsimile No. 310-550-7191

[X]   :BY MAIL:

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]   :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on August 23, 2006, in Los Angeles, California.

_____
Alex Merino

**EXHIBIT 42**
**676**

# EXHIBIT 43



1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Don W. Bulson

6              **UNITED STATES DISTRICT COURT**

7              **CENTRAL DISTRICT OF CALIFORNIA**

8   JOANNE SIEGEL, an individual; and      Civil Case No. **04-8400  RSWL (RZx)**
9   LAURA SIEGEL LARSON, an                              **&**
    individual,                             **04-8776 RSWL  (RZx)**
10
11            Plaintiff,                    **DON W. BULSON'S OBJECTIONS
                                            TO DEFENDANTS' SUBPOENA**
      vs.
12
13  WARNER BROS.
    ENTERTAINMENT INC., a
14  corporation; TIME WARNER INC., a
    corporation; DC COMICS, a general
15  partnership; and DOES 1-10,
16
17            Defendants
18
19
20  DC COMICS,
21            Plaintiff
22
      vs.
23
24  JOANNE SIEGEL, an individual; and
    LAURA SIEGEL LARSON, an
25  individual,
26
27            Counterclaim Defendants
28

                              1
              OBJECTIONS TO DEFENDANTS' SUBPOENA

**EXHIBIT 43**
**677**

1  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2      Don W. Bulson ("Bulson"), pursuant to the provisions of Rule

3  45(c)(2)(B) of the Federal Rules of Civil Procedure, makes the following

4  objections to the subpoena duces tecum (the "Subpoena") that was served on

5  him on August 11, 2006:

6  <div align="center">**I.**</div>

7  <div align="center">**OBJECTIONS TO THE ENTIRE SUBPOENA**</div>

8      Bulson objects to the entire Subpoena on each of the following grounds

9  and incorporates by reference each of the following objections into his response

10  to each individual request within it:

11      1.    Bulson objects to the entire Subpoena to the extent

12  that it seeks the production or identification of any item, or portion thereof,

13  comprising or reflecting information transmitted and maintained in confidence

14  between Bulson and any person or entity on whose behalf he is acting as

15  counsel for the purpose of obtaining legal advice or representation, on the

16  ground that such information is protected from disclosure by the attorney-client

17  privilege and the attorney work product doctrine.  Bulson will serve a log

18  identifying each item, or portion thereof, withheld from production in response

19  to the Subpoena under claim of attorney-client privilege which was created

20  before the inception of this action.

21      2.    Bulson objects to the entire Subpoena to the extent that it seeks

22  the production or identification of any item, or portion thereof, comprising or

23  reflecting information with any confidential impression, conclusion, opinion,

24  legal research, or legal theory of Bulson or any other person or entity working

25  on his behalf, on the ground that such information is protected from disclosure

26  by the attorney work product privilege and the attorney work product doctrine.

27  Bulson will serve a log identifying each item, or portion thereof, withheld from

28

<div align="center">2</div>

<div align="center">OBJECTIONS TO DEFENDANTS' SUBPOENA</div>

<div align="center">**EXHIBIT 43**
**678**</div>

1  production in response to the Subpoena under claim of attorney work product

2  privilege which was created before the inception of this action.

3       3.    Bulson objects to the entire Subpoena to the extent that it seeks

4  the production or identification of any item, or portion thereof, which is not

5  reasonably calculated to lead to the discovery of relevant and admissible

6  evidence, on the ground that it exceeds the permissible scope of discovery

7  delimited by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

8       4.    Bulson objects to the entire Subpoena to the extent that it seeks

9  the production or identification of any item, or portion thereof, comprising or

10  reflecting any trade secret or other confidential or proprietary information of

11  Bulson or any other person or entity.

12      5.    Bulson objects to the entire Subpoena to the extent that it seeks

13  the production or identification of any item, or portion thereof, which is

14  protected from disclosure by any privacy or similar rights of Bulson or any other

15  person or entity.

16      6.    Bulson objects to the entire Subpoena to the extent

17  that it seeks the production of original documents, on the ground that such

18  production would be burdensome, oppressive, and unnecessary.  Bulson

19  reserves the right to comply with the Subpoena, subject to this response, by

20  producing a true copy of any item or by permitting inspection of any item.

21      7.    Bulson objects to the entire Subpoena to the extent that it seeks

22  the production of duplicative identical items, on the ground that such production

23  would be burdensome, oppressive, and unnecessary.

24      8.    Bulson objects to the entire Subpoena to the extent that it seeks

25  the production of any item which has been served, filed, or transmitted in the

26  course of this action, on the ground that such production would be burdensome

27  oppressive, and unnecessary.

28      9.    Bulson objects to the definition of "Siegel" set forth in the

<div align="center">3</div>

---

OBJECTIONS TO DEFENDANTS' SUBPOENA

**EXHIBIT 43**
**679**

1  Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome
2  and oppressive. Bulson will treat the term "Siegel" as used in the Subpoena to
3  mean the individual Jerome Siegel only.

4      10.    Bulson objects to the definition of "Shuster" set forth in the
5  Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome
6  and oppressive. Bulson will treat the term "Shuster" as used in the Subpoena to
7  mean the individual Joseph Shuster only.

8      11.    Bulson objects to the definition "Shuster Representatives" as set
9  forth in the Subpoena on the grounds that it is vague, ambiguous, overbroad,
10 burdensome and oppressive. Bulson will treat the term "Shuster
11 Representatives" as used in the Subpoena to mean the individuals Warren Peary
12 and Jean Adele Peavey only.

13     12.    Bulson objects to the definition of "Plaintiffs" set forth in the
14 Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome
15 and oppressive. Bulson will treat the term "Plaintiffs" as used in the Subpoena
16 to mean the individuals Joanne Siegel and Laura Siegel only.

17     13.    Bulson objects to the definition of "Michael Siegel" set forth in the
18 Subpoena on the grounds that it is vague, ambiguous, overbroad, burdensome
19 and oppressive. Bulson will treat the term "Michael Siegel" as used in the
20 Subpoena to mean the individual Michael Siegel only.

21                             **II.**

22            **RESPONSES TO INDIVIDUAL CATEGORIES**

23     Subject to and without waiving the foregoing objections, Bulson responds
24 to each individual request within the Subpoena as follows:

25 **Document Category No. 1:**

26     All Documents Concerning Superman and/or Superboy.

27 **Response to Document Category No. 1:**

28     Bulson objects to this request on the grounds that it is vague and

                                4

**EXHIBIT 43**
**680**

ambiguous.  Bulson further objects to this request on the grounds that it is
overbroad, burdensome and oppressive.  Bulson further objects to this request to
the extent it seeks documents or communications protected by the
attorney/client privilege and the attorney work product doctrine.  Subject to and
without waiving the foregoing objections, Bulson will produce all non-
privileged documents he is able to determine are responsive to this request.

**Document Category No. 2:**

All Documents Concerning any negotiations Concerning Superman
and/or Superboy including but not limited to, negotiations by or with
Defendants, Plaintiffs, Michael Siegel, Dennis Larson, Toberoff, and/or the
Shuster Representatives.

**Response to Document Category No. 2:**

Bulson objects to this request on the grounds that it is vague and
ambiguous, including without limitation, the phrase "any negotiations
Concerning Superman and/or Superboy."  Bulson further objects to this request
on the grounds that it is overbroad, burdensome and oppressive. Bulson further
objects to this request to the extent it seeks documents or communications
protected by the attorney/client privilege and the attorney work product
doctrine.  Subject to and without waiving the foregoing objections, Bulson will
produce all non-privileged documents he is able to determine are responsive to
this request.

**Document Category No. 3:**

All Documents Concerning any agreements with Plaintiffs, Michael
Siegel, Dennis Larson, Toberoff, and/or the Shuster Representatives Concerning
Superman and/or Superboy, including but not limited to, any agreements
Concerning any ownership interest in and/or revenue from Superman and/or
Superboy.

**Response to Document Category No. 3:**

5

**EXHIBIT 43**
**681**

1        Bulson objects to this request on the grounds that it is vague and

2  ambiguous, including without limitation, the phrase "any agreements

3  Concerning any ownership interest in and/or revenue from Superman and/or

4  Superboy." Bulson further objects to this request on the grounds that it is

5  overbroad, burdensome and oppressive. Bulson further objects to this request to

6  the extent it seeks documents or communications protected by the

7  attorney/client privilege and the attorney work product doctrine. Subject to and

8  without waiving the foregoing objections, Bulson will produce all non-

9  privileged documents he is able to determine are responsive to this request.

10  **Document Category No. 4:**

11        All Documents Concerning any valuation of any current or potential

12  ownership interest in Superman and/or Superboy.

13  **Response to Document Category No. 4:**

14        Bulson objects to this request on the grounds that it is vague and

15  ambiguous, including without limitation, the phrase "any valuation of any

16  current or potential ownership interest." Bulson further objects to this request

17  on the grounds that it is overbroad, burdensome and oppressive. Bulson further

18  objects to this request to the extent it seeks documents or communications

19  protected by the attorney/client privilege and the attorney work product

20  doctrine. Subject to and without waiving the foregoing objections, Bulson will

21  produce all non-privileged documents he is able to determine are responsive to

22  this request.

23  **Document Category No. 5:**

24        All Documents evidencing any correspondence with any third person

25  Concerning Superman and/or Superboy, including but not limited to, Plaintiffs,

26  Dennis Larson, Toberoff, and/or the Shuster Representatives.

27  **Response to Document Category No. 5:**

28        Bulson objects to this request on the grounds that it is vague and

<div align="center">6</div>

<div align="center">

**EXHIBIT 43**
**682**

</div>

1  ambiguous, including without limitation, the phrase "correspondence with any

2  third person Concerning Superman and/or Superboy." Bulson further objects to

3  this request on the grounds that it is overbroad, burdensome and oppressive.

4  Bulson further objects to this request to the extent it seeks documents or

5  communications protected by the attorney/client privilege and the attorney work

6  product doctrine.  Subject to and without waiving the foregoing objections,

7  Bulson will produce all non-privileged documents he is able to determine are

8  responsive to this request.

9  **Document Category No. 6:**

10     All Documents Concerning Michael Siegel's estate, including but not

11  limited to, any wills, draft wills, and any communications expressing Michael

12  Siegel's wishes with respect to any assets.

13  **Response to Document Category No. 6:**

14     Bulson objects to this request on the grounds that it is vague and

15  ambiguous, including without limitation, the phrase "Michael Siegel's wishes."

16  Bulson further objects to this request on the grounds that it is overbroad,

17  burdensome and oppressive.  Bulson further objects to this request to the extent

18  it seeks documents or communications protected by the attorney/client privilege

19  and the attorney work product doctrine.  Subject to and without waiving the

20  foregoing objections, Bulson will produce all non-privileged documents he is

21  able to determine are responsive to this request.

22  **Document Category No. 7:**

23     All Documents Concerning any litigation relating to Michael Siegel's

24  estate.

25  **Response to Document Category No. 7:**

26     Bulson objects to this request on the grounds that it is duplicative. Bulson

27  objects to this request on the grounds that it is vague and ambiguous, including

28  without limitation, the phrase "any litigation relating to Michael Siegel's

<div align="center">

7

_OBJECTIONS TO DEFENDANTS' SUBPOENA_

</div>

**EXHIBIT 43**
**683**

1  estate." Bulson further objects to this request on the grounds that it is

2  overbroad, burdensome and oppressive. Bulson further objects to this request to

3  the extent it seeks documents or communications protected by the

4  attorney/client privilege and the attorney work product doctrine. Subject to and

5  without waiving the foregoing objections, Bulson will produce all non-

6  privileged documents he is able to determine are responsive to this request.

7

8  Dated: August 23, 2006          LAW OFFICES OF MARC TOBEROFF, PLC

9

10

11                                                Marc Toberoff
                                        Attorneys for DON W. BULSON
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

**EXHIBIT 43**
**684**

 

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is:  2049 Century Park East, Suite 2720, Los Angeles, California 90067.

4

5

On August 23, 2006, I served the attached document described as **DON W. BULSON'S OBJECTIONS TO DEFENDANTS' SUBPOENA** on all interested parties in this action by placing ____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

6

7

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.

8

866 United Nations Plaza
New York, NY 10017

9

Facsimile No. 212-813-5901

10

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.

11

1711 Route 9D
Cold Spring, NY 10516

12

Facsimile No. 845-265-2819

13

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

14

9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

15

Facsimile No. 310-550-7191

16

[X]  :BY MAIL:

17

As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

18

19

20

[X]  :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

21

22

I declare under penalty of perjury that the foregoing is true and correct.

23

24

EXECUTED on August 23, 2006, in Los Angeles, California.

25

26

Alex Merino

27

28

**EXHIBIT 43**
**685**

# EXHIBIT 44

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101

5  Attorneys for Marc Toberoff, Esq.

6              UNITED STATES DISTRICT COURT

7             CENTRAL DISTRICT OF CALIFORNIA

8   JOANNE SIEGEL, an individual; and    Civil Case No. **04-8400  DDP (RZx)**
9   LAURA SIEGEL LARSON, an                            **&**
    individual,
10                                           **04-8776  DDP (RZx)**

11          Plaintiff,              **MARC TOBEROFF, ESQ.'S
                                    OBJECTIONS TO DEFENDANTS'**
12     vs.                         **SUBPOENA**

13  WARNER BROS.
14  ENTERTAINMENT INC., a
    corporation; TIME WARNER INC., a
15  corporation; DC COMICS, a general
    partnership; and DOES 1-10,
16
17          Defendants
18  _____

19
20  DC COMICS,

21          Plaintiff

22
23     vs.

24  JOANNE SIEGEL, an individual; and
25  LAURA SIEGEL LARSON, an
    individual,
26
27          Counterclaim Defendants

28

                          1

1  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

2      Marc Toberoff, Esq., ("Toberoff"), pursuant to the provisions of Rule

3  45(c)(2)(B) of the Federal Rules of Civil Procedure, makes the following

4  objections to the subpoena duces tecum (the "Subpoena") that was served on

5  him on August 10, 2006:

## I.

## OBJECTIONS TO THE ENTIRE SUBPOENA

8      Toberoff objects to the entire Subpoena on each of the following grounds

9  and incorporates by reference each of the following objections into his response

10  to each individual request within it:

11      1.      Toberoff objects to the entire Subpoena to the extent

12  that it seeks the production or identification of any item, or portion thereof,

13  comprising or reflecting information transmitted and maintained in confidence

14  between Toberoff or any person or entity on whose behalf he is acting as

15  counsel for the purpose of obtaining legal advice or representation, on the

16  ground that such information is protected from disclosure by the attorney-client

17  privilege.  Toberoff will serve a log identifying each item, or portion thereof,

18  withheld from production in response to the Subpoena under claim of attorney-

19  client privilege which was created before the inception of this action.

20      2.      Toberoff objects to the entire Subpoena to the extent that it seeks

21  the production or identification of any item, or portion thereof, comprising or

22  reflecting information with any confidential impression, conclusion, opinion,

23  legal research, or legal theory of Toberoff or any other person or entity, on the

24  ground that such information is protected from disclosure by the attorney work

25  product privilege.  Toberoff will serve a log identifying each item, or portion

26  thereof, withheld from production in response to the Subpoena under claim of

27  attorney work product privilege which was created before the inception of this

28  action.

2

**EXHIBIT 44**

**687**

3.    Toberoff objects to the entire Subpoena to the extent that it seeks the production or identification of any item, or portion thereof, which is not reasonably calculated to lead to the discovery of relevant and admissible evidence, on the ground that it exceeds the permissible scope of discovery delimited by Rule 26(b)(1) of the Federal Rules of Civil Procedure.

4.    Toberoff objects to the entire Subpoena to the extent that it seeks the production or identification of any item, or portion thereof, comprising or reflecting any trade secret or other confidential or proprietary information of Toberoff or any other person or entity.

5.    Toberoff objects to the entire Subpoena to the extent that it seeks the production or identification of any item, or portion thereof, which is protected from disclosure by any privacy or similar rights of Toberoff or any other person or entity.

6.    Toberoff objects to the entire Subpoena to the extent that it seeks the production of original documents, on the ground that such production would be burdensome, oppressive, and unnecessary.  Toberoff reserves the right to comply with the Subpoena, subject to this response, by producing a true copy of any item or by permitting inspection of any item.

7.    Toberoff objects to the entire Subpoena to the extent that it seeks the production of duplicative identical items, on the ground that such production would be burdensome, oppressive, and unnecessary.

8.    Toberoff objects to the entire Subpoena to the extent that it seeks the production of any item which has been served, filed, or transmitted in the course of this action, on the ground that such production would be burdensome, oppressive, and unnecessary.

## II.

## RESPONSES TO INDIVIDUAL REQUESTS

Subject to and without waiving the foregoing objections, Toberoff

3

responds to each individual request within the Subpoena as follows:

**Document Category No. 1:**

All Writings referenced in the July 5, 2006 letter from John J. Quinn, Esq. to among others, Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit A), and which were attached to or enclosed with the July 18, 2006 letter from John J. Quinn, Esq. to Marc Toberoff, Esq. (a copy of which is attached hereto as Exhibit B).

**Response to Document Category No. 1:**

Toberoff objects to this Subpoena on the grounds that it is vague and ambiguous as to the phrase "all writings referenced." Toberoff further objects to this Subpoena on the grounds that it is overbroad, burdensome and oppressive. Toberoff further objects to this Subpoena because it seeks documents or communications clearly protected by the attorney/client privilege and the attorney work product doctrine. Toberoff further objects on the ground that Defendants are seeking to impermissibly capitalize on their receipt of clearly confidential and privileged documents stolen from Toberoff's law offices, which Defendants improperly reviewed before notifying Toberoff of the issue. But for the receipt of these stolen documents, Defendants would not have issued this subpoena.


Dated:  August 23, 2006          LAW OFFICES OF MARC TOBEROFF, PLC


_____

Marc Toberoff
Attorneys for Marc Toberoff, Esq.

4

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720,

4

Los Angeles, California 90067.

5

On August 23, 2006, I served the attached document described as **MARC TOBEROFF, ESQ.'S OBJECTIONS TO DEFENDANTS' SUBPOENA** on all interested parties in this action by

6

placing ____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed as follows:

7

James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.

8

866 United Nations Plaza
New York, NY 10017

9

Facsimile No. 212-813-5901

10

Patrick T. Perkins
PERKINS LAW OFFICE, P.C.

11

1711 Route 9D
Cold Spring, NY 10516

12

Facsimile No. 845-265-2819

13

Michael Bergman
WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

14

9665 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA 90212

15

Facsimile No. 310-550-7191

16

[X]   :<u>BY MAIL</u>:

17

As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on

18

that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal

19

cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

20

[X]   :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court

21

at whose direction the service was made.

22

I declare under penalty of perjury that the foregoing is true and correct.

23

EXECUTED on August 23, 2006, in Los Angeles, California

24

25

_____
Alex Merino

26

27

28

**EXHIBIT 44**

# EXHIBIT 45

Issued by the

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SIEGEL et al.                                    **SUBPOENA IN A CIVIL CASE**

       v.

WARNER BROS. ENTM'T INC. et al.

Case No.:[1]   CV 04-8400, 04-8776 (C.D. Cal.)

TO:    Marc Toberoff
       Law Offices of Marc Toberoff, PLC
       2049 Century Park East, Suite 2720
       Los Angeles, CA 90067

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

Marc Toberoff will be deposed on the subject matter(s) set forth in the documents requested in Schedule A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212 | Nov. 16, 2006, 10:00 am |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Schedule A.

| PLACE | DATE AND TIME |
|---|---|
| Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212, Attn: Adam Hagen | Nov. 13, 2006, 12:00 pm |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Michael Bergman by AH*   Attorney for Defendants | October 19, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Michael Bergman, Esq., Weissmann Wolff Bergman Coleman Grodin & Evall LLC, 9665 Wilshire Boulevard, Ninth Floor, Beverly Hills, California 90212, (310) 858-7888

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

**EXHIBIT 45**
**691**

AO88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 10-19-06 | 2049 Century Park East, Suite 2720, L.A., CA 90067 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| MARC TOBEROFF | |
| by Mark Perrone, Assistant | substituted service |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Melvin Steiner | registered process server |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    October 23, 2006
                    DATE

_____
SIGNATURE OF SERVER

1513 Livonia Ave., L.A., CA 90035
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)    fails to allow reasonable time for compliance,
(ii)   requires a person who is not a party or an officer of a

party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)   requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)   subjects a person to undue burden.

(B) If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)   requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)   requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**EXHIBIT 45**
**692**

## SCHEDULE A

## DEFINITIONS

A.    As used herein, the terms "You" or "Your" mean Marc Toberoff, Esq., the

Law Office of Marc Toberoff, PC, current attorneys of record for Plaintiffs in the

Superman Action and the Superboy Action, as well as their past and present employees,

associates, partners, representatives, predecessors, successors, and agents, and any

entities owned or controlled by either or both of them.

B.    "Pacific" means Pacific Pictures Corporation, as well as any past and

present officers, employees, shareholders, predecessors, successors, agents and

representatives, and any entities owned or controlled by it.

C.    "Smashbox" means Smashbox Entertainment, LLC, as well as any past

and present officers, employees, shareholders, predecessors, successors, agents and

representatives, and any entities owned or controlled by it.

D.    "IPW" means IPW, LLC, as well as any past and present officers,

employees, shareholders, predecessors, successors, agents and representatives, and any

entities owned or controlled by it.

E.    "Plaintiffs" means, collectively and severally, Plaintiffs Joanne Siegel and

Laura Siegel Larson and each of their past and present agents and representatives, and

any entities owned or controlled by them.

F.    "Siegel" means Jerome (a.k.a. "Jerry") Siegel and each of his agents and

representatives.

G.    "Shuster" means Joseph (a.k.a. "Joe") Shuster and each of his agents and

representatives.

**EXHIBIT 45**
**693**

H.    The "Shuster Representatives" means, collectively and severally, Jean Adele Peavy, Mark Warren Peary, all executors, administrators, heirs, and representatives of the estate of Joseph Shuster, and all of their respective agents and representatives.

I.    "Michael Siegel" means the late Michael Siegel the son of Jerry Siegel, and his estate, and each of his (or his estate's) past and present agents and representatives, and any entities owned or controlled by him.

J.    "Dennis Larson" means Dennis Larson, the current or former husband of Laura Siegel Larson and each of his past and present agents and representatives, and any entities owned or controlled by him.

K.    "Defendants" means, collectively and severally, Defendants Warner Bros. Entertainment Inc., Time Warner Inc., Warner Communications Inc., and Warner Bros. Television Production Inc., and Defendant and Counterclaimant DC Comics, each of their affiliated companies and/or predecessors in interest, and all of their agents, employees, and representatives.

L.    "Marks" means Kevin S. Marks, Esq. and the law firm Gang, Tyre, Ramer & Brown, Inc., as well as their past and present employees, associates, partners, attorneys, representatives, predecessors and successors.

M.    "Emanuel" means Ari Emanuel and/or Endeavor Agency, LLC, as well as any past or present officers, employees, shareholders, predecessors, successors, agents and representatives, and any entities owned or controlled by either of them.

N.    The "Superman Action" means the case pending in the U.S. District Court for the Central District of California, Case No. 04-8400 (MMM) (RZx).

O.    The "Superboy Action" means the case pending in the U.S. District Court

**EXHIBIT 45**
**694**

for the Central District of California, Case No. 04-08776 (MMM) (RZx).

P.      "Superman" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *Action Comics #1*.

Q.      "Superboy" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *More Fun #101*.

R.      "Spectre" means the character as delineated in literary works such as comic books, novels, television programs, and motion pictures, and any of the works in which he appears, including but not limited to, the comic book entitled *More Fun #52*.

S.      The "August 1, 1992 Letter" means the letter of agreement dated August 1, 1992, signed by Paul Levitz, Frank Shuster, and Jean Shuster Peavy which is attached as Exhibit 1 hereto.

T.      The "October 19, 2001 Letter" means the letter dated October 19, 2001 from Kevin S. Marks to John A. Schulman, a copy of which is attached as Exhibit 2 hereto.

U.      The "October 26, 2001 Letter" means the letter dated October 26, 2001 from John A. Schulman to Kevin S. Marks, a copy of which is attached as Exhibit 3 hereto.

V.      The "Draft Long Form Agreement" means that draft long form agreement enclosed with the February 1, 2002 letter from Patrick Perkins to Kevin Marks, a copy of which is attached as Exhibit 4 hereto.

W.      The "September 21, 2002 Letter" means the letter dated September 21,

**EXHIBIT 45**
**695**

2002 from Joanne Siegel and Laura Siegel Larson to Kevin S. Marks and Bruce M.

Ramer, a copy of which is attached as Exhibit 5 hereto.

X.     The "IPW Documents" means the documents regarding the relationship

between Joanne Siegel and Laura Siegel and IPW, LLC, a copy of which is attached as

Exhibit 6 hereto.

Y.     "Concerning" means relating to, describing, evidencing, proving, tending

to prove, referring to, comprising, constituting, disproving or tending to disprove.

Z.     Whenever the terms "and" or "or" are used they are to be construed both

disjunctively and conjunctively as necessary to bring within the scope of these discovery

requests responses that might otherwise be construed to be outside the scope.

AA.     The use of the singular form of any word includes the plural and vice

versa.

BB.     "Document" means any tangible expression or communication -- printed

or electronic -- however created, recorded, embodied, maintained, filed, or stored in any

medium, mode, form, or technology, including, without limitation, as defined by Rule

1001 of the Federal Rules of Evidence, and includes every "original" and every

"duplicate" of each such Document as defined, respectively, by Rules 1001(3) and (4) of

the Federal Rules of Evidence.

### INSTRUCTIONS

You are to produce any and all Documents in Your possession, custody or

control, or subject to Your control, including but not limited, in the possession of any of

Your attorneys, agents, shareholders, officers, and representatives.  In the event that You

cannot produce all of the Documents designated in a particular request, You shall

**EXHIBIT 45**
**696**

produce those Documents which You can produce, and shall describe in detail each

reason for Your failure or inability to produce each of the remaining Documents.

     In the event that any Document called for by this subpoena has been destroyed,

lost, discarded, or otherwise disposed of, any such Document is to be identified as

completely as possible by providing, without limitation, the following information: the

date of disposal; the manner of disposal; the reason for disposal; the person authorizing

disposal; and the person who disposed of the Document.

     If You contend that any responsive Document is privileged, You must identify

each such Document by providing the following information: the date of the Document; a

description of its nature and content; the name and capacity of the individual who

originated the Document; the name and capacity of the individual to whom the Document

is addressed and all individuals to whom it was circulated; and the privilege(s) asserted.

## DOCUMENT CATEGORIES

1.     All Documents Concerning Superman, Superboy, and/or Spectre.

2.     All Documents Concerning any communications between Plaintiffs, or

either of them, and Defendants, or any of them, the Shuster Representatives or any of

them, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW,

and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

3.     All Documents Concerning any relationship, business or otherwise,

between Plaintiffs, or either of them, and Defendants, or any of them, the Shuster

Representatives or any of them, Michael Siegel, Dennis Larson, Emanuel, Pacific,

Smashbox, You, Marks, IPW, and/or any other persons or entities Concerning Superman,

Superboy, and/or Spectre.

**EXHIBIT 45**
**697**

4.      All Documents Concerning any negotiations or agreements between Plaintiffs or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

5.      All Documents Concerning any communications between Defendants or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

6.      All Documents Concerning any relationship, business or otherwise, between Defendants, or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

7.      All Documents Concerning any negotiations or agreements between Defendants or any of them, and the Shuster Representatives, or either of them, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

8.      All Documents Concerning any communications between the Shuster Representatives, or either of them, and Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

9.      All Documents Concerning any relationship, business or otherwise, between the Shuster Representatives, or either of them, and Michael Siegel, Dennis

EXHIBIT 45
698

Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

10.    All Documents Concerning any negotiations or agreements between the Shuster Representatives or either of them, and Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

11.    All Documents Concerning any communications between Michael Siegel and Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

12.    All Documents Concerning any relationship, business or otherwise, between Michael Siegel and Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

13.    All Documents Concerning any negotiations or agreements between Michael Siegel and Dennis Larson, Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

14.    All Documents Concerning any communications between Dennis Larson and Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

15.    All Documents Concerning any relationship, business or otherwise, between Dennis Larson and Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

**EXHIBIT 45**
**699**

16.    All Documents Concerning any negotiations or agreements between Dennis Larson and Emanuel, Pacific, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

17.    All Documents Concerning any communications between Pacific and Emanuel, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

18.    All Documents Concerning any relationship, business or otherwise, between Pacific and Emanuel, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

19.    All Documents Concerning any negotiations or agreements between Pacific and Emanuel, Smashbox, You, Marks, IPW, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

20.    All Documents Concerning any communications between Pacific and Emanuel, Smashbox, You, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

21.    All Documents Concerning any relationship, business or otherwise, between Pacific and Emanuel, Smashbox, You, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

22.    All Documents Concerning any negotiations or agreements between Pacific and Emanuel, Smashbox, You, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

**EXHIBIT 45**
**700**

23.      All Documents Concerning any communications between Smashbox and Emanuel, You, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

24.      All Documents Concerning any relationship, business or otherwise, between Smashbox and Emanuel, You, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Specter.

25.      All Documents Concerning any negotiations or agreements between Smashbox and Emanuel, You, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

26.      All Documents Concerning any communications between Pacific and You, Emanuel, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

27.      All Documents Concerning any relationship, business or otherwise, between Pacific and You, Emanuel, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Specter.

28.      All Documents Concerning any negotiations or agreements between Pacific and You, Emanuel, Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

29.      All Documents Concerning any communications between You and Emanuel, Marks, and or any other persons or entities Concerning Superman, Superboy and/or Spectre.

**EXHIBIT 45**
**701**

30.    All Documents Concerning any relationship, business or otherwise, between You and Marks, Emanuel, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

31.    All Documents Concerning any negotiations or agreements between You and Marks, Emanuel, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

32.    All Documents Concerning any communications between Emanuel and Marks, and or any other persons or entities Concerning Superman, Superboy and/or Spectre.

33.    All Documents Concerning any relationship, business or otherwise, between You and Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

34.    All Documents Concerning any negotiations or agreements between You and Marks, and or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

35.    All Documents Concerning any communications between You and any other person or entity Concerning Superman, Superboy and/or Spectre.

36.    All Documents Concerning any communications between or among any persons or entities other than Plaintiffs, Defendants, the Shuster Representatives, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, IPW, or Marks Concerning Superman, Superboy and/or Spectre.

37.    All Documents Concerning any relationship, business or otherwise, between or among any persons or entities other than Plaintiffs, Defendants, the Shuster

**EXHIBIT 45**
**702**

Representatives, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, IPW, or Marks Concerning Superman, Superboy, and/or Spectre.

38.     All Documents Concerning any negotiations or agreements between or among any persons or entities other than Plaintiffs, Defendants, the Shuster Representatives, Michael Siegel, Dennis Larson, Emanuel, Pacific, Smashbox, You, IPW, or Marks Concerning Superman, Superboy, and/or Spectre.

39.     All Documents Concerning any valuation of any historical, current, or potential ownership interest in Superman and/or Superboy.

40.     All Documents Concerning the letter of agreement dated August 1, 1992, signed by Paul Levitz, Frank Shuster, and Jean Shuster Peavy.

41.     All Documents Concerning the October 19, 2001 Letter.

42.     All Documents Concerning the October 26, 2001 Letter

43.     All Documents Concerning the Long Form Agreement.

44.     All Documents Concerning the September 21, 2002 Letter.

45.     All Documents Concerning the "redraft of the February 4, 2002 document which you sent to us on July 15, 2002" referenced in the September 21, 2002.

46.     All Documents Concerning the Draft Long Form Agreement.

47.     All Documents Concerning the IPW Documents.

48.     All Documents Concerning any August 7, 2002 conference call between You and Emanuel and/or Marks.

49.     All phone logs Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel,

**EXHIBIT 45**
**703**

Dennis Larson, Pacific, Smahsbox, Emanuel, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

50.    All calendars Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smahsbox, Emanuel, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

51.    All notes Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smahsbox, Emanuel, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

52.    All memoranda Concerning any phone calls, telephone conferences, meetings, and/or other communications between You and Plaintiffs, or either of them, Defendants, or any of them, the Shuster Representatives or any of them, Michael Siegel, Dennis Larson, Pacific, Smahsbox, Emanuel, Marks, IPW, and/or any other persons or entities Concerning Superman, Superboy, and/or Spectre.

**EXHIBIT 45**
**704**