# EXHIBIT 46

Oct-23-06  09:46pm  From-                                                      T-077  P.001    F-893

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

* ALSO ADMITTED IN NEW YORK

## FACSIMILE COVER PAGE

| **TO:** James Weinberger, Esq., Patrick Perkins, Esq., Michael Bergman, Esq. | **FAX:** (212)-813-5901; (845)-265-2819; (310)-550-7191 |
|---|---|
| **FROM:** Marc Toberoff | **PAGES ( including cover ): 33** |
| **DATE :** 10/23/06 | **RE:** Superman/Superboy Litigations, Case Nos. 04-CV-8400, 04-CV-8776 |

**COMMENTS:**

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS INTENDED ONLY FOR USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS TRANSMISSION IS NOT THE INTENDED RECIPIENT, ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TRANSMISSION TO US AT THE ABOVE ADDRESS VIA THE US POSTAL SERVICE. THANK YOU.



DEFENDANT'S EXHIBIT
D-3
1/22/08
PENGAD 800-631-6989

**EXHIBIT 46**
**705**

Oct-23-06   09:46pm   From-                                    T-077   P 002   F-893

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

October 23, 2006

Via Facsimile and US Mail

James Weinberger, Esq.
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza
New York, New York 10017

Re: Superman/Superboy Litigations, Case Nos. 04-CV-8400, 04-CV-8776 RSWL (RZx)

Dear James:

Enclosed please find the privilege log for Don Bulson's files.

Very truly yours,

Marc Toberoff

cc: Michael Bergman, Esq. (via facsimile)
    Patrick Perkins, Esq. (via facsimile)

**EXHIBIT 46**
**706**

## PRIVILEGE LOG

| Log # | Date of Document | Identity of Recipient(s) | Identity of Author(s) | Document Description | Privilege Claim | Present Location |
|---|---|---|---|---|---|---|
| 1 | 7/18/1997 | Michael Siegel | Atty Himanshu Amin | Letter | Atty/Client | Plaintiffs' Counsel |
| 2 | 8/7/1997 | Atty Himanshu Amin | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 3 | 8/15/1997 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 4 | 10/14/1997 | Atty Dennis Larson | Atty Himanshu Amin | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 5 | 11/5/1997 | Atty Himanshu Amin | Atty Dennis Larson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 6 | 11/12/1997 | Michael Siegel | Atty Himanshu Amin | Letter | Atty/Client | Plaintiffs' Counsel |
| 7 | 1/15/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 8 | 2/2/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 9 | 3/18/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 10 | 6/17/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 11 | 6/26/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 12 | 6/26/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**
**707**

| 13 | 9/4/1998 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
|---|---|---|---|---|---|---|
| 14 | 11/3/1998 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 15 | 11/13/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 16 | 12/4/1998 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 17 | 12/14/1998 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 18 | 12/28/1998 | Atty Don Bulson | Atty Vinay Joshi | Memorandum | Atty Work Product | Plaintiffs' Counsel |
| 19 | 1/19/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 20 | 3/3/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 21 | 3/10/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 22 | 3/17/1999 | Atty Don Bulson | Atty Arthur Levine | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 23 | 4/16/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 24 | 6/8/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 25 | 6/9/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 26 | 6/9/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**

**708**

| | | | | | | |
|---|---|---|---|---|---|---|
| 27 | 7/12/1999 | Atty Arthur Levine, Atty Don Bulson | Atty Kevin Marks | Memorandum | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 28 | 7/20/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 29 | 8/2/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 30 | 8/10/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 31 | 8/24/1999 | Atty Don Bulson | Atty Arthur Levine | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 32 | 9/2/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 33 | 9/2/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 34 | 9/2/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 35 | 9/3/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 36 | 9/5/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 37 | 9/7/1999 | | Atty Don Bulson | Notes | Atty/Work Product | Plaintiffs' Counsel |
| 38 | 9/8/1999 | Atty Arthur Levine | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 39 | 9/9/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 40 | 9/9/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**
**709**

| 41 | 9/14/1999 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 42 | 9/14/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 43 | 9/16/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 44 | 9/17/1999 | Atty Don Bulson | Atty Arthur Levine | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 45 | 9/17/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 46 | 9/20/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 47 | 9/22/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 48 | 9/22/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 49 | 9/22/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 50 | 9/23/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 51 | 9/23/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 52 | 9/23/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 53 | 9/24/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 54 | 9/24/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**710**

| 55 | 9/27/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 56 | 9/28/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 57 | 9/28/1999 | Joanne & Laura Siegel; Atty Dennis Larson; Atty Arthur Levine; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 58 | 9/29/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 59 | 10/8/1999 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client- Joint Interest | Plaintiffs' Counsel |
| 60 | 10/8/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client- Joint Interest | Plaintiffs' Counsel |
| 61 | 10/11/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 62 | 10/11/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 63 | 10/11/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 64 | 10/11/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 65 | 10/12/1999 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 66 | | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 67 | 10/27/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 68 | 10/31/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**711**

F-893

T-077   P 007

From-

09:47nm

Oct-23-06

| | | | | | | |
|---|---|---|---|---|---|---|
| 69 | 11/3/1999 | Joanne & Laura Siegel; Atty Dennis Larson; Atty Bruce Ramer; Atty Arthur Levine; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 70 | 11/3/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 71 | 11/4/1999 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 72 | 11/5/1999 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 73 | 11/8/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 74 | 11/12/1999 | Atty Don Bulson, Atty Dennis Larson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 75 | 12/6/1999 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 76 | 12/6/1999 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 77 | 12/6/1999 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 78 | 12/10/1999 | Joanne & Laura Siegel, Atty Don Bulson, Atty Arthur Levine | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 79 | 12/22/1999 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 80 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 81 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**
**712**

| 82 | 12/22/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 83 | 12/29/1999 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 84 | 12/29/1999 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 85 | 12/30/1999 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 86 | 1/2/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 87 | 1/3/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 88 | 1/3/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 89 | 1/3/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 90 | 1/3/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 91 | 1/4/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 92 | 1/4/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 93 | 1/5/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 94 | 1/10/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 95 | 1/10/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**
**713**

| 96 | 1/10/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 97 | 1/11/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 98 | 1/14/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 99 | 1/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 100 | 1/18/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 101 | 2/14/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 102 | 2/28/2000 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 103 | 3/1/2000 | Joanne & Laura Siegel; Atty Arthur Levine; Atty Bruce Ramer; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 104 | 3/7/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 105 | 3/8/2000 | Joanne & Laura Siegel; Atty Arthur Levine;  Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client | Plaintiffs' Counsel |
| 106 | 3/9/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 107 | 3/9/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 108 | 3/13/2000 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 109 | 3/21/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**
**714**

| | | | | | | |
|---|---|---|---|---|---|---|
| 110 | 3/30/2000 | Joanne & Laura Siegel; Atty Bruce Ramer; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 111 | 3/30/2000 | Joanne & Laura Siegel; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 112 | 4/3/2000 | Joanne & Laura Siegel; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 113 | 4/5/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 114 | 4/5/2000 | Joanne & Laura Siegel; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 115 | 4/11/2000 | Joanne & Laura Siegel; Atty Don Bulson; Atty Arthur Levine | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 116 | 4/12/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 117 | 4/12/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 118 | 4/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 119 | 4/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 120 | 4/17/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 121 | 4/17/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 122 | 4/18/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 123 | 4/18/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**715**

F-893

T-077  P.012

| 124 | 5/2/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 125 | 5/3/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 126 | 5/3/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 127 | 5/4/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 128 | 5/4/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 129 | 5/5/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 130 | 5/5/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 131 | 5/8/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 132 | 5/8/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 133 | 5/9/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 134 | 5/10/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 135 | 5/18/2000 | Joanne & Laura Siegel; Atty Bruce Ramer; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 136 | 5/21/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 137 | 5/26/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |

From-

09:47 pm

Oct-23-06

**EXHIBIT 46**
**716**

| | | | | | | |
|---|---|---|---|---|---|---|
| 138 | 5/30/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 139 | 6/5/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 140 | 6/7/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 141 | 6/9/2000 | Joanne & Laura Siegel; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 142 | 6/27/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 143 | 7/5/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 144 | 7/6/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 145 | 7/7/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 146 | 7/10/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 147 | 7/10/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 148 | 7/14/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 149 | 7/14/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 150 | 7/17/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 151 | 7/17/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**717**

| 152 | 7/17/2000 | Joanne & Laura Siegel; Atty Bruce Ramer; Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 153 | 7/18/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 154 | 7/18/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 155 | 7/18/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 156 | 7/19/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 157 | 7/19/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 158 | 7/21/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 159 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 160 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 161 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 162 | 7/24/2000 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 163 | 7/24/2000 | Michael Siegel | Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 164 | 7/25/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 165 | 7/25/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**718**

F-893

T-077   P 015

| 166 | 7/26/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 167 | 7/26/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 168 | 7/26/2000 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 169 | 8/7/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 170 | 8/8/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 171 | 8/8/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 172 | 8/8/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 173 | 8/10/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 174 | 8/21/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 175 | | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 176 | 8/25/2000 | Michael Siegel | Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 177 | 9/6/2000 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 178 | 9/6/2000 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 179 | 9/6/2000 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

From—

09:47am

Oct-23-06

**EXHIBIT 46**

**719**

| 180 | 9/8/2000 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 181 | 9/11/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 182 | 9/15/2000 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 183 | 9/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 184 | 9/17/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 185 | 9/18/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 186 | 9/21/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 187 | 10/26/2000 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 188 | 11/2/2000 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 189 | 11/8/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 190 | 11/8/2000 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 191 | 11/15/2000 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 192 | 11/19/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 193 | 11/27/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**720**

| 194 | 11/28/2000 | Atty Don Bulson | Michael Siegel | Letter | Atty/Client | Plaintiffs' Counsel |
| 195 | 12/4/2000 | Atty Don Bulson | Michael Siegel | Letter | Atty/Client | Plaintiffs' Counsel |
| 196 | 12/4/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 197 | 12/5/2000 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 198 | 12/8/2000 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 199 | 1/3/2001 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 200 | 1/16/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 201 | 1/30/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 202 | 1/30/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 203 | 1/31/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 204 | 2/16/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 205 | 3/9/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 206 | 3/12/2001 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 207 | 4/30/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**

**721**

| 208 | 5/4/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 209 | 5/4/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 210 | 5/4/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 211 | 5/17/2001 | | Atty Don Bulson | Letter (Draft) | Atty Work Product | Plaintiffs' Counsel |
| 212 | 6/14/2001 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 213 | 6/26/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 214 | 7/3/2001 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 215 | 7/9/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 216 | 7/30/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 217 | 7/30/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 218 | 7/31/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 219 | 7/31/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 220 | 8/2/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 221 | 8/24/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**

**722**

F-893

T-077   P 019/033

From-

09:46pm

Oct-23-06

| 222 | 8/30/2001 | Atty Don Bulson | Atty Kevin Marks | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 223 | 9/12/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 224 | 9/13/2001 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 225 | 9/13/2001 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 226 | 9/24/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 227 | 9/24/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 228 | 10/17/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 229 | 10/17/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 230 | 10/19/2001 | Laura Siegel & Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 231 | 10/19/2001 | Laura Siegel & Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 232 | 10/19/2001 | Atty Don Bulson | Atty Kevin Marks | E-mail | Atty/Client- Joint Interest | Plaintiffs' Counsel |
| 233 | 10/24/2001 | Michael Siegel | Atty Don Bulson | Letter | Atty/Client | Plaintiffs' Counsel |
| 234 | 11/27/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 235 | 11/27/2001 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |

**EXHIBIT 46**
**723**

| 236 | 12/6/2001 | Atty Don Bulson | Atty Kevin Marks | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 237 | 12/26/2001 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 238 | 1/3/2002 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 239 | 1/3/2002 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 240 | 1/3/2002 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 241 | 1/10/2002 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 242 | 1/22/2002 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 243 | 2/5/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 244 | 2/6/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 245 | 2/7/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 246 | 2/8/2002 | Atty Don Bulson | Atty Kevin Marks | Memorandum | Atty Work Product- Joint Interest | Plaintiffs' Counsel |
| 247 | 3/2/2002 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 248 | 3/8/2002 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 249 | 4/7/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**724**

F-893

P 021/033

T-077

From-

09:48pm

Oct-23-06

| 250 | 4/8/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 251 | 5/9/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 252 | 5/10/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 253 | 5/10/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 254 | 5/10/2002 | Atty Kevin Marks & Michael Siegel | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 255 | 5/10/2002 | Atty Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 256 | 5/18/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 257 | 5/28/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 258 | 7/31/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 259 | 8/13/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 260 | 8/14/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 261 | 8/14/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 262 | 8/23/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 263 | 8/27/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**725**

| 264 | 8/28/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 265 | 9/2/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 266 | 9/2/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 267 | 9/3/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 268 | 9/4/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 269 | 9/19/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 270 | 9/19/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 271 | 9/22/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 272 | 9/23/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 273 | 9/23/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 274 | 9/24/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 275 | 9/24/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 276 | 9/24/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 277 | 9/28/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**726**

| 278 | 9/28/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 279 | 10/1/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 280 | 10/1/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 281 | 11/8/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 282 | 11/19/2002 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 283 | 11/25/2002 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 284 | 11/27/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 285 | 12/19/2002 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 286 | 1/16/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 287 | 1/23/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 288 | 1/23/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 289 | 1/24/2003 | | Atty Don Bulson | Notes | Atty Work Product | |
| 290 | 1/28/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 291 | 3/24/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**727**

| 292 | 4/2/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 293 | 4/2/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 294 | 4/4/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 295 | 4/7/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 296 | 4/7/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 297 | 4/14/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 298 | 4/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 299 | 4/16/2003 | Atty Don Bulson | Joanne & Laura Siegel | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 300 | 4/16/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 301 | 4/30/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 302 | 5/6/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 303 | 5/6/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 304 | 5/7/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 305 | 5/8/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**728**

| 306 | 5/8/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 307 | 5/12/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 308 | 5/12/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 309 | 5/12/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 310 | 5/27/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 311 | 5/27/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 312 | 5/29/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 313 | 6/3/2003 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 314 | 6/9/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 315 | 6/10/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 316 | 6/13/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 317 | 6/17/2003 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 318 | 6/18/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 319 | 6/18/2003 | Atty Marc Toberoff | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**

**729**

| 320 | 6/19/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 321 | 6/23/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 322 | 7/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 323 | 7/14/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 324 | 7/14/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 325 | 7/16/2003 | Atty Don Bulson | Atty Marc Toberoff | Facsimile | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 326 | 7/21/2003 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 327 | 8/6/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 328 | 8/6/2003 | Atty Don Bulson | Atty Marc Toberoff | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 329 | 8/12/2003 | | Atty Don Bulson | Letter(draft) | Atty Work Product | Plaintiffs' Counsel |
| 330 | 9/17/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 331 | 9/17/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 332 | 9/17/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 333 | 9/17/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**730**

| 334 | 10/22/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 335 | 10/22/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 336 | 10/23/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 337 | 10/27/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 338 | 10/28/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 339 | 11/13/2003 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 340 | 11/13/2003 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 341 | 11/18/2003 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 342 | 5/11/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 343 | 5/11/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 344 | 6/3/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 345 | 6/7/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 346 | 6/7/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 347 | 6/7/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**731**

| 348 | 6/8/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 349 | 6/9/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 350 | 6/10/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 351 | 6/15/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 352 | 6/17/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 353 | 6/21/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 354 | 6/21/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 355 | 6/21/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 356 | 6/24/2004 | Atty Kevin Marks | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 357 | 6/27/2004 | Atty Don Bulson | Atty Kevin Marks | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 358 | 7/27/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 359 | 7/27/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 360 | 7/28/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 361 | 8/4/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**732**

| 362 | 8/5/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 363 | 8/9/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 364 | 8/18/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 365 | 8/19/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 366 | 8/22/2004 | Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 367 | 8/22/2004 | Kevin Marks | Atty Don Bulson | Letter | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 368 | 10/5/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 369 | 10/5/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 370 | 10/6/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 371 | 10/6/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 372 | 10/10/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 373 | 10/12/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 374 | 10/12/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 375 | 10/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |

**EXHIBIT 46**

**733**

| 376 | 10/13/2004 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 377 | 11/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 378 | 11/12/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 379 | 11/17/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 380 | 11/17/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 381 | 11/18/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 382 | 11/18/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 383 | 11/19/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 384 | 11/19/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 385 | 11/19/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 386 | 11/24/2004 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 387 | 11/28/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 388 | 11/29/2004 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 389 | 12/2/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**

**734**

T-077    P 030/033    F-893

From-    09:49pm    Oct-23-06

| 390 | 12/5/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 391 | 12/6/2004 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 392 | 12/7/2004 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 393 | 1/17/2005 | Atty Don Bulson | Atty Marc Toberoff | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 394 | 2/4/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 395 | 2/4/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 396 | 2/5/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 397 | 2/5/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 398 | 2/5/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 399 | 2/6/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 400 | 2/17/2005 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 401 | 2/20/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 402 | 2/26/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 403 | 10/8/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |

**EXHIBIT 46**
**735**

| 404 | 10/10/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 405 | 10/11/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 406 | 10/11/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 407 | 10/24/2005 | Michael Siegel | Atty Don Bulson | Email | Atty/Client | Plaintiffs' Counsel |
| 408 | 10/24/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 409 | 10/24/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 410 | 10/25/2005 | Atty Don Bulson | Michael Siegel | Email | Atty/Client | Plaintiffs' Counsel |
| 411 | 10/31/2005 | | Atty Don Bulson | Notes | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 412 | 11/18/2005 | Atty Marc Toberoff | Atty Don Bulson | Email | Atty/Client-Joint Interest | Plaintiffs' Counsel |
| 413 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 414 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 415 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 416 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 417 | 00/00/00 | | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |

**EXHIBIT 46**

**736**

| 418 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 419 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 420 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 421 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |
| 422 | 00/00/00 | Atty Don Bulson | Notes | Atty Work Product | Plaintiffs' Counsel |

**EXHIBIT 46**
**737**

# EXHIBIT 47

1  Marc Toberoff (CA State Bar No. 188547)
   Nicholas C. Williamson (CA State Bar No. 231124)
2  LAW OFFICES OF MARC TOBEROFF, PLC
   2049 Century Park East, Suite 2720
3  Los Angeles, CA 90067
   Telephone: (310) 246-3333
4  Facsimile: (310) 246-3101
   E-mail: MToberoff@ipwla.com
5
   Attorneys for Plaintiffs and Counterclaim Defendants
6  JOANNE SIEGEL and LAURA SIEGEL LARSON

**ORIGINAL**

FILED

7           **UNITED STATES DISTRICT COURT**

8       **CENTRAL DISTRICT OF CALIFORNIA- EASTERN DIVISION**

9
10  JOANNE SIEGEL, an individual; and       Case No. CV 04-08400 SGL (RZx)
    LAURA SIEGEL LARSON, an
11  individual,                             [Honorable Stephen G. Larson]
                    Plaintiffs,
12                                          **PLAINTIFFS JOANNE SIEGEL**
            vs.                             **AND LAURA SIEGEL LARSON'S**
13                                          **MEMORANDUM OF POINTS**
    WARNER BROS.                            **AND AUTHORITIES IN**
14  ENTERTAINMENT INC., a                   **SUPPORT OF MOTION FOR**
    corporation; TIME WARNER INC., a        **PARTIAL SUMMARY**
15  corporation; DC COMICS, a general       **JUDGMENT**
16  partnership; and DOES 1-10,
                                            [Complaint filed: October 8, 2004]
17                  Defendants.
18                                          Date: ~~TBD~~ July 16, 2007
                                            Time: 10:00 a.m.
19  _____        Place: Courtroom 1
20  DC COMICS,
                                            [Notice of Motion; Statement of
21              Counterclaimant,            Uncontroverted Facts and
22          vs.                             Conclusions Of Law; Declaration
                                            of Marc Toberoff; Request For
23  JOANNE SIEGEL, an individual; and       Judicial Notice and [Proposed]
    LAURA SIEGEL LARSON, an                 Order Filed Concurrently
24  individual,                             Herewith]
25
                Counterclaim Defendants.
26
27
28



PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
738

## TABLE OF CONTENTS

I.      INTRODUCTION..........................................................................1

II.     UNDISPUTED FACTS................................................................3

        A.      Prior Legal Actions......................................................3

        B.      The Creation of Superman..........................................4

        C.      Plaintiffs' Notices of Termination Regarding "Superman"..........6

        D.      The Current Superman Action and Superboy Action.................9

III.    LEGAL ANALYSIS....................................................................10

        A.      Standard of Review.....................................................10

        B.      The Recapture Right Under The United States Copyright Act......11

                1.      Recapture Rights Under The Copyright Acts Of 1790 And 1831....................................11

                2.      Recapture Right Under The 1909 Copyright Act..........12

                3.      The Termination Rights Under The 1976 Copyright Act....13

                4.      The Termination Right Under The Sonny Bono Copyright Term ExtensionAct...................................15

        C.      Defendants Are Bound By The 1947 State Action and 1974 Federal Action Under *Res Judicata* and Collateral Estoppel........16

                1.      The Findings of Fact and Conclusions Of Law in the 1947 Action Have Preclusive Effect...........................17

                2.      The Findings And Conclusions In The 1974 Action Have Preclusive Effect In This Action........................20

        D.      Plaintiffs' Duly Exercised Their Termination Right And Recaptured Siegel's Joint Copyright Interest In The Original Superman Strips........................................................20

                1.      Plaintiffs' Termination Complied with the Copyright Act...20

                2.      Plaintiffs' Own An Undivided Fifty Percent Interest In The Copyrights To The Original Superman Strips............23

        E.      Defendants Have A Duty To Account To Plaintiffs For Fifty Percent Of The Profits Earned From The Recaptured Superman Copyright.................................................24

i

EXHIBIT 47
739

1. Defendants' Duty To Account Includes Profits Earned In Foreign Territories...................................25

F.  Defendants' Alleged Defenses To The Termination Lack Merit...........................................................28

   1. Action Comics, No. 1 Was Not A Work-Made-For-Hire...28

      a. "Work for Hire" Under The 1909 Copyright Act....29

      b. Defendants' "Work For Hire" Claim Is Precluded By *Res Judicata* And Collateral Estoppel................30

      c. The Purported Additional Material, To The Extent It Exists, Was Not "Work For Hire".........................32

   2. The Termination Notice Was Not Required To List The 1948 Consent Judgment.........................................33

   3. The December 23, 1975 Agreement Was Unaffected By Defendants Later Payment Of A Pension To Joanne Siegel And, In Any Event, Was Not An Operative "Superman" Grant...............................................37

   4. Plaintiffs' Ownership Of The Recaptured Superman Copyrights Is Not Barred By The Statute of Limitations....39

      a. Plaintiffs Complaint Was Filed Within the Purported Statute of Limitations........................39

      b. Strong Policies Disfavor Using The Statute of Limitations To Bar Termination Under § 304(c)......41

      c. Section 507(b) Is Not A Bar To Copyright Ownership...............................................43

G.  No Agreement Was Consummated By The Parties Regarding Plaintiffs' Recaptured Superman Copyrights Or Recaptured Superboy Copyrights As A Matter Of Law............................45

   1. The October 19, 2001 Letter Constitutes A Counteroffer That Was Not Accepted By Defendants.......................57

   2. No Contract Was Formed Because There Was Never A "Meeting Of The Minds" On All Material Terms...........58

   3. A Complete Written Agreement In Final Form, Signed By Both Parties, Was Clearly Contemplated But Never Completed, Approved Or Executed..............................60

IV. CONCLUSION.................................................................62

ii

**EXHIBIT 47**
**740**

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page**

*Aalmuhammed v. Lee,*
    202 F.3d 1227, 1231 (9th Cir. 2000)……………………………..……41

*Allen v. McCurry,*
    449 U.S. 90, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980)………………..18

*Anderson v. Liberty Lobby,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)……………..10

*Berlitz Sch. Of Lang. of Am., Inc. v. Everest House,*
    619 F.2d 211, 215 (2d Cir. 1980)………………………………………..17

*Bernstein & Co. v. Jerry Vogel Music Co.,*
    221 F.2d 569 (2nd Cir. 1955), *modified,* 223 F.2d 252 (1955)………...25

*Burroughs v. Metro-Goldwyn Mayer, Inc.,*
    683 F.2d 610 (2d Cir. 1982)……………………………………………..35

*Callie v. Near,*
    829 F.2d 888, 891 (9th Cir. 1987)…………………………...……..59

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)……………………………………………...........10,11

*Chase Securities Corp. v. Donaldson,*
    25 U.S. 304, 314, 89 L.Ed. 1628, 65 S.Ct. 1137 (1944)……………...…45

*Community for Creative Non-Violence,*
    846 F.2d 1485, 1498 (D.C. Cir. 1988)……………………………………26

*Dead Kennedys v. Biafra,*
    37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999)………………………….28

*De Sylva v. Ballantine,*
    351 U.S. 570, 582, 76 S. Ct. 974, 100 L. Ed. 1415 (1956)…………..….12

*Dolman v. Agee,*
    157 F.3d 708 (9th Cir. 1998)……………………...…………………….29,32,33

*EFCO Corp. v. U.W. Marx, Inc.,*
    124 F.3d 394 (2d Cir. 1997)……………………………………………...18

*Forward v. Thorogood,*

iii

**EXHIBIT 47**
**741**

985 F.2d 604, 606-7 (1st Cir. 1993)...............................................30

*Fred Fisher Music Co.* v. *M. Witmark & Sons*,
      318 U.S. 643, 657-59, 63 S. Ct. 773, 87 L. Ed. 1055 (1943) ..........12,13

*Fuchsberg & Fuchsberg v. Galizia*,
      300 F.3d 105 (2d Cir. 2002)...............................................17

*Gardiner v. A.H. Robins Co.*,
      747 F.2d 1180, 1189 (8th Cir. 1984).......................................59

*Garguili v. Thompkins*,
      790 F.2d 265 (2d Cir. 1986)...............................................18

*Gasaway v. Nothwestern Mut. Life Ins. Co.*,
      26 F.3d 957, 960 (9th Cir. 1994)..........................................10

*Goodman v. Lee*,
      1994 U.S. Dist. LEXIS 18468, *11, 13 (E.D. La. 1994)...............27

*Goodman v. Lee*,
      78 F.3d 1007 (5th Cir. 1996) *cert denied* 519 U.S. 861 (1996)........26-7

*Hamilton v. State Farm Fire & Cas. Co.*,
      270 F.3d 778 (9th Cir. 2001).............................................19

*Hampton v. Paramount Pictures Corp.*,
      279 F.2d 100, 104 (9th Cir. 1960), *cert. denied*, 364 U.S. 882 (1960)..44

*In re Pago Pago Air Crash*,
      637 F.2d 704, 706 (9th Cir. 1981)........................................57

*In re Teltronics Servs., Inc.*,
      762 F.2d 185, 193 (2d Cir. 1985).........................................17

*Jerome Siegel v. National Periodical Publications, Inc.*,
      364 F. Supp. 1032 (S.D.N.Y. 1973)....................................passim

*Jerome Siegel v. National Periodical Publications, Inc.*,
      508 F.2d 909 (2d Cir. 1974)..........................................passim

*Johnson v. Watkins*,
      101 F.3d 792 (2d Cir. 1996)..............................................17

*Kamilche Co. v. United States*,
      53 F.3d 1059, 1062 (9th Cir. 1995)....................................17,21

*Klein v. Walston Co.*,
      432 F.2d 936 (2d Cir. 1970)..............................................20

iv

*Korman v. Iglesias,*
 736 F. Supp. 261, 265 (S.D. Fla. 1990)......................................26

*Lake Nacimento Ranch Co. v. San Luis Obispo,*
 841 F.2d 872, 876 (9th Cir. 1987)................................................11

*Lin-Brook Blders Hrdwre v. Gertler,*
 352 F.2d 298 (9th Cir. 1965).....................................,,,,...............29

*Luckenbach S.S. Co. v. U.S.,*
 312 F.2d 545, 548 (2d Cir.1963).................................................43

*Marvel Characters, Inc. v. Simon,*
 *310* F.3d 280 (2d Cir. 2002)...............................................14,39

*Matsushita Elec. Indus. Co. v. Epstein,*
 516 U.S. 367, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996)....................18

*May v. Morganelli-Heumann & Assoc.,*
 618 F.2d 1363, 1368 (9th Cir.1980)...........................................29

*Mazer v. Stein,*
 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954)..................16

*Migra v. Warren City Sch. Dist. Bd. of Ed.,*
 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed. 2d 56 (1984)......................17

*Mills Music, Inc. v. Snyder,*
 469 U.S. 153, 185, 105 S. Ct. 638; 83 L. Ed. 2d 556 (1985).....13,14,42

*Montana v. U. S.,*
 440 U.S. 147, 99 S. Ct. 970, 59 L. Ed.2d 210 (1979)....................17

*Morrill v. Smashing Pumpkins,*
 157 F. Supp. 2d 1120, (C.D. Cal. 2001)....................................27

*Morse v. Fields,*
 127 F. Supp. 63 (S.D.N.Y. 1954)............................................21

*Music Sales Corp. v. Morris,*
 73 F. Supp. 2d 364 (S.D.N.Y. 1999).........................................35

*New Hampshire v. Maine,*
 532 U.S. 742, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)................19

*N.Y. Times v. Tasini,*
 533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001)......14,42

*Norris v. Grosvenor Mktg. Ltd.,*
 803 F.2d 1281 (2d Cir. 1986).................................................17

*O'Brien v. City of Syracuse,*
 54 N.Y.2d 353 (1981)..........................................................18

v

*Oddo v. Ries,*
     743 F.2d 630, 633 (9th Cir. 1984)...........................................25-8

*Ozyagcilar v. Davis,*
     701 F.2d 306, 308 (4th Cir. 1983)..............................................59

*Pension Trust Fund for Oper. Engineers v. Triple A Machine Shop, Inc.,*
     942 F.2d 1457 (9th Cir. 1991).................................................18

*Piantadosi v. Loew's Inc.,*
     137 F.2d 534, 536-537 (9th Cir. 1943).......................................25

*Picture Music, Inc. v. Bourne, Inc.,*
     457 F.2d 1213 (2d Cir. 1972)..........................................19,20,26

*Pye v. Mitchell,*
     574 F.2d 476,480 (9th Cir. 1978)..............................................24

*Reilly v. Reid,*
     45 N.Y.2d 24 (1978)...............................................................18

*Romer v. Leary,*
     425 F.2d 186, 188 (2d Cir. 1970)..............................................43

*Roth v. Garcia Marquez,*
     942 F.2d 617, 626-627 (9th Cir. 1991)......................................60

*Self-Realization Fellowship Ch. v. Ananda Ch.,*
     206 F.3d 1322 (9th Cir. 2000)..............................................21,29

*Shapiro, Bernstein & Co. v. Jerry Music Co.,*
     223 F.2d 252 (2d Cir. 1955).............................................26,29,43

*Smith v. BioWorks, Inc.,*
     2007 LEXIS U.S. Dist. 6157 at *27 (ED CA 2007).......................58

*Smith v. Russell Sage College,*
     54 N.Y.2d 185 (1981)............................................................18

*Sony Corp. v. Universal Studios,*
     464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)..............16

*Steinbeck v. McIntosh & Otis, Inc.,*
     433 F. Supp. 2d 395, 398 (S.D.N.Y. 2006)..................................14

*Stewart v. Abend,*
     495 U.S. 207, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990)...11,12,14,42

*Stone v. Williams,*
     970 F.2d 1043 (2d Cir. 1992), *cert.denied*, 508 U.S. 906 (1993).......43

vi

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**744**

*Sweet Music, Inc. v. Melrose Music Corp.*,
  187 F. Supp. 655, 659 (S.D. Cal. 1960)..................................24

*Tillman v. Nat. City Bank of N.Y.*,
  118 F.2d 631, 634 (2d Cir. 1941)........................................17

*Twentieth Century Fox Film Corp. v. Entertainment Distrib.*,
  429 F.3d 869 (9th Cir. 2005)............................................29

*Vernitron Corp. v. Benjamin*,
  440 F.2d 105 (2d Cir. 1971)..........................................18,20

*Weddington Prods. v. Flick*,
  60 Cal. App. 4th 793, 801 (1998)....................................59-61

*Woods v. Dunlop Tire Corp.*,
  972 F.2d 36, 38 (2d Cir. 1992), *cert. denied*, 506 U.S. 1053 (1993).....17

*Yardley v. Houghton Mifflin Co.*,
  108 F.2d 28 (2nd Cir. 1939), cert. denied, 309 U.S. 686.................29

**STATE CASES**

*Apablasa v. Merritt & Co.*,
  176 Cal. App. 2d 719, 726 (1959).......................................57

*Banner Entnm't v. Superior Court*,
  62 Cal. App. 4th 348 (1998).........................................58,59

*Duran v. Duran*,
  150 Cal. App.3d 176, 180 (1983).......................................60

*Durgom v. Janowiak*,
  74 Cal. App. 4th 178, (Cal. App. 4th Dist. 1999)......................28

*Forgeron, Inc. v. Hansen*,
  149 Cal. App. 2d. 352, 360 (1957).....................................60

*Glendale Motor Co. v. Superior Court*,
  159 Cal.App.3d 389 (1984).............................................57

*Grove v. Grove Valve & Reg. Co.*,
  4 Cal. App. 3d. 299, 311-312 (1970)...................................58

*In re Marriage of Worth*,
  195 Cal. App. 3d 768, 776 (Cal. App. 1st Dist. 1987)..................27

*Kruse v. Bank of America*,
  202 Cal. App.3d 38, 59 (1988).........................................61

*Landberg v. Landberg*,
  24 Cal.App.3d 742, 750 (1972).........................................57

vii

*Meyer v. Benko,*
    55 Cal. App. 3d 937 (1976)................................................................58

*Panagotacos v. Bank of America,*
    60 Cal App 4th 851, 855-856 (1998)................................................57

*Patch v. Anderson,*
    66 Cal. App. 2d 63 (1944)................................................................60

*Terry v. Conlan,*
    131 Cal. App. 4th 1445, 1460-1 (2005)............................................61

**STATUTES**

Cal. Civ. Code, § 1550................................................................58,59

Cal. Civ. Code § 1565................................................................58,59

Cal. Civ. Code § 1585................................................................57

Cal. Civ. Proc. Code § 664.6................................................................61

37 C.F.R. §201.10 (b)(1)(iv)................................................................35

37 CFR § 201.10(e)(1)................................................................36

17 U.S.C. § 24................................................................12

17 U.S.C. § 26 (repealed)................................................................22,23

17 U.S.C. § 101................................................................13,24

17 U.S.C. § 106................................................................16

17 U.S.C. § 203(a)................................................................11,13,15

17 U.S.C. §302(a)................................................................13

17 U.S.C. § 304(b)................................................................11,13,14,16

17 U.S.C. § 304(c)................................................................passim

17 U.S.C. § 304(d)................................................................11,13,14,16,22,23

17 U.S.C. § 507(b)................................................................39-41,43,45

28 U.S.C. § 1738................................................................18

**MISCELLANEOUS**

*1-3 Corbin on Contracts § 3.36 (2006)*................................................................57

viii

H.R. Rep. No. 94-1476........................................................13,14

H. Rep. No. 104-315...............................................................16

H.R. Rep. No. 150, 85th Cong., 1st Sess. 2 (1957)......................45

*Nimmer On Copyright* § 6.12[B].........................................25

*Nimmer On Copyright*, § 7.12...........................................21

*Nimmer On Copyright*, § 9.02...........................................12

*Nimmer on Copyright* § 9.11[B] [1]....................................16

*Nimmer On Copyright*, §11.01[A]......................................15

*Nimmer on Copyright* § 14.01 [A]......................................28

Sonny Bono Copyright Term Extension Act of 1998...................16

1 Williston on Contracts (4th ed. 1990) § 4:18, § 4:26...............60

1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 6, p. 44............58

ix

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**747**

# I.    INTRODUCTION

Plaintiffs Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel ("Siegel"), the co-author of the world renowned comic book hero, "Superman," and the author of "Superboy." These cases arise out of Plaintiffs' proper exercise of their right under section 304(c) of the 1976 United States Copyright Act, 17 U.S.C. § 304(c), to recapture Siegel's original copyrights in "Superman" and "Superboy" by serving statutory notices on the defendants herein ("Defendants") on April 3, 1997 and November 8, 2002, respectively terminating Siegel's prior grant(s) of "Superman" (the "Superman Termination") and "Superboy" (the "Superboy Termination") to Defendants' predecessor(s).   Plaintiffs' statutory terminations complied with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the regulations promulgated thereunder by the Register of Copyrights.

On April 16, 1999, the noticed "Superman" termination date, the joint copyright interest that Siegel had conveyed in "Superman" to Defendants' predecessors, duly reverted to Plaintiffs, sixty-one years after Siegel's original conveyance.  On November 17, 2004, the noticed "Superboy" termination date, the copyrights that Siegel had conveyed in "Superboy" to Defendants' predecessors duly reverted to Plaintiffs, fifty-six years after Siegel's original conveyance.

In the "Superboy" action (Case No. 04-8776 SGL (RZx)) Plaintiffs and Defendants filed cross-motions for partial summary judgment and summary judgment, respectively.  The Honorable Ronald S.W. Lew denied Defendants' motion and granted Plaintiffs' motion in its entirety, holding that Plaintiffs' Superboy Termination is valid and that Plaintiffs thereby recaptured the original "Superboy" copyrights.  In so holding the Court found that each of Defendants' purported defenses lacked merit.  Defendants have asserted a number of the same defenses with respect to the Superman Termination, discussed below.

Plaintiffs hereby move for partial summary judgment that their statutory

1

EXHIBIT 47
748

1  Superman Termination is valid as a matter of law with respect to the original

2  "Superman" comic strips comprising the "Superman" story published in "Action

3  Comics, No. 1," and that Plaintiffs have thereby recaptured Siegel's co-author share

4  of the copyrights therein.

5      Plaintiffs move to dismiss Defendants' First and Second Alternative

6  Counterclaims and parts of their Fifth Alternative Counterclaim, as such relate to

7  Plaintiffs' recapture of Siegel's original "Superman" copyrights, because the defenses

8  alleged therein lack merit.[1]

9      Plaintiffs also seek a ruling that they are entitled to an accounting by

10  Defendants of all profits earned from Plaintiffs' recaptured "Superman" copyrights

11  both in the United States and foreign territories based on "black letter" state law

12  principles entitling co-owners to an accounting of *all* profits as "tenants-in-common."

13      Plaintiffs also move for an order dismissing Defendants' Third and Fourth

14  Alternative Counterclaims on the ground that no binding written agreement disposing

15  of Plaintiffs' recaptured copyrights was ever consummated by the parties in October,

16  2001, or thereafter, as a matter of law.

17      These issues are ripe for summary judgment in Plaintiffs' favor.  There are no

18  material issues of fact because the relevant facts are undisputed or were adjudicated

19  in prior litigations between the parties' predecessors; and Defendants are unable to

20  demonstrate a genuine issue of material fact as to those matters as to which they bear

21  the burden.

22

23

---

24  [1] Defendants allege:  (i) that Action Comics No. 1 is in part excluded from 17 U.S.C. §304(c) as a purported "work made for hire;" First Amended Counterclaims, Declaration of Marc Toberoff

25  (Toberoff Decl.), Exhibit ("Ex."), R ("FACC"), ¶¶ 132-135; (ii) that a May 19, 1948 consent judgment, purportedly constitutes a copyright "grant," not specifically listed in Plaintiffs' notices;

26  FACC, ¶¶ 68-69;  (iii) that a December 23, 1975 agreement, purportedly constitutes a copyright "grant," and although listed in Plaintiffs' respective notice, was somehow effectively reinstated by

27  Plaintiff Joanne Siegel's acceptance of pension benefits from Defendants; FACC, ¶¶ 70-76; (iv) that the Superman Termination was purportedly not timely served; FACC, ¶¶ 86-89; and (v) that

28  Plaintiffs' Superman Termination is purportedly barred by the statute of limitations.  FACC, ¶¶ 90-96

2

**EXHIBIT 47**
**749**

( )                                                  ⌐

## II.    UNDISPUTED FACTS

### A.    Prior Legal Actions

In 1947, Siegel and Shuster filed an action in the Supreme Court of the State of New York, County of Westchester (the "1947 Action") against Defendant DC Comics' predecessor, National Comics Publications, Inc. ("National"), to determine the validity of various contracts between Siegel and Shuster and National's predecessors, including Detective Comics, Inc. ("Detective"), pursuant to which National claimed to own "Superman," and to determine ownership of Siegel's "Superboy." *See Jerome Siegel and Joseph Shuster v. National Periodical Publications et al.*, 364 F. Supp. 1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508F.2d 909, 912-913 (2nd Cir. 1974)(both the district court and Second Circuit describe the background of the 1947 Action).

Pursuant to stipulation of the parties the action was tried before an Official Referee of the New York Supreme Court, Judge Addison Young ("Judge Young"). *Id*. After trial of the 1947 Action, Judge Young rendered a comprehensive opinion dated November 21, 1947. *Id*. On April 12, 1948, Judge Young signed detailed findings of fact and conclusions of law and rendered an interlocutory judgment from which no appeal was perfected. *Id*. After reviewing considerable documentary and testimonial evidence, Judge Young found that National owned "Superman" pursuant to a written grant dated March 1, 1938 (the "March 31, 1938 Grant") but that Siegel was the sole author and owner of "Superboy." *See* Judge Young's Findings of Fact ("1948 FOF") and Conclusions of Law ("1948 COL") dated April 12, 1948 (collectively, the "1948 Findings"), Toberoff Decl., Ex. B and Request for Judicial Notice ("RJN"), Ex. B.

Settlement negotiations ensued, resulting in a stipulation of settlement by the parties dated May 19, 1948 ( the "May 19, 1948 Stipulation"), and pursuant to the stipulation the entry in the New York Supreme Court of a final consent judgment dated May 21, 1948 (the "May 21, 1948 Consent Judgment"). *Siegel,* 364 F. Supp. at

3

**EXHIBIT 47**
**750**

1   1034-1035, 508 F.2d at 912-913.  *See* Toberoff Decl., Exs. S, T.

2       In 1969, Siegel and Shuster sought declaratory relief in the U.S. District Court

3   for the Southern District of New York regarding ownership of the *renewal*

4   *copyright* to "Superman," resulting on appeal in the Second Circuit's decision in

5   *Siegel*, *supra*.  The district court and Second Circuit relied upon Judge Young's

6   opinion, findings of fact, conclusions of law and resultant consent judgment after

7   settlement of the 1947 Action and held them binding on the parties under the doctrine

8   of *res judicata*.  Based thereon it was held that National owned the renewal copyright

9   to "Superman" under the March 31, 1948 Grant.  *Siegel*, F.2d at 912-913.

10      **B.**    **The Creation of Superman**

11      The facts and conclusions set forth below are from the 1948 Findings, the

12  district court's and Second Circuit's decisions in *Siegel*, *supra*, and/or from

13  Defendants' First Amended Counterclaims as noted below.

14      In 1933, Siegel conceived of the original idea of a cartoon strip featuring a

15  unique man of superhuman powers who would perform feats for the public good.

16  Siegel called him "Superman."  *Siegel*, 508 F.2d at 911; 1948 FOF, fact 9; FACC, ¶ 6.

17  In or about 1933 Siegel wrote, and the artist, Shuster illustrated and "inked" multiple

18  "Superman" comic strips intended for publication in a newspaper format, *Siegel*,

19  508 F.2d at 911, 1948 FOF, Facts 8, 10; FACC, ¶ 7, which consisted of "(a) twenty-

20  four days (four weeks) of Superman comic strips intended for newspapers (the "1933

21  Superman Strip"); (b) a seven page synopsis of the last eighteen days (weeks 2-4) of

22  such strips; (c) a paragraph previewing future Superman exploits; (d) a nine-page

23  synopsis covering an additional two months of daily [Superman] comic strips; and (e)

24  fifteen daily comic strips.  FACC, ¶ 7; *see* 1948 FOF, Facts 8, 10.

25      By 1934, "Superman and his miraculous powers were completely developed

26  [by Siegel and Shuster]."  *Siegel*, 508 F.2d at 911, 914; 1948 FOF, Facts 8-11.

27  "Superman" was submitted by Siegel and Shuster "to a number of prospective

28  publishers and newspaper syndicates," but was not accepted for publication.  FACC,

4

**EXHIBIT 47**

**751**

¶ 8; 1948 FOF, Fact 10.

Meanwhile, from 1935 to 1937, Siegel and Shuster created other comic strips that were published. On or about December 4, 1937, Siegel and Shuster entered into an agreement with Detective (the "December 4, 1937 Agreement") to produce for publication two comic features, "Slam Bradley" and "The Spy." FACC, ¶ 10.

One of the early entities to which Siegel had submitted "Superman" was The McClure Newspaper Syndicate ("McClure"). In or about early 1938, McClure forwarded Siegel and Shuster's 1934 Superman Comic Strip to Detective Comics for potential publication in its contemplated new magazine, "Action Comics." 1948 FOF, Facts 18-19; *see* FACC, ¶ 11.

In early 1938, when Detective Comics expressed interest to Siegel and Shuster in publishing their 1934 Superman Comic Strip in a magazine, Siegel and Shuster "cut and pasted" it into a thirteen page format (the "Re-cut 1933 Superman Strip"), so as to render their newspaper strip more suitable for a magazine publication. *Siegel*, 508 F.2d at 911; 1948 FOF, Facts 17-18, 31-33; FACC, ¶ 11. Siegel and Shuster submitted their Re-cut 1933 Superman Strip to Detective in February, 1938. 1948 FOF, Fact 22. (The 1933 Superman Strip and the Re-cut 1933 Superman Strip are hereinafter collectively referred to as the "Original Superman Strips.")

"In an agreement with [Detective] dated March 1, 1938 [the March 1, 1938 Grant], Siegel and Shuster…transferred to [Detective] ' the strip entitled 'Superman'…and all goodwill attached thereto and exclusive rights to use the characters and story, continuity and title of the strip'" in consideration for $130 ($10 per page for the thirteen page Re-cut 1933 Superman Strip). FACC, ¶ 12; 1948 FOF, facts 24, 25, 32; *see* March 31, 1938 Grant, Toberoff Decl., Ex. E.

The Re-cut 1933 Superman Strip "w[as] in existence…before the execution of the instrument of March 1, 1938." 1948 FOF, Fact 32. The "March 1, 1938 [Grant]…was executed by [Siegel and Shuster] by reason of their desire to see SUPERMAN in print and in order to induce its publication by DETECTIVE

5

1   COMICS, INC.". 1948 FOF, Fact 28.

2       Thereafter, Detective published Siegel and Shuster's thirteen page "Re-cut

3   1933 Superman Strip" in the "June, 1938" issue of "Action Comics No. 1," which

4   was first published on April 18, 1938.  1948 FOF, Fact 31; Toberoff Decl., Ex. F.[2]

5       Siegel and Shuster thereafter continued to create "Superman" comic strips

6   which were published by Detective in subsequent periodical issues.  1948 FOF, Fact

7   35.  On September 22, 1938, Siegel and Shuster entered into an agreement with

8   Detective (the "September 22, 1938 Agreement") to produce the "artwork and

9   continuity" for five existing comic strips created by Siegel and Shuster, including

10   "Superman." 1948 FOF, Facts 39, 46; FACC, ¶ 15.

11       Also on September 22, 1938, Siegel and Shuster entered into an agreement

12   with Detective and McClure concerning the use of Superman in newspaper strips (the

13   "McClure September 22, 1938 Agreement").  FACC, ¶ 16.

14       On December 19, 1939, Detective and Siegel and Shuster entered into a

15   supplemental agreement raising Siegel and Shuster's compensation rate for their

16   production of the increasingly popular "Superman" comic strip from $10 to $20 per

17   page (the "December 19, 1939 Agreement"). 1948 FOF, Fact 52; FACC, ¶ 20.

18       On December 23, 1975, Siegel and Shuster entered into an agreement with

19   Warner Communications Inc.("WCI") (the "December 23, 1975 Agreement"), then

20   National's alleged parent company, which re-acknowledged that WCI was the

21   exclusive owner of "Superman," and provided Siegel and Shuster with modest annual

22   payments and finally, credit as the "creators" of "Superman."  FACC, ¶ 30.

23   **C.**     <u>**Plaintiffs' Notices of Termination Regarding "Superman"**</u>

24       On April 3, 1997, Plaintiffs availed themselves of their legal right under the

---

[2] Detective thereafter registered the Action Comics, No. 1 periodical with the Register of Copyrights under copyright registration number B: 379787 in the name of Detective Comics, Inc, which was later renewed on June 1, 1965 in the name of National Periodical Publications, Inc. under copyright renewal registration number R: 362187. The copyright in the "Superman" story contained in the Action Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of National Periodical Publications, Inc., claiming as proprietor of copyright, under copyright renewal registration number R: 362188. *See* Toberoff Decl., Ex. F; 1948 FOF, Fact 31.

6

1  United States Copyright Act, 17 U.S.C. § 304 (c) ("Section 304(c)"), as Siegel's

2  widow and daughter, respectively, to recapture Siegel's co-authorship share of the

3  copyrights in the Original Superman Strips and other Superman works, by serving a

4  statutory notice of termination on the Defendants that Plaintiffs were terminating the

5  March 1938 Grant. ("Termination Notice No. 1").  Toberoff Decl., Ex. G.

6      On April 3, 1997, Plaintiffs also served on Defendants separate notices of

7  termination of the following additional agreements, to the extent that any might be

8  construed to contain a grant to any of Siegel's "Superman" works, including the

9  Original Superman Strips:  the December 4, 1937 Agreement (non-applicable)

10 ("Termination Notice No. 2"), the September 22, 1938 Agreement("Termination

11 Notice No. 3"), the McClure September 22, 1938 Agreement ("Termination Notice

12 No. 4"), the 1948 Stipulation ("Termination Notice No. 5"), the December 19, 1939

13 Agreement ("Termination Notice No. 6") and the December 23, 1975 Agreement

14 (non-applicable) ("Termination Notice No. 7"). Toberoff Decl., Exs. H- M.

15 (Collectively, these seven notices of Termination are hereinafter referred to as the

16 "Termination Notices").

17     In particular, Termination Notice No. 2 (re:  December 4, 1937 Agreement)

18 and Termination Notice No. 7 (re:  December 23, 1975 Agreement) were served and

19 filed by Plaintiffs out of an abundance of caution. *Id.*, Exs. H, M.  The December 4,

20 1937 Agreement did not pertain to "Superman;" and the December 23, 1975

21 Agreement did not contain a grant of copyright in "Superman," and merely

22 acknowledged that Warner already owned all rights in "Superman." *Id.*

23     In each of the Termination Notices, the termination of the grant or potential

24 grant listed in the respective notice (the "Termination(s)") was noticed to take effect

25 on April 16, 1999 (the "Termination Date").  The Termination Notices were each

26 served by Regular Mail, as required, and additionally by Certified Mail, Return

27 Receipt Requested. *See* 37 C.F.R. § 201.10.  Plaintiffs' Termination duly complied

28 with all the requirements of 17 U.S.C. § 304(c) and 37 C.F.R. § 201.10, the

7

**EXHIBIT 47**
**754**

1  regulations promulgated thereunder by the Register of Copyrights.

2         Defendants originally acknowledged that the Notices of Termination are

3  effective, and that Plaintiffs thereby recaptured and jointly own the copyright(s) to at

4  least the original "Superman" elements authored by Siegel and Shuster.  On April 16,

5  1997, in response to the April 3, 1997service of the Notices of Termination, John A.

6  Schulman, Executive Vice President and General Counsel of Defendant Warner Bros.

7  wrote a letter to Joanne Siegel, stating in relevant part:

8         "As to the Notices of Termination, I wasn't surprised at their
          arrival...After the effective date of the termination, there will still
9         remain 14 years of copyright protection left to the joint copyright holders
          of the original Superman elements.  Those are what we should share."
10

11  Toberoff Decl., Ex. O.

12         Defendants similarly acknowledged that they have a duty to account to

13  Plaintiffs for Defendants' exploitation of the original "Superman" copyright(s).  On

14  October 10, 1997, Paul Levitz, President and Publisher of Defendant DC Comics,

15  wrote a letter to Plaintiffs, stating in relevant part:

16         "The [Superman] rights involved are non-exclusive; they are shared with
          DC.  Since both you and DC would have these rights, we would each
17         have the obligation to pay the other for using those rights if you did not
          re-grant them to DC."
18

19  Toberoff Decl., Ex. P.

20         However, two years later, when Defendants' initial overtures to buy-out

21  Plaintiffs had not succeeded, DC sent a letter to Plaintiffs, dated April 15, 1999, *one*

22  *day* before the Termination Date, denying the validity of the Terminations with

23  respect to any "Superman" copyrights.  Toberoff Decl., Ex. Q.

24         Soon thereafter, commencing on or about April 30, 1999, the parties started

25  negotiations of a complex transaction regarding Plaintiffs' joint interest in the

26  "Superman" copyrights.  FACC, ¶ 51.  These discussions eventually broke down,

27  however, and no agreement was consummated.  (For a detailed discussion of this

28  subject see section III. H., below.)

8

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**755**

1   On November 8, 2002, Plaintiffs exercised their right under 17 U.S.C. § 304(c)

2   to recapture Siegel's original copyright in "Superboy" by serving statutory notice on

3   the Defendants herein terminating Siegel's prior grant(s) of "Superboy" to

4   Defendants' predecessor(s) on the noticed termination date of November 17, 2004.

5   *See* FACC ¶ 57. On August 27, 2004, Defendant DC sent a letter refusing to

6   recognize the Superboy Termination and Plaintiffs' statutory recapture rights. FACC,

7   ¶ 64.

8   **D.    The Current Superman Action and Superboy Action**

9   On October 8, 2004, Plaintiffs commenced the instant action for declaratory

10  relief as to the validity of the "Superman" Notices of Termination, an accounting and

11  other relief with respect to "Superman" (Case No. 04-8770 SGL (RZx)) (the

12  "Superman Action"). *See* Plaintiffs' First Amended Complaint, Toberoff Decl., Ex.

13  GG. On October 22, 2004, Plaintiffs commenced a related action for declaratory

14  relief, copyright infringement and an accounting regarding the "Superboy" Notice of

15  Termination. (Case No. 04-8776 SGL (RZx))(the "Superboy Action"). *See* First

16  Amended Supplemental Complaint.

17  On March 24, 2006, this Court (the Honorable Ronald S. W. Lew presiding)

18  entered an order in the Superboy Action (the "March 24, 2006 Order") granting

19  Plaintiffs' motion for partial summary judgment and denying Defendants' motion for

20  summary judgment. Toberoff Decl., Ex. U. Judge Lew found that Plaintiffs' notice

21  of termination regarding "Superboy" was valid and that Plaintiffs thereby recaptured

22  Siegel's original "Superboy" copyright on November 17, 2004, the noticed

23  termination date. *Id.*, at 14-15. In so holding, the Court found that Defendants'

24  purported defenses lacked merit. *Id.*, at 8-14. The Court preserved for trial the issue

25  of Defendants infringement of Plaintiffs' "Superboy" copyrights. *Id.*, at 14-16.

26  Defendants thereafter moved for certification/interlocutory appeal of the March

27  24, 2006 Order under 28 U.S.C. §1292(b), which motion was denied by the Court by

28

9

**EXHIBIT 47**
**756**

1  an order entered on May 23, 2006.[3]  Toberoff Decl., Ex. V.

2  **III.  LEGAL ANALYSIS**

3      **A.  <u>Standard Of Review</u>**

4      Plaintiffs are entitled to the entry of summary judgment in their favor if, based

5  on the pleadings and evidence on file, there is no *genuine* issue of *material* fact and

6  Plaintiffs are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Partial

7  summary judgment" where the Court disposes of some but not all claims or issues

8  within a claim, is also permitted.  Fed. R. Civ. P. 56(c), (d).

9      "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will

10  not defeat an otherwise properly supported motion for summary judgment; the

11  requirement is that there be no genuine issue of material fact." *Anderson v. Liberty*

12  *Lobby, Inc.*, 477 U.S. 242, 247-48; 106 S. Ct. 2505, 91 L. Ed. 2d 202

13  (1986)(emphasis in original).  Once Plaintiffs has met its initial burden of

14  demonstrating the absence of a genuine issue of fact, the burden shifts to Defendants,

15  as the non-moving parties, to go beyond the pleadings and "designate 'specific facts

16  showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S.

17  317, 324; 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986); *see Gasaway v. Nothwestern*

18  *Mut. Life Ins. Co.* 26 F.3d 957, 960 (9th Cir. 1994) ("mere allegations or denials" do

19  not meet the non-movants' burden).  To avoid summary judgment the opposing party

20  must also demonstrate a "genuine" issue of "material" fact on all matters as to which

21  it bears the burden of proof.  *Celotex*, 477 U.S. at 324; *see Lake Nacimento Ranch*

22  *Co. v. San Luis Obispo*, 841 F.2d 872, 876 (9th Cir. 1987).  If Defendants do not meet

23  these burdens summary judgment must be granted in Plaintiffs' favor.

24      The instant motion presents a classic example of an issue of law that is ripe for

25  summary judgment; namely the validity of Plaintiffs' Termination under 17 U.S.C. §

26

27  [3] Judge Lew took senior status and recused himself, whereupon this case was re-assigned to the
Honorable Stephen G. Larson.  Defendants seized this as an opportunity to improperly *re-argue* the

28  parties' motions for summary judgment and Defendants' motion for certification in a purported
"motion for reconsideration" of both of Judge Lew's orders, which motion is pending.

10

1    304(c) and Plaintiffs' recapture, at a minimum, of the Original Superman Copyrights.

2    There are no material issues of fact because the relevant facts are undisputed or were

3    previously adjudicated in the 1974 Action and/or the 1947 Action, and Defendants

4    can not meet their burden as to their purported defenses to the terminations.

5        **B.**    **The Recapture Right Under The United States Copyright Act**

6           The importance and legislative purpose of the current Copyright Act's

7    termination provisions at issue herein (17 U.S.C. § 304(c)) are best understood by

8    reviewing the policies underlying its enactment and the predecessor provisions which

9    led up to it.  For over two centuries, the United States Copyright Act has consistently

10    provided authors and their families with the right to regain previously transferred

11    copyright interests.  Over time, Congress strengthened and enhanced such "recapture"

12    rights to protect authors and their heirs so as to enable them to realize the enhanced

13    value of an authors' copyrighted work.  *See Stewart v. Abend*, 495 U.S. 207, 219, 110

14    S. Ct. 1750, 109 L. Ed. 2d 184 (1990), *quoting* M. Nimmer & D. Nimmer, *Nimmer*

15    *On Copyright* (hereinafter, *"Nimmer On Copyright"*), § 9.02.  These protections

16    culminated in the current Copyright Act's termination provisions.  17 U.S.C. §§

17    203(a), 304(c) and 304(d).

18            **1.**    **Recapture Rights Under The Copyright Acts Of 1790**

19                **And 1831**

20           The initial copyright statute, the Copyright Act of 1790 (the "1790 Act"),

21    provided two separate copyright terms, an initial and renewal term of 14 years each.

22    *See* 1 Stat. 124; *Stewart*, 495 U.S. at 217.  Under the 1790 Act, authors and families

23    were permitted during a copyright's renewal term to recapture copyrights assigned

24    away during their initial term.  *Id.*

25           In the Copyright Act of 1831 (the "1831 Act"), Congress strengthened the

26    renewal/recapture right under the 1790 Act.  *See* 4 Stat. 436.  In so doing, it

27    recognized the right of authors and their families to recover copyrights during the

28    renewal term that had been previously sold to enable "the author, originally in a poor

11

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**<br>**758**

1   bargaining position, to renegotiate the terms of the grant once the value of the work

2   had been tested." *Stewart*, 495 U.S. at 217. The 1831 Act also prohibited authors

3   from assigning away their spouse's or children's renewal rights. *Id.*; *see* 4 Stat. 436.

4   "The evident purpose of the [renewal provision] is to provide for the family of the

5   author after his death." *Stewart*, 495 U.S. at 217, *quoting De Sylva v. Ballantine*, 351

6   U.S. 570, 582, 76 S. Ct. 974, 100 L. Ed. 1415 (1956).

7       The renewal term was intended as a new grant reverting to the author at the end

8   of the initial term. In fashioning the renewal term Congress was aware that authors

9   had relatively little bargaining power and often sold or assigned their copyrights to

10   publishers for small sums just to get their works published. The renewal term was

11   intended to protect authors who may have struck imprudent bargains and to allow

12   them to realize a portion of the true economic value of their work. *Stewart* at 217-20;

13   *see also Nimmer On Copyright*, § 9.02.

14       **2.**    **Recapture Right Under The 1909 Copyright Act**

15       The Copyright Act of 1909 ("1909 Act") continued the renewal system and

16   increased both the initial and renewal terms from 14 to 28 years. *See* 17 U.S.C. § 24;

17   H.R. Rep. No. 2222, 60th Congress, 2d Sess., 14 (1909). However, unlike the 1831

18   Act, the 1909 Act did not expressly prohibit authors from signing away their spouse's

19   or children's renewal rights. As a result, some publishers used their superior

20   bargaining position to force authors, their spouses and children, to assign to them

21   their renewal rights long before such rights vested. This practice of "contracting

22   around" the renewal rights was controversial until the Supreme Court in *Fred Fisher*

23   *Music Co.* v. *M. Witmark & Sons*, 318 U.S. 643, 657-59, 63 S. Ct. 773, 87 L. Ed.

24   1055 (1943), held that the renewal copyright expectancy could be assigned during the

25   initial term, before the renewal copyright vested.

26       The legislative purpose of the renewal term was thereby effectively gutted by

27   *Fred Fisher, supra. See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185, 105 S. Ct.

28   638; 83 L. Ed. 2d 556 (1985) (White, J., dissenting) (*Fred Fisher* "substantially

12

1   thwarted" Congress' goal of protecting authors through copyright recapture).  After

2   *Fred Fisher*, publishers routinely insisted that authors assign *both* the initial and

3   renewal copyrights in their initial grants, effectively eliminating the intended benefits

4   to authors and their families of the renewal copyright plan.  *Stewart*, 495 U.S. at 219.

5       **3.      The Termination Rights Under The 1976 Copyright Act**

6       On January 1, 1978, the Copyright Act of 1976 went into effect, and with it

7   major changes to U.S. copyright law that significantly affected the rights of author's

8   and their families.  17 U.S.C. § 101 *et seq.* (1978).  The 1976 Act extended the

9   renewal term from 28 to 47 years for works, such as the early "Superman" works,

10  that were in their renewal term on January 1, 1978 when the 1976 Act took effect.  17

11  U.S.C. § 304(a).  Congress intended to give the benefit of the 19 additional years of

12  copyright protection to authors and their families rather than to grantees, for whom

13  the automatic grant of the extended term would have constituted an unjustified

14  windfall.  *See* H.R. Rep. No. 94-1476 ("H. R. Rep."), at 140 (1976).

15      To that end, Congress coupled the term extension with a *new* right, at issue in

16  this case, of authors and their statutory heirs (principally spouse, children and

17  grandchildren) to terminate transfers of rights in a copyright's renewal term,

18  provided that the grant was "executed before January 1, 1978," *i.e.,* before the 1976

19  Act went into effect.  17 U.S.C. § 304(c).[4]   The termination clause provides in

20  pertinent part:

21      "In the case of any copyright subsisting in either its first or renewal term on
        January 1, 1978, other than a copyright in a work made for hire, the
22      exclusive or nonexclusive grant of a transfer or license of the renewal
        copyright or any right under it, executed before January 1, 1978, by any of
23      the persons designated by subsection (a)(1)(C) of this section, otherwise
        than by will, is subject to termination under the following conditions:..."
24

---

25  [4] A closely related termination provision governs works copyrighted after January 1, 1978.  *See* 17
    U.S.C. § 203(a).  Sections 203 and 304 are structurally parallel but diverge in some particulars.  For
26  works copyrighted after January 1, 1978, Congress established the copyright term as the life of the
    author plus 50 years (later extended for another 20 years).  *See* 17 U.S.C. §302(a) (1982).  Congress
27  also allowed the author or the author's surviving family members to terminate any license 35 years
    after any grant.  *See* 17 U.S.C. § 203(a).  Thus, for both existing and future copyrights, Congress
28  granted authors and their family members the right to terminate any grant after a period of time in
    order to recapture the author's copyright.

1   17 U.S.C. §§ 304(c) and 304(c)(5).

2      As the Supreme Court noted in *Mills Music*, 469 U.S. at 173: "The principal

3  purpose of... § 304 was to provide added benefits to authors... More particularly, the

4  termination right was expressly intended to relieve authors of the consequences of ill-

5  advised and unremunerative grants..." *Mills Music*, 469 U.S. at 172-73 *citing* H.R.

6  Rep. No. 94-1476, at 124 (1976). In devising Section 304(c), Congress recognized

7  that authors commonly agree to one-sided copyright grants that publishers with far

8  greater bargaining power design to be as expansive as possible in exchange for as

9  little payment as possible. H.R. Rep. at 124. The results are often supremely unfair,

10  as when a work proves financially successful for many years, but enriches only the

11  grantee and not the author or the author's family.

12     Indeed, the Supreme Court recently recognized the overall intent of the 1976

13  Act to "enhance the author's position" and to adjust "the author/publisher balance,"

14  emphasizing the "inalienable authorial right to revoke a copyright transfer." *N.Y.*

15  *Times v. Tasini*, 533 U.S. 483, 496 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001) ; *see*

16  *also Stewart*, 495 U.S. at 230 ("[1976 Act] provides an inalienable termination

17  right"); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002) (settlement

18  agreement cannot bar termination right); *Steinbeck v. McIntosh & Otis, Inc.*, 433 F.

19  Supp. 2d 395, 398 (S.D.N.Y. 2006).

20     The termination right lies in stark contrast to ordinary contract principles, as it

21  empowers authors and their statutory heirs to terminate grants of copyright *without*

22  *cause*, regardless of the contracting parties' promises, intent or the assignee's

23  expectations at the time the grant was made. 17 U.S.C. §304(c)(5).

24     In creating the new termination right, Congress directly addressed the

25  inequities caused by *Fred Fisher* and sought to prevent the future erosion of the right

26  of an author and his family to regain the copyright to an author's original work.

27  Thus, in further abrogation of "freedom of contract" principles, Congress clarified

28  that the termination right cannot be waived, cancelled or contracted around, and that

1  "[t]ermination of the grant may be effected notwithstanding any agreement to the

2  contrary." 17 U.S.C. § 304(c)(5) (works copyrighted before January 1, 1978); *see* 17

3  U.S.C. § 203(a)(1) (identical for authors' grants executed after January 1, 1978).

4       To further protect authors and heirs against a repetition of *Fred Fisher*,

5  Congress specified that the termination right or interest may not be assigned away

6  until exercised by service of a notice of termination. *See* 17 U.S.C. § 304(c)(6)(B)

7  ("[a] further grant, or agreement to make a further grant, of any right covered by a

8  terminated grant is valid only if it is made after the effective date of termination…[or

9  as to] the original grantee or such grantee's successor in title, after the notice of

10  termination has been served…").  Once a prior copyright grant is terminated, an

11  author's statutory heirs may grant their recaptured copyright to whomever they wish,

12  fulfilling the purpose to provide such heirs with an opportunity to realize the

13  enhanced value of such copyrights. *Nimmer On Copyright*, §11.01[A].

14       At the same time, the 1976 Act reflected "a practical compromise that [would]

15  further the objectives of the copyright law while recognizing the problems and

16  legitimate needs of all interests involved." H.R. Rep. at 124.  Thus, termination

17  under Section 304(c) is not "automatic." *Id.*  Rather, authors and their statutory heirs

18  are only permitted to terminate such grants during a five year window beginning

19  fifty-six years after copyright had originally been secured in order to "recapture" the

20  copyright for the extended renewal term. 17 U.S.C. § 304(c)(3).  Termination is

21  carried out by serving "advance notice" of the termination "not less than two or more

22  than ten years before" its effective date. 17 U.S.C. § 304(c)(4)(A).

23      **4.**    **The Termination Right Under The Sonny Bono**

24           **Copyright Term Extension Act**

25       In 1998, Congress re-affirmed their objectives with respect to the 1976 Act's

26  termination provisions.  The Sonny Bono Copyright Term Extension Act of 1998

27  ("CTEA"), effective October 27, 1998, extended the term of protection for works

28  created prior to January 1, 1978 from 75 to 95 years. 17 U.S.C. § 304(b).  As with

15

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**762**

the 1976 Act's original term extension, Congress intended this unforeseen term extension as a benefit to authors and their families, not as a windfall for grantees or their successors. Congress therefore once again coupled the extended term with a termination right for authors and their families, provided they had not exercised their termination right under Section 304(c). 17 U.S.C. § 304(d). *See* S. Rep. No. 104-315, at 22-23 (1996); *Nimmer on Copyright* § 9.11[B] [1].

The economic philosophy behind our copyright law is the conviction that the public welfare is advanced by providing economic incentives to authors to exercise their creative talents. *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Sony Corp. v. Universal Studios*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Congress provided this incentive by giving authors and thereafter, their immediate family, exclusive copyrights to their work and the ability to market those rights. 17 U.S.C. §106. When Congress' reversionary renewal scheme was thwarted, it carefully fashioned the 1976 Act's termination provisions and subsequently CTEA's termination provisions to cure the inequities caused by *Fred Fisher*, "level the playing field" and promote the economic interests of authors. 17 U.S.C. §§304(c),(d).

## C. Defendants Are Bound By The 1947 State Action and 1974 Federal Action Under *Res Judicata* and Collateral Estoppel

It is well established that the findings in a prior litigation are binding on the parties or their successors in a subsequent litigation involving the same facts under the doctrines of *res judicata* and/or collateral estoppel. *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995). Strong policies favor repose and the finality of prior litigation on the merits. *Res judicata* and collateral estoppel protect litigants against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. U.S.*, 440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979). In light of these policies, preclusion is not to be applied in an

16

1  overly technical manner. *Tillman v. Nat. City Bank of N.Y.*, 118 F.2d 631, 634 (2d

2  Cir. 1941).

3      For preclusion purposes, the true identity of the facts surrounding an

4  occurrence constitutes the cause of action, not the legal theory upon which a party

5  chooses to frame his complaint. *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d

6  Cir. 1992), *cert. denied*, 506 U.S. 1053 (1993). *See Berlitz Sch. Of Lang. of Am., Inc.*

7  *v. Everest House,* 619 F.2d 211, 215 (2d Cir. 1980)("When the factual predicate upon

8  which claims are based are substantially identical, the claims are deemed to be

9  duplicative for purposes of *res judicata*"); *In re Teltronics Servs., Inc.*, 762 F.2d 185,

10  193 (2d Cir. 1985)("New legal theories do not…defeat *res judicata*").

11      "Collateral estoppel prevents a party from re-litigating an issue decided against

12  that party in a prior adjudication" in which that party had a "'full and fair

13  opportunity'" to litigate. *Fuchsberg & Fuchsberg v. Galizia*, 300 F.3d 105, 109 (2d

14  Cir. 2002), *quoting Johnson v. Watkins*, 101 F.3d 792, 794-95 (2d Cir. 1996) and

15  *Schwartz v. Pub. Adm'r*, 24 N.Y.2d 65, 71 (1969).   Preclusion applies to issues raised

16  as well as to issues that could have been raised at the time of the earlier action.

17  *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 84, 104 S.Ct. 892, 79 L.Ed.

18  2d 56 (1984).  The preclusive effect also extends to issues not specifically addressed,

19  but which "by necessary implication . . . [are] contained in that which [was] explicitly

20  decided." *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986).

21      **1.**   **The Findings of Fact and Conclusions Of Law in the 1947**

22          **Action Have Preclusive Effect**

23      The Full Faith and Credit Act, 28 U.S.C. § 1738, commands that a federal

24  court must accord a state court's resolution of claims and issues the same preclusive

25  effect as would be accorded in the rendering court. *See Matsushita Elec. Indus. Co.*

26  *v. Epstein*, 516 U.S. 367, 369, 116 S. Ct. 873, 878, 134 L. Ed. 2d 6 (1996); *Allen v.*

27  *McCurry*, 449 U.S. 90, 96, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980).

28      Both parties agree that the preclusive effect of the 1947[New York]Action is

1  determined under New York law.  *See Pension Trust Fund for Oper. Engrs v. Triple*

2  *A Mach. Shop, Inc.*, 942 F.2d 1457, 1464-1465 (9th Cir. 1991).  New York has

3  adopted a transactional approach to the doctrine of *res judicata* or claim preclusion.

4  *Garguili v. Thompkins*, 790 F.2d 265, 269 (2d Cir. 1986).  If a subsequent claim

5  arises from the same "factual grouping" as a previously resolved claim, the

6  subsequent claim is barred regardless of whether the two suits are based on different

7  legal theories or seek different remedies.  *Smith v. Russell Sage College*, 54 N.Y.2d

8  185, 192 (1981); *Reilly v. Reid*, 45 N.Y.2d 24, 29-30 (1978); *EFCO Corp. v. U.W.*

9  *Marx, Inc.*, 124 F.3d 394, 397 (2d Cir. 1997).  In New York "once a claim is brought

10  to a final conclusion, all other claims arising out of the same transaction or series of

11  transactions are barred…"  *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981).

12       The 1948 Findings, **as later argued by National,** were held to be binding on

13  the parties' predecessors with respect to "Superman" under *res judicata* and collateral

14  estoppel principles by the Southern District of New York and the Second Circuit in

15  the federal *copyright* action, *Siegel v. National Periodical Publ., et al.*, 364 F. Supp.

16  1032, 1034-1035 (S.D.N.Y. 1973), *aff'd* 508 F.2d 909, 912-13 (2d Cir. 1974).

17  Toberoff Exs. S, T.

18       The *Siegel* district court explicitly relied on the 1948 findings of fact in holding

19  that the 1948 Action was *res judicata* as to National owning the "Superman" renewal

20  copyright.  364 F. Supp. at 1035-1036 ("The findings of the State Supreme Court in

21  the Westchester action are binding on us here."), *citing Vernitron Corp. v. Benjamin*,

22  440 F.2d 105, 108 (2d Cir. 1971); and also quoted and gave preclusive effect to the

23  1948 conclusions of law.  364 F. Supp. at 1035-1036; Toberoff Decl., Ex. S.

24       The Second Circuit, in affirming the district court's decision, likewise *quoted*

25  Judge Young's first conclusion of law ("[b]y virtue of the instrument of March 1,

26  1938…Detective Comics, Inc. became the absolute owner of the comic strip

27  Superman"), *Siegel*, 508 F.2d at 912; and delved into the heart of the case: "the state

28  court action determined that the agreements conveyed *all* of the plaintiffs'

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

**765**

1    rights...Under the doctrine of *res judicata* we are not free collaterally to re-examine

2    the agreements to determine whether the construction placed on them was

3    warranted." *Id.* at 913. "The state court...construe[d] these instruments...[and] that

4    decision is binding on us here." *Id.*

5        Defendants' predecessor, National, emphatically claimed in *Siegel* that the

6    1948 Findings were strictly binding under *res judicata* or collateral estoppel

7    regarding its *federal* claim that it owned the *renewal copyright* in "Superman," even

8    though this copyright issue was *not* addressed in the 1948 state action:

9        "It should be noted that application of the doctrines of *res judicata* and
         *collateral* estoppel here is not only proper but based on good reason.
10       There is little about the underlying facts and transactions that can be
         supplied by testimony of witnesses decades after the events and almost
11       twenty-six [now fifty-nine] years after the prior litigation"

12   *See* National's Appellate Brief, p. 12 *citing Picture Music, Inc. v. Bourne, Inc.* 314 F.

13   Supp. 640, 652 (S.D.N.Y. 1970), *aff'd* 457 F.2d 1213 (2d Cir. 1972), *cert. den.* 409

14   U.S. 997 (1972); *see also* pp. 2-3, 6-14, Toberoff Decl, Ex. W; March 24, 2006 Order

15   at 6-7, Toberoff Decl, Ex. U.

16       Defendants, after benefiting enormously from the *Siegel* holding for over thirty

17   years, are judicially estopped from taking inconsistent positions in this action

18   regarding the preclusive effect of the 1948 Findings. *Hamilton v. State Farm Fire &*

19   *Cas.*, 270 F.3d 778, 782 (9th Cir. 2001); *New Hampshire v. Maine*, 532 U.S. 742, 749

20   (2001). *See* March 24, 2006 Order at 6:21-24, Toberoff Decl, Ex. U.

21       The 1948 Findings of Judge Young, nine years after the events in question,

22   provide "a much more reliable index of the truth" than anything that can be mustered

23   by Defendants today. *See Picture Music,* 314 F. Supp. at 652. "The subsequent

24   [preclusive] effect...is a result which should be welcomed to avoid the task of

25   reconsidering issues that have already been settled by another competent tribunal."

26   *Vernitron Corp. v. Benjamin*, 440 F.2d 105, 108 (2d Cir. 1971), *cert. denied*, 402 U.S.

27   987, 29 L. Ed. 2d 154, 91 S. Ct. 1664 (1971), *citing Klein v. Walston Co.*, 432 F.2d

28   936 (2d Cir. 1970). There is little about these underlying facts that can be supplied

19

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**766**

1   by new testimonial evidence. Siegel is no longer alive and the majority of those who

2   dealt with "Superman" at the time of its creation by Siegel and Shuster are also dead.

3       On summary judgment in the Superboy Action, Judge Lew thus held that the

4   1948 Findings had preclusive effect:

> Having relied on Judge Young's findings for previous favorable
> determinations regarding Superman, Defendants now take the
> inconsistent position that this Court is not bound by the state court
> findings ... Defendants attempt to raise genuine issues of material fact,
> where the facts were clearly determined by Judge Young after the
> opportunity to take evidence and hear testimony on that evidence from
> the parties directly involved in creating this relationship.
>
> Contrary to Defendants' assertions now, both the Southern District of
> New York and the Second Circuit looked directly to, even citing to,
> Judge Young's findings of facts. This Court holds that it is consistent to
> continue this position and will look to Judge Young's findings as
> binding where relevant ... [T]his Court in keeping a consistent position
> with the previous litigation holds that Judge Young's findings of fact
> have preclusive res judicata and collateral estoppel effect on this Court.

13  March 24, 2006 Order, at 7, Toberoff Decl., Ex. U.

14      **2.**    **The Findings And Conclusions In The 1974 Action Have**

15      **Preclusive Effect In This Action**

16      The federal copyright action between the parties predecessors, *Siegel v.*

17  *National Periodical Publ., et al.,* 364 F. Supp. 1032, (S.D.N.Y. 1973), *aff'd* 508 F.2d

18  909 (2d Cir. 1974) held that "Superman" as originally published in Action Comics,

19  No. 1 was <u>not</u> a "work made for hire" under the 1909 Copyright Act, and that Siegel

20  and Shuster transferred to National, *all* rights to "Superman," including the renewal

21  copyright, in the March 1, 1938 Grant. The Second Circuit decision clearly has

22  preclusive effect under the doctrines of *res judicata* and collateral estoppel, where

23  relevant to the parties' "Superman" claims and defenses herein. *Kamilche*, 53 F.3d at

24  1062.

25      **D.**    **Plaintiffs' Duly Exercised Their Termination Right And Recaptured**

26      **Siegel's Joint Copyright Interest In The Original Superman Strips**

27      **1.**    **Plaintiffs' Termination Complied with the Copyright Act**

28      Plaintiffs fully satisfied the requirements for statutory termination set forth in

20

**EXHIBIT 47**

**767**

1    17 U.S.C. § 304(c) ("Section 304(c)"):

2    • Section 304(c) applies to "any copyright ... subsisting in its renewal term on

3    the effective date of the [1976 Act]." 17 U.S.C. § 304(c). Copyright in "Superman"

4    subsisted in its renewal term on the effective date of the 1976 Act, January 1, 1978.

5    It is undisputed that Siegel and Shuster's Original Superman Strips were published in

6    the serialized magazine, Action Comics, No. 1, for which copyright was first secured

7    on April 18, 1938, when Action Comics, No. 1 was first published with a copyright

8    notice. Toberoff Decl., Ex. F; *see* Copyright Act of 1909, § 10 ("Any person entitled

9    thereto by this title may secure copyright for his work by publication thereof with the

10   notice of copyright required by this title...."). The blanket copyright to the Action

11   Comics, No. 1 periodical was thereafter registered with the Register of Copyrights

12   under copyright registration number B: 379787 in the name of Detective Comics, Inc,

13   and renewed on June 1, 1965 in the name of National Periodical Publications, Inc.,

14   claiming as proprietor of copyright, under copyright renewal registration number R:

15   362187. *Id.*[5] The copyright in the story entitled "Superman" contained in the Action

16   Comics, No. 1 periodical was also renewed on June 1, 1965 in the name of National

17   Periodical Publications, Inc., claiming as proprietor of copyright, under copyright

18   renewal registration number R: 362188. *See* Toberoff Decl., Ex. F; 1948 FOF, Fact

19   31.

20   • Section 304(c) applies only to transfers or licenses "executed before January

21   1, 1978," by the author, the author's surviving spouse, children (or certain other

22   designated persons). 17 U.S.C. § 304(c). The principal March 1, 1938 Grant and

23   other agreements (to the extent applicable) which were terminated by Plaintiffs were

24

25   [5] The statutory copyright in this collective periodical (Action Comics, No. 1) secures the statutory copyright in its component part – the Original Superman Strips. *See Self-Realization Fellowship*

26   *Church v. Ananda Church*, 206 F.3d 1322, 1329 (9th Cir. 2000) (a blanket copyright on a periodical protects its constituent parts); *Morse v. Fields*, 127 F. Supp. 63, 64-65 (SDNY 1954) (publication in

27   a collective work will secure a copyright in all component parts); *see also* 2-7 *Nimmer on Copyright* § 7.12 ("The rule with respect to collective works under the 1909 Act...provided that a single notice

28   in the name of the copyright owner of the collective work was sufficient to protect each contribution contained therein.").

21

**EXHIBIT 47**
**768**

1   all pre-1978 instruments. No post-1978 grant of "Superman" by Siegel or his heirs

2   exists and none has been alleged by Defendants.

3         • Section 304(c) allows termination by the author's "widow" and "surviving

4   children" which together own and are entitled to exercise more than one-half of the

5   author's termination interest under the statute. 17 U.S.C. §304(c)(1) and (c)(2)(A)

6   and (B). Plaintiff Joanne Siegel is the author Siegel's widow and she therefore owns

7   fifty percent (50%) of Siegel's termination interest. 17 U.S.C. §304(c)(2)(A); FACC,

8   ¶ 2. Plaintiff Laura Siegel Larson is one of Siegel's two children, and she therefore

9   owns twenty-five (25%) of Siegel's termination interest. 17 U.S.C. §304(c)(2)(A);

10  FACC, ¶ 3. Together Plaintiffs own and constitute the more than one-half of Siegel's

11  termination interest required to effect the Termination. 17 U.S.C. § 304(c)(1).

12        • Section 304(c) requires the termination notice to "state the effective date of

13  termination, which shall fall within the five-year period" "beginning at the end of 56

14  years from the date copyright was originally secured," 17 U.S.C. §§ 304(d)(1),

15  (c)(4)(A), and requires that the termination notice be "served not less than two or

16  more than ten years" before the effective date of termination. 17 U.S.C. §

17  304(c)(4)(A). Accordingly, Plaintiffs would have had to serve notice of termination

18  on or before April 19, 1997 to comply. Service of the Termination Notices took

19  place on April 3, 1997 by First Class Mail, postage pre-paid (per 37 C.F.R. § 201.10

20  (d)) and, in addition, by Certified Mail, Return Receipt Requested, which April 3,

21  1997 service date is "not less than two or more than ten years" before the effective

22  April 16, 1999 Termination Date. Toberoff Decl., Exs.G-N; 17 U.S.C. §

23  304(c)(4)(A). Plaintiffs' Termination Notice stated the date of termination, April 16,

24  1999, which fell within the proper time-frame from the date the copyright was

25  originally secured on April 18, 1938. *Id.*; 17 U.S.C. §§ 304(d)(1), (c)(4)(A).

26        • Section 304(c) requires that a copy of the termination notice be "recorded in

27  the Copyright Office before the effective date of termination," 17 U.S.C. §

28  304(c)(4)(A), and that it comply "in form, content, and manner of service, with

22

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

**769**

1  requirements that the Register of Copyrights shall prescribe by regulation," 17 U.S.C.

2  § 304(c)(4)(B). Plaintiffs' Termination Notices were recorded in the Copyright

3  Office on February 2, 1998, well before the April 16, 1999 Termination Date

4  (Toberoff Decl., Ex. F); and the notice fully complied with 37 C.F.R. § 201.10, the

5  regulations issued by the Register of Copyrights under 17 U.S.C. §304(c).

6          Because Plaintiffs met all of the statutory requirements of Section 304(c), their

7  Termination should be deemed effective. On April 16, 1999, the noticed Termination

8  Date, Plaintiffs recaptured Siegel's joint copyright interest in the Original Superman

9  Strips comprising Action Comics, No. 1 (hereinafter, the "Recaptured Superman

10  Copyrights").

11          **2.    Plaintiffs' Own An Undivided Fifty Percent Interest In**

12                  **The Copyrights To The Original Superman Strips**

13          Plaintiffs' Recaptured Superman Copyrights constitutes Siegel's undivided

14  fifty percent (50%) joint interest in the copyrights to the Original Superman Strips for

15  the extended renewal term.

16          The Original Superman Strips published in Action Comics, No. 1 were joint

17  works created by co-authors, Siegel and Shuster. The 1909 Act did not contain a

18  definition of "joint authorship" or "joint work," which was left to the Courts to

19  define. *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406, 409 (2d

20  Cir. 1946) *cert. denied*, 67 S.Ct. 1310 (1947), a leading joint authorship case under

21  the 1909 Act, defined a "joint work" as "a work by two or more authors who merge

22  their contributions into a single composition which is perceived by the audience as a

23  unit."[6]

24          "Superman" satisfies this definition as Siegel merged his story/continuity with

25  Shuster's illustrations into a single composition in the Original Superman Strips

26  comprising Action Comics, No. 1 which is perceived as a unified work. As joint

27  _____

28  [6] The 1976 Copyright Act did not alter this definition. It defines "joint work" as "a work prepared by two or more authors with the intention that their contribution be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

23

**EXHIBIT 47**
**770**

1   authors of the Original Superman Strips, Siegel and Shuster owned an undivided fifty

2   percent interest in the entire copyrights therein as *tenants-in-common.* *See Pye v.*

3   *Mitchell*, 574 F.2d 476,480 (9th Cir. 1978); *Sweet Music, Inc. v. Melrose Music Corp.*,

4   187 F. Supp. 655, 659 (S.D. Cal. 1960). It is undisputed that Siegel and Shuster

5   conveyed their entire copyrights to the Original Superman Strips to Detective in the

6   March 1, 1938 Grant. *Siegel*, 508 F. 2d at 911, 913; FACC, ¶¶ 12, 26; 1948 FOF,

7   Facts 24 - 25, 32; *see* Toberoff Decl., Ex. E.

8        Section 304(c)(1) of the Copyright Act specifically addresses the termination

9   procedures with respect to jointly authored works, such as "Superman." A co-author,

10  if living, or if deceased, his widow, children or grandchildren, can recapture the

11  copyright for the extended renewal term to the extent of the "particular author's share

12  of the renewal copyright" in such work. 17 U.S.C. § 304(c)(1). Therefore, on April

13  16, 1999, when the March 1, 1938 Grant was terminated pursuant to Plaintiffs'

14  Termination Notice No. 1., Plaintiffs became the owners of an undivided fifty

15  percent interest in the copyrights to the Original Superman Strips comprising Action

16  Comics, No. 1, pursuant to 17 U.S.C. 304(c)(1).

17  **E.**    **Defendants Have A Duty To Account To Plaintiffs For Fifty Percent**

18        **Of The Profits Earned From The Recaptured Superman Copyrights**

19        Whereas, Plaintiffs recaptured Siegel's joint ownership interest in the Original

20  Superman Strips on April 16, 1999 pursuant to Section 304(c), Defendants, as the

21  successors to Detective, retain Shuster's joint ownership interest in the copyrights to

22  the Original Superman Strips, with the consequent duty to account to Plaintiffs for

23  fifty percent of the profits earned by such copyrights. *Bernstein & Co. v. Jerry Vogel*

24  *Music Co.*, 221 F.2d 569 (2nd Cir. 1955), *modified*, 223 F.2d 252 (1955); *see also*

25  *Piantadosi v. Loew's Inc.*, 137 F.2d 534, 536-537 (9th Cir. 1943) (publisher becomes

26  a joint owner of a work via assignment by a joint author). *See also* 1-6 *Nimmer on*

27  *Copyright* § 6.12[B] (Courts have "uniformly recognized that one joint owner is

28  accountable to the others for their rateable share of the profits that he has realized

24

1  from licensing of the work.")

2      In *Bernstein*, the co-authors of a song, the "12th Street Rag," each assigned

3  their respective joint fifty percent interest in the song's renewal copyright to a

4  different company.  The lyricist assigned his half interest to the defendant; the

5  composer assigned his half interest to a company which, in turn, assigned it to the

6  plaintiff.  The Court held that each company as a successor joint owner of the song's

7  copyright had a duty to account to the other for half the moneys earned from its

8  exploitation of the song.  221 F.2d at 571.

9      Defendants' duty to account to Plaintiffs for the profits earned from

10  Defendants' exploitation of the Original Superman Strips applies to profits earned

11  from all sources from the publication of Action Comics, No. 1 and from the

12  exploitation of new derivative "Superman" works, in any and all media, created on or

13  after the April 16, 1999 Termination Date.  17 U.S.C. § 304(c)(6)(A).

## 1.    <u>Defendants' Duty To Account Includes Profits</u>

### <u>Earned In Foreign Territories</u>

16      Claims by a co-owner of a copyright for an accounting are not governed by

17  copyright law, but are governed by state common law property principles such as

18  tenancy in common.  *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984) ("A co-owner of

19  a copyright must account to other co-owners for any profits he earns from licensing

20  or use of the copyright, but the duty to account does not derive from the copyright

21  law's proscription of infringement.  Rather, such duty to account is derived from

22  'equitable doctrines relating to unjust enrichment and general principles of law

23  governing the rights of co-owners'") (internal citations omitted).  *See also*

24  *Community for Creative Non-Violence,* 846 F.2d 1485, 1498 (D.C. Cir. 1988) ("Joint

25  authors co-owning copyright in a work are deemed to be tenants in common, with

26  each having an independent right to use or license the copyright, subject only to a

27  duty to account to the other co-owner for any profits owned thereby.") (internal

28

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

**772**

1  quotations omitted), *aff'd on other grounds,* 490 U.S. 730 (1989).[7]

2      As there can "be no copyright infringement between co-authors of a work, it

3  follows that state courts have exclusive competence to determine the fact of co-

4  authorship and the rights of assignment *and accounting* that flow therefrom."

5  (emphasis added).  3-12 *Nimmer on Copyright* § 12.01[A][1][b] (*citing Oddo v. Ries,*

6  743 F.2d 630, n.2 (9th Cir. 1984)).  *See also Korman v. Iglesias*, 736 F. Supp. 261,

7  265 (S.D. Fla. 1990) ("The Copyright Act neglected to provide for remedies between

8  co-authors ... The District of Columbia, Second, and Ninth Circuits have held and

9  Congress must have intended that co-authors may claim for an accounting...under

10  common law principles since the Copyright Act makes no mention of how co-authors

11  should enforce their rights to royalties as against each other."  Applying state law to

12  plaintiff's claim for share of royalties derived from joint work).

13      *Goodman v. Lee*, 78 F.3d 1007 (5th Cir. 1996) *cert denied* 519 U.S. 861 (1996)

14  is instructive.  The court affirmed a judgment declaring plaintiff a joint owner of the

15  copyright to the song "Let the Good Times Roll" and awarded plaintiff royalties

16  because, as a joint owner under Louisiana law, he was entitled to an accounting and

17  royalties based on all proceeds that defendants received from the song. *Id.* at 1012.

18  The Fifth Circuit held that while the issue of joint ownership of the song arises under

19  copyright law, once this issue was resolved, the accounting dispute among joint

20  owners was properly governed by state law.  *Id.*  The court held:

21        "The applicability of federal law ends with that [joint ownership]
22        determination, as Goodman's claim for an accounting is governed in all
      respects by state law.  It is widely recognized that "[a] co-owner of a
23        copyright must account to other co-owners for any profits he earns from

24  _____

[7] H.R. Rep. No. 94-1476, at 120 (1976)("Under the bill, as under the present law, co-owners of a
25  copyright would be treated generally as tenants in common, with each co-owner having an
independent right to use or license the use of a work, subject to a duty of accounting to the other co-
owners for any profits"); *Picture Music, Inc. v. Bourne, Inc.*, 314 F. Supp. 640, 646-47 (S.D.N.Y.
26  1970)("It is clearly established that where a truly 'joint work' is created, each co-owner is akin to a
tenant in common. Accordingly...compensation obtained from the unilateral exploitation of the
joint work by one of the co-owners without the permission of the others is held in a 'constructive
27  trust' for the mutual benefit of all owners, and there is a duty to account therefor.")(internal
citations omitted), *aff'd on other grounds,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997
28  (1972); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 223 F.2d 252 (2d Cir. 1955).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**773**

1    the licensing or use of the copyright.... Significantly, *'the duty to account
      does not derive from the copyright law's proscription of infringement.*
2    *Rather, it comes from"... general principles of law governing the rights
      of co-owners.'* As those general principles are rooted in state law, we
3    look to the law of Louisiana for answers to the remaining issues
      presented by this appeal."

4

5    *Id.* (emphasis in the original).

6    **Notably, the 5th Circuit affirmed the district court's finding that the co-**

7    **owners of the song had to account to each other for royalties earned both**

8    **domestically *and outside the United States*:**

9        "It is true that United States Copyright laws do not have extraterritorial
          effect and therefore, 'infringing actions that take place entirely outside
10        the United States are not actionable.' Plaintiff's claim for an accounting
          of royalties as co-owner of the copyright to 'Let the Good Times Roll' is
11        not, however, an action based upon an infringement of her copyright.
          Indeed, a co-owner of a copyright cannot be liable to another co-owner
12        for infringement of the copyright. 'Consequently, a suit to bring the co-
          owner of a copyright to account does not fall within the district court's
13        jurisdiction over actions arising under the copyright law.' The extra-
          territorial nature of copyright law is inapposite to whether plaintiff is
14        entitled to an accounting of foreign royalties received by defendants."

15   (internal citations omitted). *Goodman v. Lee*, 1994 U.S. Dist. LEXIS 18468, *11, 13

16   (E.D. La. 1994). *See also Goodman v. Lee*, 78 F.3d 1007, 1015 (5th Cir. 1996);

17   *Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984)("A co-owner of a copyright must

18   account to other co-owners for *any* profits he earns from licensing or use of the

19   copyright")(emphasis added).

20        Both state and federal courts in California have consistently held that an action

21   for an accounting between joint owners of a copyright is governed by state law under

22   which they are *tenants in common* entitled to share in *all proceeds* from such jointly

23   owned copyright. *See In re Marriage of Worth*, 195 Cal. App. 3d 768, 776 (Cal.

24   App. 1st Dist. 1987)(husband and wife hold title to copyrights as tenants in common

25   and thus wife entitled "to share in *all* of the proceeds therefrom, including any

26   settlement or award of damages resulting from the copyright infringement"); *Dead*

27   *Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999)(action for

28   accounting amongst joint authors brought in federal court remanded to California

27

1  state court because an "action for an accounting or determination of ownership as

2  between alleged co-owners is founded in state law and does not arise under the

3  copyright laws"); *Morrill v. Smashing Pumpkins,* 157 F. Supp. 2d 1120, (C.D. Cal.

4  2001)("Each author of a joint work is a tenant in common"); *Durgom v. Janowiak,* 74

5  Cal. App. 4th 178, (Cal. App. 4th Dist. 1999)(court held nonpayment of royalties was

6  a contract issue not preempted by federal copyright law, and states are expressly

7  permitted to regulate activities violating legal or equitable rights, including the right

8  to an accounting).

9       Plaintiffs are entitled as a matter of law to an accounting from Defendants for

10 half the profits earned by the jointly owned Original Superman Copyrights embodied

11 in Action Comics, No. 1. *Oddo v. Ries,* 743 F.2d at 633.  As noted in *Goodman,*

12 1994 U.S. Dist. LEXIS 18468, at 11, 13 *aff'd* 78 F. 3d at 1015, this includes profits

13 from the exploitation of such copyrights and derivative works in foreign territories

14 because an accounting between copyright co-owners is governed by state law

15 principles governing tenants in common, and is not subject to the copyright law's

16 "extraterritoriality" proscription.

17       **F.    Defendants' Alleged Defenses To The Termination Lack Merit**

18             **1.    Action Comics, No. 1 Was Not A Work-Made-For-Hire**

19       Section 304(c)'s termination provisions do not apply to a "work made for

20 hire." 17 U.S.C. § 304(c).  Defendants thus claim that part of the Re-Cut 1933

21 Superman Strip created by Siegel and Shuster and thereafter purchased and published

22 in Action Comics, No. 1 was still somehow owned by Detective at inception as

23 "works made for hire" under the now repealed 1909 Copyright Act.  17 U.S.C. § 26.

24 As set forth below, Defendants' argument is precluded by the Second Circuit's 1974

25 decision in *Siegel,* 508 F.2d 909, 914 under the doctrines of *res judicata* or *collateral*

26 *estoppel.* Notwithstanding this, it is also refuted by the plain fact that Detective

27 *purchased* the "Superman" material at issue in the March 1, 1938 Grant *after* it had

28 been independently created and submitted to Detective.

28

#### a.    "Work for Hire" Under The 1909 Copyright Act

The 1909 Act does not provide any definition of "work made for hire" or "employer." In the vast majority of cases under the 1909 Act, federal courts consistently applied the work-for-hire doctrine *only* to traditional hierarchical employment relationships. *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005). However, "[i]n the last decade of the [1909] Act the Courts expanded the doctrine *somewhat* to include less traditional relationships." *Id., quoting Self-Realization Fellowship Ch. v. Ananda Ch.*, 206 F.3d 1322, 1331 (9th Cir. 2000)(emphasis added). The Ninth Circuit has "evaluated claims that a work was 'made for hire' by requiring "credible evidence that the work was done at the 'instance and expense' of the commissioning party." *Self-Realization*, 206 F.3d at 877, *quoting Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998).

Under the 1909 Act, when one person employs another to create an artistic work it gives rise to a *presumption* that the parties' *mutual intent* is for title to the copyright to belong to the employer at whose instance and expense the work is created. *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir 1965) (work for hire status turns on "mutual intent of the parties"). However, the presumption of copyright in the employer is rebuttable, as it "is based on the presumed mutual intent of the parties." *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1368 (9th Cir.1980); *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2nd Cir. 1939), *cert. denied*, 309 U.S. 686 (presumption rests upon presumed intention).

Thus courts have often refused to apply the work for hire doctrine *even in the context of an employer-employee* relationship. *See e.g., Dolman*, 157 F.3d at 712 (no evidence that songs written within scope of author's employment and the written assignment of songs to employer's company rebutted any work for hire presumption); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir. 1955), *modified on other grounds*, 223 F.2d 252 (2d Cir. 1955) (where employer purchased song lyric from employee by paying him to write the lyric, court found that because

29

1    this was in addition to his salary and a special job assignment, it was not a work for

2    hire); *see also Forward v. Thorogood*, 985 F.2d 604, 606-7 (1st Cir. 1993) (court

3    refused to apply work for hire doctrine to music demo tapes created with plaintiff's

4    financial assistance, because while he booked and paid studio to create tapes, "he

5    neither employed nor commissioned the band members.").

b.    **Defendants' "Work For Hire" Claim Is Precluded**

**By *Res Judicata* And Collateral Estoppel**

8    Defendants did not allege that Action Comics, No. 1 (*i.e.*, the Original

9    Superman Strips) was a work for hire in their Counterclaim or Answer, in apparent

10    recognition that it was not and that they are precluded from claiming otherwise. *See*

11    FACC (Toberoff Decl., Ex. R) and Answer.  However, Defendants allege that at

12    Detective's request Siegel and Shuster cut and pasted their pre-existing "Superman"

13    newspaper strip into a magazine format and that "upon information and belief" they

14    added additional material ("Purported Additional Material") to create the Re-cut 1933

15    Superman Strip published as Action Comics, No 1.  FACC , ¶¶ 11, 14.  Defendants

16    erroneously claim that the Purported Additional Material is "work for hire" as

17    allegedly prepared "at the instance and expense of [Detective] and subject to its right

18    of control," "and that the copyright therein was owned by Detective *ab initio*," that is,

19    from inception.  FACC, ¶ 132.

20    Defendants have the burden to prove what Purported Additional Material they

21    refer to because by all accounts the conversion of the 1933 Superman Strip

22    (newspaper format) to the Re-cut 1933 Superman Strip (magazine format) published

23    in Action Comics, No. 1 was largely mechanical involving cut and pasting, slight re-

24    lettering, and trimming panels to fit a magazine format.  *Siegel,* 508 F.2d at 914.

25    In *Siegel*, 508 F.2d at 914, the Second Circuit held that "Superman" as first

26    published by Detective (in Action Comics, No. 1) was not a "work for hire." ("The

27    court below had held that **Superman** was also a "work for hire" within the meaning

28    of the Copyright Act, 17 U.S.C. § 26…We disagree.").  Defendants are therefore

30

1  precluded under *res judicata* and collateral estoppel principles from again claiming

2  that Action Comics, No. 1, or any part thereof, is a "work for hire."

3       In fact, Defendants' claim as to the Purported Additional Material is

4  specifically precluded by *Siegel*.  The Second Circuit expressly considered the 1948

5  Findings on the conversion of Siegel and Shuster's 1933 "Superman" newspaper strip

6  to a magazine format *at Detective's request* at that this was insufficient to transform it

7  into a work for hire:

8       "There was no conclusion of law in the state court that the comic strip
        was a work for hire so as to create the presumption that the employer
9       was the author.  That issue was not litigated at all in state court.  On the
        contrary, the court's finding of fact no. 8 was that the plaintiffs were "the
10      originators and authors of the cartoon character **SUPERMAN** and of the
        title **SUPERMAN** and first created cartoon material in which the said
11      character and title first appeared in 1934. . . .'"  The court below instead
        relied upon finding of fact no. 22 in which the state court found that the
12      plaintiffs did not revise and expand the **Superman** material at the
        request of the defendants and that this revised material constituted the
13      formula for the ensuing series of strips.  We do not consider this
        tantamount to a conclusion that **Superman** was a work for hire."
14

15  508 F.2d at 914.  The Second Circuit concluded that "Superman" and his powers had

16  been fully developed by Siegel and Shuster on there own and that any mechanical

17  revisions that may have been directed by Detective shortly before "Superman's" first

18  publication in Action Comics, No. 1 were simply to accommodate a magazine format

19      "Superman had been spawned by the plaintiffs four years before the
        relationship between the authors and the defendants existed...Superman
20      and his miraculous powers were completely developed long before the
        employment relationship was instituted.  *The record indicates that the*
21      *revisions directed by the defendants were simply to accommodate*
        *Superman to a magazine format.*  We do not consider this sufficient to
22      create the presumption that the strip was a work for hire."

23  *Id.* (emphasis added).

24       Defendants are thus precluded from re-litigating the claim or issue of whether

25  the Purported Additional Materials comprising such "revisions" was a "work for

26  hire" under the doctrines of *res judicata* or collateral estoppel.

27

28

**c.    The Purported Additional Material, To**
**The Extent It Exists, Was Not "Work For Hire"**

Even if the Court re-opened the "work for hire" issue, contrary to the preclusive effect of *Siegel*, 508 F.2d at 914, Defendants' admissions and documentary evidence also mandate a finding that the Purported Additional Material, to the extent it exists, was not "work made for hire."

Defendants claim that they owned the Purported Additional Material "at inception" merely because they requested that Siegel and Shuster cut and paste their newspaper strip into a magazine format makes no sense. When Siegel and Shuster re-cut their Superman strip they did so "on spec" on their own volition as they were still merely trying to get their work published. 1948 FOF, Fact 32, 34; Toberoff Decl., Ex. B.

It is undisputed that they presented their Re-cut 1933 Superman Strip to Detective in February, 1938. *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911. At that point Detective had not even accepted their work for publication. Detective purchased Siegel and Shuster's thirteen page *Re-cut 1933 Superman Strip* in the March 1, 1938 Grant *after* it was submitted to Detective and accepted for publication. *See* 1948 FOF, Fact 32 ("The first thirteen pages of SUPERMAN material ...were in existence...before the execution of the instrument of March 1, 1938."); *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911. Defendants acknowledge this. FACC, ¶ 11 ("Siegel and Shuster cut and pasted the [newspaper]comic strips...to create a thirteen page comic book story which was accepted for publication by [Detective]").

Detective was under no obligation to pay Siegel and Shuster for their Re-cut 1933 Superman Strip until such had been completed by Siegel and Shuster on spec and Detective had accepted it for publication and *purchased* the finished product in the March 1, 1938 Grant. *See* Toberoff Decl., Ex. E.

*Dolman*, 157 F.3d at 712, is instructive. The plaintiff copyright owner sued a music publisher regarding certain movie soundtrack compositions created in the

32

1   1930s. The author had composed the songs as an employee of a company that had

2   contracted with a movie company to create soundtracks, and he later assigned the

3   songs to the music publishing arm of his employer. The Ninth Circuit affirmed the

4   district court's refusal to apply the "work for hire" doctrine on the grounds that there

5   was no evidence that the songs were within the scope of the author's employment;

6   nor written at his employer's "instance and expense." Significantly, the Court stated:

7      "Moreover, even if [defendant] had established that [the author] created
8      the songs at the instance and expense of [his employer] or [the movie
       company], **[plaintiff] rebutted the work for hire presumption," by**
9      **having executed an assignment to his employer's company:** "Had the
       works been intended to be works for hire for [his employer], there would
10     have been no reason for [the music publishing subsidiary] to accept an
       invalid assignment of rights from [the author], knowing that its parent
11     company already owned those rights." *Id.* at 712-13. Additionally, "[the
       music publishing subsidiary] licensed the synchronization rights in the
       songs to [the movie company]. Had the songs been written for [the
12     movie company] as works for hire, there would have been no need for
       such a license." *Id.*
13

14      Here, as in *Dolman*, the very existence of the March 1, 1938 Grant belies the

15   notion that the Re-cut 1933 Comic Strip was "for hire." If it were a work for hire,

16   there would be no rights to grant because the work would have been owned at

17   inception by Detective. It is undisputed that the parties executed the March 1, 1938

18   Grant after receiving the Re-cut 1933 Superman Strip in February, 1938, Detective

19   decided to publish it, and thus purchased the material in the March, 1938 Grant.

20   *Siegel*, 364 F.Supp. at 1034; *Siegel*, 508 F.2d at 911; 1948 FOF, Fact 32. It is clear

21   that the copyright to both the Original Superman Strips resided with Siegel and

22   Shuster, to be assigned if and only if their speculative work was thereafter accepted

23   and purchased by Detective. As such, no portion of the Original Superman Strips,

24   published in Action Comics, No. 1, is "work for hire."

25      **2.**    **The Termination Notice Was Not Required To List The**

26          **1948 Consent Judgment**

27      As set forth above, all rights to Siegel's Original Superman Strips were granted

28   to Defendants' alleged predecessor, Detective, in the March 1, 1938 Grant. *Siegel*,

33

**EXHIBIT 47**

**780**

( )

1  508 F.2d at 913-914; 1948 COE; Conclusion 1. The regulations promulgated under

2  17 U.S.C. § 304(c) by the Register of Copyrights ask for "a brief statement

3  reasonably identifying the grant to which the notice of termination applies." 37

4  C.F.R. § 201.10(b)(1)(iv).  In compliance, Plaintiffs' Termination Notice No. 1

5  identified the March 31, 1938 Grant as the grant being terminated. Toberoff Decl. Ex.

6  G.  On the noticed April 16, 1999 Termination date, Siegel's joint copyright interest

7  in the Original Superman Strips reverted to Plaintiffs as further set forth above.

8      As discussed above, Plaintiffs' served on Defendants and filed with the

9  Copyright Office six additional Termination Notices, Nos. 2-7, out of an abundance

10 of caution, to the extent that the respective agreement set forth in each such notice,

11 granted *or might be construed to have granted* "Superman" works by Siegel.

12 Toberoff Decl. Ex. H-M.

13     Amongst Plaintiffs' additional notices, Termination Notice No. 6  listed the

14 May 19, 1948 Stipulation which settled the 1947 Action, wherein Siegel and Shuster

15 re-acknowledged National's ownership of "Superman" and received money for

16 Siegel's grant of "Superboy" to National. Termination Notice No. 5, ¶ 3, p. 551,

17 Toberoff Decl., Ex. K; May 19, 1948 Stipulation, Toberoff Decl., Ex. C.  The May

18 19, 1948 Stipulation provided for the May 21, 1948 Consent Judgment that was

19 entered into two days later incorporating the terms agreed upon in the stipulation.

20     Defendants nonetheless asserted that Plaintiffs' Terminations are purportedly

21 defective for not *also* listing the May 21, 1948 Consent Judgment.  *See* FACC, ¶¶ 66-

22 68.  Firstly, the May 21, 1948 Consent Judgment is a judgment, not a "grant" of

23 copyright.  *See* 37 C.F.R. § 201.10 (b)(1)(iv).  Secondly, the May 21, 1948 Consent

24 Judgment merely follows the parties' underlying May 19, 1948 Stipulation entered

25 into two days earlier which *is* explicitly identified in Plaintiffs' Termination Notice

26 No. 6.  Thirdly, because the March 1, 1938 Grant constituted the operative grant of

27 "Superman" to National's predecessors-in-interest, the subsequent May 21, 1948

28 Consent Judgment did not as a matter of law convey that which was previously

34

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**781**

1    granted in 1938, and already in National's possession on May 21, 1948. *Siegel*, 508

2    F.2d at 913-914; 1948 COL, Conclusion 1.

3        The Consent Judgment also has no adverse impact on Plaintiffs' Termination

4    as "[t]ermination…may be effected notwithstanding any agreement to the contrary"

5    17 U.S.C. § 304(c)(5); and Siegel's or Plaintiffs' reversionary termination interest

6    under Section 304(c) could not have been assigned, as a matter of law, until "after the

7    notice of termination ha[d] been served [in 1997]". 17 U.S.C. § 304(c)(6)(B),(D).

8        As stated, the 1948 Consent Judgment merely acknowledges what was

9    previously granted to Detective and National in agreements explicitly identified in

10   Plaintiffs' Termination Notices (*e.g.*, the March 1, 1938 Grant of the Original

11   Superman Strips.)  However, even if the May 21, 1948 Consent Judgment is

12   somehow deemed a grant of rights previously granted (it is not and can not be),

13   Plaintiffs' identification of the underlying May 19, 1948 Stipulation "reasonably

14   identifies" the parallel May 21, 1948 Consent Judgment which was issued pursuant to

15   the stipulation and mirrors it. *See* 37 C.F.R. §201.10 (b)(1)(iv).

16       There is little case law on notice of termination formalities.  In *Burroughs v.*

17   *MGM*, the court found that a Section 304(c) termination notice identifying a single

18   1923 grant and 35 titles, applied to only the titles listed, but was <u>not</u> rendered

19   ineffective with respect to those 35 titles by the fact that many of the titles were

20   assigned by the author in subsequent grants that had <u>not</u> been identified in the

21   termination notice. 683 F.2d 610, 614, 618, 622 (2d. Cir. 1982) ("As further Tarzan

22   books were written, the rights in these were also transferred to the corporation").

23       *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 378 (SDNY 1999), came to a

24   similar conclusion.  There, the termination notice simply identified the grant as "grant

25   or transfer of copyright and the rights of copyright proprietor, including publication

26   and recording right only." *Id*.  The Court held that the notice was adequate even

27   though this "generic statement would not seem to reasonably identify the grant." *Id*.

28       Defendants received more than ample *notice* within the statutory time frame of

35

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

**782**

1  Plaintiffs' intention to terminate prior grants of Siegel's "Superman" work and were

2  in no way prejudiced by Plaintiffs' not listing the May 21, 1948 Consent Judgment in

3  addition to the parallel May 21, 1948 Stipulation, the operative March 1, 1938 Grant

4  and three other prior agreements. *See* Terminations Nos. 1-6, Toberoff Exs. G-L.

5  The regulations of the Register of Copyright, on which Defendants purport to rely,

6  specifically dissuade such hyper-technical attempts to invalidate termination notices:

7  "Harmless errors in a notice that do not materially affect the adequacy of the

8  information required to serve the purposes of …section 304(c) of title 17,

9  U.S.C….shall not render the notice invalid." 37 CFR § 201.10(e)(1). Nor is such a

10  result supported by case law as set forth above.

11    Defendants alleged the same unavailing Consent Judgment defense with

12  respect to Plaintiffs' Superboy Termination in the Superboy Action (Case No. 04-

13  8776). In granting Plaintiffs' motion for partial summary judgment, Judge Lew

14  dismissed this purported defense as without merit:

15    "Defendants argued that Plaintiffs failed to comply with the termination
      regulations, because the termination notices only list the May 19, 1948
16    stipulated agreement, but did not list the May 21, 1948 'Final Consent
      Agreement.'
17
      This court finds that ***no genuine issue exists that the operative grant of***
18    ***"Superboy" by Jerome Siegel was the May 19, 1948 stipulated***
      ***settlement*** and that the consent judgment merely followed the parties'
19    stipulation and was entered by the Court two days later. Additionally,
      Regulation 201.10(b)(1)(iv) merely requires a "brief statement
20    reasonably identifying the grant to which the notice of termination
      applies." In fact, Regulation 201.10(e) provides that:
21
        harmless errors in a notice that do not materially affect the
22        adequacy of the information required to serve the purposes of
          …section 304(c) … shall not render the notice invalid.
23
      Here, by listing the May 19, 1948 stipulated settlement, the termination
24    notices provide a brief statement reasonably identifying the grant in
      question. Even if including the May 21, 1948 consent judgment would
25    have provided additional notice, its absence in no way materially
      affected the adequacy of Plaintiffs' notice."
26
27  Order Granting Plaintiffs' Motion For Partial Summary Judgment & Denying

28  Defendants' Motion for Summary Judgment, entered March 24, 2006, at pp. 12-13,

36

**EXHIBIT 47**
**783**

1  Toberoff Decl., Ex. U. This holding and logic applies with equal force to the

2  Superman Action "where the operative grant" of the Original Superman Strips was

3  the March 1, 1938 Grant.

### 3. The December 23, 1975 Agreement Was Unaffected By Defendants Later Payment Of A Pension To Joanne Siegel And, In Any Event, Was Not An Operative "Superman" Grant

7  The December 23, 1975 Agreement was listed by Plaintiffs in the separate

8  Termination Notice No. 7 out of an abundance of caution, though it did not constitute

9  or contain a copyright grant in Siegel and Shuster's "Superman" works. Toberoff

10  Decl., Exs. M, Y. Moreover, Plaintiffs need not have served and filed Termination

11  Notice No. 7 to have recaptured Siegel's copyright interest in the Original Superman

12  Strips because this was accomplished by Plaintiffs' Termination No. 1 of the

13  operative March 1, 1938 Grant which had assigned all rights therein to Detective.

14  *Siegel*, 508 F.2d at 913-914; 1948 COL, Conclusion No. 1.

15  Yet, Defendants erroneously claim herein that Plaintiff Joanne Siegel's

16  continued receipt of a widow's benefit after the Termination Date effectively

17  reinstated and somehow transformed the December 23, 1975 Agreement into a

18  subsisting "Superman" copyright grant by Siegel and Shuster. FACC, ¶¶ 70-76.

19  The 1974 Action confirmed that Defendants' predecessor, Detective, was

20  assigned all rights in "Superman" by Siegel and Shuster in their March 1, 1938 Grant.

21  *Siegel*, 508 F.2d at 913-914.[8] WCI, to engender good will prior to the release of its

22  first "Superman" movie, nonetheless agreed in the December 23, 1975 Agreement to

23  pay Siegel and Shuster a small monthly stipend. December 23, 1975 Agreement, ¶ 5,

24  Toberoff Decl., Ex. Y. Plaintiffs were not parties to the December 23, 1975

25  Agreement. *Id.*

26

27  ─────────

[8] Additional agreements followed the March 1, 1938 Grant as set forth above which re-affirmed Detective's and then their successors' ongoing ownership of "Superman" as follows: the September 22, 1938 Agreement, the McClure September 22, 1938 Agreement, and the December 19, 1939 Agreement. *See Siegel*, 364 F. Supp. at 1034.

28

1    Tellingly, the December 23, 1975 Agreement specifically acknowledged that

2    the 1974 Action held that WCI already owned all rights to "Superman": "The Court

3    of Appeals unanimously decided that 'all rights in Superman, including the renewal

4    copyright, have passed forever to [National Periodical Publications, Inc., a Warner

5    subsidiary.]'" December 23, 1975 Agreement, ¶ 3, Toberoff Decl., Ex. Y; *see also*

6    *Siegel*, 508 F.2d at 913-914. The December 23, 1975 Agreement therefore

7    acknowledged that the payment to Siegel and Shuster was not a negotiated payment

8    in exchange for a grant of "Superman" rights and specifically stated that WCI had no

9    obligation to make such payment:

10       "4.    Warner does not have any legal obligation to pay you any sum of
         money whatsoever and does not acknowledge that any wrong has been
11       done to you.

12       5.    Warner has nevertheless determined, in consideration for your
         past services to Warner and in view of your present circumstances, to
13       make the following voluntary payments."

14    *Id.*, ¶¶ 4-5. The December 23, 1975 Agreement further provided as follows:

15       "In addition, if Jerry Siegel dies, on or before December 31, 1985, Warner
         will pay his wife, Joanne Siegel, if she survives him, monthly payments at
16       the rate of $20,000 a year, commencing on the date of Jerry's death, and
         ending December 31, 1985, and thereafter monthly payments at the rate of
17       $10,000 a year for the balance of her life."

18    *Id.*, ¶ 5 b. It is undisputed that Jerry Siegel died on January 28, 1996. Thus, Joanne

19    Siegel was not eligible for any payments under the December 23, 1975 Agreement.

20       At Joanne Siegel's request, Warner agreed by letter dated March 15, 1982 that

21    they would pay her a widow's pension if her husband predeceased her. This payment

22    was also voluntary and in no respect tied to any grant of rights in "Superman" or the

23    Original Superman Strips. Toberoff Decl., Ex. FF.

24       Firstly, the December 23, 1975 Agreement, as set forth above, does not contain

25    a grant of any copyrights in "Superman." Toberoff Decl., Ex. U. Secondly, the

26    December 23, 1975 Agreement, as a matter of law, could not have granted copyrights

27    in "Superman" that were already in WCI's possession, as acknowledged by the

28    December 23, 1975 Agreement, itself. This entirely moots Defendants' purported

1  defense. Even in the unlikely event that Joanne Siegel's receipt of her widow's

2  benefit after April 16, 1999 was found to have somehow reinstated the December 23,

3  1975 Agreement, this, at best, could affect only Plaintiffs' Termination of the

4  December 23, 1975 Agreement. Because the December 23, 1975 Agreement did not

5  contain a grant of any rights in "Superman," and certainly did not grant rights in the

6  Original Superman Strips transferred in the March 31, 1938 Grant, this purported

7  reinstatement, no matter how unlikely, would have no affect.

8       The December 23, 1975 Agreement, even if it contained a grant and had been

9  reinstated (it did not and was not)[9], it could not, in any event, effectively assign

10  *Plaintiffs'* termination interest because Plaintiffs *were not parties* to the December

11  23, 1975 Agreement. Additionally, Plaintiffs' reversionary termination interest under

12  Section 304(c) could not have been assigned by Jerome Siegel in 1975 because under

13  the Copyright Act such an interest can not be assigned until "after the notice of

14  termination ha[d] been served [in 1997]." 17 U.S.C. § 304(c)(6)(B),(D).

15       Lastly, if Warner's agreement to pay Joanne Siegel a widow's pension is

16  misconstrued to somehow re-instate the December 23, 1975 Agreement and

17  transform it into a copyright grant such would also contradict the Copyright Act's

18  prohibition that "[t]ermination...may be effected notwithstanding any agreement to

19  the contrary" 17 U.S.C. § 304(c)(5). *See Marvel*, 310 F.3d at 291.

20       **4.    Plaintiffs' Ownership Of The Recaptured Superman**

21            **Copyrights Is Not Barred By The Statute of Limitations**

22       Plaintiffs' claims for declaratory relief as to the validity of their "Superman"

23  Terminations are not barred by the Copyright Act's three year statute of limitations,

24  17 U.S.C. § 507(b), or other statute of limitations, as alleged by Defendants. FACC,

25  ¶¶ 90-96; Answer, ¶ 110.

26  _____

[9] As shown above, Joanne Siegel was not eligible for any payments under the express terms of the

27  December 23, 1975 Agreement because the condition precedent that Siegel "die[], on or before December 31, 1985" did not occur. December 23, 1975 Agreement, ¶ 5 b., Toberoff Decl., Ex. U.

28  It is unlikely that her acceptance today of a pension voluntarily paid by Warner has the effect of reinstating the December 23, 1975 Agreement to which she was not a party. Toberoff Decl., Ex. FF.

### a. **Plaintiffs' Complaint Was Filed Within the**
### **Purported Statute of Limitations**

As shown below, 17 U.S.C. § 507(b)'s three year statute of limitations does not act as a bar to copyright recapture pursuant to 17 U.S.C. §304(c). Notwithstanding this, even if the three year statute of limitations were held to be triggered by a publisher's express repudiation of a §304(c) termination, Plaintiffs nonetheless filed their complaint *before* the statute ran.

As set forth above, Plaintiffs served their Terminations on April 3, 1997 by regular mail and by certified mail, return receipt requested. Toberoff Decl., Exs. G-M. On April 15, 1999, one day before the effective Termination Date, DC sent Plaintiffs a letter (the "April 15, 1999 Letter") "rejecting the scope and validity of the [Terminations]." FACC, ¶ 71. It states in relevant part:

> "[T]he absence of any steps towards negotiation for two years, particularly on the "eve" of the April 16, 1999 purported "effective" date of the termination, leaves us concerned. Thus our client has no alternative *but to move to the stage of putting your clients on clear notice*, as set forth below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights. First, your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices and will vigorously oppose any attempt by your clients to exploit or authorize the exploitation of any copyrights, or indeed any rights at all, in Supe nan."

Toberoff Decl. Ex. Q. (emphasis added).

To facilitate settlement negotiations, the parties entered into a tolling agreement dated April 6, 2000 (the "Tolling Agreement"), effective as of said date, just in case any time based defenses could later be claimed by either side. *Id.* Ex. Z, at ¶ 1. By its express te ns the Tolling Agreement remained in force until:

> "10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices [of Termination]."

*Id.* at ¶ 7.

On September 21, 2002, Plaintiffs sent a letter to DC, indicating that they were

40

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**787**

1   "stopping and ending negotiations with DC Comics, Inc., its parent company AOL

2   Time Warner and all of its representatives and associates, effective immediately."

3   *Id.*, Ex. AA. Consequently, the Tolling Agreement ended "10 business days" later on

4   October 4, 2002. *Id.*

5        The statute of limitations cannot be used to effectively bar Plaintiffs' section

6   304(c) Terminations. However, in the unlikely the statute is even held to apply, it

7   would not start to run until Defendants had communicated to Plaintiffs a *clear* and

8   *express repudiation* of their Terminations. *Aalmuhammed v. Lee*, 202 F.3d 1227,

9   1231 (9th Cir. 2000) (a "plain and express repudiation" is required under § 507(b)).

10       By Defendants' own admission this did not happen until **April 15, 1999**. *See*

11   FACC, ¶ 91 ("effective at least as early as April 15, 1999, Plaintiffs/ Counterclaim

12   Defendants were on notice that DC Comics rejected the Superman Notices."); *see*

13   *also* April 15, 1999 Letter ("our client has no alternative but to move to the next stage

14   of putting your clients on clear notice … that DC Comics rejects both the validity and

15   scope of the Notices"), Toberoff Decl., Ex. Q.

16       Therefore the statute of limitations calculation (to the extent the statute is even

17   applicable) is as follows. Three years equals 1,095 days. April 15, 1999 to April 6,

18   2000 (the date the Tolling Agreement commenced) equals 357 days, with 738 days

19   left to run. Tolling Agreement, ¶ 1, Toberoff Decl., Ex. Z. The Tolling Agreement

20   was in place until October 4, 2002, "ten business days after [Plaintiffs] terminat[ed]

21   negotiations" by letter dated September 21, 2002. *Id.*, ¶ 7; Toberoff Decl., Exs. Z;

22   AA. October 4, 2002 plus the 738 days left to run means the statute, if applicable,

23   would run on October 12, 2004. Thus, to the extent the statute of limitations is even

24   held to run against Plaintiffs' Terminations, they would have had until **October 12,**

25   **2004** to file their complaint in the Superman Action. Plaintiffs timely filed their

26   complaint regarding the "Superman" Terminations on **October 8, 2004**. Toberoff

27   Decl., Ex. X.

28          **b.**     **Strong Policies Disfavor Using The Statute of**

## Limitations To Bar Termination Under § 304(c)

The legislative purpose of the Section 304(c) termination right is to relieve authors "of the consequences of ill-advised and unremunerative grants" to publishers in recognition of the unequal bargaining power between authors and publishers. *Mills Music*, 469 U.S. at 172-73. One could find not better example of this than Siegel and Shuster's March 1, 1938 Grant of "Superman" to Detective for $130 in order to see their work published. Toberoff Decl., Ex. E.

So important are the policies behind this authorial recapture right that it trumps ordinary principles of contract and can be effected simply by the ministerial act of giving notice within a defined time window. *See* 17 U.S.C. §§ 304(d)(1), (c)(4)(A). The importance Congress placed on this statutory recapture right is further evidenced by the concerted safeguards it built into the 1976 Act's termination provisions. *See e.g.*, §304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary"); 17 U.S.C. § 304(c)(6)(B),(D) (reversionary termination interest can not be conveyed to original assignee until "after the notice of termination has been served."). Thus, this recapture right has repeatedly been held to be "inalienable." *Mills Music,* 469 U.S. at 172-73, *quoting* H.R. Rep. at 124; *Stewart v. Abend*, 495 U.S. at 230; *Tasini,* 533 U.S. at 497 (discussed author's comparable termination right under 17 U.S.C. § 203(a)(5)).

Congress surely did not intend that its concerted efforts to safeguard this important recapture right could so easily be foiled by a publisher's predictable denial of a termination notice's validity, allegedly triggering the statute of limitations.[10] This would effectively mean that an author or his family, after waiting 56 years for the termination window to open, would purportedly forever lose their recaptured

---

[10]   Interestingly, if the three year statute of limitations were to apply to Plaintiffs' Termination, then it would appear that any claims by Defendants would be barred as they failed to seek declaratory relief until long after April 3, 2000, i.e., within 3 years of being served with Plaintiffs' Terminations on April 3, 1997. Plaintiffs' Termination surely constitutes a clear and express repudiation of Defendants' exclusive copyright interests in "Superman." *Aalmuhammed,* 202 F.3d at 1231. As mere successors in interest, Defendants do not sit on a higher plain than the statutorily endowed widow and children of "Superman's" co-creator. 17 U.S.C. § 304(c)(1).

42

1  copyright if they did not undertake or, as will often be the case, could not afford to

2  undertake, the enormous expense of full blown litigation, within three years of any

3  repudiation by the publisher, *regardless of its merit. See* 17 U.S.C. §§ 304(d)(1),

4  (c)(4)(A).  Clearly such interpretation contradicts the strong policies underlying the

5  recapture right and its objective of "leveling" the playing field for authors and their

6  families.  *Stewart,* 495 U.S. at 230.

7            c.    **Section 507(b) Is Not A Bar To Copyright Ownership**

8        The Copyright Act's three year statute of limitations, 17 U.S.C. § 507(b),

9  does not eliminate the substantive right of copyright ownership; it only limits a

10  copyright owner's remedies to three years before suit.  In much the same way that a

11  copyright owner does not lose his copyright by failing to sue an infringer within three

12  years, an owner does not lose his copyright interest by failing to request declaratory

13  relief and an accounting within three years.  *Stone v. Williams,* 970 F.2d 1043, 1051

14  (2d Cir. 1992), *cert. denied,* 508 U.S. 906 (1993).

15        A request for declaratory relief under the Copyright Act is "a procedural device

16  used to vindicate substantive rights, it is time-barred only if relief on a direct claim

17  would also be barred."  *Stone,* 970 F.2d at 1048; *see Luckenbach S.S. Co. v. U.S.,* 312

18  F.2d 545, 548 (2d Cir. 1963); *Romer v. Leary,* 425 F.2d 186, 188 (2d Cir. 1970)(in

19  declaratory relief actions, one looks to the underlying coercive claim in applying the

20  statute of limitations).  The coercive relief Plaintiffs' seek is payment of their share of

21  the income earned by the Recaptured Superman Copyrights.  Plaintiffs' property right

22  is violated each time Defendants fail to account to them and the limitations period

23  begins to run regarding that wrong.  *See Shapiro, Bernstein & Co. v. Jerry Music* Co.,

24  223 F.2d 252, 254 (2d Cir. 1955); *Stone,* 970 F.2d at 1051.  Because Plaintiffs'

25  underlying coercive claim for profits from the Recaptured Superman Copyrights is

26  not time-barred, Plaintiffs' procedural claim for declaratory relief is not time-barred.

27        *Stone, supra,* is factually on point and based on controlling law.  *Stone* held

28  that 17 U.S.C. § 507(b) does not bar a declaratory relief action to establish copyright

1   ownership or an accounting action but only limits the damages (past profits) to three

2   years within suit. 970 F.2d at 1051.  While potentially limiting damages, *Stone* held

3   that the statute cannot terminate the substantive right of copyright co-ownership.

4       The plaintiff in *Stone* was the daughter of country singer songwriter Hank

5   Williams, Sr.  In 1985, she filed suit seeking a declaration that she is a one-third co-

6   owner of the renewal copyright to her father's songs and to an accounting of her

7   share of profits from their exploitation. *Id.* at 1046.  Ms. Stone was legally entitled to

8   share in the profits at least six years earlier in 1979.  The district court granted

9   summary judgment holding her barred by § 507(b) because she had notice of her

10  copyright claim more than four years prior to filing her lawsuit. *Id.* at 1047.

11      The Second Circuit *reversed* and held, based on established precedent, that 17

12  U.S.C. § 507(b) cannot be applied to cause the forfeiture of copyright ownership as

13  the statute limits only *remedies* to three years from when suit is filed. *Id.* at 1051.

14  The *Stone* Court expressly rejected the proposition that copyright ownership is

15  forfeited when a co-owner fails to assert her rights within the limitations period. *Id.*

16  at 1050-51; *citing Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.

17  1960), *cert. denied*, 364 U.S. 882 (1960)(upheld owner's failure to assert copyright

18  for 25 years).

19      *Stone* should be applied to the case at bar given the symmetry of facts and legal

20  issues presented in the two cases.  In reversing the lower court, *Stone* addressed the

21  same issue that is before this Court: the application of 17 U.S.C. §507(b) to a

22  declaratory relief action regarding a fractional copyright ownership interest and a

23  request for an accounting, constructive trust and profits.  970 F.2d at 1048; *see* First

24  Amended Complaint, ¶¶ 52-73.  While Ms. Stone's copyright entitlement is based on

25  her status as Hank Williams' daughter under 17 U.S.C. § 304(a), Plaintiffs'

26  entitlement is based on their status as Siegel's widow and daughter, respectively,

27  under 17 U.S.C. §§304(a) and (c), and the exercise of their termination rights under

28  §304(c) by the ministerial act of giving notice.

44

**EXHIBIT 47**

**791**

1  ~~Stone~~ *Stone* correctly relied on "the long established rule" directly applicable to the

2  case at bar that "statutes of limitations bar remedies, not the assertion of rights." *Id.*

3  *at* 1051.  This bedrock principle of law is expressly acknowledged by the Supreme

4  Court: "[A]s a matter of constitutional law...statutes of limitations go to matters of

5  remedy, not to destruction of fundamental rights." *Chase Securities Corp. v.*

6  *Donaldson*, 325 U.S. 304, 314, 89 L.Ed. 1628, 65 S.Ct. 1137 (1944).

7      The Ninth Circuit also holds that "[s]tatutes of limitations generally cut off the

8  remedy without extinguishing the right." *Osmundsen v. Todd Pac. Shipyard*, 755

9  F.2d 730, 733 (9th Cir. 1985).  This "constitutional" principle has been directly

10  applied to the Copyright Act.  In *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 340

11  (5th Cir. 1971), the Court held that 17 U.S.C. § 507(b) "affect[s] the remedy only, not

12  the substantive right" based on the legislative history of its nearly identical

13  predecessor, § 115(b).[11]  Because Plaintiffs' substantive copyright ownership exists

14  *by operation of law*, it can *not* be extinguished by § 507(b).

15      **G.    No Agreement Was Consummated By The Parties Regarding**

16          **Plaintiffs' Recaptured Superman Copyrights Or Recaptured**

17          **Superboy Copyrights As A Matter Of Law**

18      After the within actions were filed by Plaintiffs on October 4, 2004 for a

19  declaration that they had successfully recaptured Siegel's original "Superman" and

20  "Superboy" copyright interests, Defendants claimed *for the very first time* that they

21  purportedly purchased such interests in October, 2001 in a supposed written

22  agreement even though it was clear from the record and the parties' conduct that no

23

---

24  [11] The *Prather* Court referred to Senate Report which stated, "The committee [on the Judiciary]
25  wishes to emphasize that it is the committee's intention that the statute of limitations, contained in
   this bill, is to extend to the remedy of the person affected thereby, and not to his substantive rights."
26  S. Rep. No. 1014, 85th Cong., 1st Sess. 3 (1957).  The House Report stated: "[A]ll state statutes of
   limitation, which now govern the Federal courts in copyright actions, are limitations upon the
27  remedy, and the present bill has been drawn to apply this concept to a uniform Federal period of
   limitations.... Moreover, it was considered that the long-standing fact that both the copyright bar and
28  the courts have become accustomed to a limitation based upon the remedy warranted a continuation
   of this concept in the present bill."  H.R. Rep. No. 150, 85th Cong., 1st Sess. 2 (1957).

45

1  agreement had been made. *See* Counterclaim, ¶¶ 98-105, Answer, ¶¶ 112-113.

2  Three key documents demonstrate that as a matter of law no agreement was

3  ever consummated:  (1) a letter dated October 19, 2001 (the October 19, 2001

4  Letter") from Plaintiffs' then counsel, Kevin Marks ("Marks") to Warner's general

5  counsel, John Schulman ("Schulman"), Toberoff Decl., Ex. BB; (2) a reply letter

6  dated October 26, 2001 from Schulman to Marks, attaching an outline of purported

7  deal terms (collectively, the "October 26, 2001 Letter"), Toberoff Decl., Ex. CC; and

8  (3) a proposed first draft of an agreement sent by Defendants' outside counsel to

9  Marks on February 1, 2002 (the "February 1, 2002 Draft"), Toberoff Decl., Ex. DD.

10  The relevant history is as follows.  In 2000 and 2001 the parties communicated

11  sporadically concerning the potential settlement (*i.e*, purchase or license) of

12  Plaintiffs' Recaptured Superman Copyrights (and regarding another character called

13  "Spectre," not at issue herein).  FACC, ¶¶ 51, 52.  These negotiations became

14  increasingly complex and led to an October 16, 2001 conference between the parties'

15  counsel, Schulman and Marks, in which many different terms, including complicated

16  contingent compensation formulas, were discussed.  Toberoff Decl., Exs. BB, CC.

17  Thereafter, Marks sent Schulman the October 19, 2001 Letter which stated as

18  follows:

19  "The Siegel Family (through Joanne Siegel and Laura Siegel Larson, the
    majority owners of the terminated copyright interests) has accepted D.C.
20  Comics' offer of October 16, 2001 in respect of the "Superman" and
    "Spectre" properties.  The terms are as follows: . . . ."
21

22  Toberoff Decl., Ex. BB, p. 1.  The October 19, 2001 Letter proceeded to set forth

23  financial and other terms and concluded by stating:

24  "*John [Schulman], if there is any aspect of the above that is somehow
    misstated, please let me know*…I will be out of the office…for the
25  following four weeks."

26  *Id.*, at p. 1-6 (emphasis added).

27  Schulman responded to Marks' October 19, 2001 Letter by his October 26,

28  2001 Letter, stating as follows:

46

**EXHIBIT 47**
**793**

"I have received, and have finally had a chance to review, your outline ~~fax of October 19…. *I enclose herewith*~~ for you and Bruce **a more fulsome outline of what we believe the deal we've agreed to is.** We're working on the draft agreement so that by the time you

[return]…we will have this super-matter transaction in document form."

Toberoff Decl., Ex. CC (emphasis added).  As clearly demonstrated below,

Schulman's "*more fullsome outline*" entitled "October 2001 Outline" contained *new or different material terms* than that contained in Marks' October 19, 2001 Letter,

and was never accepted by Marks or Plaintiffs.  *Id.*

Defendants' outside counsel thereafter furnished to Marks the February 1, 2001

Draft – a first draft of a proposed agreement – along with a cover letter dated

February 1, 2002, which stated as follows:

"I am pleased to enclose a ***draft*** agreement between your clients and DC Comics concerning the Superman property. *As our clients have not seen this latest version of the agreement, I must reserve their right to comment.* In addition, you will note that the draft agreement makes reference to certain 'Stand Alone Assignments.'  We are finalizing those and, as soon as they are ready we will forward them to you."

Toberoff Decl, Ex. DD (emphasis added).

~~As demonstrated below, Defendants' February 1, 2002 Draft~~ contained even

more material *new or changed terms* than that contained in Schulman's October 26,

2001 Letter; plus "trap doors" that effectively minimized key financial terms set forth

in Marks' October 19, 2001 Letter.  *Id.*; *see also* Excerpts of Deposition Transcript of

Kevin Marks, at 183:1 - 7, 184:13 - 190:6, Toberoff Decl., Ex. EE ("Marks Depo.

Tr.").  The February 1, 2002 Draft was rejected by Plaintiffs. Toberoff Decl., Ex. AA.

Disappointed and disillusioned by Defendants' overreaching tactics, Plaintiffs

terminated further negotiations by letter dated September 21, 2002. *Id.*  Yet, at no

time prior to the filing of their original Answer and Counterclaim on November 22,

2004 did Defendants ever claim that a binding settlement agreement had been

reached.  Nor did Defendants ever proffer to Plaintiffs the fixed compensation for

Plaintiffs' recaptured copyrights expressed in either the October 19, 2001 Letter, the

October 26, 2001 Letter or the February 1, 2001 Draft. Toberoff Decl., Exs. BB-DD.

47

1    Set forth below is a graph illustrating that their was no "meeting of the minds"

2    between the parties by showing some of the material differences between the terms

3    set forth in Marks' October 16, 2001 Letter, Schulman's October 26, 2001 Letter and

4    Defendants' February 1, 2002 Draft.

| TERMS | OCT. 19, 2001 LETTER | OCT. 26, 2001 LETTER | FEB. 1, 2002 DRAFT |
|---|---|---|---|
| **Scope of Agreement** | Terms applied to Superman, Superboy, & related properties (e.g., Smallville, Lois & Clark) and Spectre ("Property"), and related trademarks. *See October 19, 2001 Letter, Toberoff Decl., Ex. BB ("10/19/01 Letter") at* p.1, ¶ 1; Marks Depo. Tr. at 155:18-19; 184:22-185:1. Toberoff Decl., Ex. EE. | Terms applied to *all* Siegel properties, including but not limited to Superman, Superboy, Spectre, and all rights of all kinds. This included everything Siegel authored for DC (whether published or not) and everything related to Superman/ Spectre (whether created for DC or not). *See October 26, 2001 Letter Toberoff Decl., Ex. CC ("10/26/01 Letter") at p. 2; Marks Depo. Tr. at* 155:25-156:3. Toberoff Decl., Ex. EE. | Terms cover any Siegel work for which he received any compensation from DC or its predecessors, including Superman and Spectre, plus associated trademarks. *See* October 1, 2002 Draft, Toberoff Decl., Ex.DD ("2/1/02 Draft") at pp. 8, 12, 20; Marks Depo. Tr. at 155:25-156:3; 184:13-187:22. Toberoff Decl., Ex. EE. <br><br> This resulted in a "trap door": Plaintiffs' royalty (see below) tied to DC licensing revenues from *Siegel's* works and **failed to include revenues from all derivative Superman properties.** *See* **Marks Depo. Tr. at 184:13-187:22.** |
| **Grant of Rights** | Plaintiffs "transfer all of its rights in the 'Superman' and 'Spectre' properties (including 'Superboy') resulting in 100% ownership to D.C Comics." *See* 10/19/01 Letter at p.3, ¶ 1. | "Grant, re-grant, etc. [of] 100% of rights, wherever created, arising out of Siegel's authorship and/or contributions for DC Comics (whether or not published) including post term. rights as members of the public" and "100% of rights, whenever created, arising out of Siegel's authorship and/or contributions re: Superman, Superboy, Spectre, and related properties - even if not | Grant of all rights in Action Comics No. 1 Superman works, Post Action Comics No. 1 Superman works, Superman Derivative Works, and all Superman Marks; all rights in the Spectre Works, the Post More Fun Comics Spectre Works, the Spectre Marks; and all rights in all other Siegel Works. *See* 2/1/02 Draft at pp. 13-20. <br><br> Termination of all past grants and re-grant of all rights in Superman, Superboy, |

48

**EXHIBIT 47**
**795**

| | | | created for DC Comics." *See* 10/26/01 Letter at p.2 | Spectre, as well as granting all rights in any other work ever created by Jerome Siegel. *See* 2/1/02 Draft at p. 14.<br><br>Plaintiffs must acknowledge that they do not have rights and will never have rights in any post-Action Comics No.1 Superman works and that all such works are [purportedly] "works made for hire" *See* 2/1/02 Draft at pp. 14-15. |
| **Gross Revenue Definition for Royalty Payments** | 6% of DC's "worldwide gross revenues derived from Property." *See* 10/19/01 Letter at p.1, ¶ 2. | "6% of DC's receipts from all Media licenses for use of the Properties," subject to substantial additional reductions of the royalty rate (see below). *See* 10/26/01 Letter at pp. 5-6. | 6% of "amounts actually received" by DC "in United States Dollars" from "Licensing." Revenues "shall not include any sums received by DC Comics for providing any services or materials in connection with the licensing of rights in the SUPERMAN Property or SPECTRE Property" even though the 6% royalty rate already accounted for DC's services. *See* 2/1/02 Draft at p. 9, ¶ 24; Marks Depo. Tr. at 188:17-189:13.<br><br>Advances against royalties paid to DC by a licensee only become Revenues when the advance becomes non-returnable. *See* 2/1/02 Draft at p. 9, ¶ 24.<br><br>Revenues only derived from "Licensing," which refers to DC "authorizing any third party to commercially exploit" Superman/Spectre. *See* 2/1/02 Draft at p. 9, ¶ 23. |
| **Royalty re: Media and Merchand-ising** | 6% royalty when property is used alone or is licensed for motion picture and | Added new categories where 6% royalty could be *further reduced.* *See* 10/26/01 Letter at pp. | Added new categories where the 6% royalty could be *further reduced. See* 2/1/02 Draft at pp. 23-24: |

49

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

| | | | |
|---|---|---|---|
| | television. 6% royalty will be adjusted pro-rata if property is used in conjunction with other book characters (other than "cameo" type appearance) but no less than 3%. The royalty can be further reduced to 1.5% in the case of "Justice League of America," "Superfriends" and "Superheroes" merchandise and to 1% for DC Comics/Warner Bros.' overall license to Six Flags. *See* 10/19/01 Letter at p. 2, ¶ 5; Marks Depo. Tr. at 158:4-159:5. | 5-6: "[W]ith respect to licenses wherein the licensee is granted rights to utilize a number of DC properties as well as the Properties DC shall allocate the income from the license based on the actual sales of individual products based on information reasonably available from the license, but to the extent such information is not available, the 6% shall be reducible to not less than 1%." *Id.* "[W]ith respect to merchandise actually produced by DC Comics, an allocable portion of the revenue, consistent with licensed merchandise produced by third parties, shall be deemed DC Comics' revenue for purposes of royalty computation." *Id.* | Revenues to which reduced 1.5% royalty applicable are much broader, encompassing all products where Superman / Spectre is not "predominant creative element" nor the "sole predominant identity or title." *See* 2/1/02 Draft at pp. 24;  Marks Depo. Tr. at 159: 10-12. Revenues to which reduced 1% royalty applicable broadened to include not only Six Flags but "other Licenses where Revenues from such Licenses are not specifically attributed to royalties earned by the sale of character merchandise that can be directly allocated either to the SUPERMAN property and/or SPECTRE Property or to other properties in which THE PLAINTIFFS do not share..." *See* 2/1/02 Draft at p. 25. Added term that only "10% of Revenue, less costs, and subject to pro rata allocations" from merchandise "actually produced" by DC "shall be deemed DC Comics' Revenues for purposes of royalty computation." *See* 2/1/02 Draft at pp. 24-25. Added term that there is no payment obligation for use of Properties in Time Warner advertising. *See* 2/1/02 Draft at pp. 27-28. |
| **Royalty re: DC Publications** | 1% of cover price of DC publications when Property is | Changed the works to which the 0.5% royalty rate is applicable. Instead | Changed the works to which the 0.5% royalty rate is applicable. Instead of paying |

50

| | | | |
|---|---|---|---|
| | used alone. Adjusted pro-rata when the Property is used in conjunction with other comic book characters (other than "cameo" appearance), but in no event less than 0.5%." *See* 10/19/01 Letter at pp. 2-3, ¶ 6. | of paying a minimum 0.5% royalty anytime Superman or Spectre appear: "[T]here will be no royalties payable hereunder when the Properties appear in publications or stories based on other properties and the Properties' characters do not appear in the title of the publication or feature in question" *See* 10/26/01 Letter at p. 6. | a minimum 0.5% royalty anytime Superman or Spectre appear: "[T]here will be no royalties payable hereunder when the SUPERMAN Property and/or the SPECTRE property appear in publications or stories based on other properties and the Properties' characters do not appear in the title of the publication or feature in question." *See* 2/1/02 Draft at p. 27. Added that no royalties are paid on units "returned, damaged, lost, distributed by DC as premiums or promotions and/or distributed to uncollectible accounts or sold at discounts in excess of seventy percent off of cover price." *See* 2/1/02 Draft at p. 9. |
| Royalty Extension ("Tail") | Royalty payments cease at the expiration of the Action Comics No. 1 copyright, except for 1) films released during last five years of the copyright (royalties paid for 5 years from release), 2) TV series where royalties would be paid until the end of consecutive original episodes plus 3 years (to cover first syndication sale), and 3) "other substantial projects" (akin to motion picture and TV projects) released during the last 5 years | Royalty payments extended only for film and TV projects for same periods, but not "other substantial projects." *See* 10/26/01 Letter at p. 6. | Royalty payments extended only for film and TV projects for same periods, but not "other substantial projects." *See* 2/1/02 Draft at p. 27. Royalties limited to revenues from direct "Licensing of exhibition and/or broadcast rights to the above motion pictures and television series," not to the associated "sale of any goods or provision of any services ancillary or collateral thereto. *See* 2/1/02 Draft at p. 27. |

51

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

**798**

| | | | |
|---|---|---|---|
| | of copyright (royalties paid for 5 years from release). *See* 10/19/01 Letter at p.3, ¶ 9. | | |
| **Right to Challenge Intra-Company DC Licensing (e.g., licenses to WB)** | Expedited dispute resolution procedure for challenging intra-company deals which fall outside "safe harbors." *See* 10/19/01 Letter at p.5, ¶ 10. | "Expedited dispute resolution procedure" applies to "any claims or between the parties." Plaintiffs limited to monetary damages only, "no injunction against DC/WB breaches, no termination rights, no reversion. DC Comics/Warner Bros. can get equitable relief against Siegels' or third parties' exploitations or other breach." *See* 10/26/01 Letter at p. 7. | Plaintiffs are to acknowledge "their awareness and acceptance that DC COMICS, in the normal course of its operations, does business on an arm's length basis with AOLTW Companies and, in doing so, may License, inter alia, the SUPERMAN Property." The Plaintiffs "shall have no right whatsoever to challenge any such license or any of the terms thereof" subject to safe harbor provisions. For "intercompany" agreements not covered by safe harbor provisions, Plaintiffs' may challenge agreement only on basis "that the agreement is not commercially reasonable and fair in light of all the circumstances." *See* 2/1/02 Draft at pp. 32-35. |
| **Credit** | "Until expiration of the U.S. Copyright for Action Comics No. 1, there will be credit on 'Superman' comics and other publications, movies and television programs that reads 'By Special Arrangement with Jerry Siegel Family.'" *See* 10/19/01 Letter at p.4, ¶ 3. | Such credit "on Superman movies and TV shows first created after the date hereof (excluding later episodes of ongoing tv series)." *See* 10/26/01 Letter at p. 7. | Such credit "on new [Superman] works…first created after the effective date hereof (excluding later episodes of ongoing television series) and initially released during the term of copyright of Action Comics No. 1." *See* 2/1/02 Draft at p. 39. |
| **Credit To Plaintiffs in "Paid Ads"** | Terms provided for credit to Plaintiffs in "paid ads" concerning the Properties. *See* | Terms do <u>not</u> provide for credit to Plaintiffs in "paid ads." *See* 10/26/01 Letter at p.7; Marks Depo. Tr. at 161:12-20. | Terms do <u>not</u> provide for credit to Plaintiffs in "paid ads." *See* 2/1/01 letter at pp. 39-40; Marks Depo. Tr. at 161:12-20. |

| | | | |
|---|---|---|---|
| | 10/19/01 Letter at p.4, ¶ 4. Marks Depo. Tr. at 161:12-20. | | |
| **Continuing relationship/ Publicity** | Provided only for mutual non-disparagement. *See* 10/19/01 Letter at p.5, ¶ 13. | New terms that Plaintiffs must furnish DC with Jerry Siegel's biography and photos for publicity purposes, and that AOLTW companies would get "first opportunity to negotiate for any biographical works in any media" by the Plaintiffs. *See* 10/26/01 Letter at p. 2; Marks Depo. Tr. at 157:4-8.<br><br>New terms imposing an affirmative obligation on the Plaintiffs to "positively publicize the Properties," including "public appearances" and related "travel," in the future. New terms included Plaintiffs issuing "a joint press release" and "consulting with DC prior to any personal appearances, written statements, interviews, or other activities they may wish to conduct relating to the Properties." *See* 10/26/01 Letter at p. 2; Marks Depo. Tr. at 157:19-158:3. | New terms regarding continuing relationship and Plaintiffs' publicity obligations:<br><br>1) Plaintiffs have obligation to positively publicize Properties, including making themselves available for public appearances/ travel; 2) DC consent required for all appearances, statements, interviews by Plaintiffs regarding Superman, etc; 3) Plaintiffs must issue joint press release with DC; 4) No contact by Plaintiffs with DC licensees is permitted. *See* 2/1/02 Draft at p. 37; Marks Depo. Tr. at 157:19-158:3.<br><br>New terms providing DC or its designee with "the first opportunity to negotiate" to buy "any biographical works in any media pertaining to Jerome Siegel." *See* 2/1/02 Draft at p. 41; Marks Depo. Tr. at 157:19-158:3. |
| **Attorney in Fact** | Appoints DC as attorney in fact. *See* 10/19/01 Letter at p. 5, ¶ 12. | Plaintiffs "will designate WB as attorney in fact." *See* 10/26/01 Letter at p. 2 | Appoints DC as attorney in Fact. *See* 2/1/01 letter at p. 36. |
| **Provide Rights Documents** | Not mentioned. | New term that Plaintiffs "[g]ive copies of all documents relating to rights/history." *See* 10/26/01 Letter at p.2. | Not mentioned. |

53

**EXHIBIT 47**
**800**

| | | | |
|---|---|---|---|
| 1 | | *See* Marks Depo at 156:20-157:3. | |
| 2–7 | **Release and Covenant Not To Sue** | Not mentioned. | Adds "[r]elease and covenant not to sue by [Plaintiffs] [t]hrough date of signing of all claims past, present, and/or future, actual or potential." Adds that Plaintiffs "[a]pprove all deals made before 12/31/00." *See* 10/26/01 Letter at p. 8. | Adds full detailed mutual release by the parties and mutual covenants not to sue. *See* 2/1/02 Draft at pp. 42-45. |
| 8–28 | **Plaintiffs' Warranties & Represent-ations** | "Siegel Family would not make any warranties as to the nature of rights, but would represent that they have not transferred the rights to any party." *See* 10/19/01 Letter at p.5, ¶ 13. *See also* Marks' Depo. at 156:6-10. | Changed terms requiring that the Plaintiffs "warrant and represent," "jointly and severally": 1) that they have "no termination nor any other rights remaining except for under this agreement;" 2) that they have entered into "no contract of any kind with any other party with respect to or related to the Properties;" 3) that they will not "exploit or enter into any agreements" re: the Properties; and 4) that they will not "diminish the DC/WB enjoyment of exclusive ownership, control, and use" of the Properties. *See* 10/26/01 Letter at p. 2; Marks' Depo. at 156:6-10. | Changed terms that Plaintiffs warrant and represent, jointly and severally, that: 1) Plaintiffs or Siegel have not granted any rights in or encumbered the Properties; 2) "they know of no other party with any rights of any kind or that claim to any rights of any kind" in the subject works or trademarks; 3) they shall not negotiate or enter into any agreement concerning the subject works; 4) any of their rights in the works derive from Siegel; 5) "no person or entity other than [Plaintiffs/DC] own any rights or could possibly claim any rights of any nature arising out of any [Siegel] Works;" 6) they know of no other Siegel works in which they claim any rights; 7) they know of no Superman works not listed in the Termination Notices; 8) that Joanne Siegel is the sole executor, trustee, administrator, and personal rep. of the Siegel Estate. *See* 2/1/02 Draft at pp. 41-42; Marks' Depo. at 156:6-10. |

54

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**

| | | | New terms affirming that Plaintiffs have no right to challenge the agreement; and that Plaintiffs have no right to terminate any new grant of the Siegel works. *See* 2/1/02 Draft at pp. 30-31. |
|---|---|---|---|
| **Indemnification and Insurance Coverage** | "Full E&O and general liability coverages and full indemnities for Joanne Siegel, Laura Siegel Larson against liability for DC or affiliate actions." *See* 10/19/01 Letter at p. 5, ¶ 14. *See also* Marks Depo. Tr. *at* 160:21-25. | Terms do <u>not</u> provide Plaintiffs E&O and general liability coverage.<br><br>Indemnification of Siegels who sign the agreement.<br><br>Instead, added new terms that Plaintiffs must "defend and indemnify DC re: third party claims," "defend and indemnify DC re: Dennis [Larson] claims and "indemnify re: Michael Siegel for all expenses, costs, any reasonable settlement or get Michael Siegel to sign." *See* 10/26/01 Letter at p.8; Marks Depo. Tr. at 156:14-19; 160:21-25. | Terms do not obligate DC to provide Plaintiffs E&O and general liability coverage.<br><br>Indemnification of Siegel family members that sign the agreement "due to wrongful acts by [DC or WB]. *See* 2/1/02 Draft at p. 46.<br><br>**Added broad new terms that Plaintiffs must jointly and severally defend and indemnify DC for any/all :** 1) claims by DC against Plaintiffs arising from a breach or claimed breach by Plaintiffs "(or any of the successors, assigns, heirs, estates, trustees, administrators or executors of Jerome Siegel);" 2) **claims by** Plaintiffs, the estate and heirs of Siegel, Dennis Larson, or **any other person or entity; including "any claims relating to [Plaintiffs'] representations and warranties"** [see above]; and Plaintiffs **obligation to indemnify is "fully binding regardless of whether any of the...claims [etc.]...are founded, valid, established in law or fact, or based on evidence."** *See* 2/1/02 Draft at pp. 45-46; Marks Depo. Tr. at 156:14-19; 160:21-25. |
| **If Rights Not Transferred** | If transfer prevented for "legal reason" (e.g., change in law), | Changed term. In the event Plaintiffs "attempt to assert claims, all but | Changed term. In the event Plaintiffs rights grant is ineffective or Plaintiffs make |

55

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**802**

| | | | | |
|---|---|---|---|---|
| | | "everything in this deal applies as a prepayment to any future transfer, except $100,000 per year would not be applicable against the compensation (if any) for a future transfer…For the sake of clarity, this provision will not in any circumstances reduce the monies due the Siegel Family under this deal." *See* 10/19/01 Letter at p. 3 ¶ 2. | $100,000/year creditable to any other obligation WB has or may have to Siegels. If any claim by Plaintiffs or successor results in DC expense or liability, compensation (over $100,000 annually) will be reduced thereby, and "only total due hereunder is ever due." *See* 10/26/01 Letter at p. 8. | a claim or have reversionary rights, resulting in any liability or damage to DC, any amounts due Plaintiffs will thereby be reduced (except $100,000 annually). Plaintiffs must acknowledge that the amount payable is more than they would have received in a court if they attempted to enforce their termination notices, and agree that any compensation payable to them, including due to a change in the law, will be capped by the amount payable in the agreement. *See* 2/1/02 Draft at pp. 48-49. |
| **Arbitration Provisions** | Expedited dispute resolution in one instance: "if the Plaintiffs were to challenge an intercompany deal that was outside a safe harbor." *See* 10/19/01 Letter at p.5, ¶10; Marks Depo. Tr. at 159:17-19. | Terms broadly require expedited dispute resolution / arbitration of "any claims between the parties." *See* 10/26/01 Letter at p. 8; Marks Depo. Tr. *at* 159:21-23. | Terms broadly require arbitration of any and all disputes and limits the remedies available to the Plaintiffs. *See* 2/1/02 Draft at pp. 47-50; Marks Depo. Tr. *at* 159:21-23. | |
| **Audit Rights** | Plaintiffs have "full audit rights." *See* 10/19/01 Letter at p.5, ¶ 10. | Plaintiffs have audit rights subject to "[s]tandard WB language and time frames" and limitation of "[o]ne audit per any period." *See* 10/26/01 Letter at p. 7. | Plaintiffs have audit rights subject to new limitations: 1) No audit will begin later than 12 months after royalty statement provided; 2) No audit for longer than 5 business days; 3) Records supporting any royalty statement may not be audited more than once; 4) All statements binding unless majority of Plaintiffs object in writing within 12 months of receipt of statement, or if audit started, within 30 days of completion; 5) Plaintiffs audit at their own expense; and | |

56

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**803**

| | | | 6) Confidentiality provisions. *See* 2/1/02 Draft at pp. 35-36. |
|---|---|---|---|

1.     **The October 19. 2001 Letter Constitutes A Counteroffer That Was Not Accepted By Defendants**

In a nutshell, Marks' October 19, 2001 Letter though styled as an "acceptance" of Schulman's "offer" of October 16, 2001 is, in reality, a "counteroffer" because, according to Schulman and his "more fulsome outline" something different was discussed on October 16, 2001 ("I enclose herewith… a more fulsome outline of what we believe the deal we've agreed to is.")   Toberoff Decl., Ex. CC. The October, 2001 Outline attached by Schulman, which purported to be Defendants' October 16, 2001 "offer," contained materially different terms (more favorable, of course, to Defendants) than that contained in the purported October 19, 2001 "acceptance." Therefore, Marks' October 19, 2001 Letter was, in reality, a counteroffer. It was not accepted by Schulman, and did not result in a contract as a matter of law.

The terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. *Panagotacos v. Bank of America*, 60 Cal App 4th 851, 855-856 (1998); *Apablasa v. Merritt & Co.*, 176 Cal. App. 2d 719, 726 (1959). A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror which must be accepted by the former offeror now turned offeree before a binding contract results. *Panagotacos*, 60 Cal App 4th at 855-856; *In re Pago Pago Air Crash*, 637 F.2d 704, 706 (9th Cir. 1981); *Landberg* v. *Landberg* 24 Cal.App.3d 742, 750 (1972); Cal. Civ. Code § 1585 ("An acceptance must be absolute and unqualified…A qualified acceptance is a new proposal.") *See also 1-3 Corbin on Contracts § 3.36 (2006)*(a counter-offer ordinarily terminates the power to accept the previously made offer to which it is a "counter" or reply in a negotiation.)

In *Glendale Motor Co. v. Superior Court*, 159 Cal.App.3d 389 (1984), where a settlement agreement was claimed, the court held that plaintiff's qualified acceptance

57

1  constituted a counteroffer and thus terminated the defendant's settlement offer as a

2  matter of law.  The court noted that "California law has generally held that a qualified

3  acceptance or counteroffer affects the viability of the offer itself, so that 'a qualified

4  acceptance amounts to a new proposal or counteroffer *putting an end to the original*

5  *offer.*'" *Id.* at 396, *quoting Apablasa* v. *Merritt & Co.* 176 Cal.App.2d at 726.

6         In *Smith v. BioWorks, Inc.*, 2007 LEXIS U.S. Dist. 6157 at *27 (ED CA 2007)

7  the court held that the plaintiff's reservation and assertion of rights evidenced that "he

8  signed the Agreement with the proviso that he did not accept certain terms.  Because

9  plaintiff's letter constituted only a qualified acceptance, no binding contract was

10  formed, and the rejection terminated defendant's offer.  Defendant's response letter,

11  dated January 10, 2005, does not indicate an acceptance of plaintiff's counter-offer."

12         **2.    No Contract Was Formed Because There Was Never A**

13              **"Meeting Of The Minds" On All Material Terms**

14         "California law is clear that there is no contract until there has been a meeting

15  of the minds on *all* material points." *Banner Entnm't v. Superior Court*, 62 Cal. App.

16  4th 348 (1998) (citations omitted).  The failure to reach a meeting of the minds on all

17  material points prevents the formation of a contract even though the parties have

18  orally agreed upon some of the terms, or have taken some action related to the

19  contract.  *Grove v. Grove Valve & Reg. Co.*, 4 Cal. App. 3d. 299, 311-312 (1970).

20         Here, Schulman's March 26, 2001 Letter made clear ("I enclose… a more

21  fulsome outline of what we believe the deal we've agreed to is") and Defendants'

22  February 1, 2002 Draft further confirmed that there had been no "meeting of the

23  minds" between the parties and widened the gap between them by changing material

24  terms and adding new material terms than that set forth in Marks' October 19, 2001

25  Letter (counteroffer). *See* Comparison Graph, *supra*; Toberoff Decl., Exs. BB- EE.

26         An essential element of any contract is "consent." Civ. Code, § 1550; 1

27  Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 6, p. 44.  Such "consent"

28  must be "mutual." Cal. Civ. Code, § 1565; 1 Witkin, Summary of Cal. Law,

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**805**

1  Contracts, § 119, p. 144; *Meyer v. Benko*, 55 Cal. App. 3d 937 (1976). Consent is

2  not mutual, unless the parties agree upon the same thing in the same sense. *Banner*

3  *Entertainment, Inc. v. Superior Court*, 62 Cal.App.4th 348, 358-359 (1998). There is

4  no contract formation without a manifestation of assent to the "same thing" by both

5  parties. Cal. Civ. Code, §§ 1550, 1565 and 1580.  Contract law precludes specific

6  enforcement of a contract when it cannot be determined exactly what terms the

7  parties agreed upon. *Weddington Prods. v. Flick*, 60 Cal. App. 4th 793, 801 (1998).

8       The Ninth Circuit has made clear that district courts "may enforce only

9  complete settlement agreements." *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987).

10 *See also Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983); *Gardiner v. A.H.*

11 *Robins Co.*, 747 F.2d 1180, 1189 (8th Cir. 1984).

12      "In addition to the intent of the parties to bind themselves, the formation of a

13 settlement contract requires agreement on its *material terms*." *Callie v. Near*, 829

14 F.2d at 891.  In *Callie*, the appellants' counsel wrote a letter to the other side "'to

15 confirm' the terms of the settlement" as the parties were in agreement as to most

16 material terms, including the settlement payment. *Id.*, at 889.  However, because they

17 failed to agree on other terms, there could be no "meeting of the minds." *Id.*, at 891.

18      *Levitz v. The Warlocks*, 148 Cal. App. 4th 531, 534 (2007) is also illustrative.

19 In ruling that a settlement agreement had not been reached although key terms had

20 been agreed upon the Court held:

21       "In their first communication with the court about their tentative
         settlement, the parties notified it they had a settlement "in principle,"
22       meaning they had yet to fix its exact terms.  A settlement with open
         material terms is not a "conditional settlement."  To the contrary, it is not
23       a settlement at all because, like all contracts, it is not binding until the
         settling parties agree on all its material terms."
24

25      In this case no contract was made because the parties attempted, but failed, to

26 agree on all material terms (see above).  Moreover, even had they provisionally so

27 agreed (they did not) it is clear from their conduct that, given the importance and

28 complexity of the subject matter and proposed deal points, any agreement would need

59

1   to be reduced to a written contract in a mutually acceptable fashion.  See October 26,

2   2006 Letter ("We're working on the draft agreement…").  Toberoff Decl., Ex.CC.

3        **3.**     **A Complete Written Agreement In Final Form, Signed By**

4                **Both Parties, Was Contemplated But Never Completed,**

5                **Approved Or Executed**

6           It is further evident that the parties contemplated a complete written agreement

7   in final form, which would contain additional terms, subject to the parties' mutual

8   consent; and that there would be no binding contract until such final written

9   agreement was reviewed, approved and executed by both parties.  *See* Cover letter

10  attaching Defendants' February 1, 2002 Draft ("As our clients have not seen this

11  latest version of the agreement, I must reserve their right to comment"), Toberoff

12  Decl., Ex. DD.  *See Patch v. Anderson,* 66 Cal. App. 2d 63 (1944)(court found no

13  enforceable written contract, merely an agreement to execute a contract whose

14  material terms had not all been settled and agreed upon); *see also* 1 Williston on

15  Contracts (4th ed. 1990) § 4:18, at 414; § 4:26, at 585-7.

16          "When it is clear…that both parties contemplated that acceptance of the

17  contract's terms would be signified by signing it, the failure to sign the agreement

18  means no binding contract was created." *Weddington*, 60 Cal. App. 4th at 801, *citing*

19  *Beck v. Amer. Health Group Intern., Inc.*, 211 Cal. App. 3d 1555, 1562 (1989).  Thus,

20  "it is a general rule…that, when it is a part of the understanding between the parties

21  that the terms of their contract are to be reduced to writing and signed by the parties,

22  the assent to its terms must be evidenced in the manner agreed upon or it does not

23  become a binding or completed contract." *Duran v. Duran*, 150 Cal. App.3d 176, 180

24  (1983) (citations omitted).  *See also Roth v. Garcia Marquez*, 942 F.2d 617, 626-627

25  (9th Cir. 1991); *Forgeron, Inc. v. Hansen*, 149 Cal. App. 2d. 352, 360 (1957).

26          "Preliminary negotiations or an agreement for future negotiations are not the

27  functional equivalent of a valid, subsisting agreement.  'A manifestation of

28  willingness to enter into a bargain is not an offer if the person to whom it is addressed

**EXHIBIT 47**
**807**

1  knows or has reason to know that the person making it does not intend to conclude a

2  bargain until he has made a further manifestation of assent.'" *Kruse v. Bank of*

3  *America*, 202 Cal. App.3d 38, 59 (1988) (citations omitted).

4      *Weddington*, 60 Cal. App. at 799, like this case, concerned a disputed

5  settlement agreement which purported to license certain *copyrights*. The parties *both*

6  *signed* a settlement memorandum before a private settlement judge that, like the

7  October 19, 2001 Letter here, included "significant deal points," and described

8  payment dates and amounts material to both sides. *Id*. When, as here, subsequent

9  disagreements arose during the parties efforts to draft the final settlement agreement,

10  the settlement judge, upon application of the putative licensee, signed an expanded

11  settlement order (under Cal. Civ. Proc. Code § 664.6), imposing a copyright license

12  "consistent with" the signed settlement memorandum; which order was entered by

13  the trial court. *Id*. at 804.

14      The Court of Appeals reversed, holding that no "meeting of the minds"

15  occurred on the material terms of the contract, and that a final agreement had not

16  been signed by the parties. "As a result, there was no settlement agreement to

17  enforce, pursuant to Cal. Civ. Proc. Code § 664.6 or otherwise." *Id*. at 812. The

18  court noted: "The fact that the context was one of settlement negotiation…has no

19  analytical impact on the question of whether an enforceable contract was ever

20  formed." *Id*. at 815. It further noted that a court does not have the authority to create

21  material terms of a settlement. *Id*. at 810-811. *See Terry v. Conlan*, 131 Cal. App.

22  4th 1445, 1459-1461 (2005) (trial court improperly attempted to define material terms

23  and fill in the gaps of a settlement agreement).

24      Here, the documentary evidence and conduct of the parties clearly

25  demonstrates that there was no meeting of the minds as to all material terms of an

26  agreement, and that as a matter of law a binding contract was never reached,

27  completed, approved and executed by the parties.

28

61

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**EXHIBIT 47**
**808**

IV.    CONCLUSION

     For the foregoing reasons, Plaintiffs respectfully requests that the Court grant their motion for summary adjudication in the form lodged separately herewith as the Proposed Judgment.

DATED: April 30, 2007       LAW OFFICES OF    ARC TOBEROFF, PLC

By _____

               Marc Toberoff

Attorneys for Plaintiffs JOANNE SIEGEL
and LAURA SIEGEL LARSON

62

**EXHIBIT 47**
**809**

1                                     **PROOF OF SERVICE**

2                     STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I am employed in the County of Los Angeles, State of California. I am over the age of eighteen
years and not a party to the within action; my business address is: 2049 Century Park East, Suite 2720,

4 Los Angeles, California 90067.

5        On April 30, 2007, I served the attached documents described as:

6              **Plaintiffs Joanne Siegel and Laura Siegel Larson's Notice of Motion And Motion
For Partial Summary Judgment**

7

8              **Plaintiffs Joanne Siegel and Laura Siegel Larson's Memorandum of Points And
Authorities in Support Of Motion For Partial Summary Judgment**

9              **Declaration of Marc Toberoff In Support of Plaintiffs' Motion For Partial
Summary Judgment**

10

11              **Plaintiffs Joanne Siegel and Laura Siegel Larson's Statement of Uncontroverted
Facts And Conclusions of Law in Support of Motion for Partial Summary
Judgment**

12

13              **Plaintiffs Joanne Siegel and Laura Siegel Larson's Request For Judicial Notice In
Support of Motion For Partial Summary Judgment**

14              **[Proposed] Order Following Partial Summary Judgment**

15 as follows:

16    [X] :BY HAND:

17        As follows: I delivered to the address listed above by hand the documents listed herein.

18        Michael Bergman
       WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP

19        9665 Wilshire Boulevard, Ninth Floor
       Beverly Hills, CA 90212

20

21    [X] :BY MAIL:

22        As follows: I am "readily familiar" with the firm's practice of collection and processing
correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on
that same day with postage thereon fully prepaid at Los Angeles California in the ordinary course of

23 business. I am aware that on motion of the party served, service is presumed invalid if postal
cancellation date or postage meter date is more than one day after date of deposit for mailing in

24 affidavit. I placed ____ the original _X_ a true copy thereof enclosed in sealed envelope(s) addressed
as follows:

25

26        James D. Weinberger
       FROSS ZELNICK LEHRMAN & ZISSU, P.C.

27        866 United Nations Plaza
       New York, NY 10017

28    [X] :BY FACSIMILE:

**EXHIBIT 47**
**810**

1    As follows: I caused the transmission of the above named documents to the fax number set forth below, or on the attached service list.

2

3    James D. Weinberger
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
866 United Nations Plaza

4    New York, NY 10017
Facsimile No. 212-813-5901

5    Patrick T. Perkins

6    PERKINS LAW OFFICE, P.C.
1711 Route 9D

7    Cold Spring, NY 10516
Facsimile No. 845-265-2819

8    Michael Bergman

9    WEISSMAN WOLFF BERGMAN COLEMAN GRODIN & EVALL LLP
9665 Wilshire Boulevard, Ninth Floor

10   Beverly Hills, CA 90212
Facsimile No. 310-550-7191

11   :(STATE) - I declare under penalty of perjury under the laws of the State of California that the

12   above is true and correct.

13   [X] :(FEDERAL) – I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

14   I declare under penalty of perjury that the foregoing is true and correct.

15   EXECUTED on April 30, 2007, in Los Angeles, California.

16

17                                                    Nicholas C. Williamson

18

19

20

21

22

23

24

25

26

.7

28

**EXHIBIT 47**
**811**

# EXHIBIT 48

LAW OFFICES

## RENNER, OTTO, BOISSELLE & SKLAR, LLP

1621 EUCLID AVENUE, NINETEENTH FLOOR
CLEVELAND, OHIO 44115-2191
TEL: (216) 621-1113   FAX: (216) 621-6165
EMAIL: MailRoom@RennerOtto.com

JOSHUA M. RYLAND
JRYLAND@RENNEROTTO.COM

February 18, 2008

**VIA ECF**

The Honorable Solomon Oliver, Jr.
United States District Court Judge
Carl B. Stokes United States Court House
801 West Superior Avenue
Cleveland, Ohio 44113-1838

Re:   *Joanne Siegel, et al. v. Warner Bros. Entertainment, Inc.*
      U.S. District Court for the Northern District of Ohio, Case No. 1:06-MC-99

Dear Judge Oliver:

I am writing to clarify which counsel and party will be asserting the attorney-client privilege and filing documents responsive to Your Honor's Order of February 6, 2008. That Order required Don Bulson to submit a revised privilege log, produce the documents on that log to the Court, and appear for deposition. Marc Toberoff, counsel in the underlying action for Joanne Siegel and Laura Siegel, will make all required filings on behalf of the estate of Michael Siegel—not Mr. Bulson.

Mr. Bulson and his firm represented Michael Siegel, now deceased, but do not represent any party involved in the underlying litigation and no longer possess the original documents at issue. After Michael Siegel's passing, the administrator for Mr. Siegel's estate, Melvin Banchek, instructed Mr. Bulson to communicate with Marc Toberoff regarding the instant subpoena. Accordingly, Mr. Bulson understands that any attorney-client privilege is not his to assert. Instead, Mr. Toberoff is asserting the attorney-client privilege on behalf of Michael Siegel's estate and Laura Siegel as his sole heir and successor.

Mr. Bulson's sole goal in this matter is to comply with the Court's Order in every respect. Thus, Mr. Bulson will take *no position* regarding privilege over these documents or his deposition testimony but will honor Ms. Siegel's and/or Mr. Banchek's assertions of attorney-client privilege unless instructed by the Court to do otherwise. To that end, Mr. Toberoff and his firm will be solely responsible for drafting and filing any revised privilege log and the production of documents. Mr. Bulson, of course, will make himself available for deposition in accord with Your Honor's Order.

**EXHIBIT 48**
**812**

The Honorable Solomon Oliver, Jr.
Case No. 1:06-MC-99
February 18, 2008

 

 

 

Should Your Honor require any additional clarification or wish to address this matter further, Mr. Bulson will cooperate in any way requested.

Respectfully submitted,

Joshua M. Ryland
Counsel for Don Bulson

**EXHIBIT 48**

# EXHIBIT 49

# LAW OFFICES OF MARC TOBEROFF

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 2720
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* ALSO ADMITTED IN NEW YORK

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

February 19, 2008

<u>Via Federal Express</u>

The Honorable Solomon Oliver, Jr.
United States District Court Judge
Carl B. Stokes United States Court House
801 West Superior Avenue
Cleveland, Ohio 44113-1838

Re:    *Joanne Siegel, et al. v. Warner Bros. Entertainment Inc., et al.*
       <u>U.S. District Court for the Northern District of Ohio, Case No. 1:06-MC-99-SO</u>

Dear Judge Oliver:

In compliance with Your Honor's February 6, 2008 order in the above-captioned matter, enclosed please find the 15 privileged communications (bates numbered DB001-DB044) which Movants still insist must be inspected *in camera.*

Joanne Siegel and Laura Siegel Larson ("Plaintiffs") are the widow and daughter, respectively, of Jerome Siegel, the co-author of the world renowned comic book hero, "Superman," and the sole author of "Superboy." Plaintiffs initiated two civil actions in the United States District Court for the Central District of California ("Siegel Actions") regarding their proper exercise, under section 304(c) of the Copyright Act, 17 U.S.C. § 304(c), of their right to recapture Jerome Siegel's original copyrights in "Superman" and "Superboy" by serving statutory termination notices on the Defendants, Warner Bros. and DC Comics, on April 3, 1997, and March 8, 2002, respectively terminating Jerome Siegel's prior grant(s) of "Superman" and "Superboy" to Defendants' predecessor(s).

Prior to initiating the actions and shortly thereafter, Plaintiffs entered into privileged communications with Michael Siegel, who was Jerome Siegel's son from his first marriage. With the exception of one letter from the Plaintiffs, all privileged communications were made between myself, on behalf of the Plaintiffs, and Michael Siegel's counsel, Ohio attorney Don W. Bulson, Esq. While Michael Siegel was not a party to the Siegel Actions, as the son of author Jerome Siegel he was a member of the statutory class entitled to participate in any proceeds from Jerome Siegel's recaptured

**EXHIBIT 49**
**814**

**LAW OFFICES OF MARC TOBEROFF**

The Honorable Solomon Oliver, Jr.
February 19, 2008
Page 2

copyrights and thus any settlement or other proceeds from the Siegel Actions. Sadly, Michael Siegel passed away on January 17, 2006. The Probate Court of Cuyahoga County, Ohio recognized Laura Siegel Larson as the sole beneficiary of Michael Siegel's estate.

In the Siegel Actions Defendants served Mr. Bulson with a subpoena duces tecum on August 11, 2006. Mr. Bulson filed timely objections to the subpoena, and a privilege log was submitted soon thereafter. As noted by Your Honor's February 6, 2008 order ("Order"), Defendants' subpoena was "extremely broad." The Order nonetheless required by February 11 a revised privilege log with respect to 15 entries, describing in greater detail the privileged nature of the communications. Plaintiffs and Mr. Bulson furnished the revised log to Defendants on February 11. The Order further required Defendants to assess the revised log and to meet and confer with Plaintiffs regarding any outstanding issues. However, Defendants made no attempt to meet and confer, instead sending on February 15 only an e-mail rejection of the *revised* privilege log on the purported basis of unspecified arguments made in their Reply brief before the privilege log had been revised in an effort to resolve this matter. Nevertheless, Plaintiffs, in accordance with the Order, hereby submit the 15 privileged communications and the revised privilege log in the event that the Court still finds *in camera* review to be appropriate.

The 15 communications are clearly protected under the doctrine of the "common interest" attorney-client privilege. As Section 76(1) of the Restatement (Third) of the Law Governing Lawyers provides, two persons with separate attorneys and a common interest in a litigated or non-litigated matter can exchange information about the matter themselves or through their attorneys, and the communications will remain privileged against third parties.

This bedrock principle has been recognized by U.S. District Courts in the Sixth Circuit, including *Fresenius Med. Care Holdings, Inc. v. Roxane Labs., Inc.*, 2007 WL 895059, at *2–*4 (S.D.Ohio 2007) and *Travelers Cas. & Sur. Co. v. Excess Ins. Co. Ltd.*, 197 F.R.D. 601, 606–07 (S.D.Ohio 2000)("The rule applies when the parties have a 'common litigation opponent'…or when information is exchanged between 'friendly litigants' with similar interests.")(internal citations omitted). The principle also has been recognized in other Circuits, including *U.S. v. Under Seal*, 902 F.2d 244, 249 (4th Cir. 1990)(collecting cases)("[T]he rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other…"); *U.S. v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)(Common interest exception applies to attorney work product doctrine); *U.S. v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir.1989); *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996); *Hunydee v. U.S.*, 355 F.2d 183, 185 (9th Cir. 1965). *See also Griffith v. Davis*, 161 F.R.D. 687, 692 n.6 (C.D.Cal. 1995); *Sedlacek v. Morgan Whitney Trading Group, Inc.*, 795 F.Supp. 329, 331 (C.D.Cal. 1992).

**EXHIBIT 49**

**815**

**LAW OFFICES OF MARC TOBEROFF**

The Honorable Solomon Oliver, Jr.
February 19, 2008
Page 3

As noted on Mr. Bulson's revised privilege log, and as is readily apparent on the face of the 15 communications, Plaintiffs' and Michael Siegel's attorneys discussed and considered in these communications Defendants' settlement proposals and the economic risks of litigation with Defendants -- classic *privileged* subject matter. Without question, Plaintiffs and Michael Siegel held a "common interest" in such settlement discussions and in the Siegel Actions of which they were both beneficiaries. To the extent any of these communications, as argued by Defendants, may contain negotiations regarding a purchase of Michael Siegel's interest, that was technically "adversarial" in nature, this would not alter the privileged status of the communications. *Hunydee*, 355 F.2d at 185 (applying the common interest doctrine to statements concerning a matter of common concern, even though co-defendants generally had a significant conflict of interest); *Eisenberg v. Gagnon*, 766 F.2d 770, 787-788 (3d. Cir. 1985)(recognizing that "communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests"). *Vis a vis* Defendants, the Siegel family remained squarely aligned in interest even to the extent of such discussions, and in reliance on the common interest privilege *all* of their communications were made in confidence.

In the context of settlement discussions and litigation, financial offers and counter-offers regarding the termination interest, if any, would necessarily reflect an assessment of litigation risk and other strategic thinking protected by the attorney work product doctrine and attorney-client privilege. Such discussions would necessarily also reflect an assessment of the Joanne, Laura and Michael Siegel's relative financial condition and their ability to weather prolonged litigation against a large corporation, both of which are likewise confidential and privileged. Additionally, any consolidation of the termination interest with the plaintiffs in anticipated litigation would, in itself, also be strategic, and thus reasonably protected by the privilege.

The privileged and confidential nature of the communications amongst the Siegel family is surely not outweighed by their dubious relevance to the issues in the Siegel Actions. F.R.C.P. 26(b)(3). The sole rationale floated by Defendants for the production of these sensitive documents is that they may be relevant to a damages valuation "for which they [Plaintiffs] are seeking an accounting in the actions." Mot. Compel 8. However, this is completely without merit. Pursuant to their Section 304(c) terminations, Plaintiffs recaptured on April 16, 1999, Jerry Siegel's 50% joint copyright interest in *Superman*. Under copyright law, this entitles Plaintiffs to an accounting from the Movants, *Superman's* other joint owner, for 50% of the Movants' *actual profits* from their exploitation of *Superman* on and after April 16, 1999. *See generally*, *Nimmer on Copyright* § 6.12 (joint owner's duty to account); *Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984); *Nimmer on Copyright* §§ 11.03, 11.04 (statutory termination of copyright transfers). Under the Copyright Act, an accounting is based on actual profits from the exploitation of a copyright, not a subjective or even a market "valuation" of the copyright. To the extent, if any, that Michael Siegel engaged in negotiations with

**EXHIBIT 49**
**816**

**LAW OFFICES OF MARC TOBEROFF**

The Honorable Solomon Oliver, Jr.
February 19, 2008
Page 4

Plaintiffs regarding his interest in *Superman*, this has no bearing on Plaintiffs' right to their requisite share of *actual profits* as joint copyright owners. In all probability Movants seek these privileged communications to prejudice a proper damage analysis based on actual profits. To the extent, if any, that the communications reflect personal valuations in light of prior settlement offers, the risks of litigation and notorious "Studio accounting" practices, this only underscores their privileged status.

At no time did Plaintiffs or Michael Siegel waive their attorney-client privilege or work product protection with regard to these communications and have otherwise maintained the privilege by keeping the documents confidential from third parties. Additionally, these documents maintain their privileged status because Laura Siegel Larson occupies the position of Michael Siegel as his sole heir and the successor to his statutory termination interest. The attorney-client privilege survives the client's death. *See Swidler & Berlin v. U.S.*, 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998), *Ohio v. Doe*, 433 F.3d 502, 504 (6th Cir. 2006); *Taylor v. Sheldon*, 172 Ohio St. 118, 122 (Oh. 1961). As Michael Siegel's heir and successor, Laura Siegel Larson appropriately holds Michael Siegel's attorney-client privilege in this matter. *See* Ohio Revised Code § 2317.02(A)(1); *Taylor v. Sheldon*, 172 Ohio St. 118, 122 (1961) (construing Ohio R.C. § 2317.02).

Very truly yours,

Marc Toberoff

cc:    James Weinberger, Esq. (Letter w/o enclosures via Facsimile and U.S. mail)
       Meggan A. Rawlin, Esq. (Letter w/o enclosures via Facsimile and U.S. mail)
       Michael Bergman, Esq. (Letter w/o enclosures via Facsimile)
       Patrick Perkins, Esq. (Letter w/o enclosures via Facsimile)

**EXHIBIT 49**
**817**

# EXHIBIT 50

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 119 of 204
Page ID #:32391
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 1 of 72

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10  JOANNE SIEGEL and LAURA SIEGEL    )
    LARSON,                            )    CASE NO. CV-04-8400-SGL (RZx)
11                                     )
                                       )    [Consolidated for pre-trial and discovery
12              Plaintiffs,            )    purposes with CV-04-8776-SGL (RZx)]
                                       )
13  v.                                 )    ORDER GRANTING IN PART AND
                                       )    DENYING IN PART PLAINTIFFS'
14  WARNER BROS. ENTERTAINMENT         )    MOTION FOR PARTIAL SUMMARY
    INC.; TIME WARNER INC.; and DC     )    JUDGMENT; ORDER GRANTING IN
15  COMICS,                            )    PART AND DENYING IN PART
                                       )    DEFENDANTS' MOTION FOR PARTIAL
16              Defendants.            )    SUMMARY JUDGMENT
                                       )
17  ────────────────────────────────

18          The termination provisions contained in the Copyright Act of 1976 have aptly

19  been characterized as formalistic and complex, such that authors, or their heirs,

20  successfully terminating the grant to the copyright in their original work of authorship

21  is a feat accomplished "against all odds."  2 WILLIAM F. PATRY, PATRY ON COPYRIGHT

22  § 7:52 (2007).

23          In the present case, Joanne Siegel and Laura Siegel Larson, the widow and

24  the daughter of Jerome Siegel, seek a declaration from the Court that they have

25  overcome these odds and have successfully terminated the 1938 grant by Jerome

26  Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of

27  the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's

28  half of the copyright in the same.  No small feat indeed.  It requires traversing the

**EXHIBIT 50**
**818**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 120 of 204
Page ID #:32392
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 2 of 72

many impediments — many requiring a detailed historical understanding both factually and legally of the events that occurred between the parties over the past seventy years — to achieving that goal and, just as importantly, reckoning with the limits of what can be gained through the termination of that grant.

Any discussion about the termination of the initial grant to the copyright in a work begins, as the Court does here, with the story of the creation of the work itself.

In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High School in Cleveland, Ohio. Siegel was an aspiring writer and Shuster an aspiring artist; what Siegel later did with his typewriter and Shuster with his pen would transform the comic book industry. The two met while working on their high school's newspaper where they discovered their shared passion for science fiction and comics, the beginning of a remarkable and fruitful relationship.

One of their first collaborations was publishing a mail-order fanzine titled "Science Fiction: The Advance Guard of Future Civilization."[1] In the January, 1933, issue, Siegel and Shuster's first superman character appeared in the short story "The Reign of the Superman," but in the form of a villain not a hero. The story told of a "mad scientist's experiment with a deprived man from the breadlines" that transformed "the man into a mental giant who then uses his new powers — the ability to read and control minds — to steal a fortune and attempt to dominate the world." (Decl. Michael Bergman, Ex. HH at 1126). This initial superman character in villain trappings was drawn by Shuster as a bald-headed mad man.

A couple of months later it occurred to Siegel that re-writing the character as a hero, bearing little resemblance to his villainous namesake, "might make a great comic strip character." (Decl. Michael Bergman, Ex. HH at 1126). Much of Siegel's desire to shift the role of his protagonist from villain to hero arose from Siegel's exposure to despair and hope: Despair created by the dark days of the Depression

---

[1] A fanzine is a publication, usually distributed at no or nominal cost, produced by fans of a particular topic (such as comic books, opera, murder mystery stories, etc.) for others who share their interest.

2

**EXHIBIT 50**
**819**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 121 of 204
Page ID #:32393
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 3 of 72

and hope through exposure to the "gallant, crusading heros" in popular literature and the movies. (Decl. Michael Bergman, Ex. HH at 1126). The theme of hope amidst despair struck the young Siegel as an apt subject for his comic strip: "Superman was the answer — Superman aiding the downtrodden and oppressed." (Decl. Michael Bergman, Ex. HH at 1126).

Thereafter, Siegel sat down to create a comic book version of his new character. While he labored over the script, Shuster began the task of drawing the panels visualizing that script. Titling it "The Superman," "[t]heir first rendition of the man of steel was a hulking strongman who wore a T-shirt and pants rather than a cape and tights." (Decl. Michael Bergman, Ex. HH at 1129). And he was not yet able to hurdle skyscrapers, nor was he from a far away planet; instead, he was simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or Tarzan, who combated crime. Siegel and Shuster sent their material to a publisher of comic books — Detective Dan — and were informed that it had been accepted for publication. Their success, however, was short-lived; the publisher later rescinded its offer to publish their submission. Crestfallen, Shuster threw into the fireplace all the art for the story except the cover (reproduced below), which Siegel rescued from the flames.

EXHIBIT 50
820

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 122 of 204
Page ID #:32394
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 4 of 72



Undaunted, Siegel continued to tinker with his character, but decided to try a different publication format, a newspaper comic strip. The choice of crafting the material in a newspaper comic strip format was influenced both by the failure to get their earlier incarnation of the Superman character published by <u>Detective Dan</u> in a comic book format, and by the fact that, at the time, black-and-white newspaper comic strips — not comic books — were the most popular medium for comics. As one observer of the period has commented:

> It is worth noting the extent to which early comic books were conjoined with newspaper strips of the day. The earliest comic books consisted of reprints of those newspaper strips, re-pasted into a comic book page format. When original material began appearing in comic book format, it was generally because companies that wished to publish comic books were unable to procure reprint rights to existing newspaper strips. The solution to this . . . was to hire young [comic strip artists] to simulate the same kind of newspaper strip material.

4

EXHIBIT 50
821

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 123 of 204
Page ID #:32395
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 5 of 72

1  (Decl. Mark Evanier, Ex. A at 5-6).

2      On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming

3  over plot ideas for this new feature when an idea struck him:  "I was up late counting

4  sheep and more and more ideas kept coming to me, and I wrote out several weeks

5  of syndicate script for the proposed newspaper strip.  When morning came, I

6  dashed over to Joe [Shuster]'s place and showed it to him."  (Decl. Michael

7  Bergman, Ex. HH at 1129).  Siegel re-envisioned his character in more of the mythic

8  hero tradition of Hercules, righting wrongs in present-day society.  His inspiration

9  was to couple an exaggeration of the daring on-screen acrobatics performed by

10  such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make

11  such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John

12  Carter of Mars stories, and placing all of this within a storyline that was the reverse

13  of the formula used in the Flash Gordon serials.  The end product was of a

14  character who is sent as an infant to Earth aboard a space ship from an unnamed

15  distant planet (that had been destroyed by old age) who, upon becoming an adult,

16  uses his superhuman powers (gained from the fact that his alien heritage made him

17  millions of years more evolved than ordinary humans) to perform daring feats for the

18  public good.

19      Siegel named his character "Superman."  Unlike his previous incarnation,

20  Siegel's new Superman character's powers and abilities were much more

21  extraordinary and fantastic:  Superhuman strength; the ability to leap 1/8th of a mile,

22  hurdle a twenty-story building, and run faster than an express train; and nothing less

23  than a bursting shell could penetrate his skin.  Siegel placed his character in a very

24  cosmopolitan environment that had the look and feel of mid-thirties America.  He

25  also humanized his character by giving his superhero an "ordinary person" alter

26  ego:  Mild-mannered, big-city newspaper reporter Clark Kent.  Siegel developed

27  this concept of Superman's secret identity both as a means for his superhero to

28  maintain an inconspicuous position in everyday society and as a literary device to

EXHIBIT 50
822

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 124 of 204
Page ID #:32396
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 6 of 72

introduce a conflict — and the potential for story lines centered around that conflict — between the character's dual identities, a conflict played out no more dramatically than in the love "triangle" between the character's dual identities and another newspaper reporter, Lois Lane.

Shuster immediately turned his attention to giving life and color to Siegel's idea by drawing illustrations for the story.  Shuster conceived of the costume for Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S" emblazoned on an inverted triangular crest on his chest, and boots as footwear.  In contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed glasses, combed black hair, and sporting a fedora.  He drew Superman and his alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive curl over his forehead, and endowed him with a lean, muscular physique.  Clark Kent hid most of these physical attributes behind his wardrobe, which he could quickly doff revealing his Superman costume underneath when he was called to action by someone in need of his superpowers.  One of the earliest of Shuster's sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted below:

6

**EXHIBIT 50**
**823**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 125 of 204
Page ID #:32397
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 7 of 72



CLARK KENT          SUPERMAN
ONE AND SAME!

The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. (Decl. Michael Bergman, Ex. H at 1). The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication. (Decl. Michael Bergman, Ex. H at 1). The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings. (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations: A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips. (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

7

EXHIBIT 50
824

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 126 of 204
Page ID #:32398
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 8 of 72

1  2).

2      The two shopped the character for a number of years to numerous

3  publishers but were unsuccessful.  As Siegel later recalled:  One publisher

4  "expressed interest in Superman," but preferred that it be "published in comic book

5  form where it would be seen in color" rather than "a black-and-white daily strip," a

6  suggestion to which he and Shuster balked given their earlier experience with the

7  comic book publisher of <u>Detective Dan</u>.  (Decl. Michael Bergman, Ex. H at 2).

8      In the meantime, Siegel and Shuster penned other comic strips, most notably

9  "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company.

10  When Nicholson folded shop in 1937, Detective Comics acquired some of its comic

11  strip properties, including "Slam Bradley" and "The Spy."

12      On December 4, 1937, Siegel and Shuster entered into an agreement with

13  Detective Comics whereby they agreed to furnish some of these existing comic

14  strips for the next two years, and further agreed "that all of these products and work

15  done by [them] for [Detective Comics] during said period of employment shall be

16  and become the sole and exclusive property of [Detective Comics,] and [that

17  Detective Comics] shall be deemed the sole creator thereof . . . ."  (Decl. Michael

18  Bergman, Ex. A).  The agreement further provided that any new or additional

19  features by Siegel and Shuster were to be submitted first to Detective Comics, who

20  was given a sixty-day option to publish the material.

21      Soon thereafter Detective Comics decided to issue a new comic book

22  magazine titled <u>Action Comics</u> and began seeking new material.  Inquiry was made

23  of many newspaper comic strip publishers, including McClure Newspaper

24  Syndicate.  Amongst the material submitted by McClure to Detective Comics was

25  the previously rejected Siegel and Shuster Superman comic strip.  Detective

26  Comics soon became interested in publishing Siegel and Shuster's now well-

27  traveled Superman material, but in an expanded thirteen-page comic book format,

28  for release in its first volume of <u>Action Comics</u>.

8

**EXHIBIT 50**
**825**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 127 of 204
Page ID #:32399
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 9 of 72

1    On February 1, 1938, Detective Comics returned the existing Superman

2    newspaper comic strip material to Siegel and Shuster for revision and expansion

3    into a full-length, thirteen-page comic book production.  Detective Comics' desire to

4    place Superman in a comic book required that Siegel and Shuster reformat their

5    existing Superman newspaper material by re-cutting the strip into separate panels

6    and then re-pasting it into a comic book format.

7    An issue emerged due to Detective Comics' additional requirement that there

8    be eight panels per page in the comic book.  Siegel and Shuster's existing

9    Superman newspaper material did not have enough drawings to meet this format.

10   In response, portions of the thirteen-page comic went forward with fewer than eight

11   panels per page, and in the remaining pages Shuster either trimmed or split existing

12   panels to stay within the page size, or drew additional panels from the existing

13   dialogue to meet the eight-panel requirement.  As Shuster later recounted:

> The only thing I had to do to prepare Superman for
> comic book publication was to ink the last three weeks of
> daily strips which I had previously completely penciled in
> detail.  In addition, I inked the lettering and the dialogue
> and story continuity and inked in the balloons containing
> the dialogue.  Certain panels I trimmed to conform to
> Detective's page size.  I drew several additional pictures
> to illustrate the story continuity and these appear on
> page 1 of the first Superman release.  This was done so
> that we would be certain of having a sufficient number of
> panels to make a thirteen page release.  Finally, I drew
> the last panel appearing on the thirteenth page.
> Detective's only concern was that there would be panels
> sufficient for thirteen complete pages.  Jerry told me that
> Detective preferred having eight panels per page but in
> our judgment this would hurt the property.  I specifically
> refer to the very large panel appearing on what would be
> page 9 of the thirteen page release.  We did not want to
> alter this because of its dramatic effect.  Accordingly, on
> this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2).  Siegel similarly recollected:

> Upon receiving word from Detective that we could
> proceed, Joe Shuster, under my supervision, inked the
> illustrations, lettering and dialogue balloons in the three
> weeks of daily strips that had been previously penciled.
> In addition, he trimmed certain pictures to meet
> Detective's panel specifications and extended others.
> To assure ourselves of having the proper number of

9

EXHIBIT 50
826

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 128 of 204
Page ID #:32400
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 10 of 72

1
2
3

> panels we added several pictures to illustrate the story continuity, I had already written.  Added as well for this reason was the scientific explanation on page 1 of the release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted Superman material to Detective Comics.  Soon thereafter Detective Comics informed Siegel that, as he had earlier suggested to them, one of the panels from their Superman comic would be used as the template (albeit slightly altered from the original) for the cover of the inaugural issue of Action Comics.  (Decl. Michael Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of Action Comics, Detective Comics wrote to Siegel, enclosing a check in the sum of $130, representing the per-page rate for the thirteen-page Superman comic book release and enclosing with it a written agreement for Siegel and Shuster's signatures.  The agreement assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]" to Superman "to have and hold forever."  (Decl. Michael Bergman, Ex. F).  Siegel and Shuster executed and returned the written assignment to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September 22, 1938, employment agreement in which Siegel and Shuster acknowledged that Detective Comics was "the exclusive owner[]" of not only the other comic strips they had penned for Nicholson (and continued to pen for Detective Comics), but Superman as well; that they would continue to supply the artwork and storyline (or in the parlance of the trade, the "continuity") for these comics at varying per-page rates depending upon the comic in question for the next five years; that Detective Comics had the "right to reasonably supervise the editorial matter" of those existing comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing the . . . characters or continuity thereof or in any wise similar" to these comics to a third party; and that Detective Comics would have the right of first refusal (to be

**EXHIBIT 50**
**827**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 129 of 204
Page ID #:32401
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 11 of 72

1   exercised within a six-week period after the comic's submission) with respect to any

2   future comic creations by Siegel or Shuster.

3       Detective Comics announced the debut of its <u>Action Comics</u> series with full

4   page announcements in the issues of some of its existing publications.  Specifically,

5   in <u>More Fun Comics</u>, Vol. 31, with a cover date of May, 1938, Detective Comics

6   placed the following black-and-white promotional advertisement on the comic's

7   inside cover, which reproduced the cover of the soon-to-be published first issue of

8   <u>Action Comics</u>, albeit in a greatly reduced size:



25      Similarly, <u>Detective Comics</u>, Vol. 15, with a cover date of May, 1938, had a

26  full-page black-and-white promotional advertisement on the comic's inside cover

27  which contained within it a reproduction of the cover (again in a reduced scale) of

28  the soon-to-be published first issue of <u>Action Comics</u>:

**EXHIBIT 50**
**828**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 130 of 204
Page ID #:32402
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 12 of 72



To provide some context and contrast, the cover of the first issue of <u>Action Comics</u> is notable for its difference from the promotional advertisements both in its scale and its colorized format.

EXHIBIT 50
829

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 131 of 204
Page ID #:32403
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 13 of 72



Superman itself was published by Detective Comics on April 18, 1938, in Action Comics, Vol. 1, which had a cover date of June, 1938.  A full reproduction of the original Superman comic contained in Action Comics, Vol. 1, is attached as an addendum to this Order.  See Attachment A to this Order.  The Superman comic became an instant success, and Superman's popularity continues to endure to this day as his depiction has been transferred to varying media formats.

The Superman character has evolved in subsequent works since his initial depiction in Action Comics, Vol. 1.  These additional works have added decades of new material to further define, update, and develop the character (such as his origins, his relationships, and his powers and weaknesses) in an ongoing flow of new exploits and supporting characters, resulting in the creation of an entire fictional Superman "universe."  For instance, absent from Action Comics, Vol. 1, was any

13

**EXHIBIT 50**
**830**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 132 of 204
Page ID #:32404
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 14 of 72

1    reference to some of the more famous story elements now associated with

2    Superman, such as the name of Superman's home planet "Krypton." Many of

3    Superman's powers that are among his most famous today did not appear in Action

4    Comics, Vol. 1, including his ability to fly (even through the vacuum of space); his

5    super-vision, which enables him to see through walls ("x-ray" vision) and across

6    great distances ("telescopic" vision); his super-hearing, which enables him to hear

7    conversations at great distances; and his "heat vision," the ability to aim rays of

8    extreme heat with his eyes. The "scientific" explanation for these powers was also

9    altered in ensuing comics, initially as owing to differences in gravity between Earth

10   and Superman's home planet (the latter being much larger in size than the former),

11   and later because Krypton orbited a red sun, and his exposure to the yellow rays of

12   Earth's sun somehow made his powers possible. In a similar Earth-Krypton

13   connection, it was later revealed that Superman's powers could be nullified by his

14   exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

15        Aside from the further delineation of Superman's powers and weaknesses,

16   many other elements from the Superman story were developed in subsequent

17   publications. Some of the most famous supporting characters associated with

18   Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and

19   Brainiac, were created long after Action Comics, Vol. 1, was published. Moreover,

20   certain elements contained in Action Comics, Vol. 1, were altered, even if slightly, in

21   later publications, most notably Superman's crest. In Action Comics, Vol. 1, the

22   crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the

23   middle, shown throughout the comic as solid yellow in most instances and as a red

24   "S" in two instances. Thereafter, the emblem changed, and today is a large yellow

25   five-sided shield, outlined in the color red, and bearing the letter "S" in the middle,

26   also in the color red.

27        The acclaim to which the release of Action Comics, Vo. 1, was greeted by

28   the viewing public quickly made Superman not only the iconic face for the comic

EXHIBIT 50
831

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 133 of 204
Page ID #:32405
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 15 of 72

1  book industry but also a powerful super-salesman for his publisher.  Detective

2  Comics oversaw the creation, development, and licensing of the Superman

3  character in a variety of media, including but not limited to radio, novels, live action

4  and animated motion pictures, television, live theatrical productions, merchandise

5  and theme parks.  From such promotional activity, Detective Comics came to "own[]

6  dozens of federal trademark registrations for Superman related indicia, such as

7  certain key symbols across a broad array of goods and services."  (Decl. Paul Levitz

8  ¶ 10).  The most notable of these marks that are placed on various items of

9  merchandise are "Superman's characteristic outfit, comprised of a full length blue

10  leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key

11  identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a

12  plane! . . . It's Superman!"  (Decl. Paul Levitz ¶ 10).

13      Meanwhile, Siegel continued to submit other comic book characters to

14  Detective Comics that were also published.  Sometimes these submissions were

15  without Shuster serving as an illustrator and sometimes, such as in the case of

16  Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.

17  Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.

18  Among these subsequent creations was "The Spectre," a comic written by Siegel

19  and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'

20  More Fun Comics, Vol. 52.  The comic told the story about a superhero with a

21  supernatural bent — the character being the spirit of a police officer killed in the line

22  of duty while investigating a gangland overlord and who, after meeting a higher

23  force in the hereafter, is sent back to Earth with nearly limitless abilities but offered

24  eternal rest only when he has wiped out all crime.

25      With Superman's growing popularity, a growing rift developed between the

26  parties.  Siegel and Shuster believed that Detective Comics' poached the artists

27  apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-

28  house to its New York offices, and further believed that Detective Comics had not

**EXHIBIT 50**
**832**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 134 of 204
Page ID #:32406
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 16 of 72

1    paid them their fair share of profits generated from the exploitation of their

2    Superman creation and from the profits generated from copycat characters that

3    they believed had their roots in the original Superman character.  As a result, in

4    1947, Siegel and Shuster brought an action against Detective Comics' successor in

5    interest in New York Supreme Court, Westchester County, seeking, among other

6    things, to annul and rescind their previous agreements with Detective Comics

7    assigning their ownership rights in Superman as void for lack of mutuality and

8    consideration.

9        After a trial, official referee J. Addison Young issued detailed findings of fact

10   and conclusions of law wherein he found that the March 1, 1938, assignment of the

11   Superman copyright to Detective Comics was valid and supported by valuable

12   consideration and that, therefore, Detective Comics was the exclusive owner of "all"

13   the rights to Superman.  The parties eventually settled the Westchester action and

14   signed a stipulation on May 19, 1948, whereby in exchange for the payment of over

15   $94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding

16   that Detective Comics owned all rights to Superman.  Two days later, the official

17   referee entered a final consent judgment vacating his earlier findings of fact and

18   conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

19       The feud between the parties did not end after the Westchester action.  In

20   the mid-1960s, the simmering dispute boiled anew when the expiration of the initial

21   copyright term for Superman led to another round of litigation over ownership to the

22   copyright's renewal term.[2]  In 1969, Siegel and Shuster filed suit in federal district

23   court in New York seeking a declaration that they, not Detective Comics' successor

24   _____

25       [2]  Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at
26   the time of Siegel and Shuster's creation of Superman and later assignment of
     rights in the same to Detective Comics, an author was entitled to a copyright in his
27   work for twenty-eight years from the date of its publication.  See 17 U.S.C. § 24,
     repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq.  Upon the expiration of
28   this initial twenty-eight year term, the author could renew the copyright for a
     second twenty-eight year period (the "renewal term").

**EXHIBIT 50**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 135 of 204
Page ID #:32407
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 17 of 72

1  (National Periodical Publications, Inc.), were the owners of the renewal rights to the

2  Superman copyright. See Siegel v. National Periodical Publications, Inc., 364

3  F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974). The end

4  result of the litigation was that, in conformity with United States Supreme Court

5  precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S.

6  643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1,

7  1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation),

8  Siegel and Shuster had assigned not only Superman's initial copyright term but the

9  renewal term as well, even though those renewal rights had yet to vest when the

10  grant (and later the stipulation) was made.

11      After the conclusion of the 1970s Superman litigation, the New York Times

12  "ran a story about how the two creators of Superman were living in near destitute

13  conditions":

14          Two 61-year-old men, nearly destitute and worried about
            how they will support themselves in their old age, are
15          invoking the spirit of Superman for help. Joseph Shuster,
            who sits amidst his threadbare furniture in Queens, and
16          Jerry Siegel, who waits in his cramped apartment in Los
            Angeles, share the hope that they each will get pensions
17          from the Man of Steel.

18  Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y.

19  TIMES, Nov. 22, 1975, at 62.

20      Apparently in response to the bad publicity associated with this and similar

21  articles, the parties thereafter entered into a further agreement, dated December

22  23, 1975. See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-

23  president of Warner Communications, Inc.,] said, 'but I sure feel that there is a

24  moral obligation on our part'"). In the agreement, Siegel and Shuster re-

25  acknowledged the Second Circuit's decision that "all right, title and interest in"

26  Superman ("including any and all renewals and extensions of . . . such rights")

27  resided exclusively with DC Comics and its corporate affiliates and, in return, DC

28  Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

17

EXHIBIT 50
834

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 136 of 204
Page ID #:32408
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 18 of 72

1    Siegel and Shuster with modest annual payments for the remainder of their lives;

2    provided them medical insurance under the plan for its employees; and credited

3    them as the "creators of Superman." In tendering this payment, Warner

4    Communications, Inc. specifically stated that it had no legal obligation to do so, but

5    that it did so solely "in consideration" of the pair's "past services . . . and in view of

6    [their] present circumstances," emphasizing that the payments were "voluntary."

7    The 1975 agreement also made certain provisions for Siegel's spouse Joanne,

8    providing her with certain monthly payments "for the balance of her life if Siegel"

9    died before December 31, 1985. Finally, Warner Communications, Inc. noted that

10   its obligation to make such voluntary payments would cease if either Siegel or

11   Shuster (or their representatives) sued "asserting any right, title or interest in the

12   'Superman' . . . copyright." As the years went by Warner Communications, Inc.

13   increased the amount of the annual payments, and on at least two occasions paid

14   the pair special bonuses.

15        As the time grew nearer to the December 31, 1985, cutoff date for surviving

16   spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her

17   "terrible worry" over the company's refusal to provide Jerome Siegel life insurance

18   in the 1975 agreement. (Decl. Michael Bergman, Ex. NN). She voiced her concern

19   that, should anything happen to her husband after the cutoff date, she and their

20   daughter "would be left without any measure of [financial] security." (Decl. Michael

21   Bergman, Ex. NN). The parties thereafter agreed by letter dated March 15, 1982,

22   that Warner would pay Joanne Siegel the same benefits it had been paying her

23   husband if he predeceased her, regardless of the time of his death. (Decl. Michael

24   Bergman, Ex. OO). Jerome Siegel died on January 28, 1996, and Joanne Siegel

25   has been receiving these voluntary survival spouse benefits since that time.

26        In the meantime, changes in the law resurrected legal questions as to the

27   ownership rights the parties had to the Superman copyright. With the passage of

28   the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

EXHIBIT 50
835

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 137 of 204
Page ID #:32409
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 19 of 72

1  concerning artists' transfers of the copyrights in their creations. First, the 1976 Act

2  expanded by nineteen years the duration of the renewal period for works, like the

3  initial release of Superman in Action Comics, Vol. 1, that were already in their

4  renewal term at the time of the Act's passage. See 17 U.S.C. § 304(b).

5        Second, and importantly for this case, the 1976 Act gave artists and their

6  heirs the ability to terminate any prior grants of the rights to their creations that were

7  executed before January 1, 1978, regardless of the terms contained in such

8  assignments, e.g., a contractual provision that all the rights (the initial and renewal)

9  belonged exclusively to the publisher. Specifically, section 304(c) to the 1976 Act

10  provides that, "[i]n the case of any copyright subsisting in either its first or renewal

11  term on January 1, 1978, other than a copyright in a work made for hire, the

12  exclusive or nonexclusive grant of a transfer or license of the renewal copyright or

13  any right under it, executed before January 1, 1978, . . . is subject to termination . . .

14  notwithstanding any agreement to the contrary . . . ."

15        It is this right of termination that Joanne Siegel and Laura Siegel Larson now

16  seek to vindicate in this case.[3] In pursuing such a claim, the two heirs, initially

17  sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

18  _____

19        [3] Although the present case only concerns the Siegel heirs' efforts to
terminate the 1938 grant, it has come to the Court's attention that the estate of
20  Superman co-creator Joseph Shuster has recently filed termination notices to
reclaim the rights to the Superman copyright. According to documents filed with
21  the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister
and the court-appointed representative of the Shuster estate, has given notice of
22  the estate's intent to terminate the 1938 grant of the Superman copyright to
Detective Comics and its successors effective 2013. As executor of the Shuster
23  estate, Peary is entitled, under changes made to the 1976 termination provisions
by the 1998 Sonny Bono Copyright Term Extension Act, to make the same
24  termination claims for the Superman copyright that Shuster or his heirs would have
been entitled to bring beforehand. See 17 U.S.C. § 304(c)(2); 3 NIMMER ON
25  COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was
originally passed if an author died without leaving heirs before exercising the right
26  to termination "the result was that no one could exercise [that] right," but this
"harsh result" was "ameliorated" through the passage of the 1998 Act by providing
27  that, "instead of lapsing," the termination right could be exercised by "the author's
executor, administrator, personal representative, or trustee").

28

**EXHIBIT 50**
**836**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 138 of 204
Page ID #:32410
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 20 of 72

1    Levine, in compiling the information necessary to draft the termination notice itself.[4]

2    On April 3, 1997, the two heirs served seven separate notices of termination

3    under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's

4    potential grant(s) in the Superman copyright to defendants, including the March 1,

5    1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975,

6    agreement.  The termination notices also specified that they covered hundreds of

7    works, with the added proviso that the intent was for the termination notice to apply

8    "to each and every work . . . that includes or embodies" Superman, and the failure

9    to list any such work in the notice was "unintentional and involuntary."  Each of the

10    termination notices had an effective date of April 16, 1999.  A flurry of settlement

11    discussions between the parties quickly ensued, but just as quickly fizzled out.

12    Nearly two years then passed without much discussion between the parties.

13    The day before the purported termination was to take effect, defendants sent

14    a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the

15    termination notices.  (Decl. Marc Toberoff, Ex. Q at 171).  The same day DC

16    Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel

17    that his company would "continue to provide the income and insurance benefits you

18    . . . have been receiving under the 1975 agreement, without prejudice to [the

19    company's] rights under that agreement, as long as we all continue to pursue the

20    goal of working together."  (Decl. Michael Bergman, Ex. P).

21    Not long after the termination notices' effective date passed, the Siegel heirs

22    retained new counsel and the parties re-entered into settlement discussions to

23    resolve their respective claims to the Superman copyright.  Towards that end, DC

24    Comics (and its "successors, past and present subsidiaries or affiliates") and the

25    Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed

26    that neither would "assert any statute of limitations . . . defense[] relating to . . . the

27

28    [4]  Before going into private practice, Mr. Levine served as General Counsel
for the United States Copyright Office and also as Executive Director for the
National Commission on New Technological Uses of Copyrighted Works.

EXHIBIT 50
837

Case 2:10-cv-03633-ODW-RZ   Document 500-8   Filed 10/10/12   Page 139 of 204
Page ID #:32411
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 21 of 72

1   [Termination] Notices" based on "the passage of time during the period from the

2   date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7

3   hereof (the 'Tolling Period')" while the parties attempted "to find an amicable

4   resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex.

5   A at 1).  The agreement further provided that the tolling period would remain in

6   effect "until 10 business days after the earlier of: (a) one of the parties terminating

7   negotiations, in writing, relating to the [Termination] Notices, or (b) the parties

8   reaching an amicable resolution of the disputes between them relating to the

9   Notices."  (Reply Decl. Marc Toberoff, Ex. A at 2).

10       At some point the broad outline of a global settlement concerning the

11   copyright to the Superman material, as well as to other works Siegel either authored

12   or contributed material to Detective Comics (notably, Superboy and The Spectre

13   properties), was reached.  Specifically, on October 19, 2001, counsel for Joanne

14   Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General

15   Counsel confirming and summarizing the substance of the settlement.  The letter

16   concluded that "if there is any aspect of the above that is somehow misstated,

17   please let me know by [October 22, 2001] at 2:00, as I will be out of the office —

18   and likely difficult to reach — for the following four weeks." (Decl. Marc Toberoff,

19   Ex. BB).

20       A week later, on October 26, 2001, Warner Bros' General Counsel John

21   Shulman responded with a letter, stating that he had "reviewed" the summary set

22   forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of

23   what we believe the deal we've agreed to is"; the outline was five pages long.

24   (Decl. Marc Toberoff, Ex. CC).  The letter concluded that Warner Bros. was

25   "working on the draft agreement" so as to "have this super-matter transaction in

26   document form."  (Decl. Marc Toberoff, Ex. CC).

27       A few months later, on February 1, 2002, outside counsel for Warner Bros.

28   provided a copy of the promised draft agreement (spanning fifty-six pages), with the

21

**EXHIBIT 50**
**838**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 140 of 204
Page ID #:32412
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 22 of 72

1    proviso that, "[a]s our clients have not seen this latest version of the agreement, I

2    must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was

3    also made in the draft agreement for the need of certain "Stand Alone Assignments"

4    that had as yet not been finalized, something which Warner's outside counsel

5    promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

6         Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time

7    Warner's Chief Operating Officer Richard Parsons, recounting that she and her

8    daughter had "made painful concessions and reluctantly accepted John Shulman's

9    last [settlement] proposal [in October, 2001]," but upon reading the proposed draft

10   agreement learned that they had been "stabbed in the back," as it "contained new,

11   outrageous demands that were not in the [October, 2001] proposal," such as

12   "condition[ing] recei[pt of] financial compensation for our rights on demands which

13   were not in the proposal we accepted." (Decl. Michael Bergman, Ex. Z). The letter

14   concluded that "[a]fter four years we have no deal and this contract makes an

15   agreement impossible." (Decl. Michael Bergman, Ex. Z).

16        Time Warner's CEO quickly responded with a letter of his own on May 21,

17   2002, expressing shock and dismay as "each of the major points covered in the

18   draft agreement . . . accurately represented the agreement previously reached" by

19   the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by

20   acknowledging that, as with all lengthy negotiations, Time Warner "expected" that

21   the submission of the draft agreement would result in further "comments and

22   questions on the draft" by Siegel family's representatives that "would need to [be]

23   resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming

24   Time Warner's continued interest "that this agreement can be closed based upon

25   the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman,

26   Ex. AA).

27        Not long thereafter, the Siegel heirs' lawyers submitted for the family's review

28   and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

**EXHIBIT 50**
**839**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 141 of 204
Page ID #:32413
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 23 of 72

1  (Decl. Marc Toberoff, Ex. AA). The Siegel heirs, on September 21, 2002, rejected

2  the redraft and fired their attorneys. (Decl. Marc Toberoff, Ex. AA). That same day

3  Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General

4  Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing]

5  negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of

6  its representatives and associates concerning" their rights to, among other things,

7  Superman. (Decl. Michael Bergman, Ex. DD).

8      Joanne Siegel and Laura Siegel Larson thereafter filed the present action,

9  with the assistance of new counsel, Marc Toberoff, on October 8, 2004. Both sides

10  have since filed cross-motions for partial summary judgment.

11      Reduced to their essentials, the legal questions at stake in the parties' cross-

12  motions are two-fold:

13      (1) The validity and enforceability of the termination notices in light of

14  (a) whether any copyrightable Superman material contained in the promotional

15  advertisements for Action Comics, Vol. 1, lies outside the reach of the termination

16  notice (and hence, the termination notice is not enforceable against it); (b) whether

17  certain portions of the Superman comic in Action Comics, Vol. 1, are in the nature of

18  a work for hire (and hence, not subject to termination); (c) whether the failure to list

19  the 1948 consent judgment in the notices as one of the grants sought to be

20  terminated materially affects the notices of termination; (d) whether the post-

21  termination receipt of benefits under the 1975 agreement acts as a novation to re-

22  grant the Superman copyright; (e) whether the statute of limitations ran out before

23  the instant action was instituted thereby forestalling this lawsuit; and (f) whether the

24  settlement negotiations that took place between the parties resulted in an

25  enforceable agreement disposing of the claims asserted in the present action; and,

26      (2) The parameters of what was recaptured (and the rights flowing therefrom)

27  through the termination notices, namely, (a) whether plaintiffs have a right to

28  defendants' post-termination foreign profits from the exploitation of the Superman

EXHIBIT 50
840

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 142 of 204
Page ID #:32414
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 24 of 72

1  copyright; (b) whether plaintiffs are entitled to profits from any of the various

2  trademarks that defendants have procured since the grant in marketing Superman;

3  (c) whether plaintiffs are entitled to profits from the derivative works of the

4  Superman material published by Detective Comics and its successors in interest

5  prior to the termination notice's effective date; and (d) whether any recovery of

6  profits extends beyond those made through DC Comics' exploitation of the

7  Superman copyright to that of its corporate siblings and parent who are licensees to

8  that copyright's movie and television rights, be it based on an alter-ego theory or

9  other notion of equity.

10          I.      Validity and Enforceability of Termination Notices

11          The 1976 Act created a new right allowing authors and their heirs the ability

12  to terminate a prior grant to the copyright in their creations.  See 17 U.S.C.

13  § 304(c).  The 1976 Act also set forth specific steps concerning the timing and

14  contents of the notices that had to be served to effectuate the termination of a prior

15  grant.  One of the most important steps was placing a limit on the temporal reach

16  such a notice could have on what was subject to being recaptured.  Specifically, the

17  "[t]ermination of the grant may be effected at any time during a period of five years

18  beginning at the end of fifty-six years from the date copyright was originally

19  secured."  17 U.S.C. § 304(c)(3) (emphasis added).  Moreover, the notice is

20  required to be "served not less than two or more than ten years before" its effective

21  date.

22          Taken together, someone seeking to exercise the termination right must

23  specify the effective date of the termination, and that effective date must fall within

24  a set five-year window which is at least fifty-six years, but no more than sixty-one

25  years, from the date the copyright sought to be recaptured was originally secured,

26  and such termination notice must be served two to ten years before its effective

27  date.  The purpose of this time window for terminating pre-1978 grants was so that

28  the only rights to the copyright affected thereby were those to the 19-year extension

24

**EXHIBIT 50**
**841**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 143 of 204
Page ID #:32415
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 25 of 72

1    in the renewal term created by the 1976 Act, leaving undisturbed the grantee's

2    vested interest to the original 28-year renewal term as set forth in the 1909 Act, the

3    governing statute at the time the grant itself was made.

4        Additional procedures required to be followed to make the termination notice

5    effective were specified as well:  The author or his or her heirs had to serve "an

6    advance notice in writing upon the grantee or the grantee's successor in title"; the

7    notice had to be signed by the author or his or her heirs; the notice was required to

8    "state the effective date of the termination"; and the notice must be "recorded in the

9    Copyright Office before the effective date of termination."  17 U.S.C. § 304(c)(4).

10       Beyond these statutory requirements, the notice was also required to

11   "comply, in form, content, and manner of service, with [the] requirements that the

12   Register of Copyrights . . . prescribe[s] by regulation."  17 U.S.C. § 304(c)(4)(B).

13   Toward that end, the Register promulgated regulations implementing this statutory

14   proviso.  See 37 C.F.R. § 201.10.  Among those regulations was one requiring the

15   terminating party to identify in the notice "each work as to which the notice of

16   termination applies."  37 C.F.R. § 201.10(b)(1)(ii).

17       As one noted author has commented, "[i]t is difficult to overstate the

18   intricacies of these [termination] provisions, the result of which is that they are

19   barely used, no doubt the result desired by lobbyists for assignees."  William Patry,

20   Choice of Law and International Copyright, 48 AM. J. COMP. L. 383, 447 (2000);

21   see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir.

22   1982) (commenting that the steps necessary to make a termination effective

23   oftentimes create "difficult, technical questions").  Those intricate provisions

24   oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating

25   party to reclaim the full measure of the copyright in a work of authorship.  This case

26   is no different.

27

28

EXHIBIT 50
842

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 144 of 204
Page ID #:32416
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 26 of 72

1.    Promotional Announcements

Plaintiffs gave notice that the effective date of the termination notices was April 16, 1999, meaning that, backdating from that date sixty-one years, the termination notices would leave unaffected (or better said, beyond their reach) any statutory copyright that had been secured in the Superman material before April 16, 1938. Defendants contend that the promotional announcements for Action Comics, Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the five-year effective window of plaintiffs' termination notices; therefore, they argue, any copyright material contained in those promotional announcements, notably the illustration of Superman on the cover of Action Comics, Vol. 1, is unaffected by the termination notices and remains theirs to exploit exclusively. As defendants frame it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of limitations[;] . . . if any work falls outside the five-year window established by the [termination] effective date, it cannot be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability." (Defs' Mot. Partial Summ. J. at 29). Thus, any work that was published with notice prior to April 16, 1938, i.e., sixty-one years before the stated effective date, remains untouched by the termination notice.[5]

Plaintiffs do not dispute the legal consequence section 304(c)'s five-year window has in this case on the effective reach of their termination notices. As drafters of the notice, Siegel's heirs were given carte blanche in identifying the termination notices' effective date. Once they chose a date, certain consequences flowed therefrom, the most important of which is to cabin the five-year window

_____

[5] Defendants also contend that the promotional advertisements are not effected by the termination notices because plaintiffs failed to list those works in their notices. As the Court finds that the promotional advertisements fall outside the five-year window during which those notices could effectively terminate the grant in the copyright contained in them, the Court will not pass on the consequences, if any, stemming from plaintiffs' additional failure to list those promotional announcements in their notices.

26

EXHIBIT 50
843

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 145 of 204
Page ID #:32417
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 27 of 72

1   within which the notice can recapture any copyright secured in the material to which

2   the grant was directed.  A copyright in a work statutorily secured even just days

3   outside this five year window is beyond the effective reach of the termination notice,

4   in much the same way a tardily-filed renewal registration has been held to be

5   ineffective.  Cf. 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even

6   several days is fatal and that the purported renewal is void to rescue the subject

7   work from the public domain, whether filed after expiration of the one year or prior to

8   its initiation").  A leading treatise supports such a calculation and the consequences

9   flowing from it:

10           The appropriate dates for termination notices are
11           measured from "the date copyright was originally
             secured, or beginning on January 1, 1978, whichever is
             later."  In the case of pre-January 1, 1978 works,
12           "secured" means the actual date the work was first
             published with notice (or in the case of unpublished
13           works, the date of registration), e.g., April 15, 1970, not
             December 31, 1970.  Failure to pay attention to the
14           differences between the date the copyright was originally
             secured for purposes of section 304(c) termination of
15           transfer and section 305 expiration of term may lead to
             an untimely notice of termination.

16

17   2 PATRY ON COPYRIGHT § 7:43; see also 3 NIMMER ON COPYRIGHT § 11.05[B][1] at

18   11-40.11 ("Suppose that statutory copyright for a song were first secured on May

19   21, 1925.  Based on the statutory provision that termination may be effected

20   'beginning at the end of fifty-six years from the date copyright was originally

21   secured,' the first effective date for termination should be May 21, 1981"); 3 JAY

22   DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL

23   CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a

24   work was so published predates the current year by more than sixty-one years, then

25   the termination right [to that work] under section 304(c) has expired.  The statute

26   apparently requires calculation of all these termination periods from the exact date

27   of publication, rather than from the end of the publication year, as is appropriate for

28   determining copyright terms under the 1976 Act").

**EXHIBIT 50**
**844**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 146 of 204
Page ID #:32418
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 28 of 72

1   It is in this sense that one can say whether a termination notice is timely or

2   not, a question that does not go to the notice's validity (the notice remains valid with

3   respect to a copyright in works that was secured during the five year window) but as

4   to its enforceability against a copyright in a particular work pre- or post-dating that

5   window. Thus, the key in deciding this timeliness question begins with a

6   determination of when the copyright in the work in question was secured, and not

7   when the work itself was created.

8   The determination of when the copyright in a work is secured is when the

9   material was protected by statute, meaning when the copyright in such a work

10  secured protection under this country's copyright laws.  Under the 1909 Act, "works

11  could have obtained statutory copyright . . . , without the necessity of registration,

12  simply by the act of publishing copies of the work bearing a proper copyright notice.

13  As to such works, registration did not create the copyright, but merely recorded it."

14  2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17

15  U.S.C. § 10 (repealed).  Thus, the initial question is whether the comic books

16  containing the promotional announcements bore such a copyright notice upon

17  them.

18  Section 19 of the 1909 Act delineated what constituted proper notice: "The

19  notice of copyright required by section 10 of this title shall consist either of the word

20  'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of

21  the copyright proprietor, and if the work be a printed literary, musical, or dramatic

22  work, the notice shall include also the year in which the copyright was secured by

23  publication."  If the comic books in question contained such a notice, then the date

24  of publication is also the date the copyright in the material contained therein was

25  secured.  If not, then any of the copyrightable material in the works (including the

26  promotional announcements) was never secured (absent evidence that the material

27  had been registered beforehand with the Copyright Office when it was in an

28  unpublished state) but instead was injected into the public domain.

28

EXHIBIT 50
845

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 147 of 204
Page ID #:32419
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 29 of 72

1    Here, the material submitted by defendants (the cover page for the magazine

2    and the page on which the promotional announcements is displayed) does contain

3    such a notice.  At the bottom of the promotional announcement itself is the

4    following:  "Entire contents copyright 1938 by Detective Comics, Inc."  (Decl.

5    Michael Bergman, Ex. C at 10 & Ex. D at 14).  Thus, the copyright for any of the

6    works contained in the comic books in question was secured on the date they were

7    published.

8    This leads to the next question:  What are the publication dates for the two

9    comic books that contained the promotional announcements for Action Comics,

10   Vol. 1, featuring an illustration of Superman?  Defendants have submitted the initial

11   copyright registrations for these comics, which indicate that More Fun Comics,

12   Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13   plaintiffs' termination notices, and that Detective Comics, Vol. 15, was published on

14   April 10, 1938, six days outside the temporal reach of the termination notices.

15   Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16   constituted prima facie evidence of the publication date for a work.[6]  See 17 U.S.C.

17   

_____

18   [6] Defendants' suggestion that the addition of section 304(a)(4)(B) by the
     Copyright Amendments Act of 1992 somehow extending this rule by extending
19   prima facie imprimatur to renewals like those in this case is simply mistaken.
     (Defs' Reply at 40 & n.16).  That section provides that, so long as the renewal
20   occurred "within 1 year before [the] expiration" of the initial term, then "the
     certificate of such registration shall constitute prima facie evidence as to the . . .
21   the facts stated in the certificate."  However, the 1992 Act's provisions placed one
     very important proviso on its applicability — its provisions applied only where a
22   party was filing a renewal registration to the "extended term of copyright in a work."
     Thus, the amendments' provisions were limited to renewal claims to works that
23   were still in their initial term when the 1976 Act became effective, January 1, 1978,
     meaning for copyrights whose first term of copyright was secured on or after
24   January 1, 1950.  That is to say, section 304(a)(4)(B)'s provisions only applies to
     works that had yet reached the time for renewal before the 1976 Act extended the
25   term of the renewal period (unlike Superman in Action Comics, Vol. 1, or the
     comics containing the promotional announcements).  For those works, the 1992
26   amendments allowed such renewal to be made at anytime, but provided incentives
     for prompt renewal, the most notable being the extension of the prima facie rule to
27   such promptly filed renewal claims.  See 2 PATRY ON COPYRIGHT § 7:50 ("Effective

28   

**EXHIBIT 50**
**846**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 148 of 204
Page ID #:32420
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 30 of 72

1   § 209 (repealed) (providing that a "certificate of registration" issued by the Register

2   of Copyrights "shall be admitted in any court as prima facie evidence of the facts

3   stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d

4   737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the

5   reason that renewal certificates issued during the 1909 Act were not accorded

6   prima facie status was because of the "minimal attention" the Register of Copyrights

7   paid to the information contained therein; "[a]s long as original registration for a

8   work has been made, the Copyright Office accept[ed] it at face value").

9          Plaintiffs attempt to refute this prima facie evidence through expert testimony

10  and by legal argument.

11         As to the latter, plaintiffs seek to discredit the value of the initial copyright

12  registration for More Fun Comics, Vol. 31, because Detective Comics' successor

13  did not obtain that registration until nearly 28 years after its publication, on the eve

14  of the expiration of the initial copyright term.  The 1909 Act required that, once

15  copyright had been secured by publication with notice, "there shall be promptly

16  deposited" the required copies of the published work and the registration claim

17  itself.  17 U.S.C. § 13 (repealed).  Plaintiffs suggest that such a "late" initial

18  registration raises questions as to the trustworthiness of any of the information

19  contained in that registration.  (Pls' Opp. at 48-49).  Plaintiffs correctly point out that

20  Professor Nimmer in his treatise has commented that, "where there was a failure to

_____

22  June 26, 1992, Congress abolished the requirements that works in their first term
    of copyright published or registered between 1964 and 1977 must be timely
23  renewed in order to enjoy the (now) 67-year renewal term.  Instead, these works
    are now automatically renewed for the full term of 75 years.  Copyrights whose
24  first term of copyright was secured between January 1, 1950, and December 31,
    1963, still had to have been renewed according to the requirements of the 1909
25  Act.  Failure to do so resulted in the work falling into the public domain. . . .
    Renewal claims may still be filed at any time during the renewal period, and a
26  number of incentives have been added to encourage filing.  [One such] incentive[]
    for renewing provided in the Copyright Act of 1992 are the prima facie status that
27  is accorded to the validity of the work").  Given that none of the comics in question
    fall within the class affected by section 304(a)(4)(B), that section's expansion of
28  the prima facie status to renewal claims does not apply here.

30

**EXHIBIT 50**

Case 2:10-cv-03633-ODW-RZ   Document 500-8   Filed 10/10/12   Page 149 of 204
Page ID #:32421
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 31 of 72

1   promptly register and deposit, under the 1909 Act, some questions as to the viability

2   of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150.

3   But Professor Nimmer's comments as to the collateral consequences flowing from

4   such a delay were not geared toward the validity of the copyright itself, but to the

5   existence of an impediment to bringing an action for infringement. See id. at 7-149

6   (noting that Supreme Court's Washingtonian decision effectively read the "words

7   'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not

8   satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . .

9   requirement was (as it still is) clearly a condition precedent to the right to bring an

10  infringement action").

11          Although the general line of reasoning plaintiffs seek to draw from such a

12  "late-in-time" registration makes sense from a policy perspective, plaintiffs have

13  cited no authority that such long delays in registration vitiates or otherwise

14  diminishes the statutorily conferred prima facie presumption to which such

15  registration claims (and the information contained therein) are entitled, especially

16  once a registration has (as here) been tendered.  Moreover, even were the Court to

17  entertain plaintiffs' invitation, there remains the initial registration for the other comic

18  book in question — Detective Comics, Vol. 15 — which was obtained shortly after

19  that comic book's publication and, hence, the problem pressed by defendants with

20  the promotional announcement contained therein falling outside the effective reach

21  of the termination notice remains.

22          Plaintiffs next contend that the copies of the registration certificates

23  submitted by defendants have not been authenticated by the declarant to whose

24  declaration they are affixed, and hence, are not admissible as proof of the comic

25  books' publication date.  (Pls' Opp. at 48-49 ("the certificate is not properly

26  authenticated, but is merely attached to the declaration of defendants' attorney, who

27  appears to have no personal knowledge of it").  Such extrinsic evidence of

28  authenticity by the declarant is unnecessary for these copyright registration

EXHIBIT 50
848

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 150 of 204
Page ID #:32422
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 32 of 72

1  certificates.  Under Federal Rule of Evidence 902(1), a "document bearing a seal

2  purporting to be that of the United States . . . or of a . . . department, officer, or

3  agency thereof," with "a signature purporting to be an attestation or execution," is

4  considered self-authenticated.  Close inspection of the copyright registration

5  certificates submitted by defendants clearly reveals the seal issued by the United

6  States Copyright Office, signed by the Register of Copyrights, and bearing the

7  following legend: "[A]ttached are additional certificates for the [comics in question]

8  which were registered in accordance with provisions of the United States Copyright

9  Law." (Decl. James Weinberger, Ex. B & C).  The requirements of Rule 902(1)

10  have been met, rendering the copies of the copyright registration certificates as self-

11  authenticated and, thus, admissible.

12      The obscure nature of these promotional announcements does not alter this

13  analysis.  It is undoubtedly true that the existence of these announcements was not

14  widely recognized even by comic book aficionados.  That, however, does not

15  change the effect their existence has vis-à-vis the termination notices' effective

16  reach.  Once a termination effective date is chosen and listed in the notice, the five-

17  year time window is an unbendable rule with an inescapable effect, not subject to

18  harmless error analysis.  See 37 C.F.R. § 201.10(e) (limiting application to

19  "[h]armless errors in a notice" that does not "materially affect the adequacy of the

20  information") (emphasis added).  That good cause may have existed for failing to

21  structure the termination notices so as to sweep the announcements within its reach

22  does not obviate application of the rule itself.

23      The importance such promotional announcements may have on the reach of

24  a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr.

25  Levine, who drafted the termination notices in this case. He also drafted plaintiffs'

26  termination notice with respect to The Spectre copyright, and structured it in such a

27  way so as to include among the works affected by the notice's five-year window a

28  promotional announcement for The Spectre contained in a comic published a month

EXHIBIT 50
849

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 151 of 204
Page ID #:32423
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 33 of 72

1    before the one containing the first comic book story of the character.  (Decl. Michael

2    Bergman, Exs. WW-YY (termination notice describing among the works affected by

3    the notice the promotional announcement as "Spectre character appearing in

4    costume in an ad in issue No. 51 of More Fun Comics, copyrighted November 28,

5    1939, as Copyright Registration No. B437786, publication date January 1940") &

6    Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

7        Having provided prima facie evidence of the comic books' publication dates,

8    the burden shifts to the plaintiffs to produce some evidence calling into question

9    those dates.  The burden of production is not a heavy one (in large measure owing

10   to the fact that so little is proffered by the applicant or scrutinized by the Copyright

11   Office in the application process to procure the registration in the first instance), but

12   it is one that must be met nonetheless.  See 3 PATRY ON COPYRIGHT § 9:14 ("the

13   Copyright Office has no ability to verify facts stated in the certificate, and not

14   surprisingly makes no effort to do so. . . . At the most, the Office can take notice of

15   any inconsistent facts that appear on the deposit copy and request clarification from

16   the claimant . . . . In any event, [the opposing party] should be required to present

17   only a small degree of evidence calling into question the fact at issue in order to

18   rebut the certificate's presumption").

19       On that point all that plaintiffs have submitted is the opinion of a comic book

20   historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among

21   other things, assist it "in attempting to determine approximate dates of past

22   publication" of its comics.  (Decl. Mark Evaier ¶ 12).  From this particular

23   experience, as well as his long history in the comic book industry, Mr. Evanier seeks

24   to cast doubt on the veracity of the asserted publication dates for the comics

25   containing the promotional announcements.  The general thrust of his expert

26   opinion is that, outside the first printing of certain famous comic superheros such as

27   Superman in Action Comics, Vol. 1,  a particular "run of the mill" comic book's exact

28   date of publication during the 1930s and 1940s is difficult to determine, rendering

33

EXHIBIT 50
850

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 152 of 204
Page ID #:32424
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 34 of 72

1  the dates listed on the certificates as nothing more than "mere guesstimates" by the

2  publisher. (Decl. Mark Evanier ¶ 10). Furthermore, Mr. Evanier downplays the

3  significance of the fact that the comic books in question contained promotional

4  announcements for Action Comics, Vol. 1, as necessarily meaning that their

5  publication must have preceded Action Comics publication. As Mr. Evanier

6  explains, the dates provided by publishers were often the dates initially scheduled

7  or intended for publication, but the actual dates often varied with printing, delivery,

8  and other delays. (Decl. Mark Evanier ¶ 11).

9        Mr. Evanier's expert opinion is chalk full of information on the publication of

10  comic books in general during this time period, but is void of any specific evidence

11  or opinion as to the publication of the particular comic books in question in this

12  case. He offers no evidence of any specific printing, delivery, or other problems that

13  may have affected the publication of More Fun Comics, Vol. 31, or Detective

14  Comics, Vol. 15. His general opinion thus does not sufficiently refute the prima

15  facie evidence set forth in the initial copyright registration certificates for these

16  particular comic books. At most, his opinion raises some doubts as to the precision

17  of the dates contained in initial copyright registrations for comic books in general

18  from this period. However, those copyright notices were completed at a time which,

19  by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate

20  as possible in listing those dates and long before any incentive to provide

21  inaccurate dates by virtue of contemplating this present litigation or the termination

22  provisions of the 1976 Act existed. Plaintiffs evidence does no more than inform the

23  Court that, despite efforts to be precise about publication dates for comic books

24  during this particular period, mistakes could be made; it is not at all probative on the

25  issue of whether mistakes were in fact made with respect to the information

26  contained in the particular registration certificates at issue in this case. The Court

27  therefore finds that the promotional announcements containing an illustration of

28  Superman from the cover of Action Comics, Vol. 1, are outside the effective reach

EXHIBIT 50
851

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 153 of 204
Page ID #:32425
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 35 of 72

1   of the termination notices.

2       Perhaps anticipating this finding, plaintiffs next seek to downplay the

3   significance of the promotional announcements themselves by arguing that, legally

4   and factually, little, if any, copyrightable Superman material is contained in those

5   announcements. Specifically, plaintiffs submit that Siegel and Shuster's material

6   was an indivisible joint work, and that the advertisements were a derivative work of

7   the authors' material. Thus, they claim that none of the Superman material

8   contained in the promotional announcements (namely, the cover artwork from

9   Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue

10   to exploit the same, regardless of the termination notice. As framed by plaintiffs:

11   "Defendants' entire argument is falsely premised on the erroneous assumption that

12   they can take the cover of Action Comics, No. 1, one of many illustrated panels in

13   Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted

14   joint work, and own a separate copyright in the illustration in the form of a mere 'in

15   house announcement' depicting a reduced image of the illustration. [Moreover,]

16   Detective's 'in-house announcements,' at best, are derivative works based on the

17   pre-existing cover and interior panel of Siegel and Shuster's pre-existing

18   'Superman' story." (Pls' Opp. at 44, 46).

19       This emphasis on the joint nature of Siegel and Shuster's Superman material

20   is rendered nugatory by the fact that Siegel and Shuster granted the copyright in

21   their material to Detective Comics on March 1, 1938, well before the promotional

22   advertisements were published by Detective Comics in April of that year. Thus, by

23   the time the promotional announcements were published, Siegel and Shuster's

24   Superman material was owned solely by Detective Comics to do with it as it saw fit,

25   whether it be as a full-length comic or as artwork in its advertising. That Siegel and

26   Shuster intended their work to be combined together and depicted as a unitary

27   whole is a separate and distinct question from whether, in later using some of

28   Shuster's artwork from that combined material it had acquired, Detective Comics

EXHIBIT 50
852

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 154 of 204
Page ID #:32426
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 36 of 72

1    somehow unraveled the copyrightability in that portion of the work.  The manner of a

2    work's authorship is entirely separate from the way in which an assignee may

3    exploit that material once it has acquired exclusive ownership of the same and,

4    correspondingly, whether there were anything copyrightable in the work the

5    assignee subsequently published using only parts of that material.

6        In this respect it is important to remember that a joint work can consist of

7    either inseparable or interdependent parts, the latter example of which include "the

8    collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result

9    of the interdependent contributions of the collaborators, i.e., one person wrote the

10   lyrics and the other the music, either of which could on its own [stand] as an

11   independent work, but which, when combined, form a single[, separate]

12   'interdependent' joint work." 2 PATRY ON COPYRIGHT § 5:6.  The original Superman

13   material was the product of the story and dialogue written by Siegel and the art work

14   drawn by Shuster; each on its own could have been a work in its own right subject

15   to copyright protection, but when merged together they formed a single new and

16   unified interdependent work.  See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111,

17   1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright

18   to [the same] (if a joint work) would be considered comprised of interdependent

19   parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and

20   color to those words").

21       At most, Detective Comics took a part of Shuster's independently

22   copyrightable art work out of the joint work and utilized it, in conjunction with other

23   material (namely, the advertising slogan), in a promotional announcement.  There is

24   no rule preventing a publisher or others from publishing portions or excerpts of

25   works, joint or otherwise, that it solely owns, and then seeking a separate copyright

26   in the same.  Indeed, the opposite is true — the holder of a copyright is expressly

27   entitled to prepare derivative works based upon a copyrighted work it owns or to

28   utilize portions of that work in other materials.  See 17 U.S.C. § 106(2); see

EXHIBIT 50
853

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 155 of 204
Page ID #:32427
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 37 of 72

1   <u>generally</u> 17 U.S.C. § 1 (repealed).  Detective Comics could just as well have

2   decided to split up the Superman material for publication into two or three

3   installments as it could (and did) decide to publish a portion of that material in an

4   advertisement to promote the comic.

5        This leads to plaintiffs' contention that the "derivative nature" of the

6   promotional advertisement itself works to exclude any of the copyright in the pre-

7   existing Superman material (notably, the art work for the <u>Action Comics</u>, Vol. 1

8   cover) contained therein from enuring to the benefit of the defendants to continue to

9   exploit.  Generally, if an author contributes additional original material to a pre-

10  existing work so as to recast, transform, or adapt that work, then the copyright

11  protection afforded to the author of that derivative work extends only to that

12  additional material and in no way extends to the underlying, pre-existing material.

13  <u>See</u> 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not

14  extend to any part of that work using "preexisting material in which copyright

15  subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10.  Thus, it is asserted that the

16  author of the pre-existing material work (here Siegel and Shuster) would continue to

17  retain ownership in the same despite its use in the derivative work (the promotional

18  announcement).

19       Even assuming that the changes made to the cover page for <u>Action Comics</u>,

20  Vol. 1, in the promotional announcements is not merely a reproduction, but

21  sufficiently "recast, transform, or adapts" the pre-existing material so as to be

22  considered a derivative work thereof (<u>e.g.</u> the cover is shown in black and white

23  instead of color, the scale of the artwork itself is diminished, and text is placed

24  alongside the artwork), there remains a complicating wrinkle.  At the time the

25  promotional announcements were placed in Detective Comics' existing comic book

26  publications, the underlying pre-existing Superman material from which a portion of

27  the announcements were derived (again the artwork for the cover) had yet to be

28  published, and, hence, copyright in the same was protected at the time under state

EXHIBIT 50
854

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 156 of 204
Page ID #:32428
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 38 of 72

1  common law. <u>See</u> 17 U.S.C. § 2 (repealed).

2       Given that the portion of the pre-existing material at issue had yet to achieve

3  statutory copyright protection when it was first published in <u>More Fun Comics</u>, Vol.

4  31, and <u>Detective Comics</u>, Vol. 15, it was injected into the public domain upon the

5  publication of the promotional announcements themselves, absent investiture of

6  statutory copyright protection through its publication. <u>See</u> 17 U.S.C. § 10

7  (repealed). That is to say, the copyright in the cover of <u>Action Comics</u>, Vol. 1, itself

8  first achieved statutory protection, if at all, upon its publication in the

9  announcements, not its later publication in <u>Action Comics</u>, Vol. 1. <u>See</u> 2 PATRY ON

10  COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work

11  copyright covers the unpublished material").

12       This fact has repercussions on plaintiffs' derivative works argument, as it

13  alters the general rule described above. Once Detective Comics published a

14  portion of the previously unpublished pre-existing material — as was its right as

15  owner of the material at that time — its continued protection resided exclusively

16  under statutory copyright in the derivative work itself lest that portion of the pre-

17  existing material (the art work for the cover) be injected into the public domain. <u>See</u>

18  <u>Batjac Productions Inc. v. GoodTimes Home Video Corp.</u>, 160 F.3d 1223, 1233 (9th

19  Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished

20  material is included in an authorized published derivative work, the derivative work

21  publishes the previously unpublished material"). As Professor Nimmer explains:

22      Because a derivative work by definition to some extent
    incorporates a copy of the pre-existing work, publication
23  of the former necessarily constitutes publication of the
    copied portion of the latter. Of course, an article that
24  merely describes a pre-existing work but does not
    incorporate any substantial portion of it is not a
25  derivative work and hence, does not publish the pre-
    existing work. Unless the basic work is reproduced in
26  the published work, it is not published. If only the broad
    outlines or other fragmentary portion of the pre-existing
27  work are copied and published in the derivative work,
    then only to that extent is the pre-existing work
28  published.

38

**EXHIBIT 50**
**855**

Case 2:10-cv-03633-ODW-RZ   Document 500-8   Filed 10/10/12   Page 157 of 204
Page ID #:32429
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 39 of 72

1 NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

("any work published prior to January 1, 1978, was not only thereby divested of

common law copyright; it was also injected into the public domain, unless at the

moment of publication copies of the work bore a proper copyright notice").

Thus, included in defendants' right to continue to exploit the copyright in the

derivative work (the promotional announcements) is the right to the copyright in that

part of the pre-existing work (the illustration from the cover) that was published for

the first time in that derivative work.

The cases cited by plaintiffs as standing for the contrary are all

distinguishable, as either the act of publication in question fell within the "limited"

publication exception because the material was distributed for promotional purposes

to members in the trade and not, as here, the general public itself, see Rushton v.

Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

derivative work was itself in the public domain (unlike here where the underlying

material was in an unpublished state protected by common law copyright), thereby

mooting any question about divestiture of the underlying work through publication.

See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

Here, the promotional announcements represent the first time Superman

appeared to the public, and consequently, the first time any of Siegel and Shuster's

Superman material was protected by statutory copyright, albeit in conjunction with

the other material contained in the advertisement itself.  Thus, all of the material in

the promotional announcement (which included the graphic depiction of Superman

later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

protection before the earliest possible date covered by the plaintiffs' termination

notices.  The Court therefore finds that the publication date for at least one of the

comics containing the promotional announcements falls outside the reach of the

termination notice and, therefore, any copyrightable material contained therein

EXHIBIT 50
856

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 158 of 204
Page ID #:32430
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 40 of 72

1    (including that found in the cover to Action Comics, Vol. 1, as depicted in those

2    announcements) remains for defendants to exploit.

3        This leads to the question of the scope of the copyrighted material remaining

4    in defendants' possession by way of the promotional announcements, a question

5    that defendants themselves acknowledge "is most obviously answered by [looking

6    at] the ads which speak for themselves" and that does not require some "special

7    'lens'" to resolve.  (Defs' Reply at 44).

8        The Court begins by observing what is not depicted in the announcements.

9    Obviously, nothing concerning the Superman storyline (that is, the literary elements

10   contained in Action Comics, Vol. 1) is on display in the ads; thus, Superman's

11   name, his alter ego, his compatriots, his origins, his mission to serve as a champion

12   of the oppressed, or his heroic abilities in general, do not remain within defendants

13   sole possession to exploit.  Instead the only copyrightable elements left arise from

14   the pictorial illustration in the announcements, which is fairly limited.

15       The person in question has great strength (he is after all holding aloft a car).

16   The person is wearing some type of costume, but significantly the colors, if any, for

17   the same are not represented, as the advertisement appears only in black and

18   white.  The argument that the "S" crest is recognizable in the promotional

19   advertisement is not persuasive.  What is depicted on  the chest of the costume is

20   so small and blurred as to not be readily recognizable, at best all that can be seen is

21   some vague marking or symbol its precise contours hard to decipher.  The Court

22   thus concludes that defendants may continue to exploit the image of a person with

23   extraordinary strength who wears a black and white leotard and cape.  What

24   remains of the Siegel and Shuster's Superman copyright that is still subject to

25   termination (and, of course, what defendants truly seek) is the entire storyline from

26   Action Comics, Vol. 1, Superman's distinctive blue leotard (complete with its

27   inverted triangular crest across the chest with a red "S" on a yellow background), a

28   red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

EXHIBIT 50
857

Case 2:10-cv-03633-ODW-RZ   Document 500-8   Filed 10/10/12   Page 159 of 204
Page ID #:32431
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 41 of 72

1    and run faster than a locomotive, none of which is apparent from the

2    announcement.

3         2.    Work Made for Hire Aspect of Portions of Action Comics, Vol. 1

4         Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5    prior grant in the copyright to a creation does not apply to a "work made for hire,"

6    because the copyright in such a creation was never the artist's to grant, belonging

7    instead to the one who employed the artist to create the work.  See 17 U.S.C.

8    § 304(c); Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)

9    ("Once it is established that a work is made for hire, the hiring party is presumed to

10   be the author of the work").  The manner in which Siegel and Shuster's Superman

11   material was submitted, then re-submitted in a reformatted version, and finally

12   accepted for publication by Detective Comics raises questions about the work for

13   hire status of the re-formatted material (but not the initial material submitted to the

14   publisher) later published in Action Comics, Vol. 1.

15        Defendants argue that portions of the copyrightable material contained in

16   Action Comics, Vol. 1, are unaffected by the termination notice because those

17   portions belong exclusively to them as "works for hire," arguing that certain material

18   found in the comic book was created by Detective Comics' in-house employees, or

19   that the material was added to the underlying Superman material by Siegel and

20   Shuster at the publisher's direction.  (Defs' Opp. at 27).  Specifically, the alleged

21   "additional" material provided by Detective Comics' in-house employees is the color

22   choices made throughout the comic, notably, the red color of the letter "S" on

23   Superman's crest and the art work for the cover to the magazine itself (albeit

24   modeled after a interior panel in the Superman comic illustrated by Shuster).

25   Similarly, the additional material supplied in response to the publisher's February 1,

26   1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27   "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28   the first Superman release" and "the last panel appearing on the thirteenth page."

EXHIBIT 50
858

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 160 of 204
Page ID #:32432
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 42 of 72

1    (Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

2          The thrust of defendants' argument was made and rejected by the Second

3    Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as

4    a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-

5    interest presented much of the same evidence now submitted in this case to argue

6    that this additional material transformed the underline entirety of Siegel and Shuster's

7    pre-existing Superman material published in Action Comics, Vol. 1, into a work

8    made for hire.  The Second Circuit rejected this argument, elaborating: "In the case

9    before us, Superman and his miraculous powers were completely developed long

10   before the employment relationship was instituted.  The record indicates that the

11   revisions directed by the defendants were simply to accommodate Superman to a

12   magazine format.  We do not consider this sufficient to create the presumption that

13   the [comic book] strip was a work for hire."  Siegel, 508 F.2d at 914.  This

14   conclusion forecloses any further litigation on the point of whether Shuster's

15   additional drawings when reformatting the underlying Superman material into a

16   comic book format or other facts related to such a theory such as the colorization

17   process for Action Comics, Vol. 1, or the party responsible for the illustration of the

18   cover to the magazine, rendered all or portions of the resulting comic book a work

19   made for hire.

20         Defendants seek to avoid the collateral estoppel effect of the Second

21   Circuit's decision by arguing that the only issue concerning the work for hire status

22   of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions,"

23   and not what was "added to the first Superman story by Detective's employees,"

24   amongst whom defendants count Siegel and Shuster after they executed the

25   December, 1937, contract.  (Defs' Opp. at 36).  Such a reading conflicts with the

26   record.  The evidence that was proffered during the 1970s litigation in the trial court

27   on the work for hire question included declarations from Siegel and Shuster

28   discussing what took place during the reformatting process.  This is the same

EXHIBIT 50
859

Case 2:10-cv-03633-ODW-RZ     Document 500-8     Filed 10/10/12     Page 161 of 204
Page ID #:32433
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 43 of 72

1  evidence that defendants now seek to use in this case to argue that the reformatted

2  material was a work made for hire.

3      Moreover, the circumstances surrounding the reformatting of the underlying

4  Superman material was not only mentioned by the Second Circuit, but discounted

5  by that court in passing on the work for hire nature of Action Comics, Vol. 1, itself,

6  not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.

7  It would be incongruous for the Court, in respecting as it must the Second Circuit's

8  judgment, to now hold that, while that reformatted material did not transform the

9  entirety of the material in Action Comics, Vol. 1, into a work made for hire, some

10  subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)

11  was somehow excised out and should be accorded work made for hire status. The

12  litigation of the larger question sweeps within it defendants' opportunity to litigate a

13  subpart thereof.

14      A contrary holding would transgress certain core principles of collateral

15  estoppel: "A new contention is not necessarily a new issue. If a new legal theory or

16  factual assertion raised in the second action is relevant to the issues that were

17  litigated and adjudicated previously, the prior determination of the issue is

18  conclusive on the issue despite the fact that new evidence or argument relevant to

19  the issue was not in fact expressly pleaded, introduced into evidence, or otherwise

20  urged." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25

21  (3rd ed. 2007). Significantly, much of the evidence underlying defendants'

22  arguments was presented in the Second Circuit litigation (notably Siegel and

23  Shusters' declarations submitted in that litigation) or, if not, was certainly available

24  to be used in that case (the colorization process for the initial printing of

25  Action Comics, Vol. 1, or that in-house employees supposedly drew the cover to the

26  magazine). "A party may be precluded from re-litigating an issue if evidence

27  supporting the party's position on the issue could have been submitted in previous

28  litigation but, for whatever reason, was not properly raised. Evidence that is not the

EXHIBIT 50
860

Case 2:10-cv-03633-ODW-RZ     Document 500-8     Filed 10/10/12     Page 162 of 204
Case 2:04-cv-08400-SGL-RZ     Document 293     Filed 03/26/2008     Page 44 of 72
Page ID #:32434

1  result of a different factual situation or changed circumstances, but is instead

2  historical in nature and could have been admitted at the first trial if properly

3  submitted, cannot be introduced in subsequent litigation of the same issue." Id. §

4  132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d

5  245, 257 (D.C. Cir. 1992)).

6      Nowhere have defendants explained why they did not bring up the question

7  of the colorization process for Action Comics, Vol. 1, or the cover art work for the

8  magazine, before the courts handling the 1970s Superman litigation. The question

9  about the legal effect the reformatting of the underlying Superman material had on

10  the work for hire question was litigated by the parties and resolved by the courts

11  during the 1970s Superman matter. Similarly, the question about the colorization

12  and cover art work (and who was responsible for the same) could have been raised

13  in conjunction with the work for hire question, but defendants failed or decided not

14  to do so. Having litigated the question and having the opportunity to present all the

15  evidence that pressed on the issue, defendants are now barred from seeking to

16  relitigate it anew even under the purported limited guise that it is now being offered.

17      Some noted treatise writers have commented that the Second Circuit's

18  analysis focusing on the work for hire nature of the additional reformatted material

19  should have been analyzed as a derivative work, that is, that the additional material

20  was derivative of the underlying Superman material. See 1 NIMMER ON COPYRIGHT

21  § 5.03[B] [1][b][I] at 5-33 n.92. ("The Siegel decision . . . may be understood as

22  holding that the first expression of the Superman character was the underlying

23  work, and the later development of the character was a derivative work. Because

24  only the derivative work was produced in a for-hire relationship, the underlying work

25  remains the property of the creators"). However, this analysis does not benefit

26  defendants.

27      First, no additional literary material was supplied in re-formatting the

28  underlying Superman material into a comic book format. All the dialogue and

EXHIBIT 50
861

Case 2:10-cv-03633-ODW-RZ   Document 500-8   Filed 10/10/12   Page 163 of 204
Page ID #:32435
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 45 of 72

1   storyline contained in Action Comics, Vol. 1, was present before Detective Comics

2   requested the pair to provide a reformatted version of the material, and that literary

3   material remained unchanged through the reformatting process.  All that is left was

4   supplying some additional illustrations by Shuster, the precise ones specified in his

5   declaration.  From the Court's review of these additional illustrations, it appears that

6   the material is completely derivative of other panels in the Action Comics, Vol. 1,

7   comic, with its origins in the underlying Superman material.  Thus, for instance,

8   while the final panel on page 13 shows Superman's crest with a red "S" on a yellow

9   background, so, too, does another panel containing the underlying, pre-existing

10  material.  Similarly, while the panels on the first page to the comic show Superman

11  leaping skyscapers, running at high rates of speed, and demonstrating feats of

12  great strength, so, too, do other panels containing the pre-existing material.  Indeed,

13  the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical

14  depiction of Superman was well on its way to being completely developed before

15  the re-formatted material in question was created some three years later.  Thus,

16  even if the additional material in question was tendered as a derivative work that

17  was made for hire by Shuster, all the potentially copyrightable material contained

18  therein is completely derivative of the pre-existing material and, hence, is not

19  subject to independent copyright protection in the first instance.  This, then, lends

20  strong support to the Second Circuit's observation: "Superman and his miraculous

21  powers were completely developed long before the employment relationship was

22  instituted." Siegel, 508 F.2d at 914.

23        Defendants also argue that the coloring for Action Comics, Vol. 1, was not

24  created or chosen by Siegel or Shuster, but was instead the product of some of

25  Detective Comics' in-house employees working in the printing department.  Even if

26  this argument was not otherwise precluded by collateral estoppel, the evidence

27  produced in support is less than persuasive.  According to "eye-witness" Jack Adler,

28  the material contained in comic books "at the time" was provided by artists to the

EXHIBIT 50
862

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 164 of 204
Page ID #:32436
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 46 of 72

1    Detective Comics' production staff in black and white. (Decl. Jack Adler ¶ 3).

2    "Typically," members of the staff then decided upon the color that would be applied

3    throughout the magazine, something that defendants argue is an additional element

4    added to the underlying Superman material that is itself subject to copyright

5    protection. (Decl. Jack Adler ¶ 3). Defendants' argument depends entirely upon

6    Mr. Adler's declaration, which is not as clear as they suggest.

7        Mr. Adler does not state that he worked on the colorizing of Action Comics,

8    Vol. 1, itself. Instead he states that he "worked for the engraving company that

9    made the metal plates for printing of, among other things, comic books for Detective

10   Comics." (Decl. Jack Adler ¶ 3). He then states that, "[a]t the time, comic book

11   artists . . . submitted drawn and inked comic book work in black and white." (Id.).

12   Mr. Adler further states that the black-and-white pages "were then photographed by

13   the engraver and a photo print was hand[-]colored by staff at Detective and by the

14   engravers." (Id.). Of course, nothing in this statement precludes the possibility that,

15   even if the Superman material was so submitted, Siegel and Shuster may have also

16   placed certain color directions with their material to be utilized in the engraving

17   process. In fact, that the earlier incarnation of Superman as hulking strongman in

18   the tradition of Tarzan was created by the pair as a comic book with color

19   illustrations lends to the possibility that they already had pre-conceived color

20   choices in mind for the later comic if it were later reformatted into a comic book,

21   rather than a newspaper comic strip.

22       Moreover, viewed in context, Mr. Adler's declaration appears to describe

23   procedures generally employed in the printing process, not as evidence of what

24   actually occurred with respect to the printing of Action Comics, Vol. 1, itself. His

25   statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value

26   in light of his candid admission that he has "no knowledge of Siegel and Shuster

27   selecting any of the color in Action Comics, No.1." (Id. ¶ 4). Mr. Adler attempts to

28   temper his admission of lack of knowledge by stating, without any basis, that he is

46

EXHIBIT 50
863

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 165 of 204
Page ID #:32437
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 47 of 72

1    "aware that Detective staff member, Ed Eisenberg, selected the color for

2    Superman's 'S' in Shield on his costume." (Id.)  Of course, Mr. Adler's statement on

3    this point is inadmissible as it is based on hearsay.  Without any direct link between

4    Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists

5    an insufficient evidentiary foundation for his conclusions concerning the manner in

6    which the Superman material was supplied to the printer and the colorization of the

7    same was handled.

8         Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn

9    by Detective Comics' in-house artists.  However, the scant evidentiary basis

10   provided in support of this argument is ambiguous.  In a letter sent to Jerome Siegel

11   dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a

12   silverprint of the cover of Action Comics," with the observation that Detective

13   Comics "used one of those panel drawings of SUPERMAN, as you suggested in

14   your recent letter." (Decl. Michael Bergman, Ex. I).  The inference sought to be

15   drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an

16   interior illustration from the Superman comic for the cover artwork he was stating

17   that one of the publisher's in-house artists saw the interior panel in question and

18   then drew the cover using the interior panel as inspiration.  Of course, given the

19   limited nature of the information contained in the passage it could also be argued

20   that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion

21   for the comic book's cover and Detective Comics decided to "use" this suggestion.

22   This alternative reading is not implausible.  As demonstrated by the pair's attempt to

23   have their earlier incarnation of Superman published by Detective Dan, Shuster had

24   in the past drawn exemplars for the cover illustration for his comics well before they

25   were ever accepted for publication.

26        In conclusion, the Court finds that the question of the work-for-hire nature of

27   certain portions of the Superman material published in Action Comics, Vol. 1, is

28   precluded from further litigation by operation of the 1974 Second Circuit decision.

EXHIBIT 50
864

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 166 of 204
Page ID #:32438
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 48 of 72

1    Accordingly, the binding nature of that court's decision leads to the conclusion that

2    all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-

3    for-hire and therefore is subject to termination.

4        3.    Failure to Include 1948 Consent Judgment

5        Among the regulatory requirements promulgated by the Register of

6    Copyrights concerning the termination notice's "form, content, and manner of

7    service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must

8    "reasonably" identify "the grant" to which it applies. 37 C.F.R. § 201.10(b)(1)(iv).

9    Thus, if the author entered into five separate grants of rights for the same work, and

10    a notice of termination identifies only four of those grants, the fifth grant remains

11    "intact," and the grantee's rights thereunder remain unaffected. See 3 NIMMER ON

12    COPYRIGHT § 11.06[B] at 11-40.22(1) n.63 ("if a grant was not effectively terminated,

13    then the rights licensed under such grant remain").

14        Here, defendants argue that plaintiffs' failure to identify the 1948 consent

15    judgment from the Westchester action is fatal to their attempts to terminate their

16    grant to the copyright in Superman, as that consent judgment was among the

17    grants leading to the transfer of ownership from the artists to Detective Comics.

18    Such argumentation is predicated upon the notion that, notwithstanding the

19    plaintiffs' act of identifying the stipulation between the parties from the Westchester

20    litigation that resulted in the consent judgment, identification of the consent

21    judgment from the Westchester action itself as (or part of) a "grant" was necessary

22    because it constituted the final step in "effectuat[ing] the transfer to [Detective

23    Comics] of the sole and exclusive ownership of all rights relating to 'Superman'";

24    "without it the rights identified in the Stipulation would not have been transferred."

25    (Defs' Opp. at 39). The Court disagrees.

26        Although the 1976 Act nowhere defines the term "grant," the central question

27    raised is plainly one of transfer: Did Siegel and Shuster transfer any rights to

28    Superman through or in conjunction with the 1948 consent judgment? If so, then it

48

**EXHIBIT 50**
**865**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 167 of 204
Page ID #:32439
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 49 of 72

1    operated as a grant by the artists in the same.

2    On that point, the 1976 Act is helpful as it defines a "transfer of copyright

3    ownership" as "an assignment, mortgage, exclusive license, or any other

4    conveyance, alienation, or hypothecation of a copyright." 17 U.S.C. § 101; see

5    Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125

6    U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to

7    any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right

8    comprised in a copyright. [Thus, a] 'transfer' includes not only assignments (as

9    understood under the [1909] Act), but also exclusive licenses and any other

10    conveyance of copyright or of any exclusive right comprised in a copyright").

11    The consent judgment at issue did not effectuate any transfer of rights from

12    Siegel and Shuster to Detective Comics. If any rights were transferred as a result of

13    the Westchester action, such a transfer was effectuated by the execution of the

14    earlier stipulated agreement of the parties, not a document created two days later

15    which simply memorialized the transfer that the stipulation itself had accomplished.

16    The binding nature of the transfer contained in the stipulation was completed the

17    moment that agreement was executed. The consent judgment was a mere

18    formality whose execution (or lack thereof) did not detract from the otherwise

19    binding nature of the parties' earlier agreement. It merely parroted what was

20    already agreed to by the parties in the stipulation itself.

21    Finally, even if the 1948 consent judgment is a "grant" separate and apart

22    from (or part and parcel with) the 1948 stipulation, the regulations recognize that not

23    all errors in compliance with its terms impact the validity of the termination notice:

24    "Harmless errors in a notice that do not materially affect the adequacy of the

25    information required to serve the purposes of . . . section 304(c) . . . shall not render

26    the notice invalid." 37 C.F.R. § 201.10(e)(1). Here, viewing the issue in the light

27    most favorable to the defendants, the 1948 consent judgment simply served to

28    culminate or otherwise finalize the transfer of the Superman copyright achieved

EXHIBIT 50
866

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 168 of 204
Page ID #:32440
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 50 of 72

1   through the stipulation the parties reached two days earlier.  That plaintiffs only

2   identified the latter rather than the former does not materially affect defendants'

3   understanding of the "grant" sought to be affected by the notice.  Indeed, courts

4   have required much less in meeting the regulation's requirement of providing "a

5   brief statement reasonably identifying the grant being terminated."  See Music Sales

6   Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of

7   the grant in the termination notice as the "grant or transfer of copyright and the

8   rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on

9   termination notices customarily accepted by the Register of Copyrights"); see also 2

10  PATRY ON COPYRIGHT § 7:45 (approving Music Sales).  Nowhere do defendants

11  argue why the harmless error rule should not apply in a situation such as this where

12  one document that is a part in the process leading to the "transfer" of rights is

13  identified, but its necessary corollary was not.

14       Accordingly, the Court concludes that, even if the consent judgment is

15  viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant

16  subject to the termination notice was a harmless error that did not diminish the

17  notice defendants received regarding the nature of the grant (and resulting transfer

18  of rights) that plaintiffs intended to terminate.

19       4.    Continued Acceptance of Benefits Under 1975 Agreement

20       Defendants argue that Joanne Siegel's continued acceptance of benefits

21  under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto

22  post-termination grant of rights in the Superman copyright to defendants under the

23  terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-

24  accepted the terms of the grant").  (Defs' Opp. at 41).  The legal premise of their

25  argument is that the 1976 Act recognizes that, once a termination notice has been

26  served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is

27  free to make "a further grant . . . of any right covered by a terminated grant" to the

28  original grantee or its successor in title.  17 U.S.C. § 304(c)(6)(D).  The Court

EXHIBIT 50
867

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 169 of 204
Page ID #:32441
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 51 of 72

1  ultimately rejects this argument as unpersuasive because it mistakenly assumes the

2  1975 agreement was a "grant" to the Superman copyright.

3      A look at the context leading up the execution of the 1975 agreement

4  illuminates in what way the parties believed (and just as importantly did not intend)

5  for that agreement to bind them.  The 1975 agreement appears to have been

6  drafted in response to bad publicity (apparently due to the juxtaposition of the

7  creators' misfortune and the Superman character's commercial success), and not

8  as a means to transfer or convey the party's rights to the Superman copyright.  The

9  agreement observed that nothing therein should be construed as undermining the

10 rights defendants had been conferred by virtue of the March 1, 1938, assignment,

11 rights which were later vindicated in the Westchester action and the 1970s Second

12 Circuit litigation.  Indeed, the agreement reaffirmed defendants' existing rights to

13 Superman and provided plaintiffs with annual payments, medical insurance, and

14 screen credits.  Such conferral of benefits was identified in the agreement as a

15 "voluntary" act by defendants in recognition of Siegel and Shuster's "past services."

16 The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's

17 widow on the timing of her husband's death.

18      This context and the language in the agreement itself demonstrate that the

19 1975 agreement was not a "grant."  The agreement's execution did not result in the

20 transfer or assignment of the Superman copyright.  Indeed, the agreement itself

21 expressly disavows such an interpretation by including language that the conferring

22 of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in

23 recognition of the pair's "past services," and that nothing therein should be

24 construed as undermining the rights defendants had been conferred in the March 1,

25 1938, assignment as vindicated in the Westchester action and the 1970s Second

26 Circuit litigation.   Thus, by its own terms, no rights were transferred through the

27 execution of that agreement.  A reaffirmation of existing rights without more is no

28 more "an assignment" or "conveyance" of rights to a copyright than it would if

**EXHIBIT 50**
**868**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 170 of 204
Page ID #:32442
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 52 of 72

1    Detective Comics had instead issued a press release declaring that previous court

2    rulings had recognized its existing ownership rights to that copyright.

3        Similarly, the 1982 codicil under which Joanne Siegel continued to receive

4    annual payments and benefits did not transfer any rights. The codicil consists of

5    five paragraphs. The first merely notes that the letter is in response to a letter

6    written by Joanne Siegel to the company's executive officer regarding her concern

7    over how she would provide for herself after her husband's death. The second

8    referenced the 1975 agreement, noted the increase in the amount of the annual

9    payments from $20,000 to $50,000 thereunder, and the payment of an additional

10   bonus. The third clarified a royalty policy that applied to creators other than Siegel

11   and Shuster. The fourth set forth the agreement to continue to pay benefits to

12   Joanne Siegel for the balance of her life in the event her husband predeceased her

13   before 1985. The fifth and final paragraph merely wishes Joanne Siegel and her

14   family well. Nowhere in these five humble paragraphs is a transfer of rights to be

15   inferred, much less explicitly found.

16       Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain

17   contained in the 1975 agreement post-termination somehow operated as a de facto

18   re-acceptance of the agreement itself (and the obligations flowing thereunder),

19   nowhere among those re-accepted "obligations" or "commitments" in that

20   agreement was there a grant to the Superman copyright. Defendants protest the

21   Court drawing this conclusion, arguing that plaintiffs have admitted in their

22   pleadings (their complaint, and by filing a termination notice directed at the 1975

23   agreement) that the 1975 agreement contained a grant to the Superman copyright.

24   It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are

25   considered judicial admissions" that bind the party who made them. American Title

26   Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988). That being said,

27   "courts still have discretion not to apply the doctrine in particular cases." 18 JAMES

28   WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

EXHIBIT 50
869

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 171 of 204
Page ID #:33443
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 53 of 72

1    (citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because the rule is

2    intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an

3    equitable doctrine invoked by a court at its discretion'")).

4         As noted at the outset, the termination provisions contained in the 1976 Act

5    are among the most complex and technical ones in the statute.  Given this

6    complexity, it is not surprising that a party seeking to harness its machinery may,

7    out of an abundance of caution, be more "over-inclusive" in terms of listing the

8    possible "grants" it seeks to terminate.  To penalize a party for being over-inclusive

9    rather than under-inclusive is all the more inequitable given the high hurdles the

10   termination provisions put in place.  Here, plaintiffs were represented by highly

11   experienced counsel who decided to list the 1975 agreement as a "grant" so as to

12   leave no stone unturned; an approach all the more justified given the extremely

13   technical and arcane arguments that have been advanced in this litigation

14   concerning the efficacy and enforceability of the termination notices themselves.

15   The Court therefore concludes that in these circumstances discretion counsels

16   against applying the judicial estoppel doctrine in the manner advocated by

17   defendants.

18        Accordingly, the Court concludes that Joanne Siegel's continued receipt of

19   payments and benefits under the 1975 agreement and 1982 codicil thereto does not

20   constitute a "further grant" or "an agreement to make a further grant" pursuant to 17

21   U.S.C. § 304(c)(6)(D).

22        5.    Statute of Limitations

23        Defendants contend that the present action was filed untimely.  The statute

24   of limitations itself is clear enough.  The Copyright Act of 1976 provides that "[n]o

25   civil action shall be maintained under the provisions of this title unless it is

26   commenced within three years after the claim accrued." 17 U.S.C. § 507(b).  The

27   issue raised by defendants implicates the latter clause and requires the Court to

28   determine when plaintiffs' claims accrued.

EXHIBIT 50
870

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 172 of 204
Page ID #:32444
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 54 of 72

1    At the outset, a clarification of terms is in order.  The instant matter, although

2    couched in terms of terminating the 1938 grant, is in effect one for co-ownership of

3    the copyright in the Superman material contained in Action Comics, Vol. 1,

4    because, if successful, plaintiffs would gain only a joint ownership interest in that

5    material with DC Comics, owing to the fact that Shuster left no heirs who could

6    simultaneously seek to terminate his half of the grant in the material.  Claims of co-

7    ownership accrue when there is a "plain and express repudiation of co-ownership

8    . . . communicated to the claimant."  Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir.

9    1996).

10    Here, defendants assert that such a repudiation was expressed by a letter

11    submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of

12    negotiations that took place between the parties shortly after the submission of the

13    termination notices.  The Court finds to the contrary.  As explained more fully below,

14    although the letter stated a position that the termination notices were "defective," the

15    letter addressed only the scope of the rights that could be recaptured by the

16    termination notices and left unchallenged the notices' validity and enforceability,

17    thus falling short of the required repudiation.[7]

18    

19    [7] One could quibble with whether any date other than the termination
effective date itself can serve as the accrual date in a case involving the right to

20    termination of a grant.  Much like having to await a judicial determination whether
one is a heir (as opposed to instances when an ownership claim is based on

21    whether or not someone is a creator) has been held to be the earliest instant for
an accrual date, see Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992) (Hank

22    Williams' putative daughter's claim to be an owner had to await judicial
determination that she was in fact his daughter and heir, thus accrual date was not

23    triggered when Hank Williams' first contested her putative status but instead when
state court made determination that she was his heir), so too a claim of ownership

24    by way of termination of a grant cannot be realized unless and until after the

25    termination's effective date.  Stated another way, a party's status as a creator is a
factual question subject to being challenged by the other putative co-owner at any

26    time, and hence, the accrual date for the same would begin at that instant.  The

27    same, however, is not true of a putative co-owner by way of termination.  Their
status as co-owner is not predicated upon a pre-existing factual scenario, like

28    whether they were involved in jointly creating the material per se.  Instead, their
status as a co-owner is predicated upon a legal mechanism — the exercise of a

54

EXHIBIT 50
871

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 173 of 204
Page ID #:32445
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 55 of 72

1    Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2    Mr. Levine, that they considered "the Superman Notices to be defective in several

3    respects." (Defs' Opp. at 50). What is telling is that the areas of defect elaborated

4    upon in the letter did not relate to the validity or enforceability of the termination

5    notices themselves, but pointed to areas curtailing the scope of what could be

6    recaptured even assuming the notice to be properly presented. These defects thus

7    did not call into question plaintiffs asserted right to termination contained in the

8    notices. For example, the letter remarks that defendants would still retain its rights

9    in trademarks that it had secured over the years to certain Superman-related

10   material, and that the termination would not give plaintiffs access to an accounting

11   of the foreign profits defendants gained from exploiting the copyright. Far from

12   repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13   validity of that ownership interest. Thus, the letter remarked that, "if the Siegels do

14   not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15   joint owners of the United States copyright in the 'Superman' comic published in

16   Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17   Even more telling was DC Comics' subsequent conduct. The parties'

18   negotiations quickly broke down and not much of substance was communicated

19   between the parties thereafter. Then, the day before the termination effective date,

20   DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22   new statutory right revoking an earlier transfer in the copyright in question, be it
23   one they solely or jointly created — that takes place at a certain defined point in
     time. Unless and until that legal triggering point is passed, there is nothing for the
24   other co-owner to reject or challenge. This is particularly the case given that
     termination notices can be served up to ten years before the effective termination
25   date. Defendants' position would, as a matter of logic, countenance scenarios
     where due to an early "rejection" of the termination notice, the passage of the
26   limitations period would occur well before the termination effective date even
27   arrived (and with it the putative co-owner's rights even vested). Nonetheless, the
     Court need not resolve this question as the letter in question does not constitute a
28   plain and express repudiation of plaintiffs' termination notice (and, hence, its right
     to co-ownership to the copyright in the Siegel and Shuster Superman material).

**EXHIBIT 50**
**872**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 174 of 204
Page ID #:32446
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 56 of 72

1    notice, proclaiming:

2        The absence of any steps towards negotiation for two
3        years, particularly on the 'eve' of the April 16, 1999
     purported 'effective' date of the termination, leaves us
4        concerned.  Thus our client has no alternative but to
     move to the stage of <u>putting your clients on clear notice</u>,
5        as set forth below, of DC Comics' rights and of its
     determination, if it becomes necessary, to take all
6        appropriate and necessary steps to protect those rights.
     First, <u>your clients are hereby put on notice that DC</u>
7        <u>Comics rejects both the validity and scope of the Notices</u>
     . . . .

8    (Decl. Marc Toberoff, Ex. Q (emphasis added)).

9        If, as defendants contend, such notice of intent had been so clearly and

10   unmistakably communicated over a year and half earlier, it is odd for them to have

11   to repeat it and then state that they were "putting" plaintiffs "on notice" about it.

12   Accordingly, the Court finds that the present action seeking declaratory relief

13   regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the

14   effective date of that termination.  DC Comics' submission of the letter the day

15   before that date denying the validity of the termination notice gave a plain and

16   express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity

17   of their termination notice was now ripe.  See 28 U.S.C. § 2201 ("In a case of actual

18   controversy within its jurisdiction, . . . any court of the United States, upon the filing

19   of an appropriate pleading, may declare the rights and other legal relations of any

20   interested party seeking such declaration, whether or not further relief is or could be

21   sought.")

22       Applying both the date of the accrual of the claim, the parties' tolling

23   agreement to the three-year statute of limitations, and the filing date of this action,

24   the Court concludes that it is timely.  The effective date of the termination notice,

25   and therefore the date of accrual, is April 16, 1999.  The parties entered into a

26   tolling agreement on April 6, 2000, which amounts to nine days less than one year

27

28

**EXHIBIT 50**
**873**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 175 of 204
Page ID #:32447
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 57 of 72

that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until ten business days after plaintiffs' September 21, 2002, letter providing written notice that they were ending settlement negotiations, that is, October 4, 2002, at which time the limitations clock started ticking once more.[9]  The present action was filed two years and four days later, on October 8, 2004.  Adding the periods of time the limitations period was running together, it is clear that they add up to a period of time just short of the three-year period set forth in § 507(b).

Accordingly, the Court concludes that the present action is timely.

### 6.    The 2001-2002 Settlement Negotiations

Defendants contend that plaintiffs' termination notice is no longer effective as the parties' settlement negotiations led to them entering into a binding post-termination agreement that resolved the issues presently before the Court.  A brief review of the time line regarding those negotiations is helpful to the Court's analysis of the present issue:

| | |
|---|---|
| October 19, 2001 | Pursuant to the parties' negotiations, plaintiffs' counsel sent to defendants' counsel a six-page letter outlining the substance of a settlement offer from defendants that |

---

[8]  Defendants' argument that the tolling agreement does not apply to plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc., because neither was a "party to" or bound by that agreement is disingenuous.  (Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound not only DC Comics but also its "past and present subsidiaries or affiliates."  (Decl. Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly qualifies as a corporate affiliate to the same; a point defendants later admit when speaking to the alter ego question presented in the pleadings.  (Defs' Mot. Summ. J. at 79 ("the following is a chart of the current corporate structure and affiliations between DC, WBEI and TWI")).  Moreover, representatives for both companies were actively involved in the settlement negotiations themselves, further undermining any suggestion that they were bystanders to the process.

[9]  Defendants argue that the tolling period concluded much earlier based on the parties earlier having reached "an amicable resolution of the dispute."  (Defs' Opp. at 51 (emphasis in original)).  Given that the Court finds that no such "resolution," as opposed to a naggingly close potential for the same, occurred through the parties settlement discussion post-termination, see infra A.6, their argument is without merit.

EXHIBIT 50
874

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 176 of 204
Page ID #:32448
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 58 of 72

1                     was "accepted" by the plaintiffs.

2   October 26, 2001    Defendants responded, noting they were working on a
draft agreement and enclosing "a more fulsome outline"
3                         of "what" they "believe the deal" they have "agreed" to is.

4   February 1, 2002    Defendants' counsel provided a fifty-six page draft
agreement that reserved the right to have their clients
5                         comment upon it and noted that certain, related "stand
alone" assignments were in the process of being
6                         finalized.

7   May 5, 2002        Plaintiffs responded to defendants' draft by stating that
the proposed agreement contained new, unacceptable
8                         terms to which they had not agreed.

9   May 21, 2002       Defendants sent a letter to plaintiffs stating that they
believed that each of the major points in the settlement
10                         had already been agreed upon.

11   Sept 21, 2002      Plaintiffs rejected their counsel's proposed draft
agreement and advised defendants in writing that they
12                         were ending negotiations.

13       The parties are in agreement that California law should be applied in

14 deciding this question, but disagree as to its application. "California law is clear that

15 there is no contract until there has been a meeting of the minds on all material

16 points." Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998).

17 The failure to reach a meeting of the minds on all material points prevents the

18 formation of a contract even if the parties have orally agreed upon some of the

19 terms, or have taken some action related to the contract. Grove v. Grove Valve &

20 Reg. Co., 4 Cal.App.3d 299, 311-12 (1970). Similarly, the terms proposed in an

21 offer must be met exactly, precisely, and unequivocally for its acceptance to result

22 in the formation of a binding contract. See Panagotacos v. Bank of America, 60

23 Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719,

24 726 (1959). A qualified acceptance constitutes a rejection terminating the original

25 offer and the making of a counteroffer to the original offeror, which must also be

26 unequivocally accepted by the former offeror for a binding contract to form. See

27 Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159

28 Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

**EXHIBIT 50**
**875**

1    acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance

2    amounts to a new proposal or counteroffer putting an end to the original offer'"); In

3    re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE

4    § 1585 ("A qualified acceptance is a new proposal.").

5         The parties disagree over whether the terms contained in plaintiffs' October

6    19, 2001, letter differ in substance from those set forth in defendants' later letter of

7    October 26, 2001 (and accompanying outline), such that there was no unequivocal

8    acceptance of an offer and, thus, no agreement.  As with much in both life and law,

9    materiality is in the eye of the beholder.  From the Court's reading of the parties'

10   correspondence, it is clear that the parties went well beyond reaching a settlement

11   in principle regarding their respective positions to the Superman property.  Rather,

12   as suggested by the time line above, the parties' correspondence, and the actions

13   taken in response thereto, illustrates that they found themselves in the all-too-

14   familiar situation in which verbal settlement negotiations result in what the parties

15   believe to be an agreement on all the major points of dispute, but which, upon

16   further discussion, falls short of the agreement needed to resolve their dispute.  The

17   devil, as it often is, was in the details.

18        That material details remained is evidenced by defendants' response to

19   plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the

20   deal" they had "agreed to."   Moreover, defendants' February, 2002, draft

21   agreement was not even considered final by its authors, who reserved the right for

22   their clients to "comment" on it, and would also require the further submission of a

23   number of "stand alone" agreements yet to be finalized.  Indeed, Time Warner's

24   CEO later commented that submission of the draft agreement was "expected" to

25   result in further "comments and questions" from the Siegel heirs that "would need to

26   be resolved."

27        This give and take reveals that the parties, while close to agreeing to a

28   complete and comprehensive settlement of their dispute, had not passed the

EXHIBIT 50
876

threshold where they had finalized and assented to all material terms of such a

settlement. Rather, as they attempted to sketch in the finer details of a settlement

from the broad outlines contained in the October 19 letter, more and more issues

arose upon which they could not reach agreement, resulting in the negotiations

falling apart. In this respect, the present case is not unlike Callie v. Near, 829 F.2d

888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

which the courts held that no enforceable agreement was reached when the parties

had agreed to a rough outline of an agreement, but were thereafter unable to reach

agreement on the finer details and the negotiations fell apart.

Defendants' argument to the contrary is premised on the notion that they can

limit the scope of the legal analysis to the October 19, 2001, letter and call it a

contract, regardless of their materially different October 26, 2001, letter in reply ("I

enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

vastly different February 1, 2002, draft, which were both part and parcel of the same

settlement negotiation. Ignoring these contemporaneous communications is at

odds with the requirement in contract formation that courts must consider "all the

surrounding circumstances." Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

agreement provides context and meaning as to the understanding the parties had

about the effect of the October 19 letter itself.

Defendants further seek to create issues of fact through post hoc testimony

and rationalizations. None of this subjective belief is sufficient to defeat the

objective manifestation of the parties' intent relayed in the documents referenced

above that aptly demonstrate that there was no "meeting of the minds" on all

material terms. See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

existence of mutual consent is determined by objective rather than subjective

criteria, the test being what the outward manifestations of consent would lead a

reasonable person to believe. Accordingly, the primary focus in determining the

60

**EXHIBIT 50**
**877**

existence of mutual consent is upon the acts of the parties involved"); <u>Stewart v.</u>
<u>Preston Pipeline Inc.</u>, 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a
contract is based upon objective and outward manifestations of the parties"); CAL.
CIV. CODE § 1639.

One need only review the language of the parties' correspondence, their
conduct in reaction thereto, and the numerous material differences between the
terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002,
draft to reach the conclusion that the parties failed to come to an agreement on all
material terms. <u>See</u> <u>Grove v. Grove Valve & Reg. Co.</u>, 4 Cal.App.3d 299, 311-12
(1970) (failure to reach meeting of the minds on all material points prevents contract
formation even though parties orally agreed on many terms, or have taken action
relating to the contract). Far from signifying that the parties' "negotiations . . .
result[ed] in a binding contract" leaving nothing more than the drafting of more
formal documentation memorializing that agreement, <u>see</u> <u>Louis Lesser Enterprises,</u>
<u>Ltd. v. Roeder</u>, 209 Cal.App.2d 401, 404 (1962), these submissions between the
parties went far beyond that by adding in or further refining areas from what was
contained in the October 19 letter. That after the submission of the October 19
letter defendants began the process of creating a settlement trust account and the
parties negotiated about providing Siegel and Shuster screen credits in the then
upcoming movie <u>Superman Returns</u> could as much be seen as goodwill gestures
on defendants' part while the negotiations continued as it could reflect an indication
on their part that they thought they were contractually bound to do the same.

From all of this there is no document or set of documents reflecting
agreement by the parties to singular, agreed terms. Defendants cannot explain to
the Court what from the parties' differing exchange constitutes this purported
contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance"
reflected in the October 19 letter and either festoon upon it all the terms contained
in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

**EXHIBIT 50**
**878**

1    clearly and unequivocally rejected that latter draft agreement), or have the Court

2    perform that task. The Court's responsibility is not to create a patch-quilt agreement

3    by stringing together certain expressions of assent made at one point (October 19),

4    and attaching to it material terms spelled out later in time (and to which the

5    supposedly assenting party promptly rejected). See Industrial Indemnity v. Superior

6    Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7      Accordingly, the Court concludes that the parties' settlement negotiations did

8    not result in an enforceable agreement resolving the issues presently before the

9    Court.

10   B.     Limitations on Scope of Recaptured Rights

11      The principal purpose behind the creation of the termination right was to give

12   authors (and their heirs) a chance to retain the extended renewal term in their work

13   and then re-bargain for it when its value in the marketplace was known. See H.R.

14   REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the

15   termination right "safeguarding authors against unremunerative transfers . . .

16   because of the unequal bargaining position of authors, resulting in part from the

17   impossibility of determining a work's prior value until it has been exploited").

18      The need for such a second bite at the apple flowed from the fact that the

19   1909 Act created a dual term in the copyright to a work, one realized upon the

20   work's publication and the second occurring twenty-eight years later with the

21   copyright's renewal. Justification for this splitting of terms was based, in part, on the

22   understanding that an author's ability to realize the true value of his or her's work

23   was often not apparent at its creation, but required the passage of time (and the

24   marketing efforts by a publisher) to materialize. The renewal term in the copyright

25   to the work thus served as a mid-course re-valuation tool allowing the author, by

26   giving him or her the right of renewal in the work, leverage in re-negotiating a better

27   deal with the original grantee or any other suitor who desired to continue to market

28   the copyright. See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

EXHIBIT 50
879

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 181 of 204
Page ID #:32453
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 63 of 72

1  theory behind a dual system of term was that it gave the author or the author's heirs

2  a 'second bite at the apple;' when the renewal term came around, the value of the

3  copyright would be better known than at the time of initial publication.  With this

4  information, a new bargain could be struck that would more accurately reflect the

5  market rate").  This re-valuation mechanism provided by the renewal term under the

6  1909 Act was largely frustrated by the Supreme Court's decision in <u>Fred Fisher</u>

7  <u>Music</u>, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their

8  rights to both the initial and the renewal term.

9      Although the termination right contained in the 1976 Act sought to correct the

10  damage done by <u>Fred Fisher</u> to an author's ability to renegotiate through the

11  reversion of rights, it did not revert to the author the full panoply of rights he or she

12  would have enjoyed upon renewal under the 1909 Act.  Owing in large measure to

13  objections by publishers seeking to minimize the disruption to "existing contracts

14  and authorized derivative works already in distribution" that such a recapture right

15  would engender, <u>see</u> 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain

16  limitations on what authors (or their heirs) gained from exercising the termination

17  right.  It is to these limits on the termination right that the Court now turns.

18      1.    Foreign Profits

19      Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant

20  under this subsection affects only those rights covered by the grant that arise under

21  this title[, Title 17 of the United States Code, governing copyrights], and in no way

22  affects rights arising under any other Federal, State, or foreign laws."  Defendants

23  read from this a statutory limitation on the scope of any accounting arising from the

24  termination notices in this case to those profits realized by the domestic exploitation

25  of the Superman copyright contained in <u>Action Comics</u>, Vol. 1, excluding those

26  realized from foreign sources.  The Court finds this argument persuasive.

27      Although the Court can locate no case that has specifically addressed the

28  issue of accounting profits from the foreign exploitation of a copyright that is subject

EXHIBIT 50
880

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 182 of 204
Page ID #:32454
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 64 of 72

1    to a valid termination notice, the statutory text could not be any clearer on this

2    subject. Through this section, Congress expressly limited the reach of what was

3    gained by the terminating party through exercise of the termination right;

4    specifically, the terminating party only recaptured the domestic rights (that is, the

5    rights arising under title 17 to the United States Code) of the grant to the copyright

6    in question. Left expressly intact and undisturbed were any of the rights the original

7    grantee or its successors in interest had gained over the years from the copyright

8    through other sources of law, notably the right to exploit the work abroad that would

9    be governed by the copyright laws of foreign nations. Thus, the statute explains

10   that termination "in no way affects rights" the grantee or its successors gained

11   "under foreign laws."

12        Such a reading is supported by leading commentators, who are in agreement

13   as to the effect of § 304(c)(6)(E) has in a case such as this.

14        Professor Nimmer states:

15        A grant of copyright "throughout the world" is
          terminable only with respect to uses within the
16        geographic limits of the United States. Because
          copyright has no extraterritorial operation, arguably
17        American law is precluded from causing the termination
          of rights based upon foreign copyright laws. A response
18        to this argument is that the nonextraterritoriality of
          copyright is irrelevant because the question here is one
19        of contract law, not copyright law, in that it concerns the
          effect of a contract granting certain rights. The contract
20        law of one nation may be applicable in another nation
          under the latter's conflict-of-laws rule. The conclusive
21        answer to this problem lies in the text of the termination
          provisions of the Copyright Act, which expressly provide
22        that statutory termination "in no way affects rights arising
          under . . . foreign laws" — that is, under foreign copyright
23        (not contract) laws. Thus, even if the conflicts rule of a
          foreign nation were to call for application of the American
24        termination rule as a rule of contract law, that rule by its
          own terms excepts from termination the grant of those
25        rights arising under foreign copyright laws.

26   3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

27        Professor Patry agrees: "Accordingly, where a U.S. author conveys

28   worldwide rights and terminates under either section, grants in all other countries

**EXHIBIT 50**
**881**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 183 of 204
Page ID #:33455
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 65 of 72

1    remain valid according to their terms or provisions in other countries' laws." 7

2    PATRY ON COPYRIGHT § 25:74.

3        Plaintiffs argue, however, that the section also allows for the possibility that

4    the terminating party gains not only the domestic rights to the copyright in question

5    (the "rights covered by the grant that arise under this title"), but also retains

6    whatever other rights it may have under "Federal, State, or foreign laws."  From this

7    premise, plaintiffs argue that, because an accounting between co-owners in a

8    copyright is governed by state law, and California state law allows for the sharing of

9    foreign profits between tenants in common, so, too, should defendants be forced to

10    account for their foreign profits.  This argument misses the fact that all plaintiffs

11    have gained from the termination right is a recapturing of the <u>domestic</u> copyright in

12    the Superman material published in <u>Action Comics</u>, Vol. 1.  Defendants continue to

13    hold, unaffected, separate rights to that copyright arising under <u>foreign</u> copyright

14    laws.  This distinction is important for two reasons.

15        First, such an open effort to extend the reach of U.S. copyright law overseas,

16    as plaintiffs' reading of the statute avows, would be in direct contradiction to not only

17    the plain terms of the statute (stating that termination does <u>not</u> affect another

18    parties' rights arising under the copyright laws of "foreign" nations), but stands in

19    stark juxtaposition to the longstanding rule "that the copyright laws [of this country]

20    have no application beyond the U.S. border." <u>Los Angeles News Serv. v. Reuters</u>

21    <u>TV Intern.</u>, 340 F.3d 926, 931 (9th Cir. 2003).  If Congress contemplated the ability

22    to attach or otherwise force the accounting of foreign profits to which the original

23    grantee or its successors are legally entitled under the copyright laws of other

24    nations through the backdoor of applying state law tenant in common principles,

25    one would have expected such an intention to have been made expressly, and

26    certainly with some explanation given the incongruity that arises from the statutory

27    language's notation that termination did <u>not</u> affect another's rights under "foreign

28    laws."

65

EXHIBIT 50
882

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 184 of 204
Page ID #:32456
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 66 of 72

1    Second, the cases cited by plaintiffs requiring one co-owner to account to the

2    other for both domestic and foreign profits involved parties who were co-owners to

3    the "world-wide" copyright in the work and, not as with the termination right, to only

4    the domestic copyright.  See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996)

5    (noting that declaratory action was filed after other co-owner obtained a "renewal of

6    the copyright" listing himself as the sole author in the song "Let the Good Times

7    Roll").  Plaintiffs have directed the Court to no case wherein a co-owner of the

8    domestic copyright in a work was allowed an accounting of a co-owner's foreign

9    profits.  See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as

10   were originally the subject of a grant will revert upon the termination of that grant.

11   [T]o the extent that a grant includes rights based upon federal law other than the

12   Copyright Act, state law, or foreign law, such rights are not subject to termination").

13       Accordingly, the Court holds that the termination notice affects only the

14   domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to

15   Detective Comics of the copyright in the Superman material contained in Action

16   Comics, Vol. 1.  The termination notice is not effective as to the remainder of the

17   grant, that is, defendants exploitation of the work abroad under the aegis of foreign

18   copyright laws.  Thus, although defendants retain the unfettered right to exploit the

19   works (and retain the profits derived therefrom) in foreign nations, they may do so

20   domestically only as a co-owner (through Shuster's share) of the works.  See Oddo

21   v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an

22   independent right to use or license the use of the copyright. . . . . A co-owner of a

23   copyright must account to other co-owners for any profits he earns from licensing or

24   use of the copyright . . . .").  As such, defendants must account to plaintiffs only for

25   the profits from such domestic exploitation of the Superman copyright.

26       2.    Trademark Rights and Ownership of Pre-Termination Derivative

27             Works

28       As noted in the previous section, the right to termination leaves undisturbed

EXHIBIT 50
883

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 185 of 204
Page ID #:32457
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 67 of 72

the original grantee or its successors in interests rights arising under "federal law." 17 U.S.C. § 304(c)(6)(E). Among the rights based on federal law that defendants secured over the years were several trademarks that utilized or incorporated portions of the copyrighted material found in Action Comics, Vol. 1. Defendants seek a declaration from the Court that, even if successful in terminating the Superman copyright contained in Action Comics, Vol. 1, plaintiffs cannot share in defendants' profits "purely attributable to [Superman] trademark rights." (Defs' Reply at 11). Plaintiffs admirably concede the point in their briefs, but argue that they are "entitled to profits from mixed trademark uses to the extent such exploit recaptured copyright elements (e.g., 'Superman costume')." (Pls' Reply at 49 n.28).

Similarly, defendants seek a declaration that, to the extent plaintiffs are entitled to an accounting as a result of their successfully terminating the 1938 grant, it should not include any profits attributable to the "post-termination exploitation of derivative works [of Action Comics, Vol. 1,] prepared prior to termination." (Defs' Mot. Summ. J. at 28). Again, plaintiffs concede, as they should, this point. (Pls' Reply at 49 n.28). Section 304(c)(6)(A) provides that derivative works created during the grant (meaning up until the termination effective date) may continue to be exploited after termination. Again, however, plaintiffs hold out as a separate question the existence of pre-termination derivative works that are "altered so as to become post-termination derivative works." (Pls' Reply at 49 n.28).

Given that these contentions by plaintiffs — the recapture or accounting from the mixed use of trademark and copyright and what to do with any alteration in pre-termination derivative works — are not the subject of the present motion, the Court will not address them in this Order. Even though it is clear that these issues will impact the accounting of profits in some manner, they cannot be fully adjudicated based on the narrow record currently before the Court and absent a full briefing of the particular mixed uses or altered pre-termination derivative works that are specifically at issue.

EXHIBIT 50
884

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 186 of 204
                                      Page ID #:32458
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 68 of 72

1   Accordingly, the Court holds that the profits defendants garner from the use

2   of Superman trademarks that "are purely attributable to [those] trademark rights,"

3   and from its use of unaltered pre-termination derivative works are not subject to

4   accounting.

5       3.    Accounting for Profits of Warner Bros. Entertainment, Inc., and Time

6             Warner, Inc.

7   The parties are in disagreement over whether plaintiffs may directly share in

8   the profits from the exploitation of the works by DC Comics corporate sibling,

9   Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time

10  Warner, Inc. ("TWI"). The genesis for this claim stems from certain inter-corporate

11  transactions amongst these actors concerning the Superman copyright. In the

12  same year that plaintiffs' termination notices became effective, DC Comics

13  executed an exclusive license in favor of WBEI (and a year later a separate

14  exclusive license with WBEI's television division) to exploit the Superman copyright

15  for the remainder of its extended renewal term in certain media formats, notably

16  movies, television, and home video. (Decl. Marc Toberoff, Exs. E & F). Defendants

17  contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an

18  accounting of the profits made by DC Comics (in the form of the licensing fees it has

19  collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has

20  made pursuant to the license.[10]

21  Defendants' argument is not without support. The Court starts with the

22  general principle that "each co-owner has an independent right to use or license the

23  use of the copyright[, but that a] co-owner of a copyright must account to other

24  co-owners for any profits he earns from licensing or use of the copyright." Oddo,

25  743 F.2d at 633. Licensees, on the other hand, are accountable only to their

26  _____

27      [10] It appears to the Court that because TWI is not a licensee of the works, it
28  may not have any profits to account for; however, absent evidence of this fact from
    either side (or the representation that such is not the case), the Court cannot rule
    on this issue at this time.

68

EXHIBIT 50
885

Case 2:10-cv-03633-ODW-RZ   Document 500-8   Filed 10/10/12   Page 187 of 204
Page ID #:32459
Case 2:04-cv-08400-SGL-RZ   Document 293   Filed 03/26/2008   Page 69 of 72

1  licensors, and owe no duty of accounting to the non-licensor co-owner of a

2  copyright the licensee exploits.  See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523

3  (9th Cir. 1990).

4      Plaintiffs, however, take a different view of the licenses, arguing that "Warner

5  has stepped exclusively into DC's shoes with respect to such motion picture and

6  television copyrights." (Pls' Opp. at 30).  In other words, the exclusive license had

7  the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs

8  (assuming the successful termination of the 1938 grant) insofar as the exploitation

9  of the copyright in the mediums in which those licenses are concerned.

10     This theory, however, requires large legal leaps that are not countenanced

11  by current law.  To begin, in order for an exclusive license in the entirety of the

12  interest in a joint work itself (such as Superman) to be effective, the consent of both

13  joint owners in the copyrighted work is required.  See 2 PATRY ON COPYRIGHT § 5:7

14  ("A joint author (or co-owner) may not, however, transfer all interest in the work

15  without the other co-owner's express (and written) authorization, since that would

16  result in an involuntary transfer of the other joint owner's undivided interest in the

17  whole"). The same requirement for prior consent holds true even with respect to the

18  wholesale transfer of exclusive licenses in subparts to a copyright, such as a license

19  transferring all the stage rights (not just the joint owner's rights) to a novel but not

20  the movie or literary rights. Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-

21  39.

22     Such consent simply did not occur here.  DC Comics unilaterally sought to

23  give an exclusive license to the entirety in the Superman property's movie and

24  television rights to WBEI post-termination.  As a result, the attempt to provide an

25  exclusive license was ineffective.  At best, all that was conveyed was a non-

26  exclusive license, and, at worst, a license agreement whose terms are null and void

27  absent ratification by plaintiffs.  See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

28     Applying these principles in a vacuum, the Court would readily reach the

EXHIBIT 50
886

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 188 of 204
Page ID #:32460
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 70 of 72

1   conclusion championed by defendants:  WBEI, as a licensee, is answerable only to

2   DC Comics as its licensor; that DC Comics is the only entity that must account for

3   profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that

4   DC Comics' accounting to plaintiffs is limited to those profits derived from licensing

5   the Superman copyright to WBEI.

6           However, the Court's analysis does not occur in vacuum; rather, it must take

7   into account the relevant facts of this case, particularly given that the accounting

8   sought by plaintiffs in this action is an equitable remedy, and the Court must

9   conduct its inquiry accordingly.  See Oddo, 743 F.2d at 633 ("A co-owner of a

10  copyright must account to other co-owners for any profits he earns from licensing or

11  use of the copyright, . . . but the duty to account does not derive from the copyright

12  law's proscription of infringement.   Rather, it comes from equitable doctrines

13  relating to unjust enrichment and general principles of law governing the rights of

14  co-owners.") (internal quotation marks and citations omitted).

15          Here, the relatedness of the transferor and the transferee entities cannot be

16  ignored.  The evidence before the Court reveals that the relevant entities are all

17  closely related entities — parent corporations, wholly and partially-owned

18  subsidiaries, partners, sibling business entities (owned directly or indirectly by the

19  same parent) — although it is not entirely clear to the Court exactly what those

20  relationships have been at all relevant times.  This fact alone raises a specter of a

21  "sweetheart deal" entered into by related entities in order to pay a less than market

22  value fee for licensing valuable copyrights.  If such were the case, the related entity

23  might be able to exploit the copyrights without the responsibility of answering to the

24  co-owner of a joint work, and the licensor co-owner would thereby be relieved of the

25  responsibility of accounting for any profits (other than a greatly reduced licensing

26  fee) to the non-licensor co-owner.  This result would be inequitable.

27          This concern is bolstered by the declaration of Paul Levitz, President and

28  Publisher for DC Comics, which states that under the post-2003 corporate

EXHIBIT 50
887

1  restructuring of Time Warner's business, "for operating management purposes, DC

2  reports" not to immediate corporate parent WCI, but to its sibling corporation

3  "WBEI," the licensee of the rights at issue in this action.  (Decl. Paul Levitz ¶ 17).

4  As Levitz explains, "I report to and obtain approvals from WBEI's President and

5  Chief Operating Officer before making significant acquisitions or certain financial

6  decisions or investments that are outside the scope of DC's customary acquisitions

7  and investments; before implementing meaningful strategic changes; and before

8  embarking on something substantially outside DC's normal course of business."

9  (Id.).  Although this is not evidence of what occurred at the time of the license, it is

10  still probative evidence of the relatedness of the licensee and licensor that could

11  result in an extremely favorable licensing arrangement that works to the detriment of

12  the non-licensor co-owner.  These open issues also touch upon factors to be

13  considered in analyzing alter ego claims.  See Sonora Diamond Corp. v. Superior

14  Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290

15  (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an

16  opposing party is using the corporate form unjustly, is that justice be done. What the

17  formula comes down to, once shorn of verbiage about control, instrumentality,

18  agency and corporate entity, is that liability is imposed to reach an equitable result").

19      Whether the license fees paid represents the fair market value therefor, or

20  whether the license for the works between the related entities was a "sweetheart

21  deal," are questions of fact that are not answered on summary judgment, certainly

22  not without the benefit of expert testimony which has not been presented by either

23  party on this topic.  The Court therefore concludes that summary judgment on this

24  issue is inappropriate at this time.[11]

25

26

27      [11]  Because the Court concludes that defendants' motion for summary

28  adjudication of this issue must be denied for the reasons stated above, the Court
does not at this time resolve other arguments raised by plaintiffs regarding this
issue.

**EXHIBIT 50**
**888**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 190 of 204
Page ID #:32462
Case 2:04-cv-08400-SGL-RZ    Document 293    Filed 03/26/2008    Page 72 of 72

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long

ago — the copyright in the Superman material that was published in <u>Action Comics</u>,

Vol. 1.  What remains is an apportionment of profits, guided in some measure by

the rulings contained in this Order, and a trial on whether to include the profits

generated by DC Comics' corporate sibling's exploitation of the Superman

copyright.

DATE:  March 26, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

**EXHIBIT 50**
**889**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 191 of 204
Page ID #:32463
Case 2:04-cv-08400-SGL-RZ    Document 293-2    Filed 03/26/2008    Page 1 of 2

**ADDENDUM A**



**EXHIBIT 50**
**890**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 192 of 204
Page ID #:32464
Case 2:04-cv-08400-SGL-RZ    Document 293-2    Filed 03/26/2008    Page 2 of 2















**EXHIBIT 50**
**891**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 193 of 204
Page ID #:32465
Case 2:04-cv-08400-SGL-RZ    Document 293-3    Filed 03/26/2008    Page 1 of 2



**EXHIBIT 50**
**892**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 194 of 204
Page ID #:32466
Case 2:04-cv-08400-SGL-RZ    Document 293-3    Filed 03/26/2008    Page 2 of 2



**EXHIBIT 50**
893

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 195 of 204
Page ID #:32467
Case 2:04-cv-08400-SGL-RZ    Document 293-4    Filed 03/26/2008    Page 1 of 2



EXHIBIT 50
894

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 196 of 204
Page ID #:32468
Case 2:04-cv-08400-SGL-RZ    Document 293-4    Filed 03/26/2008    Page 2 of 2















**EXHIBIT 50**
**895**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 197 of 204
Page ID #:32469
Case 2:04-cv-08400-SGL-RZ    Document 293-5    Filed 03/26/2008    Page 1 of 2



**EXHIBIT 50**
**896**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 198 of 204
Page ID #:32470
Case 2:04-cv-08400-SGL-RZ    Document 293-5    Filed 03/26/2008    Page 2 of 2



**EXHIBIT 50**
**897**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 199 of 204
Page ID #:32471
Case 2:04-cv-08400-SGL-RZ    Document 293-6    Filed 03/26/2008    Page 1 of 2












**EXHIBIT 50**
**898**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 200 of 204
Page ID #:32472
Case 2:04-cv-08400-SGL-RZ    Document 293-6    Filed 03/26/2008    Page 2 of 2








**EXHIBIT 50**
899

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 201 of 204
Page ID #:32473
Case 2:04-cv-08400-SGL-RZ    Document 293-7    Filed 03/26/2008    Page 1 of 2

















**EXHIBIT 50**
**900**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 202 of 204
Page ID #:32474
Case 2:04-cv-08400-SGL-RZ    Document 293-7    Filed 03/26/2008    Page 2 of 2










**EXHIBIT 50**
901

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 203 of 204
Page ID #:32475
Case 2:04-cv-08400-SGL-RZ    Document 293-8    Filed 03/26/2008    Page 1 of 2



**EXHIBIT 50**
**902**

Case 2:10-cv-03633-ODW-RZ    Document 500-8    Filed 10/10/12    Page 204 of 204
Page ID #:32476
Case 2:04-cv-08400-SGL-RZ    Document 293-8    Filed 03/26/2008    Page 2 of 2











**EXHIBIT 50**
**903**