# EXHIBIT 58

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

NEW YORK

1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067-6035

TELEPHONE  (310) 553-6700
FACSIMILE  (310) 246-6779
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

August 29, 2011

OUR FILE NUMBER
905900-321

WRITER'S DIRECT DIAL
(310) 246-6840

WRITER'S E-MAIL ADDRESS
mkline@omm.com

**VIA E-MAIL**

Marc Toberoff
Toberoff & Associates, P.C.
2049 Century Park East, Suite 3630
Los Angeles, California 90067

Gerald A. Berk
Steuer Escovar Berk Brown
55 Public Square, Suite 1475
Cleveland, Ohio 44113

Re:    *DC Comics v. Pacific Pictures Corp. et al.*, CV-10-3633 (ODW) (RZx)

Dear Counsel:

We write in response to your August 11, 2011, letter addressing issues raised in our August 3 letter regarding Don Bulson's deposition and production of documents.  For purposes of clarity if DC is required to file a motion to resolve the issues discussed below, enclosed is a final version of Mr. Bulson's deposition transcript, subject to his review and corrections, if any (referred to herein as, "Tr.").

1.  Withdrawn Objections.  On the enclosed deposition transcript, DC has bracketed the objections identified in your August 11 letter as being withdrawn by Mr. Berk on behalf of the Estate of Michael Siegel (the "Estate"):  Tr. at 36:9-17, 48:20-50:10, 60:22-62:2, 92:15-93:11 (Rough Tr. at 31:5-13, 43:12-45:3, 55:11-56:16, 85:19-86:15).  Please confirm the Estate's withdrawal of these objections.  Additionally, if the Estate intends to withdraw any further objections to DC's examination of Mr. Bulson, please identify those objections by page and line number on a question-by-question basis.  We do not want to have any ambiguity as to which objections were withdrawn or not, as given the positions asserted in your letter motion practice is very likely, and we only want to have to move once.

2.  Objections re: Documents or Information Conveyed to Mr. Bulson by Michael Siegel.  We disagree with the Estate's continued objection to examination of Mr. Bulson that "concerns or implicates the substance of *any communications* between Mr. Bulson and Michael Siegel," including "communications between Michael Siegel and Don Bulson regarding Mr. Siegel's

**EXHIBIT 58**
**1036**

O'MELVENY & MYERS LLP

August 29, 2011 - Page 2

communications with Laura Siegel Larson." You have cited no authority to support this overbroad objection to all communications between Mr. Bulson and Mr. Siegel, nor could you.

The attorney-client privilege, which is "strictly construed," is restricted to communications relating to the seeking or provision of legal advice, not simply the conveyance of factual information. *See, e.g., U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). If Ms. Larson said something to Mr. Siegel, and Mr. Siegel subsequently conveyed the fact to Mr. Bulson, Ms. Larson's recounted statements would not be privileged. *E.g., Upjohn v. U.S.*, 449 U.S. 383, 395-96 (1981) ("The privilege … does not protect disclosure of the underlying facts."); *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977); *State ex rel. Dudek v. Circuit Court*, 34 Wis.2d 559, 580 (1967) ("the courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer"); *In re Seagate Tech.*, 497 F.3d 1360, 1375 (Fed. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008) (work product doctrine does not protect from discovery factual information contained within an attorney's papers; rather, only an attorney's "mental impressions, conclusions, opinions, or legal theories" are protected); PAUL W. VAPNEK ET AL., CALIFORNIA PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY § 7:211.1 (2011). Furthermore, it is the Estate's burden to establish all the elements of the privilege, and no showing has been made here. *See U.S. v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000).

Similarly, and despite our explicit request to do so, the Estate has identified no authority to support its instructions to Mr. Bulson to not answer questions regarding non-privileged documents conveyed to Mr. Bulson by Mr. Siegel. *E.g.,* Tr. 30:1-36:2, 57:9-10, 60:22-61:6, 65:24-67:12 (Rough Tr. 24:22-30:23, 52:1-3, 55:11-20, 60:13-62:1). By contrast, DC has cited to overwhelming case law making clear that non-privileged documents do not become privileged because they are sent to an attorney or reside in his files. *E.g., U.S. v. Osborn*, 561 F.2d 1334, 1338 (9th Cir. 1977); *In re Rupert*, 309 F.2d 97, 99 (6th Cir. 1962); *Suezaki v. Super. Ct.*, 58 Cal. 2d 166, 176 (1962) (mere transmission to counsel of non-privileged communication "cannot create the privilege if none, in fact, exists"); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638 (1994); *Davies v. Columbia Gas & Elec. Co.*, 68 N.E.2d 571, 579 (Ohio C.P. 1938), *order aff'd*, 68 N.E.2d 231 (Ct. App. 1939) (non-privileged documents received by "attorney for the purposes of consultation … could not be regarded as privileged communications").[1]

---

[1] *Accord U.S. v. Ruehle*, 583 F.3d 600, 608-09 (9th Cir. 2009) (district court's presumption of privilege over all communications during attorney-client relationship was error); *U.S. v. Goldfarb*, 328 F.2d 280, 281-82 (6th Cir.), *cert. denied*, 377 U.S. 976 (1964) (attorney-client relationship does not create an automatic "cloak of protection … draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client"); *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1127 (N.D. Cal. 2003) (statements made in meeting not necessarily privileged simply because legal counsel present); *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4 (N.D. Ill. 1980) ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged by merely attaching them to a communication with an attorney.").

**EXHIBIT 58**
**1037**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 3

      The Estate's claim that it "never asserted … that non-privileged documents become privileged through their transmission to an attorney" is contradicted by Mr. Berk and Mr. Toberoff's objections during the deposition, *e.g.*, Tr. 30:1-36:2 (Rough Tr. 24:22-30:23), Tr. 65:24-67:12 (Rough Tr. 60:13-62:1)—none of which you withdrew.  For example:

- Mr. Berk said "[a]ny documents Mr. Bulson received concerning his representation of Michael Siegel is *privileged*, … any letter that he received from Michael Siegel is privileged.  I don't care where it came from or whatever, it's *privileged* as to Michael Siegel and him."  Tr. 84:11-87:7.

- As to the May 13, 2003, letter from Mr. Siegel to Ms. Larson, Mr. Berk explicitly argued it would become privileged if Mr. Siegel sent it to Mr. Bulson.  *See* Tr. 30:8-13 ("This would be privileged, unless he was to get this from Laura Siegel or someone else.  But if he got this from Michael Siegel, it would be part of -- be a *privileged document* as to Mr. Bulson.") (emphasis added).[2]  Defendants have admitted that the May 13 letter, by itself, is not a communication over which they are asserting a claim of privilege.  There is simply no basis for the Estate's objection— whether Mr. Bulson received the May 13 letter from Mr. Siegel is not privileged.

- Contrary to Mr. Berk and Mr. Toberoff's objections, the fact whether Mr. Siegel communicated with Mr. Toberoff prior to Mr. Siegel's May 13 letter does not become privileged because he conveyed that fact to Mr. Bulson. *E.g., Upjohn*, 449 U.S. at 395-96; *see also Diversified Indus., Inc.*, 572 F.2d at 611; *State ex rel. Dudek*, 34 Wis.2d at 580.  Mr. Berk and Mr. Toberoff's objections were not limited to "questions regarding [Mr. Bulson's] *attorney-client communications* with Michael Siegel," but to *any and all* communications with Mr. Siegel.  Tr. 66:2-15.  The attorney-client privilege does not shield all communications between an attorney and a client, specifically not where non-privileged facts are conveyed.  *See Upjohn*, 449 U.S. at 395-96; *Martin*, 278 F.3d at 999.

      We need to meet and confer as soon as possible to address these issues.  We intend to file a motion concerning these objections, unless they are withdrawn.

      3.  <u>Expert Report/Calendar & Billing Entries</u>.  You represented in your letter that the Estate has "asked Renner Otto for a copy of the expert report and its calendar and billing entries so that [the Estate] can review such documents and determine whether the Estate will assert privilege as to any information contained therein."  You did not, however, provide a date certain

---

    [2] *See also* Tr. 33:14-25 ("If the document was given by Michael Siegel to Mr. Bulson it becomes part of his file, it also becomes part of the *privileged file* and part of the litigation or representation by Mr. Bulson of Michael Siegel, and is therefore *privileged*. …  It's basic privilege.  It's part of the file."); Tr. 62:8-11 ("I'm going to object to that as well, because first of all, if [the May 13 letter] exists and it's in his file, it becomes a privilege, and therefore not discoverable.") (emphasis added to all).

**EXHIBIT 58**
**1038**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 4

by when you will complete your review and produce (redacted if need be) or log the requested
documents.  DC made its request for Renner Otto's expert report and calendar and billing entries
during Mr. Bulson's deposition on July 19—over one month ago.  Tr. 23:11-29:7, 25:5-29:7.
There is no reason for the Estate's failure to have produced the documents by now.  Please
confirm that the Estate will produce or log the requested documents by Tuesday, September 6.

Your contention that the discovery sought by DC is not directly relevant to its claims in
this case and is "entirely collateral" is without merit.  The timeline of Mr. Bulson and
Mr. Toberoff's interactions is directly relevant to, among other things, establishing when
Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing Ms. Siegel's purported
Superman interest (the date of Toberoff's first contacts with the heirs is a hotly disputed issue in
the case); determining whether communications exchanged between Mr. Toberoff and
Mr. Bulson occurred but have neither been produced not logged (similar to defendants' failure to
produce or log Mr. Siegel's May 13 letter); and disproving defendants' assertion of a common
interest with Mr. Siegel.

4.  <u>Michael Siegel File</u>.  Defendants do not dispute that Renner Otto is lawfully in
possession of a digital copy of Mr. Siegel's files and is entitled to retain a copy of Mr. Siegel's
files as well as review them.  *E.g.*, OH Adv. Op. 1992-8 (Ohio Bd. Com. Griev. Disp.); *In re
Int'l Corp.*, 2004 WL 5507905, at *1 (S.D. Ohio Oct. 1, 2004); OH. Prof. Cond. R. 1.15(a),
1.16(d); *Disc. Counsel v. Noel*, 894 N.E.2d 31, 34 (Ohio 2008).  Nor do defendants dispute that
Renner Otto is obligated to respond to DC's subpoena for production of documents—which
requires it to produce responsive, non-privileged documents in these digital files and produce a
privilege log.  FED. R. CIV. P. 45(d), (e); *e.g.*, *Heilman v. Vojkufka*, 2011 WL 677877, at * 18
(E.D. Cal. Feb. 17, 2011); *Martin*, 278 F.3d at 1000; *Clarke v. Am. Commerce Nat'l Bank*, 974
F.2d 127, 129 (9th Cir. 1992); *see also* William W. SCHWARZER ET AL., FEDERAL CIVIL
PROCEDURE BEFORE TRIAL ("RUTTER") §§ 11:2220-2318 (2011).

Mr. Bulson's representation of Mr. Siegel began shortly after the Siegel heirs served their
Superman termination notice in April 1997, and represented Mr. Siegel solely with respect to his
purported Superman interest.  There is no indication that documents retained by Renner Otto in
Mr. Siegel's file would not be responsive to DC's subpoena, and defendants' speculation
otherwise is not grounds for preventing Renner Otto from preparing a log of all documents in
their possession.

Defendants only true disagreement with DC's August 3 proposal is the level of detail DC
is requesting Renner Otto include in generating a log of Mr. Siegel's file.  DC is entitled to
discover the information it seeks in the proposed log,[3] especially here, where Mr. Toberoff's

---

[3] *E.g., Miller v. Pancucci*, 141 F.R.D. 292, 302 (C.D. Cal. 1992) (A log should identify the
primary addressee; "[s]econdary addressee(s); persons copied and recipient (and the relationship
of that person(s) to the client and/or author).");  *Narayan v. EGL, Inc.*, 2006 WL 3050851, at *1
(N.D. Cal. Oct. 24, 2006) (ordering amended privilege log to include separate listing for
attachments);  *In re Heritage Bond Litig.*, 2004 WL 1970058, at *5 (C.D. Cal. July 23, 2004)

**EXHIBIT 58**
**1039**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 5

privilege assertions over the Michael Siegel file have been adjudged erroneous and overbroad, and given his admissions regarding claims of privilege over non-privileged documents clipped to purportedly privileged communications. Case No. 1:06 MC 99, Docket No. 15 at 2-3 (April 1, 2008, Order of the U.S. District Court for the Northern District of Ohio) ("[T]he court finds that none of the 15 documents are subject to the attorney/client privilege ... [N]one of the 15 communications ... are for the purpose of giving legal advice."); June 20, 2011, Hearing Tr. at 16:19-18:15 ("[T]he letter we believe was part of a larger communication from the client wanting to discuss these communications with her brother ... It appeared paper clipped with the other documents."). DC should be permitted to discover the scope of Mr. Siegel's file, which can only be accomplished through a log listing each document separately. We want and are entitled to discover things like whether Ms. Larson's non-privileged letter in response to Mr. Siegel's May 13 letter is in Renner Otto's file.

The Court's prior orders regarding the adequacy of the information contained in defendants' privilege logs are no bar to DC's proposal. DC's offer to pay Renner Otto's expenses in preparing the proposed log is not "a transparent and improper attempt to motivate Renner Otto to act contrary to its former client's and not the Estate's interest," but is rather intended to alleviate Renner's asserted burden in appropriately responding to DC's subpoena. We are not asking Renner Otto to make any privilege calls or make different privilege determinations than Mr. Toberoff did in the *Siegel* case. Nor are we asking Renner Otto to harm its former client's interest. All we are asking for is a fair, simple, and accurate accounting of what documents Renner Otto possesses in its files related to its representation of Mr. Siegel concerning his purported Superman rights. DC is willing to pay for preparation of the log to avoid any dispute regarding who is responsible for the associated costs and expenses.

We request a final meet-and-confer on this issue.

5. "Confidentiality" Designations. Upon further review of Mr. Bulson's deposition transcript, we identified a third exhibit you refused to allow us to examine Mr. Bulson with on the grounds that it was marked "confidential" and therefore governed by the protective order in the *Siegel* case: (3) an October 3, 2004, letter from Mr. Toberoff to Joanne Siegel and Ms. Larson regarding "Engagement for Professional Services" (Ex. 51 LSL 00213-218), Tr. 158:1-160:7. We assume based on your August 11 letter that you intend to maintain that objection, but please advise us if we are mistaken in that assumption.

Defendants do not dispute that no protective order exists in this case; in fact, they admit as much. Nor do they dispute that they produced documents in this case—including the two

---

(same); *Mold-Masters Ltd. v. Husky Injection Sys. Ltd.*, 2001 U.S. Dist. LEXIS 20152, at *8-9 (N.D. Ill. Dec. 5, 2001) ("Since a document with an attachment constitutes two separate documents, a party objecting to the disclosure of a document with an attachment must prove that both the document and the attachment individually satisfy the requirements of the applicable privilege or doctrine."); RUTTER § 11:1919 ("Listing each e-mail separately is crucial where different e-mails in the strand potentially raise different privilege grounds.").

EXHIBIT 58
1040

O'MELVENY & MYERS LLP
August 29, 2011 - Page 6

exhibits DC identified in its August 3 letter and the third exhibit identified herein—without reservation of any rights or claims of confidentiality. Defendants instead seek to re-frame the issue by arguing that this "entire dispute … could easily be avoided if DC would agree to a protective order in this case similar in substance to the one entered into by the parties in *Siegel*." Whether DC later agrees to a protective order in this case—and we invite defendants to propose or produce a draft of one—does not change the fact that none currently exists that would operate to protect the documents defendants have thus far produced.

DC disputes defendants' claim that the protective order in the *Siegel* case applies in this case because the parties purportedly always anticipated entering into a protective order. Even if that were the case—and it is not—defendants' arguments and objections are not well-taken. First, the protective order in the *Siegel* case defines the categories of documents that fall within its protections, and can therefore be marked "CONFIDENTIAL":

> [D]ocuments may be marked "CONFIDENTIAL" if the marking or requesting party reasonably believes:
>
> (a) the Writing contains confidential proprietary information; or
>
> (b) disclosure of such commercially sensitive Writing could reasonably harm competitive advantage, or foster a competitive disadvantage; or
>
> (c) the disclosure of such confidential Writing could impair or disrupt future or current business relationships.

Docket No. 50 ¶ 4. This limited definition of documents subject to the protective order in the *Siegel* case requires the producing party to evaluate whether the underlying document can be marked "CONFIDENTIAL" under this three-part test and to so mark it as "CONFIDENTIAL" at the time of production. An underlying document that happens to have a "confidential" label affixed to it is not automatically protected because whoever applied that stamp previously, by definition, did not have this three-part test for marking documents before him or her.

Second, and as defendants admit, the protective order in the *Siegel* case permits witnesses to be examined as to documents marked "confidential." *Id.* ¶ 5. If, as defendants contend, the protective order in the *Siegel* case applied in this case, there is no basis for your objections to the use of the three exhibits.

Third, there is no "hypocrisy" in DC making clear that it will seek full relief against you and defendants if you act on your threats to disclose confidential documents produced by DC in *Siegel*. Tr. 161:12-162:20 (Rough Tr. 152:2-153:1). Unlike defendants, DC has not produced any documents in this case—defendants have not requested any to date—and, therefore, all of DC's confidential documents in defendants' possession were produced pursuant to and subject to the *Siegel* protective order.

**EXHIBIT 58**
**1041**

O'MELVENY & MYERS LLP
August 29, 2011 - Page 7

      Finally, your claim that you did not refuse to allow us to examine Mr. Bulson regarding a
May 12, 2005, letter from you to Patrick Perkins (Ex. 52) is disingenuous. Tr. 146:10-148:24
(Rough Tr. 137:2-138:19). You objected to our use of the document on the grounds that it is
subject to the protective order in *Siegel* since it is marked "confidential," and deals with
"settlement negotiations which should not be used or disclosed in litigation." You also
threatened to hold us and DC "accountable" for purportedly breaching the *Siegel* protective
order. We did not "cho[o]se not to ask any further questions after [Mr. Toberoff] objected," as
you claim; we were forced to discontinue our examination of Mr. Bulson based on your
misguided threats. Moreover, we reserved all rights to ask questions on this and other topics
during the second day of Mr. Bulson's deposition. Tr. at 181:16-182:3.

      We need to conduct a final meet-and-confer on these issues as well—and need a date
certain to do so with both of you.

      6. <u>Protective Order re: Deposition</u>. On our call, we should discuss a protective order
concerning Renner Otto's business practices. We are happy to draft such a document and submit
it to Mr. Ryland as well.

*     *     *

      Please let us know if you are available to meet and confer on these issues tomorrow,
Tuesday, August 30. Otherwise, please provide a date certain when you are available to conduct
a final meet-and-confer on these issues.

Very truly yours,

Matthew T. Kline
of O'MELVENY & MYERS LLP

Enclosure(s)
cc:     Daniel M. Petrocelli, Esq.
        Jason Tokoro, Esq.
        Josh Ryland, Esq.
        Richard Kendall, Esq.

**EXHIBIT 58**
**1042**

# In The Matter Of:

*DC COMICS*
*v.*
*PACIFIC PICTURES CORPORATION*

---

*BULSON, DON - Vol. 1*

*July 19, 2011*

---

**MERRILL CORPORATION**

LegaLink, Inc.

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT 58**
**1043**

**DON BULSON - 7/19/2011**

Page 1

            IN THE UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA

    DC COMICS,                )
                              )
              Plaintiff,      )
                              )
    vs.                       )No.CV-10-3633 ODW
                              )
    PACIFIC PICTURES          )
    CORPORATION, et al.,      )
                              )
              Defendants.     )

                - - - - -
        THE VIDEOTAPE DEPOSITION OF DON BULSON
              TUESDAY, JULY 19, 2011
                - - - - -

        The videotape deposition of DON BULSON,
    called by the Plaintiff for examination pursuant
    to the Federal Rules of Civil Procedure, taken
    before me, the undersigned, Michelle M. Lewis, a
    Registered Professional Reporter and Notary
    Public within and for the State of Ohio, taken at
    the offices of Renner Otto Boisselle & Sklar,
    1621 Euclid Avenue, Suite 1900, Cleveland, Ohio,
    commencing at 9:18 a.m., the day and date above
    set forth.

DON BULSON - 7/19/2011

Page 2

```
 1    APPEARANCES:
 2
            On behalf of the Plaintiff:
 3
            Matthew T. Kline, Esq.
 4          Jason Tokoro, Esq.
            O'Melveny & Myers
 5          1999 Avenue of the Stars
            Suite 700
 6          Los Angeles, California   90067-6035
            310.553.6700
 7          mkline@omm.com
 8      On behalf of the Defendant The Estate of
        Michael Siegel:
 9
            Gerald A. Berk, Esq.
10          Steuer Escovar Berk Brown
            55 Public Square
11          Suite 1475
            Cleveland, Ohio   44113
12          216.771.8121
            gberk@sebblaw.com
13
            On behalf of the Defendants:
14
            Marc Toberoff, Esq.
15          Toberoff & Associates
            2049 Century Park East
16          Suite 2720
            Los Angeles, California   90067
17          310.246.3333
18      On behalf of the Witness:
19          Joshua M. Ryland, Esq.
            Renner Otto Boisselle & Sklar
20          1621 Euclid Avenue
            Suite 1900
21          Cleveland, Ohio   44115
            216.621.1113
22          jryland@rennerotto.com
23    ALSO PRESENT:
24          Alex Cook, Video Technician
25
```

Merrill   Corporation   -   Los Angeles
800-826-0277                    www.merillcorp.com/law

EXHIBIT 58
1045

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

1          DON BULSON DEPOSITION INDEX

2

3    EXAMINATION BY:                              PAGE NO.
4    Mr. Kline                                        7
5

6    EXHIBIT NO.                                   PAGE NO.
7    Exhibit 27      Subpoena for deposition and      8
8                    production of documents served
9                    upon Don Bulson
10   Exhibit 28      Subpoena for deposition served  10
11                   upon Don Bulson
12   Exhibit 29      Cuyahoga County Common Pleas     16
13                   docket entry
14   Exhibit 30      May 13, 2003 letter from         29
15                   Michael Siegel to Laura Siegel
16   Exhibit 31      Order of the court               39
17   Exhibit 32      April 1, 2008 order of the       39
18                   court
19   Exhibit 34      June 18, 2003 letter from Mr.    53
20                   Bulson to Mr. Toberoff
21   Exhibit 35      July 16, 2003 letter from Mr.    53
22                   Toberoff to Mr. Bulson
23   Exhibit 36      August 6, 2003 letter from Mr.   53
24                   Toberoff to Mr. Bulson
25   Exhibit 37      November 12, 2004 email from     53

## DON BULSON - 7/19/2011

Page 4

| | | | |
|---|---|---|---|
| 1 | | Mr. Bulson to Mr. Toberoff | |
| 2 | Exhibit 38 | November 17, 2004 email from | 53 |
| 3 | | Mr. Toberoff to Mr. Bulson | |
| 4 | Exhibit 39 | November 12, 2004 email chain | 53 |
| 5 | Exhibit 40 | November 24, 2004 email from | 53 |
| 6 | | Mr. Bulson to Mr. Toberoff | |
| 7 | Exhibit 41 | November 29, 2004 email from | 53 |
| 8 | | Mr. Toberoff to Mr. Bulson | |
| 9 | Exhibit 42 | January 17, 2005 email | 53 |
| 10 | Exhibit 43 | Discovery brief | 89 |
| 11 | Exhibit 44 | No description, rescinded | 95 |
| 12 | Exhibit 45 | October 3, 2002 retainer | 102 |
| 13 | | agreement | |
| 14 | Exhibit 46 | January 21, 2002 retainer | 102 |
| 15 | | agreement | |
| 16 | Exhibit 47 | April 28, 2005 letter from | 133 |
| 17 | | Paul Levitz to Jean Adele | |
| 18 | | Peavy and Mark Warren Peary | |
| 19 | Exhibit 48 | October 19, 2001 letter from | 139 |
| 20 | | Kevin Marks to John Schulman | |
| 21 | Exhibit 49 | October 26, 2001 letter from | 139 |
| 22 | | John Schulman to Kevin Marks | |
| 23 | Exhibit 50 | February 1, 2002 cover letter | 139 |
| 24 | | from Patrick Perkins to Kevin | |
| 25 | | Marks attaching draft | |

DON BULSON - 7/19/2011

Page 5

1              agreement
2   Exhibit 51    Retainer agreement          158
3   Exhibit 52    May 12, 2005 document       146
4   Exhibit 53    Privilege log              167
5   Exhibit 54    September 21, 2002 letter    180
6                 from Joanne Siegel and Laura
7                 Siegel Larson to Kevin Marks

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DON BULSON - 7/19/2011

Page 6

1          VIDEO TECHNICIAN:  This begins
2  Volume No. 1, Videotape No. 1, in the
3  deposition of Don Bulson in the matter of DC
4  Comics versus Pacific Pictures Corporation,
5  et al., in the United States District Court,
6  Central District of California, Western
7  Division.  The case number is CV-10-03633.
8  Today's date is July 19th, 2011.  The time on
9  the video monitor is 9:18.
10          Would counsel please voice identify
11  yourselves and state who you represent?
12          MR. KLINE:     Matt Kline and
13  Jason Tokoro from O'Melveny & Myers on behalf
14  of Plaintiff DC Comics.
15          MR. TOBEROFF:   Marc Toberoff.
16  I'm here on behalf of the defendants in this
17  action, and also the Estate of Michael
18  Siegel.
19          MR. BERK:     Gerald Berk, B
20  E R K.  I represent the -- on behalf of the
21  Estate of Michael Siegel.
22          MR. RYLAND:     Josh Ryland,
23  Renner Otto Boisselle & Sklar in Cleveland,
24  Ohio, here representing third-party witness
25  Don Bulson.

## DON BULSON - 7/19/2011

Page 7

```
 1                    VIDEO TECHNICIAN:  Will the
 2      court reporter please swear in the witness?
 3                    DON BULSON
 4      of lawful age, called by the Plaintiff for
 5      examination pursuant by the Federal Rules of
 6      Civil Procedure, having been first duly sworn, as
 7      hereinafter certified, was examined and testified
 8      as follows:
 9                    EXAMINATION OF DON BULSON
10      BY MR. KLINE:
11      Q   Mr. Bulson, good morning.
12      A   Good morning.
13                    MR. BERK:        Excuse me.
14      Before we start, on behalf of the Estate of
15      Michael Siegel, I would like to voice my
16      objection to any matters that concern the
17      Estate of Michael Siegel that Mr. Bulson will
18      testify to, and we want to raise privilege,
19      our privilege of any matters concerning his
20      representation of Michael Siegel.
21                    MR. KLINE:        Understood.
22      Why don't you just -- why don't we take the
23      questions as they're asked and deal with them
24      one by one.
25                    MR. RYLAND:        I'm going to
```

DON BULSON - 7/19/2011

Page 8

1    propose this before.  Do you want to

2    establish a protocol for the objections or do

3    you want to take them as they come, because

4    there could be the potential for a lot of

5    speaking on your record, and I'm trying to --

6                    MR. KLINE:      Let's take

7    them as they come, and if we need to, we can

8    take a break and set up a protocol.  But my

9    hope is to get through as much testimony

10   today as we can.

11   Q   Mr. Bulson, we've never met before, have we?

12   A   Not to my knowledge.

13   Q   Okay.  And you understand, and I'm going to

14   ask Jason to pass this around, that DC Comics

15   subpoenaed you to testify in this case?

16   A   Yes.

17   Q   Marked as exhibit, Plaintiff's Exhibit 27,

18   I'd ask you to take a look at it, we'll give

19   copies to counsel, is a copy of that

20   subpoena.

21                    - - - - -

22       (Plaintiff's Exhibit 27 was marked.)

23                    - - - - -

24   Q   Are you familiar with that document, sir?

25   A   I believe I am.  The original one that was

## DON BULSON - 7/19/2011

Page 9

1    served, allegedly served on me I never
2    received, but I think there was a follow-up
3    that was sent.
4    Q    Okay.  Great.  And so this both calls for a
5         deposition and a production of documents,
6         correct?
7    A    Uh-huh.
8    Q    And working with Mr. Ryland, who's here
9         representing you today, you produced a few
10        documents to DC, correct?
11   A    Well, this is the document production
12        subpoena.
13   Q    Yes.
14               MR. KLINE:     And Jason, do
15        you have the --
16   A    This I did receive.
17   Q    Okay.  You did receive this?
18   A    Yes.
19   Q    And we're obviously here for your deposition
20        today, so you received the deposition notice
21        as well?
22   A    Whether or not --
23   Q    At some point, at some point we worked that
24        out.
25               But working with Mr. Ryland, do you

**Merrill  Corporation  -  Los Angeles**
800-826-0277          www.merrillcorp.com/law

EXHIBIT 58
1052

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 10

1      understand you made a production of a few

2      documents in this case?

3   A  We identified documents to be produced, yes,

4      or potentially produced.

5   Q  And Exhibit 28 is just a copy of your

6      deposition subpoena that I think we all

7      agree --

8   A  I think I got it.

9   Q  -- got you here today?

10  A  Yep.

11                    - - - - -

12      (Plaintiff's Exhibit 28 was marked.)

13                    - - - - -

14              MR. KLINE:      As I

15      understand it, we still don't have your

16      firm's formal objections to those document

17      requests.

18              MR. RYLAND:      That's

19      correct.  I mean, if we're going to -- we can

20      put it on the record or off the record, but I

21      got your responsive email to our letter.

22              MR. KLINE:      Okay.

23              MR. RYLAND:      And I think

24      that we obviously have more parties concerned

25      than just us with that production, so I was

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 11

1    hoping we could talk through how to best --

2              MR. KLINE:        Maybe over the

3    lunch hour we can do that.  And unfortunately

4    given that we don't have all the documents

5    that I think we need, we may need to reserve

6    some time to come back and see you again, but

7    I'm sure the parties have their different

8    positions on that.

9              MR. RYLAND:        Yeah.  I mean,

10   we would object to that, but I understand

11   certainly why you would say that and put it

12   on the record.

13   Q   Okay.  Mr. Bulson, have you seen a copy of

14       the complaint in this case?

15   A   I don't recall.

16             MR. KLINE:        Jason, may I

17   have a copy of it, please?  And we'll mark

18   this Exhibit 29, or actually, you know, it's

19   premarked as Exhibit 1 from the Peary

20   deposition.

21   Q   Handing you a copy, Mr. Bulson.

22             MR. RYLAND:        Do you have

23   another copy?

24   A   This is missing -- oh, no.  Yeah, you're

25   missing pages here.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 12

1          MR. KLINE:       Do you have a
2     copy that -- that one starts on Page 2,
3     Jason.  Do you have one that has all of the
4     pages on it?
5          MR. RYLAND:       Counselor,
6     this one's fine.
7          MR. KLINE:       Oh, okay.
8   A  I can't recall if I've read this or not.
9   Q  Okay.
10  A  I was aware there was a lawsuit.
11  Q  Okay.  So I take it you didn't read that
12     complaint in preparing for your deposition
13     today?
14  A  Oh, no.  I can say that.
15  Q  Can you describe for me what you did to
16     prepare for today's deposition?
17  A  Just --
18          MR. RYLAND:       I'll caution
19     the witness that any communications that you
20     and I had related to the deposition would be
21     attorney-client privilege, but if you can
22     answer without violating the privilege. . .
23  A  Just the mechanics of today's deposition.
24  Q  Did you have any meetings or discussions with
25     Mr. Toberoff?

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 13

1   A   I did not.

2   Q   Did you have any meetings or discussions with
3       Mr. Berk?

4   A   I did not.

5   Q   Did you review your deposition that you gave
6       in the Siegel action in 2008?

7   A   I did not.

8   Q   Did you review any of the exhibits that were
9       used that -- the underlying documents?

10  A   No.

11  Q   Did you review any of your case files?

12  A   No.

13  Q   Did you review any calendars that you have?
14      Do you have calendars or call log sheets that
15      show when you spoke to people?

16  A   No.

17  Q   Time entries that show when you would have
18      spoken to somebody?

19  A   No.

20  Q   Do you understand that your law firm has
21      filed a claim against the Estate of Michael
22      Siegel, correct?

23  A   Correct.

24  Q   And that's a matter of public record?

25  A   That's correct.

## DON BULSON - 7/19/2011

Page 14

1    Q    And as I understand it, and we were given a

2         copy of this document by Ms. Siegel, I

3         believe, on September 17th, 2010, the state

4         court judge in that case granted defendant's

5         motion for partial summary judgment.  Are you

6         aware of that ruling?

7    A    That's correct.  I don't recall the date, but

8         there was a. . .

9    Q    And it says that plaintiffs -- I'm just

10        reading from the docket sheet, and we'll put

11        it into the record.  And we would, if a

12        separate order exists other than this docket

13        entry, we'd request that all parties in the

14        case produce a copy of that order, because

15        we've not seen one or been able to get one

16        from the public record.  But the docket entry

17        says, plaintiff's recovery for its attorneys'

18        fees must be based on quantum meruit.  Do you

19        remember that ruling?

20   A    Yep, uh-huh.

21   Q    Has your law firm made any submission

22        documenting what its fees are or what it

23        would be entitled to on a quantum meruit

24        basis?

25   A    Yes.  Yes.

DON BULSON - 7/19/2011

Page 15

1  Q   Has that been -- do you know if that's

2      been -- we've not seen a copy of it, so we'd

3      obviously want to see that produced in this

4      case as it might bear on when you did certain

5      work, the amount of work that you did.

6                 MR. RYLAND:      Duly noted.

7  A   Is there a question?

8                 MR. RYLAND:      Duly noted.

9  Q   Did you help prepare that document?

10 A   Yes.

11 Q   Does that document recount the number of

12     hours that you spent working on the Siegel

13     matter?

14 A   I think it does.

15 Q   Does that document include dates on which you

16     would have had conversations with

17     Mr. Toberoff concerning negotiations?

18 A   I think it does.

19                MR. KLINE:      For that

20     reason, we'd very much like to get a copy of

21     that document.  The timeline here is

22     critical.  And if we could get a copy of it

23     on the lunch break, I could try to ask some

24     questions about it.  But if we can't, we may

25     have to come back.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 16

1  A   Should be a public record.

2  Q   You think it's one of the public filings in

3      the case?

4  A   Uh-huh.

5  Q   Okay.  Let's mark as Exhibit 29, this was

6      just the docket entry that I was reading

7      from.  The first one on the first page there.

8              - - - - -

9      (Plaintiff's Exhibit 29 was marked.)

10             - - - - -

11 Q   Are you familiar with this docket entry, sir?

12 A   No.

13 Q   Okay.

14 A   I mean, the substance I'm familiar with, but

15     I haven't seen the docket entry.

16 Q   That specifically.  Okay.

17         And as I understand it, no further

18     action has been taken in the case, but the

19     parties are contemplating taking some sort of

20     appeal from that ruling?

21 A   Correct.

22 Q   And the Estate of Michael Siegel has not paid

23     this firm any money, correct?

24 A   Correct.  No, I take that back, that's not

25     correct.

## DON BULSON - 7/19/2011

Page 17

1  Q   How much money has been paid, do you know?

2  A   I don't recall.

3  Q   More than a few thousand dollars?

4  A   Yes.

5  Q   More than $50,000?

6  A   No.

7  Q   Okay.  What is the amount of money that the

8     law firm is claiming is still owed under this

9     quantum meruit theory?

10  A   I believe it's around $136,000, somewhere in

11     that ballpark.

12  Q   Okay.  Okay.

13         I also understand that the law firm

14     sent Mr. Siegel's hard copy files to the

15     lawyers representing Mr. Siegel's estate in

16     the probate action in this case, correct?

17  A   We turned -- we turned custody of the files

18     over to the estate.

19  Q   Okay.  And I also understand that the firm

20     maintains an electronic database of its files

21     that it keeps for itself that it did not turn

22     over to the estate; is that correct?

23  A   I don't know if that's correct or not.  I did

24     not understand the question completely.

25  Q   I'll represent that in my conversations with

## DON BULSON - 7/19/2011

Page 18

1     your partner and in communications with

2     Mr. Toberoff it's been revealed to us that

3     your law firm not only had a paper copy of

4     the files that it turned over, I believe, to

5     Mr. Berk's firm --

6                    MR. KLINE:        Are you with

7     the Banchek firm, sir, are you --

8                    MR. BERK:        No.  I

9     represent Mr. Banchek as administrator.

10                    MR. KLINE:        Understood.

11   Q  So my understanding is that you had physical

12     hard copies of what we'll call the Michael

13     Siegel file.  You gave the Michael Siegel

14     file, the physical hard copies, to the

15     Banchek firm, correct?

16   A  Correct.

17                    MR. TOBEROFF:       Objection.  I

18     don't believe I've had any conversations or

19     correspondence with you regarding these

20     files.

21                    MR. KLINE:        I believe you

22     wrote me a letter on Friday talking about the

23     screen shot of this electronic database, and

24     we can pull that out and put it in evidence.

25                    MR. TOBEROFF:       No.  I wrote

feda831f-8f5a-4d4a-86d4-38e27c7e6947

**DON BULSON - 7/19/2011**

Page 19

1    that to Josh, Mr. Ryland.

2                    MR. KLINE:        Which was

3    forwarded to me and you were copied on.

4                    MR. TOBEROFF:      But you have

5    no correspondence from me.

6                    MR. KLINE:        Okay.

7    Q    So Mr. Toberoff sent me a letter on Friday in

8         response to a letter from your partner.  Did

9         you see this correspondence, Mr. Bulson?

10   A    No.

11   Q    We'll get a copy of that on one of the

12        breaks.

13            You do a lot of patent work, correct,

14        sir?

15   A    Yes.

16   Q    And some of the patent work you do involves

17        computers?

18   A    Yes.

19   Q    And you have an electrical engineering

20        degree?

21   A    No, I do not.

22   Q    Mechanical engineering degree?

23   A    That's correct.

24   Q    Okay.  And you're familiar that law firms

25        have databases like a concordance database in

**EXHIBIT 58**
**1062**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 20

1    which they keep files electronically at
2    times, .pdfs, .tiff images, .jpegs?
3    A    We do have an electronic files, yes.
4    Q    My understanding is that the firm has
5    maintained an electronic copy of the Michael
6    Siegel files; is that correct?
7    A    We have found an archived copy of the files
8    that were transferred.
9    Q    Okay.  And my understanding is that archive
10   copy contains an index of the materials
11   contained therein; is that correct?
12   A    No.  My recollection of that archive file is
13   there is, the file names are -- if you did a
14   directory, you would see a number of file
15   names.
16   Q    Can you give me an example of what a file
17   name would be like?  Don't give me the
18   substance, but, you know, would it be letter
19   from blank to blank on a certain day, is that
20   how it's kept in the file entries?
21   A    No.  This would have been, in this case, I
22   think it was logged in by our file number.
23   Q    So if there was something like a March 1st
24   letter, would there be any indication --
25   A    No.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 21

1    Q    -- on the log of when the letter --
2    A    No.
3    Q    What information, if any, could you glean
4         about the date or substance of the
5         communications from that index?
6    A    You could get to some extent a timing,
7         because of the file name included our file
8         number and also a reference to the content.
9         And if you correlate our file name to the
10        content, it's assuming that our file names
11        were numbered numerically, there could be
12        some timing.
13   Q    Okay.  Okay.  And by the content, what do you
14        mean by that?
15   A    Like it might have listed communications
16        with -- I think a simple one would be --
17        well, I don't remember the names of the
18        files --
19   Q    But when you --
20   A    -- the content.  But by way of example, it
21        might say communications with Michael Siegel.
22   Q    Okay.  Understood.
23   A    Which would obviously we would have files of
24        that sort.
25   Q    Many, many.

## DON BULSON - 7/19/2011

Page 22

1            If he sent you, say, a copy that
2    his -- of a letter that his sister sent to
3    him, might it say letter from sister to
4    Michael Siegel or letter from Laura to
5    Michael Siegel in those content descriptions?
6    A   No.  I don't believe so.
7    Q   Why is that?
8    A   I just don't believe so.  I haven't looked at
9    it lately, but I don't recall --
10   Q   Are you certain that --
11   A   -- seeing something that specific.
12   Q   Okay.  Would it say something like -- I mean,
13   if he sent you some underlying case
14   materials, how would that be logged?  If he
15   sent you underlying correspondence that he
16   had himself.
17   A   It wouldn't be logged in the file name of the
18   archive file.  We're just talking about
19   archive files where we transferred custody of
20   a paper file, which might be this thick or
21   this thick --
22   Q   Okay.
23   A   -- to the estate.  And it just was a scan of
24   the file.
25   Q   A scan of the whole file?

## DON BULSON - 7/19/2011

Page 23

1    A    Uh-huh.   There was no breakdown by the letter
2         to who, letter to who, or anything like that.
3    Q    But to be clear, the scan contains everything
4         that you turned over to Mr. Banchek's firm?
5    A    That's my understanding.
6    Q    Okay.   In .pdf format?
7    A    I believe it is in .pdf format.
8    Q    Okay.   Do you know if it was OCR'd such that
9         it's searchable?
10   A    I doubt it.
11   Q    Do you keep a daily calendar, sir?
12   A    Want to be more specific?
13   Q    If you have a scheduled appointment, do you
14        log that in a computer calendar or paper
15        calendar or a conference call?
16   A    I have a computer calendar now.
17   Q    Going back to the 2003 to 2005 time period,
18        did you have a computer calendar?
19   A    I don't recall.
20   Q    Did you have a paper calendar?
21   A    No.
22   Q    If you made certain calls during the day,
23        spoke to another lawyer or spoke to a
24        business person on a matter, would your time
25        entries for the day reflect that?

## DON BULSON - 7/19/2011

Page 24

1   A    Yes, in many instances.

2   Q    Okay.

3   A    Not always, but --

4   Q    Of course.

5        And would you note that on the

6   calendar or just in your daily time entries?

7   A    My electronic time book.

8   Q    Okay.  And is that electronic time book

9   maintained by the law firm here?

10  A    I maintain it.

11  Q    Is that a searchable database of information?

12  A    It would be searchable.

13  Q    So if we asked you, for example, to search

14  for the word "Toberoff" in there, you could

15  probably find that?

16  A    No, you wouldn't find it.

17  Q    Why is that?

18  A    Because my electronic calendar doesn't go

19  back that far.

20  Q    Okay.  Time entries that you kept in the

21  2003 to 2005 time period --

22  A    No.

23            MR. TOBEROFF:    Could you

24  speak a little louder?  I'm having trouble

25  hearing you.

DON BULSON - 7/19/2011

Page 25

1    A    It would not be in there.

2    Q    How did you keep your time from 2003 to 2005?

3    A    Those files, those time files I don't have

4         anymore.

5    Q    How did you prepare the submission you made

6         in the lawsuit against --

7    A    From our billing records.

8    Q    So the billing records reflect that?

9    A    (Nods head.)

10   Q    And the actual bills would say spoke to so

11        and so on such and such date?

12   A    That would often be the case.

13   Q    Okay.

14              MR. RYLAND:      Counsel, is

15        there a -- I assume there's a protective

16        order entered in this case already?

17              MR. KLINE:      There is not.

18              MR. RYLAND:      There is not.

19        Okay.  To the extent that they're getting

20        into our -- you know, how we conduct our

21        business, we would like to maintain this

22        attorneys' eyes only.  And, you know, if

23        there's no protocol for doing it, then we're

24        going to either have to move to protect

25        what's in this transcript or suspend the

EXHIBIT 58
1068

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 26

1    deposition until we can resolve some way to

2    do that.

3                    MR. KLINE:      I have no --

4                    MR. RYLAND:      I appreciate

5    why you're asking questions, the questions.

6    The problem that I have is we obviously

7    wouldn't want our business practices to be

8    public record, so. . .

9                    MR. KLINE:      And what we've

10   done, just as an example, we filed a

11   discovery motion yesterday, and we have been

12   filing motion to seal orders that

13   Mr. Toberoff has either objected to or not

14   objected to.

15                   MR. RYLAND:      Okay.

16                   MR. KLINE:      And we would

17   have no objection to keeping any portion of

18   this deposition transcript under seal that

19   you would want to.

20                   MR. RYLAND:      Yeah.  I'm

21   going to make a blanket statement right now,

22   just we can review if there's -- but I would

23   like to designate the entire deposition

24   attorneys' eyes only.  And to the extent that

25   needs to be peeled off, let me know.

## DON BULSON - 7/19/2011

1              MR. KLINE:        Yeah.   We can

2     talk about that.   I do think just to be clear

3     we're going to want to see these time entries

4     to help piece together the timeline for us.

5              MR. RYLAND:        I understand

6     the request.   It's duly noted.   I'm also

7     subject to what the wishes of the estate are.

8     We can't waive anything that would be

9     considered privilege within time records with

10    respect to either the work product doctrine

11    or attorney-client privilege, because it's

12    not ours to --

13             MR. KLINE:        No, I

14    understand.   But I think the representation

15    was made that it was already filed in the

16    public record as part of this quantum meruit

17    scenario.   I could be wrong.

18             THE WITNESS:        Am I correct

19    on that?   I don't remember.

20             MR. BERK:        My

21    recollection was that --

22             THE WITNESS:        I'm talking

23    about the expert's opinion.

24             MR. BERK:        Yeah,

25    you're --

## DON BULSON - 7/19/2011

Page 28

1          MR. RYLAND:      Hold on.  Can
2    we go off the record for a second?
3          VIDEO TECHNICIAN:  We're off
4    the record.  The time is 9:39.
5       (Discussion held off the record.)
6          VIDEO TECHNICIAN:  We're back
7    on the record.  The time is 9:40.
8          MR. KLINE:      So just to be
9    clear, we respect your request to protect the
10   privacy of this deposition.
11         MR. RYLAND:      I appreciate
12   that.
13         MR. KLINE:      Understand
14   that when it comes to the billing records,
15   there may be other subject matters that we
16   wouldn't agreed to completely blanket
17   request.  You know about our pending
18   discovery questions and issues.  We'll take
19   try to work them out the best we can.
20         MR. RYLAND:      No, I
21   understand that.  And just to -- we went off
22   the record.  The off-the-record discussion
23   was that the request is being made to see the
24   billing records that were submitted in
25   conjunction with Renner Otto's lawsuit

DON BULSON - 7/19/2011

Page 29

1    against the Estate of Michael Siegel.  The

2    firm is represented by separate counsel.  I

3    would have to check with separate counsel

4    before I could make any determination that

5    way, and that's it.

6                   MR. KLINE:      And that's

7    fine.

8                   - - - - -

9        (Plaintiff's Exhibit 30 was marked.)

10                  - - - - -

11   BY MR. KLINE:

12   Q   Mr. Bulson, I'm handing you Exhibit 30 which

13       is a May 13th, 2003 letter from your former

14       client Michael Siegel to Laura Siegel his

15       sister, and ask you to read the letter if you

16       could.

17                   MR. KLINE:      Can we go off

18       the record while we finish that?  Very sorry.

19                   VIDEO TECHNICIAN:  We're off

20       the record at 9:42.

21        (Recess from 9:42 a.m. to 9:43 a.m.)

22                   VIDEO TECHNICIAN:  We're back

23       on the record.  The time is 9:43.

24                   MR. TOBEROFF:    What exhibit

25       number is this?

DON BULSON - 7/19/2011

Page 30

```
 1                        MR. KLINE:        This is
 2     Exhibit 30.  Just want to give Josh a chance
 3     to finish it.
 4                        MR. RYLAND:       Go ahead,
 5     Counselor.
 6   BY MR. KLINE:
 7   Q   Have you seen this letter before, sir?
 8                        MR. BERK:         Objection.
 9     This would be privileged, unless he was to
10     get this from Laura Siegel or somebody else.
11     But if he got this from Michael Siegel, it
12     would be part of -- be a privileged document
13     as to Mr. Bulson.
14                        MR. KLINE:        Sharing a
15     nonprivileged document with your attorney
16     does not make that document privileged.  I'm
17     fully entitled to ask him --
18                        MR. BERK:         It's
19     privileged between Michael and him, but it's
20     not privileged from Laura to Michael.
21                        MR. KLINE:        I'm fully
22     entitled to ask him if he's seen this
23     document before.  Are you instructing him not
24     to answer that question?
25                        MR. BERK:         I'm
```

## DON BULSON - 7/19/2011

Page 31

1      instructing him not to answer that question.

2                    MR. RYLAND:       Counsel, I

3      have no choice.   We can not either assert or

4      waive the attorney-client privilege, so. . .

5                    MR. KLINE:       We're just

6      going to be back here for a second day.  If,

7      I mean, the communication -- I mean, the Ohio

8      courts have held the following:  Mere

9      relation of attorney and client does not

10     raise a presumption of confidentiality of all

11     communications made between them.  I've not

12     asked for anything Michael said about the

13     document, I've not asked for anything Don

14     Bulson said to Michael about the document.

15     I'm asking him if he's ever seen the

16     document, whether he's perceived the document

17     before.  And you're instructing him not to

18     answer that question?

19                    MR. BERK:       I'm saying he

20     can answer the question if Michael did not

21     give him the document.

22                    MR. RYLAND:       I -- you know

23     our position, Counsel.  I can't waive --

24  A   I don't know how I can answer the question.

25  Q   Independent of Michael giving you this

DON BULSON - 7/19/2011

Page 32

1       document, have you ever seen it?

2   A   No.

3                   MR. KLINE:        Okay.  And

4       Mr. Berk, we just met.

5                   MR. BERK:        Uh-huh.

6                   MR. KLINE:        I

7       unfortunately think we're going to be here a

8       second day.  I'm not aware of any case

9       authority that says if you give a

10      nonprivileged document to your attorney --

11      you can issue such an instruction or can you

12      cite such an authority that says that in

13      Ohio?  I just -- I'm not aware of a case that

14      says that.

15                  MR. TOBEROFF:        Counsel.

16                  MR. KLINE:        I'm asking

17      you, Mr. Berk.

18                  MR. TOBEROFF:        Excuse me.

19      You've often said in your depositions that

20      you don't want to engage in colloquy.  This

21      colloquy is pointless.  He's entitled to

22      instruct as he sees fit.  You can ask your

23      questions as you see fit.  Let's move on with

24      the deposition.

25                  MR. KLINE:        I'm not going

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 33

1    to move on, because we're going to have to
2    come back here a second time --
3              MR. TOBEROFF:    This is not a
4    hearing.
5              MR. KLINE:       We're going to
6    have to come back here a second time.
7              MR. TOBEROFF:    You threaten
8    that in every deposition.
9              MR. KLINE:       We're going to
10   have to come back.  I just want to know, are
11   you aware of any -- I just never heard of an
12   authority that says you can't ask a witness
13   if they've seen a document before.
14             MR. BERK:        If the
15   document was given by Michael Siegel to
16   Mr. Bulson it becomes part of his file, it
17   also becomes part of the privileged file and
18   part of the litigation or representation by
19   Mr. Bulson of Michael Siegel, and therefore
20   is privileged.
21             MR. KLINE:       Are you aware
22   of any case authority that supports that
23   proposition?
24             MR. BERK:        It's basic
25   privilege.  It's a part of the file.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 34

1          MR. KLINE:       And are you
2    invoking Ohio law here, federal law here?
3          MR. BERK:       I'm invoking
4    any law that applies to this deposition.
5          MR. KLINE:       And what is
6    your submission as to what law applies?
7          MR. BERK:       I don't think
8    I have to give you my submission to what law
9    applies.  It is privilege.  It is privilege
10   in Ohio, it is privilege under federal, it is
11   still privileged.  And I believe it is
12   privileged under both because it becomes part
13   of the work product of his representation of
14   Michael Siegel.
15         MR. KLINE:       So just so I
16   understand your position clearly, you're not
17   going to let him answer the following
18   question, just so we have a clean Q and A.
19         MR. TOBEROFF:    You already
20   had a clean Q and A.  Let's move on,
21   Counselor.
22         MR. KLINE:       It's my
23   deposition.
24   Q   Mr. Bulson, have you ever seen this document
25       before?

# DON BULSON - 7/19/2011

Page 35

1          MR. RYLAND:      I think that
2   he's asserted the privilege.  I'm not going
3   to allow my client to answer something that
4   the estate has objected to and instructed him
5   not to answer simply because I can't.  It's
6   not Renner Otto's or Mr. Bulson's privilege
7   to waive.  So to the extent that you're going
8   to ask him the same question that he's been
9   instructed to waive, I'll object that it's
10  been asked and answered.
11          MR. KLINE:      And it's your
12  instruction for him not to answer that
13  question --
14          MR. RYLAND:      When you say
15  your --
16          MR. KLINE:       -- Mr. Berk?
17          MR. RYLAND:      Thank you.
18          MR. BERK:      I've already
19  answered that question.
20          MR. KLINE:      And the answer
21  is yes?
22          MR. BERK:      I've
23  instructed him not to answer that question as
24  it relates to Michael Siegel and the
25  privilege that we have raised.

## DON BULSON - 7/19/2011

Page 36

1          MR. KLINE:       Okay.  Thank

2     you.

3  Q   Mr. Bulson, did you ever discuss this letter

4     with Mr. Toberoff?

5          THE WITNESS:      I don't

6     think -- you've instructed me not to answer

7     the earlier question.  If I answer that

8     question --

9          MR. BERK:       I would agree

10    that if you spoke to Mr. Toberoff in

11    relationship to your representation of

12    Michael Siegel, it is also a privileged

13    conversation.  It may not be to Mr. Toberoff.

14    I mean, I can't have any privilege --

15    exercise any privilege of his conversation,

16    but as it pertains to Mr. Bulson, I -- it

17    would be privileged.

18          MR. KLINE:       You understand

19    that an Ohio court ruled that 15 emails in

20    which these two gentlemen negotiated for a

21    possible purchase of Mr. Siegel's interests

22    were not privileged communications and had to

23    be produced to DC, correct?

24          MR. BERK:       No, I do not

25    know that.

EXHIBIT 58
1079

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 37

1    MR. KLINE:    Okay.  We'll

2    show you a copy of that order, and we'll show

3    you a copy of an order in which Mr. -- the

4    court found that Mr. Toberoff both

5    misdescribed those documents and erroneously

6    asserted the privilege.  So I'll represent to

7    you, if you want to take a break to talk to

8    him about it, that their negotiations

9    concerning the Michael Siegel interests, and

10   I know Mr. Ryland's aware of this, were not

11   privileged conversations.  So I think I'm

12   fully entitled to ask about his discussions

13   with Mr. Toberoff on this issue.

14   MR. TOBEROFF:    I object to

15   you mischaracterization of the Ohio order.

16   MR. KLINE:    Can I get the

17   Ohio order?

18   MR. TOBEROFF:    Warner

19   Brothers and DC moved for the entire -- all

20   Michael Siegel communications.  The vast bulk

21   of that for which a privilege was asserted,

22   the vast bulk was upheld by the Ohio court

23   with the sole exception of a sliver of emails

24   which concerned the negotiation between

25   myself and Mr. Bulson regarding the potential

DON BULSON - 7/19/2011

Page 38

1    purchase of Michael Siegel's interest.   And

2    the court did not hold that the privilege log

3    had wrongly described something.

4                    MR. KLINE:       I'll read from

5    the order.

6                    MR. TOBEROFF:     That's your

7    editorializing.

8                    MR. KLINE:       While it is

9    true --

10                   MR. BERK:       Before you

11   read from the order, could you bring the --

12   read the case, what case citation is this

13   from?  I mean, what lawsuit?  Is it this

14   particular lawsuit here?

15                   MR. KLINE:       This is from

16   In re:  Subpoena duces tecum issued by the

17   U.S. District Court for the Northern District

18   of Ohio in the matter of Joanne Siegel versus

19   Warner Brothers Entertainment.

20                   MR. BERK:       Okay.  This

21   isn't this case.

22                   MR. KLINE:       Judge Solomon

23   Oliver held the following:  While it's true

24   that counsel for Bulson, this is Mr.

25   Toberoff, did not accurately characterize

## DON BULSON - 7/19/2011

Page 39

1    some of the documents and was incorrect

2    regarding his claims of privilege, the court

3    does not find that the circumstances herein

4    are such as to cast the entire process into

5    question.  That's what Mr. Toberoff's talking

6    about when he says --

7                    MR. BERK:      Wait.  Wait.

8    Wait.

9                    MR. KLINE:      -- every

10   single document in the case need not be

11   produced.  But he also says in the same

12   order, this is his order of August 14th,

13   2008 -- I need the other order, Jason, the

14   earlier order as well.

15                    MR. TOBEROFF:    Is this an

16   exhibit?

17                    MR. KLINE:      Yeah.  We're

18   going to mark two exhibits here.

19                    -  -  -  -  -

20   (Plaintiff's Exhibits 31 and 32 were marked.)

21                    -  -  -  -  -

22                    MR. KLINE:      No. 32 is the

23   first order.  I'll put it in front of

24   Mr. Bulson.

25   Q    Mr. Bulson, do you remember these orders

**DON BULSON - 7/19/2011**

Page 40

1    concerning document requests made on you and
2    your firm?
3  A    Vaguely.
4                    MR. RYLAND:        Thanks.
5                    MR. KLINE:        So the first
6    order which is the April 1st, 2008 order --
7    and you've not seen these, Mr. Berk?
8                    MR. BERK:        I've never
9    seen them.  We were not a part of any of this
10    action at that particular time.
11                    MR. KLINE:        Well, here's
12    what I'd like to do.  I'd like to take a
13    brief break so that you can review these
14    orders, and hopefully they can inform some of
15    the privilege objections you're making.  And
16    otherwise we're just going to waste our time
17    here today.
18                    MR. BERK:        Well, I don't
19    want you to waste your time, but this is a
20    totally different case than this case.
21                    MR. KLINE:        Why don't you
22    take --
23                    MR. BERK:        Wait a minute.
24    We were not a part of it, and I'm not sure it
25    has any relevance whatsoever, because we have

## DON BULSON - 7/19/2011

Page 41

1    different -- a different situation here.
2                    MR. KLINE:        That may be
3    your ultimate position.  I want to take a
4    five minute break so you can read the orders
5    and we can figure out what the protocol is
6    going to be.
7                    MR. BERK:         Take as many
8    breaks as you want.
9                    MR. TOBEROFF:    I don't -- you
10   know, they said they have to leave here at
11   5:00 o'clock, and we got a late start, and
12   it's a burden to fly out here from Los
13   Angeles, so I don't -- these breaks during
14   the deposition to read things you could have
15   provided beforehand --
16                    MR. KLINE:        Mr. Toberoff,
17   your co-counsel here is making one objection
18   after another.  So we're going to take a
19   break, review the orders.  If you want to
20   keep on making the objections, that's fine.
21   Let's go off the record.
22                    MR. TOBEROFF:    So it
23   shouldn't come as a surprise to you,
24   Mr. Kline, that when you're taking the
25   deposition of an attorney regarding their

**EXHIBIT 58**
1084

DON BULSON - 7/19/2011

Page 42

1    attorney-client relationship, that objections

2    as to privilege are going to be made.

3                    MR. KLINE:        Let's go off

4    the record.

5                    MR. TOBEROFF:      In fact, this

6    whole lawsuit is an invasion of the

7    attorney-client relationship, so you

8    shouldn't be shocked or surprised when

9    privilege objections are being made or

10    instructions are duly given.

11                    MR. BERK:        On top of

12    that, Mr. Toberoff, I don't believe, was a

13    party to this lawsuit at that time.

14                    MR. KLINE:        We're going

15    off the record.  You guys can read these and

16    then we'll come back on, and we'll see what

17    objections you'll make going forward.  Thank

18    you.

19                    VIDEO TECHNICIAN:  We're off

20    the record.  The time is 9:54.

21      (Recess from 9:54 a.m. to 10:05 a.m. )

22                    VIDEO TECHNICIAN:  We're back

23    on the record.  The time is 10:05.

24    BY MR. KLINE:

25    Q   So Mr. Bulson, bringing -- I just want to

DON BULSON - 7/19/2011

Page 43

1    make sure the record's clear.  I put in front

2    of you Exhibits 31 and 32, which are the two

3    orders issued by the judge in Cleveland

4    concerning document production in the Siegel

5    case.  Do you see both of those?

6  A    I do.

7  Q    And Mr. Toberoff was representing you in

8    connection with that motion practice,

9    correct, along with Mr. Ryland here?

10  A    I don't recall at the moment, that may be the

11    case.  I don't recall.

12  Q    You do recall that he had kind of collected

13    documents for you, prepared a privileged log

14    for you, produced documents in that case?

15  A    I believe that's true.

16  Q    And he asserted in that case that he

17    represented Michael Siegel's interests,

18    correct?

19  A    I believe that is true.

20  Q    Thank you.

21        Bringing your attention back to --

22            MR. KLINE:    What did we

23    mark this, Jason?

24  Q    I'm going to turn back to Exhibit 30 here in

25    front of you, Mr. Bulson.  This is the letter

## DON BULSON - 7/19/2011

Page 44

1    from Michael Siegel to Laura Siegel his

2    sister, and I want to ask you the following

3    question:  In connection with the

4    negotiations that you had with Mr. Toberoff

5    concerning Michael Siegel's putative Superman

6    interests, did you and he ever discuss this

7    letter?

8                 MR. TOBEROFF:    Objection.

9                 MR. BERK:       I object as

10   well, because if he discussed any -- this

11   letter with Mr. Toberoff, he did so

12   concerning his representation of Michael

13   Siegel, and is therefore as to Michael Siegel

14   it is privileged.

15                MR. TOBEROFF:    I object

16   because the question lacks foundation.

17  Q   Okay.  Let's take a look at Exhibits 34 to 41

18   of your last deposition, actually, to 42.

19   And I'll represent to you and to Mr. Berk

20   that these were letters and emails that you

21   exchanged with Mr. Toberoff concerning a

22   potential investor's desire to purchase

23   Mr. Siegel's interest in Superman.  Do you

24   remember the letters and emails from

25   Mr. Toberoff in the 2003 time period to

DON BULSON - 7/19/2011

Page 45

1      2005 concerning those negotiations?

2                      MR. BERK:        I object

3      again, because any reference to his

4      representation of Michael Siegel, and any

5      conversations that he might have had with

6      Mr. Toberoff concerning that, is privileged

7      as to Michael Siegel.

8                      MR. KLINE:        These were

9      exhibits used at his last deposition.

10                     MR. BERK:        I mean, that's

11     fine, but we're in a different lawsuit

12     altogether.  I was not a party to or was I

13     there or had anything to do with exercising

14     the privilege rights of the estate of Michael

15     Siegel.

16                     MR. KLINE:        And you

17     understand that Mr. Toberoff, your co-counsel

18     here today, who says he represented, at the

19     very beginning of this deposition, said he

20     was here representing Michael Siegel,

21     appeared at that deposition and made numerous

22     objections on behalf of the Siegel, Michael

23     Siegel estate.

24                     MR. BERK:        I have no idea

25     when that was taken.  I don't know if Michael

### DON BULSON - 7/19/2011

Page 46

1    Siegel was alive or dead at that time.   But

2    as far as the estate of Michael Siegel and my

3    representation of the Estate of Michael

4    Siegel and exercising the privilege that

5    we're entitled to, I maintain that these are

6    privileged documents as to this deposition in

7    this lawsuit and my representation and being

8    here.

9              MR. KLINE:      So you didn't

10   read this deposition before?

11             MR. BERK:      I absolutely

12   did not.   I had nothing to do with that case.

13             MR. KLINE:      This

14   deposition was taken in 2008 when he was

15   dead, and your co-counsel here today made

16   numerous objections on behalf of the estate

17   of Michael Siegel.

18             MR. BERK:      I mean, that

19   may be true.   I have no knowledge of that.

20             MR. KLINE:      And yet you're

21   instructing him --

22             MR. BERK:      As far as I'm

23   concerned, my representation of the Estate of

24   Michael Siegel and the question that you

25   asked concerning this letter and concerning

## DON BULSON - 7/19/2011

Page 47

1    his representation of the Estate of Michael

2    Siegel is privileged.

3              MR. KLINE:        Okay.

4              MR. BERK:        It may not

5    have been privileged in that case, but it is

6    privileged here.

7              MR. KLINE:        Let's look at

8    the letters --

9  Q   Mr. Bulson --

10             MR. KLINE:        Is it your

11   position, sir, that any of his communications

12   with Mr. Toberoff concerning these

13   negotiations are privileged?

14             MR. BERK:        My position is

15   that any conversations, any letters, or any

16   documents concerning his representation of

17   Michael Siegel and his conversations that he

18   had with anyone else concerning his

19   representation of Michael Siegel is

20   privileged.  I don't know what his

21   conversations were with Mr. Toberoff and to

22   what extent they were made.  But if they were

23   made with the representation of Michael

24   Siegel, they are privileged.  If he had other

25   conversations with Mr. Toberoff not

feda831f-8f5a-4d4a-86d4-38e27c7e8947

DON BULSON - 7/19/2011

Page 48

1    concerning his representation of Michael

2    Siegel, then that is his to determine whether

3    they were privileged or not.

4                    MR. KLINE:        And you read

5    the order in there where he says he's having

6    negotiations with Mr. Toberoff concerning a

7    potential purchase of Michael Siegel's

8    rights?

9                    MR. BERK:        I read an

10   order in another case, not concerning me or

11   the Estate of Michael Siegel, and it's not in

12   detail.  I have no idea what the documents

13   were or how the decision was made.  But we're

14   in a completely different case here.  And I

15   maintain that any communications that

16   Mr. Bulson had with anyone is privileged.

17                   MR. KLINE:        Okay.

18                   MR. BERK:        As long as it

19   was in the representation of Michael Siegel.

20   Q   Mr. Bulson, between June 2003 and

21   January 2005 did you negotiate with

22   Mr. Toberoff concerning the potential

23   purchase of Michael Siegel's putative

24   Superman interests by a potential investor?

25                   THE WITNESS:        Am I okay to

## DON BULSON - 7/19/2011

Page 49

1   answer?

2         MR. BERK:        You can answer
3   that you had those conversations, but you can
4   not answer as to the -- what the negotiation
5   process was.

6   A   I had conversations, but I can't attest to
7       the timeframe.  I don't recall the timeframe.

8   Q   Okay.  And you made offers, for example, on
9       June 18th, 2003, that Michael would be
10      willing to entertain an offer that will pay
11      him $200,000 a year for the rest of his life
12      with a guaranteed minimum of 10 years.  Do
13      you remember --

14        MR. BERK:        I would object
15    to that.

16        MR. KLINE:        Can I at least
17    finish the question for the record?

18        MR. BERK:        I thought you
19    were through.

20        MR. KLINE:        If that's
21    okay?

22  Q   Do you remember making offers of that sort to
23      Mr. Toberoff on behalf of Mr. Siegel?

24        MR. BERK:        I will object
25    to that being that would be privileged and

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 50

1  made in the context of representation of

2  Michael Siegel.

3              MR. KLINE:        And are you

4  instructing him not to answer that question?

5              MR. BERK:        Correct.

6              MR. RYLAND:      Are you

7  instructing him not to answer?

8              MR. BERK:        Correct.

9              MR. RYLAND:      Yeah.  Thank

10 you.

11             MR. KLINE:        I'm going to

12 take a five minute break, because these are

13 literally questions that went -- that were

14 gone over for 20, 30 pages of his last

15 deposition.  And if you're not going to let

16 me answer these basic questions about those

17 negotiations and related correspondence like

18 Exhibit 30, we may have to go to a judge to

19 get some guidance on this.

20             MR. BERK:        Okay.  But my

21 position is, if you have testimony in another

22 matter, then I think you have the right to

23 attempt to introduce it into this matter, and

24 then we would have the right to object to it

25 as far as being privileged and not being part

## DON BULSON - 7/19/2011

Page 51

1    of that previous matter.

2                        MR. KLINE:        Well, what I

3    really want to do is start asking him about

4    Exhibit 30, which is this Michael Siegel

5    letter.  And every question that I've tried

6    to ask I believe you've instructed him not to

7    answer.

8                        MR. BERK:         Correct.

9                        MR. KLINE:        And so I'm

10   worried about us wasting our seven hours, us

11   wasting our day here.  I understand your

12   position.

13                       MR. BERK:         Okay.

14                       MR. KLINE:        We obviously

15   disagree with it and respectfully disagree

16   with it.

17                       MR. BERK:         Uh-huh.

18                       MR. KLINE:        I just wonder

19   if our time might be better served getting a

20   judge to rule on this issue and then coming

21   back here.  So what I want to do is I want to

22   take about five minutes to try to go figure

23   out the answer to that question, because I

24   was not prepared for you to make objections

25   that Mr. Toberoff did not make in the Siegel

## DON BULSON - 7/19/2011

Page 52

1    case to the same sorts of questions.   So

2    let's go off the record.

3              MR. BERK:        But in the

4    Siegel case he was not representing -- or

5    were you representing Michael Siegel?   I

6    don't know that.

7              MR. TOBEROFF:   I'd have to go

8    back and look at the deposition.

9              MR. BERK:        I mean, I

10   haven't seen the full case, so I don't even

11   know if Michael Siegel was a plaintiff.

12             MR. KLINE:       He was not a

13   party to that action.

14             MR. BERK:        So he had

15   nothing to do with this, so therefore his

16   privilege objections would not, as a --

17   wouldn't have been entered as a party.

18             MR. KLINE:       No,

19   Mr. Toberoff purported to represent his

20   interests, and instructed Mr. Bulson

21   repeatedly not to answer questions on the

22   grounds that he represented Michael Siegel,

23   and yet he let him answer questions about the

24   very document you just told him not to answer

25   questions about.  Okay.  Let's go off --

DON BULSON - 7/19/2011

Page 53

1          MR. BERK:        Mr. Toberoff
2     and I have a difference of opinion --
3          MR. KLINE:       You do.
4          MR. BERK:         -- as to
5     whether this is a privilege or not.
6          MR. KLINE:       So let's go
7     off the record for five minutes.
8          VIDEO TECHNICIAN:  We're off
9     the record.  The time is 10:16.
10       (Recess from 10:16 a.m. to 10:32 a.m. )
11         VIDEO TECHNICIAN:  We're back
12    on the record.  The time is 10:32.
13              - - - - -
14    (Plaintiff's Exhibits 34 to 42 were marked.)
15              - - - - -
16  BY MR. KLINE:
17  Q    Okay.  So I had Mr. Tokoro mark on the break
18       Exhibits 34 through 42 from your last
19       deposition as reflected by the B-34 through
20       42 Defendant's Exhibit at the bottom of these
21       exhibits.  At the top of the exhibits, and I
22       don't know how Jason got the numbers to work
23       out perfectly, they're marked Plaintiff's
24       Exhibits 34 through 42.  I just want to show
25       you these exhibits, Mr. Bulson, and we'll

## DON BULSON - 7/19/2011

Page 54

```
1    give copies to counsel.  I think they're in
2    front of you there.  And Mr. Bulson, could
3    you please flip through those documents and
4    confirm that you were deposed on them back in
5    2008?
6                    MR. RYLAND:       Objection.
7    Vague.
8  A  I don't recall, but I take it on your
9    representation if it is part of the
10   deposition and transcript, then I presumably
11   was deposed with respect to these documents.
12 Q  And in flipping through them, do you
13   recognize several of them as letters to you
14   from Mr. Toberoff conveying offers and him
15   responding in kind to you?
16                   MR. BERK:        I'm going to
17   throw the ball ostensibly to Mr. Bulson.  If
18   he feels that these items are a privilege in
19   his representation of Michael Siegel, he may
20   make that determination on his own.
21                   MR. RYLAND:      We can't --
22                   MR. BERK:        I will not
23   instruct him not to answer, and I'll let him
24   make his determination whether he feels that
25   it's privileged.
```

## DON BULSON - 7/19/2011

Page 55

1          MR. RYLAND:        We're not

2    going to continue the deposition under that

3    basis.

4          MR. BERK:        Okay.

5          MR. KLINE:        It's your

6    position that you represent the estate of

7    Michael Siegel, the holder of the privilege,

8    correct?

9          MR. BERK:        Correct.

10          MR. KLINE:        And yet you're

11    saying that --

12          MR. BERK:        And we would

13    want the full extent of our privilege in the

14    deposition of Mr. Bulson.

15          MR. KLINE:        Are you

16    disputing --

17          MR. BERK:        I'm not a

18    hundred percent sure how this letter came to

19    be, how he got it, and what discussions he

20    might have had, but as far as his

21    representation of Michael Siegel, we feel

22    that we want the full extent of the privilege

23    that we're entitled to, and Mr. Bulson can

24    make a determination as to whether it

25    violates privilege or not.  I'm not going to

DON BULSON - 7/19/2011

Page 56

1    instruct him not to answer.
2                    MR. TOBEROFF:    Which
3    question?  I think --
4                    MR. BERK:        And that was
5    the last question concerning validity or
6    about this having this letter.
7                    MR. KLINE:       No, I asked
8    him about Exhibits 34 to 42, which he was
9    asked about at his last deposition, and I
10   asked -- the last question was --
11                   MR. BERK:        I don't have
12   an objection to him answering questions
13   concerning a prior deposition and exhibits
14   that were in that deposition.
15                   MR. KLINE:       Before the
16   break you said he couldn't answer any
17   questions concerning those documents.  Have
18   you changed your position?
19                   MR. BERK:        I don't know
20   which documents you're referring to.
21                   MR. KLINE:       The ones
22   marked 34 to 42 right here in front of you.
23                   MR. BERK:        He can answer
24   questions concerning whether he sent these
25   documents, but any conversations he had with

EXHIBIT 58
1099
feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 57

1    Michael Siegel concerning these documents are

2    privileged, and we feel he should not discuss

3    any conversations that he had with Michael

4    Siegel concerning them.

5                    MR. KLINE:        And that

6    doesn't -- that's no matter what question I

7    ask about these conversations?

8                    MR. BERK:        If it's

9    conversations between Mr. Bulson and Michael

10   Siegel, it's a privilege.

11                   MR. KLINE:        Okay.  But I

12   wasn't asking about his conversations with

13   Mr. Siegel.

14                   MR. BERK:        I understand

15   that.

16                   MR. KLINE:        Before the

17   break you said I couldn't ask him any

18   questions about his conversation was

19   Mr. Toberoff.  Are you changing that

20   position?

21                   MR. BERK:        My position is

22   that Mr. Bulson can make that determination.

23                   MR. RYLAND:        No.  Let me

24   clarify as counsel for Mr. Bulson.  We will

25   not under any circumstances make a judgment

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 58

1      call with respect to the attorney-client
2      privilege that is held by the estate of
3      Michael Siegel.  We no longer represent
4      Michael Siegel, nor do we represent the
5      Estate of Michael Siegel, and we're going to
6      defer to the estate which holds the privilege
7      either to waive or assert it.  If we're told
8      that the privilege is waived, Mr. Bulson can
9      testify, we'll do so.  If we're told the
10     privilege is asserted and the estate
11     instructs us not to answer, then we will not
12     answer.  Beyond that we will not --
13     unequivocally will not make any
14     determinations with respect to privilege on
15     our own judgment, because we do not hold the
16     privilege, nor can we assert or waive it.
17                MR. TOBEROFF:    Let me try to
18     put some clarity into this.  What I think
19     Mr. Berk is saying is that he would allow
20     Mr. Bulson to answer questions about whether
21     he sent this letter or whether he received a
22     letter from me, but to the extent any
23     questioning regarding these letters
24     implicates knowledge or conversations that he
25     had with Michael Siegel, Mr. Berk on behalf

## DON BULSON - 7/19/2011

Page 59

1    of the estate would instruct him not to

2    answer; is that correct?

3                    MR. BERK:        That is

4    correct.

5                    MR. KLINE:        And Mike,

6    before the break I asked --

7  Q  Let me get back to my questions, because

8    maybe this will crystallize this.  Looking at

9    Exhibit 30, which is the May 13, 2003 letter,

10    did you ever discuss that letter with

11    Mr. Toberoff?

12                    THE WITNESS:      Answer?  Am I

13    allowed to answer that question?

14                    MR. BERK:        You can answer

15    the question whether you discussed the letter

16    with Mr. Toberoff, but not as --

17                    MR. RYLAND:      Is that a yes?

18                    MR. BERK:        You can answer

19    that question.

20                    THE WITNESS:      So --

21                    MR. RYLAND:      You can

22    answer.

23                    THE WITNESS:      This would be

24    a waiver of privilege of the first question.

25                    MR. RYLAND:      Which was the

feda831f-8f5a-4d4a-86d4-38e27c7e8947

DON BULSON - 7/19/2011

Page 60

1       first question that you're referring to?

2                        THE WITNESS:     Did I ever

3       discuss this -- have I ever seen this letter.

4       Or was this letter, you know --

5                        MR. BERK:       Is this the

6       letter we're referring to?

7                        MR. KLINE:      May 13th,

8       2003.

9                        MR. TOBEROFF:    He thought you

10      were referring to these letters.  You're

11      jumping.

12                       MR. KLINE:       I said

13      Exhibit 30, right here, May 13th,

14      2003 letter.

15                       MR. BERK:       Okay.  This is

16      Exhibit 30.

17                       MR. TOBEROFF:    I think he

18      believed you were speaking about --

19                       MR. KLINE:       That's fine.

20      Let's T it up.  Let's get a clear Q and A on

21      this.

22  Q   Mr. Bulson, pointing you to Exhibit 30, did

23      you ever discuss this letter with

24      Mr. Toberoff?

25                       MR. BERK:       I still stand

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 61

1  by my objection to this particular letter as
2  far as letters sent to Mr. Toberoff.  He can
3  answer as to whether he sent them.
4              MR. KLINE:      So are you
5  instructing him not to answer my question?
6              MR. BERK:       Correct.
7              MR. KLINE:      Did you get
8  that?
9              COURT REPORTER:   (Nods head.)
10  Q  Putting aside any conversations you had with
11  Michael Siegel and focusing on the time
12  period covered in Exhibits 34 to 42, when you
13  and Mr. Toberoff were negotiating the
14  potential purchase of Mr. Siegel's Superman
15  interests, did you and Mr. Toberoff ever
16  discuss, Mr. Bulson, Exhibit 30, which is
17  this May 13th, 2003 letter from Michael
18  Siegel to his sister Laura Siegel?
19              MR. TOBEROFF:    Lacks
20  foundation.  Asked and answered.  The same
21  question he just answered.
22              MR. KLINE:      May he answer
23  that question?
24              MR. TOBEROFF:    It's the same
25  question you instructed him not to answer.

DON BULSON - 7/19/2011

Page 62

1          MR. BERK:        Yeah.  Right.

2     No.

3   Q   Mr. Bulson, do you know whether this document

4       exists in your law firm's files?

5   A   What document?

6   Q   The May 13th, 2003 letter, Plaintiff's

7       Exhibit 30?

8          MR. BERK:        I'm going to

9     object to that as well, because first of all,

10    if it exists and it's in his file, it becomes

11    a privilege, and therefore not discoverable.

12         MR. KLINE:        So just so I

13    understand your position, I can't ask him

14    whether he discussed this letter with

15    Mr. Toberoff, correct?

16         MR. BERK:        If he

17    discussed this letter with Mr. Toberoff

18    concerning his representation of Michael

19    Siegel or the Estate of Michael Siegel, it is

20    privileged.

21         MR. KLINE:        Okay.

22  Q   Turning your attention to the second

23      paragraph of this letter, Mr. Bulson.

24         MR. RYLAND:       You mean

25    Exhibit 30, Counsel?

## DON BULSON - 7/19/2011

Page 63

1     MR. KLINE:   Exhibit 30.

2 Thank you, Josh.

3 Q During your communications with Mr. Toberoff

4  in 2003, 2004, 2005, did he mention to you

5  the mysterious billionaire averted to in the

6  second paragraph of this letter?

7     MR. BERK:   Who's he?

8     MR. KLINE:   Mr. Toberoff.

9     MR. BERK:   Oh, did

10 Mr. Toberoff represent to him?

11     MR. KLINE:   In your

12 discussions and negotiations with

13 Mr. Toberoff in 2003 and 2005, did he make

14 reference to --

15 A Can you fill in the he's?

16 Q Did Mr. Toberoff make a reference to a,

17  quote, mysterious billionaire who wanted to

18  invest in the Superman copyright?

19     MR. TOBEROFF:  Lacks

20 foundation.

21     MR. RYLAND:  Are we okay

22 with him answering that?

23     MR. BERK:   Yeah.  I think

24 he can answer as to the -- that question.

25 A In that timeframe Mr. Toberoff did mention, I

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 64

1    don't believe he used words like "mysterious
2    billionaire."  So I guess the answer would be
3    no.
4   Q  Did he make reference to a billionaire
5      investor?
6   A  He may have.
7   Q  You don't recall one way or the other?
8   A  Not right now, no.
9   Q  Did he tell you that he owned his own -- did
10     Mr. Toberoff during this 2003 and 2005 time
11     period tell you that he owned his own
12     production company?
13              MR. RYLAND:     Are you okay
14     with the estate?
15              MR. BERK:       Yeah.
16  A  I don't recall.
17  Q  During the 2003 to 2005 time period did
18     Mr. Toberoff tell you that he was going to
19     team with Ari Emanuel to make a Superman
20     movie?
21  A  I don't recall.
22  Q  Do you know whether Michael Siegel had
23     communications with Mr. Toberoff --
24              MR. BERK:       I'm going to
25     object to that.

DON BULSON - 7/19/2011

Page 65

1   Q    -- on or before May 13th, 2003?

2                    MR. TOBEROFF:    You're

3        objecting and instructing?

4                    MR. BERK:    Yes.

5   Q    Was Mr. Toberoff acting, to your knowledge,

6        2003 to 2000 -- or in May 2003 or before as

7        Michael Siegel's attorney to your knowledge?

8                    THE WITNESS:    Can I answer?

9                    MR. BERK:    Yeah.    That

10       has nothing to do with your representation.

11  A    Repeat the question specifically.

12                   MR. BERK:    To your

13       knowledge.

14  Q    On or around May 13, 2003, do you know

15       whether Mr. Toberoff was representing Michael

16       Siegel as his attorney?

17  A    I -- that's an unclear question.  I know the

18       answer to that.

19  Q    What is it?

20  A    I mean, to my knowledge he was not

21       representing Michael Siegel.

22  Q    Okay.  Based on that answer I'm going to ask

23       my question again.  You previously instructed

24       him not to answer.  Do you know whether prior

25       to May 13th, 2003, Michael Siegel had

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 66

1    communications with Marc Toberoff?

2                        MR. BERK:        I would -- if

3    he found out about any facts concerning this

4    while his -- with the communications between

5    Michael Siegel and Don Bulson, that those

6    communications between the two, two of them,

7    are privileged as --

8                        MR. TOBEROFF:    Let me

9    rephrase that.  He can only answer the

10   question insofar that it doesn't implicate

11   conversations with Michael Siegel.  If he has

12   some independent knowledge outside his

13   conversations with Michael Siegel as to what

14   transpired between Michael Siegel and me, if

15   anything, then he could answer.

16                        MR. BERK:        Yes.

17                        MR. TOBEROFF:    Otherwise --

18                        MR. KLINE:       So you're

19   instructing him not to answer?

20                        MR. BERK:        To that -- on

21   those parameters.

22                        MR. KLINE:       It's your

23   position that if Michael Siegel --

24                        MR. BERK:        Told him.

25                        MR. KLINE:       -- conveyed

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 67

1       the basic fact I talked to Marc Toberoff
2       yesterday, that's a privilege and I can't ask
3       questions about that?
4                       MR. BERK:       Correct.
5                       MR. KLINE:      And you're
6       instructing him not to answer any questions
7       on that ground?
8                       MR. BERK:       I'm
9       instructing him not to answer any
10      communications he had between himself and
11      Michael Siegel, concerning his representation
12      of Michael Siegel are privileged.
13                      MR. KLINE:      Even if it's
14      just conveying basic facts like I spoke to so
15      and so today?
16                      MR. BERK:       Well, I can't
17      make that determination on whether that was
18      part of his representation. Mr. Bulson knows
19      better than I do. But as far as it pertains
20      to his representation of Michael Siegel, it
21      is privileged.
22                      MR. KLINE:      Okay. So I
23      just want to have a clear record on this.
24    Q     In this letter in the third sentence it says
25      in the -- I'm sorry, referring your attention

EXHIBIT 58
1110

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 68

1  to Exhibit 30, May 13th, 2003 letter, I

2  really wish to discuss Marc Toberoff, and

3  then two sentences later, I told you when he

4  first contacted me he wanted to buy my share

5  of the copyright.  Marc had a mysterious

6  billionaire who wanted to invest in the

7  Superman copyright plus $15 million up front,

8  plus participation.  Do you know when Marc

9  Toberoff first contacted Michael Siegel?

10         MR. TOBEROFF:    You just asked

11  that question.

12         MR. BERK:      If he found

13  this out from Mike Siegel, I would say that's

14  privileged.  If he knows outside of that from

15  other -- other than his conversations with

16  Michael Siegel, he can answer.  But if he

17  only knows it because of his conversations

18  with Mike Siegel, it's part of his

19  conversations with Mike Siegel and his

20  representation of Mike Siegel, and we assert

21  the privilege and instruct him not to answer.

22  Q  With that instruction can you provide an

23     answer?

24         MR. RYLAND:      Hold on a

25  second.  Are you instructing him not to

## DON BULSON - 7/19/2011

Page 69

1    answer to the extent if he learned of the
2    answer to that question from Michael Siegel?
3                   MR. BERK:         Correct.
4                   MR. RYLAND:      Mr. Bulson, if
5    you can answer that question within the
6    confines of that question.
7  A  There's a foundation issue.  So to the extent
8    I have any information regarding that
9    question, it would not have arrived from
10   other means than Michael Siegel.
11 Q  Did Mr. Toberoff in your discussions with him
12   ever tell you that he had conversations, he
13   being Marc Toberoff, had conversations with
14   Michael Siegel?
15                  MR. TOBEROFF:    You can answer
16   that.
17                  MR. BERK:        Yeah.
18 A  I don't recall.
19 Q  Did Michael Siegel share with you or provide
20   to you his communications, these written
21   communications such as Exhibit 30 that he had
22   with his sister Laura Siegel?
23                  MR. BERK:        I don't
24   understand the question.  Repeat it, please.
25 Q  Did Michael Siegel provide to you or share

EXHIBIT 58
1112

## DON BULSON - 7/19/2011

Page 70

1    with you written communications that he had

2    with his sister such as Exhibit 30?

3                MR. BERK:         Again, that's

4    part of his representation of Michael Siegel,

5    and if Michael Siegel gave it to him in

6    conjunction with his representation of

7    Michael Siegel, it is privileged, and I

8    instruct him not to divulge anything

9    concerning that.

10   Q   In your law firm's files do you have copies

11       of correspondence between Michael Siegel and

12       his sister Laura Siegel?

13                MR. BERK:         I think you

14   can answer that.

15   A   The question again?

16   Q   In your law firm's files do you have copies

17       of correspondence between Michael Siegel and

18       his sister Laura Siegel?

19                MR. BERK:         I'm going to

20   raise my objection on that.

21                MR. RYLAND:         Are you

22   objecting or --

23                MR. BERK:         I'm going to

24   object to it.

25                MR. KLINE:         Understood.

DON BULSON - 7/19/2011

Page 71

1    Can you say I instruct him not to answer?
2                MR. BERK:        I instruct him
3    not to answer.
4                MR. KLINE:       So that's your
5    position, you instruct him not to answer?
6                MR. BERK:        Right.
7  Q  References made at this top of this letter,
8    Exhibit 30 to Laura's letter of November 2nd
9    of last year, presumably November 2nd of
10   2002, does your law firm have a copy of that
11   November 2nd, 2002 letter?
12               MR. BERK:        And I object
13   as to being part of the work product of
14   Michael Siegel representation and instruct
15   him not to answer.
16 Q  Can you take a look at the complaint again?
17   It's Exhibit 1 in front of you.
18 A  Uh-huh.
19 Q  And look at Exhibit A.  It's way towards the
20   end.  It's Exhibit A, 65 at the very bottom,
21   so two pages later.
22               MR. BERK:        What are you
23   referring to?  I'm sorry.
24               MR. KLINE:       Exhibit A to
25   the complaint, Page 65 at the very bottom

DON BULSON - 7/19/2011

Page 72

1      there.

2  Q    And I'd ask you to read the last paragraph of

3      that page, starting July 5th, 2003.

4          MR. RYLAND:      By the way, I

5      think we're missing a page in this one too.

6          MR. KLINE:      But do you

7      have a Page 65?

8          MR. RYLAND:      Yeah, we've

9      got it.  I'm just letting you know in this

10      exhibit --

11          MR. KLINE:      Terrific.

12      Terrific.

13  Q    Your copy has a Page 65, Mr. Bulson?

14  A    I have a Page 65, yes, that's starts July 5,

15      2002.

16  Q    Correct.

17          MR. TOBEROFF:      The copy I

18      have of this complaint, Exhibit A, is

19      incomplete.  I'm not sure whether he has a

20      complete copy.  I would also like to note for

21      the record that Exhibit A is an anonymous

22      letter enclosing privileged documents stolen

23      from my law firm by, we believe, a junior

24      attorney who took a job and left after three

25      months and stole our legal files and

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 73

1    delivered them over to Warner Brothers'
2    general counsel in the winter, and -- excuse
3    me, in December, and that they held onto them
4    for months without reporting the theft or
5    receipts of privilege material on top of
6    that --
7              MR. KLINE:    Mr. Toberoff,
8    speaking objections are not allowed.
9              MR. TOBEROFF:    Don't
10   object -- don't interrupt me.
11             MR. KLINE:    I know, but
12   speaking -- we'll go off the record.
13   Speaking objections are not permitted.
14             MR. TOBEROFF:    Don't
15   interrupt me.  I'm going to finish.  We're
16   not going off the record.  We're staying on
17   this record.
18             MR. KLINE:    Then we're
19   going to charge your time, because this is an
20   improper speaking objection.
21             MR. TOBEROFF:    You can do
22   allege what you see fit.  You're asking
23   questions about an exhibit that's an
24   anonymous document.
25             MR. KLINE:    I'm not asking

## DON BULSON - 7/19/2011

Page 74

1    any questions.  I asked him to read a

2    paragraph.

3                    MR. TOBEROFF:    You're not

4    telling him what the document was.  You're

5    giving me an incomplete document, and I'm

6    stating for the record so the witness knows

7    what this document actually is.

8                    MR. KLINE:       That's called

9    a speaking objection.

10                   MR. TOBEROFF:    Okay.

11   Q    Mr. Bulson --

12                   MR. TOBEROFF:    I'm not

13   finished.  I'm going to go back.

14                   MR. KLINE:       Then we're

15   just going to charge you for the time.

16                   MR. TOBEROFF:    I'm going to

17   repeat -- no, you're not.  I'm going to

18   repeat what I said.  And every time you

19   interrupt me, I'm going to go back and repeat

20   it.

21                   MR. KLINE:       We'll charge

22   you for that time.

23                   MR. TOBEROFF:    Well, not

24   successfully, because you interrupted me.  So

25   this is an anonymous letter enclosing

## DON BULSON - 7/19/2011

Page 75

1    privileged legal files stolen from our law

2    firm, delivered to Warner Brothers' general

3    counsel in the midst of the Siegel

4    litigation.  It says consider this an early

5    holiday gift on the front page, which is

6    omitted from my copy of this exhibit.  We

7    believe Warner Brothers received these

8    documents in the winter and held onto them

9    for months until they finally disclosed that

10   they had these privileged documents of ours.

11   And we believe this letter was written by a

12   young attorney, who not only stole the

13   documents, broke the law, but broke every

14   oath of an attorney in revealing privileged,

15   to the extent things here aren't made up, but

16   many things are, he's revealing privileged

17   information of Laura Siegel, potentially

18   Michael Siegel, and Joanne Siegel.

19   Q    So my question is, and by the way, a judge

20   ruled that Warner Brothers acted completely

21   appropriately, and we can use this document

22   in this case.

23            MR. TOBEROFF:    And we'll be

24   appealing those rulings, and we'll be

25   investigating in counterclaims of Warner

## DON BULSON - 7/19/2011

Page 76

```
1      Brothers holding onto stolen material for
2      months at a time.
3   Q  Okay.  So referring to the first sentence of
4      this paragraph, July 5th, 2003, Laura Siegel
5      reseals her ignorance of Toberoff's dubious
6      actions in her return left back to Michael.
7      My question for you, sir, is are you aware of
8      a July 5th, 2003 letter from Laura to
9      Michael?
10                  MR. BERK:      My -- I object
11     if you got this information from Michael
12     Siegel.
13                  MR. KLINE:     And --
14                  MR. RYLAND:    Are you -- are
15     you instructing him not to answer?
16                  MR. BERK:      If he got the
17     information from Michael Siegel, it's
18     privileged and I would instruct him not to
19     answer.  If he got it from Laura Siegel, then
20     that would be --
21  Q  Did you get a copy of that letter from Laura
22     Siegel?
23                  MR. TOBEROFF:    Lacks
24     foundation.  Could I have a copy of -- a
25     complete copy of this, because I'd like to
```

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 77

1    know what you're reading off of when you're
2    asking the questions.
3                    MR. KLINE:        Your
4    co-counsel has one right there, I believe.
5                    MR. BERK:        I only have --
6    I don't have Page 66.
7                    MR. KLINE:        I'm reading
8    from Page 65.
9                    MR. BERK:        Is that the
10   end, is that the complete?  It looks like it
11   goes on.
12                   MR. RYLAND:        I think we're
13   just missing the evens.
14                   MR. KLINE:        So, can you
15   read my question back, please?
16                   (Record read.)
17   A    I do not recall receiving from Laura Siegel a
18        letter dated July 5, 2003.
19   Q    Did you receive any letters from Laura
20        Siegel?
21                   MR. BERK:        I object if he
22   received the letters from Michael Siegel,
23   and --
24                   MR. TOBEROFF:        If you're
25   asking questions about letters from Laura

DON BULSON - 7/19/2011

Page 78

1    Siegel regarding their joint termination
2    interest, there is a joint interest that
3    applies to that as upheld by the Ohio court.
4    With the exception of negotiations between
5    myself and Mr. Bulson regarding the potential
6    purchase of Michael Siegel's termi -- share
7    of the termination interest, the Ohio court
8    said conversations between me or my client
9    and Mr. Bulson are protected by joint
10   interest privilege.
11 Q  Did you receive any letters from Laura
12   Siegel?
13              MR. TOBEROFF:    You could
14   answer generally.
15              MR. BERK:      You can answer
16   generally.
17 A  I don't recall.
18 Q  Did you receive copies of any letters from
19   Laura Siegel?
20              MR. TOBEROFF:    Asked and
21   answered.  You can answer.
22 A  I don't recall.
23 Q  In your law firm's files are there any
24   letters from Laura Siegel to Michael Siegel?
25              MR. BERK:      I would object

DON BULSON - 7/19/2011

Page 79

1    if it's concerning part of the representation

2    of Michael Siegel.  Any letters that he would

3    have concerning that representation would be

4    privileged.

5                    MR. RYLAND:    Are you

6    instructing --

7                    MR. KLINE:    Are you

8    instructing him not to answer?

9                    MR. BERK:    If it's

10   privileged.

11                   THE WITNESS:    No, no, no.

12                   MR. RYLAND:    You can't say

13   if it's privileged.

14                   MR. BERK:    I mean, I

15   don't know where he got the letters.

16                   MR. KLINE:    Does your

17   law --

18                   MR. BERK:    If he got the

19   letter from Laura Siegel, that's one thing.

20   But if he got the letter from Michael Siegel,

21   then it's privileged.

22                   MR. KLINE:    So are you

23   instructing him not to answer or not?

24                   MR. BERK:    To the extent

25   that he received the letters from Michael

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 80

1    Siegel and it becomes part of the -- his

2    representation of Michael Siegel, I instruct

3    him not to answer.

4              MR. RYLAND:    Mr. Bulson, if

5    you can answer that question, if you can

6    satisfy --

7              THE WITNESS:    Read that

8    question back.

9              MR. RYLAND:    -- the

10   preconditions put on by the Estate of

11   Mr. Siegel.

12   A    What was the question again?

13   Q    Does your law firm have any copies of letters

14        from Laura Siegel to Michael Siegel?

15              THE WITNESS:    And you have

16   no objection if the letters came from Laura

17   Siegel?

18              MR. BERK:    Laura Siegel.

19   To you.

20   A    If I received a letter from Laura Siegel to

21        me, a copy would be in our -- in the files

22        that were turned over to the estate.

23   Q    And if Michael Siegel received a letter from

24        his sister pertaining to these Superman

25        negotiations, would copies of those letters

DON BULSON - 7/19/2011

Page 81

1    be in your law firm's files as well?

2                    MR. BERK:        I don't

3    understand the question.  If he received them

4    from Michael Siegel, we object and indicate

5    that -- and I've said this all along, that

6    it's privileged.

7                    MR. KLINE:        So you're

8    instructing him not to answer that question?

9                    MR. BERK:        If he received

10   it from Michael Siegel.

11                   MR. RYLAND:        Are you

12   instructing him not to answer the question

13   whether he received the letters from Michael?

14                   MR. BERK:        Yes.

15   Q   Okay.  Let me ask it again, and I -- it might

16   go smoother, and I'm going to have to start

17   charging you guys time for the long

18   objections.  If you're going to say I

19   instruct you not to answer, you should just

20   make that instruction.  Because you're making

21   objections and I think it's leaving everybody

22   up in the air about is an instruction being

23   made or not.  So here's my question --

24                   MR. RYLAND:        So to that

25   point, Counsel, we just need a definitive

## DON BULSON - 7/19/2011

Page 82

1    instruction from -- as Mr. Bulson's counsel,

2    I need a definitive instruction either way.

3                    MR. KLINE:        So do I for my

4    record, because I think that we obviously

5    disagree with the objections and the

6    instructions.

7  Q    If Michael Siegel received letters from Laura

8    Siegel concerning his Superman rights in

9    these negotiations with Mr. Toberoff, would

10    such letters be kept in your law firm's

11    files?

12                    MR. TOBEROFF:      Vague and

13    ambiguous as to these negotiations with

14    Mr. Toberoff.

15                    MR. BERK:        I don't have

16    any objection to him answering the question

17    that if he did somehow receive these

18    documents whether they would be in that file,

19    which is privileged.

20                    MR. TOBEROFF:      Okay.  So you

21    can answer that question.

22  A    If I received letters from Michael Siegel,

23    they would be in our files.

24  Q    Did Michael Siegel share letters with you

25    that he received from his sister Laura?

DON BULSON - 7/19/2011

Page 83

1        MR. BERK:        That's

2    privileged, and I object to that and instruct

3    you not to answer.

4        MR. KLINE:        So any

5    communication you're saying, anything that he

6    communicates to him, even a nonprivileged

7    letter, you're instructing him not to answer?

8        MR. TOBEROFF:        Excuse me.

9    Excuse me.  I want to object here.  You just

10   launched into a speech about how you're going

11   to clock us with our time -- don't interrupt

12   me -- because he isn't making his

13   instructions clearly.  Yet when he makes his

14   instruction clearly, you engage in a long

15   colloquy testing his instruction, asking him

16   questions about it, and then repeating the

17   same question again to Mr. Bulson.

18       MR. KLINE:        I was actually

19   going to see if we could --

20       MR. TOBEROFF:        So our time is

21   valuable also.

22       MR. KLINE:        In the

23   beginning of the discussion --

24       MR. TOBEROFF:        After you ask

25   the question and he makes the instruction,

## DON BULSON - 7/19/2011

Page 84

1    move on, Counselor.  Don't ask the same thing
2    again and don't engage me in colloquy.
3                    MR. KLINE:      Marc, it's my
4    deposition.  I was going to see if we could
5    expedite things by having an agreement that
6    it's your position that any communication
7    between -- we disagree with this position.  I
8    mean, let's just stipulate.
9                    MR. BERK:      I'll state it
10   very clearly.
11                   MR. KLINE:      Any
12   conversation from Michael to Don --
13                   MR. BERK:      -- is
14   privileged, and I instruct him not to answer
15   as to any communications he had in the
16   representation of Michael Siegel, I instruct
17   him not to answer concerning any of those
18   communications.
19         Any documents he received in the
20   representation --
21                   MR. KLINE:      Being Don
22   Bulson is the "he" in that sentence?
23                   MR. BERK:      Any documents
24   Mr. Bulson received concerning his
25   representation of Michael Siegel is

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 85

1  privileged, and I instruct him not to answer

2  concerning those.

3           MR. KLINE:       And just to

4  give two examples, if -- and we've covered

5  one, which is if Laura Siegel sends a letter

6  to Michael, Michael hands it to Mr. Bulson,

7  you're saying I can't ask questions about his

8  firm's possession of that document?

9           MR. BERK:       I'm saying

10  that any letter that he received from Michael

11  Siegel is privileged.  I don't care where it

12  came from or whatever, it's privileged as to

13  Michael Siegel and him.

14           MR. KLINE:       Okay.

15           MR. BERK:       And whether

16  you can get this -- the questions answered

17  some other way, that's fine.  But as far as

18  him receiving it concerning his

19  representation of Michael Siegel, it is

20  privileged.

21           MR. KLINE:       Okay.  And --

22           MR. BERK:       I don't care

23  if it's out there somewhere else, that's

24  fine.

25           MR. KLINE:       Understood.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 86

1    So just -- so any letter that Mr. Bulson is

2    handed by Michael Siegel, no matter the

3    content, you're taking the position I can't

4    ask questions about it?

5                    MR. BERK:        I'm saying

6    it's privileged as to his representation of

7    Michael Siegel.

8                    MR. KLINE:        Understood.

9    And so to go beyond documents, if Michael

10   Siegel received a telephone call from Marc

11   Toberoff, and Marc Toberoff made an offer,

12   and I'm not saying you agree that that

13   happened, but if he made an offer for his

14   Superman rights, you're not going to let --

15                   MR. BERK:        I'm saying if

16   he communicates it to Mr. Bulson, that is

17   privileged.

18                   MR. KLINE:        Just the mere

19   fact of, hey, I got a call.  Here's what he

20   offered.

21                   MR. BERK:        Right.  First

22   of all you get into hearsay-type things.  But

23   as far as his representation of Michael

24   Siegel, any conversations that he had with

25   Michael Siegel concerning his representation

DON BULSON - 7/19/2011

Page 87

1    is privileged as to Michael Siegel.

2                    MR. KLINE:        That's your

3    position, and you'll instruct him to

4    answer -- not answer questions on this topics

5    all day long?

6                    MR. BERK:         Correct.

7    Correct.

8                    MR. KLINE:        And it's

9    our -- we respectfully disagree, and we're

10   going to take that issue up with the judge.

11                   MR. BERK:         Okay.

12                   MR. KLINE:        I just don't

13   want to spend five hours asking all of these

14   questions and having you have to make the

15   instruction again and again and again.  I

16   just wanted -- I was actually trying to save

17   us a bunch of time, Mr. Toberoff, and maybe

18   get us on an earlier plane.

19        So I think I understand your position.

20   And you understand my position, I want to ask

21   him a whole host of questions and whole host

22   of topics, but you've kind of cut off these

23   avenues of discussion.

24                   MR. BERK:         And I wish to

25   apologize, but I was not consulted concerning

DON BULSON - 7/19/2011

Page 88

1       the setting of this deposition at all.  I
2       found out about it very recently.  And as far
3       as my representation of the Estate of Michael
4       Siegel, we strictly want to make our
5       objections known as to the privilege.
6                       MR. KLINE:        Understood.
7       And I appreciate you doing that.
8                       VIDEO TECHNICIAN:  Sir, you
9       have four minutes left on this tape.
10                      MR. KLINE:        Why don't we
11      stop there.
12                      VIDEO TECHNICIAN:  We're off
13      the record.  This ends Tape No. 1 in the
14      deposition of Don Bulson.  The time is 11:09.
15        (Recess from 11:09 a.m. to 11:19 a.m. )
16                      VIDEO TECHNICIAN:  We're back
17      on the record at 11:19.
18      BY MR. KLINE:
19      Q   Okay.  I'm going to refer you to Pages 163 to
20          165 of your prior deposition.
21                      MR. RYLAND:      Mind if I pull
22      them and hand them to him, Counsel?
23                      MR. KLINE:        Not at all.
24      Q   And I'd asked you to start on Page 162 at
25          Line 20 where Mr. Weinberger avers to

DON BULSON - 7/19/2011

Page 89

1    Exhibit 37, and read down to Page 164 where
2    Exhibit 38 is marked.  Mr. Bulson, if you
3    don't mind, can you take a look at Exhibit 37
4    which is also in front of you, which is a
5    November 12th, 2004 email from you to Marc
6    Toberoff that begins, Marc, I have now had
7    the opportunity to meet with Mike Siegel and
8    discuss your, quote, investor's, end quote,
9    latest proposal.  Do you see that email?
10  A    Yes.
11              - - - - -
12       (Plaintiff's Exhibit 43 was marked.)
13              - - - - -
14  Q    And I'm going to give you what is marked
15       Exhibit No. 43, and ask you to -- and this is
16       a brief, a discovery brief that was filed in
17       this case, and I'd ask you to look at
18       Page 18, Lines 7 through 8.  And I'll
19       represent to you, Mr. Bulson, that defendants
20       have taken a position in this case that the
21       quote, unquote, investor referred to in
22       Exhibit 37 of your -- of your prior
23       deposition, and discussed at Pages 162
24       through 164 of your prior deposition, this
25       investor was a fellow named Ari Emanuel who

DON BULSON - 7/19/2011

Page 90

1    is a talent agent in Los Angeles.  And I just

2    wanted to confirm a couple things.  One,

3    Mr. Toberoff never told you that the quote,

4    unquote, investor was Ari Emanuel, correct?

5                    MR. BERK:         I believe that

6    was already asked and answered before as

7    either he didn't remember or he didn't know

8    or he doesn't remember him saying that.

9                    MR. KLINE:        Well, let me

10   give an answer to the question, because

11   you've just given three versions of that.

12   Q    Do you remember Mr. Toberoff telling you that

13       the, quote, unquote, investor was Ari

14       Emanuel?

15                   MR. TOBEROFF:     Before you

16   answer, I'd just like to object.  You

17   mischaracterized, Mr. Emanuel is not simply a

18   talent agent, he was the founder of Endeavor,

19   which is now William Morris Endeavor, the

20   second largest agency in all -- in show

21   business?

22                   MR. KLINE:        And is the

23   subject of the character Ari on Entourage,

24   and his brother was the former chief of staff

25   of the president of the United States.  He's

EXHIBIT 58
1133

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 91

```
1        one of the most powerful men in all of
2        Hollywood.
3                    MR. TOBEROFF:    That's why you
4        can't taken his deposition, right?
5    Q   Mr. Bulson, did Mr. Toberoff ever tell you
6        that the investor was Ari Emanuel?
7                    THE WITNESS:    Is it okay to
8        answer?
9                    MR. TOBEROFF:    You already
10       answered, but you can answer again.
11   A   He never told me that.
12   Q   Did Mr. Toberoff tell you that as of --
13                   MR. BERK:    Are you
14       through with this document?
15                   MR. KLINE:    For the
16       moment.
17                   MR. BERK:    Okay.
18   Q   Did Mr. Toberoff tell you that as of
19       February 12th, 2002, he had a joint venture
20       with Mr. Ari Emanuel?
21                   THE WITNESS:    Okay to
22       answer?
23                   MR. BERK:    Yeah.
24   A   He never told me that.
25   Q   Did Mr. Toberoff tell you that as a part of
```

## DON BULSON - 7/19/2011

Page 92

1    this joint venture with Mr. Emanuel, had the,

2    quote, unquote, investor referenced in

3    Exhibit 37 purchased Michael Siegel's

4    interests, Mr. Toberoff himself would have

5    had an ownership interest in Michael Siegel's

6    interests?

7                    THE WITNESS:    Okay to answer

8    it?

9                    MR. BERK:        (Nods head.)

10  A    He never told me that.

11  Q    Is that information --

12                    MR. KLINE:        Lacks

13    foundation and I believe misstates the

14    record.

15  Q    Is that information you would have wanted to

16    know in your negotiations with Mr. Toberoff?

17                    MR. BERK:        I object.

18    Instruct him not to answer, because it would

19    concern his representation of Michael Siegel.

20  Q    Is that information that you would normally

21    expect someone to disclose to you if they

22    were referring to a third-party unnamed

23    investor that they themselves would have had

24    an ownership interest in the transaction that

25    they were proposing?

**Merrill   Corporation   -   Los Angeles**
800-826-0277              www.merillcorp.com/law

**EXHIBIT 58**
1135

DON BULSON - 7/19/2011

Page 93

1          MR. TOBEROFF:    Objection.
2    Lacks foundation.   Assumes facts not in
3    evidence.
4          MR. BERK:         Speculative.
5    I object as well.   Since if he would -- if it
6    would concern the representation of the
7    estate.
8          MR. TOBEROFF:    Are you
9    instructing him --
10          MR. BERK:         Instruct not
11   to answer.   How's that?
12   Q   It says here on Page 164 that you pushed
13       Mr. Toberoff to tell you who the investor
14       was.   Do you see your testimony there, sir?
15       It's Page 164, Lines 5 through 6?
16          MR. RYLAND:       Counsel, I'll
17   show him mine.
18          MR. KLINE:        Please,
19   Mr. Ryland.
20   A   I see that.
21   Q   And yet he never told you that, A,
22       Mr. Emanuel was the investor or, B, that
23       Mr. Toberoff himself had a business deal with
24       Mr. Emanuel, correct?
25          MR. BERK:         I think we

EXHIBIT 58
1136

feda831f-8f5a-4d4a-86d4-38e27c7o6947

## DON BULSON - 7/19/2011

Page 94

1      already covered that.

2                    MR. TOBEROFF:    Asked and

3      answered.  Is there a jury in this room?

4   A  Are there two questions there?  Can you

5      repeat the question?

6                    MR. KLINE:      Would you mind

7      reading it back, please?

8                    MR. RYLAND:      I think the

9      question is just compound.

10  A  Why don't you split it up into two parts,

11     then I can -- first part -- well, you ask the

12     question.

13  Q  You pushed for an answer who is the investor,

14     correct?

15                   MR. TOBEROFF:    Assumes facts.

16     Lacks foundation.

17  A  That is what was in the testimony here, yes.

18  Q  And he didn't tell you that it was Ari

19     Emanuel, correct?

20  A  That is correct.

21  Q  And he didn't disclose to you, he being

22     Mr. Toberoff, that he had a business deal

23     with Mr. Emanuel dating back to 2002,

24     correct?

25                   MR. TOBEROFF:    Assumes facts.

## DON BULSON - 7/19/2011

Page 95

1    Lacks foundation.   Compound.

2    A    That's correct.

3    Q    Let's take a look at Exhibit No. 44.

4                      - - - - -

5    (Plaintiff's Exhibit No. 44 was marked.)

6                      - - - - -

7    Q    Just take a chance to go through this

8    document if you would, Mr. Bulson.

9                    MR. TOBEROFF:    This document

10    is, I believe is subject to a protective

11    order and was produced in the Siegel case

12    marked confidential, so it would be -- cannot

13    be used by DC publicly in this case.   That

14    protective order would still pertain.

15                    MR. KLINE:    So you're just

16    requesting that if we use the document in the

17    case we --

18                    MR. TOBEROFF:    If you file

19    any portion of the transcript pertaining to

20    this or any information in it, it has to be

21    filed under seal.

22                    MR. KLINE:    Duly noted.

23    A    Should I not be looking at this?

24    Q    No, you absolutely can look at it.

25                    MR. TOBEROFF:    Actually, you

## DON BULSON - 7/19/2011

Page 96

1    just actually breached the protective order

2    by giving him a copy of it.

3                    MR. KLINE:        By showing a

4    witness in this case?

5                    MR. TOBEROFF:       Yeah, he's a

6    third party.

7                    MR. KLINE:        And you

8    produced this in this case.

9                    MR. TOBEROFF:       Subject to a

10   protective order, which means it can't be

11   disclosed to third parties.  That's why it

12   has a big confidential stamp on the top.

13                   MR. KLINE:        That's your

14   position.  I can't even show him this

15   document?

16                   MR. TOBEROFF:       What do you

17   mean show him?  You're disclosing the

18   document and the contents to him.

19                   MR. KLINE:        You're taking

20   the position, even though there's no

21   protective order in this case, and you

22   produced this document in this case --

23                   MR. TOBEROFF:       Yes, because

24   your client DC who is the plaintiff in this

25   case signed a protective order in the other

EXHIBIT 58
1139

## DON BULSON - 7/19/2011

Page 97

```
 1        case which pertains to this document.
 2                      MR. KLINE:        You reproduced
 3        this document in this case without any
 4        protective order.
 5                      MR. TOBEROFF:      It's subject
 6        to the protective order from the prior case.
 7                      MR. KLINE:        Where does it
 8        say that in your production?
 9                      MR. TOBEROFF:      The protective
10        order doesn't just pertain to that particular
11        case.  Anyway, you can't show him this
12        document.  It's subject to protective order.
13                      MR. KLINE:        So I'll
14        assume -- I'm going to ask him one question
15        about the document.  Don't look at its
16        contents?
17                      MR. TOBEROFF:      Actually, I'd
18        like you to give the document back to him.
19    Q   Did Mr. Toberoff ever share with you his
20        business agreements with Mr. Emanuel?
21                      MR. TOBEROFF:      You can answer
22        that.
23    A   No.
24                      MR. KLINE:        And is it your
25        representation, Mr. Toberoff, that in
```

feda831f-8f5a-4d4a-86d4-38e27c7e6947

**DON BULSON - 7/19/2011**

Page 98

1    producing this document in this case by

2    averting the Bates numbers and lines numbers

3    you specifically said and we want it treated

4    confidential and subject to the protective

5    order?

6                    MR. TOBEROFF:    We're not

7    canceling a protective order that pertains to

8    DC in the prior case.

9                    MR. KLINE:    You're not

10   answering my question.

11                   MR. TOBEROFF:    I'm not going

12   to answer it your way, I'm going to answer it

13   my way since it's not my deposition.

14                   MR. KLINE:    Okay, we may

15   have to come back.

16                   MR. TOBEROFF:    I'm asserting

17   to confidentiality agreement which pertains

18   to your client.

19                   MR. KLINE:    So you're

20   refusing to --

21                   MR. TOBEROFF:    I'm not only

22   refusing you.  I believe you just breached

23   that agreement.

24                   MR. KLINE:    I don't think

25   we did at all, number one; and number two,

DON BULSON - 7/19/2011

Page 99

1    what I'm asking you is, can we ask him

2    questions about this document so we don't

3    have to come back here and do this a second

4    time?

5                    MR. TOBEROFF:    About the

6    document, no.  You can't show him the

7    document.  The document is subject to a

8    protective order.

9                    MR. KLINE:    I don't

10    believe it was produced pursuant to a

11    protective order in this case.  We'll table

12    that for a later debate, I'm just telling you

13    right now, I wish we could expedite this, ask

14    our questions, and not have to come back and

15    ask on this.  But I understand your position.

16                    MR. TOBEROFF:    Trying to file

17    a duplicative action does not vitiate the

18    protective order that binds your client from

19    the prior case.  That's our position.  And

20    it's not a position, it's clear.

21                    MR. KLINE:    I understand

22    your objection.  We'll keep moving along.

23  Q    Did Mr. Toberoff in the negotiations with you

24    concerning the, quote, unquote, investor's

25    interest in purchasing Michael Siegel's Peter

DON BULSON - 7/19/2011

Page 100

1    the Superman interest disclose to you that he

2    and Mr. Emanuel had signed an October 2002,

3    an as of dated October 2002 contract with the

4    Siegels that entitled them --

5                    MR. TOBEROFF:    Objection.   If

6    you're disclosing another confidential

7    document of substance --

8                    MR. KLINE:    There's

9    nothing marked confidential in this document.

10                   MR. TOBEROFF:    What are you

11   reading from?

12                   MR. KLINE:    I'm reading

13   from the IP Worldwide agreement that has no

14   confidential markings on it with Laura Siegel

15   and Joanne Siegel and you.  It has not a

16   single confidential marking on it.

17                   MR. TOBEROFF:    Can I see

18   that?

19                   MR. KLINE:    Jason give

20   Mr. Toberoff a copy, please.  And at his last

21   deposition Mr. Bulson was shown agreements

22   between you, Mr. Emanuel, the Siegels and

23   you, and you made no such objections.

24                   MR. TOBEROFF:    Show me.

25                   MR. KLINE:    I refer you to

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 101

1    Exhibit -- Exhibit 30 of Mr. Bulson's prior

2    deposition is an IP Worldwide agreement

3    between Joanne Siegel, Laura Siegel, Ari --

4    Ariel Emanuel and yourself dated 1-22-2003.

5                MR. TOBEROFF:    This agreement

6    that's marked confidential is not a part of

7    one of these exhibits, correct, for which he

8    testified?

9                MR. KLINE:    Correct.

10               MR. TOBEROFF:    Okay.

11   Q    So --

12               MR. TOBEROFF:    I need to find

13   out whether these were -- whether these were

14   marked as confidential in the other case.

15               MR. KLINE:    They're not so

16   marked.

17               MR. TOBEROFF:    Well, I don't

18   know whether you redacted them or not.

19               MR. KLINE:    And one of

20   these IP Worldwide agreements was used in his

21   last deposition over no objection by you.

22               MR. TOBEROFF:    Could I see

23   that?

24               MR. KLINE:    You can't see

25   my copy, but we'll give you a copy of Bulson

## DON BULSON - 7/19/2011

Page 102

1    Exhibit 30 from the last deposition.  And
2    we'll go off the record while we clarify
3    these issues.
4                    VIDEO TECHNICIAN:  We're off
5    the record.  The time is 11:35.
6                    MR. TOBEROFF:   Actually,
7    before we go off the record --
8                    MR. RYLAND:    He's off.
9                    MR. TOBEROFF:   You need to
10   ask -- in the future you need to ask me if we
11   can go off the record.
12     (Recess from 11:35 a.m. to 11:48 a.m. )
13                    VIDEO TECHNICIAN:  We're back
14   on the record, the time is 11:48.
15   BY MR. KLINE:
16   Q   Giving you Exhibits 45 and 46, Mr. Bulson,
17       which were previously marked as Exhibits 30
18       and 31 in your last deposition.
19                    - - - - -
20     (Plaintiff's Exhibits 45 and 46 were marked.)
21                    - - - - -
22   Q   Just take a second to peruse them if you
23       don't mind.
24   A   I have skimmed it.
25   Q   Mr. Bulson, just to reconfirm, Mr. Toberoff

DON BULSON - 7/19/2011

Page 103

1     didn't provide you these documents in

2     connection with the negotiations you and he

3     were having in 2003, 2004, 2005 regarding

4     the, quote, unquote, investor, correct?

5                    THE WITNESS:      Okay to

6     answer?

7                    MR. TOBEROFF:     Yes.

8  A   That's correct.

9  Q   Nor did he disclose that as of January -- or

10    in a document dated January 21st, 2002, and

11    now I'm referring to what we've marked as new

12    Exhibit 46, that's old Exhibit 30 in

13    Paragraph No. 1, that Ari Emanuel will

14    attempt to purchase all of Michael Siegel's

15    rights, title, and interest in Superman,

16    Superboy, and Specter to be financed by AA,

17    correct?

18 A   What was the question?

19 Q   He didn't disclose that Ari Emanuel will

20    attempt to purchase all of Michael

21    Siegel's --

22 A   That's correct.

23                   MR. TOBEROFF:     What is the

24    Exhibit 31 in this --

25                   MR. KLINE:      It's 45 in

EXHIBIT 58
1146

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 104

1    this case.

2                    MR. RYLAND:      And 30 is 46.

3                    MR. KLINE:       Correct.

4                    MR. RYLAND:      Thanks.

5    Q    Turning to Exhibit 31, from the old

6    deposition which is 45 in this new

7    deposition, Paragraph 6, which is on a page

8    marked IPW 00002, did Mr. Toberoff disclose

9    to you that he and Mr. Emanuel's company

10   IPW --

11                    MR. TOBEROFF:    It's IP

12   Worldwide is the name of the company.

13                    MR. KLINE:       IP Worldwide,

14   pardon me.

15   Q    -- was entitled to a fee of 10 percent of any

16   and all gross compensation in connection with

17   their services under the agreement?

18   A    That was not disclosed to me.

19   Q    Turning to Paragraph 8, did Mr. Toberoff

20   disclose to you that the Siegels, who are

21   referred to as owner in this agreement,

22   capital O, warranted and represented that

23   they would not transfer, assign, license, or

24   in any manner encumber the rights, the

25   Superman rights and Specter rights, during

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 105

1    the term or extended term other than through

2    or as a result of IPW it says here, but it's

3    IP Worldwide according to Mr. Toberoff,

4    exclusive representation hereunder?

5  A  Assuming that the owner was Joanne or Laura

6    Siegel, then that was not disclosed to me.

7  Q  And I think if you look at the first page of

8    the first -- of the document, it says, this

9    letter shall confirm the agreement and

10   understanding between you, owner, and us,

11   IPW, do you see that?

12 A  I see that.

13            VIDEO TECHNICIAN:  Excuse me,

14   sir.  You're coming through a little faint.

15   Is your mic on?

16            MR. KLINE:      I'm sorry.

17   It's over here.

18        Now, I asked a question like this

19   before.  You instructed him not to answer,

20   I'll -- let me know.

21 Q  Is this information you would have liked to

22   have known from Mr. Toberoff given you were

23   pushing him to tell you who the investor was?

24            MR. BERK:       That's an

25   interesting speculative question.  You know,

DON BULSON - 7/19/2011

Page 106

1    I really don't have any objection to the
2    answer other than in a speculative way.
3  A  I would like to have known that information.
4  Q  Given that you were pushing Mr. Toberoff to
5    tell you who the investor was, would it have
6    been important to you to know that he had his
7    own pecuniary interest in these Superman
8    rights?
9          MR. TOBEROFF:    Lacks
10   foundation.  Misstates the -- misstates the
11   documents.
12         MR. BERK:    You could --
13   if it was important to you, you could answer
14   that.
15  A  It may have been important.
16  Q  Why?
17  A  I haven't thought about it, because -- I'd
18   always like to know the parties.  If I'm
19   entering into negotiations, I always like to
20   know who I'm negotiating with.
21  Q  And you asked him and he didn't tell you,
22   correct?
23         MR. TOBEROFF:    Misstates his
24   testimony.
25  A  He did not tell me who the so-called investor

EXHIBIT 58
1149

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 107

1    is.

2  Q    And he referred to him in emails as if it was

3       a third person, correct?

4           MR. BERK:        What emails

5       are you referring to?

6           MR. KLINE:        Exhibits 34

7       through 42.

8  Q    Let's take a look at an example.  Let's look

9       at Exhibit 36.  This is an August 6th,

10      2003 letter from the law offices of Marc

11      Toberoff to you, Mr. Bulson, correct?

12  A   That appears to be the case, yes.

13  Q   And if you look one, two, three, four, five

14      paragraphs down, can you read that paragraph,

15      please?

16  A   It was not therefore not -- it was therefore

17      not surprising that the investor rejected

18      your counteroffer as unrealistic.  The

19      counteroffer was high, was so high that it

20      may have scared away a strong, potential

21      investor.  Exactly what I mentioned when I

22      asked you whether you were sure that I should

23      communicate such a high counteroffer.

24  Q   And Mr. Toberoff in writing that paragraph

25      didn't disclose to you that his business

EXHIBIT 58
1150

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 108

1    partner, Mr. Ari Emanuel, was that investor,

2    correct?

3  A    That's stating the obvious.

4              MR. TOBEROFF:    Asked and

5    answered.

6  Q    And why would it be important for you to know

7    when reading a paragraph like this that he

8    himself, Mr. Toberoff, is a business partner

9    with the, quote, unquote, investor?

10             MR. TOBEROFF:    Are you asking

11   for his mental impressions as an attorney?

12   That's work product, but it's not for me to

13   assert.

14             MR. BERK:       Would you

15   repeat the question?  I'm sorry.  Read back.

16             (Record read.)

17             MR. BERK:       You can

18   answer.

19  A   I would like to know everything about the

20   parties involved in the transaction as a

21   general rule.

22  Q   Is it common in your experience -- strike

23   that.

24             Did Mr. Toberoff disclose to you that

25   another of his companies, Pacific Pictures,

DON BULSON - 7/19/2011

Page 109

1   as of the date of this letter, August 6th,
2   2003, had acquired a 50 percent interest of
3   the Shuster family's putative copyright
4   interests in Superman?
5                   MR. BERK:        You may
6   answer.
7  A   Not to my recollection.
8  Q   Let me show you a few documents and see if he
9   shared them with you.
10                  MR. RYLAND:      Can we catch a
11  break over the next 15?
12                  MR. KLINE:       Yeah,
13  absolutely.  And what do you guys want to do
14  with lunch?
15                  MR. RYLAND:      We're happy to
16  go through if we can get this thing done.
17                  MR. KLINE:       I don't think
18  so.
19                  MR. RYLAND:      What do you
20  mean you don't think so?
21                  MR. KLINE:       I think we
22  should take a lunch break.
23                  MR. RYLAND:      How long do
24  you think we'll go?
25                  MR. KLINE:       I don't have

## DON BULSON - 7/19/2011

Page 110

1    an estimate right now, because I'm not sure

2    what areas they're going to let me ask

3    questions or not.  I wish I did.

4                    MR. RYLAND:    We still have

5    our obligations this afternoon.

6                    MR. KLINE:    Completely

7    understood.  And then you saw my email

8    reserving rights, that, hey, we need our full

9    time.

10                   MR. RYLAND:    Does 12:15

11   work for a break?  I don't know what your

12   line of questioning is like.

13                   MR. KLINE:    Why don't you

14   take a break right now.  We'll get our ducks

15   in a row in terms of the documents.

16                   MR. RYLAND:    Okay.

17                   MR. KLINE:    And then maybe

18   like 20 minutes of testimony, take a really

19   quick lunch, and then get back in.

20                   MR. RYLAND:    Okay.  Sounds

21   good.

22                   THE WITNESS:    So we're

23   convening when or we're continuing?

24                   MR. RYLAND:    Yeah, we're

25   going off the record.

DON BULSON - 7/19/2011

Page 111

1          VIDEO TECHNICIAN:  We're off
2     the record.
3       (Recess from 12:01 p.m. to 12:16 p.m. )
4          VIDEO TECHNICIAN:  We're back
5     on the record.  The time is 12:16.
6   BY MR. KLINE:
7   Q   Here you go, Mr. Bulson.  These were
8     Exhibits 10 and 13 to the Peary deposition
9     that took place a couple weeks ago.  And I
10    just wanted to confirm that Mr. Toberoff
11    never shared these joint venture agreements
12    between Pacific Pictures Corporation and the
13    Shuster/Peary family with you, correct?
14          THE WITNESS:    Okay to
15    answer?
16          MR. BERK:      Yeah.
17  A   That's correct.
18  Q   And turning to Paragraph 8 of Exhibit 10 for
19    a moment.
20          MR. TOBEROFF:    Are you
21    marking these in this --
22          MR. KLINE:      I'm just going
23    to use the ones from Peary.
24  Q   Looking at Paragraph 8 of Exhibit 10, did he
25    disclose, for example, that upon the

### DON BULSON - 7/19/2011

Page 112

```
 1        termination of this venture for any reason,
 2        the venture would hold 50 percent of the
 3        Shuster's Superman rights, and the Shusters
 4        would hold the other 50 percent?
 5                    MR. TOBEROFF:    You're reading
 6        from an agreement dated 2001, and this
 7        agreement was terminated, so I don't know why
 8        you're reading from this agreement.  It's a
 9        long-term -- this was terminated, I believe,
10        in 2003.
11    Q   Mr. Bulson, did he represent --
12                    MR. KLINE:       That's a
13        speaking objection and argument.
14    Q   Mr. Bulson, did he represent to you that he
15        had signed, his company Pacific Pictures, had
16        signed -- Mr. Toberoff disclose to you that
17        his company Pacific Pictures in
18        November 2001 had signed an agreement in
19        which -- let's look at Paragraph 5 for
20        example.
21    A   I prefer you didn't use, for example.
22    Q   Okay.  Let's look at Paragraph 5.  Did he
23        disclose to you that he had made a deal with
24        the Shuster family that Pacific Pictures,
25        Mr. Toberoff's company, would be entitled to
```

## DON BULSON - 7/19/2011

```
 1        50 percent of the Shuster estate -- in the
 2        Shuster Superman copyright interest and the
 3        Shusters would have the other half?
 4                    MR. TOBEROFF:    Objection.
 5        Assumes facts and lacks foundation.
 6                    MR. BERK:        I don't have
 7        any problem with it.
 8   A    No such disclosure was made to me.
 9   Q    Did he disclose as set forth in Paragraph 2
10        of Exhibit 10, looking at the penultimate
11        sentence, the consideration from PPC's
12        contributions to the venture and mutual
13        covenants contained herein, claimants, and
14        they're defined as --
15   A    Wait a minute.  I'm not with you.
16   Q    Second-to-the-last sentence of Paragraph 2.
17   A    Okay.  Let's find the first one.  In
18        consideration, that's the one you're
19        referring to there?
20   Q    Yep.  And claimants if you'll note is defined
21        up top here as Mark Peary f/k/a Mark Warren
22        Peary, and also Jean Peavy, do you see that?
23   A    I see Jean and Mark, yes.
24   Q    And it says, the purposes of forming this
25        joint venture are retrieving, enforcing,
```

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 114

1          exploiting all of Joe Shusters' and his
2          estate's rights, claims, copyrights,
3          property, title, and interest in and to Joe
4          Shuster's creations, do you see that there?
5      A   Uh-huh, I see that.
6      Q   And in Paragraph No. 1, the rights shall
7          include without limitation all current and
8          future rights, claims, title, copyrights,
9          skipping a few words, and all rights to
10         proceeds from Superman?
11     A   I see that paragraph, yes.
12     Q   Or Superman stories.  And at the end there it
13         includes Superboy and Smallville, do you see
14         that?
15     A   I see that.
16     Q   And then going down to Paragraph 2 the
17         sentence says, I'm having you focus on, it
18         says, in consideration for PPC's
19         contributions to the venture, and the mutual
20         covenants contained herein, claimants hereby
21         transfer and assign to the venture their
22         rights, titles, and interest in the rights,
23         do you see that?
24     A   Uh-huh.
25     Q   Did you Mr. Toberoff disclose these terms to

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 115

1   you when you were having your negotiations in
2   2003, 2004, and 2005?
3                        MR. BERK:          You can
4   answer.
5   A   These terms as specified in Paragraphs 1 and
6   2, no.
7   Q   And you'll notice on the last page of this
8   document, it says 137 on the bottom right,
9   it's signed by Marc Toberoff, President of
10  Pacific Pictures Corporation, November 28th,
11  2001, do you see that?
12  A   I see that.
13  Q   Did he disclose to you that he had a separate
14  company that he was the president of called
15  Pacific Pictures?
16  A   Not to my recollection.
17  Q   Did he disclose to you that he had a separate
18  company that was purchasing other Superman
19  rights other than Mr. Siegel's?
20                      MR. TOBEROFF:      Objection.
21  Vague.  Unless you are speaking about the
22  negotiations with Don Bulson in or about
23  August of 2003 regarding Michael Siegel's
24  interest.  Is that what you're speaking
25  about?

## DON BULSON - 7/19/2011

Page 116

1   Q   I'm talking about in the course of your

2       negotiations with Mr. --

3                   MR. TOBEROFF:     In 2003?

4   Q   In 2003, 2004, 2005, did Mr. Toberoff ever

5       disclose to you that he had a separate

6       company --

7                   MR. TOBEROFF:     In 2001?

8   Q   -- that had gone out and purchased?

9                   MR. KLINE:      At anytime.

10  Q   Had gone out and purchased Superman rights

11      from the Shusters?

12  A   Not to my recollection.

13                  MR. TOBEROFF:     Misstates the

14      document.  There's no purchase stated in that

15      document.

16  Q   Same question using the word "assignment,"

17      that he had obtained an assignment?

18  A   Not to my recollection.

19                  MR. TOBEROFF:     Misstates the

20      document.

21  Q   Same question using the word hereby transfer

22      and assign to the venture their rights, title

23      and interest in the rights?

24  A   Not to my recollection.

25  Q   Did Mr. Toberoff disclose to you Exhibit 13,

**EXHIBIT 58**
**1159**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 117

1    which is dated October 27th, 2003, at any
2    point in your negotiations between 2003 and
3    2005?
4  A  I don't recall ever seeing this letter.
5  Q  And I'll confirm for you, Mr. Bul -- let's
6    just take a quick look at this agreement.
7    You see that it is signed as Marc Toberoff,
8    President on the last page there,
9    October 27th, 2003?
10 A  I see that.
11 Q  Now, taking a quick look at Exhibit 10 again,
12    which is dated November 23rd, 2001, can you
13    take a quick look at that?
14            MR. RYLAND:    This one.  10?
15            MR. KLINE:     10.
16 A  Oh.
17 Q  Okay.  And then I want you to take a look.
18    I'm going to go through with you Exhibits 34,
19    35, 36, all the way through No. 42, so
20    there's a stack of those.
21            MR. BERK:      Is this the 10
22    you're referring to, joint venture agreement?
23            MR. KLINE:     It is,
24    correct.
25            MR. BERK:      Okay.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 118

1          MR. RYLAND:      Which

2     documents are you asking him about?

3          MR. KLINE:      I'm going to

4     ask him about 34 and 10 right now.

5          MR. RYLAND:      34 and 10.

6          MR. KLINE:      And maybe

7     Jason can help clean up some of the exhibits

8     we're not asking about, just so they're out

9     of your way and not confusing matters.

10          MR. BERK:      Is this 34?

11          MR. KLINE:      It sure is.

12          MR. BERK:      Okay.

13   Q   So 34 is a June 18th letter from you,

14     Mr. Bulson, June 18th, 2003, to Marc

15     Toberoff, correct?

16   A   Uh-huh, that's what it appears to be.

17   Q   And it says, I have discussed with Michael

18     the offer you passed on from a potential

19     investor who is interested in purchasing

20     Michael's interest in the Superman copyright.

21     And you say the amount offer is not

22     acceptable to Michael, do you see that?

23   A   Uh-huh.

24   Q   And that letter postdates Exhibit 10, which

25     is a November 23, 2001 agreement, correct?

DON BULSON - 7/19/2011

Page 119

1    A    That would appear to be correct.

2    Q    Would you have wanted to know when

3         Mr. Toberoff was trying to purchase

4         Mr. Siegel's rights on behalf of this unnamed

5         potential investor, that Mr. Toberoff had a

6         company named Pacific Pictures that had

7         created a joint venture in which the Shusters

8         had put half -- had put all of their Superman

9         interests?

10                       MR. TOBEROFF:    Calls for --

11                       MR. BERK:        I mean, you

12        can answer it.  I don't know --

13   A    Run that by me again.

14   Q    When you began your -- when you're engaged in

15        these negotiations, summer of 2003, would you

16        have liked to know that Mr. Toberoff was the

17        president of the company called Pacific

18        Pictures that had signed these two joint

19        venture agreements with the Shusters,

20        Exhibits 10 and 3?

21   A    As I mentioned earlier, as a general rule I

22        would like to know everything I can about the

23        particular transaction or the parties

24        involved.

25   Q    Okay.  Let's take a look at Exhibit No. 36,

**Merrill   Corporation   -   Los Angeles**

**EXHIBIT 58**
**1162**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 120

1       please, which is a August 6th, 2003 letter
2       from Mr. Toberoff to you.  I want to focus
3       your attention on numbered Paragraph 2, risks
4       associated with no control over the Siegel
5       termination interests, do you see that?
6    A  I see that.
7    Q  Let's take a quick look at Exhibit 45, which
8       you were looking at earlier, and I want you
9       to look at Paragraph 10 I believe it is --
10      no, sorry, 8.
11                  MR. BERK:        Now I'm lost.
12      Which is 45?
13                  MR. KLINE:       It's numbered
14      31 in the original deposition.
15                  MR. BERK:        Okay, 31.
16      That's fine.
17   Q  Look at Paragraph 8.  Now, Mr. Toberoff
18      represents to you in his August 6th,
19      2003 letter that to the extent you and
20      Michael are not already aware of this, any
21      investor will view the risks as follow:
22      Risks associated with no control over the
23      Siegel termination interest.  Michael's
24      interest unfortunately is a passive
25      25 percent interest in what Joanne and Laura

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 121

1     Siegel negotiate and receive, and therefore
2     there are major risks associated with this
3     lack of control, a good reason why Michael
4     may be interested in an investor in the first
5     place.  Let's either compare that statement,
6     Mr. Bulson, with Paragraph 8 of Exhibit 45
7     that gave Mr. Toberoff and Mr. Emanuel the
8     following right, owner, who we established
9     was Laura Siegel and her mother Joanne,
10    hereby warrants and represents that owner
11    will not transfer, assign, license, or in any
12    manner encumber the rights during the term or
13    extended term other than through or as a
14    result of IPW's exclusive representation
15    hereunder, with the exception of by will,
16    probate, or pursuant to other court order.
17    Would you have liked to know when
18    Mr. Toberoff is telling you that the investor
19    is concerned about risks if he purchases the
20    Michael Siegel interest, that he won't have
21    control over the overall Siegel interest,
22    that in fact the investor, Ari Emanuel and
23    his business partner Marc Toberoff, had
24    obtained this control set forth in
25    Paragraph 8 of Exhibit 45?

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 122

1                          MR. TOBEROFF:    Objection.
2      Misstates the documents, they speak for
3      themselves in the record in this case.
4    A    I'm having trouble with that question,
5      because I don't see where they have the
6      control in Paragraph 8.
7    Q    Do you think the Siegels, as you read
8      Paragraph 8, can do anything with their
9      rights in terms of assigning, selling them,
10     or otherwise without the approval of IPW,
11     which at that point I'll represent to you is
12     Ari Emanuel and Marc Toberoff?
13                         MR. TOBEROFF:    Are you asking
14     for his legal opinion as to the meaning of
15     this document?
16                         MR. KLINE:    I'm following
17     up on his last question to me.
18   A    I'm not in a position to answer that
19     question.  I would have to study the
20     agreement.
21   Q    Would you have liked to have access to an
22     agreement like this?
23   A    As I said before, generally speaking, I like
24     to get all of the information I can.
25   Q    Do you think it was a misrepresentation that

EXHIBIT 58
1165

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 123

1    Mr. Toberoff is talking about risks

2    associated with no control, when in fact he

3    has those tie-up agreements with the Siegels,

4    Joanne and Laura?

5              MR. TOBEROFF:    Misstates the

6    objective.   Tie-up agreement misstates the

7    record and mischaracterizes the record.

8  A   And I think I'm better off not answering that

9    without studying the full impact of this

10   agreement and any other agreements that might

11   be relevant to that.   I just don't know the

12   answer.

13 Q   You're telling me you don't know one way or

14   the other -- I think you've said, just so

15   we're clear, that you would have wanted to

16   know about the existence of this IP Worldwide

17   agreement with Laura and Joanne Siegel,

18   correct?

19             MR. TOBEROFF:    Misstates his

20   testimony.  He said generally I like to know

21   as much as I possibly can.

22 Q   Specifically would you have liked to have

23   known about this in June 2003, this document?

24 A   Since it's part of -- since it's relevant to

25   the transactions that were being discussed at

EXHIBIT 58
1166

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 124

1          that point in time, yeah.

2     Q    And you were pushing him to tell you who the

3          investor was, correct?

4     A    I was requesting the name of the investor,

5          right.

6     Q    And he's making affirmative representations

7          to you about no control over the Siegel

8          termination interest.  You would agree, would

9          you not, that Paragraph 8 has something to do

10         with the control of the disposition of Laura

11         Siegel and Joanne Siegel's rights, correct?

12    A    Well, again, I'm looking at only Paragraph 8,

13         and I can't necessarily see.  It just says,

14         as I interpret Claim 8, Paragraph 8, is they

15         have to negotiate through, as J -- IPW.

16    Q    And if you go to Page 1, look at the

17         definition of who IPW is.  What does it say?

18    A    I'm seeing Page 1, but I don't -- us.  IPW is

19         us.

20    Q    Okay.  Let's look at the last page, and look

21         who signs yours sincerely?

22    A    So this would be Marc Toberoff and Ari

23         Emanuel?

24    Q    Authorized signatories for IPW?

25                   MR. TOBEROFF:    For IP

DON BULSON - 7/19/2011

Page 125

1    Worldwide.  Us is IP Worldwide.

2  A    For IPW.

3  Q    IPW is a defined term in the document.  Did

4        they sign on that, correct?

5                MR. TOBEROFF:    Us is IP

6        Worldwide.  We signed on behalf of IP

7        Worldwide.  It's obvious from the document.

8  A    The letter's being written on stationery that

9        says IP Worldwide, and they're signing on

10       behalf of presumably IP Worldwide.

11 Q    Okay.  And let's go back to Paragraph 8 for a

12       second.  And you would agree that the Siegels

13       are agreeing, and by the Siegels I mean Laura

14       Siegel and her mother Joanne, that they won't

15       transfer, assign, license, or in any manner

16       encumber the rights during the term or

17       extended term other than through as a result

18       of IPW's exclusive representation agreement,

19       correct?

20 A    That's what it says.

21 Q    Would you have liked to know that Marc

22       Toberoff and Ari Emanuel, the unnamed

23       investor, had this right vis-a-vis the

24       Siegels?

25 A    As I mentioned before, I would have liked to

DON BULSON - 7/19/2011

Page 126

1    know all the information I could gather with

2    respect to anything involving the

3    transaction.

4  Q    And isn't it the case that it's misleading in

5    Paragraph 2 of the August 6th, 2003 letter

6    for Mr. Toberoff to say the investor will

7    view the risks as follows:  Risks associated

8    with no control over the Siegel termination

9    interest, when in fact the investor, i.e.,

10   Ari Emanuel and his business partner Marc

11   Toberoff, had obtained this right set forth

12   in Paragraph 8?

13           MR. TOBEROFF:    Misstates the

14   record.

15 A    I don't see --

16           MR. BERK:       If you're

17   reading from a document --

18 A    I'm sorry.  I mean, I see this as an

19   exclusive representation agreement, so the

20   decision makers are still going to be Laura

21   and Joanne Siegel.  They just have to deal

22   exclusively, unless I'm misunderstanding the

23   import of this clause.

24 Q    You don't think they have any control over

25   the disposition of the Siegel rights?

EXHIBIT 58
1169

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 127

1  A    And from that paragraph alone, it says their
2       exclusive representation.  That's what I see.
3  Q    Could Laura Siegel and Joanne Siegel go out
4       and make their own deal exclusive of IP
5       Worldwide, let's say with DC Comics --
6  A    Not without violating Paragraph 8.
7                    MR. TOBEROFF:    By the way,
8       you're talking about violation of the IP
9       Worldwide exhibit.
10                   MR. KLINE:    Marc, you
11      can't make speaking objections or testifying.
12                   MR. TOBEROFF:    Excuse me.
13      I'm talking.  It's not a speaking objection.
14                   MR. KLINE:    No, your
15      testifying for the record.
16                   MR. TOBEROFF:    You're
17      misstating the record.
18                   MR. KLINE:    You can object
19      to questions.  You can ask your own questions
20      of the witness.
21                   MR. TOBEROFF:    Stop talking
22      over me.  I'm in the middle of speaking.
23      You're talking over me.
24                   MR. KLINE:    No, you're not
25      making speaking objections or coaching the

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 128

1    witness.    Nope.

2                    MR. TOBEROFF:    You're not

3    going to talk over me.    It's your time.    I'm

4    going to speak.    You're not talking over me.

5    You're not going to muzzle me by talking over

6    me.    Now that you're finished, I'm going to

7    continue what I'm saying.    If you talk over

8    me, I'm going to wait until you're finished

9    then I'm going to again speak on your time.

10                    MR. KLINE:       And we're

11   going to charge you for the time.

12                    MR. TOBEROFF:    You can't

13   charge me for the time.    You're talking about

14   a --

15                    MR. KLINE:       It's an

16   improper speaking objection.    I'll go to the

17   court.

18                    MR. TOBEROFF:    You're

19   speaking over me again.    You're speaking over

20   me again.    It's an improper -- you're asking

21   him about whether a document dated

22   October 3rd -- strike that.

23        My eyesight's -- I missed the date.

24                    MR. KLINE:       Thank you.

25   And we will charge you for that time.

**EXHIBIT 58**
1171

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 129

1    Q    Mr. Bulson --

2              MR. TOBEROFF:    You'll also

3         charge your client.

4    Q    -- did he disclose in this letter to you when

5         he's talking about risks associated with no

6         control, that he, Marc Toberoff, had taken

7         the rights that Pacific Pictures had held and

8         given them -- and put them in this new

9         company that he formed with Ari Emanuel?

10   A    No.

11             MR. TOBEROFF:    Misstates the

12        record.

13   Q    Did he disclose to you that he and his

14        business partner Ari Emanuel had not only

15        obtained the rights set forth in Paragraph 8

16        of the IP Worldwide exhibit that we've been

17        discussing, but also half of the Shuster

18        copyrights through these Pacific Pictures

19        agreements?

20   A    No such disclosure was made.

21             MR. TOBEROFF:    Lacks

22        foundation and misstates the record.

23   Q    Do you have a character -- or strike that.

24             Do you have an opinion about

25        Mr. Toberoff's character for candor and full

**DON BULSON - 7/19/2011**

Page 130

1      disclosure?

2  A   Do I have an opinion?  No, not really.

3  Q   Do you have an opinion about his

4      truthfulness?

5  A   I've not formulated an opinion.

6  Q   About his honesty?

7  A   I've not formulated an opinion.

8  Q   Let's take a look at Exhibit 38.

9              MR. BERK:       Help me, where

10     is Exhibit 38?

11             MR. KLINE:      It will say

12     Exhibit 38.

13             MR. BERK:       Is this from

14     the deposition?

15             MR. KLINE:      Twice, it will

16     be --

17             MR. BERK:       Okay.  I've

18     got it.

19  Q  This is an email from Mr. Toberoff to you

20     dated November 17th, 2004, correct?

21  A  Uh-huh, yes.

22  Q  Can you explain to me, he says in the

23     beginning of the third paragraph, in addition

24     to your two proposals still amount to

25     25 percent of Warner Brothers' offer two

DON BULSON - 7/19/2011

Page 131

1    years ago.  Do you see that sentence there?

2  A    Uh-huh.

3  Q    And did you understand him to be saying that

4    the offer you were making was objectionable

5    because it's unclear that Warner Brothers

6    would ever offer that much money again?  I'm

7    trying to understand why, if you're willing

8    to settle for 25 percent of Warner Brothers'

9    best offer, why that would be unacceptable to

10    him?

11                MR. TOBEROFF:    It calls for

12    speculation as to what I was thinking.

13  Q    Did you ever discuss that with him?

14  A    To discuss?

15  Q    With Mr. Toberoff.

16  A    The 25 percent?  I don't recall.  Probably we

17    talked about that.

18  Q    Why did you think it was fair, and if you --

19    only if you articulated this to Mr. Toberoff,

20    because I don't want to get into what you

21    discussed with Mr. Siegel.  Why did you think

22    it was fair to ask for 25 percent of what

23    Warner Brothers had offered two years ago?

24  A    I don't know.

25  Q    Did you know whether Warner Brothers was

EXHIBIT 58
1174

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 132

1    still willing to pay Michael Siegel or the
2    Siegels or the Shusters on the same terms?
3  A    At this point in time, I don't recall.  I
4    don't -- the timeline is not clear in my
5    head.
6  Q    Did Mr. Toberoff share offers with you that
7    DC Comics made in 2005 just a few months
8    after this email to the Shuster family to
9    settle their claims?
10  A    Read that again.  Say that again.
11  Q    This is a November 17th, 2004 email.
12  A    Uh-huh.
13  Q    Do you recall Mr. Toberoff disclosing to you
14    that in early 2005 DC or Warner Brothers made
15    a settlement offer to the Shuster family for
16    them to settle their claims?
17  A    I don't recall.
18          MR. TOBEROFF:    Objection.
19    Assumes facts not in evidence.
20  A    I don't know.
21          MR. TOBEROFF:  And lacks
22    foundation.
23  Q    Well, let's take a look at a letter that was
24    sent to the Shusters dated April 28th, 2005?
25          MR. BERK:    Is this in the

EXHIBIT 58
1175

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 133

1  depo?

2                    MR. KLINE:      No, this is a

3  new exhibit.

4                    MR. BERK:      It's a new

5  exhibit.  Okay.

6                    MR. RYLAND:      We've got to

7  catch a break here too.

8                    MR. KLINE:      That's fine.

9  We'll ask a little bit about this document.

10                    MR. RYLAND:      Sure.

11                    - - - - -

12     (Plaintiff's Exhibit 47 was marked.)

13                    - - - - -

14  Q  Putting in front of you Exhibit 47, an

15     April 28th, 2005 letter from Paul Levitz to

16     Jean Adele Peavy as sole heir to Joseph

17     Shuster and Mark Warren Peary as personal

18     representative of the estate of Joe Shuster,

19     do you see that on the first page,

20     Mr. Bulson?

21  A  What was that I was skimming?

22  Q  I was reading the from Paul Levitz at DC

23     Comics to Jean Adele Peavy and Mark Warren

24     Peary.

25  A  Okay.  I see that.

DON BULSON - 7/19/2011

Page 134

1   Q   And you know them to be the heirs and

2       personal representatives?

3   A   Actually, I do not know that, but I assume

4       that to be the case here.

5   Q   Okay.  Did Mr. Toberoff ever share this

6       letter with you, to your knowledge?

7   A   I don't recall seeing this letter.

8   Q   Directing your attention to pages 3, 4, 5, a

9       second, if you have to -- I think you and

10      your counsel need to run for a phone call.

11      If you want to take a quick look at this over

12      the break, can we do it that way?

13              MR. RYLAND:     Are we going

14      to catch a lunch break here?

15              MR. KLINE:     Absolutely

16      catch a lunch break.

17   Q   If you just want to scan it.  After I'm just

18       going to ask you if Mr. Toberoff communicated

19      to you that DC Comics had made this offer to

20      the Shuster family during this time period?

21   A   I don't recall.

22   Q   And I'm going to ask you when we come back or

23      now to compare this to the offers that DC

24      Comics was making to your client Michael

25      Siegel a couple years earlier.  Would it be

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 135

1  easier if I gave you the documents now or --
2                MR. TOBEROFF:    I'd like to
3  object.  And first of all, you have seven
4  hours to take his deposition, and you keep
5  talking about running the clock and charging
6  time.  So if you want him to look at
7  something, it's during the deposition time.
8  You can't preload exhibits and have him
9  review them on his own time and then ask him
10 questions.
11               MR. KLINE:    That's the
12 witness' choice, so I'll defer to Mr. Ryland.
13               MR. TOBEROFF:    I object to
14 that, and I suggest you don't follow that,
15 because he's going to use it as a basis to
16 take 10 hours of your deposition.
17               THE WITNESS:    Well, put it
18 here on the table, and we'll see how the time
19 goes.
20 Q  Giving you the last back and forth with DC,
21    and then we'll just follow up from there.
22       But just so we close the loop on this,
23    as I understand it, Mr. Toberoff never shared
24    this letter with you?
25 A  All I'm going to be able to tell you from a

**DON BULSON - 7/19/2011**

Page 136

1    comparison is what the documents speak for

2    themselves.  So whatever that offer was, it

3    was; whatever this offer was, it is.  I don't

4    know -- I can't -- I don't see my having

5    anything to add.

6    Q    But let's turn back to Exhibit 38, and this

7         is what I'm trying to get at.  Is

8         Mr. Toberoff's telling you on Wednesday,

9         November 17th, 2004, that he's objecting to

10        your proposal because they still amount to

11        25 percent of Warner Brothers' offer two

12        years ago, you see that, right?

13   A    Uh-huh.

14   Q    And he doesn't disclose to you that DC makes

15        this offer in April 2005 to the Shusters,

16        correct?

17   A    That's correct.

18   Q    And around this time you've shared with

19        Mr. Toberoff that Michael Siegel is old, he's

20        around 59 years old, correct?

21   A    I forget what his age -- he was in his 50s.

22   Q    That he was not in good health?

23   A    Well --

24              MR. TOBEROFF:    Are you asking

25        a question whether he told me that?

**DON BULSON - 7/19/2011**

Page 137

1   Q   Yes, you told him he was not of good health,
2       correct?
3   A   I probably did.
4   Q   And you told him that he very much wanted to
5       settle this claim and settle his claims to
6       rights, and would even do so at a discount
7       given the position that he was in?
8   A   I can't characterize it that way.
9   Q   Okay. Well, we'll go back to the letters
10      after lunch, but I do want to explore that
11      area of testimony.
12                  MR. KLINE:       So we'll go
13      off the record.
14                  MR. RYLAND:      Sounds good.
15                  VIDEO TECHNICIAN: We're off
16      the record. The time is 12:46.
17  (Lunch recess from 12:46 p.m. to 2:00 p.m. )
18                  VIDEO TECHNICIAN:  The time is
19      2:00 o'clock. We're going back on the
20      record.
21                  MR. KLINE:       So we entered
22      an agreement to all be back at 1:30. I
23      understand that Mr. Ryland had some other
24      commitments, and Mr. Toberoff, lunch took a
25      little bit longer. But it's now 2:00

**EXHIBIT 58**
1180
feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

1    o'clock, and I understand you have a hard

2    stop at 5:00, so we'll do as much -- get as

3    much testimony as we can.  Probably be back

4    here a second day.  I understand that

5    Mr. Toberoff objects to that.

6                  MR. RYLAND:    We will too.

7    I'll be perfectly clear.  We will object --

8    if we're going to go a full day today.

9                  MR. KLINE:    We're not

10   going to get anywhere close to the seven

11   hours we're entitled to under the rules,

12   so --

13                  MR. RYLAND:    Mostly because

14   the attorneys have been talking back and

15   forth.  Mr. Bulson and I have not, so. . .

16                  MR. TOBEROFF:    And you've

17   been taking numerous breaks off the record.

18                  MR. RYLAND:    My point is

19   that if we go a full day, we will object to a

20   second day of depositions.  It's okay.  I

21   mean, you do what you have to do.  I'm just

22   telling you --

23                  MR. KLINE:    Okay.  But we

24   still don't have the documents we need.  I'd

25   rather reach an agreement and avoid --

EXHIBIT 58
1181

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 139

1          MR. RYLAND:    We're not
2     going to.  Just to be a hundred percent
3     clear, we can't do anything about the
4     documents, which you know.  That has to be
5     settled by the estate of Michael Siegel.  So
6     that is what it is.  And as far as taking
7     another day of deposition, we're a third
8     party in this.  There's no dog in the fight.
9     If you want to do another one, you can move
10    for it.  We're going to object.
11         MR. TOBEROFF:   Plus you've
12    already taken the deposition in the closely
13    related Siegel action for hours and hours.
14    You're going over similar territory.
15         MR. KLINE:    So why don't
16    we jump in and see what we can do.  We all
17    understand we disagree about this, and we'll
18    move forward.
19              - - - - -
20    (Plaintiff's Exhibits 48 through 50 were marked.)
21              - - - - -
22    BY MR. KLINE:
23    Q   I'm going to place in front of you
24        Exhibits 48, 49, and 50, Mr. Bulson, and I'll
25        represent to you that Exhibit 48 is an

## DON BULSON - 7/19/2011

Page 140

1    October 19th, 2001 letter from Kevin Marks to
2    John Schulman.  And you've seen this letter
3    before, correct?
4  A    I think so.
5  Q    And Exhibit 49 is a letter from John Schulman
6    to Kevin Marks, October 26, 2001, correct?
7  A    Yeah, it's to Marks from John Schulman, yes.
8  Q    And you've seen this letter as well, correct?
9  A    I may have, but -- there's a good chance I
10    did.
11  Q    And Exhibit 50 is a cover letter from Patrick
12    Perkins to Kevin Marks dated February 1st,
13    2002, attaching a draft agreement between the
14    Siegels and DC Comics concerning the Superman
15    property, correct?
16  A    Yes.
17  Q    And if you look at the very end here,
18    Page 52, it's a couple pages from the back,
19    there's a signature, a proposed signature
20    line for Michael Siegel, correct?
21  A    Yes.
22  Q    Your client?
23  A    Uh-huh, yes.
24  Q    Now, when Mr. -- when you and Mr. Toberoff
25    were exchanging your communications in 2003,

**EXHIBIT 58**
**1183**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 141

1    2004, and he refers to the WB offer, do you

2    understand him to be referring to Exhibit 49

3    or 50 or the same thing?

4    A    That's probably the case.

5    Q    And if you look at Exhibit 48, which I hope

6         is still in front of you?

7    A    Yes.

8    Q    And it says, in addition your proposals still

9         amount to 25 percent of Warner Brothers'

10        offer two years ago.  You understand him to

11        be referring to Exhibits 49 and 50?

12   A    Probably.  I mean. . . I haven't looked at

13        these in a long, long time, but that's

14        probably what's being referenced.  It was

15        the -- what's reflected in that

16        October '01 letter.

17   Q    Can you take a quick look at Exhibit 40,

18        which is an email from you to Marc Toberoff

19        dated November 24th, 2004?

20   A    Yes.  As soon as I find it.

21   Q    Do you mind reading the first paragraph into

22        the record, please?

23   A    Of Exhibit 40?

24   Q    Yes, please.

25   A    I appreciate your efforts to put together a

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

1      deal acceptable to your investor.  Michael

2      has considered your comments and he considers

3      his last offer a fair offer given the

4      potential for substantial income to be

5      generated by the Superman property.  The

6      Warner Brothers' offer was basically a

7      6 percent deal, as I recall.  The base for

8      the royalty included all worldwide revenue

9      paid to or derived by DC Comics from the

10     Superman property.  My calculations of the

11     value with Warner Brothers' last offer were

12     based on numbers provided by Warner Brothers

13     for a five-year period that did not include

14     any revenue booster like a movie.  Since then

15     the Lois and Clark television series has gone

16     into syndication and the Smallville

17     television series has now entered

18     syndication.  According to comments you have

19     previously made, a television property starts

20     generating significant profits when it goes

21     into syndication.

22   Q  So when you refer to the Warner Brothers'

23     last offer, are you referring to exhibit --

24     and in referring to the sentence in this

25     paragraph it begins my calculations?  When

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 143

1      you refer to Warner Brothers' last offer, are

2      you referring to Exhibits 49 and 50?

3  A   I think so.

4  Q   Okay.  Let's take a look at Exhibit 41.  It

5      should be the next in your stack there.

6  A   Yeah, they're all jumbled now.  There we go.

7  Q   And this is an email dated five days later,

8      November 29th, 2004 from Mr. Toberoff to you,

9      correct?

10 A   Yes.

11 Q   If you look at the second paragraph from the

12     bottom of the page, the last full paragraph,

13     can you read that into the record, please?

14 A   I have fully informed the investor, and he is

15     well aware of all of the developments you

16     mentioned regarding Superman, Smallville, et

17     cetera; however, the investor is also

18     conservative, experienced, and cynical with

19     regard to the entertainment industry and

20     studio accounting and knows the following.

21     Do you want me to go on?

22 Q   I actually wanted you to read, if you go down

23     to the bottom of the page, in hard business

24     terms?

25 A   Oh.

DON BULSON - 7/19/2011

Page 144

1    Q    If you can read that paragraph.

2    A    In hard business terms, although this is

3         Superman and there's only one Superman, this

4         is not the rosy, sexy picture one might

5         think.  Yes, they will likely produce a

6         Superman movie or movies; yes, they have

7         syndicated Smallville, but DC doesn't

8         participate in a big way in this.  WB/DC have

9         refuted the termination interest, and

10        stonewalled any accounting or payments for

11        over five-and-a-half years.

12   Q    Okay.  And then let's take a look at

13        Exhibit 42.  It's a January 17th, 2005 email.

14        And I believe the top email, would you agree

15        says, to make anything happen, I need a

16        little more leeway, please see --

17   A    That's not what my Exhibit 42 says.

18   Q    Don, I'm referring to the -- Don, I haven't

19        heard from you since my last email

20        November 2004, which I recopied below.  As

21        expected I can't sell your proposals.  I wish

22        I could, since they are too close to the

23        exact MPV of the old WB deal and don't take

24        into account the passivity of the investment

25        and the significant risks involved.  To make

## DON BULSON - 7/19/2011

Page 145

1    anything happen, I need a little more leeway.

2    Please see our last proposal, which is not so

3    far off from what your client wants.  Do you

4    see that?

5  A   Uh-huh.

6  Q   And obviously when Mr. Toberoff says in the

7    second sentence here, I can't sell your

8    proposals, I wish I could, he didn't disclose

9    to you at this time period that the investor

10   was Ari Emanuel, correct?

11 A   That's correct.

12 Q   And he didn't disclose to you that he had a

13   joint venture agreement with Mr. Emanuel,

14   correct?

15            MR. TOBEROFF:    Asked and

16   answered.

17 A   That's correct.

18 Q   And in this offer that he republishes below,

19   that top email there, the email that says,

20   Don, thank you for your counteroffer.  He

21   says in addition your two proposals still

22   amount to 25 percent of the Warner Brother

23   offer two years ago, correct?

24 A   That's what it says.

25 Q   If you take a look at Exhibit 47, Mr. Bulson,

**DON BULSON - 7/19/2011**

Page 146

1      it says DC on the top there?

2   A   Yeah.

3   Q   Just to reconfirm, Mr. Toberoff never shared

4      this offer with you, correct?

5   A   Not to my recollection.

6   Q   That DC made with the Shusters?

7                    MR. TOBEROFF:    Asked and

8      answered.

9                    - - - - -

10     (Plaintiff's Exhibit 52 was marked.)

11                   - - - - -

12  Q   I'm going to hand you Exhibit No. 52.  Did

13     Mr. Toberoff share this communication with

14     you at any point in time?

15  A   Not that I recall.

16  Q   Did Mr. Toberoff tell you that he rejected

17     DC's offer to the Shusters on behalf of them?

18  A   Not that I recall.

19  Q   This document's dated May 12th, 2005,

20     correct?

21  A   Yes.

22  Q   Can you read the second and third paragraph,

23     please, into the record?

24  A   While our clients certainly do appreciate

25     DC's efforts, they are passing on DC's offer.

DON BULSON - 7/19/2011

Page 147

1    It is believed that the offer is extremely

2    low and bears no relation to the net present

3    value of the estate's 50 percent interest in

4    Superman profits for the duration of

5    copyright commencing 2013.  Nor does DC's

6    offer reflect a considerable strategic value

7    of the estates's 50 percent copyright

8    interest in tandem with the Siegel's

9    50 percent copyright interest in Superman.

10   One need only to look at DC/Warner Brothers'

11   full-blown plans to reinvigorate Superman as

12   a billion dollar film, television, and

13   merchandising franchise and to Marvel's 2.5

14   billion market capitalization to understand

15   how DC's $2 million proposal bears little or

16   no relation to the marketplace and the

17   economic realities of this world famous

18   property.

19                MR. TOBEROFF:    I object to

20   your use in this deposition this exhibit.

21   It's marked confidential.  We had a

22   protective order at the time with DC which

23   would apply to this document as well.  You

24   shouldn't be giving it to Mr. Bulson and

25   making it part of a public transcript.

EXHIBIT 58
1190

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 148

1          Also, I object to the fact that you're

2     dealing on top of that with settlement

3     negotiations which should not be used or

4     disclosed in litigation.

5               MR. KLINE:      Disagree with

6     both of your points.  We'll move forward.

7               MR. TOBEROFF:    Well, you're

8     in breach of the protective order and we'll

9     hold you and your client accountable for

10    that.  That's it.

11              MR. KLINE:      Where is it

12    marked confidential when it was produced on

13    the bottom?

14              MR. TOBEROFF:    Can you read?

15              MR. KLINE:      On the Bates

16    stamp at the bottom of the page --

17              MR. TOBEROFF:    It says

18    confidential communication?

19              MR. KLINE:      It's your

20    position that --

21              MR. TOBEROFF:    Yes, it is.  I

22    just stated my position.

23              MR. KLINE:      That's fine.

24    Understood.

25    Q   Turning your attention to that letter,

DON BULSON - 7/19/2011

Page 149

1    Mr. Bulson.  On November 29th, 2004, if you
2    look at Exhibit 41, Mr. Toberoff is telling
3    you that in hard business terms, although
4    it's Superman and there's only one Superman,
5    this is not the rosy, sexy picture one might
6    think, correct?
7    A    Where is that, where do I look in the
8         document?
9    Q    Bottom of the first page in Defense Exhibit B
10        41?
11   A    In hard business terms, yes.  I see that.
12   Q    It's not the sexy picture.  At the same time
13        he's telling -- not at the same time.  A few
14        months later he tells DC Comics that one need
15        only to look at DC/Warner Brothers'
16        full-blown plans to reinvigorate Superman as
17        a billion dollar film, correct?
18   A    Uh-huh, yes.
19   Q    And he never shared this point of view with
20        you, correct, during his negotiations with
21        you?
22   A    To my recollection, he did not.
23   Q    In fact, he told you the opposite, correct?
24   A    He told me what's stated in that email.
25   Q    He also told you that DC -- he told DC Comics

DON BULSON - 7/19/2011

Page 150

1    in the May 12th, 2005 letter that the offer
2    is extremely low and bears no relation to the
3    net present value of the estate's 50 percent
4    interest in Superman profits, correct?
5                    MR. TOBEROFF:    Document
6    speaks for itself.
7    A    That's what it says, yes.
8    Q    And yet he told you in Exhibit 42, his
9    January 17th, 2005 email that he couldn't
10   sell your proposal because they're too close
11   to the exact net present value of the old
12   Warner Brothers' deal, correct?
13   A    That's what it says.
14   Q    In taking a look at Exhibit 39, and looking
15   at the first email in the chain.
16   A    I see the -- oh, the first email in the
17   chain.
18   Q    So if you look at the second and third page
19   of the document?
20   A    Uh-huh.
21   Q    Marked DV 30 -- DV 038 at the bottom?
22   A    Yes.  Okay.  Got it.
23   Q    Marc -- it's a November 12th, 2004 email from
24   you.  Marc, I've now -- I've now had the
25   opportunity to meet with Mike Siegel and

## DON BULSON - 7/19/2011

Page 151

1   discuss your investor's latest proposal.
2   Summarizing our past discussion, Mike
3   originally proposed an initial payment of
4   $300,000, annual payments of $123,000 for 20
5   years.  As understood the investor countered
6   with initial payment of $200,000, annual
7   payments of $100,000 for that 20 years.
8   Investor's recoupment of one-half of any
9   monies paid.  If aversion occurs, a follow-up
10   to some of above, the investor indicated he
11   would consider some participation.  In
12   return, Mike Siegel would be amenable to
13   initial payments of $250,000, annual payments
14   of $112,000 for 25 years, investor's
15   recoupment of one-half monies pad if aversion
16   occurs, subject to appropriate payback
17   schedule for proceeds received by Mike
18   Siegel, participation at 10 percent.  Do you
19   see that offer you conveyed to Mr. Toberoff?
20  A   Uh-huh, yes.
21  Q   And in his email above that in the chain
22   November 17th, 2004, Mr. Toberoff rejects
23   that, correct?
24  A   Yes.
25  Q   Mr. Toberoff says in his email rejecting the

EXHIBIT 58
1194

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 152

1        offer, I'm really trying, but I need some

2        help from your end if your client wants to do

3        that, do you see that?

4    A   Yep, yes.

5    Q   And on May 12th, 2005, Exhibit 52,

6        Mr. Toberoff rejects DC's 2 million-dollar

7        proposal saying it bears little or no

8        relation to the marketplace and the economic

9        realities of this world-famous property.  Do

10       you see that?  End of the third paragraph I

11       had you read, Exhibit 52.

12   A   Okay.  Yes, I see that.

13               MR. TOBEROFF:    2 million

14       dollar proposal to the Shusters.

15   Q   Is it your testimony, sir, that Mr. Toberoff

16       was dealing with you fully and fairly and

17       providing you the necessary information as

18       part of these negotiations that you conducted

19       on behalf of Mr. Siegel or Michael Siegel?

20   A   I don't believe I testified to that.

21   Q   Do you have a view on that question?

22               MR. TOBEROFF:    Asked and

23       answered.

24   A   No.  There was a lot -- there was information

25       that I was not privy to during those

DON BULSON - 7/19/2011

Page 153

1    negotiations, yes.

2    Q    In your experiences, and I understand that

3         you were the president of the IP Lawyers

4         Association in Cleveland for a number of

5         years, correct?

6    A    That's -- for a year.

7    Q    Okay.  Have you ever had an experience like

8         this where a lawyer on the other side turns

9         out claiming to be representing an investor,

10        is actually -- wants to make the investment

11        themselves or has these joint venture

12        agreements where they have separate ownership

13        interests through separate companies, have

14        you ever seen something like that?

15              MR. TOBEROFF:    Misstates the

16        record.  There's no investment in the record

17        by me.

18   A    From -- based on my -- this is relatively

19        unique.

20   Q    Have you ever had somebody consistently refer

21        to somebody in a series of correspondence

22        with you to a third-party that they refused

23        to tell you who they are, when in fact it

24        turns out that they have a business

25        relationship with that unnamed investor?

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 154

1    A    I don't recall other instances, no.

2    Q    You represented Michael Siegel who, I think

3         you testified earlier, at this point in his

4         life was close to 60 years old, not healthy,

5         looking to resolve these issues so he could

6         get some money in his pocket, correct?

7              MR. BERK:      I would object

8         to that and instruct him not to answer.

9              THE WITNESS:      Just making

10        sure.

11   Q    Did you communicate to Mr. Toberoff as part

12        of these negotiations that Michael Siegel was

13        in his late 50s?

14   A    I believe so.

15   Q    Did you communicate to him that he was not

16        healthy?

17   A    I believe so.

18   Q    Did you communicate to him that he very much

19        wanted to settle this so he could settle

20        this -- or sell his rights so that he could

21        enjoy during his lifetime some of the fruits

22        of that?

23   A    I don't think I said that.

24   Q    Why were you willing to offer 25 percent, a

25        deal in which Michael Siegel would sell his

DON BULSON - 7/19/2011

Page 155

1    interests to this unnamed investor for

2    25 percent of Warner Brothers' last offer?

3    A    I believe the answer to that would go into

4    privileged information.

5                    MR. BERK:        Yeah, right.

6                    THE WITNESS:        But I defer to

7    you.

8                    MR. BERK:        Okay.  I was

9    about to say it was a -- it's privileged and

10   I instruct you not to answer.

11   Q    But in fact that's the case, you made an

12   offer that was 25 percent of what Warner

13   Brothers was willing to pay for these rights,

14   correct?

15   A    I don't remember the math right now.  I

16   thought we today saw it was an equal deal at

17   the present market value, but I don't

18   remember the numbers, whether it was 25.  I

19   mean, I saw it today in correspondence,

20   25 percent, and then I saw there was other

21   references to it being the same as the DC

22   Comics' deal, proposal.

23   Q    Do you remember one way or the other?

24   A    No.

25   Q    Take a look at Exhibit 37 again quickly. I'm

## DON BULSON - 7/19/2011

Page 156

```
 1        sorry, 38, Mr. Bulson.  My apologies.  Do you
 2        see Mr. Toberoff in that third paragraph of
 3        his email, November 17th, 2004, in addition,
 4        your two proposals still amount to 25 percent
 5        of Warner Brothers' offer two years ago?
 6   A    Right.  But didn't we see somewhere else
 7        where the offer was essentially equal to the
 8        Warner Brothers' offer, and that 25 percent
 9        might have been -- I -- I mean, we saw it
10        earlier here in one of these other documents,
11        a reference was made to it being equal what
12        was being offered, but I forget where we saw
13        it.
14   Q    Take a look at Exhibit 41, November 29th
15        email from Marc Toberoff to you, top of the
16        second -- I think you're referring to the
17        paragraph that -- the last paragraph in the
18        first page.  It goes on to the second page.
19   A    Yeah, yeah, that's what I was referring to.
20                    MR. TOBEROFF:    Where are you,
21        please?
22                    MR. KLINE:    Exhibit 41.
23   A    Here it says, it's characterizing the
24        proposal and the offer as the same as the
25        Warner Brothers' 2002 offer.  And this letter
```

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 157

1      from -- this email from Marc Toberoff was

2      referring to 25 percent of the Warner

3      Brothers' proposal.

4  Q   But you don't remember which one it was?

5  A   Did I write either one?

6  Q   No.  Mr. Toberoff wrote those.

7                    MR. RYLAND:     Objection.

8      Assumes facts.

9  A   I don't know of -- I don't recall the -- what

10     the present market values of the two offers

11     were.

12 Q   Let's take a -- holding on to Exhibit 38 for

13     a second, this is a November 17th follow-up

14     email, 2004, 3:06 p.m. from Marc Toberoff to

15     you.  In the second paragraph he says, in

16     addition there is a legal cost to make Warner

17     Brothers pay up, for instance, with a

18     contingency lawyer at least 33.33 percent to

19     40 percent would be taken off the top, plus

20     costs and disbursements, do you see that?

21 A   Uh-huh, I see that.

22 Q   Did he tell you who that contingency lawyer

23     would be?

24 A   I don't recall.

25                    - - - - -

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 158

1          (Plaintiff's Exhibit 51 was marked.)

2               - - - - -

3    Q    This is Exhibit 51.

4               MR. TOBEROFF:    I object to

5    use of this exhibit.   It's marked

6    confidential pursuant to, I believe, a

7    protective order or a representation that the

8    parties intend to enter into a protective

9    order.   You can't be showing this document to

10   third parties.

11              MR. KLINE:    So --

12              MR. TOBEROFF:    You just heard

13   me.   That's my objection.   You should take it

14   back and you shouldn't show this retainer

15   agreement to third parties that's marked

16   confidential, pursuant -- I believe we

17   represented -- this was produced in this

18   case?

19              MR. KLINE:    Correct.

20   Pursuant to a court order.

21              MR. TOBEROFF:    We represented

22   that the parties intend to enter into a

23   protective order at some point in this

24   litigation, or we may have a protective order

25   in this case, otherwise we wouldn't have

## DON BULSON - 7/19/2011

Page 159

1    marked it confidential.

2                MR. KLINE:        My

3    understanding, Mr. Toberoff, is this is part

4    of the same ruling in which you were also

5    ordered to produce the Dennis Larson

6    documents, and the Judge Larson -- I'm sorry

7    Judge Zarefsky said those would be kept

8    confidential, filed under seal.  But when he

9    compelled you to produce this document, he

10   made no such statement.

11               MR. TOBEROFF:    I believe we

12   represented to the court at one point in this

13   litigation that although we didn't yet have a

14   protective order, we intended to have a

15   protective order.

16               MR. KLINE:       Who is we by

17   the way in that?

18               MR. TOBEROFF:    Both sides.

19               MR. KLINE:       Okay.  So let

20   me just -- just so we're clear, you're not

21   going to let me ask questions about this

22   document?

23               MR. TOBEROFF:    No.  It's

24   marked confidential.  It should be subject to

25   our protective order, and you shouldn't be

EXHIBIT 58
1202

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 160

1    passing around a retainer agreement of other

2    parties.

3                MR. KLINE:        We disagree

4    that it's subject to any protective order.

5    We understand your position.  This is going

6    to be another reason why we may have to take

7    the deposition another day.

8  Q  Did Mr. Toberoff disclose to you that he

9    signed a attorney-client contingency fee?

10 A  Oh, you're -- start again.

11 Q  Back to you, Mr. Bulson.  I want to --

12   around, looking at Exhibit 38, it's

13   November 2004, Mr. Toberoff is referring to

14   for instance with a contingency lawyer at

15   least 33 percent to 40 percent, see that

16   there?

17 A  Uh-huh.

18 Q  Did Mr. Toberoff disclose to you that a

19   month-and-a-half earlier he had signed an

20   agreement with Joanne Siegel and Laura Siegel

21   in which he himself became that contingency

22   lawyer and was entitled to a 33 to 40 percent

23   contingency?

24                MR. TOBEROFF:     I object to

25   your -- I object to you -- you're just

DON BULSON - 7/19/2011

Page 161

1    violating the protective order and the

2    confidentiality by disclosing rather than

3    giving him the document to read, disclosing

4    information in that document.

5            MR. KLINE:        I'm asking if

6    you disclosed that.

7            MR. TOBEROFF:    You're

8    violating the confidentiality of doing that.

9            MR. KLINE:        I completely

10   disagree.  I'm asking if you disclosed that

11   to him.

12           MR. TOBEROFF:    I'm going to

13   ask you again, please don't violate the

14   confidentiality agreement in this case, in

15   the Siegel case.  Warner Brothers and DC have

16   marked thousands of documents confidential

17   with all sorts of financial information.  And

18   if DC is not abiding by when we mark things

19   confidential and abiding by the protective

20   order, we're not going to abide by that order

21   either.

22           MR. KLINE:        There is no

23   order in this case.

24           MR. TOBEROFF:    There is no

25   confidentiality agreement if you keep

**DON BULSON - 7/19/2011**

Page 162

1    breaching it.

2                    MR. KLINE:        Mr.

3    Toberoff --

4                    MR. TOBEROFF:     Do you

5    understand that?  So you breach it at the

6    risk -- I'm talking.  You breaching that

7    protective order and confidentiality

8    agreement.  And you're smirking, for the

9    record, you're smirking while I'm talking.

10   You're breaching a very important protective

11   order and confidentiality agreement between

12   the parties.  We will then not hold all the

13   information that DC has given to us

14   confidential, since you're breaching the

15   essence of that agreement.

16                   MR. KLINE:        We

17   completely dis --

18                   MR. TOBEROFF:     So I advise

19   you not to keep disclosing the terms of that

20   agreement.

21                   MR. KLINE:        My term to

22   talk, Mr. Toberoff.

23                   MR. TOBEROFF:     Go ahead.

24                   MR. KLINE:        We completely

25   dispute your position.  There is no

**EXHIBIT 58**
**1205**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 163

1   protective order in this case.  You were

2   ordered by court order to produce this

3   document.  Before producing it, you did not

4   ask us to sign a stipulation or protective

5   order that would given this document.  My

6   question asked about whether a fact was

7   disclosed to Mr. Bulson.  I did not

8   represent --

9                  MR. TOBEROFF:     You are

10  reading -- you were holding the agreement up

11  visibly to Mr. Bulson.  You were reading from

12  the agreement, and you were disclosing our

13  fee structure on the agreement exactly as

14  it's set forth in the agreement, exactly what

15  you did.  That was the implication of your

16  actions.

17  Q   Going back to my question, and we obviously

18      disagree on this.

19              Going back to my question, in his --

20      in or around November 17th, 2004, did

21      Mr. Toberoff disclose to you that he had

22      entered into a contingency fee arrangement

23      with Joanne and Laura Siegel?

24                  MR. TOBEROFF:     Asked and

25      answered.

DON BULSON - 7/19/2011

Page 164

1   A   Not that I recall.
2   Q   Did he disclose to you that he was, quote,
3       the -- a contingency lawyer referred to in
4       the email?
5   A   Not that I recall.
6   Q   Did he tell you at any point in time that he
7       had a contingency fee arrangement with the
8       Siegels of at least 33 percent to 40 percent?
9               MR. TOBEROFF:    Same
10      objection.
11  A   At any point in time?
12              MR. KLINE:      Correct.
13  A   I don't know.  I can't recall.
14              MR. TOBEROFF:    Same objection
15      to your disclosure.
16  Q   Mr. Bulson, looking back over these emails
17      and letters that you've exchanged with
18      Mr. Toberoff in the 2003 to 2005 time period,
19      do you feel that Mr. Toberoff omitted
20      material facts from his communications with
21      you?
22              MR. TOBEROFF:    Asked and
23      answered.  You've asked that question five
24      times.
25              MR. RYLAND:     Objection.

**DON BULSON - 7/19/2011**

Page 165

1   A   I don't know how to answer that.

2                MR. RYLAND:      I'll object to

3        the extent that it calls for a legal

4        conclusion.

5   Q   During --

6   A   I haven't formulated an opinion on that.  I

7        mean, this is the first time I'm seeing many

8        of these documents.  As I stated earlier, I

9        would have liked to have known about it.

10       Whether they're -- we probably have

11       mischaracterizations here.

12  Q   By Mr. Toberoff?

13  A   Well, let's just say the complete picture

14       wasn't communicated.

15  Q   And you asked for the complete picture, you

16       said, please tell me who the investor is,

17       correct?

18  A   I did ask who the -- who was the investor?

19  Q   And he not only refused to tell you, but he

20       made misleading statements in these

21       documents, correct?

22                MR. TOBEROFF:    Misstates the

23       documents.

24                MR. RYLAND:      Object to the

25       extent that it calls for a legal conclusion.

**Merrill   Corporation  -  Los Angeles**

## DON BULSON - 7/19/2011

Page 166

```
 1   A   I'm not in a position at this point in time
 2       to answer that question.
 3   Q   Mr. Bulson, have you ever shared with
 4       anybody --
 5               MR. TOBEROFF:    Could you
 6       speak up?  I can't hear you.
 7   Q   Mr. Bulson, have you ever shared with
 8       anybody, and I'm not referring to Mr. Ryland
 9       as your attorney, have you ever shared with
10       anybody your opinions about Mr. Toberoff's
11       character for truthfulness?
12   A   I haven't formulated opinions regarding
13       Mr. Toberoff's character or truthfulness.
14   Q   So you never told anybody other than
15       Mr. Siegel or Mr. Ryland, I don't think he's
16       an honest guy, or something along those
17       lines?
18               MR. BERK:    I'm going to
19       object to anything he might have told to
20       Mr. Siegel as being privileged.  I instruct
21       him not to answer.  But if he wants to speak
22       to telling anybody else other than Mr. --
23       Michael Siegel, he may answer.
24               MR. KLINE:    And my
25       question said other than Mr. Siegel, other
```

**EXHIBIT 58**
**1209**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 167

1    than Mr. Ryland.

2              MR. BERK:        I'm sorry.  I

3    did not hear that.

4              MR. KLINE:       That's fine.

5    Q  Other than Mr. Siegel, other than Mr. Ryland,

6       have you said in words or in substance to

7       anyone, I don't think Mr. Toberoff is an

8       honest person?

9    A  Any words of that import would have, positive

10      or negative, would have most likely just been

11      made internally to my colleagues.

12   Q  So you don't remember any other instances?

13   A  No, I don't recall.

14   Q  I noticed on your privilege log, and I've

15      asked Jason to pull this out, and hand around

16      as an exhibit, it's going to be No. 53.  Oh

17      it's Exhibit 3 to your prior deposition.  My

18      apologies.

19              - - - - -

20      (Plaintiff's Exhibit 53 was marked.)

21              - - - - -

22   Q  Can you turn to privilege log entries 366 and

23      367?

24              MR. TOBEROFF:    You just -- I

25   just have to take a bathroom break.  It will

Merrill  Corporation  -  Los Angeles

EXHIBIT 58
1210

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 168

1    take me two seconds.  Can we just go off the
2    record?
3                 MR. KLINE:       That's fine.
4    Absolutely.
5                 VIDEO TECHNICIAN:  We're off
6    the record.  The time is 2:38.
7      (Recess from 2:38 p.m. to 3:05 p.m. )
8                 VIDEO TECHNICIAN:  We're back
9    on record at 3:05.
10                MR. KLINE:       That's fine.
11   But if you clarify them now and require me to
12   go ask three hours of questions on them, it's
13   sandbagging me at the end of the day.  So you
14   can say whatever you want to say.  Back on
15   the record.
16                MR. TOBEROFF:     Thanks for
17   your permission.
18                MR. KLINE:       As I've asked
19   the videographer to kind of tell us where
20   things stand, we only are at two hours and 59
21   minutes of on-tape testimony for the day,
22   well short of what we're permitted under the
23   federal rules.  I also understand that,
24   Mr. Ryland, you have a hard stop at 5:00 p.m.
25   today.

DON BULSON - 7/19/2011

Page 169

1          MR. RYLAND:      And Mr. Bulson

2    has interviews for the U.S. PTO, and would

3    need to prepare for this evening, because

4    they begin tomorrow morning.

5          MR. KLINE:      So that's an

6    hour and 50 minutes.  We're not going to

7    finish the amount of time that we're

8    permitted under the federal rules today.

9    We've been discussing the following protocol

10   to kind of deal with where things stand.

11   Number one, we would come back here, a day

12   hopefully in the early fall, to complete the

13   deposition.  And at that deposition we'd get

14   two-and-a-half hours of on-tape time, not to

15   exceed four hours overall of Mr. Bulson's

16   testimony.  We DC if there was some

17   obstreperous conduct, some other unforeseen

18   circumstances, a series of fire alarms or the

19   like, we'd want to be able to work with you

20   in good faith and within reason to slightly

21   modify those schedules.

22          In interim we would want to file a

23   motion on the privilege claims that have been

24   asserted in this deposition.  We'd want to

25   sort out with Mr. Toberoff his claims that

EXHIBIT 58
1212

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 170

1    protective orders cover certain documents or

2    not.  We would also want to meet and confer

3    with you and your colleagues and really the

4    Michael Siegel camp as well about getting

5    certain documents, one of them is a court

6    order, another of them is a certain expert

7    submission that it sounds like was made in

8    your law firm's case against the Siegel

9    estate, and some other document issues.  Our

10   hope would be to get rulings on the privilege

11   issues from the California, or some other

12   court, maybe it's an Ohio court if it's a

13   more expeditious basis to do it.  Sort out of

14   document issues hopefully by mutual agreement

15   rather than motion and practice, and then

16   come back here and complete the deposition.

17        And at the deposition I would do two

18   things.  One, I would cover the ground that I

19   wasn't able to cover this morning because of

20   the objections, and number two, I would

21   finish my examination.  I'm probably, I don't

22   know, two-thirds of the way through the

23   examination.  I have a third left.  But I

24   would be confined to that time period that we

25   agreed to.  We would very much like

EXHIBIT 58
1213

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 171

1    Mr. Toberoff to agree to this protocol,

2    because we think in any instance we have the

3    right to get our full seven-and-a-half hours,

4    and we're not going to get that done today.

5    Our understanding is from you, Mr. Ryland,

6    that your firm would not object to a

7    deposition on these terms.

8                    MR. RYLAND:      It's just me.

9    It's not my firm.

10                    MR. KLINE:      You and

11   Mr. Bulson, the witness.

12                    MR. RYLAND:    Mr. Bulson

13   will agree to, you know, not file a motion to

14   quash, and will agree to sit for a second

15   portion of the deposition as long as it's

16   two-and-a-half hours of tape time, not to

17   exceed four hours total of deposition.  Two,

18   that the privilege issues and confidentiality

19   issues with respect to documents that you

20   plan to use in the deposition are resolved

21   ahead of time.

22                    MR. KLINE:     Okay.

23                    MR. RYLAND:     Whether that

24   is by court order or by party agreement, we

25   don't mind.  We just don't want to have to

DON BULSON - 7/19/2011

Page 172

1    endure what we endured today, which is

2    clearly unresolved document issues.  And

3    three, if possible, and how we do this is

4    something I'm willing to negotiate on, but we

5    either have a magistrate in California, a

6    magistrate in Cleveland, or an Article 3

7    judge prepared to weigh in if we reach

8    impasse, so we can resolve the issue before

9    we would have to require anybody else to

10   travel again or Mr. Bulson to change his

11   schedule to sit for any additional deposition

12   time.

13            MR. KLINE:      How about a

14   private discovery referee from like a JAMS

15   panel or any other?

16            MR. RYLAND:      I'm happy to

17   do that as long as Mr. Bulson doesn't bear

18   the cost of the private discovery mediator, I

19   guess.

20            MR. KLINE:      Okay.  Okay.

21            MR. TOBEROFF:    I don't

22   understand, when you say two-and-a-half hours

23   of tape time, four hours of deposition time,

24   what is that extra one-and-a-half hour mean?

25            MR. RYLAND:      If we started

DON BULSON - 7/19/2011

Page 173

1    the deposition at 8:00 a.m., my understanding

2    of that, Counselor, is we started at 8:00

3    a.m., the deposition would be over by noon

4    regardless of how much --

5                MR. TOBEROFF:    So you're

6    leaving an hour and a half for breaks.

7                MR. RYLAND:    I'm building

8    in some fudge factor understanding there are

9    probably still going to be some lingering

10   objections and both of you guys have a lot of

11   words.  That's okay.

12               MR. TOBEROFF:    So I think you

13   wanted to state something about as your

14   earlier objections?

15               MR. BERK:    I would just

16   like to state that I'm not a hundred percent

17   sure all my earlier objections, but as many

18   of these documents have come in as to

19   negotiations between Mr. Toberoff and

20   Mr. Bulson, though they may be part of his

21   work product, I will not have an objection to

22   them as far as communications between

23   Mr. Toberoff and Mr. Bulson.

24               MR. KLINE:    Terrific.  And

25   so one of the ways we can sort these issues

**Merrill  Corporation  -  Los Angeles**
800-826-0277                    www.merillcorp.com/law

EXHIBIT 58
1216

## DON BULSON - 7/19/2011

Page 174

1   out before the next deposition is we can give

2   you a copy of the transcript, and you can

3   tell us which ones you're withdrawing, and

4   that way we wouldn't have to file a motion on

5   it.

6                MR. BERK:        Okay.  We can

7   do that.

8                MR. KLINE:       Great.

9                MR. BERK:        And I will

10  still have objections to any conversations

11  between Mr. Bulson and Mr. Siegel, Michael

12  Siegel.

13               MR. KLINE:       Including if

14  Mr. -- Michael Siegel gives a letter to

15  Mr. Bulson that was sent to him by Laura

16  Siegel, you still would object to him

17  answering questions about that?

18               MR. BERK:        If you asked

19  him questions of a letter that you got

20  independently of him getting it from Michael

21  Siegel, and you have it somewhere else, I

22  don't have a problem with that.  I have

23  a problem --

24               MR. RYLAND:       This is

25  exactly what we mean by --

DON BULSON - 7/19/2011

Page 175

1              THE WITNESS:    Why don't you
2     do this as part of your resolving.
3              MR. KLINE:        Understood.
4     So Mr. Toberoff, are you amenable to those
5     conditions?
6              MR. TOBEROFF:    We're
7     reserving our rights to object to having to
8     travel to Cleveland now for yet a third
9     deposition of Don Bulson, a third party, on
10    things that are absolutely marginal, of
11    marginal relevance.  You've taken now his
12    depositions twice.  You're seeking to take it
13    a third time.  You're all over the documents.
14    You're showing him is the name Ari Emanuel,
15    who is in Los Angeles, and you haven't once
16    in this case noticed his deposition, even
17    attempted to take his deposition.  Yet
18    Mr. Bulson is being subjected to a third
19    deposition testimony by your firm.  And also
20    the nature of the questions that you've asked
21    him and their marginal relevance to any
22    cognizable claim or a basis for us to, so
23    we're reserving our objections, and we're not
24    at this time agreeing to any sort of deal to
25    have to fly across country again for the

EXHIBIT 58
1218

**DON BULSON - 7/19/2011**

Page 176

```
1    third time for Mr. Bulson's deposition.
2              MR. KLINE:        Okay.  As I
3    understand it, we'll notice the deposition,
4    Mr. Bulson will appear for the deposition.
5              MR. RYLAND:        Subject to
6    those conditions.
7              MR. KLINE:         And
8    Mr. Toberoff can either appear or not appear.
9              MR. TOBEROFF:    Or move --
10              MR. RYLAND:        And not to
11    change the terms of the underlying deal, but
12    I'm hoping that we can at least get a
13    gentlemen's agreement here that there's going
14    to be some sort of protective order in place.
15              MR. KLINE:        Absolutely.
16              MR. RYLAND:        That was
17    another -- we marked the whole thing
18    attorneys eyes only.  I trust all of the
19    attorneys in this room not to cause a problem
20    with that, but we're hoping at some point we
21    can rely on a protective order as a third
22    party to --
23              MR. KLINE:        We will reach
24    an agreement with you immediately to
25    designate --
```

**EXHIBIT 58**
1219

DON BULSON - 7/19/2011

Page 177

1          MR. RYLAND:      That's fine.
2          MR. KLINE:       -- any portion
3    of this that you want protected, protected.
4          MR. RYLAND:      I think that's
5    fine.  No problem.  I just wanted to make
6    sure we're clear on that, because I know
7    we're going to get into, or at least you've
8    touched on elements of Don's practice.
9          MR. KLINE:       Understood.
10         MR. RYLAND:      And objections
11   are going to be resolved and --
12         MR. KLINE:       So my
13   understanding of this is we're going to
14   litigate whatever we litigate, work out
15   whatever we can work out with them, and at
16   some point we're going to notice a deposition
17   here, and you guys will appear for that.
18   Mr. Toberoff may say, hey, I'm not flying
19   out, or he may try to go file a protective
20   order motion, but it's not going to be
21   incumbent upon us to compel Mr. Bulson's
22   testimony.
23         MR. RYLAND:      As long as we
24   agree that it's subject to those conditions
25   that I set forth, then we're fine.

feda831f-8f5a-4d4a-86d4-38e27c7e6947

**DON BULSON - 7/19/2011**

Page 178

1          MR. KLINE:        That's fine
2    with us.   Now, as I did mention, I wanted to
3    ask about five or six more questions if we
4    can do that.   It will be quick.
5          MR. TOBEROFF:      I don't think
6    you should.   You're now going on your 5:00
7    o'clock.
8          MR. KLINE:        It's literally
9    five or six questions?
10         MR. RYLAND:        Is it
11   literally 15 minutes?
12         THE WITNESS:       Five minutes,
13   right?
14         MR. KLINE:         Five minutes?
15         THE WITNESS:       Okay.
16  Q   Mr. Tokoro was good enough to give you this
17      exhibit, what exhibit number, it's No. 3 from
18      your first deposition.   It's 53 in this
19      deposition.
20  A   Yes.
21  Q   Okay.  If you look at privilege logs entries
22      356, 357, 366, and 367, do you see those,
23      sir?
24  A   I see 356 and other ones following it.
25  Q   And the second, the column that has Attorney

EXHIBIT 58
1221

## DON BULSON - 7/19/2011

Page 179

1    Kevin Marks in it, and then next to it

2    Attorney Don Bulson, and then it says email

3    attorney, do you see those different lines

4    there?

5  A  Uh-huh, yes, yes.

6  Q  In June of 2004, and then in August of

7    2004 when these communications are taking

8    place, it's your understanding that Kevin

9    Marks had been terminated as the Siegel's

10   attorney by then, correct?

11 A  I don't recall.

12 Q  You didn't receive a letter in October of

13   2001 --

14 A  I know he was terminated.  I don't remember

15   the timing.

16 Q  In October of 2001 you received a letter from

17   the -- Mrs. -- from Joanne and Laura Siegel

18   saying we have terminated Mr. Marks and

19   terminated our discussions with Warner

20   Brothers, correct?

21 A  I don't remember.

22 Q  Do you remember why it is that you were

23   talking to Mr. Marks in June and August of

24   2004?

25 A  No.

EXHIBIT 58
1222

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 180

1    Q    After he was terminated as their attorney,
2         what other occasion, if you remember any, did
3         you have to speak to Mr. Marks?
4    A    I don't remember.
5    Q    Did you retain him at any point to help you
6         in your representation of Michael Siegel?
7    A    I don't believe so.
8                        - - - - -
9         (Plaintiff's Exhibit 54 was marked.)
10                       - - - - -
11   Q    Just marking very quickly Plaintiff's Exhibit
12        54, and I misspoke as to the date.  This is a
13        September 21, 2002 letter from Joanne Siegel
14        and Laura Siegel Larson, copying you and
15        Michael Siegel to Kevin Marks terminating
16        him.
17   A    I see the letter.
18   Q    So the privilege log entry is 356, 357, 366,
19        and 367 post date that termination by about
20        two years, correct?
21   A    Yes.
22   Q    Can you remember any attorney-client joint
23        interest agreement that you and Mr. Marks had
24        made that would cover communications in June
25        or August of 2004?

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 181

1    A    I don't remember.

2    Q    Were you doing any other work with Mr. Marks

3         on any other client matters?

4    A    No.

5    Q    Do you remember reaching any agreements with

6         Mr. Marks about attorney-client joint

7         interest?

8    A    Yes.

9    Q    And when were those agreements made?

10   A    Back during our initial discussions.

11   Q    2000, 2001?

12   A    Might be ballpark.

13   Q    But in 2004 he had been fired as the Siegels'

14        attorney, correct?

15   A    I believe so.

16             MR. KLINE:        Okay.  I think

17        reserving our rights to come back here and

18        take a second deposition under the conditions

19        we've talked about, and reserving our rights

20        to move to compel answers on the

21        conditions -- or on the bases that we'll have

22        to brief for the court, and it sounds like

23        you're going to withdraw some of those

24        objections soon, which would help narrow the

25        issues, thank you for your time, Mr. Bulson,

DON BULSON - 7/19/2011

Page 182

1    and thank you for your time, Mr. Ryland, and
2    counsel for the Michael Siegel Estate, we
3    thank you for your time as well.
4         We don't have a stipulation in terms
5    of what the court reporter -- relieving her
6    of her duties.  I would ask if okay with you
7    that you be given an original copy of the
8    deposition, along with the exhibits, you
9    being Mr. Bulson.  That Mr. Bulson within 30
10   to 60 days, whatever is reasonable for you
11   and Mr. Ryland, you give us any corrections
12   to the deposition.
13              MR. RYLAND:     Yeah, agree to
14   read and sign.
15              MR. KLINE:     And you've
16   gone through this.  We can examine you on any
17   of those corrections and the like.
18              MR. TOBEROFF:    And we reserve
19   our objections if you intend to take a third
20   deposition of Mr. Bulson.
21              MR. KLINE:      Understood.
22   And I understood that the procedure that
23   you'll pursue those objections is via a
24   protective order motion?
25              MR. TOBEROFF:    We haven't

feda831f-8f5a-4d4a-86d4-38e27c7e6947

**DON BULSON - 7/19/2011**

Page 183

1    decided yet what procedure we'll employ.

2                   MR. BERK:      Would you do

3    me the courtesy of calling me on the date?

4                   MR. KLINE:     We'll notice

5    you of the deposition.

6                   MR. BERK:      I mean before

7    you notice.

8                   MR. KLINE:     Oh,

9    absolutely.

10                  MR. BERK:      Because I do

11   spend a lot of time in Florida where my wife

12   is.

13                  MR. KLINE:     Happy to do

14   that.

15                  MR. BERK:      I'd just like

16   to work that out.

17                  MR. KLINE:     Happy to do

18   that.

19                  VIDEO TECHNICIAN:  We're off

20   the record.  The time is 3:20.

21      (Deposition adjourned at 3:20 p.m.)

22

23

24

25

**Merrill  Corporation  -  Los  Angeles**

**EXHIBIT 58**
**1226**

feda831f-8f5a-4d4a-86d4-38e27c7e6947

## DON BULSON - 7/19/2011

Page 184

1    THE STATE OF OHIO,    )    SS:
     COUNTY OF CUYAHOGA. )
2

3         I, Michelle M. Lewis, a Notary Public within
4    and for the State of Ohio, duly commissioned and
5    qualified, do hereby certify that DON BULSON, was
6    first duly sworn to testify the truth, the whole
7    truth and nothing but the truth in the cause
8    aforesaid; that the testimony then given by him
9    was by me reduced to stenotypy in the presence of
10   said witness, afterwards transcribed on a
11   computer/printer, and that the foregoing is a
12   true and correct transcript of the testimony so
13   given by him, as aforesaid.
14        I do further certify that this deposition
15   was taken at the time and place in the foregoing
16   caption specified.  I do further certify that I
17   am not a relative, counsel or attorney of either
18   party, or otherwise interested in the event of
19   this action.
20        IN WITNESS WHEREOF, I have hereunto set my
21   hand and affixed my seal of office at Cleveland,
22   Ohio, on this 27th day of July, 2011.
23

24   _____
     Michelle M. Lewis, Notary Public
     within and for the State of Ohio
25   My Commission expires January 9, 2014.

EXHIBIT 58
1227

feda831f-8f5a-4d4a-86d4-38e27c7e6947

DON BULSON - 7/19/2011

Page 185

1   STATE OF _____ )
                              )  SS:
2   COUNTY OF_____ )

3

4

5        Before me, a Notary Public in and for said

6   state and county, personally appeared the

7   above-named DON BULSON, who acknowledges that he

8   did sign the foregoing transcript and that the

9   same is a true and correct transcript of the

10  testimony so given.

11       IN TESTIMONY WHEREOF, I have hereunto

12  affixed my name and official seal at

13  _____ this _____day of

14  _____, 2011.

15

16

17

18

              _____
                   DON BULSON
19

20

21

              _____
                 Notary Public
22

23  My Commission expires:_____

24

25

EXHIBIT 58
1228

feda831f-8f5a-4d4a-86d4-38e27c7e6947

# EXHIBIT 59

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630
LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 6, 2011

<u>Via E-Mail</u>

Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Jason:

I write in response to your August 30, 2011 letter, regarding the August 2, 2011 letter between Pacific Pictures Corporation, Mark Warren Peary and Jean Adele Peavy. DC's hyperbole on this issue – that defendants have "withheld" or "secreted" the August 2 letter – is absurd. DC received the letter on August 29, 2011, three weeks after it was executed, and it was formally produced to DC on September 1, 2011. F.R.C.P. 26(e)(1) requires that parties supplement their production "in a timely manner" – not the instant a document is created. DC's demand that documents be produced immediately is especially absurd in light of DC's own practices in *Siegel*, where DC only supplemented documents on a delayed, drawn out schedule.

DC's further exaggerated comment that "Defendants are not allowed to selectively disclose documents and waive privileges" is a *non sequitur*. As DC acknowledges, Defendants do not claim privilege as to the August 2, 2011 letter.

As to DC's objection that defendants have not produced or logged the cover e-mail to Mr. Peary attaching the August 2 letter, defendants anticipate that they will update their privilege logs this month and will log the "cover" e-mail at that time, rather than on a piecemeal basis as DC suggests.

Very truly yours,

Keith Adams

**EXHIBIT 59**
**1229**

# EXHIBIT 60

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 8, 2011

<u>Via E-Mail</u>

Jason Tokoro
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    <u>*DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)</u>

Dear Jason:

I write in response to your September 2, 2011 letter that concerned various outstanding discovery issues.

1.      DC erroneously claims that our September 1, 2011 letter "notably fail[ed] to close the loop on one issue:  the corporate documents of defendants Pacific Pictures Corporation, IP Worldwide, LLC and IPW, LLC," citing various DC requests for production.  The September 1 letter addressed the issue as follows:

> e.  Corporate documents:  DC's requests on these topics were overbroad and were specifically rejected by Magistrate Zarefsky, as DC is not entitled to "everything there is about companies with which Mr. Toberoff has been associated."  Docket No. 262 at 5. DC's current demand for all financial and corporate documents continues to seek documents that have no relevance or bearing on this litigation, and is not materially different than DC's denied requests.

This response, like defendants' responses to DC's requests, are perfectly clear.

Since June 13, 2011, defendants have repeatedly stated that Toberoff Request Nos. 56-58, PPC Request Nos. 31, 33; IPWW Request Nos. 32-34; and IPW Request Nos. 27, 29 are mere variations on requests that were specifically denied in DC's prior motion to compel.

The other requests cited in DC's letter are PPC Request Nos. 29-30, IPWW Requests Nos. 29-30, and IPW Request Nos. 24-25.

**EXHIBIT 60**
**1230**

**TOBEROFF & ASSOCIATES, P.C.**

September 8, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   2 of 3

In response to PPC Request No. 30, IPWW Request No. 30, and IPW Request No. 25, which sought documents "identifying" the current corporate status of the respective entities, defendants produced the responsive documents in their possession, custody, or control.

PPC Request No. 29, IPWW Request No. 29, and IPW Request No. 24 sought all documents in any way "involved" in the formation of the entities, "including, articles of organization, operating agreements, minutes, filings, business plans." Such requests are obviously and facially overbroad and, like DC's prior, denied requests, effectively call for "everything" about the companies in question. As stated in defendants' respective responses, defendants are "willing to meet and confer with Plaintiff regarding the tailoring of this request," but DC's "modification of this request and explanation of what it seeks by this request in its July 7, 2011 letter do not sufficiently narrow the documents sought by this overbroad request." DC has in no way offered, despite ample opportunity and numerous letters on this subject since July 7, to narrow these overbroad requests.

2.      As to the Renner Otto expert report and calendar/billing entries, we requested those documents from Renner Otto on August 11 for privilege review on behalf of the estate. As we have not yet received the documents, we sent a second request to Renner Otto today, September 8, requesting such documents.

As to the Renner Otto electronic archive and the form/content of the privilege log to be furnished on behalf of Michael Siegel's estate, that is already the subject of discovery disputes and threatened motion practice by DC, as set forth in DC's August 3 and August 29, 2011 letters. Michael Siegel's estate requests that such disputes be resolved before it incurs the time and expense of having lengthy privilege logs drafted relating to the Renner Otto archive. In any event, such privilege logs will be furnished within a reasonable time.

3.      As stated in Mr. Toberoff's August 10, 2011 letter, "Ms. Larson obtained some materials when she recently cleaned out her late mother, Joanne Siegel's apartment; [] Ms. Larson has searched most of these materials for any responsive documents, and will complete this search upon return from her summer vacation. So far nothing new was located, except for the non-substantive Gary Spence materials that were produced."

Unfortunately, on September 2, 2011, Laura's son James was mugged in Westwood, suffering injuries, and, as a result, Ms. Larson has not completed her review of all of the materials from her mother's apartment. She will complete such review as soon as possible under the circumstances. However, we do not suspect that this review will result in much, if any, additional information, as apparently the materials consist, for the most part, of random personal documents (*e.g.*, bills, etc.).

4.      The August 2, 2011 letter agreement was addressed in Mr. Toberoff's September 6, 2011 letter to Mr. Tokoro.

**EXHIBIT 60**
**1231**

**TOBEROFF & ASSOCIATES, P.C.**

September 8, 2011
Re:     *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 3

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Keith G. Adams

**EXHIBIT 60**
**1232**

# EXHIBIT 61

# TOBEROFF & ASSOCIATES, P.C.

A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST, SUITE 3630

LOS ANGELES, CALIFORNIA 90067

MARC TOBEROFF*
NICHOLAS C. WILLIAMSON
KEITH G. ADAMS
JEFFREY R. RHOADS

* Also admitted in New York

TELEPHONE
(310) 246-3333

FACSIMILE
(310) 246-3101

mtoberoff@ipwla.com

September 8, 2011

Via E-Mail

Matthew Kline
O'Melveny and Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Re:    *DC Comics v. Pacific Pictures Corp., et al.*, Case No. 10-CV-03633 ODW (RZx)

Matt:

I write on behalf of defendants and the Estate of Michael Siegel (the "Estate") in response to your August 29, 2011 letter regarding Don Bulson's deposition.

1.    <u>Withdrawn Objections:</u>  The objections stated in my August 11, 2011 letter, set forth in section 1 of your August 29, 2011 letter, have been withdrawn.

2.    <u>Documents Conveyed to Mr. Bulson:</u>  DC's ongoing argument that "non-privileged documents do not become privileged because they are sent to an attorney," and that therefore the Estate's objections as to Mr. Siegel's communications with Mr. Bulson about the May 13 letter were improper, continues to miss the mark.

The cases cited by DC concern whether underlying documents are privileged; they do ***not*** concern whether a client's communications with an attorney about such documents are privileged.  *See U.S. v. Osborn,* 561 F.2d 1334, 1339 (9th Cir. 1977) (concerning "business documents" in an attorney's possession); *In re Rupert*, 309 F.2d 97, 99 (6th Cir. 1962) (stating merely that "if the client may be compelled to produce documents in his possession then the attorney may be compelled to produce the same documents when they are in his custody"); *Suezaki v. Super. Ct.*, 58 Cal. 2d 166, 176 (1962) (films made by private investigator, retained by a party's attorney without the party's knowledge, and delivered to the attorney by the investigator were not covered by the attorney-client privilege); *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638 (1994) (attorney-client privilege did not cover all of the contents of an insurer's claims file under specific Ohio statute).[1]  None of these cases stand for the proposition

_____

[1] DC's repeated citations to state law on privilege are baffling in light of DC's insistence that this litigation is governed by Federal, not state, law on privilege.  *See, e.g.,* Docket No. 160 at 14 ("Federal

**EXHIBIT 61**
**1233**

**TOBEROFF & ASSOCIATES, P.C.**

September 8, 2011
Re:    *DC Comics v. Pacific Pictures Corp.*
Page:  2 of 3

that an attorney can properly be questioned about the context in which non-privileged documents were transmitted to him during attorney-client communications.  Nor do DC's out-of-context quotations of Mr. Berk's objections change this analysis.  Mr. Berk clearly asserted privilege as to Mr. Siegel's communications with Mr. Bulson about the May 13, 2003 letter, not the May 13 letter itself.

3.    <u>Expert Report/Calendar & Billing Entries:</u>  As to the Renner Otto expert report and calendar/billing entries, we requested those documents from Renner Otto on August 11 for privilege review on behalf of the estate.  As we have not yet received the documents, we sent a second request to Renner Otto today, September 8, requesting such documents.

DC's claim that the expert report and calendar entries are relevant towards "establishing when Mr. Toberoff first contacted Mr. Bulson to inquire about purchasing *Ms. Siegel*'s purported Superman interest" does not make sense, as Mr. Bulson did not represent Ms. Siegel's interest.  Even if DC meant to refer to the Michael Siegel interest, DC is well-aware that Laura and Joanne Siegel authorized Mr. Emanuel to attempt to purchase Michael Siegel's Superman interest in January 2003; DC is also aware that such offers on behalf of Mr. Emanuel, including the communications between Mr. Toberoff and Mr. Bulson, have no bearing on any of DC's claims for relief in this case and that Mr. Siegel was not even mentioned in DC's complaint.

4.    <u>Michael Siegel File:</u>  DC's assumption that Renner Otto "represented Mr. Siegel solely with respect to his purported Superman interest," and that therefore any documents in Renner Otto's files would be responsive to DC's subpoena, is inaccurate.  DC's demand for a detailed "log of all documents in [Renner Otto's] possession" – whether or not they are responsive or non-responsive, privileged or non-privileged, produced or not-produced – is improper and not required by *any* discovery rule or practice, nor does DC cite any authority that a subpoenaed party is required to produce such a log.

Notably, DC claims that "[t]he Court's prior orders regarding the adequacy of the information contained in defendants' privilege log are no bar to DC's proposal" is nonsense.  DC claims that it is "entitled to discover the information it seeks in the proposed log" – when that is ***exactly*** the proposition that Magistrate Zarefsky rejected when he twice upheld defendants' privilege logs, and Judge Wright rejected when he denied DC's motion for review of Magistrate Zarefsky's rulings.  DC's offer to "reimburse" Renner Otto to produce such a log is a transparent and improper attempt to buy its way out of adverse discovery rulings.

5.    <u>Confidentiality Designations:</u>  DC's argument that the *Siegel* protective order does not apply because the documents were produced by designation does not comport with that protective order, which clearly states that it applies to "any writing produced in any Document

---

law governs the disposition of this issue: in 'federal question cases where pendent state law claims are raised, the [federal rules] govern all claims of privilege.'")

**EXHIBIT 61**
**1234**

**TOBEROFF & ASSOCIATES, P.C.**

September 8, 2011
Re:      *DC Comics v. Pacific Pictures Corp.*
Page:   3 of 3

Production by any party or non-party witness marked as 'CONFIDENTIAL'" (¶ 4) and binds the parties going forward.

Furthermore, DC's arguments about when and how documents were marked "Confidential" in *Siegel* are disingenuous.  Contrary to DC's assertions, the *Siegel* protective order does not require a party to mark a document as "Confidential" in any particular way, nor does it require a party to re-label a document as "Confidential" if the document was already marked as "Confidential."  Nor does DC dispute that the documents in question were produced and marked "Confidential" after the entry of the *Siegel* protective order.  Such documents are properly subject to such protective order.

Nonetheless, if DC will agree that the protective order in *Siegel* applies to documents marked "Confidential" that have been produced in this case by designation, defendants and the Estate will withdraw their objections and permit DC to question witnesses based on such documents subject to the terms of such protective order.

6.      <u>Protective Order re: Deposition:</u>  DC's position that the parties "should discuss a protective order concerning Renner Otto's business practices" is mystifying, considering that DC *publicly filed* the entire deposition transcript on August 8, 2011, as an exhibit to the declaration of Daniel Petrocelli.

Nothing in this letter should be construed as a waiver or limitation of any of defendants' rights or remedies, all of which are reserved.

Very truly yours,

Marc Toberoff

cc:      Josh Ryland

**EXHIBIT 61**
**1235**